UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
| BOY SCOUTS OF AMERICA and | . | Case No. 20-10343 (LSS) |
| DELAWARE BSA, LLC, | . |  |
|  | . |  |
| Debtors. | . |  |
| OFFICIAL TORT CLAIMANTS' | . |  |
| COMMITTEE OF BOY SCOUTS OF | . |  |
| AMERICA AND DELAWARE BSA, LLC, | . | Adv. Pro. No. 21-50032 |
|  | . |  |
| Plaintiff, | . |  |
|  | . |  |
| v. | . |  |
|  | . | Courtroom No. 2 |
| BOY SCOUTS OF AMERICA AND | . | 824 North Market Street |
| DELAWARE BSA, LLC, | . | Wilmington, Delaware 19801 |
|  | . |  |
| Defendants. | . | Wednesday, May 19, 2021 |
| . . . . . . . . . . . . . . . . . . | . | 11:00 A.M. |

TRANSCRIPT OF TELEPHONIC DISCLOSURE STATEMENT HEARING
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:        Derek C. Abbott, Esquire
                       Andrew R. Remming, Esquire
                       Eric W. Moats, Esquire
                       Paige N. Topper, Esquire
                       MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                       1201 North Market Street, 16th Floor
                       Wilmington, Delaware 19899

                       - and -

                       Jessica C. Lauria, Esquire
                       Andrew Hammond, Esquire
                       WHITE & CASE LLP
                       1221 Avenue of the Americas
                       New York, New York 10020

Audio Operator:        Brandon J. McCarthy, ECRO

| | |
|---|---|
| Transcription Company: | Reliable |
| | 1007 N. Orange Street |
| | Wilmington, Delaware 19801 |
| | (302)654-8080 |
| | Email: gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

TELEPHONIC APPEARANCES (Cont'd):

| | |
|---|---|
| For the Debtors: | Michael C. Andolina, Esquire |
| | Matthew E. Linder, Esquire |
| | Laura E. Baccash, Esquire |
| | Blair M. Warner, Esquire |
| | Erin Rosenberg, Esquire |
| | WHITE & CASE LLP |
| | 111 South Wacker Drive |
| | Chicago, Illinois 60606 |
| For Hartford Financial: | Philip Anker, Esquire |
| | WILMERHALE |
| | 250 Greenwich Street |
| | New York, New York 10007 |
| | - and - |
| | James Ruggeri, Esquire |
| | SHIPMAN & GOODWIN LLP |
| | 1875 K Street NW, Suite 600 |
| | Washington, DC 20036 |
| For the Ad Hoc Committee of Local Councils: | Richard Mason, Esquire |
| | Joseph Celentino, Esquire |
| | WACHTELL, LIPTON, ROSEN & KATZ |
| | 51 West 52nd Street |
| | New York, New York 10019 |
| For the Committee of Unsecured Creditors: | Rachel Ringer, Esquire |
| | Natan Hamerman, Esquire |
| | KRAMER LEVIN NAFTALIS& FRANKEL LLP |
| | 1177 Avenue of the Americas |
| | New York, New York 10036 |

TELEPHONIC APPEARANCES (Cont'd):

For the FCR:                Edwin Harron, Esquire
                           Robert Brady, Esquire
                           YOUNG CONAWAY STARGATT & TAYLOR LLP
                           1000 N West Street
                           Wilmington, Delaware 19801

For the U.S. Trustee:      David Buchbinder, Esquire
                           UNITED STATES DEPARTMENT OF JUSTICE
                           OFFICE OF THE UNITED STATES TRUSTEE
                           844 King Street, Suite 2207
                           Lockbox 35
                           Wilmington, Delaware 19801

For the Coalition of       David Molton, Esquire
Abused Scouts for          Eric Goodman, Esquire
Justice:                   BROWN RUDNICK LLP
                           7 Times Square
                           New York, New York 10036

                           - and -

                           Rachel Mersky, Esquire
                           MONZACK MERSKY BROWDER HOCHMAN, PA
                           1201 North Orange Street, Suite 400
                           Wilmington, Delaware 19801

                           - and -

                           Lawrence Robbins, Esquire
                           ROBBINS, RUSSELL, ENGLERT, ORSECK
                             & UNTEREINER LLP
                           2000 K Street NW, 4th Floor
                           Washington, DC 20006

For LG 37 Doe:             Amy Keller, Esquire
                           LIPSITZ GREEN SCIME CAMBRIA LLP
                           42 Delaware Avenue
                           Buffalo, New York 14202

For the Pension Benefit    Cassandra Burton, Esquire
Guaranty Corporation:      PENSION BENEFIT GUARANTY CORPORATION
                           OFFICE OF THE GENERAL COUNSEL
                           1200 K Street, N.W.
                           Washington, D.C. 20005-4026

TELEPHONIC APPEARANCES (Cont'd):

For the Girl Scouts of       Eric Lopez Schnabel, Esquire
The United States of         DORSEY & WHITNEY LLP
America:                     51 West 52nd Street
                             New York, New York 10019

For Century Indemnity:       Tancred Schiavoni, Esquire
                             Brad Elias, Esquire
                             O'MELVENY
                             7 Times Square
                             New York, New York 10036

For the Church of Jesus      Adam Goldberg, Esquire
Christ of Latter Day         LATHAM & WATKINS LLP
Saints:                      1271 Avenue of the Americas
                             New York, New York 10020

For the PCVA Claimants:      Jason Amala, Esquire
                             Vincent Nappo, Esquire
                             Benjamin Watson, Esquire
                             PFAU COCHRAN VERTETIS AMALA PLLC
                             403 Columbia Street, Suite 500
                             Seattle, Washington 98104

For AIG:                     Keith Martorana, Esquire
                             GIBSON DUNN & CRUTCHER LLP
                             200 Park Avenue
                             New York, New York 10166

For Great American:          David Christian, Esquire
                             DAVID CHRISTIAN ATTORNEYS LLC
                             105 W. Madison Street, Suite 1400
                             Chicago, Illinois 60602

For JPMorgan Chase           Kristian Gluck, Esquire
Bank:                        NORTON ROSE FULBRIGHT US LLP
                             2200 Ross Avenue, Suite 3600
                             Dallas, Texas 75201

For Tort Claimants:          James Stang, Esquire
                             PACHULSKI STANG ZIEHL JONES LLP
                             919 North Market Street, 17th Floor
                             Wilmington, Delaware 19801

1  TELEPHONIC APPEARANCES (Cont'd):

2  For the Tort Claimants:   John Lucas, Esquire
                             Maxim Litvak, Esquire
3                            Kenneth Brown, Esquire
                             PACHULSKI STANG ZIEHL & JONES LLP
4                            150 California Street, 15th Floor
                             San Francisco, California 94111
5
                             - and -
6
                             Malhar Pagay, Esquire
7                            PACHULSKI STANG ZIEHL & JONES LLP
                             10100 Santa Monica Boulevard
8                            13th Floor
                             Los Angeles, California 90067
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MATTERS GOING FORWARD:

Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof (D.I. 2411, filed 3/18/21)

Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief (D.I. 2295, filed 3/2/21)

**Ruling:  Motions Adjourned to Monday, May 24th at 10 a.m.**

DEBTORS' WITNESS(s):

**BRIAN WHITTMAN**

    Cross Examination by Mr. Goodman      17

    Cross Examination by Mr. Stang      31


EXHIBITS                  I.D.   REC'D

Declaration of Brian Whittman         16

1      (Proceedings commenced at 11:18 a.m.)

2           THE COURT:  Good morning.  This is judge

3   Silverstein.  We're here in the Boy Scouts of America case;

4   Case No. 20-10343.

5           First, my apologies to everyone.  We had a first

6   this morning with our Zoom capacity, we were over capacity on

7   the call.  I knew that because I could not get in.  So, we

8   have done a workaround and I really, very much appreciate all

9   of those who are now participating or listening for a better -

10  - more accurate listening in by phone.

11          There's been a lot of interest in this case.  We

12  have a lot of observers.  I'm sure we also had multiple people

13  from multiple firms.  And I really appreciate everyone who has

14  now linked in by phone so that we can begin.

15          We will try to get this rectified by Monday when we

16  have the continued hearing.  And the loss of the hour and

17  twenty minutes doesn't help in terms of accomplishing

18  everything today.  So, we will certainly be more specific with

19  guidance for the Monday continued hearing if, in fact, we have

20  a Monday continued hearing.

21          So, again, thank you for your patience.  I'm sorry,

22  I'm sure many people were nervous and thought the hearing had

23  started without them.  It did not.  And we will be beginning

24  now.

25          I would like Brandon, please remind everyone of the

1 protocol for the hearing.

2 UNIDENTIFIED SPEAKER: Your Honor, I think

3 (indiscernible). I'm sorry to interrupt, Your Honor, I think

4 the phone lines not working unless you just opened it up. I'm

5 sorry to interrupt, Your Honor.

6 THE COURT: Okay. There's another glitch.

7 MR. AMALA: Your Honor, its Jason Amala.

8 I'm getting emails from people saying they're on

9 the listen only line and they're not able to hear anything.

10 I'm on here with you at Zoom so I can't confirm that, but I

11 had a few people email in the last minute. I don't know if

12 you just opened up the line or not.

13 THE COURT: Okay. Thank you.

14 MR. SCHNABEL: Judge, are there two listen only

15 lines because I have a colleague who's on listen only who is

16 fine.

17 (Pause in record)

18 THE COURT: Okay. Let me ask if -- I don't know

19 who to ask. Someone on the listen only line to see if they

20 can hear me.

21 MR. NAPPO: Vinny Nappo. Vincent Nappo and Ben

22 Watson. Can you hear us? Text me if you can hear us.

23 Your Honor, these are two colleagues of mine that

24 are on the call-in only line.

25 THE COURT: Thank you.

1     MS. KELLER:  Judge, this is Amy Keller.  Do you

2 have a (indiscernible) on the listen only as well as the Zoom

3 and now it is starting to come through on the listen only

4 number, and that's the 1-888-557-8511 number.  But they did

5 not hear the initial (indiscernible) that the hearing had

6 already started.  None of that came through on the listen only

7 line.

8     THE COURT:  Thank you.

9     Okay.  Give me a minute.

10  (Pause in record)

11     THE COURT:  Okay.  Let me ask -- I'm getting an

12 echo now.  We're trying to get that resolved.  My apologies

13 again.  We did do some testing but --

14  (Pause in record)

15     THE COURT:  I don't know.  We're testing now to see

16 if there's an echo.  Seems okay.

17     MR. AMALA:  Your Honor, Jason Amala.

18     Again, my colleague's on and he's saying that they

19 are hearing your test and what's happening.

20     THE COURT:  Thank you.

21     MS. MERSKY:  Your Honor, Rachel Mersky.

22     Apparently, some but not all people are able to

23 hear.

24  (Off record discussion)

25     THE COURT:  Okay.  Ms. Mersky, can you check with

1    the people who are saying that they cannot hear me and see if

2    they can hear me saying this because I'm being told they

3    should be able to.

4            MS. MERSKY:  I'm checking right now.

5            THE COURT:  Thank you.

6            MR. ABBOTT:  Your Honor, its Derek Abbott.

7            I'm dialed in on my cell phone on that dial only

8    line and I heard your staff conducting the test, but we didn't

9    hear anything you said over that line.

10           MR. ANKER:  Judge Silverstein, this is Philip

11   Anker.

12           I'm getting a similar report which is that some

13   folks were able to hear your remarks, but they're not hearing

14   anyone else speaking, and they're only hearing you

15   sporadically.  Maybe that's as of a few minutes ago and maybe

16   it's changed, but that's the report I'm getting.

17           MS. MERSKY:  Your Honor, it has been suggested that

18   it might be worthwhile to put the call-in line on listen only

19   rather than interactive mode which may work.  That was a

20   suggestion from one of the technologically inclined attorneys

21   from the coalition.

22           MR. SCHNABEL:  Judge, I do note that you are on

23   mute on the screen.  It looks like you're muted.

24           THE COURT:  Right.  But I have to be.  And I always

25   am because I'm through the court system.  Yes.  All the

1  lawyers who are trying to figure out how to do this.

2       (Pause in record)

3            THE COURT:  We're trying to figure out what our

4  options are here in terms of being able to have the fulsome

5  participation and observation of this hearing that is required

6  and optimal.

7            MS. MERSKY:  Your Honor, Rachel Mersky.

8            I've just received all the reports that people

9  cannot hear.

10           THE COURT:  Okay.

11      (Pause in record)

12           COURT PERSONNEL:  This is Rob (indiscernible) from

13  the court staff.

14           Is anyone having an issue hearing me?  Is anyone

15  actually having an issue hearing the judge over the last few

16  minutes?  We've been conducting tests within the court room.

17  If you have not been hearing the judge --

18           UNIDENTIFIED SPEAKER:  I cannot hear.

19      (Audio interruptions)

20           COURT PERSONNEL:  Alright.  Thank you for your

21  feedback.  What we will do is we will have the (indiscernible)

22  and I ask at this time that everyone place their phones on

23  mute.  To do so press star six.  We will conduct a test now.

24      (Pause in record)

25           THE COURT:  Okay.  I'm being asked to speak to see

1  if those on the phone line can hear.  So, if you cannot hear

2  what should they do? Well, one thing to do would be to

3  communicate with whoever you've been communicating with who

4  was on the Zoom link and let them know.

5          MR. AMALA:  Your Honor, this is Jason Amala.

6          I've been speaking with my colleague who can hear

7  you on the phone line.

8          THE COURT:  Okay. Ms. Mersky?

9          MR. ABBOTT:  Your Honor, Derek Abbott.

10         I just heard that on the dial in only line as well.

11         THE COURT:  Thank you.

12         MS. MERSKY:  I'm getting some reports of people who

13 couldn't hear you who are now able to hear you.  I'm trying to

14 confirm it's universal, but it looks more (indiscernible),

15 Your Honor.  Its Rachel Mersky.

16         THE COURT:  Okay.  It looks promising.  Thank you.

17         MR. LUCAS:  This is John Lucas.

18         Judge Silverstein, I got another report from

19 somebody on the phone who can hear you now too.

20         THE COURT:  Okay.  So, wherever we are now let's

21 mark that so that we know what has worked, and let's stay

22 there.  Okay?

23         Thank you, everyone.

24         Okay.  So, again, and for those who couldn't hear

25 me before the hearing has not started.  Do not be concerned

1  that you have missed anything.  I appreciate everyone's

2  patience and I appreciate those who voluntarily switched from

3  the Zoom link to the telephone connection.

4       This is a first for the court and we reached over

5  capacity.  I understand the great interest in this case from

6  parties, and from observers, and others, and so we are doing

7  what we can to accommodate that.

8       We have a continued hearing date in this matter on

9  Monday if necessary, and we will be working in the meantime to

10  try to resolve our under-capacity problem for this case.  And

11  we will be very specific in instructions on how to connect to

12  the hearing on Monday if, in fact, we are -- we need to have

13  that hearing on Monday.

14       So, again, my apologies for everyone.  I recognize

15  we're an hour and a half beyond starting time for this matter,

16  but I guess this is one of the, you know, ultimate technology

17  issues dealing with COVID-19 and we are where we are.

18       Having said all that, let's begin and I will turn

19  it over -- well, first let me have Brandon remind all those,

20  particularly on the Zoom link video, of the protocol for the

21  hearing.

22       COURT REPORTER:  Good morning.  It is very

23  important that you put your phones on mute when you are not

24  speaking.  When speaking, please do not have your phone on

25  speaker as it creates feedback and background noise which

1  makes it difficult to hear clearly.

2          Also, it is important that you state your name each

3  time you speak for an accurate record.  Your cooperation in

4  this matter is appreciated.

5          Thank you.

6          THE COURT:  Thank you.  Ms. Lauria or Mr. Abbott?

7          MS. LAURIA:  Your Honor, this is Jessica Lauria of

8  White & Case on behalf of the debtors.

9          I'm not sure if you can see me on the Zoom.  I'm

10  under Matt Linder today.  Fortunately, the debtors' team has

11  been vaccinated and so we were able to be together in one room

12  for purposes of this hearing.  So, we're utilizing Mr.

13  Linder's Zoom connection.

14          I think what Mr. Abbott was going to start the

15  hearing by saying, and we indicated this in the amended agenda

16  that was filed, is after receiving feedback from parties, the

17  debtors are inclined to start today's hearing with the debtors

18  exclusivity motion.  As you will recall that motion has now

19  been continued.  I think we're on the third continuance.  And

20  so, from our perspective, notwithstanding the fact that that

21  motion comes up on Item Number 6 on the agenda, we thought

22  rather than diving into Item 1, which is the disclosure

23  statement, we would start with Item Number 6 if that's

24  acceptable to the court.

25          THE COURT:  That's fine.

1          MS. LAURIA:  Thank you, Your Honor.

2          So, that then brings us to the debtors' third

3     motion, I believe, to extend its exclusive period.  That's at

4     Docket Number 2411.  It was filed on March 18.

5          There are two objections that we filed to the

6     debtors' exclusivity motion.  The first was filed by the tort

7     claimants committee and that was really in response to the

8     motion when it was then filed prior to the amended plans that

9     are before the court today.

10         Thereafter, as the court may recall, the debtors

11    filed the second amended plan which is added on the "BSA

12    toggle approach" which was intended to address the TCC's

13    objection.  And then we also filed, separately, the second

14    mediator report which incorporated the Hartford settlement.

15         With those two documents, we then received another

16    objection.  That second objection was from the coalition and

17    the FCR.  That was filed, I believe, on the eve of the hearing

18    that was originally scheduled for this motion which we then

19    adjourned twice to try to work through our issues with the

20    parties.

21         We filed a reply to the TCC motion.  We filed

22    another reply to both the TCC and the coalition this past

23    Sunday on May 16th.  That was at Docket Number 4100.  And we

24    also, at that time filed a declaration of Mr. Brian Whittman

25    from Alvarez & Marsal.  That's at Docket Number 4101.

1    Your Honor, what I would propose to do, consistent

2  with how we've handled the past evidentiary hearings, and we

3  have put the parties on notice that we intended to have Mr.

4  Whittman present here today in the courtroom, is I would like

5  to offer Mr. Whittman's declaration at 4101 into evidence.  As

6  I indicated, he is present in the virtual courtroom with Mr.

7  Andolina and available for cross examination if parties would

8  to cross-examine him.

9    THE COURT:  Thank you.

10    MR. GOODMAN:  Your Honor, this is Eric Goodman for

11  the coalition of abuse scouts for justice.

12    As we notified council for the debtors yesterday we

13  would like to briefly cross-examine Mr. Whittman regarding his

14  declaration.

15    THE COURT:  Okay.  Is there any objection to the

16  declaration coming into evidence?

17    MR. STANG:  Your Honor, for the tort claimants

18  committee there is no objection.

19    THE COURT:  Okay.  Thank you.

20    MR. GOODMAN:  No objection for the coalition, Your

21  Honor.

22    THE COURT:  Thank you.

23    Then Mr. Whittman's declaration is admitted and he

24  is subject to cross examination.

25    (Declaration of Brian Whittman received into evidence)

1          THE COURT:  So, Mr. Whittman.

2          MR. ANDOLINA:  Your Honor, Mike Andolina, White &

3   Case, on behalf of the Boy Scouts of America.

4          Can you see us, Judge?  We're together in a

5   conference room.

6          THE COURT:  Okay. Yes.  Now I have found you.

7          Okay.  Mr. Whittman, can you raise your right hand

8   please so I can swear you in?

9          BRIAN WHITTMAN, DEBTOR WITNESS, SWORN

10         THE COURT:  Please state your full name and spell

11  your last name for the record.

12         THE WITNESS:  Brian Whittman, W-H-I-T-T-M-A-N.

13         THE COURT:  Thank you.

14         Mr. Goodman?

15         MR. GOODMAN:  Thank you, Your Honor.  We'll try to

16  be brief.

17                   CROSS EXAMINATION

18  BY MR. GOODMAN:

19  Q    Mr. Whittman, you are a managing director at Alvarez &

20  Marsal, is that correct?

21  A    Yes, it is.

22  Q    Did you indicate in your declaration that you have spent

23  many hours working on the BSA bankruptcy case, is that

24  correct?

25  A    Yes.

1  Q     Is it fair to say that you play a lead role in the BSA

2  restructuring?

3  A     Yes, it is.

4  Q     Are you generally familiar with the debtors' amended

5  plan and disclosure statement?

6  A     I am.

7  Q     Do you have an understanding as to what would be

8  contributed to the settlement trust if the global resolution

9  plan is confirmed?

10 A     Yes, I do.

11 Q     What is that understanding?

12 A     If the global settlement plan is confirmed by the

13 courts, there would be several components for consideration

14 contributed to the trust.

15       First, the debtor would contribute a basket of assets

16 that is valued at approximately $120 million.  That consists

17 of cash, art work, oil and gas, royalty interests, and certain

18 real-estate.

19       The debtors would also contribute their rights to

20 insurance policies into the trust.  The local councils, which

21 are separate non-debtor entities, would contribute $425

22 million to (indiscernible) forms to be determined into the

23 trust.  As long as their insurance rights.  It would be a

24 contribution under the Hartford settlement for $650 million

25 into the trust.

1      And there may be other contributions that are not yet

2 determined from other insurance companies with additional

3 settlement (indiscernible), as well as contributions from

4 certain chartered organizations if additional settlements are

5 reached with other organizations prior to (indiscernible).

6 Q    Okay. Thank you for that overview. That was very

7 helpful.

8      You mentioned and the disclosure statement refers to a

9 local council contribution in the amount of $425 million. Is

10 that correct?

11 A    That is correct.

12 Q    Do you know how much of the $425 million would be paid

13 on the effective date of the plan?

14 A    At this point, that is to be determined. The plan

15 specifies that by, I believe, June 15th there will be a status

16 provided to the court that provides the specifics of the form

17 and exact timing of the contribution.

18 Q    Do you know if any post-effective date payments would be

19 secured by any collateral?

20 A    That would be specified as part of that June 15th

21 (indiscernible) --

22      (Audio indiscernible)

23 Q    Okay. As of today --

24      (Audio indiscernible)

25        THE COURT: Okay; my apologies. I'm assuming this is

1   coming through the phone line, and people are joining and

2   leaving the phone.

3        MR. ANDOLINA:  Your Honor, Mike Andolina on behalf of

4   BSA.

5        Could I ask Mr. Goodman to repeat his last question

6   of the question of the witness?

7        MR. GOODMAN:  Of course.

8   BY MR. GOODMAN:

9   Q   So let me go back for a moment.  So let me ask this

10  question, the prior question was withdrawn.

11      Have the local council committed to --

12      (Phone interruption)

13

14  Q   -- making any contribution to the settlement trust.

15  A   I'm sorry, right in the middle of the question I couldn't

16  hear it because there was background.

17  Q   Sure.  I'll try again.

18      Have the local councils committed to making any

19  contribution to the settlement trust?

20        MR. ANDOLINA:  Your Honor, objection to the question

21  as beyond the scope of Mr. Whittman's declaration.  If Your

22  Honor declines to allow it I just want to keep the questions

23  cabined to the declaration before Your Honor in support

24  (indiscernible).

25        MR. GOODMAN:  Your Honor, the --

1    THE COURT:  Yeah.

2    MR. GOODMAN:  -- contributions that were discussing

3  are specifically referenced in Paragraph 3 of this declaration

4  at the bottom of Page 2.  So I don't understand the objection

5  as being outside the scope.

6    MR. ANDOLINA:  Your Honor, Paragraph 3 is summary of

7  the various issues in the case that Mr. Whittman has been

8  involved in is to demonstrate his familiarity with those

9  issues in the case overall.  Its (indiscernible) of the

10 declaration.

11

12    THE COURT:  I'll permit a few more questions, but I

13 agree that I think this is getting beyond the scope of his

14 declaration.

15    MR. GOODMAN:  I'll re-ask the question.

16 BY MR. GOODMAN:

17 Q   Have any local councils committed to making any

18 contribution to the settlement process?

19 A   I do not believe that any local councils have, at this

20 stage, committed; however, the ad hoc committee of local

21 councils, which has been actively involved in negotiations and

22 involved with the debtors, believe that the $425 million

23 contribution will be received.

24 Q   Do you know what happens if the local councils cannot come

25 up with $425 million?

1    MR. ANDOLINA:  Same objection as to scope.

2    THE WITNESS:  Again, we believe that the $425 million

3  will be achieved.  If the $425 million is not achieved I

4  believe that to be -- that would have to be addressed at

5  confirmation or (indiscernible) plan.

6  BY MR. GOODMAN:

7  Q   Okay.  You also mentioned the Hartford settlement and the

8  (indiscernible) contributed to the settlement trust, is that

9  correct?

10  A   Correct.

11  Q   And you indicate in your declaration that you were

12  involved with the negotiations over the Hartford settlement,

13  is that correct?

14

15  A   That is correct.

16  Q   What is your understanding as to the total value of the

17  Hartford settlement?

18    MR. ANDOLINA:  Your Honor, I just want to alert the

19  court.  As the court is aware, the Hartford settlement

20  (indiscernible) resolution reached as part of the ongoing

21  mediation in this case.  The debtors were very careful with

22  respect to the mediation confidentiality in connection with

23  the proffer Mr. Whittman (indiscernible) testimony as set

24  forth in Local Rule 9019(5)(b) in the mediation order.

25

1    We advised Mr. Whittman to continue to maintain in

2 respect to confidentiality in connection with cross-

3 examination.  I do not believe that Mr. Goodman's question

4 implicates the mediation confidentiality, but I want to alert

5 both the court and Mr. Goodman to this issue.

6    So no objection to that question, but I wanted the

7 court to be on notice that we're very cognizant of that issue

8 as Mr. Goodman proceeded with bond questioning.

9    THE COURT:  Okay.  Do you want to repeat your

10 question, Mr. Goodman?

11    MR. GOODMAN:  Of course.

12 BY MR. GOODMAN:

13

14 Q   What is your understanding as to the total value of the

15 Hartford settlement?

16 A   The Hartford settlement is for $650 million in cash to the

17 effective date to be contributed to the trust.

18 Q   And $650 million is the face amount of the settlement,

19 correct?

20    MR. ANDOLINA:  Objection to the form; vague.

21    THE COURT:  Sustained.

22 BY MR. GOODMAN:

23 Q   Could the $650 million number decrease?

24 A   There is a provision in the agreement that could result in

25 a decrease, yes.

1    Q   Okay.  Are you familiar with the provision of the Hartford

2    settlement agreement related to Century?

3    A   I am.

4    Q   Okay.  And there is a reduction provision in the Hartford

5    settlement agreement that ties Hartford's payment to a

6    settlement with Century.  Is that correct?

7    A   Yes, in that if there is a settlement with Century below a

8    certain amount.  The Hartford settlement could be reduced.  If

9    there is never a settlement with Century then I don't think

10   that would ever come into play, but I believe that is what you

11   are referring to.

12   Q   Okay.  Do you understand how that provision in the

13   agreement works?

14   A   Yes, I do.

15   Q   Okay.  So just make sure that I understand it the way you

16   do; what would happen if Century were to enter into a

17   settlement for $700 million?  What would Hartford have to pay

18   in that circumstance?

19   A   The formula in the agreement dates back to Century.  If

20   there is a settlement with Century it needs to be to the time

21   of the Hartford contribution.  To the extent that it is last

22   the Hartford contribution would be radically reduced.  So in

23   your example if Century was paying $750 million, you know,

24   under that provision Hartford targeted 650 times two is $1.3

25

billion for Century.  It would beat the ratio of $750 million

to $1.3 billion.  That would create a discount to the Hartford

number.

Q    Is this reduction provision binding on the settlement

trust?

A    The reduction provision is, as the entire Hartford

settlement agreement, is subject to the confirmation of the

global resolution plan of reorganization, but if the global

resolution plan of reorganization is confirmed then, yes, it

would be binding on the settlement trust.

Q    Okay.  So would the settlement trust, assuming the global

resolution plan is confirmed, have to pay back any part of the

$650 million if it were to settle with Century for $700

million?

A    If the agreement is as is, yes, that is correct.

Q    There would be a clawback, correct?

A    Correct.

Q    Do you know whether the settlement trust could distribute

all or a portion of the $650 million to survivors without

resolving its issues with Century?

          MR. ANDOLINA:  Objection to form; beyond the scope.

It calls for a legal conclusion.

          MR. GOODMAN:  Your Honor, the question is just simply

does he know.

1          THE COURT:  Okay.  You can ask that question.  Do you

2     know?  That is a yes or no answer.

3          MR. WHITTMAN:  It would be in the trustee's

4     discretion.

5     BY MR. GOODMAN:

6     Q  So you would agree that it's possible the settlement trust

7     could not distribute a significant portion of the $650

8     million?

9          MR. ANDOLINA:  Objection; vague.  It calls for a

10    legal conclusion.

11

12         THE COURT:  It's speculative.  I don't know how he

13    knows.  Sustained.

14    BY MR. GOODMAN:

15    Q   Mr. Whittman, have you undertaken any analysis to

16    determine whether Century has sufficient assets to pay $1.3

17    billion?

18         MR. ANDOLINA:  Objection to scope.

19         MR. GOODMAN:  Your Honor, I think this really goes to

20    the heart of the reduction provision in the Hartford

21    settlement.  It was discussed at length in Mr. Whittman's

22    declaration.

23         THE COURT:  How does it go to exclusivity?

24         MR. GOODMAN:  Your Honor, I believe Mr. Whittman's

25    declaration is intended to convince this court that the

1  ongoing negotiations could result in a consensual deal and

2  that the parties are working hard to reach an agreement.  I

3  think that that is a vast overstatement as to the reality that

4  actually exists in this case at this time.

5          THE COURT:  I don't think this question goes to that?

6      (Audio indiscernible)

7          THE COURT:  I'm going to sustain the objection and

8  ask people, please, to make sure you are muted.  I am hearing

9  cross conversation.

10  BY MR. GOODMAN:

11  Q   Mr. Whittman, you indicate in your declaration that you

12  are familiar with the debtors' insurance policies.  Is that

13  correct?

14  A   I am generally familiar, that is correct.

15  Q   Are you familiar with the terms of the policies that

16  Century -- are you generally familiar with the terms of the

17  Century policies that may be contributed to the settlement

18  trust?

19          MR. ANDOLINA:  Objection; beyond the scope. The

20  reference that Mr. Goodman made to insurance is that same

21  preparatory Paragraph 3, Your Honor.  I agree with Your

22  Honor's analysis that I do not know how this testimony goes to

23  exclusivity.

1          THE COURT:  I'm going to sustain the objection.  I

2   think we're beyond the scope of his declaration and what's

3   relevant to exclusivity.  We're more into a settlement motion

4   and I am not there yet.

5          MR. GOODMAN:  Okay, Your Honor.

6   BY MR. GOODMAN:

7   Q   Mr. Whittman, you indicate in your declaration that the

8   Hartford agreement was negotiated in Miami in recent weeks, is

9   that correct?

10  A   That is where part of the negotiations take place.

11  Q   Do you know who drafted the Hartford settlement agreement?

12  A   I don't actually know. I don't.

13  Q   To your knowledge did the coalition or the tort claimant's

14  committee see the Hartford settlement agreement before the BSA

15  signed it?

16  A   Could you repeat that? I didn't catch the full question.

17  Q   Sure.  To your knowledge did the coalition or the tort

18  claimant's committee see the Hartford settlement agreement

19  before the BSA signed it?

20  A   I do not believe so.

21  Q   Okay.  So just to confirm there were no drafts of the

22  Hartford settlement agreement that were shared with the

23  coalition, correct?

1    MR. ANDOLINA:  I would just object.  To the extent
2  we're getting into mediation confidentiality on this issue.

3    MR. GOODMAN:  Your Honor, to his declaration,
4  Paragraph 8, the first sentence, he specifically states, and I
5  quote,

6    "I disagree with the coalition and the FCR's
7  arguments that the Hartford settlement was negotiated in
8  secret."

9    We very much believe that that agreement was
10  negotiated in secret without our involvement, without our
11  knowledge.  If Mr. Whittman is going to provide that testimony
12  I think he should be required to answer these questions.  If
13  he wants to withdrawal that statement that would be acceptable
14  to me.

15

16    THE COURT:  What was your question?  Give me your
17  question again.

18    MR. GOODMAN:  Sure.

19  BY MR. GOODMAN:

20  Q    Mr. Whittman, were any drafts of the Hartford settlement
21  agreement shared with the coalition?

22    THE COURT:  Do you know, Mr. Whittman?

23    THE WITNESS:  I do.

24    THE COURT:  You can answer.

25

1      THE WITNESS:  There were extensive discussions

2 between the debtors, Hartford and the coalition both together

3 and in separate conversations regarding (indiscernible)

4 amounts to the settlement between the debtors and Hartford or

5 between the debtors and the coalition (indiscernible);

6 however, the actual written agreement I do not believe was

7 shared.

8 BY MR. GOODMAN:

9 Q   The question was were any drafts of the written agreement

10 shared?

11 A   No.

12 Q   Thank you.

13

14      MR. ANDOLINA:  Let me just clarify.  I would just

15 like to clarify whether Mr. Goodman's question was drafts of

16 the final written agreement that was executed by Hartford in

17 the Boy Scouts of America if that was what his question was

18 referring to.  I apologize, I didn't get my objection in, in

19 time.

20 BY MR. GOODMAN:

21 Q   No.  My question was were any drafts of the Hartford

22 settlement agreement shared with the coalition, the tort

23 claimant's committee and I'll even throw in the future

24 claimants representative.

25 A   I don't believe so.

1    Q   Were any of the provisions or terms of the Hartford

2    settlement agreement pertaining to the Century reduction

3    shared with the coalition before the settlement agreement was

4    signed?

5    A   Not to my knowledge.

6    Q   Were any terms of the Hartford settlement agreement made

7    known to the coalition, the TCC or the future claimants

8    representative before it was signed by the Boy Scouts and made

9    public?

10   A   As I said a moment ago, in my earlier answer, yes, there

11   were extensive discussions regarding the potential for

12   settlement, the amount that would be acceptable for a

13   settlement.  Around the amount, yes, there were extensive

14   sharing in discussions.

15

16        MR. GOODMAN:  Thank you.  I have no further

17   questions.

18        THE COURT:  Thank you.

19        Any cross by the committee?

20        MR. STANG:  Yes, Your Honor.

21        THE COURT:  Mr. Stang?

22                    CROSS EXAMINATION

23   BY MR. STANG:

24   Q   Mr. Whittman, you just testified that there were extensive

25   discussions with the coalition regarding values related to the

1  Hartford settlement.  Were there any discussions with the tort

2  claimant's committee regarding the values surrounding the

3  Hartford settlement?

4          MR. RUGGERI:  Your Honor, James Ruggeri for Hartford.

5          I missed a good chunk of Mr. Goodman's examination, I

6  apologize, but I raise an objection to the extent it calls for

7  disclosure of mediation communications which is something that

8  Mr. Andolina alerted the court to earlier in the examination.

9          MR. STANG:  Well he answered the question regarding

10  the coalition, Your Honor.  I am asking the same question vis-

11  à-vis the TCC.

12          THE COURT:  Okay.  I'll permit him to answer yes or

13  no.  I don't want the details of the conversations.

14

15          THE WITNESS:  I'm not personally aware of

16  conversations with the TCC.

17          MR. STANG:  Thank you, Your Honor.  No other

18  questions.

19          THE COURT:  Thank you.

20          I think the FCR --

21          UNIDENTIFIED SPEAKER:  Your Honor --

22          THE COURT:  -- wants to weigh-in on the objection.

23  Does the FCR have any cross-exam?

24

25          MR. HARRON:  No cross-examine, Your Honor.  Thank

   you.

1          THE COURT:  Thank you.

2          Redirect?

3          MR. ANDOLINA:  Your Honor, Michael Andolina of White

4     & Case on behalf of the Boy Scouts of America.

5          I do not have any questions on redirect.

6          I will note, to my prior statement, about our desire

7     to protect mediation confidentiality based on some of the

8     positions taken by the coalition.  The debtors will reserve

9     rights in the future to introduce evidence relating to the

10    mediation given some of the positions now taken.  Obviously,

11    that would be something that we would raise with the court in

12    advance in an intentional and thoughtful manner.

13

14         Thank you for your time, Your Honor.

15         THE COURT:  Okay.  Thank you.

16         Do the debtors have any further evidence in support

17    of their exclusivity motion?

18         MS. LAURIA:  Your Honor, this is Jessica Lauria,

19    White & Case, for the Boy Scouts.

20         We do not have any other witness evidence for

21    purposes of today.  If it is acceptable for the court I think

22    we're prepared to move to argument.

23         THE COURT:  Okay.  Let me find out if any of the

24    objectors have any evidence that they want to introduce.

25

1      MR. STANG:  Your Honor, on behalf of the tort

2 claimant's committee we do not.

3      MR. MOLTON:  Your Honor, David Molton for the

4 coalition.

5      On behalf of the coalition we do not.

6      MR. HARRON:  Your Honor, the FCR does not have

7 evidence.  Thank you.

8      THE COURT:  Thank you.

9      Ms. Lauria, argument.

10      MS. LAURIA:  For the record this is Jessica Lauria,

11 White & Case, on behalf of the Boy Scouts.

12

13      Your Honor, we have requested an extension of our

14 exclusive plan filing and solicitation period through the

15 statutory explorations.  So in other words, for the filing

16 period that would be through August 18th of 2021 and for the

17 solicitation period that would be through October 18th of

18 2021.

19      (Audio indiscernible)

20      MS. LAURIA:  Your Honor, while there are many aspects

21 of this Chapter 11 case that are extraordinarily --

22      (Audio indiscernible)

23      MS. LAURIA:  -- and I think what you will hear me say

24 today is that we have attempted, and you will hear me say this

25 a lot today, I think, we're attempting in many ways to fit a

square peg into the round hole of the Chapter 11 case in the bankruptcy code itself. After countless hours mediating, negotiating, meeting with parties, appearing before Your Honor, there are a few things that have become crystal clear to the debtors.

(Audio indiscernible)

MS. LAURIA: It sounds like someone does not have their phone on mute.

THE COURT: Yes. Everyone, please check your phones. Thank you.

Ms. Lauria?

MS. LAURIA: Thank you, Your Honor.

So as I was saying, Your Honor, having (indiscernible) sixteen months becoming intimately familiar with them. There are two issues that have become crystal clear to the debtors. I think this first one no party can dispute.

A reorganization as opposed to a liquidation is the only mechanism to achieve the (indiscernible) 11 cases. The goal of preserving the mission of the Boy Scouts as well as providing equitable compensation for victims. So there is only way we can do that, Your Honor, and that's through a reorganization, not a liquidation, of the enterprise.

1    The second issue, Your Honor, that has become very

2  clear to the debtors over the course of the past fifteen

3  months, and we studied this extensively, is there really are

4  only two reorganization alternatives that work for the debtor.

5    The first reorganization alternative, and I'm talking

6  at a structural level, is a global resolution plan.  That is a

7  plan that provides the releases of the non-debtor local

8  councils from their abuse liabilities.  That leads to enhance

9  insurance rights because we share our insurance rights with

10  the local councils.  That is all in exchange for a pot of

11  consideration and to the extent the insurers don't settle

12  insurance rights that would be transferred to a victim's

13  trust.  That is the global resolution concept.

14

15    We know to get that global resolution concept across

16  the finish line we need plaintiff support.  In fact, our plan

17  has said it, we have said it a dozen or more times, we will

18  stipulate to it; to get global resolution achieved we need

19  plaintiff support for the global resolution claims.

20    As we have studied this over the last sixteen months

21  there is one other structural option that works for the debtor

22  and that other structural option is what we have termed the

23  BSA toggle plan, but in truth, Your Honor, it's a BSA only

24  plan.  It basically permits BSA to emerge from bankruptcy

25  while preserving the tort victims' rights against non-debtors.

1    It would permit this debtor to emerge and stop the

2  exorbitant cost of these Chapter 11 cases.  And I think, Your

3  Honor, as you look to the two objections no party can --

4    (Audio indiscernible)

5    MS. LAURIA:  -- those are the two general structures

6  that are absolutely required, one or the other, to get us out

7  of this bankruptcy case at the reorganization.  We looked at

8  other structural options for a plan of reorganization.  They

9  are all fraught with greater litigation, if you can believe

10  that after looking at your docket today and seeing the

11  objections to our disclosure statement.  More importantly, any

12  other reorganization type structure has intense execution risk

13  associated with it.

14

15    So --

16    (Audio indiscernible)

17    MS. LAURIA:  -- reorganization structure on the

18  table.  It's the two that the debtors have put forward.  And,

19  you know, as we look at the exceptions we haven't seen any

20  other silver bullet from a big picture structuring

21  perspective.  So what does that mean, that means it's just

22  these two options that we're looking at.  We recognize this.

23  The TCC pointed it out in their original exclusivity

24  objection.  That is why we amended the plan to add-on that BSA

25

1  toggle with a BSA only concept to actually address the TCC's

2  concerns.

3      So, Your Honor, if I'm right and there truly are only

4  two reorganization structures that work for this debtor why

5  are we here. Why are we confronting objections from the major

6  plaintiff side constituencies in this case. If you look at

7  the plaintiff group objections, and you heard some of this in

8  Mr. Whittman's testimony, they really only raised three

9  issues. And I would say those three issues aren't big picture

10  structural issues like what I just outlined. They are, in

11  fact, component parts of one of our structures; component

12  parts mainly of the global resolution plan.

13

14      I will start with the first two that came out in Mr.

15  Whittman's testimony. That pertains to the local council

16  contributions and it also pertains to the Hartford settlement.

17  So the first two issues with the, sort of, global resolution

18  plan. It's not what the structure with two component parts.

19      The TCC's papers argue that the local counsel

20  contribution simply isn't enough at $425 million. We will

21  have seen in the disclosure statement objections and, in fact,

22  Mr. Goodman was trying to elicit this from Mr. Whittman that

23  there has been a number of complaints about the fact that the

24  local councils $425 million contributions is not

25  (indiscernible).

1     I submit to you, Your Honor, that certainly in the

2 context of this exclusivity hearing the notion of a committed

3 local council contribution is a red herring.  If I asked Mr.

4 Goodman today and if I asked Mr. Stang today or Mr. Harron if

5 I had a commitment for $425 million from the local councils as

6 I sit here today would they drop their objection to the local

7 council contribution.  The answer is they wouldn't. They made

8 it very clear in their papers, including the TCC's objection

9 to exclusivity that $425 isn't enough in their view.

10     So from our perspective they can't, on the one hand,

11 argue that, oh, the local council commitment is illusory

12 because the local councils aren't at the table with that

13 commitment paper signed while on the other say actually $425

14 is not merely enough so local councils can contribute so much

15 more.

16 

17     On the commitment point, from a plan and disclosure

18 statement perspective, we will talk about that later when we

19 get to the disclosure statement hearing, but make no mistake

20 from an exclusivity perspective this isn't about commitment.

21 The issue is about amount.  They think it's simply not enough.

22     Turning then to the Hartford, and I'm going to come

23 back to how our plan works within the contours of the local

24 council settlement.  When we look at the Hartford deal the

25 coalition's papers made it very clear, and I think Mr. Goodman

1   clearly expressed this in his cross examination of Mr.
2   Whittman, the Hartford amount from the coalition's
3   perspective, and I think the TCC and FCR agree the amount
4   isn't enough.

5          Provision in the Hartford settlement pertaining to
6   the Century (indiscernible) provision is not acceptable to
7   them.  In fact, I think if you look at their papers they will
8   tell you that the Hartford settlement is, I think they used
9   the word, "offensive" and described the global resolution plan
10  as a result as "dead on arrival".
11

12         Let me focus on these two components of their
13  objection, local council contribution and Hartford.  There is
14  absolutely nothing in the global resolution plan, or the
15  toggle plan, or the extension of the debtors' exclusivity that
16  prohibits these parties from negotiating better deals with the
17  local councils or with Hartford if they're able to do so.  The
18  debtors have been beating their heads up against a wall to try
19  to cut the best deals possible, but if these parties can
20  negotiate a more favorable deal with Hartford, a more
21  favorable deal with the local councils or a more favorable
22  deal with any other insurer or contributing chartered
23  organization in this case there is absolutely nothing in our
24  plan or the extension of exclusivity that prevents them from
25  doing that.

1      In fact, we've got a mediation process with twenty-

2 six parties at the table, that they are free to mediate with

3 and, in fact, without going into mediation discussions have

4 had one on one mediations without the debtors present. Again,

5 these are merely component parts of the debtors' global

6 settlement plan.

7      Let me turn to the third issue, Your Honor. This

8 issue, candidly, gets to the hard of what is happening in this

9 reorganization case. That issue pertains to our plan's

10 treatment of insurance.

11

12      I am going to direct you to a number of paragraphs in

13 the coalition's exclusivity objections. This is at Docket No.

14 2688. And they spend the last several paragraphs, maybe its

15 ten or fifteen paragraphs or so, of that objection talking

16 about insurance and whether the debtors' plan is, essentially,

17 letting the insurers get out of their insurance obligations.

18      In essence they're saying, and I am going to read

19 through the code in a moment because it is in code, and by

20 code I don't mean the bankruptcy code, I mean the way it's

21 drafted, but we will get to that in a moment. I will give an

22 example though; Paragraph 28 of their pleadings says that --

23 actually let me go back from that. I am going to go -- let's

24 start at Paragraph 21, in fact, of their pleadings if I may.

25

1    Paragraph 21, after walking through the Seventh

2 Circuit's UNR decision and discussing how UNR prohibited the

3 insurers to receive a windfall out of their plan, in Paragraph

4 21 they start to set the stage for what type of plan or what

5 type of insurance provision in the plan might be acceptable to

6 them.  They essentially say, applying UNR to this case means

7 the debtor's obligation -- I'm quoting,

8    "The debtor's obligation to pay abuse survivors, i.e.

9 the full allowed amount of their claims as determined under

10 trust distribution procedures, would be the "covered loss" for

11 purposes of determining the insurer's coverage obligations."

12

13    Then they provide an example of that in Paragraph 22.

14 They say, for example, if you have a survivor's claim that is

15 allowed for $2.45 million the insurer's obligations would be

16 based on that amount and not on the limited assets initially

17 available in the settlement trust to pay the claims.

18    They then engage in a discussion of Fuller-Austin and

19 Flintkote.  What happened in the Fuller-Austin and Flintkote

20 provision cases -- and these were cases coming out of

21 California.  The first one was Fuller-Austin in California

22 State Court where the court basically concluded maybe because

23 of, you know, and I think to the plaintiff's dismay where they

24 had insurance neutrality provisions in the underlying plan the

25 court basically said when the trust sought the full value of

the claim from the insurer the court said no, not so fast,

your recovery is going to be limited to the --

(Audio indiscernible)

MS. LAURIA:  -- that is paid out of the trust, not

the full value of the claim.  The California Court this time

in the Federal District Court double downed on that concept in

2016 in the Flintkote decision.

So what we have from the coalition, and you will see

this concept come up again and again in the disclosure

statement objection from both the coalition and the FCR is

this notion that by making the plan insurance neutral they are

running the risk of a Fuller-Austin or a more recent Flintkote

adverse determination when it comes to collecting against the

insurers in post-bankruptcy insurance coverage litigation.

Their solution to this, as they say in their papers,

is maybe one of two things.  You undoubtedly read this in the

estimation pleadings.  Solution one is to come forward with an

aggregate insurance binding estimation.  In other words if

Your Honor or the Federal District Court were to estimate the

debtors aggregate liabilities with respect to the abuse claims

and conveniently, I think as the insurers have pointed out,

(indiscernible) which then would correspond to coverage

liability.  If you adjudicate that as the debtors' aggregate

1  liability with respect to abuse claims that will have the

2  effect of binding the insurers in subsequent litigation.

3  Even if you don't view the binding -- insurance

4  binding estimation, if instead we remove the insurance

5  neutrality provisions from our plan and go with the coalitions

6  proposal in Paragraphs 21 and 22 where Your Honor decides in

7  connection with confirmation that the trust distribution

8  procedures or a claims type allowance process is fair, and is

9  reasonably calculated to come what should be the allowed

10  amount of the claim, the liquidated value of the claim against

11  the debtor that the trustee can then take that liquidated

12  value of the claim and submit that to the insurers and the

13  insurers are bound by the answer.

14

15  Now, Your Honor, I'm not saying what's right or

16  wrong.  What I do know is this; the insurance neutrality

17  jurisprudence has been developed over twenty years in this

18  circuit in particular, in Delaware in particular, and in the

19  Third Circuit.  That language is present in the debtors' plan

20  of reorganization.  It mirrors the language that has been

21  proposed in numerous other mass tort cases including the

22  Imerys case.

23

24  If we were to remove that language I suppose that may

25  be the alternative plan that the objecting parties would like

the debtors to pursue.  I think, as Your Honor can guess,

after looking at the twelve objections to our disclosure statement that we received from our insurers that the insurance neutrality language is not calculated to fall within the Third Circuit, so they're not even happy with that.

Removing that insurance neutrality language and setting this court or the Delaware District Court up for either a binding estimation battle or a binding trust distribution procedure battle is setting us up for the most epic battle these courts have ever seen between plaintiff lawyers on the one hand and insurers on the other hand.

Rest assured that if the plaintiff lawyers are successful in connection with that litigation the insurers, and we've got, as you know, every player in the insurance book in our case, will appeal those rulings all the way to the Supreme Court. We will not get to those rulings during 2021. Certainly not at the appellate level, but we have our doubts as to whether or not we will get to those rulings at the Bankruptcy Court level if we pursue that path.

So where does that leave us, Your Honor. We have two baskets of consideration that can certainly be built upon the Hartford and local councils, then we have this insurance neutrality issue, for lack of a better way to describe it. We're at the tipping point, Your Honor, in these Chapter 11 cases. I can't say it any differently. We are there. The

1  debtors are prepared to proceed today with the next agenda

2  item, with the disclosure statement that's ready for this

3  court's consideration.  We put a lot of work into it.  The

4  objecting parties have put a lot of work into reviewing the

5  disclosure statement and providing comments on the disclosure

6  statement.

7          We also have a plan of reorganization --

8      (Audio indiscernible)

9          THE COURT:  Please -- excuse me, Ms. Lauria.

10         Please check your phones, I am getting cross calls

11  and discussion.

12      (Audio indiscernible)

13      (Audio indiscernible)

14         MS. LAURIA:  So long as you can hear me, Your Honor,

15  I will continue.

16         THE COURT:  Go ahead, Ms. Lauria.

17         MS. LAURIA:  As I was saying we are at the tipping

18  point.  We're ready to proceed with the disclosure statements.

19  We have a plan, it's really two plans as I described; a global

20  resolution plan that was intentionally structured for a

21  framework the parties can build upon.  I should say that

22  improvements to that global resolution plan, whether it's

23  enhanced local council contributions, enhanced contributions

24  from Hartford; again, if folks can get there, we have our

25  doubts, or contributions from any other settling insured or

chartered organizations that's not going to require re-

solicitation.  That is an improvement in value for these

victims that we are very motivated to see.

In return if that plan is not voted in favor of by

the plaintiffs, and we fully acknowledge it must be, and we've

got a BSA toggle plan.  If exclusivity is not extended -- so

that is one side of that tipping point, that tipping point I

mentioned for the Chapter 11 case.

If exclusivity is not extended and we find ourselves

in a world with competing plans, as Mr. Whittman said in his

declaration and that's been uncontroverted, this case has a

very real potential to devolve into chaos.  That threatens

everyone's goals.  That threatens the BSA goals, our mission,

and it threatens the BSA's goals with respect to equitable

compensation for survivors.

I am going to get in a moment, Your Honor, to the

nine factor test that's been adopted by most courts, but

before I do that, Your Honor, I want to mention the Dow

Corning case out of the Eastern District of Michigan.  It was

another mass tort case and while there the situation was

slightly different from theirs the judge in that case was

similarly facing a chaotic situation.

The judge in that case looked to what another court

has seen was a tenth factor, a tenth factor that that court

called the "chaos factor".  And while the Eastern District of
Michigan didn't want to use the term "chaos factor" I think
that they didn't appreciate the word "chaos".  They did say in
that spirit they had some advice for themselves and that I
would say for us today which was to, quote,

"Drawback from the narrow focus on the individual
factors and scan the big picture."

That is what I am doing from that tipping point, I am
saying what is going to happen if we go on this side of the
tipping point versus the other.  Submitting competing plans to
proceed seems incredibly unnecessary given that we got two
plans, literally two plans on the table that provide building
blocks for a global resolution plan that's best for everyone
and if not, if the plaintiffs reject that and prefer to deal
wiht these issues in the tort system with respect to the non-
debtor parties they can do that.

Introducing competing plans on the table, including a
competing plan that sets the stage for what I really believe
will be an epic battle between the plaintiffs and the insurers
is simply a subscription for unbridled and costly litigation.
This is not a core process corporation, I know we've said that
a lot to Your Honor, that unbridled and costly litigation in a
non-profit debtor case where the cases are being funded

literally through parents (indiscernible) membership fees, scouts, and (indiscernible) charitable donations.

This conclusion, Your Honor, was supported by Mr. Whittman in his declaration at Paragraph 6 where he pointed out that when the debtors --

(Audio indiscernible)

MS. LAURIA:  -- needed to move their --

(Audio indiscernible)

MS. LAURIA:  If you have a dog put your phone on mute.

So the debtors recognize that they needed to move their confirmation hearing from July to August.  That movement by itself coupled with the extensive litigation in these cases has cost the debtors or actually cost the trust, it has cost the victims $25 million.  So you can imagine where we're going to be if we're in the competing plan world.

Your Honor, the extension of the debtors' exclusivity falls squarely within the bankruptcy courts discretion. The statute requires a finding of cause.  We believe that cause exists.  I know we have a packed agenda today, but due to the importance of this issue and the evidentiary support, Your Honor, I want to just briefly go through the nine factors for cause because I do think they weigh absolutely in favor of

1   this court granting an extension of the debtor's exclusivity

2   through the statutory period.

3          When we look at those nine factors the first factor -

4   - and by the way, these weren't addressed in the objections.

5   I don't believe any of the factors were specifically

6   addressed.  I will try to point them out when we get there

7   where I think the objectors were going, but under the nine

8   factor test the first factor size and complexity of the case;

9   easily satisfied.  I get it we're only two debtors, but as the

10  court knows, scouting is delivered on a local level by 251

11  local councils and literally thousands of chartered

12  organizations.

13  

14         When it comes to abuse liability we're often sitting

15  shoulder to shoulder with those organizations which is why

16  they have become entangled in this process.  We have twenty-

17  six mediation parties.  As you know, there are complicated

18  state law property issues because we are a non-profit

19  (indiscernible) restricted access of special rules under state

20  law.  We do have 80,000 abuse victims that we are working

21  with.  We have secured --

22      (Audio indiscernible)

23         MS. LAURIA:  -- people like to belittle the secured

24  debt in this bankruptcy case, but we literally have hundreds

25  of millions of dollars of secured debt in this bankruptcy

case. We have a very large pension plan that if this case were to liquidate the PBGC would be asserting a $1.1 billion claim against these bankruptcy estates and, again, we're that non-profit debtor that's like trying to fit a square peg in a round hole of the bankruptcy code. No party can dispute that we meet the first factor and, in fact, there is no evidence to the contrary.

Moving to the second factor, which is the necessity for sufficient time for the debtor to negotiate its Chapter 11 plan and prepare an adequate disclosure. I will note, Your Honor, that the timing and the negotiation and progress point come up in later factors, the sixth and the seventh factors. I am also going to try to cover all them here. I will note those when we come to them.

I want to revisit why it is, Your Honor, that we are fifteen months into this case and just now before the court on the disclosure statement hearing. You will recall, going back to the early stages of this case when the debtor entered into bankruptcy, we told the court that prior to the bankruptcy case the plaintiffs that we had negotiated with made it crystal clear to us that they would fight hard for a bar date in this case and they absolutely would not come to the negotiating table without that bar date and without the results of the bar date.

1    So consequently we filed on the first day of the case

2  a bar date motion.  It wasn't fully baked.  We wanted the tort

3  claimant's committee to be in place so that we can negotiate

4  the broad noticing protocol.  You will remember that.  In

5  fact, we were before Your Honor on the bar date motion about

6  one year ago right now.  The plaintiffs wanted a bar date at

7  the end of 2020, December 31st.

8    We negotiated back to November 16th.  November 16th

9  came and went.  We had a lot of claims filed.  94,000 claims

10  were filed, once they've been de-duplicated we're down around

11  84,000 claims.  To go through that de-duplication process and

12  actually review the claims (indiscernible) worked around the

13  clock, it took about eight weeks.  So it really wasn't until

14  January of 2021 that the parties actually had data that they

15  were willing to negotiate around.  That is why that took so

16

17  long.

18    MS. LAURIA:  With COVID, as we talked about one or

19  two hearings ago, we haven't been able to mediate in person;

20  in fact, our first in-person mediation for those of us that

21  were vaccinated was March 30th of 2021.  That was a mere six

22  weeks ago.  So, we've only been mediating face-to-face with

23  folks post bar date, post claims processing, for a period of

24  about six weeks.

25    The debtors have utilized the time that they've had

1  in this Chapter 11 case to the maximum extent possible. They

2  were deprived of several months of their exclusivity because

3  we needed the bar date to occur and we needed to process those

4  claims, but we utilized the time. We negotiated deals where

5  we could with the UTC and JP Morgan and those deals are

6  reflected in filed (indiscernible) statements and Hartford.

7           The third factor: existence of good faith progress

8  towards reorganization. The uncontroverted Whitman

9  declaration states that he has spent hundreds of hours in

10 mediation and even more time than that meeting with parties

11 outside the mediation in good faith. We've been working

12 towards resolution in good faith through the mediation process

13 and there's simply no evidence to the contrary.

14          Fourth factor: debtor is paying its debts as they

15 become due. The debtor filed monthly operating reports. MOR-

16 4 shows the debtors' progress with respect to accounts

17 payable. This Court can take judicial notice of the monthly

18 operating reports in connection with this matter because this

19 matter is within the broader administration of the case, which

20 is where those MORs are filed.

21          Fifth factor: debtor has demonstrated reasonable

22 prospects for filing a viable plan. We addressed it

23 extensively in the reply paper that was filed on May 16th,

24 Your Honor. First, the TCC, in their objection, laid the

25 groundwork for what we're calling the BSA toggle plan. I

1  certainly don't believe that the TCC, and I don't even think

2  in the disclosure statement objections, the TCC took issue

3  with the BSA toggle plan.  They can't.  It's the plan that

4  they wanted us to file and they said we should file in their

5  objections.

6          Other parties did take some issue with the BSA

7  toggle plan; those are confirmation objections.  They should

8  be dealt with at confirmation.  It is not a reason to

9  terminate exclusivity.

10          We understand that the parties don't like what is

11  the global resolution plan is today.  That does not mean that

12  the global resolution plan is not viable in this case and

13  there's nothing preventing those parties from continuing to

14  negotiate a better global resolution plan if they are able to.

15          If they are not, they will have a choice to make,

16  which is whether to vote up or down that global resolution

17  plan and defer to the BSA toggle.

18          Sixth factor:  whether we've made progress.  Again,

19  I've said it before.  We filed two mediation statements

20  already.  I know people want to minimize the UTC-JP Morgan

21  settlement.  That actually took the debtors multiple months to

22  negotiate, resolved very significant issues in this Chapter 11

23  case around JP Morgan, as well as the pension plan.  I know

24  there are still issues there that the TCC and the FCR need to

25  work through in the context of their adversary proceeding, but

1  that was a tremendous, important step forward.

2          I'd also note that the <u>Dow Corning</u> opinion out of

3  the Eastern District of Michigan noted that it's not

4  surprising in a mass-tort case that a debtor should first

5  start reaching resolutions with its secured lender and with

6  the general unsecured creditors.

7          The seventh factor:  the amount of time that's

8  elapsed in the case.  I think I have fully addressed that.

9          Eighth factor:  whether the debtor is seeking to

10  extend exclusivity to pressure creditors to cede to the

11  debtors' reorganization demand.  I think that's where these

12  objections were going, Your Honor.

13          As I said before, we are open to ideas with respect

14  to the global resolution plan, the BSA toggle plan.  There is

15  nothing within those plans that prohibits parties from

16  continuing to negotiate with the debtors and I think it's very

17  clear that the mediation is not over.

18          I know Mr. Goodman said in a colloquy on Mr.

19  Whitman's cross-examination that we were utilizing the Whitman

20  declaration to suggest that there's more going on in the

21  background than there is and that that is their position that

22  there is not.  I disagree with that.  Without getting into

23  mediation discussions, we've been mediating with parties up

24  until idea.  So, we are continuing to mediate.  We will

25  continue to mediate.

1        As I pointed out previously, I think the big issue

2   here is what to do about the insurance structure of the plan.

3   As a practical matter, that's not a global resolution versus

4   the BSA toggle plan.  If Your Honor felt that this Court or

5   the Federal District Court could take on that issue, it's an

6   add-on to the global resolution plan.  It's not a wholly

7   separate plan structure.

8        But as I've said, the debtors have had serious

9   concerns with going through insurance binding plans, given the

10  timeline, given the position of our insurers, and given the

11  necessity to get money into the hands of victims and get these

12  debtors out of bankruptcy.

13       Finally, Your Honor, the ninth factor, which is

14  unresolved contingencies.  Where I sit, Your Honor, the one

15  unresolved contingency is getting our disclosure statement

16  approved and getting it launched for solicitation.

17       You know, when we take all of these factors as a

18  whole, which is what the courts tell us to do, including that

19  ninth factor, whether you want to say looking at a thirty-

20  thousand-foot level or actually calling it the chaos factor,

21  as one court has done, I think the tipping point that we're at

22  suggests that the debtors must maintain its exclusive right to

23  file a plan through the expiration of the statutory period,

24  through August for the filing and through October for

25  solicitation.

1        This has been, and maybe will for the next few

2   months, continue to be one of the most complicated bankruptcy

3   cases that many of us will ever see between the nonprofit

4   issues, the local council issues, the insurance issues, the

5   issues with the severe harm that occurred to individuals in

6   connection with scouting that we feel very deeply about and

7   apologize sincerely for.  It's a difficult case, Your Honor.

8   We are trying to untangle this very complex knot.  We think we

9   are within sight of having that done, but the only way we

10  think we're going to truly untangle the knot is by maintaining

11  the debtors' exclusive right to file a plan of reorganization.

12       Your Honor, that concludes my remarks.  I'm happy

13  to answer any questions if Your Honor has any.

14       THE COURT:  Thank you.  I didn't know we were going

15  to launch into the insurance neutrality issues so quickly into

16  this hearing, and I actually have focused on that to some

17  degree and have questions with respect to the mythic

18  proportions that insurance neutrality seems to have taken in

19  asbestos cases, and I will certainly want guidance from all

20  the parties at the appropriate time with respect to insurance

21  neutrality.

22       I don't think the insurance neutrality issue that

23  did play heavily in the exclusivity motion responses, I don't

24  think this is the appropriate time to address insurance

25  neutrality.  I'm not sure how it impacts on exclusivity.  I

1  will be open to hearing about that, but perhaps during the

2  course of today or Monday, I will set out for parties how my

3  admittedly non-experienced view of insurance and insurance

4  neutrality and the issues that I see play out and ask for

5  appropriate submissions so that I make sure I understand that

6  issue, which I think, at least at the moment, is a

7  confirmation issue.

8           But I'll put that right out that there that it has

9  been something that I have been thinking about in various

10 contexts throughout this and, quite frankly, my other now

11 three mass-tort cases.  But I don't have any specific

12 questions with respect to exclusivity.  That's observation and

13 comment.

14          Okay.  Let me hear from Mr. Stang.

15          MR. MASON:  Your Honor, if you don't mind --

16 Richard Mason -- may I make a statement in support or would

17 you rather that we wait until the end?

18          THE COURT:  Fair enough.  Mr. Mason, yes, let's

19 hear from people in support.  Thank you.

20          MR. MASON:  Apologies for perhaps somewhat of a

21 (indiscernible) position, but -- and apologies for

22 interrupting Mr. Stang.  I'll be very brief, Your Honor.

23          Richard Mason, Wachtell, Lipton, Rosen & Katz, on

24 behalf of the ad hoc committee local councils.  I'll keep my

25 comments on exclusivity very brief, but I may have something

1  to say later about the disclosure statement.

2          Your Honor, we think that exclusivity should be an

3  easy question, if anything can be called easy in this case,

4  and I'm not sure about that.  The BSA has filed a plan.  If

5  the Court approves a disclosure statement for that plan, it

6  will be up to creditors, primarily, the claimants to vote and

7  decide whether they want the global resolution in the plan.

8  If enough of them vote yes, we'll be back in front of Your

9  Honor in August for a confirmation hearing for a global

10 resolution.  If enough of them vote no, we'll still be back

11 here in August for a confirmation hearing on the toggle plan,

12 which the debtors says can be confirmed (audio interference)

13 over the objection of the claimants.

14         Either way, Your Honor, in our view, this is a plan

15 that can at least proceed to a confirmation hearing.  Now, the

16 TCC and the coalition have said that they prefer a different

17 plan.  They haven't been very specific about what that would

18 be and that their constituents would vote no on the BSA's

19 plan, but this doesn't mean at this moment that the BSA's plan

20 can't at least be solicited, assuming your court approves the

21 disclosure statement, and put before the Court for

22 confirmation.

23         Your Honor, in our view, as difficult as this case

24 has been, without the chaos or with the chaos that would ensue

25 from halting exclusivity and allowing competing plans to be

1  filed and solicited, the chaos meter, Your Honor, would go off

2  the charts.  In the meantime, as you've heard from the BSA,

3  discussions are ongoing.  The ad hoc committee is involved and

4  those discussions could result in sufficient creditor support

5  for the global resolution between now and the voting deadline.

6          So, even if there's no announced support for the

7  global settlement today, the debtor, the ad hoc committee, and

8  we think other parties are working hard to see if that can

9  change.  In this regard, Your Honor, the ad hoc committee is

10 working hard to secure or confirm $425 million from local

11 councils.  We said in our papers and I'll repeat here, that we

12 think we can get there with a lot of intensive and continued

13 effort, Your Honor.

14         But terminating exclusivity would not advance any

15 of these efforts at all in our view and would likely set them

16 back materially and, perhaps, irrevocably.  We think that's

17 the decision for Your Honor at the moment.  Thank you.

18         THE COURT:  Thank you.

19         MR. ANKER:  Your Honor, this is Philip Anker.  May

20 I be heard, as well, in support?

21         We just filed a (audio interference) support.  Your

22 Honor, I, too, will be brief.  I want to take one minute to

23 start out by simply thanking the Court.  I can only imagine

24 how difficult it was this morning with all the logistics

25 issues.  And this is a massive case, and I think I may not

1  agree much with Mr. Stang or Mr. Molton, but one thing I think

2  we all will agree with is express our appreciation to Your

3  Honor and Your Honor's staff for everything you've done.

4         I will be brief.  Look, it seems to me there's a

5  basic credulous bias on the Bankruptcy Code in favor of

6  reorganization and in favor of allowing debtors an opportunity

7  to (audio interference) to try to get there.  That should be

8  noncontroversial.

9         It also should be noncontroversial that if Your

10 Honor doesn't extend exclusivity (audio interference) there

11 will be chaos.  I can't imagine that Mr. Stang and Mr. Molton

12 are going to disagree with (audio interference).  Can you

13 imagine if there are competing plans here with all the

14 objections you've already seen, how many more there will be.

15 The hundred million dollars in fees you referenced will only

16 go up.

17        They're really making one and only one argument

18 against exclusivity and it's what I would call, and I agree

19 here (audio interference) from Mr. Stang and Mr. Molton, the

20 plan on the table is dead on arrival.  Your Honor is simply

21 going to waste money letting it go out.  That's the argument

22 you're going to hear.

23        Well, let's think about that for a second, and I

24 say two things (audio interference) the big picture.  First,

25 as Ms. Lauria noted and Mr. Mason noted, there is what I will

1  call the Plan B, the toggle plan.  That is a plan that can be

2  confirmed, at least the debtors' view is, on a cram-down

3  basis.  That doesn't require an affirmative vote that if it

4  doesn't give any relief to any third parties, there only needs

5  to be one accepting impaired class and there are plenty of

6  trade and other classes here that are non-tort claimants.

7  Second, I do think the global resolution plan has a

8  real, meaningful shot at being confirmed.  Over my career,

9  Your Honor, I've been accused by adversaries of many things.

10 One thing I have never been accused of is tilting at

11 windmills, just going off on things that are impractical.  My

12 client, I, and co-counsel, Mr. Ruggeri and his firm spent

13 countless hours negotiating our settlement.  We didn't do that

14 out of intellectual curiosity.  I didn't spend my client's

15 money just because I wanted to spend my client's money.

16 We did it because we think when push comes to

17 shove, especially if Your Honor rules or the District Court

18 rules, as we think you will on some of the other matters, and

19 particularly, the estimation motion, I think we're going to

20 get there.  But I think at the end of the day, at least with

21 respect to the coalition, I will have one aside here.  I am

22 not going to violate the mediation privilege, but you heard

23 examination from Mr. Stang whether there were any discussions

24 with him and BSA regarding the dollar amount of the Hartford

25 settlement.

1          Mr. Stang has put in papers, essentially joint

2    papers that the coalition, the FCR, and the TCC, but the

3    statement I'm about to read, recite to you is attributed only

4    to the TCC, that the TCC thinks the exposure here for my

5    client could be 13 times that much.  I don't tilt at

6    windmills.

7          There's a point where you're dealing with someone

8    on the other side where they're just in a different

9    stratosphere and there's no practical purpose of having a

10   discussion with them.  But at least to the lawyers and the

11   principals and the (audio interference), we think there is a

12   real good shot that they get behind this.

13         What I think they will do, because I assume they're

14   rational is they'll ask the question I ask myself every time I

15   have to make a decision in my life and every time I have to

16   give advice to a client:  does it make sense to go down path

17   A?  Well, what is path B?  What is the alternative?

18         And that is going to be the question I think that

19   (audio interference).  There is $650 million worth of Hartford

20   and an answer to the argument by the coalition, they don't

21   have to settle with Century at less than 2X.  That number

22   should get to a big number.

23         There's the 425 million and you've heard from

24   Mr. -- from a local council and you heard Mr. Mason say he

25   thinks it's achievable.  There's a 115 million from BSA or 120

1 | million.  We're now at well over a billion one or a billion
2 | two, if I'm doing the math right in my head.  There's all the
3 | other insurance companies, putting Century/Chubb aside.
4 | There's the sponsoring organizations, many of whom have
5 | appeared through very serious counsel, including Latham, among
6 | others, suggesting they are serious players here.
7 | I think at the end of the day if we go down this
8 | path, we will have a pot, even putting Century aside, that is
9 | in a two-plus-billion-dollar range, maybe more.  That's
10 | serious money.  And the question is going to be compared to
11 | what?
12 | And I am going to speak one minute, Your Honor.  I
13 | understand right now is not insurance neutrality, but it does
14 | go a little bit with the compared to what.  My answer to that
15 | question is, if we -- what the bankruptcy shouldn't do is it
16 | shouldn't advantage the insurance companies, but it shouldn't
17 | prejudice them.  It should put them in a position they would
18 | have been in and the same for the tort claimants.
19 | And what would have happened outside of a
20 | bankruptcy, our insurance policies, and we'll put them in for
21 | you into evidence, say that we have the right to take over the
22 | defense of any case if we are the --
23 | VOICE:  Your line is now muted.
24 | MR. ANKER:  I assume that's not me, Your Honor.
25 | And that we are only liable, not for an aggregate

1  resolution of what may be in one year the aggregate

2  liabilities for BSA, but we are liable if BSA becomes legally

3  obligated to pay an individual claim, let's call it John

4  Jones' claim.  So, what insurance neutrality does is it gives

5  us the right to defend that claim and be liable if, but only

6  if John Jones proves his claim.  And for him to prove his

7  claim in the tort system means he takes the stand, it means

8  he's cross-examined at a trial.

9           In other words, this is a fact.  It is the biggest

10  fact in this case.  There were 275 tort lawsuits before this

11  case got filed.  There's now allegedly 82,500 -- I think

12  that's the actual number -- non-duplicative claims.  So, I

13  think if Your Honor rejects the idea of binding estimation or

14  Judge Andrews does, and we'll come for that either later today

15  or Monday, and the plaintiffs understand that their choice is

16  to go back into the tort system and actually litigate these

17  cases, when so few were actually willing to litigate before, I

18  think they're going to view 650 million from Hartford, 425

19  million from local council, and 120 million from BSA and all

20  the other money and they're going to say, wow, that's a lot of

21  money and, frankly, a lot better than we ever would have done

22  in the tort system.  And my money is on the proposition that

23  they will accept that plan in that circumstance.  Maybe I'm

24  wrong, but it's certainly within the realm of reasonableness

25  to assume it can happen; in any event, this debtor has a

1  backup plan.

2        So, when you hear the argument that I'm sure we're

3  going to hear in a few minutes, which is this plan will never

4  be supported by my clients, it will never occur, all I can say

5  is talk is cheap.  And I don't mean that in a critical way or

6  a derogatory way, but when push comes to shove, and people

7  understand that their alternative is to go back to the tort

8  system, I think people are going to end up, when money is on

9  the table, to support that plan.

10        And if they don't, Ms. Lauria is right, she's got a

11  backup plan.  Your Honor can hear objections to it.  I'm not

12  going to say, predetermine you're going to confirm it --

13  that's going to be your call -- but it's a plan that is

14  designed to let BSA survive and go forward without the

15  affirmative vote of the claimants.

16        Given all of that, Your Honor, given the chaos that

17  will occur, the extraordinary fees and, frankly, the threat to

18  BSA's existence that lifting exclusivity will do right now and

19  the distinct possibility that one way or the other, we will

20  get a plan confirmed, if you let this plan go out, I would

21  urge Your Honor to extend exclusivity for the statutory period

22  -- we're only talking about a few months -- and let's see

23  whether I'm right or whether, frankly, I have tilted at

24  windmills and wasted time.  There's a first time for

25  everything, but it's not something that I have typically done

1   in my career.

2           Thank you, Your Honor.

3           THE COURT:  Thank you.

4           Ms. Ringer, I see that you've popped up.  I'll let

5   you address the Court.

6           MS. RINGER:  Thank you, Your Honor.

7           Rachael Ringer from Kramer Levin, on behalf of the

8   unsecured creditors committee.  I just want to briefly speak

9   in support of the extension of exclusivity.  Ms. Lauria and

10  others have largely covered many of the points that I had

11  planned to cover, so I don't want to repeat.

12          But I did want to put on the record that the

13  committee continues to believe that the settlement between the

14  committee, the debtor, and JP Morgan, as reflected in both

15  versions of the plan, both, the BSA toggle plan and the global

16  settlement plan presents (audio interference) for the case and

17  does evidence significant progress that the debtors have made

18  with two important constituencies.

19          We, like the debtors, share a strong reference for

20  the global settlement plan and we truly hope that the debtors

21  and all the case parties in the case are able to foster the

22  kind of consent that is necessary to get that plan confirmed.

23  But I do think that the so-called chaos factor that Ms. Lauria

24  mentioned is important here and it's important for your

25  constituency, as well.

1          As Ms. Lauria mentioned, many of the other parties

2    in the case have tried, I think to minimize the (audio

3    interference) role of the creditors' committee, given the

4    types of creditors, given the volume of non-(indiscernible)

5    creditors in the case, particularly when compared to the

6    significant, significant abuse liability that's being

7    asserted.  But in doing so, I think they're ignoring a very

8    large potential and contingent claim, and that's a claim

9    that's held by the PBGC.  The PBGC has asserted claims in

10   excess of a billion dollars and from our perspective, those

11   claims, if they're ultimately triggered, could be asserted not

12   only against the BSA, but against all the local counsel.

13          And so, the reason why the parties, I think have

14   the luxury of calling our constituency small and very small in

15   comparison, we recognize, is because we were able to reach

16   consensus through the UCC, JP Morgan debtor settlements that

17   addressed (indiscernible) issues, and so it avoided the

18   triggering of those claims.

19          And so, as chaos builds, as litigation mounts, as

20   the risk to reorganization of this organization builds, so

21   does the likelihood of the potential for triggering that very

22   large claim and that's something that we want to avoid for our

23   constituency, but for all of the constituencies --

24          UNIDENTIFIED:  Yeah, I was calling regarding -- I'm

25   calling (indiscernible) insurance regarding a claim that we

1  received.

2        MS. RINGER:  I think someone is not on mute again.

3        But I think it's just an important piece to

4  remember when you think about the chaos factor, because it's

5  something that we shouldn't lose sight of in the longer case

6  and we can't to believe that --

7        UNIDENTIFIED:  Yeah, I was trying to talk to

8  somebody regarding a claim --

9        THE COURT:  Excuse me?

10        UNIDENTIFIED:  -- that we received.

11        THE COURT:  Excuse me.  Something has -- I'm

12  hearing somebody's discussion about an insurance claim.

13      (Laughter)

14        THE COURT:  Can you please check to make sure your

15  phones are muted.

16        UNIDENTIFIED:  Yeah, I'm calling from

17  (indiscernible) health insurance.

18        MS. RINGER:  I don't have much, Your Honor.  I

19  guess it was just an important point to make and just to

20  remind the Court of our position and, obviously, we do support

21  an extension of exclusivity and we do think that (audio

22  interference) need the progress that they need in order to

23  support the request for an extension.

24        Thank you, Your Honor.

25        THE COURT:  Thank you.  Anyone else in support

1  before I go to Mr. Stang?

2            MR. SCHIAVONI:  Tancred Schiavoni for Century.

3            Can you hear me?

4            THE COURT:  Yes, Mr. Schiavoni?

5            MR. SCHIAVONI:  So, Your Honor, I've been -- I

6  think what you're going to hear from Mr. Stang in just a

7  moment is how going all the way back to the pre-pack

8  negotiation, which I attended, and then mediations for the

9  better part of this last year, the Boy Scouts' contribution to

10 the plan has actually gone down.  It hasn't gone up and that

11 the local councils have sort of frozen or incrementally very

12 small (indiscernible).

13           The mediation, I hi you'll hear from him has been

14 100 percent devoted, really to, discussions exclusively

15 between the Boy Scouts and to some extent, the TCC, but those

16 quickly moved to the coalition, which was offering, basically,

17 to accept the lower contribution in exchange for, basically,

18 getting the Boy Scouts to throw their insurers under the bus.

19           That's what you may hear from him and there's been

20 a lot of sort of --

21           MR. MOLTON:  Your Honor, it's David Molton.  I just

22 have to object to the extent -- and I mean not conceding that

23 there's, you know, the editorialization by my friend, Mr.

24 Schiavoni, but he's talking about mediation conversations and

25 now disclosing them now, to the extent that's what he's

1   purporting to do.  And I'm not going to confirm whether those

2   are true or not; indeed, everybody will have their own view on

3   them, but I would ask all parties to be cognizant of the fact

4   that mediation discussions with our mediators are privileged

5   and confidential and should not be disclosed here.  Thank you.

6           MR. SCHIAVONI:  And, Your Honor, and that's the

7   last point I would just like to focus on, and that is that

8   there's been a tremendous discussion that there are extensive

9   mediation meetings and that they've been going on and on and

10  that there've been dozens of them that have been going on and

11  going forward.

12          I was the one insurer who attended, I think both,

13  Miami and New York in person.  I think I saw Jim here one

14  afternoon in New York.  All of the sessions that have taken

15  place in the mediation between the debtors and the claimants,

16  we've been excluded from.  We've been completely excluded from

17  the formulation of the plan and I do think that we are not

18  really poised to move forward to some great conclusion.

19          I think the plan, itself, you're going to see when

20  you move into that next, presents a different problem.  I do

21  think exclusivity ought to be continued, Your Honor, but what

22  I would suggest to you is with all of this chatter about

23  what's happening in this mediation, I think you ought to sit

24  down with Mr. Gallagher and Mr. Finn and ask them, you know,

25  why we are where we are, instead of waiting.

1    Because, essentially, what you're going to hear

2  from many standing and I think Mr. Molton, is they're going to

3  vote no and that, you know, come back and you're going to hear

4  from Mr. Anker, let's wait and see that event.  Rather than

5  rule on these motions that are before you today, I think if

6  you could, you know, use this opportunity where the pot is

7  boiling to sit down and talk to those two mediators to know

8  exactly why this thing has reached, you know, a complete

9  impasse, you know, I think that might be the best way to move

10 the case forward.

11    Because you're going to hear them say they're going

12 to vote no.  A huge amount is going to be spent between now

13 and whenever they vote.  And, you know, maybe Mr. Anker is

14 right, but I think now is the time to, you know, grab the bull

15 by the horns and try to move the case to closure.

16    You know, we did go to those sessions to try to

17 actually say we wanted to talk to someone and, you know, we

18 basically sat in the room by ourselves.  I'm here on May 19th

19 and no one has made a demand.  May 19th, no one has made a

20 demand.  I'm here on May 19th and no one has allowed me in a

21 single meeting with the coalition and the Boy Scouts at the

22 same time.  A year into the case, okay.

23    So, if they think that there's going to be some

24 gigantic change of events here, I don't see it, but I do think

25 you have an opportunity now while these motions are

outstanding to grab the bull by the horns and I think Mr.
Gallagher and Mr. Finn, who, you know, we didn't support
necessarily either one of them, but they might be helpful to
Your Honor in sort of undoing this Gordian knot and moving the
thing forward.

Thank you very much, Your Honor.

THE COURT:  Okay.  Thank you.

Mr. Stang?

MR. STANG:  Your Honor, the tort claimants'
committee opposed the extension to exclusivity because there's
not a single survivor representative group that supports the
debtors' plan.  The debtor refers to its plan as a toggle
plan.  It is a death trap plan.  It has as Plan A, a bad
solution, as Plan B, a worse solution.

And we'll get into, later, how the debtors' Plan B
isn't what the tort claimants committee supports and what the
major difference is between what we would propose doing and
what the debtors' death trap Plan B does.

As the fiduciary for survivors in this case, we
have reviewed the letters that have come to you from
individual survivors and they are painful.  They are horrific.
We read the unredacted ones.  And the nine men who sit on the
tort claimants committee echo the plea to the Court to find a
reasonable solution to this catastrophe, which is that 84,000
people have come forward to say that they were abused, and I

1  can tell you from my experience, and I think everyone on this
2  call knows, that is the tip of an iceberg.  And I don't care
3  how much advertising was done by the Plaintiffs' bar or the
4  fulsome notice program that the debtor did, people don't come
5  forward.  This is a tragedy of catastrophic proportions and
6  the debtors' death trap plan does not adequately address those
7  people who were willing to come forward.

8         We filed our objection on April 1st.  That was the
9  last day of the Miami mediation and Mr. Schiavoni and I don't
10  agree on a whole lot, but I guess we could agree that
11  mediation could at least be put in air quotes.  That third
12  day, we were ready to participate in the mediation.  And the
13  way the mediation works, Your Honor, is you get invited to the
14  mediation sessions.  The mediators tell you who you're meeting
15  with.  You can ask to meet with certain people.  That request
16  is not always honored.  And on the evening of day two, we were
17  told, tort claimants committee, you can go home, because we
18  have no sessions for you.

19         Now, Mr. Anker's explanation for that is that we
20  are unreasonable.  That our demands are too high.

21         So, let's talk about money for a minute.  We
22  believe that the estimated value of the claims in this case is
23  not less than $102 billion.  It's a staggering sum.  Frankly,
24  84,000 people being abused is a staggering number.

25         If you cut that group in half because all the

1  insurers will tell you these claims are fraudulent, it is $51

2  billion.  It's a staggering sum.  It's a staggering number of

3  people.

4          But if you take the consideration that's been laid

5  out from the debtor, the so-called contribution from the local

6  councils, because we all know -- forget about the 425.

7  There's not a single local council that has committed to pay

8  its share of $300 million, the original aspirational number

9  that the Boy Scouts put out, and then you add in the Hartford

10  contribution, that comes out to $14,300 per person.  The

11  Hartford contribution, because it has 24,000 claims in the

12  coverage years, based on our estimate, is about $27,000.

13          So, Mr. Anker says talk is cheap.  I think the

14  Hartford settlement is cheap and I will ask Mr. Anker right

15  now, how much is an anal penetration claim worth to Hartford?

16  How much is a masturbation claim worth to Hartford?  How much

17  is an oral sex claim worth to Hartford?  Is it worth more than

18  $27,000?

19          He should answer that question at some point when

20  he condemns the reasonableness of the Hartford settlement.

21          So, Ms. Lauria talks about trying to fit a square

22  peg into a round hole.  The last I tried to do that, I

23  couldn't, because their death trap proposal is just that.

24          We have a third way of billing and no one wants to

25  really give consideration to that.  They want to push everyone

1   to see if people will vote yes or no for a plan.  And Mr.

2   Molton and the coalition whose lawyers represent, according to

3   them, in excess of 60,000 people have said no.  The fiduciary

4   for the abuse survivors has said no and the future claims rep

5   has said no.

6           The Master Mortgage requirements for the plan, the

7   death trap plan that the debtors proposed requires, amongst

8   other things, overwhelming support.  Forget overwhelming

9   support.  There is overwhelming opposition.

10          And the Archdiocese of Minneapolis case, there were

11  competing plans.  The committee's plan garnered in excess of

12  90 percent support from survivors.  The archdiocese plan

13  garnered opposition of a life amount.  Judge Kressel was not

14  willing to do what Mr. Anker is encouraging you to do, which

15  is to cram-down, and refrigerating Ms. Ringer, as well, and

16  Mr. Mason and ultimately the debtor, is to cram-down the sex

17  abuse survivors.  He said, I'm not doing it.  They're asking

18  you to do something that no other judge has done in any of

19  these sex abuse cases.

20          Now, from the ones I've handled as committee

21  counsel, which is about three-quarters of it, they have all

22  been consensual.  I was not the attorney in the Minneapolis

23  case.  But that case ultimately turned out to be consensually

24  resolved, as well.

25          So, when I hear about chaos, this could devolve

1  into chaos, we are in chaos, folks.  Your Honor, I'm sorry, I

2  shouldn't have said folks.  We are in a chaotic situation.  I

3  have not, in a single one of the church abuse cases, whether I

4  was representing, except for the (indiscernible) case, that

5  we've had a situation like this with close to 100 disclosure

6  statement objections.  And Ms. Lauria has acknowledged that

7  their death trap Plan A will not be confirmed without the

8  overwhelming support of ours.  It's just not going to happen.

9          And I'll tell you, Judge, I understand people can

10 change their minds.  That's really what Mr. Anker was, I

11 think, in effect, saying, but we filed our objection to the

12 30-day extension on April 1st.  Not a single thing has changed

13 to convince survivors to change their minds.

14         So, what we do have is the prospect of confirming a

15 plan because JP Morgan and the creditors' committee cut a

16 deal.  A constituency of about $25 million (indiscernible) to

17 the PBGC, which we'll get to in a few minutes, that is going

18 to get paid north of 75 cents on the dollar, way in excess of

19 anything reasonably projected for the abuse survivors.  And

20 that's what this is going to -- that's how the Boy Scouts are

21 getting out of bankruptcy; by relying on a deal with its trade

22 creditors.  And we all know this case did not file because the

23 PBGC.  It did not file because of the Girl Scout litigation.

24 And it certainly did not file because of some vendor claims.

25         So, at the end of the day, the viability of the

1  debtors' plan depends on you being willing to cram-down on

2  84,000 people who suffered catastrophic abuse.

3          The debtor refers to the dark reality of this case,

4  the dark reality of this liquidity position.  That's not the

5  dark reality of this case.  The dark reality of this case is

6  that the debtor, after 15 months, has not been able to get any

7  survivor support.

8          And Ms. Lauria explains the timeline, but I sat --

9  or I was in your courtroom on the first day.  Mr. Mason came

10  forward and talked about how the local councils were going to

11  participate.  Participate?  Not even his council has committed

12  in public to their portion of $300 million, much less $425

13  million.

14          Counsel for the Church of Latter Day Saints

15  appeared.  They're filing oppositions to a proposed plan.

16  What has the debtor being doing with its target organizations?

17  What has the debtor been doing with its local councils over

18  the last 15 months?

19          I would submit that based on what we know about the

20  support for this plan, not very much.

21          The PBGC piece of this has become a bogeyman.  The

22  debtors' pension plan is fully funded.  It is overfunded.  The

23  debtors' plan proposed continuing to make $30 million a year

24  in contributions to that plan; some from BSA, the vast

25  majority of it from local councils, for monies that absolutely

1 are not needed to maintain the plan.  So, the notion that the

2 PBGC is going to pull the plug on the plan, frankly, we don't

3 see it.

4         MS. BURTON:  Your Honor, this is Cassandra Burton

5 from the PBGC.  That is grossly incorrect.

6         THE COURT:  Excuse me.  This is not a free-for-all.

7 Mr. Stang is speaking.

8         MS. BURTON:  Okay.

9         THE COURT:  Mr. Stang?

10         MR. STANG:  Thank you, Your Honor.

11         I'll put it this way, we believe that it's fully

12 funded and overfunded.  And maybe sometime we'll have an

13 evidentiary hearing on that, but Hartford's settlement is, as

14 Mr. Whitman testified, well, it certainly didn't include us.

15 We repeatedly -- we heard about it for the first time

16 (indiscernible) and even in contemplation when the mediators

17 said the (indiscernible) was filed.  And it's pretty clear

18 from what's been said about the problems with it and about

19 whether it's really illusory or not.

20         You have the Century, most favored nation clause.

21 There might -- as counsel pointed out, there might have to be

22 cross-examination.  There might have to be a whole

23 (indiscernible) of money by the trust to see what Century

24 does.

25         There's no treatment in the Hartford deal for

1  claims against local councils that are being channeled under
2  the Hartford deal.  You have local councils out there who have
3  exposure for claims.  They are not protected by the bar date.
4  Those claims may well be within the statute of limitations and
5  there's no explanation anywhere for how much of the Hartford's
6  $650 million is actually going to be available for claimants
7  as opposed to a reserve for those who have not yet shown up to
8  sue the local councils or in the context of direct action, to
9  sue Hartford.

10         And so, I don't know (indiscernible) 650 million, I
11  have no idea how much there actually is and, frankly, I don't
12  think they do either, because the future claims rep doesn't
13  even, Mr. Patton doesn't even represent those folks.  He
14  represents minors and people with repressed memories.

15         What are they going to do for the local councils
16  who want to have protection and not be bare because the
17  Hartford insurance policy has been brought back.  That number,
18  that 650 iceberg just keeps on shrinking and shrinking and
19  shrinking.

20         So, what are we proposing?

21         Death trap Plan B is apparently what the tort
22  claimants committee asked for.  Well, I guess if somebody had
23  bothered picking up the phone to really ask us about it, they
24  might have heard what the problem is.  This is the problem
25  with death trap Plan B.  And this was conferred to me by

1  debtors' counsel when we asked about it.  Boy Scouts get their
2  discharge.  They put in whatever they put in, this combination
3  of property and cash -- mostly property -- there's no backstop
4  for the value, by the way, it's kind of worth it is what it
5  is, and we'll get to that later I guess in (indiscernible).

6          And everyone can go to the local councils and can
7  go to the charter organizations.  The reason that there's a
8  death trap Plan B is if the settlement trust reached -- if the
9  litigation that proceeded after confirmation caused a local
10  council to come to the trust and say, can you get us a
11  channeling injunction, a post-confirmation channeling
12  injunction and protection from this litigation, here's enough
13  money to satisfy you, everyone agrees this is right amount of
14  money, can you get us protection, because we're saying uncle;
15  we've had enough.  We were clearly told by the Boy Scouts that
16  does not exist under death trap Plan B.

17          Now, can such a thing be done post-confirmation?

18          Well, Judge Drain did it the (indiscernible) case.
19  That plan provided for the trust to settle and provide
20  channeling injunctions post-confirmation, in fact, when a
21  creditor years later came forward and said, I should not be
22  governed by the channeling injunction that was given to one of
23  the Christian Brothers schools, Judge Drain overruled that
24  objection and said that approach worked.

25          So, what the Boy Scouts are saying to everyone is

1  take a bad deal, death trap Plan A, and take a really

2  (indiscernible) worse deal, which is you are (indiscernible),

3  if you will, to the tort system for the duration of your claim

4  with no ability by anyone to bring resolution for all

5  survivors, maybe all the local councils will come forward with

6  a proposal that really works or a charter reorganization that

7  wants to resolve the claims against it or an insurance

8  company.  That doesn't exist under death trap Plan B.  That's

9  the difference.  At a very high level, that's the difference.

10  We have had extensive negotiations with the coalition, with

11  Mr. Molton, Mr. Goodman, exchanging termsheets on filling in

12  the details, which means ground-level and 10,000 feet.  We can

13  do it, but not -- but death trap Plan B is not the solution.

14         So, at the end of the day, Judge, they're asking

15  you to cram-down on 84,000 survivors, paying sums that I think

16  anyone, not to be a professional claims evaluator, that anal

17  rape has got to be worth more than $27,000, and not a single

18  claim objection has been filed in this case, and I'm just

19  staggered by the suggestion that that settlement is reasonable

20  or that Century's settlement -- no, we won't get into that.

21         So, thank you, Your Honor.  That's the TCC's.  We

22  ask that you terminate the exclusivity and that you allow us

23  to pursue with our own plan of reorganization.

24         THE COURT:  Thank you.  Mr. Molton?

25         MR. MOLTON:  Yes.  Thank you, Judge.  I'm here for

1   the Coalition of Abused Scouts for Justice, as Your Honor

2   knows.  Our objection with the FCR is at docket number 2671

3   and in light of all the argument raised this morning and this

4   afternoon, and no need to repeat, but I want to hit on a few

5   really important themes that Mr. Stang raised and some of the

6   other people supporting the motion raised that I think need to

7   be addressed.

8           One of the factors, as Ms. Lauria said -- and I'll

9   get to her chaos factor at the end -- the existence of good

10  faith and reasonable progress in negotiations with creditors,

11  I don't think there's any doubt and nobody has disputed that

12  folks are working really hard.  I think that they're working

13  really hard through last hearing and I think they're working

14  really hard under daunting circumstances through this hearing.

15  But what's the result of that working hard?

16          We have two mediator statements which contain two

17  resolutions, neither of which has the approval, consent, let

18  alone the participation of what is the elephant in the room,

19  as Mr. Stang said, the 80,000-plus abuse survivors.

20          And I think Mr. Stang is correct in noting that in

21  a case like this, you know, to be talking about a cram-down by

22  general unsecured creditors of abuse survivors who have

23  suffered unbelievable harms and injury is not only incredible,

24  but something that I think no one can foresee would be a good

25  outcome here.  Clearly, Judge, that's going to be something

1  should we ever get there that we'll talk to you about.

2           The Coalition has been told by parties in this

3  case, and I think we understand it, that we hold a fulcrum

4  position in this case, and we've earnestly and in good faith

5  participated in the mediation thus far.  Using and tapping the

6  experience of our clients' state court lawyers, many of whom

7  have decades, decades of experience in resolving very complex

8  mass tort bankruptcies similar to this -- maybe not exactly on

9  point, but as complex -- and I'm referring to two going on

10 right now, Purdue and Mallinckrodt down the hall in Judge

11 Dorsey's courtroom, and the PG&E case out in California --

12 and, without invading mediation privilege, I think the

13 Coalition has been trying really hard to devise and offer

14 real, substantive and creative solutions to resolve this case

15 consensually this year, this year.

16          Last hearing, Judge, I confirmed the debtors'

17 statement to this Court that our participation was active and

18 remained vital, and that we remained hopeful.  Days later,

19 Judge, the Hartford deal was dropped on us.  And I can't

20 underestimate to this Court the damage that that deal that was

21 done, as now you heard, without the participation or consent

22 of any of the plaintiff survivor constituencies, the TCC, the

23 FCR, or the Coalition, the damage that it has wrought in this

24 case.  And to the extent that there's chaos in this case and

25 not movement along a track that we think could bring this case

1 to a resolution this year, arguably, that is perhaps the

2 principal reason right now that you're seeing this going on.

3    And I don't think it's fair to have alluded to,

4 yes, everybody was involved in talking at some point or

5 another in the mediation with or -- with Hartford or with

6 others about hosts of things, but I think it's also fair, as

7 the testimony that was given this morning unequivocally

8 states, that whatever those negotiations, the deal that was

9 done was done outside of the eyes, sight -- eyes or ears of

10 the plaintiff constituency. And it's a deal, Your Honor, as I

11 think Mr. Stang just alluded to, that not only damaged what we

12 were trying to do in the mediation, but compromised in a very

13 significant way one of the debtors' most valuable assets

14 without the consent of those who are the ultimate

15 beneficiaries of that.

16    And that brings me to an undeniable point of where

17 we are. The debtors' global plan, including the Hartford

18 settlement, as presently constituted is dead on arrival, and I

19 don't think Ms. Lauria is wrong in her saying that. It's not

20 supported by any survivor constituency. And as Mr. Stang

21 alluded to referencing, I think it was the Minneapolis case,

22 it's going to be voted down overwhelmingly by the BSA sexual

23 abuse survivors.

24    Why is this so damaging, Judge? Because

25 significantly what it signals to other insurers and

1  codefendant parties, the very ones that Mr. Stang talked about

2  who are out there and will be able to contribute to present a

3  meaningful pot of cash to these injured men, is if these co-

4  liable parties or liable parties or insurers are unhappy with

5  their mediation negotiations with the survivors -- and, yes,

6  it's a hard slog sometimes and, yes, it takes some time

7  sometimes -- they can simply walk away or walk down the hall

8  and cut a deal with the debtors that the debtors will place on

9  our laps.

10           That's why we're here, Your Honor.  And that's why

11  I'm going to -- you know, again, Mr. Anker made eloquent

12  arguments, but at the end of the day, yes, he's asking the

13  survivors here, 80,000 of them, to take, as Mr. Stang said,

14  less than 30,000 per claim in connection with Hartford and

15  about 15,000, if you look at the debtors' plan, 15,000 per

16  claim overall.

17           I'm going to talk about Mr. Schiavoni, to the

18  extent -- I'm not going to get into anything dealing with the

19  mediation conversations, but to the extent that there was any

20  suggestion that our group didn't meet with him, that's not

21  true.  To the extent that there's a suggestion that we're not

22  talking to him, that's not true.  And, put it this way, I

23  found his statement that no demand had been served on him to

24  date by any party slightly interesting, and he'll know why

25  that is.

1    In any event, Judge, you also heard Ms. Lauria go

2   on about insurance neutrality, and I understand Your Honor's

3   mention on it and I'm not going to spend too much time on it,

4   if at all, to the extent it comes up later, and I'm glad Your

5   Honor marked out it as an issue.  Simply, suffice it to say, I

6   think Ms. Lauria protests too much.  I don't think there's

7   anything in the bankruptcy code or indeed in -- under the

8   Federal Rules of Civil Procedure that mandate that a mass tort

9   plan must exempt a specific participating party from whatever

10  effects the Court's orders have, but that we'll deal with in

11  another day.

12    The toggle plan I think also is one that Mr. Stang

13  described as death trap II, and he gave some reasons why, but

14  I'm going to give another reason why.  We don't credit it, we

15  don't credit that Boy Scouts even wants to go there, even

16  though at the end of the day it will be, again, cramming down

17  80,000 abuse survivors by way of the GUC claims and the

18  general unsecured creditor claims voting their relative de

19  minimis claims in this case.  But that toggle plan creates the

20  very nightmare for Boy Scouts that Ms. Lauria from day one has

21  said they cannot survive.  It creates continued litigation in

22  the state court against chartered organizations and local

23  counsel, it creates a threat of in seriatim bankruptcies or

24  insolvencies or liquidations by those entities, and it

25  continues the narrative that has so affected the Boy Scouts'

bottom line, which is taking me back to the very beginning of
my presentation, Your Honor.

Some of what we have been attempting to stop by
offering Boy Scouts in some way or another ideas, you know, as
to how they can get out of this year, as you consider
exclusivity and the TCC's and our and the FCR's objections
thereto, I want Your Honor to consider a few things. And here
I'm going to get (indiscernible) to chaos. We're wasting
precious time and precious resources going through this
endeavor. Your Honor, we're going to have hundreds of people
going through doing a page-turn on the disclosure statement,
on a global plan that can't be a confirmed, on a toggle plan
that I submit can't be confirmed and, in any event, that Boy
Scouts can't exist with. And we've been told, I read
somewhere in some of the papers, maybe it was in the
declaration submitted on behalf of the exclusivity motion,
that the delta of professional fees through confirmation on
this is $15 million additional that could be money well spent
on getting to a consensual plan and using the remaining money
to send to survivors.

My friend Mr. Anker talks about tilting at
windmills, that's exactly what he's asking Your Honor to force
the hundreds of people on this call to do if we're going to be
going forward down this path, we're going to be tilting at
windmills at plans, proposed plans that has no creditor

1    support, creditor survivor support.

2            Judge, I think Mr. Stang referred to Minneapolis

3    and I'm going to refer to PG&E, chaos.  I think the PG&E case

4    is an interesting analogy, although very different, albeit it

5    has over 70,000 claimants with various degrees of harm, it

6    involves some of the most complex issues of any bankruptcy

7    that I've seen.  And what happened in both those cases,

8    according to Mr. Stang in Minneapolis and here, is that their

9    (indiscernible) exclusivity was -- was ended.  And what

10   happened in PG&E, Your Honor, is that broke through the

11   logjams with the debtor and resulted in a debtor plan that won

12   over fire victim consent.

13           So to the extent we're sitting here at a logjam and

14   I submit to you, with everything that's been put in front of

15   you -- and I questioned this weekend when the 18-wheel trailer

16   filled with binders came to your chambers or your house,

17   Judge, what your house must have -- what Your Honor must have

18   though when you saw those reams and reams of paper.  We are at

19   a precipice; we are at a very delicate time.  What Judge

20   Montali's decision to remove exclusivity did is prevent

21   competition, competition that finally broke through and led to

22   deals that were acceptable to the elephants in that room, the

23   fire victims.

24           I submit, Your Honor, whether you call it chaos or

25   you call it the marketplace, you know, to use a reference back

1   to one of my favorite shows, Game of Thrones, chaos in this

2   case can be a ladder.  And I submit to you, Your Honor, from

3   our perspective with, again, from day one, our sleeves rolled

4   up and us engaging, engaging, we're here.  Thinking, creating,

5   trying to come up with alternatives that Your Honor can help,

6   help this case by doing exactly what Mr. Stang has asked for

7   and we have asked for, and which the FCR has joined us in

8   asking for, is help us break through this logjam in order to

9   get to a place where we think the survivors need to be and Boy

10  Scouts needs to be.

11          And that's my presentation, Judge.  If you have any

12  questions, I'll answer them.

13          THE COURT:  What in your view has the fact that

14  there's been exclusivity in place prevented a consensual plan

15  from happening?

16          MR. MOLTON:  Judge, I'm not going to give up on

17  mediation.  I'll give you my two cents' worth, for what it's

18  worth.  I think as long as debtors believe that they control

19  the train track, so to say, to confirmation, and control what

20  trains are on the train track, there's things that are for

21  whatever reason and some of which is in -- just inexplicable

22  to me, are preventing breakthroughs on issues that we think

23  should be relatively simple.

24          So, from my perspective, Your Honor, introducing

25  competition and a threat of us and the TCC actually coming up

1   with a plan that would be supported by an overwhelming vote of

2   survivors might move them and perhaps others in a way that

3   brings us all together, so we can be here, Judge, on a joint

4   consensual plan in which the TCC, the Coalition, as well as

5   the FCR support and in which all the other advocates of the

6   exclusivity motion can be with us on as well.

7           MR. STANG:  Your Honor, from our perspective, it's

8   keeping us from effectively communicating and negotiating

9   with, at a minimum, the local councils, the Boy Scouts -- in

10  the sense that the Boy Scouts are protecting them.  There are

11  things that -- hammers and levers and they'll call it leverage

12  -- that could be brought to bear on the local councils that

13  the Boy Scouts simply aren't doing.  And our perspective on

14  this is the way to get reasonable compensation from the local

15  councils, from the chartered organizations, from the insurance

16  companies is to expose them to the risk of judgments that

17  reflect the real value of these claims.

18          Now, that's not -- I don't know if everyone is

19  going to want to litigate, but right now what's happening is

20  they're all protected and, from our perspective, the Boy

21  Scouts -- certainly the death trap plan A continues those

22  protections for an inadequate dollar amount.  And death trap

23  plan B does give us what we want in that sense, but it's -- it

24  creates -- it does not give survivors an opportunity to try to

25  resolve issues on anything other than a creditor-by-creditor

1  basis.

2          THE COURT:  But what pressure, what more pressure

3  could the local councils want than the BSA toggle plan?  What

4  more pressure could you put on the local councils than the BSA

5  toggle plan?

6          MR. STANG:  Death trap plan B puts that pressure

7  on, but it doesn't give survivors an opportunity to try to

8  resolve this case other than on a creditor-by-creditor basis.

9  And they know that, they absolutely know it.  What they're

10 telling survivors is you are sentenced in perpetuity to

11 litigate your individual claims unless you take our bad deal,

12 which is death trap plan A.  I was specifically told that

13 death trap plan B has no provision for post-confirmation

14 resolution.

15         And, Your Honor, I mentioned Christian Brothers.

16 One of my partners emailed me and said that -- I believe it's

17 (indiscernible) Insulation had a post-confirmation channeling

18 injunction opportunity as well.  It's not unheard of, but they

19 don't want that because they're trying to force us into death

20 trap plan A, which is inadequate consideration.

21         THE COURT:  Thank you.

22         Mr. Harron?

23         MR. HARRON:  Thank you, Your Honor.  For the

24 record, Ed Harron on behalf of the Future Claimants group.

25         Your Honor, we jointly objected with the Coalition

1  to exclusivity.  And first I'd like to adopt the comments made

2  by Mr. Molton and Mr. Stang, for the record, and I can be

3  brief.

4         It's unusual for the FCR to oppose exclusivity in

5  mass tort cases, in my experience.  It's equally unusual for

6  the company to go out with a plan that doesn't have any

7  claimant support.  And it's that tension that caused us to

8  object to exclusivity in the first place.

9         It's our view and we think it's evidenced by the

10  plan that contrary to all the reasons they gave when they

11  filed the case the Scouts have actually put the interests of

12  the survivors last.  And I'll talk about it much more when we

13  get to the disclosure statement, but we think the toggle plan

14  is a perfect example.  We view the toggle plan as a form of

15  coercion, intimidation.  It's meant to influence claimants to

16  vote for plan A or risk the uncertain outcome of being forced

17  into a trust with limited funding and no ability to access

18  insurance.  We don't think it's confirmable on its face, but

19  we don't think it's appropriate to even be included in

20  solicitation materials.

21         But that combined with the fact that they're

22  prepared to solicit a plan that has no commitment from the

23  councils for funding, no commitment from the chartered

24  organizations for funding, although it purports to provide

25  third party releases to all those parties, the only settlement

1  that they've reached that increases the funding for the trust

2  is the settlement with Hartford, and we actually believe that

3  settlement is prejudicial to the survivors for the reasons

4  already discussed.

5           We believe there's a better way and we'll discuss

6  it in more detail when we get to the disclosure statement, but

7  we believed all along that the fulcrum issue here is the

8  legitimacy and value of the claims.  Their plan process makes

9  no effort to resolve that issue.  We think that you address

10  that issue first and, by addressing that issue, you reach

11  settlements with the third parties, because those settlements

12  are informed by the magnitude of the liability.

13           Their whole plan process is based on a premise of

14  emerging promptly.  Again, I'll talk about it more when we get

15  to the disclosure statement, but we don't believe that they

16  have positioned themselves in a manner that will allow them to

17  emerge any time in the near future.

18           For these reasons and the reasons in our papers,

19  and those set forth by Mr. Molton and Mr. Stang, we're

20  opposing exclusivity.

21           THE COURT:  Thank you.

22           Is there anyone I haven't heard from yet who wishes

23  to address the Court?

24           MS. BURTON:  Your Honor, this is Cassandra Burton

25  from the PBGC, if I may speak about our claims?

1          THE COURT:  You may since they were raised.

2          MS. BURTON:  Mr. Stang -- I just want to mention

3  that Mr. Stang represented that the plan is over-funded, it is

4  not the case.  The plan is only 57 percent funded -- the plan

5  of -- the pension plan is only 57 percent funded and under

6  sort of both the toggle plans of reorganization, the Boy

7  Scouts of America only intends to continue to fund the pension

8  plan.  So it's nothing in and above that; it's not that it's

9  fully funded or over-funded, it's nowhere near that.

10          That's all I wanted to say.

11          THE COURT:  Thank you.  Anyone else?

12          Ms. Lauria.

13          MS. LAURIA:  Thank you, Your Honor.  Again, Jessica

14  Lauria, White & Case, for the record.  I'm going to be brief

15  because I think there's only one really issue that was raised

16  by the objecting parties that goes directly to the inquiry

17  before the Court on exclusivity and that is, what are the

18  alternatives?

19          We've heard from Mr. Molton that they've rolled up

20  their sleeves, they're working hard, they're talking to the

21  TCC, they're talking to the FCR, but I think it's very telling

22  that the plaintiffs' side of the ledger, the plaintiff groups

23  themselves can't even agree to a plan of reorganization among

24  themselves to present to the Court today, Your Honor.  They

25  haven't come here with some magic silver bullet to get

1   commitments from the local councils in excess of 425 million,

2   they haven't come here with some magic silver bullet to

3   increase the Hartford contribution; they haven't come here

4   with any contours around an alternative plan of reorganization

5   for the Boy Scouts of America beyond what Mr. Stang said.  And

6   I give him a lot of credit, he actually came forward with

7   ideas for what you could do to a plan of reorganization that

8   might actually work here.

9           The flaw with Mr. Stang's position is that while

10  they -- what apparently the plaintiff said is, reject the

11  channeling injunction in the context of our bankruptcy case,

12  once they're in the tort system, apparently, and they've

13  driven the local council to the point where it needs to file

14  bankruptcy, it wants the ability to settle with the local

15  council and bolt that onto our bankruptcy proceeding.  I don't

16  know that that's something that Your Honor would approve.

17          As I said to Mr. Stang, because I think he quoted

18  me twice in his remarks, that's not in the plan that's on the

19  table, but that's not because we're foreclosed from hearing

20  more about that idea and actually modifying the BSA toggle

21  plan to put it on the table.  We've never said to the parties

22  that we wouldn't consider some sort of post-confirmation

23  (indiscernible) what we have said is that we didn't know that

24  Your Honor would find that acceptable and we needed to

25  understand the contours of it.

1        So, again, as we sit here today and we're sitting
2    on that tipping point, we have a plan and a disclosure
3    statement that are ready to go out -- by the way, they're
4    ready to go out regardless of how you rule on this motion,
5    we're ready to proceed with respect to the plan and disclosure
6    statement.

7        And we've got a lot of suggestions on the other
8    side that they think they could come up with a plan that might
9    possibly get us out in 2021, but they haven't been able to
10   agree amongst themselves on their own side.  And it may
11   actually help Your Honor understand why we don't have a
12   plaintiffs' agreement on our side when they can't even reach
13   agreement amongst themselves.  But all we've heard is that
14   they're talking about a plan that could possibly get BSA out
15   in 2021 and we haven't heard any details around that plan; we
16   don't know what that looks like, we don't know if it
17   implicates the insurance neutrality issues that I mentioned at
18   the outset, I suspect it does, otherwise it would have been a
19   central feature in their exclusivity pleadings.

20       But with that, Your Honor, I think the only
21   evidence before the Court and the weight of the evidence
22   before the Court is that cause exists to extend the debtors'
23   exclusivity.

24           THE COURT:  Thank you.

25           MR. STANG:  Your Honor, may I respond to what Ms.

1  Lauria just said and only what she said?

2          THE COURT:  Okay.

3          MR. STANG:  She doesn't sit in the rooms -- in the

4  room with me and Mr. Molton, or Mr. Lucas and Mr. Goodman or

5  Ms. Grassgreen.  We have the outlines, I would say detailed

6  outlines, of a term sheet between the Coalition and the tort

7  claimants' committee, and while Mr. Molton and I haven't

8  discussed this and I'm just watching him to see how his eyes

9  react, we'll have a plan on file in two weeks.

10      (Pause)

11          MR. STANG:  All right, he hasn't said okay, Judge.

12          MR. MOLTON:  Was that a question, Mr. Stang?

13          MR. STANG:  Not really.

14          MR. MOLTON:  Well --

15          THE COURT:  Okay.

16          MR. STANG:  No, it was a statement.

17          MR. MOLTON:  Listen, yeah, if exclusivity is taken

18  away, you know, we're willing to work in post haste along the

19  discussions we have had to get a proposal on file.

20          THE COURT:  Okay.

21      (Pause)

22          THE COURT:  I'm going to take a break.  We're going

23  to have a recess for the hearing.  It's 1:52 and even with the

24  break -- or with the late start we've been going for a few

25  hours.

1    So we're going to reconvene at 2:45 Eastern and

2 I'll decide what we're going forward with next and how we're -

3 - and whether I'm addressing this at the moment or we're going

4 to address some other things first.  So we're in recess until

5 2:45 --

6    MR. STANG:  Your Honor --

7    THE COURT:  -- Eastern.

8    MR. STANG:  -- Your Honor, can we leave and come

9 back onto the Zoom or is there --

10    THE COURT:  I have no idea how that works.  I'm

11 just going to --

12    MR. STANG:  Leave it on?

13    THE COURT:  -- mute and take my video off.  So with

14 the way --

15    MR. STANG:  Okay.

16    THE COURT:  -- things have been going today, I

17 wouldn't take a big chance on that.

18    MR. STANG:  I agree.  Thank you.

19    THE COURT:  Thank you.

20    (Proceedings recessed at 1:54 p.m.)

21    (Proceedings resume at 2:51 p.m.)

22    THE COURT:  This is Judge Silverstein.  I'm ready

23 to begin.

24    (Pause in proceedings)

25    THE COURT:  Okay.  So to say that this case is

1  challenging is an understatement.  It has the significant

2  complicating issues of being a nonprofit, there being 252

3  local councils, there being -- if I have the number right in

4  my notes -- 41,000 chartered organizations sponsoring 50,000

5  local scouting units.  And I don't have the number in front of

6  me, there was a chart in, I think, one of the objections.  And

7  I think there are over 700,000 active Boy Scouts.

8         This is not a for-profit corporation.  It's -- the

9  debtors' mission is charitable, philanthropic, and larger than

10 the mission, if you will, of a for-profit.  And the parties,

11 and eventually the Court, will have to balance all of those

12 interests.  In the first instance, of course, it's for the

13 parties to do so and to come to a resolution that is the best

14 under very difficult circumstances.

15        This case also has other -- or "attendant" is

16 probably a better word -- attendant complicated legal issues

17 dealing with what property is available to satisfy claims and

18 what isn't; that property owned by the Boy Scouts, that

19 property owned by local councils, if the local councils are

20 going to be involved; and regular, more routine challenging

21 bankruptcy issues.

22        I would like to hear some of the other motions

23 before I decide that one.  I think many of them are of a piece

24 as to where things go.  I will say to solicit a plan that has

25 no abuse survivor support is not an attractive option, but

1  neither is engaging in protracted litigation that has the

2  potential to -- has the potential to end the Boy Scouts as it

3  currently exists.

4          So I want to hear how some of these other motions

5  factor into time lines and where we go.  The parties may have

6  given this some thought; I have, but I am not sure, quite

7  frankly, how some of it dovetails with a confirmation hearing

8  and a time line for a confirmation hearing.  So, before I rule

9  on exclusivity, as I said, I want to hear some of these other

10 motions.

11         And I want to start -- I want to start with the

12 certification of counsel that was submitted with respect to

13 the adversary proceeding, number -- I'm not sure it has a

14 number.  It's at the end of the agenda.

15         MS. LAURIA:  Your Honor, this is Jessica Lauria.

16 Are you speaking with respect to the restated property

17 adversary proceeding that was commenced -- thank you, Your

18 Honor.

19         THE COURT:  Yes.

20         MS. LAURIA:  Just so you're aware, my partner

21 Andrew Hammond, who is hopefully in Zoom land -- I'm looking

22 for him -- is handling that matter.  And obviously, it's the

23 TCC and FCR's adversary.

24         MR. LUCAS:  Yes.  And Your Honor, this is Ken

25 Lucas.  My partner Ken Brown is handling that litigation.  And

1  we were trying to avoid having too many Pachulski attorneys on

2  this call and I am arranging -- he has a Zoom log-in, and so I

3  am getting him on here right now.

4          THE COURT:  Thank you.

5          MR. HAMMOND:  Good afternoon, Your Honor.  This is

6  Andrew Hammond.  I'm here, so (indiscernible)

7          THE COURT:  Mr. Hammond, I received a scheduling

8  order, an agreed-to scheduling order with respect to this

9  adversary, that provides that the soonest this trial would be

10 heard is sometime in November, which is currently --

11         MR. HAMMOND:  Your Honor --

12         THE COURT:  -- currently after the end of summer

13 confirmation hearing that the debtors would like.  How does

14 this dovetail, in your view, with confirmation?

15         MR. HAMMOND:  I apologize, Your Honor.  I think, if

16 we go to ECF 24-1 --

17         THE COURT:  24-1.  Okay.  I don't have that.

18         MR. HAMMOND:  Yeah.  So --

19         THE COURT:  So can you tell me what that says?

20         MR. HAMMOND:  That is actually the schedule that we

21 have proposed, which dovetails with the confirmation hearing.

22 So I apologize if the filing was confused.  But there is an

23 attachment and it is -- to the schedule, which sets forth our

24 proposed schedule for the adversary proceeding, which

25 dovetails with confirmation; it's the last page, it's Page 4.

1          THE COURT: Okay. Okay. So mayge that answers the

2   question. I don't have that. So the schedule I'm looking at

3   that was filed on the -- May 14th --

4          MR. HAMMOND: (Indiscernible)

5          THE COURT: -- that's incorrect?

6          MR. HAMMOND: That was filed on?

7          THE COURT: May 14th.

8          MR. HAMMOND: Your Honor (indiscernible) --

9          MR. LUCAS: Your Honor --

10         MR. HAMMOND: The TCC --

11         MR. LUCAS: Your Honor --

12         MR. HAMMOND: I'm sorry. The TCC filed that.

13         MR. LUCAS: Yeah, yeah, Mr. Hammond, here -- so,

14  Your Honor, I'm -- this is John Lucas again, counsel for the

15  tort claimants committee. As I said, my partner Ken Brown is

16  dialing in right now.

17         On May 14, at Docket Number 21, the tort claimants

18  committee filed a certification of counsel regarding its

19  proposed scheduling order; and so, yes, that is the scheduling

20  order that the TCC filed. And Mr. Hammond, on behalf of BSA,

21  filed a competing schedule, I believe what he referenced, at

22  Docket 24.

23         THE COURT: Okay. I don't have that. Okay. Okay.

24         MR. HAMMOND: Well, I apologize --

25         THE COURT: Okay. So the --

1          MR. HAMMOND:  -- Your Honor.

2          THE COURT:  -- parties don't agree.

3          MR. HAMMOND:  But -- the parties don't agree, Your

4   Honor.  I think, you know, at the end of the day, you know,

5   it's -- we think that this probably falls where the

6   confirmation hearing falls.  And if the confirmation hearing

7   is scheduled in August, we believe the property of the estate

8   hearing should be scheduled for August, but ... and it should

9   be conducted jointly.

10          THE COURT:  Okay.  So is --

11          MR. HAMMOND:  But I'll wait, I'll wait for Mr.

12  Brown.  I don't want to take their time now --

13          THE COURT:  No, I'm going to --

14          MR. HAMMOND:  -- unless you (indiscernible)

15          THE COURT:  I'm going to wait for Mr. Brown because

16  I think this has to -- this is my question, is:  How does this

17  proceeding -- what do people envision happening with this

18  proceeding, in terms of its necessity to be decided before or

19  in connection with confirmation.  That's the question I have.

20          MS. LAURIA:  Your Honor, this is Jessica Lauria.

21  While we're waiting for Mr. Brown to join, Mr. Hammond

22  articulated, I think, exactly where the debtor is at.  We've

23  heard from the TCC that they believe the resolution of the

24  restricted asset issues is a precondition -- I think, in their

25  disclosure statement, they may have even said a precondition

1  to even soliciting the plan.

2        From the debtors' perspective, both this issue and

3  the JPMorgan issue -- which is another item on your agenda for

4  today, the standing motion related to JPMorgan, I think it's

5  Item 4, if I'm not mistaken -- those issues are all wrapped up

6  into what is being achieved through the plan of

7  reorganization.

8        When we proposed the schedule in connection with

9  the confirmation scheduling motion -- which I think is around

10 Docket 7 -- one of the gating issues for that, whether or not

11 the parties would be pursuing an insurance binding estimation

12 as I had referenced in my exclusivity remarks and as is the

13 subject of Docket Number 5, or if we're just pursuing an

14 estimation for purposes of assisting Your Honor with working

15 through the 1129 factors.

16       So we've got a couple of issues, loose ends, as

17 you've, you know, put your finger on, in terms of scheduling.

18 We've got what is the estimation (indiscernible) look like,

19 what do we need to do with the respect to the restricted

20 assets, and what needs to happen with respect to the JPMorgan

21 adversary.

22       From the debtors' perspective, I think you know and

23 all of the parties are very well aware of our perspective on

24 the time lines.  And to the extent a party believes that these

25 individuals -- or these individual issues must be dealt with

1  in order to confirm the plan, then we would like everything on

2  the same plan confirmation track.  And that's what's reflected

3  in the docket number that Mr. Hammond referenced in connection

4  with the restricted asset dispute.

5        MR. LUCAS:  And Your Honor, Mr. Brown, my partner

6  Ken Brown, is here.  I apologize for the delay and a little

7  bit of the hiccup there, but ...

8        And so, Mr. Brown, they were talking sort of about

9  the competing schedules and, you know --

10        MR. BROWN:  Mr. Lucas, actually, I've been

11  listening, even though I haven't been visible, so ...

12        Your Honor, may I be heard?

13        THE COURT:  Please.

14        MR. BROWN:  So, you know, I've been trying not to

15  be hyperbolic here.  But I have been tasked on the -- on

16  behalf of the TCC, as I think Mr. Hammond has and as you will

17  be, on the assumption that the restricted asset litigation

18  does not get settled, that we don't have a consensual plan,

19  that we have a contested plan, to litigate the issue of what

20  is the debtors' property.

21        This is a mind-numbingly fact-intensive, complex,

22  and time-consuming issue.  In our papers, I believe it was in

23  the opposition to the debtors' confirmation scheduling motion,

24  we have a small section dealing with the debtors' attempt to

25  superimpose its plan confirmation schedule on the restricted

1 asset adversary proceeding, and why that is, at the very

2 least, unrealistic.  I think, more accurately, it's

3 delusional.

4         And the reason is, I -- there's a very, very

5 informative opinion or two, a set of opinions by Judge

6 Sontchi, in the Diocese of Wilmington case.  I was the lead

7 litigator on that case.  That involved one account,

8 essentially, whether or not that account was property of the

9 estate because the Diocese said -- advanced and the parishes,

10 it was held in trust; or whether, as the committee advanced,

11 no, it wasn't held in trust; or, if it was held in trust, that

12 the debtor and the parishes had not either -- they hadn't met

13 their burden.

14         And Judg Sontchi says you have two burdens here.

15 The first burden, if you want to show something is not

16 property of the estate that is titled to the debtor; i.e.,

17 held in trust or restricted, the first burden, the first part

18 of the double burden is you have to show that that money has -

19 - you have to identify your (indiscernible) you have to show

20 that money from the date of donation to the present day was in

21 a segregated account, it wasn't mushed in with other non-trust

22 or non-restricted money.

23         If you can't do that, the law provides a legal

24 fiction called the "lowest intermediate balance test."  And

25 so, when cash is traced, when cash is commingled, you can get

1  the benefit, the debtor gets the benefit of this legal

2  fiction.  So, when money that they say is restricted went into

3  a commingled fund, they can still show that that money retains

4  its character as a restricted or trust asset, as long as they

5  can prove that the balance of the commingled account it went

6  into never went below the trust balance.  We did about a year

7  of discovery and five days of trial in front of Judge Sontchi

8  on that one issue, which, of course, the debtors and the

9  parishes lost on because they could not meet their double

10  burden.

11           Here, we have eight cash accounts, one commingled

12  account and -- I'm sorry, one commingled -- it's called a

13  "commingled endowment fund," $80 million at stake in the

14  commingled endowmenf fund, $40 million at stake in the cash

15  accounts.  We know that some of those accounts have been

16  commingled or cash has gone into commingled accounts and then

17  into those accounts.

18           We have been begging, begging, Your Honor -- and I

19  don't say that lightly -- show us, show us the flow of funds

20  because, if you do, if you show proof of restriction or proof

21  of a trust and that this went into -- from the date you got

22  it, into a co -- into a segregated account, I've been through

23  this drill before, we're not going to contest you on that.

24  And I said we can't -- until we know what you're going to do -

25  - are you going to meet the burden, the double burden Judge

1  Sontchi says you have to meet, or are you going to try to

2  convince Your Honor that you don't have to meet it?  I can't

3  get anything from them on this, so we have no idea where this

4  litigation is heading.

5      But I can tell you that the scheduling order that I

6  submitted, pursuant to local rule on Friday, which I thought

7  was absolutely the most aggressive that any of us could

8  realistically deal with, allows for, you know, discovery.  It

9  allows for expert reports and depositions after discovery

10  closes.  It allows for sum -- importantly, summary judgment on

11  this issue of can they -- do they have to meet their burden or

12  can they meet their burden.

13      What they have submitted, what they submitted to

14  you, I believe it was on Monday, their competing order, which

15  just superimposes this working backwards plan schedule, which

16  we have to get this done by August, just for starters, expert

17  reports are due a month before fact discovery closes.  There's

18  -- you know, there's lip service given to summary judgment,

19  but there is no time for the parties to brief, for the Court

20  to hear and resolve summary judgments before there would be

21  the hearing that they want to have at the end of August.  It

22  is -- the local rules, the national rules are ignored in terms

23  of briefing schedules.  It is so painfully and unrealistically

24  compressed that I think it's going to leave all of us, if we

25  don't settle this, if we have to litigate it, in just a world

1  of hurt.  That's just as a practical matter.

2           But more importantly, it doesn't even pretend to

3  give due process to the survivors in getting the chance to see

4  what the debtor is going to do with this.  How are they going

5  to -- how in the world are they going to go back from date of

6  inception on hundreds, if not thousands of donations, and meet

7  their burden to show, yep, we put them in a segregated account

8  and we haven't moved them; or, if they haven't done that, then

9  show -- meet the lowest intermediate balance test for every

10 account they came out of.  We've got a right to see that

11 before we have to try it.

12          And frankly, Your Honor, what we can do, if we have

13 the time to review what the debtor is going to do here to meet

14 its burden, we can take a whole bunch of this off of your

15 plate, which is the only way we're ever going to get through

16 this.  But until we get the information and we have it -- and

17 we've been asking -- we're not going anywhere on this.  And to

18 think that this is going to be resolved on their working

19 backward from the end of August date is beyond unreasonable

20 and unrealistic.

21          MR. HAMMOND:  Your Honor, may I respond?

22          THE COURT:  Mr. Hammond.

23          MR. HAMMOND:  Andrew Hammond from White & Case on

24 behalf of the Boy Scouts of America.

25          Your Honor, as acknowledged in the disclosure

1  statement objections, you know, the issue of the property of
2  the estate runs together with the issue of plan confirmation.
3  And in our view, we acknowledge it's an aggressive schedule,
4  but we believe that the schedule is doable on the time frames
5  allowed.

6          Now Mr. Brown has indicated that, you know, he's
7  been begging for information and what have you.  I think it's
8  important to recognize here that a substantial portion of the
9  information that will be relevant and will be used in
10 connection with the adversary proceeding has already been
11 produced.  I'm not saying that all of the information has been
12 produced in connection with this matter, but a substantial
13 portion has been produced, has been made available, has been
14 reviewed, has been analyzed by, not only the TCC, but also its
15 advisors.

16         So, while we do agree it's an aggressive schedule,
17 Your Honor, in our view, we believe it's a doable schedule.
18 We believe it's a schedule that should be -- you know, the
19 parties will work quickly, they'll work, you know, as fast as
20 we can.  I think we will -- you know, from my conversations
21 with Mr. Brown, we can work cooperatively.

22         I believe we you take a number of issues that are
23 raised in the adversary proceeding off the table via
24 stipulation because the relationship, in our view, between the
25 property of the estate litigation and the plan confirmation

1  hearing really rests on the issue of the liquidation analysis.

2  And so, if we've included debt -- assets in the liquidation

3  analysis, it seems to us there's really no need to have that

4  issue decided for purposes of the confirmation hearing.

5          So we think that there's -- there could be a

6  substantial narrowing of the issues that will be presented to

7  the Court, in connection with the adversary proceeding.  And

8  we believe that we can do it on the time frame that's set

9  forth for plan confirmation.  Now it may be, if we need a day

10  or two more for trial to litigate these issues, that is

11  possible.  I mean, we'll see when we get there at plan

12  confirmation.  But we believe that -- in our view, that this

13  can be done -- can be done in that time frame.

14          THE COURT:  Mr. Hammond, I'm confused and maybe I

15  misheard.  But I think you said that some of these issues are

16  subsumed in the liquidation analysis, and therefore, wouldn't

17  have to be decided at confirmation.

18          MR. HAMMOND:  Right.  Your Honor, I think, for

19  brevity's sake, I think, in the liquidation analysis, we've

20  included certain assets that they are challenging as property

21  of the estate.  And because those assets are included in the

22  liquidation analysis, I don't think we need to litigate that

23  or resolve those issues for purposes of adjudicating plan

24  confirmation.

25          THE COURT:  Okay.  And certain of the assets that

1  are at issue in the complaint are not part of -- not included

2  in the liquidation analysis?

3          MR. HAMMOND:  That's right, Your Honor.  I think,

4  in our view, the two biggest items that we would need to

5  litigate for purposes of plan confirmation at this point in

6  time are there are eight bank accounts.  And there is the --

7  what the TCC referred to as the "commingled endowment fund,"

8  which is actually a limited partnership interest that is held

9  by the BSA.  So it's not like the BSA has a direct interest in

10 a commingled endowment.  The BSA hones -- holds limited

11 partnership shares, and those shares are allocated amongst

12 various sub-funds that are restricted.  So this is not like

13 the Wilmington case in that respect.

14         THE COURT:  And those -- the eight bank accounts

15 and the commingled investment account are not included in the

16 liquidation analysis.

17         MR. HAMMOND:  Well, they're deemed to be restricted

18 property.  And so I think, at the end of the day, they

19 wouldn't be distributed to unsecured creditors; and,

20 therefore, I think that issue would need to be decided for

21 purposes of confirmation.

22         THE COURT:  Okay.

23         MR. BROWN:  Your Honor?  A few additional comments,

24 if I may.

25         THE COURT:  Mr. Brown.

1            MR. BROWN:  So there's just a couple of things, I

2       think, that are very important for you to understand.  The

3       debtors' statement to you that they have produced all these

4       documents, lots of documents have been produced in mediation.

5       No documents or nothing material has been produced on the

6       issue that I was sensitizing -- trying to sensitize you to,

7       which is, gee, was this money segregated from the time it was

8       received, or, if not, can you trace, nothing, nada.

9            They've produced a lot of stuff purporting to

10      support, oh, here's the will that says we want this money to

11      be used for a particular purpose but here's the letter.  But

12      that's only half of their burden.  That's the burden that

13      says, yes, this money is to be used for a particular purpose.

14      The second part -- which is the much, much, much more

15      important part -- is:  What's the flow of this money?  Nothing

16      has been produced.  That is all in front of us.

17            Okay.  Narrowing the issues.  I sent, probably a

18      week and a half ago, a very detailed letter with a view

19      towards, gee, can we narrow these issues, take some of this

20      stuff off the table, here's what we'll need to do it.  No

21      response.  So I have tried desperately to get this thing

22      launched and narrowed and the debtor is not responding.  They

23      are on the -- out of one side of their mouth, they are saying

24      this has to be done immediately, which completely jams us.

25      And out of the other side of the mouth, they are not doing

1  what they must do in order to make that happen.

2  This notion that, oh, the commingled endowment

3  fund, which is $80 million at issue, that they say it's titled

4  -- just keep in mind what they're trying to do here, also --

5  it's titled to us, we're not disputing that it's titled to us,

6  but some years ago, we took all this money and we transferred

7  it to a limited partnership and, in exchange, we got limited

8  partner units, so, because we did that and now we have units

9  in this fund, rather than actually own the fund itself, we're

10 no longer in Judge Sontchi land in Wilmington, we've cleansed

11 it, so we don't have to, any longer, show that this money was

12 -- you know, is -- was always segregated or have to trace it

13 because we cleansed it by transferring it several years ago to

14 a limited partnership and taking units in return.  Quite

15 frankly, Your Honor -- and again, I don't want to be

16 hyperbolic, but it's preposterous.  If you could do that,

17 there would never be any requirement for identifying your

18 trust (indiscernible) and tracing your assets.  Everybody

19 would just transfer it to a limited partnership.  So this is

20 Wilmington, that is what we're facing here, Your Honor, is the

21 burden and the factual intensity that was required in that

22 case.

23 So, you know, again -- and if -- I mean, if you

24 want, I can -- their proposal for doing this, their time frame

25 that doesn't -- it doesn't provide for third-party subpoenas,

1 it doesn't provide any time for resolving discovery disputes.

2 It provides that expert reports are due 5 days after BSA is

3 required to produce all the documents it's going to produce, 5

4 days. And then it requires those reports to be done 30 days

5 prior to the close of fact discovery. There is no room here

6 for Your Honor to resolve the key legal issue in this case in

7 time for the parties not to have to go through the expense and

8 the brain damage of preparing for what is going to be a very

9 complicated trial.

10 Now I do want to narrow the issues, I've tried to

11 do that, but not one issue has been narrowed yet. And my

12 solicitation to do that has not been responded to. So we have

13 to assume, as we sit here, that everything is up for grabs and

14 everything is going to have to be litigated, and it cannot be

15 done by August 30th. I promise you that. You will -- we will

16 all live to regret that, if we set that schedule, for this.

17 I want to make -- mention another thing, too,

18 that's important. The debtor was the one who filed their

19 motion to create the -- you know, a deadline for this issue,

20 to tee this issue up. We filed a complaint on January 8th, to

21 challenge their designation of (indiscernible) you know, 650

22 million of a billion dollars in assets that is titled to them,

23 saying, nope, off limits, can't be used to pay any creditors.

24 They were the ones who kept saying, oh, don't -- you know,

25 extend the answer, extend the answer, extend the answer.

1  There were, I think, two extensions.

2  So now here we are.  You know, we -- the committee

3  has made its initial disclosures.  The debtors have not, nor

4  have they responded to my, you know, very detailed and my

5  thoughtful request to narrow the issues yet.  And no matter

6  what issues we narrow, I mean, not even -- there's -- nobody

7  is taking off this $120 million of financial issues, that is

8  going to have to be litigated, that's nine completely separate

9  accounts, so that's not going away.

10  What might go away because, as Mr. Hammond said,

11  it's included, the debtor is including it in the liquidation

12  analysis, you know, are certain other like real estate assets,

13  et cetera.  But even that we may never get to a stipulation on

14  because one of the things that we have said we need is we need

15  JPM, we need JPMorgan and we need the debtor to say, look, not

16  only are you going to adhere to this in whatever liquidation

17  analysis you're going to do, you're not going to change it

18  around on us and take these assets out, but JPMorgan has to --

19  and the debtor need to agree that you're not going marshal on

20  us.  In other words, you're not going to say, well, we're

21  going to use all the unrestricted assets to satisfy JMP's

22  lien, and then what's left over are the restricted assets,

23  which are not available to pay creditors.  So that's all in

24  flux.  We have nothing from the debtor on that yet.  We put it

25  out there, we've identified it as an issue.

1          THE COURT:  Okay.  Thank you.

2          MR. HAMMOND:  Your Honor, may I just respond

3    briefly?  Because I do believe there are some inaccuracies in

4    what was just reported.  And I will say my conversations with

5    Mr. Brown, I believe, have been in good faith.

6          I will also note that, when we did talk about what

7    it -- what they were requiring in order to take issues off the

8    table were conversations -- and we talked about this on

9    Thursday or Friday -- were conversations with Alvarez &

10   Marsal.  And as everyone was getting ready for the hearing

11   this week, it just hasn't been feasible to engage in those

12   level of discussions yet, and we are hoping to engage in those

13   discussions shortly after the schedule gets set, so that we

14   can take these issues that we believe are not necessary to be

15   litigated for purposes of confirmation off the table.

16         I will say, also, with respect to the Rule 26(a)

17   disclosures, Your Honor, it's our understanding that this is a

18   26(f) conference, and so our rule -- initial disclosures are

19   due two weeks from today.  Mr. Brown did provide a Rule 26(a)

20   disclosure, where it identified two people and then -- his two

21   advisors, and then everybody else that the debtors identified.

22   So, you know, really, that's (indiscernible)

23         Also, with respect --

24         THE COURT:  Has the debtor --

25         MR. HAMMOND:  -- to the answer, Your Honor --

1          THE COURT:  Has the debtor provided its Rule 26(a)
2   disclosures?
3          MR. HAMMOND:  Your Honor, it's our understanding
4   that the 26(a) disclosures are due two weeks after the 26(f)
5   conferences today.  So we have not provided them yet.
6          THE COURT:  Yeah, I understand that.  But if the
7   debtor wants to expedite stuff, then it maybe can't stick to
8   the official deadlines.
9          MR. BROWN:  Your Honor, it's exactly what I told --
10  that's exactly what I said to Mr. Hammond.  It's like he was
11  sticking with the local rule, and I said, you know, if I were
12  you --
13         THE COURT:  Yeah --
14         MR. BROWN:  -- and I wanted to move this thing
15  along, get them to me, get this stuff to me.  You're
16  absolutely right.
17         THE COURT:  Okay.  Okay.  Well, I will look at the
18  scheduling orders; and, depending on what I do on other
19  things, I'll enter a schedule.  But I'll say right now that
20  the debtor has requested -- and I -- it's coming up in another
21  motion -- you know, a scheduling order for confirmation.  And
22  in anticipation for confirmation, we've set aside time here in
23  chambers, taking debtor at its word and recognizing the
24  expense.  And quite frankly, it's not just the expense; it's
25  the whole impact of the bankruptcy on the Boy Scouts.  And

1   we're prepared to move quickly.  But the debtors have to be
2   prepared to move quickly because the debtors are the ones who
3   want a summertime confirmation hearing.  Okay.
4           MR. BROWN:  Your Honor, one -- just one other point
5   and that is this is an adversary proceeding, this is not plan
6   confirmation.
7           THE COURT:  Yeah, but --
8           MR. BROWN:  It's an adversary proceeding --
9           THE COURT:  But --
10          MR. BROWN:  But --
11          THE COURT:  -- adversary proceedings can be
12  expedited, they are expedited, they are done in conjunction
13  with confirmation.  There's all kinds of things that can be
14  done.  And in recognition that there are real constraints to
15  how long Boy Scouts can stay in bankruptcy and not be
16  irreparable harmed by that, both on the monetary side, on the
17  fund raising side, on the narrative -- getting the narrative
18  behind them.  And you know, some things get expedited, and so
19  we all know that.  And that's all I --
20          MR. BROWN:  Yeah --
21          THE COURT:  -- need to say.
22          MR. BROWN:  -- absolutely.  I'm on the same page,
23  Your Honor.  If -- just -- and that's why the scheduling order
24  that I submitted on Friday is extremely accelerated.  I
25  believe it contemplates a trial by the end of November.  So it

1  -- you know, I understand that's not the end of August.  But
2  this is not like, you know, take a year to do this.  This is
3  like the fastest possible thing that I think is even within
4  the realm of being realistic and it's another two months.
5          THE COURT:  Well --
6          MR. BROWN:  So I'm not ask -- we're not asking for
7  the world here.
8          THE COURT:  Well, no, you are because, if it's
9  critical to confirmation -- which is what I'm hearing you say,
10 as well -- then it puts confirmation off by two months at the
11 least, at the least because then, as you point out,  have to
12 decide it.  So it is not --
13         MR. BROWN:  (Indiscernible)
14         THE COURT:  It is not a short -- in the relative
15 scheme of things, it is not a short ask.  I don't know what
16 the schedule is going to be yet; I will let you know.
17         MR. BROWN:  Thank you, Your Honor.
18         THE COURT:  Thank you.
19         MR. HAMMOND:  Thank you, Your Honor.
20    (Pause in proceedings)
21         THE COURT:  Okay.  I'm looking at the agenda.
22 Let's go back to -- let's go back to Item 4, the tort
23 claimants committee and the FCR's standing motion.
24         MR. LUCAS:  Your Honor, this is John Lucas.  My
25 partner Max Litvak will be handling that, and he should be on

1  here.

2          THE COURT:  Mr. Litvak.

3      (No verbal response)

4          MR. LUCAS:  It might be one second, Your Honor.

5          THE COURT:  Certainly.

6      (Pause in proceedings)

7          MR. ABBOTT:  Your Honor, Derek Abbott, quickly.  I

8  just want to make sure the Court is working off the amended

9  agenda.

10          THE COURT:  That's what it says.

11          MR. ABBOTT:  Okay.  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          MR. LUCAS:  And Your Honor, I apologize.  Mr.

14  Litvak is getting on right now.

15          THE COURT:  It's okay.  No need to apologize.

16  That's how this day started and it's going to continue.

17          MR. LUCAS:  We're just trying to be efficient with

18  everybody's time and to not unnecessarily bill the estate by

19  having a bunch of people sit on Zoom.

20          THE COURT:  I appreciate that.

21          UNIDENTIFIED:  Hi, how are you.  Good.

22          THE COURT:  I'm hearing someone's conversation.

23          UNIDENTIFIED:  So I'm actually --

24          UNIDENTIFIED:  Well, Judge, someone asked you how

25  you're doing.

1        (Pause in proceedings)

2        MR. BRADY:  Your Honor, it's Robert Brady for the

3   FCR.  I'll be handling this one for the FCR, but I'll wait

4   until Mr. Litvak gets on the zoom.

5        THE COURT:  Thank you.

6        (Pause in proceedings)

7        UNIDENTIFIED:  (Indiscernible)

8        MR. LUCAS:  And you know, people, we can hear you

9   talk on the Court's live calendar right now and about your

10  editorializing of what's going on and what the Judge's view

11  is.  I recommend that, if you're going to talk about the case

12  and you don't want it to be heard by hundreds and hundreds of

13  people, that you mute your line.

14       MR. HARRON:  Sorry, I didn't understand.

15       MR. LUCAS:  The first part was there was emotions

16  of love.

17       MR. HARRON:  Yeah, as there should be.

18       (Laughter)

19       MR. LUCAS:  Again, Your Honor, I apologize.

20       THE COURT:  It's okay.

21       MR. LUCAS:  It's not, but thank you.

22       (Pause in proceedings)

23       MR. LUCAS:  Your Honor, I think that mister -- my

24  partner Max Litvak is on.  Max, are you on?

25       (No verbal response)

1          MR. LITVAK:  (Indiscernible)

2          MR. LUCAS:  (Indiscernible)

3          MR. LITVAK:  I apologize.  Let me try to dial in

4  from a different location.  Give me one moment.

5       (Pause in proceedings)

6          THE COURT:  So parties know, we're going to go to

7  estimation next.  So whoever needs to be on for the estimation

8  motion should be on deck.

9          MR. LUCAS:  And Your Honor, the estimation movants

10 and the attorneys arguing that motion have all coordinated and

11 they're ready to go.

12      (Pause in proceedings)

13         MR. LUCAS:  Your Honor, there's Mr. Litvak.

14         MR. LITVAK:  Can you hear me, Your Honor?

15         THE COURT:  I can, yes.  And I see you.  Okay.

16         MR. LITVAK:  Good afternoon, Your Honor.  Max

17 Litvak, Pachulski, Stang, Ziehl & Jones, on behalf of the tort

18 claimants committee.

19         Your Honor, I understand that we're ready to

20 address the standing motion at this point.

21         THE COURT:  Correct.

22         MR. LITVAK:  Thank you, Your Honor.

23         It is a joint motion, Your Honor, that the TCC has

24 filed with the future claims representative.  And Your Honor,

25 we do have objections from JPMorgan, as well as the debtor,

1   And there was a limited joinder that was filed by the UCC.

2          Your Honor, we filed the standing motion on March

3   12th of this year, so it's been a couple of months.  We filed

4   it because that was the deadline, that was the deadline that

5   was imposed on the TCC, as well as the FCR, by JPMorgan.  We

6   had obtained some extensions of that deadline.  But at the end

7   of the day, they stood firm on March 12th, and so we felt

8   compelled to file the standing motion.  And along with the

9   standing motion, we filed our proposed complaint.

10          In summary, Your Honor, we are seeking standing as

11  challenge parties on behalf of the TCC and the FCR, in order

12  to pursue our rights with respect to certain assets that we've

13  identified after some extensive investigation and due

14  diligence on our part, assets that we believe are unencumbered

15  or unperfected.  And we also seek to reserve some rights in

16  connection with the various stipulations and accommodations

17  and admissions and waivers that the debtors made under the

18  final cash collateral order in this case.

19          And in particular, one issue of significance that

20  we identified that we think is important is with respect to

21  the Summit property, which is one of the High-Adventure sites

22  of the debtors, located in West Virginia.  It's technically

23  owned by a nondebtor, an affiliated entity called "Arrow." And

24  the debtor, BSA, actually has a mortgage on that property

25  itself, which secures an intercompany obligation of something

1  on the order of $350 million that's owed by Arrow to BSA.  And

2  that note and mortgage have been pledged to JPMorgan.

3         And we believe that that whole transactions is

4  effectively a sham transaction, it's not a real -- it's not a

5  real loan, it's not a real debt, it's not real -- it's not a

6  real mortgage.  As an example, it has a zero percent interest

7  rate and Arrow really has no ability or requirement, for that

8  matter, to repay that loan to BSA.

9         So one of the things that we wanted to assert

10 through our proposed complaint is a claim to effectively

11 recharacterize that debt as what it is.  It was a capital

12 infusion.  And when you do recharacterize it in that way, then

13 there really isn't anything there to secure, and so there's --

14 these are -- this is essentially an unencumbered asset for the

15 benefit of unsecured creditors, including tort claimants, in

16 BSA's case, and it shouldn't be set aside and effectively

17 treated as pledged to JPMorgan.

18        So that's just one -- that's one item to highlight

19 that we think is important that's, you know, a very valuable

20 property, and we don't think that it should be included within

21 the treatment that JPMorgan may get under a plan or otherwise

22 in this case.

23        So, in sum, Your Honor, we are seeking standing,

24 both the TCC and the FCR, to pursue these types of claims.

25 We've also identified a variety of other assets that are

1 fairly typical.  You see this in many, many cases where you

2 have committees exercising their challenge rights.  Oftentimes

3 these matters are settled.  Maybe they'll be settled in this

4 case.  I know there's a settlement pending with the UCC, but

5 the TCC and FCR were not parties to that, and so we were kind

6 of left out in the cold.

7 But we do have the challenge rights, which we have,

8 and we had a challenge deadline that we were facing under the

9 final cash collateral order, and so we felt like we needed to

10 take action in order to preserve those rights.  And what we're

11 asking for today, Your Honor, is simply standing to pursue the

12 claims that we've identified in the proposed complaint.

13 This request is not usually subject to a high bar;

14 it is a motion to dismiss standard.  It is usually fairly

15 uncontroversial, in terms of committees identifying certain

16 assets that are either unencumbered or unperfected and so

17 forth, and we have done that here.  We did propose a

18 stipulation to JPMorgan, which was rejected.  And the only

19 acknowledgments that we've gotten, in fact, were in the reply

20 papers -- or sorry -- the objection papers that JPMorgan

21 filed, where they acknowledged they don't have liens on

22 commercial tort claims, among other things.

23 There were the objections that were filed.  A

24 couple of the objections go to the point that the claims that

25 we've asserted are not sufficiently pled or colorable.  We do

1  believe that the claims are sufficiently pled, and that's

2  really reflected in the extent of the objections that we've

3  gotten.  JPMorgan spent over 50 pages addressing all of the

4  claims that we, the challenge parties, have asserted.  So we

5  do believe that they are sufficiently pled.  And if they're

6  not sufficiently pled, certainly they can be amended at the

7  appropriate time in the context of the adversary proceeding.

8           We do believe the claims are colorable.  And

9  indeed, the unsecured creditors' committee acknowledges that.

10 In fact, the settlement that the UCC and JPMorgan and the

11 debtors have reached expressly preserved the creditors'

12 committee's -- the unsecured creditors' committee's challenge

13 rights if that settlement is not ultimately approved through a

14 confirmed plan.

15          So the claims were important enough and significant

16 enough for the parties to try to settle them, at least

17 JPMorgan, the debtor, and the UCC.  And we believe that they

18 are significant enough for the challenge parties to now pursue

19 them.  And in fact, there's a disagreement between JPMorgan

20 and the debtor on the one hand, and the UCC on the other hand,

21 with respect to whether or not these claims are colorable.

22 The UCC believes they are colorable; JPMorgan and the debtors

23 say that they're not.  Certainly we, the TCC and FCR, believe

24 that they're colorable.  And in any case, Your Honor, that's

25 something that can be determined through the adversary

1  proceeding and doesn't have to be analyzed closely, on a
2  count-by-count basis, for purposes of today, where we're
3  simply seeking standing to pursue the claims.

4          The filing of the debtors' plan, contrary to the
5  debtors' assertions, does not render the issue of standing
6  moot.  It doesn't mean that it's a done deal.  Obviously --
7  and I apologize, I haven't been listening in to the
8  proceeding.  We're trying to conserve expenses as much as
9  possible.  I have not been listening in to all of the
10  proceedings today.  But I know that the debtors' plan is hotly
11  contested.  There are many legal and factual issues that will
12  be raised.  Now we're only at the disclosure statement stage
13  and we'll be getting to it.

14          But once this gets to a confirmation hearing, when
15  and if it ultimately gets to a confirmation hearing, there
16  will be many objections, presumably, that will be raised.  We
17  don't know whether the plan will be confirmed or whether it
18  will be consummated or in what form.  And until that happens,
19  the issues that the challenge parties have identified should
20  be pursued, so that we know heading into the confirmation
21  hearing what is encumbered or unencumbered because the
22  treatment of JPMorgan is part and parcel of that plan.

23          So we would submit, Your Honor, that the challenge
24  parties are entitled to their day in court and would ask the
25  Court to grant us standing to pursue the claims that we've

1  identified in the proposed complaint.

2          And Your Honor, I'd like to reserve a little bit of

3  time for reply.  But if you have any questions, I'd be more

4  than happy to answer them.

5          THE COURT:  Thank you.

6          Well, I fully understand why the committee filed

7  the standing motion, given the deadline.  There would have

8  been no other choice but to do so, since it wasn't extended.

9  And what I focused on, quite frankly, was not the -- whether

10  the claims were colorable or not -- although in a standing

11  analysis, you do that -- but whether, in fact, given a

12  settlement of these claims that's embodied in a plan, how the

13  committee meets the other part of the test, which is an

14  unreasonable willingness to pursue and a cost/benefit

15  analysis.

16          So I will say that I've looked at this issue many

17  years ago, in connection with my Colt case, under very similar

18  circumstances.  And where the matter is part of a settlement,

19  I'm not sure how you meet the standard.  So that's what I'm --

20  that's my question for you.  How do you meet the standard,

21  given the settlement?  Why should I permit you standing -- the

22  committee standing today, as opposed to waiting and let's see

23  if the settlement gets approved as part of a plan or not?

24          MR. BRADY:  Your Honor --

25          MR. LITVAK:  Your Honor, I think --

1          MR. BRADY:  Oh, go ahead, Max.

2          MR. LITVAK:  Your Honor, I think that the problem

3   with the settlement is that it didn't involve all of the

4   challenge parties.  And so the situation that we're in, we

5   need to be prepared, in the context of the plan or what have

6   you, in order to address the issues of relating to these

7   claims.  We'd like the ability to pursue the claims, so that

8   we know, heading into the confirmation hearing, whether these

9   assets that we've identified are, in fact, at issue.  Are they

10  encumbered, are they unencumbered or not?  I understand that

11  the settlement is pending, but frankly, under the settlement,

12  it doesn't give the tort claimants anything at all.

13         So you have the somewhat unique situation where you

14  have a final cash collateral order that gives challenge rights

15  to a diverse set of parties.  And here, you've got one set

16  that was going to be part of our complaint, the UCC.  They

17  chose to separately negotiate without us.  We, in fact, asked

18  to participate, were not given the opportunity to participate,

19  and now they've reached a settlement.

20         Now the debtor, from the debtors' perspective, Your

21  Honor, to go to your -- one of your questions was about how is

22  it that the debtor is -- how do we satisfy the fact here that

23  the debtor has unreasonably decided not to pursue it.  And in

24  this instance, the debtor did that under the final cash

25  collateral order, so it's nothing relating to the UCC

1  settlement.  The debtor already stipulated away its rights.

2  So the UCC settlement, that has nothing to do with that.  Our

3  point is that the debtor has walked away from those rights,

4  which is completely standard, it happens in every case where

5  we represent the debtor.

6          We stipulate away a lot of these challenges because

7  we need financing.  The debtor did that.  We were one of the

8  challenge parties; we, along with the FCR.  We're given the

9  right to challenge, so now we've challenged.  The way that we

10 satisfy that factor, Your Honor, is the debtor is not going to

11 be pursuing these claims because they've already waived them,

12 they've already stipulated them away.

13         Now, in terms of the cost/benefit analysis --

14         THE COURT:  Yeah, go ahead.

15         MR. LITVAK:  In terms of the cost/benefit analysis,

16 Your Honor, from our perspective, there is no benefit to the

17 UCC settlement, at least not for tort claimants.  So we will

18 be objecting to that, I presume, in the context of the plan.

19 For now, though, we were granted certain rights under the

20 final cash collateral order, and we're just asking for

21 authority from Your Honor to pursue those rights.  That's it.

22 These were rights that were already given to us under the

23 final cash collateral order.

24         I know that there is a settlement pending with the

25 UCC, and they were given their rights, too, but so were we.

1   So why can't we pursue those now?  That, to me, seems like an

2   extremely unusual situation, where we're given challenge

3   rights and then we assert the challenges, and then we're not

4   allowed to pursue the rights.

5           THE COURT:  Well, I'm not sure you were given

6   challenge rights.  There was a challenge period established

7   and now you're asking to exercise the challenge -- the -- an

8   ability to challenge.  But I think the issue here is -- and

9   it's not unusual, in the sense that the challenge period is

10  established for any party-in-interest and committees.  So you

11  always have multiple people who can bring a challenge or seek

12  to bring a challenge under the typical DIP financing order.

13  Usually, of course, it's the committee.  Sometimes -- and I do

14  have a couple of cases where it's an individual party-in-

15  interest.  And it can -- and notwithstanding that that

16  individual party-in-interest had a right to bring the

17  challenge and, in fact, did, it can still get settled.  So

18  that's what I'm -- that's why I asked the question.

19          But I certainly -- as I said, I understand why you

20  brought the motion, I understand the timing of the motion.

21  And my question is just, at this point:  What's the proper

22  relief, right now, given the scenario that we're in?  I don't

23  think -- well, I will say it's not to deny the motion with

24  prejudice, that's not going to be the result of this hearing.

25          Mr. Brady.

1        MR. BRADY:  Your Honor, I do think it's important

2   that the Court understand this -- the timing of this was not

3   of our making --

4        THE COURT:  Uh-huh.

5        MR. BRADY:  -- as Mr. Litvak said.  We were

6   excluded from the negotiations.  That was a decision made by

7   the debtors, JPM, and the UCC with the mediators to not

8   involve the other challenge parties.  The TCC specifically

9   asked to be part of those negotiations and was denied.

10       When JPM would not extend the deadline, we filed

11  the motion for standing.  The hearing was set.  We were

12  prepared to go forward.  The debtors asked us to continue

13  that.  We were reluctant, and it was the mediators who came

14  and pressed us to continue the hearing on our standing motion,

15  pushing it back.

16       But Your Honor, it's really time to get this

17  underway.  This goes to JPM's plan treatment, general

18  unsecured creditors' plan treatment, and what assets are

19  available to general unsecured creditors, including survivors.

20  Really, I think the only way the Court can properly determine

21  this proposed settlement of this claims is to understand what

22  the claims are and whether it's a fair and reasonable

23  settlement of those claims.

24       So we think that the challenge parties should be

25  given standing to commence an adversary proceeding,

1  recognizing that the Court is going to consider those claims
2  as part of confirmation and determine whether this settlement
3  meets the standards.

4          THE COURT:  So is it a distinction without a
5  difference, in the sense that I would fully expect the
6  committee to be taking discovery in connection with an
7  objection to the plan and the FCR to be taking discovery in
8  connection with the connection to the plan?

9          MR. BRADY:  Your Honor, I think, again, since the
10  UCC has acknowledged these claims are colorable, and JPM has,
11  indirectly by settling them, I think it's important that the
12  TCC and the FCR have standing to bring these claims, so that
13  then we can challenge the settlement as part of confirmation.

14          THE COURT:  I guess I'm missing why you need
15  standing to be able to challenge the settlement at
16  confirmation.

17          MR. BRADY:  Well, Your Honor, if we have standing
18  to bring these, there's a question of whether those parties
19  have the right to settle the claims, if we have standing to
20  bring them.

21          THE COURT:  Ah, well, that's different.  That's a
22  different argument.  Am I going to decide that today?  I don't
23  know.  I mean, parties getting standing do not always get
24  exclusive authority to settle or resolve, and there are fights
25  over that.  I did not realize that's part of the fight today.

1  Okay.

2         MR. LITVAK:  Your Honor, if I may just ask a

3  question, and my partners on the line can certainly shoot me

4  down and I'll defer to them entirely.  But I guess the

5  question that I have for Your Honor is:  Are you thinking

6  that, rather than granting standing now, that we would simply

7  toll all of the rights that the challenge parties have

8  asserted, at least through the confirmation hearing?  Is that

9  the -- is that what Your Honor is suggesting or thinking

10  about?

11         THE COURT:  That is certainly a possible outcome of

12  today, is I'm -- I wouldn't -- as I said, I fully understand

13  why the committee and the FCR filed the standing motion.  You

14  had no option; that was the deadline.  Things have progressed

15  since then and I've got a settlement of those very claims on

16  the table.  And I don't know whether I'm going to approve that

17  settlement or not.  But I will not -- I will not prejudice the

18  committee or the FCR by denying a motion without -- you know,

19  with prejudice.  I would certainly toll their time, continue

20  the motion, do something that preserves the committee's and

21  the FCR's rights in the event that this settlement is not

22  approved.  So, you know, time sort of went on, and we had --

23  and we had further developments after this motion was filed.

24         So let me hear from the -- I guess the debtors

25  first, in response, as to what you think the outcome of

1  today's -- of this motion ought to be.

2          MR. LINDER:  Good afternoon, Your Honor.  Matt

3  Linder of White & Case for the debtors.

4          We agree, Your Honor, I'll just say off the bat.

5  Mr. Litvak's suggestion was where we were headed with this

6  because we believe that this should be denied without

7  prejudice or just continued to confirmation.  In the event

8  that the debtors' plan is not confirmed, then the Court should

9  reconsider whether standing should be conferred on the TCC and

10  FCR.

11          And I've got a few remarks to make if your -- if

12  the Court will indulge me, but I'll keep it brief because I

13  understand that Mr. Gluck, on behalf of JPM, will be handling

14  the bulk of the argument.

15          As an initial matter, just in response to Mr.

16  Litvak's comment about who the beneficiaries of JPM and the

17  UCC's settlement are, we disagree with the notion that there

18  is no value being afforded to these claimants through the

19  settlement, and I think that's for four principal reasons:

20          Initially, JPMorgan consented to allow the

21  foundation -- to allow the Boy Scouts to take a loan from the

22  Boy Scouts of America National Foundation to enable the BSA to

23  put $42.8 million on the table and contribute that amount --

24  up to that amount to the settlement trust, which is the value

25  of the Summit property that is the subject of several of the

1 claims that are asserted in the draft complaint. That's

2 obviously a significant source of value. I think Mr. Litvak

3 called it an "issue of significance," and we agree it's

4 significant value. And that value, under either toggle under

5 the plan, either under the global resolution plan or under the

6 BSA toggle plan, that value is going to the settlement trust

7 under the debtors' proposal.

8 The second point, JPM has agreed to give the

9 debtors, the reorganized debtors a two-year principal holiday

10 under the restated JPM debt documents. The flexibility that

11 that gives us enables us, in part, to make distributions to

12 the unsecured creditor constituents, but it also gives us

13 flexibility to make larger contributions to the settlement

14 trust than we would otherwise be able to do. And that,

15 combined with the ten-year (indiscernible) maturity dates

16 under the JPM restated debt facilities will enable us to make

17 what we believe is a significant contribution to the trust,

18 which, under the current proposal, is approximately $120

19 million.

20 The last point -- and it's an important point -- is

21 that JPM, subject to approval of the settlement, has agreed to

22 waive its diminution of value claim, provided that the

23 settlement is approved by the Court. So all of those things,

24 taken together, I think really refutes the notion that this is

25 a parochial settlement among the UCC, JPM, and the debtors.

1     My other point, Your Honor, my other main point
2  really is -- it goes to the cost/benefit analysis that you
3  touched on.  In our view, the TCC and FCR have really failed
4  to meaningfully address what we view as a fully separate
5  analysis as part of the standing determination.  It's not
6  subsumed within the Court's inquiry into the colorability of
7  the claims or the debtors' unjustifiable or justifiable
8  refusal to pursue the claims.  The analysis is, you know,
9  should derivative standing be granted.  The answer is, yes,
10 it's a likelihood.  And the magnitude of the success in
11 prosecuting the claims outweighs the likely cost, disruption,
12 and delay associated with the litigation.  It's firmly our
13 view, Your Honor, that that is not satisfied here, in light of
14 the claims that are proposed to be asserted against JPM, BSA,
15 and the Arrow non-debtor entity.
16     The -- as I've mentioned, Your Honor, we've but the
17 $42.8 million on the table for contribution to the settlement
18 trust.  Under any reading of the draft complaint, the claims
19 that relate to the Summit property are the largest in
20 magnitude.  So, in our view, this should be continued to
21 confirmation; and, in the event that the plan is not confirmed
22 as it's currently constituted, then the Court should revisit
23 the issue of whether to confer standing.
24     Separate and apart from the issue of the Summit, if
25 you look at all of the claims, Your Honor, that are asserted

1 in the draft complaint, and you assess them based on the

2 dollars that are actually at issue with respect to each

3 complaint, the only other claim that, in the debtors' view,

4 suggests that there might be meaningful value that could be

5 generated for holders of these claims is the membership fee

6 claim.  The basis for that claim is that the TCC and FCR

7 dispute that JPM has an interest in membership fees, they

8 presumably contend that the membership fees are not accounts

9 under the UCC that are subject to JPM's security interest.

10         We'd just like to point out, Your Honor, that the

11 papers fail to appreciate the fact that, although, as of the

12 petition date, there were (indiscernible) million dollars of

13 membership fees that were owing, payable to the debtors as of

14 the petition date, and those fees were a hundred percent

15 collected post-petition, all of these unrestricted assets, the

16 actual cash that was received on account of membership fees,

17 was spent in the ordinary course of the debtors' post-petition

18 operations.

19         So, you know, what contested claims, what potential

20 sources of value are we left with after the Summit and the

21 membership fee claims?  In short, not much, Your Honor.  It's

22 goods, general intangibles, motor vehicles, and water crafts

23 located at certain of the debtors' properties, as well as the

24 proceeds of insurance policies and certain other miscellaneous

25 buckets of collateral.

1          So, in our view, Your Honor, it would be a waste of

2     the debtors' resources to grant standing now, to essentially

3     permit the TCC and FCR to expend hundreds of thousands -- if

4     not more -- dollars on a derivative complaint, where the value

5     of these are already flowing, in large part, to the abuse

6     claimants or it no longer exists in the case of the membership

7     fees, along with the other de minimis categories of disputed

8     collateral.

9          We're also further troubled, Your Honor -- and this

10    is a point that hasn't yet been addressed -- by the suggestion

11    in the papers that there's a relaxed pleading standard in the

12    case where the debtors control the information.  I don't

13    dispute that that may be the law.  But in this case, we've

14    provided voluminous, targeted discovery relating to these

15    precise claims.  We've provided these documents in response to

16    formal and informal discovery requests.  This is not a case

17    where the pleading requirements could be relaxed.  If they

18    cannot -- if the FCR and the TCC cannot plead their claims now

19    with sufficient specificity, it's our view that the claims

20    should not be permitted to proceed.

21         The last point that I would make, Your Honor, is

22    that there appears to be an assumption on the part -- and I

23    think you picked up on this, Your Honor picked up on this a

24    little bit -- that the low bar -- the bar is so low that

25    standing is almost a given.  I think Mr. Litvak said that the

1   TCC and FCR are entitled to their day in court.  You know, we

2   disagree with that.  That's not the law.  That is the UCC in a

3   joinder to our reply argues that the claims may be colorable,

4   that the TCC and FCR can bootstrap into that statement.  It's

5   really the TCC and FCR's burden to carry it, and we believe

6   they failed to do that.

7        So, in conclusion, Your Honor, we think that the

8   motion for standing should be continued to confirmation and

9   only reconsidered in the event that the plan, as the debtors

10   have proposed it, is not confirmed.

11        THE COURT:  Thank you.

12        Let me hear from JPM.

13        MR. GLUCK:  Good afternoon, Your Honor.  Kristian

14   Gluck of Norton Rose Fulbright on behalf of JPMorgan Chase

15   Bank, N.A.  Can you hear me, Your Honor?

16        THE COURT:  I can.

17        MR. GLUCK:  Thank you, Your Honor.

18        As a preliminary matter and as we noted in our

19   response and has been, you know, a significant part of the

20   discussion this afternoon, I mean, we do believe that the

21   standing motion is premature and should not be considered now,

22   but continued to confirmation.  Given the fact that the second

23   amended plan provides for a settlement of all those claims,

24   Your Honor, it doesn't make sense to consider them at this

25   moment and give the debtors, the UCC, and JPMorgan an

1  opportunity to present that settlement to Your Honor as part

2  of confirmation.  And obviously, if it is confirmed, then

3  those causes of action will be rendered moot.

4          That is something that several courts have done, as

5  cited in the UCC's pleading, Your Honor, including most

6  recently in the Chesapeake Energy case in front of Judge

7  Jones, where we, in fact, represented the committee in that

8  case, Your Honor, and unfortunately had that motion continued

9  to confirmation.  Then the plan was confirmed and it was never

10 heard.  So we do agree with the debtors that the matter should

11 be continued to confirmation.

12          However, addressing the merits, Your Honor, we do

13 want to point out that we -- as we pointed -- as we said in

14 our papers, that we don't believe that these are colorable

15 claims, Your Honor.  And we acknowledge that they had been

16 settled.  And certainly, there are, you know, sort of shades

17 of colorability amongst the claims.  But colorability, as you

18 pointed out, Your Honor, is just one of the factors here.

19          Again, we don't believe that the movants have

20 satisfied their cost/benefit analysis.  Indeed, Your Honor,

21 they're utterly silent on this issue, failed -- we believe

22 they've failed to satisfy that burden.

23          And then, finally, Your Honor -- and I'll go into

24 detail on these points in a second, Your Honor -- but we don't

25 believe that the movants can show that the debtors, in the

1  settlement with UCC, abused their discretion in releasing the

2  claims and that that refusal was unjustified.

3  So, turning to colorability, Your Honor -- and I

4  don't want to spend too much time on this one.  As we've

5  pointed out in our papers, as I think Mr. Litvak said, we had

6  55 pages, we did spend a considerable amount of time on these.

7  And I don't want to belabor them, unless the Court is

8  interested in hearing it.  I know we've got a lot more on the

9  docket, so I'll try to be brief.

10  But I did want to emphasize, as we pointed out in

11  our papers that, while, you know, courts have used a 12(b)(6)

12  standard in assessing the standing motions, you know, as we

13  cited, in the Sabine case, in determining whether a claim is

14  colorable, the Court may properly engage in some review of

15  disputed fact to determine if there is a proper factual

16  support for the allegations and to determine if the proposed

17  litigation would be a sensible application of estate

18  resources.

19  And Your Honor, I emphasize "a sensible application

20  of estate resources" because, as Mr. Linder indicated, you

21  know, we don't think that that would be a good use of the

22  estate's funds, as we move towards confirmation.  As I think

23  Century pointed out in their own motion, Your Honor, with

24  respect to the fees that have been paid, there's been a

25  significant cash burn on the estate, Your Honor, which has

1   been primarily borne by JPMorgan and their cash collateral

2   being used.

3           So -- and I don't -- like I said, Your Honor, I'm

4   not going to spend a ton of time on the colorability.  Mr.

5   Lender touched on the recharacterization claims.  We pointed

6   out in our papers, Your Honor, we don't believe that this is

7   even a claim that is recognized, given the fact that you're

8   seeking to recharacterize what appears to be a claim.  But to

9   the extent you're seeking to recharacterize an asset, we also

10  don't believe that that would something the Court should

11  undertake here because it would be recharacterizing a note to

12  equity, which would then put the estate behind all the

13  creditors of Arrow, which doesn't seem to be in the best

14  interests of the estate.

15          And then turning to, you know, just the Submicron

16  analysis, which we detail in our motion, we don't believe that

17  -- or our response, we don't believe that the Submicron

18  factors here would entitle the movants to recharacterization.

19          Turning, Your Honor, to Counts 2 and 3, which, you

20  know, list a number of various buckets of collateral;

21  commercial tort claims one of them, Your Honor, we did

22  stipulate in the motion that we do not have a lien on

23  commercial tort -- JPMorgan does not have a lien on it.  If

24  you've taken a look at the cash collateral order recently,

25  Your Honor, you'll note that we don't even have a diminution

1   in value claim on that.  That is carved out from the

2   collateral because we've always acknowledged we didn't have a

3   lien on that.

4           Many of the other items, Your Honor -- and I think

5   this is something that may have just been overlooked by the

6   movants, but -- because we don't seem to have any discussions

7   of the liens that are granted under the mortgages.  But as we

8   point out in our response, many of the items that are listed

9   as JPMorgan not having a lien on are actually covered by the

10  mortgages.  So they would be limited to those particular items

11  of personal property that are covered -- or at either the

12  High-Adventure bases or the headquarters, Your Honor.  But

13  when it comes to colorability, we do dispute their suggestion

14  that JPMorgan doesn't have a lien.

15          And one of the better examples of this, Your Honor,

16  which I do believe is probably just an error in their

17  pleading, but it's their declaration that JPMorgan does not

18  have a lien on owned real estate, other than the three High-

19  Adventure sites.  I think the movants even acknowledge in the

20  papers elsewhere that we do have a lien on the headquarters,

21  Your Honor, which is a piece of real estate.  So, as to

22  colorability, there are just some significant deficiencies in

23  the claims that they pled.

24          But most importantly, Your Honor, and what I really

25  want to focus on here -- I'm just shifting my outline here a

1  little bit, Your Honor.  But I want to just touch on the

2  cost/benefit analysis and the debtors' refusal to bring the

3  challenge claims.

4         You know, it is the movant's burden to establish

5  that, you know, bringing these claims would pursue -- would be

6  a likely benefit to the estate.  And we just don't believe

7  that, at the end of the day, the claims that would be brought

8  would bring a benefit to the estate.  As Mr. Linder noted, the

9  value for the Summit is already being provided without any

10 litigation at all.

11        So granting standing to pursue claims against the

12 Summit to add $42.8 million of value, Your Honor, would not

13 because you'd have to spend money to get there.  The

14 settlement between the UCC, JPMorgan, and the debtor puts that

15 value into the settlement trust without having to file any

16 litigation related to that.  So, Your Honor, we believe they

17 have utterly failed to satisfy this essential and fundamental

18 element, in order to be granted standing.

19        Mr. Linder touched on the, you know, benefits of

20 the settlement.  And I know that there was some suggestion

21 that no value was being provided.  But as Mr. Linder so

22 eloquently discussed in his argument, there is value that's

23 being provided under the settlement to these claimants.  It

24 may not be what they think the value should be, and that's

25 what -- they'll have their day in court on the 9019 on that.

1 But it absolutely is providing value to the settlement trust,

2 including the $42.8 million, which is -- I'd sort of

3 characterize that as the -- sort of the hallmark -- the sort

4 of main focus of their complaint.

5        Your Honor, I wanted to touch on a couple of items

6 that were mentioned in both the reply and then again in

7 argument today.  And the first is that JPMorgan refused to

8 extend the challenge period, and that's just absolutely not

9 true, Your Honor.  We were never asked to extend the challenge

10 period.  We extended it.  I believe it ran on March the 12th.

11 After the settlement was announced -- I believe that was on

12 the 1st -- we never heard -- or at least we are not aware of

13 any approaches that were made to extend that deadline, Your

14 Honor.  So, while I understand and I think Your Honor

15 acknowledged that they had the deadline to file, they didn't

16 ask us for an extension.  We didn't deny them an extension.

17 So any suggestion that JPMorgan did is just absolutely not

18 correct, Your Honor.

19        Secondly, Your Honor, I wanted to address the --

20 sort of the refusal to litigate the claims by the debtors and

21 being somehow unjustifiable.  And I'm going to refer to the

22 debtors' brief that they filed, Your Honor, at Docket 2733.

23 But they do cite the Caesars case, which is 561 B.R. 457, that

24 a debtor's waiver of its rights to challenge a creditors liens

25 and claims under a cash collateral is not sufficient to

1   demonstrate unjustifiable refusal.  I think it's important to
2   note that.  They made that argument in their presentation,
3   that the cash collateral order is sufficient to satisfy that
4   requirement, and we just don't believe that's the case, Your
5   Honor.  And we did want to make sure that we cited Your Honor
6   to that case.

7           And then, finally, Your Honor, I just wanted to
8   address the unwilling -- JPMorgan's alleged unwillingness to
9   stipulate.  We were presented with a stipulation in June of
10  last year, 2020; it's almost been a full year, Your Honor.
11  This was the first request to extend the deadline.  It
12  included, you know, various stipulations, you know, some of
13  which we are disputing here today.  But JPMorgan politely said
14  that they would not consider the stipulations but would extend
15  the deadline, and then we never heard from the moving parties
16  again on this issue until the complaint was filed.

17          So I don't want the Court to be left with the
18  impression that they have been banging down our door for
19  stipulations and we've just been ignoring them because that
20  has not been the case.  And as we pointed out in our motion,
21  we would be -- or in our response, we would be willing to
22  consider appropriate stipulations here and we still here.

23          So, in conclusion, Your Honor, both the debtors and
24  the UCC carefully considered the litigation alternative and
25  determining -- determined that pursuing that was not in the

1  best interests of the debtors' estates.  They considered those

2  claims and others -- the claims that were in there and others,

3  and concluded that pursuing them would lead to no better and

4  more likely a worse result for creditors.

5          Finally, Your Honor, and most importantly, the

6  larger context of these cases compels denial of the standing

7  motion or at least carrying it, Your Honor, to confirmation.

8  We believe that this is just another attempt to further delays

9  these cases in order to extract some kind of holdup value,

10  despite the fact that the centerpiece of their litigation --

11  proposed litigation, the claim relative to the Summit, is

12  already being provided to holders of abuse claims under the

13  terms of the second amended plan, Your Honor.

14          With that, Your Honor, we respectfully request that

15  the Court either deny the standing motion or carry it until

16  confirmation.  Thank you.

17          THE COURT:  Thank you.

18          Does the UCC have anything to add?

19          MR. HAMERMAN:  Your Honor, Natan Hamerman from the

20  -- Natan Hamerman from the creditors' committee.  May I be

21  heard please?

22          THE COURT:  You may.

23          MR. HAMERMAN:  From Kramer Levin.

24          THE COURT:  Yes.

25          MR. HAMERMAN:  Okay.  Thank you.  I won't belabor

1  the point.

2          We put in a very short pleading, which I think

3  dovetails perfectly with what seems to have been Your Honor's

4  instinct from the beginning of the discussion of this, which

5  is that the standing motion should simply be pushed off,

6  whatever the formal title will be -- a stay, an adjournment, a

7  dismissal without prejudice, a continuance -- to confirmation

8  because these claims are up for settlement as part of that

9  confirmation.

10          We think that we did negotiate for resolution of

11  these claims.  I don't want to wade into the merits anymore, I

12  believe that those merits are going to be addressed by the

13  settlement that we have put forward.  And if others disagree,

14  they're free to object to the plan, they're free to take

15  discovery in connection with the plan of the debtors, of

16  JPMorgan, to pursue whatever arguments they have in that

17  regard.

18          We would also, I guess, just note that, as we did

19  in our very limited response and in the event the plan is not

20  confirmed, the creditors' committee's challenge rights also

21  spring back into effect and we continue to reserve rights in

22  that regard.  But given where we are in this case right now,

23  we believe the issues are more appropriately heard in

24  connection with confirmation.  And there is ample precedent to

25  that effect, we cited it in Paragraph 3 of our limited reply.

1 Thank you, Judge.

2          THE COURT:  Thank you.

3          Mr. Litvak, do you have anything you want to add?

4          MR. LITVAK:  The only thing I would suggest, Your

5 Honor, is I don't like the option of denying the motion

6 without prejudice because I'm not sure that that addresses the

7 -- our concern or, frankly, the Court's concern with

8 preserving everyone's rights.  So I think that maybe the

9 easiest thing would be just to carry the motion to the --

10 without denying it or approving it, to the confirmation

11 hearing.  I think that might be the most efficient way to

12 proceed.

13          And that way, I think, to Your Honor's point, to

14 the extent that the tort claimants committee wants to litigate

15 these issues with respect to what's encumbered or

16 unencumbered, we have every right to do so in the context of

17 discovery associated with the plan.  And I'm sure that we'll

18 evaluate whether to pursue those rights or not under the

19 circumstances.

20          THE COURT:  Okay.  Thank you.

21          MR. BRADY:  Your Honor, Robert Brady for the FCR.

22          We agree.  At most, Your Honor should just continue

23 this.  I think a denial without prejudice they would try to

24 use against us in the future.  We should have, frankly, the

25 same rights the UCC has.  Our time to bring a challenge should

1  be tolled until after plan confirmation.

2         THE COURT:  Thank you.

3         Okay.  I am going to continue this -- the hearing

4  on this motion until after confirmation, until after we see

5  whether, in fact, the settlement that's been incorporated into

6  the plan is approved.  And I am not denying the motion because

7  -- even without prejudice because I don't know exactly what

8  that means.  And I agree that there could be a concern because

9  of the challenge period.

10        So I'm making no comments on the colorability of

11 the claims that have been asserted.  All of it is being

12 carried until after confirmation.  And I'd like the parties to

13 document a form of order that does that, that does not

14 prejudice the committee, the TCC, or the FCR.

15        MR. LITVAK:  Thank you, Your Honor.  We will do

16 that.  We'll prepare the form of order and circulate it to the

17 parties-in-interest before uploading it to the Court.

18        THE COURT:  Thank you.

19        MR. LITVAK:  And I apologize again, Your Honor, for

20 being late in getting on.  And thank you so much for your

21 discretion.

22        THE COURT:  No apologies necessary.

23        Okay.  So that brings us to Number 5, the

24 estimation motion.

25        MR. HARRON:  Well, again, Your Honor, Ed Harron on

1   behalf of the futures rep.  I think I've been -- I drew a

2   straw and I'm going to go first for the committee, the FCR,

3   and the coalition.

4           Your Honor, I wanted to back up a little bit, if I

5   may, because I recall at the last hearing, I believe, Your

6   Honor referenced some of the letters you received from the

7   survivors, and the sentiment that the Boy Scouts needs to

8   survive.  And I happened to read last night the opinion you

9   authored in the Cyprus case.  We had talked about, you know,

10  focus on what claimants deserve.  So I've been thinking about

11  that today and I've tried to kind of back up and really focus

12  on what's best for the claimants here.

13          And I wanted to show the Court, first of all, that

14  the futures rep is in no way hostile to the mission of the Boy

15  Scouts.  And the estimation motion was not filed out of

16  hostility and it was not filed to disrupt exclusivity or to

17  knock their plan off the rails.  The FCR's goal remains the

18  fair and equitable of future survivors.  And we share the

19  concern about costs, but we don't think the concern about

20  costs should cause the Court to send out a plan which we think

21  will not result in a resolution of this case.  We think

22  sending out the plan that's on the table is not the best use

23  of estate funds.

24          In every one of these cases that we've been

25  involved with -- and Your Honor was kind enough to

1   (indiscernible) and in some measure because of (indiscernible)

2   experience because we've done these cases before.  The only

3   way you get out of bankruptcy promptly in a mass tort case as

4   complicated as this is by consensual resolutions, not fully

5   litigated claims.

6           The -- and I recall, at the beginning of the case,

7   you know, it was the Scouts' goal to not only put the abuse

8   issue behind them and move forward, but also to treat the

9   claimants fairly, the survivors fairly.  And I can't help but

10  wonder how we've come to the point where there's a plan on

11  file that says take what we give you, but we're going to cram

12  you down.  It just seems to be a long way from the sentiments

13  we heard when this case began.

14          We still think that consensus is the right way to

15  get the Boy Scouts out of bankruptcy.  Your Honor knows that

16  there's a way to build consensus.  It requires a level of

17  transparency, in terms of discovery.  I have to say, Your

18  Honor, like the complaints you heard about the discovery on

19  the restricted assets litigation, we've already run into the

20  same issues with discovery related to estimation.

21          The elephants in the room here are the extent of

22  the abuse, the value of the claims, but also the value of the

23  unrestricted assets.  Quite frankly, we don't think the right

24  -- enough of the right work has been done on either of those

25  issues to bring us to a point where we can start building

1 consensual resolutions, build consensus.  You only get there

2 when you narrow the issues in dispute.  If we could narrow the

3 range of the liability, we could form a view of what's a fair

4 contribution from the councils, what the charter organizations

5 should pay and how much the insurers should pay.  We haven't

6 addressed any of those issues in the -- for the whole time

7 this case has been pending.  So we've proposed another way,

8 and it's the estimation motion.

9 Your Honor, I would note that we think the value in

10 the estimation process is multi-faceted.  This is a unique

11 case and it's about more than money.  Your Honor, I'm sure

12 you've noticed, as I do, on the Zoom screen there are

13 survivors at every hearing.  The estimation process is

14 actually a way to hear the whole story.  We could understand

15 the abuse that the survivors have endured.  We could

16 understand what stops the Scouts did and didn't take to

17 prevent the abuse.  We could form a view of why claimants

18 filed proofs of claim and why maybe some didn't.  We could

19 understand why claimants, survivors file lawsuits and some

20 don't.

21 There's a psychological component to claiming here

22 that shouldn't be discounted, that most of us can't fully

23 comprehend.  And the insurers come in and blithely suggest

24 it's all fraud.  Well, let's find out, that's what we're

25 saying.  Let's find out.  And (indiscernible) we could get the

1  facts, get the evidence that we need to confirm a plan.

2  The Scouts agree that estimation is required for

3  their claim.  They have it as a part of Plan A.  They don't

4  acknowledge it in Plan B.  But you cannot do a cram-down

5  without satisfying fair and equitable, without satisfying best

6  interests.  You can't undertake those analyses without knowing

7  the liabilities and the assets.  The very plan that's on file

8  requires estimation.  What we're saying is estimation should

9  be done in a way that's not only good for the Scouts, but also

10  that advances the interests of survivors.

11  The other difference between our approach to

12  estimation and the Scouts' approach is we think it should be

13  done before confirmation.  The problem with the Scouts'

14  approach is that they're prepared to send out a plan that

15  proposes third-party releases, and they have blanks for the

16  amount of contribution those parties are going to provide.

17  That information should be filled out before people vote.

18  That plan doesn't tell you what the charter organizations are

19  going to pay, what the councils are going to pay.  We have an

20  estimation, we negotiate those amounts, and then you do a

21  plan.

22  Your Honor, we think that, under 502(d), estimation

23  is mandatory.  And again, we think the debtors' plan is

24  (indiscernible)

25  THE COURT:  How --

1          MR. HARRON:  They propose it --

2          THE COURT:  Explain that --

3          MR. HARRON:  They propose --

4          THE COURT:  -- to me.

5          MR. HARRON:  -- (indiscernible)

6          THE COURT:  Explain that to me.

7          MR. HARRON:  Huh?

8          THE COURT:  Because when I think of what the --

9   decisions that I have to make in connection with the plan,

10  there are all kinds of decisions I have to make that are

11  mandated by 1129, and that do not require the detailed kind of

12  estimation process you're talking about, so I'm trying to

13  understand that.

14          For example, last August, I held two valuation

15  hearings in -- at confirmation.  I had to value, come up with

16  the value of the companies, in order to determine whether

17  equity was in the money or not in the money.  I made those

18  decisions at confirmation.  And I view -- and I'm questioning

19  -- and that's why I'm asking.  Why isn't this the same way?  I

20  have to make certain decisions under 1129 standards.  And to

21  do that, I'm going to have to determine certain matters.  And

22  one of them may be, on a global basis, what are the amount of

23  claims.  How is that not something that I would do as part of

24  confirmation?

25          MR. HARRON:  You can estimate claims as part of

1  confirmation, there's no doubt about that.

2          THE COURT:  I'm not talking about estimating

3  anything.  I'm talking about a hearing, an 1129 hearing, not

4  an estimation hearing, an 1129 hearing which raises issues,

5  which people will put in front of me.  And in that context, I

6  have to make findibngs.  For example, if nobody had challenged

7  the -- if nobody had challenged that equity was in the money,

8  I wouldn't have had to make those findings last year, but I

9  did in the context of that case.  So this case may require me

10 to determine an aggregate amount of claims.  How is that not

11 something that I do in an 1129 context?  Why is that

12 estimation?

13         MR. HARRON:  Well, it is estimation.  You're doing

14 it in the 1129 context.

15         THE COURT:  I'm not estimating a particular claim,

16 I'm not determining --

17         MR. HARRON:  But you're --

18         THE COURT:  -- any particular --

19         MR. HARRON:  -- estimating --

20         THE COURT:  -- claim is --

21         MR. HARRON:  You're estimating --

22         THE COURT:  -- valid --

23         MR. HARRON:  -- the value --

24         THE COURT:  -- or not --

25         MR. HARRON:  -- of --

1          THE COURT:  -- valid.

2          MR. HARRON:  I don't think I fully understand your

3   question, and it's, I think --

4          THE COURT:  Well, I think the question is you want

5   to --

6          MR. HARRON:  I mean --

7          THE COURT:  -- to start a separate estimation

8   proceeding, assuming that 502 is appropriate.  And my question

9   is:  If what you need to do is, for example, use it for a

10  liquidation analysis, then there are many decisions I may have

11  to make on a liquidation analysis, and the amount of claims

12  might be one of them, but that doesn't make it an estimation

13  proceeding.  I'm in 1129 context, I'm deciding something in

14  that context, just like I might decide the settlement in the

15  context of a plan.  They're parts of a plan.

16         So why is this different than any number of

17  decisions I have to make to determine if a plan meets 1129?

18         MR. HARRON:  That's difficult to address in the

19  abstract because it's dependent on the plan.  Here, you have a

20  whole class of survivors, undoubtedly the largest class in

21  this reorganization.  You need to come up with a way to value

22  that class, to get through the 1129 standards.  We can call it

23  "estimation," you can call it "confirmation."  You cannot

24  satisfy best interests and you can address fair and equitable

25  treatment without forming the view on the value of the claims

1  in the survivor class.

2          So the question becomes how best to do that.  If

3  the structure of the plan says that the view you form on the

4  value of that class is going to cap the amount of assets going

5  to that class, because they're personal injury claimants,

6  that's a non-core proceeding.

7          THE COURT:  I don't know if it caps it.

8          MR. HARRON:  If you're going to cap --

9          THE COURT:  Does it --

10          MR. HARRON:  -- the recovery --

11          THE COURT:  Does it cap it?

12          MR. HARRON:  -- if you're -- if -- we don't know,

13  we don't know.  You don't know how much money is going in.

14  But if -- that's what I'm saying, it depends on the plan.  If

15  the plan is going to say that this -- that your estimation is

16  going to determine the level of funding being paid to that

17  class, and leaving money go other -- elsewhere, that's a cap,

18  not core.

19          THE COURT:  I -- that -- well, that's a different

20  issue.  I have not fully been able -- fully thought through

21  that yet.

22          MR. HARRON:  Okay.

23          THE COURT:  I'm not --

24          MR. HARRON:  But --

25          THE COURT:  -- sure I --

1          MR. HARRON:  But --

2          THE COURT:  -- agree with you --

3          MR. HARRON:  But --

4          THE COURT:  -- or not on that.  But let's assume

5   that for the moment.

6          MR. HARRON:  Okay, okay, okay.  So question one is:

7   What's the value of that class?  The other questions are:  Are

8   you obtaining fair contributions for the third parties who are

9   going to be protected pursuant to the plan?  Here, those third

10  parties include councils, charter organizations, and insurers.

11  How can you form a view on the fairness of those contributions

12  unless you have an idea of the magnitude of the liability?

13  Our position is let's find out the magnitude of the liability

14  first, use that as a basis from which to negotiate fair

15  contributions, then have a confirmation hearing.

16          Your Honor, to quote Prince Harry, it's bonkers to

17  go forward with plan confirmation with blanks for the most

18  important information in this case:  What's the liability and

19  how much are people going to pay to be released from it?  It

20  doesn't make any sense.

21          So the debtors proposed an estimation process, and

22  their process is 90 some days and our process is just over 100

23  days, so the time table is comparable.

24          THE COURT:  Well, I don't know that because,

25  according to you, I will not control that, and so that's a big

1  issue.

2        MR. HARRON:  I'm -- I assume you're talking about

3  the withdrawal of the reference.

4        THE COURT:  Uh-huh.

5        MR. HARRON:  Okay.  Let's talk about that.  The --

6  we assume that it's non-core, so that the District Court will

7  have to issue or affirm whatever you do.  We also assume that

8  the insurers are going to appeal whatever happens.  Based on

9  those two assumptions, we thought it's more efficient to

10  eliminate one level of appeal.  The appeal now goes to the

11  District Court, to the Third Circuit, not from the Bankruptcy

12  Court to the District Court.  Those are the decision points

13  that inform our motion to withdraw the reference.

14        THE COURT:  How about your informing your decision

15  points by how long it will take you to get a hearing in the

16  District Court.

17        MR. HARRON:  But if we're -- well --

18        THE COURT:  Because I haven't --

19        MR. HARRON:  -- Your Honor --

20        THE COURT:  -- (indiscernible) --

21        MR. HARRON:  -- if you're --

22        THE COURT:  -- that and --

23        MR. HARRON:  -- saying --

24        THE COURT:  -- I'm sure --

25        MR. HARRON:  -- to us --

1          THE COURT:  -- and I'm sorry you do, too.

2          MR. HARRON:  But even to get in front of the -- if

3   you put the proposed findings, we're still going to need to

4   get it in front of the District Court.  But if you're telling

5   us that I agree with estimation, I think I'm better suited to

6   do it, based on the reasons that -- I've told you what our

7   thinking is.  I mean, we'll defer to you, Your Honor.

8          THE COURT:  Am I better suited to do it?  I don't

9   know that I would say that.  I would say that this case is on

10  my docket, that's what I would say.  Am I better suited?  I

11  would never --

12         MR. HARRON:  But --

13         THE COURT:  -- say that.  But the -- but let's talk

14  about what you want.  And --

15         MR. HARRON:  Uh-huh.

16         THE COURT:  -- why is it -- if I determine, as part

17  of the 1129 standard, certain -- make certain decisions, how

18  is that non-core?

19         MR. HARRON:  The case law says that you lack

20  jurisdiction to fix the recovery of personal injury claims.

21         THE COURT:  I don't think that's what it says, but

22  okay.

23         MR. HARRON:  Well, I was paraphrasing.  Your Honor,

24  I mean, either way, this is going to the District Court, the

25  insurers are going to appeal this.  So, to some extent, this

1   is an academic point.

2              THE COURT:  I don't know what happens on appeal.

3   Is it going to be stayed pending -- is confirmation going to

4   be stay pending appeal?

5              MR. HARRON:  (Indiscernible) stayed pending appeal.

6   I would think not.  It's interlocutory.  We've litigated that

7   in other cases.

8              THE COURT:  Okay.  I may have gotten us off track

9   here.  I'm --

10             MR. HARRON:  No, I prefer hearing your questions.

11             THE COURT:  -- trying to -- what specific outcome

12  do you want from your estimation proceeding?  What do you want

13  the Court to decide?

14             MR. HARRON:  Well, Your Honor, we'd like a process

15  that evaluates what's a legitimate claim, based on criteria

16  that the Boy Scouts and the insurers have used to pay claims

17  in the past.  We'd like a view on what those claims are worth,

18  based on what insurers and the Boy Scouts have paid in the

19  past.  And we'd like a view on -- of the claims that are filed

20  and potential future claims, how many of those are likely to

21  be paid.

22             And you know, there's -- the objections talk about

23  co-defendants, they talk about year by year.

24             THE COURT:  Uh-huh.

25             MR. HARRON:  So the co-defendants issue is a red

1  herring. We're talking about estimating the Boy Scouts'

2  liability. To the extent the councils and charter

3  organizations are co-liable, it's the same amount of

4  liability. And I haven't heard any basis where we could use

5  the estimation to bind the councils or the charter

6  organizations. But we wanted to put them on notice that we do

7  intend to rely on the estimation to inform our negotiation of

8  what's a fair contribution, if those parties want to be

9  protected.

10          And Your Honor, the year by year, I mean, it is

11  helpful because that's how the insurance policies work, year

12  by year. It would be helpful for us to understand how much of

13  -- the quantum of these claims that are covered by insurance

14  because that also informs the Scouts' liability. That goes to

15  the best interests test, how much would the Scouts have to pay

16  based on what's not covered by insurance.

17          So, when we looked at it, we said, you know, what

18  case will we have to put on using the historic data points,

19  and we said what findings would be helpful to fully understand

20  the magnitude of the liability and how the trust should go

21  about resolving and paying these claims, and that's what we

22  came up with.

23          And Your Honor, the other difference -- I'm sorry.

24  Did you have a question?

25          THE COURT: No. Go ahead.

1          MR. HARRON:  Well, the other difference between our
2    approach, so the debtors want to put it after confirmation,
3    but it would be much more useful to do it before confirmation.
4    They want to do it after the vote, after solicitation
5    (indiscernible) we think it should happen before solicitation,
6    they want to do it after.

7          And then there's this issue of insurance
8    neutrality, which has taken on a life of its own.  Insurance
9    neutrality is simply a concept of standing.  There are some
10   cases that say, if you put the appropriate language in the
11   plan, then the insurers' standing is limited.  We made that
12   pitch to you in Imerys, said, hey, we're going to put the
13   language in, we'd like to limit the insurers' participation in
14   the confirmation, and you said no way.

15         THE COURT:  I don't think that's what I said.

16         MR. HARRON:  And --

17         THE COURT:  I think I said do you want me to decide
18   -- I think I said do you want me to decide the standing issue
19   now, and you said no.  I think that's how it happened.

20         MR. HARRON:  All right.  We'll save that for the
21   next (indiscernible) --

22         THE COURT:  Well, look at --

23         MR. HARRON:  -- (indiscernible) --

24         THE COURT:  -- the transcript.

25         MR. HARRON:  -- clarification.  I will.

1        But -- so, in this case, even if you were to agree

2   that the plan was insurance neutral and the insurers have no

3   standing, the insurers aren't going to agree with you, they've

4   already told you that.  They've already filed pleadings.

5   Hartford and Century have filed pleadings and, in this case,

6   cited Global Industrial Technologies for the proposition that,

7   even if this plan is insurance neutral, they still get to

8   object to everything.  They've already said that.  We know

9   that's their position and we know that's what they did during

10  every other case.

11       Again, we think, if we're going to have an

12  estimation proceeding, if the insurers are going to object to

13  everything, let's treat that according to the customary and

14  usual rules of res judicata and collateral estoppel.  We're

15  not asking for insurance binding, we're asking for insurance

16  silent.  We're sophisticated litigants.  Let's rely on what

17  the rules provide.  We don't need this Court to prejudge what

18  is or isn't relevant for purposes of future coverage

19  litigation.

20       And Your Honor -- and --

21       THE COURT:  So let's say I agree with you on that,

22  let's say I agree with you on that, that neutrality was a

23  standing concept and all it said was, if it's not insurance

24  neutral, then the insurance companies get to be heard and it

25  doesn't say anything beyond that.  And then there's a separate

1  concept of can I do anything to their contract, how is it

2  different than any other contract, right?  It's the same as

3  any other contract.

4          MR. HARRON:  Right.

5          THE COURT:  Certain things the Bankruptcy Code says

6  you can change, like assignability.  Other things, I can't

7  touch a landlord's contract, I can't touch a bond --

8          MR. HARRON:  Right.

9          THE COURT:  -- issuance, I can't touch an insurance

10  contract.  That's not insurance neutrality, that's contracts,

11  right?

12          So then --

13          MR. HARRON:  Right.

14          THE COURT:  So then whatever decisions I have to

15  make in the context of a case I make.  And if I have to make a

16  decision under 1129, I've made it in the confirmation context.

17  Maybe it's an adjudication of something and maybe it's not.

18          MR. HARRON:  Right.

19          THE COURT:  Okay?  So -- but I can't fend off every

20  view that a state court judge has about what I did or didn't

21  do.

22          MR. HARRON:  Exactly.

23          THE COURT:  Okay?

24          MR. HARRON:  And we agree with you.

25          THE COURT:  So I'd like to hear responses to all of

1  that.  But here, why should --

2         MR. HARRON:  We don't think --

3         THE COURT:  -- I create --

4         MR. HARRON:  -- the --

5         THE COURT:  Why should I create an estimation

6  procedure that does things that don't need to be done in the

7  context of this case or confirmation?  Why shouldn't I just be

8  deciding what needs to be decided for confirmation, not for

9  some other purpose?  It works two ways, right?  It works two

10 ways.

11        If I decide -- for example, if I approved a

12 settlement, the settlement with JPMorgan, if I approve that

13 and then, for some reason, the plan didn't go effective and

14 somebody wants to sue later on in State Court somehow, should

15 somebody look at the fact that I approved a settlement and

16 say, well, JPMorgan must have liability?  I don't think so.

17 That's not the settlement standard.

18        So that's what I'm -- that's what I'm getting at

19 here.  I decide certain things that I have to decide in the

20 context in which I have to decide it.  This is confirmation.

21 Okay?  So --

22        MR. HARRON:  It's not just confirmation.

23        THE COURT:  So, why is it that I should set up an

24 estimation procedure when I'm not going to determine the

25 validity of any particular claim.  I'm not going to decide

1   whether a claim is valid or not valid, and neither is the
2   District Court.
3            What do I need to decide in the context of this
4   case for confirmation, and I'll have to say this, not so that
5   you feel more comfortable negotiating -- that's not the
6   standard for how we litigate -- what do I need to decide in
7   the context of confirmation?
8            I have a plan in front of me, which I haven't ruled
9   on a disclosure statement yet, but if I send it out, that's
10  what I've got.
11           MR. HARRON:  Well, we think you need the
12  information that estimation will provide, for purposes of the
13  disclosure statement.  This plan just has so many holes that
14  the estimation at the confirmation hearing is not going to
15  save it.  It's not going to get the vote.
16           You're right that you get to decide during the
17  course of the estimation of what's relevant and what's not
18  relevant or the presiding judge gets to decide.  We think it's
19  difficult to determine what the aggregate liability might be
20  without an understanding of what an individual claim looks
21  like and how many of these groups of claims represent valid
22  claims.
23           Our proposal is we leave it to the presiding judge
24  to determine what's relevant to estimation for purposes of
25  disclosure statement and confirmation, but then the people who

1  litigate and participate in the litigation of those relevant

2  facts are bound to whatever extent *res judicata* and collateral

3  *estoppel* say about it.  We're not going to argue what we

4  believe is the relevant information, but -- relevant

5  estimation, but the presiding judge will determine what they

6  need to determine in order to support a finding of an

7  aggregate liability for purposes of the confirmation

8  standards.

9          And, Your Honor, I wasn't suggesting that the

10  litigation is necessary so I can negotiate.  I was suggesting

11  what the Court knows is that litigation results in settlements

12  and if we can narrow the gap on this liability, we might be

13  able to get some settlements that fill in the holes in the

14  debtors' plan.

15          We agree that the form of plan that the debtors are

16  utilizing for Plan A is the right form.  You need the

17  councils.  You need the charter organizations.  You need them

18  onboard in order to get this case out of bankruptcy, but we

19  they estimation is necessary so we can go about filling in the

20  blanks of what's the liability and how much people pay for.

21          Why are we going to solicitation of a plan that

22  results in liability to survivors, but you're forcing them to

23  vote before the Court has even opined on what that liability

24  is.  How is that fair?

25          THE COURT:  Well, I think that happens a lot.  Not

1    necessarily in this context, and I'm not saying that it's

2    ideal, but there are times when you go to confirmation --

3    well, first of all, claims litigation rarely gets done, rarely

4    gets done before confirmation in my experience.  So, you never

5    know what the aggregate claims are.  It rarely gets done.  You

6    have guesses --

7            MR. HARRON:  But you have a sense.

8            THE COURT:  You have guesses.

9            MR. HARRON:  Yeah, you have guesses.  Your Honor,

10   the guess is, the range is so broad it's like 1 billion to 7

11   billion, according to the debtors.  The funding is going be

12   anywhere between 160 million and art work and real estate to a

13   couple billion.

14           How are people going to vote on that?  That range

15   is so broad it's unhelpful.

16           THE COURT:  But what defenses do you think are

17   going to get decided that will help a person know what their

18   claim is, because that seems to be what you're talking about,

19   too.

20           MR. HARRON:  Ideally, you'll have a matrix that

21   will identify the unfortunate categories of abuse along the

22   lines of what Mr. Stang talked about today.  From the history

23   of settlements, we'll match up values to those categories of

24   abuse.  The insurers and the Boy Scouts historically paid a

25   million dollars for this type of abuse based on this type of

1  evidence.  And if the scalp was on the roster, there's a
2  psychological report, you get a million bucks.  We would put
3  in a trust receipt.  If you have this type of evidence, this
4  type of injury, the liquidated value of your claim is a
5  million dollars, for example.

6          Then, we would have a view of the aggregate
7  liability from the estimation.  We would hopefully have a
8  sense of what people are willing to pay.  And maybe to fill in
9  many of these trusts, we would include a payment percentage.
10 So, the voter would know if I have this type of evidence, if I
11 have this type of injury, my likely recovery is within this
12 range.  That's what most voters get when they vote on a plan
13 of reorganization.  If I can prove-up my claim, my recovery is
14 going to be between X and Y, not between A and Z.

15         THE COURT:  I did think it was interesting that I
16 don't think anybody objected to the TDPs in connection with
17 the disclosure statement.  I don't think I heard anything on
18 that.  I was surprised.  Maybe because it was such the focus
19 of Imerys.

20         So, you're suggesting an estimation procedure that
21 contradicts what's currently on the table, in terms of the
22 TDPs?

23         MR. HARRON:  It may or may not contradict it.  But
24 our assumption is that the Boy Scouts prepared those TDPs
25 based on their historic experience, but we'd like to take

1   discovery and create an evidentiary record if that's, in fact,

2   the case, and then we'll multiply the values based on their

3   historical experience times the number of claims and that'll

4   be our estimation.

5           Your Honor, if I may -- did you have more

6   questions?

7           THE COURT:  No, go ahead.

8           MR. HARRON:  Just on the insurance neutrality

9   point, you were right on it.  What we're asking you to do is

10  to just not -- you make whatever rulings you need to make for

11  purposes of this bankruptcy and they'll have whatever *res*

12  *judicata*, collateral *estoppel* effect they may have and

13  substantive litigation based on the rules.  We're asking that

14  it shouldn't be baked into the plan.

15          And we actually think it's counterproductive for

16  the progress of this case to have neutrality in the plan

17  because it actually puts the insurers in the enviable position

18  of being able to object to everything with no repercussions.

19  They can object and prolong the case.  And simple math is that

20  the longer this case goes on, the longer they have to pay out

21  their money.  They're making money by holding their assets.

22  That's what insurance companies do.  That's the calculation

23  they undertake every day.  So if we let them sit back on their

24  hands without any risk of collateral *estoppel*, they'll keep

25  throwing bombs until the Third Circuit tells them to stop.

1          THE COURT:  Okay.  I know I kind of got you off

2   your presentation, I'm sure, so is there anything else you

3   want to add and then I'll certainly permit your co-movants to

4   address the Court.

5          MR. HARRON:  I just want to say, we covered a lot

6   of ground, I just wanted to check my notes.

7          (Pause)

8          MR. HARRON:  I think that's all I have, Your Honor.

9   Thank you for your time.

10          THE COURT:  Thank you.

11          MR. ROBBINS:  Good afternoon, Your Honor.  This is

12   Larry Robbins from Robbins Russell for the Coalition of Abused

13   Scouts for Justice.

14          Can you hear me all right, Your Honor?

15          THE COURT:  I can, Mr. Robbins.

16          MR. ROBBINS:  Thank you very much.  I'm going to

17   try and take us back to the Code provisions that we think

18   control the question presented and resolve it.

19          The motions brought under 502(c), the question

20   before the Court is whether an estimation of these claims that

21   are unliquidated at present, whether to liquidate them

22   individually, would unduly delay the case.  That's the

23   question presented.

24          If the answer to that is yes, if the liquidation of

25   these 82,000-plus claims would unduly delay the administration

1  of the case, a term of art I will come back to, then

2  estimation is not discretionary; it is mandatory by the plain

3  language of 502(c).

4       Now, the very fact, Your Honor, that the debtors,

5  themselves, have proposed estimation and have said in their

6  papers to you in support of their separate schedule that it

7  would, in fact, be helpful to the disposition of this case,

8  tells you that in their view, it is mandatory because if it is

9  something, if the very fact that they are proposing means that

10 as far as the debtors are concerned, we meet the standard of

11 502(c) and if we do, it is not a judgment call.  It is not

12 discretionary.  It is required.

13      So, the debtors, although they don't say so in so

14 many words, the fact that their toggle A option, if you will,

15 includes estimation, albeit on a slightly quicker schedule by

16 maybe two weeks only.  The fact that they have subscribed to

17 it tells you that in their view, it is mandatory, not

18 optional.

19      THE COURT:  Mr. Robbins, let me ask you a question

20 about the language.  So, I'm looking at 502(c) --

21      MR. ROBBINS:  Yes, Your Honor.

22      THE COURT:  -- and it says there shall be estimated

23 for purposes of allowance under this section.

24      MR. ROBBINS:  Yes.

25      THE COURT:  And I'm not going to allowing, no Court

1  is going to be allowing a claim, are they, in the context of

2  what the movants wants?

3      MR. ROBBINS:  I think the answer to that is you're

4  right, but it doesn't matter because the language says for

5  purposes of allowance.  It doesn't say in order, it doesn't

6  say, you know, the other side says, well, you know, you're not

7  actually resolving any individual claim.  There'll be a

8  further proceeding to adjudicate any individual claim at some

9  subsequent time and only then will it be allowed.

10      That's not the question presented by the statute.

11  The statute says, does it serve the purpose of allowance?

12  Does it move the football down the field?

13      The answer to that is manifestly yes for all the

14  reasons we say in our papers and for which my co-counsel has

15  adverted to.  So, where does the argument, given that the

16  debtors are effectively onboard in all but concession, what is

17  the argument under are which 502(c) is not satisfied?

18      Well, that comes of course from the insurers, who

19  don't much like estimation for all the obvious reasons.  And

20  they offer you three rather technical arguments and then some

21  claims about our actual motivation that they impute to us.

22      So, let's talk about their technical arguments,

23  because I think they can be dispatched quite quickly.  They

24  first say, well, this isn't really the estimation of a, quote,

25  claim; it's an estimation of lots of claims.

1    Well, apart from the fact that (indiscernible) by
2  its terms says that the singular includes the plural, so that
3  the reference to the world claim embeds in it the word claims,
4  is actually the most perversive arguments, because the more
5  work estimation does by estimating the entire aggregate
6  damages and placing a cap on total distribution, you would
7  think that that makes it more efficient, not less efficient to
8  proceed by estimation.  But fortunately, the Code answers that
9  hypertechnical claim by telling us that the word claim
10  includes the plural.

11    Then they say, well, it wouldn't really -- it's not
12  really for purposes of allowance because after all, the actual
13  allowance won't happen until some further proceeding.  That's
14  the question Your Honor just raised separately.  My answer is
15  that this argument reads words out of the statute in defiance
16  of ordinary canons of interpretation.  The words are for
17  purposes of.  Does it serve the purpose?  Does it advance the
18  ball?

19    The answer is (indiscernible) that it does.  Then
20  they say, well, finally, it really wouldn't unduly delay
21  administration of the case because they'll still have to be
22  proceedings later and so it's not going to resolve everything
23  and there's still more work to do.  That also is not the
24  question presented.

25    The question presented is, would it unduly delay

1 the administration of a case?

2 And by the way, the phrase "administration of the

3 case," is not the same thing as will it unduly delay

4 confirmation? Will it unduly delay the effective date of the

5 plan?

6 No.

7 The question presented is, does it unduly delay the

8 administration of the case, and the answer to that is

9 manifestly yes. Because the administration of the case

10 consists not only of the various confirmation issues that the

11 Court will have to decide, all of which, I submit, under 1129,

12 would be manifestly advanced by beginning the estimation

13 process now, requiring the debtors and the insurance companies

14 to finally cough up the history of judgments that they have

15 kept hermetically sealed like the crown jewels.

16 It's not just that the confirmation inquiry would

17 be materially advanced, but the entire rest of the case. The

18 actual liquidation of 82,000 claims and the payout to 82,000

19 claimants will be also materially advanced and that, too, is

20 part of the estimation of the case.

21 Why do I say that?

22 Well, I say that for at least three reasons.

23 First, Section 350(a) of the Code suggests that post-

24 confirmation hearings are actually a part of the

25 administration of the case. I say that also because under the

1 plan, itself, in Article 12(a), the debtors propose that this

2 Court retain jurisdiction in order to liquidate the individual

3 claims, so, they obviously believe that the liquidation of

4 claims, which estimation will unquestionably expedite by

5 leaps, by expedite enormously.

6 THE COURT:  How does it do that?  Let me ask you,

7 how does estimation of claims in the aggregate decide whether

8 --

9 MR. ROBBINS:  Yes.

10 THE COURT:  -- further advanced, whether any

11 particular claimant has a valid claim?

12 MR. ROBBINS:  Well, let's -- the question is always

13 going to be compared to (indiscernible).  So, let's suppose we

14 don't estimate the claim and therefore we remit the entire

15 liquidation to some post-confirmation proceeding.

16 Presumably, at that time, there'll have to be some

17 kind of showing about the extent to which, for example, the

18 statute of limitations requires, you know, has some

19 implication.  Whether there are certain claims that are

20 illegitimate.

21 THE COURT:  Yeah.  It's going to have to happen one

22 by one.

23 MR. ROBBINS:  Yes.  But the estimation process that

24 we have outlined and which our experts are prepared to back

25 up, will resolve those questions admittedly in the aggregate -

1  -

2          THE COURT:  Yeah.

3          MR. ROBBINS:  -- through the estimation process.

4          THE COURT:  I don't understand that.  I will tell

5  you that I don't understand that, because the statute of

6  limitations that I have dealt with in the past in other

7  matters are all individual, okay.  They are all individual.

8          And I am sure that some of the Plaintiffs'

9  attorneys are going to argue that notwithstanding that a

10 statute of limitations has passed in their particular state,

11 that there is some reason that they should still be able to

12 bring their claim and somebody is going to have to look at

13 that.

14         And while in the aggregate I could decide, okay,

15 here's a percentage of, here's the states that have a window

16 open, here's the states that don't, here's the states we

17 anticipate having a window open, here's the percentage

18 something gives me about in a certain state how the statute of

19 limitations, and I could do something perhaps on an aggregate

20 basis, I get that.

21         Any individual, no.  You have to look at that

22 individual claim.  So, how does that advance that?

23         MR. ROBBINS:  Well, again, the devil is going to be

24 in the details and we're still working through what the

25 process would look like and what would go into the analysis.

1  But I think if you begin with a determination which, you know,

2  both the debtors' plan and ours, both involve, for example,

3  what the experts tell me is called stratified sampling --

4          THE COURT:  Uh-huh.

5          MR. ROBBINS:  -- which allows us to separate out

6  categories of claims that have greater or lesser chances of

7  success, allocate them by year so that they can be matched up

8  by policies.  Allocate them by types of abuse so that we can

9  match them up by policies.

10         There's all matter of post-confirmation issues,

11  including, for example, the extent to which insurance

12  companies will be on the hook.  That an estimation process,

13  done robustly on a year-by-year basis, on a claim-by-claim,

14  type-of-injury basis, and a type-of-defendant basis, as to who

15  the perpetrators were and the extent to which they have

16  liability, will advance a process by which, at the end of the

17  day, checks are cut to 82,000 or to some subset of 82,000

18  claimants who will otherwise wait until the second coming to

19  see a dime from this case.

20         THE COURT:  I agree that's problematic.  I agree

21  that's problematic and why all parties should be talking to

22  each other.

23         But I am not sure that this estimation motion

24  advances that for any plaintiff who wants to say, oh, no, I'm

25  not -- and how could they be bound by an aggregate decision on

1  statute of limitations?

2        They couldn't be.

3        MR. ROBBINS:  Well, I don't want to prejudge the

4  question of preclusion right now.  It's a complicated question

5  and I don't want to venture a view, although I do think that

6  the one-way ratchet proposed in the debtors' plan under

7  Section XM4, which purports, as I read the XM provisions,

8  basically authorizes the insurance companies to participant in

9  an estimation proceeding and yet not be bound by it.

10       In any event, the only point I want to make, Your

11  Honor, is that there are a raft of decisions, including

12  confirmation decisions and post-confirmation decisions that

13  will be materially advanced by an aggregate estimation done

14  year by year, allocated to different actors and according to

15  different degrees of harm.

16       Will it resolve all the questions?

17       Of course it won't.  It will leave other issues to

18  be decided, including on a case-by-case basis.  But if what

19  our goal is, as it should be, that these survivors see

20  recompense during their lifetime, and I can't think of what a

21  more important goal of this process ought to be other than

22  that, then I have to agree with the debtors who obviously

23  thought about this and included it in what we can call toggle

24  A.  They must have concluded, as we have, that it meets the

25  502(c) standard.

1          I think if we go back to Your Honor's questions,

2    you're probably right that you could probably decide some of

3    these questions of under the rubric of 1129, and in that

4    sense, you could resolve some of these questions at

5    confirmation.  And I rather suspect, Your Honor, that the

6    process by which you would do that is rather similar to the

7    process that we have identified.  But that, I think, is an

8    argument in favor of estimation, not against it, because it's

9    an involved process.  It's a fact-intensive process.  It's an

10   expert-intensive process.

11          Why in the world would we want to wait to begin it?

12   We should do it now.  502(c) tells us that the standard is met

13   and if the standard is met, as the debtors agree, then it

14   isn't discretionary; it is mandatory.

15          Now, let me just leave you with one other point and

16   then I want to turn it over to counsel for the TCC, subject to

17   the Court's questions.  I'll make one last point.

18          The Court began this inquiry by raising concerns

19   about the timing.  Will this all get done in time for the

20   debtors to emerge from bankruptcy on the schedule they claim

21   they need?

22          If you put side-by-side our schedule and theirs,

23   and there's a caveat that I'll come back to, but if you lay

24   them side-by-side, Your Honor, they differ only by two weeks.

25   Two weeks.  That's it.

1          And that, of course, however, presupposes that

2    we're starting from the place we ought to be starting, but

3    we're not.  Because the single most important piece of

4    evidence for our experts to do the job that estimation

5    requires is to have a full dataset of the historic judgments

6    and settlements executed by the Boy Scouts.  You can't do it

7    without it.  That's the heart of the empirical work that the

8    experts have to do.

9          But just in their most recent filing to you, in

10   Docket 4104, where they filed their reply brief in support of

11   their competing schedule, they told you in Footnote 10, that,

12   quote, historical claims settled by the Boy Scouts, quote, is

13   not necessary evidence for purposes of the estimation motion;

14   its only relevance is as to confirmation and on that basis,

15   they have stolen (audio interference).  My co-counsel's

16   repeated efforts time and, again, to get this evidence.

17   Personally, I can't wait to see it, because 40 years of law

18   practice has told me that when my opponents want to hide

19   something and not give it to me, it usually turns out to

20   fabulous evidence.

21         But the point here for present purposes is to recur

22   to a point that Your Honor made about an hour ago, which is if

23   the debtors wish to be credited with their demands to emerge

24   from bankruptcy by August, if that is what they want, they

25   need to behave in a way that is consistent with the schedule

1 that they are imposing on the rest of us. So, cough up the

2 evidence we need to do an estimation. Give it to us now.

3   The notion that it isn't relevant to estimation

4 what their historical judgments and settlements have been is,

5 frankly, an indefensible position to take. It is palpably

6 absurd and to withhold that evidence, while at the same time,

7 proposing an estimation schedule that is even faster than

8 ours, I think forfeits the right to insist on the schedule

9 that they're asking for.

10   So, if we do nothing else on this today, I would

11 respectfully ask that they be ordered to turn that over and

12 turn it over now, because whether we do an estimation now,

13 whether we do it as part of confirmation, which I think is

14 imprudent for the reasons I've said, but whenever we do it,

15 there can be no more fundamental piece of proof than what the

16 Boy Scouts have been paying to settle claims just like ours

17 for 40 years. And the notion that we should be bereft of

18 anything other than the last four years of settlement history,

19 I think, is just palpable nonsense.

20   So, Your Honor, I'm going to turn this over to the

21 TCC, Your Honor, subject to the Court's questions, but just to

22 sum up, if, as I believe, 502(c) is satisfied, then the

23 question of whether there's a better way to do it, another way

24 to do it, some substitute for it, is, frankly, not presented.

25 If, as we believe this materially advances the administration

1  of the case, which includes post-confirmation liquidation,

2  then the Court should order it and then we can talk about what

3  venue it ought to be in.  But it seems to me once we decide as

4  the debtors have, themselves, that 502(c) is met, we ought to

5  begin the work.

6       All right.  Your Honor, if there are no further

7  questions, my colleague from the Pachulski Stang firm will bat

8  cleanup for us.

9       THE COURT:  Mr. Robbins let me ask you a question,

10  because I am still thinking about your argument on how to read

11  Section 502(c).  How do you read that together with 28 U.S.C.

12  157?

13       MR. ROBBINS:  Well, I want to be sure I understand

14  the scope of the Court's question.  Our view is that 157

15  remits this question to the District Court for the reasons

16  that we have explained in our motion to withdraw the

17  reference.  We believe this is a non-core proceeding and we

18  believe that that separate section of 157 about the trial of a

19  personal injury case in District Court makes it

20  nondiscretionary.

21       I recognize that there are competing views on that.

22  We have explained our reasoning in the motion to withdraw the

23  reference, but is there some other aspect of 157 that the

24  Court wants me to consider?

25       THE COURT:  So, both of these sections use the word

1  "allowance" and you're saying that in 502(c), purpose of

2  allowance means something other than allowance, okay.

3        So, I'm trying to figure out, just because this is

4  a related section, if you will --

5        MR. ROBBINS:  Yes.

6        THE COURT:  -- what does allowance in that section

7  mean, then?

8        I've never read 502(c) to mean that the word

9  allowance doesn't really mean allowance, it means purpose of

10  allowance and that's somehow different.

11        MR. ROBBINS:  Well, my position, Your Honor, is not

12  that the word allowance means two different things in two

13  different statutes, two different provisions.  It is, rather,

14  that the phrase "purpose of allowance" means something

15  different from the word "allowance."

16        The fact that something serves the purpose asks

17  whether it promotes that particular end, whether it is an

18  efficient way of achieving the goal.  The goal, of course, is

19  allowance.  The word doesn't change.  The question is, as

20  always, what is the context?

21        In 502(c), the relevant phrase is "for purpose."

22  There's no (indiscernible) estimate.  There shall be estimated

23  for purpose of allowance and, therefore, the question is, does

24  estimation serve the purpose of allowance?

25        That is a different question from this one.  Does

1 || estimation determine allowance?  Does it resolve allowance?
2 || Does it, by itself, constitute allowance?

3 ||         That's not what the statute says.  The statute asks
4 || the Court whether estimation is for purposes of allowance, and
5 || the answer to that is manifestly yes, if, as we contend, it
6 || moves the ball down the field and shortens the path until
7 || actual allowance, which is the day before somebody cuts a
8 || check.

9 ||         THE COURT:  That's an interesting argument, Mr.
10 || Robbins.  Okay.  Thank you.

11 ||         MR. ROBBINS:  I yield to the TCC counsel.

12 ||         MR. PAGAY:  Good afternoon, Your Honor.  It's
13 || Malhar Pagay from Pachulski Stang.  I don't know if you can
14 || hear me?

15 ||         THE COURT:  I can.

16 ||         MR. PAGAY:  Thank you, Your Honor.

17 ||         My esteemed colleagues have left me with little,
18 || because they have covered so much.  I do want to answer Your
19 || Honor's question earlier, and I think it dovetails with what
20 || Mr. Robbins is discussing with Your Honor about for purposes
21 || of allowance.  There have been many mass-tort claims over the
22 || years in bankruptcy, many of course having to do with
23 || asbestos, and in those personal injury tort claims, there has
24 || invariably been estimation and there has invariably been TDPs.
25 || And those working in conjunction with the other, I think, is a

1   perfect illustration of estimates for purposes of allowance.

2           No Bankruptcy Court is adjudicating a single

3   asbestos claim in those cases.  What's happening is you have

4   the estimation for purposes of getting through a certain point

5   in the case and then you have TDPs in which a variety of

6   methods are used to adjudicate a single claim, a claim that

7   often go to some sort of tribunal that the TDP sets up.  It

8   may opt to go to the tort system in some cases.

9           But what has been helpful in those cases is you

10  have an estimation that said, in those contexts, for example,

11  a mesothelioma claim is worth this much, let's say, in

12  general.  A certain different type of lung cancer or different

13  type of harm is worth this much.  And the estimation process

14  in those cases did similarly happen here.

15          In the course of these cases, the parties have been

16  utilizing certain categories of abuse, different descriptions

17  of the horrific abuse that have been suffered by the 84,000

18  claimants in these cases and if the Court is able to establish

19  that persons who, and I hate to use such graphic terminology,

20  but you have to, but a person who was penetrated anally

21  generally deserves this much, according to an estimate.

22  Someone who was touched inappropriately outside of their

23  clothing is worth a different amount.

24          Then these amounts help inform the TDP process and

25  help achieve what Mr. Robbins also pointed out was getting

1  this massive class of creditors satisfaction that won't go on

2  for decades and decades, because this Court was able to

3  ascribe some value in estimating the aggregate and give some

4  guide posts going forward so that claimants could help, it

5  could help claimants adjudicate their claims for allowance

6  purposes as part of the TPD.

7        So, I think that is one thing which estimation

8  helps achieve.  Another thing which estimation helps achieve,

9  which Your Honor (indiscernible) discuss with my colleagues

10 was what is really happening with the insurers, *vis-a-vis*,

11 estimation.  The involvement of insurers is really one of the

12 two big distinctions that we have with our version of

13 estimation and the debtors' version of estimation.

14       And the aspect of insurance doesn't necessarily

15 need to be dealt with now, except that if the Court were to

16 opt for the debtors' version of estimation, they explicitly,

17 pages in the plan and in their confirmation scheduling, make

18 clear that their estimation completely absolved insurance of

19 any responsibility, any implications for their involvement, no

20 *res judicata*, collateral *estoppel* or other effects.  And I

21 think what the survivor groups are saying is let the chips

22 fall where they may for insurers.

23       Whatever the impact is of Your Honor's estimation

24 is going to be decided in further proceedings in any event.

25 So, let's not take insurers, create a special class for them

1  so that they and they alone are not impacted by the estimation

2  proceedings that's happening in this case.

3       Another thing that might do, Your Honor, is, I

4  think Mr. Robbins made this point or maybe it was my earlier

5  colleague -- it's been a while -- there -- the way in which

6  these cases generally resolve these settlements and Mr.

7  Schiavoni was complaining earlier in the hearing that they

8  haven't really been involved and they've been kept outside.

9  Well, one way to get them involved would be the impact created

10 by an estimation proceeding that did not completely

11 (indiscernible) insurers from their effect.  It would be a

12 good idea to bring those insurers to the table once an for

13 all, to give them what appears to be uncertainty regarding the

14 impact of that estimation.

15       And the last thing I'll mention, again, because my

16 colleagues have mentioned some of our other arguments brought

17 up in our motion and our reply so capably, you know, the Court

18 mentioned numbers at the beginning of these proceedings and I

19 wanted to add a few myself.  Eighty-four thousand has been

20 mentioned, the number of scouting trauma sexual abuse

21 survivors who have mustered the courage to come forward and

22 assert claims in these cases.  Eighty, another number, the

23 number of years of abuse that the debtors acknowledged at the

24 beginning of these cases, as the duration of abuse that they

25 have been aware of, claims existing.  And a final number, Your

1  Honor, which Mr. Robbins started to allude to, four; four are

2  the number of years out of those 80 years that the debtors

3  have agreed to provide us with information.

4        We've indicated this in our reply papers that, and

5  Mr. Robbins just mentioned before he completed his argument

6  that our schedules, overall, in completing this process are

7  not very different, are not sort of similar, such that we

8  mentioned in our papers that estimation in the plan

9  (indiscernible), and estimation as we are recommending, are

10  maybe a distinction of a difference because they really are

11  very close in duration.  I think we may be longer by about

12  three weeks and that length of time can be attributed to our

13  getting up to speed and our getting an adequate means of

14  getting our experts up to speed to be in the same situation as

15  the debtors' experts.

16        But one thing which is an absolute (indiscernible),

17  as Mr. Robbins noted, is that getting just four years of

18  information that has been carefully curated by the debtors out

19  of a legacy of eight decades of abuse is, that is a starting

20  point.  And so, the title lines, whatever it is, whether it is

21  three weeks shorter than what we are asking or three weeks

22  longer than what we are asking, it really depends on when are

23  the debtors going to give us the information that they and

24  their experts have had now for 15 months so that the survivors

25  can be on an equal footing and we can see what they see as the

1  true extent of abuse in this case.

2          Accordingly, Your Honor, we would ask that the

3  Court grant the survivors' estimation motion, determining that

4  estimation is appropriate.  And before I close, I did want to

5  mention one thing about timing.  Your Honor mentioned that

6  there are maybe issues with timing with the District Court's

7  calendar.  Certainly, Your Honor will know better with the

8  busyness of the courts and how that may implicate timing.

9          And as discussed, there are certain jurisdictional

10  limitations that have to be considered.  I think all the

11  parties that will recognize the practicalities in the case,

12  there is obviously an important recommendation process that

13  may be employed to the extent that Your Honor's calendar moves

14  a little quicker than the District Court's and, certainly,

15  that would be up to the individual tribunals to decide,

16  depending based upon the disposition of the motion to

17  withdrawal.

18          I will note, finally, for the Court's benefit that

19  we did request oral argument from the District Court and we

20  are waiting to hear on that.  But we would ask that the Court

21  grant the survivors' motion for estimation and determine that

22  estimation is appropriate and allow us to (indiscernible) the

23  Court so that will inform its decision on the motion from

24  withdrawal of the records.  Thank you, Your Honor.

25          THE COURT:  Thank you.  I don't want to suggest

1    that the District Court won't determine it in a timely

2    fashion, consistent with their calendar.  I'm just saying

3    their calendared, as all court's calendars have been backed up

4    and they have not had criminal jury trials and they have not

5    had civil patent trials, which our District Court has an

6    extremely heavy docket, for the last year-plus.

7         And this bankruptcy case, while important, of

8    course, and they recognize that, it's not on their docket, if

9    you will, but I am not suggesting that I am more able to

10   decide it or that it wouldn't be decided timely over there,

11   consistent with their calendar.

12        Okay.  I think I have heard from all of the movants

13   now.  Let me hear from the objectors.

14        MS. LAURIA:  Your Honor, this is Jessica Lauria of

15   White & Case on behalf of the debtors.  Leading up to

16   (indiscernible), we had some communicating with Hartford

17   counsel in an effort to streamline argument today so you don't

18   hear our being repetitive with them.  Ms. Erin Rosenberg from

19   White & Case is going to briefly address the Court on the

20   matters of estimation and then she'll hand off the podium, so

21   to speak, to Mr. Anker.

22        Before doing that, there's just one issue that I

23   think, as you know, is near and dear to my heart, and that's

24   the timeline, so I just want to address it very briefly,

25   because we have heard a lot of representations that were on

1  the exact same timeline, but for, perhaps, the discovery

2  issue.  There's one other but for, and that's but for the fact

3  that Mr. Harron indicated that they want the estimation in

4  advance of the disclosure statement --

5           THE COURT:  Right.

6           MS. LAURIA:  -- but that's a very -- I think Your

7  Honor knows that's a very different timeline than the timeline

8  the debtors have contemplated.

9           I would also just note, Your Honor, that while the

10 debtors and the plaintiffs -- and by the way, the debtors have

11 suggested our timeline in the context of exactly what we were

12 contemplating, proving up the 1129 factors and any other 9019

13 factors that may come before the Court.  I do think that that

14 is a different animal than the, I guess we're calling it now

15 an insurance-silent estimation and I would encourage Your

16 Honor to hear from the insurers, who will inevitably be on the

17 other side of this as to their views of timeline, because

18 certainly, to date, they have not weighed in to my knowledge,

19 on the timeline that was proposed by the debtor.  And other

20 than their objections, I'm not sure that they have weighed in

21 on the timeline proposed by the other parties.

22           We have provided settlement data, despite the

23 representations today.  We understand that they want more.

24 Frankly, we provided the moving parties with everything that

25 the Bates White (phonetic) firm had to evaluate the claims.

1  We've had three meet-and-confers with the movant parties on

2  this topic and we'll continue to work with them.  We told them

3  that.

4          But that's all I have on the timeline, Your Honor.

5  With that, I will hand this over to Ms. Rosenberg from White &

6  Case to briefly address the Court and then we'll let Mr. Anker

7  take it from there.  Thank you very much, Your Honor.

8          THE COURT:  Thank you.

9          MS. LAURIA:  Unless you have any questions for me?

10          THE COURT:  No.  On that front, let me say this,

11  the debtor has a plan on the table.  I'm going to consider

12  this particular discovery open.  So, if you want to bring that

13  issue to my attention as to how many years of historical data

14  needs to be produced, I'll hear that.

15          MS. LAURIA:  Thank you.

16          THE COURT:  Thank you.

17          MS. ROSENBERG:  Your Honor, can you hear me?

18          THE COURT:  Ms. Rosenberg, yes.

19          MS. ROSENBERG:  Thank you.  Erin Rosenberg of White

20  & Case on behalf of the debtors.

21          The debtors' case on the estimation motion, despite

22  some of what you heard earlier is that it should not be

23  (indiscernible).  There's no reason why a binding estimation

24  that's called aggregate that requires various subfindings will

25  be faceted, which is thought to be completed before a

1   (indiscernible) disclosure statement and which is sought to be

2   ultimately performed by the District Court, should they agree

3   to withdraw the reference, is required even (indiscernible)

4   extent in this case.

5          It's not required by the Code and it's not

6   otherwise appropriate.  Instead, the debtors submit that the

7   estimation proposed be their plan, which would be non-binding

8   for limited confirmation purposes only is what should be

9   pursued with the specific dates, deadlines, and procedures to

10  be set as part of this Court's consideration of the debtors'

11  confirmation scheduling motion.

12         On the first point that --

13         THE COURT:  Does the debtors' proposal require that

14  I decide up front that whatever decision I make is somehow not

15  binding on people?

16         MS. ROSENBERG:  I think the debtors' proposal is

17  subsumed in the plan and the plan has an insurance-neutrality

18  provision and so that's how that would be handled.

19         THE COURT:  Well, I don't know that I'm going to

20  approve that provision in the plan.  So, that's why I ask the

21  question, because why should I be deciding up front what the

22  effect of my decision is in the context of 1129 or otherwise.

23  I don't give advisory opinions, so why should I be deciding

24  that issue up front and is that key to your, to the debtors'

25  proposed, I'll use the term "estimation procedure."

1          MS. ROSENBERG:  I think a lot can change over time,

2     Your Honor, and we'll see where we get at confirmation.  I

3     don't think that issue needs to be decided today or in

4     connection with the pending estimation motion, certainly.

5          THE COURT:  Okay.

6          MS. ROSENBERG:  So, moving back to the first point

7     that I wanted to make, Your Honor, which is that estimation,

8     as sought in this motion, is not required under 502(c), which,

9     as Your Honor pointed out, deals with claims allowance and

10    whether it's allowance or for purposes of allowance, that's

11    not what is going on here.

12         And I would actually point Your Honor back to Title

13    28, Section 157, where it talks about for purposes of

14    distribution and it talks about for purposes of confirmation.

15    And if you're having an estimation that can be done for

16    different purposes, but the purpose is attenuated.  At some

17    point, the exception is going to follow the rule and there

18    really needs to be a more direct connection to allowance.

19    This is the provision within Section 502.

20         And so, the debtors' position is that it's not

21    required under Section 502(c), which is for purposes of

22    allowance and applies only where the fixing or liquidation of

23    a claim would unduly delay administration of the case.

24         Here, the requested estimation is not going to

25    determine the allowance, which as the movants recognize, under

1  the plan, will be done through the TDPs, which can be further

2  negotiated and resolved in connection with confirmation.  And

3  the movants make no showing that the determination of claims

4  through that process, the TDP process is going to cause undue

5  delay.  In fact, the process that the movants are proposing

6  runs directly against the whole purpose of 502(c), because it

7  would only add unnecessary delay.  It is too complex and it's

8  not necessary to resolve the issues the movants argue about,

9  including this, for example, adequate disclosure or informing

10  trust funding.  There doesn't need to be a cap feature.

11          For similar reasons, there's no other basis,

12  whether it's the Court's equitable powers, the Court's

13  discretion, or otherwise, for this time of estimation to be

14  conducted; instead, the only type that the debtors --

15          THE COURT:  So, will I not be placing a cap on

16  claims with the debtors' process?

17          MS. ROSENBERG:  You would not with the debtors'

18  process.  I think the settlement is going to be funded in a

19  variety of ways.  It's not going to be as a result of an

20  estimation and, frankly, I would submit that you are not going

21  to be capping it in any meaningful way through the movant's

22  proposed process, because they think that estimation is going

23  to yield a hundred-billion-dollar valuation.

24          You know, we will do what we can here,

25  (indiscernible) ready as possible, Your Honor, but it's not

1  going to be a meaningful cap if that is what is sought.  And
2  so, Your Honor, we think the type of (indiscernible) is what
3  we proposed, which is not for allowance.  It's not go
4  distribution.  It's for limited confirmation purposes only and
5  what we specifically identified as the issue of settlements
6  being fair and reasonable.

7         It would not be binding for purposes beyond
8  confirmation and would apply only with the global resolution
9  claim.  The debtors have made clear that we oppose the
10  proposed estimation and we ask that the Court disregard any
11  characterization by another party to the contrary.  We have
12  not conceded that estimation would be a (indiscernible) for
13  confirmation.  A number of things could happen between now and
14  then.  Any number of objections could be resolved.

15         That said, though, because some sense of the
16  aggregate value of direct abuse claims could be relevant for
17  certain issues, the debtors are proposing a process that tees
18  things up to provide the parties with the evidence they need
19  and the procedural protections they need and allow matters to
20  be determined in connection with confirmation.

21         The next point I want to make, Your Honor, and I
22  know I want to stay my lane and you want to stay in your lane
23  here, but it impacts this Court directly, and we have now
24  heard, I think, a little bit of a clearer perspective from the
25  movants here, and so I want to touch on these issues quickly

1  is who should decide the estimation motion.  The estimation

2  motion first and foremost asks for an order authorizing

3  estimation.  That is a decision for this Court and the movants

4  have acknowledged that.

5          Their (indiscernible) makes it clear.  They made it

6  clear again today.  They want this Court to decide the

7  estimation motion now and then grant leave for the District

8  Court to advise the District Court of the disposition.  After

9  that, they say, and we oppose this, that the District Court

10 should conduct the ultimate estimation proceedings.

11         And so, this Court can and should decide the

12 estimation motion and the motion can't and, frankly,

13 shouldn't, but can't under 502(c) itself, delay proceedings in

14 this case.

15         I think the Court is well aware there are important

16 issues that need to be (indiscernible) addressed.  Every bit

17 of incremental complication and confusion or uncertainty can

18 harm everyone from the Court, the debtors, other parties in

19 interest, to, of course, the abuse survivors, whose interests

20 need to be really kept in focus here.

21         That said, I want to respond to a few of the points

22 that were raised by the movants in their (indiscernible), so I

23 appreciate the Court's indulgence here.  With regard to the

24 withdrawal of the reference, I already touched on some of

25 those issues, but I do want to say that we do not think that

1   it is going to be more efficient to have the movants

2   (indiscernible) pursue withdrawal of the reference.  Of

3   course, the District Court will decide what it thinks is

4   appropriate, but we do not believe, more importantly, for the

5   Court's consideration here, that it is going to do anything to

6   drive settlement.  We think it is more likely to cause people

7   to dig their heels in and create the added confusion that I

8   mentioned.

9           One note that I want to make here is that under

10  Title 28, Section 157(b)(3), this Court shall determine what

11  matters are core and non-core and as Your Honor said earlier,

12  confirmation is core.  We think the issues are core.  And you

13  don't have to defer to the movant's characterization of the

14  issues.  You can decide them.  So, we just ask that Your Honor

15  keep that in mind.

16          There were arguments made about disclosure.  I'm

17  going to defer to the rest of our team here who will take that

18  up in due course, but I just wanted to make a point for the

19  record that our arguments there are going to be reserved.

20          As to Your Honor's questions of the movants of what

21  specific outcome they were asking for, I, frankly, was left a

22  little bit confused and I think that dovetails nicely

23  (indiscernible) earlier.  There really would need to be added

24  clarity.  It sounds like from what we heard today that that

25  would be something that is decided again later, and so I think

1  it would involve additional delay. I think the debtors'
2  process that they have proposed is clear and allows things to
3  move forward a pace.

4           I think on the insurance neutrality point, the one
5  thing I'm going to say, Your Honor, is you hit the nail on the
6  head. Why create the procedure?

7           I think the estimation that is being sought here
8  causes more problems than it solves and the Court can do what
9  it needs to do in connection with confirmation and those
10 issues can be addressed at that time.

11          THE COURT: Well, the debtor is also creating a
12 procedure, so the question just is, I don't even know if it's
13 which procedure is best, in a sense that once this issue gets
14 teed up in some fashion, whether it is through a formal
15 estimation procedure or it's in connection with confirmation,
16 parties are going to take the discovery that they think is
17 appropriate to take and put in front of me the issues that
18 they think are important to be heard, right, in connection
19 with either proceeding.

20          So, I have to give that some thought, but I'm not
21 sure how the debtors' teeing this up is that much different
22 than the coalition and the TCC and the FCR teeing it up. The
23 debtors have decided it may be relevant and so they teed it
24 up.

25          MS. ROSENBERG: Sure, Your Honor. If I may respond

1  to that?

2        I think there are a couple key differences.  First,

3  I think is, as we've discussed before, that they want this

4  process to be conducted before the disclosure statement is

5  approved.  That's just huge.

6        I think the second point is, what are the features

7  of the estimation and we disagree that estimation is required

8  under 503(c).  We, frankly, think that the term, itself, may

9  cause some confusion, but you can have estimation for

10  different purposes, not just for purposes of allowance.  You

11  know, then, I guess the ultimate question is what does that

12  mean?

13        And what we think is it just has to provide some

14  sense of aggregate value sufficient to help these confirmation

15  requirements or where a plan includes a settlement, needs

16  settlement approval (indiscernible).  So, another key

17  difference is what the ultimate estimation would look like and

18  how many findings and the detailed level of findings in there.

19        And theirs is just wildly different from what we

20  are proposing.  The amount of permutations (indiscernible) in

21  our papers is more than the amount of claims filed.  And so,

22  the issue, I don't think, you know, at some point it may

23  become academic, Your Honor, because we are in agreement, at

24  least from the debtors' perspective, that evidence of

25  aggregate valuation of direct abuse claims may prove helpful

1  and the last thing that we want is to take a hard stance in

2  the opposite direction on this, get to confirmation, and Your

3  Honor to tell us we don't have the evidence that we need, the

4  record wasn't developed.

5          And so, the important feature, I think, from an

6  estimation perspective is these procedures that the debtors

7  have proposed is that (indiscernible) discovery because under

8  the default rules, we are not going to be able to take enough

9  depositions.  There are other features that really need to be

10 settled on and decided and so that's the process that we're

11 envisioning.

12          Just a couple more points, Your Honor, and then I

13 will wrap up.  I wanted to correct the record about the

14 estimated value for abuse claims in the plaintiffs' disclosure

15 statement.  To be clear, the range that we have in there is

16 2.4 to 7.1 billion and the process of estimation that the

17 debtors propose is designed and explained to be designed to

18 help refine that.  How much clarity we will be able to get

19 balanced against the need to avoid undue delay is to be

20 determined, but the debtors are certainly going to try with

21 the additional claimant discovery and other pre-confirmation

22 hearing processes to refine that range as much as is

23 practicable given the constraints.

24          And, Your Honor, with that, I think I have covered

25 all of my points -- oh, one last point, Your Honor.  On undue

1  delay, I heard, I think from Mr. Robbins an interesting

2  argument about the post-confirmation process.  You heard the

3  debtors' position here about claims allowance happening

4  through the TDPs.  I have trouble with the idea that the post-

5  confirmation timeline is what's really relevant here.  In

6  fact, their estimation really is impacting the pre-

7  confirmation timeline, but I will note that the house report

8  on 502 and 502(c), specifically, talks about undue delay

9  imposing on the estate and as Your Honor knows, the estate

10  (indiscernible) confirmation, and I think many of the issues

11  here are confirmation-focused, and so I wanted to make that

12  point, as well.

13          And with that, I will tender the virtual podium to

14  Mr. Anker.

15          THE COURT:  Thank you.

16          MR. ANKER:  Good afternoon, Your Honor, and, again,

17  thank you for all of your patience.  Philip Anker, WilmerHale,

18  for the Hartford, and we filed a joint brief with a number of

19  other insurers.

20          Your Honor, I want to focus principally,

21  principally on I think the two central issues that have been

22  discussed today.  First, I want to take on Mr. Robbins'

23  argument that the requirements of 502(c) have been met.  He

24  said, and I quote, "This is a motion brought under 502(c)."

25  We'll check when the transcript comes in, but I wrote that

1  quickly, I think it's a direct quote.  And he's right, if

2  502(c) requirements are met, estimation is mandatory.  It

3  says, "shall."  If they're not met, conversely, there cannot

4  be an estimation under 502(c).

5         And the second point I want to address,

6  principally, is your question and my -- to give away what I'm

7  going to say, the shorthand version in one word -- your

8  question was, "Isn't all I need to decide at plan confirmation

9  that the requirements for 1129 are met?"  My one-word answer

10  is, yes, you have exactly right.  But let me now take those

11  two points on and then I'll end with something else.

12         When I heard Mr. Robbins make the argument that

13  "for purposes of allowance" doesn't really mean for the

14  purpose of having allowance, I thought to myself, my, God, I'm

15  happy I am not someone who writes legislation, because if

16  someone could seriously make that argument then I am

17  absolutely convinced I could never write with clarity.  And at

18  what is maybe a more realistic place in my life, I'm happy I'm

19  not a transaction lawyer, because I cannot write a contract, I

20  cannot write an indenture, I could not write anything that's

21  more clear than "for purposes of allowance."

22         You asked a question, what in the world could those

23  words mean?  And I will remind Your Honor of your own holding

24  in the Pacific Sunwear -- I think it was -- of California

25  case, a case I was not in, but we found it.  And you wrote,

quote, "Section 502(c) requires that the court estimate an
unliquidated claim" -- and you quoted the statute -- "for
purposes of allowance under the section."  Therefore -- and
I'm adding the word therefore -- quote, "estimation under
Section 502(c) results in allowing a claim for purposes of the
entire case and is no different than a claim allowed under
Section 502(a) or (b)."

Mr. Robbins' argument, put bluntly, is Your Honor
was wrong, you can't read the statute.  And with all due
respect to Mr. Robbins, who is a worthy adversary, you were
right and he is wrong.

"For purposes of allowance" means to allow the
claim.  If I say, for purposes of building a house, I'm
building the house.  Allowance is allowance.  It's not
complicated; it's plain English.

And, after all, why do we have an estimation
provision in the code?  We have it for a circumstance
completely different, 502(c), from the one we have here.
Imagine a case where a debtor has liquidated all of its
assets, Your Honor, and has a million dollars.  I'm going to
make it a much smaller case.  And it has some creditors, each
of $50,000, and one disputed creditor owed -- who claims to be
owed over a million dollars.  Well, until that disputed claim
is estimated, and it's going to take very long to be resolved,
the five creditors with allowed claims can only get pennies on

1 the dollar to reserve ratably, and equity, which if the

2 disputed claim is not valid, we'll be in the money, equity

3 can't get anything.

4 That's the context of this statute where you have a

5 pot plan and you need to fix up for purposes of allowance the

6 claim so others can get distributions.  That is not this case

7 at all.

8 Mr. Robbins makes the argument that really it's

9 just advance the ball.  I've told you, I made the argument as

10 to why it's a matter of statute (indiscernible) but even if

11 he's right, you asked exactly the right question.  How does it

12 advance the ball?

13 Let's assume Your Honor does the estimation they

14 want and determines that in 1973 the aggregate liability I

15 estimate for the Boy Scouts was $10,142,347.61.  Who gets to

16 share that money, what claim?  Who has claims in that year?

17 Which claims that are asserted against that year are allowed,

18 in what amount?  As you gave an example and Mr. Robbins

19 raised, the statute of limitations, you have it exactly right.

20 To determine whether an individual's claim can be allowed

21 where they face a statute of limitations issue, we need to

22 know what state's law applies to that individual's claim,

23 which may involve complicated issues of choice of law as to

24 that individual.  We need to know whether he had a repressed

25 memory and, if so, when he first learned and could have

1  asserted a claim about this matter.  If he could have asserted

2  the claim 30 years ago, 40 years ago, at least in many states,

3  that's very different than if he can only assert it now.

4          That being the case, you have it exactly right,

5  aggregate estimation does not advance the ball and, in any

6  event, that is not the test of this statute.  You had it

7  exactly right in Pacific Sunwear and every other case on this

8  issue holds the same.  Mr. Robbins' argument, as a matter of

9  statutory construction, would form new law contrary to, I

10  literally think, every case considering the question.

11          But there's a second part of 502(c).  It only

12  provides that there can be a 502(c) estimation if not it will

13  advance the case, but if the fixing or liquidating of the

14  claim will unduly delay the case.  It says, 502(c), "there

15  shall be estimated for purposes of allowance under this

16  section any contingent or unliquidated claim the fixing or

17  liquidation of which, as the case may be, would unduly delay

18  the administration of the case."

19          Well, they don't claim, the movants, that the

20  fixing or liquidation of claims will unduly delay it.  They

21  say on page 1 in their motion, footnote 3, quote, "Estimation

22  of aggregate liability will not determine the liquidated

23  amount of any particular individual claim," and they go on to

24  say that that will occur either in a TDP or return to the tort

25  system.  As the Court said in Dow, that is a concession, that

1  is a binding concession that we don't need estimation, but as

2  a fixing or liquidating of a claim will unduly delay the case.

3  They acknowledge that the fixing and liquidation can occur

4  post-confirmation.

5          I would only make two other points about the fixing

6  or liquidation and undue delay, but I will say, Your Honor,

7  these are, in my view, icing on the cake.

8          Let's ask ourselves seriously the question whether

9  their process will expedite or delay.  As Ms. Lauria noted,

10  no, they're not seeking the same time period as the debtor is,

11  they're seeking an estimation process that would occur before

12  solicitation of -- solicitation goes out, and, frankly, would

13  mean that you couldn't extend exclusivity because, by statute,

14  it would expire by August.  I don't think that's a

15  coincidence, but maybe it is.  It would cause a delay even in

16  their own world of three and a half months in a case where the

17  expenses have been enormous.

18          But let's also look at the estimation they are

19  seeking in this case.  And, again, I'm not making this up;

20  this is on page 1 and 2 of their motion.  They seek an

21  estimation, quote, "by type of abuse, by local council, by

22  chartered sponsoring organization, and on a year-by-year

23  basis."

24          Well, as the argument went, Your Honor, I did some

25  math on my iPhone.  I don't attest that my iPhone is perfect

1  and somehow I just lost it, but I took -- I heard 80 years of

2  claims, 80 years of claims, I read the debtor to say that

3  they've come up with seven categories of abuse, so 80 times

4  seven.  I hear there are 251 chartered -- local council, and I

5  heard from Your Honor or someone that there were 41,000

6  sponsoring organizations.  That means we get to 5,762,960,000

7  determinations that Your Honor is supposed to make and we're

8  supposed to litigate in the next 111 days.  That's not

9  realistic.

10       So if we were to go down the path that the

11  claimants are seeking here -- and the Court in Dow, again,

12  made this point -- the estimation would be one that takes

13  years, not weeks, not days, not months.

14       Let me go to the second question, although the fact

15  that the plaintiff concedes that -- I said the plaintiff --

16  the movants concede this is a 502(c) estimation and it's plain

17  that the requirements of 502(c) are not met, let's then talk

18  about the question you asked, don't I have to simply decide at

19  confirmation whether 1129 is met?  And, again, Your Honor, my

20  answer to that question is you're exactly right, yes.

21       I don't mean to cabin Your Honor and I hope this

22  won't come off in an insulting way, but you're a bankruptcy

23  judge.  You're not a coverage judge; you're not there to

24  decide coverage issues, you're there to decide bankruptcy

25  issues.

1          And I want to go to the res judicata point head-on.

2   Is it possible that in connection with plan confirmation Your

3   Honor will make a finding, for example, that the Hartford

4   settlement is reasonable or not reasonable within the meaning

5   of Bankruptcy Rule 9019?  Is it possible that you will make a

6   finding that the best-interests-of-creditors test has been met

7   if someone objects?  That's right and that finding, at least

8   with respect to parties who participated in the proceeding,

9   may well give rise to res judicata.  But that's not what

10  Section XM of the plan is about and that's not what the

11  claimants want.

12          What this is all about, if they were intellectually

13  honest and candid with the Court, is they want you to become

14  the coverage judge.  They don't want to have the choice of

15  negotiate a settlement or end up back in the tort system.

16          And one main (indiscernible) I represent insurance

17  companies, insurance companies are not normally in the

18  business of saying how great the tort system is, it's hurt

19  insurance companies in a lot of contexts, but it is the legal

20  system we have for resolving claims and litigating and

21  adjudicating claims.  And at its core, at its core, what this

22  motion is really about is they want you to issue a decision

23  that they then run -- that's exactly what happened in Fuller

24  Austin and it's exactly what happened in UNR -- they run to

25  coverage court and say Judge Silverstein decided that there

1  were a billion, 200 million -- whatever the number is  --

2  dollar amount valid claims in year X, that's what they want.

3  And all Section XM is about and all we are saying when we say

4  there shouldn't be a binding estimation is that isn't,

5  respectfully, your job under 1129.

6          Your Honor, I hear you that you should not be

7  giving advisory opinions, but what you can do is say I am

8  deciding X, I am not deciding Y.  And they want you to not say

9  that because their entire theory here, their entire theory of

10  this case is to get you to say -- not say I am not deciding Y

11  and then run out and try to have Y imposed on us.

12          Mr. Robbins all but said -- and I think Mr. -- and

13  if I mispronounce his name -- Fagay (ph) -- I apologize -- did

14  say what they really want at the end of the day is not an

15  estimation for bankruptcy 1129 purposes, they want an

16  estimation that they can then use in coverage or to hammer the

17  carriers with respect to settlement.  And there should be a

18  fair settlement here based on the reasonable estimates of

19  reliability as they would exist outside bankruptcy.  The

20  insurers should not be better off by the happenstance that the

21  debtor is in bankruptcy, but we should not be worse off

22  either, that's what neutrality is about, and what they want is

23  for you to decide the coverage issues.

24          How (indiscernible) their words, why else would we

25  have an estimation, quote, "by year"?  There are different

1  policies by year.  But does the year -- does an estimation

2  that differentiates between 1972 and 1973, does an estimation

3  that distinguishes between a non-debtor local council A from

4  local council B, that distinguishes based on abuse claim, does

5  that have anything to do with whether the best-interests test

6  is met under 1129?  Whether if it's a cramdown and if

7  (indiscernible) equitable applies -- and I'll get to that in a

8  minute that it applies -- it has nothing to do with that.

9        Let me stay one minute on the bankruptcy

10  (indiscernible) first, with respect to disclosure, the notion

11  that we are going to hold off and have this process that would

12  take not 111 days, but years before we end up with a

13  disclosure statement, is fanciful.

14        Your Honor put it right, there's tons of disclosure

15  statements and tons of cases that go out for solicitation with

16  uncertainty.  Think about what a disclosure statement is

17  supposed to be, 1125 tells us it's supposed to be the analog

18  in the securities context to a prospectus.  When a prospectus

19  goes out, no prospectus I've ever seen says we assure you, if

20  you invest, you will earn dollar X.  It says, we have a

21  business, we think it may work, it may not work, here's what

22  we hope to do, but there's lots and lots of risk.

23        Think about the bankruptcy context.  And I

24  apologize to Mr. Robbins for raising this, but this is a case

25  he and I spent many, many years on and not because I was a

1 better lawyer, but I was on the side of truth and justice, I

2 won and he didn't, but it's a case from this district,

3 Tribune.  Tribune was a case where a plan got confirmed where

4 the big uncertainty was it had been the subject of an $8

5 billion leveraged buyout and was where there were going to be

6 significant clawback actions against the former shareholders.

7 That turned on questions ultimately about the safe harbor in

8 Section 546(e).  When that disclosure statement went out, what

9 it could say was, we have this potential plan, it may win, it

10 may lose, who knows, the range of recovery can be enormous --

11 and I believe it was Judge Gross, I think that's right,

12 approved --

13          THE COURT:  Carey.

14          MR. ANKER:  -- the disclosure statement -- I

15 apologize to Judge Carey -- Judge Carey approved the

16 disclosure statement and it went out and the results are where

17 the results are.

18          Indeed, if you think about it, Your Honor, to know

19 what people are going to get paid, you have to know two

20 things:  one, what that individual's claim is, that's -- and

21 what every other individual's allowed claim is, that's the

22 denominator, and the numerator is what all the assets are,

23 including how much insurance there will be, which will be the

24 result only of coverage litigation.  That numerator is

25 impossible to predict today and at best what can be given is a

1  range with everyone putting in different estimates.

2  So we don't need this estimation process for

3  disclosure purposes.  We also don't need it to provide

4  guidance to the parties.  I hear this about negotiations and

5  the like.  Judge Spector in Dow Corning took it on and he

6  said, "My estimate will just be my guess and the parties are

7  not going to like it, and if they don't like it, they're not

8  going to agree to it and it's not going to help people get to

9  the finish line on a negotiation."  What will get to a finish

10  line is telling the plaintiff that they're not going to get a

11  UNR kind of situation where they get to run -- act as if you

12  decide coverage issues.

13  Let me just spend one more minute on the 1129

14  issues, although, Your Honor, I concede that Your Honor

15  certainly can hear evidence with respect to 1129, but let's

16  think about whether their estimation process is needed.  I

17  didn't hear any of this today, which I think means they don't

18  really believe their arguments, but in their papers they say,

19  well, we may need to know what the claims are for feasibility

20  purposes.  No, feasibility asks the question whether the

21  debtor will end up having to go into a Chapter 22.  No one has

22  proposed a plan here where the debtor does anything more than

23  make a contribution and whatever recovery it leads to, it

24  leads to, but there's no open-ended commitment.

25  They ask about the best-interests test.  As Your

1  Honor knows -- and let me put aside that the debtor has an
2  argument that the best-interests test doesn't apply to a
3  nonprofit, I'm going to -- I'm going to be (indiscernible)
4  that issue, let's assume it does -- it simply asks the
5  question whether the debtor -- whether a creditor will do
6  better in a liquidation than it would do -- in a Chapter 7
7  liquidation than it would do under a plan.  Unless one is
8  going to make the assumption that a Chapter 7 trustee is going
9  to allow claims in very different numbers than will be allowed
10 otherwise, Chapter -- the claim allowance process should be
11 agnostic between the two.  So we don't need it for that
12 purpose.

13        They suggest that maybe it will be needed for an
14 unfair discrimination test.  Well, the trade class here is
15 getting $25 million.  It's not exactly a major issue in this
16 case.  At least, you know, maybe there will be indirect abuse
17 claims (indiscernible) Your Honor, by carriers that are
18 significant, but the trade itself is de minimis.

19        And then finally they say, maybe it will be needed
20 to decide whether there can be a channeling injunction.  Well,
21 the only one of the two plans that provides for a channeling
22 injunction is the global resolution plan, plan A.  If we're in
23 plan B, the whole issue is moot, so we would be doing -- plan
24 B, the toggle plan, we'd be engaging in a long process that is
25 moot.

1          And as to the global resolution plan, that plan

2    only goes forward -- and we'll have -- the parties can

3    disagree about what exactly the standard is for a channeling

4    injunction, but at a minimum it's acceptance by claimants and

5    I don't hear the debtor to dispute that.  And so, if there is

6    going to be that kind of acceptance, query whether we're going

7    to have to have a lot more evidence on claims estimation.

8          Finally, let me say one thing on this point.  Your

9    Honor asked the question, I think it was to Mr. Harron, can't

10   I decide plan confirmation issues, isn't that core?  And of

11   course it is.  And Your Honor decided that, that's your

12   decision in Millennium, which was affirmed.  It's -- I mean,

13   it is settled law.  Whatever else may not be core, 1129, plan

14   confirmation, is core.  So, yes, you can decide those plan

15   confirmation issues.

16         Finally, Your Honor, let me take on -- and I don't

17   think we're going to get there, but I think this goes to the

18   notion of what's really, really going on with the claimants,

19   their proposed procedures.  Let's put aside the fact that

20   you're going to make over five billion determinations in 111

21   days.  They say that they get to propose the sample of

22   claimants and, if the debtor doesn't like them, then the

23   debtor can object, but not the carriers.

24         Maybe, Your Honor, I'm unduly cynical, maybe I'm

25   unduly paranoid, but I think they're going to pick the hundred

1  or 200 strongest claims.  And the notion of saying to a court

2  those proposed procedures that are stacked completely against

3  the carriers, it's as if they're suggesting to Your Honor --

4  and I hate to use a pejorative term -- and to us that we all

5  fell off a turnip truck yesterday.  I mean, get real.  That is

6  not a process designed to resolve anything reasonably and

7  appropriately.

8        For all those reasons, Your Honor -- I don't have a

9  qualm about Your Honor deciding bankruptcy issues, I don't

10  have a qualm about the notion that if Your Honor concludes

11  that the best-interests test is met, that finding, they will

12  be res judicata, but Your Honor is not deciding -- and this is

13  what they want you to do, they want you to decide a coverage

14  issue, an aggregate liability issue that they can then run

15  into coverage court and say, BSA's liability has been found,

16  it's been liquidated, who was the carrier that year?  That's

17  what this is all, all about.  And that is an estimation not

18  authorized remotely by 502(c), it doesn't come within a

19  country mile of 502(c), and it's not remotely authorized by

20  1129.  It's coverage, not bankruptcy.

21        What the debtor is proposing is an estimation --

22  they call it that -- I think it's really putting on evidence

23  so Your Honor can make the factual findings under 1129,

24  including if there were any settlements, the findings required

25  under Bankruptcy Rule 9019, and if there is a sale and

1   purchase back the policies under 363.  That is appropriate, it

2   is within your wheelhouse, it's within your jurisdiction.

3   That isn't an estimation and that's not what these claimants

4   want.  The motion should be denied.

5           Your Honor, those are the principal points I wanted

6   to make.  I'm happy to answer any questions the Court may

7   have.

8           THE COURT:  Well, since I have you, let me ask

9   this.  Am I correct that insurance neutrality grew out of

10  standing jurisprudence?

11          MR. ANKER:  Your Honor, I mean, I want to give you

12  -- I actually don't know the origins of insurance neutrality

13  jurisprudence.  Many of my colleagues were in the Combustion

14  Engineering case and others that sort of started it; they were

15  smart enough to keep me off that team.  I think it has origins

16  in standing, but I honestly -- I honestly don't know.

17          But, again, all we're really looking for is to not

18  have you make findings with respect to coverage issues and not

19  alter the contract rights.  I mean, this is an issue for

20  another day, but one of the contract rights that a carrier has

21  is to assume the defense of a claim and only pay if that claim

22  is ultimately liquidated, and that requires a trial with the

23  plaintiff, John Jones, and there's then a defense.

24          And, again, I'm not going to spend time arguing to

25  Your Honor that the tort system is perfect and it would be

1  better if it were faster, I'd make a lot of changes in it, but

2  it is the system we have and both sides have to live with it.

3  And I don't think, Your Honor, putting aside standing -- Your

4  Honor is exactly right, you can -- you know, executory

5  contracts get rejected, these aren't executory contracts, I

6  think -- there are things that can be done with contracts and

7  things that can't.  You're right that anti-assignment

8  provisions have been a subject of a lot of litigation with

9  carriers, but what you can't do is say, if the policy says the

10  carrier doesn't have to pay unless that individual claim has

11  been liquidated and adjudicated and that carrier has the right

12  to defend that claim, that you can't change.

13          And at the end of the day, at the end of the day,

14  either there's going to be a settlement at numbers that people

15  can live with or what I think has to happen here is the

16  carriers don't get one iota greater rights because of a

17  happenstance of bankruptcy and the claimants don't get one

18  iota greater rights because of a happenstance of bankruptcy,

19  and we go forward exactly as it was.  That's a neutral system

20  that respects both our contract rights and their rights in the

21  tort system.

22          THE COURT:  Okay.

23          MR. ANKER:  Thank you, Your Honor.

24          THE COURT:  Thank you.  But the insurance contract

25  is no different than any other contract, which I can't modify

1  and I shouldn't interpret, unless in fact somebody puts it

2  directly in front of me and I find it appropriate to rule on

3  it, correct?

4        MR. ANKER:  Well, I think if both sides ask you --

5  well, both sides is the wrong term in connection with a

6  bankruptcy because it's multi-parties, but I don't think Your

7  Honor is going to get criticized if everyone asks you to

8  decide an issue that you go around and decide, I don't think

9  you're going to have carriers asking you to decide insurance

10  coverage issues.  And again, Your Honor, that's not to be

11  disrespectful to you, but I think --

12        THE COURT:  I spent my entire career as an

13  associate trying to avoid doing coverage work, so it's -- I'm

14  not offended at all, so -- successfully avoiding doing

15  coverage work.

16        So that's fine, but I'm not aware of any case, at

17  least nobody has pointed me to one, that says that because a

18  plan isn't insurance-neutral -- or at least that the argument

19  -- the insurance companies have standing, therefore they get

20  to participate, but they aren't -- once they choose to

21  participate, they aren't bound by whatever decisions are made

22  in the bankruptcy case.  If someone can point me to a case

23  that says that insurance-neutral means you're not bound by

24  decisions in the bankruptcy case, then I'd like to read that

25  case, because --

1        MR. ANKER:  Your Honor --

2        THE COURT:  -- that's not my understanding.  My

3   understanding is the insurance companies say this isn't

4   insurance-neutral, so we have standing to participate and

5   object and do what we want.  Once you participate and object,

6   then you're bound.  What you're bound by is a different issue,

7   okay?  And what the impact of my ruling is is a different

8   issue and I can't -- and I've had parties ask me to do this --

9   put in your order what this doesn't do.  Well, my order

10  doesn't do all kinds of things.  Once we start going down that

11  road of what an order I enter doesn't do, how do I draft that

12  order?  I draft an order that says what it says, not what it

13  doesn't do.

14       And if some state court judge misinterprets my

15  order, then you do what they did in, I guess it was <u>Fuller</u>

16  <u>Austin</u> and you appeal it.

17       MR. ANKER:  So, Your Honor, let me say a few

18  things.  First, I think that the suggestion -- and I will go

19  back and read it myself (indiscernible) the plan, but I think

20  the suggestion that the insurance neutrality provisions say

21  the carrier is bound by anything (indiscernible) what I think

22  it says is that there is no -- that the estimation does not

23  determine the allowance of any individual claim, and that is

24  consistent with the law and consistent with the facts.

25       And I do think, Your Honor, insurance neutrality

means that you have to respect the contract.  To the extent
the plan seeks to alter, deny us our contract rights, we have
a right to object to that.  I agree -- but I said this to Your
Honor earlier -- if Your Honor makes a finding the plan is
feasible, I don't think anyone is making the argument on the
carrier side -- other carrier counsel can speak up -- that
that finding of feasibility is not subject to whatever
preclusive effect it might have if carriers participated.
That is different from making a finding that the debtor is
legally obligated with respect to the calendar year 1972 to
pay dollar sign, fill in the bank.  That is a determination
that is not within Your Honor's prerogative, respectfully.

As to what you say your order doesn't do, Your
Honor, I understand the point about advisory opinions, but
courts all the time when they write opinions, as distinguished
from orders, the Supreme Court routinely as a matter of its
opinions says, we are deciding issue X, we are not deciding
issue Y.  It's done all the time and it is done to prevent
mischief.  It is designed to prevent someone clever, like Mr.
Robbins, from coming up with some argument that you really
intended to do more than you did.  I don't think that's before
Your Honor today, but I don't think there's anything
inappropriate about a judge saying what I am deciding is X, I
am not deciding anything but X, and that as much as anything
is what matters here.

1      THE COURT:  Okay, fair enough.  I did that earlier

2  today when I said I'm continuing the -- whichever motion, the

3  standing motion, and I'm not making any ruling on the merits

4  argument.  Yes, that's easy to do.  In bankruptcy, it's much

5  harder; in confirmation, it's much harder, because there's all

6  kinds of decisions that get made in the context of

7  confirmation, but I take your point.

8      In that way, though, I don't view an insurance

9  contract any different than any other contract, right?  In the

10  sense that the plan shouldn't do anything to it that the

11  bankruptcy code doesn't say can be done to it.  I can't change

12  the terms of a lease, I can't -- you know, I can't do that.

13  But if I decided in the context of, I don't know, cure

14  litigation, I had to interpret a provision that said the

15  tenant was responsible for roof repairs and not the landlord,

16  and then they have a dispute five years later on that same

17  provision, somebody might look back at my ruling, ah, the

18  judge already determined that.

19      So that's why it's very tough to decide in advance

20  what I'm determining and not determining.

21      MR. ANKER:  And that's why, Your Honor, I would

22  urge you today to decide -- today, meaning today, slash,

23  Monday -- the estimation motion, whether to grant this motion

24  or not, what preclusive or non-preclusive effect and how Your

25  Honor would create an order, if you are otherwise inclined to

1  confirm a plan, I think the devil is to some degree in the

2  details, and we can address that issue if, and I hope when, we

3  get to plan confirmation.

4          THE COURT:  Okay.  Mr. Schiavoni, I bet you've just

5  been like on the edge of your seat waiting to say something,

6  so I'm going to let you.

7          MR. SCHIAVONI:  I feel like I should get CLE credit

8  for listening to Mr. Anker for so long.

9          Judge, just a couple things, on this last point

10  that you just covered, I can't wait for when we get to

11  insurer-neutrality.  We're going to bring Mark Plevin, who's

12  written articles about it.  But just as far as the history of

13  it, one of the ways it's come up in many proceedings is a sort

14  of sideways way from standing and it's sort of like in ResCap

15  before Judge Glenn.  Some bankruptcy terms like making a

16  finding on feasibility one can imagine has no impact on

17  insurance, it is clearly a bankruptcy finding, there are

18  others like making a good -- like in ResCap, Judge Glenn made

19  some good faith findings with respect to a specific settlement

20  and he made them under Rule 9019, and one might casually refer

21  in an order -- not casually, but often in a bankruptcy order

22  as to good faith, but whether or not good faith, what the

23  implication of that was, totally separately under offshore

24  Bermuda arbitrations for Bermuda coverage, it was a different

25  standard.  Glenn knew that from his experience and he

1 specifically called out in neutrality language that, you know,

2 he was making clear that like -- you know, just another way of

3 making clear that he was ruling on the bankruptcy issue, he

4 wasn't ruling on how that -- under Bermuda law how that would

5 impact, you know, et cetera, he didn't want his finding

6 misused.  And so that's another context in which it comes up.

7 And, you know, the CE language, which I think other

8 courts have found really -- isn't really adequate -- and

9 there's some other language that other courts have adopted --

10 I think was used to some extent also to just -- to give

11 insurers comfort that they didn't need to litigate every issue

12 to prove that it didn't apply to a specific policy and

13 whatnot, so it had a kind of (indiscernible) effect of not

14 encouraging litigation.  And that oftentimes is how clauses

15 are used and sometimes they're more robust than others.

16 On estimation, I don't want to add things -- I

17 don't want to cover things that Mr. Anker covered.  We do have

18 a witness who put in a declaration who is a -- has degrees in

19 mathematics and looked at how -- it doesn't have Mr. Anker's

20 cell phone, computer, et cetera, but he did look at this sort

21 of, it sounds like a fancy word, stratify sampling of what

22 they did.  His name is David McKnight and he looked at some of

23 the sampling that the debtors propose to do on theirs -- you

24 know, from our perspective, estimation by neither the

25 plaintiffs nor the debtor are really necessary here and we

1 would just offer Mr. McKnight's declaration into evidence.

2         THE COURT:  Does anyone object?

3         MS. LAURIA:  Your Honor, this is Jessica Lauria,

4 White & Case, for the debtors.  I actually thought that that

5 declaration was submitted in connection with the debtors'

6 confirmation scheduling motion, not in connection with the

7 estimation motion.  We've got Mr. Andolina here -- again, I'm

8 not sure that we were aware that Mr. Schiavoni would be

9 submitting it in connection with the estimation motion.

10         MR. SCHIAVONI:  Well, it's exclusively about the

11 estimation, that's all it covers, and that's what we've been

12 talking about.

13         THE COURT:  Yeah, it was attached --

14         MR. ANDOLINA:  Your Honor, Mike Andolina on behalf

15 of BSA from White & Case.  Ms. Lauria is correct that the

16 declaration of Mr. McKnight was submitted in connection with

17 the debtors' confirmation scheduling motion.  I will report to

18 the Court that we've had numerous conversations with parties,

19 including other insurers, regarding both the scheduling motion

20 and also the scope of the claimant opt-outs that Mr. McKnight

21 was addressing.  Our plan is to update that process over the

22 weekend.  We intend to have conversations with Mr. Schiavoni

23 and Mr. McKnight with our experts.  We were sort of waiting

24 for the Court's reaction to the estimation motion, which it's

25 been helpful to receive.

1          So both with respect to the schedule that the Court

2     raised earlier and with respect to the claimant sampling

3     protocol, our suggestion is that you allow the debtors to

4     address Mr. McKnight's issues.  If we can't reach agreement

5     with Mr. Schiavoni, we will likely submit our own expert

6     declaration and the Court can decide that issue, but I think

7     the issue is not ripe at this point.

8          MR. SCHIAVONI:  Your Honor, the debtors raised

9     their estimation request, they put it in a motion titled

10    "Schedule," okay?  But that's where they made it.  They made

11    their estimation motion request in something called a

12    scheduling motion.  And Mr. McKnight addressed that, they had

13    full notice of it, and it gets at not the nitty-gritty

14    necessarily, but the big picture about doing a stratified

15    sampling.  It's the exact thing that the TCC/Coalition talks

16    about on their case; it's the exact thing that is at the core

17    of what, you know, the debtors are going to do.

18          If they have questions, then present them to the

19    witness.  Otherwise, if they feel they're going to change it,

20    make this thing moot, so be it, but it's like it ought to go

21    into evidence, it's like they had full notice of it.

22          MR. ANDOLINA:  Your Honor, Mr. McKnight does not

23    respond to the fulsome protocol that we intend to propose,

24    he's essentially responding to a discovery letter that was

25    sent by me.  Our expert will be putting together a more formal

1  estimation of the protocol.

2  So, again, I believe that this is premature.  If we

3  still have a dispute on Monday around this issue, then we'll

4  cross-examine Mr. McKnight on his perspective.  I suspect he's

5  likely to change his view to address the actual protocol that

6  we put forth and it seems to me that that's a more efficient

7  way to go after this issue.

8  MR. SCHIAVONI:  We have a motion, the motion before

9  the Court is to do estimations by these two parties.  We don't

10  think either one of them should do it and there's no reason

11  it's a moving target, it's like -- it's like if they're going

12  to claim it's moot, claim it's moot later, but let's let it go

13  in and move on.

14  MR. ANDOLINA:  The motion is for -- excuse me, I

15  didn't mean to interrupt you, Mr. Schiavoni, but the motion is

16  to answer a confirmation scheduling order.  We are not seeking

17  to prosecute that proposed order that was attached to the

18  motion.  We will be providing an updated motion including --

19  order including claimant procedures.  Part of the discussion

20  we had with other insurers had to do with issues such as the

21  role of the mediators, expert deadlines.  In light of what

22  we've heard today from the Court on several issues, including

23  both estimation and adversary proceeding scheduling, we need

24  to update that schedule.  That was the relief we sought in the

25  motion and we did not seek the entry of an estimation order,

1   we sought the entry of a confirmation scheduling order, and

2   that's what the McKnight declaration was addressing.

3           MR. SCHIAVONI:  No, Judge, it's not --

4           THE COURT:  Okay.  Well, here's what we're going to

5   do because the motion, even though it's understandably and

6   following my lead, parties have bled over into the debtors'

7   process as well as scheduling, I'm going to -- but,

8   technically, we are on the committee/FCR/Coalition motion for

9   estimation -- so I'm going to permit the debtors to continue

10  to talk, encourage the debtors to continue to talk with other

11  parties regarding scheduling and see where we are on this on

12  Monday.

13          And I did read Mr. McKnight's declaration.  I found

14  it interesting, quite frankly, in light of the testimony I had

15  from Dr. Martin a couple months ago, but I'm willing to let

16  the debtors continue -- as I said, continue to talk, see if

17  issues can be narrowed, see if Mr. McKnight has any different

18  reaction, so that I get his best views and best opinions on

19  things, and we'll deal with it on Monday.

20          MR. ANDOLINA:  Thank you, Your Honor.

21          MR. SCHIAVONI:  I'd like to (indiscernible) just

22  for both the debtor and the plaintiffs' estimations that

23  they're proposing to do.  There was some talk from the FCR

24  about, well, we're not -- you know, he did acknowledge that

25  they're doing, quote -- both of them propose to do so-called

1  whole case values, that would be the value of the claim both

2  against the Boy Scouts, the local council, and the sponsor.

3  And (indiscernible) sort of pooh-poohed the notion that they

4  were -- he acknowledged they were trying to do an estimation

5  of non-debtor claims, but then sort of said, well, it doesn't

6  matter, it's sort of co-liable on the parties.  The cases here

7  in the real world, they don't really work out that way.

8          We have somebody on the committee right now who we

9  settled the case with prepetition with respect to the sponsor,

10 but he retained his claim as against the Boy Scouts and I

11 believe the local council -- I'm less certain about that --

12 and that's how each sort of -- each one of them is *sui generis*

13 to the others, they're all very unique, you know, the kinds of

14 claims that they arise, whether or not -- and you can imagine

15 it with the 41,000 different sponsoring organizations, you

16 might have some in there where's a schoolmaster who, you know,

17 has some problem with the kids at the school who happened also

18 to be a Boy Scout leader or went to a Boy Scout event, and

19 then there's claims that arise on both sides.  There's claims

20 from him at the school with respect to a student and then

21 someone saying something else about him -- you know, the same

22 person saying something about him as a Boy Scout, those

23 settled differently prepetition.

24          And at the core of what both these parties have

25 said they're going to do is they're actually going to use 502

1   not just to estimate the debtors' claims, but to estimate the

2   claims against 41,000, you know, effectively, sponsors, each

3   one coming up in different fact patterns, different states,

4   and against the local councils.  I would submit that there is

5   no jurisdictional authority under 502(c) to do an estimation

6   of the non-debtor portions of the claims at all; it doesn't

7   even arise from the fact pattern here.  It's also one of the

8   things Mr. McKnight sort of covered in his declaration was how

9   difficult it would be to even come up with a kind of

10  stratified sample in that kind of context for the involving

11  the non-debtors.  It's another reason why, as a matter of law,

12  what both the Boy Scouts are proposing to do and the

13  plaintiffs, it's just not -- there's not a jurisdictional

14  basis to do it.

15          Your Honor, in the details of this, the violations

16  of due process that are put into these two estimations are

17  extraordinary.  You know, what the circuit would see coming

18  out of this is they would see all the evidence of the limited

19  number of questions that are in the proofs of claim, how --

20  and the confidentiality that prevented any inquiry into those

21  proofs of claim by us, the fact that the debtor then in

22  essence abandoned or waived its defenses to those claims to

23  send them -- to, you know, prevent them from being objected to

24  and send them to this trust.  And then really this process

25  that takes place in either 111 days or even less, 60 days,

1   where it's like with a straight face we were told the debtor

2   was going to subject, you know, a handful of claimants on a

3   stratification that they choose to 20 minutes of questioning

4   about their claims and that anyone who didn't want to come

5   wouldn't have to come.

6            This is an appeal magnet.  I agree with everything

7   that Ms. Lauria characterized about this.  It would be

8   absolutely catastrophic to the case to go down these routes.

9   It will create endless litigation.  Any notion of like handing

10  down a judgment on 81,000 cases in 60 days, you know, it's --

11  it is -- and it's the exact reason why when you look at these

12  other cases -- I mean, I've been in a lot of mass tort cases,

13  the cases where there were estimations done that I remember

14  are cases like Owens Corning where there was an issue about

15  separating equity from the claims, it's like these are not

16  casually done in these cases.  It's like in the vast majority

17  of the asbestos cases there's no estimation at all, okay?

18           In the briefs that were submitted here, there's not

19  a -- there's only one citation to an abuse case where

20  estimation came up, it was the Portland matter.  And the most

21  interesting thing about that case is when you read the

22  decision about the judge decided not to do the estimation and

23  just the concerns that she raised about what would happen if

24  she went down this path and what would have to be taken up in

25  connection with it, it is absolutely not necessary to the plan

1  that there be an estimation, to either the plan or what the

2  tort claimants are intending -- and it's not only not

3  necessary, but there's not a jurisdictional foundation, I

4  believe, to go forward and do it.

5  And I'd ask you, Your Honor, to please not go

6  forward with the plaintiffs' estimation; with the debtors' I'm

7  hopeful they're going to rethink whether they really need

8  something called an estimation in order to get home, because I

9  don't think they do and they certainly won't be able to get

10  home on a schedule that they're proposing here.

11  And this would all be in the context also of, you

12  know, issues going up on this where, you know, where we

13  presented to the Court uncontested evidence about the problems

14  with how these proofs of claim were generated, we've -- again,

15  we'll get to it when we talk about solicitation, but we've put

16  in some additional declarations about people inside the

17  process here.

18  There are just extremely serious concerns here

19  about, you know, how these proofs of claim were generated,

20  including we've got evidence now of forged proofs of claim and

21  we've got evidence of the mass stapling of the claims where,

22  you know, nobody has read them under the rules.  That's --

23  it's like what the plaintiffs really want to do is take all of

24  those proofs of claim and just hang values up.  They don't

25  want any testing or evaluation of how the proofs of claim were

generated, it's like they've all resisted the 2004 discovery.

It's like we think, if this is going to forward, a prerequisite is to go forward with the 2004 discovery. We would respectfully ask Your Honor to rule on that discovery, so we can go forward then as promptly as possible, and that you also grant us relief to serve objections -- you know, relief from the local rule to serve omnibus objections to the claims.

We would say, if there's any kind of -- I hear you on, you know, the stratified sampling, we have different views about how to go forward with it. We thought the way to go forward with it was to look at how the claims were generated by the collections of claims and to look for like systematic problems on how they were generated. That meant taking that aggregated discovery and looking at it there.

What the plaintiffs have sort of contended, right -- and this is -- I think what you see as maybe some distinction between the two declarations is that every claim, you can just somehow break these claims down into six categories of -- you know, based upon the high-line abuse, which I won't repeat the nature of it, but you've seen perhaps some of these letters that have come in, you're read some of the proofs of claim, every one of these is dramatically different by and large. These are not like -- we're not even dealing with -- putting aside the 50 states of the union, you

1  know, we're not dealing here with just all here's a Scout

2  leader and then -- a 30-year-old Scout leader and Junior

3  Scout, they run the whole gamut of different types of things.

4  Two 13-year-olds and a ten and, you know, an issue about one

5  touching the other.  There was a letter recently about two 13-

6  year-olds and a Playboy magazine, and then that leading to

7  something, you know, about, you know, pornographic abuse --

8  pornographic addiction.  Every one of these claims is

9  different.  The notion that you can just put them into six

10 categories and draw distinctions, you know, that's what

11 McKnight's declaration is about, but what we wanted to do was

12 get into how they were being generated, who was generating

13 huge collections of these, and then do sampling of those.

14            THE COURT:  The problem with that --

15            MR. SCHIAVONI:  Thank you, Your Honor.

16            THE COURT:  -- the problem with that is -- and

17 we've done some looking into this as well -- we haven't found

18 any case that disallowed a claim because of that.  There's not

19 cases that disallow a claim because they were generated

20 improperly, okay.  They permit an amendment; they discipline

21 counsel; they say that is not *prima facie* validity, but it

22 doenst disallow the claim, the claimant still gets their day

23 in court.  They just may not have the benefit of a *prima facie*

24 valid claim.

25            So I am not sure what that does, but let me ask

1   this more basic question.  Since the insurance companies are

2   going to say that they're not bound by the decisions in this

3   court what do you care?  Not you, that's bad.  What does the

4   insurance company care about how a particular claim is valued

5   or an aggregate value?

6           MR. SCHIAVONI:  (Indiscernible), I think you were

7   being a little propitious.  I mean, you know, we're,

8   obviously, bound by if you confirm a plan.  You know, there

9   are things you're going to do within the bankruptcy context.

10  Nobody is suggesting otherwise on that.

11          You know, it's like, yes, we do have a right to

12  defend the claims and we have a right to, you know, obtain a

13  legitimate verdict.  We don't think -- there is no process in

14  America under which 82,000 tort claims are adjudicated to

15  verdict in 60 days.

16          THE COURT:  I'm not doing that.

17          MR. SCHIAVONI:  Its just --

18          THE COURT:  And I'm not doing that.  So that is why

19  I'm asking; what is the insurance company's interest in

20  something that is not going to adjudicate 82,000 individual

21  claims in which your defenses aren't going to be adjudicated

22  either; no coverage issue is going to be adjudicated.

23          MR. SCHIAVONI:  (Indiscernible) stop and write that

24  in stone. I mean --

25      (Audio indiscernible)

1        THE COURT:  I'm having trouble hearing you.  Can

2  you start over?

3        MR. SCHIAVONI:  Sure.  What I was going to say was

4  I stopped because I wanted to write that in stone that it

5  wasn't going to affect us, okay, because that is definitely

6  not what the plaintiff's intent was and what they're proposing

7  on their estimation.  So it's like, you know, perhaps we're on

8  the same track then.

9        THE COURT:  I will read the motion very carefully,

10  but I can tell everyone right now that I can't imagine I would

11  decide a coverage issue.  How is that part of this process?

12  And I am not deciding any individual claim, I think we all

13  agree on that.  And I am not deciding whether there's a

14  particular statute of limitations that bars a particular

15  claim.  There might be discussions generally we should

16  discount the amount of the aggregate claims because there are

17  statute of limitations defenses; that's different.

18        So these -- it would seem to me that an insurance

19  company ought to be more concerned about what's in a TDP then

20  on what's happening right now because once you do start

21  participating, you know, then I think you're bound, but am I

22  deciding a coverage issue?

23        I have a couple cases in front of me, adversaries,

24  where people want me to decide coverage issues.  And if those

25  don't settle I will have to decide them.  I am not sure I have

1  one in this case, but I have them in some of my other cases

2  and that's different.  Then that issue is being put squarely

3  in front of me and somebody has to argue that I don't have

4  jurisdiction, or I can't decide it, or whatever, or that I'm

5  deciding it.

6         I guess I'm just really trying to understand what

7  the insurance company's issue is with feasibility, best

8  interest test, anything that doesn't impact them, at least as

9  I understand it.

10         MR. CHRISTIAN:  Your Honor, may I be heard?  This

11  is David Christian for --

12         THE COURT:  If Mr. Schiavoni is going to cede his

13  time.

14         Mr. Christian?

15         MR. CHRISTIAN:  Thank you, Your Honor.

16         I didn't mean to pre-end Mr. Schiavoni, but the

17  court has raised a number of questions that I thought I might

18  shed some light on.

19         First of all, the reason we care is that the

20  movants in this instance are explicit, that they intend a UNR

21  type result.  And what happened in UNR; the debtor filed a

22  disclosure statement, got it approved, and then confirmed a

23  plan.  That disclosure statement described the debtors' view

24  of its aggregate liability.  The Seventh Circuit then said the

25  insurers were responsible for that amount of aggregate

liability and the insurers said that it hadn't been
determined.  The Seventh Circuit said, well, it's right there
in the disclosure statement and you didn't object to it.  The
court approved it.

So where we have movants saying their express
intention is to follow UNR and we have UNR saying a debtor's
guestimate in the disclosure statement is a form of liability
that creates a loss under the policies.  We have to act to
prohibit what we view as improper under our policies and under
the law, both the bankruptcy code and non-bankruptcy law.

So as Mr. Schiavoni suggested, if we could get
written in stone what Your Honor said a few minutes ago about
what you are and aren't deciding I think that solves the
problem.  That is not what the movants want, of course, and
that's one of the reasons we think the motion should be
denied.

Another thing I was going to share with Your Honor,
because you asked about the origins of insurance neutrality in
Combustion Engineering and ensure standing is that I, like a
number of others in this hearing, was in the room when it
happened.  And so I might be able to shed a little bit of
light on it.  What I will say at the outset is that the
insurance neutrality provisions in different cases serve
sometimes different, often overlapping, often similar
functions depending on the needs of the case.

1          So in Combustion Engineering it was a prepackaged

2     plan.  It had been solicited prior to the filing of the

3     Chapter 11 case.  And it were insurers who had indemnity

4     rights against the debtor that they felt were prejudiced,

5     impaired by the prepackaged plan.  So the debtor had a problem

6     they didn't solicit their votes as part of the prepetition

7     ballot.

8          So if they had those rights and they were impaired

9     by the plan then they should have been solicited and they

10    would have had a vote.  That would have upset the prepackaged

11    process.  So Judge Fitzgerald, in the middle of the

12    confirmation hearing, ordered us, rather than going to our

13    beds and getting rest, to spend our hours away from the

14    courtroom negotiating the insurance neutrality provision.

15         In another case, so I'll just give another example,

16    the T H Agriculture & Nutrition case in New York the plan had

17    been proposed with the support of a parent company that was

18    prefunding the trust with $900 million and then it retained

19    the right to pursue coverage for some or all of that amount in

20    coverage litigation and (indiscernible) Illinois.

21         Not wanting the insurer's objections to get in the

22    way of confirming that plan on a fast track the debtor and its

23    parent were willing to stipulate to extensive insurance

24    neutrality provisions as a way of facilitating the process

25    they were trying to go through in the bankruptcy case.  And in

1  that case it made sense for them to do that because they

2  always intended on pursuing their coverage claims in a state

3  court where there was already pending litigation and not

4  litigating those issues as part of the bankruptcy case.

5       Because the trust was pre-funded it raised no

6  Section 1129 issues for Judge Gerber to consider.  And so in

7  that case the stipulation was many pages, and single spaced,

8  and heavily negotiated.  It was more than the paragraph or two

9  that you see in Combustion Engineering because that is what

10 the needs of that case required.  And what is developed in the

11 Third Circuit and other courts, but very prominently in the

12 Third Circuit and I would say being led by the Third Circuit

13 is a body of insurance neutrality law especially in the

14 context, not exclusively, but especially in the context of

15 mass tort cases where courts and often litigants fashion

16 insurance neutrality provisions that addressed a particular

17 concern raised by the case.  And what the Third Circuit

18 repeatedly says is this has become an important tool in

19 getting through these mass tort cases.

20      I am not going to be the first one to observe, and

21 I don't think the Third Circuit was the first to observe, I

22 think we've been hearing it from the Supreme Court and other

23 courts (indiscernible) that there's an unhappy lack of synergy

24 between the world of insurance law and the world of bankruptcy

25 law.  They are concepts that don't fit together very well in

new instances. And so we used these tools to get by some of these problems and the Third Circuit has embraced that, and endorsed it, and used it itself in many contexts.

I think what you are hearing from some of the insurers here is let's use that tool, as we would say deny the motion that's pending before the court, because of these kinds of arguments and considerations, but, you know, it's going to come up in a different guise when it comes to the debtors' proposed schedule and estimation process.

It's going to come up in a different guise when it comes to competing proposed findings of fact and conclusions of law at a confirmation hearing. It was a good faith finding, just about good faith under Section 1129(a)(3) or does it reach farther. Is your fairness determination in a potential cram-down scenario one determining that these claims are all appropriately compensated and fair in the vernacular or is it a term of art for purposes of confirming a plan under Section 1129 of the Bankruptcy Code.

So I predict, given the facts and circumstances of this case, this is neither the first nor the last time you're going to hear about insurance neutrality from, really, all the parties, but it is a tool endorsed by the Third Circuit to deal with some of these problems.

So the pending motion I would say this simply, and I am going to endeavor because the hour is late not to repeat

1   what you have already heard, but maybe just emphasize a

2   sentence or two that you've heard in other forums.  For the

3   purposes of the present motion it's explicitly a UNR type of

4   effort.  It is explicitly contrary to the kinds of

5   descriptions Your Honor has made today about what you are not

6   going to be doing and what is beyond your purview and function

7   here in the Chapter 11 case.  So the motion ought to be

8   denied.

9           If we need technical reasons for that Mr. Anker was

10  very thorough and as always very good. I agree that we all

11  ought to be given COE credit for it because it was well-

12  spoken, but there is no scenario, no one is suggesting and no

13  one is proposing a scenario in this case where there would be

14  undue delay in the administration of the case because of the

15  need to allow or disallow tort claims.  You are not going to

16  be allowing or disallowing tort claims, it's prohibited by

17  statute that you have heard from the movants.

18          There is a more important reason why you are not

19  going to be allowing and disallowing tort claims and that's

20  you don't need time at all for it.  That is everyone proposes

21  that those tort claims be channeled to a trust for resolution

22  years, years after confirmation of the plan.  The whole point

23  of planning of this type using a trust channeling injunction

24  structure is that there is insufficient time and there is an

25  inability to allow or disallow the tort claims in the case.

1           It's the reason Johns Manville's solution was

2   considered so created because it takes tens of thousands of

3   claims and it was just present claims it was future claims

4   that couldn't be before the court, that couldn't be named.

5   Indeed, when Congress enshrined that approach in Section

6   524(g) of the Bankruptcy Code.  One of the required findings

7   under 524(g) is that the court cannot determine the claims.

8           So we use these tools in cases of this type in

9   order to avoid the very problem of undue delay and

10  administration of the case.  So 502(c) simply cannot apply in

11  this circumstance.  Again, the movants have been explicit

12  about their intent in bringing this motion.  So what is that

13  intent?  That intent, as Mr. Anker ably explained, is to get

14  insurance on a year by year basis. And I won't regurgitate

15  (indiscernible) know that, but ask yourself is that a proper

16  bankruptcy purpose in a case that's going to involve a trust

17  and a channeling injunction where the claims are going to be

18  fixed by the trust after confirmation under the supervision of

19  a trustee according to trust distribution procedures.

20          Why would the court be involved at all in that?

21  The answer is there's no proper bankruptcy purpose for the

22  court being involved in that.  There are other purposes.

23  Again, our opponents here have been, to their credit, clear

24  about their purposes, but they're not proper bankruptcy

25  purposes for administration of this case.

1          So I have gone on too long already.  I hope I gave

2   information to the court that is useful, but we think it's

3   easy enough for today's purposes to deny the motion.

4          THE COURT:  Thank you.

5          MR. RUGGERI:  Your Honor, James Ruggeri.

6          Just to address the court's question again for

7   Hartford.  The answer to your question really lies in

8   Paragraph 55 of the omnibus reply.  If the court wants to see

9   why we care that paragraph not only states why we care, but it

10  cites UNR and then it quotes how they would propose to use an

11  estimation. I think that answers the court's question point

12  blank which is they intend to use the estimation as an

13  adjudication of liability which they then intend to foist on

14  the carriers for coverage purposes.

15         MR. ROBBINS:  Your Honor, may we present some

16  rebuttal before the hour gets too late?

17         MR. RUGGERI:  Your Honor, I didn't mean to speak

18  out of turn, I just wanted to address the court's question

19  because it's set forth right there.  That is why we care.

20         MR. GOLDBERG:  Your Honor, before we get to

21  rebuttal there's one more objector if I may be heard.

22         THE COURT:  Yes.  I want to hear from the

23  objectors.

24         MR. GOLDBERG:  Thank you, Your Honor.  Adam

25  Goldberg of Latham & Watkins on behalf of the Church of Jesus

1 Christ of Latter Day Saints.  (Indiscernible).  Thank you,

2 Your Honor.

3         I will briefly address the estimation motion as to

4 the Church and the chartered organizations.  Your Honor, the

5 United Methodist Ad Hoc Committee joined in our objection and

6 I think as Your Honor mentioned your numbers are the same as

7 mine.  There are over 41,000 chartered organizations according

8 to the debtors' disclosure statement that are implicated by

9 this motion.

10         The motion is clear, on its first page, that the

11 movants seek an estimation that would measure the liability of

12 each chartered organization.  The motion, therefore, raises a

13 distinct legal question as to the amount of each chartered

14 organization and how much it is liable.  That is distinct from

15 the debtors' liability.  And the movants have not identified

16 any law, rule or case that provides a basis for this court to

17 estimate liability of non-debtors and that is, to the best of

18 my knowledge, why there is none.

19         It makes sense because Section 502, that we talked

20 about a lot today, is about claims against the debtor.  We

21 cited in our objection the play of history of Section 502 and

22 Third Circuit opinion on point that Section 502 is about

23 claims against the debtor.  The movants did not argue

24 otherwise in their reply.  I would say that if Congress meant

25 Section 502(c) to authorize the estimation of claims against

1  non-debtors in the context of a provision of the code that

2  applies to claims against the debtors it would have expressly

3  stated so much.

4         This court, we would respectfully argue, Your

5  Honor, should not be the first to read that kind of

6  authorization into Section 502(c) and undertake an estimation

7  of claims against non-debtors particularly in a case such as

8  this one.  If this court were to estimate the liability of the

9  mindboggling number of 41,000 charter organizations there is

10  very real questions that we would have to confront about

11  notice, due process, fairness, administration of such a

12  proceeding.

13         The motion doesn't answer how to ensure that

14  parties subject to estimation receive notice, how this court

15  could efficiently and effectively administer a process

16  involving estimation of claims against tens of thousands of

17  non-debtor parties and why it would be fair or equitable to

18  estimate on a discriminatory basis; that is estimating against

19  some non-debtors, but not others without the consent of those

20  non-debtors and that would be a practical necessity given the

21  number of chartered organizations that would be involved here.

22         So the only good answer to those difficult

23  questions is that the proposed estimation process as to non-

24  debtors is unworkable and inequitable.  Furthermore, an

25  estimation process would come at tremendous cost to the

1  estates.  That is important to the Church as well as a

2  creditor.  And there is no need to incur that (indiscernible).

3  The plan includes a concept that chartered organizations could

4  benefit from a channeling injunction, but there is no proposal

5  of such a settlement before the court.  There is no

6  contributing chartered organization identified to date.

7          So there is no need, in addition to there being no

8  legal basis, to incur the cost of adjudicating the potential

9  outside bounds of liability in the absence of an actual

10  settlement proposal.  And as Your Honor pointed out the

11  question of whether a settlement and channeling injunction for

12  a particular contributing chartered organization are

13  appropriate can be addressed if and when necessary as part of

14  the confirmation hearing.  At that stage the question before

15  the court will be not an estimation, but whether the plan

16  should be confirmed under Section 1129 and whether any

17  channeling injunction for non-debtors is appropriate under the

18  circumstances of that plan and that proposed settlement.

19          Furthermore, if an estimation decision is made,

20  whatever it may be, there is no assurance that any settlement

21  with any chartered organization would be reached that could

22  result in any value to the estate.  And so in that scenario,

23  if there are no contributing chartered organizations under the

24  terms of the plan there would actually be no benefit to the

25  estate from the estimation of claims as against non-debtors.

1    There would only be a potential benefit to certain plaintiffs

2    pursuing claims against non-debtor parties on the basis of the

3    estimation rulings in other courts.

4             So in sum, Your Honor, there is no legal or

5    equitable basis, there is no need, and there is no benefit to

6    the estate for an estimation of claims against the Church or

7    other chartered organizations.  As Mr. Harron stated, the way

8    out of this case is on a consensual basis.  The parties should

9    be focused on the mediation and not litigation through

10   estimation with an uncertain time table as a gating item to

11   the plan process.  For that reason the motion should be

12   denied, Your Honor.

13            Finally, I would very briefly add that the parties

14   here today have raised an important issue in discovery that

15   will be relevant to more parties then just the debtors which

16   is that the movants here seek historical settlement

17   information.  That type of information may concern parties

18   other than the debtors and if it is not admissible, Your

19   Honor, under Federal Rule of Evidence 408.  And even if it's

20   arguably discoverable it shouldn't be because it's highly

21   prejudicial in the context of the ongoing mediation process

22   that should be the focus of the parties.

23            So given Your Honor's invitation to the parties to

24   raise this issue we will look forward to addressing that issue

25   when presented, but I did want to address it.

1          THE COURT:  Thank you.

2          MR. GOLDBERG:  Thank you, Your Honor.

3          MR. MARTORANA:  Your Honor, Keith Martorana from

4   Gibson Dunn & Crutcher on behalf of the AIG Companies.  We

5   also joined in the brief that was filed by Mr. Anker's law

6   firm.

7          Just to reiterate one point, Your Honor, and to

8   answer the question that you had before.  You know, why

9   insurers care.  I mean, Your Honor, at the end of the day to

10  the extent that there is no issues with neutrality, to the

11  extent that our contracts are kept, you know, in their current

12  form and not tampered with other then as appropriate under

13  bankruptcy law your correct that we wouldn't have any

14  concerns, but I think that what we heard today and I think one

15  of our concerns is that Your Honor may or may not, you know,

16  order or permit there to be insurance neutrality provisions in

17  the plan.

18         And to the extent that there are true insurance

19  neutrality provisions in the plan that are in line with what,

20  you know, courts are ordering today, you know, I think a lot

21  of our concerns would be alleviated, but to the extent that

22  Your Honor does not permit such provisions to be into the plan

23  I think that we, obviously, do care because I think the point

24  that Mr. Anker raised is that what we can absolutely expect is

25  that the plaintiffs, possibly the debtors, will, you know, use

1   these in coverage litigations later.

2         So to the extent you may believe that Your Honor is

3   not ruling on coverage issues, certainly the plaintiffs will,

4   you know, be arguing that, in fact, you did later.

5         Thank you, Your Honor.

6         THE COURT:  Thank you.

7         Is there anyone else who has objected that I

8   haven't heard from who wishes to add something?

9       (No verbal response)

10        THE COURT:  Okay.  I hear no one.  I will give the

11  movants an opportunity for a brief rebuttal if they choose.

12        MR. ROBBINS:  Your Honor, this is Larry Robbins for

13  the coalition.  I am going to try and be as brief as possible

14  and hopefully even briefer.

15        Let me just start with the debtors' point.  There

16  is only one point I want to make which is if, as Ms. Rosenberg

17  contends, estimation is not permissible under 502(c) for

18  reasons I don't think she articulated.  It's surpassingly hard

19  to understand how they, themselves, have advocated estimation

20  as part of a plan, albeit a different form.  It seems to me it

21  either meets 502(c) of it doesn't.

22        The answer is that it does which takes me to Mr.

23  Anker's argument. He didn't reiterate his claim versus claims

24  argument, I assume, because he found the provision that said

25  that the singular includes the plural.  He says, however, that

1  this can't be for purposes of allowance, reiterating the point

2  that unless it actually results in an allowance it can't be

3  for purposes of allowance just as you can't have the purpose

4  of building a house without actually building a house.  That

5  is, of course, preposterous.

6          If I buy a bunch of supplies and don't ultimately

7  finish the house it remains the case that I bought the

8  supplies for purposes of building the house.  You don't have

9  to complete the task in order to be serving the purpose of

10 performing that task. And if the law were otherwise you

11 couldn't have any aggregate estimation at all because no

12 aggregate estimation ever totally resolves the allowance of

13 any individual claim, but that would be news to the Bankruptcy

14 Court in the Central District of California in the In RE North

15 American Healthcare, Inc.  It would be news to the Bankruptcy

16 Court in Federal-Mogul at 330 B.R. at 164.  It would be news

17 to the Bankruptcy Court in Delaware In Re Specialty Products.

18 And it would be news for the District Court -- to the

19 Bankruptcy Court in Owens Corning at 322 B.R. at 725; all of

20 which permitted aggregate estimation even though it didn't

21 devolve to the resolutions of an individual claim.

22          So I think there is simply no heft to the argument

23 that 502(c) isn't satisfied. Just as the debtors recognize,

24 just as we recognize, and if it is satisfied it is not

25 optional.  Let me just --

1          THE COURT:  Let me ask this question.  I don't

2  think the motion is asking me to estimate for purposes of

3  allowance.  You want to use this in connection with

4  confirmation, not for purposes of allowance, subsequently in

5  the TDP process.  And there has got to be -- that is what you

6  want to use it for.  So if I'm going to go with your

7  interpretation for purposes of allowance that is not what I am

8  being asked to permit estimation for by the movants.

9          MR. ROBBINS:  We believe that estimating the

10  aggregate liability will materially advance the process by

11  which individual allowances are finally resolved.  I have made

12  that argument already, but I think the question is does it

13  move the ball down the field toward the ultimate day that an

14  individual claimant gets a check.  The answer to that is

15  manifestly yes and if so --

16          THE COURT:  Okay.  But then why would I do it now?

17  If that were the case and that's the goal why would I do it

18  now?  I've got enough other stuff I have to do now.  So if

19  that is the goal for purposes of allowance why wouldn't I do

20  it after confirmation?

21          MR. ROBBINS:  The reason to embark on estimation

22  now, Your Honor, is precisely because it is a complex process

23  that will take discovery which has been resisted at every turn

24  by the debtors and their insurers. If you don't start it now,

25  if you start it only later it will take only that much longer

1 to liquidate these individual claims and allow

2 (indiscernible). We ought to start now because the time is

3 available.

4 THE COURT: No, the time is not available. Do you

5 hear the number of issues that have come out just today with

6 respect to confirmation? You want to add on an issue that is

7 not necessary if it's for purposes of allowance. I don't have

8 unlimited time. So I don't -- I am not buying that.

9 Also, when I look at 157 it talks about -- 28

10 U.S.C. 157, it talks about estimation of claims or interests,

11 and now your words that you like, for the purposes of

12 confirming a plan. Isn't that what we are talking about here;

13 estimation of claims or interest for the purposes of

14 confirming a plan. There is more than one reason to estimate

15 and I think what everybody who's suggesting I estimate

16 something, others are opposing any estimation, why isn't it

17 for purposes of confirming a plan. That is something I have

18 to deal with today, not the allowance of the claims which

19 isn't going to happen until and if I confirm a plan.

20 MR. ROBBINS: Your Honor, I don't -- I am happy to

21 agree that one function of the estimation is to serve the

22 purpose of confirming a plan. As a matter of fact, Your

23 Honor, I don't understand how you could confirm the toggle

24 plan without determining the assets and liabilities. So I

25 absolutely share the court's view that one of the functions of

1   estimation is for purposes of confirming the plan.  That is

2   absolutely true. It's not its only purpose, but its one

3   purpose.

4          Let me just, because the time is running short and

5   the court has been more then patient with us today.  I think

6   what you have heard about this insurance neutrality really

7   gives away the ghost.  The insurers do not want your rulings

8   to have any effect on them.  They take comfort from XM-4 of

9   the plan which purports to do just that which is why we don't

10  agree with the current -- one reason we don't accept the

11  current plan and will vote it down.

12         Mr. Anker's distinction between, you know, when he

13  says, for example, the Supreme Court often says we're not

14  deciding question X, we're only deciding question Y.  That is

15  true, but I have to tell you, Your Honor, I've never seen a

16  Supreme Court case, and I've argued eighteen of them, I have

17  never seen one where the court says we're deciding question X,

18  but we want the lower courts to know that this is the effect

19  of our ruling. It will have only this effect in this court and

20  that effect on this court, and it won't have any effect on

21  insurance contracts and it won't have any effect on X and Y.

22  The Supreme Court doesn't do that.  No court does that.  It's

23  what we mean by advisory opinions.

24         We're not asking the court to say what it is the

25  rulings of this court will or will not do.  Indeed, we want

1 you to be silent on that question. We want the law of

2 preclusion to have whatever effect it would, otherwise, have.

3 They're the guys who want you to write something taking them

4 off the hook so that they get a free bite at the apple. They

5 can participate in the estimation consequence free. That is

6 not the law. It never has been.

7 So, you know, I think -- look, I think I've made

8 these points fairly well. Let me just leave you with one last

9 thought raised by Mr. Goldberg on behalf of the Church of

10 Latter Day Saints.

11 This 408 argument that the discovery we're seeking

12 somehow is impermissible under the rules of evidence is

13 nothing but a parade of red herrings. The question of prior

14 settlements is not that they're going to be put in evidence.

15 It is that they are going to be used by experts to derive the

16 value of individual categories of claims yielding an aggregate

17 value. Rule 703 of the rules of evidence prescribes how

18 experts may use materials. The fact that the underlying

19 evidence may not be itself admissible is no deterrent to the

20 use by an expert under Rule 703. This 408 issue is an utter

21 red herring.

22 Okay; I'd like to yield the floor to Mr. Pagay if

23 he has something to add.

24 MR. PAGAY: Your Honor, I will be very brief as

25 well.

1              Can you hear me okay?

2              THE COURT:  Yes.

3              MR. PAGAY:  Thank you, Your Honor.  My earbuds ran

4    out of battery power.  And thanks, again, to the court for

5    patience.

6              One thing, there seems to be a contention that

7    estimation, itself, is going to take years even though the

8    statute itself means that estimation needs to take place so

9    that litigation won't go on for years.  No one is asking the

10   court to look at however many billings and permutations that

11   counsel described.

12             The debtors have created and refined, I guess, five

13   different tranches of manipulations of filed claims.  And if

14   we say we want to see all the events in 1972 they should be

15   able to click on that and give us all that.  So no one is

16   looking to estimate non-debtor claims, no one is looking to

17   have the court produce a giant matrix.

18             There is a field that should allow us to understand

19   and once the estimation is completed figure out which claims

20   arise from years or which claims are associated with this

21   local council.  So that is all that is.  That should take

22   minutes or hours, but not days, weeks, months or years.

23             It seems also with Mr. Schiavoni's argument that he

24   has a different view on how a claim should be estimated.  In

25   the dozens of -- in the two or three dozen cases where

1  estimation has occurred that is exactly how estimation should

2  work.  Different parties in interest, and here I guess it will

3  be the insurers as well, are going to present to the court

4  this is how we think estimation should be valued, this is what

5  we think is the way the court should do it and the court will

6  hear from various experts and will decide this is the

7  appropriate way to do it based on the expert testimony that I

8  have heard.

9          So Mr. Schiavoni has one method and it sounds like

10 they are ready to present.  So they will be one of the parties

11 presenting experts to Your Honor to make that determination.

12         One quick note, before Ms. Rosenberg argued, Ms.

13 Lauria said that they have given us everything that the Bates

14 White Firm looked at in four years.  Your Honor, just because

15 the Boy Scouts only give Bates White four years out of eighty,

16 because presumably it's to the Boy Scouts advantage to have

17 their expert look at only -- their alleged expert look at only

18 four years. It shouldn't prevent other parties in interest

19 from looking at the other seventy-six years if the Boy Scouts

20 have that information in their possession.

21         So as Your Honor said, we will be brining that to

22 the court's attention.  I have one quick housekeeping

23 question.  I note that Your Honor has used both letters and

24 motions to compel, but prefers letters.  Is it the court's

25 preference that we present discovery issues to the court in

1  letter format?

2          THE COURT:  Yes, in the first instance.

3          MR. PAGAY:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          MR. PAGAY:  With that I will yield the rest of my

6  time.  Thank you.

7          MR. HARRON:  Your Honor, I think I'm last up and I

8  will be super brief.  It's a complicated case with a lot of

9  issues that have revolved over a lot of years.  We don't want

10  to be the bearers of bad news, but it's going to be a

11  complicated resolution that's going to take some time.

12          We offered the estimation proposal because we think

13  it's a way to bring settlements, to reach resolutions with the

14  counsel for chartered organizations and fund a trust.  I

15  assume you are going to consider everything in the package of

16  what is before the court on the agenda.

17          If Your Honor is convinced that the debtors' plan

18  is confirmable and will achieve value that is one thing, but

19  for reasons, I guess, we will discuss on Monday we just don't

20  think it gets us there.  We think there are far too many holes

21  on far too many important issues for that plan to be even

22  considered confirmable on its face.  If it's not we need

23  another path forward.  We propose estimation is that path.

24          THE COURT:  Thank you.

25          Okay.  Well its 7:30, we've had a long day and my

1  staff has a long day.  So we're going to adjourn for the

2  evening.  We are back on Monday at, I'm assuming, ten o'clock.

3          My courtroom deputy asked me to announce that there

4  will be a new Zoom link on the agenda filed for May 24th.  No

5  call-in number will be used.  So we have solved the capacity

6  problem and parties can -- they will all be able to link in

7  and then hopefully we won't have all the phone issues that we

8  had in the earlier part of the day.

9          So this is a complicated challenging case, but I

10  still hear that the parties want to resolve this.  There is no

11  question that a consensual resolution is best within the

12  realistic constraints of time and what can be achieved.  I

13  encourage the parties to continue to talk.  I heard a lot

14  today about how parties, at least, feel they were not included

15  in various mediation sessions or meetings that they would like

16  to have.  I am not sure what to do with that.  That is not

17  within my purview.

18          I think parties should be reaching out to each

19  other to see if there's any kind of a consensual path forward,

20  whether that's a plan or just a path, but we are going to take

21  up, at this point, the disclosure statement on Monday.  I will

22  see what I do with it.

23          As I said at the beginning of the hearing there are

24  82,000 plus individuals who have filed abuse claims that need

25  to be appropriately and timely compensated.  And I have

1   700,000 plus Boy Scouts who presumably would like to continue

2   to be Boy Scouts and that is not necessarily an interest that

3   national holds; that's 700,000 boys. So there are a lot of

4   considerations here.

5         I haven't read all the letters that have come in

6   recently because it's simply physically not possible. They

7   are overwhelming our clerk's office and we're getting them on

8   the docket as soon as we can. Many of them tell tragic

9   stories, but many of them, as I have said, also recognize the

10   need for Boy Scouts to continue. So there is a balancing act.

11         I encourage everyone to continue to have

12   discussions, even in this interim period, and I will consider

13   all of the arguments that have been made today. I appreciate

14   the excellent arguments that I have heard today. All parties

15   in this matter are well represented and it's clear that each

16   is looking out for their particular constituency as is --

17   which is exactly what they should be doing.

18         So I will end with that. I will encourage the

19   parties to continue talking, whether that's through mediation

20   or just reaching out one-on-one because I don't think there's

21   anything in the mediation procedures that says you can't talk

22   to each other outside of that process. I encourage you to do

23   so.       Everyone have a good evening. We're adjourned.

24      (A chorus of "Thank you, Your Honor")

25      (Proceedings concluded at 7:31 p.m.)

1          CERTIFICATE

2

3       I certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6
    /s/Mary Zajaczkowski              May 20, 2021
7   Mary Zajaczkowski, CET**D-531

8
    /s/William J. Garling             May 20, 2021
9   William J. Garling, CE/T 543

10

11  /s/ Tracey J. Williams            May 20, 2021

12  Tracey J. Williams, CET-914

13

14

15

16

17

18

19

20

21

22

23

24

25