IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>Ref. D.I. 5466 |

**DECLARATION OF BRIAN WHITTMAN IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO
SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING
THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING
SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF**

I, Brian Whittman, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare as follows:

1. I am over twenty-one (21) years of age and fully competent to make this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* (the "Motion"), filed concurrently herewith.[2] I am a Managing Director with Alvarez & Marsal North America, LLC ("A&M"), which serves as restructuring advisor to Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"). I have been the lead Managing Director at A&M responsible for this engagement since August 2019, and I have been actively

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion, the RSA, or the Amended Plan, as applicable.

involved with the Debtors' reorganization efforts. In doing so, I have familiarized myself with a range of matters concerning the Debtors and these chapter 11 cases, including those described herein.

2. I have participated directly in advising and assisting the Debtors in connection with negotiations with the Plaintiff Representatives and other parties in interest in these chapter 11 cases. In particular, I participated directly in advising and assisting the Debtors with the negotiation of and analyzing the terms and provisions of the Amended Plan set forth in the RSA and related restructuring documents. In each case, I have worked closely with the Debtors' management and operational teams and other advisors.

3. Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal knowledge, materials provided by, or my discussions with, members of the Debtors' executive and management team or information obtained from my personal review of relevant documents. Additionally, the views asserted in this Declaration are based upon my experience and knowledge of the Debtors' nonprofit operations, financial condition, and liquidity. If called upon to testify, I could and would testify to each of the facts set forth herein based on my personal knowledge, discussions and review of documents. I am not being compensated specifically for this testimony other than through payments received by A&M as a professional retained by the Debtors in the chapter 11 cases.

## THE RESTRUCTURING SUPPORT AGREEMENT

4. Since appointment of the Mediators, I have personally participated in hundreds of hours of mediation involving various parties, including, among others, the Coalition, the Future Claimants' Representative, the TCC, the AHCLC, the Debtors' insurers, JPM (the Debtors' senior secured lender), and the Creditors' Committee. Additionally, I have spent many more hours

interacting with these constituents' representatives outside of the mediation by videoconference, telephone, and email. Following the May 19 Hearing, the Debtors and certain of their advisors attended eight days of formal in-person mediation sessions with the mediation parties, which were held on (i) May 26–27, 2021 in New York, (ii) June 2–3, 2021 in Chicago, and (iii) June 7–10, 2021 in New York. I attended each of these meetings. Since the last in-person mediation, the Debtors have continued to engage in extensive and detailed negotiations with the representatives of certain of these parties in an effort to agree upon the terms of a plan of reorganization that would provide for agreed-upon treatment of Abuse Claims that would have the support of a substantial number of Abuse Survivors. These negotiations have resulted in resolution with every single official and/or major creditor constituency in these chapter 11 cases, and a plan of reorganization that is supported by the Future Claimants' Representative, the TCC, the Creditors' Committee, JPM, the Coalition, and the AHCLC.

5. The material terms of the Amended Plan under the RSA are summarized in the Motion and set forth in greater detail in the RSA, the Term Sheet and TDP appended thereto, and the Amended Plan. These terms include the treatment of each class of claims under the Amended Plan, the means for implementation of the Plan, discussion of certain release provisions, and conditions to confirmation and the Effective Date of the Plan. The RSA provides for the Plaintiff Representatives' agreement to an amended plan of reorganization that provides substantial value, including increased contributions from the BSA and the Local Councils. In addition to confirming Plaintiff Representative support for the economic terms in the June 18 Plan, the Amended Plan provides: (i) an additional $100 million variable-payment obligation note issued by a Delaware statutory trust (or other appropriate entity) formed on the Effective Date, and (ii) resolves or stays the Restricted Assets Adversary, the Estimation Matters, and the Exclusivity Motion. I believe

that these terms, set forth in full in the RSA and related documents, will maximize the value of the Debtors' estates and will provide significant benefits by enabling the Debtors to avoid costly litigation with the Plaintiff Representatives and confirm a plan that has overwhelming support of plaintiff and non-plaintiff creditor classes.

6. The Amended Plan provides a framework for the global resolution of Abuse Claims, including third-party releases for the Local Councils and Contributing Chartered Organizations that are crucial to the financial and operational health and future of the entire BSA organization. In a situation where only the BSA is able to emerge from bankruptcy free of these liabilities, the Local Councils and Chartered Organizations would likely face a deluge of lawsuits, which would lead to numerous bankruptcy filings and dissolutions across the country and may threaten the entire BSA structure. The third-party releases and injunctions in the Amended Plan are essential to the Debtors' ability to continue to carry out the Scouting mission through their network of Local Councils, as is the potential for further releases for Contributing Chartered Organizations and Settling Insurance Companies through the Amended Plan.

7. The payment of the Coalition's fees and expenses, on the terms set forth in the RSA, will not just benefit the Debtors. By entering into the RSA and reimbursing the Coalition, the Debtors are making a business decision that significantly benefits the Debtors' estates and creditors (abuse survivors or otherwise) as a whole by providing a pathway to plan confirmation. The Debtors cannot build the consensus needed to achieve their goals of equitably compensating abuse survivors and continuing their charitable mission without expeditiously reaching plan confirmation. They require the continuous and active involvement and leadership of the Coalition, alongside the TCC and the Future Claimants' Representative, in order to do so.

## VIABLE PATHWAY TO CONFIRMATION AND
## THE DEBTORS' BUSINESS JUDGMENT

8. I believe that entry into the RSA is a reasonable exercise of the Debtors' business judgment, and is in the best interest of the Debtors, their estates, and their creditors. The RSA builds the necessary consensus among abuse survivors to achieve a pathway to plan confirmation. Entry into the RSA secures the support of the Plaintiff Representatives, who represent the interests of over 60,000 abuse survivors. Failure to obtain approval of the RSA likely would mean further uncertainty, delay, and significant administrative and litigation costs, all of which the Debtors and their estates seek to avoid. The terms of the Amended Plan proposed under the RSA maximize recoveries to creditors, and in my view, will do so while also lowering the likelihood of significant litigation-related delay and costs.

9. The RSA is the result of good faith, arm's-length negotiations and Court-ordered mediation regarding the terms of a plan of reorganization in which I have extensively participated. The Debtors have undertaken a thorough, independent review of the Parties' respective rights and obligations under the RSA, and they have determined, in the valid exercise of their business judgment, that entry into the RSA is in the best interests of the Debtors' estates and their creditors.

10. In sum, I believe that the RSA provides the Debtors with a viable pathway to confirmation of the Amended Plan, substantial recoveries to creditors, and the resolution of certain costly and time-consuming litigation.

## THE HARTFORD SETTLEMENT

11. On April 16, 2021, the BSA and Hartford entered into the Hartford Settlement. Subject to a determination of the Court, pursuant to the Hartford Settlement, if the Plan (as defined in the Hartford Settlement) is confirmed as a Global Resolution Plan (meaning that a substantial number of holders of Direct Abuse Claims voted to confirm the Plan), the Plan would incorporate

the terms and provisions of the Hartford Settlement, and Hartford would make a contribution of up to $650 million to the Settlement Trust for the payment of Abuse Claims (the "Hartford Settlement Contribution").  In return, the Hartford Settlement provides, in pertinent part, for the sale of the Hartford Policies (as defined in the Hartford Settlement) to Hartford free and clear of the interests of all third parties, including any additional insureds under the Hartford Policies, which interests will be channeled to the Settlement Trust; the release of claims against Hartford by the Debtors and Local Councils; and the channeling of all present and future claims against Hartford relating to its provision of insurance coverage for Abuse Claims to the Settlement Trust. In contrast, if the Plan is not confirmed as a Global Resolution Plan (because a substantial number of holders of Direct Abuse Claims vote against confirmation of the plan), or if the Local Councils do not all execute releases in favor of Hartford, the Hartford Settlement will not take effect and the Settlement Trust will not receive the Hartford Settlement Contribution.

12. The Hartford Settlement Contribution is subject to reduction (or, if already paid by Hartford, to its right to a refund) if the Debtors, their Estates or the Settlement Trust enter into an agreement resolving the Debtors' or Local Councils' claims against Century (as defined in the Hartford Settlement) and its affiliates for coverage of Abuse Claims and that agreement provides for payment by Century of less than $1.3 billion (two times the Settlement Amount).

13. At the time the BSA entered into the Hartford Settlement, the Debtors and I believed it was reasonable and in the best interests of the Debtors' estates.  However, the Hartford Settlement was met with overwhelming opposition from the Plaintiff Representatives, which began immediately following the announcement of the settlement on or about April 16, 2021, and culminated in a June 9 letter from the Plaintiff Representatives informing the Debtors that the

abuse survivors would affirmatively vote to reject any plan of reorganization incorporating the terms of the Hartford Settlement under any circumstances.

14. Without the support of a substantial number of holders of Direct Abuse Claims, a global resolution plan incorporating the Hartford Settlement in its current form cannot be confirmed. To continue to prosecute and solicit a plan incorporating the Hartford Settlement without the support of the Plaintiff Representatives appears futile and would cause unnecessary expense and delay, neither of which are in the best interests of the Debtors or their estates.

15. In light of the changed circumstances that the Debtors face as a result of the abuse survivors' rejection of the Hartford Settlement, and the Debtors' inability to pursue the Amended Plan—which would maximize recoveries for creditors—while retaining the Hartford Settlement, they are seeking the Court's determination that the Debtors may enter into the RSA, which includes a determination that the Debtors are not obligated to seek approval of the Hartford Settlement.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: July 1, 2021  ALVAREZ & MARSAL NORTH AMERICA, LLC
Chicago, Illinois

*/s/ Brian Whittman*
Brian Whittman
Managing Director