<u>Exhibit B</u>

Oct. 6, 2021 Hr'g Tr., *In re Imerys Talc America, Inc.*, Case No. 19-10289 (LSS) (Bankr. D. Del. 2019)

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        .  Chapter 11
                              .
IMERYS TALC AMERICA, INC., .  Case No. 19-10289 (LSS)
*et al.*,                       .
                              .
                              .  (Jointly Administered)
            DEBTORS      Wednesday, October 7, 2020
. . . . . . . . . . . . . .        10:30 a.m.

                         Courtroom No. 2
                         824 North Market Street
                         Wilmington, Delaware 19801

    TRANSCRIPT OF TELEPHONIC CONFERENCE ON MOTION TO
    ADJOURN THE HEARING TO CONSIDER APPROVAL OF THE
DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT CHAPTER
11 PLAN OF REORGANIZATION OF IMERYS TALC AMERICA, INC.
   AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE
           BANKRUPTY CODE [DOCKET NO. 2290]
    BEFORE THE HONORABLE LAURIE SELBERT SILVERSTEIN
            UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:          Mark Collins, Esquire
                          Michael Merchant, Esquire
                          Amanda Steele, Esquire
                          Brett Haywood, Esquire
                          Marcos Ramos, Esquire
                          RICHARDS, LAYTON & FINGER,P.A.
                          One Rodney Square
                          920 North King Street
                          Wilmington, Delaware 19801


Audio Operator:           ELECTRONICALLY RECORDED
                          By Ginger Mace, ECRO

Transcription Company:  Reliable
                        1007 N. Orange Street
                        Wilmington, Delaware 19801
                        (302) 654-8080
                Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TELEPHONIC APPEARANCES (Continued):

| | |
|---|---|
| For the Debtors: | Jeffrey Bjork, Esquire<br>Helena Tseregounis, Esquire<br>Amy Quartarolo, Esquire<br>Kimberly Posin, Esquire<br>LATHAM & WATKINS LLP<br>355 South Grand Avenue<br>Suite 100<br>Los Angeles, California 90071 |
| For Johnson &<br>Johnson: | Theodore E. Tsekerides,Esquire<br>Diane P. Sullivan, Esquire<br>Ronit J. Berkovich, Esquire<br>Konrad L. Cailteux, Esquir<br>WEIL GOTSHAL & MANGES, LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>-and-<br>Patrick A. Jackson, Esquire<br>FAEGRE DRINKER BIDDLE &<br>REATH, LLP<br>222 Delaware Avenue<br>Suite 1410<br>Wilmington, Delaware 19801 |
| For Future Claimants: | Robert Brady, Esquire<br>YOUNG, CONAWAY STARGATT &<br>TAYLOR, LLP<br>1000 North King Street<br>Wilmington, Delaware 19801 |
| For the Committee of<br>Tort Claimants: | Rachel Strickland, Esquire<br>WILKIE FARR & GALLAGHER, LLP<br>787 Seventh Avenue<br>New York, New York 10019 |
| For Cyprus Amax<br>Minerals Company: | Emil A. Kleinhaus, Esquire<br>WACHTELL, LIPTON, ROSEN &<br>KATZ<br>51 West 52nd Street<br>New York, New York 10019 |
| For Cyprus Historical<br>Excess Insurers: | Tancred V. Schiavoni, Esquire<br>O'MELVENY & MYERS, LLP<br>Times Square Tower<br>7 Times Square<br>New York, New York 10036 |

TELEPHONIC APPEARANCES (Continued):

For Arnold & Itkin:           Laura Davis Jones, Esquire
                              PACHULSKI, STANG, ZIEHL & JONES
                              919 N. Market Street
                              Suite 1700
                              Wilmington, Delaware 19801


For Creditor/                 Natalie D. Ramsey, Esquire
Official Committee of         ROBINSON & COLE, LLP
Tort Claimants:               1201 N. Market Street
                              Suite 1406
                              Wilmington, Delaware 19801

For Creditor/                 Bennett S. Silverberg
Plaintiff Ad-Hoc              BROWN RUDNICK, LLP
Committee:                    7 Times Square
                              New York, New York 10036

For Creditor/                 Paul E. Heath, Esquire
Cyprus Entities:              VINSON & ELKINS, LLP
                              2001 Ross Avenue
                              Suite 3900
                              Dallas, Texas 75201

For the U.S. Trustee:         Linda Richenderfer
                              OFFICE OF THE U.S. TRUSTEE

4

1          (Audio Recording Begins.)

2          THE COURT:  Good morning, counsel.  This is

3 Judge Silverstein.  We're here on the Imerys Talc

4 America, Inc. case; Case number 19-10289 for a status

5 conference and, I guess, also in response to a motion

6 to adjourn the disclosure statement hearing.

7          Ginger, can you please remind everyone of

8 the protocol for the hearing?

9          COURT CLERK:  It is extremely important that

10 you put your phones on mute when you are not speaking.

11 When speaking, please do not have your phone on

12 speaker as it creates feedback and background noise

13 and it makes it very difficult to hear you clearly.

14 Also, it is very important that you state your name

15 each and every time you speak for an accurate record.

16 Your cooperation in this matter is greatly

17 appreciated.  Thank you.

18          THE COURT:  Okay.  Thank you.  Let me start

19 by saying that even before I got the motion to adjourn

20 the disclosure statement hearing, I was considering

21 having a status conference to determine where we are

22 and whether we're really prepared to go forward

23 tomorrow given that at the time that we were looking

24 for the disclosure statement hearing earlier this

25 week, it had not been filed, the amended disclosure

1 statement, which I envisioned would have to come given

2 that I had been working off of the previous disclosure

3 statements and documents that were filed, I think

4 around August 12th and as we all know, there were

5 developments that happened since that time.

6          So, that is to say that I am somewhat

7 amenable to moving the hearing.  So, let me start with

8 Ms. Posin, if you are going to be addressing this or

9 whoever from the debtor's side is going to be

10 addressing why we're in a position to go forward with

11 the disclosure statement hearing given that the

12 objections that I have are geared toward a disclosure

13 statement that's no longer relevant.

14          MS. POSIN:  Yes, Your Honor.  Good morning.

15 Kim Posin of Latham and Watkins, counsel for the

16 debtors.

17          Your Honor, as you noted several times in

18 this case and more recently in the last couple of

19 months, the debtors continue to believe that it's in

20 the best interest of their estate to move these cases

21 forward.  We have been in bankruptcy now for 20 months

22 and therefore, we would request that the Court permit

23 the debtors and the planned proponents to proceed with

24 the disclosure statement hearing tomorrow and allow

25 the debtors to send the second amended disclosure

1 statement and plan out for voting.

2       The hearing scheduled for tomorrow relates

3 solely to the adequacy of the disclosures in the

4 disclosure statement and of course any and all

5 objections from any of the parties that have objected

6 thus far to the content of the plan of the adequacy of

7 the concepts that are laid set forth in the plan, of

8 course are completely reserved and can be addressed at

9 confirmation.

10       The debtors, as the Court just noted, did

11 file our initial plan of disclosure statement back on

12 May 15th, almost five months ago now.  We did file a

13 amended plan of disclosure statement on August 12th,

14 almost two months ago, and of course we did file our

15 original TDP and the trust agreement 27 days ago on

16 September 10th.

17       As the Court is -- is going to hear this

18 morning and saw in the papers that the movants filed,

19 after working through revisions with each of the other

20 planned proponents over the last 10 days or so since

21 the Court entered the order denying J&J's stay motion,

22 as well as with settling parties, Rio Tinto and

23 Zurich, the debtors filed our amended plan of

24 disclosure statement and an amended TDP that the Court

25 noted on Monday.

1        However, I think the important note is if

2 you look at the black lines that were filed with all

3 three of those documents on Monday, which I'd

4 certainly be happy to walk the Court through as

5 appropriate, you will see very clearly there were

6 very, very minimal changes made from the prior

7 documents.  With respect to the plan of disclosure

8 statement, the only substantive revisions included the

9 following: one is revising a handful of definitions

10 simply to conform to the definitions that were used in

11 the TDP that was filed on September 10th.

12        The second, as the Court has already noted,

13 are revisions to reflect the denial of the J&J stay

14 motion.  That -- that hearing was held on September

15 23rd, the order was entered September 25th, not that

16 long ago, and removing the J&J protocol order language

17 from the plan of disclosure statement as a result of

18 the denial of J&J's motion, and adding a preservation

19 of rights with respect to J&J, which is substantially

20 similar to the treatment of J&J that was set forth in

21 the May 15th plan that has been outstanding for, again,

22 almost five months.

23        The third substantive revision is the

24 revision to the timeline.  Of course, because our

25 original disclosure statement was set to be heard back

1 in June and now our disclosure statement may not be

2 heard, you know, until tomorrow or later, we course

3 had to address the confirmation timeline accordingly

4 and -- culminating in a currently planned confirmation

5 hearing on December 17th and then finally, we disclosed

6 that we are proceeding with mediation, which we are

7 pleased to report to the Court with another insurance

8 company, XL (phonetic) Insurance Company, later this

9 month and we are in discussions with other insurers to

10 also proceed with mediation with them as well.

11        That's it.  That's the full -- that's the

12 sum of all of the changes.  I know the movants say

13 that the changes are dramatic, but that's it and as

14 far as the TDP's, it's exactly the same.  The only

15 substantive changes made to the TDP from the original

16 version that was filed September 10th is to remove the

17 J&J protocol language and to make it clear that J&J

18 stay motion was denied by this Court.

19        As the movants noted in their motion and the

20 Court has already noted today, it should be no

21 surprise to anybody, certainly nobody on this call or

22 any of the movants, or any of the joining parties,

23 that the disclosure statement and plan had to be

24 revised to reflect the denial of J&J's stay motion.

25        I think it's also worth noting, Your Honor,

1  that the movants here putting it by the joining

2  parties, which I'll get to in a minute, are J&J, which

3  is a co-defendant and indemnitor and several insurance

4  companies and to be clear, none of the insurers, to my

5  knowledge, have liquidated claims against these

6  estates and likely want to be to vote on the plan and

7  as to J&J, they did file a 20 million dollar indemnity

8  claim, which we have objected to and we have asked the

9  Court to disallow that claim in full.

10          As to the insurers specifically, they will

11  all receive full neutrality under the terms of the

12  plan.  Those neutrality provisions are set forth very

13  clearly in the plan and they are found in Section

14  11.4.  They have not changed since the original plan

15  was filed five months ago -- are identical.  They are

16  substantially identical to other similar neutrality

17  provisions that have been approved multiple times in

18  the Third Circuit and they ensure that the rights of

19  each of the insurers are fully preserved.

20          In any event, if any of the insurers do not

21  agree with the scope or substance of those neutrality

22  provisions despite all of the things that I just

23  noted, then they have a full and fair opportunity to

24  raise those issues with the Court at confirmation.

25          Now, as to J&J, the operative plan documents

1 now provide that all J&J's rights and obligations to

2 the debtors will simply be transferred to the trust,

3 along with all of the rest of the debtors remaining

4 Talc assets.  This treatment is also substantially

5 similar to the treatment that J&J received under the

6 original May 15th plan and provides as follows, and I

7 want to -- I want to quote because I think this is

8 important.  The plan provides, quote, "subject to

9 section" -- currently -- Subject to Section 11.5.5 of

10 the plan, which relates to the Rio Zurich settlement,

11 nothing contained in the plan, the plan documents,

12 which include the TDP or the confirmation order

13 including any provision that proports to be

14 (indiscernible) shall in any way operate or have the

15 effect of impairing, altering, supplementing,

16 changing, expanding, decreasing, or modifying the J&J

17 indemnification rights and obligations and Section

18 7.7E of the plan further provides that for all issues

19 relating to J&J's indemnification rights and

20 obligations, the provisions, terms, conditions, and

21 limitations of any agreements underlying the J&J

22 indemnification rights and obligations shall control.

23        So, again, Your Honor, to the extent that

24 J&J has any concerns with the substance of those

25 preservation provisions, they will have a full and

1 fair opportunity to discuss that with Court at

2 confirmation.  It doesn't affect the adequacy of the

3 disclosures, which is the sole purpose of the hearing

4 tomorrow.

5        Now, you know, we had originally included

6 very similar language as I noted, frankly less

7 protective language than is in the plan now in our May

8 15th plan disclosure statement.  The only reason why we

9 ever changed those provisions in our August 12th plan

10 of disclosure statement was because we had all of the

11 parties that are on this call today or many of them,

12 certainly the movants, demanding that we do so in

13 order to reflect J&J's stay motion.  Based on those

14 objections, we did that.  Now that the Court has

15 denied that motion, we've reverted back to our

16 original plan, which is to preserve those rights for

17 determination at -- at a later date, and again, to the

18 extent J&J has concerns, they can raise those at

19 confirmation.

20        As to the joining parties, so, late last

21 night and then five minutes before this hearing, I saw

22 that there were two plaintiffs groups, ad hoc groups,

23 that (indiscernible) joinders.  As to the joinder that

24 was filed late last night, the joining party, which

25 appears to be a law firm represented by another law

1  firm, I don't know that law firm -- I presume that

2  original law firm, the movants, or the joining party,

3  has -- represents plaintiffs, but I don't understand

4  how that law firm itself has standing, but in any

5  event, nobody has reached out to us.  We heard from

6  these folks, both groups, back in June when they filed

7  their original objection to our May disclosure

8  statement and plan.  I have not heard a word from them

9  since.  They have not filed anything in these cases

10 until the documents were filed last night and this

11 morning and as the Court asked me at the hearing two

12 weeks ago, I think -- it must've been two weeks ago,

13 whether we had engaged in other parties and I told the

14 Court, call me, my number and my email address are on

15 all of our papers, call me.  Let's talk.  I haven't

16 heard a word.  Nobody on this -- on this phone -- on

17 this call today or at least that I can see on this

18 Zoom have reached out and that includes the ad hoc

19 groups.  I haven't heard a word from them since June.

20         So, for all these reasons, Your Honor,

21 because we don't believe that the plan of disclosure

22 statement -- what we've heard today or what we've

23 heard in the motion is that parties need additional

24 time because we've made substantive changes to the

25 documents.  That's simply not true.  All we did was

1  reflect the Court's September 23rd ruling and to revert

2  back to preservation of J&J's indemnification rights

3  to be dealt with at a later date with a trust.  That's

4  all we did and as such, because we believe that the

5  plaintiff's groups are adequate -- let me take a step

6  back.  There is one voting class here.  There is one

7  impaired class of voting.  That is the class of Talc

8  personal injury claimants, which is the vast majority

9  of which, if not all, is made up of direct Talc

10  claimants.  Those direct Talc claimants are ably

11  represented by a committee of 11 members, of which

12  selected by United States Trustee back in 2019 and it

13  adequately represents the interest of both

14  (indiscernible) ovarian cancer claims and

15  (indiscernible).  To the extent the draining parties

16  believe that they know something better or different

17  that those 11 members, they have a full and fair

18  opportunity to ask the United States Trustee to put

19  them onto the committee.

20         We have a committee in these cases, in

21  Chapter 11 cases for a reason, and we believe that

22  this committee adequately represents the rights of

23  those parties.  Certainly, parties have an ability to

24  come in.  We are not objecting to that ability and

25  those folks certainly have done so, but we have spent

1 a significant amount of time negotiating the plan of

2 disclosure statement with -- with the committee and

3 with the FCR, which represents the future claimants in

4 this case and all of them -- or the committee and the

5 FCR and also the (indiscernible) in the non-debtor

6 affiliates fully support this plan.  They believe that

7 it is appropriate under the circumstances and it is in

8 the best interest of their constituents and it should

9 go out to vote.

10          My understanding is they also do believe

11 ultimately, despite what you may have seen in the

12 joining parties that filed their documents last night

13 and this morning, they do believe that the vote --

14 that the plan in the statement will be well received

15 and that they will be able to achieve the vote that is

16 required by Section -- by 24G of the plan -- oh,

17 sorry, the bankruptcy code.

18          So, for all of those reasons, Your Honor, we

19 don't see a reason why we should not, you know,

20 proceed with the hearing tomorrow.

21          MS. RICHENDERFER:  Your Honor, if I could?

22 This is Linda Richenderfer from the Office of the

23 United States Trustee.  I wanted to make it clear that

24 while we have not filed anything, we do join in the

25 request also, that the hearing be adjourned, I -- Ms.

1 | Sarcasion (phonetic) and I were discussing the
2 | situation we found ourselves in yesterday and we're
3 | going to reach out to the Court with an email copy to
4 | everyone and we were beaten to the punch, so to speak.
5 | So, no need to join in a request that it be adjourned
6 | since this hearing was going forward today.
7 | So, I just want to make it clear that the
8 | U.S. Trustee also believes that this needs to be
9 | adjourned.  We barely had time to look at the black
10 | lines and U.S. Trustee's objection was two-fold.  It
11 | was based on the fact that the disclosure statement
12 | was inadequate in terms of its disclosure, but it was
13 | also that it was seeking to confirm what we believe is
14 | an unconfirmable plan and the basis of those two
15 | arguments has now shifted somewhat because TDPs have
16 | been changed.  We don't think the plan -- we don't
17 | think the issues have been resolved, but we need time
18 | to analyze all of this and I will also state that I,
19 | myself, sent very detailed emails on the disclosure
20 | statement as it related to the TDPs and the trust
21 | agreement.  I never got a response, other than I was
22 | told by Ms. Posin they were passed on to the committee
23 | and to the FCR for response.  No responses were ever
24 | received and we know that there are still some
25 | outstanding issues that Ms. Sarcasion raised over the

1  summertime regarding solicitation procedures and we

2  need time to review what has now occurred with this

3  disclosure statement and with the TDPs in order to

4  respond to ensure the due process is being met and to

5  ensure that this disclosure is adequate.

6          It still only has a one-page statement

7  regarding the TDPs, which are the most important issue

8  to the claimant and now that the TDPs have been

9  changed, and have a new process in them, I think that

10 time needs to be allotted to allow people to make

11 appropriate objections, as Your Honor noted.  The

12 objections are to a disclosure statement.  That is no

13 longer the one that the Court is being asked.

14         So, I -- I apologize for jumping in before

15 Your Honor had a chance to ask for other parties who

16 don't want the continuance, but I just wanted to be

17 made very clear that the U.S. Trustee joins in the

18 request that tomorrow's hearing be adjourned.

19         THE COURT:  That's fine.  The Offices was

20 invoked there.  So, I guess, I am not surprised to

21 have you jump in.  okay.  I will hear from others who

22 have something non-duplicative to say to what Ms.

23 Posin said with respect to the need to go forward

24 tomorrow in light of where we are.

25         Okay.  Then, let me hear from whoever -- is

1 this Mr. Schiavoni?  Did you file the motion?

2          MR. SCHIAVONI:  Your Honor, I did file the

3 motion, but I did coordinate with the other parties.

4 It's my understanding that substantially all of the

5 objectives join us.  We -- J&J, Cypress, Tort claimant

6 constituency represented by the Pachulski Stang firm

7 and not a quote, "couple of insurers," but the -- a

8 significant number, like, more than a dozen -- more

9 than a dozen, perhaps two dozen insurers joined in the

10 application, but just to get right to the core of

11 really what I think you might want to consider here is

12 that the TDP was -- the TDP that was filed on

13 September 10th in order to get this deadline was at its

14 core a placeholder.  The only thing it said about the

15 J&J indemnity was that -- was that there was a J&J

16 protocol order, which is entirely now factitious.

17 There was not.  So, the briefing you have in front of

18 you from all of us are about something that doesn't

19 even exist.

20          With respect to the Class 4 claims, it was

21 represented to you as if they're exclusively asbestos

22 (indiscernible) injury claims, but they're not.  The

23 claims of all of the objectors are grouped into this

24 same class, Class 4, as, quote, "Indirect" Talc

25 claims.  Some in substance of the TDP disclosure on

1  September 10th was that procedures will be developed in

2  the future to address the liquidation of those claims.

3  That's a placeholder by its very nature.  So, what you

4  have now is you have (indiscernible) in front of you

5  that deal with those issues that aren't -- that are

6  completely not before us now.  I -- you know, I think

7  good briefs end up with good decisions.  We can try to

8  go forward tomorrow, but, you know, what we're going

9  to get is really a, sort of, very one-sided story with

10 the Court not having the benefit of briefing

11 explaining really what the issues are before it.

12         The summary statements of what the -- what

13 even the objections are present the entire matter in

14 such a bizarrely one-sided way. The list of objections

15 that are listed as, quote, "objections to the TDPs"

16 for instance, don't even list objections by our

17 clients in them.  In the -- in the -- in the list, the

18 chart's main objections, there's a statement just that

19 our objections on TDPs are premature.  This is not

20 useful briefing and it's not something that we've had

21 an opportunity to respond to and we're not the only

22 ones here.  I think the Court -- it's going to be a

23 very inefficient process for the Court to have to

24 address this, sort of, on a rolling basis.

25         I'd also just like to suggest -- you know,

1  in conclusion, just to respond to one thing.  This

2  notion that somehow the debtor, nobody reached out to

3  the debtor.  I mean, if nothing else is clear, our

4  clients have written the debtor, asked for drafts of

5  the documents, asked to participate in negotiation of

6  the plan and the TDPs.  We've been completely and

7  totally locked out.  The notion that we haven't called

8  is just completely wrong.  We have written, we've

9  written multiple times, we asked to participate.

10      So, this is a -- this is a plan that was

11 filed yesterday that we never saw before.  We didn't

12 have any input on.  We didn't get an opportunity to

13 negotiate or participate in and the reason for that,

14 not just for us, but many of the other objectives

15 here, including, I think you'll hear from J&J is that

16 it's been negotiated here are terms under which to

17 liquidate in essence claims against us for which it's

18 a completely one-sided discussion.

19      The TDP terms for how to liquidate a direct

20 claim say you -- you must file basically one-sentence

21 statement that you were exposed to Talc and have a

22 one-sentence letter from a doctor, it's all it

23 requires, saying that you -- you have some, sort of,

24 disease, that's it, and you get paid under the matrix.

25      With respect to our claims under Class 4, it

1 says we will develop a process in the future.  This is

2 -- this is a system here that it puts moral hazard

3 with capital M.  So, Your Honor, we -- we just think

4 that the much more efficient way to deal with this is

5 to put this off, allow the briefing.  There should be

6 substantive input from us in a way to try to reach

7 some, sort of, resolution, but if you just have a

8 group of tort claimants designing a scheme to allow

9 and value their claims, you're going to get a result

10 that's just fundamentally wrong.  Thank you, Your

11 Honor.

12          THE COURT:  Thank you.  Let me hear from any

13 other parties who wish to adjourn the disclosure

14 statement again to the extent not duplicative of what

15 Mr. Schiavoni has already argued.

16          MS. BERKOVICH:  Yes, Your Honor.  This is

17 Ronit Berkovich from Weil Gotshal for Johnson and

18 Johnson.  Okay.  So, the debtors filed overnight on

19 Monday and into yesterday morning a new plan of

20 reorganization, a new disclosure statement, new TDPs,

21 and a new proposed (indiscernible) solicitation order

22 and black lines of all of the -- of all of those

23 documents total hundreds and hundreds of pages.

24 Importantly, J&J never received drafts of any of those

25 documents before they were filed.

1       With the limited time we've had to review,

2  it appears at a minimum, and very contrary to what Ms.

3  Posin said that there are drastic changes to the

4  treatment of J&J's indemnity, which impacts both J&J

5  and they impact all Class 4 claimants, this includes

6  both the direct Talc claimants in the class and the

7  indirect Talc claimants in the class, like, J&J and

8  the plan otherwise modifies other issues that will

9  impact J&J and other parties in the trust.

10       I will get to these, but I think some

11  background is helpful for this status conference.  So,

12  the debtors are rushing to have the amended disclosure

13  statement be approved tomorrow, but fundamentally J&J

14  has not been provided enough time to review, analyze,

15  object to, and be heard on these new documents.

16  What's especially frustrating to us objectors is that

17  each of these changes presumably could have and should

18  have been made well before Tuesday and immediately

19  after the Court denied J&J's lift stay motion two

20  weeks ago.  That would've given us at least a little

21  time to review, ask questions, file objections, if

22  appropriate, but that fact that these documents were

23  not filed until after the objection deadline suggests

24  that the debtors, we believe under the influence of

25  the TCC and FCR, are intentionally seeking to

1 | steamroll this plan over legitimate objections or at
2 | the very least they don't care that that's the effect
3 | of what they're doing, but process matters, erroneous
4 | matters and we believe that the process here is
5 | systematic of the larger issues we complained about
6 | from the very beginning, lack of fairness and lack of
7 | transparency.

8 | One issue Your Honor heard at the stay
9 | hearing is that J&J went -- Mr. Schiavoni's clients, a
10 | major player in this case, has been left out of plan
11 | negotiations entirely and it seems the same for other
12 | objectors, the group represented by Ms. Davis-Jones.
13 | You know, as -- you know, we think the debtor's
14 | counsel should reach out to parties that raise their
15 | hands with issues on the disclosure statements, not
16 | wait for them to -- to call and Your Honor did ask the
17 | debtor's counsel at the stay hearing about our
18 | allegations that J&J's been left out of the
19 | negotiations and Ms. Posin's response was telling.
20 | She answered that, Yes, they've had negotiations with
21 | J&J over the stay order, but really, that's it.
22 | There's been zero negotiations with J&J over the plan
23 | itself or any of the associated plan documents and,
24 | again, very frustrating because since shortly after
25 | the case was filed, since Spring of 2019, we've been,

1 you know, sending them letters saying please talk to

2 us, please negotiate with us and not focus solely on

3 the TCC and FCR and we were told repeatedly that they

4 would do that after they reached a deal with the TCC

5 and the FCR.  We just had to sit tight and wait.  So,

6 we did that and they did reach a deal sometime in the

7 Spring of 2020 and they filed a plan, but even still,

8 there's been no negotiations with J&J and that first

9 plan was filed in May.

10        To the contrary, when we said please talk to

11 us now, the -- the -- the debtor said that they agreed

12 with the TCC and FCR, that they would be literally

13 forbidden from having negotiations with J&J without

14 the presence of the TCC and FCR.  That is

15 unprecedented, at least in the experience of those of

16 us from Weil who worked on this case and that includes

17 Marsha Goldstein (phonetic), who retired earlier this

18 year after working as a restructuring attorney for

19 over 44 years.  It's really shocking.

20        The debtor should be fiduciary for all --

21 fiduciaries for all creditors, including indirect Talc

22 claimants like J&J and they should never be prohibited

23 from engaging in discussions with creditors and other

24 parties.  Instead, and we've said this from the

25 beginning, the debtors have locked themselves in with

1 the TCC and FCR.  Those are fiduciaries who represent

2 only direct claimants and we believe strongly debtors

3 have given them a blank check to write their own

4 inflated claim amount in an attempt to confirm a claim

5 quickly that gets their parents, the debtors parents,

6 (indiscernible) off the hook for any liability.  You

7 know, that's the dirty deal that we speak about and

8 then the point is to foist responsibility for those

9 inflated values on third parties like J&J and the

10 insured.

11           Their failure to engage with J&J has had

12 consequences both large and small and here's just one

13 example.  Before the objection deadline on the first

14 disclosure statement, so, we're talking June, you

15 know, we've had issues with the disclosure statement.

16 So, we've asked them for a word version of this

17 disclosure statement and we sent them a markup.  Here

18 are some changes that we suggest you put input into

19 the disclosure statement to resolve our

20 disclosure-related objections.  We never heard

21 anything from them.  Instead, they file with their

22 reply a new disclosure statement, a black line, that

23 did have some of our changes, but not all of them,

24 and, so, -- oh, we in our objection had to file the

25 black line ourselves, instead of negotiating with the

Case 20-03489-LSS Doc 5432 Filed 07/09/21 Page 26 of 57

25

1 debtor. So -- and, you know, they have yet to

2 negotiate with us and all of the comments that we have

3 on the disclosure statement.

4 Now, as the Court may know, I represent many

5 debtors and that's just not the way we typically deal

6 with disclosure statement objections. We reach out to

7 parties, we negotiate with them, especially when there

8 are language objections to the disclosure statement.

9 You know, we try to resolve and narrow as many of

10 these disclosure issues as possible before we file a

11 revised disclosure statement and that certainly eases

12 the burden on the Court so the Court doesn't have to

13 sit there in Court and have us to line and line over

14 the words that we suggest be added to the disclosure

15 statements that the debtor refuses to add and I really

16 don't mean to disparage debtor's counsel here.

17 Both firms are excellent and I've had good

18 experiences with them and one thing I will say for

19 them is that they are generally available for calls to

20 answer questions when we have questions, but they

21 refuse to negotiate with us, even on simple issues,

22 like language for disclosure statement and, you know,

23 it seems like they just have their hands tied because

24 of their agreement with the TCC and FCR and, again,

25 they're (indiscernible) focused attention here on

1 getting channeling injunction for the parents and that

2 seems to their --- their sole goal from the beginning

3 of the case.

4          It really is baffling to us why they

5 couldn't send us a draft of a current version of the

6 plan of disclosure statement immediately following the

7 stay hearing or at least call us up to let us know big

8 picture about the changes they were going to make to

9 the plan structure, which again that I'll get to in a

10 minute.  You know, we thought we heard the Court say

11 loud and clear a few weeks ago that the debtors should

12 negotiate the parties about this new plan that

13 everyone knew they were going to file and we expected

14 those documents to be filed within days of the stay

15 hearing and we expected this disclosure statement

16 hearing scheduled for October 8th to be moved in light

17 of all of the changes needed, but, again, no such

18 thing occurred and Mr. Schiavoni touched on this

19 briefly, but I do think it's worth noting that the --

20 that all of this and the lateness of the debtor's

21 filing makes existing briefing much less useful and

22 creates huge inefficiencies for the Court.

23          For J&J alone, three different objections

24 has been filed for disclosure statement and some

25 issues in each of them are moot now and some are still

1 live and we definitely don't agree with the debtors

2 chart, which gives the debtor's opinion as to what in

3 our objections are moot and which issues are -- are

4 not and, so, to prepare for this hearing tomorrow, the

5 Court would have to review each of J&J's three

6 objections and then even then the Court would not have

7 a complete view of J&J's position because, of course,

8 those three filed objections do not address J&J's very

9 strong objections, which I will get to, to the new

10 issues raised in a very different plan that was filed

11 Monday night.

12        So, right now, the Court has something,

13 like, three objections and joinders in front of it and

14 many cases from -- a lot of them are from the same

15 objectors and that's a lot.  Thirty objections is a

16 lot for a disclosure statement hearing.  So, it --

17 that, kind of, briefing is not only inefficient for

18 the Court, it's unfair to the parties.  You know, the

19 debtor's haven't complied for the new documents they

20 filed with the 28 days-notice required by the

21 bankruptcy rules.  Like, we literally can't file an

22 objection to the disclosure statement that was filed

23 overnight Monday.  You know, the debtor already filed

24 their reply.  Two days is hardly enough time to

25 adequately assess how these filings will impact J&J's

1  interest.

2        To get the cases back on track, we suggest

3  the following and we think the Court should order or

4  at least strongly suggest that the debtor's whole

5  negotiating sessions with each of the objectors

6  regarding our issues to the disclosure statement of

7  plan to try to narrow the issues as much as possible

8  and I am not talking mediation here or something

9  formal.  I am just saying talk to us, negotiate with

10 us, try to solve our issues.  We may not end up

11 agreeing on everything, we probably won't, but at

12 least we'll narrow the issues before the Court.

13       Perhaps the Court can tell the debtor and

14 the other state fiduciaries that the debtors can no

15 longer be prohibited from having discussions with any

16 partying interest in this case without the presence of

17 the TCC and FCR.  After that, the debtors can file a

18 new plan of disclosure statement.  Parties can have 28

19 days to object to the new plan of disclosure statement

20 and we can use those 28 days to further engage in

21 negotiations and something else we can try to work out

22 during this period is a timeline for confirmation

23 discovery and a briefing schedule.  You know, we

24 haven't really touched on those, but we think that the

25 timeline that they're seeking and the new solicitation

1 order they filed is way too short and that, you know,

2 and that, you know, why don't we try to -- they

3 haven't -- again, agreed with us or negotiated with us

4 or engaged with us over what a briefing schedule and

5 discovery schedule looks like.  So, we think they

6 should do that and then we would come before the Court

7 if we can't reach agreement.

8          All of that we think would set the case back

9 on course at least a little bit.  Through all of this,

10 the debtors have made and will make two big points to

11 pushback.  First, they've said that the hundreds of

12 pages they filed this week contained only minor tweaks

13 to what was already on file.  Simply not true and I

14 will get to that.  Second, they say that time is of

15 the essence here, they can't afford to delay and on

16 that issue, although I have some sympathy, they really

17 have created this mess themselves and it's not a good

18 enough reason to trample on party's rights or send

19 this case careening towards confirmation when multiple

20 parties, including the United States Trustee, have

21 raised major concern regarding the conduct of plan

22 negotiation, moral hazard, and the proposed TDPs and I

23 am sure it may be that the Court hasn't reviewed the

24 three or so objections yet, but I will highlight the

25 one that the United States Trustee filed from last

1 week because it raises very significant issues about

2 the TDPs that we believe the Court will be concerned

3 about.  Okay.

4          So, there are three different plans on file.

5 The first plan when the debtors filed in May appeared

6 to address the indemnity by letting it ride through

7 and the trust would deal with it later.  It's not

8 entirely clear, but that appeared to be the gist of

9 it.

10          The second plan, the one the debtors filed

11 in August, incorporated that whole J&J protocol order

12 structure where the debtors were essentially asking

13 the Court to rewrite the J&J indemnity agreement to

14 provide more favorable terms for the debtors and

15 plaintiffs and force J&J to take those into the Tort

16 system.  I think the debtors realized that that

17 structure was unenforceable, not confirmable, and they

18 dropped it after the stay hearing.

19          The third plan, the one filed on Monday

20 night, appears in its face to be close to the first

21 version and that's what Ms. Posin said, "It's just

22 what we had before," but it's really not.  It's

23 actually a bizarre hybrid of the two plans.  Again,

24 the plan itself seems to provide plain vanilla

25 treatment to the Class 4 claims.  They're rushing them

1 to the TDPs where presumably there would be some table

2 with values and the indemnity in this case would be

3 explicit -- was explicitly transferred to the trust,

4 but all the actions in the TDPs, the debtors filed

5 yesterday.

6         There -- and this is totally new, it appears

7 that claimants who claims injuries from J&J products,

8 they call these indemnified claims, are given an

9 option, they call it an election, to either submit

10 their claims to the trust or pursue claims against the

11 debtors in the Tort system based on the, quote, "J&J

12 indemnity" and, again, the TDPs are less than clear

13 here, but they suggest that J&J will (indiscernible)

14 the debtors with respect to claims where claimants

15 elect to pursue their claims in the Tort system and

16 that, you know -- more problematic for us that if the

17 claimants obtain judgment against the debtors, that

18 J&J will pay it, but the plan can't force an

19 involuntary defense objection on J&J.  The agreements

20 themselves, the indemnity agreements, nowhere require

21 J&J to (indiscernible) the defense themselves.

22 Instead, they give the J&J the option to take over the

23 defense, not a mandate and there's been no judgment or

24 order requiring J&J to defend the debtors against such

25 claims.

1          You know, the plan also can't force such a

2   broad open-ended and unproven indemnification

3   obligation on J&J.  You know, J&J recognizes here that

4   it may have some indemnity obligations for some years,

5   but the scope of those indemnification obligations is

6   sharply disputed and in addition, J&J has made it

7   clear that it believes in a very strong defense as to

8   the indemnity.  So, we previously voluntarily offered

9   terms under which J&J would agree to indemnify all of

10  the Talc claims to avoid, you know, what we call the

11  dirty deal inflated values that are agreed to by the

12  parties as a result of the moral hazard and imposed

13  the J&J, but the debtors rejected our offer and the

14  Court denied our stay motion that contained the offer.

15         For J&J now to be responsible for

16  indemnifying the debtors under the 1989 agreement for

17  a judgment entered in Tort system in favor of a

18  particular plaintiff, there would be need to be a

19  determination of the specific judgment claim falls

20  within the scope of that indemnity and the answer

21  might be different for different claims and as we said

22  over and over again, to the extent that any of these

23  claims pursue serious based on asbestos, J&J believes

24  it has a complete defense indemnity and it's also the

25  case of course that J&J indemnity only covers certain

1 years, yet the TDP appears to have J&J fully

2 indemnified immersed in the Tort system for all of the

3 indemnified claims and we also believe in any of the

4 disputes about the scope of the indemnity should be

5 heard by Court in Vermont, which would determine

6 whether J&J is responsible under the indemnity

7 agreement.

8        So, back to the TDPs and the new ones that

9 were filed, these indemnified Class 4 claimants, they

10 get to make an election, they become either a trust

11 election claimant or a Tort system election claimant

12 because they have new concepts and new TDPs, never

13 been in there before, and the ones that make election

14 assume that the J&J takes over this defense, which

15 again is a flawed assumption without any agreement

16 from J&J or some court determination that J&J has

17 (indiscernible).

18        So, even though there's great uncertainly by

19 J&J's indemnity obligations under the -- you know,

20 they're giving these claimants the rights under the

21 TDP to make an election to go to the Tort system or go

22 to the trust when they get a lower recovery, but the

23 fact that they may not get anything from the Tort

24 system because of J&J's defenses is a risk factor

25 that's absent from the disclosure statement and beyond

1 providing an odd and uninformed choice for Tort

2 claimants, this is highly prejudicial to J&J.  It

3 permits plaintiff's lawyers to pick their best claims

4 for the Tort system and leave their weaker claims to

5 recover from the already inflated claim numbers in the

6 trust.  It's the worst of all worlds and, again, this

7 election is a totally new concept in the TDP filed

8 early Thursday morning.

9          So, more importantly for today, it leaves

10 open the question, how does this all work?  Don't look

11 at the disclosure statement for answers because this

12 major change to the treatment of the only impaired

13 class under the plan is not in there.  It's probably

14 the most important issue to creditors.  It goes to the

15 heart of their discovery, but the disclosure statement

16 doesn't contain a single sentence explaining this

17 election concept or what it means to be a trust

18 election claimant versus a Tort system election

19 claimant.  If a disclosure statement should do

20 anything, it should at the very least explain to

21 creditors what they're getting under a plan and this

22 disclosure statement does no such thing.

23          In fact, we think that the plan of

24 disclosure statement as currently written actually

25 conflicts with the TDPs as they're written.  You know,

1 Section 2.1A of the disclosure statements states that

2 following the effective date of the plan, Talc

3 Personal Injury claimants may not continue to pursue

4 the claims against the debtors.  Again, totally

5 contrary to the TDP within the elect to do so and the

6 same thing with certain language in the plan that I --

7 that I can get to, but I know that I have been

8 speaking for a long time.

9 　　　　　　So, the disclosure statement is misleading

10 and lacks adequate information because it

11 mischaracterizes the plan and the TDP.  Now, maybe the

12 debtors will say that I am misunderstanding the TDPs.

13 It's not the way it works, but if I misunderstand

14 them, how are creditors supposed to understand them?

15 You know, this all proves the point of needing more

16 time to understand, to adjust, to negotiate of asking

17 parties such as J&J the opportunity to pile objections

18 to this fundamentally new plan structure and it will

19 give the debtors time to craft disclosure that

20 actually describes to creditors what they're going to

21 receive under the plan.

22 　　　　　　You know, Susan mentioned insurance

23 neutrality.  The way that insurance neutrality is

24 written for J&J is totally new.  We haven't had time

25 to adjust it.  On first blush, it looks like it's --

1 it's -- it's -- it's not adequate and you hear the

2 insurers telling you that its not adequate for them.

3 I mean, if insurance neutrality was perfect, you

4 wouldn't hear us objecting, right, because we wouldn't

5 be worried about the effect of these inflated values

6 on us.  So, that's not the way we feel.

7          So, the second issue that Ms. Posin raised

8 is timing.  Well, they knew to move quickly.  There's

9 been no time to slow down and do things right, but as

10 I noted, the timing is an issue of their own doing.

11 You know, since the beginning of the case, not only

12 has J&J sought to participate in negotiations, you

13 know, we've also sought discovery relevant to the

14 plan, but the debtors consistently gave us

15 (indiscernible).  Since Spring of 2019, our letters

16 asked for information relevant to the most important

17 issue in this case, which is the ultimate claim value

18 and we were told that it was premature.

19          So, Your Honor may remember that J&J filed a

20 2004 motion, you know, back in June of 2019 and Your

21 Honor heard it in July of 2019, which, again, more

22 than a year ago.  When the debtor's opposed the motion

23 at that time and made the argument that it was

24 premature for us to seek this information, even though

25 it was the same information that was being shared with

1  the TCC and the FCR and "Don't worry, once the plan is

2  filed, you'll get all of the information that you

3  need."  Well, that plan was filed in May and we're

4  still waiting on this information and, you know, we

5  expressed concerns to the Court at that time, but the

6  debtors have tried to jam us -- confirmation and not

7  give us the information we need with sufficient time

8  for our experts that we've hired to analyze the data

9  and the debtors assured us that waiting for the plan

10 filing would not lead to such a result.  Well, we're

11 here.

12         Unfortunately, J&J will have to bring these

13 discovery issues before the Court in the near term

14 because as hard as we're trying, it doesn't appear

15 that we'll resolve these issues and Mr. Tsekerides may

16 at the end of this want to address the Court how it

17 wishes to hear the discovery issues, but this also

18 impacts the timing.

19         We need this information.  This is basic

20 information that's required to analyze whether the

21 values they put in the TDPs really are inflated, but

22 the debtors are refusing to provide it and they're

23 making up excuses, frankly, that don't make sense to

24 us and further our suspicions about being controlled

25 by the TCC and FCR instead of being fiduciaries for

1 all parties.

2            As to the overall timing recently in denying

3 the stay motion, Your Honor stated that certainly

4 discovery is going to be permitted with respect to

5 plan-related issues and the Court would proceed along

6 a pace that makes sense and perhaps, you know, there

7 needs to be a pause.  Well, even though the

8 confirmation timing isn't before the Court at this

9 time, we think it's worth raising now and perhaps

10 getting some guidance from the Court before the

11 debtors file in some, sort of, revised schedule.

12            So, to be clear, the deadlines that they put

13 in the revised solicitation order are way shorter than

14 the deadlines that they put in the same documents they

15 filed in May.  The confirmation objections are due 30

16 days less time and the confirmation hearing is, like,

17 a month and a half sooner.  So, the timing between the

18 approval of the disclosure statement and those two

19 dates and they may try to justify this and I think

20 they do this a little bit in their reply by saying

21 that, "Well, there's been some discovery that's taken

22 place since the initial plan was filed.  So, we can

23 have a shorter deadline," but we have not received the

24 discovery that relates to the key issue in the case.

25 The one that generally leads to a confirmation

1 │ schedule for a mass Tort hearing being longer than a

2 │ standard Chapter 11 case, which is the settlement

3 │ history and other related documents that underlie the

4 │ claim values.

5 │        So -- so, just a couple of more points about

6 │ timing.  You know, one of the cases the debtors cite

7 │ in their reply in the Court of their --

8 │        THE COURT:  I haven't read the reply --

9 │        MS. BERKOVICH:  Okay.

10 │        THE COURT:  -- and I haven't thought about

11 │ the timing yet.

12 │        MS. BERKOVICH:  Okay.

13 │        THE COURT:  So, I think I've heard enough on

14 │ whether we need to go forward tomorrow.  Is there any

15 │ objector who possibly has anything to say that's not

16 │ duplicate of what Ms. Berkovich said with respect to

17 │ the timing issue?

18 │        MS. DAVIS-JONES:  Your Honor, this is Laura

19 │ Davis-Jones with Pachulski Stang Ziehl and Jones on

20 │ behalf of Arnold and Itkin LLP.  Your Honor, we did

21 │ file a joinder last night and I appreciate the

22 │ comments that have been made by counsel and I will not

23 │ duplicate those.  Your Honor, the only point I wanted

24 │ to emphasis is, you know, obviously you hear the

25 │ frustration, we share it.  We do think we need more

1  time here.

2           Your Honor, we would ask that the TCC, the

3  FCR, the debtor, or some set of them be encouraged or

4  may be directed to meet with us and provide

5  information and to negotiate with us as well.  Thank

6  you, Your Honor.

7           THE COURT:  Ms. Jones, I did not see what

8  was filed last night.  Who was your client?

9           MS. DAVIS-JONES:  Your Honor, Arnold and

10 Itkin LLP.  They represent thousands of the Talc

11 ovarian cancer personal injury claimants.  We only

12 filed --

13          THE COURT:  Thank you.

14          MS. DAVIS-JONES:  Thank you, Your Honor.  We

15 just filed a two-page joinder and that's been covered.

16 Thank you.

17          THE COURT:  Thank you.  Anyone else?

18          MR. HEATH:  Your Honor, Paul Heath on behalf

19 of Cyprus Amax Minerals Company and Cyprus Mines

20 Corporation.  We didn't file a formal joinder last

21 night, but we do support the requests for an

22 adjournment.  Indeed in our -- I believe it was our

23 third supplemental objection we filed yesterday -- or

24 Monday, we did previous to the Court what we thought

25 would be the need for an adjournment.  So, at this

1 point, just wanted to go on the record and make the

2 Court aware that we do formally join in the request

3 for adjournment.

4          THE COURT:  Thank you.  Anyone else?

5          MR. SILVERBERG:  Your Honor, it's Bennett

6 Silverberg on behalf of the ad hoc plaintiff's group.

7 To the extent that the -- that the debtors and TCC are

8 going to be directed to negotiate with anybody, we

9 would like to be included amongst the parties that

10 they engage with.

11          THE COURT:  Thank you.  Anyone else?

12          MR. SILVERBERG:  Thank you, Your Honor.

13          THE COURT:  I want to come back to Ms.

14 Posin.  Ms. Posin, I keep hearing over and over that

15 the debtors are not negotiating with parties because

16 the FCC or the future claimants representatives have

17 mandated it; is that true?

18          MS. POSIN:  No.  I will say.  We have -- I

19 am a little bit befuddled because we have had

20 communications.  I mean, we went to mediation with

21 J&J, we went to mediation with Cyprus.  We are

22 involved in mediation with Cyprus.  We went to

23 mediation with Rio, Tinto and Zurich.  We are engaged

24 in mediation with Excel (phonetic).  We are probably

25 going to engage in mediation with a couple of other

1 insurers, including some of the movants here today.

2 So, I am little befuddled by that.

3          Certainly, there were discussions at the

4 outset.  You know, this is a 524G plan.  I know this

5 Court is well aware in order to confirm a 524G plan,

6 we have to have 75 percent acceptance rate, which is a

7 high rate, and, so, typically in a 524G case, you will

8 have to have negotiations with the committee that

9 represents the direct Talc claimants and reach an

10 agreement with them, so, that they can deliver, if you

11 will, that vote.

12          So, we have -- we did spend a fair amount of

13 time at the beginning of this case negotiating with

14 the -- the TCC and the FCR as well as ultimately a

15 parent and we reached an agreement that was filed that

16 was included in the plan that was filed in May.

17          As part of that discussion, the parties

18 reached an agreement that it made sense to -- while we

19 -- we reached an agreement, I think it's public

20 knowledge at this point, in early March.  J&J filed

21 their stay relief motion later in March and we had

22 already reached the deal in principle and it took us

23 six weeks to fully paper that deal and to file the

24 amended plan disclosure statement on May 15th.

25          So, that took some time.  We do not believe

1 that at that point in time that it made sense after we

2 had already reached a deal in principle after

3 negotiating for over a year to, kind of, rejigger that

4 and bring in new parties and try to revise that while

5 we were still negotiating the original terms that had,

6 you know -- that had been agreed to in principle.

7        So, no, we certainly have had conversations

8 with all of these various parties.  There is a lot of

9 discovery outstanding.  I understand from Ms.

10 Berkovich they haven't gotten everything they want.

11 That's frankly not unusual.  We have provided a fair

12 amount of information that we believe we can provide.

13 They have requested things that are very clearly

14 covered by mediation privilege as we discussed.  They

15 can bring those issues into Court and we're happy to

16 brief them as appropriate, but we are continuing that

17 dialogue.  We would love to have an agreement with

18 everybody, as I said before.  It has been a difficult

19 process to get to where we are with the planned

20 proponents.

21        I heard Ms. Berkovich and I think Mr.

22 Schiavoni say, you know, "The Court entered that order

23 on -- on September 25th, why didn't they have a

24 disclosure statement the next day?"  Your Honor, we're

25 dealing with four planned proponents, including a

1 committee of 11 members, a future claimants

2 representative and 300 and so non-debtor

3 (indiscernible) entities and that 10 day period is

4 over two weekends and the Jewish holidays.  We filed

5 that amended plan disclosure statement as soon as we

6 possibly could on Monday.  We are not playing games,

7 we are not trying to jam people.  We are trying to get

8 this case moved forward, point blank.

9          As far as the neutrality provisions, we

10 believe that the insurers -- the language in the

11 (indiscernible) that I noted for the insurers are

12 exactly what Mr. Schiavoni has gotten in other cases

13 for his clients exactly what has been done in many

14 other 524G cases in the Third Circuit.  It's identical

15 language and that's been in the -- in the -- in the

16 planned disclosure statement since May.  If they don't

17 like it, fine, that's a confirmation issue, it's not a

18 disclosure statement issue.

19          Ms. Berkovich just did a very eloquent

20 argument, but she basically just argued the disclosure

21 statement today.  She told you she's not ready, she

22 needs more time.  I think I just heard her entire

23 argument and she sounds like she was very well versed

24 in the changes that have been made and has responses

25 to all of them.  So, it doesn't seem to me that

1 there's additional time needed for disclosure.

2          Yes, I am hearing everybody say we need more

3 time for confirmation, we need time for more

4 discovery, but the confirmation issue can be dealt

5 with after the disclosure statement hearing.

6          THE COURT:  Okay.  Thank you.  I am not sure

7 I heard a direct answer to my first question, but I

8 will accept the answer that was given.  The -- so,

9 here's where we are.  I would agree that Ms. Berkovich

10 is perfectly capable of arguing the disclosure

11 statement, she just did, but I am not perfectly

12 capable of hearing it and it is not a -- and it's not

13 a comment on whether the debtor could have filed its

14 amended plan sooner or not, given the logistics

15 necessary to do it, the intervening holidays,

16 etcetera.  It's a question -- it's a matter -- it's

17 just a fact that revised documents were filed

18 apparently late Monday night and I have objections

19 that do not go to that disclosure statement and in

20 fact as Mr. Berkovich pointed out and as I noted as we

21 were taking a look at the agenda, I probably have

22 three objections from each objector that incorporate

23 back their objections to other plans that are not in

24 front of me and where I would have to try to figure

25 out what is still relevant and what isn't relevant and

1 I am not in a position to do that in a day and to be

2 prepared to -- to comment on the adequacy of this

3 disclosure statement.

4       The -- and I think other parties are

5 entitled to see the finished product and comment on it

6 and some parties haven't been able to see it and

7 didn't see it before yesterday and they should be

8 entitled to comment on it now.  Whether it's the same

9 as the May plan, I don't know because I didn't read

10 the May plan because it wasn't in front of me.  So, I

11 have no idea whether it's the same or not but I also

12 don't think parties should have to be preparing off of

13 three different disclosure statements and plans.

14       So, I am going to postpone the hearing

15 (indiscernible) to timing and I would like in the

16 meantime for the parties who are filing an objection,

17 although this is more work for them, but I am hearing

18 they want it, to in fact provide me one objection per

19 objecting party that has all of their objections to

20 the current plan and -- to the current disclosure

21 statement in one document.

22       We have a hearing --

23       UNIDENTIFIED FEMALE:  I think the next

24 hearing is November 16th.  That's the sale hearing.

25       THE COURT:  Yes.  We have a hearing on

1  November 16th.  So, we're going to continue disclosure

2  statement to November 16th.  I would like objections

3  filed -- well, let me work back from that.  I would

4  like the reply filed by the 9th.  So, I would like

5  objections filed on the 26th.  That should give

6  everyone time to read the new documents; synthesis

7  your objections; target me on real disclosure

8  statement objections, not confirmation objections

9  please; and that should give -- then the two weeks in

10 between should give the debtors time to see if there

11 can be agreement on language for the disclosure

12 statement and I recognize there -- you may have 300

13 non -- 300 affiliated people and others to check with,

14 but they need to move quickly.

15         As for discussions, of course the parties

16 should be talking.  I don't see why I should have to

17 order that.  If there are any constraints that three

18 people have to be in the room before the debtors can

19 have discussions, then those three people better be in

20 the room.  I don't know why that's necessary, if it

21 is, and Ms. Posin, you made an interesting comment

22 about how the fact that you didn't think that the -- I

23 think you said you didn't think that parties with

24 indirect Talc payments were going to get to vote on

25 the plan.  I don't understand that comment.  So, if

1 that's going to be part of procedures that are going

2 to be put in front of me for approval on

3 (indiscernible), then I am going to need to understand

4 that.

5        MS. POSIN:  And I apologize, Your Honor.

6 The comment was just meant to be -- I don't think any

7 of those claims are liquidated.  Certainly those folks

8 have an opportunity to file 30:18 (phonetic) motion

9 and that's what's permissible under, you know, the

10 (indiscernible) procedures for indirect Talc

11 claimants.  So, that -- that was the comment.

12        I don't otherwise see how that would work

13 and I think a lot of the indirect Talc claimants that

14 I've seen, the proofs of claims that have been filed

15 are protected and there aren't -- there aren't

16 existing claims against the estate, but not

17 (indiscernible) anybody.  I am sure a few folks on

18 this call will tell me that that's not the case for

19 their client and we're happy to take a look at that,

20 but that's my general understanding.

21        THE COURT:  So, if we're going to have to

22 build in a 30:18 hearing into the confirmation process

23 timeline, then that's something that is going to have

24 to be considered with respect to the timeline.

25        MS. POSIN:  Understood.  Your Honor, I just

49

1 wanted to get -- I know the Court is very slammed.  We

2 do have -- we did set the objection to J&J's claim for

3 November 16th.  We also will probably be filing a DIP

4 motion to be heard on November 16th.  I just wanted to

5 make sure the Court is going to have sufficient time

6 for all of those things and -- and -- and the sale

7 hearing, which -- which could be contested.

8 Obviously, we don't know that yet.  So, I wanted just

9 to make sure we have sufficient time on that date.

10          THE COURT:  Okay.  So, I have you down for

11 the 16th.  I am going to cross out the 17th and keep

12 that day open as well.

13          MS. POSIN:  Thank you, Your Honor.

14          MS. RAMSEY:  Your Honor, it's Natalie Ramsey

15 for the Tort Claimant Committee.  I don't want to

16 speak out of order and I do not want to delay things

17 and this really does not directly relate to the

18 scheduling that Your Honor is in the process of doing,

19 but I think the last question that you directed to Ms.

20 Posin caused me some concern because I don't want the

21 allegations that the Tort Claimant's Committee has

22 been unresponsive or unwilling to talk with really any

23 parties, but particularly the other represented Tort

24 claimants that have appeared is accurate at all.  We

25 had a meeting on the 29th of September most recently

1 with the folks that are represented by Brown Rudnick.

2 That meeting was a couple of weeks in the process of

3 scheduling regarding the TDP. The claimants

4 represented by the Chelsey (phonetic) firm were

5 invited -- included on those communications. For

6 whatever reason, they were -- they didn't end up

7 participating in that call, but we have talked with

8 them from time to time, in large part, you know,

9 frankly, to say to them that the TDP would be coming

10 and we would be happy to talk with the -- the deal --

11 deal has landed. For whatever reason, that didn't

12 happen. So, the first time we knew that they were

13 expressing concerns they were expressing was really

14 yesterday, but I did want to assure the Court and the

15 Court knows we are -- recently we were in mediation

16 with J&J, we have tried to include Mr. Schiavoni and

17 mediation. We had -- Mr. Pollack (phonetic) reached

18 out to Mr. Schiavoni several times with respect to

19 executing confidentiality and protective orders and

20 that didn't happen, but we have been available, we

21 remain available and it is our intention to continue

22 to be available to talk with anyone that would like to

23 talk with us about the TDP.

24        THE COURT: Thank you.

25        MS. DAVIS-JONES: Your Honor, this is Laura

1 Davis-Jones.  If I may have just one moment just in

2 response to Ms. Ramsey (indiscernible) silence the

3 acquiescence.

4          Your Honor, I have a very different history

5 of that.  I am glad to hear Ms. Ramsey saying they now

6 will be available and willing to talk to us because up

7 until now it's been "Let's just see if the TDP gets

8 filed, there's too many people under the tent.  We

9 can't involve you, we cannot include you, we cannot

10 answer your questions," and then as recently as

11 shortly before this hearing, I was told by her partner

12 that our issues are all confirmation issues and we'll

13 have to deal with them then.

14          SO, I am very glad to hear that they are

15 willing to meet with us and -- other than just pick up

16 a phone and say, "We'd like to talk with you and

17 really understand your frustration, but we have

18 nothing that we can give you."  I am glad to hear now

19 that maybe they can and we will take them up on that

20 offer.  Thank you, Your Honor.

21          THE COURT:  Okay.  Thank you.  Let me say

22 this since we are lengthening the period on the

23 disclosure statement.  There is not a need to wait

24 necessarily until disclosure statement hearing

25 approval for confirmation discovery certainly to be

1  offered by debtors and I say that because I am going

2  to permit a sufficient period of time for discovery of

3  confirmation issues and if the discovery doesn't start

4  until the confirmation -- until disclosure statements

5  been approved, then it's going to push it out, the

6  confirmation hearing schedule.  There's no question

7  about that.

8          So, I understand there's outstanding

9  discovery requests.  If the debtor chooses to go ahead

10  and respond and get a jumpstart on responding to the

11  requests, don't stand on ceremony and say we have to

12  wait until the disclosure statement is approved

13  because eventually, I assume some disclosure statement

14  is going to be approved, whether it's this one or some

15  modified one and eventually something is going to go

16  out, but from what I am understanding about the big

17  issues, they go to the TDPs and if the TDPs aren't

18  going to change, then there's really no basis to wait

19  for that discovery.

20          If the debtor chooses to wait to respond,

21  then we'll deal with that, but I see no reason why the

22  debtor can't get a jumpstart if he chooses, in

23  responding to discovery requests, certainly

24  outstanding discovery requests if the debtor deemed

25  were really confirmation issues.

1          MS. POSIN:  And Your Honor, just on that

2  point, just to be clear, my -- my litigation partner

3  is on the line, but we have received a substantial

4  amount of discovery requests, at least from four or

5  more parties on this phone call today.  We have

6  responded to all of those requests, we have served a

7  substantial amount of documents already.  We are not

8  waiting, I assure you.  Yes, there are some issues,

9  there will always been in discovery and we are working

10 through those and we are (indiscernible) appropriate

11 and we will bring those issues -- other movants, the

12 parties seeking discovery will bring those issues

13 before the Court as needed.  Hopefully that will not

14 happen, but we -- I wanted to assure you that we are

15 very much interested in moving forward with discovery

16 and we are pushing that along.

17          THE COURT:  Okay.

18          MR. TSEKERIDES:  Your Honor, Ted Tsekerides

19 for J&J.  Picking up on that last point, we are going

20 to have some disputes that we know right now we are

21 going to need to bring to your attention and from a

22 process prospective, how -- how should do that that

23 would be best for the Court?  Should we try to set up

24 a conference by telephone with chambers, should we

25 send a letter, file a motion?  What would be the best

 1 | way to do that?

 2 |         THE COURT:  You should send a letter --

 3 | well, you should file it on the docket and you should

 4 | send it to chambers and after we receive the

 5 | responses, which should be promptly, we'll set up a

 6 | time, a telephone conference or a Zoom conference to

 7 | hear it.  No motion.

 8 |         MR. TSEKERIDES:  Thank you very much.

 9 |         THE COURT:  No motion.

10 |         MR. TSEKERIDES:  Okay.

11 |         THE COURT:  One question on about what was

12 | filed on Monday or Tuesday, whenever it was filed.

13 | I've got a TDP and then I have a notice of filing of a

14 | corrected revised TDP.  I assume it's the correct

15 | revised TDP that I should be looking at?

16 |         MS. POSIN:  That's right, Your Honor.  The

17 | original document that was filed was cut off.  It only

18 | gets to Page 11.  It didn't change, it just got --

19 | there was an error in the filing.

20 |         THE COURT:  Okay.  Okay.  So, the black

21 | lines should still be good as well to the extent I go

22 | to that?

23 |         MS. POSIN:  The black line is complete and

24 | correct.  Yes.

25 |         THE COURT:  Okay.  Okay.  I don't think I

1 | have any other questions.  Any other business we can

2 | do today?  Okay.  Thank you very much, counsel.  We're

3 | adjourned.

4 |                UNIDENTIFIED FEMALE:  Thank you, Your Honor.

5 |                UNIDENTIFIED MALE:  Thank you, Your Honor.

6 |                     (Audio Recording Concluded.)

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

56

**<u>CERTIFICATION</u>**

1

2     I, KRISTIN CORRADO, the assigned transcriber, do

3  hereby certify the foregoing transcript of proceedings

4  is prepared to the best of my ability and in full

5  compliance with the current Transcript Format for

6  Judicial Proceedings and is a true and accurate non-

7  compressed transcript of the proceedings, as recorded.

8

9  BY:      *Kristin Corrado*

10      Kristin Corrado, Transcriber

11      <u>Reliable</u>                    <u>10/8/2020</u>

12      Agency Name                    Date

13

14

15

16

17

18

19

20

21

22

23

24

25