**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Case No. 20-10343 (LSS) |
| Boy Scouts of America and Delaware BSA, LLC, | Chapter 11 |
| Debtors.[1] | Jointly Administered |
| | **Re: D.I. 5466** |

**JOINT OBJECTION OF THE ROMAN CATHOLIC AD HOC COMMITTEE
AND THE UNITED METHODIST AD HOC COMMITTEE TO THE
DEBTORS' MOTION FOR AUTHORIZATION TO ENTER INTO AND PERFORM
UNDER RESTRUCTURING SUPPORT AGREEMENT AND FOR RELATED RELIEF
AND JOINDER IN LIMITED OBJECTION AND RESERVATION OF RIGHTS
OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS**

The Roman Catholic Ad Hoc Committee (the "Catholic Committee") and the United Methodist Ad Hoc Committee (the "UMAHC") object to the Debtors' Motion [D.I. 5466] seeking authorization to enter into and perform under the RSA.[2] The Catholic Committee and UMAHC also join, incorporate, and restate the Limited Objection and Reservation of Rights filed by The Church of Jesus Christ of Latter-Day Saints ("LDS").

**PRELIMINARY STATEMENT**

1.    While the Debtors trumpet the RSA as embodying "resolution with every single official major creditor constituency in these chapter 11 cases" [D.I. 5466 at 2], they have, at least thus far, neglected a key constituency that makes scouting possible—Chartered Organizations. As the Debtors acknowledge, Chartered Organizations are the ones who actually "deliver the Scouting programs to the youth of America" by "assist[ing] with the recruitment of adult leads and other

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Unless otherwise defined, capitalized terms have the meanings stated in the Debtors' Motion.

volunteers and provid[ing] meeting spaces and other monetary and in-kind support to the packs and troops that they sponsor." [D.I. 16 at 6, 9.]

2.      Catholic and Methodist Chartered Organizations are among the largest groups of Chartered Organizations.  Together, they contribute approximately a third of the Debtors' membership.  Methodist Chartered Organizations appear to be associated the largest amount of abuse claims filed against the Debtors while Catholic Chartered Organizations appear to be associated with the third largest amount of abuse claims filed against the Debtors.  [D.I. 5485 at 474.]  The RSA contains no protections for Catholic, Methodist, or any other Chartered Organizations.

3.      Rather, the RSA and proposed plan impair Chartered Organizations' insurance and indemnification rights as additional insureds under policies purchased by the Debtors and non-debtor Local Councils.  Chartered Organizations cannot assert their insurance rights because the RSA and plan enjoin them from suing insurers—even those who have not made any contributions to the Settlement Trust and are not Protected Parties.  [D.I. 5484 at 101-102.]  Further, the Indirect Abuse Claims held by Chartered Organizations arising from their status as additional insureds are channeled to the Settlement Trust and are subject to an onerous distribution process.  [D.I. 5466-2 at 64.]  There is little prospect that Chartered Organizations will receive any compensation for their claims because no reserve is set aside for those claims, which are subordinated to the full payment of Allowed Abuse Claims [D.I. 5466-2 at 111].  It appears that the only thing that Chartered Organizations can expect under the RSA is the certain expense of future litigation brought by abuse victims.

4.      Given how the RSA and proposed plan treat Chartered Organizations, it is possible, maybe even probable, that many Chartered Organizations may decline to continue to partner with

the Debtors.  If a large number of Chartered Organizations so decide, that could further erode membership and impede Debtors' attempts to find a viable financial path out of bankruptcy.  The Debtors do not appear to have fully considered these ramifications before signing on to the RSA.

5.      It is difficult to imagine how alienating *volunteer* stakeholders critical to the future of scouting can be a sound exercise of the Debtors' business judgment.  As a result, the Catholic Committee and UMAHC believe the Motion should not be approved at this time.  Rather, the Debtors should be instructed to engage and deal with the issues that affect Chartered Organizations and to devise a resolution that protects them or at least their insurance rights.  The Catholic Committee and UMAHC remain ready, willing, and able to participate in negotiations to achieve that end.

## RELEVANT BACKGROUND

6.      On July 1, 2021, the Debtors, Future Claimants' Representative, TCC, AHCLC, Coalition, and various plaintiffs' law firms entered into the RSA.  [D.I. 5466-2.]

7.      No Chartered Organization is a party to the RSA, and to the Catholic Committee's and UMAHC's ' knowledge, no Catholic or Methodist Chartered Organization was invited to participate or did participate in the mediation sessions and other negotiations that resulted in the RSA.

8.      While the RSA contains provisions that protect the Debtors and Local Councils from litigation arising from Abuse Claims, it contains no protection for any Chartered Organization and only vaguely indicates that the parties to that agreement "shall work in good faith to develop a protocol for addressing participation by Chartered Organizations in the benefits of the Channeling Injunction."  [D.I. 5466-2 at 77.]  Meanwhile, the Debtors' restructuring advisor acknowledges that "Chartered Organizations would likely face a deluge of lawsuits, which would

lead to numerous bankruptcy filings and dissolutions across the country and may threaten the entire BSA structure." [D.I. 5470 at 4.]

9.     It is bad enough that Chartered Organizations are currently vulnerable to the same abuse-related litigation that precipitated the Debtors' own bankruptcy. But even worse, under the RSA and proposed plan, Chartered Organizations won't even have access to insurance and indemnification rights that may help protect them from the financial distress that the Debtors are now under.

10.     Chartered Organizations are additional insureds under the Debtors' insurance policies. [D.I. 16 at 50, D.I. 5485 at 55.] Chartered Organizations also appear to be additional insureds under Local Councils' insurance policies.[3] As a result, Chartered Organizations hold Indirect Abuse Claims on account of their rights under the Debtors' and Local Councils' insurance policies.

11.     Under the RSA and latest proposed plan, however, Chartered Organizations are prevented by the Insurance Entity Injunction from pursuing their rights to defense and indemnification from their insurers. [D.I. 5484 at 101-102.] Chartered Organization cannot even pursue their rights against those insurers who have *not* made any contributions to the Settlement Trust and are *not* Protected Parties.

12.     Instead, all Indirect Abuse Claims held by Chartered Organizations are channeled to the Settlement Trust for administration under the proposed TDP. [D.I. 5466-2 at 64.] This includes not only Indirect Abuse Claims arising from Chartered Organizations' rights under the

---

[3] The form Annual Charter Agreement posted on the Debtors' website indicates that the Local Councils agree to provide primary general liability to insurance to Chartered Organizations and certain of their affiliates. *Available at:* https://www.scouting.org/programs/cub-scouts/how-cub-scouting-is-organized/pack-chartered-organization/ (last visited July 22, 2021). Catholic Committee has only recently begun to receive information concerning Catholic Chartered Organizations' insurance and indemnification rights and its investigation is ongoing.

Debtors' insurance policies but also Indirect Abuse Claims arising from Chartered Organizations' rights under the non-debtor Local Councils' policies.

13.    The proposed TDP also appears to winnow Chartered Organizations' claims through a series of roadblocks.  [D.I. 5466-2 at 64, 94.]  These roadblocks include, for example, requiring Chartered Organizations to have filed proofs of claim by the bar date, regardless of whether a Chartered Organization had received any notice of an Abuse Claim such that it could even conceive of holding a contingent and unliquidated Insurance Abuse Claim.  Another roadblock requires a claiming Chartered Organization to have paid in full its liability to a Direct Abuse Claimant, which would appear to strip that Chartered Organization of its right to tender its defense to an insurer and have the insurer pay any judgment up to its policy limit.

14.    Even assuming a Chartered Organization can overcome the various claims allowance obstacles, there is no guarantee that it will receive any compensation because there is no reserve set aside for Indirect Abuse Claims and under the proposed TDP, "any Indirect Abuse Claim shall be subordinate and junior in right to the prior payment in full of all Allowed Abuse Claims that are Direct Abuse Claims as liquidated under these TDP." [D.I. 5466-2 at 111.]  Indeed, the latest disclosure statement admits that Indirect Abuse Claims are "expected to have limited recovery." [D.I. 5485 at 28.]  In other words, a Chartered Organization willing and able to incur the expense to satisfy the TDP's requirements can expect to be rewarded with nothing for its efforts.

15.    It is difficult to understand how the Debtors could have agreed to the proposed treatment of Chartered Organizations under the RSA given that the future of scouting depends on the support of those very organizations.  When LDS terminated its participation as a Chartered Organization, the Debtors lost about 525,000 participants.  [D.I. 5485 at 40.]  That is nearly a

quarter of the 2.2 million scouts the Debtors had in December 2019.  [D.I. 16 at 22.]  The Debtors have acknowledged that "[i]f the number of new members and returning members is substantially reduced from projections, the BSA could lack the means to meet their operational needs or otherwise emerge from bankruptcy."  [D.I. 5485 at 236.]

16.    Together, Catholic and Methodist Chartered Organizations contribute approximately one third of the Debtors' remaining membership.  They have been valuable and loyal partners with the Debtor in the past, and deserve better than the treatment proposed by the RSA.

17.    It seems unlikely that the Debtors will be able to stem the tide of dwindling membership without continued support from Chartered Organizations.  Without sufficient membership and the fees and donations generated by that membership, it is doubtful that the Debtors will be able to meet their monetary obligations under the RSA and proposed plan, let alone survive as a going concern.

18.    The declarations submitted in support of the Debtors' Motion contain no indication that the Debtors considered any of these mission-critical issues before committing to the RSA. [*See* D.I. 5469, 5470.]  These issues are also not listed amongst the risk factors in the latest Disclosure Statement.  [*See* D.I. 5485 at 225-238.]

19.    The Debtors' CEO, Roger Mosby, appears to have confirmed in his deposition that the Debtors did not give much, if any, thought to how to protect the Chartered Organizations whose continuing partnership is critical to the future of scouting.

20.    Mr. Mosby acknowledged that Chartered Organizations are "vital to the way the BSA is organized in order to provide grassroots support for the Boy Scouting [sic] program in communities" and that the Debtors "consider them to be a vital part for the organization, and we

wouldn't want to do anything, quite frankly, that would harm that relationship." [Tr. at 192:19-25.]

21.     Mr. Mosby, did not, however, undertake any review of the chartering agreements between the Debtors and Chartered Organizations before approving the RSA:

> Q:     Well, is it fair to say that in approving the restructuring support agreement you didn't do anything to familiarize yourself with any of the agreements between the Boy Scouts and the chartering organizations?
>
> A.     I can say that I did not review any charter agreements.

[Tr. at 205:8-15.]

22.     Mr. Mosby also acknowledged that, as things stand, Chartered Organizations are vulnerable to abuse claims brought by victims:

> Q:     Sir, Mr. Mosby, if chartering organizations are not included within the injunction, they're exposed to being sued indefinitely; is that right?
>
> A.     It's my understanding that if they are not included in the channeling injunction, then they could be sued separately in state court for any claim that was attributed to their organization.

[Tr. at 188:22-189:5.]

23.     Nonetheless, the Debtors appear to lack any plan to help get Chartered Organizations the benefits of the Channeling Injunction or to otherwise support them in defending lawsuits brought by abuse victims:

> Q:     Okay.  So can you point to anything at all to give the sponsors and the chartering organizations comfort that you, in fact, had a plan and have a plan now today to get them an injunction and release as part of the bankruptcy?
>
> A.     Today, no, we're not ready to start talking about that with the chartered organizations.

[Tr. at 186:15-23.]

Q:     Does the Boy Scouts have any plan or intention to provide support to the
       sponsoring organizations defending those lawsuits if the plan is confirmed?

A.     I mean, we have -- we're not there yet, so until that happens I don't believe
       I can really give you a definitive answer.

[Tr. at 189:6-14.]

24.     The Debtors' lack of a strategy for dealing with Chartered Organizations is

surprising given that they are aware of the risk that Chartered Organizations may terminate their

relationships with the Debtors:

Q:     So do you agree with me that if -- if the chartering organizations do not end
       up getting -- coming within the injunction or a release, that the Boy Scouts
       going forward are likely to lose members from those chartering
       organizations who are subject to ongoing suits?

A.     Yes.

[Tr. at 193:19-25.]

## ARGUMENT

25.     The Debtors bear the burden of proving a sound business justification for entering

into the RSA and that they acted in good faith in doing so.  [D.I. 5466 at 17-18.]  However, because

the RSA's proposed treatment of Chartered Organizations is unlawful, the Debtors' proposed plan

appears to be infeasible absent Chartered Organizations' continued support for scouting, and the

Debtors do not appear to have considered these issues before entering into the RSA, the Debtors

cannot demonstrate that they entered into the RSA in good faith or that agreeing to the terms of

the RSA was the product of sound business judgment.

26.     Chartered Organizations' insurance and indemnification rights as additional

insureds under the Debtors' and Local Councils' insurance policies are not property of the Debtors'

estates.  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 364 B.R. 518, 527 (Bankr. S.D.N.Y. 2007)

(additional insureds' rights to payment from insurers pursuant to "their own policy entitlements"

would be received from the insurers "as a contractual entitlement, not from the property being sold, as a kind of *in rem* right, and would be independent of anything the Estate sought or received"); *In re Petters Co.*, 419 B.R. 369, 376 (Bankr. D. Minn. 2009) ("[A]ny individual insured has a contractually-distinct status that runs directly between itself and the insurer" and "the right to receive payment on a covered claim [is] the property of that insured itself"); *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 978 (Bankr. N.D. Ill. 1991), *aff'd*, 149 B.R. 860 (N.D. Ill. 1992) (additional insured had separate legal and equitable interests in the debtors' policies, including the right to make direct claims against the insurer).

27.    Accordingly, Chartered Organizations' insurance rights cannot be seized and given to the Settlement Trust without Chartered Organizations' consent (which the Debtors do not have). *See*, *e.g.*, *In re SportStuff, Inc.*, 430 B.R. 170, 178 (B.A.P. 8th Cir. 2010) (bankruptcy court "did not have the jurisdiction or authority to impair or extinguish" independent contractual rights of insureds); *In re Archdiocese of St. Paul & Minneapolis*, 579 B.R. 188, 197 (Bankr. D. Minn. 2017) (rejecting plan provision transferring insurance interests into settlement trust where parishes' indemnification and contribution claims were impaired by transfer and parishes did not consent to such transfer); *Forty-Eight Insulations*, 133 B.R. at 976-77 (insured's claims against insurers and rights under policies were not property of debtor's estate and could not be impaired by debtor's settlement with insurer); *see also* Insurance Issues in Bankruptcy: A Collier Monograph ¶ 3.03[2][d] (2014) ("The more common approach holds that a co-insured's interest in a debtor's policy is not property of the bankruptcy estate" and "[a]s these contract rights do not belong to the debtor, they cannot be impaired by a bankruptcy court").

28.    In fact, several Catholic dioceses and archdioceses are currently debtors-in-possession in bankruptcies across the country, and to the extent they are Chartered Organizations

holding rights as additional insureds, proceeding to divest those debtors of their property rights violates the automatic stays in those cases.  *See*, *e.g.*, *In re: The Roman Catholic Church of the Archdiocese of New Orleans*, No. 20-10846 (Bankr. E.D. La.); *In re: Roman Catholic Church of the Archdiocese of Santa Fe*, No. 18-10327 (Bankr. D.N.M.); *In re: The Diocese of Buffalo, N.Y.*, No. 20-10322 (Bankr. W.D.N.Y.); *In re: The Diocese of Rochester*, No. 19-20905 (Bankr. W.D.N.Y.); *In re: Roman Catholic Diocese of Harrisburg*, No. 20-00599 (Bankr. W.D. Pa.); *In re: The Roman Catholic Diocese of Rockville Centre, New York*, No. 20-12345 (Bankr. S.D.N.Y.); *In re: The Roman Catholic Diocese of Norwich*, No. 21-20687 (Bankr. D. Conn.); *In re: The Archbishop of Agana*, No. 19-00010 (Bankr. D. Guam).

29.    Similarly, Chartered Organizations' claims for defense and/or indemnification arising from their insurance rights cannot be impaired and enjoined via the Insurance Entity Injunction.  That is particularly true for claims brought against insurers who have not made any contributions to the Settlement Trust and are not Protected Parties under the plan.

30.    Nor can Chartered Organizations' Indirect Abuse Claims be impaired through allowance procedures contemplated in the proposed TDP.  For example, under that process, Indirect Abuse Claims are disallowed if not timely filed or if they are subject to disallowance under section 502(e) of the Bankruptcy Code.  [D.I. 5466-2 at 94.]  Of course, many Chartered Organizations will not have filed proofs of claim for their Indirect Abuse Claims for the very reason that such claims are contingent and liquidated and would be subject to disallowance under section 502(e).[4]  Others will not have timely filed claims because they had not yet received any notice that there were Abuse Claims asserted against them so as to trigger their Indirect Abuse Claims.

---

[4] By contrast, as noted by LDS, in other cases where indirect claims are channeled to a trust under a plan, the TDP expressly exempts indirect claims from the scope of section 502(e).  [D.I. 3263 at 14.]

31.     Further, even assuming a Chartered Organization can satisfy the requirements of the TDP to have its Indirect Abuse Claim allowed, there is no reserve for its claim, which is subordinated to the payment in full of Direct Abuse Claims, and thus that Chartered Organization should expect to receive nothing for its efforts or its seized property.  [D.I. 5466-2 at 111.]  As a result, Chartered Organizations are left without adequate protection.  *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1989) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.").

32.     It is especially inappropriate to impair Chartered Organizations' insurance rights arising from policies issued to Local Councils, who are not even debtors.

33.     Given the prejudicial treatment of Chartered Organizations under the RSA and proposed plan, it is no surprise that certain Chartered Organizations have decided to stop doing business with the Debtors while others are considering potentially doing the same.  When LDS terminated its participation as a Chartered Organization, the Debtors lost about 525,000 participants, or close to a quarter of its membership. [D.I. 5485 at 40.]  The plan linked to the RSA raises important issues that alarm Catholic, Methodist, and other Chartered Organizations and could potentially trigger a similar exodus.

34.     The Debtors' go forward business plan has no downside margin for minor, let alone material, membership dues erosion.  Their financial projections assume membership will decline only modestly before stabilizing.  [D.I. 5485 at 430, 433.]  As the Debtors admit, "membership dropped significantly in 2020 as a result of the COVID-19 pandemic" and "[i]f the number of new members and returning members is substantially reduced from current projections, the Debtors could lack the means to meet their operational needs or otherwise emerge from bankruptcy." [D.I.

5485 at 20.] This is certainly a possible outcome if volunteer Chartered Organizations stop supporting scouting.

35.     The RSA suggests a path for the Debtors that could exacerbate their financial straits and render it unlikely that the Debtors could meet their financial obligations under the RSA or plan. A plan that is "likely to be followed by the liquidation or the need for further financial reorganization of the Debtors" is not feasible, *In re Paragon Offshore PLC*, No. 16-10386 (CSS), 2016 WL 6699318, at *29 (Bankr. D. Del. Nov. 15, 2016), and support for an RSA that would lead to such a path is not an exercise of reasonable business judgment.

36.     As noted above, the declarations submitted in support of the Debtors' Motion do not indicate the Debtors thought about, much less thought through, these existential threats. Mr. Mosby's deposition testimony seems to confirm as much, as Chartered Organizations appear to be an afterthought in the Debtors' reorganization strategy. And the latest Disclosure Statement does not include these threats its descriptions of risk factors. The Debtors' failure to consult with Chartered Organizations before agreeing to the RSA and failure to consider the ramifications that prejudicing Chartered Organizations' insurance rights will have on their own financial viability suggests that the RSA was not the product of sound business judgment. *See In re Geneva Steel Co.*, 236 B.R. 770, 733 (Bankr. D. Utah 1999) (debtor did not exercise sound business judgment in proposing retention program with executives where such program was opposed by union whose support was critical to reorganization and who was not previously consulted about program).

For these reasons, and the reasons set forth in LDS's limited objection, the Catholic Committee and UMAHC respectfully request that the Court deny the Debtors' Motion at this time to allow the Debtors to engage with Chartered Organizations to find a means to protect them and

to secure their continued support for scouting, and grant the Catholic Committee and UMAHC

such other and further relief as it deems appropriate.

Dated: July 22, 2021
Wilmington, Delaware

Respectfully submitted,

**POTTER ANDERSON & CORROON LLP**

/s/ *Jeremy W. Ryan*
Jeremy W. Ryan (Bar No. 4057)
D. Ryan Slaugh (Bar No. 6325)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com
           rslaugh@potteranderson.com

*Counsel to the Roman Catholic Ad Hoc Committee and
the United Methodist Ad Hoc Committee*

- and -

**SCHIFF HARDIN LLP**

Everett Cygal, *admitted pro hac vice*
David Spector, *admitted pro hac vice*
J. Mark Fisher, *admitted pro hac vice*
Daniel Schufreider, *admitted pro hac vice*
Jin Yan, *admitted pro hac vice*
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600
Email: ecygal@schiffhardin.com
           dspector@schiffhardin.com
           mfisher@schiffhardin.com
           dschufreider@schiffhardin.com
           jyan@schiffhardin.com

*Counsel to the Roman Catholic Ad Hoc Committee*

- and -

**BRADLEY ARANT BOULT CUMMINGS LLP**

Edwin G. Rice, Esq.
100 N. Tampa Street Suite 2200
Tampa, FL 33602
Telephone: (813) 559-5500
Facsimile: (813) 229-5946
Email: erice@bradley.com

*Counsel to the United Methodist Ad Hoc Committee*