**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
| | Ref. Dkt. No. 5466 |
| | Hearing Date: July 29, 2021 at 10:00 a.m. |
| | Objection Deadline: July 22, 2021 |

**JOINDER OF THE COALITION OF ABUSED SCOUTS**
**FOR JUSTICE, THE OFFICIAL COMMITTEE OF TORT**
**CLAIMANTS, AND THE FUTURE CLAIMS REPRESENTATIVE**
**TO, AND BRIEF IN SUPPORT OF, DEBTORS' MOTION FOR**
**ENTRY OF AN ORDER, PURSUANT TO SECTIONS 363(b) AND 105(a)**
**OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS**
**TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING**
**SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF**

The Coalition of Abused Scouts for Justice (the "**Coalition**"), the Official Committee of Tort Claimants to Boy Scouts of America and Delaware BSA, LLC (the "**TCC**"), and the Future Claims Representative (the "**FCR**" and together with the Coalition and the TCC, the "**Supporting Parties**"), by and through their undersigned counsel, hereby submits this Joinder and Brief in support of the *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

*Restructuring Support Agreement, and (II) Granting Related Relief* [Dkt. No. 5466] (the "**Motion**").[2]  In support of the Motion,[3] the Supporting Parties respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The survivors deserve to be treated fairly.  Consider a child who was raped in the 1970s by his Scout leader during a camping trip in New York.  Nearly 50 years have now gone by. The survivor is in his 60s today.  He had the courage to come forward, like many have decades after the abuse occurred.  He timely filed a proof of claim, and if he proceeded in the tort system, he would stand to recover millions of dollars.  This survivor and the thousands of other like him must be treated fairly in these proceedings.  The parties that refuse to face the gravity and the consequences of the abuse here are trying to prevent a successful reorganization through obfuscation and distraction.

2.      The Debtors and the Local Councils are asking a lot of the survivor constituencies. The Debtors' cash contribution to the Settlement Trust is a fraction of their liability for abuse claims.  The Local Councils, who are not debtors, have substantial assets and play a vital role in Scouting.  The global resolution plan that the Debtors and the Local Councils desire is one that includes a channeling injunction.

3.      The importance of the RSA cannot be overstated.  The RSA encompasses a comprehensive settlement resulting from extensive, good faith negotiations in court-sanctioned mediation among the Debtors, the Local Councils, and the Supporting Parties.  The RSA reflects a good faith compromise and agreement by survivor representatives, provides an outcome that

---

[2]  Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the Amended Plan, respectively.

[3]  Issues concerning the Term Sheet attached to the RSA as Exhibit A remain outstanding.  The Supporting Parties are attempting to resolve these issues with the Debtors in the mediation.  The Supporting Parties reserve the right to withdraw this Joinder if these issues are not resolved prior to the RSA Deadline, which is July 28, 2021.

preserves the survival of Scouting, dispenses with a substantial portion of the complex pending litigation pursued by representatives of survivors and the costs, expenses, and uncertainty associated therewith, and paves the way towards confirmation of a global resolution plan.

4. Because of the RSA, the Debtors have a viable path forward to emerge from bankruptcy and satisfy their stated "restructuring" goals. But significant work remains to be done. Confirming a plan over the objections of the insurers and former chartering organizations like the Church of Jesus Christ of Latter-day Saints (the "**LDS**"), will require significant work.

5. The Supporting Parties file this Joinder to address four issues related to the Motion and/or objections presented at the July 7, 2021 status conference. Most, if not all, of these issues or objections are not ripe at either the RSA or Disclosure Statement stage and, in the Supporting Parties' view, present misguided confirmation objections. The Supporting Parties submit this Brief to address these issues head on because the failure to advance these cases via the timely approval of the RSA would deliver a fatal blow to the Debtors' objective of exiting bankruptcy in 2021 and deprive the survivors of an avenue for fair and equitable recoveries with more speed than a "free fall" of Local Council bankruptcy filings.

## ARGUMENT

### A. The Debtors Have Satisfied the Business Judgment Standard

6. The first issue that the Supporting Parties wish to address is the legal standard that the Court should apply when considering whether to approve the RSA. Consistent with sections 363(b) and 105(a) of the Bankruptcy Code and the case law discussed below, the Motion should be granted as a proper exercise of the Debtors' business judgment.[4] As the declarations

---

[4] Section 363(b) provides, in pertinent part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) further provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Together, these sections of the Bankruptcy Code provide the

filed by the Debtors in support of the Motion show, the Debtors' entry into the RSA satisfies that standard, because, among other things, the RSA furthers the Debtors' stated goals of equitably compensating abuse survivors and preserving the viability of the Boy Scouts.

7. Numerous courts have approved entry into and performance under plan support agreements under sections 363(b) and 105(a) of the Bankruptcy Code in large, complex cases. *See*, *e.g.*, *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. 13, 2017) [Dkt. No. 1359] (order approving post-petition plan support agreement pursuant to sections 363(b) and 105(a) of the Bankruptcy Code); *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. Sept. 19, 2016) [Dkt. No. 9584] order granting debtors' motion pursuant to sections 363(b) and 105(a) of the Bankruptcy Code to enter into and perform under plan support agreement); *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. Sept. 18, 2015) [Dkt. No. 6097] (same); *In re Exide Techs*, Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015) [Dkt. No. 3087] (order authorizing debtor to enter into plan support agreement pursuant to sections 363(b) and 105(a) of the Bankruptcy Code); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Dec. 23, 2009) [Dkt. No. 1030] (same).

8. In *In re PG&E Corporation*, No. 19-30088 (DM) (Bankr. N.D. Cal. Dec. 19, 2019), the bankruptcy court approved two restructuring support agreements under sections 363(b) and 105(a) of the Bankruptcy Code that led to the confirmation of a plan that was supported by the holders of tort claims. The ***first*** restructuring support agreement was between the debtors and the ad hoc group of subrogation claimants (the "**Subrogation RSA**"). The subrogation claimants held

Court with ample authority to grant the requested relief herein. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 252 B.R. 147, 153 (D. Del. 1999) (use of assets outside the ordinary course of business permitted if "sound business purpose justifies such actions").

claims arising from payments made by insurers to tort claimants. Under state law, the insurers had the right to step into the shoes of the fire victims and recover from the tortfeasor, PG&E.

9.     The Subrogation RSA, like the RSA here, required PG&E to seek the entry of a confirmation order that contained certain findings and orders. *See* PG&E's Motion to Approve Subrogation RSA, *In re PG&E Corp.*, Dkt. No. 3992 (attached hereto as **Exhibit A**) at 13-14. In *PG&E*, the subrogation claimants' support for the plan was contingent upon the bankruptcy court making certain findings in the confirmation order that would shield them from made-whole claims that could be asserted against them by their insureds. *Id.* The Subrogation RSA, like the RSA here, also required PG&E to reimburse the members of the ad hoc group for their professional fees and expenses up to an aggregate amount of $55 million (including fees and expenses invoiced before and after RSA approval, which included success fees). The subrogation claims were general unsecured claims.

10.     The ***second*** restructuring support agreement in *PG&E* was between PG&E, the official committee of tort claimants, and a group of state court counsel that represented approximately 70% of the holders of fire victim claims (the "**Fire Victim RSA**"). *See* PG&E's Motion to Approve Fire Victim RSA, *In re PG&E Corp.*, Dkt. No. 5038 (attached hereto as **Exhibit B**). Approximately 85,000 fire victims filed proofs of claim against PG&E based on damages arising from certain wildfires PG&E caused in 2017 and 2018. The fire victims held direct tort claims against PG&E.

11.     The Fire Victim RSA, like the RSA here, required state court counsel that represented the majority of fire victims to "use all reasonable efforts to advise and recommend to its existing and future clients" to vote to accept the plan. *Id.* at Ex. A, § 2(g). The Fire Victim RSA, however, was clear that the holder of each fire victim claim had "the right to make his or her

own decision regarding voting on the Amended Plan after receiving the advice of his or her individual counsel." *Id.* at Ex. A, § 2(l). The Fire Victim RSA required PG&E, in turn, to propose a plan that created a trust funded with cash, stock, and other assigned rights and actions to pay fire victims. *See id.* at 9.

12. The bankruptcy court approved the Subrogation RSA and the Fire Victim RSA under sections 363(b) and 105(a) over the objections of various parties. *See* Order Approving Subrogation RSA, *In re PG&E Corp.*, Dkt. No. 5173 (attached hereto as **Exhibit C**) and Order Approving Fire Victim RSA, *In re PG&E Corp.*, Dkt. No. 5174 (attached hereto as **Exhibit D**). Thereafter, most of the holders of subrogation claims and fire victim claims voted in favor of plan confirmation. As a result of the two restructuring support agreements, the bankruptcy court did not have to consider a cramdown plan that was opposed by the tort victims. The approval of the restructuring support agreements provided PG&E with a path to confirm a consensual plan and fund trusts to pay tort victims.

13. Similar benefits have followed from agreements approved by the bankruptcy courts in the *Mallinckrodt* and *Purdue* bankruptcies under sections 363(b) and 105(a) of the Bankruptcy Code. *See In re Mallinckrodt PLC*, Case No. 20-50850 (JTD) (Bankr. D. Del. Feb. 1, 2021) [Dkt. No. 1250] (approving reimbursement agreements for counsel to ad hoc committee of unliquidated tort claimants under sections 363(b) and 105(a) in connection with support for an unassumed restructuring support agreement); *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019) (authorized the assumption and entry of reimbursement agreements under sections 365 and 363 with counsel to ad hoc group of unsecured tort victims).

14. When the debtors in *Mallinckrodt* filed for bankruptcy, they were defendants in over 3,000 opioid-related lawsuits in all 50 states and Puerto Rico. Mallinckrodt also maintained

over $1.6 billion in unsecured note liabilities. Mallinckrodt entered into a restructuring support agreement with various creditor constituencies—*i.e.*, holders of opioid claims and fulcrum funded debt claims—prior to the bankruptcy filing. The Mallinckrodt restructuring support agreement, like the RSA here, required the debtors to pay the fees and expenses of professionals represented the supporting creditors. Several parties, including two statutory committees appointed in the case, indicated that they would object to the assumption of the restructuring support agreement and needed time to digest the proposed plan and work through various mediations.

15. In response, Mallinckrodt moved to assume certain reimbursement agreements distinct from the restructuring support agreement and enter into new agreements with parties that did not have prepetition agreements providing for the payment of professional fees and expenses. The bankruptcy court concluded that the Mallinckrodt debtors "met their burden of establishing the sound exercise of their business judgment under Section[] 363 . . . ." *Id.*, Hr'g Tr. 9:25-10:4 (hearing dated Jan. 19, 2021) (attached hereto as **Exhibit E**). Agreeing with Mallinckrodt's determination that the ad hoc groups' participation through paid professionals was beneficial for moving the cases forward, the court stated "I'm convinced that good faith participation of the ad hoc groups in the mediation process is, in and of itself, beneficial to the debtors' estates as a whole." *Id.*, Hr'g Tr. 11:5-13. This ruling has borne significant fruit—the Mallinckrodt debtors have now filed a plan of reorganization and the knotty issues about how to allocate the consideration set aside for opioid claims under the restructuring support agreement were consensually resolved through the lengthy mediation alluded to in the court's decision.

16. Similarly, in *Purdue*, another opioid mass-tort bankruptcy, the Bankruptcy Court for the Southern District of New York authorized the assumption and entry of pre-petition reimbursement agreements under sections 365 and 363 with counsel to ad hoc group of unsecured

tort victims, even without a drafted restructuring support agreement. Both the *Purdue* and *Mallinckrodt* orders approving the payment of the ad hoc group's professional fees and expenses rested on the debtors' business judgment. In *Mallinckrodt*, the order approving the payment of professional fees and expenses included certain guardrails that helped assure that the fees reimbursed would be within the scope of supporting the restructuring contemplated by the restructuring support agreement without requiring compliance with section 503(b)(3) of the Bankruptcy Code. Here, since the execution of the RSA, the Coalition has agreed to adopt the principal guardrails reflected in the *Mallinckrodt* order in response to concerns raised by the United States Trustee.

17.    The Debtors' entry into the RSA satisfies the business judgment standard. The Debtors have said that Scouting is not viable unless their geographically diverse and distinct Local Council network is preserved—and the Local Councils are subject to the same existential litigation as the Debtors over their culpability in the abuse nightmare. From day one, the only outcome that could address the goals of the BSA is a global one, and one that is unique to bankruptcy—*i.e.*, a channeling injunction and release of the Local Councils that would require significant contributions from the releasees to the abuse survivors, and critically, to be confirmable, overwhelming support by survivors.

18.    The RSA and the proposed Amended Plan represent a chance for the Boy Scouts to accomplish its restructuring goals in a manner that will see just, compassionate treatment and compensation for survivors. The RSA, which is the first step towards confirmation of the Amended Plan, includes support for the Channeling Injunction. This is only possible because of the significant changes (*e.g.*, rejection of the proposed Hartford Settlement) and improvements (*e.g.*, increased monetary contributions and pathways towards recovery from intransigent insurers)

made to the Amended Plan after lengthy negotiations and mediation. The Supporting Parties expect that the Amended Plan, which is based on the RSA, will enjoy broad survivor support.

19.     Finally, the payment of Coalition professional fees required under the RSA is consistent with the holdings in *Purdue*, *Mallinckrodt*, *PG&E* and elsewhere. The Coalition played a critical role in facilitating the proposed RSA and settlement. As Mr. Whittman, the Debtors' financial advisor, testified, "[t]he payment of the Coalition's fee and expenses, on the term set forth in the RSA, will not just benefit the Debtors." Whittman Decl. at ¶ 7 (Dkt. No. 5470). By reimbursing the Coalition, "the Debtors are making a business decision that significantly benefits the Debtors' estates and creditors (abuse survivors or otherwise) as a whole by providing a pathway to plan confirmation." *Id.* The Debtors "require the continuous and active involvement and leadership of the Coalition" to "build the consensus needed to achieve their goals." *Id.* The Coalition's professional fees and expenses are plainly reasonable given its contributions to date and by "compar[ison]" to the fees incurred by the Debtors', the UCC's, the TCC's, the Future Claimants' Representative's, and JP Morgan's professionals. *See* Whittman July 14, 2021 Depo. Tr. at 158:9-162:20.

### B.     The Findings and Orders Are Required to Satisfy Bankruptcy Code Section 1129(a)(7) and to Support the Channeling Injunction

20.     The second issue that the Supporting Parties wish to address is the proposed findings and orders included in Section II.A of the RSA (the "**Findings and Orders**"). At the status conference held on July 7, 2021, several parties previewed their confirmation objections to the Court, including the insurers. The insurers' objections target the Findings and Orders. These Findings and Orders are critical not just because the survivor constituencies will not support a plan that does not include them, but because they are required for the Amended Plan to satisfy section 1129(a)(7) of the Bankruptcy Code and the standards for issuance of the Channeling

Injunction.  To be clear, the Supporting Parties are not asking the Court to make any findings that the Court otherwise is not required to make in connection with plan confirmation.

21.     Section 1129(a)(7) requires the Court to consider whether survivors will receive less under the Debtors' plan—which includes releases of Local Councils—than they would receive in a chapter 7 liquidation where they could seek recoveries from non-debtor third parties.[5]  These recoveries must be taken into consideration under section 1129(a)(7) if the Court is going to approve a plan that includes a channeling injunction.  Here, if these Chapter 11 Cases were converted to chapter 7, survivors could liquidate claims against Local Councils in the tort system and receive full payment on their claims, including in some cases, from the same insurers (and even the same policies) that provide coverage for the Boy Scouts' national organization.

22.     Channeling injunctions that enjoin tort victims from suing non-debtor third parties like the Local Councils are not the norm.  While these channeling injunctions were codified specifically with respect to asbestos bankruptcies in section 524(g), here the Debtors are relying on section 105(a) and this Court's decision in *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017) (following *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 938 (Bankr. W.D. Mo. 1994)).  The Debtors' burden in these circumstances is high.

---

[5]     *See* 11 U.S.C. § 1129(a)(7); *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) (section 1129(a)(7) inquiry requires bankruptcy court to consider on remand whether creditor would be less secured under plan that provided for releases of non-debtor guarantors than it would in a chapter 7 liquidation where it would continue to receive the benefit of the guarantees); *In re Washington Mut., Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation."); *In re Quigley*, 437 B.R. 102, 146 (Bankr. S.D.N.Y. 2010) ("The confirmation of the … Plan and discharge of Pfizer will affect the dissenting Non-Settling Claimants because they would 'retain' their right to sue Pfizer if Quigley were liquidated under chapter 7.  As the parties recognize, the … question is whether I should consider the value of these … claims in deciding whether the Fourth Plan is in the 'best interest' of the dissenting Non-Settling Claimants.  I conclude that I must.")

23.     The Debtors must obtain the overwhelming support of the survivor community to succeed. *Master Mortgage*, 168 B.R. at 938 ("single most important factor" is creditor approval of the injunction). But that alone is not enough. To confirm a plan with nonconsensual third-party releases, the Court must also find, as a factual matter, that the survivors are being paid in full or close thereto. *Millennium Lab*, 575 B.R. at 272 (plan must provide for the "payment of all or substantially all of the claims of the class or classes affected by the injunction"); *Master Mortgage*, 168 B.R. at 938 ("[T]he Plan proposes to pay in full all of the claims impaired by the injunction. [Therefore,] [f]actor five weighs in favor of the injunction."). The Court must assess the value of the assets being assigned to the Settlement Trust relative the Debtors' and the Local Councils' liability for Abuse Claims. The only assets that could get the Settlement Trust anywhere close to being able to pay survivors in full are the Debtors' and the Local Councils' insurance assets.

24.     The value of the insurance assets is disputed. And, the insurers have made it clear that they intend to use the existence of these bankruptcy cases to attempt to escape their obligations under their policies, peddling the false narrative, among others, that the Debtors' reorganization constitutes an impermissible modification of insurance contracts.[6] To the contrary, the key issue is simply whether the insurers must honor the terms of their policies and pay all sums that the Debtors and Local Councils are legally obligated to pay because of injury during the policy periods.

25.     Insurers have used the chapter 11 process in the past to evade coverage obligations. *See*, *e.g.*, *Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1178, 1181 (N.D. Cal. 2016); *Fuller-*

---

[6]     During recent depositions, the insurers have attempted to elicit testimony, without success, that the Debtors' economic liability for Abuse Claims is their $250 million contribution to the Settlement Trust and not the value of the Abuse Claims (estimated by Bates White to be nearly $7.1 billion). *See* Disclosure Statement (Dkt. No. 5485) at 72-73; Mosby July 15, 2021 Depo. Tr. at 255:4-23; 301:8-17 ("Q. So at no point during your testimony today have you offered an opinion or view as to what you think the Boy Scout's economic liability for abuse claims is; is that correct? … A. Correct. Correct.")

*Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958 (Cal. Ct. App. 2006). In *Fuller-Austin* and *Flintkote*, debtors with asbestos liability filed for bankruptcy in Delaware. Both debtors confirmed chapter 11 plans that created trusts to pay tort claims. And both chapter 11 plans included language that was termed "insurance neutrality" language.

26.     The term "insurance neutrality" is a loaded, and often misused, misunderstood and inaccurately spun term. In fact, the insurance provisions in *Fuller-Austin* and *Flintkote* were not "neutral," but instead provided the insurers with a special exemption from otherwise generally applicable principles of *res judicata* and collateral estoppel. Agreeing to this exemption was a choice made by the debtors (and tort victims) in those cases because it was expedient under the circumstances of those cases and gave the debtors the ability to argue that the insurers lacked standing to object to plan confirmation. In those cases, the existence of other material assets which might become immediately available to pay claimants once the plans became effective led the plan proponents to take a calculated risk and provide insurers with this benefit to avoid the delay and litigation that the insurers would otherwise impose.

27.     Post-confirmation, the insurers argued in coverage actions that their obligation to indemnify the debtors was not based on the allowed amount of the tort claims, as determined under the trust distribution procedures, but rather was tied to the payment percentage established by the trust to pay tort claims based on the trust's limited assets. *See Flintkote*, 177 F. Supp. 3d at 1168 ("Aviva argues that its indemnity obligation is to pay the payment percentage or, as Aviva characterizes it, what The Trust 'actually pays" to the asbestos claimants."); *Fuller-Austin*, 135 Cal. App. 4th at 746-47 (adopting insurers' argument that their indemnity obligation is the payment percentage that the trust could afford to pay on account of allowed asbestos claims). Of course, this result creates a downward spiral of reduced payments for victims. Because the trust cannot

afford to pay claimants the full value of their claims, it cannot recover the full value of the claims from insurers, and without those recoveries, can never afford to pay claimants the full value of their claims.

28.     Circuit and district courts alike hold that an insurer may not profit from the bankruptcy of its insured.  *See Matter of Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993) ("[I]t makes no sense to allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge"); *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991) (reversing district court's finding that the insured's covered loss was the amount the settlement trust actually pays to tort victims on the ground that it conferred a "windfall" on the debtor's insurers and was contrary to applicable law); *In re Jet Fla. Sys., Inc.*, 883 F.2d 970, 975 (11th Cir. 1989) ("The 'fresh-start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured."); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, No. 03-3408, 2012 WL 734176, at *3 (D. Md. Mar. 6, 2012) (following *UNR* and rejecting insurers' argument that they are obligated to indemnify only for the actual sums which the trust pays out to claimants); *ARTRA 542(g) Asbestos Trust v. Fairmont Premier Ins. Co.*, No. 09-cv-458, 2011 WL 4684356, at *2 (N.D. Ill. Sep. 30, 2011) (following *UNR* and requiring insurers to indemnify for covered claims at the full amount of the claim rather than at the bankruptcy discount rate); *see also Chapman v. Bituminous Ins. Co. (In re Coho Res., Inc.)*, 345 F.3d 338, 343 (5th Cir. 2003) (stating that it would be "fundamentally wrong" to "allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge") (citation omitted); *Tucker v. Am. Intern. Grp., Inc.*, 745 F. Supp. 2d 53, 65 (D. Conn. 2010) ("[C]ourts have 'reasoned that the

insurance company should not be entitled to gain a benefit that was not intended or in any way computed within the rate charged for its policy.'") (quoting *In re Jet Florida*, 883 F.2d at 975).

29. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

30. But the insurers in *Fuller-Austin* and *Flintkote* were nonetheless able to obtain a bankruptcy windfall. *See Flintkote*, 177 F. Supp. 3d at 1168 (holding insurers' obligation to pay based on trust payment percentages and explaining that "if [t]he Trust assign[ed] a claim a nominal value of $184,000 [under the TDP] but the payment percentage is 8% [based on available trust assets], the amount [t]he Trust is obligated to pay the claimant is $14,720."); *Fuller-Austin*, 135 Cal. App. 4th at 746-47. The Debtors' insurers are trying to accomplish the same outcome in these cases—or at least to leverage the possibility of such a result into de minimis settlements in the face of enormous liabilities.

31. Here, the initial contribution that will be made to the Settlement Trust by the Debtors and the Local Councils is small relative to the amount of Abuse Claims. If the insurers were permitted to enjoy the benefits of a *Fuller-Austin* result, billions of dollars of coverage would

be lost. The insurers would take the position that their liability would, in effect, mirror the initial contributions made by the Debtors and the Local Councils to the Settlement Trust. This has always been the insurers' game.

32. Fortunately, the structure of the Debtors' Plan necessarily thwarts even the threat of such an insurer windfall. A critical component of the Plan is the Channeling Injunction that protects the Local Councils. Under *Millennium Lab*, this Court cannot approve such an injunction unless, as a factual matter, the survivors will receive a substantial distribution from the Settlement Trust. *Millennium Lab*, 575 B.R. at 272 (plan must provide for the "payment of all or substantially all of the claims of the class or classes affected by the injunction"); *accord Master Mortgage*, 168 B.R. at 938 ("[T]he Plan proposes to pay in full all of the claims impaired by the injunction. [Therefore,] [f]actor five weighs in favor of the injunction.")

33. And, under section 1129(a)(7), this Court cannot approve a plan unless the survivors will receive an amount from the Settlement Trust that is not less than the amount that they could recover if the Chapter 11 Cases were converted to chapter 7. Because here, the contributions of the Debtors and the Local Councils are only a tiny fraction of the value of the Abuse Claims, the Court must find—*as a predicate for approving the Local Council Channeling Injunction and releases*—that the insurance assets here are sufficient, or nearly sufficient, to fill in the gap.

34. The RSA is the ladder out of these bankruptcy cases. The RSA requires the Debtors to put forth a plan and confirmation order that includes four key factual findings that are essential to the confirmation of a plan that includes a channeling injunction and that has survivor support. Those findings are as follows:

35.     ***First***, the plan must be "binding on all parties in interest."  RSA § II.A.(i).(A).

There can (and should) be no carve-outs for the insurers.  The insurers have hurled insults at the

survivors and their attorneys for months.  Now they must litigate.  They will have a right to be

heard and offer evidence.  The Supporting Parties will not and do not question their standing and

right to object to the Plan, and as such, "insurance neutrality," as that term was used in *In re*

*Combustion Engineering* and its progeny has no relevance here.  391 F.3d 190, 216-17 (3d Cir.

2004).

36.     As full participants in the plan confirmation process, the insurers must be bound by

the confirmation order just like every other litigant that appears before this Court.  *See In re Arctic*

*Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018) ("A plan's preclusive effect is a principle that

anchors bankruptcy law:  '[A] confirmation order is *res judicata* as to all issues decided or which

could have been decided at the hearing on confirmation.'") (quoting *In re Szostek*, 886 F.2d 1405,

1408 (3d Cir. 1989)); *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991)

(order confirmation chapter 11 plan of reorganization was binding on debtor's insurers); *In re USN*

*Commc'ns., Inc.*, 280 B.R. 573, 592 (Bankr. D. Del. 2002) ("a confirmed plan acts as a binding

contract on all the parties thereto").  Moreover, section 1141(a) of the Bankruptcy Code mandates

that Hartford, Century, Liberty Mutual, and Old Republic be bound by the confirmation order since

all have filed proofs of claim.  *See* 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind

… any creditor").

37.     ***Second***, the Court must determine as a factual matter that the Trust Distribution

Procedures ("**TDP**") are "fair and reasonable based on the evidentiary record offered to the

Bankruptcy Court."  RSA § II.A.(i).(B).  The TDP is based on the Debtors' exposure in the tort

system and historical settlement practices.  The Debtors provided the information that resulted in

the matrix values in the TDP based on prepetition settlements that they reached with survivors. The scaling factors are designed to mirror how the Abuse Claims would be valued in the tort system. The TDP is designed to weed out fraudulent claims. Because the TDP is based on the same historical practices under which the insurers previously approved and paid numerous settlements of Abuse Claims, the insurers have no credible basis on which to challenge its reasonableness.

38.     The insurers suggest that the Court's issuance of a finding as to the reasonableness of the TDP would somehow impair their rights under their policies. That is not accurate. The RSA Findings and Orders are analogous to a non-bankruptcy court approving the reasonableness of a class action settlement. The approval order in the class action context does not impair an insurer's rights under potentially responsive insurance policies. In addition, the Findings and Orders (as currently proposed in the RSA) do not require that this Court make the coverage law determination of whether insurers are obligated to pay the reasonable settlements of their insureds[7] or even which policies are obligated to pay on account of such settlements.

39.     In fact, the policyholder is entitled to protect its interests by entering into reasonable settlements with claimants, particularly where, as here, the insurers have raised numerous defenses to coverage and many were litigating coverage prior to this proceeding. *See*, *e.g.*, *Re: Brightview Enter. Solutions LLC v. Farm Family Cas. Ins. Co.*, No. 20-7195, 2020 WL 6074474, at *2 (D.N.J. Oct. 15, 2020) ("Where the insurer acts in bad faith in not settling, 'an insured is permitted to settle the tort claims . . . and then recover from the insured the amount paid in settlement . . . up to the policy limits, provided that such sums were reasonable and were paid in good faith.'") (quoting

---

[7]     This Court may nevertheless determine that it must make such a finding to conclude that the Amended Plan, including the Channeling Injunction set forth therein, complies with the Bankruptcy Code and applicable law. The Supporting Parties expressly reserve the right to seek this finding and any additional findings that are necessary to obtaining the entry of a confirmation order that includes the Channeling Injunction.

*Fireman's Fund Ins. Co. v. Sec. Ins. Co. of Hartford*, 367 A.2d 864, 871 (N.J. 1976)); 1 INSURANCE CLAIMS AND DISPUTES § 3:9 (6th ed. 2021) ("If . . . the insured settles a case for a sum that the insurance company would have been obligated to pay in settlement, the company is not prejudiced by the unauthorized settlement."); *see also* 14A COUCH ON INSURANCE § 203.41 (3d ed. 2021) ("When an insurer wrongfully refuses to settle a claim or refuses to defend the insured altogether, the insured, without the insurer's consent, is free to negotiate a settlement with the claimant. . . . The insurer may be liable for the entire settlement amount, including amounts in excess of policy limits, based upon its wrongful refusal to settle.")

40.     Here, the Debtors are asking the Court to approve the procedures in the TDP as a fair and reasonable process for settling over 84,000 Abuse Claims.  To the extent the insurers truly believe that the TDP is unreasonable and inconsistent with the Debtors' exposure in the tort system, including past practices, *the insurers are free to litigate these issues in connection with plan confirmation*.  But, to the extent the Court determines that the TDP is fair and reasonable based on the evidentiary record before it, the doctrines of *res judicata* and collateral estoppel would equally apply to all parties, including the insurers.

41.     Further, the Findings and Orders do not require any alteration of the terms of the insurers' contracts and are appropriate bankruptcy-based findings.  ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ The Supporting Parties nevertheless note that to the extent that any finding or other provision of the Plan or related documents is determined to require a modification of the rights under the insurance

policies, such modification is permissible pursuant to section 1123(a) of the Bankruptcy Code or applicable law.

42.     ***Third***, the Court must determine that the "right to payment" that the holder of an Abuse Claim has against the Debtors or another Protected Party is the allowed value of the Abuse Claim as liquidated in accordance with the TDP and is not the payment percentages established under the TDP or the amount of the contributions being made to the Settlement Trust by the BSA and the Local Councils.   RSA § II.A.(i).(C).   The phrase "right to payment" is taken from section 101(5) of the Bankruptcy Code, which defines a "claim" to mean a "right to payment."   A debtor's obligation to pay a claim is not the amount that the debtor can afford to pay.   A debtor's obligation to pay is the legal "right to payment" held by a claimant.   The finding sought by the RSA is simply a restatement of clear law set forth in the Bankruptcy Code.

43.     Because, however, the insurers have made clear their intent to subvert that result, to the detriment of survivors and to avoid their obligations, the Amended Plan and Confirmation Order cannot be ambiguous on this issue.   If the Plan and Confirmation Order here produce a *Fuller-Austin* result—*i.e.*, the insurers' obligation to indemnify is capped by the amounts the Debtors and Local Councils can afford to contribute to the Settlement Trust and the resulting payment percentages—the survivors' likely distribution from the Settlement Trust will not (and simply cannot) support the imposition of the Channeling Injunction.   Nor would the Plan satisfy section 1129(a)(7) of the Bankruptcy Code.   The Supporting Parties will not support a plan that defers this issue until after confirmation.   The Supporting Parties will not put survivors in a position where years after the Debtors' receive a discharge and the Local Councils become protected parties, the insurers obtain an insolvency windfall.   The survivors will not be re-victimized.   If the insurers are seeking an insolvency windfall, that litigation must occur here and now.

44.     **Fourth**, the Court must authorize the Insurance Assignment and find that the Settlement Trust is the proper defendant against which the holders of Abuse Claims may assert liability of the Protected Parties and trigger such insurance rights.  RSA § II.A.(i).(D).  The only assets capable of getting the Debtors within a stone's throw of a meaningful distribution to survivors are the insurance rights.  If those rights cannot be cleanly assigned to the Settlement Trust by the Debtors and the Local Councils, there is no support for a Channeling Injunction.  Following *In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 369 (3d Cir. 2012), and more than twenty-five years of mass-tort defendants assigning their liabilities and insurance to post-bankruptcy trusts, this finding should not be controversial.

45.     **Fifth**, the Court must find that the Amended Plan and the TDP were "proposed in good faith."  RSA § II.A.(i).(E).  This language comes directly from section 1129(a)(3) of the Bankruptcy Code.  Whether the TDP is consistent with the Debtors' exposure in the tort system, including their past practices and satisfies the requirements of section 1129(a)(3) are issues that must be litigated in connection with plan confirmation.  *See In re Babcock & Wilcox Co.*, No. 00-10992, 2004 WL 4945985, at *17-21 (Bankr. E.D. La. Nov. 9, 2004) (finding trust distribution procedures used to evaluate tort claims were consistent with the debtors' past practices approved by insurers and satisfied the requirements of section 1129(a)(3) of the Bankruptcy Code), order vacated by *In re Babcock & Wilcox Co.*, 2005 WL 4982364 (Bankr. E.D. La. Dec. 28, 2005).

46.     Further, the insurers have raised the specter of "collusion" since the Petition Date.  If the insurers believe that the Amended Plan and TDP were not "proposed in good faith," then they have the obligation to make their case now when the issue is front and center instead of attempting to undermine the Court's good faith finding years later in coverage litigation.  If this

Court finds that the Amended Plan and TDP were not proposed in good faith, the Amended Plan cannot be confirmed and there can be no Channeling Injunction.

47.     Each of the proposed Findings and Orders is a finding that the Court must make to confirm a plan that contains the Channeling Injunction.  These issues will be before this Court at confirmation.  If the Court confirms the Amended Plan, the Debtors and the Local Councils will get the global resolution they clearly desire.  The survivors will have a legitimate chance at receiving fair compensation.  But no party before this Court should expect the survivors to support a plan that does not treat them fairly.

48.     The Supporting Parties' clear preference is for the insurers to enter into fair and reasonable settlements so that distributions can be made sooner to survivors.  But if the insurers will not be reasonable, litigation is the only path forward.  The Supporting Parties are asking this Court to apply the Bankruptcy Code and applicable case law and for the Confirmation Order to have the requisite legal effect that is has on every party in these cases.  The insurers shed crocodile tears and falsely complain about improper modifications being made to their contracts, but none of the proposed Findings and Orders can reasonably be read to do so.  But the real tears here belong to the thousands of survivors who were raped as children.  The RSA seeks the confirmation of a plan that treats these survivors fairly.

## C.     <u>Claims Asserted by Co-Defendants Are Properly Subordinated</u>

49.     The third issue that the Supporting Parties wish to address is the proposed subordination of Indirect Abuse Claims for reimbursement or contribution.  Indirect Abuse Claims are claims for subrogation, indemnification, reimbursement, and contribution.  LDS, who is a former chartering organization, has asserted Indirect Abuse Claims against the Debtors claiming the right to recover millions of dollars in attorneys' fees spent defending abuse claims asserted against LDS and funds spent settling abuse claims that are related to Scouting.  LDS complains

that the proposed treatment of its claims for reimbursement and contribution are being improperly subordinated to the claims of the survivors.

50.     Sections 509 and 502(e) apply to claims of "an entity that is liable with the debtor on" the claim of a creditor.  11 U.S.C. §§ 502(e)(1), 509(a), 509(c).  Co-debtor status involves a "sharing of a liability; although [the] source of liability may differ, each debtor must be liable to [the] same party for essentially [the] same claim."  *LTV Steel Co. v. Shalala (In re Chateaugay Corp.)*, 154 B.R. 416, 420 (S.D.N.Y. 1993), *aff'd*, 53 F.3d 478 (2d Cir. 1995) (internal citation omitted)*; see In re Provincetown-Bos. Airlines*, 72 B.R. 307, 310 (Bankr. M.D. Fla. 1987) ("[A] claim for contribution presupposes a sharing of liability and thus [creates] a co-debtor relationship.") (quoting *In re Baldwin-United Corp.*, 55 B.R. 885, 891 (Bankr. S.D. Ohio 1985)).

51.     Although the co-liable relationship is often contractual, the meaning of "liable with" includes joint tortfeasors. *See Juniper Dev. Group v. Kahn (In re Hemingway Transp.)*, 993 F.2d 915, 924 (1st Cir. 1993) ("Although [S]ection 502(e)(1)(B) may have been devised primarily with contract-based co-debtor relationships in mind (e.g., guaranties, suretyships), however, its language ('liable with') has been found too plain and inclusive to exempt 'joint and several' tort-based obligations from disallowance, and the Bankruptcy Code elsewhere carves out no exception for this variety of co-obligation." (internal citation omitted)); *Berliner Handels-Und Frank-Furter Bank v. E. Tex. Steel Facilities (In re E. Tex. Steel Facilities)*, No. 3:90-CV-2042, 2000 WL 340281, *3 n.9 (N.D. Tex. 2000) ("[Section 502(e)(1)(B)] suggests that the joint tortfeasor's claim is within its embrace.  Th[is] section disallows a contingent claim for 'contribution,' a concept clearly associated with the law of torts.  And it disallows the claim of 'an entity that is liable with the debtor,' not merely an entity that is contractually liable with the debtor."); *Al Tech Specialty Steel Corp. v. Allegheny Int'l (In re Allegheny Int'l)*, 126 B.R. 919, 922 (W.D. Penn. 1991), *aff'd*,

950 F.2d 721 (3d Cir. 1991) ("The natural reading of [Section 502(e)(1)(B)] demonstrates that Congress intended to exclude claims where the claimant and the debtor are jointly liable to a third party."); *In re Fiesole Trading Corp.*, 315 B.R. 198, 205 (Bankr. D. Mass. 2004) ("[L]iability with the debtor may exist in non-contractual relationships such as that between joint tortfeasors."); *Celotex Corp. v. Allstate Ins. Co. (In re The Celotex Corp.)*, 289 B.R. 460, 465-66 (Bankr. M.D. Fla. 2003) ("[T]he 'reimbursement or contribution' language also found in § 502(e)(1) encompasses every possible right to compensation for paying the debt of another and would include tortfeasors."); *In re Wedtech Corp.*, 87 B.R. 279, 283 (Bankr. S.D.N.Y. 1988) ("[J]oint tortfeasors' contingent claims must be disallowed.")

52.     In sum, joint tortfeasors' contingent claims for reimbursement or contribution must be disallowed under section 502(e)(1) of the Bankruptcy Code.  Such claims, when non-contingent and liquidated, must be subordinated under section 509(c) of the Bankruptcy Code until the tort victims who have claims against both tortfeasors are paid in full.

53.     LDS is a tortfeasor.  Over 2,300 survivors filed proofs of claim against the Debtors alleging LDS-related abuse in Scouting.  Several of these claims are among the most horrific claims in these cases.  LDS' own proof of claim seeks reimbursement for abuse claims that LDS allegedly settled and legal fees that LDS allegedly incurred in defending against abuse claims.  For each of these settlements, the claims result from LDS' own acts or omissions and LDS has no right to seek reimbursement or contribution from the BSA.  Prior to the commencement of the Debtors' bankruptcy cases, LDS never tendered a claim to the Debtors for indemnification.  Further, notwithstanding LDS' assertion that it has non-contingent claims, the claims LDS asserts against the Debtors appear to be entirely contingent and subject to disallowance under section 502(e)(1) of the Bankruptcy Code.

54.     But even assuming *arguendo* that all contingencies are, in fact, resolved, section 509(c) does not permit a joint tortfeasor like LDS to compete with its own victims for recovery from another joint tortfeasor's bankruptcy estate.  Section 509(c) provides that the court "shall subordinate to the claim of a creditor"—here any one of the 2,300 survivors with abuse claims against LDS and the Debtors—"an allowed claim … for reimbursement or contribution" of "an entity that is liable with the debtor on … such creditor's claim"—here the LDS as a joint tortfeasor—"until such creditor's claim is paid in full, either through payments under this title or otherwise."  11 U.S.C. § 509(c); *see In re Chateaugay Corp.*, 89 F.3d 942, 947 (2d Cir. 1996) (parting seeking contribution entitled to assert non-subordinated subrogation claim under section 509 where party fully discharged entire subclass of claims to which it was co-liable with the debtor).

55.     Section 509(c) prevents LDS from getting paid ahead of its own abuse victims from the Debtors' bankruptcy estates.  Under the TDP, no survivors will be paid in full until all survivors are paid in full.  The only possible exception is if a chartering organization like LDS settles, makes a substantial contribution and becomes a Protected Party.  In this event, LDS settlement funds would be earmarked for the payment of LDS abuse claims.  *See* RSA Ex. B, Article IX.F.  But if LDS becomes a Protected Party, it would be required to waive all claims against the Settlement Trust.  *See* RSA Ex. A at 16.  LDS' claims for reimbursement only exist in a world where LDS elects not to make a substantial contribution.  This means that LDS abuse survivors will not be paid in full until all abuse survivors are paid in full.  It follows that under section 509(c) of the Bankruptcy Code, LDS' claims for reimbursement or contribution must be subordinated, which is what the TDP provides.[8]

---

[8]     *See* TDP § IV.B ("In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates, would have

56.     The language found in Article IV.B.(1)—(3) of the TDP on this issue is not unique. Nearly identical language appears in the eligibility criteria set forth in section 5.4 of the trust distribution procedures proposed in *In re Imerys Talc America, Inc.*, No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) (Dkt. No. 2855).    This same eligibility criteria also appears in Article 8.2(b)(8) of the *Imerys* disclosure statement that was approved by order of this Court on January 27, 2021. *See Imerys* Dkt. No. 2863.

57.     The policy reflected in section 509(c) of the Bankruptcy Code also applies in these cases. An organization like LDS that failed to prevent sexual abuse should not have its attorneys' fees paid from a limited fund established to pay survivors. The Supporting Parties will not accept a plan that permits LDS to take limited trust funds from the very survivors who were abused under its care. This is a critical deal point for the Supporting Parties and an issue that should be litigated in connection with plan confirmation following discovery propounded on LDS regarding its role in abuse in Scouting.

### D.     The Rejection of the Hartford Settlement Is Essential to Plan Confirmation

58.     Finally, the Supporting Parties wish to address the Hartford Settlement. On April 14, 2021, without consulting with any of the Supporting Parties, the Debtors entered into the Settlement Agreement and Release that memorializes the Hartford Settlement (the "**Hartford Settlement Agreement**") [Dkt. No. 2624 at Ex. A]. The Hartford Settlement provides, generally, that Hartford would buy back its insurance policies in exchange for, among other things, a maximum sale price of $650 million, subject to material reduction, as described below.

---

against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment. In addition, no Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability. Further, in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim."); TDP § XI.A ("[A]ny Indirect Abuse Claim shall be subordinate and junior in right to the prior payment in full of all Allowed Abuse Claims that are Direct Abuse Claims as liquidated under these TDP.")

59.     By its own terms, the Hartford Settlement Agreement becomes effective only if, among other conditions, the Court either enters a Confirmation Order acceptable to Hartford as it pertains to the Hartford Settlement or an order approving the Hartford Settlement pursuant to a motion that Hartford may request.  Hartford Settlement Agreement § I.A.–B. at 7-8.  It further provides that "[c]onsummation of the transactions contemplated by this Agreement is expressly conditioned upon the occurrence of the Agreement Effective Date, except as expressly otherwise provided in this Agreement."  *Id.* § I.E. at 13.

**The Hartford Settlement Is Unenforceable Absent Court Approval**

60.     The Hartford Settlement, which compromises billions of dollars in coverage obligations, is clearly a transaction outside of the ordinary business of business and is unenforceable absent court approval following notice and a hearing.  *See* 11 U.S.C. § 363(b) ("[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."); *Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346, 351 (3d Cir. 1999) (settlement agreement "providing for use or sale of estate property outside the regular course of business is unenforceable absent court approval"); *In re Roth Am., Inc.*, 975 F.2d 949, 954 (3d Cir. 1992) ("[W]e hold that the 1998 memorandum agreement was not a transaction in the ordinary course of business.  It follows that the district court did not err in holding that notice and a hearing in the bankruptcy court on that agreement was required for it to be enforceable."); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("The import of Section 363 is that a trustee is prohibited from acting unilaterally; this schema is intended to protect both debtors and creditors (as well as trustees) by subjecting a trustee's actions to complete disclosure and review by the creditors of the estate and by the bankruptcy court."); *In re Sparks*, 190 B.R. 842, 845 (Bankr. N.D. Ill. 1996) (settlement involving disposition of estate assets which was to be

incorporated into plan of reorganization was not enforceable until approved by the court under sections 363 and 1129 of the Bankruptcy Code); *In re Leslie Fay Cos., Inc.*, 168 B.R. 294, 304-05 (Bankr. S.D.N.Y. 1994) (settlements involving significant claims that fall outside the ordinary course of business are unenforceable absent a hearing and court order under section 363(b)).

61.     The settlement is expressly contingent upon the entry of a confirmation order that "provides for a release and channeling injunction for the benefit of the Local Councils with respect to Abuse Claims." Hartford Settlement Agreement § I.A.4. This cannot happen if the survivors vote down the Plan. The Supporting Parties will oppose any plan that includes the Hartford Settlement. Therefore, forcing the Debtors to pursue a plan that includes the Hartford Settlement is a futility that would be a waste of estate and judicial resources and add unnecessary delay to the resolution of these cases. The Hartford Settlement cannot go into effect under its own terms.

**The Debtors Have Advised the Court of Changed Circumstances Rendering the Hartford Settlement No Longer in the Best Interests of the Estates**

62.     In the context of approving a settlement, the United States Court of Appeals for the Third Circuit imposes upon a trustee (or debtor in possession) the obligation to "inform the court and the parties of any changed circumstances since the entry into [a] stipulation of settlement" such that the court is "apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate." *Martin*, 91 F.3d at 394.

63.     In the Motion, the Debtors advised the Court:

Since the announcement of the Hartford Settlement on April 16, 2021, there has been overwhelming opposition from the Plaintiff Representatives to the Hartford Settlement. … Following the May 19 Hearing, the parties continued their intensive mediation efforts to reach consensus on the Hartford Settlement with the Plaintiff Representatives, and the Debtors remained hopeful that compromise could be reached between Hartford and the Plaintiff Representatives. But after four weeks of additional mediation, the parties remained at an impasse. On June 9, 2021, the Debtors and AHCLC received a letter from the Plaintiff Representatives informing the Debtors that the holders of abuse claims whom they represent would not support—and would affirmatively vote to reject—any plan

> of reorganization that includes the terms of the Hartford Settlement, under any circumstances. … After these events and based upon further negotiations, the Debtors have concluded that a global resolution plan cannot be confirmed to the extent it includes the Hartford Settlement in its current form.

Motion § 16 at 15-16. The Debtors noted that the RSA "expressly provides for termination of the RSA by the [Supporting Parties] in the event that the Court determines that the Debtors must adhere to the terms of the Hartford Settlement," concluding that "the Debtors do not believe that a plan that incorporates the Hartford Settlement is in the best interests of the Debtors' estates because it is not confirmable without the support of abuse survivors." Motion § 17 at 16.

64. Accordingly, the Debtors have discharged their duty under *Martin* to advise the Court of changed circumstances that render the proposed Hartford Settlement **not** in the best interests of their estates.

### The Terms of the Hartford Settlement Are Patently Unreasonable

65. The Hartford Settlement is a bad deal—one that could not be approved over the Supporting Parties' objections. And the Supporting Parties would object and seek extensive discovery from Hartford, Century, and the Debtors. The Supporting Parties regard $650 million as woefully insufficient given Hartford's coverage obligations.

66. Further, the Hartford Settlement ***is not*** for a sum certain of $650 million. The Hartford Settlement includes a reduction clause tied to a potential resolution with Century, the operation of which makes the Debtors' much publicized $650 million settlement number potentially illusory. Hartford Settlement Agreement § II.E (the "**Century Clause**"). Pursuant to the Century Clause, if the Debtors (or the Settlement Trust) execute a settlement with Century for less than $1.3 billion, the Hartford settlement will be reduced, dollar for dollar, by 50% of the difference between $1.3 billion and the amount payable by Century. Thus, for example, if Century settles for $700 million, the amount of the Hartford Settlement will be reduced by $300 million

($1.3 billion less $700 million x 50%), making the Hartford Settlement worth only $350 million. *See* Whittman July 14, 2021 Depo. Tr. at 191:1-25.

67.     The parties cannot determine whether Century can pay $1.3 billion.   Indeed, Century's publicly filed financial statements raise concerns regarding this issue.[9]   The Debtors do not have access to Century's financial records.  *See* Whittman July 14, 2021 Depo. Tr. at 196:25-197:9.   Century has refused to disclose this information to the Supporting Parties.  *See* Dkt. No. 5057.   Century and Chubb have stonewalled all discovery efforts to shed light on this issue. *See id.*  Century and Chubb have also refused to produce documents necessary to ascertain which Chubb entities are, in fact, liable for billions of dollars of abuse claims.  *See id.*  These documents remain a closely guarded secret.   Given the recent merger discussions between Hartford and Chubb, it is possible that Hartford is aware of Century's true financial condition.

68.     The bottom line is that neither the Debtors nor this Court can ascertain what Century can afford to pay on account of its BSA exposure.  And, the Debtors and this Court cannot ascertain what Chubb entities have exposure.  There is no evidence based on the positions that Century has taken as the most vociferous and litigious objector to the Plan, that it will or can pay $1.3 billion or more in the near term absent substantial litigation.  Absent this certainty, the Settlement Trust would be forced to reserve, and not distribute to survivors, hundreds of millions of dollars of the proposed Hartford Settlement (were it consummated) for years, until the Century coverage is resolved.  It follows that the Court cannot ascertain the value the Hartford Settlement actually has to survivors, and when that value could ever be realized.  It could be as little as $280.5

---

[9]     Pages 299-301 of Chubb's Form 10-K for the fiscal year ending December 31, 2020 reflect $227 million available pursuant to an Aggregate Excess of Loss Reinsurance Agreement; $25 million available in Capital Surplus (as required by the 1996 transaction); and $50 million in current Dividend Retention Fund Balances.  Page 52 indicates that Chubb increased reserves by $259 million for abuse claims (which would not be limited to BSA abuse claims or limited to Century's exposure).  The amount of solvent reinsurance available for non-aggregated claims (like abuse claims) also is unclear.  Absent a complete disclosure of Century's financial records, $561 million appears to be the entirety of Century's available assets.

million—a number well outside the range of reasonableness for a settlement compromising billions of dollars of coverage obligations—and may only be paid years hence, when the most litigious of the Debtors' insurers has resolved its disputes.

69.     The Hartford Settlement Agreement also purports to create valuable rights for Hartford even if the Hartford Settlement is not approved by the Court:  Section III.H. appears to mandate its treatment as a Settling Insurance Company under the Plan with "all benefits and protections afforded Settling Insurance Companies, including the benefit and protection of any releases and channeling (or other) injunctions," notwithstanding "any judicial disapproval of this Agreement, including the Bankruptcy Court's refusal to approve the Sale and enter the Confirmation Order or, as applicable, the Approval Order …."  Hartford Settlement Agreement §§ III.F., III.H.

70.     Assuming a plain reading of these referenced provisions, the Hartford Settlement implements the outrageous result of absolving Hartford of its insurer responsibilities and providing it with benefits afforded a Settling Insurance Company merely upon the execution of the Hartford Settlement Agreement, even if the agreement is not approved by the Court.  Section XII of the agreement (which is also expressly preserved, notwithstanding the absence of judicial approval of the settlement) states that section III of the agreement is non-severable from the remainder of the agreement.  As such, if the Court were to determine that these outrageous terms should not be approved, the entire agreement may not remain in effect and must fail.  *Id.* § XII.C.

## **CONCLUSION**

71.     Given the opportunity presented by the RSA—a consensual plan that has the support of every creditor constituency in these cases—the Debtors' refusal to walk away from the Hartford Settlement would be inconsistent with the Debtors' fiduciary duties.

WHEREFORE, the Supporting Parties respectfully request that the Court enter an order granting the Motion and granting the Supporting Parties such other and further relief as the Court deems just and proper.

Dated: July 22, 2021                         MONZACK MERSKY AND BROWDER, P.A.
Wilmington, Delaware

*/s/ Rachel B. Mersky*
(DE No. 2049)
1201 North Orange Street
Suite 400
Wilmington, Delaware 19801
Telephone:     (302) 656-8162
Facsimile:     (302) 656-2769
E-mail:        RMersky@Monlaw.com

-and-

BROWN RUDNICK LLP
David J. Molton, Esq. (admitted *pro hac vice*)
Eric R. Goodman, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-mail: DMolton@BrownRudnick.com
E-mail:  EGoodman@BrownRudnick.com

and

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-mail: SBeville@BrownRudnick.com
E-mail: TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
James I. Stang (admitted *pro hac vice*)
Robert B. Orgel (admitted *pro hac vice*)
Iain A.W. Nasatir (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (admitted *pro hac vice*)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email: jstang@pszjlaw.com
        rorgel@pszjlaw.com
        inasatir@pszjlaw.com
        joneill@pszjlaw.com
        jlucas@pszjlaw.com

        -and-

PASICH LLP

Kirk Pasich
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone:  (424) 313-7850
KPasich@PasichLLP.com

        -and-

Jeffrey L. Schulman
757 Third Avenue, 20th Floor
New York, New York 10017
Telephone:  (212) 686-5000
JSchulman@PasichLLP.com

*Counsel for the Tort Claimants' Committee*


YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Edwin J. Harron*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)

Sharon M. Zieg (No. 4196)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:          rbrady@ycst.com
                  eharron@ycst.com
                  szieg@ycst.com

*Counsel to the Future Claimants' Representative*