## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>              Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>**Ref. Docket No. 5466**<br><br>**Hearing Date: July 29, 2021, 10:00 a.m. (ET)**<br>**Objection Deadline: July 22, 2021, 4:00 p.m. (ET)** |

## HARTFORD'S OBJECTION TO
## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING
## THE DEBTORS TO ENTER INTO AND PERFORM UNDER
## THE RESTRUCTURING SUPPORT AGREEMENT, AND
## (II) GRANTING RELATED RELIEF (D.I. 5466)

BAYARD, P.A.
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: efay@bayardlaw.com
      gflasser@bayardlaw.com

SHIPMAN & GOODWIN LLP
James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
1875 K Street, N.W., Suite 600
Washington, D.C. 20003
Tel: (202) 469-7750
Fax: (202) 469-7751

WILMER CUTLER PICKERING HALE
   AND DORR LLP
Philip D. Anker (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel: (212) 230-8890
Fax: (212) 230-8888

Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (admitted *pro hac vice*)
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

*Attorneys for Hartford Accident and Indemnity Company, First State Insurance Company,
Twin City Fire Insurance Company, and Navigators Specialty Insurance Company*

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 8

ARGUMENT ................................................................................................................... 18

I.    BSA's Request For A Declaration That It Has No Obligations Under The
     Settlement Agreement Must Be Brought As An Adversary Proceeding ...................................... 18

II.   This Court Should Deny BSA's Request For A Declaration That It Has No
     Obligations Under The Settlement Agreement ............................................................................. 21

      A.    Governing Law Requires BSA To Seek Confirmation Of The Global
           Resolution Or Toggle Plan .................................................................................................. 23

      B.    Neither "Changed Circumstances" Nor "Futility" Justify BSA's Request To
           Repudiate Its Obligation To Seek Confirmation Of The Global Resolution
           Or Toggle Plan .................................................................................................................... 31

CONCLUSION ................................................................................................................ 38

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Church Joint Venture, L.P. v. Blasingame (In re Blasingame)*,
No. 15-00021, 2016 Bankr. LEXIS 3590 (Bankr. W.D. Tenn. Sep. 23, 2016) ............................ 19

*Corp. Claims Mgmt. v. Shaiper (In re Patriot Nat'l Inc.)*,
592 B.R. 560 (Bankr. D. Del. 2018) ............................................................................................ 19

*Czyzewski v. Jevic Holding Corp.*,
137 S. Ct. 973 (2017) ................................................................................................................... 33

*EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*,
356 B.R. 631 (Bankr. D. Del. 2006) ............................................................................................ 19

*In re Filene's Basement, LLC*,
No. 11-13511, 2014 WL 1713416 (Bankr. D. Del. Apr. 29, 2014) (Carey, J.) ..................... 28, 30

*In re RFE Industries, Inc.*,
283 F.3d 159 (3d Cir. 2002) .................................................................................................... 30, 31

*In re Roth American, Inc.*,
975 F.2d 949 (3d Cir. 1992) ........................................................................................................ 30

*In re Tidewater Grp., Inc.*,
8 B.R. 930 (Bankr. N.D. Ga. 1981) ............................................................................................. 27

*In re United Shipping Co.*,
No. 4-88-533, 1989 WL 12723 (Bankr. D. Minn. Feb. 17, 1989) ............................................... 29

*Liberty Towers Realty, LLC v. Richmond Liberty LLC*,
734 F. App'x 68 (2d Cir. 2018) ................................................................................................... 26

*Mobil Oil Corp. v. Wroten*,
303 A.2d 698 (Del. Ch.), *aff'd*, 315 A.2d 728 (Del. 1973) .......................................................... 29

*Musselman v. Stanonik (In re Seminole Walls & Ceilings Corp.)*,
388 B.R. 386 (M.D. Fla. 2008) .................................................................................................... 29

*Myers v. Martin (In re Martin)*,
91 F.3d 389 (3d Cir. 1996) ................................................................................................ *passim*

*Northview Motors, Inc. v. Chrysler Motors Corp.*,
186 F.3d 346 (3d Cir. 1999) ........................................................................................................ 30

*Pineo v. Turner (In re Turner)*,
274 B.R. 675 (Bankr. W.D. Pa. 2002) ........................................................................................ 29

*PRLP 2011 Holdings, LLC v. Manuel Mediavilla, Inc. (In re Manuel Mediavilla, Inc.)*,
568 B.R. 551 (B.A.P. 1st Cir. 2017) .................................................................................. 26, 27, 31

*Reading Co. v. Brown*,
    391 U.S. 471 (1968).................................................................................. 38

*Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*,
    459 B.R. 190 (Bankr. S.D.N.Y. 2011)..................................................... 20

*U.S. Bank Tr. Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*,
    730 F.3d 88 (2d Cir. 2013)....................................................................... 19

## STATUTES

11 U.S.C. § 105................................................................................... 1, 18, 21

11 U.S.C. § 363....................................................................................... *passim*

11 U.S.C. § 1123......................................................................................... 14, 23

11 U.S.C. § 1129................................................................................. 23, 25, 34

11 U.S.C. § 1141................................................................................................ 14

## RULES

Del. Bankr. L. R. 3007-1........................................................................... 9

Fed. R. Bankr. P. 2004.............................................................................. 9

Fed. R. Bankr. P. 7001.................................................................... 2, 19, 20

Fed. R. Bankr. P. 9019................................................................. 14, 23, 30

## OTHER AUTHORITIES

3 *Williston on Contracts* § 7:7 (4th ed.)............................................ 29

Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively, "Hartford") respectfully submit this objection ("Objection") to the motion of the Boy Scouts of America and Delaware BSA, LLC (collectively, "BSA" or "Debtors") captioned *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5466] (the "RSA Motion"). Hartford focuses this Objection on BSA's request, set forth in the RSA Motion, for a declaration that "the Debtors shall have no obligation to seek approval of, and have no obligations under," the Settlement Agreement and Release BSA and Hartford entered into on April 15, 2021 (the "Settlement Agreement" or "Agreement"), attached as Exhibit A to the Declaration of Joel Millar dated July 22, 2021 and filed herewith (the "Millar Decl."). *See RSA Motion* Ex. A (Proposed Order) ¶ 2. Hartford joins in the separate objection filed today by AIG and other insurers addressing other aspects of the relief BSA seeks in the RSA Motion (the "Other Insurers' Objection").[2]

## PRELIMINARY STATEMENT

The Court should deny BSA's effort to repudiate its Settlement Agreement with Hartford for two principal reasons. *First*, as a procedural matter, BSA cannot obtain the extraordinary relief it requests through a mere motion in the main bankruptcy case. It is requesting a declaration that BSA has "no obligation" to "seek approval of" the Settlement Agreement or any other "obligations under" the Agreement, and thus that Hartford has no enforceable rights at all under the Agreement. That relief, if available at all, requires an adversary proceeding initiated by a complaint setting forth the pertinent factual allegations and legal claims. *See* Fed. R. Bankr.

---

[2]     *See Certain Insurers' Objection to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement and (II) Granting Related Relief* (July 22, 2021).

P. 7001(2), (9).  BSA's failure to comply with the Rules is more than a mere technicality.  Unlike the RSA Motion, which barely addresses the legal basis for the relief BSA seeks regarding the Agreement, an adversary complaint would compel BSA to spell out that basis, would allow Hartford to assert administrative-expense counterclaims, and, to the extent the factual record is not already sufficient to mandate the denial of the relief BSA seeks, would permit the development of that record.

*Second*, on the merits, the law does not permit BSA to repudiate its obligation under the Settlement Agreement to seek confirmation of a plan that would either incorporate the settlement of Hartford's coverage obligations or return both the claimants and Hartford to the tort system. Of course, BSA cannot *consummate* the transactions set out in the Settlement Agreement or the plan the Agreement contemplates absent this Court's approval.  But under controlling Third Circuit precedent, as well as numerous other decisions, BSA must comply with its contractual obligation to *pursue* confirmation of a plan consistent with the Settlement Agreement.

BSA's about-face regarding its own Settlement Agreement with Hartford, and the quagmire in which it now finds itself as a result, stem from gross overreaching by the plaintiffs' lawyers.  Over a year ago, this Court appointed mediators to facilitate a consensual resolution of this case.  Many months of intense negotiations among the parties—including BSA, Hartford, the local councils, and the plaintiffs' lawyers representing sexual-abuse claimants—followed.  BSA engaged experts to analyze the abuse claims and to establish a range for the claims' aggregate value (which BSA's experts ultimately set at $2.4 to $7.1 billion).  Its experts also analyzed the proper allocation of liability among BSA's various insurers and BSA itself (for periods in which it was uninsured or had self-insured retentions).

Notwithstanding these considerable efforts, the parties could not reach a global resolution for one principal reason:  The plaintiffs' lawyers insisted that the abuse claims were worth far

more than they could ever realistically hope to receive if the claims were actually litigated in the tort system. Indeed, rejecting the possibility that *any* of the more than 82,000 filed claims may be invalid, counsel for the Tort Claimants Committee purported to value all the claims at over $100 billion—*fourteen times* more than the top of BSA's experts' range.

After attempting in vain to bring the plaintiffs' lawyers into the same galaxy as all the other parties, BSA approached Hartford to discuss settling Hartford's coverage obligations without the plaintiffs' lawyers' pre-approval. BSA suggested a structure under which it would propose a "Global Resolution Plan" incorporating a buy-back by Hartford of its policies, a trust to pay abuse claims funded by BSA, its local councils, Hartford, and other settling parties, and the protection of a channeling injunction for the contributing parties. If the abuse claimants voted against the Global Resolution Plan, however, the structure would shift to a "Toggle Plan" under which only BSA would receive a discharge and the trust would be funded by BSA alone, but there would be no channeling injunction for Hartford or any other third party (and thus no requirement that the abuse claimants vote in favor of the plan, as long as a single impaired class of creditors did so). In that event, the abuse claimants would be free to pursue their claims in the tort system, obtain the claims' full value through judgment or settlement, and reap the benefit of all insurance and other third-party assets available to cover those judgments or settlements outside bankruptcy.

On April 13, 2021, BSA filed its proposed Second Amended Plan, which incorporated this dual plan structure. After additional arm's-length negotiations, BSA and Hartford agreed on a settlement amount reflecting a reasonable assessment of BSA's liability for abuse claims and Hartford's fair share of the insurance coverage for those claims: $650 million. That amount was then (and remains today) more than BSA itself or any other party in this case (including all of BSA's 253 local councils put together) has agreed to pay to resolve abuse claims, and, to

Hartford's knowledge, more than any insurer has ever agreed to pay in any other abuse-driven

bankruptcy. A few days later, on April 15, 2021, BSA and Hartford executed the Settlement

Agreement. Consistent with the structure that BSA had proposed, the Agreement required BSA

to file a Global Resolution Plan incorporating the settlement of Hartford's coverage obligations,

while providing in the alternative for a Toggle Plan that would return the claimants, the insurers,

and other third parties to the tort system. The Agreement included no "fiduciary out" or other

provision allowing BSA to change its mind and to refuse to seek approval of the Global

Resolution or Toggle Plan.

That was no oversight. Both BSA and Hartford hoped and expected that the BSA-

Hartford settlement would break the impasse with the plaintiffs' lawyers and lay the foundation

for a consensual resolution of the case. But if the plaintiffs' lawyers remained intransigent, the

Toggle Plan gave BSA an alternative path to reorganization.

The plaintiffs' lawyers, however, continued to browbeat BSA. In an effort to prevent the

Global Resolution Plan from going out for a vote, they made the strategically convenient

pronouncement that their clients would never agree to a plan that incorporated the BSA-Hartford

settlement (or any insurer settlement that they did not pre-approve), and they made it clear that

they would oppose the Toggle Plan as well. In the words of BSA's Chief Executive Officer, the

claimant representatives active in the bankruptcy case "were generally objecting to everything"

and "weren't really agreeing with anything … put forward" by BSA,[3] effectively threatening

BSA that, unless it capitulated to their demands and disavowed its duties to its insurers and the

terms of the policies, it would never be able to emerge from bankruptcy.

---

[3]  *See* Millar Decl., Ex. B (Transcript of Deposition of Roger C. Mosby (July 15, 2021)) ("Mosby Dep."),
48:10-21, 123:7-124:10.

Eventually, BSA broke under the pressure.  On July 1, 2021, it signed a restructuring support agreement ("RSA") with the Tort Claimants Committee, the Coalition of Abused Scouts for Justice, and the Future Claimants' Representative.  The RSA requires BSA to "seek a determination of the Bankruptcy Court that the Debtors have no obligations under the Hartford Settlement"[4] and indeed need not "seek approval of … the Hartford Settlement" through the Global Resolution / Toggle Plan, as they had agreed to do.[5]  BSA filed a motion for approval of the RSA (the RSA Motion) and also an amended plan that eliminates the Toggle Plan and that provides that, if the Court grants the foregoing relief, BSA will "amend the Plan to remove all provisions pertaining to the approval of the Hartford Insurance Settlement Agreement."[6]

The Court should deny the RSA Motion, including its request for a declaration that BSA has no obligation to pursue approval of its settlement with Hartford through the Global Resolution / Toggle Plan.  As discussed below, controlling precedent from the Third Circuit, *see Myers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996), supported by decisions from other courts and basic principles of contract and bankruptcy law, compel that result.  While only this Court can *confirm* a plan, the law does not permit BSA to repudiate the obligation it undertook to *seek* confirmation of the Global Resolution / Toggle Plan.  To hold otherwise would undermine the basic building block of Chapter 11:  Parties will be far less likely to invest the necessary time and resources to reach a settlement with the estate, as Hartford did here, if the debtor can renege on all of its obligations under that agreement at any time for any reason it deems sufficient.

---

[4]    *See* RSA Motion Ex. 1 (RSA) § II.A(viii); *id.* Ex. A (term sheet) at 16 (same); *id.* at 20 ("The Amended Plan shall not incorporate any settlement with Hartford unless such settlement is acceptable to … the Coalition, the TCC, and the Future Claimants' Representative.").

[5]    *See* RSA Motion Ex. A (proposed order) ¶¶ F, 2; *see also* RSA Motion at 1-2, 16-17, 28.

[6]    *See Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5484] ("Fourth Amended Plan") §§ III.B.10, V.S.4 n.4.

As *Martin* makes clear, BSA may of course inform this Court of any "changed circumstances" that bear on the Court's confirmation of the Global Resolution / Toggle Plan. But no change of circumstances could permit BSA to refuse to *seek* confirmation of the plan in the first place. Regardless, there has been no change in circumstances. In its papers and in the sworn deposition testimony of its witnesses, the only reason BSA has offered for its decision to seek to repudiate the Settlement Agreement is that the plaintiffs' lawyers continue to oppose it. But BSA knew that was a risk all along. In fact, it anticipated that the Claimant Representatives would object to the Settlement Agreement. The plaintiffs' lawyers' expected opposition to the BSA-Hartford settlement is precisely why BSA proposed, and Hartford agreed to, a structure under which BSA would seek confirmation of a plan that included an alternative to the Global Resolution Plan incorporating the $650 million settlement with Hartford: the Toggle Plan, which would simply return the parties to the tort system with all of their rights intact and thus would not require a favorable vote from the claimants.

Nor would it be "futile" for BSA to pursue confirmation of the Global Resolution or Toggle Plan. Although the plaintiffs' lawyers have made the self-serving prediction that the claimants will never vote to accept a Global Resolution Plan incorporating the BSA-Hartford settlement, their representatives have admitted that such a plan would, in fact, be preferable from the claimants' standpoint to a return to the tort system via the Toggle Plan, where they would be required to prove their claims. Indeed, in a moment of candor, counsel for the Tort Claimants' Committee has described the Toggle Plan as a "death trap" that is "worse" for the plaintiffs' lawyers and the claimants than the Global Resolution Plan with the BSA-Hartford settlement.[7] There is thus good reason to think that, if the alternative they face is a Toggle Plan that fully

---

[7]     *See* Millar Decl., Ex. C (*Transcript of Telephonic Disclosure Statement Hearing* (May 19, 2021) [D.I. 4716]) ("Tr. May 19 Hr'g") at 73:9-14 (statement of Mr. Stang).

preserves their rights to prosecute their claims in the tort system and recover from Hartford, the other insurers, the local councils and the chartering organizations, the plaintiffs' lawyers and their clients will accept a Global Resolution Plan incorporating the buy-back of Hartford's insurance policies for $650 million and any other reasonable settlements that may be negotiated. And if the claimants nevertheless refuse to accept such a Global Resolution Plan, BSA devised the Toggle Plan precisely because it could be confirmed over the claimants' objection.

BSA's most recent plan sets it on a far riskier and more litigious path.  That plan and its accompanying trust distribution procedures were designed by the plaintiffs' lawyers to ensure minimal, if any, review of the abuse claims and maximum recovery, far more than most of the claimants could ever expect to receive outside bankruptcy in the tort system.  In the words of one of the plaintiffs' lawyers at a recent hearing in this case, "it's been represented in meetings held by sponsors of the RSA and the TDP to the plan that … plan confirmation would operate as a judgment enforceable against the insurers."[8]  The RSA thus requires, and the new plan documents contain, numerous unlawful provisions that would, among other things, pay time-barred and otherwise invalid claims, take away insurers' bedrock right to defend against those claims, and seek prejudicial findings by this Court blessing all of this as reasonable and in good faith, so that the plaintiffs' lawyers can then portray confirmation as a "judgment enforceable against the insurers" requiring insurers to pay tens of thousands of invalid and inflated claims without any ability to contest those claims.

The Court should not put its imprimatur on the RSA, requiring BSA to engage in the wasteful exercise of seeking confirmation of a plan that is the antithesis of "insurance neutral" and that is patently unconfirmable.  Instead, it should require BSA to comply with its contractual

---

[8]      *See* Millar Decl., Ex. D (*Transcript of Telephonic Status Conference* (July 7, 2021) [D.I. 5529]) ("Tr. July 7 Hr'g") at 36:23-37:2 (statement of Mr. Zalkin)).

obligation to move forward with the Global Resolution / Toggle Plan, allowing the claimants to

vote on the Global Resolution Plan incorporating the BSA-Hartford settlement (and BSA's

settlement with its local councils), permitting the other insurers and chartering organizations to

continue to negotiate their own potential settlements, and leaving it up to the Court to determine

if either the Global Resolution Plan or the Toggle Plan is confirmable.

## **STATEMENT OF FACTS**

*The Abuse Claims and Coverage Dispute*.  Prior to the commencement of this Chapter 11

case, Hartford issued liability insurance policies to BSA, primarily for policy periods spanning

several years in the early to mid-1970s (as further defined in the Settlement Agreement, the

"Hartford Policies").  Over the years, BSA has tendered a small number of suits asserting claims

of sexual abuse ("Abuse Claims") to Hartford; Hartford has defended and indemnified those

claims under its policies and prepetition settlement agreements with BSA.

When BSA filed the Chapter 11 case, there were only about 275 pending civil actions

alleging Abuse Claims against BSA and some of its local councils, as well as another 1,400 or

so Abuse Claims that had been asserted but not filed.[9]  Yet, following an aggressive multi-

media advertising campaign led by plaintiffs' lawyers and for-profit claims aggregators, which

effectively promised easy access to a billion-dollar bankruptcy trust without any scrutiny of a

claimant's allegations, more than 82,000 proofs of claim alleging sexual abuse were filed

against BSA.  As Hartford and other insurers explained in their motion for Rule 2004

discovery, an initial investigation revealed that a substantial majority of these proofs of claim

appeared on their face to be time-barred, and thousands more appeared to lack the information

necessary to establish a valid, legally enforceable claim against BSA, including many claims

---

[9]    *See Debtors' Informational Brief* [D.I. 4] at 3.

that failed to identify a perpetrator or even an affiliation to scouting.[10]  Indeed, there are

troubling indicia of outright fraud, including multiple reports received by BSA or local councils

of false submissions; an inquiry by a reputable investigative firm retained by Hartford finding

that, out of a sample of 100 claimants, a significant number had convictions for crimes

involving fraud (including false insurance claims) or had posted statements on social media

inconsistent with the allegations in their proofs of claim; and proofs of claim from multiple

claimants represented by the same counsel that described all the different claimants' abuse in

virtually identical narrative statements.[11]

BSA agrees with Hartford that there are nowhere near 82,000 valid Abuse Claims for

which BSA could be held liable in the tort system.  BSA's expert, Bates White, LLC ("Bates

White"), has identified nearly 60,000 proofs of claim that are presumptively barred by the

applicable statute of limitations and many others that "fail[] to provide key information that

Bates White concluded would be necessary to establish payment within the tort system."[12]  BSA

and Hartford have disputed the extent to which the Hartford Policies provide coverage for any

valid Abuse Claims, among other issues.  They have been engaged in litigation over those issues,

both pre- and post-petition.[13]

---

[10]     *See Hartford and Century's Motion for an Order (I) Authorizing Certain Rule 2004 Discovery and (II) Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections* [D.I. 1971 & 1972] at 8-11, 14-17 (noting that more than 54,000 claims appeared to be time-barred; 6,400 failed to identify a perpetrator; 8,100 did not identify an affiliation to scouting; 1,700 claims had already been the subject of litigation; and thousands of others were signed only by counsel, some by counsel who had signed hundreds of claims in a day).

[11]     *See id.* at 5-8.

[12]     *See Amended Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5485] ("Fourth Amended Disclosure Statement") at 57, 72-76 (out of the "approximately 82,500 unique and timely Abuse Claims," "approximately 59,500 are presumptively barred by statute of limitations" and "[o]f those not presumptively barred," only "approximately 14,000 named an abuser, either in full or in part," while 2,977 were categorized as "Physical Description Only" and 6,269 others as "Unknown").

[13]     *See Boy Scouts of America, et al. v. Hartford Accident and Indemnity Co., et al.*, No. DC-18-07313 (Tex. Dist. Ct., Dallas County) (filed pre-petition); *Hartford Accident and Indemnity Co., et al. v. Boy Scouts of America, et al.*, Adv. Proc. No. 20-50601 (LSS) (Bankr. D. Del.).

*Negotiation of the Settlement Agreement.*  The parties to this case have been mediating for over a year in an attempt to achieve a consensual global resolution.  Those efforts have foundered on the insistence of the plaintiffs' lawyers representing holders of Abuse Claims (including the Tort Claimants' Committee ("TCC"), the Coalition of Abused Scouts for Justice ("Coalition"), and the Future Claimants' Representative ("FCR") (collectively, the "Claimant Representatives")) that the claims have a value many times greater than all other parties deem remotely plausible.  After months of analysis, BSA's experts concluded that the total dollar amount of valid Abuse Claims was between $2.4 and $7.1 billion (*Fourth Amended Disclosure Statement* at 72-73)—a valuation that Hartford believed was higher than warranted (but not so much higher as to preclude good-faith settlement negotiations).  In contrast, the TCC asserted that the Abuse Claims were worth a total of *$103 billion*.  The TCC reached this "valuation" by assuming the validity of every proof of claim, including those that are on their face time-barred, and assigning each claim an unsubstantiated value ranging from $50,000 for the least significant claims to $2,450,000 for the most serious.[14]

After strenuous efforts to bridge the gap failed, and it became clear that the plaintiffs' lawyers would not consent to any reasonable settlement, BSA approached Hartford to discuss settling Hartford's coverage obligations without the plaintiffs' lawyers' support.[15]  Following a

---

[14]      *See The Official Committee of Tort Claimants' Objection to Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 2506] at 2.

[15]      BSA has denied the Claimant Representatives' assertion that they were excluded from the negotiations, attesting that BSA sought and obtained the "participation and input" of the Claimant Representatives in negotiating the terms for a reasonable settlement with Hartford.  *See* Millar Decl., Ex. E (*Debtors' Responses and Objections to Coalition of Abused Scouts for Justice, the Official Committee of Tort Claimants to Boy Scouts of America and Delaware BSA, LLC, and the Future Claims Representative's First Set of Requests for Admission to Boy Scouts of America and Delaware BSA, LLC, Regarding the Debtors' Plan Solicitation Procedures Motion and Related Matters* (May 12, 2021)), Response to Request for Admission No. 3.  BSA's principal financial advisor, Brian Whittman of Alvarez & Marsal, has confirmed that the Settlement Agreement was not negotiated "in secret," as the Claimant Representatives have alleged.  *See* Millar Decl., Ex. F (Transcript of Deposition of Brian Whittman (July 14, 2021)) ("Whitttman Dep.")) at 48:20-49:4; *see also Declaration of Brian Whittman in Support of Debtors' Third*

"careful[]" evaluation by BSA of "Hartford's coverage obligations," and "extensive negotiations" involving considerable "[b]ack and forth" on the dollar amount,[16] the parties agreed on a payment of $650 million. Both parties believed that amount represented a fair and reasonable settlement in light of BSA's liability for Abuse Claims and Hartford's potential share of that liability, taking into account the allocation of insurance coverage among BSA's insurers and BSA itself (for periods and amounts as to which it is self-insured), as well as Hartford's coverage defenses. Indeed, BSA's representatives have confirmed in deposition that, with the advice of both Bates White and insurance coverage experts,[17] they continue to believe that the BSA-Hartford settlement represents a reasonable compromise of Hartford's potential insurance coverage obligations,[18] that it "would provide significant compensation for abuse claimants," and that, indeed, it was a "great" deal for BSA.[19]

BSA knew when it agreed to settle Hartford's coverage obligations that it did not have the support of the Claimant Representatives for such a settlement and that it might not be possible to obtain their support for any reasonable settlement.[20] As BSA's Chief Executive Officer has acknowledged, the Claimant Representatives were "objecting to everything," "w[ere]n't liking anything," "and "weren't really agreeing with anything."[21] Nevertheless, BSA

---

*Motion for Entry of an Order Extending the Debtors' Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 4101] at 5.

[16]     Whittman Dep. 28:6-9, 30:21-23, 40:12-16.

[17]     Mosby Dep. 126:17-127:7 ("Q: So in arriving at the reasonableness of the $650 million, you drew on the analysis of both Bates White's litigation analysis and KCIC and others on the insurance analysis, right?  A: That's correct.").

[18]     Mosby Dep. 124:11-125:17; Whittman Dep. 59:17-60:4.

[19]     Mosby Dep. 160:1-4; Whittman Dep. 40:17-24.

[20]     *Id.* 44:23-45:2 ("Q: In fact, you knew at the time that the parties executed the BSA/Hartford settlement that the claimant groups would be opposed to it; isn't that right?  A: I expected that the plaintiffs would initially be opposed to it, yes.").

[21]     Mosby Dep. 48:10-21, 122:1-124:10.

decided to move forward with the settlement without seeking a "fiduciary out" or any other provision allowing BSA to repudiate the settlement even if the plaintiffs' lawyers continued to oppose it.

BSA did so because it considered the BSA-Hartford settlement an important "building block" toward its emergence from bankruptcy[22]—in the words of its Chairman, it viewed the settlement as a "great" deal for BSA[23]—and because it had a strategy to overcome the claimants' opposition: the Global Resolution / Toggle Plan. Specifically, BSA proposed that it would seek confirmation of a Global Resolution Plan incorporating Hartford's buy-back of its policies, which would create a trust to pay Abuse Claims, funded with BSA's own contribution, Hartford's contribution of $650 million (subject to the Agreement's terms), and contributions from other settling parties. Those settling parties would receive the protection of a channeling injunction. If the claimants voted to reject the Global Resolution Plan, however, BSA would seek confirmation of an alternative Toggle Plan.

Under the Toggle Plan, BSA would still make its contribution to the trust and obtain a discharge. But Hartford would not buy back its policies or receive the benefit of a channeling injunction. Instead, the Toggle Plan would allow the claimants to bring their Abuse Claims in the tort system against all third parties (and the trust as BSA's successor), just as they could outside bankruptcy, while preserving the contractual rights of Hartford and other insurers to assume the defense of any Abuse Claims for which they might owe coverage. Because the Toggle Plan would not provide a channeling injunction, it could be confirmed even if the claimants voted against it, as long as at least one impaired class of claims, such as the Debtors'

---

[22]    Whittman Dep. 41:10-42:1.

[23]    Millar Decl., Ex. G (Transcript of Deposition of Daniel Ownby (July 19, 2021)) ("Ownby Dep.") at 170:11-21, 223:10-224:10; *see also* Mosby Dep. 160:1-4 (the Hartford settlement was "great news" for BSA).

trade creditors or lenders, voted for it.  The Toggle Plan thus gave BSA a straightforward path

out of bankruptcy; in BSA's view, it was "a plan that could be confirmed" regardless of how the

claimants voted.[24]  By creating such an alternative, the Toggle Plan also provided a strong

incentive for the claimants to accept the Global Resolution Plan.

Appreciating the difficult situation that BSA was in, and relying on the assurances that

BSA gave it, Hartford agreed to a settlement structured as BSA had proposed.  Hartford

committed to contribute hundreds of millions of dollars to the payment of Abuse Claims without

any assurance that the claimants would agree that this contribution was sufficient.  Hartford

agreed to these terms only because BSA committed to seek confirmation of a plan that would

either grant Hartford the protection of a channeling injunction, if the claimants eventually voted

in favor of such a plan, or, if they did not, preserve Hartford's right to defend Abuse Claims that

implicated its policies in the tort system.

*The terms of the Settlement Agreement*.  On April 15, 2021, BSA and Hartford executed

the Settlement Agreement.[25]  Under the Agreement, BSA agreed to sell the Hartford Policies

back to Hartford, free and clear of all interests of any third party (the "Sale"), and to release

Hartford from all further obligations relating to the Hartford Policies or to Abuse Claims (as

further defined in the Settlement Agreement, the "Hartford Released Claims").  *See* Settlement

Agreement §§ Definitions Q., II.C, IV.A.  Hartford, in turn, agreed to pay $650 million to help

compensate holders of Abuse Claims.  *See id.* §§ II.A, II.D.[26]  BSA, represented by leading

---

[24]     Whittman Dep. 37:16-38:6; *see also id.* 58:13-23.

[25]     Capitalized terms in this Objection that are not otherwise defined herein have the meanings set forth in the Settlement Agreement.

[26]     Because both BSA and Hartford believed that Century Indemnity Company ("Century") is responsible for more than twice Hartford's share of the coverage obligations for Abuse Claims, *see Fourth Amended Disclosure Statement* at 92-93, the parties included a provision reducing the $650 million payment if Century ultimately settled for less than $1.3 billion—a settlement amount that, if ultimately agreed to by BSA, would strongly suggest that

bankruptcy and coverage counsel, as well as Bates White and Alvarez & Marsal North America, LLC ("Alvarez & Marsal"), warranted that it was agreeing to this sum and entering into the Settlement Agreement "in good faith, as a result of arm's-length negotiations, [and] with advice of counsel, and that [the] Agreement represents a fair, reasonable, proportionate and good-faith compromise of disputed Claims, disputed liabilities and disputed issues."  *Id.* § XIII.D.

By its terms, the Settlement Agreement requires BSA to seek confirmation of a Global Resolution Plan—that is, a "Plan [that] shall incorporate [the] Agreement and shall constitute a request by the BSA for the Bankruptcy Court to approve the Sale and [the] Agreement, including the release of the Hartford Released Claims …, pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019," as part of the Court's order confirming the plan. Settlement Agreement § III.A.  The Agreement provides that the Global Resolution Plan will treat Hartford "as a Settling Insurance Company [with] all benefits and protections afforded to Settling Insurance Companies, including the benefit and protection of any releases and channeling (or other) injunctions."  *Id.* § III.I.

The Settlement Agreement also requires BSA to "cooperate in good faith" with Hartford "to ensure that the Confirmation Order … is in form and substance acceptable to [Hartford] as it pertains to [the Settlement] Agreement, is entered by the Bankruptcy Court, and becomes a Final Order."  Settlement Agreement § III.B.  It further obligates BSA "to take such steps … as may be reasonably necessary and proper to effectuate the purpose and intent of [the Settlement] Agreement and to preserve its validity and enforceability."  *Id.* § VII.A.

Under the Agreement, the sole permissible alternative to a Global Resolution Plan incorporating the BSA-Hartford settlement is a Toggle Plan that "only provides BSA with a

BSA and Hartford had overestimated BSA's total liability for Abuse Claims in negotiating their Settlement Agreement.  *See* Settlement Agreement § II.E.

discharge and … does not provide an injunction (including any channeling injunction) affording protection with respect to Abuse Claims" for any third parties, including Hartford and the local councils.  Settlement Agreement § III.I.  The Agreement thus specifies that "BSA shall not file, and shall not support, any plan of reorganization that is inconsistent with the terms of [the] Agreement."  *Id.*[27]

The Settlement Agreement does not contain any "fiduciary out."  No provision in the Agreement relieves BSA from its obligation to pursue the Global Resolution or Toggle Plan, or its covenant not to pursue any other plan, if any claimant or Claimant Representative opposes the Agreement or Plan.[28]

*The Restructuring Support Agreement and Fourth Amended Plan*.  To no one's surprise, as soon as BSA announced the Settlement Agreement on April 16, 2021, the plaintiffs' lawyers expressed vehement opposition.  Nonetheless, BSA and Hartford continued to work together on the Global Resolution / Toggle Plan.  On May 16, 2021, BSA filed proposed amendments to the Second Amended Plan that incorporated the Settlement Agreement as part of a Global Resolution Plan, but also provided the alternative of a Toggle Plan.[29]  That Toggle Plan included Trust Distribution Procedures ("TDPs") that would allow Hartford and other insurers to assume the defense of Abuse Claims in accordance with their policies, in which case the Abuse Claims would be liquidated through the tort system, not by the trust.[30]

---

[27]    *See also* Mosby Dep. 69:7-13 ("Q: Right.  And when you entered the Hartford settlement agreement, there were two solutions provided for.  One was a global plan that included the Hartford settlement, and the other was a toggle plan that didn't include the Hartford settlement and only provided [a] discharge for BSA; isn't that correct?  A: That's what the paragraph [of the Settlement Agreement] says.").

[28]    *See id.* 77:14-22 ("I'm not aware of a fiduciary out in the settlement agreement.").

[29]    *See Proposed Amendments to Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 4107] § III.B.10.

[30]    *See id.* Ex. A-2 (BSA Toggle Plan TDP) art. IV.

That same day, the Debtors filed an amended disclosure statement. They acknowledged that the Claimant Representatives had expressed opposition to the Settlement Agreement, but stated that "[t]he Debtors believe that the Hartford Insurance Settlement Agreement is fair, reasonable, and in the best interests of the Estates and holders of Abuse Claims."[31] The Debtors explained that BSA and Hartford were "engaged in litigation over the scope of coverage provided under the Hartford Policies" and that "Hartford [had] raised a number of defenses that, if successful, would substantially reduce or even eliminate coverage for the Abuse Claims."[32] Accordingly, "continuing to litigate against Hartford would not only drain the Debtors' limited resources but also create a substantial risk that Hartford would ultimately pay significantly less toward Abuse Claims than it will under the Hartford settlement—and some risk that Hartford would pay nothing."[33] The Debtors reiterated that the Settlement Agreement was "the product of extensive, arm's-length negotiations conducted over a lengthy period between the Debtors and Hartford" and "represents a good-faith settlement and compromise of complex disputes" that "will avoid the costs, risks, uncertainty, and delay associated with protracted litigation, while providing a very substantial payment on account of Abuse Claims."[34]

In another filing made that same day, BSA rejected the suggestion made by the plaintiffs' lawyers that "the settlement is a breach of the Debtors' fiduciary duties," stating that this allegation was "false" and that "[t]he Debtors will demonstrate when the Debtors present the Hartford Settlement for the Court's approval [that] it represents a good-faith settlement" and "hard-fought, mediated compromise" that "is amply supported by the Debtors['] business

---

[31]    *See Proposed Amendments to Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 4108] at 47-48, 86.

[32]    *See id.* at 86.

[33]    *See id.*

[34]    *See id.*

judgment."[35]  A supporting declaration from Brian Whittman, of Alvarez & Marsal, attested, again, that the "Hartford settlement is the product of extensive, arm's-length negotiations" and that the "Debtors believe that the Hartford Settlement is reasonable and in the best interests of the estates and holders of Abuse Claims in large part due to the risks associated with continued coverage litigation with Hartford."[36]  The Debtors reiterated that "[t]he recent Hartford Insurance Settlement Agreement is an important initial building block" toward a consensual, global plan.[37]

The plaintiffs' lawyers, however, continued to oppose not only the Global Resolution Plan incorporating the BSA-Hartford settlement, but also the Toggle Plan.  Counsel for the TCC labeled the Toggle Plan "a death trap" that was "worse" than the Global Resolution Plan—even though the Toggle Plan would preserve the claimants' right to sue in the tort system and obtain precisely the same judgments and settlements they could obtain outside bankruptcy.[38]

On information and belief, the plaintiffs' lawyers refused to negotiate further with BSA unless BSA repudiated the Settlement Agreement and the Global Resolution / Toggle Plan, playing on BSA's fears that lengthy litigation would render it unable to exit bankruptcy intact. The Claimant Representatives wrote a letter to BSA stating that they would not support any plan, regardless of its other terms, that included the Hartford settlement.[39]

---

[35]    *See Debtors' Reply in Further Support of Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 4100] at 12, 17-20.

[36]    *See Declaration of Brian Whittman in Support of Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 4101] at 4.

[37]    *See Debtors' Omnibus Reply in Support of Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection With Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 4105] at 3.

[38]    *See Tr. May 19 Hr'g* at 73:9-14 (statement of Mr. Stang).

[39]    *See Declaration of Roger C. Mosby in Support of Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5469] Ex. 1.

Ultimately, BSA succumbed to the relentless pressure.  On July 1, 2021, BSA filed the RSA Motion, in which it seeks authorization to enter into an RSA with the Claimant Representatives that would require BSA to file a plan in direct conflict with the Settlement Agreement and the Global Resolution / Toggle Plan that BSA agreed to pursue.  The RSA Motion seeks a declaration from this Court that "the Debtors shall have no obligation to seek approval of, and have no obligations under, the Hartford Settlement."[40]  It states that BSA "believed that the Hartford Settlement was fair and reasonable" when BSA entered into it—a judgment BSA has confirmed that it still holds today[41]—but that the continued opposition of the Claimant Representatives has led BSA to conclude that "a global resolution plan cannot be confirmed to the extent it includes the Hartford Settlement in its current form."[42]

On July 2, 2021, BSA filed a Fourth Amended Plan, as contemplated by the RSA.  That plan deletes the Toggle Plan and the related TDPs that would allow Hartford to defend Abuse Claims in the tort system.[43]  And it states that, if this Court relieves BSA from its obligations under the Settlement Agreement, "the Debtors shall amend the Plan to remove all provisions pertaining to the approval of the Hartford Insurance Settlement Agreement."[44]

## ARGUMENT

### I.    BSA's Request For A Declaration That It Has No Obligations Under The Settlement Agreement Must Be Brought As An Adversary Proceeding

The RSA Motion is not the proper procedural vehicle for the extraordinary relief BSA seeks—a declaration that "the Debtors shall have no obligation to seek approval of, and have no

---

[40]    *RSA Motion* Ex. A (proposed order) ¶ 2; *accord id.* ¶ F; *RSA Motion* at 1-2, 16-17, 28.

[41]    Whittman Dep. 59:17-60:4; Mosby Dep. 124:11-125:17.

[42]    *RSA Motion* at 15-16.

[43]    *Fourth Amended Plan* § III.B.10; *id.* Ex. A (TDPs).

[44]    *Fourth Amended Plan* § V.S.4 n.4; *see also Fourth Amended Disclosure Statement* at 90 n.74, 91-92.

obligations under, the Hartford Settlement." *RSA Motion* Ex. A ¶ 2.  That relief, if available at all, requires an adversary proceeding.

Rule 7001 requires a debtor to commence an adversary proceeding to "determine the validity … or extent of … [an] interest in property" or to obtain "a declaratory judgment relating [there]to."  Fed. R. Bankr. P. 7001(2), (9).  It is well-established that the rights and interests of a debtor-in-possession or a counterparty under a contract are "interests in property."  *See, e.g.*, *EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 356 B.R. 631, 639 (Bankr. D. Del. 2006); *Corp. Claims Mgmt. v. Shaiper (In re Patriot Nat'l Inc.)*, 592 B.R. 560, 572 (Bankr. D. Del. 2018); *U.S. Bank Tr. Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 102-103 (2d Cir. 2013).  Courts have accordingly held that motions asking a bankruptcy court to declare that an agreement is valid or invalid, or enforceable or unenforceable, seek declaratory relief subject to Rule 7001.  *See, e.g.*, *Church Joint Venture, L.P. v. Blasingame (In re Blasingame)*, No. 15-00021, 2016 Bankr. LEXIS 3590, at *1 (Bankr. W.D. Tenn. Sep. 23, 2016) (motion to enforce settlement agreement was a request for declaratory relief subject to Rule 7001(9) where counterparty disputed that a binding agreement had been reached and court approval of the agreement had not yet been sought); *Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 459 B.R. 190, 195 (Bankr. S.D.N.Y. 2011) (motion seeking declaration that portion of settlement agreement was permissible under bankruptcy and non-bankruptcy law was subject to Rule 7001(9)).

Here, BSA has tacked onto a motion that seeks authority to enter into an RSA, as an exercise of BSA's business judgment under section 363 of the Bankruptcy Code, a request for an order "determining" that "the Debtors have no obligation to seek approval of the Hartford Settlement."  *RSA Motion* at 17.  The Proposed Order goes even further.  It would have this Court "find[] and conclude[] as a matter of law," and "order[], adjudge[], and decree[]," not only

that "the Debtors shall have no obligation to seek approval of … the Hartford Settlement," but also that "the Debtors … have no obligations under[] the Hartford Settlement" of any kind. *Id.* Ex. A ¶¶ F, 2. That proposed relief cannot be granted in response to a mere motion under section 363 to use estate property. In asking this Court to order that BSA has no enforceable obligations under the Settlement Agreement, BSA is seeking a declaration that Hartford has no valid property interest of any kind under the Settlement Agreement. That request for "a declaratory judgment relating to" "the validity … of … [an] interest in property" must be brought by adversary proceeding. Fed. R. Bankr. P. 7001(2), (9).

BSA's failure to comply with Rule 7001 is prejudicial. An adversary proceeding would require BSA to file a complaint and identify the specific legal basis that supposedly entitles it to a declaration that it has no enforceable obligations, and Hartford has no enforceable rights, under the Settlement Agreement. By instead including its request for such a declaration in the RSA Motion, BSA implies that this relief is subject to the relaxed "business judgment" standard applicable under section 363. As discussed below, however, a debtor cannot repudiate its obligation to seek approval of a settlement (especially, one containing no "fiduciary out") or confirmation of a plan embodying that settlement because its "business judgment" has changed.

An adversary proceeding would not only require BSA to spell out the legal basis for the relief it seeks and to address that basis under the proper legal standards; it would also enable the parties to develop any necessary facts. As discussed below, Hartford submits that BSA is not entitled to the declaratory relief it seeks as a matter of law. But BSA evidently disagrees. It has submitted two declarations in support of the RSA Motion, one from its Chief Executive Officer, Roger Mosby, and the other from its principal financial advisor, Brian Whittman of Alvarez & Marsal. To the extent that a factual record is required for the Court to determine if BSA is entitled to the relief it seeks, an adversary proceeding would permit its development. Instead, the

RSA Motion has allowed for little meaningful discovery, especially since BSA has asserted the mediation or attorney-client privilege to bar virtually any inquiry into its decision-making process.[45]

Moreover, if BSA were required to file a complaint, Hartford could assert counterclaims to require BSA to perform under the Settlement Agreement and for damages, as administrative expenses in the Chapter 11 case, arising out of BSA's post-petition breach of the Agreement. *See infra* pp.37-38. The Court could then enter an appropriate scheduling order that would allow both sides to present their claims and counterclaims on a fairly developed record, rather than permit BSA to bury its request for extraordinary declaratory relief, as almost an afterthought, into the RSA Motion, which seeks the Court's permission for the Debtors to execute a completely different agreement with entirely different parties.

In short, BSA must seek the relief it requests as to its Settlement Agreement with Hartford in an adversary proceeding, not by a simple motion submitted in its main bankruptcy case. For this reason alone, the RSA Motion's request for a declaration that BSA has no obligations under the Settlement Agreement must be denied.

## II.    This Court Should Deny BSA's Request For A Declaration That It Has No Obligations Under The Settlement Agreement

Even leaving aside that threshold procedural flaw, BSA's request for a declaration that it has no obligations under the Settlement Agreement fails on the merits. Controlling precedent, along with basic contract and bankruptcy law principles, bars BSA from repudiating its obligation under the Settlement Agreement to seek confirmation of a plan embodying the parties' deal. To be sure, only this Court can confirm a plan or approve a sale of estate property or

---

[45]    *See generally Century's Objection to the Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement and (II) Granting Related Relief* (July 22, 2021), which is being filed today.

settlement of an estate cause of action.  But once a debtor agrees—with no "fiduciary out"—to *seek* confirmation of a plan or approval of a sale or settlement, it must proceed with that plan and allow the bankruptcy court to determine if it is confirmable following a vote of the creditors, the filing of briefs, and the presentation of evidence at a confirmation hearing.  While the debtor may inform the bankruptcy court of "changed circumstances" bearing on the court's decision whether to confirm a plan or approve a settlement, no change in circumstances allows a debtor to refuse *to seek* confirmation of a plan or approval of a settlement to which it has agreed.

In any event, there has been no change in circumstances in this case.  For over a year, the plaintiffs' lawyers have insisted that they will not agree to any settlement that is remotely reasonable.  Nor are they willing to litigate the Abuse Claims in the tort system; despite the TCC's purported confidence that those claims are worth more than 100 billion dollars, the prospect of actually litigating the claims is, in the words of the TCC's lead lawyer, tantamount to "death" for his constituency.  Instead, the plaintiffs' lawyers have prevented any progress toward a global resolution by attributing twelve-figure values to Abuse Claims that they are unwilling to litigate, and by threatening BSA with liquidation unless it abets this scheme.  BSA itself proposed the Global Resolution / Toggle Plan structure because it was the only way around that roadblock.  BSA's subsequent decision to surrender to the plaintiffs' lawyers pressure tactics does not justify allowing BSA to repudiate an agreement it entered into knowing full well the challenges it might face, and that still represents the best, and perhaps only, chance for a global, consensual resolution of this case.

A. **Governing Law Requires BSA To Seek Confirmation Of The Global Resolution Or Toggle Plan**

As discussed, the Settlement Agreement requires BSA to seek confirmation of either the Global Resolution Plan or the Toggle Plan. And it bars BSA from seeking confirmation of any other plan while the Global Resolution or Toggle Plan is pending.

That specific obligation—to *seek* confirmation of the Global Resolution or Toggle Plan and, until the Court rules on that plan, no other—is binding on BSA even though this Court has not yet approved the Settlement Agreement. Only this Court can approve the buy-back of Hartford's policies and settlement of the estate's claims against Hartford or confirm a plan of reorganization embodying the parties' agreement. *See* 11 U.S.C. §§ 363(b), 1123(b)(3)(A), 1129; Fed. R. Bankr. P. 9019(a); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393-395 (3d Cir. 1996). But the need for BSA to obtain this Court's approval before it may *consummate* such a plan or settlement does not mean that BSA may repudiate its obligation under the Settlement Agreement to *seek* such approval in the first place—distinct concepts that BSA conflates. *See RSA Motion* at 26-28. To the contrary, under *Martin* and applicable case law, BSA's obligation to seek approval of the parties' settlement through the Global Resolution or Toggle Plan is enforceable in accordance with its terms.

In *Martin*, a trustee entered into an agreement to settle an estate cause of action, but permitted the debtors to continue to prosecute the claim in state court while the trustee sought bankruptcy court approval of the settlement. *See* 91 F.3d at 391-392. Before the hearing on approval of the settlement, the debtors obtained a favorable jury verdict worth more to the estate than the proposed settlement. *See id.* at 392. Nonetheless, the trustee did not withdraw her motion for approval of the settlement or request permission to do so. Rather, the trustee went forward with the motion to approve the settlement and simply informed the bankruptcy court of

the verdict at the hearing on the motion.  *See id.*  The Third Circuit held that the trustee had not breached the settlement agreement by doing so, but only because she "took no affirmative steps to withdraw the motion to approve" the settlement.  *Id.* at 395.  The court reasoned that merely "report[ing] the change in circumstances to the court … *without more* [did] not constitute a breach of contract."  *Id.* (emphasis added); *see id.* at 394-395 ("This trustee did not flout or breach any term of the stipulation.  Nor did she withdraw the motion to approve the stipulation. … [S]he simply supplied additional information to the court, disclosing the state court verdict.").

As the Third Circuit explained, while the trustee had a fiduciary duty to all creditors to maximize the estate, she also had a duty to the counterparty to the settlement agreement to "refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract."  *Martin*, 91 F.3d at 393-94.  In light of *Martin*'s unusual facts, the court had no occasion to decide more broadly the extent to which parties are bound by a settlement agreement pending bankruptcy court approval.  *Id.* at 395.  But the court made clear that a trustee or debtor-in-possession cannot unilaterally refuse to seek approval of such an agreement.  "[A] trustee herself [cannot] choose between [her] conflicting legal obligations"—*i.e.*, her contractual obligations and duty of good faith owed to the counterparty, on the one hand, and her fiduciary obligations owed to all creditors, on the other—by deciding not to seek approval of the settlement.  *Id.* at 394.  Rather, the trustee must proceed to seek approval of the settlement, because the ultimate "responsibility" to "determine what course of action will be in the best interest of the estate" lies with the bankruptcy court, not the trustee.  *See id.* at 393-394.

*Martin* makes perfect sense in light of basic principles of contract and bankruptcy law. Outside bankruptcy, a party is bound to the terms of a contract it signs.  In bankruptcy, a trustee or debtor-in-possession may likewise bind the estate to the terms of a contract it executes.  Some terms may, of course, require bankruptcy court approval; for instance, the bankruptcy court must

approve the "use, sale, or lease" of estate property outside "the ordinary course of business" before that transaction can be consummated.  11 U.S.C. § 363(b)(1).  And when a debtor agrees to propose a plan, the bankruptcy court likewise must confirm that plan before it can take effect. *Id.* § 1129.  But not every term of every contract a debtor-in-possession enters requires court approval before it becomes effective.  Contracts to use or sell estate property or obtain unsecured credit in the ordinary course of business require no court approval at all.  *Id.* §§ 363(c)(1), 364(a).  And while a contractual term providing for a transaction outside the ordinary course of business must be approved before that transaction can occur, it does not follow that other terms of the contract are unenforceable prior to such approval.  Indeed, when the contractual term at issue is a requirement to *seek* approval of a settlement or plan, it makes no sense to say that the term cannot take effect until the bankruptcy court has approved the contract of which it is a part. That is plainly the case outside bankruptcy for contracts under which parties agree to a transaction that requires regulatory or other third-party approval; a term in an asset purchase agreement, for example, that conditions the closing on one party's receipt of necessary governmental sign-off does not allow that party to change its mind and not even seek that approval.

So, too, in bankruptcy, as the Third Circuit made clear in *Martin*.  While it reserved decision on whether the trustee's agreement to settle the estate's cause of action (which is effectively a sale of estate property outside the ordinary course of business requiring approval under § 363) could be binding before the bankruptcy court approved it, such that the trustee could be in breach for permitting continued litigation pending court approval of the settlement, the court had no difficulty concluding that the trustee had a "legal obligation[]" to *seek* that approval.  *See* 91 F.3d at 394.

Many other cases, both at the appellate and trial levels, are in accord.  For example, in *Liberty Towers Realty, LLC v. Richmond Liberty LLC*, 734 F. App'x 68 (2d Cir. 2018), the Second Circuit held that the debtor-in-possession could not walk away from a settlement agreement, after receiving an allegedly better offer, before the bankruptcy court had decided whether to approve the settlement.  Citing *Martin*, the Second Circuit made clear that "the parties to a settlement agreement may not unilaterally repudiate it," *id.* at 70, affirming the lower court's ruling that "the requirement of court approval" is not a "mechanism by which [the debtor] can act on its buyer's remorse," 569 B.R. 534, 541 (E.D.N.Y. 2017).

The First Circuit Bankruptcy Appellate Panel reached the same conclusion in a case that is on all fours with this one.  *See PRLP 2011 Holdings, LLC v. Manuel Mediavilla, Inc. (In re Manuel Mediavilla, Inc.)*, 568 B.R. 551 (B.A.P. 1st Cir. 2017) (per curiam).  There, the debtors-in-possession settled claims by a secured creditor that were the subject of pending motions.  As here, the parties' agreement obligated the debtors to file a Chapter 11 plan incorporating the settlement's terms and to seek confirmation of the plan.  *See id.* at 562.  But, before the debtors could file that plan, the bankruptcy court ruled in the debtors' favor on the pending motions; the debtors then refused to seek approval of the settlement and filed a different plan that failed to incorporate the settlement.  The bankruptcy court did precisely what BSA asks this Court to do in this case:  It permitted the debtors to repudiate their settlement agreement, and it proceeded to confirm the debtor's amended plan, which was inconsistent with the terms of the settlement.  *See id.* at 560-565.

On appeal, however, the Bankruptcy Appellate Panel vacated the order confirming the plan, holding that the bankruptcy court had "erred in confirming a plan containing terms materially different from the terms of the Settlement Agreement."  *Mediavilla*, 568 B.R. at 554, 573-574.  The Panel concluded that the debtors were, instead, required to seek confirmation of a

plan incorporating the settlement pursuant to the agreement's terms. *Id.* at 573-574. The court explained that "[t]he requirement of bankruptcy court approval of a compromise does not create a right of unilateral repudiation pending the court's consideration of the proposed compromise." *Id.* at 573. Rather, "the Debtors had a contractual and good faith obligation to submit the parties' compromise to the court for consideration and failed, without reasonable justification, to do so." *Id.* "To permit the Debtors to breach their agreement with [the counterparty] without consequence … would sanction a breach of the covenant of good faith performance of the contract." *Id.* Moreover, allowing such unilateral repudiation would "place[] the estate in a precarious position when negotiating settlements," since "[c]ontracting parties are entitled to a reasonable measure of assurance that their settlement agreements are valid and effective." *Id.*

Bankruptcy courts have come to the same conclusion. *See, e.g.*, *In re Tidewater Grp., Inc.*, 8 B.R. 930, 932-933 (Bankr. N.D. Ga. 1981) (holding that debtor-in-possession could not unilaterally repudiate settlement and requiring debtor to comply with its obligation under the settlement agreement to seek court approval of the settlement). In that case, the court rejected the notion that "the agreement of a trustee or debtor in possession is a total nullity prior to Court approval," explaining that while the settlement is subject to court approval, the agreement to seek approval is enforceable, even if the debtor has changed its mind; it is "for the Court, not the debtor in possession, to determine whether or not a compromise of litigation should be approved." *See also In re Filene's Basement, LLC*, No. 11-13511, 2014 WL 1713416, at *6-7 & n.8 (Bankr. D. Del. Apr. 29, 2014) (Carey, J.) (evaluating whether to approve settlement no longer supported by the debtors and observing, although not deciding, that "[p]erhaps the Reorganized Debtors should not have withdrawn the [motion to approve the settlement], even in light of the changed circumstances in the form of the higher offer for the [property at issue]. One

party to a settlement should not be permitted to unilaterally withdraw or revoke a settlement agreement while the motion for bankruptcy court approval is pending.").

This rule of law is reflected in the existence of "fiduciary out" provisions, which are often included in plan support agreements and bankruptcy settlement agreements. If the requirement that a bankruptcy court must confirm a plan or approve a settlement meant that a debtor-in-possession could simply decide on its own not to seek that confirmation or approval, there would be no need for "fiduciary out" provisions. That debtors *do* frequently insist on fiduciary out provisions, and that such provisions are often heavily negotiated, reflects the reality that, in the absence of such a "fiduciary out," the debtor may not renege on its agreement to seek confirmation of a plan incorporating the parties' settlement. In that regard, it is notable that BSA insisted on a "fiduciary out" provision in the RSA.[46] By contrast, BSA entered into the Settlement Agreement with Hartford even though it contained no such provision.[47]

Indeed, if a debtor-in-possession could disregard its obligation to pursue bankruptcy court approval of a settlement agreement or agreement to propose a plan simply because the agreement has not yet been approved, so too could the other party to the agreement. Otherwise, such an "agreement" would be no agreement at all, but simply a one-way option in favor of the debtor, under which the counterparty would receive no consideration, rendering the counterparty's supposed unilateral "commitment" unenforceable as a matter of law.[48] But courts have routinely

---

[46]    *See RSA Motion* at 10, 12-13; *id.* Ex. 1 (RSA) §§ II.C, V.C(ix).

[47]    *See* Whittman Dep. 73:24-74:9.

[48]    *See, e.g., Mobil Oil Corp. v. Wroten*, 303 A.2d 698, 701 (Del. Ch.), *aff'd*, 315 A.2d 728 (Del. 1973) ("Where the plaintiff's promise is a mere illusion, that is, where his promise exists in form only but not in substance, then it follows necessarily that there is no consideration [] support[ing] the defendant's promise, and thus no enforceable contract."); *id.* (concluding that a promise was not illusory, although "Mobil's right to terminate the lease is conditioned upon … Mobil's not obtaining acceptable licenses and permits," because "[t]he agreement by implication binds Mobil to a good faith effort to obtain the necessary permits"); 3 *Williston on Contracts* § 7:7 (4th ed.) ("Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration. … In such cases, where the promisor may perform or not, solely on the condition of his whim, his promise will not serve as consideration.").

held that a non-debtor that has entered into an agreement with a debtor or trustee cannot simply claim that there has been a "change in circumstances" and walk away from the agreement before the bankruptcy court has considered whether to approve it.  *See, e.g.*, *Musselman v. Stanonik (In re Seminole Walls & Ceilings Corp.)*, 388 B.R. 386, 393-396 (M.D. Fla. 2008) (holding defendant in estate lawsuit could not revoke its settlement with trustee prior to court approval; "[t]he fact that a contract is entered into subject to approval of the bankruptcy court does not create a right of unilateral repudiation pending that approval").[49]  As a matter of basic contract law, the same rule must apply to the debtor, or the "agreement" would be illusory, and neither the debtor nor the non-debtor would have any incentive to enter into an entirely unenforceable settlement "agreement."

BSA cites no authority to the contrary.  The Third Circuit's decisions in *In re Roth American, Inc.*, 975 F.2d 949 (3d Cir. 1992), and *Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346 (3d Cir. 1999), on which BSA relies (*see RSA Motion* at 25-27), simply stand for the unremarkable proposition that, under 11 U.S.C. § 363(b), a trustee or debtor-in-possession cannot consummate the settlement and release of an estate cause of action or the sale of estate assets outside the ordinary course of business without court approval.  Neither decision holds that a trustee or debtor-in-possession need not *seek* such approval when it enters into an agreement obligating it to do so.  *See Northview*, 186 F.3d at 350-351 ("assum[ing], without deciding, that an agreement within the scope of § 363[(b)] is *effective on execution* subject to

---

[49]    *See also, e.g.*, *Pineo v. Turner (In re Turner)*, 274 B.R. 675, 679-681 (Bankr. W.D. Pa. 2002) (refusing to allow defendant in litigation by estate to disavow settlement agreement prior to court approval even after prevailing in litigation; reasoning that "the parties before us reached a binding agreement" and "[i]t would be inequitable to allow a party … to revoke an offer after it had been accepted merely because the court had not yet heard the motion to approve the compromise of the claim'"); *In re United Shipping Co.*, No. 4-88-533, 1989 WL 12723, at *5 (Bankr. D. Minn. Feb. 17, 1989) (holding preference defendant was bound by settlement with debtor pending court approval and rejecting argument that "there could be no agreement or settlement until it had been approved by the court under Bankruptcy Rule 9019").

conditions subsequent—[*i.e.*,] a court determination that the agreement is in the best interests of the estate" and holding only that "the Trustee … could not have been forced to *consummate* the settlement agreement absent court approval" (emphasis added)); *Roth*, 975 F.2d at 952-953 (holding that debtor could not be required to maintain operations for two years under post-petition labor agreement that had not been approved under § 363(b)). *Filene's Basement* likewise held only that the debtors were not bound to consummate a settlement that had not been approved by the court (while suggesting that the debtors might have been bound to seek approval of the settlement). *See* 2014 WL 1713416, at *5-8 & n.8. And the Third Circuit's decision in *In re RFE Industries, Inc.*, 283 F.3d 159 (3d Cir. 2002), simply recognized, as *Martin* did, that the bankruptcy court may consider changed circumstances when deciding whether or not to approve a settlement. *See id.* at 165 (debtor's return to solvency was relevant in considering whether to approve trustee's settlement of estate cause of action that debtor itself opposed).

BSA committed in the Settlement Agreement to seek confirmation of a plan under which Hartford would either buy back its policies for $650 million in settlement of its coverage obligations or would retain its right to defend Abuse Claims for which it might owe coverage in the tort system. The only way for BSA to comply with that obligation is to file the Global Resolution / Toggle Plan, solicit creditors' votes on each of the two alternatives, and then put the Plan before the Court at a confirmation hearing. It must do so; it cannot simply "flout" the Settlement Agreement. *Martin*, 91 F.3d at 394.

In short, BSA seeks relief that the law does not permit. Rather, BSA must abide by its obligation to seek confirmation of the Global Resolution or Toggle Plan, both under the plain terms of the Settlement Agreement and BSA's implied duty of good faith and fair dealing to "refrain from doing anything that would destroy or injure [Hartford's] right to receive the fruits of the contract." *Martin*, 91 F.3d at 393; *Mediavilla*, 568 B.R. at 573. This Court should deny

BSA's request for a declaration that it is not obligated to seek confirmation of the Global

Resolution or Toggle Plan, as the Settlement Agreement requires.

> **B.    Neither "Changed Circumstances" Nor "Futility" Justify BSA's Request To Repudiate Its Obligation To Seek Confirmation Of The Global Resolution Or Toggle Plan**

As *Martin* and the other cases make clear, BSA is obligated to seek confirmation of the

Global Resolution or Toggle Plan *notwithstanding* any purportedly "changed circumstances"

since it entered the Settlement Agreement.  Such changed circumstances—however

compelling—would be for the Court to consider in deciding whether to confirm the plan after it

has gone out to the creditors for a vote.  They have no bearing on BSA's legal obligation to *seek*

approval of the Hartford settlement through the Global Resolution / Toggle Plan.

In any event, there has been no change of circumstances here, compelling or otherwise.

This case presents nothing remotely similar to the discovery in *Martin* that the debtors had

obtained a judgment that was substantially more than the amount of the settlement.  To the

contrary, BSA believed when it entered into the Settlement Agreement that the Agreement was a

fair and reasonable compromise of BSA's claims for coverage, and both its Chief Executive

Officer and principal financial advisor have confirmed that BSA still believes the Agreement is a

fair and reasonable compromise today.[50]

Rather, the only supposed "change in circumstances" that BSA posits is that the

plaintiffs' lawyers have continued to oppose the Agreement.  In the words of Mr. Whittman, "we

found intense continuing opposition by the plaintiffs [to the BSA-Hartford settlement].  Those

are the changed circumstances."[51]  But that is no change at all.  BSA knew when it entered into

---

[50]    *See RSA Motion* at 15, 27; *Declaration of Roger C. Mosby* [D.I. 5469] ¶ 7; *Declaration of Brian Whittman* [D.I. 5470] ¶ 13; *Fourth Amended Disclosure Statement* at 91; Mosby Dep. 124:11-125:17; Whittman Dep. 59:17-60:4.

[51]    Whittman Dep. 72:16-17.

the Settlement Agreement that the Claimant Representatives did not support the resolution of

Hartford's coverage obligations set out in the Agreement, and that, while BSA and Hartford were

hopeful that the Claimant Representatives would ultimately change their minds, there was a risk

that they might not do so.  Indeed, BSA expected the plaintiffs' lawyers to continue, at least for

some period, to remain opposed to the BSA-Hartford settlement.[52]  That is precisely why BSA

proposed a settlement in which it would seek confirmation of either a Global Resolution Plan

incorporating the Hartford buy-back and channeling injunction or, if the claimants continued to

oppose the settlement and ultimately rejected the Global Resolution Plan, a Toggle Plan that

would allow Hartford to defend the Abuse Claims in the tort system.

BSA's "futility" argument is equally specious.  BSA contends that, in light of the

plaintiffs' lawyers' opposition to the Settlement Agreement, it would be "futile" for it to seek

confirmation of a Global Resolution Plan that includes the Hartford buy-back and release.  *See*

*RSA Motion* at 27-28.  But, as the Supreme Court has made clear, this Court is not required to

accept the plaintiffs' lawyers' self-serving statements.  *See, e.g., Czyzewski v. Jevic Holding*

*Corp.*, 137 S. Ct. 973, 983 (2017) (rejecting lower courts' reasoning that a settlement requiring a

priority-violating structured dismissal was the best possible outcome because the parties would

never have settled if required to comply with priority, and noting that "the record indicates that a

settlement that respects ordinary priorities remains a reasonable possibility").

The Supreme Court's admonition is particularly apt here.  Notwithstanding the bluster of

the plaintiffs' lawyers, there is every reason to think that the claimants will ultimately vote to

---

[52]    *See* Whittman Dep. 44:23-45:2 ("Q: In fact, you knew at the time that the parties executed the
BSA/Hartford settlement that the claimants['] groups would be opposed to it; isn't that right?  A: I expected that the
plaintiffs would initially be opposed to it, yes."); Millar Decl., Ex. H (*Debtors' Responses and Objections to
Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company,
and Navigators Specialty Insurance Company's First Set of Requests for Admission to Boy Scouts of America and
Delaware BSA, LLC* (July 8, 2021)), Response to Request for Admission No. 11 ("[T]he Debtors admit that the
Debtors expected at least an initial opposition to the BSA/Hartford Settlement Agreement from some
constituencies.").

accept a Global Resolution Plan incorporating the BSA-Hartford settlement—if the alternative is a Toggle Plan that would return the claimants to the tort system.  Before BSA filed for bankruptcy, only 275 claims were outstanding against it in the tort system.  Almost all of the more than 82,000 claims now pending against BSA were asserted only *after* BSA went into bankruptcy and the plaintiffs' lawyers and claims aggregators began their massive advertising campaign promising claimants that they could assert and be paid on claims in bankruptcy without any judicial scrutiny at all.  The TCC's lead lawyer has admitted to this Court that forcing the claimants to prove their claims in court would amount to "death," and would certainly be "worse" than accepting a Global Resolution Plan incorporating the BSA-Hartford settlement.  Tellingly, the plaintiffs' lawyers have now insisted that the Fourth Amended Plan delete the alternative of a Toggle Plan altogether.

But, even if confirmation of a Global Resolution Plan incorporating the buy-back of Hartford's insurance policies were truly "futile," BSA's agreement with Hartford provided for that eventuality by including a viable alternative:  the Toggle Plan.  Because the Toggle Plan would address only BSA's own liability, and not that of third parties, only one accepting impaired class (for instance, JP Morgan, which has settled with BSA) would be required, and the plaintiffs' lawyers would not have a veto over its confirmation.  *See* 11 U.S.C. §§ 1129(a)(10), 1129(b)(1).  As BSA's own counsel previously argued to this Court,[53] the Toggle Plan thus provides a way for BSA to exit bankruptcy and continue its scouting mission, even if, in the end, the claimants would reject a Global Resolution Plan that included the BSA-Hartford settlement.

The Toggle Plan would be fair to everyone.  BSA, the only entity that has actually filed for bankruptcy, would make a nine-figure contribution to obtain a discharge of its own liability,

---

[53]    *Tr. May 19 Hr'g* at 36:1-37:22 (statement of Ms. Lauria).

and the claimants could both pursue the Trust for any liability BSA might have and pursue any viable claims against non-debtors—the local councils, the chartering organizations, and all the insurers—in the tort system, with everyone's rights, claims, and defenses fully preserved. Indeed, at the recent status conference, counsel for the Church of Jesus Christ of Latter Day Saints expressed concerns about the "removal of the toggle plan option" in the Fourth Amended Plan, explaining that the issue "is very important to us and to other chartered organizations because … the toggle plan would have been a better outcome for chartered organizations," allowing them (among other things) to "ke[ep] their own insurance rights, which are stripped under the current [Fourth Amended] [P]lan."[54]

BSA now suggests that third-party releases and the protection of a channeling injunction for the local councils are essential to BSA's ability to maintain its scouting mission. *See RSA Motion* at 3, 20.  But the Global Resolution Plan incorporating the BSA-Hartford settlement could also include the settlement recently reached with the local councils and any settlements that BSA may someday reach with its chartering organizations; indeed, the Settlement Agreement so contemplates.  *See* Settlement Agreement § I.A.4.  And, again, if the claimants reject a Global Resolution Plan, BSA has represented to this Court that the Toggle Plan, while perhaps not as advantageous to BSA as a Global Resolution Plan, would in fact allow BSA to reorganize.[55]

The plaintiffs' lawyers currently oppose both the Global Resolution Plan incorporating the Hartford buy-back and the Toggle Plan because they prefer a third option:  They believe that, through the RSA and the Fourth Amended Plan, they can value the Abuse Claims at far more than they would be worth in the tort system, and then force the insurers to pay those inflated

---

[54]      *See Tr. July 7 Hr'g* at 56:23-57:8 (statement of Mr. Goldberg).

[55]      *Tr. May 19 Hr'g* at 36:1-37:22 (statement of Ms. Lauria).

values.  As discussed more fully in the Other Insurers' Objection, the Fourth Amended Plan and its accompanying TDPs are designed precisely to that end:  They appoint a non-disinterested, plaintiff-friendly trustee; give that trustee unfettered discretion to pay claims that would be invalid or worth little in the tort system; require the trustee to pay even the most obviously invalid claim $3,500 without any questions asked; strip insurers of their central right under their policies to defend against claims they may be required to pay; and provide that the Court will bless all of this as reasonable and in good faith, in an attempt to strip insurers of any coverage defenses they might assert.  As counsel representing some of the claimants admitted at the recent status conference, the plaintiffs' lawyers have designed the Fourth Amended Plan so that this Court's order confirming it "would operate as a judgment enforceable against the insurers."[56] That effort to turn the bankruptcy process into a "judgment" against insurers is neither fair nor lawful, and it should not gain this Court's stamp of approval.  Instead, BSA should be required to abide by its agreement to give plaintiffs' counsel, and their clients, a choice:  They can agree to the Global Resolution Plan incorporating the Hartford buy-back—and other settlements that have already been negotiated (such as the settlement with the local councils) or that may be in the future—or they can reject that plan and return to the tort system with all their rights preserved. Whatever the outcome, that is in no way a "futile," or unfair, endeavor.

BSA also suggests that pursuing the Global Resolution / Toggle Plan as it agreed would mean that it could not confirm a plan that would maximize recoveries for creditors.  *See RSA Motion* at 16, 27-28.  But there is no reason to believe that is true either.  The Global Resolution Plan could include the same contributions from BSA and the Local Councils that the RSA

---

[56]    *See Tr. July 7 Hr'g* at 36:23-37:2 (statement of Mr. Zalkin).

contemplates (*see id.* at 5-7)—plus an additional $650 million payment from Hartford, as well as payments from other insurers or chartering organizations that settle.[57]

In the final analysis, declaring that BSA has no obligation to seek approval of the Global Resolution / Toggle Plan to which it agreed under the Settlement Agreement would not only be contrary to well-established law, but it would also make achieving a consensual global resolution of this case harder, not easier.  The Fourth Amended Plan that BSA now seeks to pursue is far riskier, and manifestly less confirmable, than either the Global Resolution Plan incorporating the Hartford settlement or the Toggle Plan.  It is replete with improper provisions that remove any semblance of insurance-neutrality, dismantle the insurers' contractual rights, and require numerous prejudicial "findings" blessing that scheme that this Court has no factual or legal basis to make, with the goal of enabling the claimants to obtain far more than they are lawfully entitled to receive in the tort system.  Ms. Lauria, BSA's lead restructuring counsel, was right when she observed at a recent hearing that "[r]emoving th[e] insurance neutrality language and setting this court … up for … a binding trust distribution procedure battle is setting us up for the most epic battle these courts have ever seen between plaintiff lawyers on the one hand and insurers on the other hand."[58]  At the very least, that prospect threatens to add significant delay and expense to this case through a fiercely contested plan-confirmation proceeding (and potential appeals).

---

[57]     BSA further asserts that the RSA would maximize value by avoiding potential litigation over the Restricted Assets Adversary, the Exclusivity Motion, and the Estimation Matters.  But the Global Resolution Plan could resolve the Restricted Assets Adversary through the same increased contribution that BSA has agreed to make in the RSA to resolve that matter.  The Exclusivity Motion has already been briefed and argued; in any event, exclusivity expires in August.  *See Fourth Amended Disclosure Statement* at 64.  As for the Estimation Matters, the Claimant Representatives' motion for a "binding estimation" of BSA's aggregate liability for the more than 82,000 Abuse Claims, is likewise fully briefed and has been argued.  In any event, the Claimant Representatives have apparently agreed to drop that request in light of the skepticism this Court has already expressed regarding its power to make such a "binding estimation" of the Debtors' aggregate liability and are instead attempting to achieve the same improper outcome through the RSA and the new plan it requires.

[58]     *See Tr. May 19 Hr'g* at 45:5-11 (statement of Ms. Lauria).

If BSA were to breach its post-petition commitment to seek approval of the Global

Resolution Plan incorporating the Hartford buy-back, it would also subject the estate to

substantial administrative-expense claims for damages Hartford suffers.  Those damages would

include Hartford's legal fees and costs incurred in negotiating, documenting, and pursuing the

Settlement Agreement, as well as losses attributable to any increase in Hartford's exposure under

TDPs drafted by the plaintiffs' lawyers and administered by their hand-picked trustee, as

compared to the $650 million it agreed to pay under the Settlement Agreement and a Global

Resolution Plan.  *See, e.g., Reading Co. v. Brown*, 391 U.S. 471 (1968).  Moreover, the

Settlement Agreement obligates BSA to seek confirmation of the Toggle Plan—and not to seek

confirmation of an inconsistent plan—even if this Court declines to confirm the Global

Resolution Plan incorporating the Hartford buy-back.[59]  BSA's failure to do so would also

amount to a post-petition breach of the Settlement Agreement, again exposing the bankruptcy

estate to substantial administrative-expense liability, including Hartford's damages stemming

from any increase in its liability under the Fourth Amended Plan (if it is ever confirmed), from

that which could be reasonably anticipated if the claimants had to prove their claims in court

under the Toggle Plan.

In short, there is no legal or even pragmatic justification for granting BSA's request for a

declaration that it has no obligations under the Settlement Agreement.  BSA should be required

to seek confirmation of the Global Resolution / Toggle Plan that BSA itself conceived and

agreed to pursue.

---

[59]    *See* Settlement Agreement § III.H (providing that even if the Court disapproves the Sale of the Policies and the Settlement Agreement otherwise becomes null and void under Section III.F, "Section[] III.I … shall remain in full force and effect"); *id.* § III.I (providing that "BSA shall not file, and shall not support, any plan of reorganization that is inconsistent with" the Global Resolution Plan, except that "BSA may file" a Toggle Plan that "only provides BSA with a discharge" and that "does not provide an injunction (including any channeling injunction) affording protection with respect to Abuse Claims for other Persons").

## **<u>CONCLUSION</u>**

The Court should (i) deny the RSA Motion, including BSA's request for a declaration that it "ha[s] no obligation to seek approval of, and ha[s] no obligations under, the Hartford Settlement," and (ii) direct BSA to proceed to seek confirmation of the Global Resolution Plan (with whatever additional settlements can be reached in the ongoing mediation) or Toggle Plan in accordance with its obligations under the Settlement Agreement.

Date: July 22, 2021
    Wilmington, Delaware

BAYARD, P.A.

*/s/ Gregory J. Flasser*
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 655-5000
Facsimile:  (302) 658-6395
Email:  efay@bayardlaw.com
       gflasser@bayardlaw.com

- and -

James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
SHIPMAN & GOODWIN LLP
1875 K Street, NW, Suite 600
Washington, D.C. 20003
Tel:  (202) 469-7750
Fax:  (202) 469-7751

- and -

Philip D. Anker (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND
DORR LLP
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel:  (212) 230-8890
Fax:  (212) 230-8888

Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363

*Attorneys for Hartford Accident and Indemnity*
*Company, First State Insurance Company,*
*Twin City Fire Insurance Company, and*
*Navigators Specialty Insurance Company*