**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>**Re: D.I. 5466** |

**OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO
SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING
THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING
<u>SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF</u>**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

I.      STANDARD OF REVIEW ................................................................... 4

II.     OUTLINE OF THE RSA AND THE LACK OF SUPPORTING EVIDENCE ........ 7

III.    ARGUMENT IN OPPOSITION ............................................................. 10

     A.    THE RSA FALLS APART IF THIS COURT DOES NOT FIND SUBJECT MATTER
              JURISDICTION OVER INDEPENDENT CLAIMS AGAINST LOCAL COUNCILS AND
              CHARTER ORGANIZATIONS. ......................................................... 11

     B.    AS THE INSURERS HAVE ALREADY ARGUED, THE ASSIGNMENT OF LOCAL
              COUNCIL AND CHARTER ORGANIZATION INSURANCE POLICIES TO THE TRUST
              RUNS A CONSIDERABLE RISK OF EITHER VOIDING THE POLICIES ENTIRELY OR
              CAPPING THE POLICY PAYOUTS. .....................................................25

     C.    FORCING TDP VALUATIONS ON OBJECTING INSURERS WITHOUT ALLOWING
              THEM TO CHALLENGE THE FINDINGS IS NOT A SOUND STRATEGY ON WHICH TO
              BASE A PRESUMPTIVELY MULTI-BILLION DOLLAR PLAN. .........................32

     D.    THE LACK OF POST-CONFIRMATION JUDICIAL OVERSIGHT, COMBINED WITH
              THE ABILITY TO EXPAND THE CHANNELING INJUNCTION WITHOUT JUDICIAL
              INTERVENTION, RENDERS THE PLAN ILLEGAL. ................................... 35

     E.    THE STANDARDS FOR THIRD PARTY RELEASES ARE NOT MET, RENDERING THE
              RSA AN EXERCISE IN FUTILITY. ................................................... 39

          1.    THE BSA FAILS TO SHOW THIRD-PARTY RELEASES AND INJUNCTIONS ARE
                  NECESSARY FOR ITS REORGANIZATION (AND ALREADY CONCEDED THEY
                  ARE NOT NECESSARY). ...................................................... 40

          2.    THE BSA TOGGLE PLAN ...................................................... 41

     F.    THE BSA FAILS TO ESTABLISH THAT CREDITORS WHOSE CLAIMS ARE
              RELEASED AND ENJOINED ARE RECEIVING FAIR AND REASONABLE
              CONSIDERATION IN EXCHANGE. ................................................... 42

     G.    LACK OF A FUTURE CLAIMS FUND RENDERS THE PLAN PATENTLY
              UNCONFIRMABLE. ................................................................. 51

     H.    THE PRESUMPTIVE RELIANCE ON EQUITABLE MOOTNESS PROTECTING THE
              SETTLEMENT IS FOOLHARDY. .......................................................58

**CONCLUSION** ................................................................................................................ 60

Claimants represented by the undersigned counsel and set out by claim number in Exhibit A, attached ("Objecting Claimants"), hereby object to the Motion for an Order Authorizing the Restructuring Support Agreement ("the RSA") filed by Debtors Boy Scouts of America and Delaware BSA, LLC (collectively "the BSA") (Dkt. No. 5466) for the following reasons:

## INTRODUCTION

1.    The Objecting Claimants are thousands of abuse survivors from across the country who timely filed claims in this bankruptcy.  Approval of the RSA and ultimately the discharge plan it portends (collectively "the deal") requires that this Court must consider whether the debtor has exercised sound business judgment in constructing the deal, and whether the deal is fair and equitable to the sexual abuse survivor claimants.  The Objecting Claimants, through their counsel herein, intend by this opposition to raise serious concerns with the lack of sound business judgment the deal exposes, and how this deal unfairly and inequitably shifts the burden to the sexual abuse survivors to assume substantial risks that the deal cannot legally be confirmed, or if confirmed, will not serve its central purpose of compelling the insurers to indemnify claimants leaving some 82,500 survivors to divvy up the paltry and uncertain sum contributed by the BSA and the non-debtor Local Councils and charter organizations who would be piggy-backing on the BSA's bankruptcy.

2.    BSA is gambling both time and money (that it does not have) that it can convince this Court to confirm the unconfirmable.  And this is where the purported reasonableness of BSA's business judgment breaks down.  Rather than taking the reasonable approach of securing its own release as it has proposed and promoted for almost the entirety of this bankruptcy through what has become known as the "Toggle Plan," the BSA now insists on including channeling injunctions of unrelated non-debtor third parties who will be receiving releases in exchange for a nominal

contribution by comparison to what they are capable of contributing, and whose liability insurance coverages may very likely be voided or limited to the amount the non-debtor actually contributed.

3.      This change in the BSA's plan, as articulated by the terms of the RSA, is fraught with uncertainties, creates an unreasonable amount of risk to both the BSA and the sexual abuse survivor claimants, and seriously jeopardizes the confirmability of the ultimate discharge plan. The deal and its promotors are gambling that this Court will confirm this deal, that such confirmation will amount to the equivalent of a judgment enforceable against the insurers of the non-debtor third parties, and that they can beat an appeal by the tactic known as "equitable mootness." This is not an exercise of sound business judgment; this is nothing less than a roll of the dice.

4.      No reasonable businessperson exercising even a modicum of sound judgment would ever contemplate betting the future of their entire operation on (or sink millions of dollars into pursuing) such an uncertain, unsecure, and illusory gamble. The BSA has repeatedly proclaimed it must emerge from bankruptcy as soon as possible, both due to declining membership and the $100+ million that has been spent on professional fees in this bankruptcy to date. However, if allowed to proceed with the RSA, it will do nothing more than prolong this bankruptcy and massively increase the attendant costs. This motion provides the Court with an opportunity to curtail the waste of the BSA's assets, and plainly state that the BSA's square-peg-round-hole gameplan is simply not workable. While acknowledging as much may be difficult given how much time and money the BSA has spent in that endeavor, it must be noted that the BSA has little to show for its efforts. As it stands, there is no evidence that the Local Councils have actually agreed to contribute the $600 million, which may explain why the Local Councils have so far refused to disclose how much they are each contributing and the basis for what they are each

withholding.  Similarly, not a single charter organization is a Protected Party and a number of charter organizations stated at a recent status conference that they have barely heard from the BSA in the 15 months since this bankruptcy was filed.  In the end, the RSA is simply a wish and a prayer, and well beyond what the law allows.  An unlawful and unenforceable contract wholly fails the basic "reasonable business judgment" test for Section 363(b) settlements, particularly given the massive amounts of time and money that will be spent as the BSA hopelessly tries to fit a square peg in a round hole.

5.      The RSA fails the Rule 9019 requirement of a fair and equitable settlement for creditors.  First, it is patently unfair that the RSA provides an unqualified windfall to the Local Councils.  These nondebtor, third party corporate entities possess more than $3 billion in assets, including more than $1.8 billion in unrestricted assets, yet the RSA proposes that they be allowed to obtain permanent releases from liability for less than one-fifth of their total assets and barely one-third of the assets the BSA admits are unrestricted.  Despite this massive relief to 250+ nondebtors, the BSA fails to disclose how much each Local Council is contributing and the basis for their withholding of literally billions of dollars in assets.

6.      Second, the RSA is deeply unfair for the approximately 82,500 victims of child sexual abuse—creditors who will be forced to carry all of the risks that the deal will fail in one or more respects: (1) the risk of the BSA and Local Council property not selling for the appraised amounts; (2) the risk of allowing a small coterie of law firms with questionable priorities that directly represent only 19% of the claimants (holding considerably less of the overall creditor value) to dominate the Trust Distribution Procedures by making a determination of whether the claimant can exercise his or her absolute right as a personal injury claimant to go to a jury; and ultimately (3) the risk that after many more years of this emotional roller coaster, the entire process

might be unwound on appeal because of the length to which advocates of this "deal" are pushing the envelope of bankruptcy law.

7.      Of all the risks, perhaps the most unfair to the sexual abuse survivor creditors is the one the insurers have already raised:  the substantial danger that this plan will void or cap the exposure of the liability insurance policies of the Local Councils and the charter organizations that sponsored individual Scouting units, thereby excluding billions of dollars of potential liability coverage and leaving survivors with very little to split among a vast group of seriously harmed individuals.  This RSA presents a very serious risk of letting these insurers off the hook, giving the BSA and its Local Councils nothing to show for their years of insurance premiums paid (not to mention allowing them to abandon their responsibility to those they have injured), and awarding a windfall to insurance companies that are otherwise facing billions of dollars in exposure.  None of this is fair, none of it is just, and none of it has to happen.

8.      This Court should reject this RSA for the smoke and mirrors it is, and allow this bankruptcy to proceed to a reasonable, realistic, and legitimately funded discharge (even if it is only for the BSA) that a true majority of the survivor community can support.  Truly, the BSA's motion fails to carry its burden to demonstrate sound business judgment or true fairness to creditors, or to show that an order granting this motion is necessary or appropriate to carry out the provisions of the bankruptcy code.  The BSA's motion to approve the RSA should be denied.

## I.      STANDARD OF REVIEW

9.      The Third Circuit allows the pre-confirmation settlement of claims under Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 363(b).  The standards are well-established:

> A bankruptcy court has the authority to "approve a compromise or settlement" of a claim "after notice [to the debtor, trustee, and creditors] and a hearing" on the compromise. Fed. R. Bankr.P. 9019(a). The bankruptcy court must then decide whether the settlement is "fair and equitable," *In re Nutraquest, Inc.,* 434 F.3d 639,

644 (3d Cir.2006) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968)), and "assess and balance the value of the claim that is being compromised against the value to the estate of ... accept[ing] ... the compromise" by considering: "(1) the probability of success in ligation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin,* 91 F.3d 389, 393 (3d Cir.1996).

…

Under 11 U.S.C. § 363(b), a debtor may use estate property outside the ordinary course of business, upon notice and a hearing, to settle claims with the approval of the bankruptcy court. *Northview Motors, Inc. v. Chrysler Motors Corp.,* 186 F.3d 346, 350 (3d Cir.1999); *see* Fed. R. Bankr.P. 9019 (providing for bankruptcy court approval of settlements). The bankruptcy court is charged with ensuring that such settlements are "fair and equitable." *See Martin,* 91 F.3d at 393 (citation omitted).

*In re Energy Future Holdings Corp.*, 648 F. App'x 277, 280–81 (3d Cir. 2016). "In determining whether a sale [under Section 363(b)] satisfies this standard, the courts in this Circuit require that a [contract] satisfy four considerations: (1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith. *Id.*" *In re Antunes*, No. BR 15-16553-MDC, 2019 WL 913704, at *8 (Bankr. E.D. Pa. Feb. 19, 2019).

10.    Ultimately, "'[i]t remains a court's duty to ensure that compromises are fair and equitable, as are the other aspects of reorganizations. Under the fair and equitable standard, we look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle.' *In re Key3Media Group, Inc.*, 2006 WL 2842462, *2 (D. Del. Oct. 2, 2006) (relying on *Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968) (internal quotations and citations omitted))." *In re NovaPro Holdings, LLC*, No. 14-10895-LSS, 2019 WL 1324950, at *4 (D. Del. Mar. 25, 2019). If a proposed settlement involves the rights of third parties, the fairness inquiry encompasses those who did not agree to the

settlement: "'when the rights of non-settling parties are implicated by the terms of a settlement, the court cannot approve it without considering the interests of those non-settling parties.' *Stanwich Fin. Servs. Corp. v. Pardee (In re Stanwich Fin. Servs. Corp.)*, 377 B.R. 432, 437 (Bankr. D. Conn. 2007) (citing *In re Drexel Burnham Lambert Grp.*, 995 F.2d 1138, 1146–47 (2d Cir. 1993)); *see also In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1026 (2d Cir. 1992) ('Where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval .... [I]f third parties complain to a judge that a decree will be inequitable because it will harm them unjustly, he cannot just brush their complaints aside.')." *In re Miami Metals I, Inc.*, 603 B.R. 531, 535 (Bankr. S.D.N.Y. 2019)

11.     Furthermore, the burden is on the proponent of the settlement to prove, by a preponderance of the evidence, that the settlement meets all relevant standards. *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 509–10 (Bankr. D. Del. 2010), *citing Martin*, 91 F.3d at 393; *Grogan v. Garner,* 498 U.S. 279, 291 (1991); *Velde v. First Int'l Bank & Trust (In re Y–Knot Constr., Inc.),* 369 B.R. 405, 408 (8th Cir. BAP 2007). The numerosity of opposition to a settlement may be considered, but it is in no way determinative of whether the settlement is objectionable. *In re Nutraquest, Inc.*, 434 F.3d 639, 645 (3d Cir. 2006), *citing In re Boston & Providence R.R. Corp.,* 673 F.2d 11, 13 (1st Cir.1982) (*per curiam* ) ("[T]he court must act independently, out of its own initiative, for the benefit of all creditors. This obligation prevails even where the creditors are silent ...."). Even assuming the RSA is a valid "global" settlement agreement to which BR 9019 or 11 U.S.C. § 363(b) can apply (*i.e.*, this RSA does not appear to settle any specific creditor's claim against BSA or any litigation BSA has against any other party outside of the bankruptcy),[2]

---

[2] Although a bankruptcy plan may in some cases adjudicate third-party claims under the court's "related to" jurisdiction, *see Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), Section 363(b) is by its terms only a vehicle

the RSA flatly fails to meet the standards set out in *Energy Future* or *TMT Trailer Ferry's* fairness benchmark, as explained below.

## II.    OUTLINE OF THE RSA AND THE LACK OF SUPPORTING EVIDENCE

12.    By its terms, the RSA is not self-executing.  Instead, the RSA requires a number of contingencies be met in order for it to remain binding on those parties who signed it.  In particular, this Court is required to make specific findings lest the TCC, FCR, and Coalition be allowed to declare the BSA in breach and abandon their respective support of the agreement.  Because these proposed findings functionally amount to conditions precedent to performance, the Court must declare its ability to make these findings at this stage or there simply is no contract.  Those findings are as follows:

(A) the Bankruptcy Court has determined that the Amended Plan, the Plan Documents, and the Confirmation Order shall be binding on all parties in interest;

(B) the Bankruptcy Court has determined that (i) the procedures included in the TDP pertaining to the allowance of Abuse Claims and (ii) the criteria included in the TDP pertaining to the calculation of the Allowed Claim Amounts, including the TDP's Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors, are fair and reasonable based on the evidentiary record offered to the Bankruptcy Court;

(C) the Bankruptcy Court has determined that the right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party is the allowed value of such Abuse Claim as liquidated in accordance with the TDP and is not (i) the initial or supplemental payment percentages established under the TDP to make

---

to approve a contract for the disposition of the ***debtor's*** property.  *See* 11 U.S.C. § 363(b) (specifically discussing use of the debtor's property outside the normal course of business); *In re Claar Cellars LLC*, No. 20-00044-WLH11, 2020 WL 1238924, at *4 (Bankr. E.D. Wash. Mar. 13, 2020) (noting creative use of 363(b) agreements dealing with the debtor's property to "rehabilitate many large and notable businesses").  It is axiomatic that an individual cannot be bound to a contract to which they are not a party.  *In re Devonshire PGA Holdings LLC*, 548 B.R. 689, 703 (Bankr. D. Del. 2016); *Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *2 (Del.Ch. Apr 19, 2006); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002); *Kuroda v. SPJS Holdings, L.L.C.*, 2010 WL 4880659, at *3 (Del.Ch. Nov. 30, 2010).  The idea that a bare Section 363(b) contractual settlement between the BSA, its Local Councils, and some survivor representatives can bind non-signing survivors with respect to independent claims against Local Councils and charter organizations exceeds the bounds of logic, equity, and the law.  There appears to be no guiding caselaw specifically dealing with a debtor attempting to force an adjudication process upon non-signatory, third-party nondebtors for non-derivative claims against other nondebtors through a Section 363(b) contract, and then getting the court to cram down the plan on the objecting nondebtors.  The RSA is truly unprecedented, but not in a good way.

distributions to holders of allowed Abuse Claims or (ii) the contributions made by the Debtors or any Protected Party to the Settlement Trust;

(D) the Bankruptcy Code authorizes the Insurance Assignment as provided in the Amended Plan, notwithstanding any terms of any policies or provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights, and the Bankruptcy Court has determined that the Settlement Trust is a proper defendant for Abuse Claims to assert the liability of the Protected Parties to trigger such insurance rights; and

(E) the Bankruptcy Court has determined that the Plan and the TDP were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code.

RSA at 5-6 (Dkt. 5466-2 at 12-13).  If this Court cannot, as a matter of law or fact, make such findings, then the BSA is in material breach and cannot meet its obligation to ensure that "the Amended Plan and Confirmation Order shall contain" (*id.* at 5) these findings, and the RSA presumably crumbles.  Although the Court does not have to make all of these findings at this stage, for the purpose of evaluating the business reasonableness and overall fairness of the RSA, it must determine that it can make such findings and determine them to the extent possible.  It is the position of the non-signatory Objecting Claimants advancing this motion that this Court cannot make the findings required to satisfy criteria (A), (C), (D), and potentially (E) as a matter of law, as explained below.

13.    Nor does the Debtor provide the evidence needed to establish the reasonable business judgment or fairness to creditors required under the law.  Indeed, the "evidence" provided in support of the RSA proves to be a remarkably thin gruel all around.  The entirety of the justification from the head of the BSA—the individual in charge of the "business" of Scouting—is empty boilerplate:

In my opinion, as well as the Board's, the path set forth in the RSA is the most realistic approach to achieve the Debtors' objectives.  Any other option would likely involve significant litigation and would not yield the support of holders of Direct Abuse Claims, whose acceptance is necessary to confirm a plan that includes

third party releases. I understand that these releases are essential for a global resolution of abuse claims for the Local Councils that are essential to the Debtors' ability to carry out the charitable mission of Scouting after the conclusion of these chapter 11 cases.

Mosby Declaration (Dkt. 5469), at ¶ 6.  No evidence is offered of alternatives, nor weighing of options is suggested.  Unquestionably, the BSA's own "Toggle Plan"—for which the BSA still advocated confirmation as recently as June 18, 2021—does nothing for its Local Councils or the charter organizations.  Mr. Mosby simply "understands" that releases for these nondebtors are necessary, without any notion of why the BSA's own backstop is now deemed inadequate.  There is no "business judgment" evidenced by "the business" here at all.

14.     The declaration of the BSA's "restructuring advisor" is likewise devoid of any evidence apart from opinion and conjecture.  In his declaration, Mr. Whittman claims that resolving the bankruptcy by including the Local Councils is necessary or "the Local Councils and Chartered Organizations would likely face a deluge of lawsuits, which would lead to numerous bankruptcy filings and dissolutions across the country and may threaten the entire BSA structure." Whittman Declaration (Dkt. 5470), at ¶ 6.  As with Mr. Mosby, no proof is even hinted at that the BSA's own "Toggle Plan" that it offered as a means to leave bankruptcy is now suddenly a threat to the very existence of the reorganized BSA that was to emerge from that plan.  The only justification offered by Mr. Whittman as to the fairness of the plan toward survivors was that it would end the bankruptcy more quickly, as if haste itself justified waste.  *Id.* at ¶7.  He further erroneously suggests that the Coalition represents "the interests of over 60,000 abuse survivors." Nowhere is this supported in any of the filings before this Court.  The attorneys representing the Coalition acknowledge in public filings only 12,000 Coalition claimants.[3]  It is unclear why Mr.

---

[3] The Coalition's own filings show a direct representation of only "12,000 Members" engaged with "Coalition Counsel."  *E.g.*, Dkt. 1257 at 2; Dkt. 3569 at 6.  The latest 2019 filing from the Coalition is sealed.  Dkt. 4657.  In other forums, the Coalition has acknowledged direct representation of no more than 18,000 "Members."  Law firms

Whittman would offer as a fact personally known to him that the Coalition has the right to speak for 60,000 claimants.  In any event, Mr. Whittman's bald statement, "I believe that entry into the RSA is a reasonable exercise of the Debtors' business judgment, and is in the best interest of the Debtors, their estates, and their creditors[,]" does not change conjecture into evidence.  Nor does Mr. Whittman, or any other supporter of the RSA, offer up the fact that the Local Councils and charter organizations have potentially billions of liability insurance whose duties to defend and indemnify would be triggered by claims or lawsuits against their insured Local Councils or charter organizations.  On what evidentiary basis do they rely for the statement that the Local Councils and/or charter organizations will all file bankruptcy leading to "years" of litigation?

## III.    ARGUMENT IN OPPOSITION

15.    An unenforceable contract is not a "good deal" (or a reasonable exercise in business judgment) no matter how favorable the terms might appear to certain parties, particularly if massive amounts of time and money will be spent pursuing a "good deal" that cannot be effectuated.  Proceeding with an untenable arrangement is profoundly unfair to the survivors of child sexual abuse who have already waited almost a year and a half after being bombarded with media to come forward with what for most of them is likely the darkest chapter in their lives.

16.    There are eight significant flaws with the RSA proffered by the BSA that present risks beyond what would be considered acceptable in the exercise of reasonable business judgment:  (1) the Court lacks subject matter jurisdiction over the claims among survivors, the Local Councils, and the charter organizations; (2) as the insurers have asserted, the insurance policies covering the Local Councils and charter organizations are likely not assignable to the trust without capping the policies or potentially voiding them; (3) as the insurers also already asserted,

---

that listen to conference calls from Coalition lawyers and professionals cannot be considered in any way uniformly supportive of the RSA.

the Court must find that the insurers are bound by TDP valuations as if they represented an enforceable judgment on individual claim valuations; (4) the unlawful delegation of judicial power to the Settlement Trustee, and the domination and continuing control over the process post-confirmation by a small group of claimants with lesser-value claims represent an illegal contract; (5) channeling claims against the Local Councils and charter organizations fails the standard for non-consensual, third party releases and injunctions; (6) the third party releases are not supported by fair and reasonable consideration; (7) the lack of equal treatment of future claimants is patently unconfirmable; and, (7) presumed reliance on equitable mootness is not a sound business strategy.

A.     **THE RSA FALLS APART IF THIS COURT DOES NOT FIND SUBJECT MATTER JURISDICTION OVER INDEPENDENT CLAIMS AGAINST LOCAL COUNCILS AND CHARTER ORGANIZATIONS**

17.     The centerpiece of the RSA—its *raison d'etre*—is the global resolution of abuse claims against not only the BSA, but also its Local Councils and (eventually it would seem) charter organizations. Key to a global resolution is imposing a channeling injunction against all current and future lawsuits against any of these entities for sexual abuse associated with Scouting. However, while this Court certainly has jurisdiction over the claims against the BSA to channel any lawsuits against the BSA into a trust under 11 U.S.C. § 524(g), it does not have the authority or jurisdiction to demand that nonderivative claims against these nondebtor third parties be channeled in the same manner. The Bankruptcy Code does not permit this Court to restrict lawsuits by persons not before it, against parties who are not the Debtors, based on liability that is not directly derivative of the Debtors' liability, and that do not make any claim on the property of the Debtors. Yet the RSA demands that this Court find, as a matter of law, that it does have jurisdiction to channel lawsuits against Local Councils and charter organizations, even when premised on liability quite independent of the BSA's liability. This the Court cannot do.

11

18.     As a threshold issue, courts must independently assess subject matter jurisdiction. *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).  Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375, 377 (1994).  As a non-Article III court, the jurisdiction of a bankruptcy court is even more sharply circumscribed.  *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir.2004) ("the source of the bankruptcy court's subject matter jurisdiction is neither the Bankruptcy Code nor the express terms of the Plan. The source of the bankruptcy court's jurisdiction is 28 U.S.C. §§ 1334 and 157").  As such, "[t]hey may exercise only the authority conferred to them by statute." *In re IMMC Corp.*, 909 F.3d 589, 595 (3d Cir. 2018) (citation omitted).  "[N]either the bankruptcy court nor the parties can write their own jurisdictional ticket. Subject matter jurisdiction 'cannot be conferred by consent' of the parties." *Id.* at 161 (citing *Coffin v. Malvern Fed. Sav. Bank,* 90 F.3d 851, 854 (3d Cir.1996); *In re Continental Airlines, Inc.,* 236 B.R. 318, 323 (Bankr.D.Del.1999), *aff'd,* 2000 WL 1425751 (D.Del. Sept.12, 2000), *aff'd,* 279 F.3d 226 (3d Cir.2002)).  Perhaps most importantly, "if a court lacks jurisdiction over a dispute, it cannot create that jurisdiction by simply stating it has jurisdiction in a confirmation or other order." *Resorts Int'l*, 372 F.3d at 161.

19.     Jurisdiction under a Chapter 11 reorganization pursuant to 11 U.S.C. § 105(a) is allowed over four types of disputes:

> "Bankruptcy court jurisdiction potentially extends to four types of title 11 matters: '(1) cases under title 11, (2) proceeding[s] arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11.'" *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.),* 372 F.3d 154, 162 (3d Cir.2004) (quoting *Torkelsen v. Maggio (In re Guild & Gallery Plus),* 72 F.3d 1171, 1175 (3d Cir.1996)). Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as "core" proceedings; whereas proceedings "related to" a case under title 11 are referred to as "non-core" proceedings. *In re Resorts Int'l, Inc.,* 372 F.3d at 162 (citing 1 Collier on Bankruptcy, ¶ 3.02[2], at 3–35 (15th ed. rev.2003)). Proceedings "related to" a title 11 case include causes of action owned by the debtor that become property of the bankruptcy estate under 11 U.S.C. § 541(a), as well as

> suits between third parties that conceivably may have an effect on the bankruptcy estate. *Celotex,* 514 U.S. at 308 n. 5"

*In re Combustion Eng'g, Inc. (Combustion Engineering)*, 391 F.3d 190, 225–26 (3d Cir. 2004). The sexual abuse claims against the BSA alone, while "non-core" matters, are universally accepted as proceedings "related to" the bankruptcy and thus fall within this Court's purview.   Notably, however, "a bankruptcy court's 'related to' jurisdiction cannot be limitless." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995), *approving Pacor, Inc. v. Higgins*, 743 F.2d 984 (1984). Specifically, "bankruptcy courts have no jurisdiction over proceedings that have no effect on the ***estate of the debtor***." *Celotex*, 514 U.S. at 308 n.6 (emphasis added). **Crucially, the "estate" is not the "debtor."** 11 U.S.C. § 541; *see e.g.*, *Wilson v. Rigby*, 909 F.3d 306, 312 (9th Cir. 2018) (under 11 U.S.C. § 541(a), appreciation in property values during the pendency of a bankruptcy inures to the estate, not to the debtor); *In re Sullivan*, 626 B.R. 326, 335 (Bankr. D. Colo. 2021) (citing to distinction drawn between the estate and the debtor under 11 U.S.C. § 1112(b)(1)); *In re Williams*, 378 B.R. 811, 823 (Bankr. E.D. Mich. 2007) (distinguishing services provided to the debtor as opposed to the estate).

20.    The only means by which the BSA can hope to incorporate and channel the claims against the Local Councils and the charter organizations into its bankruptcy is through 11 U.S.C. § 524(g).  "Section 524(g)(4) permits a channeling injunction to protect nondebtor third parties from lawsuits that are derivative of a debtor's conduct or claims against the debtors." *In re W.R. Grace & Co.*, No. 01-01139 (KG), 2016 WL 6068092, at *7 (Bankr. D. Del. Oct. 17, 2016) (*Grace II*), *vacated in part on other grounds*, *In re W.R. Grace & Co.*, 900 F.3d 126, 136 (3d Cir. 2018) (*Grace III*).  The "derivative" requirement means that a 524(g) plan can only channel claims alleging that the third party is "directly or indirectly liable for the conduct of, claims against, or demands on the debtor[.]"   11 U.S.C. § 524(g)(4)(A)(ii).  In particular, this Court's statutory

13

authority (its sole source of authority) to include a third party nondebtor in a 524(g) trust can only be exercised (1) where the third party is an owner or has a financial stake in the debtor, (2) where the third party served as a manager, officer, or agent of the debtor, (3) where the third party insured the debtor, or (4) where the third party assisted in changing the corporate structure of the debtor or provided financing to the debtor.  *See* 11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV), cited in *Combustion Engineering*, 391 F.3d at 235.  None of these conditions apply—or at least the BSA has made no evidentiary showing that they apply—to the BSA and the Local Councils or charter organizations who also bear legal responsibility for sexual abuse in Scouting.  The liability of the Local Councils and charter organizations is simply not "derivative."  Section 524(g)'s scope cannot as a matter of law extend to third party nondebtor liability when based upon the third party's own independent conduct.  As the Third Circuit explained, "where the third-party's liability is based on exposure to a *nondebtor*'s asbestos, it is clearly not derivative of the conduct of or a claim against the *debtor*." *Grace III*, 900 F.3d at 137 (emphasis in original).

21.    Third Circuit case law plainly bears out this conclusion.  At the trial level in *Combustion Engineering*, the District Court used the Third Circuit's *Pacor* test to exercise related-to jurisdiction over "independent, non-derivative claims based on a 'unity of interest' between Combustion Engineering, [and two other businesses] Basic and Lummus … [described as] corporate affiliates, [that] shared insurance, even joint operations at single sites leading to the asbestos personal injury claims at issue … [with] extensive financial inter-dependence between the entities[,]" and then issued a channeling injunction directing future claims against these entities into the trust established in the bankruptcy.  391 F.3d at 224.  The *Pacor* test is written in extremely broad language: "a civil proceeding is related to bankruptcy [if] *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.*... An action is

related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom

of action (either positively or negatively) and which in any way impacts upon the handling and

administration of the bankrupt estate."  *Pacor*, 743 F.2d at 994 (emphasis in original) (citations

omitted).  Despite this sweeping language, however, *Pacor* itself held that an individual's personal

injury suit against a local business that in turn had used a bankruptcy debtor's product could not

be channeled through the bankruptcy by impleading the debtor on an indemnification theory,

because the potential indemnity of the debtor was neither automatic nor at that time already

adjudicated.  *Combustion Engineering*, 391 F.3d at 226, *citing Pacor*, 743 F.2d at 995.  Instead,

the Court explained, "'related to' jurisdiction [exists] over actions [against] nondebtors involv[ing]

contractual indemnity obligations between the debtor and nondebtor that automatically result in

indemnification liability against the debtor."  391 F.3d at 226.

     22.    *Combustion Engineering* then highlighted *In re Federal–Mogul Global, Inc.*, 300

F.3d 368 (3d Cir. 2002), in which "[t]housands of individuals brought personal injury claims in

state courts seeking damages for asbestos exposure….  Plaintiffs asserted claims against both

manufacturers and distributors of [asbestos-containing] products[.]"  391 F.3d at 226-27.  In

rejecting assertions of "related to" jurisdiction over other asbestos companies, the Third Circuit

held that "related-to bankruptcy jurisdiction [does] not extend to a dispute between nondebtors

unless that dispute, by itself, creates at least the logical possibility that ***the estate*** will be affected."

391 F.3d at 227 (emphasis added) (citation and internal quotation marks omitted).  Simply put,

"there is no 'related to' jurisdiction over a personal injury claim against a nondebtor without the

filing and adjudication of a separate claim for indemnification' against the debtor."  *Federal-

Mogul Global*, 300 F.3d at 375-76 (citation and internal quotation marks omitted).  Unless the

litigation has an immediate and direct impact on the debtor's ***estate*** at the time of the filing of the

petition, it is not related to the bankruptcy and the claim cannot be channeled.  Potential future lawsuits apportioning liability or indemnification to the debtor for joint conduct or the possibility of bankruptcy for associated business entities are not valid grounds for a bankruptcy court to exercise jurisdiction over claims by parties injured due to the independent conduct of a separate corporate entity.

23.     The *Combustion Engineering* opinion then examined five different proposed grounds for asserting related-to jurisdiction and channeling nonderivative claims against the nondebtor third party:  (1) corporate affiliation; (2) the nondebtor parties' contribution to the trust; (3) the impact of future indemnification claims; (4) shared insurance policies; and, (5) purely equitable jurisdiction under 11 U.S.C. § 105(a)—systematically rejecting all of those arguments. First, the Court held that even though the third party nondebtors were owned by the same holding company, the different corporate entities each had their own structure, management, and operations, removing them from the ambit of 11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV).  391 F.3d at 228.  The BSA offers no proof of even this type of attenuated corporate relationship with its Local Councils, let alone any corporate affiliation whatsoever with its charter organizations—a broad, wholly independent, and ideologically-diverse group throughout the nation.    Second, the *Combustion Engineering* court also rejected the notion that a financial contribution from the third party nondebtors was enough to cover nondebtor entities with the injunction, reasoning that if such were the case, "a debtor could create subject matter jurisdiction over any nondebtor third-party by structuring a plan in such a way that it depended upon third-party contributions."  *Id.*  The Court also distinguished *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187 (3d Cir. 1999), by noting that the third party nondebtor litigation there involved a payment made by the debtor to one creditor at the expense of another.  391 F.3d at 229.  Channeling the intra-creditor litigation into the

bankruptcy was allowed because the payment was some part of the estate itself, and the creditor's relinquishment of that payment to the estate allowed the bankruptcy to be resolved. *Id*.

The *Combustion Engineering* court next rejected jurisdiction based on indemnification from evidence of "joint operations at single sites," distinguishing the Sixth Circuit case of *Lindsey v. O'Brien (In re Dow Corning Corp.)*, 86 F.3d 482 (6th Cir.1996) ("*Dow Corning I*"). In particular, in *Dow Corning I*, nearly *all* of the defective products and supplies came from the debtor in that case, and so the dangerous product had a single source. 391 F.3d at 227, 230-31. Without the debtor being the sole source of the harm-causing agent, such joint operations were simply not enough to provide related-to jurisdiction because exposure from "different products, [ ] different asbestos-containing materials, … [in] different markets" could not be considered derivative under Section 524. *Id.* at 231. *See also Grace III*, 900 F.3d at 137 ("The proper inquiry is to review the law applicable to the claims being raised against the third party … to determine whether the third-party's liability is wholly separate from the debtor's liability or instead depends on it"); *In re W.R. Grace & Co.*, 607 B.R. 419, 448 (Bankr. D. Del. 2019) (*Grace IV*) (claims based on insurers own negligence and failure to warn "constitute nonderivative claims under the derivative liability inquiry" and cannot be channeled). Likewise, shared insurance policies standing alone are insufficient to show derivative liability where there is no evidence of how the policies are structured, or whether all insured parties share a single policy per occurrence or aggregate limit. 391 F.3d at 232-33 (other cases finding related-to jurisdiction based on shared policies involved extensive evidence of policy provisions showing automatic indemnification by the debtor and joint policy limits, and rejecting proponents' bald assertion of a cap on joint liability).

24.     Finally, the *Combustion Engineering* court rejected the argument that Section 105(a)'s general grant of authority to bankruptcy courts to "issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of this title[,]" 11 U.S.C. § 105(a), allowed it to channel claims against "independent non-derivative claims against nondebtor third parties." 391 F.3d at 234. As noted above, the bankruptcy statutes do not create jurisdiction, and Section 105(a)'s recognition of authority is coterminous with actions that affect the debtor's estate in bankruptcy. 391 F.3d at 236 ("Although the Bankruptcy Court has broad equitable authority to craft remedies necessary to facilitate the reorganization of a debtor, this power is cabined by the Code"). The Third Circuit was quite clear in *Combustion Engineering* that the Code could not be used to "cleanse [third party nondebtors] of non-derivative … liability without enduring the rigors of bankruptcy." *Id*. at 237. Without meeting the "derivative" requirements of Section 524(g)(4)—being an owner, manager, insurer, or lender for the debtor—Section 105(a) could not be expanded to relieve independent nondebtor entities of their own independent liability. As discussed below, the BSA has repeatedly asserted through the sworn testimony of its officials that BSA is legally independent from its Local Councils and charter organizations.

25.     Objecting Claimants anticipate that the RSA proponents will rely on *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126 (3d Cir. 2019) (*Millennium*), for the proposition that this Court has authority to channel non-derivative claims against third party nondebtors where their participation in the plan is "integral to the restructuring of the debtor-creditor relationship." *Millennium*, 945 F.3d at 135, *citing Stern v. Marshall*, 564 U.S. 462, 497 (2011). In the first instance, *Millennium* took pains to note that its holding was conditioned "[o]n the specific, exceptional facts of this case." *Id*. at 129, 140. Second, *Millennium* revolves entirely around a dispute between creditors in the bankruptcy based on representations made by one set of creditors closely aligned with the debtor (shareholder entities possessing many of the same principals as the debtor) that induced the other creditor to loan the debtor a large sum of money. Although the

closely-aligned creditors had not been adjudicated to have been in privity with or the alter ego of

the debtor, their overlap rendered them essential to the continuation of the enterprise, which was

under the threat of a business-terminating government sanction at the time the deal was struck.  *Id.*

at 130-32.  Third, while the case involved non-consensual third-party releases, the releases were

not offered as part of any 524(g) trust and there was no discussion of any derivative liability or the

need to satisfy 524(g)'s derivative requirement.  Fourth, the *Millennium* court also was careful to

caution that it was not in any way "expanding bankruptcy court authority" to allow a heedless use

of "integral to the restructuring" releases without "caution and diligence" of the bankruptcy court

in determining that any such releases are necessary to the organization, fair to the creditors, and

fully supported by detailed factual findings in the record.  *Id.* at 139, citing *In re Global Indus.*

*Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (en banc); *In re Continental Airlines, Inc.*, 203 F.3d

203, 214 (3d Cir. 2000).

26.    The BSA cannot meet the high bar set by *Millennium* to authorize non-consensual

third-party releases in this case.  The absolute need for such releases to resolve this bankruptcy is

fatally undermined here by BSA's prior insistence on the viability of its BSA-only "Toggle Plan"

as well as the current absence of any charter organizations as signatories to the RSA.  Moreover,

even if this Court possesses constitutional authority to issue non-consensual third-party releases in

general under *Stern* and *Millennium*, it lacks the ability to do so as a matter of statute because the

independent liability of the Local Councils and charter organizations flatly cannot be subject to

any channeling injunction whatsoever.  *Grace III*, 900 F.3d at 137; *Combustion Engineering*, 391

F.3d at 230-37; *see Grace IV*, 607 B.R. at 448.  To the extent the RSA requires this Court to find

that it can channel claims against Local Councils and charter organizations based on their own

independent liability (and the RSA is in fact founded upon this concept), it demands a legal

impossibility and cannot be enforced.  Making an impossibility a condition precedent to performance of a contract is absurd and plainly not a reasonable exercise of sound business judgment, particularly given the significant amount of time and money that will be spent by the (bankrupt) business in pursuit of that impossibility.

27.    The BSA makes no factual or legal showing that the liabilities of the Local Councils and charter organization derive from the liabilities of the BSA.  To the contrary, the liability of the Local Councils and the charter organizations often exceeds the liability of the BSA because the Local Councils and the charter organization directly supervised the Scouting units, including their Scout leaders and the children who participated in those Scouting units.  In turn, in many—if not most—cases, the Local Councils and the charter organizations were the entities that received complaints that a Scout leader might be sexually abusing children or otherwise learned of "red flags" that indicated a Scout leader might be sexually abusing children.  In many instances a charter organization would appoint one of its members or agents, like a church member or school employee, to act as a Scout leader despite the charter having received prior complaints that the individual might pose a danger to children.

28.    Based on its own prior admissions, BSA cannot legitimately advance the argument that the sexual abuse claims against the Local Councils and charter organizations may be channeled as "derivative" of BSA's own liability.  *See* Declaration of Kristian Roggendorf, Exhibit A (Declaration from BSA official in Oregon case, Declarations of BSA officials in Washington case; Declarations from BSA official and local council officials in California case).

29.    In 2010, the BSA filed a sworn declaration in Oregon from one of its executives that described the relationship between the BSA, the Local Councils, and the charter organizations.  Roggendorf Decl, Exhibit 1, Declaration of Nathaniel E. Marshall, at 2-6.  In the sworn declaration,

the BSA's executive describes how the BSA, the Local Councils, and the charter organizations are "three entirely separate legal entities" and "none has control over the other." *Id.* at 4-6. The BSA's executive went to great lengths to explain that "neither The Boy Scouts of America nor the local councils create, administer, or run the individual scouting units or troops. Instead, it is the local community sponsor, such as schools, churches or civic organizations, and their local community volunteers who organize, create and run all of the troop and other scouting units in the United States." *Id.* at 5. To drive the point home, the BSA's executive stated that "Nationwide, currently there are approximately 130,000 locally sponsored scouting units including Boy Scout troops. These units are created, organized, supervised and run by approximately 1.3 million community volunteers who have absolutely no employment or agency relationship with The Boy Scouts of America. … The troops or units do not belong to The Boy Scouts of America or to the Local Council but rather are owned and operated by the chartered local community organization." *Id.* at 5-6.

30.     In 2011, the BSA filed two sworn declarations in Washington from one of its executives describing the relationship between the BSA, the Local Councils, and the charter organizations. Roggendorf Decl, Exhibit 2, Declarations of Martin Walsh. In these Declarations, the BSA executive described how "BSA at the national level is an educational resource program. It makes its Scouting program available to local community organizations to use to fulfill their mission(s) to their members and to their communities[,]" and how "[n]ationwide, there are approximately 130,000 locally sponsored Scouting units … [that] are created, organized, supervised and run by approximately 1.3 million community volunteers who have absolutely no employment or agency relationship with BSA." [First] Declaration of Walsh, ¶¶ 5, 8. BSA's executive further described scouting as "consist[ing] of three "layers" of distinct legal entities[,]"

that used its "educational resource program." [Second] Declaration of Walsh, ¶¶ 3, 4. The BSA executive described the Local Councils as "are separate nonprofit or charitable corporations operating within a set geographic area" that are "established by local community leaders to serve their communities by providing guidance and support to the independent community organizations that operate Scout troops." *Id.* at ¶ 5. The executive further described charter organizations as "independent community organizations such as schools, churches or civic organizations, and their local community volunteers who organize, create and run all of the troop and other scouting units in the United States[,]" and that "[t]hese organizations own scouting units, such as Scout troops and Cub Scout packs, and select the leadership for their units." *Id.* at ¶ 6.

31.    In 2015, the BSA filed three sworn declarations in California from one of its executives and two local council officials that described the relationship between the BSA, the Local Councils, and the charter organizations. Roggendorf Decl, Exhibit 3, Declarations of Brasfield, Koppes, and Westfield. The BSA executive again described BSA as "a nonprofit educational resource program[,]" that does not "control or have the right to control the chartered organizations or the activities of local troops. Further, BSA does not control or have the right to control the day-to-day activities of the local councils." Declaration of Al Westberg at ¶¶ 3, 6. The BSA executive also described the local councils, testifying that "[e]ach council is incorporated as a separate not-for-profit entity in the state in which it is located, and each council raises and disburses its own funds and has its own board of directors." *Id.* at ¶ 4. He further disclaimed control over scout leaders: "The Scoutmasters, Assistant Scoutmasters and other adult volunteers of the troops are not agents or employees of the BSA or the local councils." *Id.* at 5. One of the local council officials testified that "the GEC did not control nor have the right to control the chartered organizations or the activities of local troops. Rather, the chartered organizations owned

and operated the individual local troops[,]" and stated that the local council "acted as a legal entity separate and apart from the BSA, the local chartered organizations and individual Boy Scout troops." Declaration of Alan Koppes at ¶¶ 2, 3, 5. The other local council official testified that a local council "does not have the right to control the chartered organizations or the activities of local troops or troop adults. At no time are local adult troop volunteers employees or agents of GEC." Declaration of Charles Brasfiled, ¶ 4.

32.     Rather than being essential to the restructuring of BSA or its exit from bankruptcy, these entities are necessarily excluded from any potential 524(g) channeling injunction under the clearly established Third Circuit precedent set out above. BSA is estopped from arguing to the contrary under theories of judicial estoppel and quasi-estoppel. *Ryan Operations, G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d. Cir. 1996) (judicial estoppel "prevent[s] a litigant from asserting a position inconsistent with one that she has previously [successfully] asserted in the same or in a previous proceeding"); *In re Price*, 361 B.R. 68, 79 (Bankr. D.N.J. 2007) (collecting cases and discussing quasi-estoppel, which has its basis in equity and precludes a party from asserting, to another's prejudice, a position that is inconsistent with a previously-held position). BSA has been successful in its argument that it bears no legal liability for its Local Councils and chartering organizations in several jurisdictions. *See e.g. Golden Spread Council, Inc., et al., v. Veronica Atkins, et al.*, 926 S.W. 2d 287 (Tx. 1996) BSA not liable for the negligence of a local council and charter organization); *Hobbs v. Boy Scouts of America, Inc., et al.*, 152 S.W. 3d 367 (Mo. 2004) (BSA not liable for negligence of a charter organization); *N.K. v. Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, et al.*, 307 P.3d 730 (Wn. App. 2013) (adopting BSA's argument that it was not liable for the sexual abuse of a Scout, including the negligence of a charter organization, but holding the charter organization had a duty

to protect the Scout from foreseeable harm); *Hammerberg v. Boy Scouts of America, et al.*, 33 Mass. L. Rptr. 54 (2015) (BSA not liable for scouting abuse despite charter organization's liability). Unquestionably, the hypocrisy of demanding that this Court find indispensable and entirely derivative the very entities from whom the BSA has spent well over two decades distancing itself should very much repel the conscience of the court. *See Price*, 361 B.R. at 79 ("The 'conscience of the court' is repelled by the inconsistency" of insurer blatantly reversing position taken pre-confirmation).

33.     Channeling claims against Local Councils and charter organizations is a foundational component of the RSA. Thus, the Objecting Claimants respectfully request that the Court, in its resolution of this motion, expressly rule on whether it can, as a matter of law, channel *all* child sexual abuse claims asserted against Local Councils and charter organizations to a post-confirmation 524(g) trust as envisioned in the RSA—including any claims based on direct, independent, and non-derivative liability of these entities arising from their own actions and knowledge. Objecting Claimants forthrightly assert that such an injunction is beyond the Court's authority under the Bankruptcy Code, which in turn strictly limits the boundaries of this Court's authority. Because it is a central pillar of the RSA that the Court finds it can channel all claims against the Local Councils and charter organizations to the trust, the legal impossibility of making such a finding dooms the RSA from the outset and renders it a functional (if not legal) nullity. No further resources of the BSA's estate should be expended in pursuing this inherently futile attempt to obtain some "global" solution.

**B.**     **AS THE INSURERS HAVE ALREADY ARGUED, THE ASSIGNMENT OF LOCAL COUNCIL AND CHARTER ORGANIZATION INSURANCE POLICIES TO THE TRUST RUNS A CONSIDERABLE RISK OF EITHER VOIDING THE POLICIES ENTIRELY OR CAPPING THE POLICY PAYOUTS.**

34.     The Objecting Claimants are concerned that the RSA fails to adequately address the arguments of the insurers that assigning the local council and charter organization insurance policies to the trust may either void the policies or cap the exposure of the insurers under those policies.  Rather than ask the Court to directly address those risks, the RSA requires the Court to make factual findings that the BSA apparently thinks may temporarily conceal those risks until after plan confirmation.  The Objecting Claimants object to the RSA because it fails to adequately ensure that these insurance policies are protected, including the rights that the creditors have to the fruits of those policies.

35.     "[A]n insurance policy is property of  the estate within 11  U.S.C.  §  541(a)(1)." *Estate of Lellock v. Prudential Ins. Co. of Am.,* 811 F.2d 186, 189 (3d Cir.1987), *quoted in In re Fed.-Mogul Glob. Inc.*, 684 F.3d at 366.  The debtor may transfer such insurance policies to a resulting 524(g) trust without running afoul of any anti-assignment provisions because the bankruptcy trustee takes the policy notwithstanding such provisions pursuant to 11 U.S.C. § 541(c)(1), and the bankruptcy court is allowed to modify the insurance contract under its power to "transfer of all or any part of property of the estate to one or more entities" upon plan confirmation. 11 U.S.C. § 1123(a)(5), *quoted in Combustion Engineering*, 391 F.3d at 218 n. 27.  Of note, these rules only apply to ***property of the debtor*** at the time of the petition, which then becomes property of the estate, and the anti-assignment contractual provisions are eliminated by the operation of the Bankruptcy Code, which only allows for such modification to ***"property of the estate."***

36.    "A liability insurance policy generally contains two basic duties—the duty to defend and the duty to indemnify its insured."   *First Bank of Turley v. Fidelity & Deposit Insurance Co. of Maryland*, 928 P.2d 298 (Okla.1996).   "Under contract and law, insureds generally have a duty to cooperate with their insurers in the resolution of claims that are subject to coverage."   *In re A.P.I., Inc.*, 331 B.R. 828, 849 (Bankr. D. Minn. 2005).   *See Verdetto v. State Farm Fire & Cas. Co.*, 510 F. App'x 209, 211 (3d Cir. 2013) (under Pennsylvania law, "insured has the responsibility to cooperate in good faith with an insurer's investigation of a covered loss"). In almost every state, insureds have a duty to obtain the insurer's consent to agree to any settlement offer, and in several states, the failure to obtain consent may void the policy coverage.   *E.g.*, *Cincinnati Ins. Co. v. Adkins*, 935 N.E.2d 190, 193 (Ind. Ct. App. 2010); *Morrison by Morrison v. Worldwide Ins. Grp.*, 212 A.D.2d 518, 519 (N.Y. 1995); *Danrik Constr. Inc. v. Am. Cas. Co. of Reading Pa.,* 314 Fed.Appx. 720, 723–24 (5th Cir.2009) (Louisiana); *Kronjaeger v. Buckeye Union Ins. Co.*, 490 S.E.2d 657, 668 (W. Va. 1997); *Virginia Farm Bureau Mut. Ins. Co. v. Gibson*, 374 S.E.2d 58, 63 (Va. 1988).   Likewise, violations of a policy's anti-assignment provisions may be void as well.   *Neurological Surgery Assocs. P.A. v. Aetna Life Ins. Co.*, No. CIV.A. 12-5600 SRC, 2014 WL 2510555, at *4 (D.N.J. June 4, 2014) ("This Court concludes that the anti-assignment provision in the benefit plan is valid and enforceable. The insured's assignment of rights or benefits to Plaintiff is void").

37.    The RSA purports to create a system by which claims against any "Protected Party"—including the Local Councils and potentially charter organizations if they agree to sign on to the RSA—are channeled into the Trust Distribution Procedures where a valuation is reached and then presented to the insurers for payment.   Restructuring Support Agreement at 5-6.   In theory, the insurers would be bound by this valuation number and would be required to pay out of

the applicable insurance policy for the insured entity.  *Id.*  Under the most recently-filed Amended

Plan (BSA's Fourth Amended Plan), incorporated into the RSA by reference to the "Insurance

Assignment" in the Plan:

> the Bankruptcy Code authorizes the Insurance Assignment as provided in the
> Amended Plan, notwithstanding any terms of any policies or provisions of non-
> bankruptcy law that is argued to prohibit the delegation, assignment, or other
> transfer of such rights, and the Bankruptcy Court has determined that the Settlement
> Trust is a proper defendant for Abuse Claims to assert the liability of the Protected
> Parties to trigger such insurance rights[.]

*Id.* at 6.  The "Insurance Assignment" is defined in the Plan as "the assignment and transfer to the

Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the

Insurance Settlement Agreements, (d) the Abuse Insurance Coverage, and (e) all other rights or

obligations under or with respect to the Abuse Insurance Policies (but not the policies

themselves)."  Fourth Amended Plan (Dkt. 5484), at 21.  In relevant part, the "Abuse Insurance

Coverage" under the Plan "means, collectively, the BSA Insurance Policies and the Local Council

Insurance Policies."  *Id.* at 5.  In other words, the Plan will transfer the rights under the Local

Council insurance policies (also a defined term, but largely self-explanatory) to the trust

automatically and without approval of the respective insurers who wrote those policies.  The RSA

demands that this Court find it has the power to do so for the policies belonging to nondebtors that

are not property of the estate.

38.     By basic operation of logic, if the rights to an insurance policy are transferred or

assigned without approval of the insurers, then there is a distinct risk (depending on each state's

common law) that such policies could be voided.  *See, e.g., Shelter Ins. Companies v. Hildreth*,

255 F.3d 921, 925 (8th Cir. 2001) (state law applies when interpreting the provisions of an

insurance policy).  As the insurers have already asserted, a bankruptcy court has no authority to

modify the terms of a contract that is not part of the property of the estate:

> Section 105 does not authorize bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law. *U.S. v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986); *Southern Ry. Co. v. Johnson Bronze Co.,* 758 F.2d 137, 141 (3d Cir.1985). Bankruptcy courts are not permitted in the name of equity to create additional property rights or remedies in favor of a debtor unless those rights or remedies are statutorily authorized under the Bankruptcy Code. *In re Holyoke Nursing Home, Inc.* 372 F.3d 1, 5 (1st Cir.2004).

*In re Geneva ANHX IV LLC*, 496 B.R. 888, 902 (Bankr. C.D. Ill. 2013). Therefore, if the Court does transfer the policies to the trust, the insurers have already made clear they will argue the policies are voided under certain states' law. While time and space constraints prevent an exhaustive run-down of how each state's law would handle a purported settlement valuation from the TDPs under a given policy, the insurers have made abundantly clear they will argue that any such settlement award is a breach of a nondebtor insured's obligation to obtain settlement approval. Additionally, the insurers have asserted that they will also argue that a transfer of rights under the policies to the trust from nondebtor third parties falls outside of *Combustion Engineering's* permissive rule for debtor policies. Indeed, while most states hold that settlements without approval can only be disclaimed if the settlement prejudices the insurer, the risk of losing some policies entirely in some states is quite plausible. *See Fed. Ins. Co. v. New Hampshire Ins. Co.*, No. CIVA 03-385-C, 2010 WL 28568, at *4 n.2 (M.D. La. Jan. 4, 2010) ("Lee R. Russ & Thomas F. Segalla, 14 COUCH ON INS. § 203:38 (collecting cases) ('[A]n insured that enters into a settlement without the insurer's consent breaches the terms of the policy, thereby voiding any coverage for the settlement); Allan D. Windt, 1 INS. CLAIMS & DISPUTES 5th § 3:9 (collecting cases) (the result of an insured's failure to comply with a 'consent to settle' clause 'is that the company is under no obligation to contribute to the settlement)'").

39.    Of more universal concern, however, is the very real and immediate risk that the amount of coverage from the insurance companies will be capped at the amount of money paid into the trust by insured entities, particularly in states such as California, where a strict indemnification-only rule has been established.  In *Fuller–Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal.App.4th 958 (2006) (*Fuller-Austin*), the Court of Appeal of California examined the effect of a 524(g) trust on insurance contracts under California state law.   Just as in the BSA's proposed plan here under the RSA, each injured asbestos claimant would be provided with a claim valuation through a TDP process, and then paid according to a periodically adjusted percentage of what the trustee believed would be an overall value of the trust:

> the Fuller-Austin plan provided that its trust would evaluate and determine whether to pay claims under that plan's version of the TDPs, called the "Claims Resolution Procedures" ("CRPs"). *Id.* at 969–70, 38 Cal.Rptr.3d 716. "The claimant could either accept the Trust's determination or seek a different ruling through binding or nonbinding arbitration, or a jury trial." *Id.* at 970, 38 Cal.Rptr.3d 716. The CRPs, like the Flintkote TDPs, provided "allowed liquidated values" for five asbestos-related disease levels. *Id.* at 969–70, 38 Cal.Rptr.3d 716. *1179 "The CRP[s] expressly provided that a claimant would receive only a periodically adjusted 'Payment Sum Percentage' of the [allowed liquidated value], based on the Trust's assets, that would amount to only a fraction of the [allowed liquidated value]." *Id.* at 970, 38 Cal.Rptr.3d 716.

*Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1178–79 (N.D. Cal. 2016) (discussing *Fuller-Austin* at length and adopting its holding as binding law in California on the interpretation of insurance indemnification contracts).

40.    The "allowed liquidation value" from *Fuller-Austin* is identical in substance to the "Claims Matrix" TDP value propounded by BSA in the RSA and in its latest proposed Plan.  The insurers in *Fuller-Austin* objected to this valuation process and refused to pay more than what the asbestos victims had received from the fund, claiming that they were obliged only to indemnify their insured for what the insured itself paid out, not what was believed would be necessary to

make the claimants whole—the California Court of Appeal agreed. *Fuller-Austin*, 135 Cal.App.4th at 997 ("Appellants' insurance policies indemnify Fuller-Austin for amounts it is 'obligated to pay' by law. The [TDPs] establish that the only amount that Fuller-Austin is obligated to pay is each claim's payment sum percentage"—the amount actually paid by the debtor's estate under the 524(g) plan). Ultimately the California court held that "[insurers] are not required to indemnify [debtor] in the [TDP-determined] amount of each claim; their obligation is to indemnify [debtor] for the amount the Plan obligates it to pay for each allowed claim." *Fuller-Austin*, 135 Cal. App. 4th at 1000. This is accepted as binding law in California. *Flintkote*, 177 F. Supp. 3d at 1173-74, 1178-79.

41.    Other jurisdictions have disagreed with the *Fuller-Austin* result, and instead require insurers to pay the full amount of damages to claimants—however, all such cases involve the court-assigned insurance of the debtor itself, not third parties. *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101 (7th Cir.1991); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, No. CIV. CCB-03-3408, 2012 WL 734176, at *3 (D. Md. Mar. 6, 2012). Furthermore, these cases do nothing for the insurers' contributions in the over 1,000 California cases where the Councils are both insured and well funded. As reflected in the chart below showing BSA's "liquidation analysis" of the unrestricted assets for the three largest Local Councils in California, such a cap would result in a massive and unwarranted windfall to both the Local Councils and their insurers, especially if those councils only pay a proportionate share of the promised $600 million outlined as the "Local Council Contribution" in the RSA:

| Local Council | Unrestricted Net Assets | Claims*[4] | Average Per Claim |
|---|---|---|---|
| Orange County | $38,005,058 | 370+ | $102,716.37 |
| Silicon Valley Monterey Bay | $33,397,061 | 291+ | $114,766.53 |
| Greater Los Angeles | $31,726,269 | 1,136+ | $27,928.05 |

Liquidation Analysis (Dkt. 5371), at 286-88.  These three Local Councils, alone, have at least $103,128,388 in unrestricted net assets, and that number relies on the BSA's unsupported view of what assets are restricted.  Yet if these Local Councils only contribute a pro rata share to the trust ($2.4 million apiece, or $7.2 million total), then their insurers may only have to contribute—at most—that same $7.2 million under current and binding California precedent.  The risk of massive underfunding of the Settlement Trust is undeniable, and yet whatever the small fraction of their unrestricted assets these Local Councils in California do contribute, the insurers' liability may likewise be capped at that amount.  Because it is a matter of state law, there is no order of this Court that can change the insurers' obligations in California or any other states that adopt the *Fuller-Austin* line of reasoning.  The RSA may well prove to be a disaster for claimants from those states and it cannot meet its stated goal of making the TDP valuations binding on the insurers.

42.    There is neither sound business judgment nor any fairness at all evident in advancing an RSA and plan that has the potential to void significant portions of what is intended to be the largest source of recovery for creditors injured as a result of the malfeasance of the Local Councils—the insurance companies—and where it may sharply curtail any potential recovery by

---

[4] The BSA's disclosure statement does not disclose the number of claims against each council.  These claim numbers are from a summary posted by the Tort Claimants' Committee on its website: http://www.pszjlaw.com/assets/htmldocuments/BSA%20Summary%20of%20Sexual%20Abuse%20Claims%20003.pdf (last checked June 29, 2021).

the trust from those insurers in one of the largest and most wealthy states with a fully open statute

of limitations and universally recognized higher jury valuations. Attempting to assign insurance

coverage to the trust from Local Councils in states such as California without the legal authority

to do so under the code, or without at first confirming there are no unintended consequences, poses

a massive risk and could represent a pure giveaway to the massively wealthy Local Councils and

an utter windfall to insurers who potentially face billions of dollars of exposure in California alone.

Such a deal is no better than "investing" at the roulette table, not to mention demonstrably unfair

to sexual abuse victims with California claims in this bankruptcy.  A settlement that openly risks

billions in creditor recovery while most likely leaving culpable third party nondebtors with an

obvious windfall cannot begin to approach the BR 9019 fair and equitable standard.  The RSA

should be rejected on this basis alone.

> **C.    FORCING TDP VALUATIONS ON OBJECTING INSURERS WITHOUT ALLOWING THEM TO CHALLENGE THE FINDINGS IS NOT A SOUND STRATEGY ON WHICH TO BASE A PRESUMPTIVELY MULTI-BILLION DOLLAR PLAN.**

43.    As set out in the RSA, one of the findings that this Court has to make is that "the

right to payment that the holder of an Abuse Claim has against the Debtors or another Protected

Party is the allowed value of such Abuse Claim as liquidated in accordance with the TDP and is

not (i) the initial or supplemental payment percentages established under the TDP to make

distributions to holders of allowed Abuse Claims or (ii) the contributions made by the Debtors or

any Protected Party to the Settlement Trust[.]"  RSA at 6.  Setting aside the fact that such findings

cannot be made as to claims arising in California given the application of *Fuller-Austin's* "amount

paid" holding, the remainder of that decision offers a roadmap of the problems inherent when

attempting to make a bankruptcy court valuation process absolutely binding on insurers.  Without

a final judgment on liability toward any particular claimant, and without an insurer being able to

challenge any particular TDP award on its facts, the duty to force insurers to pay TDP valuations as if they were "judgments" presents a massive risk, unfairly shifted to the claimants.

44.    *Fuller-Austin* involved a 524(g) bankruptcy plan in which the process for ascertaining the value of asbestos claims was presented to the bankruptcy court in the form of an evidentiary trial because the insurance policies at issue required a "final judgment against the Assured after actual trial[.]" *Fuller-Austin*, 135 Cal. App. 4th at 979.  From the BSA's description in the RSA, it appears the intention of the BSA is to present the TDPs at some type of "trial" to the Court to establish factually whether "the procedures included in the TDP pertaining to the allowance of Abuse Claims and (ii) the criteria included in the TDP pertaining to the calculation of the Allowed Claim Amounts … are fair and reasonable based on the evidentiary record offered to the Bankruptcy Court[.]"   Restructuring Support Agreement at 6 (Dkt. 5466-2), at 13.

45.    As a threshold matter, it is unclear whether the insurance policies covering the BSA and the Local Councils require such a final judgment to impose liability on any insureds. Furthermore, the idea that "liability" as used in an insurance contract can be "fixed and rendered" (135 Cal. App. 4th at 979) by adjudicating whether the ***procedures*** used to arrive at such valuations is "fair and reasonable" leaves a great deal to be desired from a logical standpoint, particularly when these are plainly settlement values and not actual verdicts.  Put simply, the fairness of a process is not the value of a claim.  For example, the fairness of a process might well dictate that a claimant's burden of proof is considerably lessened due to the inability to take discovery to rediscover facts (such as the abuse history of a perpetrator), whereas the valuation process would require the ability to discover such information and factor it into the valuation accordingly.  The same is true for the statute of limitations—it would be fair to provide a claim that is facially time-barred with a small settlement in order to get an overall settlement approved, but the insurers have

already stated that they oppose assigning any actual monetary value to such claims for purposes of assessing their financial exposure.

46.     An insurer's liability is a different animal entirely from whether a process used to obtain a settlement value is fair, or whether such a trial could yield a "judgment" sufficient to trigger an insurer's obligation to pay the amount established by the TDPs.  The BSA apparently hopes to avoid the gravamen of the *Fuller-Austin* decision by flyspecking some of the criticisms the court had for the bankruptcy process in that case while ignoring the foundational notion that one cannot impose liability without determining the debtor's actual liability or permit the insurers to challenge any particular TDP valuation.  While it would be absurd to advocate for the trial of 82,500+ individual claims, the attempt to create a "shortcut" to insurance liability poses a massive risk that the RSA will collapse like a house of cards in a hurricane, leaving abuse creditors with useless valuations and the prospect of individual trails anyway—neither a wisely calculated business risk nor a fair and equitable result for creditors.

47.     Attempting a rerun of *Fuller-Austin* by papering over the real problems in the case and focusing on a shortcut to insurance contributions cannot work in California.  This Court is being asked to find that TDP valuations that insurers play no role in establishing and have no chance to appeal bind these insurers because they will have the opportunity to challenge the process used to fix those individual values.  Such a plan fails to address the core difficulty outlined in *Fuller-Austin*—specifically, that no liability can be imposed on these insurers where no specific liability of the debtor has been determined.  If this Court cannot say with confidence at this stage that it believes that such a plan has a good chance of being upheld on the appeal that is undoubtedly coming from the insurers, then the RSA is fatally flawed and is not a sound exercise in business judgment.  It is also unfair to all the parties involved to pursue such a questionable plan in light of

the expense that failure would entail.  Either way (or for both those reasons), the Court should not approve the RSA.

### D.    THE LACK OF POST-CONFIRMATION JUDICIAL OVERSIGHT, COMBINED WITH THE ABILITY TO EXPAND THE CHANNELING INJUNCTION WITHOUT JUDICIAL INTERVENTION,  RENDERS THE PLAN ILLEGAL.

48.    There is no reasonable business judgment, sound business purpose, fairness, or good faith where the RSA requires this Court to delegate its statutory authority and judicial duties to the Settlement Trustee and a stacked committee.  It virtually goes without saying that such unlawful delegation is neither "necessary or appropriate" to carry out the provisions of the bankruptcy code.  11 U.S. § 105(a).

49.    As noted above, this Court's authority to enforce a non-consensual nondebtor release derives from 11 U.S.C. § 105(a): "***The court*** may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." (emphasis added). Although cabined by the scope of the Bankruptcy Code, this sweeping authority necessarily "include[s] the power to enjoin a state proceeding where necessary for the bankruptcy court to protect or effectuate its judgment." *In re Bartock*, 398 B.R. 135, 153 (Bankr. W.D. Pa. 2008). Importantly, Section 105(a) has not been—nor should it be—interpreted to allow delegation of this power to a non-judicial officer.  Moreover, under the authority conferred to it under Sections 105(a) and 524(g), this Court (not a trustee) must make specific factual findings in order for a nondebtor to receive a release and injunction of its current and future liabilities, including specific findings that (1) the nondebtor is paying fair consideration to the creditors whose claims are being released and enjoined, and (2) the relief is necessary to the debtor's reorganization.  *In re Cont'l Airlines*, 203 F.3d at 214.  So too, the injunction issued under 524(g) must come from the Court: "After notice and hearing, ***a court*** that enters an order confirming a plan of reorganization … may

issue, in connection with such order, an injunction…" 11 U.S.C. § 524(g)(1)(A) (emphasis added).

50.     Where a statute requires or authorizes a judicial officer to make a ruling, that judicial power cannot be delegated.  *United States v. Corley*, 500 F.3d 210, 225 (3d Cir. 2007), *vacated and remanded on other grounds*, 556 U.S. 303 (2009) ("the plain language of section 3664(f)—stating that 'the court shall' order restitution…—means that ordering restitution is a judicial function that cannot be delegated, in whole or in part."); *Franklin Brass Foundry Co v. Shapiro & Aronson*, 278 F. 435, 444 (3d Cir. 1921) (the act of making judicial findings cannot be delegated).  The Court cannot allow the Settlement Trustee to exercise powers that reside solely with judges of the United States.

51.     Even assuming for a moment that this absolute bar on delegating core judicial function did not exist, the power delegated to the Settlement Trustee under the RSA vastly exceeds the authority of this Court as well.  For instance, the RSA envisions the Settlement Trustee entering into a "global settlement after the Effective Date that causes an Insurance Company or a Chartered Organization to become a Protected Party …"  RSA (Dkt. 5466-2), Exhibit A, at 22.  In turn, the trustee then provides channeling injunctions to that Protected Party.  RSA (Dkt. 5466-2), Exhibit A, at 18.  However, nowhere does the RSA require that third parties to meet the standards required under 524(g)(4)(A)(ii)(I)-(IV) for participation in the channeling injunction.  Moreover, the RSA ignores the firm mandate found in Section 524(g)(2)(A) that the District Court has "***exclusive*** jurisdiction" over "any proceeding that involves the validity, application, construction, or ***modification of such injunction***, or of this subsection with respect to such injunction … without regard to the amount in controversy."  11 U.S.C. § 524(g)(2)(A) (emphasis added).

52.    Instead of the statutorily-mandated District Court review of injunction modifications, the RSA sets up wholly novel Star Chamber approach in which the "Settlement Trust Advisory Committee" ("STAC") reviews the trustee's proposed settlements.  If three of the seven STAC members (hand-picked by a few parties)[5] object to the proposed settlement, only then may a third party challenge the trustee's proposed settlement.  RSA (Dkt. 5466-2), Exhibit A, at 21-22.  The RSA fails to explain what standard the third party would apply in reviewing the trustee's proposed settlement, but regardless, nowhere does the RSA require the trustee or the reviewing third party to ensure that any non-consensual release and injunction is supported by the specific findings that this Court would have to make if such a release and injunction was proposed pre-confirmation.

53.    Finally, the post-confirmation addition of injunction parties by the trustee is plainly unlawful because it ignores any requirement that releases be approved by the constituency of those affected by the decision.  Indeed, creditors who have claims against nondebtors must be allowed to vote on whether that nondebtor should receive a release and injunction.  *See In re Saxby's Coffee Worldwide*, LLC, 436 B.R. 331, 335 (Bankr. E.D. Pa. 2010) ("Courts may approve third party releases only when the reorganization plan is widely supported by ***the creditor constituency that includes the parties being restrained***, accords significant benefits to that constituency and the court is satisfied that the creditors being restrained also are being treated fairly") (emphasis added); *In re Medford Crossings N., LLC*, No. 07-25115, 2011 WL 182815, at *19 (Bankr. D.N.J. Jan. 20, 2011) (declining to confirm a Chapter 11 Plan of Reorganization in part because "[t]he parties that

---

[5] Deeply concerning, the RSA expressly stacks the members of the STAC in favor of the Coalition: five members are to be selected specifically by the Coalition and two members are selected by the TCC.  Given the STAC has no ability to object to a proposed settlement unless three STAC members object, this lopsided majority serves a very apparent purpose of maintaining control over the entire post-confirmation settlement process in the hands of a few law firms. This insular arrangement is not only unlawful on its face, it is deeply unfair to any party not aligned with or serving the purposes of the Coalition-dominated STAC.

would be restrained from proceeding against the Third Party Releasees are receiving little or no distribution under the Plan and would be precluded from asserting their claims against the Releasees."). As the *Saxby's Coffee* court recognized: "[i]t is a very narrow legal realm in which a party's legal rights may be restricted because the needs of the many outweigh the rights of the few." 436 B.R. at 335.

54.    The fact that the RSA contemplates "global settlements" with insurers that would make them a protected party is alarming and illustrates why this Court cannot delegate its authority to a post-confirmation trustee. As the Court knows well from the BSA's proposed settlement with Hartford, any "global settlement" with an insurance company will likely require a release and injunction of all claims against the insureds covered by the insurer's policies. As noted above, the most recent Disclosure Statement states that the BSA believes it began purchasing insurance policies in 1978 that covered the BSA, the Local Councils, and the charter organizations. Disclosure Statement (Dkt. 5485), at 48. If that is true, any "global" settlement with insurers after 1978 might require releases and channeling injunctions of tens of thousands of claims against thousands of nondebtor entities. Rather than this Court entering the specific findings that are required to provide such relief, including making sure all such nondebtors provide a substantial contribution and not just their tiny share of a joint policy, the RSA delegates the Court's authority to a post-confirmation trustee. Similarly, nothing in the RSA requires the trustee to ensure that the consideration from those releases and injunctions is paid solely to the creditors whose claims were released and enjoined. Any global settlement is therefore inherently unfair to creditors, especially one that is judicially unreviewable and controlled by a closed group of those least affected by any given settlement with any given third party.

55.     The RSA is flatly illegal for delegating judicial power in violation of the Bankruptcy Code, and ultimately cannot be considered in good faith under 11 U.S.C. § 1129(a)(3) for doing so to a closed group of insiders.  *Cf. Combustion Engineering*, 391 F.3d at 244–47.  An illegal contract is void, and cannot be considered a reasonable exercise of sound business judgment.  The RSA's further grant of near-unfettered authority to the Settlement Trustee's authority and the partisan-dominated control of the STAC is manifestly unfair on its face.  The RSA cannot be confirmed under Section 363(b) or FBRP 9019.

### E.     THE STANDARDS FOR THIRD PARTY RELEASES ARE NOT MET, RENDERING THE RSA AN EXERCISE IN FUTILITY

56.     The Court should deny the motion to approve the RSA because the BSA has failed to meet their burden of demonstrating that it is an exercise of reasonable business judgment, that it has a sound business purpose, and that it is proposed in good faith when it fails to meet the basic requirements for a release and injunction of claims against nondebtor entities.  More specifically, the RSA fails to demonstrate that such relief is necessary and fails to ensure that creditors whose claims are released and enjoined, including claims against a Local Council or charter organization, will receive consideration for that release separate and apart from any distribution they will receive due to their status as a creditor.  Again, the BSA cannot rely on Section 105(a) when these terms of the RSA are neither "necessary or appropriate to carry out the provisions" of the bankruptcy code – if anything, they flatly contradict it.

57.     "Section 524(e) of the Bankruptcy Code makes clear that the bankruptcy discharge of a debtor, by itself, does not operate to relieve nondebtors of their liabilities."  *In re Cont'l Airlines*, 203 F.3d at 211.  In addressing the issue of non-consensual releases and permanent injunctions of nondebtor obligations, the Third Circuit has noted the "hallmarks" of permissible non-consensual releases are "fairness, necessity to the reorganization, and specific factual findings

to support these conclusions." *Id.* at 214; *see also In re Global Indus.*, 645 F.3d 201, 206 (3d Cir. 2011) (any channeling injunction must be "both necessary to the reorganization and fair").

Although the Third Circuit in *In re Continental Airlines* did not reject such releases and injunctions like other Circuits, it has cautioned that they should only be granted in a "small subset" of cases: "In *In re Continental Airlines* … we left open the possibility that some small subset of non-consensual third-party releases might be confirmable where the release is "both necessary [to the plan of confirmation] and given in exchange for fair consideration.'" *In re Lower Bucks Hosp.*, 571 F. App'x 139, 144 (3d Cir. 2014) (rejecting a non-consensual third-party release because "we cannot conclude that the Release was exchanged for adequate consideration or was otherwise fair to the [creditors whose nondebtor claims were released]").

        1.        **THE BSA FAILS TO SHOW THIRD-PARTY RELEASES AND INJUNCTIONS ARE NECESSARY FOR ITS REORGANIZATION (AND ALREADY CONCEDED THEY ARE NOT NECESSARY)**

58.      As discussed in detail below, the BSA has failed to meet its burden of providing any evidence that each nondebtor who is receiving a release and injunction, including the Local Councils and any future "Protected Party," is paying fair consideration to the creditors whose claims against them are being released and enjoined.  However, in considering that issue the Court should note that the BSA has not met, and cannot meet, its burden of showing that each nondebtor release and injunction is necessary for the BSA's reorganization.  The BSA cannot take the position that releases and injunctions for nondebtors, including the Local Councils and chartering organizations, is necessary to its reorganization because (1) the BSA previously proposed the "BSA Toggle Plan," which was a BSA-only plan that did not provide releases or injunctions to any nondebtors, and (2) not a *single* charter organization (out of 40,000+) is receiving a release or injunction under the RSA and the RSA provides that such relief is optional to any charter

40

organization that may choose to become a "Protected Party."

59.    In the BSA's own words, the BSA Toggle Plan "provide[d] for the resolution of Abuse Claims and other Claims against <u>only</u> the Debtors." Disclosure Statement for the Second Amended Chapter 11 Plan (Dkt. 2594), at 5 (emphasis in original).  Far from arguing that releases and injunctions for nondebtors was necessary for their reorganization, the BSA acknowledged that this Court could confirm a plan that provided a discharge only to the BSA without any releases or injunctions for nondebtors:

### 2.    THE BSA TOGGLE PLAN

60.    The BSA Toggle Plan provided a process by which Abuse Survivors could obtain compensation for abuse from the BSA only.  Confirmation of the BSA Toggle Plan, as opposed to the Global Resolution Plan, would have allowed abuse survivors to seek compensation on account of their claims against the Local Councils and chartered organizations by filing independent lawsuits in the tort system against such entities. Disclosure Statement for the Second Amended Chapter 11 Plan (Dkt. 2594), at 8.

61.    Given the BSA Toggle Plan was proposed by the BSA as an alternative to the current plan, the BSA cannot now be heard to argue that releases and injunctions for nondebtors are necessary for its reorganization.  While the BSA may prefer that the Local Councils, charter organizations, and other nondebtors receive releases and injunctions, its motion fails to meet their burden of establishing that such releases and injunctions are necessary, a point underscored by the fact that not a single charter organization is a party to the RSA and the BSA previously proposed the alternative BSA Toggle Plan.  *See e.g. In re TCI 2 Holdings*, LLC, 428 B.R. 117, 139 (Bankr. D.N.J. 2010) ("it must be noted that the release of the Guaranty is not necessary for the debtors' reorganization, because another potentially confirmable plan has been proposed which does not

41

contain the release"). Indeed, it makes no sense whatsoever to accept that the BSA invested obscene amounts of money constructing the BSA Toggle Plan, creating the corresponding Disclosure Statement, and stumping for its confirmation, when (now, apparently) its ultimate confirmation would have allegedly left the BSA unable to function.

### F.    THE BSA FAILS TO ESTABLISH THAT CREDITORS WHOSE CLAIMS ARE RELEASED AND ENJOINED ARE RECEIVING FAIR AND REASONABLE CONSIDERATION IN EXCHANGE

62.    The BSA has the burden of providing evidence that allows the Court to make specific factual findings that any release and permanent injunction of claims against nondebtors is "fair to Plaintiffs and [is] given in exchange for reasonable consideration." *In re Cont'l Airlines*, 203 F.3d at 215. Without such specific factual findings, "a release and permanent injunction cannot stand on their merits under any of the standards set forth in the case law of other circuits." *In re Cont'l Airlines*, 203 F.3d at 214. After canvassing the relevant law, particularly in the Third Circuit, one bankruptcy court observed that "[c]learly, the Court must undergo an analysis of each of the Releasees to determine validity" of a release and injunction. *In re 710 Long Ridge Rd. Operating Co.*, II, LLC, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014).

63.    As the Third Circuit has noted, a creditor whose claim is released and enjoined must receive fair consideration from the nondebtor for the release and enjoinder of their claim. *Id.* at 215 n. 13. A bankruptcy court cannot, as the RSA purports to do here, release and enjoin a creditor's claim against a nondebtor, place the consideration from the nondebtor into a global settlement fund, and then distribute the nondebtor's consideration to other creditors who did not have their claim against the nondebtor released and enjoined. The Third Circuit has rejected this very approach because it does not provide fair consideration to the creditors whose claims are

released and enjoined: "Some, but not all, of the Plaintiffs who were included in the proof of claim … may have received five cents on the dollar. … However, this distribution was on behalf of their "creditor" status with respect to Continental Airlines Holdings, not in exchange for the release of their claims against nondebtors." *In re Cont'l Airlines*, 203 F.3d at 215 n. 13.

64.     The Objecting Claimants raise this issue because they believe it is already clear that each Local Council is not paying fair consideration to the current and future claimants whose claims will be released and enjoined under the RSA. When the BSA finally discloses how much each Local Council is actually contributing, the Objecting Claimants believe it will become apparent that each Local Council will need to pay more consideration to their creditors whose claims are being released and enjoined. The need for this disclosure and analysis is particularly important when the BSA and the Local Councils (and proponents of the RSA) have proclaimed that their insurance policies will provide additional compensation. If a Local Council lacks enough assets to pay fair consideration then it will be all the more important that the insurers do not receive a windfall through a cheap "global" settlement. Put more simply, the BSA cannot keep proposing cheap, piecemeal settlements with illusory promises that the next settlement will somehow make up for the last settlement. There is no other way to ensure a creditor will receive fair consideration for a release of their claim, particularly when the RSA provides no safeguard that only creditors with claims against a nondebtor, and with claims under a particular insurance policy of a nondebtor, will actually receive the consideration paid for a release of their claims.

65.     The BSA cites no legal authority for their novel proposal that a group of nondebtors, such as the Local Councils or charter organizations, can offer a lump sum of money in exchange for a release of all current and future claims against them without demonstrating that each creditor is receiving fair consideration for the release of their claim(s) against the nondebtor(s). It is

unlikely any such legal authority exists because it would allow groups of nondebtors to pool their funds and demand that their respective creditors accept a group settlement without any regard to how much each nondebtor is contributing, without any regard to whether each nondebtor is paying fair consideration to the creditors whose claims against them are being released, and without any regard to whether the creditor would actually receive the value the nondebtor paid for a release of the creditor's claim against the nondebtor.

66.     One reason the BSA has failed to cite to any legal authority may be the fact that their proposal flies in the face of basic bankruptcy law.  However, *In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014), is instructive and illustrates a bankruptcy court rejecting a similar effort on a much, much smaller scale.  In *In re 710 Long Road*, the proposed plan included a release of a number of nondebtors that were related to the Debtor, including its managers, directors, officers, and employees.  *Id*. at *17.  The proposed release of the nondebtors did not specify how much each nondebtor was paying to the creditors whose claims against them were being released; rather, it provided the nondebtors would be released "[u]pon substantial consummation . . . for good and valuable consideration, the adequacy of which is hereby confirmed."  *Id*.  Some of the nondebtor parties eventually identified the contributions they would make if the release was confirmed, which allowed the bankruptcy court to analyze their contribution and approve of their release.  *Id*. at **15-16.  The managers, directors, officers, and employees, on the other hand, did not provide financial consideration in exchange for the releases.  *Id*. at *17.  In an effort to justify the lack of consideration by these nondebtors, the Debtors argued the releases "should be extended to the individuals irrespective of their lack of providing identifiable economic consideration because the funders … have required their inclusion in exchange for millions of dollars being contributed."  *Id*.

44

The Debtors went so far as to assert that "a financial contribution need not be made by each and every [nondebtor] in order to receive a release under the Plan, and that their contribution to the reorganization has been and will remain substantial." *Id*.

67.     The bankruptcy court rejected the plan and the Debtors' arguments because it recognized that "the consideration required to satisfy the claims affected must be provided by the party actually receiving the release; it is not sufficient that some creditors receive some extra value from another party." *Id*., at \*18.   The Court found "there [was] really no showing that the individuals have made a substantial contribution necessary for Plan confirmation[,]" and concluded that granting the release without fair consideration from those individuals would be "precisely the type of blanket immunity that courts have warned against." *Id*.   "Simply put, the record [was] devoid of proof the individuals seeking to be released have made a necessary contribution toward funding the Plan and, even under the extreme circumstances of this case, without such demonstration, the proposed releases to managers, director, officers, or employees is not warranted and cannot be approved." *Id*.

68.     Courts in the Third Circuit and elsewhere have also declined to approve permanent non-consensual releases of nondebtors where there is no evidence that the nondebtors paid fair consideration to the creditors whose claims against the nondebtor were released and enjoined. *See e.g. In re United Steel Enterprises, Inc.*, No. CIV.A. 05-5783 (JAG), 2006 WL 3544583, at \*7 (D.N.J. Dec. 8, 2006) (remanding for further findings because it was "unclear from the record whether Martin Skulnik, who was listed in the Plan as a nondebtor entity, actually contributed any real property to the estate in order to increase its value."); *In re Prussia Assocs.*, 322 B.R. 572, 599 (Bankr. E.D. Pa. 2005) (declining to approve a permanent third party release were there was "no evidence in the record that the injunction was given in exchange for any 'consideration,' let alone

'fair consideration.'); *In re Exide Technologies,* 303 B.R. 48, 76 (Bankr.D.Del.2003) (disapproving of subordination injunction in plan because there was "no evidence that any value" was given "to creditors or equity holders in exchange" for the injunction or that it was "necessary for the Plan's success."); *In re Boston Harbor Marina Company,* 157 B.R. 726, 732 (Bankr.D.Mass.1993) (rejecting permanent injunction and release since "parties who would benefit by the release and injunction are contributing nothing to the Plan.").

69.    The Court should deny the motion to approve the RSA because the BSA has failed to meet its burden of demonstrating that it is an exercise of reasonable business judgment, that it has a sound business purpose, and that it is proposed in good faith when it fails to meet the basic requirements for a release and injunction of claims against nondebtor entities.  More specifically, the RSA fails to ensure that creditors whose claims are released and enjoined, including claims against a Local Council or charter organization, will receive consideration for that release separate and apart from any distribution they will receive due to their status as a creditor.  If the BSA wants a release and permanent injunction for a Local Council or charter organization, it has the burden of showing how much each nondebtor is contributing for the release and injunction and how much each creditor with a claim against that nondebtor is receiving in exchange for that relief and injunction.  In turn, the BSA has the burden of showing that each such creditor will *actually receive* the consideration that is being paid for the release and injunction of their claim against the nondebtor.  *In re Lower Bucks Hosp.*, 571 F. App'x 139, 144 (3d Cir. 2014) (rejecting a non-consensual third-party release due to lack of disclosure because "we cannot conclude that the Release was exchanged for adequate consideration or was otherwise fair to the [creditors whose nondebtor claims were released]").

70.    The failure of the BSA to meet this burden is well-illustrated by its proposal to assign certain insurance policies to a trust without any analysis of the coverage provided by those policies, any analysis of how the assignment might impact the available coverage, or any disclosure regarding how the proceeds of those policies might be utilized, particularly the separate insurance policies of nondebtors.  Although the BSA acknowledges it did not start purchasing insurance for any Local Councils until at least 1971 and for any charter organizations until approximately 1978, nothing in the RSA or the Disclosure Statement provides any analysis of the value of the separate insurance purchased by the Local Councils or charter organizations or what affect the RSA might have on those separate insurance policies.  On the other hand, the BSA in its most recent Disclosure Statement states that its primary insurance policies between 1962 and 1982 "had a per-occurrence limit of $500,000" with no aggregate limit and excess policies starting in 1969 "that provided $2 million per-occurrence in coverage on top of the $500,000 per-occurrence primary policies."  Amended Disclosure Statement (Dkt. 5485), at 45-46.  If each Local Council or charter organization had similar insurance limits, the amount of available insurance coverage would be stratospheric.  The only insured under those policies would be the Local Council or charter organization, and the only abuse survivors who have a claim to those policies would be entitled to compensation from those policies.  As noted, not only do the RSA and Disclosure Statement fail to provide any analysis of the coverage available under separate insurance maintained by the Local Councils or charter organizations, but they also fail to explain whether the terms of the RSA might jeopardize the coverage available under those policies.

71.    The Third Circuit has cautioned that a bankruptcy court cannot ignore the "fact-intensive" inquiry that must be undertaken before it can issue a release and injunction that might impact the insurance available to nondebtors:  "One cannot assume too quickly that the proceeds

of this policy are property of the estate when the nondebtor D&Os, not the Continental Debtors, are the direct beneficiaries of the policy.  We previously have recognized, albeit in a different context, that the proceeds from a insurance policy should be evaluated separately from the debtor's interest in the policy itself."  *In re Cont'l Airlines*, 203 F.3d at 216-17(3d Cir. 2000).  Even if the BSA is covered by a joint insurance policy "this by itself does not justify a permanent injunction of Plaintiffs' actions against the insured [nondebtors] as necessary for the reorganization of the [] Debtors."  *Id.* at 217.  To the contrary, a bankruptcy court must also consider "whether the nondebtors made substantial contributions to the reorganization, whether the injunction is essential to reorganization, whether affected parties overwhelmingly have agreed to accept the proposed treatment, and whether the plan pays all or substantially all of the affected parties' claims."  *Id.* at 217 n. 17 (citing *Master Mortgage Inv. Fund*, 168 B.R. at 935).

72.    Finally, the motion fails to provide any legal or factual basis to justify a finding that any nondebtors have claims against the BSA, including claims for indemnification or contribution. Although the BSA does not advance this argument, the Third Circuit has made clear that the BSA has the burden of showing that any such claims are factually and legally cognizable.  *In re Cont'l Airlines*, 203 F.3d at 215-16.

73.    Far from saving time and money, the RSA will result in the exact opposite:  it will waste significant more time and money as the BSA proceeds with a futile effort to fit a round peg in a square hole.  Not only does the pending motion fail to include any evidence that would allow the Court to make the requisite findings for a release and injunction of claims against nondebtors, but the Disclosure Statement also fails to include such evidence.

74.    To the contrary, the latest Disclosure Statement says the Local Councils are "committed" to paying at least $600 million toward a settlement fund but that "commitment" is from an ad hoc committee of councils that has repeatedly made clear that it does not speak for the Local Councils and cannot bind them.  In turn, despite approximately 70 objections to the prior Disclosure Statement because it failed to disclose how much each Local Council is contributing, the latest Disclosure Statement includes a placeholder exhibit that is titled "Expected Local Council Contributions" and says those contributions are "to be supplemented."  Amended Disclosure Statement (Dkt. 5485), Exhibit C.  On the other hand, the latest Disclosure Statement includes a "liquidation analysis" whereby the BSA discloses the fact that the Local Councils collectively have at least $1.8 billion in unrestricted assets and another $1.5 billion in (allegedly) restricted assets.  Amended Disclosure Statement (Dkt. 5485), Exhibit D.  Despite acknowledging over $3.3 billion in assets, the "liquidation analysis" does not explain the factual or legal basis for why the BSA believes that certain assets of the Local Councils are restricted or how much each Local Council is contributing from their assets that the BSA now admits are unrestricted.  At most, the liquidation analysis includes the conclusory statement that the asserted restrictions regarding some assets have been "validated by BSA's legal analysis" but the BSA fails to provide the analysis or the basis for the analysis.  *Id.* at 16.

75.    On the other hand, the BSA's liquidation analysis shows that many Local Councils have *significant* assets, including significant "unrestricted assets."  The true amount of unrestricted assets is likely underreported because the liquidation analysis does not disclose the factual or legal basis for the purported restrictions.  However, taking the BSA's analysis at face value, it shows that many Local Councils have unrestricted assets in the tens of millions of dollars, including the following councils that the BSA asserts have over *$30 million* in unrestricted net assets:

| Local Council | Unrestricted Net Assets | Claims*[6] | Average Per Claim |
|---|---|---|---|
| Sam Houston | $88,569,253 | 752+ | $117,778.26 |
| Orange County | $38,005,058 | 370+ | $102,716.37 |
| Cascade Pacific | $34,421,289 | 487+ | $70,680.26 |
| National Capital Area | $33,820,605 | 532+ | $63,572.57 |
| Silicon Valley Monterey Bay | $33,397,061 | 291+ | $114,766.53 |
| Chief Seattle | $33,363,479 | 297+ | $112,334.95 |
| Greater Los Angeles | $31,726,269 | 1,136+ | $27,928.05 |

76.     These seven Local Councils, alone, have at least $293,303,014 in unrestricted net assets, and that number relies on the BSA's unsupported view of what assets are restricted.  Using the BSA's liquidation analysis, it appears the 13 most wealthy Local Councils have unrestricted net assets that exceed $500 million.  Yet the BSA suggests the 250+ Local Councils should all receive releases of current and future claims for a total of $600 million and that all 82,500+ abuse survivors should share in that $600 million without any regard to the source of the funds or whose claims were released in order to obtain those funds.

77.     The Court should deny the motion because the BSA wants the Court to approve the RSA despite the fact that it purports to give the Local Councils and Protected Parties a release and injunction of all current and future claims without disclosing how many childhood sexual abuse claims implicate each Local Council and Protected Party, an estimate for the value of the current

---

[6] The BSA's disclosure statement does not disclose the number of claims against each council.  These claim numbers are from a summary posted by the Tort Claimants' Committee on its website: http://www.pszjlaw.com/assets/htmldocuments/BSA%20Summary%20of%20Sexual%20Abuse%20Claims%20003.pdf (last checked June 29, 2021).

claims against each Local Council and Protected Party, an estimate for the value of future or unknown claims that will share in the funds contributed by each Local Council and Protected Party, and how much each Local Council and Protected Party is contributing in exchange for a release and injunction of all current and future claims against it. Not only has the BSA failed to provide this Court with the basic evidence it needs to ensure that the creditors whose claims are being released and enjoined are receiving fair consideration in exchange for that relief, but the BSA makes absolutely no effort to ensure that those funds will actually go to those creditors.

### G.    LACK OF A FUTURE CLAIMS FUND RENDERS THE PLAN PATENTLY UNCONFIRMABLE

78.    The Court should deny the motion to approve the RSA because the BSA has failed to meet its burden of demonstrating that it is an exercise of reasonable business judgment, that it has a sound business purpose, and that it is proposed in good faith when it seeks to provide a release and injunction of future claims against nondebtors without ensuring that those future claimants will receive a substantially similar recovery as the current creditors. Not only can those future claimants raise this fatal flaw in the RSA, which could render the RSA meaningless given the lack of due process, but the current claimants are entitled to know that the nondebtors are paying fair consideration for the release and enjoining of *their claims* and the Court is required to make specific factual findings reflecting the same.

79.    The Objecting Claimants raise this issue primarily because the RSA contemplates payments toward future claimants but it makes no effort to inform the current claimants how those payments will affect the compensation they will receive, either from the BSA or from nondebtors who become Protected Parties. On the other hand, the Objecting Claimants do not want the RSA to be approved, and significant time and money spent pursuing the terms of the RSA, if a future claimant can object to the lack of due process and unwind the RSA.

80.     As it stands, the Court appointed a future claimants' representative ("FCR") with a narrow constituency that the BSA has acknowledged does not adequately represent the interests of future claimants who have claims against nondebtor entities, including claims against the Local Councils and charter organizations that the BSA proposes to release and enjoin with the RSA. Despite the fact that the FCR is a signatory to the RSA, the RSA is completely silent regarding what impact future claimants will have on the recovery of the current claimants, particularly if the FCR's constituency must be expanded to account for future claimants with claims against nondebtors.

81.     When it moved to appoint the FCR, the BSA acknowledged the need for a future claims representative because of the unique nature of childhood sexual abuse:

> As other courts have acknowledged, sexual abuse can cause "cognitive and psychological injuries" that impede a survivor's ability to recognize the abuse and its effects. See In re Roman Catholic Archbishop of Portland in Oregon, Case No. 04-37154, 2005 WL 148775, at *4 (Bankr. D. Or. Jan. 10, 2005).  As a result, the Debtors believe it is critically important that the Court appoint a future claimants' representative to represent the interests of these Future Claimants in connection with these chapter 11 proceedings, including the negotiations regarding the plan of reorganization, the victims' compensation trust, and the channeling injunction.

Debtors' Motion for Entry of an Order Appointing James L. Patton, Jr., as Legal Representative for Future Claimants (Dkt. 223), at 10.  The BSA acknowledged that "it is important to the Debtors' restructuring efforts that the interests of any Future Claimants be adequately represented through these chapter 11 cases." *Id.* at 10 no. 8.  To that end, the BSA asked the Court to appoint a future claimants' representative because the interests of the Tort Claimants' Committee "may not be aligned in all respects with those of the Future Claimants.  It is therefore necessary and appropriate for the Court to appoint a separate representative and advocate for the interests of the Future Claimants." *Id.* at 11.

82.    In further support of their motion to appoint a future claimants' representative, the
BSA noted at least nine different bankruptcy courts that appointed a future claimants'
representative "to represent claimants that were unable to identify their injury at the time of the
bankruptcy case":

> Courts addressing bankruptcy cases involving significant numbers of sexual abuse
> claims have regularly appointed future or unknown claimants' representatives to represent
> claimants that were unable to identify their injury at the time of the bankruptcy case.  *See,*
> *e.g.*, *In re Archbishop of Agaña*, Case No. 19-00010 (FTG) (D. Guam Mar. 3, 2020), Dkt.
> No. 355 (appointing unknown claimants' representative); *In re USA Gymnastics*, Case No.
> 18-09108 (RLM) (Bankr. S.D. Ind. 2019), Dkt. No. 516 (appointing futures representative
> to represent future abuse claimants); *In re Roman Catholic Bishop of Great Falls, Montana*,
> Case No. 17-60271 (JDP) (Bankr. D. Mont. June 18, 2018), Dkt. No. 383 (same); In re
> Christian Brothers' Institute, No. 11-22820 (RDD) (Bankr. S.D.N.Y. Apr. 21, 2014), Dkt.
> No. 688 (appointing future claimants' representative post-confirmation to administer trust
> to settle sexual abuse claims); *In re Catholic Bishop of Northern Alaska*, No. 08-00110
> (DMD) (Bankr. D. Alaska May 30, 2008), Dkt. No. 179 (appointing future claimants'
> representative on behalf of potential sexual abuse claimants); In re Diocese of Davenport,
> No. 06-02229 (LMJ) (Bankr. S.D. Iowa Nov. 7, 2007), Dkt. No. 198 (same); *In re Roman*
> *Catholic Bishop of San Diego*, No. 07-00939 (LA) (Bankr. S.D. Cal. July 13, 2007), Dkt.
> No. 753 (same); *In re Roman Catholic Archbishop of Portland in Oregon*, No. 04-37154
> (ELP) (Bankr. D. Or. Dec. 20, 2004), Dkt. No. 723 (same); *In re Roman Catholic Church*
> *of the Diocese of Tucson*, No. 04-BK-04721 (JMM) (Bankr. D. Ariz. Nov. 1, 2004), Dkt.
> No. 107 (same).

Debtors' Motion for Entry of an Order Appointing James L. Patton, Jr., as Legal
Representative for Future Claimants (Dkt. 223), at 11-12.  The BSA represented to the Court that
the appointment of a future claimants' representative was "critical to ensure that Future Claimants
will be properly represented in negotiations and will have a zealous advocate in, among other
things, establishing and negotiating appropriate trust distribution procedures and related
documentation that will govern any trust created pursuant to section 105(a) of the Bankruptcy
Code." *Id.* at 18.

83.    Although the Court granted the BSA's motion to appoint the current FCR, it
significantly limited the FCR's constituency:

The Future Claimants represented by the Future Claimants' Representative includes individuals holding a claim based on abuse that occurred prior to the Petition Date, but who have not filed a proof of claim by the applicable bar date and who, as of the date immediately preceding the Petition Date:

(a) had not attained eighteen (18) years of age, or

(b) were not aware of such Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the State or territory where the claim arose.

Order Appointing James L. Patton, Jr., as Legal Representative for Future Claimants (Dkt. 486), at 2.  The Court did not, as the BSA requested in its motion, include future claimants who would have a timely claim in the numerous states that allow survivors of childhood sexual abuse to file a claim within a certain amount of time of discovering the injuries they suffered as a result of the abuse or the connection between the injuries and the abuse.  More specifically, the Court's definition of "Future Claimants" did not include "individuals holding a claim based on Abuse that occurred prior to the Petition Date, but who, as of the date immediately preceding the Petition Date … had not discovered the injury or the connection between the injury and the Abuse and who could not in the exercise of reasonable care have discovered the injury or connection between the injury and the Abuse."  Debtors' Motion for Entry of an Order Appointing James L. Patton, Jr., as Legal Representative for Future Claimants (Dkt. 223), at 7.

84.    While this constituency may have been omitted at the time because the only future claimants were people with claims against the BSA, the omission is now a fatal flaw given the RSA proposes to provide non-consensual releases and injunctions to nondebtors who would otherwise face future claims from this omitted constituency.  Simply put, there is no way to justify protecting the interests of abuse survivors who have timely claims due to repressed memory but not protecting the interests of abuse survivors who have timely claims under the statute of limitations in states that allow abuse survivors to come forward within a reasonable time of them

beginning to understand they were injured from the abuse or beginning to understand the connection between the abuse and their injuries.  *See e.g. In re Roman Catholic Archbishop of Portland in Oregon*, No. 04-37154 (ELP) (Bankr. D. Or. Dec. 20, 2004), Dkt. No. 723; Wash. Rev. Code Ann. § 4.16.340 (1)(b), (c).

85.     The RSA implicitly acknowledges that neither the FCR's constituency nor the definition of "Future Abuse Claims" encompasses these claimants.  Under "Claimant Eligibility," the RSA includes (1) abuse survivors who filed a proof of claim before the bar date, <u>and</u> (2) abuse survivors who allege abuse against a Local Council or Protected Party and submit their claim to the trust before the statute of limitations has expired.  RSA (Dkt. 5466-2), Exhibit B, at 5.  The problem, of course, is that abuse survivors may still have many years to timely pursue their claim against a Local Council or Protected Party, but nothing in the RSA explains how long these future claimants will have to file a claim, provides an estimate on the number of future claimants, or indicates how much will be set aside to compensate them.  The RSA acknowledges that abuse survivors will come forward in the years to come and that they will still have timely claims against a Local Council or Protected Party, but it fails to ensure any compensation will be available to them, let alone anything substantially similar to what the current creditors will receive.

86.     On the other hand, and consistent with the FCR's limited constituency, the RSA only allows "Future Abuse Claims" if the claimant was under 18 years old before the petition date or "was not aware of such Direct Abuse Claim as a result of 'repressed memory,' to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose."  RSA (Dkt. 5466-2), Exhibit B, at 7.  However, even for this very limited class of future claimants, nothing in the RSA explains how long these future claimants will have to file a claim, provides an estimate on the number of future claimants as to the BSA and each

nondebtor, or indicates how much will be set aside to compensate them, including how much will be set aside from the contributions of nondebtors who pay consideration for a release of the claims of those future claimants.  To the contrary, the RSA states that such future claimants "shall be treated as Direct Abuse Claims hereunder," which implies that any available compensation for future claimants will exhaust at the same time as the available compensation for current claimants. This begs the question:  how can the RSA adequately protect the interests of future claimants (e.g., someone who is 12 years old and was sexually abused in January 2020) when the RSA treats them the same as current claimants?  If the trust distributes all of its funds before the abuse survivor reaches the age of majority, or before he or she remembers the abuse, they will receive no compensation.

87.     Not only does the RSA create serious due process issues for those future claimants, which is why the BSA requested an FCR in the first place, but it suggests the FCR intends for a significant amount of funds to be set aside for his limited constituency, including funds from the contributions of nondebtors.  The Court should deny the pending motion because it fails to provide any evidence that would allow the Court to enter findings that each nondebtor who will receive a release of current and future claims has paid fair consideration to the creditors whose claims against it will be released.  Frankly, it is unclear how advocates of the RSA can represent that it is a "good deal" for creditors if they have no idea (1) how much each nondebtor is proposing to pay to current *and future* creditors whose claims will be released; (2) how much those current and future claims are worth; (3) how much each of their assets each nondebtor is keeping, including whether any purported restrictions are valid; and, (4) how much of each nondebtor's contribution will be used to compensate current creditors versus future creditors.

88.     These concerns are particularly troubling given the FCR signed the RSA, yet but the FCR has not made a single disclosure (in the RSA, the latest Disclosure Statement, or the latest Plan) regarding how he intends to provide fair compensation to his limited constituency who have claims against the BSA, how he intends to provide fair compensation to his limited constituency who have claims against parties who become Protected Parties, and whether he believes he has a fiduciary duty to expand the scope of his constituency given the RSA proposes the release of claims against nondebtors, including nondebtors who would otherwise face timely claims from abuse survivors who do not fall under his current, narrow constituency.  On the other hand, just fourth months ago, the FCR, the TCC, and the Coalition sought to estimate the value of the future claims. One reason for their motion was to ensure that nondebtors who might receive a channeling injunction, including the Local Councils and charter organizations, would pay fair consideration for the release of their liabilities:

> Third, estimation of the Debtors' liabilities, including the extent to which those liabilities are shared (in whole or in part) by any local council or chartered sponsoring organization, will inform the contribution that can and should be expected from any local council and chartered organization that seeks a third-party release. The Debtors' Proposed Plan contemplates a channeling injunction benefiting the 250-plus local councils affiliated with BSA, and possibly other sponsoring organizations as well. The Movants cannot (and do not) support a channeling injunction in favor of those nondebtors unless they can meaningfully evaluate the size of the liability to be extinguished by the injunction. Estimation will so inform the Movants and their constituents.

Motion of the Future Claimants Representative (Dkt. 2391), at 5.  Rather than provide any sort of estimation or explanation for how the FCR intends to ensure that his constituency receives fair consideration for the release of their claims, including whether the consideration will impact the consideration received by the current creditors for the release of their claims against nondebtors, the FCR signed the RSA and bound himself not to "take any other action to interfere with acceptance, confirmation, affirmation or implementation of the Amended Plan" and not to "take

any action that would interfere with, delay, impede, or postpone … the entry or effectiveness of the RSA Approval Order."  RSA, at 11.

89.    The Court should deny the motion to approve the RSA because it seeks to provide a release and injunction of future claims against nondebtors without ensuring that those future claimants will receive a substantially similar recovery as the current creditors.  Moreover, the motion should be denied because it fails to provide the Court with the basic evidence it needs to enter findings that any nondebtor who will receive a release and injunction is paying fair consideration to the creditors whose claims are being released and enjoined, particularly when the FCR's constituency does not fairly account for all future claimants against those nondebtors.  Even with the FCR's limited constituency, the motion and RSA fail to provide any evidence that would allow the Court to determine the impact that the future claimants will have on the consideration paid to the current claimants – without that evidence there is no way for the Court to enter findings that the nondebtors are paying fair consideration to those current claimants, particularly when it is very clear that the Local Councils are not contributing anywhere close to their available assets and could contribute more in order to pay fair consideration for the release of the future claims.

## H.    THE PRESUMPTIVE RELIANCE ON EQUITABLE MOOTNESS PROTECTING THE SETTLEMENT IS FOOLHARDY.

90.    Even assuming that the BSA gets this Court to make all of its requested findings and the Plan envisioned in the RSA is brought to a successful confirmation, there is no guarantee that such a dubious legal construct will withstand any sort of appellate scrutiny.  For this plan to have any hope of surviving, the BSA would be forced to rely on the doctrine of equitable mootness to prevent its unraveling on appeal.

91.    "Equitable mootness is a narrow doctrine by which an appellate court deems it prudent for practical reasons to forbear deciding an appeal when to grant the relief requested will

undermine the finality and reliability of consummated plans of reorganization." *In re Tribune Media Co.*, 799 F.3d 272, 277 (3d Cir. 2015) (internal quotation marks omitted). The purpose of equitable mootness is to assure all parties concerned "that a plan confirmation order is reliable and that they may make financial decisions based on a reorganized entity's exit from Chapter 11 without fear that an appellate court will wipe out or interfere with their deal." *Id.* at 280. "An equitable mootness analysis proceeds by asking two questions: (1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." *Millennium*, 945 F.3d at 140.

92.    Because equitable mootness is ultimately a post-confirmation issue, the Objecting Claimants will not spend a great deal of time on this issue. However, without any sort of fallback offered in its latest plan, the BSA clearly envisions that the RSA and Fourth Amended Plan will be approved and makes no contingency for the plan to either be voted down or rejected at confirmation. If the Plan framed by the RSA is confirmed, appeals are certain to follow. Given the serious and foundational legal problems identified above, the only way to preserve this arrangement would be by "scrambling" everything so badly that the courts would have to leave the flawed decision as-is. *See Tribune*, 799 F.3d at 281.

93.    Although exemplifying Napoleon's dictum of "*L'audace, l'audace, toujours l'audace*," this type of legal defensive strategy not only represents poor business tactics, it is profoundly unfair and deeply cynical to use such means in securing a decidedly sub-optimal result for the victims of childhood sexual abuse. In preserving an objection to the later use of equitable mootness as well as a means of drawing the Court's attention to the potential use of such reckless tactics, the Objecting Claimants simply offer that this type of strategy cannot meet the demands of

Section 363(b) or FBRP 9019, and an agreement that rests its hope on chaos cannot be approved by the law.

## CONCLUSION

94.      To approve the RSA, this Court must be persuaded of two things: 1) from the perspective of the BSA, that the RSA is an exercise of reasonable business judgment; and 2) as to the creditors, that the resolution contemplated by the RSA must be fair and equitable.  This Court should not be persuaded of either.  The BSA will argue that the RSA is not just a reasonable deal, but a great one.  For a sum of money that is all-but-certain to be far less than the $850 million that has been dangled in front of claimants and trumpeted in the media, the BSA can walk away from bankruptcy wearing an impenetrable cloak of legal immunity large enough to fit not just itself, but also all of the Local Councils and chartering organizations.  Stated differently, for less than 25% of the assets owned by the BSA and the Local Councils, the BSA is walking away from what is likely to be a years-long battle with its insurers (now foisted upon the survivors) with not just releases from the roughly 82,500 current claims for itself and 250+ of its closest friends, but also the surety that no future claimant can come knocking at its door.  This sounds like the boondoggle of a lifetime.  But when something sounds too good to be true, it usually is.

95.      The BSA is gambling both time and money (that it does not have) that it can convince this Court to confirm the unconfirmable.  And this is where the reasonableness of BSA's business judgment breaks down.  Rather than taking the reasonable approach of securing its own release and letting non-debtors approach this Court to ask for channeling injunctions one by one (to the extent they can be granted), the RSA hinges on an approach that hands out channeling injunctions to hundreds of Local Councils, and perhaps tens of thousands of charter organizations, with little or no transparency or judicial scrutiny.  This aggressive approach expands the use of

channeling injunctions far beyond anything the bankruptcy courts have ever countenanced, and flouts established Third Circuit law cautioning that such devices are to be used sparingly, and only after a compelling showing that the non-debtor receiving the benefits of the release and injunction has provided requisite value to affected claimants. The RSA also far exceeds the bounds of this Court's subject matter jurisdiction by disbursing these channeling injunctions to extinguish non-derivative claims of non-debtors. As the BSA recklessly sprints headlong toward any exit from bankruptcy it can find, the RSA ensures much of the work of arranging the channeling injunctions (and negotiating corresponding settlements) will be done post-confirmation with control over the process delegated to a small cadre of lawyers and a trustee, and no judicial oversight. All of this is outside the powers reserved to this Court. There is more. The RSA's proponents have all-but-promised claimants that the awards resulting from the TDP matrix will be binding upon the insurers; a theory that has never been confirmed and will surely be opposed by the insurance companies. Any of these issues could prevent confirmation, after a great deal of time and money have been sunk into the RSA and the Plan. And even if confirmation occurred, vigorous appeals would pose a real risk to unwind the plan due to its reliance on binding TDPs and audacious use of channeling injunctions. It is the height of folly for the BSA to invest millions of dollars, and months or more of litigation, on an RSA that is intended to carry-out a plan that is all-but-certain to fail. Blindly throwing money at a lost cause is not sound business judgment; particularly when the inevitable failure of the plan will drastically reduce the BSA's chances of eventually walking away from bankruptcy.

96.    Nor is the plan in any way fair or equitable to claimants. The RSA's allowance of slightly more than $10,000 per survivor of childhood sexual abuse is orders of magnitude less than any of the Catholic Diocese bankruptcies. The RSA's proponents have pitched the deal as a

necessary means to begin negotiations with insurance carriers. But cutting corners has consequences, and the insurance policies that are supposed to make this deal more palatable are being risked for a vain hope that the insurers will come to the negotiating table. The RSA contemplates paying survivors pennies on the dollar and the puts all of these risks on the claimants. This is by no means fair and equitable.

**RESPECTFULLY SUBMITTED** this 22nd day of July, 2021.

**BIELLI & KLAUDER, LLC**

*/s/ David M. Klauder*
David M. Klauder, Esquire (No. 5769)
1204 N. King Street
Wilmington, DE 19801
Phone: (302) 803-4600
Fax: (302) 397-2557
Email: dklauder@bk-legal.com

– and –

**THE ZALKIN LAW FIRM, P.C.**
Irwin Zalkin, Esquire
Devin Storey, Esquire
Kristian Roggendorf, Esquire
10590 West Ocean Air Drive, Suite 125
San Diego, CA 92130
Phone: (858) 259-3011
Fax: (858) 259-3015
irwin@zalkin.com
dms@zalkin.com
kristian@zalkin.com[7]

– and –

**PFAU COCHRAN VERTETIS AMALA PLLC**
Michael T. Pfau, Esquire
Jason P. Amala, Esquire
Vincent T. Nappo, Esquire
Benjamin B. Watson, Esquire

---

[7] *See* attached Exhibit A, which lists the Sexual Abuse Survivor Proof of Claim numbers for the Objecting Claimants, organized by their law firms.

403 Columbia Street, Suite 500
Seattle, WA 98104
Phone: (206) 451-8260
Facsimile: (206) 623-3624
michael@pcvalaw.com
jason@pcvalaw.com
vnappo@pcvalaw.com
bwatson@pcvalaw.com

– and –

**HOROWITZ LAW**
Adam D. Horowitz, Esquire
110 E. Broward Boulevard, Suite 1850
Fort Lauderdale, FL 33301
Phone: (954) 641-2100
Facsimile: (954) 828-0596
adam@adamhorowitzlaw.com

– and –

**PANISH SHEA & BOYLE LLP**
Spencer R. Lucas, Esquire
11111 Santa Monica Boulevard, Suite 700
Los Angeles, CA 90025
Phone: (310) 477-1700
Fax: (310) 477-1699
lucas@psblaw.com

– and –

**REBENACK ARONOW MASCOLO, LLP**
Jay S. Mascolo, Esquire
111 Livingston Avenue
New Brunswick, NJ  08901
Phone: (732) 247-3600
Fax: (732) 247-3630
jmascolo@ram.law

– and –

**AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ, PLLC**
Mary Liu, Esquire
17 East Main Street
Pensacola, FL 32502

Phone: (850) 202-1010
Fax: (760) 304-8933
mliu@awkolaw.com

– and –

**LINDER, SATTLER & ROGOWSKY, LLP**
Erica B. Sattler, Esquire
3 Park Avenue, Suite 2300
New York, New York  10016
Phone: (212) 766-4424
lsrlawny@gmail.com

– and –

**MANLY,  STEWART & FINALDI**
Taylor Boren, Esquire
Vince W. Finaldi, Esquire
19100 Von Karman Avenue, Suite 800
Irvine, CA  92612
Phone: (949) 252-9990
Fax: (949) 252-9991
tboren@manlystewart.com
vfinaldi@manlystewart.com

– and –

**DUMAS & VAUGHN**
Ashley L. Vaughn, Esquire (admitted *pro hac vice*)
Gilion C. Dumas, Esquire
3835 Northeast Hancock Street, Suite GLB
Portland, OR 97212
Phone: (503) 616-5007
ashley@dumasandvaughn.com
gilion@dumasandvaughn.com

– and –

**BETTI & ASSOCIATES**
Michele M. Betti, Esquire
30 Wall Street, 8th Floor
New York, New York 10005
Phone: (646) 895-0939
mbettilaw@gmail.com

– and –

**LAW OFFICE OF KIRK C. DAVIS**
Kirk C. Davis, Esquire
1218 Third Avenue, Suite 1000
Seattle, WA 98101
Phone: (206) 684-9339
Fax: (206) 260-3685
kirk@kirkdavislaw.com

– and –

**GREEN & GILLISPIE**
Joshua D. Gillispie, Esquire
1 Riverfront Place, Suite 605
North Little Rock, AR 72114
Phone: (501) 244-0700
josh@greenandgillispie.com

– and –

**SPAGNOLETTI LAW FIRM**
Marcus R. Spagnoletti, Esquire
Marc E. Kutner, Esquire
401 Louisiana Street, 8th Floor
Houston, TX 77002
Phone: (713) 653-5600
Fax: (713) 653-5656
mspagnoletti@spaglaw.com
mkutner@spaglaw.com

– and –

**CHASAN & WALTON, LLC**
Andrew M. Chasan, Esquire
Timothy C. Walton, Esquire
P.O. Box 1069
Boise, ID 1069
andrew.chasan@chasanwalton.com
timwalton2000@hotmail.com

– and –

**LAW OFFICES OF ANTHONY M.
DEMARCO**
Anthony M. DeMarco, Esquire

650 Sierra Madre Villa Avenue, Suite 203
Pasadena, CA 91107
paul@demarcolawfirm.com

– and –

**OSHAN & ASSOCIATES, P.C.**
Evan M. Oshan, Esquire
P.O. Box 9091
Seattle, WA 98109
Phone: (206) 335-3880
evan@oshanandassociates.com

– and –

**FASY LAW, PLLC**
Daniel Fasy, Esquire
1752 Northwest Market Street #1502
Seattle, WA 98107
Phone: (206) 450-0175
dan@fasylaw.com

– and –

**LAW OFFICE OF JOSEPH A. BLUMEL III, P.S.**
Joseph A. Blumel, III, Esquire
4407 North Division Street, Suite 900
Spokane, WA 99207
Phone: (509) 487-1651
joseph@blumellaw.com

– and –

**TAMAKI LAW OFFICES, P.S. INC.**
Bryan G. Smith, Esquire
Vito R. de la Cruz, Esquire
1340 North 16th Avenue, Suite C
Yakima, WA 98902
Phone: (509) 248-8338
bsmith@tamakilaw.com
vito@tamakilaw.com

– and –

**SILVER GOLUB & TEITELL LLP**
Paul A. Slager, Esquire
Jennifer B. Goldstein, Esquire
Nicole B. Coates, Esquire
184 Atlantic Street
Stamford, CT  06901
Phone: (203) 325-4491
Fax: (203) 325-3769
pslager@sgtlaw.com
jgoldstein@sgtlaw.com
ncoates@sgtlaw.com

*Counsel to the Objecting Claimants*

# EXHIBIT A

The foregoing Objection to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief was filed by the following creditors who each timely filed a Sexual Abuse Survivor Proof of Claim and are represented by the law firms listed below.  The numbers below are the claim numbers for each creditor's Sexual Abuse Survivor Proof of Claim.

**The Zalkin Law Firm Claimants**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 18072 | 48079 | 63165 | 67687 | 77783 | 78482 | 90468 | 97430 | 105814 | 107363 |
| 29655 | 51702 | 63175 | 74196 | 77789 | 78618 | 90485 | 97431 | 105815 | 107390 |
| 34531 | 51733 | 63188 | 77282 | 77849 | 78622 | 90728 | 104530 | 105816 | 107392 |
| 34947 | 52861 | 63190 | 77319 | 77911 | 81313 | 90739 | 104562 | 105822 | 107393 |
| 37970 | 54709 | 63201 | 77322 | 77922 | 84481 | 90799 | 105016 | 105826 | 107394 |
| 40260 | 54721 | 63208 | 77364 | 77927 | 84496 | 91547 | 105017 | 105875 | 107396 |
| 40722 | 54807 | 63220 | 77391 | 78074 | 84562 | 93305 | 105020 | 105886 | 107399 |
| 43527 | 58626 | 67605 | 77397 | 78117 | 84965 | 93523 | 105022 | 105891 | 107401 |
| 43531 | 58646 | 67612 | 77425 | 78168 | 88613 | 97419 | 105063 | 105896 | 107419 |
| 43537 | 58657 | 67614 | 77438 | 78190 | 89201 | 97420 | 105075 | 105919 | |
| 44968 | 58674 | 67630 | 77572 | 78250 | 89203 | 97421 | 105807 | 105928 | |
| 44970 | 58680 | 67633 | 77585 | 78329 | 90197 | 97423 | 105809 | 106168 | |
| 46081 | 58700 | 67637 | 77619 | 78384 | 90247 | 97424 | 105810 | 106521 | |
| 46090 | 58743 | 67660 | 77676 | 78390 | 90282 | 97426 | 105811 | 106523 | |
| 47689 | 63163 | 67671 | 77749 | 78424 | 90399 | 97429 | 105813 | 107360 | |

**Pfau Cochran Vertetis Amala PLLC, Panish Shea & Boyle, and Rebenack Aronow Mascolo Claimants**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3412 | 6363 | 11106 | 16250 | 21279 | 28216 | 35170 | 42368 | 48522 | 63914 |
| 3468 | 6365 | 11109 | 16251 | 21287 | 28223 | 35171 | 42552 | 48524 | 63921 |
| 3470 | 6366 | 11117 | 16252 | 21311 | 28233 | 35180 | 42556 | 48528 | 63970 |
| 3480 | 6367 | 11119 | 16254 | 21316 | 28241 | 35187 | 42565 | 48532 | 64018 |
| 3508 | 6368 | 11120 | 16255 | 21324 | 28245 | 35192 | 42568 | 48537 | 64038 |
| 3514 | 6369 | 11122 | 16256 | 21344 | 28247 | 35195 | 42576 | 48539 | 64069 |
| 3516 | 6370 | 11123 | 16258 | 21355 | 28248 | 35212 | 42589 | 52929 | 64080 |
| 3518 | 6376 | 11127 | 16259 | 21357 | 28262 | 35219 | 42592 | 52940 | 64137 |
| 3548 | 6380 | 11184 | 16261 | 21361 | 28265 | 35233 | 42599 | 52946 | 64184 |
| 3550 | 6381 | 12814 | 16262 | 21368 | 28267 | 35266 | 42606 | 52949 | 64211 |
| 3552 | 6382 | 12818 | 16263 | 21382 | 28270 | 36476 | 42608 | 52960 | 64213 |
| 3556 | 6383 | 12819 | 16264 | 21586 | 28272 | 36480 | 42609 | 52969 | 64279 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3626 | 6384 | 12821 | 16265 | 21607 | 28273 | 36484 | 42615 | 53104 | 64324 |
| 3628 | 6394 | 12823 | 16266 | 21720 | 28276 | 36494 | 42625 | 53128 | 65698 |
| 3630 | 6397 | 12824 | 16267 | 22410 | 28279 | 36495 | 42634 | 53153 | 65699 |
| 3632 | 6398 | 12829 | 16269 | 22414 | 28280 | 36501 | 42635 | 53172 | 65706 |
| 3634 | 6399 | 12861 | 16270 | 22433 | 28283 | 36515 | 42637 | 53191 | 65767 |
| 3636 | 6400 | 12882 | 16271 | 22446 | 28285 | 36521 | 42640 | 53208 | 65804 |
| 3637 | 6401 | 12883 | 16272 | 22459 | 28291 | 38009 | 42647 | 53213 | 65806 |
| 3638 | 6402 | 12895 | 16273 | 22463 | 28296 | 38081 | 42650 | 53230 | 65873 |
| 3640 | 6403 | 12896 | 16275 | 22494 | 28300 | 38083 | 42679 | 53287 | 66078 |
| 3642 | 6406 | 12912 | 16276 | 22507 | 28303 | 38089 | 42680 | 53303 | 70221 |
| 3644 | 6408 | 12918 | 16278 | 22508 | 28305 | 38107 | 42689 | 53315 | 70284 |
| 3646 | 7930 | 12923 | 16279 | 22518 | 28314 | 38131 | 42697 | 53328 | 70689 |
| 3648 | 7931 | 12929 | 17291 | 25251 | 28315 | 38133 | 42702 | 53337 | 70776 |
| 3652 | 7933 | 12937 | 17295 | 25252 | 28319 | 38139 | 42705 | 53360 | 70873 |
| 3654 | 7934 | 12940 | 17297 | 25253 | 28323 | 38154 | 42706 | 53374 | 70880 |
| 3656 | 7937 | 12942 | 17299 | 25254 | 28333 | 38172 | 42707 | 53389 | 71140 |
| 3658 | 7938 | 12947 | 17309 | 25256 | 28335 | 38173 | 42709 | 53392 | 71157 |
| 3663 | 7940 | 12952 | 17310 | 25257 | 28343 | 38280 | 42723 | 53412 | 71170 |
| 3665 | 7943 | 12957 | 17318 | 25258 | 28345 | 38281 | 42725 | 53416 | 71258 |
| 3669 | 7944 | 12962 | 17321 | 25259 | 28351 | 38282 | 42736 | 53447 | 71261 |
| 3675 | 7945 | 12963 | 17325 | 25261 | 29580 | 38296 | 42738 | 53466 | 71311 |
| 3677 | 7952 | 12968 | 17327 | 25262 | 29581 | 38311 | 42744 | 53467 | 71350 |
| 3681 | 7957 | 12969 | 17334 | 25264 | 29583 | 38319 | 42746 | 53468 | 71409 |
| 3683 | 7963 | 12970 | 17335 | 25265 | 29586 | 38325 | 42756 | 53472 | 71414 |
| 3685 | 7964 | 12989 | 17336 | 25266 | 29587 | 38340 | 42761 | 53474 | 71490 |
| 3689 | 7968 | 12991 | 17337 | 25267 | 29588 | 38341 | 42768 | 53487 | 71568 |
| 3691 | 7972 | 12992 | 17343 | 25269 | 29592 | 38345 | 42792 | 53489 | 71579 |
| 3693 | 7975 | 12993 | 17346 | 25270 | 29594 | 38346 | 42796 | 53522 | 71654 |
| 3701 | 7981 | 13003 | 17347 | 25271 | 29596 | 38352 | 42817 | 53530 | 71786 |
| 3943 | 7989 | 13451 | 17348 | 25272 | 29597 | 38361 | 42819 | 53533 | 71822 |
| 3944 | 7993 | 14017 | 17349 | 25275 | 29600 | 38364 | 44476 | 53557 | 71824 |
| 3945 | 8001 | 14024 | 17350 | 25276 | 29603 | 38365 | 44511 | 53558 | 71886 |
| 3946 | 8003 | 14025 | 17351 | 25277 | 29606 | 38381 | 44512 | 53565 | 71904 |
| 3947 | 8005 | 14028 | 17352 | 25278 | 29613 | 38389 | 44518 | 53578 | 71909 |
| 3948 | 8008 | 14031 | 17353 | 25279 | 31921 | 38394 | 44550 | 53581 | 71985 |
| 3949 | 8012 | 14032 | 17356 | 25281 | 31927 | 38404 | 44573 | 56184 | 72008 |
| 3950 | 8013 | 14035 | 17357 | 25283 | 31930 | 38408 | 44610 | 56189 | 72035 |
| 3951 | 8595 | 14036 | 17359 | 25284 | 31961 | 38417 | 44614 | 56214 | 72076 |
| 3952 | 9153 | 14038 | 17931 | 25285 | 31976 | 38423 | 44654 | 56216 | 72106 |
| 3953 | 9162 | 14039 | 18782 | 25286 | 31988 | 38432 | 44700 | 56492 | 72111 |
| 3954 | 9193 | 14041 | 18787 | 25287 | 32052 | 38434 | 44730 | 56514 | 72129 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3955 | 9228 | 14042 | 18788 | 25288 | 32061 | 38436 | 44844 | 56547 | 72142 |
| 3956 | 9229 | 15183 | 18820 | 25289 | 32071 | 38444 | 44857 | 56598 | 72145 |
| 3957 | 9230 | 15193 | 18826 | 25290 | 32114 | 38455 | 44873 | 56600 | 72177 |
| 3958 | 9231 | 15198 | 20615 | 25291 | 32136 | 38474 | 44884 | 56666 | 72192 |
| 3959 | 9235 | 15202 | 20624 | 25292 | 32140 | 40105 | 44914 | 56681 | 72233 |
| 4331 | 9237 | 15205 | 20647 | 25293 | 32141 | 40106 | 44946 | 56684 | 72312 |
| 4332 | 9240 | 15206 | 20659 | 25294 | 32158 | 40116 | 44998 | 56685 | 72365 |
| 4333 | 9272 | 15207 | 20667 | 25295 | 32160 | 40133 | 45006 | 56696 | 72390 |
| 4335 | 9276 | 15213 | 20682 | 25296 | 32163 | 40134 | 45044 | 56697 | 76263 |
| 4341 | 9278 | 15215 | 20685 | 25297 | 32164 | 40142 | 45058 | 56760 | 76284 |
| 4343 | 9324 | 15216 | 20708 | 25298 | 32165 | 40154 | 45064 | 56789 | 76330 |
| 4344 | 9331 | 15219 | 20714 | 25300 | 32206 | 40156 | 45082 | 56805 | 76377 |
| 4347 | 9361 | 15220 | 20725 | 25304 | 32223 | 40163 | 45087 | 56810 | 76632 |
| 4348 | 9363 | 15221 | 20747 | 25305 | 32230 | 40176 | 45088 | 56833 | 76708 |
| 4352 | 10227 | 15223 | 20760 | 25306 | 32255 | 40177 | 45092 | 57456 | 82969 |
| 4353 | 10231 | 15224 | 20768 | 25307 | 32270 | 40188 | 45095 | 57630 | 83136 |
| 4354 | 10232 | 15230 | 20770 | 25308 | 32290 | 40392 | 45103 | 57639 | 83195 |
| 4422 | 10235 | 15332 | 20779 | 25309 | 32307 | 40410 | 45109 | 57642 | 84975 |
| 4423 | 10242 | 15333 | 20781 | 25311 | 32336 | 40412 | 47687 | 60302 | 85019 |
| 4469 | 10243 | 15342 | 20782 | 27884 | 32344 | 40428 | 47729 | 60369 | 85034 |
| 4480 | 10246 | 15345 | 20784 | 27914 | 32353 | 40448 | 47745 | 60443 | 85142 |
| 4483 | 10259 | 15461 | 20790 | 27954 | 32384 | 40467 | 48013 | 60615 | 85171 |
| 4520 | 10260 | 15505 | 20812 | 27955 | 32389 | 40480 | 48028 | 60751 | 85291 |
| 4529 | 10261 | 15619 | 20825 | 27963 | 32392 | 40481 | 48035 | 60816 | 89625 |
| 4533 | 10269 | 15627 | 20839 | 27972 | 32403 | 40496 | 48057 | 60923 | 89784 |
| 4538 | 10368 | 15631 | 20850 | 27974 | 32404 | 40498 | 48059 | 61276 | 89830 |
| 4545 | 10374 | 15638 | 20863 | 28003 | 32412 | 40521 | 48060 | 61690 | 89904 |
| 4547 | 10508 | 15643 | 20872 | 28007 | 32427 | 40526 | 48087 | 61800 | 90742 |
| 4554 | 10992 | 15646 | 20876 | 28065 | 32430 | 40529 | 48089 | 61811 | 90828 |
| 4558 | 10993 | 15647 | 20879 | 28070 | 32431 | 40532 | 48093 | 61834 | 90873 |
| 4680 | 11017 | 15655 | 20882 | 28071 | 32432 | 40545 | 48094 | 61957 | 90942 |
| 4684 | 11023 | 15677 | 20892 | 28078 | 32434 | 40577 | 48099 | 61977 | 90991 |
| 4687 | 11029 | 15681 | 20916 | 28080 | 32436 | 40590 | 48104 | 61978 | 91123 |
| 4688 | 11031 | 15682 | 20939 | 28083 | 32442 | 40591 | 48107 | 62111 | 91134 |
| 4689 | 11034 | 15683 | 20940 | 28089 | 32443 | 40592 | 48113 | 62125 | 91280 |
| 4690 | 11035 | 15685 | 20968 | 28091 | 32453 | 40599 | 48427 | 62183 | 91293 |
| 4691 | 11042 | 15686 | 20973 | 28093 | 32461 | 40606 | 48441 | 63267 | 91411 |
| 4692 | 11043 | 15735 | 20980 | 28098 | 32468 | 40610 | 48446 | 63346 | 91427 |
| 4693 | 11055 | 15740 | 21002 | 28099 | 32479 | 40617 | 48451 | 63359 | 91699 |
| 4694 | 11061 | 15742 | 21010 | 28101 | 32481 | 40621 | 48454 | 63436 | 91894 |
| 4698 | 11068 | 15746 | 21018 | 28126 | 32492 | 40622 | 48467 | 63438 | 92118 |

| 4699 | 11071 | 15747 | 21039 | 28128 | 32510 | 40624 | 48480 | 63532 | 92640 |
| 4700 | 11075 | 15749 | 21046 | 28136 | 32515 | 40631 | 48490 | 63571 | 93558 |
| 4702 | 11076 | 15750 | 21053 | 28139 | 32528 | 40632 | 48491 | 63591 | 93736 |
| 4706 | 11077 | 15753 | 21056 | 28151 | 32529 | 40634 | 48492 | 63645 | 93990 |
| 4707 | 11080 | 15759 | 21149 | 28159 | 32543 | 40636 | 48498 | 63670 | 104710 |
| 4710 | 11088 | 16244 | 21161 | 28170 | 32559 | 42259 | 48500 | 63701 | |
| 4712 | 11093 | 16245 | 21174 | 28175 | 35156 | 42311 | 48501 | 63751 | |
| 4715 | 11101 | 16246 | 21202 | 28187 | 35157 | 42329 | 48505 | 63771 | |
| 4716 | 11103 | 16247 | 21212 | 28206 | 35163 | 42336 | 48506 | 63780 | |
| 4723 | 11104 | 16248 | 21227 | 28210 | 35165 | 42355 | 48514 | 63791 | |
| 4724 | 11105 | 16249 | 21272 | 28212 | 35169 | 42363 | 48520 | 63868 | |

## Horowitz Law Claimants

| 2561 | 24830 | 31754 | 36467 | 45742 | 49909 | 54825 | 60209 | 67334 | 86794 |
| 2563 | 24831 | 33974 | 36615 | 45744 | 49920 | 55092 | 60454 | 67335 | 86856 |
| 3361 | 25068 | 34509 | 36709 | 46086 | 49936 | 55150 | 60582 | 67675 | 86974 |
| 3442 | 25070 | 34611 | 36782 | 46567 | 49948 | 55200 | 60828 | 67705 | 87081 |
| 3546 | 25349 | 34836 | 36834 | 46916 | 49955 | 55848 | 60998 | 67976 | 87129 |
| 8843 | 25350 | 34862 | 37317 | 47106 | 49965 | 55850 | 61375 | 68139 | 87175 |
| 10109 | 25867 | 34904 | 37380 | 47136 | 49967 | 56200 | 61431 | 68154 | 87218 |
| 13981 | 25939 | 35384 | 37537 | 47160 | 49970 | 56201 | 61514 | 69621 | 88873 |
| 14130 | 25984 | 35385 | 37792 | 47212 | 50026 | 56614 | 62193 | 69762 | 88920 |
| 14181 | 26038 | 35387 | 38970 | 47953 | 50033 | 58311 | 62235 | 71685 | 89003 |
| 14192 | 26083 | 35412 | 39056 | 47970 | 50063 | 58359 | 62681 | 71926 | 89357 |
| 15357 | 26344 | 36041 | 39345 | 48091 | 50066 | 58361 | 62683 | 71987 | 89827 |
| 15770 | 26373 | 36046 | 40107 | 48106 | 50338 | 58369 | 63383 | 83182 | 90073 |
| 20345 | 26899 | 36049 | 40407 | 48153 | 50378 | 58372 | 63485 | 83259 | 90743 |
| 20530 | 26918 | 36072 | 40875 | 48163 | 50604 | 58730 | 63572 | 83387 | 91007 |
| 22481 | 26944 | 36078 | 40885 | 48164 | 51881 | 59091 | 63594 | 83412 | 91008 |
| 23402 | 27083 | 36079 | 40887 | 48165 | 52119 | 59309 | 63768 | 83483 | 91215 |
| 23439 | 27410 | 36422 | 41492 | 48169 | 52304 | 59450 | 63837 | 83578 | 91831 |
| 23481 | 28049 | 36426 | 41619 | 48173 | 52624 | 59458 | 63863 | 83870 | 92291 |
| 24250 | 28530 | 36429 | 41690 | 48174 | 52794 | 59631 | 64141 | 84230 | 92585 |
| 24300 | 29338 | 36435 | 43001 | 48175 | 52925 | 59668 | 64612 | 84265 | 93620 |
| 24350 | 29395 | 36437 | 43688 | 49784 | 53985 | 59813 | 65002 | 84512 | 96625 |
| 24416 | 30641 | 36438 | 43719 | 49799 | 54121 | 59930 | 65019 | 84916 | 96628 |
| 24825 | 30728 | 36440 | 44743 | 49890 | 54225 | 60037 | 65068 | 86132 | 96629 |
| 24826 | 30740 | 36442 | 45649 | 49898 | 54230 | 60040 | 67305 | 86299 | 96654 |
| 24829 | 31709 | 36444 | 45655 | 49903 | 54776 | 60082 | 67328 | 86507 | 118455 |

**Tamaki Law Offices, Law Office of Joseph B. Blumel III, and Fasy Law Claimants**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 36441 | 41333 | 43706 | 48816 | 48869 | 53505 | 55496 | 59323 | 59561 | 64792 |
| 36359 | 41342 | 43999 | 48825 | 48872 | 55112 | 55505 | 59331 | 59663 | 64822 |
| 36365 | 41355 | 44018 | 48833 | 48874 | 55138 | 57240 | 59333 | 59729 | 64829 |
| 36431 | 41365 | 44023 | 48835 | 48880 | 55141 | 57263 | 59360 | 60707 | 69070 |
| 36434 | 41371 | 44028 | 48839 | 48883 | 55153 | 57265 | 59365 | 61445 | 69084 |
| 36458 | 41377 | 48704 | 48848 | 48888 | 55156 | 57268 | 59366 | 61490 | 69101 |
| 36463 | 41384 | 48713 | 48849 | 48903 | 55183 | 57285 | 59371 | 61554 | 69105 |
| 41271 | 41394 | 48727 | 48850 | 48910 | 55192 | 57296 | 59406 | 62204 | 71178 |
| 41272 | 41404 | 48733 | 48851 | 51003 | 55217 | 57318 | 59410 | 63272 | 77238 |
| 41283 | 41408 | 48740 | 48853 | 51003 | 55225 | 57520 | 59419 | 63511 | 77255 |
| 41285 | 41416 | 48753 | 48854 | 53469 | 55228 | 58990 | 59431 | 63513 | |
| 41291 | 41417 | 48763 | 48857 | 53473 | 55232 | 59238 | 59440 | 63578 | |
| 41297 | 41426 | 48764 | 48858 | 53477 | 55276 | 59240 | 59442 | 63583 | |
| 41300 | 41430 | 48773 | 48860 | 53484 | 55277 | 59259 | 59457 | 63596 | |
| 41301 | 41435 | 48778 | 48861 | 53486 | 55284 | 59271 | 59459 | 64327 | |
| 41310 | 41443 | 48796 | 48865 | 53488 | 55304 | 59301 | 59476 | 64731 | |
| 41313 | 41460 | 48797 | 48867 | 53503 | 55334 | 59307 | 59528 | 64759 | |
| 41319 | 41539 | 48799 | 48868 | 53504 | 55357 | 59315 | 59536 | 64776 | |

**Aylstock, Witkin, Kreis & Overholtz Claimants**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 106668 | 106681 | 106927 | 106943 | 107252 | 107267 | 107280 | 107415 | 107431 | 107443 |
| 106669 | 106684 | 106929 | 106944 | 107253 | 107268 | 107281 | 107416 | 107432 | 117770 |
| 106670 | 106685 | 106930 | 106945 | 107255 | 107269 | 107282 | 107420 | 107433 | 118577 |
| 106672 | 106686 | 106931 | 106946 | 107256 | 107270 | 107402 | 107421 | 107434 | 118580 |
| 106673 | 106687 | 106932 | 106947 | 107257 | 107271 | 107403 | 107422 | 107435 | |
| 106674 | 106688 | 106934 | 106949 | 107258 | 107272 | 107405 | 107423 | 107436 | |
| 106675 | 106689 | 106937 | 106951 | 107259 | 107273 | 107407 | 107424 | 107437 | |
| 106676 | 106690 | 106938 | 106952 | 107260 | 107274 | 107408 | 107425 | 107438 | |
| 106677 | 106691 | 106939 | 106955 | 107262 | 107276 | 107409 | 107426 | 107439 | |
| 106678 | 106692 | 106940 | 106956 | 107263 | 107277 | 107410 | 107427 | 107440 | |
| 106679 | 106925 | 106941 | 107250 | 107264 | 107278 | 107412 | 107428 | 107441 | |
| 106680 | 106926 | 106942 | 107251 | 107265 | 107279 | 107414 | 107430 | 107442 | |

**Oshan & Associates Claimants**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 42646 | 42662 | 55010 | 642688 | 643123 | 643257 | 676418 | 676862 | 677283 | 678119 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 42652 | 42664 | 55015 | 642689 | 643128 | 643297 | 676508 | 676863 | 677286 | 678121 |
| 42653 | 54972 | 55015 | 642690 | 643155 | 643301 | 676848 | 676864 | 677286 | 678124 |
| 42654 | 54974 | 62761 | 642691 | 643158 | 643304 | 676849 | 676865 | 677324 | |
| 42655 | 54977 | 641967 | 642941 | 643176 | 643309 | 676850 | 676866 | 677326 | |
| 42656 | 54977 | 642663 | 643007 | 643187 | 643362 | 676852 | 676868 | 677328 | |
| 42657 | 54999 | 642672 | 643017 | 643192 | 646861 | 676853 | 676869 | 677334 | |
| 42660 | 55000 | 642673 | 643023 | 643194 | 676390 | 676856 | 676870 | 677525 | |
| 42661 | 55006 | 642675 | 643047 | 643200 | 676395 | 676857 | 677114 | 677639 | |
| 42662 | 55010 | 642679 | 643114 | 643253 | 676413 | 676859 | 677281 | 677699 | |

## Dumas & Vaughn Claimants

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 17941 | 29655 | 44934 | 51702 | 104761 | 104770 | 105063 | 105071 | 105810 | 110048 |
| 18072 | 39538 | 44937 | 51733 | 104762 | 104771 | 105064 | 105072 | 105811 | |
| 18773 | 40722 | 45063 | 52861 | 104765 | 104772 | 105065 | 105073 | 105813 | |
| 18838 | 41448 | 46398 | 54709 | 104766 | 105016 | 105066 | 105106 | 105814 | |
| 21530 | 42603 | 46721 | 55175 | 104767 | 105017 | 105068 | 105107 | 105815 | |
| 24322 | 44159 | 48079 | 56947 | 104768 | 105020 | 105069 | 105108 | 105816 | |
| 26054 | 44222 | 51220 | 90485 | 104769 | 105022 | 105070 | 105809 | 105945 | |

## Spagnoletti Law Firm Claimants

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 30958 | 44134 | 52199 | 58894 | 64622 | 92162 | 94045 | 96409 | 106006 | 106016 |
| 32209 | 44386 | 54663 | 58896 | 65086 | 93256 | 94156 | 96481 | 106008 | 106023 |
| 32264 | 44986 | 54766 | 60201 | 68468 | 93702 | 94297 | 96733 | 106010 | 106024 |
| 37613 | 44986 | 54892 | 60513 | 69346 | 93712 | 95904 | 96952 | 106011 | 106025 |
| 37670 | 46151 | 55124 | 63773 | 71090 | 93744 | 96357 | 103322 | 106012 | 106027 |
| 37950 | 47852 | 57523 | 64537 | 90674 | 94036 | 96389 | 106005 | 106013 | |

## Linder, Sattler & Rogowsky Claimants

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 76617 | 25170 | 48718 | 53810 | 64688 | 69328 | 75490 | 77583 | 84740 |
| 3345 | 25215 | 49788 | 53839 | 66010 | 69806 | 75677 | 81992 | 84878 |
| 19265 | 45193 | 50417 | 53959 | 66208 | 70561 | 75807 | 83058 | 89321 |
| 20173 | 45386 | 50466 | 56524 | 67934 | 71465 | 75974 | 83243 | 90240 |
| 25005 | 45401 | 53728 | 57714 | 68309 | 71678 | 76374 | 83566 | 92848 |
| 25011 | 48536 | 53753 | 62291 | 68888 | 71701 | 76775 | 84643 | 102605 |

**Manly, Stewart & Finaldi Claimants**

| 11036 | 34317 | 42326 | 44641 | 51924 | 53438 | 56181 | 65879 | 71844 | 82831 |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| 29483 | 38293 | 42390 | 46583 | 52909 | 53455 | 63879 | 67226 | 73245 | 82847 |
| 29496 | 40167 | 42405 | 46618 | 53424 | 53460 | 65578 | 67245 | 82798 | |
| 29498 | 41605 | 42929 | 51638 | 53428 | 55749 | 65871 | 68689 | 82807 | |

**Green & Gillispie Claimants**

| 11482 | 39438 | 44270 | 52205 | 62035 | 62069 | 63766 | 63850 | 87491 | 117865 |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|--------|
| 39351 | 42128 | 44295 | 52324 | 62036 | 62075 | 63787 | 65157 | 91441 | |
| 39428 | 42553 | 47857 | 57425 | 62063 | 62084 | 63794 | 77629 | 117820 | |

**Chasan & Walton Claimants**

| 1979 | 44159 | 44937 | 46721 | 105064 | 105066 | 105069 | 105072 | 112891 |
|------|-------|-------|-------|--------|--------|--------|--------|--------|
| 42603 | 44222 | 45063 | 56947 | 105065 | 105068 | 105070 | 105073 | 118407 |

**Silver Golub & Teitell Claimants**

| 199 | 4329 | 4974 | 9241 | 22105 | 25629 | 48746 | 69312 | 108887 | 112598 |
|-----|------|------|------|-------|-------|-------|-------|--------|--------|

**Betti & Associates Claimants**

| 112901 | 112898 | 112900 | 112899 | 112894 |
|--------|--------|--------|--------|--------|

**Law Office of Kirk C. Davis Claimant**

| 39608 |
|-------|

**Law Offices of Anthony M. Demarco Claimant**

| 94049 |
|-------|