**Exhibit A**

Excerpts From Transcript of July 15, 2021 Deposition of Roger C. Mosby

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                            ) Chapter 11
                                  )
                                  ) Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA AND         )
DELAWARE BSA, LLC,                )
Debtors.                          ) (Jointly Administered)

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF

ROGER C. MOSBY

JULY 15, 2021

(Reported Remotely)

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF ROGER C. MOSBY, produced as a witness at the instance of Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company, and duly sworn, was taken via videoconference in the above-styled and numbered cause on the 15th day of July, 2021, from 8:07 a.m. to 4:44 p.m., before Marsha Yarberry, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the law offices of Haynes and Boone, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record.

Page 129

1  Q. (By Mr. Ruggeri) Yeah. Mr. Linder said that
2  BSA was intimately involved in every aspect of the RSA
3  motion. Is that correct?
4  A. I think that's correct, yes.
5  Q. And does that include the preparation of the
6  trust distribution procedures which were attached to
7  the motion?
8  A. As far as I know, that is correct.
9  Q. Who drafted those?
10 A. Who drafted the what?
11         MR. ANDOLINA: Objection to form.
12 Q. (By Mr. Ruggeri) The trust distribution
13 procedures.
14 A. I have no knowledge of who personally drafted
15 those.
16 Q. They read to me, Mr. Mosby, as if they were
17 drafted by an asbestos plaintiff's lawyer. Is that
18 correct?
19         MR. ANDOLINA: Objection to form,
20 foundation, argumentative.
21         MR. RUGGERI: No, it's not argumentative.
22 Q. (By Mr. Ruggeri) I'm just asking. Did an
23 asbestos plaintiff lawyer draft the trust distribution
24 procedures?
25 A. Not to my knowledge.

1  Q. But you said you -- you know, you reviewed the
2  RSA motion and its attachments in connection with the
3  declaration, right?
4  A. I did in general review those, yes.
5  Q. And that would have included the trust
6  distribution procedures that were attached to the
7  motion, right?
8  A. That doesn't mean that I understood exactly
9  everything. If I had a question I would have asked a
10 question.
11 Q. Well, I'm correct, aren't I, that claimants
12 aren't required to show negligence at all to receive
13 the base matrix amount? But if they show negligence,
14 they actually get bonus points, don't they?
15 A. Again, I'm not -- I'm not that familiar with
16 those procedures.
17 Q. Let's take a look at page 104 of 118 of
18 motion, Exhibit 11.
19 A. All right. I have it.
20 Q. Okay. I want to direct your attention to on
21 that page -- it's a 104 of 118 at the top and a page 16
22 at the bottom, subparagraph D, Romanette (ii)d. Whose
23 idea was it to put that in this trust distribution
24 procedures?
25 A. Let me make sure I understand what you're

1  THE WITNESS: Again, I think that's
2  asking me to make a legal determination, and I'm not
3  qualified to do that.
4  Q. (By Mr. Ruggeri) In the course of your work
5  on this matter, did you become familiar with the
6  concept of insurance neutrality?
7  A. I heard the term "insurance neutrality."
8  Q. Do you believe these findings and orders are
9  insurance neutral?
10  MR. ANDOLINA: Objection to form.
11  THE WITNESS: Again, really I couldn't
12  say.
13  Q. (By Mr. Ruggeri) Did you have deductions
14  about whether these findings and orders are insurance
15  neutral?
16  A. Not that I recall.
17  Q. So just wasn't something that you would have
18  focused on from your perspective in reviewing the
19  documents as Boy Scouts' CEO; is that right?
20  A. I think that's a fair statement.
21  Q. How about the next one down, insurance
22  settlements? Am I correct that this says that any
23  insurance with any insurance company is subject to the
24  express written consent of coalition, TCC, and the FCR?
25  MR. ANDOLINA: Take your time.

Page 142

1      THE WITNESS:  I'm reading it.  Let me
2  make sure I understand it.  I think I understand it as
3  it's stated, that any settlement with any insurance
4  company prior to or in connection with the amended plan
5  shall be subject to the approval of the bankruptcy
6  court and/or district court and the express written
7  consent of the coalition, TCC, and Future Claimants'
8  Representatives."
9      Q.   (By Mr. Ruggeri)  So what happens if the
10 coalition reaches a deal with Insurance Company A and
11 the TCC says, "No, I don't consent"?  What happens to
12 that insurance settlement?
13      MR. ANDOLINA:  Objection to form.
14      Q.   (By Mr. Ruggeri)  What's your understanding of
15 the way this provision works?
16      MR. ANDOLINA:  Objection to form,
17 hypothetical, and calls for a legal conclusion.
18      Q.   (By Mr. Ruggeri)  No, I'm not looking for a
19 legal conclusion.  I'm looking for your layperson's
20 reading of this as the chief executive officer of Boy
21 Scouts of America.  How do you understand this
22 provision to work in that circumstance if Insurance
23 Company A reaches a settlement with the coalition but
24 the TCC says no?
25      A.   Well, I read it to say that the amended plan

Page 143

1  shall be subject to the approval of the bankruptcy
2  court and/or district court and the express written
3  consent of the coalition, TCC, and Future Claimants'
4  Representative.
5       Q.   So if the TCC says no, the TCC has veto power
6  and there's no insurance settlement.  That's how you
7  read it, correct?
8            MR. ANDOLINA:  Objection; form,
9  characterization.
10           THE WITNESS:  I mean, just the -- just
11 the English construction of the sentence to me means
12 that all three would have to approve, if that's your
13 question.
14      Q.   (By Mr. Ruggeri)  And if anyone disapproved,
15 there's no insurance settlement.  That's the English
16 reading of that provision, right?
17      A.   Well, that's drawing another conclusion.  What
18 I -- what I said was it says that it must have the
19 express written consent of all three.  It doesn't say
20 what -- it doesn't say what would happen if one didn't.
21      Q.   But a grammatical construction of what would
22 happen if one didn't agree, the deduction based on what
23 it says affirmatively.
24           MR. ANDOLINA:  Objection to form,
25 hypothetical.

HIGHLY CONFIDENTIAL

Page 144

1    THE WITNESS: Yeah, again, I don't know
2  what the parties would do in that case.
3    Q.   (By Mr. Ruggeri)  Okay. You don't know what
4  would happen based on your reading of that provision if
5  that were the case? Is that fair?
6    A.   Yes.
7    Q.   Let's turn to page 9.
8    A.   Okay.
9    Q.   Settlement trustee. It said -- it says the
10 settlement trustee shall be Eric D. Green. We know who
11 that is, don't we?
12   A.   I'm familiar with the name of Eric Green.
13   Q.   You're familiar with that name from, for
14 example, the offering of his name as a mediator in this
15 case? Is that correct?
16   A.   I recall that that was one of the names that
17 was put forth as a possible mediator, yes.
18   Q.   It's the same fellow, right?
19   A.   I don't know that.
20   Q.   No one told you it's the son of the proposed
21 mediator, did they?
22   A.   I don't recall anybody saying anything like
23 that, no.
24   Q.   Who offered the name Eric Green for the role
25 as settlement trustee?

HIGHLY CONFIDENTIAL

Page 145

1  A. I don't know.
2  Q. The court ruled that Mr. Green was too close
3  to FCR Patton to serve as a mediator. If he's too
4  close to serve as a mediator, how in the world could he
5  serve as the settlement trustee?
6           MR. ANDOLINA: Objection to form.
7           THE WITNESS: I don't know -- I don't
8  know what the judge would do in this case.
9  Q. (By Mr. Ruggeri) The settlement trustee
10 effectively serves as the judge for the trust
11 distribution procedure, doesn't he?
12          MR. ANDOLINA: Objection; form.
13          THE WITNESS: I'm just not familiar with
14 how trust distribution procedures work, so --
15 Q. (By Mr. Ruggeri) The settlement trustee is
16 the one making the allowance decisions for the claims;
17 isn't that right?
18          MR. ANDOLINA: Objection to form.
19          THE WITNESS: I would say the trust
20 distribution just isn't something that I focus on and,
21 you know, it's not something I focus on and, quite
22 frankly, know very little about.
23 Q. (By Mr. Ruggeri) So when you provide in your
24 declaration in support of the motion the attached
25 documents, were you supporting the offering of

HIGHLY CONFIDENTIAL

Page 192

1  Q. Sure.
2  A. I think I can answer your question if you'll
3  restate it.
4  Q. Sure. What did the board do to consider the
5  possibility that the claimants would simply take the
6  money the Boy Scouts were contributing and use it as
7  seed money to sue -- to finance litigation against the
8  sponsors and the chartering organizations?
9  A. I understand your question now. I don't
10 recall any conversation at all along those lines.
11 Q. So that's not something the board considered
12 as a possibility in evaluating the restructuring
13 support agreement and whether to approve it.
14 A. Not that I recall.
15 Q. Well, sitting here today do you think it's
16 something that the board should have considered?
17             MR. ANDOLINA: Objection to the form.
18             THE WITNESS: Maybe I can answer it this
19 way. The chartering organizations are vital to the way
20 the BSA is organized in order to provide grassroots
21 support for the Boy Scouting program in communities.
22 So today we consider them to be a very vital part of
23 for organization, and we wouldn't want to do anything,
24 quite frankly, that would harm that relationship.
25 Q. (By Mr. Schiavoni) Well, my question is,

1  given that the board didn't consider the possibility
2  that if the monies it was contributing might just be
3  used to fund litigation against the charters and
4  sponsors, sitting here today, do you think that's
5  something that the board should have considered?
6              MR. ANDOLINA:  Objection to form.  That
7  misstates the witness's -- and mischaracterizes the
8  witness's testimony.
9              He testified that he didn't recall
10 conversations about the seed money, Mr. Schiavoni.
11             So object to the form of the question.
12             THE WITNESS:  Again, I'll restate what I
13 think you said.  The board, to my recollection, did not
14 have a discussion around this.  It would be speculative
15 on my part to try to enter into some sort of a
16 conversation here as it relates to, you know, what they
17 should have or would have or could have done.  So it's
18 totally speculation.
19     Q.   (By Mr. Schiavoni)  So do you agree with me
20 that if -- if the chartering organizations do not end
21 up getting -- coming within the injunction or a
22 release, that the Boy Scouts going forward are likely
23 to lose members from those chartering organizations who
24 are subject to ongoing suits?
25     A.   Yes.

Page 244

1  national executive committee members who provide, in
2  essence, like some representational interests of the
3  local councils?
4      A.   It isn't set up that way.
5      Q.   Okay.  How does one get nominated to be put on
6  the national executive board?
7      A.   There is an annual election that is -- that is
8  conducted, and representatives from each of the
9  councils, based upon some membership criteria, have
10 national representatives that participate in national
11 elections.  The national board is elected each year by
12 that group of people.
13     Q.   Do any of the -- do the locals sponsor anyone
14 for inclusion or -- of the election on the national
15 executive board?
16           MR. ANDOLINA:  Objection to form of the
17 question.
18           THE WITNESS:  Well, there is a -- there
19 is a nominating committee of the national executive
20 board that puts forth a slate of members to be voted on
21 that comes before that national assembly, and a vote is
22 held.
23     Q.   (By Mr. Schiavoni)  Okay.  For the -- is there
24 local council representation on the national executive
25 board?

Page 245

1      MR. ANDOLINA: Objection; form of the
2 question.
3      THE WITNESS: The national executive
4 board -- I'm sorry. The national executive board,
5 again, are volunteers that have been nominated to serve
6 on the national executive board. They are -- they are
7 elected by the council representatives. So small
8 councils have a few representatives based upon the
9 number of registered members. Larger councils have
10 more representatives, again based upon the number of
11 registered members. So all of those come together in a
12 national vote and either vote up or vote down the slate
13 of -- of directors.
14      I'm not sure I answered your question,
15 but that's how it happens.
16   Q.  (By Mr. Schiavoni) I'm sorry. I didn't hear
17 you. How many members does the national executive
18 board have?
19   A.  I may get this wrong. We can give you a list,
20 or I think maybe a list has already been provided. But
21 there are 70-some-odd members of the national executive
22 board. There are 12 members of the national executive
23 committee.
24   Q.  Okay. If I -- if I went through the national
25 executive committee members, could you tell me what

1  councils they were -- they came from or associated
2  with?
3      A.   I think so.  I mean, I -- you know, I've only
4  known most of those people for a year or so, so a lot
5  of them came on the -- on that board in May of 2019, so
6  I'm -- I'm not personally, you know, real familiar with
7  all of them, but I probably could get pretty close to
8  the boards, or to their councils.
9      Q.   Okay.  Let me just ask you about the ones that
10 are easiest to pronounce first.  Brad Tilden, what
11 local council was he associated with?
12     A.   Seattle.
13     Q.   And Jack Furst?
14     A.   It's called Circle Ten, which is Dallas.
15     Q.   Skip Oppenheimer?
16     A.   Skip -- I may get this one wrong, but he's
17 from Idaho, so the council I think in Idaho.  I don't
18 remember the name of the council right now.
19     Q.   Okay.  Nathan Rosenberg?
20     A.   Nate is from Los Angeles, so the greater --
21 the Greater L.A. Area Council.
22     Q.   Jim Turley?
23     A.   Jim Turley was previously the president of the
24 Greater St. Louis Area Council.
25     Q.   Michael Sears?

1    A.   I don't think Michael is associated with a
2　council right now.  He's been all over the country.
3　Michael is currently on the staff of the U.S. Naval
4　Academy.  So I don't think he's associated with a
5　council right now.
6    Q.   Okay.  Michael -- Michael Sears?
7         MR. ANDOLINA:  Asked and answered.
8    Q.   (By Mr. Schiavoni)  Oh, sorry.
9    A.   That was Michael Sears I just told you about.
10   Q.   Sorry.  I apologize.  Okay.  I said I would do
11　these in order of easier to pronounce.  Now we're
12　getting the harder ones.  Thear Suzuki.
13   A.   Thear.
14   Q.   T-h-e-a-r Suzuki.
15   A.   Yeah.  It's pronounced Thear Suzuki.  That
16　would be -- that would be Dallas, Circle Ten.
17   Q.   Okay.  Then Alison Schuler.
18   A.   Alison is from Albuquerque, New Mexico.
19   Q.   The council that's located there?
20   A.   Yes.
21   Q.   Okay.  And then Devang --
22   A.   Devang Desai.
23   Q.   Yeah.  Sorry.
24   A.   That's okay.  Devang Desai, he's from Miami,
25　so that Greater Miami Council.

1    Q.   And Scott Sorrels, S-o-r-r-e-l-s.
2    A.   Yeah.  Scott is from Atlanta, so Atlanta Area
3  Council.
4    Q.   Okay.  And each of these folks had some
5  involvement with -- with those councils before serving
6  on the board, right?
7            MR. ANDOLINA:  Objection to form.
8            THE WITNESS:  The answer is yes.
9    Q.   (By Mr. Schiavoni)  Okay.  So tell us, sir,
10 how did this -- the approval process, you first went to
11 the bankruptcy committee.  What was that -- just give
12 me the name of that again.  The -- it was called what?
13 The --
14   A.   It was a task force of the executive
15 committee.  It's called bankruptcy task force.
16   Q.   Right.  And how many people are on that
17 committee?
18   A.   Let's see.  Alison Schuler, Dan Ownby, Scott
19 Sorrels, Devang Desai, Brad Tilden are representatives
20 of the executive committee on that task force, and then
21 there are some employees that are, you know -- you
22 know, I guess kind of support members or ex officio
23 members.  That would be me and Steve McGowan, general
24 counsel; Mike Ashline, the chief financial officer; and
25 I don't -- did I mention Dan Ownby?

1    Q.   No, but I'm not sure.  But you did now.
2    A.   Okay.
3    Q.   So in seeking approval for the RSA, it first
4  went to the task force.  Did the task force vote on it?
5              MR. ANDOLINA:  Objection; form.
6              THE WITNESS:  Well, the task force was
7  extremely engaged in -- in all matters of the
8  bankruptcy.  That task force typically met weekly,
9  sometimes more than once per week.  So as any of these
10 features of the bankruptcy were proceeding, they were
11 intimately involved in the discussion, both with Steve
12 and me or with the advisors.
13   Q.   (By Mr. Ruggeri)  Were they -- were they asked
14 to vote yes or no in support of the RSA?
15   A.   I mean, typically what would happen is the
16 advisors would present the issue at hand, if you will.
17 There would be -- there would be a discussion.
18 Sometimes it may not be a vote.  It may be simply just
19 a consensus of the group as to whether or not -- as to
20 what direction, you know, we should take.  So we'd
21 either be given direction out of that or in some cases
22 it might have actually been a vote to advance it to the
23 executive committee.
24   Q.   Okay.  So, look, I appreciate this sort of --
25 you know, that's a kind of general way that committee