# **EXHIBIT B**

HIGHLY CONFIDENTIAL

Page 1

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE DISTRICT OF DELAWARE
 2
 3   In re:                            ) Chapter 11
                                       )
 4                                     ) Case No. 20-10343 (LSS)
     BOY SCOUTS OF AMERICA AND         )
 5   DELAWARE BSA, LLC,                )
     Debtors.                          ) (Jointly Administered)
 6
 7           ********************************************
 8               ORAL AND VIDEOTAPED DEPOSITION OF
 9                        ROGER C. MOSBY
10                        JULY 15, 2021
11                      (Reported Remotely)
12           ********************************************
13              ORAL AND VIDEOTAPED DEPOSITION OF ROGER
14   C. MOSBY, produced as a witness at the instance of
15   Hartford Accident and Indemnity Company, First State
16   Insurance Company, Twin City Fire Insurance Company,
17   and Navigators Specialty Insurance Company, and duly
18   sworn, was taken via videoconference in the
19   above-styled and numbered cause on the 15th day of
20   July, 2021, from 8:07 a.m. to 4:44 p.m., before Marsha
21   Yarberry, Certified Shorthand Reporter in and for the
22   State of Texas, reported by machine shorthand, at the
23   law offices of Haynes and Boone, Dallas, Texas,
24   pursuant to the Federal Rules of Civil Procedure and
25   the provisions stated on the record.
```

Page 48

1  don't sign that agreement, right?"
2      Q.  (By Mr. Ruggeri)  Yes.  That was the position
3  you knew of the coalition, the TCC before you signed
4  the Hartford settlement agreement, correct, Mr. Mosby?
5      A.  I'm trying -- I'm trying to remember back.
6  I -- to my knowledge, I don't know that the Hartford --
7  I'm sorry -- that the coalition, TCC, or the FCR were
8  aware that an agreement was going to be signed between
9  Hartford and the BSA.
10     Q.  And why did BSA tell Hartford before BSA
11 signed that BSA would get blasted for the Hartford
12 settlement including the Century provision in the
13 settlement?
14             MR. ANDOLINA:  Objection to form.
15             And I will instruct him not to answer to
16 the extent that, Mr. Ruggeri, you're referring to some
17 comment that was made as part of the mediation.
18             THE WITNESS:  I mean, I think the only
19 way I can answer that is that the creditors were
20 generally objecting to everything that was put on the
21 table around that time.
22     Q.  (By Mr. Ruggeri)  And that's how and why BSA
23 knew it would get blasted for entering the agreement?
24 Is that your testimony?
25             MR. ANDOLINA:  Same objection, and I'm

1           THE WITNESS:  You and I may read it
2    differently.
3        Q.   (By Mr. Ruggeri)  Well, tell me, what do you
4    disagree with?
5        A.   Well, I don't know that I disagree.  What I'm
6    saying, I think, is that there's a whole lot more to
7    that paragraph than what is written in that paragraph.
8        Q.   And you want the court to let you out of that
9    paragraph, being Section III.I of the Hartford
10   agreement, correct?
11       A.   We expected to be able to perform under that
12   section.
13       Q.   Please answer my question.  You're asking the
14   court to let you out of Section III.I of the Hartford
15   agreement, correct?
16       A.   Yes, but it is in the contract -- is in the
17   context of performance.  We expected to be able to
18   perform under that section.  We feel now we can no
19   longer perform under that section, and that's the basis
20   for asking the court to review it.
21       Q.   And what makes it -- what makes it so that BSA
22   is no longer able to perform under the toggle plan?
23       A.   Well, that gets in, I think, to the general
24   question as to why we would want a global settlement to
25   start with.

Page 69

1  Q.  I'm sorry. I was referring to the toggle
2  plan, the Plan B as you said earlier. Why is BSA no
3  longer able to perform Plan B if that's its position?
4  A.  Again, Plan B was only to be used as a last
5  resort if there were no other solutions to a global
6  plan.
7  Q.  Right. And when you entered the Hartford
8  settlement agreement, there were two solutions provided
9  for. One was a global plan that included the Hartford
10 settlement, and the other was a toggle plan that didn't
11 include the Hartford settlement and only provided
12 discharge for BSA; isn't that correct?
13 A.  That's what the paragraph says.
14 Q.  Thank you. Mr. Mosby, how many times before
15 Hartford entered the settlement agreement did BSA tell
16 Hartford BSA would not re-trade the Hartford agreement?
17         MR. ANDOLINA: Objection to the form of
18 the question. I'm going to instruct Mr. Mosby not to
19 answer that question. Any conversations along those
20 lines without an admission that they actually occurred
21 are in the context of the mediation.
22         MR. RUGGERI: Yeah, I think it's hard to
23 do that, Mr. Andolina, because you're tendering to the
24 court and representing that there's been a change in
25 circumstances and you've made certain representations.

Page 77

1  Mr. Mosby.  BSA knew it was important to Hartford for
2  Hartford to be able to trust BSA that it wouldn't
3  re-trade the Hartford agreement, correct?
4              MR. ANDOLINA:  Objection to form.
5              THE WITNESS:  That would be a conclusion
6  I would be making about what is in your head.
7       Q.   (By Mr. Ruggeri)  Well, that was expressed to
8  BSA; isn't that right?
9              MR. ANDOLINA:  Objection; calls for
10 mediation communication.
11             THE WITNESS:  I don't recall any
12 conversations that I had with you or anyone else from
13 Hartford outside of mediation privilege.
14      Q.   (By Mr. Ruggeri)  There's no fiduciary out in
15 the Hartford settlement agreement, is there?
16             MR. ANDOLINA:  Objection to form,
17 foundation.
18      Q.   (By Mr. Ruggeri)  You know what a fiduciary
19 out is, don't you?
20      A.   I think I know what it is in laymen's terms.
21 I'm sure there's some legal terms around that.  I'm not
22 aware of a fiduciary out in the settlement.
23      Q.   And that's not an accident, is it?
24      A.   I don't know.  I didn't craft the settlement.
25      Q.   That was a term, a possible provision that was

Page 122

1   Q.  Let me ask you a question about a provision in
2   the Hartford settlement agreement that's received a lot
3   of attention, and that's the one relating to Century.
4   We're not going to get into it in detail, but BSA knew
5   when it entered the Hartford settlement agreement that
6   the coalition didn't like that provision.  Isn't that
7   true?
8            MR. ANDOLINA:  Objection to form.
9            THE WITNESS:  Yeah, I don't know that I
10  would characterize it as like or dislike.
11  Q.  (By Mr. Ruggeri)  They objected to it, didn't
12  they, before we entered the agreement?  Isn't that
13  correct?
14  A.  A lot of this was under the context of
15  mediation.  I don't think I had any conversations with
16  Century outside of mediation.
17  Q.  No, I mean the claimants, the coalition --
18  let's start with the coalition.  You knew that the
19  coalition objected to the Century provision, didn't
20  you?
21           MR. ANDOLINA:  Objection.
22  Q.  (By Mr. Ruggeri)  Before you entered the
23  agreement.
24           MR. ANDOLINA:  Objection to form.  I
25  would request that Mr. Mosby answer only in a way that

1  doesn't reflect mediation communications if he does not
2  have knowledge of the issues.  I think he can answer in
3  that regard.
4                  MR. SCHIAVONI:  Objection; coaching.
5                  THE WITNESS:  So, again, maybe repeat
6  your question, please.
7      Q.   (By Mr. Ruggeri)  Yeah, you knew the coalition
8  didn't like that provision and objected to it, didn't
9  you?
10                 MR. ANDOLINA:  Same objection.
11                 THE WITNESS:  I would say in general that
12 the coalition around that time wasn't liking anything.
13 So I don't know that I have any direct knowledge of
14 their opinion on that particular -- I didn't know if
15 they were even aware of that particular provision.
16     Q.   (By Mr. Ruggeri)  Is it fair to say that BSA
17 thought the coalition at that time was unstable and
18 uncoordinated?
19                 MR. ANDOLINA:  Objection to form.
20                 THE WITNESS:  Yeah, I don't know how to
21 answer that.  I'm not a psychiatrist either.
22     Q.   (By Mr. Ruggeri)  Yeah, I'm not either, but
23 I'm just asking the question.
24     A.   Again, I can make no judgment on that -- on
25 that particular question.

1      Q.   What about the TCC's position on the Century
2  provision before you signed the agreement?  Were you
3  aware of the TCC's position?
4      A.   Not specifically.
5      Q.   And how about the FCR?  Were you aware of the
6  FCR's position on the Century provision before you
7  signed the Hartford settlement agreement?
8      A.   Not -- not specifically.  As I said, just in
9  general.  At that time they weren't really agreeing
10 with anything they were put forward.
11     Q.   When BSA entered the Hartford settlement
12 agreement, you believed that the settlement amount was
13 fair and reasonable, correct?
14              MR. ANDOLINA:  Objection to form, vague.
15              THE WITNESS:  Simple answer to that
16 question is yes.
17     Q.   (By Mr. Ruggeri)  And you believed that it was
18 a reasonable compromise and settlement, right?
19     A.   As it relates to the amount?  What are you
20 referring to?
21     Q.   As it relates to the amount.  Sure.
22     A.   Yes.
23     Q.   And today you still believe the amount is
24 still a reasonable compromise, don't you?
25              MR. ANDOLINA:  Objection; form.

Page 125

1  THE WITNESS: Well, let's say at the time
2  I thought it was reasonable.
3   Q. (By Mr. Ruggeri) Do you not -- do you dispute
4  that now?
5   A. Well, I think substantially the amount as it
6  relates to the claims analysis is still within a range
7  of reasonableness.
8   Q. Still within the range today, correct?
9   A. A range of reasonableness, yes.
10  Q. And the analysis included analysis done by
11  your consultant Bates White, correct?
12  A. That's correct.
13  Q. And not only did you have a consultant to
14  advise you on the liability analysis, you also had a
15  consultant to advise you on the insurance analysis for
16  those liabilities, correct?
17  A. That's correct.
18  Q. And who was the insurance consultant that you
19  used for that part of the analysis?
20  A. Well, I think frankly it was probably more of
21  a collaborative effort, but Haynes and Boone was our
22  insurance counsel.
23  Q. How about your insurance consultant? Who
24  maybe put together the program and allocated to the
25  program? Who did that work?

1   A.   I'm not sure I understand the question.  Are
2   you talking about the BSA's insurance program?
3   Q.   I'm talking about who advised you on the
4   reasonableness of the settlement amount in view of both
5   Bates White's liability analysis and whatever insurance
6   analysis that was done for BSA.  Who did the insurance
7   analysis?
8   A.   Well, I don't know that I can point to a
9   particular person.  I think it was a collaborative
10  effort of our advisors.
11  Q.   What did KCIC do?
12  A.   Pardon?
13  Q.   What did KCIC do?  They were insurance
14  advisors, right?
15  A.   Yes.  So they were -- they were part of that
16  advisor group that was advising.
17  Q.   So in arriving at the reasonableness of the
18  $650 million, you drew on the analysis of both Bates
19  White litigation analysis and KCIC and others on the
20  insurance analysis, right?
21  A.   That's correct.
22  Q.   And that amount was reasonable then and it's
23  reasonable now, correct?
24           MR. ANDOLINA:  Objection to form of the
25  question.

Page 127

1  THE WITNESS: I think we still feel that
2  it was a reasonable amount for Hartford, yes.
3  Q. (By Mr. Ruggeri) The claim analysis hasn't
4  changed, has it?
5  A. Not to my knowledge.
6  Q. The insurance analysis hasn't changed, has it?
7  A. Again, not to my knowledge.
8  MR. RUGGERI: May we take five minutes
9  for me?
10 MR. ANDOLINA: Sure, Jim. Are you about
11 wrapping up on your end?
12 MR. RUGGERI: We're just getting started.
13 After me you got Tanc to deal with. We're just getting
14 started.
15 MR. ANDOLINA: No, I understand. I mean
16 for your questioning.
17 MR. RUGGERI: I've got some time left, so
18 I don't know if -- I mean, I would keep going if it's
19 me. Why don't we -- why don't we take five minutes now
20 if it's okay with Mr. Mosby, see where we are in a
21 little bit, and go from there.
22 THE VIDEOGRAPHER: We're off the record
23 at 11:13.
24 (Recess from 11:13 to 11:21)
25 THE VIDEOGRAPHER: We're on the record at

HIGHLY CONFIDENTIAL

Page 160

1  Q.  Did you think it was great news?
2  A.  Did what I think was great news?
3  Q.  The Hartford settlement.
4  A.  Yes.
5  Q.  Let me ask you this, Mr. Mosby.  Mr. Whittman
6  testified yesterday that BSA's executive board approved
7  the restructuring support agreement on June 22nd.  Is
8  that correct?
9  A.  I don't have the date in front of me.
10  Q.  Well, let me ask you this.  Let's put on --
11  let's put up Exhibit 17.  Exhibit 17 is a June 25th,
12  2021, e-mail from Mr. Martin to the insurers.  It's a
13  letter.  Sorry.
14  A.  Okay.  I have it up.
15  Q.  If Mr. Whittman is correct that the executive
16  board approved the RSA on June 22nd, why did Mr. Martin
17  send the insurers this June 25th letter pretending that
18  it still wasn't final?
19       MR. ANDOLINA:  Objection to form,
20  characterization of the question.
21       THE WITNESS:  You mind if I read the
22  letter?
23       MR. RUGGERI:  Please.
24       MR. SCHIAVONI:  Well, hold it.  Can we
25  just -- can we establish whether he's ever seen the