# **<u>EXHIBIT C</u>**

```
                                                                    1

               UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE

                              .   Chapter 11
IN RE:                        .
                              .   Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA and     .
DELAWARE BSA, LLC,            .
                              .
              Debtors.        .
OFFICIAL TORT CLAIMANTS'      .
COMMITTEE OF BOY SCOUTS OF    .
AMERICA AND DELAWARE BSA, LLC,.   Adv. Pro. No. 21-50032
                              .
              Plaintiff,      .
                              .
       v.                     .
                              .   Courtroom No. 2
BOY SCOUTS OF AMERICA AND     .   824 North Market Street
DELAWARE BSA, LLC,            .   Wilmington, Delaware 19801
                              .
              Defendants.     .   Wednesday, May 19, 2021
. . . . . . . . . . . . . . . .   11:00 A.M.

     TRANSCRIPT OF TELEPHONIC DISCLOSURE STATEMENT HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                 UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:        Derek C. Abbott, Esquire
                       Andrew R. Remming, Esquire
                       Eric W. Moats, Esquire
                       Paige N. Topper, Esquire
                       MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                       1201 North Market Street, 16th Floor
                       Wilmington, Delaware 19899

                       - and -

                       Jessica C. Lauria, Esquire
                       Andrew Hammond, Esquire
                       WHITE & CASE LLP
                       1221 Avenue of the Americas
                       New York, New York 10020

Audio Operator:        Brandon J. McCarthy, ECRO
```

1  square peg into the round hole of the Chapter 11 case in the
2  bankruptcy code itself.  After countless hours mediating,
3  negotiating, meeting with parties, appearing before Your
4  Honor, there are a few things that have become crystal clear
5  to the debtors.
6      (Audio indiscernible)
7          MS. LAURIA:  It sounds like someone does not have
8  their phone on mute.
9          THE COURT:  Yes.  Everyone, please check your phones.
10 Thank you.
11         Ms. Lauria?
12         MS. LAURIA:  Thank you, Your Honor.
13         So as I was saying, Your Honor, having
14
15 (indiscernible) sixteen months becoming intimately familiar
16 with them.  There are two issues that have become crystal
17 clear to the debtors.  I think this first one no party can
18 dispute.
19         A reorganization as opposed to a liquidation is the
20 only mechanism to achieve the (indiscernible) 11 cases.  The
21 goal of preserving the mission of the Boy Scouts as well as
22 providing equitable compensation for victims.  So there is
23 only way we can do that, Your Honor, and that's through a
24 reorganization, not a liquidation, of the enterprise.
25

1  The second issue, Your Honor, that has become very
2  clear to the debtors over the course of the past fifteen
3  months, and we studied this extensively, is there really are
4  only two reorganization alternatives that work for the debtor.
5  The first reorganization alternative, and I'm talking
6  at a structural level, is a global resolution plan. That is a
7  plan that provides the releases of the non-debtor local
8  councils from their abuse liabilities. That leads to enhance
9  insurance rights because we share our insurance rights with
10 the local councils. That is all in exchange for a pot of
11 consideration and to the extent the insurers don't settle
12 insurance rights that would be transferred to a victim's
13 trust. That is the global resolution concept.
14
15  We know to get that global resolution concept across
16 the finish line we need plaintiff support. In fact, our plan
17 has said it, we have said it a dozen or more times, we will
18 stipulate to it; to get global resolution achieved we need
19 plaintiff support for the global resolution claims.
20  As we have studied this over the last sixteen months
21 there is one other structural option that works for the debtor
22 and that other structural option is what we have termed the
23 BSA toggle plan, but in truth, Your Honor, it's a BSA only
24 plan. It basically permits BSA to emerge from bankruptcy
25 while preserving the tort victims' rights against non-debtors.

1      It would permit this debtor to emerge and stop the
2 exorbitant cost of these Chapter 11 cases. And I think, Your
3 Honor, as you look to the two objections no party can --
4    (Audio indiscernible)
5      MS. LAURIA: -- those are the two general structures
6 that are absolutely required, one or the other, to get us out
7 of this bankruptcy case at the reorganization. We looked at
8 other structural options for a plan of reorganization. They
9 are all fraught with greater litigation, if you can believe
10 that after looking at your docket today and seeing the
11 objections to our disclosure statement. More importantly, any
12 other reorganization type structure has intense execution risk
13 associated with it.
14
15      So --
16    (Audio indiscernible)
17      MS. LAURIA: -- reorganization structure on the
18 table. It's the two that the debtors have put forward. And,
19 you know, as we look at the exceptions we haven't seen any
20 other silver bullet from a big picture structuring
21 perspective. So what does that mean, that means it's just
22 these two options that we're looking at. We recognize this.
23 The TCC pointed it out in their original exclusivity
24 objection. That is why we amended the plan to add-on that BSA
25

the claim from the insurer the court said no, not so fast, your recovery is going to be limited to the --

(Audio indiscernible)

MS. LAURIA: -- that is paid out of the trust, not the full value of the claim. The California Court this time in the Federal District Court double downed on that concept in 2016 in the Flintkote decision.

So what we have from the coalition, and you will see this concept come up again and again in the disclosure statement objection from both the coalition and the FCR is this notion that by making the plan insurance neutral they are running the risk of a Fuller-Austin or a more recent Flintkote adverse determination when it comes to collecting against the insurers in post-bankruptcy insurance coverage litigation.

Their solution to this, as they say in their papers, is maybe one of two things. You undoubtedly read this in the estimation pleadings. Solution one is to come forward with an aggregate insurance binding estimation. In other words if Your Honor or the Federal District Court were to estimate the debtors aggregate liabilities with respect to the abuse claims and conveniently, I think as the insurers have pointed out, (indiscernible) which then would correspond to coverage liability. If you adjudicate that as the debtors' aggregate

1   liability with respect to abuse claims that will have the
2   effect of binding the insurers in subsequent litigation.
3           Even if you don't view the binding -- insurance
4   binding estimation, if instead we remove the insurance
5   neutrality provisions from our plan and go with the coalitions
6   proposal in Paragraphs 21 and 22 where Your Honor decides in
7   connection with confirmation that the trust distribution
8   procedures or a claims type allowance process is fair, and is
9   reasonably calculated to come what should be the allowed
10  amount of the claim, the liquidated value of the claim against
11  the debtor that the trustee can then take that liquidated
12  value of the claim and submit that to the insurers and the
13  insurers are bound by the answer.
14
15          Now, Your Honor, I'm not saying what's right or
16  wrong.  What I do know is this; the insurance neutrality
17  jurisprudence has been developed over twenty years in this
18  circuit in particular, in Delaware in particular, and in the
19  Third Circuit.  That language is present in the debtors' plan
20  of reorganization.  It mirrors the language that has been
21  proposed in numerous other mass tort cases including the
22  <u>Imerys</u> case.
23          If we were to remove that language I suppose that may
24  be the alternative plan that the objecting parties would like
25  the debtors to pursue.  I think, as Your Honor can guess,

1  after looking at the twelve objections to our disclosure
2  statement that we received from our insurers that the
3  insurance neutrality language is not calculated to fall within
4  the Third Circuit, so they're not even happy with that.
5          Removing that insurance neutrality language and
6  setting this court or the Delaware District Court up for
7  either a binding estimation battle or a binding trust
8  distribution procedure battle is setting us up for the most
9  epic battle these courts have ever seen between plaintiff
10 lawyers on the one hand and insurers on the other hand.
11         Rest assured that if the plaintiff lawyers are
12 successful in connection with that litigation the insurers,
13 and we've got, as you know, every player in the insurance book
14 in our case, will appeal those rulings all the way to the
15 Supreme Court.  We will not get to those rulings during 2021.
16 Certainly not at the appellate level, but we have our doubts
17 as to whether or not we will get to those rulings at the
18 Bankruptcy Court level if we pursue that path.
19         So where does that leave us, Your Honor.  We have two
20 baskets of consideration that can certainly be built upon the
21 Hartford and local councils, then we have this insurance
22 neutrality issue, for lack of a better way to describe it.
23 We're at the tipping point, Your Honor, in these Chapter 11
24 cases.  I can't say it any differently.  We are there.  The
25

1  outstanding to grab the bull by the horns and I think Mr.
2  Gallagher and Mr. Finn, who, you know, we didn't support
3  necessarily either one of them, but they might be helpful to
4  Your Honor in sort of undoing this Gordian knot and moving the
5  thing forward.
6          Thank you very much, Your Honor.
7          THE COURT: Okay. Thank you.
8          Mr. Stang?
9          MR. STANG: Your Honor, the tort claimants'
10 committee opposed the extension to exclusivity because there's
11 not a single survivor representative group that supports the
12 debtors' plan. The debtor refers to its plan as a toggle
13 plan. It is a death trap plan. It has as Plan A, a bad
14 solution, as Plan B, a worse solution.
15         And we'll get into, later, how the debtors' Plan B
16 isn't what the tort claimants committee supports and what the
17 major difference is between what we would propose doing and
18 what the debtors' death trap Plan B does.
19         As the fiduciary for survivors in this case, we
20 have reviewed the letters that have come to you from
21 individual survivors and they are painful. They are horrific.
22 We read the unredacted ones. And the nine men who sit on the
23 tort claimants committee echo the plea to the Court to find a
24 reasonable solution to this catastrophe, which is that 84,000
25 people have come forward to say that they were abused, and I