# **EXHIBIT F**

Page 1

1          IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE DISTRICT OF DELAWARE

2

3    In re:                     ) Chapter 11
                                )
4                               ) Case No. 20-10343 (LSS)
                                )
5    BOY SCOUTS OF AMERICA AND )
     DELAWARE BSA, LLC,          )
6    Debtors.                    ) (Jointly Administered)

7

8            ORAL VIDEOTAPED DEPOSITION OF
9                    BRIAN WHITTMAN
10                   July 14, 2021
11        ORAL VIDEOTAPED DEPOSITION OF BRIAN WHITTMAN,
12   produced as a witness at the instance of First State
13   Insurance Company, Hartford Accident and Indemnity
14   Company, Twin City Fire Insurance Company and
15   Navigators Specialty Insurance Company and duly
16   sworn, was taken in the above-styled and numbered
17   cause on the 14th day of July, 2021, from 10:04 a.m.
18   to 4:41 p.m., before Vickie G. Hildebrandt, Certified
19   Shorthand Reporter in and for the State of Texas,
20   reported by computerized stenotype machine with the
21   witness present in Dallas, Texas, pursuant to the
22   Federal Rules of Civil Procedure, the current
23   emergency order regarding the COVID-19 State of
24   Disaster, agreement of counsel and the provisions
25   stated on the record or attached hereto.

1          A.    I'm not sure how you categorize deeply.    I

2    was in a number of mediation sessions with Hartford

3    representatives and BSA representatives.    I reviewed

4    various documents and was a participating party to a

5    number of discussions.

6          Q.    And is it fair to say that the -- that there

7    were extensive negotiations leading up to the

8    finalization of the Hartford/BSA settlement?

9          A.    Yes.

10          Q.    And that, in fact, those negotiations occurred

11    over some period of time, correct?

12          A.    I would agree with that.

13          Q.    I want to show you -- in connection with that,

14    I want to show you another -- let's go ahead and mark as

15    Exhibit 2, Whittman Exhibit 2, the -- the Alvarez &

16    Marsal application for April of 2021, and give it a

17    second to load in.    Then I'll ask you to take a look at

18    it and make sure that that's what the document is.

19                        (Exhibit No. 2 marked.)

20          Q.    (BY MR. WEINBERG) Now, Mr. Whittman, do you

21    have the document?

22          A.    I can see it on the big screen.    It has not

23    showed up on my computer yet.

24                        Oh, here it is.    Okay.    Hold on, let

25    me open it.    All right.    I have it.

1   abuse claims?

2       A.   A&M did not prepare any analysis of

3   Hartford's liability.  We -- we did ultimately look

4   at estimates of Hartford's liability as compared to

5   the Hartford settlement for reasonableness but we did

6   not prepare a specific estimate of Hartford's

7   liability.

8       Q.   So you looked -- you looked at Hartford's

9   liability to determine reasonableness because BSA needed

10  to make a determination about whether or not a proposed

11  settlement amount was reasonable, correct?

12      A.   Correct.

13      Q.   And the -- the amount that's set forth in the

14  BSA/Hartford settlement is $650 million, correct?

15      A.   $650 million subject to adjustment pursuant

16  to a -- what's called the MFN provision.

17      Q.   Okay.  And that -- that amount that was arrived

18  at, that was -- it's fair to say that was the product of

19  arm's length negotiations, correct?

20      A.   I agree with that.

21      Q.   Back and forth in terms of the demand and offer

22  on both sides?

23      A.   Correct.

24      Q.   And if -- fair to say that if BSA believed that

25  the 650 million-dollar payment in accordance with the

1   a far superior outcome for BSA.

2       Q.   Now, do you have an understanding as to why BSA

3   proposed the toggle plan?

4       A.   I do.

5       Q.   And what was that -- what's your understanding

6   of that?

7       A.   I'm not sure that any understanding I have,

8   it would not come from conversations with counsel,

9   but as a -- as a general matter, it was essential for

10   BSA to have some path to emerge from bankruptcy and

11   at the time that the toggle plan was included for the

12   first -- the first time in the plan, we had no

13   support from the plaintiffs at that time and there

14   was no alternative path to get out of bankruptcy

15   without plaintiff support other than the toggle plan.

16       Q.   So at the time that BSA proposed it, BSA viewed

17   the toggle plan as a plan that could be confirmed,

18   correct?

19       A.   We viewed the toggle plan as a plan that

20   could be confirmed.

21       Q.   And BSA viewed the -- the toggle plan as a plan

22   that could be confirmed even over the objection of the

23   claimants groups, correct?

24              MR. HAMMOND:  Objection, form.

25              I just want to make sure we're clear

1   on time frame here.

2       A.   At the time we filed the plan, we did have

3   that view.  That view shifted over time, in

4   particular, as a result of certain statements that

5   were made by the judge at one of the court hearings

6   after the plan was filed.

7       Q.   Well, with respect to your view at the time

8   that the settlement was entered into -- let's turn back

9   to your declaration and I want to look at Paragraph 13

10  of your declaration, Mr. Whittman, and there you say

11  that at the time that -- that BSA entered into the

12  BSA/Hartford settlement, the debtors and you believed it

13  was reasonable and in the best interests of the debtors'

14  estates.

15              Do you see that?

16      A.   I do.

17      Q.   Now, I want to break that apart.

18              What -- what do you mean when you say

19  that the settlement was reasonable?

20      A.   That the amount of the Hartford settlement

21  fell within the range of reasonableness given

22  Hartford's share of the abuse liability and as -- as

23  such, it was reasonable.

24      Q.   And so the amount that Hartford was offering to

25  pay was a reasonable sum taking into account potential

1    disclosure statement?

2        A.    That is correct.  I -- I don't recall if

3    that was the first time that that range was -- was

4    put in the disclosure statement, but it -- it was in

5    that disclosure statement.

6        Q.    Does that same range appear in BSA's fourth

7    amended disclosure statement?

8        A.    It does.

9        Q.    And so BSA still believes that reasonably

10   reflects the range of the abuse liabilities?

11       A.    We do.

12       Q.    And it's -- it's fair to say that BSA evaluated

13   its view of Hartford's coverage obligations carefully

14   before it entered into the BSA/Hartford settlement,

15   correct?

16       A.    Correct.

17       Q.    And you also thought at the time -- or I should

18   say BSA believed at the time that it entered into the

19   BSA/Hartford settlement that the BSA/Hartford settlement

20   would provide significant compensation for abuse

21   claimants, correct?

22       A.    Yes, we believed that the Hartford

23   settlement would provide significant compensation for

24   abuse claimants.

25       Q.    And you also thought at the time that you

Page 41

1    entered into the BSA/Hartford settlement in April of
2    2021 that the settlement provided a pathway towards a
3    confirmable plan, right?
4                    MR. HAMMOND:  Objection to form.
5                    I just want to note that you -- I just
6    want to make sure who we're talking about when you
7    say "you," that we're talking about either Brian
8    or -- the witness or Alvarez & Marsal or the BSA.
9                    MR. WEINBERG:  That's fair point.
10    Q.    Let me -- let me -- let me restate the
11    question.
12                    BSA believed at the time that it
13    entered into the BSA/Hartford settlement that it
14    provided a pathway towards a confirmable plan,
15    correct?
16    A.    BSA and -- and myself at the time believed
17    that and understood that in order to have a
18    confirmable, what we've termed a global resolution
19    plan, a plan that provides for a channeling
20    injunction for the benefit of the local councils,
21    that you need to have a affirmative vote by an
22    overwhelming number of the abuse survivors to confirm
23    that plan.  We believed at the time that the Hartford
24    settlement was a building block towards getting to a
25    point where the survivors would vote in favor of the

1    plan.

2         Q.   But you also believed at the time that the

3    parties executed the BSA/Hartford settlement that the

4    toggle plan was a viable alternative, correct?

5         A.   We believed at the time that the toggle plan

6    was a viable but suboptimal alternative for a -- a

7    whole host of reasons.

8         Q.   Did you believe that the toggle plan was an

9    important strategic component towards working towards

10   the global resolution?

11        A.   At -- at that time, in the absence of -- of

12   having a resolution, yes.

13        Q.   Now, who made the decision with respect to BSA

14   to ultimately enter into the BSA/Hartford settlement?

15        A.   The settlement was reviewed with the

16   Bankruptcy Task Force which is a subset of BSA's

17   board of directors and it was ultimately approved and

18   executed by the management -- by the CEO at -- at the

19   authorization of the board.

20        Q.   Was it approved by the full board of directors?

21        A.   I don't recall.

22        Q.   Was the settlement presented to the entire

23   board of directors?

24        A.   I -- I don't recall specifically.

25        Q.   Now, did -- did a group of professionals meet

Page 44

1   make oral presentations regarding the BSA/Hartford
2   settlement to either the board of directors or the
3   Bankruptcy Task Force?
4        A.   I was involved in the discussions but the
5   primary presentations would have been made by
6   debtors, restructuring counsel or debtors' insurance
7   counsel.
8        Q.   And were you asked to make any recommendations
9   to the Bankruptcy Task Force or the board of directors
10  regarding the Hartford settlement?
11       A.   I don't recall if they specifically asked
12  for my recommendation.
13       Q.   Now, your -- your declaration in Paragraph 13,
14  it states that the Hartford/BSA settlement was met with
15  opposition from the plaintiffs' representatives.
16            Do you see that in your declaration?
17       A.   I do.
18       Q.   And did that surprise you?
19       A.   I was surprised by the intensity, the scope
20  and the duration of the opposition.  I was not
21  surprised that there was a level of initial
22  opposition.
23       Q.   In fact, you knew at the time that the parties
24  executed the BSA/Hartford settlement that the claimants
25  groups would be opposed to it; isn't that right?

1      A.    I expected that the plaintiffs would

2   initially be opposed to it, yes.

3      Q.    Right, but I just want to be clear about this,

4   it wasn't just an expectation, you were -- you were

5   confident of that, weren't you?

6             MR. HAMMOND:   Objection to form, and

7   to the extent it would require the witness to reveal

8   any communications that occurred during the course of

9   mediation, I would instruct him not to answer.

10     A.    Well, I can't answer.

11     Q.    Well, at the time that you entered into -- at

12  the time that BSA into the BSA/Hartford settlement, BSA

13  would have preferred to have a settlement that the

14  claimants signed onto, right?

15     A.    Correct.

16     Q.    And so if -- if BSA thought that the claimants

17  would have signed onto the BSA/Hartford settlement, they

18  would have gotten that sign on, correct?

19     A.    Generally, yes, although the Hartford deal

20  is one component of a whole host of issues that BSA

21  was negotiating with the various plaintiff groups so

22  I'm -- I'm not sure that it's fair to say that we

23  would have -- yes, we would have preferred --

24  preferred to have an agreement with everybody but

25  whether it would have been possible to have an

Page 48

1    This is your declaration from, I believe it's May 21st.

2                    (Exhibit No. 4 marked.)

3                    MR. HAMMOND:  Counsel, I just -- I'm

4    going to put in front of him a copy of that

5    declaration so he has a copy in paper.

6                    MR. WEINBERG:  Sure.

7         A.    Okay.

8                    MR. HAMMOND:  And -- and for the

9    record, this is NCF No. 4101.

10        Q.    (BY MR. WEINBERG) And, Mr. Whittman, this is

11   a declaration that you submitted, I believe it's

12   May 16th?

13        A.    Yes.

14        Q.    And it was submitted in connection with BSA's

15   request to extend exclusivity, correct?

16        A.    That is correct.

17        Q.    And if we go down to Paragraph 8 of the

18   declaration --

19        A.    Yes.

20        Q.    -- you state that you disagree with the

21   allegation that the BSA/Hartford settlement was

22   negotiated in secret.

23                    Do you see that?

24        A.    I do.

25        Q.    And so when you submitted this -- this

1    declaration, wasn't it the case that in your mind, the

2    claimants were aware of the negotiation of the

3    BSA/Hartford settlement?

4        A.    I do believe they were aware.

5        Q.    And they certainly were aware of it on

6    April 16th when it was submitted in connection with

7    the mediators' second report, right?

8        A.    Correct.

9        Q.    Now, at the time that you submitted this

10   declaration which was on May 16th, did BSA have a view

11   at that point in time as to whether or not the -- the

12   BSA/Hartford agreement was reasonable?

13       A.    I -- I'm sorry, I just want to clarify one

14   thing.  You -- you said plaintiff groups and -- and I

15   did specifically say here the Coalition and the FCR

16   so I just want to be clear that my response is the

17   Coalition and the FCR, not -- not all of the

18   plaintiff groups, and then I apologize because I was

19   thinking about that while you were saying your

20   question.  Could you repeat the question?

21       Q.    Sure.

22              At the time that you submitted this

23   declaration which was May 16th, did BSA have a view

24   about whether the BSA/Hartford settlement was

25   reasonable?

1    settlement in its current form cannot be confirmed.

2         Q.   Okay.  And BSA knew that at the time that it

3    entered into the BSA/Hartford settlement, right?

4         A.   BSA and Hartford were both aware of that,

5    correct.

6         Q.   And is that -- is the fact that BSA knew that

7    it could not confirm the global resolution plan without

8    the consent of the claimants, is that a reason why BSA

9    included the toggle plan as part of the BSA/Hartford

10   settlement?

11        A.   Can you -- can you restate that question?

12   I'm sorry.

13        Q.   Is the -- Mr. Whittman, is the fact that BSA

14   was aware it could not confirm a global resolution plan

15   without the consent of the claimants one of the reasons

16   why BSA included the toggle plan or the potential for a

17   toggle plan in the BSA/Hartford settlement?

18        A.   It was certainly a reason why we had the

19   toggle plan.  I think the toggle plan predates the

20   Hartford settlement.  Perhaps I don't recall exactly

21   the timing there, but certainly it was important that

22   the Hartford settlement allowed the toggle plan to

23   continue to exist.

24             MR. WEINBERG:  We've been going for a

25   little over an hour.  Why don't we just take a short

Page 59

1    break for a couple of minutes, if that's all right.

2                     MR. HAMMOND:  Sure.  Absolutely.

3                     THE VIDEOGRAPHER:  We're off the

4    record at 11:20 a.m.  This is the end of File No. 1.

5                     (Recess taken.)

6                     THE VIDEOGRAPHER:  We're back on the

7    record at 11:31 a.m.  This is the beginning of File

8    No. 2.

9         Q.    (BY MR. WEINBERG) Mr. Whittman, I think

10   that right before the break, we were looking at

11   Paragraph 14 of your July 1st declaration and --

12   which says that the global resolution plan

13   incorporating the Hartford settlement in its current

14   form cannot be confirmed.

15                    Do you see that sentence?

16        A.    I do.

17        Q.    Now, would you agree with me that if the

18   plaintiffs group -- plaintiffs' constituencies were to

19   agree to a plan that incorporated the Hartford

20   settlement, that in that situation, the BSA/Hartford

21   settlement would be reasonable?

22        A.    Well, I -- I -- the -- the Hartford

23   settlement, as I have said, falls within the range of

24   reasonableness.

25        Q.    So you -- so as we're sitting here today, you

Page 60

1   have no reason to believe that the $650 million that's

2   set forth in the BSA/Hartford settlement is not within

3   that range of reasonableness, correct?

4        A.   Correct.

5        Q.   And so just to -- just to be clear, what's --

6   in BSA's view, what is preventing BSA from moving

7   forward with the Hartford/BSA settlement agreement is

8   the position of the plaintiffs' constituencies, correct?

9             MR. HAMMOND:  Objection to form.

10       A.   Absent the affirmative vote of a majority --

11  overwhelming majority of the claimants, the plan

12  can't be confirmed and that's why we've asked the

13  Court to determine if we should move forward or -- or

14  be able to, instead, proceed down the path as

15  outlined in the RSA.

16       Q.   And absent the position of the -- the

17  plaintiffs group, you would not be doing that, correct?

18       A.   Correct.

19       Q.   Now, you say that, in -- in Paragraph 14, that

20  to continue to prosecute and solicit a plan

21  incorporating the Hartford settlement without the

22  support of the plaintiff representatives appears futile

23  and would cause unnecessary expense and delay, and I

24  want to ask you, what -- what do you mean when you say

25  it would be futile to prosecute and solicit a plan

1      Q.   My question to you, Mr. Whittman, was has --

2    has BSA done any analysis regarding whether -- or

3    regarding what the effect would be on local councils of

4    sending the -- the direct abuse claims back to the tort

5    system?

6      A.   Well, as we discussed or described in the

7    disclosure statement around the BSA toggle plan, we

8    expect that in a toggle plan scenario, there would be

9    a number of local councils that would ultimately file

10   for bankruptcy.

11     Q.   Did -- did you -- did BSA do any analysis of

12   what number that would be?

13     A.   We did -- yes, we did some analysis as to,

14   yeah, the -- the portion of councils that we expected

15   would be at risk and, therefore, the impact that the

16   toggle plan would have on the membership of BSA

17   and -- and that was incorporated into the business

18   plan.

19     Q.   Now, Paragraph 15, Mr. Whittman, also

20   references -- you also use the phrase changed

21   circumstances that the debtors face as a result of the

22   abuse survivors' rejection of the Hartford settlement.

23            You see that phrase in Paragraph 15?

24     A.   I do.

25     Q.   Now, which circumstances are you referring to

1     when you use that phrase?

2          A.    When we entered into the Hartford settlement

3     agreement, we expected that that would be a building

4     block that would allow us to build support towards a

5     global resolution plan including the Hartford

6     settlement agreement and understanding that that plan

7     would ultimately have to have the overwhelming

8     support of the plaintiffs, that this would be a step

9     that would then be followed by other steps to -- to

10    get us to that point of having a confirmable global

11    resolution plan and instead, what we found was

12    intense opposition from the plaintiffs that did not

13    subside as we continued to negotiate with the

14    plaintiffs for over two months.  As we encouraged

15    Hartford to negotiate with the plaintiffs for over

16    two months, we found intense continuing opposition by

17    the plaintiffs.  Those are the changed circumstances.

18         Q.    So you expected that there would be building

19    blocks towards the settlement and that didn't

20    precipitate the way you expected?

21         A.    That -- that's a short end to what I said,

22    but I agree with -- I agree with that point.

23         Q.    But there's been no change surrounding the

24    circumstances of Hartford's proposed contribution,

25    correct?

1     A.    There has been --

2               MR. HAMMOND:  Objection to form, and

3     just, to the extent that there's any communications

4     involving mediation, I just instruct the witness to

5     leave that out of any response.  Otherwise, you can

6     respond.

7     A.    I'm not aware of any changes to Hartford's

8     commitment or ability to pay the $650 million in the

9     settlement agreement which is again subject to the

10    MFN provision.

11    Q.    And you -- you may have -- have answered this

12    before but there hasn't been any change of facts or

13    circumstances that causes BSA to conclude that

14    $650 million falls outside the range of reasonableness

15    for the Hartford settlement, correct?

16    A.    $650 million still falls within the range of

17    reasonableness.

18    Q.    Now, you're also -- you're seeking --

19    Paragraph 15 states that BSA is seeking a determination

20    that the debtors are not obligated to seek approval of

21    the Hartford settlement.

22               Do you see that?

23    A.    Correct.  Yes, I see that.

24    Q.    Now, the BSA/Hartford settlement agreement does

25    not contain what's known as a fiduciary out clause,

1    correct?

2                    MR. HAMMOND:  Objection to form.

3                    You may answer to the extent you know.

4         A.   I believe that there is not a -- a specific

5    enumerated fiduciary out clause in the Hartford

6    settlement agreement.

7         Q.   The RSA agreement, though, does contain an

8    enumerated fiduciary out provision, correct?

9         A.   I believe that is correct.

10        Q.   What happens if the Court says that it will not

11   release BSA from the Hartford settlement at this time,

12   will BSA abandon the RSA?

13                   MR. HAMMOND:  Objection to form, calls

14   for a hypothetical.

15        A.   I think that's a -- I -- I don't think the

16   Court would, first, say that but then approve the RSA

17   so I -- I don't -- I think the logical conclusion of

18   that is, is that would only be paired with the Court

19   not approving the RSA.  There --

20        Q.   Let's go ahead and mark the -- the proposed RSA

21   order with the attachments as Exhibit 6.

22                   (Exhibit No. 6 marked.)

23        Q.   (BY MR. WEINBERG) Mr. Whittman, while that

24   document is loading, let me ask, did you attend

25   the -- the July 6th status conference with the