# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | Re: Dkt. No. 5466 |

## CENTURY'S OBJECTIONS TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING SUPPORT AGREEMENT AND (II) GRANTING RELATED RELIEF

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware 19801

O'MELVENY & MYERS LLP
Tancred Schiavoni (*pro hac vice*)
Daniel Shamah (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036-6537

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Boy Scouts of America (6300) and Delaware Boy Scouts, LLC (4311).

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ....................................................................................................... 4

    A.    The Amended Plan "Negotiations".......................................... 4

    B.    Discovery Reveals the Debtors Capitulated to the Coalition, TCC, and FCR ........................................................................................ 5

    C.    Principal Terms of the Restructuring Support Agreement ........................ 6

    D.    Principal Terms of the Amended Plan and Disclosure Statement ............. 7

    E.    Procedural History ..................................................................................... 8

OBJECTIONS............................................................................................................ 9

    I.    The RSA Is Subject to Heightened Scrutiny........................................... 9

    II.    Under Any Legal Standard the RSA Fails ............................................... 15

    A.    The RSA's "Benefits" to the Debtors Are Illusory.................................. 16

    B.    The RSA Cannot Be Approved Because It Is an Illegal Agreement ....... 19

    C.    The RSA Cannot Be Approved Because It Is Premised on an Unconfirmable Plan ................................................................................ 23

    D.    The Debtors Have Not Established that the RSA Was Negotiated in Good Faith .......................................................................................... 30

    E.    The "Fiduciary Out" Cannot Salvage the RSA........................................ 33

    III.    Other Problematic Features of the RSA that Should Be Rejected...................... 34

CONCLUSION.......................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armenian Assembly of America, Inc. v. Cafesjian*,
　772 F. Supp. 2d 20 (D.D.C. 2011) ........................................................ 11

*Aronson v. Lewis*,
　473 A.2d 805 (Del. 1984) ...................................................................... 11

*Behradrezaee v. Dashtara*,
　910 A.2d 349 (D.C. 2006) ...................................................................... 11

*Burch v. Opus LLC (In re Opus E. LLC)*
　698 F. App'x 711 (3d Cir. 2017) ........................................................... 10

*Continuing Creditors' Comm. of Star Telecomm., Inc. v. Edgecomb*,
　385 F. Supp. 2d 449 (D. Del 2004) ....................................................... 14

*Evans v. Jeff D.*,
　475 U.S. 717 (1986) ............................................................................... 19

*Fuqua Indus. S'holder Litig. v. Abrams (In re Fuqua Indus.)*,
　2006 Del. Ch. LEXIS 167 (Del. Ch. Sept. 7, 2006) .............................. 19

*Gassis v. Corkery*,
　No. CIV A 8868-VCG, 2014 WL 2200319 (Del. Ch. May 28, 2014), *aff'd*, 113 A.3d 1080
　(Del. 2015) ............................................................................................. 11

*In re ACandS, Inc.*,
　311 B.R. 36 (Bankr. D. Del. 2004) ................................................... 30, 31

*In re Aspen Village at Lost Mountain Memory Care, LLC*,
　609 B.R. 536 (Bankr. N.D. Ga. 2019) ................................................... 27

*In re Aurora Memory Care, LLC*,
　589 B.R. 631 (Bankr. N.D. Ill. 2018) .................................................... 27

*In re Bidermann Indus. U.S.A., Inc.*,
　203 B.R. 547 (Bankr. S.D.N.Y. 1997) ..................................................... 9

*In re Combustion Eng'g, Inc.*,
　391 F.3d 190 (3d Cir. 2004) ................................................................... 21

*In re Exaeris Inc.*,
　380 B.R. 741 (Bankr. D. Del. 2008) ...................................................... 28

*In re Fed.-Mogul Global Inc.*,
　684 F.3d 355 (3d Cir. 2012) ................................................................... 22

*In re Genco Shipping & Trading Ltd.*,
　509 B.R. 455 (Bankr. S.D.N.Y. 2014) ................................................... 16

TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Glob. Indus. Techs., Inc.*,
   645 F.3d 201 (3d Cir. 2011) ................................................................. 22

*In re Indianapolis Downs, LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013) ..................................................... 16

*In re Innkeepers USA Trust*,
   442 B.R. 227 (Bankr. S.D.N.Y. 2010) ........................................... passim

*In re L.A. Dodgers LLC*,
   457 B.R. 308 (Bankr. D. Del. 2011) ................................................. 9, 12

*In re LATAM Airlines Grp.*,
   620 B.R. 722 (Bankr. S.D.N.Y. 2020) ............................................. 9, 14

*In re Paragon Offshore PLC*,
   No. 16–10386, 2016 WL 6699318 (Bankr. D. Del. Nov. 15, 2016)................ 24, 27

*In re Pittsburgh Corning Corp.*,
   453 B.R. 570 (Bankr. W.D. Pa. 2011) ................................................... 21

*In re SPM Mfg. Corp.*,
   984 F.2d 1305 (1st Cir. 1993) ............................................................... 21

*In re Station Casinos, Inc.*,
   2010 Bankr. LEXIS 5672 (Bankr. D. Nev. July 14, 2010) ................... 12

*In re Triangle USA Petroleum Corp.*,
   Case No. 16-11566 (MFW) (Bankr. D. Del. Aug. 2, 2016) ................. 17

*In re Tribune Co.*,
   2011 WL 386827 (Bankr. D. Del. Feb. 3, 2011) .................................. 29

*In re Walt Disney Co. Deriv. Litig.*,
   731 A.2d 342 (Del. Ch. 1998)............................................................... 17

*In re Wonderwork Inc.*,
   611 B.R. 169 (Bankr. S.D.N.Y. 2020) ................................................. 11

*Mills Acquisition Co. v. Macmillan, Inc.*,
   559 A.2d 1261 (Del. 1988) ................................................................... 12

*Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*,
   677 F.3d 869 (9th Cir. 2012)................................................................. 22

*Oberly v. Kirby*,
   592 A.2d 445 (Del. 1991) ..................................................................... 11

*Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*,
   322 B.R. 560 (M.D. Pa. 2005) .............................................................. 30

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Official Comm. Of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*,
   335 B.R. 22 (S.D.N.Y. 2005) ....................................................................................... 9

*Taylor-Burns v. AR Res., Inc.*,
   268 F. Supp. 3d 592 (S.D.N.Y. 2017) ....................................................................... 20

*Weinberger v. UOP, Inc.*,
   457 A.2d 701 (Del. 1983) .......................................................................................... 12

*Willens v. 2720 Wisconsin Ave. Cooperative Ass'n, Inc.*,
   844 A.2d 1126 (D.C. 2004) ....................................................................................... 11

*Wilson v. Huffman (In re Missionary Baptist Found. Of Am.)*,
   818 F.2d 1135 (5th Cir. 1987) ................................................................................... 10

**Other Authorities**

Hazard, Hodes & Jarvis, THE LAW & ETHICS OF LAWYERING § 12.27 (4th ed., 2020-2 Supp.) .. 20

Century Indemnity Company ("Century"), as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, respectfully submits the following objections to the *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [Docket No. 5466] (the "Motion").[2]

## PRELIMINARY STATEMENT

The Motion, and the Amended Plan on which it is premised, represents a significant step backwards in these cases. Instead of advancing a resolution, the RSA threatens the Debtors with liquidation as it invites years of litigation. The execution of the RSA is an abdication of the Debtors' fiduciary duties owed to the estates and the contractual obligations owed to insurers. It is the output of a broken process in which plaintiffs' lawyers and conflicted estate representatives negotiated a secret deal that trades economic concessions and releases for the controlling parties in exchange for the Debtors forfeiting control over these cases and the terms for allowing and valuing claims to the plaintiff lawyers. It is the product of a "mediation" in which key parties— not just insurers, but Chartered Organizations, claimant representatives, and others that tried to participate—were excluded from virtually every negotiation session.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, including the RSA attached to the Proposed Order as Exhibit 1. Century also joins in and incorporates by reference the objections filed by *Certain Insurers' Objection to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (i) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement and (ii) Granting Related Relief* and *Hartford's Objection to Debtors' Motion for Entry of an Order (i) Authorizing the Debtors to Enter into and Perform Under The Restructuring Support Agreement, and (ii) Granting Related Relief* (other than footnote 26), filed contemporaneously. All exhibits referenced herein are attached to the *Declaration of Daniel S. Shamah*, filed in support hereof.

The Court should reject the Motion for several reasons. First, the RSA is subject to the "entire fairness" standard, not the business judgment rule standard, given the unique circumstances that led to the RSA's execution, the inherent conflicts in the process and the structure of BSA and other relevant entities. This heightened standard applies because the BSA is a non-profit and the National Executive Committee—the BSA body that considered and approved the RSA—is comprised of individuals who are affiliated with non-debtor Local Councils that benefit from the Amended Plan. Those same non-debtor Local Councils ultimately control the Debtors and likewise benefit under the Amended Plan as "Protected Parties" through the third-party releases. As a result of this self-interest of the parties controlling both the negotiation and decision to execute the RSA, the Debtors bear the burden of proving that the RSA is both the product of an entirely fair process and a fair outcome. The Debtors cannot satisfy this exacting standard. The concealment of the entirety of the negotiation and deliberation history from discovery, and lack of disclosure to the Court, further demonstrates the fundamental lack of fairness contemplated by the RSA.

Second, regardless of the applicable standard, the RSA fails on the merits for a number of reasons:

- **The benefits it confers on the Debtors are illusory.** The Debtors have not secured the vote of a single creditor in favor of the Amended Plan, the primary rationale for approving any restructuring support agreement. Nor can the Debtors enforce the RSA against any creditor. All the Debtors receive in exchange for their many concessions is an unenforceable "agreement" from a handful of favored plaintiffs' lawyers to recommend the Plan to their putative clients, clients who apparently have not agreed to support the Amended Plan themselves. By leaving the Chartered Organizations and Insurers out of any settlement, *and requiring the consent of the plaintiff's lawyers to negotiate any future settlement*, the underlying Amended Plan will lead to years of litigation at best, and more likely, the liquidation of the Debtors.

- **The RSA itself is illegal.** By paying the Coalition law firms to give legal advice to their clients, the RSA places those law firms in a "concurrent conflict," in violation of the Model Rules. The RSA also sifts to the estate Brown Rudnick fees that 2/3s of the

2

Coalition claimants affirmatively declined to join in paying without these claimants consent and against their interest. The RSA thus cannot be approved because it is an illegal contract.

- ***The Amended Plan is unconfirmable***. Century appreciates that this is not an objection to confirmation, and reserves its substantive confirmation arguments for a later date. However, at least two fundamental principles of the RSA—its anti-insurer language and the failure to resolve any issues with the Chartered Organizations—renders the plan unconfirmable as a matter of law. There is no justification to permit the Debtors to incur the obligation of spending $950,000/month on the Coalition's fees in perpetuity to pursue a plan that has no hope of being confirmed.

- ***The RSA negotiation process was flawed***. The Court will not learn much about how the Debtors negotiated the RSA or what the Debtors considered in approving the RSA, because the Debtors shielded virtually the entire record of those proceedings from discovery behind claims of mediation and attorney-client privilege. Courts have rejected restructuring support agreements where the negotiation history lacked transparency, as is the case here. Moreover, the conduct by which the Debtors reached agreement on the Amended Plan—and specifically the deliberate decision to systematically exclude insurers from all plan negotiations but most especially those dealing with the allowance and valuation of claims—will preclude a finding that the Debtors proposed the Amended Plan in good faith, as required by Bankruptcy Code section 1129(a)(3).

- ***The Debtors have tied their hands.*** Finally, the "fiduciary out" does not help the Debtors; if the RSA is approved the Debtors will have already ceded complete control of the cases to the Coalition, TCC, and FCR. As a result, any hopes of a future settlement between now and confirmation is entirely within the discretion of non-estate fiduciaries, like the Coalition. Under any legal standard, there is no rational business justification for the RSA.

Finally, the RSA contains three other problematic features that must be rejected. First, the good faith findings, in addition to lacking any evidentiary support, are inappropriate as they are nothing more than an obvious attempt to poison the record on confirmation and seek a backdoor, and unjustified, ruling that the Debtors complied with their contractual obligation to cooperate with their insurers and act in good faith. Second, the RSA requires the Debtors to pursue findings in the Confirmation Order that contravene well-settled Third Circuit law. Finally, as will be explained in a separate brief, the proposal to pay the Coalition's fees is illegal and taints the entirety of the agreement.

For all of these reasons, and for the reasons explained in greater detail below, the Motion should be denied.

## BACKGROUND

### A.     The Amended Plan "Negotiations"

While the Debtors have not disclosed any of the drafts of the RSA or any of the board materials reflecting the Debtors' consideration of the RSA, discovery and the record in these cases confirm what is plainly apparent from the terms of the Amended Plan: the RSA represents a full capitulation by the Debtors to the Claimants.   Under the Debtors' Second Amended Plan filed in April [Docket No. 2592], the Debtors and Local Councils proposed contributing about $500 million to the Settlement Trust.   Meanwhile, the TCC and Coalition made clear in their oppositions to the Debtors' request to extend exclusivity (also filed in April) their expectation that the Debtors and Local Councils could and should contribute billions to a settlement trust.[3]  The bid and the ask between the parties was significant, driven in significant measure by the difference in view in the size of the Abuse Claimant pool, an issue Century sought to remedy by requesting permission to conduct Rule 2004 discovery.   Not surprisingly, claimants voiced significant opposition to that plan at the May 19, 2021 hearing.

After that hearing, the Debtors went dark, cancelling all public hearings and disengaging from all discussions and negotiations with Century and other insurers, despite the insurers' repeated requests to be involved. While the Debtors publicly reported that they were engaged in round-the-clock mediation efforts during this time, the truth was the Debtors were in the process of capitulating to the Coalition and TCC on virtually every key point in plan negotiations.   Century

---

[3]     *See, e.g.*, Official Tort Claimant' Objection to Debtors' Third Motion for an Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 2506], at ¶¶ 10-17.

was not permitted to attend a single substantive meeting between the Debtors and the claimant constituency.[4]

On Friday evening, June 25, the Debtors shared "substantially final" documents with Century and other insurers.[5] While ostensibly requesting "comments" from the insurers by 5:00 p.m. the following Monday, the Debtors told the insurers that they viewed the documents as "substantially final."[6] Given the timing and lack of communication with insurers until that point, the Debtors' request for comments was transparently disingenuous.

### B. Discovery Reveals the Debtors Capitulated to the Coalition, TCC, and FCR

The Amended Plan and RSA reveal that the Debtors agreed to give the claimants control over the TDPs and the rest of the case in exchange for the claimant representatives letting BSA and the Local Councils keep what they had previously characterized as a significant amount of their assets. Indeed, by the time Debtors' counsel shared "substantially final" drafts of the RSA with Insurers (on June 25), (a) ███████████████████████████████████████[7] and (b) one of the state-court counsel had already *signed* it. [Dkt. 54662, p.44 of 118]. The Debtors' CEO, Roger Mosby, and its Board Chair, Dan Ownby, ███████████████████████

████████████████████████████████████████[8] ████████

████████████████████████████████████████[9] ████████

---

[4]  *See* Ex. J, Century Indemnity Company's Responses & Objections to the Debtors' First Set of Interrogatories to Century dated July 19, 2021, at 7–8.

[5]  *See* Ex. A, June 25 Letter from Ernest Martin Jr. to Insurers (with attachments).

[6]  *Id.*

[7]  *See* Ex. D, Whittman Dep. Tr. at 179:7–180:11; Ex. C, Ownby Dep. Tr. at 61:19–63:22.

[8]  Ex. B, Mosby Dep. Tr. at 129:5–15 ███████████████████████
      ████████; Ex. C, Ownby Dep. Tr. at 94:9–95:2 ███████
      ████████████████████████████████████████
      ████████████████████████████████████████

[9]  *See* Ex. B, Mosby Dep. Tr. at 144:12–149:25; Ex. C, Ownby Dep. Tr. at 98:3–99:1.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

**C.     Principal Terms of the Restructuring Support Agreement**

The RSA is signed by (i) the Debtors, (ii) the "Plaintiff Representatives" (consisting of the

TCC, the FCR, and the "State Court Counsel" for certain claimants), and (iii) the ad hoc committee

of Local Councils that is composed of a mere eight of the more than 250-plus Local Councils.  The

RSA was not signed by a single Abuse Claimant, Chartered Organization or Insurance Company,

and there is no obligation of any actual Abuse Claimant to vote in favor of the plan contemplated

by the RSA. The key terms of the RSA include the following:

- The Debtors must seek Court approval of a number of findings and orders in any confirmation order that seek to functionally deprive the Insurance Companies, including Century, of their rights and coverage defenses under their Insurance Policies. *See* RSA § II.A(i).  Among other things, the Debtors must seek a finding that the TDPs are binding on all parties, that the allowed amount of Abuse Claims—as determined unilaterally by the plaintiff selected Settlement Trustee – constitutes a determination of BSA's liability and that these procedures themselves are "fair and reasonable."  *Id.*

- The Debtors are prohibited from proposing a plan inconsistent with the TDPs that the Claimants drafted for themselves.  *See* RSA § II.B(i).

- The plan does not provide protection for any of the Chartered Organizations on which BSA relies leaving ongoing against them the same claims that BSA's bankruptcy was purportedly intended to resolve and cross claims back against the on-debtor Local Councils.  *See* RSA § II.B;

- The Debtors must obtain consent of all the Abuse Claimant Representatives (and certain other parties) in order to enter into any settlement with an Insurance Company or Chartered Organization effectively making any settlement impossible.  *See* RSA § II.B; Ex. A., Contributing Chartered Organization Settlement Contribution.

- The Abuse Claimant Representatives are vested with control over the Settlement Trust, by allowing the Coalition and TCC to select every member of the trust supervisory committee (the "*STAC*") and requiring the selection of Eric Green as Settlement

Trustee. *See* RSA Ex. A, Settlement Trust Trustee; Settlement Trust Advisory Committee.

- The Debtors must pay Coalition fees and expenses up to $10.5 million cap for fees and expenses incurred prior to entry into the RSA and up to $950,000 per month moving forward. *See Id.* § II.A(vi).

- Alleged Abuse Claims would be allowed under the Plan and TDPs without any meaningful review or process. *See* RSA Schedule 1, § VII.C. Indeed, the Settlement Trustee would be *required* to allow the underlying claims in full if they satisfied only the most cursory review with no further factual inquiry or ability to object being permitted. *Id*.

- Despite the absence of any serious inquiry or process to allow for objections to claims, the RSA further requires that the Court find that this truncated process establishes the actual value of the underlying claims beyond the amount actually being paid by the estates and the Local Councils. *See* RSA § II.A(i)(c). Presumably, this collusive process is intended to serve as a screen to manufacture otherwise unproven claims against insurers and other third parties, while stripping them of their due process rights.

- By its terms, all of these obligations would remain in place through *May 31, 2022*, even if the Court were to decline to confirm the Amended Plan or to enter any of the dubious findings that are required by the RSA *See* RSA § V.A.

**D.    Principal Terms of the Amended Plan and Disclosure Statement**

The Amended Plan and Disclosure Statement implement the terms of the RSA. As is relevant here, the Debtors have dropped all pretense of pursuing an insurance neutral plan, expressly providing that "the findings made by the Bankruptcy Court in the Confirmation Order or the findings made by the District Court in the Affirmation Order" may modify the terms of, and the rights and obligations under, any Insurance Policy. Amended Plan § X(M)(1). The TDPs themselves contain numerous provisions designed to strip the rights of Insurers to assert defenses under their insurance policies, and, in violation of the Debtors' contractual obligation to defend against invalid Abuse Claims, to allow the Plaintiffs Representatives' hand-picked Settlement Trustee—Eric Green—to unilaterally waive defenses available to the Debtors. *See* Amended Plan, Exh. A at §§ VII.B, VIII.E, X. The Amended Plan also expressly subordinates Indirect Abuse

Claims, which include claims for indemnification and contribution that belong to Chartered Organizations and Insurance Companies, to the recoveries of Direct Abuse Claims.  Amended Plan Exh. A. at §§ IV.B, XI.A.  Finally, members of the Executive Committee are all getting releases and are classified as Protected Parties in their personal capacities as current or former executives of the Local Councils.  All or virtually all of Executive Committee members came from the Local Councils.

The Amended Plan further exacerbates the moral hazards of these cases, by offering an "expedited" payment of $3,500 to holders of all Direct Abuse Claims, no questions asked.  Amended Plan § III.B.10.  In other words, notwithstanding the significant irregularities in the claims filing process that have been revealed in these cases, the Debtors propose allowing all 82,000 proofs of claim that have been filed without any vetting at all.[10]

### E.    Procedural History

It would be yet another week after the June 25 communication before the Debtors would take any further steps.  On Thursday, July 1, the Debtors filed the Motion, requesting it be heard on July 20, the same date as the Disclosure Statement. [Docket No. 5466]  On July 2, at 11:45 p.m. the Friday night of the July 4th holiday weekend, the Debtors finally filed the Amended Plan and Disclosure Statement.  [Docket Nos. 5484–86]  At a status conference on July 7, the Court rightly rejected the Debtors' proposed timetable, and instead scheduled the Motion to be heard on July 29–30 and the Disclosure Statement to be heard on August 12–13.

---

[10]     As of the filing of this objection, the Court has not ruled on Century's and  Hartford's Rule 2004 motions.

# OBJECTIONS

## I. The RSA Is Subject to Heightened Scrutiny

The Debtors' decision to pursue the RSA, and the Amended Plan itself, are subject to heightened scrutiny under the entire fairness standard of review. Although a debtor's business decisions are typically reviewed under the deferential "sound business purpose/business judgment" standard, bankruptcy courts apply the heightened "entire fairness" standard to decisions and transactions that implicate the interests of insiders (such as a board members and other control parties). *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313–14 (Bankr. D. Del. 2011).

Under well-established bankruptcy law, this standard is applied to transactions where insiders have an interest, including transactions like the RSA that are proposed under Bankruptcy Code section 363(b) as well as other provisions of the Code that require court approval for transactions outside the ordinary course of business. *See In re LATAM Airlines Grp.*, 620 B.R. 722, 771 (Bankr. S.D.N.Y. 2020) (applying entire fairness standard to insider transaction); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) ("[S]ales to fiduciaries in chapter 11 cases are not per se prohibited, but [they] are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse."); *Official Comm. Of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005) ("Courts have held that transactions that benefit insiders must withstand heightened scrutiny before they can be approved under § 363(b).").

Heightened scrutiny or entire fairness will apply to a plan support agreement that was negotiated by and will benefit insiders. *See In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (noting that heightened scrutiny standard may apply to a plan support agreement with an insider but finding the agreement in question could not be justified by even the more deferential business judgment test). In *Innkeepers*, the court found that the RSA at issue included

9

transactions that were not "disinterested" in nature—a prerequisite for the business judgment standard to apply—because an insider control party had participated in its negotiation and would receive a material benefit. *Id*. ("[T]he negotiations surrounding the PSA preclude me from finding that it was a disinterested business transaction. Indeed, it is clear from the evidence presented that, even as early as April 2010, [Apollo], the holder of 100% of the equity in [the debtor and its parent] was always intended to receive equity as part of the transaction—either directly, as a back-stop party, or through a side deal with Lehman negotiated just before the Petition Date. Apollo also appears to have been directly and inextricably involved in the negotiations and concept of the plan-related transactions from the time the deal, as described by Mr. Beilinson, was '"a peppercorn."'").

"In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *Burch v. Opus LLC (In re Opus E. LLC)* 698 F. App'x 711, 719 (3d Cir. 2017) (quoting *Innkeepers*, 442 B.R. at 231); *see also Wilson v. Huffman (In re Missionary Baptist Found. Of Am.)*, 818 F.2d 1135, 1144 (5th Cir. 1987) (noting that "the reason that the transactions of insiders will be closely studied is because such parties usually have greater opportunities for such inequitable conduct").

While the heightened standard is applied to insider transactions as an independent matter of bankruptcy law, state law involving non-profits also requires the same result.[11] If a majority of

---

[11] BSA was originally incorporated in the District of Columbia, but subsequently became a federally chartered entity. Disclosure Statement, at p.26. This Court would presumably look to Delaware law for guidance on corporate governance for a federally chartered entity. To the extent relevant, courts in the District of Columbia also frequently look to Delaware corporate law in interpreting D.C. corporate law. *See Behradrezaee v. Dashtara*, 910 A.2d 349 (D.C. 2006); *Willens v. 2720 Wisconsin Ave. Cooperative Ass'n, Inc.*, 844 A.2d 1126 (D.C. 2004) (relying on *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), to analyze the business

a board lacks independence or has an interest in the proposed transaction, heightened scrutiny or entire fairness will apply. *See Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991); *Armenian Assembly of America, Inc. v. Cafesjian*, 772 F. Supp. 2d 20, 104 (D.D.C. 2011) (the business judgment rule will not apply where fiduciaries of not-for-profit entity "lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available.").[12]  In assessing a charitable board's discharge of its duties, courts look at the interests of the beneficiaries, not the board or the entities' members.  *See In re Wonderwork Inc.*, 611 B.R. 169, 196 (Bankr. S.D.N.Y. 2020) ("Under Delaware law, fiduciaries of a non-profit charitable corporation owe fiduciary duties to the corporation itself and to its beneficiaries.") (citing *Oberly v. Kirby*, 592 A.2d 445, 461–62 (Del. 1991)); *see also Gassis v. Corkery*, No. CIV A 8868-VCG, 2014 WL 2200319, at *14 (Del. Ch. May 28, 2014), *aff'd*, 113 A.3d 1080 (Del. 2015) ("The board of directors of a charitable corporation 'owes fiduciary duties to its *beneficiaries*, not to its members *qua* members or directors *qua* directors.' (emphasis in original))."

The entire fairness standard is "exacting" and requires "rigorous judicial scrutiny," *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1988), with the burden placed on

---

judgment rule for a D.C. non-profit corporation).

[12] To be clear, this brief need not and does not address the standard of review concerning a solvent company's decision to indemnify its officers and directors.  Rather, the issue before the Court is the decision by the National Executive Committee and the National Executive Board to require the insolvent Debtors to enter transactions outside the ordinary course of business that have the effect of using estate assets and compromising estate rights to obtain the release of pre-petition claims of third parties against themselves and the controlling Local Councils.  But for the proposed RSA and its effect of advancing the interests to these controlling parties, any indemnification rights that the Local Councils would have concerning the released claims would be pre-petition unsecured claims.

the debtor to demonstrate the entire fairness of the transaction (including fair dealing and fair price).[13] *See In re L.A. Dodgers LLC*, 457 B.R. at 313–14; *In re Station Casinos, Inc.*, 2010 Bankr. LEXIS 5672, at \*36 (Bankr. D. Nev. July 14, 2010) (applying entire fairness standard to bidding procedures where stalking horse bidder was partially owned by equity owner).

Under this well-established law, the Debtors' decision to enter into the RSA is subject to heightened scrutiny. ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████[14]████████████████████████████████████

████████[15] The Local Councils control the Debtors through their super-majority representation on the National Council.[16] The National Council, among other powers, appoints the members of the Executive Board.[17] The Executive Board governs the Debtors.[18] And, finally, the Executive Committee is made up of a subset of the Executive Board.[19] In exchange for the release of liability

---

[13] According to the Delaware Supreme Court, fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[14] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████ *See* Ex. C, Ownby Dep. Tr. at 44:5-24.

[15] *See* Ex. B, Mosby Dep. Tr. at 243:19-248:8 ████████████████████████
████████████████████████████████████████████████████████████████

[16] *See* Ex. E, Charter and Bylaws of the Boy Scouts of America, as Amended Through September 2020, Article II, Section 2, Clause 6 ("The duly elected president and council commissioner of a local council shall, during their terms of office, be members of the National Council. Each local council may, in addition, elect one of its members as a member of the National Council for every 5,000 youth members . . . .").

[17] *Id*. at Article II, Section 3, Clause 1.

[18] *Id*. at Article III, Section 1, Clause 1.

[19] *Id*. at Article III, Section 7.

against themselves, and the Local Councils they represent, these controlling parties abdicated their responsibilities to the estates, the insurers and the Chartered Organizations.

BSA's CEO, Mr. Mosby, and the Chair of BSA Board, Mr. Ownby, were candid about their interests. █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████.[20] █████████████████████████████████████████████████████

███████████████████████████████████████████[21] Predictably, the Claimants drafted the TDPs to prejudice insurers any way they could.

The self-interested provisions of the RSA are clear: (i) each member of the National Executive Committee and the Debtors' board benefits from the third-party release granted to the Local Councils with which they are affiliated as Protected Parties under the Amended Plan, and (ii) the controlling Local Councils themselves benefit from the third-party releases, as do their own respective officers and directors who are in turn defined as "Representatives" for purposes of the provisions covering Protected Parties. Amended Plan § I.A.204. These conflicts must trigger heightened scrutiny. *See In re LATAM Airlines Grp.*, 620 B.R. 722, 771 (Bankr. S.D.N.Y. 2020) (applying entire fairness standard to insider transaction); *Continuing Creditors' Comm. of Star*

---

[20]   *See* Ex. B, Mosby Dep. Tr. at 255:20–23 ████████████████████

█████; Ex. C, Ownby Dep. Tr. at 44:5–24 █████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████

[21]   *See* Ex. B, Mosby Dep. Tr. at 129:5–15 ████████████████████

████████████████; Ex. C, Ownby Dep. Tr. at 94:9–95:2 ████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

*Telecomm., Inc. v. Edgecomb,* 385 F. Supp. 2d 449, 460 (D. Del 2004) (a director is interested if the director sat on both sides of a transaction). The Debtors' citations to other precedent for applying the business judgment rule to RSA motions thus fails, Motion at ¶ 21 n.8, because in the vast majority of those cases, the RSA was either uncontested or the debtors had appointed *independent* directors to approve the restructuring support agreement. Here, in contrast, the directors who approved the RSA simultaneously sat on the boards of, or are deeply affiliated with, non-debtor Local Councils that have a direct interest in the transaction.

The Debtors cannot meet their burden of proving that the process by which the RSA was negotiated was entirely fair or the result of a fair process. In fact, as described in detail below, the Debtors do not even attempt to demonstrate that the negotiation process or substantive terms of the proposed RSA are entirely fair or even reasonable. The RSA was arranged in an opaque process that has been concealed from the Court and the other parties under the cloak of "privilege." The members of the National Executive Council, the National Council, any other governing body or committee, and the Local Councils that directly or indirectly control them, are themselves all interested in the proposed transactions and releases. In exchange for those releases, they have approved an RSA that would pay millions of dollars in cash directly to or for the benefit of certain plaintiffs' counsel, who in exchange are enlisted to "recommend" approval of those same releases to their clients.[22] The beneficiaries of the releases further propose to turn over control of the most important aspects of the case to these same recommending plaintiffs' lawyers—ceding authority

---

[22] *See* RSA § IV.A(i) ("State Court Counsel shall . . . use reasonable efforts to advise and recommend to their respective clients (who hold Direct Abuse Claims) to vote to accept the Amended Plan"); *see also id*. § IV.B.(ii) ("the Coalition, the TCC, State Court Counsel, and the Future Claimants' Representative, as applicable, shall use reasonable efforts to . . . support and cooperate with Debtors to obtain confirmation of the Amended Plan.").

over future settlements[23] and even the plan provisions governing allowance of claims[24], while abandoning even the pretense of insurance neutrality[25] and any ability to help defend the Chartered Organization.[26] Under these circumstances, the RSA is by no means a wholly "disinterested" business transaction and it is thus subject to heightened scrutiny under the entire fairness test.

## II. Under Any Legal Standard the RSA Fails

Regardless of the applicable standard, there is no rational justification for the Motion. The Debtors' principal, yet flawed, justification for their entry into the RSA is that it provides a framework for a confirmable plan, and thus its execution is a reasonable exercise of business judgment. Motion ¶¶ 22–26. In addition to invoking the wrong standard of review, this argument fails for at least three reasons under either standard: (i) any benefit to the Debtors under the RSA is illusory since no actual claimant is bound to vote for the Amended Plan, (ii) the RSA is an illegal agreement because it induces the Coalition lawyers to violate their ethical duties to their clients,

---

[23] RSA § II.B(iii) ("Debtors shall not . . . pursue, or enter into any settlements with any Insurance Company without the prior written consent of the Coalition, the TCC, and the Future Claimants' Representative.").

[24] RSA § II.B(iv) ("Debtors shall not . . . participate in any . . . settlement of the Abuse Claims other than as set forth herein"); *see also* RSA, Exh. A at 18 ("the TDP cannot be modified without the consent of the Coalition, the TCC, and the Future Claimants' Representative.").

[25] The RSA provides for assignment of the insurance policies "notwithstanding any terms of any policies or provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights." *See* RSA, § II.A(i)(D). The TDPs also alienate insurers from the defense of claims. *See* RSA, Exh. B at § VII.E. (Settlement Trustee to determine allowed claim amount); *Id.* at §VIII.E(ii) ("Settlement Trustee may consider any further limitations on the Abuse Claimant's recovery in the tort system."); *Id.* at § VIII.E(iii) (Settlement Trustee to determine impact of statute of limitations defense).

[26] RSA, Exh. A at 15-16 (settlements with Chartered Organizations subject to the "consent of all Parties"); *Id.* at 21 (settlement causing Chartered Organization to be a Protected Party must be approved by the Settlement Trustee, the Future Claimants' Representative, and the Coalition and TCC appointed Settlement Trust Advisory Committee.); RSA, Exh. B, at § VIII.E.(i)(c) (allowed amount of Abuse Claims to be reduced to account for Chartered Organizations' liability).

and (iii) there is no rational purpose for signing a RSA premised on an unconfirmable plan and which will undoubtably lead to years of litigation and, likely, the liquidation of the Debtors.

Moreover, given the process by which the RSA was negotiated, and the Debtors' discovery conduct, the RSA fails because the Debtors cannot show it was negotiated in good faith (which, in turn, will preclude a finding that the Amended Plan was proposed in good faith, as required under Bankruptcy Code section 1129(a)(3)). And, the "fiduciary out" does not help the Debtors, because they have already agreed that ceding control of these cases to the claimant representatives is consistent with the exercise of their fiduciary duties.

## A. The RSA's "Benefits" to the Debtors Are Illusory

The primary purpose of any restructuring support agreement is to provide a debtor with a pathway to confirmation by ensuring that an impaired consenting class of voters is bound to support the plan. *See In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 463–64 (Bankr. S.D.N.Y. 2014). Indeed, the primary benefit to the RSA touted by the Debtors—other than the pause of various pending litigations—is that it procures the support of Abuse Claimants, thus paving the way for confirmation. (Motion ¶¶ 23–26). This statement is patently false. Not only is the Amended Plan unconfirmable (*see infra*), the RSA is a road to nowhere, not a pathway to confirmation. Further, even if the Amended Plan were confirmable (and it is not), the RSA provides no benefit to the estates for three reasons.

***First***, in a typical restructuring support agreement, the creditors themselves execute the agreement, binding themselves to vote in favor of the underlying plan and covenanting not to take any action that would impair or impede the debtor's restructuring efforts. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 296 (Bankr. D. Del. 2013) (restructuring support agreements "predictably . . . contain[ ] a commitment to vote for a plan."). Here, however, not a single claimant signed the RSA, and, other than the nine members of the TCC, no claimant is even a party to the

RSA; their *lawyers* are parties to and bound by the RSA. As a result, the Debtors have assured themselves of nothing, because no one is obligated to vote in favor of the Amended Plan. Rather, these lawyers are merely obligated to "use reasonable efforts to advise and recommend to their respective clients . . . to vote to accept the Amended Plan . . . ."[27] Because the Debtors are not receiving any benefit under the RSA, the RSA cannot withstand even business judgment scrutiny. *See In re Triangle USA Petroleum Corp.*, Case No. 16-11566 (MFW) (Bankr. D. Del. Aug. 2, 2016) [D.I. 194] (denying motion to assume plan support agreement under section 363 and 365(a), after finding that non-debtors noteholders party to the agreement "are not committing to anything. They're not committing to do a backstop. They're not committing to funding the new money rights offering. They're not even committing to vote in favor of a specific plan . . . I think there's sufficient basis to deny approval of the PSA at this point, because, quite frankly, it's an illusory agreement."); *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 369 (Del. Ch. 1998) (business judgment rule does not protect a transaction for which a company receives no consideration).[28]

The risk that the Debtors have not obtained a single affirmative vote in favor of the Amended Plan is not hypothetical. At the status conference on July 7, an attorney speaking on behalf of a group of 50 law firms representing claimants registered his objection to the Amended Plan. July 7 Tr. at 34:38. Timothy Kosnoff, one of the lead lawyers for Abused in Scouting, which represents the single largest block of Abuse Claimants, issued numerous statements vocally stating that the Amended Plan is unconfirmable and objectionable.[29] In the face of such vocal opposition,

---

[27] RSA § IV.A(i). Tellingly, not even the nine members of the TCC are obligated to vote in favor of the Amended Plan either. RSA § IV.B.

[28] While the Debtors claim that these lawyers represent more than 60,000 Abuse Claimants, there is no way to verify that assertion given the lack of any information produced by the Coalition and other state-court counsel.

[29] *See* Ex. K, July 22, 2021 Tweets from Timothy Kosnoff; Ex. L, July 14, 2021 Tweets from Timothy Kosnoff. Mr. Kosnoff represents that he speaks for the 17,000 Abuse Claimants

the absence of any vocal claimant support for the Amended Plan cements the conclusion that the Debtors are not receiving any benefit under the RSA.

*Second*, the structure of the RSA renders it entirely unenforceable, undercutting any benefit to the Debtors. Again, in a normal restructuring support agreement, the creditor is known to the debtor and signed a binding agreement to vote in favor of the plan. If a creditor votes against the plan, the debtor has immediate recourse against that creditor for breach of contract. The resulting damages could be measured in the costs of extending a bankruptcy or the opportunity cost associated with a failed transaction. Here, however, the Debtors have no way to enforce the RSA if individual claimants vote against the Amended Plan. Will the Debtors sue the lawyers who signed the RSA? How will the Debtors prove that the lawyers did not use "reasonable efforts to advise" their clients to vote for the Amended Plan? Presumably that advice is privileged. ███

████████████████████████████████████████████████████████████

███████████████████.[30] In short, the Debtors cannot even assure *themselves* that they can determine what little benefit they allegedly obtained in this RSA.

*Third*, the degree to which the Debtors ceded the pen to the TDPs and other plan documents to the Coalition, TCC, and FCR entirely neuters any purpose to the RSA. *See In re Innkeepers USA Trust*, 442 B.R. 227, 232 (Bankr. S.D.N.Y. 2010). The TDPs attached to the Amended Plan give a selected group of plaintiffs' lawyers control over the all of the key elements of the case. Those provisions will ultimately doom confirmation of the Amended Plan, violate the terms of the

---

represented by Abused in Scouting and not the lawyers who signed the RSA. *See* Ex. M, July 2, 2021 Tweets from Timothy Kosnoff ("I co-founded Abused in Scouting. We represent 16,000 survivors in this bankruptcy. Ken Rothweiler does not speak for Abused in Scouting or it's clients. He is an army of one. I doubt many of our clients know who he is.").

[30]   *See* Ex. B, Mosby Dep. Tr. at 207:7–225:20; Ex. C, Ownby Dep. Tr. at 103:11–120:20.

Debtors' insurance policies, endanger the Chartered Organizations, and may lead to the Debtors' potential liquidation. Measured against these catastrophic consequences, these provisions do very much benefit the subset of plaintiffs' lawyers who are agreeing to recommend this flawed plan to their clients. That being the case, the Debtors are free to propose the Amended Plan without the need for the RSA, because the lawyers who are party to the RSA would presumably recommend confirmation of the Amended Plan or any other plan that they personally controlled. They do not need to be given further cash benefits, plus control of the case in exchange for the illusory concession of recommending a plan that contains the faulty terms they themselves crafted. At its core, approval of the RSA renders future settlements impossible: the RSA hands the fox the keys to the henhouse by granting the Coalition, TCC, and FCR veto rights over any such settlement. *Innkeepers*, 442 B.R. at 232.

### B. The RSA Cannot Be Approved Because It Is an Illegal Agreement

The Supreme Court has held that a lawyer cannot be influenced by his or her self-interest in obtaining a fee award when advising a client about settlement. *See Evans v. Jeff D.*, 475 U.S. 717 (1986). That is even more so where the lawyer has agreed to provide some specific advice that precedes any recovery for the client. By taking money in return for promising to advise their claimant-clients' to vote for the plan, Coalition counsel breached this blackletter principle and violate Model Rule 1.7(a)(2).

The RSA agreement to pay the Coalition's fees in exchange for "advis[ing] and recommend[ing] to their respective clients (who hold Direct Abuse Claims) to vote to accept the Amended Plan" renders the RSA unlawful because it induces Coalition counsel to violate their ethical duties. *See Fuqua Indus. S'holder Litig. v. Abrams (In re Fuqua Indus.)*, 2006 Del. Ch. LEXIS 167 (Del. Ch. Sept. 7, 2006) (An engagement agreement that violated Rule 1.7(a) was "unethical" and therefore "void and unenforceable" because "there was an inherent conflict of

interest in the representative plaintiff serving both as the class representative and as an attorney for the class."); *Taylor-Burns v. AR Res., Inc.*, 268 F. Supp. 3d 592, 597–98 (S.D.N.Y. 2017) (agreement that violated ethical rules is unenforceable).

Model Rule 1.7(a)(2) states that a lawyer shall not represent a client "if the representation involves a concurrent conflict of interest." A concurrent conflict of interest exists if there is a significant risk that the representation "will be materially limited . . . by a personal interest of the lawyer." *See id.* And "a conflict of interest with a current client exists if there is a significant risk that the lawyer's ability to provide representation might be compromised, or materially limited, by the responsibilities owed by the lawyer to others, ***including fidelity to the lawyer's own interests***." Hazard, Hodes & Jarvis, The Law & Ethics of Lawyering § 12.27 (4th ed., 2020-2 Supp.) (internal quotations omitted and emphasis added). Specifically, a risk of conflict "could arise where the lawyer has a financial stake that would be implicated by the results of a matter being handled for a client." *Id.* By taking money in return for promising to advise their claimant-clients' to vote for the plan, Coalition counsel breached Model Rule 1.7(a)(2).

The RSA-established *quid pro quo* also violates Model Rules 5.6, which prohibits settlement agreements that restrict what course of conduct a lawyer may recommend. This very issue came up in the *Vioxx* case, where the settlement "required [participating lawyers] to recommend the settlement to all of the lawyer's eligible clients." Erichson & Zipursky, *Consent Versus Closure*, 96 Cornell L. Rev. 262, 266 (2011). The Ethics Committee determined that "a lawyer cannot agree to refrain from representing present or future clients against a defendant pursuant to a settlement agreement on behalf of current clients even in the mass tort, global settlement context." ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 93-371 (1993). Commentators have observed that "troublingly, [the *Vioxx* settlement] restricted what a lawyer

may do for current clients. The *Vioxx* scenario is not on the periphery but is at the core of plausible justifications for Rule 5.6(b)." Erichson & Zipursky, *supra* at 285. Rule 5.6(b) is concerned with advancing the "public policy of preventing malefactors from buying off lawyers *qua* private attorneys general." *Id.*[31]

What is more, the conflict here is un-waivable. As one noted commentator explains, "if the risk was so substantial that the lawyer could not reasonably believe that he or she will still be able to provide competent and diligent representation, as required by Rule 1.7(b)(1), then the conflict would as a practical matter be non-consentable and the lawyer would have to decline the representation or withdraw." Hazard § 12.27 (internal quotations omitted). Under the RSA, Coalition counsel have no flexibility at all—if they want to collect their contractually agreed fees, they must recommend voting for the Amended Plan. As discussed above, at least some members of the Coalition do not support approving the Amended Plan.

---

[31] *See also In re Hager*, 812 A.2d 904, 908, 924 (D.C. 2002) (suspending attorney from practicing law for one year where attorney entered into a settlement agreement with an opposing party on his client's behalf, without the clients' knowledge, in exchange for which he received payment, and "agree[d] never to represent anyone with related claims against the opposing party."); *La. Mun. Police Emps.' Ret. Sys. v. Black*, No. 9410-VCN, 2016 WL 7980898, at (Del. Ch. Feb. 19, 2016) (voiding contract premised on plaintiff's counsel's "representation that it would 'not be suing'" defendant or counsel's "promise 'not to file an action'" against defendant); *Adams v. BellSouth Telecomms., Inc.*, No. 96-2473, 2001 WL 34032759 (S.D. Fla., Jan. 29, 2001) (Court allowed plaintiffs to opt out of settlement agreements that contained a provision restricting the right of counsel to represent other plaintiffs.); *Wolt v. Sherwood*, 828 F. Supp. 1562, 1569 (D. Utah 1993) ("The purpose behind Rule 5.6 is to preserve the right of clients to have attorneys available to represent their interests, and is not because of a concern about counsel's financial wellbeing. . . . Thus, defendants cannot condition settlement on plaintiff's counsel agreeing to not accepting other cases the defendants."); *Earnings Performance Grp., Inc. v. Quigley*, 124 F. App'x 350, 353–54 (6th Cir. 2005) (determining that, if attorney had signed agreement to refrain from representing parties in future litigation against employer, such agreement most likely would not be enforceable under Michigan Rule of Professional Conduct 5.6(b)).

Separately, Brown Rudnick's fees violate Rule 1.8(f). In relevant part, that rule states that "[a] lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client gives informed consent; [and] (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship." Similarly, Brown Rudnick's fees violate Rule 1.8(g), which states that "a lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the client . . . unless each client gives informed consent, in a writing signed by the client."

In addition to the issues discussed above about RSA fees interfering with the lawyer's independent professional judgment, Movants have offered no evidence that the claimants consented to paying Brown Rudnick's fees—or that the lawyers even notified the claimants of the RSA before filing it with the Court. Many of the claimants likely do not know about the RSA fee arrangement even today. As the Court will recall, some 42,000 claimants effectively already rejected one of the essential RSA terms—paying Brown Rudnick's fees. The proper response to that rejection is not to cram down their fees on the claimants through the RSA. In disregarding the apparent wishes of its clients, and entering into the RSA fee arrangement, Brown Rudnick violated Rule 1.8. *Quintero v. Jim Walter Homes, Inc.*, 709 S.W.2d 224, 229–30 (Tex. Ct. App. 1986) ("The policy expressed in [Rule 1.8(g)] is clearly to ensure that people such as the [plaintiffs] do not give up their rights except with full knowledge of the other settlements involved."); *Abbott v. Kidder Peabody & Co.*, 42 F. Supp. 2d 1046, 1051 (D. Colo. 1999) (court refused to enforce settlement binding all claimants with only the consent of plaintiffs' steering committee because it violated Rule 1.8(g), and added that "[a]ny provision of any attorney-client agreement which deprives a client of the right to control their case is void as against public policy").

**C.** **The RSA Cannot Be Approved Because It Is Premised on an Unconfirmable Plan**

Even if the Debtors obtained the commitment of actual creditors to vote in favor of the Amended Plan (as opposed to the illusory commitment of *some* lawyers to recommend to their clients to vote in favor of the Amended Plan), there is no purpose to an RSA premised on a plan that has no hopes of being confirmed. While Century expressly reserves its confirmation objections for a later date, two fundamental planks of the Amended Plan are so flawed that entering into an RSA based on that Amended Plan cannot be approved.

*First*, while the Debtors at least paid lip service to insurance neutrality in its prior plan, the Amended Plan turns that concept on its head. In *Combustion Engineering*, the Third Circuit held that insurance neutrality requires a plan to protect "the prepetition rights and obligations of both the debtor and the insurers under the Plan by preserving for 'any Entity . . . any and all claims, defenses, rights or causes of action' under subject insurance policies and settlements." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004); *accord In re Pittsburgh Corning Corp.*, 453 B.R. 570, 584 (Bankr. W.D. Pa. 2011) ("A plan is considered to be insurance neutral if it neither increases an insurer's pre-petition obligations nor impairs its pre-petition contractual rights under the subject insurance policies"). This holding derives from the common sense principle that a debtor should not be able to misuse its bankruptcy proceeding to rewrite prepetition contracts to the detriment of its non-debtor counterparties. *See, e.g.*, *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"). Courts in this Circuit routinely reject plans that contravene principles of insurance neutrality. *See, e.g.*, *Pittsburgh Corning*, 453 B.R. at 584 ("[W]e find the Modified Third Amended Plan to be unconfirmable because of the proposed Channeling Injunction and the lack of clarity regarding insurance neutrality"); *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d

Cir. 2011) (reversing confirmation of plan where plan was not insurance neutral because it would increase the insurers' pre-petition liability); *see also Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 677 F.3d 869, 887 (9th Cir. 2012) (finding plan is not insurance neutral, because "the plan allows direct actions against Appellants. It allows the trust to pay out claims according to the trust distribution plan and then to seek indemnification from Appellants. It terminates Appellants' ability to collect claims from settling insurers. It affects the nature of Appellants' contracts with Appellees.").

The Amended Plan violates these principles in at least two ways. First, while the Third Circuit in limited circumstances permits a ***for-profit*** debtor to override anti-assignment clauses in debtor insurance contracts, *see In re Fed.-Mogul Global Inc.*, 684 F.3d 355, 382 (3d Cir. 2012), Bankruptcy Code section 1129(a)(16) expressly requires ***non-profit*** debtors to comply with applicable non-bankruptcy law when transferring any property by "keep[ing] in place the state law restrictions on such nonprofit entities." COLLIER ON BANKRUPTCY ¶ 1129.02[16] (16th rev. ed. 2021) ("Congress was clear that this provision was meant to restrict the authority of a trustee to use, sell, or lease property by a nonprofit corporation or trust."). To Century's knowledge, no court has permitted a non-profit debtor to ignore this provision to override the anti-assignment clause in an insurance contract without the insurer's consent. Moreover, the Amended Plan compounds this defect by seeking to assign the insurance contracts of ***non-debtors*** too. Again, no court has ever permitted such an assignment without an insurer's consent.

Second, rewriting insurers' contracts is precisely what the Amended Plan purports to do. Among other things, the Amended Plan and TDPs provide that:

- All Abuse Claims will be liquidated by a Settlement Trustee—Eric D. Green—handpicked by the Claimants acting in a quasi-judicial role. RSA, Exh. A at 21.[32]

- The Settlement Trustee will have the unilateral right to allow all Abuse Claims, and a holder of an allowed Abuse Claim "shall receive payment" without any judicial oversight. RSA, Ex. B, at § VII.F.

- The Confirmation Order must contain "a required finding," that the Allowed Amounts of Abuse Claims, as determined by the Settlement Trustee in his sole discretion (that is to say, by the Claimants) are "fair and reasonable." RSA, Exh. A at 20.

- The Confirmation Order must contain another required finding that TDPs are binding on all parties, including insurers, thus posing the risk that principles of res judicata or collateral estoppel would preclude insurers from asserting coverage defenses to a demand by the Settlement Trustee. RSA, Exh. A at 20.

- The Debtors' prior plan expressly authorized the Settlement Trustee disallow time-barred claims.[33] Now, the Settlement Trustee will have full discretion to waive defenses, including statutes of limitations, on the Debtors' behalf. RSA, Exh. B at §§ VII.B., VIII.E. This provision contravenes Bankruptcy Code section 502(b)(1), which prohibits allowance of proofs of claim that are "unenforceable against the debtor."

- The RSA is silent as to any Insurance Company's right to participate in settlements with Abuse Claimants, as well as any rights Insurance Companies may have with respect to Abuse Claims for which the Settlement Trustee seeks reimbursement. RSA, Exh. B, at § X.

- Claimants can elect to be paid $3,500 on an expedited basis, and no one is even *permitted* to evaluate whether such a claim is valid or not. RSA, Exh. B, at § IV.A. Considering the Debtors project claimants may recover 100% of their allowed Abuse Claim (Disclosure Statement at 21), the only people who will avail themselves of this option are holders of patently invalid Abuse Claims who want to avoid scrutiny.

These provisions, and others (which Century will detail in its forthcoming Disclosure Statement objection), blatantly run afoul of the Bankruptcy Code and binding Third Circuit law. Given the centrality of these provisions to the RSA (they are "Required Findings" that the Debtors are compelled to pursue in a confirmation order), they render the RSA unreasonable.

_____

*See* Ex. D, Whittman Dep. Tr. at 154:23–157:3.

[33] *See* Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [Docket No. 2592], Exhibit A, at § 5.4.

***Second***, the Amended Plan is not feasible, because the protections afforded by the Amended Plan are themselves illusory.  Under the Amended Plan, the same exact claims that are ostensibly resolved against BSA may be brought against the Chartered Organizations.  The resulting litigation exposure the Chartered Organizations face as a result of being left out of the channeling injunction will undermine the Debtors' mission, inevitably lead to the liquidation of the Debtors, while at the same time precluding insurer settlements.  Under Bankruptcy Code section 1129(a)(11), a plan cannot be confirmed if confirmation would likely be followed by a liquidation of the debtors. *See In re Paragon Offshore PLC*, No. 16–10386, 2016 WL 6699318 (Bankr. D. Del. Nov. 15, 2016) (denying confirmation because plan was not feasible when debtors failed to show they could meet liquidity projections).  Here, the Amended Plan, and the process by which the Debtors reached this point, lays bare a shockingly cavalier approach to feasibility.

The Chartered Organizations are the source of the Debtors' revenues, ███████████

████████████████████████████████████████████████████████████████████

████████████ [34]  The Debtors candidly acknowledge that without a third-party release and a channeling injunction, the Chartered Organizations face a "deluge of lawsuits" that jeopardize the Debtors' continued operation. [35]  The RSA abandons efforts at a global resolution and leaves the thousands of Chartered Organizations on their own to litigate the same claims that BSA is ostensibly settling.

---

[34]  *See* Ex. D, Whittman Dep. Tr. at 117:7–15 ███████████████████████████████████████
*see also* Ex. B, Mosby Dep. Tr. at 194:2–25 ████████████████████
████████████████████████; Ex. C, Ownby Dep. Tr. at 75:8–11 █████████
████████████████████████████████████████

[35]  ████ Whittman Decl. ¶ 6.

While the RSA purports to allow the thousands of Chartered Organizations to seek to obtain the protection of a channeling injunction on a one-off basis if they are able to negotiate it on their own, it is objectively impossible for this to happen on the confirmation schedule proposed by the Debtors and the Claimants. More fundamentally, the deal at the core of the RSA is illusory. It offers the claimants a multi-hundred million dollar payday without their having to release their claims with finality: in other words, they get a payment from the Settlement Trust and yet keep the right to sue on the very same claims. Worse, the RSA undermines the Chartered Organizations' position, making settlement for all practical purposes impossible by stripping them of BSA's cooperation in their defense, binding them to the TDPs findings, and mandating unanimous consent of the representatives of the current and future claimants to any settlement.

When confronted with these terms of the RSA at their depositions, BSA's CEO, Mr. Mosby and BSA's Board Chair, Mr. Ownby, ███████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████. Not surprisingly, not a single Chartered Organization has under these circumstances achieved protected status under the Amended Plan. The consequences for the Debtors are dire. The Church of Jesus Christ of Latter Day Saints announced their disassociation with the Debtors at the end of 2019, leading to the loss of approximately 500,000 members.[36] Two of the largest remaining Chartered Organizations—the Catholic Diocese and the United Methodists—stated their objection to the Proposed Plan at the July 7 status conference:

> This plan with the prejudice that it has to the chartered
> organizations is not going to achieve that consent, Your Honor.
> It's a plan designed to pressure them and a timeline to pressure

---

[36]    Ex. D, Whittman Dep. Tr. at 116:10–16 ███████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████

them into exceeding to the demand of the tort claimants. And what is going to occur, Your Honor, is that every chartered organization is going to have to make a decision, how do we continue to do business with an organization like Boy Scouts? How do we voluntary our time, volunteer our property on a weekly basis to tens of thousands of troops and hundreds of thousands of scouts, with an organization that proposes to treat us as this plan proposes to treat chartered organizations? . . .

What organization would choose to do business with Boy Scouts, being treated like this going forward?[37]

Some Methodist groups have since published their recommendation to withdraw as Chartered Organizations from BSA.[38] The Roman Catholic Ad Hoc Committee and the United Methodist Ad Hoc Committee were frank in their objection to the Motion that "it is possible, maybe even probable, that many Chartered Organizations may decline to continue to partner with the Debtors" given how the RSA treats Chartered Organizations.[39] ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████[40] The resulting claims against the Chartered Organizations will result in claims back against the non-debtor Local Councils and the Debtors.[41]

---

[37] Ex. F, July 7 Tr., at 60:10-61:3.

[38] *See* Ex. G, Rio Texas Conference Methodist Churches Advise Not to Recharter Unite in 2021, Reddit – BSA (July 16, 2021), *available at* https://www.reddit.com/r/BSA/comments/olrfgq/rio_texas_conference_methodist_churches _advise/?utm_source=share&utm_medium=ios_app&utm_name=iossmf; *see also* Ex. H, UM News, "Churches urged to file legal document in Boy Scouts lawsuit" (Oct 29, 2020) ("Churches are being cautioned not to simply suspend their Scouting programs…").

[39] *See Joint Objection of the Roman Catholic Ad Hoc Committee and the United Methodist Ad Hoc Committee to the Debtors' Motion for Authorization to Enter into and Perform Under Restructuring Support Agreement and for Related Relief and Joinder in Limited Objection and Reservation of Rights of the Church of Jesus Christ of Latter-Day Saints* [Docket No. 5676] ¶ 4.

[40] Ex. D, Whittman Dep. Tr. at 123:7-19.

[41] Ex. F, July 7 Tr. at 60:4-9 ("And the plan in this case, as Mr. Goldberg noted, proposes to strip all of our property rights, not only insurance policies procured by debtors, but

Yet, incredibly, without even a single settlement with a Chartered Organization, .[42]

[43] T

See *Paragon*, 2016 WL 6699318, at **21–28 (denying confirmation because debtors' projections were too aggressive and unreasonable).

The Amended Plan is not feasible for the independent reason that the Debtors have not obtained a commitment from the Local Council to make the $500 million contribution. While the Debtors parade the $500 million to be contributed by the Local Councils, the RSA provides nothing more than a commitment from an ad hoc committee of eight Local Councils to use "reasonable efforts to persuade Local Councils" to provide the contribution. RSA § III (A). The flimsiness of this commitment is apparent as the RSA provides "the AHCLC is not a fiduciary for and cannot bind Local Councils … nor shall anything in the [RSA] impose any liability arising from or related to any breach or other violation of [the RSA]." RSA III(B). There is no commitment. "When a plan depends on post-petition financing . . . it is not possible to satisfy the feasibility requirement in section 1129 without evidence of a firm commitment of financing." *In re Aspen Village at Lost*

---

insurance policies procured by nondebtors. That raises substantial questions of this Court's jurisdiction to do what that plan proposes, absent consent.").

[42]  Ex. D, Whittman Dep. Tr. at 118:9:119:2.
[43]  *Id.*

*Mountain Memory Care, LLC*, 609 B.R. 536, 544 (Bankr. N.D. Ga. 2019) (denying confirmation because written letter of intent was "too speculative") (citing *In re Aurora Memory Care, LLC*, 589 B.R. 631, 642 (Bankr. N.D. Ill. 2018)). Here, the Debtors obtained nothing more than a promise to use reasonable efforts to convince the Local Councils to fund the Local Council Settlement Contribution.

### D. The Debtors Have Not Established that the RSA Was Negotiated in Good Faith

In addition to the many substantive reasons the RSA is not in the Debtors' best interests, the process by which the Debtors negotiated and considered the RSA was flawed, independently dooming the RSA. The entire fairness standard requires showing both that the transaction is fair, and that the process by which the Debtors negotiated and approved the transaction was fair. *See Opus*, 698 F. App'x 711 at 719. And even if the business judgment rule applied, the Debtors still must show under Bankruptcy Code section 363 that the proposed transaction "was requested in good faith." *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).

The Debtors cannot satisfy this standard. They have refused to produce a single substantive board minute or resolution reflecting any of the Debtors' deliberations about the RSA ███████

███████████████████████████████.[44] At his deposition, the Chair of BSA's Executive Board was directed not to answer basic questions ████████████

███████████:

███████████████████████████████████████

██████████████████████████████

███████████████████████████████████

██████████████████████████

---

[44] Ex. D, Whittman Dep. Tr. at 169:12–14, 171:7–22, 173:14–17, 180:24–181:4, 181:14–18; Ex. B, Mosby Dep. Tr. at 184:23–185:1, 191:10–13, 195:14–19, 201:6–8, 201:18–21, 205:22–206:1, 214:20–23, 251:9–11, 252:17–19.

.[45]

As for the negotiations themselves, the Debtors shielded them entirely from discovery, relying on a claim of mediation privilege that cannot withstand scrutiny. *See In re Tribune Co.*, 2011 WL 386827, at \*\*6–8 (Bankr. D. Del. Feb. 3, 2011) (rejecting broad assertion of mediation privilege over every communication among mediation parties). In the face of the extensive assertion of privilege and the absence of any evidentiary record, the Court cannot approve the RSA.

Judge Chapman's decision in *Innkeepers* is instructive. There, the debtors sought to assume a plan support agreement that provided Lehman, in satisfaction of its secured mortgage claims, 100% ownership of all 92 of the reorganized debtors, notwithstanding that 51 of the debtors were not subject to Lehman's mortgage. *Innkeepers*, 442 B.R. at 231. Further, Lehman and the debtors' prepetition equity holders agreed to a side-deal whereby Lehman agreed to sell a portion of the reorganized debtors' equity back to the prepetition shareholder. Judge Chapman found that the debtors failed to demonstrate that their actions were taken in good faith, and further found that the negotiations related to the plan support agreement lacked transparency, breeding contempt among the parties. *Id*. at 234.

The same is true here: (a) despite their requests to be involved, insurers were systematically excluded from every meeting between the Debtors and claimants representatives concerning the RSA and the TDPs and Amended Plan associated with it, (b) the Debtors have wholesale withheld

---

[45]    Ex. C, Ownby Dep. Tr. at 52:3–14; *see also id.* at 227:8–228:1.

virtually every substantive document submitted to the BSA and its Board concerning the RSA and the TDPs and Amended Plan, and barred their witnesses from offering any substantive testimony, on specious mediation and attorney-client privilege grounds[46], (c) the decision-makers at the Debtors were hopelessly conflicted in approving the RSA, as they were simultaneously Local Council representatives, and (d) no other party so much as produced a single document in discovery.[47] Thus, the Court should reach the same conclusion and deny the Motion.

In the same vein, the structure of the RSA itself precludes the Debtors from satisfying their burden under section 1129(a)(3) of proving the Amended Plan was proposed in good faith. *See Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 571 (M.D. Pa. 2005) (holding that the debtors have an "obligation to their creditors to propose a plan that is fair to all creditors and not to let one creditor class dominate the formulation of a plan."). In *ACandS, Inc*., the court found that a plan did not satisfy section 1129(a)(3), because the debtor had agreed to provide asbestos claimant representatives with complete control over the settlement trust, including, like here, drafting the trust documents and selecting the settlement trustee. *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004). As the court found, "given the unbridled dominance of the [prepetition asbestos] committee in the debtor's affairs and actions during the prepetition period, its continued influence flowing from its majority status on the postpetition creditors committee, and the obvious self-dealing that resulted from control of the

---

[46]     *See* Ex. B, Mosby Dep. Tr. at 46:20–47:21, 48:14–17, 48:25–49:7, 56:1–6, 56:15–16, 70:17–20, 81:25–83:16, 259:1–8, 272:7–10, 274:5–17; Ex. C, Ownby Dep. Tr. at 50:8–10, 50:18–22, 52:6–14, 58:25–59:4, 64:16–65:13, 75:16–21, 91:4–15, 91:21–22, 101:12–20, 102:1–3, 104:18–21, 135:15–136:1, 160:12–14, 160:19–20, 179:1–8, 194:24–25, 202:7–16, 206:3–9, 206:15–20, 207:1–2, 208:20–21, 210:18–23, 211:14–15, 212:7–14, 213:8–11, 216:6–11, 220:22–25, 221:24–222:3, 227:8–12.
[47]     *See* Ex. I, The Coalition of Abused Scouts for Justice's Responses & Objections to Century Indemnity Company's Subpoena to Produce Documents, Information, or Objects to Permit Inspection of Premises in a Bankruptcy Case (of Adversary Proceeding).

debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the bankruptcy code." *Id.*  This case is no different.

### E.     The "Fiduciary Out" Cannot Salvage the RSA

Finally, the Debtors undoubtedly will argue that the RSA provides a "framework" for settlements with Chartered Organizations and Insurance Companies and that the "fiduciary out" gives them the necessary flexibility to negotiate additional settlements and build greater consensus. The opposite is true. The Debtors *forfeited* to the TCC, Coalition, and the FCR the authority to negotiate any such settlements. RSA Exhibit A, at 15–16 (settlements with Chartered Organizations subject to the "consent of all Parties"); RSA § II(B)(iii) (settlements with Insurance Companies require express written consent of the TCC, Coalition, and FCR).  As a result, the very individuals who would be initiating the "deluge of lawsuits" against Chartered Organizations have a veto power over settlements with them. The "fiduciary out" does not help the Debtors either, because the Debtors expressly acknowledge that giving the Claimants veto power over all settlements is "consistent with their fiduciary duties."  RSA § II(C).  The RSA thus creates a Catch-22: the Debtors need the Chartered Organizations to survive, and they cannot withstand the years of litigation with insurers that the Amended Plan will bring, but the Debtors no longer have the unilateral ability to negotiate or consummate settlements that would keep the Chartered Organizations in the fold or resolve any litigation with insurers.

Again, Judge Chapman's decision in *Innkeepers* is on all fours.  In addition to the lack of transparency discussed above (*see supra*), the court also found that the debtors failed to satisfy the business judgment rule for two other reasons that apply here with equal force.  442 B.R. at 231. First, she found that the debtors did not benefit from the plan support agreement by bringing them closer to confirmation, because it only "locked up" the support of one creditor among the critical mass of creditors needed to support a successful restructuring. *Id*. at 236.  In addition, the plan

support agreement substantially limited the debtors' ability to engage in further negotiations with other major creditors by preventing any party from negotiating any transaction other than one that is consistent with the proposed restructuring term sheet. *Id.* at 232.

If anything, this case presents an even stronger reason to deny the Motion than *Innkeepers*. "Support" for the Amended Plan is even flimsier here than it was in *Innkeepers*, as the Debtors have not secured a single vote in favor of the Amended Plan. The RSA will not foster further negotiations, as the Debtors granted the Coalition, TCC, and FCR a veto right, that anyone of them can elect to implement, over any settlement with Chartered Organizations or Insurers. This action has bred "contempt" among the parties, only increasing the litigation and associated expense.

## III. Other Problematic Features of the RSA that Should Be Rejected

In addition to the fundamental defects in the RSA, the RSA and Motion contain at least three other problematic features that the Court must strike.

***First***, the Court should reject the Debtors' proposed findings that the RSA was negotiated at arm's length and in good faith, or that the Debtors considered approving the RSA in good faith. RSA Order at ¶¶ A-D. As discussed above, the Debtors cannot make the evidentiary showing supporting these findings. In addition, if the RSA is subject to the business judgment rule as the Debtors urge, these findings are entirely unnecessary. The only apparent reason the Debtors are seeking them is in the hopes that they can lay the groundwork for an argument that Amended Plan was proposed in good faith under Bankruptcy Code section 1129(a)(3), or that the Debtors complied with their contractual obligations to cooperate with their insurers. If the Court were inclined to approve the Motion, it should strike those findings. At the very least, any findings must be without prejudice in all respects, including as to any and all objections to the Amended Plan, continuing discovery and future litigation over the insurance policies.

*Second*, the RSA requires findings in the Confirmation Order that contravene well-settled law. For example, it is a condition to the RSA that the Confirmation Order authorize the "Insurance Assignment," defined to include not just the assignment of the Debtors' insurance policies (which likely runs afoul of Bankruptcy Code section 1129(a)(16)), but also the insurance policies belonging to the non-debtor Local Councils. Under *Combustion Engineering*, this finding is illegal. The Court should not approve an RSA that will require the Debtors to pursue Confirmation Order findings that run afoul of binding Third Circuit law.

*Third*, the Court should not authorize the Debtors to pay the Coalition's fees and expenses. Century will explain in a separate brief why this component of the RSA violates Bankruptcy Code sections 503(b) and 363(b) and ought to be denied.

## CONCLUSION

For all of these reasons, the Court should deny the Motion.

Dated: July 22, 2021                     Respectfully Submitted,

                                         By:  _/s/ Stamatios Stamoulis_
                                                 Stamatios Stamoulis (#4606)

                                         STAMOULIS & WEINBLATT LLC
                                         800 N. West Street
                                         Third Floor
                                         Wilmington, Delaware 19801
                                         Telephone:     302 999 1540
                                         Facsimile:     302 762 1688

                                         O'MELVENY & MYERS LLP
                                         Tancred Schiavoni (*pro hac vice*)
                                         Daniel Shamah (*pro hac vice*)
                                         Times Square Tower
                                         7 Times Square
                                         New York, New York 10036-6537
                                         Telephone:     212 326 2000
                                         Facsimile:     212 326 2061

                                         *Counsel for Century Indemnity Company, as*
                                         *successor to CCI Insurance Company, as*
                                         *successor to Insurance Company of North*
                                         *America and Indemnity Insurance Company of*
                                         *North America*