# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,<br><br>      Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Re: Dkt. 5466** |

**CENTURY'S OBJECTION TO THE PAYMENT OF THE COALITION'S LAWYERS IN ACCORDANCE WITH THE DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF**

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware 19801

O'MELVENY & MYERS LLP
Tancred Schiavoni (*pro hac vice*)
Daniel Shamah (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036-6537

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America*

Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("**Century**"), respectfully objects to the provisions of the RSA Motion that provide for payment of the Coalition's lawyers.[1]

## **PRELIMINARY STATEMENT**

1. The RSA Motion seeks authority to pay millions of dollars to the Coalition ostensibly for its professional fees. Under the RSA, the Debtors propose paying $950,000 per month for the Coalition's fees. In addition, on the effective date of the Amended Plan, the Debtors will pay the State Court Counsel up to $10.5 million for amounts paid to the Coalition's professionals from July 24, 2020 through the effective date of the plan (on top of and in addition to the 40% plus contingency fees to be taken by the Coalition firms).

2. Century explained in a separate memorandum why the RSA Motion should fail.[2] Regardless of how the Court rules on the RSA Motion, the Court should reject the request to pay the Coalition's fees. The Court need not even assess whether the requested fees are appropriate because the Debtors rely on the incorrect standard for their request. A request to pay a creditor's fees is reviewed under the "substantial contribution" standard, not the business judgement standard. But the Debtors assert that payment of the Coalition's fees and expenses "is a sound exercise of the Debtors' business judgment and will benefit the Debtors' estates." The RSA Motion and supporting declarations filed by Roger Mosby, President and Chief Executive Officer

---

[1] *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5466] (the "**RSA Motion**").

[2] This objection is limited to Century's objections to payment of the Coalition's fees under the RSA. Concurrently with the filing of this objection, Century is filing *Century's Objection to the Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5707] (the "**RSA Motion Objection**") and *Declaration of Daniel S. Shamah* in support thereof [D.I. 5708] (the "**Shamah Declaration**"). All exhibits referenced herein are attached to the Shamah Declaration.

of the BSA [D.I. 5469] and Brian Whittman, a Managing Director with Alvarez & Marsal North America, LLC [D.I. 5470] (the "**Whittman Declaration**") do not provide support for even the business judgment standard.

3. The Debtors only include conclusory statements that the fee provisions are a sound exercise of their business judgment. That falls far short of what is required for a substantial contribution award.

4. There is no evidence that suggest their contribution is anything more than they are expected to do for their clients. To be considered *substantial*, a benefit to the estate must be greater than an incidental benefit arising from activities pursued in protecting the applicant's own interests. First, the Coalition has only shown that they have participated in negotiating the RSA and terms of the Amended Plan. Simply participating in the reorganization process is not enough. Second, all of the efforts thus far have been to advance the Coalition's own interests, which is contrary to the purpose for granting fee reimbursements. Finally, any Claimants' interests that the Coalition claims to represent are duplicative of the TCC's efforts. Paying fees for duplicative work is unreasonable.

5. Finally, payment of the Coalition's fees poses an irreconcilable conflict for the State Court Counsel and Brown Rudnick for the reasons stated in Century's RSA Motion and those explained in Point IV below.

## THE RELEVANT TERMS OF THE RSA

6. The RSA requires the Debtors to (1) pay all of the Coalition's legal fees and expenses up to $10.5 million incurred before entry into the RSA on the effective date of the plan contemplated by the RSA and (2) pay all reasonable and documented fees of the Coalition up to a $950,000 cap per month moving forward. RSA § II.A.(vi). There is no disclosure of the total amount of Coalition fees incurred to date, and no restriction whatsoever on the Coalition seeking

additional fees from the Settlement Trust. Indeed, the RSA expressly preserves the possibility that "amounts otherwise payable in excess" of the limits above will be payable by the Settlement Trust. *Id.*

7. The RSA would allow for payment of the Coalition's fees and expenses—up to $950,000 per month and $10.5 million upon the effective date of the Plan—without the need for any further approval. Proposed RSA Order, ¶ 4. Moreover, "[n]one of the fees and expenses are subject to further approval of the Court, and no recipient thereof shall be required to file any interim or final fee application with the Court as a condition precedent to the Debtors' obligation to pay such fees and expenses." *Id.*

8. There is no disclosure of the total amount of Coalition fees incurred to date, and no restriction whatsoever on the Coalition seeking additional fees from the Settlement Trust. Indeed, the RSA expressly preserves the possibility that "amounts otherwise payable in excess" of the limits above will be payable by the Settlement Trust. RSA § II.A.(vi).

9.  *See* Shamah Dec. Exh. D, Whittman Dep. at 115:24-116:25 *Id*. at 118:4–11. The Debtors abdicate any oversight over the Coalition's fees.

# ARGUMENT

## POINT I.

### THE MULTI-MILLION DOLLAR PAYMENT TO THE COALITION'S LAWYERS IS SUBJECT TO THE "SUBSTANTIAL CONTRIBUTION" OF SECTION 503(B) AND NOT SECTION 363

10. By its plain terms, Section 503(b) is the only authority in the Bankruptcy Code for using estate assets to pay professional fees. And cases interpreting that provision—including the authorities cited in the RSA Motion—confirm this. But Debtors and the Coalition seek to sidestep Section 503(b)'s substantial contribution requirements by casting the payments as part of the RSA deal for which they seek approval under Section 363(b). No case authorizes using Section 363(b) to buy State Court Counsel's commitment to advise their clients to vote for the Fourth Amended Plan.

11. Only if the Court were to find that State Court Counsel made "a substantial contribution" to the bankruptcy would it be appropriate to pay their fees under Section 503(b). Movants have not even tried to make that showing, nor could they at this stage of the bankruptcy. Movants simply bury the fees in the brief and cite to the underlying agreement and then ask the Court to approve the RSA. Leaving aside that attempted vote-buying is not a legitimate "substantial contribution," courts have repeatedly denied attempts to use Section 363 to pay professional fees.

12. The Third Circuit has held that a bankruptcy court cannot "create a right to recover from the bankruptcy estate where no such right exists." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 532 (3d Cir. 1999). There, the debtors argued that paying a breakup fees was permissible, without need to satisfy Section 503(b), when "a debtor believes in its business judgment that such fees will benefit the estate." *See id.* at 533. The Third Circuit rejected the

argument and held that a bankruptcy court could not permit payment unless it was specifically authorized by the Bankruptcy Code.

13. Citing *O'Brien,* a bankruptcy court held in *In re TCI 2 Holdings* that Section 503(b) is the only basis for approving fees for a noteholders *ad hoc* committee and its professionals. 428 B.R. 117, 147 (Bankr. D.N.J. 2010). The court ruled that the proponents of the plan had "failed to establish legal authority for bypassing the requirements of section 503(b) in providing for the payment of fees and expenses to the non-debtor entities proposed to receive such payments." *Id*. at 146. The court ultimately held that the parties seeking their fees must apply under Section 503(b).

14. And in *Lehman Brothers*, the district court reversed the bankruptcy court's ruling permitting payment of an unsecured committee members' professional fees and expenses under the debtors' plan, where the plan failed to justify the payment under Section 503(b). *In re Lehman Bros. Holdings Inc.*, 508 B.R. 283, 293 (S.D.N.Y. 2014). The court held that debtors cannot "circumvent the requirements of section 503(b) merely by using a different label." *Id*. at 294. The court reasoned that, "allowing payments under the plan beyond claims and expenses could lead to serious mischief," such as violations of the absolute priority rule, by permitting payments to junior creditors prior to senior creditors being paid in full, or without their consent.

15. Ignoring these precedents, the Debtors cite *In re Mallinckrodt PLC*, Case No. 20-12522 (JTD) (Bankr. D. Del.) to argue that courts "have authorized debtors to perform under post-petition reimbursement agreements with respect to the fees and expenses of an ad hoc committee pursuant to section 363." RSA Motion at pg. 22 n.10. But even *Mallinckrodt* rejects the Debtors' argument. While the court held that "Section 363 provides the procedural mechanism for a debtor

6

to seek the authority to make payments to unsecured creditor groups," it went on to hold that debtors must satisfy the Section 503(b) "substantial contribution" standard:

> I agree with the Debtors that Section 363 provides the procedural mechanism for a debtor to seek the authority to make payments to unsecured creditor groups that if the group, itself, sought payment it would need to be made pursuant to Section 503. That leaves open the question, however, as to what standard I should apply in deciding whether to allow those payments.
>
> The debtors argue it is the general business judgment standard that applies in any application made by a debtor under Section 363 to use debtor's assets outside the ordinary course and the court should defer to the debtor's business judgment. On that point I disagree with the debtors.
>
> I find that in the circumstances where a debtor is seeking to pay post-petition fees and expenses of a general unsecured creditor the standard to be applied in approving those payments is the standard provided for in Section 503, that is, are the payments in recognition of a substantial contribution provided by that creditor to the bankruptcy estate.

*Mallinkrodt* Bench Ruling at 34:1–20. In *Mallinckrodt*, the court unambiguously required satisfaction of the substantial contribution standard, even if the debtor requests that the fees be paid under section 363(b).

16. After that ruling, debtors again requested authority to pay fees to unsecured creditors, expressly acknowledging the court's ruling "that payments can only be made for work that benefits the estate as a whole, not individual creditors." *See Mallinckrodt* [D.I. 1092]. Among other revisions to ensure the substantial contribution standard was satisfied, the debtors' new request (i) explicitly excluded any fees "incurred in furtherance of litigation against the Debtors, the filing of claim objections by *ad hoc* group members, and the prosecution of group members' individual claims," limiting payment to "work associated with implementing the hard-fought settlements and the RSA transactions that the Debtors have already reached, which will minimize litigation and pave the way for an efficient restructuring of the Debtors, to the benefit of the estates," *Id.* at ¶ 56, and (ii) required that all such payments be subject to the interim compensation

7

order that required "filing regular fee statements and applications and subjecting their fees to 20% holdbacks." *Id.* at ¶ 55.

17. The other cases the Debtors cite are also off target. In *U.S. Trustee v. Bethlehem Steel Corp.* (*In re Bethlehem Steel Corp.*), the court expressly held that "Section 363(b) does not permit a debtor-in-possession to use funds solely to benefit a creditor. If the payment of creditor fees are simply aimed at helping the creditor promote its own self-interest the payment would not be permitted under Section 363(b)." No. 02 Civ. 2854 (MBM), 2003 WL 21738964, at *10 (S.D.N.Y. July 28, 2003); *Mallinckrodt* Bench Ruling at 35:2–6. This could not be more different than a request for payment of up to $10.5 million in fees (compared to the $1.4 million requested in *Bethlehem Steel*) incurred while the Coalition was adverse to the Debtors. More importantly, as noted by Judge Dorsey in *Mallinckrodt,* the *Purdue Pharma* and *Bethlehem Steel* courts each ultimately applied the substantial contribution standard, noting the numerous limitations on payments required by those courts. *Mallinkrodt* Bench Ruling at 35:7–36:6.

18. The Debtors ignore controlling Third Circuit precedent requiring satisfaction of the substantial contribution standard and that the cases it cites have applied Section 363 only as a "procedural mechanism" for a debtor to request payment of an unsecured creditor group's fees, while holding that the debtor still must satisfy the substantial contribution standard for the fees to be allowed.

# POINT II.

## THE BANKRUPTCY CODE'S SUBSTANTIAL CONTRIBUTION PROVISIONS ARE NARROWLY CONSTRUED AND ANY UNCERTAINTY AS TO THE BENEFIT MUST BE DECIDED AGAINST THE APPLICANT

**A.  Under Section 503 the Benefit Must Be More Than an Incidental One Arising from Activities the Applicant has Pursued in Protecting His or Her Own Interests**

19. Under Section 503, the party requesting payment of their fees under the substantial contribution standard must show that (i) they substantially contributed to Debtors' reorganization; and (ii) their requested estimated award constitutes actual, necessary expenses or reasonable compensation based on the time, nature, extent, and value of their services and the cost of comparable services in non-bankruptcy cases.  *See* 11 U.S.C. § 503(b); *In re Summit Metals, Inc.*, 379 B.R. at 49.  The Bankruptcy Code's substantial contribution provisions are narrowly construed and "any uncertainty as to the benefit of a service performed must be decided . . . against the applicant." *In re Senor Snacks*, 2005 Bankr. LEXIS 3295, at *4 (Bankr. S.D. Cal. Oct. 27, 2005); *In re D.A.K. Industries*, 66 F.3d 1091, 1094 n.3 (9th Cir. 1995) (construing § 503 narrowly because "the narrow construction of administrative expenses insures that payments out of the estate are kept to a minimum.").  To meet the "substantial contribution" standard, the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests.  *See Lebron*, 27 F.3d at 944.

**B.  The Debtors Offer No Admissible Evidence To Meet Their Heavy Burden**

20. In response to requests for production that asked for all documents concerning the request for fees to be paid, Brown Rudnick and the Coalition declined to produce a single document asserting that everything about their request for money are privileged.[3]

---

[3]  *See, e.g.*, D.I. 5514-2 (The Coalition of Abused Scouts for Justice's Responses and Objections to Century Indemnity Company's Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case (Or Adversary Proceeding)) Nos. 1, 2, and 3

21. The Debtors, for their part, offer a single conclusory paragraph that by reimbursing the Coalition's fees, the Debtors are making a business decision that "significantly benefits the Debtors' estates and creditors."[4] A self-serving declaration cannot satisfy the burden to prove a substantial contribution to the estate. *In re U.S. Lines, Inc.*, 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989) (requiring evidence of substantial contribution beyond "conclusory, self-serving statements regarding one's involvement in a case").

22. 

---

(invoking Rule 9019-5(d) of the Local Rules to deny production of any communications or documents); D.I. 5514-3 (Brown Rudnick LLP's Reponses and Objections to Century Indemnity Company's Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case (Or Adversary Proceeding)) Nos. 1, 2, and 3 (same).

[4] *See* Whittman Decl., ¶ 7.

[5] Exh. B, Mosby Dep. Tr. at 162:21-162:24 165:16-23 ; *see also id.* at 162:16-166:11

[6] Exh. B, Mosby Dep. Tr. at 218:7-17 222:5-7 *see also id.* 217:25-222:7

[7] Exh. C, Ownby Dep. Tr. at 119:17-120:8

10

███████████████████████████████████████████

████.[8]

23. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████. Shamah Decl, Exh. D, Whittman Dep. at

113:23–114:5 ████████████████████████████

███████████████████████████████████████████

████████████████████████████[9]

24. █████████████████████████████████████

████████████████████████████████████. Given the lack of

any evidence or justification regarding the RSA fee provisions, any uncertainty as to whether the

---

[8] Exh. C, Ownby Dep. Tr. at 118:10-13 ████████████████ Exh. B, Mosby Dep. Tr. at 218:7-18 ███████████████████████████████ 220:23-221:4 ███████████████████████████████████████████

[9] In the Disclosure Statement the Debtors assert that the approximately $10 million or more of professional fees that they incur per month (even without the Coalition's fees) is "wholly inappropriate for a non-profit chapter 11 proceeding." Disclosure Statement, pp. 14–15. The decision to pay an additional $10 plus million and $950k a month takes away what is available for the Debtors to contribute to a Settlement Trust to benefit of plaintiff lawyers who are set to get a 40% contingency fee.

Coalition's efforts provide a benefit to the estate must be decided against the Debtors and Coalition.

### POINT III.

### THE COALITION COULD NOT EVER MEET THE STANDARD UNDER EITHER SECTION 363(B) OR 503(B)

25.     The RSA Motion and supporting declarations do not meet the "heavy burden" under the substantial contribution standard. Under either Bankruptcy Code section 363(b) or 503(b), a creditor must show that it provided a substantial contribution to the estate to obtain reimbursement of the creditor's fees. Here, the Debtors cannot meet that standard because (a) the Coalition was expressly formed for the purpose of advancing its own self-interest, defeating any substantial contribution claim as a matter of law, (b) the Coalition's efforts do not go beyond self-protection, (c) the Debtors failed to provide any evidence about how the Coalition substantially contributed to the estate or the time, nature, and value of the services they performed that justify such an award, and (d) the Coalition's work is duplicative of the work of the TCC.

**A. The Coalition Was Formed for the Express Purpose of Advancing the Specific Interests of Its Plaintiff Firms and Not Claimants as a Whole.**

26.     The Coalition was formed for the express purpose of taking control of the case and advancing the specific interests of its Plaintiff firms as is reflected in email that the TCC turned over to the Office of the United States Trustee [D.I. 1285-1].

27.     Mr. Kosnoff admitted in that email how he intends to use the Coalition to supplant the TCC, avoiding the fiduciary duties owed by Committee Counsel and frustrate the mediation process. Mr. Kosnoff went on in his email, in what appears to be a reference to the "Coalition," to state bluntly that "[h]ere is the message: We control 80% of the claims i.e. our coalition controls the case," and that they "are not going to do anything to help grease the gears for [Jim] Stang and the dimwits [*the abuse survivor members of the committee*] including speeding up the insurance

analysis. Ken, that's playing in to the Andolina Stang program." Instead, he goes on, the group will "relax, keep focused on our marketing and media efforts going full tilt in to Nov, chill and enjoy our summer and evaluate in the fall. We have the luxury of doing nothing." Mr. Kosnoff contemplates that the alternative is to "go sell 15-30M of our case to a motherfunder to let it and AG digitally rape us for nine months." From there on out "[n]othing happens until AIS says so. We smile, nod our heads and do nothing, nothing at all."

28. The Coalition has not been shy that it was pursuing its own interests. Brown Rudnick even touted that the Coalition does not owe a fiduciary duty to all claimants in making clear that the Coalition was not acting on behalf of all claimants but rather the specific interests of its clients. Oct. 14, 2020 Hr'g Tr. at 49:24-50:2, 50:20-23 ("We are not here as a fiduciary for sexual abuse victims. That is what Mr. Stang is here for and that is for the TCC. We are here representing abuse survivors with a common story; physically, emotionally, and otherwise. . . . We are here on behalf of the coalition members themselves, the sexual abuse survivors who have a principal position regarding the relief sought in this motion."); *see also* D.I. 1161, ¶ 14 ("While the TCC certainly has a fiduciary duty to all sexual abuse victims (whether with filed civil actions or not, and whether from states presently with statute of limitations open windows or not), the sexual abuse victims are entitled to seek their own representative counsel. They have done so here with the formation of the Coalition by and through their Representatives.").

29. Where the contribution made is to advance a parties' self-interest, as is the case here, it is not appropriate for the estate to reimburse those fees. *See Consol. Bancshares, Inc.,* 785 F.2d 1249, 1253 (5th Cir. 1986) ("a creditor's attorney must ordinarily look to its own client for payment, unless the creditor's attorney rendered services on behalf of the reorganization, not merely on behalf of his client's interest, and conferred a significant and demonstrable benefit to

the debtor's estate and the creditors.") (quoting *In re Gen. Oil Distribs.*, 51 B.R. 794, 806 (Bankr.E.D.N.Y.1985)); *In re Bldgs. Dev. Co.*, 98 F.2d 844 (7th Cir. 1938); *In re Jensen–Farley Pictures Inc.,* 47 B.R. 557, 569 (Bankr. D. Utah 1985).

30. The Coalition worked to advance their own clients' interests, not the Claimants as a whole. No evidence whatsoever is offered that the Coalition's work went beyond protecting the Coalition's own interests. *See Lebron*, 27 F.3d at 944 ("Inherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests."). Where the party seeking reimbursement does not contribute to the reorganization beyond their work on behalf of their clients, the creditor does not get a substantial contribution award.

**B. The Benefit Alleged Arise from Activities Pursued in Protecting the Applicant's Own Interests**

31. The benefit to the estate must be substantial, which means that it is greater than an incidental benefit arising from activities pursued in protecting the applicant's own interests. *See Lebron*, 27 F.3d at 944; *see also In re Dick Bruhn*, 2007 Bankr. LEXIS 4174, at *8 (Bankr. N.D. Cal. Dec. 12, 2007). But the agreement outlined in the RSA blatantly is an attempt by the Coalition to further their own interest. "[C]reditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection." *Lebron*, 27 F.3d at 944. The Coalition's participation in arranging the RSA were consistent with the Coalition's self-interest.

32. For example, the Fourth Plan allows claims to be paid $3,500 without any review whatsoever. These terms are designed to protect the plaintiff firms that are the members of the Coalition that either bought inventories of claims from for-profit claims aggregators or are representing such claims on their behalf. Claimants with meritorious claims derive little benefit

from provisions that allow claims to be paid without review. While these types of terms provide a significant benefit to the Coalition's own interests, they do not necessarily benefit the estate.

33. There is no evidence that the Coalition's efforts go beyond self-protection.

**C. Mere Participation in Settlement Does Not Constitutes a Substantial Contribution.**

34. Mere participation in a bankruptcy does not constitute a substantial contribution meriting payment by an estate. *See* 11 U.S.C. § 503(b); *In re Summit Metals, Inc.*, 379 B.R. at 52. The RSA Motion describes nothing more than routine actions generally taken by creditors in a bankruptcy—mainly, negotiations—which primarily benefitted themselves by loosening the standard under which claims are allowed and valued.

35. Participating in negotiations without more does not constitute substantial contribution. *See, e.g.*, *In re Alumni Hotel*, 203 B.R. 624, 632–33 (Bankr. E.D. Mich. 1996) (rejecting a substantial contribution claim where the principal contribution was negotiation because otherwise "all parties to [the] settlement might well argue that they, too, made a 'substantial contribution' by agreeing to compromise their claims."); *In re Am. Plumbing*, 327 B.R. 273, 291 (Bankr. W.D. Tex. 2005) (noting that negotiation did not alone constitute substantial contribution because "[n]egotiation and settlement, by its nature, is not a unilateral action"). This is true even if Coalition is an active participant and their participation is viewed by some as a "positive for the overall outcome." 4 COLLIER ON BANKRUPTCY ¶ 503.10 [5][a]; *In re Catalina Spa & R.V. Resort, Ltd.*, 97 B.R. 13, at 18 ("Extensive participation, alone, is not sufficient to compel compensation" for substantial contribution). Nothing more than their general involvement in the case is not a basis for compensating the Coalition.

36. Nor is there any showing nor could there be that the Coalition's efforts provide a pathway to confirmation that will be successful. Based on the opposition to the Fourth Plan and the RSA at the July 7 hearing, the Debtors have significant work to advance the development of a

15

global resolution plan. And, the terms negotiated by the Coalition and outlined in the RSA Motion do not bring the Debtors any closer to that goal. It is yet to be seen whether the Coalition's efforts (and any continued efforts) could constitute a substantial contribution towards the Debtors' plan and confirmation and, further, whether such plan can even succeed.

37. The Coalition's alleged efforts also do not translate to the Claimants' support for the Debtors' plan. None of the Claimants—the parties that need to accept the Debtors' plan—are bound to support the Amended Plan. It is improper at this point to even consider and approve payment of the Coalition's fees before the Coalition shows any meaningful contribution to the plan and confirmation.

**D. Any Services that the Coalition Claim to Render that Are not Intended to Advance their Own Interests are Duplicative of the TCC.**

38. Even if the Coalition could show a contribution to the estate, it is inappropriate for the estate to pay the Coalition's fees because they are duplicative of the work of other professionals in the case. A bankruptcy court cannot award fees if the services rendered were unnecessary or duplicative. *In re Summit Metals, Inc.*, 379 B.R. at 51; *In re D.W.G.K. Restaurants, Inc.*, 84 B.R. 684, 691 (Bankr. S.D. Cal. 1988) (finding duplicative services not compensable under § 503(b)(3)(D)); *Smith v. Edwards & Hale (In re Smith)*, 317 F.3d 918, 926 (9th Cir. 2002), *abrogated on other grounds by Lamie v. United States Tr.*, 540 U.S. 526, 531-39 (2004) (duplicative services are non-compensable under § 330(a)(4)).

39. Under the RSA, the Coalition will be generously compensated for their efforts on behalf of the Claimants. But, the TCC already represents the Claimants' interests as a whole. The Coalition is only representing a portion of the Claimants. Any work that they are contributing that is not to advance their own interests is by definition duplicative of the work of the TCC. The estate should not pay the fees for two representatives serving the same purpose. Courts consistently

reject fee requests for duplicative services as unreasonable. *See In re Mirant Corp.*, 354 B.R. 113 (Bankr. N.D. Tex. 2006) (denying administrative expense treatment for attorney's fees of ad hoc committee because the ad hoc committee's efforts were largely duplicative of the work of the official committee); *In re Michigan Gen. Corp.*, 102 B.R. 554 (Bankr. N.D. Tex. 1988) (denying indenture trustee's request for reimbursement of accounting expenses that duplicated services otherwise being provided to the estate). Here, the Coalition's work and their fees will be wholly duplicative of other services provided to the estate and, therefore, are unreasonable.

## POINT IV.

### THE RSA FEE PROVISION IS ALSO IMPROPER AS IT POSES AN IRRECONCILABLE CONFLICT FOR THE STATE COURT COUNSEL AND BROWN RUDNICK.

40. As discussed in detail in Century's RSA Objection, the RSA agreement to pay the Coalition's fees renders the RSA unlawful tainting the entire RSA. But payment of the Coalition's fees pose an even more basic conflict for the State Court Counsel and Brown Rudnick.

41. The terms of the Brown Rudnick retention require that the State Court counsel pay their ratable proportion of Brown Rudnick's fees. *See* D.I. 1429, Exh. A-2 ("the New Voting Representative shall be required to pay its ratable proportion of the costs of the Coalition"). And, Brown Rudnick's "fees and related costs and expenses shall be payable monthly, without regard to whether there are any recoveries on account of the tort claims held by members of the [Coalition]." *Id.* Under the retention agreement, State Court Counsel are jointly and severally responsible for paying those fees and expenses.

42. Since Brown Rudnick was retained by the Coalition after the Coalition was formed, the Coalition had to seek approval from its members for their retention and for Brown Rudnick to join the Coalition. Each member was asked to acknowledge and consent to this fee arrangement.

17

*See* D.I. 1429, Exh. A-4 ("I further acknowledge and agree that a portion of the fees and expenses incurred by Brown Rudnick and MMBH will be paid by [FIRM] and any payment of such fees and expenses by [FIRM] will not increase the fees and expenses owed by me under the terms and conditions of my Employment Agreement or Retainer Agreement with [FIRM].").

43. Less than a third of the Coalition Law Firms' clients (approximately 18,000 out of the 60,000 Claimants) opted to be members of the Coalition. And only those Claimants that opted to be member of the Coalition agreed to accept the responsibility to pay Brown Rudnick's fees. The proposed payment of the Coalition's fees under the RSA would force those Claimants that did not elect to be a member of the Coalition to cover Brown Rudnick's monthly fees (of up to $950,000 per month) and the $10.5 million on the effective date. These fees are in addition to the contingency fees charged by each of the Coalition Law Firms.

44. State Court Counsel representing the tort claimants will recover the 40% contingency on money paid from the trust. State Court Counsel here have signed up claimants to agreements that give their lawyers a 40% interest in each claim. These enormous contingency fees are themselves problematic, as in many cases lawyers have limited their representation to the bankruptcy only. Those contingency fees, plus the millions of dollars that the Debtors would pay for the Coalition fees under the RSA will significantly reduce the pool of funds available to claimants.

45. Notwithstanding the fact that almost two thirds of the claimant clients of the Coalition firms (approximately 42,000 of the 60,000) affirmatively elected not to be Coalition members (and, thus, not responsible for Brown Rudnick's legal fees), the RSA would shift responsibility for these costs to the estate to the detriment of all claimants including the clients of the Coalition firms who affirmatively elected not to be responsible for Brown Rudnick's fees. A

large chunk of the money will ultimately be consumed by attorneys. This is a conflict for the State Court Counsel and for Brown Rudnick—neither got consent from the nearly 40,000 clients who did not agree to paying Brown Rudnick's fees. Under the RSA, they are shifting the responsibility to non-Coalition clients for the very fees that they opted out of paying. Based on the fee provisions, lawyers for claimants, rather than their clients, stand to get the bulk of the money in this case. ` provides no benefit to the estate and Claimant.

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, Century respectfully requests that the Court deny the Debtors' request to pay the Coalition's fees under the RSA as doing so is entirely improper under the "substantial contribution" standard.

*[Remainder of Page Intentionally Left Blank]*

Dated: July 22, 2021                Respectfully Submitted,


                                    By: /s/ *Stamatios Stamoulis*
                                        Stamatios Stamoulis (#4606)

                                    STAMOULIS & WEINBLATT LLC
                                    800 N. West Street
                                    Third Floor
                                    Wilmington, Delaware 19801
                                    Telephone: 302 999 1540
                                    Facsimile:  302 762 1688

                                    O'MELVENY & MYERS LLP
                                    Tancred Schiavoni (*pro hac vice*)
                                    Times Square Tower
                                    7 Times Square
                                    New York, New York 10036-6537
                                    Telephone: 212 326 2000
                                    Facsimile:  212 326 2061

                                    *Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America*


OMM_US:80056170.7