**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>Ref. Dkt. Nos. 5466, 5684, 5685, 5723, 5724<br><br>Hearing Date: July 29, 2021 at 10:00 a.m.<br>Response Deadline: July 26, 2021 |

**LIMITED SUPPLEMENTAL JOINDER OF THE COALITION OF ABUSED SCOUTS FOR JUSTICE TO AND IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF**

The Coalition of Abused Scouts for Justice (the "**Coalition**"), by and through its undersigned counsel, hereby submits this Limited Supplemental Joinder to and in support of the *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [Dkt. No. 5466] (the "**Motion**") and in response to certain arguments related to fees raised in:[2] (A) the *Certain Insurers' Objection to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the*

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] To the extent other objections to the Motion contain the same or similar arguments with respect to the reimbursement provisions of the RSA, this Limited Supplemental Brief is also intended to address such objections.

*Restructuring Support Agreement and (II) Granting Related Relief* [Docket No. 5684] (the "**Insurers**" and the "**Insurers Objection**"), (B) *Century's Objection to the Payment of the Coalition's Lawyers in Accordance with the Debtors' Motion for Entry of an Order, Pursuant to Sections 363 (b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement and (II) Granting Related Relief* [Docket No. 5724] (filed by "**Century**" and the "**Century Fee Objection**"), and *Century's Objection to the Debtors' Motion for Entry of an Order Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [Docket No. 5723] ("**Century RSA Objection**" together with the Century Fee Objection, the "**Century Objections**"), and (C) the *United States Trustee's Objection to Debtors' Motion for Entry of an Order Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief (D.E. 5466)* [Docket No. 5685] (the "**UST Objection**" and together with the Insurer Objection and the Century Objections, the "**Objections**").[3] The Debtors and the Supporting Parties will be addressing, by separate omnibus replies, joinders, or supplemental briefs, the other aspects to the Objections that are not addressed here as well as other objections to the Motion. In further support of the Motion, the Coalition respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Coalition can appreciate the concerns raised by the U.S. Trustee for certain oversight and review into the payments to be made to Coalition Professionals under the RSA. And, the Coalition agrees with the U.S. Trustee that recent precedent in this and other

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the Amended Plan, respectively.

Bankruptcy Courts approving professional fee reimbursement for representatives of tort or other unliquidated unsecured creditors as part of restructuring support or restructuring support-lite agreements under sections 363(b) and 105(a) of the Bankruptcy (e.g., *Mallinckrodt*, *Purdue*, and *PG&E*) included certain guardrails and oversight on fee approval, such as scope limitations, compliance with interim compensation orders for prospective fees, and submission of fees to fee examiners, if applicable.

2. In order to address the U.S. Trustee's concerns and align the relief requested here with precedent, the Coalition has agreed to modify the proposed order to include the guardrails and oversight this Court approved in *Mallinckrodt* that would be applicable here. As reflected in the revised proposed order, the Coalition has agreed to

a. Clarify the scope of what is reimbursable under the Order. Matters are within the "Scope" if they are in support of the RSA or confirmation of the Amended Plan, including further negotiations in support of the Amended Plan or future global consensus, and documentation of the documents and ancillary agreement related to or in connection with the Amended Plan. Preparation for, commencement or prosecution of litigation against the debtors is plainly outside the "Scope;"

b. For the go-forward reimbursement of fees for any period after July 29, 2021 or the date an Order is entered approving the RSA, comply with the *Interim Compensation Order* [Docket No. 341];

c. Subject such reimbursement applications to the review and procedures of the Fee Examiner appointed in these cases; and

d. Commit to use good faith efforts not to duplicate the work of professionals retained by the TCC or the Future Claimants' Representative.

3. The Coalition hopes that those revisions, along with the contemporaneously filed Supplemental Declaration by Brian Whittman in support of the Motion and the Debtors' omnibus reply—which in support of the Debtors' business judgment, in entering into and seeking this Court's approval of the RSA, further explains the critical and valuable role of the

Coalition in this case—will address and we submit should satisfy any remaining concerns raised in the UST Objection.

4. The Objections also argue that that the payment of the Coalition Professionals under the RSA must satisfy the standards of substantial contribution under section 503(b) of the Bankruptcy Code. This argument has been addressed and rejected recently in *Mallinckrodt* and *Purdue* over the objections of the U.S. Trustee in both instances, and, in *Mallinckrodt*, over the substantially identical objection made by one of the firms that is counsel to the Insurers that said counsel makes here.

5. The statutes, and recent analyses of the issues in case law make clear that the applicable standard to be applied is whether the Debtors have exercised sound business judgment under section 363(b) of the Bankruptcy Code. Of course, the Court may consider the reimbursed party's role and work to date in the case and the work that party must contribute going forward in evaluating whether the Debtors' business judgment was soundly exercised. But, in considering those issues, the Court should do so through the lens of section 363(b)'s deferential business judgment standard, and not section 503(b)(3), which is inapplicable.

6. The Objections mischaracterize the final holding in *Mallinckrodt*. There, with respect to entry into the post-petition reimbursement agreement that the Court was being asked to approve (there also were pre-petition reimbursement agreements at issue in that case), the Court only expressly relied on a determination of the Debtors' business judgment under sections 363(b) of the Code without a finding of substantial contribution under section 503(b)(3).[4] The factual

[4] At the hearing announcing the Court's decision, the Court concluded that the debtors "met their burden of establishing the sound exercise of their business judgment under Section[] 363 . . . ." *In re Mallinckrodt PLC*, Case No. 20-50850 (JTD), Hr'g Tr. 9:25-10:4 (hearing dated Jan. 19, 2021). The oblique reference to the prior order relied on by the Objections cannot be to incorporate section 503(b), but rather the guardrails the court requested in any future order. Even if it were interpreted to incorporate a contribution type overlay on top of section 363(b), it is clear that the facts in this case justify the same conclusion reached there.

record with respect to the Coalition's prior and future work demonstrates that the Debtors' have met the standard under section 363(b), including as applied under recent precedents. While business judgment is the correct judicial standard, the facts and supporting declarations also support a finding of substantial contribution.

## JOINDER

### A. Section 503(b) Does Not Apply When the Debtors Are Seeking to Enter into a Contract under Section 363(b)

7. Section 363(b)(1) provides that the debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Even absent an RSA, courts have authorized debtors to perform under reimbursement agreements under section 363(b).[5] *See In re Purdue Pharma,* LP, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019) [Docket No. 553] (authorizing debtors to "perform the Reimbursement Agreement pursuant to section 363 of the Bankruptcy Code"); *In re Bethlehem Steel Corp.*, 2003 WL 21738964 , *10-13 (S.D.N.Y. July 28, 2003) (authorizing reimbursement of counsel to union pursuant to section 363(b)(1) over the U.S. Trustee's objection that sections 503(b)(3) and (b)(4) were the only avenues for an unsecured creditor to receive fees).

8. In overruling the same objection that the Insurers and U.S. Trustee raise here, the District Court in *In re Bethlehem Steel Corp.* found that "Section 363(b) and subsections 503(b)(3)(D) and (b)(4) serve different purposes in bankruptcy proceedings. Section 503 allows entities that incurred certain expenses to request payment from the estate . . . Section 363, on the other hand, governs the use of funds by the debtor in possession while it operates its business after the bankruptcy petition is filed . . . " *In re Bethlehem Steel Corp.*, 2003 WL 21738964 at

[5] The Coalition does not need to restate here the lengthy precedent where full restructuring support agreements were either assumed under section 365 of the Bankruptcy Code or entered into under section 363(b) of the Bankruptcy Code, which were recounted in the Motion and Coalition's Joinder [Docket No. 5680] (the "**Joinder**"). *See, e.g.*, Motion at § 17-22; Joinder at pp. 3-9.

*11 (S.D.N.Y. July 23, 2003) (subsections 504(b)(4)(D) and (b)(4) do not bar a bankruptcy court from allowing a debtor in possession to reimburse a creditor for professional fees – provided, of course, that the standard for allowing transactions under §363(b) has been met.").

9. Section 363(b) does not permit the debtor to use funds solely to benefit a creditor. "If the payment of a creditor's fees were simply aimed at helping the creditor promote its own self-interest, the payment would not be permitted under § 363(b). The bankruptcy court may not authorize the use of funds under § 363(b) unless it finds a 'good business reason' for the expenditure." *Id*.

10. Under section 363(b), transactions outside the ordinary course of business "must be evaluated under the business judgment standard." *In re Sea Oaks Country Club, LLC*, 2020 WL 6588412 *10 (Bankr. D.N.J. Nov. 10, 2020); *see In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require a debtor to show that a sound business purpose justifies such actions.").

11. And, "[i]n evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a business judgment test." *Id.* (citing favorably to *In re Lionel Corp.*, 772 F.2d 1063 (2d Cir. 1983)). The *Lionel* Court expressed the test as follows "[t]he rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." *Id.* at 1070.

12. Section 503, on the other hand deals with one single avenue for a creditor (or other entity) to ***apply for themselves*** to receive an administrative expense claim for attorneys' fees during a bankruptcy case. *See* 11 U.S.C. § 503 ("(a) [a]n entity may timely file a request for

payment of an administrative expense . . . (b)(4) [for] reasonable compensation for professional services rendered by an attorney . . . of an entity whose expense is allowable under [the theory of substantial contribution]."); *see also In re Bethlehem Steel Corp.*, 2003 WL 21738964 at *11 (S.D.N.Y. July 23, 2003) ("concluding that sections 363(b) and 503(b) serve different purposes and "in most cases, if a creditor wants to be reimbursed, it must file an application under subsections 503(b)(3)(D) and (b)(4)[,] [t]hose provisions continue to serve a purpose.").

13. A court could consider the legal standard under section 503(b) governing the payment of professional fees in determining whether to permit a debtor to enter into a new contact involving the payment of such fees. Doing so would not make section 503(b) applicable. Rather, a court could consider the legal standard under the statute—on a prospective and retrospective basis—in deciding whether the Debtors' entry into a new agreement satisfied the business judgment standard applicable under section 363(b).

14. For example, in *RCS Capital Corp.*, this Court considered the substantial contribution standard under section 503(b) in determining whether to authorize the debtors' assumption of a restructuring support agreement that provided for the reimbursement of professional fees on a go-forward basis. *In re RCS Capital Corp.*, Case No. 16-10223 (MFW) (Bankr. D. Del. Mar. 16, 2016), Mar. 16, 2016 Hr'g Tr: 40:14-41:12 (authorizing payment of creditor professional fees in connection with assumption of a restructuring support agreement based on finding that the agreement to be assumed was "of great benefit to the Debtor.").

15. In doing so, the Bankruptcy Court rejected the U.S. Trustee's objection that professional fees could only be approved retroactively upon the confirmation of a plan. This is correct because once a debtor has obtained authority to enter into a new agreement under

section 363(b), the debtor is bound and future obligations arising under those agreements are entitled to priority as administrative expenses.

16. The same issue was addressed and resolved favorably in the *Purdue* bankruptcy. Arguing that the specific trumps the general, the Objections urge that the Southern District of New York Bankruptcy Court's decision in *In re Lehman Bros. Holdings Inc.*¸ 508 B.R. 283 (S.D.N.Y. 2014) (as opposed to the much more analogous analysis in *Purdue*) is on point. For example, according to the Insurer Objection, the *Lehman* case stands for the proposition that debtors cannot "circumvent the requirement of section 503(b) merely by using a different label." Century Fee Objection at ¶ 14.[6]

17. But this analysis reverses the canon of construction. As Judge Robert Drain explained in finding in an analogous situation in *Purdue*, reimbursement agreements may be assumed or entered into without running afoul of section 503. *See Purdue*, Nov., 19, 2019 Hr'g Tr. 153:21 - 158:4. "[S]ubsections 503(b)(3)(d) and (b)(4) are not rendered meaningless simply because a certain unique—in certain unique circumstances the bankruptcy court approves a debtor's motion to enter into an agreement to reimburse a creditor for professional fees." *Id.*

18. In most cases, a debtor will **not** make a motion under section 365 or section 363 to assume or enter into a reimbursement agreement for professional fees, as doing so would not be in the debtor's business interest to do so, or the Bankruptcy Court could refuse approval under the business judgment standard. As Judge Drain found, in that instance, "if the creditor wants to be reimbursed, it must file an application under subsections 503(b)(3)(d) and (b)(4)." *Id.*

---

[6] Additionally, the Delaware District Court has itself cabined the *Lehman* decision narrowly before, recognizing that the purported proposition flowing therefrom, that 503 is the only avenue for provision of attorneys' fees to unsecured creditors, cannot be absolute given other sections for the Bankruptcy Code. *See In re Tribune Media Co.*, 66 Bankr. Ct. Dec. 128, 2018 WL 6167504 (D. Del. Nov. 26, 2018) (RGA) (holding that unsecured creditors were permitted to include fees owed under breached contract to prepetition unsecured claim under section 502, notwithstanding section 506 of the Bankruptcy Code, and implicitly rejecting U.S. Trustee's argument that section 503 is the only avenue for unsecured creditors to receive fees).

19. Subsections 503(b)(3)(d) and (b)(4), therefore, continue to serve an important but separate purpose that does not contradict or render superfluous section 365 of section 363(b) in any way. *See id.* (following District Judge Mukasey's decision in *In re Bethlehem Steel Corp.*, 2003 WL 21738964 (S.D.N.Y. July 23, 2003) and overruling the U.S. Trustee's objection to the payment of professional fees).

20. The Objections also torture the decision in *Mallinckrodt*¸ where the court did not "unambiguously require[] satisfaction of the substantial contribution standard, even if the debtor requests that fees be paid under section 363(b)." Century Fee Objection, at ¶ 15. The Objections quote from a superseded decision, which superseded decision, in *dicta*, referred to section 503(b) and asked for certain guardrails to be put in place on the reasonableness and scope of fees (so that fees, like here, will be incurred in promoting the interests of the estate).

21. In the subsequent, governing decision approving entry into the reimbursement agreements, the Court referred only to section 363(b) and, even though it referenced the prior ruling, did not include a finding that section 503(b) was satisfied, because satisfaction of that section was not necessary. *See In re Mallinckrodt PLC*, Case No. 20-50850 (JTD), Hr'g Tr. 9:25-10:4 (hearing dated Jan. 19, 2021) (concluding that the debtors "met their burden of establishing the sound exercise of their business judgment under Section[] 363 . . . ." without reference to a finding that section 503(b) was satisfied). This is much more aligned with the decisions described above in *Purdue* and *RCS*, where it is clear that as part of evaluating the Debtors' decision under the deferential business judgment standard, the Court can and should look to the benefit or detriment to the estate incurred by the commitments in the transaction, rather than an impose restrictions imbedded in an inapplicable code section, section 503(b).

### B. The Contrary Case Law Cited is Inapposite

22. The cases on which the Objections rely are inapposite. None consider the interplay between 363(b) and 503(b) outside of a break-up fee context. Nor does their reasoning suggest a different result here.

23. The Insurers rely most heavily on the Third Circuit's decision in *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 532 (3d Cir. 1999). But that case involved a bidder break-up fee request by the unsuccessful bidder, which was a "request [] made under the applicable case law" rather than any specific provision of the Bankruptcy Code. *Id.* Indeed, the bidder "originally captioned its motion under 11 U.S.C. § 503(b)" but later disclaimed that basis for relief. *Id.*

24. The Third Circuit found no "support for the proposition that courts may create a right to recover from the bankruptcy estate where no such right exists under the Bankruptcy Code" and "decline[d] the invitation to develop a general common law of break-up fees." *Id.* In so doing, the Third Circuit emphasized that "[t]he filing of a petition for bankruptcy protection under Chapter 11 of the Code . . . precludes all efforts to obtain or distribute property of the estate other than as provided by the Bankruptcy Code." *Id.* at 532. And, notably, the Third Circuit cited section 363 as one example where the Bankruptcy Code *did* provide for such relief. *Id.* (filing of Chapter 11 petition "precludes all efforts to obtain or distribute property of the estate other than as provided by the Bankruptcy Code, *see* 11 U.S.C. §§ 362, 363, 1123").

25. Accordingly, *O'Brien* was all about whether a disappointed bidder could seek extra-statutory relief—not whether a debtor in possession could seek relief under other *statutory* provisions.[7,8] Like *O'Brien*, the Third Circuit in *EFH II* was considering payment of a break-up

---

[7] To the extent the district court in *Bethlehem Steel* suggested the *O'Brien* decision could "be read as holding that § 503(b) is the only source for approval of the payment of these fees," 2003 WL 21738964, at *9, it was mistaken.

fee to an alleged stalking horse as an administrative expense under an application, by the alleged stalking horse under section 503(b)(1)(A) as an actual or necessary expense of the estate. *In re Energy Future Hldgs. Corp. ("EFH II")*, 990 F.3d 728, 735 (3d Cir. 2021).

26. Again, the factual differences matter, and this is not a situation where a creditor is independently applying for fees. Rather, the direct statute on point is the statute governing the Debtors' decision to enter into a transaction outside the ordinary course of business under section 363(b) of the Bankruptcy code. In any event, the record here as demonstrated by the Supplemental Declaration soundly demonstrates that any contributions here far outstrip the concerns raised by thwarted alleged stalking horse bidders.

27. The U.S. Trustee also cites *Airlease II, Inc. v. Simon (In re F/S Airlease II, Inc.)*, 844 F.2d 99, 108 (3d Cir. 1988). In that case, the Third Circuit refused to allow a professional to recover fees under Section 503(b)(2) when he was ineligible to recover the same fees under the neighboring provision, Section 503(b)(1), because he had failed to comply with a necessary precondition to recovery. The court explained that "section 327(a)" puts requirements on the "authority to pay administrative expenses for [trustee-employed] professionals" under Section 503(b)(2). *Id.* The professional had failed to obtain prior approval for its work as required under Section 327(a), despite being "a sophisticated businessman who was represented by attorneys

---

Although the appellant in *O'Brien* simultaneously appealed an earlier ruling by the bankruptcy court denying *the debtor's* motion for approval of a breakup fee, which the "Bankruptcy Court refused [due to] concern that allowing such fees and expenses would 'perhaps chill or at best certainly complicate the competitive bidding process,'" *id.* at 529, the Third Circuit held that the bidder "lack[ed] standing to appeal that order," *id.* at 531. *O'Brien* thus specifically refused to consider whether the debtor lacked authority to seek fees under Section 363(b).

[8] The Insurers also cite *TCI 2 Holdings* for the proposition that 503(b) "is the only source for approval of the payment of fees . . . to 'an ad hoc committee of noteholders . . . and their professionals.'" Insurer Objection at ¶ 41 (citing *In re TCI 2 Holdings*, 428 B.R. 117, 147 (Bankr. D.N.J. 2010)). Similar to *Lehman*, the *TCI 2 Holdings* bankruptcy court was considering payment provisions under a plan in connection with section 1129(a)(4), and not section 363(b), which even the *O'Brien* court, upon which the *TCI 2 Holdings* court relied, recognized is an exception. Indeed, the *TCI 2 Holdings* court recognized that even the Third Circuit decision in *O'Brien* did not provide a bottom-line prohibition, stating that the decision "suggests strongly that § 503(b) is the only source for approval." *Id.* at 147. But, of course this Court and others in the decisions cited here and in the Debtors' papers have reached a different conclusion.

throughout the course of his dealings with" the debtor. *Id.* at 106-08. Which is why he sought relief under Section 503(b)(1) instead. It is not surprising that the Third Circuit refused to read two provisions (503(b)(1) and (b)(2)) that "exist side-by-side" as covering precisely the same expenses in a way that would allow professionals to circumvent a critical statutory requirement designed to ensure that estate professionals are not compromised by adverse interests before working for the estate. But it has little to do with this case.

### C. The Payment Obligations Under the <u>RSA Do Not Create An Irreconcilable Conflict</u>

28. Rather than compensating for the horrid sexual abuse that Century, one of Debtors' principal insurers, had agreed to cover, Century continues its years-long baseless and collateral attacks on survivors through red herring objections to their counsel. Typically, Century's protestations are leveled at the survivors' tort counsel, but now it has aimed its usual barrage at the Coalition's bankruptcy counsel too. Century urges that the RSA violates Model Rules 1.7(a) and 5.6, but they cite zero caselaw where these rules are even implicated in connection with the negotiation and implementation of chapter 11 restructuring support agreement that includes a reimbursement provision.

29. Rather, Century cites extensively to a law review article concerning the 2007 Vioxx pharmaceutical settlement. *See* Century Fee Objection at 20-21 (providing incorrect citation to Erichson & Zipursky, *Consent Versus Closure*, 96 Cornell L. Rev. 265, 266 (2011)). But Century, disappointingly but certainly not surprisingly, omits from its quotation the critically objectionable factor of the Vioxx settlement, that plaintiff counsels agreed that "if any clients decided not to participate in the settlement, the lawyer was required to withdraw from representing the nonsettling clients. A client wishing to decline the settlement, in other words,

faced the prospect of losing her lawyer and finding that every other lawyer handling Vioxx claims was similarly unavailable." Erichson & Zipursky at 266.

30. Small wonder the ABA criticized the agreement—but its Ethics Committee, cited by Century, never opined that an attorney ***could not agree to recommend a settlement***. It criticized a lawyer's receipt of payment from an adverse party in exchange for agreement to refrain from representing its own present and future clients. In this case, there is simply no agreement to refrain from representation. It may be that some clients of law firms joining the RSA will vote to reject the Plan against the recommendation of counsel, as is doubtless the case with respect to every large chapter 11 plan solicitation, and such creditors will continue to find themselves ably represented. Furthermore, restructuring support agreements are entered into in the full sunshine of notice, hearing and court consideration and approval, with their fee provisions disclosed to all parties-in-interest. It is difficult to see how allegedly secretive and coercive binding litigation settlements, such as Vioxx, are at all applicable to restructuring support agreements.

31. Century's inability to cite to ***any*** legal precedent that is on point is not surprising. Adopting Century's interpretation of the rules would turn the restructuring world upside down and negate the very purpose of restructuring support agreements—parties with often divergent views coming together to work towards a consensual exit from chapter 11, that in the view of counsel, is in the best interest of their clients and constituents. Counsel for tort claimants here are seeking comparable treatment to that demanded, provided, and approved by courts around the country to ***insurers*** and funded debt holders who have reached restructuring support agreements.

32. For example, in *PG&E* some of the largest insurance companies in the country, including Chubb (which we understand is one of Century's parent companies) formed an ad hoc group of subrogation claimants (the "**Subro AHC**") and retained Willkie Farr Gallagher LLP as counsel. *See* Verified Statement of the Ad Hoc Group of Subrogation Claim Holders Pursuant to Bankruptcy Rule 2019, *In re PG&E Corp.*, Case No. 19-30088 (DM) [Docket No. 971] (members include many of the insurers in these cases, including Chubb, AIG, Hartford Accident and Indemnity Company, and Liberty Mutual Insurance).

33. The Subro AHC did not publicly disclose the terms of their engagement with Willkie Farr. As described in the Coalition's Joinder [Docket Nos. 5678 & 5680], the insurance companies comprising the Subro AHC, negotiated and RSA ***and required*** as part of their RSA that PG&E reimburse their counsel Willkie Farr and their other professionals up to $55 million, including success fees. The members of the Subro AHC presumably relied on the upon the advice of Willkie Farr in agreeing to support the transaction and enter into the RSA, but no party, including the very insurer objecting here, raised the specter of whether Willkie Farr was somehow conflicted in so advising the insurers to join the RSA and later support the Plan because the RSA provided for the payment of their fees.

34. Again, the Subro AHC's engagement letter with Willkie Farr had not been disclosed, so it could be the case that Willkie Farr may not have been compensated ***at all*** absent the RSA. *PG&E* and its RSA that called for the reimbursement of fees at multiples of the amounts at issue here, for the benefit of the very insurers that now object shows that these types of arrangements are customary. It should make no difference even if the analysis shifts from conflicts at the bankruptcy counsel level to the underlying representative counsel level (as is necessary in a mass tort case because it would strain credulity to require an RSA to be signed up

by tens of thousands of individuals, in lieu of their counsel). There is no irreconcilable conflict—these agreements, which include their fee reimbursement components, are foundations of complex restructuring practice.

35. Century's papers also appear to leave out one important aspect of Model Rule 1.7(a). Model Rule 1.7(a)(2), provides that a conflict only exists if "there is a *significant risk* that the representation of one or more clients will be *materially limited* by the lawyer's responsibilities to . . . a third person or by a personal interest of the lawyer." (emphasis added). There is no significant risk of limited representation, as the signatories to the RSA from the Coalition have evaluated the deal included in the RSA and have come to their own independent judgment that it is in their clients' best interests to support the RSA and, if the Amended Plan is acceptable to them under the RSA, recommend their clients to vote for it. The signatories are, indeed, carrying out their "representation" to their clients in reaching their independent determination that it is in the interests of their clients to support the Amended Plan, so long as it complies with the RSA.

36. Lest there be any doubt, under the RSA all survivors can make their own voting decision—regardless of recommendation from their counsel—and signatories to the RSA are, of course, able to revoke their recommendation for the Plan if the final Plan materially deviates from the RSA (a termination event). These provisions, which are in every RSA, are what make such agreements viable under Bankruptcy Code section 1125(b) (as described in the Motion). Indeed, Century actually ***complains*** about this feature of the RSA and the fact that each individual survivor is free to make their own informed decision based on disclosure and need not rely on their counsel's independent advice. *See* Century RSA Objection, at §II.A.

37. Century is absolutely correct that each of the tens of thousands of survivors represented by Coalition RSA signatories is ***not*** bound by the recommendation to support the Amended Plan as in the survivors' best interest reached by their counsel. All that the RSA requires is that the Coalition signatories explain their decision to recommend voting in favor of the Plan based on the totality of the circumstances to their clients and thereby recommend that they too support. Each individual survivor is entitled to informed consent and the ethics rules are not violated by restructuring support agreement—there is no case law to support an alternative reading of the rules in this scenario.

38. Century also argues that the RSA involves a *quid pro quo* that violates Model Rule 5.6's restriction against the practice of law. But there is no *quid pro quo*. RSA signatories evaluated the Amended Plan that is reflected in the RSA against the totality of the circumstances and reached their own conclusion that they will recommend it to their clients as in their clients' best interests. Again, if the final Plan differs from the Amended Plan that reflects the deal in the RSA, then counsel can withdraw their support and reverse their recommendation to clients (if they believe that is in their clients' interests).

39. Finally, Century, purporting to adorn itself with a newly acquired care for the survivors that it is actually and vigorously trying to deny payment to, also implies that there is some adversity as between a Coalition Member's clients that opted into membership versus opted out of membership in the Coalition. In so doing, Century continues to misconstrue the disclosed and accepted fact that Coalition representative law firms <u>do not</u> charge back any Coalition fees and expenses to any clients—thus, at no time has any claimant in this case consented to pay any portion of the Coalition's fees, and no claimants are adverse to one another in respect thereof. Regardless, Century implies that the payment to Coalition Professionals is to

the detriment of all or some subset of survivors. To the contrary, the Motion, the Initial Declaration and Supplemental Declaration demonstrate how the RSA and the fee payments thereunder will reimburse fees that have benefited and will continue to benefit the Debtors' estate and ***all*** survivors. The proposed fees to be paid under the RSA will pale in comparison to the fees of pursuit of a plan that does not have survivor support or leads to a Chapter 7 liquidation, which will obviously lead to less being available to survivors (and certainly over a longer time frame).

**CONCLUSION**

WHEREFORE, the Coalition respectfully requests that the Court enter an order granting the Motion and overruling the Objections and entering such other and further relief as the Court deems just and proper.

Dated: July 26, 2021
Wilmington, Delaware

MONZACK MERSKY AND BROWDER, P.A.

*/s/ Rachel B. Mersky*
(DE No. 2049)
1201 North Orange Street
Suite 400
Wilmington, Delaware 19801
Telephone: (302) 656-8162
Facsimile: (302) 656-2769
E-mail: RMersky@Monlaw.com

-and-

BROWN RUDNICK LLP
David J. Molton, Esq. (admitted *pro hac vice*)
Eric R. Goodman, Esq. (admitted *pro hac vice*)
Gerard T. Cicero, Esq. (*proc hac vice* forthcoming)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-mail: DMolton@BrownRudnick.com
E-mail: EGoodman@BrownRudnick.com

and

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-mail: SBeville@BrownRudnick.com
E-mail: TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*