## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
| | Ref. Dkt. No. 5466 |
| | Hearing Date: July 29, 2021 at 10:00 a.m. |

**SUPPLEMENTAL BRIEF OF THE COALITION OF ABUSED SCOUTS FOR JUSTICE, THE OFFICIAL COMMITTEE OF TORT CLAIMANTS, AND THE FUTURE CLAIMS REPRESENTATIVE IN SUPPORT OF, DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

DOCS_SF:105826.4 85353/002

**TABLE OF CONTENTS**

Page

INTRODUCTION.................................................................................................. 1

REPLY AND SUPPLEMENTAL BRIEF ............................................................ 3

    A.    The Hartford Settlement Is Not in the Best Interest of Survivors........................... 3

        (i)    The Debtors Should Not Be Required to Expend Time and Resources Seeking Confirmation of a Futile Plan that Will Face Insurmountable Opposition.................................................................................... 5

        (ii)    The Debtors Have Advised the Court of Changed Circumstances Preventing Approval of the Hartford Settlement ........................................ 8

        (iii)    Hartford Offers No Basis to Deviate from Martin.................................... 11

        (iv)    Hartford Concedes that the Hartford Settlement Agreement Is Not Yet Effective .................................................................................. 17

    B.    The Insurers Present a False Narrative as to the Nature and Purpose of So-called Insurance "Neutrality" ........................................................................... 21

        (i)    A Plan Need Not Be "Neutral" to Be Confirmable .................................. 21

    C.    Arguments as to the Proper Scope of the Insurance Entity Injunction Are Premature and, in Any Event, the Injunction is Supported by Applicable Law... 28

    D.    Remaining Objections to the Motion Are Without Merit.................................... 29

CONCLUSION ................................................................................................... 32

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Albany Ins. Co. v. Bengal Marine, Inc.*,
  857 F.2d 250 (5th Cir. 1988) ........................................................................ 26

*Church Joint Venture, L.P. v. Blasingame (In re Blasingame)*,
  2016 Bankr. LEXIS 3590 ........................................................................ 19, 20

*Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*,
  283, F.3d 159 (3rd Cir. 2002) ...................................................................... 11

*Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*,
  922 F.3d 323 (5th Cir. 2019) ........................................................................ 16

*Goodwin v. Mickey Thompson Entertainment Group, Inc. (In re Mickey Thompson
  Entertainment Group, Inc.)*,
  292 B.R. 514 (9th Cir. BAP 2003) ................................................................ 16

Home Ins. Co. of Ill. v. Hooper,
  691 N.E.2d 65 (Ill. App. Ct. 1998) ............................................................... 26

*In re American Capital Equipment, LLC*,
  688 F.3d 145 (3d Cir. 2012) ...................................................................... 7, 8

*In re Arctic Glacier Int'l, Inc.*,
  901 F.3d 162 (3d Cir. 2018) ........................................................................ 21

*In re Babcock & Wilcox Co.*,
  2004 WL 4945985 ........................................................................................ 25

*In re Combustion Engineering*,
  391 F.3d 190 (3d Cir. 2004) ........................................................................ 22

*In re Continental Airlines*,
  203 F.3d 203 (3d Cir. 2000) ........................................................................ 29

*In re Fed.-Mogul Glob., Inc.*,
  684 F.3d 355 (3d Cir. 2012) ........................................................................ 25

*In re Filene's Basement, LLC*,
  2014 Bankr. LEXIS 2000 (Bankr. D. Del. April 29, 2014) ......................... 11

*In re Frye*,
  216 B.R. 166 (Bankr. E.D. Va. 1997) ........................................................... 15

*In re Global Industrial Technologies*,
  645 F.3d 201 (3d Cir. 2011) ........................................................................ 28

*In re Global Industrial Technologies, Inc.*,
  645 F.3d 201 (3d Cir. 2011) ........................................................................ 22

*In re Kaiser Aluminum Corp.*,
  343 B.R. 88 (D. Del. 2006) .......................................................................... 25

*In re Master Mortgage Inv. Fund, Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994) ......................................................... 29

*In re Millennium Lab Holdings II, LLC*,
  575 B.R. 252 (Bankr. D. Del. 2017) ............................................................. 29

*In re Sparks*,
  190 B.R. 842 (Bankr. N.D. Ill. 1996) ........................................................... 12

*In re Thorpe Insulation Co.*,
  677 F.3d 869 (9th Cir. 2012) ........................................................................ 22

*In re United Shipping Co.,*
  1989 WL 12723 ........................................................................................................ 15
*In re Vanderveer Ests. Holding, LLC,*
  328 B.R. 18 (Bankr. E.D.N.Y. 2005) ........................................................................ 26
*In re Venegas,*
  623 B.R. 555 (B.A.P. 9th Cir. 2020) ........................................................................ 22
*In re W.R. Grace & Co.,*
  475 B.R. 34 (D. Del. 2012) ....................................................................................... 25
*Liberty Towers Reality, LLC v. Richmond Liberty, LLC,*
  569 B.R. 534 (E.D.N.Y. 2017) .................................................................................. 11
*MacArthur Co. v. Johns-Manville Corp.,*
  837 F.2d 89 (2d Cir. 1988) ........................................................................................ 29
*Musselman v. Stanonik (In re Seminole Walls & Ceilings Corp.),*
  388 B.R. 386 (M.D. Fla 3008) .................................................................................. 15
*Myers v. Martin (In re Martin),*
  91 F.3d 389(3d Cir. 1996) ............................................................................... 8, 9, 15
*Pineo v. Turner (In re Turner),*
  274 B.R. 675 (Bankr. W.D. Penn. 2002) .................................................................. 15
*PRLP 2011 Holdings, LLC v. Manuel Mediavilla, Inc. (In re Manuel Mediavilla, Inc.),*
  568 B.R. 551, (B.A.P. 1st Cir. 2017) ................................................................. 13, 14
*Rinehart v. Stroud Ford, Inc. (In re Stroud Ford, Inc.),*
  205 B.R. 722 (Bankr. M.D. Pa. 1996) ...................................................................... 11
*Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.),*
  459 B.R. 190 (Bankr. S.D.N.Y. 2011) ................................................................. 19, 20
*UNR Indus., Inc. v. Cont'l Cas. Co.,*
  942 F.2d 1101 (7th Cir. 1991) ................................................................................... 21
*White v. C.B. Hannay Co. (In re Lyons Transp. Lines),*
  163 B.R. 474 (Bankr. W.D. Penn. 1994) .................................................................. 15

**Statutes**
11 U.S.C. § 1123 ......................................................................................................... 25
11 U.S.C. § 1129 ......................................................................................................... 12
11 U.S.C. § 1141 ......................................................................................................... 12
11 U.S.C. § 363 ........................................................................................................... 12
11 U.S.C. § 502 ........................................................................................................... 31
11 U.S.C. § 509 ........................................................................................................... 31

The Coalition of Abused Scouts for Justice (the "**Coalition**"), the Official Committee of

Tort Claimants to Boy Scouts of America and Delaware BSA, LLC (the "**TCC**"), and the Future

Claims Representative (the "**FCR**" and together with the Coalition and the TCC, the "**Supporting

Parties**"), by and through their undersigned counsel, hereby submits this Supplemental Brief in

further support of the *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and

105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the

Restructuring Support Agreement, and (II) Granting Related Relief* (Dkt. No. 5466)

(the "**Motion**").[2]  In support of the Motion,[3] the Supporting Parties respectfully state as follows:

## INTRODUCTION

1.      Nearly every page spent objecting to the Motion raises a confirmation objection.[4]

This Court does not have to decide every confirmation objection that is or will be lodged by the

insurers and other parties that want to defeat a global resolution plan.  These issues will likely be

briefed a second time in connection with the Court's consideration of the Disclosure Statement,

and, again, for a third time at plan confirmation, when they will then finally be properly before the

Court.

2.      The question before the Court today is a narrow one—is the Debtors' entry into the

RSA a proper exercise of their business judgment?  If the answer is yes, the Debtors will be one

---

[2]  Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the Supporting Parties' Joinder and Brief in Support of the Motion (Dkt. No. 5680) (the "**Joint Brief**").

[3]  Issues concerning the Term Sheet attached to the RSA as Exhibit A remain outstanding.  The Supporting Parties are attempting to resolve these issues with the Debtors in the mediation.  The Supporting Parties reserve the right to withdraw this Supplemental Brief if these issues are not resolved prior to the RSA Deadline, which is July 28, 2021.

[4]  Objections to the Motion were filed by LDS (Dkt. No. 5674) (the "**LDS Objection**"), the Roman Catholic Ad Hoc Committee and the United Methodist Ad Hoc Committee (Dkt. No. 5676) (the "**Catholic/Methodist Objection**"), Hartford (Dkt. No. 5681) (the "**Hartford Objection**") and various other insurers including Century, the United States Trustee (Dkt. No. 5685) (the "**UST Objection**"), and the Zalkin Law Firm and various affiliated firms (Dkt. No. 5682) (the "**Zalkin Objection**").  Various other joinders were also filed.  The Coalition is filing a separate supplemental brief in response to the UST Objection and those parts of other objections which relate to the Coalition professionals' fees reimbursement provision of the RSA.

step closer to presenting a global resolution plan that has the support of nearly every major creditor constituency in the chapter 11 cases. If the answer is no, the Debtors' mistake in entering into the Hartford Settlement will mean that the Supporting Parties will continue seeking the termination of exclusivity (which, as of the hearing on the Motion, the Debtors will enjoy for less than three weeks) so that they can propose a viable plan.

3.      The Debtors' insurers have a multi-billion-dollar self-interested motive to keep the Debtors from achieving their stated restructuring goals. The Hartford Settlement is illusory. In light of the "most favored nations" clause in the Hartford Settlement, it is clear that Hartford has no intention of ever paying $650 million to buy back its policies and no evidence has been offered as to what is the actual value of this proposed settlement. The Debtors' attempt to build consensus around a global resolution through deals with their insurers was destined for failure, and something the Debtors never should have done. But this Court has the final word.

4.      Confirming a plan over the survivors' objections would involve substantial litigation. The insurers have stonewalled nearly all discovery and continue to do so. Hartford will not produce any documents or even answer basic questions bearing on its exposure for Abuse Claims. Hartford's position implies that neither the Court nor the survivors are entitled to adequate information bearing on the reasonableness of its illusory settlement.[5] Century's conduct is no better. Century and Chubb also have refused to produce any documents that bear on their exposure for Abuse Claims. The insurers' edict is clear: we do not have to disclose anything; now go vote on our plan.[6]

---

[5] ████████████████████████████████████████████████████████████

[6] ████████████████████████████████████████████████████████████

5.      The insurers are going to engage in "scorched earth" litigation no matter what the Debtors do. Believing otherwise ignores the economic incentives driving these cases. The illusory Hartford Settlement is a bridge to nowhere. The Hartford Settlement did, however, deliver a positive and, to many who have watched this case closely since March 2020, remarkable outcome—it brought the Coalition, the TCC, the FCR, and the AHCLC together around a proposed plan structure to save Scouting and provide fair compensation to survivors. A key component of this structure are specific Findings and Orders and a TDP based on Debtors' actual experience in the tort system and settlement history, designed to require the insurers to actually honor their contractual obligations. The RSA is the first step toward achieving this objective and consummating a global resolution plan.

## REPLY AND SUPPLEMENTAL BRIEF

### A.      The Hartford Settlement Is Not in the Best Interest of Survivors

6.      The Court should authorize the Debtors to enter into the RSA without including the Hartford Settlement in any plan, or alternatively, that if any such obligation does exist, that the Debtors are relieved from such obligation. The Motion is the culmination of sixteen months of hard-fought negotiations that provide the necessary platform for the Debtors, the Supporting Parties, the UCC, and JP Morgan to finalize a plan, embark on the confirmation process and bring the Debtors' cases to a successful conclusion.

7.      The Supporting Parties have consistently informed the Debtors and Hartford that they do not support the Hartford Settlement.[7] The settlement does not provide adequate consideration for the multi-billion-dollar coverage provided by Hartford's policies.

---

[7]  ███████████████████████████████████████████████████

8.      Hartford issued policies to the Debtors that provide either or both primary and excess insurance for 1971 (partial year), 1972, 1973, 1974, 1975, 1976, 1977, 1978, 1979, 1981, 1982, 1988, 2012, and 2013. In 1972 alone, there are approximately 1,000 claims (based on a first occurrence analysis) that are covered by Hartford's policies. If only half of those claims are valid, their aggregate average value is approximately $750 million for that single year, which is $100 million more than Hartford's maximum exposure under the Hartford Settlement.

9.      The value of the claims is significantly more if claims that arose in New York and other jurisdictions where each instance of sexual abuse gives rise to a separate claim are considered.[8] Requiring the Debtors to seek the Court's approval of the Hartford Settlement will be a wasteful, costly, and likely disastrous exercise in futility because the Coalition, the FCR and the TCC will object, and the Coalition and the TCC will recommend to the entire survivor constituency to vote no on any plan that includes the Hartford Settlement.[9]

10.     Even if the Supporting Parties were prepared to accept $650 million as fair consideration for the Hartford's obligations under its policies, the Hartford Settlement is in fact illusory. It is impossible to determine the value of the consideration under the Hartford Settlement. The $650 million maximum amount Hartford proposes to pay is dependent upon Century's payment under different and distinct insurance policies with respect to sexual abuse claims that have nothing to do with the claims that Hartford is contractually bound to cover. For example, if

---

[8]  In 1972, there are approximately 186 claims arising in New York. Nearly all of those claims allege multiple instances of sexual abuse. As a result, Hartford's coverage exposure is increased exponentially under policies that do not have any aggregate limits.

[9]  ██████████████████████████████████████████████████████████████████████

Century paid $900 million in full and final satisfaction of its obligations under its policies, *that would reduce Hartford's $650 million obligation to $450 million.*

11.    The Hartford Settlement was entered into by the Debtors and Hartford in April 2021, without any consultation with and over the opposition of the TCC, the Coalition, and FCR.

12.    Although Hartford was well aware that these constituencies did not support its settlement when it was entered, nothing in the Hartford Settlement discusses the "Global Resolution Plan" or the Hartford's newly-alleged requirement of the settlement agreement—that absent survivor support, Debtors shift to a "Toggle Plan" *that depends on cramming down the entire survivor class.* Such a requirement could never lead to a successful plan. Cramming down on the class of sexual abuse survivors fails to meet the "fair and equitable" standard. Moreover, cramming down on tens of thousands of victims is something that has never been accomplished in any sexual abuse bankruptcy case or mass tort bankruptcy case. Section III.I of the Hartford Settlement provides:

> The BSA shall not file, and shall not support, any plan of reorganization that is inconsistent with the terms of this Agreement; provided, however, that the BSA may file a Plan that includes alternatives or conditions under which this Agreement would not be part of the Plan. . . .

(Emphasis added). Therefore, to the extent the plan contemplated by the Hartford Settlement could not be confirmed, the Hartford Settlement expressly provided that the Debtors "may" but are not obligated to shift to the so-called Toggle Plan.

**(i)    The Debtors Should Not Be Required to
Expend Time and Resources Seeking Confirmation
of a Futile Plan that Will Face Insurmountable Opposition**

13.    Hartford contends the Debtors should be compelled to waste enormous amounts of cash and time going through a confirmation process that will result in failure. Hartford also contends the Debtors have always known the TCC will oppose the Hartford Settlement, which is

not true. The TCC did not learn about the Hartford Settlement until the announcement was made by the Mediators. The TCC was not party to any of the negotiations or otherwise consulted by the Debtors regarding the Debtors' attempt to settle and sell back the Hartford policies.

14. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ While it is correct that the Coalition voiced opposition, the Coalition, unlike the TCC, does not act as a fiduciary for all of the survivors. More importantly, while the Debtors could try to force and cram down the Toggle Plan over the opposition of the Supporting Parties, the Debtors recognize that entering into the RSA provides a constructive path towards confirmation of a plan that will include the cooperation of numerous parties in interest, albeit no insurance carriers to date.

15.    Pursuing confirmation of a plan that is "dead on arrival" would waste millions of dollars of the estates' limited and dwindling assets to appease Hartford to the detriment of all other creditor constituencies and the estates. The Debtors have yet to obtain approval of a disclosure statement. From a procedural standpoint, the Hartford Settlement is not before the Court for approval. Plus, under section XII.C of the Plan, and its prior iterations, the Debtors reserved the right to revoke the plan, which would render anything contained therein null and void, even if the Court had approved the plan and it had not yet gone effective.[10]

---

[10]    Section XII.C of the Plan states:

> C.  Revocation or Withdrawal of Plan. The Debtors reserve the right, subject to the terms of the Restructuring Support Agreement, to revoke or withdraw the Plan prior to the Effective Date. **If the Plan has been revoked or withdrawn prior to the Effective Date**, or if Confirmation of the Plan or the occurrence of the Effective Date does not occur, or if the Restructuring Support Agreement terminates in accordance with its terms, then: (1) **the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan** (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, including the Settlement Trust Documents, **shall be deemed null and void**; and (3) nothing contained in the Plan shall (i) constitute a waiver or release of any

16.    If the Court were to approve a disclosure statement related to a plan containing the Hartford Settlement, the Debtors would be required to solicit votes and proceed to a contested confirmation hearing.    Then, for the Plan to be confirmed it must meet the standards of section 1129, including the "best interests of creditors" test set forth in section 1129(a)(7), and cram down the class of sexual abuse survivors, which has never been done in a chapter 11 case that is based on sexual abuse claims or any other mass tort claims.    Forcing the Debtors to include the Hartford Settlement in any plan will result in many months and likely tens of millions of dollars spent on a plan that will not be confirmable because the Supporting Parties will not support any plan that contains the Hartford Settlement, the Debtors will be unable to meet the best interest of creditors test, and the Hartford Settlement does not meet the standards for approval under Bankruptcy Rule 9019.

17.    The United States Court of Appeals for the Third Circuit has recognized that a debtor should not go through the confirmation process if the proposed plan cannot be confirmed. As stated in *In re American Capital Equipment, LLC*, 688 F.3d 145, 154-55 (3d Cir. 2012):

> [A] bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable.    A plan is patently unconfirmable where (1) confirmation "defects [cannot] be overcome by creditor voting results" and (2) those defects "concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *In re Monroe Well Serv.*, 80 B.R. at 333.    If no dispute of material fact remains and if defects cannot be cured by creditor voting or otherwise, then there is "nothing in either the language or logic of the Code requiring the court or parties to 'grind the same corn a second time,' and we will not read into the Code the requirement of redundancy." *In re Acequia, Inc.*, 787 F.2d

---

Claim against, or any Interest in, the Debtors or any other Person; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission of any sort by the Debtors or any other Person.

Plan at 107 (Emphasis added); *see* 11 U.S.C. § 1127(a) ("The proponent of a plan may modify such plan at any time before confirmation ....").

at 1358-1359 (citation omitted) (noting that although confirmation requires an evidentiary hearing, courts need not ignore evidence already submitted).

18.     Although the Debtors have just started the disclosure statement approval process, the holding and logic of *American Capital Equipment* is applicable here. Hartford's argument that the Debtors *must* go through the confirmation process with the Hartford Settlement because the Court not only might be able to *but should* cram down the abuse survivors whose claims are the entire *raison d'etre* of these cases, so that Hartford alone can get a discounted release would not only be an enormous waste of money and time, but would make a mockery of the bankruptcy process as a methodology for resolving mass tort cases.

19.     Hartford contends the Debtors cannot refuse to seek confirmation of the plan containing the Hartford Settlement because the Hartford Settlement did not contain a contractual "fiduciary out." Hartford Objection at 4, 12, 15, 20, 22, 28. Hartford is essentially asking this Court to find that a debtor can unilaterally, over the objection of creditors, waive its fiduciary duties under the Bankruptcy Code and release one its most valuable assets for pennies on the dollar. Not surprisingly, Hartford cites no case law to support this contention.

20.     While the Hartford Settlement might be in the best interest of Hartford, it is unquestionably <u>not</u> in the interest of the Debtors' estates and, more importantly, the approximately 24,000 sexual abuse survivors whose claims are covered by Hartford's policies.

**(ii)     The Debtors Have Advised the Court of Changed
Circumstances Preventing Approval of the Hartford Settlement**

21.     The Third Circuit decision in *Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996),[11] a case similar to the one here that is cited by Hartford, supports the relief requested

---

[11]    It is basic bankruptcy law that a settlement agreement, especially one that includes the sale or use of property of the estate outside the ordinary course of business of the debtor, is not valid unless it is approved by the court pursuant to section 363 of the Bankruptcy Code and in accordance with the procedures set out in Rule 9019. *In re Roth American, Inc.,* 975 F.2d 949, 954 (3d Cir. 1992) (modifications to a collective bargaining agreement that required debtor to continue to use certain property of the estate for a dictated period of time was outside ordinary

by the Debtors in the Motion. *Martin* imposes an obligation on trustees and debtors in possession to advise the court of changed circumstances that render a previously-proposed settlement not in the best interests of a bankruptcy estate and its creditors.

22.    The trustee in *Martin* settled certain pre-petition state court litigation of the debtors (the Martins) against the Myers. While the motion for approval of the settlement was pending, the bankruptcy court permitted the state court litigation to go to trial resulting in a verdict against the Myers in excess of the settlement amount. At the hearing to approve the settlement, the trustee informed the court of the verdict and withdrew her support of the settlement on the grounds that she could no longer meet her burden of proof that the settlement was in the best interest of creditors. The bankruptcy court agreed and denied approval of the settlement.

23.    On appeal by the Myers, the district court determined the trustee had violated her duty of good faith by refusing to support her own motion to approve the settlement and allowing the debtors to pursue the trial after she had already settled the matter. The district court reversed the bankruptcy court and remanded with instructions that the settlement be approved. The Third Circuit reversed. The Third Circuit held that the settlement approval process "requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *In re Martin*, 91 F.3d at 393. While the Third Circuit did not take issue with the district court's determination that the trustee had an obligation to deal fairly with the Myers, the Third Circuit concluded that a trustee, as a fiduciary, had a duty to do right by all creditors, not just the Myers.

---

course of business and therefore, was not effective or enforceable because court approval had never been sought or obtained); *see also, Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346 (3d Cir. 1999) (settlement of cause of action against Chrysler by trustee was never approved by bankruptcy court because cause of action was abandoned to holder of secured claim, and therefore, settlement could not be enforced against claim holder by Chrysler; court approval is a condition precedent to enforceability.) These cases do not address the gap period between the execution of the settlement agreement and the approval of the settlement by the court when circumstances change such that the terms of the settlement no longer make economic sense for the debtor.

24.     In *Martin*, the court stated:

> We cannot require a trustee herself to choose between these conflicting legal
> obligations.  Rather, Rule 9019(a) demonstrates the legislature's intent to
> place this responsibility with the bankruptcy court.  In order to make such a
> determination, the bankruptcy court must be apprised of all relevant
> information that ***will enable it to determine what course of action will be
> in the best interest of the estate***.  Accordingly, the trustee should inform the
> court and the parties of any changed circumstances since the entry into the
> stipulation of settlement.  The trustee may even opt not to argue in favor of
> the stipulation, as was done here, if she no longer believes the settlement to
> be in the best interest of the estate. The trustee does not breach any term of
> the stipulation by doing so, for the bankruptcy court may nonetheless
> approve the settlement.

Id. at 394 (emphasis added).  Thus, the trustee acted properly when she informed the bankruptcy

court of the expedited trial date and the results of the trial but did not withdraw the motion for

approval of the settlement leaving the bankruptcy court to determine that, in light of the judgment,

the settlement was not in the best interests of the estate.

25.     This is exactly what the Debtors are doing here.  The Debtors incorporated the

Hartford Settlement into their Plan which, unlike in *Martin*, has not yet been submitted to the Court

for approval.  Since the Debtors' entry into the Hartford Settlement, the Debtors recognized they

could not succeed getting the Court to approve a plan that included the Hartford Settlement.  Thus,

in the Motion, in accordance with the Third Circuit's procedures set out in *Martin*, the Debtors

informed the Court that circumstances have deteriorated with the Supporting Parties, that the

Debtors now recognize they will be unable to meet their burden of proof to enable the Court to

make the requisite finding that the Hartford Settlement is in the best interests of the Debtors' estate

or its creditors, and that any plan premised on the Harford Settlement would be unconfirmable.

26.     The Debtors have set forth an alternative process (the RSA) that has the support of

all the Debtors' major creditor constituencies including JPM, the Creditors' Committee, TCC, the

Coalition, the FCR, and others. The Debtors are seeking approval of the RSA and seeking the Court's authorization to embark on that course of action outlined in the RSA.

27.    The Court may authorize the Debtors to enter into the RSA because any further pursuit of the Hartford Settlement is plainly futile, and that, under the circumstances, seeking approval of a disclosure statement and plan that contains the Hartford Settlement is not in the best interests of the Debtors, their estates, or their creditors. The Court is obligated to review the settlement and the *Martin* factors in light of the circumstances that exist at the time the settlement is presented to the Court, not just at the time the settlement was entered by the parties. *Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283, F.3d 159, 165 (3rd Cir. 2002).

**(iii)    Hartford Offers No Basis to Deviate from Martin**

28.    None of the other cases cited by Hartford differ from the approach approved by the Third Circuit in *Martin*, which the Debtors have complied with. *See In re Filene's Basement, LLC*, 2014 Bankr. LEXIS 2000 (Bankr. D. Del. April 29, 2014) (relying on *Martin*, court permitted debtors to withdraw support of a settlement agreement relating to sale of certain leases where a higher bid was received; court denied motion of original prospective purchaser to compel compliance with settlement and approved new sale); *Rinehart v. Stroud Ford, Inc. (In re Stroud Ford, Inc.)*, 205 B.R. 722, 725-26 (Bankr. M.D. Pa. 1996) (Debtor agreed to sell property to Rinehart but withdrew its motion for approval upon receipt of a higher offer, which was approved by the court; relying on *Martin,* court denied Rinehart's motion for an administrative expense claim for breach of the original sale agreement.); *Liberty Towers Reality, LLC v. Richmond Liberty, LLC*, 569 B.R. 534 (E.D.N.Y. 2017), aff'd., 734 Fed. Appx. 68 (2nd Cir. 2018) (debtor not permitted to withdraw support for settlement where the bankruptcy court in approving the settlement heard evidence on the alleged better offer yet concluded the settlement met the *TMT*

11

*Trailer Ferry* factors as articulated by the Second Circuit; court expressly discussed *Martin* as being correctly decided.).[12]

29.     In another case specifically dealing with a settlement that was incorporated in a plan, the court determined that, prior to confirmation, the debtor could incorporate a better settlement into the plan. *In re Sparks*, 190 B.R. 842 (Bankr. N.D. Ill. 1996). In *Sparks*, prepetition, claimants (the LeComptes) rented a home from the debtor with an option to buy. After the debtor filed for chapter 11, it became apparent the property would have to be sold to finance the reorganization. The parties entered into a settlement agreement regarding claimants' purchase of the property and the agreement was incorporated into the plan. Prior to confirmation of the plan, the debtor received a better offer for the property and filed a modified plan that deleted reference to the original agreement.

30.     A motion by the LeComptes to enforce the agreement was denied. In denying this motion, the court ruled that while Bankruptcy Rule 9019 was also relevant to the issue, the agreement was not enforceable under 11 U.S.C. §§ 363, 1129, and 1141, because both an agreement for the sale of estate assets and plan approval were permitted only after notice and hearing, and the debtor could be bound only by a confirmed plan. *Id.* at 844. The court acknowledged the conflict and confusion that arises in such a scenario, but that the debtor had a fiduciary duty to the estate and creditors collectively to report any better offers regarding the purchase of assets. In *Sparks*, the court recognized that:

---

[12]    Hartford spills a lot of ink on how the Court would be able to cram down the Toggle Plan on the abuse survivors represented by the TCC, Coalition, and FCR. However, Hartford never addresses the standards for approval of a settlement, which must be met regardless of whether settlement approval is sought pursuant to a confirmation order or a stand-alone motion based on Bankruptcy Rule 9019. *See Protective Committee for Ind. Stockholders of TMT Trailer Ferry v. Anderson,* 390 U.S. 414 (1968). The Third Circuit articulates the standards for approval of a settlement as established by the Supreme Court in *TMT Trailer Ferry* as (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors.

The debtor-in-possession operates as a fiduciary; any actions taken by the debtor are to be in the best interests of the creditor body as a whole. For that reason the debtor is frequently, except when acting in the ordinary course of business, prohibited from acting unilaterally; instead its actions are subject to complete disclosure and review by the creditors of the estate and the bankruptcy court.

*The LeComptes suggest that the Court proceed with a hearing on approval of the settlement agreement under established case law standards. But this would pit the debtor in a conflict between his fiduciary duty to the estate and a duty to go forward with the agreement. For example, if the debtor receives a better offer to purchase the assets before the agreement is effective (i.e. approved), he has a duty to report that offer to the court and to the creditors. He would then be put in a position of either "breaching" the initial agreement or supporting the initial agreement when a better offer has been made, thereby breaching his duty to the estate.*

At the same time requiring a debtor to seek approval of an agreement it no longer supports would create confusion about the applicable legal standard. Under normal circumstances the court would defer to the debtor's judgment so long as he articulated a legitimate business justification. *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1990). But when an agreement is before the court and the debtor advises the court that he no longer supports the agreement because he has received a better offer, should the court give deference to the debtor's initial decision to enter into the agreement or its later decision to back out of the agreement? What standard should the court apply in deciding whether to approve the agreement? The very statement of these questions illustrates the difficulty with the LeComptes' position: It creates confusion and conflicts that disappear if the agreement is not enforceable until it has been approved.

*Id.* at 844-845. Thus, the plan could be modified to include the better offer and the debtor was not required to go through the confirmation process with the prior plan. This is the exact situation the Court is being faced with in connection with the Motion.

31.    In addition, Hartford cites to a First Circuit Bankruptcy Appellate Panel case, *PRLP 2011 Holdings, LLC v. Manuel Mediavilla, Inc. (In re Manuel Mediavilla, Inc.)*, 568 B.R. 551, (B.A.P. 1st Cir. 2017), arguing that a court cannot confirm a plan different from the one containing the original settlement. Hartford's reliance on this case is misplaced. *Mediavilla* involved a complex fact pattern. *Id.* at 554-566. The existence of the settlement at issue was contested and

13

was entered into the day before the court had ruled on the substantive issues involved in the settlement. *Id.* at 561-64.

32.     After the court ruled, the debtors amended their plan to conform to the ruling of the court and did not take into account the alleged settlement which they denied entering into. *Id.* at 564-65.  The non-debtor party to the settlement, PRLP, filed a motion to enforce the settlement and objected to the plan. *Id.*  At a pre-confirmation status conference, the court denied PRLP's motion and determined that there had never been a settlement. *Id.* at 565.  Subsequently, the court confirmed the revised plan relying on its earlier finding that no settlement ever existed. *Id.* at 566.

33.     While the Appellate Panel did determine that the court erred in confirming the plan, it did so because of the failure of the bankruptcy court to hold a hearing on the existence of the settlement agreement in the first place and then using that summary ruling as a basis for ignoring the settlement as part of its consideration of the plan. *Id.* at 554.  The error was the summary determination that the settlement did not exist and never reaching the issue of whether the settlement could be approved.  As the Appellate Panel stated: "As fiduciaries, the Debtors should have complied with the Settlement Agreement, at least until a time when, after notice and opportunity for hearing, the court declined to approve the agreement.  That did not happen here." *Id.* at 574.  Nowhere does the Appellate Panel ever address whether the settlement could have met the *TMT Trailer Ferry* test had it been presented to the court.

34.     In this case, the Debtors are not ignoring the Hartford Settlement and do not take the position it does not exist.  In fact, to date, the Debtors have complied with the Hartford Settlement and have incorporated it in their Plan. *See, e.g.*, Plan § V.S.4. at 64.  However, as evidenced by the Motion, circumstances have changed which demonstrate to the Court why including the Hartford Settlement in any plan is no longer commensurate with the Debtors'

14

fiduciary obligations.[13] Through the Motion, the Debtors have entered into a resolution with the survivor groups that will result in a plan enjoying broad creditor support and have been advised that if, instead, the Debtors pursue the Hartford Settlement, that resolution will be extinguished and the survivor groups will oppose the settlement and vote down any plan in which it is incorporated.

35.     This is the process contemplated by *Martin* and other case law.  Additionally, in many of the cases cited by Hartford where the court required the parties to comply with a settlement, the party seeking to avoid compliance was the non-debtor counterparty. *See Musselman v. Stanonik (In re Seminole Walls & Ceilings Corp.)*, 388 B.R. 386, 392 (M.D. Fla 3008) (litigation counterparty cannot withdraw from settlement with trustee); *In re Frye*, 216 B.R. 166, 173-74 (Bankr. E.D. Va. 1997) (litigation counterparty cannot withdraw from settlement with the trustee); *In re United Shipping Co.*, 1989 WL 12723, at *5 (Bankr. D. Minn. Feb. 17, 1989) (litigation counterparty cannot withdraw from settlement with trustee); *White v. C.B. Hannay Co. (In re Lyons Transp. Lines)*, 163 B.R. 474 (Bankr. W.D. Penn. 1994) (litigation counterparty cannot withdraw from settlement with trustee because of a change in the law that strengthens its case); *Pineo v. Turner (In re Turner)*, 274 B.R. 675 (Bankr. W.D. Penn. 2002) (after trustee filed motion for approval of settlement with personal injury defendant trial court entered summary judgment for defendant; court analyzed the *Martin* factors as to the alleged changed circumstances and determined they did not prevent approval of the settlement because the settlement was clearly in the best interests of the estate and was supported by the creditors as well as the debtor.)

---

13

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

36.    ***Thus, the determining factor is the ability of the court to find that a settlement is in the best interests of creditors***. This line of cases supports the Debtors' argument that they should not be required to seek approval of the Hartford Settlement where the change in circumstances is such that the ability of the Court to make the requisite findings for settlement approval are impaired.  The trustee or debtor in possession's fiduciary duty to maximize value trumps any contractual obligations in an agreement that is ultimately not enforceable without court approval. *Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*, 922 F.3d 323, 327-28 (5th Cir. 2019) (in the context of a 363 sale); *see also Goodwin v. Mickey Thompson Entertainment Group, Inc. (In re Mickey Thompson Entertainment Group, Inc.)*, 292 B.R. 514 (9th Cir. BAP 2003) (trustee sought approval of settlement with certain fraudulent transfer defendants and continued to prosecute settlement approval motion over the objection of creditors and an offer of a third party to purchase the fraudulent transfer claims in an amount in excess of the settlement; court denied approval of the settlement finding the trustee failed to meet his burden of proof that the settlement was in the best interests of the estate and its creditors and his obligation to maximize value for the estate trumped any contractual obligations under the settlement agreement.)

37.    The Debtors have complied with applicable Third Circuit authority by informing the Court that (a) they no longer support the Hartford Settlement, (b) they will be unable to confirm a plan containing the Hartford Settlement, (c) they cannot meet their burden of proof that the Hartford Settlement is in the best interest of the estate or its creditors, and (d) even if the Toggle Plan could be confirmed through cram down, pursuing the approval of a plan based on the RSA is a better option for the Debtors, all their creditors and other parties in interest (such as the local councils) than a BSA-only plan. ████████████████████████████████
████



Therefore, to the extent any obligations exist under the Hartford Settlement, the Supporting Parties join in the Debtors' request to be absolved from such obligations.

(iv)    **Hartford Concedes that the Hartford**
        **Settlement Agreement Is Not Yet Effective**

38.

39.

---

[14]   Although the parties have requested expedited preparation of the transcript of Mr. Kinney's deposition, as of the time this Brief is being prepared, only the rough transcript has been provided by the transcription service.

40.    Accordingly, Hartford cannot now argue that it believes that the Hartford Settlement is currently effective or is binding upon the parties.

### (v)    An Adversary Proceeding Is Not Required

41.    Hartford's contention that the relief being requested by the RSA Motion must be pursued through an adversary proceeding is misplaced.  Through the Motion, the Debtors are seeking authorization to enter into an agreement with the Supporting Parties for the purpose of formulating a plan that will be supported by the Supporting Parties.  As part of that agreement, the Debtors are seeking authorization to exclude the Hartford Settlement from the plan described in the RSA—they are not seeking a declaratory judgment or a determination from the Court on the validity, priority or extent of any interest in property.[15] *See* Fed. R. Bankr. P. 7001(2) and (9).

42.    None of the cases cited by Hartford on point.[16] Those cases do not involve a request by a debtor for authorization to enter into an agreement (*i.e.*, the RSA) with the key creditor constituencies for the purpose of formulating a plan that will be presented to the Court for its consideration, subject to any other party in interest's right to support or object to that plan at the proper time.

---

[15]

[16]    *See EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 356 B.R. 631, 639 (Bankr. D. Del. 2006); *Corp. Claims Mgmt. v. Shaiper (In re Patriot Nat'l Inc.)*, 592 B.R. 560, 572 (Bankr. D. Del. 2018); *U.S. Bank Tr. Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 102-103 (2d Cir. 2013).  These cases all stand for the unremarkable and irrelevant proposition that pre-petition contracts of a debtor are property of the estate under section 541.

43.     Hartford cites two non-Third Circuit bankruptcy court opinions in support of its

conclusion that a request for guidance on a futile settlement must be in the form of an adversary

proceeding: *Church Joint Venture, L.P. v. Blasingame (In re Blasingame)*, 2016 Bankr. LEXIS

3590, at *1 (Bankr. W.D. Tenn. Sep. 23, 2016), and *Savage & Assocs., P.C. v. Mandl (In re*

*Teligent, Inc.),* 459 B.R. 190 (Bankr. S.D.N.Y. 2011). Neither case supports that conclusion.

44.     The *Blasingame* case arose in an adversary proceeding in which the plaintiff sought

a determination that certain personal property in the debtors' possession as of the petition date was

property of the estate, an accounting of such property and judgment for the value of such property

no longer in the possession or control of the debtors. The decision itself is an order denying

defendants' joint motion for (a) entry of an order enforcing an asset purchase agreement ("**APA**")

and settlement agreement against the chapter 7 trustee and plaintiff, (b) entry of an order directing

the trustee and plaintiff to file a motion to approve the APA and settlement agreement, and (c) an

order revoking the plaintiff's derivative standing to pursue the proceeding. As noted by the court,

the principal determination to be made in the motion was "whether an enforceable agreement was

reached by and among the parties." *Blasingame*, 2016 Bankr. LEXIS 3590 at *6. While the court

did indicate that, in general "requests for declaratory relief with respect to the recovery of money

or property are adversary proceedings," it distinguished the relief requested in the motion it was

being asked to decide:

> The relief requested in the Joint Motion is, however, a request for
> declaratory relief concerning a purported agreement to settle a civil
> proceeding concerning the recovery of money or property. This court has
> concluded that even if there is bankruptcy jurisdiction over this adversary
> proceeding, ancillary jurisdiction would not extend to the Defendants'
> request for declaration and enforcement of the purported settlement
> agreement. Likewise, even if there is bankruptcy jurisdiction over this
> adversary proceeding, there is no ancillary jurisdiction to permit this
> bankruptcy court to order the Trustee to take action with respect to the
> purported settlement. Any request of that type should have been brought,

> if at all, in the main bankruptcy case because it concerns the administration
> of the bankruptcy estate rather than the particular dispute that is the subject
> of this adversary proceeding.

*Id.* at 13-14.

45.     In ultimately dismissing the motion for lack of subject matter jurisdiction, the court indicated that the type of relief sought should have been brought in the main case, ***not*** in the adversary proceeding.  Here, the Debtors do not question the existence or substance of the Hartford Settlement.  Rather, they contend that, in the exercise of their business judgment, they no longer wish to seek approval of the Hartford Settlement because they will not be able to meet the statutory and factual requirements for obtaining Court approval.

46.     *In re Teligent, Inc.* is equally inapt.  In *Teligent*, a law firm was involved in a state court malpractice action that was being pursued by the debtor corporation's former CEO pursuant to a settlement agreement reached between the former CEO and the creditors' committee representative in an adversary proceeding against the CEO.  The law firm was seeking certain discovery relating to the settlement agreement that arguably included certain privileged documents.  In addition to seeking this discovery in the state court action, the law firm filed a similar motion in the bankruptcy court.

47.     The committee's representative responded by seeking declaratory and injunctive relief against the law firm asking the bankruptcy court to find that the law firm was bound by the terms of the earlier adversary proceeding settlement to which the law firm was not a party and enjoining the law firm from seeking certain documents.  In that context, the court ruled that declaratory and injunctive relief had to be sought pursuant to an adversary proceeding.  Nothing in the *Teligent* case is comparable to the request of the Debtors here for authorization to enter into the RSA, which does not contemplate the inclusion of the Hartford Settlement.

**B.**    **The Insurers Present a False Narrative as to the Nature and Purpose of So-called Insurance "Neutrality"**

48.    The insurers assert that that the Findings and Orders render the plan unconfirmable because the "doctrine" of insurance neutrality prohibits a plan from impacting an insurer in any way—in other words, the insurers assert that they alone are legally entitled to pretend the bankruptcy never happened.  While these arguments already have been addressed in the Joint Brief and, in any event, are more appropriately raised at confirmation, the Supporting Parties will respond to some of the insurers' points below solely to correct certain gross, mischaracterizations of the facts and the law.

**(i)**    **A Plan Need Not Be "Neutral" to Be Confirmable**

49.    There is no "doctrine" of insurance neutrality insulating insurers from the impact of a debtor's bankruptcy.  Insurers are bound to a plan and confirmation order, just like any other party-in-interest.  To the extent the insurers believe the plan or confirmation order impermissibly impair their rights under their policies, they are entitled to object to confirmation of that plan (and to the extent they are creditors, vote against it), just like any other party-in-interest.  But they are not exempt from otherwise applicable principles of *res judicata* and collateral estoppel, or the generally binding nature of confirmation orders.  *See* Joint Brief at ¶¶ 26, 35 (citing *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018); *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991)).

50.    The cases the insurers cite do not hold otherwise.  In *Combustion Engineering* and its progeny, the plan proponents made a tactical decision, based on the specific circumstances of those cases, to include insurance "neutrality" language to eliminate insurer standing to object to the plan.  The relevant question in all such cases was whether the neutrality provisions were

sufficiently unambiguous to achieve that purpose. *See, e.g.*, *In re Combustion Engineering*, 391 F.3d 190, 218 (3d Cir. 2004) (concluding that the insurers have no standing because the plan "does not impair their rights or increase their burdens under the subject insurance policies"); *In re Global Industrial Technologies, Inc.*, 645 F.3d 201, 212-215 (3d Cir. 2011) (holding that plan was not "insurance neutral" and remanding to provide insurers "an opportunity to challenge the Plan in the Bankruptcy Court"); *In re Thorpe Insulation Co.*, 677 F.3d 869, 887 (9th Cir. 2012) ("The plan is therefore not insurance neutral, which provides the non-settling insurers with party in interest standing under § 1109(b)."); *In re Venegas*, 623 B.R. 555, 560 (B.A.P. 9th Cir. 2020) ("In both *Thorpe* and *GIT*, the insurers had standing to object to confirmation of chapter 11 plans because the proposed plans directly affected their liability and contractual rights and therefore, were not 'insurance neutral.'"). *None* of the cases held that a plan *must* be "neutral" to be confirmable. Given that no one is attempting to eliminate insurers' standing rights here, these cases are irrelevant.

### (ii)    An Adjudication as to the Reasonableness of the TDP Does Not Implicate the Insurers' Rights or Defenses

51.    The insurers argue that any findings as to the reasonableness of the Debtors' settlement of the Abuse Claims would violate the insurers' right to control the defense and settlement of claims and eliminate their ability to litigate coverage defenses post-confirmation. This is inaccurate for several reasons.

52.    *First*, there is no policy provision barring adjudication of claims or associated findings necessary for an insured debtor's successful reorganization. To the contrary, such findings are contemplated by and consistent with the insurance contracts' acknowledgment that the bankruptcy of the insured (and accordingly, the insured's participation in all the requisite processes and remedies available to a debtor in bankruptcy) will not release the insurer from its

22

obligations under the policy. *See, e.g.*, Hartford Insurance Group, Policy No. 10CA43359E (1/1/1977 – 1/1/1978) ("Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder.").

53.    *Second*, the Findings and Orders, as currently proposed in the RSA, do not require a coverage law determination as to whether insurers are obligated to pay the reasonable settlements of their insureds, or even which policies are obligated to pay on account of such settlements.  They simply address whether the resolutions reached by the Debtor in this bankruptcy case are appropriate, in good-faith, and reasonable.  The insurers are free to raise any state law-based coverage defenses to coverage of those resolutions post-confirmation.

54.    However, defenses that exist solely by virtue of the Debtors' bankruptcy—*i.e.*, those involving the Debtors' conduct in negotiating a settlement with the Abuse Claimants or the reasonableness of the TDP—are appropriately litigated once, in this Court. *See In re Fed.-Mogul Glob., Inc.*, 684 F.3d 355, 380 n.38 (3d Cir. 2012) (distinguishing between plan's preservation of "fact-specific coverage defenses" that could have been raised "in any asbestos proceeding prior to bankruptcy," and non-preserved defenses that "would exist only after and by virtue of the bankruptcy reorganization, and could be invoked by an insurer against any claim by the Trust, no matter how meritorious," or that "rested on the legitimacy of the TDPs as a method of adjudication").  The Debtors and their creditors are entitled to know before the Plan is confirmed if the very structure of their Plan will destroy billions of dollars of assets (as the insurers assert).

55.    To be clear, it is the insurers' arguments regarding the confirmability of the Plan, and not the Findings and Orders that rely upon state-law coverage determinations.  Under the guise of seeking "neutrality," the insurers insist that the Plan inappropriately denies them the opportunity

to control the defense and settlement of claims in this context. But the extent to which the insurers would have such rights in the first place is, itself, a coverage issue.

56.    Pursuant to state court coverage law, such rights typically exist only where the insurer unequivocally accepts its obligation to pay the resulting settlements (which has not occurred here), and not where, for example, an insurer has denied coverage or asserted reservations-of-rights that create conflicts of interests with the policyholder, or where such an arms-length settlement simply is reasonable and not prejudicial.[17] In order to rule that the Plan violates the policies' consent-to-settle provisions, the Court necessarily would have to accept the insurers' view as to the proper interpretation of these policy provisions in these circumstances—a coverage determination. Thus, the insurers' real argument, at its core, is that this Court may not make binding coverage decisions *unless those decisions favor the insurers*. Nothing in the Bankruptcy Code or the case law permits such a result.

### (iii)    If the Plan Did Modify the Insurers' Contractual Rights, Such Modification Is Permissible Under the Bankruptcy Code

57.    An essential component of mass-tort bankruptcies is the debtor's ability to administer and resolve its liabilities through an administrative framework post-confirmation. If the insurers' policies somehow could be read to prohibit the use of such a framework, the Bankruptcy Code preempts such an interpretation.

---

[17]    *See, e.g., Re: Brightview Enter. Solutions LLC v. Farm Family Cas. Ins. Co.*, No. 20-7195, 2020 WL 6074474, at *2 (D.N.J. Oct. 15, 2020) ("Where the insurer acts in bad faith in not settling, 'an insured is permitted to settle the tort claims . . . and then recover from the insured the amount paid in settlement . . . up to the policy limits, provided that such sums were reasonable and were paid in good faith.'") (quoting *Fireman's Fund Ins. Co. v. Sec. Ins. Co. of Hartford*, 367 A.2d 864, 871 (N.J. 1976)); 1 INSURANCE CLAIMS AND DISPUTES § 3:9 (6th ed. 2021) ("If . . . the insured settles a case for a sum that the insurance company would have been obligated to pay in settlement, the company is not prejudiced by the unauthorized settlement."); *see also* 14A COUCH ON INSURANCE § 203.41 (3d ed. 2021) ("When an insurer wrongfully refuses to settle a claim or refuses to defend the insured altogether, the insured, without the insurer's consent, is free to negotiate a settlement with the claimant. . . . The insurer may be liable for the entire settlement amount, including amounts in excess of policy limits, based upon its wrongful refusal to settle.")

58.    Section 1123(a)(5) of the Code states expressly that a plan can preempt otherwise applicable policy provisions that would inhibit a debtor's ability to reorganize. *See* 11 U.S.C. § 1123(a)(5) (providing adequate means for a plan's implementation "notwithstanding any otherwise applicable nonbankruptcy law").

59.    Since the establishment of the post-bankruptcy trust framework in *Manville* over three decades ago, courts routinely have declined to enforce policy provisions that would impede successful implementation of the plan, including the anti-assignment and consent-to-settle provisions cited by the insurers in their objections, as well as provisions requiring payment of SIRs or deductibles. *See, e.g., In re Babcock & Wilcox Co.*, 2004 WL 4945985, at *16-17 (Bankr. E.D. La. Nov. 9, 2004), *vacated on other grounds*, 2005 WL 4982364 (E.D. La. Dec. 28, 2005) (stating that "the weight of authority is in accord that § 1123(a)(5) preempts contrary state law or contract provisions if such provisions are necessary to the implementation of a plan," and concluding that § 1123(a)(5) preempted "nonbankruptcy law to the contrary, such as the anti-assignment clause and other contractual provisions including management of claims, cooperation and consent to settlement provisions"); *In re Fed.-Mogul Glob., Inc.*, 684 F.3d 355, 369 (3d Cir. 2012) (holding that "[t]he plain language of § 1123 evinces Congress's clear intent to preempt state law" with respect to transfer of the debtor's insurance rights in bankruptcy and noting, consistent with state law, that "to the extent that the events giving rise to liability have already occurred, there will be no additional risk to the insurance companies by virtue of the assignments"); *In re W.R. Grace & Co.*, 475 B.R. 34, 199 n.189 (D. Del. 2012) (noting that "every other court that has considered this and largely similar issues have also found that anti-assignment provisions in insurance policy contracts are preempted by § 1123(a)(5)(B) of the Bankruptcy Code" and collecting cases); *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D. Del. 2006) (under *Combustion Engineering*,

section 1123(a)(5) preempts anti-assignment clauses in insurance policies); *In re Vanderveer Ests. Holding, LLC*, 328 B.R. 18, 25 (Bankr. E.D.N.Y. 2005), *aff'd sub nom. Am. Safety Indem. Co. v. Off. Comm. of Unsecured Creditors*, No. 05 CV 5877 ARR, 2006 WL 2850612 (E.D.N.Y. Oct. 3, 2006) ("[E]ven where the debtor has continuing obligations, such as the payment of a self-insured retention, a deductible, or a premium . . . [f]ailure of the debtor to perform these continuing obligations does not excuse the insurer from performance under the contract, but gives rise to an unsecured claim by the insurer for any damages incurred by reason of the debtor's breach of the policy."); *Albany Ins. Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 255-56 (5th Cir. 1988) (concluding that the insurer was liable for claims above the deductible when the insured could not pay the deductible due to insolvency); *Home Ins. Co. of Ill. v. Hooper*, 691 N.E.2d 65, 70 (Ill. App. Ct. 1998) (holding that an insurer's reliance on an insolvent insured's self-insured retention limit to avoid payment was "directly contrary to the public policy as declared by the legislative enactment of" Illinois' bankruptcy law), *cert. denied*, 699 N.E.2d 1031 (1998). Thus, over thirty years of precedent contradicts the insurers' assertion that a plan cannot modify their rights to implement an administrative claims-resolution process in a mass-tort bankruptcy case.

60.     The insurers raise three arguments as to why section 1123(a)(5)'s preemptive effect would not apply here. Each is unavailing.    *First*, the insurers argue that section 1123(a)(5) cannot preempt anti-assignment provisions in cases outside the section 524(g) context. That is inaccurate. The U.S. Bankruptcy Court for the District of Delaware itself has authorized the transfer of insurance rights pursuant to section 1123(a)(5)(D) in a case outside the 524(g) context, and recently granted a motion to enforce the plan's transfer provisions against the debtors' insurer. *See, e.g.*, Order Confirming Fifth Amended Plan of TK Holdings, Inc. and its Affiliated Debtors, *In re TK Holdings, Inc.*, No. 17–11375 (BLS), 2018 WL 1306271, at *21 (Bankr. D. Del. Mar. 13,

2018) (approving, pursuant to section 1123(a)(5)(D), the transfer of insurance rights to a post-bankruptcy trust in non-524(g) context); Order Granting in Part and Denying in Part Motion to Enforce the Order Confirming Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization and the Confirmed Plan, *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Sept. 17, 2020).

61.    ***Second***, the insurers assert that section 1123(a)(5) cannot preempt anti-assignment provisions in cases involving non-profit debtors, arguing that section 1129(a)(16) precludes preemption of *any* state law with respect to non-profits. Again, that is inaccurate. *See, e.g.*, Order Confirming First Amended Joint Plan of Reorganization at 11, ¶ 31, *In re National Benevolent Ass'n of the Christian Church (Disciples of Christ)*, No. 04-50948 (Bankr. W.D. Tex. Mar. 2, 2005) (noting, pursuant to section 1123(a), that the non-profit organization's plan "shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law"). Section 1129(a)(16) is used to enforce state law specifically regarding not-for profit organizations. It does not nullify section 1123(a)(5). *See, e.g.*, *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202 (Bankr. W.D. Tex. 2008), *aff'd sub nom. Save Our Springs Alliance, Inc. v. WSI (II)-COS, L.L.C.*, 632 F.3d 168 (5th Cir. 2011) (concluding that restricted funds could not be used to pay other creditors because state law permits donors to restrict donations to particular uses); *In re Machne Menachem Inc.*, 371 B.R. 63, 67-68 (Bankr. M.D. Pa. 2006) (assessing whether the plan's proposed transfer of the not-for-profit corporation's real property and sale of substantially all its assets violated applicable New York Not-for Profit Law).

62.    ***Third***, the insurers' argument that a plan cannot transfer non-debtor policy rights is similarly unsupported. The plain text of section 1123(a)(5) does not limit its preemptive scope only to debtor contracts. *See* 11 U.S.C. § 1123(a)(5) (providing adequate means for a plan's

27

implementation "notwithstanding *any otherwise applicable nonbankruptcy law*") (emphasis added). In any event, such arguments are not relevant to the approval of a restructuring support agreement and are more appropriately raised at confirmation.

      **(iv)    An Increase in Claims Post-Petition**
                  **Does Not Render a Plan Unconfirmable**

63.      In the same breath that the insurers argue a plan must be "neutral" to be confirmable, the insurers cite *In re Global Industrial Technologies*, 645 F.3d 201 (3d Cir. 2011) ("*GIT*"), and assert that the Debtors could never propose an insurance neutral plan, because no plan can be neutral when a debtor facing mass-tort liability experiences a substantial increase in claims post-petition.[18]

64.      Such a conclusion is non-sensical. To the extent insurance neutrality is "required" for confirmation (as the insurers assert), a debtor facing increased claims post-petition could never successfully reorganize. If anything, *GIT* demonstrates that insurance neutrality cannot be a requirement of a confirmable plan.

**C.     Arguments as to the Proper Scope of the Insurance Entity Injunction Are Premature and, in Any Event, the Injunction is Supported by Applicable Law**

65.      The Catholic Committee and UMAHC object to the RSA on the basis that the Insurance Entity Injunction impermissibly cuts off any additional insured rights of the Chartered Organizations under the Abuse Insurance Policies. Such an argument is appropriately raised at confirmation, and not in connection with the approval of a restructuring support agreement. In any event, the Injunction is legally supportable. Any rights of the Chartered Organizations under the policies with respect to Abuse Claims would, by definition, apply only to those liabilities

---

[18]    The Supporting Parties do not concede that any Debtor facing a substantial increase in claims post-petition could not craft a plan that was sufficiently "insurance neutral" that insurers would not have standing to object, as several other factors led the *GIT* court to conclude that neutrality did not exist in that case.

arising from their conduct in connection with the Debtors.  Those rights therefore are derivative of those of the Debtors, and thus are property of the estate that may appropriately be subject to the injunction.  *See, e.g., MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988).  Moreover, while the Supporting Parties believe that the structure in the Amended Plan is confirmable, the Debtors and the Support Parties have committed in the RSA to continue to work with these parties to resolve their concerns.  If the RSA is approved, it will permit and encourage the parties to turn their attention to such negotiations.

**D.**    **Remaining Objections to the Motion Are Without Merit**

66.    Several objecting parties—the Zalkin Firm, LDS, and the Catholic and Methodist Committees, raising additional objections to the Motion that are without merit.

67.    *First*, the Zalkin Firm argues that this Court lacks subject matter jurisdiction over Abuse Claims asserted against the Local Councils and the Chartered Organizations and, as a result, the Court cannot confirm a plan that includes the Channeling Injunction.  Zalkin Objection at 11-24.  But "[i]n the Third Circuit, nonconsensual third party releases are permissible in plans of reorganization if they meet the *Continental* standard of fairness" and the *Master Mortgage* factors.  *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017) (following *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000) and *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 938 (Bankr. W.D. Mo. 1994)).

68.    An identity of interest between the Debtors and the Local Councils (and any Chartered Organizations that elect to make a substantial contribution) exists here because they are co-defendants and are co-liable for Scouting-related Abuse Claims.  This issue was briefed by the Debtors in connection with the Debtors' request for a preliminary injunction (*see* Adv. Pro. No. 20-50527, Dkt. No. 7 at 22-27), which this Court granted.

69.      The factual issues that will be before the Court at confirmation include whether the Local Councils (and any Contributing Chartered Organizations) have made a substantial contribution, whether the Channeling Injunction is essential to the reorganization, whether the survivors voted overwhelmingly in support of the Amended Plan, and whether the Debtors can show that the insurance assets fill the gap between the value of the Abuse Claims being channeled to the Settlement Trust and the non-insurance contribution of approximately $850 million.

70.      If the Debtors cannot show that the Insurance Assignment can be accomplished, or if the Amended Plan leaves open the potential for a *Fuller-Austin* result, the *Master Mortgage* factors will not be satisfied. The point of the Findings and Orders in the RSA is to address many of the issues raised in the Zalkin Objection and ensure that no *Fuller-Austin* result follows from the confirmation of a plan that includes the Channeling Injunction.

71.      ***Second***, LDS argues that the turnover provisions in the RSA present a "potentially insurmountable problem for the Church and other spiritual organizations that may engage in a settlement under the Plan." LDS Objection at 3. But the Trustee cannot administer the Settlement Trust without the tortfeasors' records. Experience has shown that unless a clear line is drawn and parties are required to turn over their records by a date certain, the information will either never be produced or will be produced years after the effective date. This would result in a substantial delay in payments to survivors. The goal here is to make payments to survivors as soon as practicably possible following the effective date.

72.      No party should expect to become the beneficiary of the Channeling Injunction and, at the same time, be permitted to withhold information from the Settlement Trust necessary to evaluate and pay Abuse Claims. Information that entities like LDS designate as "privileged" is almost always the most critical to evaluating claims. If LDS does not want to cooperate with the

Settlement Trust in this manner, then LDS does not have to become a Protected Party. The point of this provision is not to harass LDS, but to ensure that survivors are timely compensated.

73.    *Third*, the Catholic and Methodist Committees take issue with the treatment of Indirect Abuse Claims under the TDP. Catholic/Methodist Objection at ¶ 30. But the Catholic and Methodist Committees fail to mention the case law cited and discussed by the Supporting Parties on this issue in the Joint Brief.

74.    Sections 509 and 502(e) apply to claims of "an entity that is liable with the debtor on" the claim of a creditor. 11 U.S.C. §§ 502(e)(1), 509(a), 509(c). And the meaning of "liable with" includes joint tortfeasors. *See* Joint Brief at ¶ 51 (collecting authorities).

75.    Joint tortfeasors' contingent claims for reimbursement or contribution must be disallowed under section 502(e)(1) of the Bankruptcy Code. Such claims, when non-contingent and liquidated, must be subordinated under section 509(c) of the Bankruptcy Code until the tort victims who have claims against both tortfeasors are paid in full.

76.    Here, the Catholic Church and the Methodists are joint tortfeasors. Thousands of survivors filed proofs of claim against the Debtors alleging church-related abuse in Scouting that specially identify the Catholic Church and the Methodists. Sections 502(e) and 509(c) prevent the Catholic Church and the Methodists from getting paid ahead of their own abuse victims from the Debtors' bankruptcy estates.

77.    The TDP simply re-states what is black-letter law on this issue and is nearly identical to similar provision in the trust distribution procedures proposed in *In re Imerys Talc America, Inc.*, No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) (Dkt. No. 2855). Furthermore, the Supporting Parties will not accept a plan that permits the Catholic Church or the Methodists to take limited trust funds from the very survivors who were abused under their care. This is a critical

deal point for the Supporting Parties and an issue that should be litigated—like nearly *every* issue

raised in the objections to the Motion—in connection with plan confirmation

## CONCLUSION

**WHEREFORE**, the Supporting Parties respectfully request that the Court enter an order

granting the Motion and granting the Supporting Parties such other and further relief as the Court

deems just and proper.

Dated: July 26, 2021             MONZACK MERSKY AND BROWDER, P.A.
Wilmington, Delaware


                                 */s/ Rachel B. Mersky*
                                 (DE No. 2049)
                                 1201 North Orange Street
                                 Suite 400
                                 Wilmington, Delaware 19801
                                 Telephone:    (302) 656-8162
                                 Facsimile:    (302) 656-2769
                                 E-mail:       RMersky@Monlaw.com


                                     -and-

                                 BROWN RUDNICK LLP
                                 David J. Molton, Esq. (admitted *pro hac vice*)
                                 Eric R. Goodman, Esq. (admitted *pro hac vice*)
                                 Seven Times Square
                                 New York, NY 10036
                                 Telephone: (212) 209-4800
                                 E-mail: DMolton@BrownRudnick.com
                                 E-mail: EGoodman@BrownRudnick.com

                                 and

                                 Sunni P. Beville, Esq. (admitted *pro hac vice*)
                                 Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
                                 One Financial Center
                                 Boston, MA 02111
                                 Telephone: (617) 856-8200
                                 E-mail: SBeville@BrownRudnick.com
                                 E-mail: TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*

James I. Stang (admitted *pro hac vice*)
Robert B. Orgel (admitted *pro hac vice*)
Iain A.W. Nasatir (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (admitted *pro hac vice*)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email: jstang@pszjlaw.com
       rorgel@pszjlaw.com
       inasatir@pszjlaw.com
       joneill@pszjlaw.com
       jlucas@pszjlaw.com

-and-

PASICH LLP

Kirk Pasich
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone:  (424) 313-7850
KPasich@PasichLLP.com

-and-

Jeffrey L. Schulman
757 Third Avenue, 20th Floor
New York, New York 10017
Telephone:  (212) 686-5000
JSchulman@PasichLLP.com

*Counsel for the Tort Claimants' Committee*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

33

*/s/ Edwin J. Harron*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Sharon M. Zieg (No. 4196)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:        rbrady@ycst.com
        eharron@ycst.com
        szieg@ycst.com

*Counsel to the Future Claimants' Representative*

# TRANSCRIPT EXHIBITS

# FILED UNDER SEAL