# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>Ref. D.I. 5466 |

### DECLARATION OF DEVANG DESAI IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF

I, Devang Desai, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare as follows:

1. I submit this declaration (this "Declaration") in further support of the *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5466] (the "Motion") and in support of the Debtors' omnibus reply (the "Omnibus Reply") filed concurrently herewith.[2]

2. I am a volunteer member of the National Executive Board (the "NEB") and the National Executive Committee (the "NEC") of Boy Scouts of America (the "BSA"). I have served as a member of the NEB and the NEC since May 2018 and May 2020, respectively. I currently serve as chair of the NEB's Audit and Risk Management Committee, a role that I assumed in May

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the Omnibus Reply, as applicable.

2020.  I also serve as a member of the NEC's Bankruptcy Task Force (the "BTF") and have served in such capacity since the inception of the BTF in July 2020.  Each of the NEB, the NEC, and the BTF is described below.

3. Prior to becoming a volunteer member of the NEB, I was and currently remain a shareholder of the law firm of Gaebe, Mullen, Antonelli & DiMatteo based in Miami, Florida.

4. I have been involved with the BSA since my youth and am an Eagle Scout and recipient of the Order of the Arrow's Distinguished Service Award.  From 2007 until May 2020, I served as a member of the Executive Board of the South Florida Council of the BSA.  I served in various volunteer roles for the South Florida Council, including as a member of the Executive Committee of the Board (2011-20) and as the National Eagle Scout Association Chair (2011-14), Camping Committee Chairman (2007-08), Vice President of Marketing (2014-19), and Vice President of Administration (2020).  I have never received monetary compensation for my service on behalf of the South Florida Council in any capacity.

5. Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal knowledge, materials provided by, or my discussions with members of the Debtors' executive and management team or information obtained from my review of relevant documents.  Additionally, the views asserted in this Declaration are based upon my experience and knowledge of the Debtors' nonprofit operations.  If called upon to testify, I could and would testify to each of the facts set forth herein based on my personal knowledge, discussions and review of documents.  I have never have been compensated for my volunteer service as a director of the BSA or for this testimony.

**BSA GOVERNANCE**

6. **NEB.** The NEB is the governing body of the BSA. The NEB is presently comprised of 72 total members. Under the BSA's bylaws (relevant sections attached as Exhibit A), the NEB is to regularly be comprised of 64 members, in addition to the members of the NEC (described below). With the exception of the Chief Executive Officer, all members of the NEB are unpaid volunteers. A list of the current members of the NEB is attached as Exhibit B. The members of the NEB are elected by the voting members of the "National Council." All voting members are unpaid volunteers. The voting members of the National Council, of which there are approximately 1,200, include:

- All members of the NEB;

- The volunteer president and council commissioner for each of the 251 local councils;

- One volunteer individual, elected by each Local Council, for every 5,000 youth members of such Local Council; and

- Various volunteer members at large elected by the National Council and members of the National Operations and Leadership Committee and the National Operations Council.

7. The NEB establishes committees for various purposes; however, there are certain matters that cannot be delegated to a committee and must be decided by the NEB itself. Of relevance to the Motion, the NEB cannot delegate increasing or materially changing the indebtedness of the BSA beyond previously authorized levels.[3]

---

[3] "The Executive Board shall have the following reserved powers that may not be delegated to a committee: amending these Bylaws; changing the mission or purpose of the Corporation; approving nominations to and filling vacancies on the Executive Board and its standing committees; electing officers; approving any merger or dissolution; approving the sale, mortgage, pledge, or transfer of substantially all of the assets of the Corporation; increasing or materially changing the indebtedness of the Corporation beyond any previously authorized level; or authorizing distributions from the Corporation." *See* Bylaws, Art. II, Sec. 1, Cl. 2.

3

8.  Since the beginning of BSA's chapter 11 cases, the NEB has diligently monitored whether its decisions could be potentially adverse to the Local Councils. When the chapter 11 proceeding reached a stage where the specific amount of local council contributions to a trust for abuse victims became a key issue in the settlement discussions, the NEB believed it might be required to make decisions that could be viewed as potentially adverse to the local councils, such as attempting to take enforcement action or imposing assessments against individual councils. On February 7, 2021, the NEB met to address the need to avoid any conflicts due to certain NEB directors also holding roles on local council boards of directors or otherwise in connection with local councils. At this meeting, the Board reviewed a presentation from their legal advisor regarding these topics. *See* Exhibit C. Following this meeting, as of February 2021, all NEB members were asked to either (a) resign from their local council board or the NEB (*i.e.*, not hold dual roles) or (b) recuse themselves from decisions that may impact the local councils. It is my understanding that a handful of directors who hold roles on their local council boards took sabbaticals from the NEB starting in February 2021 (and therefore no longer participated in NEB meetings) or recused themselves from NEB decisions pertaining to the restructuring. I am not aware of any instance of an NEB director that serves on a local council board voting with respect to the matters at issue in the RSA.

9.  **NEC.** Pursuant to the BSA's bylaws, subject to certain specified exceptions, the NEC, a twelve-member delegation of the NEB, has the duty and authority to manage the affairs of the BSA. The NEC is comprised of the National Chair, National Chair-elect, National Commissioner, Immediate Past National Chair, Standing Committee Chairs, Chief Executive Officer, and two members-at-large recommended by the National Chair or National Chair-elect. Pursuant to the BSA bylaws, as of May 2020, no member of the NEC was permitted to

simultaneously serve as a member of any local council executive board.[4] I am a member of the NEC. A current list of the members of the NEC is attached as Exhibit E.

10. The NEC includes, among others, the National "Key 3," who are responsible for guiding the BSA organization as a whole: the National Chair (Daniel G. Ownby), National Commissioner (Scott Sorrels), and Chief Executive Officer and President (Roger Mosby). The National Chair and National Commissioner are volunteer positions.

11. **BTF.** The BSA's bylaws authorize the National Chair to appoint ad hoc committees and task forces of the NEC to handle special assignments. The BTF grew out of a predecessor task force called the General Liability Insurance Program Task Force (the "GLIP"). In the summer of 2020, through unanimous approval of the NEC, the GLIP was reconstituted and renamed the BTF, and I was appointed to the BTF. The following members of the NEC serve as members of the BTF: Alison Schuler (Chair), Scott Sorrels, Brad Tilden, Roger Mosby, and Dan Ownby. Mr. Mosby and Mr. Ownby are ex-officio members of the BTF, based on their positions as National Chair and CEO respectively.

12. The BTF was created to assist the NEC in fulfilling its governance and fiduciary duties by: (i) working with the BSA's General Counsel and staff to monitor the progress of the bankruptcy case and provide guidance on behalf of the NEC as appropriate; (ii) assisting the NEC in being currently informed and executing its governance role with respect to the Chapter 11 bankruptcy proceedings and issues arising in connection with or as a result of that filing; and (iii) performing such other duties as may be requested by the National Chair or are necessary or appropriate in light of the business judgment rule as it applies to the NEC in connection with the bankruptcy. The first meeting of the BTF was on July 6, 2020.

---

[4] I resigned from the South Florida Council Executive Board effective June 1, 2020. See Exhibit D.

## **BUSINESS JUDGMENT**

13. As a member of the BTF, I am involved in considering matters related to the formulation of a plan of reorganization for the Debtors' chapter 11 cases, including the evaluation and recommendation to the NEB and NEC of the settlement terms that were ultimately memorialized in the RSA. In connection with my responsibilities as a member of the BTF, I, along with the other members of the BTF, carefully considered and discussed with the Debtors' legal and financial advisors, as well as the Debtors' General Counsel and Chief Financial Officer, the various restructuring options available to the Debtors including terms of proposed settlements and the related benefits and risks to the Debtors and their charitable mission. In evaluating these options, the BTF was provided with draft documents prepared by the BSA's advisors and the advisors to other parties to the RSA, regularly received advice from counsel and financial advisors, and reviewed presentation materials prepared by the BSA's management and advisors.

14. The BTF periodically provides updates to the NEC and the NEB regarding the restructuring and the status of settlement negotiations. The BTF also makes recommendations to the NEC or NEB regarding proposed actions in furtherance of the Debtors' restructuring.

15. From November 2020[5] through June 2021, the NEB, NEC, and BTF met in total 57 times. These meetings generally lasted at least 90 minutes and regularly exceeded two hours. Matters pertaining to the chapter 11 cases, including the potential global resolution of the chapter 11 cases, were discussed at all 57 meetings. Of these 57 meetings, 30 separate meetings were held by the BTF (in addition to five joint meetings of the NEC and BTF) to receive updates on the

---

[5] At various points during the Chapter 11 Cases, representatives for the survivors informed BSA's advisors that they were unwilling to negotiate the terms of a global resolution prior to the bar date established by the Bankruptcy Court. The Bankruptcy Court set November 16, 2020 as the bar date in these Chapter 11 Cases. As a result, commencing around November 2020, I understand that the parties in the chapter 11 cases began focusing their attention on negotiating a plan of reorganization.

Debtors' restructuring and the progress of the mediation and to discuss and formulate the Debtors' restructuring strategy.

16. In addition, during the same time period, the NEB and the NEC met on at least 22 separate occasions in total (in addition to five joint meetings of the NEC and BTF) to receive updates on the Debtors' restructuring and the progress of the mediation and to discuss and approve certain actions recommended by the NEC or BTF.

17. Attached hereto as Exhibit F is a table that lists each of the BTF, NEC, and NEB meetings held from November 2020 through June 2021. I attended each of these meetings, or, in the case of the three meetings was unable to attend, I reviewed the minutes of the meetings and discussed the meetings with certain other directors.

18. In addition to the meetings of the BTF, NEC, and NEB, I often communicated with BSA's executive team and my colleagues on the BTF. I estimate that I have worked on issues related to the BSA's bankruptcy for at least 40 hours a month from November 2020 through the present, and in some months significantly more than that. Based on my frequent interactions with them, I believe that Ms. Schuler and Mr. Sorrels devoted even more time to BSA bankruptcy-related matters.

19. In connection with my work on the BTF, NEC, and NEB in evaluating the bankruptcy and mediation, at all times I understood that my fiduciary obligations were to act in the interests of the BSA. During my volunteer service for the BSA, I believe that the BTF, NEC, and NEB have at all times acted in the best interest of the BSA, and have not taken any action to benefit local councils to the detriment of the BSA. I receive no financial consideration from any local councils, and I am not beholden to any Local Council or Local Councils. I understand that the BSA and the Local Councils share the mission of preparing young people to make ethical and

moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law, and that Local Councils are a critical part of delivery of that mission.

20.     The BTF's consideration of the settlement terms set forth in the RSA was an iterative process that progressed during the course of the Debtors' mediation with other parties in the chapter 11 cases.  Over the course of the mediation, the NEC, NEB, and BTF discussed and considered the various components of the proposed resolutions that were ultimately embodied in the RSA and the positions of the key stakeholders in the restructuring process.  They also provided guidance or authorization to BSA's CEO and General Counsel and its legal and financial advisors on negotiating parameters during the ongoing mediation.  During these meetings, the NEB, NEC and BTF reviewed presentations prepared by the Debtors' advisor team describing the various potential terms and provisions of the settlements that now constitute the terms of the RSA and highlighting the advantages and disadvantages of entering into such agreements.  The factors considered included the BSA's contribution to a settlement trust for abuse survivors, the parties included in the RSA, the ability to make further settlements with Chartered Organizations and Insurance Companies and any related limitations, the contributions from the BSA and Local Councils, the costs required under the RSA, the conditions applicable to the Settlement Trust and the Trust Distribution Procedures, the alternatives to entering into the RSA, and the risks of achieving a successful confirmation of a plan of reorganization.  The RSA was approved only after careful deliberation of these and other considerations.

21.     In the context of the RSA negotiations, I viewed the Plaintiffs' Representatives as the opposite side of the transaction from the BSA.  In these negotiations, I viewed the Ad Hoc Committee of Local Councils' as representing the interests of local councils and responsible for negotiating a resolution with the Plaintiffs' Representatives on behalf of the Local Councils.  I

understand that the Ad Hoc Committee of Local Councils includes lawyer representatives with extensive experience in restructuring and these lawyers took the lead role in negotiating on behalf of the Local Councils.

22. I believe that in order for the BSA to successfully emerge from bankruptcy, it is important for the Local Councils' to reach a resolution with the Plaintiffs' Representatives that would allow them to obtain the benefits of a channeling injunction. I believe that if the Local Councils failed to negotiate a resolution with the Plaintiffs' Representatives that would provide the Local Councils with a channeling injunction, it would negatively impact the ability of the BSA to effectively reorganize, as it would impact the ability of the BSA to deliver its mission, including by recruiting new members.

23. The BTF's goal and focus was to achieve a plan of reorganization that would ultimately be confirmed by the Court. The RSA itself was never the goal, but it became the viable path to a confirmable plan during the negotiations. The BTF understood that the RSA was supported by all of the major claimant constituencies, which was of critical importance, and that the plan contemplated by the RSA was supported by the Creditors' Committee and JPMorgan. The BTF also understood that the BSA would need to continue to work toward resolution with important constituencies, including the Insurance Companies and Chartering Organizations.

24. Between February and May 2021, there were numerous mediation meetings and negotiations with parties, all in an effort to achieve a global resolution. On May 26, 2021, the NEC approved recommending to the NEB that BSA settle with the claimants for an aggregate value of $250 million subject to negotiation of final terms. On May 26, 2021, the NEB engaged in robust discussions about the settlement proposal and together with their counsel, reviewed a

presentation by their financial advisor as to the different options, analyzing the advantages and disadvantages of the various terms and provisions.

25.   On June 5, 2021, the NEB held a special meeting to approve a settlement valued at $250 million for a global resolution and the issuance of the BSA Settlement Note, subject to satisfactory resolution of other issues. As set forth above, the NEB was required to approve the note because only the NEB can agree to increase or materially change the indebtedness of the BSA beyond any previously authorized level. At the June 13, 2021 BTF meeting, the proposed terms of the RSA were discussed in detail. On June 21, 2021, the BTF extensively discussed the draft term sheet for the DST Note. On June 22, 2021, the NEC and BTF met jointly to review the terms and conditions of the RSA.

26.   In addition to reviewing draft documents at meetings, the NEC and BTF also frequently received communications of deal terms from their advisors and the BSA's General Counsel. On numerous occasions, there were drafts of various documents sent to the BTF by email. Final open issues that required additional guidance based on the prior negotiating parameters were authorized by e-mail to the CEO and General Counsel from the NEC on June 28, 2021, immediately in advance of the execution of the RSA on July 1, 2021, at the recommendation of the BTF following their review of key issues by e-mail. See Exhibit G. (June 28, 2021 email from BSA's General Counsel to BTF and my response; June 28, 2021 email from BSA's General Counsel to NEC and my response.)

27.   The NEB discussed Chartered Organizations, including their protection and insurance rights, on numerous occasions. There was also frequent robust discussion about the Chartered Organizations at BTF and NEC meetings. Both the BTF and NEC extensively discussed

and analyzed pathways to resolve the issues of the Chartered Organizations' insurance rights and protections during RSA negotiations.

28. For the reasons discussed above, I believe it is an appropriate exercise of the Debtors' business judgment, and is in the best interests of the Debtors' estates, to enter into the RSA.

*[Signature Page Follows]*

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: July 26, 2021
Miami, Florida

*/s/ Devang Desai*
Devang Desai