## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. D.I. 5466, 5470** |

**SUPPLEMENTAL DECLARATION OF BRIAN WHITTMAN
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT
TO SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING
THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING
<u>SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF</u>**

I, Brian Whittman, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare as follows:

1.      I submit this supplemental declaration (this "<u>Supplemental Declaration</u>") in further support of the *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5466] (the "<u>Motion</u>") and in support of the Debtors' omnibus reply (the "<u>Omnibus Reply</u>"), filed concurrently herewith. On July 1, 2021, I submitted a declaration [D.I. 5470] (the "<u>Initial Declaration</u>") in support of the Motion, which is incorporated by reference herein.[2]

2.      I am a Managing Director with Alvarez & Marsal North America, LLC ("<u>A&M</u>"), which serves as restructuring advisor to Boy Scouts of America (the "<u>BSA</u>") and Delaware BSA,

---

[1]      The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion, the RSA, the Amended Plan, the Initial Declaration, or the Omnibus Reply, as applicable.

LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors").  I have been the lead Managing Director at A&M responsible for this engagement since August 2019, and I have been actively involved with the Debtors' reorganization efforts.  In doing so, I have familiarized myself with a range of matters concerning the Debtors and these chapter 11 cases, including those described herein.

3.      As stated in my Initial Declaration, I have participated directly in advising and assisting the Debtors in connection with negotiations with the Plaintiff Representatives and other parties in interest in these chapter 11 cases, including negotiating and analyzing the terms and provisions of the RSA and attached Term Sheet setting forth the terms of the Amended Plan and related restructuring documents.  In each case, I have worked closely with the Debtors' management and operational teams and other advisors, as well as professionals representing the Plaintiff Representatives and other parties in interest.

4.      Except as otherwise stated in this Supplemental Declaration, all facts set forth herein are based on my personal knowledge, materials provided by, or my discussions with, members of the Debtors' executive and management team or information obtained from my personal review of relevant documents.  Additionally, the views asserted in this Declaration are based upon my experience and knowledge of the Debtors' nonprofit operations, financial condition, and liquidity.  If called upon to testify, I could and would testify to each of the facts set forth herein based on my personal knowledge, discussions and review of documents.  I am not being compensated specifically for this testimony other than through payments received by A&M as a professional retained by the Debtors in the chapter 11 cases.

## DEBTORS' BUSINESS JUDGMENT

5.      The decision to enter into the RSA was thoroughly considered by the NEB, the governing body of the BSA, the NEC, a twelve-member delegation of the NEB, which has the duty and authority to manage the affairs of the BSA, and the BTF, a task force established to review and provide feedback on the Debtors' restructuring strategy in connection with these chapter 11 cases.  There was robust discussion and debate at numerous meetings surrounding the terms and conditions of the RSA, as well as the negotiations leading up to the executed RSA.

6.      In the four months leading up to entry into the RSA, I personally spent more than forty hours in board meetings with the BTF, NEC, and NEB discussing the terms of the RSA and related topics in detail.  Following many of those meetings, I understand that the NEB, NEC or BTF held executive sessions to continue the discussions around the RSA without the advisors present.

7.      During this time, I gave numerous written presentations to these committees including but not limited to the following topics:

- the BSA Settlement Trust Contribution, including discussions related to unencumbered assets, cash projections, ability to take on debt, variable contribution structures, and sources and uses of cash at emergence;

- the structure of the BSA Settlement Trust Note, including without limitation the size of the note, overall debt structure and debt service burden, and structuring of principal payments;

- the Local Council Settlement Contribution, including an analysis of specific Local Council contributions to the Settlement Trust and allocations of amounts between cash and real property; and

- the structure of the DST Note and the DST Note Mechanics, including related concepts that evolved into the DST Note in the Amended Plan.

8.      I was also present for a number of presentations from the Debtors' other advisors, including the Debtors' restructuring counsel, White & Case LLP ("White & Case"), and the

Debtors' special insurance counsel, Haynes & Boone LLP, related to the risks and benefits associated with both the RSA in addition to alternatives to the RSA. During these presentations, the parties also discussed the payment of the Coalition Professional fees, the restructuring timeline, the Preliminary Injunction, the Hartford Settlement, Chartered Organizations, and various insurance issues, including related to proposed plans of reorganization and the terms of the RSA.

9.      Additionally, in January and February 2021, I gave presentations to the BTF that addressed, among others, the following foundational topics:

- the negotiating positions of the various parties in these chapter 11 cases and potential paths to compromise;

- Local Council claim allocation;

- Local Council real estate value;

- costs associated with the restructuring;

- the BSA's five-year business plan; and

- the liquidation analysis for the Disclosure Statement.

10.     I was also present in January and February 2021 for presentations to the BTF from White & Case that addressed, among other things, the following topics:

- alternatives related to a plan of reorganization;

- issues in connection with the terms for a plan proposed by the Coalition;

- issues with the negotiations with the Creditors' Committee and JPM; and

- an overview of the plan of reorganization.

11.     As a result of these and other meetings in which I participated, I believe that the NEB, NEC, and BTF were well informed and able to thoroughly consider and evaluate the risks and benefits associated with entry into the RSA as compared to potential alternatives to the RSA.

12.    I have worked as a restructuring professional for over twenty-five (25) years, and have interacted with dozens of Boards of Directors of public, private, for-profit, and not for-profit corporations, and committees thereof.  Collectively, the BSA Directors working on the bankruptcy matter (the NEB, NEC and BTF) are among some of the most diligent I have ever encountered.  They met frequently, their meetings were generally long, there was significant discussion and participation at the meetings including robust and healthy debate on key points as well as frequent, probing questions of the legal and financial advisors.  For the reasons discussed above, I believe the Debtors' decision to enter into the RSA was a reasonable exercise of business judgment, and is in the best interests of the Debtors' estates.

## ROLE OF THE COALITION

13.    I understand that the Coalition is an ad hoc group of survivors of sexual abuse who have filed Direct Abuse Claims in these chapter 11 cases (collectively, "Abuse Survivors") and was formed to represent a subset of Abuse Survivors whose stated goal was the expeditious and equitable establishment of a settlement trust.  I have been advised by counsel and advisors to the Debtors that approximately 82,500 unique, Direct Abuse Claims were timely filed against the BSA by the bar date in these chapter 11 cases.  On October 23, 2020, the Court authorized the Coalition to become a mediation party and to participate in the mediation [D.I. 1573].

## THE COALITION HAS BENEFITED
## AND WILL CONTINUE TO BENEFIT THE ESTATES

14.    As I stated in my Initial Declaration, I believe that payment of certain of the Coalition's past and future fees and expenses, on the terms set forth in the RSA, is a reasonable exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates and to creditors as a whole.  The RSA and the fee and expense provisions related to the Coalition are

the result of good-faith, arm's-length negotiations by the Debtors in which I extensively participated.

15.    Compensating the Coalition for fees and expenses within the scope and under the protections set forth in the RSA and the Revised Proposed Order will enable the Coalition to remain an engaged and active leader, alongside the TCC and the Future Claimants' Representative, in developing further consensus between stakeholders and developing and expeditiously guiding the Amended Plan described in the RSA to confirmation.  The Coalition and the Coalition Professionals have already provided, and will continue to provide, significant benefits to the Debtors' estates by helping to maximize value to be distributed to creditors, providing more certainty in negotiations about the ability to deliver the votes necessary to confirm the Amended Plan and thus implement a settlement, and reducing costs by providing a coordinated point of contact for such a large group of plaintiffs rather than being forced to engage with dozens or more groups.

16.    To date, the Coalition has generated concrete benefits for the estates.  First, the Coalition compiled and voluntarily provided certain of its members' abuse claims data to the mediators and the Debtors.  The Debtors, in turn provided this information to its insurers, including without limitation to Century Indemnity Company, prior to its admission as a formal mediation party and prior to the expiration of the bar date.  I understand that this facilitated an earlier review and analysis of Direct Abuse Claims for the Debtors and their advisors than would have otherwise been possible and generated value in moving the claims analysis process forward.

17.    Second, since its admission as a mediation party, the Coalition has been a valuable negotiating partner as the Debtors engaged with all of the plaintiff groups and other mediation parties, and ultimately was helpful in bringing the TCC and Future Claimants' Representative

together to support the RSA.  The Coalition Professionals and the TCC's professionals worked together with the Debtors' professionals regarding diligence and in discussions on the BSA and Local Councils' proposed contributions to the Settlement Trust.  Through this process, and during negotiation of the RSA, the Coalition—working with the TCC and the Future Claimants' Representative—secured significantly increased contributions to the Settlement Trust.  These contributions maximize recoveries not only to the Coalition's Abuse Survivor constituency but to *all* Abuse Survivors.

18.    The BSA's proposed contribution has more than doubled from its original planned contribution disclosed in the April 13, 2021 plan to the present—increasing from $115.6 million to an estimated $220.0 to $252.4 million, depending on time of emergence and performance through emergence.  The Local Councils have proposed to increase their Settlement Trust contribution from $425 million in the April 13, 2021 plan to an estimated $600 million.  The Coalition's efforts have thus resulted in a quantifiable benefit of approximately $310 million for all Abuse Survivors under the Amended Plan, regardless of Coalition affiliation.  As opposed to only benefitting its members, the Coalition's work provides collective benefits to all survivors.

19.    Third, the Coalition, alongside the TCC and Future Claimants' Representative, has conferred significant value on the estates by agreeing to seek a stay of the Estimation Matters and to stand down on its objection to the Exclusivity Motion.  These steps provide immeasurable value in the form of significant litigation cost savings to the estate, as well as in avoiding the expenditure of time and significant distraction to the Debtors' management and advisors.  This also demonstrates good faith by the Coalition and meaningful assistance to the Debtors' efforts to preserve estate value for the benefits of Abuse Survivors and other creditors.

20.     Moreover, the size of the Coalition's membership and its ability to collaborate with the State Court Counsel representing that membership has provided the Debtors and other mediation parties some assurance that negotiated agreements with Abuse Survivors could garner sufficient survivor support to accomplish the Debtors' global resolution plan strategy.  This provides the Debtors and other parties in interest in these cases with critical reassurance that representatives of a substantial number of Abuse Survivors support the Amended Plan and will encourage their clients to vote in favor of the Amended Plan.

21.     I believe that the Coalition will facilitate the Debtors' efforts to reach confirmation of the Amended Plan with a global resolution in these chapter 11 cases.  Negotiating with such a large subset of Abuse Survivors through the coordinated, focused efforts of the Coalition Professionals and coordinating with other plaintiff groups in this case, has the potential to significantly streamline the negotiation and confirmation process.

**PAYMENT OF THE COALITION'S FEES AND EXPENSES BENEFITS THE ESTATES**

22.     For the reasons explained above, the Coalition's continued participation in these cases is critical to ensure that the Amended Plan swiftly progresses to confirmation with global resolution.  The Coalition's active ongoing participation will result in actual, necessary, and reasonable expenses.  The RSA and the Amended Plan provide for—and reasonably limit—the payment of the Coalition's fees and expenses, and I understand that the Coalition has additionally agreed to further limitations related to the scope of the reimbursement of its professionals' fees and expenses and review of those fees and expenses by other parties in interest in the Revised Proposed Order after discussions with the U.S. Trustee.

23.     A substantial amount of work remains in these chapter 11 cases.  The filing of the RSA on July 1, 2021 was the first building block in the Debtors' advancement of their global resolution plan.  This work includes, among other things, continued negotiations with other

constituencies and mediation parties regarding the terms of the RSA and revisions to the Amended Plan, solicitation of the Amended Plan, and confirmation of the Amended Plan.  In addition, the Coalition's work includes facilitating other Abuse Survivors' support and involvement in these cases in these various stages, with the goal of quickly increasing support for a consensual resolution of these cases.

24.     Further, the Coalition's work and participation has directly benefitted the Debtors and all of the estates' creditors.  The formation of the Coalition and the work of the Coalition Professionals has alleviated a significant, time-consuming, and costly administrative burden on the estates.  By forming a single counterparty alongside the TCC and FCR, the Coalition enabled the Debtors to negotiate with a single centralized party, rather than attempting to negotiate with many individual counsel to, or individually with, at least 60,000 Abuse Survivors—this alone has provided significant financial and practical benefits to the estates.

25.     Given the size of the Abuse Survivor constituency, the Coalition Professionals are critical to the continuation and completion of the work required for these chapter 11 cases to proceed effectively and to not only maintain, but also expand, the support of all creditors for the RSA and Amended Plan.  It is my opinion that it would be more difficult and costly to the estate for this work to be performed without the assistance of the Coalition and the Coalition Professionals.  The Coalition Professionals are also critical to maintaining the timeline within which the Debtors need to exit chapter 11.  Moreover, without the Coalition's support, the Debtors' ability to pursue confirmation of the Amended Plan and the related restructuring transactions may be jeopardized.

26.     The Debtors' decision to pay the fees and expenses of the Coalition Professionals as part of the RSA is comparable to other cases in which debtors have agreed to pay the

professional fees of an ad hoc committee supporting a contemplated chapter 11 plan or restructuring framework.

27.    For the reasons discussed above, I believe it is an appropriate exercise of the Debtors' business judgment, and is in the best interests of the Debtors' estates, to enter into the RSA and to pay the fees and expenses of the Coalition as set forth in the RSA subject to the limitations set forth in the Revised Proposed Order.  I believe that the RSA provides the Debtors with a viable, if difficult, pathway to confirmation of the Amended Plan, and the Coalition will be a meaningful partner in that effort.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  July 26, 2021           ALVAREZ & MARSAL NORTH AMERICA, LLC
       Chicago, Illinois

*/s/ Brian Whittman*
Brian Whittman
Managing Director