**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 5729 & 5732** |

**DEBTORS' OMNIBUS OBJECTION TO INSURERS'**
**MOTION TO COMPEL AND MOTION TO SHORTEN NOTICE**

Boy Scouts of America (the "**BSA**") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession (together, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this omnibus objection (the "**Objection**") to the *Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* [D.I. 5729] (the "**Motion**") and *Moving Insurers' Motion for Entry of an Order Shortening the Notice and Objection Period for Moving Insurers' Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* [D.I. 5732] (the "**Motion to Shorten**") filed by certain of BSA's insurers (the "**Insurers**").[2]  In support of the Objection, the Debtors state as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] As a threshold matter, four of the nine Insurers—Arrowood Indemnity Company, Clarendon America Insurance Company, Liberty Mutual Insurance Company and Travelers Casualty and Surety Company, Inc.—have served no document requests on the Debtors in connection with the RSA Motion. Accordingly, those Insurers lack standing to compel the Debtors to produce documents they never requested.

## PRELIMINARY STATEMENT

The Motion and accompanying Motion to Shorten should be denied for at least three reasons. *One*, the Insurers have failed to meet their obligation under Local Rule 7026-1 to meet and confer in good faith. As discussed below, the Debtors stated their position on the mediation privilege to the Insurers in writing on July 8 and asked the Insurers to do the same. For two weeks, no insurer, save Great American, responded. And when the Debtors conducted a meet-and-confer with Great American on July 18, no other Insurer even bothered to show up. Great American would not commit to any position without talking to other insurers, and then never got back to the Debtors on that matter. Nonetheless, the Debtors and certain of the Insurers held a meet-and-confer on July 23, before the Insurers filed the Motion. The Debtors committed on that call to produce supplemental materials to the Insurers to address their concerns and avoid the need to involve the Court, as Local Rule 7026-1 intends. The Insurers filed the Motion anyway.

*Two*, the Debtors have mooted the Motion by producing supplemental materials addressing the concerns the Motion raises. As noted, the Insurers chose to burden this Court with the Motion before receiving these materials.

*Three*, the Motion seeks materials protected by the mediation privilege, in violation of Local Rule 9019 and the Mediation Order [D.I. 812]. Specifically, the Motion seeks presentations to and minutes of the Debtors' board regarding negotiations in the mediation. The Debtors have repeatedly pointed out this fact to the Insurers and asked them either to confirm their obligations under this Court's Mediation Order and Local Rule 9019 or explain any basis they have for violating the Order and Rules. The Insurers have refused to respond. These flagrant violations of the Mediation Order and Local Rules are improper and illustrative of the Insurers' reckless actions in this case.

2

Finally, the Insurers' motion *in limine* should be denied because the Debtors' discovery position is correct; it is the Insurers who are violating the rules. Additionally, despite the Insurers' violations and delay, the Debtors have worked diligently to provide responsive documents and information to the Insurers. The Debtors have also offered an additional witness, Devang Desai (a member of BSA's board), for deposition prior to the hearing, and he can answer questions about all the supplemental documents the Debtors have produced in response to the Insurers' belated requests. Any delay in resolving this dispute is the fault of the Insurers, not the Debtors.

## **BACKGROUND**

### A.     **The Court Adjourns the Hearing on the RSA Motion at the Insurers' Request to Avoid Making the Parties Race to Litigate Discovery Disputes**

1.      On July 1, 2021, the Debtors filed the RSA Motion, which they noticed for July 20. On July 2 and 3, the Insurers served the Debtors with voluminous discovery requests in connection with the RSA Motion—including 34 requests for production, 21 requests for admission and 7 interrogatories, many of which violated this Court's Mediation Order and Local Rule 9019, as addressed below. The Insurers requested responses by July 7, 2021, which was only four or five days after service.

2.      On July 7, 2021, the Court held a status conference regarding the schedule in connection with the RSA Motion. The Debtors told the Court that, in light of the schedule then in place, they were striving to comply with the accelerated discovery timeline that the Insurers had demanded. *See* Hershey Decl. Ex. 1 (July 7, 2021 Hr'g Tr.) at 14:7-12 ("MR. LINDER: *The timeline is highly compressed*. The insurers requested responses to their discovery by today, July 7th. The Debtors have been working around the clock, including over

the holiday weekend, to stay on track to meet the insurers' requested deadline[.]") (emphasis added).

3. Despite the Debtors' efforts, the Insurers requested an adjournment of the hearing in connection with the RSA Motion.  In making this request, the Insurers were crystal clear as to why an extension was necessary: to allow discovery disputes to be raised to the Court in a timely and orderly fashion so as to avoid jamming parties or the Court.  *See* Hershey Decl. Ex. 1 at 30:9-10 (Mr. Anker requesting adjournment so that the Insurers would not have to "come to Your Honor on, you know, five minutes notice"); *id.* at 44:2-3; 52:12-21 ("MR. SCHIAVONI: A good process results in good decisions . . . . [W]e would try to come before the Court as quickly as possible if we can't reach a resolution . . . but, you know, clearly it's a challenge for us to do that . . . [so] I would ask that you please give serious consideration to giving us some relief on the schedule.").  The Insurers further asserted that an extension was necessary because they knew the Debtors' position regarding the mediation privilege and believed it would likely lead to a discovery dispute.  *See* Hershey Decl. Ex. 1 at 30:6-8 ("MR. ANKER: [A]nd we've been told this . . . [the Debtors] take the position that everything is subject to the mediation privilege and, therefore, we will get virtually no documents."); *id.* at 52:3-5 ("MR. SCHIAVONI: [The Debtors] want . . . mediation privilege to basically protect everything about that exchange.").

4. The Court granted the extension that the Insurers requested, concluding that doing so "should give the parties plenty of time to take discovery and to give me reason[able] briefing on the issues." *See* Hershey Decl. Ex. 1 at 71:1-2.

**B.      The Insurers Violate Local Rule 9019 and This Court's Mediation Order by Seeking Material Protected by the Mediation Privilege, Then Refuse to Revise or Withdraw Their Requests or State Their Position**

5. In light of the Court's ruling, the Debtors wrote the Insurers a few hours after the July 7 conference to propose a modest adjustment to the discovery schedule, whereby the

Debtors would serve responses to the discovery requests and begin document production by July 8 (one day later than the previously proposed deadline of July 7). Hershey Decl., Ex. 2 (July 7 Email from S. Hershey to Insurers). The Debtors also proposed new dates for depositions to accommodate the Insurers. *Id.*

6.      The Insurers, led by Century, vigorously objected, arguing that the Debtors must adhere to the same highly compressed discovery schedule as the Debtors had proposed before the Court granted the extension. *See* Motion to Compel at 1-2; Cochiarro Decl. Ex. 13. The parties ultimately agreed that the Debtors would complete document production in advance of the depositions and Mr. Whittman would be deposed on July 14, Mr. Mosby on July 15, and Mr. Ownby on July 19—thus allowing for all document production and two of the three depositions to be finished a full week before the Insurers' objection deadline.

7.      In accordance with this agreed schedule, on July 8, the Debtors made their first production of approximately 600 pages of documents and served responses to all of the Insurers' discovery requests. *See* Hershey Decl., Ex. 3 (Debtors' Responses and Objections to Propounding Insurers). In their responses, the Debtors invoked privilege in connection with various documents, including board minutes, board presentations and drafts of plan documents. *See id.* at Response Nos. 1, 2 3 and 6.

8.      Along with their responses, the Debtors also served the Insurers with a letter setting forth their position regarding the mediation privilege. *See* Hershey Decl., Ex. 4 (July 8, 2021 Letter from G. Kurtz to Insurers). Specifically, the Debtors stated their view that "[t]he scope of the mediation is broadly defined under the Mediation Order to include 'the comprehensive resolution of issues and claims in BSA's chapter 11 case through a chapter 11 plan . . . which includes, without limitation, all matters that may be the subject of a motion

5

seeking approval by the Court of solicitation procedures and/or forms of plan ballots, a disclosure statement, or confirmation of a chapter 11 plan[.].'" *Id.* at 1 (citing Mediation Order ¶ 2). The Debtors also noted that, under the Local Rules, "the participants in mediation are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation." Del. Bankr. L. R. 9019-5d(i). The Debtors further noted that this rule is expressly incorporated by reference in the Mediation Order. *See* Hershey Decl. Ex. 4 at 2 (citing Mediation Order ¶ 7 ("The provisions of Local Rule 9019-5d pertaining to 'Confidentiality of Mediation Proceedings' shall govern the Mediation[.]")).

9.      The Debtors further advised the Insurers that the discovery requests they had served—which sought, among other things, "All Documents Concerning Communications with State Court Counsel, the Coalition, TCC, FCR and/or their counsel Concerning the RSA, the Term Sheet, the TDPs, the Settlement Trust Documents, and/or the Hartford Settlement" (Propounding Insurers Request for Production No. 7)—violated Local Rule 9019-5d(i), which provides that "no person shall seek discovery from any participant in the mediation with respect to any information disclosed during mediation." *See* Hershey Decl., Ex. 4 at 2 (citing Del. Bankr. L. R. 9019-5d(i)).[3]  In light of the Insurers' improper requests, the Debtors asked the Insurers to state their position on the mediation privilege and explain their attempts to seek

---

[3] *See also* Century Request for Production No. 1 ("All Documents that You reviewed and/or relied upon in evaluating and/or deciding to agree to Section II.E of the Hartford Settlement that were provided to You by Hartford and/or its counsel, consultants, and/or any other agents of Hartford."); Hartford Request for Production No. 8 ("All Documents and Communications supporting or refuting your assertion in the Third Amended Plan and Third Amended Disclosure Statement that 'all of the parties representing holders of Direct Abuse Claims,' including the TCC, Coalition, and FCR, oppose the BSA/Hartford Settlement Agreement and 'would vote to reject any plan of reorganization that includes the terms and provisions' of the BSA/Hartford Settlement Agreement.").

materials protected from disclosure by the mediation privilege, in violation of Local Rule 9019

and the Mediation Order.  *See id.*

10.    No insurer responded with its position on the mediation privilege, as the Debtors

had requested.  Nor did any Insurer revise or withdraw its improper requests.  Accordingly, on

July 9, the Debtors sent the Insurers a follow-up email stating the following:

> We did want to follow up regarding your contentions to challenge the mediation
> privilege . . . The Debtors will not produce their witnesses more than once.  If the
> Insurers intend to move to compel the production of any materials . . . then they
> should do so right away.

Hershey Decl., Ex. 5 (July 9, 2021 Email from S. Hershey to Insurers).   The Debtors also

reiterated their request that the Insurers state their position on the mediation privilege.  *See id.*

11.    In response, Mr. Schiavoni sent the Debtors a one-sentence email, stating: "Mike,

we made our position clear at the hearing and the hearing before it."   Hershey Decl., Ex. 6 (July

9, 2021 Email from T. Schiavoni to Debtors).

12.    In light of this deficient response, the Debtors responded: "Actually, your position

on the mediation privilege is not clear to us.  Since you claim that you have put it on the record

before, we would appreciate if you could do so again here."  Hershey Decl., Ex. 7 (July 9, 2021

Email from S. Hershey to Insurers).  For the avoidance of doubt, the Debtors again set forth their

position in full, stating:

> As to our position, we've advised you that we will not produce "any oral or
> written information disclosed by the parties or by the witnesses in the course of
> the mediation," in accordance with Local Rule 9019 and the Mediation Order.
> *See* Del. Bank. L. R. 9019-5d(i); Mediation Order ¶¶ 2, 7.  It should be clear from
> our responses to your discovery requests what that means for present purposes,
> but for the avoidance of doubt, this includes, among other things:
>
> - Communications with (or documents exchanged with) mediation parties
>   regarding the BSA/Hartford Settlement Agreement.
>
> - Communications with (or documents exchanged with) mediation parties
>   regarding the RSA.

- Communications with (or documents exchanged with) mediation parties regarding the Debtors' proposed plan of reorganization, disclosure statement and related documents.

*Id.*  The Debtors further noted that the Insurers' requests "appear to seek all of these things, in violation of Local Rule 9019 and the Mediation Order," and again invited the Insurers to articulate their position: "If you have any reasonable position about the parameters of the privilege, we need to discuss the issue right away to avoid delay . . . we cannot change the schedule based on your delay." *Id.*

13.    Within the hour, Mr. Schiavoni sent the Debtors' another one-sentence email, stating: "Mike and Sam, we addressed this in our meet and confer."  Hershey Decl., Ex. 8 (July 9, 2021 Email from T. Schiavoni to S. Hershey and M. Andolina).

14.    The Debtors promptly responded: "As we have repeatedly stated, we do not know your position and your refusal to simply answer our straightforward question is disappointing. Obviously, if you were comfortable with any position . . . you would simply state it."  Hershey Decl., Ex. 9 (July 9, 2021 Email from S. Hershey to Insurers).

15.    Mr. Schiavoni again refused to state a position and responded with his third one-sentence email:  "Sam, I met and conferred with a partner at your firm."  Hershey Decl., Ex. 10 (July 10, 2021 Email from T. Schiavoni to S. Hershey).

16.    All other Insurers were copied on these communications, but, like Mr. Schiavoni, not one of them sought to justify its requests or responded with their position, despite the Debtors' repeated requests that they do so.

**C.    The Debtors Finish Document Production on July 12 and Continue to Respond Quickly to the Insurers, while the Insurers Continue to Create Delay**

17.    On July 12, the Debtors made a second production of documents and produced a categorical privilege log.  The Debtors also served a letter on the Insurers explaining that the

8

Debtors would be producing board minutes and presentations later that day, which would reflect redactions for attorney-client privilege, attorney work product and the mediation privilege. *See* Hershey Decl., Ex. 11 (July 12, 2021 Letter from M. Andolina to Insurers). The Debtors produced those documents later that day.

18.    Also on July 12, the Debtors served interrogatories on a group of insurers led by Century and referring to themselves as the "Propounding Insurers."[4] The Debtors requested responses within five days, *i.e.*, by July 17. Later that day, the Propounding Insurers served reciprocal discovery on the Debtors, also requesting responses by July 17.

19.    Accordingly, on July 17, the Debtors served their responses on the Propounding Insurers. However, the Debtors did not receive any responses back, nor did the Debtors receive a request for an extension. The next day, the Debtors wrote the Propounding Insurers to request responses in accordance with the five-day deadline, which the Debtors had followed. The Propounding Insurers responded, "See Bankruptcy Rule 9006(a)(1)(C) . . . the responses are not due until tomorrow." Hershey Decl. Ex. 12 (July 18, 2021 Email from M. Plevin to Debtors). None of the Propounding Insurers served their responses until July 19—two days after the Debtors had served—and Century served its responses last, at 10:53 p.m.

**D.    The Insurers Refuse to Meet and Confer with the Debtors**

20.    On July 14, Great American sent the Debtors a letter challenging the Debtors' redactions and, for the first time, articulating Great American's position on the mediation privilege. *See* Hershey Decl., Ex. 13 (July 14 Letter from K. Krebs to Debtors).[5] The Debtors

---

[4] All of the Propounding Insurers are Moving Insurers. The Propounding Insurers were apparently led by Century, whose local counsel signed all of the Propounding Insurers' discovery requests and responses.

[5] Great American's position on the mediation privilege, which relies entirely on out-of-state authority, is that "the mediation privilege may only apply to communications to which a mediator was personally

returned a letter disputing Great American's position and proposing to meet and confer.  *See* Hershey Decl., Ex. 14 (July 15, 2021 Letter from G. Kurtz to K. Krebs).  The parties agreed to meet and confer, and Great American sent a dial-in.  All Insurers were copied on these exchanges.

21.     The Debtors suggested July 18 as the date for the meet-and-confer because, by that point, the Debtors' document production would have been complete for almost a week, giving the Insurers ample time to review the documents and identify any issues.  Additionally, by July 18, two of the Debtors' three witnesses would have been produced.  Those witnesses were the only two witnesses who had provided declarations in connection with the RSA Motion.  The Debtors, therefore, believed that the Debtors and the Insurers would be able to use the meet-and-confer to address any issues well in advance of the Insurers' July 23 objection deadline.

22.     One lawyer for Great American attended the meet-and-confer.  Not a single other Insurer attended.  Additionally, the meet-and-confer lasted less than 10 minutes, as the Debtors and Great American agreed that it did not make sense to meet and confer on an issue raised by the Insurers without their position and participation.  Great American ended the call promising to coordinate positions with the other Insurers and follow up.  The Debtors never heard back.

23.     Thus, other than the vague and generic demands and objections typified by the exhibits to the Cocchiaro Declaration, the Insurers refused to identify with any specificity the basis for their objections to the Debtors' document production or their position on the mediation privilege.

---

privy, communications that were directly made at a mediator's explicit behest, or communications undertaken with the specific intent to present them to a mediator for purposes of mediation."  *See* Hershey Decl., Ex. 13 at 3 (citations omitted).  This position contradicts Local Rule 9019-5d(i), which provides that the mediation privilege protects, among other things, "views expressed or suggestions made by a party with respect to a possible settlement of the dispute" and "statements or admissions made by a party in the course of the mediation."  Del. Bankr. L. R. 9019-5d(i).

**E.    The Insurers Offer Only Vague and Generic Objections at the Depositions of the Debtors' Witnesses and Continue to Seek Information Protected by the Mediation Privilege**

24.    As discussed above, on July 12, the Debtors produced to the Insurers board minutes and materials redacted for privilege.  The Insurers did not demand that the Debtors produce less redacted versions of these documents before the start of depositions or seek to delay the depositions in light of these redactions.  Moreover, at the depositions, the Debtors gave privilege instructions to their witnesses in keeping with the redactions of their documents.  For example, if a subject was redacted in the board minutes, the Debtors instructed their witnesses not to provide testimony regarding the redacted material.  Notably, while the Insurers continued to make vague and generic objections to the Debtors' instructions, none of them attempted to contact the Court either during or after any of the depositions regarding the Debtors' instructions. The Debtors' witnesses testified for more than 16 hours.

25.    Moreover, the Insurers improperly sought material plainly protected by the mediation privilege, in violation of Local Rule 9019 and the Mediation Order:

> 12 Q (BY MR. HALLOWELL) Mr. Ownby, before the
> 13 break, you mentioned that the Bankruptcy Task Force
> 14 has held two meetings with the mediators, correct?
> 15 I believe so.
> . . . .
> 19 Q. When was that meeting?
> 20 A. In the fall.
> 21 Q. The fall of 2020?
> 22 A. Correct.
> 23 Q. And what was discussed at that meeting?
> 24 MR. ANDOLINA: Objection. I'm going
> 25 to instruct the witness not to answer the question.

Ownby Dep. Tr. 194:12-23.

> 2 Q. Did the BSA discuss with the Ad Hoc Committee
> 3 of Local Councils the progress needed to be made at the
> 4 March 30th, 31st and April 1st mediation when it
> 5 met with the Ad Hoc Committee of Local Councils on

6 March 25th?
7 MR. ANDOLINA: I'm going to object and
8 I'm going to instruct Mr. Ownby not to answer the
9 question and I'm also going to object on the grounds
10 that it is against the local rules to seek mediation
11 communications.
12 You can go through this whole process,
13 Mr. Hallowell, but we're not going -- he's not going
14 to answer any questions about this presentation.

Ownby Dep. Tr. 212:2-14.[6]

F.    **The Insurers Hide Their Intent to File the Motion from the Debtors and the Court**

26.    On July 21, 2021—two days before the Insurers filed the Motion—the Court held

an omnibus hearing in the Debtors' chapter 11 cases.  At the start of the hearing, the Debtors

gave an update regarding the progress of discovery.  Specifically, the Debtors noted that they

"have produced numerous documents for the parties that are potentially going to be objecting to

the RSA motion."  Hershey Decl., Ex. 15 (July 21, 2021 Hr'g Tr.) at 7:14-16.  Additionally, the

Debtors stated that they "have produced three witnesses for deposition.  Those depositions

concluded this past Monday."  *Id.* at 7:12-14.  No Insurer mentioned any purported deficiency of

the Debtors' productions or any disputes regarding privilege.  Rather, Mr. Schiavoni stated, "I

---

[6] Nor was the Insurers' misconduct at the depositions limited to questions seeking protected information in violation of Local Rule 9019 and the Mediation Order.  *See, e.g.*, Ownby Dep. Tr. at 111:1-13:

1 MR. ANDOLINA: Please don't --
2 MR. SCHIAVONI: You do it on your
3 time.
4 MR. ANDOLINA: Please don't --
5 MR. SCHIAVONI: You do it on your
6 time.
7 MR. ANDOLINA: Please don't raise your
8 voice.
9 MR. SCHIAVONI: Do it on your time.
10 Let's have an answer, please.
11 MR. ANDOLINA: Please don't -- please
12 don't raise your voice, sir. We're all trying to be
13 professional here. There's 50 people on the phone.

found the status report extremely helpful." *Id.* at 12:23-24. Mr. Schiavoni said nothing about the fact that the Insurers were preparing to file a motion to compel just two days later—which the Insurers were clearly working on at the time.

27. The Insurers' claim in the Motion to Shorten that the Moving Insurers "moved promptly" because "[i]t was only through the testimony of Mr. Daniel Ownby, National Chair of the BSA, on July 19, that the Moving Insurers became fully appraised of the extent to which these documents were relied upon by BSA and its various boards" is incorrect. *See infra* ¶¶ 43-44; *see also* Motion to Shorten at 2. Moreover, Mr. Ownby's deposition occurred two days before the July 21 hearing, so the Moving Insurers were well aware at that point of their intention to file the Motion, and plainly were drafting papers, yet still remained silent.

**G.    Following the July 21 Hearing, the Insurers Suddenly Demand, in Unison, that the Debtors Meet and Confer with Them Immediately**

28. Despite failing to raise any issues with the Court on July 21, that night, at 9:53 p.m., Mr. Schiavoni emailed the Debtors to demand, for the first time, production of unredacted board presentations and minutes. *See* Hershey Decl. Ex. 16 (July 21, 2021 Email from T. Schiavoni to M. Andolina). Mr. Schiavoni stated, "We need this information in order to file our objection tomorrow." *Id.* The following day, the Debtors responded to Mr. Schiavoni and asked him to explain why he believed the materials he sought were not privileged (given that he still had not stated his position on privilege) and why, if those materials were important to his objection, he had waited until 9:53 p.m. the night before the objection deadline to request them. *See* Hershey Decl. Ex. 17 (July 22, 2021 Letter from S. Hershey to T. Schiavoni).

29. In response, Mr. Schiavoni sent the Debtors an email stating "We have done everything humanly possible to get [the Debtors] to cooperate . . . [i]f there is anything left to discuss, we would like to talk to you now. Otherwise we ask that you please consent to having

13

this matter addressed by the Court on shortened notice." Hershey Decl. Ex. 18 (July 22, 2021 Email from T. Schiavoni to Debtors). Notably, this was the first time Century had asked to discuss anything with the Debtors. Indeed, Century had refused to discuss positions with the Debtors, notwithstanding numerous requests to do so.

30.     Suddenly, other Insurers, including AIG, National, and Allianz—none of whom had ever voiced any objection to the Debtors' document productions, redactions or privilege designations—started serially emailing the Debtors demanding a meet-and-confer. For example, Allianz wrote to ask "if Debtors would like to have a call to discuss further, or please advise if Debtors believe further conferrals will not be productive"—even though Allianz and the Debtors had never had *any* "conferrals." Hershey Decl., Ex. 19 (July 22, 2021 Email from R. Smethurst to Debtors).

31.     In response to this flurry of emails, the Debtors sent the Insurers a letter setting forth their position: "It is clear that the insurers' decision to respond to the Debtors' request for a meet-and-confer two weeks after it was made and an hour before their objection deadline is an attempt to delay the schedule on the RSA Motion and mask the insurers' refusal to engage throughout this process." Hershey Decl., Ex. 20 (July 22, 2021 Letter from S. Hershey to Insurers).[7] The Debtors also noted that "despite the sudden zeal the insurers have expressed for a meet-and-confer, not one insurer identified the topic they wish to meet and confer about, much

---

[7] Other than the letter from Great American, the only other letter the Debtors received regarding alleged deficiencies in their production was a July 19 letter from Century challenging the Debtors' response to a single interrogatory. *See* Hershey Decl., Ex. 21 (July 19, 2021 Letter from S. Cocchiaro to M. Andolina). The Debtors responded to this letter the next day and, even though the Debtors disputed Century's allegations, served revised interrogatories the following day in an effort to address Century's concerns. *See* Hershey Decl., Ex. 22 (July 20, 2021 Letter from S. Hershey to S. Cocchiaro).

less stated their position on it." *Id*. Nonetheless, the Debtors agreed to meet and confer with the Insurers. *Id.*[8]

32.    As the Insurers were aware, the Debtors had just received hundreds of pages of objections to the RSA Motion. Moreover, the Debtors' only offensive deposition was scheduled to begin the following morning. Accordingly, the Debtors suggested a meet-and-confer that weekend, less than 48 hours later. *Id*.

33.    The Insurers refused. Specifically, Allianz demanded to speak the following day (Friday) and "object[ed] to debtors delaying this discussion." Hershey Decl., Ex. 23 (July 22, 2021 Email from R. Smethurst to Debtors). Allianz proposed 8:30 a.m. (with the deposition scheduled to start at 9:00 a.m.) or during a deposition break—clearly not times that would allow for a meaningful meet-and-confer. Mr. Schiavoni also demanded to speak before the deposition. Hershey Decl., Ex. 24 (July 22, 2021 Email from T. Schiavoni to Debtors).

34.    The Debtors agreed to meet and confer on Friday, as the Insurers requested. However, the Debtors asked the Insurers to send an agenda in advance of the call to help ensure a productive discussion. The Insurers failed to do so.

**H.    The Debtors Commit to Making Reasonable Efforts to Address the Insurers' Concerns, and the Insurers Respond That They Will Move to Compel Anyway**

35.    At the meet and confer, the Insurers requested (i) unredacted board minutes, (ii) unredacted board presentations and (iii) communications with local councils and chartering organizations that did not participate in the mediation. In response, the Debtors agreed to address the Insurers' concerns by (i) re-reviewing board minutes, (ii) re-reviewing board

---

[8] Moreover, to avoid the Insurers' distorting the record, the Debtors asked the Insurers to attach this letter to any motion to compel or request for shortened notice. The Insurers refused that request. *See* Cocchiaro Decl. Ex. 14 at 2.

presentations and (iii) searching for and producing communications (if any) between the Debtors' witnesses and local councils and chartering organizations that did not participate in the mediation.  Moreover, even though the Debtors had just received hundreds of pages of objections they needed to reply to, the Debtors committed to producing these materials to the Insurers over the weekend.

36.    Nonetheless, at the end of the meet and confer, the Insurers informed the Debtors that they intended to file the Motion later that evening.  The Debtors responded that a motion was inappropriate given that the Debtors were resolving any reasonable dispute.  Nonetheless, the Insurers filed the Motion shortly thereafter, seeking relief "with any adjustments to the schedule that may be necessary."  Motion at 20.

37.    Before filing the Motion, the Insurers sent the Debtors an email asking the Debtors to confirm they "will not consent to a shortened notice period [and] that we are at an impasse."  *See* Hershey Decl., Ex. 25 (July 22, 2021 Email from S. Stamoulis to D. Abbott).  The Debtors confirmed that: "We do not agree to shortened notice."  *See* Hershey Decl., Ex. 26 (July 22, 2021 Email from D. Abbott to S. Stamoulis).  The parties were ***not*** at an impasse, as the Debtors had committed to working in good faith to address the concerns that the Insurers had raised in the meet-and-confer.  The Debtors sent an email to the Insurers stating that a motion to compel was "neither proper nor productive, given that it is already after close of business on Friday and we intend to produce documents to you over the weekend in the hope that we can resolve these issues without involving the Court."  Hershey Decl., Ex. 27 (July 23, 2021 Email from S. Hershey to Insurers).  Yet in the Motion, the Insurers misstate that the Debtors

"confirm[ed] that the Debtors 'will not consent to a shortened notice period [and] *that we are at an impasse*.'"  Motion at 22, n.46 (emphasis added).[9]

### I.      Pursuant to Their Commitment on the Meet-And-Confer, the Debtors Make a Supplemental Production Addressing the Exact Concerns Raised in the Motion

38.      Two days after the meet-and-confer, on Sunday, July 25, the Debtors produced further un-redacted board presentations to the Insurers.  The Debtors also re-reviewed over four hundred communications regarding local councils and chartering organization to confirm they had not inadvertently withheld non-privileged materials, and produced one supplemental document.

## ARGUMENT

### I.      THE MOTION SHOULD BE DENIED BECAUSE THE INSURERS HAVE BREACHED THEIR OBLIGATION TO WORK COOPERATIVELY TO RESOLVE THE DISPUTE IN GOOD FAITH

39.      Delaware Local Bankruptcy Rule 7026-1(a) provides that "[p]arties are expected to confer and in good faith attempt to reach agreement cooperatively on how to conduct discovery[.]"  Del. Bankr. L. R. 7026-1(a).  Pursuant to this rule, parties filing motions to compel must certify to the court "that a reasonable effort has been made to reach agreement with the opposing party on the matters set forth in the motion[.]"  Del. Bankr. L. R. 7026-1(d).  The Insurers have breached both of these requirements.

40.      *First*, as set forth above, the Insurers have failed to "confer and in good faith attempt to reach agreement cooperatively."  Rather, the Insurers have refused to cooperate with the Debtors every step of the way.  The Insurers refused to state their position on privilege,

---

[9] The Insurers subsequently filed a purported correction, which mischaracterized this misstatement as a "typographical error."  *See* D.I. 5735.  Additionally, the Insurers' purported correction contained at least three further falsehoods.  *See* D.I. 5738.

notwithstanding multiple requests for them to do so since July 8.  The Insurers refused to meet

and confer with the Debtors even when a meet and confer was scheduled on July 18.   The

Insurers delayed their responses to the Debtors' discovery requests, even when the Debtors

timely provided their requests two days prior.  The Insurers refused to wait to file the Motion,

even when the Debtors agreed to supplement their production in an effort to address the Insurers'

concerns.  This record reflects a complete lack of good-faith engagement by the Insurers and an

unnecessary burden on the Court.  *DeWitt v. Penn0Del Directory Corp.*, 912 F. Supp. 707, 713

(D. Del. 1996), *aff'd in part, rev'd in part on other grounds*, 106 F.3d 514 (3d Cir. 1997)

(finding that the purpose of the meet-and-confer requirement is "to facilitate resolution of

disputes among the parties before formally requesting the Court's aid."); *see also Medtrica*

*Solutions Ltd. v. Cygnus Medical LLC*, 2013 WL 5966689, at *2 (W.D. Wash. Nov. 7, 2013) ("A

good faith effort to resolve this matter would have involved an exchange of information until no

additional progress was possible.  This did not happen.  Furthermore, there is no indication that

the parties reached impasse prior to the filing of this motion.").

41.    ***Second***, the certification that the Insurers submitted misrepresents the record to

the Court.  As noted above, the Insurers misstate that the Debtors "confirm[ed] . . . that we are at

an impasse."  Motion at 22, n.46.  The Debtors never confirmed that the parties were at an

impasse because that was not the case.  Rather, the Debtors had just committed to working over

the weekend—despite the fact that the Debtors were already strained by the need to reply to the

Insurers' hundreds of pages of objections—to produce documents addressing the Insurers'

concerns.  *See* Hershey Decl., Ex. 27 ("[W]e will review . . . to see whether any materials can be

un-redacted or further materials can be produced . . . Specifically, we will re-review the board

minutes and A&M presentations to determine whether those materials can be partially

unredacted[.]").  The Insurers' misrepresentation is a clear attempt to conceal that the Debtors

were the only party working cooperatively to resolve the dispute.[10]

## II.    THE MOTION SHOULD BE DENIED BECAUSE OF THE INSURERS' DELAY

42.    Courts deny motions to shorten notice where the purported need for expedited

relief is the result of the movant's self-created emergency.  *See In re EHT US1, Inc., et al.*, Case

No. 21-10036 (Bankr. D. Del. 2021) (CSS) (D.I. 217) (denying creditor's motion to shorten

notice where the creditor had been familiar with the facts and circumstances asserted in the

motion well in advance of filing the motion).  Here, the Insurers waited 11 days after the close of

the Debtors' document production and four days after deposing the Debtors' witnesses to file the

Motion, making the Motion untimely and shortened notice inappropriate.

43.    The Insurers make several excuses for their delay, none of which has merit.  The

Insurers claim that "[i]t was only through the testimony of Mr. Daniel Ownby, National Chair of

the BSA, on July 19, that the Moving Insurers became fully appraised of the extent to which

these documents were relied upon by BSA and its various boards."  Motion to Shorten at 2.  This

claim makes no sense.  Two of the three categories of documents that the Motion seeks—the

"resolutions of BSA's Boards for the RSA, Amended Plan, and TDPs" and documents reflecting

"communications  by  and  between  the  Board,  the  Local  Councils,  and  the  Chartered

Organizations"—are  not  documents  the  BSA  Board  "relied  upon"  in  making  decisions.

Moreover, the Insurers state no reason why, given that Mr. Ownby's deposition finished on

Monday afternoon, they waited until late Thursday night to request a meet and confer with the

---

[10] The Insurers likewise misstated to the Court the date for their objection to the RSA Motion to suggest they had less time.  *See* D.I. 5472 at 2 (noting that the Insurers falsely claimed they had only until July 8 for their objection when the Debtors had given them an extension until July 13).

Debtors and filed the motion on Friday night.  Nor do the Insurers explain why they failed to notify the Court of this issue at the July 21 hearing, two days after Mr. Ownby's deposition. Moreover, given that the Motion is over 20 pages, attached 16 exhibits, and was filed along with a motion to shorten, the Insurers' claim that they did not begin working on the Motion until after Mr. Ownby's deposition is not credible.

44.     The Insurers also claim that they "participated in good faith in a meet and confer with the Debtors concerning the issues raised in this Motion on July 6."  Motion at 20-21.  This is wrong.  Initially, this claim stands in direct contradiction to the Insurers' claim that they did not know the matters at issue until Mr. Ownby's deposition on July 19.  Indeed, if this claim were true, it only highlights the egregiousness of the Insurers' delay in waiting 21 days to file the Motion after purportedly meeting and conferring with the Debtors on July 6, and undermines any argument they might have to shortened notice.  In any case, as of July 6, the Debtors had not produced a single document, much less offered any of their witnesses for deposition.  Hence, it is impossible that the issues raised in the Motion, which relate entirely to the Debtors' document production and witness testimony at depositions, could have been discussed on that date.

### III.    THE MOTION SHOULD BE DENIED AS MOOT IN LIGHT OF THE DEBTORS' SUPPLEMENTAL PRODUCTION

45.     As the Debtors promised in the July 23 meet and confer, the Debtors re-reviewed hundreds of documents over the weekend and, on Sunday, July 25, the Debtors produced further un-redacted presentations by Alvarez and Marsal and a communication with a local council that was inadvertently withheld.  And on Monday, July 26, the Debtors produced further un-redacted board minutes, including authorizing minutes and board resolutions.  These documents are precisely the documents sought by the Motion.  Moreover, the remaining redactions are necessary and proper, as they redact attorney-client communications (such as communications by

20

the Debtors' counsel reflected in board minutes), attorney work product (such as analysis by the Debtors' counsel reflected in board presentations) and information protected by the mediation privilege (such as analysis of settlement offers reflected in presentations by Alvarez and Marsal). This supplemental production moots the Motion.  The Insurers' claim that the Debtors' supplemental production was an unacceptable "half-a-loaf" (Motion at 3) was made before receiving it, so it is baseless.

### IV. THE INSURERS HAVE FAILED TO OFFER ANY BASIS FOR THEIR REPEATED VIOLATIONS OF LOCAL RULE 9019 AND THE MEDIATION ORDER, INCLUDING THROUGH THIS MOTION

46.    The materials the Debtors have withheld are privileged. The Insurers do not offer any reasonable basis for seeking them. To the contrary, the Insurers have been openly flouting this Court's Mediation Order and Local Rule 9019.

47.    Local Rule 9019-5d(i) provides that "no person shall seek discovery from any participant in the mediation with respect to any information disclosed during mediation."  Del. Bankr. L. R. 9019-5d(i).  Local Rule 9019 also prohibits parties to a mediation from "divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation," including, without limitation, "views expressed or suggestions made by a party with respect to a possible settlement of the dispute"; "statements or admissions made by a party in the course of the mediation"; and "documents prepared for the purpose of, in the course of, or pursuant to the mediation."  This rule is expressly incorporated into this Court's Mediation Order.  *See* Mediation Order ¶ 7.

48.    In keeping with this rule, courts in this district recognize that "[t]he judicial system encourages the resolution of disputes by mediation and settlement. It is axiomatic that the assurance of confidentiality for communications made during the course of settlement negotiations is a critical component of the process."  *In re Student Fin. Corp.*, Nos. 04-56423,

04-1551 JJF, 05-165-JJF, 2007 U.S. Dist. LEXIS 95882, at *5 (D. Del. May 25, 2007); *see also Wilmington Hosp. v. New Castle Cnty.*, 788 A.2d 536, 541 (Del. Ch. 2001) ("[c]onfidentiality of all communications between the parties or among them and the mediator serves the important public policy of promoting a broad discussion of potential resolutions to the matters being mediated. Without the expectation of confidentiality, parties would hesitate to propose compromise solutions out of the concern that they would later be prejudiced by their disclosure."); *In re Tribune Co.*, No. 08-13141 (KJC), 2011 Bankr. LEXIS 299, at *29 (Bankr. D. Del. Feb. 3, 2011) ("Assuming they would even agree to participate in the mediation process absent confidentiality, participants would necessarily feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute. The effectiveness of mediation would be destroyed, thereby threatening the well established public needs of encouraging settlement and reducing court dockets.") (citations omitted); *Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 62 (Del. Ch. 2005) (citing "Delaware's recognition that confidentiality is vital to the effectiveness of mediation" and finding that "[t]he process works best when parties speak with complete candor, acknowledge weaknesses, and seek common ground, without fear that, if a settlement is not achieved, their words will be later used against them in the more traditionally adversarial litigation process.").

49.    The Insurers have repeatedly sought material that is plainly protected from disclosure by the mediation privilege.  These actions include, for example:

- The Insurers' document requests, which sought, among other things, "All Documents Concerning Communications with State Court Counsel, the Coalition, TCC, FCR and/or their counsel Concerning the RSA, the Term Sheet, the TDPs,

22

the Settlement Trust Documents, and/or the Hartford Settlement." *See* Propounding Insurers Request for Production No. 7.

- Emails from the Insurers demanding production of, among other things, "submission[s] made to the BSA Board for its consideration of the Hartford Settlement, the minutes of the meeting to consider it and all communications with the Board and its members and BSA's officers about it." *See* Cocchiaro Decl. Ex. 7 (July 22 email from Tancred Schiavoni to the Debtors).

- Questions of the Debtors' witnesses at their depositions, such as "what was discussed at [the] meeting" between the Debtors' Bankruptcy Task Force and the mediators. Ownby Dep. Tr. 194:12-23.

- This Motion, which seeks, among other things, board minutes as well as "Powerpoints [and] presentations" prepared by the Debtors' financial advisor regarding the RSA and the Fourth Amended Plan. Motion at 20.

50. The fact that certain of these materials were developed by the Debtors' financial advisor is irrelevant for purposes of the mediation privilege, which protects ***all*** "documents prepared for the purpose of, in the course of, or pursuant to the mediation." Del. Bankr. L. R. 9019-5d(i). Indeed, it is self-evident from the face of these documents, even in the redacted form in which the Insurers received them, that they contain information reflecting negotiations and settlement discussions occurring in the mediation—yet the Insurers filed the Motion to compel production of these materials anyway.

51. As noted above, the Debtors promptly notified the Insurers on July 8 of their violation of the Local Rules and Mediation Order and demanded that they either revise their requests or explain their position. *See* Hershey Decl. Ex. 2. None of the Insurers, save Great

American, took steps to cease violating the Local Rules and Mediation Order or explained its basis for seeking materials protected by the mediation privilege.  To the contrary, as documented in the Cocchiaro Declaration, Mr. Schiavoni repeatedly emailed the Debtors blanket demands for these documents without carving out mediation materials (which were clearly sought in his demands) or explaining his basis for seeking protected materials.  These actions were followed by the untimely and improper filing of this Motion.

52.    These violations of Local Rule 9019 and the Mediation Order also violate Rule 3.4(c) of the Delaware Lawyers' Rules of Professional Conduct, which provides that "[a] lawyer shall not: . . . knowingly disobey an obligation under the rules of a tribunal[.]"  This conduct also runs afoul of Rule 7(a) of the Delaware Lawyers' Rules of Disciplinary Procedure, which provides that "[i]t shall be grounds for disciplinary action for a lawyer to: . . . [v]iolate any of the Delaware Lawyers' Rules of Professional Conduct or any subsequent rules or code adopted by the Court in lieu thereof, whether or not the violation occurred in the course of a lawyer-client relationship[.]"  Courts routinely sanction parties for violating mediation privilege.  *Hand v. Walnut Valley Sailing Club*, 475 Fed. App'x 277 (10th Cir. 2012) (affirming dismissal of lawsuit as appropriate remedy where plaintiff sent an e-mail to third parties providing details of the parties' mediation); *In re Student Fin. Corp.*, Nos. 04-56423, 04-1551 JJF, 05-165-JJF, 2007 U.S. Dist. LEXIS 95882, at *5 (D. Del. May 25, 2007) (granting motion to strike reports and testimony of defendants' expert witnesses for breach of confidentiality provisions within the parties' mediation agreement); *Abrams-Jackson v. Avossa*, 282 F. Supp. 3d 1268, 1274 (S.D. Fla. 2017) (granting motion to strike and imposing sanctions along with an award of attorney's fees due to improper disclosure of mediation communications in violation of local rules); *Irwin Seating Co. v. Int'l Bus. Machines Corp.*, No. 1:04-CV-568, 2007 WL 518866, at *16 (W.D.

Mich. Feb. 15, 2007). (upholding magistrate judge's order striking plaintiff's expert witnesses as appropriate sanction for violating mediation confidentiality).  Moreover, it is not just the parties who are subject to sanctions: "courts routinely impose sanctions on attorneys who disclose confidential mediation communications."  *Zuver v. Sprigg*, No. 16-2505 (DLF), 2018 U.S. Dist. LEXIS 107978, at *42-43 (D.D.C. June 13, 2018).  *See, e.g.*, *Davis v. Kan. City Fire & Marine Ins. Co.*, 195 F.R.D. 33, 38 (N.D. Okla. 2000) (imposing sanctions where party filed a confidential settlement document and finding appropriate remedy included: (1) publishing the court's order as a public notice that counsels' conduct was unacceptable; (2) circulating said opinion to all judges of the court to put them on notice of the conduct of counsel; and (3) requiring counsel make a $1,500 ($500 per filing) contribution to the Tulsa County Bar Association to be used in connection with a Continuing Legal Education Program); *Williams v. Johanns*, 529 F. Supp. 2d 22, 23 (D.D.C. 2008) (holding attorney in civil contempt for violating magistrate judge's order of confidentiality in mediation); *Bernard v. Galen Grp., Inc.*, 901 F. Supp. 778, 784 (S.D.N.Y. 1995) (fining counsel $2,500 for disclosing details of mediation in violation of court's order that proceedings be kept confidential).

53.    Notably, the Debtors pointed out the ethical issues and cited certain of the cases when requesting that the Insurers abide by the Mediation Order and Local Rule 9019.  *See* Hershey Decl., Ex. 14 (response letter to Great American, copying all Insurers).  The Insurers again ignored the Debtors and their obligations.

54.    The Debtors have absolutely nothing to hide in terms of their conduct and positions in the mediation, but court orders and the Local Rules are important, and breaching mediation privilege damages the prospect of a successful mediation. *In re Student Fin. Corp.*, 2007 U.S. Dist. LEXIS 95882, at *5 ("It is axiomatic that the assurance of confidentiality for

communications made during the course of settlement negotiations is a critical component of the [mediation] process."); *Wilmington Hosp. v. New Castle Cnty.*, 788 A.2d at 541 ("Without the expectation of confidentiality, parties would hesitate to propose compromise solutions out of the concern that they would later be prejudiced by their disclosure."). Mediation here continues and the Debtors hope to gain more resolutions going forward.

## V.   THE MOTION *IN LIMINE* SHOULD BE DENIED

55.     The Insurers have not offered any basis for the Court to preclude the Debtors from offering evidence and testimony at the hearing in connection with the RSA Motion. Rather, as shown above, the Insurers have repeatedly failed to satisfy their obligation to work in good faith to resolve this dispute and avoid burdening the Court or disrupting the process. *See supra* ¶¶ 7-37. There is no basis to penalize the Debtors for the Insurers' bad conduct. Moreover, the Insurers are not entitled to the information sought. To the contrary, they are violating Local Rule 9019 and the Mediation Order by seeking these materials.

## CONCLUSION

56.     WHEREFORE, the Debtors request that the Court deny the Motion and the Motion to Shorten Notice and grant such other and further relief as the Court deems just and proper.

*[Remainder of page intentionally left blank]*

Dated: July 26, 2021
      Wilmington, Delaware

*/s/ Paige N. Topper*

WHITE & CASE LLP

Glenn Kurtz (admitted *pro hac vice*)
Jessica C. Lauria (admitted *pro hac vice*)
Andrew Hammond (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email: gkurtz@whitecase.com
      jessica.lauria@whitecase.com
      ahammond@whitecase.com
      sam.hershey@whitecase.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
Michelle M. Fu (No. 6661)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 351-9314
Email: dabbott@morrisnichols.com
      aremming@morrisnichols.com
      ptopper@morrisnichols.com
      mfu@morrisnichols.com

– and –

WHITE & CASE LLP

Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com
      blair.warner@whitecase.com