# EXHIBIT 1

1

```
1                  UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3                                  .    Chapter 11
    IN RE:                         .
4                                  .    Case No. 20-10343 (LSS)
    BOY SCOUTS OF AMERICA AND      .
5   DELAWARE BSA, LLC,             .
                                   .    Courtroom No. 2
6                                  .    824 North Market Street
                                   .    Wilmington, Delaware 19801
7                                  .
                    Debtors.       .    July 7, 2021
8   . . . . . . . . . . . . . . .       2:00 P.M.

9           TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                 UNITED STATES BANKRUPTCY JUDGE

11  TELEPHONIC APPEARANCES:

12
    For the Debtor:          Derek C. Abbott, Esquire
13                           Andrew R. Remming, Esquire
                             Paige N. Topper, Esquire
14                           MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                             1201 North Market Street, 16th Floor
15                           Wilmington, Delaware 19899

16                           - and -

17                           Jessica C. Lauria, Esquire
                             WHITE & CASE LLP
18                           1221 Avenue of the Americas
                             New York, New York 10020
19
    Audio Operator:          Brandon J. McCarthy, ECRO
20

21
    Transcription Company:   Reliable
22                           1007 N. Orange Street
                             Wilmington, Delaware 19801
23                           (302)654-8080
                             Email: gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording; transcript
25  produced by transcription service.
```

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the Debtors:          Michael C. Andolina, Esquire
                              Matthew E. Linder, Esquire
3                             Laura E. Baccash, Esquire
                              Blair M. Warner, Esquire
4                             WHITE & CASE LLP
                              111 South Wacker Drive
5                             Chicago, Illinois 60606

6
    For Hartford Financial:   Philip Anker, Esquire
7                             WILMERHALE
                              250 Greenwich Street
8                             New York, New York 10007

9   For the FCR:              Robert Brady, Esquire
                              YOUNG CONAWAY STARGATT & TAYLOR LLP
10                            1000 N West Street
                              Wilmington, Delaware 19801
11
12  For the U.S. Trustee:     David Buchbinder, Esquire
                              UNITED STATES DEPARTMENT OF JUSTICE
13                            OFFICE OF THE UNITED STATES TRUSTEE
                              844 King Street, Suite 2207
14                            Lockbox 35
                              Wilmington, Delaware 19801
15
16  For the Coalition of      David Molton, Esquire
    Abused Scouts for         BROWN RUDNICK LLP
17  Justice:                  7 Times Square
                              New York, New York 10036
18
19  For Century Indemnity:    Tancred Schiavoni, Esquire
                              Brad Elias, Esquire
20                            O'MELVENY
                              7 Times Square
21                            New York, New York 10036

22  For the Church of Jesus   Adam Goldberg, Esquire
    Christ of Latter Day      LATHAM & WATKINS LLP
23  Saints:                   1271 Avenue of the Americas
                              New York, New York 10020
24
25  For the AIG Companies:    Michael Rosenthal, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
                              200 Park Avenue
                              New York, New York 10166
```

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For Tort Claimants:        James Stang, Esquire
                               PACHULSKI STANG ZIEHL JONES LLP
3                              919 North Market Street, 17th Floor
                               Wilmington, Delaware 19801
4
                               - and -
5
                               John Lucas, Esquire
6                              PACHULSKI STANG ZIEHL & JONES LLP
                               150 California Street, 15th Floor
7                              San Francisco, California 94111

8
    For the Ad Hoc            Richard Mason, Esquire
9   Committee of Local        WACHTELL, LIPTON, ROSEN & KATZ
    Councils:                 51 W 52nd Street, Suite 29
10                            New York, New York 10019

11
    For the Creditors         Megan Wasson, Esquire
12  Committee:                KRAMER LEVIN NAFTALIS & FRANKEL LLP
                              1177 6th Avenue
13                            New York, New York 10036

14  For Timothy Kosnoff,      David Wilks, Esquire
    and Andrew Van Arsdale:   WILKS LAW, LLC
15                            920 Paoli Pike
                              West Chester, Pennsylvania 19380
16
    For the Roman Catholic    Jeremy Ryan, Esquire
17  Ad Hoc Committee:         POTTER ANDERSON & CORROON LLP
                              Hercules Plaza
18                            1313 North Market Street, 6th Floor
                              P.O. Box 951
19                            Wilmington, Delaware 19801

20
    For Numerous Firms and    Irwin Zalkin, Esquire
21  Claimants:                THE ZALKIN LAW FIRM, P.C.
                              1441 Broadway, Suite 3147
22                            New York, New York 10018

23

24

25
```

1        (Proceedings commenced at 2:00 p.m.)

2            THE COURT:  Good afternoon.  This is Judge

3   Silverstein.  We're here in the Boy Scouts of America

4   bankruptcy; Case No. 20-10343.

5            Please make sure if you are not speaking that you

6   are muted.  I will recognize Mr. Abbott.  We're here for a

7   status conference.

8            Mr. Abbott?

9            MR. ABBOTT:  Yes, Your Honor.  Thank you.

10            Can you hear me okay?

11            THE COURT:  I can.

12            MR. ABBOTT:  Thank you.  Derek Abbott of Morris

13   Nichols Arsht & Tunnell here for the debtors, Your Honor.

14            We did ask the court to convene this status

15   conference and I would like to turn the podium over to Matt

16   Linder from the White & Case Firm who will address the court

17   on the current status, if I may.

18            THE COURT:  Mr. Linder?

19            MR. LINDER:  Good afternoon, Your Honor.  Matt

20   Linder of White & Case for the debtors.

21            Can you see and hear me okay?

22            THE COURT:  I can hear you.

23            MR. LINDER:  You'll find me somewhere in the

24   squares.

25            THE COURT:  You can continue.

1              MR. LINDER:  Great.  Your Honor, Ms. Lauria had an

2    unavoidable conflict today and she asked me to convey to the

3    court her apologies for not being able to appear.  I am joined

4    by my colleagues Mr. Andolina, Mr. Kurtz, and Mr. Hammond.

5    They will be available to address the court regarding

6    litigation related items including the insurer's pending

7    discovery request and the depositions that the insurers have

8    noticed.

9              If I may, Your Honor, I'd just like to give some

10   introduction remarks to start-off the status conference.  This

11   is the first opportunity that the debtors have had to address

12   the court since the May 19th hearing on the exclusivity

13   motion, among other things.  We are extremely pleased to be

14   appearing before Your Honor today having signed on July 1st a

15   landmark restructuring support agreement between the debtors,

16   the ad hoc committee of local councils, the tort claimants

17   committee, the future claimants representative, the coalition

18   of abused scouts for justice, and State Court council

19   representing approximately 60,000 abuse claimants.

20             The debtors filed the motion to approve the RSA on

21   July 1st, and the plan and disclosure statement that

22   substantially incorporated the terms of the RSA were filed on

23   July 2nd.  As Your Honor is aware, we're seeking to have both

24   the RSA and the disclosure statement heard during the July

25   20th and 21st hearings with the hearing on the RSA to precede

1 the hearing on the disclosure statement.  Of course, neither

2 the RSA nor the disclosure statement hearing are before the

3 court today.

4          The RSA and the fourth amended plan at a high

5 level, Your Honor, provide for total liquidated contributions

6 to the settlement trust by the debtors and the local councils

7 of $850 million, plus all of the debtors and the local

8 councils' respective rights under prepetition insurance

9 policies that do not contain exclusions for sexual abuse.

10 There is evidence of these policies dating back as far as 1935

11 for the debtors and to the 1940's for some of the local

12 councils.

13          For that reason it's the debtors' belief, and is

14 fully shared by the other RSA parties, that these insurance

15 policies provide a significant source of value to the

16 settlement trust and in turn to abuse claimants.

17          While many of the terms of the RSA were already

18 incorporated into the third amended plan, which the debtors

19 filed on June 18th, there are several new additions that I

20 thought I would briefly highlight.  I will not step through

21 all of the many terms of the RSA.  I just wanted to touch on a

22 few of them.

23          First, Your Honor, the agreement provides that in

24 addition to the debtors' $250 million settlement contribution

25 which was unchanged from the third amended plan filed on June

1 18th the local councils will, under the RSA, contribute an

2 additional $100 million to the settlement trust which brings

3 the aggregate local council contribution from $500 million to

4 $600 million; again, plus significant insurance rights.

5          Second, the UCC has agreed to modify the treatment

6 for holders of non-abuse litigation claims to facilitate the

7 assignment of certain recent insurance policies to the

8 settlement trust while at the same time preserving those

9 creditors ability to recover, in-full, either under

10 prepetition settlement agreements or following the effective

11 date.  Again, those are holders of non-abuse litigation claims

12 which are predominately personal injury or wrongful death

13 claims.

14          Third, Your Honor, the TCC has agreed to stay the

15 restricted assets adversary pending the outcome of the

16 confirmation hearing.  You will recall that this is the

17 adversary proceeding that the TCC characterized as mind-

18 numbingly complex and fact intensive.  It was one of the

19 drivers of the court's concerns regarding the confirmation

20 timeline.

21          I have just been told that my video is off, so I am

22 going to start it now.  I apologize for that, Your Honor.

23 That was a technical snafu here.  Apologies.

24          Just returning to my remarks the plaintiff

25 representatives have also agreed to withdraw their objections

1   to the exclusivity extension motion.  So that motion which

2   remains pending is now unopposed by the constituents.

3   Finally, the plaintiff representatives have also agreed to

4   support the extension of the preliminary injunction through

5   the effective date of the plan.

6          The last term of the RSA that I would highlight is

7   that the debtors have agreed to seek a determination from the

8   court that they had no obligations to seek approval of and

9   have no obligations under the Hartford settlement agreement.

10  As the debtors previously noted, both in the June 18th plan

11  and in the July 2nd plan, the abuse claimants have unanimously

12  and consistently informed the debtors that they would never

13  support, in no uncertain terms, any plan of reorganization

14  that contain the Hartford settlement agreement in its current

15  form.

16         For that reason removing the Hartford settlement

17  from the plan is a condition to the RSA, but rather than

18  unilaterally excising the Hartford terms from the plan the

19  debtors have elected to seek a determination from the court in

20  an effort to prevent what we expect could, otherwise, become a

21  costly and distracting issue, contested issue, in these cases.

22         With the settlements embodied in the RSA, Your

23  Honor, the debtors have now reached agreements with each and

24  every single one of their major creditor constituencies

25  regarding the terms of the plan and related matters.  These

1  constituencies, importantly, are not limited to the abuse

2  representatives.  They also include the unsecured creditors

3  committee and JPMorgan.

4         On behalf of the debtors I'd like to acknowledge

5  and thank each of the RSA parties: the UCC; JPMorgan; our

6  mediators Kevin Carey, Paul Finn, and Tim Gallagher; counsel

7  for each of the RSA parties; James Stang for the TCC; David

8  Molton for the coalition; Jim Patton, the FCR; Rachel Ringer

9  for the UCC; and each of their respective teams for what have

10  truly been tireless efforts over the last several months to

11  resolve conflict disputes and to work through settlement terms

12  that will be best serve the interest of the estates,

13  creditors, including abuse creditors, and the charitable

14  mission of the Boy Scouts of America.

15         The plan now provides for a viable pathway to

16  deliver equitable compensation to the men who were abused

17  during their time in scouting.  The debtors are now in a

18  position where they do not need to confront either of what

19  Your Honor referred to as un-attracted options during the May

20  19th hearing.

21         First, the debtors will not be soliciting a plan

22  that has no abuse survivor support.  To the contrary, we

23  believe that the fourth amended plan, as it may be further

24  amended, will be overwhelmingly accepted by holders of abuse

25  claims.

1    Second, the debtors will not be engaging in

2  protracted litigation with abuse survivor constituents.  This

3  includes, among other things, the restricted asset adversary

4  which we have settled on the terms set forth in the RSA.

5    Importantly, before I turn to the timeline, Your

6  Honor, we have obtained the same plan structure in the fourth

7  amended plan that has been in our plan since the inception of

8  these cases with respect to insurance companies and chartered

9  organizations.  Each of those entities will have the

10  continuing ability to negotiate an appropriate resolution of

11  its liabilities and become a protected party that benefits

12  from the challenge injunction under the plan.

13    The mediation remains ongoing and our mediators are

14  continuing to actively engage with the insurers and chartered

15  organizations as well as the debtors and other parties.  For

16  our part, Your Honor, the debtors will continue to work to

17  maximize the value of the settlement trust in advance of

18  confirmation.  We certainly don't consider our work finished

19  in that regard.

20    As I previewed, I'd like to also turn to the

21  timeline and that has really been the focus of the insurance

22  filings that Your Honor has seen come in, in recent days and

23  as early as today and last night.  In what I'm sure will be a

24  preview or coming attractions the insurers, including Century

25  and Hartford, have urged the court to delay the hearings on

1  both the RSA and the disclosure statement by, at least, two

2  weeks.  As I referred to earlier they have also served the

3  debtors with extensive discovery and notice depositions and

4  certain BSA principals and advisors.

5         The court has heard Ms. Lauria, on repeated

6  occasions, emphasize the fact that the debtors needed to

7  emerge from bankruptcy by the end of the summer.

8  Unfortunately, it took longer to negotiate a resolution that

9  we have been working towards for the past seventeen months and

10 oppose delaying our timeline.

11        To address that, at least in part, the liquidity

12 concerns that is done from that delay the debtors have

13 negotiated a step-down over time of the amounts that they will

14 contribute in cash to the settlement trust upon emergence.

15 Importantly, Your Honor, those step-downs were calculated

16 based on the assumption that the debtors' operations would

17 continue to perform the plan.  There is certainly all these

18 risks that the debtors may under-perform.

19        So the need to emerge expeditiously has not changed

20 despite the fact that we will now spend -- the BSA will now

21 spend a second recruiting season which coincides with the

22 beginning of the school year in bankruptcy.  We also

23 recognize, Your Honor, that the timeline really is a balancing

24 act between the estates need to exit bankruptcy quickly,

25 preserving charitable missions, preserving value for abuse

1 survivors, and on the other hand ensuring that the court and

2 the parties have adequate time to address all of the issues,

3 some of which are complex, that will arise in connection with

4 the disclosure statement and confirmation of the plan.

5       We attempted to recognize that balance by doing

6 what we can to move forward expeditiously, that includes in

7 response to the insurers notice filing and their discovery.

8 For the debtors' part we will be ready to proceed with the RSA

9 motion and the disclosure statement as early as July 20th and

10 21st.

11       As to the RSA we filed the RSA motion along with a

12 motion to shorten notice by a mere two days so that the motion

13 could be heard on July 20th prior to the court taking up the

14 disclosure statement.  From our perspective there is no reason

15 that the RSA hearing needs to be delayed either based on the

16 slightly shortened notice that we have given the parties or

17 based on the insurers needing to take discovery and to take

18 depositions.

19       As the insurers, themselves, noted in their

20 pleadings they had drafts of the RSA, the term sheet, and the

21 TDP since as early as June 25th; although, those forms have

22 changed due to the unfolding of negotiations.  They are

23 substantially in the form that was presented to the insurers.

24 So there is really no reason that the insurers need what would

25 amount to more than one month to take discovery and prepare

1  for a hearing on what would, otherwise, be a 21 day motion.

2          As to the disclosure statement, Your Honor, we

3  filed an interim version of the disclosure statement on June

4  18th.  The debtors sought to encapsulate in that version of

5  the DS the -- I'm sorry, the plan and DS that had been

6  negotiated to date, the RSA terms that have been negotiated to

7  date.  That was preceded by other proposed amendments to the

8  DS on May 16th.  So this has really been an incrementally

9  changing document over time and the changes have been made

10 over a period of several months.

11         We want to take into account, certainly, the

12 court's calendar and the court's views on the amount of notice

13 that needs to be provided to the parties in light of the

14 changes that have been made to the disclosure statement, but

15 at the same time its critically important to the debtors that

16 the disclosure statement and the plan be put out for

17 solicitation as soon as possible.  We're really primarily

18 concerned not with the immediate timeline, but more so with

19 the backend timeline.  We understand the court has set aside

20 the week of September 27th or, at least, held those dates for

21 the confirmation hearing and we would like to keep that

22 backend timing for the confirmation hearing intact or close to

23 it if at all possible.

24         The last subject that I would address, Your Honor,

25 is discovery.  The insurers served the debtors with discovery

1  on July 2nd and 3rd shortly after we filed the RSA motion.

2  The discovery requests are voluminous, they include 34

3  requests for production, 21 requests for admission, seven

4  interrogatories and they're primarily focused, as you would

5  expect, on the negotiation of the RSA and the Hartford

6  settlement agreement.

7         The timeline is highly compressed.  The insurers

8  requested responses to their discovery by today, July 7th.

9  The debtors have been working around the clock, including over

10  the holiday weekend, to stay on track to meet the insurers

11  requested deadline and we expect to have the production

12  substantially complete by tomorrow.

13         The insurers also noticed the depositions of the

14  debtors' CEO, Mr. Mosby; the debtors' national chair, Mr.

15  Ownby; and the debtors' financial advisor, Brian Whittman of

16  Alvarez & Marsal.  These depositions were noticed for July

17  8th, 9th, 10th and 12th.  So the end of this week and the

18  beginning of next.  The debtors have agreed to produce these

19  witnesses for depositions on Monday and Tuesday of next week,

20  July 12th and 13th.  We had originally proposed to do so

21  earlier, but the insurers asked for more time following our

22  production of documents and we agreed to move the depositions

23  accordingly to next week.

24         Finally, the insurers have stated several reasons

25  why they need discovery in connection with the RSA motion; one

1  of which is really their mischaracterization of the findings

2  in the proposed order granting the RSA, approving the RSA.  To

3  be clear, the debtors agree that the relevant standard that

4  governs approval of the RSA is the business judgment standard

5  and whether the debtors' decision to enter in the RSA was a

6  sound exercise of their reasonable business judgment.

7       To make that abundantly clear and to carefully

8  delineate precisely what relief would be granted by the entry

9  of that order we included a broad carve-out in the proposed

10  order, in a reservation of rights, providing that the court's

11  findings and rulings to not extend beyond the RSA itself.

12  They do not extend to the exhibits of the RSA.  They do not

13  extend the disclosure statement or the plan.  The rights and

14  objections of the parties are expressly reserved under the

15  preserved order that is on file with the court.

16       If this reservation is not enough the debtors are

17  happy to work with the insurers to address any of their

18  concerns, but in any event the court will not be asked that

19  the RSA approval hearing to determine any plan confirmation

20  issues including good faith for purposes of 1129 of the Code.

21       I will conclude, Your Honor, by thanking the court

22  for allowing us to reschedule the disclosure statement on

23  several occasions.  That flexibility really allowed us to put

24  together a plan that enjoys broad base creditor support and

25  now that the planets have aligned we are pleased to move

1  forward deliberately and expeditiously to confirm the plan and

2  emerge from bankruptcy having achieved our reorganization

3  objectives.

4          If the court has questions I'm happy to address

5  those; otherwise, I would be happy to turn the podium over to

6  the other supporting parties who I know would like to address

7  the court.

8          THE COURT:  No.  I don't have any questions.

9          MR. MASON:  Your Honor, its Richard Mason.  May I

10 be heard?

11         THE COURT:  Mr. Mason?

12         MR. MASON:  Thank you, Your Honor.  Thank you, Mr.

13 Linder.  Good afternoon, Your Honor.  Richard Mason of

14 Wachtell, Lipton, Rosen & Katz on behalf of the ad hoc

15 committee of local councils.

16         As Your Honor is aware, the ad hoc committee, of

17 which I am very pleased to be the chair, consists of

18 volunteers from eight local councils across the country.  The

19 ad hoc committee has been closely involved in this Chapter 11

20 case from the beginning, Your Honor, was an active participant

21 in the intensive mediation sessions with the TCC, the

22 coalition, the FCR, and other parties that led to the RSA, and

23 as a signatory to the RSA itself.

24         Your Honor, if you had asked me a month ago whether

25 we would be before you today with the support of the

1  coalition, the TCC, the FCR and all major creditor groups on a

2  deal I'm not sure what I would have said, but I don't think it

3  would have been yes.  The recent months have been very

4  intensive, but they have resulted in an agreement that paves

5  the way for a successful global resolution in these cases.

6  That is an extraordinary achievement.

7       In the RSA the ad hoc committee agreed to use

8  reasonable best efforts to persuade the over 250 local

9  councils to make the contribution to the settlement trust

10  described in the amended term sheet.  The ad hoc committee is

11  literally right in the middle of that effort almost as we

12  speak, Your Honor.  It is the culmination of nearly 18 months

13  of the ad hoc committee's interaction with local councils on

14  the issue of potential settlement contributions. We're

15  spending hours on the phone and on Zoom each day at night with

16  local councils across the country and will continue those

17  efforts in the coming weeks.

18       With all the progress that has been made, Your

19  Honor, the ad hoc committee agrees with the BSA and Mr. Linder

20  that timing is absolutely critical here.  The most important

21  season for local councils is the fall when we do our

22  recruiting and scouting units, and much of our fundraising.

23  Local councils and their staff, boards, chartered partners,

24  parents and volunteers will be looking at the BSA case to see

25  whether we've made progress and if an end is nearly in sight.

1    Delays in the timeline will lead to questions that

2  will be very difficult to answer.  Parents will wonder whether

3  to pay registration fees to an organization without a clear

4  path out of Chapter 11. The owners will want their dollars to

5  go to helping kids who will ask whether this will be a

6  successful project or whether their funds are better spent

7  elsewhere.  Without a timeline, Your Honor, that answers these

8  questions and preserves the business aspects of scouting the

9  very impressive settlement, I would say, that we have reached

10  with the tort plaintiffs and other major creditor

11  constituencies in this case may well be for not.

12    In other words, Your Honor, if the debtors can't

13  keep their timeline that alone could easily undermine the

14  scouting mission and make compensating victims equitably and

15  insuring that scouting survives very difficult to achieve.

16  We're closer than ever to making these goals a reality and the

17  ad hoc committee believes that we need to stay on track to get

18  there.

19    Now, of course, were not assuming that Your Honor

20  will approve the RSA or the disclosure statement and plan;

21  although, we will, of course, urge approval at the appropriate

22  time.  We're merely asking that that time be scheduled as

23  expeditiously as reasonable and possible for the benefit, Your

24  Honor, of the millions of youth that scouting serves today and

25  hopefully as a result of this historic settlement will

1  continue to serve in the future.

2          Thank you, Your Honor.

3          THE COURT:  Thank you.

4          MR. MOLTON:  Your Honor, may I go?  David Molton.

5          THE COURT:  Mr. Molton?

6          MR. MOLTON:  Thank you.  Can you hear me, Your

7  Honor?

8          THE COURT:  I can.

9          MR. MOLTON:  Thank you.  Your Honor, David Molton

10 of Brown Rudnick for the coalition of abuse scouts for

11 justice.

12          I want to reiterate what I just heard from Mr.

13 Mason.  I think that what you have in front of you, Your

14 Honor, is a remarkable outcome in light of where we were

15 recently demonstrating the very, very hard work of the

16 mediation parties and like Mr. Linder I would like to

17 specifically thank our three mediators who were gallant and

18 untiring in their efforts to work with all the parties.

19          My first point, Your Honor, is I think it's

20 important to note, and I know others have said it, that the

21 RSA and the term sheet bring together all of the major

22 survivor creditor constituencies in the other creditor groups.

23 As Your Honor knows, the coalition presently represents 18,000

24 survivors and its affiliated counsel represent over 60,000 of

25 the 80,000 claimants, survivors in this case.

1        We signed the RSA.  We negotiated the term sheet.

2   We're looking forward to move forward.  We have done that with

3   hand-in-hand, arm-in-arm with our other survivor

4   constituencies, the two fiduciaries, the TCC and the FCR.

5   With us, Your Honor, in going forward along this line were the

6   UCC as well as Mr. Mason's local counsel ad hoc committee.

7   Truly, Your Honor, a remarkable result again when one looks

8   just a few months ago.

9        Second, Your Honor, I believe that this is a

10  seminal and historic achievement in this case.  It's a turning

11  point and as Mr. Linder said it's not the end, we still have

12  wood to chop and we still have -- you know, we still have a

13  road to walk.  But what it does do, Your Honor, and, again,

14  you know, depending -- you know, no presupposing Your Honor's

15  decisions as to RSA approval as well as disclosure statement

16  and confirmation, but it allows the plan to proceed to a

17  disclosure statement hearing and confirmation in 2021.

18       As Your Honor knows, we have a date set in

19  September for the confirmation and I think all of the RSA

20  parties are committed in working with all of the parties in

21  this case to provide an avenue towards getting there fairly

22  with adequate time and notice.

23       Second, Your Honor, it provides a structure for

24  fair and equitable treatment of the abuse survivors.

25       Third, Your Honor, it provides a platform to

1  augment the trust with contributions from other parties in

2  this case who would want to join pre-confirmation into the

3  structure in terms of going forward.

4          Fourth, Your Honor, it allows Boy Scouts to exit

5  from this bankruptcy, which is something we've heard as an

6  aspiration from day one.  And if Your Honor takes a look at

7  some of the provisions of the term sheet including the non-

8  monetary commitment section it provides the architecture for

9  safe scouting, for safe scouting going forward.  I think that

10  serves well the needs of all the parties in this case and most

11  importantly the survivors.

12          Your Honor, I'm not going to use the status

13  conference for posturing or for any dry run of responses to

14  RSA objections or confirmation objections, but I do want to

15  make just a few points before I leave.

16          Number one, Your Honor, the mediation continues, as

17  Mr. Linder says.  Any suggestion that it doesn't is just wrong

18  and disingenuous.  We look forward, the coalition looks

19  forward to engaging other parties in this case in the same way

20  that it went forward from the time it became a mediation party

21  and got to this point.  So I do want to note, Your Honor, that

22  the mediators are still working, working hard, and providing

23  an avenue for further consensus and resolution.

24          Second, Your Honor, my second point I want to make

25  is just reading some of the movants and the joinders in

1  response to the debtors' motion to shorten time.  I see,

2  again, something I've seen a lot of since I've made an

3  appearance in this case.  I wasn't here on day one, but it's

4  almost a year since we have appeared in this case.  I see a

5  lot of misdirection and attack.

6          I just want to note, Your Honor, as we go forward,

7  that, you know, from our perspective here the confirmation

8  objections, whatever they be, will be dealt with by Your Honor

9  in an appropriate time and, you know, again, I want to allay

10  what has now become the regular and customary references to

11  social media mutterings which at this point, Your Honor, is

12  probably well expects in pleadings; you know, opposing

13  movement in this case.  The coalition remains committed to

14  working hard and going forward, Your Honor.

15          Lastly, I think it's important to reiterate what

16  Mr. Linder and Mr. Mason said about keeping to schedule.  We

17  view it as important to the survivors. I know that Mr. Linder

18  and Mr. Mason talked about how important it is to scouting,

19  but it's important to the survivors to get to a confirmation

20  hearing and to get to an effective date.

21          The survivors in this case have been waiting, some

22  of them, for decades for just equitable compensation.  We now

23  have a path that gets there.  As Your Honor well knows, moving

24  this case along that path will actually facilitate and not

25  hinder whatever possible further consensual resolutions that

1   may come about.  So I do want to say, Your Honor, that we join

2   in all the RSA parties in urging this court to move forward

3   with alacrity, you know, of course, preserving everybody's

4   rights.

5          In conclusion, Your Honor, as I mentioned to you

6   during our Rule 2019 fight, so a little over a half a year

7   ago, I mentioned to you that the coalition will be a

8   constructive valuable, if not indispensable and critical party

9   in bringing this case to a successful conclusion.  I asked you

10  to look at what we did and not what was said about us.  I

11  think we have proved my points, Your Honor.  I think we have

12  demonstrated all of that and will continue, Your Honor, to

13  march forward with our RSA parties to a successful

14  confirmation.

15         If Your Honor has no questions that's all I have.

16         THE COURT:  Thank you.  I do not.

17         Does anyone else --

18         MR. LUCAS:  Your Honor, this is John Lucas of

19  Pachulski Stang Ziehl & Jones for the official committee of

20  tort claimants.  May I be heard?

21         THE COURT:  Mr. Lucas?

22         MR. LUCAS:  Thank you, Your Honor.  And, Your

23  Honor, I will be brief.  I am not going to repeat everything

24  else that has already been said, but we think that there are

25  two primary points here to be made today or at least that the

1  TCC is going to re-emphasize.

2         There is agreement here, Your Honor, among all the

3  primary constituencies and the second issue here is that

4  because there is an agreement we need to move forward with the

5  timeline and get the plan confirmation process rolling.  It's

6  imperative to the process and it's imperative to survivors

7  that the process begin so that the plan confirmations can go

8  through, and be completed, and be considered by the court.

9         Nothing further, Your Honor.

10        THE COURT:  Thank you.

11        MR. BRADY:  Your Honor, Robert Brady for the FCR.

12        THE COURT:  Mr. Brady.

13        MR. BRADY:  Your Honor, again, I will try not to

14  duplicate what has been said, but we agree this is a major

15  achievement that has been reached.  Really, the most

16  significant progress in this case to date.  And like the

17  others, the FCR remains committed and prepared to continue the

18  mediation efforts to try to reach a resolution with other

19  interested parties.

20        Your Honor has already commented about the burn

21  rate in this case.  Your Honor is well-aware of the importance

22  of the schedule to the BSA and its ability to continue its

23  scouting mission.  And, of course, Your Honor, survivors have

24  already waited far too long to receive compensation for the

25  abuse they suffered.

1      We heard you loud and clear at the May 19th hearing

2  and the primary creditor constituencies went back to work,

3  worked very hard, and came together to achieve the plan term

4  sheet.  We asked the court to resist calls for further delay

5  and to put this debtor on a path to exit this very costly

6  bankruptcy.

7      Thank you, Your Honor.

8      THE COURT:  Thank you.

9      MS. WASSON:  Your Honor, Megan Wasson from Kramer

10  Levin on behalf of the UCC.  May I be heard briefly?

11      THE COURT:  Ms. Wasson?

12      MS. WASSON:  Thank you, Your Honor.  I'm also

13  joined by my colleague, Rachel Ringer, from Kramer Levin.

14      As others have echoed, the UCC is pleased that the

15  debtors have come to an agreement on the terms of a plan with

16  the TCC, the coalition, the FCR and the ad hoc committee of

17  local councils.  We think this settlement represents a

18  material step forward for these Chapter 11 cases and we echo

19  the appreciation of the debtors for all of its constituents

20  and the mediators for their efforts.

21      For a number of reasons, including those that have

22  been discussed, (indiscernible) parties we also believe that

23  maintaining an appropriate timeline is important for the

24  success of these cases and we are supportive of facilitating

25  confirmation of a plan and a smooth emergence from bankrutpcy

1  as soon as possible.

2          We believe that the timeline the debtors have

3  proposed is reasonable and we would support the debtors

4  request to adhere to that proposed timeline subject to the

5  court's availability.

6          Thank you, Your Honor.

7          THE COURT:  Thank you.

8          MR. ANKER:  Your Honor, this is Philip Anker.  Can

9  you hear me?  I have a somewhat unstable network.  Can you

10  hear me, Your Honor?

11          THE COURT:  I can.  I want to make sure that I've

12  heard from all of the parties in support of going forward on

13  the current timeline and then I will come to you, Mr. Anker.

14          MR. ANKER:  Thank you, Your Honor.

15          THE COURT:  Anyone else?

16          MR. ZALKIN:  Your Honor, this is Irwin Zalkin of

17  The Zalkin Law Firm.  I would like to speak on behalf of a

18  number of firms and several thousand claimants who are not on

19  board yet with this plan and the RSA.  I don't know if this is

20  the appropriate time for me to speak or if you want to hear

21  from others who are still want to address their support for

22  the plan.

23          I've been putting up my little hand here.  I don't

24  know if it's working or not working.  So I don't want to speak

25  out of turn, but whenever the court would like to hear from me

1  I'd like to speak.

2          THE COURT:  Thank you.  I will not forget you, Mr.

3  Zalkin.

4          MR. ZALKIN:  Thank you.

5          THE COURT:  Is there anyone else who wants to speak

6  in support of the current timeline?

7      (No verbal response)

8          THE COURT:  I'm not hearing anyone else.

9          Mr. Anker, I'm going to go to you first.  I think

10 Hartford is in a somewhat unique position.  So I'm going to

11 come to you first.

12         I will get back to you, Mr. Zalkin.

13         MR. ANKER:  Thank you, Your Honor.  I apologize for

14 jumping the gun earlier.  I am actually seeing some delay

15 because I am not in my office today, I'm out of town at my in-

16 laws and I apologize, Your Honor, if you have difficulty

17 hearing me.

18         Your Honor, I'm going to try to focus on

19 scheduling.  I think the temptation for everyone, and you

20 heard a lot of it today, frankly, this protest to the contrary

21 is to poison the well.  I do think it is important to Boy

22 Scouts, all things being equal, to get out of bankruptcy

23 sooner rather than later. I am not going to deny that.  I do

24 not deny that it is important for those legitimate to actually

25 be able to get paid sooner rather than later.  But it is also

1  important for parties who have substantial objections and

2  whose rights would be effected to have due process and be

3  heard.

4       Hartford is in a unique position.  We will,

5  whatever Your Honor's schedule is we will abide by it.  We

6  will be filing a substantial response to the RSA.  To just

7  give you a hint and to let you know, I think I owe it to you

8  as a matter of candor, that we will make two principal broad

9  points.

10       The first is that while the debtor uses the word

11  "determination" that's a synonym for a declaration.  They're

12  seeking declaratory relief with respect to the rights my

13  client has and they have it (indiscernible) properties arguing

14  (indiscernible) today is not the day to hear substantive

15  argument that that requires an adversary proceeding.

16       Second, putting that procedural point to the side

17  for the moment.  As a matter of substance, they are seeking a

18  determination, by their own papers, that they need not seek

19  approval of the plan. The Third Circuit has held directly to

20  the contrary in the Martin case and there is case law in other

21  circuits including in the plan context, including in the plan

22  context.  We will cite that law to you.  We will have that

23  argument.  We will, in our papers, recite facts.

24       I am hopeful, because I do think I am dealing with

25  honorable adversaries on the debtor side, that they will not

1  dispute those facts.  They will not come to this court and

2  dispute that they explicitly said to us they would never re-

3  trade the deal.  They explicitly said to us we do not need and

4  want a fiduciary out.  They explicitly said to us, and this is

5  how our deal was structured, and you heard Ms. Lauria say it a

6  few weeks ago in court you have an alternative if the claimants

7  vote no.  We have a toggle plan which gets BSA, the only

8  entity that has filed for bankruptcy, out of bankruptcy

9  without

10        And you also heard, and you will see this in our

11  papers, Mr. Stang stand up in court and say that alternative,

12  returning everyone in the tort system, and letting them have

13  everything that they're entitled to as a matter of law, every

14  plaintiff gets his day in court and can seek a zillion

15  dollars; that is (indiscernible).  That is a direct quote from

16  Mr. Stang.  That is worse, worse than a plan that includes the

17  Hartford settlement.

18        I would like to think that none of those facts will

19  be disputed, but if any are disputed we need time for some

20  discovery.  We filed our discover request, and I heard Mr.

21  Abbott describe the volume of requests and I assume he is

22  right for all the insurers, but as to Hartford it was a

23  handful of document requests, a handful of requests for

24  admissions and one or two interrogatories.

25        What they cite in those documents about the

1  negotiations in one or two depositions.  We filed those in

2  less than 24 hours after the RSA was filed.  Yes, Your Honor,

3  if we absolutely have to, we will take the depos Monday and

4  Tuesday, and file our papers two days later.  Will they have

5  cites to everything, will we be able to deal with what happens

6  when -- and we've been told this, the other side doesn't take

7  the position that everything is subject to the mediation

8  privilege and, therefore, we will get virtually no documents.

9  We will, I guess, come to Your Honor on, you know, five

10 minutes notice or we'll just have to go forward and hope that

11 at the end of the day there isn't a dispute over the facts and

12 that my adversaries are honorable that would really happen

13 here.

14         I would suggest to you having a two week period to

15 let that go is hardly, hardly in the bigger picture of this

16 case going to really create enormous delay and prejudice to

17 other parties compared to the prejudice to my client which was

18 the only (indiscernible) to come to a deal.  That's point one.

19         Point two, we do ask that the disclosure statement

20 hearing be at a different time subsequent to the RSA hearing.

21 My client, under its settlement agreement, cannot object to a

22 disclosure statement or plan that includes our settlement, and

23 the currently filed one does.

24         Now I want to be candid with Your Honor, I'm not

25 going to overstate how much my hands are tied behind my back.

1  I think I can write something that says, you know, to the

2  extent they really want to go forward with our deal then

3  ignore the following twelve pages, but if they're not then

4  stick with the following twelve pages.  But it is awkward,

5  Your Honor, it is awkward drafting and contrary to the

6  suggestion that is made the disclosure statement has enormous

7  changes.

8         Let me just highlight a couple.  Your Honor may

9  recall that when the mediation process began one of the

10  proposed mediators was Eric Green.  And there was an objection

11  filed by my client, my co-counsel, Mr. Ruggeri, pointing out

12  that Mr. Green has represented Mr. Patton in case after case,

13  after case, after case.  He has now proposed, for the first

14  time, to be the trustee.  I surmise that that was not the

15  debtors' suggestion.  I surmise that that was the claimants'

16  objection and then they wrote a TDP that basically says that

17  Mr. Green can do whatever he wants to do.  So now he's going

18  to be the judge and determine BSA's liability and then stick

19  it to us.

20         Section (a), it provides that the debtors shall --

21  are obligated under a plan to seek a series of findings.  One

22  is that everything is binding on everyone.  That is after

23  mister (indiscernible) stood up in this court and said, Your

24  Honor, you can't determine whether your orders are res

25  judicata; that's, obviously, designed to stick it to the

1  insurers.

2          They go on in the second finding to ask for a

3  determination that the TDP's are reasonable and provide a

4  reasonable process for allowing every claim.  They go on to

5  seek a determination finding that goes entirely to coverage

6  about whether our coverage obligation as insurers is for the

7  full amount allowed or (indiscernible) paid out on it.  And it

8  goes all new provisions.

9          So they render the plan patently unconfirmable at

10  the disclosure statement hearing.  I'm sure we're going to

11  have a debate on that, but there certainly needs to be time

12  for disclosure including discovery.  I have a prediction, I

13  could be proven wrong.  I don't think Ms. Lauria, Mr.

14  Andolina, or anyone else from BSA asked (indiscernible)

15  findings.  I think every one of them, every one of them was

16  put in by the claimants' counsel.

17          Yes, (indiscernible) out there where claimant

18  lawyers were not on board, maybe they are folks represented by

19  Mr. Zalkin, are saying that the professionals for the

20  coalition and for the TCC are saying if we get this plan

21  confirmed the insurers will have no ability whatsoever to

22  defend the case in coverage for it.  This will be binding on

23  them.  These findings will just get rubber stamped and it will

24  be over.  I hope that's wrong.  I don't think its right, but

25  that surely implicates our due process concerns.

1          So what I would respectfully ask, Your Honor, and I

2    am going to apologize now because I said to you I wasn't going

3    to get into the merits, I realize I have, but I wanted you to

4    appreciate what's at stake here.  I would appreciate that we

5    have a little bit of time to take discovery before the RSA

6    motion goes forward.  Hopefully there won't be factual

7    disputes.

8          Hopefully we can work through the privilege issues,

9    but if not get them resolved in a matter of a couple of weeks,

10   and that we then have the disclosure statement hearing

11   thereafter so we know whether we're going forward on a

12   disclosure statement on a plan, global settlement including

13   Hartford or alternatively the toggle plan, or instead we're

14   going forward with the new fourth amended plan in its reach

15   all agreements with Hartford.  Let us know which one we're

16   going forward with, let us have a reasonable, but not

17   elongated period for discovery leading into the disclosure

18   statement hearing and let us then have that disclosure

19   statement hearing.  We're talking about what in the aggregate

20   is maybe an adjournment of a month, further then having both

21   matters heard on July 20th.

22         Your Honor, unless you have questions those are the

23   points I wanted to make and I do hope they help on the

24   scheduling issues which I think are really what is before the

25   court today.

1        THE COURT:  Thank you.

2        Mr. Zalkin?

3        MR. ZALKIN:  Thank you, Your Honor.  Good

4   afternoon.

5        I -- this is my first appearance.  Just a little

6   bit of what my background is.  Our firm we have offices in San

7   Diego and New York.  We have been representing survivors of

8   childhood sexual abuse around the country for the past twenty

9   years or more.  I was appointed liaison counsel on behalf of

10  all the claimants in the San Diego Diocese bankruptcy by Judge

11  Louise DeCarl Adler and was the principal negotiator of the

12  $200 million settlement in that case which ended up with a

13  discharge of the bankruptcy as opposed to a plan.

14       I know Mr. Molton.  He was involved with me in

15  that.  We worked closely together.  I know Mr. Stang.  He and

16  I worked together not only on the San Diego bankruptcy, but

17  other bankruptcies.

18       We have looked at our firm and I will represent to

19  you that there are probably, among the group of us, about 50

20  law firms who have been taking a very close look at the

21  disclosure statement, the RSA, the most recent proposed plan,

22  the previously proposed plan and I was going to come to you

23  today and say we are -- we have some serious concerns and

24  objections that we intend to raise at the disclosure hearing.

25  I didn't expect people to be previewing the plan, and

1 │ highlighting points of the plan in advance of that.

2 │           I would -- I'd feel remiss if I don't address some

3 │ of that.  I don't want to get into an argument on the merits

4 │ of the plan.  That would be appropriate for a confirmation

5 │ hearing.  There are serious issues with questions of the

6 │ channeling injunction and the effectiveness of the channeling

7 │ injunction here where the court has subject matter

8 │ jurisdiction over the local councils, whether the local

9 │ councils are making a substantial contribution to the plan.

10 │           There are issues with respect to whether the court

11 │ can enforce claims that are not, otherwise, enforceable within

12 │ State Courts.  There are issues as to whether there should be

13 │ parody in voting between claimants who would not have valid

14 │ claims in the State Court, with claimants that do have valid

15 │ claims in the State Courts.  I know, for example, our firm

16 │ represents substantial numbers of California claimants where

17 │ we have a valid and open statute of limitations.  And issues

18 │ whether those claims should be treated, from a voting

19 │ standpoint, at parody with claims of victims from states where

20 │ they are foreclosed from bringing claims by their statutes of

21 │ limitations.

22 │           There are issues as to whether and why the

23 │ contributions of the local councils represent less than a

24 │ third of what they are acknowledging are unrestricted assets

25 │ and whether the insurance claims or insurance liability of

1  those non-debtor third parties would, in exchange for those

2  injunctions which would release them from all claims now and

3  forever, cap the liability of those carriers to the amounts of

4  the contributions that are being made by the local councils

5  assuming the court approves the channeling injunction to those

6  councils.

7           There are questions as to what is happening with

8  the future claims.  We've got to address future claims.  There

9  is a future claims representative with respect to the BSA

10  whose mandate is limited to the claims of those who are under

11  18 or have recovered memories -- or may have recovered

12  memories of the future only in states that recognize recovered

13  memory, but there are other future claims that people brought

14  on behalf of victims like in California where they have a

15  delayed discovery, for example, where they don't make a causal

16  connection between their sexual abuse and their adult injuries

17  or psychological injuries or illnesses for years.  That would

18  give rise to a future claim.  That is not being represented,

19  those folks aren't being represented.  We don't know what

20  future claims will be as to the local councils should the

21  court agree to channel the claims against the local councils

22  to the trust.

23           It's been represented in meetings held by sponsors

24  of the RSA and the TDP to the plan that this is -- that

25  confirmation of the plan would be the equivalent of a

1  litigated plan and that the plan confirmation would operate as

2  a judgement enforceable against the insurers.  We have

3  researched this issue and we haven't seen -- we have concerns

4  as to whether that is a viable position.

5          There are more issues.  I don't want to go through

6  the litany of objections that we plan to make.  Those are just

7  some of the questions that we have that we don't feel

8  adequately were addressed.  When a client asks me what am I

9  likely to get in recovery here I have no way to answer that.

10  I don't know if the $850 million that is putting in

11  collectively between the BSA and local councils is, in fact,

12  $850 million.  That is a combination of cash and personal and

13  real properties.  I don't (indiscernible) plan or disclosure

14  statements that indicates that is adequately appraised.  We

15  have issues with is that real or what.

16          So I don't want to take up much more time.  This

17  wasn't my intention.  I just simply -- you know, I feel like I

18  needed to address, at least alert the court to what is coming.

19  We will be filing these objections.  I think we need time.

20  You know, we are looking at very serious issues.  I commend

21  the work of the people who have been involved in negotiations.

22  I have been there.  I know what it takes when you have

23  multiple moving parts.

24          I was involved in the LA Catholic abuse settlement.

25  We had hundreds of insurance companies for the insurers,

1  excess insurers that we have to try to herd into a deal.  I

2  understand the complexities and I'm not trying to blow-up

3  something.  There are serious issues and we need to make sure

4  that those are adequately addressed so that when we do get a

5  plan that's confirmable and enforceable.

6        Thank you for your patience with me.

7        THE COURT:  Thank you.

8        Mr. Rosenthal, I think I saw your hand up earlier.

9        MR. ROSENTHAL:  Yes, Your Honor.  Thank you.

10 Michael Rosenthal from Gibson Dunn on behalf of the AIG

11 Companies.

12       Your Honor, the insurers have watched with interest

13 this plan (indiscernible).  Unfortunately, we don't share the

14 debtors' celebration of success and, in fact, we think that

15 the deal that's been struck is just half a loaf and not one

16 that is likely to result either in the end of the case very

17 soon or in survivors getting money in their pocket in the near

18 future.

19       We did participate in all of the mediation

20 sessions, most of them in person.  We were largely excluded

21 from those sessions.  I think that was the plan, Your Honor.

22 As Ken Rothweiler, one of the claimant's lawyers, was quoted

23 as saying yesterday in an interview on PBS NewsHour,

24        "This settlement is the first step and that's

25 always been the plan to get the settlement with the debtors

1 and then we can turn to the insurers."

2           We were sent packing from the last mediation to

3 wait for the plan to be prepared.  Four weeks later we got

4 hundreds of pages of documents.  They came on the Friday

5 before the July 4th weekend; an RSA we hadn't seen, a term

6 sheet we hadn't seen, a plan that while it looked a little bit

7 like the other plan was different from the other plan.  TDP's

8 that were totally different from the other plan.

9           In the face of these significant changes the

10 debtors now propose that we have only seven days, eight days

11 to respond.  We don't think that accords due process to the

12 insurers, Your Honor.  We don't think that is fair.  These are

13 complicated complex documents.  As you might imagine, the

14 changes in these documents, as Mr. Anker said, are primarily

15 directed toward insurers.

16           You will see that the plan that was, relatively

17 speaking, insurance neutral before is now absolutely non-

18 insurance neutral.  Those are things that we believe are

19 absolutely essential to bring to the court's attention at the

20 disclosure statement hearing and that will require discovery

21 and significant briefing for the court.

22           As Mr. Anker said, as others have said you're going

23 to be asked to make findings that adjudicate the liability of

24 the insurers.  One of the things you said before was that you

25 didn't really know what insurance neutrality meant.  It's not

1  just a standing doctrine.  It's the expression that people use

2  for a plan that does not alter the contracts and the rights of

3  the insurers.

4        What this plan does is alter the rights of the

5  insurers under those contracts.  You cannot confirm a plan of

6  that type, Your Honor.  And we need to make those points clear

7  to you and we would hope that you would make clear to the

8  claimants that you will not approve a plan that alters those

9  rights.  You don't have the right to do that.

10       What these claimants have done, frankly, is they

11 have cut a deal with the debtor and in exchange for letting

12 the debtor get out of the case they have taken over the case.

13 They have prepared the TDP's, they have prepared the plan,

14 they put in the requisite timing that you have to make as

15 findings required by the RSA.  It is those issues, Your Honor,

16 that we need to develop for you and present to you, and it

17 will take some time.

18       As Mr. Anker said, both Century, Hartford, AIG and

19 a number of other insurers filed discovery requests the day we

20 received these documents.  They are requests that we have not

21 yet received responses to.  We did have a meet and confer.

22 The documents are supposed to be produced today or tomorrow.

23 Undoubtedly we will have discovery disputes.

24       We have already been told that many, if not all, of

25 the documents will be subject to mediation privilege.  We have

1 depositions that we've tried to schedule for next week, but in

2 the absence of both documentation it's hard to take the

3 depositions.

4          Then, under the current schedule, we would have an

5 objection due the day after, on the 14th, the day after the

6 last deposition is to be taken.  Your Honor, we believe that

7 is unreasonable and denies the insurers due process.  We

8 believe that allowing the insurers not a lot of time -- as

9 everyone has said here we're not looking to delay this case or

10 delay (indiscernible).

11          We just believe it is absolutely important for the

12 insurers to be able to evaluate their positions, evaluate

13 these documents, present their positions in a coherent and

14 cohesive manner to the court.  Delaying these hearings for ten

15 days to two weeks is not going to delay this case

16 unreasonably.  We think it's a very reasonable request, Your

17 Honor, and we would ask you to grant our motion for

18 adjournment.

19          THE COURT:  Thank you.

20          Let me ask this question, Mr. Rosenthal, with

21 respect to insurance neutrality, the way you have defined it,

22 what issues of fact need to be developed versus a position of

23 law that I, in fact, simply cannot make the findings that the

24 plan proponents are asking me to do?

25          MR. ROSENTHAL:  I think most of the issues on

1 insurance neutrality are matters of law.  I think the issues

2 of fact are the ones with respect to is the RSA a wise

3 exercise of the business judgment of the debtor.  Is it a wise

4 exercise of the business judgment of the debtor to abandon the

5 toggle plan which, effectively, put the claimants to a test of

6 agreeing to a consensual deal or going back into the tort

7 system.

8             Those kinds of issues, what did the debtor

9 consider.  We noticed the deposition of Mr. Mosby and Mr.

10 Ownby who are the two senior executives of Boy Scouts of

11 America.  We hope they will tell us what they considered, what

12 they thought about.  So those are the facts that we would be

13 discovering in the depositions.

14             I agree with you that many of the issues related to

15 insurance neutrality are issues that are governed by law.

16             THE COURT:  Thank you.

17             Who else would like to be heard?

18        (No verbal response)

19             THE COURT:  Mr. Schiavoni, you're muted, but I will

20 hear from you.

21             MR. SCHIAVONI:  Well, Your Honor, there I am, I

22 think.

23             Your Honor, one of the other issues on insurance

24 neutrality is somewhat of a mixed issue of fact and law is in

25 the run-up to the bankruptcy, the Boy Scouts, over half of the

1  amount of the claim that came in were paid for and funded by

2  the Boy Scouts under its own retained limits under the

3  policies.  The insurance program that the Boy Scouts couldn't

4  place was one that had significant, what they call "SIRs,"

5  retained limits under the policies, that the Boy Scouts had an

6  affirmative obligation to pay, as well as some of the other

7  insured entities.

8          Effectively, one of the things that has been done

9  through the RSA is to basically free that obligation,

10  completely change it so that there's sort of, essentially, a

11  dollar-one obligation, subordinate our rights with respect to

12  those claims, and effectively take away the impact of any

13  votes we would have with respect to those claims.  It

14  completely and totally changes the fundamental nature of the

15  insurance relationship with the Boy Scouts under those

16  policies, where, otherwise, the Boy Scouts are, in essence, a

17  partner in the defense of the claims.  The Boy Scouts sort of

18  walk wee there the obligation that they have on those claims

19  and at the same time, change the nature of those contracts,

20  requiring us to fund, in essence, their obligation, when

21  that's not at all really how the policy is put together.

22          But, look, I offer that to respond to your

23  question.  Your Honor, if I could, just for a moment, just

24  really, like Mr. Anker, focus on scheduling.  I join in

25  everything that Mr. Rosenthal, for AIG, had to say, but just

1   coming at it from just a slightly different angle, a friend of

2   whine who's a judge once told me that, you know, a good

3   process results in good decisions.  And as much as it's

4   important to me as a lawyer, and as a human being, just to put

5   briefs together and get things done, it's as important,

6   perhaps more important to the Court that we all, both sides,

7   give you good briefs and a full record, for you to make

8   decisions here.

9           The decisions you're going to make are obviously

10  going to be important.  They're important for both sides and

11  to the claimants.  The better record you have, the better

12  briefs you have, the better decision-making we arm you to put

13  together here.

14          And so, you understand a little the perspective

15  we're coming at about why a little time is necessary here, we,

16  at Century, we got the plan, the new plan about 20 minutes

17  before midnight.  That's when we received the blackline on

18  Friday, before the 4th of July holiday.

19          We did get a termsheet, you know, six days later,

20  but a termsheet is very different from a plan.  As far as the

21  discussing that preceded the drafting of this plan, the

22  submission of it, we didn't get drafts of that plan between

23  the time it was filed and what was previously filed.  We

24  didn't get any drafts.  We didn't get drafts of the TDPs

25  before what we were given a week before when we were given the

1   termsheet.  We were completely excluded from all of the

2   meeting between the Boy Scouts and the claimants concerning

3   the drafting of the TDPs and the drafting of this RSA.  Not

4   some of the meetings, not most of the meetings; we were

5   excluded from all of them.

6          And to be clear, we weren't really encouraged to

7   come to the mediation.  We the schedules, the agendas for them

8   were ones that made clear that we weren't going to be

9   included, but we went.  I didn't want anyone to say that

10  Century didn't go.  I traveled to Miami.  I traveled to the

11  session in Chicago and the one in New York.

12         In Chicago, I was sat on a different floor from

13  where the claimants were sitting and the Boy Scouts were

14  sitting.  I sat there for almost the entire day.  You know,

15  they did have separate food delivered to us there, but this

16  was not a process that we able to participate in.  It wasn't

17  one that we didn't ask to participate in.  I wasn't one that

18  we didn't come ready to participate in.

19         I brought business folks with us.  If there's any

20  contention about us being excluded, we will have witnesses who

21  will testify for the extent that they were excluded, how we

22  sat entire days without talking, really talking or meeting

23  with anyone whatsoever, and we were completely and thoroughly

24  excluded from the meetings about the putting together of these

25  TDPs.

1          In many ways, I think you'll see what happened here

2    was a sort of, you know, replay of what you're going to have

3    as a fact pattern in front of you in Imerys.  You know, the

4    Boy Scouts may well have had an arm's-length negotiation about

5    their economic contribution to the plan, the dollars that they

6    put up with the councils, but when that discussion ended, they

7    had no economic interest in the claims; what the claims are

8    valued at, how they were allowed.

9          So, turning the process over at that point to the

10   claimants to draft the procedures for what claims are allowed

11   and what claims are, you know, paid, that's a process that's

12   off the rails.  It's one that there's no counterparty to that

13   had any economic interest in what was done.

14         And why I bring that up is not to necessarily

15   poison the well here, Your Honor, but on the RSA, if you look

16   at the proposed order they've submitted, they're seeking, you

17   know, as part of that proposed order, and, granted, you heard

18   from Mr. Linder earlier that, well, they're willing to make

19   some changes to that, but they're seeking findings that the

20   negotiation was all in good faith, that it all included all,

21   you know, the mediation parties, and the net result here was

22   at arm's-length.

23         And, again, it may well have been the dollar

24   numbers that they set up for the Boy Scouts contribution ones,

25   but those findings, they have no purpose whatsoever in a

1  motion to approve the RSA.  The RSA is subject to a business

2  judgment, period.  It doesn't require those host of findings.

3           Those findings, to be clear, are designed to

4  prejudice us.  They're designed to prejudice us in subsequent

5  proceeding, when we talked about, gee, we weren't there.  We

6  weren't part of it.  This was a collusively designed TDP,

7  which it was.

8           And if we're in a position where we have to go into

9  a hearing in two weeks, and, you know, defend ourselves from

10 findings, factual findings being made about how to -- about --

11 that could be held against us, with regard to how these

12 negotiations took place, yes, we need discovery on that and we

13 need more than just the extra three days that was put in.

14 That's of vital importance to us and it's something that we

15 absolutely contest about how it was put together.

16           Your Honor, the RSA, it doesn't address -- and this

17 is the nature of what happened by excluding us -- it doesn't

18 address anything about the merits of the proofs of claim.  It

19 calls for the payment of all claims.  All the folks who filed

20 proofs of claim are to be paid.  There's a waiting, with

21 regard to claims that would fail the statute of limitations,

22 so everyone is paid.  Even claims that otherwise would fail

23 completely are paid $3500 apiece.  So, in essence, everyone is

24 paid to vote.  It's like that number, by the way, went up

25 there a thousand dollars to $3500 a claim.

1    There's been no vetting of the claims done.  We
2  still have before you, our 2004 motion.  We very respectfully
3  ask that that go forward.  We think that, in essence, one of
4  the reasons why there was like, no effort to include us, there
5  was in effort to really reach a deal here, was exactly what
6  was in our 2004 papers when we filed them.  That, as long as
7  the claimants think that every single claim is going to be
8  approved and paid, it's just impossible to reach any sort of
9  deal on any term -- type of reasonable terms.

10    What's come out of this is one that's not just
11 insurance and not just insurance neutral, but one that
12 facially doesn't make any sense.  Turning over this whole
13 package of claims, given the evidence that's before you, to a
14 claim and control trust, to then allow and pay them all; it's
15 a process that's completely off the rails.

16    Your Honor, the last point I would like to just
17 focus on is what the discovery would sort of focus on that the
18 Boy Scouts are telling us just three extra days would allow,
19 but it's, one, these issues of findings.  And, yes, if the Boy
20 Scouts agree to drop those findings over the course of the
21 week, we can talk about narrowing some of what's needed here,
22 but it's the findings, first of all.  It's, two, the business
23 judgment issues that went into this.

24    And there are significant issues here, Your Honor.
25 I mean, I heard all of the tier here that Boy Scouts has

1  released and the theory that they're going to go out and try

2  to recruit new claimants.  But it's like you've got the point

3  here that the plan they're going forward with doesn't -- it's

4  dropped out, in essence, any protections for any of the

5  sponsoring organizations, which are the organizations that

6  provide the Scouts.

7         So, if they're really thinking they're going to go

8  forward in November with recruiting when all of the folks

9  they're going to be talking to about recruiting are going to

10  be hit with lawsuits at that point, I don't get it.  I don't

11  get how the case is even feasible.  It's utterly, sort of

12  illusory sort of relief that they've ended up putting in here.

13         And I think Your Honor will hear from some of the

14  sponsors who are on the call about the same issue, about --

15  and how serious that is.  And it's not one that really merits

16  just three days of additional objection time to address.  You

17  know, the other issues that would need to be addressed in just

18  this three days that they've given us is the claimants,

19  themselves, you heard some allusions to this about allusions

20  to social media.

21         Well, the largest group in the coalition, it's

22  called "Abused in Scouting," it's the one -- there was a lot

23  of focus on in the 2019s.  It's the one that represents the

24  biggest collection of claimants -- 18,000.

25         The lawyer who claims to represent those claimants,

1  Mr. Kosnoff, he has vocally stood out and said that he objects

2  to this.  We've attached his statements to that regard to

3  this, being the RSA.  They're attached, I think, as Exhibit 4

4  to the declaration that accompanied our motion for an

5  adjournment.

6          We have before Your Honor, it's a sort of

7  supplementary 2019 motion asking for clarity on this exact

8  issue, and this is before this really came home fully to

9  roost, but it was one that we were concerned about.

10  Mr. Kosnoff famously recruited these claimants and then he

11  brought in a gentleman named Mr. Rothweiler to serve as his

12  co-counsel in some capacity.

13          But Mr. Kosnoff claims to represent these folks and

14  to speak for them.  You have on file the retention agreement.

15  It doesn't really give clarity about who speaks for them or

16  not.  Mr. Kosnoff claims to speak for them.  That's in the

17  filing on record.  But Mr. Rothweiler claims to be signing for

18  them on the RSA.

19          The numbers here are significant because the

20  numbers of claimants who are actually coalition members versus

21  numbers of folks who the lawyers associated with the coalition

22  represent are different and the waiting is different.  So,

23  that 2019 motion, Your Honor, we submit, does need to be

24  decided so that we have -- it's intended to give clarity on

25  who exactly, really controls those votes, so we know whether

1  or not the RSA is, in fact, authorized and carries a majority

2  of those folks with them.

3           And the result of that, in a sense, does impact

4  whether discovery is needed on that issue, whether or not

5  there's authority for those claims or not.  We've sort of held

6  back on kind of going ahead with that discovery because we

7  were hoping for a ruling on the 2019, but that is something

8  else that's sort of directly teed up by the RSA motion.

9           Another issue is, of course, the large payment

10 that's to be made to coalition professionals, in connection

11 with their agreement to vote in favor, you know, for the plan.

12 The monies are very significant.  They come in connection with

13 a case where the payment to professionals are already

14 enormous.  It's hard by any imagination to look at these

15 numbers as not duplicates of work that the TCC has already

16 done.  It's not subject to a business judgment standard.

17          And on that issue, we already have a problem.  It's

18 like, we served discovery on the coalition asking them for the

19 documents that they exchanged concerning their request for

20 money and the termsheets and whatnot that had the requests for

21 money and they objected to producing anything whatsoever.  We

22 hope, of course, to reach some sort of resolution on that, but

23 we got those objections even before they filed the RSA and I'm

24 just concerned we're going to have an issue on this, because,

25 you know, there's no question if they're going forward with

1  findings about what happened behind closed doors, and if the

2  same -- they want a finding that blesses what happened behind

3  closed doors in a certain way, but at the same time, they want

4  to vote mediation privilege to basically protect everything

5  about that exchange.  It's like the whole thing is being used

6  as a sort of sword and shield at the same time.

7        We think Your Honor sort of addressed those issues

8  in Imerys where the rulings were that communication about the

9  negotiation with the TDP has to be produced.  But whether

10 that's the case or not, it's like, yes, we're concerned that

11 briefing will have to be done on that.

12       Like Mr. Anker said, I aspire to write as fast as

13 Mr. Anker, who said that he could write this brief in five

14 minutes or he would be before the Court in five minutes on it.

15 But we would try to come before the Court as quickly as

16 possible if we can't reach a resolution with Mr. Molton.  But,

17 you know, clearly it's a challenge for us to do that.

18       So, Your Honor, for all of those reasons, I'd  ask

19 -- and there's more, I could go on -- but I would ask that you

20 please give serious consideration to giving us some relief on

21 the schedule.  There's not -- you know, no one here is being

22 driven by delay for delay's sake.  This is, you know

23 arbitration lot of time has gone under the bridge here before

24 we got this point where we are.  We did not sight on our

25 rights most certainly, Your Honor.

1          I mean, each of the last two conferences, I came to

2   Your Honor and said, we are being excluded from the

3   mediations.  We are not being included as part of these

4   discussions, you know, basically foretold where we were here.

5   And, look, I want to be clear, like, yes, periodically, people

6   came to us and said, you know, talked to just us about money,

7   but it's like, we were not included in the meetings between

8   the Boy Scouts and the claimants.  It was as if we were

9   completely excluded from that, as well as the drafts of all of

10  these TDPs; the things that affected us the most.  And, you

11  know, we did want to weigh in on those things and we did try

12  to play a productive role, and God knows, we want to play a

13  productive role.

14          And I think if the record on mediation was lifted,

15  you'd find that we played a very productive role here and

16  helped bring about, you know, this thing as far as it's gotten

17  so far.  But, Your Honor, where'd ask that you please give us

18  some additional time here so we can put before you a full

19  record so you can make good decisions on what's going to come

20  out.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.  Mr. Goldberg?

23          MR. GOLDBERG:  Thank you, Your Honor.  Adam

24  Goldberg of Latham & Watkins, on behalf of the Church of Jesus

25  Christ of Latter Day Saints.

1           I'd like to speak, Your Honor, to join in the

2   request to adjourn the disclosure statement hearing, the

3   objection deadline, and the RSA motion.  Your Honor, the

4   debtors tout the RSA as representing a breakthrough with every

5   significant creditor constituency in these cases.  They have

6   left out one major creditor constituency, that is the

7   chartered organizations.

8           The church is one of the chartered organizations.

9   According to the debtors' disclosure statement there, are over

10  41,000 of them.  Those chartered organizations are individual

11  church congregations, temples, schools, civic, and charitable

12  organizations, businesses, and groups of citizens.

13          The latest disclosure statement includes a list of

14  the top-20 chartered organizations that appear in proof of

15  claim forms.  Those organizations include the Methodist

16  Church, the Baptist Church, the Catholic Church, the Church of

17  Jesus Christ of Latter Day Saints, the Presbyterian Church,

18  the Lutheran Church, the Episcopal Church, the United States

19  Armed Forces, the YMCA, and the Salvation Army.

20          The plan does not have the support of any chartered

21  organization and none, to our knowledge, have had any advanced

22  drafts of the plan or disclosure statement before they hit the

23  docket.  Only a handful of chartered organizations have become

24  mediation parties in these cases to date.

25          The plan, as is developed under the RSA, is highly

1 prejudicial to the rights of chartered organizations and the

2 proposed -- in particular, Your Honor, there are two issues

3 that I'd focus on.  One is that the proposed TDPs expressly

4 subordinate the indemnity claims of chartered organizations

5 which are termed "indirect abuse claims" under the plan.

6 　　　　　Article 11 of the TDP is clear that indirect abuse

7 claims are subordinate to payment in full of all direct abuse

8 claims and those terms first appear in the June 18 filing

9 that, is the third amended plan.  In the context of this case,

10 it would seem highly unlikely that chartered organizations

11 would ever recover anything at all on account of their valid

12 indemnity claims under the current plan, and if they did

13 recover anything, it would be years and years down the road.

14 　　　　　In terms of disclosure to those 41,000 chartered

15 organizations who are to receive this highly discriminatory

16 treatment, the subordination is buried in a footnote in the

17 treatment summary table in the proposed disclosure statement

18 and then does not appear until page 194 of the disclosure

19 statement.

20 　　　　　The second issue, Your Honor, in addition to

21 outright subordination, the plan strips valuable property

22 recognition away from chartered organizations without any

23 compensation or consent.  The plan provides an injunction

24 against chartered organizations pursuing their own insurance

25 rights as the policies issued for the debtors and expressly

1  covering chartered organizations, as well as for policies

2  issued for nondebtor local councils and that expressly cover

3  chartered organizations.

4          This injunction does not affect just settling

5  insurance companies, if any, but all insurance companies.

6  These are extraordinary terms for treatment of insurance in

7  mass-tort cases that appear to us to be without precedent.

8          The disclosure statement states in the treatment

9  and summary table on page 22 that the indirect abuse claims

10  will have recourse to insurance rights.  That statement is

11  completely false or at least grossly misleading if the intent

12  is actually to say that chartered organizations may have

13  rights under their own insurance to which the BSA and local

14  councils were not party.

15          There are numerous other ways in which the

16  chartered organizations are prejudiced in the current plan and

17  TDPs; for example, Your Honor, before an indirect abuse

18  claimant may receive from the trust, it must release the

19  settlement trust and protected parties for all liabilities for

20  direct abuse claims.  That's effectively a nonconsensual

21  release as a condition to any distribution and that first

22  appeared in the June 18th filings, as well.

23          The RSA announced on July 1st is, itself, a very

24  material development in these cases for chartered

25  organizations and the fourth amended plan, we've had for just

1  one business day at this point, Your Honor, has material

2  changes that particularly include removal of the toggle plan

3  option.  And that change is very important to us and to other

4  chartered organizations because under the terms that were

5  proposed, the toggle plan would have been a better outcome for

6  chartered organizations.  Under the toggle plan, chartered

7  organizations would have kept their own insurance rights,

8  which are stripped under the current plan.

9       Your Honor, Delaware Local Rule 3017-1 requires 35

10  days' notice of a hearing on a disclosure statement and 28

11  days' notice of an objection deadline.  The current proposed

12  timing is shortened notice under the Local Rules, even using

13  the third amended filed on June 18th as a start date.

14       From our point of view, it's especially appropriate

15  to enforce compliance with the rules at a minimum in the

16  circumstances of these highly complex cases in which the RSA

17  parties of seek to push the boundaries of the plan terms in

18  new ways.  The RSA parties, no doubt, engaged in extensive

19  effort to develop a proposed plan and I would diminish their

20  achievement at all.

21       What it shows to me, Your Honor, is that adjourning

22  the disclosure statement at the last hearing was the right

23  decision and that time has been used productively.  This

24  achievement, among a subset of the parties in this case,

25  however, is not a justification to cut short the process when

1  real work remains.

2          I'd like to highlight as an example of the benefit

3  of more time from the perspective of chartered organizations.

4  In the second amended plan, that was the subject of the prior

5  round of hearings, the contingent indemnity claims of

6  chartered organizations would have been completely disallowed

7  without any opportunity to have those claims heard and

8  adjudicated after they became noncontingent.

9          In response to our last disclosure statement

10  objection, the debtors amended the TDPs to provide an

11  opportunity for reconsideration of contingent indemnity claims

12  when they became noncontingent, as required by law, and that

13  issue was resolved without the need for Court intervention.

14          Your Honor, from our perspective, many of the tens

15  of thousands of chartered organizations are just beginning to

16  get involved as they wake up to their treatment under this

17  plan.  The Church and other chartered organizations should

18  have their rights under the rules to evaluate the disclosure

19  statement and the TDPs, in accordance with the timeline set

20  forth in the rules and have the opportunity to seek to raise

21  and solve their issues, if possible, before a hearing.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.  Mr. Ryan?

24          MR. RYAN:  Thank you, Your Honor.  Good afternoon.

25          I represent the United Methodist Ad Hoc Committee

1  and also, the Roman Catholic Ad Hoc Committee.  The United

2  Methodists have had a 100-plus-year relationship with

3  scouting, and at current, and by far, the largest sponsoring

4  organization in terms of numbers of scouts under sponsorship.

5         I'm going to try not to reiterate too much of what

6  Mr. Goldberg said, but also on his point of chartered

7  organizations really just getting directly involved, well, the

8  Methodists have been involved since the beginning of the year.

9         The Roman Catholic Ad Hoc Committee has just

10  recently before formed.  And while we filed a Rule 2019

11  disclosure, since that time, some of the largest Diocese in

12  the country have indicated that they will be joining that ad

13  hoc committee, including New York, Chicago, Atlanta, and

14  Washington, D.C.

15         Between these two denominations, Your Honor, over

16  33 percent of the current census of scouting is covered by our

17  sponsorships.  Simply put, the future of scouting requires our

18  continued support and our value of Boy Scouts as a business

19  partner, with which we want to do business going forward in

20  the future.

21         But as Mr. Goldberg also noted, we are also

22  creditors.  We are creditors of Boy Scouts against whom we

23  have indemnity claims.  We also have additional insurer rights

24  under the Boy Scouts policies.  And as Mr. Goldberg noted, we

25  also have significant claims against the local councils, who

1  are nondebtors, and we are additional insureds under the local

2  councils' insurance policies; again, insurance policies

3  procured by nondebtors.

4         And the plan in this case, as Mr. Goldberg noted,

5  proposes to strip all of our property rights, not only

6  insurance policies procured by debtors, but insurance policies

7  procured by nondebtors.  That raises substantial questions of

8  this Court's jurisdiction to do what that plan proposes,

9  absent consent.

10        This plan with the prejudice that it has to the

11 chartered organizations is not going to achieve that consent,

12 Your Honor.  It's a plan designed to pressure them and a

13 timeline to pressure them into exceeding to the demand of the

14 tort claimants.  And what is going to occur, Your Honor, is

15 that every chartered organization is going to have to make a

16 decision, how do we continue to do business with an

17 organization like Boy Scouts?  How do we voluntary our time,

18 volunteer our property on a weekly basis to tens of thousands

19 of troops and hundreds of thousands of scouts, with an

20 organization that proposes to treat us as this plan proposes

21 to treat chartered organizations?

22        No chartered organization wants to make that

23 decision, but we're being forced into that corner and forced

24 into that corner under the timeline and the plan that Boy

25 Scouts and the tort claimants are proposing.  It's going to

1  make the decision self-fulfilling.  What organization would

2  choose to do business with Boy Scouts, being treated like this

3  going forward?

4          Chartered organizations want it be part of the

5  solution.  To date, we have been sitting back.  We have been

6  allowing the negotiations, which, frankly, had more

7  importance, to take place.  And we commend the debtors and the

8  tort claimants and the local councils for reaching major

9  agreements, but that does not mean now is the time to rush

10 forward and to jam and to prejudice the lifeblood of Boy

11 Scouts, which are the sponsored organizations.

12         What we should be doing, Your Honor, is now pausing

13 and seeing how chartered organizations, who want to continue

14 to support Boy Scouts and the mission of scouting, how they

15 can be incorporated into a plan that deals with their property

16 rights fairly, that deals with their claims fairly, that

17 allows them to make the decision, this is a business partner,

18 with whom we want to continue to do business.

19         A plan proposed 2,131 pages at midnight, July 1st,

20 seeking to be approved for solicitation 19 days later over a

21 holiday weekend, does not allow well-organized chartered

22 organizations, like Mr. Goldberg's client and my clients, to

23 respond adequately.  (Indiscernible) there are 40,000

24 chartered organizations: (indiscernible), JCs, PTAs, in the

25 middle of summer.  None of this is providing them due process.

1    It doesn't even come close to complying with the Local Rules.

2              So, we join in with the request of the insurers

3    and, more importantly, join in the request of the Latter Day

4    Saints, that this prose must be slowed down.  Chartered

5    organizations are resolution-oriented.  They want to be part

6    of the solution.  They need to be afforded that time.

7              Going forward with this plan on this timeline is

8    going to back them into a corner, that as Mr. Schiavoni noted,

9    is going to threaten the very future of Boy Scouts.  And these

10   are organizations that are for a hundred-plus years have been

11   devoted to the mission of scouting, and that is a terrible

12   place to put them in and a terrible decision for us to have to

13   make.  So, we do agree that more time is needed.

14             And as Mr. Goldberg noted, when we adjourn things,

15   people start to talk.  The chartered organizations have not

16   been involved in meaningful conversations with any

17   constituency.  We would be more than happy to do so.  We'd

18   like to do so.  We want to support scouting going forward, but

19   we need that time and we can't have that time if we're boxed

20   into a corner on an (indiscernible) tight timeline.

21             Thank you, Your Honor.

22             THE COURT:  Thank you.

23             Is there anyone else who wishes to be heard before

24   I good back to Mr. Linder?

25        (No verbal response)

1            THE COURT:  Mr. Linder?

2            MR. LINDER:  Thank you, Your Honor.  Again, Matt

3  Linder, White & Case, for the debtors.

4            I will break this up into two pieces, Your Honor.

5  I think there are -- it's clear that there is opposition to

6  the RSA motion proceeding on the timeline that we've proposed.

7  There's also opposition to the disclosure statement going

8  forward on the timeline that we've proposed.

9            I think the Court may consider viewing those

10  differently, in light of the issues that have been presented

11  in the scope of the concerns that have been voiced by the

12  parties.  And I'll start with a response to Mr. Anker's

13  argument with respect to the RSA.  Even given the unique

14  position of his client, you know, Mr. Anker outlined

15  essentially what his are argument will be and it sounds like

16  his brief may already be drafted.

17            So, we question both, the sort of the scope of the

18  fact discovery that really needs to be conducted, with respect

19  to the RSA with Hartford and the amount of time that is really

20  going to be required to put together briefing.  Again, we

21  shortened notice reluctantly, but we had to, by two days.  We

22  think this is a sufficient amount of time for Hartford to

23  adequately prepare to take discovery and make new arguments.

24            I would just say in response to the specific points

25  that Mr. Anker raised, first, with regard to whether or not

1  the determination that the debtors are seeking, it should be

2  the subject of an adversary proceeding, I'll just say at this

3  juncture, Your Honor, that we disagree with that contention.

4  I won't say more at this status conference.  We think that's

5  an issue best reserved for briefing.  We're prepared to brief

6  it and we disagree with that contention.

7        With respect to the third -- the state of the law

8  in the Third Circuit regarding the position of the debtor,

9  with respect to an agreement that has been entered into that

10 has not been approved by the Court, again, we disagree with

11 Mr. Anker's interpretation of the Martin decision by the Third

12 Circuit.  We're familiar with that decision.

13       Like in the Martin case, our duty as debtors in

14 possession to the estates and creditors irreconcilably

15 conflict with any purported duty that we might have under the

16 Hartford agreement.  That conflict doesn't break, in our view,

17 in favor of the RSA and the interests of creditors as a whole.

18 We think the Martin case is on all fours with the position

19 that we're in.  So, for those reasons, Your Honor, we don't

20 think there's a valid basis to adjourn the RSA hearing.

21       Nor, did we hear --

22       THE COURT:  Well, I haven't read the Martin case in

23 a long time, and I'll do that, but what about the findings

24 that the debtor wants for me to make in the context of the

25 RSA?  And the debtor presumably thinking it needs the findings

1  that Mr. Anker says he wants to take discovery on, as others

2  have said, as well.

3             This isn't a purely a legal issue, is what -- you

4  haven't teed up in front of me a legal issue, as I'm hearing

5  it or reading it.  You could, but you haven't.

6             So, what about the need to take discovery and to

7  address those issues?

8             MR. LINDER:  We're not -- I don't think we're

9  contending, Your Honor, that discovery is not needed or is not

10  appropriate in connection with this dispute, but I think

11  Hartford themselves conceded that the discovery that needs to

12  be taken, and as the debtors' determination to enter into the

13  RSA, is narrow in scope.  And we've set out a pathway for that

14  discovery to be undertaken and completed in advance of the

15  hearing.

16             THE COURT:  Okay.

17             MR. LINDER:  With respect to the arguments made by

18  Mr. Rosenthal and Mr. Schiavoni, I just want to correct the

19  record, Your Honor, with respect to the argument that

20  insurers, the insinuation that they were not meaningfully

21  involved in mediation.  No one was shut out of the mediation,

22  just to be clear.  I understand --

23             THE COURT:  Yeah, I'm not going to be able to

24  resolve that dispute.  I don't know what happened in mediation

25  and I, certainly from my experience, they all happen

1  differently and they're negotiations, depending on how many

2  parties are involved -- and there are a significant number of

3  parties involved here -- do take place in stages.

4          But, you know, I think there's been a significant

5  achievement of bringing together the parties that have come

6  together, which include the representatives of all of the

7  survivors, but it's also clear that not everybody was involved

8  in those negotiations and there are still parties who, at

9  least, believe that they could contribute more to resolution

10  of the case if there was mediation.  So, I can't get involved

11  in who did what and I can't resolve that.  So, we can just

12  move on from people's participation to date.

13          MR. LINDER:  Understood, Your Honor.

14          I do want to correct the suggestion, though, that

15  the debtors have turned over the pen in terms of the

16  documents, the definitive documents that will be proposed in

17  connection with the plan to the plaintiffs.  It was a *fait*

18  *accompli*, essentially, that we would select the current path

19  that we have been on.  It was a tremendous amount of work to

20  bridge the divergent perspectives of the parties and actually

21  reach this resolution.

22          So, we certainly contest the resolution that the

23  debtors have somehow turned over the pen to the plaintiffs.

24  This was a collaborative resolution and we were certainly

25  involved in every aspect of negotiating it.

1          You also heard Mr. Schiavoni, again, raise the

2    issue about the good faith finding in the proposed order

3    granting the RSA motion.  As I stated earlier, Your Honor, we

4    do not contest that the business judgment rule is the

5    appropriate standard, and we are ready to work with the

6    insurers to make whatever accommodations we need to.  We don't

7    think that that argument really necessitates delaying any

8    deadlines or any hearings.

9          THE COURT:  Okay.

10          MR. LINDER:  With respect to chartered

11   organizations, Your Honor, we certainly appreciate the

12   concerns expressed by Mr. Goldberg.  I would just say that one

13   point of distinction with respect to the Church of Jesus

14   Christ of Latter Day Saints, is that they're a uniquely

15   situated chartered organization; actually, a former chartered

16   organization of the BSA.  They're one of the few chartered

17   organizations that have actually asserted an indirect abuse

18   claim in an amount that is not a contingent indirect abuse

19   claim, but they are uniquely situated among claimants.

20          But with that being said, we will, and we do intend

21   to work with Mr. Goldberg and his colleagues at Latham, to

22   work through those issues, to the extent that we can, in

23   advance of the disclosure statement hearing.  But, really,

24   what he has raised, from our perspective, are confirmation

25   issues and are not issues that would render the plan

1  (indiscernible).

2          With respect to the other chartered organizations,

3  we do value them as go-forward partners.  They are essential.

4  They have a lifeblood of scouting.  And to the extent this

5  plan that's been filed and the deal that's been reached, has

6  been interpreted as abridging their rights, their insurance

7  rights, and their other rights to assert claims against the

8  trust, we are happy to engage with them going forward.

9          THE COURT:  Well, that's how I read it.  So, you

10  say to the extent that it does this, but that's how it read

11  it.  That's how I read the termsheet that's attached to the

12  RSA, exactly the way Mr. Goldberg described it.

13          Is he wrong?

14          MR. LINDER:  No, he's not wrong.  The proposed

15  treatment for indirect abuse claims under the TDP is, in fact,

16  that they would be subordinated to holders of direct abuse

17  claims.

18          THE COURT:  That's how I read the footnote, yes.

19          And I read it as -- well, there are all kinds of

20  insurance issues.  I would say that I'm pretty sure I read it

21  the way, or I noted the issues that have been expressed,

22  almost all of them, I believe.  So, I just note that because

23  the way you're speaking is if Mr. Goldberg, for example,

24  mischaracterized the plan, but I don't think he did.

25          MR. LINDER:  Well, I didn't intend to indicate that

1  he misrepresented anything, Your Honor.

2       THE COURT:  Okay.  Well, let me ask this, there may

3  be a difference between the RSA and when we should hear the --

4  the RSA -- do the debtors view the RSA as a gating issue to

5  the disclosure statement hearing?

6       MR. LINDER:  It's been our intent, Your Honor, to

7  have the RSA proceed before any disclosure statement going

8  forward.  That's been our view.  I think it's a view that's

9  shared by the other RSA parties.  So, we do view the RSA as a

10  gating matter.

11       (Pause)

12       THE COURT:  I'm going to hear the RSA matter first

13  and so that it can be appropriately briefed and I have an

14  opportunity to review it.  I'm going to schedule it.  I'm

15  going to move some stuff around.  I'm going to schedule it for

16  July 29 and 30.  I don't know that it will take two days, but

17  I'm going to give it two days.

18       I'd also like to hear on that day, a response to

19  the Rule 2019 motion that the insurers brought *vis-a-vis*,

20  Abused in Scouting, and is it Mr. Wilks? -- I'm trying to

21  think who represents -- he may represent Mr. Kosnoff.  I don't

22  know if he represents Abused in Scouting.  If Mr. Wilks is not

23  on the conference and if Mister -- or if there's some other

24  counsel, I would like to debtors' counsel to inform them that

25  I'm going to hear that, which I don't think I actually heard

1  argument on, also on those days.

2         And I'd like a response on the Rule 2019 to not

3  only what was briefed, but also whether the numerous letters

4  that I have been receiving from their clients, is a basis to

5  require a Rule 2019 statement to be filed.

6         MR. WILKS:  Your Honor, this is David Wilks.  I

7  don't have any camera on.  I apologize, but I hear you loud

8  and clear, and we will be prepared.

9         THE COURT:  Thank you, Mr. Wilks.

10         MR. WILKS:  Thank you, Your Honor.

11         THE COURT:  And I will say that most of the letters

12  that I'm receiving, which are significant in numbers, appear

13  to be from clients of Abused in Scouting.

14         So, we'll have that -- and you all can work

15  backwards with respect to discovery and briefing -- and I'll

16  hear that on the 29th and 30th.

17         MR. ABBOTT:  Your Honor, thank you.  Derek Abbott

18  to the debtors.

19         With respect to the objection deadline for that

20  matter, would that be something in accordance with the Local

21  Rules, which would put it at the 22nd, I believe.  We're at

22  the Court's pleasure there.

23         THE COURT:  That's fine.

24         MR. ABBOTT:  Thank you, Your Honor.

25         THE COURT:  That should give parties plenty of time

1  to take discovery and to give me reason to briefing on the

2  issues.

3          In terms of the briefing on disclosure statement, I

4  will say that it sounds like some of the issues that have been

5  raised are really confirmation objections, but I think there

6  are also disclosure statement issues and parties should have

7  opportunities to review, meaningful opportunities to review

8  the disclosure statement and weigh in on it.  And because the

9  RSA is a gating issue, then, of course, the disclosure

10 statement hearing has to be delayed.

11         I'm looking at the last week in August -- 30,

12 31st -- no -- oh, yeah -- which we'll, of necessity, move the

13 confirmation hearing out.  I don't know those dates yet.  I'm

14 trying to -- well, wait a second.  Actually, I have time --

15         MR. LINDER:  Your Honor?

16         THE COURT:  -- the week of August 17.  I have time

17 the week of August 17.  I'm going to countermand that and put

18 us back.

19         I've got, at this point, a contested hearing on the

20 16th, but start on the 17th.

21         MR. LINDER:  Your Honor, if I may?  It's Matt

22 Linder of White & Case.

23         THE COURT:  Yes.

24         MR. LINDER:  I know you indicated that your

25 preference would be to take the RSA first.  I think from our

1  perspective, given that you had circled July 29th and 30th as

2  the dates for the RSA hearing, would it be possible to take up

3  the disclosure statement earlier?

4          We're just trying to remain cognizant of -- we know

5  that recently, dates in Imerys did change, which may have

6  freed up some of August, but I think some of October was then

7  -- you know, the confirmation timeline in Imerys extends out

8  to late October.  So, we're just trying to remain cognizant of

9  the potential delay on the back end.  So, to the extent that

10 there would be any possibility to extend the timeline out to

11 the end of July and take them together, you know, in a similar

12 fashion that we propose, with July 20th and 21st, but,

13 instead, to do it on July 29th and 30th, that would be our

14 preference.

15          THE COURT:  You know, I'm not sure that's going to

16 help you in terms of a time frame and discovery, though.  I

17 understand what you're saying and you're right; my October and

18 November are pretty full, so I understand that,   although --

19 no, they're pretty full.

20          MR. LINDER:  Would there be any earlier dates in

21 August that might work?  I know Your Honor had circled the

22 17th as being a possibility, but I think we're really focused

23 on that, you know, those later dates in the fall and trying to

24 preserve them.

25          (Pause)

1            THE COURT:  I could maybe do the 12th and 13th.

2       (Pause)

3            MR. LINDER:  If that could be accommodated, Your

4   Honor, that would be the debtors' preference, but, again, if

5   you could accommodate it.

6            MR. ROSENTHAL:  Your Honor, Michael Rosenthal.

7            Can you hear me?

8            THE COURT:  Mr. Rosenthal?

9            MR. ROSENTHAL:  Yes.  Does it help, Your Honor, do

10  you contemplate that confirmation discovery would begin only

11  after the disclosure statement hearing or could it begin

12  before?

13           THE COURT:  I would let it go forward ahead of time

14  if the parties are willing to do that.  And I will say that it

15  complicates things because then you get discovery requests

16  about your objections that you haven't yet filed.  But, yes, I

17  have no problem putting discovery open and letting the party

18  work through those types of issues.  And, of course, I would

19  encourage the debtor to talk to people about that.

20           MR. LINDER:  And the debtors' view, Your Honor, is

21  that we would be willing to discuss with parties, beginning

22  plan confirmation and discovery, in advance of the disclosure

23  statement hearing.

24           THE COURT:  Okay.  Let's --

25           MR. LINDER:  Even with the August 12th, we're happy

1  to accommodate that.

2          THE COURT:  Okay.  We'll move some things.

3          MR. ABBOTT:  Your Honor, Derek Abbott.

4          I'm sorry, would those be 9:30 start dates [sic] on

5  each of those days?

6          THE COURT:  It could be.

7          MR. STANG:  Your Honor, I would simply point

8  out -- Mr. Stang speaking here -- there are a lot of people on

9  the West Coast, if people could just be sensitive to it.

10          THE COURT:  Well, then, let's say ten o'clock, but

11  the day has got to get started.

12          MR. STANG:  I will not be (indiscernible) by then.

13          THE COURT:  Okay.  Let me observe that, again, I

14  think that the RSA, whether I approve it or I don't -- and I

15  have no view on that -- certainly, the agreement among those

16  parties is a significant achievement and I would hope that

17  this delay, while it is intended to provide time for people to

18  do appropriate discovery and comprehensively brief the issues

19  that I need to decide on these two issues and not --

20          UNIDENTIFIED:  We had an emergency hearing today.

21  Can you hear me?

22          THE COURT:  Excuse me.  Somebody's -- I'm getting

23  somebody's talk-over here.  Check your phones and make sure

24  you're on mute.

25          I would hope that the time could be used to bring

1 | others into the fold to discuss or to begin or continue
2 | discussions because there's no question that a consensus plan
3 | is preferable.  As I also said, I did note, I think most of,
4 | if not all of the issues that have been raised today, and I
5 | will say, they're not necessarily easy ones for anyone,
6 | depending on which issue and which side you're on, on it.  So,
7 | that's why, again, I say, a consensus plan is preferable and
8 | certainly would bring -- would be preferable for all parties.
9 | Survivors would get paid sooner.  Boy Scouts could
10 | emerge sooner.  And there'll be a more definitive resolution,
11 | I suspect.
12 | I will note that I also noted the non-monetary
13 | provisions that I don't think I had seen before and I find
14 | that to be very appropriate to address safe scouting and how
15 | the Boy Scouts will ensure that past abuse doesn't continue
16 | into further, future activities.  And as I read the letters
17 | that many survivors have sent me, that is an aspect that is
18 | often found in the letters and is compelling.  So, I find that
19 | very appropriate.
20 | Okay.  Is there anything else we can achieve today?
21 | MR. MASON:  Your Honor, it's Richard Mason.  Would
22 | you mind if I just said one more thing for the record given
23 | some of the colloquy?
24 | THE COURT:  Mr. Mason?
25 | MR. MASON:  Yes.  Thank you, Your Honor.  Richard

1  Mason for the ad hoc committee.

2           I just want to say on behalf of the committee,

3  first of all, thank you for the hearing today, Your Honor, and

4  thank you to all of the parties who signed the RSA.  We do

5  agree with the BSA that our charter partners are absolutely

6  certainly to our business.  They are critical elements of the

7  scouting program both, locally and nationally.

8           I would just note that the termsheet does provide

9  that the RSA parties will work in good faith to try to resolve

10 the charter partner issues.  And I would agree with something

11 that Your Honor said previously, which is that sometimes

12 mediations and negotiations happen in iterations.  You deal

13 with one thing, you nail it down, and then you move to

14 another.

15          And to that end, I would just offer to our friends,

16 the charter partners on the line here, that we, the ad hoc

17 committee, are happy to engage if it's helpful with you and

18 the other parties, with your ad hoc committee, as well, to try

19 to help facilitate a resolution, if we can.

20          THE COURT:  Okay.

21          MR. MASON:  Thank you, Your Honor.  That's it for

22 me.

23          MR. BUCHBINDER:  Your Honor, this is Dave

24 Buchbinder, on behalf of the U.S. Trustee.

25          I want to thank the parties for the progress

1  they've made today, but my comment is a request to the Court

2  and ask Mr. Abbott will the debtors send out notices of

3  hearing with the new objection deadlines in them?

4            THE COURT:  They will.

5            MR. BUCHBINDER:  That's all, Your Honor.

6            MR. ABBOTT:  Yes, Your Honor, we will re-notice the

7  RSA motion and the disclosure statement, in accordance with

8  the rules.  So, not a problem, Mr. Buchbinder.

9            THE COURT:  Thank you.

10            MR. BUCHBINDER:  Thank you, Mr. Abbott.

11            THE COURT:  Okay.  Well, thank you very much.

12            I appreciate everyone getting together on short

13  notice to discuss how we proceed and I look forward to

14  receiving the submissions on the issues that we've outlined

15  and on the schedule that y'all will fill in and submit to --

16  well, re-notice it.

17            Okay.  Thank you very much.  We're adjourned.

18            COUNSEL:  Thank you, Your Honor.

19        (Proceedings concluded at 4:08 p.m.)

20

21

22

23

24

25

1                        CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4    from the electronic sound recording of the proceedings in the

5    above-entitled matter.

6
     /s/Mary Zajaczkowski              June 8, 2021
7    Mary Zajaczkowski, CET**D-531

8
     /s/William J. Garling             June 8, 2021
9    William J. Garling, CE/T 543

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25