# EXHIBIT 15

```
1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
2
                             .    Chapter 11
3    IN RE:                   .
                             .    Case No. 20-10343 (LSS)
4    BOY SCOUTS OF AMERICA and .
     DELAWARE BSA, LLC,        .
5                            .
                             .
6              Debtors.       .
     BOY SCOUTS OF AMERICA,    .    Adv. Pro. No. 20-50527
7                            .
               Plaintiff,      .
8                            .
          v.                  .
9                            .    Courtroom No. 2
     A.A., et al.,            .    824 North Market Street
10                           .    Wilmington, Delaware 19801
                             .
11             Defendants.    .    July 21, 2021
12   . . . . . . . . . . . . . . . .    10:00 A.M.

13              TRANSCRIPT OF TELEPHONIC HEARING
        BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
14              UNITED STATES BANKRUPTCY JUDGE

15   TELEPHONIC APPEARANCES:

16   For the Debtor:        Derek C. Abbott, Esquire
                            Andrew R. Remming, Esquire
17                          Eric W. Moats, Esquire
                            Paige N. Topper, Esquire
18                          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                            1201 North Market Street, 16th Floor
19                          Wilmington, Delaware 19899

20                          - and -

21                          Jessica C. Lauria, Esquire
                            Andrew Hammond, Esquire
22                          WHITE & CASE LLP
                            1221 Avenue of the Americas
23                          New York, New York 10020

24

25   Audio Operator:        LaCrisha Harden, ECRO
```

```
1   Transcription Company:    Reliable
                              1007 N. Orange Street
2                             Wilmington, Delaware 19801
                              (302)654-8080
3                             Email:  gmatthews@reliable-co.com

4   Proceedings recorded by electronic sound recording; transcript
5   produced by transcription service.

6

7   TELEPHONIC APPEARANCES (Cont'd):

8   For the Debtors:          Michael C. Andolina, Esquire
                              Matthew E. Linder, Esquire
9                             Laura E. Baccash, Esquire
                              Blair M. Warner, Esquire
10                            Erin Rosenberg, Esquire
                              WHITE & CASE LLP
11                            111 South Wacker Drive
                              Chicago, Illinois 60606
12
13  For the Ad Hoc            Richard Mason, Esquire
    Committee of Local        Joseph Celentino, Esquire
14  Councils:                 WACHTELL, LIPTON, ROSEN & KATZ
                              51 West 52nd Street
15                            New York, New York 10019

16  For the Coalition of      David Molton, Esquire
    Abused Scouts for         Eric Goodman, Esquire
17  Justice:                  BROWN RUDNICK LLP
                              7 Times Square
18                            New York, New York 10036
19
    For Century Indemnity:    Tancred Schiavoni, Esquire
20                            Brad Elias, Esquire
                              O'MELVENY
21                            7 Times Square
                              New York, New York 10036
22
    In Propia Persona:        Jeffrey Macmillan, Pro Se
23

24

25
```

1  TELEPHONIC APPEARANCES (Cont'd):

2  For Tort Claimants:        James Stang, Esquire
                              PACHULSKI STANG ZIEHL JONES LLP
3                             919 North Market Street, 17th Floor
                              Wilmington, Delaware 19801
4
                              - and -
5
                              John Lucas, Esquire
6                             PACHULSKI STANG ZIEHL & JONES LLP
                              150 California Street, 15th Floor
7                             San Francisco, California 94111

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MATTERS GOING FORWARD:

2    Third-Party Motion for Correction and Response (D.I. 5349,
     filed 6/15/21]
3
          **Ruling:  54**
4
5    Century's Motion to Amend the Court's Order (I) Approving
     Procedures for (A) Interim Compensation and Reimbursement of
6    Expenses of Retained Professionals and (B) Expense
     Reimbursement for Official Committee Members and (II) Granting
7    Related Relief (Dkt. No. 341) (D.I. 3161, filed 5/5/21)

8         **Ruling:  79**

9

10

11   DEBTORS' WITNESS(s):

12   **CATHERINE NOWNES-WHITAKER**

13        Direct Examination by Ms. Topper          27

14        Cross Examination by Mr. Macmillan        30, 45

15        Redirect Examination by Ms. Topper        48

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 10:04 a.m.)

2          THE COURT:  Good morning, counsel.  This is Judge

3 Silverstein here in the Boy Scouts of America bankruptcy, Case

4 No. 20-10343, for a limited docket today.

5          Let me turn it over to debtor's counsel.

6      (No verbal response)

7          THE COURT:  Is anyone hearing me?

8      (No verbal response)

9          THE COURT:  No.

10     (Pause)

11         THE COURT:  Good morning.  This is Judge

12 Silverstein.  We're here in the Boy Scouts of America

13 bankruptcy, Case No. 20-10343.  We have a limited docket

14 today.

15         Let me turn it over to debtor's counsel.

16         MR. REMMING:  Good morning, Your Honor.  Its Andrew

17 Remming from Morris Nichols for the Boy Scouts.  Its good to

18 see you.

19         THE COURT:  Mr. Remming?

20         MR. REMMING:  Your Honor, we do have a limited

21 agenda today.  We're actually going to work off of the amended

22 agenda that we filed yesterday.  Does Your Honor have a copy

23 of that?

24         THE COURT:  I do.

25         MR. REMMING:  Excellent.  Before we dive into the

1  matters on the agenda I am joined by my friends and colleagues

2  from the White & Case Firm.  Jessica Lauria is going to

3  provide the court with a brief status update before we get

4  into the numbered items on the agenda if that is alright.

5          THE COURT:  That's fine.  Ms. Lauria?

6          MS. LAURIA:  Thank you, Your Honor.  Jessica

7  Lauria, White & Case, on behalf of the debtors.

8          As Mr. Remming said, I will be brief.  The last

9  time we were before the court was two weeks ago today, I

10  believe, July 7th and that was shortly after the debtors had

11  announced that they reached an agreement with the ad hoc

12  committee as well as the key representatives for the survivor

13  constituencies, the TCC, the FCR and the coalition.

14          I don't think it would be an understatement to say

15  that is one of the most significant milestones that we have

16  had in these Chapter 11 cases, but suffice it to say, Your

17  Honor, we heard your remarks at the last hearing and we do

18  believe that there are more settlements to be achieved in

19  these Chapter 11 cases.  Indeed, the mediators are still at

20  work.  And on behalf of the Boy Scouts we want to encourage

21  all of the mediation parties to continue to work towards

22  settlement.  That will be best for the mission of Boy Scouts

23  as well as the dual objective of equitably compensating

24  survivors out of these bankruptcy cases.

25          To that end, Your Honor, the debtors as well as the

1   ad hoc committee, and I believe you are going to hear very

2   briefly from Mr. Mason at the conclusion of my remarks, are

3   keenly interested in working towards an acceptable format for

4   resolving the issues with our chartered organization partners.

5   As the court is well aware, the chartered organizations are

6   essential to the delivery of our mission at a local level and

7   are critical to the mission of scouting.  We look forward to

8   working with the chartered organization towards a framework

9   for resolving their issues.

10          As we look towards the next few weeks, Your Honor,

11  we are scheduled to go forward with the RSA motion on July

12  29th and we are prepared to do that.  The debtors have

13  produced three witnesses for deposition.  Those depositions

14  concluded this past Monday.  The debtors have produced

15  numerous documents for the parties that are potentially going

16  to be objecting to the RSA motion.

17          That motion -- excuse me, the objection deadline on

18  the RSA is tomorrow.  The debtors will, of course, review

19  those objections and promptly respond to them so that we are

20  ready to go on July 29th with the court.  Also looking towards

21  the next month we do have the disclosure statement hearing

22  scheduled for, I believe, August 12th.  We are prepared to go

23  forward on August 12th with the disclosure statement and are

24  working towards being in front of the court on that day and

25  minimizing the number of objections that will be before the

1  court on August 12th.

2          So with that, Your Honor, that's where we sit

3  today.  As I indicated, I think Mr. Mason would like to

4  provide a brief update on the progress with the individual

5  local councils that the ad hoc committee has made.  So I will

6  pass the podium over to him unless you have any questions for

7  me.

8          THE COURT:  I do not.  Thank you.

9          Mr. Mason?

10          MR. MASON:  Thank you, Your Honor.  Thank you, Ms.

11  Lauria.

12          Richard Mason, Wachtell Lipton Rosen & Katz, on

13  behalf of the ad hoc committee of local councils.

14          Your Honor, this morning the ad hoc committee has

15  good news to report about the local council contribution to

16  the global settlement envisioned by the RSA.  As you will

17  recall, Your Honor, the RSA requires that the ad hoc committee

18  use its best efforts to secure local council contributions of

19  $500 million in cash and real estate to the proposed

20  settlement trust.  Because the committee cannot bind local

21  councils we only have the power of persuasion, Your Honor,

22  which I will say we have widely and actively employed.

23          I am happy to report that after hundreds of hours

24  of work including calls and meetings with volunteer boards

25  across the country, all in a very concentrated time, but

1 building on over 18 months of engagement, the ad hoc committee

2 expects that local councils will be able to achieve the $500

3 million requirement.  One might think of it as the largest

4 fundraise in the shortest time in US non-profit history; at

5 least I am not aware of anything bigger.  Maybe the Red Cross

6 has done something bigger, but not that I have seen.

7         Standing here today nearly all of the over 250

8 independent local councils have submitted letters of intent to

9 contribute cash and property to meet the contribution amount.

10 We do expect, Your Honor, to have 100 percent local council

11 participation by the disclosure statement hearing, if not

12 sooner, and we expect that all local councils will agree to

13 pay their allocated share.  We also expect that of the $500

14 million more than $300, potentially much more will be in cash

15 as the RSA term sheet requires.

16         Now I won't belabor the point, Your Honor, but to

17 get to where we are at least 5,000 dedicated volunteers and

18 probably more than 10,000 on boards across the country had to

19 meet, consider the RSA and agree that it was the best and most

20 appropriate path forward.  That is truly extraordinary in our

21 view.  All of these local council contributions, as Your Honor

22 has heard before, are expressly contingent on satisfactory

23 resolution of the issues surrounding chartered organizations.

24 Not surprising, since the chartered organizations are critical

25 business partners of the local councils and the national BSA,

1  and they are co-insureds on BSA insurance policies.

2          So as Ms. Lauria stated the ad hoc committee and

3  the BSA have been hard at work together crafting potential

4  solutions that preserve our ongoing relationships with

5  chartered partners while addressing the requirement to

6  equitably compensate victims.  We have begun to discuss these

7  potential solutions with the tort plaintiffs.

8          The RSA term sheet provides that both sides will

9  work together in good faith in this matter as we are all

10  doing.  Meanwhile, Your Honor, the ad hoc committee and the

11  BSA have had good initial engagement with some of the key

12  chartered organizations and would encourage any chartered

13  partner that is listening right now and that wants to be

14  involved to reach out to the ad hoc committee, or to the BSA,

15  or to both so that we can talk.  You are, indeed, a critical

16  part of this global resolution.

17          Thank you, Your Honor.

18          THE COURT:  Thank you.

19          Is there anyone else who has some preliminary

20  remarks before we get into the agenda?

21          MR. MOLTON:  Your Honor, David Molton for the

22  coalition.  Can I just have a few words?

23          THE COURT:  Mr. Molton?

24          MR. MOLTON:  Your Honor, just in case there is -- I

25  just want to supplement what Ms. Lauria and Mr. Mason said

1  with respect to continuing efforts in the mediation.  There

2  are good faith mediation efforts continuing with respect to

3  insurers and not only with respect to insurers, and this is

4  the reason that I chose to just say a few remarks, Your Honor,

5  but with plaintiff or, you know, the plaintiff constituencies

6  and chartering organizations.

7          So the charters are part of the process.  We hope

8  they, as Mr. Mason has invited them just now to further

9  participate, to further take advantage of the very vigorous

10  mediation protocol and regime that exists and has led to the

11  achievements that have thus far been announced two weeks ago

12  and today.  And just want Your Honor to know that all of the

13  RSA parties are working hard to deal with any, whether it be

14  insured or chartered organization, that comes into and engages

15  in the mediation.

16          Thank you, Judge.

17          MR. STANG:  Your Honor, may I make a comment?

18          THE COURT:  I think I hear Mr. Stang.  There you

19  are.

20          MR. STANG:  Thank you, Your Honor.

21          Your Honor, not meaning to rain on anyone's parade,

22  but with the exception of mediation sessions with the Church

23  of Latter Day Saints, and I am aware that some other ad hoc

24  committers of chartered organizations has joined.  I am not

25  aware of any discussions with the tort claimants committee

1  regarding the framework for bringing the chartered

2  organizations outside of what is in the RSA.  If people are

3  having substantive conversations with chartered organizations

4  on making contributions to become protective parties those

5  discussions have not included the tort claimants committees

6  with the exception of, I think, three mediation discussions

7  with LDS which, of course, I can't get into the details of.

8              THE COURT:  Okay.  Thank you.

9              I know that discussions to date in mediation, I'm

10 sure, have been intensive and difficult to come to resolutions

11 that have been achieved and I suspect that the inclusion of

12 chartered organizations, given just the sheer number of them,

13 is a difficult dance to be involved in.  So I am encouraged

14 that there have been some discussions.  I do not see why there

15 should be a limitation on who reaches out to whom with respect

16 to discussions.

17             So -- but I can envision that that negotiation is

18 as difficult as any to date with respect to resolution, but I

19 encourage the parties to continue.

20             MR. SCHIAVONI:  Your Honor, for Century if I may

21 just very briefly.

22             THE COURT:  Mr. Schiavoni?

23             MR. SCHIAVONI:  I found the status report extremely

24 helpful by the various parties largely because we were

25 completely excluded from all of these discussions.  I knew

1  nothing about anything of what was said until I just heard it.

2  We -- despite what Mr. Molton just said we have had no

3  discussions with him.  We have been excluded from all of the

4  meetings despite our request with -- you know, the meetings

5  that have taken place with the sponsors.  As I understand it w

6  have been excluded from those despite our request to be

7  present.  We have had no communications with the debtor

8  whatsoever.

9       Just to reply what lead to the RSA which was two

10 parties going into the back room and drafting TDP's the

11 complete exclusion of the insurers.  It's very easy to have a

12 negotiation and then come out with an agreement where the two

13 parties are asking a third to pay and they don't have an

14 economic interest in what they are drafting.

15      So, you know, hope springs eternal that there will

16 be a change of pace here, but, you know, I think this is a lot

17 of lipstick on the pig about how these negotiations are going

18 forward because, frankly, they exclude us entirely.

19      THE COURT:  Okay.  The phone goes two ways, as my

20 mother would say.

21      Anyone else?

22    (No verbal response)

23      THE COURT:  Okay.  Thank you.  Let's get to the

24 agenda.

25      MR. REMMING:  Thank you, Your Honor.  The first

1   item on the agenda filed by a third party will be handled by

2   my colleague, Paige Topper, from Morris Nichols.

3           THE COURT:  Okay.

4           MS. TOPPER:  Good morning, Your Honor.

5           THE COURT:  Good morning.  I do believe we have

6   that individual on the line, at least that is what my sign-in

7   sheet or registration sheet is saying.  So we can go by

8   initials because this matter is under seal.  I am not sure

9   exactly how that is going to work, but it's JM.

10          MS. TOPPER:  Thank you, Your Honor.  Again, this is

11  Paige Topper with Morris Nichols on behalf of the debtors in

12  these cases.  As my colleague, Mr. Remming, mentioned I will

13  be handling this matter which is item one on the agenda.

14          Your Honor, the movant filed the initial motion for

15  correction and response requesting that his contact

16  information be updated and that he receive notification from

17  the debtor's claims agent that his contact information was, in

18  fact, updated.  In response to that initial motion the debtors

19  directed Omni, as the claims agent, to send a letter to the

20  movant confirming that Omni had, in fact, updated his address

21  both on their claims register as well as their address

22  database that they maintain for these cases.

23          Your Honor, Omni sent that letter on June 22nd and

24  as detailed in Ms. Nownes-Whitaker's declaration that the

25  debtors filed last night and should be included in the amended

1  agenda, Your Honor, it was D.I. 5642 and its included under

2  responses received on item one under the agenda.  As detailed

3  in Ms. Nownes-Whitaker's declaration the envelope label that

4  contained the letter that was sent to the movant inadvertently

5  misspelled the word institute and the letter, itself, did not

6  include that clerical error, Your Honor.  The letter, itself,

7  did include the correct mailing address for the movant.

8          Your Honor, I do want to note for the record that

9  this clerical error did not prevent the movant from receiving

10  the letter and the movant subsequently filed a further motion

11  for audit of Omni's records as well as assignment of counsel

12  and that second motion is at D.I. 5601.  In this motion, Your

13  Honor, the movant raised concerns with respect to the clerical

14  error on the envelope.

15          I just want to emphasize, and this is highlighted

16  in the declaration that was filed last night, that this was an

17  inadvertent clerical error and Omni has confirmed that despite

18  the error on the envelope both its claims register and the

19  service list, as well as the address database that it

20  maintains reflect the movant's correct address.  The debtors

21  certainly dispute any implication that there is any financial

22  incentive for Omni to maintain or to have errors in its

23  database, and the debtors are certainly not trying to abandon

24  anyone's claims at this time, certainly not in violation of

25  anyone's due process rights.

1        With respect to the rest of the relief that is

2   sought in the motion for audit, Your Honor, the debtors

3   believe that in light of these circumstances that relief is

4   both inappropriate and unnecessary.  The movant requests an

5   audit of Omni's claim register and matching the mailing

6   addresses against any claimants and that audit would be by a

7   third-party.

8        Your Honor, given that this is an isolated incident

9   it's just not necessary for there to be an audit of the 85,000

10  claims that had been submitted.  Omni has confirmed that its

11  claim register reflects the movants correct mailing address

12  and as the court is aware and as is typical of the claims

13  agent in any Chapter 11 case Omni consistently updates both

14  its claims register and its address database as it receives

15  new and updated addresses from claimants.  They have done so

16  in this case and they have confirmed that to the best of their

17  knowledge the claims register in its current form is both up

18  to date and accurate.

19       I do want to note, just as a final point, that the

20  movant is adequately represented by counsel.  They are

21  represented by the tort committee in these cases and, thus,

22  the request for assignment of counsel is, likewise,

23  unnecessary.  So the debtors believe that the relief requested

24  both in the motion for correction as well as the motion for

25  audit any relief with respect to updating the movant's mailing

1  address has already been resolved.  With respect to the

2  remaining relief requested that the court deny any such

3  relief.

4          Before asking if the court has any questions or

5  turning it over to the movant I would like to, as a procedural

6  matter, move the declaration of Ms. Catherine Nownes-

7  Whitaker's declaration into evidence.  She is available in the

8  virtual courtroom today and is available for cross-examination

9  to the extent necessary.

10          THE COURT:  I am not going to accept this

11  declaration into evidence.  It was put in last night.  I doubt

12  the movant has seen it.  I doubt the movant, being pro se, is

13  prepared to do anything with it and I don't think it's

14  necessary, quite frankly.  So I am not going to admit it into

15  evidence.

16          MS. TOPPER:  Okay.  Thank you, Your Honor.

17          Does the court have any questions for me with

18  respect to these motions?

19          THE COURT:  Yeah, I do have one question.  So I

20  noted that the address on the envelope had a typo in it and

21  I'm curious how that happens if its generated from the same

22  database that has the claimant's information in it.  How is

23  that possible that the address is correct in one place and not

24  in another place?

25          MS. TOPPER:  Your Honor, I would need to rely on

 1  Ms. Nownes-Whitaker to answer that question as I don't know

 2  the details with respect to how Omni puts labels on their

 3  envelopes.  Can I invite her to answer that question or I can

 4  get back to the court.

 5          MR. MACMILLAN:  Jeff Macmillan is on the line here

 6  with everybody.

 7          THE COURT:  Yes.

 8          MR. MACMILLAN:  There was some Zoom difficulties

 9  getting in.  I apologize.

10          THE COURT:  Did you just get in right now?

11          MR. MACMILLAN:  Yes, Your Honor.

12          THE COURT:  Did you hear Ms. Topper speak about

13  this matter?

14          MR. MACMILLAN:  I just caught the backend of what

15  she was saying.  I think it was in the process of coming in.

16          THE COURT:  Okay.  Ms. Topper -- Mr. Macmillan,

17  this is your motion.  I will let you speak to it and then Ms.

18  Topper can respond to anything.

19          MR. MACMILLAN:  Okay.  I think I can actually make

20  this fairly brief, Your Honor.

21          First, in filing this -- there are actually two

22  motions here.  I believe the court should have a supplement

23  that was filed subsequent to the initial one with anticipation

24  that all of this could be handled in a single brief meeting.

25  Since the initial motion to file the supplementary motion you

1  have plus on July 12th I received the debtor's response to

2  that initial motion.

3           The timeline is fairly simple.  On April 9th I sent

4  the initial request to the clerk and to the agent, Omni; no

5  response to either which was seeking correction of the

6  information.  That was sent via certified mail.  Absent a

7  response for the action the third-party motion was filed,

8  which is what we're doing.  The court responded by scheduling

9  this hearing.

10          On 26th June a letter received by the movant, me,

11 from Omni stating that their "database had been updated."

12 This letter made no request for any kind of response or

13 anything else.  Notably, the envelope for this letter

14 announcing that they had corrected a typographical error

15 itself had a typographical error in the addressing section.  A

16 supplementary motion was filed with this court seeking an

17 inspection, audit and review of the database based on the

18 ongoing consent for information integrity.

19          On the 12th of July I received a copy of the

20 debtor's response seeking to dispose of this motion.  Now I

21 have a very brief thing here, but I guess just a question

22 first.  Is Omni contracted by the debtor or is it some sort of

23 a court assigned entity?

24          THE COURT:  Well for purposes of noticing they are

25 an arm of the clerk.

1        MR. MACMILLAN:  Okay.  That's fine.  I just needed

2   to know that just so I understood how this all works because

3   up until all of this started I have had absolutely no contact

4   whatsoever or insight as to where everything was.  So other

5   than getting a letter from them I didn't know what was going

6   on.

7        My brief statement is this, I guess the

8   supplementary motion seems like a fair resolution to a pretty

9   obvious problem.  The debtor wants to pay as little as

10  possible, as is their right; however, this cannot be at the

11  expense or the rights of the victims involved.  The response

12  to the debtor's offer to the court is also telling, no less

13  than nine different attorneys presumptively trained in the art

14  and practice of law offered evidence as to their exhibits to

15  their response.  They included a letter that Omni sent and

16  while this letter is relevant the fact that they excluded the

17  envelop it was sent in is even more so.

18        The court does not need nine attorneys to know that

19  the failure to deliver a piece of mail due to addressing has

20  everything to do with the envelope and nothing to do with its

21  contents.  Since this entire motion centers around failure to

22  properly address the envelope and the debtor's failure to

23  include it as an exhibit is speculative.  As shown by my

24  exhibit there is likely a very good reason it was excluded.

25  The debtor clearly seeks to cherry-pick its evidence to make

1  their case for compliance while concealing the very errors at

2  issue.

3         The material attached to the supplemental motion

4  along with the debtor's selective submission of their own all

5  support the granting of the supplemental motion, the very

6  integrity of the proceeding itself stands in peril if not

7  properly representing the victims claims.

8         It clearly demonstrates the very concern that had

9  been set forth in the motion.  Motive to disregard evidence

10 relevant to the facts.  The debtors and their contractors

11 cannot and should not be trusted to comply with the proper

12 handling of abuse claimant information, at least not with a

13 diligent scrutiny and oversight by the court.

14        This motion would ensure that any evasion by the

15 debtor, whether accidental or intentional, to avoid the

16 responsibility the victims have met with all the due process

17 and oversight that is available and necessary to protect the

18 victims' rights.  The evidence supporting the need for this

19 audit as well as the other remedying measures ensure proper

20 judicial function and fairness.

21        The burden will be minimal (indiscernible) of

22 acting has far greater consequences.  The requests are laid

23 out, obviously, in the motion.  I am not an attorney so

24 forgive any (indiscernible) procedure violations here, but I

25 believe the audit would determine decisively the viability of

1   the data that everybody should be relying on.  Any

2   malfeasance, if found, should be decisively investigated and

3   addressed.  The debtors and contractors should be responsible

4   for the cost of this motion because it's entirely of their own

5   manufacture.  Any errors should be notified to the court as

6   well as the relevant parties via some service method that is

7   confirmable as to receipt.

8          That, I guess, would be the total of my statement

9   on this.

10          THE COURT:  Thank you.

11          Ms. Topper, would you like to respond, please,

12  directly to the argument that was made?

13          MS. TOPPER:  Yes, Your Honor.  Just a few brief

14  points.  And I will be brief.  I just want to reiterate

15  because I believe Mr. Macmillan missed some of my opening

16  remarks on this matter.  I do want to reiterate that this was

17  a clerical error by Omni.  While it was listed incorrectly

18  there was a typo in the envelope.  It wasn't a typo in the

19  letter.  Omni has since confirmed that the movant's mailing

20  address is correctly listed and has been updated both on their

21  claim's register as well as their address database that they

22  maintain for these cases.

23          I noted for the court that this was an isolated

24  incident.  Omni has, you know, confirmed for the debtors that

25  they believe, to the best of their knowledge, that their

1  claims register is updated and accurate.  You know, as with

2  all Chapter 11 cases they had been updating their claims

3  register as they receive new and updated addresses from

4  various claimants.

5        There certainly isn't, you know, any evidence that

6  this was anything more than a clerical error.  It was not a

7  deliberate error on the debtors or Omni's parts.  And as for

8  not receiving additional correspondence in connection with

9  these cases Omni, as the court is aware, does not provide

10 updates for where these cases stand; certainly not to every

11 claimant.

12        You know, as we move forward with the disclosure

13 statement Mr. Macmillan, in connection with the proof of claim

14 that he submitted and as a creditor in these cases, will

15 certainly receive information with respect to the disclosure

16 statement and further mailings thereto for any documents that

17 are served on the abuse claimants or all creditors, but not

18 every claimant receives every document that is filed in these

19 cases.  Certainly if Mr. Macmillan would like to be included

20 on the 2002 list we can arrange that.

21        MR. STANG:  Your Honor, this is Mr. Stang.  May I

22 make a comment about information to survivors?

23        THE COURT:  Yes.

24        MR. STANG:  Your Honor, the tort claimants

25 committee maintains a website that includes various important

1  pieces of information regarding the case including recordings

2  of town hall meetings that the TCC has conducted over the last

3  several months.  I think we have had, I believe, four.  And

4  because we understand that people cannot necessarily make the

5  time to attend those when they are done live we have posted

6  recordings on the tort claimants committee website which is

7  accessible through my law office, my law office's website.

8          We had Q and A during those town hall meetings.

9  They are not live in the sense that someone can announce

10  themselves and ask a question that everyone else can hear, but

11  Mr. Lucas, my partner who is on this call today, fields those

12  calls during the town hall and poses those questions to me or

13  to himself, as the case may be, on the subject matter so that

14  people can hear the information.

15          We have another town hall coming up, I believe, in

16  early August.  We wanted to make sure that we had gotten

17  through the RSA hearing before we presented it.  So I wanted

18  the court to -- now I don't know what this gentleman's access

19  is to the internet or to be able to attend those live town

20  hall meetings, but that is how the committee has tried to

21  fulfill its responsibilities to keep the constituency

22  informed.

23          THE COURT:  Thank you.

24          MR. LUCAS:  Your Honor, this is --

25          MR. MACMILLAN:  Your Honor, two points in response

1  to --

2              THE COURT:  Yes, Mr. Macmillan.

3              MR. LUCAS:  Your Honor, I was just going to -- to

4  the extent that any survivor or this gentleman here doesn't

5  have access to the internet we also provide written

6  transcripts of the town hall meetings.

7              THE COURT:  Thank you, Mr. Lucas.

8              Mr. Macmillan?

9              MR. MACMILLAN:  Two points in response.  Ms. Topper

10 did a good job, I think, of summarizing the position and made

11 two points that I guess I would like to discuss if not

12 outright dispute.  She claims that Omni has stated that they

13 corrected their database; however, in their latest letter

14 asserting that this database has, in fact, been corrected

15 there is a discrepancy between what is on the envelope and

16 what is on the letter itself.  That seems to indicate that

17 there is either some manual entry that is going on either for

18 the letter or for the envelope itself.  She also contends that

19 this an isolated incident, but the purpose of the motion is

20 that it seems more probable then not that that is not the case

21 especially given after being advised of this problem produced

22 more typographical errors in their corrections.

23              Given the critical nature of the victims' ability

24 to respond  and have access to this information there seems --

25 this seems to be a relatively minor manner to simply confirm

1   that all of that victim information is, in fact, consistent

2   with the information that they submitted for that contact

3   information.

4                THE COURT:  Thank you.

5                Ms. Topper, you said that Ms. Catherine Nownes-

6   Whitaker, who is the chief operating officer of Omnis, is

7   present.  Would you like to put her on as a witness and ask

8   her questions with respect to Omnis procedures?

9                MS. TOPPER:  Certainly, Your Honor.  If -- I think

10  I saw her name.  Ms. Nownes-Whitaker, are you on?

11               MS. NOWNES-WHITAKER:  I am.

12               THE COURT:  Okay.  I need to swear you in.  Please

13  raise your right hand.

14        CATHERINE NOWNES-WHITAKER, DEBTOR WITNESS, SWORN

15               THE COURT:  Please state your full name and spell

16  your last name for the record.

17               THE WITNESS:  Catherine Nownes-Whitaker.  Nownes,

18  N-O-W-N-E-S.  Whitaker, W-H-I-T-A-K-E-R.

19               THE COURT:  Thank you.  Can you make sure you are

20  close to your microphone or your computer so we can hear you.

21               THE WITNESS:  Is that better?

22               THE COURT:  I think a little bit.

23               Mr. Macmillan, Ms. Topper will ask questions first

24  and then you will have a chance to follow-up with your own

25  questions.

1          Ms. Topper?

2          MR. MACMILLAN:  No problem, but before we begin,

3  Your Honor, may I ask just a simple question because I came on

4  in the backend of this I am actually not aware of who is all

5  on the line.  Would there be a way to simply -- I see a couple

6  of names here, but I don't know who is representing who.

7  Obviously, Ms. Topper is one of the debtor's attorneys.

8          THE COURT:  There are 153 people on this line.  So

9  we can't go through everybody, but Ms. Topper represents the

10 debtor and Mr. Stang and Mr. Lucas, who you heard from,

11 represent the official tort claimants committee that is

12 representing as fiduciaries the survivors.

13         MR. MACMILLAN:  Understood.  Thank you.

14         THE COURT:  Ms. Topper?

15                    DIRECT EXAMINATION

16 BY MS. TOPPER:

17 Q    Good morning, Ms. Nownes-Whitaker.  How are you?

18 A    Good.  Thank you.

19 Q    Can you state your full name for the court?

20 A    Catherine Nownes-Whitaker.

21 Q    And what is your current job position?

22 A    I am the COO of Omni Agent Solutions.

23 Q    And how long have you held that position?

24 A    A year and a half.

25 Q    And what was your position prior to being the COO Omni?

1   A       VP corporate restructuring services.

2   Q       Was that also at Omni?

3   A       I had been with Omni for 15 years.

4   Q       Thank you.

5           What is your involvement specifically with respect to

6   the Boy Scouts bankruptcy?

7   A       Prior to being promoted I was the lead case manager.

8   Now I oversee the case.

9   Q       Okay.  And you have been involved in this case since the

10  beginning.  Is that correct?

11  A       I have.

12  Q       Did you receive a copy of the movant's motion for

13  correction that we are discussing today?

14  A       I did.

15  Q       And when Mr. Macmillan filed that motion and you

16  received a copy what actions did Omni take in response?

17  A       I researched what happened and spoke to the people who

18  made the changes to make sure that they followed the SOP.

19  Q       I'm sorry, for the record the SOP --

20  A       Standard operating procedure for address updates.

21  Q       And what is that standard operating procedure?

22  A       The database is updated, somebody does a quality control

23  on it and it's verified.

24  Q       And are there any further details you can provide the

25  court with respect to the quality control?

1  A    I can explain what happened.  The call center, we do not

2  send anything when we get address updates.  We get thousands

3  of address updates.  So there is nothing that is ever sent out

4  that says confirmed your address is updated except for if it's

5  an email, then we just send a confirmation email.  At the time

6  we received the update in April the address was updated in the

7  database and it was correct as you can see from the letter.

8       The letter was received and the request was received

9  from your firm, and the call center rep sent the letter and

10  then typed the envelope instead of using the correct

11  procedure.  So it was a typo from the call center rep who

12  actually typed it because it was a single envelope thought it

13  would be quicker and easier, and he has been written up for

14  that.

15  Q    Okay.  So the standard operating procedure is not to

16  manually type the envelope label?

17  A    No.  If you manually type an envelope then you could

18  have typos which is exactly what happened here, which is

19  exactly why it shouldn't have happened.

20  Q    Understood.  And so is it your belief and do you have

21  the ability to confirm that the movant's mailing address is

22  correct on the claims register?

23  A    It was updated April 19th correctly in the database.

24  Q    Understood.  And when you sent the letter, you sent the

25  letter, correct, to the movant?

1  A    The letter does have the correct address, as you can

2  see, and that is done from the database.  It was the envelope.

3  And, again, we do not send out confirmations unless requested.

4  We would be sending out hundreds of them all the time.  So we

5  do not send them out, neither does the Clerk of the Court.

6  Q    Has Omni received any other communications from other

7  claimants following up that, you know, after requesting an

8  update to address there were further errors.

9  A    Not to my knowledge.

10 Q    And to the best of your knowledge is the claims register

11 currently up to date?

12 A    Yes.

13         MS. TOPPER:  I don't have any further questions at

14 this time, Your Honor.

15         THE COURT:  Thank you.

16         Mr. Macmillan, do you have questions for the

17 witness?

18         MR. MACMILLAN:  I do, several actually.  I believe

19 there is a bit of a delay between the communications here, so

20 bear with me.

21         Is Ms. Whitaker still on?  I'm seeing the Judge at

22 this point here.

23         THE WITNESS:  I am.

24         THE COURT:  Oh, okay.  Good.

25                        CROSS EXAMINATION

1  BY MR. MACMILLAN:

2  Q    I appreciate you taking the time to go through this

3  today.  I recognize this is probably a bit of a nightmare all

4  the way around.

5        Just for clarification in terms of the overall process

6  so we're all clear, the envelope is the relevant piece of what

7  we're talking about.  All of these letters and various

8  communications inside have nothing to do with whether a letter

9  is delivered, correct?

10  A    Correct.

11  Q    So in the instance that was named, the first case here,

12  you said that the standard operating procedure for Omni was

13  not followed and the envelope was hand typed which is what

14  lead to this incident happening?

15  A    Correct.

16  Q    Is that correct?

17  A    Yes.

18  Q    Okay.  So normally, if I am understanding your

19  inference, the envelope would also be generated by the

20  information contained in the database and would, therefore,

21  match what is on the letter?

22  A    Correct.

23  Q    Okay.  What happened the second time?  In other words

24  after Omni was notified they made the correction and they send

25  the second letter how was that envelope inconstant?

1  A    I wasn't aware of the second letter so I apologize I

2  cannot respond to that.  I have your motion which had the

3  envelope.

4  Q    Right.  After I received the Omni letter there was a

5  second submission which I assume you probably don't have in

6  front of you. Ms. Topper can probably confirm for you that the

7  envelope does not, in fact, match the addressing on that

8  second letter.

9       So the concern I am having is that if your assertion is

10 the SOP was not followed and caused that issue it appears that

11 SOP was not followed again causing the second issue.  Can you

12 tell me why I should believe that there aren't other instances

13 where the SOP isn't followed causing concerns that other

14 people might be facing the same thing?

15 A    We do not send out confirmation for address updates.  We

16 receive -- unless somebody emails then we, of course, respond

17 and confirm that we received it.  Neither does the Clerk of

18 the Court send out confirmations for address updates.  So in

19 this case this is a one-off.

20 Q    I understand what you are saying as it relates to a

21 confirmation, but is it not possible that this could happen

22 regardless of the communication?  Say this wasn't a

23 confirmation of a change of address, but rather something

24 notifying somebody of a potential hearing or other piece of

25 information, is it not possible.  I am just asking if it's

1  possible that an employee could not follow the standard

2  operating procedure and the address would, again, be

3  incorrect.

4  A    I'm sure as humans everybody makes errors and it is

5  possible in this universe that somebody could make an error.

6  Q    Okay.  Thank you.

7       You also stated that you received no requests for any of

8  the correction information from any other clients.  Is that

9  your testimony?

10 A    I'm sorry, I didn't receive any request from any other

11 creditors?

12 Q    My -- if I understood what was said, and I may not have,

13 so bear with me, you stated Ms. Topper had asked you if any

14 other creditors had requested their addresses be corrected and

15 that they be notified of such.

16 A    We received that all the time, I would say, on a daily

17 basis.

18 Q    Okay.

19 A    We receive forwarding mail, return mail.  We receive

20 that on a daily basis.  That is what we are as a claims and

21 noticing agent.

22 Q    Understood.  So those requests for changes of their

23 address, obviously, some of those relate to people moving and

24 changing their location, correct?

25 A    Correct.

1  Q      How many of those relate to the information that you
2  possess being incorrect in some fashion?
3  A      In my 15 years at Omni this is the first time I have
4  ever appeared in court over a typo or an incorrect address.
5  Q      Okay.  Is it possible that that's because they didn't
6  receive the incorrectly addressed information?
7  A      Honestly, sir, I don't know how to respond to that
8  question.  You're asking me a question about a possibility
9  that could be -- I do not know how to -- I apologize, I do not
10 know how to reply to that.
11 Q      Fair enough.  Let me rephrase the question.  Is it
12 possible that due to an addressing error from your
13 organization they could not receive correspondence at all?
14 A      I would not say that it's possible due to a typo that
15 somebody would not receive correspondence at all.
16 Q      You would say that is not possible?
17 A      No.  A typo would not, in my opinion, I am not a post
18 office employee, my opinion a typo would not.  As it's shown
19 here --
20 Q      Okay.  So if I were --
21 A      -- to institute -- you did receive the correspondence,
22 the typo did not interfere with you receiving it.  So that is,
23 from my experience, no, a typo would not.
24 Q      Understood.  I am not taking issue necessarily with the
25 instance, but, for example, if I live at 1234 (indiscernible)

1  are you (indiscernible) --

2           THE COURT:  Mr. Macmillan?

3           MR. MACMILLAN:  It appears (indiscernible) here. I

4  got no response whatsoever on that.  I apologize, Your Honor.

5           THE COURT:  You were breaking up there.  Why don't

6  you ask that question again.

7  BY MR. MACMILLAN:

8  Q     So assuming (indiscernible) is typographically incorrect

9  your assertion is that there should be the ability on the post

10 office to interpret your intent and not read what is on the

11 envelope and get it there anyway?

12 A     The zip codes are automatically updated when it goes

13 through the NCOA process.  We run a process through the postal

14 service on addresses and the postal service process is

15 updated.  So if there was a typographical error on a zip code

16 it would automatically update that.  The bar code is what the

17 post office uses for that.

18        Mr. Macmillan, when an address is updated --

19 Q     Fair enough.

20 A     -- the database it is also going -- it goes through a QC

21 process.  So like I said in this particular case the address

22 was typed which is against policy.  We would not be here today

23 if they had followed the policy and it was done correctly.

24 And you did receive it.

25           THE COURT:  We may have lost Mr. Macmillan.  Let's

1  wait a moment and see if he is able to get back on.

2       (Pause)

3            MR. MACMILLAN:  Clearly there was some sort of

4  internet problem here, Your Honor.

5            THE COURT:  I understand that and I'm not sure if

6  you heard Ms. Nownes-Whitaker's answer to your question or

7  not.

8            MR. MACMILLAN:  I got about five vowels out of it.

9  I apologize.

10           THE COURT:  Okay.  Why don't you give her your

11 question again so she can re-answer it.

12 BY MR. MACMILLAN:

13 Q    It's perhaps better to summarize a different way.  I

14 will simply rephrase the question.

15      Ms. Whitaker, you have acknowledged that human error

16 does enter into this process whether we wish it to or not and

17 that is not a judgment or anything else, it's merely a fact

18 that humans are operating these machines and human error does

19 happen.  I have made no assertion that this was necessarily an

20 intentional act or anything else.  It certainly could be, but

21 I have not made that assertion at this point.

22      My assertion is that regardless of the motive or intent

23 of the people to do the best possible things a failure in this

24 regard creates a deprivation of rights that cannot be

25 remediated.  It is my opinion that in this particular case

1  reviewing the information has no -- there shouldn't be a

2  problem or a reluctance to confirm that this critical

3  information is correct.

4          MS. TOPPER:  This is Paige Topper.  I just want to

5  make sure that Mr. Macmillan is asking the witness a question.

6  I'm not sure there was a question there.

7          THE COURT:  I don't think there was a question

8  there.

9          MR. MACMILLAN:  Fair enough.

10 BY MR. MACMILLAN:

11 Q    Ms. Whitaker, would you agree that ensuring the

12 correctness of this information should be something that we

13 all stand behind?

14 A    Yes.

15         MR. MACMILLAN:  I have no more questions for this

16 witness, Your Honor.

17         THE COURT:  Thank you.

18         Any redirect, Ms. Topper?

19         MS. TOPPER:  No, Your Honor.

20         THE COURT:  I have a couple questions.  Ms. Nownes-

21 Whitaker, you've talked about your quality control that there

22 is a quality control, can you explain to me the process of the

23 quality control?

24         THE WITNESS:  Yes.  The address is updated in the

25 database and then it goes to quality control, and then quality

1  control goes into the database and verifies the address has

2  been updated correctly; therefore, it is seen by two humans

3  and not just one.

4        THE COURT:  Is that the same process that takes

5  place when you get a proof of claim form?  How does that

6  process work in terms of inputting the address?

7        THE WITNESS:  The -- with the proof of claim form

8  it's different.  We receive the proof of claim form, it's gone

9  through a verification which means that a person goes through

10 and makes sure that everything has been and then it also goes

11 through quality control.  So there is three to four different

12 people that look at the same information and approve the claim

13 form.

14       THE COURT:  Okay.  So if there is an error such as

15 in the first envelope which had an incomplete -- among other

16 things, an incomplete zip code, only had a three digit zip

17 code how --

18       THE WITNESS:  It would flag the database.  If it a

19 zip code -- I'm sorry, Your Honor, did you want to finish your

20 question?  I apologize.

21       THE COURT:  You can tell me how that could happen.

22       THE WITNESS:  Okay.  If I a zip code does not

23 follow the standard five digits and it's not flagged as

24 international it would be flagged in the database as

25 incomplete and at that time we would look at it and verify

1  what was going on.  We have the NCOA process.  So if you have

2  an address and you put that address in the NCOA, and please

3  don't ask me what NCOA stands for because, I apologize, I do

4  not know, its USPS.

5          So it goes through that process. Then they tell us

6  what the correct zip code is for that address or if that

7  person has moved a lot of times it will say there's a new

8  address and we update it according to their forwarding, but

9  that is through the NCOA process which we have with the post

10  office.

11          THE COURT:  Okay.  So do you know how if an

12  envelope gets sent out with an incomplete zip code how that

13  happens?

14          THE WITNESS:  That would be, again, human error and

15  people not following the SOP.

16          THE COURT:  So are you -- is it your testimony that

17  this first envelope --

18          THE WITNESS:  I did not see the first envelope,

19  Your Honor.  So I can't speak to that because I didn't do any

20  research on that, but if you -- was that because of the zip

21  code?

22          THE COURT:  It has an incomplete address and an

23  incomplete zip code.

24          THE WITNESS:  That was the first one?

25          THE COURT:  That is how I'm reading it.

1          THE WITNESS:  Do you know the date on that?

2          THE COURT:  No.

3          THE WITNESS:  Because if that was before April that

4  would have been the address that was on the proof of claim

5  form.  So I would have to look at that.  We received the

6  address update in April.  And I will be honest with you a lot

7  of these proof of claim forms that we received from the

8  attorneys the claimant's address wasn't complete.  It was --

9  there were typos, there were a lot of information and there is

10 absolutely nothing we can do if the attorneys and -- but in

11 this case it goes to the attorney they are represented.  So,

12 you know, we don't really have to do a lot because the

13 attorneys are the ones who will be served.  I would have to

14 look into that, I apologize.

15         THE COURT:  This is with respect to a communication

16 received on April 9, 2021 from Omni.

17         THE WITNESS:  And it's a letter from us?

18         THE COURT:  I've got an envelope.  Okay. Did I --

19         THE WITNESS:  Is there a --

20         THE COURT:  Excuse me.  Have we lost Mr. Macmillan?

21 It looks like we have.

22         MR. MACMILLAN:  It appears that the internet is

23 dropping in and out here.  I am losing various people and

24 apparently myself here throughout this process.

25         THE COURT:  I am hearing you.

1          MR. MACMILLAN:  The video is virtually at a

2   standstill.

3          THE COURT:  Okay, but I can hear you, Mr.

4   Macmillan.

5          MR. MACMILLAN:  So I don't --

6          THE COURT:  Okay.  Do my questions prompt any

7   questions from --

8          MR. MACMILLAN:  So, I don't know how --

9          MS. TOPPER:  Your Honor, I'm sorry, I didn't want

10  to interrupt.  Is Mr. Macmillan also stating something?

11          THE COURT:  Mr. Macmillan, can you hear me?

12       (No verbal response)

13          MR. LUCAS:  Your Honor, this is John Lucas.  It

14  looks like he popped off there.  There he is now.

15          MR. MACMILLAN:  Alright, I appear to be back again.

16  Is there a phone number that I can call-in and maybe put me on

17  speaker and call that good enough?

18          THE COURT:  I think there is a way to do that.  I

19  don't actually know.

20          MR. MACMILLAN:  I'm assuming I'm the only one

21  having this trouble, Your Honor.

22          THE COURT:  I think you are, but that happens.

23          MR. MACMILLAN:  Okay.

24          THE COURT:  I'll tell you what we're going to take

25  a recess on this particular matter and I'm going to find out

 1  if there is a telephone connection that can be arranged, then

 2  we will continue it.

 3           Actually, let's take five minutes while I see if I

 4  can get that information.  We will take a general recess.

 5           MR. MACMILLAN:  Thank you.

 6       (Recess taken at 11:03 a.m.)

 7       (Proceedings resumed at 11:09 a.m.)

 8           MR. LUCAS:  Your Honor, I was going to suggest that

 9  sometimes it helps with bandwidth problems if the person turns

10  off their video and just uses the audio if there isn't an

11  alternative.

12           THE COURT:  I have a phone number.

13           MR. MACMILLAN:  I have been (indiscernible).

14           THE COURT:  Yeah, you're still --

15           MR. MACMILLAN:  I was turning everything off there

16  for a while.

17           THE COURT:  Okay.  I can give you a phone number if

18  you're there.

19           MR. MACMILLAN:  I really need this (indiscernible).

20           THE COURT:  Mr. Macmillan?

21           MR. MACMILLAN:  I'm here, Your Honor.

22           THE COURT:  Okay.  Here's -- you're going to need

23  to write down a bunch of things.  Here is the phone number

24  833-568-8864.  Then the meeting ID is 160 --

25           MR. MACMILLAN:  Got it, Your Honor.

 1              THE COURT:  Okay.  The meeting ID is 1605970842.

 2   Then there's a passcode 408522.

 3              UNIDENTIFIED SPEAKER:  Okay.  I will call-in right

 4   away.

 5              THE COURT:  Thank you.

 6         (Pause)

 7              COURT REPORTER:  Mr. Macmillan, are you on the

 8   line?

 9         (No verbal response)

10              COURT REPORTER:  This is the courtroom, LaCrisha.

11   Mr. Macmillan?

12         (No verbal response)

13              MR. LUCAS:  Your Honor, this is John Lucas of the

14   tort committee.  He is dialed in, but it appears that his line

15   is muted right now.  He is the 608 number.

16              COURT REPORTER:  Mr. Macmillan, press star 6 on

17   your phone, please.

18              MR. MACMILLAN:  I appear to be able to talk now.

19              COURT REPORTER:  Thank you.

20              MR. MACMILLAN:  Thank you.

21              THE COURT:  This is Judge Silverstein.  Mr.

22   Macmillan, I understand we have you on the telephone line,

23   correct?

24              MR. MACMILLAN:  That is correct, Your Honor.

25              THE COURT:  Excellent.  Mr. Whitaker, I don't know

1  if you heard the series of questions that I asked Ms. Nownes-

2  Whitaker.  Did you hear them?

3           MR. MACMILLAN:  Again, they were breaking up in and

4  out and I certainly didn't hear any responses to the little

5  bit I did get.

6           THE COURT:  Okay.  Let me ask a -- I'm not going to

7  repeat every question.  I don't remember every question that I

8  asked, but let me ask a few questions again, then.

9           Ms. Nownes-Whitaker, can you please discuss your

10 quality control procedures.

11          THE WITNESS:  We received the address update.  We

12 update it in the database, then it goes into quality control,

13 and somebody verifies it has been updated directly.

14          THE COURT:  Do you have a specific group that does

15 quality control?

16          THE WITNESS:  Yes, we do.

17          THE COURT:  And do they quality control each

18 "change of address" form or request to correct an address?

19          THE WITNESS:  They don't quality control every

20 single one.  As far as if it's a forwarding mail, it's updated

21 automatically --

22          THE COURT:  And what --

23          THE WITNESS:  -- programmatically from NCOA.

24          THE COURT:  Okay.  And that's something related to

25 the Post Office?

1                THE WITNESS:  Correct.

2                THE COURT:  Do the -- can you explain your process

3    when you get a proof-of-claim form in and how you populate

4    your database.

5    A     We receive the proof-of-claim form, it is entered into

6    the database, then it is verified, and then at this time goes

7    into quality control.  So, each proof-of-claim form is

8    reviewed and looked at three to four times.

9                THE COURT:  Okay.  Do those questions prompt any

10   questions from you, Mr. Macmillan?

11               MR. MACMILLAN:  A couple very short ones, actually.

12                         CROSS-EXAMINATION

13   BY MR. MACMILLAN:

14   Q     Ms. Whitaker [sic], you said all of these address-

15   correction requests are initiated at, presumably, the people

16   who are the addressees, correct?

17   A     Correct.

18   Q     So you have no way to initiate a correction of your

19   database if the client cannot get to you, correct; in other

20   words, if they don't receive the information, they wouldn't

21   know that their information is incorrect in your database?

22   A     That's why we use NCOA in the beginning to make sure

23   that the addresses are correct and if there was any updates,

24   that it was done programmatically from the Post Office's

25   records.

1  Q     Okay.  But the -- in my particular case, the first --

2  obviously, I'm different than a fair amount of the population

3  in that I appear in an institution.  The delivery policy for

4  people is a strict reading of the envelope, and in this

5  particular case, I'm not Jeffrey S. Macmillan, first of all.

6        That would be an institutional reason why this would not

7  get to me, and I was told on numerous occasions, it was

8  fortunate it was delivered because that's not me.

9        Notwithstanding that, the local Post Office, the only

10 reason they knew that this was to the reason was because of

11 the DOC number; the number underneath my information there.

12       Were that not there, they would have no idea how to

13 deliver this mail, which means, that I would have no way to

14 contact you for the request.

15       Did you understand that information?

16 A     Yes.  Mr. Macmillan, we receive all the information from

17 the client.  If the client's information is not correct, we

18 cannot -- there's nothing that we can do about that.

19       The information that we receive originally is from the

20 client.  The secondary information we receive is from the

21 proof-of-claim form.  So --

22 Q     Okay.  And to clarify, who is the client?  Is the client

23 the debtor in this case?

24 A     Yes.

25 Q     Okay.  All right.

1   A      So, it was from their books and records.  And like I

2   said, we've been doing this -- I've been doing this for 15

3   years and we have never -- I have never had this type of issue

4   before.

5   Q      Understood.

6        In this particular case, your organization contact with

7   me did not occur because you were responding to my request for

8   information, because I wrote to your organization.  It only

9   was conducted at the behest of the Court because I had to file

10  a motion in order to compel this to happen.

11       Now, how many others might be out there who could not or

12  did not take the steps to go to the Court with a motion to

13  compel this action?

14  A      You're asking me for --

15  Q      Yeah, how many others could be out there that --

16  A      That's a hypothetical question, Mr. Macmillan.  I

17  apologize, I don't know how to respond to that.

18            MR. MACMILLAN:  Well, and I think that, Your Honor,

19  answers my entire request and reason for this motion, is

20  because we can't answer that question.

21            I have no other questions.

22            THE COURT:  Thank you.  Ms. Topper, do you have any

23  further questions?

24            MS. TOPPER:  Yes, just a few on redirect, Your

25  Honor.

1                    REDIRECT EXAMINATION

2  BY MS. TOPPER:

3  Q     Ms. Nownes-Whitaker, you had testified earlier that on

4  when Omni receives a proof of claim, Omni uses the information

5  that is listed on our proof of claim; is that correct?

6  A     Correct.

7  Q     And you discussed a quality control with respect to

8  those proofs of claim and you said I believe that three to

9  four people, in fact, review that; is that correct?

10 A     Correct.

11 Q     Okay.  And then with respect to, I take it you didn't

12 look at Mr. Macmillan's specific proof of claim, given the

13 size of parent claims in this case?

14 A     No, I apologize, I have not.  We have received over a

15 hundred thousand claims in this particular case, and in the 15

16 years I've done this, we have received millions of claims and

17 address updates and this is the only time that I've had this

18 happen.

19 Q     And what's the procedure for submitted proofs of claim

20 if the proof of claim is handwritten and hard to read?

21 A     Then you have probably more than four people looking at

22 it and we also, if the address is very difficult, we will

23 Google it.  I mean, I know how that sounds, but if -- that's

24 all you can do when you have people that you can't read

25 information.

1  Q    Understood.

2          MS. TOPPER:  No further questions, Your Honor.  But

3  I do have a few points for closing.

4          THE COURT:  Okay.  Thank you, Ms. Nownes-Whitaker.

5          Your questioning is complete.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8      (Witness excused)

9          THE COURT:  Mr. Macmillan, do you have any further

10 comments, by way of argument?

11         MR. MACMILLAN:  Just a few closing comments, if

12 that's where we're at in this process?

13         THE COURT:  Yes.

14         MR. MACMILLAN:  I think largely, my arguments have

15 been made here in pointing out that however automated and

16 efficient, I guess we could say, Omni handled the over 100,000

17 claims that they've referenced, a couple of points stand out.

18 She stated succinctly that she's reliant on the client's

19 information and the client is the debtor in this case and my

20 motion clearly addresses the point that there    is -- it's

21 not a reason to question the veracity of that information.

22 They certainly have a liability in that regard.

23         Further, and, again, in this particular case, it's

24 proven that the contact with Omni did not occur because of my

25 request that was initially sent to them and then subsequently

1   sent to the Clerk of the Court, but as a result of the motion

2   filed in this court under this action and, obviously, the

3   clerk was unable to answer how many others might be out there

4   who, unlike me, were able to bury this (indiscernible) under a

5   hundred thousand motions to have their address corrected or

6   otherwise looked at.

7           This particular action, this started off as a

8   relatively simple request for an address correction from me.

9   When this failed to happen, it moved further into this phase

10  of a more formal motion that could not be ignored.  Once that

11  happened, the ongoing and continuous typographical errors gave

12  rise to a concern that out of the hundred thousand claims that

13  she cites, how many would we consider are acceptable to be

14  incorrect, to have their due process rights stripped away

15  because somebody punched the wrong key on their computer?  I

16  contend that the answer to that is zero.  There are zero

17  assault victim that should be disregarded because of a

18  keyboard mis-entry.

19          And my motion is intended only to address that

20  point.  It is not intended to burden or sanction or anything

21  else; that is the sole discretion of the Court.  This is to

22  make sure that no other potential victims fall through the

23  cracks, no matter how small everybody can contest them to be.

24  A typographical error is potentially fatal.

25          We've been using these terms "typographical error"

1  as though it is a minuscule, non-issue, when, in fact, a

2  single misplaced character can cause non-delivery, and the

3  fact is that nobody here can contest the fact that any one

4  digit or the non-delivery of a letter is without harm.  By

5  definition, it is extremely harmful and prejudicial.

6          I believe that having this information reviewed,

7  granted, it's going to be by more humans, but the reliance on

8  the client's information being passed on to Omni, who then

9  have their own people filing an SOP or more concerningly, not

10  filing an SOP, as demonstrated in the two out of two

11  communications from Omni in any case, leads me to believe that

12  unless for some reason the client or Omni has a problem with

13  me, that there's a pattern of behavior worth exploring.

14          I have no reason to think they have a reason with

15  me, which gives me more than reason to believe that it's

16  probable there are other typographical errors in their

17  database, either transcribed from the original claim

18  information or at various phases throughout their QC process,

19  that potentially lead to non-delivery to those clients -- I'm

20  sorry, not clients.  We'll call them victims -- I don't know

21  what the term is here, so forgive me.  We'll call them victim

22  in this case.

23          The two solutions proposed in this motion deal with

24  identifying and correcting any misinformation and whatever

25  subsequent actions need to be taken on behalf of that, as well

1  as assigning a single point of contact with a fiduciary duty

2  to make sure that people who do not already have a fiduciary

3  in place to ensure this information, can address this.  That

4  person does not need to be a negotiator or anything else;

5  merely a channel of information.  And neither of those things

6  are overly burdensome, and that, I think, is where I would

7  rest on this.

8                THE COURT:  Thank you.

9                Ms. Topper?

10                MS. TOPPER:  Thank you, Your Honor.

11                Just a few brief closing points.  You heard Ms.

12  Nownes-Whitaker testify that there are standard operating

13  procedures in place at Omni.  They are working off of -- I

14  don't believe in this case, they're working off of the

15  debtors' records, because the debtors' do not have all 85,000

16  claimants in their records that we started this case and

17  they're working with the information provided to Omni in the

18  proof of claim forms that were submitted.

19                They have quality control in place.  They have

20  their standard operating procedures.  You heard Ms. Nownes-

21  Whitaker testify that the individuals and the human error that

22  resulted in us being here today, you know that, those

23  individuals were reprimanded and that they were not acting

24  within the standard operating procedures that Omni has put in

25  place to ensure that its mailing database and its address

1  database are up to date.  That's not to say that there

2  certainly isn't room for human error.  There's always room for

3  human error, but Omni certainly has protocols in place to

4  minimize that, as much as possible.

5          We have confirmed for Mr. Macmillan that his

6  contact information is, in fact, correct and updated as of

7  today.  With respect to a hypothetical for additional

8  claimants' information being incorrect or for there being a

9  pattern that Omni has incorrect information, I still go back

10 to, I don't believe that one isolated incident in Mr.

11 Macmillan's case, although unfortunate, doesn't establish a

12 pattern that Omni has consistent errors in its mailing address

13 database.

14         And I do want to note that with respect to the

15 relief that Mr. Macmillan is seeking today, particularly with

16 seeking a point of contact for *pro se* claimants, I believe

17 that Pachulski, who's the law firm that represents the tort

18 committee, both Mr. Lucas and Mr. Stang provided helpful

19 comments and information for Mr. Macmillan today, with respect

20 to how he can receive information in this case and, you know,

21 the debtors and Omni are certainly willing to pass that

22 information along to Mr. Macmillan in a subsequent letter that

23 details both, the website and the contact information for how

24 he can get more information, more up-to-date information on

25 these proceedings.

1              THE COURT:  Thank you.

2              Okay.  Well, notwithstanding the technical

3    difficulties that we had during the course of this hearing, I

4    have, I think, both the debtors and Mr. Macmillan have ably

5    made their arguments to the Court and I listened to the

6    testimony from Ms. Nownes-Whitaker.

7              I think there's no question, from looking at the

8    envelopes that were attached as exhibit to the two motions

9    that Mr. Macmillan filed, that there was error in these

10   particular instances, with respect to the addresses and it is

11   unclear to me, quite frankly, still about the first envelope

12   with the incomplete address, including an incomplete zip code

13   and an initial that Mr. Macmillan says is not his middle

14   initial.

15             As for the second envelope with the typo in the

16   word "institute," that was explained and it was explained that

17   the Omni employee did not follow standard operating procedures

18   and hand typed an envelope, apparently, believing it was

19   easier since it was a single communication, and not a mass

20   mailing.  So, they did not use the database as appropriate,

21   and that employee has been reprimanded appropriately.

22             As far as the relief that -- so, what we now know

23   is that Mr. Macmillan's address has been corrected.  It is

24   correct in the Omni database and it should not create problems

25   for Mr. Macmillan in the future.

1            As far as the relief that's requested in the

2  subsequent motion that I order an audit of all claimant

3  information, performed by a disinterested third party to

4  identify the current veracity of the database, I don't find a

5  pattern here of incorrect addresses.  I recognize

6  Mr. Macmillan's point which is that if there's one -- if there

7  is one mistake there, could be other mistakes, but I don't

8  think the instance of one mistake is enough require an audit

9  which would be costly, and under the circumstances, and having

10 heard the testimony of Ms. Nownes-Whitaker, which I credit as

11 honest -- I think she was very forthright in her responses --

12 I don't see a basis to compel an audit.

13           I will say that if, in fact, parties do not get

14 their mail because of an incorrect address, that may very well

15 correct a due process issue, which a party with bring in front

16 of this Court and make certain that their opportunity to be

17 heard happens if it's in connection with an objection to a

18 claim and they didn't receive an objection to the claim

19 because it's not properly addressed.  I can correct that, as

20 appropriate, at the time.

21           And I realize the sort of circular problem there

22 may be, but I suspect once we get into or once, more likely, a

23 trust gets into a claim objection issue, that we'll deal with

24 that as they come up.  But, to the extent a due process issue

25 is corrected, I will handle those on a one-on-one basis.

1          In terms of assignment of a limited scope counsel

2   to a subclass of claimants, I agree that there is a fiduciary

3   in place currently for all abuse victims for all survivors and

4   that is the tort claimants' committee, represented by Mr.

5   Stang and Mr. Lucas.  And they do provide updates, as we

6   heard, to their constituency.

7          I will request that Mr. Stang and Mr. Lucas reach

8   out to Mr. Macmillan -- they have his address.  We have a

9   correct address -- and provide the information, by which Mr.

10  Lucas [sic] can participate in or access the forum in which

11  the tort claimants' committee provides that information.  And

12  that is their, part of their job responsibilities, which they

13  are handling, to provide status information about the case to

14  their constituency, whether they're represented or not.

15         And so, there does not need to be another type of

16  fiduciary appointed to provide that information, which

17  Mr. Macmillan can avail himself of, certainly now that he's

18  aware of it, and he will be given that contact information.

19         So, for that reason, I'm going to deny the third-

20  party motion.  I understand why it was brought.  I understand

21  the concern that's been raised, but as I've indicated, I will

22  handle due process concerns on a case-by-case basis and I

23  don't have evidence that there is a systemic concern about the

24  handling of addresses by Omni.  And as Ms. Nownes-Whitaker

25  indicated in her 15 years working for Omni, she has not

1  encountered this particular issue before.

2          So, that concludes my ruling.

3          Let me make an observation.  The Clerk's Office is

4  getting hundreds, if not, at this point, thousands of letters

5  from, particularly from abuse survivors.  Many of them asked

6  for a response.  I cannot respond individually, and *ex parte*,

7  to those letters that are being filed.

8          And I would ask that counsel for the TCC inform

9  their constituency that I cannot respond to those letters.  It

10  does not mean that I'm ignoring them or the Clerk's Office is

11  ignoring them.  We simply cannot respond to those letters.

12          And I would ask if there are law firms that

13  requested that their clients write letters to me, which I know

14  there are, this they inform their clients directly, that I

15  cannot respond one-on-one to each of the letters that has been

16  written and filed with the Court; again, they're not being

17  ignored, but it would be improper for me to respond to those

18  letters.

19          That concludes this first matter.  Thank you.

20          MR. LUCAS:  Your Honor, this is John Lucas.  May I

21  respond just briefly, not, obviously, arguing with anything,

22  but I just wanted to confirm that the TCC will do two things.

23  They will send a communication to Mr. Macmillan ensuring that

24  he has the information of my firm's website and provide him

25  access to the town halls and the information that he can even

1  get from previous town halls and transcripts and the like.

2          And, Your Honor, at our next town hall where we

3  communicate sort of *en masse* with survivors or their counsel,

4  we will convey the Court's message at this hearing that the

5  Court cannot respond individually to the letters that are

6  being filed in the event that there's any frustration by the

7  survivor that they're not getting a response.

8          THE COURT:  Thank you, I appreciate that.

9          MR. LUCAS:  And, Your Honor, I didn't know that

10 there was going to be a hearing today, so I apologize of going

11 on and off of camera, because I'm not wearing a tie and a

12 coat.  I just didn't anticipate today's hearing and I'm

13 traveling without a suit.  I apologize.

14         THE COURT:  Okay.  Thank you.

15         Mr. Macmillan?

16         MR. MACMILLAN:  Just a brief question from

17 Mr. Macmillan, Your Honor.  You referenced the process, the

18 handling of the due process violations on a one-by-one basis.

19 I think that's absolutely fine and had I been aware at all of

20 the tort claims committee, they would have been my first

21 contact, honest with you, but, obviously, due to the

22 addressing problems, that's where that came in.

23         But relating to your handling of the due process

24 violations, is there a, shall I say, limited (indiscernible)

25 in term of the time frames people will have to bring those

1  issues to your attention?

2         THE COURT:  I really can't provide legal advice

3  with respect to how someone should bring that, but parties, to

4  the extent that they have some concern, should bring it to me

5  as promptly as possible.

6         MR. MACMILLAN:  Got it.  I represent a number of

7  other inmates who don't have access to this information, so

8  I'm trying to convey as much as I possibly can here, because

9  they, obviously, will not be able to contact these websites or

10 anything else either.

11        THE COURT:  Okay.  Thank you very much.

12        And Mr. Macmillan, you are welcome to stay on the

13 hearing if you'd like or your matter is complete and you can

14 disengage.  It's up to you.

15        MR. MACMILLAN:  All right.  I can hang out for a

16 moment, ma'am.

17        THE COURT:  Okay.  Thank you.

18        Can everyone make certain, then, that they are

19 muted and we'll continue -- except for those speaking -- and

20 we'll continue on to the next matter.

21        MR. REMMING:  Thank you, Your Honor.

22        Item 2 on the agenda has been adjourned, and that

23 brings us to Item 3, which is a motion filed by Century, and I

24 will turn the podium over to counsel for Century.

25        THE COURT:  Thank you.

1            MR. SCHIAVONI:  Good morning, Your Honor.

2            There's good news about this motion.  The -- I

3  think there's really no objection from anyone to the

4  substantive relief that's sought.  There was an objection

5  filed to the precise form of the order, but unless I'm

6  mistaken, I don't think there was any objection filed by

7  anyone to the substance of the request sought.

8            This motion, Your Honor, was filed to amend the

9  compensation order under Rule 60(b), to make a very modest

10  modification, that is, just to change the holdback period from

11  the end of the quarter to the end of the case.

12           We brought this motion, Your Honor, after speaking

13  to a number of parties in the case about the complaints about

14  the scale and size of the professional spending.  There are

15  joinders to this motion, but I can tell you there was a wide

16  variety of folks, including individual representatives of the

17  debtors that voiced support for this relief, but for various

18  reasons, I think not wanting to actually be on record, as

19  suggesting that the holdback should be at the end of the case.

20           Andrew Vara, the trustee for this district, brought

21  and sought this exact relief in the sexual abuse case The

22  Diocese of Camden.  What followed -- you know, what happened

23  there has happened in several of these cases.  There has been

24  extreme contentiousness.  The professional spending very

25  quickly was getting out of hand in The Diocese of Camden case

1   and the relief sought, moving the holdback to the end of the

2   case, was adopted by the Bankruptcy Court judge in that case.

3   And I can tell you it's had almost a night-and-day saltatory

4   effect, a positive effect, I think, in sort of how matters

5   have proceeded going forward there.

6          The relief we seek doesn't -- you know, we lay out

7   what the spending is and why we think it has gotten where it

8   is, but the relief we seek doesn't require the Court to reach

9   any conclusions or to criticize anyone for any of the spending

10  that's incurred to date.  It's not intended to do that.  It's

11  intended, simply to, sort of put in a process that

12  incentivizes people to sort of move matters forward.

13         It addresses, to some extent, some of the concerns

14  of debtor, as poised about cash flow on a going-forward basis,

15  and I think it aligns everyone's interests in trying to bring

16  about a resolution of the case.  Those were, I believe, the

17  sentiments of U.S. Trustee Vara expressed in the Camden case,

18  and I think all of those sentiments apply here.

19         There is a fee auditor in place in this case, Your

20  Honor, and we attach a schedule that shows the results of the

21  fee audits over an extended period of time and I just think

22  from looking at that schedule, one can see, like, whatever

23  impact the fee auditor is having, it doesn't address any of

24  the bigger picture issues.

25         The fee challenges or inquiries, whatever you want

1  to call them, for a significant -- it's like -- the chart

2  presents a very large number.  It (indiscernible) the data

3  owner what the challenges were and it's kind of incredible to

4  look at because the fee auditor's results come out that he

5  sort of challenges between .6 percent and 1.3 percent and

6  almost all of the challenges fit within that very, very tight

7  band of challenges.  There aren't really ones that sort of

8  break out of that.  It's almost a sort of rope kind of, you

9  know, presentation each time.

10        But whatever it is, it's not really having an

11  impact, because he doesn't look at things like how many

12  lawyers are attending a single meeting, how many people are

13  working on a single matter, what the median rates are; all the

14  things that in private practice, clients look at.  None of

15  those things are looked at.

16        But, again, the relief we seek doesn't require any

17  conclusions or criticisms about what anybody's done here.  It

18  just simply is -- it put -- by moving the holdback to the end

19  of the case, it aligns all the parties' interests in moving

20  forward and trying to bring the case to a conclusion.

21        I think the only objection to the form of order was

22  one that was sort of, like, intended to sort of put money

23  specifically in escrow to make sure that a particular firm or

24  other would, you know, absolutely get paid, and I just don't

25  think that's necessary.  We provided you with a proposed form

1  of order that simply modifies the compensation order to move

2  the holdback to the end of the case when things could be

3  evaluated, instead of after the quarter.

4           Thank you, Your Honor.

5           THE COURT:  Thank you.  You know, what I'm seeing,

6  at least I didn't see any objections.  What I saw were two

7  competing forms of order at this point; one submitted by

8  Century and one submitted by the debtor.  So, let me hear from

9  the debtors, please.

10          MR. LINDER:  Good morning, Your Honor.  Matt Linder

11  of White & Case, for the debtors.

12          Your Honor, Mr. Schiavoni is correct insofar as the

13  representatives of the various estate professionals do not

14  oppose the relief being sought by Century.  We've agreed that

15  deferring the 20-percent holdback until such time as the Court

16  approves final fee applications for the various professionals,

17  is appropriate.  Under these circumstances, we think it is an

18  appropriate recognition of the economic realities of these

19  cases and the debtors' status as nonprofit corporations.

20          And he's also correct that I believe the only issue

21  before the Court today is form of order should be entered by

22  the Court and, of course, whether the Court believes any

23  modifications should be made to the forms of order prior to

24  entry.

25          I would, however, like to address the argument that

1  Century made in its motion in support of the relief, as I

2  believe many of them are mischaracterized.  The work that has

3  been done by the various professionals, and, in particular,

4  the measures those professionals have taken to observe

5  appropriate limits on their fees, and in many cases, reduce

6  their fees voluntarily.

7          Mr. Schiavoni said he's not asking for the Court to

8  criticize any professional, but the motion was not as

9  temperate in its relate Rick, so I would like to just address

10  those in turn, if I may, briefly.

11          Your Honor, first, Century argues that the

12  professionals in these cases have made no efforts to limit

13  their fees, enforce budgets, discount their rates, or limit

14  duplication of work.  We would dispute each of those

15  contentions, and I'll just give the Court an example from

16  White & Case, because that's really the only professional that

17  I can speak to directly.

18          Just that by way of example, White & Case has taken

19  voluntary reduction of its fees totaling nearly      $1.3

20  million from the time it was retained last fall through the

21  end of April of this year, and that does not include

22  additional reductions we've agreed upon with the fee examiner.

23          White & Case also consistently applies its own

24  internal guidelines that are specific to this case to ensure

25  that fees are appropriate and limited.  Just to list a few,

1  White & Case only charges the estates for four timekeepers at

2  any court hearing.  It only charges the estate for three

3  timekeepers at any mediation session.  Only for two

4  timekeepers at board meetings.  No more than three timekeepers

5  on any particular telephone call.  And no timekeeper that has

6  less than 10 hours in a particular month is charged through to

7  the estate.

8            A couple of additional points, Your Honor, the

9  former Sidley attorneys that are now with White & Case are not

10 charging the estates their standard White & Case rates.  We

11 are actually charging a lower rate, consistent with what the

12 client would be paying, had they remained at Sidley.

13            As a final point, we've also agreed to write-off

14 time spent by any White & Case attorney in getting up to speed

15 as a result of being brought onto the case, due to the

16 transition to White & Case from Sidley.

17            The second point that I want to address is

18 Century's assertion that there's really no consensus or real

19 progress to show for the fees charged in the case.  I

20 recognize that the motion was filed prior to the RSA being

21 announced, but even at the time that the motion was filed, we

22 had entered into settlements with JP Morgan and the UCC.  And

23 the professional fees charged to the estates by each of those

24 constituents have fallen dramatically since the time that that

25 settlement was entered into.

1          The UCC's fees previously ranged from between

2   $500,000 and a million dollars a month.  Those fees have

3   fallen by nearly 75 percent, obviously, due to the absence of

4   litigation and other contested matters with those parties.  As

5   for JPM, the fees of its restructuring counsel have decreased

6   by nearly 80 percent.  So, that's a meaningful benefit, a

7   tangible benefit of those settlements.

8          In addition, Your Honor, as a result of the RSA,

9   subject to its approval, of course, the debtors will be

10  avoiding costly litigation with representatives of the abuse

11  claimants, including the estimation matters, the restricted

12  asset litigation, and perhaps most notably, an exclusivity

13  fight that might result in competing plans and after the

14  terminations of the debtors' exclusive periods.

15         The RSA parties will also be working in close

16  coordination with each other to ensure that any duplication of

17  services is minimized or eliminated, if possible.

18         Third, that Century argues that the fees were

19  incurred in the absence of litigation.  I won't repeat what

20  the Court has heard before about who has filed what

21  oppositions but suffice it to say that the movant in this

22  instance has been a material driver of the fees that have been

23  incurred by both, the debtors and other fiduciaries for the

24  estates.

25         Additionally, Your Honor, Century argues that the

1  rates in these cases are out of sync with comparable

2  bankruptcy cases.  We would dispute that.  Various cases that

3  Century cites are either well out of date or really just not

4  comparable to these cases, in terms of the complexity or the

5  size or the counsel representing the various debtors in those

6  cases.

7            Finally, Century argues that the deferred hold back

8  is perhaps a necessary means to incentivize professionals to

9  reach timely resolution of these cases.  Your Honor, the

10 professionals representing the estates do not need a 20-

11 percent holdback as an incentive to bring these cases to a

12 timely resolution.  We want to achieve the best possible

13 result for the estates and creditors in an effective manner

14 that will allow the debtors to emerge from bankruptcy

15 successfully and continue carrying out their mission.

16           So, while we appreciate Mr. Schiavoni's efforts to

17 move these cases along, we are solely focused on that, and

18 this relief, while appropriate, is not a necessary means to

19 make that happen.

20           So, I'd like to turn back to the order because I

21 think that's what's really in dispute, so I appreciate your

22 listening to my responses and the various arguments that

23 Century made.  But the orders that were filed, initially,

24 Century filed an order appended to its motion.  We responded

25 at Docket Number 4094.  The debtors proposed their own order,

1  which we believe, more appropriately, circumscribes the relief

2  that Century has requested, and Century, as Your Honor noted,

3  filed a revised form of order that was appended to its reply

4  at Docket Number 4113.

5          There are really four primary differences between

6  the forms of order, so I'd just like to step the Court through

7  those differences, explaining why we believe that those are

8  meaningful and why we think the debtors' form of order is more

9  appropriate.  The first is really the most important, Your

10  Honor, which is the fee examiner's role in these cases.

11          I don't believe that Mr. Schiavoni's

12  characterization of the reductions that have been agreed to is

13  as accurate.  I think it may be upwards of 3 percent in many

14  cases of the fees.  Various professionals have agreed to

15  reduce their fees by up to 3 percent.  But in any event, what

16  the Century order proposes to do would be to suspend any

17  obligations for the professionals to file further fee

18  applications and deem all pending applications to be

19  withdrawn.

20          As an aside, Your Honor, Century represented in its

21  reply that that was the motion, a sort of interim version of

22  motion that was proposed by debtors.  That is actually not

23  correct.  There are certain provisions in the order appended

24  to its reply that the debtors never proposed and the reason

25  for this is that if we were to withdraw all the pending

1  applications, it would create a very serious conflict with the

2  fee examiner order, which keys Mr. Rucki's review of the

3  various interim compensation applications off of those

4  applications.  The procedures are not set up in a way for him

5  to review monthly fee applications, so we want to preserve all

6  the work that he's done to review those interim fee

7  applications and allow him do to that on an ongoing basis.

8  So, we would propose for all the professionals to continue

9  filing those applications to allow those reductions to be

10  taken in accordance with the fee examiner order.

11         The second of the four differences between orders,

12  Your Honor, is that under the debtors' version of the order,

13  we would establish a reserve for the 20-percent holdback

14  amounts.  Those funds would be released only upon

15  (indiscernible) order of the Court.  We believe that's an

16  appropriate method for the debtors to account for the fees

17  that would otherwise be paid at the various interim periods.

18  Century's motion didn't contain that kind of a mechanism.

19         Third, Your Honor, the holdbacks that will be

20  awarded by the Court in response to interim applications that

21  remain pending, I think some of those date back to as early as

22  August 2020.  We would propose under our orders that this

23  relief not apply retroactively to applications for which

24  certain CNOs have been on file for months.  Century didn't

25  request retroactive relief, so our proposal is for this relief

1  to take effect on a prospective basis with respect to future

2  interim fee applications.

3         Finally, Your Honor, and this is sort of a unique

4  point to counsel of the TCC.  They have proposed to us and

5  we're amenable to it, for them to receive half of their

6  holdbacks and keep those in a client trust account pending

7  entry of a final fee order.  The reason for that is that the

8  Pachulski firm has agreed to contribute 10 percent of its fees

9  to the settlement trust and so, we have agreed in our form of

10  order to accommodate that.  Those fees would not be paid to

11  the Pachulski firm, but, instead, they would wait until the

12  end of the case and then contribute them, subject to a final

13  order, to the settlement trust.

14         With that, Your Honor, the debtors would ask that

15  the Court enter the order appended to the debtors' reply.  I'm

16  happy to address any questions.

17         MR. SCHIAVONI:  If I may be heard, Your Honor?

18         UNIDENTIFIED:  Your Honor, may I be heard before

19  Mr. Schiavoni replies?

20         THE COURT:  Yeah, let me ask a question,

21  Mr. Linder.

22         You said some of the -- I'm only aware that I have

23  the one set of fee requests under -- well, not under

24  advisement; I just haven't reviewed them yet.  Is there more

25  than that?

1          MR. LINDER:  I believe there are two, Your Honor,

2    and I'm just looking at my records here.  There is an interim

3    application for the period beginning in August of 2020, that

4    is, for which a CNO has been filed, accompanied by an omnibus

5    interim fee order.

6          And I also believe that the application for the

7    period -- and that would cover August, September, and October

8    of 2020 -- and the interim application for the period

9    November, December, and January, is also -- also remains

10   pending under a CNO.

11         THE COURT:  Okay.  Thank you.

12         I'll hear from the committee.

13         MR. LUCAS:  Thank you, Your Honor.  John Lucas for

14   the official tort claimants committee.

15         Your Honor, the TCC agrees with Mr. Linder's

16   comments and we take some issue with Century's comments.  Just

17   one point about the fee examiner.  Automatic the things that

18   Mr. Schiavoni stated on the record today that the fee examiner

19   supposedly doesn't do -- staffing, number of attorneys on --

20   working at meetings, the type of attorney working on certain

21   matters, blended rates -- if Mr. Schiavoni reads the reports

22   that Mr. Rucki files on a quarterly basis, all of those

23   matters are reviewed and are set forth in his report.

24         Like the debtors' attorneys, the TCC's counsel and

25   other advisors all go through their bills and take efforts to

1  reduce the number of attorneys that are attending meetings and

2  we work very hard and also take voluntary reductions through

3  every monthly application that we file, before we file it with

4  the Court.

5        And most importantly, Your Honor, Pachulski Stang

6  Ziehl & Jones agreed up front here to give 10 percent of its

7  compensation to the trust.  It's the first and it's the only

8  party here that is ready and has a commitment that is under a

9  court order to contribute to the trust and we think that's

10 significant.  And we aren't asking, as Mr. Schiavoni said,

11 that we are trying to pay ourselves.  We are trying to ensure

12 and to make a statement to our constituency that we are

13 representing, that we are taking the money and putting it in

14 trust and holding it there for their benefit.

15       Obviously, it's all subject to final and further

16 orders, and nothing will happen, nothing will be transferred

17 out, and it is important to our constituency that we stand by

18 and we show them that we're there with them for every step of

19 the way.

20       THE COURT:  Thank you.

21       Mr. Schiavoni?

22       MR. SCHIAVONI:  So, Your Honor, we attached to our

23 application, which there was no opposition filed, no evidence

24 offered against it, we attached a schedule showing the monthly

25 billings and the bottom line, if you just cut through it all,

1  the bottom line is the monthly billings increase every month

2  and they're increasing now.

3         It's like we talk about efforts to keep things down

4  and whatnot.  It's just not reflected in the schedules before

5  the Court.  That's not the reality we're dealing with.  The

6  reality we're dealing with, also with the fee examiner,

7  whatever he's looking at, we put a schedule in, showing what

8  the discounts were that he achieved and what his fees were to

9  achieve those.

10        And when you take his fees out from the discounts

11 he negotiated, I don't want to say it's a wash, but it

12 basically, his fees, you know, are almost a significant amount

13 of what he claims to have, you know, achieved as a discount.

14 That's the reality of the situation.  It's not contested by

15 any evidence before the Court.

16        As far as the proposed order goes, we're all in

17 favor of the fee examiner continuing to review the

18 applications.  I don't know why it is he can't review them on

19 a monthly basis as they're submitted.  It seems to me the cost

20 incurred to the estate by requiring everyone to submit

21 quarterly interim applications, on top of their monthly

22 applications, it probably outweighs any marginal reduction

23 that the fee examiner is achieving after his fees; in other

24 words, the extra fees to prepare the interim fee applications

25 is going to outweigh the cost of just having, of whatever

1   savings that are made by the fee examiner.  So, it would be
2   much more efficient just to have them look just at the monthly
3   applications as they come in.
4           Two, as far as the motion being retroactive, let's
5   be clear about what happened.  We filed this motion and then
6   at the last omnibus, you know, we asked for it to go forward.
7   The debtor didn't put it on the agenda and then, you know,
8   didn't allow the motion to go forward after we filed it.  We
9   had back-and-forth here with the debtor about (audio
10  interference) so the motion could be decided.  We put a
11  written submission just saying, look, this could be decided on
12  the record.
13          So, they haven't managed to achieve delaying a
14  hearing on the motion by more than 60 days and to now hear
15  them say it shouldn't apply retroactively, I think that sort
16  of speaks for itself about what's going on.  There's no reason
17  why if the motion has merit and it's not opposed and it's
18  relief that Trustee Vara has successfully put in place in
19  other sexual abuse cases, that the relief shouldn't apply as
20  pending to all pending applications.
21          Third, let's be clear about what the Pachulski firm
22  has done.  It sounds great that they're offering a discount
23  and that's fine.  In the reply brief we filed, we explain, we
24  provide the citations to the other cases that Pachulski is
25  serving as committee counsel for in sexual abuse cases, and

1  the on-the-ground reality is that they're charging a

2  different, much lower rate to sexual abuse claimants in the

3  sexual abuse cases involves various Dioceses and other cases,

4  than they are here.  They're applying a significantly higher

5  rate in this case than in other cases where they're serving as

6  committee counsel.

7        Now, it's fine that in retrospect, they're offering

8  a sale, you know, a discount, but it's kind of like, you know,

9  the old department store trick of raising prices 50 percent

10  and then having a 10 percent sale.  So, I just don't think

11  that it justifies what they're asking for, which is, to be

12  clear, that, you know, they be given protection for their fees

13  above and beyond what their own clients get here.  They're

14  asking for a security interest on half of those, on the

15  significant amount of the holdback.

16        But everybody ought to be equally incentivized to

17  see that the Boy Scouts case gets resolved successfully and it

18  is not a positive that the TCC is asking that they get a

19  security on their holdback amount.  We would ask that our form

20  or proposed order be entered, Your Honor, for all of those

21  reasons.

22        THE COURT:  Okay.  Thank you.

23        MR. STANG:  Your Honor, this is Mr. Stang.  May I

24  just respond to what Mr. Schiavoni just said?

25        THE COURT:  No.  Thank you.

1        MR. STANG:  Okay.  All right.

2        THE COURT:  Mr. Buchbinder?

3        MR. SCHIAVONI:  Your Honor, this is (indiscernible)

4   -- go ahead, Mr. Buchbinder.

5        THE COURT:  Mr. Buchbinder, you're muted.

6        MR. BUCHBINDER:  Good afternoon, Your Honor.  Dave

7   Buchbinder, on behalf of the United States Trustee.

8        It's interesting listening to so much argument for

9   an unopposed motion but let me make a couple of points.

10  Number one, I speak for Mr. Vara.  No one else in this case,

11  on this call does.  Number two, the U.S. Trustee did not

12  oppose this motion because the U.S. Trustee is not opposed to

13  the relief sought in the motion.

14        But the motion that was originally filed and the

15  order that was arrange filed by Mr. Schiavoni was a very

16  simple order that simply deferred the holdback until the end

17  of the case.  All of these other bells and whistles have been

18  added afterwards.

19        And with respect to Mr. Schiavoni's argument that

20  we suspend fee examiner or that we don't review monthly

21  applications or not file monthly applications, that was not

22  requested in the motion to amend the interim compensation

23  procedure and no request was made to suspend the large-case

24  fee guidelines, which the ultimately would, unequivocally,

25  oppose.

1          So, we are not opposed to the relief sought in the

2     original order, but we are opposed to all the bells and

3     whistles the parties have attached thereafter, and I speak for

4     Mr. Vara.  You do not, Mr. Schiavoni.

5          Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. Buchbinder.

7          MR. SCHIAVONI:  Your Honor, to be clear, we do not

8     seek to suspend monthly fee applications and if the Court

9     wants the interim fee applications, that's fine, okay, but we

10    do not move to terminate monthly fee applications.

11         THE COURT:  Thank you.  Mr. Rucki?

12         MR. SCHIAVONI:  Or the review of the fee examiner,

13    for that matter, as I said.

14         THE COURT:  Mr. Rucki?

15         MR. RUCKI:  Your Honor, for the record, Justin

16    Rucki, of Rucki Fee Review, the court appointed fee examiner.

17    Thank you for allowing me to be heard.

18         I'll be very brief and I won't repeat points that

19    have been raised by others.  I did just want to add one point

20    around why I do not consider reviewing monthly fee

21    applications to be practicable and also it correct the record

22    on one other point that has not yet been corrected.

23         First, with respect to why I do not believe it

24    would be feasible to review monthly applications in lieu of

25    quarterly applications, I will say that one of the things I do

1 as part of my review is looking at the work that is done by

2 one firm, relative to the work of other firms, particularly,

3 as it relates to that estate constituency.

4          And when it comes to monthly fee applications,

5 those are often not all filed at the same time, so having to

6 address a monthly application while not all other estate

7 professionals have filed their monthly for that respective

8 period, would, in fact, hinder that review.  And I will also

9 say that to some extent, the reason you do not have monthlies

10 all filed at the same time is at my request in these cases to

11 certain professionals, I have asked firms that have small

12 monthly billings not to file a monthly every month, but,

13 instead, to consolidate those fee applications so that there

14 would be fewer fees billed on top of the fee applications.

15          So, that would explain part of it, but then the

16 rest of it is, there's a delay inherent with professionals

17 being busy and not all filing their monthlies at the same

18 time.  The only other point I wanted to clarify and correct is

19 Mr. Schiavoni sort of implied in speaking here today

20 (indiscernible) correct in his motion, but in speaking here

21 today sort of implied that my fees were close to a wash or

22 something akin to a wash with the negotiated reductions, and

23 that is not the case.

24          They're approximately one-third of the negotiated

25 reductions.  Those negotiated reductions, by the way, along

1  with certain voluntary reductions, which were about 10 percent

2  of the number that I'm about to give you, were approximately

3  $872,000 for fees as of October 31st of last year, which is

4  the latest date.  That's the third quarterly from those

5  professionals in these cases.  That's the latest date you have

6  a proposed order approving those fee applications under

7  consideration, or the next quarter after that, which is the

8  period of November through January 31st.  Those applications

9  have been on file for several months.  Those reports have not

10  yet been issued by me, pending this hearing, and the

11  consideration and determination of what the go-forward

12  procedures will be.

13          But I will say I have issued initial reports for

14  all of those quarterly applications and I can report to the

15  Court that I have come to agreement with all but two of the

16  firms thus far on voluntary reductions and there will be at

17  least $300,000 of additional voluntary reductions undertaken

18  for that three-month period, November through January, which

19  will bring the total voluntary reductions to date, to at least

20  $1.1 million.  And that is against a base of approximately $60

21  million in accrued estate professional fees through the

22  inclusion of January.

23          THE COURT:  Thank you.  Well, this was a lot of

24  discussion about an uncontested motion, and as I reviewed it,

25  I did focus on the forms of order and I am not making any

1  comments.  As parties have recognized, I do not need to make

2  any comments, with respect to outstanding fees, as this was

3  uncontested.

4          So, I will grant the basic relief that was

5  requested, which is to defer the 20 percent holdback to the

6  end of the case.  My recollection for why that was done or

7  instituted in the first instance, was to ensure that there was

8  enough holdback so that on final fee application, if fees were

9  adjusted, that law firms wouldn't have to giveback money.  It

10  was really -- that's why sew oh in is my recollection of why

11  this was instituted in the first instance, that law firms

12  perceive a difference between having to not getting paid

13  something versus having to regurgitate, if you will, disgorge,

14  funds.  So, that's the purpose, as I recall it, of the

15  holdback in the first instance, was to ensure that, if, in

16  fact, the reductions are made, no firm would really have to

17  disgorge funds.

18          And I think over the years, that's been borne out,

19  except when a firm has been made to give up all of their

20  compensation for a disclosure issue or some other issue that's

21  what I would consider a non-routine type of instance.  We all

22  know that even if fees are approved on an interim basis, they

23  can always be revisited at final.  That's what the Code says.

24          So, there's no final entitlement to fees until the

25  final fee application.  So, I don't consider the relief

1  requested inconsistent with the Code in any fashion, and,

2  again, it was unopposed.

3         I will make the relief effective on the date the

4  motion was supposed to be heard in the first instance, not

5  retroactive, but on the date that it was supposed to be heard

6  in the first instance.

7         And as for a professional fee reserve, I'm not sure

8  I understand a need for that.  The Boy Scouts can figure out

9  how to account for this appropriately in their books and

10 records, but I'm not going to order a reserve.

11        As for the TCC 10 percent, I understand, and I

12 appreciate the commitment that the TCC has made to its

13 constituency, but, again, until those fees are finally

14 awarded, we don't know what the 10 percent actually is.  So, I

15 don't see a reason to separately segregate that or permit it

16 to be paid until sooner.  Let's say sooner than Pachulski

17 actually receives its fees.  So, I'll enter a simple order to

18 that effect.

19        Monthly fee applications should continue to be

20 filed.  Monthly fees should continue to be filed.  Interim fee

21 applications should continue to be filed, because they're

22 going to have to -- I'm hearing from Mr. Rucki this is a

23 better way to review them.  It's more efficient for him and

24 I'm going to accept his representations, with respect to the

25 most efficient way to review these fee applications.

1       So, I think I've addressed all of the issues.

2           MR. LUCAS:  Your Honor, this is John Lucas.  May I

3   ask a question?

4           THE COURT:  Yes.

5           MR. LUCAS:  Going forward, with respect to the

6   quarterly fee applications, I assume the Court is going to

7   enter an order and the order would say that fees are approved,

8   but the debtors are not directed to pay the holdback.  I would

9   assume there needs to be some sort of different way of doing

10  the interim orders than is currently done now if we're going

11  to continue with the interim process.  And we want to continue

12  with the interim process, obviously.  For all the reasons

13  stated, we think it's a good idea.

14          THE COURT:  I don't have an order in front of me

15  for the interim, so I don't know what they say, but what we're

16  doing is we're changing the -- I do have the -- we're changing

17  paragraph (F) in the interim compensation procedures, which

18  says upon allowance by the Court of an interim fee

19  application, the debtor shall be authorized to promptly pay

20  all requested fees, including the 20 percent holdback.  We're

21  changing that.  So, that's where the change comes in.  I don't

22  know if there needs to be a change in the interim fee order or

23  not.  If there is, then I would expect somebody to draft the

24  appropriate order, but we're making the change in 2(f) of the

25  procedures order.

1          MR. LINDER:   Your Honor, Matt Linder, again, for

2   the debtors.

3          To the extent that fee orders that have been

4   submitted under certification purports and directs the debtors

5   to make any payments, we're happy to revise those to be

6   consistent with Your Honor's order on this motion --

7          THE COURT:   Okay.  And what I --

8          MR. LINDER:   -- as well as all future orders.

9          THE COURT:   Thank you.

10         What I understand is I have one set, the one I know

11   I have that's in front of me, and then I understand another

12   set isn't yet in front of me, because Mr. Rucki hasn't

13   submitted his reports yet, but I'm sure he will promptly, now

14   that he knows what we're doing here.  I will get to the set

15   that is in front of me.  Thank you.

16         Anything further?

17         MR. REMMING:   Your Honor, this is Andrew Remming,

18   Morris Nichols, again.

19         The next item on the agenda is the preliminary

20   injunction adversary proceeding.  We filed a further

21   stipulation extending dates in that matter and a certificate

22   of no objection with regard the same, but we did leave it on

23   the agenda in case Your Honor had any questions about the form

24   of order or any questions, generally, about the matter.

25         THE COURT:   Okay.  No.  I will take a look at this.

1       MR. REMMING:  Thank you, Your Honor.

2       THE COURT:  If I have any questions, I'll let you

3  know; otherwise, I'll just enter the order.

4       MR. REMMING:  Thank you, Your Honor.

5       THE COURT:  Thank you.

6       MR. REMMING:  And that concludes the items on the

7  agenda for today, Your Honor.  Thank you for your time.

8       THE COURT:  Thank you, Mr. Remming.  We're

9  adjourned.

10     (Proceedings concluded at 12:26 p.m.)

11

12

13

14

15                   CERTIFICATE

16

17     I certify that the foregoing is a correct transcript

18  from the electronic sound recording of the proceedings in the

19  above-entitled matter.

20
   /s/Mary Zajaczkowski              July 21, 2021
21  Mary Zajaczkowski, CET**D-531

22
   /s/William J. Garling             July 21, 2021
23  William J. Garling, CE/T 543

24

25