# **<u>EXHIBIT A</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. D.I. 5466** |

**ORDER, PURSUANT TO SECTIONS 363(b) AND 105(a) OF**
**THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO**
**ENTER INTO AND PERFORM UNDER THE RESTRUCTURING**
**SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the Debtors for entry of an order (this "<u>Order</u>"),

pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004,

(i) authorizing the Debtors to enter into and perform under the RSA, substantially in the form

attached to this Order as **Exhibit 1**, including, in connection therewith, determining that the

Debtors have no obligation to seek approval of the Hartford Settlement, and (ii) granting certain

related relief; and upon the Mosby Declaration and the Whittman Declaration filed in support of

the Motion; and this Court having jurisdiction to consider the Motion in accordance with 28

U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District

Court for the District of Delaware, dated February 29, 2012; and the Court having found that this

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Debtors having consented to

entry of a final order by this Court under Article III of the United States Constitution; and the

Court having found that venue of this proceeding and the Motion in this District is proper

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the RSA, as applicable.

pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and opportunity for a hearing on the Motion having been given and no other or further notice being necessary; and upon the record herein; and all objections, if any, to the Motion having been withdrawn, resolved or overruled; and the relief requested in the Motion being in the best interests of the Debtors' estates, their creditors and other parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS, DETERMINES AND CONCLUDES AS FOLLOWS:**

A.      The RSA Parties have been engaged in extensive arm's-length negotiations and Court-ordered mediation regarding the terms of a plan.  In connection with such plan negotiations, and as a critical part thereof, certain of the RSA Parties have also engaged in extensive arm's-length negotiations, through mediation and otherwise, regarding the settlement of litigation in connection with the Restricted Asset Adversary, the Estimation Matters, and the Exclusivity Motion.

B.      As a result of the negotiations among the RSA Parties, on July 1, 2021, the RSA Parties reached the agreements embodied in the RSA.

C.      The Debtors have undertaken a thorough, independent review of the RSA Parties' respective rights and obligations under the RSA, and they have determined, in the valid exercise of their business judgment, that entry into the RSA is in the best interests of the Debtors' estates and their creditors.

D.      The RSA was negotiated at arm's length, in good faith, does not constitute a solicitation of an acceptance or rejection of a plan, and does not violate section 1125 of the Bankruptcy Code.

E.       Each of the Debtors and each of the other RSA Parties (1) has full power and authority to enter into and perform all of its obligations under the RSA and all other documents contemplated thereby, (2) has full power and authority to take any and all action or actions necessary to authorize and approve the RSA and the transactions contemplated thereby and has requested and obtained all necessary approvals required to do so, and (3) is legally authorized to enter into and perform under the RSA and to take any and all actions necessary to authorize, approve, and implement the RSA and the transactions contemplated thereby.

F.       Based on the findings set forth above, as well as the record before this Court, the Court hereby finds and concludes as a matter of law that the Debtors have no obligation to seek approval of, and have no obligations under, the Hartford Settlement.

G.       Based on the findings set forth above, as well as the record before this Court, the Court hereby concludes as a matter of law that the Debtors' entry into and performance under the RSA is an appropriate exercise of the Debtors' business judgment and satisfies the legal requirements for approval in this jurisdiction.

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.       The Motion is **GRANTED** as set forth herein, and any objections to the Motion not previously withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

2.       The Debtors' entry into and performance under the RSA, as such may be amended from time to time in accordance with the terms thereof, is hereby authorized and approved, effective upon entry of this Order, and the Debtors shall have no obligation to seek approval of, and have no obligations under, the Hartford Settlement.  The Debtors are further authorized to enter into amendments or modifications to the RSA in accordance with the terms of

the RSA without seeking further order of the Court; *provided* that the Debtors shall promptly file a notice with the Court listing any material modifications, amendments or supplements to the RSA. The RSA shall be binding and enforceable by and against the Debtors and the other RSA Parties in accordance with its terms and conditions.

3.      Notwithstanding any other provision herein, the Court makes no finding or ruling in this Order (a) as to the exhibits to the RSA, the Disclosure Statement, or the Plan for any purpose (other than the authorization to enter into and perform under the RSA), or (b) as to the standard of review or any factor required for approval of the exhibits to the RSA, the Disclosure Statement, or the Plan, or with respect to confirmation of the Plan. The rights and objections of all parties are reserved with respect to such matters (other than as expressly provided in the RSA as to the Debtors and the RSA Parties).

4.      The RSA Parties' entry into the RSA, any and all negotiations among the RSA Parties leading to the execution thereof, and the RSA Parties' performance of or actions taken in furtherance of any obligations thereunder shall not constitute a solicitation of votes in violation of section 1125(b) of the Bankruptcy Code.

5.      For so long as the RSA has not been terminated by the Debtors or the Coalition, the Debtors shall reimburse the fees and expenses of the Coalition Professionals as and to the extent set forth in the RSA and the Term Sheet, *provided* that the Debtors are not authorized to pay any fees or expenses incurred by the Coalition Professionals on or after the date of entry of this Order: (a) in connection with or in furtherance of preparing for, commencing, or prosecuting litigation against the Debtors; or (b) in connection with matters that are outside the scope of actions taken in support of the RSA or confirmation of the Amended Plan described therein, including further negotiations in support of the Amended Plan or further global consensus, and

documentation of documents and ancillary agreements related to or in connection with the Amended Plan (the "Scope").

6.     The Coalition shall comply with the procedures and processes set forth in the *Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief* [Docket No. 341] (the "Interim Compensation Order") and shall be subject to the review and procedures of the Fee Examiner appointed in these Chapter 11 Cases; *provided*, that the standard for authorization of payment of the fees and expenses of the Coalition Professionals in accordance with the terms of the RSA shall be (a) whether such fees and expenses are (i) reasonable and documented and (ii) within the Scope; and (b) whether the Coalition Professionals have used good faith efforts not to duplicate the work of professionals retained by the TCC or the Future Claimants' Representative; *provided*, *further* that: (i) for the avoidance of doubt, the Coalition Professionals shall not be considered retained professionals of the Debtors, the Creditors' Committee, the TCC, or the Future Claimants' Representative, and the retention of the Coalition Professionals shall not be required to satisfy the standards for retention set forth in sections 327, 328 or 1103 of the Bankruptcy Code; and (ii) notwithstanding anything to the contrary herein or in the Interim Compensation Order, (x) the Coalition Professionals shall not be required to comply with the procedures of the Interim Compensation Order for any period prior to July 1, 2021; and (y) subject to paragraph 5 hereof, upon receipt of summary invoices therefor, the Debtors are authorized and directed, on the Effective Date of the Amended Plan, in accordance with the RSA, to reimburse State Court Counsel for amounts they have paid to the Coalition Professionals for, and/or pay the Coalition Professionals for amounts payable by State Court Counsel but not yet paid to Coalition Professionals for, reasonable,

documented and contractual professional and advisory fees and expenses incurred by the Coalition Professionals from July 24, 2020 to and including the Effective Date up to an aggregate amount of $10.5 million.

7.　　For the avoidance of doubt and notwithstanding anything to the contrary herein, chapter 11 plan prosecution and/or RSA-related fees and expenses shall be reimbursable hereunder in accordance with the terms hereof.

8.　　The failure to describe specifically or include any particular provision of the RSA or related documents in the Motion or this Order shall not diminish or impair the effectiveness of such provision.

9.　　In the event of a conflict between the terms and conditions of this Order, on the one hand, and the terms and conditions of the RSA, on the other hand, this Order shall control.

10.　　Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.　　The Debtors are authorized to take all actions necessary, execute all documents, and make all payments that may be necessary to perform under the RSA and to effectuate the relief granted in this Order.

12.　　This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## Exhibit 1

**Restructuring Support Agreement**

**ACCEPTANCES OF THE PLAN OF REORGANIZATION CONTEMPLATED BY THIS AGREEMENT MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  THE PLAN OF REORGANIZATION CONTEMPLATED BY THIS AGREEMENT, TOGETHER WITH A RELATED DISCLOSURE STATEMENT TO BE FILED IN CONNECTION THEREWITH, HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AND IS SUBJECT TO AMENDMENT PRIOR TO SUCH APPROVAL BEING GRANTED.  YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS AGREEMENT FOR ANY PURPOSE BEFORE THE INFORMATION HAS BEEN APPROVED AS PART OF THE DISCLOSURE STATEMENT OR THE BANKRUPTCY COURT HAS OTHERWISE APPROVED THIS AGREEMENT.**

## RESTRUCTURING SUPPORT AGREEMENT

This **RESTRUCTURING SUPPORT AGREEMENT** (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, together with all exhibits and schedules attached hereto or incorporated herein, this "**Agreement**") dated as of July 1, 2021 is entered into by and among:

    (a)    Boy Scouts of America and Delaware BSA, LLC, as debtors and debtors in possession (together, the "**Debtors**");

    (b)    James L. Patton, Jr., the legal representative appointed by the Bankruptcy Court for holders of Future Abuse Claims (the "**Future Claimants' Representative**");

    (c)    the Coalition of Abused Scouts for Justice (the "**Coalition**");

    (d)    the Official Committee of Tort Claimants (the "**TCC**");

    (e)    the Ad Hoc Committee of Local Councils (the "**AHCLC**");

    (f)    the attorneys listed on **Schedule 1** hereto ("**State Court Counsel**"), each of whom is state court counsel to holders of Direct Abuse Claims; and

    (g)    any Joining Parties who subsequently become party to this Agreement in accordance with the terms hereof.

Each of the Debtors, the Future Claimants' Representative, the Coalition, the TCC, the AHCLC, the State Court Counsel, and any person or entity that subsequently becomes a party hereto in accordance with the terms hereof are referred to herein collectively as the "**Parties**" and each individually as a "**Party**."  Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the June 18 Plan (as defined below), the Boy Scouts of America Reorganization Term Sheet attached hereto as **Exhibit A** (the "**Term Sheet**"), or the Trust Distribution Procedures attached hereto as **Exhibit B** (the "**TDP**" or "**Trust Distribution Procedures**").

## RECITALS

**WHEREAS**, on February 18, 2020, the Debtors commenced voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

**WHEREAS**, on April 24, 2020, the Bankruptcy Court entered an order appointing the Future Claimants' Representative.  [D.I. 486].

**WHEREAS**, on July 24, 2020, the Coalition filed a notice of appearance [D.I. 1040].  The Coalition is an ad hoc committee comprising thousands of holders of Direct Abuse Claims.

**WHEREAS**, on June 18, 2021, the Debtors filed the *Third Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5368] (as may be subsequently amended, modified, or supplemented, the "**June 18 Plan**") and the *Proposed Amendments to Disclosure Statement for the Third Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5371] (as may be subsequently amended, modified, or supplemented, the "**Disclosure Statement**").

**WHEREAS**, the Parties have engaged in good-faith, arm's-length negotiations regarding certain restructuring transactions (as embodied herein, the "**Settlement**"), including modifications and/or amendments to the Plan and the Disclosure Statement substantially on the terms reflected in the Term Sheet and the Trust Distribution Procedures.

**WHEREAS**, this Agreement sets forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof, to seek that the June 18 Plan as modified consistent with this Agreement and the Term Sheet (the "**Amended Plan**"), is confirmed by the Bankruptcy Court.

**NOW**, **THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and incorporating and affirming the accuracy of the Recitals state above, the Parties, intending to be legally bound, agree as follows:

## AGREEMENT

I.    **DEFINITIONS; RULES OF CONSTRUCTION**

    A.    **Definitions**.  The following terms shall have the following definitions:

    "**AHCLC**" has the meaning set forth in the preamble hereof.

    "**Amended Plan**" has the meaning set forth in the recitals hereof.

    "**Bankruptcy Code**" has the meaning set forth in the recitals hereof.

    "**Bankruptcy Court**" has the meaning set forth in the recitals hereof.

"**Chapter 11 Cases**" has the meaning set forth in the recitals hereof.

"**Coalition**" has the meaning set forth in the preamble hereof.

"**Coalition Professionals**" means (i) Brown Rudnick LLP, (ii) Robbins, Russell, Englert, Orseck & Untereiner LLP, (iii) Monzack, Mersky and Browder, P.A., (iv) Province, (v) Parsons, Farnell & Grein, LLP, and (vi) any experts employed by the Coalition in connection with confirmation of the Amended Plan.

"**Court of Appeals**" means the United States Court of Appeals for the Third Circuit.

"**Creditor Termination Event**" has the meaning set forth in Section V.B hereof.

"**Debtors**" has the meaning set forth in the preamble hereof.

"**Definitive Documents**" means, collectively, (i) the Amended Plan, (ii) the Confirmation Order, (iii) the Disclosure Statement, (iv) the Disclosure Statement Order, (v) the solicitation materials with respect to the Amended Plan, (vi) the Plan Documents, (vii) the Plan Supplement, (viii) the RSA Approval Order, (ix) any motions or pleadings filed by the Debtors in the Chapter 11 Cases seeking approval or confirmation of the foregoing, and (x) any exhibits, appendices, or schedules contemplated by the foregoing clause (i) - (x).

"**Disclosure Statement**" has the meaning set forth in the recitals hereof.

"**Disclosure Statement Order**" means an order entered by the Bankruptcy Court approving the Disclosure Statement and related solicitation materials.

"**District Court**" means the United States District Court for the District of Delaware.

"**Estimation Matters**" means the Estimation Motion and the motion to withdraw the reference with respect to the Estimation Motion that is pending under Case No. 21-cv-00392 in the District Court.

"**Estimation Motion**" means the Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings [D.I. 2391].

"**Execution Date**" means the date that this Agreement, as executed by all Parties hereto, is filed with the Bankruptcy Court.

"**Findings and Orders**" has the meaning set forth in Section II.A.(i) hereof.

"**Future Claimants' Representative**" has the meaning set forth in the preamble hereof.

"**Hartford Settlement**" means the Settlement Agreement and Release executed on or about April 15, 2021 between the BSA and Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance Company, as attached to the Second Mediators' Report dated April 16, 2021 [D.I. 2624].

"**Joining Party**" has the meaning set forth in Section XXI hereof.

"**June 18 Plan**" has the meaning set forth in the recitals hereof.

"**Monthly Fee Cap**" means the cap on professional fees and expenses of the Coalition Professionals from the effective date of this Agreement until the Effective Date, which is $950,000.00 per month (pro-rated for any partial month).

"**Parties**" has the meaning set forth in the preamble hereof.

"**Plan Documents**" means, collectively, the Amended Plan, the Disclosure Statement, each of the documents comprising the Plan Supplement, all of the Exhibits and Schedules attached to any of the foregoing (including the Settlement Trust Documents).  The Plan Documents shall be in form and substance acceptable to the Debtors, the Coalition, the TCC, and the Future Claimants' Representative.

"**Plan Supplement**" means the supplement to the Amended Plan to be filed in the Chapter 11 Cases, that includes forms of certain documents effectuating the transaction contemplated in the Amended Plan and shall be filed with the Bankruptcy Court no later than fourteen (14) days prior to the deadline set for all persons entitled to vote on the Amended Plan to vote to accept or reject the Amended Plan.

"**Preliminary Injunction Order**" means the *Order Approving Fourth Stipulation by and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Modifying the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362 and Further Extending the Termination Date of the Standstill Period* [D.I. 162], Adv. Pro. Case No. 20-50527 (LSS).

"**RSA Approval Order**" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to the Debtors, the Future Claimants' Representative, the Coalition, and the TCC which shall approve the Debtors' entry into this Agreement.

"**RSA Deadline**" means July 28, 2021, which date may be amended or extended by agreement of the Debtors, the Future Claimants' Representative, the Coalition, and the TCC pursuant to Sections V.A and X hereof.

"**RSA Motion**" means a motion seeking an order of the Bankruptcy Court approving the Debtors' entry into this Agreement.

"**Scouting Termination Event**" has the meaning set forth in Section V.C hereof.

"**Settlement**" has the meaning set forth in the recitals hereof.

"**Settlement Trust Documents**" means, collectively, (i) the Settlement Trust Agreement, (ii) the Trust Distribution Procedures, (iii) the Document Agreement, and (iv) any other agreements, instruments and documents governing the establishing, administration and operation of the Settlement Trust, each of which shall be acceptable to the Debtors, the Coalition, the TCC, and the Future Claimants' Representative in all respects.

"**State Court Counsel**" has the meaning set forth in the preamble hereof.

"**Support Period**" means the period commencing on the Execution Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section V hereof and (ii) the Effective Date of the Amended Plan.

"**TCC**" has the meaning set forth in the preamble hereof.

"**TDP**" and "**Trust Distribution Procedures**" has the meaning set forth in the recitals hereof.

"**Term Sheet**" has the meaning set forth in the preamble hereof.

**B.    Rules of Construction**.  Each reference in this Agreement to "this Agreement", "hereunder," "hereof," "herein," or words of like import shall mean and be a reference to this Agreement, including, for the avoidance of doubt, the Term Sheet.  Including shall mean "including without limitation."  Additionally, for all references to written notices or other writings described herein, electronic mail to the Parties as set forth in Section XVIII shall be sufficient. When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iii) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## II.    AGREEMENTS OF THE DEBTORS

**A.    Affirmative Covenants of the Debtors**.  Subject to the terms and conditions hereof, for the duration of the Support Period, the Debtors shall:

(i)    propose and pursue the Amended Plan and seek entry of a Confirmation Order that contains (and the Amended Plan and Confirmation Order shall contain) the following provisions, findings and orders, as applicable in substantially the form set forth below (the "**Findings and Orders**"):

(A)    the Bankruptcy Court has determined that the Amended Plan, the Plan Documents, and the Confirmation Order shall be binding on all parties in interest;

(B)     the Bankruptcy Court has determined that (i) the procedures included in the TDP pertaining to the allowance of Abuse Claims and (ii) the criteria included in the TDP pertaining to the calculation of the Allowed Claim Amounts, including the TDP's Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors, are fair and reasonable based on the evidentiary record offered to the Bankruptcy Court;

(C)     the Bankruptcy Court has determined that the right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party is the allowed value of such Abuse Claim as liquidated in accordance with the TDP and is not (i) the initial or supplemental payment percentages established under the TDP to make distributions to holders of allowed Abuse Claims or (ii) the contributions made by the Debtors or any Protected Party to the Settlement Trust;

(D)     the Bankruptcy Code authorizes the Insurance Assignment as provided in the Amended Plan, notwithstanding any terms of any policies or provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights, and the Bankruptcy Court has determined that the Settlement Trust is a proper defendant for Abuse Claims to assert the liability of the Protected Parties to trigger such insurance rights; and

(E)     the Bankruptcy Court has determined that the Plan and the TDP were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code.

(ii)     use reasonable efforts to propose and pursue the Amended Plan and seek the entry of the Confirmation Order that incorporate the terms of the Settlement including any conditions thereto (including all of the terms hereof relating to the treatment of, and distributions on, Abuse Claims);

(iii)    use reasonable efforts to support, implement, and complete the Settlement and all transactions contemplated under this Agreement, including incorporating the Settlement into the applicable Definitive Documents;

(iv)     use reasonable efforts to seek confirmation of the Amended Plan prior to the automatic termination of this Agreement pursuant to Section V.A hereof;

(v)      use reasonable efforts to promptly notify or update counsel to the Coalition, the TCC, and the Future Claimants' Representative upon becoming aware of any of the following occurrences:  (A) a Creditor Termination Event has

occurred and is continuing, or (B) any event that would reasonably be expected to materially impede or prevent the implementation of the Settlement;

(vi)    (A) following the effective date of this Agreement, for so long as this Agreement remains in full force and effect and subject to the Monthly Fee Cap (*provided*, *however*, that any unused portion of the Monthly Fee Cap for any such month may be carried forward or carried back to and utilized in any subsequent or prior month), pay the reasonable, documented and contractual professional fees and expenses of the Coalition Professionals on a monthly basis promptly following the Debtors' receipt of a summary of invoices; and (B) upon the Effective Date, reimburse State Court Counsel for amounts they have paid to the Coalition Professionals for, and/or pay the Coalition Professionals for amounts payable by State Court Counsel but not yet paid to Coalition Professionals for, reasonable, documented and contractual professional and advisory fees and expenses incurred by the Coalition from July 24, 2020 to and including the Effective Date up to an aggregate amount of $10.5 million (the "***Plan Effective Date Cap***"), and amounts otherwise payable in excess thereof shall be payable, if at all, by the Settlement Trust after the Effective Date.  For the avoidance of doubt, fees and expenses paid monthly pursuant to Section II.A.(vi).A shall not count against or reduce the Plan Effective Date Cap;

(vii)    obtain the approval of the RSA Approval Order on or before the RSA Deadline;

(viii)    by the RSA Motion, or a separate motion to be filed contemporaneously with the RSA Motion, seek a determination of the Bankruptcy Court that the Debtors have no obligations under the Hartford Settlement;

(ix)    provide to the Coalition, the TCC, and the Future Claimants' Representative, by no later than July 31, 2021, a current experience study conducted by the Pension Plan actuary with respect to demographic assumptions for the Pension Plan (*e.g.,* rates of retirement, termination, spousal age difference, commencement age and forms of payment); and

(x)    absent the entry of a stay of the Confirmation Order by the Bankruptcy Court, the District Court, or the Court of Appeals, upon the entry of the Confirmation Order, and regardless of whether any party files an appeal of any order entered in the Chapter 11 Cases, move expeditiously to cause the Amended Plan to become effective.

**B.**    **Negative Covenants of the Debtors**.  Subject to the terms and conditions hereof, for the duration of the Support Period, the Debtors shall not, directly or indirectly:

    (i)        propose, pursue, or support any other plan of reorganization or confirmation order that is not materially consistent with the terms hereof, including the Amended Plan and the TDP;

    (ii)      propose or pursue a plan or confirmation order that does not incorporate the terms of the Settlement, including the Findings and Orders, and is not otherwise consistent with the terms hereof;

    (iii)    propose, pursue, or enter into any settlements with any Insurance Company without the prior written consent of the Coalition, the TCC, and the Future Claimants' Representative;

    (iv)    propose, support, solicit, encourage, or participate in any chapter 11 plan or settlement of the Abuse Claims other than as set forth herein;

    (v)     take any actions, or fail to take any actions, where such taking or failing to take actions would be, in either case, (A) materially inconsistent with this Agreement or (B) otherwise materially inconsistent with, or reasonably expected to prevent, interfere with, delay or impede the implementation or consummation of, the Amended Plan or the Settlement; or

    (vi)    encourage any entity to undertake any action prohibited by this Section II.B.

**C.**    **Fiduciary Obligations of the Debtors**.  Notwithstanding anything in this Agreement to the contrary, no term or condition of this Agreement, the Settlement, the Amended Plan or the TDP shall require the Debtors to take or refrain from taking any action that the Debtors determine in good faith would be inconsistent with their fiduciary duties under applicable law. Moreover, nothing in this Agreement shall prohibit the Debtors from (1) enforcing any right, remedy, condition, consent, or approval requirement under this Agreement or any Definitive Documents, (2) asserting or raising any objection not prohibited under or inconsistent with this Agreement in connection with the Chapter 11 Cases, (3) taking any action which is required by applicable law or declining to take any action which is prohibited by applicable law, (4) retaining the benefit of any applicable legal professional privilege, (5) making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like, (6) taking any action that is not inconsistent with this Agreement, or (7) consulting with other parties in the Chapter 11 Cases.  Notwithstanding the foregoing, the Debtors acknowledge that their entry into this Agreement is consistent with their fiduciary duties as of the Execution Date.

## III.    AGREEMENTS OF THE AHCLC

**A.**    **Affirmative Covenants of the AHCLC**.  Subject to the terms and conditions hereof, for the duration of the Support Period, the AHCLC and its members shall use reasonable efforts to persuade Local Councils chartered by the Debtors to commit to contribute the aggregate amount set forth in the Term Sheet on the terms set forth in the Term Sheet.

**B.**    **No Liability**.  Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall (x) be construed to prohibit the AHCLC or its members from contesting

whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documents, or exercising rights or remedies specifically reserved herein; (y) be construed to prohibit or limit the AHCLC or its members from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Support Period, such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Settlement; or (z) affect the ability of the AHCLC or its members to consult with any other party; *provided* that any delay or other impact on consummation of the Settlement contemplated by the Amended Plan caused by the AHCLC's or its members' opposition to (i) any relief that is inconsistent with such Settlement; or (ii) any relief that is adverse to interests of the AHCLC or its members sought by any entity, shall not constitute a violation of this Agreement. For the avoidance of doubt, the AHCLC is not a fiduciary for and cannot bind Local Councils. Nothing in this Agreement shall require the AHCLC or its members to incur any expenses, liabilities or obligations, or agree to any commitments, undertakings, concessions, indemnities or other agreements that would result in expenses, liabilities or obligations to the AHCLC or its members, nor shall anything in this Agreement impose on the AHCLC, its members, or its counsel any liability arising from or related to any alleged breach or other violation of this Agreement.

## IV.    AGREEMENTS OF THE COALITION, THE TCC, STATE COURT COUNSEL AND/OR THE FUTURE CLAIMANTS' REPRESENTATIVE

A.    **Affirmative Covenants of the State Court Counsel**.  Subject to the terms and conditions hereof, for the duration of the Support Period, the State Court Counsel shall:

(i)    use reasonable efforts to advise and recommend to their respective clients (who hold Direct Abuse Claims) to vote to accept the Amended Plan so long as the Amended Plan and the Plan Documents have not been modified to become inconsistent with the Amended Plan and this Agreement;[1]

(ii)    use reasonable efforts to support and cooperate with the Debtors and other Parties to obtain confirmation of the Amended Plan and any other approvals necessary for the confirmation or effectiveness of the Amended Plan;

(iii)    for those State Court Counsel that have elected to complete Master Ballots, timely submit Master Ballots reflecting the votes cast by their respective clients;

(iv)    for those State Court Counsel with clients who have elected to directly submit their Ballots, use reasonable efforts to cause those clients to timely submit those Ballots reflecting the votes cast by such clients;

(v)    provide information to counsel that are not Parties to this Agreement to make a meaningful and informed participation and voting decision on the

---

[1] For the avoidance of doubt, nothing in this Agreement shall require, or shall be interpreted to require, any State Court Counsel to support any plan that (i) incorporates the Hartford Settlement or (ii) would cause, directly or indirectly, the Hartford Settlement to become effective.

Amended Plan, *provided* that nothing in this provision shall be deemed to authorize the disclosure of information subject to mediation privilege or any other applicable privileges or protections;

(vi) seek a stay of the Estimation Matters pending the confirmation of the Amended Plan, it being expressly understood that the Estimation Matters will become moot if the Amended Plan is confirmed; and

(vii) seek a stay of the Restricted Assets Adversary in a manner consistent with the Term Sheet, it being expressly understood that the Restricted Assets Adversary will become moot if the Amended Plan is confirmed.

**B.** **<u>Affirmative Covenants of the Coalition, the TCC, the State Court Counsel, and the Future Claimants' Representative</u>**.  Subject to the terms and conditions hereof, for the duration of the Support Period, the Coalition, the TCC, State Court Counsel, and the Future Claimants' Representative, as applicable, shall use reasonable efforts to:

(i) support and cooperate with the Debtors in good faith in connection with the negotiation, drafting, execution, delivery and filing of Definitive Documents;

(ii) support and cooperate with the Debtors to obtain confirmation of the Amended Plan and any other approvals necessary for the confirmation or effectiveness of the Amended Plan;

(iii) obtain a stay of the Restricted Assets Adversary consistent with the provisions of the Term Sheet, it being expressly understood that the Restricted Assets Adversary will become moot if the Amended Plan is confirmed;

(iv) obtain a stay of the Estimation Matters pending confirmation of the Amended Plan, it being expressly understood that the Estimation Matters will become moot if the Amended Plan is confirmed;

(v) withdraw any objections to the extension of the Debtors' exclusive plan filing and solicitation periods and support the extension thereof to the maximum extent permitted under section 1121(d)(2) of the Bankruptcy Code; and

(vi) support the extension of the "Standstill Period" under the Preliminary Injunction Order up to and including the Effective Date of the Amended Plan.

**C.** **<u>Negative Covenants of the Coalition, the TCC, State Court Counsel, and the Future Claimants' Representative</u>**.  Subject to the terms and conditions hereof, for the duration of the Support Period, the Coalition, the TCC, State Court Counsel, and the Future Claimants' Representative, as applicable, and each of their

respective attorneys, advisors and agents, agree that they shall not, directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, confirmation, affirmation or implementation of the Amended Plan, including, without limitation, support any request to terminate the Debtors' exclusive periods to file or solicit a plan of reorganization;

(ii)    solicit approval or acceptance of, encourage, propose, file, support, or participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, or plan of reorganization for the Debtors other than the Amended Plan or any settlement of Abuse Claims against the Debtors other than as set forth herein;

(iii)   associate with any co-counsel with respect to the representation of any holder of a Direct Abuse Claim unless such co-counsel is a Party, or agrees to become, and in fact becomes, a Joining Party to this Agreement in accordance with Section XXI hereof;

(iv)    otherwise take any action that would interfere with, delay, impede, or postpone (A) the solicitation of acceptances, consummation, or implementation of the Amended Plan, or (B) the entry or effectiveness of the RSA Approval Order;

(v)     take any actions, or fail to take any actions, where such taking or failing to take actions would be, in either case, (A) materially inconsistent with this Agreement or (B) otherwise materially inconsistent with, or reasonably expected to prevent, interfere with, delay or impede the implementation or consummation of, the Amended Plan or the Settlement; or

(vi)    encourage any entity to undertake any action prohibited by this Section IV.C.

Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement, the Settlement, the Amended Plan or the TDP shall require the TCC or the Future Claimants' Representative to take or refrain from taking any action that it determines in good faith would be inconsistent with its fiduciary duties under applicable law. Moreover, notwithstanding the foregoing, but subject to the last sentence of this paragraph, nothing in this Agreement shall (x) be construed to prohibit the Coalition, the TCC, State Court Counsel, or the Future Claimants' Representative from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documents, or exercising rights or remedies specifically reserved herein; (y) be construed to prohibit or limit the Coalition, the TCC, State Court Counsel, or the Future Claimants' Representative from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Support Period, such appearance and the positions advocated in connection therewith are not materially inconsistent

with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Settlement or (z) affect the ability of the Coalition, the TCC, State Court Counsel, or the Future Claimants' Representative to consult with any other party including but not limited to the Debtors or the Creditors' Committee; *provided* that any delay or other impact on consummation of the Settlement contemplated by the Amended Plan caused by the Coalition's, the TCC's, State Court Counsel's, or the Future Claimants' Representative's opposition to (i) any relief that is inconsistent with such Settlement; (ii) a motion by the Debtors to enter into a material executory contract, lease, or other arrangement outside of the ordinary course of its business without obtaining the prior consent of the Coalition, the TCC, State Court Counsel, or the Future Claimants' Representative; or (iii) any relief that is adverse to interests of the Coalition, the TCC, State Court Counsel, or the Future Claimants' Representative sought by the Debtors (or any other party), shall not constitute a violation of this Agreement.   Notwithstanding the foregoing, nothing in this Section IV or elsewhere in this Agreement shall require the Coalition to incur any expenses, liabilities or obligations, or agree to any commitments, undertaking, concessions, indemnities or other agreements that would result in expenses, liabilities or obligations to the Coalition or its members or the Coalition Professionals or Coalition State Court Counsel, other than as may be expressly stated in other provisions of this Agreement (including the Amended Plan).

## V.    TERMINATION

A.    **Automatic Termination**.  This Agreement will terminate automatically as to all Parties if (i) the Effective Date fails to occur on or before May 31, 2022 or (ii) the RSA Approval Order is not entered on or before the RSA Deadline; *provided* that the deadlines set forth in items (i) and (ii) of the foregoing may be extended by written consent of the Debtors, the AHCLC, the Coalition, the TCC, and the Future Claimants' Representative.

B.    **Termination by Coalition, the TCC, State Court Counsel, and the Future Claimants' Representative**.  The Coalition, the TCC, State Court Counsel, and the Future Claimants' Representative may each terminate this Agreement with respect to itself only as set forth in Section V.D, in each case upon delivery of written notice to the Debtors at any time after the occurrence of or during the continuation of any of the following events (each, a "**Creditor Termination Event**"):

(i)    the material breach by the Debtors or the AHCLC of any of their obligations, representations, warranties, or covenants set forth in this Agreement;

(ii)    the Debtors at any time either (A) fail to propose and pursue an Amended Plan and Confirmation Order that contain the terms of the Settlement, including the Findings and Orders, and are otherwise consistent with the terms hereof, or (B) propose, pursue or support or announce in writing or in

court an intention to propose, pursue or support a plan of reorganization or confirmation order inconsistent with the terms of the Settlement, the terms hereof, the Amended Plan or the TDP;

(iii)    the Bankruptcy Court allows a plan proponent other than the Debtors to commence soliciting votes on a plan other than the Amended Plan incorporating the Settlement, and the Debtors have not already solicited, been authorized to solicit, or are not simultaneously soliciting, votes on the Amended Plan incorporating the Settlement;

(iv)    the Bankruptcy Court confirms a plan other than the Amended Plan;

(v)    (A) the Bankruptcy Court determines that the Debtors must adhere to the terms of the Hartford Settlement and (B) the Debtors and Hartford have failed to reach an agreement that is acceptable to the Coalition, the TCC, and the Future Claimants' Representative;

(vi)    after the RSA Deadline, the Debtors, absent the prior written consent of the Coalition, the TCC, and the Future Claimants' Representative, propose, pursue, solicit votes on, or support any plan or confirmation order that incorporates the Hartford Settlement, seek the Bankruptcy Court's approval of the Hartford Settlement, or cause, directly or indirectly, the Hartford Settlement to become effective;

(vii)    the result of the 2021 Experience Study (as defined in the Term Sheet) is a net increase in liabilities under the Pension Plan of 1.0% or more (*provided* that this Creditor Termination Event may be not be exercised after August 6, 2021);

(viii)    the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction (including, without limitation, an order of the Bankruptcy Court which has not been stayed), of any statute, regulation, ruling or order declaring the Amended Plan or any material portion thereof (in each case, to the extent it relates to the Settlement or the terms hereof) to be unenforceable or enjoining or otherwise restricting the consummation of any material portion of the Amended Plan (to the extent it relates to the Settlement) or the Settlement, and such ruling, judgment, or order has not been stayed, reversed, or vacated, within fifteen (15) calendar days after issuance;

(ix)    a trustee under section 1104 of the Bankruptcy Code or an examiner with expanded powers shall have been appointed in the Chapter 11 Cases; or

(x)    an order for relief under chapter 7 of the Bankruptcy Code shall have been entered in the Chapter 11 Cases, or the Chapter 11 Cases shall have been dismissed, in each case by order of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and the AHCLC shall have ten (10) calendar days from the receipt of any such written notice of termination from any of the Coalition, the TCC, State Court Counsel, or the Future Claimants' Representative, in each case, as applicable, specifying the purported default or Creditor Termination Event to cure any purported default or Creditor Termination Event under this section and no termination of this Agreement shall be effective unless and until the expiration of such ten (10) calendar day period without such purported default or Creditor Termination Event being waived or cured, *provided* that such ten (10) calendar day period shall not be applicable to the extent passage of such period would materially impair the right the Coalition, the TCC, State Court Counsel, or the Future Claimants' Representative, as applicable, to object to, or appear in Court with respect to, the Amended Plan, which actions shall be permitted following written notice of termination from the Coalition, the TCC, State Court Counsel, or the Future Claimants' Representative, as applicable.

**C.**     **Termination by Debtors / AHCLC**.  The Debtors or the AHCLC may terminate this Agreement as set forth in Section V.D, in each case upon delivery of written notice to the Coalition, the TCC, and the Future Claimants' Representative at any time after the occurrence of or during the continuation of any of the following events (each, a "**Scouting Termination Event**"):

(i)     the material breach by any State Court Counsel, the Coalition, the TCC, or the Future Claimants' Representative of any of their undertakings, obligations, representations, warranties, or covenants set forth in this Agreement;

(ii)     the Bankruptcy Court allows a plan proponent other than the Debtors to commence soliciting votes on a plan other than the Amended Plan;

(iii)     the Bankruptcy Court confirms a plan other than the Amended Plan;

(iv)     (A) the Bankruptcy Court determines that the Debtors must adhere to the terms of the Hartford Settlement and (B) the Debtors and Hartford have failed to reach an agreement that is acceptable to the Coalition, the TCC, and the Future Claimants' Representative;

(v)     in the case of the Debtors, the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction (including, without limitation, an order of the Bankruptcy Court which has not been stayed), of any statute, regulation, ruling or order declaring the Amended Plan or any material portion thereof (in each case, to the extent it relates to the Settlement or the terms hereof) to be unenforceable or enjoining or otherwise restricting the consummation of any material portion of the Amended Plan (to the extent it relates to the Settlement) or the Settlement, and such ruling, judgment, or order has not been stayed, reversed, or vacated, within fifteen (15) calendar days after issuance;

(vi)  a trustee under section 1104 of the Bankruptcy Code or an examiner with expanded powers shall have been appointed in the Chapter 11 Cases;

(vii)  an order for relief under chapter 7 of the Bankruptcy Code shall have been entered in the Chapter 11 Cases, or the Chapter 11 Cases shall have been dismissed, in each case by order of the Bankruptcy Court;

(viii)  termination of this Agreement by the Coalition, the TCC, any State Court Counsel, or the Future Claimants' Representative if the Debtors reasonably determine that such termination will cause the Amended Plan not to be accepted by a sufficient number of holders of Direct Abuse Claims; or

(ix)  the National Executive Board of the BSA determines that continued performance under this Agreement (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties, or duties as directors, in each case under applicable law (as reasonably determined by such board in good faith after consultation with legal counsel); *provided* that the Debtors provide written notice within three (3) business days of such determination to counsel to the Coalition, the TCC, the Future Claimants' Representative and the AHCLC of such determination.

Notwithstanding the foregoing, the Coalition, the TCC, State Court Counsel, and the Future Claimants' Representative shall have ten (10) calendar days from the receipt of any such written notice of termination from the Debtors specifying the purported default or Scouting Termination Event to cure any purported default or Scouting Termination Event under this section and no termination of this Agreement shall be effective unless and until the expiration of such ten (10) calendar day period without such purported default or Scouting Termination Event being waived or cured.

**D.**    **Termination Generally**.

(i)  No Party may terminate this Agreement based on an event caused by such Party's own failure to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions).

(ii)  Upon termination of this Agreement in accordance with this Section V by any Party (including by any State Court Counsel), (A) such Party shall be released from any prospective commitments, undertakings, and agreements under or related to this Agreement other than obligations under this Agreement that by their terms expressly survive termination; and (B) this Agreement shall remain in full force and effect with respect to all Parties other than such Party.  Additionally, solely in the case of termination by all of the Coalition, the TCC, and the Future Claimants' Representative, the Estimation Matters shall immediately recommence.

(iii)     Termination of this Agreement shall not relieve any Party of any liability on account of any breach hereof, including any breach of covenants, and the Parties may pursue remedies at law or in equity.

VI.     **DEFINITIVE DOCUMENTS**.  Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise reasonable efforts with respect to, the pursuit, approval, implementation, and consummation of the transactions contemplated by this Agreement and the Amended Plan as well as the negotiation, drafting, execution, and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

VII.     **MUTUAL REPRESENTATIONS AND WARRANTIES**.  Each of the Parties, severally and not jointly, represents and warrants to each other Party that the following statements are true, correct, and complete as of the date hereof (or, if later, the date that such Party first became or becomes a Party) but, solely with respect to the Debtors, subject to any limitations or approvals arising from, or required by, the commencement of the Chapter 11 Cases:

A.     this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

B.     except as expressly provided in this Agreement, and subject to entry of the RSA Approval Order in the case of the Debtors, it has all requisite organizational power and authority to enter into this Agreement and to carry out the Settlement contemplated by, and perform its obligations under, this Agreement;

C.     the execution and delivery by it of this Agreement, and the performance of its obligations hereunder, have been duly authorized by all necessary organizational action on its part;

D.     it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement; and

E.     the execution, delivery, and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, (ii) conflict with, result in a breach of, or constitute (with or without notice or lapse of time or both) a default under any material debt for borrowed money to which it or any of its subsidiaries is a party, or (iii) violate any order, writ, injunction, decree, statute, rule, or regulation.

16

**VIII.** **REPRESENTATIONS OF STATE COURT COUNSEL**.  Each State Court Counsel represents and warrants to the Debtors that, as of the date hereof, it represents the number of holders of Direct Abuse Claims who filed timely Direct Abuse Claims in the Chapter 11 Cases that is listed next to its name on **Schedule 1** hereto.

**IX.** **GOOD FAITH COOPERATION**.  Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, and implementation of the Settlement and the Amended Plan, subject to the same provisions contained in Sections II, III and IV of this Agreement.  The Debtors shall use reasonable efforts to provide counsel for the Coalition, the TCC, and the Future Claimants' Representative drafts of all motions, applications, and other substantive pleadings (including the Amended Plan and/or Disclosure Statement amendments) the Debtors intends to file with the Bankruptcy Court to implement the Settlement (or that could reasonably be expected to affect implementation of the Settlement) at least three (3) calendar days before the date when the Debtors intend to file such pleading, unless such advance notice is impossible or impracticable under the circumstances, in which case the Debtors shall use reasonable efforts to notify telephonically or by electronic mail counsel to the Coalition, the TCC, and the Future Claimants' Representative to advise them as such and, in any event, shall provide drafts as soon as reasonably practicable; *provided*, *however*, that nothing in this Agreement shall waive any privilege that the Parties had individually (or which the Parties (or any of them) held jointly but could not waive without the consent of another entity) prior to the entry into this Agreement.

**X.** **AMENDMENTS**.  Unless otherwise specifically provided herein, no amendment, modification, waiver, or other supplement of the terms of this Agreement (including the Amended Plan and the TDP) shall be valid unless such amendment, modification, waiver, or other supplement is in writing and has been signed by the Debtors, the Coalition, the TCC, the AHCLC, and the Future Claimants' Representative.

**XI.** **ENTIRE AGREEMENT**.  This Agreement, including the Amended Plan and the TDP, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement; *provided* that to the extent this Agreement incorporates by reference provisions of the Term Sheet, those incorporated Term Sheet provisions shall be part of the entire agreement of the Parties.

**XII.** **NO WAIVER OF PARTICIPATION AND PRESERVATION OF RIGHTS**.  If the transactions contemplated herein are not consummated, or following the occurrence of the termination of this Agreement with respect to all Parties, nothing herein shall be construed as a waiver by any Party of any or all of such Parties' rights, privileges, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, privileges, remedies, claims and defenses.

**XIII.** **COUNTERPARTS**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be

one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail in portable document format (pdf.), facsimile or otherwise, which shall be deemed to be an original for the purposes of this Section.

XIV. **HEADINGS**. The headings of the Sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

XV. **REMEDIES**. It is understood and agreed by the Parties that, without limiting any other remedies available at law or equity, money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, without the necessity of proving the inadequacy of money damages as a remedy. Each of the Parties hereby waives any defense that, with respect to an action for breach of this Agreement, a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.

XVI. **GOVERNING LAW AND DISPUTE RESOLUTION**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself, that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court, and each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court.

XVII. **WAIVER OF JURY TRIAL**. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

XVIII. **NOTICES**. All notices, requests and other communications hereunder must be in writing to the Parties at the following addresses, facsimile numbers or email addresses set forth below or on **Schedule 1** hereto (with notice of same to be provided to all applicable email addresses):

        If to the Debtors:

                Boy Scouts of America
                1325 W. Walnut Hill Lane
                Irving, Texas 75015
                Attention:    Steven McGowan, General Counsel

Email:          Steve.McGowan@scouting.org

with copies to:

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attention:    Jessica C. Lauria
Email:        jessica.lauria@whitecase.com

– and –

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Attention:    Michael C. Andolina
              Matthew E. Linder
Email:        mandolina@whitecase.com
              mlinder@whitecase.com

If to the Coalition:

Coalition of Abused Scouts for Justice
c/o Brown Rudnick LLP
Seven Times Square
New York, NY 10036
Telephone:    (212) 209-4800
Attention:    David J. Molton
              Eric R. Goodman
Email:        dmolton@brownrudnick.com
              egoodman@brownrudnick.com
              sbeville@brownrudnick.com
              taxelrod@brownrudnick.com

If to the Official Committee of Tort Claimants:

Official Committee of Tort Claimants
c/o Pachulski Stang Ziehl & Jones LLP
919 North Market Street
17th Floor
Wilmington, Delaware  19801
Telephone:    (302) 652-4100
Attention:    James I. Stang
              John W. Lucas
              James E. O'Neill
Email:        jstang@pszjlaw.com
              jlucas@ pszjlaw.com

jo'neill@pszjlaw.com

If to the AHCLC:

Ad Hoc Committee of Local Councils
c/o Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Telephone:     (212) 403-1000
Attention:     Richard G. Mason
               Joseph C. Celentino
Email:         RGMason@wlrk.com
               JCCelentino@wlrk.com

If to the Future Claimants Representative:

James L. Patton
c/o Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Attention:     James L. Patton
               Robert S. Brady
               Edwin J. Harron
Email:         jpatton@ycst.com
               rbrady@ycst.com
               eharron@ycst.com

For the avoidance of doubt when written notice or approval is required by this Agreement, electronic mail shall be sufficient.  Any notice given by mail or courier shall be effective when received.  Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

XIX.   **REMEDIES CUMULATIVE**.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party.

XX.    **RESERVATION OF RIGHTS**.  Except as expressly provided in this Agreement incorporating the Term Sheet, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests.

XXI.   **ADDITIONAL STATE COURT COUNSEL**.  Counsel for holders of Direct Abuse Claims may at any time become a party to this Agreement by executing a joinder agreement, pursuant to which such "**Joining Party**" represents and warrants to the Debtors

20

that it agrees to be bound by the terms of this Agreement as though it was State Court Counsel, as defined herein.

XXII. **NO THIRD-PARTY BENEFICIARIES**.  Solely in the event that either (A) the Coalition disbands or otherwise ceases to exist or (B) the Coalition expressly authorizes such action, on notice to the Debtors, any member of the Coalition, by and through their State Court Counsel, shall be deemed third-party beneficiaries of this Agreement and shall be entitled to enforce the rights of the Coalition (and shall be subject to the same obligations as the Coalition) under this Agreement.  Except as provided in the preceding sentence, the terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other person.

*[Signature Page(s) Follow]*

Dated: July 1, 2021

**BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC**

BY: _____
NAME: Roger C. Mosby
TITLE: Chief Scout Executive/President & CEO

**COALITION OF ABUSED SCOUTS FOR
JUSTICE**

BY: _____
NAME:
TITLE:

**OFFICIAL COMMITTEE OF TORT
CLAIMANTS**

BY: _____
NAME:
TITLE:

**FUTURE CLAIMANTS' REPRESENTATIVE**

BY: _____
NAME:
TITLE:

**AD HOC COMMITTEE OF LOCAL
COUNCILS**

BY: _____
NAME:
TITLE:

*[Signature Page to Restructuring Support Agreement]*

Dated:  July 1, 2021

**BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**


BY:    _____
NAME:
TITLE:


**COALITION OF ABUSED SCOUTS FOR JUSTICE**


BY:    _____
NAME:  David J. Molton
TITLE:  Counsel to the Coalition of Abused
        Scouts for Justice


**OFFICIAL COMMITTEE OF TORT CLAIMANTS**


BY:    _____
NAME:
TITLE:


**FUTURE CLAIMANTS' REPRESENTATIVE**


BY:    _____
NAME:
TITLE:


**AD HOC COMMITTEE OF LOCAL COUNCILS**


BY:    _____
NAME:
TITLE:


*[Signature Page to Restructuring Support Agreement]*

Dated: July 1, 2021

**BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

BY: _____
NAME:
TITLE:

**COALITION OF ABUSED SCOUTS FOR JUSTICE**

BY: _____
NAME:
TITLE:

**OFFICIAL COMMITTEE OF TORT CLAIMANTS**

BY: _____
NAME:    James I. Stang, Esq.
TITLE:    Attorney for the Official Committee of Tort Claimants

**FUTURE CLAIMANTS' REPRESENTATIVE**

BY: _____
NAME:
TITLE:

**AD HOC COMMITTEE OF LOCAL COUNCILS**

BY: _____
NAME:
TITLE:

*[Signature Page to Restructuring Support Agreement]*

Dated:  July 1, 2021

**BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC**

BY:     _____
NAME:
TITLE:

**COALITION OF ABUSED SCOUTS FOR
JUSTICE**

BY:     _____
NAME:
TITLE:

**OFFICIAL COMMITTEE OF TORT
CLAIMANTS**

BY:     _____
NAME:
TITLE:

**FUTURE CLAIMANTS' REPRESENTATIVE**

BY:     _____
NAME:        James L. Patton, Jr.
TITLE:        Future Claimants' Representative

**AD HOC COMMITTEE OF LOCAL
COUNCILS**

BY:     _____
NAME:
TITLE:

*[Signature Page to Restructuring Support Agreement]*

Dated:  July 1, 2021

**BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC**


BY:    _____
NAME:
TITLE:


**COALITION OF ABUSED SCOUTS FOR
JUSTICE**


BY:    _____
NAME:
TITLE:


**OFFICIAL COMMITTEE OF TORT
CLAIMANTS**


BY:    _____
NAME:
TITLE:


**FUTURE CLAIMANTS' REPRESENTATIVE**


BY:    _____
NAME:
TITLE:


**AD HOC COMMITTEE OF LOCAL
COUNCILS**

BY:    _____
NAME:    Richard G. Mason
TITLE:    Chair


*[Signature Page to Restructuring Support Agreement]*

## CONSENTING STATE COURT COUNSEL

By: _____

Name: _Adan P. Slater_

Firm: _Slater Slater Schulman LLP_

**CONSENTING STATE COURT COUNSEL**

By:

Name:   Joseph L. Steinfeld, Jr.

Firm:   ASK LLP

**CONSENTING STATE COURT COUNSEL**

By: _____

Name:    Anne Andrews

Firm:    Andrews & Thornton

**CONSENTING STATE COURT COUNSEL**

By  *Kenth M. Rothweiler*

Name:  *Kenneth M. Rothweiler*

Firm:  *Eisenberg, Rothweiler*

64102988 v1-WorkSiteUS-036293/0001

2

**CONSENTING STATE COURT COUNSEL**

By: _____

Name: _____
       Deborah Levy

Firm: _____
       Junell & Associates PLLC

**<u>CONSENTING STATE COURT COUNSEL</u>**

By: _____

Name: _____Dennis Reich_____

Firm: _____Reich and Binstock_____

**CONSENTING STATE COURT COUNSEL**

By:     Adam Krause

Name:

Firm:     Krause and Kinsman, LLC

**CONSENTING STATE COURT COUNSEL**

By: _____

Name: _____AARON HECKMAN_____

Firm: _BAILEY COWAN HECKAMAN PLLC_

**CONSENTING STATE COURT COUNSEL**

By: _____

Name: _____

Firm: _____

**CONSENTING STATE COURT COUNSEL**

By:

Name:    Daniel Lapinski

Firm:    MOTLEY RICE LLC

**CONSENTING STATE COURT COUNSEL**

By: _Mitchell A. Toups_

Name: _____

Firm: _Weller, Green, Toups_

6/23/21                _& Terrell LLP_

**CONSENTING STATE COURT COUNSEL**

By: _____

Name:  John G. Harnishfeger
       _____

Firm:  Colter Legal PLLC
       _____

**CONSENTING STATE COURT COUNSEL**

By:     _____

Name:     __Staesha Rath_____

Firm:     __Christina Pendleton & Associates_____

**CONSENTING STATE COURT COUNSEL**

By: _Theodore Forman_

Name: _Theodore Forman_

Firm: _Forman Law Offices, P.A._

64102988 v1-WorkSiteUS-036293/0001

2

**CONSENTING STATE COURT COUNSEL**

By: _____

Name: _____

Firm: _____

**CONSENTING STATE COURT COUNSEL**

By: _____

Name: _Kevin D. Swenson_

Firm: _Swenson & Shelley_

**CONSENTING STATE COURT COUNSEL**

By: _Brooke Cohen_____

Name: _Brooke Cohen and Andrea Hirsch_____

Firm: _Cohen Hirsch, LP_____
(Brooke F. Cohen Law, PLLC and Hirsch Law
Firm, LLC)

**CONSENTING STATE COURT COUNSEL**

By: _Damon J. Baldone_

Name: _DAMON J. Baldone_

Firm: _DAMON J. Baldone, APLC_

**CONSENTING STATE COURT COUNSEL**

By: _____

Name: C. Brooks Cutter

Firm: Cutter Law P.C.

**CONSENTING STATE COURT COUNSEL**

By: _____

Name: ____Robert G. Pahlke_____

Firm: ___The Robert Pahlke Law Group_____

64102988 v1-WorkSiteUS-036293/0001

## CONSENTING STATE COURT COUNSEL

By: _____

Name: _____Tim Porter_____

Firm: _____Porter / Malouf_____

**CONSENTING STATE COURT COUNSEL**

By: _____

Name: Willard Moody Jr

Firm: The Moody Law Firm

**CONSENTING STATE COURT COUNSEL**

By: _____

Name: _____W. CAMERON STEPHENSON_____

Firm: _____LEVIN PAPANTONIO et. al._____

**CONSENTING STATE COURT COUNSEL**

By: _____Marc J. Bern_____

Name: ___Marc J. Bern, Esquire_____

Firm: ___Marc J. Bern & Partners, LLP_____

## Schedule 1

**State Court Counsel**

## Schedule 1

### State Court Counsel

| FIRM | NOTICE ADDRESS | CLAIMS |
|---|---|---|
| Slater Slater Schulman LLP | Attn: Adam P. Slater (aslater@sssfirm.com) 488 Madison Avenue 20th Floor New York, NY 10022 | 14170 |
| ASK LLP | Attn: Joseph Steinfeld (jsteinfeld@askllp.com) 151 West 46th Street, 4th Floor New York, NY 10036 | 3277 |
| Andrews & Thornton, AAL, ALC | Andrews & Thornton Attn: Anne Andrews (aa@andrewsthornton.com) 4701 Von Karman Ave., Suite 300 Newport Beach, CA 92660 | 3009 |
| Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. | Attn: Stewart J. Eisenberg (stewart@erlegal.com) 1634 Spruce Street Philadelphia, PA 19103 | 16869 |
| Junell & Associates PLLC | Attn: Deborah Levy (dlevy@junell-law.com) 3737 Buffalo Speedway Ste. 1850 Houston, TX 77098 | 2918 |
| Reich & Binstock LLP | Attn: Dennis Reich (dreich@reichandbinstock.com) 4265 San Felipe St. #1000 Houston, TX 77027 | 336 |
| Krause & Kinsman Law Firm | Attn: Adam W. Krause (adam@krauseandkinsman.com) 4717 Grand Avenue #300 Kansas City, MO 64112 | 5981 |
| Bailey Cowan Heckaman PLLC | Attn: Aaron Heckaman (aheckaman@bchlaw.com) 5555 San Felipe St. Ste. 900 Houston, TX 77056 | 1026 |
| Jason J. Joy & Associates, PLLC | Attn: Jason Joy (jason@jasonjoylaw.com) 909 Texas St, Ste 1801 | 690 |

| | Houston, TX 770022 | |
|---|---|---|
| Motley Rice LLC | Attn: Daniel Lapinski (dlapinski@motleyrice.com) 28 Bridgeside Blvd. Mt. Pleasant, SC 29464 | 343 |
| Weller Green Toups & Terrell LLP | Attn: Mitchell Toups (matoups@wgttlaw.com) 2615 Calder Ave. #400 Beaumont, TX 77702 | 974 |
| Colter Legal PLLC | Attn: John Harnishfeger (john.harnishfeger@colterlegal.com) 1717 K St. NW Suite 900 Washington D.C. 20006 | 162 |
| Christina Pendleton & Associates, PLLC | Attn: Staesha Rath (sr@cpenlaw.com) 1506 Staples Mill Rd. Suite 101 Richmond, VA 23230 | 309 |
| Forman Law Offices, P.A. | Attn: Theodore Forman (ted@formanlawoffices.com) 238 NE 1st Ave. Delray Beach, FL 33444 | 125 |
| Danziger & De Llano LLP | Attn: Rod de Llano (rod@dandell.com) 440 Louisiana St. Suite 1212 Houston, TX 77002 | 173 |
| Swenson & Shelley | Attn: Kevin Swenson (kevin@swensonshelley.com) 107 South 1470 East, Ste. 201 St. George, UT 84790 | 175 |
| Cohen Hirsch LP (formerly Brooke F. Cohen Law, Hirsch Law Firm) | Attn: Brooke F. Cohen (brookefcohenlaw@gmail.com) Attn: Andrea Hirsch (andrea@thehirschlawfirm.com) 4318 Glenwick Lane Dallas, TX 75205 | 64 |
| Damon J. Baldone PLC | Attn: Damon J. Baldone (damon@baldonelaw.com) 162 New Orleans Blvd. Houma LA 70364 | 471 |

| | | |
|---|---|---|
| Cutter Law, P.C. | Attn: Brooks Cutter (bcutter@cutterlaw.com) 4179 Piedmont Ave. 3rd Fl. Oakland, CA 94611 | 358 |
| Linville Johnson & Pahlke Law Group | Attn: Robert Pahlke (rgp@pahlkelawgroup.com) 2425 Circle Dr., Ste. 200 Scottsbluff NE 69361 | 71 |
| Porter & Malouf P.A. | Attn: Timothy Porter (tporter@portermalouf.com) 825 Ridgewood Rd. Ridgeland, MS 39157 | 86 |
| The Moody Law Firm | Attn: Will Moody Jr. (will@moodyrrlaw.com) 500 Crawford St., Ste. 200 Portsmouth, VA 23704 | 677 |
| Levin Papantonio Thomas Mitchell Rafferty & Procter P.A. | Attn: Cameron Stephenson (cstephenson@levinlaw.com) 316 South Baylen St. Pensacola, FL 32502 | 44 |
| Marc J Bern & Partners LLP | Attn: Joseph Cappelli (jcappelli@bernllp.com) 60 East 42nd St. Ste. 950 New York, NY 10165 | 5893 |

## Exhibit A

**Term Sheet**

**THIS TERM SHEET IS NOT A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH SOLICITATION WILL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY.**

## Boy Scouts of America Reorganization Term Sheet

This Term Sheet is between Boy Scouts of America and Delaware BSA, LLC (together, the "***Debtors***"), the attorneys listed on Schedule 1 to the Restructuring Support Agreement (the "***RSA***") to which this Term Sheet is appended (together with any Joining Parties under the RSA, "***State Court Counsel***"), the Coalition of Abused Scouts for Justice (the "***Coalition***"), the Ad Hoc Committee of Local Councils (the "***AHCLC***"), the Official Tort Claimants' Committee (the "***TCC***"), and James L. Patton, Jr., the legal representative appointed by the Bankruptcy Court for holders of Future Abuse Claims (the "***Future Claimants' Representative***" and, collectively with the Debtors, State Court Counsel, the Coalition, the AHCLC, and the TCC, the "***Parties***") and describes the proposed terms of the Debtors' chapter 11 reorganization (the "***Reorganization***"), which shall be implemented through the *Third Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (D.I. 5368) filed on June 18, 2021 (the "***June 18 Plan***"), which is to be further amended in accordance with the terms hereof (the "***Amended Plan***"). The Amended Plan shall be consistent with the terms of this Term Sheet (as such may be amended or supplemented from time to time by agreement of the Parties). This Term Sheet incorporates the rules of construction set forth in Article I.B of the June 18 Plan. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the June 18 Plan or the RSA, as applicable. This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Amended Plan and the other definitive documents contemplated thereby, which remain subject to negotiation among the Parties (collectively, the "***Definitive Documents***"). Consummation of the transactions contemplated by this Term Sheet is subject to (a) the negotiation and execution of the Definitive Documents evidencing and related to the Reorganization and (b) the satisfaction or waiver of all of the conditions in any Definitive Document evidencing the transactions comprising the Reorganization, including the Amended Plan. The Definitive Documents shall satisfy the requirements of the Bankruptcy Code, this Term Sheet, and the Amended Plan. The Definitive Documents shall contain terms and conditions that are dependent on each other, including those described in this Term Sheet and the Amended Plan.

| Agreement of the Parties |
|---|
| The Coalition, State Court Counsel, the TCC, and the Future Claimants' Representative agree (and such agreements shall be included in the RSA) that they shall support the proposal, solicitation, acceptance, and Confirmation of the Amended Plan containing the terms set forth in this Term Sheet. In addition, the Coalition, State Court Counsel, the TCC, and the Future Claimants' Representative shall support extension of the Debtors' exclusive plan filing and solicitation periods to the maximum extent permitted under section 1121(d)(2) of the Bankruptcy Code and, upon the Bankruptcy Court's entry of the RSA Approval Order, the |

Coalition, the TCC, and the Future Claimants' Representative shall withdraw their objections thereto. The Parties shall also support an extension of the preliminary injunction (subject to exceptions that the Coalition, the TCC, and the Future Claimants' Representative may request and to which all of the other Parties, after consultation, do not object) regarding litigation of Abuse Claims through the Effective Date.

| Treatment of Claims and Interests under the Plan | |
|---|---|
| Other Priority Claims | Shall receive same treatment as proposed in the June 18 Plan. |
| Other Secured Claims | Shall receive same treatment as proposed in the June 18 Plan. |
| 2010 Credit Facility Claims | Shall receive same treatment as proposed in the June 18 Plan. |
| 2019 RCF Claims | Shall receive same treatment as proposed in the June 18 Plan. |
| 2010 Bond Claims | Shall receive same treatment as proposed in the June 18 Plan. |
| 2012 Bond Claims | Shall receive same treatment as proposed in the June 18 Plan. |
| Convenience Claims | Shall receive same treatment as proposed in the June 18 Plan. |
| General Unsecured Claims | Shall receive same treatment as proposed in the June 18 Plan. |
| Non-Abuse Litigation Claims | Shall receive the treatment as proposed on **Schedule 1** hereto, which treatment has been approved by the Creditors' Committee, subject to Definitive Documentation. |
| Direct Abuse Claims | Shall be channeled to the Settlement Trust and administered in accordance with the Trust Distribution Procedures ("***TDP***"). |
| Indirect Abuse Claims | Shall be channeled to the Settlement Trust and administered in accordance with the TDP. |
| Other Terms of the Restructuring | |
| BSA Settlement Trust Contribution | As set forth in the June 18 Plan, the BSA Settlement Trust Contribution shall include:<br><br>(A)  all of the Net Unrestricted Cash and Investments, which are forecasted to total approximately $90 million subject to potential variance depending upon the timing of the Effective Date. The minimum amount of Unrestricted Cash and Investments to be retained by Reorganized BSA on the Effective Date shall be:<br><br>(1)  $25 million if the Effective Date occurs on or before September 30, 2021;<br><br>(2)  $37 million if the Effective Date occurs on or after October 1, 2021 but before November 1, 2021;<br><br>(3)  $36 million if the Effective Date occurs on or after November 1, 2021 but before December 1, 2021; |

(4)     $40 million if the Effective Date occurs on or after December 1, 2021 but before January 1, 2022;

(5)     $57 million if the Effective Date occurs on or after January 1, 2022 but before February 1, 2022;

(6)     $41 million if the Effective Date occurs on or after February 1, 2022 but before March 1, 2022;

(7)     $55 million if the Effective Date occurs on or after March 1, 2022 but before April 1, 2022; and

(8)     $54 million if the Effective Date occurs on or after April 1, 2022.

The BSA will provide the Coalition, TCC, and Future Claimants' Representative the same reporting on its receipts and disbursements and cash flow forecasts versus actuals as provided for in the Final Cash Collateral Order.  The Coalition, TCC and Future Claimants' Representative shall have the right to review the BSA's cash receipts and disbursements and the BSA will respond to reasonable questions thereon.  Further, the BSA will consult with the Coalition, TCC, and the Future Claimants' Representative on any proposed disbursement outside of the ordinary course of business prior to the Effective Date.  The BSA will also provide the Coalition, TCC, and Future Claimants' Representative, each Wednesday, commencing on July 15, 2021, a report setting forth: (i) the anticipated cash disbursements in excess of $100,000 for the immediately following week, including estimated amounts for benefits-related disbursements; and (ii) any unanticipated cash disbursements in excess of $100,000 that were required during the preceding week.

(B)     the BSA Settlement Trust Note, which shall be a secured promissory note (secured by a second-lien security interest in inventory, accounts receivable (except the Arrow Intercompany Note), cash and the headquarters building of the BSA) due 91 days after the date that is ten (10) years after the Effective Date,[1] otherwise

---

[1]  Based on their financial projections, the Debtors estimate that the BSA Settlement Trust Note will be fully paid off as of the calculation occurring December 31, 2029, for which the corresponding principal payment is due February 15, 2030.

substantially in the form to be contained in the Plan Supplement, in the principal amount of $80 million. The BSA Settlement Trust Note will bear interest at a rate of 5.5% per annum, payable semi-annually, subject to a payment-in-kind election for the eighteen (18) months immediately following the Effective Date. Principal under the BSA Settlement Trust Note shall be payable in annual installments due on February 15 of each year during the term of the BSA Settlement Trust Note, commencing on February 15 of the second year following the Effective Date.  Such annual principal payments shall be equal to the sum of the following calculation: (a) $4.5 million; plus (b) $3.50 multiplied by the aggregate number of Youth Members as of December 31 of the preceding year up to the forecasted number of Youth Members for such year as set forth in the Debtors' five-year business plan; plus (c) $50 multiplied by the aggregate number of High Adventure Base Participants during the preceding calendar year; plus (d) $50 multiplied by the aggregate number of Youth Members in excess of the forecasted number of Youth Members for such year, excluding the portion of the excess that is comprised of members under the ScoutReach program, as set forth in the Debtors' five-year business plan; plus (e) $150 multiplied by the aggregate number of High Adventure Base Participants, excluding those attending events with a registration fee of less than $300 (*e.g.*, for non-typical High Adventure Base activities), in excess of the forecasted number of High Adventure Base Participants for such year as set forth in the Debtors' five-year business plan. The forecasted numbers of Youth Members and High Adventure Base Participants referenced in clauses (b), (d) and (e) of the foregoing sentence shall be included in the Financial Projections attached to the Amended Disclosure Statement.  The forecast for years after 2025 shall be deemed to be the forecast for calendar year 2025. The BSA shall provide to the Settlement Trust a quarterly report of actual Youth Members and High Adventure Base Participants, including a comparison to forecasts for the same period.  The BSA Settlement Trust Note may be prepaid at any time without penalty;

| | |
|---|---|
| | (C)  the Artwork, at a mutually agreed value of $59.0 million;[2] |
| | (D)  the estimated $11.6 million from sale-leaseback of Warehouse and Distribution Center (or the contribution of such property to the Settlement Trust and sale-leaseback thereof to Reorganized BSA); |
| | (E)  the Oil and Gas Interests at a mutually agreed value of $7.6 million); and |
| | (F)  the $1.962 million of net proceeds from the sale of Scouting University. |
| Non-Monetary Commitments | The Amended Plan shall provide for the following non-monetary commitments:<br><br>(A)  The BSA forms a Child Protection Committee ("*Committee*") of members from the BSA, Local Councils, the TCC, and the Coalition (including survivors).<br><br>(1)  No later than six months after the Effective Date, the BSA will present to the Committee on the BSA's current Youth Protection Program (the "*Program*").  The BSA will report to the Committee regarding the Program and any changes thereto on an annual basis for a period of three years following the Effective Date.<br><br>(2)  Following that presentation, the BSA and Committee will work with an entity engaged by the BSA that is selected with the consultation of the Committee that is not currently affiliated with the BSA to evaluate the Program (the "*Evaluating Entity*").  The Evaluating Entity will have expertise in the prevention of youth sexual abuse.<br><br>(i)  Any evaluation will be comprehensive in nature and include input from current BSA volunteers and professionals, survivors of sexual abuse while involved with Scouting, |

---

[2]  The terms of the storage and transfer of, and insurance for, the Artwork shall be mutually agreed among the Parties, and the rights to any insurance or the proceeds thereof with respect to missing, damaged, or destroyed Artwork shall be assigned to the Settlement Trust on the Effective Date.

the members of the Committee, and the Evaluating Entity.

(ii) The Evaluating Entity will report to the Committee assessing the current Program and make specific recommendations for reasonable improvements to the Program that may include mechanisms for the elimination of abuse and accurate and annual reporting regarding the results of the Program, including confirmed instances of sexual abuse that is made available to the public (the "*Prospective Reporting*").

(iii) The BSA will engage with the Evaluating Entity, and the Committee, and will take appropriate steps as necessary to improve the Program. Changes to the Program will be reported on the BSA's Program website and training will be reasonably adjusted to reflect changes.

(3) The BSA will propose and the Committee will consider a protocol for the review and publication of information in the Volunteer Screening Database and the Prospective Reporting, which will take into account factors including: (1) the desire to make public credibly identified perpetrators of sexual abuse in Scouting; (2) adequate protections for survivor identities; (3) consideration regarding the protection of third parties, including survivor family members and volunteers; (4) a notification process regarding any publication; (5) issues related to privacy and liability related to publication; and (6) the potential appointment or retention of an appropriate neutral party to supervise (the "*Neutral Supervisor*") the evaluation and review of the Volunteer Screening Database. If the BSA and Committee are unable to reach an agreement on the above protocol, the Neutral Supervisor shall mediate the dispute to resolution. In accordance with the process outlined above, information from the Volunteer Screening Database and Prospective Reporting shall be

published annually after agreement among the parties or determination by the Neutral Supervisor.

(4) After consultation and recommendations from the Evaluating Entity, the Committee may propose and the BSA will in good faith consider other issues relating to Child Protection, including but not limited to: (A) special BSA Scouting programs for survivors; and (B) participation and leadership in a comprehensive reporting program to include other youth-serving organizations.

(5) The BSA will engage with the Committee and consider all appropriate measures proposed by the Committee to improve transparency and accountability with respect to any future instances of sexual abuse, including the dissemination of information relating to abuse statistics, consistent with practices of other youth-serving organizations, including what information may be publically available on the BSA's website.

(B) The BSA shall turn over to the Settlement Trust the Volunteer Screening Database and all Troop Rosters in the Debtors' possession, custody, or control, in a manner permitting access to the same extent as in typical litigation discovery by the holder of a Direct Abuse Claim to the Volunteer Screening Database and Troop Rosters, if any, that relate to such holder or the Direct Abuse Claim asserted thereby, subject in each case to appropriate protection against the unauthorized dissemination of such documents and materials;

(C) The BSA shall provide the Settlement Trust reasonable go-forward discovery support regarding records and documents related to Abuse Claims;

(D) The BSA shall assign to the Settlement Trust a secured ownership interest (as designated in the Amended Plan by the Coalition, the TCC, and the Future Claimants' Representative) in any proceeds of insurance rights and insurance receivables; and

(E) The BSA shall agree to cooperate in taking all steps reasonably necessary to facilitate the Local Council

| | Settlement Contribution as set forth below. |
|---|---|
| Settlement of Restricted and Core Asset Disputes | The Coalition, TCC and Future Claimants' Representative acknowledge and agree that the BSA Settlement Trust Contribution shall be made in consideration for, among other things, the compromise and settlement of any and all disputes concerning the Debtors' restricted and/or core assets, including the claims asserted in the adversary proceeding (the "**Restricted Assets Adversary**") filed by the TCC in the adversary proceeding entitled *Official Tort Claimants' Committee of Boy Scouts of America and Delaware BSA, LLC v. Boy Scouts of America and Delaware BSA, LLC*, Adv. Pro. No. 21-50032 (LSS) (the "**Settlement of Restricted and Core Asset Disputes**"). <br><br> Upon the filing of the Amended Plan, the TCC and the Debtors shall enter into and seek Bankruptcy Court approval of a stipulation staying the Restricted Assets Adversary pending the outcome of the confirmation hearing. The Coalition and Future Claimants' Representative shall use their respective reasonable best efforts to assist the TCC and the Debtors in obtaining a stay of the Restricted Assets Adversary and support the Debtors' efforts to obtain approval of the Settlement of Restricted and Core Asset Disputes as a good-faith compromise and settlement that is in the best interests of the Debtors' estates under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. |
| Local Council Settlement Contribution | In addition to the contribution of their insurance rights to the Settlement Trust on the Effective Date, the Local Councils shall contribute the following to the Settlement Trust on the Effective Date: <br><br> (i)    at least $300 million of cash to be paid on the Effective Date, <br><br> (ii)   Unrestricted properties[3] with a combined Appraised Value (as defined below) of $200 million (the "**Property Contribution**"), which shall be reduced on a dollar-for-dollar basis by any cash payment amount in excess the $300 million, *provided that* the methodology and procedures related to property selection and acceptance are |

---

[3] "*Unrestricted*" properties are defined as those properties not included in the BSA defined Restriction Tiers 1 – 2 (Tier 1: Property limited to Boy Scout use only – any conveyance causes reversion or transfer of property to 3rd party. Tier 2: Property limited to Boy Scout use only – no reversionary clause).

provided for below; and

(iii)    a $100 million interest-bearing variable-payment obligation note (the "***DST Note***") issued by a Delaware statutory trust ("***DST***") on or as soon as practicable after the Effective Date.[4] The principal terms of the DST Note are set forth in the DST Note Mechanics described below.

A listing of each Local Council's total expected contribution will be included in the Amended Disclosure Statement and provided to the Coalition, TCC and the Future Claimants' Representative, including a specific break-down between the (i) Cash Contribution and (ii) Property Contribution. Any actual or anticipated changes in contributions for any Local Council will be set forth in the Plan Supplement. Notwithstanding any change in the Cash Contribution or Property Contribution for any Local Council, the aggregate amount of the Cash Contribution and the Property Contribution shall not be less than $500 million in any circumstance (and the Cash Contribution shall not be less than $300 million in any circumstance).

The Property Contribution shall be structured as follows: The relevant Local Council shall agree to (a) retain title to the property (and pay insurance, property taxes, other associated ownership costs and any yet unremoved debt), subject to, at the election, cost, and expense of the Settlement Trust, a mortgage in favor of the Settlement Trust, (b) post the property for sale within thirty days following the Effective Date, (c) present any written sale offer to the Settlement Trust for approval, (d) present to the Settlement Trust for its review and approval all final proposed terms of any sale and purchase offers (including price, timing and other terms) ("***Proposed Final Terms***"); *provided that* if any Proposed Final Terms would impose additional costs on the Local Council and the Settlement Trust accepts such Proposed Final Terms, at the Local Council's option any such additional costs shall be

---

[4] The Parties acknowledge and agree that the DST may be any other type of entity that ensures the DST Note is balance-sheet neutral as to the BSA and Local Councils, as determined by the BSA in consultation with the AHCLC, and, in such event, each reference in this Term Sheet to DST shall be deemed a reference to the actual entity that issues the DST Note.

deducted from the proceeds or paid by the Settlement Trust, and not by the Local Council,[5] (e) remit the proceeds of the sale to the Settlement Trust at closing net of posting/listing/marketing fees, escrow fees, sales commissions, and other typical costs of sale.[6] The Settlement Trust may review the marketing and sales efforts undertaken by the Local Council and request that the Local Council make changes to such marketing and sales efforts as are appropriate and lawful; provided that any costs associated with such changes will be paid, at the option of the Local Council, by the Settlement Trust or out of the proceeds of any sale. If the Settlement Trust is unsatisfied with the sales and marketing effort, the Settlement Trust shall have the right to require the Local Council to promptly transfer the property to the Settlement Trust by quitclaim deed. If there is a shortfall or surplus of net proceeds as compared to Appraised Value, the Settlement Trust shall bear the risk of the shortfall and keep the surplus. If the property is not sold on or before the third anniversary of the Effective Date, the Local Council and the Settlement Trust each shall have the right to require the prompt transfer of the property to the Settlement Trust by quitclaim deed. If the Local Council receives a cash offer for the property the value of which is at least equal to its Appraised Value, the Settlement Trust shall accept the offer if no superior offer is made within thirty days (or, if a lesser time is specified in an offer received, then such lesser time) or accept a quitclaim deed for the property. The Debtors shall include appropriate provisions in the Plan to eliminate any transfer tax liabilities of the Settlement Trust per section 1146(a) of the Bankruptcy Code.

The "*Appraised Value*" shall be determined as follows:

(A) In the case of the contribution of an entire Camp, Service Center, Scout Shop or other property that does not have a restriction in Restriction Tiers 3-5[7] ("***Lower Tier Restriction***"), as reasonably determined by the Debtors' property review counsel and specified on Exhibit 2 to Exhibit

---

[5]  By way of non-exclusive example, if the Proposed Final Terms requires the Local Council to retrofit a water system and the Settlement Trust accepts the Proposed Final Terms, the costs of the retrofit will, at the Local Council's option be paid (or reimbursed) out of the sale proceeds or paid by the Settlement Trust.

[6]  For the avoidance of doubt, the proceeds of the sale shall be first applied to any debt or liens remaining on the property, which debt shall have already been reflected in the Appraised Value of the property as described below.

[7]  A Tier 3-5 Restriction shall mean any of the following: (1) Tier 3: property limited to Boy Scout or similar use or recreational area; (2) Tier 4: Property subject to conservation easement or other grantor or donor restrictions on development; (3) Tier 5: Property subject to leases to 3rd party (*e.g.*, office space, cell tower, oil and gas), zoning restrictions, easements or other similar encumbrances.

B to the Disclosure Statement, which summarizes the restricted appraisal reports or broker opinions of value conducted by JLL Valuation & Advisory Services, LLC ("*JLL*"), CBRE, Inc. ("*CBRE*") or Keen-Summit Capital Partners LLC in connection the BSA's chapter 11 case prior to June 10, 2021 (the "*Specified Appraisals*"): (1) the appraised amount set forth in the Specified Appraisals (using the average of high and low values, if applicable) or (2) if the applicable Local Council elects a Qualified On-Site Appraisal, the amount established by the average of (1) and the appraised amount in such Qualified On-Site Appraisal (using, for the Qualified On-Site Appraisal, the average of high and low values, if applicable);

(B) In the case of the contribution of an entire Camp, Service Center, Scout Shop or other property that has a Lower Tier Restriction: (a) the appraised amount set forth in a Specified Appraisal if such Specified Appraisal accounts for such Lower Tier Restriction or (b) if the Specified Appraisal does not account for such Lower Tier Restriction, the amount established by a Qualified On-Site Appraisal (using the average of high and low values, if applicable) of the property taking into account the Lower Tier Restriction.

(C) In the case of a contribution of only a portion of a particular Camp, Service Center, Scout Shop or other property to the Settlement Trust, whether or not subject to a Lower Tier Restriction, the amount established by a Qualified On-Site Appraisal (using the average of high and low values, if applicable) of the specific parcel and acreage proposed to be contributed, taking into account any Lower Tier Restriction;

*provided*, that, in the case of (A), (B), or (C) the Appraised Value shall be net of any debt encumbering the property.

The applicable Local Councils and the BSA shall engage in reasonable good faith efforts to ensure all properties subject to the Property Contribution accurately reflect all restrictions that are known to (or should be reasonably known to) exist in any appraisal that is used to determine a property's Appraised Value.

In the event a restriction that was not considered by any appraisal used to determine Appraised Value is subsequently determined to exist, such appraisal shall not be eligible to determine Appraised Value, and, to the extent necessary, within a reasonable period of time, new appraisals shall be

| | |
|---|---|
| | conducted and/or the relevant Local Council shall contribute additional unrestricted properties or cash to the Settlement Trust to the extent necessary to ensure the total Appraised Value of all property or properties contributed by such Local Council is equal to or exceeds the Appraised Value of property that such Local Council had originally agreed to contribute.

A "*Qualified On-Site Appraisal*" shall mean an appraisal conducted by a licensed real property appraiser jointly selected by the Settlement Trust, or if such appraisal is to be conducted prior to the establishment of the Settlement Trust, by the TCC and the Local Council (who is not affiliated with the Settlement Trust (or the TCC, as applicable) or the Local Council) from the geographic region where the property is located and conducted in compliance with the Uniform Standards of Professional Appraisal Practice; *provided* that if JLL or CBRE prepared a restricted appraisal report or broker opinion of value with respect to a property, the applicable firm shall conduct the Qualified On-Site Appraisal unless it is not licensed in the state where the property is located. The costs associated with any Qualified On-Site Appraisals will be borne by the Local Council.  If the applicable Local Council has not commissioned a Qualified On-Site Appraisal as of the date that this Term Sheet becomes public, it will do so as soon as possible.

For the avoidance of doubt, if any part of the Local Council Settlement Contribution is not contributed to the Settlement Trust on the Effective Date as described above, then no Local Council shall be treated as a Protected Party under the Amended Plan.[8]  The BSA and the Local Councils shall establish an appropriate escrow mechanism to ensure that the cash to be paid on the Effective Date can be paid in a timely manner. |
| DST Note Mechanics | On the Effective Date, at the request of the Ad Hoc Committee, solely to facilitate payments from the LC Reserve Account, the DST shall be established as of the Effective Date pursuant to the terms of the Amended Plan, and the DST shall issue the DST Note in favor of the Settlement Trust in the principal amount of $100 million.  Local Councils shall make monthly contributions into an account (and any replacement thereof) owned by the DST (the "*LC Reserve Account*") in an |

---

[8]  For the avoidance of doubt, the Property Contribution shall be deemed to have been contributed on the Effective Date for purposes of this provision when all individual Local Councils that are to make a Property Contribution have provided a notice of intent to contribute property to the Settlement Trust in accordance with the terms of the Property Contribution above.

amount equal to the Required Percentage of the Local Councils' respective payrolls.  Until the DST Note is extinguished, the LC Reserve Account shall be used only to fund contributions to the Pension Plan in accordance with the next sentence and, to the extent of any excess, to pay any Payment Amounts due under the DST Note.  If at any time (including the end of any Plan Year) (a) the present value of the accumulated benefits for the Pension Plan, as determined in accordance with the requirements set forth in the definition of "Excess Balance" below for the most recently ended Plan Year, exceeds (b) the market value of the assets of the Pension Plan (clause (a) minus clause (b) being the "*Shortfall Amount*"), funds in the LC Reserve Account will be deposited into the Pension Plan up to the lesser of the Local Councils' collective pro rata share of the Shortfall Amount or the balance in the LC Reserve Account.

The DST Note shall be: (i) interest bearing at a rate of 1.5% per annum and without recourse except as to the LC Reserve Account; (ii) secured by a lien on the LC Reserve Account; (iii) payable on each Payment Date in an amount equal to the applicable Payment Amount; and (iv) prepayable in whole or in part at any time without premium or penalty.  The unpaid balance of the DST Note (if any) remaining on the Payment Date that is the fifteenth anniversary of the First Payment Date (the "*DST Note Maturity Date*") shall be automatically extinguished and shall be considered forgiven and satisfied after giving effect to any required payment on such date. Other than the lien on the LC Reserve Account, the Settlement Trust shall have no other recourse for payment under the DST Note.

"*Cushion Amount*" means: (i) from the Effective Date until the first June 1 that is at least one year after the Effective Date (the "*First Cushion Date*"), $150 million; (ii) from the day following the First Cushion Date until June 1 of the following year (the "*Second Cushion Date*"), $140 million; (iii) from the day following the Second Cushion Date until June 1 of the following year (the "*Third Cushion Date*"), $130 million; (iv) from the day following the Third Cushion Date until June 1 of the following year (the "*Fourth Cushion Date*"), $120 million; and (v) from the day following the Fourth Cushion Date until June 1 of the following year (the "*Fifth Cushion Date*"), $110 million; and (vi) from the day following the Fifth Cushion Date to and including the DST Note Maturity Date, $100 million.  Notwithstanding the foregoing, if the net increase in liabilities under the Pension Plan exceeds 1.0% as

a result of the completion of the 2021 Experience Study (as defined below), then each Cushion Amount shall be reduced by the dollar amount that corresponds to such net percentage increase in liabilities in excess of 1.0%; *provided*, that in no event shall any Cushion Amount on any date be reduced to an amount less than $100 million.[9]

"***Excess Balance***" means the amount in excess of the applicable Cushion Amount, if any, by which (a) the sum of (i) the market value of the assets of the Pension Plan as set forth in the actuarial report for the Pension Plan for the most recently ended Plan Year plus (ii) the balance of the LC Reserve Account as of the month-end preceding the applicable Payment Date exceeds (b) the present value of the accumulated benefits for the Pension Plan as set forth in the actuarial report for the Pension Plan for the most recently ended Plan Year calculated using a 6.5% annual interest rate, net of expenses, so long as the Pension Plan continues to be a Cooperative and Small Employer Charity (CSEC) plan.  The actuarial report shall be prepared in accordance with actuarial standards, past practice, and applicable law.

Promptly upon execution of this Term Sheet, and no later than July 31, 2021, the Debtors will conduct a current experience study by the Pension Plan actuary with respect to the demographic assumptions for the Pension Plan (*e.g.*, rates of retirement, termination, spousal age difference, commencement age and forms of payment) (the "***2021 Experience Study***").  After implementing changes, if any, based on the 2021 Experience Study, demographic assumption changes, with the exception of annual updates to mortality improvement projection scales, will not be made without a subsequent experience study, and economic assumption changes will not be made without an asset liability management study.  Reorganized BSA will not commission any such studies until five (5) years after the Effective Date of the Amended Plan unless there are material changes to Internal Revenue Code § 433 (governing CSEC plans).  In the event of such a material change, Reorganized BSA shall commission any such studies only if it reasonably believes, in consultation with the Pension Plan actuary, that such study is

---

[9] By way of non-exclusive example, if the net increase in liabilities under the Pension Plan as a result of the 2021 Experience Study is a percentage that corresponds to $50 million, and 1.0% of net liabilities is $13 million, then (i) the Cushion Amounts at the First Cushion Date and Second Cushion Date would each be reduced by $37 million to $113 million and $103 million, respectively, (ii) the Cushion Amounts at the Third Cushion Date, Fourth Cushion Date and Fifth Cushion Date would be reduced by $30 million, $20 million, and $10 million, respectively, to $100 million in each case, and (iii) the Cushion Amount from the day following the Fifth Cushion Date to and including the DST Note Maturity Date would remain at $100 million.

| | |
|---|---|
| | required.  During the term of the DST Note, on an annual basis, the BSA will provide advance notice to the Settlement Trustee of any proposed material changes that the Pension Plan actuary intends to make to its actuarial assumptions and methodologies that increase the present value of accumulated benefits under the Pension Plan by more than 1.0%.  The BSA will confer in good faith with the Settlement Trustee regarding any such proposed changes.  In addition, if the Pension Plan is amended in any regard which increases the present value of benefits under the Pension Plan, such amendments will be disregarded in the calculation of the present value of accumulated benefits for the purposes of the DST Note. |
| | "**_Payment Amount_**" means an amount, if any, on each Payment Date, payable solely from the LC Reserve Account, equal to the least of: (x) the Excess Balance on such Payment Date, (y) the remainder of the balance of $100 million accumulated at 1.5% annual interest, as amortized by any amounts previously paid; and (z) the amount in the LC Reserve Account. |
| | "**_Payment Date_**" means, unless the DST Note is prepaid in full, May 31 of each year starting on the first May 31 after the Effective Date (or starting on the first business day that is at least thirty (30) days after the Effective Date if the Effective Date occurs between May 1 and May 31) (the "*First Payment Date*") until the fifteenth anniversary of the First Payment Date. |
| | "**_Plan Year_**" means the period from February 1 to and including January 31 of the following year. |
| | "**_Required Percentage_**" means an amount equal to 12% of a Local Council's payroll, less any pension plan related expenses which are estimated to be approximately 0.50% of such payroll, less the Local Council employer contribution match for employee contributions to the section 403(b) defined contribution benefit plan, which percentage will not exceed 4.5% of participating employee payroll until at least $50 million of the DST Note principal has been paid, at which point the employer contribution match percentage will not exceed 6% until the DST Note has been paid in full (principal and interest). |
| Contributing Chartered Organization Settlement Contribution | The Parties shall work in good faith to develop a protocol for addressing participation by Chartered Organizations in the benefits of the Channeling Injunction.  Such settlements may |

| | |
|---|---|
| | occur prior to the Effective Date with the consent of all Parties. |
| Assignment of Claims and Defenses / Waiver of Claims | The Debtors, the Local Councils and any other party that is or becomes a Protected Party shall assign any and all Claims and defenses to the Settlement Trust that arise from or relate to Abuse Claims, including, without limitation, any Claims and defenses against co-defendants.  Except for the right to seek reimbursement set forth below, the Debtors, the Local Councils and any other party that is or becomes a Protected Party shall be forever barred from seeking compensation from the Settlement Trust for or on account of any Claims arising prior to the Petition Date. |
| Hartford Settlement | On June 9, 2021, the Coalition, the Future Claimants' Representative, and the TCC sent a joint letter to the Debtors stating that they would not support any plan of reorganization or separate motion/settlement that seeks approval of the Hartford Settlement and requesting that the Debtors not go forward with any such plan of reorganization or motion/settlement.  In connection with this request, the Debtors shall, by the RSA Motion or a separate motion, seek a determination of the Bankruptcy Court that the Debtors have no obligations under the Hartford Settlement. |
| Transfer of Insurance Rights to the Settlement Trust | On the Effective Date, the Debtors and any Local Council and/or Chartered Organization that is a Protected Party shall delegate to the Settlement Trust exclusive control over, transfer and assign (a) all rights, claims, benefits or causes of action, including the right to receive proceeds held by such party with respect to any insurance policy which provides or may provide coverage for Abuse Claims, (b) all rights, claims, or causes of action held by such party, including the right to receive proceeds with respect to any settlement agreements or coverage-in-place agreements that amend, modify, replace, or govern the rights and obligations of, and the coverage afforded to such party, under any insurance policy which does or may provide coverage to such party for Abuse Claims, and (c) any receivables due such party from insurance companies arising out of or relating to Abuse Claims; *provided however*, that the transfer contemplated hereby shall not include a transfer of any Reserved Rights[10] of a Local Council.  Entities that become Protected Parties after the Effective Date may be required to delegate, transfer, or assign similar rights and receivables as a condition of becoming a Protected Party, as determined by the Settlement Trust following the Effective |

---

[10] A "***Reserved Right***" is any right of a Local Council under any Specified Insurance Policy with respect to any Non-Abuse Litigation Claim; *provided* that such Local Council provides notice of such claim to the Debtors, the Coalition, the TCC and the Future Claimants' Representative prior to the Effective Date.

|  | Date. |
|---|---|
| Reimbursement | The Indemnification by Settlement Trust provisions set forth in Article IV.I of the June 18 Plan shall be deleted and restated to provide that from and after the Effective Date, the Settlement Trust shall reimburse, to the fullest extent permitted by applicable law, Reorganized BSA and each of the Local Councils for any documented out-of-pocket, losses, costs, and expenses (including, without limitation, judgments, attorney's fees and expenses) incurred by Reorganized BSA or any Local Council after the Effective Date attributable to the defense of an Abuse Claim that is channeled to the Settlement Trust if the holder of such Abuse Claim seeks to hold Reorganized BSA or such Local Council liable for such Abuse Claim in violation of the terms of the Confirmation Order; *provided that*, the Settlement Trust's reimbursement obligations to Reorganized BSA and any Local Council for any Direct Abuse Claim shall be capped at and shall not exceed the amount actually payable by the Settlement Trust to the holder of such Direct Abuse Claim under the TDP (*i.e.*, the amount paid based on the Trust payment percentage) and shall be deducted on a dollar-for-dollar basis against such holder's distribution from the Settlement Trust on account of such Direct Abuse Claim. Reorganized BSA and any Local Council shall provide notice to the Settlement Trust within ten (10) business days of the service of any claim or lawsuit filed by a holder of an Abuse Claim that could result in any reimbursement obligations by the Settlement Trust under this provision. In the event that any litigation asserting an Abuse Claim is filed naming Reorganized BSA or any Local Council as a defendant in violation of the terms of the Confirmation Order, the Settlement Trust shall, at the request of Reorganized BSA or such Local Council, promptly appear (1) before the Bankruptcy Court to obtain entry of an order enforcing the channeling injunction and (2) in such litigation and seek the dismissal of the case.<br><br>Other than this limited reimbursement obligation, the Settlement Trust shall not be required to reimburse or indemnify any Protected Parties for any claims, liabilities, losses, actions, suits, proceedings, third-party subpoenas, damages, costs and expenses, including, without limitation, any liabilities related to, arising out of, or in connection with any Abuse Claim. |
| Channeling Injunction | The Channeling Injunction set forth in Article X.F of the June 18 Plan shall be modified to permit litigation in the tort system consistent with the terms of the TDP. After the |

| | |
|---|---|
| | Effective Date, a party shall not become a Protected Party absent the consent of the Settlement Trustee, the Settlement Trust Advisory Committee, and the Future Claimants' Representative. |
| TDP Claim Values | Upon appropriate order of the Bankruptcy Court, the Debtors shall immediately produce to the restructuring professionals for the Coalition, the TCC, and the Future Claimants' Representative all settlement and judgment data in their possession, custody, or control pertaining to Abuse Claims subject to the Protective Order and a determination by the Bankruptcy Court that such production does not violate any confidentiality provision of any settlement agreement.  The values of categories of Direct Abuse Claims shall be consistent with and based on available evidence, including the Debtors' historical settlement data and other settlements involving abuse claims (the "***TDP Claim Values***").  The TDP Claim Values shall be subject to adjustments as set forth in the TDP so that all TDP claim determinations reflect the best available information concerning the value of the Direct Abuse Claims in the tort system and that similar claims are treated similarly.  In connection with the confirmation of the Amended Plan, the Debtors shall seek approval of the TDP Claim Values and related procedures (as set forth in the TDP). |
| Trust Distribution Procedures (TDP) | The TDP shall be filed with the RSA.  The TDP shall be reasonably acceptable to the Debtors and cannot be modified without the consent of the Coalition, the TCC, and the Future Claimants' Representative, which consent shall not be unreasonably withheld. |
| Restructuring Support Agreement | The Parties shall execute the RSA, pursuant to which they shall agree to implement this Term Sheet, subject to the Creditor Termination Events and Scouting Termination Events and the approval of the Definitive Documents. |
| Timing | On or about July 1, 2021, the Debtors shall file with the Bankruptcy Court:  (1) the RSA Motion, (2) an amended version of the Disclosure Statement (the "***Amended Disclosure Statement***"), (3) the Amended Plan, including draft TDP, (4) a revised proposed order granting the Case Management Motion, and (5) any necessary modifications to the Solicitation Procedures.  The Parties shall request that the Bankruptcy Court hear the RSA Motion, the Amended Disclosure Statement, the Case Management Motion, and the Solicitation Procedures at the hearing scheduled for July 20-21, 2021 or as soon thereafter as the Bankruptcy Court may agree. |
| Appeals | The Parties agree that the Amended Plan shall become effective immediately upon satisfaction of the "Conditions |

| | |
|---|---|
| | Precedent to the Effective Date" notwithstanding the filing or pendency of any appeals of Confirmation, *provided* that no court has entered an order staying the occurrence of the Effective Date pending any such appeal of Confirmation. |
| Coalition Professional and Advisory Fees | Following the effective date of the RSA, for so long as the RSA remains in full force and effect and subject to the Monthly Fee Cap (as defined below), the Debtors shall pay the reasonable, documented and contractual professional fees and expenses of (i) Brown Rudnick LLP, (ii) Robbins, Russell, Englert, Orseck & Untereiner LLP, (iii) Monzack, Mersky and Browder, P.A., (iv) Province, and (v) Parsons, Farnell & Grein, LLP (the "*Coalition Professionals*"), on a monthly basis promptly following the Debtors' receipt of a summary of invoices.<br><br>For professional fees and expenses incurred from the effective date of the RSA until the Effective Date of the Amended Plan, the Coalition Professionals' fees and expenses shall be limited to $950,000 per month (pro-rated for any partial month) (the "*Monthly Fee Cap*"), *provided*, *however*, that any unused portion of the Monthly Fee Cap for any such month may be carried forward or carried back to and  utilized in any subsequent or prior monthly period.<br><br>Upon the Effective Date, the Debtors shall reimburse State Court Counsel for amounts they have paid to the Coalition Professionals for, and/or pay the Coalition Professionals for amounts payable by State Court Counsel but not yet paid to Coalition Professionals for, reasonable, documented and contractual professional and advisory fees and expenses incurred by the Coalition Professionals from July 24, 2020 to and including the Effective Date up to an aggregate amount of $10.5 million (the "*Plan Effective Date Cap*"), and amounts otherwise payable in excess thereof shall be payable, if at all, by the Settlement Trust after the Effective Date.  For the avoidance of doubt, fees and expenses paid on monthly basis following the effective date of the RSA shall not count against or reduce the Plan Effective Date Cap. |
| Findings and Orders | The Amended Plan and Confirmation Order shall contain the following provisions, findings and orders, as applicable in substantially the form set forth below (the "*Findings and Orders*"):<br><br>(A)  the Bankruptcy Court has determined that the Amended Plan, the Plan Documents, and the Confirmation Order shall be binding on all parties in interest; |

|  | (B) the Bankruptcy Court has determined that (i) the procedures included in the TDP pertaining to the allowance of Abuse Claims and (ii) the criteria included in the TDP pertaining to the calculation of the Allowed Claim Amounts, including the TDP's Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors, are fair and reasonable based on the evidentiary record offered to the Bankruptcy Court; |
|  | (C) the Bankruptcy Court has determined that the right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party is the allowed value of such Abuse Claim as liquidated in accordance with the TDP and is not (i) the initial or supplemental payment percentages established under the TDP to make distributions to holders of allowed Abuse Claims or (ii) the contributions made by the Debtors or any Protected Party to the Settlement Trust; |
|  | (D) the Bankruptcy Code authorizes the Insurance Assignment as provided in the Amended Plan, notwithstanding any terms of any policies or provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights, and the Bankruptcy Court has determined that the Settlement Trust is a proper defendant for Abuse Claims to assert the liability of the Protected Parties to trigger such insurance rights; and |
|  | (E) the Bankruptcy Court has determined that the Plan and the TDP were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code. |
| Insurance Settlements | Any settlement with any Insurance Company prior to or in connection with the Amended Plan shall be subject to the approval of the Bankruptcy Court and/or the District Court, and the express written consent of the Coalition, the TCC, and the Future Claimants' Representative, subject to the terms of **Schedule 1** hereto.  For the avoidance of doubt, the Coalition, the TCC, and the Future Claimants' Representative do not consent to the Hartford Settlement and the Coalition, the TCC, and the Future Claimants' Representative will not support any plan that includes that settlement and its approval. The Amended Plan shall not incorporate any settlement with Hartford unless such settlement is acceptable to the Debtors, the Coalition, the TCC, and the Future Claimants' Representative.   Post-Effective Date Settlements making |

| | |
|---|---|
| | Insurers Protected Parties may be approved on the terms and conditions set forth in the Settlement Trust Agreement. |
| Turnover of Records / Transfer of Privileges | The Parties shall enter into a Document Agreement that provides, among other things, that on or before the Effective Date, the Debtors and any party that is a beneficiary of the Channeling Injunction shall be required to turn over to the Settlement Trust all records and documents in their possession, custody, or control pertaining to the Abuse Claims, including, without limitation, the Volunteer Screening Database and any documents or information necessary for the Settlement Trust to pursue the insurance rights transferred to the Settlement Trust.  For the avoidance of doubt, this turnover obligation shall include all Privileged Information and Common-Interest Communications with Insurers that relate, in whole or in part, to any Abuse Claim.  As to such records and documents, the Settlement Trust shall succeed to and hold all rights and interests in and related to the Debtors' and the Local Council's privileges, including, without limitation, the attorney-client privilege, any Common-Interest Communications with Insurers, and any Joint Defense, Common Interest, and Confidentiality Agreements.  The Settlement Trustee shall be permitted to use Privileged Information and any Common-Interest Communications with Insurers for any purpose related to the administration of the Settlement Trust and the settlement of Abuse Claims and shall be permitted to share Privileged Information and Common-Interest Communications with Insurers with any professional retained by the Settlement Trust, *provided however*, that Settlement Trustee will not share Privileged Information with the Settlement Trust Advisory Committee or any Abuse Claimant except as required by law, as the Settlement Trustee determines in good faith would be required by law, or as otherwise provided in the Settlement Trust Agreement or the Document Agreement. |
| Confirmation Order, Amended Plan and Plan Documents | The Confirmation Order (or the Approval Order), the Amended Plan, and the Plan Documents shall be in form and substance acceptable to the Parties. |
| Settlement Trustee | The Settlement Trustee shall be Eric D. Green and will be appointed by the Bankruptcy Court. |
| Settlement Trust Advisory Committee | The Settlement Trust Advisory Committee (the "***STAC***") shall be composed of seven (7) individuals, five (5) of which shall be selected by the Coalition and two (2) of which shall be selected by the TCC subject to discussion between and the consent of the Coalition and the TCC.  The STAC members shall be reasonably acceptable to the Debtors.  The commencement or continuation of a STAC Tort Election |

| | |
|---|---|
| | Claim (as defined in Article XII.B of the TDP) and the approval of any global settlement after the Effective Date that causes an Insurance Company or a Chartered Organization to become a Protected Party must be approved by the Settlement Trustee, the Future Claimants' Representative and the majority of the STAC, *provided*, *however*, that the refusal of any of the foregoing to (i) authorize the commencement or continuation of a STAC Tort Election Claim or (ii) approve a global settlement after the Effective Date that causes an Insurance Company or a Chartered Organization to become a Protected Party shall be subject to immediate review under the standard set forth in the Settlement Trust Agreement by the Honorable Diane M. Welsh (Ret.) if three (3) members of the STAC so require. |
| Future Claimants' Representative | The Settlement Trust Agreement shall provide for the continuation of the Future Claimants' Representative to represent the interests of holders of Future Abuse Claims. The initial Future Claimants' Representative shall be James L. Patton, Jr. so long as he is the Future Claimants' Representative in the Chapter 11 Cases as of the Effective Date. |
| Material Modifications to Trust Documents | The Settlement Trust Documents shall provide that the Settlement Trust Documents may not be modified in any material way that is inconsistent with the Amended Plan, the Confirmation Order, or the Bankruptcy Code without the approval of the Bankruptcy Court. Except as set forth in the Settlement Trust Documents, modifications to the Trust Agreement that may materially affect a creditor's distribution may be made only with the approval of the Settlement Trust Advisory Committee and the Future Claimants' Representative, and only to the extent that such modification does not change or inhibit the purpose of the Settlement Trust. The Parties shall negotiate in good faith the terms of the Settlement Trust Documents. |

## <u>Schedule 1</u>

**Treatment of Non-Abuse Litigation Claims**

## Treatment of Non-Abuse Litigation Claims[1]

1. <u>Pre-Emergence Settlements of Individual Non-Abuse Litigation Claims (PI/WD Claims)</u>. The Debtors will use their best efforts to obtain Bankruptcy Court approval of as many settlements of Non-Abuse Litigation Claims as possible.  The Coalition, TCC and Future Claimants' Representative agree not to oppose any reasonable settlement of a Non-Abuse Litigation Claim that is proposed to be paid from a Specified Insurance Policy that is a primary or umbrella policy.  Prior to any settlement or release of a Specified Insurance Policy by the Settlement Trust, any Non-Abuse Litigation Claim may recover for its claim from any available Specified Insurance Policy.

2. <u>Claims Handling Post-Emergence</u>.    Unless otherwise agreed among the Creditors' Committee, the Coalition, TCC, Future Claimants' Representative, and Old Republic or Evanston/Markel, Old Republic or Evanston/Markel, as applicable, will continue to handle, defend and process Non-Abuse Litigation Claims following the Effective Date in accordance with present practices.

3. <u>Insurance Assignment</u>.  Other than as set forth below in the *Local Council Insurance Rights* provisions hereof, the Amended Plan will provide the Settlement Trust with an assignment to the Settlement Trust of all of the Debtors' and other Protected Parties' rights under the Specified Insurance Policies.  Subject to rights reserved to Local Councils under the *Local Council Insurance Rights* provisions hereof, the Settlement Trust shall have the right to settle and resolve these policies.

4. <u>Treatment of Non-Abuse Litigation Claims (Non-PI/WD Claims)</u>.  The treatment for non-personal injury or wrongful death claims, including the claim held by the Girl Scouts of the United States of America, will be unchanged from the June 18 Plan, subject to confirmation by the Coalition, TCC, and Future Claimants' Representative that these claims do not implicate policies that may provide coverage for Direct Abuse Claims.

5. <u>Pre-Emergence Settlements of Specified Insurance Policies</u>.  The Creditors' Committee will retain consent rights with respect to any proposed settlement between the Debtors and its primary insurers Old Republic (Specified Insurance Policies from 2013-19) and Evanston/Markel (Specified Insurance Policies from 2019-20), unless that settlement does not release the applicable insurer for liability arising from Non-Abuse Litigation Claims. With respect to any proposed settlement of a Specified Insurance Policy that is an excess policy (above the Old Republic umbrella layer for the period 2013-19, or above the Evanston/Markel umbrella layer for the period 2019-20), the Creditors' Committee will have consultation rights.  The Debtors, Coalition, TCC, and Future Claimants' Representative agree that if they reach a pre-emergence settlement with respect to such an excess policy they will weigh equally the interests of holders of Direct Abuse Claims and the interests of holders of Non-Abuse Litigation Claims.

---

[1] With the exception of paragraph 4 (*Treatment of Non-Abuse Litigation Claims (Non-PI/WD Claims)*), Non-Abuse Litigation Claims as used herein shall refer solely to Non-Abuse Litigation Claims that are covered by Specified Insurance Policies, and not to any Non-Abuse Litigation Claims that are covered by other Insurance Policies that do not provide coverage for Abuse Claims.

6. <u>Post-Emergence Settlements of Specified Insurance Policies</u>.

    a.  If and when the Settlement Trust settles the Specified Insurance Policies:

        i.  The Settlement Trust shall have consent over any post-emergence settlement of Non-Abuse Litigation Claims, such consent not to be unreasonably withheld.  A condition of payment of a Non-Abuse Litigation Claim by the Settlement Trust shall be a release of the Non-Abuse Litigation Claim against the Debtors, Local Councils, and any other insureds under applicable Specified Insurance Policies.  Each holder of a Non-Abuse Litigation Claim (personal injury and wrongful death) shall remain entitled to recover up to $1 million of its claim under primary Specified Insurance Policies.  Any amounts exceeding $1 million shall be recoverable in the first instance from any available, unsettled umbrella or excess Specified Insurance Policies.  Subject to a review of the details concerning the Non-Abuse Litigation Claims by the Coalition, TCC and the Future Claimants' Representative, to the extent that the holder of a Non-Abuse Litigation Claim cannot recover the full amount of any judgment or settlement of their claim consented to by the Settlement Trust (such consent not to be unreasonably withheld) from any Specified Insurance Policy as a result of the Settlement Trust's release of the Specified Insurance Policy, any unpaid amounts (up to applicable policy limits) shall be submitted to the Settlement Trust, which shall pay such amounts out of the proceeds of Specified Insurance Policies.

       ii.  Settlement Trustee will have a duty to treat Direct Abuse Claims and Non-Abuse Litigation Claims that implicate the Specified Insurance Policies fairly and equally.  In negotiating any settlements involving Specified Insurance Policies, the Settlement Trust will agree to bear in mind the interests of both abuse and non-abuse claimants in structuring any settlement and use best efforts to maximize recoveries for both constituencies.

7. <u>Local Council Insurance Rights</u>.   With respect to any Non-Abuse Litigation Claim that has been asserted against any Local Council, notice of which is provided to the Debtors, the Coalition, the TCC, and the Future Claimants' Representative prior to the Effective Date, the rights of the Local Council to recover for such Non-Abuse Litigation Claim under the Specified Insurance Policies shall be preserved; *provided*, *however*, that if the holder of a Non-Abuse Litigation Claim provides a full and complete written release of any claims that such holder of a Non-Abuse Litigation Claim may have against the Local Council related to the Non-Abuse Litigation Claim, then the Local Council will be deemed to have waived any rights it may have against the Specified Insurance Policy with respect to such Non-Abuse Litigation Claim.

**Exhibit B**

**Trust Distribution Procedures**

# BOY SCOUTS OF AMERICA

## TRUST DISTRIBUTION PROCEDURES FOR ABUSE CLAIMS

## ARTICLE I
## PURPOSE AND GENERAL GUIDELINES

**A.**    **Purpose**.  The purpose of the Settlement Trust is to, among other things, assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to employ procedures to allow valid Abuse Claims against the Debtors and other Protected Parties in accordance with section 502 of the Bankruptcy Code and/or applicable law (each, an "**Allowed Abuse Claim**"), determine an allowed liability amount for each Allowed Abuse claim (the "**Allowed Claim Amount**"), determine payment methodology and direct payment of all Allowed Abuse Claims, and obtain insurance coverage for the Allowed Claim Amount of such Allowed Abuse Claims that are Insured Abuse Claims (as defined below).  These Trust Distribution Procedures (the "**TDP**") are adopted pursuant to the Settlement Trust Agreement and have been approved as reasonable by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  These TDP are designed to provide fair, equitable, and substantially similar treatment for Allowed Abuse Claims.  These TDP provide the means for resolving all Abuse Claims for which the Protected Parties have or are alleged to have legal responsibility as provided in and required by the Plan, the Confirmation Order, and the Settlement Trust Agreement.  The Settlement Trustee shall implement and administer these TDP in consultation with the Claims Administrator, Future Claimants' Representative, and Trust Professionals with the goals of securing the just, speedy, and cost-efficient determination of every Abuse Claim, providing substantially similar treatment to holders of similar, legally valid and supported Allowed Abuse Claims in accordance with the procedures set forth herein, and obtaining and maximizing the benefits of the Settlement Trust Assets.

**B.**    **General Principles**.  To achieve maximum fairness and efficiency, and recoveries for holders of Allowed Abuse Claims, these TDP are founded on the following principles:

     1.    objective Claim eligibility criteria;

     2.    clear and reliable proof requirements;

     3.    administrative transparency;

     4.    a rigorous review and evidentiary process that requires the Settlement Trustee to determine Allowed Claim Amounts in accordance with applicable law;

     5.    prevention and detection of any fraud; and

     6.    independence of the Settlement Trust and Settlement Trustee.

**C.**    **Payment of Allowed Abuse Claims and Insurance Recoveries**.  Pursuant to the terms of the Plan, the Settlement Trust has assumed the Debtors' legal liability for, and obligation to pay, Allowed Abuse Claims.  The Settlement Trust Assets, including the proceeds of the

assigned insurance rights, shall be used to fund distributions to Abuse Claimants under these TDP. The amounts that Abuse Claimants will ultimately be paid on account of their Allowed Abuse Claims will depend on, among other things, the Settlement Trust's ability to liquidate and recover the proceeds of the assigned insurance rights.  The amount of any installment payments, initial payments, or payment percentages established under these TDP or the Settlement Trust Agreement are not the equivalent of (i) any Abuse Claimant's Allowed Claim Amount or (ii) the right to payment that the holder of an Allowed Abuse Claim has against the Debtors and/or Protected Parties, as assumed by the Settlement Trust.

      **D.**    <u>**Sole and Exclusive Method**</u>.  These TDP and any procedures designated in these TDP shall be the sole and exclusive methods by which an Abuse Claimant may seek allowance and distribution on an Abuse Claim with respect to the Protected Parties.

      **E.**    <u>**Interpretation**</u>.  The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these TDP.

      **F.**    <u>**Confidentiality**</u>.  All submissions to the Settlement Trust by an Abuse Claimant shall be treated as confidential and shall be protected by all applicable state and federal privileges, including those directly applicable to settlement discussions.  The Settlement Trust will preserve the confidentiality of such submissions, and shall disclose the contents thereof only to such persons as authorized by the Abuse Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware state court, the United States District Court for the District of Delaware or any other court of competent jurisdiction.  Notwithstanding anything in the foregoing to the contrary, the Settlement Trust may disclose information, documents, or other materials reasonably necessary in the Settlement Trust's judgment to preserve, obtain, litigate, resolve, or settle insurance coverage, or to comply with an applicable obligation under an Insurance Policy, indemnity, or settlement agreement.  Nothing in these TDP shall be construed to authorize the Settlement Trustee to waive privilege or disseminate documents to any Abuse Claimants or their respective counsel, except as provided for in the Document Agreement.

## ARTICLE II
## <u>DEFINITIONS AND RULES OF INTERPRETATION</u>

      **A.**    <u>**Incorporation of Plan Definitions**</u>.  Capitalized terms used but not defined in these TDP have the meanings ascribed to them in the Plan or the Settlement Trust Agreement and such definitions are incorporated in these TDP by reference.  To the extent that a term is defined in these TDP and the Plan and/or the Settlement Trust Agreement, the definition contained in these TDP controls.

      **B.**    <u>**Definitions**</u>.  The following terms have the respective meanings set forth below:

      1.    "**Abuse Claims**" shall mean Direct Abuse Claims, Indirect Abuse Claims, and Future Abuse Claims.

      2.    "**Abuse Claimants**" shall mean the holder of a Direct Abuse Claim, an Indirect Abuse Claim, or a Future Abuse Claim.

3.      "**Base Matrix Value**" shall mean the base case value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.C) to be used to value Abuse Claims and that may be identified in connection with the description of the Scaling Factors in Article VIII.C.

4.      "**Claims Matrix**" shall mean (as specifically defined and described in Article VIII.B) a table scheduling the six tiers of Abuse Types, and identifying the Base Matrix Value, and Maximum Matrix Value for each tier.

5.      "**CPI-U**" shall mean the Consumer Price Index For All Urban Consumers: All Items Less Food & Energy, published by the United States Department of Labor, Bureau of Labor Statistics.

6.      "**Direct Abuse Claimant**" or "**Survivor**" shall mean the holder of a Direct Abuse Claim or a Future Abuse Claim.

7.      "**Indirect Abuse Claimant**" shall mean the holder of an Indirect Abuse Claim.

8.      "**Exigent Health Claim**" shall mean a Direct Abuse Claim for which the Direct Abuse Claimant has provided a declaration under penalty of perjury from a physician who has examined the Direct Abuse Claimant within one hundred and twenty (120) days of the declaration in which the physician states that there is substantial medical doubt that the Direct Abuse Claimant will survive beyond six (6) months from the date of the declaration.

9.      "**FIFO**" shall mean "first-in-first-out" and refers to the impartial basis for establishing a sequence pursuant to which Abuse Claims shall be determined and paid by the Settlement Trust.

10.     "**FIFO Processing Queue**" shall mean the FIFO line-up on which the Settlement Trust reviews Trust Claims Submissions.

11.     "**Maximum Matrix Value**" shall mean the value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.B) that represents the maximum Allowed Claim Amount achievable through the matrix calculation for an Allowed Abuse Claim assigned to a given tier after application of the Scaling Factors described in Article VIII.C.

12.     "**Non-BSA Sourced Assets**" shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Settlement Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand.  For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Companies.

13.     "**Scaling Factors**" shall mean (as specifically defined and described in Article VIII.C) the factors identified to consider with respect to each Abuse Claim and to

3

apply to the Base Matrix Value for the applicable tier of Abuse Type for such Abuse Claim to arrive at its Proposed Allowed Claim Amount.

**C.** **Interpretation; Application of Definitions and Rules of Construction**.  For purposes of these TDP, unless otherwise provided herein:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a person as a holder of a Claim includes that person's successors and assigns; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to these TDP as a whole and not to any particular article, section, subsection, or clause; (4) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (5) any effectuating provisions of these TDP may be reasonably interpreted by the Settlement Trustee in such a manner that is consistent with the overall purpose and intent of these TDP without further notice to or action, order, or approval of the Bankruptcy Court; (6) the headings in these TDP are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; (7) in computing any period of time prescribed or allowed by these TDP, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply; and (8) all provisions requiring the consent of a person shall be deemed to mean that such consent shall not be unreasonably withheld.

## ARTICLE III
## TDP ADMINISTRATION

**A.** **Administration**.  Pursuant to the Plan and the Settlement Trust Agreement, the Settlement Trust and these TDP shall be administered by the Settlement Trustee in consultation with the STAC and the Future Claimants' Representative, which represents the interests of holders of present Abuse Claims in the administration of the Settlement Trust, and the Future Claimants' Representative, who represents the interests of holders of Future Abuse Claims.  The Claims Administrator shall assist the Settlement Trustee in the resolution of Abuse Claims in accordance with these TDP and provide information necessary for the Settlement Trustee to implement these TDP.

**B.** **Powers and Obligations**.  The powers and obligations of the Settlement Trustee, the STAC, the Future Claimants' Representative, and the Claims Administrator are set forth in the Settlement Trust Agreement.  The STAC and the Future Claimants' Representative shall have no authority or ability to modify, reject, or influence any claim allowance or Allowed Claim Amount determination under these TDP.

**C.** **Consent Procedures**.  The Settlement Trustee shall obtain the consent of the STAC and the Future Claimants' Representative on any amendments to these TDP pursuant to Article XIII.B below, and on such matters as are otherwise required below and in Article 1.6 of the Settlement Trust Agreement.  Such consent shall not be unreasonably withheld.

## ARTICLE IV
## CLAIMANT ELIGIBILITY

**A.**     **Direct Abuse Claims**.  To be eligible to potentially receive compensation from the Settlement Trust on account of a Direct Abuse Claim, a Direct Abuse Claimant must:

(1)     have a Direct Abuse Claim;

(2)     have timely submitted an Abuse Claim Proof of Claim or Trust Claim Submission to the Settlement Trust as provided below; and

(3)     submit supporting documentation and evidence to the Settlement Trust as provided below.

Direct Abuse Claims can only be timely submitted as follows:

(i)     a Direct Abuse Claim for which a Proof of Claim was filed in the Chapter 11 Cases before the Bar Date or if determined timely by the Bankruptcy Court (each a "**Chapter 11 POC**") shall, without any further action by the Abuse Claimant, be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust;

(ii)     a Direct Abuse Claim alleging abuse against a Local Council (alleged to be connected to Scouting related to or sponsored by the BSA) (a) for which, as of the time the Claim is submitted to the Settlement Trust in accordance with the Settlement Trustee's designated procedures, a pending state court action had been timely filed under state law naming the Local Council as a defendant or (b) which is submitted to the Settlement Trust at a time when the Claim would be timely under applicable state law if a state court action were filed against the Local Council on the date on which the Direct Abuse Claim is submitted to the Settlement Trust, shall be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust; or

(iii)     a Direct Abuse Claim alleging abuse against any Protected Party other than a Local Council (alleged to be connected to Scouting related to or sponsored by the BSA) (a) for which, as of the time the Claim is submitted to the Settlement Trust in accordance with the Settlement Trustee's designated procedures, a pending state court action had been timely filed under state law naming the Protected Party as a defendant or (b) which is submitted to the Settlement Trust at a time when the Claim and would be (x) timely under applicable state law if a state court action were filed against the Protected Party on the date on which the Direct Abuse Claim is submitted to the Settlement Trust and (y) meets any applicable deadline that may be set by the Bankruptcy Court in connection with such Protected Party becoming a Protected Party in accordance with the Plan and Confirmation Order, shall be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust.

Any Direct Abuse Claim that is not timely submitted based on the foregoing shall be deemed untimely and Disallowed.

**B.** __Indirect Abuse Claims__.[1]    To be eligible to receive compensation from the Settlement Trust, an Indirect Abuse Claimant:

(1)    must have an Indirect Abuse Claim that satisfies the requirements of the Bar Date Order;

(2)    must establish to the satisfaction of the Settlement Trustee that the claim is not of a nature that it would be otherwise subject to disallowance under section 502 of the Bankruptcy Code, including subsection (e) thereof (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under section 502(j) of the Bankruptcy Code), or subordination under section 509(c) of the Bankruptcy Code; and

(3)    must establish to the satisfaction of the Settlement Trustee that:

(a)    such Indirect Abuse Claimant has paid in full the liability and/or obligation of the Settlement Trust to a Direct Abuse Claimant to whom the Settlement Trust would otherwise have had a liability or obligation under these TDP (and which has not been paid by the Settlement Trust);

(b)    the Indirect Abuse Claimant and the person(s) to whose claim(s) the Indirect Abuse Claim relates, have forever and fully released the Settlement Trust and the Protected Parties from all liability for or related to the subject Direct Abuse Claim (other than the Indirect Abuse Claimant's assertion of its Indirect Abuse Claim);

(c)    the Indirect Abuse Claim is not otherwise barred by a statute of limitations or repose or by other applicable law; and

(d)    the Indirect Abuse Claimant does not owe the Debtors, Reorganized Debtors, or the Settlement Trust an obligation to indemnify the liability so satisfied.

In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment.  In addition, no Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability.  Further, in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim.

---

[1]    For the avoidance of doubt, Indirect Abuse Claims may include claims for the payment of defense costs, deductibles, or indemnification obligations.

  **C.** **Future Abuse Claims**.  To be eligible to potentially receive compensation from the Settlement Trust on account of a Future Abuse Claim, a Future Abuse Claimant must:

   (1) have a Direct Abuse Claim that arises from Abuse that occurred prior to the Petition Date;

   (2) as of the date immediately preceding the Petition Date, had not attained eighteen (18) years of age or was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose;

   (3) submit the Future Abuse Claim to the Settlement Trust in accordance with these TDP, (i) at a time when the Claim would be timely under applicable state law if a state court action were filed on the date on which the Future Abuse Claim is submitted to the Settlement Trust, or (ii), if the Future Abuse Claim is not timely under (i) above, it will be eliminated or decreased in accordance with Article VIII.E(iii) below; and

   (4) have not filed a Chapter 11 POC.

Future Abuse Claims that meet the foregoing eligibility criteria shall be treated as Direct Abuse Claims hereunder.

### ARTICLE V
### GENERAL TRUST PROCEDURES

  **A.** **Document Agreement**.  As more fully described in the Document Agreement, the Settlement Trustee may require other parties to the Document Agreement to provide the Settlement Trust with documents, witnesses, or other information as provided therein (the "**Document Obligations**").

  **B.** **Document Access**.  The Settlement Trust shall afford access for Direct Abuse Claimants to relevant, otherwise discoverable non-privileged documents obtained by the Settlement Trust pursuant to the Document Agreement to facilitate their submissions with respect to their Direct Abuse Claims, including access to IV files (the Volunteer Screening Database) and to all Troop Rosters in the possession, custody or control of the Debtors, each Protected Party or the Settlement Trust.  A court of competent jurisdiction shall be able to determine whether allegedly privileged documents should be required to be produced by the Settlement Trust.  The Settlement Trust also may perform any and all obligations necessary to recover assigned proceeds under the assigned insurance rights in connection with the administration of these TDP.

  **C.** **Assignment of Insurance Rights**.  The Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order, and the Settlement Trust has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves) in accordance with the Bankruptcy Code.  Nothing in these TDP shall modify, amend,

or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under an Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of any Non-Settling Insurance Company relating to or arising out of these TDP, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

  **D.** **Deceased Abuse Survivor**. The Settlement Trustee shall consider, and if an Allowed Claim Amount is determined, pay under these TDP, the claim of a deceased Direct Abuse Claimant without regard to the Direct Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

  **E.** **Statute of Limitations or Repose**. The statute of limitations, statute of repose, and the choice of law determination applicable to an Abuse Claim against the Settlement Trust shall be determined by reference to the tort system where such Abuse Claim was pending on the Petition Date (so long as the Protected Party was subject to personal jurisdiction in that location), or where such Abuse Claim could have been timely and properly filed as asserted by the Abuse Claimant under applicable law.

**ARTICLE VI**
**EXPEDITED DISTRIBUTIONS**

  **A.** **Minimum Payment Criteria**. A Direct Abuse Claimant who meets the following criteria may elect to resolve his or her Direct Abuse Claim for an expedited distribution of $3,500 (the "**Expedited Distribution**"): (i) the Direct Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed, non-duplicative Abuse Claim Proof of Claim or Future Abuse Claim; and (ii) the Direct Abuse Claimant has personally signed his or her Proof of Claim or Future Abuse Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such verification. Direct Abuse Claimants that elect to receive the Expedited Distribution will not have to submit any additional information to the Settlement Trust to receive payment of the Expedited Distribution from the Settlement Trust.

  **B.** **Process and Payment of Expedited Distributions**. Direct Abuse Claimants who have properly elected to receive the Expedited Distribution in accordance with the Plan and Confirmation Order (the "**Expedited Distribution Election**") and who met the criteria set forth in Article VI.A above, shall be entitled to receive their Expedited Payment upon executing an appropriate release, which shall include a release of the Settlement Trust, the Protected Parties, and all Chartered Organizations. The form of release agreement that a Direct Abuse Claimant who takes the Expedited Distribution Election must execute is attached as **Exhibit A**. A Direct Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the Plan and Confirmation Order and a Future Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the deadlines and procedures established by the Settlement Trust may not later elect to receive the Expedited Distribution. A Direct Abuse Claimant who elects to receive the Expedited Distribution shall have no other remedies with respect to his or her Direct Abuse Claim against the Settlement Trust, Protected Parties, Chartered Organizations, or any Non-

8

Settling Insurance Company.  Direct Abuse Claimants that elect to receive an Expedited Distribution will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to these TDP.

## ARTICLE VII
## CLAIMS ALLOWANCE PROCESS

**A.**    **Trust Claim Submissions**.    Each Abuse Claimant that does not make the Expedited Distribution Election and instead elects to pursue recovery from the Settlement Trust pursuant to these TDP must submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee pursuant to the requirements set forth herein (each, a "**Trust Claim Submission**").  In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (i) complete under oath a questionnaire to be developed by the Settlement Trustee and submitted to the STAC and the Future Claimants' Representative for approval; (ii) produce all records and documents in his or her possession, custody or control related to the Abuse Claim, including all documents pertaining to all settlements, awards, or contributions already received or that are expected to be received from a Protected Party or other sources; and (iii) execute an agreement to be provided or made available by the Settlement Trust with the questionnaire (1) to produce any further records and documents in his or her possession, custody or control related to the Abuse Claim reasonably requested by the Settlement Trustee, (2) consent to and agree to cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee) (a "**Trustee Interview**"); and (3) consent to and agree to cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee.  The date on which an Abuse Claimant submits (i), (ii) and (iii) above to the Settlement Trust shall be the "**Trust Claim Submission Date**".  The Abuse Claimant's breach or failure to comply with the terms of his or her agreement made in connection with his or her Trust Claim Submission shall be grounds for disallowance or significant reduction of his or her Abuse Claim.  To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a "**Submitted Abuse Claim**"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the Document Obligations and shall consider supplemental information timely provided by the Abuse Claimant, including information obtained pursuant to the Document Obligations.  Non-material changes to the claims questionnaire may be made by the Settlement Trustee with the consent of the STAC and the Future Claimants' Representative.

**B.**    **Claims Evaluation**.    The Settlement Trustee shall evaluate each Trust Claim Submission individually and will follow the uniform procedures and guidelines set forth below to determine, based on the evidence obtained by the Settlement Trust, whether or not a Submitted Abuse Claim should be allowed.  After a review of the documentation provided by the Abuse Claimant in his or her Proof of Claim, Trust Claim Submission, materials received pursuant to the Document Obligations, and any follow-up materials or examinations (including, without limitation, any Trustee Interview), the Settlement Trustee will either find the Abuse Claim to be legally valid and an Allowed Abuse Claim, or legally invalid and a Disallowed Claim.

**C.**    **Settlement Trustee Review Procedures**.  The Settlement Trustee must evaluate each Submitted Abuse Claim, including the underlying Proof of Claim, the Trust Claim

Submission and/or the Trustee Interview or any other follow-up, and documents obtained through the Document Obligations, and determine whether such Claim is a legally valid Allowed Abuse Claim, based on the following criteria:

1.    **Initial Evaluation Criteria**.  The Settlement Trustee shall perform an initial evaluation (the "**Initial Evaluation**") of a Submitted Abuse Claim to determine whether:

(a)    the Abuse Claimant's Proof of Claim or Trust Claim Submission is substantially and substantively completed and signed under penalty of perjury;

(b)    the Direct Abuse Claim was timely submitted to the Settlement Trust under Article IV.A; and

(c)    the Submitted Abuse Claim had not previously been resolved by litigation and/or settlement involving a Protected Party.

If any of these criteria are not met, then the Submitted Abuse Claim shall be a Disallowed Claim.

2.    **General Criteria for Evaluating Submitted Abuse Claims**.  To the extent a Submitted Abuse Claim is not disallowed based on the Initial Evaluation, then the Settlement Trustee will evaluate the following factors to determine if the evidence related to the Submitted Abuse Claim is credible and demonstrates, by a preponderance of the evidence, that the Submitted Abuse Claim is entitled to a recovery and should be allowed (the "**General Criteria**"):

(a)    <u>Alleged Abuse</u>.  The Abuse Claimant has identified alleged acts of Abuse that he or she suffered;

(b)    <u>Alleged Abuser Identification</u>.  The Abuse Claimant has either (i) identified an alleged abuser (*e.g.*, by the full name or last name) or (ii) provided specific information (*e.g*., a physical description of an alleged abuser combined with the name or location of the Abuse Claimant's troop) about the alleged abuser such that the Settlement Trustee can make a reasonable determination that the alleged abuser was an employee, agent or volunteer of a Protected Party, the alleged abuser was a registered Scout, or the alleged abuser participated in Scouting or a Scouting activity and the Abuse was directly related to Scouting activities;

(c)    <u>Connection to Scouting</u>.  The Abuse Claimant has provided information showing (or the Settlement Trustee otherwise determines) that the Abuse Claimant was abused during a Scouting activity or that the Abuse resulted from involvement in Scouting activities;

10

(d)    <u>Date and Age</u>.  The Abuse Claimant has either:  (i) identified the date of the alleged abuse and/or his or her age at the time of the alleged Abuse, or (ii) provided additional facts (*e.g.*, the approximate date and/or age at the time of alleged Abuse coupled with the names of additional scouts or leaders in the troop) sufficient for the Settlement Trustee to determine the date of the alleged Abuse and age of the Abuse Claimant at the time of such alleged Abuse; and

(e)    <u>Location of Abuse</u>.  The Abuse Claimant has identified the venue or location of the alleged Abuse.

**3.**    **<u>Submitted Abuse Claims That Satisfy the General Criteria</u>**.  To the extent that a Submitted Abuse Claim meets the evidentiary standard set forth in the General Criteria and the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are deceptive or fraudulent, the Submitted Abuse Claim will be, and will be deemed to be, an Allowed Abuse Claim.

**4**.    **<u>Submitted Abuse Claims That Do Not Satisfy the General Criteria</u>**.  If the Settlement Trustee determines that any Submitted Abuse Claim materials provided by an Abuse Claimant include fraudulent and/or deceptive information, the Submitted Abuse Claim will be, and will be deemed to be, a Disallowed Claim.  To the extent that a Submitted Abuse Claim – after an opportunity for the Abuse Claimant to discover information from the Settlement Trust as provided in these TDP – does not meet the evidentiary standard set forth in the General Criteria, the Settlement Trustee can disallow such Claim, or request further information from the Abuse Claimant in question necessary to satisfy the General Criteria requirements.  If the Settlement Trustee finds that any of the factors set forth in Article VII.C.2(a)-(c) with respect to any Submitted Abuse Claim are not satisfied, the Claim will be *per se* disallowed and will be, and will be deemed to be, a Disallowed Claim.

**D.**    **<u>Disallowed Claims</u>**.  If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee shall provide written notice of its determination to the relevant Abuse Claimant (a "**Disallowed Claim Notice**").  If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee will not perform the Allowed Abuse Claim valuation analysis described below in Article VIII.  Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Disallowed Claim Notice as described in Article VII.G below.

**E.**    **<u>Allowed Abuse Claims</u>**.  If the Settlement Trustee finds that a Submitted Abuse Claim is an Allowed Abuse Claim, the Settlement Trustee shall utilize the procedures described below in Article VIII to determine the proposed Claims Matrix tier and Scaling Factors for such Abuse Claim (the "**Proposed Allowed Claim Amount**"), and provide written notice of allowance

and the Proposed Allowed Claim Amount to the Abuse Claimant (an "**Allowed Claim Notice**" and together with the Disallowed Claim Notice, a "**Claim Notice**") as set forth in Article VII.F below.

        **F.**      **Claims Determination**.  If the Abuse Claimant accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth below in Article VII.G has been exhausted (and no further action has been taken by the Abuse Claimant in the tort system pursuant to Article XII below), the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Claim (a "**Final Determination**"), and the holder of such Allowed Abuse Claim shall receive payment in accordance with Article IX, subject to the Abuse Claimant executing the form of release set forth in Article IX.D.

        **G.**      **Reconsideration of Settlement Trustee's Determination**.  An Abuse Claimant may make a request for reconsideration of (i) the disallowance of his or her Submitted Abuse Claim, or (ii) the Proposed Allowed Claim Amount (a "**Reconsideration Request**") within thirty (30) days of receiving a Disallowed Claim Notice or an Allowed Claim Notice (the "**Reconsideration Deadline**").  Any Abuse Claimant who fails to submit a Reconsideration Request to the Settlement Trust by the Reconsideration Deadline shall be deemed to accept the disallowance of the Abuse Claim or the Proposed Allowed Claim Amount.  Each Reconsideration Request must be accompanied by a check or money order for $1,000 as an administrative fee for reconsideration.  The Abuse Claimant may submit further evidence in support of the Submitted Abuse Claim with the Reconsideration Request.  The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request.  The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

        If the Reconsideration Request is denied, the administrative fee will not be returned, and the Settlement Trustee will notify the Abuse Claimant within thirty (30) days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in Article XII below.

        If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within thirty (30) days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.  The Settlement Trustee will then reconsider the Submitted Abuse Claim—including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Trustee Interview—and will have the discretion to maintain the prior determination or find that the Submitted Abuse Claim in question is an Allowed Abuse Claim or should receive a new Proposed Allowed Claim Amount.

        If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is an Allowed Abuse Claim and/or should receive a new Proposed Allowed Claim Amount, the Settlement Trustee will deliver an Allowed Claim Notice and return the administrative fee to the relevant Abuse Claimant.  If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is a Disallowed Claim, or that the Claim in question is not deserving of a new Proposed Allowed Claim Amount, the Settlement Trustee's earlier allowance determination and/or Proposed Allowed Claim Amount shall stand and the Settlement Trustee will

provide a Claim Notice to the Abuse Claimant of either result within ninety (90) days of the Settlement Trust having sent notice that it was reconsidering the Abuse Claimant's Submitted Abuse Claim. Thereafter, the Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described below in Article XII.

**H.** **Claim Determination Deferral**. For a period of up to twelve (12) months from the Effective Date, and by an election exercised at the time of the Trust Claim Submission, Direct Abuse Claimants whose Direct Abuse Claims may be substantially reduced by the Scaling Factor described below in Article VIII.E.(iii) (statute of limitations defense) may elect to defer the determination of their Proposed Allowed Claim Amounts to see if statute of limitations revival legislation occurs, *provided*, *however*, that this claim determination deferral window shall close for all Direct Abuse Claims twelve (12) months from the Effective Date at which time such Submitted Abuse Claims shall be determined based on then applicable Scaling Factors.

**I.** **Prevention and Detection of Fraud**. The Settlement Trustee shall work with the Claims Administrator to institute auditing and other procedures to detect and prevent the allowance of Abuse Claims based on fraudulent Trust Claim Submissions. Among other things, such procedures will permit the Settlement Trustee or Claims Auditor to conduct random audits to verify supporting documentation submitted in randomly selected Trust Claim Submissions, as well as targeted audits of individual Trust Claim Submissions or groups of Trust Claim Submissions, any of which may include Trustee Interviews. Trust Claim Submissions must be signed under the pains and penalties of perjury and to the extent of applicable law, the submission of a fraudulent Trust Claim Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in the Federal Courts.

## ARTICLE VIII
## CLAIMS MATRIX AND SCALING FACTORS

**A.** **Claims Matrix and Scaling Factors**. These TDP establish certain criteria for unliquidated claims seeking compensation from the Settlement Trust, a claims matrix below (the "**Claims Matrix**") that schedules six types of Abuse (the "**Abuse Types**") and designates for each Abuse Type a Base Matrix Value, and Maximum Matrix Value, and certain scaling factors (the "**Scaling Factors**") identified below to apply to the Base Matrix Values to determine the liquidated values for certain unliquidated Abuse Claims. The Abuse Types, Scaling Factors, Base Matrix Values, and Maximum Matrix Values that are set forth in the Claims Matrix have all been selected and derived with the intention of achieving a fair and reasonable Abuse Claim valuation range in light of the best available information, considering the settlement, verdict and/or judgments that Abuse Claimants would receive in the tort system against the Protected Parties absent the bankruptcy. The Settlement Trustee shall utilize the Claims Matrix and Scaling Factors as the basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim that does not receive an Expedited Distribution or become a STAC Tort Election Claim. The Proposed Allowed Claim Amount agreed to by the Direct Abuse Claimant as the Allowed Claim Amount for an Allowed Abuse Claim shall be deemed to be the Protected Parties' liability for such Direct Abuse Claim (*i.e.*, the claimant's right to payment for his or her Direct Abuse Claim), irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in Article IX. In no circumstance shall the amount of a

Protected Party's legal obligation to pay any Direct Abuse Claim be determined to be any payment percentages hereunder or under the Settlement Trust Agreement (rather than the liquidated value of such Direct Abuse Claim as determined under the TDP).

**B.** **Claims Matrix**. The Claims Matrix establishes six tiers of Abuse Types, and provides the range of potential Allowed Claim Amounts assignable to an Allowed Abuse Claim in each tier. The first two columns of the Claims Matrix delineate the six possible tiers to which an Allowed Abuse Claim can be assigned based on the nature of the abuse. The Base Matrix value column for each tier represents the default Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier, in each case based on historical abuse settlements and litigation outcomes which included release for all BSA-related parties, including the BSA and all other putative Protected Parties to such actions, prior to application of the Scaling Factors described in Article VIII.D (the "**Base Matrix Value**"). The maximum Claims Matrix value column for each tier represents the maximum Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier after Claims Matrix review and application of the Scaling Factors described in Article VIII.C (the "**Maximum Matrix Value**"). The ultimate distribution(s) to the holder of an Allowed Abuse Claim that has received a Final Determination may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the holder's Allowed Claim Amount based on the payment percentages determined by the Settlement Trustee. If an Allowed Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier. An Abuse Claimant cannot have multiple Allowed Abuse Claims assigned to different tiers. Commencing on the second anniversary of the Effective Date, the Settlement Trust shall adjust the valuation amounts for yearly inflation based on the CPI-U. The CPI-U adjustment may not exceed 3% annually, and the first adjustment shall not be cumulative.

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|------|---------------|-------------------|----------------------|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $600,000 | $2,700,000 |
| 2 | Oral Contact by Adult Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina.

Anal or Vaginal Penetration by a Youth Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $450,000 | $2,025,000 |

14

| 3 | Masturbation by Adult Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant.

Oral Contact by a Youth Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. | $300,000 | $1,350,000 |
| 4 | Masturbation by Youth Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant.

Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator. | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator.

Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation.

Exploitation for child pornography. | $75,000 | $337,500 |
| 6 | Sexual Abuse-No Touching.

Adult Abuse Claims. | $3,500 | $8,500 |

**C.**     **Scaling Factors**.  After the Settlement Trustee has assigned an Allowed Abuse Claim to one of the six tiers in the Claims Matrix, the Settlement Trustee will utilize the Scaling Factors described below to determine the Proposed Allowed Claim Amount for each Allowed Abuse Claim.  The Scaling Factors are based on evidence regarding the BSA's and other putative Protected Parties' historical abuse settlements, litigation outcomes, and other evidence supporting the Scaling Factors.  Each Allowed Abuse Claim will be evaluated for each factor by the Settlement Trustee through his or her review of the evidence obtained through the relevant Proof of Claim, Trust Claim Submission and any related or follow-up materials, interviews or examinations, as well as materials obtained by the Settlement Trust through the Document Obligations. These scaling factors can increase or decrease the Proposed Allowed Claim Amount for an Allowed Abuse Claim depending on the severity of the facts underlying the Claim.  By default, the value of each scaling factor is one (1), meaning that in the absence of the application of the scaling factor, the Base Matrix Value assigned to a Claim is not affected by that factor.  In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Allowed Abuse Claim is 1.5, the Proposed Allowed Claim Amount for the Allowed Abuse Claim will be increased by 50%, the result of multiplying the Base Matrix Value of the Allowed Abuse Claim by 1.5.  The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base Matrix Value of the Allowed Abuse Claim. *See* Article VIII.F for illustrative example.

**D.** **Aggravating Scaling Factors**. The Settlement Trustee may assign upward Scaling Factors to each Allowed Abuse Claim based on the following categories:

(i) **Nature of Abuse and Circumstances**. To account for particularly severe Abuse or aggravating circumstances, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5 to each Allowed Abuse Claim. The hypothetical base case scenario for this scaling factor would involve a single incident of Abuse with a single perpetrator with such perpetrator having accessed the victim as an employee or volunteer within BSA-sponsored scouting. The hypothetical base case is incorporated into the Base Matrix Value in the Claims Matrix' tiers and would not receive an increase on account of this factor. By way of example, aggravating factors that can give rise to a higher scaling factor include the following factors:

a. Extended duration and/or frequency of the Abuse;

b. Exploitation of the Abuse Claimant for child pornography;

c. Coercion or threat or use of force or violence, stalking; and

d. Multiple perpetrators involved in sexual misconduct.

(ii) **Abuser Profile**. To account for the alleged abuser's profile, the Settlement Trustee may assign an upward Scaling Factor of up to 2.0 to an Allowed Abuse Claim. This factor is to be evaluated relative to a hypothetical base case scenario involving a perpetrator as to whom there is no other known allegations of Abuse. The hypothetical base case is incorporated into the Base Matrix Value in the Claims Matrix' tiers and would not receive an increase on account of this factor. An upward Scaling Factor may be applied for this category as follows (the Settlement Trustee may only apply the scaling factor of the single highest applicable category listed below):

a. 1.25 if the abuser was accused by at least one (1) other alleged victim of Abuse;

b. 1.5 if the abuser was accused by five (5) or more other alleged victims of Abuse;

c. 2.0 if the abuser was accused by ten (10) or more other alleged victims of Abuse; and

d. 1.25 to 2.0 if there is evidence of negligence of a Protected Party (*e.g.*, the inclusion of the perpetrator in the IV files (Volunteer Screening Database) for abuse reasons).

(iii) **Impact of the Abuse**. To account for the impact of the alleged Abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged Abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee

may assign an upward Scaling Factor of up to 1.5.  This factor is to be evaluated relative to a hypothetical base case scenario of a victim of Abuse who suffered the typical level of Abuse-related distress within the tier to which the Allowed Abuse Claim was assigned.   The hypothetical base case is incorporated into the Base Matrix Values in the Claims Matrix' tiers and would not receive an increase on account of this factor.  The Settlement Trustee will consider, along with any and all other relevant factors, whether the Abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

a.  <u>Mental Health Issues</u>:  This includes anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation, suicide attempts, and hospitalization or receipt of treatment for any of the foregoing.

b.  <u>Physical Health Issues</u>:  This includes physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of Abuse, reproductive damage, self-cutting, other self-injurious behavior, and hospitalization or receipt of treatment for any of the foregoing.

c.  <u>Interpersonal Relationships</u>:  This includes problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation, damage to family relationships, and fear of children or parenting.

d.  <u>Vocational Capacity</u>:  This includes under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feelings of unworthiness, or guilt related to financial success.

e.  <u>Academic Capacity</u>:  This includes school behavior problems.

f.  <u>Legal Difficulties</u>:  This includes criminal difficulties, bankruptcy, and fraud.

**E.**    **Mitigating Scaling Factors**.  The Settlement Trustee may assign a mitigating Scaling Factor in the range of 0 to 1.0 except as specifically provided below to each Allowed Abuse Claim to eliminate or decrease the Proposed Allowed Claim Amount for such Claim.  Each mitigating factor is to be evaluated relative to a hypothetical base case scenario of a timely asserted Abuse Claim with supporting evidence that demonstrates, by a preponderance of the evidence, Abuse by a perpetrator that accessed the victim as an employee, agent or volunteer of a Protected

Party, as a registered Scout or as a participant in Scouting within BSA-sponsored Scouting. If statute of limitations revival legislation occurs in a particular jurisdiction, the Settlement Trustee may modify the applicable Scaling Factor (as described below) relevant thereto on a go-forward basis and determine Proposed Allowed Claim Amounts for Abuse Claims in such jurisdiction thereafter based on such modified Scaling Factor. Included in the hypothetical base case scenario is that the applicable period under a statute of limitations or repose for timely asserting such Abuse Claim against any potentially responsible party will not have passed. The hypothetical base case is incorporated into the Base Matrix Values in the Claims Matrix tiers and would not receive a decrease on account of these factors. Such factors may include the following:

<ol type="i">
<li><strong>Absence of Protected Party Relationship or Presence of a Responsible Party that Is Not a Protected Party</strong>.

<ol type="a">
<li><u>Familial Relationship</u>. A Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated where the perpetrator also had a familial relationship with the Abuse Claimant. Familial Abuse—even if the perpetrator was an employee, agent or volunteer of a Protected Party, and the Abuse occurred in connection with BSA-related Scouting—should result in a significant reduction of the Proposed Allowed Claim Amount.</li>

<li><u>Other Non-Scouting Relationship</u>. A Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated where the perpetrator also maintained a non-familial relationship with the Abuse Claimant through a separate affiliation, such as a school, or a religious organization, even if the perpetrator was an employee, agent or volunteer of a Protected Party, or the Abuse occurred in settings where a Protected Party did not have the ability or responsibility to exercise control. Factors to consider include how close the relationship was between the perpetrator and the victim outside of their Scouting-related relationship, whether Abuse occurred and the extent of such Abuse outside of their Scouting relationship, and applicable law related to apportionment of liability. In such event, the Settlement Trustee shall determine and apply a mitigating Scaling Factor that accounts for such other relationship and the related Abuse. By way of example, if the Settlement Trustee determines after evaluation of an Allowed Abuse Claim and application of all of the other Scaling Factors that the perpetrator, who was an employee, agent or volunteer of a Protected Party for BSA-related Scouting, also was the primary teacher (at a non-Protected Party entity or institution) of the Abuse Claimant outside of BSA-related Scouting, and if numerous incidents of Abuse occurred outside of Scouting before one incident of BSA-related Scouting Abuse occurred, the Settlement Trustee shall apply a mitigating Scaling Factor as a material reduction of the Proposed Allowed Claim Amount.</li>

<li><u>Other Responsible Non-Protected Party</u>. The Abuse Claimant may have a cause of action under applicable law for a portion of his or her Direct Abuse Claim against a responsible entity, such as a Chartered Organization, that is</li>
</ol>
</li>
</ol>

not a Protected Party.  By way of example, if the Settlement Trustee determines after evaluation of a Submitted Abuse Claim that (i) a Chartered Organization that is not a Protected Party is responsible under applicable law for a portion of the liability and (ii) a Protected Party(ies) are not also liable for the same portion of the liability) (taking into account the relevant jurisdiction's prevailing law on apportionment of damages), the Settlement Trustee shall apply a final Scaling Factor to account for such non-Protected Party's portion of the liability.

(ii)    **Other Settlements, Awards, Contributions, or Limitations**.  The Settlement Trustee may consider any further limitations on the Abuse Claimant's recovery in the tort system.  The Settlement Trustee also should consider the amounts of any settlements or awards already received by the Abuse Claimant from other, non-Protected Party sources as well as agreed and reasonably likely to be received contributions from other, non-Protected Party sources that are related to the Abuse. By way of example, the Settlement Trustee should assign an appropriate Scaling Factor to Allowed Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the Abuse occurred.  Notwithstanding the foregoing, where an Abuse Claimant has obtained a recovery based on the independent liability of a third party for separate instances of Abuse that occurred without connection to Scouting activities, no mitigating factor or reduction in value will be applied based on that recovery.

(iii)   **Statute of Limitations or Repose**.  If the evidence provided by the Abuse Claimant or otherwise obtained by the Settlement Trustee results in the Settlement Trustee concluding that the subject Direct Abuse Claim could be dismissed or denied in the tort system as to all Protected Parties against whom the Direct Abuse Claim was timely submitted (as set forth in Articles IV.A) due to the passage of a statute of limitations or a statute of repose, the Settlement Trustee shall apply an appropriate Scaling Factor based on the ranges set forth in Schedule 1 hereof; *provided, however,* the Settlement Trustee will weigh the strength of any relevant evidence submitted by the Abuse Claimant to determine whether the statute of limitations could be tolled under applicable law, and may apply a higher Scaling Factor if such evidence demonstrates to the Settlement Trustee that tolling would be appropriate under applicable state law.

(iv)    **Absence of a Putative Defendant.**  If the Direct Abuse Claim could be diminished because such claim was not timely submitted against BSA or another Protected Party (as set forth in Articles IV.A) (a "**Missing Party**"), such that in a suit in the tort system, such Direct Abuse Claim would be burdened by an "empty chair" defense due to the absence of a Missing Party(ies), the Settlement Trustee shall apply a mitigating Scaling Factor to account for a Missing Party's absence.  By way of example, where a timely submitted Direct Abuse Claim was not timely submitted against BSA (*i.e.*, the Abuse Claimant failed to timely file a Chapter 11 POC) but was only timely submitted against the Local Council and/or another Protected Party (as set forth in Articles IV.A(ii) and (iii)), such absence of the BSA due to BSA's discharge would be the basis for such a substantial reduction.  Any Direct Abuse

Claim that is reduced due to the absence of the BSA under this mitigating Scaling Factor shall only be payable, as reduced, from Settlement Trust Assets contributed by the applicable Local Council or Chartered Organization, pro rata with all other Direct Abuse entitled to share in the Settlement Trust Assets contributed by such Local Council or Chartered Organization.

**F.** **Allowed Abuse Claim Calculus**.  After the Settlement Trustee assigns an Allowed Abuse Claim to a Claims Matrix tier and determines the appropriate Scaling Factors that apply to the Claim, the Proposed Allowed Claim Amount for the Allowed Abuse Claim is the product of the Base Matrix Value of the Claim and the Scaling Factors applied to the Claim.  In no event can an Allowed Abuse Claim's Proposed Allowed Claim Amount (or Allowed Claim Amount) exceed the Maximum Matrix Value for the Claim's assigned Claims Matrix tier.  By way of example, if an Allowed Abuse Claim is determined by the Settlement Trustee to be a tier 1 claim (Base Matrix Value of $600,000) with a Scaling Factor of 1.5 for the nature and circumstances of the abuse, and a mitigating Scaling Factor of 0.75, and no other Scaling Factors, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $675,000, calculated as $600,000 x 1.5 x 0.75 = $675,000.  As a further example, if, in addition to the above Scaling Factors, the same Allowed Abuse Claim had an additional aggravating Scaling Factor of 2.0 on account of the abuser's profile, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $1,350,000 (calculated as $600,000 x 1.5 x .75 x 2.0).

**G.** **Optional Chartered Organization Release**.  To have the opportunity to exclusively share in any settlement proceeds received from a Chartered Organization that becomes a Protected Party as provided below in Article IX.F, a Direct Abuse Claimant must execute either (i) the conditional release of the Charitable Organization(s) against whom the Abuse Claimant  has an Abuse Claim, that will become effective as to that Abuse Claimant if the Charitable Organization(s) against whom the Abuse Claimant conditionally released becomes a Protected Party(ies), in the form attached as **Exhibit B** (the "**Settling Chartered Organizations Release**"), or (ii) the non-conditional release of all Chartered Organizations in the form attached as **Exhibit C** (the "**Voluntary Chartered Organization Release**").

### ARTICLE IX
### PAYMENT OF FINAL DETERMINATION ALLOWED ABUSE CLAIM

**A.** **Payment Upon Final Determination**.  Only after the Settlement Trustee has established an Initial Payment Percentage in accordance with Section 4.1 of the Settlement Trust Agreement, then once there is a Final Determination of an Abuse Claim pursuant to Article VII.F, the Claimant will receive a payment of such Final Determination based on the Payment Percentage then in effect as described in Article IX.B and IX.C.  For the purpose of payment by the Settlement Trust, a Final Judicial Determination (as defined in Article XII.H hereof) shall constitute a Final Determination.

**B.** **Initial Payment Percentage**.  After the Claimant accepts the Proposed Allowed Claim Amount and there is a Final Determination of the Abuse Claim, the Settlement Trust shall pay an initial distribution ("**Initial Distribution**") based on the Initial Payment Percentage established by the Settlement Trustee in accordance with the Settlement Trust Agreement.

**C.      Supplemental Payment Percentage**.  When the Settlement Trustee determines that the then-current estimates of the Settlement Trust's assets and its liabilities, as well as then-estimated value of then-pending Abuse Claims, warrant additional distributions on account of the Final Determinations, the Settlement Trustee shall set a Supplemental Payment Percentage in accordance with the Settlement Trust Agreement.  Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage.  Claimants whose Abuse Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the then existing payment percentage.  For the avoidance of doubt, the Allowed Claim Amount of each Allowed Abuse Claim after Final Determination shall be deemed to be the Protected Parties' liability for such Allowed Abuse Claim irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in this Article IX.  For example if the Allowed Claim Amount for an Allowed Abuse Claim that has received a Final Determination is $1,350,000, even if the Settlement Trust distributes less than $1,350,000 to the Abuse Claimant on account of such Allowed Abuse Claim based on application of the Initial Payment Percentage and any Subsequent Payment Percentage(s), the Allowed Claim Amount for the Abuse Claim is still $1,350,000.

**D.      Release**.  In order for an Allowed Abuse Claim to receive a Final Determination and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit an executed form of release to be developed, in each case, by the Coalition, the TCC, and the Future Claimants' Representative, in consultation with BSA.  The form of release agreement that a Direct Abuse Claimant who takes the Expedited Distribution Election must execute is attached as **Exhibit A** hereto.  The form of the Settling Chartered Organization Release applicable to an Abuse Claimant who has elected to provide a conditional release to certain Chartered Organizations shall be substantially in the form of **Exhibit B** hereto.  The form of the Voluntary Chartered Organization Release applicable to an Abuse Claimant who has selected a Final Determination based on the Proposed Allowed Claim Amount shall be substantially in the form of **Exhibit C** hereto.  The form of the release applicable to an Abuse Claimant who has selected a Final Determination based on the Proposed Allowed Claim Amount but who does not elect to execute the Voluntary Chartered Organization Release shall be substantially in the form of **Exhibit D** hereto.

**E.      FIFO Claims Process Queuing and Exigent Health Claims**.  The Settlement Trust shall review all Trust Claim Submissions for processing purposes on a FIFO basis as set forth below, except as otherwise provided herein with respect to Expedited Distributions, Exigent Health Claims, or Submitted Abuse Claims electing to defer determination of their Allowed Claim Amounts for up to twelve (12) months from the Effective Date pursuant to Article VII.H above.  An Abuse Claimant's position in the FIFO Processing Queue shall be determined as of the Abuse Claimant's Trust Claim Submission Date.  If any Trust Claim Submissions are filed on the same date, an Abuse Claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the claimant's date of birth, with older Abuse Claimants given priority over younger Abuse Claimants.  An Abuse Claimant that seeks recovery on account of an Exigent Health Claim based on an Allowed Abuse Claim Amount determined through the matrix shall be moved in front of the FIFO Processing Queue no matter what the order of processing otherwise would have been under these TDP.  Following receipt of a Final Determination on account of an Exigent Health Claim, the holder of an Exigent Health Claim shall receive an Initial

Distribution from the Settlement Trust (subject to the payment percentages then in effect), within thirty (30) days of executing the release as set forth in Article IX.D above.

F.     **Source Affected Weighting**.  Notwithstanding the Initial Payment Percentage and the Supplemental Payment Percentages applied hereunder, a portion of Non-BSA Sourced Assets shall be allocated (after deducting an estimated pro rata share of Settlement Trust expenses and direct expenses related to the collection of Non-BSA Sourced Assets) only among the Allowed Abuse Claims that (1) could have been satisfied from that source absent the Plan's Discharge and Channeling Injunction and (2) are held by Direct Abuse Claimants that execute a conditional release, the form of which is attached as **Exhibit B**, releasing all claims against all Chartered Organizations if the Settlement Trust enters into a global settlement making such Chartered Organization a Protected Party.  The Settlement Trustee shall establish separate payment percentages in accordance with the Settlement Trust Agreement to effectuate the distribution of the indicated portion of any Non-BSA Sourced Assets.  For the avoidance of doubt, irrespective of the establishment of any increased payment percentage under this Article IX.F and the Settlement Trust Agreement that allocates Non-BSA Sourced Assets to holders of certain eligible Allowed Abuse Claims, the maximum payment that an Abuse Claimant can recover from the Settlement Trust before all other Allowed Abuse Claims are paid in full is the Final Determination Allowed Abuse Claim Amount for his or her Claim.

## ARTICLE X
## RIGHTS OF SETTLEMENT TRUST
## AGAINST NON-SETTLING INSURANCE COMPANIES

Pursuant to the Plan, the Settlement Trust has taken an assignment of BSA's and any other Protected Party's (to the extent provided for in the Plan) rights and obligations under the Insurance Policies.  For any Abuse Claim that the Settlement Trustee determines is an Allowed Abuse Claim pursuant to Article VII above, the Settlement Trustee will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and in the materials obtained through the Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim (an "**Insured Abuse Claim**"). The Settlement Trustee may determine that multiple Non-Settling Insurance Companies have responsibility for an Insured Abuse Claim.  The Settlement Trustee shall seek reimbursement for each Insured Abuse Claim that is an Insured Abuse Claim, including the Proposed Allowed Claim Amount, from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law.  The Settlement Trustee shall have the ability to exercise all of the rights and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan, including the right to resolve any disputes with a Non-Settling Insurance Company regarding their obligation to pay some or all of an Insured Abuse Claim.  The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust. The Settlement Trustee will have the ability to request further information from Abuse Claimants in connection with seeking reimbursement for Insured Abuse Claims.

## ARTICLE XI
## INDIRECT ABUSE CLAIMS

**A.** **Indirect Abuse Claims**.  To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Abuse Claim must satisfy Article IV.B hereof.  Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with Article IX hereof, *provided*, *however*, that any Indirect Abuse Claim shall be subordinate and junior in right to the prior payment in full of all Allowed Abuse Claims that are Direct Abuse Claims as liquidated under these TDP.

**B.** **Offset**.  The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any related Direct Abuse Claim that might be subsequently asserted against the Settlement Trust as being against any Protected Party(ies) whose liability was paid by the Indirect Abuse Claimant.

## ARTICLE XII
## TORT SYSTEM ALTERNATIVE

**A.** **Remedies after Disallowance or Exhaustion of Claims Allowance Procedures**.  Within thirty (30) days after a Direct Abuse Claimant receives an Allowed Claim Notice or Claim Notice following a Reconsideration Request in accordance with Article VII.G (the "**Tort Election Deadline**"), an Abuse Claimant may notify the Settlement Trust of his or her intention to seek a *de novo* determination of its Direct Abuse Claim by a court of competent jurisdiction (a "**TDP Tort Election Claim**"), subject to the limitations set forth in this Article XII.  Such notification shall be made by submitting a written notice to the Settlement Trustee (a "**Judicial Election Notice**") by the Tort Election Deadline.  Unless the Settlement Trustee agrees to extend the Tort Election Deadline, Abuse Claimants who fail to so submit and/or file a Judicial Election Notice by the Tort Election Deadline shall be deemed to accept the disallowance of their Abuse Claims or the Proposed Abuse Claim Amounts (as applicable) and shall have no right to seek any further review of their Abuse Claims.  An Abuse Claimant that asserts a TDP Tort Election Claim may not seek costs or expenses against the Settlement Trust in the lawsuit filed and the Settlement Trust may not seek costs or expenses against the Abuse Claimant.  Any recoveries for a TDP Tort Election Claim from outside the Settlement Trust in respect of a Protected Party's liability are payable to the Settlement Trust and the Abuse Claimant shall be paid in accordance with Articles XII.G and IX hereof.

**B.** **Supporting Evidence for TDP Tort Election Claims**.  TDP Tort Election Claims in the federal courts shall be governed by the rights and obligations imposed upon parties to a contested matter under the Federal Rules of Bankruptcy Procedure, *provided*, *however*, that an Abuse Claimant that prosecutes in any court a TDP Tort Election Claim after seeking reconsideration from the Settlement Trust shall not have the right to introduce into evidence to the applicable court any information or documents that (i) were requested by the Settlement Trustee and (ii) were in the possession, custody or control of the Abuse Claimant at the time of a request by the Settlement Trust, but which the Abuse Claimant failed to or refused to provide to the Settlement Trust in connection with the claims evaluation process in these TDP.  The Abuse Claimant's responses to requests by the Settlement Trustee for documents or information shall be subject to Rule 37 of the Federal Rules of Civil Procedure, as applicable under the Federal Rules

of Bankruptcy Procedure, and/or any comparable State Rule of Civil Procedure. An Abuse Claimant shall not have the right to disclose any Proposed Abuse Claim Amount received from the Settlement Trust to any court in connection with a Tort Election Claim. Subject to the terms of any protective order entered by a court, the Settlement Trustee shall be permitted to introduce as evidence before a court all information and documents submitted to the Settlement Trust under these TDP, and the Abuse Claimant may introduce any and all information and documents that he or she submitted to the Settlement Trust under these TDP.

**C.      Authorization of Settlement Trustee and Settlement Trust Advisory Committee**. The Settlement Trustee may authorize the commencement or continuation of a lawsuit by a Direct Abuse Claimant in any court of competent jurisdiction against the Settlement Trust to obtain the Allowed Claim Amount of a Direct Abuse Claim (a "**STAC Tort Election Claim**" and together with a TDP Tort Election Claim, "**Tort Election Claims**"). STAC Tort Election Claims shall not be required to exhaust any remedies under these TDP before commencing or continuing such lawsuit. No Abuse Claimant may pursue a STAC Tort Election Claim without the prior written approval of the Settlement Trustee in accordance with the Settlement Trust Agreement. Fifty percent (50%) (or less if determined by the Settlement Trustee) of any amounts paid with respect to a judgment for, or a settlement of, a STAC Tort Election Claim by a Non-Settling Insurance Company, as to a policy as to which a Protected Party has assigned relevant insurance rights to the Settlement Trust, shall be paid over to the Settlement Trust.

**D.      Tender to Non-Settling Insurance Company**. If an Abuse Claimant is authorized to file suit against the Settlement Trust as provided in Article XII.A and XII.C herein, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission and materials received in connection with the Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to the lawsuit (an "**Insured Lawsuit**"). The Settlement Trustee may determine that there are multiple Non-Settling Insurance Companies that have responsibility to defend an Insured Lawsuit. The Settlement Trustee shall provide notice, and if applicable, seek defense, of any Insured Lawsuit to each Non-Settling Insurance Company from whom the Settlement Trustee determines insurance coverage may be available in accordance with the terms of each applicable Insurance Policy.

**E.      Parties to Lawsuit**. Any lawsuit commenced under Article XII of these TDP must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. The Abuse Claimant may assert its Abuse Claim against the Settlement Trust as if the Abuse Claimant were asserting such claim against either the Debtors or another Protected Party and the discharge and injunctions in the Plan had not been issued. The Abuse Claimant may name any person or entity that is not a Protected Party, including Non-Settling Insurance Companies to the extent permitted by applicable law. Abuse Claimants may pursue in any manner or take any action otherwise permitted by law against persons or entities that are not Protected Parties so long as they are not an additional insured or an Insurance Company as to an Insurance Policy issues to the BSA.

**F.      Defenses**. All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors or Protected Parties, except as otherwise provided in

the Plan) shall be available to both sides (which may include any Non-Settling Insurance Company) at trial.

G.     **Settlement Trust Liability for Tort Election Claims**.  An Abuse Claimant who pursues a Tort Election Claim shall have an Allowed Claim Amount equal to zero if the litigation is dismissed or claim denied.  If the matter is litigated, the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system less any payments actually received and retained by the Abuse Claimant, *provided that*, exclusive of amounts payable pursuant to Article XII.C (in the event such amounts exceed the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix), any amount of such Allowed Claim Amount for a Tort Election Claim in excess of the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all Direct Abuse Claims that are Allowed Abuse Claims as liquidated under these TDP (excluding this Article XII).  By way of example, presume (1) there is an Abuse Claimant asserting tier one abuse that achieves a $5 million verdict for his or her STAC Tort Election Claim against the Settlement Trust, and (2) a Non-Settling Insurance Company pays $750,000 in coverage under a policy providing primary coverage, $375,000 of which is paid directly to the Abuse Claimant and $375,000 of which is paid over to the Settlement Trust pursuant to Article XII.C.  Although the unpaid amount of such Allowed Abuse Claim would be $4,625,000, the maximum total payment that the Abuse Claimant can recover from the Settlement Trust (before the non-subordinated portion of all other Direct Abuse Claims that are Allowed Abuse Claims are paid in full) is $2,700,000 (the Maximum Matrix Value in tier one), or an additional $2,325,000, paid pursuant to the terms of Article IX hereof.  For the avoidance of doubt, the limit on the Settlement Trust liability under this Article XII.G shall not apply or inure to the benefit of any Non-Settling Insurance Company, and the Settlement Trust shall be able to obtain coverage, subject to Article X hereof, for the full Allowed Claim Amount obtained by the Abuse Claimant through a Tort Election Claim.

H.     **Settlement or Final Judgment**.  If the Settlement Trust reaches a global settlement making a Protected Party of a Non-Settling Insurance Company or other person or entity involved in a Tort Election Claim or obtains a final judgment in a suit against such person or entity terminating liability for such person or entity to the Abuse Claimant, the Abuse Claimant shall be entitled to proceed with the Tort Election Claim for any reason (*e.g.*, if there are persons or entities that are not Protected Parties to collect from).  Alternatively, the Abuse Claimant can elect to terminate the Tort Election Claim without prejudice and have its Abuse Claim determined through these TDP (*i.e.*, as if no STAC Tort Election Claim had been made), in which event the Abuse Claimant may submit relevant evidence from the Tort Election Claim that the Settlement Trustee shall take into account in evaluating the Abuse Claim under these TDP.  Such Abuse Claimant may be provided other alternatives by the Settlement Trust if it had been pursuing a STAC Tort Election Claim.

I.     **Payment of Judgments by the Settlement Trust**.  Subject to Article XII.G hereof, if and when an Abuse Claimant obtains a final judgment or settlement against the Settlement Trust in the tort system (a "**Final Judicial Determination**"), such judgment or settlement amount shall be treated for purposes of distribution under these TDP as the Abuse Claimant's Final Determination, and such Allowed Claim Amount shall also constitute the applicable Protected Parties' liability for such Abuse Claim.  Within thirty (30) days of executing the release as set forth

in Article IX.D above, the Abuse Claimant shall receive an Initial Distribution from the Settlement Trust (assuming an Initial Payment Percentage has been established by the Settlement Trust at that time). Thereafter, the Abuse Claimant shall receive any subsequent distributions based on any applicable Payment Percentage as determined by the Settlement Trust.

      **J.**    **Litigation Results and Other Abuse Claims**. To the extent that a Final Judicial Determination of an Abuse Claim or changes in applicable law implicate the appropriateness of the Scaling Factors or General Criteria, the Settlement Trustee, subject to the terms of these TDP and the Settlement Trust Agreement and the approval of the Bankruptcy Court or District Court, after appropriate notice and opportunity to object, may appropriately modify the Scaling Factors or General Criteria on a go-forward basis for use in evaluation of Future Abuse Claims and other Abuse Claims as to which no Allowed Claim Amount Final Determination had previously been made.

      **K.**    **Tolling of Limitations Period**. The running of the relevant statute of limitation shall be tolled as to each Abuse Claimant's Abuse Claim against each Protected Party from the earliest of (A) the actual filing of the claim against the Protected Party prior to the Petition Date, whether in the tort system or by submission of the claim to the Protected Party pursuant to an administrative settlement agreement; (B) the tolling of the claim against a Debtor prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (C) the Petition Date, and shall continue until one (1) year following release of the Abuse Claim into the tort system hereunder.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

      **A.**    **Non-Binding Effect of Settlement Trust and/or Litigation Outcome**. Notwithstanding any other provision of these TDP, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.

      **B.**    **Amendments**. Except as otherwise provided herein, the Settlement Trustee may not amend, modify, delete, or add to any provisions of these TDP without the written consent of the STAC and the Future Claimants' Representative, as provided in the Settlement Trust Agreement, including amendments to modify the system for Tort Election Claims. Nothing herein is intended to preclude the STAC and/or the Future Claimants' Representative from proposing to the Settlement Trustee, in writing, amendments to these TDP. Notwithstanding the foregoing, absent Bankruptcy Court or District Court approval after appropriate notice and opportunity to object, neither the Settlement Trustee nor the STAC or Future Claimants' Representative may amend these TDP in a material manner, including (i) to provide for materially different treatment for Abuse Claims, (ii) to materially change the system for Tort Election Claimants, or (iii) in a manner that is otherwise inconsistent with the Confirmation Order or Plan. Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC or the Future Claimants' Representative may amend any of the forms of release set forth in Article IX.D without the consent of Reorganized BSA, or remove the requirement of a release in connection with an Expedited Determination.

**C.**     **Severability**.  Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

**D.**     **Offsets**.  The Settlement Trust shall have the right to offset or reduce the Allowed Claim Amount of any Allowed Abuse Claim, without duplication as to the mitigating factors (*e.g.*, as to other responsible parties) on a dollar for dollar basis based on any amounts paid, agreed, or reasonably likely to be paid to the holder of such Claim on account of such Claim as against a Protected Party (or that reduces the liability thereof under applicable law) from any source other than the Settlement Trust.

**E.**     **Governing Law**.  These TDP shall be interpreted in accordance with the laws of the State of Delaware.  Notwithstanding the foregoing, the evaluation of Abuse Claims under these TDP and the law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in Article XII or the jurisdiction where such Abuse Claim could have been filed under applicable law.

**Schedule 1**

## Schedule 1

## Mitigating Scaling Factor Ranges for Statues of Limitation or Repose as Mitigating Scaling Factors By State

Legend

| Tier | Scaling Factor |
|------|----------------|
| Open | 1.0 |
| Gray 1 | .50-.70 |
| Gray 2 | .30-.45 |
| Gray 3 | .10-.25 |
| Closed | .01-.10 |

| **State** | **Tier** |
|-----------|----------|
| Alabama | Closed |
| Kansas | Closed |
| Oklahoma | Closed |
| Puerto Rico | Closed |
| South Dakota | Closed |
| Utah | Closed |
| Wyoming | Closed |
| ZZ / Federal | Closed |
| Connecticut | Gray 1 |
| DC | Gray 1 |
| Delaware | Gray 1 |
| Georgia | Gray 1 |
| Illinois | Gray 1 |
| Massachusetts | Gray 1 |
| New Mexico | Gray 1 |
| Oregon | Gray 1 |
| Pennsylvania | Gray 1 |
| Washington | Gray 1 |
| Iowa | Gray 2 |
| Minnesota | Gray 2 |
| New Hampshire | Gray 2 |
| North Dakota | Gray 2 |
| Ohio | Gray 2 |
| South Carolina | Gray 2 |
| Tennessee | Gray 2 |
| West Virginia | Gray 2 |
| Alaska | Gray 3 |

| | |
|---|---|
| Florida | Gray 3 |
| Idaho | Gray 3 |
| Indiana | Gray 3 |
| Kentucky | Gray 3 |
| Maryland | Gray 3 |
| Michigan | Gray 3 |
| Mississippi | Gray 3 |
| Missouri | Gray 3 |
| Nebraska | Gray 3 |
| Nevada | Gray 3 |
| Rhode Island | Gray 3 |
| Texas | Gray 3 |
| Virgin Islands | Gray 3 |
| Virginia | Gray 3 |
| Wisconsin | Gray 3 |
| Arizona | Open |
| Arkansas | Open |
| California | Open |
| Colorado | Open |
| Guam | Open |
| Hawaii | Open |
| Louisiana | Open |
| Maine | Open |
| Montana | Open |
| New Jersey | Open |
| New York | Open |
| North Carolina | Open |
| Vermont | Open |