<pre>
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2
                                   .   Chapter 11
3   IN RE:                         .
                                   .   Case No. 20-10343 (LSS)
4   BOY SCOUTS OF AMERICA AND      .
    DELAWARE BSA, LLC,             .
5                                  .
                                   .   Courtroom No. 2
6                                  .   824 North Market Street
                                   .   Wilmington, Delaware 19801
7                                  .
                    Debtors.       .   July 29, 2021
8   . . . . . . . . . . . . . . . .    10:00 A.M.

9                  TRANSCRIPT OF TELEPHONIC HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                 UNITED STATES BANKRUPTCY JUDGE

11  TELEPHONIC APPEARANCES:

12  For the Debtor:        Derek C. Abbott, Esquire
                           Andrew R. Remming, Esquire
13                         Paige N. Topper, Esquire
                           MORRIS, NICHOLS, ARSHT & TUNNELL LLP
14                         1201 North Market Street, 16th Floor
                           Wilmington, Delaware 19899
15
                           - and -
16
                           Jessica C. Lauria, Esquire
17                         Glenn Kurtz, Esquire
                           WHITE & CASE LLP
18                         1221 Avenue of the Americas
                           New York, New York 10020
19
20  Audio Operator:        Brandon J. McCarthy, ECRO

21  Transcription Company: Reliable
                           1007 N. Orange Street
22                         Wilmington, Delaware 19801
                           (302)654-8080
23                         Email:  gmatthews@reliable-co.com

24
    Proceedings recorded by electronic sound recording; transcript
25  produced by transcription service.
</pre>

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the Debtors:          Michael C. Andolina, Esquire
                              Matthew E. Linder, Esquire
3                             Laura E. Baccash, Esquire
                              Blair M. Warner, Esquire
4                             WHITE & CASE LLP
                              111 South Wacker Drive
5                             Chicago, Illinois 60606

6
    For Hartford:             James Ruggeri, Esquire
7                             SHIPMAN & GOODWIN LLP
                              1875 K Street NW, Suite 600
8                             Washington, DC 20006

9                             - and -

10                            Philip Anker, Esquire
                              WILMERHALE
11                            7 World Trade Center
                              250 Greenwich Street
12                            New York, New York 10007

13
    For the U.S. Trustee:     David Buchbinder, Esquire
14                            UNITED STATES DEPARTMENT OF JUSTICE
                              OFFICE OF THE UNITED STATES TRUSTEE
15                            844 King Street, Suite 2207
                              Lockbox 35
16                            Wilmington, Delaware 19801

17
    For Century:              Tancred Schiavoni, Esquire
18                            O'MELVENY & MYERS LLP
                              Times Square Tower
19                            7 Times Square
                              New York, New York 10036

20
    For Kosnoff Law:          David Wilks, Esquire
21                            WILKS LAW, LLC
                              4250 Lancaster Pike, Suite 200
22                            Wilmington, Delaware 19805

23
    For the Coalition of      David Molton, Esquire
24  Abused Scouts:            BROWN RUDNICK LLP
                              7 Times Square
25                            New York, New York 10036
```

1 | TELEPHONIC APPEARANCES (Cont'd):

2 | For Eisenberg                Daniel Hogan, Esquire
  | Rothweiler Winkler           HOGAN MCDANIEL
3 | Eisenberg & Jeck:            1311 Delaware Avenue
  |                              Wilmington, Delaware 19806
4 |
5 | For Ichor Consulting:        Bernard Conaway, Esquire
  |                              CONAWAY LEGAL LLC
6 |                              1007 North Orange Street, Suite 400
  |                              Wilmington, Delaware 19801
7 |
8 |
9 |
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |

1  MATTERS GOING FORWARD:

2  Hartford Accident and Indemnity Company, First State Insurance
   Company and Twin City Fire Insurance Company's Motion to
3  Compel Abused in Scouting and Kosnoff Law PLLC to Submit Rule
   2019 Disclosures (D.I. 2028, Filed 2/3/21)
4

5       **Ruling:  52**

6  Century's Motion to Compel Ichor Consulting, LLC to Submit the
   Disclosures Required by Federal Rule of Bankruptcy Procedure
7  2019 (D.I. 2029, Filed 2/3/21)

8  Century's Motion to Compel Abused In Scouting, Kosnoff Law
   PLLC, and the Coalition to Submit the Disclosures Required by
9  Federal Rule of Bankruptcy Procedure 2019 (D.I. 2030, Filed
   2/3/21)
10

11      **Ruling:  71**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 10:03 a.m.)

2               MR. ABBOTT:  Good morning, Your Honor.

3               THE COURT:  Good morning, Mr. Abbott.

4               MR. ABBOTT:  Your Honor, I thought -- this is the

5     omnibus hearing that had been set for a number of items;

6     obviously, some of those came off the calendar.  The court

7     gave us some helpful guidance at the last conference and I

8     thought, Your Honor, I might turn it over to Ms. Lauria to

9     update the court on happenings since then if I may.

10              THE COURT:  Okay.  Ms. Lauria?

11              MS. LAURIA:  Thank you, Your Honor.  Jessica

12    Lauria, White & Case, for the debtors.

13              Your Honor, when we left you on Tuesday I had

14    announced that the RSA was set to expire, by its terms,

15    yesterday and at the point where we were at on Tuesday we had

16    not yet reached an agreement with the RSA parties on an

17    extension of the RSA.  Through the hard work, yesterday, of

18    the TCC, the ad hoc committee of local councils, the

19    coalition, the FCR, and the debtor, of course, we did reach an

20    agreement on an amendment that was filed yesterday afternoon

21    at Docket No. 5813.

22              Importantly, that amendment extends the RSA

23    deadline that we were confronting yesterday to August 27th.

24    So hopefully we won't find ourselves in the positon we found

25    ourselves in this week again.  It also added a couple of

1  changes to the term sheet.  Importantly, now -- let me take a

2  step back.  As Your Honor is aware, issues pertaining to the

3  chartering organizations have really come to the forefront in

4  these Chapter 11 cases.  The parties are working hard to work

5  through those issues and indeed, Your Honor, next week the

6  mediators have convened in person mediation with the

7  chartering organizations as well as the insurers or certain of

8  the insurers, and the RSA parties to continue to work through

9  those issues.

10        What was added to the RSA yesterday is a

11  termination right that each RSA party has the independent

12  ability to exercise if the chartered organization resolution

13  is unacceptable to that party.  We also had a couple of

14  additional changes.  There was a dispute among the RSA parties

15  concerning the terms of the settlement trust obligation to

16  reimburse protected parties in the event that there was some

17  leakage of the channeling injunction.  That has now been

18  clarified that that reimbursement obligation is limited to

19  direct claim leakage, not indirect claim leakage.

20        Of course, these are not before the court today,

21  but I did want to mention them. As well as cleaning up a

22  reference to -- a sort of nonsensical reference, I will say,

23  to a security interest related to the insurance assignment and

24  clarifying one point with respect to obligations pertaining to

25  the Delaware statutory trust.

1          In addition to those amendments we also filed with

2   it, Your Honor, joinders  The good news is, you know, thanks

3   to the actions of the coalition 15 additional State Court

4   counsel law firms representing over 11,000 additional

5   claimants have now signed on to the RSA.

6          So we now have State Court counsel representing

7   around 70,000 claimants, 70,010 claimants to be precise,

8   supporting the RSA and that is with our claims population of

9   82,500 are the timely filed non-duplicative proofs of claim,

10  94,000 if you don't remove the duplicative claims.  So we had

11  a long day yesterday, but a good day in terms of progress on

12  the topic that we left the court with on Tuesday.

13         With that in mind, Your Honor, and with the

14  mediation scheduled for next week I think we would like to set

15  a date for a hearing on the RSA motion.  We are mindful of the

16  fact that you have August 12th and I believe August 13th

17  currently set aside right now for a hearing with respect to

18  the disclosure statement.  We would propose, Your Honor, to

19  start those days with the hearing on the RSA.

20         In a moment Mr. Kurtz can report to the court on

21  what the debtors propose to do with respect to some of the

22  discovery issues that were brought before the court on

23  Tuesday, but we would like to calendar the RSA motion for the

24  12th.  As I said, Your Honor, we would like to calendar it for

25  the 12th and 13th.  We don't want to take the disclosure

1  statement off the calendar.

2            That may be aggressive in terms of how much time

3  the court has on those two days, but to the extent we have

4  time once we have concluded with the RSA we would like to move

5  to the disclosure statement because we are mindful, Your

6  Honor, one of our own timeline, but also of the court's docket

7  and the many things, I understand, you may be having coming up

8  over the next couple of months.  So we don't want to waste a

9  moment that we might have with you.

10            We think that makes sense.  The parties, by the

11  time we get to August 12th, will have had 40 days with our

12  disclosure statement and plan.  So to the extent we can roll

13  into the disclosure statement we would like to do that when we

14  conclude with the RSA.

15            Being mindful that we are unlikely to conclude both

16  matters on those two days, as much as I would like to and we

17  will see what mediation brings next week, but I suppose it's

18  still possible.  We would probably be looking to the court for

19  some overflow dates with respect to the disclosure statement.

20            So that is where we stand right now, Your Honor. I

21  am happy to have Mr. Kurtz address some of the discovery

22  issues, but perhaps before I do that maybe I should pause and

23  see if you have any questions for me on that timeline and

24  where we're at with the RSA.

25            THE COURT:  I don't have any questions with respect

1  to the timeline.  We can begin hearing on the RSA on the 12th.

2  I've got you down for the 12th and 13th, and you can use those

3  days as you wish.  So we can do that.

4           As far as finding additional days I will have to

5  confer with Mrs. Johnson and we will have to get back to you

6  on that.

7           MR. ANKER:  Your Honor, this is Mr. Anker.  I don't

8  want to interrupt and don't want to interrupt Mr. Kurtz, but

9  if Your Honor is going to consider the possibility of a

10  disclosure statement hearing on the same days I would

11  appreciate the opportunity to speak to that issue before Your

12  Honor rules on that question.  This is the first we've heard

13  of that.  Happy to wait for Mr. Kurtz's comments first, but

14  there has been some discussion about insurers.

15           Right now we have a schedule where I think this is

16  right, Ms. Lauria, disclosure statement objections are due

17  this coming Monday the 2nd.  We, obviously, don't know whether

18  the RSA will or will not be approved by Your Honor.  And you

19  may remember Mr. Linder at the last hearing, I think

20  appropriately, said in response to Your Honor's question that

21  the RSA was a gating issue. It goes to questions such as is

22  the Hartford settlement in or out.

23           So we have no -- speaking just for Hartford right

24  now, I think we have no qualms having the RSA hearing go

25  forward on the 12th and 13th.  And to the extent Your Honor

1  has days thereafter for the disclosure statement, if the RSA

2  is approved, we don't have qualms with that, but we do think

3  it doesn't make sense that all of the uncertainty to have us

4  file objections this Monday on a disclosure statement.  There

5  hasn't been discovery on it.

6          The debtor just today, I'm told, I haven't read the

7  pleading, in response to Hartford's motion to strike Mr.

8  Mosby's testimony is going to reopen depositions and discovery

9  in light of Your Honor's guidance on the mediation privilege

10 and the like.  Obviously, that discovery and depositions is

11 not going to occur between now and Monday.  So we would ask

12 that the deadline to respond to the disclosure statement be

13 moved and the hearing on the disclosure statement be moved.

14         We too are not looking for delay and we appreciate

15 the concerns the debtor has, but there needs to be some

16 reasonable time for us to actually know whether we have a

17 restructuring support agreement or not, actually know what

18 plan is going forward or not and actually take discovery on

19 the disclosure statement.  Of course, the rules, as I

20 understand them, the local rules, call for disclosure

21 statement objections only to be due, I think, in seven days,

22 Your Honor, but you, obviously, know the rules better than I

23 do.  That is what I am told.

24         So I just wanted to make that clear to Your Honor.

25 I apologize for interrupting.

1          MS. LAURIA:  Your Honor, may I respond?

2          THE COURT:  Yes.

3          MS. LAURIA:  Thank you, Your Honor.  Again, for the

4  record Jessica Lauria, White & Case, for the debtors.

5          A few issues with respect to Mr. Anker's comments.

6  First, as Your Honor is well aware, we were originally

7  scheduled to have a disclosure statement hearing on May 19th.

8  While aspects of the deal have changed, and those changes are

9  reflected in the updated disclosure statement, there are still

10  a number of issues that parties raised in their objections

11  that, frankly, have nothing to do with whether the RSA goes

12  forward or not.  For example, the nature and extent of the

13  disclosures concerning the local councils' assets, the local

14  councils' contribution to the trust, and related financial

15  disclosures.  That is just one of many, many examples.

16          From the debtor's perspective there is no reason

17  that we cannot clear out a number of the issues pertaining to

18  the disclosure statement in the event the court has the

19  availability, again, on the 12th and the 13th.  Moreover, even

20  if for some reason putting the Hartford issue to the side, and

21  I understand that is a significant issue with respect to the

22  RSA and the plan itself; although, I will note that the plan

23  and disclosure statement were drafted to be self-effectuating

24  with respect to the Hartford issue.

25          Putting that issue to the side the major components

1  of the deal in these Chapter 11 cases, the deal that the BSA

2  has signed up to, as well as the deal that the local councils

3  have signed up to I believe that those major components are

4  going to be in the plan in some ways regardless of where

5  things come out on the RSA.

6        If folks have issues with the debtor's disclosure

7  concerning recovery percentages, what the recovery percentage

8  chart looks like, the financial projections, the liquidation

9  analysis, the disclosures concerning our insurance coverage

10  and our insurance program.  Those are things that, frankly,

11  are just not going to change regardless of where the RSA comes

12  out.

13        Even if the court does not rule on the RSA on

14  August 12th or August 13th we believe there is a lot of

15  progress that can be made with respect to the other disclosure

16  statement objections.  One way that I think we could handle

17  that is if the debtors, sort of, stage the disclosure

18  statement hearing to indicate what order the debtors intend to

19  take up issues so that issues that are independent of the RSA

20  and the Hartford deal could be taken up first by the debtors

21  and the court, then secondarily we could move to issues that

22  go to the heart of objections to the RSA and the Hartford

23  deal.  We do believe it's very important to get the ball

24  moving with respect to those matters.

25        As to the objection deadline, itself, I believe the

1  rule is that there must be a 28 day notice period for the

2  objection to a disclosure statement.  Frequently that 28 day

3  notice period will expire seven days prior to the hearing

4  which is, I think, the seven days that Mr. Anker was referring

5  to.  Parties -- the objection deadline right now is August

6  2nd.  The plan and disclosure statement were filed on July

7  2nd.  That is much more than the -- a few days more than the

8  28 days that the rules, I believe it's in 2002, contemplate.

9  So we believe that that is an appropriate objection deadline.

10          As the court may recall from the May 19th hearing

11  the debtors received voluminous objections to the disclosure

12  statement.  It took a lot of work for the debtors to turn

13  those objections and to prepare charts and replies that would

14  be user friendly for the parties in interest in these cases as

15  well as the court.  So we would like to see those objections

16  sooner rather than later.

17          Many of them, I think, were probably previewed in

18  the objections to the RSA motion and that were also previewed

19  in the May 19th.  So we think the timeline that we have right

20  now and that I am proposing today is appropriate.  We're happy

21  to work with the parties to stage the disclosure statement

22  hearing such that people know when their issues are coming up

23  and those are issues that we can clear out from an underbrush

24  perspective that don't go to the heart of the RSA, but we do

25  believe that we need the time with the court since we've got

1 the time we'd like to use it.

2          MR. ANKER:  Your Honor, I don't want to belabor the

3 point.  May I just very briefly respond?

4          THE COURT:  Yes.

5          MR. ANKER:  Your Honor, I think Ms. Lauria just

6 said something that is significant.  She said -- she referred

7 to the schedule that I am today proposing.  That is exactly

8 right.  The notion that we were going to go ahead with

9 sticking with a deadline and with the disclosure statement

10 hearing on the same days as the RSA is brand new.

11          You asked Mr. Linder at the last hearing -- I'm

12 sorry, not the hearing two days ago, the penultimate hearing.

13 I don't have the transcript in front of me, Your Honor, so I

14 am not making representation that these are the exact words,

15 but I remember the conversion.  Mr. Linder is the RSA a gating

16 item that has to be resolved prior to the disclosure

17 statement.  Answer one syllable, one word "yes."  We have been

18 acting accordingly.

19          There has been no deposition discovery with respect

20 to the disclosure statement because we understood the RSA had

21 to be resolved first.  So fundamental fairness called for, and

22 if you want people not scrambling all weekend on disclosure

23 statement objections that are not going to be well done

24 fundamental fairness calls for us to take up the RSA.  If it

25 is approved we can then have a disclosure statement hearing.

1  I don't think it will be approved in which case the disclosure

2  statement and all the objections will become moot, but that is

3  just my prediction.

4        It's also particular significant to Hartford.  We

5  have under our settlement agreement contractual obligations

6  not to object to a disclosure statement or plan that

7  incorporates our settlement.  I suppose I could file something

8  Monday that says this is contingent and we fully are

9  preserving our rights, but it is a difficult position and it's

10 difficult to right a disclosure statement objection when we

11 don't know what the plan is.

12        Thank you, Your Honor.

13        THE COURT:  Thank you.

14        MR. BUCHBINDER:  Your Honor, this is Dave

15 Buchbinder.  May I be heard very briefly?

16        THE COURT:  Mr. Buchbinder?

17        MR. BUCHBINDER:  Thank you, Your Honor.

18        I simply would like to observe that today is the

19 114th anniversary of the founding of the scouting movement by

20 General Robert Baden-Powell.  I would simply like everyone to

21 reflect upon that for a moment before we proceed further.

22        Thank you, Your Honor.

23        THE COURT:  Thank you.

24        Mr. Schiavoni?

25        MR. SCHIAVONI:  Your Honor, the outcome on the

1  Hartford settlement is important to Century as well as

2  Hartford.  My recollection is that this was described by the

3  debtor as the gating issue.  I am very hard pressed to think

4  what the issues are, sort of, separate and apart from the

5  restructuring support agreement on disclosure.  The

6  restructuring support agreement is at the heart of just about

7  everything that they are presenting that is drawing intense

8  objections not just from insurers, but from claimants, from

9  chartering organizations and others.

10          The restructuring support agreement really ties,

11  you know, the debtor to positions on how claims are allowed

12  and approved that just are fatal.  They go to the core of

13  disclosure statement objections.  I don't know how we can

14  separate them out.

15          It's also true that some of the discovery that was

16  sought on the restructuring support agreement, and we've since

17  been told somehow is coming, is directly tied to those

18  disclosure statement objections.  It was the subject of

19  discovery requests served, I don't know, more then 45, 50 days

20  ago by Century.  Things as basic as production of the model

21  for the feasibility that's in the disclosure statement, that's

22  been directly eluded to in the testimony of the witnesses that

23  took place for the restructuring support agreement that's the

24  subject of objections by everyone including the chartering

25  organizations.  We don't have that yet, but we're told its

1   coming.

2          So, you know, I think part of the lesson that came

3   out of the restructuring support agreement is that an enormous

4   amount of resources were wasted by filing briefs only to be

5   faced with a moving target.  To do a replay of that with the

6   disclosure statement it's not just a waste of the lawyers time

7   which, you know, I guess we can all live with except for, you

8   know, it's a waste of estate resources.  Also, it ends up

9   presenting Your Honor with like an extremely chaotic record in

10  multiple rounds of briefs; which ones should Your Honor read,

11  and not read.

12         I don't agree that the charts that were submitted

13  for the last disclosure hearing were even helpful because they

14  didn't even summarize, really, what was in the briefs.  To go

15  through another round of that here it's just going to waste a

16  huge amount of resources and it's going to make it extremely

17  chaotic for Your Honor to read what's really at issue.  I

18  don't think it's going to be productive at all, Your Honor.

19         Thank you.

20         THE COURT:  Okay.  Well I am, quite frankly,

21  skeptical that we're going to be sufficiently through a

22  hearing on the RSA to start the disclosure statement in two

23  days.  It's just not my experience.  And I understand the Boy

24  Scouts position, but I will say that my calendar has been

25  shuffled on more than one occasion for this particular case to

1  try to get days in consistent with the debtor's desire for an

2  early exit from bankruptcy.

3       I am skeptical that even if there is time left on

4  the 12th and 13th that we would get very far into a disclosure

5  statement hearing.  So I am going to need to find some time to

6  set aside for the disclosure statement hearing.

7       In terms of the deadline, you know, I did not

8  suspend the deadlines on the disclosure statement pending the

9  RSA hearing.  It's actually correct and my recollection is

10  that I asked a very direct question of the debtors was the RSA

11  a gating issue; they said it was.  So I scheduled it ahead of

12  the disclosure statement hearing.  I think its -- but I didn't

13  suspend the objections on the disclosure statement hearing.

14       So what I need to do, and I will do so later today,

15  is to see what kind of time we can carve out for a disclosure

16  statement hearing.  Then to the extent that warrants a new

17  deadline we will do it.

18       Mr. Anker, for your unique problem I would consider

19  giving the filing of the RSA that you can file whatever you

20  want to file.  And if I hear the debtors complain about it I

21  will be surprised.

22       MR. ANKER:  Thank you, Your Honor.

23       MS. LAURIA:  Thank you, Your Honor.

24       With that would you like me to hand the podium over

25  to Mr. Kurtz to describe the update on where we're at on

1  discovery pertaining to the RSA?

2          THE COURT:  I can, but I don't recall -- I mean you

3  can, but I don't recall that I left anything open on my end.

4  If you want to make some general reports, sure.

5          MR. KURTZ:  Thank you, Your Honor.  Good morning.

6  Glenn Kurtz from White & Case on behalf of Boy Scouts.

7          Let me start by thanking you for accommodating the

8  RSA on the 12th and the 13th, and for looking for other times

9  to resolve the disclosure statement issues as well.  Timing is

10 important and we really appreciate it.

11         You are correct, Your Honor, there wasn't really

12 anything that was left open, but we did focus on Your Honor's

13 observations about the import of certain categories of

14 documents.  I went back with the group, we re-reviewed certain

15 documents that were commented on or, at least, focused on by

16 Your Honor.  Some of them were pretty close calls, but we have

17 made a decision to try to get some more documents out in order

18 to resolve any lingering dispute.  We are aiming to be

19 completed with that by the end of the weekend.

20         You may also recall there was some dispute where

21 the insurers or the objectors were requesting the opportunity

22 to re-depose some of the declarants with respect to all the

23 new materials that had been produced.  And we have made a

24 decision even though we said let's meet and confer, and talk

25 about any problems we have with documents before we have

1   depositions so that we don't end up having to burden witnesses

2   twice.  But we have made a decision to reproduce all of them.

3   We will work with objectors to get that scheduled shortly

4   after the completion of the document production.

5          We think that will resolve -- hopefully that will

6   resolve any dispute people have about a full and fair

7   opportunity to question.  Obviously, those depositions will be

8   limited to the new material.

9          I will openly request and urge any objectors to

10  meet and confer with us both to resolve disputes without

11  having to burden the court further and to make sure that we

12  don't have any lingering concerns, at least, where those can

13  be resolved.

14         I suspect, but I have not heard that maybe the

15  objectors would have an interest in filing some sort of

16  supplemental objection.  Your Honor just commented that the

17  debtors wouldn't be complaining about a different submission

18  and we won't be complaining about that as well.  We're happy

19  to talk about that.  We think it should be no later than maybe

20  the 9th, a few days before the hearing.  And if that does

21  happen we would like to be able to file a reply.  We would

22  probably suggest that maybe by noon on the 11th.  I don't want

23  to burden the court. I think it might be helpful to the court

24  to have more materials.  If the court doesn't want more things

25  to read, you know, we will pick-up any supplemental matters

1   live at the hearing, but it might be helpful to have a reply.

2          I do think we will try to get a scheduling order

3   put together and submit it to the court so that everybody

4   knows what the dates are and what the rules are; maybe that

5   also will have the effect of minimizing any efforts or any

6   disputes we have, and any work that the court might have to

7   deal with in terms of some emergency applications.

8          That is really all I wanted to update the court on.

9   We appreciate the guidance both on Tuesday and today.  We look

10  forward to proceeding.

11         THE COURT:  Thank you.

12         MR. KURTZ:  Thank you, Your Honor.

13         MR. SCHIAVONI:  Your Honor, we have your rulings on

14  discovery.  I mean you just heard what was said, I mean

15  they're going to produce documents maybe Sunday night and then

16  some sort process of doing six depositions, and then more

17  briefs.  We have your rulings and have guidance on how to go

18  forward.

19         THE COURT:  Yeah, you have my rulings.  I would, of

20  course, ask parties to meet and confer, and discuss how

21  everything is going to go forward in this period of time.

22         I am being reminded, so let me say this that we got

23  a new setup, a new system in the courtroom here and for some

24  reason when I'm looking directly at the screen it looks like

25  I'm looking away, but let me assure you that I am not and that

1  I am focused on each of you as you are speaking.  I am going

2  to talk to IT about how that can be resolved, but this new --

3  since I also cannot see myself I don't realize that's

4  happening.  So in any event, I am paying attention.

5        Let's move onto the agenda.

6        MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

7  for the debtors.

8        Your Honor, the first item on the agenda is the

9  motion of certain insurance companies to compel 2019 materials

10 from abused in scouting and Kosnoff Law Firm.  I will ask them

11 to -- I'm not sure who from that group of insurers is taking

12 the lead on that.  So the podium is theirs, Your Honor.

13       THE COURT:  Yes.

14       MR. RUGGERI:  Your Honor, James Ruggeri for

15 Hartford.  I believe ours is scheduled as the first matter to

16 go forward this morning.  If it pleases the court I'm prepared

17 to do so.

18       THE COURT:  Please.

19       MR. RUGGERI:  Thank you, Your Honor.  Again, James

20 Ruggeri for Hartford.  We do appreciate the court's time

21 today.

22       This motion, as the court knows, was filed five

23 months ago.  It seeks to compel 2019 disclosures from the

24 abused in scouting entity and the Kosnoff Law Firm.  Your

25 Honor, I think that over the course of the past week I think

1   it's become clear that this motion, frankly, is more important

2   now than it was when we filed it five months ago.  The court

3   now has before it the RSA motion which now, as of this

4   morning, is now set for a hearing on August 12th and 13th.

5          A headline announcement in that motion is the

6   support of -- plaintiff support of approximately 60,000 abuse

7   survivors headlined in bold in the motion and now Ms. Lauria

8   has advised us that the number has creeped up to 70,000 and

9   ten survivors who support the motion.

10         Attached to the motion is the RSA itself which has

11  now been amended in a schedule one. I don't know if the court

12  has had an opportunity to look through it, but schedule one

13  identifies the law firms plaintiffs' representatives who

14  support the motion along with numbers assigned next to those

15  law firms.  Those numbers are the number of claimants who

16  allegedly support or are represented by the plaintiffs'

17  counsel who support the motion.

18         If the court looks at Mr. Rothweiler's firm, that's

19  the Eisenberg Rothweiler Winkler Eisenberg & Jeck Firm, it

20  seeks the number 16,869.  That is a number higher than any

21  other firm shows in support of the RSA motion.  Its nearly 30

22  percent of the 60,000 claimants who allegedly are supportive

23  of the motion and now it's, what, roughly 25 percent.  If the

24  number creeps up to 70,000 it's still a significant percent of

25  the claimants who allegedly are supportive of the RSA motion.

1          This representation that the State Court counsel

2    could deliver these numbers and these claimants was important

3    to the debtor's entry into the RSA.  We heard that two weeks

4    ago from Mr. Mosby, the Boy Scouts CEO and president.  He

5    testified by deposition two weeks ago.  We're going to have a

6    conversation about Mr. Mosby and the competence of his

7    declaration at another day with regard to the motion to

8    strike.  The deposition is also important because it showed

9    that he, as a declarant in support of the RSA motion, relied

10   on the State Court counsel's representations that they control

11   a number of claimants that they say they control including Mr.

12   Rothweiler.

13         I did ask Mr. Mosby at his deposition a question

14   how do you know that Mr. Rothweiler controls any of the

15   claimants reflected in the number 16,869.  The answer from Mr.

16   Mosby was, well, that's what they have said.  We know that Mr.

17   Rothweiler supports the RSA.  That is not news to us, but we

18   also know that Mr. Kosnoff does not.

19         We know they claim to represent the same claimants.

20   Mr. Kosnoff is, sort of, famous in this case or infamous

21   depending on your point of view for his tweeting about.  We

22   know that he has tweeted about with regard to Mr. Rothweiler,

23   his alleged co-counsel, who says he can deliver on 16,869.

24   Mr. Kosnoff says Mr. Rothweiler is an army of one, that none

25   of the claimants even knows who Mr. Rothweiler is.

1          Your Honor, we need to know who represents the

2   16,869 claimants.  If it's Mr. Kosnoff then I would submit

3   that the factual basis for Mr. Mosby's support for the RSA

4   goes out the window.  Substantively, when we get down to other

5   issues that issue is very, very important, as the court knows,

6   under the Master Mortgage test.  If the RSA and the plan is

7   only supported by 50 percent or so of the claimants and not by

8   an overwhelming support of the claimants then the court knows

9   that that can have a dramatic effect on the ability to secure

10  third-party releases which the fourth amended plan does

11  contemplate.

12          Your Honor, what do we want from AIS and Mr.

13  Kosnoff; well we want from AIS the formation documents.  How

14  was that group formed?  It's provided for in Rule 2019.  We're

15  entitled to that information.  We want from both AIS and Mr.

16  Kosnoff we want to know the names of the creditors they

17  represent, when those interests, allegedly, were acquired in

18  the amount of those interest.  Again, it comes right out of

19  Rule 2019.

20          We expect there will be overlap between those

21  already disclosed by the coalition on behalf of Mr.

22  Rothweiler.  We didn't know that.  And, Judge, because we need

23  to know and everyone needs to know who controls these

24  claimants we want to see the engagement letters, the

25  empowering documents showing who has the authority to act on

1  behalf of the claimants.  There must be documents explaining

2  the roles of the different AIS firms and there are three for

3  the individual claimants.

4          The court knows from the letters it has received

5  over the past few months that there are AIS claimants out

6  there who think they retained only one of those law firms.

7  Your Honor, I am not the only one confused by the situation

8  with AIS, and Mr. Kosnoff, and Mr. Van Arsdale, and Mr.

9  Rothweiler.  Their own claimants are confused.

10          One of the documents that the court received only a

11  few days ago, at Docket No. 5671, was the July 21st letter

12  from a claimant.  He sent a letter to the court saying I think

13  I retained one of the law firms the EDA, that's Mr. Van

14  Arsdale's law firm, but I don't know for sure because the

15  lawyers don't write or call.  He asked the court to let him

16  know if Mr. Van Arsdale or AIS is making filings on behalf --

17  on his behalf, which, of course, the court can't do.

18          Your Honor, you have seen some paper in the

19  arguments against our motion.  I don't think they're terribly

20  strong.  They say the AIS isn't anything.  It's just a

21  collaboration of law firms working together to provide a voice

22  for the victims.  Well that sure sounds to me like it's a

23  group formed to represent interest of multiple creditors

24  toward a common goal which, of course, is what Rule 2019 is

25  all about.

1          It doesn't matter, Your Honor, whether they only

2    represent 30 percent or 25 percent or more than that, or

3    whether they're actually making filings in the case showing

4    their own signatures in the case.  There is no doubt that AIS

5    and Mr. Kosnoff are actively participating in this case.  Just

6    look at the letters the court has received.  Just look at the

7    tweets that Century and Hartford have attached to their

8    briefs.  They confirm active participation.

9          Mr. Kosnoff was at it again this week, actively

10   tweeting disparaging comments about Your Honor and parties in

11   the case, and counsel in the case.  He was at it again this

12   morning, you know, advising his followers that today's 2019

13   motion is up for a hearing and they should stay tuned for

14   those keeping score at home.  That is active participation in

15   the case representing the interests of multiple creditors

16   seeking to pursue a common interest.

17         Look at Mr. Kosnoff's reply that he filed last week

18   on July 22nd.  It proves out point.  What does he say, he says

19   Kosnoff Law is a law firm that represents claimants in teh

20   bankruptcy case.  That is right.  We agree.  That is an entity

21   working toward common interest on behalf of clients to obtain

22   recoveries for abuse claims.  That is what is required under

23   2019.  It doesn't matter that each claimant will vote his or

24   her own claim.

25         Your Honor, we submit the court should do what

1    other courts have done in the context of mass tort

2    bankruptcies where multiple clients are represented by law

3    firms and groups.  It should require 2019 disclosures.  We

4    should know who is representing whom particularly as we are

5    moving forward with the all-important RSA hearing and then if

6    that were successful the disclosure statement and plan

7    confirmation hearings.

8              Thank you, Your Honor.

9              THE COURT:  Thank you.

10             MR. SCHIAVONI:  Tancred Schiavoni for Century, Your

11   Honor.  We filed a separate motion, but essentially seeking

12   the same relief.  I just would briefly like to focus, really

13   on two points.

14             What evidence there is that triggers the

15   application of 2019 and, of course, if 2019 is triggered its

16   disclosure requirements are mandatory, but then I would just

17   spend a minute on why this isn't just some technicality, why

18   it directly goes to bankruptcy issues before the court.

19             The coalition is an ad hoc committee.  It

20   acknowledges that it's subject to the reporting requirements

21   of 2019.  It has made disclosures claiming that it represents

22   as part of the committee the AIS members.  AIS, I believe, is

23   part of the coalition submission has triggered 2019 by its

24   filing of a retention agreement with the verified statement

25   putting at issue its direct role in the case.

1       Separately, Mr. Kosnoff claims he hasn't triggered

2  2019, but, Your Honor, his filing his name, his signature --

3  to be clear, you know, Century has put in evidence suggesting

4  issues, improprieties about how his signature was attached,

5  but his signature appears on large numbers of the proofs of

6  claim.  He makes an appearance in the case though those

7  filings where he is not just signing, but he's signing under

8  oath on behalf of multiple parties by doing that.

9       We have separately put before Your Honor evidence

10  of the -- much of it's in the letters, itself, but also in the

11  tweets that the letters being submitted to the court are being

12  submitted at the direction of Mr. Kosnoff or at his

13  solicitation that they be submitted.  So he's put himself

14  before the court in those two ways.

15       In addition, I believe when the appearance was made

16  in connection with the 2004 discovery and the 2019 issues by

17  Mr. Kosnoff's counsel I think he's described, actually, in the

18  pleadings there as a party, as Kosnoff's firm as being a party

19  here to the case.  All of those things put Mr. Kosnoff under

20  the compliance rule of 2019 and, of course, the coalition and

21  AIS are also.

22       The coalition has presented in its verified

23  statement that all of these folks that are coalition members,

24  that are AIS members are, in fact, part of the coalition.

25  That, itself, Your Honor, is a fact to be focused on for just

1  a second.  The so called -- the firms that are part of the

2  coalition claim to represent approximately 60,000 people, but

3  the actual members of the coalition, because remember what had

4  to happen here was those firms had to solicit agreement from

5  their clients to be part of the coalition, really, expressly

6  for the reason that they had to affirmatively consent to pay

7  Brown Rudnick's fee' that those 60,000 clients didn't agree to

8  be coalition members.

9        We're relying upon representations made by the

10 coalition in this regard.  We haven't really seen proof on it,

11 but they contend that -- they don't contend that the 60,000 of

12 their clients agreed to become coalition members and pay Brown

13 Rudnick.  They contend that a far smaller number, a number

14 closer to 18,000 of their clients, became coalition members.

15 That, first of all, means 42,000 of them affirmatively took

16 the position that they did not want to pay Brown Rudnick's

17 fees, a smaller number did.

18       Of the so-called AIS group here, which is the

19 largest, was generated by this claims aggregator run out of

20 Montana that group, you know, we believe these disclosures

21 will show is the largest group of "coalition" members.  These

22 relentless efforts throughout all what we believe if we had

23 disclosure of it the negotiation of the plan to get Brown

24 Rudnick paid by the estate.  We believe it's going to show

25 that it's dramatically driven by Mr. Kosnoff and his members

1  because he personally took on most of that obligation in

2  bringing Brown Rudnick in.  We believe that is how it will

3  show the 2019 disclosures by Brown Rudnick and Mr. Kosnoff

4  would reveal that.

5          So that is one reason it's relevant directly to the

6  bankruptcy.  Two, sort of, much more fundamental reasons are

7  you're going to see when you reach the solicitation procedures

8  motion that the solicitation procedures are very much driven

9  in sync with the RSA so that claimants will, in all

10 likelihood, never see, or get, or consider, or vote their

11 claims, but the claims will all be voted by (indiscernible).

12         Here, with this AIS group, the court needs to have

13 before it the information on who controls these to know who

14 should -- if a master ballot is going to be used, and we

15 contest that that really is a proper way to go forward here,

16 it's essential that the 2019's be in place.  That is an issue

17 on which other courts in this district have issued opinions.

18 Judge Fitzgerald in Federal-Mogul and some of these other

19 cases have all said that a prerequisite to filing a master

20 ballot is, in fact, to have on file a compliant 2019

21 disclosure.

22         So we're faced here with direct evidence of a

23 dispute about who controls the largest block of claims, a

24 block of claims it seems to have been wielded, you know,

25 directly in negotiations for the benefit of a sub-group to,

1  you know, get it over $10 million and money going forward. So

2  those disclosures are important for that.  They're important

3  for the solicitation motion and they're also important for the

4  reasons that Mr. Ruggeri has laid that nobody knows who anyone

5  is negotiating with here.

6          As a final reason that they're important is, you

7  know, these submissions by Mr. Kosnoff they have been

8  incredibly unproductive in trying to reach a resolution.

9  We've put before Your Honor -- you know, there's things he's

10  said about the court and the court process that are extremely

11  unproductive to trying to reach resolution of the case with

12  parties, but the attack, frankly, on  individual lawyers, on

13  parties.

14          My client they published pictures outside -- Mr.

15  Kosnoff published pictures outside his house of, you know, I

16  think it would put us in danger.  I personally have threats

17  made against me, my identity, identifying information on the

18  internet. I have gone to the mediators to complain and ask for

19  some relief.  I have been told, basically, there is nothing

20  anybody can do.  I think Mr. Kosnoff needs to have a 2019 on

21  file.  He needs to be before the court and we need to have

22  those disclosures in order to move the proceeding forward.

23          The coalition has not been helpful in any way on

24  this.  They have acquiesced to the demand to (indiscernible).

25  We have not been able to get them to, you know, have this kind

1  of activity stood down.  There has been direct information

2  about what happened in the negotiations that has been

3  published in this way.  It's been very unproductive.

4          Your Honor, we would ask that both the coalition,

5  and AIS, and Mr. Kosnoff file verified statements explaining

6  who controls what.  There is also here a very fundamental

7  issue that we lay out in our paper about when there are not

8  retention of any of these people.  You know, in order to

9  escape here having to file a 2019 Mr. Kosnoff admits that AIS

10 is, in fact, a totally fictitious entity.

11         Your Honor knows from the motion that you heard on

12 the false advertising claims and on these submissions that the

13 letter and the manner in which those clients were solicited

14 they weren't being told that they were engaging a law firm,

15 they were being told that they were joining an organization,

16 that they were becoming members.  We annexed to the reply

17 brief, you have it in other submissions, but just for

18 convenience, a copy of the retention letter itself.  When you

19 look at that retention letter it does not present itself as

20 here's a collection of law firms.  It presents itself that AIS

21 is a real organization.  It's just the ads that were run that

22 it was a membership organization that they're joining

23 something, not that they're hiring a lawyer.

24         You know, when these folks all gave up as part of

25 this, you know, is over 40 percent of their claim; over 40

1  percent of the claim is being given up here and, you know, for

2  those who joined the coalition and obligation is being taken

3  on in connection with paying Brown Rudnick on top of that.

4         Now to be clear, the way the structure seems to

5  work with the Brown Rudnick engagement that the plaintiff

6  (indiscernible) Mr. Kosnoff and Mr. Arsdale they appear to be

7  directly responsible for the payment on a going forward basis

8  of the fees and only if somehow the case is successful they

9  can take those fees out of their individual contingencies on a

10  going forward basis, but there is a direct obligation that the

11  firms have here.  I think that has played itself out in,

12  again, how that fee request has gone.

13         It has played itself out in just one last way on

14  that fee request.  If you just stand back and think about what

15  was done, you know, 42,000 of the 60,000 clients said no we

16  would rather not pay the Brown Rudnick fees.  Then approving

17  the RSA and going forward with the RSA we have Brown Rudnick

18  affirmatively advocating directly against what the coalition

19  clients, the 42,000, said that, in fact, they should pay and

20  that they're going to pay by putting those fees, you know,

21  into the estate.

22         So there's a lot wrong here and maybe I've gone a

23  little bit past exactly the relevance of this, but these folks

24  are subject to 2019.  We would ask that they file mandatory

25  disclosures.

1              THE COURT:  Thank you.

2              MR. WILKS:  Thanks very much, Your Honor.  Good

3    morning.  Thanks very much for the opportunity to be heard.

4              Listening this morning and reading the insurance

5    company's papers it seems that this is really about two things

6    that the insurance companies what to accomplish.  One, this is

7    really just another way of getting 2004 discovery that they

8    aren't entitled to.  They want to know how 17,000 people will

9    vote, what their lawyers are telling them, who their leader

10   is.  As we will see, Your Honor, it's all based on, at least,

11   one false premise, probably two or three false premises.  We

12   will talk about that.

13             The second thing that they're trying to accomplish

14   here, obviously, is to marginalize an opponent and to divide

15   their opponents.  Mr. Kosnoff is experienced, successful,

16   obviously very passionate about this case.  He probably has

17   more experience in this, in child sex abuse cases than anyone

18   in the country.  He expresses himself in ways that evidence

19   that passion to say the least, Your Honor.  And, yes,

20   sometimes he expresses his anger in ways that the rest of us

21   do not.

22             The insurers, Your Honor, acting, I might add, as a

23   collective, by the way, seek to marginalize him and to attack

24   his credibility in the hopes that it will somehow strengthen

25   their case against the innocent victims and that they will

1  gain insight and, sort of, inside baseball on what this large

2  group of claimants are all thinking and what they're going to

3  do.

4         Of course, we don't know for sure what the

5  insurers' agenda is.  Maybe it's to force a liquidation

6  hearing.  Maybe it's just to run out the clock and delay

7  things.  Maybe just to delay it in the name of the time value

8  of money; who knows, we don't know.  No one suggests that they

9  should have to disclose their agenda in a 2019 statement even

10 though they cooperate and represent clients with apparently

11 similar broad interests.

12        A 2019 for Mr. Kosnoff, or Kosnoff Law, or AIS is

13 equally inappropriate here, Your Honor.  This group of 17,000

14 claimants that we are here to talk about today has no leader.

15 It has no steering committee.  It has no agenda.  It has not

16 organizing documents.  It has --

17        THE COURT:  It's not -- right now we're focused on

18 AIS and the firms, okay, not the 17,000 people.  2019 requires

19 an entity that represents a group to file a 2019.  So talk to

20 me about the people we're here to talk about, okay, AIS and

21 Kosnoff in particular.

22        MR. WILKS:  That's an interesting question, Your

23 Honor, because it's hard to answer that because we don't know

24 who the insurers say that AIS is.  On one hand they say that

25 these --

1          THE COURT:  I don't care who they say what AIS is.

2   I care what AIS says AIS is.  So tell me what AIS is cause,

3   quite frankly, I'm confused.

4          MR. WILKS:  Well first the most important thing, I

5   think, for me to say right now, Your Honor, is who I

6   represent.  I represent Kosnoff Law here.  Kosnoff is the

7   party that -- well the entity that the motion was directed to,

8   not Tim Kosnoff individually.  That is who I represent.  By

9   the way, Tim Kosnoff is not before the court, tweets are not

10  filings.

11         THE COURT:  So let me ask a question.

12         MR. WILKS:  I don't represent --

13         THE COURT:  Let me ask a question, you're not

14  representing abused in scouting?

15         MR. WILKS:  I, nor anyone else, represents abused

16  in scouting, nor could anyone else represent abused in

17  scouting, Your Honor.

18         THE COURT:  Explain that to me.

19         MR. WILKS:  AIS is not an entity capable of being

20  represented.

21         THE COURT:  How is that not a group?  How is that

22  not a group?  How are those three not a group?

23         MR. WILKS:  They are a group, Your Honor.

24         THE COURT:  Okay.

25         MR. WILKS:  They are a group; however, are they a

1  group for Rule 2019 purposes?

2            Because under Rule 2019, the important thing to

3  remember is, are they pursuing, in concert, a common set of

4  interests?

5            THE COURT:  They are.

6            MR. WILKS:  And clear --

7            THE COURT:  They are.

8            Tell me how they're not.  Tell me how they are not.

9            MR. WILKS:  I would love to, but I think, actually,

10  the insurers have told you already.  Because on one hand we

11  have Mr. Rothweiler, who says, I can deliver 16,869 votes for

12  the RSA and on the other hand, his co-counsel,

13  Mr. Kosnoff, has very openly taken a contrary approach.

14            So, we have --

15            THE COURT:  So, we have a dysfunctional group.

16            MR. WILKS:  No, Your Honor.

17            THE COURT:  We have a dysfunctional group.

18            MR. WILKS:  I would disagree with that, Your Honor,

19  and here's why.  I think it's a very functional group because

20  when I'm in a group setting with co-counsel and we have

21  different views on course of action, first we talk amongst

22  ourselves, but then we both present our contrary views to our

23  client or our clients, as is the case here.  And those

24  clients, then, make the decision.

25            And that's what's happened here, Your Honor.

```
 1            THE COURT:  Okay.

 2            MR. WILKS:  There are 16,869 --

 3            THE COURT:  That's fine.  Let's say each of those

 4    makes their decision.

 5            MR. WILKS:  Yeah.

 6            THE COURT:  That doesn't mean that they aren't

 7    represented by Abused in Scouting, that Abused in Scouting

 8    isn't acting in concert, isn't representing them.  That

 9    doesn't mean that.  That doesn't mean they don't have a common

10    goal.

11            The common goal is to rectify the abuse.  The

12    common goal is to advance the position of survivors.  And the

13    clients may have different views and maybe the lawyers have

14    different views, but the common goal is to advance the

15    position of survivors.  That's what they're doing, right,

16    advance the position of survivors.

17            MR. WILKS:  That's their common goal, certainly,

18    but they're not acting in concert, Your Honor.  They're not

19    acting in concert and that's what the rule requires; they have

20    to be acting in concert --

21            THE COURT:  No.  Let's see --

22            MR. WILKS:  -- and that's not what's happening

23    here.

24            THE COURT:  -- acting in concert.

25            MR. WILKS:  That's in Rule 2019.
```

1          THE COURT:  Well, I think that if they're co-

2   counsel, they're acting in concert -- maybe they disagree --

3   but they're co-counsel.  If that's how you're saying what they

4   are.  They are still co-counsel to clients.

5          Let me tell you what Mr. Van Arsdale said in his

6   paid advertisement that was submitted previously.  He says:

7          "My name is Andrew van Arsdale and I'm a lawyer

8   with Abused in Scouting.  Abused in Scouting is an

9   organization that represent over 4,000 men who were abused at

10  the hands of the Boy Scouts."

11         He says it's an organization and he says that

12  organization represents 4,000 men.  So, I'm confused as to who

13  Abused in Scouting is.

14         MR. WILKS:  Well, Your Honor, I can tell you one

15  thing.  I can tell you several things.  One, Abused in

16  Scouting has never been formally organized as an entity.  I

17  know that's not dispositive.  That's fine, but that's a thing

18  that --

19         THE COURT:  So, in Delaware, we have unincorporated

20  associations, don't we, Mr. Wilks?

21         MR. WILKS:  No, Your Honor -- sure.

22         THE COURT:  Sure.  So, that's not dispositive.

23         MR. WILKS:  It is not dispositive, granted, but

24  it's a data point.  It has no leadership structure.  There is

25  no one who can speak for AIS.  Mr. Kosnoff --

1          THE COURT:  Mr. Van Arsdale didn't speak for AIS

2  and Mr. Kosnoff was also in this advertisement.

3          MR. WILKS:  If they're advertising purposes, Your

4  Honor, I can't speak to that.  All I can speak to is for

5  purposes of taking positions in this proceeding, no single

6  attorney can speak for 16,869 claimants.  They simply do not

7  have that authority.  No one does.

8          And no one has authority, Your Honor --

9          THE COURT:  Who speaks for AIS?

10          MR. WILKS:  No one, Your Honor.

11          THE COURT:  I'm not talking about -- I'm not going

12  to require the 16,000 people to file a 2019 -- I'm talking

13  about AIS and Kosnoff Law; that's what's in front of me.

14          MR. WILKS:  Two different things there, Your Honor.

15          Mr. Kosnoff and I, I suppose, as his attorney, can

16  speak for Kosnoff Law.  Neither one of us have the authority

17  to speak for AIS.  I believe if we were to ask Mr. Rothweiler

18  today, hey, Mr. Rothweiler, does Dave Wilks or Tim Kosnoff

19  speak for AIS?

20          He would tell you, absolutely not.

21          If you asked Tim Kosnoff, does Mr. Rothweiler speak

22  for AIS?

23          He would say, absolutely not.

24          THE COURT:  So, when --

25          MR. WILKS:  Because AIS isn't an entity that takes

1  a common position.

2          THE COURT:  So, when AIS asked people to become

3  members or sent out an advertisement and said, let us

4  represent you, who -- what were they saying to these abuse

5  victims?  What were they saying to them?

6          Join something that isn't anything, that's

7  leaderless, that we can't talk for; is that what they were

8  saying to these abuse victims?

9          MR. WILKS:  Your Honor, what they were telling them

10  was join a movement.  Join a movement to tell your stories.

11  Get your story out there.  You've been hiding.  You've been

12  suffering the long-term effects of hideous, atrocious abuse

13  that took place when you were an innocent young boy.

14          THE COURT:  Well, movements have leaders.

15  Movements have leaders.  And maybe these three leaders don't

16  agree, but maybe they need to come up with a spokesperson,

17  because I'm going to require AIS to file a 2019.

18          I need to understand what this entity is.  I do

19  consider it some type of entity.  Some type of entity asked

20  people to write to the Court, to put filings in this court.

21          AIS doesn't get to hide behind its -- these abuse

22  victims and say that they're not appearing.  AIS does not get

23  to hide behind these abuse victims.

24          AIS asked parties to file, asked parties they

25  represent or one of the law firms represents, to write to the

1  Court for what purpose --

2             MR. WILKS:  I'd like to address that, Your Honor.

3  May I?

4             THE COURT:  -- if not, an attempt to influence the

5  Court in some fashion.

6             So, AIS, through its three law firms, whatever you

7  want to call AIS, has, in fact, put itself in front of this

8  Court and I need to know who they are and what they do.  And

9  just to say, "we're not something," doesn't make them not

10 something; they're something.

11            MR. WILKS:  Your Honor, may I speak to the letters?

12            THE COURT:  Sure.

13            MR. WILKS:  Thank you.

14            A couple of hearings ago, I guess, is when Your

15 Honor asked me to file a response that we filed last week.

16 Again, I'll represent I asked -- I did it because Your Honor

17 asked me to and, of course, I'm happy to do anything that Your

18 Honor asks.

19            The letters are important and it's not just these

20 17,000 folks that the AIS lawyers, if we'll call them that,

21 represent.  Claimants -- we hear all the time, claimants read

22 about these proceedings and they're alarmed that they're

23 getting lost in the shuffle and they're frustrated and so

24 forth, that they've been forgotten.

25            THE COURT:  Maybe AIS needs to communicate with

1 them because I have read multiple letters where people say,

2 I'm not hearing from them.

3          MR. WILKS:  Yeah.  Well, that is something that --

4 it's good to get notice of that and I'm sure something is

5 going to happen there.

6          But as I was saying, these folks want to tell their

7 stories --

8          THE COURT:  Uh-huh.

9          MR. WILKS:  -- and so, they have.  And enormous

10 credit to Your Honor for doing your job.  I mean, I know you

11 raised your hand for this job, I suppose, but you've done it,

12 and enormous credit to you for reading these letters, because

13 they're not pleasant.  They're hard to read, I think.

14          But, Your Honor, only about half of them come from

15 anybody that the AIS lawyers represent.  About 1100 -- it's in

16 our papers -- about 1100 of them have come from these folks'

17 clients out of the greater than 2,000 that Your Honor has

18 received.

19          But they tell a common story, the story of a common

20 sort of abuse perpetrated by a common group of actors.  But

21 the similarities among those letters really ends there, Your

22 Honor.  They don't advocate a single position.  They don't

23 advocate a single outcome.  They don't advocate, yes, that we

24 should keep the Boy Scouts.  They don't advocate uniformly, we

25 should eradicate the Boy Scouts.

1          They tell both sides.  They tell both sides of

2    every story.  They simply tell horrible, horrible stories that

3    are shockingly true.

4          But, Your Honor, my question really is, and this is

5    maybe one of guidance if Your Honor has already ruled or is

6    about to rule, what would a Rule 2019 disclosure add to this?

7    What would be disclosed?

8          THE COURT:  What would be disclosed is who they

9    represent.  Who they represent.

10          MR. WILKS:  That's already out there, Your Honor.

11          THE COURT:  I don't know that.  I have no

12    representation from AIS, because you tell me that AIS is not

13    an entity.

14          MR. WILKS:  Well, it's in the claims register,

15    though, Your Honor.  We can -- it's easy to mine that data or,

16    listen, I would be happy to provide the Court with a list of

17    the claimants making up the 16,869.  I thought it was 869, but

18    however many it is, the almost 17,000.  That's simple to

19    provide to the Court; who is represented by these three law

20    firms, jointly.  I'm happy to provide that information.

21          You know, at the end of the day, well, and also, a

22    lot of conflation here this morning about the Coalition and

23    AIS.  Just to clarify, there's 3300 AIS clients who have also

24    signed on to the Coalition.  That's all.  So, there's thirteen

25    or 14,000 AIS clients who have not joined the Coalition.  So,

1  that's a point of clarification that pretty important.

2          But, it's because of those 3300 folks that the AIS

3  engagement letters have been produced.  They already have

4  those.  The Court already has those; they're in the record.

5          So, if it's a matter of client lists, we're happy

6  to provide that.  But beyond, that Your Honor, I'm not sure

7  who would be able to represent AIS.  It would require three

8  law firms to come together and direct someone it take

9  positions that, as a group, they don't take.

10          And another really, really important thing here

11  that the insurers seem to lose sight of or they want Your

12  Honor to lose sight of, this is not a voting bloc.  These

13  three law firms, these 17,000 individuals are not a voting

14  bloc.  There is no agenda.

15          And, Your Honor, when Your Honor ruled on it last

16  fall, I think it was on the Coalition 2019 statement, Your

17  Honor emphasized, correctly, 2019 is all about transparency of

18  agendas.

19          There is no agenda among these three law firms.

20  There is, other than, as you say, advancing the -- you know,

21  get the best deal that we can for the claimants.

22          Well, what does that look like?

23          Well, if you ask Mr. Rothweiler and he'll tell you

24  one thing and if you ask Mr. Kosnoff, he'll tell you another.

25  And if you ask every lawyer on this call what's the best for

1    the claimants, and you're going to get a lot of answers.

2            THE COURT:  Well, just because -- but just because

3    your clients may ultimately vote differently, assuming they

4    vote individually -- and I don't know yet; we're not there --

5    that doesn't mean they weren't a group and that doesn't mean

6    that there wasn't some common goal or they weren't acting in

7    concert through a lawyer.

8            MR. WILKS:  Well, that's --

9            THE COURT:  That's for anybody.  That's not just

10    for your clients.  That's for anybody who's acting as a group.

11            If it ultimately comes down to a vote, the members

12    can vote as they want.  That doesn't mean that they weren't

13    acting as a group or that someone wasn't representing them as

14    a group.

15            MR. WILKS:  So, Your Honor --

16            THE COURT:  So, that's what 2019 goes to;

17    representing a group, acting in concert to advance their

18    common interests.  Their common interests is survivors, the

19    treatment of survivors, the how are survivors going to

20    recover?

21            And that's, presumably, what Mr. Kosnoff, in terms

22    of Kosnoff Law has been doing, and what AIS has been doing.

23    They have representation letters -- I'm looking at it -- this

24    representation letter has AIS and Abused in Scouting at the

25    top of it.  It's not just an engagement letter with a

1  particular firm who then engaged co-counsel.

2         This is something more than that and I don't know,

3  and I don't know that it's my place to be concerned about

4  state law and association of separate law firms and whether

5  that's appropriate or it's an ethical violation -- I don't

6  know.

7         I just know what I have in front of me and what I

8  have in front of me is what I consider to be some type of

9  entity, some type of organization, which is what Mr. Van

10 Arsdale calls it, and what I understand is, actually, AIS

11 hasn't objected to the Rule 2019, so I should just order it,

12 because they haven't even objected.

13        So, as to AIS, there's not really even an issue.  I

14 think AIS is an entity, is an organization.  It could be an

15 unincorporated association.  It could be an affiliate.  It

16 could be an organization, as Mr. Van Arsdale says it is and

17 they are representing people.

18        MR. WILKS:  Your Honor, may I respond?

19        So, a few things.  One, the document that is the

20 engagement letter says Abused in Scouting at the top, but then

21 it has the name of all three law firms right under it.

22        THE COURT:  Pretty unusual.  Isn't that pretty

23 unusual to have the names of three law firms altogether under

24 one, what, fictional name?

25        MR. WILKS:  Well, Your Honor, a lot of my

1  engagement letters were where I partnered with other firms and

2  as co-counsel, we add both our names in the engagement letter.

3          THE COURT:  Do you have some fictional name on top

4  that's some collaboration of the two of you?

5          MR. WILKS:  Never once, Your Honor.

6          THE COURT:  Never once.

7          MR. WILKS:  But that doesn't mean that this is, for

8  2019 purposes, folks acting in concert.

9          And, please, if I could be heard on this, I think

10  it's important --

11          THE COURT:  Why are you fighting so hard?

12          MR. WILKS:  -- for Your Honor to understand --

13          THE COURT:  Why are you fighting so hard against

14  this disclosure?

15          The three decided to organize in some fashion, to

16  work together in some fashion.  So, why don't they just admit

17  that they're working together in some fashion and it's an

18  organization?

19          MR. WILKS:  So, if I can make a point and circle

20  back to that, because it's all part of the same.

21          When we're talking about Rule 2019, we're talking

22  about working in concert for a common interest.  There is a

23  wide, wide disparity among the positions of six -- 17,000,

24  80,000 claimants, because jurisdiction matters degree of

25  severity of the abuse matters, duration of the abuse, effects,

1  long-term effects of the abuse; all those things make each

2  claimant very different from one another.

3          Now, we all want to advance the best deal we can

4  for the most claimants.  Does that mean it's the same deal for

5  everybody?

6          No --

7          THE COURT:  But isn't --

8          MR. WILKS:  That's why three law firms come

9  together --

10          THE COURT:  Okay.

11          MR. WILKS:  -- and advise their clients and allow

12  the clients to vote as they will, whether it's on the RSA or

13  the plan or anything else.

14          THE COURT:  Well, I find that unusual.

15          But how -- that's not any different from the

16  Coalition.

17          MR. WILKS:  It is unusual, I agree.  It is unusual.

18  It's very different.

19          THE COURT:  The Coalition, itself, is not going to

20  vote for any of the people who are members.  Those people are

21  going to vote, themselves, or through other counsel and, yet,

22  they represent those people, together, who all have different

23  stories, who all have different degrees of abuse that was

24  visited upon them and have their own stories.

25          But they're a group.  They're an entity that

1  represents towards a common goal, even though each one of

2  those may be different.

3           MR. WILKS:  So, that's a group that came together

4  for the sole purpose of taking positions that are unified and

5  in concert and they hired their own counsel to do so.  That's

6  altogether different here.

7           AIS has never made a single filing.  It has never

8  asked to be recognized in a -- at a mediation or anywhere else

9  --

10          THE COURT:  It hasn't, but you know what it's

11 doing?

12          It's hiding behind its members by asking them to

13 file stuff with the Court.  Represented individuals do not

14 file filings with the Court; their lawyers do.

15          But in this instance, AIS or AIS law firms, ask

16 their clients to do that.  They don't get to hide behind their

17 clients.  They need to come out front and do what they want to

18 do in this court if they want to do something, but they ask

19 their clients to.

20          MR. WILKS:  Yeah, I'm sorry Your Honor looks at it

21 this way.  And it's reasonable, now I see why Your Honor looks

22 at it that way.

23          I don't think that was the intent.  I think the

24 intent was, these are folks who wanted their stories to be

25 told and this is a long road for a lot of these folks who have

1  suffered enormously and --

2          THE COURT:  I appreciate those stories.

3          MR. WILKS:  -- they wanted their story to be heard

4  by the one person that they thought could do something about

5  it.

6          THE COURT:  I appreciate those stories and I've

7  read those letters --

8          MR. WILKS:  I know you have.

9          THE COURT:  --  and they are -- and you can tell

10 how difficult they are to write.  And you can tell that

11 they're dredging things up from the past.

12         And most of those survivors are quite polite in

13 their letters.  They don't disparage other parties in this

14 case.  They certainly don't publicize somebody's home address.

15         I hear what you're saying and I'll start from the

16 beginning.  I'm confusing as to what AIS is, but I don't think

17 you get to come together in the fashion they have, advertise

18 in that fashion, say you're an organization, send out an

19 engagement agreement over the headline of AIS, and then say

20 you haven't come together because you don't agree on certain

21 strategies; somehow, you aren't representing your clients

22 collectively.  I don't think so.

23         MR. WILKS:  Understood, Your Honor.

24         THE COURT:  So, their 2019 -- so, AIS gets to file

25 a 2019 and what's required by 2019.  And so does Kosnoff Law.

1          MR. WILKS:  May I ask for clarification on that,

2    Your Honor?

3          THE COURT:  Certainly, Mr. Wilks.

4          MR. WILKS:  I don't want to be, you know,

5    impertinent, but on Kosnoff Law, Your Honor, listen, I'll

6    speak candidly.  I'm not wild about Tim Kosnoff's tweets and

7    he knows this.

8          THE COURT:  I haven't read them.  I haven't read

9    them.  I'm not on social media and I don't read them and I

10   wouldn't follow that anyway.

11         MR. WILKS:  They're put before, Your Honor, in the

12   insurance company's filings, as were information from

13   Mr. Kosnoff's divorce proceedings.  So, we got mud flying both

14   ways here in ways that are really unfortunate, particularly in

15   this state, where we're trying to do better than that.

16         But, Your Honor, you know, as far as Kosnoff Law is

17   concerned, I mean, we have a single entity.  And we talk about

18   a 2019 when folks are all affiliates of one another, the 2019

19   doesn't apply.

20         I'm not sure I see how Kosnoff Law, if it's not the

21   claimant, if it's not the clients, how Kosnoff Law is subject

22   to 2019.

23         THE COURT:  Kosnoff Law is like any law firm that

24   represents multiple clients acting in concert to advance their

25   common interests.  Those clients are -- he's got a common

1  interest for them.  He's got a common interest for survivors,

2  which good for him, if that's his lifelong passion.  Good for

3  him, but then he's subject to 2019.

4            I will also say that I'm concerned when we come to

5  the issues of the RSA and who can vote, and I need to know who

6  is advising these folks.  I need to know that.  Is it one of

7  them?  Is it all three of them?

8            I think it is going to be important, with respect

9  to those issues.

10           MR. HOGAN:  Your Honor, Daniel Hogan, on behalf of

11 Eisenberg, Rothweiler.

12           May I be heard on --

13           THE COURT:  Yes.

14           MR. HOGAN:  Thank you, Your Honor.

15           Your Honor, I represent Eisenberg, Rothweiler,

16 Winkler, Eisenberg & Jeck, and they are one of the three firms

17 that constitute AIS.  The purpose in speaking today, Your

18 Honor, is to very clearly distinguish Eisenberg Rothweiler

19 from AVA Law and from Kosnoff Law.

20           In terms of background, Your Honor, Eisenberg

21 Rothweiler is an esteemed Philadelphia law firm.  It has been

22 around for over 25 years.  Both, Mr. Eisenberg and Mr.

23 Rothweiler have each been practicing law for over 40 years.

24 They have each concentrated their practice in complex

25 litigation, representing catastrophically injured individuals,

1  suffering from brain damage and quadriplegia.

2          Eisenberg Rothweiler has earned a reputation of

3  unparalleled success in this region and is one of the most

4  accomplished law firms in Philadelphia.  They are

5  distinguished trial attorneys and they have had multiple

6  positive verdicts over the past four decades.

7          They have also been representing sexually abused

8  claimants for the last 15 years.  They participated in these

9  proceedings, Your Honor, from its inception, as a member of

10 the Coalition.  As part of the Coalition, Eisenberg Rothweiler

11 has, in fact, already submitted information, including an

12 exemplar of the AIS retention agreement.  Your Honor, that's

13 at Docket 1997-3, page 15 of 93, as well as a declaration from

14 Stewart Eisenberg, in connection with the Coalition's third

15 amended 2019 statement.

16         In addition to that, Your Honor, Ken Rothweiler had

17 a leadership role in the Coalition.  At the debtors' request,

18 the Court ordered the parties to mediate, as you're well

19 aware.  Pursuant to that mediation order, Mr. Rothweiler has

20 led the Coalition in those mediation efforts.

21         Eisenberg Rothweiler is committed to a global

22 resolution of the bankruptcy on behalf of the survivors.  So,

23 Your Honor, the purpose in laying out the history of Eisenberg

24 Rothweiler is to juxtapose the firm, as related to Mr.

25 Kosnoff.  Eisenberg Rothweiler repudiates and rejects all of

1  the tweets.

2            Now, granted, I know, Your Honor, you haven't seen

3  them, and I'm glad to hear that you haven't seen them.  I only

4  saw them yesterday.  I had to find my Twitter handle -- I

5  don't even know what it was -- and I logged in and I saw it

6  and I just want you to be clear that Eisenberg Rothweiler does

7  not support those tweets.

8            Your Honor, the AIS firms represent approximately

9  17,000 claimants.  AIS is not an ad hoc committee.  Certain of

10 the AIS members, as I indicated, are members of the Coalition.

11 Some 3,000-plus members of the Coalition are clients of

12 Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, as well as

13 AVA Law and Kosnoff Law.

14           The letters, Your Honor, indicate a co-

15 representation of the clients by those three firms, nothing

16 more.  Each of these AIS clients will file a -- has filed a

17 proof of claim and each client of AIS will individually vote

18 on the plan of confirmation.  None of the firms will vote on

19 the plan, Your Honor, as you're well aware.

20           In terms of what we're trying to accomplish, Your

21 Honor, we're trying to steer clear of hyperbole and any issues

22 that don't focus on the matter at hand; specifically, Your

23 Honor, we look at this case as being inclusive of all kinds of

24 terrible accusations being made and we're not trying to

25 emphasize those necessarily.  We're not trying to add to the

1  hyperbole; we're trying to get a deal done, Your Honor, and

2  the tweets from Mr. Kosnoff are not helpful to the process.

3  We, unequivocally, repudiate those tweets, Your Honor.  I

4  can't be more clear about that.

5          In terms of the solicitation, the letters of

6  solicitation that the Court raised as an issue for these 2019

7  statements, I just want to be clear, Your Honor, that there

8  are almost daily communications with the members or the

9  clients of AIS.  Those communications occur through both, AVA

10 Law, as well as through Eisenberg Rothweiler.  They don't

11 typically occur through Mr. Kosnoff.  There are telephone

12 calls that are made.  There are weekly meetings between

13 Eisenberg Rothweiler and AVA Law on how to answer questions

14 that are posed by claimants.

15         I saw the one letter that you referenced where the

16 claimant individual indicated that he didn't know who to

17 communicate with.  I think some of that, Your Honor, relates

18 to the fact that most of the communications are done by email.

19 I'm not certain, given the way I saw that letter, whether that

20 individual, given his current situation, whether he has access

21 to email.  So, don't take, as verbatim, the notion that the

22 individual lawyers that constitute AIS are not communicating;

23 they are, Your Honor, it's just done, typically,

24 electronically or by telephone call.

25         So, then, ultimately, Your Honor, to the matter at

1    hand.  From our perspective, the 2019 -- this is an

2    inappropriate use of 2019, but I've already heard your ruling

3    effectively, Your Honor, so I'm not going to belabor that

4    point.  Suffice it to say that Eisenberg Rothweiler has

5    already, largely, made the disclosures required by 2019 by

6    virtue of the filing made by the Coalition, the third amended

7    2019 statement.  And so, with the exception of the list of the

8    claimants that are represented by AIS, all of the various

9    disclosures required by 2019 have already been made by

10    Eisenberg Rothweiler.

11          And, finally, Your Honor, I just want to point out

12    that this motion wasn't directed at Eisenberg, Rothweiler,

13    Winkler, Eisenberg & Jeck; it was directed at Kosnoff Law and

14    at AIS, specifically.

15          And so, I just want to be clear, Your Honor, that

16    no relief has been requested, with regard to Eisenberg

17    Rothweiler, and, ultimately, I'm not sure that it ultimately

18    matters, Your Honor, because to the extent that the three

19    firms all represent the same claimants, the disclosure by one

20    of the three law firms would constitute and equivalent of the

21    other two law firms; meaning, that because they all represent

22    all of the claimants, that one disclosure by Kosnoff Law would

23    be the equivalent of a disclosure by Eisenberg Rothweiler.

24          Any questions, Your Honor?

25          THE COURT:  No, thank you.

1    And I realize, I think, well, I know I realize that

2  Eisenberg Rothweiler was not the subject of the 2019 motion

3  and I don't think I included them in my ruling, which was

4  directed at Abused in Scouting and Kosnoff Law, which were the

5  subject of the motion.

6    I will say -- No, I won't.

7    MR. HOGAN:  I read that transcript, as well, Your

8  Honor, and I did not see any indication that it was directed

9  at my client, Eisenberg Rothweiler.

10    THE COURT:  No. Okay.

11    MR. MOLTON:  Your Honor, David Molton for the

12  Coalition from Brown Rudnick.

13    Can I have a few words?

14    THE COURT:  You can have a few.

15    MR. MOLTON:  All right.  Well, I didn't want to,

16  Your Honor, but there were some inaccuracies said that I need

17  to, just on the record, change.

18    You know, number one, you know, there were

19  statements by Mr. Schiavoni as to the helpfulness or non-

20  helpfulness of the Coalition.

21    Your Honor has already ruled as to our 2019.  It's

22  law in the case.  We've complied with Your Honor's ruling;

23  indeed, in May, we supplemented that, and I don't think

24  there's been any issue with respect to that.

25    I think it's interesting, Your Honor, that a lot of

1  the arguments made seem directed more to the RSA or are

2  related to the RSA, as opposed to the disclosure issues under

3  2019.  I just want to say, Your Honor, that from the

4  Coalition's perspective, it's a remarkable achievement that

5  we're going to be dealing with an RSA for Your Honor's

6  consideration that has the support, as Ms. Boelter said, of

7  well over approximately, you know, the TCC, the debtor, local

8  counsel, the Coalition, and the FCR.

9        And as Your Honor has seen by the joining law

10  firms, substantial creditor, at least from the law firms,

11  support in terms of recommending to their clients to support

12  the plan.  In light of the history of this case that Your

13  Honor is well aware of, I think that's a remarkable thing.

14        Mr. Rothweiler, I just want to say, has been very

15  involved in leadership in the Coalition, with others, and is

16  part of our mediation delegation and will be meeting next

17  week, in accordance with what Ms. Boelter said the mediation

18  schedule will be.

19        Turning to my friend Mr. Ruggeri, I know he's a

20  very careful lawyer and he used the word "control," that this

21  is about what law firms control.  I don't think the RSA has

22  that word in it, with respect to the joining state court

23  counsel.

24        I think in Your Honor looks at the document that

25  was filed, paragraph 4(a)(1) says those local counsels shall,

1  unremarkably, Your Honor, in mass-tort cases, "Use reasonable

2  efforts to advise and recommend to their respective clients,

3  to vote to accept the amended plan," and then it continues.

4          So, this issue is not really about who controls

5  what client.  This is about what law firms have relationships

6  with clients and can, as in the conduct of their duties, make

7  a recommendation.

8          This is the same sort of procedure that was used in

9  PG&E, Your Honor, with respect to consenting law firms that

10  joined an RSA.

11          And I just want to note, Your Honor, that we have a

12  plethora of ad hoc committees in Purdue, including the ad hoc

13  committee, representing NAS babies and PI lawyers, all of whom

14  were very heavily involved, if Your Honor reads the public

15  pleadings in mediation efforts.  The Purdue vote just came in,

16  Your Honor, and my understanding is that 95 percent of the PIs

17  voted in favor of the plan and 95 percent of the NAS baby

18  claims voted in favor of the plan, using a similar sort of

19  recommendation construct as I think we have here, with respect

20  to ad hoc committees and their function.

21          THE COURT:  Isn't it important, then, to know who

22  actually represents those individuals, who the firms commit to

23  use their best efforts to convince to vote?

24          MR. MOLTON:  Yeah, I don't deny that, Your Honor.

25  I don't deny those are important points.

1           I have to turn to Mr. Schiavoni because he makes a

2   number of things that are just not correct, and I have to

3   correct it for the record, Your Honor, and I'm sorry I'm

4   taking the time.  He spent a good deal to have time talking

5   about Brown Rudnick fees and how the consents from our 18,000

6   abuse survivors who consented to be part of the Coalition

7   meant that they agreed to pay Brown Rudnick's fees.  And then

8   he said, in what could only be testimony, that 42,000 did not

9   explicitly refuse, I think he said, to sign consents because

10  they didn't want to pay those fees.

11          I don't know where that comes from.  I guess we

12  just attributed that to another one of Mr. Schiavoni's

13  statements, but I do know, Your Honor, that we talked about

14  this at length way back in the fall.  And the actual

15  submissions on the 2019 contain, and I'm referring Your Honor

16  to Docket Entry 1510, which is the supplement to the amended,

17  verified statement of the Coalition of Abused Scouts for

18  Justice, pursuant to Bankruptcy Rule 2019.  And this is

19  something, Your Honor, that has been part of all of our going-

20  forward items.  Paragraph -- to the Coalition, acknowledges

21  that neither it, nor state court counsel will charge back any

22  fees, any of the Coalition -- any fees of any of the

23  Coalition's professionals to individual survivors, in any way,

24  including by reducing individual survivors' claim

25  distribution, provided, however, that the Coalition expressly

1  reserves its right to seek a substantial contribution claim

2  and/or seek reimbursement of the fees or expenses incurred by

3  Coalition counsel, under a Chapter 11 plan.

4          So, a lot of what Mr. Schiavoni went off on in

5  connection with Brown Rudnick and its fees is just wholly

6  inaccurate and I had to say that on the record.

7          And my last point, Your Honor, is Mr. Schiavoni

8  mentioned that we had somehow defaulted in his pleading filed

9  this week, in responding to Your Honor's directive given last

10 week, that this issue be put on.

11         I recall, and the transcript is clear, and Your

12 Honor is framing of the issues today is that the issue was

13 Kosnoff and AIS.  As Your Honor notes from the amended agenda,

14 paragraph 3(a), we did submit a limited objection to Century's

15 original motion to compel at docket entry 2030.  We then

16 filed, Your Honor, afterwards, an amended 2019 statement in

17 May.

18         And from my perspective, Your Honor, that's the end

19 of the story.  So, in any event, unless Your Honor has any

20 further questions, I'll be quiet.

21         THE COURT:  I don't.  I didn't expect the Coalition

22 to file anything in response to this or certainly anything

23 further, because as I think I noted at the last hearing, I

24 don't consider this to be a Coalition issue; this is an issue

25 for AIS and Mr. Kosnoff.

1          Okay.  I've ruled.  I'm not going to repeat.  I did

2   -- I will note that when the insurance companies, I think it

3   was Century, asked for Mr. Kosnoff's deposition, I declined

4   that.  I didn't find it was relevant to the issues.

5          I think Mr. Kosnoff has now involved himself in

6   this case through AIS and through the letters that have been

7   filed in this court and is now subject to 2019, as well as for

8   the other reasons that I have indicated, including that we

9   need to know who represents these parties and I think we will

10  need to know that, in connection with, perhaps the RSA and,

11  perhaps, voting.

12          MR. WILKS:  Your Honor, may I speak to that; it's

13  David Wilks again.

14          THE COURT:  Mr. Wilks?

15          MR. WILKS:  Thank you, Your Honor.

16          Obviously, the 2004 issue wasn't noticed for today,

17  so I wasn't -- I didn't go back and prepare to argue that

18  issue.  Obviously, we resisted the 2004 motions more than

19  once, successfully, I thought.

20          THE COURT:  You did.

21          MR. WILKS:  But I would submit, Your Honor, that

22  there hasn't been that extra showing required to justify the

23  deposition of an opposing attorney.

24          THE COURT:  Oh, I'm not --

25          MR. WILKS:  But now that Your Honor has ruled

1   that --

2          THE COURT:  Yeah, I'm not suggesting there is at

3   this time.  What I'm suggesting is that the 2019 is

4   appropriate and when it's not appropriate to require something

5   of Mr. Kosnoff, I have not required it.

6          MR. WILKS:  So, I'm sorry, Your Honor.

7          Are you ordering him to appear for a deposition

8   or --

9          THE COURT:  No, no, no.

10          MR. WILKS:  My apologies.  I never should have

11   opened my mouth.

12          THE COURT:  No.

13          MR. WILKS:  I misunderstood.

14          THE COURT:  I'm sorry if I confused you -- no -- I

15   was referring to the fact that I did not require that and I

16   think appropriately so.  2019, I'm requiring, and I think

17   appropriately so.

18          MR. WILKS:  The mistake is mine, Your Honor.

19          MR. RUGGERI:  Your Honor, James Ruggeri.

20          Hartford did submit a proposed order at Docket

21   2028-1, for the Court's convenience.

22          THE COURT:  Did not look at that.  I would like you

23   to circulate it to Mr. Wilks to see if there is any issue and

24   then submit it under certification, please.

25          MR. RUGGERI:  Happy to.  Thank you, Your Honor.

1        THE COURT:  Thank you.

2        MR. BUCHBINDER:  Your Honor, this is Dave

3   Buchbinder.  May I be heard very briefly?

4        THE COURT:  Yes.

5        MR. BUCHBINDER:  Thank you, Your Honor.

6        I would simply remind the affected parties that

7   Rule 2019 requires that the statement to be filed be verified

8   under oath.  Thank you, Your Honor.

9        THE COURT:  Thank you.

10       Okay.  What's remaining?

11       MR. ABBOTT:  Your Honor, I guess the next item on

12  the agenda is Century's motion to compel Ichor Consulting to

13  comply with Rule 2019.

14       THE COURT:  Okay.

15       MR. SCHIAVONI:  Your Honor, this is another entity

16  that has appeared in the case.  They filed a notice of

17  appearance.  They represent multiple parties.

18       It particularly stands out because it's, the notice

19  of appearance was not on behalf of a law firm or such; it was

20  on behalf of a consulting firm.  And the subsequent filings by

21  the consulting firm, it is a lawyer, the fellow behind the

22  consulting firm.  But in his filings, I think he asserts that

23  he's not functioning at a lawyer in the matter.

24       So, you know, this is, again, another one that just

25  particularly stands out, that it looks like it's really coming

1  in from one of the aggregators and we'd ask for a 2019

2  disclosure.  We think it's directly tied to what you'll see on

3  the solicitation procedures, how they intend folks to vote.

4          And it's, like, for this one, it's like, I think

5  it's particularly important to have a 2019 on file.

6          THE COURT:  Okay.  Can I hear Ichor?

7          MR. CONWAY:  Good morning, Your Honor.

8          Bernard Conway, on behalf of Ichor and John

9  Edwards.

10          Virtually everything you heard about the prior

11  motion is inconsistent with the facts of this motion.  Prior

12  to the insurances carriers filing this motion, the only

13  involvement that Ichor or Mr. Edwards had was to file a notice

14  of appearance.

15          As reflected in the response that was filed by

16  Ichor, the only purpose in filing the notice of appearance was

17  to keep abreast of what was going on.  What you'll not see in

18  this case is there are no tweets.  There are no filings.

19  There's no participation, in any way, in any part of this

20  matter.  There's no evidence of any solicitation votes.

21  There's no one involved -- he's not involved in negotiations.

22  No letters written on behalf of his clients and not involved

23  in mediation.

24          Why is all of that important?

25          Because under Rule 2119 (sic), there are two

1  definitions that are critical here, one of which is the

2  disclosure of an economic interest and the other is

3  represents.  I'm not sure if there's much of an argument that

4  he has a disclosable economic interest.  The definition,

5  itself, is so broad it would be difficult to see how he

6  didn't.

7        But where this request falls flat on its face is

8  the concept of representation or represents.  If you look at

9  definitions in -- if you look at 21(b), 2119(b) (sic), you'll

10 see that it provides that a person has to represent, which,

11 presumably, reflects back to the definition that appears in

12 2019(a).

13       The advisory committee notes are pretty clear on

14 what "represents" means.  It says, the definitions provide

15 that representations requires active participation in the case

16 or in a proceeding on behalf of another entity, either by

17 taking a position on a matter before the Court or by

18 soliciting votes on the confirmation of the plan; thus, for

19 example -- and I think this is important -- an attorney who

20 was retained and consulted by a creditor or an equity security

21 holder to monitor the case, but who does not activate any

22 position before the Court or engage in solicitation activities

23 on behalf of that client, does not represent the creditor or

24 the security interest for purposes of this rule.

25       And that's precisely where we're at here, Your

1   Honor.  So, what the debtor -- what the insurance carrier has

2   done is he's done a great job proving that Mr. Edwards is a

3   lawyer, that Ichor is a law firm of some sort, but they

4   haven't met the definition and the obligations that are

5   imposed under 2019.

6           I'm going to stop.  I think we've talked the ears

7   off a head of lettuce here for the prior motion.  I think this

8   is pretty straightforward.

9           If Your Honor has questions, I'm available to

10  answer them.  Thank you.

11          MR. SCHIAVONI:  Your Honor, Ichor has -- they filed

12  a notice of appearance.  That is a representation in the case.

13  That triggers 2019.  And to be clear, we actually think what's

14  going to show up through the 2019 is that there may be an

15  ownership interest in the claims, because these are just

16  aggregator claims.

17          But whether that's what they show or not, the

18  filing of the notice of appearance triggers 2019.

19          THE COURT:  Does it?  Does just the filing of a

20  notice of appearance trigger 2019?

21          MR. CONWAY:  Your Honor, if I might be heard?

22          THE COURT:  Well, I'm going to let Mr. Schiavoni

23  answer it and then I'll let you reply, Mr. Conway.

24          MR. CONWAY:  Thank you.

25          MR. SCHIAVONI:  I think it does, Your Honor,

1  because it shows that they're a participant in the case.  You

2  know, further, it's like, when you read the solicitation

3  procedures and that's heard in another couple of weeks, I

4  think you'll see that this is how, you know, all the claims

5  are supposed to be voted on a master ballot basis or it's

6  certainly the solicitation procedures are heavily weighted in

7  that way.

8          So, we do ask, as part of our objection to the

9  solicitation procedures, that people vote.  If they're going

10 to use a master ballot, they file a 2019.

11         So, if Your Honor wants to defer it until then,

12 fine.  I do think the notice of appearance in the case

13 constitutes a participation in the case.

14         THE COURT:  But is that taking a position?

15         Mr. Conway?

16         MR. CONWAY:  I don't believe it is, Your Honor.

17 I'm not sure how else you might take note or involve yourself

18 for the purpose of keeping informed in the case, absent an

19 entry of appearance.

20         But all that said, the best the insurers have done

21 is point out that he's a lawyer, he works for a firm, and they

22 feel like he might be an aggregator.  There's no evidence of

23 that.  There's no evidence that he's done anything whatsoever

24 in this case, other than file an entry of appearance and

25 respond to the motion.  That's it.

1              THE COURT:  Okay.  Thank you.

2              I am not going to require Ichor Consulting to file

3    a Rule 2019 statement.  I don't have the evidence in front of

4    me that Ichor has either, itself, participated in the case or

5    caused its clients to participate in the case.

6              And fit becomes relevant for purposes of

7    solicitation, specifically with respect to Ichor, then we'll

8    deal with it at that point in time.  I have, obviously, not

9    made any decisions on how the vote will be solicited in this

10   case and whether Ichor is going to attempt to vote or submit a

11   master ballot, I don't know.  I don't know any parties that

12   will.  We just had the representation that AIS is not going to

13   do that, nor is Mr. Kosnoff going to submit a master ballot.

14   So, I don't know how that's going to shake out.

15             But if, in fact, it becomes a solicitation issue,

16   given that the only thing that Ichor Consulting has done is

17   file an entry of appearance, and the representation I have

18   from counsel is it was for notice purposes only and to keep

19   abreast of the case, I am not going to require it.

20             MR. CONWAY:  Thank you, Your Honor.

21             THE COURT:  Thank you.

22             MR. CONWAY:  Might I be excused?

23             THE COURT:  Yes.

24             MR. CONWAY:  Thank you.  Have a good day.

25             THE COURT:  Thank you.  You, too.

1          MR. ABBOTT:  Your Honor, the next item on the

2    agenda is Century's motion to compel Abused in Scouting,

3    Kosnoff Law, and the Coalition to make 2019 disclosures.

4    Obviously, we've talked a lot about a lot of, that but I'll,

5    again, turn it over to Mr. Schiavoni to address the Court.

6          THE COURT:  I thought we were taking this

7    altogether?

8          MR. SCHIAVONI:  I think we did, Your Honor, from my

9    perspective, also.

10          THE COURT:  Thank you.

11          MR. ABBOTT:  All right.  Fine, Your Honor.

12          That, then, I think is the last matter that was

13    intended to go forward on the agenda today, as I understand

14    it.

15          THE COURT:  Okay.  Thank you very much.  I

16    appreciate it.

17          We're adjourned.

18          MR. ABBOTT:  Thank you, Your Honor.

19        (Proceedings concluded at 11:49 a.m.)

20

21

22

23

24

25

1                          CERTIFICATE

2

3       We certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6
    /s/Mary Zajaczkowski                July 29, 2021
7   Mary Zajaczkowski, CET**D-531

8
    /s/William J. Garling               July 29, 2021
9   William J. Garling, CE/T 543

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25