# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>Re Dkt. No. 5466<br><br>Hearing Date: To Be Determined<br>Objection Deadline: To Be Determined |

## MOTION OF THE COALITION OF ABUSED SCOUTS FOR JUSTICE, THE OFFICIAL COMMITTEE OF TORT CLAIMANTS, AND THE FUTURE CLAIMS REPRESENTATIVE TO STRIKE TESTIMONY REGARDING THE REASONABLNESS OF THE HARTFORD SETTLEMENT

The Coalition of Abused Scouts for Justice (the "**Coalition**"), the Official Committee of Tort Claimants to Boy Scouts of America and Delaware BSA, LLC (the "**TCC**"), and the Future Claims Representative (the "**FCR**" and together with the Coalition and the TCC, the "**Supporting Parties**"), by and through their undersigned counsel, hereby submit this motion to strike and/or in limine (the "**Motion to Strike**") for entry of an order striking or excluding testimony regarding the reasonableness of the Hartford Settlement in connection with the Court's consideration of the *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* (Dkt. No. 5466) (the "**RSA Motion**").[2] In support of this Motion to Strike, the Supporting Parties respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the RSA Motion or the Amended Plan, respectively.

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Supporting Parties consent to the entry of a final judgment or order by the Court solely in connection with this Motion to Strike if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

3. The Hartford Settlement was signed over three months ago on April 15, 2021. *See* Dkt. No. 2624 at Ex. A (the "**Hartford Settlement Agreement**"). This settlement purports to effectuate the buyback or sale of the Hartford Policies. Hartford and the Debtors have asserted and/or offered testimony that the Hartford Settlement was fair and reasonable.[3] This assertion is

---

[3] *See, e.g.*, Hartford Objection (Dkt. No. 5681) at 3 ("After additional arm's-length negotiations, BSA and Hartford agreed on a settlement amount reflecting a reasonable assessment of BSA's liability for abuse claims and Hartford's fair share of the insurance coverage for those claims: $650 million."); Decl. of Brian Whittman at ¶ 7 (Dkt. No. 4101) ("The Debtors believe that the Hartford Settlement is reasonable and in the best interests of the estates and holders of Abuse Claims in large part due to the risks associated with continued coverage litigation with Hartford."); Whittman July 14, 2021 Depo. Tr. at 38 ("                                    ."); Mosby July 15, 2021 Depo. Tr. at 124-25

); Kinney July 23, 2021 Depo. Tr. at 141 (
).

based on the Debtors' and Hartford's undisclosed analysis of the Abuse Claims and Hartford's potential coverage obligations for such Abuse Claims.

4. Because the Hartford Settlement grossly understates the value of the Abuse Claims and the value of Hartford's insurance, the Supporting Parties have voiced their opposition to the Hartford Settlement and have asserted unequivocally that they object to any plan that includes the Hartford Settlement. As a result of the Hartford Settlement, the Coalition joined the TCC's opposition to the Debtors' third motion to extend exclusivity. *See* Dkt. No. 2672. And, the Supporting Parties began discussing their own competing plan to save the BSA and provide meaningful compensation to survivors.

5. Debtors and the Ad Hoc Committee of Local Councils engaged in discussions with the Supporting Parties through mediation. The result of those arm's-length, good faith discussions, is the RSA that is now before the Court. The RSA provides a path for the Debtors to confirm a consensual plan that provides for a global resolution through the implementation of a Channeling Injunction that protects the Local Councils and any Chartered Organization that makes a substantial contribution.

6. Hartford, Century, and various other insurers with coverage obligations for BSA Abuse Claims oppose the RSA. Hartford argues that the BSA made a mistake entering into the RSA and should, instead, press forward with a plan that includes the Harford Settlement. *See* Dkt. No. 5681. In so doing, Hartford has set the stage to argue that the RSA should not be approved as juxtaposed to the deal the Debtors reached with Hartford. The Hartford Settlement is not before the Court in the sense that the Court is not being asked to approve it, but it is very much in the room and a part of the conversation regarding the RSA.

7. The Supporting Parties sought discovery from the Debtors, Hartford, and Century in April and May regarding the Hartford Settlement. See **Exhibits A, B & C**. The discovery pertained to *two* key issues.

8. *First*, what amount, if any, will Hartford pay under the Hartford Settlement. Currently, *no one knows*. The $650 million referenced in the Hartford Settlement is not actually what Hartford has agreed to pay. Instead, it imposes—at the expense of the survivors—a cap on what Hartford will pay. To be clear, the Hartford Settlement does not obligate Hartford to pay $650 million—or any amount certain—to buy back its policies. In fact, it provides a means for Hartford to escape even paying the $650 million that it says it is prepared to pay.

9. The Hartford Settlement Agreements contain a clause that ties Hartford's obligation to pay to a future settlement with Century. The formula in Section II.E of the Hartford Settlement Agreement expressly states that the Hartford Settlement Amount is reduced by 50% of the difference between $1.3 billion and the amount payable by Century pursuant to its settlement. Harford gets a credit if Century settles for less than $1.3 billion. For example, if the Century Settlement is for $700 million, the Harford's payment obligation goes down by $300 million ($1.3 billion *less* $700 million *times* 50%) to $350 million. See Whitman July 14, 2021 Depo. Tr. at 191.

10. At deposition, Mr. Kinney—the person who negotiated and signed the Hartford Settlement Agreement on Hartford's behalf—expressed his view that this provision applies to any verdict or judgment obtained by Century regarding its BSA coverage obligations in litigation.[4]

---

[4] See Kinney July 23, 2021 Depo. Tr. at 158 ("▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇").

Hartford and Century are liable on different policies that cover different years and they have each asserted different coverage defenses. Hartford is hoping that Century will not settle immediately, will continue to litigate, and will ultimately settle for less than $1.3 billion. In such event, Hartford will either pay less than $650 million or demand a refund from the Settlement Trust. Section II.E purports to bind the Settlement Trust as well as the BSA.

11. To make matters worse, this built-in discount has nothing to do with what Hartford otherwise could be legally obligated to pay—or even what Century may be legally liable to pay. Essentially, Hartford is seeking to escape from paying based on Century's financial condition. Putting it differently, Hartford wants a discount if it turns out that Century financially lacks the ability to pay what it owes. Hartford is seeking a discount for reasons totally unrelated to its own financial condition and its own liability. Here is why.

12. A cloud hangs over Century. Century's publicly filed financial statements appear to indicate that Century does not have the ability to pay $1.3 billion to satisfy its liability for BSA Abuse Claims.[5] The Debtors' financial advisor admitted at deposition that the Debtors do not have access to Century's financial records. *See* Whitman July 14, 2021 Depo. Tr. at 193. It appears that the BSA did not do any meaningful diligence on this issue prior to entering into the Hartford Settlement Agreement.

13. It gets more complicated. Century may not be the only party that is liable under the insurance policies in question. The Century policies at issue were originally issued by Insurance Company of North America and Indemnity Insurance Company of North America

---

[5] Pages 299-301 of Chubb's Form 10-K for the fiscal year ending December 31, 2020 reflect $227 million available pursuant to an Aggregate Excess of Loss Reinsurance Agreement; $25 million available in Capital Surplus (as required by the 1996 transaction ); and $50 million in current Dividend Retention Fund Balances. Page 52 indicates that Chubb increased reserves by $259 million for abuse claims (which would not be limited to BSA abuse claims or limited to Century's exposure). The amount of solvent reinsurance available for non-aggregated claims (like abuse claims) also is unclear. Century has refused to produce information allowing the Supporting Parties to verify its financial condition, or the transaction that created this financial chaos.

(collectively, "**INA**" and the "**INA Policies**"). In 1995 and 1996, INA Financial Corporation and its subsidiaries (which included INA) underwent a restructuring and purportedly "assigned" INA's liabilities for BSA Abuse Claims to Century, which is an inactive run-off company.

14. But a party cannot relieve itself of a liability by simply assigning it to another party. The assignor remains liable unless there is a novation. *See generally* 58 AM. JUR. 2d Novation § 2 (2021) ("A novation also differs from an assignment since a novation requires the assent of all the parties concerned, while an assignment requires neither the knowledge nor the assent of the obligor, and an assignment cannot change the obligor's performance."). A novation requires the consent of the party to whom the obligation is owed. *Yoder v. T.F. Scholes, Inc.*, 173 A.2d 120, 122 (Pa. 1961) (elements of novation include "the consent of the parties"). As the California Court of Appeal stated about this very transaction: "When another insurance company assumes the insurer's obligations, the original insurer is not relieved of its liability to the insured without the consent of the insured to substitute another insurer." *AICCO, Inc. v. Ins. Co. of North Am.*, 90 Cal. App. 4th 579, 589, 109 Cal. Rptr. 2d 359 (Cal. Ct. App. 2001).

15. No evidence exists that the Debtors consented to the assignment of INA's liabilities to Century. This means that INA is still liable. As the *AICCO* court concluded, INA's letter to the policyholders "did not tell policyholders that INA had transferred its obligations under the [asbestos and environmental] policies to Century Indemnity, or that it disclaimed further responsibility under the transferred policies." *Id.* at 585-86. Indeed, the *AICCO* court had this to say about the transaction:

> We conclude these actions were likely to deceive INA's [asbestos and environmental] policyholders about the consequences of the reorganization and how it would affect their right to insurance coverage under the policies they had purchased. The allegations were sufficient to state a cause of action for ***fraud*** under the [Unfair Competition Law].

*Id.* at 589 (emphasis added).

16. INA is an active insurer and a subsidiary of Chubb. It is the Supporting Parties' belief that Chubb (or one of its active insurance subsidiaries) and Century are both responsible for the INA Policies under which the Debtors are insureds. Chubb has sufficient assets to pay the coverage obligations arising under the INA Policies. But, because of Century's and Chubb's failure to answer the discovery propounded upon them in a full and forthright fashion, the Supporting Parties do not know if Century has untapped funds available to it. The publicly available financial statements described an obligation for funding Century but remain silent as to whether there are any caps on those obligations. *See supra* fn. 5.

17. To determine how much Hartford is likely to pay, the Supporting Parties need to know how much Century can pay and which Chubb entity(ies) are liable under the INA Policies. The Supporting Parties sought discovery on these issues. Century and Chubb have invoked every litigation strategy they can think of to avoid disclosure.

18. First, Century argued that it had to have at least 30 days to respond. See Dkt. No. 3599. Then Century suggested that it would produce responsive documents. *See* Dkt. No. 5127. Century then made a production in hard copy rather than electronic form to make it take more time to review. And, Century produced the documents only to the Coalition. At the end of the day, Century ultimately produced nothing that the Coalition did not already have. Century produced the very information that the Coalition had informed Century that it had already reviewed prior to serving the discovery requests.

19. Because of this gamesmanship, no one can say with any degree of certainty that a Century Settlement could be worth $1.3 billion, which means that neither Hartford nor the BSA can credibly claim that the Hartford Settlement is worth $650 million, $400 million, $350 million,

$300 million, or even anything (if Century somehow escapes liability, then the formula would result in Hartford paying exactly *zero*).

20. **<u>Second</u>**, even if the Supporting Parties or the Court knew Hartford would pay $650 million under the Hartford Settlement, there are, to put it mildly, uncertainties regarding Hartford's actual exposure for Abuse Claims and whether $650 million is within the range of reasonableness. The Supporting Parties have performed their own analysis and determined that Hartford's liability for its coverage obligations is well above $650 million. But the Supporting Parties do not have access to the same information as the Debtors and Hartford—*i.e.*, the two parties to the Hartford Settlement.

21. The Debtors retained Bates White—a third-party consulting firm—to analyze its liability for Abuse Claims. Based on this analysis, the Disclosure Statement states that the Debtors' liability is in the range of $2.4 billion and $7.1 billion. *See* Dkt. No. 5485. The Debtors have not produced all of their claims data or analyses to the Supporting Parties, and this stated range is substantially less than what the Supporting Parties believe it to be.

22. Upon information and belief, Hartford hired NERA Economic Consulting ("**NERA**")—the firm that supplied a Declaration in support of Hartford's Rule 2004 Motion filed in January 2021 (*see* Dkt. No. 1972)—to perform a similar analysis. NERA could analyze not only data provided by the Debtors, but also data provided by Hartford to form an opinion regarding Hartford's potential exposure on its BSA policies. Hartford's analysis and data, which are a closely guarded secret, appears to presume that the vast majority of Abuse Claims are fraudulent. If the survivors are telling the truth, Hartford's exposure is likely far greater than $650 million.

23. Neither the Debtors nor Hartford will disclose all the data and information in their possession, custody, or control bearing on Hartford's exposure to liability for Abuse Claims.

8

Hartford's response is simple: nothing, nothing, nothing. Hartford will not produce any documents. Nor will Hartford permit witnesses to answer any questions regarding the basis for its opinion that $650 million is a reasonable settlement. *See* Kinney July 23, 2021 Depo. Tr. at 142-153 (attached hereto as **Exhibit D**). The Debtors are not much better on this front.

24. The Supporting Parties have been seeking a full disclosure of settlement data and related information for months. The Supporting Parties believe that the data and analysis performed by Hartford and the Debtors will likely show that $650 million is outside the range of reasonableness. But this information has been kept a secret. This is a problem.

25. Hartford opposes the RSA Motion, extolls the virtues of the Hartford Settlement, and expresses disappointment in the Debtors for seeking to abandon the Hartford Settlement. This is, in a nutshell, the narrative Hartford has advanced in its objection to the RSA Motion—RSA is bad; Hartford Settlement is good.

26. But Hartford and Century, through their stonewalling, have made it impossible for the parties to know if the Hartford Settlement is worth anywhere close to $650 million and the actual extent of what Hartford reasonably should pay. Hartford expects to hide this information from the survivor groups and this Court and at the same time attack the RSA. Hartford seeks to make the Hartford Settlement relevant to the RSA Motion. The two are linked since the approval of the RSA means that the Debtor must abandon the Hartford Settlement. The Hartford Settlement means that the Supporting Parties will oppose the Debtors' plan and propose an alternative plan if the Hartford Settlement is not abandoned. It is somewhat logical for Hartford to attack on the RSA Motion by reference to its own settlement with the Debtors. The decision to prevent discovery on the Hartford Settlement, however, has legal consequences.

## ARGUMENT

27. As Hartford has argued to this Court (*see* Dkt. No. 5819, Hartford's Motion to Strike Mosby Testimony), if a witness offers opinion testimony (lay or expert), then the witness must disclose the basis for those opinions. *See* Fed. R. Evid. 701(a) ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception . . . and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"); *see also United States v. Savage,* 970 F.3d 217, 284 (3d Cir. 2020) ("Federal Rule of Evidence 701 permits the introduction of lay opinion testimony that is rationally based on the witness's perception and helpful to clearly understanding the witness's testimony or to determining a fact in issue. . .Subsection (c) clarifies the distinction between lay opinion and expert opinion to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing."); *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 83 (3d Cir. 2009) (granting rehearing based on Court's failure to exclude lay witness testimony "of a specialized and technical nature" which "was not within [the witness's] personal knowledge."); *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 226, 50 V.I. 1122, 1129 (3d Cir. 2008) (vacating judgment for Court's failure to exclude improper lay witness opinion testimony; the lay witness opinion was improper because it was not based on the witness's first-hand knowledge but rather on information from counsel and another witness); *Chase Manhattan Bank v. Iridium Afr. Corp.*, No. CIV.A. 00-564 JJF, 2003 WL 22928042, at *3 (D. Del. Nov. 25, 2003) (stating "[t]he Third Circuit has interpreted 'rationally based on the perception of the witness' to require 'firsthand knowledge of the factual predicates that form the basis for the opinion'" and barring lay opinion testimony gained from others, including counsel) (citing *Government of Virgin Islands v. Knight*, 989 F.2d 619, 629 (3d

Cir.1993); *Alvarez v. Nicholson*, No. 03 Civ. 4173, 2005 WL 1844595, at *7 (S.D.N.Y. Aug. 3, 2005) (excluding opinion testimony because the "witness ha[d] not identified the objective bases for his opinion," therefore, the court could not "assess whether it is rationally based on the witness's perceptions . . . ."); *Baumgart v. Transoceanic Cable Ship Co., Inc.*, No. 01 Civ. 5990, 2003 WL 22520034, at *2 (S.D.N.Y. Nov. 7, 2003) (holding inadmissible "opinion . . . not based on [witness's] personal knowledge" but "on outside information, including the specialized or technical knowledge of others . . . .").

28. Here, the Supporting Parties dispute the opinions offered by witnesses that the Hartford Settlement is reasonable. But, as detailed above, the Supporting Parties have been denied access to the information necessary to assess the basis for the opinions offered regarding the reasonableness of the Hartford Settlement. It follows that this Court should strike and/or decline to hear any testimony or argument regarding the reasonableness of the Hartford Settlement in connection with the RSA Motion. If the data and analysis that factored into the decision to enter into the Harford Settlement remains undisclosed, the Court should not give any credit to testimony from anyone that the Hartford Settlement is reasonable. There is no foundation for that testimony, and it should not be considered when the Supporting Parties have been precluded from examining the support for that testimony.

29. Further, as long as Hartford insists on linking its settlement to Century (and Century's credit rating), Hartford cannot proclaim that it is offering a reasonable amount while Century and Chubb continue to stonewall all efforts to obtain their financial information and full transparency regarding the alleged "assignment" of the BSA policies to Century. The Supporting Parties are willing to litigate to obtain a fair outcome for the survivors, but we deserve a fair fight.

And it is not fair for the insurers to attack the RSA based on the Hartford Settlement while they are refusing to provide discovery regarding the fairness of that settlement.

## CONCLUSION

WHEREFORE, the Supporting Parties respectfully request that the Court enter an order granting the Motion to Strike and granting the Supporting Parties such other and further relief as the Court deems just and proper.

| | |
|---|---|
| Dated: August 6, 2021<br>Wilmington, Delaware | MONZACK MERSKY AND BROWDER, P.A. |

*/s/ Rachel B. Mersky*
(DE No. 2049)
1201 North Orange Street
Suite 400
Wilmington, Delaware 19801
Telephone: (302) 656-8162
Facsimile: (302) 656-2769
E-mail: RMersky@Monlaw.com

-and-

BROWN RUDNICK LLP
David J. Molton, Esq. (admitted *pro hac vice*)
Eric R. Goodman, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-mail: DMolton@BrownRudnick.com
E-mail: EGoodman@BrownRudnick.com

and

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-mail: SBeville@BrownRudnick.com
E-mail: TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
James I. Stang (admitted *pro hac vice*)
Robert B. Orgel (admitted *pro hac vice*)
Iain A.W. Nasatir (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (admitted *pro hac vice*)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email: jstang@pszjlaw.com
rorgel@pszjlaw.com
inasatir@pszjlaw.com
joneill@pszjlaw.com
jlucas@pszjlaw.com

    -and-

PASICH LLP

Kirk Pasich
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone: (424) 313-7850
KPasich@PasichLLP.com

    -and-

Jeffrey L. Schulman
757 Third Avenue, 20th Floor
New York, New York 10017
Telephone: (212) 686-5000
JSchulman@PasichLLP.com

*Counsel for the Tort Claimants' Committee*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Edwin J. Harron*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Sharon M. Zieg (No. 4196)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
      eharron@ycst.com
      szieg@ycst.com

*Counsel to the Future Claimants' Representative*