**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | D.I.: 5881 |

**DEBTORS' OBJECTION TO MOVING INSURERS' MOTION TO COMPEL**
**AND FOR ADDITIONAL RELIEF AND IN THE ALTERNATIVE MOTION IN LIMINE**

Boy Scouts of America (the "**BSA**") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession (together, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this objection (the "**Objection**") to the *Moving Insurers' Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* [D.I. 5881] (the "**Second Motion to Compel**") filed by certain of BSA's insurers (the "**Moving Insurers**").[2]  In support of the Objection, the Debtors state as follows:

**PRELIMINARY STATEMENT**

On July 23, the Moving Insurers filed a motion seeking production of (i) "Alvarez & Marsal's PowerPoints, presentations, and/or financial analyses or models that were submitted to

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Four of the nine Moving Insurers—Arrowood Indemnity Company, Clarendon America Insurance Company, Liberty Mutual Insurance Company and Travelers Casualty and Surety Company, Inc.—have served no document requests on the Debtors in connection with the RSA Motion.  Those insurers lack standing to compel the Debtors to produce documents they never requested.  Additionally, while the group of insurers that filed the Second Motion to Compel substantially overlaps with the group of insurers that filed the first motion to compel, there are some differences between the two groups.  For simplicity, the Debtors refer to both groups as the "Moving Insurers."

the Debtors and their Boards in evaluating the RSA and Fourth Amended Plan"; (ii) "the authorizing minutes and resolutions of BSA's Boards for the RSA, Amended Plan, and TDPs"; (iii) "the BSA's Board minutes and communications by and between the Board, the Local Councils, and the Chartered Organizations reflecting what the Board considered concerning the RSA, Amended Plan, and TDPs." *See Moving Insurers Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* [D.I. 5729] (the "**First Motion to Compel**") at 20. Additionally, the Moving Insurers asked the Court to direct "Messrs. Ownby, Mosby, and Whittman . . . to answer the questions they were instructed not to answer and questioning [be] allowed on the documents that were withheld." *Id.* The Moving Insurers also stated that they sought these documents "with any adjustments to the schedule that may be necessary." *Id.*

The schedule was adjusted and the Debtors provided all of that discovery to the Moving Insurers. The RSA hearing was adjourned by two weeks, and during that time the Debtors have made a supplemental production of, among other things, A&M presentations, board minutes and communications demonstrating that the Debtors' board deliberated and communicated extensively on the RSA. The Debtors also made their witnesses available for continued depositions, and responded to the Moving Insurers inquiries regarding which questions the witnesses would be permitted to answer, exactly as the Moving Insurers had requested. The Moving Insurers declined to take the depositions. Instead, they filed the duplicative Second Motion to Compel, seeking the same relief and to delay the RSA hearing and to preclude the evidence that has been provided.

The Moving Insurers strategically delayed in bringing the Second Motion to Compel to support a request to delay the hearing or prevent resolution of the issues to support preclusion. They failed to follow the Court's direction to meet and confer with the Debtors, refusing to do so

until five days after the Debtors proposed a schedule for supplemental discovery, and two days before the date of the continued depositions.  The Moving Insurers failed to meet their obligation under Local Rule 7026-1 to work in good faith to resolve the disputes with the Debtors before raising them to the Court by deliberately obstructing the parties' engagement and refusing to identify specific issues to the Debtors so that they could be addressed.

Moreover, the Debtors have already provided all of the information that the Moving Insurers seek that is not privileged.  They complain about certain information that they have not received, but those materials are privileged.   Indeed, the Moving Insurers have repeatedly violated Local Rule 9019 and this Court's Mediation Order [D.I. 812] in demanding privileged materials.   The Moving Insurers also identify no basis for precluding the Debtors' reply declarations.  The Debtors have the right to introduce testimony at the hearing even without filing reply declarations.  Moreover, reply evidence is allowed where the matters were raised in the opening papers or where it responds to matters raised in an opposition.   The reply declarations here satisfy both criteria.  In simple terms, the Moving Insurers cannot raise matters in their objection, and then evade an evidentiary response.

The Second Motion to Compel should be denied.

## BACKGROUND

### I.    The Debtors Enter Into The RSA, Taking A Milestone Step Toward A Plan That Compensates Abuse Victims While Preserving The Scouting Mission

1.    Only July 1, after months of intensive, court-mediated negotiations, the Debtors reached resolution with every single official and major creditor constituency in these chapter 11 cases.  Central to this resolution is the RSA, the terms of which resulted from hard-fought, good-faith, and adversarial negotiations among the Debtors, the Ad Hoc Committee of Local Councils and plaintiff representatives.  The RSA achieves for the Debtors and their estates support for a

plan of reorganization that will allow the Debtors to emerge from bankruptcy, having fulfilled their dual restructuring goals of (i) providing an equitable, streamlined, and certain process by which abuse survivors may obtain compensation for abuse, and (ii) ensuring that the Reorganized BSA has the ability to continue its vital charitable mission.

2.      Importantly, the Amended Plan under the RSA now has the support of representatives for approximately 70,000 abuse survivors—nearly 85% of holders of timely filed, non-duplicative abuse proofs of claim—and provides a framework for the global resolution of abuse claims, including third-party releases for the Local Councils and others that are essential to the Debtors' ability to continue to carry out the scouting mission.  In addition, the Amended Plan proposed under the RSA will maximize the value of the Debtors' estates for all creditors, permit the Debtors to avoid costly litigation with the plaintiff representatives, and preserve the charitable mission of the BSA.

3.      Specifically, the terms of the RSA provide, among other things:

- A commitment by the plaintiff representatives to support the Debtors' contribution of estimated $220.0 to $252.4 million, depending on time of emergence and performance through emergence, which is a more than two-fold increase in the Debtors' contributions as compared to the planned $115.6 million contribution that the Debtors set forth in the April 13, 2021 plan.

- A commitment by the plaintiff representatives to support a substantial contribution of (i) $500 million of money and property that will be transferred to the Settlement Trust from certain Local Councils to pay abuse claims and (ii) a note worth up to $100 million issued by a special-purpose entity to the Settlement Trust to pay abuse claims, funds for which shall be contributed by Local

Councils.  This total contribution represents an increase of over 40% in the contributions from Local Councils as compared to the contributions proposed in connection with the proposed April 13, 2021 plan.  In exchange, the Local Councils will be protected parties under the Plan and enjoy the benefits of the channeling injunction.

- An agreement by the plaintiff representatives to seek the compromise and settlement of all disputes concerning the Debtors' restricted or core assets, including the Tort Claimants' Committee's Restricted Assets Adversary, as well as an agreement to seek a stay of the Estimation Matters, and an agreement to withdraw any objections and agree to support the Debtors' pending request to extend their exclusivity period.

- An agreement to work in good faith to develop a protocol for addressing participation by Chartered Organizations in the benefits of the channeling injunction.

- An agreement by the Debtors to make certain other non-monetary commitments related to its youth protection programs.

## II.    The Moving Insurers File The First Motion To Compel, Seeking To Compel The Debtors To Produce Further Materials And Re-Produce Their Witnesses

4.      On July 8, within a week of filing the RSA Motion, the Debtors sent a letter to the Moving Insurers, outlining their position on the mediation privilege with supporting authority. That same day, the Debtors served responses and objections to the Moving Insurers' discovery requests, delineating which requests they believed sought privileged information.  On July 9, the Debtors informed the Moving Insurers that they would produce a categorical privilege log.  And on July 12, the Debtors finished their original document production and produced the categorical

privilege log.    *See* Fay Decl. [D.I. 5582], Ex. A.    The Debtors produced their witnesses for depositions on July 14, 15 and 19.

5.    On July 22, the Moving Insurers filed their objections to the RSA Motion.    The next day, the Debtors informed the Moving Insurers in writing that, in light of the allegations in the objections (which spanned over 350 pages of objections and attached 30 exhibits), the Debtors intended to file a declaration for an additional witness, National Executive Committee and Bankruptcy Task Force member Devang Desai, and would make Mr. Desai available for deposition before the RSA hearing (then scheduled for July 29).    *See* Hershey Decl., Ex. 1.[3]    On July 26, the Debtors filed their reply and, as noticed, included a declaration from Mr. Desai as well as a supplemental declaration from their financial advisor Brian Whittman.    *See* D.I. 5763 and 5766.

6.    After proceeding with discovery and filing their objections to the RSA Motion, on July 23, the Moving Insurers filed the First Motion to Compel, which sought production of (i) "Alvarez & Marsal's PowerPoints, presentations, and/or financial analyses or models that were submitted to the Debtors and their Boards in evaluating the RSA and Fourth Amended Plan"; (ii) "the authorizing minutes and resolutions of BSA's Boards for the RSA, Amended Plan and TDPs"; and (iii) "the BSA's Board minutes and communications by and between the Board, the Local Councils, and the Chartered Organizations reflecting what the Board considered concerning the RSA, Amended Plan and TDPs."    *See* First Motion to Compel at 20. Additionally, the First Motion to Compel requested that the Court direct "Messrs. Ownby, Mosby, and Whittman . . . to answer the questions they were instructed not to answer and questioning [be] allowed on the documents that were withheld."    *Id.*    Indeed, the Insurers

---

[3] "Hershey Decl." refers to the Hershey Declaration, filed contemporaneously with this Objection.

6

claimed that they filed the First Motion to Compel because the Debtors allegedly "did not agree to continue their deponents' depositions." *Id.* at 22.  The Insurers also stated that they sought these documents and continued depositions "with any adjustments to the schedule that may be necessary." *Id.*

7.      The Moving Insurers understood the need to raise promptly any discovery issues they intended to pursue.  July 7, 2021 Hr'g Tr. at 30:9-10 (Mr. Anker requesting adjournment so that the Insurers would not have to "come to Your Honor on, you know, five minutes notice"); *id.* at 44:2-3; 52:12-21 ("MR. SCHIAVONI:  A good process results in good decisions . . . . [W]e would try to come before the Court as quickly as possible if we can't reach a resolution . . . but, you know, clearly it's a challenge for us to do that . . . [so] I would ask that you please give serious consideration to giving us some relief on the schedule.").  The Moving Insurers also knew of the dispute at least 33 days ago.  *See id.* at 30:6-8 ("MR. ANKER: [A]nd we've been told this . . . [the Debtors] take the position that everything is subject to the mediation privilege and, therefore, we will get virtually no documents."); *id.* at 52:3-5 ("MR. SCHIAVONI: [The Debtors] want . . . mediation privilege to basically protect everything about that exchange.").

8.      On July 27, the Court held a conference in connection with the First Motion to Compel.  The Court declined to grant the Motion, ruling that "if this issue of mediation privilege and withholding of documents was evident on July 8th . . . it really should have been brought to me sooner . . . bringing issues to me at the last minute is not helpful."  July 27, 2021 Hr'g Tr. at 24:1-7.  The Court also provided guidance to the parties on the scope of the privilege: "board resolutions with respect to the RSA, presentations with respect to the board's consideration of the RSA, board minutes with respect to the resolution of the RSA are all fair game and not part of mediation privilege . . . [but] [i]f the particular documents . . . contain communications that

only took place in connection with mediation then perhaps some portion of those documents could be redacted." *Id.* at 24:11-19. At the same conference, the Court adjourned the hearing on the RSA Motion.

### III. The Debtors Agree To Supplement Their Document Production And Re-Produce Their Witnesses, As The Moving Insurers Requested

9.      At a hearing two days after the July 27 conference, the Debtors informed the Court and the parties that, in light of the Court's guidance and the adjournment of the RSA hearing, the Debtors intended to produce supplemental documents and re-produce their witnesses, as the Moving Insurers had requested:

> [W]e have made a decision to try to get some more documents out in order to resolve any lingering dispute. We are aiming to be completed with that by the end of the weekend. You may also recall there was some dispute where the insurers or the objectors were requesting the opportunity to re-depose some of the declarants . . . And we have made a decision even though we said let's meet and confer, and talk about any problems we have with documents before we have depositions so that we don't end up having to burden witnesses twice. But we have made a decision to reproduce all of them.

July 29, 2021 Hr'g Tr. at 19:20-20:2. The Debtors also stated, "We will work with objectors to get [the depositions] scheduled shortly after the completion of the document production." *Id.* at 20:3-4.

10.      No insurer offered any alternative proposal. Only counsel to Century gave any response, stating to the Court: "We have your rulings and have guidance on how to go forward." *Id.* at 21:17-18. In response, the Court stated, "I would, of course, ask parties to meet and confer, and discuss how everything is going to go forward in this period of time." *Id.* at 21:19-21. The hearing was rescheduled for August 12 and 13.

**IV.    The Moving Insurers Refuse To Meet And Confer With The Debtors, And Instead Repeatedly Obstruct Engagement**

11.    Hours after the July 29 hearing, the Debtors sent the Moving Insurers a letter providing that, consistent with the Debtors' statements at the hearing, the Debtors would provide a rolling supplemental document production (including the further un-redaction of minutes and presentations) to be completed that weekend, with continued depositions for each witness to occur on Thursday, Friday and Saturday of the following week.  Hershey Decl., Ex. 2 (July 29, 2021 Letter from Sam Hershey to Moving Insurers).  The Debtors asked the Moving Insurers to confirm the deposition dates so that the witnesses could set their schedules.  *Id.*  The Debtors also invited the Moving Insurers to "discuss [this schedule] at your convenience."  *Id.*

12.    The Moving Insurers refused.  Only two of the nine Moving Insurers responded to the Debtors, and both of them refused to discuss deposition dates or the discovery schedule until after the Debtors finished their supplemental production, *i.e.* no sooner than four days later, and three days before the Debtors had proposed to begin depositions.  *See* Hershey Decl., Ex. 3 (July 30 email from Sal Cocchiaro to Sam Hershey) ("We cannot meaningfully assess a proposed schedule without, at a minimum, knowing what directions not to answer you are withdrawing and what resolutions and Board minutes you are producing."); Ex. 4 (July 30 email from Moving Insurers to Sam Hershey) ("Until [document production] is complete and until BSA responds to Century's requests about prior instructions not to answer to be withdrawn, which requests by Century Allianz joins, we are not in a position to agree to deposition dates[.]").  The Debtors repeatedly pointed out that the issue was dates, not content, and the volunteers needed to plan, but the Moving Insurers refused to engage.  *See* Hershey Decl., Ex. 5 (July 29 email from Sam Hershey to Moving Insurers); Ex. 6 (July 31 Letter from Glenn Kurtz to Moving Insurers); Ex. 7

(August 2 email from Sam Hershey to Moving Insurers); Ex. 8 (August 2 letter from Glenn Kurtz to Moving Insurers).[4]

13.    The Debtors also made every effort to accommodate the Moving Insurers' requests for documents, even when those documents did not bear any relevance to the RSA Motion.  For instance:

- The Moving Insurers requested the model used in connection with the feasibility analysis in the Disclosure Statement.  The Debtors produced it on July 29.  *See* Hershey Decl., Ex. 5.

- The Moving Insurers asked for the Debtors' agreements with chartered organizations.  The Debtors produced exemplars on July 31.

- Century sent the Debtors a list of citations from the deposition transcripts reflecting instructions not to answer that Century said were a gating item to scheduling depositions.  The Debtors reviewed these citations and although the vast majority did not contain instructions not to answer, in many cases an answer was provided notwithstanding the instruction.  Nonetheless, on July 31, the Debtors identified the instructions that the Debtors would either maintain or agree to revisit at the continued depositions. *See* Hershey Decl., Ex. 6.

- The Moving Insurers again asked for the drafts of the TDPs and related communications exchanged with mediation parties, in continuing violation of Local Rule 9019 and the Mediation Order.  To accommodate the Moving Insurers' request for information about the mediations, on August 4, the Debtors

---

[4] The Debtors' July 30 request to confirm deposition dates was made on a phone call with the Moving Insurers.

produced a nine-page log of communications with plaintiffs' representatives regarding the TDPs.  *See* Hershey Decl., Ex. 12.

14.     As the Debtors cooperated, the Moving Insurers did the opposite.  In addition to refusing to agree to deposition dates, they continued to actively remove members of the Debtors' team from emails regarding discovery.  The Debtors repeatedly asked Century to stop deleting members of their team from its replies.  *See, e.g.*, Hershey Decl., Ex. 9 (July 8 email from Mike Andolina to Tancred Schiavoni: "[W]e have repeatedly requested that you not drop our team members from email chains.  I'm adding Sam back in."); Hershey Decl., Ex. 10 (July 29 email from Sam Hershey to Tancred Schiavoni: "Tanc, [f]irst, as we have repeatedly asked you, please do not drop our team members from your responses.  It creates confusion and makes it more difficult for the parties to engage.  Can you explain why you affirmatively remove members of our team from your responses?").  But Century continued to delete members of the Debtors' team from its replies, while consistently managing to keep over 50 insurance counsel copied. *See, e.g.*, Hershey Decl., Ex. 11 (August 2 email from Sam Hershey to Tancred Schiavoni and August 3 reply by Tancred Schiavoni, keeping all insurance counsel copied while actively deleting 10 of the Debtors' counsel; (i) Andrew Hammond; (ii) Jessica Lauria (Boelter); (iii) Matthew Linder; (iv) Laura Baccash; (v) Blair Warner; (vi) Jennifer Thomas; (vii) Paige Topper; (viii) Andrew Remming; (ix) Adrian Azer; and (x) Ernest Martin).

## V.     The Moving Insurers Finally Agree To Meet And Confer, But Decline To Depose The Debtors' Witnesses And File The Second Motion To Compel The Next Day

15.     Finally, on August 3—a full week after the July 27 conference and five days after the Debtors had sought to confer with the Moving Insurers on the discovery schedule, pursuant to the Court's instruction—the Moving Insurers agreed to meet and confer with the Debtors.  *See* Hershey Decl., Ex. 13 (August 3 email from Daniel Shamah to Sam Hershey, offering to meet

and confer on behalf of Century); Hershey Decl., Ex. 14 (August 3 letter from James Ruggeri to Mike Andolina, offering to meet and confer on behalf of Hartford).   The Debtors made themselves available that same day.[5]

16.      After spending considerable efforts avoiding the question, the Moving Insurers finally stated that they declined to depose the Debtors' witnesses and instead would file another motion to compel.   Approximately 30 hours later, the Moving Insurers filed the Second Motion to Compel.

17.      The prayer for relief and proposed order seek the exact same documents sought by the First Motion to Compel.   *Compare* Proposed Order for First Motion to Compel ¶¶ 2-4[6] *with* Proposed Order for Second Motion to Compel ¶ 1.[7]   The Debtors have already produced those documents, so this duplicative motion is puzzling.   The Second Motion to Compel also discusses various other materials, including a comprehensive privilege log (Second Motion to Compel at 1), proposals exchanged in the mediation, such as the TDPs (*id.* at 7) and unredacted

---

[5] The Moving Insurers claim that they satisfied the meet and confer requirement under Local Rule 7026-1 through a Zoom call with the Debtors on July 30.   *See* Motion at 18.   But the July 30 call was a standing mediation call that the Debtors have with the Insurers every week.   Moreover, on that call, the Moving Insurers continued to refuse to confirm deposition dates or agree to a discovery plan until the Debtors finished their supplemental document production, which would not occur until days later.   Thus, the Moving Insurers claim to have satisfied the meet-and-confer requirement by having a conversation with the Debtors in which they refused to meet and confer.

[6] "The Debtors must produce Alvarez & Marsal's PowerPoints, presentations, and/or financial analyses or models that were submitted to the Debtors and their Boards in evaluating the RSA and Fourth Amended Plan . . . the authorizing minutes and resolutions of BSA's Boards for the RSA, Amended Plan and TDPs . . . [and] the BSA's Board minutes and communications by and between the Board, the Local Councils, and the Chartered Organizations reflecting what the Board considered concerning the RSA, Amended Plan and TDPs"

[7] "The Debtors shall produce: (i) Alvarez & Marsal's PowerPoints, presentations, and/or financial analyses or models that were submitted to the Debtors and their Boards in evaluating the RSA and Fourth Amended Plan, (ii) the authorizing minutes and resolutions of BSA's Boards for the RSA, Amended Plan, and TDPs, and (iii) the BSA's Board minutes and communications by and between the Board, the Local Councils, and the Chartered Organizations reflecting what the Board considered concerning the RSA, Amended Plan, and TDPs."

privileged communications between White & Case and the Debtors' senior officers (*id.* at 6-7). However, none of these materials are requested in the prayer for relief or the proposed order. Indeed, some of these materials, like the privilege log, are mentioned in the opening paragraph and then never brought up again.  In any event, these materials are privileged, which presumably is why they are not actually requested.

18.     Lastly, the Second Motion to Compel attaches eight documents that it claims reflect improper redactions or other deficiencies.  The Moving Insurers identified only one of these documents to the Debtors' before filing the Second Motion to Compel and flatly refused to discuss or cite any others.  These documents are privileged because they reflect advice from counsel or negotiations between the mediation parties.

## ARGUMENT

### A.     THE MOVING INSURERS DELAYED TOO LONG IN SEEKING TO RESOLVE THEIR COMPLAINTS ABOUT DISCOVERY

19.     Courts routinely deny untimely motions to compel. *See, e.g.*, *Maint. Enters. v. Orascom E&C United States*, 2018 U.S. Dist. LEXIS 244179, at *26 (S.D. Iowa Feb. 16, 2018) (denying motion to compel where party "did not timely file its objections to the claim of privilege"); *Fuller v. City of Kitsap*, 2017 U.S. Dist. LEXIS 192602, at *17 (W.D. Wash. Nov. 21, 2017) (barring motion for sanctions or exclusion where "Plaintiff has not shown good cause for his delay in challenging the Defendants' claims of privilege."); *United States v. Barron Collier Co.*, 2015 U.S. Dist. LEXIS 194653, at *13 (D. Ariz. Dec. 23, 2015) (denying additional discovery where party "did not exercise diligence when it delayed challenging the . . . assertion of . . . privilege."); *Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 1998 U.S. Dist. LEXIS 18428, at *14 (E.D.N.C. Sept. 28, 1998) (finding waiver of objections due to the "delay in challenging the sufficiency of Defendants' privilege claims."); *Courtney v. Ivanov*, 2016 U.S.

Dist. LEXIS 46519, at *14 (W.D. Pa. Apr. 6, 2016) (denying motion to compel where movant "offer[s] no reasons or case law explaining why the Court should ignore their delay" in filing the motion); *Bryan v. United States*, 2012 U.S. Dist. LEXIS 152668, at *16 (D.V.I. Oct. 24, 2012) (denying motion to compel because "although plaintiffs claim to have continuously complained about discovery deficiencies, the fact is they simply failed to file their motions in anything resembling a timely manner, and they give no sufficient reason why the motions could not have been filed sooner"); *Am. Bd. of Internal Med. v. Von Muller*, 2012 U.S. Dist. LEXIS 94436, at *40 (E.D. Pa. July 9, 2012) (noting that the court denied the defendant's motion to compel because it was filed "the same day on which discovery finally closed" and denying the "very belated request to compel the plaintiff to produce" evidence).

20.    Nearly every issue that the Moving Insurers raise in the Second Motion to Compel could have been raised weeks ago.  For example, the Moving Insurers argue that, under the "at-issue waiver" doctrine, the Debtors have waived the mediation privilege by asking for certain factual findings at issue. *See* Second Motion to Compel at 1-3; 8-10. Those factual findings were requested in the RSA Motion filed on July 1, and the Debtors shared their position on the mediation privilege to the Moving Insurers on July 8.

21.    The same is true for the Moving Insurers' arguments for precluding the Debtors' reply declarations.  The Debtors disclosed their intent to file the Desai declaration on July 22—*13 days* before the Moving Insurers filed the Second Motion to Compel—and filed the Desai Declaration and supplemental Whittman Declaration on July 26—*nine days* before the Moving Insurers filed the Second Motion to Compel.

22.    Similarly, the Motion appears to seek to compel the Debtors to produce a comprehensive privilege log, rather than the categorical privilege log the Debtors already

produced.[8]  Yet the Debtors announced their intention to produce a categorical privilege log on July 9—*one month ago*—and produced that log on July 12—*23 days* before the Moving Insurers filed the Second Motion to Compel.  *See* Fay Decl., Ex. A.  Notably, the First Motion to Compel did not seek production of a privilege log, even though it was filed *11 days* after the Debtors produced the categorical log that the Moving Insurers now challenge.

### B.    THE MOVING INSURERS FAILED TO SATISFY THEIR OBLIGATION UNDER LOCAL RULE 7026-1 TO MEET AND CONFER IN GOOD FAITH WITH THE DEBTORS BEFORE FILING THE SECOND MOTION TO COMPEL

23.    Local Rule 7026-1 provides that "[p]arties are expected to confer and in good faith attempt to reach agreement cooperatively on how to conduct discovery[.]"  Del. Bankr. L. R. 7026-1(a).  Local Rule 7026-1 further requires counsel for the moving party to certify that "a reasonable effort has been made to reach agreement with the opposing party on the matters set forth in the motion[.]"  Del. Bankr. L. R. 7026-1(d).  The Moving Insurers have failed to satisfy these requirements

24.    *First*, the Moving Insurers repeatedly refused to discuss the discovery schedule with the Debtors, in violation of Local Rule 7026-1 and the Court's instruction that the parties "meet and confer and discuss how everything is going to go forward in this period of time."  July 29, 2021 Hr'g Tr. at 21:19-21.  Indeed, over the five-day period from July 29 to August 2, the Debtors invited the Moving Insurers to discuss the discovery schedule no fewer than five times.  *See* Hershey Decl., Exs. 5-8.  Each time, the Moving Insurers either failed to respond at all, or refused to meet and confer.  Hershey Decl. Exs. 3, 4.

---

[8] The request for a privilege log appears only in the first paragraph of the Motion but not in the body of the Motion, the prayer for relief or the proposed order.

25.     *Second*, since July 8, the Debtors have repeatedly asked the Moving Insurers for their position on the mediation privilege and any purported supporting authority.  *See* Hershey Decl., Exs. 15-19.  The Moving Insurers either did not respond or, with the exception of Great American, refused to state their position.[9]  This refusal extended through the August 3 meet and confer, when the Moving Insurers failed to provide any authority to support their request for mediation materials.

26.     *Third*, despite repeated requests by the Debtors, the Moving Insurers failed to identify specific disputes, much less seek to resolve them.  Indeed, except for one set of minutes, which the Debtors have produced, the Moving Insurers never raised any of the eight documents submitted with the Second Motion to Compel to the Debtors' attention.

27.     *Fourth*, on the August 3 meet-and-confer, counsel for Allianz accused the Debtors of withholding communications with Local Councils.  When the Debtors asked counsel for Allianz to identify documents supporting his position so that we could address the issue, he at first refused and then cited only one document.  The Debtors reviewed this document, but it did not support Allianz's position, and the Debtors responded the same day.  *See* Hershey Decl., Ex. 23 (August 3 email from Sam Hershey to Moving Insurers).  Now, the Second Motion to Compel cites a *different* document regarding communications with Local Councils.  Within 24 hours, the Debtors reviewed this document, determined that its attachment was withheld inadvertently, and produced it with the attachment.  *See* Hershey Decl., Ex. 24 (August 5 email from Sam Hershey to Moving Insurers).[10]  Counsel to Allianz could have resolved this issue simply by raising it

[9] As the Debtors previously noted, Century refused to state its position on the mediation privilege in three separate emails.  *See* Hershey Decl., Exs. 20-22.

[10] As the Moving Insurers acknowledge, when the Debtors withheld attachments for privilege, they marked their decision by inserting a slipsheet.  *See* Motion at 7.  The fact that this email was produced

with the Debtors in the first instance, as requested, instead of asking the Court, in violation of Local Rule 7026-1.

28.    This record reflects a lack of good-faith engagement by the Insurers, resulting in the Insurers placing an unnecessary burden on the Court in filing duplicate motions. *DeWitt v. Penn Del Directory Corp.*, 912 F. Supp. 707, 713 (D. Del. 1996), *aff'd in part, rev'd in part on other grounds*, 106 F.3d 514 (3d Cir. 1997) (finding that the purpose of the meet-and-confer requirement is "to facilitate resolution of disputes among the parties before formally requesting the Court's aid."); *see also Medtrica Solutions Ltd. v. Cygnus Med. LLC*, 2013 WL 5966689, at *4-5 (W.D. Wash. Nov. 7, 2013) ("A good faith effort to resolve this matter would have involved an exchange of information until no additional progress was possible.  This did not happen.  Furthermore, there is no indication that the parties reached impasse prior to the filing of this motion.").

## C.    THE MOVING INSURERS HAVE OFFERED NO ARGUMENT FOR THE PRODUCTION OF THE DOCUMENTS THEY ACTUALLY SEEK, AND THEY HAVE ALREADY BEEN PRODUCED

29.    While the Second Motion to Compel mentions various documents, the documents that the Moving Insurers actually seek are outlined in the conclusion and the proposed order. Notably, these documents are exactly the same as what the Moving Insurers sought in the First Motion to Compel, and are precisely what the Debtors produced in their supplemental production. *See supra* ¶ 17.  The Moving Insurers failed to even argue that the Debtors have not given them these materials, consistent with applicable privileges.

30.    Specifically, the Second Motion to Compel seeks three types of documents:

without a slipsheet should have indicated to the Moving Insurers that the failure to produce the attachment was inadvertent. *Id.*  Additionally, the Moving Insurers have not explained why they sought the email and attachment, which are irrelevant to the Moving Insurers' objection to the RSA Motion.

1) A&M presentations: The Second Motion to Compel seeks "Alvarez & Marsal's PowerPoints, presentations, and/or financial analyses or models that were submitted to the Debtors and their Boards in evaluating the RSA and Fourth Amended Plan." Second Motion to Compel at 18. The Second Motion to Compel makes no argument regarding these materials: They are mentioned in the first paragraph and the last paragraph, and nowhere in between. The Debtors have provided 11 A&M presentations to the Moving Insurers for the period from February 1 to July 1.

2) Minutes and resolutions: The Second Motion to Compel seeks "the authorizing minutes and resolutions of BSA's Boards for the RSA, Amended Plan, and TDPs." Second Motion to Compel at 18. The Debtors have produced all 26 sets of minutes from March 1 to July 6, with relevant authorizing resolutions unredacted.

3) Communications with Local Councils and chartering organizations: The Second Motion to Compel seeks "the BSA's Board minutes and communications by and between the Board, the Local Councils, and the Chartered Organizations reflecting what the Board considered concerning the RSA, Amended Plan, and TDPs." Second Motion to Compel at 18. Although these materials are not relevant to the Moving Insurers' objection to the RSA Motion, the Debtors have produced non-privileged, responsive materials.

31. Very limited redactions remain over privileged material, such as mediation proposals and communications, and the Moving Insurers have not even argued that such material is not privileged.

**D.   THE MOVING INSURERS HAVE DEMANDED PRIVILEGED MATERIAL, IN VIOLATION OF THIS COURT'S MEDIATION ORDER AND LOCAL RULE 9019**

32.     The Moving Insurers' assertion that the Debtors "routinely raise the specter of mediation privilege in response to almost any request for documents that the Moving Insurers seek" is both incorrect and revealing.  It is incorrect because the Debtors have made substantial productions.  It is revealing because the specter of mediation privilege is raised only because the Moving Insurers persistently seek documents in flagrant violation of this Court's Mediation Order and Local Rule 9019.  The materials that the Moving Insurers argue about in the body of their brief, but do not request in the conclusion or proposed order, are plainly protected by either mediation or attorney-client privilege.

33.     The Mediation Order and Local Rule 9019 preclude the Insurers from demanding mediation material: "[N]o person shall seek discovery from any participant in the mediation with respect to any information disclosed during mediation."   Del. Bankr. L. R. 9019-5(d)(i); Mediation Order ¶ 7.  Under Local Rule 9019, privileged mediation materials include "oral or written information disclosed by the parties or by witnesses in the course of the mediation," including, without limitation, "views expressed or suggestions made by a party with respect to a possible settlement of the dispute"; "statements or admissions made by a party in the course of the mediation"; and "documents prepared for the purpose of, in the course of, or pursuant to the mediation."  Del. Bankr. L. R. 9019-5(d)(i).

34.     The Moving Insurers have fragrantly violated the Mediation Order and Local Rule 9019 by repeatedly requesting mediation materials:

- The Moving Insurers' document requests sought, among other things: "All Documents Concerning Communications with State Court Counsel, the Coalition, TCC, FCR and/or their counsel Concerning the RSA, the Term Sheet, the TDPs,

the Settlement Trust Documents, and/or the Hartford Settlement." *See* Propounding Insurers Request for Production No. 7.

- Emails from the Insurers demanded production of, among other things: "All communications with the Board and its members and BSA's officers about" the Hartford Settlement. *See* Cocchiaro Decl. [D.I. 5731], Ex. 7 (July 22 email from Tancred Schiavoni to the Debtors).

- Questions of the Debtors' witnesses at their depositions asked, among other questions: "what was discussed at [the] meeting" between the Debtors' Bankruptcy Task Force and the mediators.  Ownby Dep. Tr. 194:12-23.

- This Motion seeks production of drafts of "the RSA, the Plan, the TDP and other documents" exchanged with mediation parties. *See* Second Motion to Compel at 7.

35.    The Moving Insurers offer no basis for their incorrect speculation that the redactions in the Debtors' document production do not cover privileged material.  To the contrary, the materials sought here are facially privileged.  Indeed, the minutes for the June 13, 2021 Bankruptcy Task Force meeting as to which the Moving Insurers call the redactions "little more than nonsense," provide a good example of the Debtors providing the insurers with information demonstrating privilege.  *See* Second Motion to Compel at 6.  The Debtors left the name of the lead attorney for the Debtors, Jessica Lauria, unredacted so that it would be clear to the Moving Insurers that what Ms. Lauria "advised" the Bankruptcy Task Force is privileged. *See id.*  The same is true for statements attributed to the Debtors' insurance counsel, Haynes and Boone.  *Id.*  Other portions of the minutes demonstrate that the redacted material is protected by the mediation privilege.    For example, the sequence "the Coalition, TCC and FCR

[PRIVILEGED] Restructuring Support Agreement (RSA)" makes clear that what is redacted is protected by the mediation privilege.  *See id.*

36.    The same is true for the other documents the Moving Insurers cite:

- The Moving Insurers argue that a June 5, 2021 email from the Coalition to the Debtors attaching a term sheet and RSA is not privileged because it "predates execution of the RSA by nearly four weeks."  Second Motion to Compel at 8. The proposition that the mediation privilege does not attach until after a settlement is reached is specious.  The negotiations are exactly privileged.  Local Rule 9019 ("The mediator and the participants in mediation are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation."); *In re Student Fin. Corp.*, Nos. 04-56423, 04-1551 JJF, 05-165-JJF, 2007 U.S. Dist. LEXIS 95882, at *5 (D. Del. May 25, 2007) ("The judicial system encourages the resolution of disputes by mediation and settlement.  It is axiomatic that the assurance of confidentiality for communications made during the course of settlement negotiations is a critical component of the process.").

- The Moving Insurers argue that the minutes for the April 26, 2021 National Executive Committee are not privileged because they "bear directly on the alleged 'futility' and 'change in circumstances' arguments that Debtors will argue to the Court allow it to shirk its obligations to Hartford and proceed with the RSA." *See* Second Motion to Compel at 6.  The minutes record mediation communications and reflect attorney-client communications, so they are privileged.  Information does not lose privilege because it is relevant to a party's argument.  If such an

exception to privilege were recognized, it would swallow the concept of privilege in its entirety.

- The Moving Insurers challenge the Debtors' use of slipsheets to mark the withholding of privileged email attachments.  There cannot be any legitimate dispute that when the Debtors and other mediation parties exchanged drafts of documents (the names of which are contained in the headers of the emails), those documents are protected by the mediation privilege.

- The handwritten notes of Roger Mosby and Devang Desai (*see* Fay Decl., Exs. K and L) contain references to plan options, BSA trust contributions, Bankruptcy Task Force meetings, National Executive Committee meetings, and conversations with advisors, all of which signal the basis for the redactions.

- The Moving Insurers claim that the Debtors improperly redacted from the minutes for the May 14, 2021 Bankruptcy Task Force Meeting "a report" that "Mr. Mosby and other members of the 'Key 3' gave . . . on their recent 'road trip' that took place near the end of April 2021."  *See* Second Motion to Compel at 8.  But the Moving Insurers do not attach these minutes as an exhibit, and the Debtors have reviewed them and found no reference to a report regarding a Key 3 road trip.

37.    The Debtors have nothing to hide, but they cannot violate this Court's Mediation Order or Local Rule 9019 so that the Moving Insurers can fish.  *See Wilmington Hosp. v. New Castle Cnty.*, 788 A.2d 536, 541 (Del. Ch. 2001) ("[c]onfidentiality of all communications between the parties or among them and the mediator serves the important public policy of promoting a broad discussion of potential resolutions to the matters being mediated.  Without the expectation of confidentiality, parties would hesitate to propose compromise solutions out of the

concern that they would later be prejudiced by their disclosure."); *In re Tribune Co.*, No. 08-13141 (KJC), 2011 Bankr. LEXIS 299, at *29 (Bankr. D. Del. Feb. 3, 2011) ("Assuming they would even agree to participate in the mediation process absent confidentiality, participants would necessarily feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute.  The effectiveness of mediation would be destroyed, thereby threatening the well established public needs of encouraging settlement and reducing court dockets.") (citations omitted); *Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 62 (Del. Ch. 2005) (citing "Delaware's recognition that confidentiality is vital to the effectiveness of mediation" and finding that "[t]he process works best when parties speak with complete candor, acknowledge weaknesses, and seek common ground, without fear that, if a settlement is not achieved, their words will be later used against them in the more traditionally adversarial litigation process.").  The confidentiality of mediation is important, particularly here where it is ongoing with other parties.

38.    Since July 8, the Debtors have repeatedly pointed out the Moving Insurers' violations of the Mediation Order and Local Rule 9019, and asked the Moving Insurers to explain how they could demand production of mediation materials without violating the Local Rules and Mediation Order.  The Moving Insurers have never identified any basis to support their requests, nor do they do so now.  The Moving Insurers correctly quote this Court's remarks about mediation privilege, and the Debtors have produced exactly what the Court indicated should be produced, including board resolutions with respect to the RSA, presentations with respect to the board's consideration of the RSA, and board minutes with respect to the resolution of the RSA.  July 27, 2021 Hr'g Tr. at 24:11-14.  However, the Moving Insurers then misstate

this Court's ruling that "this Court recognized that discovery of the negotiations of the … RSA was fair game[.]"  Second Motion to Compel at 4.  The Court made no such statement.  The mediation negotiations are plainly privileged, and the Moving Insurers have cited no authority to the contrary.  *See* Second Motion to Compel at 6-8.

### E.    THE DEBTORS HAVE NOT WAIVED PRIVILEGE

#### 1.    A Good Faith Finding Can Be Made Based On Mediation Without A Privilege Waiver

39.    The Moving Insurers' argument that the Debtors have waived mediation privilege by putting "at issue" their good faith is baseless.  Initially, mediation is protected by this Court's Mediation Order and Local Rule 9019, and cannot be waived by the Debtors.

40.    In any case, a court may consider both a party's participation in mediation and the outcome of the mediation to find that a settlement was entered into in good faith.  *Smith v. Wacker Neuson Corp.*, 2011 U.S. Dist. LEXIS 118052, at *3 (S.D. Ill. Oct. 13, 2011) (a settlement was "made in good faith," citing both its terms and the fact that it "was reached as a result of extended negotiations, both in third-party mediation and in Court sponsored mediation settlement conferences and ongoing settlement conferences").  Indeed, a good faith finding based on mediation is customary and does not waive privilege.  *See McMillon v. Hawaii*, 2011 U.S. Dist. LEXIS 17859, at *6 (D. Haw. Feb. 22, 2011) (finding "demonstrat[ion of] good faith and arms-length negotiations" where there were "numerous settlement discussions between the parties, and the parties also engaged in mediation"); *In re A&T Reynolds & Sons, Inc.*, 452 B.R. 374, 383-84 (S.D.N.Y. 2011) (rejecting bankruptcy court's conclusion that party did not participate in mediation in good faith, finding that courts should weigh good faith by considering a party's "compliance with orders to attend mediation, provide pre-mediation memoranda, and, in some cases, produce organizational representatives with sufficient settlement authority");

24

*AT&T Corp. v. J&J Schlaegel, Inc.*, 2020 U.S. Dist. LEXIS 239093, at *6 (S.D. Ohio Dec. 18, 2020) (finding no evidence to support assertion of lack of good faith, citing confidential nature of mediation proceedings and the magistrate judge's "failure to indicate a lack of good faith at the mediation"); *cf. In re Lightsquared Inc.*, Adv. Proc. No. 13-1390 (Bankr. S.D.N.Y. Dec. 18, 2014) (mediator's report finding that "[a]ll those involved in this renewed mediation process— including the debtors . . . have engaged in it in good faith."). Moreover, a party cannot vitiate mediation privilege by challenging good faith. *See Dietz & Waston, Inc. v. Liberty Mut. Ins. Co.*, 2015 U.S. Dist. LEXIS 9815, at *11 (E.D. Pa. Jan. 28, 2015) (rejecting argument that mediation privilege does not apply where a party "alleg[es] an insurer's failure to engage in good faith settlement negotiations."); *In re A&T Reynolds & Sons, Inc.*, 452 B.R. 374, 383-84 (S.D.N.Y. 2011) (rejecting bankruptcy court's conclusion that party did not participate in mediation in good faith and finding that courts should assess good faith by a party's "compliance with orders to attend mediation, provide pre-mediation memoranda, and, in some cases, produce organizational representatives with sufficient settlement authority.").

41.    Additionally, the Debtors can prove good faith without regard to what took place in mediation. *See In re RFC*, 2018 U.S. Dist. LEXIS 160008, at *69 (D. Minn. Sept. 19, 2018) (permitting evidence regarding whether settlement was negotiated in good faith notwithstanding invocation of mediation privilege); *Hecker & Koch, Inc. v. German Sport Guns Gmbh*, 2014 U.S. Dist. LEXIS 200643, at *19 (S.D. Ind. May 15, 2014) (finding that a party could "employ information from the privilege log [to] support inferences regarding when and to what exten[t] [plaintiff] knew" about certain conduct); *see also Cage v. Harper*, 2021 U.S. Dist. LEXIS 132820, at *4 (N.D. Ill. July 16, 2021) (noting that "an admission that a privileged communication took place on a certain day . . . can have a bearing on the issues at trial.");

*Siemens v. Seagate Tech.*, 2009 U.S. Dist. LEXIS 132522, at *16 (C.D. Cal. Apr. 27, 2009) (finding no error in admission of privilege logs as "evidence upon which the jury could have found reasonable diligence" by a party).

42.    The Moving Insurers' cite nothing supporting their argument that the Debtors have waived the mediation privilege under the "at-issue waiver." *See* Second Motion to Compel at 1-3; 8-10.  Most of the cases the Moving Insurers cite do not even involve the "at-issue waiver" doctrine or the mediation privilege.  *See CP Kelco U.S. Inc. v. Pharmacia Corp.*, 213 F.R.D. 176, 179 (D. Del. 2003) (holding that, under Fed. R. Civ. P. 26(b)(4)(B), testifying expert must disclose the materials he relied on for his opinion); *In re Unitrin, Inc. S'holders Litig.*, Civ. A. 13656, 1994 Del. Ch. LEXIS 159, *6 (Del. Ch. Sept. 7, 1994) (finding that anti-trust defendants had waived attorney-client privilege by introducing into the record "the actual advice given to them" by counsel); *In re Welded Constr., L.P.*, Nos. 18-12378 (CSS), 19-50194 (CSS), 2021 Bankr. LEXIS 345, at *6 (Bankr. D. Del. Feb. 15, 2021) (holding that a party selectively waived privilege over a specific document because it "substantially relied" on that document in multiple court pleadings).  Two of the Moving Insurers' cases only support the Debtors' position.  *See In re Grand Jury Proceedings,* 219 F.3d 175, 191 (2d Cir. 2000) (vacating order to produce privileged materials); *Tribune Co. v. Purcigliotti*, No. 93 CIV. 7222, 1997 U.S. Dist. LEXIS 228 , *28, *27 (S.D.N.Y. Jan. 10, 1997), *modified*, 1998 U.S. Dist. LEXIS 5155 (S.D.N.Y. Apr. 14, 1998)  (unreported magistrate judge opinion whose findings regarding "at issue" waiver were substantially modified by the district court to protect the attorney-client privilege).  Only one case, *G. Angel*, involved waiver of the mediation privilege, and that case was decided under Florida law and is inapt.  *See G. Angel Ltd. v. Camper & Nicholsons USA, Inc.*, No. 08-60211-CIV, 2009 WL 10666975 (S.D. Fla. May 22, 2009) (finding that "public

policy favors a mediation privilege" but finding examination of protected communications was permitted under Florida State mediation statute).

43.     The Moving Insurers also claim that the Mediation Order "expressly **preserves** the ability of parties to seek discovery concerning any good faith finding."  Motion to Compel at 4 (emphasis in original).  This is a misrepresentation of the Mediation Order, which provides that "the right to seek discovery, if any, is preserved" if "a party puts at issue any good faith finding concerning the Mediation **in a subsequent action concerning insurance coverage**."  Mediation Order ¶ 7 (emphasis added).  The RSA Motion is not a subsequent action, nor does it concern insurance coverage.

44.     The Moving Insurers cite only one Delaware case to support waiver, and in that case the court upheld the mediation privilege.  *See In re Tribune Co.*, 2011 Bankr. LEXIS 299 (Bankr. D. Del. Feb. 3, 2011).  In *Tribune*, a court-ordered mediation resulted in the debtors and certain creditors reaching a settlement and proposing a plan embodying the terms of that settlement.  As here, certain creditors filed a motion to compel the production of "documents and communications related to the Mediation to assess (and challenge) the alleged arms-length nature of the settlement negotiations."  *In re Tribune Co.*, 2011 Bankr. LEXIS 299, at \*24.  Noting the strong public policy basis for the mediation privilege, as reflected in Local Rule 9019, Judge Carey denied the motion to the extent it sought to compel the production of "written or oral communication between or among Mediation Parties concerning the Mediation[.]"  *In re Tribune Co.* at \*32 .  The court further concluded that all protections afforded by the Mediation Order entered in the case and Local Rule 9019 would be enforced.  *Id.* at \*32.

45.     Mediated resolutions are commonplace in bankruptcy and other cases.  The Moving Insurers' position that one cannot establish good faith without violating mediation orders

and Local Rule 9010 is frivolous.  Mediating to a result supports a good faith finding, it does not preclude it.

### 2.  Seeking A Finding Of Good Faith Does Not Waive Privilege

46.    The Insurers claim waiver based on a *request* for a finding that the Debtors negotiated the RSA in good faith and at arms-length.  In addition to the fact that such a finding can be made without waiving privilege (as demonstrated above), asking for a finding does not waive privilege.  A waiver requires the intentional disclosure of privileged information, not a request for a finding.  *See* Fed. R. Evid. 502(a)(1) (providing that privilege over "an undisclosed communication or information" will be waived only as a result of an "intentional" waiver).

47.    The Insurers do not cite any authority to support their novel and incorrect argument.  The Debtors either will or will not introduce sufficient evidence to support the finding, but a request for a finding has nothing to do with waiver.

### 3.  The Debtors Have Not Selectively Disclosed Privileged Material

48.    The Moving Insurers argue—without citing a single case or addressing the governing legal standard[11]—that the Debtors have waived privilege by "selectively" disclosing privileged material in certain documents.  The standard for selective waiver of attorney-client privilege is Federal Rule of Evidence 502, which applies to bankruptcy cases via Federal Rule of Bankruptcy Procedure 9017.  Rule 502(a) provides that when a disclosure of attorney-client privileged material is made in a federal proceeding "and waives the attorney-client privilege,"

---

[11] The Moving Insurers' failure to cite authority waives this argument.  *See Gochin v. Thomas Jefferson Univ.*, 752 Fed. App'x 135, 136 (3d Cir. 2019) ("To preserve arguments in a brief, a [party] must support the arguments with reasoning as well as ***citation to authorities…*** We do not consider undeveloped arguments or those not properly raised and discussed in a brief.") (emphasis added); *Rahn v. Bd. of Trs. of N. Ill. Univ.*, 803 F.3d 285, 295 (7th Cir. 2015) ("[F]undamentally, the plaintiffs have waived any claim as to [a particular argument] because they have ***failed to cite any legal authority in support of their argument***.") (emphasis added).

the waiver extends to an undisclosed communication or information only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together.  Fed. R. Evid. 502.

49.    Not all communications between an attorney and a client are protected.  The attorney-client privilege "protects communications between attorneys and clients from compelled disclosure" and applies to a communication that satisfies the following elements: (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.  *In re Tribune Co.*, 2011 Bankr. LEXIS 299, *22 (Bankr. D. Del. Feb. 3, 2011).

50.    The Moving Insurers claim that the Debtors waived privilege by unredacting two sentences in the minutes to the May 14, 2021 meeting of the National Executive Committee: (1) "the court could defer ruling on some of the issues until a confirmation hearing after the plan has been voted upon," and (2) "advisors have also been working to find ways for the BSA to reach agreement on BSA's contribution to the trust while minimizing the expense and risk of litigating issues while obtaining a global resolution."  *See* Second Motion to Compel at 6; Fay Decl., Ex. F.  Neither sentence is privileged, nor do they advantage the Debtors.  The first sentence is a textbook description of how a bankruptcy case progresses and does not reveal any legal strategy, legal advice or attorney work product, and does not support the position of the Debtors or any other RSA parties.  The same is true of the second sentence, which is merely a description of the Debtors' settlement process that has been discussed repeatedly in open court.[12]

---

[12] *See, e.g.*, May 15, 2021 Hr'g Tr. at 18:7-19:5 (testimony from Brian Whittman regarding the current status of negotiating BSA's trust contribution and achieving a global resolution); *id.* at 37:7-10 (Jessica Lauria informing the Court that the Debtors' advisors "looked at other structural options for a plan of reorganization [which] are all fraught with greater litigation.").  The Moving Insurers make the same argument regarding the minutes for the April 26, 2021 National Executive Committee Special Meeting,

The Moving Insurers provide no basis for their incorrect speculation that "similar advice from the same counsel . . . presumably [was] less helpful," so it was redacted. The Moving Insurers have no idea what the redacted portions of the Debtors' documents say.

51.     The Moving Insurers also argue that the Debtors waived privilege through unredacting certain information in a June 29, 2021 e-mail from Steve McGowan to Dan Ownby and others. *See* Second Motion to Compel at 7; Fay Decl., Ex. G. But the Debtors redacted this document consistent with the information provided in a privilege log: the only visible information is (i) the time at which the email was sent; (ii) the parties that received it and (iii) the names of the attached documents. Additionally, the Debtors left unredacted two sentences that plainly are not privileged: "Attached are the most recent redline versions of the documents being prepared" and "If you have any questions or comments, please let me know." Consequently, there was no disclosure of privileged material to support a waiver. *See, e.g., City of Seattle v. Monsanto Co.*, 2020 U.S. Dist. LEXIS 177645, at *6 (W.D. Wash. Sept. 28, 2020) (finding no waiver of mediation privilege where a party "has not . . . identified any disclosure of, representation regarding, or reliance on a mediation communication"); *Prof'l Rec. Org., Inc. v. Nat'l Union Fire Ins. Co.*, 2009 U.S. Dist. LEXIS 127343, at *10 (W.D. Wash. Sept. 4, 2009) (finding no waiver of mediation privilege where party "describe[d] the nature of the documents, communications, or tangible things not produced or disclosed—and [did] so in a manner . . .

---

which contain the unredacted sentence, "[Local] Councils seem to support the need for a global resolution." *See* Second Motion to Compel at 8; Fay Decl., Ex. J. Again, this is a fact that the Debtors' advisors have stated in open court. *See, e.g.*, Apr. 12, 2021, Hr'g Tr. at 17:13-18:9 (AHCLC informing the Court that the over 250 Local Councils have spent "thousands of [volunteer] hours . . . to try to determine the art of the possible in meeting the twin goals of the BSA case; that is, compensating victims and maintaining the scouting mission," and the AHCLC believes it is essential that the Local Councils be involved "if a global resolution is to be reached."). The Moving Insurers also claim that "[the] Debtors have redacted other portions of the minutes that discuss similar advice from the same counsel." Second Motion to Compel at 7. Of course, the Moving Insurers have no idea what the redacted portions of the Debtors' documents say.

without revealing information itself privileged or protected"); *United States v. O'Malley*, 786 F.2d 786, 794 (7th Cir. 1986); (finding no waiver of privilege "merely by disclosing a subject which he had discussed . . . In order to waive the privilege, the client must disclose the communication . . . itself."); *see also Oasis Int'l Waters v. United States*, 110 Fed. Cl. 87, 100 (Fed. Cl. 2013) (finding that "the fact of" a privilege communication "generally is not privileged because it does not directly reveal the substance of a client's request for legal advice."); *Motorola Solutions, Inc. v. Hytera Comm'ns Corp.*, 2019 U.S. Dist. LEXIS 110281, at *5 (N.D. Ill. June 2, 2019) ("Courts have consistently held that the facts surrounding . . . communications, including the fact that they occurred, their dates, topics and subject matter are discoverable and not privileged."); *Jay Global, Inc. v. Wis. Dep't of Workforce Dev. (In re Jay Global, Inc.)*, 2008 U.S. Dist. LEXIS 46495 (D. Del. June 16, 2008) ("Disclosure of the fact that a client has consulted an attorney, and even disclosure that an attorney approved a course of conduct, does not waive the privilege otherwise attaching to communications between an attorney and client on the subject of the consultation."); *Sorenson v. H&R Block, Inc.*, 197 F.R.D. 199, 205 (D. Mass. 2000) (finding no waiver of privilege, as information regarding the identity of parties to a communication and the date of the communication "are subject to disclosure regardless of the existence of a privilege or subsequent waiver thereof."); *Burton v. R.J. Reynolds Tobacco Co.*, 170 F.R.D. 481, 484 (D. Kan. 1997) ("The privilege does not apply to the fact of communication. . . . It is the substance of the communication which is protected, not the fact that there has been communication"); *H.L. Hayden Co. v. Siemens Med. Sys, Inc.*, 108 F.R.D. 686, 689 (S.D.N.Y. 1985) ("[I]nformation [such] as the existence of a privileged document, its date, its recipients and the nature of its general subject matter is generally not privileged in itself.").

52.     In addition to not being privileged, an inadvertent disclosure of privileged material would not support a waiver, especially given the tremendous effort required of the Debtors to review these materials and make productions in appropriately redacted form on an extremely compressed schedule.  *See Order Approving Confidentiality and Protective Order* [D.I. 799] § 10.1 ("The Parties agree that, pursuant to this Order and under Fed. R. Evid. 502(d), the inadvertent or unintentional disclosure of Privileged Material, or Discovery Material supplied under this Order, regardless of whether the information was designated as Protected Material or was asserted to contain Privileged Material at the time of disclosure, shall not be deemed a waiver in whole or in part of any privilege or immunity, either as to the specific information disclosed or as to any other information relating thereto or to related subject matter[.]"); *see also* Fed. R. Evid. 502.  Notably, the Debtors agreed in good faith to unredact their minutes and other overwhelmingly privileged communications, as the Moving Insurers had requested, on the basis that doing so would not constitute a waiver.  *See* Hershey Decl., Ex. 25 (July 25 letter from Sam Hershey to Moving Insurers).

## F.     THE MOVING INSURERS HAVE ESTABLISHED NO BASIS FOR PRECLUDING THE INTRODUCTION OF EVIDENCE

53.     A motion to preclude is an extreme sanction that is not even remotely supported here.  *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, Civil Action No. 09-290, 2012 U.S. Dist. LEXIS 193823, at *10 (W.D. Pa. Dec. 18, 2012) (citing *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997)) ("the exclusion of evidence at trial is an extreme sanction that is normally reserved for a showing of willful deception or flagrant disregard of a court order by the proponent of evidence[.]") (quotation marks omitted); *United States v. Kikumura*, 698 F. Supp. 546, 554 (D.N.J. 1988) ("The striking of testimony, however, is a drastic measure which should be imposed only in extreme circumstances.").  The Moving Insurers have

established no basis for precluding the documents the Debtors produced, for striking the reply declarations, or for precluding testimony based on deposition instructions.  Indeed, this evidence is exactly what the Moving Insurers sought in the First Motion to Compel.  They cannot now exclude it because it is unhelpful to their objection.

### 1. The Insurers Have Established No Basis For Precluding The Documents Produced By Debtors

54.    Any failure to meet the projected schedule for the prior hearing does not support a preclusion order.  *First*, there was no formal schedule.  The Debtors merely projected production dates.  The original projected goals for production were based on hearing dates of July 29 and 30.  The hearing was adjourned by 14 days to August 12 and 13.  The Debtors then set new projections, and met those.  Discovery schedules routinely change when the hearing date changes.  Indeed, the Court instructed the parties to "meet and confer, and discuss how everything is going to go forward in this period of time."  *Id.* at 21:19-21.

55.    *Second*, it is not uncommon to have supplemental productions in any case—indeed, the Federal Rules regarding discovery often require supplementation.  *See* Fed. R. Civ. P. 26(e).  This is particularly true in an expedited case, especially where there are substantial issues concerning both attorney client and mediation privilege.  And here, the Moving Insurers could have sought to address these issues earlier through the meet and confer process as the Debtors invited them to do on multiple occasions.

56.    *Third*, the Moving Insurers are not prejudiced.  They have received all the information that they requested within the bounds of this Court's Mediation Order, including through declarations, document production and deposition testimony.  The Debtors outline those disclosures by source in an accompanying *Chart of Supporting Evidence*, attached as <u>Exhibit A</u>. In fact, the Moving Insurers received the productions farther in advance of the depositions and

the hearing date than the prior schedule contemplated.  *See Wheaton Equip. Co. v. Franmar, Inc.*,

2005 U.S. Dist. LEXIS 55477, at \*7 (D. Idaho Apr. 20, 2005) (finding no prejudice due to initial,

insufficient discovery response where shift in schedule provided gave party "even more time" to

review a supplemental response and setting trial "shortly after the discovery period has ended");

*see also United States v. Musick*, 291 F. App'x 706, 718 (6th Cir. 2008) (finding no prejudice

where continuance of trial from June 25 to September 1 gave defendant "adequate time to study

the [untimely] discovery material").   Here, the Debtors finished their initial production of

documents on July 12 and their supplemental production on August 1.  Plainly, under these facts,

the Insurers had substantial time with the documents and were not prejudiced by the

supplemental production, which was finished 11 days before the RSA hearing.  *See Nordman v.*

*Evangelical Lutheran Good Samartian Soc'y, Inc.*, 2021 U.S. Dist. LEXIS 137194, at \*8 n.3

(W.D. Ky. June 22, 2021) (rejecting request to strike where party failed to comply with court-

imposed deadline, noting that "it was an expedited deadline" and the effect of the missed

deadline was "harmless").

57.     *Further*, certain of the Moving Insurers have informed the Debtors that they

intend to submit supplemental objections relying on materials from the Debtors' supplemental

production.  The Moving Insurers are taking contradictory positions regarding the admissibility

of evidence and discovery deadlines.  *See Lee v. Nationstar Mortg., LLC (In re Lee)*, 2020

Bankr. LEXIS 421, at \*12 (9th Cir. B.A.P. Feb. 10, 2020) (finding that a debtor "cannot rely on

the Loan Agreement while precluding [creditor] from doing the same"); *Tomeo v. CitiGroup,*

*Inc.*, 2018 U.S. Dist. LEXIS 166117, at \*26 (N.D. Ill. Sept. 27, 2018) (rejecting attempt to hold

opponents "to strict standards regarding discovery rules and deadlines, while simultaneously

arguing that they deserve an exemption from those very same rules. The parties cannot have it

both ways."); *Advanced Recovery Sys., LLC v. Am. Agencies, LLC*, 2015 U.S. Dist. LEXIS 159722, at *7 (D. Utah Nov. 25, 2015) (rejecting party's attempt to enforce the deadline for discovery while also engaging in post-deadline discovery, as a party "can't have it both ways").

### 2. The Insurers Have Established No Basis For Striking The Reply Declarations

#### a. The Debtor Is Allowed To Introduce Live Testimony At The Hearing, Even If The Testimony Was Not Included In A Declaration

58.     It is common practice to allow testimony at a hearing, even if it is not included in a declaration. *See Benitez v. Diaz Hernandez*, 2017 U.S. Dist. LEXIS 59369, at *7 (D.N.J. Apr. 18, 2017) (permitting parties to "supplement the declarations" of fact witnesses with "direct or redirect testimony"); *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 526 n.12 (Bankr. S.D.N.Y. Mar. 27, 2002) (permitting party to supplement declaration with direct testimony because "the Court considered it appropriate to hear as much relevant evidence as possible"); *In re Boston Generating, LLC*, 440 B.R. 302, 314 (S.D.N.Y. 2010) (relying on testimony of fact witness who offered "more detail in his live testimony" than in his declaration); *Feesers, Inc. v. Michael Foods, Inc.*, 2008 U.S. Dist. LEXIS 91634, at *6 (M.D. Pa. Nov. 12, 2008) (rejecting argument that the testimony of a fact witness "must be excluded because it went outside of the scope of [his] pretrial affidavit"). Consequently, the Moving Insurers have no basis for precluding any testimony at the hearing. Indeed, they only benefited by the Debtors' approach of providing written notice of the testimony.

#### b. Reply Declarations Are Permitted And Customary

59.     The Moving Insurers' position that the Debtors cannot introduce evidence on reply is frivolous. The law is clear that replies can introduce new evidence that both address what was stated originally and or to respond to objections raised in an answering brief. *See, e.g.,*

*Shaw Group, Inc. v. Next Factors, Inc. (In re Stone & Webster, Inc.)*, 359 B.R. 102, 113 (D. Del. Bankr. 2007) (noting that one party's evidence was submitted with its Reply Brief); *Quintus Corp. v. Avaya, Inc. (In re Quintus Corp.)*, 353 B.R. 77, 83 n.5 (D. Del. Bankr. 2006) (citing to evidence attached to a party's Reply Brief). Indeed, in contradiction to their new position here, the Moving Insurers have submitted multiple declarations on reply in connection with the motions that they have filed with this Court. *See, e.g.*, D.I. 530, D.I. 1449, D.I. 2169.

60.    It is well-established that parties are free to introduce evidence on reply that is relevant to the evidence submitted in the opening declarations. *Nat'l Council for Adoption v. Blinken*, 2021 U.S. App. LEXIS 20357, *11 (D.C. Cir. July 9, 2021) (reply declarations that "shore up" initial declarations are completely proper and do not prejudice the opposing party). Here, the Debtors' reply declarations address subjects that were raised in the opening declarations, including the valid exercise of business judgment by the Debtors (Whittman Decl. ¶¶ 8-10; Whittman Supp. Decl. ¶¶ 5-12; Desai Decl. ¶¶ 13-28) and the Coalition's fees and expenses (Whittman Decl. ¶ 7; Whittman Supp. Decl. ¶¶ 22-27).[13]

---

[13] The cases cited by the Moving Insurers are inapposite. *See Lab. Skin Care, Inc. v. Ltd. Brands, Inc.*, 757 F. Supp. 2d 431, 438-39 (D. Del 2010) (precluding defendant from offering 64 new materials, in defiance of the court's instruction to limit submissions to seven documents); *In re Basquez, No.* 6:18-bk-19790, 2020 Bankr. LEXIS 3211, *18-19 (Bankr. C.D. Cal. Nov. 16, 2020) (striking late-filed reply declaration); *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 360 (7th Cir. 1987) (Posner, J., concurring) (discussing rule that appellate briefs cannot add new facts because record on appeal is closed); *In re Asbestos Litig.*, 2007 Del. Super. LEXIS 238, *8 (D. Del. Super. Ct. Aug. 27, 2007 (denying motion to strike due to particular facts of case while recognizing that including new materials on reply is "a regular feature" and "not at all uncommon" in case at issue); *Praxair, Inc. v. ATMI, Inc.*, 231 F.R.D. 457 (D. Del. 2005) (excluding declarations submitted with summary judgment replies that were not responsive to opposition briefs). Other cases support the Debtors. *See In re Total Fin. Investment, Inc.*, No. 19 B 03734, 2019 Bankr. LEXIS 1832, at *9, n.4 (Bankr. N.D. Ill. Jun. 11, 2019) (granting request to file supplemental objection raising new legal arguments so that "all the issues can be decided on the merits rather than by default."); *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 235 F.R.D. 435, 437 (N.D. Ill. 2006) (allowing party to file reply citing new material); *Cruz v. Strauss (In re Cruz)*, 516 B.R. 594, 604 (9th Cir. 2014) (allowing party to file reply with new material).

61.     As the Moving Insurers' own authority recognizes, reply declarations also are appropriate to respond to arguments raised by objecting parties.  *See* Second Motion to Compel at 11-12, citing *Ethica Corp. Fin. S.r.L v. Dana Inc.*, C.A. No. N17 C-10-145, 2018 WL 3954205, at *10 (Del. Super. Ct. Aug. 16, 2018) (holding new facts and an exhibit permitted on reply because the new facts were "not a surprise based on statements made in the [original] Motion"); *Franklin Balance Sheet Inv. Fund v. Crowley*, C.A. No. 888-N, 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006) ("reply briefs should consist of material necessary to respond to the answering brief."); *Cornell Univ. v. Illumina, Inc.*, C.A. No. 10-433, 2013 WL 3216087, at *18 (D. Del. June 25, 2013) (material in the reply brief was proper when "merely respond[ing] to arguments raised in plaintiffs' answering brief . . . and is not improperly raising new argument"). That is exactly what the Debtors' reply declarations do here.  For example, in their objections to the RSA Motion, the Moving Insurers attacked that the applicability of the business judgment rule and the presumption of good faith in mediation.  Specifically, the Moving Insurers argued that the business judgment rule is not satisfied since the Debtors receive no benefits from the RSA, and that since the RSA negotiations were flawed, the RSA parties have not acted in good faith.[14]  In fact, both the Certain Insurers and Century dedicated their entire Objection to arguing why the business judgment rule does not apply and that the RSA parties have not acted in good faith.  *See id*.

62.     The Debtors' reply was their first opportunity to address these arguments, and doing so was appropriate.[15]  The Debtors outline the way that the reply declarations respond to the objections in an accompanying table attached as Exhibit B.  Moreover, the challenges raised

---

[14] Certain Insurers Obj. ¶¶ 23–76 [D.I. 5684]; Century Obj. at 9-34 [D.I. 5707].

[15] RSA Reply at 24-35, D.I. 5759.

in the objection were, by definition, new, and movants are not required to foresee or address objections before they are made. Raising objections, and then precluding responses, would be a convenient way to litigate, but that is not the way it works.[16]

63.    The Moving Insurers do not even try to satisfy the legal standards. Instead, immediately after stating the law, the Moving Insurers apply a different, and incorrect, standard, arguing that the Debtors' reply declarations do not respond to "'new' or unforeseeable" objections. *See* Second Motion to Compel at 12. The Moving Insurers cite nothing to support their leap from the law they had just stated.

### 3. The Moving Insurers Have Established No Basis For Precluding Testimony Based On Deposition Instructions

64.    The Moving Insurers provide no basis for precluding testimony based on deposition instructions. *One*, the Moving Insurers repeatedly requested that the Debtors re-produce witnesses to answer questions they were previously instructed not to answer, and asked the Court to compel such depositions.[17] The Debtors agreed to re-produce their witnesses, and spent nearly a week asking the Moving Insurers for the simple courtesy of responding to the

---

[16] The Moving Insurers' representation that "Mr. Mosby testified at his deposition that his declaration was based on information provided by counsel" is incorrect. Second Motion to Compel at 6, n.7. The Moving Insurers pushed for Mr. Mosby to say that he relied only on counsel, but he repeatedly testified that he considered the advice of a number of advisors, which included counsel, but voted to approve the RSA because the global resolution protects Local Councils and Chartering Organizations from further litigation, compensates victims, and allows BSA to continue delivering the mission of scouting. See Mosby Dep. Tr. at 98:2-8; *see also* Mosby Dep. at 178:13-180:17 (Alvarez & Marsal gave the Board regular presentations around the financial viability of the Plan and RSA; the Board was "very much engaged" in evaluating the Plan and RSA); 187:13-18 (took legal advice of counsel into account when approving the RSA); 229:1-8 (in approving the RSA, the BSA relied on "the work of our advisors and the advice of our advisors"); 232:21-233:19 (the BSA case is "extremely complex" and requires a "very extreme, narrow expertise to evaluate all the aspects of this case… I as CEO have to hire and rely on people that in my judgment [are] giving us the best advice they can, given the situation.").

[17] *See, e.g.*, D.I. 5729 (asking that "Messrs. Ownby, Mosby, and Whittman . . . be directed to answer the questions they were instructed not to answer and questioning [be] allowed on the documents that were withheld, with any adjustments to the schedule that may be necessary.").

proposed dates.   Ultimately, the Moving Insurers changed strategies and refused to take the depositions offered.   But the Moving Insurers were given the opportunity to ask the questions that they claim they could not ask during the first depositions.   And notably, the depositions were being conducted through Zoom, so there was not even a need to travel.   The Moving Insurers strategic decision to not proceed with the depositions that they previously sought this Court to order does not amount to prejudice.   *See Evolved Wireless, LLC v. Apple Inc.*, 2019 Dist. LEXIS 24142, at * (D. Del. Jan. 14, 2019) (denying motion to strike allegedly untimely report where movant "could have cured any alleged prejudice by again deposing the expert"); *Ortho-Mcneil Pharm. Inc. v. Barr Labs., Inc.*, 2006 U.S. Dist. LEXIS 44386, at *11 (D.N.J. June 29, 2006) (denying motion to exclude untimely evidence where plaintiffs "were given the opportunity to cure any prejudice against them by redeposing" a witness); *Whitaker v. Hyundai Motor Co.*, 2018 U.S. Dist. LEXIS 174362, at *5 (W.D. Va. Oct. 9, 2018) (denying motion to dismiss and noting that parties were not prejudiced by late disclosure "as they had an opportunity to redepose [the witness], which they declined to do"); *Knauff v. Dorel Juvenile Group*, 2009 U.S. Dist. LEXIS 67737, at *16 (W.D. Tex. Aug. 4, 2009) (denying motion to strike and finding that defendant was "not prejudiced" by allegedly untimely disclosure where it had the opportunity to redepose a witness); *Reeves v. FRB*, 2004 U.S. Dist. LEXIS 5730, at *27 (N.D. Ill. Apr. 2, 2004) (refusing to exclude untimely evidence as movant was "afforded an opportunity to redepose" the witness and was therefore "not prejudiced.").

65.     *Two*, none of the instructions identified by the Moving Insurers in the Second Motion to Compel prevented the Moving Insurers from obtaining testimony on the subject matters at issue.   To the contrary, the Debtors provided the information at issue, as described in an attached exhibit.   *See Chart of Instructions and Testimony*, attached as <u>Exhibit C</u>.

### 4. The Mediation Materials Are Irrelevant

66.     The issue before the Court is whether the Debtors had a valid business justification for entering into, and seeking approval of, the RSA.  The business justification is based on the final terms of the RSA, not the interim proposals.  Consequently, it is irrelevant whether it was the Debtors, the Plaintiffs, or both that drafted the TDPs.  The RSA stands on its own merits.  Moreover, the level of detail that the Moving Insurers seek is superfluous, given that business judgment requires only a valid business justification.

67.     Additionally, the Insurers are factually incorrect in claiming that the Plaintiffs drafted the TDPs, and that the Debtors did not negotiate them.  As addressed above, the TDPs are either appropriate or not, regardless of who drafted them.  But the non-privileged record also demonstrates that the Debtors drafted the TDPs, and throughout May and June, the mediation parties exchanged many TDP drafts and proposed TDP language before the TDPs were finalized and approved.  *See* Hershey Decl., Ex. 12.  On August 4, before the Moving Insurers filed the Second Motion to Compel, the Debtors produced a privilege log to the Moving Insurers that chronologically details all email correspondence regarding the TDPs, including the exchange of drafts.  *See id.*  Thus, the Moving Insurers are well aware of the months' worth of TDP negotiations among the mediation parties.  *See Siemens v. Seagate Tech.*, 2009 U.S. Dist. LEXIS 132522, at *19 (C.D. Cal. Apr. 27, 2009) (approving a party's reference to privilege logs describing attorney-client communications in support of the argument that it was diligent in prosecuting a case).

### 5. The Interest Of A Full Evidentiary Record Outweighs An Interest In Strict Compliance With Scheduling Projections

68.     The Insurers are arguing about an interest in receiving discovery in strict compliance with the Debtors' original projections based on the hearing date that was adjourned

by two weeks. The Debtors' interest is in presenting this Court with full evidentiary record in support of the RSA. The Debtors submit that the importance of fully meeting the projected discovery dates for an earlier hearing date pale in comparison to the Court's and estates' interest in a complete evidentiary record in support of a milestone agreement reached in this case that provides massive benefits to the estate.

69.     Courts routinely deny motions to preclude because they conflict with the policy of favoring decisions decided on the merits. *CallWave Comm'ns, L.L.C. v. AT&T Mobility LLC*, 2015 U.S. Dist. LEXIS 169183, at *7 (D. Del. Dec. 10, 2015) (denying motion to strike testimony due to untimely disclosure and stating that "courts favor the resolution of disputes on their merits") (quoting *Abbott Labs. v. Lupin Ltd.*, 2011 U.S. Dist. LEXIS 53846 (D. Del. May 19, 2011)); *Withrow v. Spears*, 967 F. Supp. 2d 982, 1007 (D. Del. 2013) (same); *NHI, Inc. v. Fleethboston Fin. Corp. (In re NHI, Inc.)*, 320 B.R. 563, 573 (Bankr. D. Del. Feb. 11, 2005) ("[C]ourts favor decisions on the merits rather than technicalities.") (quoting *TWA Inc. Post Confirmation Estate v. Golf Channel*, 305 B.R. 745, 746-47 (Bankr. D. Del. 2004)); *Coll v. Franco (In re Franco)*, 2019 Bankr. LEXIS 2532, at *5-6 (Bankr. D.N.M. Aug. 8, 2019) ("The reluctance to strike late answers is consistent with the public policy in favor of deciding disputes on the merits rather than on procedural grounds."); *Chroba v. Quantum3 Grp. LLC (In re Chorba)*, 582 B.R. 380, 383 n.6 (Bankr. D. Md. Mar. 8, 2018) (allowing late-filed response due to "longstanding policy in favor of merits-based adjudication") (quoting *Colleton Preparatory Acad., Inc. v. Hoover Universal Inc.*, 616 F.3d 413, 417 n.3 (4th Cir. 2010)); *In re Shafer*, 2010 Bankr. LEXIS 6597, at *8 (Bankr. M.D. Fla. Mar. 9, 2010) ("The reluctance to grant motions to strike is consistent with the general policy favoring decisions on the merits."); *Heyman v. Dec (In re Dec)*, 2000 Bankr. LEXIS 1032, at *29 (Bankr. N.D. Ill. Sept. 8, 2000) (denying motion to

strike where "preclusion conceivably would impede the truth-finding process"); *see also Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 550 (2010) (indicating that there is "a preference of the Federal Rules of Civil Procedure in general . . . for resolving disputes on their merits"); *Prof'l Cleaning & Innovation Building Servs., Inc., v. Kennedy Funding, Inc.*, 245 F. App'x 161, 165 (3d Cir. 2007) (stating that "one of the basic objectives of the federal rules . . . [is] the determination of cases on their merits").

70.    The Debtors respectfully submit that this Court should not be denied the opportunity to review a complete evidentiary record in order to evaluate the Debtors' business judgment in achieving this milestone step in this bankruptcy case, particularly where the Moving Insurers (i) are arguing against the RSA not as stakeholders of the estate, but rather as estate assets that are trying to minimize recoveries here, and (ii) have refused to cooperate in identifying or resolving discovery issues, as they instead seek to avoid the record.

## CONCLUSION

The Debtors request that the Court deny the Second Motion to Compel and grant such other relief as the Court deems just and proper.

*[Remainder of page intentionally left blank]*

Dated: August 9, 2021
      Wilmington, Delaware

*/s/ Derek C. Abbott*

WHITE & CASE LLP

Jessica C. Lauria (admitted *pro hac vice*)
Glenn M. Kurtz (admitted *pro hac vice*)
Andrew Hammond (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: jessica.lauria@whitecase.com
      gkurtz@whitecase.com
      ahammond@whitecase.com
      sam.hershey@whitecase.com

– and –

WHITE & CASE LLP

Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com
      blair.warner@whitecase.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
Michelle M. Fu (No. 6661)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 351-9314
Email: dabbott@morrisnichols.com
      aremming@morrisnichols.com
      ptopper@morrisnichols.com
      mfu@morrisnichols.com