EX. B

**Chart of Objecting Positions and Reply Declaration Responses**

| Objecting Positions | Reply Declaration Responses |
|---|---|
| **Prejudice to Chartering Organizations**<br><br>The RSA prejudices Chartered Organizations, which impairs the BSA's ability to survive as a going concern. Certain Insurers' Obj. ¶ 35.[1]<br><br>**Self-Interested Exchange of Releases**<br><br>Controlling parties abdicated their responsibilities to the estates, insurers, and Chartered Organizations in exchange for the release of liability against themselves and the Local Councils they represent. Century Obj. at 12-13. | **Chartering Organizations Considered**<br><br>Desai Decl. ¶ 27: "The NEB discussed Chartered Organizations, including their protection and insurance rights, on numerous occasions. There was also frequent robust discussion about the Chartered Organizations at BTF and NEC meetings. Both the BTF and NEC extensively discussed and analyzed pathways to resolve the issues of the Chartered Organizations' insurance rights and protections during RSA negotiations."<br><br>Desai Decl. ¶ 23: "The BTF's goal and focus was to achieve a plan of reorganization that would ultimately be confirmed by the Court. The RSA itself was never the goal, but it became the viable path to a confirmable plan during the negotiations. The BTF understood that the RSA was supported by all of the major claimant constituencies, which was of critical importance, and that the plan contemplated by the RSA was supported by the Creditors' Committee and JPMorgan. *The BTF also understood that the BSA would need to continue to work toward resolution with important constituencies, including the Insurance Companies and Chartering Organizations.*" (emphasis added). |
| **Heightened Scrutiny Applies Because of Self-Interested Insiders**<br><br>The RSA is subject to heightened scrutiny, as it was negotiated by and will benefit insiders. | **No Economic or Financial Interest**<br><br>Desai Decl. ¶ 19: "I receive no financial consideration from any local councils, and I |

---

[1] Certain Insurers is defined as The AIG Companies, Travelers Casualty and Surety Company, Inc., The Continental Insurance Company and Columbia Casualty Company, American Zurich Insurance Company, American Guarantee and Liability Insurance Company, and Steadfast Insurance Company, Arrowood Indemnity Company, Clarendon America Insurance Company, Allianz Global Risks US Insurance Company, National Surety Corporation and Interstate Fire & Casualty Company, Argonaut Insurance Company, Liberty Mutual Insurance Company, Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company, General Star Indemnity Company, Great American Assurance Company, and Munich Reinsurance America, Inc. (the "Certain Insurers").

| Objecting Positions | Reply Declaration Responses |
|---|---|
| The insider control party participated in its negotiation and would receive a material benefit. Century Obj. at 9-10.<br><br>(1) each member of the NEC and the Debtors' board benefits from the third-party release granted to the Local Councils with which they are affiliated as Protected Parties under the Amended Plan, and<br><br>(2) the controlling Local Councils themselves benefit from the third-party releases, as do their own respective officers and directors who are in turn defined as "Representatives" for purposes of the provisions covering Protected Parties. Century Obj. at 13. | am not beholden to any Local Council or Local Councils"<br><br>Desai Decl. ¶ 4: "I have never received monetary compensation for my service on behalf of the South Florida Council in any capacity."<br><br>**No Conflict of Interest/Self-Dealing**<br>Desai Decl. ¶ 19: "In connection with my work on the BTF, NEC, and NEB in evaluating the bankruptcy and mediation, at all times I understood that my fiduciary obligations were to act in the interests of the BSA. During my volunteer service for the BSA, I believe that the BTF, NEC, and NEB have at all times acted in the best interest of the BSA, and have not taken any action to benefit local councils to the detriment of the BSA."<br><br>Desai Decl. ¶ 21: "In the context of the RSA negotiations, I viewed the Plaintiffs' Representatives as the opposite side of the transaction from the BSA. In these negotiations, I viewed the Ad Hoc Committee of Local Councils' as representing the interests of local councils and responsible for negotiating a resolution with the Plaintiffs' Representatives on behalf of the Local Councils. I understand that the Ad Hoc Committee of Local Councils includes lawyer representatives with extensive experience in restructuring and these lawyers took the lead role in negotiating on behalf of the Local Councils." |
| **Unfair Process/Not Negotiated In Good Faith**<br><br>The Debtors cannot meet their burden of proving that the process by which the RSA was negotiated was entirely fair or the result of a fair process. Century Obj. at 14 | **Negotiation Process was Deliberative, Exhaustive and at Arm's Length**<br><br>Desai Decl. ¶ 20: "The BTF's consideration of the settlement terms set forth in the RSA was an iterative process that progressed during the course of the Debtors' mediation with other parties in the chapter 11 cases. Over the course |

2

AMERICAS 108676183

| **Objecting Positions** | **Reply Declaration Responses** |
|---|---|
| The Court should reject the Debtors' proposed findings that the RSA was negotiated at arm's length and in good faith, or that the Debtors considered approving the RSA in good faith. Century Obj. at 34<br><br>The RSA provides no cognizable benefits to the debtors. Certain Insurers' Obj. ¶¶ 31-33. | of the mediation, the NEC, NEB, and BTF discussed and considered the various components of the proposed resolutions that were ultimately embodied in the RSA and the positions of the key stakeholders in the restructuring process….The factors considered included the BSA's contribution to a settlement trust for abuse survivors, the parties included in the RSA, the ability to make further settlements with Chartered Organizations and Insurance Companies and any related limitations, the contributions from the BSA and Local Councils, the costs required under the RSA, the conditions applicable to the Settlement Trust and the Trust Distribution Procedures, the alternatives to entering into the RSA, and the risks of achieving a successful confirmation of a plan of reorganization. The RSA was approved only after careful deliberation of these and other considerations."<br><br>Desai Decl. ¶ 21: "In the context of the RSA negotiations, I viewed the Plaintiffs' Representatives as the opposite side of the transaction from the BSA. In these negotiations, I viewed the Ad Hoc Committee of Local Councils' as representing the interests of local councils and responsible for negotiating a resolution with the Plaintiffs' Representatives on behalf of the Local Councils. I understand that the Ad Hoc Committee of Local Councils includes lawyer representatives with extensive experience in restructuring and these lawyers took the lead role in negotiating on behalf of the Local Councils."<br><br>Whittman Decl. ¶ 5: "The decision to enter into the RSA was thoroughly considered by the NEB, the governing body of the BSA, the NEC, a twelve-member delegation of the NEB, which has the duty and authority to manage the affairs of the BSA, and the BTF, a task force |

3

| **Objecting Positions** | **Reply Declaration Responses** |
|---|---|
| | established to review and provide feedback on the Debtors' restructuring strategy in connection with these chapter 11 cases. There was robust discussion and debate at numerous meetings surrounding the terms and conditions of the RSA, as well as the negotiations leading up to the executed RSA." |
| | Whittman Decl. ¶ 6: "In the four months leading up to entry into the RSA, I personally spent more than forty hours in board meetings with the BTF, NEC, and NEB discussing the terms of the RSA and related topics in detail. Following many of those meetings, I understand that the NEB, NEC or BTF held executive sessions to continue the discussions around the RSA without the advisors present." |
| | Whittman Decl. ¶¶ 7–10 (stating that Whittman gave presentations to committees and attended presentations given by White & Case on various topics related to reorganization plans) |
| | Whittman Decl. ¶11: "As a result of these and other meetings in which I participated, I believe that the NEB, NEC, and BTF were well informed and able to thoroughly consider and evaluate the risks and benefits associated with entry into the RSA as compared to potential alternatives to the RSA." |
| | Whittman Decl. ¶ 14: "As I stated in my Initial Declaration, I believe that payment of certain of the Coalition's past and future fees and expenses, on the terms set forth in the RSA, is a reasonable exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates and to creditors as a whole. The RSA and the fee and expense provisions related to the Coalition are the result of good-faith, arm's-length negotiations by the Debtors in which I extensively participated." |

AMERICAS 108676183

| **Objecting Positions** | **Reply Declaration Responses** |
|---|---|
|  | Desai Decl. ¶ 23: "The BTF's goal and focus was to achieve a plan of reorganization that would ultimately be confirmed by the Court. The RSA itself was never the goal, but it became the viable path to a confirmable plan during the negotiations. The BTF understood that the RSA was supported by all of the major claimant constituencies, which was of critical importance, and that the plan contemplated by the RSA was supported by the Creditors' Committee and JPMorgan. The BTF also understood that the BSA would need to continue to work toward resolution with important constituencies, including the Insurance Companies and Chartering Organizations."<br><br>Desai Decl. ¶ 26: "In addition to reviewing draft documents at meetings, the NEC and BTF also frequently received communications of deal terms from their advisors and the BSA's General Counsel. On numerous occasions, there were drafts of various documents sent to the BTF by email…" |
| **No Substantial Contribution**<br><br>"There has been no attempt to show the Coalition has made a substantial contribution and the record does not support such a finding." Certain Insurers' Obj. ¶¶ 53-56.<br><br>"[A]ny argument that the actions of the Coalition will benefit the estates would similarly fail. The RSA represents a clear win for the Coalition itself, but it comes at a high cost to the estate and the rights of all parties in interest." Certain Insurers' Obj. ¶ 56. | **Payment of Coalition Fees Substantially Benefits the Estates**<br><br>Whittman Decl. ¶ 14: "I believe that payment of certain of the Coalition's past and future fees and expenses, on the terms set forth in the RSA, is a reasonable exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates and to creditors as a whole. The RSA and the fee and expense provisions related to the Coalition are the result of good-faith, arm's-length negotiations by the Debtors in which I extensively participated."<br><br>Whittman Decl. ¶ 15: "The Coalition and the Coalition Professionals have already provided, |

5


| **Objecting Positions** | **Reply Declaration Responses** |
|---|---|
| | and will continue to provide, significant benefits to the Debtors' estates by helping to maximize value to be distributed to creditors, providing more certainty in negotiations about the ability to deliver the votes necessary to confirm the Amended Plan and thus implement a settlement, and reducing costs by providing a coordinated point of contact for such a large group of plaintiffs rather than being forced to engage with dozens or more groups." |
| | Whittman Decl. ¶ 16: "To date, the Coalition has generated concrete benefits for the estates. First, the Coalition compiled and voluntarily provided certain of its members' abuse claims data to the mediators and the Debtors. The Debtors, in turn provided this information to its insurers, including without limitation to Century Indemnity Company, prior to its admission as a formal mediation party and prior to the expiration of the bar date. I understand that this facilitated an earlier review and analysis of Direct Abuse Claims for the Debtors and their advisors than would have otherwise been possible and generated value in moving the claims analysis process forward." |
| | Whittman Decl. ¶ 17: "Second, since its admission as a mediation party, the Coalition has been a valuable negotiating partner as the Debtors engaged with all of the plaintiff groups and other mediation parties, and ultimately was helpful in bringing the TCC and Future Claimants' Representative together to support the RSA. The Coalition Professionals and the TCC's professionals worked together with the Debtors' professionals regarding diligence and in discussions on the BSA and Local Councils' proposed contributions to the Settlement Trust. Through this process, and during negotiation of the RSA, the Coalition— working with the TCC and the Future |

AMERICAS 108676183

| **Objecting Positions** | **Reply Declaration Responses** |
|---|---|
| | Claimants'.") Representative—secured significantly increased contributions to the Settlement Trust. These contributions maximize recoveries not only to the Coalition's Abuse Survivor constituency but to *all* Abuse Survivors." |
| | Whittman Decl. ¶ 19: "Third, the Coalition, alongside the TCC and Future Claimants' Representative, has conferred significant value on the estates by agreeing to seek a stay of the Estimation Matters and to stand down on its objection to the Exclusivity Motion. These steps provide immeasurable value in the form of significant litigation cost savings to the estate, as well as in avoiding the expenditure of time and significant distraction to the Debtors' management and advisors. This also demonstrates good faith by the Coalition and meaningful assistance to the Debtors' efforts to preserve estate value for the benefits of Abuse Survivors and other creditors." |
| | Whittman Decl. ¶ 20: "Moreover, the size of the Coalition's membership and its ability to collaborate with the State Court Counsel representing that membership has provided the Debtors and other mediation parties some assurance that negotiated agreements with Abuse Survivors could garner sufficient survivor support to accomplish the Debtors' global resolution plan strategy. This provides the Debtors and other parties in interest in these cases with critical reassurance that representatives of a substantial number of Abuse Survivors support the Amended Plan and will encourage their clients to vote in favor of the Amended Plan." |
| | Whittman Decl. ¶ 21: "I believe that the Coalition will facilitate the Debtors' efforts to reach confirmation of the Amended Plan with a global resolution in these chapter 11 cases. |

7

| Objecting Positions | Reply Declaration Responses |
|---|---|
|  | Negotiating with such a large subset of Abuse Survivors through the coordinated, focused efforts of the Coalition Professionals and coordinating with other plaintiff groups in this case, has the potential to significantly streamline the negotiation and confirmation process." |
|  | Desai Decl. ¶ 23: "The BTF's goal and focus was to achieve a plan of reorganization that would ultimately be confirmed by the Court. The RSA itself was never the goal, but it became the viable path to a confirmable plan during the negotiations. The BTF understood that the RSA was supported by all of the major claimant constituencies, which was of critical importance, and that the plan contemplated by the RSA was supported by the Creditors' Committee and JPMorgan. The BTF also understood that the BSA would need to continue to work toward resolution with important constituencies, including the Insurance Companies and Chartering Organizations." |
|  | Whittman Decl. ¶ 24: "Further, the Coalition's work and participation has directly benefitted the Debtors and all of the estates' creditors. The formation of the Coalition and the work of the Coalition Professionals has alleviated a significant, time-consuming, and costly administrative burden on the estates. By forming a single counterparty alongside the TCC and FCR, the Coalition enabled the Debtors to negotiate with a single centralized party, rather than attempting to negotiate with many individual counsel to, or individually with, at least 60,000 Abuse Survivors—this alone has provided significant financial and practical benefits to the estates." |
|  | Whittman Decl. ¶ 25: "Given the size of the Abuse Survivor constituency, the Coalition |

AMERICAS 108676183

| Objecting Positions | Reply Declaration Responses |
|---|---|
| | Professionals are critical to the continuation and completion of the work required for these chapter 11 cases to proceed effectively and to not only maintain, but also expand, the support of all creditors for the RSA and Amended Plan. It is my opinion that it would be more difficult and costly to the estate for this work to be performed without the assistance of the Coalition and the Coalition Professionals. The Coalition Professionals are also critical to maintaining the timeline within which the Debtors need to exit chapter 11. Moreover, without the Coalition's support, the Debtors' ability to pursue confirmation of the Amended Plan and the related restructuring transactions may be jeopardized."<br><br>Whittman Decl. ¶ 26: "The Debtors' decision to pay the fees and expenses of the Coalition Professionals as part of the RSA is comparable to other cases in which debtors have agreed to pay the professional fees of an ad hoc committee supporting a contemplated chapter 11 plan or restructuring framework."<br><br>Whittman Decl. ¶ 27: "I believe it is an appropriate exercise of the Debtors' business judgment, and is in the best interests of the Debtors' estates, to enter into the RSA and to pay the fees and expenses of the Coalition as set forth in the RSA subject to the limitations set forth in the Revised Proposed Order. I believe that the RSA provides the Debtors with a viable, if difficult, pathway to confirmation of the Amended Plan, and the Coalition will be a meaningful partner in that effort." |
| **Challenge to Coalition's Representation**<br><br>The Coalition has not demonstrated that it represents any creditors at all – without that demonstration, it is premature to begin any analysis into whether the Coalition has made a substantial contribution. Brown Rudnick's | **Coalition's Legitimate Representation**<br><br>Whittman Decl. ¶ 13: "I understand that the Coalition is an ad hoc group of survivors of sexual abuse who have filed Direct Abuse Claims in these chapter 11 cases (collectively, "Abuse Survivors") and was formed to |

9

| **Objecting Positions** | **Reply Declaration Responses** |
|---|---|
| engagement letter shows that the Coalition represents the interests of State Court Counsel. Abuse claimants may be unaware of the Coalition's existence or Brown Rudnick's engagement. Certain Insurers' Obj. ¶¶ 50-56. | represent a subset of Abuse Survivors whose stated goal was the expeditious and equitable establishment of a settlement trust. I have been advised by counsel and advisors to the Debtors that approximately 82,500 unique, Direct Abuse Claims were timely filed against the BSA by the bar date in these chapter 11 cases. On October 23, 2020, the Court authorized the Coalition to become a mediation party and to participate in the mediation." |

AMERICAS 108676183