EX. C

## Chart of Instructions and Testimony

The left and middle columns are copied verbatim from the Second Motion to Compel. *See* Second Motion to Compel at 14-16. The right column was added by the Debtors to show the testimony that the Moving Insurers have received on the same subject.

| Declaration Testimony Cited in Second Motion to Compel | Challenged Instruction in Second Motion to Compel | Witness Testimony on Same Subject |
|---|---|---|
| "During these meetings, the NEB, NEC and BTF reviewed presentations prepared by the Debtors' advisor team describing the various potential terms and provisions of the settlements that now constitute the terms of the RSA and highlighting the advantages and disadvantages of entering into such agreements. The factors considered included the BSA's contribution to a settlement trust for abuse survivors, the parties included in the RSA, the ability to make further settlements with Chartered Organizations and Insurance Companies and any related limitations, the contributions from the BSA and Local Councils, the costs required under the RSA, the conditions applicable to the Settlement Trust and the Trust Distribution Procedures, the alternatives to entering into the RSA, and the risks of achieving a successful confirmation of a plan of reorganization"[1]<br><br>"Final open issues that required additional guidance based on the prior negotiating parameters were authorized by e- mail to the CEO and General Counsel from the NEC on June 28, 2021, immediately in advance of the execution of the RSA on July 1, 2021, at the recommendation of the BTF | "Q. Okay. Since I don't have the resolution from the board, can you tell me what were the deal points that the board, by resolution, agreed could be – make up a RSA?<br><br>Mr. Andolina: I'm going to object to the question and instruct Mr. Ownby not to answer that."[3]<br><br>"Q. All right. And can you tell us what were the terms of – of the recommendation or authorization of the Bankruptcy Task Force with – in connection with the Restructuring Support Agreement?<br><br>Mr. Andolina: Objection to form, foundation. And I'm going to instruct Mr. Ownby not to answer with respect to that question both based on attorney-client privilege communications."[4] | "Q. What do you mean when – when you say that it's a reasonable exercise in the debtors' business judgment?<br><br>A. I mean that the debtors considered the financial ramifications to the debtor. They considered the obligation of a debtor to maximize the recovery to its creditor constituents and that having considered the -- you know, the -- the ability to maximize value to creditors, the need to preserve the mission and the duty that BSA has to preserve the mission, that it was appropriate to move forward with the RSA."[5]<br><br>"Q. What are the other factors [in connection with the RSA] you considered as to why you believe it's in the debtors' interest?<br><br>A. Whether or not -- essentially the debtors need to be able to have a pathway to confirmation of a plan of reorganization so that the debtors can emerge from bankruptcy."[6]<br><br>"A. [O]ne of the things that we're putting into the trust in the current RSA is our insurance rights . . . there were several |

---

[1] Desai Decl. ¶ 20.
[3] Ownby Dep. Tr. at 50:4–10.
[4] *Id*. at 58:21–59:4.
[5] Whittman Dep. Tr. at 89:18-90:3.
[6] Whittman Dep. Tr. at 90:9-14.

1

| **Declaration Testimony Cited in Second Motion to Compel** | **Challenged Instruction in Second Motion to Compel** | **Witness Testimony on Same Subject** |
|---|---|---|
| following their review of key issues by e-mail."[2] | | parts of the -- that were economical and -- such as the artwork and such as the oil and gas leases and such as a mechanism for cash that we were going to put into the pot or into the trust, you know, along with some non-monetary pieces and our rights to insurance and maybe there were some other things but those were the main things, I believe . . . certain deal points that we have to Roger and Steve, and the advisors were also on the phone, that said, you know, these are the deal points the board felt comfortable with in going to and getting an RSA signed[.]"[7] |
| "The BTF also understood that the BSA would need to continue to work toward resolution with important constituencies, including the Insurance Companies and Chartering Organizations."[8]<br><br>"The NEB discussed Chartered Organizations, including their protection and insurance rights, on numerous occasions. There was also frequent robust discussion about the Chartered Organizations at BTF and NEC meetings. Both the BTF and NEC extensively discussed and analyzed pathways to resolve the issues of the Chartered Organizations' insurance rights and protections during RSA negotiations."[9] | "Q. Okay. As chair of the board, did you take into consideration in deciding to authorize anything in connection with the Restructuring Support Agreement whether or not the chartering organizations were contractually indemnified by the board?<br><br>Mr. Andolina: Objection to form. . ..<br><br>Mr. Andolina: Mr. Ownby, I – I – I – I just don't want you to testify as to the specifics – specifics of conversations at the board level. If – if – if you can testify in a way that does not raise specific conversations - | Each deponent testified regarding the consideration of the chartered organizations during the RSA negotiations, multiple times.[12]<br><br>"Q. Can you tell us, Mr. Ownby, what was it that the – that you took into consideration with regard to the contractual indemnity claims by the chartered organizations in connection with deciding to go ahead with the Restructuring Support Agreement? . . .<br><br>A. I think that we understood as a board that there was a mechanism in the RSA for chartering organizations to get through this and to – to join in and there was a mechanism for |

---

[2] Desai Decl. ¶ 26.
[7] Ownby Dep. Tr. at 47:20-49:22.
[8] Desai Decl. ¶ 23.
[9] Id. ¶ 27.
[12] Ownby Dep. Tr. at 65:21-66:25, 68:4-14, 72:2-17; Mosby Dep. Tr. at 195:1-195:23, 193:19-194:5; Whittman Dep. Tr. at 86:20-25, 87:22-88:2, 213:8-22.

2

| **Declaration Testimony Cited in Second Motion to Compel** | **Challenged Instruction in Second Motion to Compel** | **Witness Testimony on Same Subject** |
|---|---|---|
| "I was also present for a number of presentations from the Debtors' other advisors, including the Debtors' restructuring counsel, White & Case LLP ("White & Case"), and the Debtors' special insurance counsel, Haynes & Boone LLP, related to the risks and benefits associated with both the RSA in addition to alternatives to the RSA. During these presentations, the parties also discussed the payment of the Coalition Professional fees, the restructuring timeline, the Preliminary Injunction, the Hartford Settlement, Chartered Organizations, and various insurance issues, including related to proposed plans of reorganization and the terms of the RSA."[10] | - . . . But if you can testify in a way that does not raise specific conversations, you can continue your answer but I want to be very clear on not referring to specific communications . . . ."[11] | them that still was a work in progress . . . the parties would work together to – in, you know, best practices or to come up with a solution for the chartered organizations in the agreement."[13]<br><br>"A. We believe that this agreement provides a framework to continue to negotiate with the chartered organizations. It provides certain protections to the chartered organizations already and it provides a framework to — to reach settlement with chartered organizations that will ultimately lead to releases for the chartered organizations, or some of them."[14]<br><br>"Q. Are you concerned in any way that you've approved the restructuring support agreement without being familiar with the terms of the agreements between the Boy Scouts and the chartering organizations? . . .<br><br>A. I think as I said in the past I reviewed – I viewed this all as being a – step towards getting a global agreement, and the chartering organizations are one of the next pieces of the step of getting that done."[15]<br><br>"A. [T]he assumption all along is that we have a global resolution and that global resolution would – would |

---

[10] Whittman Supp. Decl. ¶ 8.
[11] Ownby Dep. Tr. at 64:3–64:25.
[13] Ownby Dep. Tr. 65:21-66:25.
[14] Whittman Dep. Tr. at 213:8-22.
[15] Mosby Dep. Tr. at 206:2-14.

3

| **Declaration Testimony Cited in Second Motion to Compel** | **Challenged Instruction in Second Motion to Compel** | **Witness Testimony on Same Subject** |
|---|---|---|
| | | include the councils and the chartering organizations . . . the membership numbers are supported by having councils, and councils depend upon chartering organizations to charter the units where their members reside. So the assumption is we have councils and the assumption is we have chartering organizations in order for us to have the membership under the assumptions of the plan."[16] |
| "From November 2020 through June 2021, the NEB, NEC, and BTF met in total 57 times. These meetings generally lasted at least 90 minutes and regularly exceeded two hours. Matters pertaining to the chapter 11 cases, including the potential global resolution of the chapter 11 cases, were discussed at all 57 meetings."[17] | "Q. How much time did the board of the Boy Scouts spend deliberating on the issue of who the person should be who reviews the claims under the plan that is associated with the Restructuring Support Agreement?<br><br>Mr. Andolina: Objection to form of the question. I'm going to instruct the witness not to answer with respect to -- . . . specific – specific – I'm going to instruct him not to answer, Mr. Schiavoni, and I want to make a record with<br>– with respect to -- . . . specific deliberations, so don't answer."[18] | All three deponents testified on this issue, multiple times.[19]<br><br>"A. I've participated in far more than a dozen meetings of the Bankruptcy Task Force . . . [i]t wouldn't surprise me if I participated in 50 meetings of the Bankruptcy Task Force by now. They meet frequently."[20]<br><br>"A. [M]any people on the board, National Executive Board, have looked at lots of documents over the last two years or year and a half – during the bankruptcy proceedings and with lots of meetings . . . ."[21]<br><br>"A. [T]he restructuring support agreement had elements in it that have come through multiple months, discussions, and plans, so, I mean, the national executive board would have had presentations around that, the national executive committee |

---

[16] Mosby Dep. Tr. at 197:22-200:3.
[17] Desai Decl. ¶ 15 (internal citations omitted); *see also id*. ¶¶ 24–25.
[18] Ownby Dep. Tr. at 90:25–91:15.
[19] Ownby Dep. Tr. at 14:14-15:8; 17:14-19:21; 31:1-32:14; 60:8-61:18; 65:21-66:6; Mosby Dep. Tr. at 178:19-179:12; 180:2-181:8; 227:25-228:12; Whittman Dep. Tr. at 166:15-167:8; 172:1-9; 172:20-173:2; 199:8-13.
[20] Whittman Dep. Tr. at 166:17-22.
[21] Ownby Dep. Tr. at 18:24-19:3.

4

| **Declaration Testimony Cited in Second Motion to Compel** | **Challenged Instruction in Second Motion to Compel** | **Witness Testimony on Same Subject** |
|---|---|---|
| | | would have had presentations, as well as the bankruptcy task force would have had presentations."[22] |
| "Between February and May 2021, there were numerous mediation meetings and negotiations with parties, all in an effort to achieve a global resolution. On May 26, 2021, the NEC approved recommending to the NEB that BSA settle with the claimants for an aggregate value of $250 million subject to negotiation of final terms. On May 26, 2021, the NEB engaged in robust discussions about the settlement proposal and together with their counsel, reviewed a presentation by their financial advisor as to the different options, analyzing the advantages and disadvantages of the various terms and provisions.<br><br>On June 5, 2021, the NEB held a special meeting to approve a settlement valued at $250 million for a global resolution and the issuance of the BSA Settlement Note, subject to satisfactory resolution of other issues. As set forth above, the NEB was required to approve the note because only the NEB can agree to increase or materially change the indebtedness of the BSA beyond any previously authorized level. At the June 13, 2021 BTF meeting, the proposed terms of the RSA were discussed in detail. On June 21, 2021, the BTF extensively discussed the draft term sheet for the DST Note. On June 22, 2021, the NEC and BTF met jointly to review the terms and conditions of the RSA."[23] | "Q. Okay. Since I don't have the resolution from the board, can you tell me what were the deal points that the board, by resolution, agreed could be – make up a RSA?<br><br>Mr. Andolina: I'm going to object to the question and instruct Mr. Ownby not to answer that."[24] | The deal terms are set forth in the RSA and several A&M presentations. Additionally:<br><br>"A. [T]he National Executive Board had delegated most of the authority that was needed to negotiate agreements in the bankruptcy, including the RSA, to the National Executive Committee but that there were certain aspects that were still reserved for the National Executive Board principally around the assumption of additional debt, indebtedness, by the organization and that any of those aspects such as the issuance of the 80 million-dollar trust note were previously approved by the National Executive Board but otherwise, the National Executive Committee was in a position to authorize the entry into the RSA."[25]<br><br>"A. I believe that this was the day [June 5] in which the [National Executive] board approved issuing up to the 80 million-dollar trust note which is one component of the RSA"[26]<br><br>"Q. Did the National Executive Committee authorize the entry into the RSA on June 22nd?<br><br>A. I believe so . . . I either saw or heard them take whatever |

---

[22] Mosby Dep. Tr. at 180:3-9.
[23] Desai Decl. ¶¶ 24–25.
[24] Ownby Dep. Tr. at 90:25–91:15.
[25] Whittman Dep. Tr. at 179:9-21.
[26] *Id*. at 181:7-11.

5

| Declaration Testimony Cited in Second Motion to Compel | Challenged Instruction in Second Motion to Compel | Witness Testimony on Same Subject |
|---|---|---|
| | | vote they needed to take to make the authorization."[27] |

---

[27] *Id*. at 179:22-23, 180:1-10.

AMERICAS 108676184