# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>　　　　　Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>Ref. Docket No. 5466<br><br>Hearing Date: August 12, 2021, 10:00 a.m.<br><br>Suppl. Obj. Deadline: August 9, 2021, 4:00 p.m. |

## HARTFORD'S SUPPLEMENT TO OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF (D.I. 5466)

BAYARD, P.A.
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: efay@bayardlaw.com
　　　　　gflasser@bayardlaw.com

SHIPMAN & GOODWIN LLP
James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
1875 K Street, N.W., Suite 600
Washington, D.C. 20003
Tel: (202) 469-7750
Fax: (202) 469-7751

WILMER CUTLER PICKERING HALE
　AND DORR LLP
Philip D. Anker (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel: (212) 230-8890
Fax: (212) 230-8888

Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (admitted *pro hac vice*)
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

*Attorneys for Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Pursuant to the *Second Amended Notice [D.I. 5887] of the Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5466] (the "RSA Motion") filed by the Boy Scouts of America and Delaware BSA, LLC (collectively, "BSA" or "Debtors"), Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively, "Hartford") respectfully submit this supplement ("Supplement") to their objection, submitted on July 22, 2021 [D.I. 5681] ("Objection") to the RSA Motion.[2]

Far from the "remarkable" achievement that BSA touts, the Restructuring Support Agreement ("RSA") reflects a fundamentally collusive deal by and between BSA and its Local Councils, on the one hand, and the Coalition, TCC and FCR (collectively, the "Claimant Representatives"), on the other. That deal requires BSA to renege on its post-petition agreement with Hartford and to seek confirmation of a plan of reorganization that is designed, at every step, to allow Abuse Claims that would never be allowed—even filed—in the tort system and to force Hartford and the other insurers to pay the wildly inflated bill. Among other things, it provides for the appointment of a "Settlement Trustee," Eric Green, who this Court has already determined is too close to the FCR even to serve as a mediator, let alone as the judge to assess thousands of claims; permits any claimant to receive $3,500 on an no-questions-asked basis, without any review at all of his claim, even to see if the claimant participated in scouting and the claim is not barred on its face by the applicable statute of limitations; permits the Trustee to allow all other claims, even those that are time barred, for up to $2,700,000 each; and requires, as

---

[2] All capitalized terms not defined herein shall have their respective meanings as set forth in the Objection.

a condition precedent to confirmation, that this Court bless all of this as "reasonable" and in "good faith" through findings that the Claimant Representatives have advertised will operate as a "judgment enforceable against the insurers."[3]  None of this is lawful.

But the RSA fails at the outset, even without consideration of the fundamental defects in the plan it requires the Debtors to pursue, because the RSA seeks a declaration by this Court that BSA can walk away from its agreement with Hartford with impunity.  There is no basis for that relief, and the reply briefs filed by BSA and the Claimant Representatives, as well as the minimal additional discovery the Debtors have provided, only make that clearer.[4]

The Law.  The RSA Motion seeks truly extraordinary relief with respect to the BSA-Hartford Settlement Agreement.  It asks this Court to enter an order "relieving [BSA] of any obligation to seek approval of the Hartford Settlement" and, indeed, declaring that BSA has "no obligations" of any kind under the BSA-Hartford Settlement Agreement.  RSA Motion ¶ 17; *id.*, Ex. A (Proposed Order), ¶ 2.  In other words, BSA wants this Court to declare that BSA can

---

[3]     *Declaration of Joel Millar in Support of Hartford's Objection to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5686] ("Millar Decl."), Ex. D (*Transcript of Telephonic Status Conference* (July 7, 2021) [D.I. 5529] at 36:23-37:2 (statement of Mr. Zalkin).

[4]     *See Debtors' Omnibus Reply in Further Support of Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5759] ("BSA Reply"); *Supplemental Brief of the Coalition of Abused Scouts for Justice, The Official Committee of Tort Claimants, and the Future Claims Representative in Support of, Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5760] ("Claimant Representatives' Reply").

Since Hartford filed its Objection, and notwithstanding the assurances that BSA's counsel provided this Court to the contrary, BSA has provided virtually no document discovery shedding any meaningful light regarding its decision to enter into, and the negotiations of, the RSA with the Claimant Representatives, including BSA's related request for authority to abandon its Settlement Agreement with Hartford.  Instead, BSA has continued to maintain the position that virtually all inquiries regarding those negotiations and that decision are shielded by the mediation privilege, the attorney-client privilege, or both.  *See Moving Insurers' Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* [D.I. 5881].

simply walk away from a post-petition agreement it freely entered into. BSA's and the Claimant Group's discussion of the legal authority supposedly entitling it to this relief is telling.

For its part, BSA all but acknowledges that courts have rejected its position that it does not need to comply with the Settlement Agreement by proposing confirmation of one of the two alternative plans of reorganization contemplated by the Agreement—either a Global Resolution Plan incorporating the proposed buy-back by Hartford of its policies for $650 million, or a Toggle Plan, under which all parties other than the Debtors would return to the tort system, with everyone's claims, defenses, and rights fully preserved. The Debtors "recognize that there is not a consensus" on the issue of whether a debtor must comply with its own post-petition agreement unless and until that agreement has been disapproved by the bankruptcy court presiding over the debtor's bankruptcy case. BSA Reply ¶ 121. But they fail to acknowledge that the vast majority of courts, including the leading appellate authorities, have rejected their position. *See, e.g., Liberty Towers Realty, LLC v. Richmond Liberty LLC*, 734 F. App'x 68, 70 (2d Cir. 2018) ("Allowing a party to withdraw from a settlement pending court approval would deter parties from entering into settlements in the first place, would permit parties to abuse the bankruptcy process, and would run contrary to generally applicable contract and settlement principles in this Circuit."); *PRLP 2011 Holdings, LLC v. Manuel Mediavilla, Inc. (In re Manuel Mediavilla, Inc.)*, 568 B.R. 551, 573 (B.A.P. 1st Cir. 2017) ("Contracting parties are entitled to a reasonable measure of assurance that their settlement agreements are valid and effective even though their performance obligations have yet to arise (as a result of the need to obtain court approval). The requirement of bankruptcy court approval of a compromise does not create a right of unilateral repudiation pending the court's consideration of the proposed compromise."); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (holding that trustee who decided a

settlement agreement was no longer in the best interests of the estate did not breach the agreement only because "she took no affirmative steps to withdraw the motion to approve" the agreement).

The Claimant Representatives' discussion of the law is even more remarkable. It relies almost entirely on a single out-of-circuit bankruptcy court decision from 25 years ago. *See* Claimant Representatives' Reply ¶¶ 29-30 (discussing *In re Sparks*, 190 B.R. 842 (Bankr. N.D. Ill. 1996)). But the Claimant Representatives do not disclose that numerous courts, including appellate courts, have expressly *rejected Sparks*. *See Mediavilla,* 568 B.R. at 572 n.12 *("Sparks* is unpersuasive"); *Liberty Towers Realty, LLC v. Richmond Liberty, LLC,* 569 B.R. 534, 542 (E.D.N.Y. 2017) ("I decline to follow *Sparks* and similar cases"), *aff'd,* 734 F. App'x 68 (2d Cir. 2018); *Pineo v. Turner (In re Turner),* 274 B.R. 675, 680-681 (Bankr. W.D. Pa. 2002) (citing *Sparks*, but siding with contrary line of cases in holding that a "settlement agreement is therefore binding on the parties, pending approval by this Court").

The Facts – "Changed Circumstances." With the law against them, BSA and the Claimant Representatives turn to the facts. They argue that "changed circumstances" justify BSA's decision to renege on its Settlement Agreement with Hartford. But BSA and the Claimant Representatives fail to cite any case holding that a change in circumstances can justify a debtor or trustee in unilaterally abandoning its own post-petition agreement, rather than potentially being a factor the court can consider in assessing whether the agreement, if properly presented under its terms, should be approved. And, in any event, the only supposed "change in circumstances" in this case cited by BSA and the Claimant Representatives—that the Claimant Representatives are not supportive of the BSA-Hartford Settlement Agreement—is, by their own admission, no change at all. Indeed, the Claimant Representatives acknowledge that BSA and

Hartford were "well aware" that "these constituencies did not support" the BSA-Hartford Settlement Agreement "when it was entered." Claimant Representatives' Reply ¶ 12. The Debtors admit the same. *See* BSA Reply ¶ 129 (acknowledging that BSA knew, when it entered into the BSA-Hartford Settlement Agreement, that the Claimant Representatives were not prepared to "join" and, to the contrary, "opposed it").

"Futility." The only remaining argument made by BSA and the Claimant Representatives for why BSA should not be required to live up to its agreement to solicit acceptances of the Global Resolution or Toggle Plan—that doing so would be futile—is equally unpersuasive. For one thing, the Claimant Representatives themselves argue, at the very outset of their reply, that the Court should not decide the RSA Motion based on potential "confirmation objection[s]" to a plan that is not currently before the Court. Claimant Representatives' Reply ¶ 1. And they all but admit that one of the two plans contemplated by the BSA-Hartford Settlement Agreement—the Toggle Plan—could be confirmed whether or not the claimants voted to accept it. *Id.* ¶ 14 ("the Debtors could try to force and cram down the Toggle Plan over the opposition of the Supporting Parties").

As for the other possible plan—a Global Resolution Plan incorporating the buy-back of Hartford's policies for $650 million—neither BSA nor the Claimant Representatives argue that it would be contrary to the terms of the Bankruptcy Code or other applicable law. They merely assert that the claimants would not vote to accept it. But that is a prediction, not a fact, and like all predictions it is inherently uncertain. Indeed, to the extent the issue is even properly before the Court at this point, it is a prediction that the Court should view with a healthy dose of skepticism. Various plaintiffs' lawyers have stressed that the claimants will ultimately decide how to vote, not those claimants' lawyers, let alone counsel for the Claimant Representatives.

5

*See Kosnoff Law's Supplemental Omnibus Objection to Hartford's and Century's Motions to Compel Rule 2019 Disclosures* [D.I. 5679] ¶ 7 ("As the Court is well aware, none of the law firms at issue will vote a single ballot for their clients. Each of the almost 17,000 claimants represented by those firms will choose for himself how he wishes to vote on any plan that is ultimately presented to him.").

The reply papers and the limited discovery that has occurred only underscore the likelihood that the claimants would, in sufficient number, support a Global Resolution Plan incorporating Hartford's payment of $650 million to buy-back its policies—if the alternative were the Toggle Plan, under which the claimants could be required to return to the tort system and prove up their claims. Over the more than 120 pages in reply papers filed by BSA and the Claimant Representatives, those parties never once address the admission by the TCC's counsel, made to this Court, that forcing the claimants to prove their claims in an adversarial process would amount to "death" for most of the claimants and would certainly be "worse" than the Global Resolution Plan with the Hartford policy buy-back.[5] Nor do the Claimant Representatives ever come to grips with the fact that, while 82,500 claimants have filed proofs of claim in this bankruptcy case, only 275 of those claimants had filed suit against BSA in court by the petition date. As for BSA, it sent a letter only a few weeks ago to the Chartered Organizations in which it predicted that "a significant portion of the claimants" will accept, under BSA's Fourth Amended Plan, the option of a "no-questions-asked" payment of $3,500, rather than submit their claims for any possible review even by the claimants' selected Trustee under the claimants' own TDPs.[6] In short, both the Claimant Representatives and BSA

---

[5] *See* Millar Decl., Ex. C (*Transcript of Telephonic Disclosure Statement Hearing* (May 19, 2021) [D.I. 4716] at 73:9-14 (statement of Mr. Stang).

[6] *See* Ex.1 hereto (Letter from Boy Scouts of America, National Key 3, to Valued Chartered Partner (July 26,

recognize that the vast majority of the 82,500 claimants who have filed proofs of claim in this bankruptcy case have shown no indication that they are prepared to litigate and prove up their claims. Rather, the overwhelming bulk of the claims filed in the bankruptcy case appear to be the result of the plaintiff lawyers' mass advertising program which promised that claimants would *not* have to establish their claims to the satisfaction of any court and instead could receive payment from a trust controlled by the plaintiffs and funded by the insurers.

Finally, if BSA and the Claimant Representatives really believe the Court must consider whether the Global Resolution Plan is futile in deciding the RSA Motion, then they necessarily also have to concede that the Court must likewise consider whether the Fourth Amended Plan that the RSA commits BSA and the Claimant Representatives to pursue is futile. It unquestionably is—and that is true whatever prediction one makes as to whether the claimants will support that plan in the requisite proportion.[7] BSA is on record that it believes the vast majority of the claims asserted in this bankruptcy proceeding are time barred, unsubstantiated or otherwise invalid.[8] And its experts (Bates White, LLC) are also on record that a reasonable estimate of the aggregate liability for all Abuse Claims facing BSA (and the Local Councils and Chartered Organizations) totals somewhere between $2.4 and $7.1 billion, a range for settlements that BSA could readily achieve, given the current agreement by BSA and the Local Councils to pay $850 million, Hartford's agreement to pay $650 million, and all the other remaining sources of recovery, including the dozens of other insurers and Chartered

---

2001), at 2.

[7] That question is hardly free from doubt. Plaintiffs' lawyers purporting to represent thousands of claimants have already voiced their objection to the Fourth Amended Plan. *See, e.g., Objection to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5682].

[8] *See Debtors' Informational Brief* [D.I. 4] at 3; *Amended Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5485] ("Am. Discl. Statement"), at 57, 72-76.

Organizations. But, instead, without increasing BSA's or the Local Councils' contributions proportionately (even though BSA has itself concluded that the Local Councils have nearly $2 billion in unrestricted net assets),[9] BSA has agreed to the Claimant Representatives' demand for a plan that is designed to manufacture tens of billions of dollars in additional claims and to force the insurers, not BSA or the Local Councils, to pay the bill.

The Claimant Representatives do not even seek to hide that this Faustian bargain is the crux of the Fourth Amended Plan. To the contrary, they argue that any plan providing the protection of a channeling injunction for third parties like the Local Councils must pay the Abuse Claims "in full or close thereto" and that they intend to look to the "insurance assets," not the actual cash and other property of BSA or the Local Councils, to achieve that payment.[10] Incredibly, they take that position while at the same time conceding that it would be the "death" of most of the Abuse Claims if the insurers were permitted to defend the claims in court. Instead, the Claimant Representatives make it clear that what they really mean by payment "in full or close thereto" is a dollar amount that exceeds any reasonable estimate of what the Abuse Claims would be worth in the tort system and that they propose to achieve this outlandish result by asking this Court to bless a plan that is *not* "insurance neutral." Again, the Claimant Representatives do not even pretend otherwise. Just the opposite, they devote an entire section of their reply brief to the remarkable proposition that "**A Plan Need Not Be 'Neutral' to Be Confirmable**,"[11] and they make it clear that, in their view, it is perfectly fine for a plan to allow

---

[9] *See* Am. Discl. Statement, Ex. D-1 (Local Council Balance Sheets) at 23 (page 406 of 474).

[10] *See Joinder of the Coalition of Abused Scouts for Justice, the Official Committee of Tort Claimants, and the Future Claims Representative to, and Brief in Support of, Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5680] at 11.

[11] Claimant Representatives' Reply at 21.

a "substantial increase in claims post-petition" compared to what the tort system would have permitted pre-petition.[12]

That is not the law. *See, e.g., In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 206, 212-14 (3d Cir. 2011) (en banc) (plan was not "insurance neutral" and thus was not confirmable where the bankruptcy case "staggeringly increased" the debtor's pre-petition tort liability and the plan created a trust to pursue payment of the inflated claims from the debtor's insurers); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 107 B.R. 856, 865-866 (E.D. Pa. 1989) ("the rights and obligations of the Debtor and [its insurer] under the [insurance] policy are not altered because of the Debtor's Chapter 11 filing"), *aff'd*, 908 F.2d 961 (3d Cir. 1990). Moreover, if the Claimant Representatives are right that the Plan can be confirmed only if it is likely to lead to payment in full of the many billions of dollars in inflated claims that they propose to allow, then the Plan is not feasible. The Plan's provisions denying the carriers their right to assume the defense of claims, and instead allowing thousands of time-barred and otherwise invalid claims, breach the terms of the policies and threatens to result in a complete loss of coverage.[13]

In short, the RSA would provide for BSA and the Claimant Representatives to seek confirmation of an unconfirmable plan. If "futility" is the test for approval of the RSA, it fails that test by a wide margin.

---

[12] Claimant Representatives' Reply at 28 ¶ 63.

[13] The Plan is not confirmable for many other reasons as well. Among others, it subordinates entirely every Indirect Abuse Claim held by Hartford and all other insurers, even to the extent that the underlying Direct Abuse Claim has been paid in full, in contravention of Section 509 of the Bankruptcy Code. *See* 11 U.S.C. § 509(c). It also risks losing the continued sponsorship of scouting by the Chartered Organizations, which, by BSA's own admission, are critical to its survival, by stripping the Chartered Organizations of their rights to assert Indirect Abuse Claims while remaining exposed to litigation by holders of Direct Abuse Claims in the tort system. Moreover, the Plan grants BSA and each Local Council, even those making no or little contribution to the Trust, a channeling injunction against all liability for Abuse Claims, in exchange for contributions that are significantly less than the assets that BSA's own analysis suggests would be available to pay claims against BSA and the Local Councils in the absence of the channeling injunction, potentially contravening (among other requirements) the "best interests of creditors" test under 11 U.S.C. § 1129(a)(7). Hartford will address these and other defects in the Plan more fully in connection with any motion for approval of a disclosure statement and plan confirmation.

Final Considerations.  For all these reasons as well as those set forth in the Objection, the Court should not allow BSA to renege on its agreement to seek approval of the Global Resolution or Toggle Plan.  But even if it does, it should not grant the RSA Motion.  The RSA will not merely provide for BSA to seek confirmation of a plan that is unconfirmable and, as a "key component" thereof (Claimant Representatives' Reply ¶ 5), to seek findings from this Court blessing that plan as "fair and reasonable"—findings that the Claimant Representatives have advertised will amount to a "judgment" by this Court against the insurers.[14]  It will also make the negotiation of any further settlements with any insurance carriers that much less likely.  By its terms, the RSA would bar BSA from even pursuing, let alone agreeing to, any settlement with any insurance carrier without the prior written consent of all three Claimant Representatives:  the Coalition, the TCC and the FCR.  See RSA § II.B(iii).  Thus, even if two of the three Claimant Representatives were willing to be reasonable, it appears that the third could block BSA from even engaging in negotiations.  Such a veto right, which will almost surely ensure that the parties will be headed toward months of additional litigation concluding with a hotly contested confirmation hearing over a plan that is admittedly not "insurance neutral," is in no one's interests.

---

[14]    See Millar Decl., Ex. D (*Transcript of Telephonic Status Conference* (July 7, 2021) [D.I. 5529], at 36:23-37:2 (statement of Mr. Zalkin).

Date: August 9, 2021
     Wilmington, Delaware

BAYARD, P.A.

 /s/ *Gregory J. Flasser*
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 655-5000
Facsimile:  (302) 658-6395
Email:  efay@bayardlaw.com
       gflasser@bayardlaw.com
- and -

James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
SHIPMAN & GOODWIN LLP
1875 K Street, NW, Suite 600
Washington, D.C. 20003
Tel:  (202) 469-7750
Fax:  (202) 469-7751
- and -

Philip D. Anker (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel:  (212) 230-8890
Fax:  (212) 230-8888
-and-

Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363

*Attorneys for Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company*