# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>              Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>Re: Dkt. No. 5466 |

**CENTURY'S SUPPLEMENTAL OBJECTION TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING SUPPORT AGREEMENT AND (II) GRANTING RELATED RELIEF**

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware 19801

O'MELVENY & MYERS LLP
Tancred Schiavoni (*pro hac vice*)
Daniel Shamah (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036-6537

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Boy Scouts of America (6300) and Delaware Boy Scouts, LLC (4311).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

SUPPLEMENTAL OBJECTIONS .......................................................................... 4

    I.      The RSA Is Subject to Heightened Scrutiny .......................................... 4

          A.      Century and the Other Insurers Have Standing. ....................... 4

          B.      The Debtors Are Wrong about the Legal Standard. ................. 5

          C.      The Debtors' Discovery Behavior and Lack of Transparency Compels the Court to Apply a Heightened Level of Review. ................. 7

          D.      The RSA Fails to Satisfy the State Law Standard. ................... 8

                 1.      The Local Councils and their Affiliates (including the NEB and NEC) Receive a Personal Benefit under the RSA. ................................................................ 9

                 2.      The Local Councils' Involvement is not Limited to "Nominating" Otherwise Independent Directors for the Debtors. ................................................................ 11

                 3.      The Conflict Is not Limited to a Voluntary "Piggy-Back" Release for the Debtors' Directors. ................... 15

    II.     The Amended Plan Is Still Unconfirmable ........................................... 18

    III.    The Debtors Gain Nothing from the RSA ........................................... 19

          A.      The Benefits to the RSA Are Illusory Because the Debtors Have Not Secured any Claimant Support ........................................... 19

          B.      The Debtors Have Not Demonstrated the Coalition Made a "Substantial Contribution" ........................................................ 23

          C.      The Debtors Fail to Distinguished the Cases that Hold that the Promised Payments to the Coalition Taint the RSA Rendering it Illegal ................................................................................... 28

CONCLUSION ................................................................................................. 29

CASE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
930 A.2d 92 (Del. 2007) ....................................................................................... 11

*Burch v. Opus LLC (In re Opus E. LLC)*,
698 F. App'x 711 (3d Cir. 2017) ............................................................................ 7

*GAMCO Asset Mgmt. v. iHeartMedia Inc.*,
2016 WL 6892802 (Del. Ch. Nov. 23, 2016) ............................................... 9, 10, 11

*Guttman v. Huang*,
823 A.2d 492, 500 (Del. Ch. 2003) ................................................................... 8, 9

*H-W Wexford LLC v. Encorp, Inc.*,
832 A.2d 129 (Del. Ch. 2003) ............................................................................. 15

*In re AbbVie Inc. Stockholder Derivative Lit.*,
2015 WL 4464606 (Del. Ch. 2015) ...................................................................... 15

*In re Am. Plumbing & Mech., Inc.*,
327 B.R. 273 (Bankr. W.D. Tex. 2005) ................................................................. 22

*In re Best Prod. Co., Inc.*,
173 B.R. 862 (Bankr. S.D.N.Y. 1994) ................................................................... 22

*In re Bidermann Indus. U.S.A., Inc.*,
203 B.R. 547 (Bankr. S.D.N.Y. 1997) ..................................................................... 6

*In re Columbia Gas Sys., Inc.*,
224 B.R. 540 (Bankr. D. Del. 1998) ..................................................................... 22

*In re EZCORP Inc.*,
2016 WL 301245 (Del. Ch. Jan 25, 2016) ............................................................ 11

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ..................................................................... 15

*In re Innkeepers USA Trust*,
442 B.R. 227 (Bankr. S.D.N.Y. 2010) .............................................................. 5, 6, 7

*In re KiOR, Inc.*,
567 B.R. 451 (D. Del. 2017) ................................................................................ 21

*In re L.A. Dodgers LLC*,
457 B.R. 308 (Bankr. D. Del. 2011) ....................................................................... 5

*In re LATAM Airlines Grp.*,
620 B.R. 722 (Bankr. S.D.N.Y. 2020 ...................................................................... 5

*In re Millennium Lab Holdings II, LLC*,
945 F.3d 126 (3d Cir. 2019) ................................................................................ 15

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re S & Y Enters., LLC,*
480 B.R. 452 (Bankr. E.D.N.Y. 2012) ...................................................................... 22

*In re Tropicana Entm't LLC,*
498 F. App'x 150 (3d Cir. 2012) .............................................................................. 22

*In re Wash. Mut., Inc.,*
442 B.R. 314 (Bankr. D. Del. 2011) ........................................................................ 16

*IRA Trust FBO Bobbie Ahmed o/b/o Class A Stockholders of NRG Yield, Inc. v.
Crane,*
2017 WL 6335912 (Del. Ch. Dec. 11, 2017) ...................................................... 11, 12

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns. Operating, LLC (In re
Charter Commc'ns.),*
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...................................................................... 17

*Kahn v. Lynch Comm. Systems, Inc.,*
638 A.2d 1110 (Del. 1994) ......................................................................................... 5

*Lebron v. Mechem Financial, Inc.,*
27 F.3d 937 (3d Cir. 1994) ........................................................................................ 21

*N.K. v. Corp. of Presiding Bishop,*
307 P.3d 730 (Wash. Ct. App. 2013) ........................................................................ 13

*Official Comm. Of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re
Enron Corp.),*
335 B.R. 22 (S.D.N.Y. 2005) ...................................................................................... 6

*Orman v. Cullman,*
794 A.2d 5 (Del. Ch. 2002) ................................................................................... 8, 10

*Wilson v. Huffman (In re Missionary Baptist Found. Of Am.),*
818 F.2d 1135 (5th Cir. 1987) .................................................................................... 6

**Statutes**

11 U.S.C. § 1141(d) ........................................................................................................ 15

11 U.S.C. § 524(e) .......................................................................................................... 15

Century Indemnity Company ("Century"), as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, respectfully submits the following supplemental objection to the *Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [Docket No. 5466] (the "Motion") and in response to the *Debtors' Omnibus Reply in Further Support of Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [Docket No. 5759] (the "Reply").[2]

## PRELIMINARY STATEMENT

Confronted with an empty factual record, the Debtors responded to the raft of objections to the Motion—not just from Century, but from other insurers, Chartered Organizations, large claimant groups, and the United States Trustee—by purporting to redo discovery in a belated attempt to backfill the record. The Debtors apparently hope that the Court will overlook their flawed governance, discovery abuses, and sham negotiation process and approve the RSA as a reasonable exercise of their "business judgment." But what little the Debtors have belatedly shared

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, including the RSA attached to the Proposed Order as Exhibit 1. Century incorporates by reference its prior objections to the RSA and to the payment of the Coalition's fees (the "Century Objections") [Docket Nos. 5707-5709] All exhibits referenced herein are attached to the *Declaration of Daniel S. Shamah*, filed in support hereof.

Century files this Supplemental Objection, because the Debtors filed a notice requesting it by August 9. Century has joined the *Moving Insurers' Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* (the "Motion to Compel") [Docket No. 5881], in which certain insurers seek an order compelling the Debtors to produce documents and witness testimony that have been withheld on improper privilege grounds. Century reserves the right to further supplement this Supplemental Objection if the Court grants that motion.

in discovery confirms what Century and other insurers have insisted was the case all along:  the Debtors never really "negotiated" an RSA let alone the TDPs and the entire review and approval process was flawed.  Century explained in the Century Objections why the Motion fails under any legal standard.  Nothing in the discovery record or the Reply changes this outcome:

*First*, the Motion is subject to an "entire fairness" standard.  There is no serious dispute that the BSA board members who authorized the RSA wore multiple hats and stood to benefit in multiple capacities from the releases and exculpations that would be issued under the Amended Plan.  The Local Councils directly or indirectly appoint the Debtors' board and have control over the Debtors.  Virtually the entire committee that approved the RSA (the "NEC") came from the Local Councils and are current or former officers of the Local Councils.  Both the Local Councils themselves and their current and former officers (including the members of the NEC) are defined as Protected Parties.  Thus, in addition to being released from any claims arising from their participation on the Debtors' board, the Local Councils and the NEC will also be released from potential liability on claims that arose directly against them for actions they took in their capacities as officers of the Local Councils.  In considering these obvious conflicts, the Debtors' response, an awkward attempt to analogize the Motion to a state-law claim for breach of fiduciary duty, both mischaracterizes the RSA and completely misconstrues the law.

*Second*, the Debtors only response to the unconfirmable plan underlying the RSA is a plea for the Court to kick the can down the road and address these issues at confirmation.  But, what substance the Debtors do offer in response to the significant confirmation infirmities shows how hopeless the Amended Plan is.  For example, in response to the host of arguments that Century and other insurers made showing that the Amended Plan is anything but insurance neutral, the Debtors' only response is (a) to point to language in the Amended Plan that by its plain terms

nullifies insurance protections, and (b) to argue that similar findings *may* be approved in the *Purdue Pharma* bankruptcy. And the Debtors offer nothing to rebut the authority the insurers offered that call out the legal absurdity of the terms of the Amended Plan and TDP requiring this Court to find that the determinations of a conflicted plaintiff controlled trustee constitute a binding adjudication of BSA's liability to be imposed on non-debtors. Even other claimants recognize this is a shockingly thin reed on which to rest confirmation of the Amended Plan and pin the hopes of claimants.

*Third*, the Debtors gain nothing by having a handful of favored lawyers agree to recommend to their clients to vote in favor of the Amended Plan. The Debtors' primary response is that this arrangement was accepted in one other mass-tort case, PG&E. But that argument ignores a host of critical differences between the two cases and authority that it is improper to promise to pay a client's lawyer as part of an agreement with that lawyer that he or she recommend something to their client. Moreover, in the absence of a settlement with any other critical stakeholder in this case, including the Chartered Organizations and the insurers, the RSA remains unfinished. Approving it, along with the substantial expense that goes along with it, when the Debtors will not be able to solicit or confirm the Amended Plan, would be a waste of estate resources.

*Finally*, the Debtors seek to obtain approval for millions to be paid to the Coalition for fees by attempting to completely redo the factual record. The Debtors' evidentiary support for the fee request consisted of a single conclusory paragraph in Mr. Whittman's original declaration. Mr. Whittman was largely precluded from testifying about any of the substance of the negotiations that led the Debtors—who have spent 18 months crying poverty—to agree to incur millions of dollars of incremental fees for a non-estate professional that represents unsecured tort claimants, who

already have an estate fiduciary looking out for their interests. Faced with the stark evidentiary shortfall, the Debtors should not be permitted to reinvent the record. And, in any event, their efforts to supplement the record fail.

For all of these reasons, and for the reasons explained in greater detail in the Century Objections and below, the Motion should be denied.

## SUPPLEMENTAL OBJECTIONS

### I.    The RSA Is Subject to Heightened Scrutiny

#### A.    Century and the Other Insurers Have Standing.

The Debtors' primary argument regarding the standard of review is the non-sequitur assertion that no one has "standing" to advise the Court that heightened scrutiny applies to the review of the RSA due to multiple conflicts of interest. The Debtors note that a breach of fiduciary duty claim may be an estate cause of action. From that unremarkable proposition, and without citing a single case under section 363 or any analogous provision of the Bankruptcy Code, the Debtors then leap to the absurd conclusion that *no one* can argue that heightened scrutiny applies under section 363 unless they could also file a state law derivative claim for breach of fiduciary duty.

The Debtors cite no case for their novel position and Century is aware of none. Rather, numerous cases have applied heightened scrutiny with no mention of any such limitation related to potential derivative claims. *See infra* Section I.B. As a creditor who filed proofs of claim and an insurer whose rights are directly affected by the RSA, Century (and the other insurers) obviously have standing to object to the RSA and raise the applicable standard. *See, e.g.*, RSA §§ II.A.(i)(D), II(B); *id.* at Ex. A pp.7, 16, 20, 22, Schedule 1. And even if Century and the other insurers had

not raised the appropriate standard of review, the Court would no doubt have considered that gating question on its own initiative.[3]

The Debtors' argument to the contrary is a tautology. According to the Debtors, heightened scrutiny can only be sought by a party that already has derivative standing to sue the board for breach of fiduciary duty. But also according to the Debtors, no one except the Debtors has standing to assert such claims because they are estate assets. In short, if the Court accepts the Debtors' argument, heightened scrutiny could ***never*** apply in a bankruptcy case where the debtor invokes section 363 or any other provision for approval of a transaction outside the ordinary course of business. This is obviously not the law, as the myriad bankruptcy cases applying heightened scrutiny to conflicted transactions confirms. *See infra* Section I.B.[4]

B.       **The Debtors Are Wrong about the Legal Standard.**

As discussed at length in the Century Objections, bankruptcy courts routinely apply heightened scrutiny in reviewing RSAs or other transactions outside the ordinary course of business that involve conflicts, whether under section 363 or otherwise. *See In re Innkeepers USA Trust*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010) (noting that heightened scrutiny standard may apply to a plan support agreement with an insider but finding the agreement in question could not be justified by even the more deferential business judgment test); *In re L.A. Dodgers LLC*, 457 B.R.

---

[3]     Even under state law (which is not the source of the heightened standard of review applicable to an insider transaction under Bankruptcy Code section 363), a court is likely required to independently determine the standard of review, whether or not it is raised by a party in interest. See *Kahn v. Lynch Comm. Systems, Inc.*, 638 A.2d 1110, 1117 (Del. 1994) (where the entire fairness standard is applicable, it is the "exclusive standard of judicial review in examining the . . . transaction.").

[4]     Since a transaction outside the ordinary course of business is not effective without court approval, it is all the more puzzling how the Debtors' proposed limitation on standing could even theoretically be implemented. Do the Debtors expect that an objector would first obtain standing to file a breach of duty claim that would only arise if the court approved the transaction, but which the court would never approve if the transaction did not satisfy the applicable standard in the first place?

308, 313–14 (Bankr. D. Del. 2011) (applying entire fairness standard for proposed debtor in possession financing transaction); *In re LATAM Airlines Grp.*, 620 B.R. 722, 771 (Bankr. S.D.N.Y. 2020) (applying entire fairness standard to insider transaction); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) ("[S]ales to fiduciaries in chapter 11 cases are not per se prohibited, but [they] are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse."); *Official Comm. Of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005) ("Courts have held that transactions that benefit insiders must withstand heightened scrutiny before they can be approved under § 363(b)"); *see also Wilson v. Huffman (In re Missionary Baptist Found. Of Am.)*, 818 F.2d 1135, 1144 (5th Cir. 1987) (noting that "the reason that the transactions of insiders will be closely studied is because such parties usually have greater opportunities for such inequitable conduct").

In their Reply, the Debtors ignore the legion of bankruptcy cases that impose heightened scrutiny for transactions outside the ordinary course of business where a debtor's board is conflicted.  They instead focus only on state law cases that address the state law procedures applied in derivative suits for breach of fiduciary duty.  In doing so, the Debtors' response fails, because this is a matter of ***substantive bankruptcy law***.  The appropriate question is whether the Court will give deference as a matter of bankruptcy law to the Debtors' decision to enter the RSA given the attendant conflicts, not whether Century or anyone else could have sued the board for approving the agreement if it had been signed outside of bankruptcy.  But as discussed below, even if the Court were to consider the state law cases cited by the Debtors relating to breach of fiduciary duty claims outside of the section 363 context, they do not support the Debtors' position.

C.     **The Debtors' Discovery Behavior and Lack of Transparency Compels the Court to Apply a Heightened Level of Review.**

Century previously explained that bankruptcy courts will apply heightened scrutiny to approval of an RSA where there are concerns about a lack of transparency or good faith negotiations. *See Innkeepers*, 442 B.R. at 234. A lack of transparency on its own triggers heightened scrutiny, because it implicates the "integrity and entire fairness of the transaction at issue." *Burch v. Opus LLC (In re Opus E. LLC)*, 698 F. App'x 711, 719 (3d Cir. 2017) (quoting *Innkeepers*, 442 B.R. at 231). As the bankruptcy court in *Innkeepers* noted, a "lack of transparency in the process . . . breeds contempt rather than fostering negotiations." 442 B.R. at 234. "This is not what chapter 11 is supposed to be about." *Id.* The Court already barred the Debtors from introducing evidence on matters where they had thwarted the insurers' discovery efforts. As Century explained in the Century Objections and the Motion to Compel, the Debtors have cloaked the entirety of negotiations and board deliberations behind various claims of privilege, waiting until they filed the Reply to try and backfill the discovery record. Their conduct calls into question the integrity of the negotiation and governance process that led to this point. Under either the business judgment rule or the entire fairness standard, this conduct dooms the RSA, because the Debtors are unable to show either a "fair process" or that they negotiated the RSA in good faith. With regard to the TDPs, there is zero evidence that they were negotiated at all.

The Debtors offer no response to any of these arguments, other than an anemic attempt to distinguish *Innkeepers*. They claim that the "RSA and Amended Plan do not put the Debtors on an island with only the Plaintiff Representatives supporting the terms," pointing to further negotiations that the Debtors hope will bring in additional support for the Amended Plan. Reply at ¶ 26. But the most recent set of mediation sessions, which the Debtors trumpeted in their Reply as the next phase in "expand[ing] support for the RSA," has yielded nothing. In other words, an

island is exactly where the Debtors find themselves, in large part due to the lack of transparency that has led to widespread opposition to the RSA, including from the largest Chartered Organizations:

> We were hopeful that there would be a transparency on the part of the Boy Scouts in providing the record as to what went into the RSA. We're deeply disappointed that we, from afar, and looking at attending depositions haven't been able to get those answers either. There were a tremendous amount of objections, a tremendous amount of instructions not to answer. And the fundamental questions as to what they considered and when with respect to this weren't answered, Your Honor.[5]

Under these circumstances, the Debtors bear the burden of proving that the RSA is both a fair deal and the product of a fair process. They cannot do so.

Finally, the only other way the Debtors attempt to distinguish *Innkeepers* is to point to the support for the RSA by the Official Committee of Unsecured Creditors and the Ad Hoc Committee that represents eight of 250 plus Local Councils. As discussed below, the Local Councils control the Debtors and the conflicts of interest are what trigger heightened scrutiny in the first place. Moreover, *Innkeepers* was obviously not a mass tort case, and the lineup of key estate stakeholders was entirely different in that case. The lesson of *Innkeepers*—one the Debtors obstinately refuse to learn—is that alienating the very stakeholders whose support is needed to exit chapter 11 is an abuse of the bankruptcy process.

### D. The RSA Fails to Satisfy the State Law Standard.

Recognizing the absence of support for their position under bankruptcy law, the Debtors attempt to sidestep Century's argument by citing state law cases governing derivative claims for breach of fiduciary duty. But even if this were a breach of duty claim for damages (which it is not), entire fairness would still apply.

---

[5]    July 27 Tr. at 20:14-22.

1.      **The Local Councils and their Affiliates (including the NEB and NEC) Receive a Personal Benefit under the RSA.**

The Debtors assert that heightened scrutiny will not apply to a transaction unless insiders are on both sides of a transaction, and the entity in question makes transfers directly to the insider. *See* Reply at ¶¶ 42-44 (citing *Guttman v. Huang*, 823 A.2d 492, 500 (Del. Ch. 2003), *Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002), and *GAMCO Asset Mgmt. v. iHeartMedia Inc*., 2016 WL 6892802, at *16 (Del. Ch. Nov. 23, 2016)).  That is both an incorrect statement of the Delaware law concerning breach of fiduciary duties and a mischaracterization of the very cases that they cite, even assuming these cases are relevant in the context of a section 363 transaction.  In fact, as these cases confirm, an insider need not be on both sides of a transaction to trigger the entire fairness test for a breach of duty claim.  And the conflict at issue here would definitely qualify for review under entire fairness even if this case were treated like a state law breach of fiduciary duty claim.

In the *Guttman* case the Debtors cite, the court considered an insider trading claim against a company's directors and held the claim was not subject to heightened scrutiny because the affected company was not even a party to the transaction in question.  *Guttman*, 823 A.2d at 502 (plaintiffs "attack[ed] a myriad of stock sales, not between the defendant-directors and [the company], but between the defendant-directors and marketplace buyers.").  The court in *Guttman* further noted that "the plaintiffs do not challenge any particular business decision made by the NVIDIA board as a whole." *Id.* at 499.  Accordingly, the court did not apply a heightened standard review.  Here, the opposite is the case.  The transaction is being orchestrated by the Debtors through an agreement signed by the Debtors.  The Debtors are giving up consideration to consummate a transaction that benefits the insiders and non-debtor entities with which they are affiliated.  In fact, the very reason the Debtors filed the Motion in the first place is that the Debtors,

under the RSA, seek to bind the estates and use property outside the ordinary course of business under Bankruptcy Code section 363.

Moreover, given the bankruptcy context, the unique releases on their own trigger heightened scrutiny. Any rights of indemnification that the Local Councils and their officers might otherwise have against the Debtors are unsecured claims. But, by releasing them in their capacities with the Local Councils in exchange for the Debtors' agreements under the RSA, the Debtors are in effect unimpairing an otherwise prepetition unsecured claim. That is yet another reason that the Local Councils and the board are in fact on both sides of the affected transaction and receiving a direct benefit. Ironically, the Debtors themselves trumpet that the releases provided in the RSA have the effect of honoring these prepetition, unsecured indemnity claims, as if it were somehow a virtue to have done so. *See* Reply at ¶ 56 (asserting that it is "procedurally efficient" to satisfy insider indemnity claims in the bankruptcy case). In doing so, the Debtors admit that the insiders are on both sides of the transaction at issue, disproving their own contention to the contrary.

But even if the members of the Local Councils, the NEC and the NEB were not on both sides of the transaction, the entire fairness standard would still apply, as once again demonstrated by the Debtors' own lead cases on the topic. For example, in *Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002), the court refused to apply the business judgment rule, despite finding the controlling shareholder *did not* stand on both sides of the challenged transaction. The court held that a showing that the relevant party was on both sides of the transaction was merely "one way" to overcome the business judgment rule. *Id.* at 20. The entire fairness standard may also apply if the relevant party was "either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders." *Id.* at 22.

*GAMCO Asset Management*, also cited in the Reply, undermines the Debtors' argument even further.  *See*  Reply at ¶ 44 (citing *GAMCO Asset Mgmt. v. iHeartMedia Inc*., 2016 WL 6892802, at *16 (Del. Ch. Nov. 23, 2016)).  There, the Delaware Chancery Court found that while the entire fairness standard applies to transactions where the insider appears on both sides, it also applies to fiduciary breach claims that allege that the insider received (1) "disparate consideration," (2) a "continuing stake" not available to other stakeholders, or (3) a "unique benefit" not made available to other stakeholders.  *Id.* at *16; *see also IRA Trust FBO Bobbie Ahmed o/b/o Class A Stockholders of NRG Yield, Inc. v. Crane*,  2017 WL 6335912, at *9 (Del. Ch. Dec. 11, 2017) (finding that retention of a "unique benefit," not shared with other stakeholders, warranted application of the entire fairness standard).

While most state court breach of duty cases involve solvent companies and shareholder rights, the same concepts apply to insolvent companies and the interests of their creditors.  *See Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007).  Here, the Local Councils and the members of the NEC and NEB as parties affiliated with the Local Councils are receiving a benefit not being equally conferred on other non-controlling stakeholders to whom they owe duties, including the Insurers and the Chartered Organization.  Thus, heightened scrutiny would apply even under state law fiduciary duty concepts on which the Debtors themselves rely, both because the insiders are on both sides of the transactions at issue and because they receive a benefit not shared with other stakeholders.

### 2.    The Local Councils' Involvement is not Limited to "Nominating" Otherwise Independent Directors for the Debtors.

In their Reply, the Debtors argue that the nomination of a director by a party does not make that director interested in a transaction that concerns the nominating shareholder.  Reply at ¶ 47. In fact, the cases cited by the Debtors hold that a director's nomination by a party is a relevant but

not necessarily controlling factor in considering independence.  *See GAMCO*, 2016 WL 6892802, at *16; *In re EZCORP Inc.*, 2016 WL 301245, at *41 (Del. Ch. Jan 25, 2016) ("[A]lthough nomination or election by an interested party, standing alone, is not dispositive, it is not necessarily irrelevant.").

Of course, the appointment of the NEC and NEB by the Local Councils is not the sole basis of the conflict at issue, which is far deeper and personally affects the Debtors' decision-makers. The Local Councils control the NEB, and therefore the NEC.  The Directors on the NEC  "came from" the Local Councils.[6]  Under the Debtors' Charter and Bylaws, Directors would typically have served as the president or a council commissioner for a Local Council as a predicate to becoming a member of the NEB or the NEC.[7]  In fact, a majority of the NEC has served as presidents of the Local Councils.[8]  As Figure 1 below shows, it is beyond dispute that these directors are not mere independent and unaffiliated nominees selected by the Local Councils. Their positions within Local Councils mean they cannot act as disinterested parties.  *See Sandys*, 152 A.3d at 131–32 (former employment by control party within three years may preclude a finding of independence).

---

[7]     *See* Ex. E, BSA Charter and Bylaws Art. II, Sec. 2, Cl. 6.  ("The duly elected president and council commissioner of a local council shall, during their terms of office, be members of the National Council."); Id. at Art. III, Sec. 3, Cl. 1 (The National Executive Board is selected by the National Council.); Id. at Art. III, Sec. 7, Cl. 1 (The National Executive Committee is a subset of the National Executive Board).

The Debtors attempt to make much of the fact that the officers of the Local Councils are not paid, as if this means that non-profit board members could never be conflicted. In fact, the benefit received by an insider need not be monetary compensation to trigger heightened review. *See IRA Trust FBO Bobbie Ahmed*, 2017 WL 6335912, at *9 (retention of voting control of company was a benefit warranting application of the entire fairness standard). Here, the direct compensation for the Local Council officer position is irrelevant, because the benefit to be received is a valuable release from potential liability. In their present or former capacities as officers of the Local Councils, the members of the NEC may well be subject to the same potential claims that are asserted against the Local Councils. In fact, there are reported decisions where plaintiffs have sought to hold Local Councils liable for Abuse Claims and the Debtors have sought to enjoin numerous lawsuits against Local Councils, including some whose representatives sit on the NEC. *See, e.g.*, *N.K. v. Corp. of Presiding Bishop*, 307 P.3d 730 (Wash. Ct. App. 2013); *see also Boy Scouts of Am. v. A.A. et al.*, Adv. Pro. 20-50527, [Docket No. 11] (identifying claims against Northeast Georgia Council, Inc., Cascade Pacific Council, Patriots' Path Council, Sussex District Boy Scouts of America, Group 83 Stillwater, Essex County Council of the Boy Scouts of America, Northern New Jersey Council of the Boy Scouts of America, Boy Scout Troop #64, and Greater New York Councils). The RSA will release them personally from those claims. They are plainly interested in the transactions proposed by the RSA (including the attendant releases) separate and apart from any benefits that may accrue to the Debtors.

**Figure 1: BSA National Executive Committee – Local Council Affiliations**

| Name | Local Council Affiliation | Source |
|------|---------------------------|--------|
| Brad Tilden | Chief Seattle | • Ex. B, Mosby Dep. Tr. at 246:10–12.<br>• Ex. D, Brad Tilden, Crunchbase profile. |

| Name | Local Council Affiliation | Source |
|---|---|---|
| | | • Ex. F, Chief Seattle Council Boy Scouts of America, *Eagle Scout Brad Tilden, CEO Alaska Air Group, on Scouting's Impact*, Facebook (July 13, 2020). |
| Jack Furst | Circle Ten (Dallas) | • Ex. B, Mosby Dep. Tr. at 246:13–14.<br>• Ex. G, CTG Staff, *Local philanthropist puts others Furst*, Southern Denton County Life (Nov. 16, 2018). |
| Arthur F. "Skip" Oppenheimer | Idaho (Mountain West/Ore-Ida Council) and/or another Council | • Ex. B, Mosby Dep. Tr. at 246:15–18. |
| Nathan Rosenberg | Greater L.A. Area and/or Orange County | • Ex. B, Mosby Dep. Tr. at 246:19–21.<br>• Ex. H, Nathan Owen Rosenberg, Insigniam profile.<br>• Ex. I, Nina Keebler, *Orange County Business Leader, Nathan Rosenberg, Elected as Chairman of Board, Boy Scouts of America*, PRLog (Feb. 2, 2009). |
| Jim Turley | Greater St. Louis Area | • Ex. B, Mosby Dep. Tr. at 246:22–24.<br>• Ex. J, James S. Turley, Olin Business School bio, Washington University in St. Louis. |
| Thear Suzuki | Circle Ten (Dallas) | • Ex. B, Mosby Dep. Tr. at 247:12–16.<br>• Ex. K, Alfia Ilicheva, *PLS Spotlight: Thear Suzuki*, Presidential Leadership Scholars (Jan. 14, 2020). |
| Alison Schuler | Great Southwest (Albuquerque) | • Ex. B, Mosby Dep. Tr. at 247:17–20.<br>• Ex. L, *Alison Schuler*, LinkedIn profile.<br>• Ex. M, Bryan Wendell, *13 Scouters to receive 2019 Silver Buffalo Award, Scouting's top honor for volunteers*, Boy Scouts of America (May 31, 2019). |
| Devang Desai | Greater Miami and/or South Florida Council | • Ex. B, Mosby Dep. Tr. at 247:21–25.<br>• Ex. N, Devang Desai, LinkedIn profile.<br>• Ex. O, President-Elect, Devang B. Desai bio, University of Miami. |
| Scott Sorrels | Atlanta Area and Northeast Georgia | • Ex. B, Mosby Dep. Tr. at 248:1–3.<br>• Ex. P, Scott Sorrels bio, NorCal College of Commissioner Science.<br>• Ex. Q, Scott Sorrels bio, Eversheds Sutherland. |
| Daniel Ownby | Sam Houston Area | • Ex. R, *Houston Business Leader Elected to Serve on World Scout Committee*, Boy Scouts of America (Jan 27, 2011).<br>• Ex. S, Dan Ownby bio, Prabook. |
| Roger Mosby | Mid-America and Sam Houston Area | • Ex. T, *Boy Scouts of America Names Roger C. Mosby as New CEO and President*, Boy Scouts of America (Dec. 30, 2019). |
| Mike Ashline | Buckeye | • Ex. U, Mike Ashline Buckeye Council BSA, Bing.com search. |

### 3.      The Conflict Is not Limited to a Voluntary "Piggy-Back" Release for the Debtors' Directors.

Ignoring the obvious fact that the Debtors are insolvent and in chapter 11, the Debtors cite a series of state law fiduciary duty cases holding that the entire fairness standard does not apply in cases where directors of a solvent company received piggy-back releases as part of a voluntary settlement of direct litigation claims.  Reply at ¶¶ 53–54.  The core basis of the state cases cited by the Debtors on this point (as noted in their Reply) is that such a voluntary release of officers and directors as part of ordinary litigation against a solvent company is "routine."  *H-W Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 149 (Del. Ch. 2003) (noting that "when a corporation pays value to settle a claim, it demands and receives releases in favor of its directors, officers and other agents"); *In re AbbVie Inc. Stockholder Derivative Lit.*, 2015 WL 4464606, at *6 (Del. Ch. 2015) (involving a "general release" of the company and directors).  The distinctions between these cases and that of an insolvent debtor in bankruptcy are myriad and obvious:

***First***, the Debtors are not getting a "release" that is being shared with their officers and directors in their capacity as such.  The Debtors are getting a bankruptcy discharge.  11 U.S.C. § 1141(d).  That discharge cannot be shared as a matter of law with non-debtors, including the Local Councils and their officers and directors.  11 U.S.C. § 524(e) ("[D]ischarge of a debt of the debtor does not affect the liability of any entity on, or property of any other entity for, such debt.").  Rather, the Local Councils and their affiliated parties (including the NEC and the NEB) receive special Protected Party status under the RSA separate and apart from the discharge being granted to the Debtors.

***Second***, the release that benefits the insiders under the RSA is not voluntary, nor is it "routine."  The RSA proposes transactions that impose involuntary releases on third parties for the

benefit of the interested Protected Parties.  As a matter of Third Circuit law, such releases are "extraordinary" and can only be granted when "exacting standards [are] satisfied."  *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019).  "The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions," and even where these criteria are satisfied, non-consensual, third-party releases should only be approved in the "context of extraordinary cases." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 608 (Bankr. D. Del. 2001); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 351 (Bankr. D. Del. 2011) ("While the Third Circuit has not barred third party releases, it has recognized that they are the exception, not the rule.").

**Third**, while the indemnification rights of officers and directors of a solvent company may justify extending a release outside of bankruptcy, here those rights are unsecured claims that share the same priority as all other unsecured claims that will not be paid in full.  This presents yet another conflict that calls for heightened review, not a reason to defer to the direct beneficiaries' business judgment.  The tort claims are at the core of this case.  Getting a release from them is undoubtedly the most valuable consideration that could be dispensed to the insiders in the case, for which, they have completely abandoned any pretext of honoring the obligations to the insurers and the Charterer Organizations.

**Fourth**, the interested parties are not just getting releases *qua* their positions as officers and directors of the Debtors.  Rather, the Local Councils are also released, as are their respective officers and directors.  Although the members of the NEB and NEC would in fact get the benefit of releases in their capacities as members of the Debtors' management under the RSA, that is only one of the benefits bestowed on them and the affiliated parties by the RSA.  These individuals are closely tied to the Local Councils as current or former officers.  *Supra* Section I.D.2, Figure 1.

16

They have potential exposure to claims as a result of their relationship with the Local Councils. As is shown below in Figure 2, the Local Councils represented by the members of the NEC account for nearly 7000 claims alone, and these Local Councils stand to benefit under the RSA by having these claims wiped away. These separate benefits create another layer of personal interest for the NEB and NEC members, as well as the Local Councils. The Debtors cite no case suggesting that directors are independent in transactions that affect themselves and a related control-party despite (i) being current or former officers of the same control party, (ii) granting that same control party a release of third party claims against it, and (iii) extending to themselves a release as a current or former officer of the control party from potential liabilities related to activities they undertook while officers of the control party. That is because there are no such cases.

*Finally*, the Debtors cite to *JPMorgan Chase Bank, N.A. v. Charter Commc'ns. Operating, LLC (In re Charter Commc'ns.)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) to suggest that the entire fairness standard does not apply to releases in the bankruptcy context. *See* Reply at ¶ 56. But the *JP Morgan* court declined to apply the entire fairness test because the insider settlement at issue had been "reviewed and approved by independent directors of Charter's board of directors" with no interference or influence from the insider benefiting from the release. *Id.* at 241. That is exactly the opposite of what happened in this case.

**Figure 2: Proof of Claims Against Local Councils Affiliated with NEC Members**[9]

| Name | Local Council Affiliation | POC Count Against Local Council | Pending or Future Abuse Actions Against Local Council |
|---|---|---|---|
| Brad Tilden | Chief Seattle | 311 | 5 |
| Jack Furst | Circle Ten | 536 | n/a |
| Arthur F. "Skip" Oppenheimer | Mountain West | 134 | 1 |
| Nathan Rosenberg | Greater L.A. Area | 1,075 | 2 |
| | Orange County | 396 | n/a |
| Jim Turley | Greater St. Louis Area | 655 | 2 |
| Thear Suzuki | Circle Ten | 536 | n/a |
| Alison Schuler | Great Southwest | 251 | 34 |
| Devang Desai | South Florida Council | 479 | n/a |
| Scott Sorrels | Atlanta Area | 443 | n/a |
| | Northeast Georgia | 126 | 10 |
| Daniel Ownby | Sam Houston Area | 782 | n/a |
| Roger Mosby | Mid-America | 250 | 1 |
| | Sam Houston Area | 782 | n/a |
| Mike Ashline | Buckeye | 182 | 2 |
| TOTAL | | 6,938 | 57 |

## II.     The Amended Plan Is Still Unconfirmable

Century and other insurers demonstrated conclusively that the Amended Plan is obviously unconfirmable, including because it violates Third Circuit law on insurance neutrality and it is obviously not feasible.  The Debtors offer little substantive response to these arguments, instead pleading that the Court should defer these issues—and authorize the Debtors to spend millions of dollars compensating estate and non-estate professionals and in solicitation expenses—until

---

[9] Deduplicated Tranche VI Data.

confirmation.  It is not surprising that a large contingent of claimants oppose the RSA on the basis that it represents a bad gamble on abuse claimant recoveries.  [Docket No. 5682].

What little substance the Debtors do offer demonstrate conclusively that the Amended Plan is hopeless.  For example, in response to Century's and others' arguments that the Amended Plan is not insurance neutral, the Debtors suggests that Article X.M.1 complies with Third Circuit law. Reply at ¶ 69.  But the portion of that provision the Debtors chose not to highlight expressly subordinates contractual insurance rights to "the Insurance Assignment, or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order, or the findings made by the District Court in the Affirmation Order."  Far from complying with Third Circuit law, the Amended Plan turns it on its head.[10]

Similarly, the Debtors have no response to Century's argument that Bankruptcy Code section 1129(a)(16) bars a non-profit debtor from assigning its insurance contracts.  They instead cite mass tort cases involving for-profit debtors.  Reply at ¶¶ 72-73.  But, of course, the Third Circuit in *Federal Mogul* (and the other courts in the cases the Debtors cite) had no reason to analyze section 1129(a)(16) because that provision by its plain terms does not apply to for-profit debtors.

## III.    The Debtors Gain Nothing from the RSA

### A.    The Benefits to the RSA Are Illusory Because the Debtors Have Not Secured any Claimant Support.

In response to Century's arguments that the Debtors have not garnered the support of a single abuse victim, the Debtors, Coalition, and TCC advance two main arguments, both of which fail. ***First***, they argue that it is routine to have lawyers sign an RSA and only obligate themselves

---

[10]    The only other support the Debtors offer for insurance neutrality is a provision in the not-yet-confirmed Purdue Pharma plan.  Reply at ¶ 70.  It would be a gross understatement to say this is unpersuasive precedent.

19

to advise their clients to vote in favor of the Amended Plan.  In addition to the legal and ethical problems with this approach that that  Third Circuit called out in *Combustion Engineering* —which the RSA parties ignore completely—this argument hinges on precisely one case where this approach was taken, *PG&E*.  But the RSA Parties ignore several critical differences between this case and *PG&E* that render that precedent inapplicable:[11]

- The claimant pool in PG&E was not tainted by potentially fraudulent or otherwise barred claims or the self-interest of those responsible for negotiating and supporting the Fire Victim RSA.  Indeed, Century and other insurers for months have sought discovery regarding the circumstances of the filing of many proofs of claim in these cases and the proposed TDPs here expressly provide that Abuse Claimants with presumptively barred claims will nevertheless receive a recovery.  *See* TDPs Article VIII.E.(iii) (providing for payment of time barred claims); *id.* Article VI.A (claimants electing to receive expedited distribution "will not have to submit any additional information to the Settlement Trust to receive payment").

- The Debtors argue that relying on signatures from counsel—instead of the underlying claimants—is a matter of expediency given the sheer volume of claims.  But PG&E's exit from chapter 11 depended in significant part on AB1054, state legislation that effectively *required* the debtors to resolve the chapter 11 cases in 18 months and *required* wildfire claims to be paid in full.  Here, in contrast, there is no statutory deadline to exit bankruptcy, the Debtors concede that it is likely that holders of Abuse Claims may not recover in full under the Amended Plan, and the Debtors do not contend that impairment of Abuse Claims is an impediment to confirmation.  There is thus no reason to take any shortcuts to ensure support for the RSA from the claimants entitled to vote on the Amended Plan.

- The Debtors arguments about expediency ring hollow given the speed with which the Coalition claimed to have obtained written consents from claimants to engage Brown Rudnick- during the Rule 2019 proceedings.[12]

- The Debtors do not cite a written decision in PG&E that sheds any  light on the basis of the ruling or even what objections were before the court.

*Second*, the Debtors, Coalition, and TCC argue that the RSA provides a "framework" for confirmation of a plan.  As of the filing of this objection, the Debtors **still** do not have the support

---

[11]    *See* Ex. V, PG&E RSA (the "Fire Victim RSA").

[12]    *See Second Amended Verified Statement of Coalition of Abused Scouts for Justice Pursuant to Bankruptcy Rule 2019* at ¶ 13, Ex.A-4 [Docket No. 1429] (within three weeks "over 4,500 Members have signed and returned these express consent and acknowledgement forms acknowledging Coalition counsel's authority to act on behalf of . . .Coalition Members.")

of a single Chartered Organization. Without such support, the Debtors do not even have the

support of the Local Councils, whose contribution to the Settlement Trust is conditioned on a

satisfactory resolution of the Chartered Organizations. *See First Amendment to Restructuring*

*Support Agreement*, at § I.C [Docket No. 5813].[13] If anything, opposition to the RSA has steadily

grown since it was filed, as joinders from dissident claimants hit the docket on a near-daily basis

and the large Chartered Organizations have grown even more vocal in their opposition.[14] As

counsel to the Methodist and Catholic *ad hoc* groups aptly put it:

---

[13]   As further evidence of this concern, high-ranking officials within the United Methodist
      Church have called on their local churches to no longer renew charters with BSA due to their
      harsh treatment by BSA during the bankruptcy. *See, e.g.*, Ex BB, July 20, 2021 Letter from
      Bishop David A. Bard, Presiding Bishop of the Michigan Conference of The United
      Methodist Church ("Under both proposed plans that the BSA has suggested as a way to
      continue after the bankruptcy, they are leaving their Chartered Organizations out on a limb
      by themselves . . . BSA is placing all our United Methodist Churches who have ever been
      involved in scouting in a very difficult position . . . **If your local church currently charters
      a scout unit**, we recommend that you **NOT** renew that chartering agreement when it is up
      for renewal or re-chartering this fall."); Ex. CC, July 16, 2021 Letter from Kendall Waller,
      Director of Finance & Administrative Ministries for the Rio Texas Conference of the United
      Methodist Church ("[T]he revised plan does not treat chartered organizations fairly . . .
      Because of some of the proceedings and how they affect our church's exposure we are
      recommending that no church renew a charter with the Boy Scouts at this time.").

[14]   *See e.g. Joint Objection of the Roman Catholic Ad Hoc Committee and the United Methodist
      Ad Hoc Committee to the Debtors' Motion for Authorization to Enter into and Perform
      Under Restructuring Support Agreement and for Related Relief and Jointed in Limited
      Objection and Reservation of Rights of the Church of Jesus Christ of Latter-Day Saints*
      [Docket No. 5676]; *Limited Objection and Reservation of Rights of the Church of Jesus
      Christ Latter-Day Saints to Debtors' Motion for Entry of an Order, Pursuant to Sections
      363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing Debtors to Perform Under the
      Restructuring Support Agreement and (II) Granting Related Relief* [Docket. No. 5676;
      *Objection to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a)
      of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the
      Restructuring Support Agreement, and (II) Granting Related Relief [Docket No. 5682];
      Joinder to Objection to Debtors' Motion for Entry of an Order, Pursuant to Section 363(b)
      and 105(a) of the Bankruptcy Code , (I) Authorizing the Debtors to Enter into and Perform
      Under the Restructuring Support Agreement, and (II) Granting Related Relief filed by the
      Mallard Law Firm Claimants* [Docket No. 5725]; *Joinder to Objection to Debtors' Motion
      for Entry of an Order, Pursuant to Section 363(b) and 105(a) of the Bankruptcy Code , (I)
      Authorizing the Debtors to Enter into and Perform Under the Restructuring Support*

From the position of my two clients, Your Honor, you know, **at this point we're not sure why we're going forward. We're being told that the RSA is not the end of the line.** We're being told there will be further negotiations specifically with the chartered organizations, with the treatment in the RSA. It is not the treatment that they ultimately intend to solicit.

**So from our perspective and the costs on the estate, the costs on the individual parties who are paying their own legal fees to be proceeding with an RSA hearing when we're being told that the deal for which approval is sought is not going to be the deal that is going to be solicited. We're left with the question as to what are we doing and what is going to be gained. Why are ou[r] clients being dragged along and forced to spend money objecting to things that aren't going to be the end of the deal.**

We would much prefer, as it has in the past, that a stopped litigation be put. If there are going to be negotiations with chartered organizations lets have that. **Let's get to the deal that is ultimately going to be solicited.** Maybe it's this deal because there is no deal with chartered organizations, but as of this date, Your Honor, there has not been one substantive mediation with chartered organizations.

Boy Scouts doesn't exist without us; it's a plan and simple fact. So before we spend all this time and money on litigations why don't we see if the plaintiffs, and the scouts, and local counsels can come to an agreement with the chartered organizations to allow us to continue the relationship that they need to go forward.[15]

---

*Agreement, and (II) Granting Related Relief filed by the Winer, Burrit & Scott Claimants* [Docket No 5743]; *Joinder to Objection to Debtors' Motion for Entry of an Order, Pursuant to Section 363(b) and 105(a) of the Bankruptcy Code , (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief filed by Arias Sanguinetti Wang & Torijos LLP Claimants* [Docket No 5744]; *Joinder to Objection to Debtors' Motion for Entry of an Order, Pursuant to Section 363(b) and 105(a) of the Bankruptcy Code , (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief filed by Cannata & Associates Claimants* [Docket No 5754]; *Joinder to Objection to Debtors' Motion for Entry of an Order, Pursuant to Section 363(b) and 105(a) of the Bankruptcy Code , (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief filed by J&C/TNF Claimants* [Docket No. 5755].

[15]    Ex. A, July 27 Tr. at 21:5-22:9 (emphasis added).

As Century explained in its Objections, Section II.B.(iii)-(iv) of the RSA mandates that BSA obtain the unanimous consent of the Coalition, TCC and FCR for any settlement with insurers.[16]  This provision allows a minority of claimants and any one of three constituencies to veto settlement. Section V.B(xi) of the RSA sets an even higher bar for settlements with the Chartering Organizations. [17]  The Debtors offer nothing to refute the proposition that this requirement makes future settlements with the Chartering Organizations and insurers virtually impossible if not impossible to achieve.

In the absence of a deal with these critical stakeholders—not to mention the Debtors' insurers—moving forward with the RSA would be a waste of estate resources.

**B.     The Debtors Have Not Demonstrated the Coalition Made a "Substantial Contribution"**

The Debtors' response to Century's argument that the "substantial contribution" standard is the correct one for payment of the Coalition's fees is to largely regurgitate their prior arguments. Century has already explained why the Debtors are wrong.  With little else to say on the law, the Debtors attempt to supplement the conclusory statement offered with its moving brief by filing the Supplemental Whittman Declaration.   But, they still fall short of satisfying the standard for

---

[16]    In relevant part, Section II.B (iii)-(iv) of the RSA provides that: "Subject to the terms and conditions hereof, for the duration of the Support Period, the Debtors shall not, directly or indirectly:…(iii) propose, pursue, or enter into any settlements with any Insurance Company without the prior written consent of the Coalition, the TCC, and the Future Claimants' Representative; (iv) propose, support, solicit, encourage, or participate in any chapter 11 plan or settlement of the Abuse Claims other than as set forth herein." [Docket No. 5466-2].

[17]    Sectoin V.B(xi) of the RSA addresses the requirement for settlement with the Chartering Organizations sets an even higher bar.  In relevant part it provides that "The Coalition, the TCC, State Court Counsel, and the Future Claimants' Representative may each terminate this Agreement with respect to itself only . . . upon delivery of written notice to the Debtors at any time after the occurrence of or during the continuation of any of the following events: . . . (xi) the protocol for addressing participation by Chartered Organizations in the benefits of the Channeling Injunction is not satisfactory to the Coalition, the TCC, State Court Counsel, or the Future Claimants' Representative, as applicable." [No. 5466-2].

reimbursement for a substantial contribution.  In a nutshell, the Debtors argument and offer of proof comes down to the proposition that because the Coalition agreed to the RSA it was helpful and its demands for money to do so should be met.

To put the RSA fee provision in context, the amount that the Debtors agreed to pay the Coalition is greater than the total amount of fees and expenses that the TCC's counsel, Pachulski Stang, incurred from the inception of the case through March 2021.[18]  Both the nature of the payment and its amount are so out of line with the standard for substantial contribution awards that they constitute further evidence that the Debtors acquiesced to whatever the Coalition's lawyers sought.

Substantial contribution awards are reserved for "actual and necessary" expenses incurred by a party whose efforts resulted in an actual and demonstrable benefit to the estate.  The benefit received by the estate must be more than an incidental one arising from activities the applicant pursued in protecting its own self-interest.  *See Lebron v. Mechem Financial, Inc.*, 27 F.3d 937, 944 (3d Cir. 1994).  Reimbursement is not appropriate for work that is primarily for the benefit of a specific party.  *In re KiOR, Inc.*, 567 B.R. 451, 461 (D. Del. 2017) (finding that substantial contribution should exclude expense reimbursement where "activities of creditors and other interested parties which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate").

---

[18]    *See Thirteenth Monthly Fee Application for Compensation and Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP, As Counsel to TCC for the Period From March 1, 2021 through March 31, 2021* [Docket No. 5481] at 2, 7 ($9,452,982.47 total fees and expenses requested. Application requested fees of $1,124,713.50, noting total previously fees requested amounted to $8,155,544.50, and $27,728.90 in expenses, listing total previous expenses as $144,995.57).

Where, as here, a party cannot show that its actions were beyond self-interest an application for fees must be denied.  *See, e.g.*, *In re Tropicana Entm't LLC*, 498 F. App'x 150, 152 (3d Cir. 2012) (finding that although the noteholders' actions "turned out to have a beneficial effect on the estates," the "action was taken largely in the self-interest of the movants here and would have been taken whether there would have been estate reimbursement or not"); *In re S & Y Enters., LLC*, 480 B.R. 452, 466 (Bankr. E.D.N.Y. 2012) (finding no substantial contribution where, even though the party participated in virtually every stage of these bankruptcy cases, it was only to advance its own interests, not necessarily to advance the bankruptcy process); *In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273, 285 (Bankr. W.D. Tex. 2005) (denying substantial contribution request where the indenture trustee's activities primarily benefited the noteholders it represented and any benefits to the estate were minimal, or only incidental to the benefit conferred upon the noteholders); *In re Best Prod. Co., Inc.*, 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994) ("Compensation must be preserved for those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate."); *In re Columbia Gas Sys., Inc.*, 224 B.R. 540, 549 (Bankr. D. Del. 1998) (denying payment of fees for creditors acting in their own self-interest and at most provided an incidental benefit to the estate).

The Debtors' attempt to show on reply that the Coalition's efforts have benefited the estate (largely in the form of Mr. Whittman's supplemental declaration), as opposed to advancing their own self-interest, fails for two reasons.  First, the Debtors bear the burden of proof on this issue and they have not satisfied it.  *See Tropicana Entm't*, 498 F. App'x at 152 ("Importantly, the party seeking reimbursement bears the burden of proving to the Bankruptcy Court that it is so entitled.").  The declaration Mr. Whittman submitted with the Motion (the Debtors' moving case) devoted just one paragraph to payment of the Coalition's fees, and focused exclusively on why it was a

reasonable exercise of the Debtors' business judgment to pay those fees, *not* on the substantial contribution the Coalition has made to the Debtors' restructuring efforts. ██████████

██████████████████████████████████████████████████████████████

███████ ██████████████████████ █████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████

        As the Moving Insurers explained in their Motion to Compel, the Court should not consider evidence that should have been part of the Debtors' case-in-chief that they strategically withheld until the Reply.  *Moving Insurers' Motion to Compel and For Additional Relief and in the Alternative Motion in Limine*, at 10–17 [Docket No. 5881]. But even if the Court were inclined to allow the Debtors to supplement Mr. Whittman's testimony it would be improper to do so here because the Debtors have refused to supplement their document production with the communications exchanged concerning the Coalition's demands for the payment of its fees or to unredact the portions of the board minutes that refer to the fee demands and the minutes/resolutions, if any, that approve the payment of fees.  *Id* at 5-8.  Brown Rundick, for its part, refused to produce a single document in response to multiple requests directed at its fee demands and the support for them claiming that everything it has done and every communication

_____

██
██  █████████████████████████████████████████████████████
        ██████████████████████████████████████████████████████
        ██████████████                ██████████████████████
██  ██████████████████████████████████████████████████████
        █████████████████████████████████████████████████████
        █████████████████████

it has received is subject to mediation privilege.[22] The withholding of these documents leaves the Court with a one sided record and immunizes Mr. Whittman from cross.

Second, even if the Court were to consider Mr. Whittman's supplemental declaration, his new statements only demonstrate that the Coalition's participation in the bankruptcy cases was motivated by advancing its own interests. The Coalition's efforts focused on aspects of the Debtors' bankruptcy cases that would have a direct impact on their clients' claims and potential recovery, including the analysis of its Abuse Claims and contributions to the Settlement Trust. *See* Supplemental Whittman Decl. at ¶¶ 16–18. The Coalition's efforts in connection with those matters were never aimed at benefiting the estate as a whole. In fact, the Coalition has barely consulted or negotiated with other constituencies, including the insurers, regarding those matters.

---

[22] *See* Ex X, Century's May 14, 2021 Subpoeana of Brown Rudnick, Req. 1 ("All Documents that refer or relate to any demand or request that the Debtors support a motion, application or inclusion of a provision in a Plan of Reorganization that calls for the payment of money to You for your fees and/or costs."); *Id*. Req. 2 ("All Documents that refer or relate to any demand or request that the Debtors support a motion, application or inclusion of a provision in a Plan of Reorganization that calls for the payment of money to any lawyer or law firm associated with the Coalition for their fees and/or costs."); *Id*. Req. 3 ("All Documents that refer or relate to any demand or request that the Debtors support a motion, application or inclusion of a provision in a Plan of Reorganization that calls for the payment of money to any vendor or consultant to the Coalition."). Ex. Z, Century's June 11, 2021 Subpoena of the Coalition, Req. 1("All Documents that refer or relate to any demand or request that the Debtors support a motion, application or inclusion of a provision in a Plan of Reorganization that calls for the payment of money to You for your fees and/or costs."); *Id*. Req. 2 ("All Documents that refer or relate to any demand or request that the Debtors support a motion, application or inclusion of a provision in a Plan of Reorganization that calls for the payment of money to any lawyer or law firm associated with the Coalition for their fees and/or costs."); *Id*. Req. 3 ("All Documents that refer or relate to any demand or request that the Debtors support a motion, application or inclusion of a provision in a Plan of Reorganization that calls for the payment of money to any vendor or consultant to the Coalition.");

Mr. Whittman also states that the "Coalition's efforts have [] resulted in a quantifiable benefit of approximately $310 million for all Abuse Survivors under the Amended Plan, regardless of Coalition affiliation." Supplemental Whittman Decl. at ¶ 18. But there is no indication that these alleged benefits are the result of the Coalition's efforts, as opposed to the TCC's efforts, whose (i) mandate is duplicative of the Coalition's, as they represent the identical constituency and pursue the same objectives; and (ii) fees are already being paid by the Debtors. Similarly, the Coalition's agreement to seek a stay of the estimation matters and stand down on its objection to the exclusivity motion is self-serving because, in exchange for that agreement, the Coalition requests reimbursement of nearly $1 million for fees on a monthly basis plus an addition $10.5 million on the effective date of the plan for the fees already incurred: the estates are no better off for having signed the RSA as they would be had they proceeded to litigate these motions.[23]

### C.    The Debtors Fail to Distinguished the Cases that Hold that the Promised Payments to the Coalition Render the RSA Illegal and Will Taint the Vote

In its decision in *Combustion Engineering*, the Delaware Bankruptcy Court disallowed an arrangement whereby a lead plaintiff firm was to receive a $20million fee by an affiliate of the Debtor, for "services in assisting in getting claimants to sign onto the [settlement agreement]." *In re Combustion Engineering*, 295 B.R. 459, 476 (Bankr.D.Del.2003) (vacated on other grounds, 391 F.3d 190 (3d Cir.2004). The Court found the plaintiff firm had an "actual conflict of interest" as he was to be paid by the parent of an entity he was suing, his clients had claims against the Debtor, and he had contingency fee agreements with those clients tied to the settlement trust. *Id.* at 477. Other cases have reached similar results. *See In re Pittsburgh Corning*, 308 B.R. 716

---

[23]    In addition, the Debtors' proposal that the Coalition's "go forward" fees comply with the Interim Compensation Procedures Order and not include reimbursement of fees for certain activities not in furtherance of confirmation of the Amended Plan confirm that reimbursement of $10.5 million is not for any substantial contribution the Coalition provided to the estates. Reply at ¶¶ 106-107.

(Bankr. W.D. Pa. 2004) (refusing to allow $30 million fee to attorney representing the asbestos claimants' committee due to conflict of interest).

The Third Circuit Court of Appeals observed similar problems in *In re Congoleum Corp.*, involving $1–2 million payments to a number of claimants' representatives for services related to negotiating the pre-packaged plan. 426 F.3d 675, 681 (3d Cir. 2005). While the Court did not rule on the fees, as no party objected to them, the Court raised the decisions in *Combustion Engineering* and *Pittsburgh Corning* of its own accord, highlighting the conflict of interest. *Id.* 681 n9.[24]

In support of its Objections, Century cited Supreme Court and other decisions condemning agreements that provide for the payment of fees in connection with a lawyer's recommendation of advice to a client. *See Century's Objections to the Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement and (II) Granting Related Relief* at 19-21 [Docket No. 5707]. The Debtors failed to distinguish this authority and offer no case in support of the proposition that it is ever proper to promise to pay a client's lawyer as part of an agreement with that lawyer that he or she recommend something to their client.

The fee provisions of the RSA render the agreement illegal, will taint the vote and invite reversal of the Amended Plan if it is confirmed.

## CONCLUSION

For all of these reasons, the Court should deny the Motion.

---

[24] See *generally* Abraham L. Gitlow, <u>Corruption in Corporate America: Who is Responsible?: who Will Protect the Public Interest?</u> at 76 (2005) (a clear conflict exists when "a lawyer represents a client, or clients, on one side of an issue, but is asked by the other side to act concurrently in the capacity of a negotiator of a settlement."); Alex Berenson, *A Caldron of Ethics and Asbestos*, N.Y. Times (March 12, 2003), https://www.nytimes.com/2003/03/12/business/a-caldron-of-ethics-and-asbestos.html ("Legal ethicists said the payment raised serious ethical concerns because he was in effect being paid by both sides in the dispute, and several class-action lawyers criticized the payment.")

Dated: August 9, 2021

Respectfully Submitted,

By:    */s/ Stamatios Stamoulis*
     Stamatios Stamoulis (#4606)

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware 19801
Telephone:    302 999 1540
Facsimile:    302 762 1688

O'MELVENY & MYERS LLP
Tancred Schiavoni (*pro hac vice*)
Daniel Shamah (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036-6537
Telephone:    212 326 2000
Facsimile:    212 326 2061

*Counsel for Century Indemnity Company, as*
*successor to CCI Insurance Company, as*
*successor to Insurance Company of North*
*America and Indemnity Insurance Company of*
*North America*