## Exhibit A

**Reply**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. D.I.: 5466, 5674, 5676, 5677, 5680, 5681, 5682, 5683, 5684, 5685, 5686, 5687, 5690, 5692, 5693, 5695, 5699, 5702, 5707, 5708, 5709, 5711, 5722, 5725, 5726, 5727, 5743, 5744, 5745** |

### DEBTORS' RESPONSE TO CERTAIN SUPPLEMENTAL OBJECTIONS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 363(b) AND 105(a) OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE RESTRUCTURING SUPPORT AGREEMENT, AND (II) GRANTING RELATED RELIEF

Boy Scouts of America (the "<u>BSA</u>") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "<u>Debtors</u>"), submit this response to the supplemental objection [D.I. 5928] of Century Indemnity Company ("<u>Century</u>") and the supplemental objection [D.I. 5916] of certain Claimants (the "<u>Objecting Claimants</u>") to the Debtors' motion [D.I. 5466] (the "<u>Motion</u>")[2] to authorize the Debtors to enter into and perform under the RSA, including, in connection therewith, determining that the Debtors have no obligation to seek approval of the Hartford Settlement.

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the RSA, including the Term Sheet attached thereto as Exhibit A, the Amended Plan, the Motion, or the *Debtors' Omnibus Reply in Further Supply of Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform under the Restructuring Support Agreement, and (II) Granting Related Relief,* [D.I. 5767] (the "<u>Omnibus Reply</u>"), as applicable.

## PRELIMINARY STATEMENT

1.     At the July 29, 2021 hearing before this Court, the Debtors offered parties objecting to the Debtors' Motion to approve the RSA an opportunity to file limited, supplemental objections to address any additional document productions made by the Debtors.   Rather than use the Supplemental Objection for its intended purpose, Century has instead filed an improper sur-reply that responds to legal arguments made in the Debtors' Omnibus Reply.   Indeed, Century does not address the Debtors' supplemental productions at all.   The Court should accordingly reject Century's unauthorized briefing and disregard the Supplemental Objection in entirety.

2.     The Supplemental Objection also fails to identify any basis for this Court to deny the Motion.   Century spends the bulk of its Supplemental Objection arguing that this Court should apply entire fairness review to the RSA.   Century's arguments are without merit.   *First*, the Objectors fail to recognize that throughout this case business judgment has been the applicable standard.   Specifically, the Debtors have sought approval of numerous transactions involving the Local Councils and the Debtors.   *See, e.g.*, D.I. 15 (Debtors' shared services motion), 1598, 1880, 1881, 1986 (motions to approve various non-abuse litigation settlements involving Local Councils).   The Objectors never before argued against that standard.   *Second*, Century cites no authority to establish that it has standing to request heightened scrutiny.   *Third*, Century fails to cite any case applying the entire fairness standard where, as here, two parties are on the same side of a transaction, negotiating with an unrelated third party.   *Fourth*, Century cannot identify any conflict, whether under bankruptcy law or otherwise, to rebut the business judgment rule.   As before, Century argues that the means by which the BSA nominates directors renders the directors conflicted, despite well-established case law to the contrary.   Century also maintains, without citing any relevant case law, that the customary Plan releases of BSA directors amounts to an RSA

conflict. Even though the party challenging a transaction bears the burden of demonstrating a conflict, Century fails to identify any material benefit to the directors from the releases and ignores the case law demonstrating that the fact that a settlement contains a release for directors is not a recognized basis for attacking the independence of directors approving a transaction.

3.      Further, in yet another improper attempt to prematurely litigate plan confirmation issues in the context of RSA approval, Century and the Objecting Claimants continue to object to terms of the Amended Plan and Plan Documents—many of which were already raised. They contend that, among other things, the third-party release and insurance neutrality provisions of the Amended Plan, the assignment of insurance rights to the Settlement Trust, and the scope of the Channeling Injunction render the Amended Plan unconfirmable. Each of these plan objections has been properly addressed, and should not be considered by the Court at the RSA hearing. As set forth in the Motion and the Debtors' Omnibus Reply, the Debtors are currently seeking the Court's authorization to enter into the RSA, not approval of any provision of the Amended Plan or Plan Documents. Additionally, the Objecting Claimants challenge, for the first time, certain aspects of the Debtors' solicitation procedures. Similarly, such arguments are not applicable to RSA authorization, and thus premature and without merit.[3]

4.      Accordingly, for the reasons set forth in the Motion, the Omnibus Reply, and herein, the Debtors respectfully ask the Court to overrule the Objections, authorize the Debtors to enter into the RSA, and determine that the Debtors have no obligations under the Hartford Settlement.

---

[3]     Hartford also submitted a supplemental objection, which is more of a sur-reply as well and which will be addressed at the hearing to consider the RSA.

3

## ARGUMENT

I.  **Century's Supplemental Objection, Which Does Not Cite Any Of The Supplemental Materials That The Debtors Produced, Is An Improper Sur-Reply And Should Be Stricken**

5.      As the Court is aware, on July 23, the Insurers (led by Century) filed a motion seeking production of (i) "Alvarez & Marsal's PowerPoints, presentations, and/or financial analyses or models that were submitted to the Debtors and their Boards in evaluating the RSA and Fourth Amended Plan"; (ii) "the authorizing minutes and resolutions of BSA's Boards for the RSA, Amended Plan, and TDPs"; (iii) "the BSA's Board minutes and communications by and between the Board, the Local Councils, and the Chartered Organizations reflecting what the Board considered concerning the RSA, Amended Plan, and TDPs." *Moving Insurers Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* [D.I. 5729] at 20.  At the July 29 hearing, the Debtors informed the Court and the parties that they would produce all these materials.  The Debtors also stated that they would allow supplemental objections to be filed after the supplemental production concluded.  While no clarification should have been necessary, the Debtors made clear that the reason for these supplemental objections was to afford the Insurers an opportunity to respond to the supplemental materials the Debtors would produce.  *See* July 29, 2021 Hr'g Tr. at 20:7-20 (stating that "[o]bviously, those [supplemental] depositions will be limited to the new material" the Debtors would produce, and agreeing also to provide the Insurers with the right to then file supplemental objections).

6.      In the following days, the Insurers refused to meet and confer with the Debtors regarding a schedule for the supplemental discovery and briefing.  Nonetheless, the Debtors set an August 9 deadline for supplemental objections and finished their supplemental document production on August 1—*eight days* before the supplemental objections were due.  However, the Supplemental Objection does not cite *any* of the supplemental materials that the Debtors

produced.  Instead, Century responds to the arguments made in the Debtors' Omnibus Reply and expands on the same arguments that it made in its initial objection.  Century's supplemental objection demonstrates that the true purpose of Century's demand for the production of supplemental materials was merely to create delay and undue burden.  Moreover, because Century's supplemental objection does not address any of the new evidence the Debtors have produced, it is nothing more than an improper sur-reply.[4]

## II.    Heightened Scrutiny Under the Entire Fairness Standard Is Inapplicable, But Also Would Be Satisfied

### A.    Century Fails To Establish Article III Standing To Raise Its Entire Fairness Argument.

7.       In the Supplemental Objection, Century argues that it has standing to assert that the RSA is subject to entire fairness review (Supp. Obj. 4), but was unable to offer any case law that it is authorized to challenge the standard by which the transaction is evaluated.  Indeed, Century's Opposition does not dispute that "[a] party's standing in a bankruptcy case [] is not an all-or-nothing proposition. Rather, it must be determined on a particularized basis as to each theory raised." *M3 Holdings LLC v. Haslam* (*In re Haslam*), Case No. WW-07-1391, 2008 Bankr. LEXIS

---

[4]     Even though Century had 15 days to prepare the Supplemental Objection, given that it responded only to materials raised in the Debtors' Omnibus Reply filed on July 26, Century still filed the Supplemental Objection over six hours after the deadline.  As Century was aware, the Debtors had less than 48 hours to prepare replies to the supplemental objections, and so Century's six-hour delay materially prejudiced the Debtors and served no purpose but to hinder the Debtors' reply.  Century did not seek leave to file late or offer any excuse for its late filing, which is part of a long pattern of late filings by Century in this case.  *See, e.g.*, *Century Indemnity Company's Objections to the Debtors' Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization* (D.I. 3856) (filed on May 12, 2021 at 10:26 p.m., despite 4:00 p.m. objection deadline); *Certain Insurers' Opposition to Debtors' Motion for Entry of Order (I) Scheduling Certain Dates and Deadlines in Connection with Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Protocols, and Granting Related Relief* (D.I. 3859) (filed on May 12, 2021 at 11:22 p.m., despite 4:00 p.m. objection deadline); *Century's Supplemental Objection to the Disclosure Statement and Solicitation Procedures* (D.I. 5214) (improperly filed as a sur-reply one day before the scheduled hearing); *Reply and Submission of Proposed Order in Further Support of Century's Motion to Amend the Court's Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief* (D.I. 4113) (filed May 17, 2021, a day after the reply deadline set pursuant to Local Rule 9006-1(d)).

4716, at *12 (B.A.P. 9th Cir. Mar. 31, 2008).  Nor does Century argue that it has standing to raise

a breach of fiduciary duty claim in connection with the RSA.  Instead, Century incorrectly argues

that the Debtors' position would mean that "heightened scrutiny could never apply in a bankruptcy

case."  (Sup. Obj. 5).  Century simply ignores that stakeholders of the estate injured by the

transaction could pursue standing to challenge the transaction.  But Century is not a stakeholder

and, in any case, it has not attempted to seek standing to bring derivative claims on behalf of the

estate because, as a party with interests in direct conflict with the estate (*i.e.*, seeking to minimize

its coverage obligations), Century could not satisfy the elements necessary to obtain such standing.

Omnibus Reply ¶ 41; *see Sebastian v. Schmitz* (*In re WorldSpace, Inc.*), Case No. 15-25, 2016

U.S. Dist. LEXIS 129497, at *29 (D. Del. Sept. 22, 2016).

### B.    Century's Claim That A Heightened Standard Of Review Should Apply To A Disinterested Transaction Is Incorrect

8.    Century claims that the Debtors ignore bankruptcy cases that impose heightened

scrutiny for transactions outside the ordinary course of business where a debtor's board is

conflicted.  (Supp. Obj. 5–6).  To the contrary, Century's cases are entirely inapposite, involving

either transactions between a company and a director or officer, or declining to apply heightened

scrutiny altogether.  *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313–14 (Bankr. D. Del. 2011)

(applying heightened scrutiny to transaction involving debtors' controlling shareholder); *In re

LATAM Airlines Grp. S.A.*, 620 B.R. 722, 771–73 (Bankr. S.D.N.Y. 2020) (applying heightened

scrutiny to transaction with controlling shareholders); *In re Innkeepers USA Tr.*, 442 B.R. 227,

231 (Bankr. S.D.N.Y. 2010) (applying heightened scrutiny to an interested transaction involving

debtors' ultimate parent); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y.

1997) (applying heightened scrutiny to transaction involving chief executive officer); *Official

Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp.* (*In re Enron Corp.*), 335 B.R. 22,

6

28 (S.D.N.Y. 2005) (declining to apply heightened scrutiny); *Wilson v. Huffman (In re Missionary Baptist Found. Of Am.)*, 818 F.2d 1135, 1144 (5th Cir. 1987) (questioning lower court's decision to apply heightened scrutiny).

9.      Century disingenuously compares the negotiation of the RSA to the circumstances in *In re Innkeepers USA Trust*, claiming that "there are concerns about a lack of transparency or good faith negotiations." (Supp. Obj. 7) (citing *In re Innkeepers USA Tr.* 442 B.R. at 233–34 (Bankr. S.D.N.Y. 2010). In *Innkeepers*, the Court found that the debtors had for months "downplayed and, at worst, obfuscated from parties in interest" a plan to provide a 50% interest in its equity to the debtors' "ultimate parent," waiting "until just a few days" before its petition date to reveal the plan to its largest creditor. *Id.* Here, the Debtors are not selling equity to an insider; indeed, as a not-for-profit, the Debtors do not have equity to sell. Moreover, the directors, as volunteers, are receiving no financial compensation at all, and Century does not present any evidence supporting the conclusion that the directors are receiving any material financial benefit from the RSA.

10.      Nor have the Debtors withheld details about terms of the RSA from interested parties. Century's real complaint is that the Debtors' invoked certain privileges, including attorney-client and mediation privilege. But the mediation is governed by Delaware law, and under Rule 9019 of the Local Rules for the United States Bankruptcy Court for the District of Delaware, "the participants in mediation are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation." Del. Bankr. L.R. 9019-5d(i).

11.      Moreover, as noted above, Century moved to compel the Debtors to produce documents concerning the RSA including the authorizing minutes and resolutions of BSA's

Boards for the RSA, Amended Plan, and TDPs" and "the BSA's Board minutes and communications by and between the Board, the Local Councils, and the Chartered Organizations reflecting what the Board considered concerning the RSA, Amended Plan, and TDPs." *Moving Insurers Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* [D.I. 5729] at 20.  As noted at the hearing on July 29, the Debtors re-reviewed their production and voluntarily produced such materials to Century and repeatedly offered their witnesses for depositions as Century had requested.  Contrary to its purported concern about "transparency," Century has declined to participate in further discovery to obtain the information that it sought the Court to compel and has refused repeated offers to depose the Debtors' witnesses.

12.     Century also objects to Debtors' reliance on state law to demonstrate that the entire fairness standard does not apply (Supp. Obj. 6), but Century's own authority demonstrates that bankruptcy courts routinely look to Delaware law when determining the appropriate standard to apply when evaluating whether to approve a transaction in a chapter 11 case. *See In re L.A. Dodgers LLC*, 457 B.R. at 313–14 (relying on Delaware law when applying the business judgment rule and entire fairness test); *In re LATAM Airlines Grp.*, 620 B.R. at 771 (relying on Delaware law for application of entire fairness test); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. at 551 (relying on Delaware law when applying the business judgment rule); *In re Enron Corp.*, 335 B.R. at 28 (same).

13.     Century's attempt to avoid relevant Delaware law also ignores the fact that substantive bankruptcy law is less stringent than Delaware law when it comes to applying heightened scrutiny.  *See* Alexander Wu, *Motivating Disclosure by a Debtor in Bankruptcy: The Bankruptcy Code, Intellectual Property, and Fiduciary Duties*, 26 YALE J. ON REG. 481, 509 (2009) (observing "some of the differences in fiduciary duties in bankruptcy and those outside of

bankruptcy" and noting the "lesser fiduciary duties" applied by bankruptcy courts).  For example, in *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns*), 419 B.R. 221 (Bankr. S.D.N.Y. 2009), the court determined that the entire fairness standard did not apply to a transaction between the controlling shareholder and the controlled company, notwithstanding the fact that no special committee was employed to evaluate the transaction and there was no independent counsel or financial advisors advising the so-called independent directors.  *Cf. Kahn v. M & F Worldwide*, 88 A.3d 635, 646 (Del. 2014) (noting that entire fairness applies unless either a majority of a disinterested board or a special committee approves a transaction).

      **C.**      **The Board's Decision Is Entitled To The Presumption Of The Business Judgement Rule**

      14.      Century again argues in the Supplemental Objection that the RSA should not be evaluated under the business judgment standard.  (Supp. Obj. 8).  But once a debtor articulates a valid business justification, a presumption arises that the debtor's decision was made "on an informed basis, in good faith, and in the honest belief the action was in the best interest of the company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).  Where an action is taken by a board comprised of a "disinterested and independent majority of directors," the business judgment rule applies.  *UFCW & Participating Food Indus. Empls Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 879 (Del. Ch. 2020).

      15.      Century's lengthy arguments essentially assert that there are three bases to apply a heightened standard of scrutiny.  *First*, Century attempts to argue, without explanation, that there is a conflict between the BSA and Local Councils with respect to the decision to enter into the RSA.  *See, e.g.*, Supp. Obj. at 9 ("The Debtors are giving up consideration to consummate a transaction that benefits insiders and non-debtor entities…") *Second*, Century contends that the

directors are somehow interested given their affiliations with Local Councils.  *Third*, Century argues that the BSA's directors are receiving some benefit in connection with entering into the RSA that is not being shared with other stakeholders in the BSA's estate.  As shown below, these arguments are baseless.

### 1. There Is No Conflict Between The BSA And The Local Councils.

16.    In the Supplemental Objection, Century fails to rebut that the RSA is not a transaction between the Debtors and the Local Councils and that the interests of the Debtors and the Local Councils were entirely aligned in connection with the RSA.

17.    Century argues that the RSA was orchestrated by the Debtors  (Supp. Op. at 9), but that is irrelevant.  The Objecting Insurers also cannot contest that the Plaintiff Representatives negotiated the settlement with the Local Councils, not the Debtors.  Century does not and cannot contest the fact that the consideration being provided by the Debtors in connection with the RSA is not being paid to the Local Councils, but rather to the BSA Settlement Trust.  D.I. 5466-2, Term Sheet at 2.  Likewise, the consideration that would be paid by the Local Councils under the RSA is not being paid to the BSA, but rather to the Settlement Trust.  D.I. 5466-2, Term Sheet at 8.  As such, the BSA and the Local Councils are not on opposite sides of the transaction.

18.    Given this fact, Century has not and cannot identify any value that was diverted to directors or Local Councils that would otherwise be paid to stakeholders in connection with the BSA's decision to enter into the RSA.  Indeed, the RSA was the product of extensive arm's-length negotiations supervised by experienced, Court-appointed Mediators, as described in the Debtors' Omnibus Reply.  The record is replete with evidence of numerous meetings to evaluate the transaction with the assistance of legal and financial advisors, demonstrating that the Debtors have more than satisfied their obligation to be informed.  And there is no evidence that the Debtors and the Local Councils had differing interests with respect to the RSA.

19.    Moreover, in their Omnibus Reply, the Debtors explained that the Objecting Insurers "failed to cite a single one of these governing cases or any case applying entire fairness to a transaction where the parties at issue were on the same side, as here."  (Omnibus Reply ¶ 44).  Century's Supplemental Objection also fails to identify any case that would support their position, and the Debtors are aware of none.  There is simply no identifiable conflict between the Local Councils and the BSA with respect to the RSA.

### 2.    Century Fails To Demonstrate That Any BSA Director Labored Under A Disabling Conflict.

20.    Recognizing that the position espoused in their Objection is fatally flawed, Century next argues that even if a party is not on both sides of a transaction, entire fairness may still apply if a party is "either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders."  (Supp. Obj. 10 (quoting *Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002)).[5]

21.    To advance such an argument, Century bears the burden of establishing that the BSA's directors have a material interest in the transaction.  *Behradrezaee v. Dashtara*, 910 A.2d 349, 361 (D.C. Cir. 2006) ("The burden is on the party challenging the decision to establish facts rebutting the [business judgment] presumption." (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984))); *Gavin v. Tousignant* (*In re Ultimate Escapes Holdings, LLC*), 551 B.R. 749, 762 (D. Del. 2016) (finding the business judgment rule is the "default standard of review" and the

---

[5]    Century misstates the holding in *Orman*, incorrectly claiming that the court refused to apply the business judgment rule."  (Supp. Obj. at 10).  Not so.  There, the court specifically found that the plaintiffs "d[id] not rebut the business judgment presumption at this stage of the litigation. . . .  Further discovery is necessary to determine whether the facts--as they truly existed at the time of the challenged transaction, rather than those accepted as necessarily true as alleged--are sufficient to rebut the business judgment rule presumption and to trigger an entire fairness review."  *Orman*, 794 A.2d at 31.  Ultimately the plaintiffs failed to rebut the business judgment presumption, as the court granted summary judgment for defendants on all claims in a later decision.  *Orman v. Cullman*, Case No. 18039, 2004 Del. Ch. LEXIS 150 (Del. Ch. Oct. 20, 2004).

burden is on the party challenging a transaction to rebut the presumption). Here, Century has failed

to show that any director lacked independence or was otherwise interested in the outcome of the

transaction.

    i.    **The Directors Are Not Conflicted By Virtue Of Any Alleged Relationship With A Local Council.**

22.    First, Century argues that the indirect appointment of the NEC and NEB by Local

Council presidents, commissioners, and other volunteers, though the 1,200-member "National

Council,"[6] rises to the level of a conflict. (Supp. Obj. 12). But Century is now forced to concede

that the ability of Local Councils to appoint directors in this fashion—even directors that receive

compensation—does not alone support a finding of lack of independence. (Supp. Obj. 11–12)

("Of course, the appointment of the NEC and NEB by the Local Councils is not the sole basis of

the conflict at issue. . . ."). Under well-established law, the manner in which a director is nominated

is not evidence of that director's lack of independence. *See Edgewater Growth Cap. P'rs LP v.*

*H.I.G. Cap., Inc.*, 68 A.3d 197, 230 (Del. Ch. 2013) ("Our Supreme Court has long recognized

that the manner in which someone is nominated to the board is not evidence of their lack of

independence."); *see also In re GGP, Inc. Stockholder Litig.*, 2021 Del. Ch. LEXIS 101, at *37

n.187 (Del. Ch. May 25, 2021) ("It is well-settled Delaware law that a director's independence is

not compromised simply by virtue of being nominated to a board by an interested stockholder."

(quoting *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014)).

Moreover, any nominated director must still be elected by the voting members of the National

Council. Desai Decl. ¶ 6.

---

[6]    The members of the National Council include: (a) all members of the NEB; (b) the volunteer president and council commissioner for each of the 251 Local Councils; (c) one individual, elected by each Local Council, for every 5,000 youth members of such Local Council; and (d) various volunteer members at large elected by the National Council and members of the National Operations and Leadership Committee and the National Operations Council. Desai Decl. ¶ 6.

23.     Nonetheless, Century claims that director's "positions within Local Councils mean they cannot act as disinterested parties." (Supp. Obj. 12). In support, Century cites *Sandys v. Pincus*, 152 A.3d 124 (Del. 2016) for the proposition that "former employment by control party within three years may preclude a finding of independence." But the rule cited by *Sandys* is not a rule of Delaware law, but a provision from the rules of the National Association of Securities Dealers Automated Quotations (NASDAQ). *Id*. at 132.

24.     Moreover, Century ignores the fact that the members of the NEB and NEC are not "employed" by Local Councils; they are volunteers. Century fails to cite a single case or explain how a person who volunteers for an organization is somehow controlled by or beholden to that organization as would be required to support a finding that the director is disinterested (Supp. Obj. 12), nor can they as the basis for conflicts is where the director gains a monetary interest in the transaction. Omnibus Reply ¶ 51. Thus, if anything, the Local Council is beholden to the volunteer who donates time and services, not vice versa. Century tries to circumvent this fact by arguing that "the benefit received by an insider need not be monetary compensation to trigger heightened review" (Supp. Obj. at 13), but the case it cites, *IRA Tr. FBO Bobbie Ahmed v. Crane*, Case No. 12742-CB, 2017 Del. Ch. LEXIS 869, at *24 (Del. Ch. Dec. 11, 2017), involved a scheme by a controlling shareholder to reclassify shares to "ensure it would be able to retain voting control of [the company] well into the future." Far from finding that a director could be interested in the absence of any monetary interest, the court observed that it is "well-accepted" that "control of a corporation has value." *Id*. at *19 n.54. That value is commonly reflected in a control premium paid in a change of control transaction. Thus, *IRA Trust* only confirms that courts look for a monetary benefit when assessing whether lack of independence warrants heightened review.

25.     Century includes a chart that purports to show that members of the BSA National Executive Committee were somehow conflicted because they had a prior "affiliation" with a Local Council.[7]  *See* Supp. Obj. Figure 1.  The fact that a member of the National Executive Committee may have had an affiliation with a particular Local Council does not pose a conflict for a director evaluating the RSA.  *First*, none of the members of the National Executive Committee served on a Local Council Board at the time that the RSA was approved.[8]  Desai Decl. ¶ 8.  *Second*, Century has failed to establish that there was any conflict or divergence of interest between the BSA, and the Local Councils as a collective group, in negotiating the RSA, as it fails to show how any value that would otherwise have been paid to stakeholders was transferred to a Local Council or a director.  Nor does Century make any attempt to explain how any director was beholden to "all" Local Councils given that the only alleged relationship is between members of the NEC and an individual Local Council.  *Third*, Century fails to establish that there was any conflict between the BSA and any individual Local Council that any member of the NEC was affiliated with.  Indeed, the RSA was negotiated by the Ad Hoc Committee of Local Councils, which did not require any individual Local Council to make a payment, but rather obligated the AHCLC and its members to "use reasonable efforts to persuade Local Councils chartered by the Debtors to commit to contribute the aggregate amount set forth in the Term Sheet."  RSA § III.A [D.I. 5466-2].  *Fourth*, Century fails to explain how the consideration that was demanded at arms-length from the Local Councils by the TCC, Coalition and FCR and agreed to in the RSA is in any way inadequate.

---

[7]    The chart is also inaccurate.  For example, the BSA's Chief Financial Officer, Michael Ashline, is listed as being affiliated with Buckeye Council.  Mr. Ashline's only affiliation with a Local Council was as a child, when he was a Cub Scout for approximately six months.

[8]    Century's argument that anyone who had an affiliation with a Local Council is forever tainted if he or she later serves on the NEB is absurd. If that were the case, nonprofits could never draw on experienced, qualified board members from their affiliates or other organizations related to the national organization.

Indeed, the survivors who have asserted claims against Local Councils must still vote on the plan and approve the consideration offered by the Local Councils.

### ii. The BSA's Directors Did Not Receive A Unique Benefit.

26.    Having failed to demonstrate a disabling conflict between members of the NEC and individual Local Councils with respect to the RSA, Century further claims that entire fairness applies where a party receives "disparate consideration," or a "unique benefit" from a transaction. (Supp. Obj. 11).  Here, Century argues that the "unique benefit" to the directors from the RSA is the release of liability.  (Supp. Obj. 13).

27.    As previously noted, in circumstances where, like here, directors are evaluating settlements, courts have consistently rejected the argument that an agreement is an interested party transaction due to the presence of director releases.  (Omnibus Reply ¶ 24).  Century asserts that the analysis is somehow different because the release is a part of a restructuring support agreement in a chapter 11 case (Supp. Obj. 15), but it cites no authority in support of its argument, and ignores the fact that virtually all plans of reorganization provide for the release of a debtors' directors and officers, including the plans previously proposed in this case.  *See, e.g.*, Third Amended Plan [D.I. 5368] at 167; *see also In re The Hertz Corp.*, Case No. 20-11218 (MFW) (Bankr. D. Del. June 10, 2021) [D.I. 5178] (confirming chapter 11 plan providing for release of directors and officers of the debtors); *In re Am. Apparel, Inc.*, Case No. 15-12055 (BLS), 2016 Bankr. LEXIS 3331, at *151– 52, 254–55 (Bankr. D. Del. Jan. 27, 2016) (same); *In re. Elec. Scooter Wind Down Corp.*, Case No. 09-13347 (KG), 2010 Bankr. LEXIS 5326, at *6 (Bankr. D. Del. May 26, 2010) (same).  Thus, regardless of whether the Debtor gets a "discharge" and the Debtors' directors and officers get a "release," the end result is the same.

28.    Century also fails to distinguish authority directly on point, finding that releases of directors were "an integral part of a comprehensive Plan" in a chapter 11 case "that provides

15

substantial value to the estates . . . in view of the fact that most of the Debtor Releasees have indemnification rights such that any claims by the Debtors against them would ultimately lead to claims being asserted against the Debtors." *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009).

29.    Century next argues that the releases are improper because they release the Local Councils, ignoring that the Local Councils are providing substantial consideration in exchange for the releases.  Moreover, those releases were negotiated with Plaintiff Representatives, unrelated third parties, who independently determined to support the releases in light of the substantial consideration provided by the Local Councils.  Moreover, no member of the NEC was serving as a board member of a Local Council during the time when the RSA was negotiated.

30.    Century also claims, without citation to authority, that the release of individual directors is improper because the directors may also serve or previously served on Local Councils. Century simply ignores that it is the Local Councils, not the BSA, that are paying for those releases, and the Local Councils likewise have an interest in finality.  *H-W Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 149 (Del. Ch. 2003).

31.    To this end, Century includes a list of the members of the NEC and purports to identify proofs of claims filed against Local Councils with whom the members of the NEC are purportedly affiliated to argue that releases of Local Councils may have some value to members of the NEC.  (Supp. Obj. Figure 2).

32.    But Century makes no attempt to establish that releases at the Local Council level are material to the directors as would be required to demonstrate a disabling conflict.  *See In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999) (finding that to challenge a director's independence, a plaintiff must allege a benefit that is "of a sufficiently material

importance, in the context of the director's economic circumstances, as to have made it improbable that [she] could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest"). *First*, Century does not explain which, if any, members of the NEC would be receiving a release at the Local Council level under the terms of the RSA. *Second*, Century does not attempt to show that the value of such a release would be material as it fails to identify any pending claims against such directors, or otherwise show that the benefit of the releases would compromise the directors' independence. Thus, the notion that any member of the NEC would receive a material benefit from a release—whether at the Local Council level or otherwise—is pure speculation. *Third*, Century fails to explain how the releases that would otherwise be paid for and obtained by the Local Councils would deviate from the rule set forth in *Sahbbouei v. Laurent*, Case No. 2018-0847-JRS, 2020 Del. Ch. Lexis 121 at *19 (Del. Ch. Apr. 2, 2020) that a general release obtained on behalf of a board of directors is not a basis to characterize the settlement "as an interested party transaction." *Fourth*, Century has failed to show that any member of the NEC even considered the fact that they could potentially receive a release at the Local Council level if the plan was supported by a sufficient number of survivors. Indeed, these members of the NEC previously approved the filing of a Plan that did not include a release for Local Councils. Simply put, the prospect that a member of the NEC may receive a release at the Local Council level is far too attenuated and speculative to create a disabling conflict. *In re AbbVie Stockholder Derivative Litig.*, Case No. 9983-VCG, 2015 Del. Ch. Lexis 192, at *16 (Del. Chl. July 21, 2015). Additionally, there would also likely be insurance and indemnification rights available to the directors. And, even if Century could show that a member of the NEC had a conflict, it would need to show that a majority of the members of the NEC had a disabling conflict to establish entire fairness review. *See M & F Worldwide*, 88 A.3d at 646 (noting that entire

fairness applies unless either a majority of a disinterested board or a special committee approves a transaction). Century has failed to do so here.

33.     Finally, Century challenges the appropriateness of a third-party release, which is not an issue concerning entire fairness, but instead a confirmation issue that will be supported by the Debtors and determined at the Confirmation Hearing. (Supp. Obj. 15). Indeed, Century's other objections regarding the appropriateness of the releases (*id*.) ignore that the survivors who have filed the proofs of claim will ultimately vote on the plan and determine whether the Local Council contribution is sufficient. Moreover, any such release would be subject to the ultimate approval of this Court. Indeed, any benefit that the Local Councils obtain in connection with making a substantial contribution to the Settlement Trust will be subject to the vote of creditors and this Court, and does not constitute a basis for the application of heightened scrutiny to the RSA.Other Arguments Raised in the Supplemental Objections Are Premature and Without Merit.

### III.    The Debtors' Solicitation Procedures Are Proper And Customary In Mass Tort Cases

34.     For the first time, the Objecting Claimants challenge certain elements of the Debtors' proposed solicitation procedures as a basis to disapprove the RSA, arguing that, "without any citation to legal authority or supporting argument, [the Debtors] allow for voting purposes all direct abuse claims at $1 regardless of timeliness and regardless of TDP value," which, they claims, violates the voting threshold requirements of section 1126 of the Bankruptcy Code. Supp. Objecting Claimants Obj. ¶ 10. Notwithstanding that RSA approval is not the proper context to raise issues regarding the solicitation procedures, which have been on file since March 1, the Objecting Claimants' objections lack merit.

35.     As made clear in the solicitation procedures, the Debtors are not permitting holders of untimely claims to vote on the Amended Plan. *See, e.g.*, Revised Proposed Solicitation Order [D.I. 5488], Ex. A, ¶ 15 ("The Solicitation Agent shall not provide Ballots to any Firm on account

of, and votes included on any Master Ballot shall not be counted for, any individuals for which a Direct Abuse Claim was not timely filed prior to the Abuse Claims Bar Date."); Bar Date Order [D.I. 695], ¶ 4(h) ("[S]uch Sexual Abuse Survivor who fails to timely file a Sexual Abuse Survivor Proof of Claim shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.").    Additionally, the Debtors have cited ample legal authority and submitted extensive briefing in support of the proposed procedure temporarily allowing all unliquidated claims at $1.00 solely for voting purposes.  *See* Solicitation Procedures Motion [D.I. 2295], ¶¶ 46–47; Omnibus Disclosure Statement Reply [D.I. 4105], ¶¶ 118–120.  Substantially all of the approximately 82,500 timely filed non-duplicative Direct Abuse Claims are unliquidated. Temporary allowance of these claims is a standard practice in large mass tort cases and ensures equitable voting for a large number of claimants holding unliquidated claims.  The court in *A.H. Robins* recognized the reasons for why a nominal value on each claim strictly for voting purposes was appropriate: "Any attempt to evaluate each individual claim for purposes of voting on the Debtor's Plan of Reorganization would, as a practical matter, be an act of futility, and would so time consuming as to impose on many, many deserving claimants further intolerable delay all not only to their detriment, but to the detriment of the financial well being of the estate as well."  *In re A.H. Robins Co., Inc.*, 88 B.R. 742, 747 (E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 631 (Bankr. S.D.N.Y. 1986) (fixing asbestos claims at $1.00 for voting purposes and holding that "[i]t has been the stated goal of this court and of the parties in interest . . . to ensure the protection and participation of the interests of the asbestos health victims").    The Debtors Solicitation Procedures – including the $1 estimation for voting

purposes – substantially the same as procedures implemented by bankruptcy courts in other large mass tort cases.[9]

36.     It would also be futile—and prohibitively costly—for the Debtors to individually evaluate each of the 82,500 unliquidated claims.  Attempting to value Direct Abuse Claims differently based on a TDP analysis or statute–of–limitations analysis would be impracticable and inappropriate.  The Debtors are not required to file claim objections or commence claims reconciliation procedures prior to soliciting votes on the Amended Plan.  In *Kane v. Johns-Manville Corp.*, the Second Circuit held that "objections to claims need not be finally resolved before voting on a plan may occur."  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 646 (2d Cir. 1988); *see also In re DeSardi*, 340 B.R. 790, 794 n.1 (Bankr. S.D. Tex. 2006) (noting that procedures for claim objection are distinct from plan confirmation procedures, and finding that claim objections may be resolved after a plan is confirmed).

37.     The Objecting Claimants also challenge the proposed third-party releases and the tabulation procedures for Class 8 holders of Direct Abuse Claims.  These objections are premature in advance of the voting results on the Amended Plan.  Facts material to these determinations are still being developed, including the outcome of the creditors' vote, the identity of interest between the Debtors and the Protected Parties, the total value of contributions to be made to the Settlement Trust, and, consequently, the total value of distributions to be made to affected creditors.  This Court should not entertain every "what if" scenario put forward by the Objecting Claimants in

---

[9]     *See also, e.g.*, *In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) [D.I. 6340] (approving procedures temporarily allowing fire victim claims at $1.00 for voting purposes); *In re Roman Catholic Bishop of Great Falls*, Case No. 17-60271 (JDP) (Bankr. D. Mont. June 18, 2018) [D.I. 382] (approving solicitation procedures temporarily allowing abuse claims at $1.00 for voting purposes); *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [D.I. 1639] (approving procedures temporarily allowing tort claims relating to Debtors' defective airbag inflators, whether based on personal injury, wrongful death, or economic loss, at $1.00 for voting purposes); *In re Catholic Diocese of Wilmington, Inc.*, Case No. 09-13560 (CSS) (Bankr. D. Del. May 20, 2011) [D.I. 1317] (approving procedures temporarily allowing abuse personal injury claims at $1.00 for voting purposes).

their attempt to interfere with the RSA. The Debtors acknowledge that they must demonstrate support for the third party releases, and will do so at confirmation.

**IV.  Section 1129(a)(16) Of The Bankruptcy Code Does Not Prohibit The Debtors' Ability To Assign Insurance Rights To The Settlement Trust**

38.    Also more properly addressed at confirmation as opposed to in connection with the RSA, in its Supplemental Objection Century further argues that section 1129(a)(16) prohibits non-profit debtors from assigning their insurance rights. Century Supp. Obj. at 19.   Century fundamentally misunderstands and misconstrues this provision of the Bankruptcy Code. Applicable case law makes clear that this section only applies to unique provisions of state law related to non-profit entities, not all state laws of general applicability. *See In re Machne Menachem, Inc.*, 371 B.R. 63, 66-8 (Bankr. M.D. Pa. 2006) (specifically referencing N.Y. Not-for-Profit Corp. Law §§ 509, 510 in determining that a plan, which provided for sale of all of assets of debtor, not-for-profit corporation, did not violate 11 USCS § 1129(a)(16));  *In re Roman Catholic Archbishop of Portland in Or.*, Case No. 04-37154, 2007 Bankr. LEXIS 1180, at *26 (Bankr. D. Or. Apr. 13, 2007) (confirming a chapter 11 plan of nonprofit where it did not violate chapter 65 of Oregon state law which governs non-profit corporations and, therefore, complies with section 1129(a)(16) requirements*); In re Albert Lindley Lee Mem'l Hosp.*, Case No. 09-30845, 2010 Bankr. LEXIS 4148, at *15–16 (Bankr. N.D.N.Y. July 15, 2010) (confirming a plan where order provided that: "The Debtor shall comply with the provisions of Section 509 or Section 510 of the New York Not-for-Profit Corporation Law, which govern such transfers by a not-for-profit corporation such as the Debtor.  As a result, the Amended Plan is in compliance with section 1129(a)(16) of the Bankruptcy Code."); *see also* 7 Collier on Bankruptcy ¶ 1129.02[16] (16th ed. 2021) ("It keeps in place the state law restrictions on such nonprofit entities . . . .").

39.     Legislative history also clarifies the proper application of § 1129(a)(16). Along with sections 363(d)(1) and 541(f), the provision cited by Century was "enacted in response to the conflict between the debtor-in-possession and the Pennsylvania State Attorney General in the Chapter 11 cases of *In re Allegheny, Health, Education & Research Foundation* and its affiliates. AHERF was a nonprofit hospital chain which disposed of assets in its Chapter 11 case without complying with applicable Pennsylvania law procedures for sale of assets of a nonprofit corporation."  Richard Levin & Alesia Ranney Marinelli, *The Creeping Repeal of Chapter 11: The Significant Business Provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 79 Am. Bankr. L.J. 603, 643 (2005) (citing *In re Allegheny Health, Educ. & Research Found.*, 252 B.R. 309, 315 (W.D. Pa. 1999)); *see also* H H.R. REP. NO. 109-31, pt. 1 at 113 (2005) (discussing three-pronged approach for ensuring that nonprofit debtor's property transfers comply with law applicable to such nonprofit).

40.     Century cites no state non-profit corporation law that prohibits the transfer of insurance rights, and the Debtors are aware of no such law.  Accordingly, generally applicable state laws not specific to non-profit corporations are not implicated by section 1129(a)(16).  The Debtors also reiterate, as stated in the Debtors' Omnibus Reply, that the Third Circuit did not differentiate between for-profit and non-profit debtors in *Federal-Mogul*, which Century relies on for the erroneous proposition that the Debtors cannot accomplish the insurance rights transfer contemplated by the Amended Plan.  *See In re Fed.-Mogul Glob.,* 684 F.3d 355 (3d Cir. 2012).

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court overrule the Objections and enter the Revised Proposed Order [D.I. 5769], substantially in the revised form filed concurrently

with the Omnibus Reply, granting the relief requested in the Motion and any further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: August 11, 2021
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Paige N. Topper*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@morrisnichols.com
      aremming@ morrisnichols.com
      ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice)*
Blair M. Warner (admitted *pro hac vice)*
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com
      blair.warner@whitecase.com

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION