```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

                                        .   Chapter 11
 3    IN RE:                            .
                                        .   Case No. 20-10343 (LSS)
 4    BOY SCOUTS OF AMERICA AND         .
      DELAWARE BSA, LLC,                .
 5                                      .
                                        .   Courtroom No. 2
 6                                      .   824 North Market Street
                                        .   Wilmington, Delaware 19801
 7                                      .
                          Debtors.      .   August 12, 2021
 8    . . . . . . . . . . . . . . . .       10:00 A.M.

 9                    TRANSCRIPT OF TELEPHONIC HEARING
             BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                  UNITED STATES BANKRUPTCY JUDGE

11    TELEPHONIC APPEARANCES:

12    For the Debtor:          Derek C. Abbott, Esquire
                               Andrew R. Remming, Esquire
13                             Paige N. Topper, Esquire
                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
14                             1201 North Market Street, 16th Floor
                               Wilmington, Delaware 19899
15
                               - and -
16
                               Jessica C. Lauria, Esquire
17                             Glenn Kurtz, Esquire
                               Andrew Hammond, Esquire
18                             WHITE & CASE LLP
                               1221 Avenue of the Americas
19                             New York, New York 10020

20
      Audio Operator:          Brandon J. McCarthy, ECRO
21
      Transcription Company:   Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
24

25    Proceedings recorded by electronic sound recording; transcript
      produced by transcription service.
```

```
 1  TELEPHONIC APPEARANCES (Cont'd):

 2  For the Debtors:          Michael C. Andolina, Esquire
                              Matthew E. Linder, Esquire
 3                            Laura E. Baccash, Esquire
                              Blair M. Warner, Esquire
 4                            WHITE & CASE LLP
                              111 South Wacker Drive
 5                            Chicago, Illinois 60606

 6
    For Hartford:             James Ruggeri, Esquire
 7                            Joshua Weinberg, Esquire
                              SHIPMAN & GOODWIN LLP
 8                            1875 K Street NW, Suite 600
                              Washington, DC 20006
 9
    For Century:              Tancred Schiavoni, Esquire
10                            O'MELVENY & MYERS LLP
                              Times Square Tower
11                            7 Times Square
                              New York, New York 10036
12
    For the AIG Companies:    James Hallowell, Esquire
13                            GIBSON DUNN & CRUTCHER LLP
                              200 Park Avenue
14                            New York, New York 10166

15
    For the Coalition of      Eric Goodman, Esquire
16  Abused Scouts:            BROWN RUDNICK LLP
                              601 Thirteenth Street NW, Suite 600
17                            Washington, DC 20005

18                            - and -

19
                              Cameron Moxley, Esquire
20                            7 Times Square
                              New York, New York 10036
21
    For the U.S. Trustee:     David Buchbinder, Esquire
22                            UNITED STATES DEPARTMENT OF JUSTICE
                              OFFICE OF THE UNITED STATES TRUSTEE
23                            844 King Street, Suite 2207
                              Lockbox 35
24                            Wilmington, Delaware 19801

25
```

1    TELEPHONIC APPEARNACES (Cont'd):

2    For the Committee          Joseph Celentino, Esquire
     Of Local Councils:         WACHTELL, LIPTON, ROSEN & KATZ
3                               51 West 52nd Street
                                New York, New York 10019
4

5    For the Roman Catholic     Jeremy Ryan, Esquire
     Ad Hoc Committee:          POTTER ANDERSON & CORROON LLP
6                               1313 N. Market Street, 6th Floor
                                Wilmington, Delaware 19801
7
     For the TCC:               Thomas Patterson, Esquire
8                               THE PATTERSON LAW FIRM, LLC
                                200 West Monroe, Suite 2025
9                               Chicago, Illinois 60606

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MATTERS GOING FORWARD:

1.  Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief [D.I. 5466; Filed 7/1/21]

    **Ruling:**

6. [SEALED] Moving Insurers' Motion to Compel and for Additional Relief and in the Alternative Motion in Limine [D.I. 5881; Filed 8/4/21]

    **Ruling:   57**

7. Century's Revised Motion for Entry of an Order Authorizing Filing Under Seal Documents Relating to Century's Objections to Debtor's Motion Relating to the Restructuring Support Agreement and Moving Insurers' Motion to Compel [D.I. 5853; Filed 8/2/21]

    **Ruling:**

10. [SEALED] Century's Motion in Limine to Bar the Debtors from Offering Evidence in Support of Their Application for Fees on Which They Have Refused to Provide Discovery [D.I. 5942; Filed 8/10/21]

    **Ruling:**


DEBTORS' WITNESS(s):

**BRIAN WHITTMAN**

    Direct Examination by Mr. Hammond          84

    Cross Examination by Schiavoni             160

    Cross Examination by Mr. Weinberg          196

    Cross Examination by Mr. Hallowell         207

    Cross Examination by Mr. Ryan              222

    Cross Examination by Mr. Goodman           229

1    Cross Examination by Mr. Buchbinder         240

2    Cross Examination by Mr. Patterson          243

3

4

5   EXHIBITS                          I.D.      REC'D

6   D1   RSA                                    112

7   D-1A                                        144

8   D42                                         146

9   Declaration of Brian Whittman               202

10  Page 93 of Whittman Declaration             209

11  Page 179, Line 22 to Page 180, Line 12
    Whittman Declaration                        216
12

13  AIG Exhibit                                 221

14  Paragraph 8 Whittman Declaration            246

15

16

17

18

19

20

21

22

23

24

25

1     (Proceedings commence at 10:05 a.m.)

2          THE COURT:  Good morning, Counsel.  This is Judge

3  Silverstein.  We're here in the Boy Scouts of America

4  bankruptcy case, Case Number 20-10343.

5          And Mrs. Johnson put the agenda right in front of

6  me and I've already misplaced it, so -- but I don't think it's

7  necessary.

8          Let me turn it over to debtors' counsel.  Mr.

9  Abbott.

10       (No verbal response)

11         THE COURT:  Nobody is hearing me.

12         MR. ABBOTT:  Good morning, Your Honor.  Derek

13  Abbott of Morris Nichols for the debtors.  It looks like we

14  may still be gathering critical mass, so we're prepared to

15  proceed when the Court is ready.

16         THE COURT:  Okay.  I'm ready.  Can parties hear me?

17       (No verbal response)

18       (Pause in proceedings)

19         MR. ABBOTT:  Good morning, Your Honor.

20         THE COURT:  Good morning.  Can you hear me now?

21         MR. ABBOTT:  Yes, I can.  Thank you.  I'm sorry, I

22  couldn't before, for some reason.

23         THE COURT:  Yes, we're looking at that.  Okay.

24  Well, let's start again.

25          This is Judge Silverstein.  We're here in the Boy

1  Scouts of America bankruptcy case, Case Number 20-10343.  And

2  I'll turn it over to Mr. Abbott.

3          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

4  of Morris Nichols, here for the debtors.  And I'm getting a

5  little bit of an echo, Your Honor.  I hope -- I'm not sure if

6  everyone else is.  I apologize for that.  But I'll try to work

7  through it.

8          THE COURT:  Okay.  I'm not getting any echo.  Can

9  everyone please make certain that they are muted, unless they

10  are speaking?

11          MR. RUGGERI:  And Your Honor (indiscernible) for

12  echo (indiscernible) speaking.

13          MR. ABBOTT:  Well, Your Honor, let me try to get

14  started and we'll see how it works.  Maybe others don't have

15  that problem.

16          MS. LAURIA:  Actually, Mr. Abbott, this is Jessica

17  Lauria.  The echo is pretty severe.  We don't hear it when the

18  Court speaks, but we do hear it when you speak, or Mr. Ruggeri

19  or -- I can hear it very loudly.

20          THE COURT:  Okay.  Let's ... here's what I'm going

21  to do.  I'm going to exit for a moment, please stay on.  I'm

22  going to have my IT people work with you.  But please, I want

23  you to stay on and be available, so we can find out of we're

24  getting this problem resolved.

25          MR. ABBOTT:  Thank you, Your Honor.

1          (Off the record at 10:09 a.m.)

2          (Proceedings resume at 10:32 a.m.)

3               THE COURT:  Okay.  Mr. Abbott.

4               MR. ABBOTT:  Thank you, Your Honor.  Appreciate it.

5     I think this is much better, and people will be able to

6     actually understand what's going on, so I appreciate it.

7               Your Honor, there's quite a lengthy agenda,

8     although it really falls into three buckets:

9               Item Number 1, Your Honor, is the debtors' motion

10    for the RSA.

11              There's another set, Items 2, 3, 4, 5, 8, 9, 11,

12    and 12, that I would sort of categorize as largely

13    administrative motions.  They're motions to exceed the page

14    limit, they're motions to seal documents in accordance with

15    the confidentiality obligations.

16              THE COURT:  Go ahead.

17              MR. ABBOTT:  Your Honor, and again, that's Items 2,

18    3, 4, 5, 8, 9, 11, and 12, on the second amended agenda.

19    They, I don't believe are the subject of any objection.  And I

20    would suggest maybe -- I would just ask the Court to grant

21    those generally to clear out the weeds on the agenda.

22              The next three items it probably makes sense to

23    take up before Item Number 1, Your Honor, are 6, 7, and 10,

24    which are the various discovery/motion to compel/motion in

25    limine items filed by the insurers and the Coalition; those

1  are Items 6, 7, and 10.  But that's my suggestion to sort of

2  deal with those first, obviously, before Item Number 1.  But

3  we're obviously at the Court's pleasure.

4          THE COURT:  Okay.  That makes sense.

5          As for all of the motions to exceed page

6  limitation, motions to seal, et cetera, those will all be

7  granted.

8          MR. ABBOTT:  Thank you, Your Honor.

9          With that, I guess we would move to Agenda Item

10  Number 6.  And so I'd ask the moving insurers to -- I'm not

11  sure which one is going to take the lead on that, but that's

12  their motion, so I'll cede the virtual podium, Your Honor.

13          THE COURT:  Thank you.

14          MR. RUGGERI:  Good morning, Your Honor.  James

15  Ruggeri for Hartford, if it pleases the Court.

16          THE COURT:  Mr. Ruggeri.

17          MR. RUGGERI:  Judge, there is one motion

18  (indiscernible) thank you, Judge.  There is one motion,

19  actually, we talked about at one of our prior hearings that I

20  did (indiscernible) on the motion, it deals with a motion to

21  strike the testimony of Mr. Mosby.  The Court said earlier

22  that it would hold that over and present that when we convene

23  for the RSA.  I do apologize for that not being added to the

24  agenda.

25          Your Honor, but this morning, I'd like to kick it

1  off by addressing Item 6 on the agenda, which is the motion to

2  compel.  And this is the motion to compel that the moving

3  insurers filed on August 4th, 2021.

4       What do we want?  The Court is aware of a prior

5  motion that was filed by certain insurers in July.  What we

6  actually want, Your Honor, through this motion, and what the

7  Court, I believe, told us is fair game on July 27th, and that

8  is we want to know what the debtors considered in approving

9  the restructuring support agreement, we want to know when they

10  considered it, and we want to know what the debtors didn't

11  consider.  Those were the items that the Court indicated were

12  fair game in connection with the RSA motion.

13       And from our perspective, Your Honor, that include

14  the Alvarez & Marsal PowerPoint presentations and financial

15  analyses submitted to the boards in evaluating the RSA.

16       Two, includes the authorizing minutes and

17  resolutions of the BSA boards.  We haven't received any

18  authorizing minutes or resolutions of the BSA boards.

19       Three, it includes the board minutes and

20  communications showing, again, what the boards considered in

21  approving the RSA.

22       Judge, if we don't have those communications, we

23  have no idea what the debtors actually considered in

24  exercising their business judgment.

25       Yesterday, the Court saw another round of filings

1  and it saw it in response to the certain supplemental

2  objections that the debtors promised at Paragraph 5, that they

3  would produce all of these materials.  They said, but they

4  didn't do that, Your Honor.  The productions are still heavily

5  redacted.

6          There's no discernible rhyme or reason that I can

7  find, except that it now appears that, with regard to board

8  minutes and the Alvarez & Marsal productions, the debtors

9  unredacted the information that they believe is useful to

10 their RSA motion.  I mean, why else, Judge, would the debtors

11 still be redacting from their documents, you know, statements

12 concerning the K-3s national road trip and meetings that the

13 had with non-mediating parties across the country.  And that's

14 attached as Exhibit J to the Erin Fay deposition, Docket 5882.

15 They redacted that.  There's no conceivable basis for a

16 privilege along those lines.

17         Judge, the fourth thing we want, because of the

18 manner in which the documents have been dribbled out and the

19 privilege logs have been provided, we want a real privilege

20 log.  The different productions and privilege logs give us no

21 comfort.  The redactions have been overly broad, they've been

22 misleading.

23         We attached as Exhibits E and F to the Fay

24 declaration, Your Honor, a couple of sequences of the document

25 productions, showing how they dribbled out in three

1  productions.  And you'll see that, in the first production,

2  the impression we were given is that the entirety of the

3  minutes was privileged advice given by Ms. Lauria and Mr.

4  Andolina.  Then we produced a couple of more lines, a couple

5  of weeks later.

6           And then the last production we saw, on August work

7  -- August 1st, they had these, again, still head-scratching

8  redactions in there.  And what they unredacted -- the

9  redactions when they wanted to tell us that, you know, Mr.

10 Andolino was saying something about the momentum gaining

11 toward a global resolution, the RSA.  Again, that's Exhibit 5

12 of the Fay declaration.  But when it came to Mr. Whittman's

13 PowerPoint presentations, the redactions remains.  We don't

14 have any confidence in the logs that we received, Your Honor.

15          We want -- and this is important, Judge, because it

16 really goes to the heart of what I think Your Honor was

17 talking about, the Court was talking about on the 27th.  We

18 also want the communications and the drafts of the RSA

19 documents exchanged between and among the RSA parties.  And I

20 don't know if Ms. Rolain has been given access to the document

21 share, but I would like to show on the screen an example of

22 the document I'm talking about.  It's Exhibit G to the Fay

23 declaration.

24          You'll see that this is an email from Mr. McGowan

25 to various people on the BSA side of the ledger.  They

1  produced a cover email.  But what you'll see is, in the

2  attachments, you'll see that there's an identification of

3  comparison documents between those worked by BSA and those

4  worked on by the other RSA parties.  We didn't get the

5  attachments, Judge, we didn't get a single attachment showing

6  any redline comparisons or anything, the communications back

7  and forth.

8          And it's troubling, Judge, because, in the RSA

9  motion, they have asked the Court to make a number of

10  findings.  They -- one, they want the Court to find and rule

11  that:

12          The parties engaged in arm's length negotiations.

13          Two, that the RSA was negotiated at arm's length

14  and in good faith.

15          Three, that the debtors undertood a thorough,

16  independent review of the RSA's -- parties' rights and

17  obligations under the RSA.

18          And fourth, that the debtors concluded that the RSA

19  was in the best interests of debtors and the creditors.

20          And they doubled down on this -- on these requested

21  findings again yesterday, in Paragraph 18.  They want this

22  Court to find that the RSA was the product of extensive arm's

23  length negotiations.  And just because they say so -- and the

24  Court knows better than I -- it doesn't mean it is so.

25          If we don't get the communications and drafts, I

1  don't know how the Court is in a position to make the rulings.

2  And certainly, I don't know how we're a participant -- in a

3  position to participate meaningfully in kicking the tires on

4  the requested finding.

5            You know, Judge, we had a conversation with

6  debtors' counsel a few days ago, and it really capsulized the

7  disagreement that we have with debtors' counsel.  I

8  appreciated the candor.  Debtors' counsel said, you, the

9  insurers, aren't entitled to discovery showing how the sausage

10  was made.  We are and we have to be because of the findings

11  that you're asking the Court to make.

12            In response to our motion, we saw some

13  contradiction.  They say we filed our motion too early in one

14  area, and then they say we filed it too late, that we waited a

15  couple of days after the Court's guidance on July 27th and

16  their promise to produce documents on the 29th.  Judge, we

17  didn't wait long at all.  The documents were produced on

18  August 1 and 2nd, and we filed our motion August 4th.

19            Again, our -- the real point of disagreement is I

20  do think we're entitled to know how the sausage was made, we

21  have to be from our perspective.  The Court knows we've been

22  clear about this.  We believe that, from what we know, it

23  looks like, once the debtors and the local councils were able

24  to negotiate their exit prices, they turned over the keys to

25  the TCC, the Coalition, and the future claims representative.

1           We know that, before they reached their agreement,

2    the debtor was responding trust distribution procedures and

3    telling the Court that they had to be insurance-neutral.  But

4    now we have TDPs that were appended to the RSA and filed with

5    the fourth amended plan that they probably say are the

6    opposite of insurance-neutral.  We need to know how that

7    happened.  We need to know who asked for it, who pushed back

8    on it, if anyone, what discussions took place.

9           And Judge, I submit that it's inappropriate to hide

10   behind privilege, mediation or otherwise.  Both parties cited,

11   you know, Former Judge Carey's ruling in the Tribune case.

12   And I think the point of it for me, in his epilogue, Former

13   Judge Carey said that there are limitations to privilege, and

14   you have to look at it from the perspective of the facts and

15   circumstances.  And here, given the findings they've asked

16   this Court to make -- not "asked" -- mandated the Court to

17   make, if they're going to go forward with the RSA, I think

18   they've placed them at issue.  And privilege does bend in

19   response to matters placed at issue.

20           They -- the debtors try to respond, Judge, by

21   telling us that their logs tell the story.  Their logs tell no

22   story at all.  I mean, I think the -- I've never seen a

23   categorical log in my 31 years of practice, Judge.  We have

24   thousands of pages of documents.  It was a two-page document,

25   it had three entries.  The entries were mediation privilege,

1  attorney/client communication, and work product.  There was no

2  document attached to any of those privileges, it was

3  wholesale.  And the date was kind of laughable.  The date

4  range was, quote, "inception of debtors to the present."

5  That's pretty darned broad.

6         The second log regarding the TDPs, again, it told

7  us nothing about who did any -- who proposed what, what they

8  said, how the back and forth went.  This case is qualitatively

9  different than any of the cases that the debtors cite to.

10  There's nothing in those logs that provide any sort of basis

11  for anyone, much less the Court, to make a good faith finding

12  about the negotiations, the alleged hard-fought negotiations

13  of the TDPs or otherwise.

14         THE COURT:  Mr. Ruggeri --

15         MR. RUGGERI:  Judge, they say they haven't shared -

16  -

17         THE COURT:  Mr. Ruggeri, let me ask you this

18  question.  And I was just looking for my proposed form of

19  order, which I thought -- the proposed form of order, which I

20  thought I had right in front of me.  But what's the -- what do

21  you think I have to find in the context of an RSA, what do you

22  think "good faith" means?

23         MR. RUGGERI:  Judge, I think there's a disagreement

24  on the standard regarding good faith, and I would defer that

25  argument to Mr. Schiavoni and Mr. Anker, who are closer to

1  that issue.  But I do think the Court needs to weigh and

2  balance.

3          But what I don't think the Court can do, Judge, is

4  I don't think it can even make the lowest finding that the RSA

5  parties asked the Court to make.  If we're being asked to make

6  this or the Court is being asked to make this in the context

7  of a black box -- and it's really what's happened here, is

8  that mediation has swallowed this whole case and everything is

9  now, you know, cloaked in mediation privilege.

10          And if I show you another document that they just

11  produced a couple of days ago, which shows, you know, my

12  personal frustration, we have a document here regarding a June

13  11th meeting, the National Executive Committee and Bankruptcy

14  Task Force legal update.  And if you scroll through a couple

15  of pages, you see there's a time line, litigation matters.

16  And then, okay, pending offer of privilege.  And then you go

17  again, it's Issue Number 1, and look what they unredacted:

18          "TCC SCR Coalition has sent BSA and AHCLC letter

19  confirming no plan with Hartford will be supported."

20          Huh, wonder why they share that, Judge?  Wonder

21  why.  But go again.  You go down to the next issue, privilege;

22  next issue, privilege.  So they produce one thing that they

23  believed went to their motion, and that was it.

24          They blame us, they kind of chastise us for not

25  telling them earlier that they improperly withheld

1  attachments.  That's not our job, Judge.  We do the best we

2  can do and we expect they will do the best that they can do.

3        You know, they filed a document yesterday, Page 41,

4  that said the debtors' interest is in presenting this Court

5  with a full evidentiary record in support of the RSA.  Judge,

6  we don't have -- we don't have the record, the discovery

7  record with which we could present the Court the Court with a

8  full evidentiary record.

9        They blame us for the depositions.  My position was

10  clear.  Until July 27th, they said they would present

11  deponents only once.  I said, look, you haven't given us what

12  the Judge kind of told me I think was fair game, what you

13  considered, when you considered it, what you didn't consider

14  it.  So, rather than have a round two of depositions, to be

15  followed by round three, I submitted that it made more sense

16  for all of the parties to bring this issue to the Court's

17  attention, where the Court could give us guidance, in terms of

18  what documents have been produced.

19        The big problem I have, Your Honor, is they haven't

20  produced the information that we believe is fair game.  We

21  agree with the Court.  And it provides no basis for us to

22  question or the Court to make the requested finding that they

23  haven't only asked for, they said the Court must make, if

24  they're going to go forward on the RSA.  Thank you, Your

25  Honor.

1          THE COURT:  Thank you.

2          Mrs. Johnson, Mr. Ruggeri is referring to something

3   filed yesterday, which I don't have.  So, if you could bring

4   that to me, I'd appreciate it.

5          Okay.  Let me hear -- let me hear a response.  And

6   I want addressed in the response the particular issues that

7   Mr. Ruggeri has raised.  I also want to understand what

8   findings -- how you think that I can make a good faith finding

9   without the discovery that -- the opportunity for the

10  discovery that Mr. Ruggieri is talking about.

11         MR. KURTZ:  Good morning, Your Honor.  Glenn Kirtz

12  from White & Case on behalf of the debtors.  Can you hear me?

13         THE COURT:  Yes, Mr. Kurtz.

14         MR. KURTZ:  Good morning again.  I will address all

15  those matters maybe in a broader context.

16         I'll try not to burden the Court with too much

17  duplication from what's in the briefs, including delay-related

18  issues, other than to note that we raised this mediation

19  position on July 8th, at the latest, more than a month ago.

20  We repeatedly raised it.  We asked the insurers to share their

21  position.  We asked to have a meet-and-confer, so that we

22  could try to resolve to the extent that there were any nuances

23  on what could be produced, if there were any other ways to

24  figure out how to get evidence in without violating the

25  mediation order.  They steadfastly refused to do so.  We

1   weren't aware of their specific position on privilege, in

2   fact, until they filed these papers more than a month after we

3   tried to engage.  So I think what's really happening is the

4   insurers are trying to raise an emergency of their own making

5   to claim prejudice, which just doesn't exist here, for reasons

6   that I'll get into.

7            For context, the insurers here are seeking to

8   preclude documents and testimony.  I think it's best maybe to

9   start with the testimony.

10           There was at least some specifics given today, and

11  I'm going to absolutely address those specifics.  But for the

12  most part, the papers have been a series of generalisms and

13  conclusory statements.  We tried to go through the actual

14  facts, the production dates, the source for the production,

15  what's been disclosed and how we dealt with the requests; we

16  put that into the papers (indiscernible) exhibits.  I won't

17  walk through it, but it does demonstrate that we've given the

18  discovery that's appropriate here.

19           And I think it is worth highlighting that the

20  insurers here are not creditors of the estate, they're not

21  objecting at least as creditors of the estate.  They're really

22  assets of the estates, they're the policies.  They don't share

23  the same interests, they're in conflict.

24           THE COURT:  Have they filed claims?

25           MR. KURTZ:  They're seeking very --

1          THE COURT:  Have they filed claims?

2          MR. KURTZ:  They have, Your Honor.

3          THE COURT:  Has the debtor --

4          MR. KURTZ:  And they --

5          THE COURT:  -- objected to them?

6          MR. KURTZ:  They have, Your Honor.

7          THE COURT:  Has the debtor objected to them?

8          MR. KURTZ:  I'm not sure of the answer to that

9   question, but -- and that's why I said how they're objecting

10  because I -- there's a couple of them that have had some

11  premium-related claims.  But they're not raising any

12  objections based on their creditor status or what they might

13  receive or not receive as creditors.  They're raising their

14  claims as policies, which are really assets of the estate.

15          I'm not suggesting they don't have every right to

16  be heard, it's not a standing issue, at least with respect to

17  the issues I'm addressing.  It's just a matter of who's trying

18  to act on behalf of the estate here, and who's trying to act

19  in a way that I think conflicts because the insurance policies

20  are assets of the estate, they're not claimants of the estate.

21          The relatively nominal premium claims will be

22  addressed in the ordinary course, but no one is claiming that

23  we've done something that's going to minimize that recovery or

24  impair it in any way.

25          I ought to probably note the standard here, which

1   is preclusion, is an extreme sanction, that it really isn't

2   typically imposed without some pretty good reason here.  Let

3   me start with the testimony.  It really goes initially to the

4   reply declarations.

5           And I think the first thing I ought to point out

6   is, you know, this effort to preclude testimony by trying to

7   strike the replies sort of ignores the fact that the debtors,

8   we believe, are entitled to show up today and tomorrow, put

9   witnesses on the stand, and produce any relevant evidence that

10  is otherwise admissible, regardless of whether they outlined

11  their -- the contents of their expected testimony in a reply

12  or otherwise.

13          And so there's sort of a premise here that the

14  evidence stops when you file the motion, which is not true,

15  and the insurers haven't addressed it.  We think, with or

16  without the replies, our witnesses who are here today will be

17  able to testify as to any appropriate matters in the

18  evidentiary hearing.  And we really gave them the benefit of

19  having an opportunity to see what we will present and who we

20  would present (indiscernible) so that they could take

21  depositions and they could prepare.

22          But getting past the fact that we don't think

23  there's any basis for precluding evidence, there's also no

24  basis for precluding the reply declarations.  I think the

25  position that somehow reply declarations aren't proper is

1   completely wrong, is inconsistent with the insurers' own

2   practice.  They have filed a number of motions seeking relief

3   from this Court affirmatively and in connection with those

4   motions, including motions for 2004 discovery for -- to

5   adjourn the disclosure statement hearing and the 2019 that

6   Your Honor recently heard.  They filed replies; and, in their

7   replies, they filed seven different declarations of fact

8   witnesses and expert witnesses.  So they recognize the normal

9   practice, and the rules don't change dependent upon whether

10  the insurers are movants or objectors.

11          In any case, the law is pretty clear, I think, and

12  consistent with practice that replies are proper under at

13  least two circumstances, reply declarations.

14          THE COURT:  I'm not --

15          MR. KURTZ:  One is where --

16          THE COURT:  That's --

17          MR. KURTZ:  -- it's within the scope --

18          THE COURT:  That's -- Mr. Kurtz, I don't need any

19  more on that.  I'm not convinced by the insurers' argument --

20          MR. KURTZ:  Okay.

21          THE COURT:  -- on that.  There was no -- I think

22  other courts have practiced by declaration, and that seems to

23  have filtered into several of my cases, but that's not the

24  practice here, it doesn't have to be the practice here.  You

25  can show up and put your witness on the stand.

1    So the question to me on the witness testimony is

2  not one I think we've heard yet argued by the insurers --

3  though they filed papers on it -- as to what happened at the

4  depositions, and should they be permitted to discuss on the

5  stand matters that they were precluded from testifying about

6  at the deposition.  But as far as being able to testify,

7  generally, that's not an issue for me.

8    MR. KURTZ:  Okay.  Well, thank you for the

9  guidance, Your Honor, so I don't waste any of your time.

10    And let me now respond to the issue that you did

11  raise as something you're interested in hearing about, which

12  is the deposition instructions.  We have two responses to

13  that:

14    The first is we put together a table demonstrating

15  that the insurers were, in fact, provided with testimony with

16  respect to the subjects they raise here.  We will continue to

17  complain about privilege, and I'm going to get to that.  But

18  we have Exhibit D to our objection, outlines very specifically

19  where there were objections and then where the testimony was

20  that responds to the questions that were asked, at least in

21  ways that we think are sufficient.

22    Most of the objections, I think, were -- there were

23  sort of three of them.  One was that they -- there was

24  instruction about answering the deal points that, quote, "make

25  up the RSA."  But of course, the RSA records everything single

1  deal point that's in there.  And we have provided testimony

2  and we have provided documents about the approvals and the

3  reasons for the approvals.

4        The objectors say that they were prevented from

5  obtaining testimony about the chartered organizations, that --

6  Your Honor, it seems (indiscernible) I've kind of lost -- I

7  heard a beep --

8        THE COURT:  I'm here.

9        MR. KURTZ:  -- and I've lost -- I'm sorry.  I see

10  you now.  I'm sorry, your screen moved.

11        About whether the charter organizations are

12  contractually indemnified by the Boy Scout Board.  That

13  doesn't even make sense because, of course, the boards don't

14  indemnify anyone.  But witnesses certainly answered questions

15  about how the board accounted for the chartered organizations

16  and the pathway forward, which is ongoing with the chartered

17  organizations.  And there are documents that were provided on

18  that subject, as well.

19        And then, lastly, it looks to me like the insurers

20  are complaining about not getting answers about the time that

21  the board spend deliberating on the RSA.  But there was ample

22  testimony on the subject, including with the specificity of

23  the number of meetings, to the extent that's important.

24        And then the second response is that we agreed to

25  reproduce each of the witnesses to answer the questions raised

1  here and also to answer related questions and to answer

2  questions that related to the supplemental document

3  productions.  We -- the insurers had repeatedly requested

4  those depositions.  They even moved the Court to compel them.

5  We agreed to them right after the hearing where Your Honor

6  made remarks about the extent of the discovery.

7      We proposed dates.  We spend five straight days,

8  maybe every day, asking them to please confirm the dates

9  because we had volunteer witnesses, they had travel issues,

10  and we wanted to lock it in.  We could not get an answer.  We

11  finally got, less than two days before one of the dates would

12  have gone forward, we had a meet-and-confer.  It took

13  considerable effort, but ultimately almost a negative vote.

14  We got the information that the insurers did not intend to

15  take the depositions.

16      And the law is that -- we think pretty clear, that,

17  if you decline an opportunity to continue a deposition, you

18  can't state any prejudice, certainly not the kind of prejudice

19  that we think that would support the extreme sanction of a

20  preclusion order.  We cited those cases on Pages 38 and 39 of

21  our objection.  And frankly, I would submit that, given the

22  repeated requests for the depositions, the motion to compel

23  the depositions, and then our offering them and a refusal even

24  to respond to us about that demonstrates that the insurers

25  weren't really looking to take the depositions; they were

1  looking to create a record that we wouldn't supply them.  But

2  we think we fixed it, and we think that that also fixes any

3  issue they have on it.

4       I think that takes me to the documents.  And we

5  found the motion a little bit puzzling, and still maybe find

6  it a little bit puzzling, in that what it actually seeks,

7  which is identified in the conclusion and then in the proposed

8  order, and really what was mentioned today, was A&M materials

9  and authorizing minutes and resolutions and the like.  And

10 those were all produced almost two weeks ago, and that is

11 simply a fact.

12      The insurers are claiming here, based on nothing

13 but speculation, that there continues to be non-privileged

14 material that has been redacted.  They don't discharge their

15 burden of demonstrating that, it's not so.  We would be happy

16 to submit in camera any documents that Your Honor might be

17 inclined to review to assess that, even though I don't think

18 there's been a showing that would justify it, but we're

19 certainly happy to do that.

20      I think their -- if you look at Page 6 of their

21 motion, you get a flavor of the kinds of challenges that

22 they're mounting here.  And given this is one that was

23 reproduced presumably, this is basically their best example,

24 complaining that this is a great showing that non-privileged

25 material was redacted.  And what the document says exactly is,

1  quote, "Jessica Lauria advised," and then there is a blank.

2  So it is still demonstrating that that picks up privileged

3  advice.  Jessica Lauria is a lead attorney for the debtors.

4  There is no argument made as to why that is not privileged.

5  It's plainly privileged on its face.  And I think using that

6  as an example sort of demonstrates that there really is

7  nothing here.

8           There seems to be just a generalized approach that,

9  if they want it, they should receive it.  And frankly, that's

10  a violation of Your Honor's mediation order and Local Rule

11  9019.  It's not the way it works.  It's not the way it works.

12  It's made it comp -- made discovery very complicated for us

13  because we're constantly dealing with demands for mediation,

14  which is time-consuming.

15           There's arguments here that they're -- you know,

16  they're entitled to the back-and-forth in the mediation.  They

17  quote me as saying we don't think they're entitled to the

18  sausage-making, and I will repeat that, that they're not

19  entitled to the sausage-making where the sausage was made

20  inside of a mediation.

21           So counsel points out that we've removed all the

22  attachments.  The attachments are the proposals made back and

23  forth in mediation.  That is core mediation privilege.  So it

24  doesn't -- it's a violation for them to ask, and it's frankly

25  a violation of the order and the rule to compel it.  But it

1   also -- they're offering no basis other than their general

2   interest in having it.

3          They kind of come back and say, well, you put it at

4   issue because you've asked for a good faith finding.  And I'll

5   respond to one of Your Honor's questions now, which is there's

6   no good faith finding required for the RSA.  It's not a 363

7   sale.  So good faith comes up only because, once we discharge

8   our burden of demonstrating a valid business justification for

9   the action, the debtors are entitled to the protections of

10  business judgment, and people can try to challenge that.  But

11  that does not let you violate orders and rules or violate

12  privilege.

13          THE COURT:  So explain --

14          MR. KURTZ:  The notion that the debtors can't --

15          THE COURT:  So explain to me, if good faith is not

16  required, if a good faith finding is not required in this

17  instance, why should I provide one?  Can't we get rid of this

18  whole issue by saying I won't make that finding, I don't --

19  the debtors don't need that finding --

20          MR. KURTZ:  Again --

21          THE COURT:  -- it's in appropriate?  And doesn't it

22  solve all these issues.

23          MR. KURTZ:  It may, and I probably, when I finish

24  commenting, maybe turn it over to Ms. Lauria to make sure that

25  what all the consequences might be for that.  She's a lot

1  closer to all the terms, but I will say, Your Honor, that a

2  good faith finding, even when one is required, can be made

3  based on the evidence that we are introducing today including

4  the basic deal terms, the reason for the deal terms, the

5  board's determination with respect to the deal terms without

6  regard to mediation at all.  Either these terms are

7  appropriate or they're not appropriate on their face.  How we

8  got there isn't a requirement to a good faith finding.

9          I will also say that the fact of the mediation is

10  often times been the predicate for a good faith finding.  It

11  is a factual issue that the parties reached an agreement as a

12  result of mediation.  Those findings are routinely made in

13  bankruptcy cases and in other cases to support a good faith

14  finding without negating the privilege.  In fact, I think

15  there's a substantial number of bankruptcy cases that everyone

16  on this call has been involved and ultimately went into

17  mediation resulting in a deal.  Nobody invaded the privilege

18  and the court made a finding of good faith nonetheless.

19          We cited a number of cases that said you don't have

20  to waive the privilege to demonstrate that it came out of

21  mediation and, therefore, its good faith.  So it's sort of a

22  faulty premise.  This at issue notion is really been --

23  there's not one case that any of the objectors, any of the

24  moving insurers have cited that have suggested, much less

25  held, that a good faith finding can't be made based on the

1  fact of a mediation without invading the mediation and

2  allowing for the production of mediation proposals.

3       Mediation is an important mechanism, its proven

4  effective here so far, its proven effective in a lot of cases,

5  and it's ongoing.  We have every optimistic view here that

6  it's going to allow us to generate some more general consensus

7  for the parties that are not on board yet.  I would be a

8  little worried about the chilling effect if people could

9  invade really without any basis.

10       I would say that we have absolutely nothing to

11  hide.  If Your Honor has an interest in seeing anything in

12  camera we'd be happy to provide it.  As I imagine you would

13  expect it was arm's length negotiations.  You have heard, and

14  I don't even know if anybody could even challenge that in a

15  premise.  I mean everybody has arm's length in here.  I think

16  the notion here that you're hearing is, well, wait a minute,

17  the debtors turned over the keys on the TDP. I will offer,

18  initially, that would be irrelevant.  The TDP either works or

19  it doesn't work and Your Honor is going to make that

20  determination no matter who has the pen.

21       We did provide a specific log when we had a meet

22  and confer.  We came out of the meet and confer, the insurers

23  were making a very big deal about the TDP drafting history.  I

24  am going to come back to the log, but they said the

25  categorical log doesn't give them what they need.  They want

1 to demonstrate that the debtors did not have a role.  So we

2 gave them a specific log on that specific issue they raised

3 and what it demonstrates is that there was a lot of back and

4 forth.  The original draft came out of the debtors, that's not

5 privileged.  There was a lot of back forth and that is not

6 privileged.

7          The specifics of the back and forth are privileged,

8 but, Your Honor, we don't have anything to hide on it, it's

9 just not something that could be or should be turned over.  It

10 violates the privilege.  The --

11          THE COURT:  Does the --

12          MR. KURTZ:  I don't think the -- I'm sorry, Your

13 Honor.

14          THE COURT:  So I'm trying to figure out, and maybe

15 someone should address it, but it seems pretty central to the

16 issue of what this hearing should encompass, what does a good

17 faith finding mean in this context if the debtors can just

18 say, well, it was a result of mediation.  Just look, as Mr.

19 Kurtz you said, there are cases that, at least, it's a factor.

20 So what does that mean?  What does a good faith finding get

21 anybody and what does it mean because I am not sure that I

22 know that in this context assuming that it's even appropriate

23 for me to make that finding.

24          I think what parties are concerned about is that

25 this finding spills over into other good faith aspects.  Quite

1  frankly, I think good faith can mean different things in

2  different circumstances and there are different standards in

3  different circumstances.  So what does it even mean here?

4          MR. KURTZ:  Thank you, Your Honor.  Maybe I can --

5  I'm sorry, Ms. Lauria, did you want to --

6          MS. LAURIA:  Yes, if I could just jump-in briefly,

7  Your Honor, to respond to your question concerning good faith.

8  First, Your Honor, and this echoes some comments that Mr.

9  Kurtz made, you're exactly right.  Good faith comes up in

10  different context in the bankruptcy code.  Under 363(m) of the

11  code parties seek findings that purchasers were -- that made

12  the purchase in good faith to bullet proof the purchase in the

13  event of appeal; that's not what we're talking about here.

14          Under 1129(a) of the Bankruptcy Code, in order to

15  confirm a plan, the court needs to find that the plan was

16  proposed by the proponents of the plan in good faith.

17  Similarly, we're not talking about that here and we were very

18  express, by the way, about that in the proposed form of order

19  in support of the RSA.

20          What we are talking about here is exactly what Mr.

21  Kurtz eluded to and that's the business judgment rule.  The

22  good faith finding goes hand and glove with the business

23  judgment determination of this court.  As the court is aware

24  the business judgment rule entitles the debtor to the

25  presumption that they acted on an informed basis and in good

1  faith.

2          The business judgment rule, and I don't mean to

3  raise the argument at this point in today's proceeding

4  concerning entire fairness versus business judgment, we will

5  get to that when we get to the argument on the RSA, but if we

6  were to assume that the business judgment rule, that judicial

7  presumption applies to today's proceeding, it suggests that if

8  the debtors are entitled to that business judgment and the

9  court isn't able to approve the RSA as a result of the

10  debtor's discharge of their fiduciary duties and adherence to

11  the business judgment rule the debtors are entitled to the

12  presumption that they acted on an informed basis and in good

13  faith.

14          Whether that means, Your Honor, that you have to

15  enter a separate ruling in connection with the RSA order that

16  all of the parties to the RSA acted in good faith, from the

17  debtors' position I don't think that is necessary.  What is

18  necessary is for the court to conclude that the business

19  judgment rule applies and that it was within the debtor's

20  business judgment to enter into the RSA.  And with that

21  follows the informed basis and the good faith of the

22  transaction.

23          MR. SCHIAVONI:  Your Honor, if I could be heard for

24  Century.

25          THE COURT:  Not yet.

1       MR. KURTZ:  Your Honor, I will say that I haven't
2  quite completed and maybe we should turn it over after I have
3  addressed a couple of points.

4       THE COURT:  Yeah, I'm not ready to hear from
5  anybody else yet.  So if the business judgment standard, as
6  it's applied in the Court of Chancery, means that there's a
7  presumption that the board acted on an informed basis and in
8  good faith what does that mean?  So if I am in the court -- if
9  I were a chancellor and someone were questioning the debtor's
10  business judgment what would the good faith mean there?  What
11  would that entitle parties to be able to challenge and what
12  would they be entitled to discover?

13       MR. KURTZ:  Your Honor, let me -- I can answer
14  that.  So in Chancery Court, which is really the most
15  developed body of law with respect to these concepts,
16  obviously, the (indiscernible) looks to it.  You just have to
17  identify a valid business justification for the steps you are
18  taking and then you were entitled to very broad protections of
19  the business judgement rule.  Practitioners will all say that
20  if you lose the challenger losers when its business judgment,
21  which is why everybody tries so hard to move it into entire
22  fairness.

23       The -- what the court's look at is process and
24  terms, price and process.  And so long as there is a valid or
25  diligent process, which here actually is a mediation, it's a

1  little bit different then a normal M&A, and you have fair

2  terms then they, sort of, it's taken together.  So the better

3  the process the less you need terms, the better the terms the

4  less you need process.

5          So here you have got deal terms that are before the

6  court.  I know this challenge is by the insurer, that's not

7  appropriate for today, they are really confirmation issues

8  about insurance neutrality and some other matters, and they

9  will be able to raise them.  They are either right or wrong

10 about that.  Obviously, we think they're wrong about it.

11          Really, the whole notion of challenging these

12 things is because its delude of potentially to

13 (indiscernible).  So, normally, that stockholder here is the

14 estate.  The notion is did you do something that took value

15 from the estate or the stockholders and transferred it to

16 another party.  That is just not the model here which is why

17 it's such -- it doesn't fit because here it's the parties that

18 are saying I don't want you to have bigger recoveries to the

19 estate because I'm paying for them.

20          Now they're complaining if anything the insurers

21 are sort of like the unsuccessful bidder that never has --

22 they don't have standing and they don't ever succeed,

23 obviously, when they challenge these cases in Chancery Court.

24 So I think the good faith is just you hear what the directors

25 relied on.  I think the fact of the mediation, most courts

1  draw some comfort that that made it even more (indiscernible)

2  then if it didn't have that kind of professional oversite, but

3  Your Honor will decide what you think is appropriate to rely

4  on.

5          It's not a preclusion issue.  It's a matter of

6  whether you believe that the debtors have submitted enough

7  evidence to demonstrate a valid business justification for the

8  transaction such as to be entitled to the protection of the

9  business judgment rule.

10          THE COURT:  Another difference from the Court of

11  Chancery is that the debtor is seeking may approval in

12  advance, in essence.  The debtor has to seek my approval.  The

13  code requires it, the bankruptcy code requires it.  When the

14  board is sitting in the board room making decisions about some

15  merger or some other action no court is going to bless that

16  before somebody challenges it.  We're in a different context.

17          So I have always had difficulty fitting the

18  business judgment rule into the correct context of bankruptcy

19  court where I am required to approve something, but your point

20  is that it's a process and terms.

21          MR. KURTZ:  Right.  And Your Honor makes an

22  excellent point.  You have a role, you have a bigger role then

23  the Chancery Court has because you have a role in protecting

24  the estate as well, but I don't think it changes the

25  substance.  I think it changes the timing.  So you get in

1  early and you get to determine whether anything is being

2  diverted in a way that harms the interest of the estate.

3  Whether that happens at this preliminary stage where we're

4  getting approval or seeking approval of the RSA or at the

5  final stage when it's a confirmation issue.  It still raises

6  exactly the same policies and exactly the same standards, and

7  that is really just to make sure that there is no leakage

8  here, inappropriate leakage.

9           There is a wide band of discretion on that as well.

10 You don't have to have the top dollar, you can consider things

11 like the consummation risk and other matters.  That is a broad

12 range for the directors to run their company, but what you

13 never have is the idea that your insurance policies are

14 unhappy.  They may have to pay something because that never

15 harms the stakeholder, that doesn't harm the stockholders in a

16 merger and that doesn't harm the estate here, any of the

17 creditors including themselves in that capacity.

18           THE COURT:  You're running a little further then I

19 think is appropriate on this.  I will note also that I've got

20 claimants who are objecting to the RSA.  So plaintiffs in

21 underlying lawsuits that are objecting.

22           Okay.  You had some -- I've gotten us off a little

23 track.  You've got something further with respect to the

24 discovery issues?

25           MR. KURTZ:  Right.  I will just be brief.  So two

1  last points.  One is on the privilege log.  So we provided a

2  categorical privilege log on, I think, July 9th, so more than

3  a month ago.  And so waiting to the week of the hearing, a

4  month after the fact we think is too much delay and, again,

5  we're a little worried about what that is about.

6          In terms of what a categorical log is I'm surprised

7  to hear counsel say he's never seen one.  We have then all the

8  time in cases I'm involved in.  It relates to privilege

9  because all you're looking for in a log is the ability to

10 challenge it.  We gave our position on mediation.  They can

11 challenge it at any point in time.  They finally have

12 challenged it.  It has nothing to do with the categories.

13         We did give them a line by line item log when they

14 specified their concern on TDP's.  So they do have that, but

15 they have not only waited more than a month, but they have

16 everything they need.  They say they should get the proposals

17 back and forth.  Those are mediation proposals.  They don't

18 get them.  They don't need the burden of pages and pages of

19 each document to know whether that is privileged or not.  So

20 we think they waited too long.

21         The last thing I want to say is just something

22 maybe kind of practical which is Your Honor is being asked,

23 effectively, to deal with competing interests here.  The

24 debtor's interests are in providing you with a complete

25 evidentiary record so that you can consider this milestone

1  agreement and event in the bankruptcy case.  That is, you

2  know, we think a pretty important interest.  The law is that

3  courts prefer to resolve matters on the merits as opposed to

4  through preclusion orders or rather impediments to an

5  evidentiary showing for truth finding and the like.

6         The insurers' interests, they didn't really argue

7  and we haven't really addressed it today, but it's, in large

8  part, been about timing.  And I don't want to deminimize that.

9  I believe that when someone projects dates that they should

10  comply with them more or less.  And so I am not -- you know,

11  I'm not criticizing the criticism, but I think it's mitigated

12  because they're not court ordered schedules, they're not even

13  agreed to schedules, they were the debtor's best efforts to

14  project compliance with production.

15         The original schedule was based on a hearing date

16  that got moved by two weeks.  It's not unusual to miss

17  projected dates and expedited matters. It's especially not

18  unusual where there's privilege issues.  Here there has been,

19  what we think are, really clear violations of a mediation

20  order and 9019 in demanding mediation materials which kind of

21  created more burden and more complexity.

22         So ultimately, and they got all the information,

23  frankly, they got it in furthering advance of these hearings

24  and the proposed depositions then they were going to have

25  under the original schedule.  Originally we had completed our

1  production on July 12th and depositions started on July 14th,

2  two days later.  Here we completed our supplemental production

3  four days before the first proposed deposition.  Under the

4  original schedule our production was done on July 26th.  The

5  hearing was for July 29th, three days later here we completed

6  the supplemental production on August 1st which was eleven

7  days before the hearing.

8          So they actually got more time.  They got

9  everything.  And we think that when balancing the interest and

10 given the heavy standard on the sanction remedy of a

11 preclusion order that we would just ask that the court deny

12 the motion. I hope I answered all your questions.  If I

13 didn't, though, I'm certainly available now to do so.

14         THE COURT:  Thank you.  You know, I read the

15 debtor's papers about how parties were violating the mediation

16 order by their document productions and I have to say I am not

17 persuaded by that.  I don't think the parties who ask for

18 documents, unless they say give me the documents you supplied

19 in mediation, are -- I don't think general requests for

20 production violate my order or the rule.

21         There has to be some balance in mediation.  Judge

22 Carey said that, former Judge Carey said that in Tribune.

23 That is where I am struggling.  But to ask for documents,

24 generally, that are relevant, the fact that they may have been

25 produced in mediation doesn't make a party violate a mediation

1   order for asking for it.

2          I think it is incumbent upon the responding part to

3   raise the objection.  I don't know how one is supposed to

4   anticipate in advance that the general documents you're asking

5   for were only available, were only part of the mediation and

6   that there aren't documents in general categories that were

7   not part of the mediation.  So I am not buying that argument.

8          Okay.  Let me hear --

9          MR. KURTZ:  Your Honor, I appreciate that.  I won't

10  press that.  I will just note that I was relying more on the

11  back and forth afterwards where we were saying we can't give

12  you mediation proposals.  Courts sometimes have different

13  tolerances on mediation.  Maybe I am a little scarred by a

14  recent case in Alabama where the judge literally said he would

15  take a baseball bat to anybody who requested any kind of a

16  proposal, but I appreciate your comments and we will certainly

17  not press that point anymore.

18         THE COURT:  Okay.  Thank you.

19         Mr. Ruggeri, why haven't -- I understand you don't

20  have all the documents you want.  And I understand some of

21  them were redacted, but the debtors did then file the

22  supplemental declarations, which are pretty fulsome, and you

23  had an opportunity to take the depositions, at least, based on

24  -- and question them about statements in their declarations,

25  and perhaps still press for documents.  Why isn't -- you're a

1  good litigator, everyone on here is a good litigator, why

2  aren't you prepared?  Why can't you cross-examine these

3  witnesses?

4          MR. RUGGERI:  Your Honor, I can cross-examine these

5  witnesses.  I'm not going to say that I can't.  I did it in

6  the first round, I will do it this round two.

7          My point, though, is and what I made clear to

8  debtors is that the information is so lacking, and I do want

9  to draw the court's attention to something which is the

10 debtors produced 408 documents on August 2nd.  Of those 280

11 were fully redacted; every single one of the attachments that

12 went back and forth between and among the restructuring

13 support agreement parties was withheld.  Those were the

14 redactions.  Every single one of those was redacted.

15         So we're pressing the motion.  What I told them is

16 in view of the obvious gap here and absence of information,

17 and I will also say that right on the first page of the

18 recitals on the RSA motion, and then right on the first

19 finding in their revised proposed order, document 5769-2, page

20 three of eight, they require the court to find, determine and

21 conclude that the RSA parties have engaged in extensive arm's

22 length negotiations.  Then Paragraph (b), the RSA was

23 negotiated at arm's length, in good faith does not constitute

24 a solicitation of an acceptance or rejected plan and does not

25 violate Section 1125 of the Bankruptcy Code.

1        Look, I understand that Ms. Lauria believes that

2   the good faith or arm's length is, sort of, a tag along to a

3   business judgement finding, it's not. It doesn't need to be

4   made, but I will tell you that even accepting or arguing under

5   the lowest standard of business judgment how in the world can

6   anyone validate someone's business judgment or the court if we

7   don't and the court doesn't know what they considered, when

8   they considered, and what they didn't consider.  That is what

9   is being withheld from us.

10        We're not in a position to -- I can't cross-examine

11   on those issues, Judge, because I don't have the documents. I

12   don't know what they considered.  I don't know what they -- I

13   don't know when they considered.  I don't know what they

14   pushed back on.  If the court wants to see, I didn't say that

15   I've never seen a categorical log; we've all seen those.  If

16   we could put up the categorical log, I've never seen one like

17   this.

18        This is the categorical log I got.  So first page

19   mediation privilege, all I got is March 1st, 2021 to present.

20   Then I got a second page.  Then I got attorney/client and work

21   product, inception to present.  That is not a categorical log

22   in the courts where I litigate, Judge.  You know, you've got

23   to give more than that, but that is what we're facing.

24        No one delayed bringing anything.  They were

25   producing their documents until August 2nd.  We were trying to

1   participate in a mediation.  We made ourselves available from

2   the mediation on August 3rd.  We filed our motion the very

3   next day.  That is the opposite of delay, and I did it, Judge,

4   not to say that I can't cross-examine the witnesses, because I

5   can, I did it because with the findings that they're

6   requesting the court to make the record is not there, I can't

7   cross-examine on the back and forth to which I am not privy.

8   I can't -- I wasn't given the documents that are fair game as

9   the court told all of us, and the debtor told the court two

10  days later on July 29th he took the words to heart that it was

11  going to make a full production; it didn't.  It said it and it

12  didn't.

13          Minor point, I am a creditor, Hartford is a

14  creditor.  We're a holder of an indirect abuse claim.  We have

15  filed proofs of claim, there has been no objection to our

16  proof of claim filed to date.  So I don't think that is going

17  to turn the court on the ruling, but to the extent that the

18  court was interested in that issue.

19          We did cite a Delaware Chancery Court case,

20  Unitrin, it's in our brief.  What the court did there again,

21  because they were asking for a good faith finding the court

22  said, you know, fairness and labor you put those at issue,

23  fairness requires you to produce those communications.  That

24  is the way it sort of plays out here.  So they can't just say

25  there are throw-away requests in here.  They go to the core of

1  this.

2          Is my antenna up about how these things can be used

3  against me; of course it is, of course it is.  It's not proper

4  though to insist that the court make, you know, all of these

5  very findings about good faith, arm's length, extensive

6  negotiations, and then tell me and the court we're not going

7  to show you what we negotiated or what went down.  That is the

8  crux of the issue, Judge.

9          THE COURT:  And which is the case that you cited,

10  the Chancery Court case?

11          MR. RUGGERI:  The Unitrin case.  Bear with me one

12  second, Judge, it is an oldie but a goodie; 1994 Westlaw 507

13  859, Delaware Chancery Court September 7th, 1994.  We studied

14  all their cases outside of Chancery Court including the

15  (indiscernible) case, but that was specifically from the

16  Delaware Chancery Court which made it clear you can't use

17  privilege, even mediation privilege as a (indiscernible)

18  issue.

19          Thank you, Your Honor.

20          THE COURT:  Thank you.

21          MR. SCHIAVONI:  Your Honor?

22          THE COURT:  Mr. Schiavoni?

23          MR. SCHIAVONI:  -- for Century, Your Honor.  Your

24  Honor, I won't duplicate anything Mr. Ruggeri had to say.  I

25  would like to just address your questions about the finding in

1 | the standard and how those two tie together.

2 | Your Honor, I would like to just start with the

3 | basic point here and it should be underlined three times over.

4 | You just heard the debtor say that they don't need a good

5 | faith finding under 363.  I want to start with that point and

6 | I want to end with that point because it really raises the

7 | question about why this is being sought in the first place,

8 | but, you know, we have provided the court with extensive

9 | briefing on why we believe the business judgment standard

10 | doesn't apply here.

11 | I am not going to get into that now, but if the

12 | business judgment standard applies the case law in Delaware

13 | and out of the Delaware Chancery, and out of Delaware

14 | Bankruptcy Courts is really crystal clear that the proponent

15 | of applying the standard in the first instance of the business

16 | judgment standard bears the burden of establishing that the

17 | board complied with its duty of care and its critical to know,

18 | in connection with whether or not the board complied with its

19 | duty of care, what the board considered, how it informed

20 | itself, and the deliberative process that the board underwent.

21 | I tried several cases before former Chancellor

22 | Strine.  It was always a pleasure.  An entertainment also, you

23 | know, to argue before him.  I would say in each of those cases

24 | he didn't even ask for briefs (indiscernible).  The very first

25 | thing he would ask for is please submit to the court a set of

1  the board minutes and the board authorizing resolutions.  That

2  was the starting point, you know, to establish whether or not

3  the business judgement rule applied.

4        Chancellor Strine would review the board minutes.  I

5  can't even imagine a case where I gave him -- where I would

6  hand-up board minutes that were entirely redacted or look at

7  them and tell them we don't have a resolution here authorizing

8  this act to show you.  It's all privileged, and that is

9  starkly the situation we have here.

10       You will not see a resolution that authorizes this

11  transaction, you won't see it.  It's what they've told us,

12  what the testimony was in the depositions was that the board

13  gave authorization for specific individual items to then be

14  pursued.  We don't have those.  That is critical to know what

15  they -- what specific items they approved.  And let me explain

16  why that it, why that is critical to know.

17       Why is it that they are seeking good faith findings

18  here, that they acknowledge that they don't need.  What we

19  have contended, Your Honor, as -- it's like there may -- it

20  may well be the case that there was arm's length negotiation

21  about what the Boy Scouts themselves were economically going

22  to contribute to this RSA, the dollar amount of what they were

23  going to put in.  They had an economic interest in that issue

24  obviously, whether it was, you know, one number or a higher

25  number.

1          They may have argued about that very extensively

2   for a better part of a year, but once they reached an

3   agreement with the coalition capping that, capping what their

4   economic contribution was they no longer had any economic

5   interest in what the claims were going -- what claims would be

6   allowed and what they would be allowed for, what the valuation

7   were.

8          Look, if it's not clear the whole case of

9   objections here is being driven by what we believe to be a

10  core deal that was fundamentally collusive.  It's not -- this

11  is not the first time the court has seen this particular kind

12  of group of plaintiffs act in this sort of way.  You have

13  before you the back and forth that's gone on in Imerys where

14  there was direct evidence, I think an admission that the

15  allowance and valuation procedures were turned over

16  exclusively to the tort claimants.  That is our belief on what

17  happened here because we weren't involved in it at all.  We

18  were excluded from all the meetings that concerned setting the

19  allowance and valuation proceedings.

20         So when you hear the debtor say that when the

21  business judgment standard applies you're to presume that the

22  board was informed and presume that they were -- that there is

23  good faith, that is not in line with the context of this case.

24  When these two parties went into a room together to finalize,

25  or prepare, or whatever one wants to call it, arrange a TDP to

1  set what claims would be allowed and how they were valued; the

2  debtor had no interest, no economic interest in the outcome of

3  that except whether or not it got an agreement on the cap on

4  the debtor's economic contribution.

5          Now we would say that in a coverage context and

6  other contexts that was collusion.  There's court cases on

7  this that, you know -- and by the way, a debtor, a party is

8  allowed to breach a contract.  They may have done that.  They

9  may have exercised their business judgment to bridge the

10 contract to get a deal on the debtor's assets, okay, but the

11 deal as far as whether that aspect of the deal agreeing on the

12 value and the allowance of the claims was in good faith.  It's

13 like it just couldn't be, it's like the case law on this is

14 really clear.  If the two parties are negotiating one doesn't

15 have an economic interest, they're not operating, you know, in

16 favor of their own interest, but whether or not --

17         THE COURT:  I'm not blessing the deal, Mr.

18 Schiavoni.  I think everybody should be clear on the fact that

19 I'm not blessing the deal, okay.  You're going to have all

20 your arguments, which I'm sure I'm going to hear again at

21 disclosure statement and then I'm going to hear if I approve a

22 disclosure statement at confirmation.  I am not, in any way,

23 at the conclusion of this hearing going to enter any order

24 that even suggests that I approve the deal, okay --

25         MR. SCHIAVONI:  Your Honor --

1          THE COURT:  -- which is why, I guess, I asked, in

2    part, what is this good faith finding about.  What could it

3    possibly mean in the context of this case.  I am not sure it

4    means anything, but I am not approving the deal.  And even --

5          MR. SCHIAVONI:  Your Honor, I'm going right --

6          THE COURT:  -- if I were to enter an order

7    permitting the debtor to go forward, which is, sort of, how I

8    view this, permitting the debtor to go forward to pursue this

9    plan I take Judge Glenn's statements to heart in ResCap where

10   he says something to the effect of but there's a lot of

11   challenges with respect to this plan.  There are a lot of

12   difficult issues with respect to this plan and I am not

13   approving any of them.

14          So that is the context of this hearing which I

15   think is much more limited, but go ahead, Mr. Schiavoni.

16          MR. SCHIAVONI:  I'm sorry to have interrupted Your

17   Honor, this video feed I have problems getting used to.

18          So, look, just to close out on the finding my point

19   is not what you are going to approve here or not, but this

20   finding is toxic.  I don't know how to put it, but it's toxic

21   to us.  It is what caused all of the discovery and the need

22   for it because they have said they don't need it.  The reason

23   they want it is to prejudice us in proceedings outside of this

24   court.  There is no other reason for it.

25          This is to draw a finding that they can waive in

1  front of a State Court and say, you see, a court found that

2  the negotiation of the TDP was at arm's length and it was in

3  good faith.  That is what they want it for.  You know, I think

4  the coalition in its papers that they submitted in support of

5  the RSA I think they're pretty clear in what they're seeking

6  and what they're trying to do.  They're saying now is the time

7  to bring out all insurance issues and we're going to try these

8  insurance issues in this case.  We're going to advocate at the

9  end of this that we don't think this good faith finding it

10  appropriate or necessary, and we'd ask that it not be made.

11         If I could just spend one minute on why this --

12  it's like Mr. Kurtz did, sort of, short thrift the importance

13  of the documents and I definitely like embrace my brother

14  Ruggeri's bravado that he can cross, he can cross anyone, but

15  the reason why we're at a significant disadvantage here is

16  that in Chancellery when the evidence that is presented to

17  establish in the first place that business judgment applies is

18  the evidence of you care and diligence.  It's the complete

19  board minutes so that you can -- these are the contemporaneous

20  documents that establish what the board considered, how they

21  deliberated and what they decided.

22         It's like what we're going to see happen here is

23  they're going to put on a witness who has never been deposed,

24  who only came in on reply and he's going to tell you that,

25  he's going to tell you what they deliberated about, what they

1  considered and what they resolved, but we won't have any of

2  the contemporaneous documents that establish that.  It's

3  remarkable that we don't have the enabling resolution or

4  minutes on what was established.  That, I think, all by itself

5  would knock out a business judgment ruling in chancery at the

6  start, but to hear it after the fact -- by the way, not from

7  somebody who was even at the negotiations, but this fellow,

8  Mr. Desi, they had to find a lawyer, you know, to testify

9  after the fact.  He is going to testify about this after the

10 fact when we'll have nothing to cross him on to present to the

11 court, well, here's what was done contemporaneously.

12         You got a preview of this already, Mr. Kurtz sort

13 of says, well, who cares about the fact that they didn't

14 actually authorize the RSA in its entirety, they just

15 authorized specific points, your points.  You want me to

16 cease, Your Honor, or you --

17         THE COURT:  I'm with you now.

18         MR. SCHIAVONI:  Okay.  It's like he, sort of,

19 glosses over the fact that he doesn't -- like who cares if the

20 board only authorized some specific point, but not the

21 agreement itself because -- and I'm sure that's what we'll

22 hear from Mr. Desi that all of a sudden (indiscernible) have

23 approved the agreement.  That is not what we heard when we

24 deposed Mr. Ownby, the chair.  He was like, no, there were

25 only specific points.

1      Your Honor, if we had those board minutes I'm sure

2   they would bear out our suspicion here that the points were

3   the dollar number that the Boy Scouts were going to contribute

4   and that there's nothing in there about setting TDP's that

5   have allowance procedures or valuation procedures that in any

6   way turn on what was realistic in the tort system; that's not

7   a deal point, that wouldn't be a deal point and we need to see

8   the resolutions to be able to cross on that.  Without them Mr.

9   Ruggeri will do a fine job asking questions, no doubt.  But he

10  won't have the benefit of having in front of him the

11  contemporaneous documents that show what actually was done and

12  there is nothing privileged about what the board actually

13  concluded.

14      THE COURT:  So let me ask you, Mr. Kurtz, were

15  there no board minutes and authorizations supplied?

16      MR. KURTZ:  That is not accurate, Your Honor.

17  There were board minutes that were supplied.  They -- there is

18  a number of them.  There was an agreement to recommend to the

19  board from the committee; that was, I think, on May 25th.

20  Then on June 5th is where the deal terms were approved by the

21  national executive board and that was supplied as well.

22      THE COURT:  Is there no board resolution?

23      MR. SCHIAVONI:  Not the terms themselves.

24      THE COURT:  Is there no board resolution approving

25  the RSA?

1        MR. KURTZ:  No.  I don't believe, Your Honor, there

2   is actually a formal resolution.  What happened is they

3   authorized the committee members to document the deal terms

4   that had been proposed.

5        THE COURT:  That is a little unusual, isn't it?

6   Isn't it a little unusual that a board doesn't actually

7   authorize the actual agreement?

8        MR. KURTZ:  Well I think the testimony will be that

9   they authorized the deal terms, they delegated the

10  documentation to the professionals.  There were members of the

11  board that are attorneys that then commented on the

12  documentation and ultimately it was approved and put forward,

13  but, Your Honor, I don't know that it was the world's most

14  formal procedure in terms of documenting the approval, but you

15  got a yes vote from all 72 board members on these deal terms.

16       I would note that Mr. Schiavoni is saying he's

17  entitled to see what happens and what they considered.  He is

18  and he can ask that.  What he is not entitled to is the back

19  and forth in the mediation, but what the board actually looked

20  at, what they relied on he can ask those questions and they

21  will tell him exactly that information.

22       There is no decision -- I mean I've also tried

23  cases before former Supreme Court Justice Strine and I've

24  never seen him violate a mediation privilege.  I recently

25  tried a case, maybe it came up under him, Vice Chancellor

1  Laster, mediation was a core issue in a multi-billion dollar

2  case.  He didn't invade it at all.

3           So, right, in the normal case where you don't

4  mediate because you're just doing a deal, you don't mediate an

5  M&A sale, you run a process through an investment bank.  Of

6  course the minutes are produced.  But when you are resolving

7  litigation in a mediation that doesn't get produced, that

8  doesn't prevent the court from evaluating the appropriateness

9  of the terms and it has not prevented prior courts from

10 relying on the fact of mediation to draw some comfort on the

11 extensive good faith negotiations.

12          I get it, Mr. Schiavoni says the debtors have no

13 economic interest in TDP's.  The law demonstrates that there

14 was a back and forth.  Who came up with the precise number

15 doesn't really matter.  You will get -- you will have, when

16 the time comes, and Your Honor correctly pointed out now is

17 not the time, you will get evidence on how that was produced

18 in terms of actuaries and the like, people that determine

19 claim amounts.  That is not relevant to today.

20          Mr. Schiavoni says that the debtors don't have an

21 economic interest and, therefore, it's, by definition he said,

22 collusive or something along those lines.  That is his

23 argument.  That doesn't require invasion of the mediation

24 privilege.  He is saying it lacks economic interest

25 (indiscernible), but, you know, good luck with the argument.

1  There is, obviously, nothing collusive.

2          If Your Honor has any concern that anyone appearing

3  before you in your court is being collusive, again, I would be

4  happy to submit, in camera, for review because that is really

5  a pretty outrageous allegation to make against the

6  professionals and the clients involved in this case.

7          THE COURT:  Okay.

8          MR. SCHIAVONI:  Your Honor, if you look at this log

9  --

10          THE COURT:  I think I've heard enough on this.

11  Here is what we're going to do, as to this motion we're going

12  to go forward.  I am going to hear the testimony.  I will make

13  a determination as to what information I need to make the

14  rulings I need to make and only the rulings I need to make

15  with respect to approval of the RSA.

16          I will, as I hear the testimony, consider these

17  objections to discovery.  I am a little surprised that there

18  wasn't a board authorization of the RSA especially given the

19  lawyer heavy consensus that the Boy Scouts seem to have on

20  many of these boards.  Grant it, they're not acting in their

21  lawyer capacity, necessarily, but it seems to be somewhat

22  lawyer heavy.  So I am a little surprised, but I'm going to

23  permit it to go forward and we will see what testimony we get

24  and we will see whether the debtor is able without an

25  authorization to convince me that they have met the business

1  judgment standard or they're entitled to business judgment

2  standard, and they have made informed decisions, and they've

3  made decisions.  So we're going to do that.

4          I will say with respect to mediation privilege this

5  is really the first case that I have had this issue come up.

6  Its, I think, a little perplexing.  There is no question that

7  mediation is an important process and we use it in bankruptcy

8  not infrequently to come to consensual resolutions of cases.

9  But being able to cloak everything in mediation privilege I am

10  finding difficult.

11          I think it is or it could play out differently in

12  different contexts as to whether a debtor can meet its burden

13  or not depending on how much its shielding and how much its

14  relying on that privilege.  So I will be thinking about this

15  and mediation privilege because it seems to be people arguing

16  almost an all or nothing concept; send us to mediation and let

17  us cloak everything in privilege or no mediation and then

18  perhaps no consensual resolution.  Neither of those seem

19  appropriate.  There seems to be something in between that.

20          So for purposes of today I am going to permit it to

21  go forward and if I feel after I've heard the testimony that

22  parties seeking discovery were to prejudge I will deal with

23  that.

24          I want to take five minutes so I make sure I have

25  the document in front of me that I don't have before we

1  continue again.  So we're in recess for five minutes.

2        MR. ABBOTT:  Your Honor, may I be heard quickly

3  before that?

4        THE COURT:  Mr. Abbott?

5        MR. ABBOTT:  Thank you, Your Honor. I think Your

6  Honor has now effectively ruled on item number 6.  7 and 10

7  are slightly different issues.  It wasn't clear to me whether

8  Your Honor was just going to get to the merits of number one

9  or wanted to hear 7 and 10 when the court returns.

10        MR. SCHIAVONI:  We could be heard briefly on 7,

11  Your Honor, or 10, maybe it's 10.

12        THE COURT:  Yeah, the Hartford --

13        MR. ABBOTT:  7 is the coalition's motion and 10 is

14  the insurers' motion.

15        THE COURT:  I will hear both of those, but from the

16  coalition's motion my understanding is Hartford isn't going to

17  put on a case on the merits of the Hartford agreement.  So I'm

18  not sure what we're arguing about, but, yeah, I will hear

19  briefly on both of those when we get back.  Thank you.

20        MR. ABBOTT:  Thank you, Your Honor.

21      (Recess taken at 11:52 a.m.)

22      (Proceedings resumed at 12:02 p.m.)

23        THE COURT:  Okay, counsel, this is Judge

24  Silverstein.  We're back on the record.

25        MR. ABBOTT:  Thank you, Your Honor.  I think that

1 leaves us at number 7 which is the coalition motion.  So I

2 will cede the podium to, I believe, Mr. Goodman.

3          MR. GOODMAN:  Thank you very much.  Good afternoon,

4 Your Honor.

5          If Hartford and the other insurers do not intend on

6 asking any questions or eliciting testimony regarding the

7 reasonableness of the Hartford settlement then our motion is

8 moot.  I don't know if they have committed themselves to that.

9 This came up at the deposition which is why we filed our

10 motion.

11          Your Honor, it's hard for us as litigants and the

12 court to evaluate an opinion when we don't know what it is

13 based on.  I asked Mr. Kenny if he thought the Hartford

14 settlement was reasonable.  Mr. Kenny, Hartford's vice

15 president, clearly loves the Hartford settlement.  The

16 Hartford settlement is a great deal for Hartford, that's not

17 in dispute.  But when I asked Mr. Kenny what his opinion was

18 based on he claimed privilege.

19          Hartford and the debtors --

20          THE COURT:  It seems to be what we do in this case,

21 right?

22          Okay.  Go ahead.

23          MR. GOODMAN:  Hartford and the debtors would not

24 have signed the Hartford settlement if they both thought it

25 was a terrible idea.  I thought it was a terrible idea, but I

1  couldn't the witnesses today will say they made a mistake.

2  But the question is, what to do with that testimony today.  Is

3  it even relevant to the RSA, and if it is relevant, and

4  Hartford seems to think it is, should it be considered?

5          If we don't have the information necessary to

6  evaluate, lay opinion testimony, should the Court consider it?

7          Bates White, the debtors' economic consultant is

8  not here today, neither is NERA Economic Consulting,

9  Hartford's advisor.  You won't hear from witnesses that are

10  experts in evaluating abuse claims.  No psychologists are on

11  deck to testify.

12          What may be offered, instead, would be opinions

13  from people that they've reviewed reports created by others.

14  We don't have those reports.  We don't have all the data that

15  those reports are based on and it's not for lack of effort,

16  Your Honor.

17          Just after the debtors announced their settlement

18  with Hartford, we served discovery.  By "we," I mean, the

19  coalition, the TCC, and the FCR, together.  We served three

20  parties:  Hartford, Century, and the debtors.  We knew that if

21  the day ever came that the Hartford settlement was before this

22  Court, we had to be ready to oppose it.

23          Hartford produced nothing.  They won't produce any

24  documents.  They refuse to answer even basic questions at

25  deposition.

1          Century was actually worst.  First, Century said we

2     need 30 days to respond, then they said they would produce

3     something.  Then they gave us several bankers boxes that

4     included the publicly filed financial statements that they

5     knew we already had.  When we asked for additional production,

6     they refused.  Century apparently gave some financial

7     information to the mediators, but Century has taken the

8     position that this means that their financial information is

9     now privileged and can't be produced.

10          We have also filed two letters with the Court at

11     Docket 5057 and 5835, requesting an order compelling Century

12     to produce the requested information.

13          The debtors have produced some, but not all of the

14     settlement data.  We have several years' worth, but not all of

15     it.  To be clear, we do have our own settlement data; we don't

16     dispute that.  We have also reached conclusions regarding the

17     Hartford settlement, based on that information, and we think

18     the Hartford settlement is well outside the range of

19     reasonableness.  But the information that has been withheld

20     creates a problem when it comes to assessing the opinion

21     testimony that may be offered today and tomorrow.

22          There are two blacks boxes regarding the Hartford

23     settlement that I want to talk about.  The first black box to

24     Century, no one knows what the Hartford settlement is worth.

25     Hartford has not agreed to pay anything.  The $650 million

1  referenced in the Hartford settlement is not what Hartford has

2  agreed or even offered to pay.  The $650 million is simply a

3  negotiated cap on Hartford's liability.

4           There's a clause in the Hartford settlement at

5  paragraph 2(e) and it says that if Century settles for less

6  than $1.3 billion, the Hartford number goes down.  Hartford

7  says, if Century pays less, then we pay less.  But if Century

8  gets pegged with a twenty-billion-dollar judgment, then we

9  only pay $650 million.  Heads, I win; tails, you lose.

10           Hartford could pay nothing.  It depends on Century.

11  But the rabbit hole actually gets deeper.  Century is in

12  what's called runoff.  Century is not an active insurance

13  company.  We can't tell from Century's publicly available

14  financial information if Century even has $1.3 billion in

15  available assets.  You are welcome to ask Mr. Schiavoni the

16  question, but I don't think he will tell you that Century has

17  the ability to pay $1.3 billion, which leads me to my next

18  point.

19           We don't think Century, alone, is liable here.

20  It's Chubb.  The twenty-billion-dollar elephant in the room is

21  Chubb.  Mr. Schiavoni represents Chubb.  Chubb is the largest

22  publicly traded property and casualty insurance company in the

23  world.  It's time everyone here gets comfortable with the fact

24  that they are in the room and have been for long time.

25           The insurance policies we're talking about were

 1  issued by a company called IMA.  Back in the 1990s --

 2              THE COURT:  Mr. Goodman --

 3              MR. GOODMAN:  -- IMA and its subsidiaries underwent

 4  a restructuring --

 5              THE COURT:  Mr. Goodman --

 6              MR. GOODMAN:  -- and purported to assign IMA's

 7  liabilities to Century.  The Boy Scouts didn't consent to

 8  this.  IMA is an active insurer and a subsidiary of Chubb.

 9              Now, Century and Chubb could give us the

10  information --

11              THE COURT:  Mr. Goodman --

12              MR. GOODMAN:  -- that we've within requesting for

13  months.

14              THE COURT:  Mr. Goodman --

15              MR. GOODMAN:  Yes, Your Honor?

16              THE COURT:  -- why is all this relevant?  Why am I

17  hearing all this?

18              I have read the papers.  I understand that Chubb is

19  out there.  I understand there's going to be an issue there.

20  I understand all that.

21              What's it relevant to today?

22              MR. GOODMAN:  It's a gating issue, Your Honor, to

23  the Hartford settlement.  We don't know if the Hartford

24  settlement actually means anything.

25              THE COURT:  Okay.  So, the Hartford settlement --

1    MR. GOODMAN:  It's illusory from that standpoint.

2    THE COURT:  The Hartford settlement is not in front

3  of me today in terms of its merits, so what does it have to do

4  with today?

5    MR. GOODMAN:  Well, again, Your Honor, I don't

6  think the Court can or should credit testimony from anyone

7  that says the Hartford settlement is reasonable when no one

8  has any idea what Hartford will pay if it's approved.

9    Now, if that testimony isn't going to be offered or

10  elicited, then you're right.  As I said at the outset, if no

11  one is going to go there with their questioning, then this

12  motion is moot.

13    THE COURT:  The argument that I understand that

14  Hartford has today is that it has a binding agreement with the

15  debtors that the debtors are not performing.  And the debtors

16  tell me it's one or the other; the agreements are mutually

17  exclusive and that's what I have to deal with today.

18    But the merits of the Hartford settlement, as I

19  understand it, are not in front of me today, so let's find out

20  if that's the case.

21    Who's representing Hartford on this one?  Am I back

22  to you, Mr. Ruggeri?

23    MR. RUGGERI:  Back to me, Your Honor.  I thought I

24  was clear.  I wasn't asleep, but I was close when I responded

25  on August 5th at nearly eleven o'clock at night.  My email is

1  pretty darn clear.  The Court is exactly right what's before

2  the Court today and tomorrow was not before the Court today

3  and tomorrow.

4          There is no motion to approve the Hartford

5  settlement.  We are not going to elicit testimony on

6  reasonableness of the Hartford settlement.

7          I will say, just for the record, and we don't need

8  do get into it because it kind of went off on a tangent, Mr.

9  Goodman's recitation of the transcript and what happened is

10 entirely incorrect, but you don't want to hear that.  We can

11 deal with that if we have to, at the appropriate time.

12          You're exactly right in terms of what's before,

13 what's not before.  I said I could cross anyone.  I'd like to

14 think I can, but I really didn't have much of an opposition on

15 this one because the Court's right; we're not seeking to ask

16 the Court to approve the Hartford settlement or to argue its

17 reasonableness today or tomorrow.

18          Thank you, Judge.

19          THE COURT:  Thank you.

20          Are we good, Mr. Goodman?

21          MR. GOODMAN:  I am.  Nothing further, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          Okay.  Item 10, Mr. Schiavoni?

24          MR. SCHIAVONI:  I apologize, I had the mute on.

25          Your Honor, this *motion in limine* is directed at

1 the specific area of relief that's sought as part of the

2 motion to approve the RSA.  It's directed at the request to

3 pay the coalition $10 million and then $950,000 on a monthly

4 basis.

5           We served discovery requests, requests for

6 production on Brown Rudnick, as well as on the debtor that's,

7 you know, sought -- that's propounded multiple requests

8 directed specifically at the coalition/Brown Rudnick's demand

9 for payment of fees.  It was served on May 14th on Brown

10 Rudnick and a set was served around then on the debtor and

11 another set on July 3rd.

12           We propound specific requests, 1 through 3, for

13 instance, on Brown Rudnick.  We specifically asked for all

14 documents concerning the demand to be paid their paid fees,

15 whether in connection with these various demands made, in

16 connection with the plan and the TDPs.

17           We received, in response to that from Brown

18 Rudnick, a blanket objection not producing anything.  The

19 Brown Rudnick subpoena response asserts, as well as in the

20 multiple meet-and-confers that followed, that absolutely

21 everything that they have that they've exchanged with adverse

22 parties, whether in the mediation or otherwise, is privileged.

23           And the debtor, you know, largely gave us the same

24 response with regard to communications that had anything to do

25 with this request demand for monies to be paid to the state

1  court lawyers or to reimburse or pay Brown Rudnick.  It's an

2  absolute assertion of privilege.

3         And, you know, I use mediation all the time.  I use

4  it in bankruptcy.  You know, I'm a big proponent of it, but,

5  you know, to be clear, you have to look at everything in the

6  context of what happened here, not unlike in <u>Imerys</u>.  You

7  know, the negotiations took place between the debtor and the

8  claimants and there was this driving matter, we believe the

9  discovery would show if we had access to it, that a trade-off

10  was made about what the debtor contributed in exchange for a

11  free pad to draft an extraordinarily onerous and unrealistic

12  allowance procedures and valuation procedures.

13         And that would be a breach under our contract to do

14  that.  The only way we could achieve that is to go on and

15  continue the case, get a mandatory order imposing

16  confidentiality over all the meetings and discussions between

17  the coalition and the debtor, and then keep all of that

18  evidence from ever seeing the light of day.

19         And we think that's what happened.  I mean, we've

20  been very clear throughout these proceedings that we were,

21  although, you know, I was invited to sessions and sat on

22  different floors and I was fed, you know, at different breaks.

23  We were excluded from all the meetings between the debtor and

24  the coalition.  We didn't get any drafts of the TDPs and, you

25  know, we think what went on there was, really, not right.

1          But this demand for fees is a very specific request

2   on the *in limine*.  We think it tainted the discussions

3   throughout that there were, you know, demands for a *quid pro*

4   *quo* of paying the fees in connection with doing a deal.  And

5   it's black and white, that Brown Rudnick refused to produce

6   anything.  The debtor refused to produce any communications

7   with the claimants about those requests for fees.

8          As far as, you know, how we're entitled to this,

9   you know, we have argued that 503 applies here, substantial

10  contribution, and not 363.  But whether or not 363 or 503

11  apply, the proponent of a request for fees still carries the

12  burden.  And even if it's under a 363 standard, you know, and

13  even if the standard applies of business judgment, they still

14  have to make out the basic elements of proof that the Board

15  acted in due care, that they followed all procedures, that

16  they were diligent in what they reviewed.

17         And we asked for production of the documents they

18  got concerning the request for fees, the schedules, you know,

19  if there were any schedules or other documents that showed

20  what they considered and reviewed.  One would have thought

21  they would ask for time reports or time summaries or time

22  projections, all that sort of thing, to make some sort of

23  reasoned judgment.  One would have thought there would be

24  board minutes discussing the propriety of paying these kinds

25  of fees, especially in the context of this particular odd

1  instance where the deal, itself, the contract is one not with

2  the claimants, but with the lawyers who were asked to make

3  simultaneously, a recommendation of advice to their client.

4  And I'm not -- we'll save those arguments for later.

5          But, you know, we put before the Court the

6  decisions in Combustion Engineering and in Congoleum, where

7  courts found there were serious legal issues about paying a

8  lawyer to sign a contract to make a make a recommendation.

9  One would have thought they would be deliberative to have

10 (indiscernible) about this.  One would think there'd be a

11 resolution, you know, making the decision authorizing it.

12         Nothing.  It's like there's one four-word reference

13 to somehow this issue coming up in one of the board minutes

14 and that's it.  So, we don't have anything from the coalition

15 -- blank slate.

16         And, by the way, not just on this, but anything; no

17 termsheets, no production of, you know, even drafts of the

18 plan.  Absolutely nothing.

19         Mr. Goodman's position is everything they have done

20 is entirely subject to mediation privilege.  Convenient,

21 because we think, yes, that is (indiscernible) from what we

22 think would be evidence of what went on.

23         As far as, then, what the -- and those requests

24 that are attached, it's 8 and 9 and 18 and 19 of the debtors'

25 request -- of the request of the debtors, 1 through 3.  To

1   Brown Rudnick, it's Exhibit G and H is the response from the

2   coalition and the debtors to our supporting declaration.

3           The case law on this is a case that's really

4   directly on point.  It's not a circuit case, but the facts are

5   directly on point.  Royal Park v Deutsche, a Southern District

6   of New York case -- that's WL9802844 -- where it talks about

7   how distorted, really, a hearing would be if a party was able

8   to withhold all document concerning a matter and then later

9   sort of present testimony at hearing how both, inefficient

10  that is, how abusive it is to the process, about how you're

11  just sort of not able to do contemporaneous sort of, like,

12  cross without the contemporaneous documents.

13          What's, I think even a little bit more startling

14  about this, and, again, you know, Mr. Ruggeri's argument to

15  this motion, it covered a lot of things, so it's hard to sort

16  of grasp what's really going on here, but here, the only proof

17  they offer was that this very cursory declaration on the

18  moving papers from Mr. Whittman saying, basically, he sort of

19  thought the coalition was helpful in doing a settlement.

20          Then, on reply, after they had sort of seen what

21  the objection was, he puts in a little bit more robust where

22  he says, well, they gave one or two, you know, they gave some

23  documents here or there.  Of course, those documents were not

24  -- it's like they gave some documents on their claims; mind

25  you, that's the coalition's own claims, but those documents

1  weren't produced.

2           What's really important here is when we questioned

3  Mr. Whittman at his deposition, we asked him basic questions

4  like -- let me just read you one.  It's Exhibit J in our

5  declaration, but it's 125, 9 through 16 to Mr. Whittman's

6  deposition.  We asked:

7           "Focusing on the monthly go-forward fee, which I

8  think is 950, up to 950 a month, how did the debtors and the

9  coalition come to agree on that number and then

10  (indiscernible)?

11           " Objection, to the extent it requires you to

12  disclose any mediation privilege information.

13           If you can answer, go ahead.

14           "I cannot."

15           And then he's asked again.  He's asked about the

16  ten-million-dollar number.

17           Again, direction not to answer.  It's 127, 6

18  through 11.  Same instruction, no answer.

19           Again -- and these are quoted in our papers.  I

20  won't go through all of them -- he's asked, What did they do

21  to review -- this is Mr. Whittman -- what did he do?

22           It's like he just -- you know, he put in his

23  declaration saying, oh, this is reasonable.  What did you do

24  to review documents or invoices to ascertain their

25  reasonableness?

1    Directed not to answer, 162, line 21, and then it

2  carries on to the next page.

3    Now, there's another direction that, you know,

4  where he was asked, Did the coalition provide documentation to

5  the debtors to support their request?

6    They were directed not to answer.

7    Now, when we -- and that's 128, line 9 through 16 -

8  - we engaged in this process.  To Mister (indiscernible), we

9  said, look, it's like you're now proposing to put up

10  witnesses, but we don't have the documents.  And you know, his

11  view is sort of like, you can question the witnesses and maybe

12  we'll supplement.

13    What he did was he got back to us with a letter

14  where he told us directions he would drop, and here, we

15  attached that letter to our brief.  It's Exhibit K, I think,

16  here, and it withdraws certain directions.

17    They withdraw the direction to Mr. Whittman about,

18  you know, was the coalition, did they provide documents to the

19  debtors to support their request?

20    That's withdrawn, but the documents, themselves,

21  weren't produced, okay.  And they didn't withdraw the other

22  directions not to answer.

23    So, yeah, I can hear them say, well, like, we

24  should have gone ahead with more depositions of Mr. Whittman,

25  but what would we have been left with?

1        It's like they didn't produce the documents and

2   they stood on the directions not to answer on the

3   deliberations.  So, you know, will be hear later today from

4   Mr. Whittman, I'm sure, in particular, that all the different

5   ways he thinks, maybe after the fact, the coalition might be

6   helpful?

7        We could hear that, but we don't have any of the

8   documents that they actually exchanged at the time and that's

9   really critical here because the Court, in essence, has before

10  it the quid, but it doesn't have the pro quo, on how these

11  fees were demanded and what they were in connection with.  And

12  it doesn't have if we're right and the substantial

13  contribution standard applies, it doesn't have any evidence at

14  all that suggests that any of these fees, whatsoever, were

15  incurred in connection with an activity that wasn't just to

16  advance the coalition's own interests.

17       And those documents are really critical, you know,

18  to any evaluation of this issue at all, especially when in the

19  context of this, we asked Mr. Mosby at his deposition and Mr.

20  Ownby about this fee demand.

21       And, look, I got it that perhaps the dollar number

22  here seems to, like, be the tail wagging the dog where we have

23  people like Mr. Goodman going around saying that there's,

24  whatever he said today, that there's a ten-million or hundred-

25  million-dollar obligation here, but it isn't a tail wagging

1  the dog on how the deal came about and that demands were made

2  and what *quid pro quos* were made.  It has some real importance

3  there and the facts of it really go directly to the

4  substantial contributions standard.

5          But Mr. Ownby, he couldn't answer basic questions

6  about even who came up with the idea to propose these fees.

7  That's 118, 10 through 13 of his deposition.

8          And Mr. Mosby distanced himself entirely from the

9  entire issue, saying that he couldn't think of any analysis

10 they had done or, you know, things that they had reviewed.

11 That's 228, 8 through 17.

12          So, Your Honor, we don't think it's fair or they

13 should be permitted to now put on evidence through Mr.

14 Whittman about something about what the coalition allegedly

15 did to justify these fees when they withheld, essentially,

16 everything and most particularly, the communications that went

17 back and forth and whatever authorizing board minutes there is

18 that authorizes these, which we have yet to see.

19          Thank you, Your Honor.

20          THE COURT:  Thank you.

21          Who's responding?

22          MR. GOODMAN:  Your Honor, I'll take the first shot

23 at trying to respond to this one.

24          THE COURT:  Mr. Goodman?

25          MR. GOODMAN:  Mr. Schiavoni told us two months ago

1  that what he was really after were the draft termsheets and

2  the draft of the RSA.  Those are the communications that he's

3  been seeking.  Century's counsel sent a subpoena to my law

4  firm, Brown Rudnick.  The subpoena sought draft termsheets and

5  drafts of the RSA.

6          No deal had been reached at the time that we

7  reached that subpoena.  We were in the middle of mediation; in

8  fact, he went to the mediators.  The mediators informed us

9  that the drafts were privileged, that we should continue with

10  the mediation, and try to reach an agreement.  That (audio

11  interference) did.

12          We did not produce the termsheets marked as

13  mediation privilege because we couldn't do so.  The drafts of

14  the termsheet do not exist independent of the mediation.

15          THE COURT:  Okay.  That's --

16          MR. GOODMAN:  They were settled and proposals

17  exchanged.

18          THE COURT:  Okay.  But I don't --

19          MR. GOODMAN:  I'm sorry, Your Honor.

20          THE COURT:  That's not what I heard Mr. Schiavoni

21  asking for right here.  Here, what I heard him talking about

22  was Mr. Whittman's declaration, I mean his deposition, in

23  which he was instructed not to answer particular questions,

24  documents provided to the debtors so they could make a

25  determination with respect to the reasonableness of what I

1  assume was a request from the coalition for fees, about the

2  bills appeared the invoices, and any authorizing minutes.

3  That's what I'm hearing him talk about, not termsheets, not

4  stuff going back, but what happened recently and the

5  particulars of the RSA.

6              So, what about those issues?

7              MR. GOODMAN:  Okay.  Well, to level set, Your

8  Honor, we have not provided our invoices or our bills to the

9  debtors.

10             THE COURT:  Oh.

11             MR. GOODMAN:  We don't have them.

12             THE COURT:  Okay.

13             MR. GOODMAN:  Under the RSA -- I want that to be

14 very clear -- under the RSA, for the period preceding the

15 Court's approval, which I hope we obtain, of the RSA, we're

16 entitled to our documented and reasonable fees up to $10.5

17 million.  The debtors are not required to pay $10.5 million

18 unless our documented and reasonable fees are at or exceed

19 $10.5 million.  We have not substantiated our entitlement to

20 $10.5 million yet.

21             If our documented --

22             THE COURT:  So, how did you come up with a number?

23 How could anyone negotiate around a number when they don't ebb

24 know what anything is?

25             Go ahead.

1    MR. GOODMAN:  Again, Your Honor, it would be a cap.

2    So, if our documented and reasonable fees are below, we come

3    in under budget, then we would be paid in full.  If the

4    documented fees were, say, $11 million, then we're capped; we

5    only get 10.5.

6         The RSA requires the debtors to pay the documented

7    reasonable fees up to a capped amount.  We don't just get

8    $10.5 million.  Let me say that again.

9         THE COURT:  I understand that.

10        MR. GOODMAN:  The approval of the RSA --

11        THE COURT:  I understand that.  I don't need an

12   explanation of that.

13        MR. GOODMAN:  Right.

14        THE COURT:  Okay.  We know the debtors got no

15   information from the coalition with respect to fees and

16   negotiated a number in the absence of any knowledge of that.

17   That's what you're telling me.

18        MR. GOODMAN:  I'm saying that they negotiated a cap

19   saying, we will agree to pay reimbursement, but only up to a

20   certain dollar amount.  If you go over, that's too bad.

21        THE COURT:  Okay.

22        MR. GOODMAN:  If you're under, then it can be paid

23   if they're reasonable, Your Honor.

24        THE COURT:  Okay.

25        MR. GOODMAN:  And, again, on a go-forward basis, I

1  think the arrangement is the same.  I think the nine hundred-

2  and-fifty-thousand-dollar number is a cap that the debtors

3  have imposed on us in terms of the reimbursement of our fees.

4  If we're over that amount, then there would be no

5  reimbursement.

6          Again, this is an RSA provision.  You know, our

7  position is we would like our professional fees paid in a

8  manner similar to how a bondholder committee would, in fact,

9  the language that we have taken --

10          THE COURT:  A bondholder committee is probably

11  different.  A bondholder committee is probably different, but

12  I'm not getting into argument.

13          What I'm trying to figure out, and you've now told

14  us, is that, as I understand it -- correct me if I'm wrong --

15  the coalition produced no documents to the debtors in

16  connection with negotiation, in mediation or not in mediation,

17  with respect to services it's provided to date, amounts billed

18  to date, et cetera, nothing.

19          MR. GOODMAN:  To be very candid, Your Honor, I

20  believe there was an Excel spreadsheet that would have

21  summarized, you know, amounts incurred to date, but beyond

22  that single, one-page document to give them a sense of where

23  we were, there was nothing else that was produced.

24          THE COURT:  Okay.

25          MR. GOODMAN:  So the debtors are not in any

1  position, Your Honor, where they have a box full of all of our

2  invoices and are refusing to produce them.  They don't have

3  those documents because, again, those have not been provided

4  yet.

5            If the RSA is approved, if we get to the end of the

6  case, if we get to the -- the plan is effective, then we

7  provide the documents.  Again, this is, I guess, the exact

8  same language, no different than what was utilized in the PG&E

9  case.  We assume since that was the insurer's position there

10 that maybe it would hold here, but perhaps not.

11           I just wanted to be clear on that issue, Your

12 Honor.

13           THE COURT:  Okay.  So, there are no documents, Mr.

14 Schiavoni.

15           MR. GOODMAN:  Well, again, Your Honor, the

16 documents -- Mr. Schiavoni knows this; we have explained this

17 to him -- the documents that he's pushing for, right, what he

18 is saying, when he says, I want the communications, the

19 documents that he's actually after are not the invoices,

20 because he knows that those have not been provided to the

21 debtors.  The documents that he keeps seeking and going after,

22 you know, trying to get from us again, and again, and again,

23 are draft termsheets that say at the top of them, mediation

24 privileged, FRE408, highly confidential, draft, exchanged

25 during the mediation process.  That is what they're trying to

1  get from us.

2        THE COURT:  Okay.  And there are no other documents

3  --

4        MR. SCHIAVONI:  Your Honor, what we're trying to

5  get --

6        THE COURT:  There are no other documents that were

7  provided outside of the mediation and outside of a termsheet.

8  There's no documents that talk about the requests by the

9  coalition, and, again, I'm assuming it was their request to

10  have their fees paid outside of whatever may be in a

11  termsheet.

12        MR. GOODMAN:  Correct.

13        THE COURT:  Okay.

14        MR. SCHIAVONI:  So, Your Honor, we know that -- we

15  now know that the Board couldn't have done any due

16  deliberation on this because nothing was provided.  As far as

17  what we asked for, I'm not going to debate it with Mr.

18  Goodman.  I am just a little disturbed by things he said now

19  and previously about Century's discovery, but we have, as

20  Exhibit G, the exchange of emails with Mr. Goodman show we

21  were asking for these fee communications, all right.

22        But, look, the one thing that is missing is

23  definitely the exchange of emails, you know, making these

24  demands that would show the *quid pro quo* and they didn't take

25  place exclusively in the context of a face-to-face mediation.

1          THE COURT:  Okay.  Well, I'm hearing there are no

2    communications that did not take place outside of the

3    mediation privilege, and for purposes of today, I have that

4    representation from counsel.  I'm accepting that

5    representation from counsel.

6          Mr. Schiavoni, you have your argument.

7          MR. SCHIAVONI:  Thank you for hearing me, Your

8    Honor.

9          THE COURT:  Thank you.

10         Okay.  Those are all the preliminaries, I believe.

11         MR. ABBOTT:  Yes, Your Honor.

12         Derek Abbott for the debtors.  I think that brings

13   us to Item 1 on the agenda, so I will cede the podium to Ms.

14   Lauria, Your Honor.

15         THE COURT:  Ms. Lauria?

16         MS. LAURIA:  Thank you, Your Honor.

17         Jessica Lauria of White & Case, on behalf of the

18   debtors.  Your Honor, as the Court, I believe is aware from

19   the agenda, the debtors intend to call four witnesses in

20   support of the motion for the RSA:  Mr. Brian Whittman, Mr.

21   Devang Desai, Mr. Roger Mosby, and Mr. Dan Ownby.  I also

22   understand that at least one other party, perhaps Hartford,

23   may have reserved the right to call a witness, as well.

24         Given just the volume of arguments that I think the

25   Court is going to be hearing and the necessity for the Court

1  to consider the evidence at the outset, what the debtors

2  propose to do is to dive right into the evidentiary portion of

3  our case, and then after the evidentiary portion concludes,

4  move to closing arguments, essentially, with respect to the

5  RSA.

6            Also, with respect to the witnesses, given the

7  nature of the -- I'm going to use the word "allegations" for

8  lack of a better word -- that came up in both, the pleadings,

9  as well as the argument that you heard this morning with

10 respect to the discovery motion, from the debtors'

11 perspective, we think it's important to put on brief direct

12 examinations of our witnesses.  We will also offer the

13 declarations into evidence and, of course, make those

14 witnesses available for cross-examination, but we have some

15 extraordinarily important matters before the Court today that

16 will impact the rest of this case.

17            And that's how the debtors would like to proceed,

18 Your Honor.  With that, Your Honor, you will be hearing from

19 three of my partners in connection with the examination of the

20 witnesses:  Mr. Andolina, who you know well; Mr. Kirk; and Mr.

21 Hammond, who appeared in front of you back in May at our May

22 19th hearing.

23            So, with that, I think I'm going to hand the podium

24 over, unless Your Honor wants to take a break or unless there

25 is anything else you'd like to do, Your Honor, I'd hand the

1 podium back over, actually, to Mr. Andolina, who will be

2 presenting our first witness, Mr. Brian Whittman.

3            THE COURT:  Let's take our first witness, Mr.

4 Whittman.

5            MR. HAMMOND:  Thank you, Your Honor.

6            This is Andrew Hammond, from White & Case, and I'll

7 be presenting, calling Mr. Whittman to the stand.

8            THE COURT:  Okay.  Mr. Whittman, I need to swear

9 you in.  Please raise your right hand.

10            BRIAN WHITTMAN, DEBTORS' WITNESS, AFFIRMED

11            THE WITNESS:  I do.

12            THE COURT:  Please state your full name and spell

13 your last name for the record.

14            THE WITNESS:  Brian Whittman, W-h-i-t-t-m-a-n.

15            THE COURT:  Thank you.  You may proceed.

16            MR. HAMMOND:  Thank you, Your Honor.

17                       DIRECT EXAMINATION

18 BY MR. HAMMOND:

19 Q    Mr. Whittman, could you please introduce yourself to the

20 Court.

21 A    I am a managing director with Alvarez & Marsal, which is

22 the restructuring and financial advisor to the debtors, and I

23 am the lead financial advisor to the debtors.

24 Q    And how long have you been employed at Alvarez & Marsal?

25 A    I've been at Alvarez & Marsal since 2002.

1  Q    And what are your duties and responsibilities as a

2  managing director at Alvarez & Marsal?

3  A    I have internal responsibilities related to staffing,

4  recruiting, training, marketing-type of activities and I'm

5  responsible for overseeing certain cases, including this

6  particular case.

7  Q    Did there come a time when Alvarez & Marsal was retained

8  by the Boy Scouts of America?

9  A    Yes.

10  Q    And when was that?

11  A    Alvarez & Marsal was retained in the fall of 2018.

12  Q    And what type of work does Alvarez & Marsal perform for

13  the Boy Scouts of America in connection with its retention?

14  A    We were retained to assist the Boy Scouts with a

15  potential restructuring and also with the Chapter 11 process,

16  and in that context, we have worked with the debtors around

17  their business plan, around cash flow forecasts and liquidity,

18  around the diligence of their assets and restricted assets.

19  We have assisted with the negotiations both, pre- and post-

20  petition with the various parties.  We have assisted with the

21  preparation for the bankruptcy filing and with reporting

22  matters since the filing of the bankruptcy, as well as with

23  the key financial analysis that has been required for the

24  planning process, including the five-year business plan and

25  liquidation analysis.

1  Q      Mr. Whittman, when did you personally start working on

2  the Boy Scouts of America matter?

3  A      In August 2019.

4  Q      Now, based on the work you've performed, have you had

5  the opportunity to engage with the decision-making bodies of

6  the Boy Scouts of America?

7  A      I have.

8  Q      And who are the decision-making bodies at the Boy Scouts

9  of America?

10 A      At the top there's a National Executive Board and

11 there's a National Executive Committee and then as it relates

12 to the bankruptcy process, there's a bankruptcy task force.

13 Q      Okay.  And just generally, what is the National

14 Executive Board, how many people are involved in it?

15 A      The National Executive Board is approximately 76

16 individuals and that is the ultimate Board of Directors of the

17 organization.

18 Q      And what is the National Executive Committee?

19 A      The National Executive Committee is 12 members on the

20 Board of Directors that are authorized to manage the day-to-

21 day affairs of the Boy Scouts, as part of their role within

22 the Board.

23 Q      And you had mentioned the bankruptcy task force, can you

24 explain to the Court what that is.

25 A      The bankruptcy task force is a subcommittee of the NEC

1  that was formed to advise on bankruptcy-related matters, to

2  oversee the day-to-day aspects of a Chapter 11 process and the

3  negotiations that occurred around the RSA and plan of

4  reorganization and advise the full NEC on any actions that

5  need to be taken, as well as provide guidance and oversight to

6  management and the estate advisors.

7  Q    And who are the members of the bankruptcy task force?

8  A    The members of the bankruptcy task force are Alison

9  Schuler, the chair; Dan Ownby; Devang Desai; Scott Sorrels;

10  Brad Tilden; and Roger Mosby, and the bankruptcy task force is

11  also attended by and advised by the other officers at BSA.

12  Q    Okay.  And what's your understanding of the bankruptcy

13  task force's role in connection with the restructuring?

14  A    The bankruptcy task force is the primary body delegated

15  by the Board to, as I said, oversee the day-to-day of the

16  bankruptcy process, get into the details of the negotiations,

17  and advise and give direction to the management team and the

18  advisors that are involved, day-to-day, in those negotiations.

19  Q    And how would you describe your level of interaction

20  with the bankruptcy task force since the Chapter 11 petition

21  was filed?

22  A    It has been very significant throughout and, in

23  particular, over the last eight or nine months.

24  Q    And how many times have you met with the bankruptcy task

25  force since March?

1  A      Since March, approximately 15 times prior to the entry

2  of the RSA and there's been a handful of times sense.

3  Q      And just, very generally, as a topical matter, what

4  subject matter is to be discussed with the bankruptcy task

5  force in your capacity as a lead financial advisor for Alvarez

6  & Marsal since March of 2021?

7  A      I've discussed with them, issues related BSA's

8  contribution to the abuse survivors trust in terms of the

9  amount and the formulation of that contribution.  I've

10 discussed matters related to the local council contribution to

11 the trust, including the BST notes and the interplay with

12 BSA's pension.  I've discussed other financial matters,

13 including the coalition professional fees, especially with the

14 RSA, as well as I've been involved in discussions around the

15 Hartford settlement, other insurance issues, including the

16 TDP, and the like.

17 Q      And in addition to your management of the bankruptcy

18 task force, have you also met with the National Executive

19 Committee since March?

20 A      I have.

21 Q      And about how many times?

22 A      I would say around 10 times.

23 Q      Okay.  And have you also met with the National Executive

24 Board since March?

25 A      Approximately three times since March.

1  Q     Okay.  Collectively, between the bankruptcy task force,

2  the National Executive Committee, and the National Executive

3  Board, how much time have you spent in meetings with these

4  bodies since March of 2021?

5  A     In excess of 40 hours.

6  Q     And did you prepare any written presentations to these

7  governing bodies of BSA?

8  A     I did, at least 10 over that period of time.

9  Q     Okay.  And were you present at any meetings of the

10 bankruptcy task force or National Executive Committee or

11 National Executive Board where other of BSA's advisors made

12 presentations?

13 A     I was.

14 Q     And what other advisors made presentations to the

15 governing bodies of BSA?

16 A     There were presentations made by White & Case, the

17 debtors' restructuring counsel, as well as Haynes & Boone, the

18 debtors' insurance counsel.

19 Q     And as a very general matter, just as topically, without

20 revealing the substance of any communication, can you just

21 generally describe what topics those presentations covered?

22         MR. SCHIAVONI:  Your Honor, I'm going to object.

23 It's like this gets directly into the waiver issue and the

24 documents that haven't been produced.  They're trying to offer

25 evidence of something without providing the documents.

1           THE COURT:  Let me have a response.

2           MR. HAMMOND:  Your Honor, in response, I was just

3  going to put on no more than what we've put on, on the

4  privileged log, Your Honor.  It's topically of the subject

5  matter of the (indiscernible) and who the recipients of those

6  communications were.

7           THE COURT:  And what do you want me to.

8           MR. SCHIAVONI:  Your Honor, the offer of proof --

9           MR. HAMMOND:  Your Honor, we're not relying on -- I

10  apologize -- we're not relying on advice of counsel here, Your

11  Honor; we're just discussing the subject matters that were

12  discussed.

13          MR. SCHIAVONI:  But, Your Honor, they're offering

14  this undoubtedly, to somehow establish that, actually,

15  diligence was done on these issues and I don't see how they

16  can cross that line without providing the documents,

17  themselves, about it.

18          MR. HAMMOND:  Your Honor, at the end of the day,

19  Mr. Schiavoni is attempting to inject himself into privileged

20  communications and we don't think that's appropriate,

21  particularly for this subject matter.  We're just establishing

22  the facts that these subject matters were discussed in front

23  of the Board, not the substance of what was discussed.

24          THE COURT:  And what do you want me to --

25          MR. SCHIAVONI:  How does anybody know they were

1 discussed without the actual documents?

2          THE COURT:  What do you want me to conclude from

3 that, that the topic was discussed, what do you want me to

4 conclude from that?

5          MR. HAMMOND:  That the subject matter was

6 discussed, Your Honor.

7          MR. RUGGERI:  Your Honor, James Ruggeri for

8 Hartford.  The other problem we have, of course, is that you

9 saw the one categorical log which didn't identify anything and

10 the only other log we've ever received is a TDP log.  That's

11 it.  Those are the logs.  If you want Mr. Schiavoni's

12 objection.

13          THE COURT:  I'm going to reserve on this.  You can

14 ask him the topics, but I'm going to reserve on whether I will

15 consider this, because documents were not produced, and

16 whether you are, in fact, putting at issue those documents and

17 the advice in those documents.

18          MR. HAMMOND:  Your Honor, this information I

19 believe was contained and also referenced in Mr. Whittman's

20 declaration.  (Indiscernible) as well as to the general

21 subject matter.

22          THE COURT:  Yes, but they objected --

23          MR. SCHIAVONI:  And that's precisely why we moved

24 on it.

25          THE COURT:  They've objected to that for the

1  reasons that I think at deposition, he was given some

2  instructions not to answer.  So, you can ask him those topics,

3  that question, if you want, and I will reserve on whether you

4  are waiving privilege in doing that.

5          MR. HAMMOND:  Thank you, Your Honor.

6          But to be clear, with respect to any instructions

7  to Mr. Whittman not to answer at deposition, there was one, a

8  singular instruction and that instruction, he had advised the

9  insurers.  They could have examined Mr. Whittman on that topic

10  and they chose not to.

11          THE COURT:  Okay.

12          MR. SCHIAVONI:  Your Honor, I gave four examples.

13  This is completely untrue that there was only one instruction;

14  there were multiple directions that he shouldn't reveal

15  privileged information and then he said he wasn't going to do

16  so.  I gave four examples of that.

17          THE COURT:  That's my recollection, that there --

18          MR. HAMMOND:  Your Honor, (indiscernible) --

19          THE COURT:  My recollection is there was more than

20  one, but I could be wrong.

21          MR. HAMMOND:  There was -- I apologize, Your Honor

22  -- there was one direction not to answer.  There was

23  cautionary language saying, to the extent that it would

24  require you to reveal privileged information, those are the

25  rest of the communications that (indiscernible).

1          THE COURT:  Did Mr. Whittman talk about --

2          MR. SCHIAVONI:  Then clearly the witness would say,

3   I'm not going to answer.

4          THE COURT:  Did Mr. Whittman, in his deposition,

5   identify the topics that you now want him to identify here?

6          MR. HAMMOND:  At the floor level, he was asked, for

7   example, about TDPs and things of that nature at his

8   deposition.  He did testify about that.

9          He didn't testify about, you know, Board-level

10  communications on that.

11          THE COURT:  Okay.  You can --

12          MR. SCHIAVONI:  He declined to testify about any

13  substance.

14          THE COURT:  I will take -- I will permit you to ask

15  him the question and I will take under advisement whether you

16  were waiving privilege, with respect to that.

17          Go ahead.

18  BY MR. HAMMOND:

19  Q    Mr. Whittman, at a very high level, just from a topical

20  perspective, what topics were discussed or just general

21  subject matter, with respect to those presentations?

22  A    There were discussions regarding the first proposed plan

23  of reorganization, alternative plan structures, the likelihood

24  of the success of various plans of reorganization.  There were

25  discussions related to the Hartford, proposed Hartford, and

1  the ultimate Hartford settlement.  There were discussions

2  related to other aspects of the RSA.  There were discussions

3  related to the trust distribution procedures and other

4  insurance matters.

5  Q      Now, during the meetings that you participated in with

6  the bankruptcy task force, did the members of the bankruptcy

7  task force ask questions of and engage in discussions with

8  their advisors?

9  A      They did.

10 Q      Okay.  And how long did those meetings typically last?

11 A      The bankruptcy task force meetings were almost always in

12 excess of 90 minutes; often times, greater than two hours.

13 Q      And were members of the National Executive Board and

14 National Executive Committee similarly engaged in the meetings

15 that you participated in?

16 A      They were, they were all very engaged.

17 Q      You've worked with a number of clients in your career on

18 restructuring matters?

19 A      I have.

20 Q      And how does the frequency of meetings with the BSA

21 compare with other clients?

22 A      The meetings were at least, if not more frequent.

23 Q      And based on the number of meetings and time that you

24 spent with the National Executive Board and the National

25 Executive Committee and bankruptcy task force, do you have a

1  view as to whether the BSA's board members generally sought to

2  inform themselves of the matters that they were considering?

3  A    I do, and I believe that they did inform themselves of

4  these matters.

5  Q    Mr. Whittman, I want to shift topics quickly.

6       During the course and scope of your work with the BSA,

7  did you participate in any mediated settlement discussions?

8  A    I did.

9  Q    And when did those discussions begin?

10 A    The mediation process began with some virtual

11 discussions late in 2020 and continued with more active

12 virtual mediation in early 2021 and really accelerated with

13 the commencement and the combination of in-person and virtual

14 mediation in late March 2021 through the present.

15 Q    All right.  And since the mediation started, how many

16 hours have you devoted to meeting with the various

17 stakeholders of the debtors?

18 A    Hundreds of hours.

19 Q    Mr. Whittman, I want to turn to the subject of the

20 Hartford settlement for a moment.

21 A    Okay.

22 Q    During the course (indiscernible) with your duties as

23 the lead financial advisor for the BSA, did there come a time

24 when the BSA engaged in settlement discussions with Hartford?

25 A    There did.

1 Q     And without relaying the contents of those discussions,

2 can you tell me the period of time over which such discussions

3 were held?

4 A     Discussions with Hartford, a large party in this case,

5 began early, but really picked up in early 2001 [sic] in

6 advance of the in-person mediation in March -- sorry, 2021 --

7 and really picked up in advance of the mediation in March of

8 2021 and continued through not only into the Hartford

9 agreement, but through to the present day.

10 Q     And did the BSA also ultimately reach an agreement with

11 Hartford?

12 A     We did in April, April 15th of 2021.

13 Q     Mr. Whittman, you have in front of you a binder that has

14 also been provided to the Court and I would ask you to turn to

15 Exhibit 5, which is the Hartford settlement, and I believe

16 it's on page 4, begins on page 4 of the document.

17 A     Okay.

18 Q     Can you tell me what this document is, Mr. Whittman.

19 A     This is the settlement agreement we were discussing that

20 was entered into between the BSA and Hartford on     April

21 15th, of 2021.

22 Q     Now, were there any conditions to the Hartford

23 settlement agreement becoming effective?

24 A     There were a number of conditions.

25 Q     Can you turn to page 7 of the agreement.

1   And under Roman numeral 1 where it says agreement

2   effective date, do you see that?

3   A    I do.

4   Q    Okay.  And does Section 1(a) discuss the conditions

5   under which the agreement would have to -- the conditions that

6   would have to occur before the agreement would become

7   effective?

8   A    It does.  Principally, that Hartford would need to

9   receive releases by the local councils, that the Bankruptcy

10  Court would have to enter into a confirmation order, and that

11  confirmation order would need to provide for a release and a

12  channeling injunction for the benefit of local councils, with

13  respect to these claims.

14  Q    And are you referring to Section 1(a)(2) on page 7 and

15  1(a)(4) on page 8?

16  A    I am.

17  Q    Now, based on your understanding, what would have to

18  happen for a release and channeling injunction to be issued?

19  A    My understanding is that we would need to receive

20  confirmation of a plan of reorganization that had the

21  affirmative support of the abused claimant class.

22  Q    Mr. Whittman, what was the amount of the Hartford

23  settlement?

24  A    The Hartford settlement was for $650 million, subject to

25  what's been called the "MSN provision" that would reduce the

1  amount of the settlement.

2  Q    Okay.  And just generally, what is the MSN provision?

3  A    The MSN provision ties the amount of the Hartford

4  settlement to any subsequent settlement with, between either

5  the debtors, pre-emergence, or the trust, post-emergence, and

6  Century Insurance and provides that if the settlement with

7  Century should occur and it is less than $1.3 billion, then

8  the amount paid by Hartford would be reduced by 50 percent of

9  the differential.

10 Q    Can you turn to the Section 2(c) of the agreement on

11 page 9, carrying over to page 10.

12 A    Okay.

13 Q    I'm at 2(e).  Is that the provision that you're

14 referring to?

15 A    2(e) on the bottom of page 10, that is correct.

16 Q    Now, with respect to the MSN provision, does that mean

17 that the total amount of the Hartford settlement would end up

18 being reduced?

19 A    It does.

20 Q    Okay.  And the six-hundred-and-fifty-million-dollar

21 payment that would be due under the Hartford settlement, would

22 that be the -- is that the ceiling of the amount that Hartford

23 would pay?

24 A    That is correct.

25 Q    Okay.  Mr. Whittman, do you know whether the debtors

1   have access to Century's financial records to assess Century's

2   wherewithal on the settlement?

3   A      We -- only the limited public information that exists.

4   Q      Did you discuss the contents of the Hartford settlement

5   with the decision-makers at the BSA?

6   A      I did.

7   Q      And as of April 15th, 2021, did you support the BSA

8   entering into the Hartford settlement?

9   A      I did.

10  Q      From April 15th to the present, have there been any

11  circumstances that have changed that would cause you to

12  reconsider your support for the Hartford settlement?

13  A      Yes, there have been two principal changes in

14  circumstance.

15  Q      And what are those changes in circumstance?

16  A      First, we have experienced the unified, intense, and

17  continued, and broad-based insistence of the (indiscernible)

18  constituents that they would never support a plan of

19  reorganization that includes the Hartford settlement.  And as

20  I mentioned earlier, absent plaintiff's support, that a plan

21  of reorganization could not be confirmed and renders the

22  Hartford settlement somewhat illusory.  And, second, that we

23  were, in fact, able to reach an agreement with the plaintiff

24  parties on a plan of reorganization that does provide for a

25  global resolution of abuse liabilities for BSA and/or counsel

1    in a framework to address the charter organizations.

2    Q     Mr. Whittman, leaving aside any communications that were

3    had in the context of mediation, how did you become aware that

4    the plaintiffs disapproved of the Hartford settlement?

5    A     Three principal points in time or methods became aware

6    outside of the mediation.  First, the various plaintiff

7    groups, the coalition, the TCC, and the FCR all expressed in

8    filings with the Bankruptcy Court at various stages, since

9    April 15th, their displeasure with the Hartford agreement.

10   Second, there have been numerous verbal presentations during

11   the court hearings and status conferences on their position

12   related to the Hartford settlement.  And, third, on, I believe

13   it was June 9th, we received a letter from all three of those

14   plaintiffs' constituents that formally documented, despite the

15   passage of almost two months and active mediation efforts, to

16   the contrary, that they would still not support a plan with

17   the Hartford settlement.

18   Q     Mr. Whittman, did the reaction of the plaintiffs

19   surprise you at all?

20   A     Their initial reaction did not surprise me, but their

21   continued and sustained reaction did.

22   Q     Mr. Whittman, can you turn to tab 1(a) in your binder.

23   This is (indiscernible) declaration of Mr. Mosby.

24   You had referenced a letter before in your testimony, a

25   June 9th letter?

1  A      I did.

2  Q      And what's been marked as Exhibit 1(a), is that the June

3  9th letter that you're referring to?

4  A      It is.

5  Q      Could you read the penultimate sentence of that letter

6  from -- first, who is this letter from and to?

7  A      This letter is from the counsel to the coalition, the

8  counsel to the tort claimants committee, and the counsel to

9  the future claimants representative to both, the BSA and the

10 ad hoc committee of local councils.

11 Q      And can you read the penultimate sentence of this

12 letter.

13 A      The sentence states:

14        "Our unequivocal view as a group comprising the two

15 estate fiduciaries for the survivors and ad hoc group of

16 thousands of those survivors, is that any plan of

17 reorganization that includes the Hartford settlement will be

18 overwhelmingly voted down by the survivor committee or

19 rejected by the Bankruptcy Court as a standalone

20 motion/settlement."

21 Q      Now, Mr. Whittman, aside from the objections of

22 plaintiffs, you also mentioned a second circumstance.

23 A      That's correct.  We reached a resolution with the

24 majority, the representatives of the majority of the claimants

25 in the form of the coalition, the TCC, and the FCR, related to

1  a plan of reorganization that would provide a, halfway for BSA

2  to emerge from bankruptcy, to provide protections for the

3  local councils, which provided the greatest chance of success

4  for reorganized BSA, and the greatest ability to continue the

5  mission of scouting going forward.

6  Q    Mr. Whittman, was that resolution documented in the

7  agreement?

8  A    It was.  It was documented in the restructuring support

9  agreement that's before the Court today.

10 Q    And which parties were involved in the negotiating the

11 restructuring support agreement?

12 A    The agreement was negotiated between the debtors, the ad

13 hoc committee of local councils, the tort claimants committee,

14 the coalition, and the future claimants representative.

15 Q    Were you personally involved in the negotiation of the

16 RSA?

17 A    I was.

18 Q    The RSA covers a wide range of topics.  What subject

19 matter were you responsible for negotiating?

20 A    I was directly responsible for negotiating the debtors'

21 financial contribution to the trust and the various aspects

22 associated with that contribution.  I was significantly

23 involved in the contribution of the local councils to the

24 trust and, in particular, with negotiations related to what

25 became known as the hundred-million-dollar DST note.  I had

1  involvement in other financial aspects, including the

2  provisions around the payment of coalition professional fees,

3  and I was aware of, and less involved in other aspects of the

4  agreement, including aspects related to the TDP and other

5  insurance issues.

6  Q    Given your role as lead financial advisor, did you also

7  have familiarity with other matters that were negotiated in

8  connection with the RSA?

9  A    I did.  I was generally familiar with all the matters in

10  the RSA.

11  Q    Over what period of time did the negotiations concerning

12  the RSA take place?

13  A    The negotiations on the RSA, while built on a foundation

14  of months of discussions among all the parties and diligence

15  of the parties on various issues, really took shape following

16  the entry of the Hartford settlement in the middle of April,

17  continuing through in-person mediation sessions that occurred

18  in May and June, and up until the morning of July 1st, when we

19  finally reached a resolution.

20  Q    And approximately how much, how many meetings were held

21  regarding the RSA?

22  A    There were dozens, if not more than a hundred meetings

23  and calls.

24  Q    And how would you, without revealing the substance or

25  content of any of the discussions, how would you characterize

1  those negotiations?

2  A     Those negotiations were --

3          MR. SCHIAVONI:  Objection.  No foundation, Your

4  Honor, and waiver.

5          THE COURT:  Can you give me the question again?

6  BY MR. HAMMOND:

7  Q     Without revealing the --

8          MR. HAMMOND:  -- do you want it read back or do you

9  want me to repeat it?

10          THE COURT:  You can repeat it.

11  BY MR. HAMMOND:

12  Q     Without revealing the content of any discussions, how

13  would you characterize those negotiations concerning the RSA?

14          THE COURT:  Overruled.  You can answer.

15          MR. SCHIAVONI:  Your Honor, the witness is being

16  asked essentially to give, you know, what they call in the

17  expert world a net opinion.  He's giving his opinion without

18  any of the foundation for it, which is all cloaked in

19  privilege.

20          THE COURT:  I thought the question was his opinion

21  based on his -- based on his involvement in the mediation.  So

22  I'm going to overrule it on that basis.

23          MR. HAMMOND:  Thank you, Your Honor.

24          THE WITNESS:  The negotiation around the RSA was

25  some of the most intense negotiation in any clients I've been

1   involved with.  The parties were very far apart.  There were

2   intense negotiations between the parties on a wide range of

3   issues, and those negotiations were robust and really came

4   down to the final moments prior to signing the agreement on

5   July 1st.

6   BY MR. HAMMOND:

7   Q     Without revealing the contents any discussions, the

8   media was involved in the negotiations of the RSA?

9   A     They were.

10  Q     In your capacity as a negotiator for the BSA, what were

11  the objectives that you considered when negotiating the terms

12  of the RSA?

13  A     From a big picture perspective, we were focused on the

14  debtors' overall objectives, which was to preserve the mission

15  of Scouting, which requires us to get to a confirmable and

16  ultimately confirmed plan of reorganization, and to provide

17  for the equitable treatment to the abuse survivors.  Within

18  the context of those broad objectives, we were very focused on

19  the financial components of the settlement and the feasibility

20  of those in terms of the debtors' business plans.  We were

21  focused on many of the non-financial components or non-

22  directly debtor financial components of the settlement as to

23  whether those components would in fact put us on a path and

24  lead us to a confirmable plan of reorganization and not put us

25  back at square one.

1  Q      Mr. Whittman, were you aware of the TDPs?

2  A      I was.

3  Q      And what are the TDPs, just generally?

4  A      They're the trust distribution procedures, which in

5  general terms will be used by the trust established at

6  emergency bankruptcy to review the claims that have been

7  submitted in this case, to determine the validity of those

8  claims, and ultimately determine the amounts of money to be

9  paid to those claimants.

10 Q      Now, were you the lead negotiator in connection with the

11 TDPs?

12 A      I was not.

13 Q      Were you copied on some correspondence regarding the

14 TDPs in your capacity as the lead financial adviser?

15 A      I was.

16 Q      We've heard some argument earlier today about the

17 debtors' interests in the TDPs, did you believe the debtors

18 had an interest in the terms of the TDPs?

19              MR. SCHIAVONI:  Objection.

20              MR. HALLOWELL:  Objection, objection.  This is Jim

21 Hallowell, Gibson, Dunn & Crutcher, counsel for the AIG Member

22 Companies.  We object to this as leading.

23              THE COURT:  As what?

24              MR. SCHIAVONI:  It's also -- it's an improper

25 opinion, Your Honor, it lacks foundation.

1    MR. HALLOWELL:  We join that objection as well.

2    MR. HAMMOND:  Your Honor, I was simply trying to

3 elicit testimony on what the debtors' interests in negotiating

4 the terms of the TDPs were in light of the argument that was

5 advanced earlier as to the suggestion that the debtors had no

6 interest in the TDPs and turned over the (indiscernible) --

7    MR. SCHIAVONI:  Your Honor, we would --

8    MR. HAMMOND:  -- saying from an objective

9 perspective what -- have Mr. Whittman explain from an

10 objective perspective what interests the debtors had in the

11 TDPs.

12    MR. SCHIAVONI:  We were blocked from absolutely all

13 inquiry at Mr. Whittman's deposition about any communications

14 he had with any directors about the TDPs or how they

15 considered them.  It's just -- this is -- and, quite frankly,

16 the other witnesses also.  They all invoked privilege on these

17 issues.

18    MR. HALLOWELL:  And, Your Honor, I would simply add

19 that Mr. Hammond's further debate on this issue is further

20 leading to the witness.

21    MR. RUGGERI:  And, Judge, mine goes back to the

22 issue -- Jim Ruggeri for the Hartford -- what we talked about,

23 which is you can't have it both ways.  You can't close the

24 door and now we're talking about this witness' testimony about

25 the TDP negotiations, which it's uncontroverted has not been

1 provided to the carriers.  I object, Your Honor.

2 　　　　　THE COURT:  I'm going to sustain this --

3 　　　　　MR. HAMMOND:  Your Honor, I was not --

4 　　　　　THE COURT:  Go ahead.

5 　　　　　MR. HAMMOND:  -- to be clear, I was not talking

6 about the TDP negotiations, I was talking about the debtors'

7 interests in the TDPs, which are -- I believe are different

8 from --

9 　　　　　MR. HALLOWELL:  Your Honor --

10 　　　　　MR. HAMMOND:  -- the negotiations --

11 　　　　　THE COURT:  How are you --

12 　　　　　MR. HALLOWELL:  -- this witness has no foundation

13 to testify with regard to the debtors' interests.

14 　　　　　THE COURT:  Yes, I'm going to sustain that

15 objection.  I haven't heard a foundation on that.

16 　　　　　MR. HAMMOND:  Okay, Your Honor.  Thank you, Your

17 Honor, I'll move on.

18 BY MR. HAMMOND:

19 Q    Mr. Whittman, do the TDPs address -- strike that.

20 　　　　　In terms of the assets of the Boy Scouts of America, do

21 you have a view as to how the insurance policies factor into

22 the assets of the Boy Scouts?

23 　　　　　MR. HALLOWELL:  Objection, Your Honor, leading

24 again.

25 　　　　　THE COURT:  Sustained.  Rephrase, please.

 1          MR. HAMMOND:  Thank you, Your Honor.

 2  BY MR. HAMMOND:

 3  Q    Mr. Whittman, what are the -- among the assets -- well,

 4  strike that.  What are the largest, most significant assets of

 5  the Boy Scouts of America?

 6  A    The significant assets of the Boy Scouts of America are

 7  the insurance policies that the Boy Scouts of America have

 8  related to abuse liability, followed by the various real and

 9  personal property of the debtors' estates.

10  Q    And do you have a view as to whether the debtors have an

11  interest in ensuring that the insurance policies remain in

12  place?

13  A    I do.

14          MR. HALLOWELL:  Objection, leading.  Objection.

15          MR. HAMMOND:  I was just asking for his view, Your

16  Honor.

17          MR. SCHIAVONI:  And also this gets into privilege.

18  It's like they invoke privilege on communications between

19  Hammond and the directors and Boy Scouts at the deposition and

20  heavily redact his PowerPoint presentations -- I mean,

21  invocation of privilege about advice he gave and

22  communications he had with Boy Scouts -- and now basically

23  they're offering him to testify in a summary way that they're

24  going to offer as a foundation for findings without having

25  given any of the contemporaneous documents that would give us

1  an actual view of what really happened.

2          THE COURT:  What's --

3          MR. HAMMOND:  Your Honor, I mean, we have produced

4  Mr. Whittman's financial presentations, they are redacted in

5  some form with respect to mediation privilege; they're

6  contained in our binder, we can walk through them and show,

7  you know, the extent to which they've been redacted and what

8  they've been redacted for.  I don't think that would be a

9  useful exercise of our time right now, but if they want to

10  examine him on that topic, that's fine.

11          THE COURT:  Okay.  Well, I've got exhibit binders,

12  but so far there's not an exhibit in evidence.  So I haven't

13  reviewed the exhibits, I won't unless and until they get

14  introduced into evidence.  So -- but give me the question

15  again.  You're asking for his view of what he thinks?

16          MR. HAMMOND:  His view -- well, I think, Your

17  Honor, I was asking whether the insurance policies were -- I

18  started off with the insurance policies being a significant

19  asset of the debtors' estate, and then the second question was

20  whether the debtors have an interest in protecting the

21  insurance policies given they're a significant asset.

22          MR. HALLOWELL:  Your Honor, Mr. Hammond has just

23  repeated the questions that you sustained objections to.

24          THE COURT:  Yeah, I think I did.  So what's the

25  relevance of his view on this?

1          MR. HAMMOND:  I think, Your Honor, going back to

2     the debtors' interests, I was trying to get at it another way,

3     but I'm happy to move on from this subject if you don't think

4     it's meaningful.

5          THE COURT:  Is he speaking for the debtor?

6          MR. HAMMOND:  I think he can, Your Honor, in terms

7     of the debtors' objectives.

8          THE COURT:  Okay.  Move on to your next question.

9     I'm going to sustain the objection.

10          MR. HAMMOND:  Okay, I'll move on.  Can we turn to

11     Exhibit 6, please?

12     BY MR. HAMMOND:

13     Q     Mr. Whittman, are you familiar with what's been marked

14     as Exhibit 6?

15     A     Yes, this is the restructuring support agreement between

16     the debtors, the ad hoc committee of local councils, the TCC,

17     the Coalition, and the FCR -- and (indiscernible) state court

18     counsel before the Court today.

19          MR. HAMMOND:  And, Your Honor, I'd move Exhibit 6

20     into evidence.

21          THE COURT:  Any objections?

22        (No verbal response)

23          THE COURT:  I hear none.  It's admitted.

24          MR. SCHIAVONI:  May I just ask, is this a signed

25     copy?

1    THE COURT:  Yes.  Yes, it's a signed copy.  It's

2  admitted.

3    (Debtors' Exhibit 6 received in evidence)

4    MR. SCHIAVONI:  Thank you, Your Honor.  Sorry.

5  BY MR. HAMMOND:

6  Q    Mr. Whittman, what's the amount of the BSA's

7  contribution under the RSA?

8  A    Under the RSA, BSA's contribution is variable depending

9  on the timing of emergence, but we estimated it between 220

10  and $250 million, comprised of a mix of real and personal

11  property, cash, and an $80 million note payable to the trust.

12  Q    And what is the amount of the local councils'

13  contribution under the RSA?

14  A    The local councils' contribution is $600 million,

15  comprised of at least $300 million of cash, $200 million of

16  real property, and a $100 million -- supporting a $100 million

17  DST note.

18  Q    And can you just describe to the Court what the DST note

19  is?

20  A    The DST is a note to be issued by a special purpose

21  entity that would be funded based on -- from the local

22  councils based on the percentage of payroll held in trust and

23  then those funds would either be used to pay off the note or

24  contributed to the pension plan, depending on a formula based

25  on the funded status of that pension plan.

1   Q     What are the benefits the BSA receives under the RSA?

2   A     The BSA receives the benefit of having the support of

3   the majority of the plaintiffs, as well as the official

4   plaintiff representative, on a plan of reorganization.  As I

5   said earlier, the plan of reorganization that provides the

6   best opportunity for BSA to succeed in its mission post-

7   emergence is a plan of reorganization that protects not only

8   BSA, but provides the channeling injunction for the benefit of

9   the local councils, and that is only possible with the

10  affirmative support of the plaintiffs.

11        The RSA also provides the benefit of providing a

12  structure in which we can continue to address and negotiate

13  the concerns of our charter organization partners, and

14  provides a platform to continue to negotiate and reach

15  settlement with insurers either pre- or post-emergence.

16  Q     Now, does the RSA reference the Hartford settlement?

17  A     The RSA does reference the Hartford settlement.

18  Q     Can you turn to page 7 of the RSA?

19        (Pause)

20  A     I'm there.

21  Q     Can you turn to romanette (viii) on page 7?

22  A     Okay.

23  Q     And is that what you're referring to when you said the

24  RSA referenced the Hartford settlement?

25  A     That is correct.  This provision requires that BSA seek

1  -- or file a motion with the Court seeking a determination of

2  the bankruptcy court that the debtors have no obligations

3  under the Hartford settlement.

4  Q    Now, Mr. Whittman, based on the benefits that the BSA is

5  receiving under the terms of the RSA, do you have a view as to

6  whether the RSA is superior to the Hartford settlement from a

7  financial perspective for stakeholders of the estate?

8             MR. RUGGERI:  Objection to form.

9             THE WITNESS:  I do believe that the --

10             MR. RUGGERI:  Objection to form, Your Honor.

11             THE COURT:  Why, is it compound?  What is your

12  objection?

13             MR. RUGGERI:  There's no foundation.  I mean, is

14  Mr. Whittman being offered as an expert, is he being offered

15  as a percipient witness?  I don't know the context in which

16  he's being offered, but now he's making relative comparisons

17  between two plan structures to a separate body of creditors.

18  No foundation.

19             MR. HALLOWELL:  And, Your Honor, Your Honor, we'll

20  join the objection and, to the extent that there has been any

21  kind of analysis of this issue prepared by the debtor or its

22  financial adviser, it hasn't been produced.

23             THE COURT:  All right.  Let me hear a response.

24             MR. RUGGERI:  And I think that's correct, Your

25  Honor.  I think it really goes to the foundation of this is an

1  issue, again, they're claiming mediation privilege over any

2  and all foundation for any of the analyses and that has not

3  been provided.

4        THE COURT:  Let me hear a response.

5        MR. HAMMOND:  Your Honor, we can -- I mean, I guess

6  I can move through some of the minutes that have been produced

7  and we can cover it in that fashion, but I believe that Mr.

8  Whittman as a percipient witness is certainly capable of

9  answering the question whether he perceives the Hartford

10  settlement -- or the relative views of the Hartford settlement

11  and the benefits under the RSA given the express terms of

12  them, which are all (indiscernible) --

13        MR. HALLOWELL:  Your Honor, the further objection

14  based on that is that Mr. Whittman's view is irrelevant, it

15  has no bearing on this proceeding, and anything that he's

16  perceiving can be perceived by anybody else in the documents.

17        THE COURT:  Why isn't his analysis being informed

18  by everything he learned in mediation?

19        MR. HAMMOND:  Well, I think -- Your Honor, I think

20  there's two separate sets of time here, right?  What you're

21  evaluating is two baked deals, the baked deals that are

22  currently sitting on the table between the Hartford on --

23  Hartford on the one side and the other baked deal that's baked

24  into the RSA on the other.  And so you don't need to be

25  comparing the two, you can look at what the final product is.

 1        MR. RUGGERI:  But, Your Honor, even under Rule 701

 2   of the Rules of Evidence, if he's being offered as a -- to

 3   give a lay opinion based on what he believes is his

 4   rationally-based perception, we're entitled to the foundation

 5   of those rationally-based perceptions.  It's not just looking

 6   at two documents.  The witness has testified, testimony was

 7   elicited from the witness about the length of time and the

 8   hours that were spent in mediation to generate both the

 9   Hartford settlement and now the RSA.  You can't have it this

10   way; it goes clearly to what they said we're not entitled to.

11        THE COURT:  Sustained.

12        MR. HALLOWELL:  And, Your Honor --

13        THE COURT:  I'm --

14        MR. HALLOWELL:  -- I'll just add for the AIG

15   Companies that Mr. Hammond would like you to consider what he

16   calls two baked deals, but he spent the last hour with Mr.

17   Whittman discussing the baking.

18        THE COURT:  Yes, he did.  Sustained.

19   BY MR. HAMMOND:

20   Q    Does the RSA potentially resolve pending litigation with

21   plaintiffs' representatives?

22   A    It does --

23        MR. HALLOWELL:  Objection, leading.

24        THE COURT:  Yeah, give me that question again.

25   BY MR. HAMMOND:

 1  Q      Does the RSA potentially resolve pending litigation with
 2  plaintiffs' representatives?
 3            THE COURT:  Overruled.  It's leading, but I'll
 4  overrule it.
 5            THE WITNESS:  It does.
 6  BY MR. HAMMOND:
 7  Q     Can turn to page 10 of the RSA, please?  Can you look at
 8  romanette (b)(iii), (iv) and (v)?
 9  A     Yes.
10  Q     And, Mr. Whittman, can you tell me what potential
11  litigations would be stayed or potentially resolved as a
12  result of the RSA?
13  A     The RSA resolved the restricted asset adversary
14  proceeding before the Court; the estimation matters that are
15  before the Court; as well as objections to the exclusive
16  period for the debtors to file a plan, specifically, as well
17  as likely other objections that were to come.
18  Q     Do you have a view as to whether the RSA would likely
19  lead to lower litigation costs for the estate as a result of
20  these agreements?
21            MR. RUGGERI:  Your Honor, objection.
22            MR. HALLOWELL:  Objection.
23            MR. RUGGERI:  I do not think this witness is
24  competent now to give legal opinion testimony, which is what
25  he's being asked; he's a financial person.

 1          MR. HAMMOND:  These are the same questions --

 2          MR. HALLOWELL:  Your Honor, we object.  The

 3   question is leading, the question lacks foundation, and

 4   there's been nothing produced with regard to any analysis by

 5   Alvarez & Marsal with regard to any of this.

 6          THE COURT:  Let me hear a response.

 7          MR. HAMMOND:  Your Honor, these questions were

 8   certainly covered at his deposition, he was examined on this

 9   subject matter and he answered questions on this subject

10   matter.  At the end of the day, being involved as the lead

11   financial adviser for the debtors, he's in a position to

12   understand what litigation was in the offing, what litigation

13   was being put off as a result of the RSA and, based on that, I

14   think he can render a view as to whether he believes that this

15   would likely lower litigation costs in this case.

16          MR. RUGGERI:  And, Your Honor, the Court

17   understands that asking questions at a deposition does not

18   cure foundational problems that may be raised when the witness

19   is tendered at the evidentiary hearing.  That's one of the

20   points of the deposition, so that doesn't get anywhere.  I

21   probably was slow on the last objection when now we're having

22   the witness go through and tell the Court the legal effect of

23   the restructuring support agreement, we're hearing from a

24   financial person, it's inappropriate, Your Honor.

25          THE COURT:  Okay.

1            MR. HAMMOND:  Your Honor, we haven't talked about

2  the --

3            MR. HALLOWELL:  Your Honor, we object --

4            MR. HAMMOND:  -- legal, but financial --

5            MR. HALLOWELL:  -- Your Honor -- Your Honor, we

6  continue to object to Mr. Hammond's speeches, which are still

7  further leading and coaching.

8            THE COURT:  Okay.  I'm going to sustain the --

9            MR. HAMMOND:  Your Honor, I'm asking it as a

10  question to the witness.

11            THE COURT:  I'm going to sustain the foundation and

12  the leading objections.

13  BY MR. HAMMOND:

14  Q    Mr. Whittman, prior to entering into the RSA, were the

15  debtors involved in several disputes with the plaintiffs'

16  representatives?

17  A    They were.

18  Q    What disputes with the plaintiffs' representatives were

19  they involved in?

20  A    They were involved in a dispute with primarily the TCC

21  regarding our restricted assets.  We were involved in a

22  dispute with several of the plaintiff parties related to

23  issues of estimation of claims liability, whether an

24  estimation proceeding was required and which court was

25  required to -- or had the authority to hear those proceedings.

 1  We were also involved in disputes related to exclusivity which

 2  were pending before the Court.

 3  Q    Mr. Whittman, do you have a view as to whether those

 4  disputes were -- strike that.

 5       Were those disputes a burden on the debtor, from your

 6  perspective as the lead financial --

 7            MR. HALLOWELL:  Objection.  Objection, lacks

 8  foundation, and vague.

 9            THE COURT:  And leading, but I'll let him -- I'll

10  let him -- I'll let him give his view on it, for what it's

11  worth.

12            THE WITNESS:  The debtors were incurring

13  significant and increasing levels of cost both for its own

14  professionals, as well as for the professionals of the

15  statutory committees that it was responsible to pay, and we

16  expected that those costs would continue to increase based on

17  the matters and the necessary activities related to in

18  particular the restricted asset adversary proceeding.

19  BY MR. HAMMOND:

20  Q    Mr. Whittman, do you believe that staying those

21  litigations resulted in a cost savings for the debtors?

22  A    I do.

23            MR. HALLOWELL:  Objection, Your Honor.

24            THE COURT:  Overruled.

25  BY MR. HAMMOND:

1  Q    Mr. Whittman, did the RSA resolve issues with chartered

2  organizations?

3  A    The RSA provides a framework and a pathway to resolve

4  issues through continued negotiation with the chartered

5  organizations and the other RSA parties.

6  Q    Does the RSA address at all those chartered

7  organizations?

8  A    It does.

9  Q    Can you turn to page 77 of -- I guess it's page 15 of

10  the term sheet, which I believe is page 77 of the -- what is

11  Exhibit 6.

12  A    I'm there.

13  Q    Can you look at the bottom of the page?

14  A    Yes, this is the provision I was referring to relating

15  to the contributing chartered organization settlement.  It

16  states that the parties shall work in good faith to develop a

17  protocol for addressing participation by chartered

18  organizations and the benefits of the channeling injunction.

19  Q    And so is this the provision that you were referring to?

20  A    It is.

21  Q    And has there been any amendments to the RSA since July

22  1st, 2021 that address chartered organizations?

23  A    There was.  In particular, there was an amendment which

24  made clear something that I -- was always my understanding,

25  but made clear for all parties, that if the resolution of

1  chartered organization issues was unsatisfactory to the BSA or

2  to the ad hoc committee of local councils that they could

3  withdraw from the RSA.

4  Q     And are there discussions ongoing right now?

5            MR. RUGGERI:  Objection, Your Honor.

6            MR. HALLOWELL:  Objection.

7            MR. RUGGERI:  He can't -- those are what they say

8  is in the context of ongoing mediation, it's not appropriate.

9            MR. HAMMOND:  It's just a topical issue, Your

10  Honor; it's just is it happening.

11            MR. RUGGERI:  Your Honor.

12            MR. HAMMOND:  (Indiscernible) --

13            MR. RUGGERI:  Your Honor, we've got a number, we

14  have a half dozen topical issues which we're prepared to walk

15  right through that door because he's opened the door, but he

16  can't have it both ways.  I object unless it's clear that

17  there's been a waiver.  Thank you, Your Honor.

18            MR. HAMMOND:  Your Honor, we are not waiving

19  mediation privilege, but this is no more than you would put on

20  a privilege log if they asked.

21            MR. RUGGERI:  It is so.  It's asserting a fact,

22  it's asserting a fact.

23            THE COURT:  The question is, are you continuing to

24  talk, that's your question?

25            MR. HAMMOND:  That's my question, Your Honor.

1    MR. RUGGERI:  Judge, the problem is he's trying to

2  give a flavor that there's some hope for a resolution, it's

3  not appropriate.  Objection.

4    THE COURT:  I'm going to sustain the objection.

5    MR. HALLOWELL:  He also has narrowed it.  The

6  question is in --

7    MR. HAMMOND:  Thank you, Your Honor.

8    THE COURT:  Yeah, the question was, are you

9  continuing to talk about this.  I think that you're skating,

10  you are skating.  I'm sustaining the objection.

11    MR. HAMMOND:  Thank you, Your Honor.

12  BY MR. HAMMOND:

13  Q    Mr. Whittman, is there a provision in the RSA that

14  speaks to whether the BSA would be obligated to pay the

15  Coalition's attorneys' fees?

16  A    There is.

17  Q    Could you turn to page 7 of the RSA?

18    (Pause)

19  Q    I believe it's section -- you're at section 2(a)(vi)?

20  A    Yes, I see that.  This is the provision.

21  Q    Okay.  In your view, has the Coalition's work and

22  participation in this matter benefitted the estate?

23    MR. SCHIAVONI:  Objection, no foundation.  It calls

24  for an expert opinion on which there's no disclosure and, if

25  there is a foundation, it's based on information that's been

1 withheld as privileged.

2          MR. HAMMOND:  Your Honor, I disagree with that.  I

3 mean, certainly he can discuss the fact that -- I'll try to

4 avoid Mr. Hallowell's objection here.  Certainly he's

5 permitted to discuss his interactions and what the Coalition

6 has done, at least in terms of from an administrative

7 perspective, for purposes of the estate.

8          MR. SCHIAVONI:  All emails have been withheld on

9 this basis, all emails from Mr. Whittman about the subject

10 matter have been withheld.

11          MR. RUGGERI:  Your Honor, we would love to hear

12 about the interactions and they have been fully withheld.

13          MR. HAMMOND:  Your Honor, I'm not talking about the

14 interactions, I'm talking about -- Mr. Whittman, could you

15 please step outside the room for a second?

16      (Pause)

17          MR. HAMMOND:  Your Honor, I'm not talking about the

18 interactions between the Coalition and the BSA for the BSA, I

19 was trying to elicit the fact that the Coalition represents a

20 number of abuse claimants.  Had they not existed, you would

21 have to deal with hundreds of lawyers and the like.

22          MR. SCHIAVONI:  That's argument.

23          MR. HAMMOND:  That is something --

24          THE COURT:  Yes.

25          MR. HAMMOND:  -- that is something that Mr.

1  Whittman can certainly speak to, without an expert testimony,

2  without an expert report, and without revealing mediation

3  privileged information.

4          MR. SCHIAVONI:  That wasn't the question, Your

5  Honor.

6          THE COURT:  I'm not sure it was.  I'm not sure that

7  was the question.  You can ask him that question.

8      (Pause)

9  BY MR. HAMMOND:

10 Q    Mr. Whittman, who does the Coalition represent?

11 A    The Coalition represents a large number of abuse

12 survivors that have claims in the Boy Scouts bankruptcy

13 process.

14 Q    From a practical perspective, has the ability to

15 negotiate with the Coalition provided any benefit to the

16 estate?

17 A    It has.

18          MR. HALLOWELL:  Objection.

19          THE COURT:  Someone posed an objection, who was

20 that?

21          MR. HALLOWELL:  Mr. Hallowell.  This lacks

22 foundation.  If he's testifying about a practical perspective,

23 anybody could testify to that and it's not relevant.

24          THE COURT:  I'll overrule that objection.  You can

25 respond.

1    THE WITNESS:  I'm sorry, I forgot the question.

2  BY MR. HAMMOND:

3  Q    Sure.  From a practical perspective, has the ability to

4  negotiate with the Coalition provided any benefit to the

5  estate?

6  A    Yes, I believe it has.  In particular, the ability to

7  speak with a single party that represents a large number of

8  claimants has been more efficient, it also has been

9  particularly important given the fact that, in order to

10  achieve the type of plan of reorganization we're looking to

11  achieve, we know that we need the affirmative support of the

12  plaintiffs group.

13  Q    And will that provide a benefit to the estate on a

14  going-forward basis?

15  A    I believe it will in that, again, as we continue to

16  negotiate settlement with various other parties, those

17  settlements could only be realized with the support of the

18  plaintiffs and having that group of plaintiffs at the table in

19  a single body allows us to have those negotiations in a

20  productive way.

21  Q    Mr. Whittman, did you support authorizing the payment of

22  the Coalition's attorneys' fees?

23  A    I did.

24    MR. HALLOWELL:  Objection.  Objection, it's not

25  relevant whether he supported it or not, and they haven't

1 provided us with any discovery with regard to whatever advice

2 he provided to his client with regard to that or any analysis

3 that he performed.

4          MR. HAMMOND:  Your Honor, I think to the extent

5 that Mr. Whittman prepared discussions on it and

6 communications with the board, that information has been

7 provided.

8          MR. SCHIAVONI:  There's not a single document, Your

9 Honor, not -- I defy Mr. Hammond to point us to a board minute

10 or one of Mr. Whittman's PowerPoint presentations where he

11 discusses the TDPs --

12          MR. HAMMOND:  We weren't talk about --

13          MR. SCHIAVONI:  -- and particularly --

14          MR. HAMMOND:  -- the TDPs, Mr. Schiavoni.

15          MR. SCHIAVONI:  -- sorry, or the fee issue --

16 frankly, either of those two issues.

17          MR. HALLOWELL:  And we have established at the

18 outset of this hearing, Your Honor, that not a single piece of

19 paper was provided to the debtor with regard to this.  So what

20 is he going to analyze?

21          MR. GOODMAN:  Your Honor, that's not accurate --

22          THE COURT:  Okay, this is --

23          MR. GOODMAN:  -- that we have not provided the full

24 --

25          THE COURT:  Okay, this isn't a free-for-all.  The

1  question is, yeah, why is this relevant, unless he advised

2  somebody about it, and you haven't provided what his advice is

3  to the board.  He can think what he wants, if he didn't advise

4  the board, why is this relevant?  What's it -- why are you

5  going to use this?

6          MR. HAMMOND:  Your Honor, I believe these are

7  documented in the minutes, but I will --

8      (Pause)

9  BY MR. HAMMOND:

10  Q    Well, let me skip over this.  Are there any limitations

11  on the Coalition's attorneys' fees in the RSA or in the

12  amendments to the RSA?

13  A    There are.

14          MR. HALLOWELL:  Objection, leading.

15          MR. HAMMOND:  I was going to point to them, Your

16  Honor; I was just directing him to it.

17          THE COURT:  Yeah, it is, but it's not harmful.  You

18  can answer the question.

19  BY MR. HAMMOND:

20  Q    And what are the limitations?

21  A    The limitations are, first, the aggregate the amount,

22  the -- there's a cap on the fees other than the go-forward

23  fees of ten and a half million dollars, there is the cap on

24  the monthly go-forward fees following the entry of the RSA,

25  entry of the confirmation of the plan, of $950,000 a month.

1   There's been subsequent additional provisions added as part of

2   the proposed form of order following discussions with the U.S.

3   Trustee regarding subjecting the go-forward fees to the same

4   review as other professionals in the case, including review by

5   the fee examiner; as well as some limitations on scope,

6   including not spending or being allowed to spend any money for

7   the $950,000 on matters that are adverse to the debtors.

8   Q     Mr. Whittman, in the subsequent amendments to the RSA

9   and the proposed order, is there any other limitation on the

10  fees on a go-forward basis?

11  A     The -- on the go-forward basis, there's the, as I said,

12  the limitation of $950,000 a month and the opportunity -- the

13  subjecting of the fees to the same review as other

14  professionals in the case.

15  Q     Mr. Whittman, did you ever discuss the relevant terms of

16  the RSA with the BSA's governing bodies?

17          MR. RUGGERI:  Objection to the form, Your Honor.  I

18  don't know what that question even asks.  Did you discuss the

19  relevant terms?  Relevant to whom?

20          THE COURT:  Why don't you rephrase the question?

21          MR. RUGGERI:  Improper question.

22          THE COURT:  Why don't you rephrase the question?

23  Sustained.

24  BY MR. HAMMOND:

25  Q     Did you ever discuss --

1    MR. HAMMOND:  -- I will, Your Honor --

2  BY MR. HAMMOND:

3  Q    -- did you ever discuss the terms of the RSA with the

4  BSA's governing bodies?

5  A    I did.

6  Q    All right.  Did you have any meetings with the

7  bankruptcy task force in NEC (ph) and the National Executive

8  Board on June 5th of 2021?

9  A    I did.

10  Q    Did you make any presentations at these meetings?

11  A    I did.

12  Q    Can you turn to Exhibit 42?

13       (Pause)

14  A    Okay.

15  Q    Can you explain to the Court what Exhibit 42 is?

16  A    Exhibit 42 is a presentation that was prepared by

17  Alvarez & Marsal at my direction related to the proposed BSA

18  trust contribution, as well as the expected liquidity of the

19  organization going forward as a result of that contribution

20  and the other obligations that BSA would be taking on in a

21  plan of reorganization.

22  Q    Mr. Whittman, can you turn --

23       MR. HAMMOND:  -- Your Honor, I'd move to introduce

24  Exhibit 42 into evidence.

25       THE COURT:  Any objections?

1          MR. RUGGERI:  Your Honor, my objection has to do

2   with the redactions.  I wouldn't have an objection if it

3   weren't redacted the way it is.  I have trouble understanding

4   how the, you know, blanks there are privileged given the

5   nature of the presentation and the role of Mr. Whittman in the

6   case.  So I have no objection to an un-redacted copy of this

7   being admitted into evidence.

8          MR. HAMMOND:  Your Honor, it's pretty clear from

9   looking at the columns here and (indiscernible) to focus on

10  what the actual objections are here.  One column says "Last

11  formal BSA offer," clearly made in mediation; one column says

12  "Coalition TCC formal position," clearly made in mediation.

13  Those seem to me to be squarely within mediation privilege.

14  I'm not sure I understand the real basis of this other than

15  they want to see the information.

16         MR. RUGGERI:  So, Your Honor, now the Court

17  obviously sees from this that we're being shielded from having

18  any of the foundational documents.  I forget the phrase that

19  Mr. Hammond used about the final agreements, right?  All you

20  get is that, you don't get anything more.  I don't think those

21  are, frankly, any more privileged than the other material on

22  the page.  If they want to admit the document, again, it

23  should be admitted in an un-redacted form.  This is a

24  financial adviser, he is providing information about

25  contributions and consideration and payments; they're just

1  blacking out those that they don't want us to see.  It's

2  inappropriate.

3          MR. HAMMOND:  No, Your Honor --

4          MR. HALLOWELL:  Your Honor -- Your Honor, this is

5  Mr. Hallowell for AIG and I would simply add to the objection

6  that, as has been established by the testimony here today,

7  this is material that the BSA board reviewed.  So this isn't

8  just back-and-forth, this is what they're trying to establish

9  is that all of this was part of the board's consideration with

10  regard to the RSA and yet they're not producing it.

11          MR. HAMMOND:  Your Honor, it would be a very odd

12  rule of privilege that you have to produce privileged

13  information that a board considered, that means there could

14  never be a privileged communication with a board.  That

15  exception would swallow the rule that Mr. Hallowell is

16  advocating for here.

17          MR. RUGGERI:  I think he's right, Judge, there is

18  something swallowing the rule, there's something swallowing

19  this whole proceeding and that's the claim of mediation

20  privilege, Your Honor.  Even under the business judgment test,

21  they have to meet their burden of proving the foundation and

22  by claiming privilege (indiscernible) privilege is that's a

23  burden they cannot met.

24          MR. SCHIAVONI:  I'm sorry, Your Honor, this is also

25  -- these are statements by a financial adviser about financial

1  issues.  This is not legal advice at all here, this is

2  financial advice.  And, look, it's noteworthy when you go

3  through the document, this is supposed to be the full

4  presentation to the board about the settlement, there's not a

5  single word about the TDPs anywhere in here or about the fees.

6  So if they're in the privileged information, we ought to see

7  them.

8        (Pause)

9        MR. HAMMOND:  Your Honor, I still don't understand

10 how you get by Rule 9019 given that this is clearly mediation

11 proposals.

12       MR. RUGGERI:  Your Honor, this goes back to your

13 instruction on July 27th, we're entitled to know what the

14 board considered, when it considered it, and what it did

15 consider.

16       MR. SCHIAVONI:  _Tribune_ talks about maintaining

17 privilege of what happened in the mediation --

18       THE COURT:  Yep.

19       MR. SCHIAVONI:  -- this is what happened before the

20 board on a matter on which the debtor is affirmatively seeking

21 findings and has waived the rest of the document and,

22 arguably, waived through the testimony that we've heard

23 already from this witness, and they're going to offer into

24 evidence in some sort of findings.  _Tribune_ doesn't go this

25 far.  You can't invoke mediation over everything from the

1  beginning of the case forward especially when you're putting

2  it at issue.

3        The case Mr. Ruggeri cited to the Court earlier

4  specifically addresses that, an instance where a party was

5  putting at issue something that they did in mediation, then

6  trying to seek a finding about it.

7        Your Honor, there's one other thing just as

8  significant in weighing like the back and forth that went on

9  in Tribune about this.  This is not -- you know, we were not a

10  mediation party to this discussion.  This isn't one mediation

11  party seeking to use a communication against the other; we

12  weren't part of this at all.  These thousands of meetings that

13  Mr. Whittman talked about, we weren't at those meetings.  It's

14  like -- so this isn't -- we're not using something that we

15  said or did in a mediation communication against them.

16        MR. HAMMOND:  Your Honor, I'm not sure what that

17  has to do with the question at hand here, which is whether to

18  admit this document or not, but -- and the objection that was

19  raised was privilege as to why the document -- what is non-

20  privileged in the document should be admitted.

21        THE COURT:  Well, yes, you're asking me to admit a

22  portion of a document and what I'm trying to figure out is

23  whether that's fair.  Okay?  But you're asking me to admit a

24  document that is redacted, redacted for what the debtor says

25  is privileged, and the question is, is that fair?

1          MR. HAMMOND:  Well, Your Honor, I think the answer

2    is, certainly I've heard no dispute that what the last formal

3    BSA offer is on the left-hand side is mediation privileged

4    material.  And the question on the right-hand side is whether

5    the Coalition/TCC formal proposal made in mediation is subject

6    to mediation privilege, which my understanding under Rule 9019

7    it is and my understanding under your order it is.

8          So can you reveal those privileged communications

9    in connection with the production of this document?  And I can

10   tell you there's certain other attorney-client privilege

11   issues down at the bottom of this page.

12         MR. RUGGERI:  No, Your Honor, the second column is

13   noteworthy because it says "likely resolution."  We're not

14   even getting the punch line here, we're getting an interim

15   report; he just doesn't want us to see the other interim

16   reports.  There's no more or less privilege to any portion of

17   this document than the portions that they're offering into

18   evidence.

19         THE COURT:  Well, I was looking at that column as

20   well trying to figure out what I would do with that, but --

21   yeah, in Tribune the court adopted an appropriate balance

22   between allowing discovery of potentially relevant information

23   and protecting the confidentiality of the mediation.  So it

24   doesn't mean that mediation privilege is always -- always

25   means that something can't be discovered or that you can

1  redact documents and use them in court.  And that's what I'm

2  struggling with is you want to use this document for a purpose

3  favorable to the debtors, but you don't want to provide the

4  entire document.  Forget any other document or the backup or

5  the analysis, you want to use this document.

6           MR. HAMMOND:  That's correct, Your Honor, but, I

7  mean, I view it no differently than you would have in the

8  circumstance where you're producing privileged board

9  materials, which happens all the time.  The question is

10 whether the material is privileged, that is the issue.

11 Clearly, it's a mediation position as reflected on the page

12 and we believe that under Rule 9019 of the local rules that is

13 mediation privilege, we believe it's mediation privilege under

14 your order, and --

15           THE COURT:  You know, don't throw --

16           MR. HAMMOND:  -- I believe the Tribune case --

17           THE COURT:  -- stop throwing --

18           MR. HAMMOND:  -- is probably --

19           THE COURT:  -- stop throwing the order back at me,

20 okay?  I --

21           MR. HAMMOND:  Well, Your Honor, I apologize --

22           THE COURT:  This is not -- the issue, even when

23 mediation privilege is recognized, in Tribune the court

24 permitted discovery of certain documents.  So it's not an

25 absolute and it makes a court hesitant to send something to

 1  mediation.  Okay?  And mediation is important.

 2         So I want to see this document.  Somebody needs to

 3  -- we're going to take a break.  I had hoped to get through

 4  Mr. Whittman's direct.  We're going to take a break now.

 5         Mr. Whittman, you are not to talk to anybody about

 6  your testimony.  You are in the middle of testimony.  I know

 7  you understand that, I'm sure you've been in this situation

 8  before.

 9         I would like that emailed to my chambers, the un-

10  redacted document, so I can take a look at it.

11         MR. HAMMOND:  Your Honor, could I just take care of

12  one housekeeping matter before we break?

13         THE COURT:  Yes.

14         MR. HAMMOND:  And that was Exhibit 1A, which was

15  the letter from the -- it was attached to the Mosley

16  declaration, the June 9th letter, and I wanted to move that

17  into evidence.

18         THE COURT:  Anyone have any objection?

19         MR. HALLOWELL:  Objection, Your Honor.

20         THE COURT:  What's the objection?

21         MR. HALLOWELL:  Objection.  It's hearsay and it

22  cannot be established by this witness, he is not a sender or

23  recipient of that document.

24         THE COURT:  1A?

25      (Pause)

1          THE COURT:  What's your response?

2          MR. HAMMOND:  Your Honor, Mr. Whittman is the lead

3   financial adviser, certainly he came into possession of this

4   document during the course and scope of his duties as a -- as

5   the lead financial adviser to the BSA and in connection with

6   participating in these discussions.

7          THE COURT:  Okay.

8          MR. HAMMOND:  So I believe he has sufficient

9   knowledge.

10          THE COURT:  When we come back, you can lay the

11   foundation and you can ask him questions about the document,

12   and we'll see if it's admissible.

13          MR. HAMMOND:  Thank you, Your Honor.

14          THE COURT:  Okay.  We're going to take a recess.

15   It's 2 o'clock, we're going to take a recess until 3:00.

16   We're in recess.

17          COUNSEL:  Thank you, Your Honor.

18      (Recess taken at 2:01 p.m.)

19      (Proceedings commenced at 3:11 p.m.)

20          THE COURT:  This is Judge Silverstein.  We're back

21   on the record.  I would like -- okay, I would like to continue

22   a discussion without Mr. Whittman --

23          MR. KENNEDY:  Your Honor, this is Doug Kennedy, a

24   member of the Tort Claims Committee.  May I beg the indulgence

25   of two minutes of the Court's time, please?

1          THE COURT:  Not right this minute.  I would like

2    Mr. Whittman to go back out in the hallway so we can have a

3    discussion.  Thank you.

4          THE WITNESS:  Yes, Your Honor.

5       (Pause)

6          THE COURT:  During the break, I've given this some

7    thought.  Mr. Kurtz in his conversation on discovery said,

8    "The debtors' case is about two things:  process and terms."

9          I think the debtor is straying away from that and

10   that's creating issues.  And if the debtor is correct that its

11   case is about process and terms then it needs to limit its

12   discussion to that and then, within that, you can get within

13   the case that talk about business judgment and they talk about

14   whether or not, for example, debtors have sought legal advice;

15   not what the legal advice is, but whether they've sought it or

16   not.

17         And I happen to be looking at Vice Chancellor

18   Parson's decision in Comverge, Inc. Shareholders Litigation,

19   2013 W.L. 1455827, which I got after reading Unitrim (ph).

20   Unitrim I think is distinguishable because communications of

21   attorneys were put into evidence.  It wasn't an at-issue case,

22   okay?  But Judge -- or former Vice Chancellor Parsons speaks

23   to due care, whether the board acted in due care, with due

24   care.

25         So I think the debtor is straying from what Mr.

1  Kurtz said, in any event, that this is about process and

2  terms.  And I think one of the reasons the debtor may be

3  straying is because the order requests a finding that the RSA

4  was negotiated at arm's length and in good faith, and that

5  suggests I need to make a finding about everybody and

6  everybody's involvement -- and not just what the debtor did,

7  but everybody's involvement, and everybody's involvement and

8  what they did I think is -- for purposes of the RSA, is a much

9  broader set of circumstances.

10         And I started out with what does good faith mean in

11  the context of an RSA and what do I need to decide.  And I'm

12  still not sure I understand what good faith means in the

13  context of an RSA and I will acknowledge that some courts have

14  found good faith for specific parties in the RSA context, but

15  I think that requires a much different evidentiary basis than

16  just what I consider to be a small scope of this hearing,

17  which is basically should the debtors be able to go forward

18  here.  From the debtors' perspective, has it properly

19  exercised its business judgment?

20         So I don't think it's too much different from what

21  I said before.  What did the debtor consider?  What advice did

22  they consider, topics did they consider.  What did they not

23  consider?  I don't think that means that objectors get to go

24  behind those topics necessarily to explore advice that was

25  given unless people are relying on that advice as part of

1  their case and, quite frankly, I'm a little unclear on

2  debtors' case.

3          So I guess the question I would have -- and if the

4  debtors need to huddle, that's fine, or if all the RSA parties

5  need to huddle, that's fine -- is how are we going forward?

6  Are we insisting on a good faith finding?  Because, if we are,

7  then I'm going to find that the scope of what can come into

8  evidence is much broader.  And, if you're not, then I think

9  the testimony should be tailored and, if it goes beyond what

10  the debtors think they have to prove to me, which is process

11  and terms, then they may open the door to privileged

12  communications coming out in evidence.

13          I did look -- I will say, I did look at the

14  document that was sent to chambers.  Thank you very much.  I

15  do believe that the redactions are either probably mediation

16  privilege or attorney-client privilege.  If you want to use

17  the document, I guess the question is why are you using it?

18  Does it go to terms?  Does it go to process?

19          MR. HAMMOND:  Do you want a response, Your Honor,

20  to that discussion?

21          THE COURT:  This is --

22          MS. LAURIA:  Actually, Mr. Hammond -- this is

23  Jessica Lauria, Your Honor, may I just before we go back into

24  the evidentiary record respond to Your Honor's request about

25  whether we need the good faith findings in the order and the

1  arm's length negotiation?  I certainly can speak for the

2  debtor, but I have not consulted with the other RSA parties on

3  that topic.  It may streamline the rest of the evidentiary

4  presentation if we take a brief, ten-minute break and consult

5  with the other RSA parties concerning what their views are on

6  that subject matter and come back to the Court.

7           THE COURT:  I think that's fine, and I'll give you

8  15.  So I've got 3 --

9           MS. LAURIA:  Thank you, Your Honor.

10          THE COURT:  -- I've got 3:20, we'll reconvene at

11 3:35.  Thank you.  We're in recess.

12      (Recess taken at 3:20 p.m.)

13      (Proceedings resumed at 3:34 p.m.)

14          THE COURT:  Ms. Lauria.

15          MS. LAURIA:  Thank you, Your Honor.  Jessica

16 Lauria, White & Case, on behalf of the debtors.  Thank you for

17 accommodating us with that brief recess.  In the olden days, I

18 think we would have just gathered behind counsel table and had

19 that conversation, but we are where we are with our

20 technology.

21          I think I can speak on behalf of all of the RSA

22 parties that we are comfortable removing the good faith, arm's

23 length findings from the form of order or from the findings

24 that the Court would be making.  Of course, you will need to

25 decide that we've satisfied the applicable legal standard, we

1  think that standard is business judgment, but beyond that we

2  do not need the good faith, arm's length findings.

3          THE COURT:  Thank you.

4          Okay.  So we can recommence with our witness.

5          MR. HAMMOND:  Thank you, Your Honor.  We'll get

6  this working.

7      (Pause)

8          THE WITNESS:  Thank you, Your Honor.

9          MR. HAMMOND:  Your Honor, I think, from a

10  housekeeping perspective, we were on Exhibit 1A.  We can defer

11  that and I think, if we could start at -- and we had moved 1A

12  into evidence and there were several objections, that Mr.

13  Whittman didn't sign the document.  I think our view is that

14  the document can come in at a minimum under Rule 807, but if

15  you'd prefer us to (indiscernible) we're happy to do that as

16  well.

17          THE COURT:  It can come in -- I'm sorry --

18          MR. HAMMOND:  Is there any real objection that this

19  is an authentic document?

20          MR. HALLOWELL:  We object.  We object to -- there's

21  no foundation for the document, the document is hearsay, and

22  we don't understand how this communication is not subject to

23  the mediation objection but everything else communicated to

24  (indiscernible) --

25          THE COURT:  Excuse me for a moment.  Are you having

1  a little --

2              MR. HAMMOND:  Is this --

3              THE COURT:  -- hesitation here or is it just me?

4        (Pause)

5              THE COURT:  Okay.  Well, the document is hearsay.

6  I didn't hear your reason for why it should come in, just

7  under the more general --

8              MR. HAMMOND:  It can come in under the residual

9  exception --

10             THE COURT:  -- residual --

11             MR. HAMMOND:  -- (indiscernible) --

12             THE COURT:  Yeah, I'll permit it under the residual

13  exception.  It looks like what it is and I think it has enough

14  indicia of authenticity.

15        (Debtors' Exhibit 1A received in evidence)

16             MR. HAMMOND:  Thank you, Your Honor.

17             I think the next order of housekeeping here was

18  Exhibit 42 that we had moved into evidence and that's where we

19  left off our discussion.

20             THE COURT:  Okay.  And are --

21             MR. HAMMOND:  And bearing in mind -- I was just

22  going to say, bearing in mind Your Honor's comments, I think

23  this does go to process and it does go to terms to the extent

24  that it results -- it's discussing communication with the

25  National Executive Board concerning terms of the deal.

1          MR. HALLOWELL:  Your Honor, based on that

2    description, this document I do not believe was prepared for

3    the National Executive Board.

4          (Pause)

5               THE COURT:  It wasn't prepared for who?

6               MR. HALLOWELL:  The National Executive Board.

7          (Pause)

8               MR. HAMMOND:  I think you cut out.

9               MR. HALLOWELL:  Can you hear me now?

10              MR. HAMMOND:  Yes.

11              MR. HALLOWELL:  This is not a document that was

12   prepared for the National Executive (indiscernible) --

13              MR. HAMMOND:  I think Mr. Whittman's testimony was

14   to the contrary.

15         (Pause)

16              THE COURT:  Okay.  Can everyone who is not speaking

17   make sure you're muted?

18         (Pause)

19              THE COURT:  Well, I'm looking back at my notes and

20   I don't know that I have that.  Could you please ask Mr.

21   Whittman again what this was prepared for?

22              MR. HAMMOND:  Yes, Your Honor.  Thank you.

23                   CONTINUED DIRECT EXAMINATION

24   BY MR. HAMMOND:

25   Q    Mr. Whittman, I'm referring you to Exhibit 42, and you

1   previously had talked about presentations that you made for

2   the National Executive Committee, the Bankruptcy Task Force

3   and the National Executive Board, can you describe who this

4   presentation, the one dated June 5th of 2021, was prepared

5   for?

6   A    This presentation was provided both to a meeting, a

7   joint meeting of the BTF and the NEC, and later the same day

8   to a meeting of the National Executive Board.

9            THE COURT:  Okay.  I will admit the document.

10        (Debtors' Exhibit 42 received in evidence)

11            MR. HAMMOND:  Thank you, Your Honor.

12   BY MR. HAMMOND:

13   Q    Mr. Whittman, at this June 5th meeting, did you discuss

14   the financial contribution of the BSA that was contemplated

15   under the RSA?

16   A    We did.

17   Q    Okay.  And why did you prepare this document?

18   A    I prepared this document to provide the board with an

19   update on the negotiations between the parties and the --

20   where we expected the likely resolution as it related to BSA's

21   contribution to the settlement trust, so that the board could

22   consider that information and approve moving forward with a

23   settlement that included -- or was an RSA that included this

24   level of contribution, including both the aggregate

25   contribution and the associated debt component of the

1  contribution.

2  Q    And why was this presentation made to both the BTF and

3  the National Executive Committee on one side and then the

4  National Executive Board?

5  A    We made the presentation first to the BTF and the NEC,

6  so they could ask their questions, and then in turn we made

7  the presentation to the NEB.  The NEC was able to recommend to

8  the full board that they approve the settlement, these

9  settlement provisions.

10 Q    And what was the amount of the settlement contribution

11 that was contemplated here?

12 A    This contemplated a settlement of up to $250 million

13 with a component, a debt component being $80 million.

14 Q    And why were those two components presented to the

15 National Executive Board?

16 A    It is my understanding that the National Executive

17 Board, their authority was required for the organization to

18 take on additional debt and that, while many aspects of the

19 RSA were within the purview of the National Executive

20 Committee, committing the BSA to taking on additional debt

21 required approval of the National Executive Board.

22 Q    In connection with this presentation you made, did you

23 discuss with the National Executive Board factors that should

24 be considered to help them evaluate the financial contribution

25 of the BSA that was requested in the RSA?

1  A    We did.  We talked about all of the commitments that BSA

2  was undertaking in accord -- or under the plan of

3  reorganization, in the proposed plan of reorganization, how

4  those commitments would position BSA from their liquidity

5  position coming out of bankruptcy, and how those commitments

6  would unfold over the following ten-year period and the impact

7  they would have on BSA's liquidity.

8  Q    And can you turn to slide 2 in the presentation, please?

9  Mr. Whittman, did you present this slide 2 at the National

10  Executive Board meeting?

11  A    I did.

12  Q    And can you explain what is in slide 2?

13  A    Slide 2 provides a look at BSA's projected liquidity

14  over the next roughly two-year period through the end of 2023,

15  starting with an assumed effective date of a plan at August

16  30th -- or 31st of 2021, and how the liquidity would unfold

17  from that point.  It also provides some alternative scenarios,

18  one is a timing scenario, delaying emergence to March 31st of

19  2022, and the other is a downside scenario.

20  Q    And you had mentioned a $80 million note before?

21  A    I did.

22  Q    Did you discuss the terms of the $80 million note with

23  NEB when you did that?

24  A    We did.  We talked about the key terms that would be

25  authorized for the note, both in terms of the size, the

1  cadence of principal payments, the interest provisions, and so

2  forth.

3  Q    Can you turn to slide 6 in Exhibit 42, please?  And, Mr.

4  Whittman, can you explain to the Court what slide 6 reflects?

5  A    In particular, slide 6, as it relates to the $80 million

6  trust note, reflects the expected principal payments on the

7  note, which were divided into a fixed component and a variable

8  component, it also reflects the interest associated with that

9  note.  And then, moving down the page, it provides the board

10 the complete picture of the other obligations that BSA would

11 have at emergence, including a JPMorgan secured debt that

12 would be reinstated, the UCC -- sorry, the payment obligation

13 to the general unsecured creditors of $25 million that would

14 be paid out over the course of two years and the loan from the

15 foundation that is contemplated in the plan, and lays out all

16 those payments over time and the expected BSA liquidity

17 position both in terms of unrestricted liquidity and the

18 restricted cash and investment balance over that same period

19 of time.

20 Q    In connection with your presentation to the National

21 Executive Board on June 5th, did the National Executive Board

22 engage you in discussions?

23 A    They did.

24 Q    And, following this presentation, did you make any

25 recommendation to the National Executive Board as to whether

1  they should authorize a settlement contribution of up to $250

2  million with a note of up to $80 million?

3  A    I did make a recommendation and I recommended that they

4  move forward with approving that -- those settlement

5  provisions.

6  Q    Did the National Executive Board ultimately authorize a

7  settlement payment to the trust of up to $250 million and it

8  turning into an $80 million at this June 5th meeting?

9  A    They did.

10  Q    Can you turn to Exhibit 30, please?

11      (Pause)

12  Q    Mr. Whittman, are these the minutes of the National

13  Executive Board meeting held on June 5th?

14  A    They are.

15  Q    And if you turn to the last page, page 3, do you see at

16  the bottom of page 3 where it says, "Upon motion, unanimously

17  approved."  Without any abstentions, the board voted to

18  approve the proposed settlement package estimated at $250

19  million, including the additional $80 million note to the

20  victims' trust?

21  A    I do.

22  Q    Is that consistent with your recollection of that

23  meeting?

24  A    That is.

25  Q    Now, Mr. Whittman, between the National Executive Board

1  meeting that was held on June 5th and July 1st, when the BSA

2  entered into the RSA agreement, did you have any other

3  meetings with the National Executive Committee and Bankruptcy

4  Task Force?

5  A    Yes, I had several meetings with the Bankruptcy Task

6  Force and at least one with the National Executive Committee.

7  Q    And during those meetings did you discuss the local

8  councils' contributions under the RSA?

9  A    I did.

10  Q    Why were you discussing with the Bankruptcy Task Force

11  and the National Executive Committee local councils'

12  contributions under the RSA?

13  A    During that period of time there was negotiations

14  ongoing related to how much the local councils would

15  contribute and in fact on July -- sorry, on June 17th we filed

16  the third amended plan reflecting a $500 million contribution

17  from the local councils to the settlement trust.  From that

18  point, there were continued discussions and negotiations

19  related to the $100 million, what became known as the DST

20  note.  Those DST notes, there's an interplay between the

21  funding of that note from the local councils and the pension

22  plan of the debtors.  The debtors were keenly interested in

23  that structure of that note and I was heavily involved in the

24  negotiations of that note, and we had numerous discussions

25  related to that component of the local council contributions

1  both before and after June 17th and up until entry of the RSA.

2  Q    And if you'd turn to Exhibit 46, Mr. Whittman?

3  A    I'm here.

4  Q    Mr. Whittman, can you explain to me what Exhibit 46 is?

5  A    This was a presentation that was prepared at my

6  direction by my team at Alvarez & Marsal for a meeting with

7  the National Executive Committee on June 22nd, specifically

8  related to the local council trust contributions, including

9  the DST note.

10 Q    Mr. Whittman, can you turn to slide 2 of Exhibit 46?

11 A    I'm there.

12 Q    And can you explain what you were trying to convey to

13 the National Executive Committee in slide 2?

14 A    On slide 2, I'm conveying first that we have an

15 agreement where the ad hoc committee has signed on to raising

16 the $500 million from the local councils and the composition

17 of the $500 million in terms of the cash and the property, and

18 some of the specific terms around how the cash and property

19 would be contributed, and then I am conveying that in the

20 event that we are able to reach an RSA that includes the --

21 not only the Coalition, but the TCC, that we are going to be

22 including -- we have an agreement to include an additional

23 $100 million of consideration in the form of a nonrecourse

24 note, which ultimately becomes what I've called the DST note.

25 Q    If you'd turn to slide 3 for a moment, please?

1  A      Okay.

2  Q      And in slide 3, at the top, it refers to a $100 million

3  nonrecourse note, is that the DST note that you're referring

4  to?

5  A      That is.

6  Q      And what are the terms of that note?

7  A      The key terms I believe (indiscernible) with the board

8  is that the note would be a nonrecourse note issued by this

9  special purpose entity, that it would only be paid --

10  essentially, money from the local councils based on a formula,

11  a 12-percent-of-payroll formula would go into this special

12  purpose entity and, depending on the level of cushion in the

13  Defined Benefit Pension Plan at certain points in time,

14  payments would come from that account to pay the note, and if

15  there was insufficient cushion in the pension plan or the

16  pension plan was underfunded, then monies would go from that

17  account into the pension plan.

18  Q      Mr. Whittman, did the National Executive Committee ask

19  you any questions about your presentation on June 22nd?

20  A      They did.  We had a very robust discussion about this

21  issue.

22  Q      Do you believe that the National Executive Committee

23  understood the information that you were conveying to it at

24  the June 22nd meeting?

25  A      I do.

1             MR. SCHIAVONI:  Objection.

2             MR. HALLOWELL:  Objection.

3             THE COURT:  Sustained.

4             MR. HAMMOND:  I'm sorry, Your Honor, I didn't --

5             THE COURT:  I sustained that objection.

6             MR. HAMMOND:  I think at this time I'll pass the

7    witness.  But before I do, I do have some housekeeping matters

8    to address -- one housekeeping matter to address.  I wanted to

9    move in the two declarations that were submitted in connection

10   with the RSA motion.

11            MR. HALLOWELL:  We object to that, Your Honor.

12            MR. RUGGERI:  We join --

13            THE COURT:  Okay.  I take it these are the two

14   declarations --

15            MR. RUGGERI:  -- for the reasons stated in our

16   motion.

17            THE COURT:  -- declarations of Mr. Whittman?

18            MR. HAMMOND:  Yes, Your Honor, I believe it's 2 and

19   4 in the binders, and it's docket number 5470 and 5766.

20            MR. HALLOWELL:  Your Honor, the declarations are

21   obviously hearsay.  We've had several hours of direct

22   testimony from Mr. Whittman that has covered every possible

23   subject and there is no reason for the debtors to move these

24   hearsay documents into evidence -- and, if they do, we ask

25   that you strike the entirety of Mr. Whittman's direct

1  examination.

2          THE COURT:  Let me hear a response.

3      (Pause)

4          THE COURT:  Mr. Hammond --

5          MR. HAMMOND:  I'm sorry, Your Honor, I --

6          THE COURT:  -- Mr. Hammond, let me hear a response.

7          MR. HAMMOND:  Your Honor, we believe it's customary

8  to introduce these declarations.  They'll have a full

9  opportunity to cross-examine him on the points raised in the

10 declarations and I assume they will.  So we believe that it's

11 -- you know, Mr. Whittman is being made available, he's been

12 made available at depositions, they've been offered -- they've

13 been offered the opportunity to cross-examine him on it at

14 depositions that they've declined and now they'll have an

15 opportunity to examine him in open court.  So we believe it's

16 appropriate to introduce those declarations into evidence at

17 this time.

18         MR. RUGGERI:  Your Honor, James Ruggeri for

19 Hartford.  I apologize for being a little slow on the draw

20 here.  I do think the declarations actually go to the issue

21 that I think was -- as the case was narrowed, when we're just

22 looking at process and terms from the perspective of debtors,

23 if you look at the declarations in particular, the 726

24 declaration, it goes into the issues that caused all the mud

25 wrestling earlier today, they're hearsay.  I think that the

1  direct testimony has supplanted the need for any declarations

2  and I actually think that letting them -- admitting them in

3  evidence gets us into the mud wrestling exercise that we're

4  trying to avoid now.

5            Thank you, Judge.

6            THE COURT:  Okay.  My inclination is to not admit

7  the declarations.  We've had significant testimony from Mr.

8  Whittman, it was not just some additional testimony, but I

9  will give the debtors an opportunity to see if there's any

10 particular paragraph of these declarations that was not

11 testify to and that is germane to the scaled-down hearing that

12 we're having.

13           MR. HAMMOND:  Thank you, Your Honor.  And one last

14 thing, I believe -- I just wanted to make sure I did this, was

15 move to introduce Exhibit 46 into evidence as well.

16           MR. SCHIAVONI:  Your Honor, I would ask to be heard

17 on 46.  I'm getting a -- by the way, I'm getting a little

18 message saying you cannot start your video because the host

19 has stopped it, I think that's the Court, and maybe there's

20 good reasons not to see me and I'm okay with that, okay?  But

21 I'm not masking myself on purpose.  I just want you to know.

22           So, Your Honor, on this particular exhibit -- oh,

23 hold it, maybe they've fixed it there.  Ah, there I am.  Okay.

24 Well, for better or for worse, right?

25           So, Your Honor, on this exhibit, I know this In re

1  Comverge, Inc. case and I just took another look at it during

2  the break, and I think the exhibit you just saw illustrates

3  really the problem we have.  In In re Comverge, Inc., what the

4  court took comfort from -- and like the money, the money

5  quote, so to speak -- in the decision is a close examination

6  of the Comverge, Inc. defendant statements reveal that they

7  have adhered assiduously to assertions that the board only

8  sought, obtained, received, or considered the advice of

9  counsel.  That's not what you just listened to for ten minutes

10  of walking through this board minutes.  They walked through it

11  and it has multiple references in it to things that Mr.

12  Whittman, a financial adviser, not a lawyer, told the board.

13          And then Mr. Whittman, they had him elicit

14  information from that document and assert that information for

15  the truth of the matter asserted, affirmatively.  Meanwhile,

16  it's like the excising of it is very -- it's very deliberate,

17  it's very selective.  It's not just sections of it where it

18  says, "Ms. Lauria said," and then excised, Mr. Whittman's

19  statements are excised.

20          So we don't think the document should come in.  We

21  think there was affirmative waiver in connection with the use

22  of the document.  And, you know, this does go back to our

23  whole issue about how we're prejudiced about even just cross-

24  examining Mr. Whittman because the only documents they've

25  released contemporaneously are sections that they want in

 1  evidence.

 2          And just on that point, to be clear, the one thing

 3  you don't see anywhere in this document is anything about the

 4  TDPs or the fees.

 5          MR. HAMMOND:  Your Honor, I think Mr. Schiavoni has

 6  the wrong document.  Obviously, I said Exhibit 46; I think

 7  he's referring to Exhibit 30.  So I'm not quite sure what his

 8  objection is.

 9          MR. SCHIAVONI:  I'm referring to Exhibit 30, which

10  was used.

11          MR. HAMMOND:  I didn't move to introduce it, so

12  what's your point?

13          MR. SCHIAVONI:  That by using it you waived

14  substantively the privilege.

15          MR. HAMMOND:  I think the subject matter at issue

16  was Exhibit 46.

17          THE COURT:  Okay.  Is there an objection to Exhibit

18  46?

19      (No verbal response)

20          MR. SCHIAVONI:  Mr. Hammond, which -- excuse me,

21  Your Honor -- Mr. Hammond, which exhibit is 46?

22          MR. HAMMOND:  46 was the A&M presentation, June

23  22nd, 2021.

24          MR. SCHIAVONI:  One second.

25      (Pause)

1          MR. SCHIAVONI:  I have the same objection to the

2  privilege assertions in it.

3          THE COURT:  Okay, I'm going to deny admission of

4  this exhibit.

5          MR. HAMMOND:  Are we talking about exhibit -- Your

6  Honor, just --

7          THE COURT:  Exhibit 46.

8          MR. HAMMOND:  -- to be clear for the record, are we

9  talking about Exhibit 46?

10          THE COURT:  46.

11      (Pause)

12          THE COURT:  Okay --

13          MR. HAMMOND:  Okay.

14          THE COURT:  -- cross.  Who's going to take the

15  lead?

16          MR. SCHIAVONI:  It's our witness, Your Honor?

17          THE COURT:  Yes.

18          MR. SCHIAVONI:  I will.  If first I may just ask

19  the courtesy from Mr. Hammond of the May 25, 2021 statement,

20  the PowerPoint presentation, can you give me the exhibit

21  number of that, please, that you used so I can use the same

22  one?

23          MR. HAMMOND:  I don't believe I used the May 25th

24  presentation; I used the June 5th one.

25          MR. SCHIAVONI:  Ah, the June 5th, yes.  What's the

1   number on that?

2          MR. HAMMOND:  June 5th is Exhibit 42.

3          MR. SCHIAVONI:  Okay.

4                    CROSS-EXAMINATION

5   BY MR. SCHIAVONI:

6   Q    Mr. Whittman, you're a financial adviser, am I right?

7   A    I am.

8   Q    And you haven't provided any legal advice in this case,

9   have you?

10  A    I have not.

11  Q    And one of the things you offered testimony on as part

12  of your direct is the information you've provided to the board

13  in connection with its decision-making associated with aspects

14  of the RSA, am I right?

15  A    I have -- yes, I have testified as to advice I've given

16  to the board as part of their decision-making process.

17  Q    Am I right, Mr. Whittman, that at the time that you

18  provided your advice to the board about going forward with

19  aspects of the RSA you didn't provide a draft of the RSA to

20  the board?

21  A    I'm not sure --

22          MR. HAMMOND:  Objection to form.  I just -- what

23  are we talking -- which board are we talking about?

24  BY MR. SCHIAVONI:

25  Q    Oh, any of the boards, Mr. Whittman.  Did you provide a

1  copy of the draft RSA to the board, any of the boards, for

2  approval?

3  A     I believe that the board saw -- the board, NEB, the NEC,

4  and the BTF saw drafts of the RSA at different points in time.

5  I'm not sure which specific point in time you're referring to.

6  Q     Before it was executed.

7  A     Yes, before it was executed.

8  Q     Okay.  Can you point us to a board minute that refers to

9  the board being provided with a draft of the RSA before it was

10  signed?

11  A     I'm not sure that I could.  I'm not familiar with all of

12  the board minutes.

13  Q     Okay.  What you have in front of you, are those the

14  board minutes?

15  A     I believe some of these exhibits --

16        (Audio gap)

17  Q     -- Mr. Whittman, provide a copy of the RSA or draft of

18  it to the board before it was signed?

19  A     That would not have been my role to do so --

20  Q     Okay.  And, Mr. Whittman, can you testify under oath

21  based on your personal knowledge that the board was in fact

22  provided with a draft of the RSA or the completed agreement

23  before the board -- before it was signed?

24  A     Which board are you referring to?

25  Q     Well, let's start with the NEC.  Do you have a present

1  recollection of providing -- of the board in fact being

2  provided with a copy of the RSA before it was signed?

3  A    I did not provide anyone with a copy of the RSA, but I

4  do believe that the NEC and Bankruptcy Task Force saw copies

5  of the RSA prior to execution.

6  Q    Okay.  And that's what I'm just trying to tease out,

7  sir.  Do you just believe it or can you testify under oath

8  that in fact it happened, that the board was in fact given a

9  copy of the RSA before it was signed?

10  A    I am certain that the board was given a copy of the RSA

11  before it was signed.

12  Q    Okay.  Have you reviewed Mr. Ownby's testimony on that

13  issue?

14  A    I have not reviewed any of Mr. Ownby's testimony.

15  Q    And is he the chair of the board?

16  A    He is the chairman of the board, that is correct; not

17  the chairman of the Bankruptcy Task Force, but is the chairman

18  of the board.

19  Q    If in fact the board, any of the boards were presented a

20  copy of the RSA to review in advance of it being signed, is it

21  your expectation that that would be reflected in the board

22  minutes based on your dealings with the Boy Scouts boards?

23        MR. HAMMOND:  Objection, Your Honor.  I believe

24  that's an incomplete hypothetical.

25        THE COURT:  Overruled.  You can answer, if you can.

1      THE WITNESS:  The board had met on -- or the

2  National Executive Committee and Bankruptcy Task Force had met

3  on June 21st and June 22nd, I believe, as we covered a moment

4  ago, the RSA was executed on July 1st.  In that intervening

5  time, drafts would have been exchanged.  That was not done in

6  the context of a meeting and so, therefore, I don't believe

7  there would have been minutes reflecting such an exchange.

8  BY MR. SCHIAVONI:

9  Q    Were the boards convened in the interim period before

10 the RSA was signed?

11 A    I'm not aware of the board convening.  I understand that

12 the board -- there was email exchanges where the board gave

13 the final green light to entering into the RSA.

14 Q    Oh, can you tell us what date that email was issued on?

15 A    That was issued on June 30th.

16 Q    And would you expect the board -- the document itself to

17 reflect that a copy of the RSA was provided?

18      MR. HAMMOND:  Objection, Your Honor.  Now we're

19 asking Mr. Whittman about what he expects?

20      THE WITNESS:  I'm not actually sure I understood

21 the question.

22      THE COURT:  Yeah, sustained.

23      MR. SCHIAVONI:  Yeah, fair enough, that's fair

24 enough.  I'll --

25      THE COURT:  Sustained.

1    MR. SCHIAVONI:  -- withdraw the question.

2 BY MR. SCHIAVONI:

3 Q    So, Mr. Whittman, is it fair to say that the board

4 didn't convene for consideration of any draft or final copy of

5 the RSA before it was signed, am I right?

6 A    The board had been discussing elements of the RSA for a

7 number of weeks.  The board did not convene immediately prior

8 to the signing of the RSA.

9 Q    Okay.  And let's get into that, the elements that were

10 being discussed.  You provided a PowerPoint that was intended

11 -- was the intent of that PowerPoint that you provided to the

12 board to present the key points that the board was supposed to

13 approve?

14 A    I'm not sure which PowerPoint you're referring to.

15 Q    All right, fair enough.  The June 5, 2021 PowerPoint,

16 Exhibit 42.

17    (Pause)

18 A    The intent of the June 5 presentation was to update the

19 -- first the Bankruptcy Task Force and the National Executive

20 Committee, and later in the same day the National Executive

21 Board, where we stood as it related to the BSA component of

22 the trust contribution.  And, as I explained earlier, given

23 that the National Executive Board was the only body that had

24 the authority to authorize the entry into additional

25 indebtedness, to have the National Executive Board authorize

1   the BSA settlement contribution including the size of the note

2   to the trust.  There were separate presentations and

3   discussions about many other aspects of the RSA at various

4   points in time and there were other discussions with the

5   boards on June 5th; however, this particular document was

6   focused on that one element of the RSA.

7   Q    Were what the terms were that the board was asked to

8   approve, were those set forth in a summary of terms that you

9   provided to the board?

10  A    The National Executive Board received this PowerPoint

11  presentation which summarized the terms of the note.  I don't

12  recall if there were any other documents they received at the

13  time with additional summaries, but this document provided

14  them with the key terms that we reviewed with them that they

15  needed to know to approve the entry into the $80 million note.

16           MR. SCHIAVONI:  If I could just ask my colleague to

17  pull up on the screen Exhibit -- from our binder, tab SF (ph).

18  I will show it to you on the screen, Mr. Whittman, it's the

19  minutes from the May 25 meeting.

20           MR. HAMMOND:  Mr. Schiavoni --

21           MR. SCHIAVONI:  Do you have a paper copy of the May

22  25 meeting with you?

23           MR. HAMMOND:  Pardon me, Mr. Schiavoni, is this the

24  note that you circulated this morning, like while we -- when

25  we had started testimony, is this one of the 111 exhibits that

1   you circulated at that point in time?

2           MR. SCHIAVONI:  These are the May 25, 2021 board

3   minutes.

4           MR. HAMMOND:  Yeah, I'm asking you when you

5   circulated them because our understanding is -- my

6   understanding is you circulated all of this after we had

7   started testifying here.

8           MR. RUGGERI:  Mr. Schiavoni, if it helps, it's

9   actually tab 27 of the debtors' binder.  So it's actually a

10  document that they circulated.

11          MR. SCHIAVONI:  Oh, that's fine.

12  BY MR. SCHIAVONI:

13  Q    So, Mr. Whittman, if we could -- why don't we go -- have

14  you seen these minutes before?

15  A    I -- yes, as part of preparing for testimony, I did

16  review the minutes.  So I have --

17  Q    Okay.  Why don't we go to the last paragraph of them?

18          It says in that last paragraph, Mr. Whittman, that "Upon

19  motion, unanimously approved by the committee," the committee

20  -- sorry, "Upon motion, unanimously approved, the committee

21  agreed to recommend that the board grant authority to settle

22  with the claimant constituent, consistent with the terms in

23  the summary of terms provided by Brian Whittman, totaling up

24  to $250 million."

25          Have I read that correctly?

1   A      That is correct.

2   Q      Okay.  And is that what happened?  The committee was

3   provided with a summary of terms by you and that's what the

4   committee voted on?

5   A      That is correct.  There was a PowerPoint presentation

6   similar in sort of form and substance to the one we were just

7   looking at from the June 5th meeting that was prepared for the

8   May 25th meeting, which I believe is Exhibit 39 in the

9   debtors' binder here, and -- no, I don't think it's 39 --

10  well, one of the exhibits here, and -- but, again, it's a very

11  similar exhibit and that was presented to the NEC on May 25th.

12  Q      Okay.  And those were the terms that the board approved,

13  right, as reflected in your summary?

14  A      And just to complete my prior answer, it was Exhibit 41

15  that has the presentation that was made on May 25th.  And the

16  reason why -- no, I would say no to your question in that

17  that's why we reconvened on June 5th.  In between May 25th and

18  June 5th, there were additional negotiations, there was some

19  movement in terms of where the terms were at and, after having

20  initial discussions on May 25th and that initial approval,

21  there was then the final approval related to BSA's trust

22  contribution given on June 5th, with the updates to the terms,

23  still totaling $250 million.

24  Q      And you did a separate PowerPoint on that, that's

25  Exhibit 42, right?

1  A      That is Exhibit 42; that is correct.

2  Q      And what the board approved, as reflected in the board

3  minute you looked at, was they approved the summary of the

4  terms that you provided them in these PowerPoints, right?

5  A      Well, just to be clear, the minutes you read out from

6  May 25th are the minutes of the National Executive Committee,

7  that's what --

8  Q      Right.

9  A      -- the National Executive Committee was approving to

10 recommend to the National Executive Board approval, that

11 National Executive Board approval then occurred on June 5th

12 with those updated terms.

13 Q      So the committee approves it first, then the committee

14 recommends it to the full board and it approves it, right?

15 A      That's correct.

16 Q      And both times what the board is approving is the

17 summary of terms as presented by Mr. Whittman in his

18 PowerPoints, am right?

19 A      I believe so.

20 Q      Okay.  Now, let's look at the PowerPoint -- let's look

21 at the June 5 PowerPoint.  That would be the one that's the

22 last one in the series, am I right?

23 A      Exhibit 42, again, I believe is what you're referring

24 to?

25 Q      Yes.  Can you show me where it is in your PowerPoint

1  that you present the terms of the TDP?

2  A    The TDP was not a subject to this presentation, nor was

3  the TDP -- the TDP was still under negotiation at this point

4  in time.  So there was nothing to be approved as it related to

5  the TDP on June 5th.

6  Q    Thank you.  Now, let me ask you this, where was it -- is

7  it anywhere at all in exhibit 42 or the prior exhibit that

8  sets out your terms, where is the payment of the fee to the

9  Coalition discussed as something for the board to approve, can

10  you show us that line?

11  A    The payment to the Coalition was discussed at numerous

12  board meetings both by myself and other members of the team.

13  And there was -- I don't recall if there were written

14  presentations around that, I don't believe I made a written

15  presentation about it, but I did make -- have verbal

16  discussions with the Bankruptcy Task Force, the NEC, and the

17  NEB related to the payment of Coalition professional fees at

18  various points in time.

19  Q    Okay.  My question was simpler than that, Mr. Whittman.

20  Just simply, is it fair to say that nowhere in your PowerPoint

21  presentation that's Exhibit 42 or in the prior one that's

22  Exhibit -- the prior one, it's the May 25 PowerPoint, is there

23  any mention whatsoever of the Coalition fee, right?

24  A    That's not correct.  If you --

25  Q    All right.  Show me where it is --

1  A      Yes.

2  Q      -- show me where it is in Exhibit 42 --

3  A      If we go to --

4  Q      -- where does it --

5  A      -- slide 5 of Exhibit 42, which is titled "Sources and

6  uses at emergence," on this slide there is a reference about

7  five lines from the bottom that says "Coalition professional

8  fees."  In the column titled "Per disclosure statement," you

9  see TBD.  And then in the second column, "Proposed pending

10 offer," you see $10 million, and then a commentary in the box

11 to the right in terms of the fact that was a placeholder

12 pending outcome of negotiations.

13      So that was a point where the number -- that wasn't the

14 ultimate number, but it was a number at the time that was

15 noted and there were discussions that occurred around that

16 number.

17 Q      Now, is one of the things you're conveying there is that

18 the dollar amount of what the Coalition fee approval amount

19 might be would change depending upon the agreement on what the

20 Boy Scouts contributed?

21 A      No.  What I was conveying is that it was still subject

22 negotiation.  The second part of that comment about the Boy

23 Scouts' performance is pointing out the fact that the total

24 amount of the contribution to the trust is variable and,

25 depending on the Boy Scouts' performance between now and the

1  effective date of the plan, the contribution to the trust

2  could be higher or lower based on the amount of cash that's

3  available at that time.

4  Q    Am I right that from the very start of the discussions

5  with the Coalition, the Coalition was demanding that it be

6  paid its attorneys' fees?

7  A    That was a term that has been discussed for quite some

8  time.

9  Q    Well, are you suggesting here that it was the Boy

10  Scouts' idea to pay the Coalition from the beginning of the

11  negotiations?

12  A    No, I'm simply say that I don't know if I would

13  characterize it as something that the Coalition demanded from

14  -- I forget your words, but I think it was something like the

15  beginning of time or the beginning of negotiations, I simply

16  would note that at -- for any point in the negotiations this

17  came up and it was a point of negotiation for quite some time.

18  Q    Well, let me ask you like a little more broadly and

19  maybe politely, is it fair to say that the Coalition at all

20  times that they were negotiating with you were requesting that

21  their fees be paid as a condition to a deal?

22  A    I would say that it was definitely something that came

23  up early in negotiation.  I don't know that I would say, you

24  know, at all times.

25  Q    Well, you were in hundreds of hours of these

1  negotiations, right?

2  A    I was.

3  Q    Can you think of a time where the Coalition dropped its

4  demand or request, however you want to phrase it, to be paid

5  all its fees?

6  A    My point is that I don't exactly recall when the

7  Coalition was formed and became a mediation party, but it was

8  sometime prior to the bar date, back I think in the fall of

9  2020.  I recall having numerous conversations with the

10  Coalition before the issue of their professional fees came

11  into the conversation.  That's my only point in my response.

12  Q    Who was it that first raised the request or demand that

13  the Coalition fees be paid?

14  A    I don't recall who it was (indiscernible) --

15  Q    Was it the Boy Scouts or was it the Coalition?

16  A    It was the Coalition.

17  Q    And was it one of the Coalition members or was it Brown

18  Rudnick that was demanding that its fees be paid?

19  A    I don't know.

20  Q    Do you not remember that or did they not tell you or

21  were you not there?  Is it one of those three or is it

22  something else?

23  A    The request was made in a communication from the

24  Coalition, so I don't know how to classify in response to your

25  question who specifically made the request.  The request came

1   in communications from the Coalition.

2   Q    Did the Coalition also ask that specific state law --

3   state court lawyers be paid too?

4   A    I don't recall any such request.

5   Q    Did the coalition also ask that specific state law,

6   state court lawyers be paid too?

7   A    I don't recall any such request.

8   Q    Who was it, if not you, Mr. Whittman, who was for the

9   Boy Scouts chiefly involved in negotiating the fee demand from

10  the coalition?

11  A    It was negotiated by myself together with the debtor's

12  restructuring counsel at White & Case.

13  Q    And was anybody from the Boy Scouts, themselves, any

14  officer, or director, or employee involved in the negotiations

15  or discussions of paying the coalition?

16  A    Absolutely.

17  Q    And was Mr. Mosby directly involved in discussions with

18  the coalition about their request to be paid?

19  A    I'm not sure if he was directly involved in discussions

20  with the coalition on that topic, but he was certainly

21  invovlved in discussion that we had on the debtor side amongst

22  the advisors and the debtor's management team (indiscernible)

23  task force, the national executive committee and national

24  executive board regarding this topic.

25  Q    What were you given that allows you to differentiate

1  between costs that the (indiscernible) for its own -- to

2  advance its own specialized interests as opposed to costs that

3  they occurred to advance the interest of all claimants?

4  A    I am not aware of anything that would provide a

5  breakdown or what that breakdown would be.

6  Q    Now at this point in time in the case like one of the

7  things that you do is you track spending by the various

8  professionals.  Is that right?

9  A    Someone does that at my direction,  yes.

10  Q    Okay.  And is it fair to say that counsel for the TCC,

11  the Pachulski Firm, they've incurred about somewhere in the

12  neighborhood of $10 million of billed fees so far in the case?

13  A    I don't recall their fee amount off the top of my head.

14  That amount would not surprise me though.

15  Q    Okay.  In making the assessment that you are planning to

16  make about the amount of the coalition fees did you seek to

17  compare the $10 million requsted by the coalition as agains

18  the amount spent by the committee that has a fiduciary duty to

19  represent all claimants?

20         MR. HAMMOND:  Objection, Your Honor.  I think that

21  question is pretty vague and unclear.

22  BY MR. SCHIAVONI:

23  Q    The committee spent about $10 million, you think, right?

24  You think that is a fair number, right?

25  A    Well I think its not the committee.  Your statement a

1  moment ago was Pachulski.

2  Q     Right.

3  A     The committee has professionals that are assisting with

4  the --

5  Q     Right.  My point is just this, you have -- the Boy

6  Scouts ended up agreeing to a mumber of $10 million which is

7  just the coalition which equals the full amount that the TCC

8  debtor's counsel has incurred from the beginning of the case.

9  Is that right?

10 A     No.  Again, I don't think that's the right way to

11 approach that.  My approach, in looking at this, was what was

12 the aggregate spend of various parties in the case, so the

13 tort claimants committee, all their profesionals, the FCR, all

14 their professionals, not just actual claim incurred today, but

15 its (indiscernible) through emergence.  And putting the

16 request of the coalition in terms of their $10 million and

17 their $950,000 per month against that.  That to me is the

18 context in which I thought about thaet.

19 Q     I see.  So your views on this about the propriety of the

20 coalition's fees that was based on an assumption that they had

21 the same array of professionals behind them, other consultants

22 and other people working them that the TCC has, right?

23 A     Well I am aware that the coalition, in addition to

24 having lead restructuring counsel, has a financial advisor

25 that has been very active.  I believe, as a handful of other

1  professionals, those are the two that I have interfaced with

2  significantly.

3  Q      Alright, and you have a lot of expertise in this

4  financial advisory field, right?

5  A      I do.

6  Q      You have incurred approximately $10 million so far?

7              MR. HAMMOND:  Objection.

8  BY MR. SCHIAVONI:

9  Q      Your firm?

10 A      A&M has incurred approximately $10 million

11 (indiscernible), that is correct.

12 Q      The -- did you -- do you have any professional view

13 about whether the coalition's financial advisor has incurred

14 $10 million alos?

15 A      I would find that incredibly unlikely.

16 Q      Alright, so we're on the same page on that.

17             MR. HAMMOND:  Your Honor, may I just interpose an

18 objection here.  Are we now asking Mr. Whitmman about his

19 views?  Is that fair game because I thought that that was --

20             THE COURT:  If you want to object you should

21 object; otherwise --

22             MR. SCHIAVONI:  I'm asking about how we --

23             MR. HAMMOND:  He just opened the door.  I'm just

24 pointing it out, that's all.

25 BY MR. SCHIAVONI:

1  Q     Mr. Whittman, let's come back to the TDP.  So at the

2  time that the RSA was approved, when we talked about this just

3  a minute ago, that was for the -- strike that.

4        At the time that the deal points that were set out in

5  your June 5th powerpoint were approved the TDP, itself, was

6  still in flux, right?

7  A     That is correct.  The June 5th approval went to one

8  specific area of the restructuring support agreement, not all

9  components.

10 Q     And you modified your presentation, did you have to

11 modify it a little later when the numbers solidified to the

12 final number?

13 A     I'm sorry, which number are you referring to?

14 Q     Was that the final number on June 5th for the deal?

15 A     The BSA settlement contribution structure did not move

16 in the aggregate after June 5th.  There were negotiations

17 related to hwo that contribution would fluctuate depending on

18 timing of emergence.  And after that June 5th hearing and

19 based on expectations of how this process was moving we moved

20 the expected emergence date in our forecast, that were

21 disclosed in the third amended plan, to December 31st.

22       So numbers fluctuated as a result of that timing, but in

23 terms of the structure of BSA's trust contribution, in terms

24 of the $809 million note that did not change after that

25 approval on June 5th.

1  Q      But by having this after June 5th the TDP was

2  negotiated, right?

3              MR. HAMMOND:  Objection.

4              THE WITNESS:  I don't  understand your -- I don't

5  understand the connection between --

6              THE COURT:  What --

7  BY MR. SCHIAVONI:

8  Q      I'm not suggesting there is a connection. I'm just

9  saying that as of June 5th there was no agreement on a TDP, am

10 I right?

11 A      Yes.

12 Q      Okay.  And it was only later, after June 5th, that

13 agreement was reached on a TDP, am I right?

14 A      That is correct.

15 Q      Who was it for Boy Scouts, as far as a Boy Scouts

16 director or officer, who was most involved in the formulation

17 of the TDP?

18 A      The issues associated with the TDP's specifically and

19 the surrounding issues associated with insurance were

20 discussed numerous times with the bankruptcy task force, a

21 number of members of the bankruptcy task force are attorneys.

22 They would have a better understanding and a closer

23 understanding of those issues then some of the members that

24 were not attorneys.  I wouldn't say there was one particular

25 person who was (indiscernible) on that issue from a board

1  perspective.

2  Q    My question is a little different.  Who was it, who was

3  the Boy Scout officer, employee or director who directly

4  participated in the negotiations of the TDP who dealt with,

5  met with the claimants about this?

6           MR. HAMMOND:  Objection.  Who are you asking that

7  they met with?

8           MR. SCHIAVONI:  I'm asking Mr. Whittman whether he

9  knows.

10  BY MR. SCHIAVONI:

11  Q    Mr. Whittman, do you know who was the Boy Scout officer,

12  director or employee that met directly with the claimants to

13  negotiate the TDP or was there no such person?

14           MR. HAMMOND:  Mr. Schiavoni -- Your Honor, I'm not

15  sure if we're talking about claimants or plaintiffs. I think

16  there's a difference there.

17           MR. SCHIAVONI:  Alright, I will rephrase the

18  question.

19  BY MR. SCHIAVONI:

20  Q    Mr. Whittman, who was it who was a Boy Scout officer,

21  employee or director who communicated or met with, directly,

22  any of the claimant representatives in this case to negotiate

23  the TDP?

24  A    The TDP was negotiated over time and so different people

25  were parts of different meetings.  The debtor's CEO Arthur

1  Mosby and general counsel Steve McGowan were part of many fo

2  the in-person mediation session and likely the TDP was

3  discussed at some of those.  I believe that generally the more

4  detailed sessions that were focused on all the technicalities

5  of the TDP were handled by the attorneys both the

6  restructuring counsel and the insurance counsel which purports

7  back to BSA not with the direct involvement of an officer of

8  BSA in those discussions.

9  Q    Let's tease that out just a little bit, Mr. Whittman.

10 Can you testify, based on personal knowledge, that Mr. Mosby

11 was, in fact, personally involved in any communications

12 directly with the claimants' representatives about the TDP or

13 you just thinking thaet most likely happened?

14 A    Mr. Mosby was present at mediation sessions.  I believe

15 the TDP would have come up.  I do not believe those would have

16 detailed discussions about the TDP.

17 Q    Okay.  Its the word belief that's got me here.  Can you

18 testify that you saw with yoru own eyes or heard Mr. Mosby in

19 the same room talking about where the TDP's were being talked

20 about with the claimants?

21 A    I am --

22        MR. CLENTINO:  Objection, Your Honor.  Sorry, this

23 is Joe Celentino.  I am with Wachtell Lipton for the ad hoc

24 committee of local councils.  I've been trying to get in on

25 video, but have not been successful.

1     Your Honor, I would object to the extent Mr.

2  Schiavoni is asking Mr. Whittman to testify as to what

3  happened, the substance of conversations that happened in the

4  mediation.

5     MR. SCHIAVONI:  Actaully, I'm just asking whether,

6  in fact, Mr. Mosby participated in them.

7     THE COURT:  Yeah, I'm going to overrule that.  I am

8  just not sure this witness knows.  So you can answer if you

9  know whether he participated in that.

10     THE WITNESS:  Mr. Mosby participated in numerous

11  mediation sessions.  None of those sesssions, I believe, would

12  have been discussing TDP's in any great detail.  I am sure

13  that the TDP, in a general matter, came up in those

14  discussions.

15     MR. HALLOWELL:  Your Honor, this is Jim Hallowell.

16  At this point Mr. Whittman is opening the door to the

17  discussions that occurred in the mediation by describing what

18  occurred.

19     THE COURT:  Okay.  I don't think that's an

20  objection.

21     MR. SCHIAVONI:  Your Honor, I think the question

22  was --

23     THE COURT:  I don't think that's an objection.  So

24  we're just sticking here with testimony and if somebody has an

25  objection they have an objection.  If there is a consequence

1  to testimony we will deal with that when we deal with that,

2  but I am not sure why you would be objecting to the question.

3          Mr. Schiavoni, why don't you ask a new question so

4  that we're all on the same page.

5          MR. SCHIAVONI:  Okay, Your HONor.

6  BY MR. SCHIAVONI:

7  Q     Other then Mr. Mosby can you identify any other Boy

8  Scout executive, or officer, or director who you think -- not

9  who you think, but you, in fact, saw in a room talking about

10  the TDP's, where they were being dicussed?

11  A     As I believe I said earlier and I will say again Mr.

12  McGowan, debtor's general counsel, was also present in those

13  same mediation sessions.  So the same answer would apply to

14  Mr. McGowan.  Beyond that, no, I do not believe that -- no,

15  the debtor's officers were not involved in detail discussions

16  related to the TDP.

17  Q     Okay.  Were the Boy Scout officers involved directly in

18  discussions with the claimant representatives about the amount

19  of assets the Boy Scouts would have to contribute to a

20  settlement trust?

21  A     Not to any degree more significant then they were with

22  the TDP because those were delegated to myself as the lead

23  financial advisor.

24  Q     The TDP's were delegated to you?

25  A     No.  I said -- you were asking me about the contribution

1  of the Boy Scouts.  My response is that while they were,

2  again, in the room for some of those mediation sessions the

3  primary negotiation around the Boy Scouts contribution and

4  those discussions were lead by myself.

5  Q    Is there any mention of the word "TDP"  in any of your

6  powerpoint presentations?

7  A    I don't believe there is because that's not an area that

8  I was leading.

9  Q    Is it fair to say that the TDP is also an area where you

10  don't have any specialized skills?

11  A    I don't know if I would agree with that

12  characterization, but as I said that was not my primary area

13  of responsibility.

14  Q    Mr. Whittman, if you could go to -- if we could call up

15  what I have as the May 25th, 2021 board minutes.  They're in

16  Exhibit Binder CC.

17        UNIDENTIFIED SPEAKER:  We had these yesterday.  We

18  had them printed out, but unless you're referring to --

19        MR. SCHIAVONI:  Its the May 25th, 2021 board

20  minutes, powerpoint presentation by Mr. Whittman.  If we could

21  just go to Page 2 of it -- no, no, no, the second page.

22  BY MR. SCHIAVONI:

23  Q    Mr. Whittman, this is a powerpoint presentation your

24  office prepsared, is that right?

25  A    This is a presentation that I and my team prepared.

1  Q     Okay.  Is one of the things you did was that you

2  provided financial information to the board about the proposed

3  BSA trust contribution at the time?

4  A     Yes.

5  Q     And the information that's redacted on this page that is

6  the information that was actually given to the board, is that

7  right, about what was going to be contributed to the trust?

8            MR. HAMMOND:  Objection.

9            THE COURT:  What's your objection?

10           MR. HAMMOND:  My objection is the information is

11 privileged and asking Mr. Whittman about the privileged

12 information is (indiscernible) mediation of attorney/client

13 information.

14           THE COURT:  Sustained.

15 BY MR. SCHIAVONI:

16 Q     If we could go to the next page, please.  Is one of the

17 other things you did, Mr. Whittman, is prepare a feasibility

18 study for the debtors?

19 A     I prepared, together with the debtor's management team,

20 a five year business plan which is included in the disclosure

21 statement and the five year business plan is a key component

22 of showing the feasibility of the debtors.  I wouldn't

23 characterize it as a feasibility study, but I believe that is

24 what you are referring to.

25 Q     Yes.  Do the chartering orgnizations play an important

1  role for the Boy Scouts financial operations?

2  A     They do.

3  Q     And why is that?

4  A     The way that the Boy Scouts are structured is that the

5  members and the delivery of the program happen on a local

6  level.  And the way that program is delivered is that the

7  local councils enter into chartering agreements with

8  chartering organizations which could be churches, synagogues,

9  community servive organizastions, schools, government

10  agencies, etc., individual citizen groups and those charter

11  agreements are what then form the units so the cub scouts,

12  packs, or the Boy Scout troopos.

13  Q     And if to the extent the charters were subject to

14  continued lawsuits is there a threat that they would have to

15  withdraw or they would feel they would have to withdraw from

16  the Boy Scouts?

17  A     It is certainly a concern of us and the Boy Scouts that

18  the charter organization issues be addressed in the bankruptcy

19  in a way that is mutually satisfactory so that the chartered

20  organizations don't feel any need to withdraw; although, we

21  believe that the charter organizations are well served and

22  well protected on a go-forward basis regardless of historical

23  issues.

24  Q     How many of the chartering organizations have achieved

25  protective party status under the plan?

1  A     At this stage there have not been any.  We are really

2  just beginning that process at this point.

3  Q     I see.  Is one of the things you did with your economic

4  model was you were trying to -- you modeled how sensitive the

5  finances were to membership changes?

6  A     Yes.  We did, as typical in building out a business plan

7  and then looking at feasibility issues, we did look at

8  sensitivities.  One area, a key area for Boy Scouts on

9  sensitivity is membership.

10 Q     And is the Boy Scouts feasibility model or this economic

11 model, whatever you want to call it, is the Boy Scouts

12 viability very economicly sensitive to whether or not charters

13 would draw from the Boy Scouts?

14 A     That would be a key factor.

15 Q     Okay.  Now let me just understand, the boards that you -

16 - you consulted with the executive board and the national

17 board, right?

18 A     I had numerous meetings, as I said earlier, with the

19 national executive board, the national executive committee,

20 and the bankruptcy task force.

21 Q     Did those boards have any way to kind of understand the

22 intersts of the local councils?

23 A     I am not --

24        MR. HAMMOND:  Objection, Your Honor, I think that's

25 vague.

1        THE COURT:  Sustained.

2  BY MR. SCHIAVONI:

3  Q     Did the board members have any -- I will withdrawal the

4  question.

5        Did the board members have any mechanism or ability to

6  understand the concerns and issues of the local councils?

7  A     There were several channels of feedback to the board on

8  local council issues.

9  Q     Is it fair to say that most of the board members

10 actually came from the local councils whwere they had

11 previously held positions?

12 A     Most of the board members have been involved in scouting

13 for quite some time and I believe many of them have at a point

14 in time had involvement with local councils.  Again, that is

15 where scouting is delivered.  Maybe there have been volunteers

16 locally in their communities or perhaps had various positons

17 with local councils prior to being elected to the national

18 executive board.

19 Q     Do the bylaws actually provide that the board members

20 shodul be selected from people who were prior presidents of

21 local councils or held committee roles with the local

22 councils?

23        MR. HAMMOND:  Your Honor, I would just object.

24 This is beyond the scope of direct.

25        THE COURT:  Sustained.

1    MR. SCHIAVONI:  Your Honor, I don't think this

2 really applies unless we are separately in a position of

3 calling the witness ourselves separately.  So we could do

4 that, but I don't think the examination should be limited to

5 what is on the direct.

6    THE COURT:  Well it usually is, so I'm going to

7 sustain the objection.

8 BY MR. SCHIAVONI:

9 Q    Are the -- as part of the plan that was -- as part of

10 the RSA were the board members presented with the fact that

11 they would be made protected parties not just indibidually as

12 Boy Scout board members, but in their capacity as former

13 directors or officers of the local councils?

14 A    I am not aware of any discussion of that issue.

15 Q    Is that, in fact, how the RSA operates?

16 A    I am actually not sure that that is how it operates.  I

17 know that the board members would get relief as is typical

18 under the plan of reorganization.  I am not sure about your

19 comment on the local council piece.

20 Q    What mechanism is there in the RSA that allows for the

21 enforcement of the terms of the RSA against the coalition?

22 A    I believe there is various requirements of the coalition

23 to perform under the RSA and failure to perform would lead to

24 a termination event under the RSA.  I don't recall what other

25 enforcement mechanisms there might be.

1  Q     So none of the claimants for the coalition actually

2  signed the RSA, is that right?

3  A     None of the individual abuse claimants signed the RSA,

4  that is correct.

5  Q     So the lawyers sign it and they agree, as part of

6  signing it, to give certain advice to their clients, is that

7  right?

8  A     My general understaning that the attorneys, certainly

9  the attorneys for the coalition and then the state court

10 lawyers who are, themselves, the members of the coalition have

11 signed on and are committing themselves to, essentially, yes,

12 advise their clients to support the plan under the terms of

13 the RSA.

14 Q     I just really want to know a yes or no answer on this.

15 Did any lawyer give a written opinion to the board as to the

16 legal and ethical propriety of contracting with a lawyer to

17 give advice to his client and as part of the same agreement

18 agreeing to pay their fees?

19         MR. HAMMOND:  Objection, Your Honor, I think that

20 question is unintelligible.

21         THE COURT:  Can you rephrase it, please?

22         MR. SCHIAVONI:  Really?  Sure.

23 BY MR. SCHIAVONI:

24 Q     Mr. Whittman, are you aware whether or not any lawyer

25 gave a written opinion to the board as to the legal propriety

1  of entering into an agreement with the lawyers for the

2  coalition?

3  A     I am not aware.

4  Q     Sir, is one -- I think you testified that this was, I

5  forget exactly the words, but a difficult process, let's put

6  it that way, with coming to the RSA.  Do you remember

7  generally the question and answer with regard to exactly what

8  you said?

9  A     It was a hard-fought negotiation.  I don't recall my

10  exact words, but soemthign to that effect.

11  Q     Okay.  One of the problems that was encountered on the

12  way to the RSA was that at some point the TCC would agree to

13  some things, but no the coalition and vice versa?

14  A     Certainly, like any negotiation, there is five parties

15  that are parties to the RSA.  Many of those parties are multi-

16  headed parties.  So that was part of the process wrangling all

17  the parties together on all of the issues.

18  Q     But the Boy Scouts, at least, as part of this, they had

19  theoretically, at least, the option of doing a deal either

20  with the TCC or the coalition in going forward with it.  Am I

21  right?

22  A     As I said before, it was important to us to have a

23  confirmable plan of reorganization. It was important for us to

24  have a plan of reorganization as provided for the channeling

25  injunction for the benefit of the local councils that provided

1   the opportunity to (indiscernible) going forward.  That could

2   only happen with the affirmative vote of the plaintiffs.

3   Clearly having the coalition it was important, given the

4   number of votes, that they reprented.  The TCC was also

5   imporntn fivne that they are the official representative of

6   the claimant community at large.

7   Q    Okay.  So you're sort of saying its better to have both

8   of them sign, right?

9   A    Certainly.

10  Q    Okay, but was the fact that you had an option or, at

11  least, could threaten an option of going with one verses the

12  other was that helpful in bringing about a deal?

13           MR. HAMMOND:  Objection, Your Honor.  I think this

14  is straying awful close to mediation privilege.

15           THE COURT:  I don't think it crosses the line yet.

16  Overruled.

17           THE WITNESS:  Its always helpful to have multiple

18  parties to have discussions with them, negotiations.

19  BY MR. SCHIAVONI:

20  Q    Were you going to say play-off one against the other?

21  A    Those are your words, but I would agree with them.

22  Q    So am I right that the agreement you ended up signing,

23  this RSA, it had negative covenatns in it for the Boy Scouts?

24  A    It does.

25  Q    And is one of the negative covenants that on a going

1  forward basis settlements may only be arrived at if this

2  unanimous consent of the FCR, the coalition and the TCC?

3  A    It would help if you refer me to the document, although,

4  generally, that sounds right.

5  Q    That means, doenst it, Mr. Whittman, that a minority

6  group of claimants from either the TCC or the coalition could

7  actually block any deal with the charters going forward, isn't

8  that right?

9  A    I don't think that's quite right from the same point

10  that either the BSA or the ad hoc committee has the right to

11  terminate the RSA if the resolution of the chartered

12  organization issues is unsatisfactory to either one of us.

13  Q    So what you are saying is that you'd have to actually

14  invoke full fledged termination in order to do a settlement

15  with an individual charter if any minority group of either the

16  TCC or coalition disagreed with it?

17  A    I don't think that's correct either.  I am not exactly

18  sure how the coalition and the TCC operation, but I would

19  think it would be typical for a statutory committee that there

20  would be votes taken.  So I would think it would be a majority

21  vote.  So I am not sure that your statement is correct.

22  Q    The fact is at any one time either the coalition or the

23  TCC don't represent all the  claimants, some of them -- its

24  like one or the other is representing a minority group?

25  A    Neither of them represent all of the claimants, that is

1  correct.

2  Q    Have the charters told you that they feel that this term

3  will make it almost impossible to reach settlements on a going

4  forward basis?

5          MR. HAMMOND:  Your Honor, at this point I just want

6  to make sure that Mr. Whittman doesn't disclose any

7  communications we've had in the context of mediation.

8          THE COURT:  Okay.

9          MR. SCHIAVONI:  I will withdrawal the question.

10 BY MR. SCHIAVONI:

11 Q    Mr. Whittman, this clause, the negative covenant, will

12 make it significantly more difficult to reach settlemnts on a

13 going forward basis, won't it?

14 A    I disagree.

15 Q    And has that been your experience since you signed the

16 agreement?

17 A    We have had active mediation sessions.  Last week we had

18 mediation sessions scheduled for next week.  Like all aspects

19 in this case deals take time.  They have all taken time and I

20 expect these will take time; however, one of the key points,

21 and I mentioned this earlier, is that in order to confirm a

22 plan of reorganization that includes the relief that the

23 parties is looking for we need the affirmative vote of the

24 plaintiff groups.

25          So us negotiating those on our own, as the debtors,

1  would be somewhat illusory because we wouldn't deliver those

2  agreements.  We need to have the plaintiff support to deliver

3  the agreements.  So having the parties together, working

4  together under the RSA it can be very productive in terms of

5  those negotiations and the other parties, the chartered

6  organizations, understanding they're negotiating with the

7  parties that can't actually deliver on a deal.

8  Q    Mr. Whittman, we talked about the TDP's a little bit and

9  you claim to be in the room at some points when the TDP's were

10 being negotiated, is that right?

11 A    That is correct.  I was in the room for certain

12 sessions.  I know I was not in the room for all sessions by

13 any means.

14 Q    Can you identify who was it that drafted them?

15 A    The TDP's were drafted by the debtor's legal counsel.

16 There were significant negotitaions back and forth with the

17 counsel to the --

18          MR. HAMMOND:  Before we open this can of worms I

19 just want to caution you not to reveal any communications that

20 were had in the context of mediation.

21          MR. SCHIAVONI:  I asked him what he saw, what he

22 knew.

23          MR. HAMMOND:  I know.  I didn't object to the

24 question.  I just don't want to open the box.

25          THE WITNESS:  There were signficnat negotiations

1  back and forth with all of the parties on the document.

2  BY MR. SCHIAVONI:

3  Q     Do you remember me being in the room with you when you

4  were negotiating the TDP?

5  A     Let me clarify, all of the parties to the RSA.

6  Q     Okay.  So its fair to say that the insurers weren't part

7  of the negotiation of the TDP, right?

8  A     That is correct.  I believe the draft of the TDP's were

9  provided to the insurers at different points in time.  I know

10  they were provided to the insurers.  I don't recall as to how

11  many (indiscernible), but you were not in the room.

12  Q     Sir, they were only provided at the very end of the

13  process, isn't that right?  You didn't provide them, right?

14  The only one we got was at the very end.  Mr. Whittman, is

15  that right?

16  A     They were provided by counsel.  I was on a

17  (indiscernible).  I do not know.

18  Q     So you don't know one way or the other?

19  A     I don't know how many times or at what time.  I just

20  know they were provided at some point.

21       MR. SCHIAVONI:  Thank you, sir.  I have no further

22  questions, Your Honor, at this time.

23       THE COURT:  Thank you.

24       Any other cross?

25       MR. WEINBERG:  Your Honor, this is Joshua Weinberg

1  on behalf of Hartford.  I'm not going to represent that Mr.

2  Ruggeri needs a break, because I know he doesn't, but if the

3  court would permit I have a few questions.

4          THE COURT:  Yes, Mr. Weinberg.

5                     CROSS EXAMINATION

6  BY MR. WEINBERG:

7  Q    Good afternoon, Mr. Whittman.  If we could put up Tab 5

8  which I believe contains the Hartford settlement. I know that

9  Mr. Hammond showed you some provisions of this, but if we turn

10  to Page 7 -- I think this is Tab 5 of the debtor's binder, the

11  agreement.

12  A    I am there.

13  Q    I think that Section 1(a) Mr. Hammond pointed you to

14  earlier today, but you would agree with me that nowhere does

15  that provision say that -- nowhere does it say that it shall

16  be -- nowhere does it use the word "binding", correct?

17          UNIDENTIFIED SPEAKER:  Mr. Weinberg, we're going to

18  put the proper document on the screen now.  Here is the one

19  you are referring to.

20          MR. WEINBERG:  Thank you.

21          UNIDENTIFIED SPEAKER:  Our apologies, Your Honor.

22          THE WITNESS:  I don't see the word "binding" in

23  Section 1(a) if that's your question.

24  BY MR. WEINBERG:

25  Q    That's fine.  You know, I think that there are some

1  other provisions that Mr. Hammond may have walked you through

2  this morning, but there are some other provisions that he

3  didn't show you.  If we could turn to Page 14 of the -- I

4  think it's 14 of the agreement.  While we're turning there you

5  would agree, Mr. Whittman, that the Hartford agreement was

6  also negotiated intensely, wouldn't you?

7  A    I would.

8  Q    It was certainly at arm's length?

9  A    I agree.

10 Q    And there were terms that were hotly disputed and

11 negotiated very intensely, right?

12 A    There were.

13 Q    And if you would turn to Page 14 there's Section 3(i),

14 do you see that provision?

15 A    I do.

16 Q    And one of the terms in Section 3(i) states that under

17 the settlement agreement the debtors would not file a plan of

18 reorganization that's inconsistent with the terms of the BSA

19 Hartford settlement, correct?

20 A    Yes, I do see that sentence.

21 Q    Okay.  And under that same provision, this is Section

22 3(i), BSA is permitted to propose an alternative plan that

23 doesn't include a release and injunction for Hartford so long

24 as there are no other third-party releases or injunctions,

25 correct?

1  A      That is correct.

2  Q      And that was noted as the toggle plan, right?

3  A      That is correct.

4  Q      And the toggle plan provides BSA or the debtors with a

5  discharge, right?

6  A      It provides just the debtors with a discharge, that is

7  correct.

8  Q      And at the time that BSA entered into the BSA Hartford

9  settlement BSA believed the toggle plan to be confirmed,

10  correct?

11  A      At that time we believed that the toggle plan could be

12  confirmed, yes.

13  Q      And would provide the debtors with a path to emerge from

14  bankruptcy, correct?

15  A      A risky and not great, but, yes, a path.

16  Q      Now when you -- when BSA entered into the settlement

17  agreement and you testified that was on April 15th at that

18  time you knew that the claimant groups would oppose the

19  settlement, correct?

20  A      That is correct.

21  Q      And let's put up Tab 5 from Hartford's binder.  This is

22  -- we provided, Your Honor, a separate binder to the court

23  with a few documents.  This is one of the few that is not in

24  the debtor's binder, so I apologize.  And we did provide these

25  documents to the debtor yesterday afternoon.

1      THE COURT:  I got it.

2    BY MR. WEINBERG:

3    Q    In Tab 5 of that binder is a declaration that you

4    submitted earlier in this case, Mr. Whittman.  Do you see

5    that?

6    A    I do.

7    Q    And do you recognize that declaration?

8    A    I do.

9    Q    That is a declaration that you submitted in conjunction

10   with the debtor's motion to extend the exclusivity, right?

11   A    Correct.

12   Q    And now if we turn to Paragraph 7 of this declaration it

13   says, in the second sentence -- the first paragraph of the

14   Paragraph 7 says,

15        "The Hartford settlement is a product of extensive arm's

16   length negotiations conducted over a lengthy period between

17   the debtors and Hartford with the active assistance of the

18   mediators."

19        Do you see that?

20   A    I do.

21   Q    And the next sentence says,

22        "The debtors believe that the Hartford settlement is

23   reasonable and in the best interest of the estates and holders

24   of abuse claims, in large part, due to the risks associated

25   with continued coverage litigation with Hartford."

1       Do you see that?

2   A    I do.

3          MR. MOXLEY:  Your Honor, Cameron Moxley of Brown

4   Rudnick.  We object to the questions concerning the

5   reasonableness of the Hartford settlement agreement for

6   reasons that were set forth in our motion in limine.  At the

7   top of today's hearing we understood from the insurers they

8   wouldn't be eliciting such testimony.  They have now done so.

9   So we would just insert that objection, Your Honor, and raise

10  the points that we raised in our motion.

11         MR. WEINBERG:  I'm not asking him, Your Honor, to

12  provide any testimony about the reasonableness.  I'm just

13  asking to what he has attested to previously in his

14  declarations in this case.

15         MR. MOXLEY:  Your Honor, respectfully, the question

16  has now been affirmatively posed to elicit testimony as to his

17  views with respect to reasonableness.  We were advised that

18  the insurers would not be taking that step today.  They appear

19  to have just done so.  If the question is withdrawn that's

20  fine, Your Honor, but if the question remains we wish to

21  interpose an objection.

22         MR. WEINBERG:  If that's the case, Your Honor, I'm

23  happy to rephrase the question.

24         THE COURT:  Okay, why don't you do that.

25  BY MR. WEINBERG:

1  Q     With respect to the first sentence in Paragraph 7, Mr.

2  Whittman, when you executed this declaration you were aware at

3  the time that the claimants opposed the BSA Hartford

4  settlement, correct?

5  A     I was aware at the time that the -- give me a second

6  here, I just want to clarify specifically.  I was aware at the

7  time that we were unable to reach a three-way deal with -- we

8  were not able to reach a deal with any of the plaintiff groups

9  at that moment.  I was not aware that they objected, however,

10 because they haven't yet objected.

11 Q     You were aware, though, at the time that you executed

12 this declaration that the claimants did not agree with the BSA

13 Hartford settlement, correct?

14 A     I'm sorry.  I apologize, this is May 16th.  Yes, I was

15 aware at this time.  I apologize.

16 Q     And when you signed this declaration you made sure that

17 all of it was accurate, right?

18 A     Yes, the declaration is accurate.

19        MR. WEINBERG:  Your Honor, at this point I'd like

20 to offer the affidavit into evidence, this declaration which

21 is Docket 4101.

22        THE COURT:  Is there any objection?

23        MR. GOODMAN:  Your Honor, we would object for the

24 same reasons that the other affidavits were not introduced

25 into evidence.  I mean we're perfectly willing for them all to

1  come in, but I don't understand why this is being done

2  selectively.

3         THE COURT:  Well this is different.  Do you have an

4  objection to this declaration?  This is not his direct

5  testimony.

6         MR. GOODMAN:  Sorry, Your Honor.

7         MR. WEINBERG:  Your Honor, this also is an

8  admission of a party opponent.

9         THE COURT:  Yes, it is.  So that is why I'm asking.

10  This is different.

11         MR. GOODMAN:  Withdrawn.

12         MR. HAMMOND:  Your Honor, I would just object to

13  the extent it's beyond the scope of his direct, but other than

14  that I have no objection.

15         MR. RUGGERI:  Your Honor, Mr. Whittman offered for

16  support that there was (indiscernible) and they presented a

17  lot of testimony on direct.  This is not beyond the scope of

18  the direct.

19         THE COURT:  The objection is overruled.  It's

20  admitted.

21      (Whittman declaration received into evidence)

22  BY MR. WEINBERG:

23  Q    Mr. Whittman, so with respect to the June 9th letter

24  that you discussed earlier -- withdrawn.

25      I'd like to actually direct your attention, Mr.

1  Whittman, to Tab 30 in your notebook which I believe is the

2  June 5th meeting minutes that you discussed at some point

3  earlier.  Do you have those in front of you?

4  A    Just one moment.

5           THE COURT:  That is in the debtor's notebook?

6           MR. WEINBERG:  Yes, Your Honor.

7           THE COURT:  Okay.

8           THE WITNESS:  Yes.  I have in front of me the June

9  5th minutes from the national executive board meeting.

10  BY MR. WEINBERG:

11  Q    And you were present at this meeting, correct?

12  A    That is correct.

13  Q    Do you recall attending this meeting?

14  A    I do.

15  Q    Now I think that we looked at the end of Page 3 of these

16  notes.  There is a statement there that says the board voted

17  to approve the proposed settlement package estimated $250

18  million.  Do you see that?

19  A    I do.

20  Q    Now could you tell me what did the board approve there?

21  Hadn't the board already approved that package at the May 26th

22  meeting?

23           MR. HAMMOND:  Objection.  It mischaracterizes his

24  prior testimony, Your Honor.

25           THE COURT:  I'll sustain that objection and ask you

1   to rephrase your question.

2   BY MR. WEINBERG:

3   Q    Maybe I will do it this way, if we could take a look at

4   Debtor's Tab 28, which is the May 26th, 2021 national

5   executive board meeting minutes.  Do you have those in front

6   of you, Mr. Whittman?

7   A    I do.

8   Q    At the end of those, on Page 3, it says the board

9   approved the $250 million proposal including the additional

10  $80 million note to the victim's trust.  Do you see that

11  reference?

12  A    I do.

13  Q    I am confused, what additional steps were taken or what

14  were the proofs at the June 5th meeting?

15  A    My belief and recollection is that what occurred at the

16  meeting on the by the 26th is that we presented where we were,

17  where we thought things were going in terms of the overall

18  $250 million; however, at that point the composition was a

19  little bit different and the note wasn't actually $80 million

20  at that point in time.  I believe it was a somewhat different

21  composition of the $250 million settlement.

22       As a result, on June 5th, the board convened again and

23  approved the final composition, the $250 million headline

24  number had not changed, but the building blocks of it had

25  shifted.  That was when the $80 million note was approved.

1  Q     If that is the case, Mr. Whittman, why do the notes for

2  the May 26th meeting, again, we're looking at Tab 28, refer to

3  the $80 million note?

4  A     I don't know.

5  Q     So one of the two sets of meeting minutes is inaccurate,

6  is that what you are saying?

7  A     I believe that the $80 million reference at the end of

8  the 26th is not correct.

9  Q     Is there anything else that changed in the package

10  between the May 26th meeting and the June 5th meeting?

11  A     I don't believe there were substantive changes.  As I

12  said, it was still $250 million.  If anything, I believe the

13  settlement had simply solidified the terms of the settlement

14  which were more influx that May 26th had become more solid by

15  the time we reached June 5th.

16  Q     Now, Mr. Whittman, in your preparation for your

17  testimony did you review the version of the board minutes that

18  are in this notebook that you have in front of you?

19  A     I did.

20  Q     And based on the board minutes that had been produced to

21  us is there anywhere in those board minutes that discusses

22  whether the board voted to withdrawal or abandon the Hartford

23  settlement agreement?

24  A     I don't recall specifically reading in the minutes;

25  however, I recall specific conversations with -- numerous

1    conversations with the BTF and the NEC about where we were

2    with the RSA and where we were with Hartford, and the

3    interplay between those two issues.

4    Q    You would agree with me, Mr. Whittman, that that is not

5    reflected anywhere in the board minutes that the debtors have

6    provided to us, correct?

7    A    I disagree with you on that because I wasn't

8    specifically (indiscernible) board minutes from references to

9    Hartford withdrawal, but I don't know.

10   Q    Okay.  But as you're sitting here you don't recall any

11   such references, right?

12   A    I don't know if there are or not.

13   Q    So, Mr. Whittman, when you testified earlier today that

14   there was a opposition to the BSA Hartford settlement was one

15   of the changes in circumstances; just to be clear, the debtors

16   were  aware from the time they signed the settlement that

17   there was opposition to the settlement agreement, correct?

18   A    What I said earlier, and I will just say it again to be

19   clear, is that we expected opposition.  We were not surprised

20   that there was opposition.  What did surprise us was the

21   continued sustained intense and broad base opposition that all

22   these many months later still exist.

23          MR. WEINBERG:  Your Honor, I have no further

24   questions.

25          Thank you, Mr. Whittman.

1        THE WITNESS:  Thank you.

2        THE COURT:  Thank you.

3        MR. HALLOWELL:  Your Honor, I have a couple of

4  further questions.

5        THE COURT:  Yes.

6                    CROSS EXAMINATION

7  BY MR. HALLOWELL:

8  Q    Mr. Whittman, Jim Hallowell for the AIG Companies.  Can

9  you hear me okay?

10 A    I can, Mr. Hallowell.

11 Q    Mr. Whittman, the TDP's are not an area that you were

12 actively involved in with any detail, correct?

13 A    As I stated earlier it was not a primary area of

14 responsibility for me.  I was aware of the negotiations

15 generally, but it was not an area where I was specifically

16 deeply involved.

17 Q    Mr. Whittman, the TDP's were not an area that you were

18 actively involved in in any detail, correct?

19 A    I just said my description. If that's the way you want

20 to characterize it, okay.

21        MR. HALLOWELL:  Your Honor, I'd like to refer Mr.

22 Whittman to his deposition testimony.

23        THE COURT:  Okay.  Does he have it?

24        MR. HALLOWELL:  I'd like to refer him to deposition

25 Page 94, Lines 3 through 6.

1    THE WITNESS:  I'm sorry, you faded at the end.  I

2  heard Page 94, but I didn't hear the line.

3    MR. HALLOWELL:  Lines 3 through 6.

4    THE WITNESS:  Okay.

5  BY MR. HALLOWELL:

6  Q    Did you review that testimony, Mr. Whittman?

7  A    I am reviewing it right now.  Yes, those were words that

8  I used in my deposition.  It was not an area that I was

9  actively involved in any detail.  I have general familiarity.

10 Q    Mr. Whittman, the TDP --

11 A    Although, I would --

12 Q    Mr. Whittman.  Mr. Whittman, there is not a question

13 pending.

14 A    (Indiscernible).

15 Q    The TDP's were not an area that you were actively

16 involved in, in any detail, correct?

17 A    You were specifically asking me in my deposition, as the

18 question reflects, the differences between the TDP's and the

19 toggle plan, and the TDP's in the third-amended plan, and that

20 is the specific context in which I gave my answer.

21    MR. HALLOWELL:  Your Honor, we move to strike that

22 statement from Mr. Whittman and we move Page 93, Line 22,

23 through Page 94, Line 6 into evidence.

24    THE COURT:  What's the response?

25    MR. HAMMOND:  Your Honor, I think I can clean it up

1    on redirect, but we have no objection to moving Page 93, Line

2    22, Page 94, Line 6 into evidence.

3            THE COURT:  Okay.  Then it's admitted.

4        (Page 93 of Whittman declaration received into evidence)

5            MR. HALLOWELL:  Your Honor, there is -- thank you.

6    BY MR. HALLOWELL:

7    Q    Mr. Whittman, you testified earlier when Mr. Hammond was

8    asking you questions about some of the general topics that

9    were discussed in presentations that were made by the debtor's

10   advisors, correct?

11   A    That is correct.

12   Q    And you summarized some of those topics and you included

13   among them the Hartford settlement, chartered organizations,

14   various insurance issues and you also specifically mentioned

15   TDP's, correct?

16   A    I did.

17   Q    Mr. Whittman, I would like you to turn to your

18   supplemental declaration that has been authored by the

19   debtors, but not admitted into evidence in this case.  Let me

20   know when you have that?

21   A    I believe that's Exhibit 4.  I am there.

22   Q    Could you turn to Paragraph 8 on Page 3 carried over to

23   Page 4 of the supplemental declaration and read that

24   paragraph, Mr. Whittman?  Let me know when you are finished.

25   A    Read it aloud or read it to myself?

1  Q     You can read it to yourself.

2  A     Okay.

3  Q     Are you finished?

4  A     No, I'm not.  Okay, I have read it.

5  Q     This is the declaration that was prepared by White &

6  Case, correct?

7              MR. HAMMOND:  Objection.

8              THE WITNESS:  It was a declaration that --

9              THE COURT:  What is the objection?

10             MR. HAMMOND:  I think it's vague in terms of

11 prepared, Your Honor.

12             THE COURT:  Overruled.  You can answer the

13 question.

14             THE WITNESS:  The --

15 BY MR. HALLOWELL:

16 Q     Was it prepared by White & Case, yes or no?

17 A     The declaration was drafted by White & Case.  I reviewed

18 it and after I made edits to it I signed it.

19 Q     You will agree with me, Mr. Whittman, that Paragraph 8

20 also discusses the presentations that were made by the

21 debtor's advisors, correct?

22 A     It does.

23 Q     Paragraph 8 summarizes some of those topics including

24 chartered organizations, the Hartford settlement and various

25 insurance issues, correct?

1  A    Correct.

2  Q    And it says nothing about TDP's, correct?

3  A    TDP's is -- that is correct.  TDP's was fit into --

4  Q    Thank you.  Thank you.  Thank you.  Thank you, Mr.

5  Whittman.

6      Your Honor, at this time we would offer just Paragraph 8

7  of the supplemental declaration into evidence.

8          THE COURT:  Is there any objection?

9          MR. HAMMOND:  No objection other then, Your Honor,

10 if they're going to introduce 8 I think you need to introduce

11 -- I'd need to look at it to see if there is other contextual

12 information that needs to be (indiscernible).  Just give me a

13 moment.

14          THE COURT:  I will give you an opportunity to do

15 that.

16      (Pause)

17          MR. RUGGERI:  Your Honor, Jim Ruggeri for Hartford.

18 Wouldn't that be more appropriate to elicit the testimony on

19 redirect?  Again, this is offered because it's an admission by

20 a party opponent.  I don't think that the debtors now get to

21 go and poach from it.  I think they would have to do it on

22 redirect, Your Honor.

23          MR. HAMMOND:  Your Honor, I think under the rule of

24 completeness, under Rule 106, it's hard to segregate a piece

25 of a document from the remainder of the document.  If they

1  want some I think, in fairness, they should take all.

2           MR. RUGGERI:  Your Honor, we certainly disagree

3  with that.

4           THE COURT:  I disagree with that, but I will give

5  you an opportunity to see if there is anything else and you

6  can offer it on redirect.

7           MR. HAMMOND:  Thank you, Your Honor.

8  BY MR. HALLOWELL:

9  Q    Mr. Whittman, the RSA calls for paying coalition

10 professional fees up to $950 per month on a going forward

11 basis, correct?

12 A    $950,000 (indiscernible) per month, that is correct.

13 Q    This is an issue that you were actively involved in,

14 correct?

15 A    Correct.

16 Q    And you didn't consider any documentation from the

17 coalition in determining that $950,000 per month is

18 reasonable, correct?

19 A    I didn't consider a specific documentation from the

20 coalition, that is correct.

21 Q    And, in fact, you did not even request invoices from the

22 coalition when you were determining whether or not that amount

23 was reasonable, correct?

24 A    Well that was a prospective amount.  So I am not sure

25 why I would consider invoices in that amount.  I would

1  consider invoices in the future in authorizing the payment of

2  the amount, but not in entering into an agreement to pay

3  opposite that amount.

4  Q    Mr. Whittman, you did not request invoices from the

5  coalition when determining whether the $950,000 per month

6  amount on a going forward basis was reasonable, correct?

7  A    My answer was correct.

8  Q    Now the RSA also calls for paying up to $10.5 billion

9  for the fees of the coalition professionals that were incurred

10  prior to the RSA effective date?

11  A    That is correct only if the plan is ultimately confirmed

12  and goes effective.

13  Q    You did not request itemized invoices from the coalition

14  when determining the reasonableness of that amount, did you?

15  A    No, I didn't need to.

16  Q    And you did not believe it was necessary to do so,

17  correct?

18  A    I did not and I do not.

19  Q    Mr. Whittman, the coalition is a group of attorneys,

20  correct?

21  A    The coalition is a group of attorneys that it represents

22  these claimants in the case.

23  Q    Okay.  The coalition is not made up of the actual

24  claimants who have submitted proofs of claim, correct?

25  A    I don't believe that is correct.  I thought there were

1   individual claimants who signed onto something, but I'm not

2   certain.

3   Q     Okay.  You are not aware of anything that the debtors

4   (indiscernible) to confirm how many claimants the coalition

5   attorneys actually represent, correct?

6   A     The debtors have asked for representations from the

7   coalition in terms of how many claimants they represent and

8   there have been filings with the RSA and amendments to the RSA

9   to that effect.

10  Q     Have the debtors done anything to confirm that the

11  coalition represents (indiscernible)?

12  A     Nothing to my knowledge beyond what I described.

13  Q     Alvarez & Marsal has not done anything to confirm how

14  many claimants the coalition (indiscernible), correct?

15  A     That is correct.

16  Q     You don't know who all the attorney members of the

17  coalition are, do you?

18  A     I don't know them personally, but they are signatories

19  to the agreement?

20  Q     You don't know their identities, correct?

21  A     They are state law attorneys that are signatories to the

22  agreement.  I don't personally know them all.  I'm not sure if

23  I am getting your question.

24  Q     There is something called consenting state court counsel

25  who are signatories to the TCC, to the RSA, correct?

1  A      That is correct.

2  Q      Do you know who are consenting state court counsel and

3  who are attorney members of the coalition?

4  A      I believe that the majority of the state court counsel

5  are members of the coalition.  I do not know if they all are.

6  Q      And you don't know who are the consenting state court

7  counsel and who are the coalition, correct?

8  A      I don't.

9  Q      Mr. Whittman, you believe that the national executive

10 committee approved the RSA at its meeting on June 22nd, 2021,

11 correct?

12 A      Sorry, could you restate that question?

13 Q      Do you believe that the national executive committee

14 approved the RSA at its meeting on June 22nd, 2021?

15 A      The --

16 Q      Do you believe that or not, Mr. Whittman?

17 A      They approved it, elements of the RSA, at that time.

18 Final elements were approved immediately prior to entering

19 into the agreement.

20 Q      Mr. Whittman, I want to refer you again to your

21 deposition and, Your Honor, I'm referring to Page 179, Line 22

22 through 180, Line 12.

23        Mr. Whittman, have you had a chance to read that?

24 A      I did.  I have, yes.

25 Q      Did I ask you those questions and did you give those

1  answers?

2  A     I did.  I believe --

3          MR. HALLOWELL:  Your Honor, we move Mr. Whittman's

4  deposition Page 179, Line 22 to Page 180, Line 12 into

5  evidence.

6          MR. HAMMOND:  Your Honor, I object.  It's not an

7  impeachment.  Its -- he says I believe so on 180, Line 12.

8          MR. HALLOWELL:  I asked him if he believed it.

9          THE COURT:  Can someone get to the page?

10          UNIDENTIFIED SPEAKER:  And that occurred on June

11  22nd. He said I believe so.

12          MR. HAMMOND:  Your Honor, his deposition transcript

13  has been -- they are binary.  It's at Exhibit 52 if you want

14  to take a look at the hard copy.

15          THE COURT:  Thank you.  It's admitted.

16      (Page 179, Line 22 to Page 180, Line 12 of Whittman

17  declaration received into evidence)

18      (No verbal response)

19          THE WITNESS:  I believe Mr. Hallowell is muted.

20          MR. HALLOWELL:  I apologize.

21  BY MR. HALLOWELL:

22  Q     Mr. Whittman, you have represented that BSA's operations

23  will be significantly impeded unless the local councils

24  receive or release as part of the plan contemplated in the

25  RSA, correct?

1  A      I don't recall the exact words.  I'm sure you would

2  point me to them, but something to that effect.

3  Q      So you agree with me, correct?

4  A      It would be a definite negative impact on BSA if the

5  local councils were not covered by the channeling injunction,

6  yes, I agree.

7  Q      And without a release you expect some individual local

8  councils to file for bankruptcy, correct?

9  A      That is correct.

10 Q      And if individual local councils start filing for

11 bankruptcy that will significantly impede BSA's ability to

12 (indiscernible), right?

13 A      BSA would still be feasible and I believe it would have

14 a feasible business plan, but it would significantly harm BSA.

15 Q      With regard to the local councils you have conducted an

16 analysis to determine the aggregate unrestricted assets of the

17 local councils, correct?

18 A      I looked at -- I'm sorry, it was a long sentence there,

19 I was unpacking it.  I looked at the unrestricted assets of

20 the local council individually and in an aggregate, yes.

21 Q      And you have determined that the local councils have an

22 aggregate of over $2 billion in unrestricted assets, right?

23 A      That is correct.

24 Q      You also understand that BSA's operations depend on the

25 chartered organizations, right?

1   A      Chartered organizations are very important to the

2   operation of BSA.

3   Q      And as currently constructed there are no chartered

4   organizations that received a release under the RSA, correct?

5   A      I believe I answered that question with Mr. Schiavoni a

6   moment ago that that process has just begun in terms of those

7   negotiations.

8   Q      But to answer my question, as it stands today, no

9   chartered organizations have received a release under the RSA,

10  correct?

11  A      That is correct.

12  Q      And, in fact, under the RSA any settlement with

13  chartered organizations must be approved by all three, the

14  TCC, the FCR, and coalition, correct?

15  A      Under the RSA they would need to be approved by all

16  three of those parties.  That is correct.  I think I already

17  described my views on the benefits of the RSA.

18  Q      So you don't have to describe it again, Mr. Whittman.

19  You can just answer my question.

20          MR. HAMMOND:  Your Honor -- I don't mean to

21  interrupt you, Mr. Hallowell, but if there is a convenient

22  breaking point I think we could all use a few minutes to, you

23  know, kind of --

24          THE COURT:  Yes.  We will take a break in a moment.

25          Mr. Hallowell, how much longer do you have?

1          MR. HALLOWELL:  I really just have a few more

2  questions, Your Honor.

3          THE COURT:  Okay.  Then let's have those few more

4  questions and then we'll take a break.

5  BY MR. HALLOWELL:

6  Q    Mr. Whittman, the RSA selects Eric Green as the

7  settlement trustee, correct?

8  A    Eric Green is mentioned.  I don't know if "select" is

9  the right word -- I forgot the specific term, if you could

10  just point them to me -- but Eric Green is mentioned as the

11  settlement trustee.

12  Q    Eric Green, he is designated as the settlement trustee

13  under the RSA, right?

14  A    Can you give me an opportunity to look at the specific

15  provision that you're referring to?

16  Q    Sure.  I think it's going to be page 21 of the RSA

17  termsheet and that's Docket Number 5466, I understand

18  interested bidder two, page 83 of 118.

19          UNIDENTIFIED:  Your Honor, that's Exhibit 6 in our

20  binder if you'd like to take a look at the paper copy.

21          THE COURT:  Thank you.

22          THE WITNESS:  Yes, the settlement trustee shall be

23  Eric Green and will be appointed by the Bankruptcy Court.

24  That is correct.

25  BY MR. HALLOWELL:

1  Q      Okay.  So, that is pretty clear, right.

2         The settlement trustee shall be Eric Green, correct?

3  A      That's correct.

4  Q      You can't tell us how the Boy Scouts reached the

5  conclusion that the settlement trustee should be Mr. Green,

6  can you?

7  A      I believe I described in my deposition that Eric Green

8  is a party known to the Boy Scouts earlier in the case, that

9  was a party that came up amongst the RSA -- he's a party that

10 came up amongst the RSA parties to be named the trustee and

11 BSA has had some knowledge of Mr. Green and BSA says it was

12 acceptable.

13         MR. HALLOWELL:  Your Honor, I want to refer

14 Mr. Whittman to his deposition transcript, again.  I'm going

15 to refer him to page 154, line 23, to page 155, line 9.

16         THE WITNESS:  Okay.

17 BY MR. HALLOWELL:

18 Q      Mr. Whittman, during your deposition, were those

19 questions asked of you and did you give those answers?

20 A      Yes.

21         MR. HALLOWELL:  Your Honor, I'd offer page 154,

22 line 23, through page 155, line 9 of Mr. Whittman's deposition

23 into evidence.

24         THE COURT:  Any objection?

25         MR. HAMMOND:  No, Your Honor.

1            THE COURT:  It's admitted.

2        (AIG Exhibit received into evidence)

3  BY MR. HALLOWELL:

4  Q    Mr. Whittman, you can't tell us if the debtors did any

5  kind of analysis to determine if Mr. Green is qualified to

6  serve in this role, can you?

7  A    No, I cannot.

8  Q    Okay.  And you don't if Mr. Green's previous

9  interactions with the FCR pose a conflict of interest for Mr.

10 Green to serve as the settlement trustee, do you?

11 A    I don't know the answer to that.

12 Q    And you don't know if anybody has looked into that

13 potential conflict of interest, do you?

14 A    I do not.

15            MR. HALLOWELL:  Your Honor, I have no further

16 questions of this witness.

17            THE COURT:  Thank you.

18            Let's take a 10-minute break and then we'll resume.

19            Can people tell me if there are any others who are

20 going to want to cross-examine?

21        (No verbal response)

22            THE COURT:  I see Mr. Ryan's hand.

23            MR. GOODMAN:  Your Honor, the coalition would like

24 to ask a few questions, too.

25            MR. BUCHBINDER:  Your Honor, this is

1  Mr. Buchbinder.  I have a couple questions, as well.

2           MR. PATTERSON:  Tom Patterson, Your Honor.  We may

3  well have some questions, as well.

4           THE COURT:  Okay.  Let's take 10 minutes.

5           We're in recess.

6       (Recess taken at 5:43 p.m.)

7       (Proceedings resumed at 5:58 p.m.)

8           THE COURT:  This is just Silverstein.

9           And Mr. Ryan?

10          MR. RYAN:  Thank you, Your Honor.

11                       CROSS-EXAMINATION

12  BY MR. RYAN:

13  Q    Good afternoon, Mr. Whittman.

14       I'm Jeremy Ryan on behalf of the United Methodist ad hoc

15  committee and also the ad hoc committee of Catholic Diocese.

16  A    Good afternoon.

17  Q    In your declaration (indiscernible) with respect to

18  (indiscernible) organizations, your testimony, as a

19  consideration, was given to them at the time the RSA was

20  considered, correct?

21  A    That's correct.

22  Q    And in that consideration, as you set out in the initial

23  declaration, that the RSA provides a framework for the

24  resolving issues of the charter organizations?

25  A    That's correct.

1  Q    And it's only a framework because the RSA doesn't

2  actually resolve those issues, correct?

3  A    That is correct.  It's a starting point to begin to

4  negotiate those issues.

5  Q    And it's true that at the time of the entry into the

6  restructuring support agreement, Boy Scouts did not have a

7  plan to get charter organizations the benefit of the

8  channeling injunction?

9  A    I'm not sure necessarily what you mean by a plan.  As

10  you rightly state, the restructuring support agreement,

11  itself, did not resolve the chartered organization issues.

12  When you say you did not have a plan, we had a strategy to

13  first bring the plaintiffs onboard, have agreement with the

14  parties that were necessary to confirm a plan and necessary in

15  order to validate any deal and make sure that any deal with a

16  chartered organization would in fact get confirmed.

17  (Indiscernible) would be approved as part of the confirmed

18  plan of reorganization and then to move forward with those

19  negotiations, which we have started today.

20  Q    Okay.  So, are you aware of Mr. Mosby's testimony, sir?

21  A    I have not reviewed Mr. Mosby's testimony.

22  Q    Okay.  So, if Mr. Mosby testified that at the time of

23  the entry of the RSA and at the time of his deposition, there

24  wasn't a plan to get chartered organizations the benefit of

25  the channeling injunction that we could give them, correct?

1    MR. HAMMOND:  Objection, Your Honor.

2    Asking Mr. Whittman, who hasn't reviewed Mr.

3  Mosby's testimony, as to what Mr. Mosby said is improper.

4    THE COURT:  Overruled.

5    THE WITNESS:  Not knowing the context of the

6  questions asked of Mr. Mosby or what Mr. Mosby said, again, it

7  may come back to different people's view of the plan, the

8  debtors' professionals, and we had discussed amongst

9  ourselves, as well as together with the bank (indiscernible)

10  any fee, the chartered organization issues extensively and

11  we're prepared to move forward with negotiating chartered

12  organization issues and turning to those issues once we've

13  reached the RSA and that's exactly what we've done.

14  BY MR. RYAN:

15  Q    Okay.  So, Mr. Mosby was asked at page 189, line 6,

16  starting at line 6 of his deposition:

17    "Question:  Does the Boy Scouts have any plan or

18  intention to provide support to sponsoring organizations,

19  defending those lawsuits if the plan is confirmed?"

20  A    I don't have Mr. Mosby's deposition in front of me, so

21  I'm not sure if you're asking me to look at something --

22  Q    I'll represent to you his answer is, "We're not there

23  yet."  And that was in response to the prior question of if

24  the plan, in its current form is confirmed that -- without --

25  the chartered organizations would not have the benefit of the

1  channeling injunction.

2  A     Maybe we're saying the same thing in different ways.

3  Q     That's fine.  We'll take that up with Mr. Mosby, as

4  well, as to whether he thought he had a plan under the

5  restructuring support agreement.

6              UNIDENTIFIED:  Take that (indiscernible).  Take it.

7              THE COURT:  Everyone please make sure you're muted.

8              MR. RUGGERI:  And if it helps, Mr. Mosby's

9  deposition is tab 53 of the debtors' binder.

10             MR. RYAN:  Thank you, Mr. Ruggeri.  I think we'll

11  lay with that now.

12  BY MR. RYAN:

13  Q     Can you turn to Exhibit 42 of the debtors' binder,

14  page 2.

15  A     I am there.

16  Q     And this was the liquidity analysis that you prepared

17  for the Boy Scouts at the time that the restructuring support

18  agreement was being considered?

19  A     This was an analysis that I prepared for the, as I said

20  earlier, the bankruptcy task force, National Executive

21  Committee, and the National Executive Board around the BSA

22  trust contribution and how that trust contribution affected

23  BSA's liquidity going forward at the time that that component

24  of the RSA was being reviewed and approved by the National

25  Executive Board.

1  Q     Okay.  So, slide 2 is a liquidity analysis, correct?

2  A     Slide 2 is not.  Slide 2 provides -- I'm sorry,

3  slide 2 -- sorry, I'm looking at slide 1.

4  Q     Slide 2 is a liquidity forecast; is that right?

5  A     Yeah, slide 2 is a liquidity forecast, that is correct.

6  Q     Okay.  And footnote 2, can you read footnote 2 for me,

7  sir.

8  A     Delayed emergence to 3/31/22.  (Indiscernible) 25,000

9  lower-use additions in 2021 and lower, unrestricted

10 contributions, in addition to additional restructuring

11 professional fees.

12 Q     Okay.  And if we look at the chart, the estimated,

13 unrestricted liquidity (3/31/22 emergence) that reflects that

14 adjustment, correct?

15 A     The estimated unrestricted liquidity 3/31/22 emergence,

16 that line, which is -- this is a black-and-white copy -- but

17 the lighter line, the lower line says it ends up at $39

18 million at the end of the period.  That is what the note is

19 referring to.

20 Q     And that is materially lower than the estimate with the

21 (indiscernible), correct?

22 A     That is materially lower.  It is taking into account --

23 Q     Just yes-or-no, sir.  It's a yes-or-no question.

24       Is there anyone or slide 2 where there is any analysis

25 of what might happen if blocks of chartered organizations

1  withdraw their support and (indiscernible) is declined?

2  A    No, that is not on slide 2.

3  Q    Okay.  So, at the time of this presentation when the RSA

4  was entered into, the only forecast with results, sensitivity

5  forecast with results in this line, addressing (indiscernible)

6  was to add 25,000 more, correct?

7  A    I don't think you're quite describing it right, but that

8  is the only sensitivity that is, that the line you're

9  referring to, that's the only sensitivity that is on this

10  slide.

11  Q    There's no footnote that says what might happen at 25

12  percent of the current (indiscernible) left scouting, correct?

13  A    That is correct.

14  Q    Okay.  And as Boy Scouts' financial advisor, you're

15  aware that Boy Scouts has taken the position that chartered

16  organizations have certain rights under the Boy Scouts'

17  insurance policies, correct?

18  A    That is correct.

19  Q    Okay.  And you're familiar with the July 28th, 2021,

20  amendments to the restructuring support agreement that was

21  filed with the Court?

22  A    Yes, I am.

23  Q    Okay.  And as part of that amendment -- and we may have

24  covered this -- but if a termination event was added in favor

25  of the TCC, the FCR, the state court counsel, and the

1  coalition for the treatment of chartered organizations,

2  correct?

3  A    Well, I don't think that's a complete description of

4  what was added.  The, as I described earlier, what was added

5  was the rights of all the parties, including BSA and those ad

6  hoc committees local councils, which you neglected to mention,

7  to terminate the RSA if the chartered organization resolution

8  was unsatisfactory.

9  Q    Sir, I wasn't trying to ask for everybody; I was trying

10 to ask on the plaintiff's side of the ledger.  They were all

11 given veto rights, correct?

12 A    Each party of the RSA was given the opportunity to exit

13 the RSA if they were unhappy with the resolution of the

14 chartered organization issues.

15 Q    Okay.  And as part of Boy Scouts' due diligence in

16 respect of whether to enter into the restructuring support

17 agreement, did Boy Scouts or anyone working on their behalf

18 estimate the value of the chartered organizations' insurance

19 rates under BSA's insurance policies or the local councils'

20 policies?

21 A    I'm not aware of anything, no.

22 Q    Thank you.

23       MR. RYAN:  I have no more questions, Your Honor.

24       THE COURT:  Thank you.

25       Mr. Goodman?

1    MR. GOODMAN:  Thank you, Your Honor.

2                CROSS-EXAMINATION

3  BY MR. GOODMAN:

4  Q    Mr. Goodman, you are a financial advisor, correct?

5  A    Correct.

6  Q    And how long have you been a financial advisor?

7  A    I've been advising companies in restructuring processes

8  for over 25 years.

9  Q    The coalition is an ad hoc group, correct?

10  A    That is correct.

11  Q    Have you been involved in bankruptcy cases before that

12  include ad hoc groups?

13  A    I have.

14  Q    What role do ad hoc groups usually serve in a bankruptcy

15  case.

16                MR. SCHIAVONI:  Objection, Your Honor; relevance,

17  beyond the scope of direct.

18                MR. RYAN:  And given the scope of the proceeding

19  now.

20                THE COURT:  Mr. Goodman?

21                MR. GOODMAN:  Your Honor, I'm just trying to lay

22  some foundation testimony.

23                MR. RYAN:  Your Honor, it's 6:10 p.m.  The witness

24  has been on the stand for the better part of the afternoon.

25  (Indiscernible) a little beyond a basic foundation which has

1  already been laid.  Again, this is irrelevant to the issues in

2  the scaled-down proceeding that we're in.

3          THE COURT:  It might be, but I'll let you ask a few

4  foundation questions and then let's get to the heart of your

5  examination.

6          MR. GOODMAN:  Of course.

7  BY MR. GOODMAN:

8  Q    Mr. Whittman, what role do ad hoc groups usually serve

9  in a bankruptcy case?

10 A    They represent a constituent, often times, it's

11 bondholders, where they will gather a large portion, a class

12 of creditors, and often negotiate a resolution that can be

13 then support by, and during confirmation, bring -- I should

14 say, a positive vote or an affirmative vote of that class of

15 creditors in the plan process.

16 Q    Do you have an understanding as to who the coalition

17 represents?

18 A    I do.

19 Q    What is that understanding?

20 A    My understanding is the coalition represents the holders

21 of abused claimants in excess of 60,000 holders of abuse

22 claimants.

23          MR. SCHIAVONI:  Your Honor, that's inconsistent

24 with the 2019 submission.  They don't represent 60,000 --

25 we're not 60,000 coalition members.

1        THE COURT:  It is.

2        MR. SCHIAVONI:  Even Mr. Goodman would admit that.

3        THE COURT:  It is and I know that.

4        MR. SCHIAVONI:  We're only 18,000.

5        THE COURT:  Mr. Goodman?

6        It shows us what people know.

7  BY MR. GOODMAN:

8  Q    Mr. Whittman, are there any parties involved in the

9  debtors' cases, other than the coalition, that represent the

10 comparable creditor constituency?

11 A    There are no other parties that I'm aware of that

12 represent this magnitude of these claimants and this claimant

13 group is the largest creditor constituency.  Yes, I would say

14 yes, I agree.

15 Q    Did the coalition turn over abuse claimants' data to the

16 debtors?

17 A    Yes.

18 Q    And when did that occur?

19 A    Sometime in the fall of 2020.

20 Q    Do you know what volume of claims data was provided by

21 the coalition?

22 A    I don't recall.

23 Q    Okay.  Do you know how the debtors used that data?

24 A    I believe that data was used to help start to formulate

25 an understanding of claims population to inform negotiations

1  in advance of the bar date.

2  Q    And that was beneficial to the Boy Scouts, wasn't it?

3  A    It was helpful, yes.

4  Q    The Boy Scouts and the local councils are making

5  contributions to the settlement trust under the RSA; is that

6  correct?

7  A    That is correct.

8  Q    Did those contribution amounts change while the RSA was

9  being negotiated?

10 A    They did.

11 Q    How did they change?

12 A    The contribution of the Boy Scouts increased over time

13 from $120 million to a target of where between two hundred

14 twenty and $250 million, depending on the time of emergence.

15 The contribution of the local councils, depending on exactly

16 when you start the clock, increased from either 300 million to

17 $425 million up to the $500 million, plus the $100 million ESP

18 (indiscernible) for a total of $600 million.

19 Q    Did the coalition play a role in that increase?

20 A    They did.

21        MR. SCHIAVONI:  Objection.  I don't see how this

22 doesn't result in a broad and extensive waiver of any

23 communications between the coalition and the Boy Scouts.

24        MR. GOODMAN:  Your Honor, the changes that are

25 reflected appear in the publicly filed versions of the

1  debtors' plan in the case.  You can pull them from looking at

2  the docket on PACER and the Omni website.  I don't understand

3  Mr. Schiavoni's objection.

4           THE COURT:  That wasn't your question.

5           Your question was, did the coalition -- I don't

6  remember exactly -- play a role in that increase, in essence?

7           So, you want to get into negotiations or no?

8           MR. GOODMAN:  No, that's fine, Your Honor.

9  Understood.

10  BY MR. GOODMAN:

11  Q    Mr. Whittman, what work remains in the debtors' cases?

12  A    There's a lot of work that remains in the debtors'

13  cases.  As I mentioned, we are in the early stages of

14  negotiating resolutions of the concerns of the chartered

15  organizations.  We are still in negotiations with the

16  insurers.  We are heading towards a disclosure statement

17  hearing, hopefully, on August 25th and -- sorry -- yeah, 25th

18  and 27th and then from there, to the plan process

19  (indiscernible).

20  Q    And what is the debtors' current timeline for exiting

21  Chapter 11?

22  A    Yes, the current timeline, I believe it's for a

23  confirmation hearing in the late-October time frame and based

24  on all the moving parts from there, we've included a, in the

25  business plan that's attached to the disclosure statement, an

1  assumption of a December 31st emergence.

2  Q     And how does the coalition fit into that process?

3  A     I expect the coalition will be an active part of the

4  negotiations that I mentioned with chartering organizations

5  and its insurers and in supporting the plan process.

6  Q     Earlier, Mr. Schiavoni asked you about the payment of

7  the coalition's professional fees.  Do you recall that?

8  A     I do.

9  Q     And under the RSA, the Boy Scouts are agreeing to pay

10  the reasonable and documented fees of the coalition up to

11  certain limits; is that correct?

12  A     That is correct.

13  Q     Do those fee caps apply to the coalition professionals

14  as a collective group?

15  A     They do.

16  Q     The 10.5 million cap includes Brown Rudnick, correct?

17  A     It does.

18  Q     And it also includes Delaware counsel, correct?

19  A     It does.

20  Q     And it also includes insurance counsel, correct?

21  A     Correct.

22  Q     And it also includes the coalition's financial advisor,

23  correct?

24  A     Yes.

25  Q     And it also includes any experts retained by the

1  coalition, correct?

2  A     That's correct.

3  Q     And the $950,000 per month going forward, that also

4  includes all of the consolidation professionals, not just a

5  single law firm, correct?

6  A     That is correct.

7  Q     Did you evaluate the professional fee caps in the RSA

8  for the Boy Scouts?

9  A     I did.

10  Q     Did they appear out of line to you?

11  A     They did not.

12        MR. SCHIAVONI:  Objection.  There's no foundation

13  for what the standard is, given that the TCC has the same

14  exact people on the same exact roles.

15        MR. GOODMAN:  Your Honor, I think I began by asking

16  questions about how long he's been involved in the

17  restructuring field appeared his involvement in cases with ad

18  hoc groups and I was asking that foundation testimony for a

19  reason.

20        THE COURT:  He can give --

21        MR. GOODMAN:  I think that the witness can testify

22  based on his experience.

23        THE COURT:  The witness can give his thoughts that

24  he has.  Overruled.

25  BY MR. GOODMAN:

1  Q     I'll ask the question again.

2        Mr. Whittman, you said that you evaluated the

3  professional fee caps in the RSA for the Boy Scouts, correct?

4  A     Correct.

5  Q     Did they appear out of line to you?

6  A     They did not.

7  Q     And why is that?

8  A     They were in the range of what I would expect for the

9  nature of this case and the complexity of this case and it was

10 in comparison to other cases, as well as in comparison to

11 other professional groups in this case.

12 Q     Okay.  Do you think the professional fee caps on the

13 coalition's -- sorry, I'm going to try again.

14       Do you think the professional fee caps on the

15 coalition's professional fees are reasonable?

16 A     I do.

17 Q     Again, what do you base that on?

18 A     What I just described; my experience in other cases, as

19 well as the other professional groups and costs that have been

20 incurred and are expected to be incurred going forward in this

21 case.

22 Q     And did you consider anything else when you evaluated

23 the professional fee caps in the RSA?

24 A     I did not.

25 Q     Okay.  Did the Boy Scouts request a budget for

1  professional fees from the coalition?

2         MR. HALLOWELL:  Objection; leading.

3         THE COURT:  Sustained.

4         MR. HALLOWELL:  Mr. Goodman and the coalition

5  (indiscernible) aligned with the debtors here.

6         THE COURT:  Sustained.

7         MR. GOODMAN:  Let me rephrase.

8  BY MR. GOODMAN:

9  Q    Mr. Whittman, do you know if the Boy Scouts requested a

10  budget for professional fees from the coalition?

11         MR. HALLOWELL:  Same objection.

12         THE COURT:  Sustained.

13         MR. GOODMAN:  Your Honor, I'm not sure how that's

14  leading.

15         THE COURT:  Because you're suggesting the answer to

16  your next question.

17  BY MR. GOODMAN:

18  Q    Mr. Whittman, did the coalition provide a budget?

19         MR. HALLOWELL:  Objection; leading.

20         THE COURT:  I'll let him answer the question.

21         THE WITNESS:  Not to my knowledge.

22  BY MR. GOODMAN:

23  Q    Okay.  I believe you testified earlier in response to

24  questions from Mr. Hallowell that when indenture trustee came

25  to the professional fee provisions in the RSA, you did not

1  request a review of itemized invoices and that such invoices

2  were not important to you.

3       Do you recall that?

4  A    I do.

5  Q    Can you explain why itemized invoices were not important

6  to you?

7  A    As it related to the $950,000 fee cap going forward,

8  there would be a requirement that we were paying the

9  reasonable fees that were actually incurred going forward.

10      So, in terms of evaluating the cap, I was more

11 interested in was the cap amount reasonable and what I

12 described before, my experience in other cases, as well as the

13 professional spend by other groups in this case and the

14 consideration with the overall budget and cash flow forecasts

15 of the organization.

16      As it related to the ten-and-a-half-million-dollar

17 number, again, I was more interested in terms of how that

18 compared to those factors as opposed to getting into the

19 details of the (indiscernible) invoices.

20 Q    All right.  Do you think it's beneficial to the Boy

21 Scouts for them to pay the coalition's fees under the RSA?

22            MR. HALLOWELL:  Objection; leading.

23            THE COURT:  Sustained.

24 BY MR. GOODMAN:

25 Q    Mr. Whittman, do you know why the Boy Scouts agreed to

1 ‖ the professional fee provisions in the RSA?

2 ‖          MR. SCHIAVONI:  Calls for hearsay.

3 ‖          THE COURT:  Well, the first question doesn't;

4 ‖ that's a yes or no.

5 ‖ BY MR. GOODMAN:

6 ‖ Q    That's a yes-or-no question.

7 ‖ A    Yes.

8 ‖ Q    Why?

9 ‖          UNIDENTIFIED:  Objection; hearsay.

10 ‖          MR. RYAN:  I think, Judge, it also lacks foundation

11 ‖ because he has to tie it to someone at BSA in order to have a

12 ‖ foundation for giving the answer.

13 ‖          THE COURT:  Yes, it's foundation.

14 ‖          Can you provide a foundation.

15 ‖ BY MR. GOODMAN:

16 ‖ Q    Mr. Whittman, did you advise the Boy Scouts

17 ‖ restructuring task force on this issue?

18 ‖ A    I did advise the bankruptcy task force on this issue.

19 ‖ Q    Okay.  Do you know if any new law firms signed joinders

20 ‖ to the RSA since it was filed?

21 ‖ A    Yes, I do, and, yes, there were.

22 ‖ Q    Okay.  Do you know what role the coalition played in

23 ‖ getting new firms to sign?

24 ‖ A    It is my understanding that the coalition has been the

25 ‖ party driving getting additional firms to sign up.

1  Q      Thank you.

2              MR. GOODMAN:  Nothing further.

3              THE COURT:  Mr. Buchbinder?

4              MR. BUCHBINDER:  Thank you, Your Honor.  David

5  Buchbinder on behalf of the United States Trustee and I will

6  try to be very brief, everybody.

7                         CROSS-EXAMINATION

8  BY MR. BUCHBINDER:

9  Q     Mr. Whittman, you've participated in negotiating other

10 restructuring support agreements?

11 A     I have.

12 Q     Typically, they arise with groups of bondholders, don't

13 they?

14 A     That's the context (indiscernible) I'm familiar with it.

15 Q     And bondholders have an indenture, correct?

16 A     That is correct.

17 Q     And the indenture generally requires the attorneys' fees

18 and the professional fees of the parties of the indenture to

19 be paid, correct?

20 A     They definitely require the fees of the indenture trust

21 fees to be paid.  I don't know that it's correct that they

22 would require the fees of individual bondholders to pay.

23 Q     And the restructuring support agreements that you're

24 typically familiar with, isn't the attorneys' fees or

25 professional fees (indiscernible) in the indenture typically

1  just (indiscernible) for payment of fees of the ad hoc

2  bondholder committee?

3  A    It may be one of the justifications, yes.

4  Q    Are you aware of any contractual agreement here, other

5  than the RSA, between the coalition and the Boy Scouts?

6  A    No.

7  Q    Are you aware of any statutory obligation, other than

8  the RSA, or the Bankruptcy Code, that would obligate the Boy

9  Scouts to pay the fees of the coalition's attorneys?

10  A    No.

11  Q    The work that you described that the coalition's

12  attorneys have to do to complete the case, isn't that the work

13  that they would have to do to represent their clients if they

14  weren't getting their fees paid by the Boy Scouts?

15  A    (Audio interference) they would or would not do as it

16  relates to the representation of their clients.

17  Q    Okay.  Now, you're a retained professional in this case,

18  aren't you, sir?

19  A    I am.

20  Q    You're familiar with the monthly fee application

21  process?

22  A    I am.

23  Q    And how the fees of the professionals are carefully

24  scrutinized?

25  A    I am.

1  Q      And so why didn't you bother to even take the cursory

2  opportunity to examine the fees of Brown Rudnick and the other

3  coalition professionals, than simply take their word for it as

4  to the amounts?

5  A      Well, again, as to the

6  nine-hundred-and-fifty-thousand-dollar go forward amount, that

7  was go forward, right; there was nothing to scrutinize.  I did

8  expect and, in fact, this (indiscernible) occurred, they have

9  agreed to have those fees subject to the many of the

10 requirements of the other professionals in terms of their

11 review.

12        In terms of the payment of the $10.5 million, which was

13 for historic, as well as any excess in the future fees, from

14 my perspective, it was important to understand the

15 reasonableness of that in the overall case.  I was looking and

16 seeing a lot of work and a lot of activity from the firms.  It

17 wasn't surprising to me that they had incurred or they would

18 incur that type of amount.

19 Q      But you have a staff, don't you, sir?

20 A      I do.

21 Q      And couldn't you have had a low-level billing person

22 review the monthly invoices of Brown Rudnick before agreeing

23 to a number almost arbitrarily?

24 A      I could have, although, it's been my experience, many of

25 those types of groups provide a summary piece of paper and

1  don't provide the debtor with details of their time

2  descriptions.

3          MR. BUCHBINDER:  I have no further questions.

4          Thank you, Your Honor.

5          THE COURT:  Thank you.

6          Mr. Patterson, do you have any questions?

7          MR. PATTERSON:  I do, Your Honor.  It's just a very

8  small number.

9                    CROSS-EXAMINATION

10 BY MR. PATTERSON:

11 Q    Mr. Whittman, my name is Tom Patterson and I represent

12 councils (indiscernible) represent certain claimants.

13      I believe you testified that the reason the debtors

14 negotiated with the coalition was because of the very

15 substantial number of claims that the attorney members of the

16 coalition were presented.

17      Do you recall that testimony?

18 A    Yes, that certainly was one of the reasons.

19 Q    Thank you.

20      Did the debtors or Alvarez & Marsal or yourself conclude

21 what percentage of claims the coalition represented when the

22 RSA was entered into?

23 A    The coalition represented, and there's signatures

24 attached of state court attorneys representing how many claims

25 they represent to the RSA.

1  Q      And do you have an estimate of the percentage that that

2  number represented, as against the 82,000 or so claims that

3  the disclosure statement says that are on file?

4  A      I believe that the time the RSA was filed, there was

5  around 60,000 signatures attached.  The RSA represented that

6  they represented approximately 60,000 of the 82,000 claims.

7  Q      And did you or the debtors conduct any analysis of the

8  severity of those claims as against the claims otherwise in

9  the full 82,000 claim pool?

10 A      That's not an analysis that I would have conducted and

11 I'm not -- there's been a lot of analysis around claims in

12 this case.  I'm not sure if that specific analysis has been

13 done or not.

14 Q      Was there any analysis performed about whether or not

15 the claims represented by the coalition had a greater or

16 lesser occurrence of being presumptively barred by the statute

17 of limitations than the pool as a whole?

18 A      My recollection is that it's not significantly different

19 from the pool, as a whole.

20 Q      How about with respect to claims against local councils,

21 do the claims represented by the coalition have a greater or

22 lesser occurrence, (indiscernible) of occurrence of claims

23 against applicable local councils?

24 A      I'm not sure I understand the question.

25 Q      It's been described in the disclosure statement that

1  thousands of claims did not name an applicable local council

2  in the proof of claim.  So, my question is, did the claims --

3  are the claims represented by the coalition, do they have a

4  greater or lesser (indiscernible) of occurrence of an

5  articulated claim against the local council, as opposed to --

6  as against the pool as a whole?

7  A    I'm not certain.

8  Q    The same question as to the chartered organizations, any

9  analysis of that?

10  A    I'm not certain.

11  Q    Okay.

12        MR. PATTERSON:  That's all my questions.  Thank

13  you.

14        THE WITNESS:  Thank you.

15        THE COURT:  Thank you.

16        Is there anyone else who has not asked questions on

17  cross that wishes to?

18     (No verbal response)

19        THE COURT:  I hear no one.

20        Redirect?

21        MR. HAMMOND:  Your Honor, if I could have just five

22  minutes to consult and wrap this up, hopefully, quickly?

23        THE COURT:  Yes, you may.

24        Yes, we're in recess for five minutes.

25        MR. HAMMOND:  Thank you.

1        (Recess taken at 6:29 p.m.)

2        (Proceedings resumed at 6:39 p.m.)

3            THE COURT:  Okay.  This is Judge Silverstein.

4            Are we ready to begin with redirect?

5            MR. HAMMOND:  No, Your Honor.  I think we aren't

6   going to redirect Mr. Whittman today.  We'll pass the witness.

7            I think there's one housekeeping item that we have

8   here and that was with respect to, I believe there was a

9   motion to introduce what was Mr. -- paragraph 8 of

10  Mr. Whittman's supplemental declaration and we didn't have any

11  other additions in terms of completeness to that.

12            THE COURT:  Thank you.

13            MR. HAMMOND:  Other than that, I think that

14  concludes (indiscernible).

15            THE COURT:  Thank you.  Then that single paragraph

16  is admitted.

17        (Whittman Declaration Paragraph 8 received in evidence)

18            THE COURT:  Okay.  And I'm sorry, are you going to

19  redirect?

20            MR. HAMMOND:  No, Your Honor.

21            THE COURT:  No, okay.

22            MR. HAMMOND:  There's no redirect of Mr. Whittman.

23            THE COURT:  Okay.  So, Mr. Whittman, your testimony

24  is concluded.

25            THE WITNESS:  Thank you, Your Honor.

1           (Witness excused)

2               THE COURT:  Okay.  It's 6:40.  We're not going to

3   start another witness tonight, obviously, so we'll commence

4   again, in the morning.

5               Ms. Boelter, do you have your hand up?

6               MS. BOELTER:  I do.  And I was just rubbing my

7   chin.

8               THE COURT:  Oh, no, I have this little hand

9   thing -- okay.  I'm sorry -- on the mouse here --

10              MS. BOELTER:  Oh, if I did, I did not mean to do

11  that.

12              THE COURT:  -- and it was hovering over you.

13              Okay.  So, we'll start tomorrow at ten o'clock.  I

14  expect that the debtors will be considering their witnesses

15  and the more slimmed-down hearing that we're having and making

16  appropriate decisions on direct and the goal, of course, is to

17  get the witnesses and argument done, but, certainly, to get

18  the witnesses done tomorrow.  So, as I said, we're going to

19  start at 10:00.

20              I am informed by Mrs. Johnson that you use the same

21  registration as you had today for Zoom.  You do not need to

22  re-register or do anything else.

23              And we are -- and I am also going to be using Zoom

24  tomorrow.  We are not going to try to go back to our system,

25  so hopefully, we will not have any issues in the morning and

1  we will start promptly.

2          Is there anything else we can accomplish this

3  evening?

4       (No verbal response)

5          THE COURT:  And thank you very much.

6          We're adjourned.  Have a good evening.

7          COUNSEL:  Thank you, Your Honor.

8       (Proceedings concluded at 6:42 p.m.)

9

10

11                    CERTIFICATE

12

13     We certify that the foregoing is a correct transcript

14  from the electronic sound recording of the proceedings in the

15  above-entitled matter.

16
   /s/Mary Zajaczkowski              August 13, 2021
17  Mary Zajaczkowski, CET**D-531

18
   /s/Coleen Rand                    August 13, 2021
19  Coleen Rand, AAERT Cert. No. 341

20
   /s/William J. Garling             August 13, 2021
21  William J. Garling, CE/T 543

22
   /s/ Tracey J. Williams            August 13, 2021
23  Tracey J. Williams, CET-914

24

25