## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
| | **Hearing Date: Aug. 25, 2021 at 10:00 a.m. (ET)** |
| | **Re: D.I. 2295, 5485 & 5488** |

**SUPPLEMENTAL OBJECTION OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, A UTAH CORPORATION SOLE, TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT AND THE FORM AND MANNER OF NOTICE, (II) APPROVING PLAN SOLICITATION AND VOTING PROCEDURES, (III) APPROVING FORMS OF BALLOTS, (IV) APPROVING FORM, MANNER, AND SCOPE OF CONFIRMATION NOTICES, (V) ESTABLISHING CERTAIN DEADLINES IN CONNECTION WITH APPROVAL OF THE DISCLOSURE STATEMENT <u>AND CONFIRMATION OF THE PLAN, AND (VI) GRANTING RELATED RELIEF</u>**

---

[1]    The Debtors ("**<u>Debtors</u>**" or "**<u>BSA</u>**") in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

OBJECTION..............................................................................................................3

I.    The Plan is Patently Unconfirmable .........................................................3

A.    The Plan Seeks to Unilaterally Extinguish the Independent
Property Rights of Non-Debtor Insureds .....................................................4

B.    The Plan Contains Multiple Third-Party Releases in Violation of
Third Circuit Law .......................................................................................7

C.    The Church's Rights in the BSA Policies and Local Council
Policies Cannot be Adjudicated through the Plan Process ........................10

D.    The Debtors Cannot Demonstrate that the Plan Satisfies the Best
Interest Test.............................................................................................11

E.    The Plan and TDPs Unfairly Discriminate Against Holders of
Indirect Abuse Claims..............................................................................12

i.    Indemnitees of the BSA Stand to Recover Nothing Under
the TDPs........................................................................................13

ii.    The TDPs Subordinate the Payment of Indirect Claims to
the Prior Payment in Full of All Allowed Direct Claims...............15

II.    The Disclosure Statement Fails to Provide Adequate Information as
Required by Section 1125 of the Bankruptcy Code.............................................16

A.    The Disclosure Statement Fails to Disclose the Highly Prejudicial
Treatment of Indirect Abuse Claims..........................................................17

B.    The Disclosure Statement Fails to Disclose the Lack of Res
Judicata and Evidentiary Protections ........................................................18

C.    The Disclosure Statement Fails to Provide Adequate Information
to Demonstrate that the Plan Satisfies the Best Interest Test....................19

RESERVATION OF RIGHTS ...................................................................................19

CONCLUSION.........................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Dakota Rail, Inc.*,
104 B.R. 138 (Bankr. D. Minn. 1989) ......................................................................3

*In re Am. Cap. Equip.*, LLC,
688 F.3d 145 (3d Cir. 2012)....................................................................................3

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652 (2019)............................................................................................4

*In re Archdiocese of Saint Paul & Minneapolis*,
579 B.R. 188 (Bankr. D. Minn. 2017) ....................................................................4

*In re SportStuff, Inc.*,
430 B.R. 170 (B.A.P. 8th Cir. 2010).......................................................................4

*In re SoyNut Butter Co.*,
No. 17 B 14970, 2018 WL 3689549 (Bankr. N.D. Ill. Aug. 1, 2018) ......................4

*In re Forty-Eight Insulations, Inc.*,
133 B.R. 976 (Bankr. N.D. Ill. 1991) .....................................................................5

*In re Burns & Roe Enters.*,
No. 00-41610, 2005 Bankr. LEXIS 3173 (Bankr. D.N.J. Feb. 17, 2005) ................5

*In re Flintkote Co.*,
No. 04-11300 (JKF) (Bankr. D. Del. Nov. 26, 2007) ..............................................5

*In re Imerys Talc Am.*,
No. 19-10289 (LSS) (Bankr. D. Del. Jan. 28, 2021) ...............................................5

*MacArthur Co. v. Johns-Manville Corp.*,
837 F.2d 89 (2d Cir. 1988).....................................................................................6

*In re Hereford Biofuels, L.P.*,
466 B.R. 841 (Bankr. N.D. Tex. 2012)....................................................................6

*In re Continental Airlines*,
203 F.3d 203 (3d Cir. 2000)....................................................................................7

*In re Master Mortgage Investment Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994)................................................................7, 8

ii

*In re Zenith Electronics Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ................................................................... 7, 9

*In re Blitz U.S.A., Inc.*,
   No. 11-13603 (PJW) (Bankr. D. Del. Dec. 19, 2013) ........................................ 8

*In re Catholic Diocese of Wilmington, Inc.*,
   No. 09-13560 (CSS) (Bankr. D. Del. Aug. 8, 2011) ......................................... 8

*In re Mahoney Hawkes, LLP*,
   289 B.R. 285 (Bankr. D. Mass. 2002) ................................................................ 9

*In re Mansaray-Ruffin*,
   530 F.3d 230 (3d Cir. 2008) ............................................................................... 10

*In re Forever 21, Inc.*,
   623 B.R. 53 (Bankr. D. Del. 2020) ..................................................................... 10

*In re Hercules Offshore, Inc.*,
   565 B.R. 732 (Bankr. D. Del. 2016) ................................................................... 10

*In re Linkous*,
   990 F.2d 160 (4th Cir. 1993) .............................................................................. 10

*In re Quigley Co., Inc.*,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010) ............................................................... 11

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006) ......................................................................... 11, 12

*In re Dow Corning Corp.*,
   244 B.R. 696 (Bankr. E.D. Mich. 1999) ............................................................ 12

*In re Johns–Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................................................................. 12

*In re Tucson Self-Storage, Inc.*,
   166 B.R. 892 (B.A.P. 9th Cir. 1994) .................................................................. 12

*In re Burns and Roe Enters. Inc.*,
   No. 08-4191, 2009 WL 438694 (D.N.J. Feb. 23, 2009) ..................................... 13

*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168 (Bankr. S.D. Ohio 1988) ................................................................ 15

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 1988) .......................................................................... 15, 16

**STATUTES**

11 U.S.C.
 § 1129(a)(7)(A)................................................................................................................10
 § 1125(a)(1) ....................................................................................................................16

**RULES**

Fed. R. Bankr. P. 7001(2) ...........................................................................................................9

iv

The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole (the "**Church**"), files this supplemental objection (the "**Objection**") to the *Debtors' Motion For Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 2295, 5488] (the "**Motion**") and the *Amended Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5485] (the "**Disclosure Statement**").[2]  In support of its Objection, the Church hereby asserts the following:

## PRELIMINARY STATEMENT

1.     The Debtors have proposed a Plan that (i) purports to seize the property rights of non-debtor insureds (including the Church and other Chartered Organizations) for the benefit of a subset of creditors, not including the insured, (ii) adjudicates the rights of non-debtor insureds in violation of such parties' due process rights, (iii) releases the contractual claims of the Church and other Chartered Organizations against non-debtor insurers and Local Councils in violation of Third Circuit law, (iv) subordinates the claims of the Church and other Chartered Organizations to the prior payment in full of Direct Abuse Claimants as a class, and (v) uses the Trust Distribution Procedures ("**TDPs**") to determine the liability of non-debtor parties, presumably in an effort to control the outcomes of litigation against non-debtors in the tort system without due process.

---

[2]    All terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement or the *Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5484] (the "**Plan**").

1

2.      The Plan is patently unconfirmable because, among other things, it violates the property rights of the Church and other Chartered Organizations—by attempting to confiscate the Church's and other Chartered Organizations' rights to insurance proceeds—without their consent. Even though Chartered Organizations are insureds under policies arranged by the Debtors and non-debtor Local Councils, the Plan attempts to seize all of the proceeds from those insurance policies, and enjoin all other insureds from enforcing their property rights to the proceeds, while making no effort to provide the Church or other insured parties with any rights to the policy proceeds.  Unless the Plan is modified to preserve the property rights of the Church and other insureds, the Plan is patently unconfirmable, and it would be futile to approve the Disclosure Statement.

3.      In addition, the Plan purports to release the claims of non-debtor third parties, including those of the Church, against non-debtor insurance companies and Local Councils, without providing releasing parties with meaningful recoveries on their claims.  The Church holds valuable claims against the insurance companies arising under the BSA insurance policies (the "**BSA Policies**") and the non-debtor Local Council insurance policies (the "**Local Council Policies**"), as well as contractual indemnity rights against certain Local Councils arising from scouting-related abuse claims.  The confiscation of these claims on the terms proposed under the Plan violates well-established precedent in this Circuit regarding the issuance of non-consensual third party releases.

4.      Finally, the Disclosure Statement fails to provide adequate disclosures required by Section 1125 of the Bankruptcy Code.  The Disclosure Statement does not provide adequate information regarding the treatment of indemnity claims and insurance rights held by Chartered

2

Organizations, the subordination of Indirect Abuse Claims, or whether the Plan satisfies the best interest test.

5.      Accordingly, the Motion to approve the Disclosure Statement should be denied.

## OBJECTION

### I.    The Plan is Patently Unconfirmable

6.      Bankruptcy courts have "an obligation not to subject the estate to the expense of soliciting votes and seeking confirmation of [a] plan" where the disclosure statement "on its face relates to a plan that cannot be confirmed." *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989). The Third Circuit has held "that a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154-55 (3d Cir. 2012) (describing a plan as unconfirmable if, among other potential factors, it is forbidden by law, not feasible, or has not been proposed in good faith).

7.      The Disclosure Statement describes a Plan that is patently unconfirmable for several separate and independent reasons. *First*, the Plan seeks to impermissibly appropriate the rights of non-debtor insured parties under the BSA Policies and the Local Council Policies, and adjudicate the rights of non-debtor insureds thereunder in violation of such insured's due process rights to litigate their interests in a procedurally proper forum. *Second*, the Plan is premised on releasing the claims of non-debtor parties against the insurance companies and Local Councils, without providing affected insureds and indemnitees with anything resembling substantial recoveries. *Third*, the Plan cannot satisfy the best interest test as to creditors—such as the Church—who would be better off in a liquidation scenario, where creditors' insurance rights and claims against non-debtors would be preserved. *Fourth*, and finally, the Plan and TDPs unfairly

3

discriminate against Chartered Organizations through procedures that subordinate Indirect Abuse Claims, while providing claims of equal priority with up to 100% recoveries. Indeed, it is highly speculative whether Indirect Abuse Claims will ever receive value under the Plan, because they are subordinated to the payment *in full* of all Direct Abuse Claims, valued at $2.4 billion to $7.1 billion. *See* Disclosure Statement § II.G.

### A.    The Plan Seeks to Unilaterally Extinguish the Independent Property Rights of Non-Debtor Insureds

8.    Fundamentally, a bankruptcy court lacks jurisdiction over property rights outside of the estate, and accordingly, a plan cannot extinguish non-debtor's property rights to insurance policy proceeds without consent. It is well-established that filing for bankruptcy does not give a debtor greater property rights than it would have had outside of bankruptcy. *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) ("The estate cannot possess anything more than the debtor itself did outside bankruptcy."). Where, as here, there are multiple insured parties under a policy, "the bankruptcy estate owns only the debtor's interest, not the co-insured's interest." *In re Archdiocese of Saint Paul & Minneapolis*, 579 B.R. 188, 202 (Bankr. D. Minn. 2017); *see also In re SportStuff, Inc.*, 430 B.R. 170, 178 n. 15 (B.A.P. 8th Cir. 2010) ("[W]hile the bankruptcy court may exercise jurisdiction over (a liability insurance) policy, the interests of the co-insured, a nondebtor, are not property of the estate. To hold otherwise would allow the court to impair a third party's contract and property rights.") (internal citation omitted). Thus, the bankruptcy court only has jurisdiction over the BSA's rights to insurance proceeds, not the Church's separate and independent rights in the BSA Policies and the Local Council Policies.

9.    The BSA cannot settle coverage under the BSA Policies and the Local Council Policies, and consequently settle the "equal and independent" rights of non-debtor insureds, such as the Church, without their consent. *See In re SoyNut Butter Co.*, No. 17 B 14970, 2018 WL

4

3689549, at *4 (Bankr. N.D. Ill. Aug. 1, 2018) (rejecting settlement that would have released rights of non-debtor co-insured downstream vendors who were "afford[ed] . . . equal and independent rights to seek indemnification and defense" under the policy).   Indeed, courts have denied insurance buyout agreements in bankruptcy proceedings based on the objection of non-debtor insureds where the offending buyout agreement purported to cut off or relieve the insurers' obligations to the non-debtor insured under the policies.   *See, e.g., In re Forty-Eight Insulations, Inc.*, 133 B.R. 976, 976 (Bankr. N.D. Ill. 1991) (concluding that co-insured non-debtor "has a contract with the insurers that allows it to make claims directly" and rejecting settlement in asbestos bankruptcy that would "extinguish[]" those rights); *In re Burns & Roe Enters.*, No. 00-41610, 2005 Bankr. LEXIS 3173, at *17 (Bankr. D.N.J. Feb. 17, 2005) (approving policy buyback between insured and insurer where rights of other non-settling insureds were preserved). Accordingly, any settlement or sale of coverage under the BSA Policies or the Local Council Policies in which the Church has rights to coverage must expressly preserve the Church's right to the policies or to the settlement or sale proceeds.   *See, e.g.*, Order Approving Settlement with English and American Insurance Company, Ltd., *In re Flintkote Co*., No. 04-11300 (JKF) (Bankr. D. Del. Nov. 26, 2007), D.I. 2845 (policy buyback between insured and insurer expressly preserved right of co-insured to assert claim to the settlement proceeds); *In re Burns & Roe Enters.*, 2005 Bankr. LEXIS 3173 at *8 (finding that to the extent any person has an interest in the settled policies, such interest will attach to the proceeds of the sale); Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code at 90-91, *In re Imerys Talc Am.*, No. 19-10289 (LSS) (Bankr. D. Del. Jan. 28, 2021), D.I. 2864 (the "Insurance Entity Injunction" explicitly provides that it will not impair in any way "the rights of any co-insured of the Debtors.").

5

10.     The Debtors argue that the Church's rights to the BSA Policies and the Local Council Policies will be preserved through the Church's ability to assert Indirect Abuse Claims against the Settlement Trust.  *See Debtors' Omnibus Reply in Support of the Motion* [D.I. 4105] ¶ 55.  However, the Insurance Entity Injunction would enjoin the ability of the Church to exercise its *direct* rights to the proceeds of the BSA Policies and the Local Council Policies.  The Church's direct rights are not adequately protected by the Plan where (i) holders of Indirect Abuse Claims stand to recovery *nothing* under the TDPs and (ii) even if the Church could recover under the TDPs, it would be subordinate to the rights of direct claimants and subject to the Settlement Trust's payment percentage.

11.     The cases the Debtors rely upon in opposition are inapposite.  In particular, in *Johns-Manville*, the court approved the debtor's settlement with its insurers despite the objections of MacArthur Corporation, which claimed it had property rights in the policy proceeds, because its interest in the policies under the "vendor endorsements" provision was "highly speculative," given that the endorsements "only" covered "liabilities resulting from the Vendor's status as a distributor of Manville's products."  *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92-93 (2d Cir. 1988).  Here, the Church, as a co-insured under the BSA Policies and the Local Council Policies, has independent rights to coverage that are not "derivative" of its relationship with the BSA or the Local Councils, and which are documented in the BSA Policies and the Local Council Policies themselves.  *See id.*

12.     Likewise, *In re Hereford Biofuels, L.P.*, 466 B.R. 841 (Bankr. N.D. Tex. 2012) does not support the Debtors' assertion that it could settle a co-insured's insurance rights without their consent.  In *Hereford*, the court rejected the claim of a non-debtor third party, which was the parent company of the debtor, that its property rights as a co-plaintiff with the debtor in a separate action

6

against the debtor's insurers were infringed when the debtor sold its claims to insurers to finance its bankruptcy estate. *See id.* at 859. This case is distinguishable from the facts present here for a variety of reasons. *First*, the party that was claiming a right under the insurance policy was *not* a named insured and claimed such a right to the insurance proceeds solely by virtue of its parent relationship with the debtor—a position the court rejected as grounds for sharing in the insurance proceeds. *See id.* at 856. *Second*, court emphasized that the insurance policy at issue was a first-party *property policy*, and the court's ruling was predicated on the fact that the debtor owned the underlying real property that the insurance policy covered. *Id.* In other words, the specific property insured by the policy was *itself* property of the bankruptcy estate, which would have benefited from the proceeds of the policy had the property required repair or replacement. *Id.* The BSA Policies and the Local Council Policies, by contrast, are third-party liability policies that provide defense and indemnity coverage in the event covered claims are asserted against an insured. They do not insure real property owned by the Debtors. They insure the named and co-insureds, including the Church, against claims asserted against those co-insureds. As such, *Hereford's* narrow ruling is inapplicable in the instant case.

### B. The Plan Contains Multiple Third-Party Releases in Violation of Third Circuit Law

13. The Plan is patently unconfirmable because it is premised on releasing the claims of non-debtor parties, including those of the Church, against other non-debtor parties, in particular the insurers and Local Councils, without providing releasing parties with meaningful recoveries on account of their claims or requiring the insurers to make any contribution to the Settlement Trust. Such relief would be an unprecedented use of section 105(a) flouting well-established Third Circuit precedent governing the issuance of non-debtor releases.

7

14.     The Third Circuit permits third-party releases only in "extraordinary cases" and based upon specific findings that support the "hallmarks" of (a) fairness, (b) necessity to the reorganization, and (c) fair consideration given in exchange for the releases.  *See In re Cont'l Airlines*, 203 F.3d 203, 212, 214, 217 (3d Cir. 2000).   In deciding whether such relief is permissible, courts in this jurisdiction consider the factors initially described in *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994), and adopted in *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999), which require (1) an identity of interest between the debtor and the released party; (2) a "substantial contribution" to the reorganization made by the released party; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.  *In re Zenith Elecs. Corp.*, 241 B.R. at 110 (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 937).

15.     The third-party releases in favor of insurance companies on the terms proposed in the Plan are an unprecedented expansion of section 105(a) and are extremely prejudicial to the interest of non-debtor insureds.  The Insurance Entity Injunction would release all abuse-related claims against the "Non-Settling Insurance Companies" without requiring such insurers to make any contribution (monetary or otherwise) to the Settlement Trust.  *See* Plan § 10.H.2 ("Insurance Entity Injunction").  Indeed, the Plan itself contemplates that the Settlement Trust will have to litigate with Non-Settling Insurance Companies to recover anything under the subject policies (including the possibility of no recovery).  The Debtors themselves concede that "[i]t is not currently known whether the Insurance Coverage Actions will result in a favorable outcome for

8

the Settlement Trust . . . the ultimate value of the Insurance Actions being contributed to the Settlement Trust is *unknown*." *See* Disclosure Statement § X.21 (emphasis added). The Church is not aware of any precedent in the mass tort context where non-contributing insurers were released of third-party claims held by non-debtor insureds. *Cf., e.g.*, Debtors' and Official Committee of Unsecured Creditors' First Amended Joint Plan of Liquidation at 24, *In re Blitz U.S.A., Inc.*, No. 11-13603 (PJW) (Bankr. D. Del. Dec. 19, 2013), D.I. 2007 (the channeling injunction explicitly reserved "the rights of any Entity to assert any claim, debt, obligation or liability for payment against a *Non-Participating Insurer*."); Conformed Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, *In re Catholic Diocese of Wilmington, Inc.*, No. 09-13560 (CSS) (Bankr. D. Del. Aug. 8, 2011), D.I. 1493 ("Protected Party" under the channeling injunction applied to "Settling Insurers and their respective predecessors and successors.").

16.     Furthermore, the Debtors' Plan would release the claims of the Church and other Chartered Organizations against the Local Councils without providing the releasing parties with meaningful recoveries on their claims. The Church and Chartered Organizations have contractual indemnity rights against certain Local Councils for scouting-related abuse claims. These claims would be confiscated and released by the Plan in consideration for a highly uncertain and illusory recovery against the Settlement Trust. Indeed, as Debtors themselves concede, any recovery that holders of Indirect Abuse Claims can expect to receive from the Settlement Trust will be "limited," as the TDPs subordinate such claims to the prior payment in full of Direct Abuse Claims. *See* Disclosure Statement § II.D.6. The proposed treatment of releasing parties is a far cry from the requirement that a plan provide payment of "all or substantially all of the claims of the class or classes affected by the injunction." *In re Zenith Elecs. Corp.*, 241 B.R. at 110; *see also In re*

9

*Mahoney Hawkes, LLP*, 289 B.R. 285, 301 (Bankr. D. Mass. 2002) (finding that non-debtor releases were inappropriate under the fifth *Zenith* factor where classes with affected claims stood to recover a range of 24-100% and 3-17% under the plan).

17.     The Debtors should not be permitted to solicit on a Plan that is premised on obtaining non-debtor releases without remotely satisfying the stringent requirements imposed under Third Circuit precedent.

>    **C.     The Church's Rights in the BSA Policies and Local Council Policies Cannot be Adjudicated through the Plan Process**

18.     As a threshold matter, any adjudication of the rights of non-debtor insureds deriving from the BSA Policies or the Local Council Policies cannot be adjudicated through the plan process.  Rule 7001(2) of the Federal Rule of Bankruptcy Procedure ("**Bankruptcy Rules**") mandates an adversary proceeding to "determine the validity, priority, or extent of a lien *or other interest in property.*"  Fed. R. Bankr. P. 7001(2) (emphasis added).  Bankruptcy Rule 7001 actions require a party to commence a separate proceeding from the bankruptcy at issue.  In contrast, other objectionable matters—such as objections to confirmation of a plan—only require the objecting party to file a motion with the bankruptcy court under Bankruptcy Rule 9014 to obtain relief.  The Third Circuit commented that because a Bankruptcy Rule 7001 adversary proceeding "entails a fundamentally different, and heightened, level of procedural protections" than a Bankruptcy Rule 9014 motion, a party with a Rule 7001 claim "has the due process right not to have that issue resolved without one."  *In re Mansaray-Ruffin*, 530 F.3d 230, 242 (3d Cir. 2008).  Moreover, the "mandatory nature" of this due process right "trump[s] [the] 'finality'" of a confirmed plan.  *Id.* at 238 (citing *In re Linkous*, 990 F.2d 160, 162 (4th Cir. 1993)).

19.     Bankruptcy courts in the District of Delaware have explicitly held that a court must determine whether insurance policy proceeds are property of the estate through a Rule 7001(2)

10

adversary proceeding. *See In re Forever 21, Inc.*, 623 B.R. 53, 62 (Bankr. D. Del. 2020) ("[I]n seeking a determination that the insurance policies are not property of the estate, Count V clearly relates to an action under Rule 7001(2) which requires an adversary proceeding for an action to determine an interest in property."). The Church's interests in the BSA Policies and the Local Council Policies and their proceeds can only be adjudicated in the context of a Bankruptcy Rule 7001 adversary proceeding, or in post-effective date coverage litigation. As such, the Plan's attempt to adjudicate the Church's property rights through the plan process violates the due process rights of non-debtor insureds, including the Church, and renders the Plan patently unconfirmable.

**D.    The Debtors Cannot Demonstrate that the Plan Satisfies the Best Interest Test**

20.    The Church's rights to the BSA Policies and the Local Council Policies would be preserved in a hypothetical Chapter 7 liquidation because the Insurance Entity Injunction would not apply in a liquidation scenario.

21.    Section 1129(a)(7) of the Bankruptcy Code provides that a bankruptcy court may not confirm a plan unless each holder of an allowed claim or interest in an impaired class either (a) accepts the plan, or (b) will receive or retain property on account of such claim or interest of a value that is not less than the amount that such holder would receive or retain, as of the effective date of the plan, if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(7)(A); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 765 (Bankr. D. Del. 2016) (restating the requirements of Section 1129(a)(7)(A)). Courts must consider not only distributions, (*i.e.*, the amounts that creditors will receive), but must also consider the value of the property that each dissenting creditor will *retain* under the plan in a hypothetical Chapter 7. *See In re Quigley Co., Inc.*, 437 B.R. 102, 144–45 (Bankr. S.D.N.Y. 2010). Furthermore, courts have recognized that in conducting such a determination, considerations such as the value of derivative claims

11

related to rights otherwise released under a plan must be taken into account to ultimately determine if a plan is in the "best" interest of dissenting creditors. *Id.*

22.     The Debtors' liquidation analysis must take into consideration the value of the Church's claims against the insurance companies that would be released under the Plan. In doing so, it would be clear that the value the Church would retain in a Chapter 7 is greater than what it would receive under the Plan. Critically, the Church's ability to directly tender claims under the BSA Policies and the Local Council Policies would provide an opportunity for *full* recovery, whereas the Church currently stands to recover *nothing* under the Plan.

### E.     The Plan and TDPs Unfairly Discriminate Against Holders of Indirect Abuse Claims

23.     The Plan unfairly discriminates against holders of Indirect Abuse Claims in Class 9, who stand to recover minimal (if any) value, while providing holders of Direct Abuse Claims in Class 8 and Non-Abuse Litigation Claims in Class 7 with up to 100% recoveries. *See* Disclosure Statement § II.D.6. The material differences in recovery between classes of equal priority constitutes unfair discrimination under section 1129(b). *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121-122 (D. Del. 2006).[3] The Debtors cannot justify the grossly disparate treatment of Indirect Abuse Claims nor demonstrate that such discrimination is necessary to the reorganization.

24.     The TDPs contain several highly prejudicial provisions that would deny holders of Indirect Abuse Claims any meaningful recovery against the Settlement Trust. *First*, the TDPs

---

[3]     Courts in the Third Circuit have found a "rebuttable presumption" of unfair discrimination where there is (1) a dissenting class, (2) another class of the same priority, and (3) a difference in the plan's treatment of the two classes that results in either (i) a materially lower percentage recovery for the dissenting class or (ii) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution. *See In re Armstrong World Indus., Inc.*, 348 B.R. at 121-122. "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *Id.* at 121 (internal citation omitted).

deny indemnitees, including the Church and potentially thousands of Chartered Organizations, any meaningful opportunity to recover indemnified losses in defending scouting-related abuse claims in the tort system. *Second*, Indirect Abuse Claims are expressly subordinated under the TDPs to the prior payment in full of all Direct Abuse Claims (including future claims), leaving holders of Indirect Abuse Claims ineligible for recovery for years to come, if ever.

25.     The Debtors cannot justify the grossly disparate treatment afforded to classes of equal priority under the law, particularly where holders of Indirect Abuse Claims, such as the Church, would recover significantly greater value outside of bankruptcy or in a liquidation scenario.[4] *See In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994) (finding unfair discrimination where Chapter 11 plan purported to pay unsecured classes of the same priority materially different recoveries).

i.     **Indemnitees of the BSA Stand to Recover Nothing Under the TDPs**

26.     Chartered Organizations, such as the Church, have historically sponsored and delivered the scouting program to communities across the country under the direction of the BSA. This partnership has always been premised on the expectation and agreement that BSA would indemnify and hold harmless the Church and potentially thousands of other Chartered Organizations of scouting-related liabilities, including those arising from scouting-related abuse claims. However, under the Plan, the Debtors seek to abandon these obligations through trust procedures that would effectively deny the Church and other Chartered Organizations any opportunity to recover on their valid indemnity claims.

---

[4]    Indirect Abuse Claims, like Direct Abuse Claims and Non-Abuse Litigation Claims, are unliquidated and contingent claims of equal priority sounding in tort and/or contract. *See, e.g.*, *In re Burns & Roe Enters. Inc.*, No. 08-4191, 2009 WL 438694, at *24 (D.N.J. Feb. 23, 2009) (approving classification of direct and indirect claims in a single class where definition of indirect claim under plan included claims for indemnification and subrogation).

13

27.    As proposed, the TDPs would only compensate Indirect Abuse Claims after the Church settles or pays a Direct Abuse Claim in full and obtains releases on behalf of the Settlement Trust (including any Protected Parties) in the tort system.  *See* TDPs § IV.B.  Once a Direct Abuse Claim has been fully paid, the Church can then assert an Indirect Abuse Claim for what the direct claimant could have recovered against the Settlement Trust, which would be net of setoff against the co-defendant's share of liability as determined by the Settlement Trustee.  TDPs § VIII-E(i)(c) (applying mitigating factor to Direct Abuse Claims reflecting share of non-Protected Party's liability).[5]  Moreover, if the Settlement Trust has already paid a Direct Abuse Claimant, such claimant may still assert a claim against the Church in the tort system, but the Church would be foreclosed from asserting an Indirect Abuse Claim against the Settlement Trust.  *See* TDPs § IV.B (foreclosing Indirect Abuse Claims where the underlying Direct Abuse Claim has already been paid by the Settlement Trust).

28.    Taken together, these procedures would deny Chartered Organizations any opportunity to recover on account of their indemnity rights against the BSA for scouting-related abuse claims.  Indemnitees would be required to  pay the costs of a settlement in the tort system before having any claim against the Settlement Trust.  For example, if a Chartered Organization settles a scouting-related abuse claim in the tort system, it would hold a liquidated indemnity claim against the BSA in the amount it paid to defend and resolve such claim.  However, under the TDPs, the Chartered Organization would not be able to assert an Indirect Abuse Claim against the Settlement Trust on its indemnity claim *unless* it also pays to settle the abuse claimant's potential

---

[5]    The TDPs provide that an Indirect Abuse Claim cannot have "any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment." *See* TDPs, § IV(B)(2).  This provision caps Indirect Abuse Claims at the liquidated amount of an Allowed Abuse Claim regardless of the amount that a claimant paid to resolve such claim in the tort system.

14

claims against the Settlement Trust (including Prospected Parties).  Regardless of what the Chartered Organization pays to settle a claim in the tort system, its recovery will be limited to the maximum values established in the TDPs multiplied by the Settlement Trust's payment percentage.  In other words, indemnitees would be expected to absorb the cost of a global settlement in the tort system to recover some fraction of what the underlying Direct Abuse Claimant could have recovered against the Settlement Trust.

### ii.    The TDPs Subordinate the Payment of Indirect Claims to the Prior Payment in Full of All Allowed Direct Claims

29.    The TDPs provide that Indirect Abuse Claims will only be eligible for payment after all Allowed Direct Abuse Claims are liquidated and paid in full.  *See* TDPs, Article XI ("Indirect Abuse Claim shall be subordinate and junior in right to the prior payment in full of all Allowed Abuse Claims that are Direct Abuse Claims as liquidated under these TDP.").  In other words, Indirect Abuse Claims can only expect to recover after all 82,500 Direct Abuse Claims (including future claims) are asserted, liquidated, and paid in full by the Settlement Trust.  Given the number of claims already known, as well as the unknown number of claims that may be asserted at some point in the future, Indirect Abuse Claims will not be eligible for distribution for years to come.[6]

30.    Furthermore, it is highly uncertain if Indirect Abuse Claims could ever recover under the Plan, as holders of Indirect Abuse Claims are made to assume the risk that the Settlement Trust may have insufficient funds to pay all claims subject to the channeling injunction.  This is particularly troublesome where the lifetime funding of the Settlement Trust will depend in large part on contingent recoveries against insurance companies in post-effective date coverage

---

[6]    Aside from future claims, the TDPs allow direct claimants to defer their claims for up to 12 months after the effective date of the Plan.  *See* TDPs § VII.H.

litigation.  *See* Disclosure Statement § X.21 (acknowledging that the ultimate value of the insurance assets is "unknown").  Moreover, the highly favorable allowance procedures for holders of Direct Abuse Claims, including the tort election, will place significant demand on the cash assets of the Settlement Trust.  The TDPs permit holders of Direct Abuse Claims to assert allowed claims in the full amount of any judgment obtained in the tort system (even if such judgment well exceeds the maximum values established under the TDPs).[7]  Such claimants will be entitled to recover the full allowed amount of any judgment before any Indirect Abuse Claim is eligible for recovery.  *Id.*  Accordingly, holders of Indirect Abuse Claims are forced to bear the risk that the Settlement Trust assets will be depleted before any payment is made on an Indirect Abuse Claim.

## II.    The Disclosure Statement Fails to Provide Adequate Information as Required by Section 1125 of the Bankruptcy Code

31.    The purpose of a disclosure statement is "to inform equity holders and claimants, as fully as possible, about the probable financial results of acceptance or rejection of a particular plan."  *See, e.g.*, *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988).  The Third Circuit has emphasized the importance of adequate disclosure, given the reliance creditors and bankruptcy courts place on disclosure statements.  *See id.*  ("[W]e cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'").  "[A]dequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C.

---

[7]    Article XII.G provides that "the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system, provided that . . . any amount of such Allowed Claim Amount for a Tort Election Claim in excess of the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all Direct Abuse Claims that are Allowed Abuse Claims as liquidated under these TDP."

§ 1125(a)(1).  Whether a disclosure statement provides "adequate information will be determined by the facts and circumstances of each case."  *Oneida Motor Freight*, 848 F.2d at 417.

A.    **The Disclosure Statement Fails to Disclose the Highly Prejudicial Treatment of Indirect Abuse Claims**

32.    The Disclosure Statement fails to disclose the highly prejudicial treatment of Chartered Organizations under the Plan and provides misleading information regarding expected recoveries for holders of Indirect Abuse Claims.

33.    *First*, the Disclosure Statement fails to adequately disclose that Indirect Abuse Claims consisting of indemnification, reimbursement, or subrogation claims will be subordinated to the prior payment *in full* of all 82,500 Direct Abuse Claims, including any claims that may be asserted in the future against the Settlement Trust.  The first time such a provision appears in the Disclosure Statement is a footnote on page 22, and it does not appear again until page 194.  *See* Disclosure Statement §§ II.G, VII.B.10.  More importantly, nowhere in the Disclosure Statement is it disclosed that Indirect Abuse Claims would not recover anything under the Plan unless all direct claims are paid *in full*, which will depend on various contingencies occurring, including the success of the Settlement Trust in post-effective date coverage litigation with insurance companies.

34.    *Second*, the Disclosure Statement fails to disclose that the Plan would release the claims of non-debtor insureds against the insurance companies, and thus adjudicate the state law property rights of such parties, in abrogation of parties' due process rights.  What is more, the Disclosure Statement is misleading in that it states that holders of Indirect Abuse Claims will have unspecified "insurance rights."  *See* Disclosure Statement § II.G, p. 22.  The Disclosure Statement should make clear that non-debtor insureds with claims against the BSA Policies and the Local Council Policies would be released under the Plan, and that such insureds would be left without

17

recourse to access the proceeds of the BSA Policies and the Local Council Policies or pursue claims against the insurance companies.

35.     *Third*, the Disclosure Statement fails to disclose that the TDPs extinguish the indemnity claims of potentially tens of thousands of Chartered Organizations, who are left to fend for themselves in the tort system without recourse against the Settlement Trust or the BSA.  The Disclosure Statement does not disclose the reality that in order to have a compensable claim at all, holders of Indirect Abuse Claims are required to settle direct claims on behalf of the Settlement Trust (including Protected Parties) in the tort system, with the expectation that they could recover some fraction of what the direct claimant could have recovered under the TDPs.  These provisions are highly prejudicial to the interests of thousands of Chartered Organizations, many of whom may not be represented by counsel, and should be fully disclosed in order to inform parties of their expected treatment under the Plan.

**B.      The Disclosure Statement Fails to Disclose the Lack of Res Judicata and Evidentiary Protections**

36.     The Disclosure Statement wholly fails to disclose the lack of *res judicata* and evidentiary protections for the Chartered Organizations under the Plan, and fails to disclose any such risks associated with the impact of determinations made by the Settlement Trustee.

37.     The Disclosure Statement fails to disclose that the TDPs were revised in such a way such that protections in place for non-settling parties were explicitly stricken, with the result that determinations by the Settlement Trustee may subsequently be admissible as evidence in, binding in, or have *res judicata* or other preclusive effect in any lawsuit or other proceeding against non-settling third parties in the tort system.  *See* Plan Redline, Exhibit A-1, § XIII.A. [D.I. 5372-1]. The removal of such protections leaves non-settling third parties, like the Church, vulnerable to the risk that determinations by the Settlement Trust, for which the Church has no say, will be used

18

against the Church in a binding or highly prejudicial manner.  The fact that such protections have been completely removed and that such removal and the attendant risks have not been disclosed renders the Disclosure Statement inadequate.

> **C.    The Disclosure Statement Fails to Provide Adequate Information to Demonstrate that the Plan Satisfies the Best Interest Test**

38.    The Disclosure Statement fails to disclose the risk that the Plan would not satisfy the "best interests" test with respect to holders of Indirect Abuse Claims.  The Debtors' proposed Plan seeks to extinguish the valuable rights of non-debtor insureds, including Chartered Organizations, in the BSA Policies and Local Council Policies.  *See* Plan § X.H ("Insurance Entity Injunction").  In a Chapter 7 liquidation, however, Chartered Organizations would retain the right to directly pursue claims under the BSA Policies and the Local Council Policies and against the insurance companies, and therefore stand to recover greater value than they would under the Plan. Despite this being the fourth Disclosure Statement that the Debtors have filed in these Chapter 11 cases, the liquidation analysis still does not take into consideration the Chartered Organizations' rights under the historical insurance policies in a hypothetical Chapter 7 liquidation, nor is there any discussion of the best interests test in Article X of the Disclosure Statement, therefore rendering the Disclosure Statement inadequate.

## **RESERVATION OF RIGHTS**

39.    The Church reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections, to introduce evidence prior to or at any hearing regarding the Disclosure Statement in the event the Church's objections are not resolved prior to such hearing, to seek to introduce documents or other relevant information in support of the positions set forth in this Objection, and to raise any and all objections to confirmation of the Plan.

19

## **CONCLUSION**

40.      For the reasons stated herein, the Court should reject the Disclosure Statement for failing to provide creditors with adequate information, or in the alternative, rule that the Disclosure Statement provides for a patently unconfirmable Plan on which votes should not be solicited and, in each instance, grant such other relief as may be just and proper.

20

Dated: August 16, 2021
Wilmington, Delaware

*/s/ Michael J. Merchant*

**RICHARDS, LAYTON & FINGER, P.A.**
Michael J. Merchant (No. 3854)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  merchant@rlf.com

- and -

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (admitted *pro hac vice*)
Deniz A. Irgi (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
        deniz.irgi@lw.com

- and -

Adam J. Goldberg (admitted *pro hac vice*)
Robert J. Malionek (admitted *pro hac vice*)
Madeleine C. Parish (admitted *pro hac vice*)
Benjamin A. Dozier (admitted *pro hac vice*)
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020-1401
Telephone: (212) 906-1200
E-mail: adam.goldberg@lw.com
        robert.malionek@lw.com
        madeleine.parish@lw.com
        benjamin.butzin-dozier@lw.com

*Counsel to The Church of Jesus Christ of Latter-day
Saints, a Utah corporation sole*

21