1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                .    Chapter 11
IN RE:                          .
                                .    Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA AND       .
DELAWARE BSA, LLC,              .
                                .    Courtroom No. 2
                                .    824 North Market Street
                                .    Wilmington, Delaware 19801
                                .
              Debtors.          .    August 13, 2021
. . . . . . . . . . . . . . . .      10:00 A.M.
```

TRANSCRIPT OF TELEPHONIC HEARING
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

```
For the Debtor:          Derek C. Abbott, Esquire
                         Andrew R. Remming, Esquire
                         Paige N. Topper, Esquire
                         MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                         1201 North Market Street, 16th Floor
                         Wilmington, Delaware 19899

                         - and -

                         Jessica C. Lauria, Esquire
                         Glenn Kurtz, Esquire
                         Andrew Hammond, Esquire
                         WHITE & CASE LLP
                         1221 Avenue of the Americas
                         New York, New York 10020

Audio Operator:          Brandon J. McCarthy, ECRO

Transcription Company:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         (302)654-8080
                         Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the Debtors:         Michael C. Andolina, Esquire
                             Matthew E. Linder, Esquire
3                            Laura E. Baccash, Esquire
                             Blair M. Warner, Esquire
4                            WHITE & CASE LLP
                             111 South Wacker Drive
5                            Chicago, Illinois 60606

6
    For Hartford:            James Ruggeri, Esquire
7                            Joshua Weinberg, Esquire
                             SHIPMAN & GOODWIN LLP
8                            1875 K Street NW, Suite 600
                             Washington, DC 20006
9
                             - and -
10
                             Philip Anker, Esquire
11                           WILMERHALE
                             7 World Trade Center
12                           250 Greenwich Street
                             New York, New York 10007
13
    For Century:             Tancred Schiavoni, Esquire
14                           O'MELVENY & MYERS LLP
                             Times Square Tower
15                           7 Times Square
                             New York, New York 10036
16
17  For the AIG Companies:   James Hallowell, Esquire
                             GIBSON DUNN & CRUTCHER LLP
18                           200 Park Avenue
                             New York, New York 10166
19
20  For the Coalition of     Eric Goodman, Esquire
    Abused Scouts:           BROWN RUDNICK LLP
21                           601 Thirteenth Street NW, Suite 600
                             Washington, DC 20005
22
                             - and -
23
                             Cameron Moxley, Esquire
24                           7 Times Square
                             New York, New York 10036
25
```

1   TELEPHONIC APPEARNACES (Cont'd):

2   For the Committee          Joseph Celentino, Esquire
    Of Local Councils:         WACHTELL, LIPTON, ROSEN & KATZ
3                              51 West 52nd Street
                               New York, New York 10019
4

5   For the Roman Catholic     Jeremy Ryan, Esquire
    Ad Hoc Committee:          POTTER ANDERSON & CORROON LLP
6                              1313 N. Market Street, 6th Floor
                               Wilmington, Delaware 19801
7
    For the TCC:               Thomas Patterson, Esquire
8                              THE PATTERSON LAW FIRM, LLC
                               200 West Monroe, Suite 2025
9                              Chicago, Illinois 60606

10  For the U.S. Trustee:      David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
11                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
12                             Lockbox 35
                               Wilmington, Delaware 19801
13

14

15

16

17

18

19

20

21

22

23

24

25

MATTERS GOING FORWARD:

1.  Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief [D.I. 5466; Filed 7/1/21]

7. Century's Revised Motion for Entry of an Order Authorizing Filing Under Seal Documents Relating to Century's Objections to Debtor's Motion Relating to the Restructuring Support Agreement and Moving Insurers' Motion to Compel [D.I. 5853; Filed 8/2/21]

10. [SEALED] Century's Motion in Limine to Bar the Debtors from Offering Evidence in Support of Their Application for Fees on Which They Have Refused to Provide Discovery [D.I. 5942; Filed 8/10/21]

DEBTORS' WITNESS(s):

**DEVANG DESAI**

Direct Examination by Mr. Andolina          31

Cross Examination by Mr. Ruggeri            79

Cross Examination by Mr. Hallowell          109

Cross Examination by Mr. Schiavoni          140

| EXHIBITS | I.D. | REC'D |
|---|---|---|
| Debtor's 7 | | 12 |
| Debtor Paragraphs from Presentation | | 30 |
| Debtor's 8 through 34 | | 78 |
| AIG Exhibit Tab 42 | | 122 |
| AIG Exhibit Tab 43 | | 128 |
| AIG Exhibit Boy Scout Bylaws | | 131 |

1  AIG Exhibit Handwritten Notes                    138
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1       (Proceedings commenced at 10:00 a.m.)

2               THE COURT:  Good morning, Counsel.  This is Judge

3  Silverstein.  We're here for our continuation of our hearing

4  on the restructuring support agreement in the Boy Scouts of

5  America bankruptcy case.

6               I will turn it over to debtors' counsel.

7               MR. REMMING:  Good morning, Your Honor, Andrew

8  Remming from Morris Nichols for the debtors.  Good to see you

9  this morning.

10              If it's acceptable to Your Honor, I'd like to turn

11  it over to Mr. Kurtz to go over the debtors' game plan for

12  today.

13              THE COURT:  Okay.  Mr. Kurtz.

14              MR. REMMING:  Thank you, Your Honor.

15              MR. KURTZ:  Good morning, Your Honor.  For the

16  record, Glenn Kurtz, White & Case, on behalf of the debtors.

17              We just wanted to start today by updating the Court

18  on our game plan, which is a little different than it was

19  yesterday.  We had the opportunity to regroup following

20  yesterday's hearing and Your Honor's suggestion that we think

21  about how we streamline our proof to be consistent with the

22  standards that Your Honor has articulated.

23              We also took into account, obviously, the clock.

24  We got through exactly one witness yesterday.  And I think I'm

25  pleased to report that we're going to move forward with just

1  two witnesses, two further witnesses.  It will be Devang

2  Desai, he sits on the Bankruptcy Task Force, the National

3  Executive Committee and the National Executive Board, so he

4  can provide evidence to Your Honor about those governance

5  matters.  Then we will move to Mr. Roger Mosby, he is the CEO

6  and one of the authorized negotiators, so he can provide

7  testimony relevant to that subject as well.

8          Before moving to closings, we also have made an

9  effort to streamline presentations and part of that effort is

10 to offer into evidence portions of the reply declaration that

11 we wouldn't cover live, which we think is mostly matters that

12 aren't really in controversy.  My understanding is we don't

13 have an agreement on that.  I'll leave it to the examining

14 attorneys to address with Your Honor the most efficient way we

15 can proceed using what was submitted in the motion papers and

16 this motion and what we're doing live.

17         Hopefully that streamlines things and gets us

18 through this today and with maybe some time left.  And, unless

19 Your Honor has any questions or other preliminary matters, the

20 debtors are prepared to call their next witness.

21         THE COURT:  Okay.  Let's call the next witness and

22 then you can let us know what paragraphs of declarations you

23 want to use in lieu of direct testimony.  And others, of

24 course, will have an opportunity to weigh in.

25         MR. KURTZ:  Thank you very much, Your Honor.

1          THE COURT:  Thank you.

2          MR. KURTZ:  I will turn -- it looks to me like Mr.

3  Hallowell, if I have that pronunciation right, is trying to

4  get the Court's --

5          THE COURT:  Mr. --

6          MR. SCHIAVONI:  Your Honor, we just would have one

7  quick preliminary evidentiary matter and that was, you know,

8  we looked again at the Comverge, Inc. case and it does talk

9  very explicitly about, you know, the debtor not making any --

10  like assiduously not doing anything to get into the substance

11  of, you know, what is done.  We would like to email it to

12  chambers so you have a physical copy of it the log of

13  documents concerning the TDPs that they've acknowledged

14  withholding.  You will see on there that there are literally

15  dozens and dozens and dozens of communications about the TDPs

16  that occurred from between the dates of when -- you heard

17  testimony yesterday that the deal terms were approved by the

18  board, and then you'll see that there's dozens of these

19  communications that the insurers were completely excluded from

20  concerning the TDPs.

21          Yesterday, you heard testimony offered by Mr.

22  Whittman that somehow suggested that, you know, the insurers

23  were getting drafts, it's completely not reflected on this

24  document at all.  We think either that testimony should be

25  struck or the log admitted into evidence about what was

1  withheld or, I think, more appropriately, the documents

2  themselves produced.  These documents, there are some that

3  copy mediators and under Tribune I suppose you could, you

4  know, withhold those, but the bulk of them are exchanged, you

5  know, without mediators and outside the mediation.  And, you

6  know, ultimately, this is going to have to come forward -- you

7  know, they're going to have to come forward with these

8  documents in connection with confirmation in any event.  It's

9  a done deal on what they've done on the TDPs.  It's at core

10 really to our objections here, you know, to sort of completely

11 go forward on this sort of fiction that somehow like, you

12 know, this stuff was shared with us when this was all, you

13 know, as reflected on this log, extensive back and forth on

14 this took place after the deal was struck.  And you'll see

15 most of the emails on the log are emails from the Coalition

16 folks, really, to the Boy Scouts.

17         So, yeah, it's true that like on a plan, you know,

18 going back six months ago there was a TDP attached.  So it is

19 true that the debtors drafted a TDP at one point, but our

20 contention is basically the pen was handed over, it's

21 reflected in the log.  So we can go forward on -- you know, to

22 a decision on this without seeing any of that, but I think

23 it's really kind of like the elephant in the room.  And, you

24 know, we can kick the can down the road, but these documents

25 we think are really -- really tell really what was going on.

1   And it's the core of our objections, the core of what's going

2   on, that we think that basically the -- you know, the

3   claimants -- you know, the deal here that took place that's

4   behind all those redactions is the claimants dropped their

5   demands against the non-debtor, the local councils, a

6   significant amount of money because they were promised that

7   they would basically allow any claim under these TDPs, which

8   is more or less how -- what the TDPs say.

9           So you have our request.  And we would like to just

10  email that log to chambers, so you can at least see it and

11  look at it perhaps during the lunch break.

12          THE COURT:  I will be happy to take a look at the

13  log; it can be emailed to chambers.  I don't know that it

14  affects anything that's going forward today.  What I'm really

15  hearing, I think, are confirmation objections and a

16  continuation of a concern that the insurers have expressed

17  from the beginning of the case.  And whether that concern that

18  the insurers are expressing prevents confirmation or not is an

19  issue I'll have to deal with at confirmation.  I understand

20  the issue, I'm not sure that there's any case law that

21  suggests that TDPs can't be drafted by plaintiffs' counsel.

22  If plaintiff counsel has overreached on what's appropriate,

23  then we'll deal with that.

24          And I am going to have many issues that are

25  challenging in this case that will have to be addressed and

1 whether debtors are overreaching, plaintiffs' representatives

2 are overreaching, the insurance company is overreaching, and

3 what the law is and what I can do at confirmation, we'll find

4 out, if we get there.  But I understand the argument, I

5 understand the concern.  I think I can take it into

6 consideration, if it's appropriate, in the context of this

7 hearing, but as I said yesterday, I view this as a much more

8 limited hearing than I think many of you do.

9         So -- but, yes, you may send me that -- the log,

10 send it to --

11         MR. KURTZ:  Your Honor --

12         THE COURT:  -- Mrs. Johnson.

13         MR. KURTZ:  Your Honor, Glenn Kurtz.  Maybe I can

14 make this even easier.  The log is in tab 7, exhibit binder

15 tab 7 in our exhibit binder.  We certainly have no objection

16 to its introduction into evidence.  As you know, the

17 proceeding started with a lot of arguments that the debtors

18 had no role, it's now, I guess, conceded that the debtors had

19 a big role back and forth.  We're not -- certainly not looking

20 to hide the log and we're happy to move it into evidence right

21 this second for Your Honor.

22         MR. SCHIAVONI:  We're not contending that they

23 didn't have a role, they -- their role was to completely

24 exclude us from the allowance procedures and to basically

25 throw us under the bus, like that's what we think the log

1  would show.

2        MR. KURTZ:  Your Honor, also -- I'll also tell you

3  that I'm happy to provide in camera any of these documents or

4  any others to sort of get rid of this collusion theory that's

5  being raised which is completely not factual.

6        THE COURT:  Okay.  Well, I'm not going to entertain

7  any documents in camera today, but debtors have offered to

8  move Exhibit 7, tab 7 into evidence, which I understand is the

9  log.  Are there any objections?

10       (No verbal response)

11       MR. SCHIAVONI:  Your Honor, I think we would ask

12  that you take it as judicial notice what's being withheld with

13  the confirmation of the substance of it to be provided at a

14  subsequent date if and when it's produced.

15       THE COURT:  Well, I'm -- Mr. Schiavoni, you asked

16  that I take a look at the log, Mr. Kurtz has now offered --

17       MR. SCHIAVONI:  That's fine, Your Honor --

18       THE COURT:  -- it into --

19       MR. SCHIAVONI:  -- take it --

20       THE COURT:  -- evidence.  I'm going to admit it

21  into evidence and I'll consider it for what I consider it for.

22  It's admitted.

23       (Debtors' Exhibit 7 received in evidence)

24       MR. KURTZ:  Thank you, Your Honor.  I'll cede the

25  podium to Mr. Andolina to call our next witness, unless the

1  Court has any other preliminary matter.  And I'm seeing Mr.

2  Hallowell again.

3         THE COURT:  I see Mr. Hallowell.

4         MR. HALLOWELL:  I apologize for the hand-waving,

5  Your Honor.  Can you hear me okay?

6         THE COURT:  I can.

7         MR. HALLOWELL:  We had some trouble earlier.  We

8  have some questions for Mr. Ownby.  Mr. Ownby has been on the

9  debtors' witness list throughout these proceedings and up

10  until now, we would like to ask him those questions.

11         THE COURT:  Okay, I'll get to that when we get past

12  our other two witnesses.  Just remind me at that point, Mr.

13  Hallowell, and we'll --

14         MR. HALLOWELL:  Yes, Your Honor.

15         THE COURT:  address it then.

16         Mr. Andolina?

17         MR. RUGGERI:  And, Your Honor, James Ruggeri for

18  Hartford.  If Mr. Andolina confirms that he intends to call

19  Mr. Desai, I do want to raise an issue with the Court.

20         THE COURT:  Okay.  I don't see Mr. Andolina.

21         MR. RUGGERI:  Then I really can't raise the issue

22  now, Your Honor.

23      (Laughter)

24         MS. LAURIA:  Your Honor, this is Jessica Lauria.

25  We're just trying to track down where he is in the camera feed

1  here, so if you could just bear with us for a moment.

2         THE COURT:  Yes.

3      (Pause)

4         MR. KURTZ:  Mr. Andolina is telling us he's on the

5  screen, I don't know where -- oh, I think he's -- well,

6  everybody's is always different, the bottom right for me.

7         THE COURT:  Mr. Andolina, I can see you, but now I

8  don't hear you.

9         MR. ANDOLINA:  Can you hear us now, Your Honor?

10        THE COURT:  I can.

11        MR. ANDOLINA:  Sincere apologies, Your Honor.  I

12 was waving furiously and now I'm glad that you're able to see

13 me and I'm able to see you.

14        I am here, Your Honor, with Mr. Desai.  As Mr.

15 Kurtz indicated, we reached out to the insurers last night and

16 proposed for the admission of several paragraphs of Mr.

17 Desai's declaration in order to streamline the process.  The

18 paragraphs that we identified we believe are background

19 information, it should be noncontroversial testimony.  We also

20 identified several exhibits.  We heard from the insurers late

21 last night and this morning that they object.  The objections

22 seem to be focused with respect to the exhibits.  My thought

23 is that we can deal with the exhibits as part of Mr. Desai's

24 testimony, but I do think that it's worth the Court taking a

25 look at the paragraphs of Mr. Desai's declaration that really

1  provide background information and I think will save the

2  Court, you know, 45 minutes to an hour if we're able to have

3  those entered into evidence.

4            THE COURT:  Okay.  What paragraphs --

5            MR. ANDOLINA:  And, Your Honor --

6            THE COURT:  Well, let's get what paragraphs they

7  are and then I will entertain a response.

8            MR. ANDOLINA:  So, Your Honor, we can project them.

9  This is tab number -- Jen, what tab is --

10           UNIDENTIFIED SPEAKER:  The declaration is tab 3.

11           MR. ANDOLINA:  Tab 3, Your Honor, and the

12  paragraphs are 1 through 7, 9 through 12, and 14 through 18.

13  And, Your Honor, there was one revision to paragraph, which

14  will be projected on the screen for Your Honor.

15           MR. RUGGERI:  And, Your Honor, before we project

16  anything, again, I'd ask to be heard, James Ruggeri for

17  Hartford.

18           THE COURT:  Okay, Mr. Ruggeri.

19           MR. RUGGERI:  Thank you, Your Honor.  Your Honor,

20  my objection arises from yesterday's testimony by Mr.

21  Whittman.  Mr. Desai serves on the Bankruptcy Task Force, the

22  National Executive Committee and the National Executive Board.

23  Yesterday, Judge, we heard Mr. Whittman say that the

24  Bankruptcy Task Force participated in discussions regarding

25  the trust distribution procedures and insurance, both those

1 things.  That's a problem.  It's a problem because Mr. Desai

2 is a lawyer; not only is he a lawyer, he's an insurance

3 lawyer.  He's a shareholder at Gaebe Mullen, a 19-attorney

4 firm.  When I saw his name and I saw the firm name, I knew it

5 was familiar, and now I know how.

6 On his website, Mr. Desai says he concentrates in

7 insurance defense and insurance bad faith work.  His firm

8 shows 53 insurance companies as clients, including my client,

9 Hartford.  He says in his declaration that as a member of the

10 Bankruptcy Task Force he carefully considered and discussed

11 the debtors' insurance and legal advisers; various

12 restructuring options, including terms of settlements, risks

13 and benefits to the Boy Scouts.  Obviously, one of those

14 settlements involves my client, the Hartford.

15 Mr. Desai is here as an advocate for Boy Scouts to

16 provide testimony against his clients, including Hartford.  We

17 did not grant and we did not provide a waiver.  Lawyers should

18 not be permitted to offer testimony adverse to a client absent

19 a waiver in accord with Rule 4-1.7 of the Florida Rules of

20 Professional Conduct.  Your Honor, we object to his testimony

21 and he shouldn't be allowed to testify today.

22 Thank you, Judge.

23 THE COURT:  Thank you.

24 Mr. Andolina?

25 MR. ANDOLINA:  Your Honor, a few observations.

1  Number one, as Your Honor is well aware, Mr. Desai has been

2  raised as a witness for I believe close to two and a half, if

3  not three weeks.  We disclosed that he was going to be called

4  and we submitted his supplemental declaration.  And I don't

5  want to use the word sandbagged, but for Mr. Ruggeri to five

6  minutes before his testimony begins first raise this issue, I

7  think it's wholly inappropriate.

8          More to the point, Your Honor, Mr. Desai is not

9  testifying in his capacity as a law firm partner, he's

10  testifying in his capacity as a volunteer member of the

11  Bankruptcy Task Force of the National Executive Committee and

12  the National Executive Board of the Boy Scouts of America.

13  And he's not here as a lawyer, he's here as a volunteer board

14  member, and we'd ask that Your Honor allow him to proceed with

15  his testimony.

16          MR. RUGGERI:  Judge, you can't disentangle the

17  knowledge that he's acquired as an advocate for adversaries in

18  this case.  And the testimony from yesterday that says that

19  task force that he serves on, no doubt serves on, plus he's a

20  lawyer, an insurance lawyer, discusses issues regarding the

21  trust distribution procedures and insurance.  I did not expect

22  that testimony from Mr. Whittman yesterday, it did come in

23  yesterday.  You know, I think that while I didn't object, Mr.

24  Andolina and I did have a prior conversation about Mr. Desai's

25  background and his representations of insurers, including my

1  client, but the link is undeniable now based on the record and

2  the presentation made yesterday.

3          Again, we know one of the exhibits they want to

4  offer is a letter that Mr. Desai sent to his local council

5  resigning from the local council because of his appointment to

6  the national councils because of the appearance of an

7  impropriety.  I mean, so we know he knows how to do it and,

8  frankly, every lawyer knows that if you're going to offer

9  testimony adverse to your current client -- first of all, I

10  don't think you can do it, but if you can, you better get a

11  waiver.  I asked my client if any waiver was requested, the

12  answer was no; if any waiver was granted, the answer is no.

13  Gaebe Mullen does represent the Hartford now, Judge, today.

14          MR. ANDOLINA:  Your Honor, the point that Mr.

15  Ruggeri did have a conversation with me more than, I believe,

16  a week ago in which he referenced the fact that Mr. Desai is

17  an insurance lawyer goes exactly to my initial argument, which

18  is this is an issue that the Hartford has known about.  So to

19  have Mr. Desai spend literally two weeks preparing to testify

20  and then to show up and five minutes before he begins to raise

21  an issue where he's testifying in his capacity not as an

22  attorney, but as a volunteer board member, I believe is

23  completely inappropriate.

24          Mr. Whittman testified yesterday as to the TDP

25  issue and as to insurance issues, but those issues have been

1  clearly before the Court for weeks.  So we would ask that we

2  proceed with Mr. Desai's testimony.

3  　　　　　THE COURT:  What does Rule 1.47 say of the Florida

4  -- this is of the Florida Rules of Professional Conduct?

5  　　　　　MR. RUGGERI:  Bear with me one moment, Your Honor.

6  　　　　　MR. ANDOLINA:  Your Honor, I don't believe there's

7  any conflict rule with respect to witnesses.

8  　　　　　THE COURT:  That's what I'm asking.

9  　　　　　MR. RUGGERI:  Your Honor, it has to do with there

10  are interests of the lawyer adverse to clients and that's what

11  I was focused on.

12  　　　　　THE COURT:  It's one point --

13  　　　　　MR. RUGGERI:  One moment, Your Honor.

14  　　　　　THE COURT:  It's 1.47?  Excuse me for a moment.

15  　　　　　MR. RUGGERI:  Your Honor, it is 4.1 -- I'm sorry,

16  4-1.7.  And (a), it's (a)(2), representing adverse interests

17  and, quote, there is -- the lawyer must not represent a client

18  if too there is a substantial risk to the representative of

19  one or more clients will be materially limited by the lawyers'

20  responsibility of another client, a former client or a third

21  person, or by a personal interest of the lawyer.

22  　　　　　MR. ANDOLINA:  I believe that language that Mr.

23  Ruggeri just discussed does not involve testimony, it involves

24  representation.

25  　　　　　THE COURT:  Okay.  Well, I'm being told Mr. Desai

1    is a fact witness.  I'm going to permit him to testify -- no,

2    let me say this:  I'm going to hear his testimony.  I'm not

3    absolving Mr. Desai of whatever his professional and ethical

4    obligations are to whomever his clients are.  So I'm going to

5    permit -- I'll hear the testimony.

6             MR. ANDOLINA:  Thank you, Your Honor.  If we could

7    go back to the declaration, Your Honor, and I wanted to

8    address the proposed paragraphs that we'd like to have

9    admitted into evidence.  And, Your Honor, those would be

10   paragraphs 1 through 7, with the redaction in paragraph 6 that

11   Ms. Thomas will identify to the Court.  That redaction just

12   references the fact that the chief executive officer of the

13   BSA, Mr. Mosby, is not in fact a member of the NEB.  Other

14   than that, Your Honor, our desire is to have the Court admit

15   paragraphs 1 through 7, 9 through 12, and 14 through 18.

16            There are also two exhibits that I believe have not

17   drawn any objection from the insurers and those would be the

18   list of National Executive Committee members, which is

19   Exhibit, I believe, 3F -- I'm sorry, Your Honor, 3E is the

20   list of National Executive Committee members, and the other

21   issue -- or the other exhibit is Exhibit B, which is a list of

22   National Executive Board members.  I do not believe that the

23   insurers have any objections to those two lists.

24            As I said, the other exhibits they have raised

25   issues with and my thought was that we'd handle that as part

1  of Mr. Desai's presentation.

2          THE COURT:  Okay.  Thank you.

3          Let me hear if there are any objections to

4  paragraphs 1 through 7, 6 with the redaction, 9 through 12,

5  and 14 through 18.  And I'll already recognize the general

6  objection to Mr. Desai's testimony, so you don't need to raise

7  that again.  Are there any particular objections to those

8  paragraphs being admitted into evidence?

9          MR. HALLOWELL:  Yes, Your Honor.  This is Mr.

10  Hallowell.  I'll go paragraph by paragraph.

11          We object to paragraph 6.  Paragraph 6 refers to

12  the BSA bylaws, which are one of the exhibits that are in

13  dispute here.  Mr. Desai has attached to his declaration an

14  incomplete excerpt from some unidentified bylaws of the BSA.

15  We have a copy of the BSA bylaws that are current through

16  September 2020; we were told in deposition that a more-updated

17  version of the bylaws exists.  We asked for a copy of those

18  bylaws and we've never received it.  We checked in the

19  production and I don't believe that it's there.  We object to

20  inclusion of simply an excerpt from the bylaws in a

21  declaration like this one, we certainly objection to it being

22  admitted into evidence.  And because paragraph 6 refers to

23  those bylaws and attempts to essentially cite what's included

24  in those bylaws, we object to that paragraph.

25          We object to paragraph 7 on the same basis; we

1   object to paragraph 9 on the same basis; we object to

2   paragraph 10 on the same basis; we object to paragraph 11 on

3   the same basis.

4           We object to paragraph 12.  Paragraph 12 contains a

5   description of the Bankruptcy Task Force.  Maybe that

6   description is included in the bylaws, we don't know because

7   we don't have them.  There's no source.  The description

8   that's provided in paragraph 12 provides a very fulsome

9   explanation for what the Bankruptcy Task Force supposedly is.

10  If there's a resolution out there that lays all this out, we'd

11  consider it, but we don't believe it's appropriate to do so in

12  Mr. Desai's declaration.

13          MR. SCHIAVONI:  Your Honor, I would just -- if I

14  could just add that this is not a purely just technical issue,

15  it goes to substance, as there was a debate between the local

16  councils and the board and the Boy Scouts about whether to

17  amend the bylaws.  So, you know, the issue has more substance

18  that you'll see in testimony.

19          MR. HALLOWELL:  Carrying forward, Your Honor, we

20  object to paragraph 14.  It's the same issue, the missing

21  bylaws.

22          Paragraph 15 refers to a different attachment.

23  This is an attachment of various meetings that were conducted

24  by the various BSA boards.  We believe that the list that was

25  provided as part of Mr. Desai's declaration is inaccurate.  We

1 also would note, Your Honor, that the list contains

2 approximately three months' worth of meetings for which the

3 BSA has not provided bylaw -- or, sorry, provided minutes in

4 their productions to us.  And so we object to being asked to

5 stipulate to any kind of list that would include listings of

6 meetings that we can't confirm whether they occurred or didn't

7 occur.  So we object on that basis as well.  Objections to

8 paragraphs 16, 17, and 18 also flow from that list, Your

9 Honor.

10          And I would just like to add that we object to

11 Exhibit C of Mr. Desai's declaration because we don't

12 understand it.  Mr. Desai's declaration attaches board minutes

13 of the Special National Executive Board from February 7th,

14 2020.  Mr. Desai in his declaration describes these minutes as

15 minutes of a meeting that took place in 2021.  We don't know

16 which year it is.  We asked BSA to clear that up for us, they

17 didn't do it.  And so, Your Honor, we object to the inclusion

18 of these minutes.

19          And, Your Honor, there are also issues with regard

20 to -- you'll see that the minutes are basically almost

21 entirely redacted for privilege.  We reserve our rights to

22 challenge the privilege redactions included on that exhibit,

23 but we don't think it should be admitted at all

24 (indiscernible).

25          MR. ANDOLINA:  May I respond, Your Honor?

1    THE COURT:  Yes.

2    MR. ANDOLINA:  Well, I heard that they do not

3  object to the admission of Exhibit B and Exhibit E, which is

4  the list of NEC and NEB board members.  So I believe that that

5  can come in without further discussion.

6    Regarding the issue with respect to the BSA's

7  governing bylaws, the only reference that is applicable in the

8  bylaws to Mr. Desai's testimony in these paragraphs is with

9  respect to the specific bylaw that is referenced in that

10  footnote, Your Honor, and I believe it's in footnote number 3.

11  As has been testified to by Mr. Ownby and as I will represent

12  to the Court, that specific language has not been altered in

13  any way; that is the existing paragraph in the bylaws.  Mr.

14  Desai can also confirm that.  And I believe that that is the

15  only bylaw paragraph that is implicated in the paragraphs that

16  we're seeking admission.

17    Again, we're attempting to streamline, Your Honor,

18  and certainly Mr. Desai is willing to address any of these

19  issues on his direct, but this is the effort that we tried to

20  make.

21    With respect to Mr. Hallowell's issue on Exhibit C,

22  the board minutes from February 7th, he did email me about 45

23  minutes ago.  I apologize, I haven't been able to get back to

24  him, but that is correct, the date of those minutes should be

25  February 7th, 2021.  I'm hearing that there are other issues

1  with respect to that exhibit that we can get into with Mr.

2  Desai.

3          THE COURT:  Okay.

4          MR. HALLOWELL:  Your Honor, we stand on all of our

5  objections to the admission of these paragraphs of this

6  declaration.  We certainly -- and I'll remind Your Honor of

7  the doctrine of completeness that Mr. Hammond mentioned

8  yesterday -- we certainly object to the admission into

9  evidence of a portion of BSA's bylaws, we think that that is

10 unfair.  I certainly plan to ask Mr. Desai about other

11 portions of the BSA bylaws.  And so we believe that there

12 should be either a complete version of the bylaws for this

13 Court or no version at all.

14         THE COURT:  Mr. Andolina, is there a reason why I

15 don't have the full version of the bylaws?

16         MR. ANDOLINA:  No, Your Honor, we're happy to

17 provide the full version -- the current version of the bylaws

18 and we'll do that later today.

19         MR. SCHIAVONI:  Maybe we could change the order of

20 the witnesses then, Your Honor.

21         THE COURT:  Were they not produced?  It seems like

22 Mr. Hallowell has them.  Were they not produced?

23         MR. ANDOLINA:  I think --

24         MR. HALLOWELL:  Your Honor, the point is I do not

25 have them --

1          MR. ANDOLINA:  Your Honor --

2          MR. HALLOWELL:  -- I simply do not have them.  I

3    found bylaws on the internet.  I asked the witnesses if those

4    bylaws were current, they said no.  I asked the BSA for the

5    current bylaws, this happened weeks ago, and they have not

6    been produced.

7          MR. ANDOLINA:  Your Honor, the version on the

8    internet that Mr. Hallowell has is the current version of the

9    complete bylaws.

10          THE COURT:  Well --

11          MR. ANDOLINA:  There have been -- I apologize, Your

12    Honor, the have been --

13          THE COURT:  -- apparently, he was told they

14    weren't.  So I don't know if that was in --

15          MR. HALLOWELL:  Mr. Ownby has testified --

16          THE COURT:  -- deposition --

17          MR. HALLOWELL:  -- otherwise, Your Honor.

18          THE COURT:  Yeah.  So --

19          MR. ANDOLINA:  Yeah, let me clarify, Your Honor,

20    just so you understand.  There have been revised bylaws, the

21    entirety of those bylaws have not been reconstituted.  We are

22    happy to provide Mr. Hallowell with any amendments to the

23    bylaws that are available.

24          MR. HALLOWELL:  Your Honor, we're getting this for

25    the first time now.  They have had weeks to provide this exact

1  information to us and we have requested it repeatedly.  Moving

2  forward now with a witness who's going to testify about the

3  bylaws while giving us the bylaws now is improper,

4  inappropriate, and prejudicial.

5          THE COURT:  Okay, here's what we're going to do.

6  We're going to hear the other witness and the BSA needs to

7  circulate the bylaws and any amendments that exist in writing

8  and that have been approved, and send them to chambers.  And

9  we're going to go forward with your next witness, if you're

10  prepared to call your next witness.

11          MR. ANDOLINA:  Your Honor, may I make a request?

12  The only issue on direct relating to the bylaws is from the

13  paragraph that is cited.  Mr. Desai is prepared to go forward,

14  we can avoid any testimony relating to the bylaws.  We are not

15  prepared with respect at this point to call our next witness

16  and I would urge the Court to allow us to go forward with Mr.

17  Desai.  We will have those materials provided to the insurers

18  immediately and we will avoid testimony with respect to the

19  bylaws, but we would appreciate the opportunity to go forward

20  with Mr. Desai; he's here, he's ready to go forward.  And,

21  understanding the Court's position, we would -- we will carve

22  out anything that relates to the bylaws.

23          MR. SCHIAVONI:  Your Honor --

24          THE COURT:  And then what?

25          MR. SCHIAVONI:  -- you should understand that --

1            THE COURT:  And then what?  No.

2            Okay, so here's what we're going to do.  You're

3  going to circulate the bylaws, including to chambers.  We'll

4  take an hour recess and, assuming those bylaws get circulated

5  immediately, then we'll go forward in an hour since you are

6  unprepared to go forward with your next witness.

7            So I've got 10:37.  We're going to reconvene at

8  11:45.  Get the bylaws circulated, please.

9            MR. ANDOLINA:  Thank you, Judge.

10            THE COURT:  We're in recess.

11        (Recess taken at 10:37 a.m.)

12        (Proceedings resumed at 11:45 a.m.)

13            THE COURT:  This is Judge Silverstein.  It's 11:45,

14  are we prepared to go back on the record?

15            MS. LAURIA:  Your Honor, this is Jessica Lauria.

16  I'm just looking for our conference room with Mr. Andolina and

17  Mr. Desai.  There they are.

18            THE COURT:  Okay.  I have received the three

19  documents; the charter and bylaws as amended through September

20  2020, a redline showing as amended through May 2021, and a

21  four page proposed amendments to bylaws approved by the

22  national executive committee July 9th, 2020.  I take they have

23  been circulated?

24            MR. HALLOWELL:  Yes, Your Honor.

25            THE COURT:  Okay.  Thank you.

1           Mr. Andolina, I don't know if you are -- if you've

2    revised what you are doing with Mr. Desai, but I am prepared

3    to indicate what portions of his declaration I am willing to

4    accept into evidence if you're still seeking to admit certain

5    portions of it.

6           (No verbal response)

7                THE COURT:  Mr. Andolina, I think you're muted.

8                MR. ANDOLINA:  Can you hear me now, Judge?

9                THE COURT:  Yes.

10                MR. ANDOLINA:  I apologize.  Your Honor, we would

11    like you to submit the paragraphs that I referenced in my

12    initial presentation for purposes of admission into evidence.

13    Mr. Desai is available to testify that none of the revisions

14    to the bylaws in any way impact his testimony, and he's

15    prepared to provide that testimony.

16                THE COURT:  Okay.  Here is what I will accept into

17    evidence; Paragraph 1, Paragraph 2, Paragraph 3, 4 and 5, none

18    of which were objected to, Paragraph 6 except for the second

19    sentence.

20                MR. ANDOLINA:  Okay.

21                THE COURT:  And Paragraph 7 except for the

22    footnote.  I will accept Paragraph -- in Paragraph 9 I will

23    accept the second sentence and the last sentence.  I will

24    accept all of Paragraph 10.  I will accept all of Paragraph

25    11, all of Paragraph 12, and I will accept Paragraphs 14, 15,

1  16, 17, and 18.

2          I heard the objections, but I believe all of this

3  can be within Mr. Desai's personal knowledge and he can be

4  cross-examined on it.  I will accept -- I will admit Exhibit

5  3E and B as requested. And if the debtors want Exhibit C I

6  will hear that at an appropriate time.

7      (Debtor Exhibits received into evidence)

8          MR. HALLOWELL:  I'm sorry, Your Honor, could you

9  repeat the exhibits that you accepted?

10          THE COURT:  I accepted E which is the list of

11  national executive committee members, and Exhibit B which is

12  the list of the national executive board members.

13          MR. HALLOWELL:  Do we have a ruling with regard to

14  Exhibit A or are we able to move the entirety of the charter

15  and bylaws of Boy Scouts into evidence?

16          THE COURT:  I haven't been asked yet to admit any

17  of that.  So I will deal with that when somebody asks me to

18  admit them.

19          MR. ANDOLINA:  Your Honor, we're prepared to

20  proceed if Your Honor would like to have the witness sworn.

21          THE COURT:  Yes.  Mr. Desai, please raise your

22  right hand.

23          DEVANG DESAI, DEBTOR WITNESS, SWORN

24          THE COURT:  Please state your full name and spell

25  your last name for the record?

1      THE WITNESS:  My name is Devang Desai, spelled D as
2   in David, E, V as in Victor, A-N-G.  Last name Desai, D as in
3   David, E, S as in Sam, A-I.
4      THE COURT:  Thank you.
5      Mr. Andolina?
6      MR. ANDOLINA:  Thank you, Your Honor.  Before we
7   begin I want to apologize to the court for that distraction
8   and I greatly appreciate the court's accommodation in getting
9   us back on track.  So thank you very much and apologize to the
10  court and to the parties.  We will try to proceed as
11  efficiently as possible with Mr. Desai's testimony.
12                      DIRECT EXAMINATION
13  BY MR. ANDOLINA:
14  Q    Mr. Desai, where are you currently employed?
15  A    I am employed at the law firm of Gaebe, Mullen,
16  Antonelli.
17  Q    And how long have you been employed at that law firm?
18  A    I have been employed as an attorney for the last 17
19  years.
20  Q    And what is your current role?
21  A    I am a partner.
22  Q    How long have you been a partner?
23  A    Approximately 10 years.
24  Q    What is your current role with respect to scouting?
25  A    I am a member of the national executive board, and the

1  NEC, and the bankruptcy task force.

2  Q    We will come back to those roles, but I want to ask you

3  a few questions about your experience in scouting.  Can you

4  tell the court how you first became involved in scouting?

5  A    I can.  I joined the scouting program as a cub scout in

6  elementary school at Devon Aire Elementary in Miami, Florida

7  when I was a younger kid. I started with the school life for

8  scouting program [phonetic] where I brought a flyer home to my

9  parents because a lot of my friends were joining scouting.  My

10 parents were happy to sign both myself and, then eventually,

11 my brother up.  I went through the scouting program as a

12 youngster and stayed involved since aging out.

13 Q    Can you describe, Mr. Desai, your scouting experience?

14 A    I can.  I think I like to have, we will call it, I

15 guess, the quintessential scouting experience.  One of the

16 fondest memories I have of my scouting experience is that it

17 allowed my family, as a first generation American family, to

18 not only assimilate to life in Miami, Florida, but also

19 provided us with opportunities to learn, develop leadership

20 skills, make friends, have fun in the outdoors, and be

21 surrounded by folks in my life that have continued to remain

22 good mentors and friends of mine.

23 Q    Mr. Desai, did you achieve any particular levels of

24 awards in scouting?

25 A    I have.  I am an Eagle Scout.

1   Q      And when did you achieve Eagle Scout status?

2   A      I came to the rank of Eagle Scout on December 12th,

3   1989.

4   Q      Can you tell the court what it takes to become an Eagle

5   Scout?

6   A      I can.  In order to earn the ranks of Eagle Scouts one

7   has to stay involved with the scouting program working your

8   way from the rank of Scout all the way through six additional

9   ranks before you obtain the rank of Eagle Scout.  There are a

10  total of 21 merit badges that are required along with an Eagle

11  Scout service project, along with a host of various

12  conferences as well as some timing requirements and the

13  ability to be proficient in several skills both pertaining to

14  scouting as well as life.

15  Q      Can you explain --

16          MR. BUCHBINDER:  Your Honor, this is Dave

17  Buchbinder on behalf of the United States Trustee.  I am not

18  objecting or making a motion to strike, but the testimony here

19  appears to be duplicative of Paragraph 4 of Mr. Desai's

20  declaration.  And if we're going to repeat it in testimony why

21  didn't we admit it to save time.  I would just ask counsel to

22  proceed accordingly.

23          Thank you, Your Honor.

24          MR. ANDOLINA:  Thank you, Mr. Buchbinder.  I was

25  attempting to put a little bit more context behind the

1  testimony that has been admitted, but I appreciate your

2  comments.

3  BY MR. ANDOLINA:

4  Q    Can you explain a little more, Mr. Desai about the Eagle

5  Scout service project program?

6  A    All scouts wanting to achieve the rank of Eagle Scout

7  are required to perform a service project that benefits either

8  their charter organization or a non-profit organization in the

9  communities in which they live.  Scouts every single day since

10 the start of the Eagle Scout rank and scouting have provided

11 over several hundred thousand hours of community service to

12 the communities in which they live and serve.

13 Q    About how many scouts each year achieve the rank of

14 Eagle Scout?

15 A    The number fluctuates, but approximately 1 to 5 percent

16 of all registered scouts achieve the rank of Eagle Scout.  And

17 by way of a data point in 2019 we had approximately 60 some

18 thousand.  And just this past year, for the first time, we had

19 a thousand young women attain the rank of Eagle Scout.

20 Q    Mr. Desai, you're declaration that has been admitted

21 references the Order of the Arrow.  What is the Order of the

22 Arrow?

23 A    The Order of the Arrow is the National Honor Society of

24 the Boy Scouts of America.  Its purposes are twofold; one, to

25 promote scout camping and, secondly, to provide cheerful

1 service that furthers admission of the Boy Scouts of America.

2 Q    How does one become selected to be an Order of the

3 Arrow?

4 A    Members of the Order of the Arrow are elected by non-

5 members of the Order of the Arrow and, namely, those are

6 members of your scout unit or your venturing post.  And you

7 have to achieve a certain rank and have a certain amount of

8 camping nights under your belt before you can be elected into

9 the Order of the Arrow.

10 Q    Is there as service component involved with Order of the

11 Arrow?

12 A    Yes.  The Order of the Arrow provides cheerful service

13 not only to our local councils, but also to a host of

14 communities.  By reference, on a national level the Order of

15 the Arrow embarked on probably one of the largest national

16 service projects in 2008 where it performed cheerful service

17 at five of our national parks building trails, building

18 structures, clearing brush, all working alongside the National

19 Forestry Service and Department of Interior.  I am happy to

20 say as a result of a lot of those efforts then sitting

21 President George Bush recognized the Order of the Arrow with

22 the President's National Volunteer Award.

23 Q    Have you recently been involved in any Order of the

24 Arrow service project?

25 A    In fact, last week I had an opportunity to go to

1    Philmont Scout Ranch where the Order of the Arrow hosted 400

2    of our young people to talk about things that are impacting

3    our scouting program, to know that the future of our country

4    is bright because young people can deal with change in

5    adversity and help us through a lot of the complicated issues

6    that we seem to find ourselves in.

7    Q    What role did you play during your week at Philmont?

8    A    I served as a volunteer advisor and also facilitated

9    several training sessions.

10   Q    I want to talk briefly, Mr. Desai, about your experience

11   in scouting as a volunteer.  What roles have you played as an

12   adult volunteer in scouting?

13   A    Once I aged out of scouting as a youth I was able to

14   serve on my counsel's executive board.  Following that I was

15   able to move in our organization and serve in my current

16   capacity as a member of the national executive board.

17   Q    What roles do you have, actually, I believe this was

18   admitted, so let's just go forward to your service on the

19   national executive board.  I think your testimony about the

20   national executive board has also been admitted, so let me ask

21   you that you are a member of the NEC.  What is the NEC?

22   A    The NEC is an acronym for the national executive

23   committee.  The NEC is comprised of 12 members all of whom are

24   members of the national executive board except for our CEO and

25   chief scout executive Roger Mosby who is an ex officio member

1  of the NEC.

2  Q     I believe that the background on the BTF has also been

3  admitted and I know Her Honor heard extensively from Mr.

4  Whittman about that. When is the first meeting of the BTF that

5  you attended?

6  A     First meeting that I attended was in July of 2020.

7  Q     And who are the other members of the BTF?

8  A     The BTF is chaired by Alison Schuler.  Other members of

9  the BTF include Brad Tilden, Scott Sorrels, two ex officio

10  members who are Dan Ownby, along with our CEO and chief scout

11  executive Roger Mosby and myself.

12  Q     With respect to Mr. Sorrels, Ms. Schuler and Mr. Tilden

13  do you know what their current or past employment status is?

14  A     I do.  Ms. Schuler and Mr. Sorrels are both attorneys

15  and retired.  Mr. Tilden just completed his tenure as CEO of

16  Alaska Airlines and is now chairman of the board.

17  Q     I believe the testimony regarding your attendance of

18  BTF, NEB, and NEC meetings has been admitted.  Do you know how

19  many times between November 2020 and present you actually

20  missed one of those meetings?

21  A     I recall missing approximately three meetings in recent

22  times due to other obligations.

23  Q     Sir, can you describe for the court the length and

24  format of a BTF meeting?

25  A     Generally, the BTF meetings ranged in time, but

1  certainly took a lot of time.  Each meeting would last

2  sometimes in excess of two hours.  I think I recall on

3  probably a couple fingers meetings that lasted less than 40

4  minutes.

5          The BTF received materials on occasion to,

6  obviously, review ahead of time.  There were presentations

7  made during the meetings, conversations were had between the

8  members of the BTF and we also had robust dialog with all of

9  our advisors; sometimes more often than not asking a lot of

10  questions, challenging them, not necessarily agreeing with

11  them at times, but at the end of the day, after dialog and

12  consensus move forward.

13  Q    Can you describe the format of the NEC meetings that you

14  attended?

15  A    Yes.  So if I can for a second, the BTF was created to

16  have, as members of the BTF, members of the board and NEC who

17  could do, what I call, kind of a deeper dive into all of the

18  issues surrounding the BSA bankruptcy.  The BTF would make

19  recommendations to the national executive committee or NEC, as

20  we call it.  The NEC would also receive reports from members

21  of the BTF particular our chair person, Ms. Schuler, along

22  with reports from our advisors.

23          Following dialog and discussion during NEC meetings the

24  NEC would eventually take a position by way of a vote and make

25  a recommendation if the circumstances require to bring those

1  decisions and recommendations to the full board which we have

2  referred to as NEB or the national executive board to take

3  action.

4  Q    From November 2020 through present can you estimate how

5  much time you have devoted as a volunteer to BSA bankruptcy

6  related matters?

7  A    Well over 300 hours.

8  Q    During that same time did you have an opportunity to

9  observe your colleagues, Ms. Schuler and Mr. Sorrels, and

10  their work on bankruptcy related matters?

11  A    I did.

12  Q    And what did you observe in that regard?

13  A    I observed a lot of active communication between Mr.

14  Sorrels and Ms. Schuler in between meetings which would take

15  the form of emails of course, several phone call conversations

16  that I know have been had by myself with each of them, and

17  their active participation in meetings.  I chalk it up largely

18  to the fact that they're both retired professionals and had

19  more time than I did.

20  Q    Do you have an opinion in terms of how much time they

21  committed as compared to you?

22  A    A little bit more given they didn't have a day job like

23  I do.

24  Q    I want to ask you a series of questions about the

25  restructuring support agreement, Mr. Desai.  At what point did

1   you first hear about the possibility of a restructuring

2   support agreement?

3   A      I first heard about an RSA or a restructuring support

4   agreement in the early part of February of 2021.

5   Q      And how would you describe the BSA's consideration of

6   the settlement terms that were ultimately included in the RSA?

7   A      The BSA, through the various arms that I just described,

8   the NEC, the BTF, the NEB, took into consideration a lot of

9   different factors, risks and also the benefits of entering

10  into an RSA at various meetings between the relevant

11  timeframes.

12  Q      What were the factors and issues that were considered by

13  the BSA through the NEB, NEC and BTF during the timeframe of

14  March 2020 through the execution of the RSA?

15  A      There were several factors that were considered.

16         The first would be who the parties were to the RSA.

17         Secondly, the amount and ability of the National

18  Organization for the Boy Scouts of America and local councils

19  to be able to make contributions to a settlement trust for

20  abuse victims.

21         Third, the ability for charter partners and insurance

22  companies to likewise, at some point, provide the ability to

23  have an opportunity to contribute to a trust.

24         Fourth would have been some of the non-monetary benefits

25  that will be obtained under the terms of the RSA for not only

1  the benefit of the Boy Scouts of America, but also the other

2  partners, if you will, our local councils and chartering

3  organizations.

4       The next consideration was on costs, costs that were

5  being borne by the Boy Scouts of America, costs being borne by

6  other parties not only involving the bankruptcy, but also

7  those that are participating indirectly in the bankruptcy.

8       The next piece would have been the TDP or the trust

9  distribution procedures.  There was dialog around that.  And

10 eventually the overall pros and cons of the RSA and the entry

11 into the RSA were all factors that were considered such that

12 it would allow for the Boy Scouts of America to be able to

13 emerge from this bankruptcy and achieve its objectives of

14 mission preservation as well as the ability to equitably

15 compensate the victims of historical sex abuse.

16 Q    The factors that you just outlined, Mr. Desai, were all

17 of those discussed with the BSA's advisors?

18 A    Yes, they were.

19           MR. HALLOWELL:  Objection, leading.

20           THE COURT:  Overruled.

21 BY MR. ANDOLINA:

22 Q    Which advisors, without getting into specific legal

23 advice, do you recall in your BTF, NEB and NEC meetings

24 engaging?

25 A    We had representatives from the White & Case Law Firm,

1  we had representatives from the Haynes & Boone Law Firm, and

2  we had representatives from the Alvarez & Marsal financial

3  advising firm.

4  Q    Did BSA also have an estimation expert?

5           MR. HALLOWELL:  Objection, leading.

6           THE COURT:  It is, but I'll permit it.  Overruled.

7           THE WITNESS:  We did have experts in that regard as

8  well.

9  BY MR. ANDOLINA:

10  Q    Mr. Desai, was there a component of the RSA that

11  required specific NEB approval?

12  A    Yes, there was.

13  Q    What was that component?

14  A    Certain components that required the Boy Scouts of

15  America to add-on additional debt to its balance sheets

16  required the approval of the national executive board.

17  Q    Mr. Desai, I'd like to direct your attention to Exhibit

18  30 which are NEB minutes from a June 5th, 2021 meeting.

19       Your Honor, do you have those materials?

20           THE COURT:  I do.

21  BY MR. ANDOLINA:

22  Q    Do you recall this meeting, Mr. Desai?

23  A    I do.

24  Q    And do you recall receiving minutes of this meeting

25  after the meeting occurred?

1   A     I do.

2   Q     And who would have sent you those minutes?

3   A     Normally the way that meeting minutes were circulated we

4   received meeting minutes from our general counsel and

5   corporate secretary Steven McGowan.  Meeting minutes would

6   also be placed in our -- if we were to have a national

7   executive board meeting our meeting binder materials and we

8   would have an opportunity to review those meeting minutes and,

9   of course, the meeting, itself, when the time came to approve

10  the minutes make any modifications, changes, amendments, etc.,

11  before (indiscernible).

12  Q     And at this June 5th, 2021 meeting were there advisors

13  present?

14  A     Yes, there were.

15  Q     And who were those advisors?

16  A     The advisors were the ones that I referenced earlier.

17  Q     Was there discussion among the NEB and the advisors of

18  the meeting without discussing specific details of the

19  (indiscernible)?

20  A     Yes, there were.

21  Q     Did the NEB ultimately approve a motion at this June 5th

22  meeting?

23  A     Yes, we did.

24  Q     And can you describe the motion that was approved?

25  A     I can.  In looking at the minutes the motion, as

1 indicated, at the end of the minutes whereby the NEB voted to

2 approve the amount of $250 million which included an $80

3 million note to the victims' trust which were part of the

4 terms that we were dealing with as part of the RSA.

5          MR. HALLOWELL:  Objection.

6          THE COURT:  What is the objection?

7          MR. HALLOWELL:  It mischaracterizes the

8 (indiscernible).

9          THE COURT:  Overruled.  You can cross.

10 BY MR. ANDOLINA:

11 Q    Mr. Desai, were there any other components of the RSA

12 that required NEB approval?

13 A    No, there were not.

14 Q    And why not?

15 A    Because the -- let me back up.  First and foremost the

16 NEB, back on April 8th, 2021, had filed a resolution or passed

17 a motion delegating authority that it had as a board to

18 members of the NEC, BTF for purposes of engaging in

19 conversations, dialog, and to agree to settlement terms and

20 conditions such that it would further the approval and filing

21 of a plan that would allow for the BSA to have confirmation of

22 a plan and emerge from bankruptcy.

23          Based upon that level of approval and delegation by the

24 board on April 8th many of the terms of any potential

25 settlement terms, etc., did not need to have full board

1  approval accept for the decision to encumber the organization

2  with additional debt as I just indicated and memorialized in

3  the June 5th meeting.

4  Q    So let me direct you, Mr. Desai, to Tab 16 which is

5  minutes of an April 8th, 2021 meeting of the national

6  executive board.  Are you there?

7  A    Yes, sir.

8  Q    Do you recall this meeting, Mr. Desai?

9  A    I do.

10  Q    And were advisors present at this meeting?

11  A    Yes, they were.

12  Q    Can you identify from the minutes which advisors were

13  present?

14  A    Michael Andolina, Jessica Lauria, Matthew Linder, Ernest

15  Marvin, Rachel Rosenblatt and Brian Whittman.

16  Q    And do you recall there being discussion between the

17  advisors and the NEB during this meeting?

18  A    Yes.

19  Q    And with respect to the motion that you just referred to

20  is that identified on Page 4?

21  A    Yes, it is.

22  Q    Were there any advantages to the national executive

23  board granting the national executive committee authority to

24  continue to negotiate and approve a plan of reorganization?

25  A    Yes, there were.  The BSA has a 72 member board and if

1  we needed to obtain and pass 72 members present for every

2  little detail moving forward in a fairly fast paced and

3  complicated bankruptcy process we'd be probably leap years

4  behind where we are currently, but because of the need for

5  speed and the ability to make decisions on behalf of the

6  organization recommendations were made to the national

7  executive board to vest authority in the NEC after

8  consultation with our advisors, as indicated in the motion, to

9  approve and enter into an agreement that would allow for the

10  BSA's objectives to be carried out; mission preservation and

11  the ability to compensate our victims, and, of course, have a

12  plan that was confirmable that would allow us to emerge.

13  Q    Taking you back to the June 5th authorization, Mr.

14  Desai, between that date and the execution of the RSA did the

15  BTF and the NEC continue to meet?

16  A    Yes, we did.

17  Q    Do you know how many times the BTF and NEC met between

18  June 5th and July 1st?

19  A    Yes.  BTF and NEC met on four occasions between June 5th

20  and July 1st.

21  Q    I'd like to direct your attention, Mr. Desai, to Tab 31

22  which are the minutes of the June 11th, 2021 NEC and BTF

23  special meeting.  Are you there?

24  A    I am.

25  Q    Do you recall that meeting, Mr. Desai?

1  A      I do.

2  Q      If I direct your attention to Page 2 of the minutes

3  there's a reference to the claimants group provided the BSA

4  with a letter that it would not support any BSA plan of

5  reorganization with the Hartford deal as a component.  Do you

6  see that reference?

7  A      Yes, sir.  I do.

8  Q      Do you recall discussions around that issue with the BTF

9  and the NEC without providing details?

10  A      I do.  Not only do I recall it, I also received a copy

11  of the correspondence.

12  Q      And that was in connection with the June 11th meeting?

13  A      That's correct.

14  Q      Let me direct you now to Tab 32 which references minutes

15  of the June 13th, 2021 BTF meeting.  Do you see that?

16  A      Yes, sir.

17  Q      Do you recall this meeting?

18  A      I do.

19  Q      And do you recall or can you identify the advisors that

20  were present for this meeting of the BTF?

21  A      Yes.  The advisors are listed on Page 1.  Ms. Lauria,

22  Mr. Andolina, Mr. Linder, Mr. Whittman and Mr. Torre

23  [phonetic] were all present.

24  Q      And you recall what role Mr. Torre played?

25  A      Yes.  Mr. Torre serves as counsel to the BSA on all

1  issues related to pension and he attended this meeting to

2  provide us with information in that regard.

3  Q    And is that because at that point the -- strike that.

4      Without providing information regarding legal advice

5  that Mr. Torre may have shared what was your understanding of

6  why he was present and active in that meeting?

7  A    Mr. Torre was asked to be present because at the time

8  period that we're discussing here from June 1st up until --

9  I'm sorry, from June 5th up until July 1st the BTF and NEC

10 were actively engaged in conversations surrounding that we

11 refer to the DST note, Delaware statutory trust note, relative

12 to bridging a gap and funding pursuant to the terms contained

13 in the RSA term sheet.

14 Q    Let me direct your attention now to Tab 33 which are the

15 BTF minutes from June 21st, 2021.  Do you recall that meeting,

16 Mr. Desai?

17 A    Yes, sir.

18 Q    And advisors were also present at that meeting, correct?

19 A    Yes, sir.

20 Q    Do you recall whether there was any discussion at the

21 meeting on June 21st, 2021 with respect to the issue of

22 chartered organizations?

23 A    I do.

24 Q    And without providing any detail about that discussion

25 and any legal advice was the issue of chartered organization

1 something that was considered by the BTF, NEB and NEC during

2 the time period of -- well going -- strike that.

3      During your BTF, NEB, and NEC meetings, Mr. Desai, did

4 those three committees discuss the issues of treatment of

5 chartered organizations under the plan?

6 A    Yes, we did.

7 Q    Finally, let me take you to Tab 34.  Can you identify

8 this document?

9 A    These are minutes of the NEC from June 22nd, 2021.

10 Q    And do you recall attending this meeting as well?

11 A    I do.

12 Q    And, again, which advisors were present at this meeting?

13 A    Ms. Lauria, Mr. Andolina, Mr. Linder, Mr. Whittman and

14 Mr. Martin along with Mr. Azer of Haynes & Boone.

15 Q    And what was your understanding of the role that Haynes

16 & Boone played in connection with advising the BSA?

17 A    Haynes & Boone served as the BSA's insurance counsel.

18 Q    In addition to the meetings with the NEB, NEC, and BTF

19 did you receive other communications regarding the RSA?

20 A    I did, we did.  Between the timeframe you're discussing

21 we received various emails which contained iterations, if you

22 will, of the RSA conclusive of the term sheet, the TDP, and

23 also I recall a proposed motion as well as an order being

24 circulated as well.

25 Q    And that would have been during the timeframe between

1  June 5th and July 1st when the RSA was executed?

2  A      That is correct.

3              MR. HALLOWELL:  Objection, leading.

4              MR. ANDOLINA:  I was just clarifying, Your Honor.

5              THE COURT:  I think he was.  Overruled.

6              MR. SCHIAVONI:  We renew our request for the

7  production of those emails so we can cross-examine the

8  witness.

9              THE COURT:  Okay.  Mr. Andolina?

10 BY MR. ANDOLINA:

11 Q      Did you review those documents that were provided that

12 you just testified about?

13 A      I did.

14             MR. HALLOWELL:  Objection, leading.

15             THE COURT:  I'm sorry, I missed that question.  Can

16 you repeat it?

17 BY MR. ANDOLINA:

18 Q      Sure.  What did you do with respect to the documents

19 that you received relating to the RSA term sheet and TDP that

20 you just testified about?

21 A      When I got the emails and the attachments that were

22 contained on it I opened the attachments to review what they

23 were and the redline changes that they contained.

24             MR. SCHIAVONI:  Your Honor, again, we are left

25 literally helpless in any ability to cross-examine this

1  witness or to examine him at all about documents that he's

2  saying he received to leave the inference that he's done

3  something with them when they have all been withheld.

4          THE COURT:  I'm hearing you, but we're in the

5  middle of direct, and I'm going to permit the direct to

6  continue, and then you can make whatever arguments you want to

7  make.

8          MR. ANDOLINA:  Thank you, Your Honor.

9  BY MR. ANDOLINA:

10 Q   Mr. Desai, let me provide to you or direct you to tab

11 number 47.

12         MR. HALLOWELL:  Your Honor, we have a hearsay

13 objection at this time.

14         THE COURT:  To what?

15         He hasn't asked a question and he hasn't sought to

16 admit anything yet.  Overruled.

17         MR. ANDOLINA:  Thank you, Your Honor.

18 BY MR. ANDOLINA:

19 Q   Mr. Desai, what is this document?

20 A   This is an email that was sent by Mr. McGowan, our

21 general counsel, on June 11th to members of the National

22 Executive Committee.

23 Q   And is this one of the communications that you just

24 testified about, in terms of documents that would be attached

25 that you would review?

1          THE WITNESS:  That's correct.

2          MR. HALLOWELL:  Objection; hearsay and leading.

3          He's describing a document that's not admitted into

4  evidence and he's responding to a leading question.

5          MR. ANDOLINA:  I can rephrase, Your Honor.

6          THE COURT:  Rephrase, but -- yeah, rephrase.

7  BY MR. ANDOLINA:

8  Q    Do you recall your previous testimony about

9  communications with Mr. McGowan?

10 A    Yes.

11         MR. HALLOWELL:  Objection, that is leading, as

12 well.

13         THE COURT:  No, overruled.

14         MR. HALLOWELL:  He could ask him, what is this

15 document --

16         THE COURT:  Overruled.

17 BY MR. ANDOLINA:

18 Q    Do you know what documents were attached to this email

19 from Mr. McGowan?

20 A    I do.  As I've indicated, this is an email that Mr.

21 McGowan sent to members of the NEC and I know I received it,

22 because I'm listed has a recipient on it, containing several

23 attachments, which are identified as BSA termsheet ad hoc

24 local council group, BSA markup, the letter that was drafted

25 and eventually sent by Ms. Luria to the TCC, FCR, and

1  coalition, the BSA termsheet, the restructuring support

2  agreement, and a response of June 10th, 2021, to the PDF

3  letter.

4  Q    There's a reference in this letter to Alison.  Do you

5  see that?

6  A    I do.

7  Q    And is that the -- who is Alison?

8  A    The Alison reference in the June 11th email refers to

9  Alison Schuler, who's the chairwoman of the Bankruptcy Task

10 Force.

11 Q    And you previously testified about Ms. Schuler's role;

12 is this the same person?

13 A    That's correct.

14 Q    Let me direct you to tab 50.

15 Can you identify this document?

16 A    Yes, this is an email that was sent by Mr. McGowan,

17 again, to members of the NEC, including myself, containing

18 various documents, as indicated in the email, itself, which

19 are the redlined changes to the RSA termsheet, the

20 restructuring support agreement itself, the redlined changes

21 to the TDPs, as well as another comparison of changes of the

22 RSA that were being negotiated during the mediation process.

23 MR. HALLOWELL:  Your Honor, we continue to object to this

24 process.  The witness is simply reading into the record, the

25 hearsay documents.  The Boy Scouts aren't moving to admit the

1  documents because they know that they're hearsay, but they're

2  attempting to get them into the record by another means.

3          THE COURT:  What's your response, Mr. Andolina?

4          MR. ANDOLINA:  Your Honor, I'm establishing a

5  process by which Mr. Desai, who has direct evidence of this

6  document, is being updated on the process.  I also believe

7  this is not a hearsay document; it's a business record that is

8  an ordinary course email that is provided by Mr. McGowan.

9  Mr. Desai received the letter contemporaneously when it was

10  sent and I believe this is not hearsay.

11          I'm also not --

12          MR. HALLOWELL:  Your Honor, emails are not business

13  records, Your Honor.

14          THE COURT:  Mr. Andolina --

15          MR. ANDOLINA:  Emails can be business records.

16          I'm sorry, Your Honor.

17          THE COURT:  Mr. Andolina was speaking.  Please

18  finish your response.

19          MR. ANDOLINA:  Your Honor, the other point I'd like

20  to make is I'm simply using this document for purposes of

21  identifying the materials that Mr. Desai testified that he

22  received.  He has independent recollection of that issue.

23          THE COURT:  Overruled.

24  BY MR. ANDOLINA:

25  Q    Mr. Desai, can you describe the status conference of the

1   approval of the RSA at the end of June.

2   A     Yes.  So, based upon the delegated authority by the NEB

3   of April 8th, the vote that took place to encumber the

4   organization with debt of the $250 million on June 5.  The

5   NEC, through the BTF, along with advice from its counsel, was

6   actively engaged in reviewing and negotiating various terms

7   that are contained in the RSA.

8         Following various iterations that the group received,

9   the NEC did take a vote, electronically, to approve some of

10  the terms that were needed, as I indicated in the Delaware

11  Statutory Trust note, through that vote that occurred between

12  June 28 and June 29th; thereby, as of June 29th and

13  June 30th, Mr. McGowan also circulated the most current draft

14  versions of the agreements that I just indicated in an email

15  of June 29th, because there were certain changes being worked

16  on that did not impact the materiality in terms of the terms

17  of the settlement that was approved by not only the Board, but

18  also by the NEC.  It's simply dealing with other language in

19  the RSA, itself.

20        And we know that the NEC did unanimously support the

21  entry into the RSA because our chief staff executive and CEO,

22  Mr. Mosby, executed same on July 1st.

23              MR. HALLOWELL:  Objection, Your Honor.  That entire

24  last answer is nonresponsive to the question that was asked.

25  We move to strike.

1          THE COURT:  Overruled.  You can cross.  Overruled.

2  BY MR. ANDOLINA:

3  Q    Mr. Desai, I'd like to direct your attention to a

4  June 28th email that you wrote to Mr. Tilden and Mr. McGowan.

5          MR. ANDOLINA:  Your Honor, this is Exhibit G to

6  Mr. Desai's declaration.

7          If you want to go up to page 2 of 7, Jen.  There

8  you go.

9  BY MR. ANDOLINA:

10  Q    Is this the communication that you referred to in your

11  prior answer regarding the DST note?

12  A    Yes, it is.

13  Q    And in responding to Mr. McGowan, what do you write in

14  your email?

15  A    I write:

16          "Steve, thanks to the efforts of our legal team to

17  get us to this point.  We've had many robust conversations

18  about the proposal below and I am voting yes to move this

19  along to a global resolution.  Thanks, Devang."

20  Q    And it's your understanding that all of the other NEC

21  members also voted yes on this issue?

22  A    Yes.

23          MR. HALLOWELL:  Objection; lacks foundation.

24          MR. SCHIAVONI:  Your, that's actually important.

25  Can we just see the next page, which is the quote proposal

1  below that they're referring to.

2          If you can just scroll down on that, Mr. Andolina.

3          THE COURT:  Mr. Schiavoni, you can cross-examine

4  him on this.

5          MR. ANDOLINA:  Thank you, Your Honor.

6          THE COURT:  And I am going to overrule the

7  objection.

8          MR. ANDOLINA:  Thank you, Judge.

9          MR. SCHIAVONI:  Your Honor, the objection was that

10 the actual proposal is redacted below.  So, that's why there's

11 no foundation.

12          THE COURT:  Well, you can cross-examine him on it.

13 There's been a lot of testimony.

14 BY MR. ANDOLINA:

15 Q    So. Mr. Desai, you just testified as to -- well, strike

16 that.

17        Did the BTF, the NEB, and the NEC discuss the TDPs at

18 any point?

19 A    We did.

20 Q    Let me take you to tab 23.  Can you identify what tab 23

21 is, Mr. Desai.

22 A    Tab 23 are the May 7th, 2021, meeting minutes from the

23 Bankruptcy Task Force, where members of the National Executive

24 Committee were also invited.

25 Q    And do you recall attending this meeting?

1  A      I was not in attendance at this meeting.

2  Q      Do you recall having conversations with any of your BTF

3  compatriots following this meeting?

4           UNIDENTIFIED:  Objection.  That is eliciting

5  hearsay.

6           THE COURT:  That's a yes-or-no question.

7  Overruled.

8           THE WITNESS:  I do recall having conversations with

9  some members of the BTF because it advance of --

10          UNIDENTIFIED:  Objection.  That's the answer.  It

11  was a yes-or-no question and he answered.

12  BY MR. ANDOLINA:

13  Q      Is there a reason you recall having conversations

14  following the meeting?

15  A      Yes, because my normal practice, if I were to miss a

16  meeting, which was rare in this instance, was to, one, find

17  out what took place at the meeting; two, if there are any

18  items that I needed to be aware of for purposes of helping out

19  with my colleagues on the BTF; and I would generally speak to

20  Ms. Schuler, who is the chairwoman of the BTF, and I would

21  also contact our general counsel, Mr. McGowan, and following

22  meetings, of course, review minutes that were sent to members.

23  Q      There's a reference in the meeting to Mr. Azer, do you

24  see that?

25  A      Yes, I do.

1   Q     And what was Mr. Azer's role?

2   A     Mr. Azer is a member of the law firm of Haynes and

3   Boone, who is insurance counsel to the BSA.

4   Q     In addition to Haynes and Boone, did the BSA receive

5   legal advice on the TDPs from any other advisors?

6   A     Yes.

7             MR. HALLOWELL:  Objection.

8             THE COURT:  What's the objection?

9             MR. HALLOWELL:  Leading.

10            THE COURT:  Overruled.

11            THE WITNESS:  The BTF and NEC received advice from

12  all of our advisors as they related to the TDP procedures,

13  legal, financial, and insurance.

14  BY MR. ANDOLINA:

15  Q     Mr. Desai, after your --

16            MR. ANDOLINA:  Did we send him our -- I apologize.

17  Your Honor, I'm sorry.

18  BY MR. ANDOLINA:

19  Q     Mr. Desai, after your hundreds of hours of volunteer

20  efforts working on the BSA bankruptcy, did you form an opinion

21  regarding whether the BSA should enter the RSA?

22  A     Yes, I did.

23  Q     And what was that opinion?

24  A     My opinion was, and is, that the RSA allows for the BSA

25  to emerge from this bankruptcy process with a confirmable

1  plan, along with achieving its objectives of mission

2  preservation and compensating victims of historical sex abuse.

3  I say that because for many months, I had the opportunity to

4  listen to and observe firsthand, the vehement concerns raised

5  by members of the Plaintiff's group concerning entering into

6  any type of agreement or plan with certain parameters and the

7  fact that they would never support anything like that, coupled

8  with the fact that in May, I had an opportunity to hear --

9  attend a hearing on an audio-only format with this Court and I

10 heard loud and clear, several objections by Mr. Stang, as well

11 as members of the coalition and some carriers, concerning some

12 of the initial agreements that were being entered into.

13       And at the time, I also heard from the Court, some of

14 the concerns that the Court had in being presented with a plan

15 that did not have any victims support and the ability of the

16 Court to potentially allow for a plan like that to be

17 solicited.

18       And so, for all those reasons and the other reasons that

19 we discussed and the factors that we considered as a Board,

20 BTF, and NEC, the entry into the RSA serves as the best option

21 available to the BSA in order to build blocs and consensus to

22 achieve a global resolution that would allow for the BSA, as

23 the debtor in this case, along with our other partners and

24 other constituency groups, to emerge from this bankruptcy

25 process.

1  Q     Mr. Desai, I want to bring you back to the time frame

2  when you first joined the National Executive Committee.

3        Do you recall that?

4  A     I do.

5  Q     And what was that time frame?

6  A     I was elected onto the NEC in May of 2020.

7  Q     And at that time, did you know whether there were any

8  restrictions for service on the NEC as it related to local

9  council for service?

10 A     Yes, I knew that our bylaws prohibited members of the

11 National Executive Committee to simultaneously serve on their

12 Local Council Executive Board.

13 Q     And what steps did you take regarding your service at

14 that point on the South Florida Local Council Board?

15 A     Following my election to the NEC, at the end of May 22,

16 I contacted my scout executive Jeffrey Berger by telephone and

17 I followed up with an email officially resigning my role with

18 the South Florida Council Executive Board, effective June 1,

19 along with requests that I be removed from all Board-related

20 list service.

21 Q     After June 2020, were you involved in any

22 decision-making with respect to the South Florida local

23 council?

24 A     I was not.

25 Q     Was the issue of potential conflicts regarding local

1    Council Board service considered, by the NEB at any point?

2    A    Yes, it was.

3    Q    Can you describe the context in which the NEB considered

4    that issue.

5    A    Yes, prior to the start of what I'll call is the after

6    mediations and the processes that have gotten us to this

7    point, in the early part of this year, following receipt of

8    some demands that the organization had obtained from the TCC

9    and the coalition and what that would require, not only of the

10    organization, but of the local councils, there was significant

11    dialogue amongst the BTF and NEC and Board members concerning

12    the ability of local councils to be able to contribute to a

13    pot of funds for a global resolution.

14    Q    And at that point, did the NEB receive any legal advice

15    with respect to potential conflicts of interest, without

16    sharing the nature of that advice?

17    A    Yes, I recall an NEB meeting in February of 2021, where

18    a representative from the White & Case firm, Mr. Reece, if I'm

19    pronouncing it correctly, attended the meeting.

20    Q    I'd like to direct you to tab 8.  Can you identify this

21    document for the record, Mr. Desai?

22    A    These are the meeting minutes from the special

23    (indiscernible) and National Executive Board meeting, dated

24    February 7 -- it says 2020, but it's a typo -- 2021.

25    Q    So, your understanding is that the date on this document

1   is incorrect and the meeting occurred on February 7th, 2021?

2   A      That's correct.

3   Q      And you attended this meeting, correct?

4   A      Yes, sir.

5   Q      Following, did the Board, in addition to an oral

6   preparation, also receive any additional materials?

7   A      Yes, we did.

8   Q      Following this presentation from Mr. Reece, did the NEB

9   take any steps?

10  A      Yes.  Following the presentation and the materials that

11  were provided to the Board, members of the Board were afforded

12  an opportunity to do a few things.  One, members could simply

13  recuse themselves from any vote on the NEB level that may have

14  anything to do with taking action cut out adverse to a local

15  council.  Prior any discussions of bankruptcy-related topics

16  or council-related topics, members would be told, we're about

17  to go into that phase of the meeting and they would have an

18  opportunity to recuse themselves and not receive the

19  materials, as well as, given the pandemic and the time that we

20  were operating in, simply just Zoom out of the meeting or log

21  off, if you will.  The other option members had was to decide

22  if they wanted to be a member of the National Executive Board

23  or be a member of the local Council Board and pick one.  And

24  so, those would have been the options available to each of the

25  mechanics.

1    Q     Do you know if any NEB members, following 2021, remained

2    on your local Council Board?

3    A     I do.

4    Q     And do you know how many?

5    A     I know of approximately two to three people who remained

6    on their local council boards, as well as on the NEB.

7    Q     And do you know whether they took the steps that you

8    just described?

9    A     I do.  I know that they either recused themselves from

10   votes or didn't participate in dialogue once we got to that

11   portion of the meeting dealing with the bankruptcy and local

12   council issues.

13   Q     Do you have an understanding, Mr. Desai, regarding your

14   fiduciary obligations, given your role on the NEC, NEB, and

15   BTF, with respect to your prior association with the South

16   Florida local council?

17   A     Yes, I do.

18   Q     And what is that?

19   A     As a member of the National Executive Board, NEC, and

20   the Bankruptcy Task Force, my fiduciary obligation is to the

21   preservation of the mission of the Boy Scouts of America, no

22   one else, and it is under that understanding that I have

23   attended meetings and made decisions that have been in the

24   best interests of the Boy Scouts of America.

25   Q     And do you have an understanding that your fiduciary

1  obligations run to the national organization, as opposed to

2  any local council?

3  A     That's correct.

4  Q     Based on your attendance at more than 50 meetings and

5  hundreds of hours of work on BTF -- on the BSA bankruptcy, do

6  you have a belief regarding whether the BTF, the NEC, and NEB

7  have, at all times, acted in the best interests of the BSA?

8  A     I do.

9          MR. SCHIAVONI:  Objection.

10         THE COURT:  I'm sorry, did I hear an objection?

11         MR. SCHIAVONI:  Yes, Your Honor.  He has no -- this

12 is, basically, calling for a legal decision or a legal opinion

13 from him.

14         THE COURT:  I'll sustain it, but I'll let him

15 express his view, his individual view for what it's worth.

16         THE WITNESS:  Can you tell me the question, again.

17 BY MR. ANDOLINA:

18 Q     Sure.  Based on your attendance at more than 50 meetings

19 and hundreds of hours of work on the BSA bankruptcy, do you

20 have a belief regarding whether the BTF, NEC, and NEB have, at

21 all times, acted in the best interests of the BSA?

22 A     Yes.  My belief and my understanding and observations of

23 my fellow Board members, NEC members, and BTF members is that

24 we all share a passion for scouting and we all have done what

25 we believe to be in the best interests of this organization

1  and to no one else.

2  Q     Do you believe that the BTF, NEC, or NEB, has ever taken

3  any action to benefit local councils to the detriment of the

4  BSA?

5  A     We have not.

6  Q     When making your decision to support the RSA, did you

7  take into account the fact that the plan would provide for

8  relief for your prior volunteer work at the South Florida

9  Local Council Board member?

10  A     That wasn't even a thought.

11  Q     In the context of the RSA negotiations, Mr. Desai, did

12  you have a view as to who represented the interests of the

13  local councils?

14  A     Yes, I knew, as well as, you know, in dealing with our

15  BTF meetings and NEC meetings, local councils were governed by

16  their own Boards, had the benefit of their own counsel, many

17  of them did.  But as a collective group, I know firsthand that

18  a group referenced as the ad hoc group of local councils

19  represented the interests of all of our local councils and

20  that group was chaired by Mr. Mason.

21  Q     And do you know which law firm Mr. Mason worked for?

22  A     I do.  He is the chair of the restructuring practice

23  group at Wachtell.

24  Q     And do you know whether there are additional

25  restructuring lawyers that represent the ad hoc committee?

1  A      I believe that there are, yes.

2           MR. ANDOLINA:  Your Honor, if it would be

3  appropriate, can we take a 10-minute break?  I think I'm close

4  to wrapping up.

5           THE COURT:  Yes.  It's 12:52.  I'll give you eight

6  minutes --

7           MR. ANDOLINA:  Unless Your Honor wants to break for

8  lunch, and I assume you're going to give us a short lunch

9  respite?

10          THE COURT:  I will, but I'd like your direct to be

11 completed.

12          MR. ANDOLINA:  Okay.  Give us 10 minutes, please,

13 Your Honor.

14          THE COURT:  Okay.  Thank you.

15          We're in recess.

16      (Recess taken at 12:53 p.m.)

17      (Proceedings resumed at 1:03 p.m.)

18          THE COURT:  This is Judge Silverstein.

19          Mr. Andolina, are we ready to begin?  Any opposed,

20 say no he's a hard guy to keep an eye on, Your Honor.

21      (Laughter)

22          MR. ABBOTT:  Your Honor, we've heard from Mr.

23 Andolina.  He's working through a couple of A/V problems.

24      We'll get there in a second.

25          THE COURT:  Thank you.

1    (Pause)

2        MR. ANDOLINA:  Can you hear us now, Your Honor?

3        THE COURT:  I can hear you, Mr. Andolina.  I cannot

4  see you yet.

5    (Pause)

6        MR. ANDOLINA:  Oh, did it come on?

7        THE COURT:  There we go.

8        MR. ANDOLINA:  Okay.  Can you see me now, Your

9  Honor?

10        THE COURT:  Yes.

11        MR. ANDOLINA:  Sincere apologies.  I promise I did

12  not touch anything.

13        Your Honor, thanks, again, for the break, and

14  apologies.  As I mentioned, I think we only have about 10 or

15  15 more minutes of direct and I'll go as efficiently as

16  possible.

17                DIRECT EXAMINATION (Resumed)

18  BY MR. ANDOLINA:

19  Q    Mr. Desai, are you familiar with BA's settlement with

20  Hartford?

21  A    I am.

22  Q    And do you recall approximately when the NEC authorized

23  that settlement?

24  A    The settlement was authorized in April of 2021.

25  Q    Did you review the proposed settlement agreement before

1  it was executed?

2  A     I did.

3  Q     Did you, at the time, support the BSA's entry into the

4  Hartford settlement?

5  A     I did, and I supported it because it was the start of

6  what we perceived to be a building block to hopefully allow

7  for a settlement fund to be built, such that we would be able

8  to maintain support from a variety of constituent groups,

9  including all the victims, in order to, going back to the

10  objectives of the BSA, mission preservation, and to equitably

11  compensate the victims of historical sexual abuse and allow

12  the organization to emerge from this bankruptcy with a

13  confirmable plan.

14  Q     Did your review of the Hartford settlement change over

15  time?

16  A     Yes, it did.

17  Q     Can you describe how that happened?

18  A     I would probably tell you that, and I'd break it down

19  into --

20         MR. RUGGERI:  Your Honor, I'd have to object

21  because he's getting into attorney-client communications.  I

22  will tell you that Mr. Desai never had any communications with

23  Hartford and those communications necessarily came by and

24  through counsel.

25         THE COURT:  Okay.

1          MR. RUGGERI:  So, long as he's on fair warning that

2    I will go through that door on cross-examination.

3          THE COURT:  Mr. Andolina, you can proceed.

4    BY MR. ANDOLINA:

5    Q    Mr. Desai, let me ask the question this way, you just

6    testified you were initially supportive of the Hartford

7    settlement, correct?

8    A    Yes.

9    Q    What happened -- you then -- strike that.

10         Did your review of the Hartford settlement change?

11   A    Yes, it has.

12   Q    What happened to change that view?

13   A    So, at the time the BSA entered into the settlement

14   agreement with Hartford, I knew, because I saw it in all the

15   newspapers and the emails that we would get concerning the

16   press, that there was some disagreement by others about the

17   BSA entering into the agreement.

18         Secondarily, during the hearings that I previously

19   referenced in May, I attended the hearing in an audio-only

20   capacity for the entire duration of that hearing with this

21   Court and I heard it, firsthand, the objections that were

22   raised by representatives of the TCC, the coalition, the

23   future claimants representative, along with some of the other

24   attorneys that represent various carriers involving this case.

25         I also heard from the Court where the Court, after

1  listening to Mr. Stang, indicate that it would be concerning

2  that a claim would be presented to the Court such that there

3  might not be any support by victims for a plan that would

4  incorporate an agreement with the Hartford.

5       And the third point in time that I was able to

6  reconsider my thoughts about the Hartford agreement was when

7  the BSA received correspondence that was signed off on by Mr.

8  Stang, the coalition attorney, as well as the future claimants

9  representative, advising Ms. Luria, who, in turn, provided a

10 letter to the members of the task force that under no

11 circumstances would the victims ever support a confirmable

12 plan that incorporated the terms of the Hartford settlement

13 agreement.

14 Q    At that point, Mr. Desai, did you believe that it would

15 be possible for the BSA to achieve a global resolution with

16 the Hartford settlement as part of the plan?

17 A    I did not because, again, having no victim support for

18 an agreement would basically render us without the ability to

19 emerge with a confirmable plan.

20 Q    A few financial questions, Mr. Desai, and then I have

21 some housekeeping.  In your volunteer role serving the South

22 Florida local council and the BSA national organization, have

23 you ever received any compensation?

24 A    I have not.

25 Q    All your work has been entirely volunteer?

1  A      Yes, sir.

2  Q      With respect to your service on the BTF, NEC, and NEB

3  over the past several years, why have you volunteered to spend

4  so much time on this matter?

5  A      One, I know what the program, the bout program has done

6  for me personally.  I know what it has done for the many

7  people that I have encountered along the way and what it

8  continues to do for the youth of this country.

9         While I am extremely sorry and apologetic for some of

10  the things that occurred to all of our victims of sexual

11  abuse, and for that, again, I apologize, I know that there's a

12  powerful force in the Boy Scouts of America to do good and it

13  is a labor of love.  And so, while we are doing what we can to

14  remedy these wrongs, there is still a great amount of work to

15  be done by the Boy Scouts of America in the areas of

16  leadership development and character development, particularly

17  when our country needs it the most.

18  Q      Mr. Desai, before I pass you, you have a witness binder

19  in front of you with documents labeled Exhibit 8 through

20  Exhibit 35 and those are various meeting minutes.

21  A      Yes.

22  Q      Did you receive -- well, first, did you review those

23  minutes in the context of your witness preparation?

24  A      I did.

25  Q      And did you receive those minutes concurrent with the

1  time that they were made in connection with the various

2  meetings that you attended?

3  A     I did.

4  Q     And did you review the minutes at the time that you

5  received them?

6  A     I did.

7  Q     Are the minutes that are in the witness binders true and

8  correct copies of the minutes you received with the exception

9  of redacted, frivolous materials?

10 A     They are, and with the scrivener's error from 2020 to

11 2021, yes.

12         MR. ANDOLINA:  Your Honor, we would move for the

13 admission of the Board minutes that are exhibit tabs 8 through

14 34 into evidence.

15         MR. RUGGERI:  Objection, Your Honor; completeness.

16 I think that would require a document-by-document review from

17 the Court on the privilege assertion and the unredacting of

18 the documents, to the extent, completeness requires them.

19         MR. SCHIAVONI:  The Century joins in this, but it

20 goes beyond this, Your Honor.  This is the line that

21 Convergence draws.  They're offering into evidence half of the

22 communication, but not the other half, and many of these were

23 not -- have nothing whatsoever to do with mediation at all.

24         THE COURT:  Well --

25         MR. ANDOLINA:  Your Honor, may I respond?

1           THE COURT:  Well, let me ask this -- yes, you can

2    respond.

3           MR. ANDOLINA:  Your Honor, a few reactions.  As the

4    Court is aware, Board minutes are core business records and

5    are often, almost always moved into evidence and here we have

6    a Board member who has testified that he participated in the

7    meetings, that he reviewed the minutes.  The fact that we have

8    redacted attorney-client privilege information and mediation

9    communications does not impact the foundation or the

10   admissibility of the documents.

11          And, Your Honor, I will tell you, we worked

12   extremely hard to try to limit our redactions.  We're happy to

13   provide any documents *in camera*, but there's no strategy here

14   other than to protect those privileges and to demonstrate, and

15   I think accurately, the fact that the Board was actively

16   involved with the (indiscernible).  So, we think it's

17   completely appropriate for these Board minutes to come into

18   evidence with the redactions.  It's standard and we would ask

19   the Court to do that.

20          MR. SCHIAVONI:  Your Honor, if I could -- one last

21   thing that I may be heard on.  If they do go forward with this

22   and Your Honor admits it, I think what Your Honor said when

23   you addressed the evidentiary motion at the beginning was that

24   should they go ahead and make this sort of proffer, you'd hear

25   us later in submitting briefs and motions to, you know, that

1  explain in detail why this material now is waived.  We don't

2  have that deal with that right now.  Your Honor could have

3  full briefing in front of you on that issue after you admit

4  them into evidence.

5        This is a line and Convergence is being drawn and

6  we can present briefs afterwards.

7        THE COURT:  Well, I'm looking at Convergence and

8  Convergence has a second part of it, which is dealing with the

9  March 24th, 2012, minutes and the Convergence court, with a

10  few exceptions, after a review *in camera*, said they were

11  properly redacted.  So, this is not unusual that Board minutes

12  are redacted and produced in redacted form and, therefore

13  admitted in redacted form.

14        And let's remember the limited nature of this

15  hearing, the limited nature of this hearing, as I perceive it,

16  is what did the Board consider, what topics did they consider,

17  perhaps, what did they not consider.  These Board minutes, as

18  redacted, reflect that.

19        MR. SCHIAVONI:  Your Honor, they go a step beyond

20  that.  It's more than just (indiscernible) in Convergence

21  (indiscernible) meeting and was it by the counsel provided.

22        They've selectively unredacted portions of these

23  Board minutes, many of them on things that help them, and

24  redacted other portions that don't have nothing to do with

25  anything that occurred in mediation that's outside of

1  mediation entirely, and it's like it's a selective waiver on a

2  matter that they put at issue.

3            All the timed Board minutes are redacted and when

4  they're produced, the redactions are honored, but when the

5  party is affirmatively putting at issue what occurred at the

6  Board meeting.  And here, that's exactly what this is being

7  offered for.

8            MR. ANDOLINA:  Your Honor, if I may respond?

9            Yesterday, at the beginning of argument, Mr.

10 Schiavoni stood up or sat down, as we are now in a virtual

11 courtroom, and told the Court, the Boy Scouts have not

12 produced any information with respect to these boards with

13 minutes.  There's no authorization.  There's absolutely

14 nothing in there we could possibly comment on and cross-

15 examine on.

16           And now Your Honor has seen these minutes for

17 herself and it is clear that we have done our best to try to

18 redact privileged information.  As I mentioned, we're happy to

19 provide *in camera* inspection, but it's wholly appropriate for

20 these Board minutes to be entered into evidence.

21 And the fact of the matter is that we had an extensive ongoing

22 mediation and we had very, very active engagement with

23 advisors, which is why there are these great actions that

24 there are.

25           MR. SCHIAVONI:  Your Honor, I stand by

1  wholeheartedly the comments I made, and you're going to see

2  when we examine Mr. Desai on the email that was presented to

3  him with the page that was unredacted saying that this is

4  evidence of him voting yes to approve the RSI [sic].  When you

5  go down to the very next page, you see that they have redacted

6  what actually he was voting on, but in the text above it, it

7  says he's voting on approving the note.  It doesn't say he's

8  approving the RSI.

9         So, yes, it's like the redactions are being used to

10  present the evidence in a way that's uncharacteristic of what

11  it actually is.  You don't know what the evidence is without

12  knowing what's actually inside the redactions.  The critical

13  document on the vote yes, it shows it better than anything.

14         MR. HALLOWELL:  Your Honor, this is Mr. Hallowell,

15  just briefly.  I have a process objection in addition to all

16  of this.  We have spent the last several hours with Mr.

17  Andolina going through these documents and referring (audio

18  interference).  His opportunity to move those documents into

19  evidence was at the time that he was discussing them with this

20  witness and he intentionally did not do so.

21         One of the reasons for that is because one of the

22  minutes, Mr. Desai candidly admitted he didn't attend the

23  meeting.  So, for instance, the May 7th, Bankruptcy Task Force

24  and National Executive Committee Board minutes of May 7, 2021,

25  Mr. Desai has no basis to support the entry of those minutes

1  into evidence.  And that's why proceeding in this manner

2  (audio interference).

3           THE COURT:  Okay.  So, what we're going to do is

4  you can cross-examine him and if we find out that he wasn't at

5  some of these meetings, then I'll consider that with respect

6  to particular Board minutes; other than that, they're going to

7  be admitted and I don't think that, as I'm reading these Board

8  minutes, the unredacted portion of the Board minutes, I

9  don't -- I view them as a process issue, what was considered.

10 That's how I view them and let's remember, in the context of

11 business judgment, the Board can be wrong, okay, in its

12 ultimate decisions.  So, let's remember the context in which

13 this hearing arises, as opposed to perhaps other and future

14 hearings, okay.

15           If parties can agree on which meetings Mr. Desai

16 was not present at and stipulate to that, then we'll exclude

17 those particular minutes.

18        (Debtors' Exhibits 8 through 34 received into evidence)

19           MR. ANDOLINA:  Thank you, Your Honor.

20           MR. HALLOWELL:  We can do that in a process

21 offline, Your Honor?

22           THE COURT:  Yes, offline.

23           And I'm not sustaining the objection as to when Mr.

24 Andolina chose to move documents into evidence.

25           Okay.  We're going to take our lunch break.  It's

1  1:24.  We're going to come back at 2:15.

2         Mr. Desai, you remain a witness during this period.

3  Please do not talk about your testimony with anybody.

4         THE WITNESS:  Yes, Your Honor.

5         THE COURT:  Okay.  We are in recess.

6     (Recess taken at 1:24 p.m.)

7     (Proceedings resumed at 2:16 p.m.)

8         THE COURT:  This is Judge Silverstein.  Are we

9  prepared to begin cross?

10        MR. RUGGERI:  We are, Your Honor.  James Rugger for

11 Hartford.  I don't know if we're drawing straws on our side or

12 not, but we are prepared.

13        THE COURT:  I was going to ask, have you figured

14 out an order or if not, Mr. Ruggeri, you can go first.

15        MR. RUGGERI:  Thank you, Your Honor.  I'm going to

16 try to figure out how to highlight Mr. Desai.

17                     CROSS EXAMINATION

18 BY MR. RUGGERI:

19 Q    Good afternoon, Mr. Desai.

20 A    Good afternoon.

21 Q    My name is James Ruggeri.  I represent Hartford in

22 connection with these bankruptcy proceedings.

23        Mr. Desai, let's talk a little bit about the bankruptcy

24 task force.  You identified the members on the task force and

25 Ms. Schuler is the bankruptcy lawyer on that task force, isn't

1   she?

2   A      No.

3   Q      Well she certainly has an active practice in bankruptcy

4   as her website shows.  I think you put her into early

5   retirement earlier today, didn't you?

6   A      She has retired.  My understanding is her practice

7   relates to corporate matters.

8   Q      And it's an active practice as she says on the Schuler

9   daily website, right?

10  A      I can't speak to her volume of work, sir, but I do know

11  that Ms. Schuler is retired and does do some work as an

12  arbitrator.

13  Q      And you know she also does some work as a restructuring

14  attorney as she says on her website, correct, sir?

15  A      She may have.

16  Q      And in any event, she certainly brought her years of

17  experience in the bankruptcy and restructuring arena to her

18  work on the bankruptcy task force, correct?

19  A      Sir, I think that Ms. Schuler, like the other members of

20  the task force, are all volunteers of the Boy Scouts of

21  America and as such we act in our capacity as volunteers in

22  making decisions on behalf of the organization.

23  Q      And when I make decisions on behalf of the voluntary

24  groups that I make decisions on behalf of I don't leave my JV

25  behind and neither does Ms. Schuler, does she?

1  MR. ANDOLINA:  Objection; argumentative.

2  THE COURT:  Sustained.

3  THE WITNESS:  I can't speak for Ms. Schuler, but --

4  MR. RUGGERI:  Let the Judge --

5  THE COURT:  Sustained.

6  BY MR. RUGGERI:

7  Q    And Ms. Schuler is actually an accomplished lawyer.  I

8  mean she, unlike me, graduated from Harvard, didn't she?

9  MR. RUGGERI:  Objection.

10  THE COURT:  Overruled.  Does he know?

11  THE WITNESS:  I am aware that Ms. Schuler did

12  graduate from Harvard Law School.

13  BY MR. RUGGERI:

14  Q    So, your BTF task force you have six lawyers -- I mean

15  six members and three attorneys on that task force, right?

16  A    That is correct.

17  Q    You have Ms. Schuler who practiced bankruptcy law,

18  right?

19  A    Mr. Ruggeri, as I indicated, I don't know if that was

20  her sole focus, but Ms. Schuler is a corporate lawyer as far

21  as I understand.

22  Q    Let's talk about your focus.  You are the insurance guy

23  on the bankruptcy task force, aren't you?

24  MR. ANDOLINA:  Objection to the term "insurance

25  guy."

1  BY MR. RUGGERI:

2  Q    You're the insurance lawyer on the bankruptcy task

3  force, aren't you?

4         MR. ANDOLINA:  Objection; suggestion that his

5  capacity is as an insurance lawyer on the bankruptcy task

6  force.  He testified that he is a volunteer.

7         THE COURT:  Overruled.

8  BY MR. RUGGERI:

9  Q    You're a volunteer -- I'm sorry.

10        THE COURT:  Overruled.

11 BY MR. RUGGERI:

12 Q    You can answer.

13 A    Can you repeat the question, please?

14 Q    Yeah, you're the insurance lawyer on the bankruptcy task

15 force, aren't you?

16 A    No, sir.

17 Q    You're a volunteer who during your day job, as you put

18 it, practices law as an insurance lawyer, correct?

19 A    I practice law in the area of insurance for representing

20 policy holders and carriers.  Yes, sir.

21 Q    Representing policy holders and carriers.  Mr. Desai,

22 how many carriers does your firm represent?

23        MR. ANDOLINA:  Objection; relevance.

24        THE COURT:  What is the relevance?

25        MR. RUGGERI:  It goes to the credibility of the

1  witness, Your Honor.  It goes to the ethics of the witness.

2  It goes to -- I think it's entirely relevant to tease out his

3  role as an insurance counsel on the bankruptcy task force.

4          MR. ANDOLINA:  Your Honor, he's challenging Mr.

5  Desai's ethics as a volunteer witness I believe is wholly

6  inappropriate.

7          MR. RUGGERI:  Its cross examination, Your Honor.

8          THE COURT:  I'll permit you to explore this

9  briefly, but I will say I am not seeing all that relevance to

10  it.

11  BY MR. RUGGERI:

12  Q    Your firm, by my count, represents 53 insurance

13  companies, correct, Mr. Desai?

14  A    Sir, all I know is our firm does represent several

15  insurance companies.

16  Q    It gets into this issue too, Your Honor, Mr. Desai

17  talked about White & Case's presentation on fiduciary

18  obligations at the February 7th, 2021 meeting.  You remember

19  that testimony earlier today, right, Mr. Desai?

20  A    I do.

21  Q    Did White & Case or anyone else present any

22  presentations on fiduciary duties to your day job clients?

23          MR. ANDOLINA:  Objection; foundation, form.

24          MR. RUGGERI:  Foundation?  You asked about the

25  presentation, (indiscernible).  I'm entitled to get to the

1   scope of the fiduciary duties that were discussed at this

2   February 7th meeting. I don't know what was talked about.

3           MR. ANDOLINA:  Mr. Desai may understand the

4   question, but to your day job clients.  I have no idea what

5   that means.

6           MR. RUGGERI:  Mr. Desai used the reference day job

7   during his testimony, Mr. Andolina.  So I'm just using his

8   words.

9           THE COURT:  Okay.  Can you repeat the question

10  because I am not sure I understood your question?

11  BY MR. RUGGERI:

12  Q    Mr. Desai, you testified earlier about the White & Case

13  presentation on fiduciary duty on February 7th, 2021.  Do you

14  remember that?

15  A    Yes.

16  Q    Did that presentation include a discussion of fiduciary

17  duties to the bankruptcy task force members' clients?

18          MR. ANDOLINA:  Objection; compound.  I don't

19  understand the question.

20          MR. RUGGERI:  It's actually not compound. It's

21  singular.

22          MR. ANDOLINA:  Did the bankruptcy task force

23  clients --

24          MR. RUGGERI:  The bankruptcy task force members'

25  clients.

1              THE COURT:  You can answer.

2              THE WITNESS:  Sir, I don't understand why any of

3  our clients would have any business in terms of the work we,

4  as volunteers, perform on behalf of the bankruptcy task force

5  in recognizing our objectives to act in the best interest of

6  the BSA.

7  BY MR. RUGGERI:

8  Q     Please just answer my question.  Was there any

9  presentation by White & Case on your obligations as a

10 volunteer to your outside clients?

11 A     Sir, no there was hot; however, as I just mentioned, I

12 don't understand why that would be important in my capacity as

13 a volunteer.

14 Q     Let's talk a little bit about the TDP's.  You said you

15 were in discussions regarding the TDP's, correct?

16 A     Yes.

17 Q     And Mr. Andolina showed you the minutes from the May

18 7th, 2021 meeting.  Do you remember that?

19 A     Yes.

20 Q     And that was at Tab 23 of the debtor's binder, correct?

21             MR. ANDOLINA:  Can you show him, Mr. Ruggeri, if

22 you're --

23             MR. RUGGERI:  It's in front of him, so that was one

24 of the documents that you moved into evidence.  It's in your

25 binder, Mr. Andolina.

1        MR. ANDOLINA:  Thank you.

2        THE WITNESS:  Yes, I have it.

3   BY MR. RUGGERI:

4   Q    And you weren't there, but you said you learned that Mr.

5   Azer presented on some of the issues with the trust

6   distribution procedures.  Do you remember that testimony?

7        MR. ANDOLINA:  Objection; misstates the testimony.

8   BY MR. RUGGERI:

9   Q    Well let me ask, Mr. Desai, did Mr. Azer present at that

10  meeting on some of the issues for the trust distribution

11  procedures?

12  A    Yes, he did.

13  Q    Okay.  And am I correct that the trust distribution

14  procedures that he was discussing were the TDP's proposed by

15  the claimants?

16       MR. ANDOLINA:  Objection; foundation.

17       THE COURT:  Overruled.

18       THE WITNESS:  The TDP's that would have been

19  discussed at or near May 7th my understanding is that the

20  counsel for the BSA in conjunction with our insurance counsel

21  had initially drafted the TDP's and so at or near this time

22  those TDP's would have been the subject of some discussion.

23  BY MR. RUGGERI:

24  Q    So it was the TDP's drafted by BSA that were being

25  discussed at this meeting?

1    MR. ANDOLINA:  Objection; knowledge of the witness.

2  BY MR. RUGGERI:

3  Q    I'm asking do you know whether the TDP's being discussed

4  were the TDP's drafted by BSA?

5  A    Since I wasn't present at the actual meeting I can't

6  comment on which version of the TDP's were discussed.

7  Q    Okay.  Did you ever -- all the conversations that you

8  participated in regarding the TDP's did they involve TDP's

9  drafted by BFA?

10  A    I would answer your question, sir, with a yes and no

11  because the initial TDP's were drafted by the BSA and

12  insurance counsel.  And depending on at what point in time

13  there were various iterations of the TDP based on input from

14  other parties.

15  Q    Are those other parties the claimants?

16  A    The other parties would be the various parties to the

17  RSA.

18  Q    Okay.  But they wouldn't be me, would they?

19  A    I don't believe you were involved with the negotiations

20  of the TDP, sir.

21  Q    So at this May 7th meeting it wasn't a discussion about

22  the TDP I drafted and provided BSA the day before, was it or

23  don't you know?

24  A    Sir, since I wasn't at the meeting I can't tell you if

25  the TDP's discussed were the ones you presented or the ones

1  that were being circulated between the RSA parties.

2  Q    Understood.  You don't know and we can't tell from the

3  document and what has been redacted.  We can't tell whether it

4  was my TDP's or someone else's TDP's.  Is that fair?

5  A    That is correct.

6         MR. RUGGERI:  Your Honor, I renew my objection on

7  the completeness issue.  That is one of the reasons why I

8  raised it.  We just don't know.

9  BY MR. RUGGERI:

10  Q    Did you know, Mr. Desai, that I, on behalf of Hartford,

11  drafted TDP's and shared those with BSA?

12  A    I recall that there was some conversation about TDP's

13  that were drafted by the carrier, yes.

14  Q    Did you know that I provided by draft TDP's on May 6th,

15  2021 to BSA, the day before this meeting?

16  A    I don't know when those TDP's were received, sir, since

17  I wasn't the recipient of them; however, I do know that we

18  were advised that there were TDP's.

19  Q    So in your testimony earlier today you weren't trying to

20  suggest that you were being advised on BSA's TDP's at this or

21  any other meeting, right?  You don't know?

22         MR. ANDOLINA:  Objection to the term BSA's TDP's.

23         THE COURT:  Overruled.  I understand the context.

24         THE WITNESS:  Sir, I don't believe I understand

25  your question.

1  BY MR. RUGGERI:

2  Q    You don't know -- when you talked earlier today about

3  the discussions about the TDP you don't know, for example, on

4  May 7th whose TDP's were being discussed.  You weren't trying

5  to suggest that you did, were you?

6  A    On May 7th since I was not at the meeting I am not

7  suggesting who's TDP's were discussed on May 7th.

8  Q    And your follow-up to find out what happened didn't

9  include getting information about the details of the meeting

10 including who's TDP's were being discussed, fair?

11 A    That would be fair.

12 Q    Let's talk a little bit about the June 11th, 2021

13 meeting and that's behind Tab 31.  You told us about this

14 meeting and there was a discussion about what to do with the

15 Hartford settlement in view of the claimant opposition,

16 correct?

17          MR. ANDOLINA:  Objection; I think that misstates

18 the prior testimony.  I believe Mr. Desai just testified about

19 the receipt of the letter and I will not -- I would ask that

20 the court not allow Mr. Desai to testify about the content of

21 the communications with counsel.  We were very careful in our

22 presentation of Mr. Desai not to talk about specific

23 communications and board meetings of counsel.

24          MR. RUGGERI:  Your Honor, the unredacted portion

25 talks about the discussion about the claimants' opposition to

1  the Hartford settlement.

2           THE COURT:  Okay.  And what is your question?

3  BY MR. RUGGERI:

4  Q    That discussion took place at that meeting, correct, Mr.

5  Desai; you were there.

6           THE COURT:  You can answer that.

7           THE WITNESS:  Yes, sir.

8           THE COURT:  Okay.

9  BY MR. RUGGERI:

10 Q    And this was two days after BSA received the June 9th,

11 2021 letter, correct?

12 A    Yes, sir.

13 Q    And by this time is it correct that you formed a view

14 that the Hartford settlement would not gain the acceptance of

15 the claimants?

16 A    I wouldn't say that it was at June 11th that I formed

17 that belief.  I believe I indicated earlier, sir, that

18 following the entry into the agreement there was substantial

19 disagreement by various people based upon newspaper articles

20 that I had read coupled with the ongoing conversations that

21 were being had between BSA's counsel and the mediators with

22 the various parties.

23       Then, eventually, my participation, by way of listening,

24 during the May hearing where I did hear specific opposition to

25 the Hartford agreement being included in any plan or reorg by

1  the BSA and how that would be an impediment to a plan that

2  would be confirmed and received victim support which is also a

3  concern expressed by the Judge in terms of the fact that if

4  victims would not be in a position to support a plan that

5  would not be something that would be palatable.

6        And based on those timelines, those events, coupled with

7  the letter which is probably the final nail in the coffin, if

8  you will, I finalized that opinion, yes.

9  Q    So let me ask you this, were there discussions about

10 whether BSA should walk away from the Hartford deal or not at

11 these meetings that you attended?

12            MR. ANDOLINA:  Objection to the characterization.

13            THE COURT:  Overruled.

14            THE WITNESS:  There were discussions about the fact

15 that the claimants groups were not supportive of the agreement

16 that was entered into by the BSA and Hartford.  There were

17 additional discussions with counsel as to the pros and cons,

18 if you will, on our ability to move forward with the ability

19 to achieve our objections as an organization to allow for

20 compensation for past sex abuse victims along with caring out

21 the mission.

22 Q    Okay.  So the answer to my question is, yes, there were

23 discussions about whether to walk away from the Hartford deal,

24 right?

25 A    I don't believe that I would affirmatively tell you that

1   we walked away.  I know that there are discussions being had

2   and it's my understanding that BSA is -- we're asking the

3   court for some guidance given the inability to perform under

4   the agreement as its currently drafted and given the

5   opposition to saying that's been presented by the plaintiffs.

6   Q     Do you believe BSA's unable to perform under the

7   agreement?

8             MR. ANDOLINA:  Objection; calls for a legal

9   conclusion.

10            MR. RUGGERI:  No more than he's offered.

11            THE COURT:  Overruled.

12            THE WITNESS:  Sir, in understanding the terms of

13  the agreement and given the conditions that are required under

14  the agreement, and the fact that victims are not in favor of a

15  plan for confirmation purposes that would allow the BSA to

16  emerge and be able to carry out its mission, yes, there are

17  some challenges.

18  BY MR. RUGGERI:

19  Q     Do you believe BSA is unable to perform under the

20  Hartford agreement?  Please answer my question, yes or no?

21  A     I believe so, yes.

22  Q     Let me ask you this, Mr. Desai, when your bankruptcy

23  task force, your NEB, your NEC discussed what to do with the

24  Hartford agreement in light of the claimants' oppositions did

25  you recuse yourself from those discussions or did you

1  participate in those discussions?

2  A    I participated in the discussions.

3  Q    And let's talk a little bit about the Hartford

4  settlement agreement.  You said you reviewed it, right?

5  A    Yes.

6  Q    Did you review it before it was signed?

7  A    Yes.

8  Q    How late did you work on April 14th and April 15th?

9  A    Sitting here I can't tell you that.

10  Q    Did you work till midnight those nights?

11  A    I don't know, sir.

12  Q    You know that's when we agreed to the language before we

13  executed was midnight on April 15th.  Do you know that?

14         MR. ANDOLINA:  Objection; assumes facts in

15  evidence.

16         THE COURT:  Sustained.

17         THE WITNESS:  I can tell you that I -- sorry.

18  BY MR. RUGGERI:

19  Q    What do you know?

20         MR. ANDOLINA:  I think Your Honor sustained the

21  objection, Mr. Ruggeri.

22         MR. RUGGERI:  Oh, I didn't hear.

23         THE COURT:  I'm sorry.  I have to move closer to

24  the mic.

25  BY MR. RUGGERI:

1  Q    So let's talk a little bit about your belief that BSA is

2  unable to perform under the agreement.  Did Ms. Schuler ever

3  tell you that?

4  A    I don't believe that there is a specific person that

5  said that to me other than my own reading of the agreement and

6  conversations during our meetings with our advisors.

7  Q    And you are an insurance lawyer, not a bankruptcy

8  lawyer, correct?

9         MR. ANDOLINA:  Objection; argumentative.

10 BY MR. RUGGERI:

11 Q    No, it's not.  Your area of expertise is insurers' law,

12 not bankruptcy law, isn't it?

13        MR. ANDOLINA:  Objection.

14        THE COURT:  Overruled.  You can answer the

15 question.

16        THE WITNESS:  I do work in the areas of insurance

17 defense and insurance coverage work.  Yes, sir.

18 BY MR. RUGGERI:

19 Q    And you said you reviewed the Hartford agreement and if

20 you look at my tab its Tab 2.  I'm sure its Tab 5 in the BSA

21 binder.  Do you have the settlement agreement in front of you,

22 Mr. Desai?

23 A    Yes, sir.

24 Q    And this is the agreement that you said you reviewed

25 before it was signed, right?

1  A      Yes.

2  Q      And you reviewed it carefully, is that right?

3  A      I reviewed the agreement, sir.

4  Q      And reviewing the agreement you saw Section 3(e) on Page

5  10, right?

6  A      Yes.

7  Q      And you reviewed Section 3(h) on Page 14?

8  A      Yes.

9  Q      And you saw that even if the agreement was declared null

10  and void the parties agree that certain sections of the

11  agreement would remain in effect.  You saw that, right?

12          MR. ANDOLINA:  Objection.  Are you reading from the

13  -- is Mr. Ruggeri reading from a portion of the document and

14  if so could he point the witness to that portion.

15          MR. RUGGERI:  3(h) on Page 14, same place we were

16  during the last question.

17  BY MR. RUGGERI:

18  Q      You saw that the parties agreed that if the agreement

19  becomes null and void pursuant to 3(f) then the agreement,

20  except for, among other provisions, 3(i) shall be vitiated,

21  right?

22  A      Are you reading 3(h)?

23  Q      3(h) the first three lines.

24  A      Yes, I'm following.

25  Q      The parties agree that even if the settlement agreement

1 did not become effective then 3(i) would stay, in effect,

2 between them, didn't they?

3          MR. ANDOLINA:  Objection; calls for a legal

4 conclusion.

5          MR. RUGGERI:  No, it doesn't.  It calls for a

6 reading by someone who says he read the agreement and approved

7 it.

8          THE COURT:  I think the question is did you read

9 it.  That is what I understand the question to be.

10 BY MR. RUGGERI:

11 Q     Did you read that?

12          THE COURT:  That can be answered.

13          THE WITNESS:  Yes.

14 BY MR. RUGGERI:

15 Q     Did you understand that 3(i) would remain in force and

16 effect even if the agreements were disapproved by the court?

17 A     I --

18 Q     Let me rephrase.  Did you understand that 3(i) would

19 remain in effect even if the global plans were not approved

20 and incorporated the Hartford settlement?

21          MR. ANDOLINA:  Objection; calls for a legal

22 conclusion, compound.

23          THE COURT:  Sustained.

24 BY MR. RUGGERI:

25 Q     What did you understand that provision to mean with

1 regard to 3(i) when you read it, Mr. Desai?

2        MR. ANDOLINA:  Objection; calls for a legal

3 conclusion.

4        MR. RUGGERI:  It calls for the reading, the

5 interpretation of someone who says he read it before it was

6 signed and he authorized the organization to enter it.

7        MR. ANDOLINA:  Objection; misstates testimony.

8 Your Honor, obviously, Mr. Ruggeri is entitled to ask his

9 questions, but if we're going to use the witness to conduct

10 the contract analysis I suspect Mr. Anker would prefer to be

11 involved in that process then having our witnesses.

12        MR. RUGGERI:  That is a bizarre statement, Mr.

13 Andolina which isn't appreciate.

14        MR. ANDOLINA:  No, but the statement was this is

15 attorney argument and you're trying to do it through a lay

16 volunteer witness.

17        MR. RUGGERI:  I am asking because, Your Honor, Mr.

18 Andolina elicited testimony that BSA could not pursue the

19 Hartford settlement (indiscernible) objections over the

20 claimants.  It goes directly to the testimony elicited on

21 direct.  I am asking the witness in his careful review what

22 does he understand 3(h) to mean with regard to 3(i) in the

23 event the Hartford settlement were not incorporated into a

24 global plan.

25        MR. ANDOLINA:  Same objection.

1       THE COURT:  Mr. Desai, if you had an opinion on

2  that with respect to your decision making or an understanding

3  with respect to your decision making you can testify as to

4  your understanding.  If you didn't, you didn't.

5       THE WITNESS:  I just read the document and that was

6  the extent of what I can tell you.

7  BY MR. RUGGERI:

8  Q    Were you aware, Mr. Desai, before the Hartford

9  settlement agreement was signed that BSA had put on file a

10  second amended plan that included a global plan and a toggle

11  plan?

12  A    Yes, I was.

13  Q    Did you approve, as a member of the bankruptcy task

14  force, the NEC or the NEB, the filing of that second amended

15  plan that included both the global and a toggle plan?

16  A    Yes, I did.

17  Q    Did you understand, when you reviewed the Hartford

18  settlement agreement, Section 3(i), that Section 3(i) was a

19  reference to the toggle plan; specifically the language that

20  follows provided however in Section 3(i)?

21  A    Yes, sir.

22  Q    Did you understand that the toggle plan could be

23  confirmed over the objections of the claimants, Mr. Desai?

24       MR. ANDOLINA:  Objection to form.

25       THE COURT:  Overruled.

1      THE WITNESS:  I didn't know if it would be

2  confirmed, but I knew that it was an option, albeit not

3  optimal, but an option available to the BSA.

4  BY MR. RUGGERI:

5  Q    It was an option you understood that was "confirmable",

6  to borrow the word from BSA bankruptcy counsel?

7      MR. ANDOLINA:  Objection; calls for a legal

8  conclusion.

9      THE COURT:  Sustained.

10 BY MR. RUGGERI:

11 Q    Do you know whether BSA represented to this court that

12 the toggle plan was "confirmable"?

13 A    I believe I did hear that, yes.

14 Q    Mr. Desai, you told us a little bit about the comments

15 you heard from this court at the May 19th status conference

16 that it wasn't appealing to the court to confirm a plan

17 without creditor support.  Do you remember that testimony?

18 A    Yes, sir.

19 Q    And that was one of the things that caused you to change

20 your view, you said, of the Hartford settlement, is that

21 correct?

22 A    Yes.

23 Q    And is that one of the things that also changed the

24 bankruptcy task force to change its view of the Hartford

25 settlement?

1  A      Yes.

2  Q      So the court made those comments on May 19th and that

3  was concerning to the bankruptcy task force, right?

4           MR. ANDOLINA:  Objection to the extent he's

5  testifying on behalf of a group.  I believe he can give his

6  own response to that.

7           THE COURT:  Sustained.

8  BY MR. RUGGERI:

9  Q      There was a discussion among the bankruptcy task force

10 on what to do with the toggle plan in light of the court's

11 comments.  Isn't' that right, Mr. Desai?

12 A      Sir, I don't believe that I said that it was solely due

13 to the comments from the court.  As I indicated there was

14 significant reservations expressed by the representatives of

15 all of the claimant groups that would prevent the BSA from

16 achieving a global resolution through a confirmable plan if it

17 included the Hartford agreement.  That is what I heard

18 expressed during the May hearing in addition to some of the

19 observations made by Her Honor.  It was not because of what

20 the judge had indicated as comments to what was taking place.

21 Q      But you listened in on May 19th and you heard what the

22 court said, right?

23 A      I did hear what the court said, yes.

24 Q      And then the bankruptcy task force met six days later on

25 May 25th and talked about what to do with the toggle plan,

1  right?

2          MR. ANDOLINA:  Objection; foundation.

3  BY MR. RUGGERI:

4  Q     If you recall.

5  A     I believe we discussed many things and that would have

6  probably been part of it, yes.

7  Q     And one of the things you discussed, turning to Tab 26,

8  at the May hearing is that the plan B toggle plan will not be

9  taken off the table.  Isn't that right, sir?

10 A     Allow me a minute to take a look at that, please.

11 You're referring to Tab 26?

12 Q     Tab 26, the May 25th meeting of the bankruptcy task

13 force.  The last sentence before the adjournment,

14     "The plan B toggle will not be taken off the table."

15          MR. ANDOLINA:  I'm going to object to the extent

16 that I'm not sure that Mr. Desai is listed as an attendant to

17 this meeting.

18          THE COURT:  He can answer the question if he knows.

19 He's testified about a lot of meetings.

20          THE WITNESS:  I was on an airplane during the time

21 of this meeting so I can't speak to that, sir.

22 BY MR. RUGGERI:

23 Q     Right.  Your counsel offered this document into evidence

24 through you, but you don't doubt the accuracy of the minutes

25 entry here that the bankruptcy task force decided on May 25th

1  the plan B toggle will not be taken off the table, do you?

2  A    I don't, sir.

3  Q    And, again, that is six days after you listened in to

4  the status conference in this court -- in this case.

5  A    Okay.

6  Q    Mr. Desai, you just said that while you were listening

7  into one of the hearings you heard the claimants say they

8  oppose the Hartford settlement and that was another reason

9  that changed your view about whether to pursue the Hartford

10 settlement. Is that fair?

11 A    That is what I said, yes.

12 Q    How many hearings have you listened in on?

13 A    I believe I have listened in on two hearings.

14 Q    Were you listening on July 7th?

15 A    I can't -- as I sit here today I can't tell you the

16 other hearing I listened to, but it was not as long of a

17 hearing as the one in May.

18 Q    Have you heard any comments made by Mr. Zulchin about

19 whether he supports the restructuring support agreement?

20 A    I have not.

21 Q    Have you seen the verified statement filed by Mr.

22 Kosnoff earlier this week on whether he supports the

23 restructuring support agreement?

24 A    It's my understanding that Mr. Kosnoff doesn't support

25 the restructuring support agreement; however, I know that the

1  other two members of his group do support the restructuring

2  support agreement.

3  Q    Mr. Kosnoff repudiates their support, his words, of the

4  restructuring support agreement, doesn't he?

5  A    All I know is that Mr. Kosnoff is one of three of the

6  members of the that group does not support it; the other two

7  did.

8  Q    Mr. Kosnoff says he represents 15,103 claimants.  Do you

9  know that?

10            MR. ANDOLINA:  Objection; foundation.

11            THE COURT:  Overruled.

12            THE WITNESS:  I know that Mr. Kosnoff, along with

13  the other two members of that group, represent several

14  claimants.

15  BY MR. RUGGERI:

16  Q    And I'll help you out here, Mr. Desai, if you look to my

17  Tab 9.

18  A    I don't have that in front of me.

19  Q    We provided counsel with -- if you look, Mr. Andolina, I

20  think it was provided in connection with Mr. Mosby's

21  testimony.

22            MR. ANDOLINA:  I'm looking now.

23            THE WITNESS:  I have Tab 9.

24  BY MR. RUGGERI:

25  Q    Okay.  Have you seen the verified statement of Kosnoff

1  Law before your testimony today?

2  A    No.  I can't attest to the fact that I've seen all the

3  pleadings in this case.

4  Q    Directing your attention to Paragraph 24, Mr. Kosnoff

5  verified that his law firm represents 15,103 claimants.  Do

6  you see that?

7  A    I do.

8  Q    Then he says that of that group only 3,054 are members

9  of the coalition.  Do you see that?

10  A    I do.

11  Q    Do you know how many -- on behalf of how many claimants

12  other plaintiffs' lawyers have found objections to the

13  restructuring support agreement?

14         MR. ANDOLINA:  Objection to form, vague.

15  BY MR. RUGGERI:

16  Q    Do you know?  Do you know how many have --

17         THE COURT:  Rephrase.

18  BY MR. RUGGERI:

19  Q    Do you know how many -- let me start over.  Do you know

20  how many claimants, through their counsel, have objected to

21  the RSA?

22  A    I do not know the specific number, no.

23  Q    Is there a number of claimants that you believe

24  (indiscernible), in your view, that have to support the RSA

25  for that to continue to be, I think we said, the most viable

1  structure for BSA to emerge from bankruptcy?

2          MR. ANDOLINA:  Objection; speculation, calls for a

3  hypothetical.

4          THE COURT:  I'm going to overrule it.  You can

5  answer it if you have a view on it.

6          THE WITNESS:  All I know is that we need victim

7  support for a plan that would allow for the organization to

8  emerge from bankruptcy.

9  BY MR. RUGGERI:

10 Q    And you don't know a magic percentage or a magic number,

11 is that fair?

12 A    No, I do not aside from what I have been advised by

13 counsel.

14 Q    Let me ask you this, Mr. Desai, are you aware of what

15 counsel for Latter Day Saints said at the July 7th hearing

16 about the restructuring support agreement?

17 A    I can't specifically tell you what they said.  I do know

18 that there are some concerns that have been filed by

19 representatives of the various chartering organizations.

20 Q    Do you know that the chartered organizations said on

21 July 7th that they support the toggle plan over the

22 restructuring support agreement.  Is that something you know?

23         MR. ANDOLINA:  Objection; misstates positions in

24 defining "chartering organizations."

25         MR. RUGGERI:  Counsel for LDS.

1       MR. ANDOLINA:  Thank you.

2       THE WITNESS:  I don't know that.

3  BY MR. RUGGERI:

4  Q    Do you know whether counsel for the Methodist and

5  Catholic Local Councils support the restructuring support

6  agreement?

7       MR. ANDOLINA:  Objection.  I believe he said

8  Methodist and Catholic Local Councils.

9       MR. RUGGERI:  Charters, I'm sorry.

10      MR. ANDOLINA:  Same objection in terms of that

11  group.  Mr. Ruggeri, I think it's misleading to characterize -

12  -

13  BY MR. RUGGERI:

14  Q    (Indiscernible) how many sponsors support the

15  restructuring support agreement?

16  A    All I know is that there have been some objections filed

17  by some of our chartered partners.

18  Q    And have you seen some letters filed by your chartered

19  partners encouraging their members not to renew their

20  affiliations with Boy Scouts?

21      MR. ANDOLINA:  Objection; form.

22      THE COURT:  Overruled.

23      THE WITNESS:  I have seen one letter.

24  BY MR. RUGGERI:

25  Q    If the charters withdrawal their support for Boy Scouts

1  what happens to the membership numbers?

2              MR. ANDOLINA:  Objection; hypothetical, vague.

3              THE COURT:  Overruled.

4              THE WITNESS:  The Boy Scouts values our

5  relationship with our chartering partners and should

6  chartering partner organizations cease to support the Boy

7  Scouts of America I am sure that there would be some changes

8  in our membership.

9  BY MR. RUGGERI:

10  Q     And if there were changes in the membership they would

11  be changes to the detriment of Boy Scouts, right?  The

12  membership numbers would go down, correct?

13  A     Yes.

14  Q     And if the membership numbers go down then revenue goes

15  down, correct?

16  A     Yes.

17  Q     And in making the decision to support the entry into the

18  restructuring support agreement is that an issue that you took

19  into consideration?

20  A     Yes.

21  Q     How many sponsors are RSA parties as we sit here today?

22  A     At the present time none; however, my understanding is

23  that there are ongoing discussions taking place with the

24  chartering organizations and so I don't know what the future

25  holds.

1  Q      The present holds the answer is zero, right?

2  A      At the present time that's correct.

3  Q      Okay.  Let me ask you this, in considering whether to

4  approve entry into the RSA did you consider the deductible

5  obligations that Boy Scouts has under its primary general

6  liability policies issued after 1986?

7  A      I know that we have relied upon our counsel to give us

8  guidance and we defer to their judgment.

9  Q      So you, independent of counsel, never reviewed the

10  policies.  Is that your testimony?

11  A      That would be correct.

12  Q      Okay.  And is it fair to say that -- do you know how the

13  amount that BSA proposes to pay to the trust compared to the

14  amount of its deductible obligations if it had to pay those

15  consistent with claims that are allowed under the TDP's?

16            MR. ANDOLINA:  Objection; vague, compound.

17            MR. RUGGERI:  I can rephrase.

18            THE COURT:  Rephrase, please.

19  BY MR. RUGGERI:

20  Q      Have you seen an analysis comparing BSA's deductible

21  obligations to the payment amount it proposes to make to the

22  trust?

23  A      I know that we've had discussions about that, but have I

24  personally seen an analysis done on that, no, which is why we

25  deferred to our financial insurance and other advisors.

1   Q      How about the deductible obligations under the umbrella

2   program post 1986, have you seen an analysis of that as well?

3   A      My answer would be the same as before.

4   Q      And the answer is yes, right?

5   A      My answer is we would have deferred to our insurance

6   counsel and other advisors for that information.

7   Q      My question is a little bit different, did you defer to

8   -- I mean had they don't that analysis I think you said we

9   would have.  I am just asking is that an analysis that has

10  been done?

11  A      That would be something that you would have to ask them.

12  Q      So as you sit here today you don't know whether there's

13  been an analysis done of BSA's obligations under its

14  deductibles under its primary umbrella policy, is that fair?

15  A      That would be fair.

16          MR. RUGGERI:  Thank you, Mr. Desai, that's all I

17  have.

18          THE COURT:  Thank you.

19          MR. HALLOWELL:  Your Honor, this is Jim Hallowell,

20  AIG Companies, and I had some questions for Mr. Desai.

21                      CROSS EXAMINATION

22  BY MR. HALLOWELL:

23  Q      Mr. Desai, it's your view that whatever course is chosen

24  in this bankruptcy the scouting program must survive, correct?

25  A      The mission of the organization needs to continue, yes.

1   Q     Your view is that whatever course is chosen in this

2   bankruptcy the scouting program must survive, correct?

3             MR. ANDOLINA:  Objection; asked and answered.

4             THE COURT:  Sustained.

5   BY MR. HALLOWELL:

6   Q     Mr. Desai, could you turn to Tab 21 in your binder?

7   A     The initial binder or the Hartford binder, sir?

8   Q     The debtor's binder.

9   A     Okay.

10  Q     Mr. Desai, do you --

11  A     Pardon me, sir, Tab 21 of the BSA's binder?

12  Q     The debtor's binder.

13  A     Can you direct me to where you're talking about?

14  Q     Mr. Desai, would you please take a look at the virtual

15  meeting minutes for April 25th, 2021.  Do you see that?

16  A     Yes.

17  Q     You told the bankruptcy task force at that time that

18  whatever course is chosen the scouting program must survive,

19  correct?

20            MR. ANDOLINA:  Your Honor, I am going to object to

21  the teaching a witness with board minutes which is what I

22  think Mr. Hallowell is attempting to do here.  It says Mr.

23  Desai noted, not a direct quote.  He gave his answer and I

24  think it's totally inappropriate for Mr. Hallowell to try to

25  impeach him with board minutes.

1        THE COURT:  Sustained.

2        UNIDENTIFIED SPEAKER:  I object to the coaching,

3 Your Honor.

4        THE COURT:  Sustained.

5 BY MR. HALLOWELL:

6 Q    Mr. Desai, are these the board minutes or the bankruptcy

7 task force April 25th (indiscernible)?

8 A    Yes, they are.

9 Q    Do you recognize these documents?

10 A    I do.

11 Q    Is it a true and correct representation of what occurred

12 at that meeting?

13 A    The document, I think, indicates what occurred.

14        MR. HALLOWELL:  Your Honor, we move this document,

15 Tab 21, into evidence.

16        THE COURT:  Any objection?

17        MR. ANDOLINA:  No, Your Honor.

18        THE COURT:  Its admitted.

19     (AIG exhibit received into evidence)

20 BY MR. HALLOWELL:

21 Q    Mr. Desai, you're a licensed attorney, correct?

22 A    Yes, sir.

23 Q    You're a litigator, correct?

24 A    Yes, sir.

25 Q    Mr. Desai, you didn't have any direct involvement, did

1  you, in negotiating the amount of professional fees to be paid

2  to the coalition, did you?

3  A      No, I did not.

4  Q      You didn't have any direct plausibility in obtaining any

5  documentation in connection with that agreement, did you?

6  A      No, I did not.

7  Q      You haven't reviewed any documentation with respect to

8  the $10.5 million that the coalition has requested in

9  professional fees, have you?

10  A      We have not at this time, no.

11  Q      You haven't prepared any analysis either, have you?

12  A      I don't know if I can answer that with a yes or no, sir.

13  Q      Okay.  I will move to the next question.  You haven't

14  considered any documentation with regard to the $750,000 in

15  professional fees that the coalition is requesting on a

16  monthly basis, correct?

17          MR. ANDOLINA:  Objection; misstates the terms of

18  the RSA, I believe, but we appreciate the discount.

19          MR. HALLOWELL:  Did I say $950,000?

20          MR. ANDOLINA:  You said 750.

21          THE COURT:  Seven something.

22          MR. HALLOWELL:  Oh, okay, $950,000.

23          THE COURT:  Okay.  What is the question?

24          MR. ANDOLINA:  Could you ask Mr. Hallowell to

25  repeat the question?

1        THE COURT:  Yes, please.

2        MR. ANDOLINA:  Thank you.

3   BY MR. HALLOWELL:

4   Q    Mr. Desai, you haven't reviewed any documentation in

5   connection with the $950,000 in professional fees that the

6   coalition is requesting on a monthly basis going forward under

7   the RSA, correct?

8   A    I have not yet, no, because many of those --

9   Q    That's all.  Mr. Desai, you understand how cross

10  examination works, that answer is fine.

11  A    I was just going to --

12  Q    Mr. Desai, could you turn to Tab 27 of -- that is what

13  redirect is for, Your Honor.  Could you turn to Tab 27 of your

14  binder, please?

15  A    I wasn't finished answering your question, but I will be

16  happy to move to Tab 27.

17  Q    Thank you, Mr. Desai.

18       And, Your Honor, I'd move to strike the comment from the

19  witness about him not being finished.

20       THE COURT:  I'm not striking anything.  Go ahead,

21  next question.

22  BY MR. HALLOWELL:

23  Q    Mr. Desai, do you recognize the document that is behind

24  Tab 27?

25  A    I do.

1    Q    Okay.  And these are minutes from the national executive

2    committee special meeting that you participated in on May

3    25th, 2021, correct?

4    A    Yes.

5    Q    And at the end of those minutes it states,

6         "Upon motion unanimously approved, the committee agreed

7    to recommend that the board grant authority to settle with the

8    claimant constituencies consistent with the terms in the

9    summary of terms, provided by Brian Whittman, totaling up to

10   $250 million."

11        Correct?

12   A    Yes.

13   Q    There is nothing in that statement about an RSA,

14   correct?

15   A    The words RSA do not appear; however, the motion --

16   Q    Thank you.

17        Would you turn to --

18            THE COURT:  I'm going to --

19   BY MR. HALLOWELL:

20   Q    -- Tab 41, please.

21   A    Okay.

22   Q    Do you recognize this document?

23   A    Yes.

24   Q    This is the document that was prepared by Mr. Whittman

25   and reviewed by the national executive committee at its May

1  25th meeting, correct?

2  A     That's correct.

3  Q     Turning to Page -- well turning to the first slide it

4  states proposed BSA trust contribution, correct?

5  A     Can you point me to where you are looking at, Mr.

6  Hallowell?  Oh, are you talking about the header?

7  Q     Yes.

8  A     I apologize.

9  Q     BSA, RSA 8/22.

10 A     Thank you.  Yes, I do see that.

11 Q     It says proposed BSA trust contribution, correct?

12 A     Yes, it does.

13 Q     Everything else on that page is redacted, correct?

14 A     There are some of the things that are not redacted, but,

15 yes.

16 Q     The next page is captioned variable principal payments

17 on trust note, correct?

18 A     That is correct.

19 Q     And that page discusses the trust note, doesn't it?

20 A     Yes.

21 Q     The next page is sources at emergence, correct?

22 A     Yes.

23 Q     And this relates to sources and uses for BSA national

24 upon emergence from bankruptcy, correct?

25 A     Yes.

1  Q    There is a reference to coalition professional fees

2  among those uses, correct?

3  A    Yes.

4  Q    And there's a footnote one to that which is entirely

5  redacted, correct?

6  A    Yes.

7  Q    The coalition professional fees are listed at this time

8  as TBE, correct?

9  A    That is what the document says, yes.

10  Q    Okay.  Turning to the next page, that page reflects

11  ongoing settlement obligations and projected liquidity,

12  correct?

13  A    Yes.

14  Q    There is no discussion in this presentation of trust

15  distribution procedures, correct?

16  A    As the actual text on the pages you just read to me

17  appear, yes, that is correct?

18  Q    And there is no discussion in this presentation about

19  findings and quarters required to be entered by the bankruptcy

20  court, correct?

21  A    Correct.

22  Q    I'd like to turn your attention to Tab 28 -- oh, I'm

23  sorry, Your Honor, this may have happened already, but if it

24  hasn't happened I would like to move Tab 41 into evidence.

25            THE COURT:  Is there any objection?

1          (No verbal response)

2                THE COURT:  I hear none.  It's admitted.

3          (AIG exhibit received into evidence)

4    BY MR. HALLOWELL:

5    Q    Mr. Desai, Tab 28 are the minutes of the national

6    executive board May 26th, 2021, correct?

7    A    Yes, sir.

8    Q    And you attended that meeting, correct?

9    A    I did.

10   Q    Turn to the last page, please.

11               UNIDENTIFIED SPEAKER:  I'm sorry, Mr. Hallowell,

12   what tab is that, please?

13               MR. HALLOWELL:  It is the debtor's binder Tab 28

14   and it's the May 26th national executive board minutes.

15   BY MR. HALLOWELL:

16   Q    Here, Mr. Desai, the minutes state upon motion

17   unanimously approved (indiscernible) the board approved the

18   $250 million proposal including the additional $80 million

19   note to the victims trust.  Do you see that?

20   A    Yes, sir.

21   Q    And there is no discussion on that page of an RSA,

22   correct?

23   A    Again, the term "RSA" does not appear; however, the

24   settlement or the motion that was approved dealt with terms

25   that were contained within the proposed term sheet for the

1  RSA.

2  Q     None of what you have just stated is recorded in these

3  minutes, correct?

4  A     The -- that's correct.

5  Q     Would you turn to Tab 30, please?

6          MR. ANDOLINA:  Your Honor, my understanding is that

7  the board minutes that Mr. Hallowell just referenced are

8  already admitted in evidence and that the only outstanding

9  issues are with respect to minutes that -- meetings where Mr.

10  Desai may have not participated.

11          THE COURT:  That's correct.

12          MR. HALLOWELL:  I agree with that, but it is also

13  my understanding that that is something that we're going to

14  resolve offline, right, Your Honor?

15          THE COURT:  Yes.

16  BY MR. HALLOWELL:

17  Q     Mr. Desai, I'm referring you to the special national

18  executive board minutes June 5th, 2021.  Do you see that?

19  A     Yes, sir.

20  Q     You attended that meeting, didn't you?

21  A     I did.

22  Q     Could you look at Page 2 of those minutes?  At the very

23  bottom those minutes state the chartered organization issue

24  has yet to be a focal point in the mediation.  Do you see

25  that?

1  A     Yes.

2  Q     And that is, in fact, something that was said in this

3  meeting, correct?

4  A     I don't know if those exact words were used, but that is

5  a summary of what was said.

6  Q     And that was -- and you remember that, right?

7  A     I know that they did discuss the chartered organization

8  piece on many instances including at this meeting.

9  Q     And, in fact, at that meeting you discussed the fact

10  that the chartered organizations issue has yet to be a focal

11  point, right?

12  A     We understood that the chartered partners had not been

13  engaged in active mediations at that point in time.

14  Q     I'm sorry, let me just unpack that a little bit.  So the

15  answer to my question is you did understand at this meeting

16  that the chartered organization issue has yet to be a focal

17  point in the mediation, correct?

18  A     That is what the minutes reflect as a summary of the

19  conversation, yes.

20  Q     Okay.  And you do understand that the minutes would

21  accurately reflect the summary of the conversation that was

22  had at (indiscernible)?

23  A     The minutes are a summary of what took place, yes.

24  Q     An accurate summary, correct?

25  A     Yes.

1  Q     You're not disagreeing with the minutes?

2  A     No.

3  Q     You seem to be suggesting were the chartered

4  organizations not a focal point in the mediation because they

5  weren't willing to participate or for some other reason?

6          MR. ANDOLINA:  Objection; misstates testimony,

7  argumentative.

8          THE COURT:  Would you phrase the question.

9          MR. HALLOWELL:  I'll withdraw.

10 BY MR. HALLOWELL:

11 Q     Mr. Desai, turn to the last page of these minutes.

12 A     Okay.

13 Q     Now, these minutes also state:

14          "Upon motion, unanimously approved without any

15 abstentions, the Board voted to approve the proposed

16 settlement package estimated at 250 million, including the

17 additional (indiscernible) note for the Victims Trust."

18     Do you see that?

19 A     Yes, sir.

20 Q     And you'll agree with me that there is nothing recorded

21 in these minutes about an RSA?

22 A     I agree that the term RSA does not appear, but I defer

23 to my prior answer on that question.

24 Q     Would you turn to tab 42, please.

25 A     Okay.

1  Q      This is a presentation from Alvarez & Marsal dated

2  June 5th, 2021, correct?

3  A      Yes, sir.

4  Q      Okay.  And this was a presentation that was made by

5  Alvarez & Marsal at the June 5th meeting, correct?

6  A      Yes.

7  Q      Now, I just want to check one thing.  Now, there were

8  two June 5th meetings.  There was a meeting of the Executive

9  Committee and Bankruptcy Task Force and that was followed by a

10 meeting of the Executive Board.

11 Would you agree with me on that?

12 A      Yes, sir.

13 Q      Do you know if this presentation was made at both

14 meetings or only at one?

15 A      I know that the presentation was certainly made to the

16 NEC, BTF and while I can't guarantee 100 percent that the

17 entirety of the presentation was given to the Board, I can

18 tell you that based on just recollection of prior meetings and

19 presentations, that a summary format could have been given at

20 the National Executive Board meeting by Mr. Whittman.

21 Q      Understood.

22        Now, Mr. Desai, I'm willing to go page by page with you

23 through tab 42, but I'll start by asking, would you agree with

24 me that tab 42 is directed solely to the financial aspects of

25 any settlement and has no reference to the TDPs or findings

1  and orders or other items?

2  A    I would agree that the presentation gives the financial

3  aspects of the proposed deals.

4  Q    Okay.  I'd like for you to turn to tab 32, please.

5         MR. HALLOWELL:  Oh, by the way, Your Honor, I'd

6  offer tab 42 into evidence.

7         THE COURT:  Any objection?

8         MR. ANDOLINA:  No objection, Your Honor.

9         THE COURT:  I hear none.

10        It's admitted, if it wasn't before.

11     (AIG Exhibit Tab 42 received into evidence)

12        THE COURT:  And I'm sorry, now Mr. Hallowell, what

13  tab are we on?

14        MR. HALLOWELL:  I'm sorry.  Tab 32, tab three two.

15        THE COURT:  Okay.  Thank you.

16  BY MR. HALLOWELL:

17  Q    These are the minutes of the June 13th Bankruptcy Task

18  Force meeting, correct, Mr. Desai?

19  A    Yes, sir.

20  Q    And this meeting dealt, at least according to the

21  minutes from what we could tell, almost entirely with regard

22  to the one-hundred-million-dollar note, right?

23  A    A good part of this meeting did deal with the BTF and

24  there were other matters that were discussed at the meeting.

25  Q    But you'll agree with me that the meeting was dominated

1  by the DST note, correct?

2          MR. ANDOLINA:  Objection to the characterization.

3          THE COURT:  Overruled.

4          THE WITNESS:  I think I just answered the question,

5  but I would agree that the conversation that was had at the

6  meeting did pertain to the DST note, amongst other things that

7  are reflected in the minutes.

8  BY MR. HALLOWELL:

9  Q    Do you believe that discussion of the DST note was more

10  than a majority of the time spent?

11  A    Yes, the conversation about the DST did take up a good

12  portion of the meeting.

13  Q    And Mr. Whittman testified yesterday about what he

14  called an interplay between the DST note and the pension plan

15  that provides the retirement for retired employees of the

16  local councils (indiscernible).

17          Do you have an understanding of what that interplay is?

18  A    My understanding of the one-hundred-million-dollar note

19  was that it would be funded on contributions received from

20  local council employee payrolls, such that depending on the

21  viability of the pension fund and its funding obligations, the

22  amount being set aside in this DST would be used to offset the

23  gap between the 500 million and 600 million required for local

24  councils to be able to extricate themselves and benefit from a

25  channeling injunction, should a global resolution be achieved.

1  Q     So, I just want to try to understand that a little

2  better.  So, the DST note is a non-recourse note, correct?

3  A     Yes.

4  Q     And what's happening in the DST note is that payments

5  might be made from someplace in the DST, the Delaware

6  Statutory Trust, to the Victims Trust, correct?

7              MR. ANDOLINA:  Object to the -- sorry.

8  BY MR. HALLOWELL:

9  Q     And any of those payments are going to be payments that

10  come from the pension plan and no other place, right?

11  A     I don't understand your question when you mean that

12  payments are coming from the pension plan.

13  Q     If any amounts are paid by this note to the Victims

14  Trust over time, those amounts will come solely from the

15  pension plan that protects the retirements of local council

16  and BSA national employees, correct?

17  A     My understanding is that local councils, through their

18  contribution amounts, will be deferring a percentage of the

19  amounts withheld from payroll to be placed into this Delaware

20  Statutory Trust, such that if the BSA's pension obligations

21  are deemed appropriate and satisfactory by our pension

22  advisors and that the pension is not underfunded, any surplus

23  of the pension would then allow for the funds sitting in the

24  DST to be utilized to pay off the one-hundred-million-dollar

25  note, which would go to the Victims Trust.

1  Q     Okay.  So, where does the money come from that goes into

2  the DST?

3  A     That would be coming from local councils through their

4  contribution amounts towards the pension.

5  Q     The payroll -- so, the local councils will take monies

6  that they otherwise would have put into the pension plan and

7  put it in the DST and then that might go to the Victims Trust,

8  correct?

9  A     That's correct.

10 Q     But it might not, right?  There might not be sufficient

11 funding and then in that case, the Victims Trust would not

12 receive payment, correct?

13 A     That is correct.  That was the agreement reached between

14 the parties of the RSA, yes.

15 Q     And this is a pretty complicated thing, right?

16 A     I'd agree that everything in this case has been

17 complicated.

18 Q     This, especially, is complicated, right, this DST note?

19 A     I don't quite understand what your question is about the

20 note, though.

21 Q     I'm just asking if the DST note is complicated.  Is it?

22          MR. ANDOLINA:  Objection; asked and answered.

23          THE WITNESS:  I think the --

24          THE COURT:  Sustained.

25          THE WITNESS:  -- terms of the note speak for

1  themselves and they are what they are.

2  BY MR. HALLOWELL:

3  Q    Would you turn to tab 43 in your binder, please, Mr.

4  Desai.

5  A    Yes, sir.

6  Q    This is the presentation that was made by Alvarez &

7  Marsal at the June 13th meeting, right?

8  A    Yes.

9  Q    And it's titled, "Local Council Trust Contribution

10 Considerations for Discussion With BTF."

11      Do you see that?

12 A    I do.

13 Q    And there's a slide on the first page that provides the

14 local council contribution status, right?

15 A    Yes.

16 Q    That's part of the discussion of where the negotiations

17 were with claimant entities at this point in time, right?

18           MR. ANDOLINA:  Objection.

19           THE WITNESS:  Yes.

20           THE COURT:  What's the objection?

21 BY MR. HALLOWELL:

22 Q    And, in fact, it focuses on the local council

23 contribution, not observe any other aspect of any agreement

24 with the claimants, correct?

25 A    My understanding is that the DST is in place to assist

1  with the local council funding obligations under the terms of

2  the RSA.

3  Q    Okay.  Mr. Desai, my question was just a little simpler.

4       It was, this page of the presentation focuses solely on

5  the local council financial contribution as part of any

6  settlement with the claimants and not on any outcome, correct?

7  A    Yes.

8  Q    Okay.  Now, the next page deals with the DST note,

9  right?

10 A    Yes.

11 Q    And we can go through it, but the next 10 pages of this

12 presentation all deal with the DST note, correct?

13 A    It goes through an analysis of the viability of entering

14 into the DST note.  That would be correct.

15 Q    Okay.  And is this analysis complicated or is it

16 something that you could just summarize for us in two

17 sentences or so?

18 A    I'm not that smart, so I would agree that there were

19 some challenges in understanding this, yes.

20 Q    Yeah, and this is what the BTF talked about at the

21 June 13th meeting, correct?

22 A    Yes.

23          MR. HALLOWELL:  Your Honor, I'd move tab 43 into

24 evidence.

25          THE COURT:  Any objections?

1      (No verbal response)

2            THE COURT:  I hear none.

3            It's admitted.

4      (AIG Exhibit Tab 43 received into evidence)

5    BY MR. HALLOWELL:

6    Q    Mr. Desai, do you believe that the BSA National

7    Executive Committee approved the RSA at its meeting on

8    June 22nd, 2021?

9    A    Can I take a look at the documents from that meeting,

10   please?

11   Q    No, I'm just asking you if you remember whether or not

12   the BSA National Executive Committee approved the RSA at its

13   meeting on June 22nd, 2021?

14           MR. ANDOLINA:  I think he's asking to look at the

15   Board minutes so he can have an informed decision, Your Honor.

16   Can we allow him to do that?

17           MR. HALLOWELL:  But before he looks at it, I'm

18   entitled to know whether or not he remembers --

19           THE COURT:  Sustained.  Sustained.

20           MR. HALLOWELL:  -- before he looks at something.

21   BY MR. HALLOWELL:

22   Q    The Board minutes, Mr. Desai, are behind tab 34.

23   A    Mr. Hallowell, what date are they?

24   Q    June 22nd.

25   A    Okay.  I've read them.

1  Q    Okay.  Do you believe that the BSA National Executive
2  Committee approved the RSA at its meeting on June 22nd, 2021?
3  A    No, at this point in time, the terms of the RSA were
4  still under negotiation.
5  Q    Mr. Desai, I want to ask you a couple of questions about
6  (audio interference) declaration.  Let me know when you have
7  that.
8  A    I have that.
9  Q    In your declaration, you discussed among other things,
10  your decision to resign from the South Florida Council,
11  effective June 1st, 2020, correct?
12  A    Yes.
13  Q    In your resignation letter, you reassured the South
14  Florida Council that you were hopeful that after your service
15  on the BSA Executive Committee concludes, you'll be able to
16  rejoin the Council Board, correct?
17  A    Can you point to a specific document, Mr. Hallowell.
18  Q    Sure.  Exhibit D to his declaration.
19  A    Yes, I wrote to my (indiscernible) executive that once I
20  concluded my service, I would like to be able to rejoin the
21  Board.
22  Q    So, after you concluded your service on the BSA Boards
23  that you currently serve on, which are the National Executive
24  Committee, National Executive Board, and the Bankruptcy Task
25  Force, you let him know that you wanted to rejoin the Board of

1  the South Florida Council, correct?

2         MR. ANDOLINA:  Objection.  I think the predicate of

3  that question was misstated.  If you could read it back,

4  you're suggesting, I believe, Mr. Hallowell, that the

5  communication took place after Mr. Desai served on the

6  National Board.

7         MR. HALLOWELL:  No, not at all.  I'm just asking --

8         THE COURT:  Overruled.

9         You can respond.

10        THE WITNESS:  I indicated in my email on May 26th

11 that once my service as a member of the BSA Executive

12 Committee concluded, that I was hopeful that I would be able

13 to rejoin the Council Board.

14 BY MR. HALLOWELL:

15 Q    You also told him that you will continue to be a

16 committed member of the South Florida Council, correct?

17 A    That is what I wrote; that's correct.

18 Q    Mr. Desai, are you familiar with the charter and bylaws

19 of the Boy Scouts of America that I have here?

20 A    I can't see what you're holding up, sir.

21 Q    The Court received them today.  I'm referring to what we

22 received today as amended through May 2021.  So, they're not

23 in a binder.

24 A    I do have them here, yes.

25 Q    You do?

1  A     Yes.

2  Q     Are you familiar with these files?

3  A     Yes.

4  Q     Are these in fact, the chartering bylaws of the Boy

5  Scouts of America?

6  A     They are.

7  Q     This says that they're, as amended through May 2021, do

8  you see that?

9  A     Yes.

10  Q     Have there been any further amendments to the bylaws

11  that you're aware of?

12  A     No.

13          MR. HALLOWELL:  Your Honor, at this time, I'd move

14  these bylaws into evidence.

15          THE COURT:  Is there any objection?

16      (No verbal response)

17          THE COURT:  I hear none.

18          They're admitted, and it is this redline, correct?

19          MR. HALLOWELL:  Correct.

20      (AIG Exhibit Boy Scout bylaws received into evidence)

21  BY MR. HALLOWELL:

22  Q     I'm just curious, Mr. Desai, have you seen this version

23  of the bylaws before?

24  A     Yes, I have.

25  Q     When?

1  A      I would have seen them prior to, obviously, adopting

2  them and I would have seen them in my capacity as the member

3  of the NEC at the time that the proposed changes were being

4  suggested.

5  Q      Okay.  There is a provision, Mr. Desai, to these bylaws

6  that permits the Boards to vote (audio interference)?

7  A      Pardon.  I only heard, "Permit the Board to vote by."

8  Q      Email.

9  A      There is a reference to those kinds of communications

10 under Section 5, which is on page 9 of the bylaws.  There's a

11 reference to meetings taking place, telecommunication meetings

12 at Section 6.

13 Q      Is there anything else?

14 A      No, sir.

15 Q      Okay.  Section 5, electronic communications, does state

16 that the parties can rely upon electronic communications,

17 records, and signatures or notices, waivers, consents,

18 undertakings, and other documents, but it doesn't say anything

19 about votes, correct?

20 A      No, the word "vote" does not appear there.

21 Q      Turning to Section 6 on telecommunication meetings, this

22 section states that the Executive Board or any committee or

23 subcommittee thereof may meet by telecommunication, correct?

24 A      Yes.

25 Q      It doesn't say anything about meeting by email or voting

1  by email, correct?

2  A    It does not expressly state it; is that correct?

3  Q    Okay.  There's nothing in bylaws anywhere that permit

4  any of the BSA Boards to act by unanimous or (indiscernible),

5  right?

6              MR. ANDOLINA:  Objection to "act."

7              THE COURT:  Overruled.

8              THE WITNESS:  That specific statement is not

9  addressed, that's correct.

10  BY MR. HALLOWELL:

11  Q    Have you ever discussed with anyone at the BSA whether

12  it is appropriate for the BSA Boards to vote by email?

13              THE COURT:  I didn't hear the last part of that

14  question.

15  BY MR. HALLOWELL:

16  Q    Have you ever discussed with anyone at the BSA whether

17  it is appropriate for any of the BSA Boards to vote by email?

18  A    I personally, have not discussed that.

19              MR. HALLOWELL:  I'm getting some background noise,

20  Your Honor.

21  BY MR. HALLOWELL:

22  Q    Mr. Desai, could you turn to Exhibit G of your

23  declaration.

24  A    Okay.

25  Q    Exhibit G is an email string that you're involved in,

1  correct?

2          THE COURT:  Excuse me, will everyone please make

3  sure they're muted.

4          THE WITNESS:  Yes, it is.

5  BY MR. HALLOWELL:

6  Q    Okay.  And it's an email string in which the BSA

7  National Executive Committee purports to vote by email,

8  correct?

9  A    Yes.

10 Q    And if you turn to the bottom, it says:

11         "Please reply by email with a 'yes' to approve the

12 bridge note, as per the terms set forth above and 'no' if you

13 do not want to approve it without a meeting of the NEC."

14      Do you see that?

15 A    I see that.

16 Q    And that's what was voted on in this email vote,

17 correct?

18 A    In this specific email vote, yes.

19 Q    And your understanding that you testified to earlier

20 with Mr. Andolina is that everybody on the NEC agreed and this

21 thing passed, right?

22 A    That's correct.

23 Q    And you'll agree with me that that's not reflected in

24 anything in Exhibit G, correct?

25 A    The vote tally is not reflected in Exhibit G; however,

1  knowing that we didn't have an NEC meeting to discuss this

2  motion and/or the fact that the RSA was entered into by our

3  chief (indiscernible) executive, the motion passed.

4  Q    Well, knowing those things, it's your assumption that

5  the motion passed, right?

6  A    Again, I have not seen the vote tallies, but I know that

7  the agreement was entered into and I also know that we did not

8  have a NEC meeting to discuss the terms of the note because no

9  one lodged any (indiscernible) objection to it from the NEC.

10 Q    And you have never seen the vote tally from this vote,

11 correct, Mr. Desai?

12 A    No, I did not.

13 Q    And, in fact, what was voted on was the bridge note, as

14 per the terms set forth above, correct?

15 A    In this email, that is what was asked of us to vote on,

16 yes.

17 Q    And you'll agree with me that there is nothing in which

18 you are asked to vote on in this email that says anything

19 about RSA, correct?

20 A    No, because the deal points that pertain to the RSA had

21 already been approved based upon the authority provided by the

22 NEB on June 5.

23 Q    Okay.  Well, let's go back to June 5.  We talked about

24 that earlier.  You're referring to the National Executive

25 Board minutes on June 5?

1  A     Yes, sir.

2  Q     And the only thing that is stated in the June 5 minutes

3  of the National Executive Board --

4         MR. HALLOWELL:  And so everybody has it, I'm at tab

5  30, the last page.

6  BY MR. HALLOWELL:

7  Q     "Upon motions unanimously approved without any

8  abstentions, the Board voted to approve the proposed

9  settlement package estimated at $250 million, including the

10 additional $80 million note of the Victims Trust."

11        Do you see that?

12 A     Yes.

13 Q     There's no other approvals there, correct?

14 A     That's correct.

15 Q     Now, Mr. Desai, you've mentioned a couple of times that

16 you've attended by voice, the May 19th hearing that was

17 conducted by the Court, right?

18 A     I attended the hearings in an audible fashion, that's

19 correct.

20 Q     Okay.  And you also testified that there were a number

21 of statements at that hearing that made an impression upon

22 you, correct?

23 A     Yes, sir.

24 Q     And one of those statements was the statement by the

25 lawyer for the TCC that the toggle plan equals a debt trap,

1  correct?

2         MR. ANDOLINA:  I object.  It misstates prior

3  testimony.

4         THE COURT:  Sustained.

5  BY MR. HALLOWELL:

6  Q    Mr. Desai, did you have a copy of your handwritten notes

7  that have been produced in this matter?

8         MR. HALLOWELL:  Your Honor, these are in the binder

9  that was provided by Century and AIG and they are -- it's a

10 little bit of a complicated binder, but it's Section 3, Tab A.

11      (Pause)

12         MR. ANDOLINA:  Just one moment, Your Honor.  I'm

13 giving Mr. Desai a copy of these.

14         THE COURT:  Okay.

15      (Pause)

16         THE WITNESS:  Okay.  I am looking at my handwritten

17 notes.

18         MR. HALLOWELL:  Your Honor, do you have them?

19         THE COURT:  I do.

20 BY MR. HALLOWELL:

21 Q    Okay.  Mr. Desai, would you turn to BSA RSA 2066.

22 A    Okay.

23 Q    That's a page that's captioned, "Bankruptcy hearing

24 5/19/2021," correct?

25 A    Yes.

1  Q     These are your notes from your listening in audibly to

2  that bankruptcy hearing, correct?

3  A     Yes.

4  Q     Turn to the next page, please.  About an inch and a half

5  down there's a line that says, "TCC" and it's underlined.

6        Do you see that?

7  A     Yes.

8  Q     And then the next line down says, "Toggle equals debt

9  trap."

10       Do you see that?

11 A     Yes.

12 Q     You wrote that, right?

13 A     Yes.

14          MR. HALLOWELL:  Your Honor, at this time, we would

15 move Mr. Desai's handwritten notes into evidence.

16          THE COURT:  Is there an objection?

17          I hear --

18          MR. ANDOLINA:  I apologize, Your Honor.

19          Are they seeking to enter the entirety of the notes

20 into evidence?

21          MR. HALLOWELL:  Yes.

22          THE COURT:  I believe that was the request.

23          MR. ANDOLINA:  No objection.

24          THE COURT:  They're admitted.

25        (AIG Exhibit Handwritten notes received into evidence)

1  BY MR. HALLOWELL:

2  Q    Mr. Desai, these notes are notes that you have taken in

3  connection with your service on the Boards of the BSA,

4  correct?

5  A    That would be correct.

6  Q    Okay.  And there's notes about meetings that you

7  attended, corrections that you had, issues that you dealt

8  with; is that fair?

9  A    Yes.

10  Q    And the first note is on the first page, page 2044, is

11  March 7th, 2021, correct?

12  A    Yes.

13  Q    And it goes all the way up, if you turn to the

14  second-to-last page, it goes all the way to June 22nd, 2021.

15       Do you see that?

16  A    I do.

17  Q    Mr. Desai, in all of these notes, is there any mention,

18  even once, (audio interference)?

19  A    In the documents I'm looking at, that phrase does not

20  appear.

21  Q    Thank you, Mr. Desai.

22       MR. HALLOWELL:  I have no further questions, Your

23  Honor.

24       MR. ANDOLINA:  Your Honor, might this be an

25  appropriate time for a very short break?

 1             THE COURT:  Yes.  It's 3:52.  Let's come back at

 2  four o'clock.

 3             We're in recess.

 4        (Recess taken at 3:52 p.m.)

 5        (Proceedings resumed at 4:01 p.m.)

 6             MR. SCHIAVONI:  Your Honor, I think I'm up next.

 7  It's Tanc Schiavoni.  Oh, there is video live.  Sorry, it was

 8  saying the host had to activate it.

 9             THE COURT:  Okay.  Mr. Schiavoni?

10                     CROSS-EXAMINATION

11  BY MR. SCHIAVONI:

12  Q    Hello, Mr. Desai.  Thank you for joining us today.

13  Mr. Desai, can you tell us what's your understanding of what

14  the role is that the TDP plays in the bankruptcy plan.

15  A    (No verbal response.)

16  Q    I'm sorry, Mr. Desai.  You're on mute.

17  A    Yes, I'm here now, Mr. Schiavoni.

18  Q    Okay.  Let me just ask the question again.

19        Mr. Desai, can you tell us what your understanding is as

20  to what role the TDP plays in the bankruptcy plan.

21  A    Yes, sir.

22        I had initially said, "Good afternoon" to you when you

23  couldn't hear me, but my understanding of the trust

24  distribution procedures, as we now call them "TDPs," is that

25  they are a set of guidelines by which the trustee will be able

1  to work through all of the various claims that have been

2  submitted in an effort to allocate a settlement value to those

3  claims in order to allocate the funds that are available as

4  part of the settlement Victims Trust.

5       My understanding of the TDPs is also that parties will

6  have an opportunity to provide their input and comments and

7  it's up to the Court's discretion in order to enter into TDPs

8  that the Court feels are appropriate.

9  Q    And so, the TDP isn't a binding term, like the TDP

10 doesn't propose -- it's not a binding term of the RSA?

11           MR. ANDOLINA:  Objection; calls for a legal

12 conclusion.

13           THE COURT:  Sustained.

14 BY MR. SCHIAVONI:

15 Q    Well, let me ask you, did you know, in approving the or

16 in reviewing the documents here, did you believe that the TDP

17 was not part of the agreement for the RSA?

18           MR. ANDOLINA:  Objection; vague.

19           THE COURT:  Overruled.

20           THE WITNESS:  I understood that the TDPs were a

21 component of the overall RSA agreement package, however you

22 want to phrase it, and that it served as an exhibit to the RSA

23 motion, which was to be approved by the Court at a later date.

24 BY MR. SCHIAVONI:

25 Q    Not today, or not as part of this hearing?

1  A      That is my understanding, that the TDPs would be

2  agreed-upon or discussed at a later date.

3  Q      Okay.  So, Mr. Desai, let me just ask you about the TDP,

4  itself.  Depending upon how they're written, is it fair to say

5  that either a lot of claims would be allowed at a high value

6  or a lesser amount of claims at a lower value, that there

7  could be a range of values, depending upon how they're

8  drafted?

9           MR. ANDOLINA:  Objection; form, hypothetical,

10 foundation.

11          THE COURT:  Sustained.

12 BY MR. SCHIAVONI:

13 Q      Okay.  Let me put it this way, you characterized the

14 TDPs as setting a settlement value; is that right, Mr. Desai?

15          MR. ANDOLINA:  Objection.  I think that misstates

16 testimony.

17 BY MR. SCHIAVONI:

18 Q      That's why I asked him, sir.

19      Is that right, in your mind, do the TDPs set the

20 settlement values?

21 A      My understanding of the TDPs is that they do contain

22 guidelines or suggested ranges for certain types of abuse

23 allegations and what the trustee, in making a determination,

24 could do.

25 Q      Mr. Hallowell walked you through at great length,

1  various Board minutes that provided authorizations for

2  settlement amounts.

3       Do you remember the line of those questions?

4  A    Yes, sir.

5  Q    Okay.  And one of them, the June 5 meeting, and I can

6  show it to you, if you want, it's the one that says that the

7  Board voted to approve the preferred settlement package

8  estimated at $250 million, including $80 million

9  (indiscernible) to the Victims Trust.

10      Do you remember that being reflected in that June 5

11 meeting?

12 A    Yes, sir.

13 Q    Okay.  And, sir, is any element of that $250 million and

14 $80 million that the Board is approving, associated with what

15 is going to be approved under the TDPs or not?

16           MR. ANDOLINA:  Objection; form, vague.

17           THE COURT:  I'm going to sustain that.

18           Can you rephrase it.

19           MR. SCHIAVONI:  Sure.

20 BY MR. SCHIAVONI:

21 Q    Mr. Desai, did you understand, as a Board member, in

22 voting here to approve 250 and 80, okay, on June 5th, that

23 that was, in essence, the cap of the financial contribution

24 that the Boy Scouts would be making to the trust?

25 A    That was the amount that the BSA was considering, yes.

1  Q     Okay.  And you understood at that point that regardless

2  of how many claims the settlement trust approved or didn't

3  approve or what value they assigned on them, the Boy Scouts'

4  economic exposure would be capped at that 250 plus

5  eighty-million-dollar note, right?

6           MR. ANDOLINA:  Objection, to the extent that it

7  calls for a legal conclusion, defining economics exposure.

8           THE COURT:  I'm going to overrule that.

9           You can answer.

10           THE WITNESS:  The contribution by the BSA for the

11  settlement trust, yes, was capped at that dollar amount, but

12  the BSA had other obligations under the terms of the RSA,

13  which also had some monetary pieces to it, such as the payment

14  of the coalition's attorney's fees (indiscernible).

15  BY MR. SCHIAVONI:

16  Q     Yeah, I want to come back to those attorneys' fees,

17  okay, but my point is just simply that you knew, as a Board

18  member, when you were presented and asked to vote on the 250

19  million and the eighty-million-dollar note, that no matter

20  what happened afterwards, with regard to the TDPs, how they

21  were applied by the trust, that's all the Boy Scouts would be

22  economically on the hook for, right?

23  A     Yes.

24  Q     Okay.  And is it fair to say that after June 5, and

25  after the vote on June 5, those TDPs, they continued to be

1  worked on; is that right?

2  A    Yes, sir.

3  Q    Okay.  Now, let me just ask you a few questions about

4  the boards.  I'm all confused about it.  There's so many of

5  these different Boards, okay.  If you could just help me out a

6  little bit.

7       It's like the main Board is the National Council; is

8  that right?

9            MR. ANDOLINA:  Objection.

10            THE COURT:  Overruled.

11            THE WITNESS:  Yeah the -- sorry, Judge -- the main

12  Board, as you've described it, sir, is called the National

13  Executive Board, and the National Executive Board -- sorry --

14  the National Executive Board is comprised of a total of 72

15  members, some of whom happen to be National Council

16  representatives or members at large, and the 64 other members

17  are true National Executive Board members who are elected to

18  the Board on an annual basis.

19  BY MR. SCHIAVONI:

20  Q    Okay.  Look, I told you that I was confused and now I'm

21  bearing that out.  So, I think the starting point for me in

22  understanding this is, what is the National Council?

23  A    The National Council is the entirety of the Boy Scouts

24  of America.

25  Q    Well, it's not every member of the Boy Scouts, right;

1  it's a subgroup of that, right?

2  A     The National Council would be the very members, either

3  by virtue of their position on the local level or because of

4  their position on the national level, that comprise the

5  National Council, yes.

6  Q     Okay.  I've got it.

7         So, the National Council, its members select the

8  Executive Board's members; is that right?

9  A     Yes.

10  Q     Okay.  And do the bylaws set out how someone is made a

11  member of the National Council?

12  A     Yes.

13  Q     Okay.  And is it fair to say that Article 2 of the --

14  no, it's not Article 2 -- it's Article 6 of the bylaws

15  provides specifically for multiple council representation on

16  the National Council?

17             MR. ANDOLINA:  Can you direct Mr. Desai to the

18  provision in the bylaws you're referring to, Mr. Schiavoni.

19  BY MR. SCHIAVONI:

20  Q     I'm happy for him to look, but do you know off --

21  without having to look?

22  A     I would rather refer to the document, sir.

23  Q     Okay.  That's fine.

24  A     Can you please --

25  Q     Yeah, I think it's Clause 6 of the bylaws?

1    A     Clause 6, Article 2?

2    Q     Yes.

3    A     Article 2 -- I'm sorry, Section 2 --

4    Q     Clause 6.

5    A     -- Clause 6, members at large?

6    Q     I have that Article 2, Section 2, Clause 6 provides for

7    local council representation on the Board -- on the National

8    Council; is that right?

9    A     Well, sir, I'm looking at the May 2021 bylaws that are

10   currently in effect.

11         Are you looking at something different?

12   Q     Why don't we pull them up on the screen.  I'll have my

13   colleague bring them up.

14         (Pause)

15             THE COURT:  It's now Clause 5.  Is that what you're

16   looking at, Mr. Schiavoni?

17             MR. SCHIAVONI:  Clause 5, yes.

18             THE WITNESS:  Okay.  I'm with you.

19   BY MR. SCHIAVONI:

20   Q     And do the bylaws for the Boy Scouts provide that

21   specifically for the National Council, they have

22   representation of the local councils on it?

23   A     Yes, members of the National Council do consist of a

24   dually elected local council president, as well as a council

25   commissioner, and, in addition, it goes on.  But based upon a

1  certain council's membership status, you're entitled to maybe

2  additional members.

3  Q     All right.  So, for each of the 250-plus local councils,

4  each of them get, well, their president gets to be a member,

5  as well as the commissioner of the local council, right?

6  A     Yes, that's what the bylaws indicate.

7  Q     And in addition to that, they get purported

8  representation in the local councils so that for every 5,000

9  members they have, (indiscernible) members, they get another

10 member on the National Council, right?

11 A     Yes.

12 Q     Okay.  Do the charters have any designated

13 representation under the bylaws on the Board, on the National

14 Council, rather?

15 A     No.

16 Q     Okay.  So, the National Council, then, appoints the

17 Executive Board, right?

18           MR. ANDOLINA:  Objection to the term "appoints."

19           MR. SCHIAVONI:  I mean, look, the gentleman

20 submitted a whole affidavit of explaining how the Boards work,

21 so --

22           THE COURT:  Yeah, overruled.

23           He can answer.  It's yes or -- they do or they

24 don't.

25           THE WITNESS:  I would disagree with the use of the

1  word "appoints."

2          The National Council elects members of the National

3  Executive Board at its annual meeting every May.

4  BY MR. SCHIAVONI:

5  Q    Okay.  Terrific.

6          And then, the National Executive Board, it's like that

7  Board, the Executive Board then appoints the Executive

8  Committee; is that right?

9  A    So, the National Executive Committee starts off with

10  one, you have to be a member of the National Executive Board,

11  however, you are asked to or nominated to serve on the

12  National Executive Committee by the national chair.  The

13  national chair puts out the slate of who the proposed members

14  of the NEC would be in advance of the May meeting and the

15  National Council votes on the proposed slate of NEC members at

16  that May meeting, which is also the same time that they can

17  vote on members of the NEB.

18  Q    Okay.  That's helpful.

19          So, then the National Executive Committee, it has 12

20  members; is that right?

21  A    Yes, sir.

22  Q    Okay.  And can you identify any of the 12 members on the

23  National Executive Committee that didn't either currently or

24  previously hold positions as either officers or directors or

25  members of their local councils?

1          MR. ANDOLINA:  Objection.  I understand officers

2   and directors.  I'm not sure I understand --

3          MR. SCHIAVONI:  Stick to the objection form,

4   please.

5          MR. ANDOLINA:  Pardon me, sir.

6          My objection is to the term "member."  I don't know

7   that that is a defined term.

8          THE COURT:  We'll find out.

9          You can answer.

10          THE WITNESS:  Sir, and I don't want to mispronounce

11   your name which is why I call you sir, I don't understand your

12   question.

13   BY MR. SCHIAVONI:

14   Q    Okay.  So, first of all, I thought I might mispronounce

15   your name, so I feel for you.  It's Schiavoni or you can call

16   me Tanc, if you want.

17          But here's the question, all right, can you identify any

18   of the -- the National Executive Committee, do you call those

19   people members or Board members?  What do you call them?

20   A    I refer to the members as, the 12 as members of the NEC.

21   Q    Okay.  So, can you identify any members of the NEC who

22   were members in May and June, you weren't, at that time,

23   either currently officers, directors, or members of the local

24   councils or previously, officers, directors, members?

25          MR. ANDOLINA:  Objection; compound.

1          THE COURT:  Overruled.

2          THE WITNESS:  If I understand your question

3   correctly, my answer would be that there are no members of the

4   NEC that are members, officers, directors, of their local

5   council or Executive Board because of the prohibition in our

6   bylaws for them to do so.

7   BY MR. SCHIAVONI:

8   Q    That's something that was put into place when?

9   A    Certainly at the time that I was elected onto the NEC,

10  that existed.

11  Q    Okay.  The letter you wrote, I think it was dated -- you

12  said it was effective your resignation of the Florida Board,

13  it's dated -- it was effective June 1; is that right?

14  A    Yeah, I wrote the email right after the annual meeting,

15  following a conversation I had with Mr. Berger on May 28th.  I

16  sent him the email, used June 1 as just the date, because that

17  was the start of the month and we were at the end of May.

18  Q    Okay.  Was that June 1, 2020?

19  A    Yes, sir.

20  Q    Okay.  Good.

21        So, I just still want to focus on this issue for a

22  minute.  The National Executive Committee, do they have any

23  members in May and June of 2021 that weren't, you know, former

24  officers, directors of their local councils?

25  A    I know that the current NEC members, which you seem to

1  refer to, had previously in a prior lifetime, I guess, or

2  role, before they resigned, may have served in a capacity on

3  their council's Executive Board.

4  Q    Okay.  I mean, you know many of these people very well,

5  don't you?

6  A    Yes, after many, many Zoom calls this past year and a

7  half, I do.

8  Q    Okay.  So, can you identify which ones you believe to be

9  former officers or directors of local councils?

10  A    I do know Brad Schulman (phonetic).  I know that

11  Ms. Schuler.  I know Ms. Suzuki (phonetic).  I know at some

12  point in time, Mr. Ownby.  So, I do believe that a good number

13  had served in a capacity as a member of a local council Board

14  prior to their progression, if you will, in the organization

15  to become a member of the National Executive Board and then of

16  course as a member of the National Executive Committee.

17  Q    Is one of the things your firm does is represent the Boy

18  Scouts in the matters?

19              MR. ANDOLINA:  Objection; relevance.

20              MR. SCHIAVONI:  I'll tie it up in a moment.

21              THE COURT:  I'll permit that.  Overruled.

22              THE WITNESS:  My law firm has not represented the

23  Boy Scouts of America, no.

24  BY MR. SCHIAVONI:

25  Q    Really?  You haven't represented them in sexual abuse

1  cases?

2  A    The Boy Scouts of America?

3  Q    Yes.

4  A    No.

5  Q    Do you represent the local councils?

6  A    My law firm, to my knowledge, has not represented the

7  local council in a sex abuse claim, but may have provided some

8  guidance based on attorneys in the firm being members of the

9  council board may have provided some advice to lawyers for the

10  BSA.

11  Q    You understand that one of the claims that plaintiffs

12  bring against the councils and against the Boy Scouts is a

13  claim for negligent supervision, right?

14  A    That can be a claim, yes.

15  Q    And the council that you were -- that you participated

16  with or the South Florida council, did they have claims

17  brought against them as part of the bankruptcy, proofs of

18  claim?

19  A    Yes, I believe every council has received proofs of

20  claim against them.

21  Q    Okay.  Did the board -- did the National Executive

22  Committee -- I'm sorry, I still get these confused, but did

23  the National Executive Committee in its meetings discuss the

24  issue of whether the bankruptcy posed conflicts as between the

25  Boy Scouts and the local councils?

1        MR. ANDOLINA:  Objection, beyond the -- my

2   objection is, is this in addition to his previous testimony,

3   Mr. Schiavoni?  Is there something different?

4        MR. SCHIAVONI:  I'm not aware of that as a form

5   objection, sir.

6        THE COURT:  Yeah, I don't think so.  Overruled, he

7   can answer the question.

8        THE WITNESS:  The NEC, BTF, NEB did have

9   discussions as it related to potential scenarios, in the event

10  that local councils were not in a position to contribute to a

11  global settlement fund that was satisfactory to the claimant

12  group subset, we could have a plan of reorg that would allow

13  for a global resolution, and potentially what actions the

14  National Board could take vis-a-vis local councils should it

15  come to that point.

16  BY MR. SCHIAVONI:

17  Q    Have you heard of something called the local council

18  working group?

19  A    I have.

20  Q    What is that?

21  A    The local council working group represents interests of

22  local councils and I understand that, as I indicated

23  previously, many of the councils have their own legal

24  advisers, coupled with representation through the ad hoc.

25  Q    Did things get at some point so bad between the local

1   councils and the Boy Scouts that the NEC board had to discuss

2   whether the local council working group, the issues they were

3   raising posed a conflict of interest between the Boy Scouts

4   and the local councils?

5   A     I don't know if I would characterize it as if things got

6   so bad, but I would tell you that conversations were had at

7   the NEC level, NEB level, and BTF level concerning what we

8   could do if local councils were not in a position to

9   contribute and/or participate in a global resolution in order

10  to allow for the mission of the organization to continue.

11  Q     Am I right that the local councils were insisting that

12  Boy Scouts get them the benefit of a third party release?

13            MR. ANDOLINA:  Objection, form.

14            THE COURT:  Overruled.

15            MR. ANDOLINA:  Also foundation.

16  BY MR. SCHIAVONI:

17  Q     You can answer, sir.

18            THE COURT:  You can answer.

19            THE WITNESS:  In order for the Boy Scouts of

20  America to achieve its objectives and allow for the mission of

21  the organization to continue, we always knew that it was

22  important to be able to have a channeling injunction in place

23  such that local councils would be able to benefit from a

24  release through the bankruptcy process.

25  BY MR. SCHIAVONI:

1  Q     Right, but my question is a little different.  It's

2  like, at this point in time before June, right, of this year,

3  is it -- isn't it in fact the case that the local councils

4  were insisting that the Boy Scouts get them a third party

5  release?

6            MR. ANDOLINA:  Objection to form.  Consolidated

7  discussion with local councils, there's 251 of them.

8            THE COURT:  Sustained.

9  BY MR. SCHIAVONI:

10 Q     Sir, why don't you tell us, did the local council

11 working group demand that the governance procedures for Boy

12 Scouts change in the course of the discussions of whether or

13 not they get a release or not?

14           MR. ANDOLINA:  Objection, foundation.

15           THE COURT:  Overruled.

16           THE WITNESS:  I think those are apples and oranges,

17 sir.  In terms of prospective things moving the organization

18 forward, assuming we're able to emerge from bankruptcy, there

19 has been best practices, if you will, and lessons that we've

20 learned along the way.  A subset, some representatives of

21 councils have suggested that governance changes be considered

22 and put in place to allow for more representation, if you

23 will, at the national level.

24           Number two, as it relates to your question about

25 releases, the two topics are not necessarily related.  The

1  release conversation has always been in play with respect to

2  the thought processes and actions of the BTF, NEC and NEB

3  because we recognize that, in order for Scouting to continue

4  and survive, Scouting is local and we need for our local

5  councils to be the beneficiaries of a channeling injunction

6  through this process, which is why in working with Mr. Mason's

7  group, yes, Mr. Mason, along with his peers, adequately

8  represented the ad hoc and the local councils.  While we

9  didn't agree on everything, we have finally been able to reach

10  an agreement with several constituent groups in this case

11  which would allow for local councils, in addition to the

12  national council, to emerge from this bankruptcy with a plan

13  that is confirmable.

14  BY MR. SCHIAVONI:

15  Q     Okay, my question is really very different; it just goes

16  to the conflict.  Like did it -- was there -- did it come up

17  in the NEC board minutes that there was a conflict between the

18  local councils and the Boy Scouts with regard to who would

19  contribute what, that members were actually advised that they

20  needed to recuse themselves at board meetings associated with

21  such issues?

22          MR. ANDOLINA:  Objection, asked and answered.  This

23  testimony was covered on direct.

24          MR. SCHIAVONI:  No, it wasn't.  Please, stop.

25          THE COURT:  Okay.

1          MR. ANDOLINA:  I can point --

2          THE COURT:  This is cross.  You can answer.

3          THE WITNESS:  Yes, ma'am.  Sir, the issue of the

4   conflict did come up, that is correct.  It came up in the

5   context of what would happen if local councils could not

6   participate at a level that was being asked of them by the

7   demands received from the TCC and the Coalition such that, in

8   the event we as a national organization needed to agree on

9   numbers, how would that be viewed and/or how would local

10  councils participate in that figure given what we had been

11  told by the ad hoc group in terms of their position relative

12  to various points in time during the negotiation process.

13          And so, in order for the board to be informed and

14  take actions and make decisions, we sought the advice of

15  counsel related to conflict issues.  I testified previously

16  and the minutes reflect that, in February of 2021, Mr. Reiss

17  from White & Case provided guidance, options were presented to

18  board members, and we moved forward.

19          MR. SCHIAVONI:  Okay.

20          THE WITNESS:  I hope that answers your question.

21  BY MR. SCHIAVONI:

22  Q    And what underlies the conflict was differing views on

23  who should contribute what to get a third party release and

24  the scope of the third party release, right?

25  A    While I wasn't and I'm not a member of the ad hoc group,

1  so I can't tell you what all the local councils thought who

2  should do what and how much each of them should give, at a

3  very high level we were advised in certain sessions with the

4  ad hoc and also just in our meetings that there was some

5  disagreements as to the overall number that local councils

6  could fund and that it might not be possible for them to

7  arrive at a number that would be satisfactory to the

8  complainants' groups.

9  Q    Now, sir, if a board member of the NEC recused himself

10 from a matter, that would be something that would be reflected

11 -- it's your practice to reflect that in the minutes

12 themselves, right?

13 A    If an NEC, National Executive Committee member --

14 Q    Yes.

15 A    -- you're referring to the 12?

16 Q    Yes.

17 A    If any one of the 12 were to recuse themselves, then

18 that should be indicated in the minutes, yes.

19 Q    Okay.  And you were asked by Mr. Hallowell about

20 questions in the minutes about when the charters were engaged,

21 do you remember those questions?

22 A    Yes, he asked me to verify what minutes said about

23 charter organizations.

24 Q    Okay.  And it's fair to say, is it not, that what

25 happened here was the Boy Scouts and the locals both sort of

1  worked together to get releases for each other through the RSA

2  and didn't share copies of the RSA with the charters until

3  after they had reached agreement with the claimants on it and

4  signed it, is that right?

5            MR. ANDOLINA:  Objection, compound.

6            THE COURT:  Sustained.

7  BY MR. SCHIAVONI:

8  Q     Sir, did the Boy Scouts share with the charters drafts

9  of the RSA before the Boy Scouts signed it?

10  A     I personally can't answer that question because I don't

11  know what our various advisers did with the various drafts and

12  who they circulated them to outside of the BTF and NEC.

13  Q     Is it fair to say, though, that you're personally

14  unaware of any effort to in fact communicate with the charters

15  about the terms of the RSA until after it was signed?

16  A     It is my understanding that chartered partners were not

17  a party to the RSA, but that the RSA allowed for the ongoing

18  nature of conversations that were taking place with the

19  chartered partners, and it's also my understanding that, as we

20  sit here today, that there was --

21  Q     That's not my question, that's not my question.  My

22  question is just simply this, do you have any personal

23  knowledge of any effort made to reach out to the local -- to

24  the chartering organizations to provide them with drafts of

25  the RSA before it was signed?

1  A     Everything I would know would be based upon knowledge I

2  have with conversations through counsel concerning efforts

3  with our chartered partners during the months of April, May,

4  and June.

5  Q     Okay.  So do you have any personal knowledge outside of

6  what was told to you by your legal -- the lawyers here for the

7  board that in fact any effort was made to share the RSA drafts

8  with the charters before it was signed?

9  A     Other than what I've testified to, no, sir.

10  Q     And why is it -- like would you expect them to provide

11  copies of the RSA to the charters before it was signed to get

12  their input?

13  A     I don't know if I would have an expectation that that

14  would be done.  However, what I do know is that the RSA served

15  as a framework for a building block to allow for additional

16  parties to continually work out their differences through the

17  mediation process in an effort to eventually join in the RSA,

18  which continues to remain a possibility.

19  Q     Isn't another way to look at it is that what the RSA

20  does is it gets you personally released as a local council

21  member, a former officer, it gets Boy Scouts a release and it

22  gets the local councils a release, and it funds the tort

23  claimants to just sue now the charters?

24          MR. ANDOLINA:  Objection, argumentative.

25  BY MR. SCHIAVONI:

1  Q     Why is it, Mr. Desai, that you think that the signing of

2  the RSA will in fact cause anyone to enter into an agreement

3  with the charters?

4  A     It's my belief that this is the first time in this

5  entire bankruptcy process that we have been able to get the

6  support of the victims' groups along with our local council

7  partners, in addition to the secured creditor and the

8  unsecured creditor committee, to come to an agreement that

9  would allow for additional parties to hopefully work through

10 some differences and be able to reach a global resolution.

11 And this RSA agreement informs my opinion, which allows for us

12 to go back to achieving our objectives here, which are to

13 equitably compensate the victims of historical sex abuse,

14 coupled with allowing the mission of the Boy Scouts of America

15 to continue.

16 Q     Mr. Desai, isn't another way to look at the -- or let me

17 ask you this.  In considering going forward with this

18 transaction, did you give thought as an NEC member to whether

19 or not the claimants might view the RSA as simply a vehicle to

20 allow Boy Scouts and local councils to confirm a plan, get

21 out, and then sue the charters indefinitely?

22           MR. ANDOLINA:  Objection, argumentative and calls

23 for speculation.

24 BY MR. SCHIAVONI:

25 Q     Did you consider that as a possibility?

1           THE COURT:  You can answer if you considered it.

2           THE WITNESS:  What we considered was the fact that

3   we knew that this is the first time that we had this much

4   support and in particular from all the victims' groups toward

5   a meaningful resolution and that we were in the process of

6   continued dialogue with our chartered partners.

7   BY MR. SCHIAVONI:

8   Q    One of the terms of the RSA is that for any of the

9   5,000-plus charters to get out they actually need unanimous

10  consent of both -- of the Coalition, the TCC and the FCR, is

11  that right?

12  A    I believe that the agreement does speak to that and I'll

13  leave it at that.

14  Q    Okay.  Can you tell us whether you're aware of whether

15  or not the NEC made any effort at all to consult with the

16  charters about that term?

17  A    You broke up in the question, sir.  Could you please --

18  Q    Sure.

19  A    -- re-ask it?

20  Q    Sure.  Prior to signing the RSA, did the Boy Scouts make

21  any effort to consult with the charters with regard to this

22  term that requires unanimous consent of the FCR, TCC and

23  Coalition?

24  A    I would have to defer that to our advisers.  I

25  personally was not involved in that specific request.

1  Q     Okay.  Can you tell us, what did the board have in front

2  of it with regard to Eric Green when it considered matters

3  concerning the financial contribution towards a resolution?

4  A     You're breaking up a little bit.  I think your question

5  was what material did the board have in front of it about Eric

6  Green?

7  Q     Yes.

8           MR. ANDOLINA:  And just objection to are you

9  defining the board, Mr. Schiavoni, just so the witness is

10  clear, as --

11          MR. SCHIAVONI:  Yes, the NEC, the NEC.

12          MR. ANDOLINA:  Okay.  Well, we define the board as

13  the NEB.  And I apologize if I haven't been on top of that,

14  but when you say board, I think Mr. --

15          MR. SCHIAVONI:  NEB is fine.

16          MR. ANDOLINA:  Okay.  Thank you.

17          THE WITNESS:  If you're referring to the NEB, which

18  is the full board, the NEB, who, if you will recall, delegated

19  its authority to make decisions and enter into terms and

20  conditions that were satisfactory to the overall mission of

21  the Boy Scouts on April 8th when they did that.  As far as

22  materials that were presented to the full board about Mr.

23  Green, there was not full materials in terms of paper and

24  documents given to the full board.  What the board received

25  was through a presentation, references to Mr. Green and some

1  background information in a verbal setting from our advisers.

2  The -- I hope that answers your question.

3  BY MR. SCHIAVONI:

4  Q    Sure.  And tell us, what was the verbal information that

5  was provided about him?

6  A    Mr. Green had been proposed as the trustee in

7  contemplation of the RSA.  Mr. Green was an eminently

8  qualified attorney, slash, mediator in the bankruptcy world.

9  It's my understanding that we knew about the fact that Mr.

10  Green was not appointed as a mediator in this case for a

11  variety of reasons that I'm not necessarily privy to, but

12  overall he came recommended by the BSA's counsel and our

13  advisers and was supported to be a proposed trustee, again,

14  subject to court discretion, but under the terms of the RSA.

15  Q    So it's fair to say you as a board member weren't aware

16  of why it was he wasn't appointed as a mediator?

17  A    All I remember is that there may have been a conflict

18  issue for him in his role as a mediator, but moving forward

19  from that process, it didn't appear that that conflict, at

20  least at this time until that's approved by the Court or heard

21  by the Court, presented any challenges to the parties to the

22  RSA when he was suggested to serve as the proposed trustee.

23  Q    Did the fact that BSA's economic contribution to the

24  trust was capped at that point, did that help you kind of get

25  comfort with Mr. Green?

1          MR. ANDOLINA:  Objection, argumentative.

2          THE COURT:  Overruled.

3          THE WITNESS:  No, sir.  The suggested trustee name

4  of Mr. Green and the amount that the Boy Scouts of America is

5  proposing to contribute under the terms of the RSA, in my

6  opinion and in my thought processes in voting to support the

7  RSA, had nothing to do with each other.

8          MR. SCHIAVONI:  Okay, thank you.  Thank you, Mr.

9  Desai, thank you very much.

10          THE COURT:  Okay.  Is there anyone else who has

11  questions for Mr. Desai?

12       (No verbal response)

13          THE COURT:  I hear no one.  Any redirect?

14          MR. ANDOLINA:  Your Honor, no redirect.

15          THE COURT:  Thank you.  Mr. Desai, thank you for

16  your testimony.

17          THE WITNESS:  Thank you, Your Honor.

18       (Witness excused)

19          THE COURT:  Okay.  So let me ask the debtor, who

20  was your next witness going to be?

21          MR. ANDOLINA:  Your Honor, we were prepared to call

22  Mr. Mosby.  I believe it's 4:45 Eastern --

23          THE COURT:  Yeah, we're not going to start that at

24  4:45 Eastern on Friday.

25          MR. ANDOLINA:  I didn't think so.

1          THE COURT:  And what's going to be the subject

2  matter of Mr. Mosby's testimony?  How is it -- well let me ask

3  it this way --

4          MR. ANDOLINA:  Well --

5          THE COURT:  -- how is it not duplicative of

6  testimony we've already had?

7          MR. ANDOLINA:  Well, Your Honor, I was going to

8  recommend that we talk among our team on exactly that issue.

9  I do think, in light of the very substantial testimony

10 provided by Mr. Desai and Mr. Whittman, we can put our heads

11 together on that.  So if the Court would allow us to take a

12 brief recess to discuss, we could jump back on the Zoom

13 shortly.

14         THE COURT:  Okay, I'll give you that.  How much

15 time would you like?

16         MR. ANDOLINA:  How about 15 minutes, Your Honor?

17 Is that too long?

18         THE COURT:  You got it, 15 minutes.  It's 4 --

19         MR. SCHIAVONI:  Your Honor --

20         THE COURT:  Yes?

21         MR. SCHIAVONI:  -- if I just -- it's like, you

22 know, just so it's clear, we're going to -- we subpoenaed Mr.

23 Mosby and Mr. Ownby, one is the chair, the other one is the

24 CEO.  They put them last in order, okay?  They started with a

25 witness who's a paid consultant and, you know, Mr. Mosby was

1   actually the man on the ground, okay?  Who actually was at the

2   negotiations.

3            So it's fine if the debtor doesn't want to call

4   him, but at a minimum we'd want to offer testimony from the

5   depositions as admissions against interest.  Perhaps we could

6   work that out with Mr. Andolina over the weekend, putting in

7   deposition designations for them.  We cite them in our briefs,

8   statements by them, so we'd want to use that testimony.  We

9   did ask Mr. Andolina to agree to the declarations we put in

10  with those cites attached.  So that's something we might be

11  able to work out with them over the weekend.  But, you know,

12  even if the debtor decides not to call him, it doesn't resolve

13  the issue of us needing to.

14            THE COURT:  Because you believe he's going to give

15  different testimony?

16            MR. SCHIAVONI:  Yes, actually.  Yes, Your Honor.

17  This -- we cite --

18            THE COURT:  On relevant issues?

19            MR. SCHIAVONI:  Yes, Your Honor.  Look, if we can

20  just get agreement that the testimony cited in the briefs will

21  come into evidence, that gets us a long way there.

22            THE COURT:  Okay, I'll let you have those

23  discussions.

24            Mr. Anker, I see your hand up.

25            MR. ANKER:  Your Honor, I just raised it before Mr.

1  Andolina -- first off, Your Honor, nice to see you.  I've been

2  off camera for the last two days.  I raised my hand before Mr.

3  Andolina asked for the 15-minute recess because obviously we'd

4  like to talk to Your Honor and the parties about closing

5  argument.  We do have -- Your Honor has been extraordinarily

6  patient and I don't want to overstay my welcome, but we do

7  have argument, particularly on the Hartford side, on issues

8  that frankly don't have a lot to do with the evidence.

9        On the evidentiary issue, I would just echo

10  something Mr. Schiavoni just said.  We do, for example, in our

11  papers cite to deposition testimony and I would hope to avoid

12  burdening Your Honor with even more testimony.  I know how

13  tight your schedule is.  I would hope the debtors would agree

14  to allow those deposition excerpts to come in and thereby we

15  can move quickly to closing argument.  But I'm happy to have

16  that conversation after the 15-minute recess, so that's why I

17  figured that sort of timing.

18        Your Honor, one other issue I just wanted to raise

19  and I know we've raised it once, disclosure statement

20  objections are due on Monday.  I will be candid with Your

21  Honor, we are far along on one, but the RSA is a gating item

22  and if -- if what we're going to do -- and I'm not being

23  presumptuous -- is to move closing argument to the date that

24  was set for the disclosure statement, which I think is a day

25  of the week after next (indiscernible) if that were the case,

1  Your Honor, I would have suggested that we not go forward with

2  disclosure statement objections on Monday so the parties can

3  really prepare and focus on the RSA, which is a gating item.

4  And, again, I don't want to -- I'm happy to let Mr. Andolina

5  have his 15 minutes and we come back, but I wanted to put the

6  thought in Your Honor's mind and at least plant for you that

7  that is a consideration from our perspective.

8          THE COURT:  Okay.  Thank you.

9          MR. ANKER:  Thank you, Your Honor.

10          THE COURT:  Thank you.  I will give Mr. Andolina

11  his 15 minutes.  I've got -- we'll come back at 5:10, ten

12  minutes after 5:00.

13          MR. ANDOLINA:  Thank you, Your Honor.

14          THE COURT:  We're in recess.

15      (Recess taken at 4:53 p.m.)

16      (Proceedings resumed at 5:11 p.m.)

17          THE COURT:  This is Judge Silverstein.

18          MR. ANDOLINA:  Good afternoon, Your Honor, Mike

19  Andolina, White & Case, on behalf of BSA.  We greatly

20  appreciate the opportunity to caucus and Your Honor's patience

21  throughout the day, we've been able to discuss as a debtor

22  team.  I'm going to hand the podium to Mr. Kurtz, who can

23  provide an update.  And, again, thank you for your patience,

24  Your Honor.

25          THE COURT:  Mr. Kurtz.

1          MR. KURTZ:  Good afternoon, Your Honor, Glenn
2   Kurtz, White & Case, for the debtors.

3          We understand -- we took your guidance, Your Honor.
4   I don't think we need to put on any further witnesses, I think
5   they are largely duplicative, at least for purposes of the
6   exercise that we think we're engaged in at this point.  So
7   we're pleased to report that we can bring that piece of this
8   to a close.

9          The second issue that has come up is the statement
10  by Mr. Schiavoni that they had subpoenaed Mr. Ownby and Mr.
11  Mosby, that's not true.  There's been no trial subpoenas
12  issued, we've not seen any; none of them have been docketed.
13  They never put them on a witness list.  And so these are just
14  not their witnesses.

15         Having said that, we basically support a full
16  record.  We have no objection to them designating portions of
17  depositions, so long as it doesn't cause delay.  And so we're
18  agreeable to have them provide us with designations for both
19  of those witnesses and only those witnesses by the end of
20  Saturday, we'll counter designate by the end of Sunday, and
21  that will put us in a position to complete the record before
22  Your Honor by Monday morning, leaving only closing arguments.
23  We are prepared to go forward on closing arguments at Your
24  Honor's earliest convenience.

25         And I think that only leaves this notion of the

1  disclosure statement objections.  We certainly oppose any

2  extension on that.  We've had the disclosure statement

3  extended before.  We've had -- the disclosure statements have

4  been out since July 2nd, so it's been more than 40 days.

5  Obviously, counsel are -- have already prepared objections, I

6  don't think anybody is waiting until Monday.

7          We're all very, very familiar with the objections.

8  Somebody told me they recently counted all of the pages that

9  the insurers have submitted to Your Honor in connection with

10  these issues, including in the RSA and some of the discovery

11  motions, and it exceeded 3500 pages.  We certainly have heard

12  them throughout the last couple of days in statements and

13  objections, even in cross-examination.  So I don't think

14  there's anything novel or new that's going to be raised.  We'd

15  love to keep on our schedule; we think we need to keep on our

16  schedule.  We don't think anything is advanced by delaying and

17  so we certainly would object to an extension of the time to

18  file objections to the disclosure statement in advance of the

19  August 25th hearing.

20          MR. SCHIAVONI:  Your Honor, we did in fact list Mr.

21  Ownby and Mr. Mosby in our interrogatory responses as

22  witnesses for the hearing.  So it's just not true that like we

23  didn't disclose them.  We were told that they were going to be

24  here and that we were going to examine them, we cite them in

25  our moving objection.  You know, it's important testimony to

1  just simply the core issue of process.  They gave testimony

2  that's contradictory to Mr. Whittman, who's a paid consultant.

3  Ms. Mosby was actually the man on the ground who negotiated

4  the deal.  You know, you can -- it's like you will hear from

5  him and Mr. Ownby.  Mr. Ownby, the chair, who testified, among

6  other things, that he didn't think the board had

7  (indiscernible) the RSA before it was signed.  So there are

8  core issues that go to process.

9          I'd ask you to hear from AIG on really the

10  importance of giving us an opportunity to just -- you know,

11  because really this, fundamentally, goes to really the

12  credibility of some of what you've heard, a lot of which, you

13  know, was presented -- testimony presented with heavily,

14  heavily redacted documents.  So the contradictions are

15  important and to see the witnesses, you know, actually face-

16  to-face.  I think we could do -- we would coordinate the

17  examination, we would, you know, do it in a very limited

18  period of time.  We might even be able to agree on, you know,

19  an individual questioner among us.  But I'd ask you just to

20  hear from Mr. Hallowell briefly on this.

21          Mr. Hallowell?

22          THE COURT:  Well, I thought that you --

23          MR. HALLOWELL:  Your Honor --

24          THE COURT:  -- I thought that you offered

25  deposition designations and Mr. Kurtz has agreed to that.  So

1  why can't we do that?

2         MR. HALLOWELL:  Your Honor, I stated at the outset

3  of this when he withdrew Mr. Mosby that I wanted to ask

4  questions of Mr. Mosby, I have never agreed to -- sorry, Mr.

5  Ownby -- I have never agreed to do deposition designations of

6  Mr. -- nor have I agreed to do deposition designations of Mr.

7  Mosby.  And I do believe, Your Honor, that the Court needs to

8  hear from each of these witnesses.  These are not witnesses

9  that need to be subpoenaed, they are the CEO and chairman --

10         THE COURT:  Why don't they need --

11         MR. HALLOWELL:  -- of Boy Scouts of America.

12         THE COURT:  -- why don't they need to be subpoenaed

13  for trial?  Mr. Hallowell --

14         MR. HALLOWELL:  Because --

15         THE COURT:  -- you have been the most stickler on

16  the rules and the evidence rules and everything.  So why don't

17  they have to be subpoenaed for trial if you're going to call

18  them and why don't you have to tell me, consistent with my

19  practice, that they're going to be witnesses?

20         MR. HALLOWELL:  Because they're parties to the

21  proceeding, they're the executive -- they're an executive and

22  the chairman of the board of the --

23         THE COURT:  Okay, but the executive and the

24  chairman don't have to testify at every hearing.  So you have

25  been the stickler for the rules, good for you, and -- but now

1  you want to say that you don't have to issue a trial subpoena.

2          MR. HALLOWELL:  I don't believe that we needed to

3  do so in this context, Your Honor, because they were listed as

4  witnesses throughout every agenda for this hearing and they --

5  up through and including today, everyone has known that these

6  are witnesses that would testify at this hearing.

7          THE COURT:  And what am I going to hear that you

8  think is going to make a difference in the evidentiary record?

9          MR. HALLOWELL:  I do -- what we've talked about,

10  Your Honor, is -- as Mr. Kurtz said, it's all about process,

11  and you will hear about the process from the two people who

12  were most involved in that process for the BSA, and that's the

13  CEO and the chairman of the board.

14          THE COURT:  Well, I think --

15          MR. HALLOWELL:  They're going to tell you, for

16  instance --

17          THE COURT:  Okay.

18          MR. HALLOWELL:  -- Mr. Ownby will tell you that he

19  never read the RSA --

20          THE COURT:  Okay.

21          MR. HALLOWELL:  -- until his deposition 15 days

22  after.  Mr. Ownby will also tell you that he has no real

23  concept of what TDPs are or what they do, he was not involved

24  in discussions with regard to them.

25          THE COURT:  Mr. Desai does.

1            MR. HALLOWELL:  He will also tell you --

2            THE COURT:  Mr. Desai --

3            MR. HALLOWELL:  -- he will also tell you that --

4            THE COURT:  -- has that knowledge.

5            MR. HALLOWELL:  He will also tell you that he

6  acknowledges that there is no difference for the Boy Scouts of

7  America if the claims in this case are two dollars or a

8  hundred trillion dollars.

9            THE COURT:  And you can make --

10            MR. HALLOWELL:  These are the kinds of statements

11  that --

12            THE COURT:  -- that argument because I think you

13  have -- you have testimony on this.  Listen, I guess I'm going

14  to hear from them, we're going to do it Monday and that's --

15  then we're going to do it Monday.  And both witnesses are

16  going to get in and you get an hour with each witness and

17  that's it.  So make --

18            MR. HALLOWELL:  Thank you, Your Honor.

19            THE COURT:  -- make your good points, get your good

20  evidence, relevant evidence out.

21            MR. KURTZ:  Your Honor --

22            MR. SCHIAVONI:  Thank you.

23            MR. KURTZ:  -- if that's the case, I won't say

24  much, but he certainly does need a subpoena, but we won't

25  require it under these circumstances.  But I think we've all

1  seen that cross-examination here is -- are largely argument,

2  here's a document, do you see a word in it, and to extend this

3  just seems more designed to extend this procedure than it is

4  to get evidence.  Everything Mr. Hallowell just mentioned he

5  says he has in the deposition, we agreed to use the deposition

6  designations.  The more you give, the more they don't want to

7  take it anymore.

8          THE COURT:  I'm going to give them an hour with

9  each witness and that's it.  You divide the time how you want

10  to divide it.

11          MR. HALLOWELL:  Thank you, Your Honor.

12          THE COURT:  That's all objectors.  And I'm going to

13  hear argument -- my thought was I was going to hear argument

14  on Monday.  I can still hear argument on Monday.

15          We are going to start with the first witness at 10

16  o'clock; we're going to end with that witness at 11 o'clock.  I

17  actually have a hearing at 11:00, which will not take more

18  than an hour.  So we'll start with the next witness at 12

19  o'clock, we'll end at 1:00, and we'll start argument at 2:00.

20          MR. HALLOWELL:  Thank you.

21          THE COURT:  And we're going to get it done.

22          MR. KURTZ:  Thank you, Your Honor.

23          MR. RUGGERI:  Your Honor, one matter of

24  housekeeping.  James Ruggeri for Hartford.  In order to make

25  Monday more efficient, I assume the debtors are open to a

1  discussion of housekeeping including agreeing to stipulations

2  of admissibility of certain evidence, including, for example,

3  the Hartford agreement, which is not yet into evidence, but

4  should be in evidence.  I assume they're open to those

5  conversations, again, to make Monday more efficient.

6         MR. KURTZ:  We are always open to conversations,

7  Your Honor.

8         THE COURT:  I think the parties need to be open to

9  making everything more efficient.  If this is a preview of the

10 disclosure statement hearing and a preview of any confirmation

11 hearing, the parties need to cooperate.  Exhibits in advance,

12 what are the objections anyone has in advance, who the

13 witnesses are going to be, et cetera.

14        MR. KURTZ:  Thank you.

15        MR. ANKER:  Your Honor, this is Mr. Anker.  To that

16 end -- and I am trying to make things simpler rather than more

17 complicated -- I trust that the debtor will stick with its

18 agreement on designations, so that hopefully we can work them

19 out --

20        MR. SCHIAVONI:  No.

21        MR. ANKER:  No?

22        THE COURT:  No, no, not going there.  You guys need

23 to coordinate --

24        MR. ANKER:  Okay.  Thank you, Your Honor.

25        THE COURT:  -- you guys need to coordinate on your

1  objections.  There was an insisting that I would be

2  prejudicing people if I didn't get this testimony in person so

3  I could assess credibility, so that's what I'm going to do and

4  debtors do not have to designate.

5          MR. KURTZ:  Thank you, Your Honor.

6          THE COURT:  Okay.  So I will see everybody back on

7  Monday at 10 o'clock.  And I don't know if you need some other

8  thing, I'll have to check with Mrs. Johnson.  If there needs

9  to be some new registration, you'll get something over the

10  weekend or first thing Monday morning.  I don't know how that

11  works.

12          Okay.  Thank you very much.  We're adjourned.

13          COUNSEL:  Thank you, Your Honor.

14      (Proceedings concluded at 5:23 p.m.)

15

16                      CERTIFICATE

17

18      We certify that the foregoing is a correct transcript

19  from the electronic sound recording of the proceedings in the

20  above-entitled matter.

21
   /s/Mary Zajaczkowski              August 13, 2021
22  Mary Zajaczkowski, CET**D-531

23  /s/William J. Garling             August 13, 2021
24  William J. Garling, CE/T 543

25
   /s/ Tracey J. Williams            August 13, 2021
   Tracey J. Williams, CET-914