**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | **Re: D.I. 5485, 5488, 5488-1, 3265** |

**CANNATA & ASSOCIATES CLAIMANTS' SUPPLEMENTAL OBJECTION TO THE
ADEQUACY OF DEBTORS' DISCLOSURE STATEMENT IN SUPPORT OF
AMENDED CHAPTER 11 PLAN OF REORGANIZATION AND OBJECTION TO
THE DEBTORS' REVISED PROPOSED SOLICITATION PROCEDURES ORDER**

## I. INTRODUCTION

1.      On May 6, 2021, the Claimants represented by Gregory J. Cannata & Associates, LLP (the "Claimants") filed their *Objection to the Adequacy of Debtors' Disclosure Statement in Support of Amended Chapter 11 Plan of Reorganization* (Dkt. No. 3177).

2.      On July 2, 2021, the Debtors filed the *Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 5484) ("the Plan"),[1] the *Amended Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* ("the Disclosure Statement") (Dkt. No. 5485), and the *Notice of Filing of Revised Proposed Solicitation Procedures Order* ("the Solicitation Procedures") (Dkt. No. 5488).  On July 7, 2021, the Debtors filed the *Third Amended Notice of Hearing to Consider Approval of Disclosure Statement and Solicitation Procedures for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, (Dkt. No. 5527) and noted that "[t]o the extent any party has already filed an objection to the

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.  Statutory references are to the Bankruptcy Code unless otherwise noted.

Disclosure Statement consistent with the procedures prescribed in the Prior Notice, it does not need to refile such objection." Dkt. No. 5527 at 1.

3.      The Claimants re-assert and restate the facts, legal arguments, and objections made in their prior objection, and object to the Disclosure Statement and the Solicitation Procedures for the additional reasons stated below.

## II.  SUPPLEMENTAL OBJECTION

4.      The Plan is not nearly ready to be put out for a vote.  Many questions the Claimants and others have raised in their prior Objections involve fundamental features of the Plan, including the mechanisms for the treatment of Local Councils, Chartered Organizations, and insurance rights and insured claims. Those questions remain unanswered, leaving the Claimants without adequate information to make an informed judgment regarding the Plan.  *See* § 1125(a)(1), (b).

5.      The Claimants file this Supplemental Objection to point out additional critical flaws that, if unremedied, will render it impossible to confirm the Plan because the solicitation and vote tabulation will have been conducted in an unlawful manner.  In particular, there are five crucial points made here:

(i) vote tabulation procedures must reflect the enormous differences between the values of claims to prevent the overwhelming number of very low value claims (including claims that are time-barred under applicable non-bankruptcy law for whom the Plan and the TDP are a windfall) from swamping the votes of abuse survivors presently holding large claims enforceable under state law who will bear the burden of that windfall;

(ii) vote tabulation procedures and the TDP itself must distinguish among claimants based on which Local Council (if any) is alleged to be co-liable with the Debtors, to avoid those holding claims against financially weak and underinsured Local Councils from swamping the votes of abuse survivors with viable claims against financially strong or well-insured Local Councils, otherwise the burden of extending the Channeling Injunction

to all Local Councils will fall entirely on the subset of claimants with valid claims against more asset-rich Local Councils;

(iii) the Disclosure Statement must incorporate adequate information about the liquidation value of direct abuse claims against non-debtors released by the Plan so individual claimants may assess the Debtors' compliance with the best interests of the creditors test;

(iv) the identity of any third party non-debtor Chartered Organization designated a Protected Party under the Plan, its potential liability to claimants, and the contribution being made to obtain the protection of this Court's Channeling Injunction, must be disclosed and the votes of affected creditors separately tabulated, before the Channeling Injunction is issued by the Court.  Alternatively, if a settlement with a Chartered Organization is reached post-confirmation that provides for the Court's Channeling Injunction to be modified to designate the Chartered Organization as a Protected Party, the same material information must be disclosed and then all affected claimants must be given notice and an opportunity for a hearing to assess the fairness of such post-confirmation settlement to the affected claimants before the modification becomes effective, otherwise impacted creditors will have no right to vote on that relief, and this Court will not be asked to (or be in a position to) find that the expansion of its Channeling Injunction to cover a new Protected Party is fair and equitable or that an overwhelming number of impacted creditors support the relief; and

(v) the Disclosure Statement must incorporate adequate information about the material risks arising from coverage positions asserted by liability insurers for the Debtors and non-debtors that, if successful, in whole or in part, could substantially limit or eliminate insurer contributions and significantly reduce amounts claimants could recover from the Trust.

Unless these five issues are appropriately dealt with prior to solicitation, the defective solicitation will result in a nonconfirmable Plan regardless of the extent of abuse survivor support manifested through the defective voting procedures.

**A.    Weighted Voting.**

6.      Section 1126 contains two voting thresholds that must be satisfied in order to confirm a chapter 11 plan consensually—one half in number and two-thirds in amount to ensure that the plan achieves creditor support both by reference to the number of claims, but also by reference to the amount of liability represented by those claims.  NORTON BANKRUPTCY LAW AND PRACTICE 3D § 110:19 (William L. Norton III ed.) ("The requirement of Code § 1126 that a plan be accepted by two-thirds in amount protects the holders of large claims, while the majority-in-number requirement protects the holders of smaller claims.").  Such a mechanism prevents a plan supported by many small claims from being confirmed without the support of a supermajority of those holding the bulk of the economic stake in the outcome.

7.      The Debtors estimate that of their 82,500 abuse survivor claims, Disc. Stmt. (Dkt. No. 5485) at 72, only 14,000 identify an alleged abuser and are not presumptively time-barred to varying degrees depending upon the state law applicable to the claim, whereas approximately 59,500 abuse survivor claims are presumptively time-barred.  *Id.* at 74, 76 & Exhibit F.  The TDP adjusts the value of time-barred claims to reflect the strength of the Debtors' (and their insurers') statute of limitations defense.  But the Solicitation Procedures, at ¶ 25, without any citation to legal authority or supporting argument, allow, for voting purposes, all direct abuse claims at $1 regardless of timeliness, and regardless of TDP value.  In so doing, the Debtors ignore the mandate of section 1126—to ensure that the Plan receives the support of claimants holding two-thirds of the economic stake in the outcome.

8.      Given the distribution of claims in this case, under the Solicitation Procedures it would be theoretically possible for the Debtors to confirm a plan rejected by all 14,000 abuse

claimants with enforceable state law claims against the Debtors, and also compel the release of their co-liable Local Councils, settling Chartered Organizations, and settling insurers, with only the votes of those holding claims that are time-barred or otherwise incapable of being enforced outside of bankruptcy against any of those entities. Moreover, under these tabulation and voting protocols, this Court would have no mechanism for assessing the degree of actual creditor support for the Plan from those holding valid enforceable claims.[2]

9.      The Solicitation Procedures must differentiate among claims to give practical effect to the two-thirds in amount requirement of § 1126. At a minimum, the votes of those holding time barred claims should be segregated and weighted in accordance with their TDP discount value to ameliorate the distortions that will result from the proposed vote tabulation protocol.

**B.      Required Vote Tabulation that Reflects Whether Claimants Have Claims Against Particular Local Councils or Chartered Organizations.**

10.      The Solicitation Procedures (1) allow creditors who do not have a claim against a non-debtor Local Council or Chartered Organization to vote on whether the current and future claims against the non-debtor should be released and enjoined, even though they will not be impacted by that release, and (2) fail to provide any mechanism for this Court (or a creditor) to determine whether such relief was supported by a sufficient number of the creditors actually impacted by the release being granted.

11.      The Court must eventually enter specific findings that any third-party release was "overwhelmingly" supported by the creditors whose claims are impacted by the release. *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Lower Bucks Hosp.*, 471 B.R. 419, 456 (Bankr. E.D. Pa. 2012) ("A critical factor in assessing the confirmability of a plan that includes a third-party release is whether the adversely affected class of creditors have manifested

---

[2] Although there are presently no Chartered Organization settlements, if any such settlements are entered into, the same voting and distributional concerns discussed herein with respect to Local Council settlements would likewise apply to any Chartered Organizations that may seek to become Protected Parties under the Plan.

their strong support for the plan through the plan voting process."); *In re Saxby's Coffee Worldwide, LLC*, 436 B.R. 331, 338 (Bankr. E.D. Pa. 2010) (a third-party release must be "widely supported by the creditor constituency that includes the parties being restrained"); *see also In re Medford Crossings N., LLC*, No. 07-25115, 2011 WL 182815, at *19 (Bankr. D.N.J. Jan. 20, 2011) (declining to confirm a chapter 11 plan in part because "[t]he parties that would be restrained from proceeding against the Third Party Releasees are receiving little or no distribution under the Plan and would be precluded from asserting their claims against the Releasees."). As *Saxby's Coffee* recognized: "[i]t is a very narrow legal realm in which a party's legal rights may be restricted because the needs of the many outweigh the rights of the few." 436 B.R. at 338. The Solicitation Procedures are not constructed in a way that allows the Court to make the required findings regarding the support from affected creditors.

12.      *In re National Heritage Foundation, Inc.*, 478 B.R. 216, 230 (Bankr. E.D. Va. 2012), illustrates the importance of distinguishing between impacted and unimpacted creditors in conferring third-party releases. In that case, the debtor argued a third-party release should be approved because it was "overwhelmingly approved by the creditors." *Id.* at 230. The Court rejected the release because the votes that constituted the "overwhelming majority" were not cast by creditors who were impacted by the release: "the class impacted by the Release Provisions (the Donors) did not vote to accept the Plan; rather, the class that was to be paid in full under the Plan (the Annuitants) voted to accept the Plan." *Id.* at 230-31.

**C.      Required Disclosure Regarding the Pooling of Debtor and Non-Debtor Local Council Assets and Liabilities.**

13.      The Plan bars claimants from pursuing their claims against the approximately 251 non-debtor Local Councils organized as independent legal entities under separate management and control in exchange for an aggregate contribution of $600 million, pools those funds with the other Trust assets, and then allocates those funds among abuse claimants in accordance with the TDP

without regard to what recourse particular individual claimants have against which Local Councils. Further, it contemplates a mechanism under which unrelated third parties (the Chartered Organizations) who have independent tort liability to some but not all abuse claimants, may also be granted a release that would be binding on all abuse claimants without regard to any disclosure, voting, Court process or approval, or consent of those directly affected claimants who actually suffered the tortious sexual assaults or abuse for which those third parties are responsible. Presumably the proceeds of these settlements with Chartered Organizations will also be subject to the general pooling of funds contemplated by the Plan and TDP and distributed without reference to which claimants suffered the abuse at their hands.

14. Claimants' state law rights against Local Councils and Chartered Organizations vary enormously. Many claimants—a clear majority of those proposed to be solicited—have no enforceable claim at all against these entities. These include claimants who have only a claim against the Debtors themselves and the Debtors' insurance, and claims that are time-barred under applicable non-bankruptcy law. Other claimants have rights only against the estate and a particular Local Council or Chartered Organization. Their Local Council or Chartered Organization may have limited resources or responsibility under applicable law. But some claimants, including some of the Claimants, may have strong claims against financially strong or well-insured Local Councils or Chartered Organizations that have the ability to satisfy their claims in full or at least in a greater measure than they may receive under the TDP. For claimants with no, or only weak claims, against third parties, or with claims against financially weak or underinsured third parties, the Plan is a boon, providing them the opportunity for some recovery where the tort system might leave them with none. For claimants of the second kind, the Plan destroys their right to pursue solvent, well-insured entities and compels them to share the contribution from the released entity with claimants who had no such right. The Plan ignores the range of nonbankruptcy outcomes against the non-debtors, and effects a substantive consolidation of the Debtor and the Local Councils, sharing the

assets they are contributing *pro rata* among all claimants, without regard to the entity against which the claimant actually has claims.

15.     Because the claimants hold fundamentally different economic rights against the various non-debtors, the pooling and third-party release features of the Plan violate § 1123(a)(4): creditors with superior claims against more solvent non-debtors are being compelled to relinquish those valuable claims, but are receiving the same treatment as those without such claims.  *In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986) is a leading case in point.  There, a plan placed all unsecured creditors in a single class sharing *pro rata* in a fund comprised of $800,000 contributed by the debtor, and $3,000,000 to be contributed by the creditors who were sponsoring the plan.  792 F.2d at 1150.  The debtor's contribution would fund an approximate 4% dividend for creditors; the creditor contribution an additional 13%.  *Id.*  Critically, the plan also provided that creditors could receive the 13% creditor enhancement only by executing a release in favor of the sponsoring creditors.  *Id.*  For the most part, creditors had only claims derivative of the debtors' claims against the sponsoring creditors, but one creditor – Hawley Fuel Coal—objected to the plan on the basis that, alone among creditors, Hawley asserted a direct guarantee claim against one of the sponsoring creditors, a claim that was substantially more valuable than the derivative claims held by the other unsecured creditors.  *Id.*  The D.C. Circuit agreed.  *Id.* at 1151-52.  Noting that the "most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members," the Court observed that the "other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment."  *Id.* at 1152.  The Court explained:

> It is disparate treatment when members of a common class are required to tender more valuable consideration – be it their claims against specific property of the debtor or some other cognizable chose in action—in exchange for the same percentage of recovery.  *Id.*

16.     In recognizing these principles, the Third Circuit has observed that § 1123(a)(4) "does not require precise equality, only approximate equality." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (*quoting In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)).  "Certain procedural differences, such as a delay in receipt of distributions for some claims, do not alone constitute unequal treatment." *In re W.R. Grace & Co.*, 729 F.3d at 327.  But here, the differences are not minor or procedural, nor is it unworkable to establish how claimants are differentially affected; instead, the differences are substantive and may profoundly alter creditor rights, conferring windfalls on some creditors and starkly prejudicing those with the strongest and most collectible claims under nonbankruptcy law.

17.     It may well be that claimants with rights against non-debtor Local Councils (and Protected Parties) will agree to vote to release the Local Councils and share some or all of the amounts they contribute with other claimants who do not have such rights as part of a general pooling of assets and liabilities.  Perhaps their vote to do so as a class could bind all class members under some circumstances.  But to force pooling of the proceeds of non-debtor settlements based on lumping together a small number of claimants with rights against the wealthier, better-insured settling Local Councils with vastly larger numbers of other claimants without such rights, and giving each claimant one vote on the matter, violates not only the classification and voting provisions in chapter 11, but also the equal treatment mandate of section 1123(a)(4).

18.     Because claimants' rights against the Local Councils fundamentally differ, the Disclosure Statement must address at a minimum:

   a.  Local Council assets and liabilities (including separate insurance assets);

   b.  The claims asserted against each Local Council;

   c.  Claimants' estimated recovery against each Local Council (without regard to insurance shared with the Debtors); and

   d.  The amount contributed by each Local Council for its release.

Only with that information can an individual claimant with claims against a financially strong or well-insured Local Council make an informed judgment whether or not to accept the less favorable treatment offered by the Plan, release the Local Councils, and agree to forego its claims under nonbankruptcy law as against its responsible Local Council.

19.     In addition, under the best interest of the creditors test, each claimant is entitled to receive value under the Plan that is at least equal to its rights in liquidation.  § 1129(a)(7).[3]  In making that calculation the Court must consider the value of rights against non-debtors that are released under the terms of the Plan.  *See, e.g.*, *In re Washington Mutual, Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation."); *In re Quigley Co.*, 437 B.R. 102, 144-46 (Bankr. S.D.N.Y. 2010) (plan violated best interest test because the debtor's liquidation analysis did not reflect that some creditors would retain their rights to sue the solvent non-debtor parent in a chapter 7 liquidation, rights released under the chapter 11 plan).  In *Quigley*, as here, the plan also violated § 1123(a)(4)'s equal treatment requirement even though all class members received the same 7.5% *pro rata* distribution, because only some of those creditors were "being compelled to give up their valuable derivative claims—which [other creditors in that class had already surrendered]—to get the same 7.5% distribution."  437 B.R. at 148.  The court concluded "[j]ust as the retention of the derivative claim in a Quigley chapter 7 results in the violation of the 'best interest' test, the

---

[3] The Debtors assert without authority that the best interests of the creditors test does not apply to them because the Bankruptcy Code does not permit involuntary chapter 7 proceedings to be instituted against them.  Disc. Stmt. (Dkt. No. 5485) at 211.  But there is no logical connection between the bar on involuntary proceedings for non-profits and application of the best interests test as a mandatory chapter 11 confirmation requirement in this case.  The best interests test requires comparison of the plan value with the outcome of a hypothetical chapter 7 proceeding.  The hypothetical chapter 7 proceeding in this case would be a hypothetical voluntary chapter 7 case.  The best interests standard is routinely applied in chapter 11 cases involving non-profit entities.  *See, e.g.*, *In re Roman Catholic Archbishop*, 339 B.R. 215, 227 (Bankr. D. Or. 2006) (discussing application of best interest test to a non-profit entity); *In re Cajun Elec. Power Coop.*, 230 B.R. 715, 741 (Bankr. M.D. La. 1999) (same); *In re General Teamsters, Warehousemen & Helpers Union Local 890*, 225 B.R. 719, 733-34 (Bankr. N.D. Cal. 1998) (same).

compelled surrender of the derivative claim in a Quigley chapter 11 results in 'unequal treatment' under [ ]§ 1123(a)(4)." The same is true here.

20.    The Disclosure Statement's purported "liquidation analysis," Dkt. 5485 at Ex. D, is fatally flawed because it does not explain the factual or legal basis for the Debtors' (or Local Councils') belief that certain assets of the Local Councils are restricted, or indicate how much each Local Council will contribute from their (admittedly unrestricted) assets. *Id.* at 16 (asserting, without elaboration, that restrictions regarding some assets have been "validated by BSA's legal analysis"). *Cf. In re M.J.H. Leasing, Inc.*, 328 B.R. 363, 371 (Bankr. D. Mass. 2005) (finding a failure of proof as to whether a third party's contribution was substantial where no information was provided regarding the third party's assets or ability to pay); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 302 (Bankr. D. Mass. 2002) ("There is no information about whether the contribution is significant in terms of what the partners are able to pay.").

21.    Even taking the liquidation analysis at face value, it shows many Local Councils with significant unrestricted assets, including these with over *$30 million* in unrestricted net assets:

| Local Council | Unrestricted Net Assets | Claims*[4] | Average Per Claim |
|---|---|---|---|
| Sam Houston | $88,569,253 | 752+ | $117,778.26 |
| Orange County | $38,005,058 | 370+ | $102,716.37 |
| Cascade Pacific | $34,421,289 | 487+ | $70,680.26 |
| National Capital Area | $33,820,605 | 532+ | $63,572.57 |
| Silicon Valley & Monterey Bay | $33,397,061 | 291+ | $114,766.53 |
| Chief Seattle | $33,363,479 | 297+ | $112,334.95 |
| Greater Los Angeles | $31,726,269 | 1,136+ | $27,928.05 |

22.    These seven Local Councils, alone, have at least $293,303,014 in unrestricted net assets. Again, according to the Debtors' (flawed) liquidation analysis, the 13 wealthiest Local

---

[4] The Disclosure Statement does not disclose the number of claims against each Local Council. These claim numbers are from a summary posted by the Tort Claimants' Committee. *See* http://www.pszjlaw.com/assets/htmldocuments/BSA%20Summary%20of%20Sexual%20Abuse%20Claims%20003.pdf (last checked August 9, 2021).

Councils have unrestricted net assets that exceed $500 million.  Yet the Debtors suggest all 251

Local Councils should receive releases of current and future claims for a total of $600 million.

**D.      Required Disclosure Regarding Unrelated Non-Debtor Protected Parties.**

23.      The Disclosure Statement and Plan indicate that a post-confirmation trustee can

enter into settlements that will release and enjoin current and future claims against non-debtor

Chartered Organizations, and neither creditors who actually hold abuse claims against such

Chartered Organizations, nor this Court, will have any say in approving that settlement or the

modification of the Court's Channeling Injunction.  Impacted creditors have no right to vote on

that relief, and this Court will not be asked to (or be in a position to) find that the expansion of its

Channeling Injunction to cover a new Protected Party is fair and equitable or that an overwhelming

number of impacted creditors support the relief.  These procedures are wholly inadequate to protect

the rights of the parties being enjoined.  Disclosure must be made as to the identity of any third

party non-debtor Chartered Organization that becomes a Protected Party under the Plan and the

contribution being made to obtain the protection of this Court's Channeling Injunction before the

votes are cast and the votes of impacted creditors separately tallied so this Court can determine

whether there is overwhelming support from impacted creditors, or, in the alternative, if a

settlement with a Chartered Organization is reached post-confirmation that provides for the

modification of the Court's Channeling Injunction to include that Chartered Organization as a

Protected Party, after notice and an opportunity for a hearing to assess the fairness of such post-

confirmation settlement to all affected claimants, at which point the Court can determine whether

the necessary overwhelming majority of affected claimants support the proposed expansion of the

Channeling Injunction.

**E.      Required Disclosure Regarding Coverage Positions Asserted by Liability Insurers.**

24.      The Claimants further object to the adequacy of the Disclosure Statement because

it fails to explain the material risks arising from hotly disputed coverage positions asserted by the

Debtors' and non-debtor Protected Parties' carriers (Dkt. No. 5684) that, if successful in whole or in part, could substantially limit or eliminate insurer contributions and significantly reduce amounts claimants could recover from the Trust.  Although the Claimants believe these self-serving "coverage defenses" are incorrect in the context of this case — legally and factually — court decisions throughout the country have not been uniform in addressing them.  Accordingly, abuse survivors must understand the nature of these risks and that that the insurers are well-funded, experienced in contesting abuse claims in the court system, and fully prepared to engage in protracted litigation over their policy obligations.  A number of "coverage defenses," if successful, could potentially eliminate insurer recoveries altogether, and others could reduce amounts available to Claimants.  Moreover, the agreement of the Local Councils to resolve their liability without the applicable insurers' involvement and the transfer of the Local Council's insurance rights to the Trust trigger *additional coverage defenses that could further diminish the recovery from the insurers from what a claimant could achieve today* [5]  No abuse survivor should read the Disclosure Statement and believe they will receive up to 100% of their claim awarded through the TDP and matrix values without generally understanding these risks.

25.    A number of "coverage defenses" are aimed at eliminating coverage entirely.  For example, some insurers contend that pursuing a bankruptcy to address the abuse liabilities and negotiate a proposed settlement, without first obtaining insurer consent, violates the cooperation obligations of the policyholders and results in the forfeiture of coverage.  Instead of viewing the bankruptcy process as a legitimate means of addressing decades of sexual abuse nationwide, the insurers would transform the bankruptcy into a coverage forfeiture event.  Although Claimants reject this contention, it has been asserted and should be identified and addressed in the Disclosure

---

[5] With respect to any future settlements with Chartered Organizations, the same concerns discussed herein would apply with regard to shared insurance between the Debtors and the settling Chartered Organizations in light of the fact that, starting in approximately 1978, the Chartered Organizations have generally been insured under the same policies as are the Debtors.

Statement as a material risk that the insurers are seeking to shift onto abuse survivors.  However, the position of the insurers in this regard has been asserted and should be identified and addressed in the Disclosure Statement.  Another argument raised by insurers in an effort to eviscerate billions of dollars of historic liability insurance challenges the assignment of insurance policies to the Trust — a cornerstone of the Plan — as violative of the insurance contracts.  The insurers appear to accept that their "anti-assignment" defense is preempted by federal bankruptcy law as to the Debtors, having lost the issue in multiple bankruptcy courts.  *See, e.g.*, *In re Combustion Engineering, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004) (bankruptcy law preempts state law and overrides anti-assignment provisions in debtors' insurance policies).  However, the insurers continue to challenge assignments of non-debtor policies, an area that remains unsettled.  *See id.* at 219 (federal law preemption ruling not applicable to non-debtor participants in bankruptcy); *Fluor Corp. v. Superior Court*, 61 Cal.4th 1175, 1219 (2015) (overturning prior state law cases and permitting assignment of insurance after damage/injury has occurred).  If successful in their anti-assignment arguments, the insurers could deprive the Trust of billions of dollars of insurance assets otherwise available to the nondebtors to cover their liabilities to abuse victims.  As currently drafted, the Disclosure Statement does not provide adequate information to allow a reasonable Claimant to appreciate the material risks of the insurers' positions on these key issues.

26.    Other "coverage defenses" may not eliminate coverage entirely, but seek to reduce available coverage substantially. The Debtors proclaim that the TDP may result in creditors receiving up to 100% of the value assigned to their claim under the TDP, *see* Disc. Stmt. (Dkt. No. 5485) at 214, but they fail to disclose or discuss the insurers' argument that those values are not binding on the insurers and that their duty to indemnify their insureds may be capped at the amounts their insureds paid into the Trust.  Here, again, the law remains unsettled and conflicting.[6]

---

[6] *Compare Fuller–Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958, 999-1000 (Cal. Ct. App. 2006) (finding insurer is only required to pay trust payment percentage, not full allowed value); *Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1178–80 (N.D. Cal. 2016) (discussing *Fuller-Austin* at length and adopting its holding as

If the trust distribution awards are not binding, and if the exposure of the insurers is capped at the contribution of their insureds, an abuse survivor whose claim is valued at $2.7 million may receive a small fraction of that amount. The Disclosure Statement must disclose these material risks so abuse survivors can decide whether to vote in favor of a plan that leaves these issues unresolved.

27.     The Claimants further object because the Disclosure Statement fails to explain how creditors will be affected if the insurers prevail on these contentions. The Disclosure Statement goes to great lengths to make abuse survivors believe there is a chance they will actually receive 100% of the value assigned by the TDP, *see* Disc. Stmt. (Dkt. No. 5485) at 214, but it fails to disclose how Claimants will fare if the insurers prevail on one or more of their "coverage defenses." The Disclosure Statement indicates there are approximately 82,500 non-duplicate claims by survivors of child sexual abuse. As it stands, the Plan would provide each Claimant an average of about $10,000 (or significantly less after administrative expenses), from the funds provided by the Debtors and the Local Councils, far less than the TDP value of these claims. The Debtors rely on the availability of assigned insurance coverages to make up the difference, which underscores why Claimants must have adequate information to evaluate the risks of the Plan, including any risks as to denial or restriction of insurance coverage.

### III. PRAYER

28.     The Court should order the Debtors to modify the Disclosure Statement, the Plan, and the Solicitation Procedures so that (1) there is proper segregation and weighting of the votes of the holders of timely direct abuse claims to enable this Court to make the requisite findings to enter the discharge, third-party releases, and Channeling Injunction that is sought; (2) proper

---

binding law in California on the interpretation of insurance indemnification contracts), *with UNR Indus., Inc. v. Continental Casualty Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991) (concluding under Illinois law, insurer is obligated to pay full allowed value, not just the trust payment percentage, in order to avoid insurer benefitting from UNR's bankruptcy); *National Union Fire Ins. Co. of Pittsburgh v. Porter Hayden Co.*, 2012 U.S. Dist. LEXIS 29568 at *11-16 D. Md. Mar. 6, 2012 (rejecting *Fuller-Austin* and concluding under Maryland law, insurers are required to pay full allowed claim value).

disclosure is made of the assets and liabilities of Local Councils (and any Protected Party) such that direct abuse claimants can meaningfully assess whether the Plan meets the best interests of creditors test; (3) disclosure and opportunity to object to the fairness of any proposed settlement for a Chartered Organization be afforded to all affected claimants before such a Chartered Organization can be deemed a Protected Party under this Court's Channeling Injunction, and (4) disclosure regarding the coverage positions asserted by liability insurers that, if successful in whole or in part, could substantially limit or eliminate insurer contributions and significantly reduce amounts Claimants could recover.

Respectfully submitted,

Dated: August 16, 2021
Wilmington, Delaware

**BIELLI & KLAUDER, LLC**

*/s/ David M. Klauder*
David M. Klauder, Esquire (No. 5769)
1204 N. King Street
Wilmington, DE 19801
Phone: (302) 803-4600
Fax: (302) 397-2557
Email: dklauder@bk-legal.com

and

**GREGORY J. CANNATA & ASSOCIATES, LLP**
Robert Cannata, Esquire
60 East 42nd Street, Suite 932
New York, NY 10165
Phone: (212) 553-9152
Facsimile: (212) 227-4141
Email: rcannata@cannatalaw.com

*Counsel to Cannata & Associates Claimants*

**APPENDIX A**

The foregoing Supplemental Objection to the Adequacy of the Debtors' Disclosure Statement in Support of Amended Chapter 11 Plan of Reorganization and Objection to the Debtors' Revised Proposed Solicitation Procedures Order was filed by the following creditors who each filed a Sexual Abuse Survivor Proof of Claim and are represented by Gregory J. Cannata & Associates, LLP.  The numbers below are the claim numbers for each creditor's Sexual Abuse Survivor Proof of Claim.

| SA-179 | SA-238 | SA-728 | SA-906 | SA-3388 |
|--------|--------|--------|--------|---------|
| SA-13945 | SA-18563 | SA-41358 | SA-46628 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |