## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | **Re: D.I. 5485, 5485, 5488, 5488-1, 3265** |

### THE ZALKIN LAW FIRM CLAIMANTS' SUPPLEMENTAL OBJECTION TO THE ADEQUACY OF DEBTORS' DISCLOSURE STATEMENT IN SUPPORT OF AMENDED CHAPTER 11 PLAN OF REORGANIZATION AND OBJECTION TO THE DEBTORS' REVISED PROPOSED SOLICITATION PROCEDURES ORDER

## I. INTRODUCTION

1.      The various Abuse Claimants set out in Appendix A[1] are represented by Irwin Zalkin, Esq., Devin Storey, Esq., and Kristian Roggendorf, Esq., of the Zalkin Law Firm, P.C. ("the ZLF Claimants") and by William Kelleher, Esq., of Gordon Fournaris & Mammarella, P.A. On May 6, 2020, the ZLF Claimants filed their original Objection (Dkt. 3276) to the Debtors' Disclosure Statement for the Second Amended Plan of Reorganization.  The ZLF Claimants submit this objection separately to address some specific issues related to the voting procedures, for the reasons set out below.

2.      On July 2, 2021, the Debtors filed the *Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 5484) ("the Plan"),[2]

---

[1]   See attached Appendix A, listing the Sexual Abuse Survivor Proof of Claim numbers for the Zalkin Law Firm Claimants.  Several of these claims represent a further amendment of the original filing, and where possible, the latter claim number is used.

[2]   Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan. Statutory references are to the Bankruptcy Code unless otherwise noted.

the *Amended Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* ("the Disclosure Statement") (Dkt. No. 5485), and the *Notice of Filing of Revised Proposed Solicitation Procedures Order* ("the Solicitation Procedures") (Dkt. No. 5488).  On July 7, 2021, the Debtors filed the *Third Amended Notice of Hearing to Consider Approval of Disclosure Statement and Solicitation Procedures for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, (Dkt. No. 5527) and noted that "[t]o the extent any party has already filed an objection to the Disclosure Statement consistent with the procedures prescribed in the Prior Notice, it does not need to refile such objection."  Dkt. No. 5527 at 1.

3.    The ZLF Claimants re-assert and restate the facts, legal arguments, and objections made in their prior objection (Dkt. No. 3276), and the Claimants object to the Fourth Amended Plan's Solicitation Procedures and the Disclosure Statement for the additional reasons stated below.

4.    The Plan is not nearly ready to be put out for a vote.  Many questions the Claimants and others have raised in their prior Objections involve fundamental features of the Plan, including the mechanisms for the treatment of Local Councils, Chartered Organizations, and insurance rights and insured claims. Those questions remain unanswered, leaving the Claimants without adequate information to make an informed judgment regarding the Plan.  *See* § 1125(a)(1), (b).

5.    The Claimants file this Supplemental Objection to point out additional critical flaws that, if unremedied, will render it impossible to confirm the Plan because the solicitation and vote tabulation will have been conducted in an unlawful manner.  In particular, there are five crucial points made here:

(i)    vote tabulation procedures must reflect the enormous differences between the values of claims to prevent the overwhelming number of very low value claims (including

claims that are time-barred under applicable non-bankruptcy law for whom the Plan and the TDP are a windfall) from swamping the votes of abuse survivors presently holding large claims enforceable under state law who will bear the burden of that windfall;

(ii)   vote tabulation procedures and the TDP itself must distinguish among claimants based on which Local Council (if any) is alleged to be co-liable with the Debtors, to avoid those holding claims against financially weak and underinsured Local Councils from swamping the votes of abuse survivors with viable claims against financially strong or well-insured Local Councils, otherwise the burden of extending the Channeling Injunction to all Local Councils will fall entirely on the subset of claimants with valid claims against more asset-rich Local Councils;

(iii)  the Disclosure Statement must incorporate adequate information about the liquidation value of direct abuse claims against non-debtors released by the Plan so individual claimants may assess the Debtors' compliance with the best interests of the creditors test;

(iv)   the identity of any third party non-debtor Chartered Organization designated a Protected Party under the Plan, its potential liability to claimants, and the contribution being made to obtain the protection of this Court's Channeling Injunction, must be disclosed and the votes of affected creditors separately tabulated, before the Channeling Injunction is issued by the Court.  Alternatively, if a settlement with a Chartered Organization is reached post-confirmation that provides for the Court's Channeling Injunction to be modified to designate the Chartered Organization as a Protected Party, the same material information must be disclosed and then all affected claimants must be given notice and an opportunity for a hearing to assess the fairness

of such post-confirmation settlement to the affected claimants before the modification becomes effective, otherwise impacted creditors will have no right to vote on that relief, and this Court will not be asked to (or be in a position to) find that the expansion of its Channeling Injunction to cover a new Protected Party is fair and equitable or that an overwhelming number of impacted creditors support the relief; and

(v)   the Disclosure Statement must incorporate adequate information about the material risks arising from coverage positions asserted by liability insurers for the Debtors and non-debtors that, if successful, in whole or in part, could substantially limit or eliminate insurer contributions and significantly reduce amounts claimants could recover from the Trust.

Unless these five issues are appropriately dealt with prior to solicitation, the defective solicitation will result in a nonconfirmable Plan regardless of the extent of abuse survivor support manifested through the defective voting procedures.


## II.  SOLICITATION PROCEDURES OBJECTION

**A.    The Failure to Differentiate Between Timely Claims and Untimely Claims in Voting Renders the Plan Fundamentally Flawed and Unconfirmable.**

6.    Every individual who was sexually abused during their time in scouting has suffered horribly and each of these individuals deserves to be recognized, heard, and obtain some recovery in the BSA Reorganization Plan.  Even so, not every individual has the same ability under the law of the state in which the injury occurred to pursue recovery for these terrible injuries.

7.    "Holders of allowed claims may vote to accept or reject a Chapter 11 plan. *See* 11 U.S.C. § 1126(a) …   A timely filed proof of claim is deemed allowed unless an interested party objects.  *See* 11 U.S.C. § 502(a) …." *In re Sandia Resorts, Inc.*, 557 B.R. 217, 220 (Bankr. D.N.M.

2016). "The right [to vote] is limited to those who have a claim under § 502 and only those parties may accept or reject the plan. Pursuant to 11 U.S.C. § 502, allowance of the claim is limited to one 'proof of which is filed under section 501.' 11 U.S.C. § 502(a)." *In re Claremont Towers Co.*, 175 B.R. 157, 163 (Bankr. D.N.J. 1994) (emphasis omitted). No party in interest has objected to any particular group or class of claims as being time-barred, so all timely filed proofs of claim should be entitled to vote on the Plan. *See In re Pac. Sunwear of California, Inc.*, No. 16-10882(LSS), 2016 WL 4250681, at *4 (Bankr. D. Del. Aug. 8, 2016) (timely filed proofs of claim are deemed allowed).

8.      No creditor or class of creditors has filed a motion to estimate claims for voting purposes under FRBP 3018. *Pac. Sunwear*, 2016 WL 4250681 at *4-*5 (temporary estimation under Rule 3018 is inappropriate for timely filed proofs of claim unless objection has been filed). No evidence has been submitted to establish the actual value of any particular claim or general subset of abuse claims.

9.      The BSA has proposed assigning all timely-filed proofs of claim a value of $1.00, exclusively for voting purposes. Proposed Solicitation Order at 11-12. Although these proofs of claim have been timely filed, not all of them can be considered timely under the respective state's statute of limitations.

10.      The Debtors estimate that of their 82,500 abuse survivor claims, Disc. Stmt. (Dkt. No. 5485) at 72, only 14,000 identify an alleged abuser and are not presumptively time-barred to varying degrees depending upon the state law applicable to the claim, whereas approximately 59,500 abuse survivor claims are presumptively time-barred. *Id.* at 74, 76 & Exhibit F. The TDP adjusts the value of time-barred claims to reflect the strength of the Debtors' (and their insurers') statute of limitations defense.

11.      Time-barred claims are still claims against a debtor's estate, and may be brought

under the Bankruptcy Code. *In re Motors Liquidation Co.*, 619 B.R. 63, 79 (Bankr. S.D.N.Y. 2020), *citing Lewis v. Lvnv Funding, LLC*, 2015 WL 5819992, at *5 (S.D. Fla. 2015) (citing *In re Simpson*, No. 08-00137, 2008 WL 4216317, at *2 (Bankr. N.D. Ala. Aug. 29, 2008)) ("The claims allowance process of the Bankruptcy Code contemplates that time-barred claims may be filed and expressly preserves the statute of limitations as a defense and a ground for disallowance of the claim."). At the same time, "'if as of the date of the debtor's bankruptcy filing a creditor's claim was barred by the applicable statute of limitations, then the claim must be disallowed upon objection by a party in interest.' *In re Keeler,* 440 B.R. at 360." *Torres v. Asset Acceptance, LLC*, 96 F. Supp. 3d 541, 545 (E.D. Pa. 2015).

12.     The BSA's Plan and Solicitation Procedures Order therefore propose something quite alien to the "fair and equitable" process envisioned by the Bankruptcy Code—claims that are disallowed as a matter of law are being presumptively allowed to vote because of a timely-filed proof of claim. In so doing, the Debtors ignore the mandate of section 1126—to ensure that the Plan receives the support of claimants holding two-thirds of the economic stake in the outcome.

13.     The distribution provisions of the Plan deal with the statute of limitations issue by assigning "tiers" of value to claims from various States and Territories, yielding a percentage of value depending on the locus of the injury. *See* Plan, Exhibit A (Trust Distribution Procedures), Schedule 1 ("Mitigating Scaling Factor Ranges for Statues of Limitation or Repose"). Those ranges are as follows:

| Legend | |
| --- | --- |
| Tier | Scaling Factor |
| Open | 1.0 |
| Gray 1 | .50-.70 |
| Gray 2 | .30-.45 |
| Gray 3 | .10-.25 |
| Closed | .01-.10 |

*Id.* (Dkt. 5484 at 148 of 473). While there are certainly objections to some of the classifications of certain States in certain tiers (*e.g.*, Oregon and Washington State, for instance, are functionally "Open" states—see ORS 12.117; R.C.W. § 4.16.340), these statute of limitations "Mitigating Scaling Factors" represent an intra-Plan method of accounting for the very real differences in values among claims from various states based on factors wholly separate from the merits of the individual claims.

14.     The application of these "Mitigating Scaling Factors" to the Solicitation Procedures for the holders of direct abuse claims poses very little difficulty in implementation during the voting process. In the few instances where multi-state abuse is alleged, it would seem reasonable to apply the Scaling Factor of the highest State in which abuse occurred. Using the mean levels of the ranges is also reasonable. This Court has discretion to do so under Third Circuit precedent. *Bittner v. Borne Chemical Company*, 691 F.2d 134, 138 (3d Cir.1982) (a rational basis satisfies due process in vote estimation rulings by the bankruptcy court).

15.     Under the proposed voting alternative, the weighing of votes according to their statute of limitations tiers would result in the following balance of votes per tier[3]:

---

[3]   The numbers of claims cannot be directly ascertained directly by the ZLF Claimants. These numbers are taken from the Tort Claimants Committee webpage setting out the breakdown of claims by state, territory, and foreign country.
http://www.pszjlaw.com/assets/htmldocuments/BSA%20%20Summary%20of%20Sexual%20Abuse%20Claims.pdf (last visited August 16, 2021).

| Statute of Limitations Tier | Total Number[4] of Votes in Tier | Weighing Factor[5] | Weighted Votes in Tier[6] |
|---|---|---|---|
| Open | 24,246 | 1.0 | 24,246 |
| Gray 1 | 15,746 | 0.6 | 9,447 |
| Gray 2 | 8,642 | 0.375 | 3,203 |
| Gray 3 | 24,289 | 0.175 | 4,251 |
| Closed | 9,048 | 0.05 | 452 |

As can be seen from the above totals, weighing the votes in this manner allows the vast number of claims facing difficult statute of limitations environments to be balanced against the otherwise unrestricted claims of those in open state court environments. Such a voting mechanism prevents the predominant weight enjoyed by the lower tiers of claims from overwhelming claims that face no such limitations in state court proceedings.

16.     The alternative is having legally invalid claims voting on equal footing with fully valid and often exceedingly valuable claims. Although this is not an asbestos case, caselaw criticisms of 524(g) plans with respect to voting echo the problems in this case, because equally weighted voting among individuals with widely different levels of injury "allows the more numerous holders of small claims to outvote those with … serious injuries, who, unlike in a class action settlement, cannot opt out of the trust mechanism." *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 361–62 (3d Cir. 2012). Here, all of the sexual abuse survivors vary generally in the severity of the abuse they suffered and the amount of damage it has caused in their lives. There is no efficient or consistent way to distinguish claims on the basis of severity. However, there is an

---

[4]   Claims evaluated amount to 81,971 claims. Claims involving territories and foreign countries that are not included in BSA's Schedule 1 of Mitigating Scaling Factors have not been included, and amount to fewer than 500 total claims.

[5]   As discussed above, the proposed weighing method uses the median tier Mitigating Scaling Factor value in calculating overall vote weight.

[6]   Vote totals have been rounded to even numbers for ease of reference.

exceedingly simple means of weighing claims based on their legal validity. A meaningful weighting of votes based on the nature of a claimant's injury or damage poses significant difficulties when faced with 82,500 separate claims, even if just estimating such claims for voting purposes.

17.     Section 1126 contains two voting thresholds that must be satisfied in order to confirm a chapter 11 plan consensually—one half in number and two-thirds in amount to ensure that the plan achieves creditor support both by reference to the number of claims, but also by reference to the amount of liability represented by those claims.  NORTON BANKRUPTCY LAW AND PRACTICE 3D § 110:19 (William L. Norton III ed.) ("The requirement of Code § 1126 that a plan be accepted by two-thirds in amount protects the holders of large claims, while the majority-in-number requirement protects the holders of smaller claims.").  Such a mechanism prevents a plan supported by many small claims from being confirmed without the support of a supermajority of those holding the bulk of the economic stake in the outcome.

18.     Given the distribution of claims in this case, under the Solicitation Procedures it would be theoretically possible for the Debtors to confirm a plan rejected by all 14,000 abuse claimants with enforceable state law claims against the Debtors, and also compel the release of their co-liable Local Councils, settling Chartered Organizations, and settling insurers, with only the votes of those holding claims that are time-barred or otherwise incapable of being enforced outside of bankruptcy against any of those entities.  Moreover, under these tabulation and voting protocols, this Court would have no mechanism for assessing the degree of actual creditor support for the Plan from those holding valid enforceable claims.

19.     The Solicitation Procedures must differentiate among claims to give practical effect to the two-thirds in amount requirement of § 1126.  At a minimum, the votes of those holding time

barred claims should be segregated and weighted in accordance with their TDP discount value to ameliorate the distortions that will result from the proposed vote tabulation protocol.

**B.     Required Vote Tabulation that Reflects Whether Claimants Have Claims Against Particular Local Councils or Chartered Organizations.**

20.      The Solicitation Procedures (1) allow creditors who do not have a claim against a non-debtor Local Council or Chartered Organization to vote on whether the current and future claims against the non-debtor should be released and enjoined, even though they will not be impacted by that release, and (2) fail to provide any mechanism for this Court (or a creditor) to determine whether such relief was supported by a sufficient number of the creditors actually impacted by the release being granted.

21.      The Court must eventually enter specific findings that any third-party release was "overwhelmingly" supported by the creditors whose claims are impacted by the release. *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Lower Bucks Hosp.*, 471 B.R. 419, 456 (Bankr. E.D. Pa. 2012) ("A critical factor in assessing the confirmability of a plan that includes a third-party release is whether the adversely affected class of creditors have manifested their strong support for the plan through the plan voting process."); *In re Saxby's Coffee Worldwide, LLC*, 436 B.R. 331, 338 (Bankr. E.D. Pa. 2010) (a third-party release must be "widely supported by the creditor constituency that includes the parties being restrained"); *see also In re Medford Crossings N., LLC*, No. 07-25115, 2011 WL 182815, at \*19 (Bankr. D.N.J. Jan. 20, 2011) (declining to confirm a chapter 11 plan in part because "[t]he parties that would be restrained from proceeding against the Third Party Releasees are receiving little or no distribution under the Plan and would be precluded from asserting their claims against the Releasees."). As *Saxby's Coffee* recognized: "[i]t is a very narrow legal realm in which a party's legal rights may be restricted because the needs of the many outweigh the rights of the few." 436 B.R. at 338. The Solicitation

Procedures are not constructed in a way that allows the Court to make the required findings regarding the support from affected creditors.

22.    *In re National Heritage Foundation, Inc.*, 478 B.R. 216, 230 (Bankr. E.D. Va. 2012), illustrates the importance of distinguishing between impacted and unimpacted creditors in conferring third-party releases.  In that case, the debtor argued a third-party release should be approved because it was "overwhelmingly approved by the creditors."  *Id.* at 230.  The Court rejected the release because the votes that constituted the "overwhelming majority" were not cast by creditors who were impacted by the release: "the class impacted by the Release Provisions (the Donors) did not vote to accept the Plan; rather, the class that was to be paid in full under the Plan (the Annuitants) voted to accept the Plan."  *Id.* at 230-31.

### III.  DISCLOSURE STATEMENT OBJECTIONS

**A.    Required Disclosure Regarding the Pooling of Debtor and Non-Debtor Local Council Assets and Liabilities.**

23.    The Plan bars claimants from pursuing their claims against the approximately 251 non-debtor Local Councils organized as independent legal entities under separate management and control in exchange for an aggregate contribution of $600 million, pools those funds with the other Trust assets, and then allocates those funds among abuse claimants in accordance with the TDP without regard to what recourse particular individual claimants have against which Local Councils.  Further, it contemplates a mechanism under which unrelated third parties (the Chartered Organizations) who have independent tort liability to some but not all abuse claimants, may also be granted a release that would be binding on all abuse claimants without regard to any disclosure, voting, Court process or approval, or consent of those directly affected claimants who actually suffered the tortious sexual assaults or abuse for which those third parties are responsible. Presumably the proceeds of these settlements with Chartered Organizations will also be subject to

the general pooling of funds contemplated by the Plan and TDP and distributed without reference to which claimants suffered the abuse at their hands.

24.     Claimants' state law rights against Local Councils and Chartered Organizations vary enormously.  Many claimants—a clear majority of those proposed to be solicited—have no enforceable claim at all against these entities.  These include claimants who have only a claim against the Debtors themselves and the Debtors' insurance, and claims that are time-barred under applicable non-bankruptcy law.  Other claimants have rights only against the estate and a particular Local Council or Chartered Organization.  Their Local Council or Chartered Organization may have limited resources or responsibility under applicable law.  But some claimants, including some of the Claimants, may have strong claims against financially strong or well-insured Local Councils or Chartered Organizations that have the ability to satisfy their claims in full or at least in a greater measure than they may receive under the TDP.  For claimants with no, or only weak claims, against third parties, or with claims against financially weak or underinsured third parties, the Plan is a boon, providing them the opportunity for some recovery where the tort system might leave them with none.  For claimants of the second kind, the Plan destroys their right to pursue solvent, well-insured entities and compels them to share the contribution from the released entity with claimants who had no such right.  The Plan ignores the range of nonbankruptcy outcomes against the non-debtors, and effects a substantive consolidation of the Debtor and the Local Councils, sharing the assets they are contributing *pro rata* among all claimants, without regard to the entity against which the claimant actually has claims.

25.     Because the claimants hold fundamentally different economic rights against the various non-debtors, the pooling and third-party release features of the Plan violate § 1123(a)(4): creditors with superior claims against more solvent non-debtors are being compelled to relinquish those valuable claims, but are receiving the same treatment as those without such claims.  *In re*

*AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986) is a leading case in point.  There, a plan placed all unsecured creditors in a single class sharing *pro rata* in a fund comprised of $800,000 contributed by the debtor, and $3,000,000 to be contributed by the creditors who were sponsoring the plan.  792 F.2d at 1150.  The debtor's contribution would fund an approximate 4% dividend for creditors; the creditor contribution an additional 13%.  *Id.*  Critically, the plan also provided that creditors could receive the 13% creditor enhancement only by executing a release in favor of the sponsoring creditors.  *Id.*  For the most part, creditors had only claims derivative of the debtors' claims against the sponsoring creditors, but one creditor – Hawley Fuel Coal—objected to the plan on the basis that, alone among creditors, Hawley asserted a direct guarantee claim against one of the sponsoring creditors, a claim that was substantially more valuable than the derivative claims held by the other unsecured creditors.  *Id.*  The D.C. Circuit agreed.  *Id.* at 1151-52.  Noting that the "most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members," the Court observed that the "other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment." *Id.* at 1152.  The Court explained:

> It is disparate treatment when members of a common class are required to tender more valuable consideration – be it their claims against specific property of the debtor or some other cognizable chose in action—in exchange for the same percentage of recovery.  *Id.*

26.    In recognizing these principles, the Third Circuit has observed that § 1123(a)(4) "does not require precise equality, only approximate equality." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (*quoting In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)).  "Certain procedural differences, such as a delay in receipt of distributions for some claims, do not alone constitute unequal treatment." *In re W.R. Grace & Co.*, 729 F.3d at 327.  But, here the differences are not minor or procedural, nor is it unworkable to establish how claimants are

differentially affected; instead, the differences are substantive and may profoundly alter creditor rights, conferring windfalls on some creditors and starkly prejudicing those with the strongest and most collectible claims under nonbankruptcy law.

27.      It may well be that claimants with rights against non-debtor Local Councils (and Protected Parties) will agree to vote to release the Local Councils and share some or all of the amounts they contribute with other claimants who do not have such rights as part of a general pooling of assets and liabilities.  Perhaps their vote to do so as a class could bind all class members under some circumstances.  But to force pooling of the proceeds of non-debtor settlements based on lumping together a small number of claimants with rights against the wealthier, better-insured settling Local Councils with vastly larger numbers of other claimants without such rights, and giving each claimant one vote on the matter, violates not only the classification and voting provisions in chapter 11, but also the equal treatment mandate of section 1123(a)(4).

28.      Because claimants' rights against the Local Councils fundamentally differ, the Disclosure Statement must address at a minimum:

    a.     Local Council assets and liabilities (including separate insurance assets);

    b.     The claims asserted against each Local Council;

    c.     Claimants' estimated recovery against each Local Council (without regard to insurance shared with the Debtors); and

    d.     The amount contributed by each Local Council for its release.

Only with that information can an individual claimant with claims against a financially strong or well-insured Local Council make an informed judgment whether or not to accept the less favorable treatment offered by the Plan, release the Local Councils, and agree to forego its claims under nonbankruptcy law as against its responsible Local Council.

29.     In addition, under the best interest of the creditors test, each claimant is entitled to receive value under the Plan that is at least equal to its rights in liquidation.  § 1129(a)(7).[7]  In making that calculation the Court must consider the value of rights against non-debtors that are released under the terms of the Plan.  *See, e.g.*, *In re Washington Mutual, Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation."); *In re Quigley Co.*, 437 B.R. 102, 144-46 (Bankr. S.D.N.Y. 2010) (plan violated best interest test because the debtor's liquidation analysis did not reflect that some creditors would retain their rights to sue the solvent non-debtor parent in a chapter 7 liquidation, rights released under the chapter 11 plan).  In *Quigley*, as here, the plan also violated § 1123(a)(4)'s equal treatment requirement even though all class members received the same 7.5% *pro rata* distribution, because only some of those creditors were "being compelled to give up their valuable derivative claims—which [other creditors in that class had already surrendered]—to get the same 7.5% distribution."  437 B.R. at 148.  The court concluded "[j]ust as the retention of the derivative claim in a Quigley chapter 7 results in the violation of the 'best interest' test, the

---

[7] The Debtors assert without authority that the best interests of the creditors test does not apply to them because the Bankruptcy Code does not permit involuntary chapter 7 proceedings to be instituted against them.  Disc. Stmt. (Dkt. No. 5485) at 211.  But there is no logical connection between the bar on involuntary proceedings for non-profits and application of the best interests test as a mandatory chapter 11 confirmation requirement in this case.  The best interests test requires comparison of the plan value with the outcome of a hypothetical chapter 7 proceeding.  The hypothetical chapter 7 proceeding in this case would be a hypothetical voluntary chapter 7 case.  The best interests standard is routinely applied in chapter 11 cases involving non-profit entities. *See, e.g.*, *In re Roman Catholic Archbishop*, 339 B.R. 215, 227 (Bankr. D. Or. 2006) (discussing application of best interest test to plan proposed by a non-profit entity); *In re Cajun Elec. Power Coop.*, 230 B.R. 715, 741 (Bankr. M.D. La. 1999) (same); *In re General Teamsters, Warehousemen & Helpers Union Local 890*, 225 B.R. 719, 733-34 (Bankr. N.D. Cal. 1998) (same).

compelled surrender of the derivative claim in a Quigley chapter 11 results in 'unequal treatment' under [ ]§ 1123(a)(4)."  The same is true here.

30.     The Disclosure Statement's purported "liquidation analysis," Dkt. 5485 at Ex. D, is fatally flawed because it does not explain the factual or legal basis for the Debtors' (or Local Councils') belief that certain assets of the Local Councils are restricted, or indicate how much each Local Council will contribute from their (admittedly unrestricted) assets.  *Id.* at 16 (asserting, without elaboration, that restrictions regarding some assets have been "validated by BSA's legal analysis").  *Cf. In re M.J.H. Leasing, Inc.*, 328 B.R. 363, 371 (Bankr. D. Mass. 2005) (finding a failure of proof as to whether a third party's contribution was substantial where no information was provided regarding the third party's assets or ability to pay); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 302 (Bankr. D. Mass. 2002) ("There is no information about whether the contribution is significant in terms of what the partners are able to pay.").

31.     Even taking the liquidation analysis at face value, it shows many Local Councils with significant unrestricted assets, including these with over *$30 million* in unrestricted net assets:

| Local Council | Unrestricted Net Assets | Claims*[8] | Average Per Claim |
|---|---|---|---|
| Sam Houston | $88,569,253 | 752+ | $117,778.26 |
| Orange County | $38,005,058 | 370+ | $102,716.37 |
| Cascade Pacific | $34,421,289 | 487+ | $70,680.26 |
| National Capital Area | $33,820,605 | 532+ | $63,572.57 |
| Silicon Valley & Monterey Bay | $33,397,061 | 291+ | $114,766.53 |
| Chief Seattle | $33,363,479 | 297+ | $112,334.95 |
| Greater Los Angeles | $31,726,269 | 1,136+ | $27,928.05 |

---

[8] The Disclosure Statement does not disclose the number of claims against each Local Council. These claim numbers are from a summary posted by the Tort Claimants' Committee. *See* http://www.pszjlaw.com/assets/htmldocuments/BSA%20Summary%20of%20Sexual%20Abuse%20Claims%20003.pdf (last checked August 9, 2021).

32.     These seven Local Councils, alone, have at least $293,303,014 in unrestricted net assets.  Again, according to the Debtors' (flawed) liquidation analysis, the 13 wealthiest Local Councils have unrestricted net assets that exceed $500 million.  Yet the Debtors suggest all 251 Local Councils should receive releases of current and future claims for a total of $600 million.

**B.     Required Disclosure Regarding Unrelated Non-Debtor Protected Parties.**

33.     The Disclosure Statement and Plan indicate that a post-confirmation trustee can enter into settlements that will release and enjoin current and future claims against non-debtor Chartered Organizations, and neither creditors who actually hold abuse claims against such Chartered Organizations, nor this Court, will have any say in approving that settlement or the modification of the Court's Channeling Injunction.  Impacted creditors have no right to vote on that relief, and this Court will not be asked to (or be in a position to) find that the expansion of its Channeling Injunction to cover a new Protected Party is fair and equitable or that an overwhelming number of impacted creditors support the relief.  These procedures are wholly inadequate to protect the rights of the parties being enjoined.  Disclosure must be made as to the identity of any third party non-debtor Chartered Organization that becomes a Protected Party under the Plan and the contribution being made to obtain the protection of this Court's Channeling Injunction before the votes are cast and the votes of impacted creditors separately tallied so this Court can determine whether there is overwhelming support from impacted creditors, or, in the alternative, if a settlement with a Chartered Organization is reached post-confirmation that provides for the modification of the Court's Channeling Injunction to include that Chartered Organization as a Protected Party, after notice and an opportunity for a hearing to assess the fairness of such post-confirmation settlement to all affected claimants, at which point the Court can determine whether the necessary overwhelming majority of affected claimants support the proposed expansion of the Channeling Injunction.

C.      **Required Disclosure Regarding Coverage Positions Asserted by Liability Insurers.**

34.      The Claimants further object to the adequacy of the Disclosure Statement because it fails to explain the material risks arising from hotly disputed coverage positions asserted by the Debtors' and non-debtor Protected Parties' carriers (Dkt. No. 5684) that, if successful in whole or in part, could substantially limit or eliminate insurer contributions and significantly reduce amounts claimants could recover from the Trust. Although the Claimants believe these self-serving "coverage defenses" are incorrect in the context of this case — legally and factually — court decisions throughout the country have not been uniform in addressing them. Accordingly, abuse survivors must understand the nature of these risks and that that the insurers are well-funded, experienced in contesting abuse claims in the court system, and fully prepared to engage in protracted litigation over their policy obligations. A number of "coverage defenses," if successful, could potentially eliminate insurer recoveries altogether, and others could reduce amounts available to Claimants. Moreover, the agreement of the Local Councils to resolve their liability without the applicable insurers' involvement and the transfer of the Local Council's insurance rights to the Trust trigger *additional coverage defenses that could further diminish the recovery from the insurers from what a claimant could achieve today* [9] No abuse survivor should read the Disclosure Statement and believe they will receive up to 100% of their claim awarded through the TDP and matrix values without generally understanding these risks.

35.      A number of "coverage defenses" are aimed at eliminating coverage entirely. For example, some insurers contend that pursuing a bankruptcy to address the abuse liabilities and negotiate a proposed settlement, without first obtaining insurer consent, violates the cooperation

---

[9] With respect to any future settlements with Chartered Organizations, the same concerns discussed herein would apply with regard to shared insurance between the Debtors and the settling Chartered Organizations in light of the fact that, starting in approximately 1978, the Chartered Organizations have generally been insured under the same policies as are the Debtors.

obligations of the policyholders and results in the forfeiture of coverage. Instead of viewing the bankruptcy process as a legitimate means of addressing decades of sexual abuse nationwide, the insurers would transform the bankruptcy into a coverage forfeiture event. Although Claimants reject this contention, it has been asserted and should be identified and addressed in the Disclosure Statement as a material risk that the insurers are seeking to shift onto abuse survivors. However, the position of the insurers in this regard has been asserted and should be identified and addressed in the Disclosure Statement. Another argument raised by insurers in an effort to eviscerate billions of dollars of historic liability insurance challenges the assignment of insurance policies to the Trust — a cornerstone of the Plan — as violative of the insurance contracts. The insurers appear to accept that their "anti-assignment" defense is preempted by federal bankruptcy law as to the Debtors, having lost the issue in multiple bankruptcy courts. *See, e.g.*, *In re Combustion Engineering, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004) (bankruptcy law preempts state law and overrides anti-assignment provisions in debtors' insurance policies). However, the insurers continue to challenge assignments of non-debtor policies, an area that remains unsettled. *See id.* at 219 (federal law preemption ruling not applicable to non-debtor participants in bankruptcy); *Fluor Corp. v. Superior Court*, 61 Cal.4th 1175, 1219 (2015) (overturning prior state law cases and permitting assignment of insurance after damage/injury has occurred). If successful in their anti-assignment arguments, the insurers could deprive the Trust of billions of dollars of insurance assets otherwise available to the nondebtors to cover their liabilities to abuse victims. As currently drafted, the Disclosure Statement does not provide adequate information to allow a reasonable Claimant to appreciate the material risks of the insurers' positions on these key issues.

36.     Other "coverage defenses" may not eliminate coverage entirely, but seek to reduce available coverage substantially. The Debtors proclaim that the TDP may result in creditors receiving up to 100% of the value assigned to their claim under the TDP, *see* Disc. Stmt. (Dkt. No.

5485) at 214, but they fail to disclose or discuss the insurers' argument that those values are not binding on the insurers and that their duty to indemnify their insureds may be capped at the amounts their insureds paid into the Trust. Here, again, the law remains unsettled and conflicting.[10] If the trust distribution awards are not binding, and if the exposure of the insurers is capped at the contribution of their insureds, an abuse survivor whose claim is valued at $2.7 million may receive a small fraction of that amount. The Disclosure Statement must disclose these material risks so abuse survivors can decide whether to vote in favor of a plan that leaves these issues unresolved.

37.     The Claimants further object because the Disclosure Statement fails to explain how creditors will be affected if the insurers prevail on these contentions. The Disclosure Statement goes to great lengths to make abuse survivors believe there is a chance they will actually receive 100% of the value assigned by the TDP, *see* Disc. Stmt. (Dkt. No. 5485) at 214, but it fails to disclose how Claimants will fare if the insurers prevail on one or more of their "coverage defenses." The Disclosure Statement indicates there are approximately 82,500 non-duplicate claims by survivors of child sexual abuse. As it stands, the Plan would provide each Claimant an average of about $10,000 (or significantly less after administrative expenses), from the funds provided by the Debtors and the Local Councils, far less than the TDP value of these claims. The Debtors rely on the availability of assigned insurance coverages to make up the difference, which

---

[10] *Compare Fuller–Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958, 999-1000 (Cal. Ct. App. 2006) (finding insurer is only required to pay trust payment percentage, not full allowed value); *Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1178–80 (N.D. Cal. 2016) (discussing *Fuller-Austin* at length and adopting its holding as binding law in California on the interpretation of insurance indemnification contracts), *with UNR Indus., Inc. v. Continental Casualty Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991) (concluding under Illinois law, insurer is obligated to pay full allowed value, not just the trust payment percentage, in order to avoid insurer benefitting from UNR's bankruptcy); *National Union Fire Ins. Co. of Pittsburgh v. Porter Hayden Co.*, 2012 U.S. Dist. LEXIS 29568 at *11-16 D. Md. Mar. 6, 2012 (rejecting *Fuller-Austin* and concluding under Maryland law, insurers are required to pay full allowed claim value).

underscores why Claimants must have adequate information to evaluate the risks of the Plan, including any risks as to denial or restriction of insurance coverage.

## IV.  PRAYER

38.    In addition to the relief requested in the Objection and Supplemental Objection filed by ZLF Claimants, the Court should order the Debtors to modify the Solicitation Procedures so that there is proper weighting of the votes of the holders of timely direct abuse claims, including proper weighing of claims from Oregon and Washington State, to enable this Court to make the requisite findings to enter the discharge, third-party releases, and Channeling Injunction that is sought.

**DATED**: August 16, 2021          /s/ *William M. Kelleher*

William M. Kelleher, Esq.
**GORDON FOURNARIS & MAMMARELLA, P.A.**
1925 Lovering Avenue
Wilmington, DE 19806
Tel: 302-652-2900
Fax: 302-652-1142 (telefax)
WKelleher@gfmlaw.com

and

Irwin Zalkin, Esq.
Devin Storey, Esq.
Kristian Roggendorf, Esq.
(all admitted *pro hac vice*)
**THE ZALKIN LAW FIRM, P.C.**
10590 W. Ocean Air Dr. #125
San Diego, CA 92130
Tel:  858-259-3011
Fax:  858-259-3015

# APPENDIX A

The "Zalkin Law Firm Claimants" consist of the following claimants represented by either the Zalkin Law Firm, P.C., exclusively, or by the Zalkin Law Firm, P.C., jointly with the law firm of Dumas & Vaughn, LLP, Portland, OR (joint representation indicated with "*"), or those represented jointly with the firm of Potter Hardy, LLP, of San Diego, CA (joint representation designated with a "#"). These claimants are identified by the claim number provided in their initial claim filing or the latest amended claim number on file, as appropriate:

SA37970; SA43527; SA43531; SA43537; SA44968; SA44970; SA46081; SA46090; SA47689; SA54709; SA54721; SA54807; SA58626; SA58646; SA58657; SA58674; SA58680; SA58700; SA58743; SA63163; SA63165; SA63175; SA63188; SA63190; SA63201; SA63208; SA63220; SA67605; SA67612; SA67614; SA67630; SA67633; SA67637; SA67660; SA67671; SA67687; SA77282; SA77319; SA77322; SA77364; SA77391; SA77397; SA77425; SA77438; SA77572; SA77585; SA81313; SA77619; SA77676; SA77749; SA77783; SA77789; SA77849; SA77911; SA77922; SA77927; SA78074; SA78117; SA78168; SA78190; SA78250; SA78329; SA78384; SA78390; SA78424; SA78482; SA78618; SA78622; SA84481; SA84496; SA84562; SA84965; SA88613; SA89201; SA89203; SA90197; SA90247; SA90282; SA90399; SA90468; SA90728; SA90739; SA90799; SA91547; SA93305; SA93523; SA97419; SA97420; SA97421; SA97423; SA97424; SA97426; SA97429; SA97430; SA97431; SA104530; SA104562; SA105075; SA105807; SA105822; SA105826; SA105875; SA105886; SA105891; SA105896; SA105919; SA105928; SA106168; SA106521; SA107360; SA107363; SA107390; SA107392; SA107393; SA107394; SA107396; SA107399; SA107401; SA107419; SA18072*; SA29655*; SA34531*; SA34947*; SA40260*; SA40722*; SA48079*; SA51702*; SA51733*; SA52861*; SA90485*; SA105016*; SA105017*; SA105020*; SA105022*; SA105063*; SA105809*; SA105810*; SA105811*; SA105813*; SA105814*; SA105815*; SA105816*; SA74196#; SA106523#