## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
|  | Jointly Administered |
| Debtors. | **Re: D.I. 5485, 5488, 5488-1, 3265** |

### CLAIMANT 23060's SUPPLEMENTAL OBJECTION TO THE ADEQUACY OF DEBTORS' DISCLOSURE STATEMENT IN SUPPORT OF AMENDED CHAPTER 11 PLAN OF REORGANIZATION AND OBJECTION TO THE DEBTORS' REVISED PROPOSED SOLICITATION PROCEDURES ORDER

### I.  INTRODUCTION

1.      On May 6, 2021, Claimant 23060 represented by Stephanie Morris ("the Claimant") filed an *Objection to the Adequacy of Debtors' Disclosure Statement in Support of Amended Chapter 11 Plan of Reorganization* with a claim number of 5841 which was originally assigned to Claimant in the Proof of Claim. (May 6, 2021, Dkt. No. 3163) (See also, Exhibit A). Undersigned counsel recently discovered this claim was reassigned claim number 23060. Therefore, the Claimant requests this Honorable Court consider the initial objection filed by the Claimant, along with the supplemental objection contained herein.

2.      On July 2, 2021, the Debtors filed the *Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (Dkt. No. 5484) ("the Plan"),[1] the *Amended Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* ("the Disclosure Statement") (Dkt. No. 5485), and the *Notice of Filing of Revised Proposed Solicitation Procedures Order* ("the Solicitation Procedures") (Dkt. No. 5488).  On July 7, 2021, the Debtors filed the *Third Amended Notice of*

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.  Statutory references are to the Bankruptcy Code unless otherwise noted.

*Hearing to Consider Approval of Disclosure Statement and Solicitation Procedures for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, (Dkt. No. 5527) and noted that "[t]o the extent any party has already filed an objection to the Disclosure Statement consistent with the procedures prescribed in the Prior Notice, it does not need to refile such objection."  Dkt. No. 5527 at 1.

3.      The Claimant re-asserts and restates the facts, legal arguments, and objections made in the prior objection, and objects to the Disclosure Statement and the Solicitation Procedures for the additional reasons stated below.

## II.  SUPPLEMENTAL OBJECTION

4.      The Plan is not nearly ready to be put out for a vote.  Many questions the Claimant and others have raised in prior Objections involve fundamental features of the Plan, including the mechanisms for the treatment of Local Councils, Chartered Organizations, and insurance rights and insured claims. Those questions remain unanswered, leaving Claimants without adequate information to make an informed judgment regarding the Plan.  *See* § 1125(a)(1), (b).

5.      The Claimant files this Supplemental Objection to point out additional critical flaws that, if unremedied, will render it impossible to confirm the Plan because the solicitation and vote tabulation will have been conducted in an unlawful manner.  In particular, there are five crucial points made here:

> (i) vote tabulation procedures must reflect the enormous differences between the values of claims to prevent the overwhelming number of very low value claims (including claims that are time-barred under applicable non-bankruptcy law for whom the Plan and the TDP are a windfall) from swamping the votes of abuse survivors presently holding large claims enforceable under state law who will bear the burden of that windfall;

> (ii) vote tabulation procedures and the TDP itself must distinguish among claimants based on which Local Council (if any) is alleged to be co-liable with the Debtors, to avoid

those holding claims against financially weak and underinsured Local Councils from swamping the votes of abuse survivors with viable claims against financially strong or well-insured Local Councils, otherwise the burden of extending the Channeling Injunction to all Local Councils will fall entirely on the subset of claimants with valid claims against more asset-rich Local Councils;

(iii) the Disclosure Statement must incorporate adequate information about the liquidation value of direct abuse claims against non-debtors released by the Plan so individual claimants may assess the Debtors' compliance with the best interests of the creditors test;

(iv) the identity of any third party non-debtor Chartered Organization designated a Protected Party under the Plan, its potential liability to claimant, and the contribution being made to obtain the protection of this Court's Channeling Injunction, must be disclosed and the votes of affected creditors separately tabulated, before the Channeling Injunction is issued by the Court.  Alternatively, if a settlement with a Chartered Organization is reached post-confirmation that provides for the Court's Channeling Injunction to be modified to designate the Chartered Organization as a Protected Party, the same material information must be disclosed and then all affected claimants must be given notice and an opportunity for a hearing to assess the fairness of such post-confirmation settlement to the affected claimants before the modification becomes effective, otherwise impacted creditors will have no right to vote on that relief, and this Court will not be asked to (or be in a position to) find that the expansion of its Channeling Injunction to cover a new Protected Party is fair and equitable or that an overwhelming number of impacted creditors support the relief; and

(v) the Disclosure Statement must incorporate adequate information about the material risks arising from coverage positions asserted by liability insurers for the Debtors

and non-debtors that, if successful, in whole or in part, could substantially limit or eliminate insurer contributions and significantly reduce amounts claimants could recover from the Trust.

Unless these five issues are appropriately dealt with prior to solicitation, the defective solicitation will result in a nonconfirmable Plan regardless of the extent of abuse survivor support manifested through the defective voting procedures.

**A.    Weighted Voting.**

6.    Section 1126 contains two voting thresholds that must be satisfied in order to confirm a chapter 11 plan consensually—one half in number and two-thirds in amount to ensure that the plan achieves creditor support both by reference to the number of claims, but also by reference to the amount of liability represented by those claims.  NORTON BANKRUPTCY LAW AND PRACTICE 3D § 110:19 (William L. Norton III ed.) ("The requirement of Code § 1126 that a plan be accepted by two-thirds in amount protects the holders of large claims, while the majority-in-number requirement protects the holders of smaller claims.").  Such a mechanism prevents a plan supported by many small claims from being confirmed without the support of a supermajority of those holding the bulk of the economic stake in the outcome.

7.    The Debtors estimate that of their 82,500 abuse survivor claims, Disc. Stmt. (Dkt. No. 5485) at 72, only 14,000 identify an alleged abuser and are not presumptively time-barred to varying degrees depending upon the state law applicable to the claim, whereas approximately 59,500 abuse survivor claims are presumptively time-barred.  *Id.* at 74, 76 & Exhibit F.  The TDP adjusts the value of time-barred claims to reflect the strength of the Debtors' (and their insurers') statute of limitations defense.  But the Solicitation Procedures, at ¶ 25, without any citation to legal authority or supporting argument, allow, for voting purposes, all direct abuse claims at $1 regardless of timeliness, and regardless of TDP value.  In so doing, the Debtors ignore the mandate

of section 1126—to ensure that the Plan receives the support of claimants holding two-thirds of the economic stake in the outcome.

8.      Given the distribution of claims in this case, under the Solicitation Procedures it would be theoretically possible for the Debtors to confirm a plan rejected by all 14,000 abuse claimants with enforceable state law claims against the Debtors, and also compel the release of their co-liable Local Councils, settling Chartered Organizations, and settling insurers, with only the votes of those holding claims that are time-barred or otherwise incapable of being enforced outside of bankruptcy against any of those entities.  Moreover, under these tabulation and voting protocols, this Court would have no mechanism for assessing the degree of actual creditor support for the Plan from those holding valid enforceable claims.[2]

9.      The Solicitation Procedures must differentiate among claims to give practical effect to the two-thirds in amount requirement of § 1126.  At a minimum, the votes of those holding time barred claims should be segregated and weighted in accordance with their TDP discount value to ameliorate the distortions that will result from the proposed vote tabulation protocol.

**B.      Required Vote Tabulation that Reflects Whether Claimants Have Claims Against Particular Local Councils or Chartered Organizations.**

10.      The Solicitation Procedures (1) allow creditors who do not have a claim against a non-debtor Local Council or Chartered Organization to vote on whether the current and future claims against the non-debtor should be released and enjoined, even though they will not be impacted by that release, and (2) fail to provide any mechanism for this Court (or a creditor) to determine whether such relief was supported by a sufficient number of the creditors actually impacted by the release being granted.

---

[2] Although there are presently no Chartered Organization settlements, if any such settlements are entered into, the same voting and distributional concerns discussed herein with respect to Local Council settlements would likewise apply to any Chartered Organizations that may seek to become Protected Parties under the Plan.

11.     The Court must eventually enter specific findings that any third-party release was "overwhelmingly" supported by the creditors whose claims are impacted by the release.  *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Lower Bucks Hosp.*, 471 B.R. 419, 456 (Bankr. E.D. Pa. 2012) ("A critical factor in assessing the confirmability of a plan that includes a third-party release is whether the adversely affected class of creditors have manifested their strong support for the plan through the plan voting process."); *In re Saxby's Coffee Worldwide, LLC*, 436 B.R. 331, 338 (Bankr. E.D. Pa. 2010) (a third-party release must be "widely supported by the creditor constituency that includes the parties being restrained"); *see also In re Medford Crossings N., LLC*, No. 07-25115, 2011 WL 182815, at *19 (Bankr. D.N.J. Jan. 20, 2011) (declining to confirm a chapter 11 plan in part because "[t]he parties that would be restrained from proceeding against the Third Party Releasees are receiving little or no distribution under the Plan and would be precluded from asserting their claims against the Releasees.").  As *Saxby's Coffee* recognized: "[i]t is a very narrow legal realm in which a party's legal rights may be restricted because the needs of the many outweigh the rights of the few."  436 B.R. at 338.  The Solicitation Procedures are not constructed in a way that allows the Court to make the required findings regarding the support from affected creditors.

12.     *In re National Heritage Foundation, Inc.*, 478 B.R. 216, 230 (Bankr. E.D. Va. 2012), illustrates the importance of distinguishing between impacted and unimpacted creditors in conferring third-party releases.  In that case, the debtor argued a third-party release should be approved because it was "overwhelmingly approved by the creditors."  *Id.* at 230.  The Court rejected the release because the votes that constituted the "overwhelming majority" were not cast by creditors who were impacted by the release: "the class impacted by the Release Provisions (the Donors) did not vote to accept the Plan; rather, the class that was to be paid in full under the Plan (the Annuitants) voted to accept the Plan."  *Id.* at 230-31.

C.      **Required Disclosure Regarding the Pooling of Debtor and Non-Debtor Local Council Assets and Liabilities.**

13.      The Plan bars claimants from pursuing their claims against the approximately 251 non-debtor Local Councils organized as independent legal entities under separate management and control in exchange for an aggregate contribution of $600 million, pools those funds with the other Trust assets, and then allocates those funds among abuse claimants in accordance with the TDP without regard to what recourse particular individual claimants have against which Local Councils. Further, it contemplates a mechanism under which unrelated third parties (the Chartered Organizations) who have independent tort liability to some but not all abuse claimants, may also be granted a release that would be binding on all abuse claimants without regard to any disclosure, voting, Court process or approval, or consent of those directly affected claimants who actually suffered the tortious sexual assaults or abuse for which those third parties are responsible. Presumably the proceeds of these settlements with Chartered Organizations will also be subject to the general pooling of funds contemplated by the Plan and TDP and distributed without reference to which claimants suffered the abuse at their hands.

14.      Claimants' state law rights against Local Councils and Chartered Organizations vary enormously.  Many claimants—a clear majority of those proposed to be solicited—have no enforceable claim at all against these entities.  These include claimants who have only a claim against the Debtors themselves and the Debtors' insurance, and claims that are time-barred under applicable non-bankruptcy law.  Other claimants have rights only against the estate and a particular Local Council or Chartered Organization.  Their Local Council or Chartered Organization may have limited resources or responsibility under applicable law.  But some claimants, including some of the Claimants, may have strong claims against financially strong or well-insured Local Councils or Chartered Organizations that have the ability to satisfy their claims in full or at least in a greater measure than they may receive under the TDP.  For claimants with no, or only weak claims, against

third parties, or with claims against financially weak or underinsured third parties, the Plan is a boon, providing them the opportunity for some recovery where the tort system might leave them with none. For claimants of the second kind, the Plan destroys their right to pursue solvent, well-insured entities and compels them to share the contribution from the released entity with claimants who had no such right. The Plan ignores the range of nonbankruptcy outcomes against the non-debtors, and effects a substantive consolidation of the Debtor and the Local Councils, sharing the assets they are contributing *pro rata* among all claimants, without regard to the entity against which the claimant actually has claims.

15.    Because the claimants hold fundamentally different economic rights against the various non-debtors, the pooling and third-party release features of the Plan violate § 1123(a)(4): creditors with superior claims against more solvent non-debtors are being compelled to relinquish those valuable claims, but are receiving the same treatment as those without such claims. *In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C. Cir. 1986) is a leading case in point. There, a plan placed all unsecured creditors in a single class sharing *pro rata* in a fund comprised of $800,000 contributed by the debtor, and $3,000,000 to be contributed by the creditors who were sponsoring the plan. 792 F.2d at 1150. The debtor's contribution would fund an approximate 4% dividend for creditors; the creditor contribution an additional 13%. *Id.* Critically, the plan also provided that creditors could receive the 13% creditor enhancement only by executing a release in favor of the sponsoring creditors. *Id.* For the most part, creditors had only claims derivative of the debtors' claims against the sponsoring creditors, but one creditor – Hawley Fuel Coal—objected to the plan on the basis that, alone among creditors, Hawley asserted a direct guarantee claim against one of the sponsoring creditors, a claim that was substantially more valuable than the derivative claims held by the other unsecured creditors. *Id.* The D.C. Circuit agreed. *Id.* at 1151-52. Noting that the "most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members," the Court observed that the "other side of the coin of unequal

8

payment, however, has to be unequal consideration tendered for equal payment." *Id.* at 1152.  The

Court explained:

> It is disparate treatment when members of a common class are required to tender more valuable consideration – be it their claims against specific property of the debtor or some other cognizable chose in action—in exchange for the same percentage of recovery.  *Id.*

16.    In recognizing these principles, the Third Circuit has observed that § 1123(a)(4)

"does not require precise equality, only approximate equality."  *In re W.R. Grace & Co.*, 729 F.3d

311, 327 (3d Cir. 2013) (*quoting In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y.

2007)).  "Certain procedural differences, such as a delay in receipt of distributions for some claims,

do not alone constitute unequal treatment."  *In re W.R. Grace & Co.*, 729 F.3d at 327.  But, here

the differences are not minor or procedural, nor is it unworkable to establish how claimants are

differentially affected; instead, the differences are substantive and may profoundly alter creditor

rights, conferring windfalls on some creditors and starkly prejudicing those with the strongest and

most collectible claims under nonbankruptcy law.

17.    It may well be that claimants with rights against non-debtor Local Councils (and

Protected Parties) will agree to vote to release the Local Councils and share some or all of the

amounts they contribute with other claimants who do not have such rights as part of a general

pooling of assets and liabilities.  Perhaps their vote to do so as a class could bind all class members

under some circumstances.  But to force pooling of the proceeds of non-debtor settlements based

on lumping together a small number of claimants with rights against the wealthier, better-insured

settling Local Councils with vastly larger numbers of other claimants without such rights, and

giving each claimant one vote on the matter, violates not only the classification and voting

provisions in chapter 11, but also the equal treatment mandate of section 1123(a)(4).

18.    Because claimants' rights against the Local Councils fundamentally differ, the

Disclosure Statement must address at a minimum:

a.      Local Council assets and liabilities (including separate insurance assets);

b.      The claims asserted against each Local Council;

c.      Claimants' estimated recovery against each Local Council (without regard to insurance shared with the Debtors); and

d.      The amount contributed by each Local Council for its release.

Only with that information can an individual claimant with claims against a financially strong or well-insured Local Council make an informed judgment whether or not to accept the less favorable treatment offered by the Plan, release the Local Councils, and agree to forego its claims under nonbankruptcy law as against its responsible Local Council.

19.      In addition, under the best interest of the creditors test, each claimant is entitled to receive value under the Plan that is at least equal to its rights in liquidation.  § 1129(a)(7).[3]  In making that calculation the Court must consider the value of rights against non-debtors that are released under the terms of the Plan.  *See, e.g.*, *In re Washington Mutual, Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation."); *In re Quigley Co.*, 437 B.R. 102, 144-46 (Bankr. S.D.N.Y. 2010) (plan violated best interest test because the debtor's liquidation analysis did not reflect that some creditors would retain their rights to sue the solvent non-debtor parent in a chapter 7 liquidation, rights released under the chapter 11 plan).  In *Quigley*, as here, the plan also violated

---

[3] The Debtors assert without authority that the best interests of the creditors test does not apply to them because the Bankruptcy Code does not permit involuntary chapter 7 proceedings to be instituted against them.  Disc. Stmt. (Dkt. No. 5485) at 211.  But there is no logical connection between the bar on involuntary proceedings for non-profits and application of the best interests test as a mandatory chapter 11 confirmation requirement in this case.  The best interests test requires comparison of the plan value with the outcome of a hypothetical chapter 7 proceeding.  The hypothetical chapter 7 proceeding in this case would be a hypothetical voluntary chapter 7 case.  The best interests standard is routinely applied in chapter 11 cases involving non-profit entities.  *See, e.g.*, *In re Roman Catholic Archbishop*, 339 B.R. 215, 227 (Bankr. D. Or. 2006) (discussing application of best interest test to plan proposed by a non-profit entity); *In re Cajun Elec. Power Coop.*, 230 B.R. 715, 741 (Bankr. M.D. La. 1999) (same); *In re General Teamsters, Warehousemen & Helpers Union Local 890*, 225 B.R. 719, 733-34 (Bankr. N.D. Cal. 1998) (same).

§ 1123(a)(4)'s equal treatment requirement even though all class members received the same 7.5%

*pro rata* distribution, because only some of those creditors were "being compelled to give up their

valuable derivative claims—which [other creditors in that class had already surrendered]—to get

the same 7.5% distribution."  437 B.R. at 148.  The court concluded "[j]ust as the retention of the

derivative claim in a Quigley chapter 7 results in the violation of the 'best interest' test, the

compelled surrender of the derivative claim in a Quigley chapter 11 results in 'unequal treatment'

under [ ]§ 1123(a)(4)."  The same is true here.

20.     The Disclosure Statement's purported "liquidation analysis," Dkt. 5485 at Ex. D,

is fatally flawed because it does not explain the factual or legal basis for the Debtors' (or Local

Councils') belief that certain assets of the Local Councils are restricted, or indicate how much each

Local Council will contribute from their (admittedly unrestricted) assets.  *Id.* at 16 (asserting,

without elaboration, that restrictions regarding some assets have been "validated by BSA's legal

analysis").  *Cf. In re M.J.H. Leasing, Inc.*, 328 B.R. 363, 371 (Bankr. D. Mass. 2005) (finding a

failure of proof as to whether a third party's contribution was substantial where no information

was provided regarding the third party's assets or ability to pay); *In re Mahoney Hawkes, LLP*,

289 B.R. 285, 302 (Bankr. D. Mass. 2002) ("There is no information about whether the

contribution is significant in terms of what the partners are able to pay.").

21.     Even taking the liquidation analysis at face value, it shows many Local Councils

with significant unrestricted assets, including these with over *$30 million* in unrestricted net assets:

| Local Council | Unrestricted Net Assets | Claims*[4] | Average Per Claim |
|---|---|---|---|
| Sam Houston | $88,569,253 | 752+ | $117,778.26 |
| Orange County | $38,005,058 | 370+ | $102,716.37 |
| Cascade Pacific | $34,421,289 | 487+ | $70,680.26 |
| National Capital Area | $33,820,605 | 532+ | $63,572.57 |

---

[4] The Disclosure Statement does not disclose the number of claims against each Local Council.  These claim numbers are from a summary posted by the Tort Claimants' Committee.  *See* http://www.pszjlaw.com/assets/htmldocuments/BSA%20Summary%20of%20Sexual%20Abuse%20Claims%20003.pdf (last checked August 9, 2021).

| Silicon Valley & Monterey Bay | $33,397,061 | 291+ | $114,766.53 |
| Chief Seattle | $33,363,479 | 297+ | $112,334.95 |
| Greater Los Angeles | $31,726,269 | 1,136+ | $27,928.05 |

22.     These seven Local Councils, alone, have at least $293,303,014 in unrestricted net assets.  Again, according to the Debtors' (flawed) liquidation analysis, the 13 wealthiest Local Councils have unrestricted net assets that exceed $500 million.  Yet the Debtors suggest all 251 Local Councils should receive releases of current and future claims for a total of $600 million.

**D.     Required Disclosure Regarding Unrelated Non-Debtor Protected Parties.**

23.     The Disclosure Statement and Plan indicate that a post-confirmation trustee can enter into settlements that will release and enjoin current and future claims against non-debtor Chartered Organizations, and neither creditors who actually hold abuse claims against such Chartered Organizations, nor this Court, will have any say in approving that settlement or the modification of the Court's Channeling Injunction.  Impacted creditors have no right to vote on that relief, and this Court will not be asked to (or be in a position to) find that the expansion of its Channeling Injunction to cover a new Protected Party is fair and equitable or that an overwhelming number of impacted creditors support the relief.  These procedures are wholly inadequate to protect the rights of the parties being enjoined.  Disclosure must be made as to the identity of any third party non-debtor Chartered Organization that becomes a Protected Party under the Plan and the contribution being made to obtain the protection of this Court's Channeling Injunction before the votes are cast and the votes of impacted creditors separately tallied so this Court can determine whether there is overwhelming support from impacted creditors, or, in the alternative, if a settlement with a Chartered Organization is reached post-confirmation that provides for the modification of the Court's Channeling Injunction to include that Chartered Organization as a Protected Party, after notice and an opportunity for a hearing to assess the fairness of such post-confirmation settlement to all affected claimants, at which point the Court can determine whether

the necessary overwhelming majority of affected claimants support the proposed expansion of the Channeling Injunction.

**E.    Required Disclosure Regarding Coverage Positions Asserted by Liability Insurers.**

24.    The Claimants further object to the adequacy of the Disclosure Statement because it fails to explain the material risks arising from hotly disputed coverage positions asserted by the Debtors' and non-debtor Protected Parties' carriers (Dkt. No. 5684) that, if successful in whole or in part, could substantially limit or eliminate insurer contributions and significantly reduce amounts claimants could recover from the Trust.  Although the Claimants believe these self-serving "coverage defenses" are incorrect in the context of this case — legally and factually — court decisions throughout the country have not been uniform in addressing them.  Accordingly, abuse survivors must understand the nature of these risks and that that the insurers are well-funded, experienced in contesting abuse claims in the court system, and fully prepared to engage in protracted litigation over their policy obligations.  A number of "coverage defenses," if successful, could potentially eliminate insurer recoveries altogether, and others could reduce amounts available to Claimants.  Moreover, the agreement of the Local Councils to resolve their liability without the applicable insurers' involvement and the transfer of the Local Council's insurance rights to the Trust trigger *additional coverage defenses that could further diminish the recovery from the insurers from what a claimant could achieve today* [5]  No abuse survivor should read the Disclosure Statement and believe they will receive up to 100% of their claim awarded through the TDP and matrix values without generally understanding these risks.

25.    A number of "coverage defenses" are aimed at eliminating coverage entirely.  For example, some insurers contend that pursuing a bankruptcy to address the abuse liabilities and

---

[5] With respect to any future settlements with Chartered Organizations, the same concerns discussed herein would apply with regard to shared insurance between the Debtors and the settling Chartered Organizations in light of the fact that, starting in approximately 1978, the Chartered Organizations have generally been insured under the same policies as are the Debtors.

negotiate a proposed settlement, without first obtaining insurer consent, violates the cooperation obligations of the policyholders and results in the forfeiture of coverage. Instead of viewing the bankruptcy process as a legitimate means of addressing decades of sexual abuse nationwide, the insurers would transform the bankruptcy into a coverage forfeiture event. Although Claimants reject this contention, it has been asserted and should be identified and addressed in the Disclosure Statement as a material risk that the insurers are seeking to shift onto abuse survivors. However, the position of the insurers in this regard has been asserted and should be identified and addressed in the Disclosure Statement. Another argument raised by insurers in an effort to eviscerate billions of dollars of historic liability insurance challenges the assignment of insurance policies to the Trust — a cornerstone of the Plan — as violative of the insurance contracts. The insurers appear to accept that their "anti-assignment" defense is preempted by federal bankruptcy law as to the Debtors, having lost the issue in multiple bankruptcy courts. *See, e.g.*, *In re Combustion Engineering, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004) (bankruptcy law preempts state law and overrides anti-assignment provisions in debtors' insurance policies). However, the insurers continue to challenge assignments of non-debtor policies, an area that remains unsettled. *See id.* at 219 (federal law preemption ruling not applicable to non-debtor participants in bankruptcy); *Fluor Corp. v. Superior Court*, 61 Cal.4th 1175, 1219 (2015) (overturning prior state law cases and permitting assignment of insurance after damage/injury has occurred). If successful in their anti-assignment arguments, the insurers could deprive the Trust of billions of dollars of insurance assets otherwise available to the nondebtors to cover their liabilities to abuse victims. As currently drafted, the Disclosure Statement does not provide adequate information to allow a reasonable Claimant to appreciate the material risks of the insurers' positions on these key issues.

26. Other "coverage defenses" may not eliminate coverage entirely, but seek to reduce available coverage substantially. The Debtors proclaim that the TDP may result in creditors receiving up to 100% of the value assigned to their claim under the TDP, *see* Disc. Stmt. (Dkt. No.

5485) at 214, but they fail to disclose or discuss the insurers' argument that those values are not binding on the insurers and that their duty to indemnify their insureds may be capped at the amounts their insureds paid into the Trust. Here, again, the law remains unsettled and conflicting.[6] If the trust distribution awards are not binding, and if the exposure of the insurers is capped at the contribution of their insureds, an abuse survivor whose claim is valued at $2.7 million may receive a small fraction of that amount. The Disclosure Statement must disclose these material risks so abuse survivors can decide whether to vote in favor of a plan that leaves these issues unresolved.

27. The Claimants further object because the Disclosure Statement fails to explain how creditors will be affected if the insurers prevail on these contentions. The Disclosure Statement goes to great lengths to make abuse survivors believe there is a chance they will actually receive 100% of the value assigned by the TDP, *see* Disc. Stmt. (Dkt. No. 5485) at 214, but it fails to disclose how Claimants will fare if the insurers prevail on one or more of their "coverage defenses." The Disclosure Statement indicates there are approximately 82,500 non-duplicate claims by survivors of child sexual abuse. As it stands, the Plan would provide each Claimant an average of about $10,000 (or significantly less after administrative expenses), from the funds provided by the Debtors and the Local Councils, far less than the TDP value of these claims. The Debtors rely on the availability of assigned insurance coverages to make up the difference, which underscores why Claimants must have adequate information to evaluate the risks of the Plan, including any risks as to denial or restriction of insurance coverage.

---

[6] *Compare Fuller–Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958, 999-1000 (Cal. Ct. App. 2006) (finding insurer is only required to pay trust payment percentage, not full allowed value); *Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1178–80 (N.D. Cal. 2016) (discussing *Fuller-Austin* at length and adopting its holding as binding law in California on the interpretation of insurance indemnification contracts), *with UNR Indus., Inc. v. Continental Casualty Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991) (concluding under Illinois law, insurer is obligated to pay full allowed value, not just the trust payment percentage, in order to avoid insurer benefitting from UNR's bankruptcy); *National Union Fire Ins. Co. of Pittsburgh v. Porter Hayden Co.*, 2012 U.S. Dist. LEXIS 29568 at *11-16 D. Md. Mar. 6, 2012 (rejecting *Fuller-Austin* and concluding under Maryland law, insurers are required to pay full allowed claim value).

### III. PRAYER

28.    The Court should order the Debtors to modify the Disclosure Statement, the Plan, and the Solicitation Procedures so that (1) there is proper segregation and weighting of the votes of the holders of timely direct abuse claims to enable this Court to make the requisite findings to enter the discharge, third-party releases, and Channeling Injunction that is sought; (2) proper disclosure is made of the assets and liabilities of Local Councils (and any Protected Party) such that direct abuse claimants can meaningfully assess whether the Plan meets the best interests of creditors test; (3) disclosure and opportunity to object to the fairness of any proposed settlement for a Chartered Organization be afforded to all affected claimants before such a Chartered Organization can be deemed a Protected Party under this Court's Channeling Injunction, and (4) disclosure regarding the coverage positions asserted by liability insurers that, if successful in whole or in part, could substantially limit or eliminate insurer contributions and significantly reduce amounts Claimants could recover.

Respectfully submitted,

Dated: August 16, 2021

*Stephanie Morris*

Stephanie Morris
Law Office of Stephanie Morris, LLC
142 W. Market Street, 2nd Floor
West Chester, PA 19380
484-401-9848 (office)
*smorrislaw@outlook.com*
Attorney for Claimant

**APPENDIX A**

The foregoing Supplemental Objection to the Adequacy of the Debtors' Disclosure Statement in Support of Amended Chapter 11 Plan of Reorganization and Objection to the Debtors' Revised Proposed Solicitation Procedures Order was filed by the following creditor who filed a Sexual Abuse Survivor Proof of Claim and is represented by The Law Office of Stephanie Morris, LLC.  The number below is the claim number for the creditor's Sexual Abuse Survivor Proof of Claim.

| 23060 | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | **Re: D.I. 2592 and 2594** |

**OBJECTION TO THE ADEQUACY OF DEBTORS' DISCLOSURE STATEMENT
IN SUPPORT OF SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION
AND JOINDER OF THE OBJECTION OF THE TORT CLAIMANTS' COMMITTEE**

On April 13, 2021, the Debtors filed a Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (Dkt. No. 2592) ("the Plan"), and on April 14, 2021, the Debtors filed a Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC ("the Disclosure Statement") (Dkt. No. 2594).

Claimant Number 5841, represented by The Law Office of Stephanie Morris, LLC (Morris Claimant") is a survivor of childhood sexual abuse and has filed a Sexual Abuse Survivor Proof of Claim.  As reflected in the individual proof of claim, the story of claimant is unique, including how Claimant was sexually abused, how the abuse affected Claimant, and the circumstances that led to the abuse.  Claimant was eleven to twelve years of age when he suffered sexual abuse, including forced  anal penetration and oral sex.  In addition, he was forced to perform both types of sexual acts on the perpetrator and other boys.

The Morris Claimant objects to the sufficiency and adequacy of the Disclosure Statement for the following reasons:

**A.    Failure to Disclose the Assets and Liabilities of Each Party Receiving a Release**

1.    The Morris Claimant objects to the adequacy of the Disclosure Statement because it fails to provide him with sufficient information to make an informed decision on whether (a) to vote to accept or reject the Plan, which proposes a release of all local councils and may propose a release of charter organizations, or (b) to raise a "Best Interest of Creditors" objection.

2.    The Disclosure Statement does not provide any property-by-property valuation of the real or personal property that the Debtors intend to transfer to a settlement trust, or any property-by-property valuation of the real or personal property that the Debtors seek to retain.  The same is true of the Debtors' other assets, including investments.  It is imperative that the Disclosure Statement provide the liquidation value or fair market value for each such property.

3.    The Disclosure Statement does not include in its liquidation analysis the properties of the local councils.  Under the Debtors' governance documents, a local council's property reverts to the Debtors if the local council's charter is not renewed.  In a Chapter 7 liquidation of the Debtors, the Chapter 7 trustee presumably would not renew any local council charters.  Since the properties revert to the Debtors, the liquidation analysis must include the liquidation value of all local council real and personal property.

4.    The Disclosure Statement and the Plan fail to provide any property valuation information for a creditor, including the Morris Claimant, to determine if each local council is making a substantial contribution that warrants a release and channeling injunction.  Any such valuation must include the liquidation or fair market value of the local council's assets, including any justification by a council for asserting that an asset is unavailable to pay its creditors (e.g., donor restricted), how many childhood sexual abuse claims implicate the local council, and how

much the local council is contributing in exchange for a release of such childhood sexual abuse claims.

5.      Based on each local council's publicly available IRS Form 990 statements, each local council has significant assets, including significant unrestricted assets.  Moreover, if a local council accounted for its real property using "book value" (e.g., the value it was worth at the time it was acquired) and not its current fair market value, its IRS Form 990 statements likely *undervalue* its total assets given the length of time most of these councils have existed and the property holdings they have acquired over that time.

6.      The Disclosure Statement and the Plan do not provide any property valuation information of any charter organization that will be released, including any justification by a charter organization for asserting that an asset is unavailable to pay creditors (e.g. donor restricted), how many childhood sexual abuse claims implicate each charter organization, and how much each charter organization is contributing in exchange for a release of such childhood sexual abuse claims.  Like the local councils, many of the charter organizations, such as the Methodist Church, Mormon Church, and Catholic Church, have significant real property and other assets.

7.      The Morris Claimant cannot make an informed decision to vote to accept or reject the Plan because the Disclosure Statement does not contain any information about the number of claims against each local council or charter organization, or any estimate of the value of such claims.  To the extent that sexual abuse claims have not been filed against a local council or charter organization, the Debtors should disclose whether they have any indemnification or contribution claims against each local council or charter organization.

8.      The Disclosure Statement also fails to adequately explain how any contribution by non-Debtor entities, including local councils and charter organizations, will be utilized, including whether their contribution will be used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim against that entity.

9.      The inadequacy of the Disclosure Statement is illustrated by the fact that the Debtors state in the Plan that they are "committed" to ensuring the local councils collectively contribute at least $425 million.  This disclosure is illusory because there is no agreement with the local councils to contribute anything to the Plan.  In this regard, the Plan is speculative at best and the Disclosure Statement does nothing to inform abuse survivors whether and when any contribution by the local councils might be realized.  In addition, the Debtors fail to disclose how much each council has available to contribute, how much each council is contributing, and how the contributions of each council will be utilized, including whether the contributions of a council will be used to compensate abuse survivors who do not have a claim against that council.

10.     Similarly, in the Disclosure Statement the Debtors do nothing more than assert that childhood sexual abuse claims will range in value from somewhere between $2.4 billion and $7.1 billion.  There is no discussion on how that value is determined.  The Debtors project that the recoveries on the childhood sexual abuse claims will range from 8% to 23%, and up to 100% with the inclusion of available insurance.  Under the Plan, the Debtors are the only parties that have offered any consideration ($115 million) for the benefit of the childhood sexual abuse claims. Assuming the childhood sexual claims are valued at $2.4 billion, the $115 million provides a 4.8% recovery, far less than the lower amount asserted by the Debtors. With only $115 million available for sexual abuse survivors, the Disclosure Statement does not describe how recoveries will reach 8%, let alone up to 23% or 100%, when no other consideration has been committed by any other party.

11.     This lack of basic information makes it impossible for creditors, including the Morris Claimant, to determine whether each council is making a substantial contribution, to make an informed decision on whether to vote to accept or reject the Plan, which proposes to release each council, and to make an informed decision on whether to raise a "Best Interest of Creditors"

objection because the Plan fails to award them the liquidated value of their claim against all entities they are releasing.

**B.      Failure to Disclose the Specific Entities to Be Released**

12.      The Morris Claimant objects to the adequacy of the Disclosure Statement and the accompanying solicitation procedures because they fail to notify creditors, including the Morris Claimant, which local council and/or charter organization is associated with their abuse, whether any such entity will receive a release, and if so, the terms of the release.  If the Plan is designed to provide a release to non-Debtor third parties, such as the local councils and charter organizations, the Debtors should identify each local council and charter organization and their relationship to each of the creditors, including the Morris Claimant.  For example, under the Global Resolution Plan in the Plan, the "Protected Parties" (e.g., those that benefit from a release and channeling injunction) should only include those non-Debtors that make a substantial contribution and receive sufficient support by claimants whose claims will be released and/or the subject of a channeling injunction.

13.      In their proof of claim forms, the Morris Claimant made a good faith effort to identify the local council(s) and/or charter organization(s) that may be liable for the childhood sexual abuse they suffered that is the basis for their claim.  However, the Morris Claimant was a child when he was sexually abused.  Due to the passage of time and/or the psychological effects of the abuse, Morris Claimant is unsure whether he identified the correct entities and was simply too young to recall the correct names today.

14.      For the Morris Claimant and other abuse survivors who do not know this information, the information they need is largely within the purview of the Debtors and local councils, which possess the Scouting unit rosters (e.g., Boy Scout Troop rosters and Cub Scout Pack rosters), camp rosters, and adult volunteer rosters.  In preparation for litigation, this disclosure would generally occur through discovery that is currently barred by the preliminary injunction.

Prior to the preliminary injunction, the Morris Claimant would normally issue discovery that demanded the Debtors and/or local council(s) produce the roster(s) for the Claimant's Scouting unit and/or Scout Camp so the Claimant can find their name on the roster and confirm they have identified the correct local council(s) and charter organization(s) for their Scouting unit and/or Scout Camp.

15.     If a Claimant's name did not appear on a roster, which may have happened as a result of human error and/or if the Claimant joined a Scouting unit in-between the annual registration process, the Claimant could review the roster to see if the Claimant recognized the names of the other children or adults on the roster.  If so, the Claimant could contact some of the other members of the Scouting unit to see if they could corroborate that the Claimant was a member of the Scouting unit and/or attended the Scout Camp.  If not, the Claimant would work with the Debtors and/or the local council(s) to determine whether the Claimant identified the wrong Scouting unit and appeared on the roster of a different Scouting unit.  In addition to rosters, the Claimant would also ask the Debtors and/or local council(s) in discovery to produce the charter for the Claimant's Scouting unit so the Claimant could confirm the correct charter organization(s) that chartered the Claimant's Scouting unit, particularly if the Debtors and local council(s) no longer had rosters for the Scouting unit.

16.     If the Claimant was unable to obtain records that confirm the Claimant has identified the correct local council(s) and/or charter organization(s), the Claimant would ask the Debtors and/or the local council(s) for a "person most knowledgeable" deposition about the local council(s) and/or charter organization(s) who were responsible for the Claimant's Scouting unit and/or the Scout Camp the Claimant attended so that the Claimant could confirm that the Claimant has identified the correct local council(s) and/or charter organization(s) for their Scouting unit and/or Scout Camp.  If the Claimant believes they may know the correct local council(s) and/or charter organization(s), the Claimant would ask for any documents those organizations have about

the Claimant's Scouting unit and the Claimant would ask the organizations for a "person most knowledgeable" deposition to confirm the Claimant identified the correct local council(s) and/or charter organization(s).

17.     Nothing under the Plan provides a mechanism by which a Claimant can confirm the Claimant has identified the correct local council(s) and/or charter organization(s) before a release is given to those entities.  As a result, Claimant's potential civil claim against local council or a charter organization cannot be properly evaluated.

### C.     Trust Distribution Procedures

18.     The Morris Claimant objects to the adequacy of the Disclosure Statement because it fails to explain how their claims will be valued in the trust procedures and what ability they will have to contest the proposed valuation of their claim.

19.     For example, the Plan identifies a number of factors to be used in valuing each claim, but neither the Plan nor the Disclosure Statement discloses how much weight will be assigned to those factors.  Given the current state of negotiations it may not be appropriate to disclose the weight afforded to each factor.  However, if such a valuation system is ultimately included in the Plan, the weight afforded to each factor must be disclosed prior to when votes are solicited for the Plan so that claimants understand how their claim would be valued, can fairly estimate how their claim would be valued, can see how their claim would be valued when compared to other claims, and can decide whether to vote in favor or against the Plan given that valuation system.

20.     The Plan also suggests that the value of a claim might be reduced if the claimant lacks certain information, such as the full name of the Scout leader who abused them, but neither the Plan nor the Disclosure Statement indicates whether the claimant will have an opportunity to pursue discovery so that they can supplement their claim with that missing information.

21.     As noted above, many abuse survivors may not recall the full name of the person who abused them because they were too young to recall the name, but the Debtors, the local councils, and the charter organizations likely possess evidence, such as membership rosters and the "ineligible volunteer files," that could allow abuse survivors to supplement their claim with that information.

22.     This is particularly important to Morris Claimant as it is believed that the perpetrator in his case was transferred from another troop after he was suspected and/or accused of sex abuse against other scout members.  If so, it is very likely Morris Claimant would have claims against the other local council and/or charter organization for its failure to report and/or act, and for its fraudulent concealment of the known abuse which placed Morris Claimant in harm's way and essentially created the abusive situation.

### D.     Failure to Disclose Insurance Coverage Risks

23.     The Morris Claimant objects to the adequacy of the Disclosure Statement because it fails to explain the likelihood of defeating the insurers' coverage defenses or the insurance companies' ability to pay abuse claims that total billions of dollars.  The Disclosure Statement barely makes a passing note that the insurers have asserted coverage defenses, and the Debtors make no effort to evaluate those risks.  Beyond the coverage risks associated with the Debtors' prepetition conduct, the Debtors fail to discuss any risk associated with the proposed assignment of all of the insurance of the Debtors, the local councils, and participating charter organizations to a trust, including any risk associated with the anti-assignment clauses in such policies.  If the Plan's assignment violates the anti-assignment clauses, the insurance coverage could evaporate.

### E.     Failure to Disclose How Insurance Policies Will Be Utilized

24.     The Morris Claimant objects to the adequacy of the Disclosure Statement because it fails to explain how the proceeds of any insurance policies assigned to the trust will be utilized. The Morris Claimant is entitled to know how the proceeds of any policies will be utilized,

including whether the proceeds of a policy that covers Claimant's claim is being used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim covered under the same policy.

25.     For example, if Claimant has a $1 million childhood sexual abuse claim against the Mormon Church, the Mormon Church presumably has sufficient assets to pay the full value of that claim.  In an insurance buy-back scenario, the insurers and the insured will insist that the insured receives a release of all current and future claims against the insured, otherwise the insured would be without insurance on those claims, would still be responsible for the defense costs on those claims, and would still be at risk for a judgment on those claims.  The Morris Claimant is entitled to know whether they will be required to release all of their claims against all insureds in order to effectuate a buy back of a given policy, and if so, how the proceeds of any such buy back will be utilized.  In the foregoing example, the hypothetical Claimant is entitled to know whether he will be required to release a claim worth $1,000,000 against the Mormon Church to effectuate a "buy back" of a policy that names the Mormon Church as an insured.  Moreover, the hypothetical Claimant is entitled to know whether his share of the sale price of the policy could be a small fraction of the value of his claim against that defendant.

26.     The Morris Claimant needs to know this information to determine whether each non-Debtor who is released is making a substantial contribution and whether the "best interests" test is met by that contribution.

**F.       Failure to Disclose the Contribution of Insurers and Their Insureds**

27.     The Morris Claimant objects to the adequacy of the Disclosure Statement because it fails to explain what contribution the insurers and their non-Debtor insureds will make in order to receive a release.

28.     As noted above, almost every Claimant may have a legal claim against a local council and/or a charter organization.  In addition to the Debtors, a local council was responsible

for all Scouting units in its geographic region, including handling and processing complaints against Scout leaders for allegedly sexually abusing children and ensuring that each Scouting unit abided by policies and procedures to protect children from foreseeable harm.  These local councils, the "eyes and ears" of the Debtors, were often amongst the parties who neglected to protect the children in their care from foreseeable harm.

29.     In turn, a charter organization was responsible for staffing and supervising the adult volunteers of a Scouting unit, like a Boy Scout Troop or Cub Scout Pack, and were also amongst the parties who neglected to protect the child members of a Scouting unit from foreseeable harm. The leaders of the charter organization, including the Scout leaders who the charter organization appointed to oversee its Scouting unit(s), were often amongst those to receive complaints that another Scout leader was sexually abusing children in the Scouting unit, or saw the "red flags" or warning signs that another Scout leader was sexually abusing children in the Scouting unit, but neglected to take steps to protect the children from that danger.

30.     The Morris Claimant objects to the adequacy of the Disclosure Statement because it fails to specify what contribution the local councils and/or charter organizations will have to make to receive a release, including a contribution above and beyond their rights under insurance policies.  The Morris Claimant needs to know this information to determine whether each entity who is receiving a release, including any local council or charter organization, is making a substantial contribution and whether the "Best Interests" test is met by that contribution.

**G.     No Disclosure Regarding the Proposed Hartford Settlement Agreement**

31.     The Morris Claimant objects to the adequacy of the Disclosure Statement because it fails to explain how much each Claimant may receive as a result of the Debtors' proposed settlement with Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively "Hartford"), whether each Claimant would be forced to release any of their claims in order to

effectuate the settlement, including claims they have against non-Debtor entities, and whether any party, including Hartford and non-Debtor entities, would receive a channeling injunction as a result of the settlement.

32.     The Debtors' proposed settlement with Hartford, which was attached as Exhibit A to the Second Mediators' Report that was filed on April 16, 2021 (Dkt. 2624), is for $650,000,000 and appears to require a release of all current and future claims that may exist under Hartford's policies.  Based on a review of Hartford's policies, it appears that Hartford's policies cover some or all of the claims of approximately 25,000 claimants in this bankruptcy.  Pursuant to this analysis, the Debtors' proposed settlement with Hartford equates to an average of only about $26,000 per claimant if the settlement proceeds are shared by the claimants with a claim that is covered by a Hartford policy, and to an average of approximately $7,647 per claimant if the settlement proceeds are shared with 85,000 claimants.

33.     Not only does the Disclosure Statement fail to disclose how the Debtors propose to allocate those settlement funds, but it fails to disclose how much coverage is available under each of the Hartford policies; which claimants have claims under each of the Hartford policies; the number of claims that implicate each policy; the type of claims; and, the value of the claims.  Based on the years of the Hartford policies, it appears many of the policies had per occurrence limits of $500,000 with no aggregate limit.  The Disclosure Statement fails to explain why a claimant whose claim triggers a $500,000 insurance policy should vote in favor of a Plan that may result in them receiving an average of $7,647 from a settlement with Hartford.

34.     The Disclosure Statement also fails to disclose the insured(s) under each of the Hartford policies, including whether the Debtors are insureds under each policy or whether the only insured under some policies is a non-Debtor entity, such as a local council.  In turn, the Disclosure Statement fails to explain whether all current and future claims against the insured(s), including non-Debtor entities, will have to be released in order to effectuate the settlement, and if

so, the value of those claims and why a claimant should agree to such a release if the insured has substantial assets, including other insurance, that should be used to compensate the claimant.

**H.    The Scope of this Bankruptcy Necessitates Transparency Regarding the Handling of Insurance Policies**

35.    As it stands, the Plan would provide each Claimant an average of $6,000, or less, from the Debtors and the local councils, which they partly justify by the assignment of insurance policies.  The average award could be significantly lower, if non-existent, after administrative expenses.  The Morris Claimant must have sufficient information to evaluate the risks of the Plan if the Morris Claimant is to release multiple non-Debtor entities.   As filed, the Disclosure Statement falls far short of the Bankruptcy Code's standard for its approval.

**I.    Voting and Solicitation Procedures for Claimants with Multiple Sexual Abuse Survivor Proof of Claims**

36.    As the Court is aware, multiple Sexual Abuse Survivor Proof of Claim forms were filed on behalf of some claimants.  The Morris Claimant objects to the Disclosure Statement and to the proposed voting and solicitation procedures because they will disenfranchise the votes of survivors in the event that more than one law firm submits a ballot on behalf of the same claimant. Instead, the Debtors' voting and solicitation procedures should require them to verify whether the law firm who submits a ballot on behalf of a claimant has the authorization to act on behalf of the claimant in those instances when it matters.  For example, verification is not necessary if multiple ballots on behalf of the same claimant vote in the same manner.  However, if the votes conflict and the outcome of the tabulation could be affected, the Debtors must verify which ballot should be counted by determining which law firm was authorized to submit the ballot.  As it stands, the Debtors have failed to explain how they intend to solicit and count votes for such claimants, including how to ensure such claimants do not vote multiple times, how to determine who can vote on behalf of such claimants, and how to determine which vote to count if inconsistent votes are submitted on behalf of the same claimant.

**J.      Objection to Future and/or Amended Disclosure Statements**

37.      The Morris Claimant object to any future and/or amended disclosure statement by

the Debtors that fails to resolve the objections raised in this objection.

**K.      Joinder to the Objection to the Disclosure Statement by the Tort Claimants'
Committee**

38.      The Morris Claimant joins the objection to the Disclosure Statement filed by the

Tort Claimants' Committee.

Dated: May 6, 2021                    Respectfully submitted,


                                      By:

                                              *Stephanie Morris*
                                              Stephanie Morris, Esquire
                                              Counsel for Morris Claimant
                                              Pa. Bar No. 87191
                                              142 W. Market St. – 2nd Flr.
                                              West Chester, PA 19380
                                              smorrislaw@outlook.com
                                              t. 484-401-9848
                                              f. 484-551-0473