**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 2295, 5485, 2618** |

**CERTAIN INSURERS' SUPPLEMENTAL OBJECTION TO
MOTION FOR APPROVAL OF DEBTORS' DISCLOSURE STATEMENT**

---

[1]   The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

{01779882;v1}

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

SUPPLEMENTAL OBJECTION ............................................................................... 6

I.      THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED
        BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE. ............................ 6

        A.      The Plan Is Unconfirmable Because It Is Affirmatively "Insurance
                Prejudicial" Rather Than Insurance Neutral. ................................. 7

        B.      The Plan Contravenes Section 1129(a)(1) Because It Violates
                Sections 502 and 524(e) of the Bankruptcy Code. .................................. 13

        C.      The Plan Was Not Proposed in Good Faith as Required by Section
                1129(a)(3) of the Bankruptcy Code. ................................................ 21

        D.      The Classification and Treatment of Direct Abuse Claims Violate
                Sections 1122(a), 1123(a)(4) and 1129(a)(7) of the Bankruptcy
                Code. ................................................................................................ 25

        E.      The Plan Is Not Feasible as Required Under Section 1129(a)(11) of
                the Bankruptcy Code. ..................................................................... 28

        F.      The Bankruptcy Court Does Not Have Jurisdiction to Determine
                Personal Injury Claims. .................................................................. 30

II.     THE DISCLOSURE STATEMENT MUST ADEQUATELY DESCRIBE
        THE SUBSTANTIAL RISKS TO CONFIRMATION OF THE PLAN. ............. 31

III.    THE SOLICITATION AND VOTING PROCEDURES CONTAIN
        SERIOUS FLAWS AND SHOULD NOT BE APPROVED. ............................ 32

        A.      The Expedited Distribution Procedures Constitute Impermissible
                Vote-Buying and Promote Fraud in the Administration of the
                Settlement Trust. .............................................................................. 32

        B.      Temporarily Allowing Each Abuse Claim at $1.00 for Voting
                Purposes Regardless of Its Validity and Enforceability Violates
                Section 1126(c) of the Bankruptcy Code. ......................................... 33

        C.      The Abuse Claimant Representatives' "Plain English Plan
                Summary" Should, At a Minimum, Be Revised to Accurately
                Reflect the Terms of the Plan. .......................................................... 36

IV.     THE DEBTORS' PROPOSED CONFIRMATION SCHEDULE
        SHOULD NOT BE APPROVED. ...................................................................... 39

RESERVATION OF RIGHTS ................................................................................... 42

CONCLUSION .......................................................................................................... 42

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re 641 Associates, Ltd.*,
    1993 WL 332646 (E.D. Pa. August 26, 1993) ........................................................................8

*In re Abbotts Dairies of Pa., Inc.*,
    788 F.2d 143 (3d Cir. 1986) ...............................................................................................21

*In re ACandS, Inc.*,
    311 B.R. 36 (Bankr. D. Del. 2004) ....................................................................................24

*In re Adelphia Commc'ns Corp.*,
    352 B.R. 592 (Bankr. S.D.N.Y. 2006), *clarified on denial of reconsideration*,
    2006 WL 2927222 (Bankr. S.D.N.Y. Oct. 10, 2006) ...........................................................37

*In re Am. Cap. Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012) ................................................................6, 22, 23, 29, 30, 41

*Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*,
    97 B.R. 220 (Bankr. E.D. Pa. 1989), *aff'd*,
    *Amatex Corp. v. Stonewall Ins. Co.*, 102 B.R. 411 (E.D. Pa. 1989) .........................................8

*In re AOV Indus., Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986) ........................................................................................26

*ARTRA 524(g) Asbestos Trust v. Fairmont Premier Ins. Co.*,
    2011 WL 4684356 (N.D. Ill. 2011) ...................................................................................11

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ................................................................................26

*Butner v. United States*,
    440 U.S. 48 (2007) ..........................................................................................................15

*In re Cajun Elec. Power Co-op., Inc.*,
    230 B.R. 715 (Bankr. M.D. La. 1999) ............................................................................7, 27

*In re Chateaugay Corp.*,
    1993 WL 563068 (Bankr. S.D.N.Y. 1993) .........................................................................27

*Cissel v. American Home Assur. Co.*,
    521 F.2d 790 (6th Cir. 1975), *cert. denied,* 423 U.S. 1074 (1976) ...........................................8

*Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Co.*,
    769 F. Supp. 671 (D. Del. 1991) *aff'd*, 988 F.2d 414 (3d Cir. 1992) ....................................7, 8

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*In re Combustion Engineering, Inc.*,
    391 F.3d 190 (3d Cir. 2004)....................................................................3, 13, 14, 42

*In re Cont'l Airlines*¸
    203 F.3d 203 (3d Cir. 2000).......................................................................18, 21, 25

*In re CRIIMI MAE, Inc.*,
    251 B.R. 796 (Bankr. D. Md. 2000) ..........................................................................6

*In re Curtis Ctr. Ltd. P'ship*,
    195 B.R. 631 (Bankr. E.D. Pa. 1996) .......................................................................6

*DeWitt Rehab. & Nursing Ctr., Inc. v. Columbia Cas. Co.*,
    464 B.R. 587 (S.D.N.Y. 2012)................................................................................11

*In re Durrett*,
    139 B.R. 1 (Bankr. D.N.H. 1992) ...........................................................................27

*In re Emerge Energy Servs. LP*,
    No. 19-11563, 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019).........................19

*EMS Fin. Servs., LLC v. Fed. Ins. Co. (In re EMS Fin. Servs., LLC)*,
    491 B.R. 196 (E.D.N.Y. 2013) ...............................................................................11

*In re Exide Holdings, Inc.*,
    No. 20-11157, 2021 WL 3145612 (D. Del. July 26, 2021) ......................................8

*Flintkote Co. v. Aviva PLC*,
    177 F.Supp.3d 1165 (N.D. Cal. 2016) ....................................................................10

*In re Fort Knox Mini Warehouse, Inc.*,
    2002 WL 1842452 (Bankr. N.D. Iowa, July 31, 2002) ..........................................30

*In re Frascella Enters., Inc.*,
    360 B.R. 435 (Bankr. E.D. Pa. 2007) .....................................................................35

*Fuller-Austin Insulation Co. v. Highlands Ins. Co.*,
    135 Cal. Rptr. 3d 958 (2006) ..................................................................................10

*G.W. White & Son v. Tripp*,
    No. 94--681, 1995 U.S. Dist. LEXIS 1887 (N.D.N.Y. Feb. 14, 1995)...................14

*In re General Teamsters, Warehousemen & Helpers Union Local 890*,
    225 B.R. 719 (Bankr. N.D. Cal. 1998) ...................................................................27

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*In re Glob. Indus. Techs., Inc.*,
   645 F.3d 201 (3d Cir. 2011)................................................................12, 16, 18, 19, 24, 25

*In re Glob. Indus. Techs., Inc.*,
   No. 02-21626, 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013) ........................................25

*In re Haardt*,
   65 B.R. 697 (Bankr. E.D. Pa. 1986) ....................................................................................30

*In re Innovasystems, Inc.*,
   No. 11-36228, 2014 WL 7235527 (Bankr. D.N.J. Dec. 18, 2014).........................................36

*Keeler v. PRA Receivables Mgmt., LLC (In re Keeler)*,
   440 B.R. 354 (Bankr. E.D. Pa. 2009) ..................................................................................16

*In re Lakeside Global II, Ltd.*,
   116 B.R. 499 (Bankr. S.D. Tex. 1989) .................................................................................30

*Lawrence Grp., Inc. v. Hartford Cas. Ins. Co. (In re Lawrence Grp., Inc.)*,
   285 B.R. 784, 789 (N.D.N.Y. 2002) ....................................................................................11

*Longview Power, LLC v. First Am. Title Ins. Co. (In re Longview Power, LLC)*,
   515 B.R. 107 (Bankr. D. Del. 2014) ....................................................................................11

*Matter of U.S. Brass Corp.*,
   110 F.3d 1261 (7th Cir. 1997) ............................................................................................11

*In re Millennium Lab Holdings II, LLC*,
   945 F.3d 126 (3d Cir. 2019)...........................................................................................19, 20

*In re Mirant Corp.*,
   334 B.R. 787 (Bankr. N.D. Tex. 2005).............................................................................37, 39

*Moody v. Amoco Oil Co.*,
   734 F.2d 1200 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984)............................................8

*Mt. McKinley Ins. Co. v. Corning Inc.*,
   399 F.3d 436 (2d Cir. 2005).................................................................................................11

*National Union Fire Ins. Co. of Pittsburgh, Pa. v. Porter Hayden Co.*,
   2012 WL 734176 (D. Md. 2012) ..........................................................................................10

*Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*,
   322 B.R. 560 (M.D. Pa. 2005)..............................................................................................24

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*In re Pac. Shores Dev., Inc.*,
2011 WL 778205 (Bankr. S.D. Cal. Feb. 25, 2011) ...............................................37

*In re Pac. Sunwear of Ca., Inc.*,
No. 16-10882, 2016 WL 4250681 (Bankr. D. Del. Aug. 8, 2016) ..........................34

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)....................................................................................21

*In re Quigley Co.*,
346 B.R. 647 (Bankr. S.D.N.Y. 2006) .......................................................34, 35, 36

*In re Quigley Co., Inc.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007)..................................................................6, 26

*In re Quigley Co., Inc.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010) ...............................................22, 27, 28, 30

*In re ReoStar Energy Corp.*,
No. 10-47176, 2012 WL 1945801 (Bankr. N.D. Tex. May 30, 2012) ....................37

*In re Roman Catholic Archbishop*,
339 B.R. 215 (Bankr. D. Or. 2006)..........................................................................27

*In re Save Our Springs (S.O.S.) Alliance, Inc.*,
388 B.R. 202 (Bankr. W.D. Tex. 2008)....................................................................27

*Scott v. AIG Props. Cas. Co.*,
No. 17-1052, 2017 WL 1380607, at *4 (S.D.N.Y. Apr. 17, 2017) .........................11

*Silva v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.)*,
Nos. 07-10416 (BLS), 11-53199 (KJC), 2014 Bankr. LEXIS 924
(Bankr. D. Del. Mar. 7, 2014)...................................................................................17

*Silverman v. Tudor Ins. Co. (In re Lenders Abstract & Settlement Serv.)*,
493 B.R. 385, 394 (E.D.N.Y. 2013) .........................................................................11

*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010) .........................................................................20

*In re Sydnor*,
571 B.R. 681 (Bankr. E.D. Pa. 2017) .......................................................................14

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*In re Thorpe Insulation Co.*,
    677 F.3d 869 (9th Cir. 2012) ............................................................12

*Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*,
    127 S. Ct. 1199 (2007) ......................................................................14

*U.S. v. Sanford*,
    979 F.2d 1511 (11th Cir. 1992) .........................................................14

*In re USG Corp.*,
    290 B.R. 223 (Bankr. D. Del. 2003) .................................................17

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ...............................................................26

*In re WR Grace & Co.*,
    729 F.3d 332 (3d Cir. 2013) ..............................................................29

*In re Washington Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ............................................19, 28

*Westmoreland Hum. Opportunities, Inc. v. Walsh*,
    246 F.3d 233 (3d Cir. 2001) ..............................................................17

*In re Zenith Electronics Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .....................................................7

**STATUTES**

11 U.S.C. § 502(b)(1) .............................................................................14

11 U.S.C. § 524(e) ..................................................................................19

11 U.S.C. § 558 .......................................................................................15

11 U.S.C. § 1122(a) ................................................................................27

11 U.S.C. § 1123(a)(4) ............................................................................26

11 U.S.C. § 1126(a) ................................................................................34

11 U.S.C. § 1126(c) ................................................................................34

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

11 U.S.C. § 1129(a)(1)................................................................................................................7

11 U.S.C. § 1129(a)(3)............................................................................................................7, 21

**OTHER AUTHORITIES**

14 COUCH ON INS. § 199:13 (2003)..........................................................................................30

NORTON BANKRUPTCY LAW AND PRACTICE 3D § 110:19 (William L. Norton III ed.) .................34

The undersigned insurance carriers (collectively, "***Certain Insurers***") file this supplemental objection ("***Supplemental Objection***")[2] to the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 2295] (the "***Motion***")[3] and approval of the *Amended Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5485] (the "***Disclosure Statement***"). In support of this Supplemental Objection,[4] Certain Insurers respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     At the May 19, 2021 hearing on the Debtors' exclusivity motion, Debtors' counsel stated that "[r]emoving that insurance neutrality language and setting this court or the Delaware District Court up for either a binding estimation battle or a binding trust distribution procedure battle is setting us up for the most epic battle these courts have ever seen between plaintiff lawyers on the one hand and insurers on the other hand." May 19, 2021 Hr'g Tr. at 45:5-11. Despite

---

[2]    The intent of Certain Insurers is for this Supplemental Objection to largely supersede the objections set forth in *The AIG Companies' Objection to Motion for Approval of Debtors' Disclosure Statement* [D.I. 3523] (the "***Initial Objection***") (several of which have been mooted by additional language added to the Disclosure Statement). However, there are certain key background and discussion included in the Initial Objection that are not duplicated here. Any relevant discussion from the Initial Objection is noted with pin cites throughout.

[3]    Capitalized terms used but not defined herein (including in **Exhibit A** and **Exhibit B**) shall have the meanings ascribed to them in the Motion, the Disclosure Statement, the *Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5368] (the "***Plan***"), or the Trust Distribution Procedures (the "***TDPs***"), as applicable.

[4]    Certain Insurers incorporate by reference (i) the Initial Objection, subject to footnote 2 above, and (ii) *Certain Insurer's Objection to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement and (II) Granting Related Relief* [D.I. 5684] (the "***Certain Insurers' RSA Objection***").

acknowledging this reality, the Debtors have now, in an abrupt about-face, eliminated any slight semblance of insurance neutrality that was present in prior versions of the Plan[5] and proposed in its place a Plan that, in their words, guarantees that "most epic battle" will take place. This, apparently, is the price the Debtors are willing to pay for the support of the Tort Claimants' Committee, the Future Claimants' Representative, and the Coalition (the "***Abuse Claimant Representatives***"). But their support comes at the cost of not only the war foreshadowed by the Debtors, but also confirmability of the Plan, which can only be described as a product of collusion between the Debtors and the Abuse Claimant Representatives.

2.      Unfortunately for the Debtors, leaving the insurers holding the bag is not a realistic option. Contrary to the Debtors' and Abuse Claimants' Representatives' arguments, "insurance neutrality" is not a "loaded, and often misused, misunderstood and inaccurately spun term."[6] And it certainly does not include any "special exemption" for insurers.[7] The simple intent of the "insurance neutrality" doctrine is to keep the prepetition rights and obligations of debtors and their insurers intact post-bankruptcy (and post-assignment), which is not a novel concept at all with respect to debtor contracts.

3.      Here, the language of the Plan—including the TDPs attached thereto—*expressly* seeks to alter the prepetition rights and obligations of the Debtors' insurers by, among other things:

---

[5]    To be clear, *none* of the prior iterations of the Debtors' Plan were insurance neutral; at best, the prior Plans provided ambiguous protections. But instead of working with the insurers to remove the ambiguities to ensure insurance neutrality and confirmability of the Plan (the only route that would, as the Debtors have conceded, allow a swift conclusion to these Chapter 11 Cases), the Debtors have instead made their Plan unambiguously ***not*** insurance neutral—and, as a result, have made the Plan patently unconfirmable.

[6]    *See Joinder of the Coalition of Abused Scouts for Justice, the Official Committee of Tort Claimants, and the Future Claims Representative to, and Brief in Support of, Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5680] (the "***Abuse Claimant Representatives' RSA Joinder***") ¶ 26.

[7]    *Id.*

(i) taking away the insurers' right under their policies to defend claims in an adversarial proceeding in which legal judgments are entered following consideration and testing of evidence, a key part of the contractual bargain with BSA and a foundational principle of the bundle of economic rights reflected in the insurance contracts; (ii) taking away the insurers' right to consent to settlements, another key element of the contractual bargain; (iii) attributing binding claim valuations in derogation of the insurers' rights to assume the defense and litigate claim valuation and/or the reasonableness of any claim settlement; (iv) expanding the "quantum of liability" that the insurer would otherwise face in the tort system by as much as $100 billion; and (v) assigning non-debtor (*i.e.*, Local Council and Contributing Chartered Organization) insurance policy rights to the Settlement Trust in complete derogation of established Third Circuit precedent. For each of these reasons, the Plan is plainly not insurance neutral, and is unconfirmable as a matter of law. In fact, the Abuse Claimant Representatives do not even dispute that the Plan is not insurance neutral.[8]

4.    But the lack of insurance neutrality, although dispositive in and of itself with respect to the confirmability of the Plan, is only one element of the unconfirmable deal that has been reached by the Debtors, the Local Councils, and the Abuse Claimant Representatives. The Plan and the TDPs bear all of the hallmarks of an improper collusive deal, which not only demonstrates that the Plan cannot satisfy the good faith requirement of section 1129(a)(3) of the Bankruptcy Code but also violates numerous other requirements for confirmation:

- <u>First</u>, in contravention of the statutory scheme for allowance and disallowance of claims set forth in section 502 of the Bankruptcy Code, the TDPs facilitate the payment of fraudulent, time-barred, and otherwise invalid Abuse Claims, which

---

[8]    *See* Abuse Claimant Representatives' RSA Joinder ¶¶ 35-36 ("[T]he plan must be 'binding on all parties in interest.' RSA § II.A.(i).(A). There can (and should) be no carve-outs for the insurers. . . . They will have a right to be heard and offer evidence. The Supporting Parties will not and do not question their standing and right to object to the Plan, and as such, 'insurance neutrality,' as that term was used in *In re Combustion Engineering* and its progeny has no relevance here. 391 F.3d 190 216-16 (3d Cir. 2004). As full participants in the plan confirmation process, the insurers must be bound by the confirmation order just like every other litigant that appears before this Court.").

would not be compensable in the tort system and would typically be disallowed pursuant to section 502(b)(1) of the Bankruptcy Code. At the same time, the Plan deprives all parties in interest (other than the Settlement Trustee, who is bound to resolve Abuse Claims pursuant to the lax TDPs drafted by the Abuse Claimant Representatives) of the right to object to such claims. In light of the Debtors' own claims expert's belief that 83% of asserted Abuse Claims are "presumptively barred" or otherwise not entitled to compensation, and the fact that the TDPs leave open the possibility that substantially more Abuse Claims will be filed in the future, it is difficult to fathom how the Debtors could legitimately believe that the Abuse Claims resolution process contemplated by the Plan and the TDPs is reasonable, proposed in good faith, or otherwise consistent with the Bankruptcy Code's requirements for allowance and treatment of claims. Bankruptcy simply does not permit this Court to bless the allowance of claims that could not otherwise be asserted under applicable state law.

- <u>Second</u>, in violation of sections 524(e) and 105(a) of the Bankruptcy Code, the Plan expressly provides for a discharge of non-debtor Protected Parties' abuse liabilities without making the required showing under controlling Third Circuit authority. This comes as no surprise given that the Local Councils control the Debtors' corporate governance and have orchestrated these Chapter 11 Cases and Plan negotiations to avail themselves of the benefits of the bankruptcy process without actually having to file for—and take on the burdens of—bankruptcy themselves.

- <u>Third</u>, the conflict of interest posed by the Local Councils' effective control of the BSA National Executive Board and, as a result, the administration of these Chapter 11 Cases, coupled with the fact that the Debtors have ceded complete control of the remainder of these cases and the administration of the Settlement Trust to the Abuse Claimant Representatives after having negotiated a sweetheart deal that relieves the Debtors and the Local Councils of their non-insured liabilities, preclude the good faith finding required by section 1129(a)(3) of the Bankruptcy Code. Moreover, the impermissible vote-buying that is effectuated through the Expedited Distribution procedures to incentivize acceptance of the Plan further precludes the required finding of good faith.

- <u>Fourth</u>, the classification and treatment of Direct Abuse Claims under the Plan ignores the unique economic rights of each Direct Abuse Claimant and, therefore, violates sections 1122(a), 1123(a)(4), and 1129(a)(7) of the Bankruptcy Code. Likewise, the Solicitation Procedures, which seek to temporarily allow all Direct Abuse Claims at $1.00 per claimant regardless of the validity and enforceability of the claims, fail to ensure voting power that is commensurate with each Direct Abuse Claimant's economic interests and the economic realities of these Chapter 11 Cases and is intended to circumvent the two-thirds in amount requirement for class acceptance under section 1126(c) of the Bankruptcy Code.

- <u>Fifth</u>, the Plan is not feasible as required under section 1129(a)(11) of the Bankruptcy Code because it relies on projections that assume the Chartered

Organizations continue to generate Scouting membership fees—an assumption that has no validity because the Plan leaves the Chartered Organizations fully exposed to continuing lawsuits which, as the Chartered Organizations themselves have indicated, calls into serious question why they would even be associated with BSA on an ongoing basis.[9]

- Lastly, as a condition precedent to confirmation, the Plan improperly requires a finding by this Court that all Allowed Claim Amounts are "fair and reasonable" based on the evidentiary record offered to the Court at the time of confirmation and, thereby, requires the Court to prospectively adjudicate Abuse Claims. Not only does this violate the terms of the insurance policies, which, assuming coverage exists, require insurers to pay only judgments after an actual trial or settlements approved by the insurers, but such a finding, together with the requested finding that the Confirmation Order and Affirmation Order "shall be binding on all parties in interest," risks misuse of such ruling in post-confirmation coverage litigation, which appears to be the intended result.[10] Moreover, this Court does not have jurisdiction to try personal injury tort claims under 28 U.S.C. § 157(b)(2)(B).

5. No amount of additional disclosure could cure any of these defects—the Plan, in its current form, is patently unconfirmable. Moreover, as is apparent from the concerns raised by counsel to the Roman Catholic Ad Hoc Committee and the United Methodist Ad Hoc Committee at the discovery conference on July 27, 2021, there is a serious question as to whether the Plan is even the plan the Debtors will ultimately seek to have confirmed.[11] Accordingly, approving the Disclosure Statement and proceeding with solicitation of the Plan (the terms of which apparently

---

[9]  *See* July 27, 2021 Hr'g Tr. at 22:4-9 (J. RYAN: "Boy Scouts doesn't exist without us; it's a pla[i]n and simple fact. So before we spend all this time and money on litigations why don't we see if the plaintiffs, and the scouts, and local coun[ci]ls can come to an agreement with the chartered organizations to allow us to continue the relationship that they need to go forward.").

[10]  *See* July 7, 2021 Hr'g Tr. at 36:23-37:2 (I. ZALKIN: "It's been represented in meetings held by sponsors of the RSA and the TDP to the plan that . . . confirmation of the plan would be the equivalent of a litigated plan and that the plan confirmation would operate as a judgment enforceable against the insurers.").

[11]  *See* July 27, 2021 Hr'g Tr. at 21:5-22:3 (J. RYAN: "From the position of my two clients, . . . at this point we're not sure why we're going forward. We're being told that the RSA is not the end of the line. We're being told there will be further negotiations specifically with the chartered organizations, with the treatment in the RSA. It is not the treatment that they ultimately intend to solicit. So from our perspective and the costs on the estate, the costs on the individual parties who are paying their own legal fees to be proceeding with an RSA hearing when we're being told that the deal for which approval is sought is not going to be the deal that is going to be solicited. We're left with the question as to what are we doing and what is going to be gained. . . . Let's get to the deal that is ultimately going to be solicited.").

are in flux) will only be a waste of time and resources to every party's detriment. The Debtors'

Motion should be denied.

## SUPPLEMENTAL OBJECTION

## I.    THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE.

6.    A disclosure statement that describes a plan that is unconfirmable should not be

approved. *See In re Am. Cap. Equip., LLC,* 688 F.3d 145, 154-55 (3d Cir. 2012) ("if it appears

there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider

and resolve that issue at the disclosure stage . . . The debtor has the burden of proving that a

disclosure statement is adequate, including showing that the plan is confirmable" (internal

quotation marks and citations omitted)); *see also In re Quigley Co., Inc.*, 377 B.R. 110, 115-16

(Bankr. S.D.N.Y. 2007); *In re CRIIMI MAE, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000); *In re

Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996). A plan is "patently

unconfirmable where (1) confirmation defects cannot be overcome by creditor voting results, and

(2) those defects concern matters upon which all material facts are not in dispute or have been fully

developed at the disclosure statement hearing." *Am. Capital Equip.*, 688 F.3d at 154-55 (cleaned

up).

7.    The Plan is patently unconfirmable because it (i) is facially "insurance prejudicial"

and impermissibly modifies the contractual rights and obligations under the insurance policies; (ii)

fails to comply with various Bankruptcy Code provisions in contravention of section 1129(a)(1)

of the Bankruptcy Code; (iii) was not proposed in good faith as required by section 1129(a)(3) of

the Bankruptcy Code; (iv) violate sections 1122(a), 1123(a)(4), and 1129(a)(7) of the Bankruptcy

Code in its classification and treatment of Direct Abuse Claims; (v) is not feasible as required

under section 1129(a)(11) of the Bankruptcy Code; and (vi) effectively requires the Bankruptcy

Court to determine personal injury claims, which this Court does not have the jurisdiction to do. Accordingly, the Motion for approval of the Disclosure Statement should be denied.

**A.      The Plan Is Unconfirmable Because It Is Affirmatively "Insurance Prejudicial" Rather Than Insurance Neutral.**

8.      Under section 1129 of the Bankruptcy Code, the Court may confirm a plan only if it "complies with the applicable provisions of [title 11]" and "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(1), (3). Section 1129(a)(3) incorporates state law. *See In re Zenith Electronics Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999) ("[T]he Plan must not only comply with the provisions of the Code, but must meet the standards for approval of such a transaction under Delaware corporate law. We agree that section 1129(a)(3) does incorporate Delaware law (as well as any other applicable nonbankruptcy law).").

9.      The Plan impermissibly modifies, and was specifically designed to evade the terms of, the Debtors' (and certain non-debtors') insurance contracts. Attached hereto as **Exhibit A** and **Exhibit B** are summaries of key policy provisions that are modified and/or breached by the Plan and TDPs. Because the Plan affirmatively seeks to prejudice insurers, it is the polar opposite of "insurance neutral" and violates section 1129(a)(1)-(3) of the Bankruptcy Code. *See In re Cajun Elec. Power Co-op., Inc.*, 230 B.R. 715, 737 (Bankr. M.D. La. 1999) (finding that plan violated section 1129(a)(3) and, therefore, was unconfirmable because it "call[ed] for an improper modification of the [power supply contracts] in that it seeks to bind the Members for 25 years to treatment which they do not want and for which they did not contract"); *cf. Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Co.*, 769 F. Supp. 671, 707 (D. Del. 1991), *aff'd*, 988 F.2d 414 (3d Cir. 1992) ("Courts do not rewrite contracts to include terms not assented to by the

parties."); *In re Exide Holdings, Inc.*, No. 20-11157, 2021 WL 3145612, at *6 (D. Del. July 26,

2021) (citing *Coca-Cola Bottling Co. of Shreveport*, 769 F. Supp. at 707, with approval).[12]

      10.    Certain Insurers' RSA Objection provides background information and explains in

detail why any plan that incorporates the terms of the RSA would not be insurance neutral and,

therefore, unconfirmable as a matter of law. *See* Certain Insurers' RSA Objection ¶¶ 13-22; 57-

73. Certain Insurers will not repeat those arguments here and instead incorporate them by

reference. To assist the Court and for ease of reference, below is a high-level overview of the

arguments concerning insurance neutrality set forth in Certain Insurers' RSA Objection.

      11.    In amending the Plan in order to incorporate the terms of the RSA, the Debtors have

removed any semblance of insurance neutrality by replacing what was, at best, ambiguous

protections of insurers' rights with "Insurance Provisions" that are now unambiguously insurance

prejudicial. *See* Plan § X.M. The Plan expressly provides that the Confirmation Order and

Affirmation Order may "modify, amend, or supplement, or be interpreted as modifying, amending,

or supplementing, the terms of, and rights and obligations under, an Insurance Policy."[13] The Plan

---

[12]   That a debtor may not misuse bankruptcy to rewrite its prepetition contracts is not a novel concept—bankruptcy courts have long recognized that they cannot alter or enlarge insurers' contractual obligations even outside the context of plan neutrality. *See, e.g.*, *Cissel v. American Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir. 1975), *cert. denied*, 423 U.S. 1074 (1976) (bankruptcy trustee could not obtain recovery from insurer for claims filed against the estate absent a judgment or a written settlement agreement between the policyholder, the claimant, and the insurance company, as required by the policyholder); *In re The Wallace & Gale Co.*, No. 85-40092 (Bankr. D. Md.), July 22, 1998 Hr'g Tr. at 119-21 (refusing to confirm a plan that violated insurer's contractual rights in asbestos bankruptcy); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989), *aff'd*, *Amatex Corp. v. Stonewall Ins. Co.*, 102 B.R. 411, 414 (E.D. Pa. 1989) (refusing to compel insurers to make lump-sum payments to debtor "contrary to the terms of their policies"); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984) (holding that the Bankruptcy Code is not intended to expand debtor's rights against others more than they exist at the commencement of the case); *In re 641 Associates, Ltd.*, 1993 WL 332646 at *8 (E.D. Pa. August 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to disregard state-law contractual rights.").

[13]   *Id.* § X.M.1 (emphasis added):

      *Except . . . as otherwise provided in . . . the findings made by the Bankruptcy Court in the Confirmation Order or the findings made by the District Court in the Affirmation Order*, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights or obligations under an Insurance Policy to the extent such rights and obligations

then requires, as a condition precedent to confirmation, a finding by the Court that the Confirmation Order—including any modification, amendment, or supplementation of an Insurance Policy as provided for therein, no matter how prejudicial to insurers—is "binding on all parties in interest" (including the insurers). *Id.* § IX.A.3. These provisions render the Plan facially *not* insurance neutral, such that insurers have no protections whatsoever from the myriad provisions in the Plan and TDPs that affirmatively modify the insurance contracts in order to nullify certain bargained-for rights and obligations arising thereunder.

12.     For example, the Plan requires the Court to prospectively adjudicate Abuse Claims, in violation of the insurance policies. As a condition precedent to confirmation, the Court must make a finding that any Allowed Claim Amount as determined by the Settlement Trustee in his sole discretion is "fair and reasonable" based on the evidentiary record before the Court at the time of confirmation, even though the actual liquidation of the Abuse Claims will occur at a later point in time, possibly years after confirmation. *See id.* § IX.A.3. This violates the terms of the insurance policies, which obligate insurers to provide coverage (assuming coverage exists) in only two circumstances: (a) entry of a judgment against the insured following "an actual trial" or (b) a settlement to which the insurer has expressly consented. And even if the Court were lawfully able, and inclined to attempt, to make such a finding, the discovery necessary to fairly present this issue to the Court would take years to develop, given the 82,500 claimants who have filed Abuse Claims and who would be seeking recoveries from the Settlement Trust.

13.     Moreover, providing the Settlement Trustee with sole authority to evaluate and settle Abuse Claims (all while completely excising the insurers from the Abuse Claims resolution process) deprives insurers of various negotiated rights and coverage defenses under their insurance

---

are otherwise available under applicable law.

contracts, including, but not limited to, (i) the right to control the defense of Abuse Claims; (ii) the right to approve the settlement of Abuse Claims; (iii) the right to pay only for losses which the insured is legally obligated to pay; and (iv) the right to apply policy exclusions to the losses. The Plan then requires a finding by the Court that the Allowed Claim Amounts as determined unilaterally by the Settlement Trustee in the future, are "fair and reasonable" (*id.* § IX.A.3), and attempts to bind Non-Settling Insurance Companies to the Allowed Claim Amounts, regardless of whether the applicable insurance policies would obligate the insurers to pay the full Allowed Claim Amounts or the amounts that are ultimately paid by the Settlement Trust after application of the payment percentage. *See* TDPs §§ VIII.A; IX.C; XII.G, I.

14.    No court has previously approved such brazen attempts to abrogate insurer's state law contractual rights.  Instead, bankruptcy courts faced with  coverage issues, such as determining an insurer's indemnity obligations, (including whether the insurer is obligated to pay the full liquidated value of a claim as determined by a settlement trustee or a lesser amount actually distributed by the settlement trust on account of the claim), defer such adjudications to post-confirmation coverage courts. *See Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. Rptr. 4th 958, 997 (2006) (holding in post-confirmation coverage action that the insurers' indemnity obligations should be based on the payment percentage that the debtor was obligated pay, as opposed to the allowed liquidated value of a claim, because "the policies indemnify [the debtor] for amounts it is 'obligated to pay' by law"); *Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1180 (N.D. Cal. 2016) (finding in post-confirmation coverage action that "*Fuller-Austin* determines the 'obligated to pay' issue, and that [the insurer] is accordingly obligated to pay [the debtor] the trust payment percentage, not the liquidated value"); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Porter Hayden Co.*, 2012 WL 734176, *4 (D. Md. 2012) (finding in post-

confirmation coverage action that state law and policy terms obligated insurer to indemnify the trust for the full liquidated value of claims); *ARTRA 524(g) Asbestos Trust v. Fairmont Premier Ins. Co.*, 2011 WL 4684356 (N.D. Ill. 2011) (same). Contrary to the Debtors' position in the Hartford adversary proceeding, the Debtors now request that the Court predetermine this issue (which requires review of all of the applicable insurance policies) and effectively preclude insurers from making the argument that holding insurers accountable for the full Allowed Claim Amount is a violation of the applicable policy terms. *See Hartford Acc. & Indem. Co. v. Boy Scouts of America*, Adv. Pro. No. 20-50601 (LSS) (Bankr. D. Del.) [D.I. 22] at 12-26. This has the effect of depriving the insurers of the right to assert an otherwise valid coverage defense. As discussed below, such deprivation and alteration of insurers' rights renders the Plan unconfirmable as a matter of law. *See infra* § I.B. Moreover, this Court has made clear that it will not be deciding any coverage issues,[14] and in any event, there is a question as to whether coverage disputes are core proceedings that could be adjudicated by the Bankruptcy Court.[15]

15.    Again, even if the Court were lawfully able, and inclined to attempt, to make such determinations, the discovery necessary to fairly present the relevant issues to the Court would take years to develop, given the thousands of insurance policies potentially at issue, and require the Bankruptcy Court effectively to become an insurance coverage court for all of those policies.

---

[14]  *See* May 19, 2021 Hr'g Tr. at 241:22 (THE COURT: "no coverage issue is going to be adjudicated"); *id.* at 242:9-11 (The Court: "I will read the motion very carefully, but I can tell everyone right now that I can't imagine I would decide a coverage issue.").

[15]  *See, e.g., Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 450 (2d Cir. 2005); *Matter of U.S. Brass Corp.*, 110 F.3d 1261, 1268 (7th Cir. 1997); *Longview Power, LLC v. First Am. Title Ins. Co. (In re Longview Power, LLC)*, 515 B.R. 107, 115 (Bankr. D. Del. 2014); *Scott v. AIG Prop. Cas. Co.*, No. 17-cv-1052, 2017 WL 1380607, at *4 (S.D.N.Y. Apr. 17, 2017); *EMS Fin. Servs., LLC v. Fed. Ins. Co. (In re EMS Fin. Servs., LLC)*, 491 B.R. 196, 203 (E.D.N.Y. 2013); *Silverman v. Tudor Ins. Co. (In re Lenders Abstract & Settlement Serv.)*, 493 B.R. 385, 394 (E.D.N.Y. 2013); *DeWitt Rehab. & Nursing Ctr., Inc. v. Columbia Cas. Co.*, 464 B.R. 587, 591 (S.D.N.Y. 2012); *Lawrence Grp., Inc. v. Hartford Cas. Ins. Co. (In re Lawrence Grp., Inc.)*, 285 B.R. 784, 789 (N.D.N.Y. 2002).

16.     The Plan also materially increases the quantum of liability the insurers are required to cover under their insurance contracts, thereby fundamentally altering the risk an insurer may be subject to thereunder—a result that the Third Circuit, in striking down a plan that attempted this very strategy, determined not to be insurance neutral. *See In re Glob. Indus. Techs., Inc.* ("**GIT**"), 645 F.3d 201, 212 (3d Cir. 2011) ("'Insurance neutrality' is a meaningful concept where . . . a plan does not materially alter the quantum of liability that the insurers would be called upon to absorb."). Insurers here would be far worse off than the insurers in *GIT*, where the Third Circuit found that a 2,700% increase in silica-related claims (169 prepetition claims compared to over 4,600 claims asserted) constituted a "tangible disadvantage" to the insurers even though the proposed plan contained insurance neutrality language that preserved their coverage defenses. *Id.* at 214. By contrast, here, the Plan expressly does not preserve insurers' coverage defenses and is facially insurance prejudicial *and*, at the same time, increases the magnitude of claims by more than 300,000% (275 prepetition claims compared to 82,500 claims currently asserted).[16]

17.     The Plan also contemplates the transfer of the rights of *non-debtor* insured parties (*i.e.*, Local Councils and Contributing Chartered Organizations) under the insurance policies to the Settlement Trust without insurer consent,[17] "notwithstanding any terms of any policies or

---

[16]   *See* Disclosure Statement § V.N ("there are approximately 82,500 unique, timely Abuse Claims"); *id.* § III.E (noting that there were "approximately 275 civil actions asserting personal injury Claims against the BSA and certain Local Councils and Chartered Organizations as of the Petition Date"); *Debtors' Information Brief* [D.I. 4] at 3 (same). Even if the higher number of total expected claims (1,700) were to be used as the starting point, the 2,700% increase in *GIT* would pale in comparison to the 5,000% increase here (1,700 expected claims compared to 82,550 claims currently asserted). *See* Disclosure Statement § IV.A ("In addition to the [275] Pending Abuse Actions . . . attorneys for Abuse survivors had provided information regarding approximately 1,400 additional Claims not yet file, for a total of approximately 1,700 known asserted Abuse Claims.").

[17]   *See* Plan § I.A.136 (defining "Insurance Assignment" as "the assignment and transfer to the Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, (d) the Abuse Insurance Coverage, and (e) all other rights or obligations under or with respect to the Abuse Insurance Policies (but not the policies themselves)"); *id.* § I.A.69 (defining "Contributing Chartered Organization Settlement Contribution" to include "any and all of the Contributing Chartered Organizations' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, . . . arising under or attributable to: (i) the Abuse Insurance Policies, the Abuse Insurance Coverage, the Insurance Settlement Agreements, and claims

provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights." Plan § IX.A.3.j. The Plan's attempt to override anti-assignment clauses with respect to non-debtor insureds is impermissible under controlling Third Circuit authority. *See In re Combustion Engineering, Inc.*, 391 F.3d 190, 218-19 (3d Cir. 2004) ("To the extent the subject insurance policies are jointly held by [the debtor] and a non-debtor, . . . the § 541 preemption of anti-assignment provisions applies only to [the debtor's] interest in the shared policies.").[18]

18.     In sum, the Plan unambiguously requires the Confirmation Order and Affirmation Order to modify Non-Settling Insurance Companies' insurance policies, and the rights and obligations thereunder, and, at the same time, does not adequately protect against the misuse of the Plan, Plan Documents, and Confirmation Order against Non-Settling Insurance Companies in post-confirmation coverage litigation. Accordingly, the Plan is not insurance neutral and violates section 1129(a)(1)-(3) of the Bankruptcy Code, and is therefore unconfirmable as a matter of law.

**B.     The Plan Contravenes Section 1129(a)(1) Because It Violates Sections 502 and 524(e) of the Bankruptcy Code.**

19.     The Plan is also unconfirmable under section 1129(a)(1), which requires that any plan comply with the provisions of the Bankruptcy Code, because it fails to comply with sections 502 and 524(e) of the Bankruptcy Code.

---

thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries"); *id.* § I.A.54 (defining "Local Council Settlement Contribution" to include "any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, . . . arising under or attributable to: (i) the [BSA / Local Council] Insurance Policies, the Abuse Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries").

[18]   While it is clear that preemption applies to override anti-assignment clauses in debtor insurance contracts in the section 524(g) context, *see, e.g., In re Thorpe Insulation Co.*, 677 F.3d 869, 883 (9th Cir. 2012), it is not clear that such preemption applies in the context of non-524(g) mass tort cases, such as this one. Accordingly, it may be that preemption of anti-assignment clauses in *debtor* contracts themselves may not be permissible in this case.

20.    <u>First</u>, the TDPs violate section 502(a) and 502(b)(1) of the Bankruptcy Code because they expressly permit (and to some extent require) the payment of claims that are not compensable in the tort system, including fraudulent and time-barred claims, without allowing parties in interest to file objections to such claims.  Section 502(a) of the Bankruptcy Code provides that claims supported by a proof of claim are deemed allowed "unless a party in interest . . . objects."  Section 502(b)(1) of the Bankruptcy Code provides that a claim, subject to an objection, is not allowable if it is "unenforceable against the debtor, and property of the debtor under any agreement or applicable law[.]"

21.    "To determine whether claims are enforceable for bankruptcy purposes, § 502 relies upon applicable non-bankruptcy law. . . . A claim against the bankruptcy estate, therefore, 'will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy.'" *Combustion Engineering*, 391 F.3d at 245, n.66 (quoting *U.S. v. Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992)); *see also In re Sydnor*, 571 B.R. 681, 686 (Bankr. E.D. Pa. 2017) ("If a claim is time-barred under applicable nonbankruptcy law when a bankruptcy case is commenced a proof of claim based on that claim will be disallowed upon objection by a party in interest."); *G.W. White & Son v. Tripp*, No. 94-681, 1995 U.S. Dist. LEXIS 1887, at *4 (N.D.N.Y. Feb. 14, 1995) ("Statutes of limitations are examples of 'applicable law' which might render a claim unenforceable against a debtor and not allowable."). "Any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1204 (2007); *see also* 11 U.S.C. § 558 ("The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses."); *Butner v. United States*, 440 U.S. 48, 55-56 (1979) ("Property interests are created

and defined by state law. . . . [T]he federal bankruptcy court should take whatever steps necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued.").

22.    Here, instead of permitting parties to test the validity of claims—and weed out fraudulent or barred claims through an adversarial process—the Plan and TDPs facilitate the allowance of such claims by: (i) appointing a Settlement Trustee who has a close personal and professional relationship with the FCR, and was previously rejected by this Court for the role of mediator, (ii) limiting the Settlement Trustee's ability to reduce the amount of a Direct Abuse Claim by eliminating from the TDPs certain mitigating factors that the Settlement Trustee could consider, including "incomplete or suspicious" or "deliberately false or misleading" evidence;[19] (iii) eliminating the Settlement Trustee's discretion to zero out Direct Abuse Claims that are time-barred under state law;[20] (iv) allowing the Settlement Trustee to determine the applicable statute of limitations or choice of law based not only on where a Direct Abuse Claim was pending on the Petition Date, but also based on "where such Abuse Claim could have been timely and properly filed as asserted by the Abuse Claimant under applicable law,"[21] without any opportunity for any party—who, under the proposed Plan, is bound by the Settlement Trustee's determination—to review or challenge this determination; (v) allowing Abuse Claimants whose Direct Abuse Claims may be substantially reduced by the Scaling Factors to elect to defer the determination of their Proposed Allowed Claim Amounts for up to 12 months from the Effective Date to see if statute of limitation revival legislation occurs;[22] (vi) not requiring a showing of negligence on the part of the

---

[19]    *Compare Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2592], Exhibit A (the "***Second Amended Plan TDPs***") § 5.4 *with* TDPs § VIII.E.

[20]    *Compare* Second Amended Plan TDPs § 5.4 *with* TDPs § VIII.F, Schedule 1.

[21]    TDPs § V.E.

[22]    *Id.* § VII.H. This is contrary to well-established bankruptcy law that tests the merits of a proof of claim as of the

Protected Party, a showing without which no state law claim is ever allowed, in order for a Direct Abuse Claim to be allowed at a Base Matrix Value (and, as if that is not enough, providing an enhancement to Base Matrix Value if negligence is shown;[23] and (vii) providing a no-questions-asked, no-proof-required Expedited Distribution of $3,500 to holders of Abuse Claims who elect to receive such payments, rather than attempt to show their claims have even potential validity.[24] This is particularly concerning given that, according to the Debtors' own claims expert, approximately 83% of Abuse Claims filed to date are "presumptively barred" or otherwise not entitled to recovery. *See* Disclosure Statement § V.N.

23.    If those claims were submitted to the tort system, or even an adversarial claims allowance process in front of the Bankruptcy Court, they would be subject to defenses that could either reduce or completely bar the claims. Under the TDPs, however, potentially tens of thousands of invalid or even fraudulent claims will be paid. This is an overt end-run around the statutory scheme set forth in section 502 of the Bankruptcy Code, which provides for an adversarial process to weed out illegitimate claims and ultimately supports the policy of equitable distribution that underlies the Bankruptcy Code. *See GIT*, 645 F.3d at 215 (vacating district court's order affirming confirmation of plan and remanding the matter to the bankruptcy court for further proceedings, including "to address the procedures by which the trust calls for claims funds to be distributed" because "it may be advisable to examine whether those procedures would require claims to be paid . . . without regard to any affirmative defenses available under state law, and, if so, whether those procedures would then cause the trust to violate 11 U.S.C. § 502"); *Westmoreland Hum.*

---

petition date. *Keeler v. PRA Receivables Mgmt., LLC (In re Keeler)*, 440 B.R. 354, 360 (Bankr. E.D. Pa. 2009) ("Therefore, if as of the date of the debtor's bankruptcy filing a creditor's claim was barred by the applicable statute of limitations, then the claim must be disallowed upon objection by a party in interest.").

23    *See* TDPs § VIII.D.(ii)d.

24    *See id.* § VI.A.

*Opportunities, Inc. v. Walsh*, 246 F.3d 233, 251 (3d Cir. 2001) ("the Bankruptcy Code attempts to provide for the efficient and equitable distribution of an insolvent debtor's remaining assets to its creditors"); *In re USG Corp.*, 290 B.R. 223, 225 (Bankr. D. Del. 2003) ("[I]f the debtor maintains that its creditors are not legitimate and that, properly analyzed, claims against it do not exceed its assets, the Court must assist as well. The statements in counsels' brief compel the Court to state the obvious. In an asbestos bankruptcy, the Court will, within the constraints of the law, reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation. The court will protect those who have been truly harmed.").

24.     The Plan and TDPs also leave open the possibility that substantially more Abuse Claims will be filed in the future in complete disregard of the Bar Date Order, which also violates section 502(b) of the Bankruptcy Code. *See Silva v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.)*, Nos. 07-10416 (BLS), 11-53199 (KJC), 2014 Bankr. LEXIS 924, at *16 (Bankr. D. Del. Mar. 7, 2014) ("[T]he bar date is a 'drop-dead date' that prevents a creditor from asserting prepetition claims unless he can demonstrate excusable neglect."). Section IV.A of the TDPs provides that, even if a Direct Abuse Claim was not filed prior to the Bar Date, it can still be considered timely so long as the Direct Abuse Claim (i) is asserted against a Local Council or other Protected Party and (ii) would not be barred "under applicable state law." TDPs § IV.A. Permitting Abuse Claimants to submit their claims to the Settlement Trust after the Bar Date renders the Bar Date and Bar Date Order meaningless and it is impossible to predict the total number of claims that will ultimately be submitted to, and administered by, the Settlement Trust. Indeed, it would allow every person in America—even those who never had any involvement with Scouting—to submit a future request for payment of a no-questions-asked Expedited Distribution

of $3,500, costing the Settlement Trust more than the federal government paid out in special COVID-19 distributions.[25]

25.    <u>Second</u>, the Plan provides for a discharge of non-debtor Protected Parties' (and their successors' and assigns') abuse liabilities without making the required showing under applicable Third Circuit law, all in violation of section 524(e) of the Bankruptcy Code.[26] Pursuant to Article X.J.1.3 of the Plan, "all holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever *<u>discharge and release each and all of the Protected Parties and their respective property and successors and assigns</u>* of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, . . . arising from or related in any way to such Abuse Claims." The Channeling Injunction also provides that "to supplement, where necessary, the injunctive effect of the Discharge [of the Debtors] . . . the sole recourse of any holder of an Abuse Claim *<u>against a Protected Party</u>* on account of such Abuse Claim shall be to and against the Settlement Trust . . . and such holder shall have no right whatsoever at any time to assert such Abuse Claim *<u>against any Protected Party or any property</u>*

---

[25]  The payment of claims that are not compensable in the tort system is not an insurer-specific issue. Even certain Abuse Claimants have raised concern with the lax Abuse Claims allowance scheme. *See* July 7, 2021 Hr'g Tr. at 35:10-21 (I. ZALKIN: "There are issues with respect to whether the court can enforce claims that are not, otherwise, enforceable within State Courts. There are issues as to whether there should be [parity] in voting between claimants who would not have valid claims in the State Courts. I know, for example, our firm represents substantial numbers of California claimants where we have a valid and open statute of limitations. And issues whether those claims should be treated, from a voting standpoint, at [parity] with claims of victims from states where they are foreclosed from bringing claims by their statutes of limitations.").

[26]  Unlike channeling injunctions and settlement trusts implemented pursuant to section 524(g) of the Bankruptcy Code for the administration and resolution of asbestos liabilities, channeling injunctions and trusts for the administration and resolution of non-asbestos liabilities do not have explicit statutory support and are instead evaluated under the Bankruptcy Court's general equitable powers under section 105(a) of the Bankruptcy Code. *See GIT*, 645 F.3d at 205, n.10. Accordingly, channeling injunctions and trusts for non-asbestos liabilities require even closer scrutiny to ensure that they are necessary and fair. *See id.* at 206 ("For the Plan to be approved as designed . . . the debtors needed to show that the Plan's resolution of silica-related claims is necessary or appropriate under 11 U.S.C. § 105(a), which, under our precedent *requires showing with specificity* that the Silica injunction is both necessary to the reorganization and fair." (emphasis added)); *see also In re Cont'l Airlines*, 203 F.3d 204, 211 (3d Cir. 2000) ("[S]ection 105(a) has a limited scope. It does not create substantive rights that would otherwise be unavailable under the Bankruptcy Code." (cleaned up)).

*or interest in property of any Protected Party*." *Id.* § X.F.1. Unlike the Releasing Claim Holders, Abuse Claimants may not opt out of the Channeling Injunction or third-party releases and are bound by them whether or not they vote in favor of the Plan. In other words, the Channeling Injunction and Abuse Claimants' release are plainly nonconsensual. *See*, *e.g.*, *In re Emerge Energy Servs. LP*, No. 19-11563, 2019 WL 7634308, at *17-18 (Bankr. D. Del. Dec. 5, 2019); *In re Washington Mut., Inc.*, 442 B.R. 314, 354-55 (Bankr. D. Del. 2011).

26.     Section 524(e) of the Bankruptcy Code provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). While this general rule prohibiting the extension of a debtor's discharge to non-debtors can be overcome in certain circumstances, the Channeling Injunction and Abuse Claimants' release here fail to satisfy the Third Circuit's "exacting standards" for evaluating non-debtor injunctions and releases.[27] Under *Continental Airlines*, "[t]he hallmarks of permissible non-consensual [non-debtor] releases" are "fairness, necessity to the reorganization, and specific factual findings to support these conclusions." 203 F.3d at 214; *see also GIT*, 645 F.3d at 206 ("For the Plan to be approved as designed . . . the debtors needed to show that the Plan's resolution of silica-related claims is necessary or appropriate under 11 U.S.C. § 105(a), which, under our precedent requires showing with specificity that the Silica injunction is both necessary to the reorganization and fair."). Courts in the Third Circuit typically consider four factors in determining whether a non-consensual third-party release and injunction satisfy *Continental Airlines*:

> whether: (i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the

---

[27]     *See In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019) ("Consistent with our prior decisions, we are not broadly sanctioning the permissibility of nonconsensual third-party releases in bankruptcy reorganization plans. Our precedents regarding nonconsensual third-party releases and injunctions in the bankruptcy plan context set forth exacting standards that must be satisfied if such release and injunctions are to be permitted, and suggest that courts considering such releases do so with caution.").

release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release.

*In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010).

27.     The Channeling Injunction and Abuse Claimants' release cannot be justified under this standard. The Debtors cannot establish that the Local Councils—the only non-debtor Protected Parties at this time—have provided a critical financial contribution since, in the Ad Hoc Committee's counsel's own words, "[a]ll of these local council contributions . . . are expressly contingent on satisfactory resolution of the issues surrounding chartered organizations," July 21, 2021 Hr'g Tr. at 9:21-23,[28] and the Debtors themselves have concluded that the Local Councils have nearly $2 billion in unrestricted net assets, which calls into question the sufficiency and fairness of the aggregate amount of the Local Council Settlement Contribution (*i.e.*, $500 million, comprised of at least $300 million in cash with the balance in unrestricted properties and a $100 million DST Note).[29] Moreover, as discussed in further detail in the Initial Objection at ¶ 15, the Plan contemplates that all Local Councils will be Protected Parties, whether or not they make any contribution to the Settlement Trust. *See* Plan § I.A.192 (defining "Protected Parties" to include "the Local Councils," which refers to "each and every current or former local council of the BSA"). Indeed, neither the Plan nor Disclosure Statement reveal which Local Councils are contributing what to the Settlement Trust. And the reasonableness of the compensation in exchange for the release and Channeling Injunction is, at best, questionable—even if the

---

[28]   In *Millennium Lab Holdings II*, the Third Circuit found that the nonconsensual third-party release and injunction provisions were critical to the success of the plan because, without them, the released parties would not have been willing to make their contributions, and absent those contributions, no chapter 11 plan would have been feasible. 945 F.3d at 137. By contrast, here, the contributions of the non-debtor Protected Parties (and, therefore, the Channeling Injunction and releases for the benefit of the non-debtor Protected Parties) clearly are not necessary given that Debtors previously filed a "BSA Toggle Plan," which did not require contributions by non-debtors nor a release and injunction in their favor.

[29]   *See* Disclosure Statement, Liquidation Analysis (Local Council Balance Sheets) at 23.

distributions on account of Abuse Claims can be viewed as the requisite compensation for the actual amount of valid Abuse Claims,[30] Abuse Claimants' recoveries in these Chapter 11 Cases are far from "reasonable" in light of the allowance of tens of thousands of presumptively barred or otherwise invalid Abuse Claims under the Plan, which are by definition not insured claims. *See supra* § I.B.

28.     Under these circumstances, the Abuse Claimants' release and Channeling Injunction "amount[] to nothing more than a lockstep discharge of non-debtor liability and fall squarely into the section 542(e) prohibition." *Cont'l Airlines*, 203 F.3d at 218. Accordingly, the Plan is unconfirmable under section 1129(a)(1) of the Bankruptcy Code.

## C.     The Plan Was Not Proposed in Good Faith as Required by Section 1129(a)(3) of the Bankruptcy Code.

29.     Section 1129(a)(3) of the Bankruptcy Code requires any plan to be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (citing *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150, n.5 (3d Cir. 1986)).

30.     The principal purpose of these Chapter 11 Cases is to protect the Local Councils, who have not sought bankruptcy protection for themselves, by bringing those non-debtors under the wing of the Channeling Injunction and release provisions of the Plan. As set forth in further detail in Certain Insurers' RSA Objection at ¶¶ 23-28, the Local Councils exercise complete and

---

[30]  *See Cont'l Airlines*, 203 F.3d at 215, n.13 (distinguishing between "the distribution . . . on behalf of their 'creditor' status with respect to Continental Airlines Holdings" and compensation "in exchange for the release of their claims against non-debtors").

total control over the Debtors' corporate governance.[31] The Local Councils exercised that control

to force the Debtors into chapter 11 (instead of the Local Councils and the Chartered

Organizations, who, in many cases, have direct, primary, and/or sole liability for abuse) and to

negotiate a plan that is extremely favorable to the Local Councils, while providing no cognizable

benefit to the Debtors other than a release and an end to their Chapter 11 Cases, which the Debtors

could achieve under the BSA Toggle Plan.[32] This inherent conflict alone warrants a finding of bad

faith under section 1129(a)(3) of the Bankruptcy Code. *See Am. Cap. Equip.*, 688 F.3d at 158

(establishing that a plan that "will not fairly achieve the Bankruptcy Code's objectives because it

establishes an inherent conflict of interest" is unconfirmable under section 1129(a)(3)).[33]

      31.     Lack of good faith here is further evidenced by the fact that the Debtors have ceded

complete control of these Chapter 11 Cases and the administration of the Settlement Trust to the

---

[31]  The Local Councils elected 100% of the members of the Debtors' National Executive Board, which is the functional equivalent of a board of directors. *See* Transcript of July 15, 2021 Deposition of Roger C. Mosby ("***Mosby Dep. Tr.***") at 244:5-12 ("[R]epresentatives from each of the councils, based upon some membership criteria, have national representatives that participate in national elections. The national board is elected each year by that group of people."). Moreover, substantially all of the members of the National Executive Committee (a subset of the National Executive Board that independently approved the RSA) were affiliated with a Local Council. *See id.* at 245:24-248:8. Excerpts from the Mosby Dep. Tr. are attached here to as **Exhibit C**.

[32]  *See Claimants' Supplemental Objection to the Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* (the "***Claimants' Supplemental RSA Objections***") [D.I. 5916] ¶ 5 (correctly noting that "[t]his stands in stark contrast to many other mass tort cases involving supplemental injunctions where the Debtors' conduct, . . . stands at the center of, and serves as a predicate for, the liability of non-debtors who are sought to be released" and providing examples of actions pending in the tort system in which the Debtors were dismissed as defendants because they were found to not be responsible for the underlying tort committed by an employee or representative of a Local Council or Chartered Organization).

[33]  The circumstances here parallel those in *Quigley*, where the court found that Quigley's non-debtor parent, Pfizer, had manipulated the voting process—and, really, Quigley's bankruptcy case as a whole—to "gain the benefit of the channeling injunction for itself and the other Pfizer Protected Parties," and denied confirmation of Quigley's plan as having been proposed in bad faith. *See In re Quigley Co., Inc.*, 437 B.R. 102, 125-29 (Bankr. S.D.N.Y. 2010). According to the court, Quigley's bankruptcy was "a Quigley bankruptcy in name only" and Pfizer (the "architect of the global strategy, the only source of chapter 11 and plan financing and the principal beneficiary of the channeling injunction") was the "real proponent of th[e] plan," which was "designed to free the Pfizer Protected Parties from derivative liability, and only incidentally, to reorganize Quigley to the extent necessary to confirm the plan." *Id.* at 126-27.

Abuse Claimant Representatives. The Debtors' complete derogation of their duties as debtors-in-possession is evidenced by the following: (i) the Settlement Trustee, who has a pre-existing relationship with the FCR, was handpicked by the Abuse Claimant Representatives, with no input from the Debtors[34] (ii) the TDPs have been revised to prevent scrutiny into Abuse Claims and to provide recoveries to holders of "presumptively barred" claims;[35] (iii) the Plan provides the Abuse Claimant Representatives complete control over the remainder of these Chapter 11 Cases by providing them with a consent right over all future settlements between the Debtors and any insurer or Chartered Organization;[36] and (iv) the Plan provides the Abuse Claimant Representatives complete control over the payment and liquidation of Abuse Claims, the terms of the TDPs (including amendments, which are permitted without any Court supervision), and the administration of the Settlement Trust.[37] At the same time, as explained above, insurers are completely removed from the Abuse Claims resolution process, in contravention of the insurance policies.

32.    This abdication of the Debtors' fiduciary duties to all stakeholders and elimination of insurers' procedural rights preclude the good faith finding required by section 1129(a)(3) of the Bankruptcy Code. *See Am. Cap. Equip.*, 688 F.3d at 159 (holding that "the lack of good faith pursuant to § 1129(a)(3) makes the Fifth Plan patently unconfirmable" where, among other things, the plan "severely limit[ed] or eliminat[ed] Insurers' ability to take discovery, submit evidence, contest causation, or appeal a decision, and all without the protective channeling injunction of § 524(g)"); *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) ("given the unbridled

---

[34] *See* Plan §§ I.A.227; IV.E, F.

[35] *See supra* § I.B.

[36] *See* Plan §§ I.A.142; IV.F.2.

[37] *See id.* § I.A.177, 235; TDPs § XIII.B.

dominance of the [prepetition asbestos] committee in the debtor's affairs and actions during the prepetition period, its continued influence flowing from its majority status on the postpetition creditors committee, and the obvious self-dealing that resulted from control of the debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the bankruptcy code"); *Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 571 (M.D. Pa. 2005) (holding that the debtors have an "obligation to their creditors to propose a plan that is fair to all creditors and not to let one creditor class dominate the formulation of a plan").

33.    Moreover, "collusive plans are not in good faith and do not meet the good faith requirement of § 1129(a)(3)," *Am. Capital Equip.*, 688 F.3d at 158, and collusion between the Debtors and the Abuse Claimant Representatives cannot be more evident than from the Plan and TDPs, which (i) are patently insurance prejudicial, (ii) provide for an abdication of the Debtors' duties to design and prosecute a plan and resolve claims, and hand those duties to the Abuse Claimant Representatives, (iii) provide significant unwarranted cash awards to the Abuse Claimant Representatives without a showing of substantial contribution as required by the Bankruptcy Code, (iv) are designed to deprive insurers of their contractual rights and entitlements, and (v) materially expand insurer liability.

34.    In *GIT*, the Third Circuit reversed the district court's order affirming confirmation and remanded for further proceedings where mere "nonfrivolous **allegations** of collusion between GIT and the asbestos claimants' counsel" called into question the integrity of the bankruptcy proceedings. *GIT*, 645 F.3d at 214 (emphasis added). Specifically, the Third Circuit found that insurers' assertion that the debtor "sold out" insurers "by setting up a system in which they would pay for newly ginned-up silica claims in exchange for the asbestos claimants casting their votes in

favor of the GIT Plan" was a "serious charge" that called into question "whether there is a legitimate basis for concluding that the APG Silica Trust and Silica Injunction are necessary to the reorganization and fair." *Id.* at 214-15.[38]

35.     This is the exact situation that is presented by the Plan: in exchange for the support of the Abuse Claimant Representatives, the Debtors are now proposing a plan and trust distribution procedures that provide recoveries to holders of tens of thousands of time-barred or otherwise invalid Abuse Claims. Accordingly, not only is the Plan unconfirmable because the bankruptcy-triggered explosion of new claims effectively rewrites the terms of the insurance policies by altering the risks an insurer may be subject to thereunder, but it also calls into question the fairness and propriety of the Settlement Trust and Channeling Injunction under section 105 of the Bankruptcy Code. *See id.* at 206 ("For the Plan to be approved as designed (*i.e.*, with the inclusion of the Silica Injunction), the debtors needed to show that the Plan's resolution of silica-related claims is necessary or appropriate under 11 U.S.C. § 105(a), which, under our precedent, requires showing with specificity that the Silica Injunction is both necessary to the reorganization and fair.") (citing *Cont'l Airlines*, 203 F.3d at 214).

**D.      The Classification and Treatment of Direct Abuse Claims Violate Sections 1122(a), 1123(a)(4) and 1129(a)(7) of the Bankruptcy Code.**

36.     The Plan classifies all Direct Abuse Claims together in the same class and contemplates the same *pro rata* distribution of a single pooled fund comprised of the contributions of the Protected Parties and insurance recoveries, regardless of the strength of the claims and the differences in rights each of the Direct Abuse Claimants would be compelled to relinquish under

---

[38]    Although the bankruptcy court on remand ultimately found that the allegations of collusion were not supported by the facts of that case and confirmed the debtor's plan, *see In re Glob. Indus. Techs., Inc.*, No 02-21626-JKF, 2013 WL 587366, at *41-52 (Bankr. W.D. Pa. Feb. 13, 2013), the Third Circuit's decision still establishes that the bankruptcy court must conduct a "searching review" of such allegations and that evidence of collusion and manufactured liability renders a plan unconfirmable. *See GIT*, 645 F.3d at 215.

the Plan and against which entity such claimants could assert those claims and rights. Such classification and treatment of Direct Abuse Claims render the Plan unconfirmable in numerous respects.

37.     First, by providing the same *pro rata* distribution of the pooled fund to Direct Abuse Claimants who hold claims against financially secure Local Councils or other non-debtor Protected Parties as those who, for example, hold claims against only the Debtors or claims that are time-barred or otherwise unenforceable, the Plan fails to provide the "same treatment" to all Direct Abuse Claimants as required by section 1123(a)(4) of the Bankruptcy Code. *See* 11 U.S.C. § 1123(a)(4) ("a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest"). "Same treatment" not only requires all class members be subject to the same process for claim satisfaction and receive equal value—it also requires all class members to give up the same degree of consideration for their distribution under the plan. *See In re W.R. Grace & Co.*, 475 B.R. 34, 121 (D. Del. 2012); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986); *In re Breitburn Energy Partners LP*, 582 B.R. 321, 357-58 (Bankr. S.D.N.Y. 2018); *Quigley*, 377 B.R. at 116-17.

38.     Here, Direct Abuse Claimants who hold claims against—and the right to recover from—financially secure non-debtor Protected Parties are providing a release of those claims and, therefore, a greater degree of consideration for their distribution compared to claimants who are not giving up such claims. By ignoring the different economic rights and degree of consideration each Direct Abuse Claimant is providing in exchange for the same distribution as all other Direct Abuse Claimants, the Plan does not provide the same treatment for all Direct Abuse Claims and, therefore, violates section 1123(a)(4) of the Bankruptcy Code.

39.     <u>Second</u>, the disparate treatment of Direct Abuse Claims also renders the claims

dissimilar and requires separate classification under section 1122 of the Bankruptcy Code. *See* 11

U.S.C. § 1122(a) ("a plan may place a claim or an interest in a particular class only if such claim

or interest is substantially similar to the other claims or interests of such class"); *In re Chateaugay*

*Corp.*, 1993 WL 563068, *4 (Bankr. S.D.N.Y. 1993) ("If LTV had proposed a plan that included

both subordinated and unsubordinated claims in the same class, it would have clearly violated

§ 1123(a)(4) and such plan would not have been confirmable."); *In re Durrett*, 139 B.R. 1, 8

(Bankr. D.N.H. 1992) ("Even if Shawmut possesses an unsecured claim similar to that of other

members of the class, the disparate treatment of Shawmut's claim makes it substantially dissimilar

to those of other members of class 12.").

40.     <u>Third</u>, to the extent any Direct Abuse Claimant votes to reject the Plan, the Plan

would not satisfy the "best interests test" under section 1129(a)(7) of the Bankruptcy Code, which

requires that each claimant in a dissenting class of claims "receive or retain under the plan on

account of such claim . . . property of a value, . . . that is not less than the amount that such holder

would receive or retain" in a hypothetical chapter 7 liquidation.[39] The best interest test "is not

limited to comparing distributions, i.e., the amounts that creditors will receive. The express

language of § 1129(a)(7) also requires . . . consider[ation of] the value of the property that each

dissenting creditor will *retain* under the plan and in the hypothetical chapter 7." *Quigley*, 437 B.R.

at 144-45. Such property includes claims against non-debtors that are released under a chapter 11

plan but cannot be released in a chapter 7 liquidation. *See Washington Mut.*, 442 B.R. at 359-60

---

[39]   Contrary to the Debtors' unsupported assertion that the best interests test does not apply because a chapter 11
case of a non-profit debtor cannot involuntarily be converted into a chapter 7 liquidation, *see* Disclosure Statement
§ IX.D, courts routinely apply the best interests test in chapter 11 cases of non-profit debtors. *See, e.g.*, *In re Save
Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 239 (Bankr. W.D. Tex. 2008); *In re Roman Catholic
Archbishop*, 339 B.R. 215, 227 (Bankr. D. Or. 2006); *Cajun Elec. Power Coop.*, 230 B.R. at 741; *In re General
Teamsters, Warehousemen & Helpers Union Local 890*, 225 B.R. 719, 733-34 (Bankr. N.D. Cal. 1998).

("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation."); *Quigley*, 437 B.R. at 145 ("the Fourth Plan releases [debtor's non-debtor parent] from derivative liability; [debtor's non-debtor parent] would not receive a release in a hypothetical chapter 7 case").

41.     Here, the Liquidation Analysis is fundamentally flawed because it depicts distributions and retention of property under a hypothetical chapter 7 liquidation *of the Local Councils*, and not the retention of claims against Local Councils in a hypothetical chapter 7 liquidation *of the Debtors*. *See* Liquidation Analysis at 15-18. Moreover, the Plan provides the Debtors and Local Councils with the benefits of the Channeling Injunction in exchange for contributions with value that is less than the value of their unrestricted assets that would be available for distribution in a hypothetical chapter 7 liquidation. *See*, *e.g.*, Liquidation Analysis (Individual Local Council Balance Sheets) at 23 (reflecting total unrestricted net assets of $1,870,754,935); Financial Projections, Ex. E-1 (Retained Property List) (reflecting unrestricted property in the amount of $135 million to be retained by BSA post-Effective Date). Accordingly, the Debtors cannot establish that the Plan would satisfy the best interests test under section 1129(a)(7).

**E.     The Plan Is Not Feasible as Required Under Section 1129(a)(11) of the Bankruptcy Code.**

42.     According to the Debtors, continuation of Chartered Organizations is critical to maintaining membership, and, indeed, the Debtors' financial projections are premised on maintaining membership. *See* Financial Projections at 6 ("Membership levels are assumed to decrease in 2021 by 13%, primarily due to the impact of COVID-19 on programming, but are

forecasted to stabilize between 2023 to 2024 and achieve model growth in 2024 and 2025."); Mosby Dep. Tr. 197:3-12 ("the plan assumes a certain amount of membership each year for the five years of . . . the business plan, and . . . part of that model . . . is having councils and having chartered organizations. . . . If we didn't have councils and we didn't have chartered organizations, . . . the membership numbers would be . . . impacted."). But the assumption that the Debtors will be able to maintain that level of membership is speculative, at best, given that the Debtors' inability to reach an agreement with the Chartered Organizations and provide them with Protected Party status under the Plan could, as the Debtors concede, cause some or all of the Chartered Organizations to withdraw from the Scouting program or render some or all of the Chartered Organizations insolvent or inoperable, which will, in turn, impact the Debtors' liquidity and ability to operate. *See* Disclosure Statement § III.A.3 ("Local Councils and Chartered Organizations work closely together to carry out the mission of Scouting. Each of these entities plays a vital role in training Scouts in responsible citizenship, character development, and self-reliance."); *id.* § III.A.3.b. (disclosing that termination of the Debtors' relationship with the Church of Jesus Christ of Latter-day Saints "resulted in approximately 525,000 fewer participants in the BSA's Scouting programs").

43.    Since the Chartered Organizations' ability to continue generating Scouting membership fees is speculative, the Plan is not feasible as required under section 1129(a)(11) and cannot be confirmed. *See Am. Cap. Equip.*, 688 F.3d at 156 ("A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely."); *In re WR Grace & Co.*, 729 F.3d 332, 349 (3d Cir. 2013) (same (quoting *Am. Cap. Equip.*, 688 F.3d at 156)); *Quigley*, 437 B.R. at 142 (finding that plan was not feasible where funding source was "speculative at best and visionary at worse"); *In re*

*Lakeside Global II, Ltd.*, 116 B.R. 499, 506-09 (Bankr. S.D. Tex. 1989) (plan not feasible where funding was to come from anticipated proceeds of speculative real estate sale); *In re Fort Knox Mini Warehouse, Inc.*, No. 01-03493, 2002 WL 1842452, at *6 (Bankr. N.D. Iowa, July 31, 2002) ("Projections of the income necessary to finance a plan of reorganization must be based on concrete evidence of financial progress and must not be speculative, conjectural or unrealistic."); *In re Haardt*, 65 B.R. 697, 701-02 (Bankr. E.D. Pa. 1986) ("The purpose of § 1129(a)(1) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a plan than debtor could possibly provide after confirmation.").[40]

## F.    The Bankruptcy Court Does Not Have Jurisdiction to Determine Personal Injury Claims.

44.    The Plan improperly requires this Court to make certain determinations with respect to the Abuse Claims (*i.e.*, personal injury tort claims) that the Court lacks jurisdiction to make. For example, and as discussed above, the Plan requires a finding by the Bankruptcy Court that the

---

[40]    The Plan also relies on the proceeds of applicable insurance policies to fund distributions to Abuse Claimants. *See* Disclosure Statement § I.C ("The amounts that Abuse Claimants will ultimately be paid on account of their Allowed Abuse Claims will depend on, among other things, the Settlement Trust's ability to liquidate and recover the proceeds of the assigned insurance rights."). But the Debtors disclose that they are "not able to calculate the total amount of Insurance Coverage that is available to fund Abuse Claims," *id.* § III.F, and acknowledge that recovery of insurance proceeds is inherently uncertain. *See id.* at 226 (acknowledging that "there is a risk that the Settlement Trust may not realize contributions from Insurance Companies, or that the Settlement Trust's efforts to realize recoveries on account of the Insurance Coverage will be the subject of litigation that is expensive and time-consuming and in which Non-Settling Insurance Companies could raise meritorious coverage defenses that may reduce the amount of coverage available under the Insurance Policies"); *id.* at 228 (recognizing that coverage disputes "could potentially reduce or eliminate the right to payment under certain Insurance Policies" and that "defenses, disputed, and other relevant circumstances could arise that could potentially reduce or eliminate the right to payment under certain Insurance Policies"). The Debtors and their insurers have conflicting views on critical coverage issues that will significantly impact the amount of recoverable insurance proceeds available for the Settlement Trust (including, but not limited to, exhaustion of underlying insurance, application of various policy terms and exclusions, and allocation of claims to the proper policy periods). Moreover, as explained above, the Plan breaches numerous terms of the insurance contracts and applicable non-bankruptcy law, which vitiates any otherwise available coverage for Abuse Claims and the Debtors' right to receive any insurance proceeds. *See, e.g.*, 14 COUCH ON INS. § 199:13 (2003) ("As a general rule, an insured's breach of a cooperation clause precludes coverage and releases the insurers from its responsibilities."). Since the availability of insurance proceeds—a critical component of the funding of the Settlement Trust—is subject to substantial dispute, the disclosure that holders of Direct Abuse Claims are "expected to yield up to 100%," *see* Disclosure Statement § IX.D, is misleading and should be struck from the Disclosure Statement.

Allowed Claim Amount is "fair and reasonable based on the evidentiary record offered to the Court." Plan § IX.A.3. Section 157(b)(2)(B) of title 28, however, makes clear that "[t]he district court shall order that personal injury tort and wrongful death claims be tried *in the district court* in which the bankruptcy case is pending, *or the district court* in the district in which the claim arose." (emphasis added). Pursuant to section 157(b)(2)(B), the Bankruptcy Court does not have jurisdiction to make a finding that all Allowed Claim Amounts are "fair and reasonable," a determination that, realistically, could only be made after a trial of each individual Abuse Claim.[41] Moreover, because the insurance policies, assuming coverage exists, require a judgment or approved settlement for each Abuse Claim on an individualized basis, a blanket Affirmation Order affirming the Bankruptcy Court's determination as to all Allowed Claim Amounts cannot cure the Bankruptcy Court's lack of jurisdiction.

## II.   THE DISCLOSURE STATEMENT MUST ADEQUATELY DESCRIBE THE SUBSTANTIAL RISKS TO CONFIRMATION OF THE PLAN.

45.     The defects described above render the Plan patently unconfirmable and are, therefore, more than sufficient to preclude approval of the Disclosure Statement. While no amount of additional disclosure could cure these fatal flaws, to the extent the Court were inclined to defer consideration of plan objections until confirmation and focus solely on disclosure issues, the Court should still deny approval of the Disclosure Statement because it fails to provide adequate information for parties in interest to appropriately evaluate the Plan. While the Disclosure Statement contains some risk factors associated with the confirmability of the Plan and describes,

---

[41]   In fact, this Court has made clear that it would not be adjudicating any Abuse Claims on an individual basis. *See* May 19, 2021 Hr'g Tr. 241:19-22 (THE COURT: "[W]hat is the insurance company's interest in something that is not going to adjudicate 82,000 individual claims in which your defenses aren't going to be adjudicated either; no coverage issue is going to be adjudicated."); *see id.* at 242:12-17 (THE COURT: "And I am not deciding any individual claim, I think we all agree on that. And I am not deciding whether there's a particular statute of limitations that bars a particular claim. There might be discussions generally we should discount the amount of the aggregate claims because there are statute of limitations defenses; that's different.").

at a high level, certain objections to confirmation that could be raised by parties in interest, it does not meaningfully address the substantial merits of those objections so that creditors who are voting on the Plan may fully appreciate the severity of the risks to confirmation of the Plan. At a minimum, the Disclosure Statement must be revised to disclose the substantial obstacles to confirmation set forth herein and raised in the numerous other objections to the Disclosure Statement filed to date. Until it is so revised, the Disclosure Statement cannot be approved.

III.    **THE SOLICITATION AND VOTING PROCEDURES CONTAIN SERIOUS FLAWS AND SHOULD NOT BE APPROVED.**

A.    **The Expedited Distribution Procedures Constitute Impermissible Vote-Buying and Promote Fraud in the Administration of the Settlement Trust.**

46.    In the Initial Objection, the AIG Companies objected to the Expedited Distribution of $1,500 (which has since been increased to $3,500) to any holder of a Direct Abuse Claim who elects to receive an Expedited Distribution and votes in favor of the Plan as constituting impermissible vote-buying in violation of section 1129(a)(3) of the Bankruptcy Code. *See* Initial Objection ¶¶ 27-29. The Debtors' omnibus reply in support of disclosure statement approval [D.I. 4105] (the "***Omnibus Reply***") indicated that this objection had been resolved because the Debtors had modified the Plan to "unlink the vote to accept the Plan from the election to receive the Expedited Distribution." *See* Omnibus Reply, Ex. B at 34; *see also id.* ¶¶ 48-49.

47.    But the superficial fix of "unlinking" voting from an entitlement to the Expedited Distribution does not cure the defect that is inherent in the Expedited Distribution procedures: that the lax requirement of the TDPs that allows a claimant to receive an immediate cash payment *with no support* other than the filing of a proof of claim in and of itself incentivizes persons with unsubstantiated Abuse Claims to vote in favor of the Plan.

48.     Accordingly, Certain Insurers renew the objections of the AIG Companies to the Expedited Distribution as constituting impermissible vote-buying and incorporate by reference the arguments set forth in the Initial Objection.[42]

**B.      Temporarily Allowing Each Abuse Claim at $1.00 for Voting Purposes Regardless of Its Validity and Enforceability Violates Section 1126(c) of the Bankruptcy Code.**

49.     According to the Debtors, the Plan and the global resolution contemplated therein now have the support of the Abuse Claimant Representatives, "which is expected to result in the holders of Direct Abuse Claims voting to accept the Plan." Disclosure Statement § II.E. The Debtors are so confident in being able to achieve the requisite level of support from the Direct Abuse Claimants that they have gone so far as to abandon the option to toggle to a BSA-only plan in the event the Plan does not receive sufficient support from Direct Abuse Claimants.[43] As a threshold matter, as discussed in further detail in Certain Insurers' RSA Objection, there is a question as to whether the support of the Abuse Claimant Representatives (each of whom either controls no vote or only purports to control votes) indeed translates to a sufficient number of votes by actual Direct Abuse Claimants to accept the Plan. *See* Certain Insurers RSA Objection ¶¶ 4, 31-33. Even if it does, however, the Debtors' proposal to temporarily allow Abuse Claims in the

---

[42]    The Debtors' assertion that the cost of evaluating the validity of every Direct Abuse Claims "would cost substantially more than the $1,500 [the amount of the Expedited Distribution originally proposed] that a holder of such claims would receive from electing an Expedited Distribution," Omnibus Reply ¶ 53, does not take into account the potential aggregate cost of Expedited Distributions on account of invalid claims. As noted above, the Debtors' claims expert believes that 83% of asserted Abuse Claims are "presumptively barred" or otherwise not entitled to any compensation. *See* Disclosure Statement § V.N. This would mean that holders of over 68,500 alleged Abuse Claims can be expected to elect to each receive an Expedited Distribution of $3,500, requiring the Settlement Trust to pay over $239 million on account of Abuse Claims that are not entitled to compensation outside of these Chapter 11 Cases. *See supra* ¶ I.B.

[43]    *Id.* ("Prior to the Restructuring Support Agreement, there had not been sufficient support for a plan of reorganization from the survivor constituencies to facilitate a global resolution that would accomplish the dual goals of this restructuring. However, the Debtors now have the support for the Plan from the Tort Claimants' Committee, the Coalition, and the Future Claimants' [Representative], which is expected to result in the holders of Direct Abuse Claims voting to accept the Plan.").

amount of $1.00 per claimant for voting purposes[44] seeks to circumvent the two-thirds in amount

requirement under section 1126(c) of the Bankruptcy Code, and must be revised to account for the

state law rights (or the lack thereof) of each Direct Abuse Claimant in order to give effect to section

1126.

50.    Pursuant to section 1126(c) of the Bankruptcy Code, a class of claims can only

accept a plan "if such plan has been accepted by creditors . . . that hold at least two-thirds in amount

*and* more than one-half in number of the allowed claims of such class held by creditors . . . that

have accepted or rejected such plan." 11 U.S.C. § 1126(c) (emphasis added). "The requirement . . .

that a plan be accepted by two-thirds in amount protects the holders of large claims, while the

majority-in number requirement protects the holders of smaller claims." NORTON BANKRUPTCY

LAW AND PRACTICE 3D § 110:19 (William L. Norton III ed.). While, generally, only holders of

allowed claims are entitled to vote on a plan, *see* 11 U.S.C. § 1126(a), a court may temporarily

allow disputed, contingent, or unliquidated claims in an amount it deems proper for voting

purposes pursuant to Bankruptcy Rule 3018(a). Temporary allowance under Bankruptcy Rule

3018(a) should "ensure[] voting power that is commensurate with the [claimants'] economic

interests and the economic realities of the case." *In re Quigley Co.*, 346 B.R. 647, 658 (Bankr.

S.D.N.Y. 2006); *see also In re Pac. Sunwear of Ca., Inc.*, No. 16-10882, 2016 WL 4250681, at *3

(Bankr. D. Del. Aug. 8, 2016) (observing that "some courts have estimated a claim at $0 when the

court finds it unlikely that the claimant will succeed on the merits" while "[o]ther courts have

similarly assessed the probability of success on the merits and discounted the claim

---

[44]    *See* Motion ¶ 45 ("The Debtors propose to temporarily allow Direct and Indirect Abuse Claims for the limited
purpose of voting on the Plan in the amount of $1.00 in the aggregate per claimant."); *Revised Proposed
Solicitation Procedures Order* [D.I. 5488-1] ¶ 25 ("All Direct and Indirect Abuse Claims in Classes 8 and 9 of
the Plan shall be temporarily allowed in the amount of $1.00 in the aggregate per claimant solely for purposes of
voting to accept or reject the Plan and not for any other purpose, or as otherwise ordered by the Bankruptcy
Court.").

appropriately"); *In re Frascella Enters., Inc.*, 360 B.R. 435, 458 (Bankr. E.D. Pa. 2007) ("The court makes no definitive findings but rather assesses the possibilities of the various contentions and applies the appropriate discount to reflect the uncertainties of the contingencies. However, in performing this task, the court is bound by the legal rules which govern the ultimate value of the claim.").

51.    Because the Direct Abuse Claims are contingent and/or unliquidated, in order to ascertain whether at least two-thirds in amount of Direct Abuse Claims—and, therefore, the class of Direct Abuse Claims (Class 8)—has voted to accept the Plan, the Debtors propose to temporary allow such claims in the amount of $1.00 per claimant. *See* Motion ¶ 45. This mechanism, however, does not account for the validity and enforceability of each Direct Abuse Claim. As discussed above, 83% of the 82,500 unique and timely Abuse Claims are "presumptively barred." Nevertheless, each presumptively barred claim would be assigned a value of $1.00 for voting purposes and carry the same weight as each valid and enforceable Abuse Claims, thereby creating the possibility that the Plan could be confirmed over the votes of the holders of the 14,000 Abuse Claims that are more likely to have a legitimate economic stake in the outcome of these Chapter 11 Cases. Providing the holders of presumptively barred Abuse Claims substantially more control over the outcome of the voting process than they deserve does not "ensure[] voting power that is commensurate with the [claimants'] economic interests and the economic realities of the case," *Quigley Co.*, 346 B.R. at 658, and is fundamentally unfair to holders of compensable Abuse Claims, particularly in light of the impermissible vote-buying that is effectuated through the Expedited Distribution procedures and the objections to the voting procedures raised by numerous Abuse Claimants themselves.[45]

---

[45]    *See, e.g.*, Claimants' Supplemental RSA Objection ¶¶ 9-16; [D.I. 5955] ¶¶ 6-9; [D.I. 5963] ¶¶ 6-9; [D.I. 5964] ¶¶ 6-9; [D.I. 5965] ¶¶ 6-9; [D.I. 5966] ¶¶ 6-9; [D.I. 5967] ¶¶ 6-9; [D.I. 5968] ¶¶ 6-9; [D.I. 5971] ¶¶ 6-9; [D.I.

52.     If the Court were inclined to assign a token value to each Abuse Claim for voting

purposes, the Court must take into account whether or not the claims are presumptively barred and

discount the votes on account of such claims, either by weighing the votes according to TDP-based

values, as suggested by certain Abuse Claimants,[46] or applying some other objective criteria in the

Court's discretion. Discounting votes in accordance with a claimant's economic interests is not

unprecedented. *See*, *e.g.*, *Quigley*, 346 B.R. at 657-58 (discounting certain claims by 90% for

voting purposes because the claimants had entered into a prepetition settlement with the debtor's

non-debtor parent and agreed to accept only 10% of the allowed amount of their claims under

certain circumstances); *In re Innovasystems, Inc.*, No. 11-36228, 2014 WL 7235527, at *8 (Bankr.

D.N.J. Dec. 18, 2014) (temporarily allowing claim in the amount of $0 given that the claimant's

"ultimately prevailing on its claims, in light of its lack of success at the appellate level, is uncertain

at best"). And such discounting is most appropriate here, where the Debtors' own claims expert

concedes that the vast majority of the asserted Abuse Claims are presumptively barred and voting

results could be compromised if such claims are permitted to improperly dilute the voting power

of holders of valid Abuse Claims in contravention of the policies behind both Bankruptcy Code

section 1126(c) and Bankruptcy Rule 3018(a).

**C.     The Abuse Claimant Representatives' "Plain English Plan Summary" Should, At a Minimum, Be Revised to Accurately Reflect the Terms of the Plan.**

53.     On July 22, 2021, the Abuse Claimant Representatives filed a *Notice of Submission*

*of Proposed Plain English Plan Summary for Abuse Survivors* [D.I. 5706], requesting Court

---

5978] ¶¶ 6-9; [D.I. 5982] ¶¶ 6-9; [D.I. 5989] ¶¶ 6-9; [D.I. 5990] ¶¶ 6-9; [D.I. 5991] ¶¶ 6-9; [D.I. 5992] ¶¶ 6-9; [D.I. 6003] ¶¶ 6-9; [D.I. 6005] ¶¶ 6-9, [D.I. 6006] ¶¶ 6-9, [D.I. 6007] ¶¶ 6-9, [D.I. 6010] ¶¶ 6-9; [D.I. 6015] ¶¶ 6-9; [D.I. 6016] ¶¶ 5-8; [D.I. 6017] ¶¶ 6-9; [D.I. 6018] ¶¶ 6-9; [D.I. 6024] ¶¶ 6-9; [D.I. 6028] ¶¶ 6-9; [D.I. 6029] ¶¶ 6-9; [D.I. 6030] ¶¶ 6-9; [D.I. 6031] ¶¶ 6-19; [D.I. 6033] ¶¶ 10-13; [D.I. 6036] ¶¶ 6-9; [D.I. 6037] ¶¶ 6-9; [D.I. 6040] ¶¶ 6-9; [D.I. 6046] ¶¶ 6-9; [D.I. 6047] ¶¶ 6-9.

[46]   *See id.*

approval of a proposed *Plan Summary and Frequently Asked Question* (the "***Plan Summary***") to be distributed with the Disclosure Statement in connection with solicitation of votes on the Debtors' Plan. While Certain Insurers do not object to the inclusion in the Solicitation Package of a recommendation letter from the Abuse Claimants Representatives to their constituents, the Plan Summary, which contains what is purported to be a detailed summary of the Plan and certain "Frequently Asked Questions," goes above and beyond a recommendation on voting and is wholly inappropriate to the extent it contains material inaccuracies and misleading information.

54.     The Court has discretion to prevent the dissemination of misleading materials to creditors for solicitation of votes on the Plan. *E.g.*, *In re Mirant Corp.*, 334 B.R. 787, 793 (Bankr. N.D. Tex. 2005) ("Solicitation . . . through the use of misleading or counterfactual materials is commercial speech not entitled to First Amendment protection and does not constitute good faith solicitation within the meaning of Code § 1125(e). Such speech may be subject to limitation by injunctive relief."); *In re ReoStar Energy Corp.*, No. 10-47176, 2012 WL 1945801, at *2 (Bankr. N.D. Tex. May 30, 2012) ("The potential liability for inadequate disclosure provides, in the court's judgment, sufficient sanction to protect against misleading disclosure in connection with the Plan."). Courts generally will not approve disclosure statements that contain statements that are "false, misleading, or defamatory." *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006), *clarified on denial of reconsideration*, 2006 WL 2927222 (Bankr. S.D.N.Y. Oct. 10, 2006); *see also In re Pac. Shores Dev., Inc.*, 2011 WL 778205, at *6 (Bankr. S.D. Cal. Feb. 25, 2011) (denying approval of disclosure statement that contained "inaccurate and misleading statements"). There is no reason why the same standard should not be applied to the Plan Summary, which the Abuse Claimant Representatives intend to be distributed to claimants with the Disclosure Statement.

55. The Plan Summary, in its current form, should not be approved because, at best, it oversimplifies key provisions of the Plan and, at worst, it is intentionally misleading:

| Plan Summary | Objection |
|---|---|
| • "The Coalition comprises more than 18,000 sexual abuse survivors who have submitted proofs of claim against the Boy Scouts and signed affirmative consents to being a part of the Coalition, as well as law firms that have filed statements with the Bankruptcy Court that they represent approximately 60,000 sexual abuse survivors." Plan Summary at 1. | • Although the Plan Summary states that "more than 18,000 sexual abuse survivors . . . signed affirmative consents to being a part of the Coalition," the Disclosure Statement discloses that the Coalition is "made up of approximately 11,875 Abuse survivors having signed an 'Affirmative Consent.'" Disclosure Statement § V.F.5. |
| • "[T]he Boy Scouts, Local Councils and the Survivor Groups reached a settlement. The Plan includes this settlement, which provides for contributions of money and other property from the Boy Scouts and Local Councils and puts in place a framework for potential future settlements with other parties such as Insurance Companies and Chartered Organizations." Plan Summary at 3. | • The Plan Summary does not disclose that the Local Council Settlement Contribution is uncertain because, according to counsel for the Ad Hoc Committee, "[a]ll of these local council contributions . . . are expressly contingent on satisfactory resolution of the issues surrounding chartered organizations." July 21, 2021 Hr'g Tr. at 9:21-22. |
| • "Depending on the value and availability of insurance, the Settlement Trust could end up with substantially more assets to pay claimants than the enumerated $850 million." Plan Summary at 4. | • Although the Plan Summary states that "the value of insurance assets is uncertain," it does not contain any specific disclosures about the litigation risk the Plan poses, meritorious coverage defenses that may reduce the amount of available coverage, and the various other coverage risks that are described in the Disclosure Statement. *See* Disclosure Statement § X.A.20-24. |
| • "It is difficult to predict the total amount of recoveries for survivors. . . . The Survivor Groups believe that the amount of the recoveries from [Chartered Organizations and Insurance Companies] (in total) will be much more than the settlements with the Boy Scouts and the Local Councils." Plan Summary at 13. | • As explained above, the Plan Summary does not contain any specific disclosures about the litigation risk the Plan poses, meritorious coverage defenses that may reduce the amount of available coverage, and the various other coverage risks that are described in the Disclosure Statement. *See* Disclosure Statement § X.A.20-24. |

56. Even if the Plan Summary is revised to address these inaccuracies, inclusion of the Plan Summary in the Solicitation Package in itself may lead to the Abuse Claimants' _not_ receiving adequate information to make an informed decision on the Plan. Distribution of a document titled "Plain English Plan Summary" creates a risk that Abuse Claimants will only read the

oversimplified and misleading Plan Summary and forgo reading the full Disclosure Statement, which contains the key risk factors and other critical disclosures that have been omitted from the Plan Summary.[47] Accordingly, unless and until the Plan Summary is revised to conform to the form of recommendation letters typically submitted by creditors' committees in chapter 11 cases, which generally are either not titled or are couched as a recommendation of the relevant creditors' committee, the Abuse Claimant Representatives' request to include the Plan Summary in the Solicitation Package should be denied.

## IV.    THE DEBTORS' PROPOSED CONFIRMATION SCHEDULE SHOULD NOT BE APPROVED.

57.    On April 15, 2021, the Debtors filed a motion seeking approval of a schedule and certain protocols to govern discovery and other proceedings in connection with confirmation of the Plan [D.I. 2618] (the "*Confirmation Scheduling Motion*" and the proposed order granting the Confirmation Scheduling Motion, the "*Confirmation Scheduling Order*"), to which several parties, including certain insurers, objected.[48] On July 2, 2021, the Debtors filed a revised proposed Confirmation Scheduling Order [D.I. 5489] (the "*Revised Confirmation Scheduling Order*"). As a preliminary matter, the schedule set forth in the Revised Confirmation Scheduling Order should not be approved given that it is premised on the Court having approved the proposed schedule and protocols at a hearing on the Disclosure Statement that was previously scheduled for—and did not go forward on—July 20, 2021[49] and is, therefore, now stale.

---

[47]    *See Mirant*, 334 B.R. at 795 ("The Solicitation Materials are but a few pages long, written in sound-byte style. The Disclosure Statement presents 253 pages and a score of attachments containing densely packed information and is written in a style charitably described as dry. It is unrealistic to expect that a shareholder or creditor, especially one without counsel and with a relatively small holding, will take the time to compare statements in the Solicitation Materials with the contents of the Disclosure Statement; rather such a stakeholder will likely find that Wilson's 'Cliff Notes' approach provides a more useable source for deciding how to vote—particularly given Wilson's assurance that there is no downside to a rejection and that the Plan represents a worst-case scenario.").

[48]    *See* [D.I. 3708, 3747, 3771, 3739, 3794, 3799, 3806, 3816, 3855, 3859, 3928].

[49]    *See Notice of Filing of Revised Proposed Confirmation Scheduling Order* [D.I. 5489] at 2 ("**PLEASE TAKE**

58.    Moreover, substantively, the current schedule contemplates a mere two months from the deadline to serve written discovery to the first day of the confirmation hearing. *See* Revised Confirmation Scheduling Order ¶ 5. That overall timeline is unreasonably compressed given that the Debtors are now moving forward with a plan that is patently insurance prejudicial and contemplates binding trust distribution procedures. *See supra* § I.A. For example, as noted above, the Plan now requires a prospective finding by the Court that the Allowed Claim Amounts as determined unilaterally by the Settlement Trustee in the future are "fair and reasonable" and then attempts to bind Non-Settling Insurance Companies to the Allowed Claim Amounts. *See id.* The Abuse Claimant Representatives assert that the complex factual and legal issues pertaining to such a finding and other similar determinations must be addressed now.[50] While Certain Insurers believe that requiring the Court to make such a finding is wholly inappropriate and requires the Bankruptcy Court effectively to become an insurance coverage court, to the extent the Court were inclined to address the relevant issues now, the Court must ensure adequate time for a full and fair presentation of evidence, experts, and arguments by insurers to allow insurers to protect their interests.

59.    While Certain Insurers do not oppose imposing a unified discovery schedule, that schedule must reflect an appropriate timeline designed to accommodate the volume of discovery required by the significant legal and factual disputes and objections to the Plan that have already been raised by numerous parties, including a significant number of Abuse Claimants

---

**NOTICE** that the Debtors will seek approval of the Revised Proposed Confirmation Scheduling Order at the continued [Disclosure Statement] hearing scheduled for **Tuesday, July 20, 2021, at 10:00 a.m. (ET)** before the Court.") (emphasis in original).

[50]    *See* Abuse Claimant Representatives' RSA Joinder ¶ 43 ("The Supporting Parties will not support a plan that defers this issue [(*i.e.*, a so-called *Fuller-Austin* result)] until after confirmation. . . . [T]hat litigation must occur here and now."); [D.I. 5760] ¶ 54 ("defenses that exist solely by virtue of the Debtors' bankruptcy—*i.e.*, those involving the Debtors' conduct in negotiating a settlement with the Abuse Claimants or the reasonableness of the TDP are appropriately litigated once, in this Court").

notwithstanding the fact that the Abuse Claimant Representatives support the Plan. The schedule must allow adequate time for parties in interest to stress test the Plan, particularly where there is a question as to whether the Plan is even the plan that the Debtors actually intend to present for confirmation.[51]

60.    While Certain Insurers appreciate the Debtors' objectives of providing equitable recoveries to Abuse Claimants and timely emerging from chapter 11 to be able to continue with the Debtors' charitable mission, they cannot do so in derogation of the substantive and procedural rights of the various parties in interest participating in the confirmation process. *See Am. Cap. Equip.*, 688 F.3d at 159 (denying confirmation where, among other things, the plan "severely limit[ed] or eliminat[ed] Insurers' ability to take discovery, submit evidence, contest causation, or appeal a decision, and all without the protective channeling injunction of § 524(g)"). As the Abuse Claimant Representatives themselves have recognized, because the Plan is not insurance neutral, Certain Insurers are "full participants in the plan confirmation process" and "have a right to be heard and offer evidence."[52] Any delay in the confirmation process is a product of the Debtors' and the Abuse Claimant Representatives' own accord, and Certain Insurers cannot be faulted for

---

[51]    *See* July 27, 2021 Hr'g Tr. at 21:5-22:3 (J. RYAN: "From the position of my two clients, . . . at this point we're not sure why we're going forward. We're being told that the RSA is not the end of the line. We're being told there will be further negotiations specifically with the chartered organizations, with the treatment in the RSA. It is not the treatment that they ultimately intend to solicit. So from our perspective and the costs on the estate, the costs on the individual parties who are paying their own legal fees to be proceeding with an RSA hearing when we're being told that the deal for which approval is sought is not going to be the deal that is going to be solicited. We're left with the question as to what are we doing and what is going to be gained. . . . Let's get to the deal that is ultimately going to be solicited.").

[52]    *See* Abuse Claimant Representatives' RSA Joinder ¶¶ 35-36 ("[T]he plan must be 'binding on all parties in interest.' RSA § II.A.(i).(A). There can (and should) be no carve-outs for the insurers. They will have a right to be heard and offer evidence. The Supporting Parties will not and do not question their standing and right to object to the Plan, and as such, 'insurance neutrality,' as that term was used in *In re Combustion Engineering* and its progeny has no relevance here. 391 F.3d 190 216-16 (3d Cir. 2004). As full participants in the plan confirmation process, the insurers must be bound by the confirmation order just like every other litigant that appears before this Court.").

seeking protective measures to ensure that any proposed confirmation schedule and protocols take account of insurers' rights.

61.     Based on the foregoing, Certain Insurers join in the *Certain Excess Insurers' Objections to the Proposed Confirmation Schedule*, filed contemporaneously herewith, and support approval of the schedule proposed therein.

## **RESERVATION OF RIGHTS**

62.     Certain Insurers reserve all of their rights to object to confirmation of the Plan, whether or not the bases for such objection are expressly referred to herein. Further, Certain Insurers reserve the right to join in any argument or objection made by any other parties relating to the adequacy of the Disclosure Statement and confirmability of the Plan. Moreover, nothing contained herein shall be deemed an admission by Certain Insurers as to the existence of or coverage under any insurance policies alleged to have been issued by Certain Insurers.

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, Certain Insurers respectfully request that the Court (i) deny the Motion and the Confirmation Scheduling Motion, and (ii) grant such other and further relief as the Court deems just and proper.

Dated: August 16, 2021          Respectfully submitted,
        Wilmington, Delaware

By: */s/ Deirdre M. Richards*

**FINEMAN KREKSTEIN & HARRIS PC**
Deirdre M. Richards (DE Bar No. 4191)
1300 N. King Street
Wilmington, DE 19801
Telephone:      (302) 538-8331
Facsimile:      (302) 394-9228
Email: drichards@finemanlawfirm.com

-and-

**FORAN GLENNON PALANDECH PONZI &
RUDLOFF P.C.**
Susan N.K. Gummow (admitted *pro hac vice*)
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
Telephone:    (312) 863-5000
Facsimile:    (312) 863-5009
Email: sgummow@fgppr.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (admitted *pro hac vice*)
James Hallowell (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035
Email: mrosenthal@gibsondunn.com
 jhallowell@gibsondunn.com
 kmartorana@gibsondunn.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Matthew G. Bouslog (admitted *pro hac vice*)
3161 Michelson Drive
Irvine, California 92612
Telephone:    (949) 451-3800
Facsimile:    (949) 451-4220
Email: mbouslog@gibsondunn.com

*Attorneys for the AIG Companies*

By:  */s/ Maria Aprile Sawczuk*

**GOLDSTEIN & MCCLINTOCK LLLP**
Maria Aprile Sawczuk (DE #3320)
501 Silverside Road
Wilmington, DE 19809
302-444-6710
marias@goldmclaw.com

-and-

**LOEB & LOEB LLP**
Laura McNally
Emily Stone
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155
lmcnally@loeb.com
estone@loeb.com

*Attorneys for The Continental Insurance*
*Company and Columbia Casualty Company*

**MORRIS JAMES LLP**

By:  */s/ Carl Kunz, III*

Carl Kunz, III (DE Bar No. 3201)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: ckunz@morrisjames.com

- and –

Margaret M. Anderson, Esq. (pro hac vice)
Adam A. Hachikian (pro hac vice)
**FOX SWIBEL LEVIN & CARROLL LLP**
200 W. Madison Street, Suite 3000
Chicago, IL 60606
Telephone: (312) 224-1200
Facsimile: (312) 224-1201
Email: panderson@foxswibel.com
        ahachikian@foxswibel.com

*Counsel for Old Republic Insurance Company*

By: */s/ Kathleen M. Miller*
    Kathleen M. Miller (No. 2898)
    Smith, Katzenstein & Jenkins LLP
    1000 West Street, Suite 1501
    P.O. Box 410
    Wilmington, DE  19899 [Courier 19801]
    Telephone: (302) 652-8400
    Facsimile: (302) 652-8405
    Email: kmiller@skjlaw.com

    and

    Lloyd A. Gura*
    Pamela J. Minetto*
    Mound Cotton Wollan & Greengrass LLP
    One New York Plaza 44th Floor
    New York, NY 10004
    Tel: (212) 804-4282
    Email: lgura@moundcotton.com
    pminetto@moundcotton.com
    (*Admitted pro hac vice)

    *Attorneys for Indian Harbor Insurance
    Company, on behalf of itself and as successor
    in interest to Catlin Specialty Insurance
    Company*

By: */s/ Matthew G. Summers*
    Matthew G. Summers (DE No. 5533)
    Chantelle D. McClamb (DE No. 5978)
    BALLARD SPAHR LLP
    919 N. Market Street, 11th Floor
    Wilmington, Delaware 19801-3034
    Telephone: (302) 252-4428
    Facsimile: (302) 252-4466
    E-mail: summersm@ballardspahr.com
    mcclambc@ballardpshar.com

    -and-

    Harry Lee*
    John O'Connor*
    Brett Grindrod*
    STEPTOE & JOHNSON LLP
    1330 Connecticut Avenue NW

Washington, DC 20036
Telephone: (202) 429-8078
Facsimile: (202) 429-3902
E-mail: hlee@steptoe.com
joconnor@steptoe.com
bgrindrod@steptoe.com
(*Admitted pro hac vice)

*Attorneys for Clarendon America Insurance
Company, Maryland Casualty Company,
Maryland American General Group, American
General Fire & Casualty Company*

By: /s/ Louis J. Rizzo, Jr.
      Louis J. Rizzo, Jr., Esquire (#3374)
      REGER RIZZO & DARNALL LLP
      1521 Concord Pike, Suite 305
      Brandywine Plaza West
      Wilmington, Delaware 19803
      (302) 477-7100
      E-mail: lrizzo@regerlaw.com

*Attorney for Travelers Casualty and Surety
Company, Inc. (f/k/a Aetna Casualty & Surety
Company), St. Paul Surplus Lines Insurance
Company and Gulf Insurance Company*

By: /s/ Michael J. Joyce
      Michael J. Joyce, Esquire (No. 4563)
      **JOYCE, LLC**
      1225 King Street, Suite 800
      Wilmington, DE 19801
      (302)-388-1944
      mjoyce@mjlawoffices.com

      -and-

      Kevin Coughlin, Esquire (*Pro Hac Vice*)
      Lorraine Armenti, Esquire (*Pro Hac Vice*)
      Michael Hrinewski, Esquire (*Pro Hac Vice*)
      **COUGHLIN MIDLIGE & GARLAND, LLP**
      350 Mount Kemble Ave.
      PO Box 1917
      Morristown, NJ 07962
      973-267-0058 (Telephone)
      973-267-6442 (Facsimile)

larmenti@cmg.law
mhrinewski@cmg.law

-and-

Britton C. Lewis, Esquire (*Pro Hac Vice*)
**CARRUTHERS & ROTH, P.A.**
235 N. Edgeworth St.
P.O. Box 540
Greensboro, NC  27401
(336) 478-1146 (Telephone)
(336) 478-1145 (Facsimile)
bcl@crlaw.com

*Counsel to Arrowood Indemnity Company*

**DILWORTH PAXSON LLP**

By:  */s/ Thaddeus J. Weaver*
Thaddeus J. Weaver (Id. No. 2790)
704 King Street, Suite 500
P.O. Box 1031
Wilmington, DE  19899-1031
(302) 571-8867 (telephone)
(302) 655-1480 (facsimile)
tweaver@dilworthlaw.com

and

William E. McGrath, Jr. (Admitted PHV)
**DILWORTH PAXSON LLP**
2 Research Way, Suite 103
Princeton, NJ  08540
(609) 924-6000 (telephone)
(215) 893-8537 (facsimile)
wmcgrath@dilworthlaw.com

*Attorneys for Munich Reinsurance America,
Inc., formerly known as American Re-Insurance
Company*