## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| | ) | Case No. 20-10343 (LSS) |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | ) ) ) | (Jointly Administered) |
| Debtors. | ) ) ) ) | **Objection Deadline: August 16, 2021 at 4:00 p.m. (ET)**[1] **Hearing Date: August 25, 2021 at 10:00 a.m. (ET)** |
| | ) | Re: Docket No. 2594, 3578, 5484, & 5485 |

## JOINDER AND SUPPLEMENTAL OBJECTION OF LIBERTY MUTUAL INSURANCE COMPANY TO THE DISCLOSURE STATEMENT FOR THE FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

Liberty Mutual Insurance Company, together with its affiliates and subsidiaries (collectively, "Liberty"), by and through its undersigned counsel, hereby files this objection (the "Supplemental Objection") to the *Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America* [Docket No. 5485] (the "Disclosure Statement").[2] In support of its Supplemental Objection, Liberty respectfully states as follows:

## PRELIMINARY STATEMENT

Liberty files this Supplemental Objection to raise two primary issues.[3] First, far from remedying the deficiencies and confusion around whether the Second Amended Plan was, in fact, "insurance neutral", the modified Plan and Disclosure Statement compound those problems. At a

---

[1] Extended by agreement of the Debtors.

[2] Capitalized terms used herein but otherwise undefined shall have the meanings ascribed to them in the Disclosure Statement or the *Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America* [Docket No. 5484] (the "Plan").

[3] Unless noted herein, those issues and objections raised in the *Objection of Liberty Mutual Insurance Company to the Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 3578] (the "Original Objection") remain unresolved.

minimum, the Plan and Disclosure Statement must be revised to clarify whether, as stated in the Plan and Disclosure Statement, the Plan is insurance neutral, or whether, as set forth in the Trust Distribution Procedures (the "TDPs"), it is not. Liberty submits that the Plan, and the TDPs in particular, attempt to alter and impair Liberty's contractual rights under the LM Policies (defined below) in a manner that renders the Plan unconfirmable under binding Third Circuit precedent. The Disclosure Statement provides no explanation for this departure from binding precedent, nor does it properly account for the substantial risks inherent in confirming a Plan that may eliminate any coverage under the LM Policies. Instead, the Disclosure Statement claims that the Plan offers a "global resolution" that is supported by over 60,000 Claimants. No level of support, however, can remedy the infirmities that render the Plan unconfirmable as a matter of law.

Second, the Plan and Disclosure Statement seek to rewrite the LM Policies and disregard a decades' long course of performance between Liberty and the Debtors over the payment of deductibles and self-insured retentions ("SIRs"). Rather than relying on the provisions of the LM Policies and/or historical practice, the Plan seeks to shift onto Liberty the obligation to satisfy deductibles and SIRs because, according to the Debtors, they "cannot" or choose not to pay such amounts. To be clear, this is a choice by the Debtors. The Debtors have chosen to put forward a Plan that attempts to assign the benefits of the LM Policies to the Settlement Trust (i.e., coverage) but eliminate the obligations under those policies to satisfy any deductible or SIR.

The Plan's purported rewriting of Insurance Policies is especially egregious with respect to the LM Policies. Liberty wrote "fronting policies" for the Debtors, meaning the deductibles and SIRs under those policies matched the limits of liability. As a result, Liberty never charged the Debtors premiums for "coverage" under the LM Policies, only claims handling charges. That is

because, under the LM Policies, any amounts that came due were paid in full by the Debtors. The parties never diverged from this course of performance.

Now, however, the Plan impermissibly requires Liberty to pay whatever deductible or SIR the Debtors otherwise would owe under the LM Policies. The primary policies are fully eroded, and thus the principal concern for Liberty is how SIRs under the umbrella policies are to be treated. This amount reflects the entire amount of "coverage" available under the non-exhausted LM Policies. In exchange for such payment, the Plan proposes to provide Liberty an Indirect Abuse Claim. Indirect Abuse Claims, in turn, will be subordinated to payment in full of the Direct Abuse Claims. The Debtors fail to disclose the legal justification for separately classifying Direct Abuse Claims from Indirect Abuse Claims and subordinating Indirect Abuse Claims that may arise (in the case of Liberty) on account of a contractual breach of the Debtors' obligations. If the intent is to require that Liberty pay the full deductible and/or SIR — *which matches the full limit of liability under its policies* — and, in exchange, receive an Indirect Abuse Claim that the Debtors project will receive little, if any, recovery, the Disclosure Statement should explicitly state as much. It should also explain how the Plan can be insurance neutral and yet unilaterally rewrite the LM Policies and disregard decades of performance between the Debtors and Liberty. Absent revisions and modifications as set forth herein, the Disclosure Statement cannot be approved.

## JOINDER

1.        The Plan claims to be "insurance neutral" but includes a number of provisions that impair or prejudice Liberty's rights under the LM Policies. One of the most blatant examples of these inconsistencies is the attempt to make TDP Claim Values binding upon Insurance Companies and in subsequent litigation, as well as excluding the Insurance Companies from the claims evaluation and liquidation processes. The Debtors acknowledge that, notwithstanding language to

the contrary in the Disclosure Statement and Plan, "it is possible that the Bankruptcy Court will not confirm the Plan with Article X.M as currently drafted and will require that the Debtors include amended insurance neutrality language prior to confirmation of the Plan." Disclosure Statement, Article X.A.24. Liberty respectfully submits that, at a minimum, the Disclosure Statement must be amended to reconcile the conflicting statements in the Disclosure Statement, Plan, and TDPs. Liberty further submits that, if the Court chooses to approve the Disclosure Statement, extensive discovery into these and other issues will be necessary in advance of any confirmation hearing. The proposed confirmation schedule is simply too compressed for the volume of issues that certain of the Claimants and the Debtors have proposed be adjudicated in connection with Plan confirmation.

2.       Accordingly, for the reasons set forth in *Certain Insurers' Supplemental Objection to Motion for Approval of Debtors' Disclosure Statement* (the "Insurer DS Objection") and *Certain Excess Insurers' Objections to the Debtors' Proposed Confirmation Schedule* (the "Insurer Scheduling Objection"), each of which is filed contemporaneously herewith, Liberty joins in the arguments and positions set forth the Insurer DS Objection and the Insurer Scheduling Objection.

## RELEVANT FACTS

I.       **"Fronting" Policies Were the Cornerstone of the Debtors' Insurance Program**.

3.       The policies issued by Liberty are "fronting" policies that the Debtors described in *The BSA's Opening Brief in Support of Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code*. The relevant portion of that description is as follows:

> Starting in 1986, the BSA substantially altered its insurance program; the primary and umbrella insurance policies procured were "fronting" policies. Whittman Decl. ¶ 8. "Fronting" policies are policies where the deductibles match the policy's limit of liability. *Id.* Specifically, between 1986 and 2018, the CGL Policies contain a $1

million deductible that matches a $1 million limit of liability. Whittman Decl. ¶ 9. Likewise, the umbrella "fronting" policies include a deductible that matches the aggregate limits of liability. *Id.* Initially, the umbrella policies included a $1 million deductible that had a matching $1 million aggregate limit of liability, but starting in 2002, the deductible and the aggregate limit of liability increased to more than $1 million. *Id.* Notably, between 2008 and 2018, the BSA's umbrella "fronting" policies included a deductible of $9 million and a matching aggregate limit of liability of $9 million. *Id.* **Historically, the deductibles for these "fronting" policies have been paid by the BSA**. *Id.*

*The BSA's Opening Brief in Support of Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* [Adv. Pro. 20-50527; Docket No. 7], at 12 (emphasis supplied).

4.    The Disclosure Statement includes additional information about how the Debtors believe the fronting policies may work:

> The Debtors contend that their primary insurance policies at least between 1986 and 2008 have a $1 million per-occurrence deductible. **The BSA's obligation to pay the deductibles for the Insurance Policies between 1986 and 2008 versus the Insurance Company's obligation to pay such deductibles is subject to the terms of such Insurance Policies**. However, it is the BSA's and other parties', including The Church of Jesus Christ's, position that when the BSA cannot or does not pay the deductible, the primary Insurance Policies issued between 1986 and 2008 require the Insurance Company to pay. Certain insurers believe that this is a different position than reflected by how the BSA and certain of its primary insurers operated and performed for many years.

Disclosure Statement, Article III.F.1 (emphasis added).

## II.    Liberty Was One of the Insurance Companies That Wrote "Fronting Policies" Under Which the Deductibles and SIRs Matched the Aggregate Limits of Liability.

5.    Liberty issued a series of primary and umbrella general liability policies to the Debtors for the years 1996-2008 (the "LM Policies"). All of the LM Policies are "fronting" policies, such that the Debtors alone are responsible for all indemnity and defense costs for claims arising under the LM Policies. There is no risk transfer to Liberty. This fronting arrangement is achieved by having each policy's deductible, which erodes the policy's limit of liability, match the

policy's limit.[4] The absence of risk transfer to Liberty is also evidenced by the "advance premium" charged for the Primary Policies (defined below), which, as set forth in the Declarations Extension Schedule in each of the Primary Policies, was comprised solely of a flat administrative fee and claim handling fee.

6.      Because the LM Policies are no risk transfer policies and Liberty was advancing payments, BSA provided collateral to Liberty in the form of (i) a letter of credit (No. CTCS-158223 issued by JPMorgan Chase Bank, N.A.), the current face value amount of which is $6,500,000, and (ii) a cash escrow in the amount of $210,002 (collectively, the "Security"). The Security ensures that Liberty will be repaid in full in the event the Debtors ever are delinquent in reimbursing Liberty for the expenses it advanced, which they never have been or even suggested being prior to the bankruptcy filing. In connection with the Security and the contingent claims that may arise under the LM Policies, Liberty filed proofs of claim against each of the Debtors in the amount of $6,710,002.[5]

7.      Between March 1, 1996 and March 1, 2008, Liberty issued eleven consecutive commercial general liability policies to the Debtors (the "Primary Policies"). Each of the Primary Policies contains a $1 million per-occurrence limit of liability, a $1 million aggregate limit of liability, and a $1 million deductible. In addition, between March 1, 1996 and March 1, 2007, Liberty issued ten consecutive umbrella excess liability policies to the Debtors (the "Umbrella Policies"). The Umbrella Policies issued to the Debtors between March 1, 1996 and March 1, 2002 each contain limits of liability of $1 million each occurrence and $1 million in the aggregate,

---

[4]    For example, each of the primary policies contains a per-occurrence limit of $1 million, an aggregate limit of $1 million, and a deductible of $1 million.

[5]    *See* Proofs of Claim Nos. 4971 (Case No. 20-10343) & 639 (20-10342) (such proofs of claim, collectively, the "Liberty Claim").

and a deductible in the amount of $1 million. The Umbrella Policies issued to the Debtors between March 1, 2002 and March 1, 2006 each contain limits of liability of $3 million each occurrence and $3 million in the aggregate, and a deductible in the amount of $3 million. The Umbrella Policy issued to BSA from March 1, 2006 to March 1, 2007 contains limits of liability of $4 million each occurrence and $4 million in the aggregate, and a deductible in the amount of $4 million.[6]

8.    In addition to a deductible, the Umbrella Policies each contain an SIR. Each of the Umbrella Policies includes an endorsement titled "Retention Endorsement – Aggregate Exhaustion," which provides, in relevant part, as follows:

> In consideration of the premium charged, it is agreed that in the event of the exhaustion of the aggregate underlying limit of liability provided under [the specified Primary Policy], *the Insured will retain the amount indicated below* of any claim or loss on the same basis that coverage would have been provided under [the specified Primary Policy] but for the exhaustion of any applicable aggregate.

(emphasis added). The Umbrella Policies issued to the Debtors between March 1, 1996 and March 1, 2002 contain an SIR in the amount of $1 million each occurrence. The Umbrella Policies issued to the Debtors between March 1, 2002 and March 1, 2006 contain an SIR in the amount of $3 million each occurrence. The Umbrella Policy issued to the Debtors from March 1, 2006 to March 1, 2007 contains an SIR in the amount of $4 million each occurrence.

### III.    The Plan Rewrites the Insurance Policies by Eliminating Any Requirement that Deductibles and/or SIRs Be Satisfied as a Condition to Accessing Insurance Coverage.

9.    As set forth more fully in the Insurer DS Objection and this Supplemental Objection, various components of the Plan – including the findings that the Debtors' restructuring support agreement (the "RSA") require be made – effectively rewrite the requirements of the

---

[6]    The limits of the Primary Policies have been exhausted and there are limits remaining under only four of the Umbrella Policies. The four Umbrella Policies with remaining limits are: (1) the 1996-1997 Umbrella Policy, with $73,965 remaining; (2) the 1999-2001 Umbrella Policy, with $1,312,849.47 remaining; (3) the 2003-2004 Umbrella Policy, with $921,135.32 remaining; and (4) the 2005-2006 Umbrella Policy, with $2,395,331.29 remaining.

"fronting" policies. The Debtors attempt to supplant the terms of the LM Policies with the TDPs. But the TDPs' proposed treatment of deductibles and SIRs is wholly inconsistent with the terms of the LM Policies, the parties' decades of performance, and binding Third Circuit precedent. Under those TDPs, Liberty and the other Insurance Companies would potentially be liable for payment of any deductible and/or SIR, regardless of the terms of the applicable Insurance Policy. At least with respect to the LM Policies, failure to satisfy such amounts would constitute a breach of those policies, meaning any confirmed Plan imposing such obligations may eliminate coverage under the LM Policies, where the amount of the deductible/SIR matches the limit of liability under those policies. If that is the intended effect of the Plan, the Disclosure Statement should be revised to make more explicit the proposed treatment of deductibles and SIRs. The Disclosure Statement also must make more explicit the risk that if the Plan is confirmed, it may eliminate *all* coverage obligations under the LM Policies.[7]

10.     If the Debtors do not intend to shift the burden for satisfying deductibles and SIRs onto Liberty, then the Disclosure Statement must be revised to disclose how deductibles and SIRS are to be treated. Prior versions of the Debtors' plan and disclosure statement explicitly required the Insurance Companies to pay such amounts and, in return, receive an Indirect Abuse Claim for whatever the Debtors' obligations would be under the applicable Insurance Policies. *See, e.g., Third Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 5368], Exhibit A-2 ("BSA Toggle Plan TDP"), Article 8.5. The Disclosure Statement

---

[7] The Disclosure Statement discusses a "dispute" over satisfaction of deductibles and SIRs and the possible outcome if the Debtors' position proves to be wrong. *See* Disclosure Statement, Article X.A.22. Liberty submits that (i) the plain language of the LM Policies and consistent course of performance between Liberty and the Debtors shows that any "dispute" is being manufactured by the Debtors and (ii) the brief statement buried hundreds of pages into the Disclosure Statement that such "dispute could potentially reduce or eliminate the right to payment under certain Insurance Policies" fails to properly account for the impact that confirmation of this Plan may have on Claimants. *Id.*

now provides that an Indirect Abuse Claim "would include but not be limited to claims for the payment of defense costs, deductibles, or indemnification obligations." Disclosure Statement, Article VII.B.3.b.

11.    Finally, the Plan and the Disclosure Statement subordinate the payment of any Indirect Abuse Claim to the payment *in full* of Direct Abuse Claim. *See* Disclosure Statement, Article II.G ("Pursuant to the Trust Distribution Procedures, recoveries on account of Indirect Abuse Claims that are liquidated and non-contingent are subordinated to recoveries on account of Direct Abuse Claims."). There is no factual or legal predicate in the Disclosure Statement for such subordination.

## SUPPLEMENTAL OBJECTION

**I.    <u>Certain Of The Issues Raised In Liberty's Original Objection Remain Outstanding</u>.**

12.    Liberty files this Supplemental Objection to highlight not only those issues that may affect a number of parties, but also those that are unique to Liberty as the issuer of fronting policies who holds collateral to secure the Debtors' obligations under those policies. In its Original Objection, Liberty noted that the Disclosure Statement must be revised to clarify how the Plan seeks to treat the Security held by Liberty. In response, the Debtors added language to the Disclosure Statement that reads, in relevant part: "Neither any provision in the Plan nor the occurrence of the Effective Date shall alter, amend, or otherwise impair the rights and obligations of BSA, JPM, or any applicable Insurance Company holding one or more Insurer LCs." Disclosure Statement, Article III.F.7. Despite the Debtors having filed multiple iterations of their disclosure statements and plans since this language was added to address, in part, Liberty's Original Objection, such language remains missing from the Plan. Instead, the Disclosure Statement and Plan contain seemingly-contradictory language providing that the only recourse Liberty may have to satisfy any amounts that come due under the LM Policies

(including deductibles and/or SIRs) is to assert an Indirect Abuse Claim against the Settlement Trust. *See* Disclosure Statement, Article VI.Q.2.a ("[T]he sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party.").

13.    The Debtors must modify the Disclosure Statement and Plan in one of two ways to address this inconsistency.  If the intent of the Plan is to leave unaffected Liberty's right to set off claims against its Security, the Disclosure Statement *and the Plan,* which purports to control Liberty's treatment, must make that point explicit.  If, however, the intent is to eliminate Liberty's recourse to its Security, the Disclosure Statement must be amended to clarify that point and to explain both the legal justification for such action and how the Plan can be insurance neutral in the face of such a provision.  *See, e.g., In re Compton Corp.*, 831 F.2d 586, 589-90 (5th Cir. 1987) (a debtor cannot enjoin the post-petition payment of letter of credit proceeds to an insurer named as a beneficiary of that letter of credit).  As set forth in this Supplemental Objection, it appears that the proposed treatment of deductibles and SIRs is yet another example of how the Plan lacks insurance neutrality and, consequentially, is unconfirmable as a matter of law.

## II.    The Disclosure Statement Fails to Adequately Disclose (1) How Deductibles and Self-Insured Retentions Will Be Treated Under the Plan And (2) Why Indirect Abuse Claims are Subordinated.

14.    The Disclosure Statement fails to explain the legal bases for (i) shifting onto Liberty and the other Insurance Companies the obligation to satisfy any deductible or SIR; (ii) treating a claim for payment of a deductible or SIR as a subordinated Indirect Abuse Claim and not as a breach of contract claim; (iii) subordinating such claims to payment in full of Direct Abuse Claims;

and (iv) terminating Liberty's right to seek payment of a deductible or SIR from non-debtor entities, such as the Local Councils and Chartered Organizations. Taken together, the provisions of the Disclosure Statement that discuss the Plan's treatment of deductibles and SIRs appear to propose a unilateral and non-consensual rewriting of the LM Policies in such a way as to materially increase the "quantum of liability" imposed on Liberty. The Disclosure Statement either should be modified to clarify that this is not, in fact, the intended effect of the Plan, or it should be denied because such provisions render the Plan unconfirmable as a matter of law.

A.    **The Plan Seeks to Rewrite the Terms of the Insurance Policies And Is Not Insurance Neutral Despite the Debtors' Claims to the Contrary**.

15.    The Disclosure Statement describes a dispute fabricated by the Debtors over the treatment of deductibles and SIRs. First, the Debtors have alleged that the Insurance Companies that wrote primary fronting policies, including Liberty, must pay the deductible under those policies "where BSA cannot or does not pay the deductible[.]" Disclosure Statement, Article III.F.1. The Disclosure Statement also notes that the "obligation to pay such deductibles is subject to the terms of such Insurance Policies." *Id.* What the Disclosure Statement lacks is any explanation as to how the Debtors cannot, or why they have made the deliberate choice not to, satisfy deductibles in accordance with the plain terms of the Insurance Policies, including the LM Policies. As noted, the Debtors have *always* satisfied deductibles and SIRs under the LM Policies, which amounts match the full limits of liability for a claim under the LM Policies. The Debtors should not be allowed to deliberately breach the LM Policies and yet expect to receive the benefits of insurance coverage under those policies.

16.    Second, the Debtors also manufacture a dispute over whether an SIR must be satisfied in order to access coverage under other Insurance Policies, including those written by

Liberty. *Id.* The Debtors claim that such SIRs are actually deductibles that do not have to be satisfied to access coverage or defense obligations. *Id.*

17.    Regardless of whether the Debtors are obligated to satisfy a deductible or an SIR, they cannot use their bankruptcy to rewrite the terms of the LM Policies. A court, including a bankruptcy court, may not change the terms or conditions of an insurance policy, nor may it modify the obligations of the insured thereunder. *See, e.g., Fed. Ins. Co. v. SKMDV Holdings, Inc. (In re Green Jacobson, P.C.)*, Nos. 15-41404-705, 15-04115-705, 2017 Bankr. LEXIS 2059, at *14 (Bankr. E.D. Mo. 2017)* ("[n]either the Court nor the parties can rewrite the Policy."); *Physicians' Reciprocal Insurers v. Brunswick Hosp. Ctr., Inc. (In re Brunswick Hosp. Ctr., Inc.)*, 399 B.R. 582, 588 (Bankr. E.D.N.Y. 2009) (explaining that adopting claimant's argument regarding interpretation of insurance policy "would require this Court to rewrite the insurance policy, which it may not do"); *In re Bunnell*, 322 B.R. 331, 336 (Bankr. N.D. Ohio 2005) (explaining that "the Court will not rewrite the Debtor's life insurance policy" so as to change the beneficiary designation set forth therein).

18.    The proposed revisions to the LM Policies are especially egregious in light of the nature of the fronting policies that Liberty wrote for the Debtors. A number of commentators have explained that fronting policies have no risk transfer associated with them. *See, e.g.,* Mark W. Flory & Angela Lui Walsh, Know Thy Self-Ins. (And Thy Primary and Excess Ins.), 36 Tort & Ins. L. J. 1005 (2001) ("'Fronting policies' are one step removed from true self-insurance. 'Fronting' refers to the issuance of an insurance policy under which the insured is left to administer all claims and agrees to reimburse the insurer for all settlements or judgments paid. . . . [T]he insurer essentially functions as a surety relative to the insured's ability to pay covered third-party claims."). In *Northwestern National Insurance Co. v. Esmark, Inc.*, the Delaware Supreme Court

ruled that where a deductible endorsement in a fronting policy provided that a $1 million deductible was to be deducted from any loss reported under the policy, and the policy's per-occurrence limit of liability was $1 million, such deductible endorsement "negate[d]" the issuing insurer's "obligation to pay any claims." 672 A.2d 41, 42 (Del. 1996).

19.     Where an insurer holds collateral to secure it insured's obligations, as is the case with Liberty, there still is no shifting of risk, even in bankruptcy, because the "economic reality" of a fronting policy arrangement is such that any amounts paid out by the insurer will be satisfied by the insured's security. *See, e.g.*, *Carns v. Smith*, No. 01-972H, 2003 Ohio Misc. LEXIS 38, at *14-16 (Ohio Comm. Nov. 7, 2003) (collecting cases and noting that "[i]n the event of a bankruptcy, there is a fund via the letter of credit or collateral trust provided by [the insured] that would generate the costs associated with any losses paid by [the insurer]. In this regard, the risk of loss is not shifted to [the insurer] but is secured by the letter of credit or collateral trust. Based on the foregoing, we find [the insured] to be self-insured in the practical sense[.]").

20.     Requiring Liberty to satisfy any deductible in connection with payment of a Direct Abuse Claim effectively rewrites the LM Policies and provides further evidence that the Plan is not insurance neutral. *See, e.g.*, *In re Metro Affiliates*, No. 13-13591 (SHL), 2016 Bankr. LEXIS 324, at *11-15 (Bankr. S.D.N.Y. Feb. 3, 2016) (confirmation of a plan does not act as a "novation" of an insurance policy thereby eliminating the obligation for the insured to pay a deductible). The Primary Policies that Liberty wrote are fully eroded, meaning the deductibles in the Primary Policies are not in issue.

21.     There is likewise no basis for attempting to shift the burden to pay SIRs onto Liberty. A "self-insured amount is [ ] not an amount that is owed by the Debtor to [its insurer] but, rather, represents the threshold of [the insurer's] liability to the Debtor." *In re Amatex Corp.*,

107 B.R. 856, 872 (Bankr. E.D. Pa. 1989). SIRs must be exhausted before the liability of the insurer arises, and as such, an insurer is only obligated to pay that portion of the damages in excess of the SIR. *See* Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 13.13 (20th ed. 2020) ("A covered loss must exceed the amount of the SIR before an excess or umbrella policy will respond to the loss."); *see also* Richard L. Epling, Kerry A. Brennan & Brandon Johnson, Intersections of Bankruptcy Law and Insurance Coverage Litigation, 21 J. Bankr. L. & Prac. 2 Art. 1 (2012) (an SIR is structured such that "the insurer's coverage obligations do not commence until the SIR is satisfied").

22.    In the bankruptcy context, where a debtor is unable to pay an SIR, courts have adopted one of two approaches. Under one approach, the insurer pays only that amount of any judgment which exceeds the SIR. *See, e.g., Rosciti v. Ins. Co. of Penn.,* 659 F.3d 92, 100 (1st Cir. 2011) (finding that insurer "would only be liable for the amount of the judgment above [the SIR]" and that it "will not pay the 'first dollars insofar as any recovery from [the insurer] will be reduced by [the SIR amount]'"); *Sturgill v. Beach at Mason Ltd. P'ship,* No. 1:14cv0784 (WOB), 2015 U.S. Dist. LEXIS 142490, at *4 (S.D. Ohio Oct. 20, 2015) (finding that insurer was responsible for providing coverage under excess policy, but was not liable for applicable SIRs); *Admiral Ins. Co. v. Grace Indus.,* 409 B.R. 275, 282 (E.D.N.Y. 2009) (same). Under the second approach, the failure of the debtor to exhaust the SIR is a complete bar to coverage. *See Pak-Mor Mfg. Co. v. Royal Surplus Lines Ins. Co.,* No. SA-05-CA-135-RF, 2005 U.S. Dist. LEXIS 34683, at *5 (W.D. Tex. Nov. 3, 2005) (finding that the insurer "need not pay anything under its policy unless [the debtor] first satisfies the self-insured retention"); *In re CJ Holdings Co.,* Case. No. 16-33590, 2018 Bankr. LEXIS 2437 (Bankr. S.D. Tex. Aug. 15, 2018) (denying plaintiff's motion for relief from the plan injunction to pursue insurance proceeds where the insurers' obligations did not begin until

an SIR was satisfied). The Plan does not even attempt to adopt one of these two approaches. Instead, it attempts to rewrite the law and the Insurance Policies to eliminate altogether the Debtors' requirement to satisfy SIRs.

**B.**    **The Disclosure Statement Fails to Provide a Rationale for Treating**
**Claims for Deductibles and SIRs as Subordinated Indirect Abuse Claims.**

23.    Although the Plan and Disclosure Statement no longer explicitly require Liberty to satisfy any deductible or SIR, those documents still provide that an Indirect Abuse Claim "would include but not be limited to claims for the payment of defense costs, deductibles, or indemnification obligations." Disclosure Statement, Article VII.B.3.b; *see id.*, Article II.G.

24.    If the intent is to require Liberty to satisfy such amounts in violation of the terms of the LM Policies, the Disclosure Statement must be revised further to explain why a claim for payment of a deductible or SIR is being treated as a subordinated Indirect Abuse Claim and not as a breach of contract claim. *See generally Lincoln Gen. Ins. Co. v. A&G Commer. Trucking, Inc.*, Case No. 12-cv-01534, 2013 U.S. Dist. LEXIS 82775 (M.D. Pa. May 23, 2013) (explaining that the failure for an insured to satisfy a deductible under an insurance policy gives rise to a breach of contract claim for the insurer). Such disclosure must explain how the Settlement Trust *cannot* satisfy deductibles and SIRs. If the Debtors have simply decided that they are *choosing* not to satisfy such amounts, the Disclosure Statement should explain that the estate's anticipatory breach of the LM Policies jeopardizes insurance coverage under the LM Policies.

25.    Were the Plan truly insurance neutral, Liberty would retain whatever rights it may have under the LM Policies with respect to a breach that may arise from the Debtors' failure to satisfy any deductible and/or SIR, including, without limitation, the right to challenge any coverage obligations as to a specific claim or to set off amounts the Debtors owe Liberty against the Security. Without explanation from the Disclosure Statement, the Plan also appears to grant

Liberty an Indirect Abuse Claim, which is "expected to have limited recovery," as opposed to a breach of contract claim that should receive the same *pro rata* treatment as other general unsecured claims. Disclosure Statement, Article II.G.

**C.    The Disclosure Statement Fails to Provide Any Basis for the Subordination Of Indirect Abuse Claims to the Payment *In Full* of Direct Abuse Claims.**

26.    Even if there is a justification for separately classifying those claims that arise from the Debtors' contractual breach under the LM Policies, the Disclosure Statement fails to provide a basis for subordinating such claims to the payment *in full* of the corresponding Direct Abuse Claim. *See id.* Given that Indirect Abuse Claims and Direct Abuse Claims are of equal legal rank with respect to the Debtors,[8] there does not appear to be any basis for structurally subordinating Indirect Abuse Claims. There certainly is no basis for contractual subordination of a claim for deductibles and/or SIRs. On the contrary, payment of such claims is required to access coverage under the LM Policies.

27.    Nor does the Disclosure Statement include any allegation that could substantiate a claim for equitably subordinating Indirect Abuse Claims. The Third Circuit Court of Appeals has described the remedy of "equitable subordination" as one available "to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Shubert v. Lucent Techs. Inc. (In re Winstar*

---

[8]    "The similarity of claims is determined by their legal status in relation to the debtor. Accordingly, unsecured claims will, generally speaking, comprise one class . . . because they are claimants of equal legal rank entitled to share pro rata in values remaining after payment of secured and priority claims." *FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd.*, 155 B.R. 93, 99 (D.N.J. 1993). The Indirect Abuse Claims and the Direct Abuse Claims share the same "legal status in relation to the debtor" and are claims "of equal legal rank". *Id.* Notwithstanding that fact, Direct Abuse Claims are "expected to yield up to 100% recovery." Disclosure Statement, Article II.G. In contrast, Indirect Abuse Claims have an "unknown" recovery. *Id.* The Disclosure Statement provides no justification for this separate classification or distribution for claims that have the same legal status and rank with respect to the Debtors.

*Cmmc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (citation and quotations omitted). The Debtors, who bear the burden of establishing the basis for equitably subordinating any claim, must prove that: (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to the Debtors' creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. *Id.*; *see Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 79 (Bankr. D. Del. 2010) (explaining that for non-insiders, only "egregious conduct such as fraud, spoliation or overreaching" will serve as the basis for equitably subordinating a claim).

28.     Allegations seeking equitable subordination cannot be general or conclusory but must set forth a "substantial factual basis" for the extraordinary remedy of subordination. *See e.g., In re Castillo*, 7 B.R. 135, 138 (Bankr. S.D.N.Y. 1980) (dismissing equitable subordination claims for insufficient factual pleadings); *see also In re Mobile Steel Co.*, 563 F.2d 692, 701 (5th Cir. 1977) (objection based on equitable subordination must contain "substantial factual basis" to support allegation of impropriety). The Disclosure Statement asserts no basis for subordinating the contingent secured Liberty Claim (or, for that matter, any Indirect Abuse Claim).

29.     The Disclosure Statement should be denied unless it remedies these infirmities. Furthermore, Liberty reserves all rights to object to the Plan on the basis that the classification and treatment of Indirect Abuse Claims constitutes unfair treatment and bad faith on behalf of the Debtors, as well as a violation of applicable Third Circuit case law.

**D.      The Disclosure Statement Fails to Provide a Basis For
Eliminating Liberty's Rights Against Non-Debtor Insureds.**

30.     Also missing from the Disclosure Statement is the legal basis for asking this Court to extinguish rights that Liberty has against non-debtor entities, such as the Local Councils and

Chartered Organizations. If the LM Policies allow Liberty to look to a non-debtor, such as one of the Local Councils or Chartered Organizations, to satisfy a deductible or SIR, the Plan should not have the effect of cutting off this right. Furthermore, even if the Court has the authority to channel the Abuse Claims *against the Debtors* to the Settlement Trust, the Disclosure Statement provides no justification for how claims against non-debtors – including the Chartered Organizations who are not receiving releases or the benefit of any injunction – can be subject to Court-approved TDPs. The Disclosure Statement must be modified to explain the legal basis for modifying contract rights between Liberty and its non-debtor insureds, including the right to require that non-debtor named insureds satisfy any deductible and/or SIR.

## CONCLUSION

31.    The Disclosure Statement is woefully insufficient in describing the effect that the Plan will have on the obligations – of both the Debtors and non-debtor entities – to satisfy deductibles and SIRs. Clarifying such treatment is of paramount importance to Liberty given the other concerns about the Disclosure Statement that are raised in this Supplemental Objection and the Insurer DS Objection. There are approximately "82,500 unique, timely Proofs of Claims" seeking recovery on account of Direct Abuse Claims. Disclosure Statement, Article V.N. Holders of Direct Abuse Claims need not prove *any* negligence on the part of a Protected Party to be entitled to a recovery on such claims.[9] For those Abuse Claimants who do not elect to receive an Expedited

---

[9]    The Expedited Distribution election further compounds the problem of how deductibles and SIRs are to be treated under the Plan. A Claimant who elects to receive an Expedited Distribution is not required to provide any documentation that could prove negligence on behalf of a Protected Party. Without such proof, there's no basis to trigger coverage obligations under any of the LM Policies. In their response to prior disclosure statement objections, the Debtors dismissed such concerns, asserting that "to the extent Liberty Mutual or any other Non-Settling Insurance Company believes that the Expedited Distribution election process may result in the Settlement Trust making an erroneous distribution in error, their rights under their insurance policies are fully preserved under the insurance neutrality provisions of the Plan." Docket No. 4105, at 40. That may be true if the Plan were truly insurance neutral. But, for the reasons stated herein and in the Insurer DS Objection, it is not. In any event, the

Distribution, the sufficiency of any evidence they submit to substantiate negligence will be determined solely by the Settlement Trustee. Taken together, these claims allowance and payment procedures threaten to materially alter and increase the "quantum of liability" that Liberty could be subject to under the LM Policies. *See In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011) ("'Insurance neutrality' is a meaningful concept where, as in *Combustion Engineering*, a plan does not materially alter the quantum of liability that the insurers would be called to absorb.").

32.     The Plan purports to assign to the Settlement Trust those provisions of the LM Policies that confer a benefit on the estate while eliminating any provision that requires the Settlement Trust to comply with the terms of the LM Policies. This is not insurance neutrality and is not permissible under binding Third Circuit precedent. The Disclosure Statement either (i) should be modified to clarify that the proposed Plan transactions will not increase the "quantum of liability" as they appear intended to do, or (ii) must be denied because it describes a Plan that is unconfirmable as a matter of law.

## **RESERVATION OF RIGHTS**

33.     Liberty reserves, and does not waive, any and all of its rights and defenses under the Liberty Policies and applicable law. Liberty further reserves all rights to assert any and all such rights and defenses in any appropriate manner and forum. Nothing contained in this Supplemental Objection, the Original Objection, the Insurer DS Objection, or the Insurer Scheduling Objection shall be deemed to alter or expand any coverage that may otherwise be

---

Disclosure Statement fails to account for how any deductibles and/or SIRs will be treated by the Settlement Trust in the event the Settlement Trustee seeks reimbursement from Liberty on account of any Expedited Distribution for which there has been no proof of negligence. As a practical matter, even if the Primary Policies were not exhausted, the $3,500 Expedited Distribution would not exceed the deductible or SIR obligation under any of the LM Policies.

available under the LM Policies, any related agreements issued by Liberty, or any settlement agreement or other adjudication to which Liberty is a party.  Liberty reserves the right to amend, supplement, alter, or modify the objections and points raised herein, including, without limitation, the right to join in, and adopt, any objections to the Disclosure Statement and proposed confirmation schedule filed by any other person or entity.

Dated: August 17, 2021

SEITZ, VAN OGTROP & GREEN, P.A.

/s/ R. Karl  Hill
R. Karl Hill (No. 2747)
222 Delaware Avenue
Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-0600
Email: khill@svglaw.com

-and-

Douglas R. Gooding (admitted *pro hac vice*)
Jonathan D. Marshall (admitted *pro hac vice*)
CHOATE HALL & STEWART, LLP
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

Kim V. Marrkand (admitted *pro hac vice*)
Laura Bange Stephens (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO PC
One Financial Center
Boston, MA 0211
Telephone: (617) 542-6000
KVMarrkand@mintz.com
LBStephens@mintz.com