## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |

## HARTFORD'S OBJECTION TO AMENDED DISCLOSURE STATEMENT FOR THE FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC [D.I. 5485]

BAYARD, P.A.
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: efay@bayardlaw.com
       gflasser@bayardlaw.com

SHIPMAN & GOODWIN LLP
James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
1875 K Street, N.W., Suite 600
Washington, D.C. 20003
Tel: (202) 469-7750
Fax: (202) 469-7751

WILMER CUTLER PICKERING HALE
   AND DORR LLP
Philip D. Anker (admitted *pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel: (212) 230-8890
Fax: (212) 230-8888

Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (admitted *pro hac vice*)
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

*Attorneys for Hartford Accident and Indemnity Company, First State Insurance Company,*
*Twin City Fire Insurance Company, and Navigators Specialty Insurance Company*

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ...................................................................................................1

OBJECTION...............................................................................................................................5

I.    The Disclosure Statement Should Not Be Approved Because The Fourth
Amended Plan Is Patently Unconfirmable...................................................................................5

    A.    The Plan Embodies An Unlawful Scheme To Inflate Liability For
Abuse Claims And Foist That Liability On Insurers ...............................................6

        1.    The Plan unlawfully inflates BSA's liability while depriving
insurers of their contractual rights, including the right to
defend and control the settlement of claims against their insured ..............8

        2.    The Plan violates section 502 of the Bankruptcy Code by
replacing the Code's claims-allowance process with a
non-adversarial, non-judicial process that would allow legally
unenforceable claims ................................................................................13

        3.    The Plan requires the Court to make findings designed to
prejudice the ability of insurers to assert insurance-coverage
defenses ...................................................................................................15

        4.    The Plan's anti-insurer provisions violate the Bankruptcy
Code's requirement of good faith under section 1129(a)(3).....................18

        5.    The Plan contains additional unlawful provisions abridging
insurers' rights ........................................................................................20

    B.    The Plan's Proposed Injunctive Relief For BSA And The Local
Councils Is Unlawful ...........................................................................................22

        1.    Under the TDP's inflated valuation of the Abuse Claims,
BSA's and the Local Councils' contributions are inadequate ..................23

        2.    The inadequate contributions by BSA and the Local Councils
violate the best interests of creditors test under section 1129(a)(7)...........25

II.    The Disclosure Statement Should Not Be Approved Because It Lacks
Adequate Information ...............................................................................................................27

    A.    The Disclosure Statement Fails To Provide Sufficient Information
Concerning The Adequacy Of The Contributions Of Protected Parties................27

    B.    The Disclosure Statement Fails To Provide Adequate Information
Concerning The Risks To Claimants' Recovery Under The Plan .........................30

III.    BSA's Proposed Schedule For Confirmation Proceedings Is Not Reasonable .................33

CONCLUSION.........................................................................................................................34

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Andalora v. R.D. Mech. Corp.*,
   152 A.3d 968 (N.J. Super. Ct. 2017) ...................................................................................29

*Banks Tower Commc'ns, Ltd. v. Home Ins. Co.*,
   590 F. Supp. 1038 (E.D. Pa. 1984) ......................................................................................29

*Boy 1 v. Boy Scouts of Am.*,
   832 F. Supp. 2d 1282 (W.D. Wash. 2011) ...........................................................................10

*Congoleum Corp. v. Ace Am. Ins. Co.*,
   No. MID-L-8908-01 (N.J. Super. Ct. May 18, 2007) ..........................................................32

*Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*,
   926 S.W.2d 287 (Tex. 1996) ................................................................................................10

*In re ACandS, Inc.*,
   311 B.R. 36 (Bankr. D. Del. 2004) .......................................................................................20

*In re Am. Cap. Equip., LLC*,
   688 F.3d 145 (3d Cir. 2012) ...................................................................5, 6, 13, 18, 19, 20

*In re Amatex Corp.*,
   107 B.R. 856 (E.D. Pa. 1989) ...............................................................................................12

*In re Combustion Eng'g*,
   391 F.3d 190 (3d Cir. 2005) ................................................................... 12-13, 16, 21, 24

*In re Congoleum Corp.*,
   426 F.3d 675 (3d Cir. 2005) .........................................................................................20, 32

*In re Continental Airlines*,
   203 F.3d 203 (3d Cir. 2000) .........................................................................................23, 26

*In re Crippin*,
   877 F.2d 594 (7th Cir. 1989) ...............................................................................................11

*In re Denario*,
   267 B.R. 496 (Bankr. N.D.N.Y. 2001) .................................................................................12

*In re Fed.-Mogul Glob. Inc.*,
   684 F.3d 355 (3d Cir. 2012) ..........................................................................................12, 21

*In re Glob. Indus. Tech., Inc.*,
   645 F.3d 201 (3d Cir. 2011) (en banc) ...............................................6, 7, 8, 11, 13, 16, 20

*In re Lloyd E. Mitchell, Inc.*,
No. 06-13250, 2012 Bankr. LEXIS 5531 (Bankr. D. Md. Nov. 29, 2012) ......................12

*In re Master Mortg. Inv. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994)...........................................................................29

*In re MF Glob. Holdings Ltd.*,
469 B.R. 177 (Bankr. S.D.N.Y. 2012) ............................................................................12

*In re Millennium Lab Holdings II, LLC*,
575 B.R. 252 (Bankr. D. Del. 2017), *aff'd*, 591 B.R. 559 (D. Del. 2018),
*aff'd*, 945 F.3d 126 (3d Cir. 2019).................................................................................29

*In re Millennium Lab Holdings II, LLC*,
591 B.R. 559 (D. Del. 2018), a*ff'd*, 945 F.3d 126 (3d Cir. 2019)...................................23

*In re Quigley Co., Inc.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010).....................................................................25, 26

*In re SPM Mfg. Corp.*,
984 F.2d 1305 (1st Cir. 1993).......................................................................................11

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ..............................................................................26

*Infant C. v. Boy Scouts of Am., Inc.*,
391 S.E.2d 322 (Va. 1990)............................................................................................10

*Interstate Fire & Cas. Ins. Co. v. Cleveland Wrecking Co.*,
105 Cal. Rptr. 3d 606 (Ct. App. 2010) ..........................................................................29

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652 (2019)...................................................................................................11

*Moody v. Amoco Oil Co.*,
734 F.2d 1200 (7th Cir. 1984) .......................................................................................11

*Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*,
848 F.2d 414 (3d Cir. 1988)...........................................................................................27

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968).......................................................................................................17

*Roe No. 1 v. Boy Scouts of Am. Corp.*,
84 A.3d 443 (Conn. App. Ct. 2014)................................................................................10

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
 81 F.3d 355 (3d Cir. 1996)............................................................................27

## STATUTES

11 U.S.C. § 105................................................................................5, 11, 15, 17, 33

11 U.S.C. § 363....................................................................................5, 15, 17, 33

11 U.S.C. § 502........................................................................13, 14, 15, 22, 26

11 U.S.C. § 509................................................................................................22, 26

11 U.S.C. § 524................................................................12, 21, 23, 24, 25

11 U.S.C. § 541................................................................................................11

11 U.S.C. § 704................................................................................................26

11 U.S.C. § 726................................................................................................26

11 U.S.C. § 1125................................................................................................27

11 U.S.C. § 1129................................................15, 17, 18, 20, 22, 25, 26

## RULES

Bankr. D. Del. L.R. 3007-1(f)........................................................................14

Fed. R. Bankr. P. 2004................................................................................13, 14

Fed. R. Bankr. P. 2019................................................................................14

Fed. R. Bankr. P. 9014................................................................................13

Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively, "Hartford") respectfully submit this objection to the *Amended Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5485] (the "Disclosure Statement") filed by the Boy Scouts of America and Delaware BSA, LLC (collectively, "BSA" or "Debtors") on July 2, 2021.[2]

## PRELIMINARY STATEMENT

The Plan described in the Disclosure Statement now before the Court centers on an improper scheme to inflate BSA's liability for Abuse Claims far beyond what it would be in the tort system and force BSA's insurers to foot the resulting bill. In return, the Plan grants BSA and its Local Councils permanent absolution from Abuse Claims for a fraction of their ultimate liability, assuming (which Hartford, of course, does not concede) that the plaintiffs' lawyers

---

[2]    Hartford is filing this objection as a cautionary measure to ensure that its rights are fully protected. As the Court is aware, Hartford and BSA previously entered into an agreement (the "Settlement Agreement") that would have resolved Hartford's coverage obligations for sexual-abuse claims ("Abuse Claims") against BSA for $650 million (subject to the Settlement Agreement's terms and to this Court's approval). The Settlement Agreement obligated BSA to seek confirmation of either (a) a Global Resolution Plan incorporating that deal and channeling claims against Hartford to a trust or (b) a Toggle Plan that would not give any party other than BSA the benefit of a channeling injunction, instead allowing the claimants, insurers, and other third parties to litigate their claims and obligations in the tort system. While Hartford remains committed to the Settlement Agreement, BSA has sought this Court's approval of a restructuring support agreement ("RSA") with the Official Committee of Tort Claimants ("TCC"), the Coalition of Abused Scouts for Justice ("Coalition"), the Future Claimants' Representative ("FCR"), and certain state court counsel (the "State Court Counsel") (collectively, "Claimant Representatives") that would require BSA to repudiate its obligation under the Settlement Agreement to seek confirmation of a Global Resolution or Toggle Plan, to modify the Fourth Amended Plan [D.I. 5484] (the "Plan") to remove all provisions relating to the Hartford settlement, and to move forward with a version of the Plan that is inconsistent with the Settlement Agreement. Because this Court has not yet ruled on the motion to approve the RSA, it is not yet clear what plan BSA will be pursuing, and it is thus premature, in Hartford's view, to consider whether to approve the Disclosure Statement. Indeed, BSA has taken the position that approval of the RSA is a gating issue that should be resolved before any hearing on approval of a Disclosure Statement. *See Transcript of Telephonic Status Conference* (July 7, 2021) [D.I. 5529] ("July 7 Hr'g Tr.") at 69:2-69:10 (statement of Mr. Linder), attached as Exhibit D to *Declaration of Joel Millar in Support of Hartford's Objection to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5686]. Nonetheless, Hartford files this objection now, in compliance with the deadline set for Disclosure Statement objections, to protect its rights in the event that the RSA is approved and BSA is permitted to move forward with a plan consistent with the RSA. Capitalized terms not defined herein shall have the meanings set out in the Plan.

1

succeed in their efforts to shield the claims from any meaningful scrutiny.  That Plan is patently unconfirmable, and the Disclosure Statement thus should not be approved.  Approving the Disclosure Statement would not move this case forward.  To the contrary, it would almost certainly foreclose any possibility of a consensual resolution and any possibility of BSA's exiting bankruptcy in the short term.  That would harm every constituency in this case, including claimants with valid Abuse Claims and BSA itself.  The Court should make clear now that it will not confirm a plan centered on manufacturing liability that would not exist in the tort system and foisting that liability on insurers.  Only then will BSA and the plaintiffs' lawyers do what is necessary to resolve this case—work with all parties in interest to craft a plan that is lawful and fair to all concerned.

The Plan contains numerous unlawful provisions.  For example, the Plan and its accompanying Trust Distribution Procedures ("TDP") unabashedly provide for the payment of Abuse Claims that are invalid—because, for instance, they are time-barred under applicable state law (and, according to BSA's own experts, about 59,500 of the proofs of claim filed in this case are presumptively time-barred)—and for payment of claims in inflated amounts with little or no scrutiny.  They permit any claimant to elect a payment of $3,500 with no inquiry at all into the merits of the Abuse Claim, even if the claim is time-barred or fails to allege basic requirements for liability such as involvement in scouting.  The remaining Abuse Claims will be resolved by a plaintiff-friendly trustee, Eric Green, whom this Court refused to appoint as a mediator because of his close relationship with the FCR.  And the trustee has unfettered discretion to allow those Abuse Claims in enormous amounts—up to $2.7 million each—based solely on the completion of a basic questionnaire, without any requirement that claimants provide actual evidence to substantiate their allegations.

2

Moreover, the Plan and TDP deprive insurers of their fundamental rights under the policies to control the defense and settlement of claims by eliminating any role for insurers in the claims-allowance process. These fundamental contractual rights exist to prevent exactly the kind of moral hazard enshrined in the Plan here. And perhaps most brazenly, the Plan requires this Court to make findings blessing this process and its results as "fair," "reasonable," in "good faith," and "binding" on the insurers. As one plaintiff's lawyer recently admitted, the Plan and TDP are designed to "operate as a judgment" by this Court "enforceable against the insurers" for any and all Abuse Claims, in whatever amounts, the Trustee may decide to allow.[3] The Plan thus not only shuts insurers out of the process of evaluating and determining whether to allow claims that will be paid with the insurers' money, it also attempts to preempt the insurers from asserting any defenses to coverage based on the Plan's prejudicial terms.

Fundamental principles of bankruptcy, as well as decisions by the Third Circuit and other courts, make plain that such a plan is unconfirmable as a matter of law. The Plan contravenes the basic precept, reflected in multiple provisions of the Code and recognized by the Third Circuit, that a plan of reorganization may not rewrite a debtor's insurance policies to increase the insured's, or diminish the insurer's, rights. It flouts the Code's provisions governing claims allowance, allowing claims that are unenforceable against the debtor under applicable law and barring parties in interest—including the insurers who will be asked to pay the claims—from objecting. And it violates the requirement that a plan must be proposed in good faith, with the aim of *fairly* achieving a result consistent with the Code's objectives—not manipulating the bankruptcy process to obtain an improper advantage over insurers.

In addition to its scheme to foist liability on BSA's insurers, the Plan contains other key

---

[3]     *See July 7 Hr'g Tr.* at 36:23-37:2 (statement of Mr. Zalkin).

provisions that render it patently unconfirmable.  Although Hartford will not raise here all of the reasons why the Plan is unlawful, another key defect is that the injunctive relief the Plan would provide BSA and its Local Councils is unlawful.  BSA and the Local Councils can obtain the protection of a channeling injunction against present and future Abuse Claims related to BSA's alleged misconduct only by contributing sufficient assets to the Trust, in addition to insurance rights, to make such relief fair and equitable in light of the portion of liability that is uninsured or self-insured.  Under the Plan, BSA and the Local Councils will pay about $250 million and up to $600 million, respectively, for freedom from all present and future Abuse Claims.  Those payments cannot possibly account for BSA's and the Local Councils' share of the wildly inflated liability that the Plan will generate.

Approval of the Disclosure Statement would thus merely lead to solicitation and confirmation proceedings that would be futile.  Worse, it would encourage the plaintiffs' lawyers to seek an unjustified windfall from BSA's insurers, and encourage BSA to capitulate to the plaintiffs' lawyers' impermissible demands.  The Court should make clear now, by refusing to approve the Disclosure Statement, that only a plan that deals fairly with all constituencies will be confirmed.

Separately, even if the Court is inclined to permit solicitation of the Plan to proceed, the Disclosure Statement should not be approved because it does not provide adequate information to the holders of Abuse Claims (including holders of Indirect Abuse Claims such as Hartford). The Disclosure Statement should disclose what each Protected Party (including each individual Local Council) is contributing to obtain the protection of the Plan's channeling injunction.  It should also disclose the risk that the Plan's anti-insurer provisions may result in denial of confirmation of the Plan or may reduce, or vitiate altogether, insurance coverage for the claims.

Finally, even if the Court approves the Disclosure Statement, it should not approve the unrealistically compressed confirmation schedule BSA has proposed.  Instead, the Court should set a schedule that affords the insurers a reasonable period to develop the record before such a consequential hearing on confirmation of a plan that is unabashedly not "insurance neutral" and that would require this Court to make the sorts of extraordinary findings demanded by the plaintiffs' lawyers.

## **OBJECTION**

### I.    THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE FOURTH AMENDED PLAN IS PATENTLY UNCONFIRMABLE

The Court should not approve the Disclosure Statement because the Fourth Amended Plan is patently unconfirmable.  "[A] bankruptcy court can determine at the disclosure statement stage that a Chapter 11 plan is unconfirmable without first holding a confirmation hearing" "if it is obvious that the plan is patently unconfirmable, such that no dispute of material fact remains and defects cannot be cured by creditor voting."  *In re Am.  Cap. Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012).  The Claimant Representatives have acknowledged that this Court should not permit a patently unconfirmable plan to go out for solicitation.[4]  That makes sense:  "[A] court should not proceed with the time-consuming and expensive proposition" of solicitation and a confirmation hearing "when the plan [is] not … confirmable," *id.* at 154 (internal quotation marks and brackets omitted)—particularly where, as here, one constituency's insistence on an unlawful plan is preventing the parties from reaching agreement on a lawful one.

"The debtor has the burden of proving that a disclosure statement is adequate, including

---

[4]    *See Supplemental Brief of the Coalition of Abused Scouts for Justice, the Official Committee of Tort Claimants, and the Future Claims Representative in Support of, Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5760] ("Claimant Representatives' Supplemental RSA Brief") at 7.

showing that the plan is confirmable or that defects might be cured or involve material facts in dispute." *Am. Cap. Equip.*, 688 F.3d at 155.  BSA cannot meet that burden here, as the Plan is patently unconfirmable for multiple reasons.

### A.    The Plan Embodies An Unlawful Scheme To Inflate Liability For Abuse Claims And Foist That Liability On Insurers

At the heart of the Plan is a deal under which BSA, working with the plaintiffs' lawyers, has "sold out [its] insurers by setting up a system in which [insurers] would pay for newly ginned-up … claims in exchange for the … claimants casting their votes in favor of the … Plan." *In re Glob. Indus. Tech., Inc.*, 645 F.3d 201, 214-215 (3d Cir. 2011) (en banc) ("*GIT*").  That deal is a "profoundly serious" affront to the "integrity" of the bankruptcy process, *id.*, and the provisions that implement it render the Plan patently unconfirmable.

BSA has touted the deal with the plaintiffs' lawyers reflected in the Plan as "remarkable." And it is.  But not in the way BSA would have this Court believe.  Rather, it is a remarkably egregious example of a scenario that has occurred before in mass-tort bankruptcies: A company with a small number of tort claims against it files for bankruptcy, hoping to free itself of such claims through a trust and channeling injunction.  Plaintiffs' lawyers go to work soliciting claimants, and the debtor is deluged with a torrent of dubious or invalid claims that it never would have faced outside bankruptcy.  The debtor may protest at first.  But because the plaintiffs' lawyers with the most clients can drive the outcome of the vote on any plan, the debtor ultimately surrenders to them.  The plaintiffs' lawyers agree to advise their clients to vote in favor of a plan that will grant permanent protection to the debtor and its affiliates for a relatively modest sum; in return, the debtor agrees to assign all of its liability insurance to the trust and to grant the plaintiffs' lawyers free rein in crafting trust distribution procedures that will govern the allowance and payment of claims, looking the other way when those procedures permit inflated

payments on dubious or invalid claims.

The *en banc* Third Circuit addressed precisely such a scenario in *GIT*. There, as here, the debtors' plan sought to create a trust to liquidate and pay present and future tort claims (in that case, claims arising out of exposure to silica), funded in large part by an assignment of the debtors' liability insurance policies. *GIT*, 645 F.3d at 205. There, as here, the bankruptcy filing and proposed trust "triggered [an] explosion of new claims"; while there were only 169 silica claims pending against the debtors on the petition date, more than 4,600 such claims were filed in the bankruptcy. *Id.* at 213-214. And there, as here, the debtors' insurers objected to the plan, arguing that it would pay invalid claims, that it would dramatically inflate the debtors' silica liability beyond what it would have been in the tort system, and that it improperly took away the insurers' rights under their policies to defend and consent to settlement of the silica claims. The debtors in *GIT* contended that the insurers had no standing to object to the plan in light of the plan's "insurance neutrality" language providing that nothing in the plan or confirmation order would preclude insurers from asserting any rights or defenses under the policies (except for defenses based on the policies' anti-assignment provisions). *See id.* at 206, 212.

The Third Circuit rejected that contention, holding that notwithstanding the plan's language preserving the insurers' coverage defenses, "it cannot fairly be said that the … plan is 'insurance neutral.'" *GIT*, 645 F.3d at 212. To be "insurance neutral," the court explained, a plan must "neither increase[] the insurers' pre-petition obligations nor impair[] their pre-petition contractual rights under the … insurance policies." *Id.* "Here, however, the Plan's promise of [a] Silica Trust appears to have staggeringly increased—by more than 27 times—the pre-petition liability exposure." *Id.* The "manifold increase in silica-related claims" stemming from creation of the trust "constitute[d] a tangible disadvantage" to the debtors' insurers sufficient to give them

standing to object to the plan.  *Id.* at 213-214.

But *GIT* is not just a standing case.  The Third Circuit also made clear that the kind of deal central to the Plan here—in which a debtor obtains protection for itself in return for allowing plaintiffs' lawyers to craft procedures designed to pay invalid and inflated claims and send insurers the bill—is anathema to "the integrity of the bankruptcy proceeding."  *GIT*, 645 F.3d at 214.  Indeed, the Plan here is more "disturbing" than the *GIT* plan, *id.*, in at least three respects.  *First*, while in *GIT* the debtors' silica liability grew "by more than 27 times" due to the lure of a bankruptcy trust, *id.* at 212, in this case the mere 275 Abuse Claims pending as of the petition date ballooned into some 82,500 claims filed in the bankruptcy, following the blandishments of plaintiffs' lawyers promising easy money from the trust—a *300-fold* increase.  *Second*, although the silica claims in *GIT* were of questionable *factual* validity due to the manner in which they were diagnosed, *see id.* at 213-214, the Plan and TDP here unambiguously provide for the payment of claims that are *legally* invalid because they are barred by the applicable statute of limitations.  And *third*, the *GIT* plan preserved the insurers' coverage defenses, while the Plan here does precisely the opposite, affirmatively seeking to prejudice the insurers' assertion of coverage defenses and obtain an unfair advantage in later coverage litigation.

As set out in more detail below, each key provision of the anti-insurer scheme at the core of the Plan is unlawful under the Bankruptcy Code and governing precedent.  Taken together, those provisions add up to a Plan that is not proposed in good faith as a matter of law and harms the integrity of the bankruptcy process before this Court.

      *1.*     *The Plan unlawfully inflates BSA's liability while depriving insurers of their contractual rights, including the right to defend and control the settlement of claims against their insured*

The Plan deprives Hartford and other insurers of their fundamental rights under their policies by taking the Abuse Claims against BSA out of the tort system and resolving them

through a plaintiff-approved TDP in which the insurers have no role.  Standard general liability insurance policies—including Hartford's policies here—require an insurer to indemnify its insured for judgments or settlements that the insured is legally obligated to pay and that are within the scope of the policy's coverage.  Because the insured's liability for such judgments or settlements is ultimately borne by the insurer, that arrangement can give rise to moral hazard and to the possibility of collusion between the insured and third parties asserting claims; the insured does not have the same economic incentive as the insurer to defend claims vigorously and negotiate for settlements less than the policy limits.  For that reason, liability policies such as Hartford's give the insurer the right to assume the defense of claims against the insured; require the insured to cooperate with the insurer in investigating and defending claims; and give the insurer control over the settlement of any claims.[5]  The Plan guts these critical contractual protections and maximizes the insured's liability at the insurers' expense.

Specifically, the Plan and TDP provide for the Abuse Claims to be resolved exclusively by a non-disinterested, plaintiff-friendly trustee chosen by the plaintiffs' lawyers themselves— Eric D. Green.[6]  This Court declined to appoint Mr. Green as a mediator in this case because "his relationship with Mr. Patton," the FCR, "would lead a reasonable person to be concerned about his mediating this case."[7]  Yet, under the Plan and TDP, Mr. Green would take on a far more important role; he would be the sole judge of the validity and amount of all Abuse Claims.  Mr.

---

[5]    *See* Complaint ¶¶ 91, 93, 96, *Hartford Accident and Indemnity Co., et al. v. Boy Scouts of America, et al.*, Adv. Proc. No. 20-50601 (LSS) (Bankr. D. Del.) (setting forth such provisions in Hartford's policies).

[6]    *See Plan* §§ III.B.10, IV.R, V.N, VII.A, VIII.A (providing that Abuse Claims will be exclusively "resolved by the Settlement Trust in accordance with the Trust Distribution Procedures"); *id.* §§ IV.E, IV.H (appointing Eric D. Green as the Settlement Trustee).  Moreover, Mr. Green would be overseen only by plaintiffs' lawyers or their representatives—by a Settlement Trust Advisory Committee with five members selected by the Coalition and two selected by the TCC, and by the FCR, Mr. James L. Patton, Jr.  *See id.* §§ IV.F.1, IV.G; Ex. A (TDP) art. III.A.

[7]    *See Transcript of Telephonic Hearing* (June 8, 2020) [D.I. 811] at 55:23-56:3.

Green would be given broad discretion to allow Abuse Claims that would be worth little or nothing in the tort system.  For example, the TDP allows any claimant to elect to receive a payment of $3,500 without any review of his claim at all, not even to determine if the claimant was actually a Boy Scout or if his claim is time-barred.[8]  Other claimants would be entitled to up to $2.7 million each for simply filling out a questionnaire designed by the plaintiffs' lawyers.[9] The TDP disregards the well-settled legal standard of liability for Abuse Claims, which requires a showing that the defendant was at least negligent, and instead allows Abuse Claims based on the plaintiffs' lawyers' preferred standard of absolute, strict liability, which has no legal basis.[10] The TDP would also allow time-barred claims, leaving it solely up to the Trustee to decide, in his discretion, whether to discount the value of such claims or to allow them in full, if he concludes that tolling of the statute of limitations would be "appropriate."[11]  Notably, the Trustee has no discretion to *disallow* (rather than merely make a potentially minor reduction to the allowed amount of) a claim that is time-barred.  The TDP would even allow Abuse Claims that

---

[8]     *See Plan* § III.B.10; *id.* Ex. A (TDP) art. VI.A (providing that any claimant who filed a timely proof of claim and signed it may receive $3,500; such claimants "will not have to submit any additional information to the Settlement Trust to receive payment of the Expedited Distribution").

[9]     *See Plan* Ex. A (TDP) art. VII.A-B (providing that to "make a Trust Claim Submission," a claimant need only submit a completed questionnaire "developed by the Settlement Trustee and submitted to the STAC and the Future Claimants' Representative for approval"; "[t]o complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission," the "Settlement Trustee also may, *but is not required to*, obtain additional evidence from the Abuse Claimant or from other parties") (emphasis added); *id.* VIII (permitting claim values up to $2,700,000).

[10]     *See Plan* Ex. A (TDP) art. VIII.D(ii)(d) (providing that "evidence of negligence" is an "aggravating factor" that increases the dollar value assigned to the claim, rather than the minimum requirement to establish a valid claim at all); *see, e.g., Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 290 (Tex. 1996) (finding no negligence or vicarious liability on part of BSA for sexual abuse by scoutmaster; finding negligence on part of local council); *Infant C. v. Boy Scouts of Am., Inc.*, 391 S.E.2d 322, 324-26 (Va. 1990) (refusing to impose negligent hiring and retention liability on BSA where BSA had no knowledge of scoutmaster's previous conviction for sexual molestation and had no part in selecting scoutmaster); *Roe No. 1 v. Boy Scouts of Am. Corp.*, 84 A.3d 443, 450 (Conn. App. Ct. 2014) (BSA and local council had no duty to aid or protect sexual assault victim under theory of negligence from troop leader where they had no prior knowledge of troop leader's abuse); *Boy 1 v. Boy Scouts of Am.*, 832 F. Supp. 2d 1282, 1290 (W.D. Wash. 2011) (granting BSA's motion to dismiss plaintiffs' negligence claims).

[11]     *See Plan* Ex. A (TDP) art. VIII.E(iii), Schedule 1.

were not timely asserted in a proof of claim filed before the bar date, so long as in the Trustee's

judgment the claimants could timely file suit against a local council or chartered organization.[12]

Insurers would be wholly excluded from this process. They would have no right to take

discovery or investigate the claims' bona fides, no right to assume the defense of such claims or

to litigate their validity or amount in any court, and no right to participate in, much less control,

any settlement of such claims.[13] The insurers would simply be asked to pay the Abuse Claims in

whatever amounts the Trustee allowed them.[14]

As the *en banc* Third Circuit recognized in *GIT*, that is unlawful under bedrock principles

of bankruptcy law. Under the Bankruptcy Code, the estate succeeds only to whatever "legal or

equitable interests of the debtor in property" the debtor had before bankruptcy. 11 U.S.C. §

541(a)(1). "The estate cannot possess anything more than the debtor itself did outside

bankruptcy" under the terms of a prepetition contract. *Mission Prod. Holdings, Inc. v.

Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019). "Whatever limitations on the debtor's property

apply outside of bankruptcy apply inside bankruptcy as well. A debtor's property does not

shrink by happenstance of bankruptcy, but it does not expand, either." *Id.* (internal quotation

marks, alterations, and citations omitted).[15]

---

[12]    *See Plan* Ex. A (TDP) art. IV.A(ii)-(iii), VIII.E(iv).

[13]    *See Plan* Ex. A (TDP) arts. IV-VIII (specifying a claims-allowance process in which the Settlement Trustee has exclusive authority to determine which Abuse Claims to allow and in what amounts, with no right for the insurers to defend claims, control any settlements, or participate in any way in the resolution of such claims).

[14]    *See Plan* Ex. A (TDP) art. X (providing that, "[f]or any Abuse Claim that the Settlement Trustee determines is an Allowed Abuse Claim," "the Settlement Trustee will … seek reimbursement … from the applicable Non-Settling Insurance Company(ies)").

[15]    *See also In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (courts lack equitable power under § 105(a) to enter orders that "expand the contractual obligations of parties"); *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("[B]ankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms."); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("The filing of the chapter 11 petition cannot expand debtors' rights as against [a contract counterparty].").

This basic rule of law applies to insurance policies. "The filing of a bankruptcy petition does not alter the scope or terms of a debtor's insurance policy," *In re MF Glob. Holdings Ltd.*, 469 B.R. 177, 193 (Bankr. S.D.N.Y. 2012), or permit an insured to "obtain greater rights to the proceeds of [an insurance] policy," *In re Denario*, 267 B.R. 496, 499 (Bankr. N.D.N.Y. 2001). "[T]he rights and obligations of the Debtor and [its insurer] under the [insurance] policy are not altered because of the Debtor's Chapter 11 filing." *In re Amatex Corp.*, 107 B.R. 856, 865-866 (E.D. Pa. 1989), *aff'd*, 908 F.2d 961 (3d Cir. 1990). Accordingly, "insurance contracts cannot be re-written" in bankruptcy. *In re Lloyd E. Mitchell, Inc.*, No. 06-13250, 2012 Bankr. LEXIS 5531, at *20 (Bankr. D. Md. Nov. 29, 2012). A bankruptcy court cannot confirm a plan that "excise[s]" provisions of an insurance policy "because doing so would rewrite the [insurance] [p]olicies and expand the Debtors' rights under them," and "the Court cannot modify those rights pursuant to the Bankruptcy Code." *MF Glob. Holdings*, 469 B.R. at 193.

Those same principles apply in mass-tort bankruptcy cases. The Third Circuit has held that the Bankruptcy Code expressly preempts one specific provision of liability insurance policies, the prohibition on assigning the policies without the insurer's consent, to the extent it would bar assignment of the debtors' insurance policies to a § 524(g) trust. *See In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355 (3d Cir. 2012). But it has repeatedly made clear that unless the Code specifically overrides a particular provision of a policy, basic bankruptcy principles prevent a debtor from stripping insurers of their contractual rights. For example, in *In re Combustion Engineering*, the Third Circuit ordered reinstatement of language in a plan addressing asbestos liabilities under § 524(g) "ma[king] clear that any pre-petition contractual rights [of the insurers] remained unaltered"—language that the bankruptcy court had originally added because it properly "recogniz[ed] [that] the Plan should not modify the contractual rights

12

of insurers." 391 F.3d 190, 209, 218 (3d Cir. 2005) (as amended). As described above, *GIT* made clear that a plan, like that here, under which the debtor has "sold out [its] insurers by setting up a system in which [insurers] would pay for newly ginned-up … claims" under a lax TDP barring insurer participation, in return for a favorable vote from claimants, is unlawful. 645 F.3d at 214. And in yet another asbestos bankruptcy involving a trust funded by insurance recoveries, the Third Circuit affirmed the bankruptcy court's decision—at the disclosure statement stage—that a plan was not proposed in good faith as a matter of law and was thus patently unconfirmable where it "financially incentivized" the debtor "to sabotage its own defense" of claims and limited insurers' ability to participate in claims resolution, rather than affording insurers their full contractual rights to defend and settle claims. *In re Am. Cap. Equip.*, 688 F.3d at 158-160.

Under those principles, the Plan's provisions rewriting the terms of the debtor's insurance policies to deprive insurers of key protections against having to pay invalid or inflated claims are impermissible as a matter of law.

2.      *The Plan violates section 502 of the Bankruptcy Code by replacing the Code's claims-allowance process with a non-adversarial, non-judicial process that would allow legally unenforceable claims*

The Plan and TDP also violate section 502 of the Bankruptcy Code. That provision requires that disputed claims be determined in bankruptcy through an adversarial process in which parties in interest—including insurers—may object to the allowance of those claims, *see* 11 U.S.C. § 502(a), and take discovery, *see* Fed. R. Bankr. P. 2004, 9014. It also requires that claims that are not legally enforceable against the debtor under applicable non-bankruptcy law be disallowed. *See* 11 U.S.C. § 502(b)(1). The Plan and TDP flout these provisions.

As noted, this case has seen an unprecedented increase in the number of claims asserted against BSA. BSA's own expert, Bates White, LLC, has concluded that the vast majority of the

Abuse Claims are "presumptively barred."[16]  And one of the principal plaintiff's lawyers involved in orchestrating the advertising efforts that led to the increase in claims has recently admitted that dozens of claims were filed in his name without his knowledge or permission.[17]

After Hartford's own preliminary investigation raised serious questions about the validity of a substantial majority of the claims, Hartford filed a motion seeking Rule 2004 discovery into the validity of the Abuse Claims, with a view to filing objections to the proofs of claim pursuant to section 502.[18]  But the Plan would thwart any such inquiry into the validity of the Abuse Claims.  It would remove the Abuse Claims from the claims register, *see* Plan § IV.R, and take them out of the Bankruptcy Code's claims-allowance process under section 502, so they can instead be allowed under the process set out in the TDP, under which Abuse Claims would be evaluated, valued, and allowed exclusively by the Trustee, with no opportunity for judicial review in this or any other court, as section 502 requires.  And the TDP would explicitly permit the Trustee to allow legally invalid claims, including time-barred claims and claims that fail to establish BSA's negligence, in direct contravention of the Code's requirement that the court must disallow claims that are "unenforceable against the debtor … under … applicable law."  11 U.S.C. § 502(b)(1).

The Bankruptcy Code does not authorize any of this.  The plaintiffs' lawyers cannot pick and choose the provisions of the Bankruptcy Code they like and simply disregard those they do

---

[16]    *See Disclosure Statement* at 57, 72-76 (out of the "approximately 82,500 unique and timely Abuse Claims," "approximately 59,500 are presumptively barred by statute of limitations" and "[o]f those not presumptively barred," only "approximately 14,000 named an abuser, either in full or in part," while 2,977 were categorized as "Physical Description Only" and 6,269 others as "Unknown").

[17]    *See Verified Statement of Kosnoff Law, PLLC Pursuant to Rule of Bankruptcy Procedure 2019* [D.I. 5924] at 6 (¶ 17).

[18]    *See Hartford and Century's Motion for an Order (I) Authorizing Certain Rule 2004 Discovery and (II) Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections* [D.I. 1971 & 1972] at 5-11, 14-17.

not, any more than they can cherry-pick the provisions of the insurance policies to obtain an insurance contract more to their liking.  To be sure, a plan may provide for the resolution of claims under a TDP.  But it does not follow that a TDP may therefore resolve claims in disregard of the law.  As BSA and the Claimants Representatives themselves have argued in defending a different provision of the Plan, the "TDP cannot contravene the requirement[s] of the Bankruptcy Code," including section 502.[19]  Congress mandated a process under which claims are subject to objection by interested parties, with an opportunity for judicial review, and allowed only if the claims are valid and enforceable under applicable non-bankruptcy law.  The Plan must comply with that process.  *See* 11 U.S.C. § 1129(a)(1) (a plan may be confirmed only if it "complies with the applicable provisions" of the Code).

3.    *The Plan requires the Court to make findings designed to prejudice the ability of insurers to assert insurance-coverage defenses*

The Plan would not only give the plaintiffs' lawyers free rein to control the allowance and valuation of their clients' claims, in disregard of the insurers' contractual rights and the Bankruptcy Code, but also require the Court to make findings that—by plaintiffs' counsel's own admission—are designed to prejudice the insurers in coverage litigation and force them to pay whatever inflated value the Settlement Trust places on the Abuse Claims.

For example, while the Plan contains a so-called "insurance neutrality" provision (Article X.M.1), it is actually quite the opposite of insurance-neutral.  As the *en banc* Third Circuit has explained, to be "insurance neutral" in any meaningful sense, a plan must "neither increase[] the

---

[19]     *See Debtors' Omnibus Reply in Further Support of Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5759] ("BSA RSA Reply") at 60 of 103 (¶ 82); *Supplemental Brief of the Coalition of Abused Scouts for Justice, the Official Committee of Tort Claimants, and the Future Claims Representative in Support of, Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5760] at 31.

insurers' pre-petition obligations nor impair[] their pre-petition contractual rights under the … insurance policies."  *GIT*, 645 F.3d at 212; *see also Combustion Eng'g*, 391 F.3d at 209, 211-212, 216-218 & n.25 (requiring inclusion of insurance neutrality provision stating, without qualification, that "nothing" in the plan "shall in any way operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights").  The purported "insurance neutrality" provision in this Plan, by contrast, provides that nothing affects the insurers' rights "[e]xcept for" pretty much everything that could possibly affect the insurers' rights, including the "findings made by the Bankruptcy Court in the Confirmation Order," the "findings made by the District Court in the Affirmation Order," the "Bankruptcy Code," "applicable law," and the "Insurance Assignment" (which includes the assignment to the Trust of policies issued to the non-debtor Local Councils).[20]  And while the Plan states that non-settling insurers may raise any "Insurance Coverage Defense" in response to a demand for coverage by the Trust, the definition of "Insurance Coverage Defense" is likewise "subject to Article X.M.1," and hence to all the same, numerous exceptions.[21]

Worse, the Plan then conditions confirmation on this Court's making a series of "findings and determinations" designed to prejudice the insurers in coverage litigation.  Among other things, the Court must "find" and "determine" that the TDP is "binding" on all parties in interest, including the insurers (notwithstanding the Claimant Representatives' argument at the hearing on their "estimation motion" that no court can determine what preclusive effect its orders should have in later litigation in a different court), and that the TDP's procedures "pertaining to the

---

[20]    *Plan* art. X.M.1; *see id.* X.M.3 ("Nothing in this Article X.M is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Person.").

[21]    *See Plan* § I.A.139 (defining "Insurance Coverage Defense" to be "subject to Article X.M.1"); *see also id.* § V.N (providing that Non-Settling Insurance Companies "may, *subject to Article X.M.1*, raise any valid Insurance Coverage Defense in response to a demand by the Settlement Trust") (emphasis added).

allowance of Abuse Claims" and the Trustee's "calculation of the Allowed Claim Amounts" are "fair and reasonable" and "proposed in good faith."[22]  In other words, the Plan asks this Court to put its imprimatur on the TDP so that the plaintiffs' lawyers can take this Court's confirmation order to a coverage court and portray it as a "binding judgment" "determining" that the Settlement Trustee's unilateral liquidation of the Abuse Claims is a "fair," "reasonable" and "good faith" resolution of the claims.

The Court has no basis to make such findings.  Under the insurance policies it issued to BSA, Hartford agreed to indemnify BSA only for individual claims that BSA becomes "legally obligated" to pay.[23]  Here, the Court is not being asked to determine if BSA is legally obligated to pay any claim.  It is not being asked to review or approve the allowance or settlement of any individual Abuse Claim, which would require, at a minimum, the submission of an evidentiary record and consideration of the probability of success on the merits if the claim were litigated. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).  Accordingly, as the numerous claimants who objected to BSA's motion to approve the RSA noted, this Court cannot determine that BSA is legally obligated to pay any Abuse Claim.[24]  And, because of the TDP's glaring deficiencies, including their allowance of patently

---

[22]     *See Plan* § IX.A.3.p ("the Plan, the Plan Documents, and the Confirmation Order *shall be binding* on all parties in interest"') (emphasis added); *id.* § IX.A.3.q ("(i) the procedures included in the Trust Distribution Procedures pertaining to the allowance of Abuse Claims* and (ii) *the criteria included in the Trust Distribution Procedures pertaining to the calculation of the Allowed Claim Amounts*, including the Trust Distribution Procedures' Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors (each as defined in the Trust Distribution Procedures), *are fair and reasonable* based on the evidentiary record offered to the Bankruptcy Court") (emphasis added); *id.* § IX.A.3.s ("*the Plan and the Trust Distribution Procedures were proposed in good faith* and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code") (emphasis added).

[23]     *See* Complaint ¶¶ 91, 93, 96, *Hartford Accident and Indemnity Co., et al. v. Boy Scouts of America, et al.*, Adv. Proc. No. 20-50601 (LSS) (Bankr. D. Del.).

[24]     *See Objection to Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5682] ("Claimants RSA Objection") at 32-35.

invalid claims, there is also no basis for the Court to make any kind of determination in the confirmation order that any future decision the Trustee makes, post-confirmation, to allow any Abuse Claim is a "fair," "reasonable" or "good faith" resolution of the claim.  The requirement that the Court do so renders the Plan unconfirmable as a matter of law.

Notably, the Claimant Representatives argue that "insurance neutrality [is not] a requirement of a confirmable plan."[25]  In their view, "insurance neutrality" is merely a toothless rule of standing—if a plan denies an insurer its basic contractual and legal rights, the insurer has standing to complain, but its complaint will fall on deaf ears, because a plan need not be "'neutral' to be confirmable."[26]  That is wrong.  As case after case holds, the mere happenstance that an insured has filed for bankruptcy does not give it, or persons with alleged claims against it, license to rewrite the terms of the debtor's insurance policies or to obtain the bankruptcy court's imprimatur on procedures for resolution of tort claims that materially increase the insurers' potential liability, in violation of their rights under the policies, applicable law, and the Bankruptcy Code.  This basic rule of law, which the Claimant Representatives effectively concede the Plan disregards, renders the Plan patently unconfirmable.

4.     *The Plan's anti-insurer provisions violate the Bankruptcy Code's requirement of good faith under section 1129(a)(3)*

All of the foregoing also renders the Plan patently unconfirmable under section 1129(a)(3) of the Bankruptcy Code, which requires that a plan be proposed in good faith.  In *American Capital Equipment*, the Third Circuit held that a plan in an asbestos mass-tort case was properly deemed "patently unconfirmable" at the disclosure-statement stage because it was not proposed in good faith under section 1129(a)(3).  688 F.3d at 161, 164.  In particular, the Third

---

[25]    *See Claimant Representatives' Supplemental RSA Brief* at 28.

[26]    *See id.* at 22.

Circuit emphasized that (1) the plan provided for tort claims against the debtor to be paid by a trust funded by an assignment of the debtor's rights to insurance and resolved according to procedures that gave the decisionmakers "financial[] incentiv[es] to sabotage [the debtor's] own defense" and maximize the claims insurers would be asked to pay, and (2) the TDP would "severely limit[] or eliminat[e] Insurers' ability to take discovery, submit evidence, contest causation, [or] appeal a decision," and otherwise "strip[] Insurers of [their] procedural and substantive rights." *Id.* at 158-160.

The Plan in this case shares those flaws—and in some respects is substantially worse. While it does not contain precisely the same provision as the *American Capital* plan, which required tort claimants who received a payout from the trust to contribute 20% of the payout to fund unpaid administrative expenses, it unquestionably creates a financial incentive to sabotage the defense of Abuse Claims in order to maximize the insurance payout. As discussed above, BSA's incentive is to obtain the claimants' votes in favor of a plan that grants BSA permanent relief from Abuse Claims, while the incentive of the plaintiffs' lawyers needs no explanation. Indeed, here, the "sabotage" of the defense of Abuse Claims is not just incentivized, but plain on the face of the Plan and TDP, which *require* the allowance and payment of claims that are invalid as a matter of law. Moreover, the Plan here goes much farther in stripping insurers of their rights than the *American Capital* plan, which at least allowed insurers to seek review from the bankruptcy court of claims decisions with which they disagreed. The Plan here gives insurers no role at all in the allowance of Abuse Claims and attempts to foreclose insurers' assertion of coverage defenses through the findings it requires this Court to make.

As the Third Circuit has repeatedly emphasized, the "integrity of the bankruptcy proceeding is called into question" when debtors and plaintiffs' lawyers ask a bankruptcy court

to approve a plan that would allow invalid or dubious claims and then demand insurers pay them, while stripping insurers of the protections that their policies and the Bankruptcy Code require. *GIT*, 645 F.3d at 212-216; *see also In re Congoleum Corp.*, 426 F.3d 675, 692 (3d Cir. 2005) ("careful scrutiny" is required when the "parties … seek the court's *imprimatur* of a reorganization that will free the debtor of all … [tort] liability"; the "legitimacy of such a transaction is dependent on the stature of the court").  Such a plan does not "*fairly* achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *Am. Cap. Equip.*, 688 F.3d at 158 (emphasis in original); *see also, e.g.*, *In re ACandS, Inc.*, 311 B.R. 36, 42-43 (Bankr. D. Del. 2004) (denying confirmation of plan under § 1129(a)(3) because plaintiffs' lawyers representing asbestos claimants drafted the plan and trust documents, chose the trustee, and "decided who was going to get what"; "[g]iven the unbridled dominance of the [plaintiffs' lawyers] in the debtor's affairs and actions … and the obvious self-dealing that resulted from control of the debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code").  Because the Plan's anti-insurer provisions do not fairly achieve a legitimate bankruptcy purpose, the Plan is not proposed in good faith as a matter of law.

       5.     *The Plan contains additional unlawful provisions abridging insurers' rights*

The Plan also impermissibly violates the insurers' rights under their policies and the Bankruptcy Code in other ways.  For example, the Plan purports to assign to the Trust all rights under insurance policies issued to the Local Councils, in contravention of the policies' anti-assignment provisions barring assignment without the insurer's consent, and further requires the Court to find that the insurers are precluded from raising any defense to coverage based on the

violation of those provisions.[27]  Although the Third Circuit has held that the Bankruptcy Code

preempts such provisions when the debtor seeks to assign *its* insurance policies to a trust

established under § 524(g), *see Fed.-Mogul*, 684 F.3d at 381, it has also held that the Code does

not preempt provisions barring the assignment of a *non-debtor*'s insurance policies or rights to

such a trust, *see Combustion Eng'g*, 391 F.3d at 218-220.  The Plan's provisions purporting to

assign the non-debtor Local Council insurance rights to the Settlement Trust thus contravene

controlling Third Circuit precedent.

 The Plan would also strip Hartford of its claims against BSA, the Local Councils, and

any Contributing Chartered Organizations for indemnification, contribution, subrogation, or

allocation based on any Direct Abuse Claims that Hartford has paid or may pay in the future.

These claims arise under Hartford's insurance policies, pre-petition settlements in which

Hartford "bought back" certain of its primary policies from BSA, and applicable law.  Hartford

filed proofs of claim asserting such claims, some of which are liquidated, and it has asserted such

claims against BSA and many of the Local Councils in its pending coverage action.[28]

 The Plan, however, would enjoin Hartford from asserting indemnification or contribution

claims not only against BSA, but against all non-debtor Protected Parties—all 251 Local

Councils and all Contributing Chartered Organizations—without one penny of compensation in

---

[27] *See* Plan § IX.A.3.j (requiring, as a condition to confirmation, that the Court find that "the Bankruptcy Code authorizes the Insurance Assignment"—which includes the assignment to the Settlement Trust of all rights under the Local Council policies—"as provided in the Plan, notwithstanding any terms of any policies or provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights"); *see id.* § III.B.10, IV.D.1, V.L (providing for assignment of all rights under the Local Council Insurance Policies to the Settlement Trust); *id.* § I.A.139 (defining "Insurance Coverage Defense" to exclude "any defense that the Insurance Assignment is prohibited by the Abuse Insurance Policies or applicable non-bankruptcy law").

[28] *See* Proof of Claim No. 8191 (Hartford Accident and Indemnity Company); Proof of Claim No. 8176 (First State Insurance Company); Proof of Claim No. 26 (Hartford Fire Insurance Company as Assignee of Hartford Specialty Company); *Hartford Accident and Indemnity Co., et al. v. Boy Scouts of America, et al.*, Adv. Proc. No. 20-50601 (LSS) (Bankr. D. Del.).

exchange.  Instead, the Plan would give Hartford only an illusory right to assert an "Indirect

Abuse Claim" against the Trust.  Not only would Indirect Abuse Claims be determined solely by

the conflicted Trustee, with no right of review in this Court, but even if Hartford's Indirect

Abuse Claim were allowed, the TDP categorically subordinates *all* Indirect Abuse Claims to the

prior payment in full of *all* Direct Abuse Claims,[29] and not merely to the payment in full of the

particular Direct Abuse Claim giving rise to the applicable Indirect Abuse Claim, as the

Bankruptcy Code provides, *see* 11 U.S.C. § 509(c).  As a practical matter, therefore, the TDP

would disallow all Indirect Abuse Claims and extinguish Hartford's claims against the non-

debtor Local Councils and Contributing Chartered Organizations without any compensation at

all.  This treatment of Hartford's Indirect Abuse Claims would violate numerous provisions of

the Bankruptcy Code, including sections 502 and 1129(a)(1), the "best interests of creditors" test

under section 1129(a)(7), and the strict standards for granting non-consensual releases of

creditors' claims against non-debtor parties.  These provisions, too, render the Plan patently

unconfirmable.

### B. The Plan's Proposed Injunctive Relief For BSA And The Local Councils Is Unlawful

The Plan cannot be confirmed for yet another fundamental reason: The extraordinary

injunctive relief it seeks for BSA and its Local Councils is unlawful.  BSA and the Local

Councils can obtain the benefit of a channeling injunction against present and future Abuse

Claims only if each of them contributes sufficient assets to the Trust, in addition to insurance

---

[29]     *See Plan* Ex. A (TDP) art. IV.B(2) (providing that holders of Indirect Abuse Claims "must establish to the satisfaction of the Settlement Trustee" that their claims are allowable, and providing, in stark contrast to the lax criteria for allowing Direct Abuse Claims, that Indirect Abuse Claims are not allowed if they are disallowed under section 502 or are time-barred under applicable statutes of limitation); *id.* art. XI.A ("any Indirect Abuse Claim shall be subordinate and junior in right to the prior payment in full of all Allowed Abuse Claims that are Direct Abuse Claims as liquidated under these TDP").

rights, to make such relief fair and equitable in light of the portion of liability that is uninsured or self-insured and thus falls entirely on BSA and the Local Councils.  While the contributions BSA and the Local Councils propose to make under the Plan—$250 million and up to $600 million, respectively—might well meet that standard if the Plan applied the same standards to Abuse Claims that BSA and the Local Councils would face in the tort system, those contributions are wholly inadequate when set against the massively inflated liability that the Plan and TDP will generate.

> 1.   *Under the TDP's inflated valuation of the Abuse Claims, BSA's and the Local Councils' contributions are inadequate*

BSA has agreed to the plaintiffs' lawyers' demand for a plan and TDP designed to gin up tens of billions of dollars in additional claims because BSA evidently believes that it and its Local Councils will obtain a channeling injunction allowing them to walk away from all further liability (which will be foisted on the insurers) while retaining most of their assets.  That is not the law.

Under controlling Third Circuit law, a non-debtor cannot receive the protection of a non-consensual release and injunction of third-party claims against it unless (among other things) the non-debtor makes a "substantial contribution … of assets," *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 584 (D. Del. 2018), *aff'd*, 945 F.3d 126 (3d Cir. 2019), in an amount sufficient to make it "fair" to grant an injunction freeing the non-debtor from liability for such claims.  *See In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000); *id.* at 215 (rejecting injunction in favor of non-debtors where court did not determine that "the release and permanent injunction were fair to [the enjoined parties] and were given in exchange for reasonable consideration").  Furthermore, under the only provision in the Bankruptcy Code that expressly authorizes a channeling injunction against *future* claims (section 524(g) in asbestos cases),

neither the debtor nor any third party can obtain such extraordinary injunctive relief unless (among other things) "the court determines … that … such injunction … is fair and equitable … in light of the benefits provided … to such trust on behalf of such debtor or debtors or such third party." 11 U.S.C. § 524(g)(4)(B)(ii).[30]

BSA's and the Local Councils' contributions are not remotely adequate to account for their fair share of the enormous liability that the Plan and TDP would generate.  As BSA has acknowledged, BSA and the Local Councils face significant exposure for Abuse Claims for periods in which they are either uninsured (due to the exhaustion of policy limits, release of coverage under pre-petition settlements, insurer insolvencies, etc.) or self-insured (through significant deductible obligations and self-insured retentions).[31]  Yet the Plan caps their liability for Abuse Claims at a fraction of their available assets, while leaving the insurers to pay the vast share of the Plan's newly manufactured liability.  Under the Plan, BSA would contribute only about $250 million, despite disclosing assets of approximately $1 billion or more.[32]  While BSA has asserted that most of its assets are unavailable to satisfy Abuse Claims because of alleged donor restrictions on such assets, it has failed to establish any legal or factual basis for that assertion.  Likewise, the Local Councils collectively will contribute, at most, only $600 million, although they have more than $3.3 billion in net assets, including at least $1.87 billion that even BSA concedes are unrestricted.[33]

These contributions are neither "substantial" nor "fair and equitable" in the context of

---

[30]     By its terms, section 524(g) authorizes a channeling injunction against future claims only in asbestos cases. But assuming the Code can be construed to permit a channeling injunction against future claims outside the asbestos context, any such relief must adhere to the strict requirements that Congress imposed for granting such an injunction.  *See Combustion Eng'g*, 391 F.3d at 234 & n.45.

[31]     *See Disclosure Statement* at 44-49.

[32]     *See Disclosure Statement*, Ex. D, at 14.

[33]     *See Disclosure Statement*, Ex. D-1, at 23.

this Plan and the enormous liability it is designed to generate.  *See, e.g.*, *In re Quigley Co., Inc.*,

437 B.R. 102, 133-140 (Bankr. S.D.N.Y. 2010) (holding contribution was not "fair and

equitable" under § 524(g) where non-debtor contributed assets worth only 25% of the non-

debtor's liability for claims released under the injunction).  For this reason as well, the Plan is

thus unconfirmable under section 1129(a)(1).

> 2.    *The inadequate contributions by BSA and the Local Councils violate the best interests of creditors test under section 1129(a)(7) of the Bankruptcy Code*

BSA's and the Local Councils' inadequate contributions also violate the best interest of

creditors test.  As the holder of Indirect Abuse Claims, including liquidated claims, Hartford is a

creditor entitled to vote on the Plan.[34]  Hartford intends to vote to reject the Plan, and many other

holders of Indirect Abuse Claims and Direct Abuse Claims may do so as well.[35]  Under the best

interests test, each rejecting creditor must "receive or retain under the plan … not less than the

amount that such [creditor] would so receive or retain if the debtor were liquidated under chapter

7" of the Bankruptcy Code.  11 U.S.C. § 1129(a)(7)(A)(ii).  The Plan fails that test.

As described above, under the Plan, Hartford will receive *no* recovery on its Indirect

Abuse Claims, which would be categorically (and unlawfully) subordinated and effectively

disallowed.  Furthermore, Hartford's Indirect Abuse Claims against the Local Councils and other

non-debtor Protected Parties will be extinguished under the channeling injunction.[36]

That recovery is far less than what Hartford would receive in Chapter 7.  In a case under

that Chapter, a trustee would be charged with maximizing the value of all of BSA's available

---

[34]    *See* Proof of Claim Nos. 8191, 8176, 26.

[35]    Plaintiffs' lawyers purporting to represent thousands of claimants have already voiced their objection to the Plan.  *See, e.g.*, Claimants RSA Objection.

[36]    *See* Plan §§ III.B.11, X.F, X.G.5; *id.* Ex. A (TDP) arts. IV.B, XI.

assets for its creditors—not withholding as much of those assets as possible from creditors under untested claims of donor restrictions, as BSA has done. *See* 11 U.S.C. § 704(a). Furthermore, the trustee would be required to allow and pay Indirect Abuse Claims on a pro rata basis with Direct Abuse Claims, except to the extent that the court disallows or subordinates individual Indirect Abuse Claims in accordance with sections 502 and 509 of the Code. *See id.* §§ 502, 509, 726(a)(2). And in a Chapter 7 liquidation, there would be no basis to enter a non-debtor injunction or release, which is permissible, if at all, only where the injunction or release is necessary to reorganize the debtor. *See Cont'l Airlines*, 203 F.3d at 214. In Chapter 7, therefore, Hartford would retain its contribution and subrogation rights against all non-debtors, including the Local Councils. It is well-settled that section 1129(a)(7) requires the court to take into account the claims that dissenting creditors would "retain" in Chapter 7 against non-debtor third parties who are obtaining releases or injunctions under a Chapter 11 plan. *See, e.g., In re Wash. Mut., Inc.*, 442 B.R. 314, 359-360 (Bankr. D. Del. 2011); *Quigley,* 437 B.R. at 144-146.

Accordingly, the Plan violates section 1129(a)(7) because Hartford would receive less under the Plan than it would receive or retain in Chapter 7. And the same analysis applies to any other holder of an Abuse Claim who votes to reject the Plan. Rather than receiving a limited right to recover under the Plan from BSA's and Local Councils' capped contributions of $250 million and $600 million, respectively, dissenting creditors would retain the right in a liquidation to pursue their Abuse Claims against *all* available assets of both BSA and the Local Councils— who have collectively disclosed assets of more than $4.3 billion, including nearly $2 billion in "unrestricted" net assets of the Local Councils alone.

26

## II. THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT LACKS ADEQUATE INFORMATION

Even if the Court is inclined to permit solicitation of the Plan to proceed—and, for the reasons above, it should not—the Court should deny approval of the Disclosure Statement because it lacks "adequate information" to enable holders of Abuse Claims to make an informed judgment about the material risks presented by the Plan. 11 U.S.C. § 1125(a)(1); *see Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996); *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417 (3d Cir. 1988).

### A. The Disclosure Statement Fails To Provide Sufficient Information Concerning The Adequacy Of The Contributions Of Protected Parties

The Disclosure Statement and Plan provide that the Debtors will contribute cash and other assets totaling approximately $220 million to $250 million to the Settlement Trust for resolution of their liability for Abuse Claims. *See Disclosure Statement* at 15-16. And the Plan similarly provides that the Local Councils will, in the aggregate, contribute $500 million in cash and real property, and will fund a $100 million promissory note to be contributed to the Settlement Trust. *See id.* But the Disclosure Statement nowhere provides sufficient information to determine whether those amounts are adequate. Indeed, the Disclosure Statement does not even confirm that the amounts the Local Councils have agreed to contribute add up to the $500 million plus the potential $100 million promissory note that the Plan identifies.

This omission is particularly glaring because the Disclosure Statement states that the Local Councils have more than $3.3 billion of cash and real property, most of which is unrestricted.[37] The Claimants' Representatives have alleged that the Local Councils are liable

---

[37] As discussed above, the Disclosure Statement itself states that nearly $2 billion of those assets are unrestricted. *See Disclosure Statement*, Ex. D-1, at 23.

for tens, if not hundreds, of billions of dollars in damages on account of Abuse Claims. Yet, the Disclosure Statement offers no explanation for why the Local Councils are contributing only a fraction of their unrestricted assets to the Settlement Trust in exchange for complete relief that normally can be afforded only to a debtor in bankruptcy.

Nor does the Disclosure Statement identify how much *each* Local Council has agreed to contribute. The Debtors have previously stated that each Local Council has been assigned an allocation based on a formula that the Ad Hoc Committee of Local Counsel developed, yet the Disclosure Statement neither provides that formula nor explains the rationale for each Local Council's contribution.

This omission is not simply an academic concern. Under the proposed Plan, Abuse Claimants would be enjoined from asserting their Abuse Claims against the Local Councils. Some of those Local Councils have tens of millions of dollars (or more) in assets and operate in "open" jurisdictions where statutes of limitation allegedly do not pose a bar to abuse lawsuits.[38] All holders of Abuse Claims are entitled to know what assets are being contributed in exchange for a vote to release forever the claims against each Local Council, what assets are being withheld, and what rationale supports affording each Local Council an injunction against all the liability it allegedly faces.

Similarly, claimants holding Indirect Abuse Claims—including Hartford—are entitled to know what amounts the Protected Parties are contributing in exchange for an injunction that would terminate any rights of subrogation or contribution that holders of Indirect Abuse Claims

---

To the extent that the Court approves the Disclosure Statement and permits solicitation on the Fourth Amended Plan, Hartford reserves the right to seek discovery regarding the extent to which allegedly "restricted" assets may be available for distribution to creditors.

[38]    *See Disclosure Statement*, Ex. D-1.

might have against the Local Councils.[39]  To the extent that Hartford has paid, or becomes obligated to pay in the future, on account of a Direct Abuse Claim for which a Local Council is liable, Hartford may have a claim against that Local Council.  *See, e.g., Andalora v. R.D. Mech. Corp.*, 152 A.3d 968, 972 (N.J. Super. Ct. 2017) ("an insurer who has indemnified an insured for damage or loss is subrogated to any rights that the insured may have against a third party, who is also liable for the damage or loss"); *Interstate Fire & Cas. Ins. Co. v. Cleveland Wrecking Co.*, 105 Cal. Rptr. 3d 606, 613 (Ct. App. 2010) ("a general liability insurer that has paid a claim to a third party on behalf of its insured may have an equitable right of subrogation against [] other parties who contributed to the harm suffered by the third party (joint tortfeasors)"); *Banks Tower Commc'ns, Ltd. v. Home Ins. Co.*, 590 F. Supp. 1038, 1040 (E.D. Pa. 1984).  Yet, under the Plan, those rights against non-debtor Local Councils would be terminated by virtue of the channeling injunction.  *See* Plan § X.F.; *id.* § X.J.3-4.

To qualify for injunctive relief that cuts off Hartford's present and future claims, each Local Council that seeks to become a Protected Party must, at a bare minimum, show that it is making a "substantial contribution" to the Settlement Trust.  *See, e.g., In re Millennium Lab Holdings II, LLC*, 575 B.R. 252 (Bankr. D. Del. 2017), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd*, 945 F.3d 126 (3d Cir. 2019); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).  Whether a Local Council is making a substantial contribution depends first and foremost on what it is putting in the pot.  Before approving the Disclosure Statement, the Court should require Debtors to provide that information, as well as the rationale for the allocation of responsibility among the Local Councils so that all creditors entitled to vote on the

---

[39]    Hartford has claims for indemnification, contribution, subrogation or allocation against BSA, some of which are liquidated, and accordingly would be entitled to vote in Class 9.  *See* Proof of Claim Nos. 8191, 8176, 26.

Plan can assess the propriety of injunctive relief in favor of each separate Protected Party.

**B.      The Disclosure Statement Fails To Provide Adequate Information Concerning The Risks To Claimants' Recovery Under The Plan**

The Disclosure Statement is also inadequate because it fails to disclose all of the risks

that are likely to prevent holders of Abuse Claims from realizing the rosy recoveries that the

plaintiffs' lawyers—and the Disclosure Statement—have promised.  The Disclosure Statement

projects that holders of Direct Abuse Claims may recover up to 100% on their claims.  *See*

Disclosure Statement at 21.  That representation appears to be predicated on the assumption that

the TDP will be implemented as written and that insurance will be available for all, or nearly all,

of the inflated claims liquidated under the TDP.  But the Disclosure Statement offers no real

basis for that assumption.  It simply states in summary fashion that BSA does not agree with the

insurers' coverage defenses.  That is insufficient in at least two respects.

*First*, the Disclosure Statement should inform holders of Abuse Claims that Hartford and

other insurers assert that the proposed Plan is unlawful and will object to confirmation of the

Plan, and that if the Court agrees with the insurers' objections, the Court may deny confirmation

of the Plan or may condition confirmation on amendments to the Plan that could affect the Plan's

treatment of the Abuse Claims.  The Disclosure Statement's "risk factors" contain only a few,

general statements regarding the risk that the Court may refuse to confirm or require

modifications to the Plan.[40]  These risk factors do not adequately inform claimants of the nature

of Hartford's objections to the Plan or of the material changes to the Plan that could be required

if those objections prevail.  The Disclosure Statement should inform claimants that Hartford

asserts that the Plan cannot be confirmed under the Bankruptcy Code because it purports to strip

---

[40]      *See Disclosure Statement* at 222-229.

Hartford of its contractual rights and insurance-coverage defenses, including the right to assume

the defense of Abuse Claims; fails to comply with the Bankruptcy Code's requirements that the

Abuse Claims be determined through a process that permits parties in interest to object to claims

and disallows claims that are not valid and legally enforceable against BSA under applicable

non-bankruptcy law; and conditions confirmation on this Court's making improper findings that

would prejudice Hartford's ability to raise defenses to insurance coverage.

Likewise, the Disclosure Statement should disclose the risk that the Court might

condition confirmation on material amendments to the Plan that could affect the holders of

Abuse Claims, including the addition of provisions (1) preserving insurers' contractual rights,

including the right to assume control of the defense and settlement of Abuse Claims, as well as

insurers' coverage defenses; (2) mandating that Abuse Claims be determined by a neutral,

disinterested trustee via a process in which parties in interest, including insurers, may object to

claims and take discovery, and claimants must prove that their claims are legally enforceable

against BSA under applicable non-bankruptcy law; and (3) making clear that by confirming the

Plan the Court is not blessing—or making any determination at all regarding—the

reasonableness or good faith of any liquidation or settlement of any Abuse Claim under the Plan

and TDP.

*Second*, the Disclosure Statement should inform abuse claimants that, in Hartford's view,

the Plan may operate to vitiate any available insurance coverage under Hartford's policies for the

Abuse Claims.  Indeed, some of the claimants have already recognized that, as proposed, the

Plan may lead to the result that Hartford (and other insurers) will not be obligated to pay Abuse

31

Claims allowed under the TDP.[41]

In particular, the Disclosure Statement should explain that Hartford may assert in coverage litigation that the resolution of Abuse Claims solely by the Trustee under the TDP without Hartford's participation or consent breaches multiple provisions of Hartford's insurance policies—including Hartford's rights to assume the defense of claims, to obtain the insured's cooperation in such defense, and to control any settlement of such claims—and thus relieves Hartford of any obligation to indemnify such claims under the policies.  If that defense prevails (and a similar defense did prevail in coverage litigation related to the *Congoleum* bankruptcy[42]), the Plan could result in the loss of insurance coverage for Abuse Claims liquidated under the TDP.  The Disclosure Statement should inform claimants of that risk.

Similarly, the Hartford policies contain conditions precedent to coverage that preclude assignment of any interest in the policies to a third party without Hartford's consent.  As discussed above, the Plan proposes to assign to the Trust certain insurance policies issued not to BSA, but to the non-debtor Local Councils—something the law does not permit.  The Disclosure Statement should inform creditors that such a purported assignment may abrogate coverage under those policies.

As also discussed above, the Plan also interferes with Hartford's right to seek subrogation or contribution from other non-debtors on account of indemnification payments to BSA or the Trust.  The Hartford policies provide that the policyholder may not compromise those rights of recovery.  Yet the releases and injunctions in the Plan, which enjoin all suits on account of

---

[41]    *See Claimant RSA Objection* at 4 (citing "the substantial danger that this plan will void or cap the exposure of the liability insurance policies"); *id.* at 25-35.

[42]    *See* Decision and Judgment, *Congoleum Corp. v. Ace Am. Ins. Co.*, No. MID-L-8908-01 (N.J. Super. Ct. May 18, 2007) at 10-16.

Abuse Claims against the non-debtor Local Councils and other Protected Parties, deprive Hartford of that remedy in derogation of its contractual rights. The Disclosure Statement should inform creditors that this Plan provision may also vitiate coverage under the Hartford policies.

### III.    BSA'S PROPOSED SCHEDULE FOR CONFIRMATION PROCEEDINGS IS NOT REASONABLE

If the Court nevertheless approves the Disclosure Statement, it should set a reasonable schedule for confirmation proceedings, not the exceedingly truncated schedule BSA proposed. Hartford appreciates that BSA would like to emerge from bankruptcy sooner rather than later. But as discussed above, BSA is seeking to do so by agreeing with the plaintiffs' lawyers to a plan that dramatically inflates its liability and send the insurers the bill, while asking this Court to make findings blessing that scheme to prevent the insurers from raising defenses to coverage. That is unlawful, and the Court should disapprove the Disclosure Statement because the Plan is patently unconfirmable. But if the Court is not prepared to do that, due process requires that Hartford and the other insurers be afforded the time to develop the record before entry of a purported "judgment" approving the procedures for the allowance of some 82,500 or more Abuse Claims. The Claimant Representatives have stressed that they expect any litigation about the TDPs' claims allowance provisions to occur now in this Court as part of plan confirmation, not after the plan is confirmed in coverage litigation in state court.[43] BSA and the Claimant Representatives have no one but themselves to blame for any attendant delay in the confirmation proceedings.

---

[43]     *See, e.g., Joinder of the Coalition of Abused Scouts for Justice, the Official Committee of Tort Claimants, and the Future Claims Representative to, and Brief in Support of, Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter Into and Perform Under the Restructuring Support Agreement, and (II) Granting Related Relief* [D.I. 5680] ¶ 40 ("To the extent the insurers truly believe that the TDP is unreasonable and inconsistent with the Debtors' exposure in the tort system, including past practices, *the insurers are free to litigate these issues in connection with plan confirmation*.) (emphasis in the original); *id.* ¶ 43 ("The Supporting Parties [the Claimant Representatives] will not support a plan that defers this issue until after confirmation.").

## **CONCLUSION**

The Disclosure Statement should not be approved because the Plan is patently unconfirmable.  Even if the Court is inclined to permit solicitation of votes on the Plan, the Disclosure Statement should not be approved because it fails to contain adequate information. Finally, even if the Disclosure Statement is approved, the Court should reject BSA's proposed schedule for confirmation proceedings and set a schedule that affords the insurers and other parties in interest a reasonable amount of time to develop the record.

Date: August 17, 2021
    Wilmington, Delaware

BAYARD, P.A.

*/s/ Gregory J. Flasser*
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 655-5000
Facsimile:  (302) 658-6395
Email: efay@bayardlaw.com
gflasser@bayardlaw.com
- and -

James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
SHIPMAN & GOODWIN LLP
1875 K Street, NW, Suite 600
Washington, D.C. 20003
Tel:  (202) 469-7750
Fax:  (202) 469-7751
- and -

Philip D. Anker (admitted *pro hac vice*)
WILMER   CUTLER   PICKERING   HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel:  (212) 230-8890
Fax:  (212) 230-8888
-and-

Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (admitted *pro hac vice*)
WILMER   CUTLER   PICKERING   HALE
AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363

*Attorneys for Hartford Accident and*
*Indemnity Company, First State Insurance*
*Company, Twin City Fire Insurance*
*Company, and Navigators Specialty Insurance*
*Company*