## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | **Objection Deadline: August 17, 2021 at noon (ET) (by agreement with Debtors)**<br>**Hearing Date: August 25, 2021 at 10:00 a.m. (ET)** |

## CERTAIN INSURERS' SUPERSEDING OBJECTIONS TO THE DISCLOSURE STATEMENT FOR DEBTORS' FOURTH AMENDED PLAN

American Zurich Insurance Company, American Guarantee and Liability Insurance Company, Steadfast Insurance Company, The Continental Insurance Company, Columbia Casualty Company, Allianz Global Risks US Insurance Company, National Surety Corporation, Interstate Fire & Casualty Company, Clarendon America Insurance Company, General Star Indemnity Company, and Arrowood Indemnity Company (collectively, the "Insurers") hereby object to the Amended Disclosure Statement for the Fourth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (the "Disclosure Statement," Dkt. No. 5485).

This objection supersedes the objection filed by certain of the Insurers at Dkt. No. 3478, to address differences between the Disclosure Statement and the previous disclosure statement for the Second Amended Plan.

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

*Summary of argument*

The Court should decline to approve the Disclosure Statement because, instead of providing "adequate information" as required by § 1125(b) of the Bankruptcy Code, it provides misleading, incorrect, and incomplete information concerning the effect of uncapped, per-occurrence self-insured retentions ("SIRs") applicable to the excess policies issued by the Insurers to the Boy Scouts of America (the "Policies") and most other policies issued to BSA in 1986 and later. A fulsome and accurate disclosure of the effect of the SIRs is necessary to inform Abuse Claimants and other parties in interest of the likelihood that insurance coverage for Abuse Claims could be completely barred, or significantly restricted, under such policies.

Rather than providing accurate information, the Disclosure Statement attempts to mischaracterize the SIRs as deductibles, which Debtors misleadingly assert insurers must pay. However, the actual terms of the SIRs applicable to the Policies defy that misinterpretation. Because payment of SIRs is the insured's responsibility, even if the insured is a debtor in bankruptcy, the Disclosure Statement should not be approved, because it fails to adequately disclose that SIRs of at least $1 million per occurrence must be satisfied by the insured (or, potentially, the Settlement Trust) before any coverage could be accessed under the Policies.

The Disclosure Statement also fails to inform readers that solvent non-debtors who claim coverage under the Policies, such as Local Councils and Contributing Chartered Organizations, must fully satisfy applicable SIRs before they could be entitled to any coverage. That would remain true even if Local Councils and Contributing Chartered Organizations became Protected Parties under the Plan.

In addition, the Disclosure Statement cannot be approved because it fails to provide adequate information regarding how the SIRs will be treated. Although the Disclosure

Statement suggests that excess insurers will have to pay SIR amounts and then assert Indirect

Abuse Claims against the Settlement Trust to recover their SIR payments, that statement is

contrary to law, and should be corrected.

At the end of this objection, we suggest specific language changes that, if inserted

into the Disclosure Statement, would bring it into conformity with the requirements of § 1125

with respect to the existence and application of SIRs.

### Objections to the Disclosure Statement

**A.    Legal background**

The Bankruptcy Code requires that a disclosure statement contain "adequate

information," defined as "information of a kind, and in sufficient detail . . . that would enable a

hypothetical investor of the relevant class to make an informed judgment about the plan."[2]  The

provision of adequate information in a disclosure statement is a key requirement of the Code.[3]

The purpose of a disclosure statement "is to give all creditors a source of

information which allows them to make an informed choice regarding the approval or rejection

of a plan."[4]  Therefore, "a proper disclosure statement must clearly and succinctly inform the

average unsecured creditor what it is going to get, when it is going to get it, and what

contingencies there are to getting its distribution."[5]  A debtor's obligation to file a disclosure

---

[2]    11 U.S.C. § 1125(a), (b).

[3]    *See, e.g., Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996), citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414 (3d Cir. 1988).

[4]    *Duff v. United States Trustee (In re California Fidelity, Inc.)*, 198 B.R. 567, 571 (9th Cir. B.A.P. 1996).  *See also In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) (same).

[5]    *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

statement containing "candid disclosure" is a "pivotal" and "critical step" in a Chapter 11

reorganization:

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of "adequate information."[6]

A disclosure statement is the means by which creditors are provided with "all

pertinent information bearing on the success or failure of the proposals in the plan of

reorganization," and "should likewise contain all material information relating to the risks posed

to creditors and equity interest holders under the proposed plan of reorganization."[7]

Plan proponents bear the burden of establishing that their disclosure statement

contains adequate information.[8]

> **B.** **The Disclosure Statement fails to adequately inform Abuse Claimants that any failure by the Debtors or the Trust to satisfy applicable SIRs bars or reduces potential insurance coverage for Abuse Claims**

Approval of the Disclosure Statement should be denied, because the Disclosure

Statement fails to provide Abuse Claimants with adequate information about the impact of SIRs

on the obligations of the Insurers and the effect that the failure of Debtors or the Settlement

Trust to satisfy applicable SIRs would have on any potential insurance recovery for Abuse

Claims.  Absent a clear disclosure that insurance coverage for Abuse Claims will be reduced or

negated by Debtors' (or the Trust's) failure to satisfy applicable SIRs, Abuse Claimants could be

---

[6]     *In re Oneida Motor Freight, Inc.*, 848 F.2d at 417.

[7]     *In re Budd Co.*, 550 B.R. 407, 412 (Bankr. N.D. Ill. 2016), quoting *In re Cardinal Congregate I*, 121 B.R. 760, 765-66 (Bankr. S.D. Ohio 1990).

[8]     *Official Comm. Of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 720 (Bankr. E.D. Cal. 1992).

falsely lulled into accepting a Plan that may provide little or no benefit to them.

**1.    The Zurich Policies are subject to SIRs of at least $1 million per occurrence**

The Zurich Policies illustrate how SIRs apply to many of BSA's excess insurance policies.  The Zurich Policies consist of 14 commercial excess liability policies issued to BSA from March 1, 1989 through March 1, 1990 and from March 1, 1996 through March 1, 2007.[9] All of the Zurich Policies sit above, and follow form to, underlying policies that explicitly contain per-occurrence SIRs of at least $1 million (and potentially up to $4 million in some years), which continue to apply even when coverage underlying the Zurich Policies is exhausted. These SIRs have no aggregate limit, which means they must be satisfied for each separate occurrence, no matter how many occurrences there may be.  In practical effect, this means that even if all underlying coverage below a particular Zurich Policy were exhausted, a judgment in an amount less than $1 million would not be entitled to any payment from that Zurich Policy; and a judgment in an amount of, for example, $1.5 million would be paid $1 million per occurrence by BSA (if the SIR was only $1 million) and up to $500,000 by Zurich (assuming the judgment was otherwise within the coverage provided by the Zurich Policy).[10]  The Disclosure Statement is silent, and thus misleading, with respect to the effect these per-occurrence SIRs have on Zurich's putative obligations.

The fact that the Zurich Policies sit above SIRs is incontestable.  For example,

---

[9]    One other Zurich Policy, issued for the period 3/1/98-3/1/99, is exhausted.

[10]    The example in the text assumes that the hypothetical judgment constitutes a single "occurrence" under the policy.  Courts in coverage litigation regarding sexual abuse claims have taken different approaches to the issue of number of occurrences.  It is not necessary for this Court to address, at this stage, in this context, how many occurrences are presented by the claims against BSA.

the first Zurich Policy issued to BSA, policy CEO 6371780-00 (3/1/89-3/1/90), follows form

to a policy issued by INA, INA excess policy CA0 G1 135164-5 (3/1/88-3/1/90), which in turn

was excess to INA general liability policy HDO G1 136741-0 (3/1/88-3/1/90).  INA excess

policy CA0 G1 135164-5 contains an endorsement titled, "Retention Endorsement – Aggregate

Exhaustion," which states that, "in the event of the exhaustion of the aggregate underlying limit

of liability provided under INA policy HDO G1 136741-0, *the Insured will retain the*

*amount indicated below* of any claim or loss on the same basis that coverage would have been

provided under policy HDO G1 136741-0 but for the exhaustion of any applicable aggregate"

(emphasis added).  The Insured's retained limit "indicated below" is "$1,000,000 Each

Occurrence."

      Similarly, Zurich Policy AUO 3657270-01 (3/1/97-3/1/98) contains an

endorsement that describes that policy's attachment point as follows:

> It is hereby understood and agreed that Item No. 5 of the Declarations Page is
> amended to read as follows:
>
> **The limits of the Company's liability apply in excess of the following limits of**
> **underlying insurance**
>
> (A)      Per Occurrence $2,000,000
>
> (B)      Aggregate Limits
>
>      (i)      Products Hazard and Completed Operations Hazard Combined
>            $2,000,000
>
>      (ii)     All Other Coverage Combined: $2,000,000
>
>            *excess of*
>
>            *$1,000,000 each and every self insured retention*.[11]

      This Zurich Policy follows form to a St. Paul policy that, in turn, follows form to

---

[11]     *See* Amendatory Endorsement (Endt. 17) attached to American Zurich policy AUO
3657270-01 (3/1/97-3/1/98) (emphasis added).

a Liberty Mutual umbrella excess policy that reflects an "INSURED'S RETENTION" of

"$1,000,000 EACH OCCURRENCE."  Endorsement 3 to the Liberty policy, titled "Retention

Endorsement – Aggregate Exhaustion," states that "in the event of the exhaustion of the

aggregate underlying limit of liability provided under Liberty Mutual's policy, . . . the Insured will

retain the amount indicated below of any claim or loss on the same basis that coverage would

have been provided under [such underlying policy] *but for* the exhaustion of any applicable

aggregate" (emphasis added).  The Insured's retained limit "indicated below" is "$1,000,000

Each Occurrence."

Further, the excess policy underlying the Zurich Policies from 2001 to 2006

contains an endorsement containing a schedule of underlying insurance that lists a "Self-

Insurance" layer consisting of a "Self-Insured Retention" of $1M each occurrence as respects,

*inter alia*, Bodily Injury Liability, Personal Injury Liability, and other types of claims, and further

states, "No Aggregate Limit applies."  The endorsement goes on to say that, "[i]f the Aggregate

Limits of the policies listed above [which include Liberty primary coverage] are exhausted by the

payment of damages due to an occurrence, that occurs during the policy period *then the*

*insured self-insurance program of $1,000,000 Each Occurrence Retained Limit shall*

*apply and be borne by the Insured*" (emphasis added).

The references in these policies to "self insured retentions," "Insured's

retention," "retained limits," or amounts "retained" by the insured are clear and unambiguous.

Calling them "deductibles," instead of SIRs, is not correct, accurate, or reasonable.[12]

---

[12]     *See IMO Indus. Inc. v. Transamerica Corp.*, 101 A.3d 1085, 1112 (N.J. Super. App. Div. 2014)
(where policy referred to an amount "retained by the insured" and a "retention," and the word

(Continued...)

These SIR provisions will have a significant impact on the availability of insurance coverage here.  The TDPs provide that every type of claim against Debtors has a "Base Matrix Value" of less than $1 million.  Thus, every claim allowed by the Settlement Trust at the Base Matrix Value would not be eligible for coverage under any of the Zurich Policies, even if all underlying coverage is exhausted, because every such claim would fall within the SIRs, which are Debtors' responsibility to pay.  The TDPs also provide that for claims in Tiers 1-3, the Settlement Trustee can, by exercising his discretion to apply certain Scaling Factors, allow claims in amounts exceeding $1 million.  Assuming coverage is otherwise available, and putting aside for the moment any potential "*Fuller-Austin* issues," any such claim that fell within the policy period of a particular Zurich Policy would be entitled to payment from Zurich only to the extent the allowed claim value exceeded $1 million per occurrence, if the Debtors or the Settlement Trust paid the first $1 million per occurrence of the value of the claim.

2.    **The Disclosure Statement is misleading, to the extent it asserts that there could be a difference of opinion as to whether the Zurich Policies are subject to SIRs**

With respect to the SIRs, the Disclosure Statement confusingly muddles the issues by attempting to conflate deductibles contained in the primary layer of coverage with the SIRs contained in policies above the primary layer.  Moreover, the Disclosure Statement seeks to cast doubt on the existence of the SIRs by saying that "[c]ertain excess carriers ***contend***" that their policies are subject to SIRs (emphasis added) when, as shown above, the existence and applicability of the SIRs is an incontrovertible fact.  As a result, the Disclosure Statement, as

_____
"deductible" appeared nowhere in the relevant provisions, the policy could not be interpreted to include a deductible).

written, is misleading.  The Disclosure Statement also nowhere reflects the reality that the SIRs

apply on a per-occurrence basis, which is another factor that makes the putative indemnification

obligation of Zurich and other excess insurers unlikely to attach, to the extent suggested in the

Disclosure Statement.

The Disclosure Statement currently provides as follows:

> The Debtors contend that their primary insurance policies at least between 1986 and 2008 have a $1 million per-occurrence deductible. . . . it is the BSA's and other parties', including The Church of Jesus Christ's, position that when the BSA cannot or does not pay the deductible, the primary Insurance Policies issued between 1986 and 2008 require the Insurance Company to pay.

> \*        \*        \*

> Certain excess insurers contend that the excess policies between 1986 and 2007 sit above self-insured retentions of $1 million per occurrence, as compared to a deductible.  These excess insurers have asserted that, as a condition of accessing the coverage provided by the excess policies, BSA must, in addition to exhausting the primary coverage, pay the full retained limit of $1 million for each occurrence.  The excess insurers further assert that they have no obligation to pay or incur the retained limit amounts on the Debtors' behalf and then seek reimbursement of such amounts from the Debtors.  As noted above, the Debtors assert that the primary policies between 1986 and 2007 are subject to a deductible, not a self-insured retention and, therefore, the Debtors contend that there is no self-insured retention that requires satisfaction before accessing the excess policies.[13]

Whether certain primary policies contain deductibles in addition to, or instead of,

SIRs is an issue that is separate and distinct from whether coverage under the excess Zurich

Policies and other excess policies is subject to SIRs that must be satisfied as a precondition to

the Debtors (or the Settlement Trust) accessing coverage under those excess policies.  The

Zurich Insurers take no position regarding whether certain primary policies contain deductibles

as opposed to SIRs.  But the Disclosure Statement must accurately address issues concerning the

---

[13]        *See* Disclosure Statement at 47.

effect of applicable SIRs, without misleadingly confusing the SIRs with deductibles.  Debtors'

mischaracterization of plain policy language that expressly refers to SIRs serves only to

confound and mislead.

Below, the Zurich Insurers set out revised language that, if adopted, would make

the above-quoted language from the Disclosure Statement correct and not misleading.

3.      **The Disclosure Statement should not be approved because it falsely portrays the effect of the SIRs as merely a hypothetical risk, instead of a reality.**

The Disclosure Statement characterizes the presence of SIRs in the underlying

policies as merely a risk factor that might potentially affect recoveries for Abuse Claims, instead

of a certainty that will unquestionably preclude coverage under the Zurich Policies unless the

SIRs are satisfied for each and every putative occurrence.  The current language of the

Disclosure Statement provides:

> It is BSA's position that excess insurers' policies sit above deductible [sic], not self-insured retentions ("SIRs"). The excess insurers, in contrast, take the position that their policies sit above SIRs and they have no obligation to drop down and pay SIRs and, instead, either the BSA or the Settlement Trust would have to pay the SIR, the claimant could not recover unless his or her claim exceeded the SIR amount, or the excess insurer would have no coverage obligation whatsoever.
>
> *        *        *
>
> Any of the forgoing disputes could potentially reduce or eliminate the right to payment under certain Insurance Policies.[14]

Unlike deductibles, SIRs function as conditions precedent to coverage; an insured

such as BSA or a Local Council must satisfy, or pay, the full amount of any applicable SIRs as a

---

[14]      *Id.* at 227 (Risk Factor No. 22).

pre-condition to accessing coverage sitting above the SIRs.[15]  If an insured fails to satisfy

applicable SIRs, coverage under the policies above the SIRs is simply unavailable.  A New Jersey

appellate court recently explained the differences between SIRs and deductibles as follows:

> A SIR differs from a deductible in that a SIR is an amount that an insured retains
> and covers before insurance coverage begins to apply.  Once a SIR is satisfied, the
> insurer is then liable for amounts exceeding the retention, less any agreed deductible.
> In contrast, a deductible is an amount that an insurer subtracts from a policy
> amount, reducing the amount of insurance.  With a deductible, the insurer has the
> liability and defense risk from the beginning and then deducts the deductible amount
> from the insured coverage.[16]

In bankruptcy, where a debtor is (or claims to be) unable to pay SIRs, courts use

different approaches to applying SIRs.  One approach is to allow debtors or claimants to access

coverage without first satisfying SIRs, but, in such instances, the excess insurer is obligated only

to pay amounts in excess of the SIR.  For example, where a claimant whose claim arises from a

single occurrence obtains a judgment of $1.5 million and the policy has an SIR of $1 million, the

excess insurer would only be required to pay $500,000 – the amount in excess of the SIR

calculated on a per-occurrence basis – and the claimant either recovers nothing for the first $1

million or, in some cases, can assert a claim against the estate's non-insurance assets for the

uninsured first $1 million.[17]  Under another approach, the debtor's failure to satisfy the SIR is a

---

[15]     *See e.g., Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 107 B.R. 856, 872 (E.D. Pa. 1989), *aff'd*, 908 F.2d 961 (3d Cir. 1990) (table) (pursuant to SIR contained in policy, debtor must exhaust "self-insured retention limit and must seek indemnification from its primary insurance policies before looking to Stonewall for indemnification").

[16]     *See IMO Indus.*, 101 A.3d at 1111, quoting *In re September 11th Liab. Ins. Coverage Cases*, 333 F. Supp.2d 111, 124 n.7 (S.D.N.Y. 2004), quoting Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 13.13[a] (12th ed. vol. 2, 2004).

[17]     *See, e.g., Rosciti v. Ins. Co. of the State of Pa.*, 659 F.3d 92, 97 (1st Cir. 2011); *In re Vandeveer Estates Holding, LLC*, 328 B.R. 18, 21 (Bankr. E.D.N.Y. 2005); *Amatex*, 107 B.R. at 872.

complete bar to coverage.[18]

The Disclosure Statement attempts to dismiss the presence of SIRs in Debtors' insurance coverage as merely a competing interpretation of policy language that could pose a hypothetical risk of a reduced recovery.  Moreover, the Disclosure Statement references the fact that the SIRs apply on a per-occurrence basis, but nowhere discloses to the claimants the ramifications of that reality on an insurer's alleged obligation to pay.  Debtors' unjustified failure to acknowledge the unambiguous terms and legal effect of the applicable policies obscures issues that should be of concern to Abuse Claimants who are seeking compensation for their alleged injuries.  Under one of the approaches followed by courts in applying SIRs to coverage claims against policies issued to debtors, coverage for Abuse Claims, under the Zurich Policies and other excess policies, would either be completely unavailable or severely limited, if Debtors, or the Settlement Trust, fail to pay any applicable SIRs.  An Abuse Claimant who is deciding how to vote on the Plan would undoubtedly want to know whether excess insurance coverage would or might be available to pay his claim, if allowed.  If the other approach were to be used, an Abuse Claimant would also undoubtedly want to know whether his recovery will be reduced by the amount of applicable SIRs.  To the extent the Settlement Trust intends to use its funds to pay SIRs, Abuse Claimants surely would want to know the projected amount of Trust funds that would be expended to satisfy SIRs.  The Disclosure Statement, however, is completely silent on these critical issues.

It may be that Debtors do not agree with the legal arguments set forth above, and instead would continue to assert – contrary to both the policy language and existing case law –

---

[18]    *See, e.g.*, *Pak-Mor Mfg. Co. v. Royal Surplus Lines Ins. Co.*, 2005 WL 3487723 (W.D. Tex. Nov. 3, 2005) (applying Texas law).

that the excess insurers would have to "drop down" to pay amounts within the SIRs.  And it may be that Debtors or other parties would take different positions concerning the applicable number of occurrences, which, as explained above, affects significantly the amount of the SIRs applicable to each abuse claim and in total across all of the claims.  The hearing on whether to approve the Disclosure Statement is not the proper forum for resolving such coverage disputes.  But § 1125(a) requires, at a minimum, that Debtors accurately describe (i) the existence of the per-occurrence SIRs in BSA's insurance program, (ii) how the SIRs likely limit potential recoveries for Abuse Claims, and (iii) why Debtors believe (if they do) that the insurers' legal arguments are, or might be, mistaken.

### C.    Solvent insureds such as Local Councils and Chartered Organizations must satisfy the SIRs for each and every putative occurrence

The Plan extends Protected Party status to Local Councils and Contributing Chartered Organizations.  Some of these entities claim rights to coverage under Debtors' policies as additional named insureds or as additional insureds, and some of the insurers dispute those claims.  To the extent that the Local Councils and Contributing Chartering Organizations seek coverage under the Insurers' policies, however, they are indisputably subject to all the terms and conditions of those policies, including the requirement to satisfy applicable per-occurrence SIRs as a condition to obtaining coverage.

While some decisions permit claimants to access coverage under policies subject to SIRs where the insured is a debtor, by allowing the insurer to deduct the full amount of the SIR before paying any amounts in excess of the SIR, we have not located a single decision that allowed a ***non-debtor*** to evade its obligation to fully satisfy applicable SIRs on the basis that another insured under the policy was a debtor.  Thus, before the Insurers could be obligated to pay anything under their policies on account of the liability of a non-debtor insured who has

become a Protected Party, that non-debtor Protected Party must pay the full amount of

applicable SIRs.  Failure to do so would be a complete defense to coverage.

> **D.     The Court should also deny approval of the Disclosure Statement because it fails to provide adequate information to parties in interest, such as the Insurers, concerning how SIRs in underlying policies will be treated under the Plan**

Beyond the need to accurately disclose the factual existence of SIRs in Debtors'

insurance coverage, their application on a per-occurrence basis, and the significant risks that

application of such SIRs poses to claimant recoveries, the Disclosure Statement is also

affirmatively misleading in describing the Settlement Trust's responsibility with respect to SIRs.

The Disclosure Statement currently provides:

> The Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred on or after the Effective Date arising from, relating to, or associated with any legal action or other proceeding which is the subject of Article IV.Q of the Plan and shall pay Indirect Abuse Claims, in accordance with the Trust Distribution Procedures, that may arise from deductibles, *self-insured retentions*, retrospective premium adjustments, or other charges.[19]

In other words, the Disclosure Statement suggests that excess insurers will have

to pay SIR amounts and then assert Indirect Abuse Claims against the Settlement Trust to

recover their SIR payments.  But this provision of the Disclosure Statement is contrary to law.

We are aware of no case that requires an insurer whose policy sits above an SIR to pay that SIR,

then assert a claim in the debtor's bankruptcy case to recover the paid SIR amount.  In fact, the

court in *Amatex* held precisely the opposite.  There, the debtor requested a declaratory judgment

that the insurer had to pay the debtor's SIR and then file a claim for it.  The district court

rejected the debtor's request, stating:  "We also hold that Stonewall is entitled to withhold the

---

[19]     Disclosure Statement at 170 (emphasis added).

'self-insured retention' sum of $25,000 recited in the policy, rather than being obliged, as the Debtor urged, to pay over this amount and then file a claim for it."[20]  Because the Disclosure Statement asserts a flatly incorrect legal proposition, it is misleading, does not provide adequate information, and should not be approved.

### D.   Proposed revisions to the Disclosure Statement

The Insurers believe that if the Disclosure Statement is revised as follows, it would provide adequate information regarding the existence and effect of SIRs.

Page 47:

Excess policies issued by certain ~~Certain~~ excess insurers ~~contend that the excess policies between~~ in 1986 and thereafter ~~2007~~ sit above self-insured retentions of $1 million per occurrence~~, as compared to a deductible~~.  ~~These excess insurers have asserted that, as~~ As a condition of accessing the coverage provided by the excess policies, BSA must, in addition to exhausting the primary coverage and any other underlying coverage, pay the full retained limit of $1 million for each occurrence. The excess insurers ~~further assert that they~~ have no obligation to pay or incur the retained limit amounts on the Debtors' behalf and then seek reimbursement of such amounts from the Debtors.  ~~As noted above, the Debtors assert that the primary policies between 1986 and 2007 are subject to a deductible, not a self-insured retention and, therefore, the Debtors contend that there is no self-insured retention that requires satisfaction before accessing the excess policies.~~  As a consequence, coverage under such excess policies will be unavailable for any single occurrence unless BSA (or, potentially, the Settlement Trust), has satisfied the SIR by paying $1 million on account of each such occurrence.  The same is true with respect to any claim against a Local Council or a Contributing Chartered Organization; those entities must satisfy the full amount of applicable SIRs, on a per-occurrence basis, before any excess policy that is subject to an SIR would have any obligation to pay.

Some courts (but not all) would allow a claimant against a debtor to recover insurance even if the debtor fails to satisfy the SIR, but only if the amount paid to the claimant is first reduced by the full amount of all applicable SIRs.  No court has ever allowed a claimant against a non-debtor co-insured, such as a Local Council or a Contributing Chartered Organization, to recover on such a theory, even if the claimant reduces his claim by the amount of the applicable SIRs.

---

[20]   *Amatex*, 107 B.R. at 859 ("Stonewall is entitled to withhold the 'self-insured retention' sum of $25,000 recited in the policy").

Page 227 (Risk Factor No. 22):

~~It is~~ Certain of BSA's ~~position that~~ excess ~~insurers'~~ policies sit above ~~deductible, not~~ self-insured retentions ("SIRs"). The excess insurers whose ~~, in contrast, take the position that their~~ policies sit above SIRs ~~and they~~ have no obligation to drop down and pay such SIRs and, then, seek reimbursement from either BSA or the Settlement Trust.  Instead, ~~instead, either~~ the BSA, any Local Council, any Contributing Chartered Organization, or the Settlement Trust would have to pay the full SIR or SIRs applicable to a particular claim before the BSA, the Local Council, the Contributing Chartered Organization, the Settlement Trust, or the claimant could recover any insurance coverage on account of such claim.   If the BSA, the Local Council, the Contributing Chartered Organization, or the Settlement Trust fail to satisfy the SIRs, then~~, the claimant could not recover unless his or her claim exceeded the SIR amount, or~~ the excess insurer would have no coverage obligation whatsoever.

Under the law in some jurisdictions, if the BSA or the Settlement Trust fail to satisfy the SIRs, a claimant against the BSA might still be able to receive a payment if it obtained a judgment in excess of the SIR, but only if the amount paid to the claimant was first have to be reduced by the full amount of all applicable SIRs.  No court has ever allowed a claimant against a non-debtor co-insured, such as a Local Council or a Contributing Chartered Organization, to recover on such a theory, even if the claimant reduces his claim by the amount of the applicable SIRs

*     *     *

Any of the foregoing disputes could potentially reduce or eliminate the right to payment under certain Insurance Policies.

Page 170:

The Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred on or after the Effective Date arising from, relating to, or associated with any legal action or other proceeding which is the subject of Article IV.Q of the Plan and shall pay Indirect Abuse Claims, in accordance with the Trust Distribution Procedures, that may arise from deductibles, ~~self-insured retentions~~, retrospective premium adjustments, or other charges.  In contrast to the treatment of deductibles, an insurer whose policy is subject to a self-insured retention has no obligation to make any payment unless and until the Debtors (or, potentially, the Settlement Trust) has satisfied the self-insured retention on a per-occurrence basis.

### *Joinders and Reservation of Rights*

The Insurers reserve the right to join in, and adopt as their own, any objections

to the disclosure statement filed by any other person or entity.  In particular, but without limitation, the Insurers reserve the right to join in objections filed by other insurers to the extent the arguments set forth in those objections are applicable to the Insurers.

In addition, the Insurers reserve (i) all of their objections to confirmation of the Fourth Amended Plan, any subsequently filed plan, and any revised disclosure statement and (ii) all rights under, and with respect to, their Policies, and waive none.

## Conclusion

The Disclosure Statement is affirmatively misleading in fundamental respects and incomplete in other respects.  The Insurers therefore urge the Court to decline to approve the Disclosure Statement.

DATED:  August 17, 2021                      Respectfully submitted,


                                             */s/ Robert D. Cecil, Jr.*
                                             Robert D. Cecil, Jr. (No. 5317)
                                             TYBOUT, REDFEARN & PELL
                                             750 Shipyard Drive, Suite 400
                                             Wilmington, Delaware  19899-2092
                                             Phone:  (302) 658-6901
                                             E-mail:  rcecil@trplaw.com


                                             Mark D. Plevin (admitted *pro hac vice*)
                                             Kevin D. Cacabelos (admitted *pro hac vice*)
                                             CROWELL & MORING LLP
                                             Three Embarcadero Center, 26th Floor
                                             San Francisco, California  94111
                                             Phone:  (415) 986-2800
                                             E-mail:  mplevin@crowell.com,
                                             kcacabelos@crowell.com

                                             -and-

Clifford J. Zatz (admitted *pro hac vice*)
Tacie H. Yoon (admitted *pro hac vice*)
Rachel A. Jankowski (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Phone:  (202) 624-2500
E-mail:  czatz@crowell.com, tyoon@crowell.com,
rjankowski@crowell.com

Attorneys for American Zurich Insurance
Company, American Guarantee and Liability
Insurance Company, and Steadfast Insurance
Company


Maria Aprile Sawczuk (DE #3320)
GOLDSTEIN & MCCLINTOCK LLLP
501 Silverside Road
Wilmington, Delaware  19809
Phone:  (302) 444-6710
E-mail:  marias@goldmclaw.com

Laura McNally
Emily Stone
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, Ilinois  60654
Phone:  (312) 464-3155
E-mail: lmcnally@loeb.com,
estone@loeb.com

Attorneys for The Continental Insurance
Company and Columbia Casualty Company


David M. Fournier (DE No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, Delaware  19899-1709
Phone:  (302) 777-6500

-and-

Harris B. Winsberg (admitted pro hac vice)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Bank of America Plaza
600 Peachtree Street NE, Suite 3000
Atlanta, Georgia  30308-2216
Phone:  (404) 885-3000

Margaret H. Warner (admitted pro hac vice)
Ryan S. Smethurst (admitted pro hac vice)
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Phone:  (202) 756-8228

Attorneys for Allianz Global Risks US Insurance
Company

David M. Fournier (DE No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Hercules Plaza
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, Delaware  19899-1709
Phone:  (302) 777-6500

Harris B. Winsberg (admitted pro hac vice)
TROUTMAN PEPPER HAMILTON SANDERS LLP
Bank of America Plaza
600 Peachtree Street NE, Suite 3000
Atlanta, Georgia  30308-2216
Phone:  (404) 885-3000

Todd C. Jacobs (admitted pro hac vice)
John E. Bucheit (admitted pro hac vice)
BRADLEY RILEY JACOBS PC
500 West Madison Street, Suite 1000
Chicago, Illinois  60661
Telephone:  (312) 281-0295

Attorneys for National Surety Corporation and
Interstate Fire & Casualty Company

Matthew G. Summers (DE No. 5533)
Chantelle D. McClamb (DE No. 5978)
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4428
E-mail: summersm@ballardspahr.com,
mcclambc@ballardpshar.com

Harry Lee*
John O'Connor*
Brett Grindrod*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone: (202) 429-8078
Facsimile: (202) 429-3902
E-mail: hlee@steptoe.com,
joconnor@steptoe.com,
bgrindrod@steptoe.com
(*Admitted *pro hac vice*)

Attorneys for Clarendon America Insurance
Company


Kathleen M. Miller (No. 2898)
SMITH, KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, Delaware  19899
Phone: (302) 652-8400
E-mail:  kmiller@skjlaw.com

Gary P. Seligman (admitted *pro hac vice*)
Ashley L. Criss (admitted *pro hac vice*)
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC  20006
Phone: (202) 719-7000
E-mail:  gseligman@wiley.law,
acriss@wiley.law

Attorneys for General Star Indemnity Company

Michael J. Joyce (No. 4563)
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, Delaware  19801
Phone:  (302) 388-1944
E-mail:  mjoyce@mjlawoffices.com

Kevin Coughlin (admitted *pro hac vice*)
Lorraine Armenti (admitted *pro hac vice*)
Michael Hrinewski (admitted *pro hac vice*)
COUGHLIN MIDLIDGE & GARLAND LLP
350 Mount Kemble Ave.
PO Box 1917
Morristown, New Jersey  07962
Phone:  (973) 267-0058
E-mail:  larmenti@cmg.law, mhrinewski@cmg.law

Britton C. Lewis, Esquire (*Pro Hac Vice*)
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth St.
P.O. Box 540
Greensboro, North Carolina  27401
Phone:  (336) 478-1146
E-mail:  bcl@crlaw.com

Attorneys for Arrowood Indemnity Company

906093346.02