# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 20-10343 (LSS) |
| Boy Scouts of America and Delaware BSA, LLC,[1] | Chapter 11<br>Jointly Administered |
| Debtors. | **Re: D.I. 5485** |

## THE ROMAN CATHOLIC AND UNITED METHODIST AD HOC COMMITTEES' OBJECTION TO THE DEBTORS' AMENDED DISCLOSURE STATEMENT FOR THEIR FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

OBJECTIONS ...................................................................................................... 4

I.  The Disclosure Statement Does Not Provide Adequate Information ................................ 4

    a.  The Disclosure Statement Fails to Disclose the Highly Prejudicial Treatment Afforded to Chartered Organizations with Indirect Abuse Claims ................................................................................. 5

    b.  The Disclosure Statement Provides Inadequate Information Concerning the Protocols for Contributing Chartered Organizations, Available Insurance, and the Nature, Scope, and Treatment of So-Called Indirect Abuse Claims ......................................... 7

    c.  The Disclosure Statement Fails to Disclose the Lack of Res Judicata and Evidentiary Protections .......................................... 9

    d.  The Disclosure Statement Fails to Provide Adequate Information to Demonstrate that the Plan Satisfies the Best Interest Test ................... 9

II.  The Plan Is Patently Unconfirmable ....................................................................... 10

    a.  The Plan Seeks to Unilaterally Extinguish Independent Property Rights of Non-Debtor Insureds ................................................. 12

    b.  The Plan's Multiple Third-Party Releases Violate Third Circuit Law ......................................................................................... 19

    c.  The Plan and TDPs Unfairly Discriminate Against Holders of Indirect Abuse Claims ....................................................................... 23

        1)  Indemnitees of the BSA Stand to Recover Nothing Under the TDPs ................................................................................. 25

        2)  The TDPs Subordinate the Payment of Indirect Claims to the Prior Payment in Full of all Allowed Direct Claims ............. 26

    d.  The Proposed Plan Would Violate the Automatic Stay in Other Bankruptcies ........................................................................ 28

    e.  The Proposed Plan is not Feasible Because it Incentivizes Chartered Organizations to Abandon Scouting ..................................... 28

    f.  The Proposed Plan Strips Interested Parties of Their Statutory Right to Object to Proofs of Claim .......................................... 30

    g.  The Chartered Organizations' Rights in the Scouting Policies Can Be Resolved Only Through an Adversary Proceeding ........................... 31

    h.  The Debtors Cannot Demonstrate that the Plan Satisfies the Best Interest Test ....................................................................... 32

    i.  The Debtors' Plan is Not Proposed in Good Faith ................................ 33

RESERVATION OF RIGHTS ................................................................................................ 34

CONCLUSION...................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ACandS, Inc.*,
  311 B.R. 36 (Bankr. D. Del. 2004) ........................................................................33

*In re Adelphia Commc'ns Corp.*,
  364 B.R. 518 (Bankr. S.D.N.Y. 2007) ...................................................................13

*In re Am. Capital Equip., LLC*,
  688 F.3d 145 (3d Cir. 2012)...................................................................................33

*In re Archdiocese of St. Paul & Minneapolis*,
  579 B.R. 188 (Bankr. D. Minn. 2017) .......................................................14, 15, 18

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006).............................................................................23, 24

*In re Blitz U.S.A., Inc.*,
  No. 11-13603 (PJW) (Bankr. D. Del. Dec. 19, 2013) [D.I. 2007].........................21

*In re Bloomingdale Partners*,
  155 B.R. 961 (Bankr. N.D. Ill. 1993) .......................................................................4

*In re Burns & Roe Enters.*,
  No. 00-41610, 2005 Bankr. LEXIS 3173 (Bankr. D.N.J. Feb. 17, 2005) ........14, 15

*In re Burns and Roe Enters. Inc.*,
  No. 08-4191, 2009 WL 438694 (D.N.J. Feb. 23, 2009) .........................................24

*In re Catholic Diocese of Wilmington, Inc.*,
  No. 09-13560 (CSS) (Bankr. D. Del. Aug. 8, 2011)...............................................22

*In re Cavanaugh*,
  271 B.R. 414 (Bankr. D. Mass. 2001) ....................................................................28

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004)...........................................................18, 19, 30, 33

*In re Dakota Rail, Inc.*,
  104 B.R. 138 (Bankr. D. Minn. 1989) ....................................................................10

*In re Dow Corning*,
  280 F.3d 648 (6th Cir. 2002) ......................................................................2, 21, 22

*In re Flintkote Co.*,
    No. 04-11300 (JKF) (Bankr. D. Del. Nov. 26, 2007) ..........................................................15

*In re Forever 21, Inc.*,
    623 B.R. 53 (Bankr. D. Del. 2020) ........................................................................................32

*In re Forty-Eight Insulations, Inc.*,
    133 B.R. 973 (Bankr. N.D. Ill. 1991), *aff'd*, 149 B.R. 860 (N.D. Ill. 1992)...............13, 17, 18

*In re Forty-Eight Insulations, Inc.*,
    133 B.R. 976 (Bankr. N.D. Ill. 1991) ......................................................14, 15, 18, 19, 22, 23

*In re Frascelle Enters., Inc.*,
    360 B.R. 435 (Bankr. E.D. Pa. 2007) ....................................................................................29

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ......................................................................................20

*Gillman v. Continental Airlines (In re Continental Airlines)*,
    203 F.3d 203 (3d Cir. 2000)..................................................................................................20

*In re Hercules Offshore, Inc.*,
    565 B.R. 732 (Bankr. D. Del. 2016) ......................................................................................32

*In re Hereford Biofuels, L.P.*,
    466 B.R. 841 (Bankr. N.D. Tex. 2012)..............................................................................18, 19

*In re Imerys Talc Am.*,
    No. 19-10289 (LSS) (Bankr. D. Del. Jan. 28, 2021) .............................................................15

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988)................................................................................16, 17, 18, 23

*In re Mahoney Hawkes, LLP*,
    289 B.R. 285 (Bankr. D. Mass. 2002) ..................................................................................22

*In re Mansaray-Ruffin*,
    530 F.3d 230 (3d Cir. 2008)..................................................................................................31

*In re Master Mortgage Investment Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994)..................................................................................20

*In re Millennium Lab Holdings II, LLC*,
    945 F.3d 126 (3d Cir. 2019)..................................................................................................20

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
    139 S. Ct. 1652 (2019)..........................................................................................................13

*Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*,
   322 B.R. 560 (M.D. Pa. 2005) ..................................................................................34

*Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*,
   848 F.2d 414 (3d Cir. 1988)......................................................................................4

*In re Paragon Offshore PLC*,
   No. 16-10386 (CSS), 2016 WL 6699318 (Bankr. D. Del. Nov. 15, 2016) .......28, 29

*In re Petters Co.*,
   419 B.R. 369 (Bankr. D. Minn. 2009) ....................................................................13

*In re Quigley Co., Inc.*,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010) ....................................................................32

*In re Resorts Int'l, Inc.*,
   372 F.3d 154 (3d Cir. 2004)...............................................................................16, 18

*In re: Roman Catholic Church of the Archdiocese of Santa Fe*,
   No. 18-10327 (Bankr. D.N.M.)...............................................................................28

*In re: Roman Catholic Diocese of Harrisburg*,
   No. 20-00599 (Bankr. W.D. Pa.) ............................................................................28

*Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*,
   81 F.3d 355 (3d Cir. 1996).........................................................................................5

*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168 (Bankr. S.D. Ohio 1988)........................................................................4

*In re SoyNut Butter Co.*,
   No. 17B14970, 2018 WL 3689549 (Bankr. N.D. Ill. Aug. 1, 2018) .......................14

*In re SportStuff, Inc.*,
   430 B.R. 170 (B.A.P. 8th Cir. 2010)..........................................................14, 15, 18

*St. Paul v. Home Depot*,
   Nos. 03 C 50389, 50390, 2004 WL 2075129 (N.D. Ill. 2004) ...............................13

*In re: The Archbishop of Agaña*,
   No. 19-00010 (Bankr. D. Guam) .............................................................................28

*In re: The Diocese of Buffalo, N.Y.*,
   No. 20-10322 (Bankr. W.D.N.Y.) ...........................................................................28

*In re: The Diocese of Rochester*,
No. 19-20905 (Bankr. W.D.N.Y.) ......................................................28

*re: The Roman Catholic Church of the Archdiocese of New Orleans*,
No. 20-10846 (Bankr. E.D. La.) .......................................................28

*In re: The Roman Catholic Diocese of Norwich*,
No. 21-20687 (Bankr. D. Conn.) ......................................................28

*In re: The Roman Catholic Diocese of Rockville Centre, New York*,
No. 20-12345 (Bankr. S.D.N.Y.) .......................................................28

*In re Tribune Co.*,
972 F.3d 228 (3d Cir. 2020)........................................................5, 11

*In re Tucson Self-Storage, Inc.*,
166 B.R. 892 (9th Cir. BAP 1994)....................................................24

*In re Weathersfield Farms, Inc.*,
34 B.R. 435 (Bankr. D. Vt. 1983) .....................................................13

*In re Zenith Electronics Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ...................................2, 20, 21, 22

**Statutes**

11 U.S.C. § 105 ............................................................................................2

11 U.S.C. § 105(a) ..............................................................................19, 21

11 U.S.C. § 362(a) .....................................................................................27

11 U.S.C. § 363 ..........................................................................................18

11 U.S.C. § 502(a) ...............................................................................29, 31

11 U.S.C. § 502(e) .....................................................................................34

11 U.S.C. § 1109 ........................................................................................30

11 U.S.C. § 1125(a)(1)..................................................................................4

11 U.S.C. § 1125(a)(3)................................................................................33

11 U.S.C. § 1125(b) ......................................................................................4

11 U.S.C. § 1129(a)(1)..........................................................................27, 30

11 U.S.C. § 1129(a)(2)..........................................................................27, 30

11 U.S.C. § 1129(a)(3) ................................................................................12

11 U.S.C. § 1129(a)(7)(A) ............................................................................32

11 U.S.C. § 1129(a)(11) ................................................................................28

11 U.S.C. § 1129(b) ......................................................................................23

11 U.S.C. § 1129(b)(1) ...................................................................................5

**Rules**

Federal Rule of Bankruptcy Procedure Rule 7001 ...................................31, 32

Federal Rule of Bankruptcy Procedure Rule 9014 .......................................31

The Roman Catholic and United Methodist Ad Hoc Committees (the "Catholic and Methodist Committees") object to the Debtors' Amended Disclosure Statement (D.I. 5485) for their proposed Plan (D.I. 5484).[2]

## PRELIMINARY STATEMENT

1.    Debtors have made it clear to the Court that Chartered Organizations are the "lifeblood of scouting."[3]  Nonetheless, Debtors seek approval of a Disclosure Statement for a Plan that will abridge Chartered Organizations' rights by subordinating their right to recover from insurance to those of tort claimants.[4]  The Catholic and Methodist Committees believe a confirmable plan of reorganization must ensure that abuse victims are fairly compensated, but cannot accept the current proposal that unfairly shifts significant litigation risk to the Chartered Organizations while depriving them of recourse to insurance coverage.

2.    As it concerns Chartered Organizations (like the members of the Catholic and United Methodist Ad Hoc Committees), Debtors' Amended Disclosure Statement is facially inadequate.  While the Disclosure Statement reiterates the importance of Chartered Organizations to the future of Scouting, it describes a Plan that improperly modifies the pre-existing, admitted insurance and contractual rights of Chartered Organizations (to the point of effective obliteration) and leaves Chartered Organizations to fend for themselves.[5]

3.    On page 15 of the Plain English Summary (under the heading "Parties who may be sued by Survivors after confirmation of the Plan"), Debtors listed 10 entities with adjoining "Yes/No" columns.  (D.I. 5706-1 at 15)  Every entity (including Debtors) received a "No," except

---

[2] Unless otherwise defined, capitalized terms have the meanings stated in the Disclosure Statement.

[3] 07/07/21 Hearing Transcript at 68:4.

[4] 07/07/21 Hearing Transcript at 68:4-69:1.

[5] Chartered Organizations' insurance rights appear to fall within the broad definition of "Indirect Abuse Claims;" claims invoking those insurance rights would be "permanently channeled to the Settlement Trust;" and those claims are "**expected to have limited recovery**."  (D.I. 5485 at page 28 of 474 & n.35 (emphasis in original).)

Chartered Organizations and their insurers.[6]  (*Id.*)  But the disclosures themselves shroud the treatment of Chartered Organizations with opacity: while Debtors have admitted in open court and the Court has acknowledged that Chartered Organizations' rights to insurance proceeds would be subordinated to paying tort claimants, that treatment — for 41,000 Chartered Organizations — is relegated to a footnote on page 22 of the Disclosure Statement and then does not appear again until page 194.

4.      The law is clear that this Court lacks the power under 11 U.S.C. § 105 to change (much less to eliminate) the contractual rights of non-debtor third parties, like those of the Chartered Organizations, unless the plan compensates those non-debtor third parties.  *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *see also In re Dow Corning*, 280 F.3d 648, 658 (6th Cir. 2002).  Rather than attempt to satisfy *Zenith* at the threshold, Debtors have told the Court and the Chartered Organizations, "we're working on it," where the "it" is bringing Chartered Organizations into the fold, while simultaneously holding over their heads the threat of lawsuits against them that Debtors themselves will fund, rather than providing the defense and indemnity to which Debtors' contracted.  Nothing commends this path to the Court.

5.      Debtors have recognized that Chartered Organizations possess rights under Debtors' insurance policies.  But Debtors have admitted that in seeking to nullify those rights they have taken no steps to value them.[7]  And as described in the Disclosure Statement, the way to become a "Contributing Chartered Organization" is to do just that — not to receive the protection of the Channeling Injunction in exchange for eliminating the Chartered Organizations' contractual

---

[6] So-called "Contributing Chartered Organizations" may not be sued.  In his August 13, 2021 testimony during the RSA hearing, BSA Bankruptcy Task Force member Mr. Desai admitted that nearly six weeks after filing the Disclosure Statement, there are no Contributing Chartered Organizations.  Non-participating Chartered Organizations may not be sued *if* a claimant elects an Expedited Distribution.

[7] In his August 12, 2021 testimony during the RSA hearing, Debtors' financial advisor Mr. Whitman admitted that as part of Debtors' due diligence in respect to whether to enter into the RSA, neither BSA nor anyone working on BSA's behalf estimated the value of the Chartered Organization's insurance rights under BSA's insurance policies.

rights, but rather to receive that protection only by putting new money into the proposed Settlement Trust. Yet, the Disclosure Statement provides no detail about the protocol or the expected level of contribution to become a Contributing Chartered Organization. Indeed, there is not even sufficient information about the number and nature of claims against the Chartered Organizations for them to individually evaluate their potential exposure and to determine whether to become Contributing Chartered Organizations.

6. The patent unfairness of the Plan to the Chartered Organizations is remarkable: Debtors agree that Chartered Organizations' rights will be subordinated without their consent.

7. While the Catholic and Methodist Committees would like to see Debtors emerge from bankruptcy, undermining Chartered Organizations' contractual rights is not a proper path forward. Seeking approval of a Disclosure Statement that undermines those contractual rights while simultaneously contending that this is not what Debtors are really aiming for is needless wordplay. Debtors can provide the Court with no authority to approve what they are *seeking* in the Plan, and it is what they are seeking, not what they aspire to achieve, that is before the Court for approval.

8. Debtors' contention that the process is fluid and that they have every intention of proposing a confirmable plan that *does* protect the Chartered Organizations is baffling. Debtors should have proposed a plan that *already* protected the Chartered Organizations, non-debtor, third-parties over whom the Court's power is limited.

9. For these reasons and those discussed below, the Court should reject the Disclosure Statement as currently proposed. The Disclosure Statement does not provide adequate information and the proposed Plan is patently (and apparently *admittedly*) unconfirmable. Because nothing

would be served by soliciting votes for an unconfirmable plan, Debtors should be directed to try again.

## OBJECTIONS

### I.    The Disclosure Statement Does Not Provide Adequate Information.

10.    A Disclosure Statement's purpose is "to inform equity holders and claimants, as fully as possible, about the probable financial results of acceptance or rejection of a particular plan." *See In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988).  The Third Circuit has emphasized the importance of adequate disclosure, given the reliance creditors and bankruptcy courts place on disclosure statements.  *See, e.g.*, *Oneida Motor Freight, Inc. v. United Jersey Bank* (*In re Oneida Motor Freight, Inc.*), 848 F.2d 414, 417 (3d Cir. 1988) ("[W]e cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'").

11.    A debtor may not *solicit* votes for a plan until after it has provided, and a court has approved, a written disclosure statement containing adequate information.  11 U.S.C. § 1125(b).  "[A]dequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).  Hence, "[d]epending on the level of sophistication among 'typical' holders in each 'relevant class', the required information for each relevant class may vary."  *In re Bloomingdale Partners*, 155 B.R. 961, 972 (Bankr. N.D. Ill. 1993).  Whether a disclosure statement provides "adequate information will be determined by the facts and circumstances of each case."  *Oneida Motor Freight*, 848 F.2d at 417.  The debtor bears the burden of proving that its disclosure statement is adequate.  *In re Am. Capital*

*Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012); *Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*,

81 F.3d 355, 362 (3d Cir. 1996).

> **a.  The Disclosure Statement Fails to Disclose the Highly Prejudicial Treatment Afforded to Chartered Organizations with Indirect Abuse Claims**

12.     The Disclosure Statement does not adequately disclose the highly prejudicial —

indeed, discriminatory — treatment of Chartered Organizations under the Plan, and provides

misleading information regarding expected recoveries for holders of Indirect Abuse Claims.[8]  The

Chartered Organizations are generally not sophisticated parties with engaged counsel that are

active in this case.  The Court should not approve a disclosure statement that does not plainly and

simply explain that, under the Plan, Chartered Organizations are unlikely to have any recovery on

their Indirect Abuse Claims and will be deprived of insurance coverage.

13.     *First*, the Disclosure Statement fails to adequately disclose that Chartered

Organizations' Indirect Abuse Claims — consisting of indemnification, reimbursement, or

subrogation claims — will be subordinated to the prior payment *in full* of all 82,500 direct claims,

including any claims that may be asserted in the future against the Settlement Trust.  The first time

this provision even appears in the Disclosure Statement is in footnote 35 on page 22; it does not

appear again until page 194.  *See* Disclosure Statement, Art. II.G; Art. VII.B.10. Additionally,

nowhere in the Disclosure Statement do Debtors reveal that holders of Indirect Abuse Claims

recover nothing under the Plan unless all direct claims are paid in full, something that would

depend on various contingencies, including the Settlement Trust's success in post-effective date

coverage litigation.

---

[8] 11 U.S.C. § 1129(b)(1); *see also In re Tribune Co.*, 972 F.3d 228, 240 (3d Cir. 2020) ("Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes.") (citations omitted).

14.    *Second*, the Disclosure Statement fails to disclose that the Plan releases the claims of non-debtor insureds (such as the Chartered Organizations) against the insurance companies, and thus adjudicates the state law property rights of these parties, in abrogation of parties' due process rights.  Instead of being forthright about these non-consensual releases, the Disclosure Statement provides that holders of Indirect Abuse Claims will have unspecified "insurance rights."  *See* Disclosure Statement, Art. II.G, p. 22.  The Disclosure Statement should make clear that Debtors are asking the Court to take the unprecedented step of wiping out Chartered Organizations' admitted rights under the the BSA and non-debtor Local Councils' insurance policies (collectively, the "**Scouting Policies**")  for no value.

15.    *Third*, the Disclosure Statement fails to disclose that the Trust Distribution Procedures ("TDPs") extinguish the indemnity claims of potentially tens of thousands of Chartered Organizations, all of whom will be are left to fend for themselves in the tort system without recourse against the Settlement Trust or the Debtors.  The Disclosure Statement does not disclose the reality that in order to have a compensable claim against the Settlement Trust, Chartered Organizations must settle direct claims on behalf of the Settlement Trust (including Protected Parties) in the tort system, with the expectation that settling Chartered Organization could recover some fraction of what the direct claimant could have recovered under the TDPs.  These provisions are highly prejudicial to the interests of thousands of Chartered Organizations, many of which are not represented by counsel.  These provisions should be fully, plainly, and simply disclosed in order to inform Chartered Organizations of their treatment under the Plan.

**b. The Disclosure Statement Provides Inadequate Information Concerning the Protocols for Contributing Chartered Organizations, Available Insurance, and the Nature, Scope, and Treatment of So-Called Indirect Abuse Claims.**

16.     In addition to providing the Chartered Organizations inadequate information regarding the treatment of their claims, the Disclosure Statement also fails to disclose how the Chartered Organizations can obtain the benefit of the proposed Channeling Injunction, and the insurance and litigation risks of the Plan.

17.     The Disclosure Statement indicates that the Debtors will work with other interested parties to develop a "protocol" by which Chartered Organizations can become Contributing Chartered Organizations and obtain the benefits of the Channeling Injunction. (DS at 11, 13.) But the Disclosure Statement delineates no protocol. The Disclosure Statement's lack of specificity regarding the mechanics of becoming a Contributing Chartered Organization and the protection that comes with doing so makes it impossible for Chartered Organizations, such as members of the Catholic and Methodist Committees, to properly evaluate the merits of becoming a Contributing Chartered Organization.

18.     Similarly, the Disclosure Statement fails to contain adequate information regarding Chartered Organizations' potential exposure to abuse lawsuits that might justify becoming a Contributing Chartered Organization. While the Disclosure Statement provides detailed information concerning the number and type of abuse claims asserted against each Local Council, no information is provided for Chartered Organizations. (*See* DS, Ex. F.) Instead, there is only a single page chart containing aggregated claims against Chartered Organizations with certain affiliations. (*Id.*) This does not allow individual Chartered Organizations (particularly those who did not receive prior notice of any abuse claims) to determine whether they have any exposure to abuse claims, much less the amount of that exposure. Hence, Chartered Organizations are unable

to make informed decisions regarding whether to pursue becoming Contributing Chartered Organizations.

19.    Given that the Debtors acknowledge that Chartered Organizations are additional insureds under the Debtors' insurance policies (DS at 49), the Disclosure Statement must contain adequate information regarding those policies. It does not.  Instead, the Disclosure Statement provides only summary and patchwork descriptions of the Chartered Organizations' rights under those policies.  (*Id.* at 49-50.)  Indeed, Debtors admit that they have not fully analyzed their policies and cannot calculate total available insurance coverage.  (*Id.* at 44.)

20.    With respect to the Chartered Organizations' rights under Local Councils' insurance policies, the Disclosure Statement provides no information at all concerning the nature and scope of those rights.  Chartered Organizations cannot be expected to vote on a proposed Plan that assigns their insurance rights to the Settlement Trust without knowing exactly what is being assigned.

21.    Chartered Organizations have Indirect Abuse Claims because of their rights under the Debtors' and Local Councils' insurance policies.  The Disclosure Statement notes that those claims are impaired, but contains no information about the *extent of* the impairment.  (DS at 22.) The estimated amounts and percentages of recoveries are simply listed as "unknown," along with an acknowledgement that Indirect Abuse claims are "expected to have limited recovery."  (*Id.*) This level of vagueness renders the Disclosure Statement inadequate. Debtors plainly have (or certainly should have) more than a theoretical idea about the rights that they have asked the Court to eliminate:  they should provide the information that they have so that Chartered Organizations can make an informed decision.

22.     Because Chartered Organizations cannot discern from the Disclosure Statement the extent of their rights, much less the extent of impairment of those rights, the Disclosure Statement lacks adequate information and should not be approved.

### c. The Disclosure Statement Fails to Disclose the Lack of Res Judicata and Evidentiary Protections

23.     The Disclosure Statement fails to disclose the lack of *res judicata* and evidentiary protections for the Chartered Organizations under the Plan, and fails to disclose any risks associated with determinations made by the Settlement Trustee relating to the Indirect Abuse Claims.

24.     The Disclosure Statement fails to disclose that the TDPs were negotiated to eliminate any protections for non-settling parties, with the result that determinations by the Settlement Trustee may subsequently be admissible as evidence in, binding in, or have *res judicata* or other preclusive effect in any lawsuit or other proceeding against non-settling third parties in the tort system.  *See* Plan Redline, Exhibit A-1, Article XIII.A. [D.I. 5372-1].  The removal of these protections leaves non-settling third parties, like the Chartered Organizations, vulnerable to the risk that determinations by the Settlement Trust, for which the Chartered Organizations have no say, will be used against the Chartered Organizations in a binding or highly prejudicial manner. The fact that these protections were removed and the attendant risks have not been disclosed renders the Disclosure Statement inadequate.

### d. The Disclosure Statement Fails to Provide Adequate Information to Demonstrate that the Plan Satisfies the Best Interest Test

25.     The Disclosure Statement fails to disclose the risk that the Plan would not satisfy the "best interests" test with respect to holders of Indirect Abuse Claims.  The Plan seeks to extinguish the valuable rights of non-debtor insureds, including Chartered Organizations, in the Scouting Policies.  *See* Plan, Art. X.H ("Insurance Entity Injunction").  In a Chapter 7 liquidation,

however, Chartered Organizations would retain the right to directly pursue claims against the insurance companies, and therefore stand to recover greater value than they would under the Plan. Despite this being the fourth Disclosure Statement that the Debtors have filed in these Chapter 11 cases, the liquidation analysis still does not take into consideration the Chartered Organizations' rights under the insurance policies in a hypothetical Chapter 7 liquidation, nor is there any discussion of the best interests test in Article X of the Disclosure Statement.  Indeed, on cross-examination during the RSA hearing, Debtors' financial advisor admitted to the Court that as part of Debtors' due diligence in respect to whether to enter into the RSA, neither BSA nor anyone working on BSA's behalf estimated the value of the Chartered Organization's insurance rights under BSA's insurance policies before asking the Court to wipe them out.  The Disclosure Statement is accordingly inadequate.

## II.    **The Plan Is Patently Unconfirmable.**

27.    Bankruptcy courts have "an obligation not to subject the estate to the expense of soliciting votes and seeking confirmation of [a] plan" when the disclosure statement "on its face relates to a plan that cannot be confirmed."  *In re Dakota Rail, Inc*., 104 B.R. 138, 143 (Bankr. D. Minn. 1989).  Under Third Circuit precedent, "a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable." *In re Am. Cap. Equip*., LLC, 688 F.3d 145, 154-55 (3d Cir. 2012) (plan unconfirmable, inter alia, if forbidden by law, not feasible, or not proposed in good faith); *see also id.* ("[c]ourt [should] not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and plan when the plan may not be confirmable") (internal quotations and citations omitted).  A plan is patently unconfirmable when confirmation defects cannot be cured by creditor voting and when the defects concern matters where there are no material factual disputes.  *Id.* at 155.

- 10 -

28.     The Disclosure Statement describes a Plan that is patently unconfirmable, for multiple reasons.  *First*, the Plan seeks to impermissibly appropriate the rights of non-debtor insured parties under the Scouting Policies.  *Second*, and relatedly, the Plan is premised on releasing the claims of non-debtor insureds against the insurance companies and Local Councils, without providing affected insureds and indemnitees with anything resembling substantial recoveries.  *Third*, the Plan and the accompanying TDPs unfairly discriminate against Chartered Organizations through procedures that subordinate Indirect Abuse Claims, while providing claims of equal priority with up to 100% recoveries.  As the Disclosure Statement concedes, Indirect Abuse Claims are expected to have "limited recovery," something baked into the Plan, since these claims are subordinated to the payment in full of all Direct Abuse Claims, valued at $2.4 billion to $7.1 billion.  *See* Disclosure Statement, II.G.  *Fourth*, the proposed Plan would violate the automatic stay in certain other bankruptcies affecting members of the Catholic Ad Hoc Committee. *Fifth*, the proposed Plan is not feasible because it incentivizes chartered organizations to abandon scouting.  *Sixth*, the proposed Plan improperly seeks to strip interested parties of the statutory right to object to invalid proofs of claim.  *Seventh*, while the Chartered Organizations rights in the Scouting Policies can be resolved only through an adversary proceeding, the proposed Plan strips them of this procedural protection.  *Eighth,* the Plan cannot satisfy the best interest test as to creditors—such as the Catholic and Methodist Committees—who would be better off in a liquidation scenario under which creditors' insurance rights and claims against non-debtors would be preserved.  *Ninth*, the Plan was not proposed in good faith. *And tenth,* Chartered Organizations holding Indirect Abuse Claims are given a materially lower recovery than similarly situated unsecured creditors.  *See In re Tribune Co.*, 972 F.3d at 243 (rebuttable presumption of unfair discrimination applies where there is a materially lower percentage recovery for the dissenting

- 11 -

class).  As noted in the Disclosure Statement, Chartered Organizations holding Indirect Abuse Claims can expect to receive a "limited" recovery on account of those claims.  (DS at 22.)  By contrast, holders of Direct Abuse Claims can expect to receive "up to 100%."  (*Id.* at 21.)  Those Direct Abuse Claimants who elect to receive Expedited Distributions will get $3,500, even if their claims are invalid and barred by applicable statutes of limitation.  (*Id.* at 22.)  Similarly, holders of General Unsecured Claims can expect 75-95% recoveries while holders of Non-Abuse Litigation Claims can expect 100% recoveries.  (*Id.* at 20.)  Given that the financial viability of the Debtors' go forward business plan and indeed, the future of scouting, depends on Chartered Organizations' continued voluntary participation (discussed below), there is no reasonable basis for providing Chartered Organizations a materially lower recovery, much less zero recovery, on account of their Indirect Abuse Claims

### a. The Plan Seeks to Unilaterally Extinguish Independent Property Rights of Non-Debtor Insureds.

29.    As noted above, Chartered Organizations are additional insureds under insurance policies issued to the Debtors as well as to the Local Councils.

30.    Based on their investigations (which remain ongoing), the Catholic and Methodist Committees believe that Chartered Organizations are covered under the Debtors' policies going back as far as 1962 (far earlier than the 1970s, when Debtors have admitted Chartered Organizations are covered).

31.    Under the proposed Plan, all of the Debtors' as well as Local Councils' insurance coverage will be transferred to the Settlement Trust.  (*See* Plan, Art. I.A.20 ("Abuse Insurance Coverage"), Art. I.A.21 ("Abuse Insurance Policies"), Art. I.A.136 ("Insurance Assignment").)  In fact, Court approval for this Insurance Assignment is a condition precedent to confirmation.  (*Id.*, Art. X.A.3.j.)  Because that approval would be unlawful, however, it follows that the Plan cannot

be confirmed.  *See* 11 U.S.C. § 1129(a)(3) (requiring a plan be "proposed in good faith and not by any means forbidden by law").

32.     Fundamentally, a bankruptcy court lacks jurisdiction over property rights outside of the estate, and accordingly, a plan cannot extinguish a non-debtors' property rights to its insurance policy proceeds without its consent.  It is well-established that filing for bankruptcy does not give a debtor greater property rights than it would have had outside of bankruptcy.  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) ("The estate cannot possess anything more than the debtor itself did outside bankruptcy."); *see also In re Weathersfield Farms, Inc.*, 34 B.R. 435, 439-40 (Bankr. D. Vt. 1983) ("[T]he bankruptcy court has no power to enlarge the debtor's rights under applicable nonbankruptcy law.").

33.     Chartered Organizations' insurance and indemnification rights as additional insureds under the Debtors' and Local Councils' insurance policies are not property of the Debtors' estates, but rather distinct property rights belonging to the Chartered Organizations.  *See*, *e.g.*, *In re Petters Co.*, 419 B.R. 369, 376 (Bankr. D. Minn. 2009) ("The case law recognizes that any individual insured has a contractually-distinct status that runs directly between itself and the insurer. This makes the right to receive payment on a covered claim the property of that insured itself."); *In re Adelphia Commc'ns Corp.*, 364 B.R. 518, 527 (Bankr. S.D.N.Y. 2007) (additional insureds' rights to payment from insurers pursuant to "their own policy entitlements" would be "independent of anything the Estate sought or received"); *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 978 (Bankr. N.D. Ill. 1991), *aff'd*, 149 B.R. 860 (N.D. Ill. 1992) (additional insured had separate legal and equitable interests in the debtors' policies, including the right to make direct claims against the insurer); *St. Paul v. Home Depot*, Nos. 03 C 50389, 50390, 2004 WL 2075129, at *2 (N.D. Ill. 2004) ("The debtor's contractual interest in the insurance policy is property of the

estate, while Home Depot's is not.  They are co-insured with separate contractual claims against St. Paul for defense and payment of judgments or settlement until the policy limits are exhausted.").

34.     When, as here, there are multiple insured parties under a policy, "the bankruptcy estate owns only the debtor's interest, not the co-insured's interest." *In re Archdiocese of St. Paul & Minneapolis*, 579 B.R. 188, 202 (Bankr. D. Minn. 2017); *see also In re SportStuff, Inc.*, 430 B.R. 170, 178 n. 15 (B.A.P. 8th Cir. 2010) ("[W]hile the bankruptcy court may exercise jurisdiction over (a liability insurance) policy, the interests of the co-insured, a nondebtor, are not property of the estate.  To hold otherwise would allow the court to impair a third party's contract and property rights.").  The Court has jurisdiction over *the Debtors'* rights to insurance proceeds, but not over the Catholic and Methodist Committees' separate and independent rights in the Scouting Policies.

35.     Debtors cannot settle coverage under the Scouting Policies, and consequently settle the "equal and independent" rights of non-debtor insureds, such as the Catholic and Methodist Committees, without their consent.  *See In re SoyNut Butter Co.*, No. 17B14970, 2018 WL 3689549, at *4 (Bankr. N.D. Ill. Aug. 1, 2018) (rejecting settlement that would have released rights of non-debtor co-insured downstream vendors who were "afford[ed] equal and independent rights to seek indemnification and defense" under the policy).  Courts have denied insurance buyout agreements in bankruptcy based on the objection of non-debtor insureds when the offending buyout agreement purported to cut off or relieve the insurers' obligations to the non-debtor insured under the policies.  *See, e.g., In re Forty-Eight Insulations, Inc.*, 133 B.R. 976 (Bankr. N.D. Ill. 1991) (co-insured non-debtor "has a contract with the insurers that allows it to make claims directly" rejecting settlement in asbestos bankruptcy that would "extinguish[]" those rights); *but*

*see In re Burns & Roe Enters.*, No. 00-41610, 2005 Bankr. LEXIS 3173, at *17 (Bankr. D.N.J. Feb. 17, 2005) (approving policy buyback between insured and insurer when rights of other non-settling insureds were preserved).

36.    Nor may Debtors seize Chartered Organizations' insurance rights and transfer them to the Settlement Trust without Chartered Organizations' consent (which, again, Debtors lack). *See*, *e.g.*, *In re SportStuff, Inc.*, 430 B.R. at 178 (bankruptcy court "did not have the jurisdiction or authority to impair or extinguish" independent contractual rights of insureds); *In re Archdiocese of St. Paul & Minneapolis*, 579 B.R. at 197 (rejecting plan provision transferring insurance interests into settlement trust where parishes' indemnification and contribution claims were impaired by transfer and parishes did not consent to such transfer); *Forty-Eight Insulations*, 133 B.R. at 976-77 (insured's claims against insurers and rights under policies were not property of debtor's estate and could not be impaired by debtor's settlement with insurer); *see also* Insurance Issues in Bankruptcy: A Collier Monograph ¶ 3.03[2][d] (2014) ("The more common approach holds that a co-insured's interest in a debtor's policy is not property of the bankruptcy estate.  As these contract rights do not belong to the debtor, they cannot be impaired by a bankruptcy court.").

37.    Accordingly, any settlement or transfer of coverage under the Scouting Policies in which the Catholic and Methodist Committees have rights to coverage must expressly preserve the Catholic and Methodist Committees' right to the Scouting Policies or to the settlement or sale proceeds.  *See*, *e.g.*, *In re Flintkote Co.*, No. 04-11300 (JKF) (Bankr. D. Del. Nov. 26, 2007) [D.I. 2845] (policy buyback between insured and insurer expressly preserved right of co-insured to assert claim to the settlement proceeds); *In re Burns & Roe Enters.*, 2005 Bankr. LEXIS 3173 at *8 (to extent any person has interest in settled policies, that interest will attach to sale proceeds); *In re Imerys Talc Am.*, No. 19-10289 (LSS) (Bankr. D. Del. Jan. 28, 2021) [Docket No. 2864] (the

"Insurance Entity Injunction" explicitly provides that it will not impair in any way "the rights of any co-insured of the Debtors.").

38.     Debtors have contended that Chartered Organizations' rights to the Scouting Policies will be preserved through their ability to assert Indirect Abuse Claims against the Settlement Trust. *See Debtors' Omnibus Reply In Support of the Motion* [D.I. 4105], ¶ 55. That is incorrect. The Insurance Entity Injunction would enjoin the ability of Chartered Organizations to exercise their *direct* rights to the proceeds of the Scouting Policies. These direct rights are not adequately protected by the Plan when (i) holders of Indirect Abuse Claims stand to recover *nothing* under the TDPs and (ii) even if Chartered Organizations could recover under the TDPs, that recovery would be subordinate to the rights of direct claimants and subject to the Settlement Trust's payment percentage.

39.     Nor can the Debtors impair Chartered Organizations' insurance rights arising from policies issued to Local Councils, who are not even debtors. (*See* Plan, Art. I.A.152 ("Local Council Insurance Policies"); Art. I.A.154 ("Local Council Settlement Contribution").) The Court lacks jurisdiction over that non-debtor property, even if the Local Councils consent to contributing their policies to the Settlement Trust. *See In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004) ("Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.").

40.     Debtors' cases purporting to support the Court's authority to eliminate the rights of Chartered Organizations provide nothing of the kind. The Debtors have indicated that they believe that *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988) "supports their position on assignment of rights under shared insurance policies." (D.I. 5759 at ¶ 76.) They are mistaken

for two separate reasons.  *First*, *MacArthur* is inapplicable on its facts.  *Second*, *MacArthur* on its own facts is inconsistent with the Code.

41.     In *MacArthur*, the bankruptcy court approved insurance settlements that transferred the debtor's insurance policies to a settlement fund for asbestos claimants, relieved the insurers of all obligations under those policies, and enjoined further litigation against the insurers.  *Id.* at 90. A vendor claimed that it was a coinsured under the subject policies and objected to the settlements on the ground that those settlements impaired its contractual rights and argued that the bankruptcy court lacked jurisdiction to do so.  *Id.* at 92.  The Second Circuit disagreed.

42.     The court characterized the purported interest under the "vendor endorsements" provision as "highly speculative," since the endorsements "only" covered "liabilities resulting from the Vendor's status as a distributor of Manville's products."  *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988).  Here, the Chartered Organizations are *conceded* to be co-insureds under the Scouting Policies and accordingly have concrete, independent rights to coverage that are not "derivative" of their relationship with the BSA or the Local Councils, rights plainly documented in the Scouting Policies themselves.  *See id.* 92-93.

43.     But Debtors have not settled with any of the insurers, no insurer has approved any policy assignment to the Settlement Trust, and, as explained further below, Chartered Organizations' rights are not adequately protected.

44.     Moreover, the rationale in *MacArthur* is unsound and was thoroughly deconstructed in *Forty-Eight Insulations*:

> The *MacArthur* court, therefore, dealt with MacArthur's rights under the policy endorsement as if they were somehow property of the debtor, within the jurisdiction of the bankruptcy court. Even on the facts in that case, it is hard to follow the Second Circuit's reasoning. Under Section 541(a) of the Bankruptcy Code, only "legal or equitable interests of the debtor" become property of the estate. In *MacArthur,* as here, the issue was a non-debtor's interests in an insurance policy.

Another party's interests do not become property of the estate, and therefore cannot be sold under Section 363, which deals with sales of only property of the estate. Nor do we understand how a named insured's rights against an insurer are derivative in the same way as a tort claimant's. A tort claimant has a claim against the debtor that can be dealt with in bankruptcy. The claimant's rights against insurers, like his or her rights against other assets of the debtor, depend entirely upon the success of the claim against the debtor. So it may be fair to say that a tort claimant's rights against the insurer are derivative. It might be clearer to say simply that tort claimants have no "legal or equitable interest" in the insurance policy in the first place, any more than they do in other property of the estate, so that their property rights are not impaired by a settlement of the debtor's claim to coverage.

MacArthur, and FWC here, however, do have "legal or equitable interests" in the policies. FWC is a named insured with the right to make direct claims on the insurers if the conditions of the policies are satisfied. It has rights to be defended and to indemnification that do not depend upon a prior resolution of any claim against Forty-Eight. And providing an alternate remedy does not create a power to deprive FWC of those rights without its consent.

*Forty-Eight Insulations*, 133 B.R. at 978; *see also SportStuff*, 430 B.R. at 178 n.15 (following *Forty-Eight Insulations*); *Archdiocese of St. Paul & Minneapolis*, 579 B.R. at 198 (same).

45.     This Court should follow *Forty-Eight Insulations* and to the extent it finds any factual alignment decline to follow *MacArthur* and its overly expansive view of bankruptcy jurisdiction over nondebtor property, a view at odds with Third Circuit precedent. *See Resorts*, 372 F.3d at 161 (bankruptcy courts are vested with "limited jurisdiction" and "neither the bankruptcy court nor the parties can write their own jurisdictional ticket"); *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 228 (3d Cir. 2004) ("[T]he boundaries of bankruptcy jurisdiction cannot be extended simply to facilitate a particular plan of reorganization.").

46.     The Debtors also rely on *In re Hereford Biofuels, L.P.*, 466 B.R. 841 (Bankr. N.D. Tex. 2012). *Hereford* does not support eliminating the contractual rights of non-consenting creditors against non-debtor third parties either. In *Hereford*, the court rejected the claim of a non-debtor third party (the parent company of the debtor), that its property rights as a co-plaintiff with the debtor in a separate action against the debtor's insurers were infringed when the debtor sold its

- 18 -

claims to insurers to finance its bankruptcy estate. *See id.* at 859. But the parent was not a named insured and claimed its right to the insurance proceeds solely by virtue of its parent relationship with the debtor—a position that the court rejected as grounds for sharing in the insurance proceeds. *See id.* at 856. Additionally, the court emphasized that the insurance policy at issue was a property policy and the court's ruling was predicated on the fact that the debtor owned the underlying real property that the insurance policy covered. *Id.* The Scouting Policies do not insure real property owned by the BSA, and, as such, *Hereford's* narrow ruling provides no basis for the Debtors' requested relief.

### b. The Plan's Multiple Third-Party Releases Violate Third Circuit Law.

47.     The Plan is patently unconfirmable because it is premised on releasing the claims of non-debtor parties, including those of the Chartered Organizations, against other non-debtor parties, in particular the insurers and Local Councils, without providing the releasing parties with meaningful recoveries for their claims or requiring the insurers to make any contribution to the Settlement Trust. The requested relief would be an unprecedented use of Section 105(a), inconsistent with well-established Third Circuit precedent concerning third-party releases.

48.     The Plan cannot impair Chartered Organizations' insurance rights by enjoining their claims for defense and/or indemnification against insurers via the Insurance Entity Injunction. (*See* Plan, Art. X.H.) *See Combustion Eng'g*, 391 F.3d at 233 (Section 105(a) "does not permit the extension of ad channeling injunction to the non-derivative claims against non-debtors"); *Forty-Eight Insulations*, 133 B.R. at 978 (named insured has the "right to make direct claims on the insurers if the conditions of the policies are satisfied" and that the insured "has rights to be defended and to indemnification that do not depend upon a prior resolution of any claim against [the debtor]"); *see also* Insurance Issues in Bankruptcy: A Collier Monograph ¶ 3.03[2][d] (2014)

("[A] bankruptcy court cannot enter orders (such as channeling injunctions) barring claims against insurers of a co-insured entity.").

49.     This is particularly true for claims against insurers who have not made any contribution to the Settlement Trust and are not Protected Parties under the Plan.  Nonconsensual third party releases and injunctions are allowed under Third Circuit precedent only when there are special factual findings demonstrating those releases are both necessary for the reorganization and fair.  *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019) ("Our precedents regarding non-consensual third-party releases and injunctions in the bankruptcy plan context set forth exacting standards that must be satisfied if such releases and injunctions are to be permitted, and suggest that courts considering such releases do so with caution."); *see also In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606-607 (Bankr. D. Del. 2001) (rejecting third party release of debtor's management where they contributed no assets to the reorganization and there was no showing that absent an injunction in favor of management, the reorganization stood little chance of succeeding).  An insurer that has not made *any* contribution to the Settlement Trust cannot meet these standards and cannot benefit from the Insurance Entity Injunction.

50.     The Third Circuit permits third-party releases only in "extraordinary cases" and based upon specific findings that support the "hallmarks" of (a) fairness, (b) necessity to the reorganization, and (c) fair consideration given in exchange for the releases.  *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 217 (3d Cir. 2000).  In deciding whether such relief is permissible, courts in this jurisdiction consider the factors initially described in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994), and adopted in *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999), which require (1) an identity of interest between the debtor and the released party; (2) a "substantial contribution"

to the reorganization made by the released party; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction. *In re Zenith Electronics Corp.*, 241 B.R. at 110; *see also Dow*, 280 F.3d at 658 (adopting the same *Zenith* factors and adding "(6) The plan provides an opportunity for those claimants who choose not to settle to recover in full; and (7) The bankruptcy court made a record of specific factual findings that support its conclusions" (internal citations omitted)).

51.     The Plan's third-party releases in favor of insurance companies are an unprecedented expansion of Section 105(a) and unconstitutionally prejudicial to the interest of non-debtor insureds such as the Chartered Organizations.  The Insurance Entity Injunction would release all abuse-related claims against the "Non-Settling Insurance Companies" without requiring those insurers to make any contribution (monetary or otherwise) to the Settlement Trust.  *See* Plan, § 10.H.2 ("Insurance Entity Injunction").  Indeed, the Plan itself contemplates that the Settlement Trust will have to litigate with Non-Settling Insurance Companies to recover anything under the subject policies (including the possibility of no recovery).  The Debtors concede that "[i]t is not currently known whether the Insurance Coverage Actions will result in a favorable outcome for the Settlement Trust . . . the ultimate value of the Insurance Actions being contributed to the Settlement Trust is *unknown*."  *See* Disclosure Statement, § X.21 (emphasis added).  The Catholic and Methodist Committees are unaware of any precedent in the mass tort context under which non-contributing insurers were released of third-party claims held by non-debtor insureds.  *Cf., e.g.*, *In re Blitz U.S.A., Inc.*, No. 11-13603 (PJW) (Bankr. D. Del. Dec. 19, 2013) [D.I. 2007] (the

channeling injunction explicitly reserved "the rights of any Entity to assert any claim, debt, obligation or liability for payment against a *Non-Participating Insurer*."); *In re Catholic Diocese of Wilmington, Inc.*, No. 09-13560 (CSS) (Bankr. D. Del. Aug. 8, 2011) [D.I. 1493] ("Protected Party" under the channeling injunction applied to "Settling Insurers and their respective predecessors and successors.").

52.    The Debtors' Plan also releases the Chartered Organizations' claims against the Local Councils without providing the releasing parties with meaningful recoveries on such claims. The Chartered Organizations have contractual indemnity rights against certain Local Councils for scouting-related abuse claims.  These claims would be confiscated and released by the Plan in consideration for a highly uncertain and illusory recovery against the Settlement Trust.  Indeed, as Debtors themselves concede, any recovery that holders of Indirect Abuse Claims can expect to receive from the Settlement Trust will be "limited," as the TDPs subordinate these claims to the prior payment in full of Direct Abuse Claims.  *See* Disclosure Statement, Article II.D.6.  The proposed treatment of releasing parties falls considerably short of *Zenith*'s requirement that a plan provide payment of "all or substantially all of the claims of the class or classes affected by the injunction."  *In re Zenith Electronics Corp.*, 241 B.R. at 110; *Dow*, 280 F.3d at 358 (same); *see also In re Mahoney Hawkes, LLP*, 289 B.R. 285, 301 (Bankr. D. Mass. 2002) (finding that non-debtor releases were inappropriate under the fifth *Zenith* factor where classes with affected claims stood to recover a range of 24-100% and 3-17% under the plan).

53.    The proposed Plan also improperly eliminates the Chartered Organizations' rights to a defense, without providing a dime of consideration.  *See Forty-Eight Insulations*, 133 B.R. at 976 ("Most important, however, the channeling order, whatever benefits it might confer, would not be the same thing as FWC's contractual rights against the insurers, which would be

extinguished. If FWC does not choose to relinquish those rights, then the settlement would impair FWC's rights, even if the economic effect were otherwise ameliorated."). Nothing in the Settlement Trust Agreement obligates the Settlement Trust to provide Chartered Organizations with defense or indemnification, so once the Debtors' and Local Councils' policies are assigned to the Settlement Trust, those rights are simply extinguished. (*See* D.I. 5770-1.)

54.    Chartered Organizations also lack adequate protection following the transfers of their insurance rights as the Settlement Trust holds no reserve for their Indirect Abuse Claims. *See MacArthur*, 837 F.2d at 94 ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition."). Instead, those claims are fully subordinated to Direct Abuse Claims under the TDP (Plan, Ex. A, Art. XI.A) and are "expected to have limited recovery" (DS at 22). *See Forty-Eight Insulations*, 133 B.R. at 976 (additional insured's interests not adequately protected because estate to which its interests were channeled could be depleted before that insured had an opportunity to make a claim).

55.    The Debtors should not be permitted to solicit a Plan premised on non-debtor releases that facially fails the stringent requirements imposed by Third Circuit precedent. At present, Debtors are miles from meeting these standards.

> **c.  The Plan and TDPs Unfairly Discriminate Against Holders of Indirect Abuse Claims.**

56.    The Plan unfairly discriminates against holders of Indirect Abuse Claims in Class 9, who stand to recover minimal (if any) value for their rights, while providing holders of Direct Abuse Claims in Class 8 and Non-Abuse Litigation Claims in Class 7 with up to 100% recoveries. *See* Disclosure Statement, Article II.D.6. The material differences in recovery between classes of equal priority constitutes unfair discrimination under Section 1129(b). *See In re Armstrong World*

*Indus., Inc.*, 348 B.R. 111, 121-122 (D. Del. 2006).[9]  To be sure, the Catholic and Methodist Committees take no issue with the full payment of legitimate Direct Abuse Claims.  But Debtors' proposed treatment of Indirect Abuse Claims (which are defined to include Chartered Organizations' claims against insurers) would leave Chartered Organizations with none of the insurance coverage that BSA and the Local Councils agreed to provide.  The Debtors cannot demonstrate that this discrimination is necessary to the reorganization.

57.     The TDPs contain several highly prejudicial provisions that would deny indirect claimants any meaningful recovery against the Settlement Trust.   *First*, the TDPs deny indemnitees, including the Catholic and Methodist Committees and potentially thousands of Chartered Organizations, any meaningful opportunity to recover indemnified losses in defending scouting-related abuse claims in the tort system.   *Second*, the recoveries of indirect claimants are expressly subordinated under the TDPs to the prior payment in full of all direct claims (including future claims), leaving indirect claimants ineligible for recovery for years to come, if ever.

58.     Debtors cannot justify the disparate treatment afforded to classes of equal priority under the law, particularly when holders of indirect claims, such as the Catholic and Methodist Committees, would recover substantially greater value outside of bankruptcy or in a liquidation scenario.[10]  *See In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. BAP 1994) (unfair

---

[9] Courts in the Third Circuit have found a "rebuttable presumption" of unfair discrimination when there is (1) a dissenting class, (2) another class of the same priority, and (3) a difference in the plan's treatment of the two classes that results in either (i) a materially lower percentage recovery for the dissenting class or (ii) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.  *See In re Armstrong World Indus., Inc.*, 348 B.R. at 121-122.  "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *Id.* at 121.

[10] Indirect Abuse Claims, like Direct Abuse Claims and Non-Abuse Litigation Claims, are unliquidated and contingent claims of equal priority sounding in tort and/or contract.  *See, e.g., In re Burns and Roe Enters. Inc.*, No. 08-4191, 2009 WL 438694, at *24 (D.N.J. Feb. 23, 2009) (approving classification of direct and indirect claims in a single class where definition of indirect claim under plan included claims for indemnification and subrogation).

discrimination; plan purported to pay unsecured classes of same priority materially different recoveries).

### 1) Indemnitees of the BSA Stand to Recover Nothing Under the TDPs

59.    Chartered Organizations, such as the Catholic and Methodist Committees, have historically sponsored and delivered the scouting program to communities across the country under the direction of the BSA.  This partnership has always been premised on the expectation and agreement that BSA would indemnify and hold harmless the Catholic and Methodist Committees and potentially thousands of other Chartered Organizations of scouting-related liabilities, including those arising from scouting-related abuse claims.  But under the Plan, Debtors seek to abandon these obligations through trust procedures that would effectively deny all Chartered Organizations any opportunity to recover on their valid indemnity claims.

60.    As proposed, the TDPs would compensate Indirect Abuse Claims only after a claimant settles or pays a Direct Abuse Claim in full and obtains releases on behalf of the Settlement Trust (including any Protected Parties) in the tort system.  *See* TDPs, § IV.B.  Once a Direct Abuse Claim has been fully paid, an indirect claimant can then assert an Indirect Abuse Claim for what the direct claimant could have recovered against the Settlement Trust (setoff against the indirect claimant's share of liability as determined by the Settlement Trustee).[11]  TDPs, §§ IV.B; VIII-E(i)(c) (applying mitigating factor to direct claim reflecting share of non-Protected Party's liability).  Moreover, if the Settlement Trust has already paid a Direct Abuse Claimant, that claimant may still assert a claim against the Catholic and Methodist Committees in the tort system,

---

[11] The TDPs provide that an Indirect Abuse Claim cannot have "any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment." *See* TDPs, § IV(B)(2).  This provision caps Indirect Abuse Claims at the liquidated amount of an Allowed Abuse Claim regardless of the amount that a claimant paid to resolve that claim in the tort system.

but the Catholic and Methodist Committees would be foreclosed from asserting an Indirect Abuse

Claim against the Settlement Trust. *See* TDPs, § IV.B (foreclosing Indirect Abuse Claims when

the underlying Direct Abuse Claim has already been paid by the Settlement Trust).

61.     In tandem, these procedures would deny Chartered Organizations any opportunity

to recover on account of their indemnity rights against the BSA for scouting-related abuse claims.

Indemnitees would be required to pay the costs of a settlement in the tort system before having

any claim against the Settlement Trust.  For example, if a Chartered Organization settles a

scouting-related abuse claim in the tort system, it would hold a liquidated indemnity claim against

the BSA in the amount that it paid to defend and resolve the claim.  But under the TDPs, the

Chartered Organization would not be able to assert an Indirect Abuse Claim against the Settlement

Trust on its indemnity claim *unless* it also pays to settle the abuse claimant's potential claims

against the Settlement Trust (including Protected Parties).  Regardless of what the Chartered

Organization pays to settle a claim in the tort system, its recovery will be limited to the maximum

values established in the TDPs multiplied by the Settlement Trust's payment percentage.  In other

words, indemnitees would be expected to absorb the cost of a global settlement in the tort system

to recover some fraction of what the underlying Direct Abuse Claimant could have recovered

against the Settlement Trust.[12]

### 2)     The TDPs Subordinate the Payment of Indirect Claims to the Prior Payment in Full of all Allowed Direct Claims

62.     The TDPs provide that indirect claimants will be eligible for recovery only after all

allowed direct claims are liquidated and paid in full.  *See* TDPs, Article XI ("Indirect Abuse

---

[12] And at the same time, under the RSA, Debtors will provide up to a $10.5 million past litigation expense true up and an on-going $950,000 per month litigation funding for claimants to pursue claims against Chartered Organizations in the tort system, while the Plan simultaneously eliminates the rights of Chartered Organizations to tender the defense of those claims to Debtors' insurers.

shall be subordinate and junior in right to the prior payment in full of all Allowed Abuse Claims that are Direct Abuse Claims as liquidated under these TDP.").  Indirect claimants can accordingly expect to recover only after all 82,500 direct claims (including future claims) are asserted, liquidated, and paid in full by the Settlement Trust.  Given the number of claims already known, as well as the unknown number of claims that may be asserted at some point in the future, indirect claimants will be ineligible for any distribution for years to come.[13]

63.    It is also highly uncertain whether indirect claimants could ever recover under the Plan, as indirect claimants are forced to assume the risk that the Settlement Trust may have insufficient funds to pay all claims subject to the channeling injunction.  This is particularly troublesome because the lifetime funding of the Settlement Trust will depend in large part on contingent recoveries against insurance companies in post-effective date coverage litigation.  *See* Disclosure Statement, § X.21 (acknowledging that the ultimate value of the insurance assets is "unknown").  The highly favorable allowance procedures for direct claimants, including the "Tort Election," will also place significant demand on the cash assets of the Settlement Trust.  The TDPs permit direct claimants to hold allowed claims in the full amount of any judgment obtained in the tort system (even if that judgment well exceeds the maximum values established under the TDPs).[14]  These claimants will be entitled to recover the full allowed amount of any judgment before any indirect claimant is eligible for any recovery.  *Id.*  Accordingly, indirect claimants are forced to bear the risk that the Settlement Trust assets will be depleted before any indirect claimant is paid.

---

[13] Aside from future claims, the TDPs allow direct claimants to defer their claims for up to 12 months after the effective date of the Plan.  *See* TDPs, § VII.H.

[14] Article XII.G provides that "the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system, *provided that* . . . any amount of such Allowed Claim Amount for a Tort Election Claim in excess of the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all *Direct Abuse Claims* that are Allowed Abuse Claims as liquidated under these TDP") (emphasis added).

### d. The Proposed Plan Would Violate the Automatic Stay in Other Bankruptcies.

64.     Both a debtor and its proposed plan must comply with applicable provisions of the Bankruptcy Code.  11 U.S.C. §§ 1129(a)(1), (a)(2).  That includes, of course, the automatic stay.  11 U.S.C. § 362(a); *see also In re Cavanaugh*, 271 B.R. 414, 424 (Bankr. D. Mass. 2001) ("[T]he automatic stay is the single most important protection afforded to debtors by the Bankruptcy Code.").

65.     Currently, several Catholic dioceses and archdioceses are debtors-in-possession in bankruptcies across the country, and some have filed claims against the Debtors.  Proceeding to divest these debtors of their property rights would amount to a willful violation of the automatic stay.  *See*, *e.g.*, In *re: The Roman Catholic Church of the Archdiocese of New Orleans*, No. 20-10846 (Bankr. E.D. La.); *In re: Roman Catholic Church of the Archdiocese of Santa Fe*, No. 18-10327 (Bankr. D.N.M.); *In re: The Diocese of Buffalo, N.Y.*, No. 20-10322 (Bankr. W.D.N.Y.); *In re: The Diocese of Rochester*, No. 19-20905 (Bankr. W.D.N.Y.); *In re: Roman Catholic Diocese of Harrisburg*, No. 20-00599 (Bankr. W.D. Pa.); *In re: The Roman Catholic Diocese of Rockville Centre, New York*, No. 20-12345 (Bankr. S.D.N.Y.); *In re: The Roman Catholic Diocese of Norwich*, No. 21-20687 (Bankr. D. Conn.); *In re: The Archbishop of Agaña*, No. 19-00010 (Bankr. D. Guam).

### e. The Proposed Plan is not Feasible Because it Incentivizes Chartered Organizations to Abandon Scouting.

66.     To be confirmable, the Debtors' proposed Plan must be feasible.  11 U.S.C. § 1129(a)(11) (requiring that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan"); *see also In re Paragon Offshore PLC*, No. 16-10386 (CSS), 2016 WL 6699318, at *16 (Bankr. D. Del.

Nov. 15, 2016) ("A debtor must prove a Chapter 11's plan feasibility by a preponderance of the evidence"); *In re Frascelle Enters., Inc.*, 360 B.R. 435, 453 (Bankr. E.D. Pa. 2007) ("[T]he plan proponent must demonstrate there is a reasonable assurance of compliance with plan terms").

67.    The feasibility of the Debtors' proposed Plan depends on their being able to maintain a sufficient level of membership.  That membership "dropped significantly in 2020 as a result of the COVID-19 pandemic."  (DS at 14.)  Membership also declined significantly when The Church of Jesus Christ of Latter-day Saints terminated its participation as a Chartered Organization, resulting in Debtors' losing about 525,000 participants (*id.* at 34), nearly a quarter of the 2.2 million scouts the Debtors had in December 2019 (D.I. 16).  The Debtors admit that "[i]f the number of new members and returning members is substantially reduced from current projections, the Debtors could lack the means to meet their operational needs or otherwise emerge from bankruptcy."  (DS at 14.)

68.    The Debtors' financial projections assume they will be able to hold on to around one million members going forward.  (DS, Ex. E.)  Currently, Catholic and Methodist Chartered Organizations contribute approximately a third of the Debtors' remaining membership, and as expressed above and in prior filings, those organizations have serious concerns about their proposed treatment under the Plan.

69.    The Debtors cannot execute their business plan without the continued support of Chartered Organizations, and yet the proposed impairment of Chartered Organizations' rights jeopardizes that support.  If a sufficient number of Chartered Organizations terminate their relationships with the Debtors, then it is unlikely the Debtors will be able to meet their financial obligations under the proposed Plan.  *See In re Paragon Offshore PLC*, 2016 WL 6699318, at *29 (denying confirmation where the debtor's financial projections were not reasonably achievable).

**f.    The Proposed Plan Strips Interested Parties of Their Statutory Right to Object to Proofs of Claim.**

70.    Section 1109(b) of the Bankruptcy Code provides that any party in interest "may raise and may appear and be heard on *any* issue in a case under this chapter."  11 U.S.C. § 1109(b) (emphasis added); *see also Combustion Eng'g*, 391 F.3d at 214 (explaining that Section 1109 "has been construed to create a broad right of participation in Chapter 11 cases").  Similarly, and even more specifically, Section 502(a) expressly allows *any* party in interest to object to a claim.  11 U.S.C. § 502(a).  The Debtors and their proposed Plan abrogate these statutory rights.  11 U.S.C. §§ 1129(a)(1), (a)(2).

71.    Under the proposed Plan, the Settlement Trust handles "processing, liquidation and payment of all compensable Abuse Claims in accordance with the Settlement Trust Documents." (Plan, Art. IV. B.1.)  The proposed TDP provides that the "TDP and any procedures designated in these TDP shall be the sole and exclusive methods by which an Abuse Claimant may seek allowance and distribution on an Abuse Claim with respect to the Protected Parties."  (*Id.*, Ex. A, Art. I.D.)

72.    Under the Plan, the entire claims allowance process is controlled by hand-picked representatives of the Direct Abuse Claimants.   Their Settlement Trustee administers the Settlement Trust and TDP in consultation with the Settlement Trust Advisory Committee (composed of persons selected exclusively by the Coalition and Tort Claimants' Committee) and Future Claimants' Representative. (*Id.*, Ex. A, Art. III.A.)  Meanwhile, Indirect Abuse Claimants, who have every incentive to challenge illegitimate claims, have no right to participate in the process. (*Id.*, Ex. A at Art. VII.)

73.    The Plan's creation of a closed claims allowance process run by the Direct Abuse Claimants' preferred adjudicators is likely to result in the allowance of bogus claims to the

detriment of both legitimate Direct Abuse Claimants and Indirect Abuse Claimants, whose recoveries are subordinated to the full payment of Direct Abuse Claims.  As an example of the extreme moral hazard inherent in the TDP structure, Direct Abuse Claimants can obtain an expedited distribution of $3,500 simply by submitting a proof of claim form that is "substantially complete" and verified, even if that claim would be barred under the relevant state's statute of limitations.  (DS, Ex. A, Art. VI.A.)  This runs directly counter to Section 502(a), which enables claims to be vetted through an adversarial process overseen by a neutral arbiter.

### g.  The Chartered Organizations' Rights in the Scouting Policies Can Be Resolved Only Through an Adversary Proceeding.

74.  As a threshold matter, any adjudication of the rights of non-debtor insureds deriving from the Scouting Policies requires an adversary proceeding.  Rule 7001(2) of the Federal Rule of Bankruptcy Procedure ("**Bankruptcy Rules**") mandates an adversary proceeding to "determine the validity, priority, or extent of a lien *or other interest in property.*"  Fed. R. Bankr. P. 7001(2) (emphasis added).  Bankruptcy Rule 7001 actions require a party to commence a separate proceeding from the bankruptcy at issue.  In contrast, other matters—including objections to plan confirmation—require only that the objecting party file a motion with the bankruptcy court under Bankruptcy Rule 9014.  The Third Circuit commented that because a Bankruptcy Rule 7001 adversary proceeding "entails a fundamentally different, and heightened, level of procedural protections" than a Bankruptcy Rule 9014 motion, a party with a Rule 7001 claim "has the due process right not to have that issue resolved without one."  *In re Mansaray-Ruffin*, 530 F.3d 230, 242 (3d Cir. 2008).  Moreover, the "mandatory nature" of this due process right "trump[s] [the] finality" of a confirmed plan.  *Id.* at 238.

75.  Delaware bankruptcy courts have explicitly held that a court must determine whether insurance policy proceeds are property of the estate through a Rule 7001(2) adversary

proceeding. *See In re Forever 21, Inc.*, 623 B.R. 53, 62 (Bankr. D. Del. 2020) ("[I]n seeking a determination that the insurance policies are not property of the estate, Count V clearly relates to an action under Rule 7001(2) which requires an adversary proceeding for an action to determine an interest in property."). The Chartered Organizations' interests in the Scouting Policies and their entitlement to proceeds under those policies can be adjudicated only in the context of a Bankruptcy Rule 7001 adversary proceeding. Accordingly, the Plan's attempt to adjudicate the Chartered Organizations' property rights outside of the Bankruptcy Rule 7001 context violates the due process rights of non-debtor insureds, including the Catholic and Methodist Committees, rendering the Plan patently unconfirmable.

> ### h.  The Debtors Cannot Demonstrate that the Plan Satisfies the Best Interest Test.

76.     The Chartered Organizations' rights to the Scouting Policies would be preserved in a hypothetical Chapter 7 liquidation because the Insurance Entity Injunction would not apply in a liquidation scenario.

77.     Section 1129(a)(7) of the Bankruptcy Code provides that a bankruptcy court may not confirm a plan unless each holder of an allowed claim or interest in an impaired class either (a) accepts the plan or (b) will receive or retain property on account of such claim or interest of a value that is not less than the amount that such holder would receive or retain, as of the effective date of the plan, if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(7)(A); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 765 (Bankr. D. Del. 2016) (restating the requirements of Section 1129(a)(7)(A)). Courts must consider not only distributions, (that is, the amounts that creditors will receive), but also the value of the property that each dissenting creditor will retain under the plan in a hypothetical Chapter 7. *See In re Quigley Co., Inc.*, 437 B.R. 102, 144–45 (Bankr. S.D.N.Y. 2010). Courts have recognized that in conducting

this determination, the value of derivative claims related to rights otherwise released under a plan must be taken into account to ultimately determine if a plan is in the "best" interest of dissenting creditors. *Id.*

78.     The Debtors' liquidation analysis must take into consideration the value of the Chartered Organizations' claims against the insurance companies that would be released under the Plan.  In doing so, it would be clear that the value the Chartered Organizations, including the Catholic and Methodist Committees, would retain in a Chapter 7 is greater than what they would receive under the Plan.  Critically, the Chartered Organizations' ability to directly tender claims under the Scouting Policies would provide an opportunity for *full* recovery, whereas the Catholic and Methodist Committees currently stand to recover *nothing* under the Plan.

### i.     The Debtors' Plan is Not Proposed in Good Faith.

79.     A plan cannot be confirmed unless it is proposed in good faith.  11 U.S.C. § 1125(a)(3); *see also Combustion Eng'g, Inc.*, 391 F.3d at 246 ("Courts and commentators have recognized the good faith requirement provides an additional check on a debtor's intentional impairment of claims.")  While the Code does not define good faith, the Third Circuit has instructed that "the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *Id.* at 247; *see also Am. Capital Equip.*, 688 F.3d at 154 (Bankruptcy Code's objectives include discouraging debtor misconduct and achieving fundamental fairness and justice).

80.     The Plan is not proposed in good faith because its terms reflect the Debtors' capitulation to the demands of Direct Abuse Claimants and their counsel to the detriment of Chartered Organizations and other key stakeholders, who were not invited to the bargaining table. *See In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) ("[G]iven the unbridled dominance of the [prepetition tort claimants'] committee in the debtor's affairs and actions during the

prepetition period, its continued influence flowing from its majority status on the postpetition creditors committee, and the obvious self-dealing that resulted from control of the debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the bankruptcy code."); *Off. Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 571 (M.D. Pa. 2005) (debtors have an "obligation to their creditors to propose a plan that is fair to all creditors and not to let one creditor class dominate the formulation of a plan.").

81.     The Plan also denies due process to Chartered Organizations by denying Indirect Abuse Claims that were late-filed because Chartered Organizations never received any prior notice of claims or even threatened claims against them.  Chartered Organizations have yet to receive individualized notice from the Debtors informing them of abuse claims, even though the Debtors have access to those claims and information concerning which claims are associated with particular Chartered Organizations.  Further, many Chartered Organizations will not have filed proofs of claim for their Indirect Abuse Claims for the very reason that those claims are contingent and unliquidated and may be subject to disallowance under Section 502(e).  Chartered Organizations were not given notice that they should nonetheless file Indirect Abuse Claims subject to disallowance in order to potentially protect their rights.

## RESERVATION OF RIGHTS

82.     The Catholic and Methodist Committees reserve all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections, to introduce evidence prior to or at any hearing regarding the Disclosure Statement in the event the Catholic and Methodist Committees' objections are not resolved prior to the hearing, to seek to introduce documents or other relevant information in support of the

positions set forth in this Objection, and to raise any and all objections to confirmation of the Plan, including the Debtor's proposed schedule for Plan confirmation.

## CONCLUSION

83.    For the reasons stated herein, the Catholic and Methodist Committees respectfully request that the Court deny Debtors' request for approval of the Disclosure Statement because it fails to provide creditors with adequate information and is patently unconfirmable, and grant such other relief as it deems appropriate.

Dated: August 17, 2021
Wilmington, Delaware

Respectfully submitted,

**POTTER ANDERSON & CORROON LLP**

/s/ *Jeremy W. Ryan*
Jeremy W. Ryan (Bar No. 4057)
D. Ryan Slaugh (Bar No. 6325)
1313 N. Market Street, 6th Floor
Wilmington, DE 19801-6108
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com
          rslaugh@potteranderson.com

*Counsel for the Roman Catholic and United Methodist Ad Hoc Committees*

-- and --

**BRADLEY ARANT BOULT CUMMINGS LLP**

Edwin G. Rice, Esq.
100 N. Tampa Street
Suite 2200
Tampa, FL 33602
Telephone: (813) 559-5500
Facsimile:  (813) 229-5946
Primary email:          erice@bradley.com
Secondary emails:    ddecker@bradley.com
                                  ebrusa@bradley.com


*Counsel for the United Methodist Ad Hoc Committee*

**SCHIFF HARDIN LLP**

Everett Cygal, *admitted pro hac vice*
David Spector, *admitted pro hac vice*
J. Mark Fisher, *admitted pro hac vice*
Neil Lloyd, *admitted pro hac vice*
Daniel Schufreider, *admitted pro hac vice*
Jin Yan, *admitted pro hac vice*
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600
Email: ecygal@schiffhardin.com
          dspector@schiffhardin.com
          mfisher@schiffhardin.com
          nlloyd@schiffhardin.com
          dschufreider@schiffhardin.com
          jyan@schiffhardin.com

*Counsel for the Roman Catholic Ad Hoc Committee*

IMPAC - 7333672v.2  08/17/2021 3:44 PM