1

```
              UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF DELAWARE
```

| | |
|---|---|
| | .   Chapter 11 |
| IN RE: | . |
| | .   Case No. 20-10343 (LSS) |
| BOY SCOUTS OF AMERICA AND | . |
| DELAWARE BSA, LLC, | . |
| | .   Courtroom No. 2 |
| | .   824 North Market Street |
| | .   Wilmington, Delaware 19801 |
| | . |
| Debtors. | .   August 16, 2021 |
| . . . . . . . . . . . . . . . . . | .   10:00 A.M. |

```
              TRANSCRIPT OF TELEPHONIC HEARING
        BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                UNITED STATES BANKRUPTCY JUDGE
```

TELEPHONIC APPEARANCES:

For the Debtor:        Derek C. Abbott, Esquire
                       Andrew R. Remming, Esquire
                       Paige N. Topper, Esquire
                       MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                       1201 North Market Street, 16th Floor
                       Wilmington, Delaware 19899

                       - and -

                       Jessica C. Lauria, Esquire
                       Glenn Kurtz, Esquire
                       Andrew Hammond, Esquire
                       WHITE & CASE LLP
                       1221 Avenue of the Americas
                       New York, New York 10020

Audio Operator:        Brandon J. McCarthy, ECRO

Transcription Company: Reliable
                       1007 N. Orange Street
                       Wilmington, Delaware 19801
                       (302)654-8080
                       Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

TELEPHONIC APPEARANCES (Cont'd):

For the Debtors:          Michael C. Andolina, Esquire
                          WHITE & CASE LLP
                          111 South Wacker Drive
                          Chicago, Illinois 60606

For Hartford:             James Ruggeri, Esquire
                          SHIPMAN & GOODWIN LLP
                          1875 K Street NW, Suite 600
                          Washington, DC 20006

                          - and -

                          Philip Anker, Esquire
                          WILMERHALE
                          7 World Trade Center
                          250 Greenwich Street
                          New York, New York 10007

For Century:              Tancred Schiavoni, Esquire
                          Daniel Shamah, Esquire
                          O'MELVENY & MYERS LLP
                          Times Square Tower
                          7 Times Square
                          New York, New York 10036

For the Future           Robert Brady, Esquire
Claimants:               YOUNG CONAWAY STARGATT & TAYLOR LLP
                          Rodney Square
                          1000 North King Street
                          Wilmington, Delaware 19801

                          - and -

                          Emily Grim, Esquire
                          GILBERT LLP
                          700 Pennsylvania Avenue, SE
                          Suite 400
                          Washington, DC 20003

For the Ad Hoc           Richard Mason, Esquire
Committee of Local       Joseph Celentino, Esquire
Councils:                WACHTELL, LIPTON, ROSEN & KATZ
                          51 West 52nd Street
                          New York, New York 10019

```
 1  TELEPHONIC APPEARANCES (Cont'd):

 2  For AIG Companies:        Michael Rosenthal, Esquire
                              GIBSON DUNN & CRUTCHER LLP
 3                            300 Park Avenue
                              New York, New York 10166
 4

 5  For the U.S. Trustee:     David Buchbinder, Esquire
                              UNITED STATES DEPARTMENT OF JUSTICE
 6                            OFFICE OF THE UNITED STATES TRUSTEE
                              844 King Street, Suite 2207
 7                            Lockbox 35
                              Wilmington, Delaware 19801
 8

 9  For the Coalition of      Eric Goodman, Esquire
    Abused Scouts:            BROWN RUDNICK LLP
10                            601 Thirteenth Street NW, Suite 600
                              Washington, DC 20005
11
                              - and -
12
                              David Molton, Esquire
13                            7 Times Square
                              New York, New York 10036
14

15  For the Roman Catholic    Jeremy Ryan, Esquire
    Ad Hoc Committee:         POTTER ANDERSON & CORROON LLP
16                            Hercules Plaza
                              1313 North Market Street, 6th Floor
17                            P.O. Box 951
                              Wilmington, Delaware 19801
18

19  For Allianz Global        Harris Winsberg, Esquire
    Risks US Insurance        TROUTMAN PEPPER HAMILTON SANDERS LLP
20  Company:                  600 Peachtree Street, N.E.
                              Suite 3000
21                            Atlanta, Georgia 30308

22  For the TCC:              Thomas Patterson, Esquire
                              THE PATTERSON LAW FIRM, LLC
23                            200 West Monroe, Suite 2025
                              Chicago, Illinois 60606
24

25  For Tort Claimants:       James Stang, Esquire
                              PACHULSKI STANG ZIEHL JONES LLP
                              919 North Market Street, 17th Floor
                              Wilmington, Delaware 19801
```

1  MATTERS GOING FORWARD:

2  1.  Debtors' Motion for Entry of an Order, Pursuant to
   Sections 363(b) and 105(a) of the Bankruptcy Code, (I)
3  Authorizing the Debtors to Enter Into and Perform Under the
   Restructuring Support Agreement, and (II) Granting Related
4  Relief [D.I. 5466; Filed 7/1/21]

5
   7. Century's Revised Motion for Entry of an Order Authorizing
6  Filing Under Seal Documents Relating to Century's Objections
   to Debtor's Motion Relating to the Restructuring Support
7  Agreement and Moving Insurers' Motion to Compel [D.I. 5853;
   Filed 8/2/21]
8
   10. [SEALED] Century's Motion in Limine to Bar the Debtors
9  from Offering Evidence in Support of Their Application for
   Fees on Which They Have Refused to Provide Discovery [D.I.
10 5942; Filed 8/10/21]

11
   CLOSING ARGUMENTS:  19-247
12
        **Ruling: Matters Taken Under Advisement**
13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 10:04 a.m.)

2              THE COURT:  Good morning.  This is Judge

3  Silverstein.  We're here in the Boy Scouts of America

4  bankruptcy; Case 20-10343.

5              Let me turn it over to debtor's counsel.

6              MR. ABBOTT:  Thank you, Your Honor.  Good morning.

7              Can you hear me alright?

8              THE COURT:  I can.

9              MR. ABBOTT:  Thank you.  Derek Abbott of Morris

10  Nicholas Arsht & Tunnell here for the debtors, Your Honor.

11              We had a productive weekend trying to streamline

12  things.  I am going to turn it over to Mr. Kurtz to describe

13  that for the court if I may.

14              THE COURT:  Mr. Kurtz?

15              MR. KURTZ:  Good morning, Your Honor.  Glenn Kurtz,

16  White & Case, on behalf of the debtors.

17              As Mr. Abbott indicated we did have a productive

18  weekend.  The insurers determined to proceed with deposition

19  designations instead of live testimony.  We then spent the

20  weekend, all the parties, working diligently and

21  cooperatively.  Thank you, Your Honor, for some guidance on

22  working cooperatively to come up with how we think we can

23  complete the record here.

24              Specifically, we have gotten deposition

25  designations for the parties.  We have counter designations.

1  That exercise is complete and we will be filing, shortly, a

2  chart which will have, of course, the lines and the pages.  We

3  will also be filing highlighted transcripts that will show all

4  the testimony that is being introduced.  The yellow are the

5  designations, the blue are the counter designations.

6          In addition to the deposition designations the

7  parties worked out and have agreed to the introduction of

8  certain of the exhibits and certain paragraphs of declarations

9  that have been filed along with the motion, and also in reply.

10  That will be filed this morning.

11          I will say that the debtors have expressed the view

12  and continue to have the view that some of the material that

13  will be submitted is not relevant, but we did not think it was

14  a good use of the court's time to have a lot of fighting and

15  argument about relevance.  Your Honor will choose to rely on

16  whatever you want to rely on, but we didn't want this to go in

17  as sanctions relevant from the debtors.

18          There is only one exception to all of this, the

19  debtors don't have any lingering objections and I am not aware

20  that the insurers have any objections as well.  I think Mr.

21  Goodman, on behalf of the coalition, has a limited objection

22  to certain evidence that he will address with the court.

23          So, as I mentioned, we will file all this and the

24  record will be complete, as far as we understand it, this

25  morning in which I don't think impacts the timing of any

1  closing.  Unless the court has any questions I would cede the

2  mic to Mr. Goodman to address his issue.

3        THE COURT:  No, thank you.  I do not have any

4  questions. I appreciate the parties working cooperatively to

5  come up with a way to agree to the submission of additional

6  evidence on a consensual basis, but I do understand we have

7  one objection.

8        Mr. Goodman?

9        MR. GOODMAN:  Thank you, Your Honor.  I will try to

10  be very brief.  We have one unresolved issue regarding the

11  deposition designations and I am not thrilled to have to raise

12  this issue because I think we all want to move onto oral

13  argument, but over the weekend Hartford did designate the

14  testimony offered by Mr. Mosby concerning the reasonableness

15  of the Hartford settlement that we had moved to strike.

16        I will note that Century specifically did not join

17  in this designation.  We informed Hartford that we objected to

18  their designation of this testimony based on Mr. Ruggeri's

19  representations to this court and to us that Hartford was not

20  going to elicit testimony under reasonableness of the Hartford

21  settlement.  And I don't mean to be difficult, but the Mosby

22  testimony that Hartford designated over the weekend is the

23  very testimony that prompted us to file the motion to strike

24  in the first place.  It's the testimony appearing on pages 124

25  to 125 of the transcript.

1          Again, trying very hard not to get into the weeds

2   on this issue.  So I will just simply note that I think Mr.

3   Ruggeri's states were unequivocal on this issue.  They are

4   without qualification.  We would respectfully ask that the

5   testimony from Mr. Mosby regarding the reasonableness of the

6   Hartford settlement be stricken.

7          Thank you, Your Honor.

8          THE COURT:  Thank you.  And that, as I understand

9   it, is pages 124 and 125 of the transcript.

10          MR. GOODMAN:  Yes, it is.  I could screen share

11   that if you're interested, Your Honor, but I don't need to.

12          THE COURT:  That's okay.

13          Mr. Ruggeri?

14          MR. RUGGERI:  Good morning, Your Honor.  James

15   Ruggeri for Hartford.  And we cannot screen share the excerpt;

16   although, I was inclined to do so.

17          I am not trying to be difficult, Your Honor, and

18   the court recalls that Thursday's presentation by Mr. Goodman

19   started into a discussion of Mr. Kenney at his deposition and

20   Mr. Kenney's alleged love of the Hartford settlement.  From

21   there we went into a discussion of Century and Chubb, and

22   discovery issues, and the court halted Mr. Goodman and said,

23   look, why am I hearing this?  The merits of the Hartford

24   settlement agreement are not before me.

25          The issue, as I understand it, between Hartford and

1  debtors is whether there is a binding agreement that Hartford

2  believes that the debtors must proceed to seek approval of.  I

3  told the court there is no motion to approve the Hartford

4  settlement pending before the court and I also said we're not

5  going to elicit testimony on the reasonableness of the

6  Hartford settlement.  That is what I told the court, that is

7  what we have done, that is what we continue to do.

8          Judge, the debtors are arguing in this case against

9  Hartford, and our position, that there has been a change in

10  circumstances that should cause the court to relieve them of

11  their obligations under the settlement agreement.  We

12  designated the Mosby testimony not to show the Hartford

13  settlement agreement is reasonable, that is not before the

14  court, but rather to show that any alleged change of

15  circumstances has nothing to do with the debtor's assessment

16  of the reasonableness of the settlement amount.

17          I am happy to stipulate that we are not offering

18  this testimony to prove the reasonableness of the Hartford

19  settlement, but rather just as evidence to show that any

20  alleged change in circumstances has nothing to do with the

21  debtor's assessment of the reasonableness of the Hartford

22  settlement amount.

23          Mr. Mosby testified, in the 20 lines or so, that he

24  believed the settlement amount was reasonable when he signed

25  the settlement in April and he continues to believe that it I

1  within the range of reasonableness now.  That is all we are

2  citing this for.  It is not to prove the reasonableness of the

3  settlement; he may be right or wrong.  It is just to show that

4  the debtors have not changed their position, their assessment

5  of the reasonableness of the Hartford settlement amount.

6            Thank you, Your Honor.

7            THE COURT:  Thank you.

8         (Pause)

9            THE COURT:  I lost Mr. Goodman.  There you are.

10            MR. GOODMAN:  Yes, Your Honor.  Just briefly.  I

11  mean the issue we have, and again I don't want to belabor the

12  point anymore, but, you know, our view was, again, that the

13  debtors had not appropriately diligenced the Century issue in

14  connection with the Hartford settlement.  You know, that was a

15  line of questioning that we didn't pursue last week based on

16  Mr. Ruggeri's representations to the court.

17            I think I was somewhat difficult on this issue.  He

18  had emailed me and I felt like, you know, they were still

19  trying to leave the door open to get this testimony in and it

20  wasn't until Mr. Ruggeri, you know, said what he said

21  definitively on the record that I said, okay, if that's the

22  case then we're done here.

23            Over the weekend -- in fact, on Sunday morning I

24  opened up my email and I saw, you know, the designation and it

25  was the exact designation from our motion.  It wasn't in the

1  ballpark, it was the very testimony that we had moved to

2  strike was designated by Hartford on this issue.  I was, you

3  know, taken aback by this.  We raised it yesterday.  We were

4  unable to reach agreement, so that is why we are here on this

5  issue.

6            THE COURT:  Okay.

7            MR. RUGGERI:  Your Honor, if I can give Mr. Goodman

8  comfort, we're not asking the court to rule or comment on

9  whether the debtors properly diligenced the Century issue.

10 That is not what I am offering his testimony for.  It is for a

11 much more limited purpose in the scope of what we're trying to

12 resolve both last week and this week with regard to the RSA

13 motion.  It has to do with the alleged change in

14 circumstances.

15            All I am trying to do is make sure the record is

16 clear that from the debtor's perspective there has been no

17 change in circumstances and how they perceive the

18 reasonableness of the Hartford settlement; that is it.

19            Thank you, Judge.

20            THE COURT:  Thank you.  I will consider this when I

21 get the actual designations, but my inclination is to permit

22 it for the limited purpose that Mr. Ruggeri  has stated, which

23 I believe is wholly consistent with the position that the

24 debtor has taken in its papers which is, as I recall it, that

25 the debtors thought the Hartford settlement was appropriate

1  when they entered into it and they still do think that it's a

2  reasonable settlement that they aren't going forward with it

3  because of, among other things, the fact that the plaintiff

4  representatives have said it's a non-starter.

5          So that's how I understand the debtor's position.

6  They can correct me if I'm wrong on it, but I think that

7  testimony sounds very consistent with the debtor's position in

8  front of the court.  So thank you.

9          Okay.  So I understand the evidentiary record is

10 now closed and I will be receiving shortly, at some point this

11 morning, designations and counter designations of deposition

12 testimony and a list of the exhibits that have been or are

13 being agreed to be introduced into evidence including certain

14 paragraphs of certain declarations.

15         So that just leaves us with argument.  We can

16 start; although, as I said on Friday, I've got an 11 o'clock

17 hearing.  So we can have argument for 40 minutes now or we can

18 come back at noon and start argument then and go continuously

19 until we are done.

20         My thought -- I will say my thought is to hit some

21 of these issues squarely as between the parties who have

22 raised them.  So, for example, the Hartford issue I'd like to

23 hear all at one time.  I don't want to hear the debtor's

24 argument on Hartford and twenty other things and then come

25 back to Hartford.  I'd like to hear that issue.  I'd like to

1 hear the issue on the appropriate standard, the conflict

2 issue.  I'd like to hear that all at one time.  I'd like to

3 hear the issue on the coalition's fees all at one time.

4        Then, I think, looking at my piles here I think

5 that the remainder of the issues go more to the

6 appropriateness of the RSA and the debtor's business judgment.

7 And that may be more difficult to manage, but is there a more

8 discreet issue that anyone can identify for me that I have not

9 put into the first bucket?

10        MS. LAURIA:  Your Honor, this is Jessica Lauria

11 from White & Case for the debtors.

12        Your outline, largely, comports with actually how I

13 had arranged the debtor's closing remarks by separating t hose

14 closing remarks between the business judgment rule, whether

15 the business judgment rule was satisfied, the entire fairness

16 step test, our view that that is not applicable here, and

17 finally Hartford.

18        To your point, Your Honor, there are some cats and

19 dogs that get caught-up in the business judgment rule.  There

20 are a handful of items that the parties have pointed out

21 should call into question whether the debtors appropriately

22 exercised their business judgment. I am not talking about the

23 confirmation related issues that we have heard about, which

24 candidly, Your Honor, we were not intending to argue today.

25 We took your comments to heart last week and we agree with you

1  that those matters are not before the court.

2          We can proceed in whatever order you would like,

3  but I do think from the debtor's perspective you capture the

4  list of things that we do need to cover today.

5          MR. SCHIAVONI:  Your Honor, for Century we're

6  amenable to go in the order that you suggested leading with

7  the Hartford issue; although, it's not my issue.  I do wonder

8  whether it might make sense for Hartford to lead rather than

9  the debtors, but I would leave that for Hartford and the

10 debtors to deal with that.

11         MR. ANKER:  Your Honor, this is Mr. Anker.

12 Whatever works for Your Honor.  I will -- I don't want to

13 start the argument now, but I do want to flag for the court,

14 you know, when you say are issues going to bleed together Ms.

15 Lauria just made the argument that we leave plan confirmation

16 for later.  I will give her a preview of something and, Your

17 Honor, you're likely to hear out of my mouth which is if an

18 argument, and I think it is the central argument, against

19 approval of the Hartford -- against requiring the debtor to go

20 forward and seek approval of the Hartford settlement is it is

21 "futile."

22         Futility is a two-way street and if we're going to

23 talk about an RSA that commits the debtor to a plan that we

24 would say requires findings by you, and I'm really not

25 engaging in hyperbole here, that in our view would require you

1  to violate controlling Third Circuit Law or disobey it then

2  futility has to be assessed in two ways; what is good for the

3  goose is good for the gander.

4          If the debtor wants to take that entirely off the

5  table and so if Your Honor said the argument can't be made the

6  Hartford settlement is a dead letter I can live in that

7  (indiscernible) prepared to live in that world.  But I can

8  assure you that if I make futility arguments at the debtor's

9  fourth amendment plan in the RSA I will do so in a limited way

10  both as saying on what is before Your Honor, but I wanted to

11  be candid with Your Honor that is absolutely a positon we take

12  what is good for the goose is good for the gander.

13          Thank you, Your Honor.  And as to whether -- look,

14  I think it is the debtor's burden on the RSA motion.  It's the

15  debtor's burden on walking away from the Hartford settlement,

16  but if Your Honor would rather hear from me first before the

17  debtors on that issue as long as there is no concession by

18  that as to who bears the burden of either proof or persuasion

19  I want to do what is helpful to Your Honor.  So if you want to

20  hear from me first I'm happy to go first, if you want to hear

21  from the debtors and the plan proponents on that issue first

22  I'm happy to proceed that way; whatever works best for Your

23  Honor.

24          THE COURT:  Well I have questions for both sides.

25          MS. LAURIA:  Your Honor?

1          THE COURT:  Yes.

2          MS. LAURIA:  If I may just briefly respond to Mr.

3 Anker's remarks.  We understand where the burden lies with

4 respect to the RSA and to that end while the Hartford

5 component of the RSA is certainly important and important as

6 between Hartford and the debtors I do think in light of the

7 burden it may make sense to start with, sort of, the broader

8 topic of the business judgment rule and what the debtor is

9 gaining, and deal with the business judgment arguments first,

10 then deal with entire fairness, then leave Hartford towards

11 the end of this hearing.

12          I suspect there may be a number of folks here that

13 don't necessarily want to participate in just the Hartford

14 component of the argument.  I know the RSA folks will, but I

15 don't imagine that many of the insurers are going to want to

16 weigh-in on that other than Hartford, but, again, Your Honor,

17 we're very happy to proceed however you would like to proceed

18 today.  We're ready to go.

19          THE COURT:  Okay.  Well I'll -- well I have

20 identified some discreet issues.  I recognize there could be

21 some overflow and I am not going to constrain how the parties

22 argue their issues, I just do see the entire fairness

23 argument, the Hartford issue and the coalition fees as

24 discreet within the context of what is being argued today.

25 You can argue to me you don't think something is discreet;

1  that's fine.

2          So I am going to let the debtor start and frame the

3  issues, that way others can listen and see if, in fact, what

4  is on the table and what is not on the table and respond

5  accordingly. I will say it sometimes is more helpful to just

6  hear the objectors first, but given what I am hearing here I

7  will permit Ms. Boelter to frame -- sorry, Ms. Lauria to frame

8  the issues -- your maiden name is still up there.

9          MS. LAURIA:  I know.  I know.

10       (Laughter)

11         THE COURT:  The -- I will let her frame the issues

12  and as for the order it doesn't really matter to me as long as

13  when we get to -- well, we will take the first issue first,

14  business judgment.

15         MR. ANKER:  Your Honor, this is Mr. Anker.

16  Obviously, we will proceed as you would like.  I am concerned

17  -- frankly, the insurers had spoken.  I was among the insurers

18  to speak first.  We were going to address the Hartford issues

19  which, frankly, frame, from our standpoint, substantially

20  above the other issues.

21         I am concerned.  We had two days of testimony and,

22  frankly, haven't dealt with that legal issue at all.  I can

23  understand why Ms. Lauria would like to push it to the end of

24  the day when Your Honor (indiscernible); although, I must say

25  I am quite impressed by your patience and stamina, but you may

1 | be tired.

2 |        If we can move the Hartford issue up that would

3 | certainly be our preference, but, again, we would defer to

4 | Your Honor on how you would like to proceed.

5 |        THE COURT:  Well the debtor -- I'm changing my mind

6 | here.  The debtors described the Hartford issue as a gating

7 | issue.  And I do view it as a discreet issue.  I don't

8 | anticipate being exhausted at the end of the day, but who

9 | knows.  So let's start with that.  And given that we're going

10 | to start there I'd like to start the argument at noon.  We

11 | only have a half an hour here anyway.  It will give time for

12 | parties to adjust, to the extent necessary, how they plan to

13 | argue.  Let's start at noon so we're not breaking up the

14 | argument and the rhythm of the argument.

15 |        Okay, so --

16 |        MR. ANKER:  Thank you, Your Honor.

17 |        THE COURT:  Thank you.  So we are in recess until

18 | noon.

19 |      (Recess taken at 10:26 a.m.)

20 |      (Proceedings resumed at 12:02 p.m.)

21 |        THE COURT:  This is Judge Silverstein.  We're back

22 | on the record in Boy Scouts to begin to start argument.

23 |        Let me just say that I find that the rhythm of Zoom

24 | hearings is not the same as it is if you're in the courtroom

25 | and I'm sure you all recognize some version of that on your

1  own.  So I always feel like I'm interrupting people on Zoom.

2  So if it seems like that I apologize in advance, but since I

3  anticipate asking questions I just thought I would mention

4  that.

5          Mr. Lauria?

6          MS. LAURIA:  Thank you.  Jessica Lauria of White &

7  Case on behalf of BSA.  Just holler at me if I start talking

8  over you because we do definitely appreciate that Zoom

9  hearings are not an ideal way to present to the court either

10 evidence or argument.

11         So we're starting today's hearing on the Hartford

12 issue and let me start by saying that the Hartford settlement

13 agreement and the position that the parties took with respect

14 to the Hartford settlement agreement is really exactly as Your

15 Honor articulated it in the colloquy with Mr. Ruggeri and Mr.

16 Goodman.

17         From the debtor's perspective, when we had the

18 opportunity to enter into the RSA we viewed this as a very

19 significant milestone in these Chapter 11 cases.  We finally

20 had, after eighteen months -- and by the way, our eighteen

21 month anniversary is Wednesday, I will come back to that later

22 on in my presentation.  But we finally, after eighteen months

23 of this bankruptcy proceeding, fourteen months of mediation,

24 have the ability to reach an agreement with the TCC, the FCR,

25 the coalition and State Court counsel representing 70,000

1  survivors.  That was critically important to the debtor.

2         As Your Honor acknowledged, and I think as everyone

3  is aware, the coalition, the FCR, the TCC, and State Court

4  counsel all informed the debtor and this court, in no

5  uncertain terms, that they would "never" support a plan of

6  reorganization that contains the Hartford settlement.  Indeed,

7  they have told us repeatedly and they've told the court

8  repeatedly that they believe the Hartford settlement is not in

9  the best interest of survivors.

10        So with that backdrop our board had to look at

11 entering into an RSA with the support of the survivor

12 constituency and recall, Your Honor, from the very first day

13 of this bankruptcy case we had dual objectives, preservation

14 of the mission and equitable compensation for survivors.  The

15 survivors are key to achieving both of those goals.  We

16 finally got to the point where we were able to achieve those

17 goals and unfortunately we have survivor constituents that

18 believe the Hartford deal is not good for them.  That is then

19 reflected in multiple places in the RSA.

20        You will have seen in the RSA, on page 7, that the

21 debtors are required to seek the determination from this court

22 that we're not obligated under the Hartford settlement.  By

23 the way, I want to pause on that a moment and I'll come back

24 to it multiple times.  Mr. Anker previewed for you this notion

25 that if Hartford is futile so is the RSA, isn't this just, you

1  know, two sides of the same coin.  It's not, Your Honor.  The

2  RSA requires us to get a determination with respect to the

3  Hartford deal.  There is a specific finding in the order that

4  requires this court to conclude that we're not obligated under

5  Hartford.

6        With respect to the issues that Mr. Anker is

7  speaking about and, again, I am going to come back to this in

8  the presentation, insurance neutrality being one of them, we

9  have been very express we are not seeking that determination

10  today; we are only seeking a path forward.  That futility

11  argument is very different from the board's perspective and I

12  think from the court's perspective in terms of what we need to

13  conclude to get past today's hearing and to approve the RSA.

14        In addition to that determination that we're

15  required to seek the RSA also has various termination events.

16  So if this court were to conclude that the debtors are

17  obligated to pursue Hartford the survivor constituencies have

18  the right to terminate it.  Similarly the debtors would have

19  the right to terminate it as well.  The survivor

20  constituencies also have the right to terminate the RSA if we

21  file a plan that incorporates the Hartford settlement.

22        So suffice it to say this was a very important

23  issue with respect to the survivor constituencies.  It's one

24  that the debtors did not take lightly before bringing this

25  before the court, but it is exactly, Your Honor, as you

1  articulated it before the break, we are not going to be

2  arguing changed circumstances in the context of the Hartford

3  dollar amount.  That is something that the survivors feel, not

4  something that the debtors feel.

5          So that brings me to what should we do with the

6  Hartford settlement.  I think there are two approaches.

7  Approach one is Hartford is taking the position that

8  notwithstanding the fact that this court has not yet approved

9  the Hartford settlement it is binding on the debtor.  We are

10 going to walk through that in a moment, but we think under the

11 Third Circuit's Martin decision you don't even need to get to

12 the four corners of the contract, you don't need to get to

13 what the contract says, what the contract doesn't say.  What

14 Martin says is when you have an embedded conflict between the

15 debtor's fiduciary obligations to the creditor body as a whole

16 versus their duties to a singular creditor they're supposed to

17 bring that conflict before the court, let the court know of

18 changed circumstances and see where the court comes out.

19         Nonetheless, let's go to the contract because I

20 know Hartford is going to argue that the contract is binding

21 on the debtors and that the debtors are obligated to pursue

22 either the Hartford plan or the BSA toggle plan

23 notwithstanding the fact that this court has not approved this

24 agreement.

25         So if I may, Your Honor, I'd like to turn to Tab 5

1  in your evidence binder, this is the debtor's evidence binder,

2  Tab 5 is the mediator's report that attaches to it the

3  Hartford agreement.  And we think the first provision of the

4  agreement, and it occurs on page 7, I will give you a moment

5  to get there.

6            THE COURT:  I'm there.

7            MS. LAURIA:  Thank you, Your Honor.  We think this

8  answers the question, but I will go through a couple of other

9  provisions as well.  The first part of this agreement says,

10           "This agreement shall become effective on the

11 earliest date on which all of the following conditions

12 precedent have occurred unless those conditions are waived by

13 each party."

14           Now Hartford, in their pleading, tries to analogize

15 this to a circumstance where the only condition that is left

16 in order for the agreement to be effective is bankruptcy court

17 approval.  That is not our circumstance.  We are very far from

18 meeting these five conditions precedent, which I will walk

19 through in a moment.

20           The courts that have said that a debtor is bound by

21 a particular post-petition 363 agreement up until the point

22 that the court doesn't approve it are situations where the

23 only thing left from a condition precedent perspective was

24 bankruptcy court approval.  And in those circumstances the

25 court analogized bankruptcy court approval to a condition

1  subsequent.

2          The court's essentially said the debtor is going to

3  be bound with a bankruptcy court approval condition

4  subsequent.  If that condition subsequent fails the debtor is

5  no longer bound, but up until that point in time the agreement

6  is binding.  In this case the language could not be clearer;

7  these are not conditions subsequent.  They are, in fact,

8  conditions precedent to the obligations of the parties.

9          Let's review them because only one of these, by the

10  way, has been met and that's the first one; each party has

11  executed the agreement.  We have met that condition.

12          The second condition, Hartford has received a fully

13  executed local council relief on behalf of each local council.

14  What is this talking about?  This agreement contemplates that

15  every local council, all 250 local councils, will sign a

16  separate release agreement that releases their rights in the

17  Hartford insurance policy.  Suffice it to say, Your Honor, not

18  only is this not done, I would guess that Mr. Mason will tell

19  you that he hasn't even seen a copy of the local council

20  release agreement.  I don't think any local council has seen a

21  copy of the local council release agreement.  This is very far

22  from being achieved.  That is one of the second condition

23  precedent.

24          The third condition precedent, and this is where we

25  get to bankruptcy court approval, the bankruptcy court has

1  either entered the confirmation order or the approval order,

2  in accordance with Section 1(b) below and I'm going to come

3  back to that 1(b).  What the agreement sets up for bankruptcy

4  court approval is, essentially, a two prong approach; either

5  the debtors could incorporate the Hartford agreement into the

6  plan of reorganization and receive approval of the Harford

7  deal that way or if you turn to the next page, page 8 -- by

8  this way, this is one provision that expressly by its terms

9  applies notwithstanding the fact that the agreement effective

10 date has not occurred says,

11         "As an alternative to obtaining approval of the

12 sale and the agreement through the confirmation order,

13 Hartford may request at any time after the execution date."

14         That is a different date that is contemplated by

15 the agreement.  Hartford can request at any time after the

16 execution date that we proceed by a motion.  Hartford has not

17 made that request, Your Honor.  And I suspect that is because

18 Hartford knows, unfortunately, what the outcome of that

19 request would be.

20         THE COURT:  So, Ms. Lauria, I did notice this

21 provision on the agreement effective date provision.  I did

22 notice the use of the term execution date in Paragraph (b).

23 You are going to walk me through some other provisions, I take

24 it.  I, at least, found one other which dealt with the

25 agreement effective date.

1          What does that say with respect to the debtor's

2    commitment to file a motion and pursue a plan?  How do I

3    reconcile the agreement effective date provision with other

4    provisions in the agreement that require the debtor to

5    cooperate, for example?  How do I reconcile those?

6          MS. LAURIA:  Yeah, that's a fair question, Your

7    Honor, because I recognize that some of those cooperation

8    provisions don't specify after the execution date versus the

9    agreement effective date.  I think the way the document is

10   drafted it assumes that both parties and, in fact, there is a

11   cooperation provision that will continue to work to get the

12   agreement approved.

13          In our view, Your Honor, that is not in a

14   circumstance where there has been, what I would describe, as a

15   colossal failure of conditions precedent to occur.  In fact,

16   the agreement contemplates circumstances where the effective

17   date would not occur. So, for example, if you look at page 13

18   there's a proviso that fully reserves Hartford's rights, this

19   is at the top of the page, provided, however, and it talks

20   about up above what Hartford is required to do unless the

21   agreement does not go into effect then it says provided,

22   however, notwithstanding anything to the contrary contained in

23   this agreement nothing herein shall be construed to preclude

24   or limit Hartford's right to object to a plan or the

25   disclosure statement.

1          So we actually contemplated the possibility that

2 this could occur or take any other actions in the bankruptcy

3 case that it may deem necessary to protect Harford's rights

4 and interests.  In the event that this agreement is not

5 approved by the court or to the extent that the plan includes

6 any alternatives or conditions under which this agreement

7 would not be part of the plan as confirmed and the agreement

8 effective date would not occur.  That is how this provision

9 concludes.

10          So Hartford's rights we contemplated it.  Their

11 rights are fully reserved with respect to that issue.  The

12 only provision of this agreement that I believe Hartford can

13 point to, and I would argue is completely inapplicable here,

14 that they would say obligates the debtor to continue to pursue

15 the Hartford plan or the BSA toggle plan is on page 14.  That

16 is in 3(I) of the agreement.

17          What they are pointing to is BSA's agreement that

18 they shall not file and shall not support any plan of

19 reorganization that is inconsistent with the terms of the

20 agreement other then, and there's a long proviso, that suffice

21 it to say this proviso is describing, essentially, the BSA

22 toggle plan, a plan where local councils were not getting

23 relief or survivor constituencies were not voting in favor of

24 the plan and where the Hartford agreement was not part of the

25 plan.

1      Hartford is arguing that this provision here is

2  binding on the debtors and if the court concludes that the

3  Hartford agreement is not -- that you will not approve the

4  Hartford agreement that this survives.  They are basing that

5  on, if you turn back a page, Section 3(f) that says,

6      "Notwithstanding anything to the contrary in this

7  agreement in the event of any judicial disapproval of this

8  agreement, including the bankruptcy court's refusal to approve

9  the sale and enter the confirmation order, or as applicable

10  the approval order, or upon appeal it's been vacated or

11  reversed the parties can void the agreement."

12      If you turn to (h) on page 14 it says, basically,

13  if this agreement becomes null and void pursuant to Paragraph

14  3(f) above then accept for Sections, and it says 3(I), which

15  shall remain in full force and effect.  So what Hartford is

16  arguing is that 3(I), which we just read, that  has the

17  obligation to support the plan or only to a BSA toggle plan

18  survives if this court concludes that the approval order

19  cannot be entered or the confirmation order cannot be entered

20  approving the Hartford deal.  That is the Hartford argument as

21  I understand it.

22      What is very important from the debtor's

23  perspective, Your Honor, is that 3(f), which is the one

24  section when combined with 3(h) that speaks to survival, only

25  talks about judicial approval.  It doesn't talk about a

1  complete failure to satisfy the conditions precedent to this

2  agreement.  And those conditions precedent are the 250 local

3  councils releases, it is a channeling injunction in favor of

4  the local councils.  The conditions precedent include that the

5  plan effective date has occurred.  By the way, that plan

6  effective date has -- the plan, itself, has 11 conditions

7  precedent in the plan itself.  To get to the plan effective

8  date would require, Your Honor, to conclude that the plan is

9  confirmable under Section 1129.

10         So we think while there is a survivability

11  provision in this agreement it only applies, by its terms, in

12  the event that the court concludes that the agreement can't be

13  approved.  It doesn't speak to a complete and absolute failure

14  of the conditions precedent to agreement.  And in the face of

15  a complete and absolute failure we believe, Your Honor, that

16  this (I) should not be enforced upon the debtor and the

17  debtor's estates.  That is, I think, where the rub is in

18  connection with the contract itself.

19         THE COURT:  How do I -- so you think, temporal

20  nature if you will of these provisions puts Paragraph (h)

21  looking at now versus at looking at some time in the future?

22         MS. LAURIA:  So I would say, Your Honor, that

23  Paragraph (h) and Paragraph (f), when read with it, really --

24  so I think it's a tortured reading that Hartford is employing

25  to try to apply these now.  In our view, when the agreement

1  was entered into, as with any mass tort case, there is a

2  possibility for appeal.  And so when we look at (f) it really

3  speaks to, well, if something happens with the approval order

4  and all of the other conditions precedent have been met there

5  are certain things that must, by definition survive.  They

6  have listed them out.

7        I -- subpart (I), in my view, doesn't actually make

8  a lot of sense in terms of the survival for that context.  I

9  mean read Sentence one,

10        "Hartford shall be treated as a settling insurance

11 company under the plan and shall be provided all benefits and

12 protections afforded to settling insurance companies including

13 the benefit and protection of any releases, and channeling or

14 other injunctions."

15        Hartford is attempting to argue that that sentence

16 survives notwithstanding the fact that the survivability

17 clause only comes into play if the court doesn't, in fact,

18 approve the agreement.  Its nonsensical, Your Honor, to make

19 that argument.  We think the only logical reading, though, of

20 (f) is that it only applies if the one condition precedent

21 hasn't been satisfied and that's bankruptcy court approval.

22 Even then (I) doesn't make sense in the context of these

23 cases.  That is the argument that Hartford is hanging their

24 hat on.

25        Again, from the debtor's perspective it's not

1   simply that the bankruptcy court hasn't approved the

2   agreement.  The issue is that it is impossible to meet the

3   conditions precedent under this document.  In fact, there is

4   no evidence that any plaintiff, not even one survivor, would

5   vote in favor of a plan if Hartford were in it.  That means

6   that of the four of the five conditions precedent to the

7   effectiveness of this agreement cannot be met.

8          Now one thing I'm sure Your Honor noted, and it was

9   in the papers, was that there is no fiduciary out in this

10  agreement.  The debtors believe that that is a red herring.

11  We have viewed Article 1(a), conditions 1 through 5, as

12  stronger than a fiduciary out.  It requires the bankruptcy

13  court to make so many different findings, all of the 1129

14  findings, it requires all of the plaintiffs to be supportive

15  of the plan including the Hartford deal.  It requires

16  confirmation orders, it requires all 250 local councils to

17  have actually supported the Hartford deal.

18          We think this is better than a fiduciary out.  This

19  is a court out.  It's a survivor out.  It's a local council

20  out and it provides the protection for the debtor in entering

21  into the agreement. But if Your Honor, as I said, you're not

22  convinced by the four corners of the agreement because of

23  3(f), 3(h) 3(I), we think under <u>Martin</u> you don't have to get

24  there.

25          So what <u>Martin</u> says to us is, and this is the

1   situation that the debtor's found themselves in, we have the

2   TCC, the coalition, the FCR, representatives for 70,000

3   survivors telling us they hate the Hartford deal, they will

4   never support the Hartford deal.

5          THE COURT:  So Hartford says, well, you really need

6   to test that because who's to say if you put out, I think, the

7   second amended plan that contains the Hartford deal and the

8   toggle deal who's to say that, in fact, those -- the

9   plaintiffs, the abuse survivors won't vote for the Hartford

10  plan because the toggle plan is worse according to plaintiff's

11  lawyers or, at least the TCC.

12         So what about the idea that we have to test that to

13  know?

14         MS. LAURIA:  So, Your Honor, we did test that and I

15  think the testimony of the witnesses on Thursday and Friday,

16  including in the deposition designations, demonstrates that we

17  entered into the Hartford agreement on April 15th and we

18  mediated, and we mediated, and we mediated afterwards and

19  there has been no solution.

20         By the way, on April 15th, when the debtors entered

21  into the Hartford agreement, the debtors didn't have a deal

22  with the plaintiffs with respect to their own contribution to

23  the trust.  We didn't have a deal with the plaintiffs with

24  respect to the ad hoc committee or the local councils

25  contribution to the trust, but we continued to work at it and

1    if you look at the plan that was filed just prior to the

2    Hartford deal I don't -- you may not recall this, but I have

3    strangely a good memory on this, I was before Your Honor on

4    Monday, which I believe was the 12th, on that Monday I

5    announced to the court that we were going to be filing a

6    toggle plan that was on the heels of a mediation that we were

7    very concerned that we would not reach an agreement with the

8    plaintiff representatives.  We announced the Hartford deal two

9    or three days later, also had a toggle plan, but as I said to

10   the court then, and we still feel it this way today with

11   respect to both the insurers and the chartering organizations,

12   we were going to keep mediating and that is what we did.  We

13   went back to several in-person mediation sessions.

14           In fact, from the debtor's perspective if you

15   compare the plan of reorganization that we filed on or about

16   that April 12th, April 13th timeline from today the local

17   council and BSA contributions to the settlement trust have

18   gone up by 57 percent.  On that day we were at $540 million.

19   We have gone up to $850 million.  We tested our own

20   contributions to the settlement trust. We sat through a very

21   long, you may recall, and painful exclusivity hearing on both

22   our contributions and the Hartford contributions to the

23   settlement trust, but we kept at it, we kept mediating.

24           So from the debtor's perspective it's not as if we

25   didn't test the hypothesis that maybe the plaintiffs would

1  come around, we tested, we poked, we prodded, but we don't

2  think from the estate's perspective that we should incur the

3  cost of going out with a solicitation of a plan that we have

4  been told for months, and months and months is dead on

5  arrival.

6        The other thing that I would note, since I

7  mentioned exclusivity, and this is something that you will

8  hear me discuss in the context of business judgment, but it

9  also comes up particularly in the context of Hartford. I think

10 Hartford would like us to test the hypothesis.  Hartford would

11 like us to try to solicit a plan A plan that has Hartford as

12 the plan A centerpiece along with the local councils and the

13 debtor, and then have a plan B toggle plan to see if the

14 plaintiffs really want the toggle versus the plan A.

15        The fact of the matter is, and the reason I raise

16 the 18 month anniversary of this case, Your Honor, is our

17 exclusivity expires on Wednesday.  Now just to remind you of

18 where we're at today the last time your court -- Your Honor

19 considered and entered an order on exclusivity was way, I want

20 to say was January or February of this year.  We have the

21 exclusive right to file a plan through March 18th and the

22 exclusive right to solicit through May 18th.  That is what

23 Your Honor's order said earlier this year.

24        The debtors filed a motion to extend under the

25 Delaware Bridge Rules, the extension happens automatically.

1 Your Honor, heard us on that point on May 19th at that

2 hearing.  There was very loud and vocal objection from the

3 TCC, the FCR and the coalition.  Your Honor has not ruled.  So

4 we are currently living under the Delaware Bridge Rules, but,

5 again, the right to file -- the exclusive right to file a plan

6 expires on the 18th of -- so two days from now and the

7 exclusive right to solicit our plan would expire on October

8 18th.  And that is assuming, by the way, Your Honor, you

9 actually grant the request that we asked for back in May.

10      If you grant what the objecting parties wanted, and

11 by the way it's a huge benefit of the RSA that we resolve

12 their objections to exclusivity.  Without the RSA I can assure

13 you the TCC, the FCR, and the coalition will be back up in

14 front of you, Your Honor, saying don't extend the debtors,

15 terminate the solicitation period and we're going to file our

16 own plan.

17      Hartford assumes that we have the luxury of

18 unlimited exclusivity to test their hypothesis, we do not.  We

19 are 18 months into this case, we are at the end and very near

20 the end of the debtor's statutory exclusive period.  If the

21 court were to conclude that the debtors don't have the ability

22 to not seek approval of the Hartford deal the very simply

23 answer from the plaintiffs, and they've told us this, is to

24 terminate what little time we have left and pursue their own

25 plan of reorganization that looks the exact same as the plan

1  of reorganization we have now.

2      So the RSA, and I don't want to bleed into some of

3  the other RSA arguments, but the RSA actually maintains the

4  debtor's feet at the table notwithstanding where we are at in

5  our exclusive right to file a plan of reorganization.  So that

6  is how we respond to Hartford's argument as far as that is

7  concerned.

8      I think, Your Honor, the weight of the evidence was

9  clear if we're looking to Martin as guidelines.  Martin says

10  the debtor should bring the changed circumstances before the

11  court and that is what we are here to do.  I think all of the

12  debtor's witnesses testified that in their view circumstances

13  did change.  In Hartford's view Hartford purports that we all

14  knew the plaintiffs were going to object so what really has

15  changed.

16      Well we knew at the time we entered into the

17  agreement that the plaintiffs objected, but as Mr. Whittman

18  testified, you know, what was changed from his perspective was

19  the unified intent and continued in broad based insistence of

20  plaintiff constituents that they would never support a plan of

21  reorganization that included Hartford.  So it wasn't that we

22  thought that we were going to be soliciting a plan that the

23  plaintiffs disapproved.  We entered into an agreement, we went

24  to mediation in good faith.  We ultimately cut a deal with the

25  plaintiff constituencies which was a tremendous achievement

1  for this bankrutpcy case.  We view that as a changed

2  circumstance.  We viewed the fact that the plaintiffs were not

3  able to come along and repeatedly told us that they would

4  never come along with Hartford as certainly a changed

5  circumstance and that was a certainly a changed circumstance

6  for our board.

7           So that, I think, Your Honor, brings me back to the

8  futility argument.  In light of --

9           THE COURT:  Well, let's talk about Martin.

10          MS. LAURIA:  Sure.

11          THE COURT:  Let's talk about Martin, because that's

12 an interesting case.  We all think about it in the Third

13 Circuit, anyway, as the standard for settlements and not this

14 particular issue that Hartford has raised.

15          So, when you go back and you read the case, it's

16 really kind of fascinating, but one distinction in the case,

17 and in some of the other cases, though, probably not all of

18 the cases that were cited by the parties, is that this is an

19 individual Chapter 7 case and you have a debtor and a

20 Chapter 7 Trustee.  So, you don't have the same entity,

21 though, I recognize there's a distinction between a debtor and

22 a debtor-in-possession.  You have different entities who are

23 making the motion, objecting to the motion, and creating the

24 changed circumstances.

25          So, it's different factually, I think, from, and

 1  procedurally, from our posture.  And the Court calls it a very

 2  unique set of facts and circumstances.

 3          But it also, even as a matter of law, here, the

 4  Court intervened, right.  The settlement motion was in front

 5  of the Court.  The Court had the settlement hearing.  The

 6  Court was apprised that the trial court might actually go

 7  forward with the underlying litigation and there might be a

 8  verdict and the judge put off the hearing on the settlement

 9  motion, continued it to a future date.

10          And in the meantime, in fact, the trial court

11  happens and there's a verdict in favor of the debtors, and

12  then when the Bankruptcy Court reconvenes the hearing on the

13  settlement motion, that jury verdict has happened and there's

14  a changed circumstance.

15          So, the Court, in essence, with the motion in front

16  of it, continued the hearing for the changed circumstance.

17  How do I -- and the Third Circuit says somewhere that --

18  shoot.  Well, the Court considers the Bankruptcy Courts

19  actions in connection with its ruling; they also inform its

20  ruling.

21          So, we really don't have anything like that here,

22  or do we?

23          MS. LAURIA:  Yeah, so, great question, Your Honor.

24          Two things that I want to respond.  Understand that

25  we are not on all fours in a sense that we had a debtor and a

1  trustee that were clearly on different pages with respect to

2  the underlying litigation, which essentially resulted in the

3  changed circumstance.  But I would note that the nondebtor,

4  settling party, one of the arguments that they presented to

5  the Court -- and I was just looking for the cite in my own

6  copy of Martin, and I couldn't find it right offhand -- but

7  that party actually argued that when the trustee entered into

8  the settlement and it became clear that there was going to be

9  a jury trial where there would be a verdict, the trustee

10  represented to the other party that that was not, in fact, a

11  changed circumstance.

12        So, as you noted, it wasn't even the debtor saying;

13  it was the Court saying, I don't feel good about the situation

14  that's being presented to me, and actually approving an

15  agreement when I have before me a very significant changed

16  circumstance that affects the best interests of the creditors

17  in this case.

18        And that's where I think we are in the same place,

19  Your Honor.  I do think that you do have in front of you an

20  RSA, that it clearly has the support of the overwhelming

21  number of survivors and it is those survivors that are the

22  direct beneficiaries of the dollars that Hartford is going to

23  be putting into the estate.

24        So, you do have a question before you of, does it

25  make sense for me to require the debtor to continue to follow

1  the Hartford settlement?

2         Now, I take the struggle, because in Martin, as in

3  the other cases, I think even in Filene's Basement, what was

4  before the Court was actually a motion to approve the

5  settlement.

6         You don't have the motion to approve the

7  settlement.  I'm going to get back to the Hartford argument,

8  by the way, of why that requires an adversary proceeding.  I

9  think they're assuming that what we're effectively asking the

10  Court to do is to declare a declaratory judgment.  We think

11  they're wrong that that requires an adversary proceeding, but

12  you're right, you don't have a motion in front of you.

13         From the debtors' perspective, you know, we could

14  have simply proceeded along the lines of the RSA, had that RSA

15  silent about Hartford, filed a plan that didn't include

16  Hartford, but then we would be confronted with the very real

17  possibility, as Hartford said to us previously, that we were

18  breaching an agreement that we thought was ineffective with

19  respect to us and that somehow that breach would give Hartford

20  some special rights, some special administrative priority

21  rights, *vis-a-vis*, the debtors.

22         So, I guess we could have set it to the side.  I

23  guess we could have not brought it by motion, but we decided

24  that in light of Martin and the struggle that Martin

25  acknowledged between the fiduciary responsibilities of the

1  debtor to the estate versus to a particular creditor, it made

2  the most sense for us to bring it before the Court and get

3  guidance from the Court.

4        I suppose we could proceed with the RSA or the plan

5  and just drop Hartford from it, but when you have a party in

6  interest that is actually telling the debtor that they are

7  obligated to comply with the terms of an agreement that the

8  debtor thinks is ineffective, we felt we needed to bring that

9  to Your Honor.

10        And now, I guess, maybe I should briefly address

11  the adversary proceeding point, Your Honor, unless you have

12  other questions about Martin.

13        Like you, I found Martin interesting.  When Martin

14  was cited back to me for this proposition, I thought, you

15  can't be talking about Martin, because that's, you know, we

16  all know Martin from a different context, so I also found the

17  case very interesting.

18        THE COURT:  Yeah, the Court talks about what

19  doesn't constitute a breach, but it's not clear to me exactly

20  the contours of the agreement that was before the Court and at

21  least at Headnote 19 on page 395, the Court says:

22        "Accordingly, we conclude that the better course is

23  to allow a trustee, who fulfills her statutory duty to

24  maximize assets of the estate, the opportunity to report the

25  change in circumstances to the Court and to the creditors.

1  Such an act, without more, would not constitute a breach of

2  contract."

3        So, the Court is, again, sort of confining itself

4  to the very specific factual circumstances in front of it and

5  is saying, what this trustee did, without more, would not

6  constitute a breach of contract.  She took no affirmative

7  steps to withdraw the motion -- that's at the top of the next

8  column -- but simply supplied additional information to the

9  Court, disclosing the State Court verdict.

10        MS. LAURIA:  And, again, Your Honor, I think that

11  goes to my point that in light of Martin, while I suppose we

12  could have attempted to proceed with the RSA or the fourth

13  amended plan -- and, by the way, I should note, we continued

14  to have the Hartford agreement in the last draft of the plan

15  that we filed, the fourth amended plan, with a footnote,

16  because as I noted, we have a party that is arguing the debtor

17  is bound by a post-petition agreement and that we are

18  breaching the agreement by not pursuing it.

19        So, again, from the debtors' perspective, whether

20  you want to read Martin to say the Court can make a choice

21  between the fiduciary obligations of the debtor to the

22  creditor body as a whole versus an individual creditor, we

23  think that is very clear guidance the Third Circuit is

24  providing you, or whether you want to take a more narrow view

25  of In re Martin to simply say, the debtor is not breaching its

1  post-petition agreement by failing to pursue it in the face of

2  the (indiscernible) bringing the changed circumstances to the

3  Court.

4         That's what we're here doing.  We felt that we

5  needed to bring it to you before we took further action, by

6  filing a plan that did include Hartford.  But we think, Your

7  Honor, it's not binding on the estate; it's clearly an

8  exercise in futility.  It's not effective.  Hartford has

9  protection under the agreement.

10        We think that in order for you to even approve the

11  agreement and lock the debtor into pursuing a BSA toggle plan

12  or lock the debtor into pursuing a Hartford plan, we would

13  need to conclude that that is somehow in the best interests of

14  the creditors here.  It's not and we think it's rather

15  remarkable that Hartford is taking the position that they can

16  actually lock the debtor-in-possession into pursuing a path

17  that has no upside for Hartford, by the way.

18        The Hartford deal is not going to be approved.  The

19  only -- the plaintiffs have said it.  I mean, they're all --

20        THE COURT:  The plaintiffs have said it.

21        Let me ask you this, is Hartford bound by this

22  agreement?  Could Hartford walk today if they wanted to?

23        MS. LAURIA:  I think so, and I think Mr. Anker

24  would tell you that he is absolutely not bound by the terms of

25  the Hartford agreement.  It hasn't been -- you know, the

1  effectiveness of the agreement has simply not occurred.

2  They're not obligated to pay their $650 million, and, in fact,

3  I think if I submitted to them, you know, a bill for paying

4  that, they would say, No way.  They're just not obligated.

5          THE COURT:  Okay.  So, there's sort of like the

6  meat of the agreement and then there's everything that goes

7  around the agreement, right.  So, the meat of the agreement is

8  the six-hundred-and-fifty-million-dollar payment, right, and

9  the release, et cetera.  But there is what goes around the

10  meat of the agreement, like filing the motion, filing the

11  plan, seeking approval, cooperating.

12          And maybe they're not effective because of the way

13  the agreement was drafted and the definition of agreement

14  effective date and some of the other provisions.  So, maybe

15  they're not effective.

16          But, yeah, I don't think anybody is suggesting that

17  the meat of the agreement, the six-hundred-and-fifty-

18  million-dollar buy-back of the policy and the channeling

19  injunction isn't effective today, before it gets Court

20  approval.  But Mr. Anker argues that the rest of it is.

21          And why shouldn't parties be bound, in some

22  fashion, by agreements they enter or aren't we

23  disincentivizing parties from spending so much time and

24  resources on agreements?

25          MS. LAURIA:  So, Your Honor, my response to that

1  is, the provision that Hartford wants to enforce against the

2  debtor is the meat of the agreement.  It's not that Hartford

3  wants the debtor to file a motion approving the Hartford

4  agreement.

5         As I said to you, Hartford has never come to the

6  debtor and said, we're giving you the 20-day notice period.

7  We want you to file the motion.

8         The meat of the agreement, from the debtors'

9  perspective, is the pursuit of a Hartford deal, so they want

10 to enforce the meat of the agreement.

11        When it comes to all of the other stuff, the

12 cooperation provisions, Your Honor, we cooperated.  We filed

13 the mediator's report with the Hartford agreement.  We filed a

14 plan of reorganization that incorporated the Hartford

15 agreement.  We filed a disclosure statement that incorporated

16 the Hartford agreement.  We filed a motion to extend our

17 exclusivity in order to propose the Hartford agreement and

18 solicit the Hartford agreement.

19        In the face of that motion to extend exclusivity,

20 every single plaintiff party objected and I sat here for hours

21 before the Court and argued the merits of the Hartford

22 agreement and why the plaintiffs were wrong, and we submitted

23 the declaration of Mr. Whittman.

24        We took all -- and we continued to go to

25 mediations, and we invited Hartford to mediations, and we

1  invited all of the plaintiff parties to mediation.  We

2  continued to fight for that Hartford agreement, but we are

3  sitting here many months in and we have made no progress, with

4  respect to the plaintiffs.

5          In fact, the plaintiffs have said, we will not do a

6  BSA local council deal with you if Hartford is a part of it:

7  not simply, they're agnostic; not simply, like, oh, maybe

8  we'll hold our nose or let's kind of see where things shake

9  out in the case.  They have affirmatively said to us they

10  won't do the deal, and that's after the Boy Scouts did

11  everything they could, after entering into the Hartford deal,

12  to try to get the plaintiffs onboard with the Hartford deal,

13  including jeopardizing our own exclusivity, because of the

14  Hartford deal.

15          The coalition wasn't objecting to the debtors'

16  extension of exclusivity, prior to Hartford; in fact, the

17  objection deadline had passed on exclusivity.  We filed the

18  Hartford deal; the coalition filed an objection.  And we

19  defended the Hartford deal and we defended our exclusivity,

20  but we're now at a point in time, Your Honor, where we're at

21  the end of exclusivity, even assuming you were to extend it,

22  and the plaintiffs could file their own plan of

23  reorganization.

24          So, not only is the Hartford agreement futile,

25  because no single plaintiff will ever vote in favor of it, but

1   it's only going to cause the debtor to take a sideline in

2   these Chapter 11 cases if we're forced to abide by it, unless

3   the plaintiff constituencies file their own plan of

4   reorganization when exclusivity gets terminated or expires in

5   a few months.

6           THE COURT:  Okay.  What about the cases that say,

7   what about the cases on the other side of this, the cases that

8   say, sure, the debtor can take another path; they can decide

9   that their fiduciary duty requires them to take another path.

10  But then they have an option.  They should evaluate a breach

11  is better for them than pursuing the original path.

12          Why are those cases wrong?

13          MS. LAURIA:  Your Honor, I wouldn't say that those

14  cases are necessarily wrong.  I guess from our perspective, we

15  elected to go what I'll call "the Martin path," which is

16  before stepping into a world where we were arguably in breach

17  of the agreement, at least from Hartford's perspective.  We

18  wanted to come to you.

19          And, again, from the debtors' perspective, those

20  breach cases, and in particular, the cases that kind of talk

21  about that condition, subsequent Bankruptcy Court approval

22  point, that's not our facts.

23          You know, we don't think the agreement is binding.

24  We are pretty confident that it wasn't binding.

25          We were cooperating, as we thought was the right

1  thing to do.  The cooperations failed.  We saw failure of the

2  conditions precedent, and so we elected to go the Martin

3  route, not the breach route.

4        THE COURT:  So, the parties just decided to enter

5  into an agreement that wasn't binding and take their chances

6  that neither of them would back out?

7        MS. LAURIA:  Well, Your Honor -- and, listen, this

8  is -- I have been on the other side of this where I'm

9  representing a non-debtor party that is engaged in a

10 transaction with the debtor -- there is always an element of

11 risk before the Bankruptcy Court approves the transaction.

12 And that's true, by the way, whether we're -- even if we're in

13 the conditions subsequent world, there's always a risk that

14 the Court would conclude that the transaction is not viable

15 and in that event, the nondebtor party, as well as the debtor

16 is out of luck.

17        There is always an inherent risk doing a deal with

18 the debtor-in-possession that the Court would have to think

19 more broadly than the nondebtor counterparty's rights, has to

20 think broadly about the best interests of the estates, is not

21 going to approve the transaction.

22        THE COURT:  Yes, but don't the parties assume that

23 they're going to work toward getting Court approval?

24        MS. LAURIA:  I think they do and, Your Honor, I

25 think we did.  As I said, I think the debtor did employ every

1  effort to try to defend its exclusivity in the face of

2  Hartford.

3         We filed a plan.  We received -- again, we never

4  got to the disclosure statement on May 19th, but the

5  disclosure statement was also scheduled to be heard that day

6  and I had binders this tall of objections from the survivor

7  constituencies and the big objection, among other things, was

8  the Hartford agreement.  So, we heard it then, but we

9  continued to mediate.  We defended the Hartford agreement at

10 that time.  We continued to mediate.

11        And I think as you've heard now from our Board and

12 from Mr. Whittman, we now believe it is, in fact, futile.  We

13 received a letter from the plaintiffs.  I don't know how long

14 we should be forced to continue to pursue a deal that the

15 plaintiffs are saying, categorically, they will never vote in

16 favor of.  That, to us, is waste of estate resources,

17 particularly, when we have a viable proposal before the Court

18 that provides, just from BSA and the local councils,

19 $850 million of consideration.  It doesn't foreclose the

20 ability for us and the plaintiffs and Hartford to reach an

21 agreement.  We just haven't been able to get there and the

22 plaintiffs are saying they just will not get there with

23 respect to the six-hundred-and-fifty-million-dollar Hartford

24 deal.

25        THE COURT:  And I assume that the debtors' position

1   is that Hartford could have no damages of any kind if the

2   agreement is not enforceable before approval?

3            MS. LAURIA:   I think the debtors' position is this,

4   Hartford has raised in its papers that if this were brought by

5   adversary proceedings, that Hartford would then have the

6   ability to assert an administrative claim for damages.

7   Hartford has not articulated to the debtor what it believes

8   those damages may be, but I would note that if Hartford

9   believes it has damages from the action of this Court, if the

10  Court were to approve the RSA and make the conclusions that

11  the parties, the RSA parties have asked for, if Hartford

12  believes it has damages, it is free to bring a proceeding

13  before this Court; it doesn't require an adversary proceeding.

14  They can file a motion, I would assume,      under 503, and

15  assert those, and we would need to litigate whether there are

16  damages that are allowable, because the Bankruptcy Court

17  hasn't approved.

18           I think the debtors' position would also be that

19  we've done everything in our power to try to get Hartford to

20  cross the finish line or even for the starting line; we've not

21  been able to do that, despite all of our efforts.  And we can

22  determine whether or not Hartford would be entitled to

23  damages, despite the debtors' efforts in getting the Hartford

24  deal approved, notwithstanding the plaintiffs' objection, and

25  the fact that we're now here with a complete failure, as I

1  call it "a colossal failure" of the conditions precedent.

2           THE COURT:  So, what does the finding in the order

3  that the debtors want --

4           MS. LAURIA:  Yes, that --

5           THE COURT:  I'm looking at my order.

6           MS. LAURIA:  Let me just pull mine out.

7           So, Your Honor, we filed --

8           THE COURT:  Paragraph F.  I'm looking at

9  paragraph F of this -- hopefully, the right document:  5769-1.

10           MS. LAURIA:  Correct.  That's what I have, as well.

11           THE COURT:  Okay.  So, paragraph F wants me to make

12  a finding that the debtors have no obligation to seek approval

13  of and no obligations under the Hartford settlement.

14           So, if this provision doesn't preclude Hartford

15  from asserting a damage claim, if I were to permit the debtors

16  to go forward with the RSA, then what does it -- what's that

17  finding, what's the import of that finding?

18           MS. LAURIA:  Yeah, fair enough, Your Honor.

19           Because, you know, as I'm reading it, the note

20  obligations under the Hartford settlement could certainly

21  suggest that the debtors don't have any obligation to pay any

22  damages to Hartford.

23           I would want to confer with the RSA parties,

24  because this language was taken from the RSA.

25           THE COURT:  Uh-huh.

1        MS. LAURIA:  Again, I can speak from the debtors'

2   perspective.  We were not, nor did we brief whether or not

3   Hartford could assert a damages claim against the estate on

4   account of the action under the RSA.  I don't believe that

5   that is what was intended.

6        I think the parties were intending to say the

7   debtors are not obligated to pursue the Hartford settlement,

8   not that the debtors wouldn't have some monetary damages,

9   obligations to Hartford, but I would need to confer with the

10  RSA parties, because I know where we stand, but I think we

11  need to find out where others stand.

12       THE COURT:  Okay.  Because I think -- yeah, the use

13  of the word "obligated" -- well, maybe it's "obligation" and

14  "obligations" in that paragraph, I think, is something that I

15  had a question about, as I've been thinking about what it is

16  that I'm supposed to consider today, what it is that I am

17  supposed to be ruling on, and what is the standard that I

18  should be using to rule, which we're going to get into later.

19       But considering the posture I'm in, what rulings

20  can I make, putting aside the adversary proceeding argument

21  for a moment, and I know, for example, in filings, the Court

22  also had thoughts that procedurally, there were some

23  procedural irregularities, but the issue of whether he had to

24  approve the first agreement was in front of him.

25       I don't have the first agreement for approval in

1  front of me.  I don't have the Hartford agreement for approval

2  in front of me, yet, what today I'm being asked to do is let

3  the RSA, is to approve the RSA and at disclosure statement,

4  I'm going to be allowed to -- I'm going to be asked to permit

5  the debtor to pursue a plan, to solicit a plan.  The

6  solicitation of the plan requires my approval, although, I'm

7  not really sure that there's a provision in the Code that says

8  that.

9       So, I'm trying to figure out in sort of this larger

10 context here, what I can, and should, be deciding.  So, I

11 don't know that I had a question there.  I'm saying that I

12 need to know what the import of that provision in the order

13 is, to know what it is that I'm deciding today.

14       MS. LAURIA:  Fair enough, Your Honor.

15       I will certainly consult with the RSA parties;

16 again, from the debtors' perspective, we wanted to ensure that

17 we were not going to sort of further breach the Hartford

18 agreement by going forward after today, even though we don't

19 think we are in breach of the Hartford agreement.

20       Again, if Hartford believes that it has a claim, an

21 administrative claim for damages, we don't agree with that,

22 but I don't think that we, the debtors, are asking Your Honor

23 to decide the merits of that administrative claim today.

24       THE COURT:  Thank you.

25       I think I had a question on another provision of

1 | the order, but it may not have had -- yeah, I guess it's the
2 | complementary order in paragraph 2.
3 | MS. LAURIA:  Yes, I see that, Your Honor.
4 | My response would be the same for that.
5 | THE COURT:  Right.
6 | MS. LAURIA:  Again, we'll confer with the RSA
7 | parties, but not seeking to preclude parties from submitting
8 | claims against the estate.
9 | THE COURT:  Okay.
10 | MS. LAURIA:  Well, Your Honor, I think, via your
11 | question, that covers everything that I would have otherwise
12 | covered in my presentation.  So, unless you have any more
13 | questions, I can cede the podium.
14 | THE COURT:  Thank you.
15 | MS. LAURIA:  Thank you, Your Honor.
16 | MR. ANKER:  Your Honor, this is Mr. Anker.  I don't
17 | think if there were others who want to speak in support on the
18 | debtors' side of this issue, and notwithstanding the length of
19 | the debtors' presentation, but I don't want to jump in and be
20 | presumptuous.
21 | THE COURT:  Yes, if there's anyone else who's going
22 | to speak in support, I'd like to hear that now.
23 | Mr. Stang?
24 | MR. STANG:  Thank you, Your Honor.
25 | We had tried to coordinate this amongst the RSA

1  parties.  I don't know if Mr. Mason wants to go next, but I am

2  prepared to read the statement on behalf of the TCC, if he is

3  not.

4        MR. MASON:  It's Richard Mason, Your Honor.

5        I would defer to Mr. Stang, other than to confirm

6  what Ms. Lauria has said in terms of the local councils

7  receiving a form of release in the Hartford agreement.  I'm

8  probably notoriously behind on my emails, but I think I would

9  have noticed that if it came across, so I believe I can say we

10 did not.

11       MR. STANG:  Then I'll proceed, Your Honor.

12       Your Honor, everyone has told you they want to be

13 short.  I'm going to try to make good on my promise.

14       Your Honor, I suspect that there are dozens of

15 survivors watching this hearing today and over the course of

16 the two days that we had of evidentiary testimony, we got some

17 emails and people said, What does this got to do with us?

18       No one is talking about the survivors.  I want the

19 survivors to know, and I want the Court to know, that the TCC

20 has been involved in every aspect of the negotiation of the

21 restructuring support agreement.  We have been engaged as an

22 active party with the other RSA parties, and that the Hartford

23 issue was a significant part of the ongoing mediations that

24 Ms. Lauria referred to.

25       So, to the survivors that are listening today, the

1  TCC, which is a fiduciary to all of you, is very engaged in

2  the RSA and now the Hartford issue, in particular.

3          Your Honor, just as we have said before, the answer

4  to Hartford, the Hartford settlement is a no.        Mr. Anker

5  made a comment a few hearings ago that we should all just

6  watch and see what happens, because at the end of the day,

7  survivors are going to take the money.

8          Well, we are going into the disclosure statement

9  hearing shortly, where we have no settlements with any of the

10 carriers.  We do not have settlements with any of the

11 chartered organizations.  We are looking at the contribution

12 from BSA and the local councils that, on its face, is $150

13 million.

14         Mr. Anker, the answer is still, no.  We are not

15 taking the $650 million from Hartford, which we believe is not

16 only extremely low, given our analysis of the Hartford

17 exposure, but, in fact, is illusory, because of the Century

18 provision.  Century has said that it does not have the ability

19 to pay what we believe is a fair settlement, which is well

20 above the $1.3 billion, which (indiscernible) the fifty-cent

21 reduction.  So, the answer is no, because Hartford's payment

22 is too low.  Hartford's payment, because it is too low, is not

23 going to set the map for the other carriers and, in fact, we

24 can't tell if Hartford's even going to pay a dime under the

25 settlement.

1          Ms. Lauria was quite right about the impending

2    exclusivity problem and the confusion that it will entail, at

3    least confusion for the thousands of survivors who are going

4    to be facing dueling plans.

5          I did not say that the toggle plan works.  The

6    toggle plan was not an acceptable alternative because it did

7    not provide for post-confirmation opportunities to do the

8    kinds of global resolutions that everyone is working towards

9    now, pre-confirmation.  There will be -- if the RSA does not

10   go forward, the TCC, in combination, hopefully, with the

11   coalition, but regardless of how that turns out, the TCC will

12   file its own plan and it will ask the Court during the 60-day

13   solicitation exclusivity, to allow its plan to go out, as

14   well.  And so, this is an exercise in futility.  The TCC will

15   proceed in the best interests of survivors and we would

16   support, Your Honor, the approval of the RSA.

17          Thank you, Your Honor.

18          THE COURT:  Thank you.

19          MR. MOLTON:  Your Honor, David Molton.

20          May I say just a couple of even shorter words on

21   this issue?

22          THE COURT:  Yes, Mr. Molton.

23          MR. MOLTON:  Yes.  David Molton, Your Honor, of

24   Brown Rudnick, for the coalition.

25          As you'll hear today, the plan -- the RSA

1   components on the plaintiffs' side, have divided up the

2   assignments and, accordingly, what I have to say on this is

3   just some added few comments.  But I join with Mr. Stang and

4   Ms. Lauria in all of the arguments that they made.

5          I do want to reiterate something, I think

6   Mr. Stang said, is that we heard a lot of talk and a lot of

7   testimony on Thursday and Friday; very little of that on

8   survivors.  We'll deal with that later on today, I'm sure.

9          Your Honor should realize, and I think Mr. Stang

10  touched on it, that we all, on the Plaintiffs' side,

11  representing the survivors, bristle when we hear the term $650

12  million, that this is a six-hundred-and-fifty-million- dollar

13  settlement.  We're not going to get there today, but it's

14  really a mischaracterization.

15          And I just want to do two things, Your Honor, that

16  I think you mentioned.  We want to reiterate from the

17  coalition's perspective, representing 18,000 or so survivors

18  who have signed our consents, and with State Court's counsel

19  affiliated with us, who represent over 60,000 survivors, and

20  then with the remaining State Court counsel, who join the RSA,

21  representing, as Ms. Lauria said, over 70,000, we adamantly,

22  vigorously, and unequivocally, reject and will not approve the

23  Hartford settlement.  That should be on the record, noted, and

24  realized.

25          I'm not going to go into the reasons as to the

1  merit.  If Your Honor wants to, Your Honor has our joinder to

2  the TCC's objection to plan exclusivity extension, which is

3  Docket Number 2672, which, in detail, outlines the problem

4  with Hartford that Mr. Stang alluded to.

5           I do want to say, Your Honor, you mentioned earlier

6  that you thought the TCC objected to the toggle plan.  We also

7  have objected to that.  We also think it provides Boy Scouts

8  with no opportunity for survival.  And, actually, if adhered

9  to and followed, would put the local councils into

10  (indiscernible) bankruptcies, which would deprive survivors of

11  fair and equitable compensation for years.  And I would refer

12  Your Honor to paragraph 37 of Docket 2672, where we noted our

13  objection to the toggle plan.

14           Thank you, Judge.

15           THE COURT:  Thank you.

16           Anyone else?

17           MR. BRADY:  Your Honor, Robert Brady for the FCR.

18           THE COURT:  Mr. Brady?

19           MR. BRADY:  Your Honor, we join in the arguments of

20  the debtors, the TCC, and the coalition here.  As we said from

21  the beginning, the Hartford settlement and the toggle plan is

22  really a road to nowhere.

23           The RSA is a path to emergence and is a platform

24  for a consensual plan.  We think it moves the case forward,

25  Your Honor, where the Hartford settlement or path, really -- I

1  hesitate to even call it a settlement, Your Honor, because

2  what it is, is just a cap on their liability.  It really does

3  not advance this case at all.  We would urge Your Honor to

4  proceed with the RSA.

5          THE COURT:  Thank you.

6          Anyone else before I go to Mr. Anker?

7      (No verbal response)

8          THE COURT:  Mr. Anker?

9          MR. ANKER:  Thank you, Your Honor.

10          I'm going to change on the fly what I was going to

11  say.  It was part of the order, given what occurred on the

12  other side.

13          I want to start with Ms. Lauria's argument about

14  conditions subsequent and conditions precedent.  I think Your

15  Honor has some skepticism about that and it was well taken.

16  First, it's a brand-new argument.  I haven't gone back and

17  read every case, but I don't think the words "conditions

18  precedent" and "conditions subsequent" appear in their papers.

19  You should think about whether when a party starts its

20  argument with (audio interference) having nothing to do with

21  the merits, what that says.

22          The second observation I want to raise, could we

23  have walked?

24          Ms. Lauria didn't answer your question.  It is

25  right that if Your Honor doesn't enter into a confirmation

1  order approving a plan that includes the Hartford settlement

2  in it, we will not have to pay $650 million.  But that's not

3  the point.

4         The point is what we couldn't have done is a day

5  after we signed the agreement, say, you know what, we think

6  650 is too high.  Even if the Court enters the approval, we

7  won't pay it.  You shouldn't go forward and seek approval.  We

8  have a right to just take this agreement, as you put it, and

9  treat it like it's an agreement to do nothing.  That's not

10 right.

11        I accept, and I will represent to the Court during

12 the break today and half of yesterday in another case where I

13 represent an ad hoc bondholder committee and there is a

14 fiduciary-out and there is an issue about whether that debtor

15 will exercise it, I know what it is to enter an agreement

16 where a debtor can unilaterally change its mind.  That is a

17 disagreement.  There is no fiduciary-out, and it's distinct,

18 in that sense, from the RSA, where the agreement with those

19 parties does have the fiduciary-out.

20        Let me talk one minute about the agreement itself,

21 because I think you have it exactly right.  The debtor says

22 there's been a complete failure of conditions precedent and it

23 points to Section 1(a)(4) of our agreement.  Let's take a look

24 at those provisions for a moment.

25        Each party has executed the agreement; that's

1  occurred.  Hartford has fully (indiscernible) local council

2  relief on behalf of each local council.

3         She's right, we have not, but has received, as in

4  the future, is look at the fourth condition, the confirmation

5  order provides for a release and channeling injunction for the

6  benefit of the local councils.  No one is seriously going to

7  argue that if a plan is confirmed that gives the local

8  councils a channeling injunction, they would not grant the

9  release provided by Section 182.  Your Honor, we're not

10  even -- Your Honor didn't fall off the turnip truck, nor did

11  I, in negotiating this.  Three, the Bankruptcy Court has

12  entered a confirmation order.  That is prospective, entering

13  the order.  And, finally, five, the BSA has provided notice.

14         Look at what the agreement says in the provisions

15  Ms. Lauria pointed to.  She pointed to paragraph 3(e), as in

16  Earl, which is on page 13.  Look at what that says,

17  Consummation of the transactions, transactions contemplated by

18  this agreement, is expressly conditioned upon occurrence of

19  the agreement effective date.  Yes, our payment of

20  $650 million and a grant of the releases is all conditioned on

21  that, but not seeking approval.

22         Look at paragraph 3(h) which says, quote, if this

23  agreement becomes by, in the future, null and void pursuant to

24  3(f)(n), and then various provisions remain in effect.

25         And look at 3(f) on page 13, Not listing anything

1  in the (indiscernible) agreement in the event of judicial

2  disapproval of this agreement, can the Bankruptcy Court's

3  refusal to approve the sale and enter the confirmation order,

4  and it then goes on.  This was not a nullity.  It was an

5  agreement without a fiduciary-out, obligating the debtor to

6  seek approval of either a global resolution plan, including

7  the Hartford settlement, or a toggle plan.

8           And, Your Honor, Ms. Lauria is right about one

9  thing.  We did not ask that they separately file a settlement

10 motion, which we could have.  This agreement was written so

11 that only we have that option, and that was critical.

12          What was critical -- and Your Honor got it right --

13 what we really think -- and I'm going to get to this when I

14 get to futility -- notwithstanding Mr. Stang's remarks,

15 notwithstanding Mr. Molton's remarks, if the choice the

16 claimants have to actually prove their claims, go in the court

17 with all their rights, duties, and obligations and seek every

18 penny they're entitled to -- that's the toggle plan -- the

19 debtor gets a release and a discharge.  No one else does.  We

20 think, and we think the evidence is overwhelming, and I will

21 get it to you, that, in fact, they will take not only the

22 Hartford settlement, but, frankly, we will have settlements

23 with other carriers in short order.

24          And I will get to that --

25          THE COURT:  So, that's Hartford's leverage?  Is

1   that what that provision was, some kind of Hartford leverage?

2            MR. ANKER:  Well, Your Honor, I don't think

3   "leverage" is the right word.  Let me try to put it

4   differently, Your Honor.

5            And I am now going completely out of order in my

6   argument, but that's fine.  That's fine.

7            THE COURT:  Judges do that to you all the time,

8   don't they?

9        (Laughter)

10           MR. ANKER:  Judges do that and it's totally fair.

11           Okay.  So, let me push that.  You said the other

12  day, I wonder who's really overreaching here.  Maybe the

13  debtor is overreaching, maybe the claimants are overreaching,

14  maybe the insurers are overreaching.

15           And I have a suggestion on how you should answer

16  that question.  See, talk is cheap.  Actions speak louder than

17  words.  They're the sayings my mother told me way back when.

18  They're not as good as your saying that your mother told you

19  that the telephone works both ways; something, I will make

20  sure to use someday with my kids.

21           We are willing to live with going back to the tort

22  system because we think in the tort system, we will end up

23  with a result that is not bad.  We will end up with a result

24  where valid claims get paid and invalid claims don't get paid.

25  We knew that there were only 275 lawsuits as of the petition

1   date, not 82,500 proofs of claim today.  We knew when you --

2   as you'll see in the exhibit, that the debtors now believe,

3   the debtors now believe that even with all the friendly

4   trustee they have, the vast majority of the claimants are

5   going to be $3500 and walk away, an amount of money that no

6   one would take if they were really ready to prove-up a claim

7   of anal penetration or oral penetration in the tort system.

8          So, no, Your Honor, I don't think it's leverage as

9   in there's something illegitimate about it.  Going back to the

10  tort system is exactly what insurance neutrality is; it's

11  saying let's not have the bankruptcy change the result, let's

12  see where we end up.

13         And you just heard Mr. Stang say and Mr. Molton say

14  they are unwilling, for all their bluster about how great

15  their clients' claims are, they're unwilling to go to the tort

16  system.  So, we were willing to do one of two things; one, put

17  this whole matter behind us for $650 million, more than anyone

18  has ever been willing to pay in any abuse (audio interference)

19  or, two, if the claimants think it's too cheap and we knew

20  that that first alternative would require confirmation of a

21  plan, then go back to the tort system and let's see who's

22  right and who's wrong about the law and the facts.

23         Let me speak to one other issue.  You raised the

24  question, and it's a fair one, is there a remedy here (audio

25  interference) beyond specific performance?

1     Let me back up.  I don't think you can read this

2   agreement -- I am jumping, so let me go back a moment.

3     One thing you didn't hear Ms. Lauria talk about at

4   all was the implied duty of good faith that exists in every

5   agreement.  Of course they had an obligation to seek approval.

6   That's what the cooperation provision means.  That's what the

7   implied duty of good faith is.

8     And agreements are entered into all the time.

9   Think of your typically 363 sale agreements.  They are

10  agreements that say the sale, the transaction will be

11  effective the date, which is defined as following Court

12  approval.  That doesn't mean you can't say that the debtor can

13  unilaterally decline to seek approval in the first place.

14  That would violate the spirit of the agreement, the terms of

15  the agreement, and the duty of good faith.

16    You then asked the question -- I'm sorry, Your

17  Honor, were you going to ask me a question?

18    THE COURT:  No, go ahead.

19    MR. ANKER:  You then asked me, (indiscernible)

20  Ms. Lauria the question, what about remedy?

21    And I thought about that.  Is there a concern here

22  about whether we're entitled to specific performance as

23  opposed to damages?

24    First, I will say, point you to the RSA.  The RSA

25  requires, by its terms, that this Court enter an order holding

1  that the debtor has no obligations under the agreement, to

2  seek Court approval or any other approval.  If you look, Your

3  Honor, in the RSA, Roman two, "Agreements of Debtors," Section

4  2(a)(viii) on page 7, the debtors are obligated by the RSA

5  motion or a separate motion to seek, quote, a determination of

6  a Bankruptcy Court that the debtors have no obligations under

7  the Hartford settlement.  If the debtors have no obligations,

8  then I'm not sure how we do have an administrative plan.

9           And if you look at, again, termination rights,

10  romanette -- Roman V, termination, starting on page 12, but if

11  you go to (v)(b), this is termination by the coalition, the

12  TCC, State Court counsel, and the FCR, if you look at (v), the

13  Bankruptcy Court determines that debtors must adhere to the

14  terms of the Hartford settlement.

15           Moreover, Your Honor, so, one, it would be a

16  failure of the RSA.  Number two, it is kicking down the can

17  something that is extraordinary.  We would be talking about

18  here, an administrative claim under Reading v Brown, a claim

19  for the difference in our exposure, potentially, what it would

20  be if our settlement doesn't go through under either of the

21  two alternatives, the toggle plan or the BSA settlement versus

22  what it would be if this fourth amended plan, a plan that I'm

23  going to get to, I think is designed to manufacturer tens upon

24  tens of billions of dollars of liability.

25           THE COURT:  But wouldn't that depend on whether or

1  not I would have ultimately approved the Hartford plan, the

2  Hartford settlement?

3             MR. ANKER:  It --

4             THE COURT:  That --

5             MR. ANKER:  It might well, Your Honor, but just

6  think about the issue that you're putting yourself, where

7  we're headed.  We asserted an administrative expense claim if

8  it is a valid claim.  (Audio interference) reach that issue.

9  The point -- every plan, then, fails because the debtor is

10 administratively insolvent.

11             You know, one of the reasons why sometimes specific

12 performance is the remedy is because the damages would not be

13 adequate.  Damages are not adequate in this context because

14 this debtor would be administratively insolvent if (audio

15 interference), and so, what the Court should do -- and my last

16 point on that -- is look at the cases.  None of the cases that

17 we've talked about -- Martin -- and I would point the Court to

18 Manuel Mediavilla, I am surely butchering the last name of

19 that case, and I apologize to the gentleman.  By the way, that

20 was both, a corporate 11 and a Chapter 13.  It's not a

21 debtor-in-possession.

22             And the debtor-in-possession, that was a case

23 (audio interference) issued an order.  Parties entered into a

24 settlement with a secured creditor.  The secured creditor

25 would be treated a certain way.  The Court, before the

1  settlement agreement could be teed up for approval, issued a

2  decision on the merits, giving the secured creditor inferior

3  treatment.  The debtor refused to go forward, confirmed the

4  plan that gave the treatment that the Bankruptcy Court had

5  provided, and the First Circuit unanimously reversed plan

6  confirmation and held that the debtor had to seek approval of

7  the plan under the deal that was proposed.

8          So, I don't think that under the facts of this

9  circumstance, the circumstances of this case, kicking the can

10  down the road and saying, maybe you'll have an admin claim,

11  works.  That is (audio interference) RSA.  It creates a

12  situation where there can be an administrative insolvency and,

13  therefore, damages don't end up being an adequate remedy, and

14  it's contrary to the case law that -- in all of the cases.

15  None of the courts did that.

16          Let me step back for one moment, Your Honor.  Those

17  are my (audio interference) --

18          THE COURT:  Well, one of the courts I think did

19  that.  And I was just looking at my notes on Manuel Mediavilla

20  --

21          MR. ANKER:  You certainly got it better than I did,

22  Your Honor.

23          THE COURT:  Oh, I don't know.  Yeah, the -- it does

24  talk about it.  I think maybe it's one of your stronger cases,

25  although it is -- well, I was looking at the bankruptcy court.

1   I read the lower opinion too.

2           MR. ANKER:  The BAP is --

3           THE COURT:  Where's my BAP opinion.

4           MR. ANKER:  -- 560 -- 568 B.R. 551, Your Honor.

5           THE COURT:  Yeah, where's my BAP opinion.  No, I

6   don't think I have it.  So let's forget that, but let me ask

7   you a question.  At least one of the cases, though, I also

8   read talked about this debtor's choice between breaching the

9   agreement if it thought it was in its fiduciary duties to do

10  that versus -- and weighing that, I guess, and is your thought

11  there we can't do that here because we don't know what the

12  administrative claim is going to be?

13          MR. ANKER:  I guess I would say three things, Your

14  Honor, one is the point you just raised.  When is specific

15  performance required as a matter of law?  It's required where

16  damages would not provide an adequate remedy.  Damages don't

17  provide an adequate remedy when you have an insolvent obligor

18  who can't pay.  Two, as a -- there are a lot of cases on that,

19  Your Honor.

20          Two, I think what's before you today is an RSA

21  motion that is conditioned on Your Honor making a

22  determination that the debtors may with impunity not proceed

23  with our agreement because the debtors have, quote, "no

24  obligation thereunder."  Unless the claimants are all prepared

25  to waive that and we change all the language, and this Court

1  makes it clear we can file a claim and the Court is not in any

2  way adjudicating whether they are in breach, that is

3  inconsistent with the one piece of relief that is before Your

4  Honor, the request for approval of the RSA, and I pointed the

5  Court to the sections.

6            As a practical matter, isn't Your Honor going to

7  have to face this issue?  Let's imagine Your Honor did that.

8  We then file an objection to plan confirmation saying we're an

9  administrative expense creditor entitled to X hundreds of

10 millions of dollars, whatever the number would be, the plan is

11 infeasible, Your Honor is going to have to at that point

12 adjudicate the question you posed, which is could the debtor

13 without any legal liability simply not proceed with this

14 agreement.  And so it seems to me the issue is before Your

15 Honor now and you're just kicking down the road -- kicking the

16 can down the road otherwise.

17            Let me go --

18            THE COURT:  Let me ask you another question before

19 we get off the agreement because I will readily say that I

20 didn't see the argument with respect to the contract language

21 in the briefing.  I did, however, pull out the contract

22 because I wanted to know what the obligations were, and so I

23 saw the provision on the agreement effective date.  I saw on

24 page 22 -- I'll let you get to it --

25            MR. ANKER:  I'm there, Your Honor.

1          THE COURT:  -- the representations and warranties

2   and other miscellaneous provisions, paragraph (a), and which

3   says -- it has the intro and then it says, "Subject to the

4   occurrence of the agreement effective date, no further action

5   is necessary to make this agreement binding and legally

6   enforceable."

7          So I'm finding some of the provisions in the

8   agreement make me question -- and I'm the one who has to make

9   a determination on this --

10          MR. ANKER:  Sure.

11          THE COURT:  -- the effectiveness of the agreement.

12  I know that there are often in agreements that have provisions

13  with respect to the effective date or the execution date,

14  provisions that delineate this paragraph is effective

15  immediately, this paragraph is effective upon some other date,

16  et cetera.  This one doesn't do that specifically.  So, if I

17  find that the agreement is not clear on its face, then what do

18  I do?

19          MR. ANKER:  Well, I suppose, Your Honor, if you

20  concluded it's not clear on its face and it's ambiguous, you

21  would have to go to parol evidence and there's been no

22  evidence by the debtor on that question and it has the burden.

23  But let me push back, Your Honor.

24          One of the things that I think sometimes we all as

25  lawyers -- and I am guilty of this too -- is we check our

1   commonsense at the door.  What is the commonsense reading of

2   this agreement?  The commonsense reading of this agreement is

3   that the parties had a duty starting immediately to seek and

4   to cooperate, to seek approval and cooperate in getting that

5   approval from the Court.  And that when the agreement says

6   that it's not effective until the agreement effective date,

7   that means the obligation of the debtor to sell the policies,

8   the agreement on my part to pay six -- my client's part to pay

9   650 million.  And I point you again to section 3

10  (indiscernible) consummation of the transactions is on page

11  13, Your Honor.  Consummation of the transactions contemplated

12  by the agreement is expressly conditioned.  And 3(f), which

13  (indiscernible) the agreement being a nullity not if either

14  side decides we just want to walk away, but in the event of

15  any judicial disapproval of this agreement.

16          The hypothetical you are -- the possible reading

17  you're positing is that not one word in this agreement is

18  meaningful in both sides.  You asked exactly the right

19  question to Ms. Lauria.  Ask yourself the question, imagine

20  that we have had -- we're buying the policies back, so I think

21  buyer's remorse is the right -- we had buyer's remorse and the

22  next day after signing this agreement we said, you know what,

23  on second thought, we only want to 600 million, not 650 in

24  settlement.  And let's just assume the hypothetical is

25  different, Mr. Molton, Mr. Stang, Mr. Brady all thought it was

1  a great deal.  We couldn't have said and Your Honor never

2  would have ruled that we could have just walked away and said,

3  on second thought, just take this thing and rip it up.  That's

4  (indiscernible) the logical conclusion you're drawing.

5  So I would submit to you, in answer to your

6  question, the only viable reading of this agreement is that

7  the obligation to go forward and seek approval was effective

8  immediately and, after all, that agreement doesn't require

9  court approval.  And so you're getting to a point where you're

10  finding ambiguity where it's not there.

11  Two, if you did -- and, two, there's a duty of good

12  faith in every agreement under settled law, that would take

13  that duty of good faith and push it aside.

14  Third, if you did find that there is ambiguity, the

15  debtor has to lose because it presented no evidence on this

16  issue and it can't present any evidence on this issue.  Ms.

17  Lauria said there were extensive negotiations of the

18  agreement, that's right.

19  So if I've answered your question, Your Honor, let

20  me go back to what -- and let me start out by trying to put in

21  some context what is at issue here.  What is at issue here is

22  relevant to this case, but it's also relevant, Your Honor, for

23  the administration of bankruptcy cases generally.  I don't

24  mean to put more burden on Your Honor, but I will say to Your

25  Honor the advice I give clients on whether -- when they can

1   enter into agreements with debtors that don't have fiduciary

2   outs and that -- then that the debtor will have to go forward

3   and seek court approval, that's the advice I've given for 30

4   years.  This case will I think change that advice if the

5   answer is, even without a fiduciary out, the debtor can simply

6   change its mind and walk away.

7          And you asked earlier about whether we were seeking

8   leverage.  Think about the testimony from Mr. Desai and

9   (indiscernible) Mr. Whittman.  One of the supposed changed

10  circumstances they cited is that they got to a deal,

11  ultimately, after our deal, with the FCR, with the TCC, and

12  with the Coalition.  I got a pit in my stomach when I heard

13  that testimony.  So the answer is that we were just a foil, we

14  were just leverage for them to get to a better deal with

15  others and that that agreement wasn't at all binding, even to

16  seek court approval?  Even though it didn't say -- and it

17  could have said, if the debtors insisted on it, we never would

18  have signed it -- our obligation as debtors to seek approval

19  is conditioned on our ability to get the FCR, the TCC, and the

20  Coalition on board.  It could have said that, it didn't say

21  that, and they never would have gotten to a deal with us had

22  it said that.

23         So what's at stake here is how parties in

24  bankruptcy act and whether a debtor when it signs an agreement

25  is bound by its words, and that brings me to my next point,

1    setting the stage.  The debtor isn't -- I mean, I heard Mr.

2    Desai and it came out of their briefs, he obviously read the

3    debtors' brief, where he said, you know, we're just seeking

4    guidance form the Court.  It's a quaint term, it would be an

5    advisory opinion if you gave it, but that's not what they're

6    seeking.  Their motion seeks, quote, paragraph 17, "Entry" --

7    "The debtors are seeking entry of an order relieving them of

8    any obligation to seek approval of the Hartford settlement."

9           THE COURT:  Excuse me, everyone please make sure

10   your phones are muted but Mr. Anker.

11          MR. ANKER:  Paragraph (f), they find -- in the

12   findings, they ask this Court to, quote, "The Court hereby

13   finds and concludes as a matter of law that the debtors have

14   no obligation to seek approval and have no obligations under

15   the Hartford settlement."  They are asking you to bless them

16   and say they are not in breach and they don't even need to

17   seek approval and, unquestionably, ultimately, confirmation of

18   a plan, either the global resolution plan with the Hartford

19   settlement or the toggle plan instead, will require Court

20   approval, but the obligation to seek it is something they had

21   from day one and it's not something that needed this Court's

22   approval.

23          I don't know, Your Honor, if you see it, but

24   someone is on the screen with a Seven-Mile Bridge

25   (indiscernible) to the Florida Keys.  I don't know if that can

1  be taken off the screen, but I will continue in either event.

2          Your Honor, I'm not going to spend much time, I

3  think Your Honor knows the law in the adversary proceeding,

4  but I do want to spend one minute on it.  What is being sought

5  here is declaratory relief.  They used the determination

6  (indiscernible) seeking -- the debtors aren't seeking damages,

7  they're not seeking injunctive relief, the only other form of

8  relief (indiscernible) they're seeking a declaration that

9  there are no enforceable (indiscernible) as you put it, under

10 the Hartford settlement agreement.  That is a request for a

11 declaration with respect to property rights.  Why do I say

12 that?  A contract is of course a property right.

13          We all learned at the very outset as bankruptcy

14 lawyers that after a debtor files a (indiscernible) cannot --

15          THE COURT:  Excuse me --

16          MR. ANKER:  -- simply terminate the agreement --

17          THE COURT:  -- I'm sorry.  Everyone needs to mute

18 your phones or your computer and, if they're not muted, I'm

19 going to ask that you be taken off the call.  So, please right

20 now check.

21          I'm sorry, Mr. Anker.  Go ahead.

22          MR. ANKER:  Thank you, Your Honor.  I appreciate

23 it.

24          Where I was headed, Your Honor, where I was headed,

25 Your Honor, was simply to say, the proposition that a contract

1  right is not property would turn bankruptcy law on its head.

2  When a debtor files for bankruptcy, can a counterparty five

3  days later (indiscernible) notice?  I think everyone on this

4  call who spent one minute studying bankruptcy law would say,

5  no, it's a violation of the stay because it's an exercise of

6  control over property.  Contract rights include property --

7  I'm sorry, property rights include contract rights.  I

8  certainly would -- my intellectual property law partners would

9  be pretty amazed at hearing that contract rights are not forms

10 of property.

11         So they are seeking a declaration.  Why does it

12 matter?  Your Honor may say, look, we've had the evidence, but

13 I will say two things.  First -- three things -- first, they

14 try to put all of their requests in the prism of business

15 judgment.  This isn't a question of business judgment, this is

16 a question of whether the debtor has the legal authority,

17 notwithstanding Martin, notwithstanding Manuel -- I'm not

18 going to even try to pronounce the last name --

19 notwithstanding the Second Circuit case and notwithstanding

20 Judge Carey -- former Judge Carey's decision in Filene and all

21 the other cases, to simply walk away after signing an

22 agreement and not even seek its approval, to simply renege

23 entirely on the agreement.

24         Two, an adversary -- if Your Honor has any concerns

25 -- you asked whether the agreement is ambiguous -- that would

1 allow for the development of that parol evidence.

2          And, three, it would allow us to put in the

3 administrative counterclaim.

4          That being said, let me go to the merits for a

5 moment.  And Your Honor has clearly read the cases, I am not

6 going to spend -- I'm happy to take Your Honor's questions,

7 but I want to just say a few things about the case law and

8 then move on to what I think really matters here.

9          It is telling that the debtors say in their brief

10 there is a conflict in the law and not uniformity on whether a

11 debtor that enters into an agreement, a debtor in bankruptcy,

12 has to seek approval of that agreement or can unilaterally

13 renege on its obligation to do so.  And the Coalition and the

14 FCR and the TCC say the same thing citing the Starks decision,

15 a 1996 Northern District of Illinois case that has been

16 explicitly rejected by appellate court after appellate court

17 after appellate court.

18          The appellate authority on this issue is uniform;

19 it is Martin, it is Liberty Towers in the Second Circuit, and

20 it is Manuel Mediavilla -- I hope I've now pronounced it right

21 -- the First Circuit BAP, and it all says that, while the

22 Court ultimately has to decide whether to confirm the plan or

23 not and while -- or approve the settlement or not and, while

24 the debtor can bring changed circumstances to the Court's

25 attention, the debtor has to go forward and seek approval, it

1  can't unilaterally not do so.

2        THE COURT:  Let me ask, let me ask a question on

3  that because the Second Circuit opinion, Liberty Towers, is

4  non-precedential and, arguably, the statement is dicta that

5  parties to a settlement agreement may not unilaterally

6  repudiate it after approval of it has been sought because the

7  debtors -- I think there were multiple debtors here -- but the

8  debtors' counsel conceded that the debtors may not

9  unilaterally rescind.  So that's arguably dicta.

10        And then I found interesting the statement at

11  almost -- I guess it's the penultimate paragraph, at the end -

12  - "A debtor-in-possession who comes across a better offer or

13  otherwise thinks the settlement is no longer in compliance

14  with its fiduciary duties to creditors may argue against court

15  approval of the settlement," it does say, but it may not

16  withdraw unilateral" -- "it may not withdraw it," I guess,

17  "unilaterally," citing Martin.

18        So the Second Circuit I think has in dicta chosen a

19  side without discussion, but it does say, maybe going further

20  than Martin, that the debtor-in-possession can argue against

21  court approval.  Isn't that essentially what the debtor is

22  doing here, sort of sub --

23        MR. ANKER:  No.

24        THE COURT:  -- in a different context?

25        MR. ANKER:  I think not, Your Honor.  I think the

1  debtor is obligated, what all of these cases do is they say

2  the debtor is obligated to see approval of the deal.  The deal

3  here can't be determined today -- I'm going to get to futility

4  in a moment and the double standard the debtor seeks to apply

5  -- the way the debtor seeks approval of a plan is to file a

6  disclosure statement and solicit acceptances of approval of

7  it.  We would then know how the actual vote comes out and we

8  would actually get to a final hearing.

9          But I do think, Your Honor, imagine that the vote

10  in the final plan was to reject the global resolution with the

11  Hartford settlement and the debtor still was able to get the

12  toggle plan.  I think the debtor could stand up at that

13  confirmation hearing and argue, if it really wanted to, why

14  the Court should not approve and not confirm a toggle plan,

15  but it has to come up in the context of seeking approval.

16  Manuel Mediavilla is right on point.  It's a case about a plan

17  and it's a case saying the debtor has to go forward and seek

18  approval of the plan that the debtor committed to do.

19  Otherwise, we entered into an agreement that's worthless.  We

20  entered into -- we were made -- you know, we entered into an

21  agreement that did nothing for us.

22          And, yes, I am not arguing, Your Honor, that if

23  there are changed circumstances, at the confirmation hearing

24  the debtor can't bring those to your attention.  I think

25  Martin says it can and that's controlling law.

1                  THE COURT:  Okay.  What about -- what about --

2    well, and before I forget -- actually, it looks like in the

3    First Circuit BAP opinion that they remanded to file a motion

4    to approve the settlement agreement, which I found interesting

5    because, you're right, it was part of a plan.  So I didn't

6    quite get that, but what about in the context of solicitation?

7    Can the debtors stand up at the disclosure statement hearing

8    and say changed circumstances, we within our fiduciary duty

9    believe it's not prudent to go out on the solicitation,

10   because doesn't going out on solicitation require me to at

11   least approve the disclosure statement?  The debtor can't

12   solicit on their own.

13                 MR. ANKER:  So I think, Your Honor, at the

14   disclosure statement hearing -- and, frankly, this is a

15   question I've not thought about, so I'm answering you on the

16   fly, but I think it's fair -- I certainly think at the

17   disclosure statement hearing the debtor could say, Your Honor,

18   under the current circumstances, we believe the plan is

19   patently un-confirmable, which is a different version of

20   futility, and I will be happy to address that.  I don't think

21   it can say, gee, we've changed our mind.  That is not what is

22   before the Court at the disclosure statement stage.  What is

23   before the Court at the disclosure statement stage is whether

24   the disclosure is adequate and whether the plan is

25   (indiscernible) number one, I don't want to -- one thing I

1  deeply care about is not being misleading -- I think, if there

2  is a disclosure statement hearing, you will see a brief from

3  us on the fourth amended plan that it is patently un-

4  confirmable.

5        So I acknowledge that case law is out there and

6  that standard is out there and, if the debtor wants to make a

7  serious argument based on a prediction without a single vote

8  and with a toggle plan that every (indiscernible) come down on

9  the claimant that they have -- that our plan would be patently

10 un-confirmable, they can make that argument.  I don't think it

11 would be a serious argument.

12       So what they have to do is come to the Court and

13 seek approval.  That is the holding the lesson of Martin, it

14 is the holding the lesson of Liberty Towers.  And I'll say,

15 Your Honor, it is not for publication.  I thought that the

16 statute now says that a court cannot make a decision not

17 citable and not precedential.  And I will note that the Second

18 Circuit cited Martin for its view of the law, and it is also

19 clearly the impact of Manuel -- I'm not going to try the last

20 name, I'm going to butcher it too many times.

21       Your Honor, but think for a moment about the

22 implications of the counter -- did I answer Your Honor's

23 question?  You --

24       THE COURT:  No, you have.  And I'm just thinking,

25 aside from perhaps the Manuel Mediavilla case, what -- are you

1 aware of any cases that have forced a debtor to solicit a plan

2 they no longer wish to solicit?

3          MR. ANKER:  I am not, but I'm not aware of any case

4 to the contrary and Manuel Mediavilla (indiscernible) an

5 application in the plan context of Martin, which is

6 controlling Third Circuit application of all the other cases.

7 And there is contrary law, I will acknowledge.  The debtor is

8 right and the Coalition is right or the TCC, there is Starks,

9 there are one or two other cases, they are a distinct,

10 distinct minority and not one of them is the Third Circuit,

11 not one of them is appellate.

12          But, Your Honor, think about the implications in

13 other contexts, and I want to make three points quickly in

14 this context.  One, why do I have in my other case an RSA,

15 which is a plan support agreement, plan support agreement that

16 has a fiduciary out.  I mean, under Ms. Lauria's argument --

17 and I will represent to the Court it's Kirkland on the other

18 side -- Kirkland just wasted paper, it didn't have to put that

19 provision in.  It's hard to believe that we've all been

20 mistaking the law for the last 30 years.

21          Two, think about the implications of this from our

22 perspective, going back to something we talked about a little

23 bit earlier.  It is first year, first week of contract law

24 that contracts are only enforceable if they're enforceable

25 against both sides.  So the implication of the argument being

1  made is exactly that if they're right that we and every other

2  counterparty to an agreement with a debtor-in-possession are

3  not bound, we can simply have buyer's remorse the next day.

4  That is black letter law.  The TCC and Coalition are right

5  that some of the cases -- not Manuel Mediavilla and not

6  Liberty Towers, not Martin -- are cases where it's a

7  counterparty, the equivalent of Hartford seeking to back out,

8  those cases uniformly say it can't and that couldn't be law,

9  that party would absolutely have the right to back out if the

10 debtors' view is right.

11         Think about this issue, Your Honor, outside the

12 bankruptcy context.  We act as if fiduciary duties exist only

13 in bankruptcy but, as we all know, the board of directors of

14 every corporation owes a fiduciary duty to its shareholders.

15 There are transactions and agreements that require regulatory

16 approval of one kind or another all over the place.  Most

17 merger and acquisition agreements of size require antitrust

18 clearance by the Department of Justice or the FTC.  Many

19 agreements require, because they're dealing with the telecomm

20 industry where there were concerns in the regulatory law about

21 having foreign control of our networks and telecommunications

22 companies, or environmental cases, manufacturing plants,

23 required regulatory approval in one case by the Federal

24 Communications Commission and the other case by the EPA or

25 state regulators.

1           So imagine this hypothetical.  I enter -- I am the

2      board of directors of a seller and I have -- I want to sell a

3      line of business that requires antitrust approval and requires

4      regulatory environmental approval as well, and I'm selling it

5      for a billion dollars and I enter into an agreement with

6      buyer.  The next day someone says, why did you get an

7      agreement with the buyer?  I'll give you a billion and a half.

8      Forget the billion; I'll give you a billion and a half.  Does

9      anyone seriously contend, anyone seriously contend that the

10     board of the seller having signed an agreement that said we

11     agree to sell to you for a billion dollars subject to

12     antitrust and regulatory approval can simply tear that

13     agreement up and not keep the approval in good faith?  Of

14     course not.  The corporate lawyers and M&A lawyers and

15     antitrust and regulatory lawyers at every law firm represented

16     on this call would laugh at that proposition, but that is the

17     argument being made by the other side.  Whenever there's a

18     fiduciary duty, you can simply walk away.

19           My client, my client is a public company; it has

20     fiduciary duties to its shareholders.  Could it simply have

21     walked away and said, sorry, we changed our mind, 650 isn't

22     good enough?

23           So that brings me, Your Honor -- and I realize

24     we've gone a while -- to what I think are the two --

25           THE COURT:  Yeah, so I guess -- I have one final

1  question, then I'm going to let you move on -- so you say, you

2  know, could we all be mistaken for the last 30 years that we

3  were practicing that we've put these fiduciary-out provisions

4  in our agreement.  But I would also comment, which in this

5  case is dangerous, as I've found out, but I would also comment

6  that I would posit most bankruptcy lawyers would say, maybe on

7  a very general basis and maybe too broadly, that, sure, the

8  debtors is not -- until the Court approves the agreement,

9  there's no agreement, nobody is -- it's not enforceable.  And

10  I was surprised to see your brief.  This issue -- maybe this

11  issue doesn't come up because this doesn't happen that often,

12  is that why?  I mean, you know, if we're talking about what

13  we're used to thinking about what's happened over the last 30

14  years, that's my question.

15          MR. ANKER:  So I think two things make this an

16  unusual situation, Your Honor.  One -- and I want to be -- I

17  don't want to go beyond the record, I want to be careful, but

18  I don't want to leave the implication that there was a

19  drafting glitch, there was no drafting glitch, this was

20  discussed and it was intentional -- most agreements that I am

21  aware of have fiduciary outs, this didn't.  That matters.

22          Two, I don't normally have debtors change their

23  minds.  I mean, you know, most of the time when I enter into

24  an -- when I represent a party that enters into a 363 sale

25  agreement and buys from a debtor, the hypothetical I posed

1  where the day afterwards a new and different -- a different

2  potential buyer says I'll pay $500 million more, that

3  situation is a hypothetical that doesn't arise very often for

4  a simple reason, the bankers for the seller corporation in

5  that case really messed up because they didn't get this other

6  offer out there.

7            So I think this is an unusual situation.  But going

8  to your question, I think when bankruptcy lawyers say, until

9  the court approves it, it's not enforceable, you've got to ask

10  the question what is "it" in that setting?  It is the

11  obligation by the debtor to scale us back up (indiscernible)

12  50 million.  I agree that is not enforceable until and unless

13  there's a plan confirmed that --

14        (Pause)

15            THE COURT:  Oh.  Mr. Anker, I've lost you, I've

16  lost the audio.

17        (Pause)

18            THE COURT:  I'm being told that's on your end.

19        (Pause)

20            THE COURT:  Can you all hear him?

21        (No verbal response)

22            THE COURT:  Can anybody hear me?

23        (No verbal response)

24            THE COURT:  No.

25            THE ECRO:  They can't hear -- okay.  Let me --

1          THE COURT:  Okay.

2          THE ECRO:  -- let me try to get IT because I

3   haven't touched anything.

4      (Discussion held off the record)

5          THE COURT:  Okay, my apologies.  Somehow the phone

6   just lost connection even though we have a landline here, so

7   my apologies.

8          MR. ANKER:  Your Honor, no apology is needed.  I

9   was going to (indiscernible) literally on supposed things, but

10  first as a matter of (indiscernible) if circumstances change,

11  that is something to raise when what is before the Court is

12  approval of the settlement or approval of the plan and the

13  debtor has (indiscernible) that's not before the Court.  It's

14  not a ground to not seek approval, no court has so held and

15  that rule would obviously be in conflict with Martin,

16  Mediavilla, and Liberty Towers.  But, second, there are no

17  changed circumstances.  The claimants were opposed to the

18  settlement before the claimant representatives (indiscernible)

19  they are today.  That's not a change.  Going from no to yes or

20  yes to no is a change, going from no to no is the same, not a

21  change.  And we've already established the debtor still thinks

22  the deal is reasonable.  No, Mr. Goodman, I'm not asking the

23  Court to make a finding on that issue, I'm just arguing

24  absence of changed circumstances.

25          So that raises what I think is the real issue here,

1   which is futility, and let me start with a couple of points.

2   First, the notion that it is, quote, impossible to perform,

3   which Mr. Desai said, is just wrong.  The debtor can file the

4   plan it committed itself to file and see what happens.

5          Second, I want to go back to where we are and what

6   we're talking about on futility, and I'm going to go through

7   two different plans, the global resolution plan with the

8   Hartford settlement on the one hand and the toggle plan on the

9   other.  As to the latter -- and I'll get to this in a little

10  more detail -- the toggle plan, there is no argument that it's

11  futile.  There's an argument by some people that it's not

12  quite as good, but it doesn't require the vote of the

13  claimants, it requires a single impaired accepting class and

14  JPMorgan by itself is that class.

15         On the first, the only argument as to futility is

16  that it's not legal, it's not -- there's nothing illegal about

17  the plan.  And the fact on the grounds today, it's a

18  prediction, a prediction of how people will vote.  And I agree

19  with Ms. Lauria, there is on the -- on her response to me that

20  what's good for the goose is good for the gander, if we're

21  going to talk about futility, let's talk about the fourth

22  amended plan, I agree with her there's a difference.  The

23  fourth amended plan is unlawful on its face as a matter of law

24  and a hundred-percent vote can't change that result.  Our

25  plan, the only issue is a prediction of how people will vote.

1          One other initial observation.  The claimant

2   representatives in their reply brief begin and the debtor

3   begins by saying, put all those plan confirmation arguments

4   made by the insurers to the side, all that is before the Court

5   today is the RSA.  I'm willing to live with that world, but

6   then that means that we have to put aside all of the futility

7   arguments if we're going to just -- if we're going to decide

8   whether it's futile or not, let's decide it, but otherwise the

9   street goes two ways, not one way.

10          So let's talk about for a minute this prediction,

11  prediction.  With all due respect to Mr. Stang, Mr. Molton,

12  Mr. Brady, all of them are distinguished lawyers, they're not

13  claimant, they don't vote.  Mr. Kosnoff filed a 2019 last week

14  and I want to quote from it.  I don't always agree with Mr.

15  Kosnoff, but I want to quote this.  This is Docket 5679,

16  paragraph 7.  Quote, "As the Court is well aware, none of the

17  law firms at issue will vote a single ballot for their

18  clients.  Each of the almost 17,000 claimants represented by

19  the firms will choose for himself how he wishes to vote on any

20  plan that is ultimately presented to him," unquote.

21          It's pretty clear there's some pretty side

22  disagreement even among the plaintiff lawyers.  You've seen

23  Mr. Kosnoff's filings, you've seen Mr. Zalkin's filings

24  (indiscernible) three hours, 15 other objections to the fourth

25  amended plan disclosure statement came in.  But if we're going

1  to credit lawyers, there's going to be my theme of that two-

2  way street.  If we're going to credit lawyers, let's credit

3  everything they say, not selectively what they say.  Mr.

4  Stang, Mr. Molton say their clients will never vote for a plan

5  that includes the Hartford settlement, but what Mr. Stang said

6  when it was before the Court before the debtor had changed its

7  mind was that the toggle plan was, quote, "worse," end quote.

8  Indeed, it was, quote, "death," end quote, to his clients.

9          If Mr. Stang's predictions are to be credited --

10 and, frankly, I don't think we should credit what any lawyer

11 says in a prediction, I think that's why you actually have

12 votes, but if it is, then the implication is strongly that,

13 when push comes to shove, the claimants will vote in favor of

14 a global resolution plan that includes the Hartford settlement

15 and lots of other settlements if the alternative is that they

16 return -- they have to return to the tort system.

17         And there are facts beyond Mr. Stang's remarks that

18 substantiate that.  There were 175 lawsuits on the petition

19 date.  So of the 82,500 proofs of claim, unique proofs of

20 claim, 82,225 haven't seen fit to sue.  And in one of the

21 documents that is going to get before Your Honor that you will

22 see because we've agreed to it, BSA on July 26th, 2021 sent a

23 letter to all of its local councils saying it expects that a,

24 quote, "significant portion," end quote, of the claimants if

25 the fourth amended plan is accepted will accept the $3500

1  payout.

2         I meant what I said earlier, I think an anal

3  penetration claim in a state where the statute of limitations

4  hasn't run and that is provable is worth more than $3500.  Mr.

5  Stang asked me once rhetorically what it's worth.  Someone

6  who's willing to take $3500 isn't going to, if they're given

7  the alternative, go back to the tort system.  They will vote

8  for a plan that pays them, even if it's not 3500, $1,000 or

9  some amount like that.

10         But I will say this, Your Honor.  I think all

11  rational people when they make decisions in life -- and I'm

12  not going to begrudge and not suggest that the claimants are

13  not rational -- when I'm asked do I want to do something, I

14  ask myself the question compared to what, what's the

15  alternative.  If the alternative is the toggle plan, I think

16  we have a lot of evidence where it's going to end up.  The

17  alternative is a fourth amended plan -- and here I am going to

18  get into talking about futility in both directions -- a plan

19  in which the claimant representatives -- and I applaud them

20  for their intellectual honesty -- have a heading in bold and

21  underlined, a plan need not be insurance-neutral.

22         If we have a fourth amended plan where the debtor

23  says, in the aggregate, we think the liability here is between

24  2.4 and 7.1 billion, numbers that we think are high, but where

25  Mr. Stang stands up and says, no, it's 103 billion, and a plan

1  that is not insurance-neutral that asks Your Honor to make

2  findings -- and these are not my words -- that Mr. Stang and

3  Mr. Molton and their colleagues have been selling  -- this is

4  directly from Mr. Zalkin's mouth -- will amount to, quote, "an

5  entry of judgment by Your Honor, enforceable against the

6  insurers," that whatever claims in whatever amount that Mr.

7  Green, who is not neutral enough to even be the mediator, let

8  alone the judge, chooses to allow, and so they just come up

9  with $103 billion in liability, they may choose that

10  alternative over it.  That possibility, if we can step back at

11  the moment, is the 64,000-pound gorilla that is preventing

12  this case from getting done.

13        If Your Honor -- and I don't want you to put you in

14  a difficult position -- is prepared to sort of look at that

15  and say, "Not on my watch, not on my watch," and the real

16  choice is to negotiate settlements within a range of 2.4 to

17  7.1 billion in the aggregate or somewhere in there and go back

18  to the tort system, I think I know which way we're ending up,

19  we're ending up with settlements in this case and settlements

20  read very quickly.

21        And also think, Your Honor, if we're thinking about

22  alternatives, about delay.  I heard -- and I apologize, I

23  don't think it was Ms. Lauria, I think it may have been Mr.

24  Kurtz, it may have been Mr. Andolina, sort of suggest the

25  other day a confirmation hearing in October on the fourth

1   amended plan.  And I don't mean to be facetious, Your Honor,

2   but I said to myself under my breath, October '21 or '22?

3   They're asking for a finding by Your Honor that explicitly

4   would find that everything Mr. Green does prospectively and

5   all of the claims allowance and everything he does is

6   appropriate and valid.  That is right in the RSA itself --

7   Your Honor, I'm going to get it, I apologize, for Your Honor,

8   but if you look at the RSA itself, this is the RSA which is

9   5466-2, section (II), romanette -- roman (II), bottom of page

10  5, "Agreement of the debtors.  The debtors must propose and

11  pursue" -- I don't know if Your Honor is there, the bottom of

12  page 5?

13          THE COURT:  Yes.

14          MR. ANKER:  -- "a plan and seek entry of a

15  confirmation that contains the following provisions, defined

16  as the findings and orders."  Look at finding 2.  "The

17  bankruptcy court has determined that the procedures including

18  the TDP pertaining to the allowance of abuse claims and the

19  criteria included in the TDP pertaining to the calculation of

20  allowed claim amounts, including the TDP's claim matrix, base

21  matrix value, maximum matrix value, and salient factors are

22  fair and reasonable based on the evidentiary record offered to

23  the bankruptcy court."

24          Without a single deposition of any of the 82,500

25  claimants?  Without any exploration of the facts and how we

1  got from 275 claims to 82,500?  Without any discovery into

2  what has been going on in terms of negotiations, how the

3  sausage was made, it's all mediation privilege?  Maybe, Your

4  Honor, it's not October '22, but it's October '21.

5          Ms. Lauria said before she changed her mind that

6  this would set up the most epic battle possible.  That's out

7  of the debtors' mouths and that's right, that's exactly right.

8          So if -- so my point, Your Honor, is if the fourth

9  amended plan comes off the table and what we really have is a

10  choice between neutrality, real neutrality, and deals for go

11  back to the tort system and everyone has every right they

12  would have out in the tort system, I am pretty optimistic

13  which way it's going to come out.  But let's say I'm wrong.

14          Let's talk about the toggle plan.  Everyone

15  concedes the toggle plan wouldn't require the vote of the

16  claimants.  Ms. Lauria stood up in court and represented to

17  Your Honor, it is an avenue that gets us out of bankruptcy.

18  Mr. Whittman testified, quote, "it would still be feasible

19  even if that ends up causing some local council to go into

20  bankruptcy."  So that plan, that alternative is indisputably

21  feasible, the argument is that it's not ideal from BSA's

22  standpoint.  Well, that's not the test, but if it is, I submit

23  to you that it's like beauty, beauty is in the eyes of the

24  beholder and different people have different views of beauty.

25          You heard Mr. Zalkin, you read his briefs, he

1   thinks it's a better alternative.  Why?  Because he has

2   claimants who are in open -- I mean, I assume this is right, I

3   have not talked to him, but I assume he has claimants in open

4   states who he thinks could actually prove their claims, not

5   like -- I mean, the debtors' disclosure statement projects

6   that day 20, 59,000 of the 82,500 claims are presumptively

7   barred by the statute of limitations, 59,000 out of 82,500.

8   He must have clients in states that aren't that way.

9           But you heard Mr. Goldberg from Latham & Watkins at

10  a prior hearing on behalf of the Latter-day Saints say that

11  the elimination of the toggle plan was very unattractive to

12  the Latter-day Saints being charter organizations, they like

13  that alternative, they want that alternative.  There's nothing

14  terribly unfair, Your Honor, about a plan that says the

15  debtor, but no one else gets relief.

16          Let me quote the claimant representatives in the

17  RSA motion.  These aren't my words, they're theirs.  Quote,

18  "Channeling injunctions that enjoin tort victims from suing

19  non-debtor third parties like the local council are not the

20  norm.  The debtors' burden in these circumstances is high."

21  That's Docket 560, paragraph 22.

22          And that's especially so, Your Honor, when we're

23  talking about direct liability, not derivative.  My clients'

24  liability is entirely derivative, it exists, it was just an

25  insurer of the debtor, but the people who ran day to day the

1  Boy Scouts operation were the local councils.  Think of -- the

2  analogy has been drawn to a franchisor and franchisee.

3  Imagine that I run a McDonald's franchise and I hire to be my

4  night manager without doing any diligence someone who has a

5  record of sexual abuse and at 11:00 at night, before the store

6  closes, he rapes a woman.  My liability is not derivative of

7  McDonald's, McDonald's liability is derivative of mine, but it

8  sure doesn't work in that direction.  And, as Your Honor

9  knows, there is legislation pending to limit third party

10  releases that are nonconsensual as well.

11          So there's nothing untoward about it but, finally,

12  it would be the epitome of insurance neutrality.  You asked

13  once what does insurance neutrality mean; let me try to

14  explain it the way I view it as its core.  Bankruptcy

15  shouldn't change the outcome when it comes to insurance.  I

16  hear the plaintiff lawyers when they say the insurers

17  shouldn't get a windfall because of bankruptcy.  I'm not

18  unsympathetic to that position in the abstract, but it's a

19  two-way street, just like your mother's two-way phone call, it

20  also shouldn't increase liability.

21          And when we try to create a plan that mirrors the

22  result that would be in the tort system, we know that it's

23  imperfect.  We're trying to get something as a substitute for

24  the real thing.  The real thing that would get us exactly the

25  result that would be in the tort system is to go to the tort

1   system.  Does that mean that maybe some local council would

2   have to on their own file for bankruptcy?  Perhaps.  That's

3   not the end of the world that companies who want discharges or

4   entities that want discharges in bankruptcy actually have to

5   become debtors and go through the rigors of a plan.  The

6   notion that it's just we should give people bankruptcy

7   protection without actually going into bankruptcy and that

8   should be the norm, that's not only the opposite of what the

9   claimant representatives have argued, but it's contrary to

10  basic law.

11          I want to end on that note with a point I made

12  earlier.  I appreciate that this Court -- you know, I always

13  wonder and I say to myself, I know what's going on in the

14  mediation, but the Judge doesn't and I can't tell her

15  everything, and I feel for you.  When you said maybe the

16  claimants are overreaching, maybe the BSA is overreaching,

17  maybe the insurers are overreaching, I said, God, if I were in

18  her position, I'd be asking that question, and I'd try to

19  figure out how to answer it.  And I would answer it not by

20  crediting anything I just.  My words are cheap.  Don't credit

21  Mr. Stang's words, Mr. Molton's words, Mr. Brady's words, or

22  Ms. Lauria's words either.  What matters is actions.

23          My client and I think the vast bulk of insurers are

24  prepared to put their money where their mouth is and go into

25  and defend claims in the tort system.  The claimants are

1  saying to you, the claimant representatives, that would be

2  death for my clients, it would be death to actually have to

3  litigate.  We think that's action.  We put our money where our

4  mouth is, they won't.

5          And so, Your Honor, at the end of the day, I ask

6  you to deny the RSA motion to the extent that it seeks to

7  preclude -- it seeks to exonerate the debtors from their

8  failure to even seek approval of the plan.  I think if we go

9  forward we will get to a confirmable plan -- I'm sure we'll

10 get to a confirmable plan, if the toggle plan is confirmable,

11 I think the only question is do we get to a global resolution

12 plan that includes the Hartford settlement.  And I think the

13 answer to that on my prediction is yes, when push comes to

14 shove at the end of the day.  I know that and I think there

15 will be many other settlements once the claimants understand

16 that they're not getting Your Honor to issue a decision that,

17 quote, "operates as a judgment enforceable against the

18 insurers."

19          I know Mr. Buchbinder wanted to say a few remarks

20 on the Hartford issue.  So, if Your Honor doesn't have any

21 more questions for me, I would propose to turn the podium over

22 to him.

23          THE COURT:  I have one question for you and then we

24 need to take a short break, so -- but let me ask this

25 question.  I hear the argument that you just made generally on

1   what we'll call the futility argument, your last argument

2   about the various plans, but is that the decision before me or

3   is the decision -- well, are you asking me to make some

4   strategic decision?  And by that I mean a decision on what's

5   the best strategy to go forward because isn't that really the

6   debtors' decision?  I am not involved in the mediation.  Even

7   if there were no mediation, I know five percent of what

8   happens in a bankruptcy case because it all happens outside

9   the courtroom.

10          And so for me, I think that's the worst decision to

11  put in front of a judge.  I don't know how a judge makes a

12  decision about what's the best way to build consensus, which I

13  would say most of us think is a worthy goal.  And the debtors

14  made one decision and now maybe they've made another decision

15  and that could be problematic, but how does the Court judge

16  and should the court judge, isn't that really the decision in

17  front of me that the Court -- that I'm being asked to make,

18  which is what's the best strategy to go forward.

19          MR. ANKER:  I think that's a totally fair question,

20  Your Honor, and I don't think you should make that judgment.

21  I don't think it's appropriate, I don't think it's within your

22  -- A, you know five percent of what's going on and, B, I don't

23  think the bankruptcy code allows you to do that.

24          So I agree with that, but I do think there are two

25  questions, one before Your Honor today, one before Your Honor

1  potentially in a week.  The question today before you is

2  whether to approve an RSA that has an indispensible element to

3  it an order by you not saying that the debtor has no

4  obligation, no obligation to seek approval of a plan with the

5  Hartford settlement or the toggle plan in it and Your Honor

6  should not do so because you would be acting contrary to

7  settled law.  And all I was trying to argue there is that to

8  the extent that the debtor is really saying, look, Your Honor,

9  you can make the decision today that ultimately the Hartford

10  settlement wouldn't be approved, we can short-circuit process,

11  it would be futile, I'm just saying I don't think you should

12  go there at all, I don't think you should make a determination

13  on futility one way or the other.  I think you should ignore

14  most of what I said, but if you are going to go there, with

15  all due respect, you have to consider whether the alternative,

16  because the RSA does permit the debtor to seek approval of the

17  fourth amended plan, whether that would be futile.  It can't

18  be a one-way street.

19          And the only other point I will make to you is, if

20  we get past today and we actually get to a disclosure

21  statement hearing on the fourth amended plan, I am going to

22  want to argue to you, and I think many others are, that the

23  kind of findings they put in here make this plan patently un-

24  confirmable.  Your Honor would have to read Third Circuit law

25  differently from how I read it and how everyone in the

1  insurance neutrality world has read it for the last 25 to 30

2  years.  That's not a strategy judgment, that's a legal

3  judgment, but that second one is not before you today.

4       What is before you today is can Your Honor -- is

5  Your Honor going to enter an order saying that the debtors

6  have no obligations to seek approval of the Hartford

7  settlement and, for all the reasons we've argued, focusing on

8  the case law, I respectfully suggest the answer is no.

9       THE COURT:  Thank you.  Okay.  We need to take a

10  break.  I said short, but I lied.  We're going to make it 40

11  minutes.  So this is going to be our lunch break.  We're going

12  to make it 40 minutes, then we'll come back and if -- and, Mr.

13  Buchbinder, we'll start with you.

14       Thank you.  We're in recess, let's say until ten

15  after 3:00.

16       COUNSEL:  Thank you, Your Honor.

17       (Recess taken at 2:26 p.m.)

18       (Proceedings resumed at 3:12 p.m.)

19       THE COURT:  Okay, this is Judge Silverstein.

20       (Pause)

21       THE COURT:  This is Judge Silverstein.  I want to

22  make sure we have Mr. Anker before we recommence.  And I am

23  assuming you all can hear me.

24       MS. LAURIA:  We can, Your Honor.

25       THE COURT:  Thank you.

1          COUNSEL:  We can, Your Honor.

2          MR. RUGGERI:  Your Honor, it's Jim Ruggeri.  I'll

3   try to reach Phil now and see if we can get him on the line.

4          COUNSEL:  Your Honor, some people logged out and

5   they're getting back in.  I had a little bit of a problem and

6   so that might be the case with Mr. Anker.

7          THE COURT:  Okay.  We will wait a few minutes then.

8      (Pause)

9          MR. RUGGERI:  He will be on momentarily, Your

10  Honor.

11         THE COURT:  Thank you.

12         MR. ANKER:  My apologies, Your Honor.

13         THE COURT:  That's fine.

14         MR. ANKER:  I thought you said 3:15 and I must have

15  misheard.

16         THE COURT:  Lucretia, can we tell if there are

17  people who are waiting to get in?

18      (Pause)

19         THE COURT:  Okay, I understand there are no parties

20  waiting to get in.  So let's recommence.

21         MS. LAURIA:  Your Honor, this is Jessica Lauria.

22  If I can ask just a quick housekeeping question before we

23  start again.  I understand from earlier today we were going

24  topic-by-topic.  Obviously, Mr. Anker gave us a heads-up that

25  he may have to stray into other topics in order to make his

1   Hartford argument, but I assume that that is still the case,

2   that we are going to conclude argument on Hartford and then

3   continue on with other aspects of the RSA.  And I would just

4   ask that the debtor be permitted to provide a brief rebuttal

5   to some of the remarks that Mr. Anker made in his opening

6   statement on that.

7          THE COURT:  Yes, that's correct, all of it.  Okay.

8          Mr. Buchbinder, Mr. Anker said you might have

9   something to say about this, so if you do, this would be a

10  time.

11         MR. BUCHBINDER:  Thank you, Your Honor.  I was

12  waiting for you to give me the cue.  Dave Buchbinder on behalf

13  of the United States Trustee.

14         I felt these remarks were appropriate at this time

15  because they go directly to the process and to the Hartford

16  settlement and how it relates to the process here.  To do so,

17  I want to spend a little more time with the Martin case that

18  we spent a lot of time with this morning, and I won't try to

19  repeat or belabor what has already been said about the case,

20  but I think a little more detailed review of the facts may be

21  helpful here.

22         The case actually involved a Chapter 7 trustee who

23  about a year after the bankruptcy was filed determined that a

24  dispute between the debtor and a third party should be settled

25  by simple mutual releases and dismissal of the cases so the

1  trustee could close their case.  Earlier in the bankruptcy

2  case, though, the debtor had apparently given permission for

3  the debtors to proceed to litigate a complaint in common pleas

4  court.  While in September of 1993, the trustee entered into a

5  stipulation to dismiss the case and mutual releases, and

6  reported that to the court.

7        In December, the stipulation was presented to the

8  court and the court improperly signed it ex parte and later

9  set the matter for hearing.  The debtors, who were the

10 plaintiffs in the lawsuit, objected to the settlement and

11 advised the court that the matter was actually set for trial

12 about a month later -- or less than a month later.  The

13 trustee's counsel indicated that they had a communication

14 lapse and, if the trustee had known the case was set for trial

15 so shortly after entering into the stipulation, she might not

16 have entered into the stipulation.

17       The judge adjourned the hearing to see the outcome

18 of the trial.  The debtor obtained a judgment for $160,000.

19 So the trustee still brought the motion forward and at the

20 adjourned hearing simply advised the court of the judgment

21 that the debtors had obtained against the now judgment debtor,

22 and the trustee fell on her sword and did not argue the

23 motion.  The bankruptcy court, faced with an asset of the

24 estate worth $160,000 and mutual dismissals, made it -- that

25 wasn't a hard decision for the judge to make to not approve

1  the settlement under the settlement standards and let the

2  judgment stand.

3          The judgment debtors, the party against whom the

4  $160,000 judgment had been entered, they appealed to the

5  district court and they claimed that the trustee had breached

6  her duty of good faith and fair dealing by not arguing to

7  support the motion, and the district court agreed, but the

8  Third Circuit did not agree and restored the judgment of the

9  bankruptcy court not approving the compromise.

10          And the case, as Judge Silverstein noted earlier,

11 isn't about the four factors that all of us could probably

12 recite from memory right now, but it's about whether the court

13 abused its discretion in not approving the compromise and

14 whether the trustee abused her discretion in falling on her

15 sword, as I'll put it.  And I'm not going to belabor by

16 repeating the quotes that the Court read to us earlier, but I

17 will read several other quotes.

18          On page 394 of the opinion, the court sums up the

19 trustee's fiduciary duties to all creditors of the estate and

20 states, "Thus, this trustee was faced with a conflict between

21 her fiduciary duty to the creditor body as a whole and the

22 alleged duty to go forward with a settlement agreement

23 favoring one creditor but otherwise detrimental to the

24 estate."

25          The next paragraph:  "We cannot require a trustee

1 | herself to choose between these conflicting legal obligations.

2 | Rather, Rule 9019(a) demonstrates the legislature's intent to

3 | place this responsibility with the bankruptcy court."

4 | And then moving over to the first full paragraph on

5 | the next column, "Hence, we reject the proposition that a

6 | trustee is required to champion a motion to approve a

7 | stipulation that is no longer in the interest of the estate.

8 | The trustee did not flout or agree to any term of the

9 | stipulation, nor did she withdraw the motion to approve the

10 | stipulation; rather, at the hearing, the trustee simply

11 | elected not to argue in favor of her motion."

12 | And then the court reached the conclusion that Your

13 | Honor read into the record earlier that she took no

14 | affirmative steps to withdraw the motion to approve, but

15 | simply supplied additional information to the court disclosing

16 | the state court verdict, and then the trustee let the court

17 | decide.

18 | So let's take a look at three differences here.

19 | Number one, in Martin, the trustee brought the motion to

20 | approve the settlement in dispute.  Here, we're looking today

21 | at not the motion, the Hartford settlement RSA, we're looking

22 | at a different RSA, and the only issue today is whether we

23 | should approve the different one first, but the debtor has not

24 | brought a motion to approve the Hartford RSA, which the

25 | trustee did in Martin.

1          The second difference that's very critical here is

2   that in _Martin_ the trustee was not the party who got the

3   judgment, it was the debtor.  If the trustee had gone out and

4   tried the suit and gotten the judgment after entering into the

5   stipulation, the trustee would clearly have been in breach of

6   contract, but it wasn't the trustee who got the judgment, it

7   was the debtor.  In this case, the debtor, after entering into

8   the Hartford settlement, coming to court and announcing it,

9   went back and negotiated.  No problem.  They should be

10  negotiating, they should have been negotiating on February

11  19th of 2020, but that's for another part of the argument.

12  They went back and negotiated with other parties and they made

13  a different and inconsistent deal and then brought it to the

14  Court.

15          That's the second big difference, different parties

16  doing different deals, which leads us to the third point.  If

17  the Court were to approve this RSA, the tort claimants' RSA,

18  under these circumstances, it would mean that in any case a

19  tranche of bondholders with whom a debtor negotiated a better

20  deal can get their way and the debtor can walk from deal A and

21  move to deal B.  And if that were to be the situation, who is

22  going to enter into negotiations and enter into restructuring

23  support agreements in the future?  And they're very beneficial

24  because they do move states along, they do make cases be more

25  expeditious, but not here.          And that is what wanted to

1    say about the Martin case and how it affects this matter and

2    how it affects the bankruptcy system systemically.  Thank you,

3    Your Honor.

4                THE COURT:  Okay.  Ms. Lauria?

5                MS. LAURIA:  Thank you, Your Honor.  And, again,

6    Jessica Lauria on behalf of the debtors.

7                I want to respond to a few of the points that Mr.

8    Anker made, as well as some of the statements that we just

9    heard from Mr. Buchbinder, but let's start with Mr. Anker.

10   And I think Your Honor asked him a very important question,

11   which is, are you asking me, the Court, to take a strategic

12   decision with respect to this case because isn't that the role

13   of the debtors?  It most certainly is.  I think Mr. Anker is

14   trying to interject the insurers' strategic vision for this

15   case on the debtors, we think that is wholly inappropriate.

16   He is uniquely not qualified to interject his strategic vision

17   for the case.  While I understand they filed a proof of claim,

18   at the end of the day we're talking about an asset holder of

19   the debtor, not him appearing as a creditor of the debtor.  So

20   he's uniquely not positioned to determine the strategic

21   outcome of the case, but let me talk about two of his specific

22   points, I'm going to start with futility and then I'm going to

23   turn to the fiduciary out.

24               Mr. Anker argued at length that the toggle plan is

25   not futile, that it is confirmable on its face and it's

1   confirmable essentially as a cramdown plan on the survivor

2   constituencies in these Chapter 11 cases.  What Mr. Anker

3   didn't mention at all during his argument is the debtors'

4   point about exclusivity.  While the toggle plan, in Mr.

5   Anker's view, may be confirmable on its face, I note that the

6   plaintiffs' representative said something very different when

7   the toggle plan was on the table at the disclosure statement

8   hearing, but while it may be confirmable on its face, that is

9   not the legal standard that courts employ in determining

10  between two competing plans and that is most certainly where

11  we would be.

12          1129(c), which pertains to a court's decision to

13  confirm a competing plan, is very clear on this point.  It

14  says that when there has been more than one plan, if the

15  requirements of subsections (a) and (b) of this section are

16  met with respect to more than one plan, i.e. you have two

17  confirmable plans before you, "the court shall consider the

18  preferences of creditors and equity security holders in

19  determining which plan to confirm."

20          So we're not, again, in a circumstance where the

21  debtor has the unilateral right to file a plan of

22  reorganization.  We are -- and Mr. Stang was very clear about

23  this -- we're at the end of exclusivity.  If the Court were to

24  enforce the last 60 days of our exclusive solicitation period

25  without approving the RSA, they would file a competing plan

1  and 1129(c) sets up the standard for approval of the two

2  plans.

3          So we do think in the context of where we're at

4  right now in this bankruptcy case that the toggle plan in fact

5  is futile and we think that's really important.  And I'm a

6  little surprised by Mr. Buchbinder taking the positions that

7  he's taking because, as a practical matter, if we were to

8  bring the Hartford plan or the toggle plan that Hartford is

9  advocating for to fruition, the cost involved in soliciting --

10  proposing a disclosure statement for that plan, getting the

11  plan all the way to solicitation, is extraordinary.  The

12  debtor would no longer be maximizing the value of the estate;

13  rather, the debtor would be suppressing the value of the

14  estate and taking cash on hand and allocating it to legal fees

15  and the legal costs of solicitation in a futile attempt to get

16  that plan confirmed over the plan that the plaintiff

17  representatives would propound.

18          And I think it's interesting, Your Honor, that the

19  position of both Mr. Anker and Mr. Buchbinder is that we

20  should have to bring that plan before the Court.  Imagine what

21  that disclosure statement would look like.  So, given where

22  we're at today, would the debtors then file a disclosure

23  statement that we sign that says, even though we understand

24  that nobody in this case would vote in favor of this plan and

25  even though we understand that there is a plan that is

1  preferable by the creditors, the debtors are hereby forced

2  because of Mr. Anker's desire to have the toggle plan

3  solicited, we're hereby forced to put this disclosure

4  statement forward, how would we ever sign a disclosure

5  statement that actually seeks approval of either a Hartford

6  plan or the toggle plan and where we're at with respect to the

7  creditor constituencies.  We think it's futile and we think

8  it's a waste of estate resources to pursue it further.

9          I want to also address his futility argument that

10 essentially the fourth amended plan is illegal on its face.

11 I'm going to adhere to the ground rules that we set for the

12 hearing and not get into that deeply, although I can assure

13 you that there are a number of parties that want to be heard

14 on the insurance neutrality point that Mr. Anker mentioned,

15 but let me just start with the basics.  He's right, I did say

16 on the May 19th hearing that the insurance issues are going to

17 present for this Court an epic battle and that is the

18 direction that we're going.  That's why we have so many

19 insurers that are objecting to the RSA and we've got these

20 survivor side of the ledger, you know, arguing through I think

21 over a hundred pages of briefing that in fact the plan is

22 appropriate and consistent with law.  Your Honor, that tells

23 me we don't have a plan that's illegal on its face; that tells

24 me, Your Honor, that we have a litigable issue where the

25 insurers believe on the one hand the plan needs to contain

1   sort of standard insurance neutrality language that we see in

2   the Third Circuit, and the survivors think on the other hand -

3   - and they listened to I think Your Honor at the May 19th

4   hearing when you made a few observations.  Observation one, if

5   parties appear in front of me and I'm making a decision,

6   they're going to be bound by my ruling, that's one thing the

7   language represents.  I think you also said that I don't have

8   the power to modify someone's contract other than insurance

9   assignment and other than what law tells me I can do.  That's

10  another piece that the plaintiffs heard.

11          So that's sort of the epic battle is whether we

12  need sort of what I'll call regular way, Third Circuit,

13  insurance neutrality language, which the survivor

14  constituencies have pointed out in their pleading is

15  problematic, versus the language that is set forth in the term

16  sheet and the findings that would ultimately be required at

17  confirmation.  I point that out not to sub-simply (ph) argue

18  it, Your Honor, but to point out to the Court that the plan

19  that is contemplated by the RSA is not illegal on its face, it

20  actually sets up a litigable issue that is not futile from the

21  perspective of the RSA parties.

22          THE COURT:  Did they hear --

23          MS. LAURIA:  Next let me turn to --

24          THE COURT:  -- did they hear that I didn't think I

25  was going to be deciding coverage issues?

1          MS. LAURIA:  I certainly heard that, Your Honor.

2 So --

3          THE COURT:  I just --

4          MS. LAURIA:  -- I certainly heard that.

5          THE COURT:  Okay.

6          MS. LAURIA:  You've certainly said that, I heard

7 you say that.  And I will let them address, I think from their

8 perspective they're not asking this Court to make those

9 determinations.

10          Turning then to the fiduciary issue that Mr. Anker

11 raised extensively in his remarks.  First, there's no contract

12 that can cancel out the overriding concern of the bankruptcy

13 court, the bankruptcy code, Section 363 of the code that we

14 must maximize the value of debtors' bankruptcy estate, that's

15 what the entire bankruptcy regime is about.  Martin in fact

16 says that the implied duty of good faith and fair dealing also

17 includes with respect to a trustee a fiduciary obligation, and

18 that's on page 393.  And in fact the Martin settlement

19 agreement didn't contain a fiduciary out in it.  I can point

20 you to it, if you'd like, Your Honor, but Martin acknowledges

21 that that implied duty exists in every contract.  And I will

22 tell you as having been someone that was on the opposite side

23 of this argument, in other words, the side that Mr. Anker is

24 on in front of Judge Glenn at one point, I'm rather astounded

25 that he feels that he can argue to the Court that in some way

1  the -- an agreement that is clearly outside of the ordinary

2  course of business, that is subject to Section 363 of the

3  bankruptcy code, which requires the bankruptcy court to make a

4  finding that it is in the best interest of the estates,

5  somehow overrides a debtor's duty in these cases, particularly

6  when we specifically negotiated for five -- and they're within

7  the language, I don't have to rely upon, you know, being cute

8  about mediation and things that were said in the mediation,

9  all I have to do is look to the four corners of the document

10 and I see five conditions precedent, four of which require

11 extensive findings by the bankruptcy court in order to approve

12 the agreement.

13        Now, I take your point, Your Honor, that there's

14 the meat and then there's the side dishes.  The side dishes in

15 this case, Mr. Anker would like to argue that we have the duty

16 to cooperate; we have the duty to push the contract forward.

17 We think that, Your Honor, we absolutely discharged that duty

18 until it got to a point where the cost to the estate was so

19 great that we had to come back to the Court and raise with the

20 Court the obligations.

21        Also, Mr. Anker says that in his 30 years of

22 practice that all debtor agreements have fiduciary outs.  In

23 fact, why is it that he's involved in another case right now

24 involving an RSA that has a fiduciary out.  I beg to differ

25 with him.  It is not uncommon for settlement agreements to

1  have no fiduciary out or any other post-petition contract that

2  the debtor may enter into.  In fact, where you do commonly see

3  fiduciary outs are restructuring support agreements.  Why is

4  that?  Because the debtor enters into the restructuring

5  support agreement at the early stage of the case, it asks the

6  bankruptcy court, as we are today, to approve that

7  restructuring support agreement now, and that restructuring

8  support agreement will actually guide the debtor as we proceed

9  through the rest of the bankruptcy case.

10          In this instance, it was very clear from the face

11  of the document that it would not be effective until we got to

12  the end of the case and we had assurances that the creditor

13  constituencies and the bankruptcy court were behind the

14  document.  So what we're really arguing about today, what

15  we're really arguing about today is whether we should continue

16  to pursue an agreement that the creditors have said -- and

17  they said it again today -- cannot go forward, they will not

18  vote in favor of it, whether the debtor should continue to put

19  its name on an agreement that it no longer thinks it can get

20  across the finish line -- we can't even get to the starting

21  line, in fact we tried to do that back in May, we were

22  unsuccessful.  I wanted to have a disclosure statement hearing

23  on the Hartford deal on May 19th, we couldn't even get there.

24  We've tried it once; we couldn't do it, we failed.  So now we

25  are back before the Court and asking the Court for guidance on

1  what we should do with this agreement, which we don't think is

2  effective today.

3        Mr. Anker wants to talk about precedent.  It would

4  be extraordinary, in our view, if the Court ruled that this

5  agreement that is not before the Court, that the Court has not

6  approved, binds the debtor to an outcome in these Chapter 11

7  cases, an outcome that the creditor constituents have clearly

8  said they do not support.

9        THE COURT:  But doesn't that --

10        MS. LAURIA:  With respect to --

11        THE COURT:  -- just mean -- doesn't that just mean

12  that the debtor can choose to breach the agreement?  There's

13  nothing that prevents a debtor from choosing to breach an

14  agreement.

15        MS. LAURIA:  Your Honor, my response to that is,

16  look to any 363 sale.  When a party enters into a stalking

17  horse agreement with a debtor, first of all, up until the

18  moment in time that that stalking horse agreement has been

19  approved, they have no downside protection for their breakup

20  fee.  What Mr. Anker is effectively arguing to you is that you

21  should approve his breakup fee today without having the

22  agreement go before the Court and, if you were to decide, if

23  we were in that context, that the breakup fee is not

24  approvable, that he's entitled to it anyway.  That's what he's

25  trying to argue, that notwithstanding the fact that you

1  haven't had the ability to opine on the damages -- and in that

2  context the damages for a stalking horse bidder between the

3  time of entry into the stalking horse agreement and the time

4  that the bankruptcy court approves the stalking horse deal,

5  unfortunately, they have exposure.

6           In fact, the matter I mentioned, it was <u>Residential</u>

7  <u>Capital</u> in front of Judge Glenn, I was representing the

8  stalking horse, we filed the stalking horse agreement on the

9  petition date, we had objections to it, and Judge Glenn said

10 two things:  one, don't try to enforce your fiduciary out

11 provisions with respect to the debtor; and, two, I have the

12 power as the bankruptcy court to modify the damages provision

13 in this contract because it's never been approved by me.

14          What Phil Anker wants you to do is enforce the

15 downside protection in favor of his client to the detriment of

16 the BSA.  He wants you to force the BSA to solicit a toggle

17 plan which we know is going to be a loser to the detriment of

18 all of the survivor constituencies.  That, Your Honor, we

19 think is an extraordinary result, we think it is not supported

20 by the law, we think it would create a terrible precedent for

21 debtors.  We think that it is the case that there is exposure

22 for all parties, including Mr. Anker and including my client,

23 prior to bankruptcy court approval, but it's that bankruptcy

24 court approval that gets people to go to the next phase and

25 we're just not there yet, and we don't think the debtors

1  should be forced to continue to pursue an agreement that

2  otherwise is a dog that just can't hunt in this bankruptcy

3  case.

4          THE COURT:  I am sympathetic to the idea -- and I

5  meant to ask Mr. Anker about this, but I didn't -- in terms of

6  the relative expense of pursuing a settlement motion versus

7  going out and soliciting a plan -- and I think there are

8  significant differences in the costs and the cases don't

9  really deal with that -- and whether the debtor should have to

10  go through the cost and expense of soliciting a plan that it

11  no longer supports, and I'm not sure that it should, but why

12  doesn't this just lead to a series of agreements that the

13  debtor believes it doesn't really have to perform and why

14  doesn't it, you know -- okay, so you approve the RSA and then,

15  guess what, some other deal comes along, so now we approve

16  that deal.  I mean, so now the debtor goes with that deal, and

17  you have a series of agreements and the debtor just feels it

18  can walk away from them.  That's not a great precedent either.

19          MS. LAURIA:  But, Your Honor, I don't think that's

20  a fair characterization of what has happened here.  This is

21  not a circumstance where the debtor signed a document and

22  turned around tried to suggest to Your Honor that we shouldn't

23  have to abide by its terms, quite the contrary.  The debtors

24  entered into the Hartford agreement, we drafted a plan that

25  incorporated the Hartford agreement; we drafted a disclosure

1  statement that incorporated the Hartford agreement.  We had

2  objections to our exclusivity.  In fact, I would say we were

3  quite close to Your Honor terminating exclusivity in May

4  because the debtor entered into the Hartford agreement.  We're

5  only here because of the bridge order in Delaware, quite

6  frankly, because of our exclusivity bridge.

7          We went back to mediation; we mediated for several

8  additional weeks.  You know, Mr. Anker wants to present what

9  happened in mediation as the debtors utilizing the Hartford

10 deal to gain leverage with respect to the TCC, the Coalition,

11 and the FCR on our own deal, nothing could be further from the

12 truth.  I'm disappointed that he said that.  The debtor sat

13 through mediation -- several mediation sessions where this was

14 a central focus.  So it's wholly unfair for him to make that

15 statement because that is exactly not what happened in the

16 context of the mediation.

17         So we are here today, four months after signing the

18 Hartford deal, and the parties simply have not budged.  The

19 creditor constituencies have said they are not supportive and

20 they will never support the Hartford deal, we heard all of

21 them say that.

22         I suppose, Your Honor, the debtors could have filed

23 a motion seeking approval of the Hartford deal and having the

24 -- paying for the TCC and we pay for the FCR to object to that

25 deal, get to the hearing, have Your Honor conclude that you're

1  not going to approve the deal because no creditor constituency

2  supports it.  And you know what, Your Honor?  Mr. Anker would

3  say that BSA in that instance has to go forward with the

4  toggle plan because that is his reading of the agreement, that

5  the toggle plan is the debtors' only other option.  That is

6  not in the best interests of the estate, it's not in the best

7  interests of the creditors of this estate; it is not

8  consistent with the law.  Mr. Buchbinder read a number of

9  provisions from Martin that clearly demonstrate that when the

10  debtor has a conflict with its fiduciary duties -- let's put

11  process to the side, it's not about process, it's about the

12  substance here -- we have an issue with our fiduciary

13  obligations, we have creditors that are saying they will not

14  vote for Hartford, and we're before the Court, asking the

15  Court for guidance.

16            THE COURT:  Okay.

17            MS. LAURIA:  I have nothing further, Your Honor, on

18  the Hartford.

19            THE COURT:  Thank you.

20            MR. ANKER:  Your Honor, this is Mr. Anker.  I don't

21  want to -- you know, I leave it to Your Honor, I would love

22  two minutes, but I realize we've gone a long time.  So I don't

23  want to be presumptuous.

24            THE COURT:  You can have two minutes.

25            MR. ANKER:  Your Honor, first, that is exactly, in

1  answer to Ms. Lauria, what the settlement agreement, Hartford

2  settlement agreement says.  It says in Section 3(i) that BSA

3  "may file a plan that includes alternatives or conditions

4  under which this agreement would not be part of provided

5  that," and it goes on to specify the toggle plan, that is

6  exactly, verbatim the deal we struck.

7          But, second, when Ms. Lauria says we aren't not

8  abiding, yes, you are.  The debtors' agreement was to file and

9  seek approval of our plan.

10         Third, on your question, Your Honor, can't the

11  debtor just reach -- I will just go back and I won't repeat it

12  to what I said earlier -- they broke for lunch, I said earlier

13  it is a condition -- what is before you today is approval of

14  the RSA, it is a condition precedent to approval of the RSA

15  that Your Honor determine that the debtor has no obligations

16  in the agreement, so it isn't a breach, and I have not heard

17  the debtor come back and say there is agreement by the

18  claimant representatives that that is wrong.

19         Finally, I suppose, Your Honor, what one might do

20  here is have the debtor go out for approval of a plan that

21  includes the Hartford settlement, a toggle plan, and maybe the

22  fourth amended plan as well, and let people see what choice

23  they prefer, but also have an opportunity so that if Your

24  Honor concludes on the confirmation date that we're right and

25  the fourth amended plan is violative of the bankruptcy code,

1  completely contrary (indiscernible) you just said that you're

2  not going to decide coverage issues, but instead it has been

3  sold that it will operate as a judgment enforceable against

4  the carriers, then we'll see between the two other

5  alternatives which the claimants have.  That would reduce

6  costs because we will get everything out there at once.  So I

7  suppose that is an option.

8              THE COURT:  Thank you.

9              Okay.  I appreciate the argument, Counsel.  It's a

10  challenging issue.  Thank you.

11              MS. GRIM:  Your Honor, Emily Grim, Gilbert LLP, on

12  behalf of the FCR and Coalition.  We would like an opportunity

13  to address Mr. Anker's comments regarding the insurance-

14  related implications of the RSA findings.  We can do that now

15  or later, I leave that to the Court's pleasure.

16              THE COURT:  I would like to get to the other

17  arguments rather than to the merits of the insurance dispute.

18  So thank you.

19              MS. GRIM:  Understood.  And it is of course our

20  view that these are confirmation issues that don't need to be

21  addressed now.  We just obviously, you know, to the extent you

22  need comfort on that front, we want to have the opportunity to

23  address Mr. Anker's points, but we don't want to hold up this

24  line of discussion anymore.

25              THE COURT:  Thank you.  Okay, next issue.

1          MS. LAURIA:  Again, Your Honor, Jessica Lauria on

2    behalf of the debtors.

3          Your Honor, I'm happy to turn to either business

4    judgment or the entire fairness doctrine, if you have a

5    preference, or I can address both of them since they are

6    different sides of the coin.

7          THE COURT:  Let's address which standard is

8    appropriate, entire fairness or business judgment.  I

9    understand this to be an issue raised by I think just Century,

10   but I could be wrong, with respect to whether the board is

11   conflicted or not, so Ms. Lauria.

12         MS. LAURIA:  Sure.  And, Your Honor, I believe the

13   entire fairness doctrine was raised by both Century and the

14   certain insurers.

15         THE COURT:  Okay.

16         MS. LAURIA:  So I'm not sure if they've allocated

17   argument, but in fairness I think this was raised by both of

18   those parties in their objections to the RSA.

19         So I'm going to start then with the entire fairness

20   doctrine and I think what is important to recognize here, Your

21   Honor, two things.  One, you asked last week, is it process

22   and terms or just process that matter?  When we talk about

23   business judgment, it's just process that matters; under

24   entire fairness, it's process and terms, but let's talk about

25   which standard applies.

1    First, I think it's important to note that

2  Bridgeport Holdings, and I think other cases are in accord,

3  that the business judgment rule applies unless the objecting

4  party can establish facts to support a reasonable inference

5  that the directors breached their fiduciary duties, and

6  thereby overcome the presumption and change the judicial

7  standard of review from business judgment to entire fairness.

8  The cases are universal, the burden is on the objecting

9  insurers to present the evidence, necessitating the

10  application of entire fairness doctrine, and they have failed.

11    The arguments for the application of entire

12  fairness by Century and the certain insurers are basically

13  twofold.  The first is on the conflict point and there they're

14  essentially raising two issues.  Issue one is that somehow the

15  local councils control the debtors because the NEB is

16  appointed by what's called the national council.  Their second

17  argument is that there are conflicts with respect to the

18  actual directors that sit on the NEB and the NEC because of

19  what I'll call an overlapping rule theory.  So that's sort of

20  the first basket are the conflicts arguments.

21    The second basket -- and the certain insurers I

22  don't think are still pursuing this, but I will mention that

23  they raised in their original objection that there was a

24  complete failure of the board to adequately inform itself with

25  respect to the RSA and, because of that entire, the entire

1  fairness doctrine should apply, not the business judgment

2  rule.  Well, let me take a quick step back just to remind Your

3  Honor about the corporate governance at the BSA because it's

4  necessary to understand the entire fairness arguments.

5           The Court heard testimony from Mr. Whitman and Mr.

6  Devang essentially about three governing bodies.  And I'm

7  going to ask for a moment that we suspend some of our thinking

8  about corporate governance in the for-profit context because a

9  not-for-profit board looks a little different from the for-

10  profit context.  Our not-for-profit is governed at the top

11  level by the National Executive Board.  That National

12  Executive Board has 72 members.  The members are listed on an

13  exhibit to Mr. Desai's declaration, it was also entered into

14  evidence during the testimony, it was Tab 3B.  And if you look

15  at that, there are 72 directors at the -- what we call the

16  NEB, the National Executive Board level.  Seventy two is a lot

17  and that's why I ask us to suspend for a moment our for

18  regular way corporate because normally in a corporation you'll

19  have five directors, seven, nine, sometimes 11 and 13, but 72

20  directors is an extraordinary number.

21           And if you look at the list of directors, I mean,

22  you will see the former Secretary of Defense, former Director

23  of the CIA, the former Secretary of State, sort of the who's

24  who of corporate America.  These are individuals that are

25  passionate about scouting and the mission of scouting, and are

1 very active in the organization and, therefore, play a role on

2 the NEB.  I'll come back to how they were appointed.

3          The next level of governance below the NEB is the

4 National Executive Committee, NEC.  This is the organization

5 that per the bylaws has sort of day-to-day responsibility with

6 respect to the debtors.  The bylaws provided that the NEB has

7 very specific areas of authority that can't be delegated.  The

8 one that was implicated by the RSA is the incurrence of debt.

9 I can give you the citations somewhere on my desk, but I'm

10 going to keep going because I think we can come back to that

11 if you need it.  But we've got NEB incurrence of debt.  NEC,

12 that has sort of day-to-day authority, those are 12

13 individuals that meet frequently.

14          The next level is the Bankruptcy Task Force.  These

15 are actually members of the NEC, but I would liken it to a

16 special committee.  These are individuals that are

17 responsible, again, for the bankruptcy case, take lead

18 responsibility with respect to negotiating the case, and

19 receiving reports from advisers, reviewing documents, et

20 cetera.

21          So now that we kind of have the stage set for our

22 three governing bodies, the first argument that I think the

23 insurers have made is that the NEB, that top level, the 72

24 directors have a conflict of interest because of how they're

25 appointed.  That we believe, Your Honor, is entirely baseless.

1  The argument seems to be that because a body called the

2  National Council, the National Council is comprised of 12 --

3  about 1200 individuals.  Those individuals are -- some of them

4  come from National, but many of them are nominated by the

5  local councils.  They're not necessarily local council

6  individuals, all of them, but they are nominated by the local

7  councils.  Those 1200 individuals actually vote for the slate

8  of directors that comprise the NEB.

9          We think it's very clear and we cited the Aaronson

10  decision, among others in our pleadings, that when you have a

11  group of individuals, even if it's shareholders, that are

12  simply voting on the slate of directors, that does not give

13  rise to a conflict and that certainly does not give rise to

14  the application of the entire fairness doctrine.  So let me

15  move on to what I think is actually the crux of the

16  Century/certain insurers' argument and that's this notion that

17  because some of the directors have current or past overlapping

18  roles with local councils, that somehow this gives rise to a

19  conflict that should necessitate the application of the entire

20  fairness doctrine.

21          First of all, there's actually no evidence that

22  supports this contention.  Mr. Desai testified before you on

23  Friday that BSA National has actually been very sensitive to

24  overlapping roles, not because of the reasons that the

25  insurers have espoused, but because National was concerned, as

1  Mr. Desai testified, and you see it in the minutes, that at

2  some point in time National would be called upon to make a

3  decision that is adverse to the local councils.  And so,

4  consequently, we did not want to have directors at the

5  national level that overlapped with local councils.

6          What actions were taken because of these concerns?

7  Starting in February -- and this is very clear in the February

8  7th board minutes that came into evidence -- Mr. Desai

9  explained that there was a presentation made to the board with

10 respect to conflicts and that BSA NEB, so the executive board

11 directors, were requested that they not hold dual roles or, if

12 they did, they needed to recuse themselves from decisions

13 pertaining to the local councils.  And if you review the board

14 minutes, you will see smattered throughout individuals that

15 recused themselves from decision-making.  That was at the NEB

16 level, but, again, the NEB is only responsible for signing off

17 on the debt component of the RSA.

18          The NEC level had much more involvement and, as Mr.

19 Desai explained, there is no member of the NEC that can have a

20 dual directorship with a local council, and that actually is

21 also very clear in BSA's bylaws at Article III, Section 7,

22 Clause 5.  And Mr. Desai is a good example of this.  The

23 evidence shows and it's uncontroverted that 14 months ago in

24 May 2020, when Mr. Desai was named to the NEC and the NEB of

25 the BSA, he resigned from his local council board.  Now,

1  because the Bankruptcy Task Force, as I explained, is

2  comprised of NEC members, the same holds true at the

3  Bankruptcy Task Force level.  There are no overlapping roles

4  at the task force.  So there's no evidence before the Court

5  that -- one, that there were the overlapping roles or that,

6  two, these overlapping roles had any impact on the decision-

7  making of the board of directors.

8         I should also note, Your Honor, that the RSA is not

9  a transaction between the BSA on the one hand and the local

10 councils on the other.  To the contrary, it's -- you can

11 either look at a singular agreement that has Scouting on the

12 one side and the survivor constituencies on the other or two

13 essentially bilateral agreements where you had BSA on the one

14 side, the creditor constituents on the other.  And I think the

15 evidence and the testimony that Your Honor heard last week is

16 very clear on this point, the BSA directors, the BSA board

17 minutes, the BSA presentations were very focused on the BSA

18 contribution to the settlement trust.

19        The one point in time where you'll see a

20 significant divergence from that is there were a number of

21 presentations on that Delaware statutory trust note, which is

22 essentially funds that are going into a Delaware statutory

23 trust from the local councils.  If the pension plan is

24 sufficiently funded, those funds get released to pay down on

25 the note; if not, they go to the pension plan.  There were

1  extensive presentations on that.  That is because BSA is the

2  pension plan administrator and of course has concerns over

3  these thousands of retirees that benefit from the pension

4  plan, so the BSA wanted to be crystal clear that that Delaware

5  statutory trust note made sense.  So that's the one time where

6  you see the NEC becoming significantly involved in the

7  contributions that ultimately the local councils are making to

8  the trust.

9            But, in any event, again, this is an agreement

10  where you have Scouting on one side, two fiduciaries for

11  survivors, the Coalition, and state court counsel, which are

12  fiduciaries for their own clients on the exact side of the

13  transaction.  That's critically important because any benefits

14  the local councils received, including releases, were not

15  negotiated between BSA and the local councils, they were

16  actually negotiated by the parties who were granting the

17  release themselves.  And in fact, if you look at the cases

18  that were cited by Century and the certain insurers in support

19  of the application of the entire fairness doctrine, I counted

20  eight, of those eight, there were only two where the court

21  applied the entire fairness doctrine in a circumstances where

22  there was a conflict of interest, that was LATAM and LA

23  Dodgers, and both of those proved exactly the point that I'm

24  making.

25            Both LATAM and LA Dodgers involved debtor-in-

1  possession financing facilities and, as I know Your Honor is

2  well aware, debtor-in-possession financing facilities are

3  frequently -- not always, but frequently negotiated prior to

4  the commencement of the bankruptcy case, and in LATAM and LA

5  Dodgers it was no different.  LATAM involved a DIP facility

6  where one of the tranches of the facility was a tranche that

7  was provided by the debtor's shareholders, LA Dodgers involved

8  a DIP facility, although it was not with one of the insiders

9  of the debtors, Mr. McCord (ph), who was an insider of the

10 debtor, actually had a personal guaranty involved with the DIP

11 facility that actually caused him to not consider any other

12 DIP facilities.  Both of those DIP facilities were negotiated

13 prior to the bankruptcy case, both of those DIP facilities did

14 not have a creditor fiduciary present at all at the

15 negotiating table.

16         The other -- in the LATAM case, it was the board

17 versus the shareholders, in the LA Dodgers case, it was the

18 board versus the outside lender party, but the individual who

19 controlled the board actually had a vested interest in making

20 sure that that DIP facility got approved.  There was no

21 creditor -- there was not an official TCC, an FCR, or state

22 court counsel representing 70,000 individuals who were

23 actually signing off on the transaction.

24         And if you look at Judge Garrity's opinion from

25 LATAM, he says, "The Court cannot in this case defer to the

1   debtor's business judgment because Tranche C DIP facility is

2   the product of an exclusive negotiation by the company and its

3   controlling shareholders, and that those shareholders are on

4   both sides of the transaction."

5          LATAM and LA Dodgers had a deal that didn't have

6   the actual creditor constituency, the interested party on the

7   other side.  Here, there were in fact two sides.  The very

8   releases that Century and the certain insurers say that our

9   directors are getting the benefit of, one, there is absolutely

10  no evidence that that was at all a consideration of those

11  directors; but, two, there was a fiduciary for the parties

12  that were going to be granting the releases that were on the

13  other side of the transaction.

14         So, from our perspective, Your Honor, there's

15  absolutely no evidence of conflict.  It's been -- there's no

16  evidence that our board, comprised of these volunteer,

17  philanthropic directors, were looking to financially gain from

18  the transaction, that's something else the courts look to.

19         And as for the remaining argument, I guess, that

20  the certain insurers put forward that the heightened standard

21  should apply because our board failed to adequately inform

22  itself, I don't want to repeat what I'm going to argue in

23  connection with the business judgment rule, but suffice it to

24  say, Your Honor, Mr. Desai's declaration, one of the

25  paragraphs that is in evidence was very clear that the board

1  met from the time of the bar date, which is when the parties

2  started rolling up their sleeves on a deal, through the actual

3  RSA, the directors, some form thereof, met 57 times on a

4  formal basis.  The testimony was very clear that there were

5  advisers present at virtually all of those meetings and there

6  were presentations from the advisers, the meetings were

7  robust.  Like I said, I can come back to that in connection

8  with business judgment because I recognize it's 4 o'clock this

9  afternoon, but there is simply no evidence that entire

10  fairness should apply and the burden is on the objecting party

11  to make that assertion.

12          Unless you have any questions, Your Honor, that's

13  all I had on that point.

14          THE COURT:  Thank you.  No, let me hear from

15  whoever is going to take the lead from the insurers.

16          MR. SHAMAH:  Your Honor, Daniel Shamah, O'Melveny &

17  Myers, on behalf of Century.  Can you hear me and see me okay?

18          THE COURT:  Yes, Mr. Shamah.  Thank you.

19          MR. SHAMAH:  Thank you, Your Honor.

20          Your Honor, I want to start with something that Ms.

21  Lauria did not address and I don't know if it's because the

22  debtors are abandoning it, but they made an argument in their

23  papers that we lack standing to even address this issue and,

24  I'm happy to rely on our papers on that, I think they're

25  confusing a number of different standing doctrines, but if

1  you'll indulge me, I'm happy to give you two minutes of why

2  they're wrong on standing.

3          THE COURT:  I will confess that I didn't understand

4  that argument and how it could be correct.  So, in my view,

5  you don't need to -- you don't need to address it.

6          MR. SHAMAH:  Thank you, Your Honor.  I will take

7  that instruction and guidance and move right along.

8          And, Your Honor, we put together a couple of slides

9  summarizing some of the evidence and I had asked that -- I was

10 told to ask that the screen share be turned over to Mr.

11 Cocchiaro -- Cocchiaro -- I always mispronounce his name -- so

12 that we can put those up on the screen.

13         THE COURT:  Can you spell that so that my ECRO can

14 find him or her?

15         MR. SHAMAH:  Sure -- he -- C-o-c-c-h-i-a-r-o.

16         THE COURT:  We will find him.

17     (Pause)

18         THE COURT:  It looks like we did.

19         MR. SHAMAH:  Excellent.  Thank you, Your Honor.

20         And I want to start with a couple of basic

21 principles that I don't think are really in dispute, and I

22 think the most important one is that the cases teach -- and

23 this is across the board both in the cases we cite, as well as

24 the cases that the debtors cite, that whether a transaction is

25 conflicted or whether a director is disinterested or not is

1   facts and circumstances specific.  There is no black-and-white

2   rule, nobody cites a case that lays out a black-and-white test

3   for whether a transaction is conflicted or not and whether a

4   director is laboring under a conflict or is disinterested with

5   respect to a transaction when that director approves the

6   transaction.

7          The other basic principle I think is important to

8   keep in mind here -- and I think part of the point of

9   departure between us and the debtors is everyone is looking to

10  state law because I think, you know, by analogy, state cases

11  offer guidance for what a proper process looks like and what a

12  board should consider when it approves a transaction, but the

13  source of authority here is obviously Bankruptcy Code Section

14  363(b).  And Your Honor pointed out at the outset of the

15  hearing in the motion to compel process that you sit in a very

16  different posture than a Chancery Court.  You're not being

17  asked to evaluate a claim against the estate and whether the

18  debtor retrospectively discharged -- or, excuse me, a company

19  retrospectively discharged its obligation, you are sitting

20  prospectively and evaluating whether a transaction ought to be

21  approved.  And we'll come back to that when we talk about the

22  business judgment standard because I think that's a very

23  important distinction to keep in mind.

24         So -- and that's, I think, one of the key lessons

25  in Innkeepers and Dodgers and LATAM and all these cases where

1  courts have applied heightened scrutiny.  The fact patterns

2  are slightly different in each of them, but the common theme

3  there, even though Dodgers does cite state law, is that the

4  Court is obviously evaluating it under substantive bankruptcy

5  law.  It's a question of what the Court's standard -- what

6  standard the Court needs to apply.

7          And I think -- one thing Ms. Lauria said that I

8  think is worth emphasizing is, unlike those cases, you do not

9  have an independent committee, unlike any of these cases where

10 these transactions are challenged.  I think it's a very

11 unusual process and which makes the review here a little bit

12 challenging for how to think about the appropriate standard.

13         So, if we can move forward, I think -- the

14 evidence, I think, is overwhelming the overlap between the

15 NEB, NEC members, and the local council members.  I think we

16 cite to -- these are deposition transcripts from Mr. Ownby and

17 Mr. Mosby, as well as Mr. Desai's testimony last week.  I

18 don't think you've seen the deposition testimony yet, I

19 believe the designations were just agreed.  And I'll tell you,

20 Your Honor, it was eye-opening and we'll come back to a lot of

21 it later on, but it's not really in dispute that the NEB and

22 NEC members, as well as, by definition, the Bankruptcy Task

23 Force members who are a subset of the NEC members, have

24 longstanding relationships with the local councils.  Nobody is

25 really arguing that, those relationships that were

1    intertwined, they go back a long, long time.

2            If we can go to the next slide, Your Honor, there's

3    also no real dispute that the local councils are subject to

4    proofs of claim.  I think the bankruptcy record is clear that

5    there have been thousands of them that have been filed against

6    the local councils and Mr. Desai acknowledged that the

7    individual members of the local councils, the officers,

8    directors, could potentially be implicated in those claims.

9    And so, as a matter of corporate governance law and how courts

10   evaluate these transactions, it is fairly straightforward that

11   the non-debtor entities are getting a benefit out of the RSA.

12           Now, Ms. Lauria responded to that earlier by saying

13   there's no evidence that it was material, I would suggest to

14   you that's an astonishing statement because one way to think

15   about the evidence that it's not material is the debtors have

16   abandoned the toggle plan, right?  The not granting a release

17   to the local councils is the toggle plan, that's the plan the

18   debtors have contended is futile.  And so the notion that the

19   directors both in their individual capacities, but as well as

20   by dint of their relationships with the local councils, are

21   not getting a benefit under the RSA that's different, that's

22   qualitatively and categorically different than the benefit

23   other stakeholders have gotten, is just not true.

24           And in fact, if you -- what little we can glean --

25   and if we can move to the next slide -- this is also in the

1  evidence and Ms. Lauria alluded to it earlier, they're

2  cognizant of it, they're cognizant of the likelihood of a

3  conflict and it's -- again, many of these minutes are

4  redacted, so we don't have all the information, obviously, but

5  it's clear that a conflict was on their minds and the

6  prospective cure that they tried to facilitate where they --

7  where Ms. Lauria alluded to they resigned their dual role,

8  I'll come back to that in a second, but for purposes of right

9  now it's a fig leaf and it's insufficient as matter of law.

10         The last point I want to make, Your Honor, is the

11  existence of a conflict and why we think that, as a matter of

12  basic corporate governance law, this is an interested

13  transaction which triggers heightened scrutiny.  There's

14  actually one of the more interesting ones, which is if you

15  look at the June 5th NEB minutes, they reference that the

16  impact on the Boy Scouts balance sheet will be much more

17  significant than the impact on the local council balance

18  sheet.  What does that mean?  What it means is that the local

19  councils are paying less for their release than the Boy Scouts

20  are paying -- than the debtors are paying.

21         And why I find that interesting is because if you

22  look at the GAMCO case that the debtors cite in their brief,

23  and that's 2016 WL 6892802 and it's the case they cite

24  probably more than any other in their reply brief -- is that

25  where an insider -- and these are insiders, the local councils

1   are affiliates, the directors are obviously on the board --

2   receives a, quote, disproportionate benefit, that is

3   sufficient to trigger a heightened scrutiny for the Court and

4   it's sufficient to trigger that heightened scrutiny.  And if

5   you look at the plan, if you look at the disclosure statement,

6   the debtors are contributing a substantial portion of their

7   assets to the settlement trust; they've lowered their minimum

8   cash threshold.  The local councils, on the other hand, are

9   retaining $2 billion of assets in their -- you know, on their

10  balance sheets.  And so that by itself under the cases they

11  cite is sufficient to trigger heightened scrutiny.

12          So I want to circle back to the two arguments that

13  I think I heard Ms. Lauria principally argue.  The first is

14  this idea that the releases are somehow immaterial.  I found

15  that argument fairly incredible and I think it underscores the

16  influence of the local councils on the debtors' decision-

17  making.  Conceptually, there isn't much of a difference

18  between the local councils and the chartered organizations

19  from the standpoint of how they sit vis-a-vis the debtors.

20  The debtors need both of them to survive, they've said so

21  themselves.  They require that the chartered organizations,

22  you know, strike a deal, that they retain their relationship

23  with the debtors.  The evidence and the testimony is that

24  without the chartered organizations the debtors' membership

25  would essentially collapse and they would be unable to fulfill

1  their missions.

2       The chartered organizations have been left

3  completely out of this deal.  And you'll hear more I'm sure

4  from them later when we move on to the business judgment rule,

5  but suffice to say, even today, seven weeks or six weeks or

6  however long it's been since the RSA was announced, there's

7  still no deals with the chartered organizations.  That was

8  testimony last week; it's still true as of today.  Yet the

9  local councils are in the deal and the chartered organizations

10  are not in the deal.  Why is that?  Well, because one has

11  board representation and one doesn't.  It's Occam's razor,

12  that's the simplest explanation for any of it.

13       And so I don't think it's correct to say that it

14  wasn't on anybody's mind, it's implausible to think that.  I

15  think the relationships between the local councils and the

16  debtors make it clear that that's -- that that could not have

17  not been on their mind, if I could articulate a double or a

18  triple negative.  And so I don't think that's sufficient to

19  get out from underneath this rubric.

20       The second argument is this idea that, well, they

21  resigned their dual role and, as a result of that, they've

22  cured the issue.  As I started off, Your Honor, the cases

23  teach that whether a conflict exists is very, very fact

24  specific, and the evidence I think shows that the ties between

25  the local councils and the debtors themselves are fairly deep.

1  And if we can show Exhibit 3D, which is Mr. Desai's

2  resignation letter, I think it's very telling.  Ms. Lauria

3  cited it in her remarks as well -- I do want it up there,

4  thank you -- and this is his letter, right?  He resigns from

5  the local council and he specifically says in the third

6  paragraph, "I'm hopeful that after my service on the BSA

7  Executive Committee concludes I will be able to rejoin the

8  council board."

9           This is not somebody resigning from a second role

10 and saying I'm focused entirely, exclusively on my

11 responsibilities as a director of the debtors, this is

12 somebody saying I hope to rejoin you later.

13          He goes on to say, "Rest assured, I will continue

14 to be a committed member of our council and to not make the

15 decision to resign lightly."

16          Your Honor, the idea that they required the NEC

17 members to resign dual roles is a fig leaf; it's a transparent

18 attempt to after the fact cure the conflict.  I find it

19 fascinating because, if you step back and you read all the

20 heightened scrutiny cases and some of the cases that say

21 (indiscernible) standard like Innkeepers -- and we're going to

22 talk a lot about Innkeepers I think a little bit later, I'm

23 sure you read it -- the way you -- the debtors didn't do the

24 things you typically see where you have an independent

25 director, they don't have any loyalty to any other

1  constituency that has a stake in the case, they delegate to

2  that independent director or that special committee the

3  authority to negotiate, they didn't do any of that, they

4  didn't do any of that.  They recognized that they have this

5  conflict issue, but rather than do the appropriate thing,

6  which is find a truly independent board to evaluate the

7  transaction from the standpoint of the debtors and the debtors

8  only, they try to sort of, you know, maneuver their way around

9  it in this way and I don't think it's sufficient.

10         And I think the last point I'll make on this, Your

11 Honor, and sort of just rounding it out, this is a very

12 unusual case.  I will -- I think Ms. Lauria and I agree on

13 that.  You don't have 72-member boards.  And I understand that

14 that presents challenges in terms of how the governance is

15 going to move forward and how the board can remain informed,

16 but I think that the way they've structured this transaction

17 and the way the board considered it has made it simply

18 impossible for the Court to take comfort that the parties that

19 approved it were doing it solely and exclusively from the

20 standpoint of the debtors.  The ties are too deep, the

21 evidence shows that they have longstanding relationships and

22 in fact hope to return to those former roles and, under those

23 circumstances, Your Honor, we respectfully submit that the

24 entire fairness standard applies.  And if it does, Your Honor,

25 I don't think Your Honor can approve the RSA.  I don't think

1  it fails passes business judgment, we'll get to that in a

2  second, but I think the debtors essentially having abandoned

3  their argument that, you know -- or submitting evidence of

4  arm's length negotiations in good faith, I don't think they

5  can make any case that entire fairness is satisfied.

6          And so with that, Your Honor, unless you have any

7  specific questions for me, that's all I had.  I believe Mr.

8  Rosenthal did want to pipe up after me.

9          THE COURT:  Okay.  I do have a question.  Are there

10  any cases that deal with interested boards in the context of

11  not-for-profits?

12          MR. SHAMAH:  Your Honor, I don't have one at my

13  fingerprints, but we cite cases in our brief that find that

14  non-profit fiduciary duties are not that dissimilar than for-

15  profit fiduciary duties.  I understand that there's going to

16  be a fundamental difference because there are no shareholders

17  here, so I get that.  In most of these state law cases, the

18  balancing act the court is trying to strike is between the --

19  you know, the shareholders enriching themselves, so to speak -

20  - or directors, excuse me, getting some kind of

21  disproportionate benefit at the expense of other shareholders.

22          I don't think it matters in this context because we

23  have an insolvent debtor.  And so what we're talking about

24  here is not whether shareholders are, you know, being deprived

25  of some residual value, but whether the debtors are moving

1   forward on a restructuring path that is not in their best

2   interests as opposed to in the best interests of non-debtor

3   entities -- non-disclosure statement constituencies.  I think

4   -- I'll concede, I don't have a non-profit case that -- a case

5   involving a non-profit insolvent debtor that deals with that

6   precise issue, but I think if you read the cases, I think that

7   is the way you would analyze that question.

8            THE COURT:  Okay.  I was curious because some of

9   the cases looked to economic remuneration, and incentives and,

10   obviously, we don't have that here.  So I was curious on the

11   take on that.

12            MR. SHAMAH:  Well, Your Honor, if I could respond

13   to that very briefly because I'm not entirely sure I can agree

14   with you respectfully.  These individual directors as well as

15   the local councils, themselves, do have rights of

16   indemnification that are prepetition claims, that are,

17   essentially, being released and unimpaired under the plan.  So

18   there is certainly -- and the evidence that, you know, claims

19   in the thousands have been submitted against the local

20   councils.

21            So I do think there is -- it's a different economic

22   incentive, I will grant you, then some of the other cases

23   involving for profit debtors, but I think it would be

24   incorrect to suggest that there was no economic incentive

25   here.  I think it's not at the exclusion of non-economic

1  incentive.  I think Mr. Desai's resignation letter is a

2  testament to that.  I don't doubt his security and the depth

3  of his affinity for his local council and scouting generally.

4  I certainly am not doubting that, but that just calls into

5  question of -- that just brings the duty of loyalty question

6  to the table, Your Honor.

7           THE COURT:  Well that was part of why I asked.  Let

8  me ask you to respond to Ms. Lauria's argument that even if

9  this were the case the local councils and the BSA are not on

10 the other side of the V from each other; that, in fact, the

11 releases were, and the compensation for the releases were

12 negotiated by the official committee, the TCC, and the

13 coalition, and there was separate negotiation of the BSA

14 contribution.

15          So why doesn't say that this is not an interested

16 transaction?

17          MR. SHAMAH:  So I have two responses to that, Your

18 Honor.

19          One, we don't actually know that.  I don't think

20 there is really evidence that the negotiations were bifurcated

21 in that way.  I think, you know, because of the way the

22 mediation privilege was asserted here I don't know that we

23 have, really, evidence to conclude that somehow only the TCC,

24 and the FCR, and the coalition negotiated the releases with

25 the local councils.

1          The second response, Your Honor, is it's nice to

2   kind of frame the agreement that way.  I don't think that's

3   what the law requires the court to do.  I think you have to

4   look at the transaction objectively and what is it that each

5   party to this deal is getting.  The ad hoc committee of local

6   councils are a party to the deal.  They are not -- it's not

7   like two deals smashed into one.  It's not -- you know, its

8   they're a party to this transaction.

9          So I think the implications of that argument are

10  that you could strip out one piece or the other and the deal

11  could continue to stand and I don't think that's true.  I

12  don't think the debtors would take that position.

13         THE COURT:  But the argument that I understand your

14  clients focused on are the releases, that that's the "sin", if

15  you will, in the transaction that makes it interested.  And

16  if, in fact, and I guess that's a question if, in fact, the

17  negotiation over the releases was between the local councils

18  and the plaintiff representatives then why can't I -- I'm not

19  sure why I think that is a conflict.

20         MR. SHAMAH:  So let me try to answer the question

21  slightly differently, Your Honor, because I don't think --

22  well, I think the flaw in that premise, I should say, is that

23  those were releases for -- those are necessarily releases for

24  the plaintiffs to give away.  I think there are releases that

25  the plaintiffs negotiated for sure, but there were releases

1 | that the estate is also granting as well.

2 |         THE COURT:  That's fair.

3 |         MR. SHAMAH:  It states bankruptcy, itself, that

4 | these local councils are being released.  They could file for

5 | bankruptcy and get the betterment of a discharge.  I mean that

6 | is not something that is inconceivable.

7 |         The other way I would answer it, Judge, is it may

8 | be helpful to, sort of, think about how this could have been

9 | done differently and what a different process could have

10 | looked like where there was an independent on this board with

11 | authority to actually evaluate this transaction from the

12 | standpoint of the debtors and the debtors alone.  You would

13 | have heard testimony from that individual as to why, from the

14 | debtor's perspective, this release was appropriate.

15 |         Instead, what you have is testimony from, you know,

16 | the CRO as well as one board member or three board members, I

17 | should say, the latter three of whom have long standing

18 | relationships with the very entities that are being released

19 | under this plan.  I just think of because the way they have

20 | set this up -- and, one other thought that just occurred to

21 | me, and I'm sorry, Your Honor, I'm jumping around a little

22 | bit, if you look at what some of these cases talk about

23 | heightened scrutiny is important or appropriate when there are

24 | these concerns around the parties incentives and whether they

25 | are truly aligned and whether there are, in fact, the

1  fiduciaries are pursuing the best interest of the debtor to

2  the exclusion of all other interests.  I think in the absence

3  of that, that is the overlay that I think requires heightened

4  scrutiny.

5          THE COURT:  Okay.  Thank you.

6          MR. SHAMAH:  Thank you, Your Honor.

7          THE COURT:  There is someone else who wanted to

8  address this.

9          MR. ROSENTHAL:  Yes, Your Honor.  Michael Rosenthal

10 of Gibson Dunn on behalf of the AIG Companies and certain

11 insurers.

12          Your Honor, we spent a lot of time talking about

13 the duty of loyalty, but in order to be free from the business

14 judgement test you not only have to comply with the duty of

15 loyalty you have to comply with the duty of care.  I am going

16 to focus on the duty of care because I think that what the

17 evidence demonstrates is that this board did not comply with

18 the duty of care which requires paying the benefit of the

19 business judgment rule, the board to make an informed

20 decision.

21          I don't think they made an informed decision.  We

22 don't know exactly what they considered in the meetings

23 because much of what we were given was redacted, but there is

24 nothing that we have been given that indicates that they

25 considered a number of factors that would be relevant and

1  important for them to make an informed decision which would

2  enable them to get the benefit of the business judgment rule.

3         We know a couple things.  We know that there is no

4  particular board resolution authorizing the RSA.  They

5  approved some general guideline principals which have been

6  undisclosed to us, but there was no board meeting, there was

7  no board resolution itself.

8         We know that the CEO testified that he had never

9  seen the TDPs until after he executed, actually executed the

10  RSA.  We know that the chairman of the NEB testified that he

11  had never seen the RSA; although, he did read it immediately

12  before his deposition.  We have a little evidence that Mr.

13  Desai might have received the draft of the RSA in an email,

14  but there is no evidence about what exactly he considered or

15  what exactly he approved.

16         The evidence demonstrates that the sole focus of

17  this board was really on the economics of the contribution by

18  the BSA and the local council, but that is not all that is

19  relevant in the context of a compliance with the duty of care.

20  We know that in order to comply with the duty of care, and we

21  advise our clients all the time, you have to be fully informed

22  about everything surrounding the decision, but this board was

23  not.

24         It did not consider the terms of the TDPs that were

25  to be approved.  It did not consider whether those TDPs raised

1  confirmation issues.  It did not consider or review the

2  findings that were going to be required by this court and how

3  that might impact the ability of the debtor to emerge.  It did

4  not consider, at least as far as we can tell, why the plan

5  contemplated by the RSA is better than the toggle plan. It did

6  not consider whether the decidedly non-insurance neutral plan

7  that is part of the current plan could be confirmed and if so

8  what the time table would be for that.  How long would it

9  take; are we talking about an emergence in 2022, 2023, as Mr.

10 Anker has said and others have said.

11         The evidence that would have to be put together to

12 prepare and fully present to this court a case of all those

13 issues would take a long time.  There is no evidence that this

14 board considered any of these critical factors and the simple

15 reason is because they weren't concerned about it.  They were

16 only concerned about what they would have to pay, what BSA

17 would have to pay, what releases it would obtain.

18         I would submit to Your Honor that that does not

19 satisfy the duty of care.  You only need to look at this --

20 there was a recent case the end of last year that raised quite

21 a stir among the corporate community which was the Nine West

22 case where Judge Rakoff, out of the Southern District of New

23 York, actually heard, considered whether a motion to dismiss

24 should be granted because the board had deliberately turned a

25 blind eye to a couple things that were related to the

1  transaction including what the company was going to look like

2  after the sale.  He found, at least in terms of that motion to

3  dismiss and the case was subsequently settled, that that did

4  not justify dismissal of the case, that the board had to do

5  more than that.  It was a more extensive inquiry that the

6  board had to engage in.

7           This board did not engage in that.  And in our

8  view, Your Honor, that is what means that the entire fairness

9  standard must apply here and not the business judgement

10  standard.  As Mr. Shamah said, if you apply the entire

11  fairness standard it's very difficult, if not impossible, Your

12  Honor, to approve this plan because, and I don't want to spend

13  too much time on the arguments that we have raised before, but

14  the issues raised by the insurance findings, the issues raised

15  that this court has already said it cannot enter, the issues

16  raised by the non-insurance neutrality which the Third Circuit

17  does not permit, the issues raised by the 503(b) treatment of

18  the coalition's fees all of those issues are issues which at

19  the end of the day mean that this plan is not going to be able

20  to be confirmed.

21           I suggested to Your Honor that it is, finally, for

22  the court to approve an RSA that allows the debtor to propose

23  a plan and pursue a plan that at the end of the day, after

24  wasting a lot of time and resources, is going to be determined

25  to be not confirmable.  That is a waste of time.  That is an

1 | exercise in futility.

2     I want to, for one second, get back to the toggle

3 | plan for a second.  You know, the toggle plan -- I know you

4 | don't think you have to decide this right now, but I actually

5 | think its central to what you have to decide in the RSA

6 | because you are only going to get one shot of this.  Ms.

7 | Lauria would like you to -- would like to suggest to you that

8 | that one shot of the debtors should be to pursue the plan that

9 | is currently on the table.  If that plan is not confirmable,

10 | however, Your Honor, and I think it's not then at the end of

11 | the day what they will be sitting with is less money, a lot of

12 | time would elapse, exclusivity will have expired.

13     By contrast the toggle plan, if you let that go

14 | forward, yes, the claimants might not vote for it, but there

15 | would be a strong incentive to vote for it if, in fact, they

16 | really don't want to go back to the tort system.  Guess what,

17 | if they did not vote for it, as Mr. Anker said to you, then

18 | the plan would toggle to the BSA only plan which doesn't

19 | require the consent of the claimants.

20     The fact that it would toggle to a plan that puts

21 | claimants in the tort system where they do not want to be

22 | does, and Your Honor had mentioned it a little bit, does

23 | leverage them, I think; it makes them think twice before they

24 | vote to disapprove a plan.  But in any event, at the end of

25 | the day we would either end up with a plan that is approved by

1  the claimants or a toggle plan that can be confirmed over the

2  claimant's objective.

3          I think, Your Honor, that the way to get to a

4  global deal, the way to get to a global deal is not to approve

5  this RSA, to exercise your judgment, your independent judgment

6  under the entire fairness standard, that the plan that is on

7  the table is not confirmable and is not the way to go forward.

8          Let me just raise one other point with you, Your

9  Honor, a practical point which no one has mentioned yet and

10  that is that the plan that is on the table suggests that there

11  will be efforts made to cut deals with chartered organizations

12  and insurers, but what no one has mentioned to you is that the

13  RSA requires that any settlement for the chartered

14  organization or an insurer be approved by each of the RSA

15  parties.  In other words, each RSA party has a veto right.  So

16  I call it the lowest common denominator, you might call it

17  something else, but basically the most unreasonable person can

18  hold up a deal.

19          I don't think, Your Honor, that if the debtor had

20  been looking at this as it should have been in terms of a

21  fully informed decision it would have thought and that you

22  should think that giving over and feeding to the claimants a

23  veto right over any settlements, and not just a veto right to

24  any -- to all the claims, a veto right to the most

25  unreasonable of the claimants' representatives at any point in

1  time is in the best interest of this debtor.

2          THE COURT:  Mr. Rosenthal, let me ask you a

3  question.  In the -- what was the posture of the Nine West

4  case and Judge Rakoff's decision?

5          MR. ROSENTHAL:  I think it was a motion to dismiss.

6          THE COURT:  On a breach of corporate fiduciary duty

7  claim or --

8          MR. ROSENTHAL:  Yes.  It was breach of corporate

9  fiduciary duty claim where post-closing the purchaser was

10  going to spin-off the most important division for less than

11  adequate consideration leaving the creditors without any

12  recourse.

13          THE COURT:  Okay.  And now let me ask you a

14  question, and this is dangerous because it's just occurring to

15  me as I'm hearing your argument, so the debtor doesn't need

16  permission to file a plan, it doesn't need permission to file

17  the Hartford plan, it doesn't need permission to file the

18  toggle plan, it doesn't need permission to file the plan

19  embodied in the RSA.

20          So when I am considering approval of the RSA, given

21  that a debtor can file any plan it wants to file, does that

22  inform the standard at all?

23          MR. ROSENTHAL:  I think it does.  I think that

24  approving the RSA actually puts the debtor in a worse position

25  then they would be in even if they file this plan without the

1   RSA being approved because they would not have ceded the keys

2   of the kingdom to the claimants' representative.  Now the

3   claimants' representative apparently like this plan so they're

4   probably going to vote for it whether you approve the RSA or

5   not, but in the absence of the RSA there's nothing that says

6   that the debtor, you know, and the coalition, if it wants to

7   cut a deal with the chartered organization or an insurer, can

8   cut a deal that people can shoot at.

9          They can at least cut a deal that they think is a

10  reasonable deal without having to make sure that every, you

11  know, that the TCC, the future claimants representative, the

12  coalition, in the case of every chartered organization, every

13  State Court council has to approve the settlement which is a

14  very, very onerous standard and really does tie the debtor's

15  hands behind its back.

16          THE COURT:  Thank you.

17          Is there anyone else who wants to address this

18  before I go back to Ms. Lauria?

19          MR. MASON:  Your Honor, Richard Mason for the ad

20  hoc committee.

21          I have a brief five to ten minute closing statement

22  where I wrapped in entire fairness and business judgment.  I

23  can break it up or maybe after Ms. Lauria goes to business

24  judgment then I can come back and just speak to both if that

25  makes sense.

1          THE COURT:  That's fine.  Thank you, Mr. Mason.

2          Ms. Lauria?

3          MS. LAURIA:  Thank you, Your Honor.  I am going to

4  first respond to Mr. Shamah's remarks concerning the conflict

5  issue and then what I think I will do, if it's acceptable to

6  the court, is address Mr. Rosenthal's remarks on the duty of

7  care in the context of business judgment because there is just

8  so much overlap there.

9          First, just talking about Mr. Shamah's remarks, and

10 I want to go back to what I opened with which is the burden is

11 on the objecting party to establish facts that entire fairness

12 should apply.  When I was listening to Mr. Shamah I didn't

13 hear any facts.  In fact, what I did hear was a lot of

14 innuendo.

15         Innuendo point one that the directors could

16 actually be implicated in proofs of claim and, therefore, they

17 might have a vested interest in the local council releases.

18 There is absolutely no evidence before the court that the

19 directors are implicated in the proofs of claim.  In fact, the

20 notion that local councils could have been named in those

21 proofs of claim in no way links up to the fact that these

22 particular individuals were serving in the local councils at

23 the relevant time or that they had anything to do with the

24 abuse in question.  Indeed, if they did have something to do

25 with the abuse in question the plan is crystal clear that they

1   are carved out of the very releases that Mr. Shamah was

2   discussing with the court.

3           The second piece of innuendo that Mr. Shamah made

4   was the notion that as between the chartered organizations and

5   the local councils it's really clear why it is the local

6   councils got releases and not the chartering organizations,

7   and that is because the local councils had representation on

8   the board.  That, again, is absolutely false and there is no

9   basis in the record to support that statement.  It is, as Your

10  Honor observed, I believe, two hearings ago, maybe it was one

11  hearing ago, negotiating with respect to the local councils

12  was extraordinarily complicated, that's why we had Mr. Mason

13  there and the ad hoc committee of local councils which had

14  multiple bankruptcy lawyers negotiating on their behalf.

15          As Your Honor observed the chartered organizations

16  are even more complicated.  The local councils were all

17  talking about scouting related liability.  The chartered

18  organizations there are several and their liability stems from

19  potentially other avenues not just scouting.  That is

20  something that is extraordinarily complicated, that is why we

21  are addressing that in mediation now.

22          Next, he suggests that if perhaps the debtor had

23  had a more traditional  independent director construct maybe

24  that would establish a cure for the purported conflicts of

25  interest; also false.  In fact, I'm quite confident that if we

1  had an independent director I would hear from Mr. Shamah that

2  that wasn't enough.  In fact, in Latam there was independent

3  directors on the board.  It was those independent directors

4  that were involved in negotiating the debtor-in-possession

5  financing.

6         What Judge Garrity said in that case was it's not

7  about the fact that there are independent directors.  The

8  thing that is dispositive in this case is the fact that we had

9  two different sides of the transaction that both had insiders

10 on both sides.  It was an exclusive negotiation with

11 shareholder interest on both sides.  And that is not what we

12 have here.

13        Next there was an innuendo that maybe there was

14 something that was received by the national with respect to

15 the local council releases or that it really wasn't nationals

16 releases to give away.  I am not sure what he is talking about

17 there. The releases that are at issue in the RSA are releases

18 of the local councils and individuals associated with the

19 local councils, protected parties.

20        The local councils are paying $600 million for

21 those releases.  That is the consideration.  That is

22 consideration that goes from the local councils to the

23 settlement trust; not consideration between the BSA and the

24 local councils.  We're simply not just across from each other

25 with respect to the transaction.

1          There is no evidence that the BSA had any role with

2   respect to the negotiation of those releases.  There is no

3   evidence that BSA sat on the opposite side of the table.  In

4   fact, we have fiduciaries, I understand it's not the claimants

5   themselves, but we had fiduciaries for those very claimants

6   that were conducting the negotiations.

7          Finally, Your Honor, with respect to the conflicts

8   issue I do want to address the fiduciary duty point.  While

9   the fiduciary duties of a non-profit are similar to a for

10  profit corporation they are not the same.  You are right, we

11  don't have shareholders so there is not a duty to shareholders

12  that then transfers to creditors.   Instead, in a not for

13  profit corporation there is a duty of obedience and that duty

14  of obedience is to the mission of the organization.

15         So as you review the minutes and if you think

16  through the decision making process for this board this

17  board's duty was to ensure that the mission of the corporation

18  was preserved.

19         Finally, and Mr. Shamah said this a few times, this

20  also came up in the context of the duty of care and the

21  business judgment rule.  So I am going to hammer this home

22  again shortly, but I keep hearing about the debtor not

23  entering into a transaction that was in the debtor's best

24  interest.  They are distinguishing between the debtor and

25  other non-debtor parties like the local councils.

1        The insurers have a very myopic view of what the

2   legal standard is to approve an RSA or to review the debtor's

3   business judgment.  They keep saying it's about the debtor.

4   It's not about the debtor.  It's about the debtor, the

5   debtor's estates, and the debtor's creditors.  And the

6   overwhelming majority of the debtor's creditors, in fact, I

7   would say, as I've said at the outset, the official tort

8   claimant's committee, the FCR, the coalition, State Court

9   counsel representing 70,000 claimants are all on board with

10  this transaction.  Best interest of the debtor's creditors.

11  In addition, we also have deals with the official committee of

12  unsecured creditors and JP Morgan which are preserved by the

13  RSA.

14       So if we think about what the legal standard really

15  is its not what's in the best interest of the debtors, its

16  what's in the best interest of the debtor's estates and the

17  debtor's creditors and that is who we negotiated with and that

18  is who the RSA deal was cut with.  And I will also say, and

19  I'm sure Mr. Mason will get to this when he provides his

20  argument, I think Mr. Mason has appeared at virtually every

21  hearing before this court on behalf of the ad hoc committee of

22  local councils.

23       The ad hoc committee of local councils have had

24  their own representation in this case.  Its Mr. Mason and his

25  colleagues at Wachtell.  The ad hoc committee is comprised of

1   other bankruptcy lawyers.  Mr. Will Sugden from Alstin & Bird,

2   Mr. Mark Chehi retired from Skadden Arps.  The local councils

3   have very prominent bankruptcy lawyers that are representing

4   their interests in this case; that is why the local councils

5   were negotiating local council issues and national was

6   negotiating national issues.  I think that is all I have on

7   the conflict point.

8        I would like to turn to duty of care and business

9   judgment, Your Honor --

10       MR. SHAMAH:  I'm sorry, Ms. Lauria.  Before we turn

11  to that can I just have one minute to respond to those final

12  remarks on entire fairness?

13       THE COURT:  Yes.  You can have one minute.

14       MR. SHAMAH:  Thank you, Your Honor.  I will keep to

15  that minute.  I think when Ms. Lauria refers to innuendo I

16  refer to the evidence.  I think the evidence is clear about

17  the interest of the local councils in the transaction itself,

18  that's in Mr. Desai's testimony.  That is every local counsel

19  that had claims asserted against it.  That is in the evidence

20  of the relationship between the members of the NEB and the NEC

21  and those local councils.  I don't think that is innuendo.  I

22  am asking you to draw a common sense conclusion from those

23  relationships.

24       Second point, Your Honor, and then I will cede the

25  podium to the next issue, if there is any innuendo it's in

1  this idea that there was the arm's length negotiations of the

2  releases between the FCR and the TCC on the one hand and the

3  local councils on the other.   There is simply no evidence of

4  that.   There is none.   There is no minutes of that, there is

5  no negotiation of that.   The only way you can conclude that is

6  by assuming that, you know, drawing that inference and I just

7  don't think there is anything to support it.

8             Thank you, Your Honor.

9             THE COURT:   Thank you.

10            Let's move on.

11            MS. LAURIA:   Thank you, Your Honor.   Again, Jessica

12 Lauria on behalf of the debtors.

13            I do, as I mentioned, want to address the duty of

14 care point in the context of business judgment because I do

15 think the two concepts go hand and glove.

16            So then turning to the business judgment rule, and

17 I want to, again, return to some remarks that I made earlier

18 that respond to a question that the court asked last week

19 which is what are we focused on; are we focused on process or

20 are we focused on term.   In the business judgment context

21 we're really focused on process.   The question is whether the

22 debtors made a business decision and what does the process

23 look like that they followed in making that business decision.

24            I think the LA Dodgers case articulates it well, so

25 does Latam.   The business judgment rule is a standard of

1   judicial review designed to protect the wide latitude

2   conferred on a board of directors in handling the affairs of a

3   corporate enterprise.  It refers to the judicial policy of not

4   second guessing the decisions of a debtor.  It establishes a

5   presumption that in making a business decision the debtors

6   acted on an informed basis in good faith and in the honest

7   belief that the actions that were taken were in the best

8   interest of the corporation.

9            Again, that sort of addresses the good faith point

10  too, I think, Your Honor.  I want to pause on that for a

11  moment that you asked about last week.  You are right, we did

12  take out the good faith, arm's length finding, but in

13  rendering a decision that the complied with the business

14  judgment rule it is implicit within that decision that there

15  is an element of good faith.  In fact, some courts actually

16  look to seeing good faith in determining that the debtors

17  acted within their business judgment.  I think that we get

18  there easily, Your Honor.

19           There is no evidence of bad faith.  In fact, all of

20  the evidence before the court squarely points to the fact that

21  this board worked very hard, and formed itself, and used due

22  care in rendering its business decision.  So let's talk

23  briefly about what that business decision was.

24           Your Honor was right when you started the hearing

25  by saying you are not here to approve a plan of reorganization

1  or the terms of the plan of reorganization.  You are here to

2  approve a process by which the debtors are going to get from

3  point A, to where we are today, to hopefully point B which is

4  the confirmation of a plan.  But in considering whether to

5  enter into the RSA the debtors did have to consider, again,

6  not the myopic view of the insurers in terms of what is in the

7  best interest of this debtor, but the debtors actually had to

8  consider is the transaction that they are looking towards in

9  the best interest of themselves, their estates and creditors.

10        As the court knows, this transaction provides $850

11  million for the benefit of creditors.  That maximizes the

12  value of the debtor's bankruptcy estate and provides the

13  survivor constituency in this case which has suffered for a

14  very long time and I know we heard Mr. Stang talk about this

15  previously, we want to hear more about survivors. Well that is

16  what the RSA is about; it's committing value to the survivors.

17  That was very important to the debtors and it was very

18  important to the debtors to come to ground on what their

19  contribution would be to the settlement trust.

20        What was also very important to the debtors from a

21  business perspective are some of the benefits that the RSA

22  conveys upon the debtors today, immediately if the bankruptcy

23  court enters the RSA order.  That is really the fact that

24  there are five major disputes that come off the table

25  immediately today in connection with the RSA order.

1            One, and this was referenced earlier -- and I am

2    going to talk a lot about that May 19th hearing because we had

3    a packed agenda that day and it really implicates a lot of

4    what has happened in connection with the RSA.  You heard a

5    standing motion by the FCR and the TCC to bring claim and lien

6    challenges against JP Morgan.  You put that in abeyance, the

7    standing motion in abeyance, but the TCC and the FCR were

8    crystal clear that if they were not parties to the ultimate

9    deal that the debtors put forward as part of their plan they

10   would challenge the treatment of JP Morgan under the plan.

11   That dispute comes off the table.

12            Second dispute that comes off the table the

13   restricted asset adversary proceeding.  Also thinking back to

14   that May 19th hearing, you heard counsel from the TCC

15   explaining to the court why they were going to require

16   voluminous discovery in connection with the restricted asset

17   adversary proceeding.  I think at that point in time they were

18   predicting that they would be taking discovery through

19   November, that the court couldn't even issue a ruling with

20   respect to the restricted asset adversary proceeding until

21   much later in 2021 or even 2022.  That adversary proceeding

22   comes off the table immediately with the RSA.

23            Next, you also heard argument at that hearing on

24   the estimation motion filed by the TCC, the FCR and the

25   coalition, and you will recall that there is a withdrawal of

1  the reference pending with respect to that estimation motion.

2  You Honor hasn't ruled on that yet, but guess what that comes

3  off the table too.

4          Also, the RSA delivers immediate support for the

5  standstill period under the preliminary injunction.  Now a lot

6  of parties have taken issue with the fact that the chartering

7  organizations are not yet wrapped into the deal.  I will come

8  back to that point in a moment when I address some of the

9  specific issues people have called into question with respect

10 to the debtor's business judgment, but that is, frankly, not

11 the case.

12         If you look at the preliminary injunction order

13 that this court entered that is an exhibit to that order that

14 lists the chartered organizations that received a benefit of

15 the preliminary injunction which we now negotiated through the

16 effective date of the plan and it will go through the

17 effective date of the plan if the RSA is approved.  That

18 preliminary injunction protects 135 Catholic entities that

19 have been named in 353 lawsuits, it protects 44 Methodist

20 entities that have been named in 63 lawsuits, it protects 26

21 Church of Jesus Christ, 26 entities and 56 lawsuits, and it

22 protects 25 Episcopalian entities in 37 different lawsuits.

23 So there were definitely protections that were negotiated for

24 the chartered organizations and that standstill period is also

25 critically important to our local councils.

1          Finally, the RSA results in immediate stand down on

2    the debtor's exclusivity.  You have heard me argue a lot about

3    that previously today, so I am not going to belabor that point

4    again, but it is critically important because if this RSA is

5    not approved any one of the coalition, TCC, FCR, can re-raise

6    their objection to the extension of debtor's exclusivity.

7          If the exclusivity is terminated today or even if

8    it's not terminated it's going to end statutorily no later

9    than October 18th.  So any of those parties can file their own

10   plan of reorganization either immediately, i.e. as soon as the

11   court rules, and I think you might hear Mr. Stang say that he

12   has a different view of the debtor's exclusivity then we do

13   outside of the RSA, but at the latest they could file their

14   own plan of reorganization on October 18th and that is simply

15   a matter of statute.  So a business decision was made.  The

16   debtors stand behind that business decision.

17          The next inquiry for the court is what is the

18   process that the debtor employed to arrive at the business

19   decision that it made, and this is the duty of care argument

20   that Mr. Rosenthal was making.  Now while he wants to focus on

21   a few discreet components of the record we need to look at it

22   more holistically.

23          From November 2020 through the RSA the Desai

24   declaration is absolutely clear, the NEB, the NEC and the BTF

25   met a combined total of 57 times, 57 times over a seven month

1  period of time.  Those meetings lasted between 90 minutes and

2  two hours; Mr. Whittman testified to that.  Mr. Whittman

3  testified that from March, right before -- excuse me, right

4  after the first mediation through, and by that I mean the in-

5  person mediation, June Mr. Whittman, himself, attended 28

6  meetings; 15 of them were of the bankruptcy task force, 10 of

7  them were in the national executive committee, and three of

8  them were the national executive board.

9       Both witnesses testified that at all of these

10  meetings the Chapter 11 cases were discussed.  All of these

11  meetings covered the status of the mediation and efforts to

12  resolve the Chapter 11 cases.  Mr. Whittman testified that the

13  directors were all very engaged.  Mr. Desai testified that the

14  meetings were vigorous with robust discussions.  I believe he

15  said something to the effect of putting the advisors through

16  their paces and that is, in fact, what happened.

17       The BTF members devoted significant time to the

18  Chapter 11 cases.  Mr. Desai spent, at least, 40 volunteer --

19  again, these are not paid directors, these are volunteer

20  directors.  Mr. Desai testified that he spent at least 40

21  volunteer hours a month to this process, often he spent more.

22       Not only did the board spent an extensive amount of

23  time on the Chapter 11 cases, but they were also advised by

24  experienced experts.  They had White & Case as their legal

25  restructuring expert, Alvarez & Marsal as their financial

1  restructuring expert, Haynes & Boone is their lawyers with

2  respect to coverage matters, Bates White is the abuse claims

3  consultant, Morris Nichols is White & Case's Delaware co-

4  counsel, and Ogletree Deakins is national abuse claims defense

5  counsel.  So we got a lot of advisors representing the debtors

6  here.

7          Reviewing the meeting minutes that are in evidence

8  it is very clear that the advisors were present at merely

9  every single meeting.  There may have been one where White &

10 Case and Alvarez & Marsal was not present, but, otherwise,

11 they were present at every single meeting.  It is clear from

12 the testimony of our witnesses that the board was very

13 actively engaged.  And as I mentioned, they engaged in

14 extensive questioning of their advisors as Mr. Desai said.

15         The advisors provided presentations to the

16 directors.  Some of those A&M presentations are actually in

17 evidence, but Mr. Whittman and Mr. Desai both testified that

18 they received several presentations from their advisors. There

19 is no evidence that the board was anything but thoughtful,

20 deliberate and cognizant of their fiduciary obligations.  The

21 witnesses testified that they considered BSA's contributions

22 to the trust, the ability to reach further settlements with

23 the chartered organizations.  By the way, that is reflected on

24 the fact of multiple meeting minutes.  The concern that the

25 directors had over the chartered organizations and the desire

1   to reach future deals with the chartered organizations.  Hey

2   thought about costs under the RSA.  They thought about

3   alternatives to the RSA.

4          One thing that the parties, including Mr.

5   Rosenthal, have made much about is the fact that it's not

6   evidenced from the board meeting minutes that the TDPs were

7   discussed.  First of all, Mr. Whittman testified that the TDPs

8   were discussed by the board, but the testimony is clear that

9   the advisors negotiated the TDPs themselves.  They are

10  complicated documents.  They involve abuse claims expertise

11  such as Bates White.  They involve insurance expertise from

12  Haynes & Boone.  And the fact of the matter is the TDPs, as

13  this court knows, are simply not before the court today.  The

14  insurers will have more than adequate opportunity, I am sure,

15  to seek discovery with respect to the TDPs and we will have

16  that fight with them over the TDPs, the substance of the TDPs

17  another day.  That is not a decision that has to be made

18  today.

19         So left with what we think are no truly viable

20  attacks on the debtor's duty of care, at least from the

21  witnesses that we heard on Thursday and Friday, I understand

22  that Mr. Rosenthal pointed to some statements made, by some I

23  mean like two or three statements made, by the chairman of the

24  board, the chairman of the board by that I mean the chairman

25  of the national executive board not the chairman of the

1  bankruptcy task force, about whether he had the opportunity to

2  review the RSA before it was signed.  We don't think that that

3  takes into -- calls into question the duty of care of the

4  board.

5          In fact, the case that was cited by the insurers

6  for a failure of duty of care rising to the level of entire

7  fairness was the Bridgeport Holdings case and in that case,

8  Your Honor, the debtor approved a fire sale, those are the

9  court's words, of their principal assets and there was no

10  evidence that the debtor utilized any sort of process at all,

11  any sort of sale process, and there is no evidence that the

12  debtor utilized evaluation experts.  They simply entered into

13  a sale.  That is not the facts before the court.  That case

14  could not be more distinguishable.

15          We have, as I said, 57 meetings that demonstrate

16  the commitment that these volunteer directors had to this

17  bankruptcy process and to approving and RSA.  So I would say,

18  Your Honor, that left with no viable attacks to the board

19  process itself in the face of that overwhelming evidence that

20  the board met so many times, and again these were not short

21  meetings, these were two hour meetings, the objecting

22  insurers, I guess, are now calling into question whether the

23  RSA was actually authorized by the board.

24          First, Your Honor, every single witness testified

25  that the RSA was, in fact, authorized.  If you walk through

1  the meeting minutes it becomes pretty clear what happened.  On

2  March 25th the bankruptcy task force met and granted Mr.

3  Mosby, the CEO of the Boy Scouts, and Mr. McGowan, the general

4  counsel to Boy Scouts negotiating authority so long as their

5  negotiations were consistent with the outlines of a

6  transaction that was approved by the board.

7          In April the NEB met and authorized the NEC,

8  through resolutions that are reflected in the board minutes,

9  to negotiate and agree to terms of a deal in connection with

10  this bankruptcy case so long as they were consistent with what

11  had been discussed at that time.  The only thing that changed

12  over time was the fact that we added indebtedness to the deal.

13  And the NEB recognized that pursuant to the BSA's very own

14  bylaws, for the BSA to incur additional debt it needed NEB

15  approval and that is exactly what happened. The NEB approved

16  that additional debt on June 5th.

17          Now the parties want to make much of the fact that

18  the approvals with respect to the transaction contemplated by

19  the RSA were approved well in advance of the debtor's entry

20  into the RSA.  This is not surprising.  The debtors have been

21  involved in an active mediation for the last several months.

22  In order to go to a mediation we need decision makers with

23  authority.  That was a point that the board was cognizant of

24  and that's why dating all the way back to March Mr. McGowan,

25  and this is in the minutes, and Mr. Mosby were clearly granted

1  authority to negotiate and reach deals on behalf of the

2  debtor.

3           Your Honor, there is no evidence that the -- there

4  was a suggestion made that Mr. Desai may or may not have

5  reviewed the RSA or may or may not have received emails.  He

6  was pretty clear in his testimony that the documents were

7  provided to the NEC members and the bankruptcy task force

8  members in advance of the approval.  The fact that there isn't

9  a resolution that fits the contours of what Mr. Rosenthal

10  would like to see is not a basis for applying the entire

11  fairness to this transaction, a transaction that had, once

12  again, 57 board meetings from November through the actual

13  approval.

14           Then I do have to just mention one more point.  I

15  don't want to get into the mediation, but I think it's worth

16  noting that from a business judgment perspective, from the

17  perspective of the board in exercising its judgment to approve

18  the transaction it is meaningful that this was a mediated

19  result.  The reason that is meaningful, Your Honor, is you

20  will recall we had three hearings back in 2020 simply to

21  appoint those mediators.

22           In the context of the appointment of the mediators

23  Your Honor ordered that the mediation candidates provide Rule

24  2014 disclosures and it was only after those disclosures that

25  the court was willing to approve the three mediator candidates

1  that we have on our panel today.  Two of those mediator

2  candidates were actually appointed or nominated by the

3  insurers; Mr. Gallagher and Mr. Carey.  Those were two

4  mediator candidates that the insurers, themselves, proposed

5  for purposes of the mediation.

6          So it's hardly a surprise that the bankruptcy task

7  force, the NEC and the NEB, took into account the fact that

8  this was a meditative result and the mediators were not simply

9  individuals that were handpicked by the plaintiffs or the BSA.

10  They were actually individuals that were selected by the

11  insurers and approved by the court.

12          So, again, there are several material benefits that

13  the RSA has to the debtor.  We think the process satisfies the

14  duty of care and demonstrates that the business judgment rule

15  too was satisfied.  There are a handful of issues, Your Honor,

16  that I think the parties have raised in the context of calling

17  into question the debtor's business decision.  I will mention

18  them briefly; although, I think you have allocated some of

19  them as separate side bar issues.

20          One is, of course, the coalition fees.  Why don't

21  we come back to that when we get to that segment of the

22  argument so we don't get business judgment bogged down.

23          A second one that has been raised is that the

24  actual claimants didn't sign the RSA, so the debtors really

25  aren't getting the benefit of their bargain.  That is hardly

1  surprising.  There is 70,000 individual claimants.  Most of

2  those individuals, I suspect, are unsophisticated parties.  If

3  the debtors were to go out with a request for 70,000

4  individuals to sign an RSA I don't want to opine on this

5  because it's not before you, but I suspect we might hear some

6  concerns about satisfying Section 1125 of the Bankruptcy Code

7  in that context, asking 70,000 individuals to sign-up to an

8  RSA.

9          The debtors were actually very thoughtful about the

10  fact that the individual claimants were not signing.  In fact,

11  because of that the debtors specifically negotiated, and it

12  occurs on page 17 of the RSA, a clause, and again this is tab

13  6, Exhibit 6, page 17 of the RSA, a representation of State

14  Court counsel.  It says,

15          "Each State Court counsel represents and warrants

16  to the debtors that as of the date hereof it represents the

17  number of holders of direct abuse claims who filed timely

18  direct abuse claims in the Chapter 11 cases that is listed

19  next to its name on Schedule 1 hereto."

20          So while we couldn't get teh actual claimants to

21  sign we did think it was important before we agreed to this

22  deal to understand who the State Court counsel were and who

23  they -- and who and  how many they represented.  It was also

24  important that we were talking about timely filed actual

25  claimants in this bankruptcy case.  Individuals that

1 ultimately would vote.

2          The other business issue, and its one that I

3 briefly touched on, was the fact that the debtors didn't

4 resolve the chartered organization issues.  They are

5 complicated as the court acknowledged.  We're engaging in

6 mediation with the chartered organizations. It's a lot more

7 complicated than it was with the local councils.  Suffice it

8 to say, and I think I'm speaking on behalf of all the RSA

9 parties, all of the RSA parties are committed to reaching

10 resolution with the chartered organizations.  That commitment

11 is confirmed on Exhibit 6, page 15 of the term sheet itself.

12 We have committed to working in good faith on those issues.

13          Finally, Your Honor, and again I am going to put

14 aside the coalition fees for the separate segment and

15 argument, this goes along the lines of what I think Mr.

16 Rosenthal argued that we have, sort of, ceded control of our

17 destiny by agreeing to an RSA that requires all of the RSA

18 parties to consent to settlement.

19          The fact of the matter is, Your Honor, when you

20 reach an RSA agreement with other parties including official

21 constituencies that is part of the program.  Settlement, I

22 understand, is complicated, it's difficult, it requires a lot

23 of work, but that is not a reason by which we wouldn't agree

24 to lock arms with our official constituents that represent the

25 survivors and work together to try to reach deals with other

1  parties in these cases.

2          So for all of these reasons, Your Honor, we think

3  the debtor satisfied its duty of care.  We think an entire

4  fairness doesn't apply.  We think the business judgment rule

5  and the protections afforded by the business judgement rule

6  are clearly something that this particular debtor is entitled

7  to.  We made a business decision.  We exercised the business

8  decision after informing ourselves and acting, frankly, in

9  good faith with due care, and we think the RSA should fall

10 under the business judgment rule and should be approved.

11         THE COURT:  Thank you.

12         MR. MASON:  Your Honor, my apologies, could I speak

13 next?

14         THE COURT:  Yes, Mr. Mason.

15         MR. MASON:  Thank you, Your Honor.  I think someone

16 is not on mute.

17         THE COURT:  Please check your phones, computers.

18         Mr. Mason?

19         MR. MASON:  Thank you, Your Honor.  Richard Mason

20 of Wachtell, Lipton, Rosen & Katz for the ad hoc committee of

21 local councils which have been the subject of a lot of

22 discussing at today's hearing.  So I would like to give our

23 perspective.

24         First, Your Honor, some context.  Candidly, Your

25 Honor, although it isn't quite how I envisioned it this is the

1   day that I had hoped for when the BSA file for bankruptcy in

2   February of 2020.  And since scouting is a faith based

3   organization I might even say I prayed for it, a day when I

4   could ask this court to approve the Boy Scouts of America's

5   entry into a restructuring support agreement with the ad hoc

6   committee, the TCC, the coalition and the FCR that would

7   deliver equitable compensation to victims and preserve the

8   mission of scouting.

9           Now, Your Honor, I made this request, of course, on

10  behalf of the eight counsels on the ad hoc committee, Mr.

11  Sugden, and Mr. Chehi, and others who have worked tirelessly

12  as fellow volunteers for eighteen months.  It is also the

13  request of 243 other local councils including mine, the

14  greater New York councils, of which I am pleased to be the

15  president.  And their nearly 10,000 board members, and the

16  scout executives, and the staff for whom they employ.  And the

17  thousands of retirees who dedicated their careers to scouting

18  and the hundreds of thousands of local volunteers.

19          It is also, Your Honor, the request, I think, of

20  the nearly one million young men and women from Cub Scouts to

21  Eagle in packs, and troops, and other units across the country

22  who benefit from scouting today.  And although they aren't

23  here I think it would also be the request of the millions more

24  whom scouting will serve in the future if this restructuring

25  is successful.

1  Now, Your Honor, that is a lot of people and quite

2  a mouthful, but it cannot be lost in the testimony and

3  argument over the past three days that all of those eyes and

4  the fate of the 110 year old scouting movement are on this

5  courtroom.  Either the BSA can be permitted to take this step

6  forward or it will have to slam on the brakes, shut down the

7  effort and move in some other unchartered, unmapped direction

8  with no compass.

9  Now speaking as an Eagle Scout, a rank I earned an

10  uncomfortable number of years ago, and I don't remember how to

11  tie a square knot, I do know that moving in the dark without a

12  compass is a very dangerous thing to do generally and I think

13  would be here as well.  Ultimately, Your Honor, none of these

14  important interesting atmospherics, if you will, are really

15  before you as a legal matter.

16  What is before you are, what I think, at this

17  hearing two fairly straight-forward even mundane questions;

18  what is the standard by which you must judge the debtor's

19  request to enter into the RSA and has the debtor satisfied

20  that standard.  Your Honor, we think the law is very clear

21  that the proper standard for evaluating the debtor's actions

22  here is the business judgement rule, as Ms. Lauria has argued.

23  The insurers have argued that entire fairness applies because

24  in their view local councils control the BSA, something I

25  never thought I would have heard.  They have shown no evidence

1 whatsoever of any such control; none at all.

2          Their argument seems to be that since local

3 councils nominate BSA directors through the national council

4 those directors must have dual loyalty and, thus, be

5 conflicted.  You heard Mr. Desai say very clearly only a small

6 handful of members of the national executive board out of over

7 (indiscernible) members, none of the national executive

8 committee or bankruptcy task force members are local council

9 board members.  And as a bankruptcy task for and board member

10 Mr. Desai stated emphatically and to me convincingly that his

11 only loyalty is to the BSA and its mission not to any local

12 council even the one from which he came and to which he wrote

13 a nice letter.

14          A rule, Your Honor, in our view that says that

15 directors are conflicted simply because of who nominates them

16 will turn governance law completely on its head at least as I

17 understand it and I think as the Delaware cases show.

18 Frankly, carried to its logical conclusion it could easily

19 lead to absurd results including, I suppose, that the only

20 non-conflicted directors are the ones not nominated by any

21 stakeholder maybe, if you will, beamed down from another

22 planet like in Star Trek to avoid any supposed taint from

23 prior association.  That, obviously, can't be the rule and

24 shouldn't be the rule that Your Honor imposes here.

25          Now, of course, the insurers' arguments about local

1  council control of the BSA goes completely against what we

2  have heard throughout the case which is that allegedly it's

3  the BSA who controls the local councils including through its

4  alleged charter reversion rights and not the other way around.

5  So we are really seeing today and upside down world as

6  propounded by the insurers.

7        The truth, Your Honor, I think, is what the

8  witnesses said, in negotiating the RSA no one controlled

9  anyone.  BSA negotiated for itself the ad hoc committee, which

10  I chair negotiated for ourselves.  Everyone negotiated for

11  themselves.  Mr. Whittman, I think, described it best, Your

12  Honor, that the negotiations were "some of the most intense I

13  have ever been involved in."  That, Your Honor, is the very

14  antithesis of control by any party.

15        Now the insurers are trying to make much of the

16  plan releases that the debtor's directors or some of them

17  might be getting in their capacity as former local council

18  board members, but the insurers elicited no testimony as to

19  how those potential releases actually effected their decision

20  making.  In fact, Mr. Whittman testified that he was unaware

21  of any discussion of local council board member releases at

22  any of the 28 BSA board meetings he attended since March of

23  this year.  And Mr. Desai said he gave the possibility of such

24  a release not even a thought.

25        So if this was an issue that drove the board's

1  decision making it must have done so silently and mysteriously

2  like a ghost, but as you know, Your Honor, courts are supposed

3  to deal in facts not ghosts.  So far more likely it just

4  wasn't a part of the story at all.  I think that is what is to

5  believe from the testimony.

6          So to us, Your Honor, none of the insurers'

7  arguments are even remotely sufficient to remove the debtor's

8  decision making process here from the business judgment rule

9  where it should sit.  And under business judgement the right

10 focus, we think, as Ms. Lauria noted, is on process.  And as

11 to the process, while I listen carefully, as I know Your Honor

12 did to Mr. Whittman's testimony he testified that the national

13 executive board, the national executive committee, and the

14 bankruptcy task force met 28 times since March when the

15 mediation intensified for a total of 40 hours.  That is

16 literally, in a few short months, a solid business week of

17 meetings for eight hours each day.  At each of those meetings,

18 according to the testimony, the BSA boards received

19 presentations, updates or advice from the advisors or all

20 three.

21          The evidence is compelling that the board members

22 were focused, took their job seriously and asked numerous

23 questions; as Ms. Lauria said, took the advisors to their

24 paces.  You heard all of this from Mr. Desai as well who

25 testified that he devoted several hundred hours of volunteer

1  time to this process.  Now, Your Honor, I have had the

2  pleasure and honor or advising numerous boards in distressed

3  situations in bankruptcies; candidly, I have rarely seen one

4  meet as often as this one did in such a short period of time.

5  If this all was not good process then, Your Honor, I don't

6  know what is.

7          As to the terms, if they're relevant at this stage,

8  Your Honor has clearly heard them.  Up to $250 million from

9  the Boy Scouts of America, half a billion dollars in cash and

10 property from local councils, I think, Your Honor can assume

11 didn't just appear out of thin air, plus the backing for a

12 note of up to $100 million.  Our insurance rights, a framework

13 to address remaining issues, including, as Ms. Lauria noted,

14 most importantly the treatment of our valued chartered

15 partners which we are working on extensively.  All of this,

16 Your Honor, is a path for the BSA to exit bankruptcy, to

17 compensate victims and to avoid the end of scouting.  That is

18 what this case is about.

19         Now if Your Honor thinks back to where we were just

20 a few weeks ago, what may seem like years ago, we believe it

21 will be clear why the RSA should easily satisfy business

22 judgment.  Just a short time ago we were faced with a plan

23 that had the vocal and vociferous opposition of every single

24 tort plaintiff group in this case.  The only thing the BSA had

25 (indiscernible) was a single proposed settlement from

1  Hartford.  You, of course, heard how the plaintiffs feel about

2  that.  An agreement, a building block if you will, with JP

3  Morgan and the UCC.  Literally, nothing with the plaintiffs

4  who after all are the crux of this case, they are why we are

5  here.

6         Your Honor heard argument at that time regarding an

7  estimation motion which would have taken many months to

8  litigate during which time the BSA would have likely run out

9  of cash, making the point entirely academic.  You heard about

10  restricted assets adversary proceeding that everyone, even the

11  tort plaintiffs advocating it, told you was going to require

12  massive litigation.  There was no clear path forward, Your

13  Honor.

14         Your Honor astutely referred the parties back into

15  mediation and after several intensive weeks of in-person

16  sessions the RSA parties hammer out an agreement against all

17  odds.  Now the RSA is not a perfect document.  Honestly, in

18  all my years I have never seen one that is.  Sometimes I think

19  that the three letter acronym, in some cases RSA, is

20  transformed into a four letter word.  And as the parties have

21  testified the plan that the RSA outlines still needs work.

22         Your Honor, perfection is not the standard under

23  Section 363 of the Bankruptcy Code.  And as Your Honor has

24  well noted in the past few days the plan, itself, is not

25  before you.  The debtor's entry into the RSA is before you.

1  It has the support of the ad hoc committee, the TCC as

2  statutory fiduciary for all survivors, the future claimants

3  representative, lawyers representing 70,000 out of 82,000

4  claimants and, of course, the coalition who, in our view, who

5  have come in for an artillery barrage of criticism from the

6  insurers, but have been a very constructive force for a global

7  resolution.

8           Your Honor, the RSA parties are what I would call a

9  consortium of the willing with each representing its own

10 interest quite vigorously, but all are signatories to a

11 document that is the first step toward bringing this case to a

12 conclusion.  We don't believe that Your Honor needs to make

13 any decisions today about leader steps in the case.  I mean,

14 after all, the debtor still has a disclosure statement that

15 needs to be approved, a vote that actually needs to be taken,

16 and a confirmation hearing that needs to occur.  That is all

17 for later.

18          The question for the court now is whether you will

19 authorize the debtor to take the first step so that we can

20 keep marching, if you will, like scouts want to do or whether

21 we should, instead, stop dead in our tracks.  The ad hoc

22 committee, Your Honor, respectfully requests that you approve

23 the debtor's entry into the RSA and please allow us to keep

24 moving forward.

25          Thank you, Your Honor.

1              THE COURT:  Thank you.

2              Okay.  I am trying to determine what we have left

3    and an order.  I know we have the coalition fees and I have

4    general objections that I would consider confirmation

5    objections.  So who else --

6              MR. RYAN:  Your Honor?

7              THE COURT:  -- would like to speak?  Mr. Ryan?

8              MR. RYAN:  Your Honor, I wasn't sure -- I know Mr.

9    Rosenthal touched briefly on the business judgment.  My two

10   committees did have remarks.  I wasn't sure if other carriers

11   also had remarks on those, but I know Mr. Stang wants to speak

12   in support of business judgment.  So I would yield to the

13   remaining people who want to speak in support of business

14   judgment and then perhaps those who still wish to speak

15   against business judgment could go.

16             THE COURT:  Okay.

17             MR. SHAMAH:  Your Honor, Daniel Shamah with

18   O'Melveny.  I was planning on responding to the business

19   judgment. I know there was some -- you know, they overlap with

20   entire fairness, but Mr. Rosenthal I am going to kick him

21   under the table.  He stole a little bit of my thunder, but I

22   am going to try to, obviously, not duplicate anything, but I

23   did want to respond to a few of the remarks that Ms. Lauria

24   and Mr. Mason said, but, obviously, after the other proponents

25   of the RSA would go.

1          THE COURT:  Okay.  We're going to take five minutes

2   and then we will come back.  I will hear from parties who want

3   to speak in support of the debtor's proper exercise of its

4   business judgment and then I will hear from those opposing and

5   I'd simply just ask to raise issues that I haven't yet heard

6   or emphasize your most important points.  So we're taking five

7   minutes.  Thank you.

8          (Recess taken at 5:27 p.m.)

9          (Proceeding resumed at 5:35 p.m.)

10          THE COURT:  This is Judge Silverstein.  We're back

11   on the record.

12          I see Mr. Stang and Mr. Molton, both of whom I

13   assume are speaking in support of business judgment.  I will

14   start with Mr. Stang.

15          MR. STANG:  Your Honor, I will make this short and

16   hopefully sweet.  This was an extremely difficult document to

17   negotiate.  We dealt with the BSA separately, from the local

18   councils, we set out with, frankly, the coalition separately

19   at times and separately with the FCR.  Our goal was to reach a

20   path, a map not having reaching the final destination to a

21   fair settlement for our constituents which has unique needs in

22   terms of age, financial need, health, both physical and

23   psychological.  We felt that given how long this case has gone

24   on, the financial cost of the case to the money and resources

25   that were available to compensate survivors, that the RSA was

1  the best way to go.

2         As Mr. Mason said, there is still a lot of work to

3  be done, this is not a perfect document.  The issue regarding

4  the chartered organizations is, obviously, something that

5  needs to -- that everyone is working hard to fill-in.  But

6  giving the TCC the rights vis-à-vis the settlement really

7  reflects what this case is about.  It is about compensating

8  survivors.  And once BSA had established that our demands on

9  it left it as a viable entity that it could go along and

10 likewise the local councils.  We saw this as the most

11 efficient path to moving forward.

12         That is it, Your Honor.  Thank you.

13         THE COURT:  Thank you.

14         Mr. Molton?

15         MR. MOLTON:  Judge, I'm just making sure you can

16 hear me?

17         THE COURT:  I can.

18         MR. MOLTON:  Thank you.  I am going to also be

19 brief.  I'd like to thank all the hard work that has gone into

20 getting us to this point.  I'd like to thank Ms. Boelter and

21 Mr. Mason who I think eloquently in the last hour have

22 succinctly and concisely put forth the issues.

23         I think from our perspective, Your Honor, there is

24 no doubt that the debtors have satisfied their business

25 judgment in going forward with this RSA.  Again, I want to

1  reiterate what this case is about; this case is about the

2  horrific sexual abuse suffered by survivors and an attempt to

3  make that right in terms of providing fair and equitable

4  compensation while at the same time dealing with the debtor's

5  desire and the local councils desire to keep and maintain

6  scouting.

7         I want to add something I think I mentioned to Your

8  Honor at a previous hearing.  The term sheet through which the

9  RSA is a companion or the RSA is a companion to the term

10  sheet, they are, basically, you know, two halves of the same

11  deal contains provisions for safe scouting in the future.  So

12  it is important that I -- I don't want it lost on Your Honor

13  that there are other non-economic aspects to this deal that

14  are extremely important to the survivor community, but also to

15  scouting, Your Honor.

16         Listen, Your Honor, we've been in this case less

17  than anybody else on this screen, I believe, and since we have

18  entered this case we have taken, as I think Mr. Mason just

19  said, (indiscernible).  I have no doubt we will see more of it

20  as we get to the fee issue, but, you know, we continue to move

21  forward.  We are not bothered by it.  At this point we expect

22  it because, you know, it shows to us what really is going on,

23  an attempt to slow down the victims working with the debtor

24  and now the local councils, and the UCC, and JPM in getting

25  this case out of bankruptcy with a vehicle to resolve all the

1  issues.

2          I remember, Your Honor, at the beginning of this

3  hearing, which seems like now an attorney ago, when you tried

4  to get the parties and focus the parties on marrying the case.

5  You said this is about moving the case forward.  It is not

6  about the disclosure statement objections, it's not about

7  confirmation objection.  Your Honor was interested in the

8  standard you would apply to approving the RSA.  I think quite

9  clearly its business judgement.

10          Everybody in the Zoom room and in this courtroom is

11  going to have full opportunity in front of Your Honor with

12  evidence when we come to confirmation, evidence regarding the

13  TDPs, the legal arguments regarding whatever findings are at

14  issue; all of that is going to be vetted and put in front of

15  Your Honor with everybody having a fulsome opportunity to deal

16  with it.

17          We have heard over the past, you know, weeks

18  whenever we get here the big broadside against parts of the

19  RSA.  The fact that we're not going, you know, basically

20  answer for answer has less to do, as Ms. Grim said earlier,

21  that we don't have answers to them, but we think we don't want

22  to waste the time.  We need to get forward, Your Honor.  We

23  need this RSA to be decided on and we submit we need you to

24  give us the platform to really, really take this case forward.

25          So this is a first step.  It is an important first

1  step.  I think it's a groundbreaking first step.  As I

2  mentioned it provides for a successful exit from bankruptcy

3  for the debtors and notwithstanding what Mr. Anker may guess

4  about the time I think it's going to happen this year and it

5  provides the fair and equitable means for fair and equitable

6  compensation to survivors and it also provides for safe

7  scouting in the future.

8        I know that Mr. Stang just mentioned about the

9  negotiation and I am going to refer to Brian Whittman's

10 testimony, Your Honor, from August 12th where he said that

11 negotiations on the RSA were "some of the most intense

12 negotiations in any clients I have been involved with.  The

13 parties were very far apart."  That is Thursday's transcript,

14 page 105.  I think that that is generally true.

15       The RSA reflects those negotiations, hard-fought.

16 Again, as somebody just mentioned, you know, this isn't

17 perfect.  There is a road to go.  We have got the ability to

18 do it.  As I have heard mentioned repeatedly this year let's

19 not make the perfect the enemy of the good.  This is good,

20 Your Honor.  This is a good point in this case and it should

21 be celebrated for that.

22       It is really a remarkable achievement going back to

23 my first entry in this case where it just looked like a free

24 for all in terms of folk's positions, folk's arguments,

25 various litigations that might occur.  The RSA treats those

1  and seeks to resolve those in a consensual way.

2        I think, Your Honor, one of the most important

3  aspects, I know it's been noted, is that there are 42 law

4  firms that have joined the RSA, 27 coalition firms

5  representing 63,521 clients, that is all from the exhibits and

6  amendments to the exhibits of the RSA.  Significantly, Your

7  Honor, 15 non-coalition firms representing, when you don't

8  duplicate, 6,826 claimants bringing us to 70,347 claimants.

9        Now I know that there are survivors out there and

10  their counsel that have issues and have made objections, we've

11  seen objections, but I do want to note, Your Honor, and we

12  will deal with them, we have already -- you know, I know that

13  there has been discussions between the coalition and Mr.

14  Zalkin, I know that the debtor has had discussions and we

15  anticipate those will continue, but, Your Honor, when you look

16  from my last count to the objectors, and it may have changed

17  recently, and so maybe it may be a little more than we are

18  now, 2,700 survivors represented by the objectors.  That is my

19  last count.  Again, I could be wrong.  A little bit on the

20  downside there may be more.

21        In any event, Your Honor, I would say that for the

22  reasons you've heard today, and it's been a long day, and

23  we're not yet done, and you're going to hear from me again in

24  a few minutes, I hope, the debtor has successfully, through

25  the evidence submitted, demonstrated an efficient,

1  appropriate, prudent exercise of its or their business

2  judgment to enter into this RSA.

3         As with any other RSA parties, Judge, we come out

4  of here with yellow pages filled with issues that we're going

5  to have to address.  Not remarkable.  It happens in not even

6  the most complex bankruptcies, and this is one of the most

7  complex I've ever been involved in.  So we've got wood to

8  chop, Your Honor, but what this RSA, what this agreement does,

9  what this seminal critical moment in this case does is give

10 those parties an opportunity to go forward, to disclosure

11 statements, to confirmation, all the while understanding what

12 the issues are out there and being able to proceed and address

13 them in a responsible way.

14        I know Ms. Boelter has mentioned, Your Honor, that

15 mediations continued to be scheduled, significantly, I think

16 with the charters and the insurers.  Our sleeves are rolled

17 up.  I have said that since day one Judge.  And if you take a

18 look, as I've said before, put the words to the side, look at

19 the actions, the actions of these RSA parties in coming to

20 this point should be recognized.  From my point of view it's

21 remarkable.  We would ask you to approve the RSA.

22        THE COURT:  Thank you.

23        MR. MOLTON:  Thank you, Judge.

24        THE COURT:  Mr. Brady?

25        MR. BRADY:  Thank you, Your Honor.  For the record

1  Robert Brady for the FCR.

2         Your Honor, there has been a lot of noise created

3  around this RSA by the insurers.  I submit to Your Honor that

4  that was their goal.  At the May 19th hearing, in connection

5  with the motion to extend exclusivity, Your Honor said the

6  following, I will quote,

7         "I will say, to solicit a plan that has no abuse

8  survivor support is not an attractive option, but neither is

9  engaging in protracted litigation that has the potential to

10 end the Boy Scouts as it currently exists."

11        Your Honor, the RSA creates exactly the path that

12 Your Honor urged the debtors to take at that May 19th hearing.

13 If they went back to mediation, we all went back to mediation,

14 and through that mediation the once unthinkable happened, the

15 RSA was achieved.  It has the support of all of the major

16 survivor constituencies and more.  Both official committees,

17 Your Honor, support the RSA, the UCC and the TCC.

18        The large block of survivors in the form of the

19 coalition support the RSA and the term sheet. The FCR supports

20 it, the local councils support it, the largest secured

21 creditor in the case supports it.  It is a significant

22 achievement and as for the litigation Your Honor mentioned the

23 proposed plan resolves estimation, resolves the JPM fight and

24 resolves the restricted asset litigation.

25        Of course, Your Honor, if this is a proper exercise

 1  of the debtor's business judgement how could it not be when

 2  the debtor has the agreement of so many of their creditor

 3  constituencies.  This is exactly how a bankruptcy case should

 4  work, in particular a mass tort bankruptcy.  The debtor built

 5  consensus with those who actually vote on the plan and the

 6  fiduciaries assigned in the case, and then uses that consensus

 7  to create a platform for more agreements.

 8          Your Honor, I already mentioned why the Hartford

 9  settlement fails.  The insurance rights have always been

10  scheduled to be assigned to the trust.  It makes perfect sense

11  that the survivor representatives have a say in the most

12  efficient way to pay claims and the most effective way to

13  monetize the assets.  That is why the Hartford settlement

14  fails, that is why it's an act of futility because no survivor

15  or survivor group supports the Hartford settlement.

16          Your Honor, as I said, it's important to note as

17  much as the RSA accomplishes it does more.  It creates a

18  platform for continuing negotiations and discussions with the

19  chartered orgs, and the insurers, and other survivors.  The

20  record is clear those discussions with the chartered orgs in

21  particular are already on the way and there's a mediation

22  later this week.

23          For any insurer who wants to seriously engage in

24  settlement negotiations this is their opportunity.  If an

25  insurer's goal is to delay and disrupt these proceedings as

1   along as possible to avoid paying on their obligations to

2   compensate survivors then we will deal with them at

3   confirmation.  This is the time.  The RSA will build momentum.

4   It creates opportunities to garner more support.  This puts

5   the debtor on a path to emerge from bankruptcy and accomplish

6   their goals when they filed the case.  Fair compensation for

7   survivors and continuing permission of scouting.

8           Denying this RSA, really, Your Honor, just an

9   agreement for the parties to work together plays right into

10  the insurers' hands more delay, more chaos.  I think it's

11  important to note, Your Honor, does not prejudice any of the

12  insurers except for perhaps Hartford who won't get the benefit

13  of the cap on their liability that they negotiated.

14          This is really just a third bite at the apple for

15  the insurers.  They have raised confirmation objections in

16  connection with the RSA.  They no doubt will raise

17  confirmation objections as part of the disclosure statement

18  hearing, and then they will finally properly raise those

19  confirmation objections at the confirmation hearing.  The

20  insurers' real problem with this RSA is that it moves this

21  case forward and that's not something they want.

22          Your Honor, the FCR urges the court to approve the

23  RSA and move this case forward.

24          THE COURT:  Thank you.

25          Mr. Ryan?

1           MR. RYAN:  Thank you, Your Honor.

2           First, I'd like to correct a little bit of the

3    record which is being created from the podium.  To the extent

4    that people are trying to create the illusion, Your Honor,

5    that there have been extensive and robust mediations and

6    negotiations with the chartered organizations it's not true.

7    At best we are at the beginning of square one.  So I would

8    just like Your Honor to have that context rather than the

9    innuendo that there have already been extensive negotiations

10   to date.

11          Your Honor, as you said last week we're here on

12   process and we're here on terms.  I'd like to focus first on

13   process.  As you said last week directors and officers are

14   allowed to be wrong.  They are allowed to be wrong only so

15   long as they actually consider the issue.  They have to be

16   able to demonstrate that they actually considered the issue.

17   That is what business judgement requires.

18          So with respect to chartered organizations what I

19   would ask Your Honor to ask herself is did the Boy Scouts

20   actually consider how chartered organizations were going to

21   react to this RSA.  Because, Judge, I think the evidence is

22   clear they didn't and they did it in a manner that is so

23   egregious as to be grossly negligent.  And gross negligence,

24   we know, is (indiscernible), it takes one outside of the

25   business judgment standard protections.

1         What makes failure to consider chartered

2  organizations so important in this case, while everything that

3  has been said on the record about chartered organizations and

4  Mr. Mosby's testimony and Mr. Whittman's testimony.  They are

5  the lifeblood of the organization.  The source of the vast

6  majority is scouts.  Their continued support is vital.  We

7  will not go forward without their support Mr. Mosby said.  We

8  don't want to do anything to harm the relationship.  Why is

9  that, Your Honor; because the chartered organizations are the

10 source of revenue for Boy Scouts to be a viable organization

11 going forward.

12         So what was the process with respect to Boy Scouts

13 major and predominant revenue source.  All you have heard in

14 the testimony, from Mr. Desai and Mr. Whittman, are vague

15 generalities.  The chartered organizations were mentioned in

16 discussions.  For there to be a real process and a real

17 consideration of chartered organization issues you need to

18 hear more than the phrase chartered organization was mentioned

19 a lot at a lot of the meetings.  They need to show there is an

20 actual consideration of issues.

21         Those gentlemen didn't testify as to what was

22 considered with respect to chartered organizations.  Indeed,

23 most of what was discussed the debtors had attempted to shroud

24 in the privilege.  You go to Mr. Mosby's deposition, again,

25 the last line of page 200, he was asked a series of questions

1 about what consideration the board gave to chartered

2 organizations and their indemnity claims.  Repeatedly, Mr.

3 Mosby was instructed not to answer on privilege grounds.

4 　　　　　Then at the top of page 203, Your Honor, he

5 testifies that he is not aware that chartered organizations

6 are asserting claims for defense and indemnity.  So after all

7 of those meetings, all the way till the end of July, you have

8 the CEO who sits on all of these boards has no idea that

9 chartered organizations are asserting plans for defense and

10 indemnity.  That is his testimony, Your Honor.

11 　　　　　So while we don't know what was discussed at board

12 meetings with respect to chartered organizations we do know

13 what wasn't; their claims, their defense and indemnity rights,

14 the contracts, the contracts that weren't being honored.

15 Indeed, Mr. Mosby testified he's never even reviewed a charter

16 agreement.

17 　　　　　We also know what else the board didn't consider,

18 Your Honor, they didn't consider the chartered organizations

19 might leave the Boy Scouts with a restructuring support

20 agreement.  How do we know that, debtor's Exhibit 42, the

21 liquidity analysis Boy Scout's ability to enter into the

22 restructuring support agreement and whether they could

23 financially do so.

24 　　　　　Slide 2, it contains four scenarios of the Boy

25 scouts liquidity.  Not one of those scenarios, Your Honor,

1  contemplates a loss of scouting census as a result of

2  chartered organization resistance and withdrawal support.  The

3  closest they come to a downside scenario, Your Honor, is they

4  might not add 25,000 scouts this fall.

5          Nowhere in slide 2 do they envision that chartered

6  organizations might take the plan as is proposed by the

7  restructuring organizations support agreement be so offended

8  as to end their relationship, but that is what they

9  (indiscernible) is none of that.  They kept their scouting

10  census where it is.  They didn't consider it at that meeting

11  what if we lose 10 percent, what if we lose 20 percent, what

12  if we lose 30 percent of our members what does that do to our

13  liquidity.

14          The disclosure statement that is a result of that

15  plan and that restructuring support agreement contains no

16  discussion of any of those potential --

17      (Audio interruption)

18          MR. RYAN:  So we know, Your Honor, that there could

19  not have been any serious consideration by the Boy Scouts as

20  to what this --

21      (Audio interruption)

22          THE COURT:  Excuse me, Mr. Ryan --

23          MR. RYAN:  Mr. Bambrick, you need to mute yourself.

24          THE COURT:  Yeah, I think that's Mr. Bambrick.  Can

25  you please -- can everyone please check your phones and mute

1  them particularly Mr. Bambrick.

2          Mr. Ryan?

3          MR. RYAN:  Thank you, Your Honor.  So we know, Your

4  Honor, there can't have been any serious consideration based

5  on teh record that has been presented to you about the RSA's

6  impact on its most (indiscernible).

7          Mr. Mosby's testimony sums this all up all too

8  clearly at the end of page 183.  He was asked,

9          "Was there any concern that chartered organizations

10 might object to the restructuring support agreement?"

11         His answer, Your Honor,

12         "I don't recall any conversations along those

13 lines."

14         Your Honor, an organization that's taking an action

15 and entering into an agreement as impactful as this in a

16 restructuring or even outside of restructuring that takes

17 absolutely no consideration as to what will this do to our

18 revenue stream that is what boards of officers and directors

19 have to do.  What is going to happen to our organization?

20 Will we still be able to make money if we do this?  Failure to

21 do that, Your Honor, is grossly negligent.  Its conduct that

22 is not protected by the business judgment standard.  No other

23 organization in their right mind would do this and not ask the

24 question will we still make money.

25         The Boy Scouts know this all too well because they

1  have already lost the support of the Church of Latter Day

2  Saints.  They know the impact, negative impact of the effects

3  of chartered organizations.  They know what that does to their

4  revenues.  They know what that does to their financial

5  ability.  So to not (indiscernible) as they enter into the

6  restructuring support agreement, Your Honor, we think is not

7  an exercise of business judgment.

8         Now Your Honor also talked about terms and the

9  restructuring support agreement when I think of one is an

10  agreement that parties agree has all the necessary terms to

11  form the basis of a confirmable plan, a complete path to

12  confirmation.  I am not going to go through all the

13  confirmation objections the parties had raised.  Your Honor

14  has read the pleadings.  Your Honor has read the plan.  Your

15  Honor has made her own observations at the July 7th hearing.

16         Let's assume for the plan on the table that all

17  those issues could be overcome, that plan would meet

18  tremendous opposition from the chartered organizations.

19  Again, the debtor's revenue stream.  So let's take everyone's

20  statements for true there is a lot of wood left to chop, this

21  is not the final stop, we have to get more deals done.  So

22  what does that make this?  That does not make this an

23  agreement as a path to confirmation.  What it makes it is a

24  path to a way point, a way point where they then have to get

25  the chartered organizations on board.

1        The problem with that, Your Honor, is there are

2   five vetoes, absolute vetoes on that deal with the chartered

3   organization.  So what you have is an agreement to agree on a

4   future agreement with a constituency with whom no discussions

5   have been had yet, an agreement that is controlled and held

6   hostage by any one constituency that doesn't want to vote in

7   favor of it, and that doesn't like that agreement.  What

8   happens at that point, Your Honor, the restructuring support

9   agreement will terminate.

10       What cost?  The cost is $10 and a half million now

11  and nearly a million dollars in (indiscernible) perpetuity

12  until another avenue is found.  So when Your Honor asked Mr.

13  Rosenthal about can a debtor just propose a plan right now,

14  what is the difference between that and a restructuring

15  support agreement the answer is -- one of the other answers in

16  addition to what Mr. Rosenthal said that the debtors have to

17  pay millions, tens and millions of dollars to enter into this

18  restructuring support agreement rather than just propose the

19  plan with those exact same terms.

20       This is not a restructuring agreement that's a

21  pathway to confirmation.  At most it's a partial path, a way

22  point that may end in failure at that point.  So we think for

23  those two reasons, Your Honor, both on terms and process that

24  the debtors fail in business judgment and that the

25  restructuring support agreement shouldn't be approved.

1    I do want to make clear, Your Honor, while my

2 clients are opposed to the restructuring support agreements

3 clients who collectively represent more than one third of the

4 scouting census today, and they oppose the plan that is on the

5 table in the restructuring support agreement that does not

6 believe that they don't mean there is a path forward.  We

7 remain very optimistic that there can be a global resolution.

8 We know that that is what every party in this case really

9 wants, survivors, carriers, Boy Scouts, local council,

10 chartered organizations, everyone wants a plan that allows for

11 healing, provides payments for survivors and those payments to

12 be made as quickly as possible.  We want a plan that allows

13 chartered organizations to support scouting and provide a

14 future for a mission they can safely shape the lives of young

15 men and women for the better.

16    So we would ask, Your Honor, is that this

17 restructuring support agreement be denied because it does not

18 meet the business judgment rule and let the parties get to

19 work on a true global compromise, one that we think can be

20 done quickly.

21    Thank you.

22    THE COURT:  Thank you.

23    Mr. Patterson?

24    MR. PATTERON:  Thank you very much, Your Honor.  I

25 am trying to emerge from the sea of platitudes that we heard

1  over the last hour or so.  So I would like to turn to the

2  question that the court asked which is what happens if this

3  RSA is not approved and the answer is tomorrow is a pretty

4  good day.  Tomorrow is a day in which the debtor is free to

5  pursue this plan.  It is not compensating a chosen group of

6  claimants' lawyers to pursue a plan.  The debtor is not bound

7  to get the consent of each of the RSA parties each and every

8  change that the debtor wants to make to the plan and the

9  process goes forward in a very constructive and conventional

10  way.

11          The underlying architecture of this plan may be

12  favorable, but I want to tell the court what we hear, in light

13  of the RSA environment, when we go to people and say that we

14  believe that the plan needs to be changed in certain ways.

15  What we get told is that those changes can't be made because

16  parties have agreed to support the RSA assigned and those

17  changes are not permissible.

18          So the process of signing an RSA is converting what

19  should be a constructive move forward path towards a plan of

20  reorganization into a destructive this is the plan process.  I

21  want to take a minute and I know the court doesn't want to

22  hear what our confirmation objections; that is a way of saying

23  not today.

24          It's the structure of the plan that most concerns

25  us.  So we understand there is about 80,000 claims and we

1  understand from the disclosure statement that 60,000 of them

2  or so 59,000, about three quarters, are not timely under State

3  Law.  I think the debtor, in their reply brief when we send

4  out timely we meant time barred by the bar date.  We meant the

5  disclosure statement says that 60,000 are presumptively not

6  valid liens asserted in accordance with the applicable state

7  statute of limitations.

8       We're told today, I think Mr. Anker said it, that

9  the expectation is thousands of the claimants in this case are

10 going to accept a $3,500 offer in order to exit this case.

11 The way the plan classifies creditors, direct abuse claimants,

12 there's one class, there's one class comprised of every single

13 direct abuse claimant all the way from the person who doesn't

14 have a timely claim under State Law who wants their $3,500 and

15 is ready to move on with life, all the way to someone who

16 suffered horrific abuse over a sustained period of time not

17 just at the hands of the BSA, but at the hands of a local

18 council employee at a location that was supervised or owned by

19 a local counsel, by an employee of a chartered organization,

20 and those entities are distinctly and separately liable for

21 the horrific harm that took place.

22       So this is not a case -- we all call this mass tort

23 case and we call it our mass tort kind of binder, well here is

24 how we do mass tort cases.  The typical court mass tort cases

25 like Dalkon Shield, (indiscernible), these are cases, Johns

1    <u>Manville</u>, where the debtor is at the nexus of the harm that

2    was caused, that the debtor designed a product that was

3    inherently faulty and caused tremendous damage, and a bunch of

4    people are also liable.  That isn't the nature of these cases.

5         As we said it in our brief, Your Honor, Your Honor,

6    in many, many cases the Boy Scouts themselves are dismissed as

7    a defendant because of the circumstances of those cases.  So

8    the liability between the three levels here is very distinct,

9    different, and independent who relies on different legal

10   theories, it relies on different factual circumstances.

11        So the idea that everybody is in the same soup

12   voting on a single plan in a single class, and with respect to

13   a single unified distribution is fundamentally unfair to those

14   who were harmed by local councils, chartered organizations,

15   and that has significant claims against those entities.  We

16   would love to be part of an overall solution to this; that

17   would be one that provides timely, fair compensation to the

18   survivors.

19        This plan doesn't do it.  This plan sets up a

20   mechanism where thousands and thousands of claimants who may

21   not have timely claims under State Law will vote as a single

22   class a dollar a claim and wash out those who have significant

23   claims against non-debtor entities that are solvent and that

24   are insured.  And that, Your Honor, is an unfair structure.

25   That is not a structure that can be confirmed in the Third

1   Circuit.  And I haven't even gotten into the manner in which

2   the plan purports to deal with insurance, but, essentially,

3   what is the architecture that is put in place is not one that

4   treats differently situated survivors appropriately.

5          And as I said, no one has invited us to a

6   mediation.  We have made our points.  We've been told that our

7   points -- that there is not flexibility to advocate for our

8   points and we know now from the structure of the plan that,

9   you know, the debtor, the ad hoc committee, the coalition, the

10  TCC, everybody has to agree in order to make a change to the

11  plan.  They may not agree and they may come to Your Honor or

12  they may say, you know, Patterson makes some theoretical

13  points but it's not really a lot claimants.  If we don't get

14  this plan done, you know, Boy Scouts are going to be out of

15  business, so we need to get this done.

16         So the fact that this (indiscernible) everybody in

17  the same plan requires you to consent for other settlements if

18  fundamentally dysfunctional.  Would our claimants agree to

19  settle with chartered organizations; yes, but under

20  circumstances where their recovery would depend on the

21  strength of their claims against those chartered organizations

22  or against those local councils.  That is no more then what

23  the law requires.  That is a (indiscernible).  That is many,

24  many cases which say that the strength of a claim that is

25  being released can constitute unequal treatment under

1  1123(a)(4).

2          We don't want to assert these objections, Your

3  Honor.  We just want to help design a plan that makes sense

4  for everybody and that fairly treats the claimants properly.

5          So the debtor says, well, a dollar a claim is the

6  way mass tort voting works. So, you know, your objection is

7  too late because we filed this motion in February and you're

8  objection is too early because we don't have solicitation.  So

9  I suggest that if it's too late and too early then maybe it

10  could be heard today.  Quigley gave a very intelligent

11  discussion of this, Judge Bernstein, he ultimately didn't

12  change the voting requirement ruling that it was effectively

13  harmless error.  He did go through to see whether it would

14  make a difference and he ultimately decided --

15          THE COURT:  I've read this.  This is his Quigley,

16  decision, right?

17          MR. PATTERSON:  Yes, Your Honor.  It absolutely is.

18          THE COURT:  Yeah, it's an interesting decision.

19          MR. PATTERSON:  Well, it really is, and the

20  alternative that we encouraged the debtor to consider, and

21  then I think, with respect to which the ultimate tabulation

22  took place was, use your TDP values.  You've indicated that

23  there's a strengthen of claim based on a degree of harm that

24  took place.

25          There's no perfect way to value unliquidated

1   claims.  But here's how you propose to give the money out.

2   Maybe that's a good starting place and maybe that'll be a

3   place to give effect to both parts of 1126, not just the

4   numerosity requirement, but also the amount of claims so that

5   creditors with meaningful claims for significant harm aren't

6   downvoted by people who want $3500 and get on with their life.

7            We're also very concerned about the insurance

8   issues in this case, Your Honor.  The mechanism that is

9   contemplated by the findings that are proposed to be made in

10  the RSA.  Now, the RSA doesn't make the findings, doesn't

11  require the Court to make them today, but the confirmation of

12  the plan and their support for the plan, the RSA parties, is

13  contingent on the Court making certain findings at

14  confirmation; Mr. Anker alluded to them.

15           And by the way, the irony of Mr. Schiavoni and some

16  of my friends from other cases and I being on the same side of

17  issues is not lost on me.  But they are not wrong in pointing

18  out the extraordinary work that is required in order to make

19  those findings.  And when Your Honor said, it's not making

20  coverage findings, I believe that that's what those findings

21  are and that's what they're intended to be.

22           They're intended to make the TDP values judgments,

23  not just to comply with the indemnity provisions of insurance

24  contracts so they can be tendered to insurers.  And the case

25  law is often mixed, Your Honor, but that's optimistic.  There

1  are cases in which the Courts have said that the TDP values do

2  not constitute binding values, but the amount paid in the

3  initial percentage may be a binding indemnity obligation on

4  the insurers.

5          And so, from the point of view from lawyers who

6  represent clients who were meaningfully harmed, by solvent

7  local councils, solvent chartered organizations with

8  insurance, to take those assets, run them through a washing

9  machine, in which millions of dollars go to claimants without

10 strength of claims, and the insurance rights could be made

11 worse because of the effect of Fuller Ross (phonetic) and/or

12 other decisions and the effort to have an enhanced or quick

13 way to bill the insurers, that is a very dangerous outcome

14 from the point of view of my clients.

15         But from the point of view of my clients, by the

16 way, they are more than happy enough, if the plan isn't fair,

17 to take their chances against all the Defendants in the tort

18 system.  They are not -- if the plan is good, then the plan is

19 right and building in, but if the plan is not right, then the

20 idea that their claims against solvent, nondebtor entities

21 should be destroyed made worse, is not acceptable to them.

22         Other insurance issues.  Can nondebtor insurance be

23 transferred using the debtors' bankruptcy power?

24         I'll just say Combustion Engineering says no; it

25 didn't allow it in that case.  There may be differences.

1          But these are some of the very, very serious issues

2    that we want to bring to bear through our influence, through

3    the expertise of the lawyers that handle these claims and

4    through the education of the nature of these claims to the

5    other parties so they can see that this is something -- these

6    are changes that need to be made.

7          Then finally, Your Honor, you know, what happens if

8    the Court doesn't approve the RSA?

9          Well, there is local council settlement.  There's

10   no amount that the local councils have agreed to commit.

11   There's a number and, you know, someone said, well, chop some

12   wood and bring some wood in, but there's no wood there.

13   There's no chartered organization settlements, no insurer

14   settlements.

15         And, quite candidly, maybe that's a good thing

16   because from our point of view, we believe we need to be

17   involved in this plan in redirecting the sharing mechanisms,

18   the voting mechanisms so that distributional provisions are

19   appropriate and then at that point, we can talk about what the

20   settlements need to look like so that claimants get treated

21   fairly.

22         Your Honor, I'd be happy to answer any questions

23   that the Court has.  I am not going to speak to the 503 issue

24   and the coalition fees.  I have found it dangerous in the past

25   to stand between a lawyer and a fee.

1          But I would just point out that in suggesting that

2     there's a cap on the fees and that the coalition agrees to

3     limit their fees and that that's a real advantage to the

4     estate, I would simply point out that under the restructuring

5     support agreement, itself, there is no cap on the fees.  That

6     to the extent the fees exceed the $10.5 million or the

7     $950,000, those are to be based on the trust, under which, as

8     I understand it, they will have a majority of the members of

9     the trust advisory committee, and so that right is reserved.

10          And I thought that that was something that they

11     should have pointed out to Your Honor, and because they

12     didn't, I thought I would, just so the Court has it in mind.

13          But those are our concerns, Your Honor.  We would

14     like to be involved in the process.  To this point, we have

15     not been involved in this process.

16          We do think there are serious confirmation issues.

17     I think that under the Innkeepers case and other cases, if a

18     plan raises serious confirmation issues, that goes directly to

19     whether or not the debtor has properly exercised its business

20     judgment in entering into it, because -- now, I'm going to mix

21     metaphors, because I just had this crazy picture in my mind;

22     they're all tied to the mast in this ship and they're all

23     fighting for the steering wheel, at the same time.  So, I

24     won't keep (indiscernible) tied to the mast and reaching the

25     wheel at the same time.

1          But that is, in effect, the Good Ship Lollipop that

2   has been designed by this RSA and we would like to change the

3   direction of it a little bit.  We'd love to be involved.

4          I think that if the Court does not approve the RSA,

5   it allows the normal, negotiating process contemplated by

6   Chapter 11 to go forward, I think the process will be

7   enhanced.

8          Thank you, Your Honor.

9          UNIDENTIFIED:  (Indiscernible.)

10          THE COURT:  Excuse me.  People, please check your

11   phones.

12          Can you get him muted, Mr. Johnson.

13          Okay.  I see hands from Mr. Shamah and Mr. Anker.

14          MR. SHAMAH:  Thank you, Your Honor.

15          For the record, Daniel Shamah of O'Melveny, on

16   behalf of Century.  I'm not sure if it's my turn.  I'm

17   somewhat nervous following Mr. Patterson and Mr. Ryan, but you

18   called my name first, so I'll venture a toe into the water, if

19   it's acceptable to Your Honor.

20          THE COURT:  That's fine.

21          MR. SHAMAH:  Thank you, Judge.

22          And first, I want to start by saying, I appreciate

23   Your Honor's patience.  I know it's late and I will try not to

24   repeat anything others have said.

25          But I do think it's worth just being specific,

1  because I think one of the things that struck me in hearing

2  Ms. Lauria's and Mr. Mason's comments, was how general and

3  abstract the description of the process really was, so I want

4  to be a little bit more concrete and specific than that, and

5  then I want to talk about the terms very briefly.

6         If Mr. Cocchiaro could have the screen, again, Your

7  Honor -- that's C-o-c-c -- and I'm not going to repeat, like I

8  said, but there are a couple of things that I did want Your

9  Honor to see.  Because I always have this internal sort of

10 struggle with deposition designations, because Your Honor

11 heard the testimony last week and you haven't yet made the

12 deposition designation, but it's a part of the record and it's

13 important.

14        And, you know, when I read these depositions, when

15 I went through these depositions, in some circumstances, I

16 nearly fell off my chair.

17        And so, Mr. Cocchiaro, I do want to put up a couple

18 of snippets to highlight for Your Honor what was considered

19 and what was not considered during this process.

20        THE COURT:  I think he is getting rights.

21        MR. SHAMAH:  Thank you, Your Honor.

22        And I will just ask to go right to slide 3 so we

23 can move this along a little bit faster.

24        You heard a little bit earlier about there not

25 being Board resolutions authorizing the RSA and I think we

1  didn't highlight that fact to suggest that, you know, the

2  debtors aren't seeking approval of the RSA, as much as to

3  highlight the irregularity of the process that we have here.

4  The only evidence, the only evidence that you have, Your

5  Honor, is that the Board considered the terms of the note and

6  the settlement contribution.

7          You heard from Mr. Ryan about the paucity of

8  evidence around consideration of the treatment of the

9  chartered organizations and, Your Honor -- which I'll get to

10  in just a second -- there is no evidence; in fact, the

11  evidence is exactly the opposite.  They did not consider any

12  other element of this RSA, prior to approving it.

13          Now, their response to that was largely

14  generalities.  They gave the thesaurus a real good workout

15  with intense, and engaged, and thoughtful, and deliberate, but

16  there's no substance to any of it.  There's no testimony at

17  all.

18          And this is critical because this is not just an

19  economics plan.  This RSA is not just about the settlement

20  trust contribution and the terms of the notes.  I am not going

21  to get into the specifics of why the TDPs are appropriate,

22  but, Your Honor, the Board has to consider the TDPs and

23  insurance neutrality and claims matrix and all of these other

24  components of the plan, because they bound the debtors to

25  pursue that transaction; that's what the debtors agreed to

1  pursue.

2          And the fact that the Board did not consider them

3  is critical.  It's critical in how you evaluate business

4  judgment.  So, if you move forward, I wish I could say I'm

5  kidding, but this is what Mr. Ownby said:

6          "Mr. Ownby, you read the RSA, right?

7          "Answer:  I reviewed the restructuring support

8  agreement after it was signed.  I did not review it prior to

9  being signed."

10          They didn't read the RSA.  This is the debtors'

11  chair.

12          If you'd go to the next slide, and this is even

13  more critical.  Ms. Lauria just said Mr. Mosby was the first

14  person delegated back in April to negotiate the terms of this

15  transaction.  What was his testimony?

16          "I wasn't involved in any discussions around trust

17  distribution procedures."

18          Now, what you heard was that these are complicated

19  and that they left it to the professionals to negotiate it,

20  but it's for the simply a technical bankruptcy document.  It's

21  the case.  It's how the debtors' stakeholders are going to be

22  dealt with under the plan and they didn't consider it.  They

23  didn't discuss it.  It didn't rise to the level of the Board.

24          Go forward to the next slide.

25          They didn't review the claims matrix.  Again,

1  Mr. Ownby:

2              "I don't think I saw the claims matrix prior to

3  agreeing to it."

4              Your Honor, that is the treatment of each of the

5  claims under this plan.

6              Now, I am not arguing whether the claims matrix is

7  appropriate or not, whether those claims values are correct or

8  not.  I'm not arguing today that the TDPs are inappropriate;

9  our papers make that argument.

10             I do think, Your Honor, it's unavoidable for a

11 business judgment perspective to evaluate whether this plan is

12 really going to get confirmed.  I agree with Mr. Patterson,

13 that is one of the lessons -- not the only one -- but one of

14 the lessons of Innkeepers.

15             But even if you don't want to get to that issue,

16 even if you want to say that, that's a confirmation issue or

17 it may be a disclosure statement issue, it's not an RSA issue.

18 I don't know how the debtor can make a case and how they can

19 show that this is a reasonable exercise of business judgment,

20 that they were not grossly negligent, if they did not -- if

21 the evidence is that they did not even consider these

22 cornerstones of the plan.  And so, that's all I want to say on

23 process, Your Honor, because I know that you have heard a lot

24 about it.  But there is a gaping hole here and it can't be

25 papered over with generalities and abstractions about, you

1  know, they met a hundred times and, you know, intense

2  conversations and thoughtful negotiations, when the substance

3  of what was actually considered, that which we can evaluate

4  and see, is as bereft as what we found in the evidence.

5          So, briefly, Your Honor, I do want to spend the

6  rest of my time talking to the firms, because I think it's

7  important to evaluate the RSA on its merits.  And I want to

8  cover two -- three key points.  The first is, what are the

9  debtors getting out of this deal?

10          I think the debtors and the other claimant lawyers

11  are suggesting that we're being nitpicky when we say that the

12  claimants, themselves, haven't signed the RSA, just the

13  lawyers did, and we sort of -- you know, it's kind of like a

14  gotcha argument and they try to downplay it.

15          I don't think that's specifically true.  I think

16  it's a critical issue and it's a function of the unique

17  circumstances of this case.

18          Your Honor has seen many, many RSAs, obviously.

19  Normally, the creditors sign the RSA.

20          The whole point of the RSA is that the debtors

21  assure themselves of a confirmable plan, that they have the

22  votes to get an impaired, consenting class, and that those

23  votes are there so that they can proceed forward.

24          They don't have that.

25          Now, there's two issues here.  One is the fact of

1   just the enforceability of this plan, right -- well, excuse

2   me, of this RSA, where, not only do you have sort of ethical

3   issues around paying lawyers to give specific advice to their

4   clients and whether you're even allowed to do that.  We cite

5   cases that you can't and, you know, there really isn't even a

6   response to that.  But let's put that aside for a second.

7           From an enforceability perspective, what happens if

8   some of these claims don't vote in favor of this plan?

9           Are the debtors going to sue the lawyers?  I mean,

10  how is this even going to work?

11          So, you sort of have at the gate, a basic,

12  practical problem of this agreement is unenforceable from the

13  debtors' perspective; more importantly, I think it fails the

14  basic threshold issue of that getting or securing claimants'

15  support for the case plan.  You've heard over and over and

16  over again today from Mr. Stang, Mr. Molton, Ms. Lauria, about

17  overwhelming support and 60,000 to 70,000.

18          I personally can't make the numbers add up.  Mr.

19  Anker referred to it earlier.  Mr. Kosnoff, you know, verified

20  statements that he represents 15,000 claimants, that he

21  repudiates this agreement.  We've literally seen on an hourly

22  basis, during this hearing, just, you know, claimant

23  objections.  We've heard from Mr. Patterson.  I know

24  Mr. Austin is here, as well.

25          So, I can't make these numbers add up, and I think

1  you have to -- given the irregularities with the claim process

2  in this case, and I know Your Honor is familiar with our

3  motions -- I'm not going to argue them -- but I think, at a

4  minimum, the representations that have been made both, from

5  the documents and from the podium today, have to be taken with

6  a mountain-size grain of salt.

7         It is not the case that you have bondholders that

8  signed an RSA, you know who they are, and they're readily

9  identifiable and they're signing the RSA and they can vote.

10         Now, the response to why the claimants, themselves,

11  the people who are going to be voting on this plan, didn't

12  sign it is because, oh, it's going to be, you know, too

13  cumbersome and too complicated, and there's so many of them

14  and how could we ever have done that and maybe we would have

15  had an 1125 solicitation problem.

16         I don't think that's really an answer, Judge.  I

17  don't think anybody is suggesting the debtors needed to

18  solicit those claimants.  If those claimants are real and they

19  hired lawyers, they signed engagement letters.  This is the

20  crux of a lot of the issues that are plaguing these cases and

21  making it so difficult to move this case forward.

22         So, you know, the coalition, you know, went out and

23  solicited many of these claimants.  They say court counsel

24  have these claimants as clients.  There's no reason, and

25  there's no evidence, that having signed engagement letters and

1  having submitted proofs of claim, these same claimants

2  couldn't have signed an RSA signature sheet.

3          The only example they're ever identified of where a

4  lawyer signed the RSA instead of the actual underlying

5  creditor is PG&E, and as we pointed out in our papers, that's

6  a completely different case and I don't think the Court can

7  draw much of a strong precedent from that for this becoming

8  the norm where lawyers sign the RSA and, you know, recommend

9  to their clients that they vote in favor of the plan.

10          The other benefit that the debtors have been

11  touting in favor of the RSA is that this is a building block

12  and they've called it a "pathway"; again, they gave the

13  thesaurus a good workout.  I think, Your Honor, the proof is

14  in the pudding.  It's been seven weeks.  We have not had a

15  single, additional settlement, other than a handful of

16  additional State Court counsel.

17          You heard Mr. Ryan comment that they're at the

18  beginning of square one of those negotiations.  And I think

19  the reason for that is it's a function of the way the RSA is

20  structured.  And this is the other critical lesson of

21  Innkeepers and the debtors really haven't answered this.

22          The way that this is structured, and Mr. Rosenthal

23  alluded to this earlier, the way this is structured is they

24  cannot agree to a settlement until, unless each of these

25  constituencies sign off on it.  They have consent rights over

 1  every insurer settlement, over every target organization

 2  settlement.  That has made it harder, not easier, to

 3  negotiate, because you've got to run the gauntlet and you get

 4  this problem where the most aggressive or most obstinate

 5  constituents sort of has a veto power over it.

 6          The debtors said in one of their papers that

 7  they're not -- they don't intend to end up on an island with

 8  the claimant lawyers, yet that's where they are and that is a

 9  function of the way that this RSA is structured.

10          And I think, Your Honor, what's bizarre about this,

11  is I don't know why they need this.  I really, really don't.

12  The only tangible thing that's going to come out of this

13  hearing if Your Honor, you know, authorizes the RSA, and I

14  submit you should not for all of the reasons that we have been

15  talking about, is that the coalition's fees will get paid.

16  That is the only tangible thing -- I'll come back to

17  litigation in a second -- that's the only tangible thing

18  that's going to come out of it, and Mr. Schiavoni is going to

19  cover why that's illegal.

20          But plan settlements get approved all the time

21  without an RSA.  It's striking to me that we're even here.

22  They could have filed this plan and disclosure statement and

23  now suppress relief of the settlement with these various

24  claimant lawyers and the TCC and the FCR and (audio

25  interference).

1           I'm sorry, Your Honor, I'm hearing an echo.  I
2  don't know if that's just me?
3           THE COURT:  I'm getting some feedback; again,
4  please check your phones.
5           MR. SHAMAH:  Thank you, Your Honor.
6           I think it's a little better now, hopefully.
7           So, they could have announced the plan and
8  disclosure statement and -- excuse me -- they could have
9  announced the settlement, filed the plan and disclosure
10  statement.  We may very well have had a disclosure statement
11  hearing by now.  Presumably, having negotiated this
12  settlement, these lawyers would have advised their clients to
13  vote in favor of the plan that they were pursuing, and we
14  could have moved on.
15          Instead, they've gone this opposite direction,
16  where they've pursued this RSA that is, you know, as we've
17  seen obviously today, has drawn vociferous opposition from all
18  corners of the debtors' stakeholders, and they're no closer to
19  confirmation than they were back in July.  It has not built
20  consensus; it has done the opposite.  It has not driven
21  additional settlements; it's done the opposite.
22          And so, I think what Innkeepers is teaching us --
23  and I know, Your Honor, it's not a mass-tort case; there are
24  differences between Innkeepers -- but the fundamental climate
25  that Ms. Chapman was observing is that the point of an RSA --

1  an RSA is in the debtors' best interests.  It's where it is a

2  transparent process, obviously, but it is also one that is

3  structurally capable of growing a consensus and getting

4  additional settlements in the, you know, within the debtors'

5  stakeholders, and that's just -- the RSA has just failed in

6  that respect.  It just has failed.  It's failed over the last

7  seven weeks.  There has not been any consensus.  And I think,

8  Your Honor, as I was just saying a few minutes ago, that is a

9  function of the way that the RSA, itself, is structured.

10         And lastly, Your Honor, on the terms, and then I'll

11  cede the podium, it requires the debtors to do things they

12  cannot do.  And, again, Your Honor, I don't -- this goes back

13  a little bit to the process point, but just to emphasize this

14  a little bit more, you're not -- you're being asked to

15  confirm, to allow the debtors to bind themselves to a plan

16  that they will not be able to confirm.  And I think it's hard

17  to think of a circumstance where it is less appropriate to

18  bless the debtors' business judgment, to allow them to enter

19  into an agreement that fundamentally will be unlawful.

20         And so, Your Honor -- and I guess -- sorry, Your

21  Honor, one last point, because we've heard mediation thrown

22  about quite a bit -- you know, it's a double-edged sword, Your

23  Honor.  I mean, obviously we have this mediation-privilege

24  issue.  I think it's notable, and someone can correct me, but

25  I don't think the mediator has filed a report or anything like

1  that supporting the agreement in and of itself.  And so, it's

2  not like you have the mediator's blessing this agreement in

3  and of itself.

4          And so, I think, Your Honor, there's only so much

5  Your Honor can rest on, on the ongoing mediation,

6  particularly, the lack of progress over the last, you know,

7  several weeks since the RSA was announced.

8          Your Honor, unless you have any questions for me,

9  that's all I have.

10          THE COURT:  That's all I -- no, I don't have any

11  questions.

12          Mr. Anker?

13          MR. ANKER:  Thank you, Your Honor.

14          This is dangerous, but I'm going to try this for

15  one minute.  I just thought if it were helpful for the Court

16  along this issue Mr. Shamah and Mr. Rosenthal alluded to about

17  the way the RSA is structured and the veto provision, if Your

18  Honor hasn't focused, I'll just point it to Your Honor.

19          If you look at the RSA, with respect to the

20  insurers, Section II, which starts on page 5, agreement of the

21  debtors, (B), (B) begins on page 7, negative covenants of the

22  debtor.  Subject -- I don't know if you're there, Your Honor,

23  the bottom, the very bottom of page 7 of the RSA?

24          THE COURT:  Yes.

25          MR. ANKER:  "Subject to the terms and conditions

1  hereof, for the duration of the support period, the debtors

2  shall not directly or indirectly" -- so he can't go through

3  anyone else.  And now, let's go to III in the hole on the next

4  page, "propose, pursue, or enter."

5          So, it's not just entering into a settlement, but

6  even having a discussion with any insurer.

7          "Propose, pursue, or enter into any settlements

8  with any insurance company without the prior, written consent

9  of the coalition, the TCC -- " and now it's the conjunctive --

10 "and the future claimants representative."

11         That does, as I read it, (audio interference) if

12 you had a situation with any insurer where the -- by way of

13 example, the coalition and the FCR were prepared to support a

14 settlement, the debtor would be prohibited from even picking

15 up the phone, because it wouldn't have the written consent of

16 the TCC.

17         And I just wanted to call Your Honor's attention to

18 the provision in case the legal arguments, you wanted to see

19 where that is in the agreement.  That's where it is as to the

20 insurers.  I think there's separate provisions, with respect

21 to the chartered organizations.

22         Thank you, Your Honor.

23         THE COURT:  Thank you.

24         Okay.  Ms. Boelter?

25         MS. BOELTER:  Thank you, Your Honor.

1        I'm going to be brief because it is getting late

2   this evening and I know we have one more argument left to

3   hear, and that is, at least with respect to the coalition

4   fees, and in response to some of your prior questions, I'm not

5   aware of any discrete issues that need to be addressed today.

6   I think everything is very much subsumed within the relevant

7   standard.

8        One, I just want to respond to Mr. Ryan's

9   suggestion that I was very disappointed to hear that somehow

10  BSA's National Executive Board, comprised of 72 devoted

11  scouts, was somehow grossly negligent in not considering

12  chartered organization issues.  First of all, they did

13  consider them.  Second of all, he's not addressed the fact

14  that the chartered organization issues confronting this

15  organization are extraordinarily complicated.  That's not an

16  issue that is easy to deliver on.

17       And as I pointed out in my opening remarks, the

18  debtors were very sensitive to this issue.  So, were the other

19  RSA parties.  We all committed to work in good faith, to come

20  up with a chartered organization solution and there was an

21  amendment filed to the RSA a few weeks ago that essentially

22  indicates that if a party is not happy with a chartered

23  organization solution, they can withdraw from the RSA.

24       We certainly don't want that to happen, but we are

25  cognizant of the fact that the chartered organizations are

1  extremely important to this organization, and as Mr. Mason

2  said, we do view this as a building block and something that

3  we can build a chartered organization solution on.

4          The fact that the debtors didn't reach a deal with

5  every single party in this Chapter 11 case does not, is not

6  the legal standard for application of the business judgment

7  rule to a particular contract.  The fact that we didn't reach

8  an agreement with one particular party, again, is not the

9  legal standard and it is not relevant, in our view, to a

10  determination by this Court as to whether the debtors did, in

11  fact, exercise their business judgment to enter into an

12  agreement with the TCC, the FCR, the coalition, and the State

13  Court counsel; again, we reserved on this issue very clearly

14  in connection with the RSA.

15          I also want to address, I'm going to move now to

16  Mr. Shamah's remarks, and in particular, some of his remarks

17  about what he calls the, I guess, "irregularities" of the

18  process.  And he takes to task, Mr. Ownby, the chairman of our

19  Board of Directors, and Mr. Mosby's, our CEO, and I'm going to

20  take each of those in turn.

21          Mr. Ownby is the chairman of a 72-person NEB.  And

22  while the bankruptcy is clearly one of the central folks of

23  the NEB, there are many other things that go on in scouting

24  that go on in this organization, including addressing the

25  impact of, for example, COVID, on the scouting movement; I

1  talked about that before.

2          It is hardly surprising that we have a special

3  committee that is specifically designated to deal with the

4  bankruptcy issues and it is that special committee that did,

5  in fact, deal with them.  Mr. Desai very clearly testified

6  that he read the documents, that he received the documents

7  from Mr. McGowan, that he carefully considered the documents,

8  and that was Mr. Desai's job as a member of the bankruptcy

9  task force.

10          He also testified that the other team members of

11  the bankruptcy task force, and I believe he brought up

12  Ms. Schuler, who happens to chair the bankruptcy task force,

13  and Mr. Sorrels, who also sits on the bankruptcy task force,

14  worked just as hard as he did on the bankruptcy task force.

15  He thought maybe even more than he did; that was his

16  testimony.

17          With respect to Mr. Mosby, I don't find it

18  surprising at all that Mr. Mosby wasn't involved in the TDPs.

19  The testimony was very clear.  The advisors weren't granted

20  the authority to negotiate that document, consistent with

21  historical claims experience, consistent with the proof of

22  claim, consistent with precedent, with respect to

23  trust-distribution procedures.

24          So, the fact that Mr. Mosby or Mr. Ownby weren't

25  intimately involved in the TDP is not surprising and should

1  not call into question this Board's business judgment rule.

2           We will have to present evidence with respect to

3  the TDPs.  We fully acknowledge that.  That's incorporated,

4  actually, into the findings in the RSA that the parties have

5  called out, and we fully understand, Your Honor, that in order

6  to get that TDP approved, there is going to have to be a

7  sufficient evidentiary record before the Court, but we're not

8  seeking to have it approved today.

9           Finally, I just want to respond very briefly to Mr.

10 Shamah's points that the debtors are really getting nothing

11 out of this.  I addressed this before.  It's not just about

12 the debtors.

13          But if we're really getting nothing out of this or

14 if the RSA is of no moment, I question why it is that we've

15 had three days of hearing and literally thousands of pages of

16 paper before the Court.  I think there clearly is a moment

17 here, a moment in this case where the debtors are reaching an

18 agreement with the official survivor constituencies and the

19 unofficial survivor constituencies.

20          The insurers, in their capacity as insurers, not in

21 their capacity as claimants, don't feel that that agreement is

22 good for them.  I will remind everyone, they are not

23 fiduciaries for this estate.  They are not fiduciaries for the

24 creditors.  And their judgment simply cannot supplant the

25 debtors' in terms of what is right for the estates and

1 creditors in this case.

2           So, with that, Your Honor, like I said, I wanted to

3 keep it brief, but I did this there were a few points worth

4 mentioning.  I'm happy to provide very brief perspective on

5 the debtors' views on the coalition's legal fees, although I

6 understand that the Brown Rudnick firm may have more to say

7 about that, as well, and the other objecting parties, but I'm

8 obviously happy to proceed however you would like, Your Honor.

9           THE COURT:  That's fine.  We'll turn to the

10 coalition's fees.

11           MS. LAURIA:  All right.  And I will be brief.

12           Your Honor, with respect to the record before the

13 Court, Mr. Whittman testified that the coalition has been a

14 very constructive participant in this bankruptcy case and that

15 the fee request of the coalition that's comprised of the

16 monthly and the catch-up payments at the end of the case, is

17 consistently with what he would expect for a party that is as

18 active as the coalition is and has been in this cases, and in

19 any event, the debtors' estates have the ability to review the

20 reasonableness of the invoices when they are submitted to the

21 debtors going forward, and determine whether or not they are,

22 in fact, reasonable and consistent with expectations for an ad

23 hoc committee, such as the coalition.

24           Now, I think it was in a certain insurer's

25 pleading, points out that if we're looking at the past actions

1  of the coalition, so, not the $950,000 a month, but the things

2  that have happened prior to today, that would be the subject

3  of this catch-up payment, their view was that the debtors'

4  estates should not be compensating the coalition for those

5  legal fees because they were, in large part, attributable to

6  objections that the coalition was making in the bankruptcy

7  case, itself; in other words, they were fighting, according to

8  the certain insurers, the debtors.

9          If you actually look at the history of the

10  coalition's activities in front of this Bankruptcy Court,

11  that's just simply not true.  While the coalition did spend

12  time fighting the 2019 request of the insurers -- by the way,

13  the debtors settled with the coalition because the coalition

14  did provide debtors that material and, in fact, we represented

15  as such in response to those pleadings.

16          But while the coalition has fought those, if you

17  look at the other activities that the coalition engaged in,

18  generally in the case, in each instance, with one exception

19  that is actually relevant to today's proceeding, they did

20  something that was conceivably helpful to the Plaintiff.  The

21  first time we really heard from them -- and, again, I'm

22  talking about outside of the 2019 -- was in connection with

23  the debtors' bar date motion.  The coalition did object and

24  argued that the debtors or the claims agent should accept

25  proofs of claim that were signed by attorney representatives.

1          The debtor did oppose that, but the debtors'

2    objection to that was overruled.  So, they did, in fact, they

3    were, in fact, successful in that objection to our bar date.

4          Next, we had the debtors' advertising motion.  And

5    you may recall that the coalition objected to the debtors'

6    advertising motion as infringing on the attorneys' First

7    Amendment rights and being overly broad.  We had multiple

8    hearings on that.  But in advance of the second hearing, the

9    debtors had reached an agreement with the coalition, where the

10   coalition lawyers agreed to scale back their attorney

11   advertising and ensure that their attorney advertising was not

12   misleading.  So, the coalition was largely, I would say,

13   successful in that.

14         The one time that we saw the coalition come out and

15   actively object to matters before this Bankruptcy Court with a

16   will the of vigor was the debtors' disclosure statement and

17   exclusivity.  And that's something that I covered extensively

18   already in this proceeding.  When we announced the Hartford

19   deal, the coalition came forward and started objecting

20   vigorously to matters that were central to the bankruptcy case

21   at that time, because they were not pleased with the Hartford

22   deal.

23         But other than that, Your Honor, the coalition has

24   been a constructive, negotiating partner to the debtor.  I

25   think the testimony was clear with respect to that.  And from

 1  the debtors' perspective, the payment of the coalition fees is

 2  consistent with the debtors' business judgment.

 3          That's the debtors' perspective on the payment of

 4  the fees.  I don't have anything more to add.  I'm happy to

 5  hand off the podium to other supporters or as you see fit,

 6  Your Honor.

 7          THE COURT:  Mr. Molton?

 8          MR. MOLTON:  Your Honor, I think the way we've done

 9  it is I'll take the laboring oar for now on this issue and

10  I'll try to be -- recognizing the lateness of the day, I'm

11  going to try to be as concise as I can.

12          A number of parties, Your Honor, have objected to

13  the RSA with respect to the debtors' agreement to reimburse

14  the coalition's state counsel for amounts paid and owed to

15  their professionals and amounts incurred on an go-forward

16  basis for work done under the scope of the RSA, and I just

17  want to take what Ms. Boelter said, I know she mentioned a

18  number of issues where we, at first, had been adverse to the

19  debtor.  At the end of the day, Your Honor, most of those

20  brought value to the estate, both, in terms of resolving some

21  of the advertising issues, and I do note that Your Honor also

22  thought, going back to my first experience in this case, that

23  some of the relief requested by the debtor on that issue was a

24  little overbroad.  I think we helped them.

25          And also, number two, Your Honor, the Hartford

1  issue, which I think at the end of the day, is going to

2  reverberate to great benefit to the estate, our R&R brethren

3  and sistren Plaintiff constituencies' objections to that.  So,

4  in any event, the debtors have agreed, and it's their business

5  judgment, we'd submit, that's at issue, and the fee issue is

6  part and parcel of the RSA.

7          The RSA approval requires the fee agreement

8  approval and we think we marked out conservative, responsible,

9  prudent steps to doing that, subject to a cap.  And I know my

10  friend, Mr. Patterson, talked about that, to pay the coalition

11  fees through the effective date with a cap, and, likewise, a

12  cap for reimbursement.

13          There is language, Your Honor, in the RSA regarding

14  excess and, you know, it says that the payment of fees in

15  excess of the $10.5 shall be payable, if at all, by the

16  settlement trust after the effective date.  That's an issue

17  that is not before us now, Your Honor.

18          I would submit, Your Honor, this is not an unusual

19  situation and, in fact, as I will describe, certain of the

20  insurers that I see on the Zoom screen in another case has

21  recently sought and received similar payments in significantly

22  greater dollars for their ad hoc committee involvement in a

23  complex Chapter 11 case.  I'll get to that in a minute.

24          There are two different objections to the RSA

25  provisions concerning the reimbursement of the coalition's

1  fees, Your Honor.  The first is that the debtors and the

2  coalition have failed to meet the standard for approval of the

3  reimbursement.

4       We submit, Your Honor, we've met any relevant

5  standard, whether it's 363(b), which we submit is the correct

6  standard when the debtor has agreed to pay the fees, by way of

7  an RSA or by way of an reimbursement agreement or, otherwise,

8  by 503(b) of the Bankruptcy Code, which, as I'll get to,

9  usually arises when the applicant makes a motion for

10 reimbursement in lieu of a debtor agreement.

11      We'd submit it is clear from the statutory

12 structure (audio interference) in this district and others

13 that the correct standard is the debtors' business judgment

14 under 363.

15      The second objection, Your Honor, is Century's

16 contention that the RSA fee payment provisions are unethical.

17 I just do want to note, Your Honor, that, you know, we've seen

18 an abundance of the use of the nissles (phonetic) of ethical

19 conduct in this case.  It seems to be that the old adage when

20 you've got the facts, you argue the facts.  We've you've got

21 the law, you then -- not the facts, you argue the law and,

22 otherwise, you just shout.  I think that's been replaced in

23 this case.  If you don't have the facts and you don't have the

24 law, you sling ethics allegation violations at people who

25 stand in your way.

1          I'll deal with that briefly, only at the end, Your

2    Honor.  I think that those arguments are all be settled.

3          Regarding the relevant standard, Your Honor, and

4    this is one where the U.S. Trustee and us disagree and the

5    U.S. Trustee has taken a different view, has taken the same

6    view in other cases and has been overruled, and I'll get to

7    that in a minute.

8          The Bankruptcy Court has two different mechanisms,

9    as I just said, for providing reimbursement for creditors'

10   expenses.  Section 363, Your Honor, as you know, allows the

11   debtor to perform under reimbursement agreements when it has a

12   sound business purpose for doing so.  It's part of the

13   debtors' right to use, sell, or lease its property,

14   post-petition.

15         Cases that we cite in the coalition's reply brief

16   are the Purdue case in the Southern District of New York,

17   which is steadily heading for confirmation; Mallinckrodt, in

18   Judge Dorsey's virtual courtroom next door, Your Honor, where

19   Judge Dorsey approved post-petition entry into a reimbursement

20   agreement under Section 363(b) with an ad hoc committee of

21   tort victims in connection with an unassumed RSA; and

22   Bethlehem Steel case, Your Honor, 2003 WL 21738964, Southern

23   District of New York (2003), authorizing the reimbursement of

24   counsel to a union pursuant to 363(b) over the U.S. Trustee's

25   objection that Section 503(b)(3) and (b)(4) were the only

1  avenues for a secured creditor to receive fees.

2          Section 363 transactions, as Your Honor knows, has

3  been evaluated under a business judgment standard.  I do want

4  to note, Your Honor, that the U.S. Trustee said the business

5  judgment standard should not be allowed and it should be

6  503(b).  In Mallinckrodt, that was overruled -- that

7  objection, we submit, was overruled by Judge Dorsey.  And,

8  Judge Drain also applied, in Purdue, the 363 standard.

9          THE COURT:  I thought Judge --

10          MR. MOLTON:  There's been plenty said today about

11  the RSA --

12          Yes, Your Honor?

13          THE COURT:  I thought Judge Dorsey said 363 was the

14  mechanism to bring, for the debtor to ask for the request, but

15  he -- didn't he look at whether it was beneficial?

16          MR. MOLTON:  Yes.  And I'm going to get to that,

17  Judge.  He did.  He said, in evaluating the debtors' business

18  judgment, I think what you can read into what he said is, in

19  evaluating the debtors' business judgment, you can look to see

20  whether the recipient of the fees and who they're working for,

21  had actually added value to the case.

22          So, I think that there was, to some extent, a

23  conflation of the reference to what I would call "substantial

24  contribution" in ascertaining the debtors' business judgment.

25          I would say that under a 503(b), Your Honor, we

1   meet that standard.  As I said, I'm not going to go over all

2   of Mr. Whittman's testimony that you heard on Thursday, but he

3   testified, and Ms. Boelter argued or talked about a little

4   bit, Mr. Whittman testified from a practical perspective, the

5   ability to negotiate with the coalition as a whole, benefited

6   the estate, to the estate, and will continue to do so going

7   forward; in particular, the ability to speak with a single

8   party that represents a large claimant have been more

9   efficient and it's particularly important, given the fact that

10  in order to achieve the type of plan of reorganization that

11  the debtor is looking to achieve, they need to know that they

12  received the affirmative support of that Plaintiff's group.

13  That's page 125 and 126.

14          He also testified that no group has the comparable

15  creditor constituency as the coalition, page 231.  The

16  coalition turned over to claimants, data, early in this case,

17  large amounts of data in the fall of 2020.  That data helped

18  the debtors formulate an understanding of the claims

19  population to inform negotiations in advance of the bar date.

20          Mr. Whittman testified that was helpful to the

21  debtors.  That was page 231.

22          Mr. Whittman testified that the coalition played a

23  role in the increase of the BSA and the local council

24  contributions to the settlement trust.  And as Your Honor

25  knows what those numbers started at and what they, you know,

1  where they fell.  That's page 3 -- 232.

2         And he said that the coalition will continue to be

3  an active part of negotiations with chartered organization and

4  insurers, in supporting the plan process.  Page 234.

5         And one of the most important things, Your Honor,

6  he said is the coalition is the party driving additional firms

7  to sign joinders to the RSA.  That's page 239.  The value of

8  bringing those 42 firms and 70,000 of their clients by way of

9  it to the RSA, should not be understated, Your Honor.

10         To be clear, the debtors, in their business

11  judgment, decided that the coalition fees were a small price

12  to pay, compared to the alternative.  I submit, Your Honor,

13  that the fees requested, in light of the substantial

14  administrative costs of this case, are -- I won't say *de*

15  *minimis* -- but are -- you know, make us one of the cheapest

16  dates, if not the cheapest dates at the party and a pretty

17  good date, I would think.

18         THE COURT:  Mr. Molton?

19         MR. MOLTON:  Nonetheless, the insurers argued --

20         THE COURT:  Mr. Molton, you just said, "In light of

21  the alternative."

22         What's the alternative?

23         MR. MOLTON:  The alternative, Your Honor, would be

24  where what I saw when I entered this case and what I saw when

25  we were doing the 2019.  I saw the possibility, indeed, you

1  know, what looked like this case heading to a free fall.

2        And that free fall would have not only resulted in

3  huge amounts of expenditures, litigation, as you you've heard

4  on restricted assets, litigation on other issues, et cetera.

5        And the alternative, Your Honor, was a world in

6  which this RSA would not be in front of your Court now and

7  would not be in front of Your Honor now with all of its

8  benefits.  So, that's what I'm saying, Your Honor.

9        THE COURT:  In either Mallinckrodt or Purdue, was

10 the ad hoc committee -- who was the ad hoc committee in those

11 cases, what was it made of, what constituency?

12       MR. MOLTON:  The ad hoc committee in Purdue, Your

13 Honor, that received fees from Judge Drain for the approval of

14 the fee order from Judge Drain was made up of States, the

15 consenting States, local municipalities, and an Indian tribe,

16 as well as the opioid, national opioid PEC, Plaintiffs'

17 Executive Committee in the national opioid MDL.

18       In Mallinckrodt, there were a number of creditors,

19 including non-tort creditors that basically were the

20 beneficiaries to that fee order, including credit, funded debt

21 creditors.  But principally, the ad hoc equity committee in

22 Mallinckrodt was made up of States, and the PEC, from the

23 national opioid MDL, but there was also the MSGE Group, Your

24 Honor, that was made up of two to 3,000 litigant creditors,

25 municipalities, who were -- had State Court action and did not

1    have MDL actions all over the country.  So, that's what the ad

2    hoc committees there were made up of.

3                THE COURT:  Well, the reason I asked, one, because

4    I didn't know -- and I apologize, I'm sure it was in your

5    papers -- so, States and governmental entities, can they be on

6    committees?

7                MR. MOLTON:  The governmental entities cannot, Your

8    Honor, beyond a creditors' committee, as Your Honor knows.

9                THE COURT:  That's what I thought.

10               MR. MOLTON:  So, yeah, they can -- but that, you

11   know, the issue there was whether or not they, as an ad hoc

12   committee, in light of the debtors' business judgment, could,

13   you know, receive a fee by way of, as Your Honor notes, and as

14   Judge Dorsey said in Mallinckrodt, adding value to the case.

15               So, you know, just to go to your question, Judge,

16   as the Purdue Court notes, as Judge Drain noted, the debtors

17   pursuit of reimbursement under 363 does not render 503(b)

18   meaningless; it's just another avenue to get fees paid and

19   it's done when the debtor actually makes the agreement and

20   basically seeks approval of the fee reimbursement component of

21   the agreement.

22               And in Mallinckrodt, Your Honor, just to get where

23   you were -- your question, and I'm referring to Judge Dorsey's

24   hearing transcript on January 19th, 2021, I think it's page 9

25   to 10, Judge Dorsey approved the reimbursement agreement under

1  363, and I'm going to quote him:

2          "Because the debtors met their burden there,

3  establishing a sound exercise of their business judgment under

4  Section 363."

5          I don't think either Judge Drain or Judge Dorsey,

6  at all, said, well, you're going to get your fees because you

7  can't be on a creditors' committee.  The key was, you know,

8  looking at, you know, the debtors' business judgment and in

9  terms of Your Honor correctly noting Judge Dorsey, in light of

10 the value that the organized creditor ad hoc committee could

11 supply to the case.

12          And we noted in our reply brief, Judge, Century

13 actually quoted when they cited to Mallinckrodt from a

14 superceded decision in Mallinckrodt.  In that superceded

15 decision, the Court referred to Section 503 and asked for

16 certain oversight provisions to be added prior to

17 reimbursements.

18          We've worked out the same guardrails here, indeed,

19 the order we're submitting to Your Honor mirrors the

20 Mallinckrodt order, but at no time did Judge Dorsey require a

21 finding concerning Section 503.  He said the 503 factors would

22 inform the 363 analysis.

23          I submit, Judge, the insurers have ignored this,

24 you know, or as they did when they cited to Mallinckrodt and

25 they cite to, principally to O'Brien Environmental Energy, a

1  Third Circuit case, 181 F.3d 527.  But that was a case where

2  an unsuccessful bidder made an attempt, a request to obtain a

3  break-up fee under common law, disclaiming (indiscernible)

4  under 503 and the Court specifically refused to consider

5  authority under 363(b).  It just doesn't apply.

6         And I do want to note, Your Honor, because here we

7  don't have governmental entities, and I'm going to refer to

8  PG&E, which I just heard some of, I think it was from the

9  insurance side says, well, you can't look at that case.  Well,

10  let's look at that case.  And funny enough, in PG&E, there was

11  an RSA that contained a reimbursement agreement.  It was

12  called the subrogation RSA for subrogation claimants, and

13  those are tort claims, Judge; those are indirect tort claims

14  that come to insurance companies when they pay the tort --

15  where they pay the claims of their insureds.

16         And the ad hoc committee of insurers included AIG,

17  Hartford, Liberty Mutual, and affiliates of Century and Chubb

18  Group.  And the case, again, PG&E, 19-30088.  The insurers in

19  that case required that PG&E reimburse their counsel up to $55

20  million, Your Honor, and I don't even think that the retainer

21  agreement, unlike ours here, was ever disclosed in that case.

22  That case, if you want to see the RSA, Your Honor, and the

23  language, it's at Docket Entry Number 3992, paragraph

24  3(a)(iii) of the subrogation RSA on behalf of the insurer

25  subrogation creditors.

1          I do want to go before I finish, Judge, to the

2    issue of our proposed order and Mr. Buchbinder's principal

3    objection.  We do think that of the objections, Mr. Buchbinder

4    has a principal objection, one that he's made where the U.S.

5    Trustee has made in other cases.

6          We do submit, Judge, that based on the recent case

7    law, the proper standard here where the debtor in its business

8    judgment has decided for the benefit of the estate, here an

9    RSA that is, you know, the predicate and foundation of a plan,

10   that 503(b) is not the right standard, we have agreed,

11   however, with the U.S. Trustee, although, we differ and we're

12   unable to come to total agreement with the U.S. Trustee, and

13   I'll let Mr. Buchbinder talk -- I don't want to put words in

14   his mouth -- because we have a disagreement about the relevant

15   standard that he feels needs to be decided by the Court.

16         But we have put into our proposed order, Your

17   Honor, the very same guardrails that were put into the

18   Mallinckrodt order, which includes compliance with the interim

19   fee order, you know, et cetera.  And if Your Honor takes a

20   look at the proposed order that was submitted by the debtors,

21   which contains at paragraphs 5 and 6, you'll see -- I'm not

22   going to go over it at length -- but the significant

23   agreements that we're willing to make in order to resolve this

24   issue.

25         I do want to note, Your Honor, a point that I heard

1  one or more people make last week that somehow an ad hoc

2  equity committee of tort claimants, which are creditors who

3  hold claims, as claims is defined under the Bankruptcy Code,

4  is different than an ad hoc group of bondholders and those

5  bondholders usually are hedge funds who have bought, you know,

6  debt, bond debt at a severe discount.  So, we're trying to

7  organize and use, help get the bankruptcy case to a point

8  where they can realize a gain; often times, a very meaningful

9  gain on their discounted purchases.

10       And that somehow, Your Honor, there's a special

11  rule that ad hoc committees of bondholders, whether there's an

12  indenture trustee or not, are entitled to get their

13  professional fees reimbursed, whether it be by the debtors'

14  agreement, in accordance 363, or on their own application,

15  pursuant to 503.

16       Judge, I just want to say that, you know, I find it

17  rich that someone can take a position that bondholders, mostly

18  in the guise of hedge funds, have some sort of special rule

19  for them in the Bankruptcy Code or on the case law that gives

20  them special rights to get their attorneys' fees paid.

21       The coalition rejects that position.  I don't

22  believe the Bankruptcy Court -- the Bankruptcy Code in

23  Sections 503(b) or in Section 363 provide support for that

24  position.  In numerous recent courts, including Judge Drain

25  Purdue, dealing with opioid claims, litigation claims, Judge

1  Dorsey in Mallinckrodt, dealing with opioid litigation claims,

2  and, Judge Montali in PG&E, dealing with indirect tort

3  claimants, held by subrogation claimants, found had no --

4  didn't recognize such a rule and made decisions without

5  reference to it.

6          So, I'm not going to get -- if Your Honor has any

7  further questions about the standard, I know it's late in the

8  day and I'm trying to get through this as best I can.

9          THE COURT:  Let me ask a question, and I appreciate

10 that you got the -- you drew the short straw on your last.

11         MR. MOLTON:  The (indiscernible).

12     (Laughter)

13         THE COURT:  Is that it?

14     (Laughter)

15         THE COURT:  So, I'm not trying to rush you.  My

16 staff may feel differently, but I'm not trying to rush you.

17         Here's the question I really have is, I've got two

18 committees here.  The U.S. Trustee appointed two committees;

19 they appointed a general unsecured creditors committee and

20 then they appointed a tort claimants' committee.  And your

21 constituency falls squarely within the tort claimants'

22 committee; it's not just a subset of an unsecured creditors

23 committee.  It's right in there with the official tort

24 claimants' committee.

25         And so, I think the question that people, that just

1  naturally comes up from that is, is there duplication; that's

2  the first question.

3  And then the second question is, here, my

4  recollection is that the members of the coalition are

5  16,000 -- 18,000 -- I forget the number -- individuals, you

6  know, abuse survivors.  But the fees of the coalition counsel

7  and other professionals, I assume, were to be paid by State

8  Court counsel.  They're not being paid by the creditors,

9  themselves.  They're not owed by the creditors, themselves.

10  It's the creditors' State Court counsel that are responsible

11  under the engagement agreement between your firm, Ms. Mersky's

12  firm, and anybody, for payment of fees.

13  So those are the two questions, the two particular

14  issues that are flowing around.  And that's aside from whether

15  I feel you've been constructive in the process and my

16  observation, which again, is 5 percent of what happens in a

17  case, is that you have been.  But those are the issues that I

18  have, I'd like you to address.

19  MR. MOLTON:  I'll try to do my best, Your Honor.

20  I hope Your Honor has seen that the pleadings that

21  have come to Your Honor from the point of the survivors' side,

22  really, since almost the beginning of the year -- I'm sure

23  that there are times when it's not the case, but increasingly

24  so -- have been joint pleadings, Your Honor.  You haven't been

25  getting three pleadings.  You haven't been getting a

1  duplication of effort.

2           Have been getting, actually, a coordination and

3  collaboration and communication of, you know, really, from my

4  perspective, unprecedented nature from the tort claimants'

5  committee, the FCR, and the coalition, in presenting to Your

6  Honor, whether it be the briefs that are in front of you on

7  the RSA, whether it was the contested estimation proceeding.

8  You have in front of you, Your Honor, in plain sight, a

9  commitment -- and, again, not just my words, but by deed, by

10  what you see in front of you, really, efficiencies in

11  coordination.  So, I don't think the duplication issue, in

12  light of what we've done and how we're working with the other

13  Plaintiff groups is a significant issue.

14           You know, number two, Your Honor, you know, yes,

15  the individuals who were part of the coalition, you know, have

16  representation by the tort claimants' committee.  But I think

17  that's generally true for most ad hoc committees that are

18  funded, you know, either by debtor agreed to 363 fee

19  reimbursement agreements or by 503(b), notwithstanding the

20  fact that government entities can't sit on creditors'

21  committees, I know that counsel for the opioid creditors'

22  committee in Mallinckrodt and the UCC in Purdue, has a very,

23  very, very strong view that he represents, that his firm

24  represents all of the creditors.

25           You know, I don't think there can be an artificial

1  rule that says that, to the extent that there's an official

2  committee, official committees all the time, you know,

3  represent the interests of bondholders.  But one of the most

4  important things in a financial reorganization case where

5  there's lots of funded debt is to be able to get, you know,

6  the fulcrum constituency of bondholders to coordinate and

7  communicate and lead a case to a resolution.

8         And the same thing in a mass-tort case, Judge.  The

9  same thing here, whether you call this a mass-tort case or you

10  call it something else.  I think you've seen, quite clearly,

11  the positive and salutary results of the coalition having come

12  together, what we've done in the case, and where we've helped

13  bring the case with our Plaintiffs' side partners.  So, you

14  know, the duplication issue on that, I think, is addressed in

15  my answers to you.

16         You know, your other issue, Your Honor, I've taken

17  a look.  First of all, 363, I don't think a fee reimbursement

18  agreement under 363(b), you know, really interferes with the

19  business judgment or precludes the business judgment of the

20  debtors in our situation, when the fees of the coalition

21  professionals are being paid by the State Court lawyers,

22  precludes them or provides, you know, a per se rule.  I don't

23  see there's any there, you know, reimbursing fees in the

24  debtors' business judgment when the debtors have concluded

25  that that will help bring a case home.

1       And, Your Honor, I read 503(b)(3)(B) and 503(4)

2  [sic] and, you know, the actual going to 503(4), 503(b)(4),

3  the actual expenses of the ad hoc committee are what's at

4  issue.  The legal fees and accounting, financial advisor fees

5  in 503(b)(4) are what's at issue, and I don't see there, Your

6  Honor, any bright-line rule that says to the extent that the

7  underlying creditor is not going out-of-pocket, that that is

8  not a valid vehicle for payment of the ad hoc committee's

9  actually incurred fees under 503(b).

10      So, that's my attempt at late in the day, Judge.

11  I'm sure that I'll get, you know, as I said, I'm waiting for

12  the salvos that I know are coming, but I hope that that

13  answers your questions, Judge.

14      THE COURT:  Thank you.

15      MR. MOLTON:  Yeah, one last thing, Judge.  I do

16  want to get to the ethics allegations.  I don't know if Your

17  Honor wants me to address them.

18      I would say that, you know, that's just mud on the

19  wall and none of them are applicable.  Our papers go into, in

20  great detail:  why the Vioxx settlement, and what was wrong

21  there isn't applicable here; why Model Rules 1.8(f) and (g)

22  have no pertinence here under the facts of this case; why

23  Model Rule 1.7(b)(4), which deals with concurrent clients --

24  we represent one client -- has any relevance here; and why the

25  class action issue, which I know Judge Kovner wrote about,

1  where Defendants are motivated to pay off lawyers and thereby

2  incents those lawyers to offer their class constituents what

3  appears to be *de minimis* results -- sometimes coupons,

4  sometimes other things -- you know has no relevance here

5  where.

6           Already, you're looking, Your Honor, at the amounts

7  at issue from our fees against what is a base of up to $850

8  million; $850 million in the RSA, we settled.  I think none of

9  those issues have any relevance whatsoever.

10          And, you know, accordingly, if Your Honor has any

11 questions, then I'll answer them, but, again, I think that the

12 ethics allegations border on (indiscernible).

13          THE COURT:  Thank you.

14          MR. BRADY:  Your Honor --

15          MR. SHAMAH:  I apologize for interrupting you, Mr.

16 Brady, but Mr. Schiavoni, for Century, was going to respond to

17 this.  I think he's been kicked out of the Zoom room.

18          I was hoping that we could have him be readmitted.

19 I apologize for interrupting.  And we emailed your clerk, but

20 he said he's in the waiting room.

21          I apologize.

22          THE COURT:  Can we see if someone is in the waiting

23 room?

24          THE CLERK:  It's just taking a little bit longer

25 for them to be admitted.

1          MR. SHAMAH:  Oh, there he is.  I see him now.

2          MR. SCHIAVONI:  Terrific.  Sorry.

3          MR. SHAMAH:  Tanc, you're not up yet; I'm just

4   drawing the judge's attention.

5          MR. SCHIAVONI:  Okay.  Thank you, Your Honor.

6          THE COURT:  Okay.

7          MR. BRADY:  Your Honor, I was just going to give

8   one (indiscernible) to the Court.

9          THE COURT:  Yes, Mr. Brady?

10          MR. BRADY:  Your Honor, Robert Brady for the FCR.

11          The FCR does, obviously, support this provision

12   that's in the RSA, but I can tell the Court that the coalition

13   has been a very constructive, negotiating party in the

14   mediation and, really, in the case, generally.  They have

15   added value by building consensus, encouraging collaboration

16   and cooperation.

17          Your Honor, without the coalition, I am not sure

18   that we would have achieved the RSA.  So, while the FCR

19   doesn't always agree with the coalition -- we have had our

20   disagreements; we're likely to have those disagreements in the

21   future, as well -- they have worked very hard and they have

22   advanced this case, so we support this provision.

23          THE COURT:  Thank you.

24          MR. BRADY:  Thank you, Your Honor.

25          THE COURT:  Okay.  Mr. Schiavoni?

1           MR. SCHIAVONI:  Thank you, Your Honor.

2           Everyone's new, first, you know, big nightmare in

3   the Zoom world of losing your connection.

4           Your Honor, there are four points that I'd like to

5   make, but, you know, before I do, I think the big overlay, not

6   just for this particular argument -- it's particularly

7   relevant to this argument -- but the overlay, in a sense to a

8   lot of things today is, if the plan, the amended plan is such

9   a great plan and the coalition lawyers and all the Plaintiffs'

10  lawyers are prepared to support it, what do we need an RSA for

11  at all?

12          In other words, if they're prepared to recommend to

13  their clients and provide advice, legal advice to their

14  clients to vote in support of it, why are these going forward

15  with this RSA at all?

16          Well, you'll see one of the things -- and I want to

17  come back to this at the end -- but one of the things is how

18  the fees are locked up into this.  And Mr. Molton was quite

19  clear in the beginning of his argument that his fees are, in

20  particular, part of the agreement, that is part and parcel of

21  this agreement.  It's absolutely part of it.

22          He could have made a substantial contribution

23  motion.  He could have brought that motion, like is normally

24  done.  He could have supported it with affidavits and time

25  records, but he didn't do that.  It's like it was built

 1   directly into the agreement so that, as presented, just like

 2   the TDPs, it's presented as a condition to allowing the debtor

 3   to go forward.

 4          And I think that has, like, a number of

 5   implications in connection with this, but that's an overlay --

 6          THE COURT:  But that's not unusual, is it?

 7          I mean, that's not unusual that we see requests for

 8   fees in RSAs.

 9          MR. SCHIAVONI:  Your Honor, no, but in a totally

10   different context, it is unusual when you're seeing the

11   signatories being the lawyers and not the claimants.

12          And to be clear, Your Honor, it's, like, this

13   notion that the claimants couldn't have signed it, when Mr.

14   Molton was retained, he didn't rely upon just the simple

15   advice of the coalition law firm that is -- he -- like, they

16   were just going to sign on and he would be paid.  He was very

17   careful in going out and getting written consents to the

18   coalition members to being members and to be agreeing to pay.

19          And there was no complaint that there were too many

20   of them or it would take too long.  It's like they got that

21   done fairly quickly, and that was very important to Mr. Molton

22   to do that there.  That was not done in connection with the

23   RSA.

24          All this notion that it was, you know, impractical

25   or infeasible, that wasn't what happened when Mr. Molton

1  presented his verified statement about how he had the support

2  of the individual claimants.  They went out, they got them

3  signed up.  They did it in fairly short order.

4          But let me turn to the four points that I would

5  just like to go through here.  And I have a little PowerPoint,

6  so I suggest that -- I think you have to enable us, if you

7  could do that, to bring it up.

8          THE COURT:  Who do we need to enable?

9          You're not doing it, right?

10          MR. SCHIAVONI:  I don't think so.

11          Judge, my colleague, Sal, are you able to pull it

12  up?

13          MR. COCCHIARO:  Your Honor, it's Mr. Cocchiaro,

14  again.  Thank you.

15          THE COURT:  Ah, the same person.

16          MR. SCHIAVONI:  Ah, Mr. Cocchiaro.

17          THE CLERK:  It's the same person?

18          THE COURT:  Yes.

19          THE CLERK:  Okay.  Thank you.

20          MR. COCCHIARO:  He's helpless without me, Your

21  Honor.

22      (Laughter)

23          THE COURT:  Okay.  I think we've got you now.

24          MR. SCHIAVONI:  Okay.  Sal, if you could just pull

25  up the first.

1          So, Your Honor, the four points, it's going to the

2   first one here.

3          If you could turn the slide.

4          The next slide is -- and I think you're going to

5   find fundamentally here, both, the law and the facts are not

6   really ultimately in dispute here.  The payment of the

7   coalition lawyers is subject to a 503(b) standard, not a

8   Section 363.

9          If you can go to the next slide.

10          The precedent for looking at, you know, how this

11   works is fairly clear.  I mean, the Code, itself, is clear of

12   what provisions deal with the payment of estate professionals;

13   503(b) is that provision.

14          The Third Circuit took the issue on in <u>O'Brien</u> and,

15   yes, it dealt with a break-up fee, but the Court was clear in

16   its statements that that is the provision for dealing with the

17   payments for estate -- for creditors who are seeking the

18   benefit of fees from the estate.  It's pretty clear, the Code

19   is clear.

20          If you'd go to the next slide.

21          THE COURT:  So, did Judge Dorsey get it wrong?

22          MR. SCHIAVONI:  I don't think he did, Your Honor,

23   because if you look closely at what Judge Dorsey had to say in

24   <u>Mallinckrodt</u>, he did exactly what Your Honor suggested.  He

25   said that that was the vehicle in that instance to bring the

1  matter on, but he ultimately held the applicant to a 503(b)

2  standard in making a decision about whether to go forward.

3         And I think if you look at Purdue and you look at

4  the (indiscernible) case, you'll find the same thing happened

5  in both of those cases, that they ultimately held the Court to

6  a 503(b) standard.  But, Your Honor, that almost sort of

7  answers the question here, the best precedent, you know, that

8  the coalition can come forward with is the Mallinckrodt case;

9  that's their best precedent, or Purdue, two recent cases, you

10 know, over the last decade for bringing fees.

11        This is not a well-supported application.  If

12 that's all one had to do, one would think that there would be

13 plenty of cases supporting this sort of application under the

14 363(b) standard, but there isn't.  You know, the cases that

15 have looked at O'Brien since, and we gave two examples of

16 them, both found that they followed the O'Brien case and found

17 that 503 had to be followed in making an application.

18        So, we do think the application falls under 503(b)

19 and, Your Honor, I think if you look at how the Code is just

20 constructed overall, if one were to just generally allow

21 applications for fees to be made under this lesser standard,

22 there would be almost be no gatekeeping on what fees would be

23 made in cases.

24        It's extremely unusual in mass-tort cases in the

25 asbestos world to see an application by a Plaintiff

1   constituency or a group of Plaintiffs for compensation and

2   there's a good reason for it.  If you want to allow that, it

3   would actually encourage subgroups to be formed in endless

4   opposition when, otherwise, the tort claimants' committee with

5   the fiduciary duty, is the one that's supposed to gather folks

6   together and bring about consensus.

7          So, we think the standard is clear that 503(b)

8   applies and that's what the Circuit would hold here.

9          THE COURT:  What about --

10         MR. SCHIAVONI:  If we could go to the next slide.

11         THE COURT:  What about what we often, we do see in

12  plans, where there's a provision in a plan to permit payment

13  of an indenture trustee fee or something of that sort?

14         MR. SCHIAVONI:  I think often times, that turns on

15  the specific nature of who the applicant is, like, for

16  instance, if the indenture trustee might otherwise have a

17  contractual or other right to get fees and the application

18  gets approved as part of the plan as part of that.

19         I mean, I can give Your Honor two examples of cases

20  where in mass-tort asbestos cases, requests were made through

21  the plan for fees.  And Mr. Patterson, I think, was actually

22  in one of those cases, who's on the line: In re Thorpe and In

23  re Plant.  In both instances, Plaintiffs' lawyers that were

24  part of, you know, representing people on the committee,

25  applied for fees and in both instances, the Court rejected

1  those fees being paid, as part of a plan.

2           And, again, the reason is, there's really two

3  reasons -- there's a number of reasons for this.  The

4  Plaintiffs' lawyers here, who are applying, it's like let's be

5  clear about what's actually going on here.  Of the $800

6  million that they've collected for the plan so far, you have,

7  as part of the 2019 process, the applications of the coalition

8  or the retention agreement for the coalition.  It's like you

9  can see from those, the 40 percent contingency throughout

10  them.  If that runs through for the remainder of the

11  claimants, almost $320 million of the $800 million is going to

12  fund those contingencies.

13           The coalition contingency on the $320 million, it

14  would vary under a variety of hypotheses here, but it runs

15  somewhere in the neighborhood of $200 million.

16           There is a very good reason the coalition went out

17  and hired their own lawyer.  The lawyers behind the case had

18  enormous amounts of, you know, (indiscernible) at stake and

19  they just decided to invest in their own lawyer.  For these to

20  hoist the cost of that endeavor on top of the claimants, on

21  top of a 40-percent take is extremely corrosive to the entire

22  plan process and it isn't helpful.

23           If we could go to the next slide here.

24           The second point I just wanted to cover is, I think

25  there's a lot of misconceptions being thrown around about

1   what, really, the standard is, (indiscernible) substantial

2   contribution or, you know, otherwise, to make it -- to get a

3   fee award.  All it was, was just simply that one cooperated in

4   getting a settlement done.  It's like Mr. Anker should be

5   applying for the settlement he did.

6           It's like, that is not the standard, but here, Your

7   Honor, it's like the debtors have offered really no admissible

8   evidence to meet what the standard is.  It's a heavy standard

9   and it's applied narrowly.

10          It's like you've heard during *in limine* arguments

11  that no documents at all were produced to the debtor and have

12  been produced to us.  The coalition, the client didn't produce

13  anything.  In their exchange with you, they were crystal clear

14  that there was nothing.  They made reference to a single

15  spreadsheet and that was it.

16          That's what they -- it's like the platitudes

17  exchanged during argument, it doesn't go to what's actually in

18  the record.  There were no documents turned over.

19          If you could go to the next slide.

20          We questioned the witnesses about --

21          THE COURT:  Is that remedied by the revised order?

22          MR. SCHIAVONI:  No, I don't think so, Your Honor.

23          And I'll tell you why.  What the revised order says

24  is that they shall, going forward, provide a fee application

25  or, basically, present some type of invoices and they'll be

1  approved, simply based on reasonableness, and that's not the

2  standard for a substantial contribution.

3          It's also the approval of the dollar amount by the

4  debtor, all of that was done by the debtor without having any

5  sense of what actually has been spent already in the case or

6  what -- any real (indiscernible) of what should be spent on a

7  going-forward basis by the coalition.  I mean, not only do

8  they have no documents when (indiscernible).

9          If we could go to the next slide.

10         It's like the Board members who looked at this,

11  they all testified that they really knew nothing about it at

12  all.  They didn't -- it's like they didn't have copies of any

13  of the documents to make an assessment on how to go forward

14  here and they didn't know really how it was going to go

15  forward.

16         It's like, you know, we questioned Mr. Ownby about

17  it and Mr. Mosby; Mr. Mosby, being the person who was the lead

18  negotiator.

19         If you could go to the next slide.

20         Mr. Desai, what you heard from him on

21  cross-examination was he had no documentation in order to, in

22  any way assess, quantify.  They didn't do any quantification,

23  any assessment, nothing whatsoever, in connection with it.

24         What you did have --

25         If you'd go to the next slide.

1       -- from Mr. Whittman is, you've got, look, Mr.

2  Whittman, basically, sort of saying that, because other

3  lawyers have spent a lot of money in this case and he knows

4  how expensive some other cases are, it's like these fees seem

5  like sort of in the ballpark.

6       But when you got to have the substance, he

7  testified that he didn't consider any specific documentation

8  from the coalition at all.  They have no factual basis, the

9  Boy Scouts, to make any decision about this whatsoever.

10      And the cases on this, you know, that look at

11  these -- and there's lots of cases that deny substantial

12  contribution applications that are based on sort of simply

13  (indiscernible).  U.S. Lines is one of those cases -- we

14  provide the cite here for that case -- where, you know, they

15  really say, you don't meet your burden with this sort of

16  self-serving assertion that, you know, you did something.

17  It's just simply not enough.  It's a heavy burden to meet the

18  substantial contribution.

19      The terms, also, Your Honor, what they're actually

20  asking to propose, first of all, there was, of course, no

21  disclosure of the total amount of what the coalition has

22  actually, really incurred that we've seen in the record

23  (indiscernible).  There's no restrictions on the coalition

24  seeking additional fees from the settlement trust, so on top

25  of the 40 percent contingency and on top of the $10 million

1  and on top of the 950, they're open to making an additional

2  application to the settlement trust, which they will control

3  through the RSA of governance provisions that they put in

4  place.

5          You know, the third thing about these provisions

6  are --

7          If we go back to where you were -- actually, the

8  next page.

9          The third point I would like to make is even if

10 they could make, even if they could provide these documents on

11 a going-forward basis, this is not a standard that they can

12 meet, either under 363(b) or 305(b).

13         If you can go to the next page.

14         It's like the substantial contribution cases are

15 really clear that it's, like, if you're acting in your own

16 self-interests, you do not get a fee award.  It's just not

17 what the standard is for.  Again, if that wasn't the standard,

18 everyone would apply for the fees.

19         And when Mr. Molton introduced himself to the

20 Court, he was crystal clear, you know, when the coalition was

21 brought in, what they were doing and what role they had.  And

22 what he told the Court is we are not here as a fiduciary for

23 sexual abuse victims; that's what Mr. Stang is here for and

24 that's what the TCC is for.  That's what's in his papers; in

25 fact, it's not the only time that he said it in his initial

1  papers.

2          They were representing a subgroup of claimants who

3  were heavily involved in the advertising campaign; that's why

4  they and on the advertising campaign and that's why they

5  appeared in connection with the bar date motion and advocated

6  that the order be loosened up to (indiscernible) instead of

7  claimants.

8          The notion that the debtor would now come in and

9  offer as a basis for a substantial contribution award, that

10  the coalition's role in connection with the advertising

11  campaign and resisting admitting the advertising, and that the

12  debtor would offer as a basis for the substantial contribution

13  that the coalition's effort to loosen the order to allow

14  non-claimants from signing, in light of what went wrong with

15  the proofs of claim and the abuses that are before the Court,

16  the 2004 motion, and in connection with solicitation, it's

17  just, frankly, more of a sort of testament to how the debtor

18  has fallen completely into the orbit of control of the

19  coalition and the TCC, with the RSA.

20          Both of those things were incredibly corrosive to

21  this case.  They've led to terrible abuses and they're going

22  to make the case extremely difficult to resolve.

23          But beyond that, they hurt the claimants,

24  themselves, by allowing, you know, these huge amounts of

25  proofs of claim to come in with all sorts of questionable

1  issues about it.

2          But the main point there is the advocacy that they

3  were making was in support of their constituency.  You've

4  heard from another group of Plaintiffs with a different view

5  about the merits of the claims and how they should be

6  attested.  This coalition group was the group behind the mass

7  advertising.  They have specific interest in what they were

8  trying to achieve.  It was set out.  Your Honor saw it in

9  Mr. Kosnoff's email that was turned over to the U.S. Trustee's

10  Office.  They were pursuing their own interests.

11          Because there are no documents before the Court on

12  what they did and they withheld all documents about the TDPs,

13  the Court doesn't have a record in front of it that allows

14  anyone to make an assessment about whether they were acting in

15  the interests of creditors, generally, or whether they were

16  acting (indiscernible) in advancement of their own interests.

17          If we could go to the next slide.

18          It's like we've cited in our papers, a host of

19  cases that support the proposition that the mere participation

20  in a settlement doesn't constitute (indiscernible) to

21  substantial contribution.  In large measure, when you sort of

22  cut through it all, that's what you've heard.  You've heard

23  that, you know, from the debtor and from others, and from Mr.

24  Molton, himself, that his contribution was that he did a

25  settlement, that he did the RSA.  He also put his fees in the

1  RSA, but that role of participating in a settlement, that

2  doesn't get one a substantial contribution.  It just isn't an

3  act on behalf of all creditors; it's an act upon your own

4  constituency.

5            If you'd go to the next page.

6            So, we point out here that the issue about the

7  duplication of services.  Your Honor, it's like, again,

8  because there are no documents before you, nobody can make a

9  particularized assessment of this.  The proposed order that

10 they presented to you, it doesn't even address this issue; it

11 addresses, just simply, you know, do the fees appear to be

12 reasonable, which I'm not even sure how they would apply that

13 standard.  On a substantial contribution application, you

14 would have to demonstrate that your fees were not done for

15 services that the TCC, otherwise, did.

16           And here, if you just stand back and look at the

17 big picture, the Pachulski firm has incurred somewhere in the

18 neighborhood of approximately $10 million of fees.  The

19 application by the coalition is equal to that.

20           And you heard Mr. Molton say he's a relative

21 newcomer to the case.  It's like, (audio interference)

22 questions here about whether there was massive duplication

23 between will role played by these two entities.

24           I think you heard from Mr. Whittman that they

25 actually have sort of put together their own shadow financial

1  advisor and other, some other consultant as part of this.

2  There's nothing before the Court to suggest that these are not

3  significant duplicative costs built into the estate here.

4         If we could go to the next slide.

5         The last point I would like to state is the case

6  law about what's really going on here when you pay, when you

7  embed in a settlement, an agreement, and a negotiation on what

8  to pay someone in the same agreement where you're supposed to

9  be, you know, just a zealous advocate of your own client.

10         You can go to the next slide.

11         So, Combustion Engineering is not a case that is

12  100 percent on all fours, but it's a case where the lead

13  Plaintiff lawyer in the case sought a fee from a debtor

14  affiliate in order to advocate that his services would be

15  assisting in getting the claimants to sign onto the agreement

16  in that case; in that way, it's very similar to this.

17         Mr. Rice, who's also on this case, it's like, was

18  seeking this fee in order that he go out and advocate for the

19  clients.

20         The Court, the Bankruptcy Court in Combustion

21  Engineering said, No, you can't do that; it's an obvious

22  conflict of interest.  You can't take -- it's like, your role

23  is exclusively on behalf of your client and you can't, in

24  advocating and giving legal advice to your client, you can't

25  accept money from someone else to give advice on that same

1  matter.

2          The Court rejected that (indiscernible).  It was

3  mentioned -- you know, it's been led, by the way, I will tell

4  you to a voting challenge in connection with solicitation in

5  Combustion Engineering.  Ultimately, the Third Circuit sort of

6  went a different route and found that due to the unique

7  circumstances there, they didn't need to address that.  They

8  did take on the fee issue and found that it created an actual

9  conflict of interest.

10          Let's go to the next slide.

11          In Congoleum and to the Third Circuit, to be clear,

12  it's like the Court -- it's like the issue there, there was

13  another one of these fee payments also involving Mr. Rice and,

14  you know, it was a payment by the debtor to get him to get the

15  other (indiscernible) to encourage the claimants to vote in

16  favor of a settlement and to support the settlement.  It was

17  through oddities of the case, it wasn't challenged, but when

18  the case went to the Circuit, it was mentioned in the facts

19  and the Circuit, the panel called it out and said, look, we're

20  not going to take this (indiscernible) issue because it's not

21  a challenge, but in the footnotes of the case, the Court notes

22  that, hey, in two other cases, this has been brought to us and

23  it posed a problem.

24          It's like this is going to be a lightning rod for

25  appeals; the payment of these lawyers, in connection with an

1   agreement where they're the signatories and the parties to.

2         You can go to the next page.

3         The ethics rules on this, there's a number of

4   ethics provisions that are triggered and, you know, nobody is

5   talking about here, but this is the reality of it.  It's

6   extremely unusual to have an agreement signed by a lawyer

7   committing to give legal advice and recommendations to his

8   client, paid by the adversary.  That's what's happening here.

9         And in connection with these payments that took

10  place in Combustion, it sparked a whole, like, set of

11  different legal ethics experts.  There were articles -- there

12  was a large article in the *Cornell Law Journal* and some

13  others.  We cite some of those in our papers.

14        But the range of rules it triggers is 1.7, the

15  concurrent conflict of interest where you're being sort of

16  paid by two different parties, by your adversary, while at the

17  same time you're supposed to be representing your client.

18  Rule 5.6, you know, sets out rules about what kinds of

19  settlements you can enter into and what sorts of promises you

20  can make.

21        And, you know, one of the things that's drawn an

22  ethics decision have been cases where lawyers agree to limit

23  their role as part of getting compensation, themselves, with

24  respect to advice or actions of the estate going forward.  And

25  that's, you know, that provision was specifically taken up in

1  connection with Vioxx, where there was an effort to get, as
2  part of the settlement, Plaintiffs' lawyers to agree to
3  certain things themselves and received payments in connection
4  with that.  And it generated, cited in our papers, a whole
5  series of decisions on it.
6          1.8(f) actually addresses, specifically, the
7  situations under which you can get money from someone, other
8  than Your Honor client.  And there both, has to be a waiver
9  and there has to be no interference with the lawyer's
10 independent and professional judgment.
11         Here, Your Honor, you have, actually, there were
12 (indiscernible) for the coalition, for many of the coalition
13 firms.  And in connection with solicitation, you'll see a
14 significant number of them don't have multiparty waivers and
15 so that, alone, poses a sort of problem by itself.
16         But even if they had waivers and the significant
17 question is not whether a waiver what do here, paying a lawyer
18 to sign an agreement, you know, allowing a payment to be made
19 in connection with a document the lawyer agrees to give
20 advice, you know, it's just, on its face, it's a problem.
21 It's a huge issue.
22         And go to the next page.
23         THE COURT:  So, do none of the other cases that
24 we've talked about, or examples, do they not have the
25 reimbursement provision in a RSA or in some other document

1  that's filed with the Court?

2          How are they not a problem?  How is PG&E not a

3  problem or Purdue not a problem or Mallinckrodt not the same

4  problem?

5          MR. SCHIAVONI:  Well, Your Honor, I'll answer that

6  in a few ways.  First of all, my understanding of PG&E, and my

7  colleague, Mr. Shamah, I think, may have been involved in that

8  case, is that the coalition, the ad hoc group there,

9  (indiscernible) not as part of its role, making any

10 recommendation on how to vote.  That's my understanding of

11 that decision.

12         Mr. Shamah, is that right?

13         MR. SHAMAH:  Your Honor, I think the PG&E RSA --

14 I'm sorry, my camera suddenly decided to now stop working and

15 I apologize -- but the PG&E and the RSA Mr. Molton was

16 referring to the subrogation one, was with insurance claimants

17 who, themselves, were the creditors.  So, they were going to

18 vote on the plan.  So, it had a different structure than the

19 RSA we have here.

20         There's a separate RSA, the fire victim RSA, that's

21 a different issue that did not have the same reimbursement

22 provisions.

23         MR. SCHIAVONI:  And, Your Honor, I don't know

24 exactly how Purdue was put together, but, look, I mean, as we

25 all know, if something is not opposed, almost anything can

1  happen in bankruptcy.  Like, you can get almost anything

2  agreed if there's no opposition to it, okay.

3       This is a different kind of issue on how this is

4  being set up; in fact, it's entirely like we (audio

5  interference) objections could be made.  You've seen what

6  Mr. Kosnoff has said, putting at issue the largest group of

7  claimants here.  It's like, you can well get challenges just

8  from that.

9       So, you know, I don't think that -- it's like the

10  notion that Mallinckrodt and Purdue are precedent for what's

11  right here, you know, it's like, I mean, not only are they not

12  applicable, really, or at least Purdue is, you know, or PG&E

13  is definitely not an applicable case, but these aren't

14  precedent to really, you know, that gives strong guidance on

15  really how to proceed.

16       But, you know, there is case law that addresses

17  directly what happened when an agreement signed by lawyers,

18  where they get money, what happens if that agreement is deemed

19  unethical.  And the bottom line is it's deemed voidable.

20       And I think that's what we have here.  It's like

21  these agreements are fundamentally, they're not enforceable

22  unless you enforce them against the claimants' lawyers and

23  it's like that, itself, obviously creates a tremendous

24  conflict.  So, Your Honor, it's like we have objections,

25  substantive objections to the RSA that are based on the

1  process and other issues about it, but there's at least two

2  ways and they're tied really to this (indiscernible) issue

3  that the agreement, putting aside what standard one applies,

4  it's fundamentally, you know, we think should be rejected.

5         And there's a turn on, not whether it's a strict

6  standard of entire fairness or business judgment, but just

7  that when the consideration for an agreement is entirely

8  illusory, which it is when you have signatures just by

9  lawyers, or when the agreement itself is fundamentally

10  illegal, because it's signed by lawyers who have been paid to

11  promise to give advice to their clients.

12         It's like the (indiscernible) and it should fail

13  here, Your Honor, for those reasons.  Thank you.

14         THE COURT:  Thank you.

15         Is there anyone else?

16         Mr. Buchbinder?

17         MR. BUCHBINDER:  Good evening, Your Honor.

18         Dave Buchbinder, on behalf of the United States

19  Trustee, and I will do my best, Your Honor, to be brief.

20         Irrespective of the standard that the Court finds

21  for the underlying RSA agreement, the U.S. Trustee believes

22  that Section 503(b)(3), the substantial contribution standard

23  is what should apply here if fees are going to be awarded to

24  the coalition.

25         In the moving papers that the debtor filed and in

1 the reply that the coalition filed, they rely primarily on two

2 cases to support their proposition:  the Bethlehem Steel case

3 and the Adelphia case.  Now, both of those cases predate two

4 important Supreme Court decisions decided after 2010:  the

5 RadLAX v Gateway [sic] decision and Law v Siegel.  Both of

6 those opinions stand for the same proposition; RadLAX on the

7 commercial side and Law v Siegel on the consumer side.  And

8 what do those two holdings say?

9          Those two holdings say that specific provisions of

10 the Code control over more general provisions.  So, Section

11 503(b)(3) will trump Section 363.

12          That wasn't the case in Adelphia or Bethlehem

13 Steel, but that is the evolving case now; in fact, based upon

14 RadLAX Gateway, and Law v Siegel, that's exactly how Judge

15 Dorsey ended up ruling recently in the Mallinckrodt case,

16 where he did apply a 503(b)(3) standard and, as Mr. Molton has

17 noted in his comments, they have -- Judge Dorsey did require

18 them to comply with monthly fee applications and some of those

19 provisions modified have been incorporated into the proposed,

20 revised order here, but I'll get to those in a moment.

21          Therefore, looking at a 503(b)(3) standard, you

22 need to go back a small step from there, because under

23 American law, a party seeking attorney's fees has to have a

24 right to the attorney's fee.  Those rights can arise by way of

25 a contractual agreement.  They can arise by way of a statute.

1  Or they can arise by operation of law in some other way.

2         I questioned Mr. Whittman, the debtors' financial

3  advisor, about RSA agreements, to which he indicated he had

4  some familiarity and he indicated that typically, they involve

5  either bondholders who have attorney fee rights in the

6  indenture agreements or the right to the fees is based on some

7  sort of statute.

8         We don't have that here.  When I asked Mr. Whittman

9  if the coalition had a right to its attorneys' fees, based on

10 some contractual agreement, other than the RSA, he wasn't

11 aware of any.  When I asked him if he was aware of any statute

12 upon which the claim would be based, he wasn't aware of any.

13        So, that leaves us with Section 503(b)(3) and the

14 administrative expenses.  There's no question that what this

15 agreement is proposing to pay is an administrative expense:

16 post-petition attorneys' fees that are not being incurred in

17 the ordinary course of business; they're being incurred by

18 this ad hoc group, that as the Court has noted, the tort

19 claimants already have their own independent committee and

20 they would need to show a substantial contribution to become

21 entitled to the fees.  That would be the legal basis for

22 awarding the fees.

23        All of the activities they've described and that

24 the insurers have outlined in their objections all relate to

25 the coalition representing its clients.  The coalition's

1   offers, they went out and hustled thousands of clients.  They

2   accepted the legal responsibility that is entailed when you

3   agree to represent thousands of clients in the same case.

4   That means a lot of extra work.  But that doesn't mean the

5   estate has to pay for it, unless the applicant can show a

6   substantial contribution.

7           Not only has that not been done here, but the

8   amazing testimony was that the debtor didn't even look at the

9   underlying fees.  They weren't produced.  And Mr. Whittman

10  testified, well, they're just in the same range as everybody

11  else's, so why not.

12          That's not appropriate and that's not right, and

13  the same thing applies going forward.  Now, substantial

14  contribution is an issue that is looked at, primarily,

15  retrospectively, at the end of the case.  Demanding the

16  payment of the coalition fees at this point in time will not

17  preclude them from the prospect of filing a substantial

18  contribution application at the end of the case, when we can

19  see the results.

20          If the Court is inclined to approve the RSA and

21  needs to get into the fees, the revised order that Mr. Molton

22  submitted (indiscernible) and makes some provision towards

23  monthly fees, but it also contains provisions that are

24  unacceptable.  I can go through those now, or if the Court is

25  inclined to grant the motion, we can go through those when we

1  go over the order.

2          Does the Court have a preference this evening?

3          THE COURT:  Let's wait and see how I rule on it.

4  Thank you.

5          MR. BUCHBINDER:  Okay, Your Honor.  No problem.

6          And having said that, that concludes my comments

7  about substantial compensation, but I'd like to make a few

8  closing comments.

9          Over the past several weeks and months in this

10 case, it's become apparent in reading the volumes of material

11 that the so-called global resolution plan is a total misnomer.

12 It remains aspirational.

13         What amazes me that on the first day of this case,

14 the debtor filed a plan.  The debtor filed an informational

15 statement and a plan that identified the chartered

16 organizations, the insurers, and the local councils as three

17 of the major constituencies in the case.  The debtor explains

18 to us back in February of 2020, how important the chartered

19 organizations were to the Boy Scouts of America.  The debtor

20 has tried to do that every step of the way.

21         Then, the debtor tells us how complicated the

22 chartered organizations issues are.  I don't deny any of that,

23 but that being the case, why have we learned in the past two

24 months that in 18 months, the debtor hasn't bothered to sit

25 down with its chartered organizations to determine what they

1  will accept and what they won't accept.

2         And by the same token, we have heard testimony from

3  one or more of the insurers that they've been excluded from

4  mediations or not involved in them or not invited, similar to

5  the chartered organization.  I'm sure there are some issues

6  that the insurers would work with and I am sure that there are

7  other issues that can been resolved.  And, yes, there are

8  complicated interfaces here, but they're only going to be

9  resolved if these people are sat down in groups and engaged to

10 identify their points in common and their points in

11 differences.

12        This case has been managed for 18 months as if it

13 is a bondholder case with (indiscernible) of bondholders who

14 we will individually divide and conquer until we isolate the

15 last one and paint them into a corner.

16        But all that this debtor has achieved in 18 months

17 with that velocity is painting itself into a corner with two

18 inconsistent, plan support agreements that now the Court must

19 unravel and at the cost of millions of dollars of fees.

20        If the debtor wants to achieve a truly global

21 resolution on this case in a short period of time, now is the

22 time to set aside litigation, stay it all, and organize these

23 groups and work out the issues and come back with, truly, a

24 global resolution plan, not six more months of litigation or

25 the next RSA with the chartered organizations and six more

1  months after that for the insurers.

2          It's time to roll up the sleeves, stop the

3  litigation, organize this (indiscernible), and get the job

4  done.  Thank you, Your Honor.

5          THE COURT:  Okay.  Thank you.

6          Is there anyone else?

7          MR. WINSBERG:  Your Honor, real briefly.  Harris

8  Winsberg, on behalf of the Allianz insurers.

9          Just to answer your question on does the order

10  chair the problem, I don't believe the order has

11  (indiscernible) as being applicable to the $10.5 million fee

12  request; in other words, the guardrails for restrictions on

13  scope, as well as the proposal of fee applications, interim

14  fee applications.  I don't mean that to imply the $10.5

15  million fee request.  At least that's my reading of it.  And

16  it's also, I think the debtors' reading of it in their reply

17  brief on pages 73 and 74 at Docket 5759.

18          THE COURT:  Thank you.

19          MR. WINSBERG:  And I guess the last remaining

20  question I want to point out, Your Honor, there is an

21  inconsistency between the RSA, the $10.5 million fee cap, it

22  does, in the RSA, itself, say that if there's an excess, it

23  (indiscernible) will be paid by the settlement trust.

24          But if you read the revised, proposed order in

25  paragraph 6 at the end, it's locked off.  There's no spillover

1   to the settlement trust.  There seems to be an inconsistency

2   on that point between the RSA and the proposed order.  I just

3   wanted to point that out to Your Honor.

4             THE COURT:  Thank you.

5             MR. WINSBERG:  Thank you, Your Honor.

6             MR. MOLTON:  Quick response, Your Honor?

7             THE COURT:  Yes.

8             MR. MOLTON:  And I don't know if Ms. Boelter wants

9   to respond to the last statements from the U.S. Trustee, but

10  I'm just going to go quickly, try to go very quickly, bullet

11  points over some of the things that were cited.

12            Your Honor, I didn't coin lobster ship.  It really

13  feels that -- when I was a young prosecutor in New York City,

14  one of your first assignments was to do the 12:00 midnight to

15  6:00 a.m. arraignment court shift; night court, they called

16  it.  So, we're not there yet, but we're getting there.  So, in

17  any event, it brought me back a little bit.

18            In any event, first of all, we're going to work

19  with Mr. Buchbinder.  We've worked with him in the past.  I've

20  worked with the Delaware trustee in Mallinckrodt to get things

21  done and we've worked in Purdue, as well, to get an order that

22  works.  So, to the extent that Your Honor gives me that

23  opportunity, we'll work with Mr. Buchbinder.

24            I do know that the order does talk about the, with

25  respect to the ten-million-dollar true-up, or up to $10

1  million, documented, reasonable, documented, professional

2  advisory fees.  So, in any event, there is language there that

3  would, I think -- can be the basis for satisfying some of the

4  issues.

5         I do want to note, you know, one of the things

6  that, you know, Mr. Schiavoni put up there was, you know,

7  we're only working for us.  Well, clearly, any ad hoc

8  committee that is being reimbursed for its fees has its own

9  goals in sight and here, as Your Honor knows, most of the

10  creditor class, and I think it's undisputed that we're here

11  because of the abuse survivors, the historical sexual abuse

12  that was perpetrated on these survivors.

13         But I think Your Honor can see by everything that's

14  in front of you, including the RSA, that the benefits to all

15  creditors inuring from our participation are noted there and

16  have been noted in our pleadings and have been noted in our

17  participation and some of the orders.

18         I do note, Your Honor, Mr. Schiavoni tried to go

19  after the bar date order.  It was us, Your Honor, who brought

20  to Your Honor's attention that Your Honor's bar date order

21  overrode the local rules and the Bankruptcy Rules, with

22  respect to the signature of an attorney.  Now, needless to

23  say, there are issues on that, but Your Honor was surprised

24  that that hadn't been brought to Your Honor's attention

25  beforehand.  And we brought it to Your Honor's attention and

1  Your Honor granted the order.

2          One of the buy words of the past few days is, you

3  know, the Plaintiffs have taken the pen, with control of the

4  case.  Needless to say, those are litigation tactical code

5  words.  You're going to hear them again, and again, and again,

6  Your Honor.  When Your Honor sees the evidence in front of

7  you, should we ever get -- when we get -- I don't want to say

8  "should" because we will -- when we get to our confirmation

9  hearing and deal with the TDPs, you're going to see what the

10  evidence shows, which is a very different story.

11          Indeed, Mr. Whittman, himself, as I said before,

12  said these were some of the most intense negotiations in any

13  clients I've been involved in.

14          Number three, Your Honor, Mr. Whittman's testimony

15  is replete with his analysis that he did conduct analysis of

16  the fee issue and found that the caps were reasonable in light

17  of the complexity of this case and the work that we were

18  doing.  He basically testified on page 88 that he was involved

19  with the BSA task force and the discussion on the coalition

20  professional fees, page 102.  He was responsible for

21  negotiating the coalition professional fees, page 169 to 171.

22          He stated that the copayment of the coalition was

23  discussed at numerous Board meetings, both, by myself and

24  other members of the team -- I'm just trying to shortcut, Your

25  Honor -- page 173.

1      Mr. Whittman and the debtors' counsel at White &

2 Case, again, negotiated the fee provision, testified

3 absolutely, to use Mr. Whittman's words, that officers,

4 directors, and employees of the BSA were involved in the

5 discussions regarding the coalition fee payment.  Testified,

6 page 175 to 176, that he believes that the payment of the

7 coalition's professional fees was proper and he's well aware

8 that the coalition (indiscernible), in addition to having lead

9 bankruptcy counsel, the financial advisor that has been very

10 active.  I believe, has a handful of other professionals that

11 he is interfaced with repeatedly, page 212.

12      He testified he felt it was reasonable to agree to

13 the coalition fee provision without needing invoices or other

14 supporting documents.  It was a cap that would be subject to

15 later review in authorizing the payment of the amount.  And

16 when he dealt with the 950 fee cap on page 238, he said, in

17 evaluating that, he was more interested in whether it was

18 reasonable in light of his other experiences in other cases,

19 as well as the professional spend by other groups in this

20 case.

21      Finally, page 235 to 236, the fee cap is reasonable

22 because it is within the range of what I would expect of the

23 nature of the case and the complexity of this case, and it was

24 comparison to other cases, as well as in comparison to the

25 other professional groups in this case.

1    I just want to go back to what my friend

2  Mr. Buchbinder said.  I know he may not be happy with what

3  Judge Dorsey did in Mallinckrodt or what Judge Drain did in

4  Purdue, but they both did overrule the U.S. Trustee's

5  objection, similar to the ones you've heard now, and,

6  basically approved the fee reimbursement agreements, based on

7  363.

8    And, again, to repeat Judge Dorsey, the

9  Mallinckrodt debtor met their burden of establishing the sound

10  exercise of their business judgment under 363.  That's the

11  reasoned case law around us.

12    I do want to note one thing, Your Honor.  We've

13  heard a lot, and, you know, one of the things is those of us

14  who take seriously mediation privilege when we hear points

15  that folks weren't involved, folks haven't been involved,

16  folks aren't talking.

17    I know Mr. Buchbinder has expressed his view, and I

18  don't begrudge him it because all he's heard is people, you

19  know, what I would call "grandstanding" for the benefit of the

20  Court.  You know, it's fair to say that insurers and chartered

21  organizations, Mr. Buchbinder, aren't part of the mediation

22  process; indeed, we'll be dealing with those issues going

23  forward.

24    Mr. Buchbinder says now is the time, Your Honor,

25  now is the time to get a global deal done.  We agree.  We

1  absolutely agree and we have provided this case, all the

2  mediation parties, all the RSA parties, rather, with the

3  foundation and the groundwork to do it.

4         It would be my position, Your Honor, that upsetting

5  the work that was done and getting us so go back and start

6  again, start anew, would just be a waste of time and, again,

7  as Ms. Boelter had said, fraught with danger for all sorts of

8  reasons.

9         So, at the end of this long day, Judge, again, from

10  the coalition's point of view, and I know I've taken up some

11  of the labor oar for the debtor on the business judgment issue

12  and 503(b) in connection with the fee issue, we'd respectfully

13  ask Your Honor to approve what is really a critical and

14  seminal agreement here in this case and allow us to do exactly

15  what Mr. Buchbinder urged, which the RSA parties are ready and

16  prepared to do.

17         Thank you, Judge.

18         THE COURT:  Thank you.

19         Okay.  It's 8:15.  We're going to adjourn.

20         And I guess I trust that the deposition

21  designations and exhibits have been forwarded to my chambers

22  at some point today, and I will take a look at that, and

23  consider the arguments and I will get back to you as soon as I

24  can, with respect to my decisions.

25         So, thank you very much.  It's been a long day, but

1    we're adjourned.

2              COUNSEL:  Thank you, Your Honor.

3          (Proceedings concluded at 8:15 p.m.)

4

5

6                        CERTIFICATE

7

8        We certify that the foregoing is a correct transcript

9    from the electronic sound recording of the proceedings in the

10   above-entitled matter.

11
     /s/Mary Zajaczkowski              August 17, 2021
12   Mary Zajaczkowski, CET**D-531

13   /s/William J. Garling             August 17, 2021
14   William J. Garling, CE/T 543

15   /s/ Tracey J. Williams            August 17, 2021
     Tracey J. Williams, CET-914
16

17

18

19

20

21

22

23

24

25