**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>Re:  D.I. No. 5485 |

**CENTURY'S OBJECTIONS TO THE DEBTORS'**
**DISCLOSURE STATEMENT FOR THE FOURTH AMENDED PLAN, SOLICITATION**
**PROCEDURES AND FORM OF BALLOTS**

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware  19801

O'MELVENY & MYERS LLP
Tancred Schiavoni (*pro hac vice*)
Daniel Shamah (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York  10036-6537

*Counsel for Century Indemnity Company, as*
*successor to CCI Insurance Company, as successor*
*to Insurance Company of North America and*
*Indemnity Insurance Company of North America*

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are:  Boy Scouts of America (6300) and Delaware Boy Scouts, LLC (4311).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

OBJECTIONS.......................................................................................................... 5

    I.    The Plan is Patently Unconfirmable. ................................................... 5

        A.    The Amended Plan is Unconfirmable Because it is Not Insurance Neutral.................................................................................... 6

        B.    The Collusive Plan Creates Perverse Incentives While Stripping Insurers of Their Procedural Rights, In Violation of Skinner.................. 14

        C.    The Amended Plan is Not Feasible and Would Result in Liquidation of the Debtors. .................................................... 21

        D.    The Amended Plan Unfairly Discriminates Between Unsecured Creditors.................................................................................. 25

        E.    The Plan Improperly Deprives Insurers' Rights to Object to Claims...... 28

        F.    The Third Party Releases Are Improper ................................................. 30

    II.    The Disclosure Statement Still Contains Misleading Disclosures...................... 33

    III.    The Solicitation Procedures Remain Defective and the Confirmation Schedule Is Inappropriate. ................................................... 35

CONCLUSION...................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants*,
   321 B.R. 147 (D. N.J. 2005) ................................................................ 16

*Bittner v. Borne Chemical Co.*,
   691 F.2d 134 (3d Cir. 1982).................................................................. 23

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004)................................................... 11, 12, 15, 23

*In re Indian Palms Assocs., Ltd.*,
   61 F.3d 197 (3d Cir. 1995).................................................................... 14

*In re P-R Holding Corp.*,
   147 F.2d 895 (2d Cir. 1945).................................................................. 11

*In re The Muralo Co.*,
   295 B.R. 512 (Bankr. D. N.J. 2003)...................................................... 14

*Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm. (In re Fed.-Mogul Glob. Inc.)*,
   330 B.R. 133 (D. Del. 2005) ................................................................ 23

*Raleigh v. M. Dept. of Revenue*,
   530 U.S. 15 (2000) ............................................................................... 23

**Statutes**

11 U.S.C. § 1126(c) ................................................................................ 3, 21

11 U.S.C. § 501(b) ...................................................................................... 18

11 U.S.C. § 501(c) ...................................................................................... 18

11 U.S.C. § 502(a) ...................................................................................... 18

N.J. Stat. § 2A:15-3..................................................................................... 22

**Other Authorities**

Mark D. Taylor and Scott L. Alberino, *Who Is Authorized to Vote on a Plan of Reorganization?: Issue Pending in the USG Bankruptcy Case Could Alter the Asbestos Bankruptcy Landscape*, Mealey's Asbestos Bankr. Rep. Vol. 2, #6 (Jan. 2003) ........................ 22

William P. Shelley and Jacob C. Cohn, *Unraveling the Gordian Knot of Asymptomatic Claimants:  Statutory, Precedential and Policy Reasons Why Unimpaired Asbestos Claimants Cannot Recover in Bankruptcy*, Mealey's Asbestos Bankr. Rep. Vol. 3, #10 (2004) ............. 22

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Rules**

Fed. R. Bankr. P. 3005(a) ................................................................................................. 18

Fed. R. Bankr. P. 3007 ..................................................................................................... 18

Fed. R. Bankr. P. 3018 ..................................................................................................... 18

Mod. R. Prof. Conduct 1.7 ............................................................................................... 19

Century Indemnity Company ("Century"), as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, respectfully submits the following objections to (i) the Debtors' proposed Solicitation Procedures and Form of Ballots for the Fourth Amended Chapter 11 Plan of Reorganization for Boys Scouts of America and Delaware BSA, LLC (the "Solicitation Procedures") (the "Amended Plan" or "BSA Plan") and (ii) the Debtors' proposed Disclosure Statement for the Amended Plan (the "Disclosure Statement" or "DS").[2]

## PRELIMINARY STATEMENT

The Debtors propose to do something extraordinary and unprecedented: abandon all objections to the proofs of claim and then have this Court rule that a conflicted settlement trustee controlled by the plaintiff firms has the authority to adjudicate liability for tens of thousands of tort claims while excluding the insurers from participating.  Binding Third Circuit law prohibits this result.

---

[2] *See* Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, [D.I. No. 5485] (July 2, 2021) ("Disclosure Statement"); Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC [D.I. No. 5484] (July 2, 2021) ("Amended Plan"); Solicitation Procedures [D.I. No. 2295] (Mar. 2, 2021).  Unless otherwise indicated, docket cites refer to the docket in *In re: Boy Scouts of America*, No. 20-10343 (Bankr. D. Del.), all emphasis is added, and all citations, quotations, and footnotes are omitted.
Century further joins in and incorporates by reference (i) *Certain Insurers' Supplemental Objection to Motion for Approval of Debtors' Disclosure Statement*, (ii) *Supplemental Objection of the Church of Jesus Christ of Latter-Day Saints, a Utah Corporation Sole, to Debtors Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief,* (iii) *Certain Excess Insurers' Objections to the Debtors' Proposed Confirmation Schedule*, and (iv) *Hartford's Objection To Amended Disclosure Statement For The Fourth Amended Chapter 11 Plan Of Reorganization For Boy Scouts Of America And Delaware BSA, LLC* (sections I.A, II, and III only).

The law in the Third Circuit is clear:  a plan of reorganization may not impair the rights of non-debtor insurers to defend themselves in coverage actions with non-debtor claimants.  Yet, by throwing in with the Coalition and the TCC, the Debtors propose doing just that.  Despite paying lip service to "insurance neutrality" in the Disclosure Statement, the Plan and TDPs contain numerous provisions that put the lie to that assertion:

- The Settlement Trustee, Eric Green, will not only be responsible for evaluating Abuse Claims, he will be responsible for determining the allowed liability for each claim.  In other words, the Debtors propose having an Article I court delegate judicial decision-making to an individual handpicked by the very claimants whose claims he will be adjudicating, while stripping insurers of their participation rights in the process.

- The Settlement Trustee will adjudicate and purport to determine the liability attributed to non-debtor entities.

- The Settlement Trustee, standing in the shoes of the Debtors, will abrogate key affirmative defenses, including the statute of limitations, while shielding Abuse Claims from any form of judicial scrutiny prior to allowance and payment.

- With respect to valuation decisions, the Debtors have stripped the Settlement Trustee of previously contemplated discretion to adjust claim amounts downward based on mitigating factors, causing further prejudice to insurers.

- There is no process to evaluate or investigate the validity of claims; indeed, the Settlement Trustee is barred from doing anything more than confirming that the proofs of claim include minimal allegations in support of the claim.  If they do, the claims are mandatorily allowed in full.

- The Amended Plan would expressly override anti-assignment clauses in the Debtor insurance contracts, notwithstanding the Debtors' non-profit status;

The Court is then required to find that the resulting allowed amount from this truncated process is the appropriate value and the amount for which BSA and non-debtors are liable, not merely the amount to be paid under the Plan.  There is no process to allow other parties in interest to object to invalid claims.  The obvious purpose here is to manufacture claims against third parties such as the insurers and then bar them from defending the claims.

The Amended Plan expressly provides that the Confirmation Order and Affirmation

Order will modify the terms of insurance policies, and requires a prospective finding that Allowed Claim Amounts and the procedures leading thereto are "fair and reasonable," effectively guaranteeing that claims will be allowed based on a limited evidentiary record at confirmation. The claimants will then assert that res judicata and collateral estoppel will apply, eliminating any doubt that contractual rights will be trampled.

As if these missteps were not enough, the Amended Plan would plainly violate the Third Circuit's decision in *Skinner* (and its progeny) because it is the clear product of collusion and would strip insurers of myriad procedural rights. Putting aside that the Debtors and claimant committees have brazenly excluded all other interested parties from negotiations, facially the Amended Plan bears all the hallmarks of collusion. For example, the expedited distribution mechanism would open the door to thousands of fraudulent or otherwise invalid claims receiving $3,500 payments without any scrutiny whatsoever, all while excluding insurers from the claims resolution process.

The Amended Plan offers no mechanism for eradicating time-barred claims from the resolution process, including those claims opting into expedited distribution. The funneling of all Abuse Claims to the Settlement Trust, where they will be administered by the Settlement Trustee—an individual hand-selected by the Abuse Claimant Representatives who will be supervised exclusively by the Abuse Claimant Representatives—will offer an entirely rigged procedural process for claimants, while depriving insurers and the non-debtors whose liability is set by this process of procedural safeguards commonly afforded in a mass bankruptcy.

And as part of this collusive scheme, the Plan purports to bar the insurers from objecting to claims. In doing so, it improperly strips them of rights guaranteed by Bankruptcy Code Section 502(a). These features collectively create a dynamic that the Third Circuit resoundingly

rejected in *Skinner*, where due process protections and procedural safeguards were "relaxed" by the plan in favor of a "procedurally much more favorable" plan for claimants.

The Disclosure Statement describes a plan that is also unconfirmable for a host of other reasons, including that (i) it is not feasible and would result in the Debtors' liquidation; (ii) it discriminates unfairly between unsecured creditors; (iii) it deprives insurers' of their right to object to claims; (iv) it contains improper third party releases, and (v) it contains numerous misleading disclosures—all described in greater detail below. Each of these flaws independently renders the Disclosure Statement inadequate.

Finally, the Court cannot authorize solicitation until a full investigation is undertaken into the process by which the proofs of claims were submitted in these cases. In January, Century requested permission to pursue discovery from claimant lawyers pursuant to Rule 2004. The recent Rule 2019 disclosure by Kosnoff Law underscores the importance of granting the relief Century, Hartford and a host of other insurers sought. In that disclosure, Mr. Kosnoff admits to running a public relations campaign to sign up legally invalid claims and confirms the other evidence before the Court that attorney signatures were copied and pasted onto proofs of claim without authorization from either the client or the lawyer. Mr. Kosnoff claims to represent over 15,000 abuse claims; the fraud he revealed taints the claim pool and, simultaneously, is likely the tip of the iceberg. The Court cannot green-light solicitation under such a shadow.

There are other problems with the solicitation procedures. The so-called Master Ballot Solicitation Method threatens greater harm now that the "no questions asked" expedited payment has increased to $3,500. On top of this, BSA has promised to pay the fees of the Coalition whose lawyers have in turn promised as part of the same agreement to "recommend and advise" that their clients vote "yes." Under the Solicaiton Procedures, it is these plaintiff lawyers who

will be signing the "Master Ballots" and not their claimant clients. The RSA and Solicaiton

Procedures were designed to work hand an glove in this manner tainting the vote.

The Debtors are engaging in blatant vote-buying, and have now sweetened the deal.

What's more, the Debtors have delegated the task of policing the solicitation process to the very

parties who engaged in questionable conduct to begin with—the claimants' attorneys—and have

watered down the few safeguards that were in place. The only purpose for these changes is to try

and "control the vote" with illegitimate claims and a conflicted voting process. For these reasons

and others, the Solicitation Procedures and Confirmation Schedule must be rejected as explained

in Century's separately filed *Objections to the Debtors' Solicitation Procedures and Form of

Ballots* [Dkt No. 3857].

## OBJECTIONS

## I.    The Plan is Patently Unconfirmable.

This Court should not approve the Disclosure Statement because the Amended Plan is

patently unconfirmable. The Third Circuit held in *In re American Capital Equipment, LLC*, 688

F.3d 145 (3d Cir. 2012) ("*Skinner III*"), "that a bankruptcy court may address the issue of plan

confirmation where it is obvious at the disclosure statement stage that a later confirmation

hearing would be futile because the plan described by the disclosure statement is patently

unconfirmable." *Id*. at 154; *see also In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D.

Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement ... if

the plan could not possibly be confirmed."); *In re Felicity Assocs.*, 197 B.R. 12, 14 (Bankr. D.

R.I. 1996) (same); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) (same); Lawrence P.

King, 7 Collier on Bankruptcy ¶ 1125.03[5] (15th Ed. Rev. 2004) ("most courts will not approve

a disclosure statement if the underlying plan is clearly unconfirmable on its face"). "A plan is

patently unconfirmable where (1) confirmation defects cannot be overcome by creditor voting

results and (2) those defects concern matters upon which all material facts are not in dispute or

have been fully developed at the disclosure statement hearing." *Skinner III*, 688 F.3d at 154–55.

Here, the Amended Plan is patently unconfirmable for a host of reasons, including

because it (a) is not insurance neutral; (b) undercuts any incentive to pursue claims objections,

while stripping away key procedural safeguards belonging to insurers; (c) is not feasible and

would thus result in liquidation of the Debtors; (d) unfairly discriminates between unsecured

creditors; (e) improperly deprives insurers of their right to defend, settle, and object to claims;

and (f) grants improper third party releases.

###### A.     The Amended Plan is Unconfirmable Because it is Not Insurance Neutral.

The Amended Plan cannot be confirmed because it would strip insurers of their

contractually-guaranteed participation rights while demonstrably increasing the magnitude of

liability insurers face.  In *Combustion Engineering*, the Third Circuit held that insurance

neutrality requires a plan to protect "the prepetition rights and obligations of both the debtor and

the insurers under the Plan by preserving for 'any Entity . . . any and all claims, defenses, rights

or causes of action' under subject insurance policies and settlements." *In re Combustion Eng'g,

Inc.*, 391 F.3d 190, 218 (3d Cir. 2004); *accord In re Pittsburgh Corning Corp.*, 453 B.R. 570,

584 (Bankr. W.D. Pa. 2011) ("A plan is considered to be insurance neutral if it neither increases

an insurer's pre-petition obligations nor impairs its pre-petition contractual rights under the

subject insurance policies").  This holding derives from the common sense principle that a debtor

should not be able to misuse its bankruptcy proceeding to rewrite prepetition contracts to the

detriment of its non-debtor counterparties.  *See, e.g.*, *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311

(1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual

obligations of parties"); *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("[B]ankruptcy courts

do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms."); *Moody v. Amoco Oil Co*., 734 F.2d 1200, 1213 (7th Cir. 1984).[3]

Courts in this Circuit routinely reject plans that contravene principles of insurance neutrality.  For example, courts considering plans proposed by mass tort debtors have held that such plans were not insurance neutral—and thus denied confirmation of such plans—in the following situations:

- The insurance provisions in the plan were ambiguous.  *See, e.g.*, *Pittsburgh Corning*, 453 B.R. at 584 ("[W]e find the Modified Third Amended Plan to be unconfirmable because of the proposed Channeling Injunction and the lack of clarity regarding insurance neutrality").

- The real world impact of the plan would be to rewrite the terms of the insurance policies. *Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 677 F.3d 869, 887 (9th Cir. 2012) (finding plan was not insurance neutral because it "allow[ed] direct actions against [non-settling insurers]," "allow[ed] the trust to pay out claims according to the trust distribution plan and then [] seek indemnification from [non-settling insurers]," "terminate[d] [non-settling insurers]' ability to collect claims from settling insurers," and "affect[ed] the nature of [non-settling insurers]' contracts with [the future claimants' representative]").

- The impact of the bankruptcy proceeding would materially alter the quantum of liability insurers would be subject to under their insurance policies. *See, e.g.*, *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011) ("'Insurance neutrality' is a meaningful concept where, as in *Combustion Engineering*, a plan does not materially alter the quantum of liability that the insurers would be called to absorb.").

Here, the Amended Plan is not insurance neutral because it (i) impermissibly overrides anti-assignment clauses in debtor insurance contracts; (ii) fundamentally alters insurers' rights relating to claims resolution while dramatically increasing the quantum of insurer liability, and

---

[3]    *See also Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) ("The estate cannot possess anything more than the debtor itself did outside bankruptcy" under the terms of a prepetition contract. . . . Whatever limitations on the debtor's property apply outside of bankruptcy apply inside bankruptcy as well.  A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either.") (internal quotation marks, alterations, and citations omitted).

(iii) gives preclusive effect to the Confirmation Order and Affirmation Order to modify the terms

of, and the rights and obligations under, an insurance policy.

     ***The Amended Plan Unlawfully Overrides Anti-Assignment Clauses.***   The Amended

Plan impermissibly seeks to assign Century's insurance contracts—both with the Debtors and the

non-debtor Local Councils—to a Settlement Trust, in violation of the applicable terms of those

contracts.   Moreover, Bankruptcy Code Section 1129(a)(16) provides that transfers of property

by ***non-profits*** must be made "in accordance with any applicable provisions of non-bankruptcy

law."   *See also* COLLIER ON BANKRUPTCY ¶ 1129.02[16] (16th rev. ed. 2021) ("Congress was

clear that this provision was meant to restrict the authority of a trustee to use, sell, or lease

property by a nonprofit corporation or trust.").   Bankruptcy Code section 541(f) similarly

provides that a non-profit may transfer property of the estate to another non-profit, "but only

under the same conditions as would apply if the debtor had not filed a case under this title."   To

Century's knowledge, no court has permitted a non-profit debtor to ignore this provision to

override the anti-assignment clause in an insurance contract without the insurer's consent.[4]

Because Century's insurance contracts prohibit assignment to anyone else, the "Insurance

Assignment" is thus impermissible and the Amended Plan unconfirmable.

     Moreover, because the Debtors are a non-profit organization, they cannot rely on caselaw

permitting assignment of insurance contracts by ***for-profit*** debtors.   *See In re Federal-Mogul*

---

[4]    The cases the Debtors cite in their Reply to the RSA objections [Docket No. 5961-1 at ¶¶ 38-40] do not hold otherwise, as each simply found that the plan at issue complied with applicable non-profit law. *See In re Machne Menachem, Inc.*, 371 B.R. 63, 66-8 (Bankr. M.D. Pa. 2006) (plan complied with New York non-profit law); *In re Roman Catholic Archbishop of Portland in Or.*, 2007 Bankr. D. Or. Apr. 13, 2007) (plan did not violate Oregon non-profit law); *In re Albert Lindley Lee Mem'l Hosp.*, , 2010 Bankr. LEXIS 4148, at *15–16 (Bankr. N.D.N.Y. July 15, 2010) (directing debtors in confirmation order to comply with New York non-profit law).

*Global Inc.*, 385 B.R. 560, 567 (Bankr. D. Del. 2008), *aff'd*, 684 F.3d 355, 382 (3d Cir. 2012).[5]

Indeed, such an argument cannot hold when it comes to non-profit debtors, for which Congress

expressly found that all transfers of property—including insurance contracts—must comply with

applicable non-bankruptcy law.  Moreover, the Amended Plan compounds this defect by seeking

to assign the insurance contracts of *non-debtors* too.  Again, no court has ever permitted such an

assignment without an insurer's consent.

> ***The Amended Plan Fundamentally Alters Insurers' Rights While Dramatically
> Increasing the Quantum of Insurer Liability.***  The Amended Plan fundamentally changes

insurers' rights concerning claims resolution, which in this case will drastically increase the

quantum of insurer liability.  By abandoning all objections to the proofs of claim and then

channeling all Abuse Claims to the Settlement Trust administered by the Settlement Trustee, the

Trust Distribution Procedures will significantly alter how Abuse Claims are liquidated by (i)

liquidating Abuse Claims almost exclusively by the pronouncements of a conflicted Settlement

Trustee rather than litigation—thus shielding such Abuse Claims from any judicial scrutiny prior

to allowance and payment thereof—and (ii) completely removing any Non-Settling Insurer's

rights to meaningfully participate in the Abuse Claim resolution process.  This feature would

fundamentally change the rights of any non-settling insurer with respect to the resolution of

claims.  Not only would over 84,000 Abuse Claims be channeled from the tort system to

resolution by the Settlement Trust, but no Non-Settling Insurance Company would have the right

to consent to or even participate in the decision to make any settlement offers or the size thereof

---

[5]    In their reply to the RSA objections, the Debtors have argued that *Federal Mogul* supports
them because it did not distinguish between for-profit and non-profit debtors.  Of course,
the Third Circuit had no reason to draw that distinction, as that case did not involve a non-
profit debtor.

prior to payment, notwithstanding a number of conflicting provisions in the insurance policies, such as the duty to cooperate, an insurer's rights to assume and control the defense, and an insurer's ability to challenge a settlement to which it did not consent.

Instead, under the TDPs, substantially all Abuse Claims shall be liquidated by a summary determination by the Settlement Trust rather than litigation before a court, and all determinations are to be made solely by the Settlement Trustee—Eric Green, an individual selected by the Claimant Lawyers themselves[6]—based on pre-determined Claims Matrix values.  *See* TDPs Article VII.B-G; *id*. Article IX.A-C.  The Settlement Trustee is subject only to the supervision of the Settlement Trust Advisory Committee, which will consist exclusively of Claimant Lawyers. Non-Settling Insurance Companies' rights appear to be limited to receiving information sufficient to let them make a coverage determination under the TDPs.  *See* TDPs Article X.

Making matters worse, to attract the claimants' support for the Amended Plan, the Debtors have stripped the TDPs of various protections that would provide the Settlement Trustee with discretion to adjust an "Allowed Claim Amount" downward based on certain mitigating factors.  These changes include:

- deleting language that potential mitigating factors "are not limited" to those listed in the TDPs, such that the Settlement Trustee, arguably, no longer has the discretion to reduce recoveries for mitigating factors not explicitly listed in the TDPs;

- deleting incomplete or suspicious evidence as a mitigator factor and the requirement that "[i]f the Settlement Trustee believes the evidence provided is deliberately false or misleading," the Settlement Trustee must apply a Scaling Factor of 0; and

- deleting lack of knowledge on the part of a Protected Party that an alleged perpetrator was likely to commit acts of abuse as a mitigating factor.[7]

---

[6]    *See* Article I.A.(227).
[7]    *Compare* [D.I. 5372-1] at 144-47 *with* TDPs Article VIII.E.

Thus, not only does the Amended Plan strip insurers of their right to participate in

settlements, it deprives the appointed Trustee of expressly-contemplated discretion necessary to

defend against fraudulent, weak, or otherwise invalid claims.  Consequently, the overall quantum

of liability that insurers face will dramatically increase.

The quantum of liability under the Amended Plan will also increase because of the

remarkable increase in claims.  Currently, the Amended Plan contemplates a 5,000% increase in

claims (1,700 expected claims compared to 82,550 now).  Compared to *In re Global Indus.*

*Techs., Inc.*, 645 F.3d 201, 207 (3d Cir. 2011)—where the court described a potential 2,700%

increase in claims as "staggering[]"—the increase in this case is more egregious.  Such an

extreme increase bears no relationship whatsoever with the prepetition rate at which claims

against the Debtors were increasing prior to the Petition Date. Indeed, according to the Debtors,

as of the Petition Date, they were subject to only 275 Abuse Claims.  *See* Debtors' Informational

Brief [D.I. 4].

This increase in liability is underscored by the Debtors' acknowledgment in the

Disclosure Statement that they believe at least 72% of the filed Abuse Claims are "presumptively

barred" and 11% are otherwise not entitled to compensation.[8]  And this figure fails to account

---

[8]    Disclosure Statement  Article V.N.:

> While there are approximately 82,500 unique, timely Abuse Claims*, the majority of*
> *these are presumptively barred* and many more fail to provide key information that
> would be necessary to establish payment within the tort system or potentially under
> the Trust Distribution Procedures and Settlement Trust Agreement. ***Within this set,***
> ***Bates White focused its valuation on the approximately 14,000 claims that are not***
> ***presumptively barred*** and identify, by name, either in full or in part, an alleged
> abuser. These claims are the most similar to those that were resolved by the BSA,
> often in conjunction with its Insurance Companies, prior to these Chapter 11 Cases.
> There are multiple reasons, however, why the eventual number of compensable
> Abuse Claims could differ from this current core Claim count.

for any effect that the discovery requested in January by Hartford and Century concerning illegitimate claims [D.I. 1972, 1975]—which has not yet begun—might have.  If the Debtors are correct, then over 68,500 claims are not entitled to compensation.  The holders of such presumptively barred and/or invalid claims can be expected to elect the Expedited Distribution and receive their Allowed Claim Amount of $3,500 from the Settlement Trust.  If that occurs, the Settlement Trust will pay over $239 million on account of alleged Abuse Claims that are not entitled to compensation.  This, combined with the Amended Plan's requirement that all Allowed Claim Amounts and the procedures leading thereto are "fair and reasonable," amount to an attempt by the Debtors and Abuse Claimant Representatives to bind the Debtors' insurers to pay **over $239 million in liability claims** that are not subject to review by anyone—not even the Abuse Claimant Representatives' handpicked Settlement Trustee.

Accordingly, the potential increase in the quantum of insurer liability under the Amended Plan would be unprecedented, rendering the plan far from insurance neutral.  *See In re Global Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011) (reversing confirmation where plan "staggeringly increased" the insurers' "pre-petition liability exposure" and was thus not insurance neutral); *see also In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("[B]ankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms.").

***The Amended Plan's Preemption and Rewriting of Insurance Policies.***  The Amended Plan also contravenes the insurance neutrality doctrine because the Debtors have removed all protective neutrality language that was present in prior iterations of the Amended Plan, and the Amended Plan now expressly provides that the Confirmation Order and Affirmation Order may

modify the terms of, and the rights and obligations under, an Insurance Policy.  *See* Amended

Plan Article X.M.1 ("Except for … the Confirmation Order or the findings made by the District

Court in the Affirmation Order, nothing in the Plan shall modify, amend, or supplement, … the

terms of any Insurance Policy").  Further, the Amended Plan virtually guarantees that such

modification will in fact occur because it requires, as conditions precedent to confirmation of the

Amended Plan:

- a finding by the Court that the BSA Plan, the Plan Documents (including the Global Resolution Plan TDPs), and the Confirmation Order are binding on all parties (see Amended Plan Article IX.A.3); and

- a prospective finding that any Allowed Claim Amount as determined by the Settlement Trustee in the Settlement Trustee's sole discretion is "fair and reasonable" based on the evidentiary record offered to the Court, whether or not such Allowed Claim Amount is, in fact, "fair and reasonable." *Id.* Article A.3(q).

Essentially, the Debtors ask this Court to green-light any and all Allowed Claim Amounts

based on the evidentiary record at the time of confirmation, even though the settlement of the

Abuse Claims will occur in the future, sometimes years after confirmation.  And, for claimants

who choose expedited distribution (discussed in greater detail below), the Amended Plan would

green-light allowance of time-barred claims without any scrutiny, in violation of Bankruptcy

Code section 502(b)(1), which prohibits allowance of proofs of claim that are "unenforceable

against the debtor."  *See In re W.R. Grace & Co.*, 626 B.R. 217, 235 (Bankr. D. Del. 2021) ("The

expiration of the statute of limitations on a claim is a common rationale for disallowing a claim

under 11 U.S.C. § 502(b)(1).").

Consequently, confirmation of the Amended Plan would require preemption of a

multitude of contractually bargained-for rights, including an insurer's right to consent to any

settlement, an insurer's rights to assume the defense, and an insurer's ability to challenge a

settlement to which it did not consent.  It is thus impossible to know whether an Insurance

Company will be precluded from arguing that (i) the amount of any settlement is not reasonable, (ii) the Debtors' conduct breached their cooperation obligations, or (iii) the Trust Distribution Procedures deprive the Insurance Company of its right to assume the defense of any Abuse Claim. The inclusion of these ambiguous and seemingly conflicting provisions preclude a finding that the Amended Plan is insurance neutral.

And although the Amended Plan includes language purporting to preserve the rights of Insurance Companies, the above-described language makes it impossible to know whether and to what extent any Insurance Company's rights are actually preserved. Article X.M1 and N.1 purport to preserve the rights of Insurance Companies, stating that such sections preempt anything else "in the Plan" and anything else "contained in the Plan Documents, including the Plan, the Confirmation Order, and the Affirmation Order." But subsequent language in these Articles explicitly preempt the entirety of the Insurance Provisions. Indeed, Article X.M.3 provides:

> ***Nothing*** in this Article X.M is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Person.

This provision casts doubt upon the earlier stated protective language concerning amendments to the insurance policies. If a subsequent court deciding coverage litigation issues later determines that the Confirmation Order or any related documents should be given preclusive effect, then it is unclear whether the provisions purporting to preserve the rights of Insurance Companies will apply at all.

### B.    The Collusive Plan Creates Perverse Incentives While Stripping Insurers of Their Procedural Rights, In Violation of *Skinner*

Where, as here, a proposed plan is the product of collusion and would undercut a debtor's incentive to defend against claims while stripping the insurers of their procedural rights, that plan

is patently unconfirmable.  *See In re American Capital Equipment, Inc*., 405 B.R. 415, 422–23 (Bankr. W.D. Pa. 2009) ("*Skinner I*"), *aff'd sub nom. Skinner Engine Co. v. Allianz Global Risk U.S. Ins. Co*., 2010 WL 1337222, at *1 (W.D. Pa. Mar. 29, 2010) ("*Skinner II*"), *aff'd sub nom. Skinner III, LLC*, 688 F.3d at 158–160 (explaining that proposed settlement embodying the proposed plan had "not been entered into in good faith" where, under its terms, the debtor was "nothing but financially incentivized to sabotage its own defense" and where "due process protections/procedural safeguards afforded to the Insurers … [had] been relaxed by relevant terms of the … Plan.").

For example, in *Skinner I*, the debtor and the asbestos claimants proposed—over the objection of the insurers—to enter into a settlement that would have permitted asbestos claimants, rather than pursuing court litigation, to resolve their claims by opting into an alternative dispute resolution process, which on its face was "indisputably procedurally much more favorable [than court litigation] and, thus advantageous to the Asbestos Claimants' cause." 405 B.R.. at 422.  Further, "[i]n return for the opportunity to take advantage of" the alternative dispute resolution process, the asbestos claimants were required "to give to the [d]ebtor 20% of any insurance proceeds that the Asbestos Claimants would obtain from the Insurers if, and to the extent that, they prevail on their claims," which the debtor would use to pay its creditors.  *Id.* The bankruptcy court surmised that, in light of the significant procedural advantages accorded to the asbestos claimants, such claimants were "eminently more than happy" to agree to this arrangement.  *Id.*  Finally, because the debtor would only receive the 20%  "surcharge" if the debtor's defense of such claims proved unsuccessful, "the [d]ebtor [was] nothing but financially incentivized to sabotage its own defense or, more aptly, the Insurers' defense of itself vis-à-vis the Asbestos Claims."  *Id*. at 423.

15

The court rejected the plan, finding that it was "the result of patent collusion" between the debtor and the claimants, and that it was "no[] surprise[] to see the extreme extent to which due process protections/procedural safeguards afforded to the Insurers" had "been relaxed by relevant terms of the Fifth Plan." *Id*. at 422–23.  The court observed, "there is really no valid reason for the [d]ebtor to even care if the Asbestos Claims get settled"; even if they were settled, any excess judgment beyond what is covered by insurance would be "worthless" because, inter alia, "the [d]ebtor is in bankruptcy" and would not have pay on any judgments. *Id*. at 422–23. Accordingly, the court concluded, the debtor "wishe[d] to settle for one reason"—"to obtain the 20% Surcharge." *Id.* at 423.  Indeed, the debtor "hope[d] that its defense—or, more aptly, the Insurers' defense of itself—[would] be unsuccessful, given that such defense must fail in order for the [d]ebtor to obtain such surcharge," and the proposed plan was simply an attempt "to facilitate [such] defeat." *Id*.

On appeal, the district court affirmed, finding "no error, let alone a clear error," with the bankruptcy court's determination, including that the proposed plan "was the result of collusion between the [d]ebtor and the asbestos claimants." *Skinner II*, 2010 WL 1337222, at \*1.  The Third Circuit also affirmed, finding that the plan was not proposed in good faith because "it establishe[d] an inherent conflict of interest," namely, a system in which the debtor would be "financially incentivized to sabotage its own defense." *Skinner II*, 688 F.3d at 158.  The court observed that "[a]lthough settlements will be controlled by a Plan Trustee with no financial interest in the outcome of the proceedings, it is not as if [debtor] can entirely remove itself from the process," because "these settlements [would] require [debtor]'s involvement in both defense and discovery." *Id*. at 158–59.  Because this "inherent conflict of interest" undercut any incentive to defend against the claims, the plan failed § 1129(a)(3)'s good faith requirement. *Id*.

The same concerns loom here.  The Amended Plan proposed by the Debtors has all the hallmarks of collusion, with several of its key features—described in greater detail below—demonstrating that for the same reasons the court rejected the proposed plan in *Skinner*, the Court should likewise reject the Debtors' Amended Plan here:

**The Expedited Distribution Mechanism.**  The first hallmark of collusion between the Debtors and the claimants is the Expedited Distribution Mechanism, a feature of the Amended Plan that amounts to nothing more than brazen vote-buying.  Under the Amended Plan, claims filed by claimants who opt for the expedited distribution mechanism will face virtually no scrutiny or analysis whatsoever—a process even more "procedurally … favorable" than the process contemplated in Skinner, and certainly "advantageous to the" claimants' cause.  *Skinner I*, 405 B.R. 415 at 422.  Indeed, a holder of Direct Abuse Claims may elect to receive an "Expedited Distribution" of $3,500 so long as the holder has timely filed a non-duplicative proof of claim personally signed by such holder under penalty of perjury.  *See* TDPs Article VI.A.  Neither the Amended Plan nor the TDPs require the Debtors or the Settlement Trustee to evaluate the validity of the asserted claims, including whether they are time-barred or otherwise invalid under applicable state law.

The lack of scrutiny is particularly problematic given the Debtors' statement in the Revised Disclosure Statement that they believe at least 83% of the pool of Abuse Claims are "presumptively barred."  Disclosure Statement  Article V.N.  The Debtors do not even bother to conceal this feature; the TDPs provide that the "Abuse Claimants that elect to receive the Expedited Distribution will ***not*** have to submit any additional information to the Settlement Trust in order to receive payment of the Expedited Distribution."  TDPs Article VI.A.  Thus, not only will Debtors not be incentivized "to cooperate[] in its defense," there simply will be no defense.

*Skinner III*, 688 F.3d at 159.  And, presuming holders of such "presumptively barred" claims are rational economic actors, these claimants will of course be "eminently happy" to elect such expedited distribution, given that the alternative is to receive $0.  *Skinner I*, 405 B.R. 415 at 422.

The Debtors attempt to defend the Expedited Distribution Mechanism by analogizing it to a "convenience class."[9]  This analogy is a perversion of the purpose of convenience classes. "Convenience classes" are typically used for small unsecured claims to avoid the administrative burden of reviewing claimants for whom a recovery would otherwise be *de minimis*.  *See, e.g.*, *In re Autterson*, 547 B.R. 372, 393 (Bankr. D. Colo. 2016) (explaining that the "administrative convenience class" is akin to a "small fry" class, where "[t]he idea is that the claims are so numerous and so small that it would cause an administrative headache … to deal with the claims in the normal distribution process."); *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. BAP 1994) ("Generally, an administrative convenience class is one where the claims are so small in amount and large in number as to make dealing with them burdensome.").  Here, the Expedited Distribution Mechanism is not reserved for "smaller claims"; rather, by offering an expedited payment, no questions asked, it will invariably be invoked by holders of ***invalid*** claims who would otherwise have no legal entitlement to a payment.  This scheme is thus "the result of patent collusion," and renders the Amended Plan unconfirmable.  *Skinner*, 405 B.R. at 422–23.

***The Allowance of Time-Barred Claims.***  Second, the Amended Plan would compensate time-barred claims with no scrutiny, further underscoring the procedural advantage claimants get out of this deal.[10]  Under the BSA  Plan, any Direct Abuse Claim for which a proof of claim was filed before the Bar Date or otherwise determined to be timely by the Bankruptcy Court is

---

[9]    See Ex. A, Whittman Dep. Tr. at 96:11–97:3.
[10]    The TDPs contemplate that such claims will be paid out, albeit at a reduced rate.

deemed a "timely submitted" Abuse Claim Proof of Claim, without any further action by the Abuse Claimant and regardless of whether the Direct Abuse Claim would be time-barred or otherwise invalid under applicable state law.  *See* TDPs Article VI.A.  As explained, this lack of scrutiny is highly problematic given the Debtors' acknowledgement that they believe at least 83% of the pool of Abuse Claims are "presumptively barred."  Disclosure Statement Article V.N.  If the Debtors are correct, then this will mean that over 68,500 claims (83% of 82,550) are not entitled to compensation.  Thus, if holders of such claims are economically rational, they will choose the Expedited Distribution and receive $3,500 from the Settlement Trust, meaning the Settlement Trust will pay over $102 million on account of presumptively barred Abuse Claims.

The same concerns that led the court in *Skinner I* to reject the proposed plan exist here; claimants who would be entitled to nothing in the court system will naturally be "eminently happy" to vote in favor of this plan.  *Skinner I*, 405 B.R. at 422.  Likewise, the Debtors (i) are assured votes in favor of their preferred plan in exchange for this highly favorable treatment, (ii) have no incentive to cooperate in the pursuit of objections to claims that are presumptively invalid, and (iii) move one step closer to their goal of emerging expeditiously from bankruptcy.  Meanwhile, and as further explained below, the insurers are deprived of any opportunity to participate in the claims resolution process, let alone consent to any settlements.  Simply put, this proposal is "the result of patent collusion" between the debtor and the claimants, and should, accordingly, be rejected.  *Skinner I*, 405 B.R. at 422–23.

**The Amended Plan Strips Insurers of Key Procedural Rights.**  Third, the Amended Plan is the product of collusion because it would significantly increase the quantum of insurer liability while stripping insurers of their contractually-guaranteed participation rights, as described above.  Indeed, by channeling all Abuse Claims to the Settlement Trust administered by the Settlement

Trustee—an individual the Abuse Claimant Representatives handpicked—the Trust Distribution Procedures will significantly alter how Abuse Claims are liquidated. Abuse Claims will be liquidated almost exclusively by settlement rather than litigation, and all settlement offers are to be made solely by the Settlement Trustee based on pre-determined Claims Matrix values. *See* TDPs Article VII.B-G; *id.* Article IX.A-C. This process will shield Abuse Claims from any judicial scrutiny prior to allowance and payment, and will completely strip Non-Settling Insurers of their rights to meaningfully participate in the Abuse Claim resolution process. What's more, the Debtors have stripped the TDPs of various protections that would provide the Settlement Trustee with discretion to adjust an "Allowed Claim Amount" downward based on certain mitigating factors, such as adjusting claim values downward because of incomplete or suspicious evidence.

This dynamic is reminiscent of the proposal in *Skinner I*, under which the debtor was not "financially incentivized" to defend against claims, and, in fact, "there [was] really no valid reason for the [d]ebtor to even care" if the claims got settled. *Skinner I*, 405 B.R. at 423. Likewise here, the Debtors will have no real reason to care about the fate of Abuse Claims—nor the discovery necessary to defend against such claims. And, as in *Skinner*, where the court denounced the "extreme extent to which due process protections/procedural safeguards afforded to the Insurers" had "been relaxed by relevant terms of the" plan, *Skinner I*, 405 B.R. at 422–23, the TDPs here would override the express terms of insurance policies and deprive insurers of their bargained-for rights, such as the right to challenge a settlement, or even to participate in the process. Non-Settling Insurance Companies would thus be denied any role in determining whether to make a settlement offer—and in what quantum—to satisfy any Abuse Claim. Such

"relaxing" of procedural safeguards, coupled with the perverse incentives created for the Debtors and claimants, render the "collusion" "readily apparent." *Skinner I*, 405 B.R. at 421.

### C.    The Amended Plan is Not Feasible and Would Result in Liquidation of the Debtors.

The Amended plan is not feasible because the protections ostensibly afforded by the Amended Plan are illusory.  Under Bankruptcy Code section 1129(a)(11), a plan cannot be confirmed if confirmation would likely be followed by a liquidation of the debtors. *See In re Paragon Offshore PLC*, No. 16–10386, 2016 WL 6699318 (Bankr. D. Del. Nov. 15, 2016) (denying confirmation because plan was not feasible when debtors failed to show they could meet liquidity projections).  That is precisely what would happen here.

Under the Amended Plan, the same exact claims that are ostensibly resolved against BSA may be brought against the Chartered Organizations.  Throughout these bankruptcy proceedings, the Debtors have repeatedly noted the importance of their partnerships with the Chartered Organizations, stating, for example, at the July 7 status conference that, "[w]ith respect to the other [non-LDC] Chartered Organizations, we value them as go-forward partners.  They are essential.  They [are the] lifeblood of scouting." Ex. B, July 7, 2021 Hr'g Tr. at 68:2-4.  Indeed, the Chartered Organizations are the source of the Debtors' revenues, accounting for the "vast majority" of scouts, without whom the Debtors would have no revenue and would be unable to operate.  Yet, the Amended Plan fails to provide any protections from Abuse Claim liability for these organizations that are so critical to the BSA's operations.  The Debtors candidly acknowledge that without a third-party release and a channeling injunction, the Chartered Organizations face a "deluge of lawsuits" that jeopardize the Debtors' continued operation.[11]

---

[11]    *See* Ex. A, Whittman Dep. Tr. at 117:7–15 ("[S]o the vast majority of the – the membership would have some association with a chartered organization as a result of that structure."); *see also* Ex. C, Mosby Dep. Tr. at 194:2–25 ("Again, today – under the current model of the BSA,

The resulting litigation exposure the Chartered Organizations face as a result of being left out of the channeling injunction will undermine the Debtors' mission, inevitably lead to the liquidation of the Debtors, while at the same time precluding insurer settlements.

What's more, under the Amended Plan, the Debtors are prohibited even from treating the Chartered Organizations' Indirect Abuse Claims equally with Direct Abuse Claims, let alone from including any protections for Chartered Organizations of the type the Debtors have secured for their affiliates, without the unanimous consent of the Abuse Claimant Representatives. If all the Abuse Claimant Representatives do not consent to such releases (and, therefore, the Chartered Organizations remain subject to litigation in the tort system), any of the contribution or indemnity claims the Chartered Organizations may hold against the estate will be expressly subordinated to the recoveries of Direct Abuse Claimants, despite the fact that the Debtors believe nearly all Direct Abuse Claims are either presumptively or otherwise not entitled to recovery from the estate. *See* Disclosure Statement § V.N.

Such treatment has not gone unnoticed, as the Roman Catholic Ad Hoc Committee and United Methodist Ad Hoc Committee have filed objections to the RSA and have announced their opposition to the Amended Plan.[12] Together, the Catholic and Methodist Chartered Organizations contribute approximately one third of the Debtors' remaining membership. [Docket No. 5676 at 6.]. Some representatives of the Methodists, who collectively represent

---

chartering organizations are where a vast majority of the membership comes from."); Ex. D, Ownby Dep. Tr. at 75:8–11 ("So if all 40,000 chartered organizations minus the LDS church were to withdraw and not have – we would not have locations for scouts to meet, would that have an economic impact to the scouts? Yes.").

[12]   *See* Joint Objection of the Roman Catholic Ad Hoc Committee and the United Methodist Ad Hoc Committee to the Debtors' Motion for Authorization to Enter Into and Perform Under Restructuring Support Agreement and For Related Relief and Joinder in Limited Objection and Reservation of Rights of the Church of Jesus Christ of Latter-Day Saints, July 22, 2021 [D.I. 5676].

approximately 300,000 members, have already expressed a willingness to follow the lead of the

Church of Jesus Christ of Latter-Day Saints and disassociate from the Boy Scouts.  If that were

to happen, the Debtors would collapse—when LDS terminated its participation as a Chartered

Organization, the Debtors lost about 525,000 participants.  [Docket No. 5485 at 40.]  That is

nearly *a quarter* of the 2.2 million scouts the Debtors had in December 2019  [Docket No. 16 at

22], and the Debtors' projections already assume razor-thin margins on membership count.[13]  It

is not difficult to deduce that the affiliation of Chartered Organizations is, for the Debtors,

existential.  A departure of 300,000 members, which is what would happen if the Methodists

disassociated from the Boy Scouts, would cause the complete collapse of the Debtors.[14]

Other than acknowledging the obvious—that it would have a "negative impact"—the

Debtors have not even modeled the impact of the departure of any Chartered Organization on

membership counts.[15]   The Debtors have merely acknowledged that "[i]f the number of new

---

[13]    Disclosure Statement, at Ex. E.

[14]    See Joint Objection of the Roman Catholic Ad Hoc Committee and the United Methodist
Ad Hoc Committee to Debtors' Motion for Authorization to Enter Into and Perform Under
The Restructuring Support Agreement and For Related Relief and Joinder in Limited
Objection and Reservation of Rights of the Church of Jesus Christ of Latter-Day Saints, Jul.
22, 2021 [D.I. 5676] at ¶¶ 4, 33 ("the Plan . . . raises important issues that alarm Catholic,
Methodist, and other Chartered Organizations and could potentially trigger a similar exodus
[to the LDS]."); see also Ex. E, July 20, 2021 Letter from Bishop David A. Bard, Presiding
Bishop of the Michigan Conference of The United Methodist Church ("Under both
proposed plans that the BSA has suggested as a way to continue after the bankruptcy, they
are leaving their Chartered Organizations out on a limb by themselves . . . BSA is placing
all our United Methodist Churches who have ever been involved in scouting in a very
difficult position . . . If your local church currently charters a scout unit, we recommend that
you NOT renew that chartering agreement when it is up for renewal or re-chartering this
fall."); Ex. F, July 16, 2021 Letter from Kendall Waller, Director of Finance &
Administrative Ministries for the Rio Texas Conference of the United Methodist Church
("[T]he revised plan does not treat chartered organizations fairly . . . Because of some of the
proceedings and how they affect our church's exposure we are recommending that no
church renew a charter with the Boy Scouts at this time.").

[15]    Ex. A, Whittman Dep. Tr. at 123:7–13.

members and returning members is substantially reduced from projections, the BSA could lack

the means to meet their operational needs or otherwise emerge from bankruptcy." [Docket No.

5485 at 236.]  Moreover, the Debtors' CEO, Roger Mosby, appears to have confirmed in his

deposition that the Debtors did not give much, if any, thought to the fate of the Chartered

Organizations whose continuing partnership is critical to the BSA's future.  Mr. Mosby

acknowledged that Chartered Organizations are "vital to the way the BSA is organized in order

to provide grassroots support for the Boy Scouting [sic] program in communities" and that the

Debtors "consider them to be a vital part for the organization, and we wouldn't want to do

anything, quite frankly, that would harm that relationship." Ex. C, Mosby Tr. at 192:19-25.  Mr.

Mosby did not, however, undertake any review of the chartering agreements between the

Debtors and Chartered Organizations before approving the RSA:

> Q:    Well, is it fair to say that in approving the restructuring support agreement
> you didn't do anything to familiarize yourself with any of the agreements
> between the Boy Scouts and the chartering organizations?
>
> A.    I can say that I did not review any charter agreements.

*Id*. at 205:8-15.  Further, Mr. Mosby acknowledged that, as things stand, Chartered

Organizations are vulnerable to abuse claims brought by victims:

> Q:    Sir, Mr. Mosby, if chartering organizations are not included within the
> injunction, they're exposed to being sued indefinitely; is that right?
>
> A.    It's my understanding that if they are not included in the channeling
> injunction, then they could be sued separately in state court for any claim
> that was attributed to their organization.

*Id.* at 188:22-189:5.  And Mr. Mosby acknowledged the risk under the RSA that Chartered

Organizations may terminate their relationships with the Debtors:

> Q:    So do you agree with me that if -- if the chartering organizations do not end
> up getting -- coming within the injunction or a release, that the Boy Scouts
> going forward are likely to lose members from those chartering

24

organizations who are subject to ongoing suits?

A.    Yes.

*Id*. at 193:19-25.  The Debtors' failure to even consider the impact on membership that the departure of a substantial number of Chartered Organization could bring is reason enough the plan linked to the RSA is unconfirmable.  *See Paragon*, 2016 WL 6699318, at \*\*21–28 (denying confirmation because debtors' projections were too aggressive and unreasonable).

The Amended Plan is also not feasible for the independent reason that the Debtors have not obtained a commitment from the Local Council to make the $500 million contribution. While the Debtors highlight that $500 million will be contributed by the Local Councils, the RSA provides nothing more than a commitment from an ad hoc committee of eight Local Councils to use "reasonable efforts to persuade Local Councils" to provide the contribution.  RSA § III (A). The flimsiness of this commitment is apparent as the RSA cautions, "the AHCLC is not a fiduciary for and cannot bind Local Councils … nor shall anything in the [RSA] impose any liability arising from or related to any breach or other violation of [the RSA]."  RSA III(B). There is no commitment.  "When a plan depends on post-petition financing . . . it is not possible to satisfy the feasibility requirement in section 1129 without evidence of a firm commitment of financing." In *re Aspen Village at Lost Mountain Memory Care, LLC*, 609 B.R. 536, 544 (Bankr. N.D. Ga. 2019) (denying confirmation because written letter of intent was "too speculative") (citing *In re Aurora Memory Care, LLC*, 589 B.R. 631, 642 (Bankr. N.D. Ill. 2018)). Here, the Debtors obtained nothing more than a promise to use reasonable efforts to convince the Local Councils to fund the Local Council Settlement Contribution.

**D.    The Amended Plan Unfairly Discriminates Between Unsecured Creditors.**

The Amended Plan is also patently unconfirmable because it unfairly discriminates against insurer claims, which rank in the same priority as all other unsecured claims.  The policy

of "equality of distribution among creditors" is a central policy of the Bankruptcy Code,

preventing Debtors from discriminating between creditors.  *See In re Combustion Engineering,*

*Inc.*, 391 F.3d 190, 239-40 (3d Cir. 2004).  Although a chapter 11 plan may treat similarly

situated classes differently, a dissenting class must generally receive "relative value equal to the

value given to all other similarly situated classes." *In re Armstrong World Indus., Inc.*, 348 B.R.

111, 121 (D. Del. 2006). In *In re Tribune Co.*, 972 F.3d 228, 241–45 (3d Cir. 2020), the Third

Circuit adopted a rebuttable presumption of unfair discrimination where there is (i) a dissenting

class; (ii) another class of the same priority; and (iii) a difference in the plan's treatment of the

two classes that results in either (a) a materially lower percentage recovery for the dissenting

class (measured in terms of the net present value of all payments) or (b) regardless of percentage

recovery, an allocation under the plan of materially greater risk to the dissenting class in

connection with its proposed distribution.

      The Amended Plan unfairly discriminates against insurers by providing them with a

materially lower percentage recovery than similarly situated unsecured creditors.  Any Non-

Settling Insurer owed a deductible or self-insured retention from the Settlement Trust is deemed

to hold an Indirect Abuse Claim.  *See* DS at 170 ("Indirect Abuse Claims, …may arise from

deductibles, self-insured retentions, retrospective premium adjustments, or other charges."). The

Plan provides General Unsecured Claims (Class 6) with 75-95% recovery and Direct Abuse

Claims (Class 8) with up to 100% recovery.  *See* DS at 24, 26.  Meanwhile, estimated recovery

for Indirect Abuse Claims (Class 9) is "unknown" (DS at 27), which is presumably $0 given that

previous iterations of the Disclosure Statement indicated recovery would be $0 (Second

Amended DS, D.I. No. 2594 at 24) and the current Plan and Disclosure Statement provide no

additional mechanisms by which Indirect Abuse Claims will be paid.  In fact, Debtors' current

Plan and Disclosure Statement provide even worse treatment to Indirect Abuse Claims. Article

XI.A. of the Trust Distribution Procedures now expressly subordinates Indirect Abuse Claims to

the "prior payment in full of all Allowed Abuse Claims." Plan, Ex A-1 at 21.  The TDPs

(through Art. IV.B(3)(c)) also provide that Indirect Abuse Claims will not be paid if they are

barred by a statute of limitations, (DS, Ex A-1 at 6), while Direct Abuse Claims will receive

compensation notwithstanding any time bars applicable to their claims.  *Id.* at 18.[16]  Not only

will Indirect Abuse claimants receive nothing under the Plan, any conceivable recovery would be

"against the Settlement Trust assets," (DS at 27, n. 32), which Debtors envision to be comprised

primarily of insurer contributions.  *See* DS at 26.[17]  Article XI.B. of the TDPs makes clear that no

assets will be set aside for Indirect Abuse Claims, nor will Class 9 claimants be entitled to offset

any of their claims against the significant amounts they will pay to the Settlement Trust on

account of Abuse Claims, as any recovery will be at most limited to offsets against the "value of

any Direct Abuse Claim that might be subsequently asserted against the Settlement Trust.") (DS,

Ex A-1 at 21) (emphasis added), which may not exist.

The Amended Plan effectively expunges insurers rights to payment on account of

deductibles or SIRs, while expanding Abuse Claimants' rights—by enabling recovery on account

of time-barred claims—and providing materially higher recovery to Abuse Claimants and

General Unsecured Creditors.  There is simply no justification for this blatantly unfair treatment

of Indirect Abuse Claims, and the unfair risk-shifting it entails, nor do Debtors attempt to assert

---

[16]   Art.VIII.C. provides that time barred abuse Claims will be paid at a scaling factor of 0.1 which may be adjusted upwards if the statute may be tolled, based on the strength of the evidence.

[17]   Direct Abuse Claims estimated recovery is 9-28% from Settlement Trust contributions and "up to 100%" with insurance assets. Thus Debtors predict that up to 91% of Settlement Trust assets will come from insurance.

one.  Debtors cannot use the Plan to rewrite the priority status of creditors, disconnected from

their rights against Debtors, or prefer one creditor class to another of equal priority. *In re*

*Hercules Offshore, Inc.*, 565 B.R. 732 (D. Del. 2016) ("A plan unfairly discriminates…if it

provides materially different treatment for creditors and interest holders with similar rights

without compelling justification.").  Therefore, the Plan is untenable and this Court should

decline to approve the Disclosure Statement.

      **E.**      **The Plan Improperly Deprives Insurers' Rights to Object to Claims**

      The Amended Plan is unconfirmable for the additional reason that it deprives Century

and other insurers of their statutory right to object to claims under Bankruptcy Code section

502(a).[18]  As Century explained in its initial objection, Bankruptcy Code section 502(a) vests in

all "parties in interest" the right to object to claims.  Yet, the Amended Plan assigns that right—

without Century's consent—to the Settlement Trust, vesting in the Trustee the exclusive right to

object to claims.  Because this feature violates Bankruptcy Code section 502(a), the Amended

Plan is unconfirmable.  11 U.S.C. § 1129(a)(1).

      Debtors have defended this erosion of insurers' rights by claiming that this objection has

been "consistently reject[ed]" by bankruptcy courts.[19]  As the cases cited by Debtors show, this

is far from true.  In fact, in most of the cases the Debtors identify, the plan *preserved* the rights of

parties in interest to object to claims under section 502(a).  *See Catholic Diocese of Wilmington,*

---

[18]    Although Debtors have revised the Plan language to preserve section 502 objection rights in
certain circumstances, such preservation only extends to circumstances in which insurers or
others are "sued on account of an abuse claim," but fails to remedy the encroachment of
objection rights outside this limited context.  *See* Plan. Art. IV.D.5.

[19]    *Debtors' Omnibus Reply in Support of Debtors' Motion for Entry of an Order (i) Approving
the Disclosure Statement and the Form and Manner of Notice, (ii) Approving Plan
Solicitation and Voting Procedures, (iii) Approving Forms of Ballots, (iv) Approving Form,
Manner, and Scope of Confirmation Notices, (v) Establishing Certain Deadlines in
Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and
(vi) Granting Related Relief* [Docket No. 4105] at ¶ 85.

*Inc.*, Case No. 09-13560 (Bankr. D. Del. 2019) [ECF No. 1493] at Section 13.3 ("nothing in this Section shall affect the right of any party in interest (including the Reorganized Debtor) to object to any claim to the extent such objection is otherwise permitted by the Bankruptcy Code."); *In re Remington Outdoor Co.*, Case No. 20-81688 (Bankr. N.D. Ala. 2020) [ECF No. 1370], at Art. VII.C. ("Except insofar as a Claim is Allowed under the Plan, the Plan Administrator, and any other party in interest to the extent permitted under section 502(a) of the Bankruptcy Code, shall be entitled to object to Claims.").  In other words, the Debtors conflate the assignment of exclusive rights to enforce and prosecute claims with the assignment of an exclusive right to object to claims.  While the former may be commonplace, the latter is plainly impermissible.

Debtors' reliance on *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899 (D.N.J. 2008) and *In re W. Asbestos*, 313 B.R. 832, 845 (Bankr. N.D. Cal. 2003), is similarly misplaced. Those cases involve asbestos tort claims and implicate Bankruptcy Code section 524(g), which is not relevant here.  In *Congoleum*, the Court held that the insurers' argument that they would lose their right to object to claims was "seemingly at odds with the intent of Congress in drafting § 524(g)."  2008 WL 4186899 at *9.  Because this is not an asbestos case, and Congress enacted no analogous provision for personal injury tort claims, the same logic does not apply.  Moreover, the *Congoleum* opinion was limited to a denial of summary judgment on this issue "[s]ince the Court [could not] determine in advance whether all claim objections would implicate the jurisdictional limitation" of bankruptcy courts with respect to tort claims."  *Id.*

Finally, Century respectfully submits that the California bankruptcy court decision in *Western Asbestos*, which is not binding on this Court, is wrong for several reasons.  First, in that case the asbestos claimants did not file proofs of claim, but filed an alternative form of claim with their ballots.  *W. Asbestos*, 313 B.R. at 845 n.18.  Thus, section 502(a), which refers to

claims "proof of which is filed under section 501 of this title," was not implicated.  11 U.S.C. §

502(a).  Second, that court relied on Bankruptcy Code section 1141(a) to suggest that "once a

plan is confirmed, the terms of the plan govern who may object to the claim." *W. Asbestos*, 313

B.R. at 845.  The court did not identify a single authority—caselaw, statutory, secondary, or

otherwise—that stands for that proposition.  Nor does that proposition make any sense.  Section

1141(a), which deals with the effect of the discharge on the debtor, says nothing about section

502(a), and section 502 says nothing about the effect of the discharge.  The court did not explain,

nor could it, why only section 502(a) applied pre-confirmation but the rest of section 502, which

deals with claims allowance generally, does not.[20]

## F.    The Third Party Releases Are Improper

The Amended Plan is also unconfirmable because it impermissibly seeks to impose broad

non-consensual releases in favor of non-debtor third parties, including the non-consensual

release of Abuse Claims. The releases set forth in Article X.J.3 seek to release the Protected

Parties, a term that includes the Local Councils and Contributing Chartered Organizations, from

among other things, all Claims and Causes of Action arising from or related in any way to an

Abuse Claim.  This means, as a practical matter, that non-debtor entities will be discharged from

liability owed to Insurance Companies on account of deductibles, self-insured retentions, and

indemnification, in exchange for contributing a pittance compared to the assets they hold.  The

Court should not approve a Disclosure Statement for a plan that contains illegal releases.

Bankruptcy Code section 524(e) provides that "discharge of a debt of the debtor does not

---

[20]    The only other cases the Debtors cite in support of the section 502(a) assignment are
uncontested confirmation orders.  Disclosure Statement Reply, at ¶ 87.  Century never
argued that they could not consent to the assignment of their right to object to claims.
Century only argues that the Debtors may not unilaterally assign these rights without
Century's consent.  These consensual orders are thus of no help to the Debtors.

affect the liability of any other entity on, or the property of any other entity for, such debt."

Accordingly, the bankruptcy discharge of a debtor, by itself, does not operate to relieve non-

debtors of their liabilities. *See Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203,

211 (3d Cir. 2000). Although the Third Circuit has not established a blanket rule permitting or

proscribing non-debtor releases, it has stated that "our precedents regarding nonconsensual third-

party releases and injunctions in the bankruptcy plan context set forth exacting standards that

*must be satisfied* if such releases and injunctions are to be permitted, and suggest that courts

considering such releases *do so with caution*." *In re Millennium Lab Holdings II, LLC*, 945 F.3d

126, 139 (3d Cir. 2019) (emphasis added); *see also In re Cont'l Airlines*, 203 F.3d at 214 ("The

hallmarks of permissible non-consensual releases [are] *fairness*, *necessity to the reorganization*,

and *specific factual findings to support these conclusions*[.]").

Further, "even if the threshold *Continental* criteria of fairness and necessity for approval

of non-consensual third-party releases were marginally satisfied…the broader context of the

Continental discussion" provides that such releases should only be approved in the "context of

extraordinary cases." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 608 (Bankr. D. Del.

2001), *appeal dismissed by*, 280 B.R. 339 (D. Del. 2002); *see also*, *Was. Mut.*, 442 B.R. at 351

("While the Third Circuit has not barred third party releases, it has recognized that they are the

exception, not the rule.") (citing *In re Cont'l Airlines*, 203 F.3d 203), *In re Aegean Marine*

*Petroleum Network, Inc.*, 599 B.R. 717, 726-27 (S.D.N.Y. 2019) ("[T]hird party releases are not

a merit badge that somebody gets in return for making a positive contribution to a

restructuring.").

There is nothing "extraordinary" about this case justifying the Amended Plan's

remarkably broad non-consensual third-party releases, other than the Debtors' delegating their

fiduciary duties to the Claimant Representatives.  The releases force Holders of Indirect Abuse

Claims—the Insurance Companies—to release the non-debtor Local Councils and Contributing

Chartered Organizations from any and all obligations under Insurance Policies.  This includes

claims the Insurance Companies have against those non-debtors for the payment of defense

costs, deductibles, self-insured retention amounts, indemnification obligations or other causes of

action related to Abuse Claims.  As will be demonstrated at the Confirmation Hearing, the Local

Councils have billions of dollars of assets that can be contributed to the Settlement Trust

currently held back under specious claims of "donor restrictions."  In the absence of a showing

of a substantial contribution, the third-party releases are illegal.

At a minimum, the Disclosure Statement cannot be approved until the precise nature of

the non-debtor contributions are expressly spelled out.  As currently drafted, the Disclosure

Statement, without any specificity, merely provides "[b]ecause of the [Restructuring Support

Agreement], *substantial contributions to the Settlement Trust by* the Debtors, *Local Councils,*

*Contributing Chartered Organizations*, and Settling Insurance Companies, if any, *will be made*

*in exchange for the treatment of the foregoing Entities as Protected Parties*[.]"  Disclosure

Statement at 9-10 (emphasis added).  This conclusory disclosure is wholly inadequate.  *In re*

*Oneida Motor Freight, Inc.*, 848 F.2d 414, 417 (3d Cir. 1988) ("[W]e cannot overemphasize the

debtor's obligation to provide sufficient data to satisfy the Code standard of adequate

information.").  The Disclosure Statement attempts to remedy this deficiency by citing Exhibit C,

which purports to include a "list of each Local Councils total expected contribution, including a

specific break-down between the (i) cash contribution and (ii) property contribution[.]"

Disclosure Statement at 11.  Exhibit C also supposedly describes the "mechanism" by which

Contributing Chartered Organizations can also make a "substantial contribution" to the

Settlement Trust in exchange for the benefit of a third party release.  Exhibit C, however, is

blank—it contains nothing.  Thus, even if the third-party releases were legal—and they are not—

the disclosure surrounding the third-party releases must be augmented before the Disclosure

Statement can be approved and solicitation commence.

## II.    The Disclosure Statement Still Contains Misleading Disclosures

In addition to the numerous legal defects in the Amended Plan catalogued above, the

Disclosure Statement still contains a host of incomplete, misleading, and inaccurate statements

that must be remedied before solicitation can commence.  Century identified many of these

infirmities in its prior objection.  The Debtors have not fixed many of those problems:

- The Disclosure Statement does not describe what the Debtors did to verify the validity of proofs of claim.

- While the Disclosure Statement now discloses the aggregate assets held by the Local Councils, it still fails to disclose each Local Council's Settlement Trust contribution and the amount of liabilities—both to Abuse Claimants and Insurers—that will be released under the Amended Plan. The Plan indicates that the Disclosure Statement provides "[a] listing of each Local Council's total expected contribution," (Plan, Ex. F at 1) however, the Disclosure Statement simply contains a placeholder exhibit for that information "to be supplemented." Disclosure Statement, Ex. C.

- The Plan does not describe the treatment of Century's secured claim, or how insurers' self-insured retention and deductible claims will be treated generally.

- The Disclosure Statement now contains a "Document Agreement" by and among the Debtors, the Local Councils, and the Settlement Trustee that will hand over to the Settlement Trust all of the Debtors' books and records.  Under the Amended Plan, the Settlement Trust Advisory Committee will consist entirely of representatives of the Coalition and the TCC.  Accordingly, parties should know the terms and conditions of this information sharing prior to solicitation.

- The Plan also omits a number of other crucial documents and information, including the identity and contributions of the Contributing Chartered Organizations (Plan, Ex. C, D), the Settlement Trust Agreement (*id.*, Ex. B), and each of the documents to be included in the Plan Supplement, including the DST Agreement (containing the mechanics of the note to be issued by Local Counsels), a number of note and bond documents, and details of the Settlement Trust Advisory Committee.

The disclosure provided about potential payout to claimants is also fundamentally

misleading as it provides no information about the monies that are to be paid to lawyers as opposed to claimants.  If the RSA is approved, it provides for the Coalition's fees to be paid from the estate while preserving the right for the Coalition to seek fees in excess of the RSA amounts from the Settlement Trust.  There must be clear disclosure that the Coalition preserves this right and that a majority of the governing body of the Settlement Trust consists of Coalition plaintiff firms.

There is also no disclosure of the fact that distributions to claimants may be subject first to deductions by counsel or the scale of these deductions. In the case of claimants associated with the Coalition and the Coalition plaintiff firms, these deductions are material if the engagement agreements are found to be enforceable.  The disclosure statement should contain an explanation of these deductions and a simple pictural pie chart that sets out the reductions and their source such as the following:



There should also be disclosure of the options that could be taken up with the Court to bring down the scale of the funds diverted away from claimants to lawyers especially in light of the fact that the bulk of the claims will be processed under the present TDPs without the need for any effort by counsel.  In an Order issued on August 5, 2021, U.S. District Judge Dan Aaron Polster capped the fees for individually retained plaintiff's attorneys in the Opioid MDL at 15%.[21]  Under the Order, the Court will only allow firms to enforce a fee contract at higher than 15%, provided they present evidence of the exceptional work and extraordinary risk they went through on a particular claim.  To the extent that options to increase the relative payout to claimants as opposed to lawyers have been rejected or intentionally not pursued, this should also be disclosed as this maybe the way claimants have to learn of this.

In addition to these deficiencies, the TCC's proposed "plain English" insertion should be rejected.  As the Moving Insurers' objection observes, the TCC's proposed insert contains numerous statements that are at best oversimplified, and, in some cases, outright misleading.  Century joins in that objection.

## III.   The Solicitation Procedures Remain Defective and the Confirmation Schedule Is Inappropriate.

The Solicitation Procedures remain defective for the reasons set forth in Century's *Objections to the Debtors' Solicitation Procedures and Form of Ballots* [Dkt No. 3857] (the "Solicitation Procedures Objection"), incorporated by reference herein.  Since the disclosure of the RSA and the recent disclosures by Mr. Kosnoff, the fundamentally flawed Master Ballot Solicitation Method and its attendant problems have only gotten worse and threaten to taint the entire solicitation and voting process.

---

[21]   *See* Mike Curley, *Atty Fees Capped At 15% In $26B Opioid MDL Settlement*, Law360, (August 9, 2021).

As a threshold matter, by increasing the "no questions asked" payout from $1,500 to $3,500, the Debtors have only exacerbated the moral hazards that have infected these cases. This payout corresponds to the lowest possible payout under the claims matrix, allocated to claims constituting a single instance of abuse involving either no touching or an adult claimant, and no aggravating factors warranting a higher distribution. (Amended Plan, Ex. A at 15). Thus, holders of the vast majority of legitimate claims have no incentive to select this option, because the proposed TDPs will pay them multiples of this distribution. Rather, the increased payout, accompanied by a promise not to scrutinize the claim, simply amounts to a transfer to the holders of illegitimate claims who are legally entitled nothing.

On top of this, BSA has promised to pay the fees of the Coalition whose lawyers have in turn promised as part of the same agreement to "recommend and advise" that their clients vote "yes." Under the Solicaiton Procedures, it is these plaintiff lawyers who will be signing the "Master Ballots" and not their claimant clients. The RSA and Solicaiton Procedures were designed in this way to work hand and glove to ensure the vote.

In its decision in *Combustion Engineering*, the Delaware Bankruptcy Court disallowed an arrangement whereby a lead plaintiff firm was to receive a fee by an affiliate of the Debtor, for "services in assisting in getting claimants to sign onto the [settlement agreement]." *In re Combustion Engineering*, 295 B.R. 459, 476 (Bankr.D.Del.2003) (vacated on other grounds, 391 F.3d 190 (3d Cir.2004). The Court found the plaintiff firm had an "actual conflict of interest" as he was to be paid by the parent of an entity he was suing, his clients had claims against the Debtor, and he had contingency fee agreements with those clients tied to the settlement trust. *Id.* at 477. Other cases have reached similar results.

The Third Circuit Court of Appeals observed similar problems in *In re Congoleum Corp.*, involving $1–2 million payments to a number of claimants' representatives for services related to negotiating the pre-packaged plan. 426 F.3d 675, 681 (3d Cir. 2005). While the Court did not rule on the fees, as no party objected to them, the Court raised the decisions in *Combustion Engineering* and *Pittsburgh Corning* of its own accord, highlighting the conflict of interest. *Id.* 681 n9.[22]

The principle is simple. One may not pay a lawyer to give advice to his client on how to settle his or her claim. The scheme employed here is designed explicitly to do just this.

In support of its Objections to the RSA, Century cited Supreme Court and other decisions condemning agreements that provide for the payment of fees in connection with a lawyer's recommendation of advice to a client. *See Century's Objections to the Debtors' Motion for Entry of an Order, Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code, (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement and (II) Granting Related Relief* at 19-21 [Docket No. 5707]. The Debtors failed to distinguish this authority and offer no case in support of the proposition that it is ever proper to promise to pay a client's lawyer as part of an agreement with that lawyer that he or she recommend something to their client.

The fee provisions of the RSA taken together with the Master Ballot provisions of the Solicitation Procedures will taint the vote, render it voidable and invite reversal of the Amended Plan if it is confirmed.

---

[22]    See *generally* Abraham L. Gitlow, <u>Corruption in Corporate America: Who is Responsible?: who Will Protect the Public Interest?</u> at 76 (2005) (a clear conflict exists when "a lawyer represents a client, or clients, on one side of an issue, but is asked by the other side to act concurrently in the capacity of a negotiator of a settlement."); Alex Berenson, *A Caldron of Ethics and Asbestos*, N.Y. Times (March 12, 2003), https://www.nytimes.com/2003/03/12/business/a-caldron-of-ethics-and-asbestos.html ("Legal ethicists said the payment raised serious ethical concerns because he was in effect being paid by both sides in the dispute, and several class-action lawyers criticized the payment.")

In addition to the vote buying, the Debtors have also forfeited the obligation to police the solicitation process to the very parties who have engaged in the questionable behavior that has plagued these cases, and watered down the minimal safeguards against abuse that were in place. Specifically:

- By stripping the requirement that a master ballot include the last four digits of a claimant's social security number, the Debtors have eliminated from the Solicitation Procedures even the barest level of assurances that only valid claimants will be solicited. *See* Docket No. 5488-2, Ex. 1 at ¶ 21.

- Under the revised Solicitation Procedures and the RSA, the Debtors are required to cooperate with the TCC and the Coalition in evaluating and potentially waiving or curing defects in Master Ballots, extending the voting deadline, accepting ballots which fail to comply with Plan documents, and contesting withdrawal of ballots after the voting deadline.

- Under the revised Solicitation Procedures the solicitation package will contain a letter from an official committee or the Coalition, the contents of which has not yet been disclosed.

The likelihood that that the Debtors will solicit invalid claims is no longer a question: it's a fact.  As this Court recognized in the July 29, 2021 hearing, for many months in these cases it has been entirely unclear who speaks for Abused in Scouting ("AIS")—and its thousands of underlying claimants.  *See* Ex. G, July 29, 2021 Hr'g Tr. at 37 ("So tell me what AIS is cause, quite frankly, I'm confused"); *id.* ("Let me ask you a question, you're not representing abused in scouting?"); *id.* at 42 ("So, when AIS asked people to become members or sent out an advertisement and said, let us represent you, who – what were they saying to these abuse victims?").

This Court thus ordered AIS to file a Rule 2019 statement, recognizing that "movements have leaders," and the law firms purporting to represent these claimants "do[] not get to hide behind these abuse victims."  *Id.* at 42.  Requiring these firms to file a Rule 2019 statement would disclose, as this Court noted, "who they represent," which is critical heading into

solicitation because the Debtors must accurately disclose which claimants these firms will be seeking to persuade.  *See id.* at 61 ("Isn't it important, then, to know who actually represents those individuals, who the firms commit to use their best efforts to convince to vote?").

The *Verified Statement of Kosnoff Law, PLLC Pursuant to Rule of Bankruptcy Procedure 2019* [Docket Nos. 5919, 5924] ("Kosnoff Law Verified Statement"), filed after the July 29 hearing, confirms that fraudulent proofs of claims have been filed in this case.  Mr. Kosnoff, who purports to represent over 15,000 Abuse Claimants, admits that he undertook a public relations campaign to sign up legally invalid claims.[23]  He further states that an unnamed law firm digitally signed his name to "dozens more proofs of claim, without [his] knowledge or permission."[24]  Since Kosnoff Law is the only firm to file Rule 2019 statement (and only after fighting tooth and nail against disclosure), Mr. Kosnoff's stunning admission is likely the tip of the iceberg.  The parties are thus faced with the specter of solicitation where an untold number of facially invalid and fraudulent claims will be solicited, tainting the entire process.  In January 2021, Century and Hartford filed motions requesting Rule 2004 discovery into the claims filing process, raising the very suspicions that Mr. Kosnoff has confirmed is true [Docket Nos. 1971, 1972].  Those motions should be granted, and a true investigation into the claims process undertaken, before any solicitation is authorized.

Finally, the Disclosure Statement also contains misstatements about the precise nature of Claimant support for the Plan.  Given the numerous deficiencies with the Coalition and other law firms' purported representation of a large proportion of abuse claimants [*See, e.g.*, Docket No. 1975 at 12–15], the assertion in the Confirmation Hearing Notice (which is to be distributed in

---

[23]    Kosnoff Law Verified Statement, ¶¶ 11, 24.
[24]    Kosnoff Law Verified Statement, ¶ 17.

Solicitation Packages) and elsewhere that "every single major creditor constituency" supports the Plan is misleading.  *See* Solicitation Procedures Motion, Ex. 3 at 2; *see also* Disclosure Statement at p.6.  This insinuates that the body of creditors themselves have expressed support for the Amended Plan.  This is false: under the RSA, certain favored lawyers signed the RSA and only committed to recommend to their clients—the actual creditors—to vote in favor of the Amended Plan.  In addition, even if one assumes the clients represented by those lawyers will vote in favor of the Amended Plan, "major" claimant groups oppose the Amended Plan.  For example, Kosnoff Law states that it represents 15,103 claimants[25] and it "repudiates" the Amended Plan.[26]  And while Kosnoff Law is notable for the sheer number of "claims" it purports to represents, Mr. Kosnoff is hardly alone in his opposition to the Amended Plan; objections from claimants to the Disclosure Statement have been pouring in almost every day, a major claimant constituency objected to the RSA, and scores of law firms have filed joinders in that objection.[27]  Moreover, given that many attorneys have provided no evidence that they are

---

[25]   Kosnoff Law Verified Statement, ¶ 24.

[26]   Kosnoff Law Verified Statement, ¶ 10.

[27]   *See* Objections to Disclosure Statement filed on behalf of claimants represented by *e.g.* Gair, Gair, Conason, May 6, 2021 [D.I. 3155], Aug. 13, 2021 [D.I. 6003]; Jacobs & Crumplar and the Neuberger Firm, April 30, 2021 [D.I. 2741], Aug. 13, 2021 [DI 6002]; Massey Law Firm, May 6, 2021 [D.I. 3424], Aug. 11, 2021 [D.I. 5971]; Law Officers of Anthony M. DeMarco, May 6, 2021 [D.I. 3219], Aug. 11, 2021 [D.I. 5978]; Oaks Law Firm, May 5, 2021 [3158], Aug 12, 2021 [5982]; Kralovec, Jambois & Schwartz, May 6, 2021 [D.I. 3165], Aug. 12, 2021 [D.I. 5989]; Nettles l Morris, May 6, 2021 [D.I. 3251], Aug. 13, 2021 [5990]; Spagnoletti Law Firm, May 6, 2021 [D.I. 3198], Aug. 13, 2021 [D.I. 5991]; Winer, Burrit & Scott, LLP, Aug. 11, 2021 [D.I.5968]; Alonso Krangle LLP, May 6, 2021 [D.I. 3279], Aug 11, 2021 [D.I. 5967]; James, Vernon & Weeks, P.A., May 6, 2021 [D.I. 5789], Aug. 11, 2021 [D.I. 5966]; Chiacchia & Fleming, LLP, May 6, 2021 [D.I. 3178], Aug. 11, 2021 [D.I. 5965]; Bonina & Bonina P.C., Aug 10, 2021 [D.I. 5955]; Van Zanten & Onik, LLC, May 6, 2021 [3262], Aug. 13, 2021 [5992]; Dumas & Vaughn, LLC, May 5, 2021 [D.I. 3154]. Jun. 1, 2021 [D.I. 5172]; Saunders & Walker, P.A., Jun. 17, 2021 [D.I. 5366]; Paul Mones, P.C. May 6, 2021 [D.I. 3949]; Nesenoff & Miltenberg, LLP, May 6, 2021 [D.I. 3254], Aug. 16, 2021 [D.I. 6005]; Kenneth J. Ready & Associates, May 6, 2021 [D.I. 3253], Aug. 16, 2021 [D.I. 6006]; Green & Gillispie, May 6, 2021 [D.I. 3243],

Aug. 16, 2021 [D.I. 6007]; Linder, Sattler & Rogowsky, LLP, May 6, 2021 [D.I. 3225]; Aug. 16, 2021 [D.I. 6010]; Gellert Scali Busenkell & Brown, LLC and Lomurro, Munson, Comer, Brown & Schottland, LLC, May 6, 2021 [D.I. 3167], Aug 16, 2021 [D.I. 6015]; Sullivan, Papain, Block, McGrath, Coffinas & Cannavo, P.C., Aug 16, 2021 [D.I. 6016]; Perdue & Kidd, May 6, 2021 [D.I. 3252], Aug. 16, 2021 [D.I. 6017]; Gordon & Partners, P.A., May 6, 2021 [D.I. 2739], Aug. 16, 2021 [D.I. 6018]; Betti & Associates, May 6, 2021 [D.I. 3281], Aug. 16, 2021 [D.I. 6024]; Anderson & Cummings, LLP, May 6, 2021 [D.I. 3150], Aug. 16, 2021 [D.I. 6028]; Cannata & Associates LLP, May 6, 2021 [3177], Aug. 16, 2021 [D.I. 6029]; Dumas & Vaughn, LLC, May 6, 2021 [D.I. 3154], Aug 16, 2021 [D.I. 6030]; Zalkin Law Firm, P.C and Gordon Fournaris & Mammarella, P.A., May 6, 2021 [D.I. 3276], Aug. 16, 2021 [D.I. 6031]; Herman Law, May 6, 2021 [D.I. 3182], Aug. 16, 2021 [D.I. 6032]; The Rosner Law Group, LLC, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, and Kaufman LIeb Lebowitz & Frick LLP, May 6, 2021 [D.I. 3264], Aug 16, 2021 [D.I. 6033]; Stephanie Morris, May 6, 2021 [D.I. 3163], Aug. 16, 2021 [D.I. 6036]; Oshan & Associates PC, May 6, 2021 [3159], Aug. 16, 2021 [6037]; Lujan Wolff LLP, Aug. 16, 2021 [D.I. 6039]; Searcy Denney Scarola Barnhart & Shipley, P.A., Aug. 16, 2021 [D.I. 6040]; The Rosner Law Group LLC, May 6, 2021 [D.I. 3268], Aug. 16, 2021 [D.I. 6042]; Zuckerman Spaeder LLP, May 6, 2021 [D.I. 3277], Aug. 16, 2021 [D.I. 6043]; Beasley Allen Law Firm, May 6, 2021 [D.I. 3176], Aug. 16, 2021 [D.I. 6046]; Siegle & Sims LLP, May 5, 2021 [D.I. 2973], Aug. 16, 2021 [D.I. 6047]; PCVA Claimants, May 6, 2021 [D.I. 3265], Aug. 11, 2021 [D.I. 5964] *see also* Joinders of Bielli & Klauder, LLC and Morgan & Morgan, P.A., Aug. 13, 2021 [6004]; Aylstock, Witkin, Kreiz & Overholtz, PLLC, Aug. 16, 2021; Bielli & Klauder, LLC, Aug. 16, 2021 [D.I. 6034]. *See also* Objection to RSA Motion, July 22, 2021 [D.I. 5682]; *see also* Joinders, *e.g.*, Biella & Klauder, LLC [D.I. 5682]; The Zalkin Law Firm, P.C. [D.I. 5682]; PFAU Cochran Vertetis Amala PLLC [D.I. 5682]; Horowitz Law [D.I. 5682]; Panish Shea & Boyle LLP [D.I. 5682]; Rebenack Aronow Mascolo, LLP [D.I. 5682]; Aylstock, Witkin, Kreis & Overholtz, PLLC [D.I. 5682]; Linder, Sattler & Rogowsky, LLP [D.I. 5682]; Manly, Stewart & Finaldi [D.I. 5682]; Dumas & Vaughn [D.I. 5682]; Betti & Associates [D.I. 5682]; Law Office of Kirk C. Davis [D.I. 5682]; Green & Gillispie [D.I. 5682]; Spagnoletti Law Firm [D.I. 5682]; Chasan & Walton, LLC [D.I. 5682]; Law Offices of Anthony M. Demarco [D.I. 5682]; Oshan & Associates, P.C. [D.I. 5682]; Fasy Law, PLLC [D.I. 5682]; Law Office of Joseph A. Blumel III, P.S. [D.I. 5682]; Tamaki Law Offices, P.S. Inc. [D.I. 5682]; Silver Golub & Teitell LLP [D.I. 5682]; The Mallard Law Firm [D.I. 5725]; Christopher A. Kreid & Associates, LLC [D.I. 5727]; Jacobs & Crumplar [D.I. 5727]; Winer, Burritt & Scott [D.I. 5743]; Arias Sanguinetti Wang & Torrijos LLP [D.I. 5744]; Cannata & Associates [D.I. 5754]; J&C/TNF Claimants (Jacobs & Crumplar/The Neuberger Firm) [D.I. 5755]; Chiacchia & Fleming [D.I. 5765]; Siegle & Sims LLP [D.I. 5777]; Messa & Associates [D.I. 5787]; James, Vernon & Weeks, P.A. [D.I. 5789]; Beasley Allen Law Firm [D.I. 5792]; OLF (Oaks Law Firm) [D.I. 5794]; Wagstaff and JLC, LLC (The Wagstaff Law Firm & Justice Law Collaborative) [D.I. 5808]; Ciardi Ciardi & Astin [D.I. 5811]; Bonina & Bonina, P.C. [D.I. 5811]; Doroshow, Pasquale, Krawitz, & Bhaya [D.I. 5812]; Sullivan Papain Block McGrath Coffinas & Cannavo PC [D.I. 5812]; Hach Rose Schirripa & Cheverie LLP [D.I. 5815]. The Chartered Organizations have also filed supplemental objections to the Disclosure Statement, *see* objections of the Church of Jesus Christ of the

authorized to represent their clients (and in thousands of instances, may not even have clients), let alone even notified such possible clients of the RSA, it is highly unlikely that such claimants—to the extent they even exist—were consulted for their views on the Amended Plan and Disclosure Statement.

## CONCLUSION

For the foregoing reasons, the Court should reject the Disclosure Statement and proposed Solicitation Procedures.  The Court should grant Century's Rule 2004 Motion, and allow discovery to proceed.  Only then should the Court permit solicitation to proceed, and it should require that claimants be individually solicited absent evidence of a case-specific grant of authority to the attorney to vote on the client's behalf, and an effective retention agreement containing a joint retention waiver.

---

Latter-Day Saints, Aug. 16, 2021 [D.I. 6009]; *see also* Joinders of the Episcopal Church, Aug. 16, 2021 [D.I. 6014]; Roman Catholic Archbishop of Los Angeles and Related BSA-Chartered Organizations and the Roman Catholic Diocese of Brooklyn, New York, Aug. 16, 2021 [D.I. 6044].

Dated:  August 17, 2021

Respectfully Submitted,

By:  */s/ Stamatios Stamoulis*
     Stamatios Stamoulis (#4606)

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware  19801
Telephone:    302 999 1540
Facsimile:    302 762 1688

O'MELVENY & MYERS LLP
Tancred Schiavoni (*pro hac vice*)
Daniel Shamah (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York  10036-6537
Telephone:    212 326 2000
Facsimile:    212 326 2061

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America*