# EXHIBIT A

## (Redacted)

# EXHIBIT B

1

1                  UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE

2

                       .   Chapter 11

3
IN RE:                       .

4                       .   Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA AND    .

5
DELAWARE BSA, LLC,         .

                       .   Courtroom No. 2

6                       .   824 North Market Street
                       .   Wilmington, Delaware 19801

7                       .
              Debtors.    .   July 7, 2021

8 . . . . . . . . . . . . . . . .   2:00 P.M.

9          TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
        BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN

10            UNITED STATES BANKRUPTCY JUDGE

11
TELEPHONIC APPEARANCES:

12
For the Debtor:        Derek C. Abbott, Esquire

13                   Andrew R. Remming, Esquire
                   Paige N. Topper, Esquire

14                   MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                   1201 North Market Street, 16th Floor

15                   Wilmington, Delaware 19899

16                   - and -

17                   Jessica C. Lauria, Esquire
                   WHITE & CASE LLP

18                   1221 Avenue of the Americas
                   New York, New York 10020

19
Audio Operator:        Brandon J. McCarthy, ECRO

20

21
Transcription Company:   Reliable

22                   1007 N. Orange Street
                   Wilmington, Delaware 19801

23                   (302)654-8080
                   Email:  gmatthews@reliable-co.com

24

Proceedings recorded by electronic sound recording; transcript

25 produced by transcription service.

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For the Debtors:          Michael C. Andolina, Esquire
                               Matthew E. Linder, Esquire
 3                             Laura E. Baccash, Esquire
                               Blair M. Warner, Esquire
 4                             WHITE & CASE LLP
                               111 South Wacker Drive
 5                             Chicago, Illinois 60606

 6
     For Hartford Financial:   Philip Anker, Esquire
 7                             WILMERHALE
                               250 Greenwich Street
 8                             New York, New York 10007

 9   For the FCR:              Robert Brady, Esquire
                               YOUNG CONAWAY STARGATT & TAYLOR LLP
10                             1000 N West Street
                               Wilmington, Delaware 19801
11

12   For the U.S. Trustee:     David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
13                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
14                             Lockbox 35
                               Wilmington, Delaware 19801
15
     For the Coalition of      David Molton, Esquire
16   Abused Scouts for         BROWN RUDNICK LLP
     Justice:                  7 Times Square
17                             New York, New York 10036

18
     For Century Indemnity:    Tancred Schiavoni, Esquire
19                             Brad Elias, Esquire
                               O'MELVENY
20                             7 Times Square
                               New York, New York 10036
21
     For the Church of Jesus   Adam Goldberg, Esquire
22   Christ of Latter Day      LATHAM & WATKINS LLP
     Saints:                   1271 Avenue of the Americas
23                             New York, New York 10020

24   For the AIG Companies:    Michael Rosenthal, Esquire
                               GIBSON, DUNN & CRUTCHER LLP
25                             200 Park Avenue
                               New York, New York 10166
```

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For Tort Claimants:      James Stang, Esquire
                              PACHULSKI STANG ZIEHL JONES LLP
 3                            919 North Market Street, 17th Floor
                              Wilmington, Delaware 19801
 4
                             - and -
 5
 6                            John Lucas, Esquire
                              PACHULSKI STANG ZIEHL & JONES LLP
 7                            150 California Street, 15th Floor
                              San Francisco, California 94111
 8
     For the Ad Hoc          Richard Mason, Esquire
 9   Committee of Local      WACHTELL, LIPTON, ROSEN & KATZ
     Councils:               51 W 52nd Street, Suite 29
10                           New York, New York 10019

11
     For the Creditors       Megan Wasson, Esquire
12   Committee:              KRAMER LEVIN NAFTALIS & FRANKEL LLP
                             1177 6th Avenue
13                           New York, New York 10036

14   For Timothy Kosnoff,    David Wilks, Esquire
     and Andrew Van Arsdale: WILKS LAW, LLC
15                           920 Paoli Pike
                             West Chester, Pennsylvania 19380
16
     For the Roman Catholic  Jeremy Ryan, Esquire
17   Ad Hoc Committee:       POTTER ANDERSON & CORROON LLP
                             Hercules Plaza
18                           1313 North Market Street, 6th Floor
                             P.O. Box 951
19                           Wilmington, Delaware 19801

20
     For Numerous Firms and  Irwin Zalkin, Esquire
21   Claimants:              THE ZALKIN LAW FIRM, P.C.
                             1441 Broadway, Suite 3147
22                           New York, New York 10018

23

24

25
```

1          (Proceedings commenced at 2:00 p.m.)

2              THE COURT:  Good afternoon.  This is Judge

3  Silverstein.  We're here in the Boy Scouts of America

4  bankruptcy; Case No. 20-10343.

5              Please make sure if you are not speaking that you

6  are muted.  I will recognize Mr. Abbott.  We're here for a

7  status conference.

8              Mr. Abbott?

9              MR. ABBOTT:  Yes, Your Honor.  Thank you.

10             Can you hear me okay?

11             THE COURT:  I can.

12             MR. ABBOTT:  Thank you.  Derek Abbott of Morris

13 Nichols Arsht & Tunnell here for the debtors, Your Honor.

14             We did ask the court to convene this status

15 conference and I would like to turn the podium over to Matt

16 Linder from the White & Case Firm who will address the court

17 on the current status, if I may.

18             THE COURT:  Mr. Linder?

19             MR. LINDER:  Good afternoon, Your Honor.  Matt

20 Linder of White & Case for the debtors.

21             Can you see and hear me okay?

22             THE COURT:  I can hear you.

23             MR. LINDER:  You'll find me somewhere in the

24 squares.

25             THE COURT:  You can continue.

1          MR. LINDER:  Great.  Your Honor, Ms. Lauria had an

2    unavoidable conflict today and she asked me to convey to the

3    court her apologies for not being able to appear.  I am joined

4    by my colleagues Mr. Andolina, Mr. Kurtz, and Mr. Hammond.

5    They will be available to address the court regarding

6    litigation related items including the insurer's pending

7    discovery request and the depositions that the insurers have

8    noticed.

9          If I may, Your Honor, I'd just like to give some

10   introduction remarks to start-off the status conference.  This

11   is the first opportunity that the debtors have had to address

12   the court since the May 19th hearing on the exclusivity

13   motion, among other things.  We are extremely pleased to be

14   appearing before Your Honor today having signed on July 1st a

15   landmark restructuring support agreement between the debtors,

16   the ad hoc committee of local councils, the tort claimants

17   committee, the future claimants representative, the coalition

18   of abused scouts for justice, and State Court council

19   representing approximately 60,000 abuse claimants.

20          The debtors filed the motion to approve the RSA on

21   July 1st, and the plan and disclosure statement that

22   substantially incorporated the terms of the RSA were filed on

23   July 2nd.  As Your Honor is aware, we're seeking to have both

24   the RSA and the disclosure statement heard during the July

25   20th and 21st hearings with the hearing on the RSA to precede

1  the hearing on the disclosure statement.  Of course, neither

2  the RSA nor the disclosure statement hearing are before the

3  court today.

4        The RSA and the fourth amended plan at a high

5  level, Your Honor, provide for total liquidated contributions

6  to the settlement trust by the debtors and the local councils

7  of $850 million, plus all of the debtors and the local

8  councils' respective rights under prepetition insurance

9  policies that do not contain exclusions for sexual abuse.

10  There is evidence of these policies dating back as far as 1935

11  for the debtors and to the 1940's for some of the local

12  councils.

13        For that reason it's the debtors' belief, and is

14  fully shared by the other RSA parties, that these insurance

15  policies provide a significant source of value to the

16  settlement trust and in turn to abuse claimants.

17        While many of the terms of the RSA were already

18  incorporated into the third amended plan, which the debtors

19  filed on June 18th, there are several new additions that I

20  thought I would briefly highlight.  I will not step through

21  all of the many terms of the RSA.  I just wanted to touch on a

22  few of them.

23        First, Your Honor, the agreement provides that in

24  addition to the debtors' $250 million settlement contribution

25  which was unchanged from the third amended plan filed on June

1  18th the local councils will, under the RSA, contribute an

2  additional $100 million to the settlement trust which brings

3  the aggregate local council contribution from $500 million to

4  $600 million; again, plus significant insurance rights.

5          Second, the UCC has agreed to modify the treatment

6  for holders of non-abuse litigation claims to facilitate the

7  assignment of certain recent insurance policies to the

8  settlement trust while at the same time preserving those

9  creditors ability to recover, in-full, either under

10 prepetition settlement agreements or following the effective

11 date.  Again, those are holders of non-abuse litigation claims

12 which are predominately personal injury or wrongful death

13 claims.

14         Third, Your Honor, the TCC has agreed to stay the

15 restricted assets adversary pending the outcome of the

16 confirmation hearing.  You will recall that this is the

17 adversary proceeding that the TCC characterized as mind-

18 numbingly complex and fact intensive.  It was one of the

19 drivers of the court's concerns regarding the confirmation

20 timeline.

21         I have just been told that my video is off, so I am

22 going to start it now.  I apologize for that, Your Honor.

23 That was a technical snafu here.  Apologies.

24         Just returning to my remarks the plaintiff

25 representatives have also agreed to withdraw their objections

1    to the exclusivity extension motion.  So that motion which

2    remains pending is now unopposed by the constituents.

3    Finally, the plaintiff representatives have also agreed to

4    support the extension of the preliminary injunction through

5    the effective date of the plan.

6           The last term of the RSA that I would highlight is

7    that the debtors have agreed to seek a determination from the

8    court that they had no obligations to seek approval of and

9    have no obligations under the Hartford settlement agreement.

10   As the debtors previously noted, both in the June 18th plan

11   and in the July 2nd plan, the abuse claimants have unanimously

12   and consistently informed the debtors that they would never

13   support, in no uncertain terms, any plan of reorganization

14   that contain the Hartford settlement agreement in its current

15   form.

16          For that reason removing the Hartford settlement

17   from the plan is a condition to the RSA, but rather than

18   unilaterally excising the Hartford terms from the plan the

19   debtors have elected to seek a determination from the court in

20   an effort to prevent what we expect could, otherwise, become a

21   costly and distracting issue, contested issue, in these cases.

22          With the settlements embodied in the RSA, Your

23   Honor, the debtors have now reached agreements with each and

24   every single one of their major creditor constituencies

25   regarding the terms of the plan and related matters.  These

1   constituencies, importantly, are not limited to the abuse

2   representatives.  They also include the unsecured creditors

3   committee and JPMorgan.

4          On behalf of the debtors I'd like to acknowledge

5   and thank each of the RSA parties: the UCC; JPMorgan; our

6   mediators Kevin Carey, Paul Finn, and Tim Gallagher; counsel

7   for each of the RSA parties; James Stang for the TCC; David

8   Molton for the coalition; Jim Patton, the FCR; Rachel Ringer

9   for the UCC; and each of their respective teams for what have

10  truly been tireless efforts over the last several months to

11  resolve conflict disputes and to work through settlement terms

12  that will be best serve the interest of the estates,

13  creditors, including abuse creditors, and the charitable

14  mission of the Boy Scouts of America.

15         The plan now provides for a viable pathway to

16  deliver equitable compensation to the men who were abused

17  during their time in scouting.  The debtors are now in a

18  position where they do not need to confront either of what

19  Your Honor referred to as un-attracted options during the May

20  19th hearing.

21         First, the debtors will not be soliciting a plan

22  that has no abuse survivor support.  To the contrary, we

23  believe that the fourth amended plan, as it may be further

24  amended, will be overwhelmingly accepted by holders of abuse

25  claims.

1    Second, the debtors will not be engaging in

2  protracted litigation with abuse survivor constituents.  This

3  includes, among other things, the restricted asset adversary

4  which we have settled on the terms set forth in the RSA.

5    Importantly, before I turn to the timeline, Your

6  Honor, we have obtained the same plan structure in the fourth

7  amended plan that has been in our plan since the inception of

8  these cases with respect to insurance companies and chartered

9  organizations.  Each of those entities will have the

10  continuing ability to negotiate an appropriate resolution of

11  its liabilities and become a protected party that benefits

12  from the challenge injunction under the plan.

13    The mediation remains ongoing and our mediators are

14  continuing to actively engage with the insurers and chartered

15  organizations as well as the debtors and other parties.  For

16  our part, Your Honor, the debtors will continue to work to

17  maximize the value of the settlement trust in advance of

18  confirmation.  We certainly don't consider our work finished

19  in that regard.

20    As I previewed, I'd like to also turn to the

21  timeline and that has really been the focus of the insurance

22  filings that Your Honor has seen come in, in recent days and

23  as early as today and last night.  In what I'm sure will be a

24  preview or coming attractions the insurers, including Century

25  and Hartford, have urged the court to delay the hearings on

1  both the RSA and the disclosure statement by, at least, two

2  weeks.  As I referred to earlier they have also served the

3  debtors with extensive discovery and notice depositions and

4  certain BSA principals and advisors.

5          The court has heard Ms. Lauria, on repeated

6  occasions, emphasize the fact that the debtors needed to

7  emerge from bankruptcy by the end of the summer.

8  Unfortunately, it took longer to negotiate a resolution that

9  we have been working towards for the past seventeen months and

10  oppose delaying our timeline.

11          To address that, at least in part, the liquidity

12  concerns that is done from that delay the debtors have

13  negotiated a step-down over time of the amounts that they will

14  contribute in cash to the settlement trust upon emergence.

15  Importantly, Your Honor, those step-downs were calculated

16  based on the assumption that the debtors' operations would

17  continue to perform the plan.  There is certainly all these

18  risks that the debtors may under-perform.

19          So the need to emerge expeditiously has not changed

20  despite the fact that we will now spend -- the BSA will now

21  spend a second recruiting season which coincides with the

22  beginning of the school year in bankruptcy.  We also

23  recognize, Your Honor, that the timeline really is a balancing

24  act between the estates need to exit bankruptcy quickly,

25  preserving charitable missions, preserving value for abuse

1  survivors, and on the other hand ensuring that the court and

2  the parties have adequate time to address all of the issues,

3  some of which are complex, that will arise in connection with

4  the disclosure statement and confirmation of the plan.

5          We attempted to recognize that balance by doing

6  what we can to move forward expeditiously, that includes in

7  response to the insurers notice filing and their discovery.

8  For the debtors' part we will be ready to proceed with the RSA

9  motion and the disclosure statement as early as July 20th and

10 21st.

11         As to the RSA we filed the RSA motion along with a

12 motion to shorten notice by a mere two days so that the motion

13 could be heard on July 20th prior to the court taking up the

14 disclosure statement.  From our perspective there is no reason

15 that the RSA hearing needs to be delayed either based on the

16 slightly shortened notice that we have given the parties or

17 based on the insurers needing to take discovery and to take

18 depositions.

19         As the insurers, themselves, noted in their

20 pleadings they had drafts of the RSA, the term sheet, and the

21 TDP since as early as June 25th; although, those forms have

22 changed due to the unfolding of negotiations.  They are

23 substantially in the form that was presented to the insurers.

24 So there is really no reason that the insurers need what would

25 amount to more than one month to take discovery and prepare

1   for a hearing on what would, otherwise, be a 21 day motion.

2           As to the disclosure statement, Your Honor, we

3   filed an interim version of the disclosure statement on June

4   18th.  The debtors sought to encapsulate in that version of

5   the DS the -- I'm sorry, the plan and DS that had been

6   negotiated to date, the RSA terms that have been negotiated to

7   date.  That was preceded by other proposed amendments to the

8   DS on May 16th.  So this has really been an incrementally

9   changing document over time and the changes have been made

10  over a period of several months.

11          We want to take into account, certainly, the

12  court's calendar and the court's views on the amount of notice

13  that needs to be provided to the parties in light of the

14  changes that have been made to the disclosure statement, but

15  at the same time its critically important to the debtors that

16  the disclosure statement and the plan be put out for

17  solicitation as soon as possible.  We're really primarily

18  concerned not with the immediate timeline, but more so with

19  the backend timeline.  We understand the court has set aside

20  the week of September 27th or, at least, held those dates for

21  the confirmation hearing and we would like to keep that

22  backend timing for the confirmation hearing intact or close to

23  it if at all possible.

24          The last subject that I would address, Your Honor,

25  is discovery.  The insurers served the debtors with discovery

1  on July 2nd and 3rd shortly after we filed the RSA motion.

2  The discovery requests are voluminous, they include 34

3  requests for production, 21 requests for admission, seven

4  interrogatories and they're primarily focused, as you would

5  expect, on the negotiation of the RSA and the Hartford

6  settlement agreement.

7         The timeline is highly compressed.  The insurers

8  requested responses to their discovery by today, July 7th.

9  The debtors have been working around the clock, including over

10 the holiday weekend, to stay on track to meet the insurers

11 requested deadline and we expect to have the production

12 substantially complete by tomorrow.

13        The insurers also noticed the depositions of the

14 debtors' CEO, Mr. Mosby; the debtors' national chair, Mr.

15 Ownby; and the debtors' financial advisor, Brian Whittman of

16 Alvarez & Marsal.  These depositions were noticed for July

17 8th, 9th, 10th and 12th.  So the end of this week and the

18 beginning of next.  The debtors have agreed to produce these

19 witnesses for depositions on Monday and Tuesday of next week,

20 July 12th and 13th.  We had originally proposed to do so

21 earlier, but the insurers asked for more time following our

22 production of documents and we agreed to move the depositions

23 accordingly to next week.

24        Finally, the insurers have stated several reasons

25 why they need discovery in connection with the RSA motion; one

1  of which is really their mischaracterization of the findings

2  in the proposed order granting the RSA, approving the RSA.  To

3  be clear, the debtors agree that the relevant standard that

4  governs approval of the RSA is the business judgment standard

5  and whether the debtors' decision to enter in the RSA was a

6  sound exercise of their reasonable business judgment.

7        To make that abundantly clear and to carefully

8  delineate precisely what relief would be granted by the entry

9  of that order we included a broad carve-out in the proposed

10 order, in a reservation of rights, providing that the court's

11 findings and rulings to not extend beyond the RSA itself.

12 They do not extend to the exhibits of the RSA.  They do not

13 extend the disclosure statement or the plan.  The rights and

14 objections of the parties are expressly reserved under the

15 preserved order that is on file with the court.

16        If this reservation is not enough the debtors are

17 happy to work with the insurers to address any of their

18 concerns, but in any event the court will not be asked that

19 the RSA approval hearing to determine any plan confirmation

20 issues including good faith for purposes of 1129 of the Code.

21        I will conclude, Your Honor, by thanking the court

22 for allowing us to reschedule the disclosure statement on

23 several occasions.  That flexibility really allowed us to put

24 together a plan that enjoys broad base creditor support and

25 now that the planets have aligned we are pleased to move

1  forward deliberately and expeditiously to confirm the plan and

2  emerge from bankruptcy having achieved our reorganization

3  objectives.

4          If the court has questions I'm happy to address

5  those; otherwise, I would be happy to turn the podium over to

6  the other supporting parties who I know would like to address

7  the court.

8          THE COURT:  No.  I don't have any questions.

9          MR. MASON:  Your Honor, its Richard Mason.  May I

10 be heard?

11         THE COURT:  Mr. Mason?

12         MR. MASON:  Thank you, Your Honor.  Thank you, Mr.

13 Linder.  Good afternoon, Your Honor.  Richard Mason of

14 Wachtell, Lipton, Rosen & Katz on behalf of the ad hoc

15 committee of local councils.

16         As Your Honor is aware, the ad hoc committee, of

17 which I am very pleased to be the chair, consists of

18 volunteers from eight local councils across the country.  The

19 ad hoc committee has been closely involved in this Chapter 11

20 case from the beginning, Your Honor, was an active participant

21 in the intensive mediation sessions with the TCC, the

22 coalition, the FCR, and other parties that led to the RSA, and

23 as a signatory to the RSA itself.

24         Your Honor, if you had asked me a month ago whether

25 we would be before you today with the support of the

1  coalition, the TCC, the FCR and all major creditor groups on a

2  deal I'm not sure what I would have said, but I don't think it

3  would have been yes.  The recent months have been very

4  intensive, but they have resulted in an agreement that paves

5  the way for a successful global resolution in these cases.

6  That is an extraordinary achievement.

7         In the RSA the ad hoc committee agreed to use

8  reasonable best efforts to persuade the over 250 local

9  councils to make the contribution to the settlement trust

10 described in the amended term sheet.  The ad hoc committee is

11 literally right in the middle of that effort almost as we

12 speak, Your Honor.  It is the culmination of nearly 18 months

13 of the ad hoc committee's interaction with local councils on

14 the issue of potential settlement contributions. We're

15 spending hours on the phone and on Zoom each day at night with

16 local councils across the country and will continue those

17 efforts in the coming weeks.

18         With all the progress that has been made, Your

19 Honor, the ad hoc committee agrees with the BSA and Mr. Linder

20 that timing is absolutely critical here.  The most important

21 season for local councils is the fall when we do our

22 recruiting and scouting units, and much of our fundraising.

23 Local councils and their staff, boards, chartered partners,

24 parents and volunteers will be looking at the BSA case to see

25 whether we've made progress and if an end is nearly in sight.

1        Delays in the timeline will lead to questions that

2   will be very difficult to answer.  Parents will wonder whether

3   to pay registration fees to an organization without a clear

4   path out of Chapter 11. The owners will want their dollars to

5   go to helping kids who will ask whether this will be a

6   successful project or whether their funds are better spent

7   elsewhere.  Without a timeline, Your Honor, that answers these

8   questions and preserves the business aspects of scouting the

9   very impressive settlement, I would say, that we have reached

10  with the tort plaintiffs and other major creditor

11  constituencies in this case may well be for not.

12        In other words, Your Honor, if the debtors can't

13  keep their timeline that alone could easily undermine the

14  scouting mission and make compensating victims equitably and

15  insuring that scouting survives very difficult to achieve.

16  We're closer than ever to making these goals a reality and the

17  ad hoc committee believes that we need to stay on track to get

18  there.

19        Now, of course, were not assuming that Your Honor

20  will approve the RSA or the disclosure statement and plan;

21  although, we will, of course, urge approval at the appropriate

22  time.  We're merely asking that that time be scheduled as

23  expeditiously as reasonable and possible for the benefit, Your

24  Honor, of the millions of youth that scouting serves today and

25  hopefully as a result of this historic settlement will

1  continue to serve in the future.

2          Thank you, Your Honor.

3          THE COURT:  Thank you.

4          MR. MOLTON:  Your Honor, may I go?  David Molton.

5          THE COURT:  Mr. Molton?

6          MR. MOLTON:  Thank you.  Can you hear me, Your

7  Honor?

8          THE COURT:  I can.

9          MR. MOLTON:  Thank you.  Your Honor, David Molton

10  of Brown Rudnick for the coalition of abuse scouts for

11  justice.

12          I want to reiterate what I just heard from Mr.

13  Mason.  I think that what you have in front of you, Your

14  Honor, is a remarkable outcome in light of where we were

15  recently demonstrating the very, very hard work of the

16  mediation parties and like Mr. Linder I would like to

17  specifically thank our three mediators who were gallant and

18  untiring in their efforts to work with all the parties.

19          My first point, Your Honor, is I think it's

20  important to note, and I know others have said it, that the

21  RSA and the term sheet bring together all of the major

22  survivor creditor constituencies in the other creditor groups.

23  As Your Honor knows, the coalition presently represents 18,000

24  survivors and its affiliated counsel represent over 60,000 of

25  the 80,000 claimants, survivors in this case.

1        We signed the RSA.  We negotiated the term sheet.

2   We're looking forward to move forward.  We have done that with

3   hand-in-hand, arm-in-arm with our other survivor

4   constituencies, the two fiduciaries, the TCC and the FCR.

5   With us, Your Honor, in going forward along this line were the

6   UCC as well as Mr. Mason's local counsel ad hoc committee.

7   Truly, Your Honor, a remarkable result again when one looks

8   just a few months ago.

9        Second, Your Honor, I believe that this is a

10  seminal and historic achievement in this case.  It's a turning

11  point and as Mr. Linder said it's not the end, we still have

12  wood to chop and we still have -- you know, we still have a

13  road to walk.  But what it does do, Your Honor, and, again,

14  you know, depending -- you know, no presupposing Your Honor's

15  decisions as to RSA approval as well as disclosure statement

16  and confirmation, but it allows the plan to proceed to a

17  disclosure statement hearing and confirmation in 2021.

18        As Your Honor knows, we have a date set in

19  September for the confirmation and I think all of the RSA

20  parties are committed in working with all of the parties in

21  this case to provide an avenue towards getting there fairly

22  with adequate time and notice.

23        Second, Your Honor, it provides a structure for

24  fair and equitable treatment of the abuse survivors.

25        Third, Your Honor, it provides a platform to

1  augment the trust with contributions from other parties in

2  this case who would want to join pre-confirmation into the

3  structure in terms of going forward.

4       Fourth, Your Honor, it allows Boy Scouts to exit

5  from this bankruptcy, which is something we've heard as an

6  aspiration from day one.  And if Your Honor takes a look at

7  some of the provisions of the term sheet including the non-

8  monetary commitment section it provides the architecture for

9  safe scouting, for safe scouting going forward.  I think that

10 serves well the needs of all the parties in this case and most

11 importantly the survivors.

12      Your Honor, I'm not going to use the status

13 conference for posturing or for any dry run of responses to

14 RSA objections or confirmation objections, but I do want to

15 make just a few points before I leave.

16      Number one, Your Honor, the mediation continues, as

17 Mr. Linder says.  Any suggestion that it doesn't is just wrong

18 and disingenuous.  We look forward, the coalition looks

19 forward to engaging other parties in this case in the same way

20 that it went forward from the time it became a mediation party

21 and got to this point.  So I do want to note, Your Honor, that

22 the mediators are still working, working hard, and providing

23 an avenue for further consensus and resolution.

24      Second, Your Honor, my second point I want to make

25 is just reading some of the movants and the joinders in

1  response to the debtors' motion to shorten time.  I see,

2  again, something I've seen a lot of since I've made an

3  appearance in this case.  I wasn't here on day one, but it's

4  almost a year since we have appeared in this case.  I see a

5  lot of misdirection and attack.

6        I just want to note, Your Honor, as we go forward,

7  that, you know, from our perspective here the confirmation

8  objections, whatever they be, will be dealt with by Your Honor

9  in an appropriate time and, you know, again, I want to allay

10 what has now become the regular and customary references to

11 social media mutterings which at this point, Your Honor, is

12 probably well expects in pleadings; you know, opposing

13 movement in this case.  The coalition remains committed to

14 working hard and going forward, Your Honor.

15       Lastly, I think it's important to reiterate what

16 Mr. Linder and Mr. Mason said about keeping to schedule.  We

17 view it as important to the survivors. I know that Mr. Linder

18 and Mr. Mason talked about how important it is to scouting,

19 but it's important to the survivors to get to a confirmation

20 hearing and to get to an effective date.

21       The survivors in this case have been waiting, some

22 of them, for decades for just equitable compensation.  We now

23 have a path that gets there.  As Your Honor well knows, moving

24 this case along that path will actually facilitate and not

25 hinder whatever possible further consensual resolutions that

1  may come about.  So I do want to say, Your Honor, that we join

2  in all the RSA parties in urging this court to move forward

3  with alacrity, you know, of course, preserving everybody's

4  rights.

5          In conclusion, Your Honor, as I mentioned to you

6  during our Rule 2019 fight, so a little over a half a year

7  ago, I mentioned to you that the coalition will be a

8  constructive valuable, if not indispensable and critical party

9  in bringing this case to a successful conclusion.  I asked you

10  to look at what we did and not what was said about us.  I

11  think we have proved my points, Your Honor.  I think we have

12  demonstrated all of that and will continue, Your Honor, to

13  march forward with our RSA parties to a successful

14  confirmation.

15          If Your Honor has no questions that's all I have.

16          THE COURT:  Thank you.  I do not.

17          Does anyone else --

18          MR. LUCAS:  Your Honor, this is John Lucas of

19  Pachulski Stang Ziehl & Jones for the official committee of

20  tort claimants.  May I be heard?

21          THE COURT:  Mr. Lucas?

22          MR. LUCAS:  Thank you, Your Honor.  And, Your

23  Honor, I will be brief.  I am not going to repeat everything

24  else that has already been said, but we think that there are

25  two primary points here to be made today or at least that the

1   TCC is going to re-emphasize.

2          There is agreement here, Your Honor, among all the

3   primary constituencies and the second issue here is that

4   because there is an agreement we need to move forward with the

5   timeline and get the plan confirmation process rolling.  It's

6   imperative to the process and it's imperative to survivors

7   that the process begin so that the plan confirmations can go

8   through, and be completed, and be considered by the court.

9          Nothing further, Your Honor.

10          THE COURT:  Thank you.

11          MR. BRADY:  Your Honor, Robert Brady for the FCR.

12          THE COURT:  Mr. Brady.

13          MR. BRADY:  Your Honor, again, I will try not to

14   duplicate what has been said, but we agree this is a major

15   achievement that has been reached.  Really, the most

16   significant progress in this case to date.  And like the

17   others, the FCR remains committed and prepared to continue the

18   mediation efforts to try to reach a resolution with other

19   interested parties.

20          Your Honor has already commented about the burn

21   rate in this case.  Your Honor is well-aware of the importance

22   of the schedule to the BSA and its ability to continue its

23   scouting mission.  And, of course, Your Honor, survivors have

24   already waited far too long to receive compensation for the

25   abuse they suffered.

1       We heard you loud and clear at the May 19th hearing

2  and the primary creditor constituencies went back to work,

3  worked very hard, and came together to achieve the plan term

4  sheet.  We asked the court to resist calls for further delay

5  and to put this debtor on a path to exit this very costly

6  bankruptcy.

7       Thank you, Your Honor.

8       THE COURT:  Thank you.

9       MS. WASSON:  Your Honor, Megan Wasson from Kramer

10  Levin on behalf of the UCC.  May I be heard briefly?

11       THE COURT:  Ms. Wasson?

12       MS. WASSON:  Thank you, Your Honor.  I'm also

13  joined by my colleague, Rachel Ringer, from Kramer Levin.

14       As others have echoed, the UCC is pleased that the

15  debtors have come to an agreement on the terms of a plan with

16  the TCC, the coalition, the FCR and the ad hoc committee of

17  local councils.  We think this settlement represents a

18  material step forward for these Chapter 11 cases and we echo

19  the appreciation of the debtors for all of its constituents

20  and the mediators for their efforts.

21       For a number of reasons, including those that have

22  been discussed, (indiscernible) parties we also believe that

23  maintaining an appropriate timeline is important for the

24  success of these cases and we are supportive of facilitating

25  confirmation of a plan and a smooth emergence from bankrutpcy

1  as soon as possible.

2          We believe that the timeline the debtors have

3  proposed is reasonable and we would support the debtors

4  request to adhere to that proposed timeline subject to the

5  court's availability.

6          Thank you, Your Honor.

7          THE COURT:  Thank you.

8          MR. ANKER:  Your Honor, this is Philip Anker.  Can

9  you hear me?  I have a somewhat unstable network.  Can you

10  hear me, Your Honor?

11          THE COURT:  I can.  I want to make sure that I've

12  heard from all of the parties in support of going forward on

13  the current timeline and then I will come to you, Mr. Anker.

14          MR. ANKER:  Thank you, Your Honor.

15          THE COURT:  Anyone else?

16          MR. ZALKIN:  Your Honor, this is Irwin Zalkin of

17  The Zalkin Law Firm.  I would like to speak on behalf of a

18  number of firms and several thousand claimants who are not on

19  board yet with this plan and the RSA.  I don't know if this is

20  the appropriate time for me to speak or if you want to hear

21  from others who are still want to address their support for

22  the plan.

23          I've been putting up my little hand here.  I don't

24  know if it's working or not working.  So I don't want to speak

25  out of turn, but whenever the court would like to hear from me

1 | I'd like to speak.

2 |             THE COURT:  Thank you.  I will not forget you, Mr.

3 | Zalkin.

4 |             MR. ZALKIN:  Thank you.

5 |             THE COURT:  Is there anyone else who wants to speak

6 | in support of the current timeline?

7 |      (No verbal response)

8 |             THE COURT:  I'm not hearing anyone else.

9 |             Mr. Anker, I'm going to go to you first.  I think

10 | Hartford is in a somewhat unique position.  So I'm going to

11 | come to you first.

12 |             I will get back to you, Mr. Zalkin.

13 |             MR. ANKER:  Thank you, Your Honor.  I apologize for

14 | jumping the gun earlier.  I am actually seeing some delay

15 | because I am not in my office today, I'm out of town at my in-

16 | laws and I apologize, Your Honor, if you have difficulty

17 | hearing me.

18 |             Your Honor, I'm going to try to focus on

19 | scheduling.  I think the temptation for everyone, and you

20 | heard a lot of it today, frankly, this protest to the contrary

21 | is to poison the well.  I do think it is important to Boy

22 | Scouts, all things being equal, to get out of bankruptcy

23 | sooner rather than later. I am not going to deny that.  I do

24 | not deny that it is important for those legitimate to actually

25 | be able to get paid sooner rather than later.  But it is also

1  important for parties who have substantial objections and

2  whose rights would be effected to have due process and be

3  heard.

4         Hartford is in a unique position.  We will,

5  whatever Your Honor's schedule is we will abide by it.  We

6  will be filing a substantial response to the RSA.  To just

7  give you a hint and to let you know, I think I owe it to you

8  as a matter of candor, that we will make two principal broad

9  points.

10        The first is that while the debtor uses the word

11 "determination" that's a synonym for a declaration.  They're

12 seeking declaratory relief with respect to the rights my

13 client has and they have it (indiscernible) properties arguing

14 (indiscernible) today is not the day to hear substantive

15 argument that that requires an adversary proceeding.

16        Second, putting that procedural point to the side

17 for the moment.  As a matter of substance, they are seeking a

18 determination, by their own papers, that they need not seek

19 approval of the plan. The Third Circuit has held directly to

20 the contrary in the Martin case and there is case law in other

21 circuits including in the plan context, including in the plan

22 context.  We will cite that law to you.  We will have that

23 argument.  We will, in our papers, recite facts.

24        I am hopeful, because I do think I am dealing with

25 honorable adversaries on the debtor side, that they will not

1  dispute those facts.  They will not come to this court and

2  dispute that they explicitly said to us they would never re-

3  trade the deal.  They explicitly said to us we do not need and

4  want a fiduciary out.  They explicitly said to us, and this is

5  how our deal was structured, and you heard Ms. Lauria say it a

6  few weeks ago in court we have an alternative if the claimants

7  vote no.  We have a toggle plan which gets BSA, the only

8  entity that has filed for bankruptcy, out of bankruptcy

9  without

10        And you also heard, and you will see this in our

11  papers, Mr. Stang stand up in court and say that alternative,

12  returning everyone in the tort system, and letting them have

13  everything that they're entitled to as a matter of law, every

14  plaintiff gets his day in court and can seek a zillion

15  dollars; that is (indiscernible).  That is a direct quote from

16  Mr. Stang.  That is worse, worse than a plan that includes the

17  Hartford settlement.

18        I would like to think that none of those facts will

19  be disputed, but if any are disputed we need time for some

20  discovery.  We filed our discover request, and I heard Mr.

21  Abbott describe the volume of requests and I assume he is

22  right for all the insurers, but as to Hartford it was a

23  handful of document requests, a handful of requests for

24  admissions and one or two interrogatories.

25        What they cite in those documents about the

1   negotiations in one or two depositions.  We filed those in

2   less than 24 hours after the RSA was filed.  Yes, Your Honor,

3   if we absolutely have to, we will take the depos Monday and

4   Tuesday, and file our papers two days later.  Will they have

5   cites to everything, will we be able to deal with what happens

6   when -- and we've been told this, the other side doesn't take

7   the position that everything is subject to the mediation

8   privilege and, therefore, we will get virtually no documents.

9   We will, I guess, come to Your Honor on, you know, five

10  minutes notice or we'll just have to go forward and hope that

11  at the end of the day there isn't a dispute over the facts and

12  that my adversaries are honorable that would really happen

13  here.

14          I would suggest to you having a two week period to

15  let that go is hardly, hardly in the bigger picture of this

16  case going to really create enormous delay and prejudice to

17  other parties compared to the prejudice to my client which was

18  the only (indiscernible) to come to a deal.  That's point one.

19          Point two, we do ask that the disclosure statement

20  hearing be at a different time subsequent to the RSA hearing.

21  My client, under its settlement agreement, cannot object to a

22  disclosure statement or plan that includes our settlement, and

23  the currently filed one does.

24          Now I want to be candid with Your Honor, I'm not

25  going to overstate how much my hands are tied behind my back.

1  I think I can write something that says, you know, to the

2  extent they really want to go forward with our deal then

3  ignore the following twelve pages, but if they're not then

4  stick with the following twelve pages.  But it is awkward,

5  Your Honor, it is awkward drafting and contrary to the

6  suggestion that is made the disclosure statement has enormous

7  changes.

8        Let me just highlight a couple.  Your Honor may

9  recall that when the mediation process began one of the

10  proposed mediators was Eric Green.  And there was an objection

11  filed by my client, my co-counsel, Mr. Ruggeri, pointing out

12  that Mr. Green has represented Mr. Patton in case after case,

13  after case, after case.  He has now proposed, for the first

14  time, to be the trustee.  I surmise that that was not the

15  debtors' suggestion.  I surmise that that was the claimants'

16  objection and then they wrote a TDP that basically says that

17  Mr. Green can do whatever he wants to do.  So now he's going

18  to be the judge and determine BSA's liability and then stick

19  it to us.

20        Section (a), it provides that the debtors shall --

21  are obligated under a plan to seek a series of findings.  One

22  is that everything is binding on everyone.  That is after

23  mister (indiscernible) stood up in this court and said, Your

24  Honor, you can't determine whether your orders are res

25  judicata; that's, obviously, designed to stick it to the

1  insurers.

2         They go on in the second finding to ask for a

3  determination that the TDP's are reasonable and provide a

4  reasonable process for allowing every claim.  They go on to

5  seek a determination finding that goes entirely to coverage

6  about whether our coverage obligation as insurers is for the

7  full amount allowed or (indiscernible) paid out on it.  And it

8  goes all new provisions.

9         So they render the plan patently unconfirmable at

10  the disclosure statement hearing.  I'm sure we're going to

11  have a debate on that, but there certainly needs to be time

12  for disclosure including discovery.  I have a prediction, I

13  could be proven wrong.  I don't think Ms. Lauria, Mr.

14  Andolina, or anyone else from BSA asked (indiscernible)

15  findings.  I think every one of them, every one of them was

16  put in by the claimants' counsel.

17         Yes, (indiscernible) out there where claimant

18  lawyers were not on board, maybe they are folks represented by

19  Mr. Zalkin, are saying that the professionals for the

20  coalition and for the TCC are saying if we get this plan

21  confirmed the insurers will have no ability whatsoever to

22  defend the case in coverage for it.  This will be binding on

23  them.  These findings will just get rubber stamped and it will

24  be over.  I hope that's wrong.  I don't think its right, but

25  that surely implicates our due process concerns.

1          So what I would respectfully ask, Your Honor, and I

2   am going to apologize now because I said to you I wasn't going

3   to get into the merits, I realize I have, but I wanted you to

4   appreciate what's at stake here.  I would appreciate that we

5   have a little bit of time to take discovery before the RSA

6   motion goes forward.  Hopefully there won't be factual

7   disputes.

8          Hopefully we can work through the privilege issues,

9   but if not get them resolved in a matter of a couple of weeks,

10  and that we then have the disclosure statement hearing

11  thereafter so we know whether we're going forward on a

12  disclosure statement on a plan, global settlement including

13  Hartford or alternatively the toggle plan, or instead we're

14  going forward with the new fourth amended plan in its reach

15  all agreements with Hartford.  Let us know which one we're

16  going forward with, let us have a reasonable, but not

17  elongated period for discovery leading into the disclosure

18  statement hearing and let us then have that disclosure

19  statement hearing.  We're talking about what in the aggregate

20  is maybe an adjournment of a month, further then having both

21  matters heard on July 20th.

22          Your Honor, unless you have questions those are the

23  points I wanted to make and I do hope they help on the

24  scheduling issues which I think are really what is before the

25  court today.

1          THE COURT:  Thank you.

2          Mr. Zalkin?

3          MR. ZALKIN:  Thank you, Your Honor.  Good

4   afternoon.

5          I -- this is my first appearance.  Just a little

6   bit of what my background is.  Our firm we have offices in San

7   Diego and New York.  We have been representing survivors of

8   childhood sexual abuse around the country for the past twenty

9   years or more.  I was appointed liaison counsel on behalf of

10  all the claimants in the San Diego Diocese bankruptcy by Judge

11  Louise DeCarl Adler and was the principal negotiator of the

12  $200 million settlement in that case which ended up with a

13  discharge of the bankruptcy as opposed to a plan.

14         I know Mr. Molton.  He was involved with me in

15  that.  We worked closely together.  I know Mr. Stang.  He and

16  I worked together not only on the San Diego bankruptcy, but

17  other bankruptcies.

18         We have looked at our firm and I will represent to

19  you that there are probably, among the group of us, about 50

20  law firms who have been taking a very close look at the

21  disclosure statement, the RSA, the most recent proposed plan,

22  the previously proposed plan and I was going to come to you

23  today and say we are -- we have some serious concerns and

24  objections that we intend to raise at the disclosure hearing.

25  I didn't expect people to be previewing the plan, and

1   highlighting points of the plan in advance of that.

2           I would -- I'd feel remiss if I don't address some

3   of that.  I don't want to get into an argument on the merits

4   of the plan.  That would be appropriate for a confirmation

5   hearing.  There are serious issues with questions of the

6   channeling injunction and the effectiveness of the channeling

7   injunction here where the court has subject matter

8   jurisdiction over the local councils, whether the local

9   councils are making a substantial contribution to the plan.

10          There are issues with respect to whether the court

11  can enforce claims that are not, otherwise, enforceable within

12  State Courts.  There are issues as to whether there should be

13  parody in voting between claimants who would not have valid

14  claims in the State Court, with claimants that do have valid

15  claims in the State Courts.  I know, for example, our firm

16  represents substantial numbers of California claimants where

17  we have a valid and open statute of limitations.  And issues

18  whether those claims should be treated, from a voting

19  standpoint, at parody with claims of victims from states where

20  they are foreclosed from bringing claims by their statutes of

21  limitations.

22          There are issues as to whether and why the

23  contributions of the local councils represent less than a

24  third of what they are acknowledging are unrestricted assets

25  and whether the insurance claims or insurance liability of

1   those non-debtor third parties would, in exchange for those

2   injunctions which would release them from all claims now and

3   forever, cap the liability of those carriers to the amounts of

4   the contributions that are being made by the local councils

5   assuming the court approves the channeling injunction to those

6   councils.

7            There are questions as to what is happening with

8   the future claims.  We've got to address future claims.  There

9   is a future claims representative with respect to the BSA

10  whose mandate is limited to the claims of those who are under

11  18 or have recovered memories -- or may have recovered

12  memories of the future only in states that recognize recovered

13  memory, but there are other future claims that people brought

14  on behalf of victims like in California where they have a

15  delayed discovery, for example, where they don't make a causal

16  connection between their sexual abuse and their adult injuries

17  or psychological injuries or illnesses for years.  That would

18  give rise to a future claim.  That is not being represented,

19  those folks aren't being represented.  We don't know what

20  future claims will be as to the local councils should the

21  court agree to channel the claims against the local councils

22  to the trust.

23            It's been represented in meetings held by sponsors

24  of the RSA and the TDP to the plan that this is -- that

25  confirmation of the plan would be the equivalent of a

1  litigated plan and that the plan confirmation would operate as

2  a judgement enforceable against the insurers.  We have

3  researched this issue and we haven't seen -- we have concerns

4  as to whether that is a viable position.

5        There are more issues.  I don't want to go through

6  the litany of objections that we plan to make.  Those are just

7  some of the questions that we have that we don't feel

8  adequately were addressed.  When a client asks me what am I

9  likely to get in recovery here I have no way to answer that.

10  I don't know if the $850 million that is putting in

11  collectively between the BSA and local councils is, in fact,

12  $850 million.  That is a combination of cash and personal and

13  real properties.  I don't (indiscernible) plan or disclosure

14  statements that indicates that is adequately appraised.  We

15  have issues with is that real or what.

16        So I don't want to take up much more time.  This

17  wasn't my intention.  I just simply -- you know, I feel like I

18  needed to address, at least alert the court to what is coming.

19  We will be filing these objections.  I think we need time.

20  You know, we are looking at very serious issues.  I commend

21  the work of the people who have been involved in negotiations.

22  I have been there.  I know what it takes when you have

23  multiple moving parts.

24        I was involved in the LA Catholic abuse settlement.

25  We had hundreds of insurance companies for the insurers,

1  excess insurers that we have to try to herd into a deal.  I

2  understand the complexities and I'm not trying to blow-up

3  something.  There are serious issues and we need to make sure

4  that those are adequately addressed so that when we do get a

5  plan that's confirmable and enforceable.

6          Thank you for your patience with me.

7          THE COURT:  Thank you.

8          Mr. Rosenthal, I think I saw your hand up earlier.

9          MR. ROSENTHAL:  Yes, Your Honor.  Thank you.

10 Michael Rosenthal from Gibson Dunn on behalf of the AIG

11 Companies.

12         Your Honor, the insurers have watched with interest

13 this plan (indiscernible).  Unfortunately, we don't share the

14 debtors' celebration of success and, in fact, we think that

15 the deal that's been struck is just half a loaf and not one

16 that is likely to result either in the end of the case very

17 soon or in survivors getting money in their pocket in the near

18 future.

19         We did participate in all of the mediation

20 sessions, most of them in person.  We were largely excluded

21 from those sessions.  I think that was the plan, Your Honor.

22 As Ken Rothweiler, one of the claimant's lawyers, was quoted

23 as saying yesterday in an interview on PBS NewsHour,

24         "This settlement is the first step and that's

25 always been the plan to get the settlement with the debtors

1   and then we can turn to the insurers."

2           We were sent packing from the last mediation to

3   wait for the plan to be prepared.  Four weeks later we got

4   hundreds of pages of documents.  They came on the Friday

5   before the July 4th weekend; an RSA we hadn't seen, a term

6   sheet we hadn't seen, a plan that while it looked a little bit

7   like the other plan was different from the other plan.  TDP's

8   that were totally different from the other plan.

9           In the face of these significant changes the

10  debtors now propose that we have only seven days, eight days

11  to respond.  We don't think that accords due process to the

12  insurers, Your Honor.  We don't think that is fair.  These are

13  complicated complex documents.  As you might imagine, the

14  changes in these documents, as Mr. Anker said, are primarily

15  directed toward insurers.

16          You will see that the plan that was, relatively

17  speaking, insurance neutral before is now absolutely non-

18  insurance neutral.  Those are things that we believe are

19  absolutely essential to bring to the court's attention at the

20  disclosure statement hearing and that will require discovery

21  and significant briefing for the court.

22          As Mr. Anker said, as others have said you're going

23  to be asked to make findings that adjudicate the liability of

24  the insurers.  One of the things you said before was that you

25  didn't really know what insurance neutrality meant.  It's not

1   just a standing doctrine.  It's the expression that people use

2   for a plan that does not alter the contracts and the rights of

3   the insurers.

4          What this plan does is alter the rights of the

5   insurers under those contracts.  You cannot confirm a plan of

6   that type, Your Honor.  And we need to make those points clear

7   to you and we would hope that you would make clear to the

8   claimants that you will not approve a plan that alters those

9   rights.  You don't have the right to do that.

10          What these claimants have done, frankly, is they

11  have cut a deal with the debtor and in exchange for letting

12  the debtor get out of the case they have taken over the case.

13  They have prepared the TDP's, they have prepared the plan,

14  they put in the requisite timing that you have to make as

15  findings required by the RSA.  It is those issues, Your Honor,

16  that we need to develop for you and present to you, and it

17  will take some time.

18          As Mr. Anker said, both Century, Hartford, AIG and

19  a number of other insurers filed discovery requests the day we

20  received these documents.  They are requests that we have not

21  yet received responses to.  We did have a meet and confer.

22  The documents are supposed to be produced today or tomorrow.

23  Undoubtedly we will have discovery disputes.

24          We have already been told that many, if not all, of

25  the documents will be subject to mediation privilege.  We have

1  depositions that we've tried to schedule for next week, but in

2  the absence of both documentation it's hard to take the

3  depositions.

4  Then, under the current schedule, we would have an

5  objection due the day after, on the 14th, the day after the

6  last deposition is to be taken.  Your Honor, we believe that

7  is unreasonable and denies the insurers due process.  We

8  believe that allowing the insurers not a lot of time -- as

9  everyone has said here we're not looking to delay this case or

10  delay (indiscernible).

11  We just believe it is absolutely important for the

12  insurers to be able to evaluate their positions, evaluate

13  these documents, present their positions in a coherent and

14  cohesive manner to the court.  Delaying these hearings for ten

15  days to two weeks is not going to delay this case

16  unreasonably.  We think it's a very reasonable request, Your

17  Honor, and we would ask you to grant our motion for

18  adjournment.

19  THE COURT:  Thank you.

20  Let me ask this question, Mr. Rosenthal, with

21  respect to insurance neutrality, the way you have defined it,

22  what issues of fact need to be developed versus a position of

23  law that I, in fact, simply cannot make the findings that the

24  plan proponents are asking me to do?

25  MR. ROSENTHAL:  I think most of the issues on

1  insurance neutrality are matters of law.  I think the issues

2  of fact are the ones with respect to is the RSA a wise

3  exercise of the business judgment of the debtor.  Is it a wise

4  exercise of the business judgment of the debtor to abandon the

5  toggle plan which, effectively, put the claimants to a test of

6  agreeing to a consensual deal or going back into the tort

7  system.

8           Those kinds of issues, what did the debtor

9  consider.  We noticed the deposition of Mr. Mosby and Mr.

10 Ownby who are the two senior executives of Boy Scouts of

11 America.  We hope they will tell us what they considered, what

12 they thought about.  So those are the facts that we would be

13 discovering in the depositions.

14          I agree with you that many of the issues related to

15 insurance neutrality are issues that are governed by law.

16          THE COURT:  Thank you.

17          Who else would like to be heard?

18     (No verbal response)

19          THE COURT:  Mr. Schiavoni, you're muted, but I will

20 hear from you.

21          MR. SCHIAVONI:  Well, Your Honor, there I am, I

22 think.

23          Your Honor, one of the other issues on insurance

24 neutrality is somewhat of a mixed issue of fact and law is in

25 the run-up to the bankruptcy, the Boy Scouts, over half of the

1  amount of the claim that came in were paid for and funded by

2  the Boy Scouts under its own retained limits under the

3  policies.  The insurance program that the Boy Scouts couldn't

4  place was one that had significant, what they call "SIRs,"

5  retained limits under the policies, that the Boy Scouts had an

6  affirmative obligation to pay, as well as some of the other

7  insured entities.

8          Effectively, one of the things that has been done

9  through the RSA is to basically free that obligation,

10 completely change it so that there's sort of, essentially, a

11 dollar-one obligation, subordinate our rights with respect to

12 those claims, and effectively take away the impact of any

13 votes we would have with respect to those claims.  It

14 completely and totally changes the fundamental nature of the

15 insurance relationship with the Boy Scouts under those

16 policies, where, otherwise, the Boy Scouts are, in essence, a

17 partner in the defense of the claims.  The Boy Scouts sort of

18 walk wee there the obligation that they have on those claims

19 and at the same time, change the nature of those contracts,

20 requiring us to fund, in essence, their obligation, when

21 that's not at all really how the policy is put together.

22         But, look, I offer that to respond to your

23 question.  Your Honor, if I could, just for a moment, just

24 really, like Mr. Anker, focus on scheduling.  I join in

25 everything that Mr. Rosenthal, for AIG, had to say, but just

1  coming at it from just a slightly different angle, a friend of

2  whine who's a judge once told me that, you know, a good

3  process results in good decisions.  And as much as it's

4  important to me as a lawyer, and as a human being, just to put

5  briefs together and get things done, it's as important,

6  perhaps more important to the Court that we all, both sides,

7  give you good briefs and a full record, for you to make

8  decisions here.

9          The decisions you're going to make are obviously

10  going to be important.  They're important for both sides and

11  to the claimants.  The better record you have, the better

12  briefs you have, the better decision-making we arm you to put

13  together here.

14          And so, you understand a little the perspective

15  we're coming at about why a little time is necessary here, we,

16  at Century, we got the plan, the new plan about 20 minutes

17  before midnight.  That's when we received the blackline on

18  Friday, before the 4th of July holiday.

19          We did get a termsheet, you know, six days later,

20  but a termsheet is very different from a plan.  As far as the

21  discussing that preceded the drafting of this plan, the

22  submission of it, we didn't get drafts of that plan between

23  the time it was filed and what was previously filed.  We

24  didn't get any drafts.  We didn't get drafts of the TDPs

25  before what we were given a week before when we were given the

1 termsheet.  We were completely excluded from all of the

2 meeting between the Boy Scouts and the claimants concerning

3 the drafting of the TDPs and the drafting of this RSA.  Not

4 some of the meetings, not most of the meetings; we were

5 excluded from all of them.

6 　　　　　And to be clear, we weren't really encouraged to

7 come to the mediation.  We the schedules, the agendas for them

8 were ones that made clear that we weren't going to be

9 included, but we went.  I didn't want anyone to say that

10 Century didn't go.  I traveled to Miami.  I traveled to the

11 session in Chicago and the one in New York.

12 　　　　　In Chicago, I was sat on a different floor from

13 where the claimants were sitting and the Boy Scouts were

14 sitting.  I sat there for almost the entire day.  You know,

15 they did have separate food delivered to us there, but this

16 was not a process that we able to participate in.  It wasn't

17 one that we didn't ask to participate in.  I wasn't one that

18 we didn't come ready to participate in.

19 　　　　　I brought business folks with us.  If there's any

20 contention about us being excluded, we will have witnesses who

21 will testify for the extent that they were excluded, how we

22 sat entire days without talking, really talking or meeting

23 with anyone whatsoever, and we were completely and thoroughly

24 excluded from the meetings about the putting together of these

25 TDPs.

1        In many ways, I think you'll see what happened here

2   was a sort of, you know, replay of what you're going to have

3   as a fact pattern in front of you in Imerys.  You know, the

4   Boy Scouts may well have had an arm's-length negotiation about

5   their economic contribution to the plan, the dollars that they

6   put up with the councils, but when that discussion ended, they

7   had no economic interest in the claims; what the claims are

8   valued at, how they were allowed.

9        So, turning the process over at that point to the

10  claimants to draft the procedures for what claims are allowed

11  and what claims are, you know, paid, that's a process that's

12  off the rails.  It's one that there's no counterparty to that

13  had any economic interest in what was done.

14       And why I bring that up is not to necessarily

15  poison the well here, Your Honor, but on the RSA, if you look

16  at the proposed order they've submitted, they're seeking, you

17  know, as part of that proposed order, and, granted, you heard

18  from Mr. Linder earlier that, well, they're willing to make

19  some changes to that, but they're seeking findings that the

20  negotiation was all in good faith, that it all included all,

21  you know, the mediation parties, and the net result here was

22  at arm's-length.

23       And, again, it may well have been the dollar

24  numbers that they set up for the Boy Scouts contribution ones,

25  but those findings, they have no purpose whatsoever in a

1 motion to approve the RSA.  The RSA is subject to a business

2 judgment, period.  It doesn't require those host of findings.

3            Those findings, to be clear, are designed to

4 prejudice us.  They're designed to prejudice us in subsequent

5 proceeding, when we talked about, gee, we weren't there.  We

6 weren't part of it.  This was a collusively designed TDP,

7 which it was.

8            And if we're in a position where we have to go into

9 a hearing in two weeks, and, you know, defend ourselves from

10 findings, factual findings being made about how to -- about --

11 that could be held against us, with regard to how these

12 negotiations took place, yes, we need discovery on that and we

13 need more than just the extra three days that was put in.

14 That's of vital importance to us and it's something that we

15 absolutely contest about how it was put together.

16            Your Honor, the RSA, it doesn't address -- and this

17 is the nature of what happened by excluding us -- it doesn't

18 address anything about the merits of the proofs of claim.  It

19 calls for the payment of all claims.  All the folks who filed

20 proofs of claim are to be paid.  There's a waiting, with

21 regard to claims that would fail the statute of limitations,

22 so everyone is paid.  Even claims that otherwise would fail

23 completely are paid $3500 apiece.  So, in essence, everyone is

24 paid to vote.  It's like that number, by the way, went up

25 there a thousand dollars to $3500 a claim.

1      There's been no vetting of the claims done.  We

2  still have before you, our 2004 motion.  We very respectfully

3  ask that that go forward.  We think that, in essence, one of

4  the reasons why there was like, no effort to include us, there

5  was in effort to really reach a deal here, was exactly what

6  was in our 2004 papers when we filed them.  That, as long as

7  the claimants think that every single claim is going to be

8  approved and paid, it's just impossible to reach any sort of

9  deal on any term -- type of reasonable terms.

10      What's come out of this is one that's not just

11  insurance and not just insurance neutral, but one that

12  facially doesn't make any sense.  Turning over this whole

13  package of claims, given the evidence that's before you, to a

14  claim and control trust, to then allow and pay them all; it's

15  a process that's completely off the rails.

16      Your Honor, the last point I would like to just

17  focus on is what the discovery would sort of focus on that the

18  Boy Scouts are telling us just three extra days would allow,

19  but it's, one, these issues of findings.  And, yes, if the Boy

20  Scouts agree to drop those findings over the course of the

21  week, we can talk about narrowing some of what's needed here,

22  but it's the findings, first of all.  It's, two, the business

23  judgment issues that went into this.

24      And there are significant issues here, Your Honor.

25  I mean, I heard all of the tier here that Boy Scouts has

1  released and the theory that they're going to go out and try

2  to recruit new claimants.  But it's like you've got the point

3  here that the plan they're going forward with doesn't -- it's

4  dropped out, in essence, any protections for any of the

5  sponsoring organizations, which are the organizations that

6  provide the Scouts.

7            So, if they're really thinking they're going to go

8  forward in November with recruiting when all of the folks

9  they're going to be talking to about recruiting are going to

10 be hit with lawsuits at that point, I don't get it.  I don't

11 get how the case is even feasible.  It's utterly, sort of

12 illusory sort of relief that they've ended up putting in here.

13           And I think Your Honor will hear from some of the

14 sponsors who are on the call about the same issue, about --

15 and how serious that is.  And it's not one that really merits

16 just three days of additional objection time to address.  You

17 know, the other issues that would need to be addressed in just

18 this three days that they've given us is the claimants,

19 themselves, you heard some allusions to this about allusions

20 to social media.

21           Well, the largest group in the coalition, it's

22 called "Abused in Scouting," it's the one -- there was a lot

23 of focus on in the 2019s.  It's the one that represents the

24 biggest collection of claimants -- 18,000.

25           The lawyer who claims to represent those claimants,

 1  Mr. Kosnoff, he has vocally stood out and said that he objects

 2  to this.  We've attached his statements to that regard to

 3  this, being the RSA.  They're attached, I think, as Exhibit 4

 4  to the declaration that accompanied our motion for an

 5  adjournment.

 6           We have before Your Honor, it's a sort of

 7  supplementary 2019 motion asking for clarity on this exact

 8  issue, and this is before this really came home fully to

 9  roost, but it was one that we were concerned about.

10  Mr. Kosnoff famously recruited these claimants and then he

11  brought in a gentleman named Mr. Rothweiler to serve as his

12  co-counsel in some capacity.

13           But Mr. Kosnoff claims to represent these folks and

14  to speak for them.  You have on file the retention agreement.

15  It doesn't really give clarity about who speaks for them or

16  not.  Mr. Kosnoff claims to speak for them.  That's in the

17  filing on record.  But Mr. Rothweiler claims to be signing for

18  them on the RSA.

19           The numbers here are significant because the

20  numbers of claimants who are actually coalition members versus

21  numbers of folks who the lawyers associated with the coalition

22  represent are different and the waiting is different.  So,

23  that 2019 motion, Your Honor, we submit, does need to be

24  decided so that we have -- it's intended to give clarity on

25  who exactly, really controls those votes, so we know whether

1  or not the RSA is, in fact, authorized and carries a majority

2  of those folks with them.

3         And the result of that, in a sense, does impact

4  whether discovery is needed on that issue, whether or not

5  there's authority for those claims or not.  We've sort of held

6  back on kind of going ahead with that discovery because we

7  were hoping for a ruling on the 2019, but that is something

8  else that's sort of directly teed up by the RSA motion.

9         Another issue is, of course, the large payment

10  that's to be made to coalition professionals, in connection

11  with their agreement to vote in favor, you know, for the plan.

12  The monies are very significant.  They come in connection with

13  a case where the payment to professionals are already

14  enormous.  It's hard by any imagination to look at these

15  numbers as not duplicates of work that the TCC has already

16  done.  It's not subject to a business judgment standard.

17         And on that issue, we already have a problem.  It's

18  like, we served discovery on the coalition asking them for the

19  documents that they exchanged concerning their request for

20  money and the termsheets and whatnot that had the requests for

21  money and they objected to producing anything whatsoever.  We

22  hope, of course, to reach some sort of resolution on that, but

23  we got those objections even before they filed the RSA and I'm

24  just concerned we're going to have an issue on this, because,

25  you know, there's no question if they're going forward with

1  findings about what happened behind closed doors, and if the

2  same -- they want a finding that blesses what happened behind

3  closed doors in a certain way, but at the same time, they want

4  to vote mediation privilege to basically protect everything

5  about that exchange.  It's like the whole thing is being used

6  as a sort of sword and shield at the same time.

7          We think Your Honor sort of addressed those issues

8  in Imerys where the rulings were that communication about the

9  negotiation with the TDP has to be produced.  But whether

10 that's the case or not, it's like, yes, we're concerned that

11 briefing will have to be done on that.

12         Like Mr. Anker said, I aspire to write as fast as

13 Mr. Anker, who said that he could write this brief in five

14 minutes or he would be before the Court in five minutes on it.

15 But we would try to come before the Court as quickly as

16 possible if we can't reach a resolution with Mr. Molton.  But,

17 you know, clearly it's a challenge for us to do that.

18         So, Your Honor, for all of those reasons, I'd  ask

19 -- and there's more, I could go on -- but I would ask that you

20 please give serious consideration to giving us some relief on

21 the schedule.  There's not -- you know, no one here is being

22 driven by delay for delay's sake.  This is, you know

23 arbitration lot of time has gone under the bridge here before

24 we got this point where we are.  We did not sight on our

25 rights most certainly, Your Honor.

1        I mean, each of the last two conferences, I came to

2   Your Honor and said, we are being excluded from the

3   mediations.  We are not being included as part of these

4   discussions, you know, basically foretold where we were here.

5   And, look, I want to be clear, like, yes, periodically, people

6   came to us and said, you know, talked to just us about money,

7   but it's like, we were not included in the meetings between

8   the Boy Scouts and the claimants.  It was as if we were

9   completely excluded from that, as well as the drafts of all of

10  these TDPs; the things that affected us the most.  And, you

11  know, we did want to weigh in on those things and we did try

12  to play a productive role, and God knows, we want to play a

13  productive role.

14       And I think if the record on mediation was lifted,

15  you'd find that we played a very productive role here and

16  helped bring about, you know, this thing as far as it's gotten

17  so far.  But, Your Honor, where'd ask that you please give us

18  some additional time here so we can put before you a full

19  record so you can make good decisions on what's going to come

20  out.

21       Thank you, Your Honor.

22       THE COURT:  Thank you.  Mr. Goldberg?

23       MR. GOLDBERG:  Thank you, Your Honor.  Adam

24  Goldberg of Latham & Watkins, on behalf of the Church of Jesus

25  Christ of Latter Day Saints.

1          I'd like to speak, Your Honor, to join in the

2  request to adjourn the disclosure statement hearing, the

3  objection deadline, and the RSA motion.  Your Honor, the

4  debtors tout the RSA as representing a breakthrough with every

5  significant creditor constituency in these cases.  They have

6  left out one major creditor constituency, that is the

7  chartered organizations.

8          The church is one of the chartered organizations.

9  According to the debtors' disclosure statement there, are over

10  41,000 of them.  Those chartered organizations are individual

11  church congregations, temples, schools, civic, and charitable

12  organizations, businesses, and groups of citizens.

13          The latest disclosure statement includes a list of

14  the top-20 chartered organizations that appear in proof of

15  claim forms.  Those organizations include the Methodist

16  Church, the Baptist Church, the Catholic Church, the Church of

17  Jesus Christ of Latter Day Saints, the Presbyterian Church,

18  the Lutheran Church, the Episcopal Church, the United States

19  Armed Forces, the YMCA, and the Salvation Army.

20          The plan does not have the support of any chartered

21  organization and none, to our knowledge, have had any advanced

22  drafts of the plan or disclosure statement before they hit the

23  docket.  Only a handful of chartered organizations have become

24  mediation parties in these cases to date.

25          The plan, as is developed under the RSA, is highly

1   prejudicial to the rights of chartered organizations and the

2   proposed -- in particular, Your Honor, there are two issues

3   that I'd focus on.  One is that the proposed TDPs expressly

4   subordinate the indemnity claims of chartered organizations

5   which are termed "indirect abuse claims" under the plan.

6           Article 11 of the TDP is clear that indirect abuse

7   claims are subordinate to payment in full of all direct abuse

8   claims and those terms first appear in the June 18 filing

9   that, is the third amended plan.  In the context of this case,

10  it would seem highly unlikely that chartered organizations

11  would ever recover anything at all on account of their valid

12  indemnity claims under the current plan, and if they did

13  recover anything, it would be years and years down the road.

14          In terms of disclosure to those 41,000 chartered

15  organizations who are to receive this highly discriminatory

16  treatment, the subordination is buried in a footnote in the

17  treatment summary table in the proposed disclosure statement

18  and then does not appear until page 194 of the disclosure

19  statement.

20          The second issue, Your Honor, in addition to

21  outright subordination, the plan strips valuable property

22  recognition away from chartered organizations without any

23  compensation or consent.  The plan provides an injunction

24  against chartered organizations pursuing their own insurance

25  rights as the policies issued for the debtors and expressly

1  covering chartered organizations, as well as for policies

2  issued for nondebtor local councils and that expressly cover

3  chartered organizations.

4          This injunction does not affect just settling

5  insurance companies, if any, but all insurance companies.

6  These are extraordinary terms for treatment of insurance in

7  mass-tort cases that appear to us to be without precedent.

8          The disclosure statement states in the treatment

9  and summary table on page 22 that the indirect abuse claims

10  will have recourse to insurance rights.  That statement is

11  completely false or at least grossly misleading if the intent

12  is actually to say that chartered organizations may have

13  rights under their own insurance to which the BSA and local

14  councils were not party.

15          There are numerous other ways in which the

16  chartered organizations are prejudiced in the current plan and

17  TDPs; for example, Your Honor, before an indirect abuse

18  claimant may receive from the trust, it must release the

19  settlement trust and protected parties for all liabilities for

20  direct abuse claims.  That's effectively a nonconsensual

21  release as a condition to any distribution and that first

22  appeared in the June 18th filings, as well.

23          The RSA announced on July 1st is, itself, a very

24  material development in these cases for chartered

25  organizations and the fourth amended plan, we've had for just

1  one business day at this point, Your Honor, has material

2  changes that particularly include removal of the toggle plan

3  option.  And that change is very important to us and to other

4  chartered organizations because under the terms that were

5  proposed, the toggle plan would have been a better outcome for

6  chartered organizations.  Under the toggle plan, chartered

7  organizations would have kept their own insurance rights,

8  which are stripped under the current plan.

9         Your Honor, Delaware Local Rule 3017-1 requires 35

10 days' notice of a hearing on a disclosure statement and 28

11 days' notice of an objection deadline.  The current proposed

12 timing is shortened notice under the Local Rules, even using

13 the third amended filed on June 18th as a start date.

14         From our point of view, it's especially appropriate

15 to enforce compliance with the rules at a minimum in the

16 circumstances of these highly complex cases in which the RSA

17 parties of seek to push the boundaries of the plan terms in

18 new ways.  The RSA parties, no doubt, engaged in extensive

19 effort to develop a proposed plan and I would diminish their

20 achievement at all.

21         What it shows to me, Your Honor, is that adjourning

22 the disclosure statement at the last hearing was the right

23 decision and that time has been used productively.  This

24 achievement, among a subset of the parties in this case,

25 however, is not a justification to cut short the process when

1   real work remains.

2          I'd like to highlight as an example of the benefit

3   of more time from the perspective of chartered organizations.

4   In the second amended plan, that was the subject of the prior

5   round of hearings, the contingent indemnity claims of

6   chartered organizations would have been completely disallowed

7   without any opportunity to have those claims heard and

8   adjudicated after they became noncontingent.

9          In response to our last disclosure statement

10  objection, the debtors amended the TDPs to provide an

11  opportunity for reconsideration of contingent indemnity claims

12  when they became noncontingent, as required by law, and that

13  issue was resolved without the need for Court intervention.

14         Your Honor, from our perspective, many of the tens

15  of thousands of chartered organizations are just beginning to

16  get involved as they wake up to their treatment under this

17  plan.  The Church and other chartered organizations should

18  have their rights under the rules to evaluate the disclosure

19  statement and the TDPs, in accordance with the timeline set

20  forth in the rules and have the opportunity to seek to raise

21  and solve their issues, if possible, before a hearing.

22         Thank you, Your Honor.

23         THE COURT:  Thank you.  Mr. Ryan?

24         MR. RYAN:  Thank you, Your Honor.  Good afternoon.

25         I represent the United Methodist Ad Hoc Committee

1  and also, the Roman Catholic Ad Hoc Committee.  The United

2  Methodists have had a 100-plus-year relationship with

3  scouting, and at current, and by far, the largest sponsoring

4  organization in terms of numbers of scouts under sponsorship.

5       I'm going to try not to reiterate too much of what

6  Mr. Goldberg said, but also on his point of chartered

7  organizations really just getting directly involved, well, the

8  Methodists have been involved since the beginning of the year.

9       The Roman Catholic Ad Hoc Committee has just

10 recently before formed.  And while we filed a Rule 2019

11 disclosure, since that time, some of the largest Diocese in

12 the country have indicated that they will be joining that ad

13 hoc committee, including New York, Chicago, Atlanta, and

14 Washington, D.C.

15      Between these two denominations, Your Honor, over

16 33 percent of the current census of scouting is covered by our

17 sponsorships.  Simply put, the future of scouting requires our

18 continued support and our value of Boy Scouts as a business

19 partner, with which we want to do business going forward in

20 the future.

21      But as Mr. Goldberg also noted, we are also

22 creditors.  We are creditors of Boy Scouts against whom we

23 have indemnity claims.  We also have additional insurer rights

24 under the Boy Scouts policies.  And as Mr. Goldberg noted, we

25 also have significant claims against the local councils, who

1   are nondebtors, and we are additional insureds under the local

2   councils' insurance policies; again, insurance policies

3   procured by nondebtors.

4           And the plan in this case, as Mr. Goldberg noted,

5   proposes to strip all of our property rights, not only

6   insurance policies procured by debtors, but insurance policies

7   procured by nondebtors.  That raises substantial questions of

8   this Court's jurisdiction to do what that plan proposes,

9   absent consent.

10          This plan with the prejudice that it has to the

11  chartered organizations is not going to achieve that consent,

12  Your Honor.  It's a plan designed to pressure them and a

13  timeline to pressure them into exceeding to the demand of the

14  tort claimants.  And what is going to occur, Your Honor, is

15  that every chartered organization is going to have to make a

16  decision, how do we continue to do business with an

17  organization like Boy Scouts?  How do we voluntary our time,

18  volunteer our property on a weekly basis to tens of thousands

19  of troops and hundreds of thousands of scouts, with an

20  organization that proposes to treat us as this plan proposes

21  to treat chartered organizations?

22          No chartered organization wants to make that

23  decision, but we're being forced into that corner and forced

24  into that corner under the timeline and the plan that Boy

25  Scouts and the tort claimants are proposing.  It's going to

1  make the decision self-fulfilling.  What organization would

2  choose to do business with Boy Scouts, being treated like this

3  going forward?

4         Chartered organizations want it be part of the

5  solution.  To date, we have been sitting back.  We have been

6  allowing the negotiations, which, frankly, had more

7  importance, to take place.  And we commend the debtors and the

8  tort claimants and the local councils for reaching major

9  agreements, but that does not mean now is the time to rush

10  forward and to jam and to prejudice the lifeblood of Boy

11  Scouts, which are the sponsored organizations.

12         What we should be doing, Your Honor, is now pausing

13  and seeing how chartered organizations, who want to continue

14  to support Boy Scouts and the mission of scouting, how they

15  can be incorporated into a plan that deals with their property

16  rights fairly, that deals with their claims fairly, that

17  allows them to make the decision, this is a business partner,

18  with whom we want to continue to do business.

19         A plan proposed 2,131 pages at midnight, July 1st,

20  seeking to be approved for solicitation 19 days later over a

21  holiday weekend, does not allow well-organized chartered

22  organizations, like Mr. Goldberg's client and my clients, to

23  respond adequately.  (Indiscernible) there are 40,000

24  chartered organizations: (indiscernible), JCs, PTAs, in the

25  middle of summer.  None of this is providing them due process.

1  It doesn't even come close to complying with the Local Rules.

2          So, we join in with the request of the insurers

3  and, more importantly, join in the request of the Latter Day

4  Saints, that this prose must be slowed down.  Chartered

5  organizations are resolution-oriented.  They want to be part

6  of the solution.  They need to be afforded that time.

7          Going forward with this plan on this timeline is

8  going to back them into a corner, that as Mr. Schiavoni noted,

9  is going to threaten the very future of Boy Scouts.  And these

10 are organizations that are for a hundred-plus years have been

11 devoted to the mission of scouting, and that is a terrible

12 place to put them in and a terrible decision for us to have to

13 make.  So, we do agree that more time is needed.

14         And as Mr. Goldberg noted, when we adjourn things,

15 people start to talk.  The chartered organizations have not

16 been involved in meaningful conversations with any

17 constituency.  We would be more than happy to do so.  We'd

18 like to do so.  We want to support scouting going forward, but

19 we need that time and we can't have that time if we're boxed

20 into a corner on an (indiscernible) tight timeline.

21         Thank you, Your Honor.

22         THE COURT:  Thank you.

23         Is there anyone else who wishes to be heard before

24 I good back to Mr. Linder?

25     (No verbal response)

1           THE COURT:  Mr. Linder?

2           MR. LINDER:  Thank you, Your Honor.  Again, Matt

3    Linder, White & Case, for the debtors.

4           I will break this up into two pieces, Your Honor.

5    I think there are -- it's clear that there is opposition to

6    the RSA motion proceeding on the timeline that we've proposed.

7    There's also opposition to the disclosure statement going

8    forward on the timeline that we've proposed.

9           I think the Court may consider viewing those

10   differently, in light of the issues that have been presented

11   in the scope of the concerns that have been voiced by the

12   parties.  And I'll start with a response to Mr. Anker's

13   argument with respect to the RSA.  Even given the unique

14   position of his client, you know, Mr. Anker outlined

15   essentially what his are argument will be and it sounds like

16   his brief may already be drafted.

17          So, we question both, the sort of the scope of the

18   fact discovery that really needs to be conducted, with respect

19   to the RSA with Hartford and the amount of time that is really

20   going to be required to put together briefing.  Again, we

21   shortened notice reluctantly, but we had to, by two days.  We

22   think this is a sufficient amount of time for Hartford to

23   adequately prepare to take discovery and make new arguments.

24          I would just say in response to the specific points

25   that Mr. Anker raised, first, with regard to whether or not

1  the determination that the debtors are seeking, it should be

2  the subject of an adversary proceeding, I'll just say at this

3  juncture, Your Honor, that we disagree with that contention.

4  I won't say more at this status conference.  We think that's

5  an issue best reserved for briefing.  We're prepared to brief

6  it and we disagree with that contention.

7          With respect to the third -- the state of the law

8  in the Third Circuit regarding the position of the debtor,

9  with respect to an agreement that has been entered into that

10 has not been approved by the Court, again, we disagree with

11 Mr. Anker's interpretation of the Martin decision by the Third

12 Circuit.  We're familiar with that decision.

13         Like in the Martin case, our duty as debtors in

14 possession to the estates and creditors irreconcilably

15 conflict with any purported duty that we might have under the

16 Hartford agreement.  That conflict doesn't break, in our view,

17 in favor of the RSA and the interests of creditors as a whole.

18 We think the Martin case is on all fours with the position

19 that we're in.  So, for those reasons, Your Honor, we don't

20 think there's a valid basis to adjourn the RSA hearing.

21         Nor, did we hear --

22         THE COURT:  Well, I haven't read the Martin case in

23 a long time, and I'll do that, but what about the findings

24 that the debtor wants for me to make in the context of the

25 RSA?  And the debtor presumably thinking it needs the findings

1 that Mr. Anker says he wants to take discovery on, as others

2 have said, as well.

3          This isn't a purely a legal issue, is what -- you

4 haven't teed up in front of me a legal issue, as I'm hearing

5 it or reading it.  You could, but you haven't.

6          So, what about the need to take discovery and to

7 address those issues?

8          MR. LINDER:  We're not -- I don't think we're

9 contending, Your Honor, that discovery is not needed or is not

10 appropriate in connection with this dispute, but I think

11 Hartford themselves conceded that the discovery that needs to

12 be taken, and as the debtors' determination to enter into the

13 RSA, is narrow in scope.  And we've set out a pathway for that

14 discovery to be undertaken and completed in advance of the

15 hearing.

16          THE COURT:  Okay.

17          MR. LINDER:  With respect to the arguments made by

18 Mr. Rosenthal and Mr. Schiavoni, I just want to correct the

19 record, Your Honor, with respect to the argument that

20 insurers, the insinuation that they were not meaningfully

21 involved in mediation.  No one was shut out of the mediation,

22 just to be clear.  I understand --

23          THE COURT:  Yeah, I'm not going to be able to

24 resolve that dispute.  I don't know what happened in mediation

25 and I, certainly from my experience, they all happen

1 differently and they're negotiations, depending on how many

2 parties are involved -- and there are a significant number of

3 parties involved here -- do take place in stages.

4 But, you know, I think there's been a significant

5 achievement of bringing together the parties that have come

6 together, which include the representatives of all of the

7 survivors, but it's also clear that not everybody was involved

8 in those negotiations and there are still parties who, at

9 least, believe that they could contribute more to resolution

10 of the case if there was mediation.  So, I can't get involved

11 in who did what and I can't resolve that.  So, we can just

12 move on from people's participation to date.

13 MR. LINDER:  Understood, Your Honor.

14 I do want to correct the suggestion, though, that

15 the debtors have turned over the pen in terms of the

16 documents, the definitive documents that will be proposed in

17 connection with the plan to the plaintiffs.  It was a *fait*

18 *accompli*, essentially, that we would select the current path

19 that we have been on.  It was a tremendous amount of work to

20 bridge the divergent perspectives of the parties and actually

21 reach this resolution.

22 So, we certainly contest the resolution that the

23 debtors have somehow turned over the pen to the plaintiffs.

24 This was a collaborative resolution and we were certainly

25 involved in every aspect of negotiating it.

1        You also heard Mr. Schiavoni, again, raise the

2   issue about the good faith finding in the proposed order

3   granting the RSA motion.  As I stated earlier, Your Honor, we

4   do not contest that the business judgment rule is the

5   appropriate standard, and we are ready to work with the

6   insurers to make whatever accommodations we need to.  We don't

7   think that that argument really necessitates delaying any

8   deadlines or any hearings.

9        THE COURT:  Okay.

10       MR. LINDER:  With respect to chartered

11  organizations, Your Honor, we certainly appreciate the

12  concerns expressed by Mr. Goldberg.  I would just say that one

13  point of distinction with respect to the Church of Jesus

14  Christ of Latter Day Saints, is that they're a uniquely

15  situated chartered organization; actually, a former chartered

16  organization of the BSA.  They're one of the few chartered

17  organizations that have actually asserted an indirect abuse

18  claim in an amount that is not a contingent indirect abuse

19  claim, but they are uniquely situated among claimants.

20       But with that being said, we will, and we do intend

21  to work with Mr. Goldberg and his colleagues at Latham, to

22  work through those issues, to the extent that we can, in

23  advance of the disclosure statement hearing.  But, really,

24  what he has raised, from our perspective, are confirmation

25  issues and are not issues that would render the plan

1  (indiscernible).

2          With respect to the other chartered organizations,

3  we do value them as go-forward partners.  They are essential.

4  They have a lifeblood of scouting.  And to the extent this

5  plan that's been filed and the deal that's been reached, has

6  been interpreted as abridging their rights, their insurance

7  rights, and their other rights to assert claims against the

8  trust, we are happy to engage with them going forward.

9          THE COURT:  Well, that's how I read it.  So, you

10  say to the extent that it does this, but that's how it read

11  it.  That's how I read the termsheet that's attached to the

12  RSA, exactly the way Mr. Goldberg described it.

13          Is he wrong?

14          MR. LINDER:  No, he's not wrong.  The proposed

15  treatment for indirect abuse claims under the TDP is, in fact,

16  that they would be subordinated to holders of direct abuse

17  claims.

18          THE COURT:  That's how I read the footnote, yes.

19          And I read it as -- well, there are all kinds of

20  insurance issues.  I would say that I'm pretty sure I read it

21  the way, or I noted the issues that have been expressed,

22  almost all of them, I believe.  So, I just note that because

23  the way you're speaking is if Mr. Goldberg, for example,

24  mischaracterized the plan, but I don't think he did.

25          MR. LINDER:  Well, I didn't intend to indicate that

1  he misrepresented anything, Your Honor.

2           THE COURT:  Okay.  Well, let me ask this, there may

3  be a difference between the RSA and when we should hear the --

4  the RSA -- do the debtors view the RSA as a gating issue to

5  the disclosure statement hearing?

6           MR. LINDER:  It's been our intent, Your Honor, to

7  have the RSA proceed before any disclosure statement going

8  forward.  That's been our view.  I think it's a view that's

9  shared by the other RSA parties.  So, we do view the RSA as a

10  gating matter.

11      (Pause)

12           THE COURT:  I'm going to hear the RSA matter first

13  and so that it can be appropriately briefed and I have an

14  opportunity to review it.  I'm going to schedule it.  I'm

15  going to move some stuff around.  I'm going to schedule it for

16  July 29 and 30.  I don't know that it will take two days, but

17  I'm going to give it two days.

18           I'd also like to hear on that day, a response to

19  the Rule 2019 motion that the insurers brought *vis-a-vis*,

20  Abused in Scouting, and is it Mr. Wilks? -- I'm trying to

21  think who represents -- he may represent Mr. Kosnoff.  I don't

22  know if he represents Abused in Scouting.  If Mr. Wilks is not

23  on the conference and if Mister -- or if there's some other

24  counsel, I would like to debtors' counsel to inform them that

25  I'm going to hear that, which I don't think I actually heard

1  argument on, also on those days.

2         And I'd like a response on the Rule 2019 to not

3  only what was briefed, but also whether the numerous letters

4  that I have been receiving from their clients, is a basis to

5  require a Rule 2019 statement to be filed.

6         MR. WILKS:  Your Honor, this is David Wilks.  I

7  don't have any camera on.  I apologize, but I hear you loud

8  and clear, and we will be prepared.

9         THE COURT:  Thank you, Mr. Wilks.

10         MR. WILKS:  Thank you, Your Honor.

11         THE COURT:  And I will say that most of the letters

12  that I'm receiving, which are significant in numbers, appear

13  to be from clients of Abused in Scouting.

14         So, we'll have that -- and you all can work

15  backwards with respect to discovery and briefing -- and I'll

16  hear that on the 29th and 30th.

17         MR. ABBOTT:  Your Honor, thank you.  Derek Abbott

18  to the debtors.

19         With respect to the objection deadline for that

20  matter, would that be something in accordance with the Local

21  Rules, which would put it at the 22nd, I believe.  We're at

22  the Court's pleasure there.

23         THE COURT:  That's fine.

24         MR. ABBOTT:  Thank you, Your Honor.

25         THE COURT:  That should give parties plenty of time

1  to take discovery and to give me reason to briefing on the

2  issues.

3          In terms of the briefing on disclosure statement, I

4  will say that it sounds like some of the issues that have been

5  raised are really confirmation objections, but I think there

6  are also disclosure statement issues and parties should have

7  opportunities to review, meaningful opportunities to review

8  the disclosure statement and weigh in on it.  And because the

9  RSA is a gating issue, then, of course, the disclosure

10  statement hearing has to be delayed.

11          I'm looking at the last week in August -- 30,

12  31st -- no -- oh, yeah -- which we'll, of necessity, move the

13  confirmation hearing out.  I don't know those dates yet.  I'm

14  trying to -- well, wait a second.  Actually, I have time --

15          MR. LINDER:  Your Honor?

16          THE COURT:  -- the week of August 17.  I have time

17  the week of August 17.  I'm going to countermand that and put

18  us back.

19          I've got, at this point, a contested hearing on the

20  16th, but start on the 17th.

21          MR. LINDER:  Your Honor, if I may?  It's Matt

22  Linder of White & Case.

23          THE COURT:  Yes.

24          MR. LINDER:  I know you indicated that your

25  preference would be to take the RSA first.  I think from our

1  perspective, given that you had circled July 29th and 30th as

2  the dates for the RSA hearing, would it be possible to take up

3  the disclosure statement earlier?

4          We're just trying to remain cognizant of -- we know

5  that recently, dates in Imerys did change, which may have

6  freed up some of August, but I think some of October was then

7  -- you know, the confirmation timeline in Imerys extends out

8  to late October.  So, we're just trying to remain cognizant of

9  the potential delay on the back end.  So, to the extent that

10  there would be any possibility to extend the timeline out to

11  the end of July and take them together, you know, in a similar

12  fashion that we propose, with July 20th and 21st, but,

13  instead, to do it on July 29th and 30th, that would be our

14  preference.

15          THE COURT:  You know, I'm not sure that's going to

16  help you in terms of a time frame and discovery, though.  I

17  understand what you're saying and you're right; my October and

18  November are pretty full, so I understand that,    although --

19  no, they're pretty full.

20          MR. LINDER:  Would there be any earlier dates in

21  August that might work?  I know Your Honor had circled the

22  17th as being a possibility, but I think we're really focused

23  on that, you know, those later dates in the fall and trying to

24  preserve them.

25          (Pause)

1          THE COURT:  I could maybe do the 12th and 13th.

2      (Pause)

3          MR. LINDER:  If that could be accommodated, Your

4  Honor, that would be the debtors' preference, but, again, if

5  you could accommodate it.

6          MR. ROSENTHAL:  Your Honor, Michael Rosenthal.

7          Can you hear me?

8          THE COURT:  Mr. Rosenthal?

9          MR. ROSENTHAL:  Yes.  Does it help, Your Honor, do

10  you contemplate that confirmation discovery would begin only

11  after the disclosure statement hearing or could it begin

12  before?

13          THE COURT:  I would let it go forward ahead of time

14  if the parties are willing to do that.  And I will say that it

15  complicates things because then you get discovery requests

16  about your objections that you haven't yet filed.  But, yes, I

17  have no problem putting discovery open and letting the party

18  work through those types of issues.  And, of course, I would

19  encourage the debtor to talk to people about that.

20          MR. LINDER:  And the debtors' view, Your Honor, is

21  that we would be willing to discuss with parties, beginning

22  plan confirmation and discovery, in advance of the disclosure

23  statement hearing.

24          THE COURT:  Okay.  Let's --

25          MR. LINDER:  Even with the August 12th, we're happy

1  to accommodate that.

2            THE COURT:  Okay.  We'll move some things.

3            MR. ABBOTT:  Your Honor, Derek Abbott.

4            I'm sorry, would those be 9:30 start dates [sic] on

5  each of those days?

6            THE COURT:  It could be.

7            MR. STANG:  Your Honor, I would simply point

8  out -- Mr. Stang speaking here -- there are a lot of people on

9  the West Coast, if people could just be sensitive to it.

10            THE COURT:  Well, then, let's say ten o'clock, but

11  the day has got to get started.

12            MR. STANG:  I will not be (indiscernible) by then.

13            THE COURT:  Okay.  Let me observe that, again, I

14  think that the RSA, whether I approve it or I don't -- and I

15  have no view on that -- certainly, the agreement among those

16  parties is a significant achievement and I would hope that

17  this delay, while it is intended to provide time for people to

18  do appropriate discovery and comprehensively brief the issues

19  that I need to decide on these two issues and not --

20            UNIDENTIFIED:  We had an emergency hearing today.

21  Can you hear me?

22            THE COURT:  Excuse me.  Somebody's -- I'm getting

23  somebody's talk-over here.  Check your phones and make sure

24  you're on mute.

25            I would hope that the time could be used to bring

1  others into the fold to discuss or to begin or continue

2  discussions because there's no question that a consensus plan

3  is preferable.  As I also said, I did note, I think most of,

4  if not all of the issues that have been raised today, and I

5  will say, they're not necessarily easy ones for anyone,

6  depending on which issue and which side you're on, on it.  So,

7  that's why, again, I say, a consensus plan is preferable and

8  certainly would bring -- would be preferable for all parties.

9          Survivors would get paid sooner.  Boy Scouts could

10  emerge sooner.  And there'll be a more definitive resolution,

11  I suspect.

12          I will note that I also noted the non-monetary

13  provisions that I don't think I had seen before and I find

14  that to be very appropriate to address safe scouting and how

15  the Boy Scouts will ensure that past abuse doesn't continue

16  into further, future activities.  And as I read the letters

17  that many survivors have sent me, that is an aspect that is

18  often found in the letters and is compelling.  So, I find that

19  very appropriate.

20          Okay.  Is there anything else we can achieve today?

21          MR. MASON:  Your Honor, it's Richard Mason.  Would

22  you mind if I just said one more thing for the record given

23  some of the colloquy?

24          THE COURT:  Mr. Mason?

25          MR. MASON:  Yes.  Thank you, Your Honor.  Richard

1  Mason for the ad hoc committee.

2           I just want to say on behalf of the committee,

3  first of all, thank you for the hearing today, Your Honor, and

4  thank you to all of the parties who signed the RSA.  We do

5  agree with the BSA that our charter partners are absolutely

6  certainly to our business.  They are critical elements of the

7  scouting program both, locally and nationally.

8           I would just note that the termsheet does provide

9  that the RSA parties will work in good faith to try to resolve

10 the charter partner issues.  And I would agree with something

11 that Your Honor said previously, which is that sometimes

12 mediations and negotiations happen in iterations.  You deal

13 with one thing, you nail it down, and then you move to

14 another.

15          And to that end, I would just offer to our friends,

16 the charter partners on the line here, that we, the ad hoc

17 committee, are happy to engage if it's helpful with you and

18 the other parties, with your ad hoc committee, as well, to try

19 to help facilitate a resolution, if we can.

20          THE COURT:  Okay.

21          MR. MASON:  Thank you, Your Honor.  That's it for

22 me.

23          MR. BUCHBINDER:  Your Honor, this is Dave

24 Buchbinder, on behalf of the U.S. Trustee.

25          I want to thank the parties for the progress

1  they've made today, but my comment is a request to the Court

2  and ask Mr. Abbott will the debtors send out notices of

3  hearing with the new objection deadlines in them?

4              THE COURT:  They will.

5              MR. BUCHBINDER:  That's all, Your Honor.

6              MR. ABBOTT:  Yes, Your Honor, we will re-notice the

7  RSA motion and the disclosure statement, in accordance with

8  the rules.  So, not a problem, Mr. Buchbinder.

9              THE COURT:  Thank you.

10             MR. BUCHBINDER:  Thank you, Mr. Abbott.

11             THE COURT:  Okay.  Well, thank you very much.

12             I appreciate everyone getting together on short

13 notice to discuss how we proceed and I look forward to

14 receiving the submissions on the issues that we've outlined

15 and on the schedule that y'all will fill in and submit to --

16 well, re-notice it.

17             Okay.  Thank you very much.  We're adjourned.

18             COUNSEL:  Thank you, Your Honor.

19        (Proceedings concluded at 4:08 p.m.)

20

21

22

23

24

25

1                              CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4    from the electronic sound recording of the proceedings in the

5    above-entitled matter.

6
     /s/Mary Zajaczkowski              June 8, 2021
7    Mary Zajaczkowski, CET**D-531

8
     /s/William J. Garling             June 8, 2021
9    William J. Garling, CE/T 543

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

## (Redacted)

# EXHIBIT D

## (Redacted)

# EXHIBIT E



MICHIGAN AREA

**THE UNITED METHODIST CHURCH**

1011 Northcrest Road • Lansing, MI 48906-1262
(517) 347-4003 • email: bishop@michiganumc.org

DAVID ALAN BARD
RESIDENT BISHOP

JENNIFER BROWNE
CLERGY ASSISTANT TO THE BISHOP
jbrowne@michiganumc.org

July 20, 2021

Re: Boy Scout Units Chartered by Local United Methodist Churches

Dear Michigan United Methodists:

We write this letter with heavy hearts.

Personal Background

I am the Bishop of the Conference. As a youth, I was active in Boy Scouts in my home state of Minnesota. I attained the rank of Life Scout before summer jobs and other activities prevented me from continuing with the scouting program. But I have fond memories of campouts, friendships and learning skills that I still use. I even preached my first sermon on a Boy Scout camping trip.

I am the Chancellor of the Conference. I became an Eagle Scout in 1980 with my troop in Des Moines, Iowa. Both of my sons are also Eagle Scouts with Troop 205 in Kalamazoo, Michigan. I learned leadership skills and independence through scouts, and experienced many adventures that would not have been available to me otherwise. And my boys are better people because of scouting.

BSA Current Reality

The Boy Scouts of America is overwhelmed with potential liability exposure from sexual assault allegations nationwide. The BSA has filed for bankruptcy protection. Under both proposed plans that the BSA has suggested as a way to continue after the bankruptcy, they are leaving their Chartered Organizations out on a limb by themselves. The Chartered Organizations are the local churches, schools, and civic groups that sponsor or host a Scout Troop, Pack, Crew, or other unit. The details of these plans are still being played out, but the BSA is placing all our United Methodist Churches who have ever been involved in scouting in a very difficult position.

**Deana E. Nelson**, Executive Assistant to the Bishop
dnelson@michiganumc.org

**Aritha Davis**, Executive Administrative Assistant to the Clergy Assistant
adavis@michiganumc.org

Despite their consistent past assurances that they held enough insurance to cover their chartered organizations in case of injured scouts, we now know that the BSA did not have enough or sufficient insurance.  The local churches are at risk of having to pay significant sums to victims to compensate them for the damages they suffered at the hands of some scout leaders.  In addition, the local churches will have to pay for the cost of their own attorneys to defend those claims.  All of this is because the BSA did not fulfill their promise to have enough insurance to protect the local churches.

Future Relationship with the BSA

We are recommending that local churches change their relationship with their scouting units.

**If your local church currently charters a scout unit**, we recommend that you **NOT** renew that chartering agreement when it is up for renewal or re-chartering this fall.  Instead, we recommend one of two options, the choice of which is up to you.

1. Tell the local scout council that you will NOT renew that chartering agreement but will only extend the current agreement until December 31, 2021.
2. Tell the local scout council that you will NOT renew that chartering agreement but will enter into a Facilities Use Agreement with their unit until December 31, 2021.  This will act similar to a lease allowing the scout unit to use your space, but they will be responsible for everything else, including the selection of leaders.

After December 31, 2021, we should be in a better position to see how the future will unfold.  Once a BSA plan is approved by the bankruptcy court, we will know better how to proceed.

**If your local church does not charter a scout unit at this time**, we recommend that you **NOT** consider chartering a unit until the bankruptcy case is finalized and we have an understanding of how The United Methodist relationship with scouts will continue in the future.

We understand that these suggestions are dramatic, but we think them to be the prudent course of action currently.  We want to protect our local churches from costly litigation.

Final Thoughts


     We know the value of scouting.  It has played a very large role in the mission and ministry of The United Methodist Church for a very long time.  But the BSA is not proving faithful to The United Methodist Church as they are leaving us without the protections that they promised.  We simply cannot continue the relationship with the BSA as it has existed in the past.  Until we know how the BSA will be organized and operate in the future, we must make some changes.  Hopefully, we will be able to continue our long connection with scouting in a more robust way in the future, but we need to make some changes today to protect our congregations.



May God Smile on You,


Bishop David A. Bard            Andrew J. Vorbrich, Chancellor

# EXHIBIT F



↑ 26 ↓    📄 Rio Texas Conference Methodist churches advise not to recharter unite in 2021  **BSA**    ✕ Close

Posted by u/funkymonkey2077 24 days ago

26

## Rio Texas Conference Methodist churches advise not to recharter unite in 2021

**BSA**

Here is the wording of the letter from Rev. Kendall Waller, Director of Admin Services for the Conference.

To all of our churches that work with Boy Scout organizations:

As you are probably aware the Boy Scouts of America are currently involved in bankruptcy hearings to resolve the claims that have been filed against them. The proceedings and the decisions made there will affect churches that charter with the BSA. The Rio Texas Annual Conference has joined other conferences across the United States in securing a legal team that will be advising the United Methodist churches in these proceedings. They are referred to in the following communication as "the Ad Hoc Committee".

On July 2 the BSA filed a revised plan for resolution. You may have read some about it in the press. This week I received the following update from our legal counsel:

A few days after the BSA filed a revised plan on July 2, the Bankruptcy Court held a status conference. During that conference, one of the Ad Hoc Committee's outside counsel (1) pointed out to the Court some of the issues and impacts the revised plan has on chartered organizations and (2) voiced support for extensions of certain unreasonable timelines associated with the revised plan. He noted the importance of the Boy Scouts ministry, both to the Church and to the BSA. He highlighted how the revised plan does not treat chartered organizations fairly and emphasized that such treatment could lead United Methodist chartered organizations to reconsider their relationships with the BSA. It was clear the judge heard our concerns, as well as how important chartered organizations are to the BSA's future viability.

Because of some of the proceedings and how they affect our church's exposure we are recommending that no church renew a charter with the Boy Scouts at this time. Some of the chartering language has been changed to limit the coverage of a chartering organization through BSA insurance. Other language may negatively affect our relationship to whatever agreement is reached in the Bankruptcy agreement. The communication continued:

While the Ad Hoc Committee is not recommending that local churches cease their Boy Scouts ministries at this point, it does recommend that chancellors advise their annual conferences to promote/suggest one or more of the following approaches to Boy Scouts ministries:

When a charter comes up for renewal, the local church can tell the Local Council it will not sign a new charter and will only agree to an extension of the existing charter through December 31, 2021. When the charter comes up for renewal, the local church can tell the Local Council it will only agree to enter into a Facilities Use Agreement recommended by the General Commission on United Methodist Men (form can be provided) and that such agreement will only extend through December 31, 2021. Whether or not the charter is coming up for renewal, advise the Local Council that the local church wishes to immediately terminate the charter at least until the conclusion of the bankruptcy, or that the charter must be converted to a Facilities Use Agreement which will only extend through December 31, 2021.

We affirm with the committee our continued commitment to the work of the Boy Scouts and their continued work with our churches. We also affirm with the committee that not continuing the charter as written is in the best interest of the church until this case is resolved. I have heard from many of you wanting to receive an update or recommendation of any action to take. If you have already signed a charter agreement then there is no action needed until the time comes to renew the charter. If you have not yet signed a charter agreement we ask that you prayerfully consider the options recommended above. A copy of the use agreement from UMM is attached:

2021 UMM Recommended Boy Scout & UMC facility agreement [PDF] 2021 UMM Recommended Boy Scout & UMC facility agreement [Word]

The proceedings are moving forward and we are hopeful for a resolution in the near future. In the meantime thank you all for your faithful work during this time of uncertainty and challenge.

💬 4 Comments    ↗ Share    🔖 Save    ⊘ Hide    ⚑ Report    95% Upvoted

# EXHIBIT G

1                    UNITED STATES BANKRUPTCY COURT
2                         DISTRICT OF DELAWARE

3                                    .    Chapter 11
    IN RE:                           .
4                                    .    Case No. 20-10343 (LSS)
    BOY SCOUTS OF AMERICA AND        .
5   DELAWARE BSA, LLC,               .
                                     .    Courtroom No. 2
6                                    .    824 North Market Street
                                     .    Wilmington, Delaware 19801
7                                    .
                    Debtors.         .    July 29, 2021
8   . . . . . . . . . . . . . . . .  .    10:00 A.M.

9                    TRANSCRIPT OF TELEPHONIC HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                  UNITED STATES BANKRUPTCY JUDGE

11  TELEPHONIC APPEARANCES:

12
    For the Debtor:          Derek C. Abbott, Esquire
13                           Andrew R. Remming, Esquire
                             Paige N. Topper, Esquire
14                           MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                             1201 North Market Street, 16th Floor
15                           Wilmington, Delaware 19899

16                           - and -

17                           Jessica C. Lauria, Esquire
                             Glenn Kurtz, Esquire
18                           WHITE & CASE LLP
                             1221 Avenue of the Americas
19                           New York, New York 10020

20  Audio Operator:          Brandon J. McCarthy, ECRO

21  Transcription Company:   Reliable
                             1007 N. Orange Street
22                           Wilmington, Delaware 19801
                             (302)654-8080
23                           Email:  gmatthews@reliable-co.com

24
    Proceedings recorded by electronic sound recording; transcript
25  produced by transcription service.

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the Debtors:          Michael C. Andolina, Esquire
                              Matthew E. Linder, Esquire
3                             Laura E. Baccash, Esquire
                              Blair M. Warner, Esquire
4                             WHITE & CASE LLP
                              111 South Wacker Drive
5                             Chicago, Illinois 60606

6
    For Hartford:             James Ruggeri, Esquire
7                             SHIPMAN & GOODWIN LLP
                              1875 K Street NW, Suite 600
8                             Washington, DC 20006

9                             - and -

10                            Philip Anker, Esquire
                              WILMERHALE
11                            7 World Trade Center
                              250 Greenwich Street
12                            New York, New York 10007

13
    For the U.S. Trustee:     David Buchbinder, Esquire
14                            UNITED STATES DEPARTMENT OF JUSTICE
                              OFFICE OF THE UNITED STATES TRUSTEE
15                            844 King Street, Suite 2207
                              Lockbox 35
16                            Wilmington, Delaware 19801

17
    For Century:              Tancred Schiavoni, Esquire
18                            O'MELVENY & MYERS LLP
                              Times Square Tower
19                            7 Times Square
                              New York, New York 10036
20
    For Kosnoff Law:          David Wilks, Esquire
21                            WILKS LAW, LLC
                              4250 Lancaster Pike, Suite 200
22                            Wilmington, Delaware 19805

23  For the Coalition of      David Molton, Esquire
    Abused Scouts:            BROWN RUDNICK LLP
24                            7 Times Square
                              New York, New York 10036
25
```

1  TELEPHONIC APPEARANCES (Cont'd):

2  For Eisenberg              Daniel Hogan, Esquire
   Rothweiler Winkler         HOGAN MCDANIEL
3  Eisenberg & Jeck:          1311 Delaware Avenue
                              Wilmington, Delaware 19806
4
5  For Ichor Consulting:      Bernard Conaway, Esquire
                              CONAWAY LEGAL LLC
6                             1007 North Orange Street, Suite 400
                              Wilmington, Delaware 19801
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>MATTERS GOING FORWARD</u>:

2    Hartford Accident and Indemnity Company, First State Insurance
     Company and Twin City Fire Insurance Company's Motion to
3    Compel Abused in Scouting and Kosnoff Law PLLC to Submit Rule
     2019 Disclosures (D.I. 2028, Filed 2/3/21)
4

5        **Ruling:   52**

6    Century's Motion to Compel Ichor Consulting, LLC to Submit the
     Disclosures Required by Federal Rule of Bankruptcy Procedure
7    2019 (D.I. 2029, Filed 2/3/21)

8    Century's Motion to Compel Abused In Scouting, Kosnoff Law
     PLLC, and the Coalition to Submit the Disclosures Required by
9    Federal Rule of Bankruptcy Procedure 2019 (D.I. 2030, Filed
     2/3/21)
10

11       **Ruling:   71**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commenced at 10:03 a.m.)

2            MR. ABBOTT:  Good morning, Your Honor.

3            THE COURT:  Good morning, Mr. Abbott.

4            MR. ABBOTT:  Your Honor, I thought -- this is the

5    omnibus hearing that had been set for a number of items;

6    obviously, some of those came off the calendar.  The court

7    gave us some helpful guidance at the last conference and I

8    thought, Your Honor, I might turn it over to Ms. Lauria to

9    update the court on happenings since then if I may.

10            THE COURT:  Okay.  Ms. Lauria?

11            MS. LAURIA:  Thank you, Your Honor.  Jessica

12    Lauria, White & Case, for the debtors.

13            Your Honor, when we left you on Tuesday I had

14    announced that the RSA was set to expire, by its terms,

15    yesterday and at the point where we were at on Tuesday we had

16    not yet reached an agreement with the RSA parties on an

17    extension of the RSA.  Through the hard work, yesterday, of

18    the TCC, the ad hoc committee of local councils, the

19    coalition, the FCR, and the debtor, of course, we did reach an

20    agreement on an amendment that was filed yesterday afternoon

21    at Docket No. 5813.

22            Importantly, that amendment extends the RSA

23    deadline that we were confronting yesterday to August 27th.

24    So hopefully we won't find ourselves in the positon we found

25    ourselves in this week again.  It also added a couple of

1   changes to the term sheet.  Importantly, now -- let me take a

2   step back.  As Your Honor is aware, issues pertaining to the

3   chartering organizations have really come to the forefront in

4   these Chapter 11 cases.  The parties are working hard to work

5   through those issues and indeed, Your Honor, next week the

6   mediators have convened in person mediation with the

7   chartering organizations as well as the insurers or certain of

8   the insurers, and the RSA parties to continue to work through

9   those issues.

10          What was added to the RSA yesterday is a

11  termination right that each RSA party has the independent

12  ability to exercise if the chartered organization resolution

13  is unacceptable to that party.  We also had a couple of

14  additional changes.  There was a dispute among the RSA parties

15  concerning the terms of the settlement trust obligation to

16  reimburse protected parties in the event that there was some

17  leakage of the channeling injunction.  That has now been

18  clarified that that reimbursement obligation is limited to

19  direct claim leakage, not indirect claim leakage.

20          Of course, these are not before the court today,

21  but I did want to mention them. As well as cleaning up a

22  reference to -- a sort of nonsensical reference, I will say,

23  to a security interest related to the insurance assignment and

24  clarifying one point with respect to obligations pertaining to

25  the Delaware statutory trust.

1          In addition to those amendments we also filed with

2   it, Your Honor, joinders  The good news is, you know, thanks

3   to the actions of the coalition 15 additional State Court

4   counsel law firms representing over 11,000 additional

5   claimants have now signed on to the RSA.

6          So we now have State Court counsel representing

7   around 70,000 claimants, 70,010 claimants to be precise,

8   supporting the RSA and that is with our claims population of

9   82,500 are the timely filed non-duplicative proofs of claim,

10  94,000 if you don't remove the duplicative claims.  So we had

11  a long day yesterday, but a good day in terms of progress on

12  the topic that we left the court with on Tuesday.

13         With that in mind, Your Honor, and with the

14  mediation scheduled for next week I think we would like to set

15  a date for a hearing on the RSA motion.  We are mindful of the

16  fact that you have August 12th and I believe August 13th

17  currently set aside right now for a hearing with respect to

18  the disclosure statement.  We would propose, Your Honor, to

19  start those days with the hearing on the RSA.

20         In a moment Mr. Kurtz can report to the court on

21  what the debtors propose to do with respect to some of the

22  discovery issues that were brought before the court on

23  Tuesday, but we would like to calendar the RSA motion for the

24  12th.  As I said, Your Honor, we would like to calendar it for

25  the 12th and 13th.  We don't want to take the disclosure

1  statement off the calendar.

2          That may be aggressive in terms of how much time

3  the court has on those two days, but to the extent we have

4  time once we have concluded with the RSA we would like to move

5  to the disclosure statement because we are mindful, Your

6  Honor, one of our own timeline, but also of the court's docket

7  and the many things, I understand, you may be having coming up

8  over the next couple of months.  So we don't want to waste a

9  moment that we might have with you.

10          We think that makes sense.  The parties, by the

11  time we get to August 12th, will have had 40 days with our

12  disclosure statement and plan.  So to the extent we can roll

13  into the disclosure statement we would like to do that when we

14  conclude with the RSA.

15          Being mindful that we are unlikely to conclude both

16  matters on those two days, as much as I would like to and we

17  will see what mediation brings next week, but I suppose it's

18  still possible.  We would probably be looking to the court for

19  some overflow dates with respect to the disclosure statement.

20          So that is where we stand right now, Your Honor. I

21  am happy to have Mr. Kurtz address some of the discovery

22  issues, but perhaps before I do that maybe I should pause and

23  see if you have any questions for me on that timeline and

24  where we're at with the RSA.

25          THE COURT:  I don't have any questions with respect

1  to the timeline.  We can begin hearing on the RSA on the 12th.

2  I've got you down for the 12th and 13th, and you can use those

3  days as you wish.  So we can do that.

4       As far as finding additional days I will have to

5  confer with Mrs. Johnson and we will have to get back to you

6  on that.

7       MR. ANKER:  Your Honor, this is Mr. Anker.  I don't

8  want to interrupt and don't want to interrupt Mr. Kurtz, but

9  if Your Honor is going to consider the possibility of a

10  disclosure statement hearing on the same days I would

11  appreciate the opportunity to speak to that issue before Your

12  Honor rules on that question.  This is the first we've heard

13  of that.  Happy to wait for Mr. Kurtz's comments first, but

14  there has been some discussion about insurers.

15       Right now we have a schedule where I think this is

16  right, Ms. Lauria, disclosure statement objections are due

17  this coming Monday the 2nd.  We, obviously, don't know whether

18  the RSA will or will not be approved by Your Honor.  And you

19  may remember Mr. Linder at the last hearing, I think

20  appropriately, said in response to Your Honor's question that

21  the RSA was a gating issue. It goes to questions such as is

22  the Hartford settlement in or out.

23       So we have no -- speaking just for Hartford right

24  now, I think we have no qualms having the RSA hearing go

25  forward on the 12th and 13th.  And to the extent Your Honor

1  has days thereafter for the disclosure statement, if the RSA

2  is approved, we don't have qualms with that, but we do think

3  it doesn't make sense that all of the uncertainty to have us

4  file objections this Monday on a disclosure statement.  There

5  hasn't been discovery on it.

6           The debtor just today, I'm told, I haven't read the

7  pleading, in response to Hartford's motion to strike Mr.

8  Mosby's testimony is going to reopen depositions and discovery

9  in light of Your Honor's guidance on the mediation privilege

10 and the like.  Obviously, that discovery and depositions is

11 not going to occur between now and Monday.  So we would ask

12 that the deadline to respond to the disclosure statement be

13 moved and the hearing on the disclosure statement be moved.

14          We too are not looking for delay and we appreciate

15 the concerns the debtor has, but there needs to be some

16 reasonable time for us to actually know whether we have a

17 restructuring support agreement or not, actually know what

18 plan is going forward or not and actually take discovery on

19 the disclosure statement.  Of course, the rules, as I

20 understand them, the local rules, call for disclosure

21 statement objections only to be due, I think, in seven days,

22 Your Honor, but you, obviously, know the rules better than I

23 do.  That is what I am told.

24          So I just wanted to make that clear to Your Honor.

25 I apologize for interrupting.

1          MS. LAURIA:  Your Honor, may I respond?

2          THE COURT:  Yes.

3          MS. LAURIA:  Thank you, Your Honor.  Again, for the

4    record Jessica Lauria, White & Case, for the debtors.

5          A few issues with respect to Mr. Anker's comments.

6    First, as Your Honor is well aware, we were originally

7    scheduled to have a disclosure statement hearing on May 19th.

8    While aspects of the deal have changed, and those changes are

9    reflected in the updated disclosure statement, there are still

10   a number of issues that parties raised in their objections

11   that, frankly, have nothing to do with whether the RSA goes

12   forward or not.  For example, the nature and extent of the

13   disclosures concerning the local councils' assets, the local

14   councils' contribution to the trust, and related financial

15   disclosures.  That is just one of many, many examples.

16         From the debtor's perspective there is no reason

17   that we cannot clear out a number of the issues pertaining to

18   the disclosure statement in the event the court has the

19   availability, again, on the 12th and the 13th.  Moreover, even

20   if for some reason putting the Hartford issue to the side, and

21   I understand that is a significant issue with respect to the

22   RSA and the plan itself; although, I will note that the plan

23   and disclosure statement were drafted to be self-effectuating

24   with respect to the Hartford issue.

25         Putting that issue to the side the major components

1  of the deal in these Chapter 11 cases, the deal that the BSA

2  has signed up to, as well as the deal that the local councils

3  have signed up to I believe that those major components are

4  going to be in the plan in some ways regardless of where

5  things come out on the RSA.

6           If folks have issues with the debtor's disclosure

7  concerning recovery percentages, what the recovery percentage

8  chart looks like, the financial projections, the liquidation

9  analysis, the disclosures concerning our insurance coverage

10  and our insurance program.  Those are things that, frankly,

11  are just not going to change regardless of where the RSA comes

12  out.

13           Even if the court does not rule on the RSA on

14  August 12th or August 13th we believe there is a lot of

15  progress that can be made with respect to the other disclosure

16  statement objections.  One way that I think we could handle

17  that is if the debtors, sort of, stage the disclosure

18  statement hearing to indicate what order the debtors intend to

19  take up issues so that issues that are independent of the RSA

20  and the Hartford deal could be taken up first by the debtors

21  and the court, then secondarily we could move to issues that

22  go to the heart of objections to the RSA and the Hartford

23  deal.  We do believe it's very important to get the ball

24  moving with respect to those matters.

25           As to the objection deadline, itself, I believe the

1  rule is that there must be a 28 day notice period for the

2  objection to a disclosure statement.  Frequently that 28 day

3  notice period will expire seven days prior to the hearing

4  which is, I think, the seven days that Mr. Anker was referring

5  to.  Parties -- the objection deadline right now is August

6  2nd.  The plan and disclosure statement were filed on July

7  2nd.  That is much more than the -- a few days more than the

8  28 days that the rules, I believe it's in 2002, contemplate.

9  So we believe that that is an appropriate objection deadline.

10       As the court may recall from the May 19th hearing

11  the debtors received voluminous objections to the disclosure

12  statement.  It took a lot of work for the debtors to turn

13  those objections and to prepare charts and replies that would

14  be user friendly for the parties in interest in these cases as

15  well as the court.  So we would like to see those objections

16  sooner rather than later.

17       Many of them, I think, were probably previewed in

18  the objections to the RSA motion and that were also previewed

19  in the May 19th.  So we think the timeline that we have right

20  now and that I am proposing today is appropriate.  We're happy

21  to work with the parties to stage the disclosure statement

22  hearing such that people know when their issues are coming up

23  and those are issues that we can clear out from an underbrush

24  perspective that don't go to the heart of the RSA, but we do

25  believe that we need the time with the court since we've got

1  the time we'd like to use it.

2          MR. ANKER:  Your Honor, I don't want to belabor the

3  point.  May I just very briefly respond?

4          THE COURT:  Yes.

5          MR. ANKER:  Your Honor, I think Ms. Lauria just

6  said something that is significant.  She said -- she referred

7  to the schedule that I am today proposing.  That is exactly

8  right.  The notion that we were going to go ahead with

9  sticking with a deadline and with the disclosure statement

10 hearing on the same days as the RSA is brand new.

11          You asked Mr. Linder at the last hearing -- I'm

12 sorry, not the hearing two days ago, the penultimate hearing.

13 I don't have the transcript in front of me, Your Honor, so I

14 am not making representation that these are the exact words,

15 but I remember the conversion.  Mr. Linder is the RSA a gating

16 item that has to be resolved prior to the disclosure

17 statement.  Answer one syllable, one word "yes."  We have been

18 acting accordingly.

19          There has been no deposition discovery with respect

20 to the disclosure statement because we understood the RSA had

21 to be resolved first.  So fundamental fairness called for, and

22 if you want people not scrambling all weekend on disclosure

23 statement objections that are not going to be well done

24 fundamental fairness calls for us to take up the RSA.  If it

25 is approved we can then have a disclosure statement hearing.

1  I don't think it will be approved in which case the disclosure

2  statement and all the objections will become moot, but that is

3  just my prediction.

4        It's also particular significant to Hartford.  We

5  have under our settlement agreement contractual obligations

6  not to object to a disclosure statement or plan that

7  incorporates our settlement.  I suppose I could file something

8  Monday that says this is contingent and we fully are

9  preserving our rights, but it is a difficult position and it's

10 difficult to right a disclosure statement objection when we

11 don't know what the plan is.

12        Thank you, Your Honor.

13        THE COURT:  Thank you.

14        MR. BUCHBINDER:  Your Honor, this is Dave

15 Buchbinder.  May I be heard very briefly?

16        THE COURT:  Mr. Buchbinder?

17        MR. BUCHBINDER:  Thank you, Your Honor.

18        I simply would like to observe that today is the

19 114th anniversary of the founding of the scouting movement by

20 General Robert Baden-Powell.  I would simply like everyone to

21 reflect upon that for a moment before we proceed further.

22        Thank you, Your Honor.

23        THE COURT:  Thank you.

24        Mr. Schiavoni?

25        MR. SCHIAVONI:  Your Honor, the outcome on the

1 Hartford settlement is important to Century as well as

2 Hartford.  My recollection is that this was described by the

3 debtor as the gating issue.  I am very hard pressed to think

4 what the issues are, sort of, separate and apart from the

5 restructuring support agreement on disclosure.  The

6 restructuring support agreement is at the heart of just about

7 everything that they are presenting that is drawing intense

8 objections not just from insurers, but from claimants, from

9 chartering organizations and others.

10          The restructuring support agreement really ties,

11 you know, the debtor to positions on how claims are allowed

12 and approved that just are fatal.  They go to the core of

13 disclosure statement objections.  I don't know how we can

14 separate them out.

15          It's also true that some of the discovery that was

16 sought on the restructuring support agreement, and we've since

17 been told somehow is coming, is directly tied to those

18 disclosure statement objections.  It was the subject of

19 discovery requests served, I don't know, more then 45, 50 days

20 ago by Century.  Things as basic as production of the model

21 for the feasibility that's in the disclosure statement, that's

22 been directly eluded to in the testimony of the witnesses that

23 took place for the restructuring support agreement that's the

24 subject of objections by everyone including the chartering

25 organizations.  We don't have that yet, but we're told its

1  coming.

2          So, you know, I think part of the lesson that came

3  out of the restructuring support agreement is that an enormous

4  amount of resources were wasted by filing briefs only to be

5  faced with a moving target.  To do a replay of that with the

6  disclosure statement it's not just a waste of the lawyers time

7  which, you know, I guess we can all live with except for, you

8  know, it's a waste of estate resources.  Also, it ends up

9  presenting Your Honor with like an extremely chaotic record in

10  multiple rounds of briefs; which ones should Your Honor read,

11  and not read.

12          I don't agree that the charts that were submitted

13  for the last disclosure hearing were even helpful because they

14  didn't even summarize, really, what was in the briefs.  To go

15  through another round of that here it's just going to waste a

16  huge amount of resources and it's going to make it extremely

17  chaotic for Your Honor to read what's really at issue.  I

18  don't think it's going to be productive at all, Your Honor.

19          Thank you.

20          THE COURT:  Okay.  Well I am, quite frankly,

21  skeptical that we're going to be sufficiently through a

22  hearing on the RSA to start the disclosure statement in two

23  days.  It's just not my experience.  And I understand the Boy

24  Scouts position, but I will say that my calendar has been

25  shuffled on more than one occasion for this particular case to

1  try to get days in consistent with the debtor's desire for an

2  early exit from bankruptcy.

3          I am skeptical that even if there is time left on

4  the 12th and 13th that we would get very far into a disclosure

5  statement hearing.  So I am going to need to find some time to

6  set aside for the disclosure statement hearing.

7          In terms of the deadline, you know, I did not

8  suspend the deadlines on the disclosure statement pending the

9  RSA hearing.  It's actually correct and my recollection is

10 that I asked a very direct question of the debtors was the RSA

11 a gating issue; they said it was.  So I scheduled it ahead of

12 the disclosure statement hearing.  I think its -- but I didn't

13 suspend the objections on the disclosure statement hearing.

14         So what I need to do, and I will do so later today,

15 is to see what kind of time we can carve out for a disclosure

16 statement hearing.  Then to the extent that warrants a new

17 deadline we will do it.

18         Mr. Anker, for your unique problem I would consider

19 giving the filing of the RSA that you can file whatever you

20 want to file.  And if I hear the debtors complain about it I

21 will be surprised.

22         MR. ANKER:  Thank you, Your Honor.

23         MS. LAURIA:  Thank you, Your Honor.

24         With that would you like me to hand the podium over

25 to Mr. Kurtz to describe the update on where we're at on

1  discovery pertaining to the RSA?

2          THE COURT:  I can, but I don't recall -- I mean you

3  can, but I don't recall that I left anything open on my end.

4  If you want to make some general reports, sure.

5          MR. KURTZ:  Thank you, Your Honor.  Good morning.

6  Glenn Kurtz from White & Case on behalf of Boy Scouts.

7          Let me start by thanking you for accommodating the

8  RSA on the 12th and the 13th, and for looking for other times

9  to resolve the disclosure statement issues as well.  Timing is

10  important and we really appreciate it.

11          You are correct, Your Honor, there wasn't really

12  anything that was left open, but we did focus on Your Honor's

13  observations about the import of certain categories of

14  documents.  I went back with the group, we re-reviewed certain

15  documents that were commented on or, at least, focused on by

16  Your Honor.  Some of them were pretty close calls, but we have

17  made a decision to try to get some more documents out in order

18  to resolve any lingering dispute.  We are aiming to be

19  completed with that by the end of the weekend.

20          You may also recall there was some dispute where

21  the insurers or the objectors were requesting the opportunity

22  to re-depose some of the declarants with respect to all the

23  new materials that had been produced.  And we have made a

24  decision even though we said let's meet and confer, and talk

25  about any problems we have with documents before we have

1  depositions so that we don't end up having to burden witnesses

2  twice.  But we have made a decision to reproduce all of them.

3  We will work with objectors to get that scheduled shortly

4  after the completion of the document production.

5           We think that will resolve -- hopefully that will

6  resolve any dispute people have about a full and fair

7  opportunity to question.  Obviously, those depositions will be

8  limited to the new material.

9           I will openly request and urge any objectors to

10  meet and confer with us both to resolve disputes without

11  having to burden the court further and to make sure that we

12  don't have any lingering concerns, at least, where those can

13  be resolved.

14           I suspect, but I have not heard that maybe the

15  objectors would have an interest in filing some sort of

16  supplemental objection.  Your Honor just commented that the

17  debtors wouldn't be complaining about a different submission

18  and we won't be complaining about that as well.  We're happy

19  to talk about that.  We think it should be no later than maybe

20  the 9th, a few days before the hearing.  And if that does

21  happen we would like to be able to file a reply.  We would

22  probably suggest that maybe by noon on the 11th.  I don't want

23  to burden the court. I think it might be helpful to the court

24  to have more materials.  If the court doesn't want more things

25  to read, you know, we will pick-up any supplemental matters

1  live at the hearing, but it might be helpful to have a reply.

2          I do think we will try to get a scheduling order

3  put together and submit it to the court so that everybody

4  knows what the dates are and what the rules are; maybe that

5  also will have the effect of minimizing any efforts or any

6  disputes we have, and any work that the court might have to

7  deal with in terms of some emergency applications.

8          That is really all I wanted to update the court on.

9  We appreciate the guidance both on Tuesday and today.  We look

10  forward to proceeding.

11          THE COURT:  Thank you.

12          MR. KURTZ:  Thank you, Your Honor.

13          MR. SCHIAVONI:  Your Honor, we have your rulings on

14  discovery.  I mean you just heard what was said, I mean

15  they're going to produce documents maybe Sunday night and then

16  some sort process of doing six depositions, and then more

17  briefs.  We have your rulings and have guidance on how to go

18  forward.

19          THE COURT:  Yeah, you have my rulings.  I would, of

20  course, ask parties to meet and confer, and discuss how

21  everything is going to go forward in this period of time.

22          I am being reminded, so let me say this that we got

23  a new setup, a new system in the courtroom here and for some

24  reason when I'm looking directly at the screen it looks like

25  I'm looking away, but let me assure you that I am not and that

1  I am focused on each of you as you are speaking.  I am going

2  to talk to IT about how that can be resolved, but this new --

3  since I also cannot see myself I don't realize that's

4  happening.  So in any event, I am paying attention.

5          Let's move onto the agenda.

6          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

7  for the debtors.

8          Your Honor, the first item on the agenda is the

9  motion of certain insurance companies to compel 2019 materials

10 from abused in scouting and Kosnoff Law Firm.  I will ask them

11 to -- I'm not sure who from that group of insurers is taking

12 the lead on that.  So the podium is theirs, Your Honor.

13         THE COURT:  Yes.

14         MR. RUGGERI:  Your Honor, James Ruggeri for

15 Hartford.  I believe ours is scheduled as the first matter to

16 go forward this morning.  If it pleases the court I'm prepared

17 to do so.

18         THE COURT:  Please.

19         MR. RUGGERI:  Thank you, Your Honor.  Again, James

20 Ruggeri for Hartford.  We do appreciate the court's time

21 today.

22         This motion, as the court knows, was filed five

23 months ago.  It seeks to compel 2019 disclosures from the

24 abused in scouting entity and the Kosnoff Law Firm.  Your

25 Honor, I think that over the course of the past week I think

1  it's become clear that this motion, frankly, is more important

2  now than it was when we filed it five months ago.  The court

3  now has before it the RSA motion which now, as of this

4  morning, is now set for a hearing on August 12th and 13th.

5        A headline announcement in that motion is the

6  support of -- plaintiff support of approximately 60,000 abuse

7  survivors headlined in bold in the motion and now Ms. Lauria

8  has advised us that the number has creeped up to 70,000 and

9  ten survivors who support the motion.

10        Attached to the motion is the RSA itself which has

11  now been amended in a schedule one. I don't know if the court

12  has had an opportunity to look through it, but schedule one

13  identifies the law firms plaintiffs' representatives who

14  support the motion along with numbers assigned next to those

15  law firms.  Those numbers are the number of claimants who

16  allegedly support or are represented by the plaintiffs'

17  counsel who support the motion.

18        If the court looks at Mr. Rothweiler's firm, that's

19  the Eisenberg Rothweiler Winkler Eisenberg & Jeck Firm, it

20  seeks the number 16,869.  That is a number higher than any

21  other firm shows in support of the RSA motion.  Its nearly 30

22  percent of the 60,000 claimants who allegedly are supportive

23  of the motion and now it's, what, roughly 25 percent.  If the

24  number creeps up to 70,000 it's still a significant percent of

25  the claimants who allegedly are supportive of the RSA motion.

1           This representation that the State Court counsel

2    could deliver these numbers and these claimants was important

3    to the debtor's entry into the RSA.  We heard that two weeks

4    ago from Mr. Mosby, the Boy Scouts CEO and president.  He

5    testified by deposition two weeks ago.  We're going to have a

6    conversation about Mr. Mosby and the competence of his

7    declaration at another day with regard to the motion to

8    strike.  The deposition is also important because it showed

9    that he, as a declarant in support of the RSA motion, relied

10   on the State Court counsel's representations that they control

11   a number of claimants that they say they control including Mr.

12   Rothweiler.

13          I did ask Mr. Mosby at his deposition a question

14   how do you know that Mr. Rothweiler controls any of the

15   claimants reflected in the number 16,869.  The answer from Mr.

16   Mosby was, well, that's what they have said.  We know that Mr.

17   Rothweiler supports the RSA.  That is not news to us, but we

18   also know that Mr. Kosnoff does not.

19          We know they claim to represent the same claimants.

20   Mr. Kosnoff is, sort of, famous in this case or infamous

21   depending on your point of view for his tweeting about.  We

22   know that he has tweeted about with regard to Mr. Rothweiler,

23   his alleged co-counsel, who says he can deliver on 16,869.

24   Mr. Kosnoff says Mr. Rothweiler is an army of one, that none

25   of the claimants even knows who Mr. Rothweiler is.

1      Your Honor, we need to know who represents the

2  16,869 claimants.  If it's Mr. Kosnoff then I would submit

3  that the factual basis for Mr. Mosby's support for the RSA

4  goes out the window.  Substantively, when we get down to other

5  issues that issue is very, very important, as the court knows,

6  under the Master Mortgage test.  If the RSA and the plan is

7  only supported by 50 percent or so of the claimants and not by

8  an overwhelming support of the claimants then the court knows

9  that that can have a dramatic effect on the ability to secure

10 third-party releases which the fourth amended plan does

11 contemplate.

12     Your Honor, what do we want from AIS and Mr.

13 Kosnoff; well we want from AIS the formation documents.  How

14 was that group formed?  It's provided for in Rule 2019.  We're

15 entitled to that information.  We want from both AIS and Mr.

16 Kosnoff we want to know the names of the creditors they

17 represent, when those interests, allegedly, were acquired in

18 the amount of those interest.  Again, it comes right out of

19 Rule 2019.

20     We expect there will be overlap between those

21 already disclosed by the coalition on behalf of Mr.

22 Rothweiler.  We didn't know that.  And, Judge, because we need

23 to know and everyone needs to know who controls these

24 claimants we want to see the engagement letters, the

25 empowering documents showing who has the authority to act on

1 behalf of the claimants.  There must be documents explaining

2 the roles of the different AIS firms and there are three for

3 the individual claimants.

4          The court knows from the letters it has received

5 over the past few months that there are AIS claimants out

6 there who think they retained only one of those law firms.

7 Your Honor, I am not the only one confused by the situation

8 with AIS, and Mr. Kosnoff, and Mr. Van Arsdale, and Mr.

9 Rothweiler.  Their own claimants are confused.

10          One of the documents that the court received only a

11 few days ago, at Docket No. 5671, was the July 21st letter

12 from a claimant.  He sent a letter to the court saying I think

13 I retained one of the law firms the EDA, that's Mr. Van

14 Arsdale's law firm, but I don't know for sure because the

15 lawyers don't write or call.  He asked the court to let him

16 know if Mr. Van Arsdale or AIS is making filings on behalf --

17 on his behalf, which, of course, the court can't do.

18          Your Honor, you have seen some paper in the

19 arguments against our motion.  I don't think they're terribly

20 strong.  They say the AIS isn't anything.  It's just a

21 collaboration of law firms working together to provide a voice

22 for the victims.  Well that sure sounds to me like it's a

23 group formed to represent interest of multiple creditors

24 toward a common goal which, of course, is what Rule 2019 is

25 all about.

1          It doesn't matter, Your Honor, whether they only

2    represent 30 percent or 25 percent or more than that, or

3    whether they're actually making filings in the case showing

4    their own signatures in the case.  There is no doubt that AIS

5    and Mr. Kosnoff are actively participating in this case.  Just

6    look at the letters the court has received.  Just look at the

7    tweets that Century and Hartford have attached to their

8    briefs.  They confirm active participation.

9          Mr. Kosnoff was at it again this week, actively

10   tweeting disparaging comments about Your Honor and parties in

11   the case, and counsel in the case.  He was at it again this

12   morning, you know, advising his followers that today's 2019

13   motion is up for a hearing and they should stay tuned for

14   those keeping score at home.  That is active participation in

15   the case representing the interests of multiple creditors

16   seeking to pursue a common interest.

17         Look at Mr. Kosnoff's reply that he filed last week

18   on July 22nd.  It proves out point.  What does he say, he says

19   Kosnoff Law is a law firm that represents claimants in teh

20   bankruptcy case.  That is right.  We agree.  That is an entity

21   working toward common interest on behalf of clients to obtain

22   recoveries for abuse claims.  That is what is required under

23   2019.  It doesn't matter that each claimant will vote his or

24   her own claim.

25         Your Honor, we submit the court should do what

1  other courts have done in the context of mass tort

2  bankruptcies where multiple clients are represented by law

3  firms and groups.  It should require 2019 disclosures.  We

4  should know who is representing whom particularly as we are

5  moving forward with the all-important RSA hearing and then if

6  that were successful the disclosure statement and plan

7  confirmation hearings.

8              Thank you, Your Honor.

9              THE COURT:  Thank you.

10             MR. SCHIAVONI:  Tancred Schiavoni for Century, Your

11 Honor.  We filed a separate motion, but essentially seeking

12 the same relief.  I just would briefly like to focus, really

13 on two points.

14             What evidence there is that triggers the

15 application of 2019 and, of course, if 2019 is triggered its

16 disclosure requirements are mandatory, but then I would just

17 spend a minute on why this isn't just some technicality, why

18 it directly goes to bankruptcy issues before the court.

19             The coalition is an ad hoc committee.  It

20 acknowledges that it's subject to the reporting requirements

21 of 2019.  It has made disclosures claiming that it represents

22 as part of the committee the AIS members.  AIS, I believe, is

23 part of the coalition submission has triggered 2019 by its

24 filing of a retention agreement with the verified statement

25 putting at issue its direct role in the case.

1        Separately, Mr. Kosnoff claims he hasn't triggered

2   2019, but, Your Honor, his filing his name, his signature --

3   to be clear, you know, Century has put in evidence suggesting

4   issues, improprieties about how his signature was attached,

5   but his signature appears on large numbers of the proofs of

6   claim.  He makes an appearance in the case though those

7   filings where he is not just signing, but he's signing under

8   oath on behalf of multiple parties by doing that.

9        We have separately put before Your Honor evidence

10  of the -- much of it's in the letters, itself, but also in the

11  tweets that the letters being submitted to the court are being

12  submitted at the direction of Mr. Kosnoff or at his

13  solicitation that they be submitted.  So he's put himself

14  before the court in those two ways.

15       In addition, I believe when the appearance was made

16  in connection with the 2004 discovery and the 2019 issues by

17  Mr. Kosnoff's counsel I think he's described, actually, in the

18  pleadings there as a party, as Kosnoff's firm as being a party

19  here to the case.  All of those things put Mr. Kosnoff under

20  the compliance rule of 2019 and, of course, the coalition and

21  AIS are also.

22       The coalition has presented in its verified

23  statement that all of these folks that are coalition members,

24  that are AIS members are, in fact, part of the coalition.

25  That, itself, Your Honor, is a fact to be focused on for just

1  a second.  The so called -- the firms that are part of the

2  coalition claim to represent approximately 60,000 people, but

3  the actual members of the coalition, because remember what had

4  to happen here was those firms had to solicit agreement from

5  their clients to be part of the coalition, really, expressly

6  for the reason that they had to affirmatively consent to pay

7  Brown Rudnick's fee' that those 60,000 clients didn't agree to

8  be coalition members.

9      We're relying upon representations made by the

10  coalition in this regard.  We haven't really seen proof on it,

11  but they contend that -- they don't contend that the 60,000 of

12  their clients agreed to become coalition members and pay Brown

13  Rudnick.  They contend that a far smaller number, a number

14  closer to 18,000 of their clients, became coalition members.

15  That, first of all, means 42,000 of them affirmatively took

16  the position that they did not want to pay Brown Rudnick's

17  fees, a smaller number did.

18      Of the so-called AIS group here, which is the

19  largest, was generated by this claims aggregator run out of

20  Montana that group, you know, we believe these disclosures

21  will show is the largest group of "coalition" members.  These

22  relentless efforts throughout all what we believe if we had

23  disclosure of it the negotiation of the plan to get Brown

24  Rudnick paid by the estate.  We believe it's going to show

25  that it's dramatically driven by Mr. Kosnoff and his members

1  because he personally took on most of that obligation in

2  bringing Brown Rudnick in.  We believe that is how it will

3  show the 2019 disclosures by Brown Rudnick and Mr. Kosnoff

4  would reveal that.

5          So that is one reason it's relevant directly to the

6  bankruptcy.  Two, sort of, much more fundamental reasons are

7  you're going to see when you reach the solicitation procedures

8  motion that the solicitation procedures are very much driven

9  in sync with the RSA so that claimants will, in all

10  likelihood, never see, or get, or consider, or vote their

11  claims, but the claims will all be voted by (indiscernible).

12          Here, with this AIS group, the court needs to have

13  before it the information on who controls these to know who

14  should -- if a master ballot is going to be used, and we

15  contest that that really is a proper way to go forward here,

16  it's essential that the 2019's be in place.  That is an issue

17  on which other courts in this district have issued opinions.

18  Judge Fitzgerald in Federal-Mogul and some of these other

19  cases have all said that a prerequisite to filing a master

20  ballot is, in fact, to have on file a compliant 2019

21  disclosure.

22          So we're faced here with direct evidence of a

23  dispute about who controls the largest block of claims, a

24  block of claims it seems to have been wielded, you know,

25  directly in negotiations for the benefit of a sub-group to,

1  you know, get it over $10 million and money going forward. So

2  those disclosures are important for that.  They're important

3  for the solicitation motion and they're also important for the

4  reasons that Mr. Ruggeri has laid that nobody knows who anyone

5  is negotiating with here.

6          As a final reason that they're important is, you

7  know, these submissions by Mr. Kosnoff they have been

8  incredibly unproductive in trying to reach a resolution.

9  We've put before Your Honor -- you know, there's things he's

10 said about the court and the court process that are extremely

11 unproductive to trying to reach resolution of the case with

12 parties, but the attack, frankly, on  individual lawyers, on

13 parties.

14         My client they published pictures outside -- Mr.

15 Kosnoff published pictures outside his house of, you know, I

16 think it would put us in danger.  I personally have threats

17 made against me, my identity, identifying information on the

18 internet. I have gone to the mediators to complain and ask for

19 some relief.  I have been told, basically, there is nothing

20 anybody can do.  I think Mr. Kosnoff needs to have a 2019 on

21 file.  He needs to be before the court and we need to have

22 those disclosures in order to move the proceeding forward.

23         The coalition has not been helpful in any way on

24 this.  They have acquiesced to the demand to (indiscernible).

25 We have not been able to get them to, you know, have this kind

1  of activity stood down.  There has been direct information

2  about what happened in the negotiations that has been

3  published in this way.  It's been very unproductive.

4         Your Honor, we would ask that both the coalition,

5  and AIS, and Mr. Kosnoff file verified statements explaining

6  who controls what.  There is also here a very fundamental

7  issue that we lay out in our paper about when there are not

8  retention of any of these people.  You know, in order to

9  escape here having to file a 2019 Mr. Kosnoff admits that AIS

10 is, in fact, a totally fictitious entity.

11        Your Honor knows from the motion that you heard on

12 the false advertising claims and on these submissions that the

13 letter and the manner in which those clients were solicited

14 they weren't being told that they were engaging a law firm,

15 they were being told that they were joining an organization,

16 that they were becoming members.  We annexed to the reply

17 brief, you have it in other submissions, but just for

18 convenience, a copy of the retention letter itself.  When you

19 look at that retention letter it does not present itself as

20 here's a collection of law firms.  It presents itself that AIS

21 is a real organization.  It's just the ads that were run that

22 it was a membership organization that they're joining

23 something, not that they're hiring a lawyer.

24        You know, when these folks all gave up as part of

25 this, you know, is over 40 percent of their claim; over 40

1  percent of the claim is being given up here and, you know, for

2  those who joined the coalition and obligation is being taken

3  on in connection with paying Brown Rudnick on top of that.

4          Now to be clear, the way the structure seems to

5  work with the Brown Rudnick engagement that the plaintiff

6  (indiscernible) Mr. Kosnoff and Mr. Arsdale they appear to be

7  directly responsible for the payment on a going forward basis

8  of the fees and only if somehow the case is successful they

9  can take those fees out of their individual contingencies on a

10  going forward basis, but there is a direct obligation that the

11  firms have here.  I think that has played itself out in,

12  again, how that fee request has gone.

13          It has played itself out in just one last way on

14  that fee request.  If you just stand back and think about what

15  was done, you know, 42,000 of the 60,000 clients said no we

16  would rather not pay the Brown Rudnick fees.  Then approving

17  the RSA and going forward with the RSA we have Brown Rudnick

18  affirmatively advocating directly against what the coalition

19  clients, the 42,000, said that, in fact, they should pay and

20  that they're going to pay by putting those fees, you know,

21  into the estate.

22          So there's a lot wrong here and maybe I've gone a

23  little bit past exactly the relevance of this, but these folks

24  are subject to 2019.  We would ask that they file mandatory

25  disclosures.

1          THE COURT:  Thank you.

2          MR. WILKS:  Thanks very much, Your Honor.  Good

3   morning.  Thanks very much for the opportunity to be heard.

4          Listening this morning and reading the insurance

5   company's papers it seems that this is really about two things

6   that the insurance companies what to accomplish.  One, this is

7   really just another way of getting 2004 discovery that they

8   aren't entitled to.  They want to know how 17,000 people will

9   vote, what their lawyers are telling them, who their leader

10  is.  As we will see, Your Honor, it's all based on, at least,

11  one false premise, probably two or three false premises.  We

12  will talk about that.

13         The second thing that they're trying to accomplish

14  here, obviously, is to marginalize an opponent and to divide

15  their opponents.  Mr. Kosnoff is experienced, successful,

16  obviously very passionate about this case.  He probably has

17  more experience in this, in child sex abuse cases than anyone

18  in the country.  He expresses himself in ways that evidence

19  that passion to say the least, Your Honor.  And, yes,

20  sometimes he expresses his anger in ways that the rest of us

21  do not.

22         The insurers, Your Honor, acting, I might add, as a

23  collective, by the way, seek to marginalize him and to attack

24  his credibility in the hopes that it will somehow strengthen

25  their case against the innocent victims and that they will

1  gain insight and, sort of, inside baseball on what this large

2  group of claimants are all thinking and what they're going to

3  do.

4         Of course, we don't know for sure what the

5  insurers' agenda is.  Maybe it's to force a liquidation

6  hearing.  Maybe it's just to run out the clock and delay

7  things.  Maybe just to delay it in the name of the time value

8  of money; who knows, we don't know.  No one suggests that they

9  should have to disclose their agenda in a 2019 statement even

10 though they cooperate and represent clients with apparently

11 similar broad interests.

12        A 2019 for Mr. Kosnoff, or Kosnoff Law, or AIS is

13 equally inappropriate here, Your Honor.  This group of 17,000

14 claimants that we are here to talk about today has no leader.

15 It has no steering committee.  It has no agenda.  It has not

16 organizing documents.  It has --

17        THE COURT:  It's not -- right now we're focused on

18 AIS and the firms, okay, not the 17,000 people.  2019 requires

19 an entity that represents a group to file a 2019.  So talk to

20 me about the people we're here to talk about, okay, AIS and

21 Kosnoff in particular.

22        MR. WILKS:  That's an interesting question, Your

23 Honor, because it's hard to answer that because we don't know

24 who the insurers say that AIS is.  On one hand they say that

25 these --

1          THE COURT:  I don't care who they say what AIS is.

2    I care what AIS says AIS is.  So tell me what AIS is cause,

3    quite frankly, I'm confused.

4          MR. WILKS:  Well first the most important thing, I

5    think, for me to say right now, Your Honor, is who I

6    represent.  I represent Kosnoff Law here.  Kosnoff is the

7    party that -- well the entity that the motion was directed to,

8    not Tim Kosnoff individually.  That is who I represent.  By

9    the way, Tim Kosnoff is not before the court, tweets are not

10   filings.

11         THE COURT:  So let me ask a question.

12         MR. WILKS:  I don't represent --

13         THE COURT:  Let me ask a question, you're not

14   representing abused in scouting?

15         MR. WILKS:  I, nor anyone else, represents abused

16   in scouting, nor could anyone else represent abused in

17   scouting, Your Honor.

18         THE COURT:  Explain that to me.

19         MR. WILKS:  AIS is not an entity capable of being

20   represented.

21         THE COURT:  How is that not a group?  How is that

22   not a group?  How are those three not a group?

23         MR. WILKS:  They are a group, Your Honor.

24         THE COURT:  Okay.

25         MR. WILKS:  They are a group; however, are they a

1  group for Rule 2019 purposes?

2  　　　　　Because under Rule 2019, the important thing to

3  remember is, are they pursuing, in concert, a common set of

4  interests?

5  　　　　　THE COURT:  They are.

6  　　　　　MR. WILKS:  And clear --

7  　　　　　THE COURT:  They are.

8  　　　　　Tell me how they're not.  Tell me how they are not.

9  　　　　　MR. WILKS:  I would love to, but I think, actually,

10  the insurers have told you already.  Because on one hand we

11  have Mr. Rothweiler, who says, I can deliver 16,869 votes for

12  the RSA and on the other hand, his co-counsel,

13  Mr. Kosnoff, has very openly taken a contrary approach.

14  　　　　　So, we have --

15  　　　　　THE COURT:  So, we have a dysfunctional group.

16  　　　　　MR. WILKS:  No, Your Honor.

17  　　　　　THE COURT:  We have a dysfunctional group.

18  　　　　　MR. WILKS:  I would disagree with that, Your Honor,

19  and here's why.  I think it's a very functional group because

20  when I'm in a group setting with co-counsel and we have

21  different views on course of action, first we talk amongst

22  ourselves, but then we both present our contrary views to our

23  client or our clients, as is the case here.  And those

24  clients, then, make the decision.

25  　　　　　And that's what's happened here, Your Honor.

1          THE COURT:  Okay.

2          MR. WILKS:  There are 16,869 --

3          THE COURT:  That's fine.  Let's say each of those

4   makes their decision.

5          MR. WILKS:  Yeah.

6          THE COURT:  That doesn't mean that they aren't

7   represented by Abused in Scouting, that Abused in Scouting

8   isn't acting in concert, isn't representing them.  That

9   doesn't mean that.  That doesn't mean they don't have a common

10  goal.

11          The common goal is to rectify the abuse.  The

12  common goal is to advance the position of survivors.  And the

13  clients may have different views and maybe the lawyers have

14  different views, but the common goal is to advance the

15  position of survivors.  That's what they're doing, right,

16  advance the position of survivors.

17          MR. WILKS:  That's their common goal, certainly,

18  but they're not acting in concert, Your Honor.  They're not

19  acting in concert and that's what the rule requires; they have

20  to be acting in concert --

21          THE COURT:  No.  Let's see --

22          MR. WILKS:  -- and that's not what's happening

23  here.

24          THE COURT:  -- acting in concert.

25          MR. WILKS:  That's in Rule 2019.

1           THE COURT:  Well, I think that if they're co-

2    counsel, they're acting in concert -- maybe they disagree --

3    but they're co-counsel.  If that's how you're saying what they

4    are.  They are still co-counsel to clients.

5           Let me tell you what Mr. Van Arsdale said in his

6    paid advertisement that was submitted previously.  He says:

7           "My name is Andrew van Arsdale and I'm a lawyer

8    with Abused in Scouting.  Abused in Scouting is an

9    organization that represent over 4,000 men who were abused at

10   the hands of the Boy Scouts."

11          He says it's an organization and he says that

12   organization represents 4,000 men.  So, I'm confused as to who

13   Abused in Scouting is.

14          MR. WILKS:  Well, Your Honor, I can tell you one

15   thing.  I can tell you several things.  One, Abused in

16   Scouting has never been formally organized as an entity.  I

17   know that's not dispositive.  That's fine, but that's a thing

18   that --

19          THE COURT:  So, in Delaware, we have unincorporated

20   associations, don't we, Mr. Wilks?

21          MR. WILKS:  No, Your Honor -- sure.

22          THE COURT:  Sure.  So, that's not dispositive.

23          MR. WILKS:  It is not dispositive, granted, but

24   it's a data point.  It has no leadership structure.  There is

25   no one who can speak for AIS.  Mr. Kosnoff --

1          THE COURT:  Mr. Van Arsdale didn't speak for AIS

2    and Mr. Kosnoff was also in this advertisement.

3          MR. WILKS:  If they're advertising purposes, Your

4    Honor, I can't speak to that.  All I can speak to is for

5    purposes of taking positions in this proceeding, no single

6    attorney can speak for 16,869 claimants.  They simply do not

7    have that authority.  No one does.

8          And no one has authority, Your Honor --

9          THE COURT:  Who speaks for AIS?

10         MR. WILKS:  No one, Your Honor.

11         THE COURT:  I'm not talking about -- I'm not going

12   to require the 16,000 people to file a 2019 -- I'm talking

13   about AIS and Kosnoff Law; that's what's in front of me.

14         MR. WILKS:  Two different things there, Your Honor.

15         Mr. Kosnoff and I, I suppose, as his attorney, can

16   speak for Kosnoff Law.  Neither one of us have the authority

17   to speak for AIS.  I believe if we were to ask Mr. Rothweiler

18   today, hey, Mr. Rothweiler, does Dave Wilks or Tim Kosnoff

19   speak for AIS?

20         He would tell you, absolutely not.

21         If you asked Tim Kosnoff, does Mr. Rothweiler speak

22   for AIS?

23         He would say, absolutely not.

24         THE COURT:  So, when --

25         MR. WILKS:  Because AIS isn't an entity that takes

1  a common position.

2          THE COURT:  So, when AIS asked people to become

3  members or sent out an advertisement and said, let us

4  represent you, who -- what were they saying to these abuse

5  victims?  What were they saying to them?

6          Join something that isn't anything, that's

7  leaderless, that we can't talk for; is that what they were

8  saying to these abuse victims?

9          MR. WILKS:  Your Honor, what they were telling them

10  was join a movement.  Join a movement to tell your stories.

11  Get your story out there.  You've been hiding.  You've been

12  suffering the long-term effects of hideous, atrocious abuse

13  that took place when you were an innocent young boy.

14          THE COURT:  Well, movements have leaders.

15  Movements have leaders.  And maybe these three leaders don't

16  agree, but maybe they need to come up with a spokesperson,

17  because I'm going to require AIS to file a 2019.

18          I need to understand what this entity is.  I do

19  consider it some type of entity.  Some type of entity asked

20  people to write to the Court, to put filings in this court.

21          AIS doesn't get to hide behind its -- these abuse

22  victims and say that they're not appearing.  AIS does not get

23  to hide behind these abuse victims.

24          AIS asked parties to file, asked parties they

25  represent or one of the law firms represents, to write to the

1  Court for what purpose --

2          MR. WILKS:  I'd like to address that, Your Honor.

3  May I?

4          THE COURT:  -- if not, an attempt to influence the

5  Court in some fashion.

6          So, AIS, through its three law firms, whatever you

7  want to call AIS, has, in fact, put itself in front of this

8  Court and I need to know who they are and what they do.  And

9  just to say, "we're not something," doesn't make them not

10 something; they're something.

11         MR. WILKS:  Your Honor, may I speak to the letters?

12         THE COURT:  Sure.

13         MR. WILKS:  Thank you.

14         A couple of hearings ago, I guess, is when Your

15 Honor asked me to file a response that we filed last week.

16 Again, I'll represent I asked -- I did it because Your Honor

17 asked me to and, of course, I'm happy to do anything that Your

18 Honor asks.

19         The letters are important and it's not just these

20 17,000 folks that the AIS lawyers, if we'll call them that,

21 represent.  Claimants -- we hear all the time, claimants read

22 about these proceedings and they're alarmed that they're

23 getting lost in the shuffle and they're frustrated and so

24 forth, that they've been forgotten.

25         THE COURT:  Maybe AIS needs to communicate with

1   them because I have read multiple letters where people say,

2   I'm not hearing from them.

3              MR. WILKS:  Yeah.  Well, that is something that --

4   it's good to get notice of that and I'm sure something is

5   going to happen there.

6              But as I was saying, these folks want to tell their

7   stories --

8              THE COURT:  Uh-huh.

9              MR. WILKS:  -- and so, they have.  And enormous

10  credit to Your Honor for doing your job.  I mean, I know you

11  raised your hand for this job, I suppose, but you've done it,

12  and enormous credit to you for reading these letters, because

13  they're not pleasant.  They're hard to read, I think.

14             But, Your Honor, only about half of them come from

15  anybody that the AIS lawyers represent.  About 1100 -- it's in

16  our papers -- about 1100 of them have come from these folks'

17  clients out of the greater than 2,000 that Your Honor has

18  received.

19             But they tell a common story, the story of a common

20  sort of abuse perpetrated by a common group of actors.  But

21  the similarities among those letters really ends there, Your

22  Honor.  They don't advocate a single position.  They don't

23  advocate a single outcome.  They don't advocate, yes, that we

24  should keep the Boy Scouts.  They don't advocate uniformly, we

25  should eradicate the Boy Scouts.

1          They tell both sides.  They tell both sides of

2   every story.  They simply tell horrible, horrible stories that

3   are shockingly true.

4          But, Your Honor, my question really is, and this is

5   maybe one of guidance if Your Honor has already ruled or is

6   about to rule, what would a Rule 2019 disclosure add to this?

7   What would be disclosed?

8          THE COURT:  What would be disclosed is who they

9   represent.  Who they represent.

10          MR. WILKS:  That's already out there, Your Honor.

11          THE COURT:  I don't know that.  I have no

12   representation from AIS, because you tell me that AIS is not

13   an entity.

14          MR. WILKS:  Well, it's in the claims register,

15   though, Your Honor.  We can -- it's easy to mine that data or,

16   listen, I would be happy to provide the Court with a list of

17   the claimants making up the 16,869.  I thought it was 869, but

18   however many it is, the almost 17,000.  That's simple to

19   provide to the Court; who is represented by these three law

20   firms, jointly.  I'm happy to provide that information.

21          You know, at the end of the day, well, and also, a

22   lot of conflation here this morning about the Coalition and

23   AIS.  Just to clarify, there's 3300 AIS clients who have also

24   signed on to the Coalition.  That's all.  So, there's thirteen

25   or 14,000 AIS clients who have not joined the Coalition.  So,

1  that's a point of clarification that pretty important.

2         But, it's because of those 3300 folks that the AIS

3  engagement letters have been produced.  They already have

4  those.  The Court already has those; they're in the record.

5         So, if it's a matter of client lists, we're happy

6  to provide that.  But beyond, that Your Honor, I'm not sure

7  who would be able to represent AIS.  It would require three

8  law firms to come together and direct someone it take

9  positions that, as a group, they don't take.

10         And another really, really important thing here

11  that the insurers seem to lose sight of or they want Your

12  Honor to lose sight of, this is not a voting bloc.  These

13  three law firms, these 17,000 individuals are not a voting

14  bloc.  There is no agenda.

15         And, Your Honor, when Your Honor ruled on it last

16  fall, I think it was on the Coalition 2019 statement, Your

17  Honor emphasized, correctly, 2019 is all about transparency of

18  agendas.

19         There is no agenda among these three law firms.

20  There is, other than, as you say, advancing the -- you know,

21  get the best deal that we can for the claimants.

22         Well, what does that look like?

23         Well, if you ask Mr. Rothweiler and he'll tell you

24  one thing and if you ask Mr. Kosnoff, he'll tell you another.

25  And if you ask every lawyer on this call what's the best for

1 the claimants, and you're going to get a lot of answers.

2      THE COURT:  Well, just because -- but just because

3 your clients may ultimately vote differently, assuming they

4 vote individually -- and I don't know yet; we're not there --

5 that doesn't mean they weren't a group and that doesn't mean

6 that there wasn't some common goal or they weren't acting in

7 concert through a lawyer.

8      MR. WILKS:  Well, that's --

9      THE COURT:  That's for anybody.  That's not just

10 for your clients.  That's for anybody who's acting as a group.

11      If it ultimately comes down to a vote, the members

12 can vote as they want.  That doesn't mean that they weren't

13 acting as a group or that someone wasn't representing them as

14 a group.

15      MR. WILKS:  So, Your Honor --

16      THE COURT:  So, that's what 2019 goes to;

17 representing a group, acting in concert to advance their

18 common interests.  Their common interests is survivors, the

19 treatment of survivors, the how are survivors going to

20 recover?

21      And that's, presumably, what Mr. Kosnoff, in terms

22 of Kosnoff Law has been doing, and what AIS has been doing.

23 They have representation letters -- I'm looking at it -- this

24 representation letter has AIS and Abused in Scouting at the

25 top of it.  It's not just an engagement letter with a

1  particular firm who then engaged co-counsel.

2          This is something more than that and I don't know,

3  and I don't know that it's my place to be concerned about

4  state law and association of separate law firms and whether

5  that's appropriate or it's an ethical violation -- I don't

6  know.

7          I just know what I have in front of me and what I

8  have in front of me is what I consider to be some type of

9  entity, some type of organization, which is what Mr. Van

10 Arsdale calls it, and what I understand is, actually, AIS

11 hasn't objected to the Rule 2019, so I should just order it,

12 because they haven't even objected.

13         So, as to AIS, there's not really even an issue.  I

14 think AIS is an entity, is an organization.  It could be an

15 unincorporated association.  It could be an affiliate.  It

16 could be an organization, as Mr. Van Arsdale says it is and

17 they are representing people.

18         MR. WILKS:  Your Honor, may I respond?

19         So, a few things.  One, the document that is the

20 engagement letter says Abused in Scouting at the top, but then

21 it has the name of all three law firms right under it.

22         THE COURT:  Pretty unusual.  Isn't that pretty

23 unusual to have the names of three law firms altogether under

24 one, what, fictional name?

25         MR. WILKS:  Well, Your Honor, a lot of my

1  engagement letters were where I partnered with other firms and

2  as co-counsel, we add both our names in the engagement letter.

3         THE COURT:  Do you have some fictional name on top

4  that's some collaboration of the two of you?

5         MR. WILKS:  Never once, Your Honor.

6         THE COURT:  Never once.

7         MR. WILKS:  But that doesn't mean that this is, for

8  2019 purposes, folks acting in concert.

9         And, please, if I could be heard on this, I think

10 it's important --

11        THE COURT:  Why are you fighting so hard?

12        MR. WILKS:  -- for Your Honor to understand --

13        THE COURT:  Why are you fighting so hard against

14 this disclosure?

15        The three decided to organize in some fashion, to

16 work together in some fashion.  So, why don't they just admit

17 that they're working together in some fashion and it's an

18 organization?

19        MR. WILKS:  So, if I can make a point and circle

20 back to that, because it's all part of the same.

21        When we're talking about Rule 2019, we're talking

22 about working in concert for a common interest.  There is a

23 wide, wide disparity among the positions of six -- 17,000,

24 80,000 claimants, because jurisdiction matters degree of

25 severity of the abuse matters, duration of the abuse, effects,

1  long-term effects of the abuse; all those things make each

2  claimant very different from one another.

3          Now, we all want to advance the best deal we can

4  for the most claimants.  Does that mean it's the same deal for

5  everybody?

6          No --

7          THE COURT:  But isn't --

8          MR. WILKS:  That's why three law firms come

9  together --

10          THE COURT:  Okay.

11          MR. WILKS:  -- and advise their clients and allow

12  the clients to vote as they will, whether it's on the RSA or

13  the plan or anything else.

14          THE COURT:  Well, I find that unusual.

15          But how -- that's not any different from the

16  Coalition.

17          MR. WILKS:  It is unusual, I agree.  It is unusual.

18  It's very different.

19          THE COURT:  The Coalition, itself, is not going to

20  vote for any of the people who are members.  Those people are

21  going to vote, themselves, or through other counsel and, yet,

22  they represent those people, together, who all have different

23  stories, who all have different degrees of abuse that was

24  visited upon them and have their own stories.

25          But they're a group.  They're an entity that

1 || represents towards a common goal, even though each one of

2 || those may be different.

3 ||          MR. WILKS:  So, that's a group that came together

4 || for the sole purpose of taking positions that are unified and

5 || in concert and they hired their own counsel to do so.  That's

6 || altogether different here.

7 ||          AIS has never made a single filing.  It has never

8 || asked to be recognized in a -- at a mediation or anywhere else

9 || --

10 ||          THE COURT:  It hasn't, but you know what it's

11 || doing?

12 ||          It's hiding behind its members by asking them to

13 || file stuff with the Court.  Represented individuals do not

14 || file filings with the Court; their lawyers do.

15 ||          But in this instance, AIS or AIS law firms, ask

16 || their clients to do that.  They don't get to hide behind their

17 || clients.  They need to come out front and do what they want to

18 || do in this court if they want to do something, but they ask

19 || their clients to.

20 ||          MR. WILKS:  Yeah, I'm sorry Your Honor looks at it

21 || this way.  And it's reasonable, now I see why Your Honor looks

22 || at it that way.

23 ||          I don't think that was the intent.  I think the

24 || intent was, these are folks who wanted their stories to be

25 || told and this is a long road for a lot of these folks who have

1  suffered enormously and --

2  THE COURT:  I appreciate those stories.

3  MR. WILKS:  -- they wanted their story to be heard

4  by the one person that they thought could do something about

5  it.

6  THE COURT:  I appreciate those stories and I've

7  read those letters --

8  MR. WILKS:  I know you have.

9  THE COURT:  --  and they are -- and you can tell

10  how difficult they are to write.  And you can tell that

11  they're dredging things up from the past.

12  And most of those survivors are quite polite in

13  their letters.  They don't disparage other parties in this

14  case.  They certainly don't publicize somebody's home address.

15  I hear what you're saying and I'll start from the

16  beginning.  I'm confusing as to what AIS is, but I don't think

17  you get to come together in the fashion they have, advertise

18  in that fashion, say you're an organization, send out an

19  engagement agreement over the headline of AIS, and then say

20  you haven't come together because you don't agree on certain

21  strategies; somehow, you aren't representing your clients

22  collectively.  I don't think so.

23  MR. WILKS:  Understood, Your Honor.

24  THE COURT:  So, their 2019 -- so, AIS gets to file

25  a 2019 and what's required by 2019.  And so does Kosnoff Law.

1          MR. WILKS:  May I ask for clarification on that,

2   Your Honor?

3          THE COURT:  Certainly, Mr. Wilks.

4          MR. WILKS:  I don't want to be, you know,

5   impertinent, but on Kosnoff Law, Your Honor, listen, I'll

6   speak candidly.  I'm not wild about Tim Kosnoff's tweets and

7   he knows this.

8          THE COURT:  I haven't read them.  I haven't read

9   them.  I'm not on social media and I don't read them and I

10  wouldn't follow that anyway.

11         MR. WILKS:  They're put before, Your Honor, in the

12  insurance company's filings, as were information from

13  Mr. Kosnoff's divorce proceedings.  So, we got mud flying both

14  ways here in ways that are really unfortunate, particularly in

15  this state, where we're trying to do better than that.

16         But, Your Honor, you know, as far as Kosnoff Law is

17  concerned, I mean, we have a single entity.  And we talk about

18  a 2019 when folks are all affiliates of one another, the 2019

19  doesn't apply.

20         I'm not sure I see how Kosnoff Law, if it's not the

21  claimant, if it's not the clients, how Kosnoff Law is subject

22  to 2019.

23         THE COURT:  Kosnoff Law is like any law firm that

24  represents multiple clients acting in concert to advance their

25  common interests.  Those clients are -- he's got a common

1  interest for them.  He's got a common interest for survivors,

2  which good for him, if that's his lifelong passion.  Good for

3  him, but then he's subject to 2019.

4       I will also say that I'm concerned when we come to

5  the issues of the RSA and who can vote, and I need to know who

6  is advising these folks.  I need to know that.  Is it one of

7  them?  Is it all three of them?

8       I think it is going to be important, with respect

9  to those issues.

10      MR. HOGAN:  Your Honor, Daniel Hogan, on behalf of

11  Eisenberg, Rothweiler.

12      May I be heard on --

13      THE COURT:  Yes.

14      MR. HOGAN:  Thank you, Your Honor.

15      Your Honor, I represent Eisenberg, Rothweiler,

16  Winkler, Eisenberg & Jeck, and they are one of the three firms

17  that constitute AIS.  The purpose in speaking today, Your

18  Honor, is to very clearly distinguish Eisenberg Rothweiler

19  from AVA Law and from Kosnoff Law.

20      In terms of background, Your Honor, Eisenberg

21  Rothweiler is an esteemed Philadelphia law firm.  It has been

22  around for over 25 years.  Both, Mr. Eisenberg and Mr.

23  Rothweiler have each been practicing law for over 40 years.

24  They have each concentrated their practice in complex

25  litigation, representing catastrophically injured individuals,

1  suffering from brain damage and quadriplegia.

2         Eisenberg Rothweiler has earned a reputation of

3  unparalleled success in this region and is one of the most

4  accomplished law firms in Philadelphia.  They are

5  distinguished trial attorneys and they have had multiple

6  positive verdicts over the past four decades.

7         They have also been representing sexually abused

8  claimants for the last 15 years.  They participated in these

9  proceedings, Your Honor, from its inception, as a member of

10 the Coalition.  As part of the Coalition, Eisenberg Rothweiler

11 has, in fact, already submitted information, including an

12 exemplar of the AIS retention agreement.  Your Honor, that's

13 at Docket 1997-3, page 15 of 93, as well as a declaration from

14 Stewart Eisenberg, in connection with the Coalition's third

15 amended 2019 statement.

16        In addition to that, Your Honor, Ken Rothweiler had

17 a leadership role in the Coalition.  At the debtors' request,

18 the Court ordered the parties to mediate, as you're well

19 aware.  Pursuant to that mediation order, Mr. Rothweiler has

20 led the Coalition in those mediation efforts.

21        Eisenberg Rothweiler is committed to a global

22 resolution of the bankruptcy on behalf of the survivors.  So,

23 Your Honor, the purpose in laying out the history of Eisenberg

24 Rothweiler is to juxtapose the firm, as related to Mr.

25 Kosnoff.  Eisenberg Rothweiler repudiates and rejects all of

1 | the tweets.

2 | Now, granted, I know, Your Honor, you haven't seen

3 | them, and I'm glad to hear that you haven't seen them.  I only

4 | saw them yesterday.  I had to find my Twitter handle -- I

5 | don't even know what it was -- and I logged in and I saw it

6 | and I just want you to be clear that Eisenberg Rothweiler does

7 | not support those tweets.

8 | Your Honor, the AIS firms represent approximately

9 | 17,000 claimants.  AIS is not an ad hoc committee.  Certain of

10 | the AIS members, as I indicated, are members of the Coalition.

11 | Some 3,000-plus members of the Coalition are clients of

12 | Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, as well as

13 | AVA Law and Kosnoff Law.

14 | The letters, Your Honor, indicate a co-

15 | representation of the clients by those three firms, nothing

16 | more.  Each of these AIS clients will file a -- has filed a

17 | proof of claim and each client of AIS will individually vote

18 | on the plan of confirmation.  None of the firms will vote on

19 | the plan, Your Honor, as you're well aware.

20 | In terms of what we're trying to accomplish, Your

21 | Honor, we're trying to steer clear of hyperbole and any issues

22 | that don't focus on the matter at hand; specifically, Your

23 | Honor, we look at this case as being inclusive of all kinds of

24 | terrible accusations being made and we're not trying to

25 | emphasize those necessarily.  We're not trying to add to the

1   hyperbole; we're trying to get a deal done, Your Honor, and

2   the tweets from Mr. Kosnoff are not helpful to the process.

3   We, unequivocally, repudiate those tweets, Your Honor.  I

4   can't be more clear about that.

5           In terms of the solicitation, the letters of

6   solicitation that the Court raised as an issue for these 2019

7   statements, I just want to be clear, Your Honor, that there

8   are almost daily communications with the members or the

9   clients of AIS.  Those communications occur through both, AVA

10  Law, as well as through Eisenberg Rothweiler.  They don't

11  typically occur through Mr. Kosnoff.  There are telephone

12  calls that are made.  There are weekly meetings between

13  Eisenberg Rothweiler and AVA Law on how to answer questions

14  that are posed by claimants.

15          I saw the one letter that you referenced where the

16  claimant individual indicated that he didn't know who to

17  communicate with.  I think some of that, Your Honor, relates

18  to the fact that most of the communications are done by email.

19  I'm not certain, given the way I saw that letter, whether that

20  individual, given his current situation, whether he has access

21  to email.  So, don't take, as verbatim, the notion that the

22  individual lawyers that constitute AIS are not communicating;

23  they are, Your Honor, it's just done, typically,

24  electronically or by telephone call.

25          So, then, ultimately, Your Honor, to the matter at

1   hand.  From our perspective, the 2019 -- this is an

2   inappropriate use of 2019, but I've already heard your ruling

3   effectively, Your Honor, so I'm not going to belabor that

4   point.  Suffice it to say that Eisenberg Rothweiler has

5   already, largely, made the disclosures required by 2019 by

6   virtue of the filing made by the Coalition, the third amended

7   2019 statement.  And so, with the exception of the list of the

8   claimants that are represented by AIS, all of the various

9   disclosures required by 2019 have already been made by

10  Eisenberg Rothweiler.

11          And, finally, Your Honor, I just want to point out

12  that this motion wasn't directed at Eisenberg, Rothweiler,

13  Winkler, Eisenberg & Jeck; it was directed at Kosnoff Law and

14  at AIS, specifically.

15          And so, I just want to be clear, Your Honor, that

16  no relief has been requested, with regard to Eisenberg

17  Rothweiler, and, ultimately, I'm not sure that it ultimately

18  matters, Your Honor, because to the extent that the three

19  firms all represent the same claimants, the disclosure by one

20  of the three law firms would constitute and equivalent of the

21  other two law firms; meaning, that because they all represent

22  all of the claimants, that one disclosure by Kosnoff Law would

23  be the equivalent of a disclosure by Eisenberg Rothweiler.

24          Any questions, Your Honor?

25          THE COURT:  No, thank you.

1         And I realize, I think, well, I know I realize that

2 Eisenberg Rothweiler was not the subject of the 2019 motion

3 and I don't think I included them in my ruling, which was

4 directed at Abused in Scouting and Kosnoff Law, which were the

5 subject of the motion.

6         I will say -- No, I won't.

7         MR. HOGAN:  I read that transcript, as well, Your

8 Honor, and I did not see any indication that it was directed

9 at my client, Eisenberg Rothweiler.

10         THE COURT:  No. Okay.

11         MR. MOLTON:  Your Honor, David Molton for the

12 Coalition from Brown Rudnick.

13         Can I have a few words?

14         THE COURT:  You can have a few.

15         MR. MOLTON:  All right.  Well, I didn't want to,

16 Your Honor, but there were some inaccuracies said that I need

17 to, just on the record, change.

18         You know, number one, you know, there were

19 statements by Mr. Schiavoni as to the helpfulness or non-

20 helpfulness of the Coalition.

21         Your Honor has already ruled as to our 2019.  It's

22 law in the case.  We've complied with Your Honor's ruling;

23 indeed, in May, we supplemented that, and I don't think

24 there's been any issue with respect to that.

25         I think it's interesting, Your Honor, that a lot of

1  the arguments made seem directed more to the RSA or are

2  related to the RSA, as opposed to the disclosure issues under

3  2019.  I just want to say, Your Honor, that from the

4  Coalition's perspective, it's a remarkable achievement that

5  we're going to be dealing with an RSA for Your Honor's

6  consideration that has the support, as Ms. Boelter said, of

7  well over approximately, you know, the TCC, the debtor, local

8  counsel, the Coalition, and the FCR.

9         And as Your Honor has seen by the joining law

10  firms, substantial creditor, at least from the law firms,

11  support in terms of recommending to their clients to support

12  the plan.  In light of the history of this case that Your

13  Honor is well aware of, I think that's a remarkable thing.

14        Mr. Rothweiler, I just want to say, has been very

15  involved in leadership in the Coalition, with others, and is

16  part of our mediation delegation and will be meeting next

17  week, in accordance with what Ms. Boelter said the mediation

18  schedule will be.

19        Turning to my friend Mr. Ruggeri, I know he's a

20  very careful lawyer and he used the word "control," that this

21  is about what law firms control.  I don't think the RSA has

22  that word in it, with respect to the joining state court

23  counsel.

24        I think in Your Honor looks at the document that

25  was filed, paragraph 4(a)(1) says those local counsels shall,

1  unremarkably, Your Honor, in mass-tort cases, "Use reasonable

2  efforts to advise and recommend to their respective clients,

3  to vote to accept the amended plan," and then it continues.

4        So, this issue is not really about who controls

5  what client.  This is about what law firms have relationships

6  with clients and can, as in the conduct of their duties, make

7  a recommendation.

8        This is the same sort of procedure that was used in

9  PG&E, Your Honor, with respect to consenting law firms that

10  joined an RSA.

11        And I just want to note, Your Honor, that we have a

12  plethora of ad hoc committees in Purdue, including the ad hoc

13  committee, representing NAS babies and PI lawyers, all of whom

14  were very heavily involved, if Your Honor reads the public

15  pleadings in mediation efforts.  The Purdue vote just came in,

16  Your Honor, and my understanding is that 95 percent of the PIs

17  voted in favor of the plan and 95 percent of the NAS baby

18  claims voted in favor of the plan, using a similar sort of

19  recommendation construct as I think we have here, with respect

20  to ad hoc committees and their function.

21        THE COURT:  Isn't it important, then, to know who

22  actually represents those individuals, who the firms commit to

23  use their best efforts to convince to vote?

24        MR. MOLTON:  Yeah, I don't deny that, Your Honor.

25  I don't deny those are important points.

1            I have to turn to Mr. Schiavoni because he makes a

2    number of things that are just not correct, and I have to

3    correct it for the record, Your Honor, and I'm sorry I'm

4    taking the time.  He spent a good deal to have time talking

5    about Brown Rudnick fees and how the consents from our 18,000

6    abuse survivors who consented to be part of the Coalition

7    meant that they agreed to pay Brown Rudnick's fees.  And then

8    he said, in what could only be testimony, that 42,000 did not

9    explicitly refuse, I think he said, to sign consents because

10   they didn't want to pay those fees.

11           I don't know where that comes from.  I guess we

12   just attributed that to another one of Mr. Schiavoni's

13   statements, but I do know, Your Honor, that we talked about

14   this at length way back in the fall.  And the actual

15   submissions on the 2019 contain, and I'm referring Your Honor

16   to Docket Entry 1510, which is the supplement to the amended,

17   verified statement of the Coalition of Abused Scouts for

18   Justice, pursuant to Bankruptcy Rule 2019.  And this is

19   something, Your Honor, that has been part of all of our going-

20   forward items.  Paragraph -- to the Coalition, acknowledges

21   that neither it, nor state court counsel will charge back any

22   fees, any of the Coalition -- any fees of any of the

23   Coalition's professionals to individual survivors, in any way,

24   including by reducing individual survivors' claim

25   distribution, provided, however, that the Coalition expressly

1  reserves its right to seek a substantial contribution claim

2  and/or seek reimbursement of the fees or expenses incurred by

3  Coalition counsel, under a Chapter 11 plan.

4          So, a lot of what Mr. Schiavoni went off on in

5  connection with Brown Rudnick and its fees is just wholly

6  inaccurate and I had to say that on the record.

7          And my last point, Your Honor, is Mr. Schiavoni

8  mentioned that we had somehow defaulted in his pleading filed

9  this week, in responding to Your Honor's directive given last

10  week, that this issue be put on.

11          I recall, and the transcript is clear, and Your

12  Honor is framing of the issues today is that the issue was

13  Kosnoff and AIS.  As Your Honor notes from the amended agenda,

14  paragraph 3(a), we did submit a limited objection to Century's

15  original motion to compel at docket entry 2030.  We then

16  filed, Your Honor, afterwards, an amended 2019 statement in

17  May.

18          And from my perspective, Your Honor, that's the end

19  of the story.  So, in any event, unless Your Honor has any

20  further questions, I'll be quiet.

21          THE COURT:  I don't.  I didn't expect the Coalition

22  to file anything in response to this or certainly anything

23  further, because as I think I noted at the last hearing, I

24  don't consider this to be a Coalition issue; this is an issue

25  for AIS and Mr. Kosnoff.

1            Okay.  I've ruled.  I'm not going to repeat.  I did

2    -- I will note that when the insurance companies, I think it

3    was Century, asked for Mr. Kosnoff's deposition, I declined

4    that.  I didn't find it was relevant to the issues.

5            I think Mr. Kosnoff has now involved himself in

6    this case through AIS and through the letters that have been

7    filed in this court and is now subject to 2019, as well as for

8    the other reasons that I have indicated, including that we

9    need to know who represents these parties and I think we will

10   need to know that, in connection with, perhaps the RSA and,

11   perhaps, voting.

12           MR. WILKS:  Your Honor, may I speak to that; it's

13   David Wilks again.

14           THE COURT:  Mr. Wilks?

15           MR. WILKS:  Thank you, Your Honor.

16           Obviously, the 2004 issue wasn't noticed for today,

17   so I wasn't -- I didn't go back and prepare to argue that

18   issue.  Obviously, we resisted the 2004 motions more than

19   once, successfully, I thought.

20           THE COURT:  You did.

21           MR. WILKS:  But I would submit, Your Honor, that

22   there hasn't been that extra showing required to justify the

23   deposition of an opposing attorney.

24           THE COURT:  Oh, I'm not --

25           MR. WILKS:  But now that Your Honor has ruled

1  that --

2            THE COURT:  Yeah, I'm not suggesting there is at

3  this time.  What I'm suggesting is that the 2019 is

4  appropriate and when it's not appropriate to require something

5  of Mr. Kosnoff, I have not required it.

6            MR. WILKS:  So, I'm sorry, Your Honor.

7            Are you ordering him to appear for a deposition

8  or --

9            THE COURT:  No, no, no.

10            MR. WILKS:  My apologies.  I never should have

11  opened my mouth.

12            THE COURT:  No.

13            MR. WILKS:  I misunderstood.

14            THE COURT:  I'm sorry if I confused you -- no -- I

15  was referring to the fact that I did not require that and I

16  think appropriately so.  2019, I'm requiring, and I think

17  appropriately so.

18            MR. WILKS:  The mistake is mine, Your Honor.

19            MR. RUGGERI:  Your Honor, James Ruggeri.

20            Hartford did submit a proposed order at Docket

21  2028-1, for the Court's convenience.

22            THE COURT:  Did not look at that.  I would like you

23  to circulate it to Mr. Wilks to see if there is any issue and

24  then submit it under certification, please.

25            MR. RUGGERI:  Happy to.  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          MR. BUCHBINDER:  Your Honor, this is Dave

3    Buchbinder.  May I be heard very briefly?

4          THE COURT:  Yes.

5          MR. BUCHBINDER:  Thank you, Your Honor.

6          I would simply remind the affected parties that

7    Rule 2019 requires that the statement to be filed be verified

8    under oath.  Thank you, Your Honor.

9          THE COURT:  Thank you.

10         Okay.  What's remaining?

11         MR. ABBOTT:  Your Honor, I guess the next item on

12   the agenda is Century's motion to compel Ichor Consulting to

13   comply with Rule 2019.

14         THE COURT:  Okay.

15         MR. SCHIAVONI:  Your Honor, this is another entity

16   that has appeared in the case.  They filed a notice of

17   appearance.  They represent multiple parties.

18         It particularly stands out because it's, the notice

19   of appearance was not on behalf of a law firm or such; it was

20   on behalf of a consulting firm.  And the subsequent filings by

21   the consulting firm, it is a lawyer, the fellow behind the

22   consulting firm.  But in his filings, I think he asserts that

23   he's not functioning at a lawyer in the matter.

24         So, you know, this is, again, another one that just

25   particularly stands out, that it looks like it's really coming

1  in from one of the aggregators and we'd ask for a 2019

2  disclosure.  We think it's directly tied to what you'll see on

3  the solicitation procedures, how they intend folks to vote.

4         And it's, like, for this one, it's like, I think

5  it's particularly important to have a 2019 on file.

6         THE COURT:  Okay.  Can I hear Ichor?

7         MR. CONWAY:  Good morning, Your Honor.

8         Bernard Conway, on behalf of Ichor and John

9  Edwards.

10        Virtually everything you heard about the prior

11 motion is inconsistent with the facts of this motion.  Prior

12 to the insurances carriers filing this motion, the only

13 involvement that Ichor or Mr. Edwards had was to file a notice

14 of appearance.

15        As reflected in the response that was filed by

16 Ichor, the only purpose in filing the notice of appearance was

17 to keep abreast of what was going on.  What you'll not see in

18 this case is there are no tweets.  There are no filings.

19 There's no participation, in any way, in any part of this

20 matter.  There's no evidence of any solicitation votes.

21 There's no one involved -- he's not involved in negotiations.

22 No letters written on behalf of his clients and not involved

23 in mediation.

24        Why is all of that important?

25        Because under Rule 2119 (sic), there are two

1  definitions that are critical here, one of which is the

2  disclosure of an economic interest and the other is

3  represents.  I'm not sure if there's much of an argument that

4  he has a disclosable economic interest.  The definition,

5  itself, is so broad it would be difficult to see how he

6  didn't.

7        But where this request falls flat on its face is

8  the concept of representation or represents.  If you look at

9  definitions in -- if you look at 21(b), 2119(b) (sic), you'll

10 see that it provides that a person has to represent, which,

11 presumably, reflects back to the definition that appears in

12 2019(a).

13       The advisory committee notes are pretty clear on

14 what "represents" means.  It says, the definitions provide

15 that representations requires active participation in the case

16 or in a proceeding on behalf of another entity, either by

17 taking a position on a matter before the Court or by

18 soliciting votes on the confirmation of the plan; thus, for

19 example -- and I think this is important -- an attorney who

20 was retained and consulted by a creditor or an equity security

21 holder to monitor the case, but who does not activate any

22 position before the Court or engage in solicitation activities

23 on behalf of that client, does not represent the creditor or

24 the security interest for purposes of this rule.

25       And that's precisely where we're at here, Your

1  Honor.  So, what the debtor -- what the insurance carrier has

2  done is he's done a great job proving that Mr. Edwards is a

3  lawyer, that Ichor is a law firm of some sort, but they

4  haven't met the definition and the obligations that are

5  imposed under 2019.

6         I'm going to stop.  I think we've talked the ears

7  off a head of lettuce here for the prior motion.  I think this

8  is pretty straightforward.

9         If Your Honor has questions, I'm available to

10  answer them.  Thank you.

11         MR. SCHIAVONI:  Your Honor, Ichor has -- they filed

12  a notice of appearance.  That is a representation in the case.

13  That triggers 2019.  And to be clear, we actually think what's

14  going to show up through the 2019 is that there may be an

15  ownership interest in the claims, because these are just

16  aggregator claims.

17         But whether that's what they show or not, the

18  filing of the notice of appearance triggers 2019.

19         THE COURT:  Does it?  Does just the filing of a

20  notice of appearance trigger 2019?

21         MR. CONWAY:  Your Honor, if I might be heard?

22         THE COURT:  Well, I'm going to let Mr. Schiavoni

23  answer it and then I'll let you reply, Mr. Conway.

24         MR. CONWAY:  Thank you.

25         MR. SCHIAVONI:  I think it does, Your Honor,

1 because it shows that they're a participant in the case.  You

2 know, further, it's like, when you read the solicitation

3 procedures and that's heard in another couple of weeks, I

4 think you'll see that this is how, you know, all the claims

5 are supposed to be voted on a master ballot basis or it's

6 certainly the solicitation procedures are heavily weighted in

7 that way.

8            So, we do ask, as part of our objection to the

9 solicitation procedures, that people vote.  If they're going

10 to use a master ballot, they file a 2019.

11           So, if Your Honor wants to defer it until then,

12 fine.  I do think the notice of appearance in the case

13 constitutes a participation in the case.

14           THE COURT:  But is that taking a position?

15           Mr. Conway?

16           MR. CONWAY:  I don't believe it is, Your Honor.

17 I'm not sure how else you might take note or involve yourself

18 for the purpose of keeping informed in the case, absent an

19 entry of appearance.

20           But all that said, the best the insurers have done

21 is point out that he's a lawyer, he works for a firm, and they

22 feel like he might be an aggregator.  There's no evidence of

23 that.  There's no evidence that he's done anything whatsoever

24 in this case, other than file an entry of appearance and

25 respond to the motion.  That's it.

1          THE COURT:  Okay.  Thank you.

2          I am not going to require Ichor Consulting to file

3  a Rule 2019 statement.  I don't have the evidence in front of

4  me that Ichor has either, itself, participated in the case or

5  caused its clients to participate in the case.

6          And fit becomes relevant for purposes of

7  solicitation, specifically with respect to Ichor, then we'll

8  deal with it at that point in time.  I have, obviously, not

9  made any decisions on how the vote will be solicited in this

10 case and whether Ichor is going to attempt to vote or submit a

11 master ballot, I don't know.  I don't know any parties that

12 will.  We just had the representation that AIS is not going to

13 do that, nor is Mr. Kosnoff going to submit a master ballot.

14 So, I don't know how that's going to shake out.

15         But if, in fact, it becomes a solicitation issue,

16 given that the only thing that Ichor Consulting has done is

17 file an entry of appearance, and the representation I have

18 from counsel is it was for notice purposes only and to keep

19 abreast of the case, I am not going to require it.

20         MR. CONWAY:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22         MR. CONWAY:  Might I be excused?

23         THE COURT:  Yes.

24         MR. CONWAY:  Thank you.  Have a good day.

25         THE COURT:  Thank you.  You, too.

1          MR. ABBOTT:  Your Honor, the next item on the

2   agenda is Century's motion to compel Abused in Scouting,

3   Kosnoff Law, and the Coalition to make 2019 disclosures.

4   Obviously, we've talked a lot about a lot of, that but I'll,

5   again, turn it over to Mr. Schiavoni to address the Court.

6          THE COURT:  I thought we were taking this

7   altogether?

8          MR. SCHIAVONI:  I think we did, Your Honor, from my

9   perspective, also.

10          THE COURT:  Thank you.

11          MR. ABBOTT:  All right.  Fine, Your Honor.

12          That, then, I think is the last matter that was

13   intended to go forward on the agenda today, as I understand

14   it.

15          THE COURT:  Okay.  Thank you very much.  I

16   appreciate it.

17          We're adjourned.

18          MR. ABBOTT:  Thank you, Your Honor.

19      (Proceedings concluded at 11:49 a.m.)

20

21

22

23

24

25

1

CERTIFICATE

2

3      We certify that the foregoing is a correct transcript

4  from the electronic sound recording of the proceedings in the

5  above-entitled matter.

6

7  /s/Mary Zajaczkowski              July 29, 2021
   Mary Zajaczkowski, CET**D-531

8

9  /s/William J. Garling             July 29, 2021
   William J. Garling, CE/T 543

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25