1                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE
2
   IN RE:                         .  Chapter 11
3                                 .  Case No.: 20-10343 (LSS)
   BOY SCOUTS OF AMERICA AND      .
4  DELAWARE BSA, LLC,             .  (Jointly Administered)
                                  .
5             Debtors.            .
                                  .
6  . . . . . . . . . . . . . . .  .
                                  .
7  OFFICIAL TORT CLAIMANTS'       .
   COMMITTEE OF BOY SCOUTS OF     .
8  AMERICA AND DELAWARE BSA, LLC, .  Adversary Proceeding No.:
                                  .  21-50032 (LSS)
9             Plaintiff,          .
                                  .
10 v.                             .
                                  .
11 BOY SCOUTS OF AMERICA AND      .
   DELAWARE BSA, LLC,             .  Courtroom 2
12 A.A., *et al.*,                .  824 Market Street
                                  .  Wilmington, Delaware 19801
13            Defendants.         .
                                  .  Thursday, August 19, 2021
14 . . . . . . . . . . . . . . .  .  3:00 p.m.

15                    TRANSCRIPT OF ZOOM HEARING
            BEFORE THE HONORABLE LAURIE S. SILVERSTEIN
16            CHIEF UNITED STATES BANKRUPTCY JUDGE

17


18


19 (APPEARANCES CONTINUED)

20 Electronically
   Recorded by:            LaCrisha Harden, ECRO
21
   Transcription Service:  Reliable
22                         1007 N. Orange Street
                           Wilmington, Delaware 19801
23                         Telephone: (302) 654-8080
                           E-Mail:  gmatthews@reliable-co.com
24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

1 | <u>APPEARANCES</u>:

2 | For the Debtors
and Debtors in

3 | Possession:                Jessica C. Lauria, Esquire
                               WHITE & CASE, LLP

4 |                            1221 Avenue of the Americas
                               New York, New York 10020

5 |

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                                   INDEX

2    MOTIONS:                                                     PAGE

3    Agenda
     Item 1:   Oral Ruling on Debtors' Motion for Entry of an        4
4              Order, Pursuant to Sections 363(b) and 105(a)
               of the Bankruptcy Code, (I) Authorizing the
5              Debtors to Enter Into and Perform Under the
               Restructuring Support Agreement, and (II)
6              Granting Related Relief

7    Transcriptionist's Certificate                                 31

8
                                   -o0o-
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 3:00 p.m.)

2          THE COURT:  Good afternoon, counsel.  This

3  is Judge Silverstein.  We're here in the Boy Scouts of

4  America bankruptcy case, case number 20-10343.  Thank you for

5  gathering on short notice.  I am going to read my decision

6  from the bench.  I will say if I had more time, it would

7  probably be more concise, so I

8  apologize in advance for the length.

9          Boy Scouts of America is a not-for-profit

10  organization whose mission is to train youth in responsible

11  citizenship, character development, and self-reliance through

12  participation in a wide variety of outdoor and educational

13  activities.

14          Notwithstanding its mission, pre-petition, Debtors

15  were defendants in numerous lawsuits relating to sexual abuse

16  in scouting programs.  Debtors filed these cases because of

17  the abuse claims with two objectives in mind: Equitable

18  compensation of victims of abuse in Scouting and maintaining

19  Scouting's mission.

20          At that time, Debtors were aware of

21  approximately 1,700 asserted abuse claims.  There were over

22  80,000 nonduplicative proofs of claim filed in these cases.

23  Debtors had hoped to proceed expeditiously through a

24  bankruptcy proceeding.  Unfortunately, this is Month 18 of

25  the bankruptcy case.

1     Before me is Debtor's motion for permission to

2   enter into a restructuring support agreement as it has been

3   amended with the Official Tort Claimants Committee, the self-

4   named Coalition of Abused Scouts for Justice, the Future

5   Claimants Representative, and an ad hoc committee of Local

6   Councils.  The RSA has also been signed by numerous

7   consenting State councils.  The Debtors hope further

8   consenting State Council will sign on.

9     Broadly speaking, the RSA requires Debtors

10   to pursue a plan of reorganization that conforms to a term

11   fee attached to the RSA.  As for Debtors, the RSA and/or term

12   sheet provide for a $250 million contribution to a trust for

13   holders of direct and indirect abuse claims under a plan.

14     The RSA also requires that the plan pursued by

15   Debtors contain various findings and orders, including

16   certain findings blessing trust distribution procedures and

17   values established by them, insurance assignment, and other

18   insurance-related provisions and good-faith findings.

19     As for the ad hoc committee of Local Councils, it

20   is required to use its reasonable efforts to persuade all

21   Local Councils chartered by Boy Scouts to contribute in the

22   aggregate 600 million, consisting of cash, property, and an

23   interest-bearing variable payment note issued by a Delaware

24   statutory trust.

25     As for the State Court counsel, they are to use

1  their respective reasonable efforts to advise and recommend

2  to their clients, the holders of direct abuse claims, that

3  they accept the plan reflected in the term fee.  They are

4  also to provide information to council to who are not parties

5  to the RSA so that those other parties can make meaningful

6  and informed voting decisions on the plan.

7          As for the TCC Coalition, FCR, and State Court

8  counsel, they are to cooperate in good faith with Debtors in

9  connection with the plan and agree to support and/or seek as

10 appropriate stays of certain motions currently pending before

11 the Court, including the estimation motion and the restricted

12 assets adversary.

13         The RSA and/or term sheet contain certain outs or

14 termination events.  A key event is the ability of each party

15 to terminate the RSA if any protocol for addressing chartered

16 organizations is not satisfactory to it.  The term sheet also

17 requires that any settlements with a chartered organization

18 or an insurance company have unanimous approval.

19         No chartered organizations or insurance companies

20 are currently parties to the RSA.  While not signatories to

21 the RSA, JPMorgan, Debtor secured creditor, and the

22 creditors' committee support the RSA.  Importantly, Debtors

23 have a fiduciary out.

24         In addition to those provisions, which I will call

25 somewhat typical, there are three additional provisions of

1  the RSA and/or proposed form of order that were the subject

2  of much discussion during the argument.  First, the RSA

3  requires a finding in the RSA approval order that the RSA

4  parties have been engaged in extensive good-faith, arm's-

5  length negotiations and Court-ordered mediation regarding the

6  terms of the plan.

7           I question whether I could make such a finding

8  given the scope of the RSA hearing and relevant standards.  I

9  also questioned what a finding of good faith means in this

10 context.  During the hearing, the RSA parties withdrew the

11 request for a good-faith finding, so that is no longer an

12 issue.

13          Second, the RSA provides for the payment of the

14 fees of coalition professionals.  As will be discussed, I am

15 not approving that at this time.

16          Third, the RSA provides that the RSA approval

17 order contain a finding and conclusion that, "Debtors have

18 no obligation to seek approval of and have no obligations

19 under the Hartford Settlement."  I cannot make the finding

20 and conclusion requested.  As I'll discuss, the clear import

21 of these findings is that Hartford has no damages, and I

22 cannot, and as importantly, should not, make that

23 determination at this time in this context.

24          Approximately, 50 objections, reservation of

25 rights, or joinders to objections have been filed by a

1  variety of parties, including insurers, chartered

2  organizations, and groups of individuals holding direct abuse

3  claims.  I've reviewed the filings and the exhibits, and this

4  is my decision.

5          Starting with the Debtor's business judgment.  The

6  motion was brought under Section 363 of the Bankruptcy Code,

7  and I find that Debtors have met the relevant standard.  The

8  business judgment standard applies to a review of the Board's

9  consideration of a transaction unless the objecting party can

10  establish by competent evidence facts to support a heightened

11  standard.  I cite to In re: LATAM Airlines Group SA, 620 B.R.

12  722 out of the Bankruptcy Court in the Southern District of

13  New York in 2020, which holds that transactions with insiders

14  are by definition subject to a heightened standard.

15          And for the Delaware State Law standard, which is

16  informative, I cite to Shabbouei v Laurent, a Chancery Court

17  decision, 2020, Delaware Chancery Lexis 121, April 2nd, 2020,

18  which in turn cites to Aronson v Lewis, 473, A.2nd 805 out of

19  the Delaware Supreme Court in 1984.  These cases hold that

20  transactions are subject to a heightened scrutiny where a

21  majority of the board is interested in the challenged

22  decision, or the decision was not a product of valid business

23  judgment.

24          Here, Century and the Certain Insurers contend

25  that the BSA Board was conflicted.  The Certain Insurers

1  contend that, "The Local Councils had complete and total

2  control over the Debtor's corporate governance electing the

3  representatives" and that these representatives were the ones

4  who evaluated and approved the RSA.  The Certain Insurers

5  also contend that heightened scrutiny is necessary because

6  the Debtor's directors and officers failed to familiarize

7  themselves with the RSA.

8          Century identifies the self-interested provisions

9  of the RSA to be that each member of the National Executive

10 Council and Debtors Board benefits from the third-party

11 releases granted to the Local Councils with which they are

12 affiliated and are protected parties.  And second, the

13 controlling Local Councils themselves benefit from the

14 third-party releases as do their own respective officers and

15 directors.

16         While pointing to the releases to support a

17 conflict, the provisions of the RSA that both Century and

18 Certain Insurers focus on are the purported lack of insurance

19 neutrality, the provisions of the TDPs, and the lack of any

20 settlements with Chartered Organizations.

21         The National Executive Board of the BSA is

22 comprised of 72 members, an unusually large board.  The

23 members of the National Executive Board are selected by the

24 National Council, which is comprised of 1,200 individuals,

25 many nominated by Local Councils.  Those 1,200 members

1 include the 72 board members themselves, the President and

2 Council Commissioner for each of the 251 Local Council, slots

3 based on youth members in each council, and various

4 volunteers.

5          As for responsibilities, the National Executive

6 Board delegated responsibility for managing the affairs of

7 the Boy Scouts of America to the Executive Committee with a

8 few exceptions, one of which is the incurrence of debt which

9 was reserved to the Board.  The Executive Committee is made

10 up of 12 individuals who are all Board members.  As of May

11 2020, no member of the Executive Committee was permitted to

12 simultaneously serve on a Local Council Executive Board.

13          The National Executive Committee formed a

14 Bankruptcy Task Force in July 2020.  Mr. Desai is one the

15 five members of the Bankruptcy Task Board and is also a

16 member of the National Executive Committee and the National

17 Executive Board.  The Bankruptcy Task Force was created to

18 assist the Executive Committee in their governance

19 responsibilities by working with BSA General Counsel and

20 monitoring the progress of the bankruptcy case, helping to

21 the keep the Executive Committee informed so it could perform

22 its governance role.

23          Mr. Desai testified that Debtors were aware of

24 potential conflicts with the Local Councils as it relates to

25 the BSA bankruptcy and so took steps to avoid them.  On

1  February 7, 2021, the National Executive Board met with their

2  advisors to discuss this issue.  After that meeting, each

3  Board member was asked to resign from his or her Local

4  Council or recuse him or herself from decisions that may

5  impact Local Councils.

6       Mr. Desai testified that he is not aware of any

7  Board member that served on a Local Council who voted on

8  merits at issue in the RSA.  The insurers argue that because

9  the National Council elect the 72 members of the Board, the

10  directors are conflicted.

11       But Delaware law has long held that a director is

12  not interested simply because he was voted or selected by

13  a particular faction.

14       As for overlapping membership on the National

15  Executive Board and a Local Council Board, the evidence is

16  that directors had to resign from Local Council Boards or

17  recuse themselves from decisions where there may be

18  adversity.  There are no overlapping roles at the Executive

19  Committee or Bankruptcy Task Force levels.  Certain Insurers

20  also point to the longstanding relationships between Board

21  members and Local Councils.  They asked me to draw the

22  commonsense conclusion from the relationships that BSA

23  directors must be interested.  I understand the argument and

24  have considered it.  Financial incentives may not be the

25  appropriate consideration here.  I am persuaded, however,

1  that the Board took appropriate precautions and reminded

2  Members of the need to recuse themselves as necessary.

3        But even if Board members are conflicted,

4  and I did not conclude that, I do not find that the Boy

5  Scouts and the Local Councils are actually adverse to each

6  other with respect to the RSA.  The Boy Scouts of America and

7  the Ad Hoc Committee of Local Councils are two of five

8  parties to the RSA.

9        The third party releases in favor of the Local

10  Councils that are the focus of the disinterestedness argument

11  were not negotiated by Boy Scouts of America.  Rather, the

12  third-party releases and the $600 million Local Council

13  contribution were negotiated between the Ad Hoc Committee of

14  Local Councils and the Plaintiff's representatives, namely

15  the Tort Claimants Committee, the FCR, and the Coalition.

16        In other words, those providing the releases

17  negotiated the terms, so I do not see Boy Scouts on both

18  sides of this aspect of the transaction.  What happened here

19  was exactly what should happen.  The parties with the alleged

20  liabilities each negotiated their own contribution.

21        As for any releases being granted by the Boy

22  Scouts to the Local Councils, which no one really raised

23  except in argument, there the Boy Scouts and Local Councils

24  would be adverse, but again, what happened was exactly what

25  should happen.  The fiduciaries of the estate, the TCC, and

1  FCR either negotiated the transaction or are presently

2  supporting the resolution.

3          Finally, on this front, the question of whether

4  the Board was conflicted in the RSA transaction is

5  interesting because ultimately, the third-party releases and

6  any other benefits that Local Councils may receive will be

7  tested in the plan context.  As discussed during argument,

8  Debtors can file the plan contemplated by the RSA whether I

9  approve the RSA or not.  If the plan is proposed, then, the

10 third-party releases will be tested by the applicable

11 standard.

12         Judge Garrity's decision in LATAM Airlines

13 is informative in how it contrasts to the scenario before me.

14 That case is distinguishable in at least three respects.

15         First, the order presented to the Court was not an

16 interlocutory order, as is the order before me. Judge Garrity

17 was asked to approve the terms of a DIP facility.  In

18 contrast, any order I would enter on the RSA does not approve

19 any term of the plan embodied in the term sheet or speak to

20 any confirmation standard.

21         Second, as I've already discussed, I do not see

22 insiders on both sides of the transaction.  Third, the

23 objectors in LATAM Airlines objected to the portions of the

24 DIP facility that favored the insiders, that is the third

25 tranche of the DIP.  They did not use the existence of a

1   conflict with the insiders to object to a tranche of the DIP

2   not funded by the insiders.

3         Here, to my recollection, at no point in this case

4   had the insurers objected to third-party releases, Debtor

5   releases, or the Local Council contribution.  Rather, the

6   insurers' objections throughout the entire BSA case,

7   including here, have been consistent.  The insurers contend

8   that the plan cannot be confirmed because it is not

9   insurance- neutral.  As stated in Century's objection, the

10  plan is, "Affirmatively insurance prejudicial."  Further, the

11  insurers contend that Debtors have conceded control of the

12  TDPs to the Abuse Survivors Representatives and have

13  abdicated their obligation under the insurance policies to

14  cooperate with insurers.

15        A recently added objection that Debtors have not

16  yet brought the chartered organizations into the mix is, in

17  essence support for yet further third-party releases.  None

18  of these objections go to any provision of the RSA or term

19  sheet that purportedly improperly favor Local Councils.

20        While I'm not going to go through Judge Chapman's

21  decision in In re Innkeepers USA Trust, 442 B.R. 227, out of

22  the Bankruptcy Southern District New York 2010, it is highly

23  distinguishable, including that Debtors sought approval of

24  the RSA at an early stage of the case, the RSA was one -- was

25  with one creditor, it precluded Debtor from shopping the

1  company, Debtor had not canvassed any alternatives, and

2  Debtor did not have an effective fiduciary out.

3         This case is not in its infancy.  Debtors have

4  negotiated with the Unsecured Creditors Committee and

5  JPMorgan.  The RSA is signed by State Court counsel who have

6  represented to the Court that they represent in excess, I

7  think, of 70,000 claimants, but I know it's at least 60,000

8  claimants, and Debtors have a fiduciary out.

9         The insurer's second argument for a higher

10  standard is that Debtors have failed to inform themselves.

11  The clear evidence is to the contrary.  While the Board's

12  process may not have been perfect, there is no question the

13  Bankruptcy Task Force, which was tasked with all things

14  bankruptcy, was informed.  The Bankruptcy Task Force kept the

15  National Executive Committee informed, and the Board was

16  informed by both.

17         Mr. Desai, who was a very credible witness,

18  testified that the National Executive Board, the National

19  Executive Committee, and the Bankruptcy Task  Force met a

20  combined total of 57 times over a seven- month period.  At

21  all levels, Debtors had the advice of their respective

22  professionals, and they received several presentations.

23  Directors were engaged.

24         Topics included the Chapter 11 cases, the progress

25  of the mediation, including which groups had and had not yet

1   been a focal point in the mediation, the BSA contribution,

2   the effect of the BSA contribution, and the DST note on Boy

3   Scouts go-forward operations, and the impact of the JPM debt.

4           There were discussions of plan options, including

5   a discussion of the pros and cons of dropping the toggle plan

6   and having a deal with the coalition, the TCC, and FCR, and

7   whether these groups would be able to resolve concerns over

8   the Hartford deal.

9           And there was discussion of Boy Scouts'

10  relationship with the Local Councils and some discussion of

11  chartered organizations.  Minutes also reflect the term

12  sheets were circulated.

13          Insurers focus most on the fact that Mr. Ownby,

14  chair of the Board, testified that he didn't review the RSA

15  before it was signed, and Mr. Mosby, president and chief

16  executive officer, was not involved in discussions around the

17  TDPs.  Mr. Ownby also testified that the Board had

18  discussions about the major elements of the RSA, the Board

19  had been presented with numerous documents since the filing

20  of the bankruptcy case leading up to the signing of the RSA,

21  and the Boy Scouts had advisors with respect to claim

22  procedures.

23          Mr. Desai and the Bankruptcy Task Force had the

24  RSA and the TDPs.  And the Board gave Mr. Mosby permission to

25  move forward with the RSA under certain parameters, including

1  providing a mechanism for reaching out to chartered

2  organizations.  Also, Mr. Mosby testified in his deposition

3  succinctly but comprehensively as to why he thinks the RSA is

4  the best path forward for Boy Scouts and that this is a step

5  toward a global resolution.

6          Insurers also focus on the fact that Debtors did

7  not receive or review any invoices from coalition

8  professionals.  Mr. Whitman testified he based his advice on

9  the coalition's fees, on his experience as a professional in

10 the bankruptcy arena, and the fees of other professionals in

11 the case.

12         Others assert that there was little consideration

13 of the chartered organizations and the loss of membership on

14 the BSA going forward.  Many of the objectors attacked the

15 plan as not confirmable.

16         The RSA as illusory.  But there is no -- as

17 illusory because there is no signature of actual creditors,

18 and the RSA -- let me start this over.

19         Others assert that there was little consideration

20 of the charted organization and the loss of membership on the

21 BSA going forward.  Many of the objectors attacked the plan

22 as not confirmable, the RSA as illusory because there is no

23 signature of actual creditors, and that the BS -- and that

24 the RSA is the wrong way to build consensus.  Finally,

25 objectors point to a lack of a board resolution or one board

1  resolution approving the entire RSA.

2          Having reviewed the evidence, I conclude that

3  Debtors were sufficiently informed to make this decision.

4  And while a specific resolution would have been preferable,

5  the evidence is clear that Debtors approved the transaction.

6  Because I make these conclusions, I also conclude that

7  objectors have met their burden to show the entirely -- have

8  not met their burden to show the entirely fair standard

9  applies.  In turn, this leads to the conclusion that Debtors

10 have met their burden under Section 363.

11         Debtors want me to approve an RSA, which they

12 believe is the best path forward to build consensus with as

13 many non-RSA parties as possible.  While the signatories are

14 not creditors, the RSA parties have obligations to use their

15 reasonable efforts to achieve their obligations under the

16 RSA.  Objectors disagree with Debtors assessment, contending

17 that the RSA will hinder further resolutions.

18         As I said in argument, a Court is particularly

19 ill-suited to address strategic business decisions such as

20 this one.  Debtors may ultimately be wrong in their

21 assessment, but that is not the test of business judgment.

22 While in the words of Ms. Lauria, unless there are further

23 resolutions, this case is headed toward an epic confirmation

24 fight.  Debtors choice of which fights to have is due some

25 deference.  Ultimately, whether any plan is confirmable is my

1  decision.

2          With the two exceptions I'm about to discuss, I

3  conclude that Debtors have met the standard under Section 363

4  for approval of the RSA.

5          I'll turn to the coalition fees.  While the RSA is

6  in effect, Debtors agree to pay on a go-forward basis the

7  "reasonable, documented, and contractual" fees and expenses

8  of the coalition's professionals on a monthly basis.  On the

9  effective date of a plan, Debtors are to either reimburse

10 State Court counsel for amounts they have already paid to the

11 coalition's professionals or pay directly to those

12 professionals amounts that are owed by State Court counsel up

13 to $10.5 million.

14         Amounts otherwise payable in excess of that cap

15 are to be paid by the settlement trust after the effective

16 date.  By a revised proposed form of order, Debtors have made

17 these payments subject to procedures for estate professionals

18 with respect to interim compensation, and there are other

19 restrictions on the scope of services that can be

20 compensated.

21         I agree with Judge Dorsey's recent analysis of the

22 363.503 issue in Mallinckrodt.  Debtors can use Section 363

23 as a vehicle to bring a request to pay fees of a creditor

24 while a creditor's request is properly brought under Section

25 503(b).  But in either event, the standard to apply is a 503

1  standard, the requirement to find a substantial contribution.

2        Here, I have several concerns that cause me to

3  deny the request at this point in time.  First, the

4  coalition's members are abuse victims, the very same

5  constituency that the Official Committee of Tort Claimants

6  represents.  The logical question is whether services are

7  being duplicated.

8        While coalition counsel argues that there is now

9  consideration between the coalition, the official committee,

10 and the FCR, something that I can see in the filings before

11 me, that does not ensure lack of duplication.

12       Second, in connection with the Rule 2019 motion

13 directed at the coalition and its request to become a

14 mediation party, there was much discussion regarding how the

15 coalition would work and who would pay for it.  I have

16 reviewed the coalition's filing, Docket Item 1429, and it

17 states in bold print, "Coalition counsel are being paid by

18 State Court counsel.  Coalition members will not in any way

19 be responsible for the fees of coalition counsel."

20       The cost of the coalition's professionals was to

21 be borne by the State Court counsel who formed the coalition,

22 not their clients.  Payment by Boy Scouts and certainly any

23 payment by the investor trust comes directly or indirectly

24 out of their client's pockets and, indeed, the pockets of all

25 abuse victims. While one can argue that on a relative scale

1  that's not that great, any funds diverted from abuse victims,

2  especially to pay an obligation of their lawyers,

3  needs to be closely examined.

4           Third, it needs to be clear that the coalition is

5  making a substantial contribution.

6           Debtor's testimony is that the benefit to having

7  the coalition at the table is that State Court counsel

8  represent in excess of 60,000 abuse victims.  Debtors can,

9  therefore, negotiate with a single entity, the coalition and

10 its State Law counsel, rather than numerous counsel to abuse

11 victims.

12          Further, as evidenced by the RSA itself and the

13 obligations of the State Court counsel, the belief is that

14 their clients will vote in favor of a plan.  But that has yet

15 to occur.

16          Further, the RSA provides the coalition with

17 numerous termination rights, many of which are subjective.

18 In the circumstances of this case, I think it is necessary to

19 see the outcome of the coalition's efforts.  I also note that

20 because of invocation of mediation privilege, there was no

21 evidence on the role of the coalition played in the mediation

22 and in the RSA.

23          Now I turn to the Hartford objection.

24          Debtors and Hartford executed a settlement and

25 release agreement on April 15, 2021.  It was filed on the

1  docket on April 16 as an exhibit to the second mediator's

2  report.  In the agreement, Hartford and BSA agreed to

3  Hartford's buy-back of its insurance policies for $650

4  million as adjusted, releases, and mutual cooperation.

5        There are two options for presenting the

6  settlement to the Court at Hartford's election.  First,

7  approval can be obtained through an order confirming a plan

8  of reorganization containing the Hartford settlement.

9        Second, at any time on 20 days' notice, Hartford

10  can request that BSA file a motion with the Court seeking

11  approval under Section 363 and Rule 9019.

12        There's no evidence in the record that Hartford

13  made a request for BSA to bring a 363 motion, nor has

14  Hartford filed a motion to -- nor has Hartford filed a motion

15  to enforce the settlement agreement or compelled BSA to file

16  the settlement motion.  Rather, BSA filed a second amended

17  plan, which contains both the Hartford settlement and so-

18  called toggle option.

19        BSA also filed a disclosure statement that was

20  scheduled to be considered for approval on May 19 as part of

21  a very long calendar.  After a full-day hearing on other

22  motions, incident exclusivity, derivative standing to sue

23  JPM, and the estimation motion, any remaining motions,

24  including the motion to approve the disclosure statement,

25  were adjourned until the following Monday, May 25.

1       The hearing did not resume on May 25; rather, I

2   was asked to adjourn the hearing so the mediation sessions

3   could continue.  My recollection is that the Tort Claimants

4   Committee objected, but I determined to honor the request

5   that parties go to mediation.  My recollection is that there

6   were further adjournments after that.  Since parties were in

7   mediation, I did not rule on the motions that had been argued

8   on May 19 at that time.  Or I didn't rule at that time or

9   subsequently because they were in mediation.  And because the

10  motions were interconnected, I was considering them together.

11      The disclosure statement related to the plan based

12  on the Hartford Settlement did not continue.  Sorry, the

13  hearing on the disclosure statement.

14      Related to the plan based on the Hartford

15  Settlement did not continue.  Rather on July 1, Debtor filed

16  their motion to approve RSA and related plan and disclosure

17  statement.  In the RSA, Debtors seek authorization to enter

18  into and perform under the RSA.  And they also seek a finding

19  and conclusion that "Debtors shall have no obligation to seek

20  approval of and have no obligations under the Hartford

21  settlement."  Debtors acknowledge in their required read that

22  the RSA and the Hartford Settlement are mutually exclusive.

23  Hartford has objected to the motion and the requested

24  findings and conclusions in the proposed form of order on two

25  grounds.

1          First, it argues that any relief must be sought in
2    an adversary procedure.  Second, it argues that Debtors
3    cannot repudiate the Hartford Agreement because the
4    obligation is to seek approval of the agreement as currently
5    binding on Debtors.  Hartford draws a distinction between
6    Debtor's obligation to seek approval under the agreement and
7    Debtor's obligation to consummate the agreement which
8    Hartford agrees Debtors cannot do until the Court approves
9    the settlement.  Hartford argues Debtors conflate the two
10   concepts.

11          In its reply brief, Debtors acknowledge that
12   there's not a consensus on the issue of whether a settlement
13   agreement is enforceable before it has been approved by the
14   Court.  The Debtors argue that the better reasoned view is
15   that it is not.  Even so, Debtors contend that they have
16   complied with their affirmative obligations under the
17   Hartford settlement agreement to the extent possible.

18          Debtors have also incorporated the Hartford
19   Settlement into the fourth amended plan.  But now they say
20   they need guidance from the Court due to change
21   circumstances.

22          The Debtors argue that the existence of the RSA
23   now creates conflicting duties, a duty to Hartford under the
24   Hartford settlement agreement and its fiduciary duty to all
25   other creditors.  At argument, Debtors took an entirely new

1  position.  They argued that by its terms, the Hartford

2  Agreement is not currently effective and that none of its

3  provisions, save one perhaps, are currently operable because

4  conditions precedent to effectiveness have not been met.

5          The coalition, FCR, and TCC filed a joint reply to

6  Hartford's argument.  They, too, contend that circumstances

7  have changed and "as evidenced by the motion itself" it is

8  clear that the plan is no longer commensurate with Debtor's

9  fiduciary duties.  They argue that there is now an agreement

10  with broad creditor support, and if Debtors pursue the

11  Hartford agreement, the RSA will be extinguished, and the

12  survivor groups will oppose the Hartford settlement

13  and vote down any plan incorporating it.

14          The coalition, FCR, and TCC emphasize that with

15  respect to Debtor -- Debtor's obligations under the Hartford

16  agreement "the determining factor is the ability of the Court

17  to find that a settlement is in the best interest of

18  creditors" and that Debtor's should not be forced to solicit

19  a plan where the Court's ability to make the requisite

20  findings for settlement are impaired.

21          Having reviewed the posture of the cases cited by

22  all parties, I conclude that the issue of Debtor's

23  obligations, if any, is not properly before me.  Not one case

24  is in the instant posture.  What is before me is the entry

25  into the RSA.  A Restructuring Support Agreement memorializes

1   the material terms of a restructuring plan that one or more

2   parties have agreed to.  It provides that the RSA parties

3   will support the implementation of the plan embodied in it.

4           It is not a vehicle by which the RSA parties can

5   append other requests.  In other words, you can't just roll

6   up any relief you want and put it a request to approve on

7   RSA.

8           What the RSA parties have done here is just that.

9   They seek a ruling or guidance that Debtors have no

10  obligations under another document, the Hartford Settlement

11  Agreement, which is not before me. Further, Hartford has not

12  put its agreement before me. Hartford does not argue that

13  Debtors are forbidden to enter into the RSA by the terms of

14  the Hartford agreement.  Hartford has not moved to compel

15  compliance with the Hartford -- Hartford Agreement.

16          And Hartford is not asking me to force the Debtors

17  to solicit any plan.  Rather, Hartford simply argues that I

18  cannot rule on the Hartford Agreement in this context, and to

19  the extent I can, Hartford argues that the finding and

20  conclusions the RSA parties seek are incorrect.

21          While I do not think that the issue of Debtor's

22  obligations under the Hartford agreement necessarily need to

23  be decided in an adversary proceeding, it's clear the RSA

24  motion is not the proper vehicle.  One, the import of the

25  rulings that the RSA parties seek is that Hartford can have

1  no claim against Debtors.  But Hartford has not filed the

2  claim, administrative or otherwise, based on Debtor's breach

3  of the Hartford agreement.  I have no context to make a

4  determination of whether any damages Hartford may seek are

5  appropriate.

6          Two, if Hartford's position is correct that

7  Debtors have an obligation to seek approval of the agreement,

8  Debtors may yet be able to perform.

9          Assuming Debtors will not seek approval in a plan,

10  Hartford can make a request that Debtors file a 363 motion.

11  Whether that request is made and whether Debtors comply with

12  any such request could either moot the issue entirely or

13  impact on any claimed damages.

14          Three, Hartford has not placed the merits of the

15  Hartford settlement agreement in front of me nor have the

16  Debtors.  In fact, the coalition, the TCC, and FCR filed a

17  motion in limine to preclude any evidence regarding the

18  reasonableness of the Hartford Settlement.  So their argument

19  that I can find that it is not in all parties' best interest

20  to solicit a plan containing the Hartford Settlement cannot

21  be made, even if it were appropriate to do so.  And, of

22  course, many objectors find fault with the plan embodied in

23  the RSA.

24          Four, Hartford has not made a motion to compel

25  compliance with or enforce the Hartford agreement.  Five,

1  Debtors raised for the first time at argument that the

2  Hartford agreement is not affected by its terms, that issue

3  therefore was unfairly raised, and it's another reason not to

4  consider the argument now.  It may also require evidence.

5  All of this is to say that the request to determine Debtor's

6  obligations -- are conversely Hartford's damages -- is not

7  appropriate in this context.

8          My conclusion:  I have found that the entry into

9  the RSA is a sound exercise of Debtor's business judgment.

10  The parties can proceed with the RSA without the findings

11  regarding the Hartford settlement agreement and fees for the

12  coalition, or not.  And, of course, Debtors can file any plan

13  they choose.  If there are consequences, they will be

14  addressed in a proper context.  If the RSA parties determine

15  they want to proceed under these circumstances, I do have a

16  question on the form of order.

17          Paragraph E, as in Edward, has me make findings

18  with respect to the non-Debtor parties.  I question if I can

19  do that and why I need to.  I have no evidence on others'

20  ability to enter into the RSA or whether they are legally

21  authorized to do so.  So I do not know the import of this

22  paragraph *vis-a-vis* anyone other than the Debtors.  I also

23  recall that Mr. Bookbinder may have objections to certain

24  provisions in the order.  So please consult with

25  Mr. Bookbinder and ask chambers to set up a further hearing

1  to discuss the order, if necessary, if the RSA parties

2  determine to go forward, notwithstanding my ruling.

3          Let me emphasize the limited nature of my ruling

4  today.  I am being asked to approve Debtor's entry into the

5  RSA.  I am not approving the term sheet, the fourth amended

6  plan, any disclosure statement, or anything else, and the

7  order I entered today does not suggest that I will do so or

8  need to do so.

9          As Judge Glenn said in his decision in, <u>In re:</u>

10  <u>Residential Capital, LCC</u>, 2013 Westlaw 328-619(a), Bankruptcy

11  Court Southern District of New York, 2013, this decision

12  interlocutory.  So that concludes my ruling.

13          Again, I apologize for the length and that you had

14  to sit there.  I hope it was clear enough.  I realize

15  things -- I realize verbal decisions are often hard to

16  follow, but I've noted that parties have been getting

17  transcripts rather quickly.  Also, if -- when I read the

18  transcript I determine that I should put my bench ruling on

19  the docket, I will -- I will do so.

20          That is all I have for today.  I note that we are

21  back here Wednesday.  I've got it down as an omnibus.  But I

22  also have it written down as the disclosure statement

23  hearing.  I guess what I will need to know, what all -- all

24  parties will need to know as soon as possible is whether, in

25  fact, the Debtor intends to go forward, given my ruling on

 1  the RSA.  So I think it would help if you put something on

 2  the docket with respect to that -- with respect to that.

 3           MS. LAURIA:  Your Honor, this is Jessica Lauria.

 4           We obviously in the circle of internally, thank

 5  you for your ruling and thank you for ruling so quickly.

 6           With respect to the RSA, I'm sure that was a

 7  monumental task that we're having three days of hearing in

 8  the volume of documents but we very much appreciate that.  We

 9  will circle up and then we will get back to the Court ASAP

10  and other parties.

11           THE COURT:  Thank you very much then we are

12  adjourned.

13           COUNSEL:  Thank you, Your Honor.

14       (Proceedings concluded at 3:50 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                             CERTIFICATION

2              I certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of my

5     knowledge and ability.

6

7

8

9     /s/ Wendy Sawyer                          August 19, 2021

10    Wendy Sawyer, CDLT

11    Certified Court Transcriptionist

12    For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25