# EXHIBIT A

BEFORE THE INSURANCE COMMISSIONER
OF THE
COMMONWEALTH OF PENNSYLVANIA

IN RE:

Plan of Restructuring of
INA Financial Corporation,
Bankers Standard Insurance
Company, et al.

:
:
:
:
:
:
:
:
:
:
:
:
:

Pursuant to Section 1405 of
the Insurance Holding
Companies Act, Article XIV
of the Insurance Company
Law of 1921, Act of May 17,
1921, P.L. 682, as amended,
40 P.S. Section 991.1405
(Supp. 1995) and Section 207
of the GAA Amendments Act of
1990, Act of December 19,
1990, P.L. 834, 15 P.S.
Section 21207

Docket No. MS95-10-056

### DECISION & ORDER

AND NOW, this 7th day of February, 1996 Linda S. Kaiser, Insurance Commissioner of the Commonwealth of Pennsylvania, makes the following ORDER:

Pursuant to the Insurance Holding Companies Act, the Business Corporation Law of 1988, and the GAA Amendments Act of 1990, and in consideration of the information, presentations, reports and documents noted herein, as well as other documents and materials received and other inquiries, audits, investigations and supplemental studies as permitted by law, the Commissioner hereby makes the following findings of fact.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014485

<u>FINDINGS OF FACT</u>

<u>Identification of Parties</u>

1.   CIGNA Corp. is a Delaware business corporation and is the ultimate parent of numerous insurance companies and business corporations, many of whom are domiciled in Pennsylvania.

2.   INA Financial Corporation is an insurance holding company, an intermediate subsidiary of CIGNA Corp., and the parent of most of CIGNA's property and casualty and reinsurance companies.  These insurance company subsidiaries include Bankers Standard Insurance Company, Century Indemnity Company, Century Reinsurance Company, CIGNA Employers Insurance Company, CIGNA Fire Underwriters Insurance Company, CIGNA Indemnity Insurance Company, CIGNA Reinsurance Company, Delaware Reinsurance Company, Indemnity Insurance Company of North America and Insurance Company of North America.

3.   INA Financial Corporation, on behalf of certain subsidiaries, is the entity that filed the instant proposed Plan of Restructure. (Ex. 1)

4.   Brandywine Holdings Corporation is an insurance holding company that is created under the proposed Plan of Restructure to be the owner of the inactive companies in run off.

5.   INA Holdings Corporation is an insurance holding company, and will be the owner of the active companies.  (Ex. 1)

6.   Insurance Company of North America (herein "INA") is a Pennsylvania domestic insurance company founded in 1792, licensed in all 50 states, and the District of Columbia.  INA also conducts business in various international jurisdictions as well as throughout the United States.  Under the proposed restructuring,

2

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014486

INA will be divided into two companies: CCI Insurance Company (herein "CCI") and a company referred to herein as "Resulting INA".

7. CIGNA Specialty Insurance Company (herein "CIGNA Specialty") is a California domestic insurance company that will run off its liabilities after merging into Century Indemnity.

8. Century Indemnity Company (herein "Century Indemnity") is a Pennsylvania domestic stock insurance company, licensed to conduct business in all 50 states and the District of Columbia. CCI and CIGNA Specialty will merge into Century Indemnity which, as the surviving company, will only engage in run off operations in the future.

## Prior Restructuring Activities

9. In December, 1994, all of CIGNA property and casualty (P&C) companies (hereinafter, collectively "CIGNA") were downgraded by A.M. Best, a rating agency of national prominence, from A- (excellent) to B++ (very good).

10. On January 3, 1995, INA Financial Corporation and certain of its affiliates filed for the Commonwealth of Pennsylvania Insurance Department's ("Department") review and approval a plan for a partial re-arrangement of its P&C inter-company reinsurance pools ("Mini-restructuring").

11. The proposed Mini-restructuring was filed pursuant to the requirements of Section 991.1405 of the Insurance Holding Companies Act, Article XIV of the Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, as amended, 40 P.S. §991.1405 (Supp. 1995).

12. The Mini-restructuring was proposed as a temporary and partial solution to rating issues which had arisen because of CIGNA's poor

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1). ABC000014487

operating results and exposures to asbestos and environmental ("A&E") liabilities.

13. At the time of the Mini-restructuring, CIGNA advised the Department that a more comprehensive and permanent inter-company reorganization would be undertaken at some point in the future.

14. The Department reviewed the Mini-restructuring and approval was granted on January 31, 1995.

15. In the Mini-restructuring, CIGNA created a second inter-company reinsurance pool. Previously, only one pool had existed for all of the CIGNA P&C companies affected by the instant Plan of Restructure.

16. Pooling arrangements are inter-company reinsurance agreements whereby affiliates agree to share premiums, losses and expenses in a predetermined specified amount, so that the financial results of any one affiliate are not significantly affected by adverse development in losses, expenses or revenue from premiums.

17. In the Mini-restructuring, four affiliates withdrew from the existing pool and created a new inter-company reinsurance arrangement called "the active pool":

      Bankers Standard Insurance Company
      CIGNA Insurance Company
      Connecticut General Fire & Casualty Insurance Company
      Indemnity Insurance Company of North America

18. The remaining affiliates including INA (15 in all) remained in the existing pool, known as "the inactive pool".

19. The Mini-restructuring resulted in almost a complete segregation of A&E exposures into the inactive pool; however, after the Mini-restructuring, the active pool companies remained

4

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).    ABC000014488

subsidiaries of INA, which was designated as an inactive pool company.

20. Through the instant Plan of Restructure, CIGNA intends to conclude its reorganization so that its A&E liabilities are held in a separate holding company from its ongoing active operations.

21. As part of the Mini-restructuring, CIGNA committed to infuse $125 million in capital to INA, effective as of year end 1995.

22. After the Mini-restructuring was approved, A.M. Best downgraded the companies in the inactive pool to a B+ with "negative implications", but raised the rating for the four companies in active pool to A- with "developing implications".

23. A.M. Best has indicated that, under the proposed Plan of Restructure, P&C companies in the active pool will continue to receive an A- rating but without the "developing implications" designation, and Century Indemnity and the other run-off insurers owned by Brandywine Holdings Corporation will continue to receive a B+ rating without a "negative implications" designation.

24. A.M. Best ratings have significance because some policyholders, governmental units, agents and brokers use an A- rating as a minimum qualification requirement when making a purchasing decision.

25. Companies with a B+ rating are not able to market to the same quality of risks as companies with an A- or better rating.

Description of Plan of Restructure

26. The Plan of Restructure provides for the reorganization of INA, the realignment of management, and the segregation of the

5

CIGNA P&C insurance and reinsurance businesses into inactive and active operations.

27. The Plan of Restructure also provides that INA will be divided into two entities as authorized under the GAA Amendments Act of 1990 (GAA Amendments), Act of December 19, 1990, P.L. 834, 15 P.S. §21101 et seq. and Subchapter D of the Business Corporation Law of 1988 (BCL), Act of December 21, 1988, P.L. 1444, 15 Pa.C.S. §1951 et seq. Under the Plan of Restructure, INA will divide into two resulting companies, an active company which will be known as INA (herein "Resulting INA") and an inactive company which will be known as CCI Insurance Company (herein "CCI").

28. The Plan of Restructure further provides that CCI will then merge into Century Indemnity after the division.

29. Further, the Plan of Restructure provides that CIGNA Specialty will, simultaneously with CCI, merge into Century Indemnity.

30. Thus, at the conclusion of the Restructure, Century Indemnity's business will include 1) its own policyholders, 2) the INA policyholders allocated to CCI, and 3) CIGNA Specialty's policyholders.

31. Under the Plan of Restructure, INA Holdings Corporation will own the stock of the insurance company subsidiaries in the active pool. The companies in the active pool will include: Resulting INA; Bankers Standard Fire and Marine Company; Bankers Standard Insurance Company; CIGNA Employers Insurance Company; CIGNA Fire Underwriters Insurance Company; CIGNA Indemnity Insurance Company; CIGNA Insurance Company; CIGNA Property and Casualty Insurance Company; Indemnity Insurance Company of North America (the former INA Insurance Company and the successor company to Indemnity Insurance Company of North America, following its merger into INA Insurance Company); Pacific Employers Insurance Company; Allied

6

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).            ABC000014490

Insurance Company; American Adjustment Company, Inc.; Atlantic Employers; CIGNA Insurance Company; CIGNA Bond Services, Inc.; CIGNA Excess & Surplus Insurance Services, Inc; CIGNA Insurance Company of Illinois; CIGNA Lloyds Insurance Company; CIGNA Insurance Company of the Midwest; CIGNA Insurance Company of Ohio; CIGNA Insurance Company of Texas; Delaware Reinsurance Company; ESIS, Inc.; Excess & Surplus Insurance Services, Inc.; Illinois Union Insurance Company; INAC Corporation; INAC Corp. of California; INAPRO, Inc.; INA Special Risk Facilities, Inc.; MarketDyne International Inc.; Railroad Insurance Brokers, Inc.; Recovery Services International, Inc.; and other non-insurance subsidiaries.

32. Under the Plan of Restructure, Brandywine Holdings Corporation will own the stock of Century Indemnity. Century Indemnity will in turn own the following insurance companies with run-off operations: Century Reinsurance Company; CIGNA Reinsurance Company; and CIGNA Reinsurance Company S.A.- N.V. (Belgium). Brandywine Holding Corporation will also directly own the stock of CIGNA International Reinsurance Company, Ltd. (Bermuda); CIGNA Runoff Services, Inc.; Cravens, Dargan & Co., Pacific Coast; International Surplus Adjusting Services; Lewis & Norwood, General Agents, Inc.; National Employee Benefits Corporation; Premium Recovery Services International, Inc.; Robert F. Coleman, Inc.; Trans Asian Insurance Services, Inc.; and other non-insurance subsidiaries.

33. Under the Plan of Division, Resulting INA will be allocated the name and licenses of existing INA, in-force policies, assets and liabilities associated with loss sensitive business, and all the subsidiaries of INA except CIGNA Specialty.

34. Under the Plan of Division, CCI will be allocated all of the run-off operations of INA, all of the reserves related to the run-off operation, designated assets as hereinafter described, all of INA's policyholders' surplus except for investment in subsidiaries,

7

and all of the stock of CIGNA Specialty and two other insurance subsidiaries in run-off.

35. After the Restructure, Century Indemnity will write no new policies except or required by law or contract. Century Indemnity will only pay the claims and administer the business for Century Indemnity policyholders.

36. Resulting INA will remain as a separate insurance company and will not be merging with any other affiliate under the Plan of Restructure.

37. After the Restructure, Resulting INA will continue to actively engage in the business of insurance and intends to write business in Pennsylvania and other states where it is licensed.

38. The Plan of Restructure also changes the existing inter-company pooling arrangements. The inactive pool will be dissolved, but the active pool formed in January of 1995 will remain in effect.

39. Under the Plan of Restructure, the active pool companies will reinsure all of their direct general liability policies written prior to January 1, 1987 with Century Indemnity.

40. Following the restructuring, the majority of CIGNA's existing A&E liabilities will be held under a separate holding company from its active ongoing operations.

41. Under the Plan of Restructure, Resulting INA will provide reinsurance coverage to Century Indemnity under an Aggregate Excess of Loss Reinsurance Agreement. Under this Agreement, Resulting INA will provide reinsurance coverage to Century Indemnity in an amount up to $800 million, if the capital and surplus of Century Indemnity falls below $25 million.

8

42.  The Plan of Restructure includes various other changes in reinsurance arrangements, none of which adversely affect Century Indemnity and thus are not discussed at length herein.

43.  Under the Plan of Restructure, INA Financial Corporation will contribute an additional $375 million in capital to Century Indemnity.  Thus, between the Mini-restructuring and the Plan of Restructure, a total of $500 million in capital will be immediately contributed to Century Indemnity.

44.  Several CIGNA affiliates domiciled in other states have been or may be redomesticated to Pennsylvania to facilitate the Plan of Restructure.  Those transactions filed have already been approved by the Commissioner and are not addressed at length in this Decision and Order.

45.  Under the Plan of Restructure, INA Financial Corporation will assume all restructuring charges and all costs of retirement benefits other than pensions incurred by Century Indemnity.

46.  It is intended that the Department will retain regulatory jurisdiction over the run-off operations after the Plan of Restructure is implemented.

47.  CIGNA has no intent to divest the run-off operations.

48.  Several linkages between the active and inactive companies mitigate against divestiture, including:  1) they share a common parent, INA Financial Corporation; 2) both holding companies are subject to the regulatory control of the Pennsylvania Insurance Department; 3) Century Indemnity will be reinsured by the active companies; 4) the existing A&E exposures of the active companies are reinsured by Century Indemnity; 5) they participate in a Tax Sharing Agreement permitting tax benefits to both operations; and, 6) it is anticipated, that some policyholders will be customers of

9

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).                    ABC000014493

the active companies even though their liabilities under prior policies have been allocated to the run-off operation.

## Procedural Background – CIGNA and Department Documents

49. On October 2, 1995, INA Financial Corporation (INA Financial) filed a Plan of Restructure for approval by the Insurance Commissioner of the Commonwealth of Pennsylvania (Commissioner). (Ex. 1)

50. The Plan of Restructure was filed pursuant to the requirements of the BCL, 15 Pa.C.S. §§1951-1957, as amended; the requirements of Section 1405 of the Insurance Company Law, May 17, 1921, P.L. 682, as amended, Article XIV, §1405, 40 P.S. §991.1405; and the requirements of Chapter 25 of 31 Pa. Code.

51. On October 4, 1995, INA Financial separately filed a duplicate copy of the Plan of Division that had been previously filed on October 2, 1995. (Ex. 2)

52. On October 14, 1995, the Department published notice of the Plan of Restructure in the Pennsylvania Bulletin, allowing 15 days for public comment. (Ex. 3)

53. On October 18, 1995, INA Financial filed the Articles of Division providing details of the division of INA; the INA Financial Board's Resolutions approving the Plan of Restructure; and the Shareholder's Acceptance of the Board Resolutions. (Ex. 4, 5 and 6)

54. On October 23, 1995, INA Financial submitted various board resolutions from its subsidiaries supporting the proposed Plan of Restructure. (Ex. 155)

10

55. On October 24, 1995, the Department sent a letter to CIGNA requesting certain information and documents pertinent to the Plan of Restructure. (Ex. 156)

56. On October 26, 1995, INA Financial filed revised pro forma reconciliations showing the balance sheets of the active and inactive companies as of June 30, 1995 (as if the Plan of Restructure had been approved) and showing the A&E reserve strengthening on a statutory accounting principle (SAP) basis. (Ex. 7)

57. On October 26, 1995, INA Financial submitted the report of William M. Mercer ("Mercer Report") which provided a peer review of certain actuarial work performed to analyze the Plan of Restructure. (Ex. 9)

58. Also on October 26, 1995 INA Financial submitted a report by Milliman & Robertson ("M&R Report"). The report was an actuarial review of CIGNA's A&E reserves. (Ex. 8)

59. On October 28, 1995, the Department published notice in the Pennsylvania Bulletin, that a public hearing regarding the Plan of Restructure would be held. The notice allowed 15 days for written comments to be sent to the Department. The notice also invited interested persons who wanted to make a presentation at the hearing to identify themselves to the Department, and to provide a brief description of the topics they intended to address. (Ex. 15)

60. On October 30, 1995, INA Financial filed: the existing Tax Sharing Agreement between CIGNA Corp. and its subsidiaries; an explanation of the Aggregate Excess of Loss Reinsurance Agreement; a discussion of the premium calculation for the Aggregate Excess of Loss Reinsurance Agreement; and Biographical Affidavits of the directors of Century Indemnity. (Ex. 16, 17, 18, 20)

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014495

61. On October 30, 1995, INA Financial also filed a fairness opinion prepared by J.P. Morgan. (Ex. 19)

62. On November 1, 1995, INA Financial filed a solvency opinion prepared by Houlihan, Lokey, Howard & Zukin. (Ex. 21)

63. On November 6, 1995, INA Financial filed a reinsurance recoverable analysis which provided a review of the process used to monitor, collect and settle outstanding reinsurance recoverables; an analysis of existing and projected reinsurance balances; an analysis of the quality of its reinsurers and prospects for recovery; the actuarial data supporting a 10K Reserves report filed with the federal Securities and Exchange Commission (SEC); and copies of the engagement letters used to retain J.P. Morgan and Houlihan, Lokey. (Ex. 22, 23, 24, 25)

64. On November 9, 1995, INA Financial filed a pro forma balance sheet for the period ended June 30, 1995 showing a more detailed allocation of assets between CCI and Resulting INA. (Ex. 28)

65. On November 10, 1995, the Department received the Tillinghast Reserve Review Report of CIGNA as of December 31, 1994. (Ex. 147)

66. On November 13, 1995, INA Financial filed an explanation of: the Aggregate Excess of Loss Reinsurance Agreement, the premium calculation for Aggregate Excess of Loss Reinsurance Agreement, and the Inter-company Services Agreement. (Ex. 48)

67. On November 13, 1995, INA Financial also filed a revised Tax Sharing Agreement; risk based capital calculations for its affiliates; and an organizational chart for all of its companies. (Ex. 49, 50, 51)

68. On November 13, 1995, INA Financial also filed its reconciliation of its reserve activity and its model for testing

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014496

the sufficiency of the assets to pay the A&E liabilities of Century Indemnity (called a "stress test"). (Ex. 52, 53).

69. On November 16, 1995, INA Financial filed its analyses of total gross, ceded and net reserves for A&E claims by accident year and line of business, and additional documents relating to its stress test. (Ex. 58, 59)

70. On November 16, 1995, INA Financial also filed revisions relating to the division of assets among CCI and Resulting INA. (Ex. 60)

71. On November 20, 1995, INA Financial filed revised copies of the Aggregate Excess of Loss Reinsurance Agreement and Pre-1987 General Liability Reinsurance Agreement. (Ex. 62, 63)

72. On November 20, 1995, INA Financial filed information relating to CIGNA's top 30 A&E exposures, and environmental cases by state. (Ex. 64, 65).

73. On November 20, 1995, CIGNA also filed a balance sheet showing the assignment of assets and liabilities among CCI and Resulting INA as of September 30, 1995. (Ex. 67)

74. On November 20, 1995, the Department received additional information from Tillinghast. (Ex. 66)

75. On November 22, 1995, INA Financial filed a memorandum in support of its Plan of Restructure. (Ex. 69)

76. On December 4, 1995, INA Financial filed: CIGNA Corp.'s complete SEC 10-Q filing for the period ended September 30, 1995 showing the $1.2 billion reserve strengthening for Century Indemnity; the real estate appraisal for certain real estate ("the Brandywine Building"), which will be owned by Century Indemnity;

13

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014497

INA Financial Corporation's Board Resolutions regarding intercompany credit lines with respect to INA Corporation; a list of all asset-backed securities and how same would be allocated to CCI and Resulting INA pursuant to the division; pro forma financial statements for CCI and Resulting INA on a SAP basis; and a copy of the M&R detail report. (Ex. 92, 93, 94, 95, 96, 97)

77. On December 6, 1995, INA Financial filed a response to questions regarding whether the Plan of Restructure caused a novation or assumption of INA policies by CCI. (Ex. 100)

78. On December 11, 1995, a draft of a report from Tillinghast was received regarding CIGNA Reinsurance Company. (Ex. 113)

79. On December 18, 1995, CIGNA's P&C proposed dividend retention program was filed. (Ex. 114)

80. On December 18, 1995, INA Financial filed a report of CCI's Other Assets and Liabilities. (Ex. 115)

81. On December 18, 1995, INA Financial filed an explanation of its investment in Hicks Muse. (Ex. 116)

82. On December 18, 1995, INA Financial filed an explanation of CIGNA's A&E reserve discounting. (Ex. 117)

83. On December 22, 1995, INA Financial filed a revised balance sheet split as of September 30, 1995. (Ex. 119)

84. On January 5, 1996, INA Financial filed a revised copy of its Form D Filing. (Ex. 146)

85. On January 10, 1996, Houlihan, Lokey, Howard & Zukin filed a written response to the 12/27/95 written submission of Mark A. Peterson, Ph.D., of Legal Analysis Systems. (Ex. 128)

14

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).    ABC000014498

86.  On January 11, 1996, Tillinghast submitted a written response to the December 28, 1995 presentation of W. James MacGinnitie and Mark A. Peterson.  (Ex. 130)

87.  Also on January 11, 1996, M&R submitted a written response to the December 28, 1995 presentation of W. James MacGinnitie, James H. MacNaughton and Jon H. Barry.  (Ex. 129)

88.  On January 12, 1996, INA Financial filed a revised balance sheet, as of September 30, 1995, which assumes that the division has occurred.  (Ex. 137)

89.  On January 16, 1996, INA Financial filed a revised pro forma statement as of September 30, 1995.  (Ex. 138)

90.  On January 16, 1996, INA Financial submitted a letter responding to issues raised during a January 5, 1996, meeting with the Department.  (Ex. 153)

91.  On January 24, 1996, INA Financial filed "final" copies of the Plan of Restructure, incorporating all of the changes for the Plan initially submitted on October 2, 1995.  (Ex. 139)

92.  On January 25, 1996 INA Financial filed a revision to the dividend retention program.  (Ex. 140)

93.  On January 26, 1996, INA Financial filed revisions to the Plan of Division which addressed concerns raised by the Illinois Insurance Department.  (Ex. 141)

94.  On January 29, 1995 INA Financial filed a description of how charge-offs for reinsurance bad debts will be handled.  (Ex. 142)

95.  On January 30, 1996, INA Financial filed revisions to its "final" copy of the Plan of Restructure.  (Ex. 143)

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014499

96. On February 1, 1996, INA Financial filed further revisions to the Aggregate Excess of Loss Reinsurance Agreement. (Ex. 145)

97. On February 1, 1996, INA Financial filed further information relating to its reinsurance recoverables. (Ex. 150)

98. On February 4, 1996, INA Financial filed correspondence responding to requests from insurance regulators of other domiciliary states for information and clarification of the Restructuring Agreement. (Ex. 153)

99. On February 5, 1996, INA Financial filed revisions to the Aggregate of Excess of Loss Reinsurance Agreement. (Ex. 161)

100. On February 6, 1996, INA Financial filed revisions to the Plan of Restructure relative to the requests from insurance regulators in other domiciliary states. (Ex. 162)

101. On February 7, 1996, INA Financial filed further revisions to the Plan of Division. (Ex. 163)

102. On February 7, 1996, the Commissioner issued an Order denying an outstanding Motion to Deem Facts Admitted or to Compel an Answer. (Ex. 164)

Procedural Background - Documents from Participants

103. The Department invited comments from members of the public on the Plan of Restructure in its October 14 and October 28, 1995 Pennsylvania Bulletin notices, in its November 22, 1995 notice, in the Commissioner's November 30, 1995 Order, and at the conclusion of the public informational hearings on December 28, 1995. (Ex. 3, 15, 70, 83; Notes of Transcript "N.T." 633). In response thereto, numerous documents were filed by or on behalf of a variety of interested persons.

16

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014500

104. On October 26, 1995, St. Paul Fire and Marine Insurance Company filed Objections and Comments. (Ex. 10)

105. On October 26, 1995, General Refractories Company filed Objections and Comments. (Ex. 11)

106. On October 27, 1995, Objections and Comments were filed by or on behalf of: Lafarge Corporation; Beazer East, Inc.; HM Holdings, Inc.; Federal Insurance Company; Chubb Group of Insurance Companies; St. Paul Fire and Marine Insurance Company; Insurance Company of the State of Pennsylvania; National Union Fire Insurance Company of Pittsburgh, Pennsylvania; Birmingham Fire Insurance Company of Pennsylvania; and American International Group. (Ex. 12)

107. On October 27, 1995, Objections and Comments were filed by or on behalf of: AAF-McGuay; The Dial Corporation; McCall Oil and Chemical Corporation; Quaker Chemical Corporation; General Refractories Company; SmithKline Beecham Corporation; Ford Motor Company; Montrose Chemical Corporation of California; and Beckman Instruments, Inc. (Ex. 13)

108. On October 27, 1995, Objections and Comments were filed by or on behalf of: Lafarge Corporation; Beazer East, Inc.; H.M. Holdings, Inc.; Chubb Group Insurance Company; St. Paul Fire and Marine Insurance Company; and American International Group. (Ex. 14)

109. On November 8, 1995, Peninsula Insurance Company filed Objections and Comments. (Ex. 26)

110. On November 8, 1995, General Refractories Company filed Objections and Comments. (Ex. 27)

111. On November 9, 1995, further Objections and Comments were filed. (Ex. 29)

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).        ABC000014501

112. On November 10, 1995, Blakeslee Arpaia Chapman, Inc. filed Objections and Comments. (Ex. 30)

113. On November 10, 1995, Federal Insurance Company filed Objections and Comments, Statements and Questions. (Ex. 31)

114. On November 10, 1995, the National Association of Independent Insurers (NAII) filed Objections and Comments representing its 550 member insurance companies. (Ex. 32)

115. On November 11, 1995, Objections and Comments were filed by or on behalf of: Allegheny Power Systems and Subsidiaries. (Ex. 33)

116. On November 11, 1995, Objections and Comments were filed by or on behalf of: Truk-Away of Rhode Island, Inc. (Ex. 34)

117. On November 11, 1995, Objections and Comments were filed by or on behalf of: Domtar, Inc. (Ex. 35)

118. On November 11, 1995, further Objections and Comments were filed. (Ex. 36)

119. On November 12, 1995, Objections and Comments; Petition for Recusal; and Memorandum of Law were filed by or on behalf of: American International Group. (Ex. 37)

120. On November 13, 1995, Objections and Comments were filed by or on behalf of: Rohm & Haas Company; McDonnell Douglas Corporation; Quantum Chemical Corporation; and M.H. Detrick Company. (Ex. 38)

121. On November 13, 1995, St. Paul Fire and Marine Insurance Company filed Objections, Comments and a Statement. (Ex. 39)

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014502

122.   On November 13, 1995, Objections, Comments, Questions, Statements and Petitions were filed by or on behalf of:   Lafarge Corporation, et al.  (Ex. 40)

123.  On November 13, 1995, W. R. Berkley Corporation filed Objections and Comments.  (Ex. 41)

124.  On November 13, 1995, Objections and Comments were filed by or on behalf of:  Pennsylvania Property and Casualty Insurance Guaranty Association.  (Ex. 42)

125.  On November 13, 1995, Objections and Comments were filed by or on behalf of:  Borden, Inc.; Chromalloy American Corporation; Clark Equipment; Elf Atochem; Maricopa County; Olin Corporation; Pfizer, Inc.; PRF Metal Products, Inc.; Reichold Chemical Corporation; and Sequa Corporation.  (Ex. 43)

126.  On November 13, 1995, a Notice of Appearance; Petition to Intervene; Application for Subpoena; Statement; and List of Documents Requested were filed by or on behalf of:  Pfizer, Inc.; PRB Metal Production, Inc.; Quaker Chemical Corporation; Reichhold Chemical Corporation; and Sequa Corporation.  (Ex. 44)

127.  On November 13, 1995, a Notice of Appearance was filed on behalf of:  Hercules, Incorporated, who joined in Comments and Objections previously filed.  (Ex. 45)

128.  On November 13, 1995, a Notice of Appearance was filed on behalf of:  Betz Laboratories, who joined in Comments and Objections previously filed.  (Ex. 46)

129.  On November 13, 1995, a Statement of Objections was filed by or on behalf of:  SmithKline Beecham; General Refractories; Ford Motor Company; Montrose Chemical; and Beckman Instruments, who joined in Comments and Objections previously filed.  (Ex. 47)

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014503

130. On November 13, 1995, Objections and Comments were filed by or on behalf of: PPG Industries, Inc.; Dresser Industries, Inc.; and Crane Company. (Ex. 54)

131. On November 13, 1995, additional Objections and Comments were filed. (Ex. 55)

132. On November 13, 1995, Objections and Comments were filed by or on behalf of: National Confederation of Insurance Guaranty Funds; and the Massachusetts Insurers Insolvency Fund. (Ex. 56)

133. On November 14, 1995, an additional Notice of Appearance and Objections and Comments were filed by or on behalf of: American International Group. (Ex. 57)

134. On November 17, 1995, Objections and Comments were filed by or on behalf of: Pennsylvania Property and Casualty Insurance Guaranty Association. (Ex. 61)

135. On December 1, 1995, the National Conference of Insurance Guaranty Funds filed Comments. (Ex. 84)

136. On December 1, 1995, Royal Insurance Company filed Comments. (Ex. 85)

137. On December 4, 1995, Comments were filed on behalf of the NAII. (Ex. 87)

138. On December 4, 1995, the NAII filed Comments. (Ex. 86)

139. On December 4, 1995, 3M Company filed Comments. (Ex. 88)

140. On December 4, 1995, Comments were filed by or on behalf of: PPG Industries, Inc.; Dresser Industries, Inc.; and Crane Company. (Ex. 89)

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).       ABC000014504

141.  On December 4, 1995, Wausau Insurance Company filed Comments. (Ex. 90)

142.  On December 4, 1995, Consumer Federation of America filed Comments.  (Ex. 91)

143.  On December 4, 1995, National Council on Compensation Insurance filed Comments.  (Ex. 98)

144.  On December 6, 1995, Comments and Objections were filed by or on behalf of:  Rohm & Haas Company, et al.  (Ex. 101)

145.  On December 6, 1995, Comments and Objections were filed by or on behalf of:  AAF-McGuay, Incorporated, et al. (Ex. 102)

146.  On December 6, 1995, Comments, Objections and an Affidavit were filed by or on behalf of: Lafarge Corporation, et al. (Ex. 103)

147.  On December 6, 1995, a Motion for the Release of Information was filed by or on behalf of:  National Conference of Insurance Guaranty Funds and the Massachusetts Insurers Insolvency Fund. (Ex. 104)

148.  On December 21, 1995, American International Group filed a Reply Memorandum.  (Ex. 118)

149.  On December 28, 1995, a Motion to Deem Facts Admitted or Compel an Answer was filed by or on behalf of American International Group.  (Ex. 122)

150.  On January 11, 1996, an Entry of Appearance was filed on behalf of:  Textron, Inc. and Avco Corporation.  (Ex. 132)

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).        ABC000014505

151. On January 12, 1996, Objections were filed by or on behalf of: Niagra Mohawk Power Corporation. (Ex. 133)

152. On January 12, 1996, an Entry of Appearance was filed on behalf of Dow Chemical Company. (Ex. 135)

153. On January 12, 1996, a Request for Stay, Policyholder Consent, and Request for Admissions were filed by or on behalf of: Lafarge Corporation; Beazer East, Inc.; H.M. Holdings, Inc.; Chubb Group; The St. Paul Group; and American International Group. (Ex. 136)

154. INA Financial filed various documents responsive to the documents filed by the several participants. (Ex. 68, 99, 120, 121, 127, 134)

## Hearing Procedures

155. On October 14, 1995, the Department published notice of the Plan of Restructure in the <u>Pennsylvania Bulletin</u>, requesting public comment by October 30, 1995. (Ex. 3)

156. On October 28, 1995, the Department published notice in the <u>Pennsylvania Bulletin</u>, that a public hearing regarding the Plan of Restructure would be held on December 8, 1995. The notice requested written comments by November 13, 1995. The notice also invited interested persons who wanted to make a presentation at the hearing to identify themselves to the Department by that date, and to provide a brief description of the topics they intended to address. (Ex. 15)

157. On November 22, 1995, the Department extended the time for public comment until December 4, 1995.

22

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).    ABC000014506

158. On November 30, 1995, the Commissioner issued an Order, soliciting further comments or objections from interested persons. (Ex. 83).

159. Also on November 30, 1995, the Commissioner issued an Order scheduling further hearings. (Ex. 82)

160. On December 28, 1995 at the conclusion of the public informational hearings, the record in the proceeding was held open until January 12, 1996 for the receipt of additional written comments by CIGNA or its consultants, the participants or other persons regarding issues which had been raised in the Plan of Division, at any of the three hearings, or in the written comments previously submitted. (N.T. 633)

161. In response to the five separate solicitations for public comment, the Department received thousands of pages of written comments from dozens of interested persons. (Ex. 26, 27, 29-47, 54-57, 61, 84-91, 99, 101-104, 118, 133, 135, 136, 148)

162. In response to the October 28, 1995 solicitation for persons to participate at the public informational hearing, 18 persons indicated a desire to speak at public hearing.

163. The interested persons who indicated a desire to speak included representatives of three insurers, three guaranty fund representatives, one representative of a trade association on behalf of its 550 members, and representatives of more than 40 policyholders of various CIGNA affiliates.

164. All of the persons who indicated a desire to speak were permitted 15 minutes to make their oral presentation to the Commissioner.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014507

165. Interested persons were permitted to combine their allocated time, in their discretion, so that a more lengthy presentation could be made on an issue of mutual interest to several participants.

166. Written comments were not limited as to page length.

167. A public informational hearing was convened on November 28, 1995. (N.T. 1-250)

168. At the November 28, 1995 hearing the Commissioner granted limited intervention for the purposes of submitting written comments and making oral presentations to all persons who had indicated a desire to participate in the hearing.

169. After approximately six hours of presentations, the public informational hearing was adjourned to December 8, 1995.

170. On November 30, 1995, the Commissioner announced by Order that a third hearing date would be scheduled for December 28, 1995 to accommodate those interested persons who had requested additional time to review the materials and prepare responses.

171. The public informational hearing reconvened on December 8, 1995. (N.T. 250 - 478)

172. After approximately 4 and 1/2 hours of presentations, the public informational hearing was adjourned to December 28, 1995.

173. On December 28, 1995, the third and final public informational hearing was held. (N.T. 487-636)

174. After approximately three hours of presentations, the oral comment portion of the hearing was concluded, there being no further presenters.

24

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014508

175. Several presenters availed themselves of the opportunity to file written comments after the close of the public informational hearing.

176. The Commissioner presided over the hearing on all three hearing dates.

## Public Availability of Documents

177. Certain documents were obtained by the Department under the examination law (40 P.S. §323.1 et seq.); additional documents were obtained which are otherwise confidential. Non-confidential documents obtained by the Department were made publicly available.

178. Subsequent to the October 2, 1995 filing of the Plan of Restructure, the Department released copies of the Plan of Division (Ex. 2) and certain related documents to interested persons without charge.

179. Other portions of the Plan of Restructure were not initially released by the Department.

180. Some of the written comments received from various persons included requests to release additional documents relating to the Plan of Restructure.

181. On November 22, 1995, the Department announced the release of certain additional documents at no charge to all persons who had previously contacted the Department regarding the Plan of Restructure.

182. At the November 28, 1995 public informational hearing, the Commissioner again announced the availability of those documents, and copies were made available for distribution at that time.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014509

183. At the November 28, 1995 hearing, copies of the public comments received to date were made available at no cost to all interested persons.

184. In addition, written statements of the CIGNA representatives and expert consultants who offered presentations (and copies of slides used during the presentations) were made available at the November 28, 1995 hearing at no charge.

185. During the November 28, 1995 hearing, some participants asked that the Tillinghast, M&R and Mercer reports and materials be made public.

186. In response thereto, the Commissioner issued an Order on December 8, 1995 ruling that the Tillinghast, M&R and Mercer reports and materials would remain confidential. (Ex. 112)

187. At the December 8 and 28, 1995 public informational hearings, copies of comments received to date from the various interested persons and written statements from the commenters were made available to all other interested participants.

188. In addition, written statements of the Department's presenter and expert consultant (and copies of the slides used during the presentation) were made available at the December 8, 1995 hearing at no charge.

CIGNA's expert consultants

189. CIGNA engaged the investment banking consulting firm of J.P. Morgan to examine the fairness of the Plan of Restructure with respect to the interests of INA's policyholders and shareholders.

190. J.P. Morgan is a nationally known firm with expertise in corporate financial restructurings and capital financing

26

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014510

transactions.

191.  J.P. Morgan concluded that:

1)   that the Plan of Restructure was, in the aggregate, fair
to the policyholders of those companies which will be
owned by the Brandywine Holdings Corporation, from a
financial point of view;

2)   the division of INA into Resulting INA and CCI was fair
to CCI's shareholder;

3)   the exchange of assets and liabilities in the depooling
transaction is fair to shareholders of the affected
companies;

4)   the merger of CCI into Century Indemnity is fair to the
shareholder of each affected company;

5)   the merger of CIGNA Specialty into Century Indemnity is
fair to the shareholder of Century Indemnity; and

6)   the contribution of Century Indemnity and CIGNA
Reinsurance Company to Brandywine Holdings Corporation is
fair to the shareholder of Brandywine Holdings.

192.  CIGNA engaged the investment banking firm of Houlihan, Lokey,
Howard and Zukin to provide opinions with respect to the solvency
and financial condition of the companies affected by the Plan of
Restructure both immediately before and after the restructure,
giving effect to the $375 million recapitalization proposed in the
Plan.

193.   Houlihan Lokey is a well-known firm that provides
professional valuation services and financial advice.

194.  Houlihan Lokey concluded that:

1)   each of the active and run off companies affected by the
Plan of Restructure will be solvent following the

27

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014511

restructure;

2) each of the active and run off companies affected by the Plan of Restructure will be able to pay its debts as they come due;

3) each of the active and run off companies affected by the Plan of Restructure will have adequate capital with which to operate; and

4) each of the active and run off companies affected by the Plan of Restructure will meet the required insurance solvency standards as set forth in the law in their respective domiciliary states.

195. CIGNA engaged the consulting actuarial firm of Milliman & Robertson, Inc. ("M&R") to perform an evaluation of the CIGNA Major Claims Unit which handles A&E claims. M&R also performed an actuarial peer review of the methodologies used by internal CIGNA personnel for the valuation of its A&E liabilities and the economic approach used by CIGNA to fund the run off of the liabilities of Brandywine Holdings Corporation subsidiaries after the restructure. M&R was also retained to perform a comparison of CIGNA A&E reserve levels to those of its peers in the market.

196. M&R is a nationally renowned and well-respected actuarial consulting firm.

197. M&R concluded that:

1) the Major Claims Unit was adequately staffed with professionals with excellent credentials;

2) the establishment of a unit dedicated to the handling of major A&E claims was consistent with sound industry practice;

3) the existence of the unit since 1980 has created a significant base of knowledge and expertise in the handling of A&E claims;

28

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).        ABC000014512

4) the claim reserving procedures were technically sound; and

5) CIGNA's approach to settling cases was consistent with "best practices" in the industry.

198.   M&R also concluded that CIGNA's methodology and assumptions used in its estimation of its A&E exposure were reasonable in the context of existing state of the art for such estimations.

199.   M&R also concluded that CIGNA's methodology and assumptions used in developing the stress test to measure the capitalization needed to fund the run off of A&E liabilities were reasonable.

200.   M&R also concluded that CIGNA's A&E reserve level is one of the strongest among the insurance companies in the peer group examined, and is higher than the industry average.

201.   M&R opined that CIGNA's claim handling practices result in fewer losses than the losses seen by the rest of the industry as a whole.

202.   M&R also opined that, because of its claims practices, CIGNA has disposed of more A&E claims, and is further advanced in the payment cycle, than is the rest of the industry as a whole.

203.   George Bernstein, Esq., a former Deputy Superintendent and General Counsel and First Deputy Superintendent of the New York State Insurance Department, was retained as a CIGNA consultant to opine on the public policy issues attendant to the Plan of Restructure.

204. . Mr. Bernstein opined that:

1) the downgrading of CIGNA P&C operations to B++ by A.M. Best in December 1994 left CIGNA no choice but to

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014513

restructure its operations to address its A&E exposures;

2) no major insurer can continue to attract profitable business with less than an A- rating;

3) the quality of business that CIGNA would have been able to write as a B++ rated company would decline, resulting in diminished cash flow from premiums; and

4) had these exposures not been addressed there would be legitimate cause for concern that CIGNA might eventually not be able to honor its policyholder obligations.

## Issues Raised by Presenters

205. At the December 8 and 28, 1995 hearings, the interested participants who had been granted limited intervenor status presented comments and objections on a variety of topics. (N.T. 341-42, 343-46, 346-57, 359-402, 403-24, 425-26, 429-44, 444-57, 457-75, 480-636)

206. Many of those policyholders voicing objection to the Plan of Restructure are currently in litigation against various CIGNA companies involving A&E claims.

207. Several of the insurance company participants voicing objection to the Plan of Restructure compete with CIGNA in the marketplace.

## Commenters - Entitlement to Stream of Income

208. Some of the commenters objected to the Plan of Restructure on the basis that Century Indemnity's assets will be insufficient to cover its liabilities in the absence of access to the premium income stream of the active companies.

30

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).        ABC000014514

209. Insurance premium rates are calculated prospectively to estimate the expected values of future costs of policies to be issued.

210. Pennsylvania law mandates that rates not be excessive, inadequate or unfairly discriminatory.

211. The Pennsylvania Insurance Department will not approve rates which include provision for the recoupment of losses on previously issued policies, as such rates would be excessive and/or unfairly discriminatory.

212. Losses on previously issued policies may not be funded from the income stream from premiums from future policies but rather are funded by the insurer's profits or from capital contributions to the insurer.

213. There is no legal prohibition in Pennsylvania which prevents an insurance company from ceasing to write new business. Notice to or consent of the Department is not required by law.

214. INA could cease to write new business in Pennsylvania, and merely service existing policyholders, even in the absence of a Plan of Division.

215. Existing INA policyholders, therefore, can have no reasonable expectation that losses from existing policies will be funded by future premium income from ongoing active operations.

216. Existing INA policyholders have no legal right to the future stream of income that might be received by INA if it continued to sell policies and abandoned its Plan of Division.

217. Policyholders have no legal authority to force their insurer to continue to sell policies in the future.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014515

<u>Commenters - Continuity of Relationship, Policyholder Consent</u>

218. Concerns were raised by commenters regarding whether the division of INA is deemed to cause a legal disruption of the policy contractual relationship which currently exists between INA and its insureds. Under the Plan of Restructure, some INA policyholder liabilities will be allocated to CCI, a run-off company which will merge into Century Indemnity. Some commenters claimed that this allocation constitutes a novation requiring policyholder consent; others claimed that the allocation constitutes an assumption of contractual duties by a new party which mandates policyholder consent.

219. Pennsylvania law permits a corporation to divide and allocate its liabilities to one or more resulting corporations.

220. INA may lawfully allocate its liabilities, including policyholder liabilities, to CCI and Resulting INA.

221. All of INA's unsatisfied liabilities are allocated to either CCI or Resulting INA.

222. Upon a division, the extinguishment of INA's liability for policyholder obligations and other liabilities allocated to CCI occurs by operation of law.

223. After the division, CCI will be legally responsible for the liabilities allocated to it by INA.

224. After the division, Resulting INA will be legally responsible for the liabilities allocated to it by INA.

225. The General Assembly did not intend for creditors, including policyholders, to have approval power over a Plan of Division.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014516

226. The division statute does not grant creditors of the dividing corporation, including policyholders, approval power over the allocation of the liabilities to a resulting corporation.

227. The division statute does not grant creditors including policyholders, approval power over a Plan of Division.

228. The division statute does grant shareholders approval power over a Plan of Division. See e.g., 15 Pa.C.S. §1952.

229. Policyholders of stock insurance companies are not entitled to voting privileges as are shareholders of the company.

230. There is no novation or assumption of liabilities from INA by either resulting corporation because the resulting corporations are legal successors to INA.

231. No novation or assumption of liabilities occurs in a merger of stock insurance companies. The liabilities become the obligation of the surviving company in a merger by operation of law.

232. Pennsylvania law does not require policyholder consent when a policyholder liability of one company becomes the legal obligation of its successor resulting from a merger.

233. Other types of corporate changes, some which may significantly affect the financial condition of the insurer, are permitted to occur in the absence of policyholder consent. For example, insurers can, and routinely do, change intercompany pooling agreements to decrease a carrier's share of the premiums, or increase its share of losses; investment strategies may change; reserving practices may be revised; and subsidiaries may be created or divested - all without policyholder consent.

33

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014517

234.  In reviewing a Plan of Division, the Commissioner is charged with protecting _inter alia_ the interests of policyholders.

235.  Policyholder approval of a Plan of Division was not required by the General Assembly because of the Commissioner's role in reviewing and approving the transaction.

236.  The General Assembly has expressly reserved to creditors, including policyholders, the right to proceed against the diving corporation, as if the division had not taken place, or the resulting corporations as joint and several obligors, in the event the affected creditor sustains actual loss and can establish that the division operated as a fraud upon creditors or was otherwise in violation of law.

237.  The Commissioner's approval of a Plan of Division does not foreclose the rights of policyholders, creditors or other persons dealing with the dividing or resulting corporations of any rights or remedies specifically set forth at 15 Pa.C.S. §1957(b)(1)(iv)-(v).

238.  INA policyholders do not have approval power over the division of INA or the allocation of INA's liabilities to CCI and Resulting INA.

239.  INA policyholders do not have approval power over the Plan of Restructure.

240.  An approval of a Plan of Division does not foreclose creditors, including policyholders, from pursuing any remedy at law which may be available to them.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014518

Commenters - Guaranty Fund Coverage

241.   Suggestions were raised by commenters that guaranty fund coverage may not be available for policyholder liabilities allocated in the division to CCI.

242.   The Guaranty Fund statute states that the Fund is obligated to pay covered claims "which arise out of ... an insurance policy ... issued by an insurer if such insurer becomes an insolvent insurer ..."  40 P.S. §991.1802.

243.   Some commenters raised concerns that coverage from the Pennsylvania Property and Casualty Insurance Guaranty Association ("the Guaranty Fund") and guaranty funds in other states would be unavailable because if Century Indemnity becomes insolvent, Century Indemnity will not have been the precise insurer that issued the policy to the former INA policyholders whose liabilities were allocated to CCI, an unlicensed insurance company.

244.   Upon the division of INA, until the moment of its merger into Century Indemnity, CCI will be an unlicensed insurance company. The division of INA and the merger of CCI into Century Indemnity are nearly simultaneous transactions.

245.   With the merger of CCI into Century Indemnity, policyholder liabilities allocated to CCI in the Plan of Division will become liabilities of Century Indemnity, a licensed insurance company.

246.   The General Assembly intended that the Guaranty Fund pay covered claims if the insolvent company was licensed at the time of the insolvency or if the carrier issuing the policy was licensed at the time of policy issuance.

247.   Historically, the Pennsylvania Guaranty Fund has paid covered claims to Pennsylvania residents without regard as to whether the

35

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014519

licensed insolvent insurance company is precisely the licensed insurer that issued the policy.

248. Any issue as to the applicability of Guaranty Fund coverage does not become ripe unless Century Indemnity becomes insolvent. Accordingly, given the findings herein, there is no need to address this concern further.

## Defense Costs

249. Various commenters raised concern whether defense costs were adequately addressed in the reserve analysis conducted by CIGNA, the Department, and their consultants.

250. In the insurance policies at issue, defense costs are not capped by policy limits and can sometimes greatly exceed policy limits.

251. Defense costs were sufficiently and adequately accounted for in the calculations of reserves by CIGNA and its experts, and in the analysis of ultimate A&E liability and reserve study conducted by the Department and its consultants.

## Impact on Contractual Arrangements

252. Several commenters ("contracting parties") noted that they currently had contractual arrangements with INA, including risk sharing pools and reinsurance agreements. These contracting parties expressed concern that their interests would be harmed because an underfunded Century Indemnity would result from the Plan of Restructure.

253. All of the contracting parties commenting on this issue are large sophisticated insurance companies who are presumed to have equally bargaining power with INA.

36

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).      ABC000014520

254. If INA were declared insolvent, the contracting parties asserted they would be contractually obligated to pay INA's share of liabilities arising under the pooling or reinsurance agreement.

255. This obligation, if any, to "cover" for contractual partners is not altered or expanded by either the entire Plan of Restructure or the Plan of Division.

256. To the extent these contracting parties assumed the risk of fluctuations in INA's financial condition and/or corporate structure, the concerns raised do not mandate the disapproval of the Plan of Restructure.

257. To the extent that an allocation of liability from INA under the Plan of Restructure violates any previous contractual commitment made by INA, this Decision and Order does not extinguish any remedy at law the contracting parties may possess.

Financial Examination

258. A portion of the Department's review of the Plan of Restructure was conducted under Section 323.3 of Article IX of the Insurance Department Act of 1921 ("Examination Law"), 40 P.S. §323.3.

259. Under the Examination Law, the Department is required to examine domestic insurance companies at least once every five years. However, the Department may exam a company more frequently, in it discretion.

260. On February 21, 1995, the Department initiated a financial examination of CIGNA pursuant to the Examination Law. This examination was commenced one year in advance of the required quadrennial examination.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014521

261. Because several of the CIGNA P&C companies are domiciled in states other than Pennsylvania, examiners from other domiciliary states participated in the examination.

262. Under the authority granted by Section 323.3 of the Examination Law, the Department is authorized to retain consultants to assist it in an examination.

263. To assist in reviewing materials presented during the public informational hearing, the Department retained Deloitte and Touche, a nationally known accounting firm.

264. The Department selected Deloitte and Touche because of its experience and expertise on insurance holding company transactions.

265. On March 22, 1995, the Department engaged Tillinghast to perform a review of CIGNA's reserves with a special emphasis on the A&E related reserves.

266. The Department chose Tillinghast because of the firm's national reputation and its experience and expertise in A&E exposures.

267. Tillinghast was initially charged with conducting a reserve analysis of CIGNA's A&E exposures on a consolidated basis.

268. In conducting an actuarial analysis to develop estimates of CIGNA's probable ultimate exposure to A&E claims, both known and incurred but not reported (IBNR), Tillinghast developed a range of three exposure estimates (low, medium and high).

269. Tillinghast's analysis contemplated no reform to federal Superfund laws, even though certain changes to such laws are currently being considered by Congress which might lessen exposure for environmental liability.

38

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014522

270. Tillinghast's actuarial reserve analysis was conducted in an appropriate and reasonable manner.

271. Tillinghast's actuarial reserve analysis concluded that CIGNA reserves were deficient.

272. In response thereto, CIGNA added $1.2 billion to its reserves as of September 30, 1995.

## CIGNA Reserve Review and Stress Test

273. Prior to its third quarter 1995 10-Q filing with the SEC, CIGNA's SEC filings claimed that estimates of its A&E IBNR exposures could not be developed; however, CIGNA did report upon its reserves for known A&E exposures in its SEC filings.

274. CIGNA's SEC disclosure regarding A&E IBNR exposures was consistent with that used by other large insurers which have significant A&E exposures, including commenters such as American International Group, and the Chubb Group of Insurance Companies.

275. CIGNA first reported an estimate of its ultimate A&E exposures in its third quarter 1995 10-Q filing with the SEC.

276. CIGNA undertook a "bottom-up" internal reserve review to estimate its actual and IBNR A&E reserves, evaluating and aggregating all known liabilities on a case-by-case, policy-by-policy basis, and then adding in a factor for IBNR claims.

277. To estimate reserves for known claims, CIGNA selected samples of its existing claims; had the files reviewed by knowledgeable and experienced personnel; and developed a range of damage estimates after analyzing the actual damages being claimed, the terms and conditions of the applicable policy, and the law of the relevant

39

jurisdiction. These results were then extrapolated to the entire population of claims which have been filed against CIGNA.

278. To estimate the potential for loss which will arise from A&E claims which have not yet been filed, CIGNA analyzed its experience with Fortune 200 companies and concluded _inter alia_ that:

> 1)    the overwhelming percentage of large companies that are likely to file A&E claims under CIGNA policies have already done so; and
> 2)    a small number of policy accounts represents a majority of CIGNA's A&E exposures.

279. CIGNA thoroughly reviewed its known A&E claims, appropriately evaluated its IBNR A&E exposure, and developed a realistic estimate of its ultimate A&E liabilities.

280. CIGNA's internal estimates of ultimate liability were consistent with those made by Tillinghast; Tillinghast had used variations of traditional actuarial methodologies to estimate ultimate A&E liabilities.

281. The credibility of both the CIGNA reserve review and the Tillinghast reserve study are enhanced because the two analyses arrived at similar conclusions, even though they analyzed the reserves using completely different methodologies.

282. In addition to conducting its reserve review, CIGNA developed a cash flow model stress test to evaluate the adequacy of the assets of Century Indemnity to fund the liabilities of that company.

283. In its stress test, CIGNA relied upon the probable ultimate liabilities and payment patterns that had been developed by Tillinghast.

40

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014524

284. CIGNA relied upon its historic investment yield patterns in its stress test.

285. CIGNA's stress test showed that, with the infusion of $500 million in capital, Century Indemnity would be fully funded in all tested scenarios.

Tillinghast Stress Test Results

286. Tillinghast was also charged with reviewing the methodology of CIGNA's stress test, the results of such test, and the ability of Century Indemnity to fund potential liabilities resulting from the Restructure.

287. Tillinghast reviewed the mechanics of the stress test developed by CIGNA and concluded that the model was reasonable.

288. Based upon the information and analyses received, and the Department's independent review, the Commissioner finds the stress test developed by CIGNA was appropriate.

289. Tillinghast then used the model to develop 162 scenarios which tested varying loss, investment yield, and payment patterns to determine whether the assets allocated to Century Indemnity through CCI were adequate to ensure the payment of all liabilities which Century Indemnity will have, including those INA policyholders liabilities which will be allocated to CCI.

290. Tillinghast used the three loss payment patterns developed during the reserve analysis and then assumed that the patterns 1) stayed the same ("slow"), 2) increased by 25% ("medium") and 3) increased by 50% ("fast").

291. In developing its stress test scenarios, Tillinghast assumed varying investment yields of 7%, 6.5% and 6%.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014525

292. Historically, an acceptable investment yield for insurance companies has not fallen below 6%.

293. CIGNA's historic investment yield has exceeded 7%.

294. The assumptions made by Tillinghast in its analysis were conservative, and were designed to err on the side of caution.

295. Tillinghast's stress test resulted in a matrix with one end of the spectrum being "high/fast" (fast dispositions of cases at a high amount of payment) and the other end of the spectrum being "low/slow" (slow payouts at low amounts).

296. Assumptions at the extremes of the spectrum are unrealistic and unlikely to occur.

297. Based upon the information and analyses received, and the Department's independent review, the Commissioner finds Tillinghast's stress test analysis was reasonable and appropriate.

298. Of the 162 scenarios tested by Tillinghast, all of Century Indemnity's liabilities were adequately funded in all but four unlikely scenarios (at the high/fast end of the spectrum).

299. Liabilities under the remaining four scenarios will be adequately funded by the Aggregate Excess of Loss Reinsurance Agreement provided to Century Indemnity by Resulting INA.

The Art of Estimating A&E Exposures

300. Several of the speakers during the three days of public hearings noted the uncertainty inherent in an evaluation of A&E exposure, because of the long term and latent injury nature of the liability.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014526

301. That uncertainty does not, however, render a reasonable estimate of A&E exposures impossible.

302. Other long tail exposures such as medical malpractice, products liability, and worker's compensation exposures are routinely estimated with a reasonableness acceptable to regulators and the industry.

303. Variations of standard actuarial principles and methodologies can be used to construct a reasonable estimate of A&E exposures because of recent expansions of available data regarding such liabilities and advances in actuarial science.

304. An actual reserve review and claims study such as that performed by CIGNA can serve as the basis for a reasonable estimate of A&E exposures.

305. Exposure for A&E liabilities can be realistically estimated for the purpose of establishing adequate reserves.

Financial Stability of Century Indemnity

306. Under the Plan of Restructure, invested assets of Century Indemnity will equal approximately $3,800,000,000 ($3.8 billion), excluding investments in subsidiaries.

307. Under the Plan of Restructure, CCI will receive $3.4 billion of INA's $4.8 billion in total assets, and only $1.4 billion will be apportioned to Resulting INA.

308. Total assets of Century Indemnity will exceed $4.5 billion, excluding investments in subsidiaries.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014527

309. As a result of the restructuring, reserves for the Brandywine Holding Corporation subsidiaries have been strengthened by $1.2 billion.

310. With implementation of the Plan of Restructure, $500 million in capital will have been contributed to Century Indemnity.

311. Under the Plan of Restructure, an additional $800 million in reinsurance has been made available to Century Indemnity. This layer of reinsurance is in addition to Century Indemnity's existing external reinsurance programs.

312. Further, under the Plan of Restructure, a dividend retention fund, which is anticipated to reach a minimum balance of $50 million will be established for the benefit of Century Indemnity's policyholders and creditors.

313. The Plan of Restructure will result in the transfer of approximately $160 million of aggregate write-ins for other-than-invested assets to the active companies in exchange for high quality assets allocated to Century Indemnity.

314. The Plan of Restructure will result in the transfer of $80 million of receivables to the active companies in exchange for high quality assets allocated to Century Indemnity.

315. The Plan of Restructure will result in the transfer of all collateralized mortgage obligations (CMO's) with high volatility to the active companies in exchange for high quality invested assets allocated to Century Indemnity.

316. Century Indemnity's financial stability is also enhanced by the prohibition against the declaration or payment of any dividends to its shareholder.

44

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).                ABC000014528

317.   Century Indemnity's financial stability is additionally enhanced by the improvement in the quality of securities which it will be permitted to acquire.

318.   Century Indemnity's financial stability is further enhanced by its insulation from future operating losses, including catastrophic losses, which may be incurred by the active insurance company subsidiaries of INA Holdings Corporation.

319.   The interests of policyholders and claimants are enhanced by all of the above mentioned improvements to the financial condition of Century Indemnity.

320.   The requirement that Century Indemnity submit to enhanced regulatory control so long as any liabilities remain unpaid affords yet greater protections to policyholders and claimants.

321.   The designation of management specifically devoted to the run-off operations better serves the interests of policyholders and claimants.

322.   The public interest benefits from the improved ability of INA Holdings Corporation to attract capital which results from the Plan of Restructure.

323.   The public interest benefits from the improved ability of Resulting INA to attract profitable business which results from the Plan of Restructure.

324.   The public interest is afforded additional protection because residual market obligations of Century Indemnity will be satisfied by an active company, rather than an inactive company in run-off.

325.   The public interest is better served because both CIGNA and the Department now have a more complete understanding of the full

45

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014529

extent of CIGNA's exposure to A&E claims.

326. The management, officers and directors of Brandywine Holdings Corporation and Century Indemnity have sufficient experience, integrity and general fitness to effectively manage the run-off operations.

327. The Plan of Restructure has been reviewed by four actuarial firms, and two investment banking firms, all of whom have concluded that the Plan of Restructure is fair and reasonable. The Plan of Restructure has also been reviewed by eight insurance regulators who must approve the transactions thereunder.

328. Based on all the information and analyses reviewed, and the Department's independent review, the Commissioner finds that Century Indemnity is sufficiently funded under the Plan of Restructure to meet all liabilities.

329. Because Century Indemnity will be adequately capitalized, guarantees from its parent or ultimate parent are not needed to protect policyholders, creditors or the public interests.

Solvency Considerations

330. Based upon the information and analyses received, and the Department's independent review, the Commissioner finds:

1) INA is not insolvent or in a financially hazardous condition such as would require or allow regulatory action under Article V of the Insurance Department Act, 40 P.S. §221 et seq. ("Article V")

2) Resulting INA will not be insolvent or in a financially hazardous condition as a result of the Plan of

46

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).      ABC000014530

Restructure such as would require or allow regulatory action under Article V.

3) CCI will not be insolvent or in a financially hazardous condition as a result of the Plan of Restructure such as would require or allow regulatory action under Article V.

4) Century Indemnity is not, and as a result of the Plan of Restructure will not be, insolvent or in a financially hazardous condition such as would require or allow regulatory action under Article V.

331. Nothing in this Decision and Order precludes future regulatory action, under Article V or otherwise, should circumstances warrant.

332. Based on all the information and analyses reviewed, the Plan of Restructure is not injurious to policyholders.

333. Based on all the information and analyses reviewed, the Plan of Restructure is fair and reasonable.

Approval by Other States

334. Many of the insurance regulators from the other domicilary states having approval regulatory authority over the Plan of Restructure participated in the three days of public informational hearings.

335. Insurance regulators from the other domicilary states have undertaken their own review and analysis of the Plan or Restructure, independently of the review conducted by Pennsylvania.

336. In addition to Pennsylvania, seven other states are required to approve portions of the Plan of Restructure, under the insurance

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014531

holding company laws applicable in their states: California, Connecticut, Illinois, Indiana, New Jersey, Ohio and Texas.

337. The Plan of Restructure, as filed with the Pennsylvania Insurance Department, cannot be implemented unless and until approvals have been received from all eight jurisdictions.

338. California will be required to approve the Restructuring Agreement, Withdrawal and Dissolution Agreement and Amendment No. 1 to the Active Company Pooling Agreement with respect to California domiciliaries Allied Insurance, CIGNA Insurance, Pacific Employers and CIGNA Indemnity.

339. Connecticut will be required to approve the Restructuring Agreement, Withdrawal and Dissolution Agreement and Amendment No. 1 to Active Company Pooling Agreement with respect to Connecticut domiciliary CIGNA Property & Casualty.

340. Illinois will be required to approve the Restructuring Agreement, the Withdrawal and Dissolution Agreement and the Pre-87 General Liability Reinsurance Agreement with Century Indemnity with respect to Illinois domiciliaries CIGNA Illinois and Illinois Union.

341. Indiana will be required to approve the Restructuring Agreement and the Withdrawal and Dissolution Agreement with respect to Indiana domiciliary CIGNA Midwest.

342. New Jersey will be required to approve the Restructuring Agreement and the Withdrawal and Dissolution Agreement with respect to New Jersey domiciliary Atlantic Employers.

343. Ohio will be required to approve the Restructuring Agreement and the Withdrawal and Dissolution Agreement with respect to Ohio domiciliary CIGNA Ohio.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014532

344. Texas will be required to approve the Restructuring Agreement, Withdrawal and Dissolution Agreement and Amendment No. 1 to Active Company Pooling Agreement with respect to Texas domiciliaries Bankers Standard Fire and Marine and CIGNA Texas.

345. Texas will be required to approve the Reinsurance Agreement between CIGNA Lloyds and INA.

346. Many of the regulators from the various domiciliary states participated in the three public informational hearings held regarding the Plan of Restructure.

## Compliance with Statutory Standards

347. Section 1405 of the Insurance Holding Companies Law establishes standards which the Plan of Restructure must satisfy in order for approval to be granted.

348. Section 1405 states that the inter-company transactions under the Plan of Restructure must:

1) have fair and reasonable terms;
2) have reasonable charges or fees for services performed;
3) allocate expenses incurred and payment received in accordance with customary insurance accounting practices;
4) be in writing and authorized by the domestic insurer's board of directors;
5) be documented in appropriate books and records;
6) ensure that the policyholder surplus is reasonable in relation to liabilities and is otherwise adequate; and
7) not adversely affect the interests of policyholders.

349. Based on all the information and analyses received, and the Department's independent review, the Commissioner finds:

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).    ABC000014533

1) the terms under the Plan of Restructure as modified by this Order are fair and reasonable;

2) the charges or fees for services performed under the Plan of Restructure as modified by this Order are reasonable;

3) the expenses incurred and payments received are allocated under the Plan of Restructure as modified by this Order in accordance with customary insurance accounting practices;

4) the cost-sharing and expense allocation arrangements have been formalized in writing and authorized by the appropriate board(s);

5) the transactions under the Plan of Restructure as modified by this Order have been clearly and adequately disclosed in the books and records of the relevant companies;

6) the policyholder surplus of all companies affected by the Plan of Restructure as modified by this Order is reasonable in relation to their liabilities and is otherwise adequate for their financial needs; and

7) the transactions under the Plan of Restructure as modified by this Order do not adversely affect the interests of policyholders.

350. Section 205 of the GAA Amendments establishes the standards which must be met for the Plan of Division to be approved.

351. Section 205 states that a plan of division shall be approved if it "is in accordance with law and not injurious to the interests of the policyholders and creditors."

352. Based upon all of the information and analyses received, and the Department's independent review, the Commissioner finds that the Plan of Division as modified by this Order is in accordance with law and is not injurious to the interests of INA's policyholders and creditors.

50

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014534

353. If any of the above Findings of Fact are determined to be Conclusions of Law, they shall be incorporated in the Conclusions of Law as if fully set forth therein.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014535

## CONCLUSIONS OF LAW

1.  The Commissioner has jurisdiction to review and approve the Plan of Restructure, including the Plan of Division.

2.  The division of Insurance Company of North America ("INA") is permitted under Pennsylvania law, 15 Pa.C.S. §1951 et seq.

3.  The Plan of Division filed by INA Financial Corporation complies with the requirements of 15 Pa.C.S. §1952.

4.  Section 207 of the GAA Amendments does not require that the Insurance Commissioner hold a trial-type hearing before approving or disapproving the plan of division submitted for her review.

5.  Participants have no constitutional right to a trial-type hearing in the instant matter.

6.  The General Rules of Administrative Practice and Procedure, 1 Pa. Code §§31.1-35.251, do not control the conduct of hearings under Section 207 of the GAA Amendments.

7.  The formal components of an adversarial trial-type hearing are not mandated in a hearing conducted pursuant to Section 207 of the GAA Amendments.

8.  In a public informational hearing pursuant to Section 207:
    (1) Strict rules of evidence need not be followed;
    (2) Documents may be admitted into the record without regard to hearsay considerations;
    (3) Opinions may be presented even in the absence of a strict legal foundation;
    (4) Persons making oral presentations are not required to be sworn as witnesses; and

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).                    ABC000014536

(5) The opportunity to question or cross examine other participants is not required.

9. The publication of the notices of the INA Financial filing and the hearing, as well as the content of those notices, in the _Pennsylvania Bulletin_ satisfy the "reasonable notice" requirement of Section 207 of the GAA Amendments.

10. The publication of the notices of the INA Financial filing and the hearing, as well as the content of those notices, in the _Pennsylvania Bulletin_ satisfy due process requirements.

11. The process afforded at the public informational hearing satisfies due process requirements.

12. The process of review of the Plan of Restructure was reasonable and was in accordance with the requirements of Section 207 of the GAA Amendments, and Section 1405 of the Insurance Holding Companies Act.

13. Under 15 Pa.C.S. §1957(b)(1), a dividing corporation may allocate its assets and liabilities pursuant to its Plan of Division to the resulting corporations.

14. Pursuant to 15 Pa.C.S. §1957(b)(1), INA has allocated all of its liabilities to either CCI or Resulting INA according to the Plan of Division.

15. CCI and Resulting INA, as resulting corporations, are legally liable for INA's liabilities only to the extent such liabilities have been allocated to each under the Plan of Division, and otherwise as provided by 15 Pa.C.S. §1957(b)(1)(ii),(iv).

16. The Division statute authorizes creditors, including policyholders, to proceed against the dividing corporation, as if

53

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).     ABC000014537

the division had not taken place, or against the resulting corporations as joint and several obligors, in the event the affected creditor sustains actual loss and can establish that the division operated as a fraud upon creditors or was otherwise in violation of law. 15 Pa.C.S. §1957(b)(1)(iv)-(v).

17. This Decision and Order does not foreclose the rights of policyholders, creditors or other persons dealing with the dividing or resulting corporations of any rights or remedies specifically set forth at 15 Pa.C.S. §1957(b)(1)(iv)-(v).

18. The Plan of Division complies with 15 Pa.C.S. §1957(b)(1).

19. A division cannot become effective without approval by a majority of the dividing company's shareholders pursuant to 15 Pa.C.S. §1952(c). The sole shareholder of INA, INA Financial Corporation, has approved the division of INA.

20. Policyholders have not been granted any right to approve an insurance company's Plan of Division under constitutional, statutory or common law.

21. Pursuant to 15 Pa.C.S. §1952(c), the board of directors of the dividing corporation must approve the plan for division. The Board of Directors of INA has approved the Plan of Division.

22. Under Section 205 of the GAA Amendments, a Plan of Division shall be approved by the Commissioner if the Plan is in accordance with law and is not injurious to the interests of the policyholders and creditors.

23. The Plan of Division of INA satisfies the standards for approval set forth in Section 205 of the GAA Amendments.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).      ABC000014538

24. Pursuant to 15 Pa.C.S. §1957(b)(1), the assets and obligations of a dividing corporation are transferred to the resulting corporations by operation of law.

25. As a result of the division of INA, Resulting INA and CCI will succeed to dividing INA's assets and obligations by operation of law. 15 Pa.C.S. §1957(b)(1).

26. Because the resulting corporations succeed to the policy obligations of INA by operation law, there is no novation, assignment or assumption, and policyholder consent is not required.

27. Under the BCL, mergers between domestic stock insurance companies are governed by Section 205 of the GAA Amendments and the standards of Subchapter C, 15 Pa.C.S. §1921 et seq.

28. Under Pennsylvania law, a Plan of Division effects a corporate succession that neither impairs nor divests the rights of creditors including policyholders.

29. Policyholder consent is not required for a merger of domestic stock insurance companies in Pennsylvania. Section 205 of the GAA Amendments; 15 Pa.C.S. §1921 et seq., Subchapter C.

30. Policyholder consent is not required for the merger of CCI and CIGNA Specialty into Century Indemnity.

31. The allocation of liabilities to a resulting insurance company that does not hold a certificate of authority is not prohibited by Pennsylvania law so long as that company does not transact the business of insurance.

32. The allocation of liabilities to CCI resulting from the division of INA does not violate Pennsylvania law. The holding of

55

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014539

policyholder liabilities by CCI does not constitute the transaction of the business of insurance under Pennsylvania law.

33. Pennsylvania law does not require notice to or approval by the Commissioner if an insurance company decides to cease writing new business.

34. Under Pennsylvania law, guaranty fund protection is available to pay covered claims if the insurer was licensed at the time of the insolvency or at the time the policy was issued. 40 P.S. §991.1802.

35. The Plan of Restructure must satisfy the standards of Section 1405 of the Insurance Holding Companies Act.

36. The Plan of Restructure satisfies the standards of Section 1405 of the Insurance Holding Companies Act.

37. As required by Section 1405(a)(1)(i), the terms of the transactions under the Plan of Restructure are fair and reasonable.

38. As required by Section 1405(a)(1)(ii), the charges or fees for services to be performed under the Plan of Restructure are reasonable.

39. As required by Section 1405(a)(1)(iii), the allocation of expenses incurred and payments to be received under the Plan of Restructure is consistent with customary insurance accounting practices.

40. As required by Section 1405(a)(1)(iii), the allocation of all cost-sharing or other expense allocation arrangements have been duly formalized in writing and authorized by the appropriate board(s) of directors.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).    ABC000014540

41.   As required by Section 1405(a)(1)(iv), the books, accounts and records clearly and accurately disclose the transactions under the Plan of Restructure.

42.   As required by Section 1405(a)(1)(v), the surplus of each company affected by the Plan of Restructure is reasonable in relation to its liabilities and is otherwise adequate for its financial needs.

43.   As required by Section 1405(a)(4), the transactions proposed under the Plan of Restructure do not adversely affect the interests of policyholders.

44.   The Plan of Restructure as filed and as modified by this Decision and Order cannot be implemented until such time as approval is granted by the remaining domiciliary states authorized to approve or disapprove any transaction contemplated by the Plan of Restructure.

45.   If any of the above Conclusions of Law are determined to be Findings of Fact, they shall be incorporated in the Findings of Fact as if fully set forth therein.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014541

<u>ORDER</u>

Upon consideration of the foregoing, the Insurance Commissioner of the Commonwealth of Pennsylvania (hereinafter the "Commissioner") hereby approves the Plan of Restructure, including the Plan of Division, filed on October 2, 1995 by INA Financial Corporation on behalf of certain subsidiaries, including Insurance Company of North America, and as subsequently amended, subject to the following conditions:

1.    INA Financial Corporation shall provide notice of the allocation of liabilities made under the Plan of Division as follows:

    a.    INA Financial shall provide written notice to all known policyholders and claimants who can be identified by an electronic search of INA's records;

    b.    INA Financial shall provide written notice to all policyholders who participated in the proceedings before the Commonwealth of Pennsylvania Insurance Department (hereinafter the "Department") related to the Plan of Restructure; and

    c.    INA Financial shall respond in writing to any inquiry requesting to be advised of an allocation.

Notice under this paragraph shall be provided to a person regarding the allocation of liabilities related to that person's account(s) only. Any notice required by this paragraph shall be provided within 45 days of INA Financial Corporation's receipt of the necessary approvals from the regulators of all the other domiciliary states.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014542

2. No dividends shall be declared by either Century Indemnity Company or CIGNA International Reinsurance Company Limited (Bermuda) to Brandywine Holdings Corporation without prior written approval of the Commissioner.

3. No dividends shall be declared by the direct insurance company subsidiaries to their parent, INA Holdings Corporation, during calendar year 1996.

4. Century Indemnity Company shall not make any capital contributions to any of its subsidiaries without prior written approval of the Commissioner.

5. To the extent that dividends are paid by INA Holdings Corporation to its parent INA Financial Corporation, and to the extent that INA Financial Corporation pays such dividends to its parent, INA Corporation, such payments shall be in accordance with the following requirements:

    a. INA Financial Corporation shall pay no more than ninety percent (90%) of such dividends to its parent, INA Corporation.

    b. Not less than ten percent (10%) of the dividends paid to INA Financial Corporation shall be retained by INA Financial Corporation for the sole purpose of establishing a working capital fund (hereinafter the "Fund") to support operations of Century Indemnity Company.

    c. The Fund shall be considered fully funded, and the retention by INA Financial Corporation of ten percent (10%) of any dividends received from INA Holdings Corporation may cease, when the cumulative

59

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).

ABC000014543

principal amount of retained dividends, excluding investment income thereon, exceeds fifty million dollars ($50,000,000).

d.   The principal amount of the Fund shall be fully funded to at least fifty million dollars ($50,000,000) by December 31, 2001 through the retained dividends or capital contributions.

e.   In the event that the principal sum of the Fund decreases below fifty million dollars ($50,000,000), the amount of the shortfall shall be paid back into the Fund within five (5) years of the date on which the shortfall occurs and such repayment shall be made through the retention of dividends.

f.   Any capital contribution to Century Indemnity Company from the Fund shall be made first from the principal amount.

g.   No capital contributions from the Fund to Century Indemnity Company shall be made without prior written approval of the Commissioner.

h.   The Fund including but not limited to the principal amount and investment income shall be established and maintained in a segregated account.

i.   All investment income earned by the Fund shall be deposited in the Fund.

j.   The Fund may not be terminated without prior written approval of the Commissioner.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014544

k.   This Order shall supersede the dividend payment restrictions described in the January 27, 1995 letter from INA Financial Corporation to the Department, which restrictions were approved on January 31, 1995 as part of the Mini-restructuring.

l.   The Aggregate Excess of Loss Reinsurance Agreement shall not be triggered until all the monies in the Fund are exhausted.

6. Century Indemnity Company shall not acquire investments except securities rated "1" or "2" by the National Association of Insurance Commissioners ("NAIC") Securities Valuation Office or as otherwise authorized by prior written approval of the Commissioner; Century Indemnity Company may continue to hold all securities in the company's portfolio on the date of this Order until they reach maturity.

7. Immediately after CCI Insurance Company and CIGNA Specialty Insurance Company merge with and into Century Indemnity Company, Century Indemnity Company shall transfer all intercompany balances to Resulting INA, except for reinsurance balances, in exchange for securities rated "1" or "2" by the NAIC Securities Valuation Office or as otherwise authorized by prior written approval of the Commissioner.

8. Except as set forth herein, no change shall be made to any of the relationships between INA Holdings Corporation and Brandywine Holdings Corporation and no divestiture of any of their subsidiaries shall occur without the prior written approval of the Commissioner.

9. Century Indemnity Company shall not write any new business without prior written approval of the Commissioner except as required by law or contract.

61

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).      ABC000014545

10.   Century Indemnity Company shall not file an application for voluntary dissolution within five (5) years of the effective date of this Order.

11.   No domestic insurance company subsidiary, direct or indirect, of Brandywine Holdings Corporation shall redomesticate without prior written approval of the Commissioner.

12.   CCI Insurance Company shall not pay claims nor transact the business of insurance.

13.   Except for balances with INA Corporation, the insurance company subsidiaries, direct or indirect, of INA Financial Corporation shall not establish any intercompany balance with any company which is not a subsidiary of INA Financial Corporation.

14.   All intercompany balances due to Century Indemnity Company shall be settled within ninety (90) days of the end of each quarter, except for the reinsurance balances.

15.   The results of the Tillinghast Stress Test and any other test acceptable to the Department shall be compared to the actual results of Century Indemnity Company, and all variances shall be analyzed and reported to the Department annually in a form acceptable to the Department at such time as the Annual Statement is filed.

16.   Century Indemnity Company shall file quarterly statements with the Department in a form acceptable to the Department.

17.   The insurance company subsidiaries of INA Financial Corporation shall continue to submit such reports as required by law.

18.   Century Indemnity Company shall deliver to the Department,

62

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).        ABC000014546

within thirty (30) days after the end of each quarter, a report setting forth net losses and ultimate net losses cumulative to date and a statement of any amount paid by Insurance Company of North America ("Resulting INA") pursuant to Articles II and IV of the Aggregate Excess of Loss Reinsurance Agreement.

19. The insurance company subsidiaries of INA Financial Corporation shall provide to the Department monthly operating reports in a form acceptable to the Department within thirty (30) days after the end of each month, until such time as Century Indemnity Company discharges all of its liabilities or such time as the Commissioner gives prior written approval that the reports may cease.

20. Century Indemnity Company shall develop a format for a monthly operating report in a form acceptable to the Department within thirty (30) days of the effective date of this Order, and shall submit such report to the Department within thirty (30) days after the end of each month until such time when Century Indemnity Company discharges all of its liabilities or until such time when the Commissioner gives prior written approval that the reports may cease.

21. An independent actuary shall review and analyze the reserves of Century Indemnity Company, including but not limited to the adequacy of the reserves for reinsurance uncollectibles, at least once every two years, and the selection of the actuary and scope of the review shall be subject to the prior written approval of the Commissioner.

22. Century Indemnity Company shall submit annually to the Department financial projections in a form acceptable to the Department at such time as the Annual Statement is filed.

23. With each filing of the Annual Statement of Resulting

63

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014547

INA, a description in a form acceptable to the Department shall be included in the Statement of: 1) the Plan of Restructure; 2) the division of Insurance Company of North America into two resulting companies, one with active insurance company subsidiaries and one with inactive insurance company subsidiaries; 3) the Aggregate Excess of Loss Reinsurance Agreement; and 4) a reference to the Business Corporation Law of 1988, 15 Pa.C.S. §1957(b)(1) which describes the obligations of resulting corporations following a plan of division.

24. Century Indemnity Company shall provide notice to the Department of any staff reductions occurring within a rolling twelve month period affecting more than ten percent (10%) of the company's employees; such notice shall be provided within ninety (90) days of such reductions.

25. Century Indemnity Company shall provide to the Department written notice of any judgment, award or settlement in excess of twenty-five million dollars ($25,000,000) within thirty (30) days of the date of entry of such judgment or award or execution of such settlement.

26. Any insurance company subsidiary of INA Financial Corporation which has been named as a Defendant or Respondent in a action or proceeding in pursuit of a claim under 15 Pa.C.S. §1957(b)(1)(iv) and (v) shall provide written notice thereof to the Department, within thirty (30) days of receipt of services of such claim. This paragraph shall also apply to companies in receipt of any demand for relief.

27. The insurance company subsidiaries of Brandywine Holdings Corporation shall not establish security deposits with any other jurisdiction without the Commissioner's prior written approval except to the extent required by law.

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).          ABC000014548

28. Any residual market obligation incurred by Century Indemnity Company shall be satisfied by one or more active insurance company subsidiaries of INA Holdings Corporation.

29. Century Indemnity Company may discount reserves, as allowed by law, including but not limited to asbestos and environmental case reserves, but such discounting shall in no event be greater than six percent (6%).

30. Having represented that there would be no tax liability to Century Indemnity Company resulting from the Restructure, INA Financial Corporation shall fund such liability in the event that it occurs.

31. The transactions contemplated by the Restructure shall be accounted for as of December 31, 1995.

32. This Order shall be effective immediately.

_Linda S Kaiser_
LINDA S. KAISER
Insurance Commissioner

Confidential Pursuant to the Confidentiality and Protective Order, filed June 8, 2020 (Dkt. No. 799-1).        ABC000014549