**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |

**MOTION OF OFFICIAL COMMITTEE OF TORT**
**CLAIMANTS FOR ENTRY OF AN ORDER TERMINATING THE DEBTORS'**
**EXCLUSIVE PERIODS TO FILE A PLAN AND SOLICIT ACCEPTANCES**
**THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE**

The Official Committee of Tort Claimants (the "Tort Claimants' Committee" or "TCC")

appointed in the jointly administered bankruptcy cases of the above-captioned debtors and

debtors in possession (together, the "Debtors"), filed under chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), hereby files its *Motion of*

*Official Committee of Tort Claimants for Entry of an Order Terminating the Debtors' Exclusive*

*Periods to File a Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the*

*Bankruptcy Code* (the "Motion"). In support of the Motion, the Tort Claimants' Committee

respectfully represents as follows:

**INTRODUCTION**

1.       The Tort Claimants' Committee seeks termination of the Debtors'

exclusivity period to file a plan and solicit acceptances thereof (the "Exclusivity Periods"). This

relief is justified for several reasons. First, the Debtors plan filing exclusivity expired on August

18, 2021. Second, by the Debtors' own admission, they cannot solicit acceptances of their

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

recently filed fifth amended plan ("BSA's Fifth Plan")[2] before solicitation exclusivity expires on October 18, 2021.  In connection with the BSA's Fifth Plan, the Debtors have proposed a voting deadline of November 16, 2021. The RSA expired by its own terms on August 27, 2021, and the Debtors made no effort with the TCC to maintain the balance of the agreements that everyone worked so hard to achieve. Therefore, the Tort Claimants' Committee should be permitted to file its own proposed plan so that the Tort Claimants' Committee's plan may be solicited at the same time as BSA's Fifth Plan. More than 18 months into the chapter 11 cases, the Debtors' fifth effort at a plan is just as inadequate and flawed as the first four.

2.      The Tort Claimants' Committee – the *only* fiduciary to known survivors – is the *only* party in this case that can propose a plan that treats survivors fairly and equitably. Unlike the Boy Scouts, the Local Councils and the "Coalition of Abused Scouts for Justice," the Tort Claimants' Committee will not sell out the survivors for an exit to these bankruptcy cases that will pay, with the most optimistic estimates under BSA's Fifth Plan, an *average* of $35,000 per survivor.  The aggregate settlement amounts in BSA's Fifth Plan may sound like a lot of money but, in the end, the individual survivors are left short.  As reflected in BSA's Fifth Plan, the Debtors, FCR, and Coalition's steering committee of plaintiffs' attorneys will not make the demands that are required on insurance carriers so that survivors will be adequately and fairly compensated.

3.      The BSA's Fifth Plan includes settlements with Local Councils that leave them with billions of dollars of cash and property in excess of their current need to fulfill their mission of Scouting. The Local Councils assert they will assign their "first named" insurance policies to the trust but no one can explain how that is possible when non-settling insurance

---

[2] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in BSA's Fifth Plan.

DOCS_SF:105999.6 85353/001

carriers will object to an assignment of non-debtor policies.  Second, Chartered Organizations are not paying for the broad, non-consensual releases of sexual abuse claims that arise from and after 1976. Instead, the Chartered Organizations are being handed a "get-out-of-jail-free card" in exchange for a transfer of their interests in the Debtors' shared-insurance policies that were purchased by the Boy Scouts. Like the Local Councils, there is no explanation how the Chartered Organizations will assign their independent insurance rights without insurance carrier consent when the Court does not have the power to authorize a transfer of a non-debtor asset. Third, the Boy Scouts and Local Councils paid substantial sums to the insurance carriers in annual premiums for decades to cover the sexual abuse claims. Hartford, the current settling insurer, is paying a small fraction of the coverage it is contractually obligated to provide.

4.      The Tort Claimants' Committee's proposed plan does not comport with the now-defunct RSA.[3] The Tort Claimants' Committee originally supported a settlement with the Local Councils because the Boy Scouts and the Coalition publicly confirmed that the primary value for survivors would be recovered through the billions in available insurance coverage. However, over the past few weeks since the expiration of the RSA, the Boy Scouts and the Coalition have changed their course and are now seeking a quick exit from the bankruptcy cases. The road to the exit is paved with inadequate insurance and chartered organization settlements that fail to capture the billions in value they promised would pay the sexual abuse claims of survivors.

---

[3] On July 1, 2021, the Debtors filed the *Motion for an Order Authorizing Entry into Restructuring Support Agreement* [Docket No. 5466] (the "RSA Motion"). By the RSA Motion, the Debtors, Tort Claimants' Committee, UCC, Coalition, FCR and the Ad Hoc Local Council Committee (together, the "RSA Parties") agreed to work towards the formulation of a plan in accordance with the plan term sheet filed as part of the RSA Motion.

5.      As set forth in greater detail in the RSA Motion, the RSA Parties had agreed to three intermediate settlements:  (a) the Debtors would contribute $250 million in cash and other assets to the settlement trust for the benefit of survivors: (b) the Local Councils would collectively contribute $600 million in cash and other assets to the settlement trust for the benefit of survivors; and (c) commercial unsecured creditors would receive a sum in cash, which would be distributed to that constituency in accordance with the waterfall outlined in the RSA Motion.

6.      The Tort Claimants' Committee initially was not satisfied with BSA's and the Local Councils' proposed contributions to a plan. The Tort Claimants' Committee commenced an adversary proceeding challenging the alleged restrictions on the Debtors' assets having a value of more than $650 million. Similarly, the Tort Claimants' Committee conducted extensive diligence regarding the Local Councils' ability to contribute towards a settlement trust in exchange for a release. The Tort Claimants' Committee determined that the Local Councils have the financial wherewithal to contribute several multiples of their contingent $600 million offer without endangering their mission of Scouting.  Critically for the Tort Claimants' Committee, the RSA required the unanimity of the RSA Parties to approve a settlement.

7.      The Tort Claimants' Committee entered into the RSA and supported the Debtors' contribution of $250 million and the Local Councils' contribution of $600 million because the "primary source of recovery for survivors would come from insurance." The Tort Claimants' Committee's prior concessions with respect the Debtors' and the Local Councils' contributions were premised on putting pressure on the more than two dozen insurance carriers that provided many billions in insurance coverage that could be used to meaningfully compensate survivors. As reflected in BSA's Fifth Plan and discussed herein, the Debtors, FCR (as an estate fiduciary), and the Coalition (not an estate fiduciary) have abandoned that effort and

4

are now willing to accept from one of the most significant Boy Scout insurers a small fraction of the value that should be made available to the more than 82,500 survivors who suffered unchecked childhood sexual abuse.

8.    The RSA Motion was not approved and the RSA expired by its own terms on August 27, 2021.  For the other RSA parties (and the insurers and the Charter Organizations looking for a low-ball deal), the RSA's expiration was a godsend.  No longer did they have to deal with the Tort Claimants' Committee (the fiduciary for the survivors) and its demands for fair compensation.  Instead, they cut a deal amongst themselves, Hartford and The Church of Jesus Christ of Latter-Day Saints (the "TCJC") that never would pass muster with the Tort Claimants' Committee, who was excluded from the discussions.

9.    The Plan includes a $250 million settlement with TCJC, which had direct involvement in every aspect of the Scouting program for decades. If approved, the proposed settlement, if allocated to the survivors sexually abused by the TCJC, would yield a small fraction of the actual damage given that TCJC is implicated in more than 2,500 childhood sexual abuse claims.

10.    Likewise, Hartford is not paying amounts commensurate with its coverage risk. Hartford increased its inadequate offer of $650 million to an equally subpar offer of $787 million. Hartford's insurance settlement will not be ear-marked for the holders of claims that implicate Hartford Policies. Instead, the $787 million will be used to compensate all survivors whether or not they are covered by a Hartford policy, thereby substantially diluting the coverage yielding an average recovery of less than $10,000 per survivor.

11.    Given the defects in BSA's Fifth Plan, the inevitable expiration of the Exclusivity Periods through the passage of time, and the expiration of the RSA and the

agreements that the Debtors, FCR and Coalition are no longer pursuing, the time has come to end

the Debtors' plan exclusivity and allow the Tort Claimants' Committee to file its own plan that

allows the Debtors to reorganize without fire-sale settlements with insurance companies, Local

Councils and Chartered Organizations.

**JURISDICTION AND VENUE**

12.      Pursuant to sections 157 and 1334 of title 28 of the United States Code,

this Court has jurisdiction to consider and grant the relief requested herein. This matter is a core

proceeding pursuant to section 157(b) of title 28 of the United States Code. Venue is proper

before this Court pursuant to sections 1408 and 1409 of title 28 of the United State Codes. The

statutory predicates for the relief requested in this Motion are sections 1121(c) and 1121(d) of

the Bankruptcy Code.

**RELIEF REQUESTED**

13.      The Tort Claimants' Committee requests that the Court enter an order

terminating the Debtors' exclusivity periods (the "Exclusive Periods") pursuant to sections

1121(b) and 1121(c) of the Bankruptcy Code and granting the Tort Claimants' Committee such

other relief as may be appropriate under the circumstances. The proposed form of order granting

this Motion is attached hereto as **Exhibit "A."**

**BACKGROUND**

A.      **The Commencement of the Debtors' Bankruptcy Cases**

14.      The Debtors commenced these cases on February 18, 2020 (the "Petition

Date"), and they continue to operate their non-profit organization and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The

chapter 11 cases are being jointly administered for procedural purposes only pursuant to

6

Bankruptcy Rule 1015(b) and rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

15.    On March 5, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Tort Claimants' Committee as well as an Official Committee of Unsecured Creditors (the "UCC") pursuant to section 1102 of the Bankruptcy Code.  On April 24, 2020, the Court appointed James L. Patton ("FCR") as the representative of the future abuse claimants pursuant to section 105(a) and 1109(b) of the Bankruptcy Code.

**B.    The Debtors' Fifth Amended Plan, Disclosure Statement, and Proposed Plan Solicitation Procedures.**

16.    On September 15, 2021, the Debtors filed BSA's Fifth Plan.  The Debtors have requested that the Court consider approval of the Disclosure Statement on September, 21, 2021, just six (6) days after the filing of BSA's Fifth Plan, which includes substantial and material changes when compared to the previously-filed version of the Plan.[4]

17.    The Court has extended the Exclusive Periods on three occasions at the Debtors' request.  The last extension of the Exclusive Periods was coextensive with the maximum 18-month and 20-month extensions of the Exclusive Filing Period and Exclusive Solicitation Period, respectively, that the Court may grant under section 1121(d)(2)(B) of the Bankruptcy Code.

**C.    The Tort Claimants' Committee Plan**

18.    The Tort Claimants' Committee seeks authorization to file the Tort Claimants' Committee Plan (the "TCC Plan") to provide survivors with the option of supporting

---

[4] These six (6) days include includes a major religious holiday observed by many of the counsel in these cases and a weekend.

a plan that maximizes the recovery for survivors instead of BSA's Fifth Plan that is designed to get the Boy Scouts out of bankruptcy at the expense of survivors. The Tort Claimants' Committee Plan is ready to file, along with a plain-English disclosure statement summary (the "Plan Summary") that compares the Tort Claimants' Committee Plan to BSA's Fifth Plan. Allowing the Tort Claimants' Committee to file the Tort Claimants' Committee Plan now permits the Court to consider approval of the Plan Summary and revise the Debtors' solicitation procedures so that both plans can be solicited at the same time.

19.    The principal differences between the TCC Plan and the BSA Fifth Plan are (a) the TCC Plan does not include a fire-sale settlement with Hartford; instead, the TCC Plan will preserve the Hartford policies so that true value can be realized by survivors; (b) the TCC Plan does not include the proposed $600 million settlement with the Local Councils; instead, if the Local Councils want protection from the childhood sexual abuse claims each Local Council will need to make a substantial contribution that is commensurate with the liability that implicates each Local Council; (c) the TCC Plan will not provide a release for Chartered Organizations unless each such Chartered Organization makes a substantial contribution that is commensurate with the liability that implicates each Chartered Organization; (d) Non-settling insurance carriers will not be insulated by a channeling injunction; instead, the settlement trust, or survivors who have a direct right of action, may sue the non-settling insurance carriers until such carriers have settled with the settlement trust and purchased back their policies in exchange for adequate consideration; (e) any global settlement with an insurance carrier, Local Council, Chartered Organization, or any other party seeking a non-consensual third party release and protection by the channeling injunction will need Court approval; (f) the TCC Plan includes modified TDPs that allow survivors to pursue and liquidate their claims in the tort system,

enabling them to trigger the payment provisions under the applicable insurance policies; and (g)

the settlement trust will be overseen by a disinterested settlement trustee that has experience with

sexual abuse.

## BASIS FOR RELIEF REQUESTED

**A.     The Debtors' Exclusive Periods**

20.     Section 1121 of the Bankruptcy Code states, in relevant part:

(b)     Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.

(c)     Any party in interest, including . . . a creditors' committee . . . may file a plan if and only if –
…
        (2)     the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

        (3)     the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, . . . .

(d)
        (1)     . . . [O]n request of a party in interest … and after noticing and a hearing, the court may for cause reduce . . . the 120-day period or the 180-day period referred to in this section.

11 U.S.C. § 1121.  "This provision curbs the unfair disadvantage to creditors of giving the

debtor perpetual exclusive rights to initiate a plan."  *Jasik v. C.S. Conrad (In re Jasik)*, 727 F.2d

1379, 1380 (5th Cir. 1984).

21.     The Debtors filed a plan and disclosure statement on July 2, 2021, in

response to the agreement reached with the RSA Parties. On August 18, 2021, the Court entered

an order extending the Debtors' Exclusive Filing Periods through August 18, 2021(which

coincided with the statutory limit), and also extended the Debtors' Exclusive Solicitation Period

through October 18, 2021 (which coincides with the statutory limit).  Inasmuch as BSA's Fifth

Plan was filed on September 15, 2021, with a proposed voting deadline of November 16, 2021,

9

the Debtors have acknowledged that they cannot obtain acceptances to their Plan within the

Exclusive Solicitation Period.  Accordingly, the Tort Claimants' Committee now seeks to file the

TCC Plan and Plan Summary which will be confirmable and supported by survivors because it

will realize the value that should be made available to 82,500 childhood sexual abuse victims.

There is nothing to be gained by requiring the Tort Claimants Committee to wait four weeks to

file its plan until the Solicitation Exclusivity Period expires of its own accord.

**B.**     **The Court May Terminate Exclusivity for "Cause"**

22.     "The exclusivity period affords the debtor the opportunity to negotiate the

settlement of its debts by proposing and soliciting support for its plan of reorganization without

interference -- in the form of competing plans -- from its creditors or others in interest."

*Geriatrics Nursing Home v. First Fidelity Bank, N.A. (In re Geriatrics Nursing Home)*, 187 B.R.

128, 131, (D.N.J. 1995).  This right however is not unlimited, and can be subject to abuse.[5]  The

legislative history of section 1121(d) of the Bankruptcy Code makes clear that a debtor's

exclusive right to propose and solicit votes on a plan "should not be employed as a tactical

device to put pressure on parties in interest to yield to a plan they consider unsatisfactory."  S.

Rep. No. 99-764; H.R. Conf. Rep. No. 99-958, *reprinted in* 1986 U.S. Code Cong. & Adm.

News 5227; *see also In re All Seasons Indus.*, 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990)

(denying extension of exclusivity when "such an extension would have the result of continuing

to hold creditors hostage to the Chapter 11 process and pressuring them to accept a plan they

believe to be unsatisfactory").[6]  Indeed, Congress codified section 1121(d) to place limits on the

---

[5] Congress expressly recognized that chapter 11 debtors had been significantly abusing to their ability to obtain unlimited extensions of the exclusive period when it amended section 1121(d) in 2005.  Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

[6] Instead, creditors should be encouraged to take an active role in the reorganization:

Manifestly, it is important that creditors be encouraged to participate in the reorganization process, since the Bankruptcy Code is so structured as to

DOCS_SF:105999.6 85353/001

debtor's exclusive right to propose a plan in recognition of creditors' interests in the debtor's

business. *In re Wash.-St. Tammany Elec. Coop. Inc.*, 97 B.R. 852, 855 (Bankr. E.D. La. 1989)

("'Sec. 1121 represents a congressional acknowledgement that creditors, whose money is

invested in the enterprise no less than the debtor's, have a right to a say in the future of that

enterprise . . . .") (quoting *In re Timbers of Inwood Forest Assoc.*, 808 F.2d 363, 372 (5th Cir.

1987)). As a result, section 1121 amended the prior practice under the Bankruptcy Act that gave

debtors undue bargaining leverage to extract a settlement out of otherwise unwilling creditors by

delay. *See id.*

   23.  Under that provision of the Bankruptcy Code, the court "may for cause

reduce" the Debtors' exclusive period to file and solicit acceptance of a plan. 11 U.S.C. §

1121(d). Although the term "cause" is not defined in the Bankruptcy Code, it is well established

that "cause" is a flexible standard designed to balance the competing interests of debtors and

their stakeholders. *United States Sav. Ass'n v. Timbers of Inwood Forest Assocs. (In re Timbers

of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988)

(the intent of section 1121 is to "limit the delay that makes creditors the hostages of Chapter 11

debtors"). Ultimately, whether "cause" exists is based on the "facts and circumstances in each

individual case" and "the court is granted broad discretion to determine what is sufficient cause."

*In re Sharon Steel Corp.*, 78 B.R. 762, 763-65 (Bankr. W.D. Pa. 1987). For example, "cause"

has been defined in more than one instance as the ability of the movant to provide alternative

plan options for creditors of a debtor. *In re Situation Mgmt. Syst.*, 252 B.R. 859, 865 (Bankr. D.

---

contemplate negotiations and give and take between the debtor and the creditors.
It is in this context that knowledgeable creditors should take an active role in
determining the course that the reorganization case should take, including an
investigation and examination into the conduct of the debtor's affairs and the
negotiations necessary for the confirmation of the debtor's plan of reorganization.

*In re Toy & Sports Warehouse Inc.*, 38 B.R. 646, 648 (Bankr. S.D.N.Y. 1984).

Mass. 2000) (terminating exclusivity to give creditors option to choose between competing plans); *In re Dave's Detailing, Inc.*, 2015 Bankr. LEXIS 2528, at *65 (Bankr. D. Ind. July 30, 2015) ("termination of exclusivity provides an open market for competition in the form of competing plans"). Also, "'[c]ause might include an unusually large or unusually small case, delay by the debtor, or recalcitrance among creditors.'" *Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.)*, 844 F.2d 1142, 1161 (5th Cir. 1988) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. at 406 (1977), *reprinted in* 1978 U.S. Code Cong. & Admin. News 6362.)

### C.    Cause Exists to Terminate the Debtors' Exclusivity Periods

24.    Some courts review nine factors when determining whether to terminate the exclusive periods. *See In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997) (citing *In re Express One Int'l*, 194 B.R. 98, 100 (Bankr .E.D. Tex. 1996)). These factors are: (a) the size and complexity of the case, (b) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information, (c) the existence of good faith progress toward reorganization, (d) the fact that the debtor is paying its bills as they become due, (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan, (f) whether the debtor has made progress in negotiations with its creditors, (g) the amount of time which has elapsed in the case, (h) whether the debtor is seeking an extension of the exclusive periods in order to pressure creditors to submit to the debtor's reorganization demands, and (i) whether an unresolved contingency exists. *Dow Corning Corp.*, 208 B.R. at 664-65.

25.    Many of these factors weigh in favor of terminating the Exclusive Periods in these cases:

a.    *Size and Complexity of the Case.* This factor weighs in favor of terminating the Exclusive Periods because, notwithstanding the size of

their cases, the Debtors already have proposed five iterations of a plan that have received insufficient support to be confirmed by the end of the Exclusive Solicitation Period.  Given the Debtors' stated liquidity crises, there is no time to pivot to an alternative plan if BSA's Fifth Plan fails.

b.      *Sufficient Time to Negotiate Plan and Prepare Adequate Information.* This factor weighs in favor of terminating exclusivity. The Debtors, the Tort Claimants' Committee, other survivor representatives, Local Councils, insurers and Charter Organizations have been through over a year of mediation and negotiation without reaching any agreements that are satisfactory to the official fiduciary for survivors. The Debtors have already filed five iterations of their plan and the disputes continue to be such that it will be impossible for the current Plan to be confirmed by the end of the Exclusive Solicitation Period.

c.      *Good-Faith Progress towards Reorganization*.  This weighs in favor of terminating the Exclusive Periods. Survivors are the key constituent that must be addressed by any plan. After the Court refused to approve the RSA, the Debtors, Hartford, and Coalition refused to respond to any of the settlement offers made by the Tort Claimants' Committee and formulated BSA's Fifth Plan without any involvement of an estate fiduciary. By failing to obtain support from the official fiduciary to survivors, the Debtors have not made good faith progress.  In fact, the recent delays and costs are directly tied to the Debtors' decision to agree to an inadequate settlement with Hartford and TCJC.

d.      *Debtors Paying Bills as They Come Due*.  To the best of the Tort Claimants' Committee's knowledge, the Debtors are currently paying their bills on time but as set forth above, the liquidity crisis facing the Debtors weighs in favor of terminating exclusivity.

e.      *Reasonable Prospects for Filing Viable Plan*.  The Debtors have already filed five plans.  However, the current plan is unacceptable to the Tort Claimants' Committee for the reasons set forth above.

f.      *Debtors' Progress in Negotiations with Creditors*.  The sixth factor weighs in favor of terminating the Exclusive Periods because, to date, the Debtors have not made progress in negotiations with the Tort Claimants' Committee.  BSA's Fifth Plan was negotiated without any input from the Tort Claimants' Committee. Importantly, the Tort Claimants' Committee sent counteroffers and counterproposals to the Debtors and Hartford and the Tort Claimants' Committee never received a single response.

g.      *Time Elapsed in the Case*.  The Debtors' cases have been pending for over eighteen months.  They have received their last statutory extension of their Exclusivity Periods and have still be unable to propose a confirmable plan.

h.    *Debtors Seeking Extension of Exclusivity*.  The eighth factor does not apply because the Debtors have received their last statutory extension of their Exclusivity Periods.

i.    *Existence of Unresolved Contingency*.  The Debtors are not waiting on this Court or any other court to determine the outcome of an unresolved contingency that once resolved will enable the Debtors to chart a path under a proposed plan. As a result, this factor weighs in favor of terminating exclusivity.

26.    Notwithstanding these factors, the ultimate question when deciding whether to terminate the Exclusive Periods is whether the termination will move the cases along. *See Dow Corning Corp.*, 208 B.R. at 669-70 *see also In re Adelphia Commc'ns Corp.*, 352 B.R. at 590 ("[T]est is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case. Certainly practical considerations, or other considerations in the interests of justice, could override, in certain cases, the result after analysis of the nine factors.").  Here, the TCC Plan will provide survivors an alternative to the inadequate settlements in BSA's Fifth Plan.  Absent that alternative, when BSA's Fifth Plan fails to be confirmed, if the BSA and its financial professionals are to be believed, there will be no time left and it will signal the end of the Boy Scouts.  By contrast, allowing the TCC Plan to move forward will not only help ensure that Scouting can continue but that survivors will have a meaningful choice to select a plan that does not liquidate and sell back value estate assets for small fractions of what they are really worth.

27.    As noted above, acceptance of BSA's Fifth Plan cannot be obtained within the Exclusive Solicitation Period.  Moreover, the filing and consideration of a TCC Plan will not alter the timetable of the cases which have already been pending for a year and a half.  Thus, there should be no detriment to the Debtors' estates in allowing the filing of the TCC Plan. Creditors deserve an immediate and viable option to BSA's Fifth Plan.

14

C.       **Termination of Exclusivity Benefits the Debtors as Well as Creditors**

28.     Courts have recognized that the termination of exclusivity benefits both creditors and the debtor.  Increased competition by other parties frequently helps negotiations toward a consensual plan.  *See, e.g., In re Public Svc. Co.*, 99 B.R. 155 (Bankr. D.N.H. 1989) (termination of the exclusive period created a level playing field and fostered the negotiation of a consensual plan of reorganization).  Indeed, "the ability of a creditor to compare the debtor's proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals."  *Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 102 (3d Cir. 1988); *see also In re Rook Broadcasting of Idaho, Inc.*, 154 B.R. 970, 976 (Bankr. D. Idaho 1993) ("It is in the interest of creditors that they have a choice between competing plans."); *All Seasons Indus.*, 121 B.R. at 1005.  At this juncture, it is not necessary for the Court to determine whether or not stakeholders will receive better treatment under alternative proposals; rather, "it is sufficient for [the Court] to recognize and express the judgment that opening up the process to those alternative approaches in this particular case is desirable.  The market will tell us the answer and I think that is appropriate on the facts of this case."  *In re EUA Power Corp.*, 130 B.R. 118, 119 (Bankr. D.N.H. 1991).

29.     No inequity results to a debtor if exclusivity is terminated.  *See, e.g., In re Tony Downs Food Co.*, 34 B.R. 405, 407 (Bankr. D. Minn. 1983).  As stated by one court that denied the debtors' first request to extend exclusivity, "by denying the extension, the Court does not prejudice the debtors' coexistent right, nor dilute the debtors' duty to file a plan."  *In re Southwest Oil Co.*, 84 B.R. 448, 454 (Bankr. W.D. Tex. 1987); *see also In re Grossinger's Assoc.*, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) ("[L]oss of plan exclusivity does not mean that the debtor is foreclosed from promulgating a meaningful plan of reorganization; only that the

right to propose a chapter 11 plan will not be exclusively with the debtor."). If anything, the existence of competing plans results in a higher and more expeditious recovery for the parties. *See, e.g., Bank of Am. v. 302 N. LaSalle Street P'ship*, 526 U.S. 434, 457 (1999) (explaining that allowing competing plans is one method of ensuring that property is exposed to the marketplace and tends to increase creditor dividends); *In re Sound Radio, Inc.*, 93 B.R. 849 (Bankr. D.N.J. 1988).  *See In re Akbari-Shahmirzadi*, 2015 U.S. Dist. LEXIS 164737, at *19-20 (D.N.M. Nov. 25, 2015) (a provisional or draft plan with "important details yet to be figured out" does not qualify as a plan for purposes of extending exclusivity); s*ee, e.g., Hansen, Jones & Leta, P.C. v. Segal*, 220 B.R. 434, 443, 474 (D. Utah 1998) (concurring with the bankruptcy court's finding that an "incomplete and unconfirmable" plan filed just to protect the exclusivity period was not filed in good faith).

30.      In these cases, the goal of terminating the Exclusive Periods and filing the TCC Plan is to ensure the reorganization of the Debtors in a manner that maximizes the assets available for survivors and provides a path for scouting to continue.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

31.    WHEREFORE, the Tort Claimants' Committee requests that the Court enter its order (a) terminating the Debtors' Exclusivity Periods pursuant to sections 1121(b) and 1121(c) of the Bankruptcy Code and (b) granting the Tort Claimants' Committee such other relief as may be appropriate under the circumstances.

Dated:  September 15, 2021

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*

James I. Stang (admitted *pro hac vice*)
Robert B. Orgel (admitted *pro hac vice*)
Iain A.W. Nasatir (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (admitted *pro hac vice*)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email: jstang@pszjlaw.com
        rorgel@pszjlaw.com
        inasatir@pszjlaw.com
        joneill@pszjlaw.com
        jlucas@pszjlaw.com

*Counsel for the Tort Claimants' Committee*

DOCS_SF:105999.6 85353/001