**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 2295 and 6213** |

**JOINT REPLY OF THE FUTURE CLAIMANTS' REPRESENTATIVE
AND THE COALITION OF ABUSED SCOUTS FOR JUSTICE IN
SUPPORT OF DEBTORS' DISCLOSURE STATEMENT FOR THE FIFTH
AMENDED PLAN, SOLICITATION PROCEDURES AND FORM OF BALLOTS**

James L. Patton, Jr., the Future Claimants' Representative (the "FCR") and the Coalition

of Abused Scouts for Justice (the "Coalition") hereby submit this joint reply (the "Reply") in

support of (a) the *Amended Disclosure Statement for the Fifth Amended Chapter 11 Plan of*

*Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6213]

(the "Disclosure Statement") and (b) the *Debtors' Motion for Entry of an Order (I) Approving the*

*Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and*

*Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope*

*of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the*

*Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [Docket

No. 2295] (the "Disclosure Statement Motion").[2]  The FCR and Coalition submit this Reply to

respond to certain issues raised in objections to the Disclosure Statement and the Disclosure

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement Motion or Disclosure Statement, as applicable.

Statement Motion (collectively, the "<u>Objections</u>").  In support of this Reply, the FCR and Coalition respectfully state as follows:

<u>PRELIMINARY STATEMENT</u>

When these Chapter 11 Cases were commenced, the BSA stated that it had two objectives: (i) timely and equitably compensate victims of abuse in Scouting and (ii) ensure that the BSA emerges from bankruptcy with the ability to continue its scouting vital charitable mission.  *See Debtors' Informational Brief* [Docket No. 4] at pp. 5-6.  The Amended Plan, which is the product of extensive arms' length negotiations among the Debtors, the AHCLC, the Coalition, the FCR, Hartford and The Church of Jesus Christ of Latter-Day Saints (the "<u>TCJC</u>") will permit the Debtors to achieve these objectives by establishing a trust with billions of dollars for survivors along with the right to pursue other sources of recovery, and putting the Debtors on a path to emerge from bankruptcy on a timetable that allows BSA to remain a viable institution.  To be sure, there is still work to be done.  The Tort Claimants Committee has indicated its opposition to the Amended Plan and there are a number of other parties with concerns and that will be addressed through mediation or the confirmation process.  The FCR and Coalition are committed to continuing to work with all parties to achieve a consensual plan of reorganization.

The Amended Plan is supported by the FCR, the Creditors Committee, the Coalition, and JPMorgan, and incorporates settlements with the Local Councils, Hartford, and the TCJC, and, with negotiations with various parties ongoing, it is expected that additional settlements will be reached.  Unfortunately, certain of the Debtors' insurers (the "<u>Insurers</u>") are using the Disclosure Statement Hearing to continue a pattern of litigious behavior that has spanned the duration of these cases, raising a litany of objections aimed at creating delay, increasing administrative expenses, and generally wreaking havoc to protect their own economic interests.

28612337.1

To advance these efforts, Insurers have interposed objections to the Disclosure Statement based on every dissatisfaction they have with the proposed Amended Plan, notwithstanding this Court's clear statements in connection with the Restructuring Support Agreement that confirmation issues will addressed and ruled upon by the Court at the Confirmation Hearing, not at the Disclosure Statement Hearing.  Nonetheless, the FCR and Coalition believe it is necessary to respond to certain of the confirmation objections that parties have raised so that the record is clear—the Amended Plan is confirmable, and the Debtors should be given the opportunity proceed with solicitation without further delay.  The Debtors and the FCR and Coalition will establish the record supporting approval of the Amended Plan in connection with the Confirmation Hearing.

## REPLY

### I.    The Plan's Treatment of Insurance Is Consistent With Applicable Law

#### A.    Insurers Have No Right to an Insurance "Neutral" Plan

Several Insurers assert that the Amended Plan is patently unconfirmable because it is not "insurance neutral."  In the Insurers' view, "neutrality" means that the Insurers are exempt from otherwise applicable principles of *res judicata* or collateral estoppel and are uniquely entitled to appear, litigate, file claims, objections, and motions, and then operate as if the bankruptcy never occurred.  This is **not** "neutrality."  What the Insurers are seeking is a special exemption from rulings made by this Court in connection with confirmation of the Amended Plan that otherwise would be binding on them, just as they would be on any other party-in-interest.  Neither the Bankruptcy Code nor state law entitles the Insurers to such an exemption.

In the Third Circuit, "[a] plan's preclusive effect is a principle that anchors bankruptcy law: '[A] confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation.'"  *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018) (quoting *In re Szostek*, 886 F.2d 1405, 1408 (3d Cir. 1989)); *see also In re USN Commc'ns., Inc.*,

280 B.R. 573, 592 (Bankr. D. Del. 2002) ("a confirmed plan acts as a binding contract on all the parties thereto").  This principle applies to insurers as it applies to all other parties to a bankruptcy.

The carve-out from this principle that the Insurers demand—and call "neutrality"—is a tool developed *by debtors and their creditors* in mass tort cases to limit the ability of a debtor's insurers to frustrate or delay the process of confirming a chapter 11 plan.  This concept, first approved in the Third Circuit's ruling in *Combustion Engineering*, has been implemented by agreement among debtors and creditors to minimize the ability of insurers to derail chapter 11 cases by:  (a) limiting or eliminating the issues that insurers have standing to contest in connection with confirmation, and (b) providing a basis for appellate courts to find that the insurers are not "persons aggrieved" and thus lack standing to appeal the bankruptcy court's confirmation order.  *See In re Combustion Eng'g*, 391 F.3d 190, 214-18 (3d Cir. 2004).

Contrary to the Insurers' assertions, no court has *ever* held that insurers have a right to a "neutral" plan.  The United States Bankruptcy Court for the Southern District of New York recently rejected this precise argument in Purdue Pharma's bankruptcy proceedings, confirming a plan with language similar to that proposed by the Debtors here, and ruling that the plan and confirmation order were binding on the insurers.  Tr. of Judge Drain Bench Ruling 36:13-14, *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 1, 2021) ("Purdue Ruling") ("There is no such concept or requirement that a plan be insurance neutral."), a copy of the Purdue Ruling is attached hereto as **Exhibit A**;[3] *see also UNR Indus., Inc. v. Cont'l Cas. Co.*,

---

[3]  *See* Eleventh Am. Joint Chapter 11 Plan of Reorganization at 89, *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Aug. 31, 2021), ECF No. 3706. ("5.10 *Insurance Neutrality*. Nothing in the Plan, the Plan Documents or the Confirmation Order shall alter, supplement, change, decrease or modify the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Purdue Insurance Policies, including the MDT Insurance Policies, and thus the rights or obligations of any of the Insurance Companies, the Debtors and the applicable post-Effective Date Entities, including the Master Disbursement Trust, arising out of or under any Purdue Insurance Policy, including any MDT Insurance Policy, whether before or after the Effective Date, are subject to the Bankruptcy

942 F.2d 1101, 1105 (7th Cir. 1991) (order confirming chapter 11 plan of reorganization was binding on debtor's insurers).

The cases cited by the Insurers do not hold otherwise.[4]  In all cases, the plan proponents **chose** to include neutrality language, based on the specific circumstances of each case, to eliminate insurer **standing** to object to the plan.  In all cases, the relevant question was whether the neutrality provisions included in the plan were sufficiently unambiguous to achieve that purpose—**not** whether the law required "neutrality."[5]  Here, as in *Purdue*, no one is attempting to eliminate insurer standing rights.  Thus, the Insurers' cases are irrelevant.  In fact, there are two reasons why insurance "neutrality" is not desirable in these Chapter 11 Cases.

---

Code and applicable law (including any actions or obligations of the Debtors thereunder), the terms of the Plan and the Plan Documents, the Confirmation Order (including the findings contained therein or issued in conjunction therewith, including but not limited to any findings pursuant to Sections 5.2 and 5.6(i) of the Plan) and, to the extent the Insurance Companies have or had adequate notice from any source, any other ruling made or order entered by the Bankruptcy Court whether prior to or after the Confirmation Date.  For the avoidance of doubt, nothing contained in the Plan, the Plan Documents or the Confirmation Order shall operate to require any Insurance Company to pay under any Purdue Insurance Policy the liability of any Person that was not an insured prior to the Petition Date.").

[4]  The Insurers' objections misstate the holdings in multiple Third Circuit decisions.  *Compare* Century Objection [Docket No. 6083] at p. 6 ("the Third Circuit held that insurance neutrality *requires* a plan to protect 'the prepetition rights'")(emphasis added) (citing *In re Combustion Eng'g*, 391 F.3d 190, 218 (3rd Cir. 2004)), *with Combustion Eng'g*, 391 F.3d at 218 ("the neutrality provision added by the District Court protects the pre-petition fights and obligations of both the debtor and the insurers… We conclude, therefore, the Objecting Insurers…have no appellate standing to challenge the addition of the neutrality provision.") and *compare* Certain Insurers Objection [Docket No. 6062, 6052] at ¶ 16 (describing "a result that the Third Circuit, in striking down a plan that attempted this very strategy, determined not to be insurance neutral") (citing *In re Global Indus. Techs., Inc.* ("GIT"), 645 F.3d 201, 212 (3d Cir. 2011), *with GIT*, 645 F.3d at 215 ("[W]e conclude that Hartford and Century have legally protected interests as insurers on policies to be transferred to the [trust] and that their interests are affected by the GIT Plan such that they should have an opportunity to challenge the Plan in the Bankruptcy Court.").

[5]  *See, e.g.*, *In re Combustion Eng'g*, 391 F.3d at 218 (concluding that the insurers had no standing because the plan "does not impair their rights or increase their burdens under the subject insurance policies"); *In re Global Indus. Tech., Inc.*, 645 F.3d 201, 212-15 (3d Cir. 2011) (holding that plan was not "insurance neutral" and remanding to provide insurers "an opportunity to challenge the Plan in the bankruptcy court"); *In re Thorpe Insulation Co.*, 677 F.3d 869, 887 (9th Cir 2012) ("The plan is therefore not insurance neutral, which provides the non-settling insurers with party in interest standing under § 1109(b)."); *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 589 (Bankr. W.D. Pa. 2011) ("*If the goal of the Debtor is to create a plan with insurance neutrality*, the insurance neutrality language must follow the *Combustion Engineering* analysis . . . Because the purported insurance neutrality provisions . . . are ambiguous as currently drafted, we find that the . . . Plan is not insurance neutral. . . . [A]s a result, we find that [insurer] has the necessary standing to prosecute its objections to the confirmation of" the plan) (emphasis added).

28612337.1

**First**, certain of the Insurers already have asserted that they have standing to contest every issue in these cases irrespective of insurance neutrality.[6]  In light of these Insurers' position, inclusion of insurance "neutrality" language in the Amended Plan would not streamline these cases.  Nothing—except complete capitulation to insurer positions that are antithetical to these cases—could make the Insurers stop attempting to prolong these proceedings.

**Second**, the Insurers have made clear that their intent in seeking "neutrality" is to enable them to re-litigate core findings as to the validity and appropriateness of fundamental components of the Amended Plan—specifically, the transfer of insurance rights to the Settlement Trust, the Debtors' conduct in negotiating the Amended Plan settlements, the process through which the Settlement Trust will value and resolve claims, and the range of values potentially available to Abuse Claimants whose claims are allowed—in post-confirmation coverage litigation. *See* Century Objection at pp. 7-13 (arguing that a "neutral" Plan may not transfer Debtors' insurance rights without insurer consent or require findings as to reasonableness of a Plan's claims administration framework).

Permitting such litigation would defeat the purpose of these bankruptcy proceedings, undermine the Amended Plan's settlement framework, and waste valuable Settlement Trust assets that otherwise would go to Abuse Claimants.  The Third Circuit has made clear even the broad neutrality language the Insurers seek is not intended to permit Insurers to challenge the validity of key plan components post-confirmation.  *See In re Fed.-Mogul Glob., Inc.*, 684 F.3d 355, 380 n.38 (3d Cir. 2012) (distinguishing between plan's preservation of "fact-specific coverage defenses" that could have been raised "in any asbestos proceeding prior to bankruptcy," and non-preserved

---

[6]  *See, e.g.*, *Insurers' Reply Brief in Support of Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim* [Docket No. 2180] at p. 12-15; Feb. 17, 2021 Hr'g Tr. 135:10-21.

28612337.1

defenses, such as those challenging the validity of a plan's insurance rights transfer, that "would exist only after and by virtue of the bankruptcy reorganization, and could be invoked by an insurer against any claim by the Trust, no matter how meritorious," or that "rested on the legitimacy of the TDPs as a method of adjudication"); *In re TK Holdings, Inc.*, Omnibus Hearing Tr. 62:10–16, *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. Del. Sept. 16, 2020) (rejecting insurers' argument in post-confirmation coverage litigation that plan's neutrality provision entitled insurer to re-litigate validity of insurance rights transfer post-confirmation and noting that such an outcome would render the bankruptcy proceedings "a fool's errand").[7]

As the *Purdue* court recognized, the Insurers' position is just not right.  *See* Hr'g Tr. 196:14-18, *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Aug. 25, 2021) ("[I]nsurers can't sit back and say everything that happens in a bankruptcy case on notice to us doesn't matter.  You know, the normal rules of judicial estoppel, collateral estoppel, and law of the case just don't matter for insurers.  That's just—that's not right."), attached hereto as **Exhibit B**.

---

[7] Contrary to the Insurers' assertions, it is not the Debtors who are seeking to prejudice the Insurers in coverage litigation, but the Insurers who are seeking to prejudice the Settlement Trust.  The Insurers' ultimate goal, of course, is to use key components of the Amended Plan and the settlement framework embodied therein to limit or disclaim their coverage obligations post-confirmation.  While nothing in the Amended Plan requires the Court to wade into this dispute, it bears emphasis that voluminous case law (not to mention the insurers' own policies) prohibits insurers from using the bankruptcy of their insured to escape or limit their payment obligations and reap a windfall in this manner. *See, e.g. Matter of Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993) ("[I]t makes no sense to allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge"); *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991) (reversing district court's finding that the insured's covered loss was the amount the settlement trust actually pays to tort victims on the ground that it conferred a "windfall" on the debtor's insurers and was contrary to applicable law); *In re Jet Fla. Sys., Inc.*, 883 F.2d 970, 975 (11th Cir. 1989) ("The 'fresh-start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured.").  The reason why the Insurers are so quick to assert that other parties are seeking coverage determinations reflects the Insurers' own agenda before this Court.

B.      **The Amended Plan Does Not Require Coverage Determinations**

The Insurers next assert that the findings and orders required by Article IX.A.3 of the Amended Plan (the "Findings and Orders") are inappropriate because they require this Court to decide state law coverage issues appropriately adjudicated in post-confirmation coverage litigation—for example, they assert that the Findings and Orders require this Court to determine the Insurers' indemnity obligations under their policies for the Abuse Claims and nullify the Insurers' purported rights under the policies to control the administration of the Abuse Claims. But the plain language of the Amended Plan contradicts the Insurers' argument.

To be clear, the Findings and Orders seek no coverage determinations. They do not require this Court to determine whether the Abuse Claims are covered by the Insurers' policies. They do not require this Court to determine what rights the Insurers have or do not have under state coverage law. They do not require this Court to determine the impact of any factual findings made in connection with plan confirmation on subsequent coverage litigation (for example, whether state law requires insurers to consent to or pay reasonable settlements embodied in a plan, or whether a debtor's failure to obtain such consent for a reasonable settlement excuses insurers from their coverage obligations). In fact, nothing in the Amended Plan precludes the Insurers from raising state law-based defenses to coverage of the Abuse Claims in post-confirmation coverage litigation.

What the Findings and Orders do seek is a determination that the Debtors' resolution of their liabilities in this bankruptcy case—including the transfer of the Debtors' insurance assets to the Settlement Trust and the claims administration framework set forth in the TDP—is reasonable, was negotiated in good faith, and is consistent the Bankruptcy Code. These are core issues that could not arise outside the context of bankruptcy, and thus are properly decided by this Court— not by a non-bankruptcy court in post-confirmation coverage litigation. *See, e.g.*, *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 196 (3d Cir. 1999) ("A proceeding is core under section 157

if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); Purdue Ruling at 38:5-40:5 (ruling as to reasonableness of plan settlements and validity of insurance rights transfer as part of confirmation); *In re Washington Mut., Inc.*, 442 B.R. 314, 325 (Bankr. D. Del. 2011) (stating that consideration of the reasonableness of a settlement incorporated in a plan is a core proceeding).

C.     **The Insurers Are Asking this Court to Make Coverage Determinations**

Contrary to the Insurers' assertions, it is the Insurers' arguments regarding the adequacy of the Disclosure Statement and the confirmability of the Amended Plan, and not the Findings and Orders, that rely upon and seek state-law coverage determinations from this Court.   Under the guise of seeking "neutrality," the Insurers insist that (1) any findings by the Court as to the reasonableness of the TDP would strip them of their purported right to control the defense and settlement of claims in this context, and (2) the insurance assignments contemplated by the Plan violate their purported consent rights over any such transfers.   Both arguments beg the question or assume the conclusion that the Insurers have such rights.   The extent to which the Insurers even have such rights in the first place is, itself, a coverage issue.

Pursuant to state court coverage law, an insurer's right to control the defense of lawsuits against its insured typically exists only where the insurer unequivocally accepts its obligation to pay the resulting settlements (which has not occurred here),[8] and not where, for example, an insurer

---

[8] As part of the discovery the Coalition, the FCR and the TCC served on Century and Chubb, the propounding parties specifically asked Century to admit that Century has liability under Insurance Policies that the Debtors are contributing to the Settlement Trustee.  *See* Century RFA No. 2, Letter to The Honorable Laurie Selber Silverstein dated May 26, 2021 [Docket No. 5057] (attaching all discovery served on Century and Chubb).  Century refused to admit or even acknowledge that it has any obligation to pay any settlements involving Abuse Claims.

has denied coverage or has a conflict of interest with the insured, or where such an arms-length settlement simply is reasonable and not prejudicial.[9]

Here, to rule that the Amended Plan violates the policies' consent-to-settle provisions, the Court necessarily would have to accept the Insurers' view as to the proper interpretation of these policy provisions in these circumstances (a coverage determination) and make an advance determination, on a claim-by-claim basis, as to the impact of its findings on the Trust's ability to seek coverage.

Similarly, the vast majority of courts nationwide have ruled that anti-assignment clauses are not implicated where the events giving rise to a loss already have occurred, as such a transfer of insurance rights merely shifts liabilities for which the insurers were already responsible to the trust.[10]  In order to rule that the Amended Plan violates the anti-assignment provisions in the Insurers' policies, the Court, again, would have to accept the insurers' view as to the proper interpretation of these policy provisions.

Separately, Liberty and Zurich ask the Court to accept their position on the existence and applicability of self-insured retentions in their policies as a basis for finding the Disclosure Statement inadequate and the Plan unconfirmable.  *See, e.g.*, Liberty Mutual Joinder &

---

[9]  *See, e.g., Re: Brightview Enter. Solutions LLC v. Farm Family Cas. Ins. Co.*, No. 20-7195, 2020 WL 6074474, at *2 (D.N.J. Oct. 15, 2020) ("Where the insurer acts in bad faith in not settling, 'an insured is permitted to settle the tort claims . . . and then recover from the insured the amount paid in settlement . . . up to the policy limits, provided that such sums were reasonable and were paid in good faith.'") (quoting *Fireman's Fund Ins. Co. v. Sec. Ins. Co. of Hartford*, 367 A.2d 864, 871 (N.J. 1976)); 1 INSURANCE CLAIMS AND DISPUTES § 3:9 (6th ed. 2021) ("If . . . the insured settles a case for a sum that the insurance company would have been obligated to pay in settlement, the company is not prejudiced by the unauthorized settlement."); *see also* 14A COUCH ON INSURANCE § 203.41 (3d ed. 2021) ("When an insurer wrongfully refuses to settle a claim or refuses to defend the insured altogether, the insured, without the insurer's consent, is free to negotiate a settlement with the claimant. . . . The insurer may be liable for the entire settlement amount, including amounts in excess of policy limits, based upon its wrongful refusal to settle.").

[10]  *See, e.g., Fed.-Mogul Glob.*, 684 F.3d at 379 ("[A]fter events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.") (quoting 3 COUCH ON INS. § 35.8 (3d ed. 2011); *see also OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. 06-167, 2006 WL 1473004 at *2–3 (D. Minn. May 25, 2006) (noting general consensus among courts that assignment of loss does not expand insurer's risk; simply allows change in identity to "reconnect the policy's coverage to the insured loss").

Supplemental Objection to Disclosure Statement [Docket No. 6057]; Zurich Superseding Objections to Disclosure Statement [Docket No. 6062]. This, again, is an issue that may involve the interpretation of policy language and application of state coverage law and would be appropriately addressed in post-confirmation coverage litigation.

The Insurers are asking this Court to presume that they have rights under their policies, and then conclude that the Plan is impairing such rights. The Insurers' real argument, at its core, is that this Court may not make binding coverage decisions *unless those decisions favor the Insurers*. Nothing in the Bankruptcy Code or the case law permits such a result.

### D.     The Bankruptcy Code Permits a Plan to Alter the Insurers' Purported "Rights" Under Their Policies

Assuming, *arguendo*, that this Court were to determine that the Amended Plan would otherwise impair the Insurers' purported rights under their policies' anti-assignment provisions or consent-to-settle provisions, any impairment of such rights is appropriate given that enforcement of those rights in this context would impede the implementation of the Amended Plan.

Section 1123(a)(5) of the Bankruptcy Code states that a plan preempts otherwise applicable state law that would inhibit a debtor's ability to reorganize. *See* 11 U.S.C. § 1123(a)(5) (providing adequate means for a plan's implementation "notwithstanding any otherwise applicable nonbankruptcy law"). Since the establishment of the post-bankruptcy trust framework in *Manville* over three decades ago, courts routinely have declined to enforce policy provisions that would impede successful implementation of the plan, including the anti-assignment and consent-to-settle provisions cited by the insurers in their objections.[11]

---

[11]  *See, e.g.*, *In re Fed. Mogul Glob., Inc.*, 684 F.3d 355, 369 (3d Cir. 2012) (holding that "[t]he plain language of § 1123 evinces Congress's clear intent to preempt state law" with respect to transfer of the debtor's insurance rights in bankruptcy and noting, consistent with state law, that "to the extent that the events giving rise to liability have already occurred, there will be no additional risk to the insurance companies by virtue of the assignments"); Purdue Ruling at 38:5-40:5 (approving proposed confirmation order with findings that Bankruptcy Code preempted any anti-assignment and consent-to-settle provisions); *In re Babcock & Wilcox Co.*, 2004 WL 4945985, at *16-17 (Bankr. E.D. La. Nov. 9,

28612337.1

From the outset of these Chapter 11 Cases, the Debtors have been clear that they could not continue to address Abuse Claims on a piecemeal basis in the tort system and the administration and resolution the Abuse Claims through an administrative framework post-confirmation was critical to their restructuring strategy. *Debtors' Informational Brief* at pp. 38-39. The ability to administer and resolve the Abuse Claims through the TDP is an essential component of the Amended Plan that accomplishes the Debtors' ultimate objective of compensating Abuse Claimants in an equitable and efficient manner.

The use of settlement trusts like that contemplated by the Amended Plan is a key feature of mass-tort bankruptcies and furthers public policy by alleviating the burden on state court systems resulting from individualized litigation of mass-tort actions. *See In re Dow Corning Corp.*, 211 B.R. 545, 577–88 (Bankr. E.D. Mich. 1997). Moreover, the purpose of assigning insurance rights to a settlement trust is to provide for the ratable distribution of assets to creditors, which avoids the proverbial "race to the courthouse" and eliminates the risk of inconsistent outcomes in the tort system for similarly situated tort claimants. *See id.* Here, allowing the Insurers to litigate individual claims in the tort system—or before this Court—is antithetical to the entire purpose of these proceedings and the Settlement Trust.

Further, with respect to policies under which defense costs erode policy limits, the Insurers would be perversely incentivized to consume such limits by defending claims rather than paying them if permitted to litigate Abuse Claims in state court. Accordingly, any alteration of the

---

2004), *vacated on other grounds*, 2005 WL 4982364 (E.D. La. Dec. 28, 2005) (stating that "the weight of authority is in accord that § 1123(a)(5) preempts contrary state law or contract provisions if such provisions are necessary to the implementation of a plan," and concluding that § 1123(a)(5) preempted "nonbankruptcy law to the contrary, such as the anti-assignment clause and other contractual provisions including management of claims, cooperation and consent to settlement provisions").

Insurers' purported rights to consent to the transfer of insurance rights or settlement of claims under the policies is permissible under the section 1123(a)(5) of the Bankruptcy Code.

The policies themselves recognize this potential outcome.  The policies state that the insurers remain obligated to pay their policyholder's liability, whether that liability is resolved through the tort system or through the bankruptcy system.  *See, e.g.,* Insurance Company of North America, Policy No. HDO G1 07 54 47-1 (3/1/1991-3/1/1992) ("Bankruptcy or insolvency of the insured shall not relieve the company of any of its obligations hereunder.").

Such a promise would be rendered illusory if it meant that insurers would pay liability of a bankrupt insured only if that insured did not avail itself of the tools available to it in bankruptcy, but rather, resolved its claims in the tort system as if there were no bankruptcy.  The Insurers raise no arguments regarding the preemptive power of section 1123(a)(5) with respect to any consent-to-settle provisions.  The three arguments they assert regarding 1123(a)(5)'s preemption of anti-assignment provisions are unavailing.

**First**, the insurers argue that section 1123(a)(5) cannot preempt anti-assignment provisions in cases outside the section 524(g) context.  That is inaccurate.  *In re Federal–Mogul*, the preeminent case addressing this issue, clearly rested its decision on the express text of section 1123(a)(5), and not section 524(g).  *In re Federal–Mogul*, 684 F.3d at 368.[12]

Moreover, the United States Bankruptcy Court for the District of Delaware itself has authorized the transfer of insurance rights pursuant to section 1123(a)(5)(D) in a case outside the

---

[12] *See also In re W.R. Grace & Co.*, 475 B.R. 34, 198 (D. Del. 2012), *aff'd sub nom. In re W.R. Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013), and *aff'd sub nom. In re W.R. Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) (finding that anti-assignment provisions were preempted based on (i) the express text and legislative history of sections 541(c) and 1123(a)(5) of the Bankruptcy Code, which deal broadly with the administration of all assets of the estate, and (ii) the "overall purpose of the Bankruptcy Code, most notably, the goals of obtaining a 'fresh start' through bankruptcy reorganization and harmonizing the interests of debtors and creditors alike") (citing *In re Federal–Mogul*, 684 F.3d at 368).

524(g) context, and recently granted a motion to enforce the plan's transfer provisions against the debtors' insurer. *See, e.g.,* Order Confirming Fifth Amended Plan of TK Holdings, Inc. and its Affiliated Debtors, *In re TK Holdings, Inc.*, No. 17–11375 (BLS), 2018 WL 1306271, at *21 (Bankr. D. Del. Mar. 13, 2018) (approving, pursuant to section 1123(a)(5)(D), the transfer of insurance rights to a postbankruptcy trust in non-524(g) context); Order Granting in Part and Denying in Part Motion to Enforce the Order Confirming Debtors' Fifth Amended Joint Chapter 11 Plan of Reorganization and the Confirmed Plan, *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Sept. 17, 2020).

In addition, just last month, the *Purdue* court similarly ruled, in a non-524(g) context, that the plan's transfer of insurance rights was authorized by the Bankruptcy Code notwithstanding any anti-assignment provisions in the insurers' policies. Purdue Ruling at 39:10-40:5 (ruling that "ample case law establishes the authority under Sections 1123(a)(5)(B) and (b)(2) and (6) to transfer as part of a plan and in furtherance of a plan insurance rights and insurance policies to a trust to pay mass claims," and noting that the analysis set forth by the Third Circuit in *In re Federal–Mogul* was not based on section 524(g)).

**Second**, Century asserts that section 1123(a)(5) cannot preempt anti-assignment provisions in cases involving non-profit debtors, arguing that sections 541(f) and 1129(a)(16) preclude preemption of *any* state law with respect to non-profits. *See* Century Objection at 8-9. Again, that is inaccurate. Courts and commentators have made clear that sections 541(f) and 1129(a)(16) are intended to apply only to nonbankruptcy law *specific* to non-profits or trusts (for example, state law prohibiting non-profits from using restricted donations for other purposes), and not general nonbankruptcy law applicable to all entities.[13]

---

[13] *See, e.g.,* COLLIER ON BANKRUPTCY ¶ 541.30 (16th rev. ed. 2021) ("[S]ections [541(f) and 1129(a)(16)] basically establish a regime in which charitable type organizations in bankruptcy, such as hospitals, cannot be sold to profit-

Century cites no case where a court has ruled that these provisions override section 1123(a)(5)'s express preemption of otherwise applicable nonbankruptcy law that impedes the implementation of a plan. Indeed, its position is undercut by numerous confirmation orders that have allowed churches, dioceses, and other non-profit organizations to transfer property free and clear, notwithstanding state tax law or other nonbankruptcy law.[14] Century's dearth of legal support is not surprising—under its construction of sections 541(f) and 1129(a)(16), reorganization of non-profits facing mass tort liability would be untenable, as they would never be able to transfer their insurance assets to a post-confirmation trust.

**Third**, the Insurers argue that section 1123(a)(5)'s preemptive scope does not apply to non-debtor insurance rights. This argument is contradicted by the plain text of section 1123(a)(5), which does not limit its preemptive scope only to debtor rights. Nonetheless, the Court need not reach this issue to confirm the Amended Plan (let alone approve the Disclosure Statement).

---

making, taxpaying entities without compliance with state law, such as state laws that require state-law regulatory approval for the sale of not-for-profit hospitals to for-profit buyers"); *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202 (Bankr. W.D. Tex. 2008), *aff'd sub nom. Save Our Springs Alliance, Inc. v. WSI (II)-COS, L.L.C.*, 632 F.3d 168 (5th Cir. 2011) (concluding that restricted funds could not be used to pay other creditors because state law permits donors to restrict donations to particular uses); *In re Machne Menachem Inc.*, 371 B.R. 63, 67-68 (Bankr. M.D. Pa. 2006) (assessing whether the plan's proposed transfer of the not-for-profit corporation's real property and sale of substantially all its assets violated applicable New York Not-for-Profit Law); *In re Roman Catholic Archbishop of Portland in Or.*, 2007 Bankr. LEXIS 1180, at *26 (Bankr. D. Or. Apr. 13, 2007) ("There are no provisions in [Oregon non-profit law], that would prevent the transfers of property that are included in this plan. Therefore, the plan complies with this requirement."); *In re Albert Lindley Lee Mem'l Hosp.*, 2010 Bankr. LEXIS 4148, at *15–16 (Bankr. N.D.N.Y. July 15, 2010) ("The Debtors shall comply with the . . . New York Not-for-Profit Corporation Law . . . As a result, the Plan is in compliance with section 1129(a)(16) of the Bankruptcy Code.").

[14] *See, e.g.*, Order Confirming First Amended Joint Plan of Reorganization at 11, ¶ 31, *In re Nat'l Benevolent Ass'n of the Christian Church (Disciples of Christ)*, No. 04-50948 (Bankr. W.D. Tex. Mar. 2, 2005) (noting, pursuant to section 1123(a), that the non-profit organization's plan "shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law"); Order Confirming Third Amended and Restated Joint Plan of Reorganization of Debtor, Tort Claimants Committee, Future Claimants Representative, and Parish and Parishioners Committee at 5–6, ¶ 6, *In re Roman Catholic Archbishop of Portland in Oregon*, No. 04-37154 (Bankr. D. Or. Apr. 17, 2007) ("all transfers of property of the Estate or of the Archdiocese . . . shall be free and clear of all Claims, liens, encumbrances, charges and other interests of Creditors and Claimants provided for by the Plan. Pursuant to 11 U.S.C. § 1146(c) [transfers] . . . shall not be taxed under any law"); Order Confirming Debtor's Second Amended Joint Plan of Reorganization at 6, ¶ 3; Order Confirming the Third Amended and Restated Plan of Reorganization, at 7 ¶ I, *In re Diocese of Tuscon*, No. 4-04-bk-04721 (Bankr. D. Ariz.) ("any instrument or transfer under the Plan shall not be taxed under any law").

28612337.1

The definitions relevant to the insurance assignment under the Plan—*i.e.*, Amended Plan at Article I.A. 69.a, 161, 180.a—make clear that all assignments of third-party rights are being made solely to the extent permissible under applicable law.  Article V.S.1 provides a "savings" clause ensuring that, to the extent a court ultimately determines that such transfers are impermissible, the Local Councils, Contributing Chartered Organizations, Participating Chartered Organizations may retain their insurance rights, pursue them for the benefit of Abuse Claimants, and transfer any proceeds recovered to the Settlement Trust—thus preserving the integrity of the Plan's settlement framework and ensuring that any applicable insurance proceeds reach survivors.

### E.    An Increase in Claims Post-Petition Does Not Render a Plan Unconfirmable

Finally, in the same breath that the Insurers argue a plan must be "neutral" to be confirmable, the insurers cite *GIT*, 645 F.3d 201 (3d Cir. 2011), and assert that the Debtors could never propose an insurance neutral plan, because no plan can be neutral when a debtor facing mass-tort liability experiences a substantial increase in claims post-petition.

Such a conclusion is nonsensical.  To the extent insurance neutrality is "required" for confirmation (as the insurers assert), a debtor facing increased claims post-petition—which often occurs in response to a court setting a claims bar date and approving a related noticing program— could never successfully reorganize.  If anything, *GIT* demonstrates that insurance neutrality cannot be a requirement of a confirmable plan.  The Third Circuit case law the Insurers cite shows that they have standing, which, again, is not in dispute and has nothing to do with whether the Disclosure Statement contains adequate information and should be approved by the Court.

## II.    The Amended Plan and the TDP are the Product of Extensive Negotiations Between the Most Significant Stakeholders in the Chapter 11 Cases.

The Amended Plan and TDP are the result of extensive, good-faith negotiations between the Debtors, the Ad Hoc Committee, the FCR, the Coalition, Hartford, and the TCJC.

Nevertheless, in its unrelenting quest to paint those supporting the Amended Plan as bad actors, Century argues that the Amended Plan is the product of collusion, is intended to strip insurers of certain rights to which they are entitled under the Debtors' insurance policies and violates the Third Circuit's decision in *Skinner* (and its progeny).[15] *See* Century Objection at 13-14.

As "evidence" of this collusion, and in its attempt to analogize the Amended Plan to the plan before the court in *Skinner*, Century points to the Amended Plan's Expedited Distribution mechanism, claims allowance provisions, and assignment of insurance rights. *Id.* at 14-21. Several other Insurers also raised objections to the TDP, and in particular, these provisions of the TDP.[16] Century's conspiracy theory that parties are colluding against the Debtors' insurers is worth addressing at the outset—negotiation with creditors regarding the terms of a plan and the disposition of estate assets is an essential part of bankruptcy and is not collusion.[17]

A debtor is required to manage a case in a way that maximizes estate assets, including insurance.[18] The TDP is justified by the facts and circumstances of the Chapter 11 Cases, and the

---

[15] *See In re American Capital Equipment, Inc.*, 405 B.R. 415, 422–23 (Bankr. W.D. Pa. 2009), *aff'd sub nom. Skinner Engine Co. v. Allianz Global Risk U.S. Ins. Co.*, 2010 WL 1337222, at *1 (W.D. Pa. Mar. 29, 2010), *aff'd sub nom. Skinner III, LLC*, 688 F.3d at 158–160.

[16] *See* Docket Nos. 6052, 6055, 6057.

[17] *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 380 (3d Cir. 2012) ("Insurers also allege the trust mechanism might distort ordinary incentives between insurer and insured, encouraging the debtor to collude with claimants and impose costs on the insurer. But as [the debtor] points out, this shift in incentives is not unique to the asbestos context and occurs in bankruptcy where there is a discharge of the liability of the debtor but not that of the insurer. Nor do the Insurers provide any evidence of such collusion in this case. Such bare speculation does not establish an increase in [the Insurers'] risk." (internal citations omitted)).

[18] *See, e.g., In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) (holding that "[a] paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors" and therefore courts "enable [debtors in possession] to recover property on behalf of the bankruptcy estate") (citations omitted); *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988), *subsequently aff'd*, 871 F.2d 1217 (3d Cir. 1989) (establishing that debtor-in-possession has a "duty to protect and to conserve property in his possession for the benefit of creditors.") (citing *In re Devers*, 759 F.2d 751, 754 (9th Cir. 1985)); *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (stating that "among the fiduciary obligations of a debtor-in-possession is the 'duty to protect and conserve property in its possession for the benefit of creditors.'") (quoting *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr.S.D.N.Y.1990)).

provisions of the TDP are not evidence of collusion.  Any attempt to analogize the Amended Plan to the plan at issue in *Skinner* is severely misguided.

A.     **The Trust Distribution Procedures**

The TDP provides a mechanism to efficiently resolve Abuse Claims, recognizing that the sheer number of Abuse Claims makes it impracticable, perhaps even impossible, to litigate each claim in the tort system.  Notwithstanding the Insurers' theories to the contrary, neither the Amended Plan nor the TDP caused the number of pending claims.  Rather, the Abuse Claims are the result of nationwide, decades-long sexual abuse.  The Amended Plan and the TDP represent a fair and reasonable framework to reconcile these Abuse Claims and compensate eligible survivors of childhood sexual abuse in a timely manner.

The Insurers seek to undermine this framework by misrepresenting the TDP provisions and lobbing unfounded accusations that the Amended Plan and TDP will pay fraudulent and invalid claims.  As an initial matter, because the Insurers vigorously opposed estimation, their arguments regarding the merits of individual claims should be viewed with skepticism.  Moreover, the Insurers, who are no strangers to mass tort bankruptcy cases, ignore the complexities associated with the resolution of tort claims filed in a mass tort bankruptcy.  As they most certainly know, claim-by-claim litigation is simply not a viable option here, not only because of the obvious practical difficulties, but because the Bankruptcy Code requires the limited assets of the estate to be distributed equitably to all Abuse Claimants.  With limited and insufficient assets to pay all comers, similar Abuse Claimants could not be compensated similarly through a tort system mechanism until *all* pending and future Abuse Claims were fully litigated—an untenable result.

The TDP is generally modeled on trust distribution procedures approved in numerous diocesan sex abuse bankruptcy cases,[19] and is designed to mirror the Debtors' own historical settlement practices.  Like these other cases, the TDP requires evidence to demonstrate that a claim is valid,[20] and employs reasonable and objective criteria for determining claim values.[21]  In making these determinations, the Settlement Trustee must use only the criteria set forth in the TDP.[22]

The TDP provides a fair and equitable means to compensate survivors, and represents a laudable achievement considering the complexities associated with proposing a confirmable plan in the largest sexual abuse bankruptcy in history.  As will be established with evidence at the confirmation hearing, the TDP resolve Abuse Claims in a manner consistent with the Debtors' experience and exposure in the tort system and the historical practices under which the insurers themselves previously approved and paid numerous settlements of Abuse Claims.

## B.    The Expedited Distribution Mechanism

Century contends that the Expedited Distribution is a "hallmark of collusion," and along with several other Insurers, argues that the procedures governing Expedited Destructions are designed to manipulate voting on the Amended Plan.  *See* Century Objection at 17-18; *see also*

---

[19]  *See, e.g.*, *In re Crosier Fathers& Brothers Province, Inc.*, Case No. 17-41681 (Bankr. D. Minn.); *In re Roman Catholic Bishop of Great Falls, Montana*, Case No. 17-60271 (Bankr. D. Mont.); *In re Diocese of Duluth*, Case No. 15-50792 (Bankr. D. Minn.); *In re The Archdiocese of Saint Paul and Minneapolis*, Case No. 15-30125 (Bankr. D. Minn.); *In re The Roman Catholic Bishop of Stockton*, Case No. 14-20371-C-11 (Bankr. E.D. Cal.); *In re Roman Catholic Church of the Diocese of Gallup*, Case No. 13-13677-t11 (Bankr. D.N.M.); *In re The Christian Brothers' Institute*, Case No. 11-22820 (RDD) (Bankr. S.D.N.Y.); *In re Archdiocese of Milwaukee*, Case No. 11-20059-svk (Bankr. E.D. Wis.); *In re Society of Jesus, Oregon Province*, Case No. 09-30938-elp11 (Bankr. D. Or.); *In re Catholic Bishop of Northern Alaska*, Case No. 08-00110-DMD (Bankr. D. Alaska); *In re Diocese of Davenport*, Case No. 06-02229-11 (Bankr. S.D. Iowa); *In re Roman Catholic Church of the Diocese of Tucson*, Case No. 4-04-04721 (Bankr. D. Ariz); *In re Roman Catholic Archbishop of Portland in Oregon*, Case No. 04-37154-elp11 (Bankr. D. Or.).

[20]  *See* TDP Art. VII.C.

[21]  *See* TDP Art. VIII.

[22]  *See* TDP Art. VII.C ("The Settlement Trustee must evaluate each Submitted Abuse Claim . . . based on the following criteria . . ."); TDP Art. VIII(A) ("The Settlement Trustee shall utilize the Claims Matrix and Scaling Factors as the basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim that does not receive an Expedited Distribution or become a STAC Tort Election Claim.").

Docket Nos. 6052, 6055, 6057.  These hyperbolic contentions are false.  There are several well-founded justifications for including the Expedited Distribution procedures in the TDP.

**First**, abuse survivors have endured unimaginable suffering, and many are simply trying to put the trauma sustained because of being abused behind them and rebuild their lives.  For certain survivors, prosecuting their Abuse Claims is simply not a viable option.  They have suffered enough, and they are either unable to, or uninterested in, putting their lives under a microscope so that they may potentially be awarded a larger claim under the TDP.

The Expedited Distribution Election affords survivors the ability to receive compensation for their claim on an expedited basis without having to relive their abuse a second time.  Although $3,500 may not be a significant amount, it is some acknowledgment of the trauma that the survivors endured and by filing a claim in these Chapter 11 Cases and receiving any distribution—albeit small—perhaps they may be able to turn the page.

**Second**, the Expedited Distribution mechanism will ease the administrative burden on the Settlement Trust.  There have been more than 82,000 Abuse Claims filed in the Chapter 11 Cases, and the process of reviewing and reconciling each of these claims will be costly and time-consuming.  The Expedited Distribution will reduce the costs associated with reconciling the Abuse Claims (thus increasing the amount available to compensate survivors) and facilitate timely distributions to other survivors.  The use of the Expedited Distribution Election is not a novel concept in mass tort chapter 11 cases despite the Insurers' suggestion otherwise, and expedited distribution procedures have been approved in numerous other cases.[23]  The Insurers have failed to provide any legitimate reason why such a provision is inappropriate here.

---

[23] *See, e.g., In re Roman Catholic Church of the Diocese of Tucson*, Case No. 04-04721 Bankr. D. Ariz. Sep. 21, 2005) [D.I. 887], Debtors' Third Amended and Restated Plan of Reorganization, ¶¶ 2.127, 12.4 (providing for payment of $15,000 for claims that had been objected to on statute of limitation grounds but were otherwise credible, without requiring evidentiary standards); *In re Catholic Diocese of Wilmington, Inc.*, Case No. 09-13560, (Bankr. D. Del.

**Third**, the TDP includes procedural safeguards that ensure the Expedited Distribution mechanism does not result in payments on account of fraudulent claims.  To receive an Expedited Distribution under the TDP, a Direct Abuse Claimant must have timely submitted a "properly and substantially completed, non-duplicative Abuse Claim Proof of Claim or Future Abuse Claim" that the claimant has signed, "attesting to the truth of its contents under penalty of perjury" or supplemented "to provide such verification."[24]  Further, before receiving a payment, the Direct Abuse Claimant must execute a release, which must include a release of the Settlement Trust, the Protected Parties, and all Contributing Chartered Organizations.[25]  These requirements provide the Settlement Trust the ability to confirm the identity of each claimant that has completed a proof of claim under oath and are reasonable safeguards against fraud and abuse that are commensurate and appropriate in light of the amount of the Expedited Payment.

### C.   Claims Allowance Provisions

Century also points to the Amended Plan's claims allowance provisions as evidence of collusion.[26]  Other Insurers have asserted similar objections, arguing that the Amended Plan would compensate time-barred claims with no scrutiny.[27]  Initially, it is important to note that these objections are premised upon an oversimplification of the TDP.

While it is accurate that a proof of claim will be considered *timely filed* if it was filed before the Bar Date or otherwise determined to be timely by the Court,[28] a timely-filed claim and an

---

Aug. 8, 2011) [D.I. 1493], Conformed Second Amended Chapter 11 Plan of Reorganization of Catholic Diocese of Wilmington, Inc., ¶ 10.6 (providing for payments of $75,000 or $25,000 for holders of abuse claims who had elected treatment as "Survivor Convenience Claims").

[24]   *See* TDP Art. VI.A.

[25]   *Id.* at IV.B.

[26]   *See* Century Objection at 18-19.

[27]   *See* Docket Nos. 6052, 6055.

[28]   *See* TDP Art. VI.A.

allowed claim are not the same thing.  As it pertains to the allowance of claims themselves, all claims will be reconciled by the Settlement Trustee in accordance with the TDP, which includes scaling factors that address, among other things, claims that may be subject to statute of limitations defenses.[29]

As the Court is likely aware, states across the nation have enacted legislation that prospectively and retrospectively eliminates or limits statute of limitations defense for claims involving abuse of minors.  And even assuming that some Abuse Claims may be subject to statute of limitations defenses on their face, claimants in the tort system would still possess the ability to show that their claims are subject to tolling or other theories that would delay the accrual of their claims so as to render them actionable, and these claims likely would be settled and paid in the tort system context.  These complex factual and legal issues would likely cost millions of dollars (if not more) to fully litigate for each of the tens of thousands of individual survivors.  The TDP, along with the aforementioned Expedited Distribution procedures, provides a means to avoid this wasteful exercise while attempting to appropriately balance the efficient administration of the Settlement Trust with the desire to compensate only those survivors with valid claims.

### D.    The Insurers' Alleged Procedural Rights

A number of Insurers argue that the Amended Plan strips them of key procedural rights by increasing insurer liability and stripping them of their contractually-guaranteed participation rights in the claim resolution process—with Century unsurprisingly going so far as to say these provisions are further indicia of collusion amongst the parties.[30]  These arguments are meritless for the reasons discussed above.  The Amended Plan does not impair the Insurers' rights under

---

[29] *See* TDP Art. VIII.E.(iii).

[30] *See* Century Objection at 19-20.

their policies, and even if it did, the Bankruptcy Code permits alteration of such rights to the extent they would interfere with the implementation of the Amended Plan. And, to the extent that a coverage court later determines that there *has* been a breach of the insurance contracts that would give rise to a defense to coverage, nothing in the Amended Plan precludes the Insurers from raising that defense in future coverage litigation.

### E.    *Skinner* Is Easily Distinguishable

Century's reliance on *Skinner* is misplaced, as the facts of these Chapter 11 Cases and *Skinner* are starkly different. The plan proposed by the debtors in *Skinner* permitted asbestos claimants to resolve their claims through the plan's alternative claim resolution process (the "Skinner Claim Procedures"). *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 151-52 (3d Cir. 2012). Asbestos claimants opting into the Skinner Claim Procedures were required to pay *the debtors* 20% of any cash received from the debtors' insurers (the "Surcharge"). *Id.* at 151.

The Surcharge was the plan's *sole* source of funding—the debtors were no longer operating and had no other assets—and was used to fund distributions to non-asbestos creditors. *Id.* at 156. As a result, the plan in *Skinner* could only succeed if asbestos claimants opted into the Skinner Claim Procedures and obtained recoveries, thus requiring them to pay the Surcharge to the debtors. *Id.* The bankruptcy court found that the plan was not proposed in good faith because the Skinner Claim Procedures rendered the plan collusive. *Id.* at 158.

On appeal, the Third Circuit held that the plan was not collusive because the debtors' insurers failed to present any evidence of an agreement to defraud insurers. *Id.* However, the Third Circuit affirmed the lower court's conclusion that the debtors did not propose the plan in good faith on a separate basis. *Id.* Specifically, the Third Circuit held that the plan in *Skinner* did

not "fairly achieve the Bankruptcy Code's objectives because it establishe[d] an inherent conflict of interest" given that the debtors were incentivized to "sabotage [their] own defense." *Id.*

The only way that creditors and attorneys could possibly be paid under *Skinner's* plan was if the asbestos claimants obtained settlements against the debtors. *Id.* at 158-59. Even though an independent trustee controlled the claim resolution process, this was insufficient to remedy the plan's defects because the trustee could not defend against the claims without the debtors' cooperation. *Id.* at 159. But the Surcharge incentivized the debtors to do just the opposite. *Id.*

The Third Circuit found the debtors' attempt to compare their plan with a section 524(g) trust unconvincing. *Id.* The *Skinner* plan created a fund designed solely to pay off attorneys and creditors, not to pay future asbestos claimants. *Id.* at 160. Moreover, the debtors made no contribution to the fund. *Id.* Rather, the plan required the debtors to take money out of the fund to make distributions to other creditors. *Id.* Finally, unlike a section 524(g) trust, the *Skinner* plan did not contain a channeling injunction protecting the debtors or insurers from future claims. *Id.*

The inherent conflict serving the basis for the Third Circuit's finding of lack of good faith is obviously not present in the Amended Plan. The Debtors are not seeking approval of a mechanism akin to the Surcharge, and the Amended Plan does not include any provisions that incentivize the Debtors to sabotage their own defense in connection with resolution of Abuse Claims. Rather, the Amended Plan will be funded by contributions from, among others, the Debtors or Reorganized BSA, as applicable, the Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies.[31]

Further, the Settlement Trust will be used solely for the purposes of compensating holders of Abuse Claims and will not be used to fund distributions to other creditors or the Debtors

---

[31] *See* Disclosure Statement at 12.

28612337.1

themselves.[32]    Unlike *Skinner*, the Settlement Trust contemplated by the Amended Plan is consistent with the goals and objectives of the Bankruptcy Code and will facilitate the equitable and efficient resolution of both current and future Abuse Claims by channeling all Abuse Claims to the Settlement Trust for resolution in accordance with the TDP.  Century's argument that the Amended Plan is analogous to the plan in *Skinner* is entirely meritless.

### III.    The Insurance Injunctions Apply to Direct Action Claimants

The Tort Claimants represented by Lujan & Wolff LLP ("Lujan Claimants") assert that the Disclosure Statement is inadequate because it fails to state the authority by which the Amended Plan's insurance injunctions may enjoin their purported direct-action rights against the insurers under Guam law.  Lujan Claimants' Suppl. Obj. to the Adequacy of Debtors' Disclosure Statement in Support of Am. Chapter 11 Plan of Reorganization at 2-3, ECF No. 6039 (the "Lujan Objection").  They argue that the Disclosure Statement must "disclose why Guam statutory law regulating the business of insurance by providing for direct action rights (22 GCA § 18305) does not reverse preempt federal bankruptcy statutes that do not specifically regulate the business of insurance." *Id.*

To be clear, such disclosure is not required, and any disputes as to the Amended Plan's treatment of the Lujan Claimants' rights is properly litigated at confirmation.  Nonetheless, it bears emphasis that the Debtors appropriately may enjoin the Lujan Claimants from filing direct action lawsuits against insurers.

The McCarran-Ferguson Act ("MFA") provides that state law related to the business of insurance shall reverse preempt federal law.  The MFA's scope is limited, however—it protects

---

[32]  Amended Plan Art. IV.B.  Certain non-abuse claims may be eligible to the proceeds of a limited number of reserved abuse insurance policies that also cover such claims.

state regulation only against "*inadvertent* federal intrusion"; it "does not seek to insulate state insurance regulation from the reach of all federal law." *Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 39 (1996). Where a statute expressly preempts state law, the MFA does not apply.[33]

Here, the Court's authority to issue the insurance injunctions flows from the Bankruptcy Code's express preemptive power. Section 1123(a)(5) of the Bankruptcy Code grants the Court authority to provide adequate means for implementation of a plan "notwithstanding any otherwise applicable nonbankruptcy law." 11 U.S.C. § 1123(a)(5). Because section 1123(a)(5)'s preemptive effect is express, the MFA does not apply. *See, e.g.*, *Lander*, 251 F.3d at 116–20; *Stephens*, 69 F.3d at 1232–33; *Spirt*, 691 F.2d at 1065.

Over three decades of precedent confirms this conclusion. Since the genesis of the mass-tort reorganization framework in *Manville*, courts have confirmed numerous plans enjoining all persons other than a post-confirmation trust from asserting any purported rights against the policies. *See*, *e.g.*, Eleventh Amended Joint Chapter 11 Plan of Reorganization, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Aug. 31, 2021) (confirmed plan enjoining claims against insurers as to policies transferred to settlement trust); Third Amended Prenegotiated Plan of Reorganization for Duro Dyne Nat'l Corp., et al., Under Chapter 11 of the Bankruptcy Code, as Modified § 9.07, *In re Duro Dyne Nat'l Corp*, No. 18-27963 (MBK) (Bankr. D.N.J. June 6, 2019), ECF No.729 (same); Amended and Restated Second Plan of Reorganization, *In re Plant Insulation Co.*, No. 09-31347 (Bankr. N.D. Cal. Apr. 2, 2012) (same); Fifth Amended Joint Plan

---

[33] *See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 116–20 (2d Cir. 2001) ("[W]here the preemptive force of [the Securities Litigation Uniform Standards Act] is explicit, and where we have strong indications that Congress intended just such an effect, . . . we hold that McCarran-Ferguson does not preclude the application of SLUSA to variable annuity contracts."); *Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1232–33 (2d Cir. 1995) (holding the MFA was inapplicable to the Foreign Sovereign Immunities Act as it "preempt[s] all other law purporting to set forth rules for suits against foreign sovereigns"); *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1065 (2d Cir. 1982), *vacated and remanded on other grounds*, 463 U.S. 1223, 1232 (1983) ("Title VII [of the Civil Rights Act] is not being *construed* to *implicitly* pre-empt state laws. Title VII contains a broad and explicit pre-emptive provision.").

28612337.1

of Reorganization, *In re Thorpe Insulation Co.*, No. 2:07-19271 (Bankr. C.D. Cal. Dec. 28, 2009)

(same); Modified Plan of Reorganization*, In re ABB Lummus Global Inc.*, No. 06-10401 (Bankr.

D. Del. Jun. 21, 2006) (same); First Amended Joint Plan of Reorganization, *In re J.T. Thorpe, Inc.*,

No. 2:02-14216 (Bankr. C.D. Cal. Aug. 15, 2005) (same).  Without such injunctions, certain tort

claimants could seek to recover substantially more than other similarly-situated claimants.  Such

an outcome defeats the Bankruptcy Code's objective of equitable distribution among creditors.

## **CONCLUSION**

WHEREFORE, the FCR and Coalition respectfully request that the Court approve the

Disclosure Statement and grant such other and further relief as justice may require.

Dated: September 16, 2021          YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Rodney Square, 1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Emails:  rbrady@ycst.com
            eharron@ycst.com

and

GILBERT LLP
Kami E. Quinn (admitted *pro hac vice*)
Emily Grim (PA ID # 308259)
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Telephone: (202) 772-2336
Facsimile: (202)772-2337
Email: quinnk@gilbertlegal.com
            grime@gilbertlegal.com

*Counsel to the Future Claimants' Representative*

28612337.1

MONZACK MERSKY AND BROWDER, P.A.
Wilmington, Delaware

*/s/ Rachel B. Mersky*
Rachel B. Mersky (No. 2049)
1201 North Orange Street
Suite 400
Wilmington, Delaware 19801
Telephone: (302) 656-8162
Facsimile: (302) 656-2769
E-mail: RMersky@Monlaw.com

-and-

BROWN RUDNICK LLP
David J. Molton, Esq. (admitted *pro hac vice*)
Eric R. Goodman, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-mail: DMolton@BrownRudnick.com
E-mail: EGoodman@BrownRudnick.com

and

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-mail: SBeville@BrownRudnick.com
E-mail: TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*