**EXHIBIT B**

28612337.1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-23649-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   PURDUE PHARMA L.P.,

8

9            Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11                  United States Bankruptcy Court

12                  Tele/Video Proceedings

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  August 25, 2021

17                  10:03 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: UNKNOWN

1    HEARING re Continuance of Confirmation Hearing From August

2    23, 2021

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
1    A P P E A R A N C E S :

2

3    DAVIS POLK WARDWELL LLP

4         Attorney for Debtors

5         450 Lexington Avenue

6         New York, NY 10017

7

8    BY:  MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

9         BENJAMIN KAMINETZKY (TELEPHONICALLY)

10        JAMES I. MCCLAMMY (TELEPHONICALLY)

11        ELI J. VONNEGUT (TELEPHONICALLY)

12        GERARD MCCARTHY (TELEPHONICALLY)

13        MARC J. TOBAK (TELEPHONICALLY)

14

15   CAPLIN DRYSDALE

16        Attorneys for Multi State Governmental Entities Group

17        One Thomas Circle

18        Washington, DC 20005

19

20   BY:  KEVIN MACLAY (TELEPHONICALLY)

21

22

23

24

25
```

Page 4

1    PULLMAN COMLEY

2         Attorneys for State of Connecticut

3         850 Main Street

4         Bridgeport, CT 06604

5

6    BY:  IRVE GOLDMAN (TELEPHONICALLY)

7

8    MILBANK, TWEED, HADLEY & MCCLOY LLP

9         Attorneys for the Raymond Sackler Family

10        55 Hudson Yards

11        New York, NY 10001

12

13   BY:  GERARD UZZI (TELEPHONICALLY)

14

15   KRAMER LEVIN NAFTALIS & FRANKEL LLP

16        Attorneys for Ad Hoc Committee

17        1177 Avenue of the Americas

18        New York, NY 10036

19

20   BY:  JONATHAN WAGNER (TELEPHONICALLY)

21

22

23

24

25

Page 5

1   WEST VIRGINIA ATTORNEY GENERAL'S OFFICE

2        Attorneys for the Attorney General for the State of

3        West Virginia

4        State Capitol Complex, Bldg. 1, Room E-26

5        Charleston, WV 25305

6

7   BY:  PATRICK JAMES MORRISEY (TELEPHONICALLY)

8

9   SULLIVAN WORCESTER LLP

10        Attorneys for Purdue Pharma, L.P.

11        1633 Broadway

12        New York, NY 10019

13

14   BY:  JEFFREY R. GLEIT (TELEPHONICALLY)

15

16   LITE DEPALMA GREENBERG AFANADOR, LLC

17        Attorneys for Canadian Municipality and First Nation

18        Creditors

19        570 Broad Street, Suite 1201

20        Newark, NJ 07102

21

22   BY:  ALLEN J. UNDERWOOD (TELEPHONICALLY)

23

24

25

```
1   OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

2        Attorney for State of Maryland

3        200 Saint Paul Place

4        Baltimore, MD 20852

5

6   BY:  BRIAN EDMUNDS (TELEPHONICALLY)

7

8   US ATTORNEY'S OFFICE

9        86 Chambers Street, 3rd Floor

10       New York, NY 10007

11

12  BY:  LAWRENCE FOGELMAN (TELEPHONICALLY)

13

14  PILLSBURY WINTHROP SHAW PITTMAN LLP

15       Attorneys for Ad Hoc Group of Non-Consenting States

16       31 West 52nd Street

17       New York, NY 10019

18

19  BY:  ANDREW M. TROOP (TELEPHONICALLY)

20

21

22

23

24

25
```

1   FRANK OZMENT ATTORNEY AT LAW, LLC

2        Attorneys for Bridges Bloyd Fitch

3        217 Country Club Park, Box 501

4        Birmingham, AL 35213

5

6   BY:  JAMES FRANKLIN OZMENT (TELEPHONICALLY)

7

8   WHITE & CASE LLP

9        Attorneys for The Ad Hoc Group of Individual Victims of

10        Purdue Pharma

11        1221 Avenue of the Americas

12        New York, NY 10020

13

14   BY:  J. CHRISTOPHER SHORE (TELEPHONICALLY)

15

16   GILBERT LLP

17        Attorneys for Ad Hoc Comm. of Gov't and Litig.

18        Claimants

19        700 Pennsylvania Ave. SE, Suite 400

20        Washington, DC 20003

21

22   BY:  EMILY GRIM (TELEPHONICALLY)

23

24

25

```
 1   WILMER CUTLER PICKERING HALE AND DORR

 2        Attorneys for Navigators Specialty Insurance Company

 3        7 World Trade Center

 4        New York, NY 10007

 5

 6   BY: PHILIP D. ANKER (TELEPHONICALLY)

 7

 8   REED SMITH LLP

 9        Attorneys for the Debtor

10        Reed Smith Centre

11        225 Fifth Avenue

12        Pittsburgh, PA 15222

13

14   BY:  PAUL M. SINGER (TELEPHONICALLY)

15

16   MARIA ECKE, PRO SE  (TELEPHONICALLY)

17

18   CARRIE L. MCGAHA, PRO SE  (TELEPHONICALLY)

19

20   ALSO PRESENT TELEPHONICALLY:

21   J. CHRISTOPHER SHORE

22   CATHERINE STEEGE

23   ANDREW M. TROOP

24   EVAN JONES

25   ARIK PREIS
```

1    PAUL KENAN SCHWARTZBERG

2    MATTHEW J. GOLD

3    THOMAS ROBINSON O'NEILL

4    JILL S. ABRAMS

5    ROXANA ALEALI

6    ANDREW VINCENT ALFANO

7    PHILIP D. ANKER

8    MICHAEL ATINSON

9    MITCHELL JAY AUSLANDER

10   JASMINE BALL

11   PRIYA BARANPURIA

12   BROOKS BARKER

13   DAVID E. BLABEY JR.

14   LOUIS BOGRAD

15   SARA BRAUNER

16   DAVID BROWN

17   GABE BRUNSWICK

18   AARON CAHN

19   MARK CHALOS

20   GERARD CICERO

21   HAYDEN COLEMAN

22   DANIEL CONNOLLY

23   ABBY G. CUNNINGHAM

24   MELANIE L. CYGANOWSKI

25   MARIO D'ANGELO

1    PETER C. D'APICE

2    STACY DASARO

3    JOSEPH G. DAVIS

4    KEVIN DAVIS

5    MARK DEARMAN

6    JESSE DELACONTE

7    SHANNON DEVON

8    CLINT DOCKEN

9    JOHN C. DOUGHERTY

10   JOHN DUBEL

11   STEPHANIE EBERHARDT

12   KENNETH H. ECKSTEIN

13   BERNARD ARDAVAN ESKANDARI

14   MATHEW FARRELL

15   JENNIFER S. FEENEY

16   LAURA FEMINO

17   ROBERT FINZI

18   MATTHEW FITZSIMMONS

19   PAMELA FLETCHER

20   SAM FRAIDIN

21   HEATHER FRAZIER

22   BRYCE L. FRIEDMAN

23   KATHERINE GALLE

24   CAROLINE GANGE

25   JOSEPHINE GARTRELL

1   GILL GELDREICH

2   MELISSA GIBSON

3   JARED GIDDENS

4   MAGALI GIDDENS

5   SCOTT GILBERT

6   MICHAEL GOLDSTEIN

7   GEOFFREY S. GOODMAN

8   ISLEY MARKMAN GOSTIN

9   GARY GOTTO

10  JARED T. GREEN

11  JAMES S. GREEN, JR.

12  DEBORAH GREENSPAN

13  EMILY GRIM

14  JOHN GUARD

15  ADAM P. HABERKORN

16  CATHERINE BEIDERMAN HEITZENRATER

17  ANGELA K. HERRING

18  MICHELE HIRSHMAN

19  JENNA A. HUDSON

20  MITCHELL HURLEY

21  ELISA HYDER

22  LINDA IMES

23  MARK S. INDELICATO

24  HAROLD D. ISRAEL

25  SAMUEL ISSACHAROFF

```
 1   STEVEN IVES

 2   ETHAN KAMINETZKY

 3   NICKOLAS KARAVOLAS

 4   KAREN KENNEDY

 5   MARC KESSELMAN

 6   DARREN S. KLEIN

 7   JEREMY C. KLEINMAN

 8   LAWRENCE KOTLER

 9   ANN KRAMER

10   M. NATASHA LABOVITZ

11   ALEXANDER LEES

12   DANIEL LENNARD

13   NICOLE A. LEONARD

14   MARA LEVENTHAL

15   DANIELLE J. LEVINE

16   RUTH LICHTENFELD

17   JEFFREY LIESENMER

18   EDAN LISOVICZ

19   JOHN LONGMIRE

20   JOHN LOWNE

21   MICHAEL LUSKIN

22   BRIAN S. MASUMOTO

23   PATRICK C. MAXCY

24   LAURA MCCLOUD

25   HUGH M. MCDONALD
```

1    SHANNON M. MCNULTY

2    MICHELE MEISES

3    LIVY MEZEI

4    NATHANIEL MILLER

5    JONATHAN E. MITNICK

6    DAVID MOLTON

7    MAURA KATHLEEN MONAGHAN

8    ANDREW J. MUHA

9    AISLING MURRAY

10   EDWARD E. NEIGER

11   MICHAEL PATRICK O'NEIL

12   DAMIAN O'SULLIVAN

13   JAMES FRANKLIN OZMENT

14   JENNIFER PEACOCK

15   STEPHEN POHL

16   KATHERINE PORTER

17   DOUGLASS PRESS

18   NICHOLAS PREY

19   MICHELE PULGGARI

20   KAMI QUINN

21   MARION QUIRK

22   GILLIAN RENDEL

23   CHRISTINA RICARTE

24   JOSEPH RICE

25   RACHAEL RINGER

| | |
|---|---|
| 1 | CHRISTOPHER ROBERTSON |
| 2 | JEFFREY J. ROSEN |
| 3 | JORDAN ROSENBAUM |
| 4 | PAUL S. ROTHSTEIN |
| 5 | JASON RUBINSTEIN |
| 6 | MEGAN PARIS RUNDLET |
| 7 | WILLIAM T. RUSSELL |
| 8 | JEREMEY W. RYAN |
| 9 | JAMES SALWEN |
| 10 | DANIEL JOSEPH SAVAL |
| 11 | SETH SCHINFELD |
| 12 | ELIZABETH SCHLECKER |
| 13 | FREDERICK E. SCHMIDT |
| 14 | MICHAEL SHEPHERD |
| 15 | RICHARD SHORE |
| 16 | RICHARD SILBERT |
| 17 | LIANNA SIMMONDS |
| 18 | PAUL SINGER |
| 19 | MARC F. SKAPOF |
| 20 | ARTEM SKOROSTENSKY |
| 21 | D. RYAN SLAUGH |
| 22 | JOSEPH L. SOROKIN |
| 23 | CLAUDIA Z. SPRINGER |
| 24 | HOWARD STEEL |
| 25 | ERIC STODOLA |

1   ADAM SWINGLE

2   JEROME TAPLEY

3   PAMELA THURMOND

4   MARC J. TOBAK

5   SARA E. TONNESEN

6   KELLY TSAI

7   JOSEPH TURNER

8   MELISSA L. VAN ECK

9   MICHAEL J. VENDITTO

10  RYAN A. WAGNER

11  JORDAN A. WEBER

12  WENDY WEINBERG

13  SHIRA WEINER

14  WILLIAM P. WEINTRAUB

15  MARTIN WEIS

16  MARTIN JAMES WEIS

17  ALLISON H. WEISS

18  THEODORE WELLS, JR.

19  STEVEN WILAMOWSKY

20  DANIEL WOLF

21  LAUREN S. ZABEL

22  JAMIE ZEEVI

23  DAVID ZYLBERBERG

24

25

1                    P R O C E E D I N G S

2           THE COURT:  Good morning.  This is Judge Drain.

3      We're here in In Re Purdue Pharma L.P., et al., on the

4      second day of oral argument in relation to the Debtors'

5      request for confirmation of their amended Chapter 11 plan.

6           MR. HUEBNER:  Your Honor, with apologies, we're

7      not hearing any audio.  I'm not sure if the Court needs to

8      be heard yet or not.  I apologize for interrupting.

9           THE COURT:  Thank you.  I thought it was off of

10     mute, but it wasn't.  Let me start over again.  Thanks.

11          Good morning, this is Judge Drain.  We're here in

12     In Re Purdue Pharma L.P., et al., on the second and last day

13     of oral argument on the Debtors' request for confirmation of

14     their amended Chapter 11 plan.

15          I have the order of topics and time that the

16     parties have agreed to allocate to them, which the parties

17     circulated overnight.  And I'm happy to follow that order

18     for purposes of today's hearing.

19          MR. HUEBNER:  Perfect, Your Honor.  Good morning.

20     For the record, Marshall Huebner, from Davis Polk &

21     Wardwell, on behalf of the Debtors.

22          Your Honor, two things before we start the agenda.

23     You know, as always, we have sort of a dual role as a plan

24     proponent and as an advocate sometimes for our stakeholders,

25     but also a shepherd of the process.

1           Your Honor, I think it was not lost on anybody on

2    Monday that Your Honor expressed strong views about

3    attempting to get to a deal with a final very small number

4    of stakeholders not yet onboard.  I believe three times you

5    mentioned the heroic effort of Judge Chapman, who worked in

6    Phase 3 of mediation.

7           I do want to advise the Court that Judge Chapman

8    seems to have heard that, and she is absolutely back in the

9    saddle, working extraordinarily hard, again, as a sitting

10   judge, for, of course, no compensation, just part of public

11   service, to try to see if anything can be done.

12          As I'm sure it's also not going to be a surprise

13   for the Court to hear, further work tailoring and narrowing

14   the releases is something that is the subject of many of the

15   objections, and certainly the subject of a fair number of

16   very clear thoughts from the Judge.

17          And so while on one hand, because there are

18   elements that are being discussed among the parties.  And I

19   won't say more than that, except that the Debtors are

20   working around the clock to try to facilitate to see if

21   something can be done assisting Judge Chapman.

22          There are other elements as well, as there were in

23   round 3 of mediation.  There were new covenants and

24   economics and other things.  And I can't say more than that.

25   That would be inappropriate, and so, of course, I won't.

1           But a fourth or additional element is the

2    releases.  Strategically, one might have argued for a

3    position that that should be sorted used as part of a

4    potential big set of final trades in a ground-floor

5    mediation by Judge Chapman.  But I think that would not have

6    been the right answer.

7           The right answer is to fix (indiscernible) it now

8    and give the Court and all parties comfort that people,

9    including on the Sackler side, and facilitated very strongly

10   by the Debtors and others, continuously recalibrating and

11   trying to make this the best possible deal for all Purdue

12   stakeholders.

13          In the middle of the night last night, we filed

14   the ninth amended plan of reorganization, which really does

15   one thing primarily, which is substantially further narrow

16   and tailor the third-party releases that I think it's fair

17   to say lie at the heart of much of the colloquy and

18   objection at this hearing.

19          And so rather than saving it to be offered in

20   mediation, which is now basically ongoing, it's in already

21   and there for people to see.  I think some people understand

22   it.  Some people, I think, are still having it explained to

23   them.  It's very complicated.  We are working around the

24   clock on located things.

25          So in about 30 seconds, I will turn the podium

1   over to Mr. Uzzi, who will, I think, probably be in the best

2   position to describe to describe those releases, and how

3   they have changed, and how it is hopefully important to the

4   objectors , and also quite important to the Court.

5           But before I do that, one over item in my other

6   role, which is I do want to let the Court know that the Gulf

7   objection, as Your Honor may remember, was argued by Mr.

8   Luskin (indiscernible) with Mr. Tobak, negotiations towards

9   settling that also continue, as we are.  Obviously, as

10  you've seen, you know, every time I get up, we have either

11  another settlement or fewer objections to announce.  I think

12  everyone knows that's our MO, and we're still doing it here

13  at the last day of oral argument.  And so those are the two

14  procedural matters before we get to the agenda.

15          So with that, with the Court's permission, I'd ask

16  Mr. Uzzi to help explain the changes, and certainly in the

17  minds of the Sacklers, you know, the changes that they made.

18          THE COURT:  Okay.  Before I hear from Mr. Uzzi, I

19  think I ought to say two things.  First, I have not spoken

20  to Judge Chapman about her continuation as a mediator in the

21  case, either before or after what you have just described.

22  Nevertheless, I'm quite grateful to her, you know, if she's

23  been willing to take on that role.  And I obviously

24  encourage the parties to try to resolve their differences,

25  including with her really dedicated and expert efforts,

1    which she brings to every mediation, and certainly from my

2    reading of her mediators report that was filed earlier in

3    the case, she brought to this one.  So I welcome that

4    development.  Although it's a surprise to me.  But I'm

5    grateful for it, and it's certainly in line with the

6    admonition I gave to the parties on Monday.

7              Secondly, unfortunately, I have not had the

8    opportunity to review the change in the ninth amended plan.

9    So I'm largely in listening mode here, not commenting mode.

10   But again, I welcome the parties continued work on the scope

11   of the release and injunction of third-party claims.

12             So, having said that, I'm happy to hear from Mr.

13   Uzzi.

14             MR. HUEBNER:  Your Honor, before he begins, just

15   two very quick notes.  To give credos where they're also

16   due, the first round mediators also continued after

17   mediation formally entered (indiscernible) mediation --

18             THE COURT:  I understand that.

19             MR. HUEBNER:  -- privilege --

20             THE COURT:  And, you know, we've been really

21   fortunate to have world-class mediators in this case, and

22   they take their role -- they took their role and take their

23   role seriously and continued beyond the original time

24   allocated.  And you know, again, I encouraged that under the

25   mediation order.  And similarly, even though my mediation

1    order for Judge Chapman set a specific deadline for the

2    parties, and as everyone knows, deadlines are important,

3    based on what you've described to me, the discussions that

4    are ongoing now are similarly under that order.  If you face

5    a similar deadline, which is I intend to rule on Friday on

6    this request for confirmation on the plan.

7              MR. HUEBNER:  Yeah, Your Honor.  That was the

8    tentative point I was going to make.  I actually did not

9    have time to double check it, but hopefully my memory is

10   right, that the order actually expressly contemplates post-

11   mediation conversations that I actually believe keep our --

12   remained governed by the confidentiality shields.  And so,

13   everyone who is having those conversations is treating them

14   as such.

15             So with that, Your Honor, let me turn my

16   microphone off and turn it over to Mr. Uzzi to explain what

17   was filed overnight.

18             THE COURT:  Okay.

19             MR. UZZI:  Thank you, Your Honor.  Gerard Uzzi of

20   Milbank, on behalf of the Raymond Sackler family.

21             Your Honor, I think what I'd like to do here is

22   explain to you what we try to accomplish and the changes,

23   but not necessarily go through those changes line by line.

24   Obviously, if you'd like us to do that, we can do that as

25   well.  But at least, you know, first give you the conceptual

1   overview, and then I'll take direction from the Court.

2          Your Honor, I mean, I would agree with Mr.

3   Huebner.  You know, we did not and weren't interested in

4   (indiscernible) these things up as a bargaining chip in

5   mediation, further discussions.  What we've tried to do is

6   be sponsored, not only to the Court's comments, but also to

7   comments of some of the objectors, to the extent that we

8   could.

9          Before I get into the actual changes, Your Honor,

10  just for the sake of clarity of the record, I think there

11  are a few things that I can say that I hope is helpful as it

12  relates to what the releases don't cover, never have

13  covered.  And you know, one of those things, of course, is

14  criminal liability.

15         And I know Your Honor knows that the releases

16  don't cover criminal liability.  There continues to be, you

17  know, some innuendo and clouding, I think, that issued both

18  inside this courtroom and outside.  And I thought it might

19  be helpful, just for on the record, to hear a Sackler

20  representative say these releases do not cover criminal

21  liability.  Hopefully, that puts any debate on that topic to

22  an end.

23         There's been a number of suggestions of the tax

24  liability being released.  Tax liability is expressly carved

25  out.  There is no release of tax liability.  It doesn't

1    matter who the taxing authority is.  There's no release of

2    tax liabilities.

3           There also has been some suggestion that we were

4    attempting to shield releasing parties from their future

5    conduct.  The release never contemplated that.  We've

6    clarified that.  But it was something that was never in the

7    release, and I thought it might be helpful just to clarify

8    that.

9           As far as the comments we've tried to address now,

10   that were admittedly picked up by the release, the first one

11   is one that I would characterize as the undiscovered

12   McKinsey issue, or the undisclosed McKinsey issue, or

13   something to that effect.  And the release was drafted, Your

14   Honor, against a backdrop of the Sacklers and their entities

15   having been thoroughly examined and thoroughly investigated.

16   And we just, in the drafting of the releases, believe that

17   if there were that type of party, somebody would come to us,

18   they would identify it, and of course, we would add to that

19   excluded party list.  And that's the spirit of how we had

20   drafted that release in (indiscernible).

21          What we originally proposed on Monday to address

22   what I'll call the undisclosed or undiscovered McKinsey

23   issue, is a carve out for -- we used the defined term

24   willful misconduct, which was probably not a good defined

25   term -- but to really pick up some intentional wrongdoing.

1           As we worked on this over the last day, we decided

2      to make really what I think is a material change here as it

3      relates to the third-party releases of the shareholder

4      consultants.  And that is to simply carve them out.  And so

5      the shareholder consultants are carved out -- with one

6      exception I'll talk about in the second -- are carved out of

7      the release, the third-party release, completely.  And we

8      hope that that just dispenses with the issue.

9           The one consultant that's not an outside third-

10     party firm, which then exists on what used to be Exhibit H -

11     - and we've updated it to be Schedule X, I believe, now --

12     is simply Norton Rose, Your Honor.  And they do fit into a

13     different category.  They have been both the family and the

14     Debtors' -- with their predecessor, Chadbourne & Parke,

15     counsel to the firm for decades.  They have been subject to

16     discovery here.  They have been investigated.  And we do

17     think it's appropriate to keep them on the exhibit.  But

18     we've otherwise carved everybody else out.

19           Because of that, we then removed the defined

20     willful related party claim, as we just don't believe it's

21     necessary anymore and doesn't and shouldn't probably apply

22     to the other parties that were in the release who are

23     similarly situated to what I would call the core releasees

24     here.

25           I'll note further, Your Honor, if the exhibit had

1    my permanent, Milbank -- and I don't think I'm stretching to

2    say the release of professionals is pretty standard in any

3    release -- but we heard the commentary of why does a certain

4    named firm need a release.

5              The fact is, my firm doesn't need a release, so we

6    carved ourself out.  And we did that because I, along with

7    all of my co-advisors here, we do not want to be a

8    distraction here.  So Milbank is out, and the other named

9    third-party advisors are also off the schedule.  And we hope

10   that that goes a material way to addressing all of the

11   concerns.

12             The other issue we tried to address, Your Honor,

13   is to be further responsive on the non-opioid-related

14   claims.  And as you'll remember from Monday, Your Honor,

15   there was some colloquy over what did that mean.  First,

16   I'll say we've added "reckless" to the definition there of

17   the type of conduct, the predicate conduct or the predicate

18   state of mind, I should say, that would trigger that.

19             Your Honor asked me if that definition picked up

20   fraud, and I incorrectly said no.  And I apologize for that.

21   I went back and read it and I think under that definition,

22   it already picked up fraud.  And actually, things are a lot

23   broader than fraud, are not limited to fraud.  And the

24   operative word, when you take a look at it, Your Honor, is

25   "unlawful."  All right?  So, clearly, fraud is unlawful, but

1    unlawful isn't limited to fraud.  And I think that that word

2    really does it.  But we did add fraud or fraudulent conduct

3    to the definition, just to be clear.

4              We changed then, Your Honor, the definition from

5    willful misconduct to non-opioid actual misconduct claim.

6    We just think that that is a more descriptive term.  I've

7    had a lot of semi-scholarly colleagues try to tell me that

8    willful misconduct was confusing, so we just try to take

9    that confusion out.  That, Your Honor, applies to all the

10   releasees.  So if all the releasees are on for non-opioid

11   liability are subject to the non-opioid actual misconduct

12   claim.

13             And then, if you look -- when you go through this,

14   Your Honor, and you know, I will give you the cite.  In

15   10.7(v), where the heaviest blackline is, that is simply to

16   pick up the indemnification claims that could otherwise be

17   asserted against the Sacklers.  If we're carving out from

18   the releasees the -- I'll call it the McKinseys of the world

19   -- we can't have, of course, a backdoor coming back in.  And

20   we just clarified that language in there.  It was always

21   like that, Your Honor, but we just needed to change the

22   words in order to pick it up because of other changes we've

23   made.

24             Your Honor, that's the overview.  I'm happy to go

25   into some detail.  I'm also happy to answer any questions

1    you might have.

2              THE COURT:  Well, again, I haven't had a chance to

3    parse the language, but I appreciate the overview.  I guess

4    what I would say -- and I appreciate that these changes, as

5    you've described them, are constructive and have narrowed

6    considerably the release -- is that I'll carve out some time

7    at the end of today's argument for people who have objected

8    on the basis of the breadth of the release, and that only.

9    Not any other aspects of the release, but just the breadth

10   of the release, to have the chance to point out to me their

11   view, if they still have it, that the releases still overly

12   broad.

13             So I think all of the people on the call today or

14   on the Zoom today have the proposed allocation of time for

15   oral argument today.  And just at some time at the end of

16   that schedule for people to point out to me if they want to,

17   and for the Debtors and others to respond, issues that

18   remain as to the breadth of the release language.  And that

19   will --

20             MS. UZZI:  Thank you --

21             THE COURT:  -- give me a chance to look it over at

22   the lunch break also.

23             MR. UZZI:  Very well, Your Honor.

24             THE COURT:  Okay.  Thank you.

25             MR. HUEBNER:  Okay.  So, Your Honor, I believe

1    that brings us to the first item on the agenda, which is

2    best interests of Ditech.  Mr. Goldman asked for 35 minutes,

3    so we're fine with that.  I may run a little bit longer than

4    my initial plan of 20, for fairness and symmetry, and

5    because I have something I want to begin with before I

6    actually head into best interests.

7               THE COURT:  Okay.

8               MR. HUEBNER:  Your Honor, there was some

9    interesting colloquies from the Court, pretty scholarly,

10   frankly, for those of us who are, you know, bankruptcy

11   folks.  On Pages 180-182 of the transcript, and then again

12   on 57-259, about the factor of Metromedia that requires, or

13   seems to contemplate, creditors being paid in full, which

14   just makes no analytic sense, because there's nothing to

15   release if creditors are paid in full.  And Your Honor cited

16   millennium labs and their fairness test, the much more

17   recent Third Circuit decision, as seemingly a logical

18   imperative and much more sensible.

19               In addition, Your Honor, you actually cited

20   ourself to 1129(a)(7) on Page 181, Line 12-16, and said, you

21   know, isn't this the right answer?  Because if 1127 requires

22   -- 1129(a)(7) requires that you're getting more than you

23   would get in another scenario, is not definitionally fair,

24   so that proving the best interests test may actually be kind

25   of what the Third Circuit meant.

1          Third Circuit Standard, as of course I think all

2     litigants in this case know, in their recent decision from

3     2019, is that, "The hallmarks of permissible nonconsensual

4     releases are fairness, necessity to reorganization, and

5     specific factual findings to support these conclusions."

6     That's Metromedia at Page 139.  I'm sorry -- Millenium --

7     I'm just so tired -- at Page 139.

8          So I think that's actually dead on.  And so, you

9     know, when I now will launch into my best interests

10    argument, which is really so important because it is the

11    view of basically everybody in the case, rather than one

12    objector, implicitly or explicitly, that this is the highest

13    and best recovery for creditors, and it is better than a

14    liquidation,  plus the pursuit of third-party claims.  I

15    think that actually the Third Circuit maybe had it right.

16    And fairness means, you know, if you can't do better than

17    what we're getting for you under this plan, what else should

18    we be doing but this plan?

19          So with that, if Your Honor will let me launch it.

20          THE COURT:  Can I -- and I, at risk of -- and I

21    don't think it's -- it doesn't derail your argument, but I

22    want to be clear.  The best interests test, as set out in

23    Section 1129(7), is a statutory test, and one needs to

24    follow the words of the statute.  And the courts to some

25    extent disagree about what the statute says, based on its

1   plain terms.

2           What I was addressing contemplates one

3   interpretation of the best interests test.  But even if one

4   takes the other interpretation of it, which is that you

5   don't look at what one gets on one's claim in the case, you

6   just look at what you get on the claim in the case, I think

7   that fairness, in the sense described not only by the

8   Millenium Court, but actually in the earlier section of

9   Quigley by Judge Bernstein, requires some analysis, if it

10  can be done, into what sort of recovery the enjoined parties

11  would have if the plan were not confirmed.  And that's not

12  applying strictly the best interests test.  That's a more

13  rigorous view of fairness than one might normally apply to a

14  9019 settlement, in other words.

15          MR. HUEBNER:  Your Honor, I agree completely.  And

16  as you'll hopefully here in a few minutes, I'm going to

17  cover every alternative interpretation of 1129(a)(7), and

18  show you why we are extraordinarily comfortable that we meet

19  the statute's 24:16  we meet the statute's _____

20          Your Honor, 1129(a)(7), as of course everyone

21  knows, requires that the Debtors demonstrate that rejecting

22  impaired creditors who receive no less under the plan than

23  they would in the hypothetical Chapter 7 liquidation.

24          Here, Your Honor, the Debtors' proposed plan is

25  expected to distribute well in excess of $5.5 billion in

1   cash on account of contingent liability claims.  There is no

2   dispute that creditors will recover billions more under

3   claims against the Debtors than they would recover if the

4   Debtors had to liquidate.

5          The only possible dispute is whether the rejecting

6   creditors could actually recover, in a Debtor liquidation on

7   their own third-party claims against the Sacklers and

8   others, value that exceeds all of their many recoveries

9   under the plan, including the settlement of those third-

10  party claims, but as to a very small number of parties is

11  being imposed by the will and the votes and positions of the

12  overwhelming majority.  There are three principal objections

13  why this objection fails.

14         First, as Your Honor just noted, the Second

15  Circuit has not actually determined whether third-party

16  claims should be considered at all in the best interests

17  analysis.  And other courts that are also thoughtful, do not

18  agree with Quigley and Ditech.

19         The AHC argued this in their brief at Pages 155-

20  158.  I will actually rest of their papers on this point,

21  because I actually prefer to spend my time on the assumption

22  that it is obligatory, including for the larger fairness

23  reasons, for us to get the Court and all parties comfortable

24  that even rejecting creditors do better under this plan than

25  any other alternative we know of.

1           So, Your Honor, if you accord with Quigley and

2      Ditech, which is just fine for us and many others, it is

3      clear beyond peradventure that under the holdings of those

4      cases, we are not required to assign a specific dollar value

5      to the potential recoveries on rejecting creditors'

6      unknowable, inestimable third-party claims.

7           To the contrary, both of those cases make it

8      crystal clear that the value of third-party claims is only

9      to be considered when the claims are both, one, not

10     speculative, and two, capable of estimation.

11          Let's take a close look at those cases.  Quigley

12     is an asbestos case in which Judge Bernstein estimated the

13     value of third-party claims against Pfizer, Quigley's

14     parent, based on a 19-year track record of settlements, for

15     which Pfizer had paid over $1.2 billion and a mathematical

16     average of 23 percent of the claims asserted against it over

17     almost two decades.  437 B.R. 134, 146.  But that two-decade

18     track record, the claims at issue were not speculative and

19     were capable of estimation.

20          In Ditech, the Debtor tried to do something really

21     pretty sneaky, and they were caught.  They actually, in

22     fact, estimated the settlement and resolution value of the

23     varied third-party claims for some purposes under their plan

24     and (indiscernible).  And then -- but not for these

25     purposes.  And Judge Wiles said, no way, you can't pick some

1    purposes and not others.  You have already told me that the

2    claims are not speculative and hypothetical, but rather that

3    you can estimate them.  606 B.R. 544, 620-621.

4              The contrast to the instant facts could not

5    possibly be greater.  Unlike Quigley, there is no multi-

6    decade history of judgments or settlements or percent

7    allocations against the third parties to draw from.

8              And unlike in Ditech, the Debtors have

9    consistently stated that the value of an individual

10   rejecting creditor's direct claims, what they would actually

11   recover some day if this plan failed, is the very definition

12   of unknowable and unquantifiable.

13             Your Honor, given the Debtors' extensive record

14   evidence on liquidation, including its DelConte expert

15   report, Paragraph 9, et seq., the disclosure settlement

16   Sections 173-175, the objectors really need to demonstrate

17   that their own actual recoveries on direct claims in a

18   liquidation would be massive, knowable and quantifiable.

19             I will stop at 11 reasons why that quixotic

20   endeavor cannot succeed.  One, the terrible destruction of

21   estate value in a liquidation.  It is uncontested and

22   uncontestable that the liquidation of the Debtors would

23   greatly reduce the value available to go to these very

24   creditors.  DelConte at 9; Turner at 22; disclosure Appendix

25   B at 11.  So those billions get wiped from creditor

1  recoveries in a liquidation.

2         Two A and two B, massive professional fees and

3  totally uncertain allocation of any recovery to specific

4  creditors from the estates in a liquidation.  Liquidating

5  the estates and resolving the hundreds of thousands of

6  claims filed, will require a multi-year massive investment

7  of professional these.

8         Liquidating the claims and resolving the relative

9  entitlement of creditors vis-à-vis one another, once Phase 1

10  mediation is erased, would be an intercreditor litigation

11  maelstrom of victims and stakeholders against victims and

12  stakeholders, whose outcome is unknowable.  The only thing

13  we do know is that rational fees will be at least half a

14  billion and maybe more than $1.5 billion.  DelConte

15  declaration at Paragraph 36.

16         And as Mr. Shore, who actually represents tens of

17  thousands of PI victims, told the Court: "Do not forget.  We

18  are the largest group, the largest number of voters, the

19  largest claimants."  And as he had told many of us, they

20  will be back if there is no deal under this plan.

21         Number 3, reduced recovery on the estate claims

22  against the Sacklers.  The estate might recover less on its

23  claims against the Sacklers in a liquidation.  Mr. DelConte

24  sets forth multiple reasons for this in his report.  See

25  DelConte declaration at 33.  This result is also described

1    in our disclosure statement.  It's painful, but it's true.

2    No party cross-examined Mr. DelConte on this sworn

3    testimony.

4            And then we have the testimony of Ms. Conroy, who

5    has been suing Purdue for 19 years under his partner and

6    (indiscernible) partner, named partner, who was there

7    alongside her.  Her testimony, August 16, transcript 18, 9-

8    22, is that this deal reflects a peace premium where we're

9    getting more than we would get if global peace were not able

10   to be on offer.

11           Four.  The DOJ's claims.  The DOJ has an agreed $2

12   billion forfeiture claim with superpriority status.  They

13   also have billions of dollars of other claims, that if the

14   deal falls apart, they will likely assert, or likewise, in

15   rem claims, priority claims, nondischargeable claims,

16   because they're the federal government, et cet.

17           Those claims might absorb every dollar of net

18   estate liquidation proceeds, leaving nothing for anybody

19   else.  Because among so many other things, even if parts of

20   the deal stuck, we don't think we can satisfy the conditions

21   for getting the $1.775 billion forfeiture credit that is in

22   fact on offer in the settlement this Court approved, with

23   them ironically over the objection of the remaining

24   objectors to confirmation.

25           Five -- which is a coalition of sorts.  Instead of

1    four or five or more billion dollars that non-federal

2    governmental creditors in Class 4 are getting, they will

3    likely get close to zero.  The consequence, when you add up

4    all the predecessor points of the value destruction in

5    seismic into creditor reallocations that I have outlined, is

6    massive and uncontroverted.

7            Mr. DelConte's liquidation analysis lays out in

8    two of the three scenarios, Class 4 creditors get zero.

9    Only in a high case scenario, there's $699.1 million for all

10   creditors to share, not just the rejecting creditors in

11   Class 4.

12           The objectors did not question any of these

13   conclusions, although they had ample opportunity in days of

14   trial testimony.  I talked on Monday about my simplistic

15   view that we're here to apply facts to law.  No objector

16   designated a competing expert.  No objector submitted an

17   expert report with a competing liquidation analysis.  No

18   objector designated a rebuttal expert, critiquing Mr.

19   DelConte's analysis.  No party even deposed Mr. DelConte.

20   And no party spent any material time on cross-examination on

21   these issues.  If they meant it, we should have tried to

22   prove it.

23           There is no evidence of any kind from any party at

24   all that the likely recovery on their own direct claims is

25   concrete for estimable.  The Debtors' evidence that the

1    claims are speculative and not capable of estimation is

2    overwhelming.

3              Six -- and a lot of these are tied to the public

4    good and to helping America and Americans -- abatement.  Dr.

5    Gaurisankaran testified, without contravention, and I quote,

6    "Abatement programs that reduce opioid misuse for a

7    population will confer economic value to all entities that

8    serve the same population and claim to incur costs because

9    of opioid misuse."  Declaration at 47.  And that abatement

10   results in "multiplier effects" that provide creditors,

11   especially governments, I believe, with value that may well

12   exceed the dollar value distributed under the plan.

13             In the liquidation, there can be no guarantee that

14   all or most or even a substantial portion of the funds

15   creditors someday recover from the Sacklers would actually

16   have to go to abatement, and thus, this important multiplier

17   is gone.

18             I do want to reiterate, Your Honor, one last time,

19   my apology to Washington and Maryland, who seemingly passed

20   statutes -- who did pass statutes -- of course, what they

21   said to the Court is true -- directing their recoveries must

22   go to abatement.  I got that wrong and I'm very sorry about

23   that.  But as I also then noted, there are many, many other

24   states whose situation is exactly the contrary, and there

25   are tens of thousands of other creditors who would be in

Page 38

1   line with no obligations, as they have extraordinarily

2   agreed to in this case, to dedicate all of their recoveries,

3   other than the PIs, to abatement.

4           Seven.  Objectors would need to bridge a chasm of

5   billions of dollars to win an 1129(a)(7) argument, because

6   they are billions in the hole due to the total wipeout of

7   their plan recoveries.  And it's from there they must begin

8   to try to argue that exclusively and solely from their own

9   potential recoveries on non-speculative claims against the

10  third parties, they would get more than the billions that

11  they would make unavailable to everybody if the plan was not

12  confirmed.

13          Eight.  It is utterly impossible for any of the

14  few objecting rejecting creditors to demonstrate that they,

15  and only they -- and that's the critical phrase -- and only

16  they, will when the frenetic race to the courthouse against

17  third parties.

18          The objectors' suggestion that the Debtors could

19  have hired a damages expert to addressed the objectors' best

20  interest argument only highlights the staggering depth of

21  their misunderstanding of the law.  Damages are about claims

22  that one could assert.  The best interests test is about

23  recoveries; what I actually do better than this plan at the

24  end.

25          It is beyond cavil, Your Honor, that no claimant

1    could possibly credibly predict that the actual recovery on

2    their claim against the Sacklers, after years of internecine

3    warfare among creditors and disorderly races to hundreds of

4    thousands -- or for thousands of courthouses -- is knowable.

5    It's like trying to solve a single equation that has

6    hundreds or thousands of variables. 4(a) plus 5(b) minus

7    5(c) plus 8(d) equals X?  It cannot be solved.

8            And it has nothing to do -- nothing -- with the

9    merits and strength and validity of the claims of any

10   individual entity against the Sacklers.  Because for an

11   individual rejecting creditor to prove that it itself would

12   actually recover more, it can't only show that it's likely

13   to get a big judgment.  It has to show that no one else

14   would, and only they would.

15           Because logic dictates that if the three rejecting

16   states who have made a best interests objection have

17   meritorious claims, so do all the non-rejecting states.  And

18   if all the states have meritorious claims, then it stands to

19   reason that many other public creditors also have

20   meritorious claims.  And if all states and tribes and

21   municipalities have valid claims against the Sacklers,

22   likely so do the hundreds of thousands of private contingent

23   liability claimants.

24           And every one of these groups for whom the Debtor

25   is a fiduciary has filed proofs of claim under penalty of

1    perjury, that they believe that they have those claims

2    against the Debtors and the Sacklers, which is why the

3    States' $2.156 trillion claim, as large as it is, is dwarfed

4    20 times over by the $39 trillion of other filed claims.

5    And that's only 10 percent of them, because while the

6    states' claim was liquidated, most of the other claims, 90

7    percent of them, were not.

8              Nine.  Thousands of claimants would be chasing a

9    smaller and possibly (indiscernible) of assets.  Let's

10   assume that direct claimants are able to recover every penny

11   of the aggregate personal wealth of the individual members

12   of the Sackler Family, named as Defendants in the third-

13   party litigation.  Claimants would still come up billion

14   short of the $4.375 billion that the Sackler Families have

15   agreed to pay under the settlement, and even more billions

16   short of the $5.5 billion total in minimum projected value

17   that those creditor standard receiver under the plan.

18             And during the years that people were suing the

19   Sacklers, one would imagine the Sacklers will pay hundreds

20   of millions or more in legal fees, and might, for example,

21   use their assets to settle with non-rejecting creditors.  So

22   if non-rejecting creditors get settlements, then rejecting

23   creditors even more can't do better than they would do under

24   the plan.  Which is why the intercreditor complexity, which

25   seemingly, virtually every single party in the entire case,

1   except for nine, seemingly understands and has reluctantly

2   and painfully led them to conclude that this settlement,

3   which does leave the Sacklers with material wealth, is

4   better for them, the claimants, than any other alternative.

5          Ten.  Claimants cannot reasonably estimate the

6   prospect of they themselves successfully recovering on their

7   direct claims.  I am not going to cite -- and I am most

8   certainly not ever going to accord with or endorse the

9   evidence and argument submitted by the Sacklers about their

10  lack of culpability and their defenses to collection with

11  respect to their trusts.  Not now.  Not ever.  They are the

12  Defendants and estate is the Plaintiff, along with many

13  others.  And if we do not settle, we will be suing them for

14  billions of dollars.  Make no mistake.

15         But what I am is the fiduciary and spokesman for

16  the shareholders.  The Debtors didn't vote on the plan.

17  That's not our job.  But 38 attorneys general, and the UCC,

18  and the AHC, and the MSG, and the adult (indiscernible), and

19  the pediatric (indiscernible), and the tribes, and the

20  hospitals, and the TPPs, and the rate payers, and the

21  Board's Special Committee, considered a great, great many

22  things in deciding to accept this settlement.

23         I think it is fair to say that while we disagree,

24  Jersey law, Wyoming and Connecticut trusts, and Mr.

25  Cushing's testimony, do raise litigable issues with respect

1   to the ability to recover on direct claims against the

2   Sacklers from the very material assets held in their

3   (indiscernible) trusts.

4           As I noted on Monday, Your Honor -- ironically, I

5   think it was Paragraph 239 of our brief -- the Debtors have

6   the strongest claims against those trusts, because we have

7   in rem claims based on the irrevocable vested in the estate

8   of the fraudulent transfer and analogous claims.  Those are

9   not direct claims.  So they don't figure into the

10  hypothetical 1129(a)(7) showing when you're trying to weigh

11  a direct claim as an add-on to what you might get in a

12  liquidation.

13          And Your Honor, in this regard, the litany I just

14  read to you, it is incredibly telling that in this case,

15  with over half a million creditors, there is one objection,

16  one, that makes a best interests objection.  One.  Mr.

17  Gold's pleading on behalf of DC, Maryland and Connecticut.

18  And with no disrespect intended, because I think he's doing

19  a terrific job and he's a very serious lawyer, he made that

20  objection in one page of his brief.  No factual support for

21  the types of claims that would need to be proved.

22          THE COURT:  Actually, I thought it was just

23  Connecticut --

24          MR. HUEBNER:  Finally, Your Honor --

25          THE COURT:  I thought it was just Connecticut and

Page 43

1    Maryland on that one.  DC joined the other one --

2           MR. HUEBNER:  Oh, Your Honor, I apologize.  I

3    thought that objection said filed on behalf of DC, Maryland

4    and Connecticut.  But if DC didn't join that argument, then

5    it's one objection on behalf of two parties, as opposed to

6    three.  But I think, you know -- I think the point is the

7    same.

8           THE COURT:  You know what?  I was wrong.  It does

9    include DC.

10          MR. HUEBNER:  Your Honor, Judges are never wrong.

11          THE COURT:  Well, I was wrong.

12          MR. HUEBNER:  Number 11.  Your Honor, Number 11.

13   Claimants rejecting creditors making a best interests

14   argument cannot possibly quantify or know or estimate the

15   massive cost and delay to them of lengthy and chaotic

16   jurisdiction, because as many as 58 jurisdictions all over

17   the world.  No creditor could possibly allege without

18   speculating what they would actually recover net of the cost

19   of litigation and collection and delay, after years of

20   (indiscernible) warfare by thousands of creditors with all

21   against all.

22          For these 11 reasons, Your Honor, among others,

23   the direct claims of three creditors out of the hundreds of

24   thousands who have raised a best interests test, I believe

25   are literally the archetype -- actually the archetype of

1   claims that in these complex circumstances are speculative

2   and not capable of estimation.

3           Your Honor, that brings me to my third and final

4   meta point.  While I hope that my reasons each individually,

5   and certainly collectively, demonstrate the views of so many

6   for whom I'm speaking today, that rejecting creditors would

7   not do better in the liquidation, and would do ever so

8   terribly worse even inclusive of their direct claims.  I

9   have overwhelmingly, in fact, perfect empirical evidence

10  from July and August of 2021 for the unassailable veracity

11  of this position.

12          38 states, 80 percent of the voting states have

13  done the work for years, litigating against Purdue and the

14  Sacklers, weighing the alternatives, and fighting like hell

15  for their citizens against Purdue and the Sacklers.  And

16  they have concluded that the Plan provides superior value to

17  states than does liquidation.  This is true for this -- many

18  other creditor groups, who I will not again list, who

19  support this Plan.  And between all these parties, they are

20  represented by many of the most sophisticated, and one might

21  argue fearsome, mass tort plaintiffs' firms and other

22  litigation firms in this country whose clients I can

23  guarantee you, having done almost nothing else for three and

24  a half year, have suffered at least as much loss and have

25  unthinkable antipathy for the Sacklers as any of the Plan

1    objectors.

2            In stark contrast to the wild speculation to the

3    nth power, they would be involved in assessing what an

4    individual rejecting creditor, out of 614,000 competitors,

5    would actually recover in liquidation, the market of states

6    identically situated to the one best interest set of

7    objectors, has spoken on this point with extraordinary

8    clarity, and chosen which gives them the better recovery.

9            And of course, Your Honor, the bankruptcy system

10   under the guidance of the Supreme Court, love market tests

11   to prove things.  See e.g., 203 N. Lasalle, 119 S.Ct. 1411.

12   There's no better way to know what something is worth than

13   what people will actually choose when faced with a choice.

14   80 percent of identically situated claimants clearly think

15   that their direct claims against the Sackler cannot close

16   the more than $5.5 billion gap between what people are

17   getting under the Plan to help their citizens in these

18   terrible times.  And the alternative, whose worst feature

19   would be creditors fighting one another and competing

20   another.

21           And for the record, Your Honor, the $5.5 billion

22   number that I have been using is exceedingly conservative

23   because it does not take into account, as our evidence shows

24   recoveries on insurance proceeds, which we hope are the

25   billions, and terminal asset value when NewCo is monetized,

1     that it's slated also to flow all but exclusively to

2     governmental creditors, these very objecting creditors, for

3     abatement with its multiplier under the Plan.

4              I also didn't count PHI, which many people believe

5     itself could be worth billions, especially to states by

6     avoiding further damage, and helping their citizens, or the

7     public spillover multiplier.  None of that is in the math.

8     $5.5 billion is just the cash in the sworn evidence and

9     nothing more.

10             And, Your Honor, this is therefore a much more

11    central plaintivist case than just best interest.  The value

12    hold that any alternative to this Plan, and certainly

13    liquidation, would create for all creditors, but for the

14    states far more than anyone else, is way bigger than $5.5

15    billion, and it cannot possibly be refilled and then

16    exceeded by a liquidation and direct suits against the

17    Sacklers.

18             I should also note, Your Honor, that I did not

19    include or take into account Mr. Prices argument that Your

20    Honor Mr. Gold about on Monday, that over $4 billion out of

21    the $10.4 billion in cash that the Sacklers took out of

22    Purdue, which in 2008 and 2019, went directly -- directly to

23    state and federal governments at the Sacklers' request to

24    pay their person income taxes.  Because they set Purdue up

25    as a limited partnership, the Sacklers, it's not a taxpayer.

1          I believe, Your Honor, cited a figure of $285

2     million in the Atkinson declaration about Connecticut;

3     ironically, the objector on best interest ground.  And the

4     federal government whose number is 10 times that, who might

5     face serious exposure as the transferee's a preferential

6     transfers that were made for the benefit of the Sacklers.

7     There is a day they have to pay that money back so that all

8     creditors could share it, not just the data to keep it.

9          And that also goes into best interest because in a

10    liquidation, that money might come back into the estate to

11    be shared by all.  But as I said, I left many, many things

12    out of my core analysis because it was enough.

13         To assume, Your Honor, that 80 percent of the

14    states are wrong about what is in the best interest of

15    states is not rational.  And even out of the nine objectors,

16    only two states and D.C. even made the objection at all,

17    which is more telling.  States have accepted the Plan, as

18    all other creditors have, by an overwhelming margin -- all

19    other creditor classes and groups have because they believe

20    that while it is painful and difficult and horrible to the

21    lives of many to leave the Sacklers with wealth, the Plan

22    furthers their best interests and provides value billions in

23    excess of what would result from the meltdown of the estates

24    and resuming the litigation free-for-all that prevailed

25    before these cases began.

1          Your Honor, except for lawyers, nobody does better

2     in a liquidation, nobody, which would destroy so much that

3     so many have worked for so long to bring -- to bring to

4     fruition, to help victims and abate the opioid crisis.  We

5     ask that the best interest objection be overruled.

6               THE COURT:  Okay.  Thanks.

7               Mr. Goldman, I think you're taking this on behalf

8     of Connecticut, Maryland, and D.C.?

9               MR. GOLDMAN:  Yes, Your Honor, and I can add to

10    that list since we have been coordinating among all the

11    objecting states, and the states of Oregon, Delaware,

12    Vermont, Rhodes Island, and Maryland, and Washington.

13              THE COURT:  Okay.  Although I don't think any of

14    those actually raised this issue.

15              MR. GOLDMAN:  I would correct the record, Your

16    Honor.  Washington and Oregon did join in our objection at

17    Paragraph 104 of their objection.

18              THE COURT:  Okay.

19              MR. GOLDMAN:  So, there are actually five -- well,

20    four states and the District of Columbia that are advancing

21    this objection.

22              THE COURT:  Okay.

23              MR. GOLDMAN:  So, let me proceed.  I think Mr.

24    Huebner did a good job of explaining the best interest test,

25    but if I could just go over it briefly to set the framework

1    for my argument?  As you mentioned, it requires that in a

2    peered class of creditors, each of the class members must

3    either accept the Plan or will receive under the Plan, at

4    least as much as they would receive in a Chapter 7.

5            THE COURT:  Actually, that isn't the specific

6    language of 1129(a)(7), right?  The provision says, "With

7    respect to each impaired class or claims... each holder of a

8    claim or interest of such class has accepted the plan; or" -

9    - and then here's the key language -- "will receive" will

10   replayed -- "or retained under the plan on account of such

11   claim... property of a value as of the effective date of the

12   plan that is not less than the amount that such holder would

13   so receive or retain if the debtor were liquidated under

14   chapter 7 of this title".  I emphasize the word, "so"

15   because I think it's arguably there for a reason.  And as

16   the AHC objection points out, it would seem to modify on

17   account of such claim, and therefore, focus the Court on the

18   claims' recovery in Chapter. 7, as opposed to just recovery

19   generally.

20           I don't know if you have a response on that point?

21           MR. GOLDMAN:  Of course, both the courts in

22   Quigley  and Dietech have rejected that --

23           THE COURT:  They -- well, actually, they didn't

24   reject it in that the argument wasn't made to them.  There's

25   no discussion of that reading or the meaning of the word, or

1    -- of "so" in that provision, in either of those cases that

2    they cite.  But I appreciate that Judge Garrity and Judge

3    Bernstein are certainly -- or -- but Judge Bernstein's now

4    retired, so are or were certainly excellent judges, but it's

5    an argument that's been made to me that I don't think was

6    made to them.

7              MR. GOLDMAN:  Well, I would point out first that

8    the Debtor has not argued for any back in their brief --

9              THE COURT:  But AHC did.  The --

10             MR. GOLDMAN:  Yes.

11             THE COURT: -- the Ad Hoc group of governmental

12    entities.

13             MR. GOLDMAN:  I would -- I would respond that I

14    don't think "so" would change the idea that was expressed in

15    the Dietech and the Quigley cases, that in the Chapter 7,

16    those creditors would be retaining on account of their

17    claim, rights against third parties.  That plan proposes two

18    weeks.

19             So, I would argue that the single word "so" would

20    not alter the analysis that was articulated in both of those

21    cases that where they distinguished between the Chapter 13

22    test, which doesn't include the word "retain," to conclude

23    that what they would retain in Chapter 7 is the right to go

24    against third parties who are proposed to be released.

25             THE COURT:  Okay.  Well --

1          MR. GOLDMAN:  That's -- that's fair.

2          THE COURT:  -- again, I -- as I said to Mr.

3    Huebner, I'm not sure ultimately this matters because I

4    think consistent with the section of the Quigley case as

5    well as other cases that have considered plans that have

6    sought to impose a third-party release or injunction, it is

7    incumbent on the Court to look at what's being given up

8    under the plan in terms of evaluating that request, whether

9    or not it's under 1129(a)(7), too.

10         So, I just wanted to note the issue.  I -- to me,

11   I can't ignore the word.  I will note also that "claim" is

12   not defined as a claim against the debtor in 1015 of the

13   Code.  On the other hand, it would, I think, open up a

14   fairly large can of worms if courts started to look at all

15   sorts of recoveries from third-party sources, that one would

16   get under it in Chapter 7 as a mandatory exercise for

17   confirming a plan.

18         But maybe it's -- maybe it's academic given the

19   larger point that I think controls here, which is that I

20   have to look at -- beyond the 9019 analysis because that

21   really applies to the Debtors' estate and creditors -- what

22   it is that the injunction of third-party claims would

23   deprive the objectors of, or alternatively, whether it's

24   actually a fair deal for them.

25         MR. GOLDMAN:  May I proceed, Your Honor?

1          THE COURT:  Sure.  Yes.  Go ahead.

2          MR. GOLDMAN:  Okay.  So, as the Dietech court

3    observed, according -- from an earlier Southern District

4    case, the command of Section 1129(a)(7)(ii) is perhaps the

5    strongest protection creditors have in Chapter 11.

6          I think Mr. Huebner's argument that because 80 or

7    90 percent of the states have accepted the Plan, should

8    somehow mean that the best interest test is satisfied.

9    Well, if you go with the majority or super-majority of

10   creditors who are voting in favor of the Plan, that

11   essentially wipes out the purpose of the best interest test,

12   which was -- is to protect the dissenting creditors.  It's a

13   totality to say that because the majority voted yes, they

14   must be right.

15         That is a sophistic, S-O-P-H-I-S-T-I-C --

16         THE COURT:  Right.

17         MR. GOLDMAN:  -- argument.

18         THE COURT:  Right.  The purpose of the test is --

19         MR. GOLDMAN:  So --

20         THE COURT:  -- really to protect the minority on

21   your -- I understand that.

22         MR. GOLDMAN:  Fine.  And the Plan proponent bears

23   the burden of proof to demonstrated with evidence that the

24   test has been satisfied.  They can't shift to the burden to

25   the dissenting creditor, as suggested by Mr. Huebner, to

1    prove what it would recover on its direct claims.  It's the

2    Debtors' burden of proof on best interest.

3              And just to remind the Court, the dissenting

4    creditors here are California, Connecticut, Delaware, the

5    District of Columbia, Maryland, New Hampshire, Oregon, Rhode

6    Island, Vermont, and Washington.

7              And the best interest of creditors requires a

8    comparison of what those dissenting creditors would receive

9    under the Plan, and what they were to receive in a

10   hypothetical litigation.  It doesn't say what all of the

11   Class 4 creditors would receive under the Plan in relation

12   to what they all would receive in a liquidation.  The

13   analysis is focused on the dissenting creditors.  And for

14   that first part of the test, the Debtors did not even

15   present evidence of the amount the dissenting creditors

16   would receive under the Plan.

17             Now, although Mr. DelConte testified that it would

18   be a multiplication exercise --

19             THE COURT:  No, I actually have --

20             MR. GOLDMAN:  -- based on the allocation --

21             THE COURT:  -- I actually have a chart of what

22   each of those states would receive under the Plan and I

23   don't think that's controverted.

24             MR. GOLDMAN:  Well, my point is, they didn't

25   present evidence of that, Your Honor, prepare a chart.  It -

1    - like --

2              THE COURT:  I mean, I believe it's -- I believe

3    it's in the record.  I -- we -- I didn't -- we didn't make

4    it up.

5              MR. GOLDMAN:  Be that as it may, they didn't

6    present it in their brief as to what we would receive or in

7    argument to make the comparison of what we would receive in

8    a liquidation.

9              And on the other side of the equation --

10             THE COURT:  Oh, I'm sorry.  I thought you -- I

11   don't have a specific number of what they would receive in a

12   liquidation.  I do have what they would receive under the

13   Plan, at least an estimate of what they would receive.

14             MR. GOLDMAN:  That's what I meant.  That's what I

15   meant, so I acknowledge that.

16             THE COURT:  Okay.

17             MR. GOLDMAN:  All I'm saying is there wasn't --

18   that wasn't presented by Mr. DelConte, it was presented in

19   the Debtors' brief as to what we would receive, to make the

20   comparison.

21             And on the other side of the equation, because in

22   Chapter 7 there would be no third-party releases, it's our

23   contention there must be some proof of what the dissenting

24   states would receive if they were permitted to go forward

25   against the Sacklers.  And yet, no such proof was provided.

1            Mr. DelConte testified that no attempt was even

2     made to estimate or project what the dissenting states would

3     recover on claims against the Sacklers.  That was at the

4     8/13 Transcript, Page 61.  And that his liquidation analysis

5     did not include the value for any of the direct claims of

6     Purdue creditors against any of the Sacklers.  Ant that was

7     at Page 58 of his testimony.

8            Indeed, the Debtors did not even attempt to

9     ascertain university -- universal creditors in these estates

10    that are asserting claims against the Sacklers.  We

11    acknowledge that Mr. DelConte, at Page 57 of his testimony,

12    that failure stands in stark contrast to the evaluation that

13    was done in the Dietech case by Alex Partners.  He should

14    have at least attempted to identify and put a settlement

15    value on the consumer claims that would have survived in

16    Chapter 7 case in Dietech, and could have been asserted

17    against the buyer of the consumer credit agreements there.

18            The Debtors attempt to excuse their lack of proof

19    with the argument that the claims are speculative but not

20    capable of estimation, that is not supported by anything

21    other than the Debtors' counsel's say-so.  The same argument

22    was made by the debtors in Dietech and it was squarely

23    rejected.

24            THE COURT:  Well, it --

25            MR. GOLDMAN:  There, the --

1          THE COURT:  -- it was made, but obviously it was

2     rejected because they'd actually quantified them.

3          MR. GOLDMAN:  They tried -- they tried to quantify

4     them, and the court held that that was not acceptable proof.

5     And the consumer claims there that would have been

6     extinguished if --

7          THE COURT:  But even as -- even as quantified,

8     there was no countervailing benefit at all in return for

9     them.

10          MR. GOLDMAN:  In the sense of -- I'm not sure I

11     understand what Your Honor means.

12          THE COURT:  There was no showing of any real

13     benefit to the -- to the consumers that were giving up those

14     claims other than the $5 million.  So, you had $252 million

15     versus $5 million.

16          MR. GOLDMAN:  Well, I understand that, Your Honor,

17     my -- my point is that the claims -- the consumer claims --

18     that would have been extinguished under the Plan by the 363

19     Sale of the consumer credit agreements, would have been

20     available to assert against the buyer in Chapter 7, a buyer

21     of the consumer credit agreements.  And they were based on

22     very attenuated claims.

23          There were account misstatements, claims --

24     wrongful -- claims of wrongful foreclosure, unfair

25     collection practices and the like, and they gave rise to

1    potential claims under the Real Estate Settlement Procedures

2    Act, the Truth in Lending Act, Fair Credit Reporting Act,

3    and Fair Debt Collection Practices Act.  All those claims

4    were unliquidated.

5             And based on the analysis done by Alex Partners,

6    3,900 proofs of claim were identified as being consumer-

7    related, and 265 proofs of claim having been matched to

8    pending litigation.  No such analysis was done in this case.

9             THE COURT:  But in -- in Dietech, Dietech and its

10   predecessor had a history of dealing with these types of

11   claims and with settling them, which was a basis for Alex

12   Partners' analysis.

13            What I have here is something more attenuated.  I

14   have the settlements from the 2007 period.  I have the

15   settlement with the State of New York where the Sacklers

16   themselves paid $75,000.  I have the settlement more

17   recently with the State of Oklahoma, where they paid $75

18   million.  And I have a number of complaints, some of which

19   have survived motions to dismiss, although largely on

20   procedural grounds -- those motions being made largely on

21   procedural grounds, such as noncompliance with federal law,

22   preemption, or jurisdiction grounds.  So, you just don't

23   have the same type of track record here.

24            MR. GOLDMAN:  You don't have the same type of

25   track record, but I would point out that in neither of those

1    cases did the court hold that some sort of settlement

2    history was a prerequisite to, you know, the finding that

3    they weren't speculative or remote.

4              THE COURT:  That's true.

5              MR. GOLDMAN:  There was a settlement --

6              THE COURT:  But they -- but they did rely on the

7    settlement history.

8              MR. GOLDMAN:  Oh, well, it's -- it would be hard

9    to dispute that, Your Honor, and I do agree.  However, I

10   would point out in Dietech that the settlement history was

11   only for about a year and a half, and it didn't include that

12   many claims.  That's not to say that because there is no

13   settlement history, by necessity, claims are speculative and

14   remote.

15             Remember, the Debtors, as Mr. Huebner pointed out

16   in a prior hearing, there were a total of 18 experts that

17   were hired in this case, albeit not all of them by the

18   Debtor.  And I find it more than curious that on this one

19   issue, given all those experts and how creative the Debtors

20   have managed to be in this case, didn't present any expert

21   even on the issue of whether the claims themselves were

22   speculative and incapable of estimation.  They're just

23   asking you to make that conclusion based on their say-so.

24             Mr. DelConte was not an expert on estimating

25   claims or affixing damages.  He said -- he gave the party

```
1    line, that, well, we just didn't feel comfortable that we
2    could estimate these claims.  But he wasn't the expert that
3    was hired to do it.  In fact, he acknowledged that the
4    Debtors didn't hire an expert to do that or even to tell the
5    Court that they weren't estimable.
6              THE COURT:  Fair point.
7              MR. GOLDMAN:  I just, again, point out and I
8    recognize the difference on settlement history, but in
9    Pfizer -- or Quigley as well, the claims were unliquidated
10   and disputed, albeit there was some history for the court to
11   evaluate.  But again, my point is, it's not a necessary
12   condition.  No court has held that.  And in Dietech, none of
13   the consumer claims at issue have even gone to judgement.
14             I would also point out that --
15             THE COURT:  But there had been -- but there had
16   been other consumer claims that had gone to the stage where
17   they were settled.
18             MR. GOLDMAN:  Correct.  And my point is they
19   hadn't gone to judgment.
20             THE COURT:  These particular ones, yeah.
21             MR. GOLDMAN:  Yes, yes.
22             THE COURT:  But I think there were similar claims
23   that had gone to judgment as well as some being settled.  I
24   mean, frankly, I think they're some that have been ruled on
25   in the Southern District Bankruptcy Court.
```

1        MR. GOLDMAN:  Your Honor, I'll defer -- I'll defer

2   to you on that.  I just -- I don't -- my -- I thought that

3   based on the settlement data they had, that none had gone to

4   judgment, but I'm not completely sure about that --

5        THE COURT:  Okay.

6        MR. GOLDMAN:  -- now that Your Honor has raised

7   the point.

8        The fact -- it's ironic that the fact that no

9   settlement and litigation data is available here is the

10  result of the Debtors' own doing.  I mean, the states have

11  been prevented from continuing with actions against the

12  Sacklers for almost two years by the preliminary injunction,

13  that the Debtors were asked -- weren't even successful in

14  getting.  They shouldn't be able to turn around now and use

15  that standstill to argue that the claims can't be valued

16  because there's no settlement data.

17       But if the states had been permitted to go

18  forward, we may very well have had some settlement data or

19  judgments in either direction for the Court to make a

20  decision on this task.

21       THE COURT:  But I guess that goes to the other

22  point, which is the primary point I think that the Debtors

23  have been making, which is they have focused only lightly on

24  the strength of the states' claims against the Sacklers and

25  very heavily on the recovery that the states would have on

1    those claims.

2              MR. GOLDMAN:  They haven't focused.

3              THE COURT:  They have focused primarily on the

4    recovery that the states would have on those claims.

5              MR. GOLDMAN:  Yes.  And I -- I will get to that.

6              THE COURT:  Okay.

7              MR. GOLDMAN:  Point, Your Honor.  But before I do

8    that, I'd like to address the argument that they make in

9    their brief that in order for it to be true that holders of

10   all third-party claims would be better off in a liquidation

11   because of the value of claims released under the Plan, the

12   aggregate recovery due in those claims, it would be -- it

13   exceeds $4.8 billion.

14             Now, Mr. DelConte confirmed, the Debtors made no

15   attempt to even ascertain the universe of creditors that are

16   asserting claims against the Sacklers.  The Debtors are

17   simply assuming that every creditor in the case would assert

18   claims against the Sacklers and that all those claims would

19   be completely homogenous, would not vary in their merit, or

20   type of claim, and that is simply not a valid assumption.

21             They did not do the analysis that was done in

22   Ditech to see which creditors were asserting claims against

23   the Sacklers, and I'm not aware of any proof of claim in the

24   case that was asserted against the Sacklers as opposed to

25   the Debtor.

1              Second, the best interest test requires looking at

2     what the dissenting creditors would receive on their direct

3     claims.  We'll recover, I acknowledge recovery, and now with

4     the holders of all third-party claims, which the Debtors

5     haven't even identified, would receive, in a hypothetical --

6              THE COURT:  But I think the point is the dilutive

7     effect of the claims that actually are, we know, just leave

8     it to that.  The claims of the individual states filed

9     against the Debtors, and I think we know a fair number of

10    the governmental entities, non-state governmental entities,

11    as well as the liquidated value of those claims.

12              I think their point is that even if you confine it

13    to that aggregate amount, there would be an enormous

14    dilutive effect, not that you would measure what the others

15    got, but that the effect of their pursuit of those claims

16    would dilute the objector's recovery, along with various

17    other things too, like the cost and delay.

18              MR. GOLDMAN:  I do understand the point, but I'm

19    not sure that it's a valid assumption that every state is

20    asserting claims against the Sacklers; not all states did

21    file claims against the Sacklers.  I don't think any effort

22    was made to identify which complaints were actually filed.

23    And if they weren't filed, which states intended to make

24    claims against the Sacklers, but not because of the Chapter

25    11 filing in September of 2019 and the preliminary

1   injunction.

2           So my point is they simply haven't been

3   identified.  They've asked Your Honor to assume that

4   everyone would make claims against the Sacklers, but there

5   really is no evidence that all of them would is my point.

6           And as to the competing claims of the estates

7   against the trust, I would submit that analysis ignores that

8   if just three states get judgments against one or more of

9   the Sacklers, they could be put into involuntary bankruptcy

10  where the interest in their offshore trusts would be

11  susceptible to becoming property of their estates.  No

12  analysis was done on the effect of a potential bankruptcy

13  filing and what that would mean in terms of their interests

14  in the trusts and whether the estates' claims against the

15  trust would prevail or have priority over those interests

16  that could possibly become property of the estate.

17          THE COURT:  Can we just --

18          MR. GOLDMAN:  There's no --

19          THE COURT:  I think you're making two points there

20  and I want to just make sure I understand them.

21          There would be estate claims that would be

22  asserted by Purdue in a liquidation against the trust,

23  fraudulent transfer claims.  We do have expert testimony on

24  that, and as well as the recoverability of that.  Parties

25  have said that they would dispute it if, in fact, there was

1    litigation, but they haven't disputed it in this case.

2    Under the stipulation, there's no adverse consequence to

3    them for having not disputed it.

4              And then I think you're saying that in a Sackler

5    parties bankruptcy, the assets of the estate or his or her

6    estate would become property of the estate.  But there is

7    testimony, I believe, that most, if not all, of those trusts

8    are spendthrift trusts, which you would have to adjudicate

9    in, I believe, Jersey.

10             MR. GOLDMAN:  Well, to the extent those trusts are

11   self-settled with monies from the settlors, I think they're

12   vulnerable to attack.  The cases cited by the Debtor in its

13   brief about the Greenwich v. Tyson case in Connecticut, they

14   all presume that the trusts were not self-settled.  Self-

15   settled trusts are not given protection from creditors.

16             So I would just make the point that they could be

17   vulnerable to that type of challenge in an individual

18   bankruptcy.  But even getting beyond that, you know, the --

19             THE COURT:  But again, there would be a factual

20   determination of that in a Sackler bankruptcy, an individual

21   Sackler personal bankruptcy, but then you'd have to enforce

22   that judgment against the assets of the trust, which I think

23   mean you'd have to go through Jersey.  And when I say

24   Jersey, I don't mean the state of New Jersey, I mean the

25   bailiwick of New Jersey.

Page 65

1          MR. GOLDMAN:  I understand.  I understand what you

2     mean.

3          THE COURT:  Right.

4          MR. GOLDMAN:  And I acknowledge that, Your Honor.

5     But I know the states, the states would be poised to do that

6     I'm sure.

7          THE COURT:  Well, they might well be poised, but

8     they didn't cross-examine Mr. Cushing on their ability to

9     actually move from being poised to collecting.

10         MR. GOLDMAN:  Well, I'm merely pointing out that

11    that analysis on the bankruptcy aspect of this was not done

12    in terms of an individual bankruptcy of any of the Sacklers

13    that might suffer judgments from the states.

14         And beyond that, I'm presuming since they would be

15    themselves the subject of Chapter 11 cases, their post-

16    bankruptcy income would also become part of their estates

17    and, you know, going forward.

18         So the trust would not be the only source of

19    recovery.  You'd also have their interest in the IACs that

20    would come into their bankruptcy estates and potentially --

21    well, basically, all of their assets and interest in

22    property, and no analysis was done on that.

23         And I think that it's important that it had to

24    have been done because in the absence of a confirmed plan

25    and if the states are committed to go forward, we would

Page 66

1    maintain it's likely that the estates would obtain judgments

2    against one or more of the Sacklers and is a likelihood that

3    they could be subject to a bankruptcy proceeding.

4              And I would just also note that this idea that the

5    disclosure statement and the assumption that these claims

6    are just speculative and not capable of estimation shouldn't

7    be held to satisfy their burden of proof on the best

8    interest of creditors test, given its importance to

9    dissenting creditors like the ones we have here.

10             As the Bankruptcy Court stated in In re. Mcorp,

11   137 B.R. at 228, a proposed plan of reorganization may not

12   be confirmed where the evidence is not sufficient on which

13   to base an independent determination that the proposed plan

14   is in the best interest to creditors.  And I submit that was

15   not done here.

16             Just to briefly address a few points that Mr.

17   Huebner made.  I don't want to forget those.

18             I viewed his point that we can't prove the

19   authority that we can prevail on our claims or get a

20   recovery as effectively shifting the burden of proof on the

21   best interest of creditors test.  It's not our burden to

22   prove what we would recover.  They made this point in their

23   brief that we didn't submit expert testimony on what we'd

24   recover.  It's not our burden of proof.

25             On this issue of the taxes that Connecticut and

1    other states may have received from the tax distribution, I

2    think is a complete red herring.  Each of the states was

3    immediate transferee of that money.  So if we took in good

4    faith and without knowledge, we're protected under Section

5    550, and there's no colorable claim that the states didn't

6    take tax money in good faith.

7              With that, Your Honor, I --

8              THE COURT:  So the states -- I mean, I think -- I

9    don't want to really -- I think that the personal injury

10   claimants would say, well, who was supposed to be regulating

11   Purdue if not its home state and the federal government, the

12   two of which got the most taxes.  So I guess that comes down

13   to whether a failure regulation warrants any sort of either

14   presumption of knowledge as to the taxes or some basis to

15   subordinate claims.

16             MR. GOLDMAN:  I understand the theory, Your Honor.

17   I'll just say that is quite a stretch.

18             THE COURT:  Well, I think it would be an argument.

19   Let's leave it at that.

20             MR. GOLDMAN:  I'm happy to leave it at that, Your

21   Honor.

22             THE COURT:  And personal injury lawyers, I'm sure

23   wouldn't hesitate to make it; whether it'd win or not is

24   another story.

25             MR. GOLDMAN:  With that, Your Honor, I'll give the

1      floor to any rebuttal.

2              THE COURT:  Okay.  Thank you, Mr. Goldman.

3              MR. GOLDMAN:  Thank you, Your Honor.

4              MR. HUEBNER:  Your Honor, I think I'll be

5      relatively brief, but there are some things that were said

6      that -- there were quite a few things that were said

7      factually, but I think it's worth letting everybody know it.

8              And, you know, this is actually a much more

9      important conversation that he raised than just best

10     interests because in many ways, this is the heart of

11     everything, which is why are so many people in favor of

12     doing this as opposed to its alternative.  And so, I

13     actually embrace a demanding Third Circuit standard that

14     this is the fairest, best outcome under extraordinary

15     outcomes, which is why we didn't actually brief that Ditech

16     don't really apply, someone else did, because we're fine

17     within the plan.

18             And here you asked me a few days ago during cross-

19     examination to not get into conceptions of justice and

20     fairness, but let's talk about a few things that are more

21     directly relevant to the statute.  Number one, Your Honor,

22     is you've heard me say many times, I have never once ever

23     defended Purdue's past conduct or the Sacklers.  We arrived

24     in March 2018.

25             But the facts are that it was not the Sacklers who

1    paid $75,000 to New York State; it was Purdue.  And in

2    Oklahoma, the Sacklers were note even sued; Purdue was sued.

3    And Purdue paid to settle that for a variety of reasons and

4    the Sacklers were not parties to the consent judgment and

5    made a voluntary contribution of $75 million.  Might those

6    suits have expanded and were they thinking lots of complex

7    things when they settled?  They are not my clients and never

8    have been, so I don't know and it's not my business.

9            But the facts are that there is no track record, I

10   believe, which is part of what angers so many people, of the

11   Sacklers actually having had judgments entered against them.

12   I believe there are none.

13           Your Honor, the first point -- and I appreciate

14   the references both to sophistry and to tautologies -- are

15   simply not correct.  In many cases, an individual member of

16   the class is differently situated and has a third-party

17   claim that many others might not have.  They might be

18   properly classified in the same class vis-à-vis the Debtors

19   but have a unique opportunity to recover more than in a

20   liquidation because they have third-party claims that could

21   be pursued that the plan would take away.

22           And if those claims are not speculative and

23   reasonably capable of estimation, which is the best possible

24   law for Mr. Goldman's clients, then they have a real

25   argument.

1           Here, it is absolutely appropriate to take

2    judicial notice of 50 states, 48 states, 38 states that I

3    will argue in more detail in a few minutes are, in fact,

4    virtually identically situated, have made the same choice.

5    So, in fact, it's neither a tautology nor is it sophistry.

6           Number two, Your Honor.  We fully accept that it

7    is our burden, but the Court has to consider everything

8    including what the objectors bring as part of raising an

9    objection and one page in a brief with no claims that they

10   would actually do better and nothing to suggest it.  Even

11   now, no one has ever said I know a better way where

12   creditors get more, I know a better way where victims get

13   more redress.  If someone thought that was really the case

14   after $500 million in legal fees, maybe they should have

15   just said it.

16          Your Honor, with respect to burden, let's talk

17   about the facts in the record.  The allocation chart among

18   the states about what each one is getting goes to, like,

19   nine decimal places.  I'll read one example: Alabama,

20   $1.6579015983 percent.  The Debtors had no involvement in

21   that.  The states worked it out amongst themselves and

22   decided how much each one was getting and then handed it to

23   us and said please staple it to the documents and file it on

24   the docket, which we did at No. 3232, Exhibit C, Schedule 3.

25   Don't take it from me.  Take it from them.

1            Then there's Mr. DelConte's testimony under oath

2    in these proceedings that perhaps the objectors did not

3    remember.  We're all dancing faster than anyone should have

4    to.  So I quote, this is from the transcript on August 13th

5    at Page 72, beginning at Line 9.  The questioner was Mr.

6    Kaminetzky.  The witness under oath was Mr. DelConte.

7            "Q: And could you tell the Court why is it that

8    you didn't account or put a value on those causes of

9    action?"  This is in response to the questions that he got

10   about direct claims.

11           "A: We did not.  We determined that we couldn't

12   adequately estimate the value of those potential claims, you

13   know, based on the fact that, as I testified before and as

14   laid out in the disclosure statement, the fact that there's

15   a number of different causes of action that various third

16   parties could have against the shareholders, as well as a

17   number of defenses that the shareholders could have against

18   those particular causes of action and the fact that none of

19   these causes of action had been taken to judgment to date.

20   We didn't think that we were accurately able to estimate

21   what the total value should be, so we determined that we

22   should not include that in the liquidation analysis."

23           He testified under oath in a Federal Court that

24   the claims were not estimable.

25           THE COURT:  But he is not --

1          MR. HUEBNER:  (crosstalk) requires --

2          THE COURT:  He is not a lawyer, and Mr. Goldman's

3     point is that he thinks you could have provided a lawyer who

4     would testify as to why it would be speculative.  What is

5     your response to that?

6          MR. HUEBNER:  Your Honor, apologies, Your Honor.

7     I'm actually going to get to that with cites and more in a

8     few moments if that's okay with you as part of the flow.

9          Your Honor, the next issue is that, you know, with

10    all due respect, he actually ignored every single one of my

11    11 points, right, and it's basically now agreed, as the

12    record makes clear, that the five to six to seven billion

13    dollars of Debtor value is gone in a liquidation.

14          What he did was he said there's no evidence of

15    what we get in a liquidation; that's false.  In two of the

16    three scenarios in the declaration, Class 4 creditors share

17    zero.  If Connecticut's percentage is 1.3490069542 of zero,

18    it is still zero.

19          The third scenario, which is the only one where

20    they would get anything, they share $699 million, compared

21    to the five to six to eight billion dollars that states

22    alone are sharing under the plan.  I can't get anyone -- I

23    couldn't get a bevy of supercomputers to testify what

24    Connecticut would likely end up with out of $699 million.

25    When all the intercreditor deals were voided, Mr. Shore

1   moved to subordinate their claims.  We had $400 trillion --

2   trillion of projected non-state claims against their 2.156

3   trillion.

4            To say that I need a lawyer under oath to say

5   nobody could possibly in the universe credit a material

6   recovery that Connecticut in a liquidation I think is not

7   what -- that's arguably sophistry.  I mean, the facts are so

8   clear, and they're not arguing to the contrary.  They're

9   just saying we don't have to prove anything.  We think we've

10  met our burden by miles.

11           And let me keep explaining why, Your Honor.  Your

12  Honor, we sort of covered this and, you know, it's not

13  curious that there's no expert.  There's no expert because

14  it's so obvious and so unassailable that if everyone chases

15  the Sacklers -- and everyone is everyone -- it's unknowable

16  what any individual creditor gets.

17           Think about what Mr. Goldman had to argue.  Oh,

18  maybe many of the states won't sue the Sacklers.  They'll

19  just say, you know, even though we're going to get nothing

20  from this case because the Debtors melted down, the company

21  was destroyed, and we couldn't get that value and we lost

22  PHI, we'll let our brother and sister states go through the

23  Sacklers and we'll just stay home and wish them the very

24  best while our citizens get zero, zero from the Sacklers,

25  zero for abatement.

1          I mean, it's not -- it's just so far beyond the

2    pale to have to respond to an assumption.  I mean, I could

3    ask Mr. Eckstein to speak after me and confirm that there's

4    no state anywhere that's going to allow others to sue the

5    Sacklers while they do nothing.  They all have identical,

6    similar, analogous, different causes of action.  The only

7    reason the Sacklers are named in some complaints and not

8    others is because of the Chapter 11, which we'll discuss in

9    a minute.

10          In fact, you know what?  Let's discuss it right

11    now, because it's just so not right that almost two years

12    in, we're still hearing what is truly -- and I don't mean

13    this unkindly -- a canard about the PI blocking information

14    flow.

15          So let me remind everybody.  The preliminary

16    injunction was supported by the Official Committee of

17    Unsecured Creditors on behalf of everybody as the statutory

18    fiduciary appointed by the Department of Justice to

19    vindicate all of Purdue's creditors as best they know how.

20    They were supported by the AHC.

21          THE COURT:  If I could interrupt.  I think Mr.

22    Goldman's point was not about -- he was not saying there was

23    a lack of information about the Sacklers or claims that

24    might be asserted against them.

25          I think what he was saying is that they -- certain

1    states at least would have gotten a judgment but for the

2    injunction and, therefore, the claims could be -- the face

3    amount of the claims could be treated as something that

4    there is evidence on.

5              MR. HUEBNER:  So, Your Honor, that's exactly where

6    I was about to go.

7              THE COURT:  Okay.

8              MR. HUEBNER:  I was first noting, because people

9    keep implying that the injunction was somehow put in place

10   for the benefit of the Sacklers --

11             THE COURT:  Well, I don't think Mr. Goldman was

12   doing that.

13             MR. HUEBNER:  -- and wanting to be farther --

14             THE COURT:  I don't think he could because that's

15   not -- he wasn't doing it and he couldn't have done it

16   because it's not --

17             MR. HUEBNER:  Correct.

18             THE COURT:  -- the fact.

19             MR. HUEBNER:  So now let me address the actual

20   point.

21             THE COURT:  Okay.

22             MR. HUEBNER:  I agree, and it was both nothing and

23   too much at the same time.  As Your Honor might remember the

24   state of Washington actually said when reading the

25   injunction, please let just us proceed to trial because

Page 76

1    we're very far along and we think it would be helpful.

2           You've never heard me ever dispute the strength or

3    validity of any individual claimant's claim against the

4    Sacklers.  The problem is one creditor winning against the

5    Sacklers only supports the likelihood that all creditors

6    would win against the Sacklers, and if all creditors win

7    against the Sacklers, no individual creditors' recovery is

8    knowable.  But what is knowable is that four, five, six,

9    seven, eight billion dollars that is already on the table

10   evaporates and creditors have to do better trying to share

11   only what they get against the Sacklers in that scenario,

12   and that's my argument.

13          You know, the notion of Mr. Goldman having to say,

14   you know, only a small number of states might sue them, it's

15   just so -- I don't even know what to say in response to

16   that.  We can line up 100,000 creditors right now at the

17   podium to say I swear I will sue the Sacklers along with

18   suing Purdue to recover for the acts of this company and its

19   owners, and everyone on the planet knows it.

20          Your Honor, Mr. Gold then -- Mr. Goldman, I'm so

21   sorry.  Mr. Goldman then sort of testified and sort of

22   speculated that in a subsequent Sackler bankruptcy, if that

23   happened, we would all do better because maybe they go into

24   Chapter 11 and maybe their trusts would be brought in and

25   maybe they're not self-settled trusts and maybe we could get

1   all their assets.

2          Well, here's my answer to that.  With all due

3   respect to Mr. Goldman, who is in the 1/500th of 1 percent

4   of our creditors who objected to confirmation, many of us

5   have spent years figuring out how to get the best deal and

6   analyzing the all risks and rewards.

7          And here's the testimony, which is in evidence,

8   from Mr. Atkinson, whose declaration is extraordinarily

9   important and attaches the UCC letter which went out to all

10  creditors and is extraordinarily important.  Paragraph 11:

11         "At the outset of these Chapter 11 cases, Akin and

12  Province commenced an investigation on behalf of the

13  Official Committee of among other things, the claims that

14  could be asserted against the Sacklers and related entities

15  on behalf of the Debtors' estates.  This also included an

16  investigation concerning the likelihood of success of any

17  potential estate claims against the Sacklers and related

18  entities, the likely damages associated with such claims,

19  and the likelihood of collecting on any judgment rendered in

20  favor of such claims."

21         Everyone looked at collectability.  What does Mr.

22  Goldman think we were all doing for the last three years?

23  This is a huge part of what people were doing, people like

24  the AHC and the UCC and the PIs and the special committee

25  thought about all of these thing.  So like an intellectual

1   colloquy about what might happen in a hypothetical Sackler

2   bankruptcy which Jersey law and Connecticut and Maryland

3   law, this is the work that was done for tens of thousands of

4   hours and all the people suing Purdue and suing the

5   Sacklers.

6         And nobody but this one objection apparently

7   believes that there's a better alternative, and this

8   objection doesn't really believe it either because you'll

9   notice you never heard anybody say, and you certainly didn't

10   hear Mr. Goldman say, I actually think my clients would do

11   better.  Nobody could say that, not under oath and not in a

12   signed pleading.

13         I have tremendous respect for how seriously Mr.

14   Goldman takes his signature, and unlike other pleadings in

15   this case, there is nothing in his that an officer of the

16   court should not be comfortable saying, but I think the

17   silences are also important.  And ironically, I think that

18   you can take judicial notice of the silences as well.

19         Two final points, Your Honor.  In case the record

20   is somehow not clear, I have never ever said that any state

21   would not prevail against the Sacklers.  My point is

22   different, and it has always been different, which is we're

23   back to the tragedy of the commons, is that everybody would

24   prevail.  And we discussed this or there's a risk and the

25   odds are the same for everybody.

1        And so, Connecticut on its $50.1 billion claim is

2    likely to prevail.  o are 47 or 48 or 42 other states and

3    tens and tens of thousands of other Creditors who suffered

4    similar injury.

5        Finally, it's not really relevant because I said

6    it's Mr. Preis' argument and I'm not making it, but right is

7    right.  So let me be very clear.  Purdue as you have heard

8    in other context, often in very strong tones, pled guilty to

9    multiple crimes in 2007 and had a corporate monitor in place

10   that many of these states participated in the monitoring and

11   had rights and access to information.  Suffice it to say

12   that if the Estate is forced to go in a different place and

13   has to seek fairness in recoveries for all, Mr. Goldman's

14   sort of testimony again about we're a BFP.  We have no

15   knowledge, we weren't on notice -- not my theory, not in my

16   pleadings, but that's something that a lawyer can represent

17   to a court and I daresay Mr. Goldman has no facts to support

18   that some day some court might find about who might have

19   been able to stop this years ago.  I have nothing further.

20       THE COURT:  Okay.  All right.  Why don't we move

21   on then to the next topic on today's agenda which is the

22   classification argument made by the objecting states other

23   than West Virginia, which frankly, I'm not sure at this

24   point, given the vote, matters that much, but it's on the

25   agenda and I'll hear it briefly for the time that's been

1    allotted.

2           MR. MCCARTHY:  Your Honor, for the record, Gerry

3    McCarthy of Davis Polk on behalf of the Debtors.  Can Your

4    Honor hear me clearly?

5           THE COURT:  Yes.

6           MR. MCCARTHY:  So the next item on the agenda, as

7    Your Honor just noted, which I now will address are the

8    classification objections of Washington, Oregon, as well as

9    Connecticut, Maryland, and the District of Columbia.  I

10   believe there were also some joinders by California,

11   Delaware, Rhode Island and Vermont.

12          The objecting states contended the plan improperly

13   classifies them with cities, municipalities and other local

14   governments.  That objection should be overruled for two

15   basic reasons.  First, and most importantly, the Debtor's

16   classification framework is entirely proper.  The objecting

17   states arguing to the contrary is simply incorrect.

18          The Court, I know, is more than familiar with the

19   straightforward rules governing classification, the first

20   set forth in Section 1122(a) is that claims or interests may

21   be classified together if they're "substantially similar."

22   The second is that a Debtor has a great deal of flexibility

23   to place similar claims into different classes and can do so

24   as long as there is a legitimate reason for it, but doesn't

25   have to.  It's the first of these rules that disposes of the

Page 81

1    issues here.

2              The claims of the states and municipalities are

3    substantially similar, and thus are properly classified

4    together.  As to the initial matter, these claims are all

5    unsecured and thus have an identical relationship to the

6    property in the Debtors' Estate.  That alone is sufficient

7    to classify them together.

8              These claims also arise out of the Debtors'

9    production, marketing, and sale of opioid medications.  In

10   other words, they arise from the same facts.  And although

11   there is no need whatsoever to get this granular, and there

12   may so variation state to state, state and municipal claims

13   also allege many similar theories to recover.  For

14   illustrative purposes, one could compare the complaints of

15   Seattle and Washington State at JX79 and JX944 respectively.

16   They both have a certain public nuisance claims under the

17   same statute, Revised Code of Washington Chapter 7.48.  They

18   both assert consumer protection claims under the same

19   statute, the Washington Consumer Protection Act.

20             Or one could compare the complaints of San

21   Francisco and California at JX825 and JX947 respectively.

22   They too both assert public nuisance claims under the same

23   statutes, California Civil Code Sections 3479 and 3480, and

24   the two both assert consumer protection claims under the

25   same statutes.

1           In addition to the foregoing, the Class 4 claims

2    were all recovering under and through NOAT, treatment that

3    the states and local governments specifically negotiated for

4    and that arose out of the Phase 1 mediation.  It is not at

5    all unusual in Chapter 11 cases that claims arising --

6    claims recovering under the same trust are classified

7    together.

8           All in all, the states had no case that even

9    purports to require, let alone actually holds that states

10   must be classified from other creditors as a general matter

11   because that case doesn't exist.  To the contrary, multiple

12   states invariably hold claims in sizeable Chapter 11 cases

13   including for things like taxes and environmental matters

14   and the Debtors invariably had discretion to classify states

15   with other creditors.

16          Here, the states are classified with other non-

17   federal government creditors which is entirely proper under

18   the circumstances.

19          Second, Your Honor, as you mentioned at the onset,

20   the states' objections are essentially moot.  If the states

21   were to be separately classified, the class would be an

22   accepting class, overwhelmingly so any way you look at it.

23          Christine Pullo from Prime Clerk testified in

24   Exhibit B of her declaration -- that's at Docket No. 3372 --

25   that of the 48 states that voted on the plan, 38 voted in

1    favor and 10 voted to reject.  That's 79.17 percent of the

2    states that voted to accept.  The number stays basically the

3    same if one equates the District of Columbia and other U.S.

4    territories.  In that case, Ms. Pullo testified 79.25

5    percent of the states voted to accept the plan.  And that's

6    Footnote 5 of Ms. Pullo's declaration.

7            If we were to count by population, one would reach

8    approximately the same results as Washington concedes in

9    Paragraph 67 of its objection and Connecticut concedes in

10   Paragraph 63 of its.  The states voting to reject the plan

11   account for roughly 20 percent of the U.S. population.

12   That's a number that doesn't really vary if you include the

13   U.S. territories.

14           If one were to go by states on proof of claim, you

15   would again reach the same result as Washington and

16   Connecticut concede in those two paragraphs.  And if we were

17   to count by the percentage of allocations each state

18   received from NOAT, one could reach approximately the same

19   result too.

20           For all these reasons, Your Honor, the objecting

21   states classification objection should be overruled.  It

22   shouldn't pass without mention that the objecting states

23   evoke a number of irrelevant legal doctrines that they

24   believe demonstrate that their claims are different in class

25   from those of local governments.  These certain notions of

1    state sovereignty and a so-called Dillon Rule.  Suffice it

2    to say that none of these doctrines in any way mandate

3    separate classification here.

4            I will now turn the virtual podium over, unless

5    Your Honor has any questions, to Mr. Maclay who represents

6    the Multi-State Entity Group and who I understand will

7    address some of the points that I just mentioned briefly.

8            THE COURT:  Okay, that's fine, thank you.

9            MR. MACLAY:  Thank you, Your Honor, Kevin Maclay

10   for the Multi-State Governmental Entities Group.  Cognizant

11   of Your Honor comments, I will keep this argument brief.

12           Your Honor, despite the fact that local

13   governments have strong claims that they've expended

14   significant efforts in pursuing opioid defendants, including

15   Purdue, despite the fact they have suffered substantial harm

16   and despite the critical role that local governments play in

17   abatement efforts, including under the proposed plan here,

18   objecting states seek to challenge the plan's

19   classifications of the non-criminal domestic governmental

20   claims in Class 4.

21           Your Honor, just to make a very important

22   overarching point, local governments are at the front lines

23   of the opioid crisis.  If you're in your local community and

24   you call 911, Your Honor, whether it's because of the

25   criminal emergency related to opioids or a medical emergency

1    related to opioids, the person who comes, Your Honor, is a

2    local policeman, a local firefighter, a local county

3    hospital member, et cetera.

4           It is the local governments who brought most of

5    the claims against the Debtors prepetition as set forth in

6    the Debtors' docketed filing at 718 earlier on this case and

7    it is a clear fact, as has been noted by many of the cases

8    cited to in our brief, that cities and counties and other

9    local governmental entities have numerous claims including

10   for increased healthcare costs, increased foster care costs,

11   increased crime-related costs, info, and tax revenue.  And a

12   number of cases, such as the City of Surprise case, Your

13   Honor, lay this out.

14          Secondly, Your Honor, it is surprisingly absent

15   from any of the objections filed by the objecting states any

16   mention of the Home Rule Doctrine.  They mention Dillion's

17   Rule which has been largely superseded as a point of matter

18   by the nearly ubiquitous entry into the Home Rule Doctrine

19   by almost every state and this is laid out quite cogently,

20   Your Honor, in our brief in the dispatch of the City of New

21   York versus Beretta Corp, which is the District Court for

22   the Eastern District of New York.

23          For example, in that case, the court reasoned that

24   precluding the City of New York from bringing a suit aimed

25   at redressing the problem of gun-related violence would

1    interfere with its authority to promote the safety and well-

2    being of its inhabitants.  It is quite clear, Your Honor,

3    that local governments have both the duty and the authority

4    to pursue defendants of mass tort-related incidents

5    including opioid defendants.  And the record is replete with

6    examples of that.

7            For example, Your Honor, if you were to look at

8    Paragraph 20 of the MSGE Group reply is support of plan

9    confirmation, we list a litany of cases demonstrating that

10   local governments have standing to bring such claims and in

11   Paragraph 16 to 19 and 21 to 24, we have another litany of

12   cases demonstrating the survival of motions to dismiss by

13   those same governmental entities.

14           It is also clear, Your Honor, that very recently

15   in Tennessee, nine counties and eighteen cities and towns

16   reached a tentative 35-million-dollar settlement with Endo

17   Corporation, another opioid defendant, on July 22nd of 2021.

18   And in three other state courts, Your Honor, California, New

19   York, and West Virginia, county and city plaintiffs are

20   either currently in trial or have recently concluded trial

21   and are waiting verdicts seeking billions of dollars in

22   damages.

23           And, of course, as the Debtor's counsel aptly

24   noted, Your Honor, it is, of course, true that under the

25   proposed plan, cities and counties are part of the abatement

1    efforts and a very important part of the abatement efforts

2    set forth in the plan that we week confirmation of here

3    today.

4            And, of course, one final point, Your Honor, the

5    parens patriae argument made by the objecting states is

6    overstated first of all, because parens patriae powers do

7    belong to the various states and localities in their various

8    circumstances as our brief pointed out.  And secondly, the

9    proprietary actions that all local governments can bring

10   heavy overlap with such parens patriae actions as pointed

11   out also in the authorities that we cited you to.

12           To make a long story short, Your Honor, there is

13   no valid basis to argue the states must be classified

14   separately from local government and the surprising

15   suggestion in the states objections that local governments

16   don't have valuable and important rights to pursue against

17   opioid defendants is just incredibly shortsighted as well as

18   misleading and just flatly wrong.  And so for those reasons,

19   Your Honor, we support the Debtors in this particular

20   example of argument as well as overall with the plan.  We

21   restate Your Honor that local governments and states, in

22   fact, are appropriately classified together in Class 4.

23   Thank you.

24           THE COURT:  Okay.  Thanks.  I think Mr. Gold is

25   handling this for the objecting states, but I may be wrong.

1           MR. GOLD:  Your Honor, you are correct, Matthew

2      Gold, Kleinberg, Kaplan, Wolff and Cohen, representing

3      Washington, Oregon and District of Columbia.  Your Honor,

4      can you hear me?

5           THE COURT:  Yes.

6           MR. GOLD:  Okay.  Thank you.  I will proceed.  I

7      will first note that this oral argument is based on

8      coordination and cooperation with the Attorneys General

9      Offices of Connecticut, Delaware, Maryland, Rhode Island,

10      and Vermont and will be provided in a unified fashion as

11      we've discussed before, Your Honor.

12           THE COURT:  Right.

13           MR. GOLD:  And, Your Honor, I, too, will be brief

14      in my comments in this regard.  First, I want to

15      emphatically say that our argument is not meant -- and we

16      don't believe it is -- in any way to be disrespecting to

17      local governments and the first responders and anyone in

18      that group.  We have not been arguing that they do not have

19      claims.  We are not arguing that their claims do not, in

20      certain respects, overlap with claims that are brought by

21      the states.

22           But we are arguing is that the states, the

23      totality of the claims brought by the states and the

24      objecting states in particular, contain many significant

25      areas that cannot be brought by the municipalities which

1    supports why the states should be classified separately.

2           For example, in Washington, only the state can

3    seek as a remedy civil penalties with respect to violations.

4    That is not something that can be brought by municipalities.

5    Now particularly with respect to classification, I will

6    first --

7           THE COURT:  Have the states asserted a different

8    priority based on that right?

9           MR. GOLD:  No, Your Honor.

10          THE COURT:  Okay.

11          MR. GOLD:  I will first note that it is the

12   Debtors' burden to prove that the classifications were

13   proper.  The Debtors have argued that the argued that the

14   classification error can be fixed by going back to the

15   voting results and preparing a count of what the results

16   would have been had the states been in a separate class.

17          And frankly, Your Honor, I find this is amazing.

18   The Debtors waited until after the votes had been cast to

19   rearrange them into a better classification.

20          A classification error cannot be fixed through a

21   hypothetical analysis of how the votes might have been

22   arranged under a different classification.  The Debtors

23   certainly cite no cases to support this theory that

24   classification can ex post facto be revised.  The disclosure

25   statement certainly did not disclose to the voters that

1    their claims might be rearranged into separate classes for

2    purposes of determining how the plan would go.

3              And, Your Honor, as you, yourself, stated, show me

4    an election where that was done.  I'm not aware that that's

5    how elections are handled in this country that the votes can

6    be re-scrambled and realigned if they were not properly

7    counted in the first place.

8              THE COURT:  They are counted.

9              MR. GOLD:  They are counted.

10             THE COURT:  My statement was as to somehow

11   assuming votes that weren't counted.  But let me just cut to

12   the chase.  I just frankly do not understand this argument.

13   The caselaw could not be clearer that the focus as far as

14   1122 of the Bankruptcy Code is concerned, which refers to

15   substantially similar claims, goes to the right of the

16   claimant against the assets of the estate.  So you can,

17   although you don't have to, classify claims based on breach

18   of contract in the same class with claims based on tort

19   because each of them is unsecured and has the same right

20   against the debtor's assets, general unsecured claims.  Is

21   there any aspect of your argument that is consistent with

22   that proposition?

23             MR. GOLD:  Your Honor, I'm not disputing that the

24   claims as treated in the plan are all general unsecured

25   claims.

1          THE COURT:  Okay.  So I think you lose.  So let's

2    move on to the NOAT allocation.

3          MR. GOLD:  I simply --

4          THE COURT:  This is just a waste of time, Mr.

5    Gold, and I don't understand frankly -- it's just -- I've

6    read your brief.  The only question I had is whether you had

7    some sort of priority claim, which you told me you don't or

8    your clients don't.  There's been no attempt to designate

9    any vote in the class as to, you know, being for a claim

10   that is only held by a state, which would be the remedy

11   under the brief's argument that only the states can assert

12   certain types of claims as opposed to a classification

13   argument since concededly there are general unsecured claims

14   held by the other governmental entities.  There's no

15   contention of any vote manipulation here given -- and this

16   is where the actual votes, I think, are relevant.

17          So this is just, this argument makes no sense.

18          MR. GOLD:  Your Honor, I was simply responding to

19   the argument that the Debtors' had just made and they made

20   in their papers.

21          THE COURT:  Well, okay.

22          MR. GOLD:  I have one other response to the

23   argument that the Debtors have made in their papers, Your

24   Honor.  I will be brief with respect to this as well.

25          THE COURT:  All right.

1          MR. GOLD:  It relates to feature that the claims

2     were all accorded one dollar votes.  We submit that the one

3     dollar claim setup was preposterous on its face.  There may

4     well be cases where that is the right approach, but not in

5     this case.  While the amounts of the claims might not have

6     been fixed, the one dollar setup lumped together claims that

7     were known to be different and several orders of magnitude

8     different in size.  The Attorneys General of the states

9     represent the entire state and are not simply the sum of the

10    municipalities that are contained therein.  And by arranging

11    the class and one dollar votes for every party in it, the

12    Debtors were setting up a structure where they knew that

13    they would be able to prevail in the ultimate voting and in

14    a way that was inconsistent with what they had to be aware

15    were the significant differences in the sizes of the claims.

16    We submit that it is improper in this case.  I have nothing

17    further to add, Your Honor, unless you have questions.

18          THE COURT:  No, I don't.  Thank you.

19          MR. GOLD:  Thank you, Your Honor.

20          THE COURT:  I don't know if the Debtors or the

21    MSGE want to respond on the one dollar point?

22          MR. HUEBNER:  Your Honor, I'll hit that one.  The

23    answer is very simple.  The NOAT allocation and he actually

24    answers a bunch of the sort of points that were made, the

25    NOAT allocation was agreed to among all the states and

1    entities as their Class 4 shared distribution.  The one

2    dollar was agreed to basically by everybody to avoid what

3    could have been an unthinkable 3018 process.  No 3018

4    motions were ever filed.  We've never heard from anybody

5    ever in this case until this objection was filed.  And these

6    procedures, as Your Honor remembers, were worked out with

7    the AHC, with the NCSG, and with the UCC and the disclosure

8    statement and these mechanics were agreed to by no objection

9    from either today's objectors or I believe anyone else that

10   was unresolved.  To say now that the one dollar thing

11   justifies some sort of infirmity is totally inappropriate.

12            And one other very brief point, speaking of

13   inappropriate, to recharacterize Mr. McCarthy's presentation

14   or brief as the Debtors have conceded they made a mistake

15   and now they're trying to fix it, is just misrepresenting to

16   this Court, just ridiculous.

17            THE COURT:  I don't need to hear on that point.

18            MR. HUEBNER:  Thank you, Your Honor.

19            MR. MACLAY: Your Honor, Kevin Maclay for the MSGE

20   Group.  On the legal aspects of the one dollar claim, I

21   would direct Your Honor to Page 16 of our confirmation brief

22   and No. 27, where we go through a number cases that have

23   held a one dollar -- in a mass tort case, a one dollar

24   voting amount is appropriate.  And I would just like to read

25   to Your Honor the A.H. Robbins analysis, which was affirmed

1    by the Fourth Circuit: "Any attempt to evaluate each

2    individual claim for purposes of voting on the debtors plan

3    of reorganization would, as a practical matter, be an act of

4    futility and would be so time consuming as to impose on many

5    deserving claimants further intolerable delay not only to

6    their detriment but to the detriment of the financial well-

7    being of the estate as well."

8              And I think, Your Honor, that analysis totally

9    applies here and clearly justifies the one dollar voting

10   amount because to liquidate the various and complex

11   interrelated claims of all of the claimants here would have

12   been essentially an impossible undertaking and certainly the

13   gain would not have been worth the gamble, Your Honor, as

14   noted by A.H. Robin and a litany of other cases cited in our

15   brief.

16             THE COURT:  Okay.  Very well.  I guess to me,

17   ultimately the fact that the class that the objecting states

18   say that they would want to be in, which would be a class of

19   states only, voted overwhelmingly in favor of the plan,

20   suggests that they would want to fight it out with these

21   other 38 states as to the amounts of their claims, which I

22   don't think is what Mr. Gold was saying, which is that the

23   local governments have smaller claims.  I actually think it

24   is a nonmaterial amendment to a plan to allow a plan to be

25   amended to reclassify in a class if one believed that the

Page 95

1    class needed to be reclassified.

2              So I guess, to me, this seems to be unlike some of

3    the other arguments that the objecting states have made,

4    just an attempt to throw sand in the gears without any real

5    merit to it whatsoever.

6              So why don't we move onto the next topic, which is

7    the NOAT allocation issue raised as the only basis for West

8    Virginia's objection to the plan and I think here, counsel

9    for the Ad Hoc Committee of States and other Governmental

10   Entities will argue in support of the plan and then we'll

11   hear from West Virginia's counsel in support of the

12   objection.

13             MR. WAGNER:  Thank you, Your Honor.  Can you see

14   and hear me?  It's Jonathan Wagner from Kramer Levin on

15   behalf of the Ad Hoc Committee of Governmental and Other

16   Contingent Litigation Claimants.

17             THE COURT:  Yes, I can.

18             MR. WAGNER:  Before I start, I just want to thank

19   my Kramer Levin colleagues who have worked on this matter.

20             Your Honor, there are difficult questions that you

21   need to answer in this hearing, but allocation is not one of

22   them.  And while we take the objection every seriously, it's

23   not really a close question.  The context is very important.

24   We have 49 states on one side and 1 on the other.  And when

25   does the majority of the states in this country agree on

1    anything?

2           Here, you have 49 states who agree, or at least

3    didn't object -- I don't want to overstate it -- and only

4    one has disagreed.  In fact, 49 --

5           THE COURT:  I actually think it's 47 to 1, but

6    that's okay.

7           MR. WAGNER:  I won't round up to 49, but it's 1 on

8    the other side and if the plan is so grossly unfair, why is

9    it that only one state is objecting?  These numbers alone

10   could be used to justify compliance with the code, but even

11   if you put aside those numbers and address the objections on

12   its merits, it's clear that this plan satisfies the code.

13   And as Mr. Huebner noted, no plan is perfect, but this one

14   is pretty good.  It's also fair to West Virginia.

15          As we heard during the testimony, West Virginia

16   has about half a percent of the nation's population, but is

17   getting more than twice that under the plan.  And the reason

18   is because the plan takes into account the intensity and

19   severity measures that have been advocated by West Virginia

20   itself.  It just doesn't take them into account at the same

21   extent.

22          Now Your Honor has to decide this issue based on a

23   record that's before you and I don't know what Attorney

24   General Morrisey is going to raise, but in this case, we

25   have two witnesses, one was John Guard from the Florida

1    Attorney General's Office who was a very credible witness,

2    and on the other side, we had Dr. Cowan who was the only

3    witness offered by West Virginia and his testimony was full

4    of admissions and contradictions.  And his admissions on

5    fairness and the reasonable nature of the plan and good

6    faith are prone to objection.

7           Let me bring up the specific objection.  The first

8    is that the plan was not proposed in good faith in violation

9    of Section 1129(a)(3).  Under 1129(a)(3), a plan has to be

10   proposed with honestly and good intentions.  That's the

11   Chassix case, 533 B.R. 64 at 74.  To get in on one side, we

12   had John Guard's testimony and his declaration.  And Dr.

13   Cowan's testimony to the contrary just does not overcome

14   that testimony.

15          Mr. Guard was extremely credible and as Your Honor

16   will recall, there was no significant cross-examination of

17   him.  He testified to years of negotiations and compromises

18   back and forth.  That was at Paragraph 10 to 47 of his

19   declaration, and the testimony on Day 2, Pages 95, 105-106,

20   and 118.

21          Now, could it really be that an allocation plan

22   that was negotiated by all of the country's Attorneys

23   General was negotiated in bad faith, that there was some

24   national conspiracy among the top legal officers of the

25   various states?  Just to state that proposition shows how

1    farfetched it is.  These are negotiations that had to

2    balance the interests of fifty different states.  And nobody

3    ganged up on West Virginia.

4           Now the two -- there were two specific complaints

5    raised by West Virginia under 1129(a)(3).  The first is that

6    the plan is a political compromise.  As Your Honor is well

7    aware, compromise is de rigueur in bankruptcy and is, in

8    fact, favored.  Compromise is not a dirty word.

9           A second specific objection is that the large

10   states somehow took control of this process.  This is not

11   consistent with the outcome here.  The small states,

12   including West Virginia, do very well under this plan, and,

13   Your Honor, should ask what proof has been offered here that

14   the large states seized the process.  There's been no fact

15   witness offered by West Virginia, and on top of this we have

16   the admission by Dr. Cowan, that the plan, that reasonable

17   people may differ.  That's at page 230 of the fourth day of

18   the hearing.

19          Another (indiscernible) issue of good faith, Your

20   Honor, is whether the plan achieves the result that's

21   consistent with the Bankruptcy Code.  That's the Chassix

22   case at 533 B.R. 74, and as -- my -- the others who have

23   made presentations before have noted, this is a plan that --

24   that confers substantial value on many different creditor

25   groups, and it not only delivers value to creditors, I think

1    it's fair to say it's a plan that's in the national

2    interests.  It's a plan that literally saves lives, and how

3    often can -- how often can somebody say that about a

4    bankruptcy plan?

5           On this score that (indiscernible) that the

6    statements pre-litigation by Dr. Cowan, I think, are very

7    relevant, "spending more now in an effective way, though,

8    will reduce damages".  That's Exhibit 389 at Page 12, and as

9    he also admitted, all the plans here are effective, at the

10   pages 241 to 242 of his testimony.  So how could a plan

11   that's in the national interest somehow be bad faith?  That

12   -- is that an objection raised by West Virginia is that it

13   is one of equal treatment under 1123(a)(4) of the plan, of

14   the code.

15          Now here, all the states are subject to the same

16   criteria, the treatment is identical, and under the W.R.

17   Grace case, "what matters is not the claimants recover the

18   same amount, but they have an equal opportunity to recover

19   on their claims".  That's W.R. Grace 729 f.3rd after Page

20   327.  Since all the states are treated equally, you could

21   argue that the proper standard is Rule 9019, and here the

22   settlement clearly falls above the lowest point in raise of

23   -- in range of reasonableness.

24          There's no argument to the contrary and Dr.

25   Cowan's admissions that the plan -- that the plan is

Page 100

1    reasonable really ends the matter, and I'd also note his

2    admission that he prefers the bankruptcy plan to no plan.

3    That's at Page 242 to 243 of the fourth day of the hearing.

4    But even if Rule 9019 is not the standard, and you simply

5    apply 1123(a)(4), the objection still fails.  West Virginia

6    has characterized this objection as -- as follows, "same

7    treatment does not mean identical treatment, and courts have

8    approved settlements where the class members received

9    different percentages of recovery to take into account

10   different factors.  So long as the settlement terms of

11   fashionably based on legitimate considerations."  That's the

12   West Virginia objection at Paragraph 28, citing cases.

13            The objection that West Virginia raised is -- is

14   that the plan places too much emphasis on population,

15   however, we have Dr. Cowan's statement, prelitigation, that

16   "large communities likely should receive more than small

17   communities".  That's Exhibit 380 -- 388 at Page 6.  In any

18   event, West Virginia overstates the importance of population

19   under this plan.

20            Just to go into a little bit of math, population

21   is 31 percent of 80 -- of the first 85 percent and the

22   balance is intensity measures, and then you have the

23   remaining 15 percent that's all intensity measures and you

24   all have the -- you also have the 1 percent intensity fund,

25   and for all of those reasons, that's why West Virginia,

1    which has about a half a percent of the population, is

2    getting more -- is getting 1.16 percent of the funds.

3              But, Your Honor, may legitimately ask why

4    (indiscernible) the population at all?  It's not at a

5    political -- or it's not a political criteria.  It's a

6    rational criteria.  It's not like throwing darts against the

7    wall.  Mr. Guard testified that there are issues concerning

8    the intensity and severity measures, which make them

9    subjective in some sense, and population is an objective

10   measure.  And I'd refer the Court to Mr. Guard's testimony

11   at Pages 90 to 91 of the second day of the hearing, where he

12   noted issues concerning under reporting as to those severity

13   and intensity measures, inconsistencies among the states in

14   reporting cause of death; and he said at Page 91,

15   "population was added to try to deal with the issues that

16   existed for the other metrics", and -- and he went on to

17   say, "population was and is a typical metric that is

18   utilized in State Attorney General settlements", again, Page

19   91.  And we cited in our -- in our response a couple of -- a

20   couple of among many instances in which national settlements

21   used population as the only factor.  In Recompact Disc, 216

22   F.R.D. 197 at 200, in re Toys-R-Us antitrust litigation 191

23   F.R.D. 347 at Page 350, and significantly, Dr. Cowan

24   admitted that this settlement is a lot more fair than other

25   national settlements, including the national tobacco

Page 102

1    settlement. That's at Page 2 -- (indiscernible).

2           Just a minute on California, I don't know whether

3    Attorney General Morris is going to raise that issue.  It's

4    a minor point, whether they contribute to the intensity

5    fund.  But during cross-examination, it was established that

6    had the plan used expenditures on criminal justice as a

7    factor, as Dr. Cowan did in his prelitigation hypotheticals,

8    then California would have been far better than the 9.9

9    percent it gets under this plan.

10          The one final point, Dr. Cowan's plan, it's

11   legally irrelevant under NII Holdings 536 B.R. at 125, but

12   even if you plan more than (indiscernible) it doesn't really

13   advance the objection.  And when an expert changes his

14   opinion so dramatically, as I think Dr. Cowan did from

15   prelitigation to post-litigation, really has no credibility.

16   And he admitted during his -- during the cross that his

17   post-litigation plan is not remote -- does not remotely

18   resemble his pre-litigation plan.  And then also, he

19   admitted before litigation -- he admitted before litigation

20   that "there is no simple answer to the question how to

21   allocate one large settlement -- one large opioid

22   settlement.  Too many questions remain.  Too many issues

23   need to be resolved."  That's Exhibit 388 at Page 14.  He

24   had admitted that what's fair under these circumstances is

25   complicated.  That's Pages 233 to 234.

1          He said that spending more money won't necessarily

2     get you better results.  That's Exhibit (indiscernible) at

3     Page (indiscernible).  He said, "treatment in terms of

4     offerings may not translate into increased efficacy", and

5     just -- "just spending more to achieve equality may not be

6     the best outcome".  That's Exhibit 392 at Page 12.  And then

7     also, his plan produces very odd results.  Washington, which

8     has one fourth the population of Texas gets more than Texas.

9     Kentucky, one fourth the population of New York, gets more

10    than New York.  Virginia, with a growing population, four

11    times the population of West Virginia, which is loosing

12    population, gets less than West Virginia.  And Your Honor,

13    the point of that exercise was to understand the point that

14    if you change this plan to make it more fair to one state,

15    for example, West Virginia, you have problems elsewhere in

16    the plan.  But I think it underscores how difficult it was

17    to reach a compromise here, a balance, and I think all of

18    that allows, Your Honor, discretion to (indiscernible)

19    allocation under this plan.

20          To sum up, Your Honor, allocation under this plan

21    is based on rational and legitimate considerations.  It's

22    actually quite an achievement.  It confers the benefit on

23    the States and on the Nation as a whole.  And I have to say

24    no good deed goes unpunished because West Virginia, does

25    pretty well under this plan, and West Virginia's criticism

Page 104

1   really fail on their own terms, but certainly in the large

2   context of this case.  And the larger context is as the West

3   Virginia expert, himself noted, the more time that this

4   problem festers without additional spending on opioid

5   abatement, the worse the problem will become.  And that's

6   probably why the West Virginia expert admitted that he

7   prefers the current plan to no plan.  And for all those

8   reasons, Your Honor, the Court should reject the objection.

9   Thank you.

10          THE COURT:  Okay.  Thanks.  So again, Counsel for

11  West Virginia, Mr. Morrisey, I think is going to handle the

12  argument in support of the objection.

13          MR. MORRISEY:  Your Honor, this is Attorney

14  General, Patrick Morrisey, and I'm grateful for the

15  opportunity to appear before you today.  I would mention, at

16  the outset, that the issue of the opioid epidemic is quite

17  severe in our state, and regardless of all of the issues

18  that you're hearing about, I think one area that we can find

19  in common with virtually every party, is everyone would

20  mention that West Virginia was ground zero at the opioid

21  epidemic.  If you looked at many of the metrics, West

22  Virginia had the most horrific of experience with the level

23  of intensity and severity that I think virtually all counsel

24  would concede.

25          The reason I'm very appreciative to be before you

1    today is because this decision represents the first of

2    likely many in a series of court cases which will determine

3    how abatement is going to occur in the country, and I

4    recognize that many of the states spent many years and they

5    worked on it.  But just because many states agree on a

6    flawed formula doesn't make it correct.  And so we are

7    asking the Court to look at the grave issues associated with

8    this particular case in having the predominant population

9    based model, contrary to Counsel's argument that it's 31

10   percent population, effectively, a vast majority of this

11   formula is based upon population.  It's not based on

12   severity.  In fact, the one severity measure that everyone

13   can point to is the 1 percent fund that's been discussed a

14   lot.

15           If you actually looked very carefully at what the

16   principle public health agency of the country, whose task

17   was charged with looking at these issues comes up with,

18   they've indicated that intensity should represent 15 percent

19   of the overall formula.  The difference between 1 percent

20   and 15 percent is obviously very stark.  Now Counsel --

21           THE COURT:  Can I just say that --

22           MR. MORRISEY:  -- indicated --

23           THE COURT:  -- let me just interrupt you --

24           MR. MORRISEY:  Sure.

25           THE COURT:  -- Mr. Morrisey, that -- you're --

1    you're referring to the, it's an acronym, it's S A -- S H --

2    I'm not trying to letter --

3            MR. MORRISEY:  SAMHSA?

4            THE COURT:  SAMSA, but it's SAMHSA?

5            MR. MORRISEY: SAMHSA -- I think it's Substance

6    Abuse Mental Health Services Administration.

7            THE COURT:  And -- and as I understand it, that

8    has changed -- that comes out once a year or every other

9    year and it is changed from time to time?

10           MR. MORRISEY:  It has changed.  I know that the

11   most recent formula that we've looked at, they have an

12   intensity fund applying to ten states that then would be

13   able to claim up to 15 percent of the aggregate dollars that

14   Congress appropriates.

15           THE COURT:  Okay.

16           MR. MORRISEY:  So if we step back to Counsel's

17   arguments that this plan was made in good intention, I think

18   that that statement could be torn apart fairly quickly.

19   Let's start with something that Counsel indicates is a very

20   small issue, and you can make an argument about whether 1

21   percent of the aggregate funds going to a particular state

22   is small or large, but when you're talking about the largest

23   state in the country for all the states to come together

24   behind, what I would call, the California carveout or cash

25   grab, you're talking about a significant amount of money.

1    Not only with respect to the amount with this Purdue

2    bankruptcy, but all those in the future.  And so, that 1

3    percent is not indicative of good intentions.

4              How could every state contribute to a particular

5    intensity fund showing that at least on a minimal basis, all

6    states believe that intensity's important and one state be

7    afforded the opportunity, due to political consideration, to

8    argue well, we shouldn't have that in there.

9              Your Honor, the arguments we bring before you

10   today, we think are straight forward and don't contain some

11   of the same controversy that you had on Monday, or you've

12   had throughout.  These issues that we'll bring in with

13   respect to No. 1, trying to eliminate the California carve

14   out.  That's straight forward.  That could be easily

15   adjusted because there's no rational basis, whatsoever, no

16   legitimate consideration that one state should ignore

17   intensity considerations.  I would defy Counsel to come up

18   with one good reason.  They cite an 18 percent issue with

19   respect to judicial enforcement and other matters, but

20   nothing in the record indicates that that's even tied

21   directly to opioids.

22             There are many reasons why a state ultimately

23   might have more resource needs with respect to law

24   enforcement and other areas.  But everyone that's gone

25   through this process would acknowledge that the California

1    piece is one of the blites on this deal that needs to be

2    changed, because once again, it's not good faith to allow

3    one state to not contribute to a fund that every other state

4    does.

5           The second piece, which I think is equally

6    powerful, is that most of this formula is once again based

7    upon population.  Counsel cites 31 percent, but if you look

8    closely at the formula when you're looking at morphine

9    equivalents, when you're looking at several other factors,

10   it's clear that we're effectively quadrupling the population

11   count, and Counsel and our expert witness, Chuck Cowan,

12   testified to that fact without any contravention.

13          That's something that's not rational when you're

14   trying to solve a problem.  It -- Counsel states that this

15   is consistent with many other matters that get settled by

16   the state, but frequently, when states are involved in a

17   consumer or an antitrust matter, there could be

18   discouragement and there could be something focused on a

19   population.  This particular issue deals with the disease

20   state of individuals and what's happening within specific

21   communities.

22          So to be able to say there should be a population

23   based formula to solve the problem, rational economic theory

24   would never suggest that you're going to go in and say how

25   many people live in a state?  That's how we're going to deal

1    with the opioid epidemic?  It's an embarrassment and an

2    affront to any attempt to have good faith when the focus is

3    so much on population.  And of course, there were rigorous

4    discussions about this for years.  I recognize that many of

5    my colleagues ultimately decided to move in a different

6    direction, but the importance for this Court, for this

7    precedent, to get it correct, to do two things; eliminating

8    that California carve out, and two, asking to go back and to

9    either: a) change the population based system and move it

10   more to an intensity system, or b) simply taking an easier

11   tactic, which would be to move from 1 percent of intensity

12   fund to 2 percent or 3 percent, which I would note is very

13   different than what SAMHSA recommends, at 15 percent.  That

14   would create a much different abatement structure, which is

15   going to allow money to flow to the communities that

16   actually need it most.  And I think that's what we're all

17   here to do, to make sure that money gets out quickly.

18   That's why we've tried to work collaboratively with the

19   states, and we haven't objected to other provisions, but we

20   see this as a fatal flaw of the agreement.

21            But, Your Honor, you have the ability to help

22   change that and to convince the parties that a California

23   cash grab, or carve out, is inappropriate.  It should make

24   America very, very upset, and separately, the intensity fund

25   is still inadequate, given the fact that when you solve a

1   problem, you look at healthcare capacity.  You look at the

2   structure or what's being done to deliver healthcare within

3   a particular community.  You look at the opioid deaths and

4   you look at the people that are not treated, currently.

5   Based upon all of those factors, it's clear that West

6   Virginia is a unicorn, so it's not surprising that we would

7   get voted out on a particular issue like this because our

8   numbers are so bad, compared to every other state.

9            We're asking the Court to help bring that good

10  faith back to the process by making those two modest

11  considerations: 1) eliminate that carve out, and 2) increase

12  the size of the intensity fund so that many years from now,

13  we're not going to go back and look at this like we all

14  looked at tobacco, that the moneys were actually not put in

15  adequately to solve the problem.  That is just ended up

16  being a political grab bag.  That's what we should all

17  oppose.

18           This is a court of law where everyone expects to

19  get the best treatment under a quality of law.  It's not

20  Congress, it shouldn't be compared to that where they make

21  political deals all the time.  We have a chance to actually

22  focus on solving the problem, the right way, in a manner

23  that this allocation formula does not.

24           Your Honor, I'm very grateful for the opportunity

25  to personally come before you today.  This is the number one

1    issue facing our state, and I wanted to amplify how

2    important it is that we fix this because what this Court

3    decides to do is likely to serve as a president going

4    forward for all the other litigation that we have against

5    manufacturers and pharmacies.  And what we've found through

6    all the years, West Virginia's been out in front, leading on

7    this issues, is that we have to focus on intensity and

8    severity.  And this allocation formula does not do that, and

9    the record makes that clear.

10           THE COURT:  Okay.  Thank you.

11           MR. WAGNER:  This issue has to be decided on the

12   record and there's a -- there's a record before your Honor.

13   I don't think I need to dwell on it any longer.  Second, Mr.

14   Guard, I think testified eloquently why population is not

15   some random (indiscernible).  It covers some of the

16   subjective problems with the other factors; and third and

17   for this, I'm going to have to defer to my bankruptcy

18   colleagues, but as I understand it, Your Honor, doesn't get

19   to redline this part of the plan.  It's either plan or no

20   plan, and it's significant that Dr. Cowan, when he was asked

21   plan or no plan, he said he prefers the plan.  Thank you.

22           THE COURT:  Well, don't go away yet, Mr. Wagner.

23   I -- I agree, the record is pretty -- is not pretty, it's

24   well developed on this issue, with one possible exception,

25   which is why California, of all states isn't contributing to

1    the 1 percent small state fund.  I understand there was

2    testimony that California has the highest, I believe there

3    was testimony, I'll have to go back and look at it.  Either

4    has the highest or a significant amount of criminal justice

5    expense.  But and I appreciate your, and Mr. Guard was

6    (indiscernible) limited in what could be discussed about the

7    party's negotiations, particularly given the sensitive

8    nature of individual states negotiations.  But I -- I --

9    again, I'm dealing with a specific statute, which is

10   1123(a)(4), which says that a plan shall provide the same

11   treatment for each claim or interest of a particular class,

12   unless the holder of a particular claim or interest agrees

13   to less favorable treatment.  And I understand that you said

14   that this proposal, just like the State of West Virginia's

15   proposal, isn't a straight or simple pro-rata treatment,

16   it's a formula that has adjustments to it to take into

17   account various different states or groups of states

18   interests.  But they all seem to have acted as a group,

19   except on this one point, where only California is carved

20   out, unless I'm missing something.

21          MR. WAGNER:  No it's only -- it's only California.

22   So a couple of points.  First, the class -- first of all the

23   class has voted for this.  Everyone else has gone along with

24   it --

25          THE COURT:  No, but that's --

1          MR. WAGNER:  -- second of all --

2          THE COURT:  -- that's not -- but that's not --

3    1123(a)(4) applies notwithstanding the class vote, if

4    there's an objector, like West Virginia, then they can raise

5    1123(a)(4).

6          MR. WAGNER:  Well, look, I -- I can't speak to

7    California's motivation, but this is not -- it's not a big

8    issue.  It's a contribution to 1 percent, and California

9    does have an argument, as I noted during the cross of Dr.

10   Cowan, that had a different set of factors been used --

11         THE COURT:  I understand that, but again, the

12   statute I'm dealing with is provide the same treatment for

13   each claim.  Now here, I get it, it's in the context of a

14   heavily negotiated settlement among the states, the 48

15   states that are participating in this plan.  The other two

16   having settled with Purdue, pre-bankruptcy.  So I think to

17   some extent, one looks at the fairness of the overall

18   settlement as opposed to the same treatment, and that's

19   corroborated by the fact that the -- Mr. Cowan's proposal is

20   depends on different factors too, it's not the same, you

21   know, it's not just a prorata under one measure for -- for

22   any state.

23         But it -- it is -- unless there's a really good

24   explanation for it, it is somewhat anomalous that

25   California, alone, is not contributing to the small state

Page 114

1    fund.  Unless I'm missing something.

2             MR. WAGNER:  Well, again --

3             THE COURT:  I mean, I think, I mean, maybe I'm

4    putting words in Mr. Morrisey's mouth, but if it's not that

5    big a contribution, why doesn't California just agree to it?

6             MR. WAGNER:  Again, I can't speak to California's

7    motivation, but I would say it's in the general context of

8    the plan.  It's not -- it's not material.

9             THE COURT:  Well --

10            MR. WAGNER:  The contribution --

11            THE COURT:  -- but -- I -- (indiscernible) I don't

12   know.  I don't -- I think that argues both ways, frankly.

13   All right.

14            MR. WAGNER:  I -- yeah, I take, Your Honor's

15   point.

16            MR. MORRISEY:  Your Honor --

17            THE COURT:  I mean, I -- I -- the reason I've had

18   -- and I'm sorry to interrupt you, Mr. Morrisey, the reason

19   I'm asking this is you do have a very good record here, Mr.

20   Wagner, generally.  But all I have, I think on the

21   California piece, unless I'm missing some piece of it, is

22   that one can argue that if you took law enforcement as an

23   allocation factor and Mr. Cowan, did testify that that could

24   be taken as an allocation factor, California would actually

25   be getting a lot more.  What I don't have is whether that's

1    any different than all the other 47 states or whether

2    they're just saying my way or the highway.  Even though they

3    really aren't that different than the other 47.  But maybe

4    there's something in the record that suggests that they are

5    unique, or that of the states contributing to the 1 percent

6    fund, they have a highly disproportionate amount of law

7    enforcement activity, particularly related to opioids.

8            MR. WAGNER:  Well, again, I think -- again, I

9    think the (indiscernible) of California could have argued

10   otherwise, and this was a -- this was (indiscernible) and a

11   compromise among the states, and they've all gone -- they've

12   all gone along with it, including others similarly situated

13   (indiscernible) West Virginia, but I take, Your Honor's

14   point.

15           THE COURT:  Okay.  Well, I hate to --

16           MR. MORRISEY:  Your Honor --

17           THE COURT:  -- I hate to -- if I could just get

18   this out, Mr. Morrisey.  I hate to suggest more issues for

19   people to negotiate over in the next couple of days, but

20   this may be one that the states may want to discuss with the

21   State of California.  I -- I under -- I think I do

22   understand both sides arguments on this point.  But I'll

23   hear Mr. Morrisey on it.

24           MR. MORRISEY:  Your Honor, I would address the

25   materiality issue that in light of the sums of money that

1    are involved, when you're talking about 1 percent of a

2    state's share, if you look at $10 billion, hypothetically,

3    that's $100 million.

4              THE COURT:  No I -- that's --

5              MR. MORRISEY:  And so it --

6              THE COURT:  -- I agree.

7              MR. MORRISEY:  -- from a West Virginia

8    perspective, when you're talking about a small intensity

9    fund, we could be talking millions of dollars, and so that's

10   the first piece.  So it is material, and second, once again,

11   we would point out that the record is very clear, that John

12   Guard testified that California said this was good enough,

13   and that they weren't going to give any more, but once again

14   that doesn't meet a good faith standard, and that's why

15   we've always asked, at a minimum, not only to increase the

16   intensity fund but this is a blight on the deal, and it

17   doesn't meet any rational considerations.  It's not based on

18   a legitimate consideration.

19             THE COURT:  Well, I -- I do -- I would put a

20   qualification on what you just said, sir, which is I don't

21   think this is a good faith issue.  I think it's really a

22   same treatment issue and I -- I have a hard time seeing one

23   state, whether it be West Virginia on one side or California

24   on the other, having a unique treatment that other hadn't

25   negotiated, you know, for some very good reason, and I'm not

1   sure I see one here.  But I'll have to -- I'll have to

2   consider this carefully.

3               MR. WAGNER:  And just one more point about the

4   math, if the intensity fund is 1 percent, 1 percent of 40 --

5   $4.5 billion, if my lawyer math is right, is $45 -- $45

6   million, the West Virginia --

7               THE COURT:  I -- but look, it's the, you know,

8   it's the (indiscernible) Webster's line it's a small school,

9   but there are those that love it, you know, money's money

10  here.  It's important.

11              MR. WAGNER:  The West Virginia share of that is

12  $450,000.

13              THE COURT:  Well, that -- that can help -- that

14  can help someone in West Virginia.

15              MR. HUEBNER:  But Your Honor, one very small point

16  from the Debtors, if the states are able to work this out

17  amongst themselves in connection with the Court's, I think,

18  pretty strong direction, we think that'll be fabulous.  If

19  the Court, nonetheless, felt in the absence of such an

20  agreement, that the Court was essentially going to direct

21  it, this is not the debtor's fight, but we would certainly

22  not have no objection to that as the plan proponent it is

23  our plan that would be changed.  I think that the Debtor's

24  view has at least some small relevance and we would not

25  object.

1          THE COURT:  Okay.  Thank you.

2          MR. ECKSTEIN:  Your Honor, I would just make one

3  point.  This is Kenneth Eckstein.  I do want to point out --

4  and I hear Your Honor's suggestion, and I think we would

5  obviously love to have that consensus achieved.  I do want

6  to point out that California remains an (indiscernible)

7  state and I don't --

8          THE COURT:  I understand.

9          MR. ECKSTEIN:  -- hold out the likelihood that

10  we're going to be able to resolve this specific issue with a

11  state still objecting to the plan.  So from a resolution

12  standpoint, I don't want to give the wrong impression, Your

13  Honor, about what's (indiscernible).

14          THE COURT:  That's fair.  I just -- I want -- I

15  think -- and I don't know whether specific counsel from

16  California is listening, although they've joined in.

17  California's joined in the Oregon and Washington objection

18  and others.  It's -- look, I'm just pointing out my concern

19  about this issue.  That's all.

20          MR. ECKSTEIN:  And we do understand, Your Honor.

21  And obviously, the states worked as hard as they possibly

22  could to bring the broadest possible consensus.

23          THE COURT:  Well, that's clear.

24          MR. ECKSTEIN:  There is this --

25          THE COURT:  I -- look, that is clear to me.  That

1    is clear to me, but nevertheless, I have to apply

2    1123(a)(4).

3             MR. ECKSTEIN:  I believe, Your Honor, that you

4    can, and I believe that there is equal treatment.  But

5    you're correct that that equal treatment includes an

6    exception, in a sense, for one state that would've argued

7    for more.  They believe they were entitled to more --

8             THE COURT:  I agree.

9             MR. ECKSTEIN:  -- than they're getting, and this

10   is where the settlement came to rest.  Can it be improved?

11   Like all settlements, yes, but I just --

12            THE COURT:  Well, that's --

13            MR. ECKSTEIN:  -- want to suggest, Your Honor,

14   that this one may be difficult for us to change.  And I

15   don't --

16            THE COURT:  That's fair --

17            MR. ECKSTEIN:  -- want Your Honor frustrated by

18   the inability to make that movement right now.

19            THE COURT:  Okay.  Very well.

20            MR. ECKSTEIN:  Thank you.

21            THE COURT:  All right.  Thank you both counsel on

22   that issue.  So I think we are next, on the topic list, for

23   the objection by the Canadian municipalities and First

24   People's listed in Mr. Underwood's objection.  And again,

25   this is to cover points other than the third-party release

1    point, except for one sort of overarching jurisdictional

2    point that Mr. Underwood wanted to discuss I think, which is

3    sovereign immunity or foreign sovereign immunity.  So the

4    Debtors have reserved a very brief time for their remarks,

5    and then I'll hear from Mr. Underwood.  And then they have

6    some time for rebuttal.

7              MR. TOBAK:  Thank you, Your Honor.

8              MR. UNDERWOOD:  Your Honor, Allen --

9              MR. TOBAK:  Oh.

10             MR. UNDERWOOD:  Go ahead.

11             MR. TOBAK:  Anyway, this is Mark TOBAK, Davis Polk

12   for the Debtors.  The Debtors' response to the Canadian

13   objector's objection is set forth in full in our brief, and

14   there's no need to repeat it here.  It appears that over the

15   course of the hearing, Mr. Underwood's argument may have

16   evolved since the filing of our reply brief.  So the Debtors

17   do reserve their time for rebuttal.

18             THE COURT:  Okay.  So --

19             MR. UNDERWOOD:  Thank you.

20             THE COURT:  -- Mr. Underwood, you can go ahead.

21             MR. UNDERWOOD:  Thank you, Your Honor.  Allen

22   Underwood on behalf of -- Allen Underwood with the firm of

23   Lite Depalma Greenberg and Afanador on behalf of certain

24   Canadian municipal creditors and Canadian First Nations

25   creditors.  I think the way that we have always viewed this

1   proposed plan (indiscernible) and it's a (indiscernible)

2   short period of time that it may be leading this Court to

3   error.  In particular, irregardless of any of the other

4   arguments made by other creditors, that may be leading this

5   Court to errors particularly with regard to the Canadian

6   Municipalities and First Nations.

7           Technically, the Sacklers (indiscernible) vast

8   wealth beyond the jurisdiction of this U.S. court, and that

9   wealth was largely derived from the U.S. enterprise that is

10  actually before this Court.  In so doing, and unfortunately

11  at least as this plan is drafted, the Sacklers have made

12  themselves in their trust something along the effect of --

13  and it's not (indiscernible) themselves.  And in effect, in

14  the manner in which they're contributing assets to the plan,

15  they are not -- they're not bowing to this Court.  Rather,

16  they're seeking to direct it.

17          THE COURT:  Mr. Underwood, this is --

18          MR. UNDERWOOD:  In essence --

19          THE COURT:  -- really far afield from, not only

20  your objection, but also from what I just said, which is

21  that you had your chance to argue about third-party release

22  already.  I -- it's also, I think, just not -- I'm not quite

23  sure where you're going on this.  They actually are

24  submitting to the Court's jurisdiction to perform the

25  settlement, including the injunctive provisions of the

1    settlement.  So --

2              MR. UNDERWOOD:  I --

3              THE COURT:  And as far as the -- your clients,

4    whether the Court would have jurisdiction over your clients,

5    they've all filed claims in this case.  They're looking to

6    recover --

7              MR. UNDERWOOD:  That correct.

8              THE COURT:  -- money in this case.

9              MR. UNDERWOOD:  That's correct, Your Honor.  And

10   where I was going from the outset was this notion,

11   effectively, that the Sacklers cast a dark pale over this

12   entire settlement by suggesting that -- there's a pinhole

13   that they suggest that they would walk away from this plan

14   in the event that these releases are not approved.  And I

15   don't know whether that's true or not.

16              But what they've done is to -- effectively, this

17   Court is administering non-Debtor assets in Canada by way of

18   the IACs and the rights of the Canadian Claimants in Canada

19   to bring claims against the Sacklers.  And I think that

20   jurisdictionally in the first instance here, that's a bit of

21   a problem.

22              Now I'll go to Section 106, and I guess the

23   related issue, which is the way that this plan was

24   structured, if you were an international creditor, you were

25   given the devil's choice of filing a claim and affirmatively

1    participating in this process or not filing a claim and

2    seeing how it played out.  And I guess reserving your rights

3    to pursue assets elsewhere.

4              The problem is that this Court -- because of the

5    fact that the overall resolution here is actually

6    administering non-Debtor assets in such a vast manner, that

7    it's a bit unfair, generally, I think, to hold the Canadian

8    Creditors to the kind of global Section 106 waiver that the

9    Debtors would suggest.  And the Debtors cite no case law

10   about the scope of 106.  And I think in principle, my

11   understanding of what Section 106 is, is it's a defensive

12   provision effectively to make sure that there are counter-

13   claims under the Bankruptcy Code that can be brought so that

14   if a sovereign submits to this Court an affirmative claim,

15   there can be counterclaims.

16             Now, in this case, there's been no allegation of

17   any form of Debtor claim, counterclaim, avoidance action

18   claim against Canada.  All Canada's set to do by

19   participating is preserving its rights.  And in fact,

20   obviously the Canadian Municipal Creditors are glad they

21   participated because, frankly, assets in Canada are being

22   directed under the plan confirmed here to U.S. trusts, and

23   those are U.S. trusts, which the Canadian Municipal

24   Creditors and First Nations are not -- they're not

25   beneficiaries.

1          And this is really because of the manner in which

2     the Debtor has structured this plan.  And when I say that, I

3     -- we would have no argument here today had the Debtor

4     effectively put the Canadian Municipal and First Nation

5     Creditors in Classes 4 and 5 under the plan.  And in fact,

6     actually, factually, that's exactly what my clients thought

7     up until -- and the Debtor admits this -- up until virtually

8     a week before the plan objection on the sixth amended plan

9     was due, at which point the Canadians were advised, well,

10    despite the fact that you received ballots in Classes 4 and

11    5, you're actually going to be treated in Class 11C.

12          And it was at that point that the Canadian

13    Municipalities and First Nations realized that merely filing

14    a claim in this case was not going to be enough to preserve

15    their rights before this Court, and that they would have to

16    take the actions they have taken since that point.  But bear

17    in mind, Your Honor, that was a point 30 days ago.  I think

18    there was a presumption on the part of the Canadians that by

19    filing a claim, their claim would get -- again, in same

20    manner and fashion, and fairly with respect to other

21    similarly situated claims.

22          Now, the Debtor clearly will make a distinction

23    between the Canadian Municipal claims and Canadian First

24    Nation claim, and the municipality claims, the State claims,

25    the City claims that are filed by the United States

Page 125

1   entities.  And they make that distinction by a nebulous

2   reference to how different those claims are.  They've never

3   actually factually driven down why is a Canadian state

4   different -- or excuse me, a Canadian municipality different

5   from a U.S. municipality.

6           I would assert that the main difference is that

7   there was a coalition of U.S. states and later

8   municipalities that understood that they were -- and did

9   press in their own direction to establish the classes under

10  the plan, and that that was something that the Canadians

11  presumed that ultimately they would be brought into.  And

12  they waited patiently, and ultimately, that never happened.

13          THE COURT:  Well --

14          MR. UNDERWOOD:  And that, again, is why we're

15  here.

16          THE COURT:  -- the objection itself acknowledges

17  that the plan says what it says, which is that --

18          MR. UNDERWOOD:  Right.

19          THE COURT:  -- they're in the -- that the class

20  that would receive the governmental entities and the class

21  that would receive Native American tribes that would receive

22  distributions for abatement purposes through the trust would

23  be U.S. governmental entities and tribes governed by U.S.

24  law.  I mean, that's -- that is clear in the plan, and it's

25  acknowledged.  So I think the issue here, the legal issue,

Page 126

1    is not that your clients have a right to be in that -- in

2    one of those two classes depending on whether they're a

3    First Nations Creditor or a Canadian Municipal Creditor, but

4    whether their treatment in the Class 11 is somehow improper.

5    Now, Class 11 --

6              MR. UNDERWOOD:  And --

7              THE COURT:  -- Class 11 voted for the plan, right?

8              MR. UNDERWOOD:  It --

9              THE COURT:  In favor of the plan.

10             MR. UNDERWOOD:  Interestingly enough, Your Honor,

11   I think if you look at the voting tabulation for Class 11C,

12   and we did examine (indiscernible) tabulation, the

13   tabulation -- had the Canadian Creditors been able to

14   (indiscernible) dollar claim, the tabulation would have been

15   -- I think in terms of numerosity, the majority of creditors

16   in 11C, no matter how you slice it, would have voted in

17   favor of 11C.

18             But in terms of overall value, but for the dollar

19   value restriction, if you attribute any reasonable value to

20   the Canadian First Nations claims in terms of dollar value,

21   that class would've voted against the plan.  And I don't --

22             THE COURT:  But those claims are unliquidated.

23   And the Debtors, I think, are correct.  Having received the

24   proofs of claim myself, it's very hard to see from the

25   claims whether they're against the Debtors or against Perdue

1    Canada or one of the Canadian entities.  So there's been no

2    motion to estimate.  I don't know why you don't count the

3    dollar amount.

4              MR. UNDERWOOD:  And I don't want to waste a lot of

5    the Court's time on that subject.  I think what we really

6    come down to is the Debtor hasn't presented anything to

7    suggest these Canadian municipalities and First Nations are

8    any different than tribes or cities in the U.S.  Now what

9    does that mean --

10             THE COURT:  But I would push back on that too.

11   They do say that there's a substantial issue, which again, I

12   could not get to the bottom of in looking at the proofs of

13   claim and the complaints attached to, as to whether these

14   claims are against Perdue Canada or against the Debtors.

15   And it's only to the extent they're against the Debtors that

16   they would even have a right to recover.

17             And of course, if they're against Perdue Canada,

18   they're not covered by the injunction under the plan.  And

19   on top of that, and we just spent about 40 minutes on this

20   issue, it's quite clear to me that as far as the allocation

21   under the plan is concerned on the public side, the

22   governmental entities side, it's pretty much a minor

23   miracle, but it did happen that those public entities were

24   able to agree on an allocation.

25             But I have no basis to think that that agreement

1    would then include folding in foreign creditors who did not

2    participate, and I don't think sought to participate, in the

3    mediation on that issue.  And --

4              MR. UNDERWOOD:  I think --

5              THE COURT:  And so, you know, I think courts have

6    been recognized that there is a basis for separate

7    classification.  In fact, making a distinction even between

8    foreign claimants and U.S. claimants as long as there's a

9    rational basis for it, and including in the Sixth Circuit in

10   the Dow Corning case, Class 5 Nevada Claims v. Dow Corning

11   Corp., 288 F.3d 648, 642 (6th Cir. 2012).

12             Now, that was a case where there was evidence as

13   to the different types of recovery in different countries.

14   So -- but the principle is you don't have to -- you can

15   discriminate between domestic and foreign creditors if

16   there's a rational basis for it.  And it seems to me there's

17   a rational basis.

18             I -- what is not clear to me is whether these

19   three -- I'm sorry, I think it's -- not three, I think it's

20   six creditors, would have any right to get involved in the

21   allocation abatement aspect of this, and frankly, how much,

22   if they even did, would go to them as opposed to their share

23   of the $15 million in cash, which is coming out right away,

24   which they could certainly apply to abatement if they

25   liquidate their claims and they're against the U.S.

1          MR. UNDERWOOD:  I think the difficulty that I'm

2    seeing here, Your Honor, is that I haven't seen anybody

3    distinguish what makes the international border here.  What

4    makes Windsor, Canada different from Detroit?  What makes a

5    Canadian Mohican different from a New York State Mohican?

6          THE COURT:  I --

7          MR. UNDERWOOD:  And that I understand, Your Honor.

8          THE COURT:  Well --

9          MR. UNDERWOOD:  I understand.

10         THE COURT:  -- but I'll answer that -- I'll try to

11   answer that question from my own perspective, and you could

12   try to persuade me otherwise.  I think the answer is we had

13   a many-months-long process in the mediation with Messrs.

14   Fineburg and Philips, as well as a mediation among the

15   states themselves, regarding the public side allocation,

16   which was incredibly difficult.  And frankly, I don't see

17   how do we open that.  I just -- you know, there was --

18   people -- look, I -- people did ask to be involved in the

19   mediation.  The NAACP asked to be involved in it.  I said

20   okay, but I think not having participated in that, and I

21   can't predict how that would've turned out if the -- if your

22   clients had sought and been granted the right to participate

23   in it, whether the U.S. entities would've said, no, it's

24   just too complicated.

25         But leave that aside.  They didn't participate in

1    it.  And at this point, we would be rewriting rules that

2    just, you know, I think the Debtor has the perfect right

3    under the Bankruptcy Code to have separate classification

4    and given the acceptance of the plan, separate treatment by

5    these two -- well, it was -- really would be four because

6    you have the Native American tribes and the First Nation

7    tribes, four different classes.

8              So, you know, it's not as if the class in which

9    the -- your clients are classified are getting nothing.

10   They're getting money upfront.  There's no argument that

11   they would be getting more in the -- if they had

12   participated in the no-added Native American tribes class.

13   And indeed given the acceptance by Class 11, I don't think

14   that argument flies because that's a cram-down argument.

15   That's an 1129(b) disparate treatment or unfair treatment

16   argument.

17             So I just -- I don't -- to me, this objection sort

18   of tries to fit within applicable sections of the Bankruptcy

19   Code, but it just doesn't -- it doesn't -- to me it doesn't.

20   It doesn't fit in.

21             MR. UNDERWOOD:  Your Honor, I appreciate your

22   explanation, and I'm going to try to convince you otherwise

23   --

24             THE COURT:  Okay.

25             MR. UNDERWOOD:  -- in the few minutes allowed.

1           THE COURT:  And I'm going to (indiscernible) --

2           MR. UNDERWOOD:  (indiscernible)

3           THE COURT:  -- to make a good -- you can hear if

4    they have that chance.

5           MR. UNDERWOOD:  I greatly appreciate it.  And I

6    will -- I am reserving to subsequently here address the

7    jurisdictional question.  But as to this issue, the counsel

8    for these Creditors did reach out to the Debtors.  The

9    Debtors, in my opinion, were the first parties that had the

10   last clear chance to address these claims in what I think is

11   a more equitable fashion.

12          Mr. Dubel testified that the Special Committee

13   never reached out to these Creditors.  These Creditors filed

14   their proofs of claim.  Ultimately, Your Honor, what I would

15   go back to here is reference to the In re Dana Corp. case in

16   the Southern District, and Public Airways and this notion

17   that all claimants that are in a class must have the same

18   opportunity for recovery.  I understand the notion that that

19   you're driving --

20          THE COURT:  They're not in the same class.

21   They're in a different class.

22          MR. UNDERWOOD:  All right.  I'm not going to beat

23   a dead horse there.

24          THE COURT:  Okay.

25          MR. UNDERWOOD:  I think the placement of them into

1    a different class was a problem, and that's why I actually

2    started this argument at a different -- perhaps a higher

3    level, which is ultimately what happens here is material to

4    the global perception of U.S. courts and their manner in

5    which they deal with creditors.

6          And I think that the perception of the Debtors not

7    having addressed foreign municipalities in the same way that

8    they addressed U.S. municipalities when -- and let's face

9    it.  If they were all vendors, the fact that they were

10   across the state border would not have impacted -- all other

11   things being equal would not have impacted their

12   classifications, and they would have this (indiscernible).

13             THE COURT:  I agree with that.

14             MR. UNDERWOOD:  All right.

15             THE COURT:  I agree with that.  On the other hand

16   --

17             MR. UNDERWOOD:  So --

18             THE COURT:  On the other hand, if they were

19   personal injury claimants, a la the Dow Corning case, the

20   Court -- the plan proponent wouldn't be within its rights to

21   have a separate classification if there was a rational basis

22   for it based on the different nature of their recovery.  And

23   again, there is a -- there was a very lengthy, expensive,

24   and well-publicized process here to mediate the allocation

25   and treatment of public creditors that those who wish to

Page 133

1    participate in, really pretty much just had to file

2    something if they were let in the door in a timely fashion,

3    and they would've participated, including the NAACP for

4    example and the school districts.

5              So I think -- look, clearly it is up to the

6    Canadian court in it's -- in response to a motion for final

7    recognition to decide this issue.  But I think the record

8    should be clear that there was no exclusion of the Canadian

9    Municipal Creditors and First Nations Creditors from that

10   process, and the process was a lynchpin of this plan.  To

11   now reopen it would be, I think, impossible to bring other

12   parties into it.

13             On the other hand, the class in which the Canadian

14   Creditors were classified, voted to accept the plan, and I

15   don't -- I have no evidence that they're -- even setting

16   aside that they -- because of that vote this is irrelevant

17   to me legally, under the Bankruptcy Code it might be

18   relevant to a Canadian court of recognition.  I don't know,

19   but there's no evidence that they're getting a worse deal

20   than if they had been included in the trust structure.

21   They're getting their pro rata share of $15 million in cash

22   right away that wouldn't happen but for, I believe, the

23   other aspects of the plan.

24             MR. UNDERWOOD:  I think, Your Honor, I just want

25   to make clear that at least the Canadian Creditors view this

Page 134

1    as a conscious choice by the Debtors in the manner which

2    they classified these Creditors.  And ultimately, it's

3    impossible to say how the mediation might have ended.  It

4    never even started, and that again there was a conscious

5    choice by someone other than this Creditor.

6            So, ultimately -- I don't want to necessarily

7    belabor this point any further, but it does raise the

8    ultimate implication, which is an issue for this Court and

9    for the United States, which is it would not be a good thing

10   generally for the Canadian (indiscernible) to accept this

11   Court's confirmation of a plan.  And specifically with

12   regard to this case, there is no question that that outcome

13   would affect the implementation, I think, of the plan.  So

14   it is material, I think, in a larger perspective.  I'm

15   willing to move onto jurisdiction.

16           THE COURT:  Okay.

17           MR. UNDERWOOD:  And essentially, with regard to

18   that -- and even there, it's still a release issue, I

19   suppose.  Because what we're really talking -- what I'm

20   talking about is under (indiscernible) Petroleum Network,

21   and I'm sure you're more familiar with the case than I am,

22   what these (indiscernible) are affecting is an involuntary

23   release of a foreign sovereign's, effectively, claims

24   against the U.S. Debtor.

25           Now, in terms of those claims, the proof of claims

1    attached complaints that assert fraud, public, nuisance, a

2    variety of forms of relief.  And those are the very same

3    forms of relief that are sought by United States

4    municipalities.

5              In terms of the jurisdiction of this Court to

6    enter a nonconsensual release under Section 1141 of the

7    Bankruptcy Code, I think there is fundamentally -- and this

8    is absolutely without offense to the Court, but I think that

9    there is a jurisdictional question at the outset of whether

10   a non-Article 3 judge actually has that authority.

11             I'll pull very quickly back to the second aspect

12   of this issue, which is, all right, we all agree about what

13   Section 106 specifically says, but what was it really

14   intended to do and what does it really mean in this case?

15   And are there other statutes that abrogate 106 for the very

16   specific purposes of this case?  And I think in terms of

17   106, the Debtors, who really don't cite any case law or

18   analysis of 106, I think -- I think the way that I look at

19   106 and the way other courts have looked at Section 106 is

20   that it is to preserve defensive rights.

21             Meaning preserve avoidance actions, preserve, you

22   know, separate Debtor actions against foreign sovereigns so

23   that they can't sneak in and sneak out of the court without

24   having full relief on both sides.  But I think here, as I

25   stated earlier, there is no -- there are no such claims that

Page 136

1    have been asserted.  So ultimately, with regard to 106, the

2    -- ultimately, the way that the foreign sovereignty immunity

3    statute actually trumps Section 106 in the Code.  To be

4    frank, I couldn't find any law on that either way.

5              And maybe Davis Polk can correct me on that, but

6    ultimately there is no exception under the Foreign Sovereign

7    Immunities Act that would otherwise apply here.  So other

8    than filing a claim, which unquestionably my clients had to

9    do, wanted to do, they wanted to participate in this case,

10   it was important that they did it because, frankly, Canadian

11   assets are affected by the proceedings before this Court,

12   and there's no denying that.

13             I think ultimately there's a real question here

14   about whether the Foreign Sovereign Immunities Act, under

15   this very specific factual circumstance, may trump the plain

16   language of Section 106.  Because what we're talking about

17   here is really the relationship between two countries, and

18   I'm certain that the people of Canada will not be happy when

19   they come to understand that there is an entire abatement

20   procedure that they were effectively left out of.  Maybe

21   that is what it is, but that's fundamentally, I think the

22   Foreign Sovereign Immunities Act jurisdictional Section 106

23   issue before this Court.  And I hope I was able to frame

24   that in some fashion.

25             THE COURT:  Well --

1         MR. UNDERWOOD:  And we'll certainly raise it on an

2    objection.

3         THE COURT:  I understand your objection, and I

4    think it really comes down to the Court's, the Circuit

5    Court's, analysis of, first, what is being done when a plan

6    does enjoin the prosecution of a third-party claim; and

7    secondly, whether, by its plain terms, 106(a)(1) and (b)

8    permit that with regard to an entity, a governmental entity

9    that has sovereign immunity.

10        But I will note, though, that the injunction is,

11   as argued by the Debtors and their allies, the committee and

12   the other ad hoc groups that are supporting the plan, serve

13   an integral role enabling any recovery under the plan,

14   including the recovery in Class 11, which is what your

15   clients would have.

16        And again, as far as participating in an abatement

17   program, the -- I have no -- nothing to suggest that the pro

18   rata share of the Class 11 consideration that would flow to

19   the Canadian Creditors that you represent would be anything

20   less than the value of the abatement program that would flow

21   to them, which is, you know, obviously something that, I

22   mean, directly flow to them.  To the extent they're right

23   across the border from a state or municipality that has that

24   type of program, there would be some indirect effect, as was

25   testified.  But notwithstanding the size of the value that's

1    going into the NOAT and Native American tribes' trusts, when

2    you look at the denominator, if you added your client's

3    claims to it, it's quite possible to me that, even if they

4    had asked to participate in the mediation, and had been

5    included in the procedures, these creditors wouldn't have

6    any aliquot share of that abatement program that would come

7    close to their pro rata share of the cash that they're

8    getting right away that they can themselves apply to

9    abatement.

10             MR. UNDERWOOD:  I think, Your Honor -- and it's a

11   funny thing because I have always said I would never, ever

12   listen to a client who says -- that says to me that it's

13   just about money.  This isn't just about money, and I think

14   we cannot say because there never was an allocation to

15   Canada as to what it might have received as to these claims.

16   But that be -- I would also say that, and sincerely, very

17   sincerely, the municipalities and First Nation's interests

18   in the Class 4 and 5 programs wasn't just money.  They were

19   genuinely interested in the other aspects of the abatement

20   programs that they are also not partaking in.

21             THE COURT:  Well, they have every opportunity to

22   use those programs as a model for their own use of the money

23   that they're getting, and frankly to -- if they -- if there

24   are other municipalities that would oppose that, try to

25   convince the court in Canada that the condition of

1    recognition is that the recoveries by Canadian creditors be

2    used towards abatement.

3              MR. UNDERWOOD:  I -- I'm sure that someone will

4    make those arguments in Canada before the NCAA.  I guess my

5    concern also is that the result of this confirmed plan will

6    be, to a degree potentially, a handcuffing of the Canadian

7    Creditors to recover presuming that they are locked out of

8    any recovery against the U.S. assets.  They're not a part of

9    the NOAD or the tribal trust.

10             And presuming that the liquidation value or net

11   sale value of the Canadian entity is then conveyed to those

12   very trusts, which the Canadians are not participating, and

13   presuming that as (indiscernible) --

14             THE COURT:  That's a mistake.  Your clients, to

15   the extent they have claims against the Canadian entities,

16   can go against the Canadian entities.  There's -- they're

17   not being enjoined from doing that.  To the extent they have

18   claims against the Canadian entities, they are not being

19   enjoined from proceeding against them.  There might be a

20   race to the courthouse on that point, but they have those

21   claims.

22             MR. UNDERWOOD:  I understand.

23             THE COURT:  There's no doubt about that.  So I

24   just --

25             MR. UNDERWOOD:  I understand the fundamental

Page 140

1   difficult position, and I'm greatly appreciative of the work

2   that everyone in this case has done to achieve any kind of

3   result in an otherwise insoluble case.  But I think

4   ultimately when we look at the liquidation value of those

5   Canadian assets, they pale in comparison to the U.S. assets.

6               THE COURT:  But --

7               MR. UNDERWOOD:  Or their treatment of the note.  I

8   think ultimately if we believe that the Canadian Creditors

9   will be handcuffed in their ability to collect against the

10  Sacklers under Canadian actions, we've left Canada with very

11  little from this proceeding, and that is what it is.  And I

12  told clients that on the first day that I took this case.  I

13  think ultimately I appreciate Your Honor's work in this

14  case.

15              THE COURT:  Okay.

16              MR. UNDERWOOD:  Thank you.

17              THE COURT:  Thank you.  All right.  Any rebuttal?

18              MR. TOBAK:  Briefly, Your Honor.  The first point

19  I'll note -- and this is Mark TOBAK, Davis Polk for the

20  Debtors, is that oddity that we had earlier in argument that

21  it was illegal for the Debtors to classify states in the

22  United States together with the municipalities of counties

23  within that state.  And now we have an argument that it is

24  apparently illegal for the Debtors to classify cities in an

25  entirely different country separately from the states and

1    municipalities in this country.  And I think that gets to

2    the point of, you know, it was asked many times why the

3    Canadian municipalities and First Nations are being

4    (indiscernible).

5              THE COURT:  You cut out.  I'm not sure what

6    happened there.  Are you there?

7              WOMAN:  (indiscernible)

8              MR. TOBAK:  All right.  Your Honor, can you hear?

9              THE COURT:  Yeah, now I can hear you.

10             MR. TOBAK:  Thank you.  I don't know where it cut

11   out, but I'll say that the suit (indiscernible) --

12             THE COURT:  You got -- you cut out again.  Yeah, I

13   think when you move your paper you might mute yourself.

14             MR. TOBAK:  Oh.  There's a (indiscernible)

15   keyboard underneath my lectern.

16             THE COURT:  There you go.

17             MR. TOBAK:  Your Honor, I apologize for that.

18             THE COURT:  That's fine.

19             MR. TOBAK:  In any event, the point is that Canada

20   is a separate country, and that's fundamentally important

21   for many reasons.  The most important reason, as Your

22   Honor's already noted, is that there is an independent

23   company, an IAC, in Canada called Purdue Canada, and that

24   entity sells and markets pharmaceuticals in Canada.  The

25   importance of the border, which Mr. Underwood asked about,

Page 142

1    is particularly important in the context of highly regulated

2    pharmaceutical products which are subject to a great deal of

3    regulation in the United States, an entirely separate regime

4    of regulation in Canada under that country's laws.  That is

5    why Perdue Pharma does business in the United States and not

6    in Canada.

7            To the point of the Canadian municipalities'

8    desire to participate in an allocation and abatement scheme,

9    fundamentally we hope, as Your Honor has already noted, that

10   perhaps this plan of confirm can be used as a model for a

11   similar scheme in Canada with respect to Canadian

12   municipalities and assets of the Canadian company.

13           I will note, however, that in this plan here, the

14   testimony is that it has taken literally years, including

15   years before Perdue filed for bankruptcy, to develop this

16   plan and to develop an abatement model that was targeted to

17   the communities in this country.  It would be entirely

18   inappropriate to attempt to in-graph that model into

19   different communities in the different country under

20   different legal regimes with different allocations of

21   national, provincial, and local responsibilities, and to

22   address different conduct by different companies and solve

23   the different needs.

24           With respect to the jurisdictional point, I think

25   it can't really be said better than 106(a), which

1    specifically provides that it abrogates the sovereign

2    immunity of any governmental entity, including a foreign

3    state with respect to Section 105 of the Bankruptcy Code.  I

4    can't find in the Code any suggestion that it is limited

5    only to the assertion of a counter claim by a Debtor.

6            As Your Honor also noted, the jurisdictional basis

7    for this proceeding is a simple, Section 1334, and this is

8    on the basis of any other aspect of a plan being confirmed.

9    With respect to whether there's any case holding that

10   sovereign immunity is abrogated by Section 106, one case is

11   the In re RMS Titanic case, which is at 569 B.R. 825 from

12   the Middle District of Florida 2017 which states that

13   pursuant to Section 106(a), foreign states can no longer

14   assert sovereign immunity from liability under the

15   Bankruptcy Code.

16           And then it notes that Section 106 abrogates

17   sovereign immunity as to a governmental unit.  It cites to

18   several cases.  One from the Ninth Circuit and others from

19   other bankruptcy courts across the country.  I think that's

20   really all there is to say with respect to sovereign

21   immunity other than, also, the fundamental point that the

22   municipalities and First Nations did come to this court and

23   seek to participate in this proceeding, which is also a

24   waiver of whatever immunity they might have had otherwise.

25           Unless Your Honor has any further questions, I

1    think we rest on that and our papers.

2              THE COURT:  No, I think that's fine.  Thank you

3    both.

4              MR. UNDERWOOD:  Your Honor, may I make one comment

5    as to the reference to the RMS Titanic case?

6              THE COURT:  Sure.

7              MR. UNDERWOOD:  And I think it came through in

8    what counsel said.  The RMS Titanic case refers to the

9    liability of a foreign sovereign.  It doesn't refer to the

10   taking of a right, and I'll rest on that, and I appreciate

11   it.  Thank you.

12             THE COURT:  Okay.  Thank you.  All right.  It's

13   1:30.  We have probably another two or three hours at most.

14   Does it make sense to take a break for lunch?

15             MAN:  Your Honor, that actually is exactly what I

16   was going to suggest.  And just for people who are following

17   the hearing, we have the (indiscernible) and Bridges, I

18   think, objection up next, then insurers, then pro ses, and

19   then whatever miscellaneous matters are remaining with

20   respect to the releases.  I think the allocated time for

21   those things is actually a little bit under three hours.  So

22   hopefully we will be able to keep to that, but we'll see how

23   the afternoon goes.

24             THE COURT:  Okay.  So I'll come back at 2:30 then.

25             MR. UZZI:  Your Honor, if I may, just before we

1    break, I have a comment that I hope is helpful as it relates

2    to narrowing the release a little bit.  And again for the

3    record, Gerard Uzzi of Milbank for the Ray Sackler family.

4    Now, I realize, Your Honor, when I made the presentation

5    earlier, I said something, with I meant, and it's a little

6    inconsistent with one of the words on the page, which is

7    there is no release of tax liability.  But the carve-out for

8    that is in the definition of excluded claim, and when I went

9    back and checked --

10            THE COURT:  But that's been there for a while.

11            MR. UZZI:  Well, and it has been, Your Honor.  And

12   I realize, though, I said any taxes.  What it says in

13   excluded claims is income tax, and we meant any tax.  And so

14   we could strike the word income.  And just -- I know people

15   are preparing for, you know, possible argument after lunch.

16   And just if that helps simplify things, I wanted to make

17   that announcement prior to the break.  That's all.

18            THE COURT:  Okay.  That's good.  Thank you.  All

19   right.  So again --

20            MR. UZZI:  You're welcome.

21            THE COURT:  -- we'll come back at 2:30.

22            (Recess)

23            THE COURT:  Okay, good afternoon.  This is Judge

24   Drain.  We are back on the record In re Purdue Pharma LP and

25   the confirmation hearing.

1          The next matter, or next topic rather, of oral

2    argument I believe is the argument on objections filed by

3    Mr. Overton and his counsel to Creighton Bloyd, Stacey

4    Bridges, and Charles Fitch.  Creighton Bloyd actually had

5    two objections.  The other two people joined with him in

6    one.  And I'm sorry, I said Overton.  And I apologize, Mr.

7    Ozment, it's Mr. Frank Ozment.

8          So I think the Debtor's counsel is going to go

9    first on this and then we were going to hear from Mr.

10   Ozment.

11         MR. TOBAK:  That's correct, Your Honor.  For the

12   record, it's Marc Tobak from Davis Polk for the Debtors.

13         Reserving most of our time for rebuttal, I want to

14   make two points with respect to the objections by Mr. Bloyd,

15   Ms. Bridges, and Mr. Fitch to notice provided to

16   incarcerated unknown claimants.

17         And the fundamental point, Your Honor, is that

18   this is not their objection to raise.  They do not argue

19   that they were not provided with the adequate notice, and

20   they can't.  That would be contradicted by the facts.

21         According to the timestamp on Ms. Bridges' proof

22   of claim, she filed just three days after this Court entered

23   the bar date order in February 2020.  And Mr. Bloyd filed

24   his proof of claim in June 2020.

25         Mr. Fitch, by the way, hasn't filed a proof of

1    claim even though he is a plaintiff in an adversary

2    proceeding against the Debtors.  And we have been in contact

3    with his counsel since at least January of this year.

4            So their objection to notice is raised on behalf

5    of other parties who, as far as we were aware, Mr. Ozment

6    does not represent in this proceeding, and as far as we are

7    aware, not before the Court.  Mr. Ozment's clients,

8    therefore, lack standing to assert the rights of other

9    parties in attempt to thwart confirmation of the plan.

10           And I quote from the Second Circuit's opinion in

11   Kane v. Johns-Manville, which is 843 F2.d 636 at 642,

12   "Generally, litigants in federal court are barred from

13   asserting constitutional and statutory rights of others in

14   an effort to obtain relief for themselves."  That rule

15   precludes Mr. Ozment's clients from raising the alleged

16   notice rights of others.

17           Indeed, the Second Circuit's decision in Kane is

18   almost an exact parallel here.  There, an asbestos claimant

19   in Johns Manville bankruptcy attempted to appeal on the

20   ground that other asbestos claimants had not obtained

21   adequate notice.  The Second Circuit refused to entertain

22   that appeal, and it held that an objector who had himself

23   received notice could not assert the alleged rights of third

24   parties.

25           Judge Newman, for the panel, noted that, "The

1    general rule that third party standing is particularly

2    relevant in bankruptcy proceedings, as parties may often

3    find it personally expedient to assert the rights of others

4    in attempt to block confirmation of a plan."  And that quote

5    is from 843 F.2d at 645.

6            I don't doubt the sincerity of Mr. Ozment or his

7    clients.  But in this case where his three clients stand,

8    just as in Kane, opposed to over 95 percent of the voting

9    creditors in their class, opposed to the statutory

10   fiduciary, all unsecured creditors, and also opposed to the

11   Ad Hoc Group of individual victims, there is more than

12   sufficient reason to conclude that his clients lack standing

13   to assert the rights of others.

14           I also briefly note that the objection was quite

15   untimely.  Your Honor approved the Debtor's extraordinary

16   and exhaustive noticing program in February 2020.  And that

17   program was expanded through the extended bar date order,

18   which is at Docket 1221, on June 3rd, 2020.  And as Ms.

19   Finigan testified earlier, the Debtors engaged in yet

20   another additional and extensive noticing program in

21   connection with the confirmation hearing.  And that was

22   approved on June 3rd of this year at Docket 2988 in the

23   exposure statement order.  Mr. Ozment and his clients never

24   before raised these issues until filing their objections on

25   July 19th.

1          With all respect, had they wished to alter the

2    notice program rather than belatedly point to it as an

3    obstacle to confirmation, it could have been raised earlier

4    at a time in 2020 or 2021 when it might have -- when things

5    might have been changed.

6          With that, I will reserve the rest of our time for

7    rebuttal.

8          THE COURT:  Okay.  Do you want to -- there is a

9    second declaration.  Are you going to deal with that

10   separately?  A second objection by Mr. Creighton.

11          MR. TOBAK:  I believe we addressed all -- both the

12   Bloyd and Bridges and --

13          THE COURT:  I'm sorry, Mr. Creighton Bloyd.

14          MR. TOBAK:  Mr. Bloyd, correct.  So that's the one

15   at -- I think it's Docket 3277.

16          THE COURT:  Right.

17          MR. TOBAK:  We'll rest on our papers with respect

18   to that unless the Court has any questions and rebuttal to

19   Mr. Ozment's argument.

20          THE COURT:  All right.  So you're reserving

21   rebuttal on that one.  Okay.

22          MR. TOBAK:  Correct.  Thank you.

23          THE COURT:  Okay.  All right, Mr. Ozment.

24          MR. OZMENT:  Your Honor, thank you.  This is Frank

25   Ozment, and I represent Creighton Bloyd, Stacey Bridges, and

1   Charles Fitch.

2           With respect to the Article Three and case or

3   controversy issue, I'm not familiar with the case that he

4   cited.  But I would point that we are not bringing a case or

5   controversy here.  There is a case or controversy already.

6   I think, you know, the power of Congress to regulate

7   bankruptcy under Article 1, Section 8, is really what this

8   is about, is our coming in and saying, you know, we don't

9   think this is fair.

10          With respect to Ms. Bridges in particular, while

11  she is not presently incarcerated, she certainly has been.

12  And, you know, that threat remains.  So to the extent that

13  there is some issue there, perhaps it's capable of

14  repetition but (indiscernible).

15          The more important thing I think is to get to the

16  heart of what we're saying here.  And I normally don't read

17  a closing argument to a judge, but in the interest of time,

18  I wrote this one down.

19          In Mullane v. Central Hanover, the court

20  recognized that due process requires a debtor to give notice

21  to a creditor before the creditor's claims could be

22  extinguished.  If the identity of the debtors and their

23  whereabouts are unknowable, then those can be by

24  publication.  If the identity and whereabouts are reasonably

25  ascertainable, the creditor cannot rely merely on those by

1    publication absent some other extraordinary circumstances.

2            Over the years, courts have recognized that

3    creditor (indiscernible).  The creditor has a lien, the

4    debtor generally has to do a little more.  The creditor is

5    unsecured perhaps by publication by notices where acceptable

6    if the creditor is unknown.

7            Here, there is no doubt, and Christina Pullo

8    testified about it in her declaration but also in cross, the

9    Debtors made a herculean effort to notify a lot of people.

10   And to a large extent, they appear to have succeeded, with

11   one very notable exception.

12           Their efforts were focused on people in the free

13   world, not so much people in prison.  Normally, this might

14   not matter much.  In an ordinary case, notice provided to

15   the free world might leak over into the incarcerated world.

16   And if this were a case about promissory notes and the

17   creditors were all banks, well, you wouldn't expect to find

18   too many creditors in prison, or at least in federal prison

19   -- I'm sorry, in state prison.

20           But this is not a normal case.  This is a case

21   about addiction.  Addiction drives people to crime, and

22   everybody knows that.  Prisons are disproportionately likely

23   to house people suffering from addiction.  Moreover, this

24   was noticed during a period in American History that was

25   very nearly unique.  A pandemic, when common sense dictates

1    that the public not go in and out of prisons, which of

2    course are places where social distancing is pretty much

3    impossible.

4           While Ms. Pullo I think gave very good testimony

5    and certainly put some of my concerns (indiscernible) notice

6    of the free world, it was also clear from her testimony that

7    the Debtors did very little to alert prisoners in particular

8    about the need to file claims.

9           This is particularly unfortunate in this case --

10   and this goes somewhat to Mr. Bloyd's objection, Your Honor

11   -- because victims should have been lienholders under the

12   Mandatory Victims Restitution Act.  The United States and

13   the Debtor basically agreed that victims would not get their

14   rights under the MVRA because it would take too long to

15   figure out who they were or just generally to calculate what

16   they would receive.

17          And at this point, I want to emphasize that was

18   not a proceeding in which Davis Polk represented the

19   Debtors.

20          Ultimately, that issue may be a matter for the

21   sentencing court to revisit.  It may ultimately be something

22   that Congress wants to take up.  But in the meanwhile, that

23   deprivation of lienholder status and that effort to ignore

24   the rights of victims under the MVRA -- sorry about that,

25   Judge -- aggravates this situation that we (indiscernible).

1         Personal injury victims might argue that their

2    liens should prime those of the (indiscernible) states.

3    Right now, we are merely trying to avoid the injury that

4    resulted from the lack of notification.  Interestingly --

5    well, I'll just skip that point.

6         There is a solution to all this, although this not

7    be the time, place to take it up.  Bridges and Bloyd filed

8    proofs of claim on behalf of all people similarly situated

9    to them.  That is to say living former opioids addicts who

10   are in active recovery.  Perhaps allowing their claims to

11   serve as timely filed proofs of claim will overcome the

12   (indiscernible) notice, especially for those who are locked

13   up.

14        As a practical matter, this may not mean much from

15   the perspective of outsiders in the free world.  For

16   prisoners, however, the recovery of amounts as low as $3,500

17   is life-changing.  It can pay off fines, pay the fees

18   necessary to get into community corrections, or pay child

19   support.

20        But, again, the proof of claim issue is not before

21   the Court today.  We have filed a motion to allow those

22   proofs of claim to be treated as adequate for satisfying the

23   bar date.  However, we don't have a hearing date on that

24   yet.  I thought we did, and I called Ms. Li yesterday and

25   she said she didn't (indiscernible).

1          The issue today is whether the Debtors proved that

2     they provided notice to one of the most densely-concentrated

3     populations of opioid use disorder victims in the nation,

4     that is to say the men and women who are incarcerated.  I

5     don't think it's very hard to find those people.  They have

6     publicly-listed addresses.  At each address, the

7     concentration of victims is high.

8          I respectfully submit, and somewhat reluctantly

9     submit in light of all the work that's gone into this case,

10    that confirmation should be denied unless and until the

11    Debtors are going to get or allow the prisoners formally to

12    file late claims.

13         And that ends my written statement, Your Honor.

14    And with respect to Creighton Bloyd's objection, I will tell

15    you that I filed that because I felt as if I did not file

16    it, then I would not be able to take it up with the United

17    States District Court when sentencing is concluded.  I don't

18    know, quite frankly, that there is much that you can do

19    about that in this proceeding, but I did feel like it had to

20    be (indiscernible).  And I'll be glad to take questions on

21    it if you like.

22         THE COURT:  Well, I have reviewed the Mandatory

23    Victims Restitution Act.  I don't think I have questions on

24    it.  And ultimately that is an act that applies I think at

25    the sentencing stage.  So I don't think I have any questions

1    there.

2           As far as the notice point is concerned, I think

3    standing is probably an absolute barrier here since it does

4    not seem to me that Creighton Bloyd or Ms. Bridges or Mr.

5    Fitch have an injury to be addressed by the relief sought in

6    the first objection to them.  So I don't think I have

7    questions, Mr. Ozment.

8           MR. OZMENT:  Thank you, Your Honor.  That's it for

9    me.

10          THE COURT:  Okay.  You're on mute.

11          MAN:  Yes.  I see Mr. Shore has joined, and I

12   defer to him if he wishes to respond to any points regarding

13   the treatment of personal injury claimants under the TDPs.

14          MR. SHORE:  Two points, Your Honor.  It's Chris

15   Shore from White & Case on behalf of the Ad Hoc Group of

16   personal injury victims, which includes 55,000 individuals,

17   including incarcerated individuals.

18          It's unclear to me what the status is of the full

19   objection.  We've heard some argument today on it.  I'd like

20   to address the class proof of claim issue because I think to

21   some extent what is happening today, or if the Court

22   confirms the plan is going to affect the class claims

23   status.  Two, to address the claims and the objections that

24   somehow either of the TDPs is disproportionally unfavorable

25   to incarcerated individuals or otherwise does not take into

Page 156

1    consideration their unique circumstances.

2            On the first point, the TDPs, which are plan

3    supplements -- I think the 16th plan supplement was just

4    filed -- the Court will be approving those.  Those require

5    that anybody who receives money from the TDP has an

6    individual proof of claim on file.

7            So while Mr. Ozment is saying he wants to reserve

8    the right to seek class treatment, he hasn't done it yet.

9    And if you -- without getting too far into it, the Musicland

10   factors that would go into whether or not that claim would

11   be filed, it would certainly be our position that the

12   allowance of a class proof of claim, which would, according

13   to the papers, take the personal injury class from 135,000

14   individuals to 1.5 million individuals, would affect the

15   administration of the estate going forward because the whole

16   TDP gets upended, distributions are made uncertain, and

17   you're going to have to change a central feature of the TDP,

18   which is that it's being done on an individualized basis.

19           So, you know, while I appreciate he's not pressing

20   and not seeking today class treatment for the claims, we are

21   going to have some distinct views with respect to whether

22   that would ever be appropriate.

23           But to be clear, I don't think the objection is

24   that the TDPs as drafted were drafted in bad faith.  I think

25   the point Mr. Ozment was making in the objection was it

1  doesn't take into consideration the unique facts of

2  incarcerated individuals.

3          And I hope Your Honor can see from the TDPs and

4  what have been said about them, there was a great deal of

5  thought and effort that was put into balancing the due

6  process issues on the one hand with code requirements and

7  the need to get money out to individuals in a timely

8  fashion.  And to some extent, it was a zero sum game.  The

9  more money that's spent on process, the less money there is

10  to distribute at the end of the day.

11          The -- one of the central premises of the TDPs is

12  the requirement under the Code that people file proofs of

13  claim.  And the TDP, the notice in the TDP backs off of the

14  Debtor's incredible notice program, both at the -- or with

15  respect to both bar date times.

16          Even so, there are provisions in the TDP which

17  allow individuals with late filed claims to either come to

18  the Court and seek relief under Rule 9006 or go to the

19  claims administrator, who has authority in his or her

20  discretion to allow the claim as timely.  And that's

21  Footnote 6 in the non-NAS TDP.

22          So there's nothing discriminatory against

23  individuals who are incarcerated.  They have the same right

24  and ability to file a late claim as anybody else.  Nor is

25  the actual claims process discriminatory.  Every claim under

Page 158

1    the Code is required to be substantiated with proof.

2           There are two -- and maybe Mr. Ozment can address

3    it with more specificity.  There are two ideas I think

4    buried in the concerns of incarcerated individuals.  One is

5    it just takes them longer to get the health records that are

6    necessary to substantiate their claims.  Again, under the

7    TDP, the claims administrator has discretion to elongate the

8    deadlines for any given individual.  That's Footnote 8 in

9    the non-NAS TDP.  So there is already built-in flexibility

10   to the extent it's a question of timing.

11          We extended the question of being able to gain

12   access to records at all, which is an issue faced by some

13   incarcerated individuals.  Again, the TDP provides that if

14   the individual is not able to gain access to their medical

15   records, they can file declarations to that effect and make

16   the necessary showings to obviate the need for their actual

17   medical records to substantiate.

18          So, you know, I'm not sure what else we can do

19   consistent with the law and the Code to relieve the

20   obligations that exist under the Code with respect to people

21   having to file proofs of claim and people having to

22   substantiate proofs of claim with proof.  Because we just

23   can't have a TDP in which any individual can come forward

24   without any proof and take money out of the PI trust that is

25   otherwise slated for real individuals with real proof and

1    real harm.

2              THE COURT:  Okay.  Thank you.

3              MR. OZMENT:  Your Honor, may I briefly address

4    that?

5              THE COURT:  Well, I just want to make sure -- do

6    the Debtors have anything more to say on this point, or

7    shall I just hear briefly from Mr. Ozment?

8              MAN:  With regard to the TDPs, no.  With regard to

9    notice, while Your Honor's ruling with respect to standing

10   probably disposes of the issue, just given the importance of

11   notice and its scope of notice provided, I want to note just

12   two points if that's appropriate right now.

13             THE COURT:  Okay.

14             M:  The first is that under the law, constructive

15   notice by publication is sufficient notice to unknown

16   claimants.  It's not accurate to say that everyone who is

17   incarcerated was provided notice through a constructive

18   means such as publication or television or other forms of

19   ads.  To the contrary, any known claimants, as is set forth

20   in Ms. Finigan's declarations, were provided with actual

21   notice by mail.

22             Secondly, in response to a question from Mr.

23   Ozment in the hearing, she testified that there was actual

24   specific outreach by mailings directed to prison outreach

25   organizations and to entities responsible for the management

Page 160

1    of prison facilities, which is set forth in her testimony of

2    August 12th, 2021 at Transcript, Page 76, Lines 10 through

3    18.

4            And the third point builds off those two.  And on

5    the other hand, we don't have any record evidence to support

6    Mr. Ozment's and his clients' assertions regarding the scope

7    of notice and what is or isn't available in prisons.  And

8    while, again, we don't doubt the sincerity of any of them or

9    in any way discount the importance of providing relief to

10   those who are incarcerated, on the other hand, there just

11   isn't record evidence of those assertions.  And with that,

12   we rest on our papers.

13           THE COURT:  Okay.

14           MR. OZMENT:  Your Honor, first, a quantitative

15   issue.  This would not amount (indiscernible) the claims.

16   There are roughly 1.2 million in physical custody of state

17   prisons.  And, you know, roughly 20 percent of those

18   probably use opioids even while in custody.  But that

19   doesn't mean that they product manufactured by Purdue.  So

20   we're not talking about flooding the trust with those

21   claims.

22           With respect to the issue regarding trust

23   distribution procedures, we are not asking for relief on it.

24   As a practical matter, by the time a prisoner arrives in

25   prison as opposed to jail, the people who run those

1    correction facilities know pretty much everything there is

2    to know about them.  And so hopefully to the extent that

3    people have had an opioid use disorder, problem that's well

4    known, and also perhaps even a level of what drug was it.

5    So, for example, you know, some drug courts will keep up

6    with, you know, was it OxyContin, Lortab, what led you

7    astray.

8              So we're not asking for relief on it.  But as a

9    practical matter, as you saw in the hearing involving

10   Augustus Evans earlier, I think it was last week, you know,

11   prisoners need help navigating this.  And it's very

12   difficult to motivate and engage people to help them,

13   especially volunteers, when, you know, it could be sort of a

14   dry well and in the discretion of my fellow bar member here

15   in Birmingham, who is a fine fellow, Ed Gentle, who is the

16   claim administrator.

17             I think, you know, we're going to get people

18   engaged in helping these folks, as we did with voting rights

19   issues and things of that nature.  They need to have some

20   understanding that, you know, if you get your stuff together

21   and it's in order, you're not totally wasting your time.

22   Otherwise, these claims are not going to get filed.  It's

23   just going to be too overwhelming for them.

24             And finally, in terms of filing a proof of claim

25   late and so forth, one of the last things in the world we

Page 162

1    want to do is snow the Court, or Mr. Gentle, or anybody else

2    with a ton of paperwork on whether somebody should be

3    allowed to file a late claim.

4            What we're talking about here is just one

5    (indiscernible).  Okay?  We're not asking for the right to

6    vote as we did -- as one of the earlier petitioners did.

7    We're just saying there's a problem with notice.  And it

8    needs to be addressed so that those people who are, you

9    know, perhaps not as poignant and heart-tugging as some of

10   the other stories, can file claims where it's appropriate.

11           So much of this is getting ahead of ourselves. But

12   since we touched on this issue, I wanted to clarify that

13   we're not, you know, going (indiscernible).

14           THE COURT:  Okay.  Thank you.  All right, thank

15   you both.

16           I think the next topic that is on is objections by

17   certain insurers to either aspects of the plan or proposed

18   aspects of the confirmation order.  And the Debtors, again,

19   will go first, as will the -- they will be followed by the

20   Ad Hoc Committee of Certain States and Other Governmental

21   Entities.  And then we'll hear from Navigators' counsel, I

22   think Mr. Anker.

23           So who is going to be speaking on behalf of the

24   Debtors on this?

25           MR. SINGER:  Good afternoon, Your Honor.  It's

1   Paul Singer from Reed Smith on behalf of --

2            THE COURT:  Okay, afternoon.

3            MR. SINGER:  Thank you, Your Honor.  We are

4   special counsel -- special insurance counsel to the Debtors.

5   I will be (indiscernible) with provisions of Section 510 of

6   the plan, which we believe as written is appropriate and

7   consistent with appliable law.  Emily Grim will be speaking

8   on behalf of the AHC and will address the findings of fact

9   and the conclusions of law to which the insureds have

10  objected.

11           Section 526(I) of the plan, Your Honor, provides

12  that the Master Disbursement Trust will receive the Debtor's

13  rights under any insurance policy that may -- and I

14  emphasize may -- provide coverage for opioid claims.

15           The purpose of the transfer is to enable the MDP

16  to pursue recoveries under the Debtors' policies, and if

17  successful, would distribute any proceeds recovered to

18  opioid creditors pursuant to (indiscernible) the plan.

19           This arrangement is typical of those found in mass

20  tort cases.  The assignment of insurance rights has been

21  proved under Section 1123.05, most notably by the Third

22  Circuit in the Federal Mogul case.

23           To be clear, the plan does not require any

24  findings as to the value of the insurance or the extent to

25  which the policy would actually cover opioid claims.  But

Page 164

1    the plan does seek findings intended to insure that the plan

2    itself doesn't somehow create additional risk to recover

3    that the Debtors would not have faced prepetition.  For that

4    reason, the plan includes language in Section 510 that

5    confirms, consistent with applicable law, that this Court's

6    findings are binding on insurers but then any other defenses

7    to coverage insurers may have are preserved.

8              According to certain insurers, they should be

9    entitled to argue in first confirmation coverage litigation

10   that keep components of the plan vitiates coverage.  Under

11   objection, they assert that the plan would insulate them

12   from any aspects of the plan or the confirmation order that

13   may be detrimental to these arguments.  They make these

14   assertions notwithstanding the understanding the adversary

15   proceeding that findings of the Court would be binding on

16   them in the coverage litigation.

17             Quite simply, the law does not permit the insurers

18   to undermine the plan's settlement framework, but to use it

19   as a basis to stake their coverage obligation.  To the

20   contrary, the Bankruptcy Code, the policies underlying it

21   that the parties should negotiate a plan that settles

22   claims, and the insurers' own policies, may of which contain

23   provisions that, notwithstanding the bankruptcy of the

24   insured, they remain in effect.  All of that prohibit the

25   insured from seeking an exemption from the (indiscernible)

1    of the plan, the confirmation order for the Bankruptcy Code.

2            To be sure, neither the Bankruptcy Code nor its

3    prior iteration in 1898 or 1939 requires the inclusion of

4    the broad neutrality language sought by the insureds.

5    Indeed, the term neutrality as used by the insureds is a

6    misnomer.  What the insurers are seeking are special

7    exemptions from rulings that are otherwise binding on them

8    as they would be on any other party in interest.  There is

9    no law saying matters that are decided in connection with

10   the plan confirmation can't be used in a subsequent

11   insurance coverage action.  Indeed, Your Honor confirmed

12   this we believe in the insured's adversary proceeding --

13            WOMAN:  Quiet.  I think they heard me yell.

14            MR. SINGER:  Am I being heard, Your Honor?

15            THE COURT:  People should keep their phone on mute

16   unless they are speaking.

17            MR. SINGER:  As I was saying, the principle that

18   plan confirmation orders can be used in other proceedings is

19   longstanding.  Discharge orders are often used with effect

20   to the release of claims under a plan in a state law

21   proceeding.  And indeed, free and clear orders likewise

22   issued under Section 363 are often used in state court

23   proceedings to demonstrate that there's no success or

24   liability.

25            The carveout that the insurers seek here, if you

1    call it neutrality, was developed in the early 2000s in the

2    Combustion Engineering and Pittsburgh Corning cases as a

3    tool to limit the ability of a debtor's (indiscernible)

4    frustrate or delay the plan confirmation process.

5              Indeed, each of those cases went to the Third

6    Circuit several times, and the Pittsburgh Corning case took

7    over a decade to get to confirmation.

8              The neutrality language that the insurers seek

9    indicate that they would have no -- the confirmation would

10   have no impact on their rights.  And by that, they would be

11   deprived of standing to object or interfere with

12   confirmation.  Such provisions (indiscernible) on the

13   specific considerations of each case.  Here, no one has

14   concluded the insureds are deprived of standing.  Indeed,

15   they have appeared and are being heard here.

16             As such, as any other party in interest, the

17   insurer should not be able to deny the existence of a plan

18   confirmed by this Court in conformity with the Bankruptcy

19   Code and the findings by this Court contained in the order

20   approving the confirmation and the settlements embodied in

21   the plan.  Accordingly, we believe that the language as set

22   in Section 510 of the plan is appropriate and

23   (indiscernible).

24             Unless the Court has questions, I would like to

25   turn the podium over to Ms. Grim on behalf of the AHC.

1          THE COURT:  I don't think I have any questions for

2     you, Mr. Singer.  If I have questions, it goes to -- or they

3     go to what besides the transfer of the policies to the

4     trust, to the MDT, are the Debtors and their allies seeking

5     to put in the confirmation order.  But I think Ms. Grim is

6     going to discuss that.

7          MR. SINGER:  If she doesn't, I can come back to

8     it, Your Honor.  Thank you.

9          THE COURT:  Okay, fine.

10         MS. GRIM:  Thank you, Mr. Singer.  And good

11    afternoon, Your Honor.  Emily Grim, Gilbert LLP, counsel to

12    the Ad Hoc Committee of Governmental and Other Contingent

13    Litigation Claimants.

14         Your Honor, the Debtors have included a number of

15    findings and conclusions in the proposed confirmation order

16    that are necessary to preserve the value of the insured's

17    rights being transferred to the MDT.

18         We provided Your Honor with a list of these

19    findings in Exhibit A in our joint reply to the insurer's

20    confirmation objections, so I won't read them word for word

21    unless you'd like me to.  But generally speaking, they

22    provide that the settlements embodied in the plan are

23    reasonable and were negotiated in good faith, that the

24    insurers had notice and an opportunity to participate in the

25    negotiations, and that the negotiation and resolution of the

1    Debtor's liabilities through these bankruptcy proceedings

2    shall not excuse any insurer from its coverage obligations,

3    regardless of any contrary policy terms.

4            The purpose of these findings is to ensure that

5    nothing about the plan itself or the Debtor's actions in

6    negotiating and proposing the plan diminishes the value of

7    the insurance assets being transferred to the MDT.

8            Now, certain of the Debtor's insurers have argued

9    in their plan and confirmation objections that this Court

10   can't issue these rulings.  Their view is that they should

11   be entitled to argue in coverage litigation that key

12   components of the plan release them from any and all

13   liability under the policies.

14           One of the defenses that they've specifically said

15   that the plan must preserve for them, that the plan's

16   settlement of the opioid liabilities violates the policy's

17   consent to settle provisions.  They argue that these are

18   just your typical, non-core, state law based coverage

19   defenses, and therefore that they must be decided in the

20   insurance adversary proceeding and not here.  We would argue

21   that that's not accurate for a number of reasons.

22           The first, these findings don't require the Court

23   to rule on garden variety coverage disputes.  They don't

24   require the Court to rule on whether the policies provide

25   coverage for opioid liabilities, they don't require the

1    Court to determine the value of any such coverage.  What

2    they seek is a determination that the insurers cannot

3    disclaim coverage based solely on the Debtor's actions in

4    this bankruptcy or on the contents of the plan itself.

5              We would argue that that's an issue that's

6    inextricably intertwined with the Debtor's ability to

7    marshal, preserve, and distribute their assets to creditors,

8    satisfaction of their liabilities, and that it couldn't

9    exist outside of bankruptcy.  That makes them core issues

10   properly decided by this Court as part of confirmation and

11   not, for example, by a Bermuda arbitration panel considering

12   coverage disputes post-confirmation.

13             The second reason that these findings are

14   appropriate for confirmation is that they are required by

15   the plan.  The Ad Hoc Committee and the other creditors that

16   voted in favor of the plan did so with the understanding

17   that the MDT will be entitled to access the same rights to

18   coverage as the Debtors for the opioid liabilities.

19             Now, they agreed to take on the risk that insurers

20   could raise garden variety coverage defenses.  For example,

21   that an occlusion bars coverage for the claims.  But they

22   did not agree to take on the additional risk that the plan

23   itself would destroy the value of the insurance asset.  And

24   in fact --

25             THE COURT:  Could I interrupt just for a second?

1        MS. GRIM:  Of course.

2        THE COURT:  Sorry, you can go ahead.

3        MS. GRIM:  Of course.  They negotiated language in

4    the plan specifically intended to protect against that risk.

5    And I'll give you some cites.

6        Section 9.10 of the plan requires that the

7    confirmation order contain a finding that the insurance

8    rights transfer is effective, notwithstanding any policy

9    provisions to the contrary.

10        THE COURT:  Can I interrupt you?  I understand

11    this is a negotiated provision of the plan.  But if it -- if

12    that violates the Bankruptcy Code in some way, then it

13    doesn't matter, right, other than that the parties'

14    intentions with regard to the plan are frustrated.  It

15    doesn't --

16        MS. GRIM:  Yeah.  I think Your Honor has to

17    determine -- sorry.

18        THE COURT:  The argument to override this is

19    really the argument under 1123(a)(5) and the caselaw.

20        MS. GRIM:  That's correct, Your Honor.

21        THE COURT:  Okay.

22        MS. GRIM:  Section 5.6(I), just to give you the

23    other cite in the plan so that you have it, requires that

24    the confirmation order contain findings necessary to

25    preserve the MDT insurance rights.  These provisions have

1    been in the plan since its inception.  And omitting the

2    findings they require would be a material change to the

3    plan.

4         A third reason these findings are appropriate is

5    that they are consistent with the Bankruptcy Code and the

6    policies underlying it.  The purpose of the Code, as Your

7    Honor well knows, is to enable debtors to use their existing

8    assets to resolve liabilities promptly and efficiently.

9         If insurers were entitled to control a debtor's

10   settlement of its liabilities in bankruptcy, that would

11   frustrate that purpose.  It would give insurers, who have no

12   fiduciary obligations to the estate and who, frankly, have

13   every incentive to use the reorganization process to delay

14   or minimize their coverage obligations, an effective veto

15   right over the plan.

16        Accepting the insurers' argument would mean that

17   this Court is powerless to prevent a debtor's insurers from

18   frustrating the Chapter 11 process, and we just don't think

19   that's an outcome that the Code contemplates here.  We think

20   that's the very reason Congress gave bankruptcy courts tools

21   like Section 1123(a)(5) to be implemented into the plan.

22        I would also like to address briefly the insurers'

23   reference to other cases where the plan and confirmation

24   order may have, for whatever reason, preserved all coverage-

25   related issues (indiscernible) confirmation.  And I have two

1    responses to that.

2           The first is I think there is emphasis that not

3    all plans have preserved coverage issues for resolution

4    post-confirmation.  The Babcock case we cited in our reply

5    to the insurer's plan objections included findings in the

6    confirmation order that the plan did not violate any consent

7    to settle provisions.

8           Second, these other cases cited by the insurers

9    are largely irrelevant because every case is different.  I

10   can't really speak to the specific considerations at issue

11   in those cases, but I can tell you that the findings the

12   Debtors seek here are critically important to this plan

13   because of its unique abatement-based trust structure.

14          If you look at the more traditional asbestos trust

15   structures, claims typically are channeled to a trust, and

16   then the trust liquidates and pays individual claimants post

17   confirmation.  So in that scenario, if the insurers

18   (indiscernible) about what the claims were worth or whether

19   the trust's award was reasonable, the parties would have an

20   opportunity to litigate that dispute and its impact on the

21   coverage post-confirmation.

22          But here, there is no post-confirmation

23   liquidation process for most of the creditors' claims.

24   There is no point, for example, at which NOAD is going to be

25   valuing individual claims.  So there's really no other

1     opportunity for the insurers and the MDT to establish the

2     value of any liabilities dissolve by the plan or the

3     reasonableness of that resolution.  So that's why any

4     dispute should be resolved here during confirmation and why

5     this Court's ruling on these issues should be binding on the

6     insurers.

7              As Your Honor knows, we have addressed the

8     insurers' objections to specific findings and conclusions in

9     our papers.  So in the interest of time, I'll just address

10    any specific findings on which you have questions.  But

11    before I do that, I do have one issue I would like to clean

12    up the record for.  And that is on the finding that you

13    referenced earlier on the assignment of insurance rights.

14             The insurers seek to modify Confirmation Order

15    Finding LE, which states that the Bankruptcy Code authorizes

16    the transfer and vesting of the MDT transferred assets

17    notwithstanding any terms of the Purdue insurance policies

18    or provisions of non-bankruptcy law.

19             The objecting insurers have asserted that since

20    they previously notified the Debtors that they don't object

21    to the transfer of the MDT insurance rights, the Court

22    shouldn't render what they call an advisory ruling regarding

23    the Code's authorization of such transfer.  Instead, they

24    propose a finding that basically says the objecting insurers

25    have not challenged the validity of the transfer.

1              In our joint reply to the insurers' confirmation

2       objections, we noted that a ruling on this issue would not

3       be advisory because another insurer, Chubb, had objected to

4       the transfer.  We understand that Chubb has formally

5       withdrawn its objection on that point, so we do want to make

6       the record clear on that.

7              But I do think it's important to emphasize that

8       this withdrawal doesn't obviate the need for the finding.

9       The finding addresses a crucial component of the plan,

10      including in the confirmation order, and a condition

11      precedent to plan confirmation.  And in addition, the

12      language proposed by the certain insurers doesn't indicate

13      universal commitment from all insurers, including those

14      insurers subject to Bermuda arbitration who have not

15      appeared at confirmation.  So it really just doesn't provide

16      sufficient protection for the Debtors (indiscernible).

17             So I will pause now to address any questions Your

18      Honor might have.  And otherwise, I'll save any of my

19      remaining time for rebuttal.

20             THE COURT:  Okay.  I think it's probably better to

21      hear from Mr. Anker first and then I'll see if I have

22      questions for you if you want to raise anything in rebuttal.

23             MS. GRIM:  Thank you, Your Honor.

24             THE COURT:  Thanks.

25             MR. ANKER:  Thank you, Your Honor.  Philip Anker,

1    Wilmer Cutler Pickering Hale & Dorr, for Navigators.  Can

2    you hear me okay, Your Honor?

3              THE COURT:  Yes, fine.  Thank you.

4              MR. ANKER:  I am in a -- I apologize, Your Honor.

5    I am on the West Coast.  Came out for a niece's wedding.

6    And so I'm in a hotel.  And if the connection gets bad, I

7    will do my best.

8              Your Honor, I am not in the habit -- and this will

9    be the first time when I quote Admiral James Stockdale, who

10   Your Honor may remember was Ross Perot's vice presidential

11   candidate I think in '92, when at his debate, he said in a

12   puzzled way that looked like it wasn't rhetorical, "Why am I

13   here?"  He got crucified for that, and I think that was

14   unfair.  History has shown it.  But I am raising it as a

15   rhetorical question, at least in part, because I don't know

16   why we are here.

17             You have lots of complicated issues to resolve,

18   and I echo the sentiments that someone had expressed earlier

19   that, frankly, this is a case about the public interest more

20   than a typical commercial bankruptcy.

21             Insurance coverage, however, is not one of the

22   issues.  And frankly -- and I will say this and it's not

23   directed at Mr. Singer, it's not directed personally at Ms.

24   Grim, it's certainly not directed at Davis Polk.  But what I

25   think we are fundamentally about here is an attempt by the

1    Gilbert firm and for coverage reasons to get precedent for

2    other cases not before you where there are in fact tricky

3    issues.  There is nothing here that warrants the Court's

4    intervention.

5            Let me start with the plan, which I hope I can

6    deal with quickly, and then move to the findings and

7    conclusions, which I think are where Your Honor is

8    principally focused.

9            What I didn't hear Mr. Singer address was the

10   basic point.  We are prepared to live with the language --

11   we suggested a minor tweak, a minor tweak -- the language

12   that was in the plan that went out to vote.  This is not our

13   language.  I agree, insurers have sometimes asked for five

14   pages on insurance neutrality.  The Debtor went out with a

15   single sentence in their Fifth Amended Plan.  That sentence

16   we are prepared to live with.  As I said, we asked for one

17   tweak to it, which was to add a sentence that made it clear

18   what we think Your Honor already said in the ruling in the

19   adversary that while Your Honor would be making findings,

20   the legal consequences of those findings for coverage would

21   be for another day.

22           We made that clear to the Debtors on July 5th.  We

23   did not hear from the Debtors until they actually filed,

24   they actually filed their Sixth Amended Plan very late on

25   the night of the 15th.  I saw it for the first time on the

1   morning of the 16th when I got up.  And it was a complete

2   rewrite.  Instead of saying nothing in the plan, the plan

3   documents or the order will one way or the other have any

4   affect on the rights or obligations of the insurance

5   companies or the rights or obligations of the Debtors, they

6   then said, provided, however, everything can change it.  The

7   plan can change it, the plan documents can change it.  Any

8   order Your Honor has entered at any point in time in this

9   bankruptcy, any order in other litigation can change it.

10          And think about that for a moment, Your Honor.

11  Most of the plan documents we have not seen yet.  They are

12  going to be filed with -- ultimately at the time it's

13  defined to include any document necessary when the plan goes

14  into effect or to have it go effective.

15          There are provisions in documents that have

16  already been filed that state, for example, that insurance

17  policies provide coverage, something we may well dispute

18  given products exclusions and the like.  There are

19  references to policies that we think were -- in fact at

20  least some insurers think were settled and released long

21  ago.

22          Think about every order Your Honor has entered.  I

23  have not, I will confess, followed this bankruptcy.  One of

24  the things that I think may be lost here is that until the

25  adversary was filed, which was in 2021, no insurer thought

1    that this bankruptcy affected them at all because, frankly,

2    given the products exclusions, my client and every other

3    client thought that there would never be an attempt to get

4    coverage here.  You will hear the merits of that later.  But

5    I don't know what happened in 2020 in various adversaries or

6    other cases, yet their language would cover that.

7              So we ask that you simply go back to and the

8    Debtors go back to the language they had when they solicited

9    acceptances of the plan.  We have suggested a tweak.  I will

10   leave it to Your Honor whether it's appropriate or not.  But

11   frankly, the main issue there is just the basic language

12   that went out in solicitation.  And no one can argue on the

13   other side the new languages required for confirmation, but

14   the creditors overwhelming voted in favor of confirmation

15   with the original language, and no one is suggesting that

16   anyone is changing their vote, and no one is going to make

17   that suggestion and file the motion and seek relief.

18             With that, unless Your Honor has questions, I

19   thought I might move to the findings and conclusions.  First

20   --

21             THE COURT:  Could I --

22             MR. ANKER:  Sure.

23             THE COURT:  And maybe this goes to the findings

24   and conclusions point.  But the first sentence that -- or

25   the first question that the Admiral asked was who am I.  And

1   then he said why am I here.  And Ms. Grim has said that you

2   don't represent all of the insurers.  In fact, there are

3   other insurers that are covered by arbitration agreements.

4   Am I right about that?

5          So when I hear you talk about the revised language

6   for the proposed findings of fact and conclusions, that's

7   just from your clients, right?

8          MR. ANKER:  Your Honor, let me try to take that

9   on, the language with respect to the transfer or assignment

10  of the policy.  First, I represent Navigators, but I have

11  been asked to argue on behalf of all objecting carriers.  So

12  none of the other carriers objected, including the ones in

13  the arbitration.  I also think -- and I will ask coverage

14  counsel to correct me if I'm wrong -- they have -- and I

15  think they've proposed this to Your Honor, to have a stay of

16  the arbitration until and unless Your Honor, or if the

17  reference is withdrawn, the district court, decides the

18  insurance coverage action.

19         But the language we have proposed with respect to

20  the transfer issue would specifically --

21         THE COURT:  So much for arbitration being fast and

22  efficient.  But go ahead.

23         MR. ANKER:  Your Honor, on that point I'm not

24  going to disagree with you.  But let me just read to you the

25  last sentence.  And this is our language.  Your Honor, I

1   don't know if you have it in front of you.

2           THE COURT:  I do.

3           MR. ANKER:  I am looking -- okay.  If you look at

4   our blackline, the last sentence says, "In the absence of

5   any outstanding objections, such transfer (indiscernible)

6   the MDT insurance rights is authorized."  It doesn't simply

7   say no one will object, it says it's authorized.  The only

8   real difference is we want a predicate that says it's based

9   on the absence of objection by those parties who actually

10  filed an objection.  And that goes to the point I was

11  raising earlier.

12          Look, I think it's a very different case.  But one

13  of my insurance clients is in another case right now that

14  almost has as much publicity as this case.  And so is Ms.

15  Grim on the other side.  And there is an effort there to

16  assign to the trust non-debtor insurance policies.  We think

17  that is not something that 1123 authorizes, including in the

18  Third Circuit.  And I think this is all about precedent for

19  another case not before Your Honor that can be resolved

20  then.  Our language would make it a hundred percent clear

21  that the transfer is authorized to the trust.  That is going

22  to preclude anyone from arguing that the transfer vitiates

23  coverage.  We simply want it as the predicate that there is

24  no dispute over the issue.  And because there's no dispute

25  over the issue, the Court can go on and not resolve -- not

1    reach it.

2            As Ms. Grim notes, the only party that objected on

3    this ground, Chubb, has withdrawn that objection.  Mr.

4    Copper of the Duane Morris firm is I believe on the line and

5    can confirm that if Your Honor has any doubts.  But I spoke

6    to him specifically and got that representation and

7    therefore feel comfortable that I can confirm with Ms. Grim

8    set on the record.

9            I will also say that Debtors and the Committee

10   suggested the stay of the arbitration.  So it wasn't other

11   insurers.  But that's not my fight, Your Honor.  That's an

12   issue for another day about the wisdom, or lack thereof, of

13   arbitration.

14           Let's look at the other findings.  The second

15   issue on which there is some slight disagreement is over

16   Finding JJA, where we have stricken the second sentence and

17   added the words, "viewed collectively" in the first

18   sentence.  This is a finding, quote, "The settlements

19   reached between the Debtors, we would add viewed

20   collectively" and the opioid-related claimants as embodied

21   in the plan are reasonable and were entered in good faith

22   based on arm's length negotiations.  We then would strike

23   such negotiation, settlement, or resolution of liabilities,

24   shall not operate to excuse any insurer from its obligations

25   under any policy notwithstanding any terms of such insurance

1    policy, including any consent to settle or pay first

2    provision or provisions of non-bankruptcy law.

3           Let me explain what's going on here.  But let me

4    start with a predicate.  No one is asking on our side for a

5    finding (indiscernible) the finding Ms. Grim

6    (indiscernible).  We are not asking that Your Honor find

7    that in fact the settlements do create any defenses

8    (indiscernible).  That is a question for another day to be

9    decided again by Your Honor with full briefing and a full

10   record.

11          Let's talk now about the two things, the two

12   tweaks here.  First, why viewed collectively?  Well, this is

13   an issue specific, Your Honor, to my client.  My client,

14   with respect to some of its policies, insured a particular

15   debtor, Rhodes, R-h-o-d-e-s.  The disclosure statement notes

16   that Rhodes did not advertise or market any opioids at all.

17   It just manufactured generics.  There is nothing in this

18   record, nothing in this record about it at all and whether

19   to the extent it's contributing any settlement is or is not

20   reasonable.

21          You may remember in the examination -- and if I

22   butcher her last name, Your Honor, I apologize.  Ms.

23   Horewitz, the expert for the Committee.  She acknowledged on

24   cross that her evaluation of comparing the liabilities to

25   the assets was done on an aggregate basis looking at all of

1   the debtors collectively, not individually.

2           So that brings me to the second point.  Why strike

3   the second sentence?  Your Honor, I don't know whether --

4   I'm not a coverage lawyer, as Your Honor knows.  I am a

5   bankruptcy lawyer.  I don't know whether there are or are

6   not defenses here relating to whether the Debtors violated

7   policy provisions.  But I do know this.  There is no record

8   before Your Honor.  I know the following chronology.  The

9   mediation occurred in 2020.  And it was not until 2020 there

10  was an adversary and anyone had a clue -- I think you will

11  get this when the evidence comes in in the insurance

12  coverage action -- that the Debtors were even mediating and

13  -- there was no clue that the Debtors would seek any

14  coverage.  What will the evidence be about whether the

15  Debtors in connection with their mediation reached out to

16  the carriers, spoke to the carriers, consulted with the

17  carriers, sought the carriers' consent to any settlement?

18  That -- and none of that evidence is before Your Honor

19  today.  What are the implications (indiscernible) about what

20  that evidence is?  That's going to turn on what state law

21  may apply.  Is it the law of New York, the law of New

22  Jersey, the law of Oklahoma, the law of California?  None of

23  that in that briefing is before Your Honor, in part because

24  the Debtors didn't seek these findings and didn't put them

25  in their proposed order until after briefing had closed by a

1     month on plan confirmation objections.

2            We are not asking Your Honor to make any

3     determination that somehow the Debtors have impaired

4     coverage that otherwise would exist.  We simply think that

5     is an issue to be decided in this adversary proceeding upon

6     a full factual record and a full legal briefing, none of

7     which is before Your Honor today.  And so not only would

8     (indiscernible) due process where we had no notice before

9     plan objections came in that these findings would be sought.

10           I will pause there.  Section 9.1 and 5.6(I) that

11    Ms. Grim and Mr. Singer referenced are all about transfer.

12    The headings are about transfer and assignment.  They have

13    nothing to do with reasonableness of settlement.  And so,

14    no, there was no notice they would be seeking this finding

15    or conclusion.

16           So, A, it's inconsistent with due process for them

17    to seek it now.  And, B, Your Honor doesn't have the

18    evidence and doesn't have the briefing.  And I will say it

19    as clearly as I can.  We are not saying, therefore, that

20    there has been a waiver by the Debtors that they can't later

21    argue that of course they can seek coverage, of course there

22    is no problem here.  But this is not the occasion.

23           And I'll just make one last point on that this is

24    not the occasion.  Your Honor has determined

25    (indiscernible).  This is not a case where insurance

1   coverage is a predicate to plan confirmation and

2   feasibility.  Your Honor has determined that whether or not

3   there is coverage, this plan is feasible.

4           There's only two other findings, and I'll just go

5   through them really quickly.  One is a finding in Paragraph

6   E, as in Earl, H as in Harold, in our objection, Your Honor,

7   to the findings.  I think we discussed this one in Paragraph

8   -- I actually skipped over it.  I think it was in Paragraph

9   1, Your Honor.  Yes, it is.  We are perfectly with a finding

10  that all parties, including the carriers, had notice of the

11  filing of the Chapter 11 cases.  We are not going to claim

12  that we were ostriches that put our heads in the sand.  It

13  was all over the front page of every newspaper in the

14  country.  But whether as a result we had an opportunity

15  participate or notice that the liabilities were being

16  mediated, negotiated, and resolved, that's the sentence we

17  propose to have stricken.  It's really the same point.  No,

18  until the adversary was filed, I don't think the evidence

19  will show any carrier who had any reason to think there was

20  going to be any effort to get coverage here.  And again, Ms.

21  Grim may dispute that, but the evidence is not in front of

22  you, and the briefing is not in front of you, and it can be

23  resolved in the coverage (indiscernible).

24          The final provision, Your Honor, is I think in our

25  objection covered by Paragraph 5.  I'm skipping over the one

1   in Paragraph 4, Your Honor, which deals with Plan

2   Confirmation Order JJB.  The Debtors no longer seek that

3   finding, so there is no reason we need to discuss it.  But

4   as to the last one, Paragraph NN, again, I don't know what

5   we're arguing about.  We do not deny that Section 524(e) of

6   the Bankruptcy Code says what it says.  We are not arguing

7   it's unconstitutional.  The discharge of a debtor does not

8   discharge anyone else in their liability.  No one is arguing

9   that.  What effect, if any, any release may have, whether we

10  had notice of it or not, are things to be argued later.

11           Your Honor, I want to end, unless Your Honor has

12  questions, where I started.  We didn't have due process

13  about these findings.  We didn't have an opportunity to

14  address them.  We didn't have an opportunity to retain

15  experts and the like.  And more importantly, now there is no

16  record before Your Honor on any of them and there is no

17  reason why you need to reach them in a case where insurance

18  coverage is not core to confirmation in which the adversary

19  is before Your Honor, the arbitration will be stayed.  And

20  we will proceed on a full record with full briefing.  And

21  it's particularly inappropriate in a case where whatever

22  coverage there is or isn't will not be outcome determinative

23  in the feasibility of this bankruptcy, and the creditors

24  overwhelmingly voted for the plan without any such findings

25  and with the plan and with the neutrality language in 510

1    that the Debtors went out with and we are perfectly

2    comfortable with.

3              So with that, Your Honor, I would be happy to

4    address any issues Your Honor may have.  I see you're

5    flipping pages.  If I can be of help, happy to do so.

6              THE COURT:  Well, I guess I wanted to focus on the

7    language in JJA and the third sentence.  What's being

8    referred to here is settlements of the opioid-related

9    claims.  It would seem to me that any insurer of an entity

10   that has opioid-relate liability, including the D&O insurer,

11   should be covered by this provision.  And you're just

12   confining your remarks to insurers of companies that don't

13   have opioid-related liability, right?

14             MR. ANKER:  Your Honor, you referred to the third

15   sentence of JJA, and I see two sentences.

16             THE COURT:  Well, the third clause.  Maybe it's

17   the third clause.  You don't like the phrase, you want to

18   strike the phrase, "Such negotiation, settlement, or

19   resolution of liability shall not operate to excuse any

20   insurer from its obligations under any insurance policy."

21             MR. ANKER:  Correct, Your Honor.

22             THE COURT:  Including any consent to settle or pay

23   first provisions.  And I want to set aside an insurer of a

24   company that does not have opioid-related claims.  I don't

25   see why this sentence shouldn't have that language in it as

Page 188

1    to every other insurer.

2          MR. ANKER:  So by every other insurer I take it,

3    Your Honor, you mean an insurer of Purdue, insurer of those

4    Debtors who marketed --

5          THE COURT:  Who have opioid-related claims.

6          MR. ANKER:  Your Honor, there are insurance

7    policies -- and again, I'm going to get a little bit over my

8    skis here because I'm not a coverage lawyer.  But insurance

9    policies as a basic predicate have as a term of them dealing

10   with the moral hazard.  If you're going to ask me, the

11   insurer, to pay, then you've got to bring me in.  You can't

12   settle without talking with me --

13         THE COURT:  Right.  But that law is different in

14   bankruptcy cases.  So I'm just trying to figure out -- I

15   think your point was -- and you made it by focusing on

16   Rhodes -- that how can a settlement be reasonable of opioid-

17   related liability if it applies to a insured that doesn't

18   have opioid-related liability.  And there is some logic to

19   that.  But I don't understand the logic otherwise.  I mean,

20   the parties have briefed the bankruptcy issue otherwise.  So

21   I mean, I just --

22         MR. ANKER:  Let me try to address the bankruptcy

23   issue.  Your Honor, I think 99 percent of the cases about

24   whether bankruptcy law preempts -- my apologies Your Honor -

25   - bankruptcy law preempts state law with respect to

1    insurance policies and contract rights deals with the

2    transfer question.  Really two questions.  Can the transfer

3    occur on the initiation of the bankruptcy from the

4    prepetition debtor to the estate and (indiscernible)

5    transfer later to the trust.  That's the issue in Federal

6    Mogul, the case Your Honor cited.  And it in fact goes off

7    on the language in 1123(a)(5) that addresses whether -- that

8    specifically says a plan can provide for the transfer of

9    rights.

10           There is not a lot of law, there is very little

11   law on whether consent to settle provisions are or are not

12   overwritten by the Bankruptcy Code.  I would ask Your Honor

13   to resolve that issue.  I'm not asking you to rule my way,

14   but I would ask you to let that issue be briefed with a

15   record.  I think you will find a record here that there was

16   no effort to consult with the insurers.  That's not what

17   typically happens in bankruptcy.  I can tell you or

18   represent to you that I am in other bankruptcies where the

19   debtors come to us and say here's what we're thinking of

20   doing.  What do you think?  What are your views?  How do you

21   think about it?  Would you consent to this?  And that's not

22   going to be the record here I think, but Your Honor doesn't

23   know one way or the other.  And I'd like to have an

24   opportunity to full brief that issue with an opportunity to

25   convince you that that's not what Federal Mogul stands for.

1           But neither the factual record nor the legal

2      briefing is there.  And again, I'm not asking by striking

3      this language out.  I want to be a hundred percent clear.

4      And if you think language needs to be added to be neutral to

5      make the point express, I don't have any objection to that.

6      I am not arguing that by striking this language, you're

7      implicitly ruling our way on the merits.  I am simply, if I

8      can use the colloquial expression, suggesting we kick the

9      can down the road so that down the road there can be full

10     briefing, and to the extent it matters, a factual record.

11          But, Your Honor, I'll just end on this.  Federal

12     Mogul and 99 percent of the cases, Combustion Engineering

13     and others, are about the transfer question, not about

14     whether a debtor can settle without -- not about provisions

15     and policies -- not about anti-assignment provisions, but

16     about -- they are about anti-assignment provisions, but

17     they're not about provisions that require consent or at

18     least consultation.  And obviously lots of insurers' rights

19     are fully preserved.  Let's look at one that's going to be -

20     - frankly may make all of this moot in the end of the day.

21          The policies overwhelmingly have products

22     exclusions.  They exclude any liability of a carrier to the

23     extent that the insured, Purdue's liability arises out of

24     its manufacture of a product.  No one is arguing, including

25     Ms. Grim or Mr. Singer, that somehow the Bankruptcy Code

1   overrides that.  No one would argue that the Bankruptcy Code

2   overrides limits, aggregate limits in policy.  No one would

3   --

4          THE COURT:  All right.  But I was really going to

5   a different question.  I can look at and will look at

6   further the cases on consent or pay first, et cetera.  I'm

7   really focusing just on the point you made with regard to

8   insureds that don't have opioid-related claimants.

9          I don't see how -- this is really a question for

10  both of you.  I don't see how a settlement with opioid-

11  related claimants would affect one way or another an

12  insurer's obligation with respect to a consent or pay first

13  provision unless the insured -- I mean, I don't see how they

14  could be claiming on that insurance policy to pay the opioid

15  claims.  By definition it seems to me that your Rhodes issue

16  wouldn't come up.

17         MR. ANKER:  Your Honor, the Debtors are seeking

18  coverage from Rhodes.  I think we're conflating multiple

19  issues.  So let me try to help divide them up in a way that

20  may be helpful.

21         First, the Debtors are seeking coverage from

22  Rhodes.  Our position is that they are not entitled to that

23  coverage, and the Court should not be making a

24  reasonableness finding that affects Rhodes.  That goes to

25  reasonableness.

1          THE COURT:  Well, are they looking for coverage

2    for opioid-related claims?

3          MR. ANKER:  I believe they are, Your Honor.  I

4    don't know that there are any opioid -- I mean, I don't know

5    that there are any -- we actually looked at proofs of claim

6    and could hardly find a proof of claim against Rhodes.

7          THE COURT:  Okay.

8          MR. ANKER:  But I do think in the adversary, they

9    are seeking coverage under the Rhodes policy with respect to

10   their settlements of opioid liability, including I think

11   settlements by other debtors.  And so we simply want to be

12   able -- and this is one issue -- preserve as to Rhodes the

13   ability to argue that whatever reasonableness there may be

14   of the aggregate settlement, as to Rhodes there is no basis

15   for there to be a claim for coverage.  Because if it is

16   contributing, it is doing so as a volunteer because it does

17   not face opioid liability having not marketed opioids.

18   That's one issue.

19          THE COURT:  Again, this language just goes to

20   opioid-related claimants.  So I don't see how --

21          MR. ANKER:  Yes.  Your Honor, I confused you, and

22   I apologize.  When I was making the Rhodes point, it was the

23   first part of this clause, the words "Viewed collectively".

24   There's two different points going on here.  One is why did

25   we want to add the words "Viewed collectively"?  Because we

1   don't want a finding that's specific to Rhodes.  The

2   strikeout on the second sentence --

3            THE COURT:  Well, I don't think there is one.  It

4   says Debtors, plural.

5            MR. ANKER:  If we have a clear record on that,

6   Your Honor, and there's going to be no argument, we want it

7   viewed collectively to be clear.  But the (indiscernible) is

8   going to be in front of Your Honor.  Your Honor understands

9   that that is about the Debtors -- Debtors, S, plural -- I

10  can accept that.

11           The second sentence has nothing to do with the

12  Rhodes issue.  And I apologize, Your Honor.  I evidently

13  confused you.  So --

14           THE COURT:  Okay.  So I don't think we need to

15  cover the second sentence further, because now I understand

16  where we are on this one.

17           MR. ANKER:  Okay.

18           THE COURT:  Okay.

19           MR. ANKER:  Thank you, Your Honor.  Are there are

20  any other questions Your Honor has?

21           THE COURT:  Well, I guess I want to go back to the

22  first part, which is I have the proposed findings, I have

23  the plan.  I don't -- you expressed a concern that under the

24  language of the plan, the Debtors could sneak something in

25  besides what's in the proposed findings.  And say, for

1   example, the coverage limits or the coverage exception is

2   waived.  I mean, I don't -- is that the concern?  I mean, I

3   think I have what is before me that they're actually

4   seeking.

5          So, Your Honor, let me focus you on Section 510 of

6   the current plan as opposed to the one that went out for

7   solicitation.

8          THE COURT:  Right.

9          MR. ANKER:  It is very much like the one we have.

10  But then it has a proviso.  After saying nothing in the

11  plan, the plan documents, or the confirmation order shall

12  alter, supplement, change, decrease, or modify the terms of

13  the Purdue insurance policies, including the MDT insurance

14  policies.  That's all that was in there when it went out to

15  the creditors.

16         Now they've added the following, quadruple the

17  number of words.  "Provided that notwithstanding anything in

18  the foregoing to the contrary, the enforceability and

19  applicability of the terms, including conditions,

20  limitations, and/or exclusions of the Purdue insurance

21  policies, including the MDT insurance policies.  And thus,

22  the rights or obligations of any of the insurance companies,

23  the Debtors, or the trust, including the Master Distribution

24  Trust, arising out of or under any Purdue insurance policy,

25  including any MDT insurance policy, whether before or after

1    the effective date, are subject to the Bankruptcy Code and

2    appliable law, including any actions or obligations of

3    Debtors thereunder.  The terms of the plan and the plan

4    documents, the confirmation order, including findings," --

5    and they (indiscernible) -- "and any other ruling or order

6    entered by the Bankruptcy Code.

7              So they have a proviso that says --

8              THE COURT:  So -- so I understand that.  So I

9    think you are worried about the plan documents and any other

10   orders or rulings, including in the future.  Right?

11             MR. ANKER:  And the past.

12             THE COURT:  Okay.

13             MR. ANKER:  Correct, Your Honor.

14             THE COURT:  And I can understand that if, you

15   know, the insurers didn't have notice of those issues.  And

16   maybe it should be dealt with that way.  I'm not -- as far

17   as I'm concerned, what they're asking me to find and rule on

18   is what we're just been talking about for the last half hour

19   or so.  It's the proposed findings of fact and conclusions

20   of law provisions that we've been discussing.  And if they

21   actually -- and I don't believe this is the case -- sought

22   something from the Court that was not on notice to your

23   clients, it couldn't be encompassed by that language because

24   you wouldn't have notice of it.  And if that's what needs to

25   be clarified, it should be.  I mean, I just don't -- that

1    should be an easy fix.

2           MR. ANKER:  Your Honor, I think it is an easy fix

3    if it's limited to the plan and the confirmation order.  But

4    let me -- what I'm looking at.  First, I am concerned about

5    the plan documents.  I don't know what's going to be in

6    them, when we're going to have an opportunity to look at

7    them.  But going back in time, it says under any order

8    entered by the bankruptcy court without any temporary

9    limitation, without any language about notice on us.  That

10   would include any order you entered at the outset of the

11   case before the adversary --

12          THE COURT:  I understand.  But that has to be

13   qualified by notice, obviously.  I mean, Mr. Singer's point

14   is insurers can't sit back and say everything that happens

15   in a bankruptcy case on notice to us doesn't matter.  You

16   know, the normal rules of judicial estoppel, collateral

17   estoppel, and law of the case just don't matter for

18   insurers.  That's just -- that's not right.  But those

19   principles all require notice.  So that could be --

20          MR. ANKER:  And, Your Honor, I think that can be

21   fixed with a notice provision, adequate notice.  I will say,

22   Your Honor, there's a lot of law on whether findings in a

23   contested matter are in fact res judicata for purposes of a

24   future adversary.  That's an issue we can brief with you

25   later.

1           But I will say, Your Honor, let me go back to this

2    provision for a moment.  Why can't we have the language that

3    was there when the plan went out that the creditors wrote it

4    on?  This is a last second change.

5           THE COURT:  But it's not a last second change.

6    You all have been able to blackline the proposed order, for

7    example.  I mean, you -- as you said, you and Ms. Grim and

8    Mr. Singer have been living these issues in multiple cases.

9    You know the caselaw.  You know the issues.  This is not

10   really a surprise here.  And if you just have that language,

11   then you have the potential for the coverage exclusions.

12   And I don't think that's right given the record as far as

13   the transfer.

14           And I think, although I will double check the

15   caselaw with regard to the pay first and consent points --

16           MR. ANKER:  Your Honor, this is not a pay -- I

17   want to make sure we're drawing issues --

18           THE COURT:  I understand.  But that's why I don't

19   think it really matters.  And, frankly, I don't think the

20   consent really matters, either.  I mean, to me, if the

21   claims are being settled, they will only be settled in this

22   context.  They will be settled for a lot worse in some other

23   context.  So what -- the deletion of this language would

24   mean that the insurers could go -- could raise this whole

25   issue, that we've had six days of trial and two days of oral

1    argument on as to whether the settlement is proper or not

2    all over again.  That just doesn't make sense.

3              MR. ANKER:  Your Honor --

4              THE COURT:  And I think the underlying principle

5    is right, that in bankruptcy it's a collective proceeding.

6    The insurers' rights are to object on the context of the

7    collective proceeding.  And if they really believed that

8    these settlements were on their backs properly or

9    improperly, they would have objected.  They would have

10   raised their voice.  And they've just not.

11             MR. ANKER:  So, Your Honor --

12             THE COURT:  I mean, their issues are much more

13   narrow, primarily.  They're basically saying we didn't cover

14   this sort of stuff.  And the settlement doesn't say they

15   did.  This is not a -- this is very different from a case

16   where they're asking for a finding that there's X degree of

17   insurance coverage that actually applies to these claims.

18   They're not seeking that relief.  They just want to prevent

19   settlements that if I approve them, I will find are

20   reasonable on notice to the insurers, the insurers coming

21   back and saying no, we have to relitigate that whole thing.

22   And to me that just is not right.

23             MR. ANKER:  I understand Your Honor's position.

24   Do I understand correctly that either we'll have the words

25   "viewed collectively" added or at as clear to Your Honor

1   that this is not specific to -- is not a finding with

2   respect to Rhodes --

3           THE COURT:  It's to all the debtors.  It says

4   debtors, plural.

5           MR. ANKER:  That's correct.

6           THE COURT:  We're not allocating, you know, X to

7   one debtor and Y to another.  But at the same time, I don't

8   -- I think that the language that insurers have proposed be

9   stricken really should stay, because it's -- I think under

10  these circumstances, isn't a settlement that is being

11  proposed to be funded primarily by the insurers.  In fact,

12  the evidence suggests -- Mr. Huebner's presentation today

13  was exclusive of insurance.  So that was on top.  And so I

14  think all things considered, I understand why the insurers

15  haven't objected, because to them it's -- it actually

16  ensures that, frankly, as much money as possible goes out to

17  reduce their potential liability.

18          MR. ANKER:  Your Honor, so I take it you believe

19  the language should remain in Paragraph JJA.  Does Your

20  Honor have any questions about any of the other provisions

21  that are --

22          THE COURT:  Well, I don't really agree with them.

23  I just think, again, I think there should be a reference to

24  the withdrawal of the objections.  That's fine.  I think

25  that's an important aspect of the record.  And that may well

1    help you in your concern about precedent, although I don't

2    think what we're dealing with here involves insurance of

3    non-debtors being used to pay debtor obligations.  But I

4    think the objection should be noted and the withdrawal of

5    objections and the lack of objections by any others.

6              MR. ANKER:  Thank you, Your Honor.

7              THE COURT:  Okay.  Okay.  And as far as the

8    language in the plan itself, I mean, I think I've been

9    clear.  If the Debtors or the MDT try to alter the insurers'

10   rights other than as set forth in the findings of fact or in

11   the confirmation order itself or in the plan documents that

12   you have, without due notice, you just can't -- that's not

13   operative.  That can't be operative.

14             MR. ANKER:  Thank you, Your Honor.

15             THE COURT:  I don't know how you word that.  I

16   imagine you'll probably come up with some language to cover

17   that.  But it's basically a fundamental principle.  So even

18   if you can't in the next day or so come up with that

19   language, I think the record is clear that, you know, you

20   can't have super-secret probation.

21             MR. ANKER:  Thank you, Your Honor.

22             THE COURT:  Okay.  Okay.  Thank all three of you.

23   I do, that is.

24             MS. GRIM:  Your Honor, may I have the opportunity

25   to address a few of Mr. Anker's points?

1           THE COURT:  Sure.  I'm sorry.  Go ahead.

2           MS. GRIM:  On Mr. Anker's point as to why are we

3    here, I just want to reiterate I think we've made it pretty

4    clear that we're here because the insurers have made it

5    clear that they seek to negate coverage solely based on the

6    plan.  And even if Mr. Anker agrees not to object to any

7    aspect of the plan, that we need these findings to preserve

8    the value of the MDT insurance rights.

9           Mr. Anker is correct and we agree, the recovery of

10   proceeds is not a predicate to confirmation, but transfer of

11   the insurance rights is a predicate.  And the MDT's ability

12   to access those rights without having the transfer itself or

13   any other aspects of the plan vitiates coverage is also a

14   predicate.  And 1123(a)(5) preempts any policy provisions

15   that may impede the Debtor's ability to implement this plan.

16           I also need to address Mr. Anker's suggestion that

17   our firm, Gilbert, is seeking confirmation findings solely

18   for precedent in other cases.  Because, frankly --

19           THE COURT:  Well, it wouldn't work anyways.  So

20   that's fine.

21           But I just want to -- again, can I go back to

22   something?  I am not aware of any other provision of the

23   plan that -- other than what we've been talking about today,

24   that affects the insurers' rights.  Is there any?  I'm not

25   aware of any.

1           MS. GRIM:  No, Your Honor.  And I know certain

2    insurers raised some concerns regarding -- I believe it was

3    the definition of the MDT insurance rights or the schedule

4    that listed certain policies that fall within that

5    definition.  We want to make clear the plan is not

6    presupposing that those policies provide coverage for the

7    opioid liabilities.  You know, if any of these provisions

8    give Mr. Anker heartburn, I think he's had a number of weeks

9    now to raise them.  We have addressed other concerns by

10   other objecting insurers to clarify language, that we're not

11   trying to do that.

12           So I think what you see is what you get here.  We

13   are seeking the findings that we are seeking.

14           THE COURT:  All right.

15           MS. GRIM:  And that's it.

16           THE COURT:  Okay.  All right.  Thank you.

17           MS. GRIM:  I do think it's important, if I could

18   just have two minutes to address his due process arguments.

19   And I don't want to drag this out, but I do think it's

20   important to correct the record on this.  We've had numerous

21   conversations about the scope and intent of this provision,

22   starting back on May 9th.  The Ad Hoc Committee and the

23   Debtors made clear from the get-go even with the old

24   language that the intent was to preserve the same rights and

25   obligations the insurers and debtors had under the policies

1    prepetition, but not to permit the insurers to limit or

2    escape their coverage obligations based on any aspects of

3    the plan for the Chapter 11 process.  The insurers expressed

4    a contrary view, and that's why revised the provision to

5    begin with.  So I think it's a little bit of a stretch to

6    say that they were taken off guard.  But even if they were -

7    - and I'm not going to beat a dead horse on this because I

8    think Your Honor made the point effectively -- what exactly

9    have the insurers been deprived of?  They've had the

10   opportunity to object to the plan, to the confirmation

11   order.  We are here right now.  They had the opportunity

12   cross-examine witnesses during trial last week.  And so any

13   due process confers here being unfounded.  And in fact, I

14   believe we provided these confirmation order findings back

15   on August 11th, which might have been before the Court even

16   had them, although Debtor counsel can correct me on that.

17   So, again, I just need to correct the record on that point.

18           Again, if Your Honor has any specific questions on

19   the particular findings that were not already addressed, I'm

20   happy to address those.  But otherwise, I'll --

21           THE COURT:  I don't think I do.  I think you've

22   gone through them.

23           MR. ANKER:  Your Honor, this is Mr. Anker.  I'm

24   not going to reargue anything.  I will say I assume that --

25   I note Your Honor is talking about working on language in

1    the next two days.  I think we heard you loud and clear

2    about the notice points and other points.  I assume and will

3    request that the Debtors furnish us with a copy of any

4    revised confirmation order and plan documents so we can see

5    them.  And not formally settling the order, but so that we

6    can see them and give our comments.

7              THE COURT:  Absolutely.  That's fine.

8              MR. ANKER:  Thank you, Your Honor.

9              THE COURT:  But again, as far as these proposed

10   findings are concerned, except for the references to the

11   withdrawal of the objection and there being no other

12   objections and just the record being clear, the Debtors

13   means Debtors, plural.  I am actually comfortable with the

14   language as proposed by the Debtors here.  And that includes

15   the release point, which is really tied into the settlement

16   point which we discussed for a while.

17             MR. ANKER:  Thank you, Your Honor.

18             THE COURT:  Okay.  All right.

19             The next thing for oral argument is time that I

20   asked be reserved for the people who filed pro se objections

21   to the plan, i.e. people who were not represented by lawyers

22   who filed a timely objection to the plan.  And I think two

23   of those people have, as I understand from my clerks, either

24   signed up for the Zoom for Government feed to address their

25   objection or at least been given the information to do that

1    because of an earlier request to speak.

2           So the Debtors at this point don't have anyone to

3    speak first.  I think they reserve their rights to respond.

4    But I am happy to hear from the individuals who did want to

5    speak who filed a timely objection.

6           And I have down on my list Ms. McGaha.  I hope I

7    am pronouncing that right.  I see you there.  And you can go

8    ahead, ma'am.  I want to assure you and the other pro se

9    objectors, even if they've not signed up to speak, that I

10   have reviewed each of the plan objections.  And actually,

11   there were some statements by claimant that were not

12   expressly couched as an objection, but they were riled

13   around the time before the -- around and before the deadline

14   for objecting to the plan.  And I think actually Ms.

15   McGaha's filing was one of those.  But I was treating it as

16   a plan objection.  So I am happy to hear from you, ma'am.

17          MS. MCGAHA:  Thank you, Your Honor.  Before I --

18   my name is Carrie McGaha.

19          THE COURT:  McGaha, okay.

20          MS. MCGAHA:  McGaha.

21          THE COURT:  Thank you.  Okay.

22          MS. MCGAHA:  You are not alone in mis pronouncing.

23   Before I begin, I would like to ask a couple questions, if I

24   may.

25          THE COURT:  Okay.

1          MS. MCGAHA:  I was confused on the voting. I've

2     heard you all talk about it.  And I was kind of under the --

3     it sounded to me -- now, I'm not a lawyer.  I don't know if

4     this is all like -- plus, I have a damaged mind from all the

5     opiates I took, and I process information kind of like sand

6     through a colander.  And so -- but when I was reading the

7     voting and the ballot, it seemed like if I voted no, I was

8     kind of relinquishing some of my claim amount.  Like I was

9     almost ready to vote yes just to --

10          THE COURT:  No.

11          MS. MCGAHA:  And so I don't know if anyone else

12     had that understanding, but --

13          THE COURT:  No one has raised that point.  And I

14     think the ballot materials were clear.  The vote was just a

15     vote on the plan.  It had nothing to do with whether your

16     claim would be allowed or not.

17          MS. MCGAHA:  Okay, thank you.  Also, my broad

18     understanding of this plan is that the new company will be

19     able to -- is going to continue the sale of OxyContin and

20     partial opiates, opiate antagonists, and other drugs in

21     order to fund abatement.  Is that an improper understanding?

22          THE COURT:  Well, it depends what you mean by the

23     word continue.  It will be under a very strict set of

24     operating guidelines in the form of an injunction.  It will

25     have, as it has had during the whole course of this case, a

1    monitor.  The first monitor I think is now the Health and

2    Human Services Secretary.  People of statute.  It will have

3    governance by representatives of, you know, the Claimants.

4            So your answer is -- again, depends on how you

5    define the word continuing.  I think it's quite clear -- and

6    the Debtors already have represented and the monitors have I

7    think made this clear -- that whatever marketing practices

8    that Purdue had that have been alleged to have flooded the

9    country with opioids, of just its opioids, will not -- has

10   not and will not be occurring, that the salesforce doesn't

11   exist.  There is no salesforce.

12           So if you've been listening to the trial over the

13   last week or so, there is a balance for a regulated company

14   like this that sells products that are inherently dangerous

15   where nevertheless the regulators contend that they agree

16   that they are not prohibited and can be used for proper

17   purposes.

18           So it's not going to stop selling opioids, but it

19   will not be selling them in a way that existed at least

20   through the period that it was marketing them with the

21   salesforce and trying to drive up prescriptions, et cetera.

22           MS. MCGAHA:  Okay.  Thank you.  I appreciate the

23   previous speakers and yourself for giving me an intro into

24   what I feel like I need to say.  I don't have a script

25   written here.  I'm just going to try to pray that the whole

1    experience speaks for me and anoints my words.  Because this

2    is all very confusing.

3              But who am I?  I am someone who has had --

4    apparently I am the only on this list that's willing to

5    speak to you today who has been through this.  But I feel

6    like I have relevant life experience with this.  Because I

7    did work around, as I have indicated in my submissions,

8    drugs, you know, a lifetime ago.  And I've never been in

9    trouble with the law.  I never did anything, you know,

10   illegal and all that kind of stuff while I was working.  But

11   way back in the eighties, you know, somehow people didn't

12   need long-acting opiates to get their relief from pain.  And

13   when the Oxycontin was introduced by Purdue onto the market

14   and then pushed out by the doctors -- who I also hold highly

15   responsible, because one can't function without the other.

16   That having taken these drugs for over 15 years and

17   survived, those long-acting opiates act completely different

18   than short-acting opiates.

19             And I know that there's a lot of testimony

20   concerning the diversion, that that's why they formulated

21   OxyContin the way they did, to prevent diversion, and it's

22   not 100 percent -- or however they adulterate it or

23   whatever.  I don't know.

24             I don't have a lot of experience with the illegal,

25   incarcerated, all that kind of stuff, but having taken those

1    drugs, when you're taking those long-acting drugs for

2    chronic pain -- and I'm not talking about acute pain -- I

3    think that these drugs are miracles to help people with

4    acute pain.  But these long-acting drugs, they take away

5    your individual ability to kind of manage your own pain.

6            You know, used to it was as-needed for pain.  Once

7    you get over that, you know, three to -- three days to 10

8    days of post-op or whatever the injury, or whatever it is,

9    and you kind of start to heal.  You know, you should be

10   decreasing the usage, and your pain should lessen.

11           And what they did to me was they just kind of --

12   and then they -- the doctors still give you the breakthrough

13   pain pills, and so either way you're getting a long acting

14   drug that's supposed to prevent you from abusing it, but

15   then they still give you the short-acting drugs to help with

16   the breakthrough pain because every time you take them and

17   if you're on a constant level, your tolerance is constantly

18   building up, and so you're just always building up this

19   tolerance to the drug, and your tolerance to the pain goes

20   way, way down.

21           And so it's a vicious snowball of psychic hell

22   that happens on these drugs.  And as a patient who still

23   suffers from chronic pain, but the Lord really helped me in

24   dealing with it, the -- see, this is the sand going through

25   the colander.  I just lost my thought, but I do have a few

1    notes here.

2            It's the risk of reinjury.  That's what I was

3    going to say.  When you're taking those drugs just constant

4    long term, especially for chronic pain that you really need

5    to address in non-pharmaceutical ways if possible, which I

6    think the introduction of these drugs pushed like they were

7    onto the market prevented a lot of development of the

8    alternatives that, you know, could've been really developed

9    over the past 20 years rather than just relying on all these

10   opiates and then, you know, we're in the situation that

11   we're in.

12           But when you take opiates for pain and injury,

13   like I have a really bad back, and so it does take away that

14   (indiscernible) of the pain, and so you think you can do

15   stuff that you really shouldn't do it.  You know, you are

16   feeling less pain.  It's really not that -- I never felt no

17   pain unless I was unconscious, but your pain is -- whatever

18   happens to you, you do -- you do more than you really should

19   do.  You don't allow yourself to heal so that you -- and you

20   know, eventually heal fully, and I'm going on and on.

21           THE COURT:  No, no.  I think I understand your

22   point.

23           MS. MCGAHA:  Okay.  I'm sorry.  I'm going to try

24   to keep this short because I don't want to cost anyone --

25           THE COURT:  That's fine.

1          MS. MCGAHA:  -- any more money than necessary.

2    You guys get paid beaucoups of money, so I don't want to

3    take away from --

4          THE COURT:  Well, I don't get paid by the hour, so

5    you can go ahead.

6          MS. MCGAHA:  Okay.  I think it delays healing,

7    anyway, the OxyContin especially.

8          I feel like the way that that was approved by the

9    FDA and all of the experts that have -- not all but a lot of

10   experts that approved these -- that regulate and approve

11   these decisions, I -- I mean, I just really kind of -- I

12   don't understand it because OxyContin -- no one should

13   really need constant opiate of OxyContin if they're still

14   going to get the short-acting drugs.  I mean, it just

15   doesn't make sense to me.

16         But I think I tried to make that point in my

17   submission also, that there's a symbiotic relationship

18   between the healthcare system and the pharmaceutical

19   industry.  And it's like hand in glove, and the -- all these

20   people out here would not have been prescribed these drugs

21   if the doctors hadn't have been, you know, benefiting

22   somehow.

23         And that, I feel like, is kind of a missing link

24   or whatever in this plan is that it -- I know this is a

25   pharmaceutical bankruptcy and all this kind of stuff, and I

1    just hope that whoever, you know, the state leaders or

2    whoever gets to introduce the solutions or decide how the

3    money's spent in each state remembers that people out here

4    like myself in, you know, Podunk USA where you have to drive

5    an hour just to get, you know, anywhere, and if you want to

6    go to a good -- a really good doctor, you're going to drive

7    three hours.

8            And so a lot of the solutions that I've outlined

9    in my submissions are alternatives that I personally have

10   been trying to use some of them on my own, but if they'd

11   have been more available, you know, years ago, if this had

12   not been offered as a solution, I would not have gone out on

13   the street and looked for illegal drugs to ease my pain.

14           I would've had to -- I mean, I was the type of

15   person -- I would've done what I -- you know, what the

16   doctor recommended, and I relied on those doctors to put my

17   best interests at heart and to, you know, follow their

18   Hippocratic Oath and not just get the country addicted to

19   opiates like that's the only solution.

20           I mean, you've got these task forces who know all

21   of this.  All these doctors, they know this.  But down here

22   in these -- you know, out here in no man's land, it's a

23   different world, and the way that they're doing the funding

24   of the abatement programs, you know, and a lot of this, it

25   is based on population and the MMEs.

1             And I fear that there's just going to be these

2     huge bureaucracies of these agencies who are going to -- you

3     know, it's all going to funnel through.  And by the time it

4     gets down on the ground to the people that really need it,

5     there's not going to be very much left, and I know there's

6     all sorts of formulas that they go by and everything, and

7     that's kind of necessary.  But from where I'm standing,

8     that's just what I see, and that's what happens in rural

9     areas.

10            The drug-induced decline that we experienced over

11    the years, you know, people leave.  And they go to nice

12    areas, the big city where, you know, those places, their

13    population grows, and they get more money, and people leave

14    here because, you know, less money.  And so it's just kind

15    of -- the problem gets bigger, and it's all because of the

16    drugs.  And --

17            THE COURT:  Okay.

18            MS. MCGAHA:  I just wanted to say also that on the

19    unit dose thing, I tried to describe how that would've

20    helped me, and I feel like if they're going to continue to

21    sell especially OxyContin -- but I feel like all narcotics

22    should be in like a card.

23            I don't know if you're familiar with Accutane, but

24    it's a drug, and it's sold on a card so the you can see,

25    okay, I took that.  You don't want to overdo it.  You know,

1    or birth control pills.  You can see when you took it and,

2    you know, how many you took.

3           And that was one of my problems because for a long

4    time, I was on fentanyl patches.  I had 100 microgram

5    fentanyl patch every 48 hours, and I was taking 120 Dilaudid

6    a month along with it, and it went on for years.  And it was

7    either fentanyl or OxyContin along with the Dilaudid or

8    other drugs.

9           And so the doctors that prescribe these and the

10   doctors that are in the Sackler family and executives with

11   the pharmaceutical company, you know, they're uniquely

12   trained and credentialed to know the pharmacology and the

13   human anatomy and how all this kind of interacts.  And you

14   know, they should've known the history of opium in this

15   country and, you know, for hundreds of years, the addiction

16   that can happen from it.

17          But the side effects, you know, you get memory

18   loss and confusion, and then you combine that with Valium or

19   whatever, and it's just even worse.  And so I can just

20   remember, I mean, you're looking down the barrel of a bottle

21   of pills, and you can't tell how many are in there, and

22   you're in pain.  You're suffering and you're vulnerable, and

23   you know, we're depending on the doctor to not give us

24   something that really is going to harm us.

25          But when you're in that situation, and I was the

1    only one that could manage my drugs.  I was like the

2    healthcare drug expert in my family.  And you know, I didn't

3    do a very good job.  There was never a time that I ever

4    diverted my drugs or mis -- abused my drugs or did anything

5    like that, but there were times that I made my mistakes, and

6    one of those times caused me to almost die, and my children

7    found me.  And you know, they were traumatized by that, and

8    you know, they probably should've filed a claim for all of

9    the trauma that they went through, but that's beside the

10   point.

11            But the diversion that the Sacklers talk about

12   when they testified, like that's the biggest problem, which

13   I get that that is a big problem in this country.  In fact,

14   before I even filed this claim, I had written letters to my

15   governor, and the attorney general, and my local sheriff

16   kind of similar to the things that I've written in my

17   submissions because I felt like the -- that's what I felt

18   like God was trying to tell me what to do.

19            But they kept talking about diversion.  In this

20   case, you're only going to get paid money as a personal

21   injury person if you have proof, you know, medical records

22   and pharmacy records that you actually took these drugs,

23   from my understanding of it.

24            And so -- but it seems like all of these abatement

25   programs and a lot of the talk that the Sacklers had was all

1    about diversion, and they kept mentioning, you know, heroin

2    was on the rise anyway, and kind of like it was inevitable

3    that opiates were going to be a crisis, and if they knew

4    heroin was already on the rise, why they thought introducing

5    OxyContin and pushing all these drugs out onto the market

6    would be a great solution, I don't know.

7            I think that's negligence, and I think not putting

8    those drugs, knowing the side effects of those drugs on the

9    patients taking them and expecting those people to manage

10   the consumption of those drugs -- when you go in the

11   hospital, you know, the nurses chart every pill.  They count

12   every pill.  They keep up with every pill like it's some

13   kind of piece of gold or something.  But if you're a

14   patient, you're supposed to manage all this on your own

15   while you're suffering, and suffering the side effects?  It

16   just seems like negligence to me.

17           And the quantities were just outrageous.  And I've

18   had multiple surgeries over my lifetime, and I do know what

19   -- the quantities and how drugs were prescribed in the '80s,

20   and somehow people managed to recover from surgery, and

21   recovery from injury, and recover from all sorts of things

22   without being -- having it necessary to be put on long-

23   acting opiates.  And that's my biggest concern --

24           THE COURT:  Right.

25           MS. MCGAHA:  -- is (indiscernible).

1          THE COURT:  I hate to do this, Ms. McGaha, but I

2     think -- I read your objection.  I think we're now circling

3     back to things we've already discussed, and --

4          MS. MCGAHA:  Okay.

5          THE COURT:  -- you discussed them quite clearly,

6     so I'm going to --

7          MS. MCGAHA:  Okay.

8          THE COURT:  -- thank you.

9          I want to make two observations.  First, the

10    abatement programs under this plan are not locked in stone,

11    except for the fact that the money has to be used for

12    abatement, so my hope is -- and I believe this is the hope

13    of the states, and local governments, and hospitals that had

14    a hand in putting together these abatement and treatment

15    programs is that people learn as they go along, and part of

16    the learning is going to come from the reports that have to

17    be filed in this case as to effectiveness of treatment and

18    the effectiveness of the abatement programs, how to do this

19    best.

20         And I think -- it is clear to me at least that

21    this -- that that task is a complicated one, but it includes

22    the ability of people like yourself, people who run

23    community groups, who run associations of both people who

24    themselves have suffered from opioid use disorder and their

25    relatives to have input, to speak to their councilmen, their

1    mayor, their governor, and the local health authorities, to

2    give them their input.  And I think that's important,

3    obviously.

4            So this is not -- you know, I think this money is

5    to come in over a substantial amount of time, and it is not

6    going to -- if I confirm the plan -- always going to be a

7    2021 abatement program.  We'll learn from it, and so your

8    observations are important there.

9            MS. MCGAHA:  Thank you, Your Honor.  I appreciate

10   the opportunity to voice my concerns and speak to the Court,

11   and I really appreciate all your time and effort.

12           THE COURT:  Okay.  Thank you.

13           All right.  I don't know if -- I just have on my

14   list Ms. McGaha, but I don't know if anyone else who filed a

15   timely objection as a pro se wants to speak.  Otherwise, I

16   guess I'll hear from the Debtor's counsel.

17           Okay.  Oh, I think there is one other person.  Ms.

18   Eck?

19           MS. ECKE:  Yes.  Judge Drain, please, please

20   forgive the unmuting, the untimely unmuting of my computer.

21           THE COURT:  Oh, that was -- that's --

22           MS. ECKE:  And the --

23           THE COURT:  That's fine, ma'am.  That was for like

24   one tenth of a second, and I'm sure Mr. Singer has

25   experienced much worse over the pandemic on various Zoom

1  calls that he was on, including probably dogs and children

2  and all sorts of things, so don't worry about that.

3           MS. ECKE:  Thank you.  Anyway, I'm going to --

4           THE COURT:  And Ms. Eck, I don't know if you want

5  -- if you want to be on the screen.  You don't have to be,

6  but I'm not able to see you.  If you don't want to be on the

7  screen, that's fine.

8           MS. ECKE:  It's okay.  I just don't know how to do

9  it.

10          THE COURT:  Oh, okay.

11          MS. ECKE:  Any way.

12          THE COURT:  The person who's running this in the

13  courtroom -- my tech person says your camera is actually

14  covered by something.

15          MS. ECKE:  Oh.  Oh, oh, oh.  I got it.  That's

16  still not -- that's the lights above.

17          THE COURT:  Yeah.  It has to be pointed --

18          MS. ECKE:  It's not helping.

19          THE COURT:  Anyway, it's all right.

20          MS. ECKE:  Okay.  Anyway, my objection to the

21  restructuring of Purdue Pharma LP et al, case number 19-

22  23649.

23          Dear Judge Drain, I began researching OxyContin,

24  and its generative derivatives as my son prescribe -- my

25  son's doctor prescribed this to him at an early age.  After

1    my dearest firstborn died December 17th, 2015, nine days

2    after my birthday on December 8th, and nine days bore my

3    poor, deaf, Vietnam veteran's ex-husband's birthday on

4    December 26th in 2015, I was immediately awoken to learn

5    about this overprescribed drug.

6            At first when I started to -- trying to write a

7    motion for claim payment in early November of 2020, I

8    spilled out my heart to all the following individuals in

9    this instance.  This was an extreme, extreme tragedy, as

10   many of the attorneys, including Marshall Huebner of Davis

11   Polk & Wardwell; Layn Phillips of Corona Del Mar,

12   California; Kenneth Feinberg of Washington DC, and many

13   others, including Ryan Hampton, Blue Cross Blue Shield

14   Association, CVS Caremark Part D Services LLC; and Health

15   LLC; Cheryl Juaire, T -- L-S --LTS Lohmann Therapy Systems

16   Corporation, Pension Benefit Guaranty Corporation, Walter

17   Lee Salmons, Kara Trainor, West Boca Medical Center; the

18   official committee of unsecured creditors, care of Akin Gump

19   Strauss Hauer & Feld LLP; Bank of America Tower, One Bryant

20   Park, New York, New York 10036.

21           Attention Attorney Edan Lisovicz and Attorney Arik

22   Preis who are in my letter dated December 13th, 2020.  My

23   letter to Judge Drain July 30th, 2020 you can read in full

24   online.  Please also view my motion for claim payment dated

25   December 15th, 2020.

```
 1              Previously, I had begged the Attorney General of
 2    Connecticut, George Jepsen, presiding attorney general for
 3    Connecticut from 2011 to 2019 for help for the mothers of
 4    Connecticut who had lost their children due to this crisis.
 5    I had also contacted the Connecticut Department of Health
 6    previously and received no help from anyone -- or from
 7    anyone personally or for my group of bereaved mothers.
 8              Gloria (indiscernible), head of Consumer Affairs
 9    for Attorney George Jepsen of Connecticut who was in office
10    from 2011 to 2019 and Sandra Arenas, the new head of
11    Consumer Affairs for Attorney George -- Attorney General
12    William Tong of Connecticut from January 1st, 2019 had
13    already told me that the state only sues for the state, not
14    for the individuals.
15              At this point in my life, I feel in my opinion
16    that I have been used and abused by the state of
17    Connecticut.  I was born in the great country of America and
18    always thought that I would receive help if I asked for it.
19    I'm really hurt by everyone's indifference to my personal
20    tragedy and the personal tragedies of many others.
21              Attorney James I. McClammy of Davis, Polk &
22    Wardwell, the attorneys who are defending Purdue Pharma LP's
23    actions first contacted me via e-mail, later by Jacquelyn
24    Knudson of Davis Polk & Wardwell on December 3rd, 2020 via
25    telephone.  Then I called Attorney Knudson on December 7th,
```

1    2020.  Attorney James I. McClammy wrote a letter dated

2    December 8th, 2020 and mail it to me December 9th, 2020

3    stating that I had talked to Attorney Knudson on December

4    7th, 2020.

5           My previous letter to you, Judge Drain, was dated

6    December 15th, 2020.  That was my motion for claim payment.

7    On February 24th, 2019, there was a segment on television of

8    60 Minutes entitled "Did the FDA Ignite the Opioid Epidemic?

9    A drug manufacturer Denounces his own industry and explains

10   to 60 minutes how a label change by the FDA expanded the use

11   of opioids" in which correspondent Bill Whitaker talks to Ed

12   Thompson, a Pennsylvania drug manufactures -- manufacturer

13   who tells about his lawsuit of the FDA at the beginning of

14   the OxyContin crisis.

15          60 Minutes had to petition the courts of West

16   Virginia to get the information to issue this segment of the

17   television program since according to 60 Minutes, the drug

18   manufacturers and the FDA were holding secret meetings about

19   the labeling of the drug.

20          Ed Thompson states that OxyContin was on the

21   market since 1990, and the FDA new how potent the drug was.

22   Ed Thompson explains how a high-dose long-duration opioid

23   kills people when there was no scientific evidence to

24   condone long-term use of opioids.  Ed Thompson had stopped

25   the high-potency, high-dose drugs that he manufactured in

1    1962.

2            Therefore, in my opinion, I don't agree with the

3    declaration of Jonathan Greville White on page 4, Article 9,

4    which states "Beacon Trust, one of the general trusts is the

5    ultimate owner of the 50 percent limited partner Purdue

6    Pharma LP, Purdue, which holds for the benefit of Side A an

7    entity for the benefit of Raymond Sackler or Side B is the

8    ultimate owner of the blankie of the Purdue equity.

9            "Beacon Trust was settled in 1993 by Mortimer D.

10   Sackler, several years before OxyContin was launched.  I am

11   the director of Heathridge Trust Company Limited, which is a

12   trustee of the Beacon Trust Company Limited, which is a

13   trustee of the Beacon Trust.

14           "Since the death of Mortimer D. Sackler in 2019,

15   the Beacon Trust has been an irrevocable trust of the

16   benefit of Theresa Sackler, Dr. Mortimer D. Sackler's issue,

17   and various charitable beneficiaries.  The Beacon Trust

18   instrument provides that its trustee holds the Beacon Trust

19   funds in its discretion with prior written consent of the

20   special trustees to pay income and/or capital to or for the

21   benefit of one or more Dr. Mortimer D. Sackler's spouse,

22   defendants, and/or charitable foundations."

23           Later, Jonathan Greville White states, "Each of

24   these general trusts is an irrevocable discretionary trust.

25   Their beneficiaries are typically to the Sackler, and the

1    issue of Dr. Mortimer D. Sackler.  One general trust confers

2    upon Theresa Sackler a life interest over the income that is

3    generated each year."

4           According to LexisNexis and the Bloomberg Law on

5    December 17th, 2019 at 6:09 p.m., Samantha Stokes wrote,

6    "Purdue Pharma has paid several big law firms for the legal

7    work on behalf of the Sackler family members, including

8    Debevoise, McDermott and Norton Rose, according to new

9    documents" and "Purdue Pharma, the embattled pharmaceutical

10   company at the center of the opioid crisis has paid more

11   than 17.5 million in legal fees on behalf of the Sackler

12   family to more than a dozen law firms, according to the new

13   documents filed in the company's bankruptcy. Debevoise &

14   Plimpton was paid the majority of the legal spend, more than

15   11.4 million for its legal work for the Sacklers from the

16   first half of 2018 through 2018 through early 2019 according

17   to an audit filed Monday in the U.S. Bankruptcy Court in the

18   Southern District of New York where the company is

19   undergoing Chapter 11 restructuring."

20          If the Sackler family used the money that they

21   spent on attorneys instead of for themselves -- instead of

22   themselves, all parties would be happier.

23          As far as my understanding from Arik Preis,

24   partner at Akin Gump who called me at 6:30 p.m. on July

25   30th, 2021 after I sent my original July 30th letter off and

Page 225

1   will object if I give you actual numbers for our

2   conversation dated Friday, July 30th, 2021, there are four

3   main sides of this restructuring equation, one consisting of

4   the official committee of unsecured creditors and all the

5   others in my previous letter dated December 13th, 2020;

6   another side consisting of a few brave pro se advocates and

7   me who are supposedly supposed to get virtually nothing; an

8   additional side of states with attorney generals,

9   municipalities, and an abundance of lawyers handling Chapter

10  11 in case number 19-234649, getting the majority of at

11  least three quarters of the funds, which may or may not help

12  injured victims directly from an 18-year trust.  And

13  finally, the fourth side consisting of the Sackler family

14  who is trying to use their ill-gotten fortune off the backs

15  of heartbroken people who lost their loved ones.

16          On July 19, 2021, Attorney William -- Attorney

17  General William Hong filed objections to, "Bankruptcy plan

18  with legal shields for the Sackler family."  Therefore, I'm

19  asking the Honorable Judge Drain for Rule number 3008-1,

20  reconsideration of claims.  We need to object to the

21  restructuring of Perdue Pharma and initiate an entirely new

22  vote for the mothers, fathers, brothers, sisters, and all

23  who are now living a life of heartache, depression, and

24  loneliness from this drug that had been evaluated years

25  earlier by the Perdue Corporation and hidden from the public

1    that highly addictive and shoved under the proverbial rug.

2              Are the Sacklers and their lawyers at Davis Polk

3    and Wardwell willing to clone my dear son or bring him back

4    to help me in my disabled old feeble age?  I don't think so.

5    thank you, Your Honor.

6              THE COURT:  All right.  And thank you, Ms. Ecke.

7    I will say just one point, and that is that it obviously

8    took a lot of courage to say what you've said in this

9    setting.  I some people will disagree with it, and I think

10   there are some points that just weren't right like Davis

11   Polk being the Sacklers' lawyers, which is not true.  But on

12   the other hand, what comes through very clearly is I think

13   the main point of your objection and your statement, which

14   is that this company's product or products caused tremendous

15   pain and harm.

16             And it is turning over all of its assets under

17   this plan in a way that the parties interested in the case

18   have determined best resolves that pain and harm knowing

19   full well that it never can resolve that pain and harm, and

20   that is something that will never be fully resolved or even

21   partially resolved.

22             THE COURT:  All right.  We had reserved time at

23   the end of this argument for miscellaneous matters,

24   including further discussion of the release language in the

25   plan.  I don't know whether there is a remaining argument on

1    the DMP issues or not.

2         MR. GLEIT:  Your Honor, Jeff Gleit of Sullivan and

3    Worcester.  I have a -- just a brief statement that I'd like

4    to make in connection with it, and I'm available to answer

5    any questions you have.

6         THE COURT:  Okay.  That's fine.

7         MR. GLEIT:  Okay.  Thank you, Your Honor.  On

8    Monday morning, Ms. Duvani had stated that the Debtors, the

9    AHC, and the DMPs reached a settlement in connection with

10   substantially all of the DMPs objections.  The plan with one

11   narrow exception, that is the objection that the insured

12   injunction improperly deprived certain DMPs of their rights

13   as additional insureds under the DMVT insurance policies.

14   With regard to that objection, the DMPs have agreed to rest

15   on their papers, which can be found at docket 3306.

16         I'd like to make just one brief point, which is

17   not in my firm's reply brief but is addressed in Davis

18   Polk's brief, which is at docket number 3461 at paragraph

19   206.  As we've heard throughout this confirmation hearing,

20   the plan contains multiple settlements and transactions, all

21   of which must be approved for this plan to be consummated.

22   As I'm sure Your Honor's aware, the MVT insurance -- insurer

23   injunction is one of these essential and integrated

24   provisions.

25         The Debtor's insurance policies, the rights to

1    which are being transferred to the master disbursement

2    trust, provide a substantial source of value for the

3    abatement distributions and the distributions the personal

4    injury claimants contemplated to be made under the plan.

5    The MVT insured injunction is essential to preserving and

6    ultimately realizing the value.  It is integral to the plan,

7    and its applicability to the DMPs is necessary for this plan

8    to be consummated.

9             Absent questions from Your Honor, I will not

10   repeat the arguments which are fully set forth in the briefs

11   of my firm, Davis Polk's firm -- the Davis Polk firm, and

12   the AHC which are located at docket numbers 3506, 3461, and

13   3465 respectively.  I do want to, though, note to Your Honor

14   that there was a joint stipulation between the Debtors and

15   the DMPs which was filed at docket number 3612, which

16   contains excerpts from the relevant insurance provisions in

17   the parties' contracts, which the Court may find helpful.

18             So unless Your Honor has questions, I'm happy to

19   cede the Zoom podium.

20             THE COURT:  Okay.  That's fine.  Thank you.

21             Do the Debtors have any rebuttal, or are they

22   going to rest on their papers too?

23             MR. GLEIT:  I think you mean the DMPs.  I'm

24   (indiscernible) counsel.

25             THE COURT:  I'm sorry.  Excuse me.  The DMPs.

1        WOMAN:  No, Your Honor.  We rest on our papers.

2        THE COURT:  Okay.  Very well.  All right.  So I

3   had a chance to review what I think are the changes that

4   were included in the ninth amended plan that was the subject

5   of discussion at the beginning of this oral argument this

6   morning.  I'm assuming that other parties have too at this

7   point.  I don't know if there are further changes in it, but

8   I said I would give parties who were objecting to the

9   breadth of the third party injunction release and the plan

10  an opportunity to comment on the revisions and as to whether

11  there was still, in light of those revisions, an issue as to

12  the breadth of the release.

13        And obviously this is without prejudice to

14  objectors' other arguments regarding the release, which I've

15  heard and will be considering.  This just goes to the

16  release language.  And I don't know if there's been further

17  discussion and agreement beyond what was submitted this

18  morning, so maybe I should ask that question first and then

19  I'll hear from objecting parties.  And I see the Debtor's

20  counsel on the screen, Mr. Vonnegut.  Have there been any

21  further changes from what was filed this morning or last

22  night?

23        MR. VONNEGUT:  Good afternoon, Your Honor.  For

24  the record, Eli Vonnegut of Davis Polk and Wardwell.  There

25  have been no further revisions to the drafting of the

1    releases.  However, we have had several conversations with

2    Mr. Edmunds of Maryland that I think have been helpful in

3    clarifying his understanding of how the releases function.

4    And so I'm happy to walk Your Honor and other parties

5    through those issues so that hopefully everybody else can

6    share that understanding, if that would be helpful.

7              THE COURT:  Okay.  All right.  That's fine.

8              MR. VONNEGUT:  Okay.  So a number of the questions

9    about the releases that we've gotten this week from Mr.

10   Edmunds I think are premised on some misunderstandings of

11   how they work, so I'd just like to clarify a couple of

12   foundational issues about what is in and what is out.

13             First, there have been a number of references to

14   conduct that is described as unlawful asking whether claims

15   arising from unlawful conduct would not be released.  That

16   one is very simple.  The very first provision of excluded

17   claims is criminal claims.  Criminal claims are not being

18   released, period, full stop.  What is a little bit harder

19   and what we have had extensive discussions with Mr. Edmunds

20   about is capacity limitations.

21             So a variety of parties that received revisions

22   under the plan only received those releases for claims

23   against them in their specified capacities.  So for

24   instance, with respect to related parties of the Debtor that

25   Mr. Edmunds raised, there were a couple of questions along

1    the lines of if some participant in the pharmaceutical

2    industry had a relationship with the Debtor, do they become

3    released for all claims against them, and the answer is no.

4    The only claims that are released that party are claims

5    against them in their capacity with which they were related

6    to the Debtor.

7            A similar limitation, which we've discussed before

8    but I think it bears emphasis because it's important, is

9    that parties are only released for claims that relate to the

10   Debtor.  So they have to be tied to the Debtor.  And again,

11   it's not the case that if you have one claim against you

12   released because it is related to the Debtor that other

13   claims become released.  You are only released in that

14   limited capacity.  So if a party had one relationship with

15   the Debtor and then independent conduct, claims arising from

16   the independent conduct is not released.

17           Now, the most important issue that we discussed

18   with Mr. Edmunds that I think is important to emphasize is a

19   revision that we made in response to Your Honor's commentary

20   on Monday's hearing regarding the settlement with the

21   distributors, manufacturers, and pharmacies, the DMPs.  So

22   we had some colloquy about whether those parties are

23   included in the third-party releases.  The answer is no, and

24   we've now made that very clear in Section 10.6B, which is

25   the third-party release provision as distinct from the

1    releases of claims held by the Debtors.

2           So we've now added to Section 10.6B a footnote

3    that says co-defendants are not released parties under

4    Section 10.6B of the plan.  This is important.  As we

5    discussed with Mr. Edmunds, we believe that this addresses a

6    lot of the concerns and the confusion that have been raised

7    regarding the scope of the releases here.  "Co-defendant" is

8    a very broad term.  It includes any party that is a

9    defendant in a pending opioid action commenced as of the

10   effective date.  It also includes any holder of a co-

11   defendant claim.  And a holder of a co-defendant claim is

12   effectively anybody who has asserted or might assert a claim

13   against the Debtors to attempt to recoup their own costs in

14   opioid-related litigation.

15          So if you zoom back out, effectively the term is

16   what it sounds like.  Co-defendants in the opioid litigation

17   are excluded wholly from the third-party releases.  And the

18   only exclusions to that are --

19          MAN:  (indiscernible)

20          THE COURT:  You can go ahead.

21          MR. VONNEGUT:  Excuse me.  The only exceptions to

22   that are current a informer, officers, directors, authorized

23   agents, and employees of the Debtors.  So I'm hopeful that

24   that helps, Your Honor.  I am cognizant that these are

25   complex, and we've been fielding many, many questions as

1    quickly as we can.

2              THE COURT:  Okay.  All right.  Thank you.

3              MR. VONNEGUT:  Of course.

4              THE COURT:  I have some comments, but I'm happy to

5    hear from other parties first.  Maybe they have the same

6    comments.

7              MAN:  Your Honor, good afternoon, Your Honor.

8    Sorry, Brian.  Do you want to go first, or you want me to go

9    first?

10             MR. VONNEGUT:  Oh, one more point that I forgot to

11   clarify.  Mr. Edmunds also raised the question of whether

12   the releases might complicate efforts to obtain discovery in

13   unrelated litigation.  The answer is that they will not.  We

14   received a proposed addition to the plan from Mr. Edmunds

15   that we're working on, but recipients of releases are still

16   obligated to comply with subpoenas and other discovery.

17   We're not attempting to relieve them of that obligation.

18   And that will be made clear in the next amended plan.

19             THE COURT:  Okay.  I know you both spoke at the

20   same time and then neither of you spoke, so I'll just look

21   to Mr. Edmunds first.

22             MR. EDMUNDS:  Thank you, Your Honor.  I'll be

23   brief.  I think that we've had this -- Mr. Vonnegut and Mr.

24   Huebner and I in various, I guess, combinations have had

25   this discussion for quite some time.  The issue -- and I'm

1    not sure that Mr. Vonnegut's presentation exactly resolves

2    it as we agreed over the lunch hour that we took when Mr.

3    Huebner, Mr. Vonnegut and I were on the call to resolve it.

4              But let me just -- the issue narrowly that I have

5    been raising and on behalf of other objecting states have

6    been raising is that the -- is the same one that you went

7    over Monday, which is that the definition of related

8    parties, specifically Debtor-related parties who were

9    released under 10.6B is very broad.  And we -- the position,

10   our position, is that those releases are inappropriate if

11   they release people who independently, who are not closely

12   connected with the Debtors, those who have independently

13   engaged in conduct, including conduct that involves the

14   marking and sale of produced opioids.  There is -- so there

15   has been --

16             THE COURT:  Can I -- I'm sorry to interrupt just

17   for a second.  10.6D, is that the Debtor release or the

18   third-party release?

19             MR. EDMUNDS:  It's B, Your Honor, and it's the

20   Debtor release.  It's the --

21             MAN:  10.6B is third-party.  The Debtor release is

22   10.6A, Your Honor.

23             THE COURT:  All right.  So --

24             MR. EDMUNDS:  Right.

25             THE COURT:  -- I think it's important to keep the

1    -- so we're talking about the third-party release?

2              MR. EDMUNDS:  Yes, we're talking about the third-

3    party release --

4              THE COURT:  All right.

5              MR. EDMUNDS:  -- of the Debtor-related parties,

6    and I misunderstood your question.

7              THE COURT:  Right.  Okay.

8              MR. EDMUNDS:  The third-party release of claims

9    against Debtor-related parties --

10             THE COURT:  Right.

11             MR. EDMUNDS:  -- which is the issue here.  And

12   that could be very broad, and that's as literally

13   incorporated as it's broad.  There is a new footnote, and

14   this is a new understanding that I understood Mr. Huebner

15   was going to clarify this afternoon on the record, which is

16   that those actors, the related parties who, in their own

17   right, engaged in the same misconduct related to Purdue

18   should not be released and are released, they are arguably

19   partially incorporated in -- if you go through a string of

20   definitions, the definition of co-defendants.

21             And the definition of co-defendants then

22   incorporates the holders of co-defendant claims under which

23   you can make an argument that those who participated in

24   Perdue's opioid-related conduct are, in fact, released by

25   the footnote.

1          MAN:  One issue I just want to clarify, the

2    footnote makes clear that co-defendants are not released.

3    That is the purpose of the footnote.  It is not expanding in

4    any way.

5          MR. EDMUNDS:  I may have miss -- I may have

6    omitted a "not", but I think that's sort of the reason that

7    this is getting difficult.  We're going through multiple

8    layers of --

9          THE COURT:  Well, if the intent is that they don't

10   have that release, then the parties can make that clear.

11   And that's what I'm hearing, at least.

12          MR. EDMUNDS:  I think that we have agreed.  I

13   thought it was going to be made clearer on the record.  I

14   think that there is still an issue that needs to be that --

15   and Mr. Vonnegut and I have been discussing this by email

16   during the hearing this afternoon.  I think that there is

17   something -- some work that we still need to do, and I think

18   that we will be able to do that.

19          But I wanted to -- we may not be arguing before

20   the Court again on this issue, so I wanted to explain

21   overall what the issue is that we are trying to resolve, and

22   that is that wrongdoers shouldn't be released from state

23   police power claims when they've not contributed to the

24   plan.  And I think that we're -- there is an agreement in

25   principle as to that.  I think we need to make sure that the

1   language is -- it incorporates that and is clear.  And clear

2   because I think we'll face interpretive questions over that

3   if it's not in implementing our police powers.  So --

4               THE COURT:  Well --

5               MR. EDMUNDS:  -- that's the concern, and I think

6   --

7               THE COURT:  All right.

8               MR. EDMUNDS:  -- we can work on that.

9               THE COURT:  I want to be clear, though.  I think

10   that I heard from Mr. Vonnegut that there was an agreement

11   generally on that point.  But on the other hand there are

12   certain causes of action that the Debtor has, such as, you

13   know, failed to supervise vicarious liability, veil-piercing

14   alter ego, things like that where a discharge of the Debtor,

15   if someone was acting just without wrongdoing, you know,

16   without their own knowledge of unlawful conduct, really

17   shouldn't be a back door to violate the bankruptcy discharge

18   or the injunction from those who were contributing.

19               So that's where I draw the line.  And it really

20   should go truly to their own independent wrongful conduct,

21   not conduct as, you know, an employee of the Debtor, just as

22   an employee of the Debtor.  And this is similar to the

23   language in Section 524(g)(4), you know, which provides for

24   an injunction of claims related to the Debtor based on the

25   third-party's involvement in the management of the Debtor or

1    predecessor to the Debtor, or services as an officer or

2    director or employee.

3            So those types of claims really shouldn't -- I

4    view -- and there is going to be some line-drawing here that

5    you can't do -- inevitably, there might be someone who gets

6    sued where you're not sure until you actually look at the

7    facts carefully, which is why I think they have the

8    provision to come back here.  And I've done this once in

9    another case, and I found that the injunction actually

10   applied in one situation but not in another, and that may

11   well happen.  But I think if there is separate independent

12   wrongdoing that's short of being illegal, a crime, which no

13   one is protected from by a co-defendant, we do carve it out.

14           And that would cover any -- you know, any third-

15   party like, I don't know, some pharmacy chain that Perdue

16   dealt with.  But if you're talking about officers,

17   directors, employees, you know, the case law is pretty clear

18   that you can't, through the back door, go after them just

19   because they worked for a company that you would have a

20   claim against.  So I hope that provides some guidance to you

21   all.

22           MR. EDMUNDS:  It does, Your Honor, and that's not

23   the issue.  The issue is to take, for example, the seven, I

24   think, entities identified on the -- actually, entities or

25   individuals identified on the excluded party list, or at

1    least the corporate ones that are there.  Those are actors

2    who engaged in Perdue's marketing, but they're not

3    employees.  They're not close to the company.  They're not

4    of the kind that you're mentioning.

5              And the idea is just to make sure that these

6    releases do not categorically apply to what Mr. Uzzi

7    referred to this morning as, you know, the undiscovered

8    McKenzie.

9              THE COURT:  Right.  If -- obviously, if they have

10   engaged in their own separate wrongdoing, and I think the

11   Debtors -- I think if I heard Mr. Vonnegut correctly, the

12   Debtors agree with you on that.  It's just a matter of

13   making the language clear.

14             MR. EDMUNDS:  Right.  I think that's the case.

15             MR. VONNEGUT:  That's correct, Your Honor.

16             THE COURT:  Okay.

17             MR. VONNEGUT:  Unsurprisingly, we think you've got

18   it exactly right.  The independent conduct is not released.

19   Co-defendants, period, full stop, do not get third-party

20   releases.

21             THE COURT:  Okay.  All right.  Okay.  Should I

22   have Mr. --

23             MR. EDMUNDS:  Thank you, Your Honor.

24             THE COURT:  Should I have Mr. Fogelman then?

25             MR. FOGELMAN:  Thank you, Your Honor.  Good

1   afternoon.  This is Larry Fogelman on behalf of the United

2   States.  Your Honor, as you said while preserving all of our

3   arguments set forth in our statement, the changes made

4   overnight do not address the very issues the Court has

5   raised throughout this hearing concerning the extraordinary

6   overbreadth of the non-Debtor releases, including Your

7   Honor's admonition that the non-Debtor releases should not

8   include fraud concern non-opioid products.  Let me explain.

9          First, the release in Section 10.7B still covers

10  everything related to the Debtors, et al.  The key language

11  has not changed.  The release includes all causes of action

12  based on or relating to the Debtors, to the estates, or the

13  Chapter 11 cases.  That covers literally everything.  Now,

14  there is a carve-out to the extent that such of action "is

15  based on such shareholder release parties actual and

16  separate non-opioid actual misconduct".

17         But the definition of non-opioid actual misconduct

18  is too narrow and does not clearly permit (indiscernible)

19  concerning the other pharmaceutical products that the

20  Debtors manufactured, including (indiscernible), as well as

21  any other liabilities that could arise from owning and

22  operating a pharmaceutical company, including police and

23  regulatory claims.  These could relate to state consumer

24  protection statutes, state public nuisance laws, state

25  environmental liabilities, state workplace safety laws,

1    state employment laws, state civil fraud claims, state fraud

2    and contracting, any state ADA laws, state labor laws just

3    to name a few examples.

4              THE COURT:  So, could I interrupt?

5              MR. FOGELMAN:  Specifically, Your Honor -- yeah.

6              THE COURT:  Could I interrupt you?  I had the same

7    reaction, I have to confess, when I read the definition of

8    non-opioid actual misconduct.  I had two reactions.  The

9    first was I -- it seemed in clause 1 to take away what it

10   gave at the beginning of clause 1.  It says an action taken

11   or not taken --

12             MR. FOGELMAN:  I --

13             THE COURT:  -- deliberately or recklessly in bad

14   faith, and with actual knowledge.  So reckless is not with

15   actual knowledge, but so --

16             MR. FOGELMAN:  That --

17             THE COURT:  -- so it seems to take away language

18   that arguably is there, but that I think it takes away.  But

19   more importantly, I have this point.  And again, I am

20   distinguishing between releases --

21             MAN:  (indiscernible)

22             THE COURT:  -- that a debtor can give and is

23   giving here based on the Debtor's own analysis --

24             MAN:  (indiscernible)

25             THE COURT:  -- and I think everyone else's

Page 242

1    analysis, as to the types of things that are listed in the

2    language at the bottom of the next definition.  Veil-

3    piercing alter ego, agency vicarious liability, constructive

4    notice, controlled personal liability, failure to supervise,

5    or otherwise, with the exception of maybe of controlled

6    personal liability.  Those are all things that a debtor can

7    release.  Those are all -- there's no contention here that

8    any individual, as to these non-opioid matters, has taken

9    any action that would give rise to anything like this, and

10   it's the Debtor's claim in the first place.

11            So I can see why one would want to make it clear

12   in the Debtor release that this covers this type of conduct,

13   and I don't have a problem with a strike-suit mechanism that

14   has people -- if there's any doubt as to which side of the

15   line it would fall on, bringing their suit here first.  But

16   I just -- I don't -- by definition, then, what we're talking

17   about are not debtor claims, but third-parties claims.  I

18   just -- I'm not -- I don't see why we are covering them in a

19   release for non-opioid conduct.  I just don't -- why?

20   There's no money being paid for that.

21            MS. MONAGHAN:  Your Honor --

22            MR. FOGELMAN:  Your Honor, I see both Ms. Monaghan

23   and Mr. Uzzi looking like --

24            THE COURT:  Right.

25            MR. FOGELMAN: -- they're ready to address that, so

1    I'll let them.

2            THE COURT:  Right.

3            MS. MONAGHAN:  I'll start, Your Honor, and then

4    Mr. Uzzi can talk you through the language.  So I don't want

5    you to get the wrong idea about us.  We were trying to draft

6    a release that matched and mirrored the claims that have

7    been made and not anything else.  But even though claims for

8    things like alter ego or vicarious liability are estate

9    claims, the complaints here have frequently almost, you

10   know, without exception raised claims on the theory that the

11   former directors are vicariously and strictly liable for

12   everything the company did.

13           THE COURT:  Yeah, and I --

14           MS. MONAGHAN:  So for example --

15           THE COURT:  -- want to be clear.  I don't have a

16   problem with that as far as the language of a release, again

17   tracking 524(g)(4).  But we're talking now about non-opioid

18   conduct, and --

19           MS. MONAGHAN:  So let me turn to that.

20           THE COURT:  -- if someone just, you know, says

21   that director so-and-so or officer so-and-so, not a Sackler

22   person, but just -- you know, or a Sackler I suppose, is

23   liable for alter-ego, that's an estate claim, and it's being

24   released by the estate.  So I don't think -- I think other

25   than having a mechanism to come to the court if you're going

Page 244

1    to be asserting such a claim, you need anything more than

2    the estate release to the Debtor release.  And it just

3    complicates things to include all this other stuff, and the

4    alter-ego, etc.

5            Because what is the other stuff?  It has to be

6    something broader than that, that isn't an estate claim.

7    And if it's for non-opioids, I don't see -- I mean, that's

8    not been the focus of the case.  It's not the basis for the

9    settlement.

10           MS. MONAGHAN:  So, Your Honor, we tried to draft

11   the release in a way that addressed what we see as the

12   fundamental problem with the non-opioid claims, which is

13   that they are often opioid claims in disguise.

14           THE COURT:  Well, all right, but that would be

15   released.  And so, you could say that, again, even if it's a

16   opioid claim in disguise, it's released and you have to come

17   to the Court if you're saying no, it's not in disguise, so

18   you don't have litigation in Florida by the equivalent of

19   the people in the Madoff case that kept saying, oh, it's not

20   really a claim against the Madoff estate, it's something

21   else.

22           MS. MONAGHAN:  That, frankly, Your Honor, is what

23   we were nervous about.  The concept that the release extends

24   to or does not extend to non-opioid related activity that a

25   person actually undertakes, as opposed to something that's

1    just being attributed to them by virtue of their position as

2    a director or shareholder.

3                 THE COURT:  All right.

4                 MS. MONAGHAN:  That is what we were trying to

5    capture.

6                 THE COURT:  Okay, but --

7                 MS. MONAGHAN:  If the language doesn't do that, I

8    think we can try to address.

9                 THE COURT:  I don't think -- see if I get this

10   right.  I don't think the way to address those concerns,

11   which are legitimate ones, is to create a category of

12   misfeasance that is excluded from the release.  I think it's

13   to create a category that's clearly covered by the Debtor

14   release and to make it clear that you can't get around the

15   settlement release, which is over opioid related claims, by

16   creative pleading.

17                 And ultimately, the Court that imposes the release

18   should be the person that decides whether it's creative

19   pleading or whether it's legitimate, and that is an issue.

20   I mean, that, as I said in the case that I was referring to,

21   the released party one on one point and lost on the other

22   one and, frankly, the only one that had any value was the

23   one they won on, so the party stopped suing.

24                 But that plan didn't have the gatekeeping

25   mechanism.  They had to go down to Florida and they had an

Page 246

1    extra, you know, two stages of litigation and expense before

2    they finally got up here.  But I think I'm happy with the

3    gatekeeping mechanism like that if the gate is clear enough.

4           MR. UZZI:  Your Honor, for the record, Gerard Uzzi

5    of Milbank on behalf of the Raymond Sackler Family.

6           Look, we take a great deal of comfort with the

7    gatekeeping mechanism.  But it does matter what those gates

8    are or what the gate that needs to go through, I guess, is

9    the better, you know, metaphor.

10          But, you know, I do think, and I'd like to address

11   for a moment, Your Honor, what these releases were always

12   intended to pick up and whether it's supposed to be non-

13   opioid -- excuse me -- only opioid liability or whether it

14   was supposed to be broader than that.

15          And, Your Honor, I think we need to put these

16   releases and this plan in the context of the facts and

17   circumstances that brought this plan before the Court.  And

18   along those facts and circumstances are that we were

19   approached by our counterparties -- so the creditors are

20   large, the Debtors here, the fiduciaries -- to negotiate a

21   release that was expressly supposed to be what we've said

22   global peace, but, you know, is a complete and clean

23   separation from these Debtors for all civil liability.

24          And that's in the record, Your Honor.  It's in the

25   record, Ms. Conroy --

1          THE COURT:  It really isn't.  I mean, David

2    Sackler said it was for opioid liability.  I know others

3    said --

4          MR. UZZI:  Well, he said --

5          THE COURT:  -- they wanted global peace and they

6    were going to rely on the lawyers.  But look, the way this

7    reads right now, non-opioid actual misconduct, if David

8    Sackler -- it probably hasn't happened, but if he was in a

9    car accident where he was negligent, it would be released

10   because this doesn't cover negligence and that can't be

11   right.

12         MR. UZZI:  Well, I agree with that, Your Honor,

13   but I don't believe it's -- I believe it can't be right, but

14   I also don't believe that's what's picked up here.  I mean,

15   I don't -- if he's in a car accident, whether he's negligent

16   or not --

17         THE COURT:  Well, all right.  If he was driving a

18   company car.

19         MR. UZZI:  I don't -- I don't believe, Your Honor,

20   that is in the release as it relates to -- and it was Mr.

21   Vonnegut said there are capacity limiters on both ends of

22   the release, and there's a capacity limiter also with

23   respect to the party who's granting the release.

24         And so, you know, a car accident in a company car

25   that is the negligence of the individual person is not an

1    action taken in the capacity as the employee or the director

2    or the shareholder or whatever it may be of the Debtors, and

3    we're not trying to pick that up, Your Honor.

4            What we were trying to do here, Your Honor, what

5    we were trying to do is we're trying to be responsive to the

6    allegation of or maybe a concern that if there were facts

7    that were later discovered that people would have said, hey,

8    you know, that was conduct that should not have been

9    released had we identified it today that it can be picked up

10   here.

11           But if we listen to the testimony, Your Honor, and

12   the questioning in this case -- I mean, you know, in the

13   record, you know, as far as the investigation that --

14           THE COURT:  Well, all right, I'm going to cut you

15   short.  I just think that would mean then that this language

16   is, I think, too narrow.  I understand your point.  If

17   someone is being sued just because they were a board member,

18   all right, or just because they were an officer because it

19   turned out that, you know, Purdue had negligently put

20   together the formula for a non-opioid drug and they were

21   just being sued as an officer or an employee, I think the

22   Debtor release covers it.

23           But I also think there are probably claims that

24   are not deliberate and with actual knowledge that

25   legitimately someone's conduct might actually -- their own

1    conduct, not just conduct as an officer, but their own

2    individual conduct would make them liable for that product,

3    and we've done nothing about that hypothetical product in

4    this case.  So either this has to be really --

5              MR. FOGELMAN:  Your Honor, can I give --

6              THE COURT:  I mean, look, in the case --

7              MR. FOGELMAN:  I'm sorry.

8              THE COURT:  In the case law, the Second Circuit,

9    including in the Quigley case and in the Manville IV case

10   after the remand from the Supreme Court has really cabined

11   the term derivative -- or actually expanded the term

12   derivative from how it's normally used, which is a claim on

13   behalf of the debtor or through the debtor to be something

14   broader than that.  But there's some limits to that, and

15   it's not just based on, you know, actual knowledge of

16   misconduct or bad faith or deliberate.  It can be separate

17   and independent conduct.

18              So I want to -- I think if you're going to cover

19   non-opioid claims, it really needs to be something more than

20   just Debtor related and really bad stuff.

21              MR. FOGELMAN:  Can I -- sorry.

22              THE COURT:  I mean, non-debtor related or really

23   bad stuff, because you can have debtor-related stuff that I

24   think would fall outside of the Second Circuit's admittedly

25   broad definition of what a derivative claim is, is that

Page 250

1   entitled to a release under the right circumstances under a

2   plan, and I don't think this language does it.

3           And you can spend a lot of time dealing with that

4   language or you can just carve out non-opioid conduct,

5   except for conduct that is independent of one's acting under

6   one's duty as an officer, director, or, you know, alter ego,

7   veil piercing, et cetera, all of which is clearly

8   derivative.

9           MR. FOGELMAN:  Your Honor, that's all helpful, and

10  I take to heart your comments that you believe that many of

11  those claims, like the failure to supervise claim, would be

12  a Debtor claim.  That may be right, Your Honor, it may not

13  be, depending upon how somebody would plead it.

14          I'd like to give you the example or one of the

15  examples we're trying to solve for Your Honor, just to put

16  it clearly out there.  You've heard a lot about Adhansia in

17  the questioning, and there's certainly a fair amount of

18  inuendo about Adhansia and what the Sacklers involvement in

19  Adhansia may have been.  Adhansia was one of the search

20  terms in the discovery that was taken.

21          There's been plenty of discovery and plenty of

22  investigation about Adhansia.  Adhansia was not approved by

23  the FDA until all of the Sacklers were off the board.

24  Adhansia wasn't launched until about the petition date.

25          And so, anything that relates to Adhansia, the

1    marketing and sale of Adhansia has been done by a Chapter 11

2    debtor with a pristine board under the supervision of this

3    Court and under the supervision of a court-appointed

4    monitor.  Yet, yet there seems to be a pretty clear effort

5    that people want to string something along and tie some sort

6    of wrongful conduct to the Sacklers around Adhansia.

7              Now, if in fact, one of the Sacklers or one of the

8    released parties, not just the Sacklers, did something with

9    respect to Adhansia that was reckless or deliberate and

10   intended to cause harm, of course, that should be carved

11   out, Your Honor.

12             But these creative legal theories on trying to --

13   and I'm just picking Adhansia of one example of trying to

14   bring the Sacklers back in and seems to be intended to get

15   through a back door is what we're trying to solve for.

16             I'm not particularly wedded to how we solve for

17   that, Your Honor, but it is something that either --

18             THE COURT:  Again, to me, if people are suing

19   them, I guess it's perfectly legitimate to not to want to

20   have your clients even be sued for just being on the board,

21   which includes getting information, or for being an officer.

22             But at the same time, you're putting the onus on

23   the party suing to show not only that that isn't the case,

24   but also that they acted deliberately, recklessly, or in

25   some other standard that's not really tied, I think,

1   necessarily to a cause of action that would be independent.

2   I think you might be trying, although I didn't like this

3   language, to do that.

4           But I think a -- I mean, I just -- Adhansia is not

5   a control person liability type of liability, right?  It

6   just isn't.  That's not --

7           MR. FOGELMAN:  I don't know, Your Honor.  I mean,

8   that's the problem that I have.  I just -- I don't know.

9           THE COURT:  But no one has asserted in this case,

10  it's just can't be -- and they're not paying for it.

11          MR. FOGELMAN:  No, but, Your Honor --

12          THE COURT:  They're paying for peace of mind --

13          MR. FOGELMAN:  Your Honor --

14          THE COURT:  -- over something that I think they

15  get peace of mind on just by the fact that they can't be

16  sued as an officer and director.

17          MR. FOGELMAN:  I think what we bargained for, Your

18  Honor, is a complete separate from civil liability.

19          THE COURT:  No, I don't --

20          MR. FOGELMAN:  Now, I recognize --

21          THE COURT:  The record doesn't show that.  I'm

22  sorry, the record just doesn't show that.

23          MR. FOGELMAN:  I think that --

24          THE COURT:  It doesn't show that.

25          MR. FOGELMAN:  Your Honor --

1          THE COURT:  It doesn't show that your clients

2    bargained, for example, for release from CERCLA liability.

3          MR. FOGELMAN:  It's (crosstalk).

4          THE COURT:  It just doesn't.

5          MR. FOGELMAN:  Your Honor, I mean, the settlement

6    agreement and this plan speaks for itself as far as what the

7    bargain was.  The testimony of Miss Conroy made it clear

8    that they wanted the peace premium, that they want to be --

9          THE COURT:  Miss Conroy is a PI lawyer.  She's not

10   an environment lawyer.  If the Sacklers have control group

11   liability for an undiscovered Superfund site, I'm not giving

12   them a release.  It's just not going to happen period.

13         MR. FOGELMAN:  But, Your Honor --

14         THE COURT:  It's not going to happen period.  It's

15   not going to happen, and the lawyers should realize it.

16   That's it.  I've given you enough time to draft it.  I'm

17   telling you how it should be drafted now because you

18   haven't' drafted it.  I am not releasing them from a

19   Superfund site, for example, which would be related to

20   Purdue.  That's not what this case is about.  Had enough of

21   this.

22         MR. FOGELMAN:  Your Honor, we will --

23         THE COURT:  And no court would affirm me if I did

24   on appeal.

25         MR. FOGELMAN:  Your Honor, they think --

1          THE COURT:  It didn't even affirm -- it wouldn't

2     have affirmed Judge Lifland if the interpretation was right

3     as to the separate fraud of the insurance company to the

4     asbestos claimants.  Now the question wasn't that it was

5     fraud; it's that it was separate.  So you can't define your

6     way out of that by behavior unless you cover all of the

7     types of claims that could be raised for separate conduct,

8     not the Debtor conduct or as an officer and director of the

9     Debtor.

10          So look, you're not going to persuade me on this,

11     that you're just not going to persuade me.

12          MR. FOGELMAN:  I'm not trying to persuade you to

13     go further, Your Honor, then I think what I'm asking for.

14     What we've tried to address is that very issue of the

15     separate conduct.  Maybe we didn't do it well.  We will take

16     another shot at this, Your Honor, and try and submit

17     something.

18          THE COURT:  All right, but the times a' wasting.

19          MR. FOGELMAN:  Understood.

20          THE COURT:  And I think there are going to be

21     examples that you're not going to be able to cover unless

22     you do it the other way around and not do it with the

23     gravamen of every potential truly separate claim and instead

24     say that this release will cover, because it's a Debtor

25     release, as to non-opioid conduct claims that the Debtor

1    would have and those are expansive, including derivative

2    claims for acting improperly on the board, for example.

3           But if there's a separate claim that doesn't fit

4    into that and it comes back to the Court and the Court finds

5    that, this release shouldn't cover it.

6           MR. FOGELMAN:  That's helpful.

7           THE COURT:  I think that the released parties

8    should have the protection of strike suits brought all over

9    the country.  Instead, they should be channeled here, and

10   you should be able to show this to a state court or a

11   federal court in wherever, Tennessee or Florida or wherever,

12   saying, no, you know, they had to come to the bankruptcy

13   court first to decide whether this provision applied or not.

14          I understand that and I've encouraged that, but I

15   just don't think you can define out by qualitative types of

16   misconduct from this release, unless they're going to pay a

17   lot more than they're paying because they're not paying to

18   be released from a CERCLA claim, for example.

19          MR. FOGELMAN:  And, Your Honor, we were not trying

20   to do that, so --

21          THE COURT:  Well, but this -- I mean, that would

22   be the effect.

23          MR. FOGELMAN:  Understood, Your Honor.  Well,

24   there is a separate carveout for all federal liabilities, so

25   technically --

1          THE COURT:  Well, state law equivalent.

2          MR. FOGELMAN:  But understood, Your Honor, but

3     understood.

4          THE COURT:  All right.

5          MR. FOGELMAN:  So we will do our best, Your Honor,

6     to accommodate or to address your --

7          THE COURT:  All right.  No, Mr. Fogelman, I think

8     -- I mean, you have other points, but there is a balance

9     here under the case law.  And I'm not asking you to waive

10    your rights to say that case law is wrong, but there's a

11    balance here between how the Second Circuit defines broadly

12    derivative actions that can be enjoined and separately

13    independent actions that can't.  And I think what I'm

14    getting at is how you draw that line.

15         MR. FOGELMAN:  I appreciate Your Honor's

16    considering our argument, and I have nothing further at this

17    time.  Thank you.

18         THE COURT:  Okay.  All right.  I mean, look, this

19    is all over the case law.  The Carter Corporation, Judge

20    McMahon says, you know, you address what you were settling

21    and not everything else, and they rewrote the plan in

22    Carter.  It was a small plan, it's a small construction

23    company, but they rewrote it, and they shouldn't have had

24    to.

25         MR. SCHWARTZBERG:  Good afternoon, Your Honor.

Page 257

1   Paul Schwartzberg from the U.S. Trustee's Office.

2           THE COURT:  Afternoon.

3           MR. SCHWARTZBERG:  Thank you, Your Honor.  I just

4   wanted to take up the opportunity Your Honor had offered.

5   We do have a few comments on the recent changes, in addition

6   to what we had filed in our objection and our oral

7   arguments.

8           And I wanted to bring the Court's attention of the

9   new definition of shareholder releases, which is now Exhibit

10  X to the shareholder agreement, as well as the defined term,

11  "designated shareholder release parties," which is Exhibit S

12  to the shareholder agreement.  And I wanted to point out --

13  Your Honor, can you hear me?

14          THE COURT:  Yes.  I can hear you fine.

15          MR. SCHWARTZBERG:  Okay.  All right, thank you,

16  Your Honor.

17          I wanted to point out first the shareholder

18  agreement as testimony shared, it has not actually been

19  finalized yet, so the released parties are Exhibit X and

20  Exhibit S could be expanded and we don't know who those are.

21  And, in fact, Your Honor, pursuant to the shareholder

22  agreement of Section 1106, even after it's signed, it could

23  still be amended, and I think between agreement of the NBT

24  and the Sacklers.  So we're concerned that even after --

25          THE COURT:  I'm assuming it will be attached to

1    the confirmation order and the parties will have a chance to

2    review it before the order is entered.

3              MR. SCHWARTZBERG:  But, Your Honor, even after the

4    order is entered, the shareholder agreement does allow --

5              THE COURT:  No, no, not after the order is entered

6    because that's the injunction.

7              MAN 1:  Your Honor, we're not going to be adding

8    parties.

9              THE COURT:  No.

10             MAN 1:  Mr. Fogelman doesn't need to worry about

11   that.

12             THE COURT:  They wouldn't be able to even if they

13   wanted to.  They're not going to do that.

14             MR. SCHWARTZBERG:  Could they make the case,

15   Section 11.06 to make it clear that the amendments that they

16   can make only are up to confirmation?

17             THE COURT:  Well, put it in the confirmation

18   order.  The Court's approving this and nothing further.

19             MR. SCHWARTZBERG:  Thank you, Your Honor.  That

20   would be very helpful.

21             THE COURT:  Okay.

22             MAN 1:  That works for us, Your Honor.

23             MR. SCHWARTZBERG:  And as I said also, Your Honor,

24   Exhibit X still -- we were talking about the breadth of the

25   releases.  Exhibit X still includes as related entities the

1    businesses, the assets, and the entities owned by Side A.

2    We believe this is overly broad and, in fact, I believe it

3    was Mr. Mortimer Sackler had indicated he couldn't even

4    identify all of his investments, so we think that term is

5    too broad.

6              THE COURT:  Why?

7              MR. SCHWARTZBERG:  Unidentified, Your Honor, at

8    this point.  We can't identify.

9              THE COURT:  But if you cabin the -- there's no --

10   these are the payors, right?  And as we've just discussed,

11   what's going to be released as far as third parties is

12   opioid-related claims.  So there's no indication that any of

13   these entities, separately and apart in conjunction with

14   Purdue, was engaging in any opioid-related activity.

15             On the other hand, they are backing up the payment

16   of the plan.

17             MR. SCHWARTZBERG:  Our concern, Your Honor, is

18   these are entities that even the Sacklers may not know.

19             THE COURT:  But -- all right.  Keep going.

20             MR. SCHWARTZBERG:  I'll move on to my next point,

21   Your Honor.

22             THE COURT:  Okay.

23             MR. SCHWARTZBERG:  In regard to the --

24             THE COURT:  I guess you haven't read the discovery

25   that the committee and the Debtors had, right?

1           MR. SCHWARTZBERG:  That's correct, Your Honor.

2           THE COURT:  Okay.  They have.

3           MR. SCHWARTZBERG:  Your Honor, in regard to the

4      non-opioid misconduct claims, we -- I think you had

5      addressed that, and we just reserve our rights on that to

6      see what the new drafting is regarding this because we had

7      concerns regarding that.

8           And then last point, Your Honor, I had is just a

9      concern regarding, once again, the breadth of the releases.

10     We do note that the Debtors -- we're trying to figure out if

11     the Debtors are including released parties that are not --

12     releasing parties that are not -- or causing releases that

13     will be suffered by parties that are not creditors of this

14     case.

15          The releasing parties include holders of claims

16     and causes of action.  And I know the bankruptcy code

17     defines creditors in this case as just part of the holders

18     of claims.  So when they throw in holders of claims and

19     causes of actions, it makes it look like they're trying to

20     expand those who are going to give releases to those who are

21     not creditors in the case.  And if they need to limit it to

22     just people who are creditors in the case, they should make

23     it clear in the documents, Your Honor.

24          And I believe those are the only additional

25     comments I had, unless Your Honor has any questions.

```
1              THE COURT:  Okay.

2              MR. UZZI:  Nothing further from the Debtor, Your

3    Honor.

4              MR. GOLDMAN:  Your Honor, may I be heard briefly?

5              THE COURT:  Sure.

6              MR. GOLDMAN:  Irve Goldman, Pullman Comley, for

7    the State of Connecticut.

8              I had agreed to very briefly address this argument

9    under the miscellaneous topic, as opposed to separately.  I

10   don't expect to take more than five minutes on this, Your

11   Honor, so I hope you'll bear with me.

12             So I'm presenting this in addition to the states

13   that joined our objection either expressly or by

14   incorporation, and also on behalf of Rhode Island and

15   Delaware.  It relates to the argument in our brief that the

16   plan infringes on the states' rights to have had their

17   police power claims adjudicated with damages fixed in the

18   actions they commenced against Purdue in their own courts.

19             And this relates to Section 362(b)(4), the

20   legislative history of which provides that the purpose of it

21   is to allow a government action for a violation of a

22   consumer protection law to proceed unabated by the automatic

23   stay in order to "fix damages for violations of such a law."

24             The plan takes away that right by channeling all

25   the states' claims to the NOAT Trust, which will be funded
```

1    by the Sackler plan contributions, and then distributing

2    those funds based on a state-by-state allocation percentage.

3    And in fact, it's a pot plan from which the states will take

4    their allocated share of what is put in the pot.

5              This mechanism, we contend, eliminates the states'

6    rights to fix damages in their own actions, and therefore,

7    the plan doesn't comply with the applicable provisions in

8    Title 11.

9              I realize it would have been administratively

10   cumbersome and time-consuming to have allowed for the fixing

11   of damages in those actions in this case, but that is simply

12   the hand the Debtors were dealt when they invoked the

13   protections of the bankruptcy court, and I would submit they

14   must therefore live with the burdens of the Code.  And that

15   is set forth in 362(b)(4).

16             I would also submit that administrative

17   convenience can't be allowed to trump the clear protection

18   provided for states to fix their claims for damages without

19   being held up by the automatic stay.

20             THE COURT:  Well --

21             MR. GOLDMAN:  And that's all I have, Your Honor.

22             THE COURT:  -- that's already been litigated and

23   affirmed on appeal, without any further appeal.  I'm not

24   quite sure what you're saying at this point.  Are you

25   suggesting that even though 362 by itself wouldn't apply

Page 263

```
1    post-confirmation, that somehow they would have a right to

2    liquidate their claims, even though they would get whatever

3    recovery they'd get under the plan?  So they would --

4              MR. GOLDMAN:  No, I'm not saying --

5              THE COURT:  -- the states would actually spend the

6    money to do that?

7              MR. GOLDMAN:  No, I'm not saying that, Your Honor.

8    I'm saying that that was a preliminary injunction.  It

9    wasn't a permanent injunction --

10             THE COURT:  Right.

11             MR. GOLDMAN:  -- to stay the states.  And the fact

12   that we're at the confirmation stage should not cut off the

13   rights to have liquidated those claims --

14             THE COURT:  That's the --

15             MR. GOLDMAN:  -- because of --

16             THE COURT:  -- whole reason that the...  Look,

17   Congress, in the legislative history made it clear that one

18   could still enjoin police power under the right

19   circumstances to liquidate a claim.  And of course, the

20   provision itself says it doesn't apply to payment of the

21   claim.  The plan is just providing for payment of the claim.

22             So I just -- I hear your argument, but frankly, it

23   makes no sense.  It's another sand in the gears.  I mean,

24   it's just...

25             MR. GOLDMAN:  I hear Your Honor.  I'm just trying
```

1    to make the point that I understand the injunction was

2    issued and it was preliminary.  I don't think that that

3    means we shouldn't have had the right to -- before the plan

4    reached the confirmation stage -- to liquidate those claims,

5    instead of having them just put into a trust based on an

6    allocation formula.

7              THE COURT:  In fact, the injunction applies

8    through confirmation, and then the stay is no longer in

9    place, and therefore, 362 doesn't apply at all.  Instead,

10   it's the plan.

11             MR. GOLDMAN:  I would maintain that because of

12   that, our rights are subverted under 362(b)(4).  And I'll

13   just leave it at that, Your Honor.

14             THE COURT:  Okay.

15             MR. KAMINETZKY:  Your Honor, if I could briefly

16   respond?  Benjamin Kaminetzky, of Davis Polk, for the

17   Debtors.

18             THE COURT:  Okay, fine.

19             MR. KAMINETZKY:  I know -- I'm actually so happy

20   that this was raised, because we've all been wondering what

21   plan B was for the objecting states, and I think this is

22   just a perfect way to end today.  Because what they're

23   saying is that we should go back to the first day of this

24   case, when the Debtors basically said, we're done, we're not

25   litigating anymore.  In Your Honor's words, we've given

1    ourselves up.

2            But they're still demanding -- and then we've

3    worked for months and months, years, on a distribution

4    mechanism, but now they're saying, you know what, we want to

5    have a trial anyway on the merits against the Debtors, who

6    aren't contesting liability, just for like fun, so that we

7    could then...

8            I don't know -- are they saying then they'll go

9    back to the NOAT anyway after they have their show trial,

10   that we're not contesting liability, and they'll abide by

11   the NOAT?  Or are they saying, no, we won't; we'll jump the

12   line, and the State of Connecticut will ignore the last two

13   years, and we'll get our judgment against the Debtors, who

14   aren't contesting liability, and we'll get everything?  It

15   is just so confounding.

16           And I'm actually -- this is a great way to end the

17   hearing because what we've just showed is that there's

18   absolutely no alternative other than going back to September

19   of 2019, relitigating the automatic stay, having Your Honor

20   give us this day.  And this isn't even what was

21   controversial about the automatic stay.

22           Remember, the automatic stay that was the most

23   controversial was the Sacklers.  He's saying he wants to

24   litigate.  They want to have 50 trials.  Maybe it's even

25   more.  Maybe because -- I'm not sure if this goes to all the

1   instrumentalities of the stay too, so we should have

2   thousands of trials around the country against a Debtor that

3   admitted on the first day that it's no longer contesting

4   liability.

5           It is just the insanity -- or, I shouldn't say

6   that -- the idea that this is what's being advocated at this

7   point, right here, at the last minute of the confirmation

8   hearing, I think speaks volumes.

9           THE COURT:  Well, look, I think...  I want to say

10  this diplomatically.  There have been times in this case

11  where the high quality of the lawyers has actually not been

12  a good thing, because lawyers who are really creative and

13  thoughtful sometimes come up with ideas that maybe seem well

14  in the shower, but actually don't make any sense.  And I

15  just...

16          Look, Mr. Goldman, your clients have made some

17  good points going to the merits of the Sackler settlement.

18  That's where the focus should be, not on something like

19  this.  This is just not constructive.  So, I would hope the

20  parties would continue to discuss the former, and not burden

21  this case with the latter.

22          MR. GOLDMAN:  I hear you, Your Honor.

23          THE COURT:  Okay.  All right.  Mr. Underwood, I

24  don't know if you had a comment on the release language, or

25  you just...

1           MR. UNDERWOOD:  Yes.  I have a very quick comment,

2    Your Honor, that I want to raise.  We have a provision in

3    the plan.  It's very straightforward as well.  We have a

4    provision in the plan that regards excluded claims.  There

5    is a portion of that provision that addresses Canadian

6    claims, or Canadian claims against Purdue Canada.

7           We now have language in that provision that says

8    that non-opioid actual misconduct claims are effectively, I

9    guess, released.  And this is --

10          THE COURT:  No, that's what we've just been

11   talking about, so I wouldn't worry about that.

12          MR. UNDERWOOD:  Okay.  And the second aspect of

13   that, very quickly, Your Honor.  My understanding is -- and

14   I did ask the Debtors' counsel about this last evening, or

15   this morning -- provision 11.1(e) would then suggest that if

16   there's any provision such as the non-opioid actual

17   misconduct claim in the excluded claim, we would have to

18   come back to the United States to get approval.  It seems a

19   little untoward that the Provinces at this point would have

20   to come to Your Honor in order to bring, you know, a federal

21   conveyance action against a Canadian entity.

22          I just want to put that on the record, make sure

23   the Debtor understood where I was coming from.

24          THE COURT:  No.  Look, first of all, claims

25   against the Canadian entity would have to be for fraudulent

1    -- I don't think there's any release of a fraudulent

2    transfer claim against the Canadian entity in this plan.

3              MR. UNDERWOOD:  Okay.  I'm not -- perhaps it's not

4    a release.  But what this seems to say is -- and I don't

5    want to delay this further, but -- a claim that is not based

6    upon conduct of the Debtors, including opioid-related

7    activities of the Debtors, and that effectively -- or any

8    non-opioid actual misconduct claim.

9              So I would presume that any Canadian creditor

10   could argue in Canada that the officers, directors,

11   Sacklers, owners, whomever, have left the Canadian entity

12   with unreasonably small capital.  That, to me, would be the

13   type of claim that may be a non-opioid claim that could not

14   then be brought.

15             THE COURT:  Again, but I want to be clear, if it's

16   just against these third parties because they are an

17   employee or officer of the Debtor, which would be, I guess,

18   the transferee, then, yeah, they would have to come back

19   here if there's any question about that.  It would have to

20   be based on their own independent conduct.  So, for example,

21   if they were a transferee of the Canadian company, then you

22   wouldn't have to come back here.

23             MR. VONNEGUT:  Your Honor, may I address this

24   point?  I think I should be able to clear up some confusion.

25             THE COURT:  Okay.

1          MR. VONNEGUT:  So, the gatekeeping function that

2     Mr. Underwood is referring to in 11.1(e).  That only applies

3     to non-opioid actual misconduct claims, which are their own

4     prong under excluded claims.  The claims against the

5     Canadian entity that are not tied to the Debtor, those are

6     separately excluded claims, and there's no gatekeeping

7     function if he's pursuing those claims.

8          THE COURT:  No, but his point was a different one,

9     which is if the Debtor or a released party was being sued

10    for having received a fraudulent transfer by the Canadian

11    company, whether they would have to -- the Plaintiff would

12    have to come to this Court as a gatekeeping mechanism to

13    proceed.

14          And this should be able to be drafted so that the

15    gatekeeping mechanism doesn't apply to clearly independent

16    claims such as that, where if board member X received

17    $100,000 as a gift from Purdue Canada, he wasn't a board

18    member of Purdue Canada, didn't do anything for Purdue

19    Canada, was just a -- you know, they decided to give him a

20    gift, and Purdue Canada was insolvent.  If under applicable

21    fraudulent transfer law in Canada, that would be a

22    fraudulent transfer law, I don't think you should have to

23    come to this Court to sue that board member.

24          MR. VONNEGUT:  Understood and agreed, Your Honor.

25          THE COURT:  Right.  So, on the other hand, if

1    Purdue Canada is suing the board member because she was a

2    board member of Purdue when Purdue got a fraudulent

3    transfer, you would have to come to the Court, because if

4    the only basis for the lawsuit is -- or the basis for the

5    lawsuit, or a basis for the lawsuit, is that she was just a

6    board member.  And that's a veil-piercing claim, and the

7    creditors -- those types of claims are subject to the

8    discharge, the Debtors' discharge, because you're just

9    trying to do a backdoor to get at the Debtor through the

10   insurance and through the former officer or director.

11              Okay.  All right.  Anything else?

12              MR. HUEBNER:  Your Honor, one very last thing from

13   the Debtor.  As Your Honor noted last week, there are

14   extraordinary letters and other filings on the docket, and

15   actually, we just wanted to echo the courage that it takes

16   to tell stories, and specifically to come to court as a non-

17   lawyer is extraordinary.  Those are things that all of us

18   weigh and worked on, and we read many of those in working on

19   all this.

20              We (indiscernible) for many parties.  I think that

21   we all owe the Court and chambers -- whichever way the

22   confirmation hearing ends and whatever order is issued,

23   we're all aware that we have dumped thousands and thousands

24   of pages on the Court.  And I think that -- you know, I just

25   wanted to note that as we move towards the closing of the

1    confirmation hearing, in probably the most difficult Chapter

2    11 case in history in terms of what is at stake, in terms of

3    what was at stake, in terms of the national health issues

4    and the impact of the crisis.  And it seemed odd to end the

5    hearing without some recognition of the just extraordinary

6    nature, in every possible way, of these proceedings.

7              THE COURT:  Okay.  Well, certainly I want to thank

8    the Clerk's office.

9              MR. HUEBNER:  Yes.  Including certainly that the

10   Zooms for hundreds of people and the accessibility in the

11   (indiscernible).  So I won't belabor the record.  It just

12   felt appropriate to say something, given what we've all been

13   working on together.

14             One last thing, Your Honor.  There are obviously

15   still some documents to be finalized.  Those things are

16   moving along at warp speed and the emails are being

17   exchanged.  Obviously, we're aware that those things have to

18   be done and on file prior to entry of the confirmation

19   orders and the like.  Obviously, Your Honor gave some pretty

20   clear guidance on some of the restructuring issues within

21   the last hour, which we will attend to; the shareholders

22   settlement agreement, in addition to the representations we

23   just talked about, about not letting anyone add any further

24   parties.

25             So those things will be hitting the docket in

1    revised forms as fast as we humanly can get the parties sort

2    of shepherded together to do that.

3            I see Mr. Troop has come on (indiscernible) I

4    assume that is not an accident, since he is quite nimble in

5    Zoom and appears, I think, only when he plans to.  So let me

6    ask him what he wants to talk about, and maybe that will be

7    what brings us home.

8            MR. TROOP:  Well, thank you very much, Mr.

9    Huebner.  Your Honor, Andrew Troop, for the Nonconsenting

10   States.

11           Your Honor, I actually don't want to divert at all

12   from the (indiscernible) truly heartfelt comments by the

13   Court and Mr. Huebner with respect to the individuals in

14   this case.  I think it's something that all of us who don't

15   represent individual victims (indiscernible) that we all

16   share, and our admiration for the two victims who spoke

17   (indiscernible).

18           But do we have some process things that we have to

19   get to, and Mr. Huebner touched on them.  And we just need

20   to make sure that we, at the appropriate time and in the

21   appropriate way, do not lose sight of the issues that remain

22   unresolved and may be subject to debate with regard to how,

23   for example, the Sackler settlement is resolved.

24           Your Honor, this afternoon during the hearing,

25   Your Honor, the Debtors filed a revised perspective

1    injunction for NewCo, where there is an issue that is

2    identified (indiscernible) open, and we just need to manage

3    that process and want to do so in a way that's efficient for

4    the Court.  And so we will continue to work on that with the

5    Debtors.

6              But this is a complex case with lots of threads

7    still untied, and we just need to make sure that we don't

8    lose sight of that.

9              THE COURT:  Okay.  Fair point.  I've told the

10   parties that I intend to rule Friday morning at 10:00.  I

11   intend to give you a bench ruling.  As you know, I believe

12   it's important in cases large and small to move the matter

13   promptly, after having heard the evidence.  And given my

14   calendar, that's the best way to do it.  As I often do with

15   a lengthy bench ruling, I'll go over the transcript, and I

16   may edit it, although I won't change it in terms of the

17   substance.  But I think it's important for the parties to

18   get that ruling and know that they're going to get it on

19   Friday morning.

20             However, if the parties, as I have encouraged them

21   to do, will reach some form of agreement, either among

22   themselves or with the efforts of Judge Chapman as mediator,

23   they can let me know before I give that ruling, if they want

24   to circulate it, socialize it, make sure everyone

25   understands it.  I won't be offended at all by that.  In

1   fact, I'll encourage you, as I have encouraged you, to

2   continue that work.

3          As far as other loose ends are concerned, if they

4   are truly loose ends, I guess I will have to deal with them

5   after I give you my ruling, which the parties have to

6   realize will in some measure give me a fair amount of

7   control over the outcome, if they can't reach an agreement

8   themselves, because the issue, almost by definition, will

9   not be so important that it would hold up confirmation.

10  Rather, it's just an issue that needs to get resolved one

11  way or the other, and of course, I would rather the parties

12  resolve it on their own, as I expect they would do.  But if

13  they can't, I guess we'll deal with that after my ruling and

14  as part of the process of submitting the confirmation order.

15         I won't require the order to be formally settled

16  if I grant confirmation.  But I will want to make sure the

17  parties have sufficient time to read any changes to it,

18  including -- you know, obviously, as I told Mr. Anker, he

19  would have time, everyone else falls in that boat too.

20         So, I want to thank all the parties.  We covered

21  an extraordinary amount of ground in six days of trial and

22  two days of oral argument.  We could not have done that

23  without the parties working very hard to streamline the

24  trail efficiently, which I believe by and large they did.

25         And I also want to thank all of the lawyers, some

Page 275

1     of whom I have made some gruff comments to.  But that is no

2     reflection on the lawyers themselves, but simply to let the

3     parties know my views on that particular issue, which

4     unfortunately, when you're on Zoom, I found the Court needs

5     to be more expressive about than if you're there in person.

6     I'm not quite sure what human chemistry leads to that

7     result, but it's true, based on over a year's experience now

8     in handling hearings remotely.  So I hope no one took that

9     personally.  It really went to the argument, and not the

10    lawyer.

11            So, thank you all, and I'll see you all again on

12    Friday morning at 10:00.

13            (Whereupon, these proceedings were concluded at

14    6:03 PM)

15

16

17

18

19

20

21

22

23

24

25

Page 276

C E R T I F I C A T I O N

1

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2021.08.26 13:49:09 -04'00'

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 26, 2021

| & | | | |
| --- | --- | --- | --- |

**&** 4:8,15 7:8
16:20 24:14
155:15 175:1
220:11,19 221:21
221:24 224:13

**0**

**06604** 4:4
**07102** 5:20

**1**

**1** 5:4 34:9 77:3
82:4 95:24 96:5,7
100:24 105:13,19
106:20 107:2,13
109:11 110:11
112:1 113:8 115:5
116:1 117:4,4
137:7 150:7 185:9
241:9,10 258:7,10
258:22
**1.16** 101:2
**1.2** 32:15 160:16
**1.3490069542**
72:17
**1.5** 34:14 156:14
**1.6579015983**
70:20
**1.775** 35:21
**1/500th** 77:3
**10** 40:5 47:4 83:1
97:18 116:2 160:2
209:7
**10.4** 46:21
**10.6a** 234:22
**10.6b** 231:24
232:2,4 234:9,21
**10.6d** 234:17
**10.7** 26:15
**10.7b** 240:9
**100** 116:3 208:22
214:4

**100,000** 76:16
269:17
**10001** 4:11
**10007** 6:10 8:4
**10017** 3:6
**10019** 5:12 6:17
**10020** 7:12
**10036** 4:18 220:20
**1015** 51:12
**104** 48:17
**105** 143:3
**105-106** 97:19
**106** 122:22 123:8
123:10,11 135:13
135:15,17,18,19
135:19 136:1,3,16
136:22 137:7
142:25 143:10,13
143:16
**10601** 1:14
**10:00** 273:10
275:12
**10:03** 1:17
**11** 16:5,14 33:19
33:25 43:12,12,22
52:5 62:25 65:15
72:11 74:8 76:24
77:10,11 82:5,12
126:4,5,7 130:13
137:14,18 171:18
185:11 203:3
224:19 225:10
240:13 251:1
262:8 271:2
**11.06** 258:15
**11.1** 267:15 269:2
**11.4** 224:15
**1106** 257:22
**1122** 80:20 90:14
**1123** 99:13 100:5
112:10 113:3,5
119:2 170:19
171:21 180:17

**189:7** 201:14
**1123.05** 163:21
**1127** 28:21
**1129** 28:20,22
29:23 30:17,20
38:5 42:10 49:6
51:9 52:4 97:9,9
98:5 130:15
**1141** 135:6
**11501** 276:23
**1177** 4:17
**118** 97:20
**119** 45:11
**11c** 124:11 126:11
126:16,17
**11th** 203:15
**12** 99:8 103:6
**12-16** 28:20
**120** 214:5
**1201** 5:19
**1221** 7:11 148:18
**125** 102:11
**12th** 160:2
**13** 50:21
**1334** 143:7
**134** 32:17
**135,000** 156:13
**137** 66:11
**139** 29:6,7
**13th** 71:4 220:22
225:5
**14** 102:23
**1411** 45:11
**146** 32:17
**15** 100:23 105:18
105:20 106:13
109:13 128:23
133:21 208:16
**15222** 8:12
**155** 31:19
**158** 31:20
**15th** 176:25
220:25 222:6

**16** 35:7 86:11
93:21
**1633** 5:11
**16th** 156:3 177:1
**17.5** 224:11
**173-175** 33:16
**17th** 220:1 224:5
**18** 35:7 58:16
107:18 160:3
225:12
**180-182** 28:11
**181** 28:20
**1898** 165:3
**19** 32:14 35:5
86:11 219:21
225:16
**19-234649** 225:10
**19-23649** 1:3
**191** 101:22
**1939** 165:3
**1962** 223:1
**197** 101:22
**1990** 222:21
**1993** 223:9
**19th** 148:25
**1:30** 144:13
**1st** 221:12

**2**

**2** 35:11 97:19
102:1 109:12
110:11
**2.156** 40:3 73:2
**20** 28:4 40:4 83:11
86:8 160:17 210:9
**200** 6:3 101:22
**20003** 7:20
**20005** 3:18
**2000s** 166:1
**2007** 57:14 79:9
**2008** 46:22
**2011** 221:3,10
**2012** 128:11

**2015**  220:1,4
**2017**  143:12
**2018**  68:24 224:16
  224:16
**2019**  29:3 46:22
  62:25 221:3,10,12
  222:7 223:14
  224:5,16 265:19
**2020**  146:23,24
  148:16,18 149:4
  178:5 183:9,9
  220:7,22,23,25
  221:24 222:1,2,2
  222:4,6 225:5
**2021**  1:16 2:2
  44:10 86:17 149:4
  160:2 177:25
  218:7 224:25
  225:2,16 276:25
**203**  45:11
**206**  227:19
**20852**  6:4
**21**  86:11
**216**  101:21
**217**  7:3
**22**  33:24 35:8
**225**  8:11
**228**  66:11
**22nd**  86:17
**23**  2:2 32:16
**230**  98:17
**233**  102:25
**234**  102:25
**23649**  219:22
**239**  42:5
**24**  86:11
**241**  99:10
**242**  99:10 100:3
**243**  100:3
**248**  1:13
**24:16**  30:19
**24th**  222:7

**25**  1:16
**252**  56:14
**25305**  5:5
**26**  5:4 276:25
**265**  57:7
**26th**  220:4
**27**  93:22
**28**  100:12
**285**  47:1
**288**  128:11
**2988**  148:22
**2:30**  144:24
  145:21

**3**

**3**  17:6,23 34:21
  70:24 97:9,9 98:5
  109:12 135:10
**3,500**  153:16
**3,900**  57:6
**30**  18:25 124:17
**300**  1:13 276:22
**3008-1**  225:19
**3018**  93:3,3
**30th**  220:23
  224:25,25 225:2
**31**  6:16 100:21
  105:9 108:7
**3232**  70:24
**327**  99:20
**3277**  149:15
**33**  34:25
**330**  276:21
**3306**  227:15
**3372**  82:24
**3461**  227:18
  228:12
**3465**  228:13
**347**  101:23
**3479**  81:23
**3480**  81:23
**35**  28:2 86:16
**350**  101:23

**3506**  228:12
**35213**  7:4
**36**  34:15
**3612**  228:15
**362**  261:19 262:15
  262:25 264:9,12
**363**  56:18 165:22
**38**  41:17 44:12
  70:2 82:25 94:21
**380**  100:17
**388**  100:17 102:23
**389**  99:8
**39**  40:4
**392**  103:6
**3rd**  6:9 148:18,22
  221:24

**4**

**4**  36:2,8,11 39:6
  46:20 53:11 72:16
  82:1 84:20 87:22
  93:1 99:13 100:5
  112:10 113:3,5
  119:2 124:5,10
  138:18 186:1
  223:3 237:23
  243:17 261:19
  262:15 264:12
**4.375**  40:14
**4.5**  117:5
**4.8**  61:13
**40**  117:4 127:19
**400**  7:19 73:1
**42**  79:2
**437**  32:17
**45**  117:5,5
**450**  3:5
**450,000**  117:12
**47**  37:9 79:2 96:5
  97:18 115:1,3
**48**  70:2 79:2 82:25
  113:14 214:5
**49**  95:24 96:2,4,7

**5**

**5**  39:6,7 56:14,15
  83:6 124:5,11
  128:10 138:18
  170:19 171:21
  185:25 189:7
  201:14
**5.5**  30:25 40:16
  45:16,21 46:8,14
**5.6**  170:22 184:10
**50**  70:2 223:5
  265:24
**50.1**  79:1
**500**  70:14
**501**  7:3
**510**  163:5 164:4
  166:22 186:25
  194:5
**524**  186:5 237:23
  243:17
**526**  163:11
**52nd**  6:16
**533**  97:11 98:22
**536**  102:11
**544**  33:3
**55**  4:10
**55,000**  155:16
**550**  67:5
**569**  143:11
**57**  55:11
**57-259**  28:12
**570**  5:19
**58**  43:16 55:7
**5th**  176:22

**6**

**6**  100:17 157:21
**60**  222:8,10,15,17
**606**  33:3
**61**  55:4
**614,000**  45:4
**620-621**  33:3
**63**  83:10

**636** 147:11
**64** 97:11
**642** 128:11 147:11
**645** 148:5
**648** 128:11
**67** 83:9
**699** 72:20,24
**699.1** 36:9
**6:03** 275:14
**6:09** 224:5
**6:30** 224:24
**6th** 128:11

**7**

**7** 8:3 28:20,22
  29:23 30:17,20,23
  38:5 42:10 49:4,6
  49:14,18 50:15,23
  51:9,16 52:4
  54:22 55:16 56:20
**7.48.** 81:17
**700** 7:19
**718** 85:6
**72** 71:5
**729** 99:19
**74** 97:11 98:22
**75** 57:17 69:5
**75,000** 57:16 69:1
**76** 160:2
**79.17** 83:1
**79.25** 83:4
**7th** 221:25 222:4

**8**

**8** 39:7 150:7 158:8
**8/13** 55:4
**80** 44:12 45:14
  47:13 52:6 100:21
**80s** 216:19
**825** 143:11
**843** 147:11 148:5
**85** 100:21
**850** 4:3
**86** 6:9

**8th** 220:2 222:2

**9**

**9** 33:15,24 35:7
  71:5 223:3
**9.1** 184:10
**9.10** 170:6
**9.9** 102:8
**90** 40:6 52:7
  101:11
**9006** 157:18
**9019** 30:14 51:20
  99:21 100:4
**91** 101:11,14,19
**911** 84:24
**95** 97:19 148:8
**99** 188:23 190:12
**9th** 202:22 222:2

**a**

**a.h.** 93:25 94:14
**aaron** 9:18
**abate** 48:4
**abatement** 37:4,6
  37:9,16,22 38:3
  46:3 73:25 84:17
  86:25 87:1 104:5
  105:3 109:14
  125:22 128:21,24
  136:19 137:16,20
  138:6,9,19 139:2
  142:8,16 172:13
  206:21 212:24
  215:24 217:10,12
  217:14,18 218:7
  228:3
**abby** 9:23
**abide** 265:10
**ability** 42:1 65:8
  109:21 140:9
  157:24 166:3
  169:6 192:13
  201:11,15 209:5
  217:22

**able** 35:9 40:10
  60:14 71:20 79:19
  92:13 106:13
  108:22 117:16
  118:10 126:13
  127:24 136:23
  144:22 154:16
  158:11,14 166:17
  192:12 197:6
  206:19 219:6
  236:18 254:21
  255:10 258:12
  268:24 269:14
**abrams** 9:4
**abrogate** 135:15
**abrogated** 143:10
**abrogates** 143:1
  143:16
**absence** 65:24
  117:19 180:4,9
**absent** 85:14
  151:1 228:9
**absolute** 155:3
**absolutely** 17:8
  70:1 135:8 204:7
  265:18
**absorb** 35:17
**abundance** 225:9
**abuse** 106:6
**abused** 215:4
  221:16
**abusing** 209:14
**academic** 51:18
**accept** 41:22 49:3
  70:6 83:2,5
  133:14 134:10
  193:10
**acceptable** 56:4
  151:5
**acceptance** 130:4
  130:13
**acceptances** 178:9

**accepted** 47:17
  49:8 52:7
**accepting** 82:22
  171:16
**access** 79:11
  158:12,14 169:17
  201:12
**accessibility**
  271:10
**accident** 247:9,15
  247:24 272:4
**accommodate**
  256:6
**accomplish** 21:22
**accord** 32:1 41:8
**accorded** 92:2
**account** 31:1
  45:23 46:19 49:10
  49:17 50:16 56:23
  71:8 83:11 96:18
  96:20 100:9
  112:17
**accurate** 159:16
  168:21 276:4
**accurately** 71:20
**accutane** 213:23
**achieve** 103:5
  140:2
**achieved** 118:5
**achievement**
  103:22
**achieves** 98:20
**acknowledge**
  54:15 55:11 62:3
  65:4 107:25
**acknowledged**
  59:3 125:25
  182:23
**acknowledges**
  125:16
**acronym** 106:1
**act** 57:2,2,2,3
  81:19 94:3 136:7

136:14,22 152:12
154:23,24 208:17
**acted** 112:18
251:24
**acting** 208:12,17
208:18 209:1,4,13
209:15 211:14
216:23 237:15
250:5 255:2
**action** 71:9,15,18
71:19 74:6 123:17
165:11 179:18
183:12 232:9
237:12 240:11,14
241:10 242:9
248:1 252:1
260:16 261:21
267:21
**actions** 60:11 87:9
87:10 124:16
135:21,22 140:10
168:5 169:3 195:2
221:23 256:12,13
260:19 261:18
262:6,11
**active** 153:10
**activities** 268:7
**activity** 115:7
244:24 259:14
**actors** 235:16
239:1
**acts** 76:18
**actual** 22:9 26:5
26:11 33:17 39:1
75:19 91:16
157:25 158:16
159:20,23 225:1
240:15,16,17
241:8,14,15 247:7
248:24 249:15
267:8,16 268:8
269:3

**acute** 209:2,4
**ad** 4:16 6:15 7:9
7:17 50:11 95:9
95:15 137:12
148:11 155:15
162:20 167:12
169:15 202:22
**ada** 241:2
**adam** 11:15 15:1
**add** 23:18 26:2
36:3 42:11 48:9
92:17 176:17
181:19 192:25
271:23
**added** 25:16
101:15 130:12
138:2 181:17
190:4 194:16
198:25 232:2
**addicted** 212:18
**addiction** 151:21
151:21,23 214:15
**addictive** 226:1
**addicts** 153:9
**adding** 258:7
**addition** 28:19
82:1 174:11
233:14 257:5
261:12 271:22
**additional** 18:1
104:4 148:20
164:2 169:22
225:8 227:13
260:24
**address** 23:9,21
25:12 61:8 66:16
75:19 80:7 84:7
96:11 115:24
131:6,10 142:22
154:6 155:20,23
158:2 159:3 163:8
171:22 173:9
174:17 176:9

186:14 187:4
188:22 200:25
201:16 202:18
203:20 204:24
210:5 240:4
242:25 245:8,10
246:10 254:14
256:6,20 261:8
268:23
**addressed** 38:19
132:7,8 149:11
155:5 162:8 173:7
202:9 203:19
227:17 244:11
260:5
**addresses** 154:6
174:9 189:7 232:5
267:5
**addressing** 25:10
30:2
**adequate** 146:19
147:21 153:22
196:21
**adequately** 71:12
110:15
**adhansia** 250:16
250:18,19,19,22
250:22,24,25
251:1,6,9,13
252:4
**adjudicate** 64:8
**adjudicated**
261:17
**adjusted** 107:15
**adjustments**
112:16
**administering**
122:17 123:6
**administration**
106:6 156:15
**administrative**
262:16

**administratively**
262:9
**administrator**
157:19 158:7
161:16
**admiral** 175:9
178:25
**admiration**
272:16
**admission** 98:16
100:2
**admissions** 97:4,4
99:25
**admits** 124:7
**admitted** 99:9
101:24 102:16,19
102:19,24 104:6
266:3
**admittedly** 23:10
249:24
**admonition** 20:6
240:7
**ads** 159:19
**adult** 41:18
**adulterate** 208:22
**advance** 102:13
**advancing** 48:20
**adversaries** 178:5
**adversary** 147:1
164:14 165:12
168:20 176:19
177:25 183:10
184:5 185:18
186:18 192:8
196:11,24
**adverse** 64:2
**advertise** 182:16
**advise** 17:7
**advised** 124:9
**advisors** 25:7,9
**advisory** 173:22
174:3

advocate  16:24
advocated  96:19
  266:6
advocates  225:6
afanador  5:16
  120:23
affairs  221:8,11
affect  134:13
  155:22 156:14
  177:4 191:11
affirm  253:23
  254:1
affirmative
  123:14
affirmatively
  122:25
affirmed  93:25
  254:2 262:23
affixing  58:25
afforded  107:7
affront  109:2
afield  121:19
afternoon  144:23
  145:23 162:25
  163:2 167:11
  229:23 233:7
  235:15 236:16
  240:1 256:25
  257:2 272:24
age  219:25 226:4
agencies  213:2
agency  105:16
  242:3
agenda  16:22
  19:14 28:1 79:21
  79:25 80:6
agents  232:23
aggravates
  152:25
aggregate  40:11
  61:12 62:13
  106:13,21 182:25
  191:2 192:14

ago  68:18 79:19
  124:17 177:21
  208:8 212:11
agree  22:2 30:15
  31:18 58:9 75:22
  95:25 96:2 105:5
  111:23 114:5
  116:6 119:8
  127:24 132:13,15
  135:12 169:22
  176:13 199:22
  201:9 207:15
  223:2 239:12
  247:12
agreed  16:16
  35:11 38:2 40:15
  72:11 92:25 93:2
  93:8 152:13
  169:19 227:14
  234:2 236:12
  261:8 269:24
agreement  109:20
  117:20 127:25
  229:17 236:24
  237:10 253:6
  257:10,12,18,22
  257:23 258:4
  271:22 273:21
  274:7
agreements  55:17
  56:19,21 179:3
agrees  112:12
  201:6
ahc  31:19 41:18
  49:16 50:9 74:20
  77:24 93:7 163:8
  166:25 227:9
  228:12
ahead  52:1 120:10
  120:20 162:11
  170:2 179:22
  201:1 205:8 211:5
  232:20

aimed  85:24
airways  131:16
aisling  13:9
akin  77:11 220:18
  224:24
al  7:4 16:3,12
  219:21 240:10
alabama  70:19
albeit  58:17 59:10
aleali  9:5
alert  152:7
alex  55:13 57:5,11
alexander  12:11
alfano  9:6
aliquot  138:6
allegation  123:16
  248:6
allege  43:17 81:13
alleged  147:15,23
  207:8
allen  5:22 120:8
  120:21,22
allies  137:11
  167:4
allison  15:17
allocate  16:16
  102:21
allocated  20:24
  144:20 262:4
allocating  199:6
allocation  27:14
  34:3 53:20 70:17
  91:2 92:23,25
  95:7,21 97:21
  103:19,20 110:23
  111:8 114:23,24
  127:20,24 128:21
  129:15 132:24
  138:14 142:8
  262:2 264:6
allocations  33:7
  83:17 142:20

allotted  80:1
allow  74:4 94:24
  108:2 109:15
  153:21 154:11
  157:17,20 210:19
  258:4 261:21
allowance  156:12
allowed  130:25
  162:3 206:16
  262:10,17
allowing  153:10
allows  103:18
alongside  35:7
alter  50:20 149:1
  194:12 200:9
  237:14 242:3
  243:8,23 244:4
  250:6
alternative  30:17
  31:25 41:4 45:18
  46:12 68:12 78:7
  265:18
alternatively
  51:23
alternatives  44:14
  210:8 212:9
amazing  89:17
amended  16:5,14
  18:14 20:8 94:25
  124:8 176:15,24
  229:4 233:18
  257:23
amendment  94:24
amendments
  258:15
america  37:4
  109:24 220:19
  221:17
american  125:21
  130:6,12 138:1
  151:24
americans  37:4

**americas** 4:17
7:11
**amount** 49:12
53:15 62:13 75:3
93:24 94:10 99:18
106:25 107:1
112:4 115:6 127:3
160:15 206:8
218:5 250:17
274:6,21
**amounts** 92:5
94:21 153:16
**ample** 36:13
**amplify** 111:1
**analogous** 42:8
74:6
**analysis** 30:9
31:17 36:7,17,19
47:12 50:20 51:20
53:13 55:4 57:5,8
57:12 61:21 63:7
63:12 65:11,22
71:22 89:21 93:25
94:8 135:18 137:5
241:23 242:1
**analytic** 28:14
**analyzing** 77:6
**anatomy** 214:13
**andrew** 6:19 8:23
9:6 13:8 272:9
**angela** 11:17
**angers** 69:10
**anker** 8:6 9:7
162:22 174:21,25
174:25 175:4
178:22 179:8,23
180:3 187:14,21
188:2,6,22 191:17
192:3,8,21 193:5
193:17,19 194:9
195:11,13 196:2
196:20 197:16
198:3,11,23 199:5

199:18 200:6,14
200:21 201:6,9
202:8 203:23,23
204:8,17 274:18
**anker's** 200:25
201:2,16
**ann** 12:9
**announce** 19:11
**announcement**
145:17
**anoints** 208:1
**anomalous** 113:24
**answer** 18:6,7
26:25 28:21 77:2
92:23 95:21
102:20 129:10,11
129:12 207:4
227:4 231:3,23
233:13
**answers** 92:24
**ant** 55:6
**antagonists**
206:20
**anti** 190:15,16
**antipathy** 44:25
**antitrust** 101:22
108:17
**anybody** 17:1
35:18 78:9 93:4
129:2 156:5
157:24 162:1
232:12
**anymore** 24:21
264:25
**anyway** 120:11
211:7 216:2 219:3
219:19,20 265:5,9
**anyways** 201:19
**apart** 35:14
106:18 259:13
**apologies** 16:6
72:6 188:24

**apologize** 16:8
25:20 43:2 141:17
146:6 175:4
182:22 192:22
193:12
**apology** 37:19
**apparently** 78:6
140:24 208:4
**appeal** 147:19,22
253:24 262:23,23
**appear** 104:15
151:10
**appeared** 166:15
174:15
**appears** 120:14
272:5
**appendix** 33:24
**appliable** 163:7
195:2
**applicability**
194:19 228:7
**applicable** 130:18
164:5 262:7
269:20
**applied** 238:10
255:13
**applies** 26:9 51:21
94:9 113:3 154:24
188:17 198:17
264:7 269:2
**apply** 24:21 30:13
36:15 68:16 100:5
119:1 128:24
136:7 138:8
183:21 239:6
262:25 263:20
264:9 269:15
**applying** 30:12
106:12
**appointed** 74:18
251:3
**appreciate** 27:3,4
50:2 69:13 112:5

130:21 131:5
140:13 144:10
156:19 207:22
218:9,11 256:15
**appreciative**
104:25 140:1
**approach** 92:4
**approached**
246:19
**appropriate**
24:17 70:1 93:24
156:22 159:12
162:10 163:6
166:22 169:14
171:4 178:10
271:12 272:20,21
**appropriately**
87:22
**appropriates**
106:14
**approval** 267:18
**approve** 198:19
211:10
**approved** 35:22
100:8 122:14
148:15,22 211:8
211:10 227:21
250:22
**approving** 156:4
166:20 258:18
**approximately**
83:8,18
**aptly** 86:23
**arbitration**
169:11 174:14
179:3,13,16,21
181:10,13 186:19
**archetype** 43:25
43:25
**ardavan** 10:13
**area** 104:18
**areas** 88:25
107:24 213:9,12

**arenas** 221:10
**arguably** 49:15
  73:7 235:18
  241:18
**argue** 38:8 44:21
  50:19 60:15 70:3
  73:17 87:13 95:10
  99:21 107:8
  114:22 121:21
  146:18 153:1
  164:9 168:11,17
  168:20 169:5
  178:12 179:11
  184:21 191:1
  192:13 268:10
**argued** 18:2 19:7
  31:19 50:8 89:13
  89:13 115:9 119:6
  137:11 168:8
  186:10
**argues** 114:12
**arguing** 73:8
  80:17 88:18,19,22
  180:22 186:5,6,8
  190:6,24 236:19
**argument** 16:4,13
  19:13 27:7,15
  29:10,21 38:5,20
  41:9 43:4,14
  46:19 49:1,24
  50:5 52:6,17 54:7
  55:19,21 61:8
  67:18 69:25 76:12
  79:6,22 84:11
  87:5,20 88:7,15
  90:12,21 91:11,13
  91:17,19,23 99:24
  104:12 105:9
  106:20 113:9
  120:15 124:3
  130:10,14,14,16
  132:2 140:20,23
  145:15 146:2,2

149:19 150:17
  155:19 170:18,19
  171:16 193:6
  198:1 204:19
  226:23,25 229:5
  235:23 256:16
  261:8,15 263:22
  274:22 275:9
**arguments** 95:3
  106:17 107:9
  115:22 121:4
  139:4 164:13
  202:18 228:10
  229:14 240:3
  257:7
**arik** 8:25 220:21
  224:23
**arises** 190:23
**arising** 82:5
  194:24 230:15
  231:15
**arm's** 181:22
**arose** 82:4
**arranged** 89:22
**arrangement**
  163:19
**arranging** 92:10
**arrived** 68:23
**arrives** 160:24
**artem** 14:20
**article** 135:10
  150:2,7 223:3
**articulated** 50:20
**asbestos** 32:12
  147:18,20 172:14
  254:4
**ascertain** 55:9
  61:15
**ascertainable**
  150:25
**aside** 96:11
  129:25 133:16
  187:23

**asked** 25:19 28:2
  60:13 63:3 68:18
  111:20 116:15
  129:19 138:4
  141:2,25 176:13
  176:16 178:25
  179:11 204:20
  221:18
**asking** 58:23
  105:7 109:8 110:9
  114:19 160:23
  161:8 162:5 182:4
  182:6 184:2
  189:13 190:2
  195:17 198:16
  225:19 230:14
  254:13 256:9
**aspect** 65:11
  90:21 128:21
  135:11 143:8
  199:25 201:7
  267:12
**aspects** 27:9 93:20
  133:23 138:19
  162:17,18 164:12
  201:13 203:2
**assert** 35:14 38:22
  56:20 61:17 81:18
  81:22,24 91:11
  125:6 135:1
  143:14 147:8,23
  148:3,13 164:11
  232:12
**asserted** 26:17
  32:16 55:16 61:24
  63:22 74:24 77:14
  89:7 136:1 173:19
  232:12 252:9
**asserting** 55:10
  61:16,22 62:20
  147:13 244:1
**assertion** 143:5

**assertions** 160:6
  160:11 164:14
**assessing** 45:3
**asset** 45:25 169:23
**assets** 40:9,21
  42:2 64:5,22
  65:21 77:1 90:16
  90:20 121:14
  122:17 123:3,6,21
  136:11 139:8
  140:5,5 142:12
  168:7 169:7 171:8
  173:16 182:25
  226:16 259:1
**assign** 32:4
  180:16
**assignment**
  163:20 173:13
  179:9 184:12
  190:15,16
**assisting** 17:21
**associated** 77:18
  105:7
**association**
  220:14
**associations**
  217:23
**assume** 40:10
  47:13 63:3 203:24
  204:2 272:4
**assuming** 61:17
  90:11 229:6
  257:25
**assumption** 31:21
  61:20 62:19 66:5
  74:2
**assure** 205:8
**astray** 161:7
**atinson** 9:8
**atkinson** 47:2
  77:8
**attached** 127:13
  135:1 257:25

**attaches** 77:9
**attack** 64:12
**attempt** 55:1,8,18
  61:15 91:8 94:1
  95:4 109:2 142:18
  147:9 148:4
  175:25 178:3
  232:13
**attempted** 55:14
  147:19
**attempting** 17:3
  23:4 233:17
**attend** 271:21
**attention** 220:21
  257:8
**attenuated** 56:22
  57:13
**attorney** 3:4 5:1,2
  6:1,2 7:1 96:23
  97:1 101:18 102:3
  104:13 215:15
  220:21,21 221:1,2
  221:9,11,11,21,25
  222:1,3 225:8,16
  225:16
**attorney's** 6:8
**attorneys** 3:16 4:2
  4:9,16 5:2,10,17
  6:15 7:2,9,17 8:2
  8:9 41:17 88:8
  92:8 97:22 220:10
  221:22 224:21
**attribute** 126:19
**attributed** 245:1
**audio** 16:7
**audit** 224:17
**august** 1:16 2:1
  35:7 44:10 71:4
  160:2 203:15
  276:25
**augustus** 161:10
**auslander** 9:9

**authorities** 87:11
  218:1
**authority** 23:1
  66:19 86:1,3
  135:10 157:19
**authorization**
  173:23
**authorized** 180:6
  180:7,21 232:22
**authorizes** 173:15
  180:17
**automatic** 261:22
  262:19 265:19,21
  265:22
**available** 33:23
  56:20 60:9 160:7
  212:11 227:4
**ave** 7:19
**avenue** 3:5 4:17
  7:11 8:11
**average** 32:16
**avoid** 93:2 153:3
**avoidance** 123:17
  135:21
**avoiding** 46:6
**award** 172:19
**aware** 61:23 90:4
  92:14 98:7 147:5
  147:7 201:22,25
  227:22 270:23
  271:17
**awoken** 220:4

**b**

**b** 1:21 33:25 34:2
  39:6 82:24 109:10
  130:15 137:7
  184:17 223:7
  234:19 261:19
  262:15 264:12,21
**b.r.** 32:17 33:3
  66:11 97:11 98:22
  102:11 143:11

**babcock** 172:4
**back** 17:8 25:21
  26:19 34:20 47:7
  47:10 50:8 78:23
  89:14 97:18
  106:16 109:8
  110:10,13 112:3
  127:10 131:15
  135:11 144:24
  145:9,21,24 167:7
  178:7,8 193:21
  196:7,14 197:1
  198:21 201:21
  202:22 203:14
  208:11 210:13
  217:3 226:3
  232:15 237:17
  238:8,18 251:14
  251:15 255:4
  264:23 265:9,18
  267:18 268:18,22
**backdoor** 26:19
  270:9
**backdrop** 23:14
**backing** 259:15
**backs** 157:13
  198:8 225:14
**bad** 97:23 99:11
  110:8 156:24
  175:6 210:13
  241:13 249:16,20
  249:23
**bag** 110:16
**bailiwick** 64:25
**balance** 98:2
  100:22 103:17
  207:13 256:8,11
**balancing** 157:5
**ball** 9:10
**ballot** 206:7,14
**ballots** 124:10
**baltimore** 6:4

**bank** 220:19
**bankruptcies**
  189:18
**bankruptcy** 1:1
  1:11,23 28:10
  45:9 59:25 63:9
  63:12 64:5,18,20
  64:21 65:11,12,16
  65:20 66:3,10
  76:22 78:2 90:14
  98:7,21 99:4
  100:2 107:2
  111:17 113:16
  123:13 130:3,18
  133:17 135:7
  142:15 143:3,15
  143:19 147:19
  148:2 150:7
  164:20,23 165:1,2
  166:18 168:1
  169:4,9 170:12
  171:5,10,20
  173:15,18 175:20
  177:9,23 178:1
  182:2 183:5 186:6
  186:23 188:14,20
  188:22,24,25
  189:3,12,17
  190:25 191:1
  195:1,6 196:8,15
  198:5 211:25
  224:13,17 225:17
  237:17 255:12
  260:16 262:13
**banks** 151:17
**bar** 146:23 148:17
  153:23 157:15
  161:14
**baranpuria** 9:11
**bargain** 253:7
**bargained** 252:17
  253:2

**bargaining** 22:4
**barker** 9:12
**barred** 147:12
**barrel** 214:20
**barrier** 155:3
**bars** 169:21
**base** 66:13
**based** 21:3 29:25
  32:14 42:7 53:20
  56:21 57:5 58:23
  60:3 71:13 88:7
  89:8 90:17,18
  96:22 100:11
  103:21 105:9,11
  105:11 108:6,23
  109:9 110:5
  116:17 132:22
  168:18 169:3
  172:13 180:8
  181:22 201:5
  203:2 212:25
  237:24 240:12,15
  241:23 249:15
  262:2 264:5 268:5
  268:20 275:7
**basic** 80:15
  176:10 178:11
  188:9
**basically** 18:20
  29:11 65:21 72:11
  83:2 93:2 152:13
  173:24 198:13
  200:17 264:24
**basis** 27:8 57:11
  67:14 87:13 95:7
  107:5,15 127:25
  128:6,9,16,17
  132:21 143:6,8
  156:18 164:19
  182:25 192:14
  244:8 270:4,4,5
**beacon** 223:4,9,12
  223:13,15,17,18

**bear** 124:16
  261:11
**bears** 52:22 231:8
**beat** 131:22 203:7
**beaucoups** 211:2
**becoming** 63:11
**began** 47:25
  219:23
**begged** 221:1
**beginning** 71:5
  222:13 229:5
  241:10
**begins** 20:14
**behalf** 16:21
  21:20 42:17 43:3
  43:5 48:7 74:17
  77:12,15 80:3
  95:15 120:22,23
  147:4 153:8
  155:15 162:23
  163:1,8 166:25
  179:11 224:7,11
  234:5 240:1 246:5
  249:13 261:14
**behavior** 254:6
**beiderman** 11:16
**belabor** 134:7
  271:11
**belatedly** 149:2
**believe** 17:4 21:11
  23:16 24:11,20
  27:25 37:11 40:1
  43:24 46:4 47:1
  47:19 54:2,2 64:7
  64:9 69:10,12
  78:8 80:10 83:24
  88:16 93:9 107:6
  112:2 119:3,4,7
  133:22 140:8
  146:2 149:11
  163:6 165:12
  166:21 181:4
  192:3 195:21

199:18 202:2
  203:14 217:12
  232:5 247:13,13
  247:14,19 250:10
  259:2,2 260:24
  273:11 274:24
**believed** 94:25
  198:7
**believes** 78:7
**belong** 87:7
**bench** 273:11,15
**beneficiaries**
  123:25 223:17,25
**benefit** 47:6 56:8
  56:13 75:10
  103:22 220:16
  223:6,7,16,21
**benefiting** 211:21
**benjamin** 3:9
  264:16
**bereaved** 221:7
**beretta** 85:21
**bermuda** 169:11
  174:14
**bernard** 10:13
**bernstein** 30:9
  32:12 50:3
**bernstein's** 50:3
**best** 18:11 19:1
  28:2,6,24 29:9,13
  29:22 30:3,12
  31:16 38:19,22
  39:16 42:16 43:13
  43:24 45:6 46:11
  47:3,9,14,22 48:5
  48:24 52:8,11
  53:2,7 62:1 66:7
  66:14,21 68:9,14
  69:23 73:24 74:19
  77:5 103:6 110:19
  175:7 212:17
  217:19 226:18
  256:5 273:14

**better** 29:13,16
  31:24 38:23 40:23
  41:4 44:7 45:8,12
  48:1 61:10 70:10
  70:11,12 76:10,23
  78:7,11 89:19
  102:8 103:2
  142:25 174:20
  246:9
**bevy** 72:23
**beyond** 20:23
  32:3 38:25 51:20
  64:18 65:14 74:1
  121:8 229:17
**bfp** 79:14
**big** 18:4 39:13
  113:7 114:5
  213:12 215:13
  224:6
**bigger** 46:14
  213:15
**biggest** 215:12
  216:23
**bill** 222:11
**billion** 30:25
  32:15 34:14,14
  35:12,21 36:1
  40:13,14,16 45:16
  45:21 46:8,15,20
  46:21 61:13 72:12
  72:21 76:9 79:1
  116:2 117:5
**billions** 31:2
  33:25 35:13 38:5
  38:6,10 40:15
  41:14 45:25 46:5
  47:22 86:21
**binding** 164:6,15
  165:7 173:5
**birmingham** 7:4
  161:15
**birth** 214:1

**birthday** 220:2,3
**bit** 28:3 100:20
  122:20 123:7
  144:21 145:2
  188:7 203:5
  230:18
**blabey** 9:13
**blackline** 26:15
  180:4 197:6
**blankie** 223:8
**bldg** 5:4
**blight** 116:16
**blites** 108:1
**block** 148:4
**blocking** 74:13
**bloomberg** 224:4
**bloyd** 7:2 146:3,4
  146:14,23 149:12
  149:13,14,25
  153:7 155:4
**bloyd's** 152:10
  154:14
**blue** 220:13,13
**board** 248:17
  250:23 251:2,20
  255:2 269:16,17
  269:23 270:1,2,6
**board's** 41:21
**boat** 274:19
**boca** 220:17
**bograd** 9:14
**border** 129:3
  132:10 137:23
  141:25
**bore** 220:2
**born** 221:17
**bottle** 214:20
**bottom** 127:12
  242:2
**bowing** 121:15
**box** 7:3
**brauner** 9:15

**brave** 225:6
**breach** 90:17
**breadth** 27:8,9,18
  229:9,12 258:24
  260:9
**break** 27:22
  144:14 145:1,17
**breakthrough**
  209:12,16
**brian** 6:6 12:22
  233:8
**bridge** 38:4
**bridgeport** 4:4
**bridges** 7:2
  144:17 146:4,15
  149:12,25 150:10
  153:7 155:4
**bridges'** 146:21
**brief** 31:19 42:5
  42:20 50:8 54:6
  54:19 61:9 64:13
  66:23 68:5,15
  70:9 84:11 85:8
  85:20 87:8 88:13
  91:6,24 93:12,14
  93:21 94:15 120:4
  120:13,16 189:24
  196:24 227:3,16
  227:17,18 233:23
  261:15
**brief's** 91:11
**briefed** 188:20
  189:14
**briefing** 182:9
  183:23,25 184:6
  184:18 185:22
  186:20 190:2,10
**briefly** 48:25
  66:16 79:25 84:7
  140:18 148:14
  159:3,7 171:22
  261:4,8 264:15

**briefs** 228:10
**bring** 48:3,3 70:8
  86:10 87:9 97:7
  107:9,12 110:9
  118:22 122:19
  133:11 188:11
  226:3 251:14
  257:8 267:20
**bringing** 85:24
  150:4 242:15
**brings** 20:1 28:1
  44:3 183:2 272:7
**broad** 5:19 27:12
  165:4 206:17
  232:8 234:9
  235:12,13 249:25
  259:2,5
**broader** 25:23
  244:6 246:14
  249:14
**broadest** 118:22
**broadly** 256:11
**broadway** 5:11
**brooks** 9:12
**brother** 73:22
**brothers** 225:22
**brought** 20:3
  76:24 85:4 88:20
  88:23,25 89:4
  123:13 125:11
  246:17 255:8
  268:14
**brown** 9:16
**brunswick** 9:17
**bryant** 220:19
**bryce** 10:22
**building** 209:18
  209:18
**builds** 160:4
**built** 158:9
**bunch** 92:24
**burden** 52:23,24
  53:2 66:7,20,21

66:24 70:7,16
  73:10 89:12
  266:20
**burdens** 262:14
**bureaucracies**
  213:2
**buried** 158:4
**business** 69:8
  142:5
**businesses** 259:1
**butcher** 182:22
**buyer** 55:17 56:20
  56:20

## c

**c** 3:1 10:1,9 12:7
  12:23 16:1 39:7
  52:15 70:24 276:1
  276:1
**cabin** 259:9
**cabined** 249:10
**cahn** 9:18
**calculate** 152:15
**calendar** 273:14
**california** 53:4
  80:10 81:21,23
  86:18 102:2,8
  106:24 107:13,25
  109:8,22 111:25
  112:2,19,21 113:8
  113:25 114:5,21
  114:24 115:9,21
  116:12,23 118:6
  118:16 183:22
  220:12
**california's** 113:7
  114:6 118:17
**call** 23:22 24:23
  26:18 27:13 84:24
  106:24 166:1
  173:22 234:3
**called** 84:1 141:23
  153:24 221:25
  224:24

calls 219:1
camera 219:13
canada 122:17,18
  123:18,21 127:1
  127:14,17 129:4
  136:18 138:15,25
  139:4 140:10
  141:19,23,23,24
  142:4,6,11 267:6
  268:10 269:17,18
  269:19,20,21
  270:1
canada's 123:18
canadian 5:17
  119:23 120:12,24
  120:24 121:5
  122:18 123:7,20
  123:23 124:4,12
  124:23,23 125:3,4
  126:3,13,20 127:1
  127:7 129:5 133:6
  133:8,13,18,25
  134:10 136:10
  137:19 139:1,6,11
  139:15,16,18
  140:5,8,10 141:3
  142:7,11,12 267:5
  267:6,21,25 268:2
  268:9,11,21 269:5
  269:10
canadians 124:9
  124:18 125:10
  139:12
canard 74:13
candidate 175:11
can't 146:20
  158:23 165:10
  168:10 172:10
  184:20 188:11
  196:14 197:2
  200:12,13,18,20
  208:15

capable 32:10,19
  37:1 44:2 55:20
  66:6 69:23 150:13
capacities 230:23
capacity 110:1
  230:20 231:5,14
  247:21,22 248:1
capital 223:20
  268:12
capitol 5:4
caplin 3:15
capture 245:5
car 247:9,15,18
  247:24,24
card 213:22,24
care 85:10 220:18
carefully 105:15
  117:2 238:7
caremark 220:14
caroline 10:24
carrie 8:18 205:18
carrier 185:19
  190:22
carriers 179:11
  179:12 183:16,16
  183:17 185:10
carriers' 183:17
carter 256:19,22
carve 23:23 24:4
  27:6 107:13 109:8
  109:23 110:11
  145:7 238:13
  240:14 250:4
carved 22:24 24:5
  24:6,18 25:6
  112:19 251:10
carveout 106:24
  165:25 255:24
carving 26:17
case 1:3 7:8 19:21
  20:3,21 29:2,11
  30:5,6 32:12 36:9
  38:2 40:25 42:14

46:11 51:4 52:4
  55:13,16 57:8
  58:17,20 61:17,24
  64:1,13 70:13
  73:20 78:15,19
  82:8,11 83:4 85:6
  85:12,23 92:5,16
  93:5,23 96:24
  97:11 98:22 99:17
  104:2 105:8 122:5
  122:8 123:9,16
  124:14 128:10,12
  131:15 132:19
  134:12,21 135:14
  135:16,17 136:9
  140:2,3,12,14
  143:9,10,11 144:5
  144:8 148:7 150:2
  150:3,4,5 151:14
  151:16,20,20
  152:9 154:9
  155:15 163:22
  166:6,13 172:4,9
  175:19 180:12,13
  180:14,19 184:25
  186:17,21 189:6
  195:21 196:11,15
  196:17 198:15
  206:25 215:20
  217:17 219:21
  225:10 226:17
  231:11 238:9,17
  239:14 244:8,19
  245:20 248:12
  249:4,6,8,9,9
  251:23 252:9
  253:20 256:9,10
  256:19 258:14
  260:14,17,21,22
  262:11 264:24
  266:10,21 271:2
  272:14 273:6

caselaw 90:13
  170:19 197:9,15
cases 32:4,7,11
  47:25 50:1,15,21
  51:5 58:1 64:12
  65:15 69:15 77:11
  82:5,12 85:7,12
  86:9,12 89:23
  92:4 93:22 94:14
  100:12 105:2
  143:18 163:20
  166:2,5 171:23
  172:8,11 176:2
  178:6 185:11
  188:14,23 190:12
  191:6 197:8
  201:18 240:13
  273:12
cash 31:1 46:8,21
  106:24 109:23
  128:23 133:21
  138:7
cast 89:18 122:11
categorically
  239:6
category 24:13
  245:11,13
catherine 8:22
  11:16
caught 32:21
cause 101:14
  251:10 252:1
caused 215:6
  226:14
causes 71:8,15,18
  71:19 74:6 237:12
  240:11 260:16,19
causing 260:12
cavil 38:25
cede 228:19
center 8:3 220:17
  224:10

**central** 46:11
150:19 156:17
157:11
**centre** 8:10
**cercla** 253:2
255:18
**certain** 25:3 74:25
81:16 83:25 88:20
91:12 120:23
136:18 162:17,20
164:8 168:8
174:12 202:1,4
227:12 237:12
**certainly** 17:15
19:16 20:1,5 41:8
44:5 46:12 50:3,4
78:9 89:23,25
94:12 104:1
117:21 128:24
137:1 150:11
152:5 156:11
175:24 250:17
271:7,9
**certified** 276:3
**cet** 35:16
**cetera** 85:3 191:6
207:21 250:7
**chadbourne**
24:14
**chain** 238:15
**challenge** 64:17
84:18
**challenged** 173:25
**chalos** 9:19
**chambers** 6:9
270:21
**chance** 27:2,10,21
110:21 121:21
131:4,10 229:3
258:1
**change** 20:8 24:2
26:21 50:14
103:14 109:9,22

119:14 156:17
171:2 177:6,7,7,9
194:12 197:4,5
222:10 273:16
**changed** 19:3 26:4
106:8,9,10 108:2
117:23 149:5
240:11
**changes** 19:16,17
21:22,23 22:9
26:22 27:4 102:13
229:3,7,21 240:3
257:5 274:17
**changing** 153:17
178:16
**channeled** 172:15
255:9
**channeling**
261:24
**chaotic** 43:15
**chapman** 17:5,7
17:21 18:5 19:20
21:1 273:22
**chapter** 16:5,14
30:23 49:4,14,18
50:15,21,23 51:16
52:5 54:22 55:16
56:20 62:24 65:15
74:8 76:24 77:11
81:17 82:5,12
171:18 185:11
203:3 224:19
225:9 240:13
251:1 271:1
**characterize**
23:11
**characterized**
100:6
**charged** 105:17
**charitable** 223:17
223:22
**charles** 146:4
150:1

**charleston** 5:5
**chart** 53:21,25
70:17 216:11
**chase** 90:12
**chases** 73:14
**chasing** 40:8
**chasm** 38:4
**chassix** 97:11
98:21
**check** 21:9 197:14
**checked** 145:9
**chemistry** 275:6
**cheryl** 220:15
**child** 153:18
**children** 215:6
219:1 221:4
**chip** 22:4
**choice** 45:13 70:4
122:25 134:1,5
**choose** 45:13
**chosen** 45:8
**chris** 155:14
**christina** 13:23
151:7
**christine** 82:23
**christopher** 7:14
8:21 14:1
**chronic** 209:2,23
210:4
**chronology** 183:8
**chubb** 174:3,4
181:3
**chuck** 108:11
**cicero** 9:20
**cir** 128:11
**circle** 3:17
**circling** 217:2
**circuit** 28:17,25
29:1,15 31:15
68:13 94:1 128:9
137:4 143:18
147:21 163:22
166:6 180:18

249:8 256:11
**circuit's** 249:24
**circuit's** 147:10
147:17
**circulate** 273:24
**circulated** 16:17
**circumstance**
136:15
**circumstances**
44:1 82:18 87:8
102:24 151:1
156:1 199:10
246:17,18 250:1
263:19
**cite** 26:14 41:7
50:2 89:23 107:18
123:9 135:17
170:23
**cited** 28:15,19
47:1 64:12 85:8
87:11 94:14
101:19 150:4
172:4,8 189:6
**cites** 72:7 108:7
143:17 170:5
**cities** 80:13 85:8
86:15,25 127:8
140:24
**citing** 100:12
**citizens** 44:15
45:17 46:6 73:24
**city** 85:12,20,24
86:19 124:25
213:12
**civil** 81:23 89:3
241:1 246:23
252:18
**claim** 24:20 26:5
26:12 30:5,6
35:12 37:8 39:2
39:25 40:3,6
42:11 49:8,11,17
50:17 51:11,12

57:6,7 61:20,23
67:5 69:17 76:3
79:1 83:14 91:7,9
92:3 93:20 94:2
106:13 112:11,12
113:13 122:25
123:1,14,17,18
124:14,19,19,24
126:14,24 127:13
131:14 136:8
137:6 143:5 145:8
146:22,24 147:1
153:8,11,20,22
155:20 156:6,10
156:12 157:13,20
157:24,25 158:21
158:22 161:16,24
162:3 185:11
192:5,6,15 206:8
206:16 215:8,14
220:7,24 222:6
231:11 232:11,11
232:12 238:20
242:10 243:23
244:1,6,16,20
249:12,25 250:11
250:12 254:23
255:3,18 263:19
263:21,21 267:17
267:17 268:2,5,8
268:13,13 270:6
**claimant** 38:25
90:16 147:18
205:11
**claimant's** 76:3
**claimants** 7:18
34:19 39:23 40:8
40:10,13 41:4,5
43:13 45:14 67:10
94:5,11 95:16
99:17 122:18
128:8,8 131:17
132:19 146:16

147:20 155:13
159:16,19 167:13
172:16 181:20
191:8,11 192:20
207:3 228:4 254:4
**claiming** 191:14
**claims** 20:11
25:14 26:16 29:14
31:1,3,7,10,16
32:6,8,9,13,16,18
32:23 33:2,10,17
34:6,8,21,23
35:11,13,15,15,15
35:17 36:24 37:1
38:9,21 39:9,17
39:18,20,21 40:1
40:4,6 41:7 42:1,6
42:7,8,9,21 43:23
44:1,8 45:15 49:7
49:18 51:22 53:1
55:3,5,10,15,19
56:5,14,17,17,22
56:23,24 57:1,3
57:11 58:12,13,21
58:25 59:2,9,13
59:16,22 60:15,24
61:1,4,10,11,12
61:16,18,18,22
62:3,4,7,8,11,15
62:20,21,24 63:4
63:6,14,21,23
66:5,19 67:15
69:20,22 70:9
71:10,12,24 73:1
73:2 74:23 75:2,3
77:13,17,18,20
80:20,23 81:2,4,8
81:12,16,18,22,24
82:1,5,6,12 83:24
84:13,20 85:5,9
86:10 88:19,19,20
88:23 90:1,15,17
90:18,20,24,25

91:12,13 92:1,5,6
92:15 94:11,21,23
99:19 122:5,19
123:13 124:21,23
124:24,24,25
125:2 126:20,22
126:25 127:14
128:10,25 131:10
134:23,25,25
135:25 138:3,15
139:15,18,21
145:13 150:21
152:8 153:10
154:12 155:22,23
156:20 157:17,19
157:25 158:6,7
160:15,21 161:22
162:10 163:14,25
164:22 165:20
169:21 172:15,18
172:23,25 187:9
187:24 188:5
191:15 192:2
197:21 198:17
225:20 230:14,17
230:17,17,22
231:3,4,4,9,13,15
232:1 235:8,22
236:23 237:24
238:3 240:23
241:1 242:17,17
243:6,7,9,10
244:12,13 245:15
248:23 249:19
250:11 254:7,25
255:2 259:12
260:4,15,18,18
261:17,25 262:18
263:2,13 264:4
267:4,6,6,8,24
269:3,4,4,6,7,16
270:7

**clarified** 23:6
26:20 195:25
**clarify** 23:7
162:12 202:10
230:11 233:11
235:15 236:1
**clarifying** 230:3
**clarity** 22:10 45:8
**class** 20:21 36:2,8
36:11 49:2,2,7,8
53:11 69:16,18
72:16 82:1,21,22
83:24 84:20 87:22
89:16 90:18 91:9
92:11 93:1 94:17
94:18,25 95:1
100:8 112:11,22
112:23 113:3
124:11 125:19,20
126:4,5,7,11,21
128:10 130:8,12
130:13 131:17,20
131:21 132:1
133:13 137:14,18
138:18 148:9
155:20,22 156:7
156:12,13,20
**classes** 47:19
80:23 90:1 124:5
124:10 125:9
126:2 130:7
**classification**
79:22 80:8,16,19
83:21 84:3 89:5
89:14,19,20,22,24
91:12 128:7 130:3
132:21
**classifications**
84:19 89:12
132:12
**classified** 69:18
80:21 81:3 82:6
82:10,16,21 87:13

87:22 89:1 130:9
133:14 134:2
**classifies** 80:13
**classify** 81:7
82:14 90:17
140:21,24
**claudia** 14:23
**clause** 187:16,17
192:23 241:9,10
**clean** 173:11
246:22
**clear** 17:16 26:3
29:22 32:3,8
72:12 73:8 78:20
79:7 85:7 86:2,14
96:12 108:10
110:5 111:9
116:11 118:23,25
119:1 125:24
127:20 128:18
131:10 133:8,25
152:6 156:23
163:23 165:21
174:6 176:17,22
180:20 190:3
193:5,7 198:25
200:9,19 201:4,5
202:5,23 204:1,12
206:14 207:5,7
217:20 231:24
233:18 236:2,10
237:1,1,9 238:17
239:13 242:11
243:15 245:14
246:3 251:4 253:7
258:15 260:23
262:17 263:17
268:15,24 271:20
**clearer** 90:13
236:13
**clearly** 25:25
45:14 80:4 94:9
99:22 124:22

133:5 184:19
217:5 226:12
240:18 245:13
250:7,16 269:15
**clerk** 82:23
**clerk's** 271:8
**clerks** 204:23
**client** 138:12
178:2,3 182:13,13
**client's** 138:2
**clients** 44:22 69:7
69:24 78:10 91:8
122:3,4 124:6
126:1 129:22
130:9 136:8
137:15 139:14
140:12 147:7,15
148:7,7,12,23
179:7 180:13
195:23 251:20
253:1 266:16
**clients'** 160:6
**clint** 10:8
**clock** 17:20 18:24
**clone** 226:3
**close** 32:11 36:3
45:15 95:23 138:7
239:3
**closed** 183:25
**closely** 108:8
234:11
**closing** 150:17
270:25
**clouding** 22:17
**club** 7:3
**clue** 183:10,13
**coalition** 35:25
125:7
**coast** 175:5
**code** 51:13 81:17
81:23 90:14 96:10
96:12 98:21 99:14
123:13 130:3,19

133:17 135:7
136:3 143:3,4,15
157:6,12 158:1,19
158:20 164:20
165:1,2 166:19
170:12 171:5,6,19
173:15 186:6
189:12 190:25
191:1 195:1,6
260:16 262:14
**code's** 173:23
**cogently** 85:19
**cognizant** 84:10
232:24
**cohen** 88:2
**colander** 206:6
209:25
**coleman** 9:21
**collaboratively**
109:18
**collateral** 196:16
**colleagues** 26:7
95:19 109:5
111:18
**collect** 140:9
**collectability**
77:21
**collecting** 65:9
77:19
**collection** 41:10
43:19 56:25 57:3
**collective** 198:5,7
**collectively** 44:5
181:17,20 182:12
183:1 192:23,25
193:7 198:25
**colloquial** 190:8
**colloquies** 28:9
**colloquy** 18:17
25:15 78:1 231:22
**colorable** 67:5
**columbia** 48:20
53:5 80:9 83:3

88:3
**combinations**
233:24
**combine** 214:18
**combustion** 166:2
190:12
**come** 23:17 40:13
47:10 65:20
106:23 107:17
110:25 127:6
136:19 138:6
143:22 144:24
145:21 157:17
158:23 167:7
189:19 191:16
200:16,18 217:16
218:5 238:8
243:25 244:16
255:12 266:13
267:18,20 268:18
268:22 269:12,23
270:3,16 272:3
**comes** 67:12 85:1
105:17 106:8
137:4 183:11
226:12 255:4
**comfort** 18:8
246:6
**comfortable**
30:18 31:23 59:1
78:16 181:7 187:2
204:13
**coming** 26:19
128:23 150:8
198:20 267:23
**comly** 4:1 261:6
**comm** 7:17
**command** 52:4
**commenced** 77:12
232:9 261:18
**comment** 144:4
145:1 229:10
266:24 267:1

**commentary** 25:3
231:19
**commenting** 20:9
**comments** 22:6,7
23:9 84:11 88:14
204:6 233:4,6
250:10 257:5
260:25 272:12
275:1
**commercial**
175:20
**commitment**
174:13
**committed** 65:25
**committee** 4:16
41:21 74:16 77:13
77:24 95:9,15
131:12 137:11
162:20 167:12
169:15 181:9
182:23 202:22
220:18 225:4
259:25
**common** 104:19
151:25
**commons** 78:23
**communities**
100:16,17 108:21
109:15 142:17,19
**community** 84:23
110:3 153:18
217:23
**companies** 142:22
177:5 187:12
194:22
**company** 8:2
73:20 76:18
141:23 142:12
187:24 206:18
207:13 214:11
223:11,12 224:10
224:18 238:19
239:3 240:22

243:12 247:18,24
254:3 256:23
268:21 269:11
**company's** 224:13
226:14
**compare** 81:14,20
**compared** 72:20
110:8,20
**comparing** 182:24
**comparison** 53:8
54:7,20 140:5
**compensation**
17:10
**competing** 36:16
36:17 45:19 63:6
**competitors** 45:4
**complaints** 57:18
62:22 74:7 81:14
81:20 98:4 127:13
135:1 243:9
**complete** 67:2
177:1 246:22
252:18
**completely** 24:7
30:15 60:4 61:19
208:17
**complex** 5:4 44:1
69:6 94:10 232:25
273:6
**complexity** 40:24
**compliance** 96:10
**complicate** 233:12
**complicated**
18:23 102:25
129:24 175:17
217:21
**complicates** 244:3
**comply** 233:16
262:7
**component** 174:9
**components**
164:10 168:12

**compromise** 98:6
98:7,8 103:17
115:11
**compromises**
97:17
**computer** 218:20
**concede** 83:16
104:24
**conceded** 93:14
**concededly** 91:13
**concedes** 83:8,9
**concentrated**
154:2
**concentration**
154:7
**concept** 244:23
**conceptions** 68:19
**conceptual** 21:25
**concern** 118:18
139:5 193:23
194:2 200:1
216:23 237:5
240:8 248:6
259:17 260:9
**concerned** 90:14
127:21 155:2
195:17 196:4
204:10 257:24
274:3
**concerning** 77:16
101:7,12 208:20
240:5,19
**concerns** 25:11
152:5 158:4 202:2
202:9 218:10
232:6 245:10
260:7
**conclude** 41:2
50:22 148:12
**concluded** 44:16
86:20 154:17
166:14 275:13

**conclusion** 58:23
184:15
**conclusions** 29:5
36:13 163:9
167:15 173:8
176:7 178:19,24
179:6 195:19
**concrete** 36:25
**condition** 59:12
138:25 174:10
**conditions** 35:20
194:19
**condone** 222:24
**conduct** 23:5
25:17,17 26:2
68:23 142:22
230:14,15 231:15
231:16 234:13,13
235:24 237:16,20
237:21 239:18
242:12,19 243:18
248:8,25 249:1,1
249:2,17 250:4,5
251:6 254:7,8,15
254:25 268:6,20
**confer** 37:7
**confers** 98:24
103:22 203:13
224:1
**confess** 177:23
241:7
**confidentiality**
21:12
**confine** 62:12
**confining** 187:12
**confirm** 74:3
142:10 181:5,7
218:6
**confirmation** 2:1
16:5,13 21:6
35:24 77:4 86:9
87:2 93:21 134:11
145:25 147:9

148:4,21 149:3
154:10 162:18
164:9,12 165:1,10
165:18 166:4,7,9
166:12,20 167:5
167:15,20 168:9
169:10,12,14
170:7,24 171:23
171:25 172:4,6,17
172:21,22 173:4
173:14 174:1,10
174:11,15 178:13
178:14 184:1
185:1 186:2,18
194:11 195:4
196:3 200:11
201:10,17 203:10
203:14 204:4
227:19 258:1,16
258:17 263:1,12
264:4,8 266:7
270:22 271:1,18
274:9,14,16
**confirmed**  30:11
38:12 61:14 65:24
66:12 123:22
139:5 143:8
165:11 166:18
**confirming**  51:17
**confirms**  155:22
164:5
**conflating**  191:18
**conformity**
166:18
**confounding**
265:15
**confused**  192:21
193:13 206:1
**confusing**  26:8
208:2
**confusion**  26:9
214:18 232:6
268:24

**congress**  106:14
110:20 150:6
152:22 171:20
263:17
**conjunction**
259:13
**connected**  234:12
**connecticut**  4:2
41:24 42:17,23,25
43:4 47:2 48:8
53:4 64:13 66:25
72:24 73:6 78:2
79:1 80:9 83:9,16
88:9 221:2,3,4,5,9
221:12,17 261:7
265:12
**connecticut's**
72:17
**connection**
117:17 148:21
165:9 175:6
183:15 227:4,9
**connolly**  9:22
**conroy**  35:4
246:25 253:7,9
**conscious**  134:1,4
**consensus**  118:5
118:22
**consent**  69:4
168:17 172:6
182:1 183:17
187:22 189:11,21
190:17 191:6,12
197:15,20 223:19
**consenting**  6:15
**consequence**  36:3
64:2
**consequences**
176:20
**conservative**
45:22
**consider**  70:7
117:2

**considerably**  27:6
**consideration**
107:7,16 116:18
137:18 156:1
157:1
**considerations**
100:11 103:21
107:17 110:11
116:17 166:13
172:10
**considered**  31:16
32:9 41:21 51:5
199:14
**considering**
169:11 229:15
256:16
**consistent**  51:4
90:21 98:11,21
108:15 158:19
163:7 164:5 171:5
**consistently**  33:9
**consisting**  225:3,6
225:13
**conspiracy**  97:24
**constant**  209:17
210:3 211:13
**constantly**  209:17
**constitutional**
147:13
**construction**
256:22
**constructive**  27:5
159:14,17 242:3
266:19
**consult**  189:16
**consultant**  24:9
**consultants**  24:4,5
**consultation**
190:18
**consulted**  183:16
**consumer**  55:15
55:17 56:5,17,19
56:21 57:6 59:13

59:16 81:18,19,24
108:17 221:8,11
240:23 261:22
**consumers**  56:13
**consuming**  94:4
262:10
**consummated**
227:21 228:8
**consumption**
216:10
**contact**  147:2
**contacted**  221:5
221:23
**contain**  88:24
107:10 164:22
170:7,24
**contained**  92:10
166:19
**contains**  227:20
228:16
**contemplate**
28:13
**contemplated**
23:5 228:4
**contemplates**
21:10 30:2 171:19
**contend**  207:15
262:5
**contended**  80:12
**contention**  54:23
91:15 242:7
**contents**  169:4
**contested**  196:23
**contesting**  265:6
265:10,14 266:3
**context**  79:8
95:23 104:2,2
113:13 114:7
142:1 197:22,23
198:6 246:16
**contingent**  31:1
39:22 95:16
167:12

continuance 2:1
continuation
  19:20
continue 19:9
  206:19,23 213:20
  266:20 273:4
  274:2
continued 20:10
  20:16,23
continues 22:16
continuing 60:11
  207:5
continuously
  18:10
contract 90:18
  189:1
contracting 241:2
contracts 228:17
contradicted
  146:20
contradictions
  97:4
contrary 32:7
  37:24 73:8 80:17
  82:11 97:13 99:24
  105:9 159:19
  164:20 168:3
  170:9 194:18
  203:4
contrast 33:4 45:2
  55:12
contravention
  37:5 108:12
contribute 102:4
  107:4 108:3
contributed
  236:23
contributing
  111:25 113:25
  115:5 121:14
  182:19 192:16
  237:18

contribution 69:5
  113:8 114:5,10
contributions
  262:1
control 98:10
  171:9 214:1 252:5
  253:10 274:7
controlled 242:4,5
controls 51:19
controversial
  265:21,23
controversy
  107:11 150:3,5,5
controverted
  53:23
convenience
  262:17
conversation 68:9
  225:2
conversations
  21:11,13 202:21
  230:1
conveyance
  267:21
conveyed 139:11
convince 109:22
  130:22 138:25
  189:25
cooperation 88:8
coordinating
  48:10
coordination 88:8
copper 181:4
copy 204:3
core 24:23 47:12
  168:18 169:9
  186:18
corning 128:10,10
  132:19 166:2,6
corona 220:11
corp 85:21 128:11
  131:15

corporate 79:9
  239:1
corporation 86:17
  220:16,16 225:25
  256:19
correct 48:15
  59:18 69:15 75:17
  88:1 105:6 109:7
  119:5 122:7,9
  126:23 136:5
  146:11 149:14,22
  170:20 179:14
  187:21 195:13
  199:5 201:9
  202:20 203:16,17
  239:15 260:1
correction 161:1
corrections
  153:18
correctly 198:24
  239:11
correspondent
  222:11
corroborated
  113:19
cost 43:15,18
  62:17 210:24
costs 37:8 85:10
  85:10,11 232:13
couched 205:12
could've 210:8
couldn't 169:8
  195:23
councilmen
  217:25
counsel 24:15
  86:23 95:8,11
  104:10,23 105:20
  106:19 107:17
  108:7,11,14
  118:15 119:21
  131:7 144:8 146:3
  146:8 147:3

162:21 163:4,4
  167:11 179:14
  203:16 218:16
  228:24 229:20
  267:14
counsel's 55:21
  105:9 106:16
count 46:4 83:7
  83:17 89:15
  108:11 127:2
  216:11
counted 90:7,8,9
  90:11
counter 123:12
  143:5
counterclaim
  123:17
counterclaims
  123:15
counterparties
  246:19
countervailing
  56:8
counties 85:8
  86:15,25 140:22
countries 128:13
  136:17
country 7:3 44:22
  90:5 95:25 105:3
  105:16 106:23
  140:25 141:1,20
  142:17,19 143:19
  185:14 207:9
  212:18 214:15
  215:13 221:17
  255:9 266:2
  276:21
country's 97:22
  142:4
county 85:2 86:19
couple 101:19,20
  112:22 115:19
  205:23 230:11,25

courage 226:8
270:15
course 17:10,25
22:13 23:18 26:19
29:1 30:20 37:20
45:9 49:21 86:23
86:24 87:4 109:3
120:15 127:17
152:2 170:1,3
184:21,21 206:25
233:3 251:10
263:19 274:11
court 1:1,11 16:2
16:7,9 17:7,13
18:8 19:4,6,18
20:18,20 21:18
22:1 27:2,21,24
28:7,9 29:20 30:8
31:23 34:17 35:22
37:21 42:22,25
43:8,11 45:10
48:6,13,18,22
49:5,17,23 50:9
50:11,25 51:2,7
52:1,2,16,18,20
53:3,19,21 54:2
54:10,16 55:24
56:1,4,7,12 57:9
58:1,4,6 59:5,6,10
59:12,15,20,22,25
60:5,19,21 61:3,6
62:6 63:17,19
64:19 65:3,7
66:10 67:8,18,22
68:2 70:7 71:7,23
71:25 72:2 74:21
75:7,11,14,18,21
78:16 79:17,18,20
80:5,18 84:8
85:21,23 87:24
88:5,12 89:7,10
90:8,10 91:1,4,21
91:25 92:18,20

93:16,17 94:16
95:17 96:5 101:10
104:8,10 105:2,7
105:21,23,25
106:4,7,15 109:6
110:9,18 111:2,10
111:22 112:25
113:2,11 114:3,9
114:11,17 115:15
115:17 116:4,6,19
117:7,13,19,20
118:1,8,14,23,25
119:8,12,16,19,21
120:18,20 121:2,5
121:8,10,15,17,19
122:3,4,8,17
123:4,14 124:15
125:13,16,19
126:7,9,22 127:10
128:5 129:6,8,10
130:24 131:1,3,20
131:24 132:13,15
132:18,20 133:6
133:18 134:8,16
135:5,8,23 136:11
136:23,25 137:3
138:21,25 139:14
139:23 140:6,15
140:17 141:5,9,12
141:16,18 143:22
144:2,6,12,24
145:10,18,21,23
146:22 147:7,12
149:8,13,16,18,20
149:23 150:19
152:21 153:21
154:17,22 155:10
155:21 156:4
157:18 159:2,5,13
160:13 162:1,14
163:2 164:15
165:15,22 166:18
166:19,24 167:1,9

168:9,22,24 169:1
169:10,25 170:2
170:10,18,21
171:17 173:21
174:20,24 175:3
178:21,23 179:17
179:21 180:2,25
187:6,16,22 188:5
188:13 191:4,23
192:1,7,19 193:3
193:14,18,21
194:8 195:8,12,14
195:22 196:8,12
197:5,18 198:4,12
199:3,6,22 200:7
200:15,22 201:1
201:19 202:14,16
203:15,21 204:7,9
204:18 205:19,21
205:25 206:10,13
206:22 210:21,25
211:4 213:17
216:24 217:1,5,8
218:10,12,21,23
219:4,10,12,17,19
224:17 226:6,22
227:6 228:17,20
228:25 229:2
230:7 232:20
233:2,4,19 234:16
234:23,25 235:4,7
235:10 236:9,20
237:4,7,9 239:9
239:16,21,24
240:4 241:4,6,13
241:17,22,25
242:24 243:2,13
243:15,20,25
244:14,17 245:3,6
245:9,17 246:17
247:1,5,17 248:14
249:6,8,10,22
251:3,3,18 252:9

252:12,14,19,21
252:24 253:1,4,9
253:14,23,23
254:1,18,20 255:4
255:4,7,10,11,13
255:21 256:1,4,7
256:18 257:2,14
257:25 258:5,9,12
258:17,21 259:6,9
259:19,22,24
260:2 261:1,5
262:13,20,22
263:5,10,14,16
264:7,14,18 266:9
266:23 267:10,24
268:15,25 269:8
269:12,23,25
270:3,16,21,24
271:7 272:13
273:4,9 275:4
court's 19:15 22:6
117:17 121:24
127:5 134:11
137:4,5 257:8
258:18
courthouse 38:16
139:20
courthouses 39:4
courtroom 22:18
219:13
courts 29:24
31:17 49:21 51:14
86:18 100:7 128:5
132:4 135:19
143:19 151:2
161:5 171:20
222:15 261:18
court's 164:5
173:5 176:3
covenants 17:23
cover 22:12,16,20
30:17 119:25
163:25 178:6

193:15 198:13
200:16 238:14
247:10 249:18
254:6,21,24 255:5
**coverage** 163:14
164:7,9,10,16,19
165:11 168:2,11
168:18,23,25
169:1,3,12,18,20
169:21 171:14,24
172:3,21 175:21
176:1,20 177:17
178:4 179:13,18
180:23 183:4,12
183:14 184:4,21
185:1,3,20,23
186:18,22 188:8
191:18,21,23
192:1,9,15 194:1
194:1 197:11
198:17 201:5,13
202:6 203:2
**covered** 22:13
73:12 127:18
179:3 185:25
187:11 219:14
245:13 274:20
**covering** 242:18
**covers** 111:15
240:9,13 242:12
248:22
**cowan** 97:2 98:16
99:6 101:23 102:7
102:14 108:11
111:20 113:10
114:23
**cowan's** 97:13
99:25 100:15
102:10 113:19
**cram** 130:14
**create** 46:13
109:14 164:2
182:7 245:11,13

**creative** 58:19
245:16,18 251:12
266:12
**credentialed**
214:12
**credibility** 102:15
**credible** 97:1,15
**credibly** 39:1
**credit** 35:21 55:17
56:19,21 57:2
73:5
**creditor** 33:25
36:5 39:11 40:17
43:17 44:18 45:4
47:19 52:25 61:17
73:16 76:4 98:24
122:24 126:3,3
134:5 150:21,25
151:3,3,4,6 268:9
**creditor's** 33:10
**creditors** 5:18
28:13,15 29:13
30:22 31:2,6,24
32:5 33:24 34:4,9
36:2,8,10,10
37:10,15,25 38:14
39:3,19 40:21,22
40:23 42:15 43:13
43:20,23 44:6
45:19 46:2,2,13
47:8,18 49:2
50:16 51:21 52:5
52:10,12 53:4,7,8
53:11,13,15 55:6
55:9 61:15,22
62:2 64:15 66:8,9
66:14,21 70:12
72:16 74:17,19
76:5,6,7,10,16
77:4,10 79:3
82:10,15,17 98:25
120:24,25 121:4
123:8,20,24 124:5

126:13,15 128:1
128:15,20 131:8
131:13,13 132:5
132:25 133:9,9,14
133:25 134:2
137:19 138:5
139:1,7 140:8
148:9,10 151:17
151:18 163:18
169:7,15 178:14
186:23 194:15
197:3 220:18
225:4 246:19
260:13,17,21,22
270:7
**creditors'** 172:23
**creditor's** 150:21
**credos** 20:15
**creighton** 146:3,4
149:10,13,25
154:14 155:4
**crime** 85:11
151:21 238:12
**crimes** 79:9
**criminal** 22:14,16
22:20 84:19,25
102:6 112:4
230:17,17
**crisis** 48:4 84:23
216:3 221:4
222:14 224:10
271:4
**criteria** 99:16
101:5,6
**critical** 38:15
84:16
**critically** 172:12
**criticism** 103:25
**critiquing** 36:18
**cross** 35:2 36:20
65:8 68:18 97:16
102:5,16 113:9
151:8 182:24

203:12 220:13
**crosstalk** 72:1
253:3
**crucial** 174:9
**crucified** 175:13
**crystal** 32:8
**ct** 4:4
**culpability** 41:10
**cumbersome**
262:10
**cunningham** 9:23
**curious** 58:18
73:13
**current** 104:7
194:6 232:22
**currently** 86:20
110:4
**cushing** 65:8
**cushing's** 41:25
**custody** 160:16,18
**cut** 90:11 141:5
141:10,12 248:14
263:12
**cutler** 8:1 175:1
**cvs** 220:14
**cyganowski** 9:24

---
**d**
---

**d** 1:22 8:6 9:7
11:24 14:21 16:1
39:7 182:15
220:14 223:9,14
223:16,21 224:1
**d&o** 187:10
**d.c.** 47:16 48:8
**damage** 46:6
**damaged** 206:4
**damages** 38:19,21
58:25 77:18 86:22
99:8 261:17,23
262:6,11,18
**damian** 13:12
**dana** 131:15

dancing 71:3
dangerous 207:14
daniel 9:22 12:12
  14:10 15:20
danielle 12:15
daresay 79:17
dark 122:11
darren 12:6
darts 101:6
dasaro 10:2
data 47:8 60:3,9
  60:16,18
date 49:11 71:19
  146:23 148:17
  153:23,23 157:15
  195:1 232:10
  250:24 276:25
dated 220:22,24
  222:1,5 225:2,5
david 9:13,16
  13:6 15:23 247:1
  247:7
davis 3:3 10:3,4
  16:20 80:3 120:11
  136:5 140:19
  146:12 152:18
  175:24 220:10
  221:21,24 226:2
  226:10 227:17
  228:11,11 229:24
  264:16
day 16:4,12 19:13
  24:1 33:11 47:7
  79:18 97:19 98:17
  100:3 101:11
  140:12 157:10
  176:21 181:12
  182:8 190:20
  200:18 264:23
  265:20 266:3
days 36:13 68:18
  115:19 124:17
  146:22 197:25,25

204:1 209:7,8
  220:1,2 274:21,22
dc 3:18 7:20 42:17
  43:1,3,4,9 220:12
de 98:7
dead 29:8 131:23
  203:7
deadline 21:1,5
  205:13
deadlines 21:2
  158:8
deaf 220:3
deal 17:3 18:11
  34:20 35:8,14,20
  51:24 77:5 80:22
  101:15 108:1,25
  116:16 132:5
  133:19 142:2
  149:9 157:4 176:6
  246:6 274:4,13
dealing 57:10
  112:9 113:12
  188:9 200:2
  209:24 250:3
deals 72:25
  108:19 110:21
  186:1 189:1
dealt 195:16
  238:16 262:12
dear 219:23 226:3
dearest 220:1
dearman 10:5
death 101:14
  223:14
deaths 110:3
debate 22:21
  175:11 272:22
debevoise 224:8
  224:13
deborah 11:12
debt 57:3
debtor 1:9 8:9
  31:6 32:20 39:24

49:13 50:8 51:12
  58:18 61:25 64:12
  72:13 80:22
  122:17 123:6,17
  124:2,3,7,22
  127:6 130:2
  134:24 135:22
  143:5 150:20
  151:4 152:13
  176:14 180:16
  182:15 186:7
  189:4 190:14
  199:7 200:3
  203:16 230:24
  231:2,6,10,10,12
  231:15 234:8,17
  234:20,21 235:5,9
  237:12,14,21,22
  237:24,25 238:1
  240:6,7 241:22
  242:6,12,17 244:2
  245:13 248:22
  249:13,13,20,22
  249:23 250:12
  251:2 254:8,9,24
  254:25 261:2
  266:2 267:23
  268:17 269:5,9
  270:9,13
debtor's 80:15
  86:23 90:20
  117:21,23 218:16
  227:25 229:19
  241:23 242:10
debtors 3:4 16:4
  16:13,21 17:19
  18:10 24:14 27:17
  30:21,24 31:3,4
  33:8,13,22 36:25
  38:18 40:2 41:16
  42:5 51:21 53:2
  53:14 54:19 55:8
  55:18,21,22 58:15

58:19 59:4 60:10
  60:13,22 61:14,16
  62:4,9 69:18
  70:20 73:20 77:15
  80:3 81:6,8 82:14
  85:5,6 87:19
  89:12,13,18,22
  91:19,23 92:12,20
  93:14 94:2 117:16
  120:4,12,12,16
  123:9,9 126:23,25
  127:14,15 131:8,9
  132:6 134:1
  135:17 137:11
  140:20,21,24
  146:12 147:2
  148:19 150:22
  151:9 152:7,19
  154:1,11 159:6
  162:18,24 163:4
  164:3 167:4,14
  169:18 171:7
  172:12 173:20
  174:16 176:22,23
  177:5 178:8 181:9
  181:19 183:1,6,12
  183:13,15,24
  184:3,20 186:2
  187:1 188:4
  189:19 191:17,21
  192:11 193:4,9,9
  193:24 194:23
  195:3 199:3,4
  200:3,9 202:23,25
  204:3,12,13,14
  205:2 207:6 227:8
  228:14,21 232:1
  232:13,23 234:12
  239:11,12 240:10
  240:12,20 246:20
  246:23 248:2
  259:25 260:10,11
  262:12 264:17,24

265:5,13 267:14
268:6,7 270:8
272:25 273:5
**debtors'** 163:16
**debtor's** 146:8
148:15 157:14
163:12 166:3
168:1,5,8 169:3,6
171:9,17 201:15
**decade** 32:17 33:6
166:7
**decades** 24:15
32:17
**december** 220:1,2
220:4,22,25
221:24,25 222:2,2
222:3,6 224:5
225:5
**decide** 96:22
133:7 212:2
255:13
**decided** 24:1
70:22 109:5
111:11 165:9
168:19 169:10
182:9 184:5
269:19
**decides** 111:3
179:17 245:18
**deciding** 41:22
**decimal** 70:19
**decision** 28:17
29:2 60:20 105:1
147:17
**decisions** 211:11
**declaration** 34:15
34:25 37:9 47:2
72:16 77:8 82:24
83:6 97:12,19
149:9 151:8 223:3
**declarations**
158:15 159:20

**decline** 213:10
**decrease** 194:12
**decreasing** 209:10
**dedicate** 38:2
**dedicated** 19:25
**deed** 103:24
**defendant** 86:17
232:7,9,11,11
235:22 238:13
**defendants** 40:12
41:12 84:14 86:4
86:5 87:17 223:22
232:3,16 235:20
235:21 236:2
239:19
**defended** 68:23
**defending** 221:22
**defenses** 41:10
71:17 164:6
168:14,19 169:20
182:7 183:6
**defensive** 123:11
135:20
**defer** 60:1,1
111:17 155:12
**define** 207:5
254:5 255:15
**defined** 23:23,24
24:19 51:12
177:13 257:10
**defines** 256:11
260:17
**definition** 25:16
25:19,21 26:3,4
33:11 145:8
191:15 202:3,5
234:7 235:20,21
240:17 241:7
242:2,16 249:25
257:9 274:8
**definitionally**
28:23

**definitions** 235:20
**defy** 107:17
**degree** 139:6
198:16
**del** 220:11
**delaconte** 10:6
**delaware** 48:11
53:4 80:11 88:9
261:15
**delay** 43:15,19
62:17 94:5 166:4
171:13 268:5
**delays** 211:6
**delconte** 33:14,24
34:14,23,25 35:2
36:19 53:17 54:18
55:1,11 58:24
61:14 71:6
**delconte's** 36:7,19
71:1
**deletion** 197:23
**deliberate** 248:24
249:16 251:9
**deliberately**
241:13 251:24
**deliver** 110:2
**delivers** 98:25
**demanding** 68:13
265:2
**demonstrate**
30:21 33:16 38:14
44:5 83:24 165:23
**demonstrated**
52:23
**demonstrating**
86:9,12
**denied** 154:10
**denominator**
138:2
**denounces** 222:9
**densely** 154:2
**deny** 166:17 186:5

**denying** 136:12
**depalma** 5:16
120:23
**department** 74:18
221:5
**depending** 126:2
214:23 250:13
**depends** 113:20
206:22 207:4
**deposed** 36:19
**depression** 225:23
**deprivation**
152:23
**deprive** 51:23
**deprived** 166:11
166:14 203:9
227:12
**depth** 38:20
**derail** 29:21
**derivative** 249:11
249:12,25 250:8
255:1 256:12
**derivatives**
219:24
**derived** 121:9
**describe** 19:2,2
213:19
**described** 19:21
21:3 27:5 30:7
34:25 230:14
**descriptive** 26:6
**deserving** 94:5
**designate** 91:8
**designated** 36:16
36:18 257:11
**desire** 142:8
**despite** 84:12,15
84:16 124:10
**destroy** 48:2
169:23
**destroyed** 73:21
**destruction** 33:20
36:4

detail  26:25 70:3
determination
  64:20 66:13 169:2
  184:3
determinative
  186:22
determine  105:2
  169:1 170:17
determined  31:15
  71:11,21 184:24
  185:2 226:18
determining  90:2
detriment  94:6,6
detrimental
  164:13
detroit  129:4
develop  142:15,16
developed  111:24
  166:1 210:8
development  20:4
  210:7
devil's  122:25
devon  10:7
dictates  39:15
  151:25
didn't  153:25
  176:9 183:24,24
  186:12,13,14
  195:15 198:13
  208:11
die  215:6
died  220:1
dietech  49:22
  50:15 52:2 55:13
  55:16,22 57:9,9
  58:10 59:12
differ  98:17
difference  59:8
  105:19 125:6
  180:8
differences  19:24
  92:15

different  24:13
  71:15 74:6 78:22
  78:22 79:12 80:23
  83:24 89:7,22
  92:7,8 98:2,24
  100:9,10 109:5,13
  109:14 112:17
  113:10,20 115:1,3
  125:2,4,4 127:8
  128:13,13 129:4,5
  130:7 131:21
  132:1,2,22 140:25
  142:19,19,20,20
  142:22,22,23
  172:9 180:12
  188:13 191:5
  192:24 198:15
  208:17 212:23
  269:8
differently  69:16
difficult  47:20
  95:20 103:16
  119:14 129:16
  140:1 161:12
  236:7 271:1
difficulty  129:1
dilaudid  214:5,7
dillion's  85:16
dillon  84:1
dilute  62:16
dilutive  62:6,14
diminishes  168:6
diplomatically
  266:10
direct  33:10,17
  36:24 40:10 41:7
  42:1,9,11 43:23
  44:8 45:15 46:16
  53:1 55:5 62:2
  71:10 93:21
  117:20 121:16
directed  123:22
  159:24 175:23,23

175:24
directing  37:21
direction  22:1
  60:19 109:6
  117:18 125:9
directly  46:22,22
  68:21 107:21
  137:22 225:12
director  223:11
  238:2 243:21
  245:2 248:1 250:6
  252:16 254:8
  270:10
directors  232:22
  238:17 243:11
  268:10
dirty  98:8
disabled  226:4
disagree  29:25
  41:23 179:24
  226:9
disagreed  96:4
disagreement
  181:15
disbursement
  163:12 228:1
disc  101:21
discharge  165:19
  186:7,8 237:14,17
  270:8,8
disclaim  169:3
disclose  89:25
disclosure  33:15
  33:24 35:1 66:5
  71:14 89:24 93:7
  182:15
discount  160:9
discouragement
  108:18
discovered  248:7
discovery  24:16
  233:12,16 250:20
  250:21 259:24

discretion  82:14
  103:18 157:20
  158:7 161:14
  223:19
discretionary
  223:24
discriminate
  128:15
discriminatory
  157:22,25
discuss  74:8,10
  115:20 120:2
  167:6 186:3
  266:20
discussed  17:18
  78:24 88:11
  105:13 112:6
  185:7 204:16
  217:3,5 231:7,17
  232:5 259:10
discussing  195:20
  236:15
discussion  49:25
  226:24 229:5,17
  233:25
discussions  21:3
  22:5 109:4 230:19
disease  108:19
disguise  244:13
  244:16,17
dismiss  57:19
  86:12
disorder  154:3
  161:3 217:24
disorderly  39:3
disparate  130:15
dispatch  85:20
dispenses  24:8
disposes  80:25
  159:10
disproportionally
  155:24

**disproportionate** 115:6

**disproportionat...** 151:22

**dispute** 31:2,5 58:9 63:25 76:2 172:20 173:4 177:17 180:24,24 185:21

**disputed** 59:10 64:1,3

**disputes** 168:23 169:12

**disputing** 90:23

**disrespect** 42:18

**disrespecting** 88:16

**dissenting** 52:12 52:25 53:3,8,13 53:15 54:23 55:2 62:2 66:9

**dissolve** 173:2

**distancing** 152:2

**distinct** 156:21 231:25

**distinction** 124:22 125:1 128:7

**distinguish** 129:3

**distinguished** 50:21

**distinguishing** 241:20

**distraction** 25:8

**distribute** 30:25 157:10 163:17 169:7

**distributed** 37:12

**distributing** 262:1

**distribution** 67:1 93:1 160:23 194:23 265:3

**distributions** 125:22 156:16

228:3,3

**distributors** 231:21

**district** 1:2 48:20 52:3 53:5 59:25 80:9 83:3 85:21 85:22 88:3 131:16 143:12 154:17 179:17 224:18

**districts** 133:4

**ditech** 28:2 31:18 32:2,20 33:8 61:22 68:15

**diversion** 208:20 208:21 215:11,19 216:1

**divert** 272:11

**diverted** 215:4

**divide** 191:19

**dmp** 227:1

**dmps** 227:9,10,12 227:14 228:7,15 228:23,25 231:21

**dmvt** 227:13

**docken** 10:8

**docket** 70:24 82:24 148:18,22 149:15 227:15,18 228:12,15 270:14 271:25

**docketed** 85:6

**doctor** 212:6,16 214:23 219:25

**doctors** 208:14 209:12 211:21 212:16,21 214:9 214:10

**doctrine** 85:16,18

**doctrines** 83:23 84:2

**document** 177:13

**documents** 70:23 177:3,7,11,15

194:11 195:4,9 196:5 200:11 204:4 224:9,13 260:23 271:15

**doesn't** 157:1 160:19 164:2 167:7 170:13,15 174:8,12,15 180:6 184:17,18 188:17 189:22 196:15 198:2,14 207:10

**dogs** 219:1

**doing** 19:12 29:18 42:18 60:10 68:12 75:12,15 77:22,23 121:10 139:17 189:20 192:16 212:23

**doj** 35:11

**doj's** 35:11

**dollar** 32:4 35:17 37:12 86:16 92:2 92:3,6,11,21 93:2 93:10,20,23,23 94:9 126:14,18,20 127:3

**dollars** 35:13 36:1 38:5 41:14 72:13 72:21 76:9 86:21 106:13 116:9

**domestic** 84:19 128:15

**don't** 35:20 148:6 150:8,16 153:23 154:5,17,23,25 155:6 156:23 160:5,8 167:1 168:22,23,25 171:18 173:20 175:15 178:5 179:2 180:1 183:3 183:5 185:18 186:4 187:12,17

187:24 188:19 190:5 191:8,9,10 191:13 192:4,4,20 193:1,3,14,23 194:2 195:21,25 196:5,17 197:12 197:18,19 199:7 199:22 200:1,15 202:19 203:21 205:2 206:3,11 207:24 273:7

**door** 133:2 237:17 238:18 251:15

**dorr** 8:1 175:1

**dose** 213:19 222:22,25

**double** 21:9 197:14

**doubt** 139:23 148:6 151:7 160:8 242:14

**doubts** 181:5

**dougherty** 10:9

**douglass** 13:17

**dow** 128:10,10 132:19

**dozen** 224:12

**dr** 37:4 97:2,12 98:16 99:6,24 100:15 101:23 102:7,10,14 111:20 113:9 223:16,21 224:1

**draft** 243:5 244:10 253:16

**drafted** 23:13,20 121:11 156:24,24 253:17,18 269:14

**drafting** 23:16 229:25 260:6

**drag** 202:19

**drain** 1:22 16:2 16:11 145:24

218:19 219:23
220:23 222:5
225:19
**dramatically**
102:14
**draw** 33:7 237:19
256:16
**drawing** 197:17
238:4
**drive** 207:21
212:4,6
**driven** 125:3
**drives** 151:21
**driving** 131:19
247:17
**drug** 161:4,5
209:14,19 213:10
213:24 215:2
220:5 222:9,12,17
222:19,21 225:24
248:20
**drugs** 206:20
208:8,16 209:1,1
209:3,4,15,22
210:3,6 211:14,20
212:13 213:16
214:8 215:1,4,4
215:22 216:5,8,8
216:10,19 222:25
**dry** 161:14
**drysdale** 3:15
**dual** 16:23
**duane** 181:4
**dubel** 10:10
131:12
**due** 20:16 38:6
61:12 72:10 77:2
107:7 124:9
150:20 157:5
184:8,16 186:12
200:12 202:18
203:13 221:4

**dumped** 270:23
**duration** 222:22
**duty** 86:3 250:6
**duvani** 227:8
**dwarfed** 40:3
**dwell** 111:13
**d'angelo** 9:25
**d'apice** 10:1

**e**

**e** 1:21,21 3:1,1 5:4
9:13 13:5,10
14:13 15:5 16:1,1
182:15 185:6
186:5 221:23
267:15 269:2
276:1
**e.g.** 45:11
**earl** 185:6
**earlier** 20:2 30:8
52:3 85:6 135:25
140:20 145:5
148:19 149:3
161:10 162:6
173:13 175:18
180:11 205:1
225:25
**early** 166:1
219:25 220:7
224:16
**ease** 212:13
**easier** 109:10
**easily** 107:14
**eastern** 85:22
**easy** 196:1,2
**eberhardt** 10:11
**echo** 175:18
270:15
**eck** 15:8 218:18
219:4
**ecke** 8:16 218:19
218:22 219:3,8,11
219:15,18,20
226:6

**eckstein** 10:12
74:3 118:2,3,9,20
118:24 119:3,9,13
119:17,20
**economic** 37:7
108:23
**economics** 17:24
**ecro** 1:25
**ed** 161:15 222:11
222:20,22,24
**edan** 12:18 220:21
**edit** 273:16
**edmunds** 6:6
230:2,10,19,25
231:18 232:5
233:11,14,21,22
234:19,24 235:2,5
235:8,11 236:5,12
237:5,8 238:22
239:14,23
**edward** 13:10
**effect** 23:13 62:7
62:14,15 63:12
121:12,13 137:24
158:15 164:24
165:19 177:14
186:9 255:22
**effective** 49:11
99:7,9 170:8
171:14 177:14
195:1 232:10
**effectively** 66:20
105:10 108:10
122:11,16 123:12
124:4 134:23
136:20 203:8
232:12,15 267:8
268:7
**effectiveness**
217:17,18
**effects** 37:10
214:17 216:8,15

**efficacy** 103:4
**efficient** 179:22
273:3
**efficiently** 171:8
274:24
**effort** 17:5 62:21
147:14 151:9
152:23 157:5
180:15 185:20
189:16 218:11
251:4
**efforts** 19:25
84:14,17 87:1,1
151:12 233:12
273:22
**ego** 237:14 242:3
243:8,23 244:4
250:6
**eight** 38:13 72:21
76:9
**eighteen** 86:15
**eighties** 208:11
**either** 19:10,21
49:3 50:1 60:19
67:13 78:8 86:20
93:9 109:9 111:19
112:3 136:4
155:24 157:17
162:17 197:20
198:24 204:23
209:13 214:7
249:4 251:17
261:13 273:21
**election** 90:4
**elections** 90:5
**element** 18:1
**elements** 17:18,22
**eli** 3:11 229:24
**eliminate** 107:13
110:11
**eliminates** 262:5
**eliminating** 109:7

elisa  11:21
elizabeth  14:12
elongate  158:7
eloquently  111:14
else's  241:25
email  236:15
emails  271:16
embarrassment
  109:1
embattled  224:9
embodied  166:20
  167:22 181:20
embrace  68:13
emergency  84:25
  84:25
emily  7:22 11:13
  163:7 167:11
emphasis  100:14
  172:2 231:8
emphasize  49:14
  152:17 163:14
  174:7 231:18
emphatically
  88:15
empirical  44:9
employee  237:21
  237:22 238:2
  248:1,21 268:17
employees  232:23
  238:17 239:3
employment
  241:1
enable  163:15
  171:7
enabling  137:13
encompassed
  195:23
encourage  19:24
  274:1
encouraged  20:24
  255:14 273:20
  274:1

endeavor  33:20
ended  110:15
  134:3
endo  86:16
endorse  41:8
ends  100:1 154:13
  247:21 270:22
  274:3,4
enforce  64:21
enforceability
  194:18
enforcement
  107:19,24 114:22
  115:7
engage  161:12
engaged  148:19
  161:18 234:13
  235:17 239:2,10
engaging  259:14
engineering  166:2
  190:12
enjoin  137:6
  263:18
enjoined  30:10
  139:17,19 256:12
enormous  62:13
ensure  168:4
ensures  199:16
enter  135:6
entered  20:17
  69:11 146:22
  177:8,22 181:21
  195:6 196:8,10
  258:2,4,5
enterprise  121:9
entertain  147:21
entire  40:25 92:9
  122:12 136:19
entirely  80:16
  82:17 140:25
  142:3,17 225:21
entities  3:16 23:14
  37:7 50:12 62:10

62:10 77:14,18
  84:10 85:9 86:13
  91:14 93:1 95:10
  125:1,20,23 127:1
  127:22,23 129:23
  139:15,16,18
  159:25 162:21
  238:24,24 258:25
  259:1,13,18
entitled  119:7
  164:9 168:11
  169:17 171:9
  191:22 222:8
  250:1
entitlement  34:9
entity  39:10 84:6
  137:8,8 139:11
  141:24 143:2
  187:9 223:7
  267:21,25 268:2
  268:11 269:5
entry  85:18
  271:14
environment
  253:10
environmental
  82:13 240:25
epidemic  104:16
  104:21 109:1
  222:8
equal  99:13,18
  119:4,5 132:11
equality  103:5
equally  99:20
  108:5
equals  39:7
equates  83:3
equation  39:5
  54:9,21 225:3
equitable  131:11
equity  223:8
equivalent  244:18
  256:1

equivalents  108:9
erased  34:10
eric  14:25
error  89:14,20
  121:3
errors  121:5
escape  203:2
eskandari  10:13
especially  37:11
  46:5 153:12
  161:13 210:4
  211:7 213:21
essence  121:18
essential  227:23
  228:5
essentially  52:11
  82:20 94:12
  117:20 134:17
establish  125:9
  173:1
established  102:5
estate  33:21 34:21
  34:22 35:18 41:12
  42:7 47:10 51:21
  57:1 63:16,21
  64:5,6,6 77:17
  79:12 81:6 90:16
  94:7 156:15
  171:12 189:4
  243:8,23,24 244:2
  244:6,20
estates  34:4,5
  47:23 55:9 63:6
  63:11,14 65:16,20
  66:1 77:15 240:12
estimable  36:25
  59:5 71:24
estimate  33:3 41:5
  43:14 54:13 55:2
  59:2 71:12,20
  127:2
estimated  32:12
  32:22

estimating  58:24
estimation  32:10
  32:19 37:1 44:2
  55:20 58:22 66:6
  69:23
estoppel  196:16
  196:17
et  16:3,12 33:15
  35:16 85:3 191:6
  207:21 219:21
  240:10 250:7
ethan  12:2
evaluate  59:11
  94:1
evaluated  225:24
evaluating  51:8
evaluation  55:12
  182:24
evan  8:24
evans  161:10
evaporates  76:10
evening  267:14
event  100:18
  122:14 141:19
eventually  210:20
everybody  24:18
  29:11 38:11 68:7
  74:15,17 78:23,25
  93:2 151:22 230:5
everyone's  221:19
evidence  33:14
  36:23,25 41:9
  44:9 45:23 46:8
  52:23 53:15,25
  63:5 66:12 72:14
  75:4 77:7 128:12
  133:15,19 160:5
  160:11 183:11,14
  183:18,20 184:18
  185:18,21 199:12
  222:23 273:13
evidently  193:12

evoke  83:23
evolved  120:16
ex  89:24 220:3
exact  147:18
exactly  37:24 75:5
  124:6 144:15
  203:8 234:1
  239:18
examination
  36:20 68:19 97:16
  102:5 182:21
examine  65:8
  126:12 203:12
examined  23:15
  35:2
example  40:20
  70:19 85:23 86:7
  87:20 89:2 103:15
  133:4 161:5
  169:11,20 172:24
  177:16 194:1
  197:7 238:23
  243:14 250:14
  251:13 253:2,19
  255:2,18 268:20
  272:23
examples  86:6
  241:3 250:15
  254:21
exceed  37:12
exceeded  46:16
exceedingly  45:22
exceeds  31:8
  61:13
excellent  50:4
exception  24:6
  111:24 119:6
  136:6 151:11
  194:1 227:11
  242:5 243:10
exceptions  232:21
excerpts  228:16

excess  30:25
  47:23
exchanged  271:17
exclude  190:22
excluded  23:19
  145:8,13 230:16
  232:17 238:25
  245:12 267:4,17
  269:4,6
exclusion  133:8
exclusions  177:18
  178:2 190:22
  194:20 197:11
  232:18
exclusive  199:13
exclusively  38:8
  46:1
excuse  55:18
  125:4 168:2
  181:24 187:19
  228:25 232:21
  246:13
executives  214:10
exemption  164:25
exemptions  165:7
exercise  51:16
  53:18 103:13
exhaustive  148:16
exhibit  24:10,17
  24:25 70:24 82:24
  99:8 100:17
  102:23 103:2,6
  167:19 257:9,11
  257:19,20 258:24
  258:25
exist  82:11 158:20
  169:9 184:4
  207:11
existed  101:16
  207:19
existence  166:17
existing  171:7

exists  24:10
expand  260:20
expanded  69:6
  148:17 222:10
  249:11 257:20
expanding  236:3
expansive  255:1
expect  151:17
  261:10 274:12
expected  30:25
expecting  216:9
expects  110:18
expedient  148:3
expended  84:13
expenditures
  102:6
expense  112:5
  246:1
expensive  132:23
experience  104:22
  208:1,6,24 275:7
experienced
  213:10 218:25
expert  19:25
  33:14 36:16,17,18
  38:19 58:20,24
  59:2,4 63:23
  66:23 73:13,13
  102:13 104:3,6
  108:11 182:23
  215:2
experts  58:16,19
  186:15 211:9,10
explain  19:16
  21:16,22 182:3
  236:20 240:8
explained  18:22
explaining  48:24
  73:11
explains  222:9,22
explanation
  113:24 130:22

**explicitly** 29:12
**exposure** 47:5
  148:23
**express** 190:5
**expressed** 17:2
  50:14 175:18
  193:23 203:3
**expression** 190:8
**expressive** 275:5
**expressly** 21:10
  22:24 205:12
  246:21 261:13
**extend** 244:24
**extended** 148:17
  158:11
**extends** 244:23
**extensive** 33:13
  148:20 230:19
**extent** 22:7 29:25
  64:10 96:21
  113:17 127:15
  137:22 139:15,17
  150:12 151:10
  155:21 157:8
  158:10 161:2
  163:24 182:19
  190:10,23 240:14
**extinguished** 56:6
  56:18 150:22
**extra** 246:1
**extraordinarily**
  17:9 30:18 38:1
  77:8,10
**extraordinary**
  45:7 68:14 148:15
  151:1 240:5
  270:14,17 271:5
  274:21
**extreme** 220:9,9
**extremely** 97:15

**f**

**f** 1:21 14:19 276:1
**f.2d** 148:5
**f.3d** 128:11
**f.3rd** 99:19
**f.r.d.** 101:22,23
**f2.d** 147:11
**fabulous** 117:18
**face** 21:4 47:5
  75:2 92:3 132:8
  192:17 237:2
**faced** 45:13
  158:12 164:3
**facilitate** 17:20
**facilitated** 18:9
**facilities** 160:1
  161:1
**facing** 111:1
**fact** 25:5 32:22
  35:22 44:9 59:3
  60:8,8 63:25 70:3
  70:5 71:13,14,18
  74:10 75:18 84:12
  84:15 85:7 87:22
  94:17 96:4 98:8
  98:14 105:12
  108:12 109:25
  113:19 123:5,19
  124:5,10 128:7
  132:9 163:8
  169:24 176:2
  177:19 179:2,6
  182:7 189:6
  195:19 196:23
  199:11 200:10
  203:13 215:13
  217:11 235:24
  251:7 252:15
  257:21 259:2
  262:3 263:11
  264:7 274:1
**facto** 89:24

**factor** 28:12
  101:21 102:7
  114:23,24
**factors** 100:10
  108:9 110:5
  111:16 113:10,20
  156:10
**facts** 33:4 36:15
  68:25 69:9 70:17
  73:7 79:17 81:10
  146:20 157:1
  238:7 246:16,18
  248:6
**factual** 29:5 42:20
  64:19 136:15
  184:6 190:1,10
**factually** 68:7
  124:6 125:3
**fail** 104:1
**failed** 33:11
  237:13
**fails** 31:13 100:5
**failure** 55:12
  67:13 242:4
  250:11
**fair** 17:15 18:16
  28:23 41:23 51:1
  51:24 57:2,3 59:6
  62:9 96:14 99:1
  101:24 102:24
  103:14 118:14
  119:16 150:9
  250:17 273:9
  274:6
**fairest** 68:14
**fairly** 51:14
  106:18 124:20
**fairness** 28:4,16
  29:4,16 30:7,13
  31:22 68:20 79:13
  97:5 113:17
**faith** 67:4,6 97:6,8
  97:23 98:19 99:11

108:2 109:2
  110:10 116:14,21
  156:24 167:23
  181:21 241:14
  249:16
**fall** 202:4 242:15
  249:24
**falls** 35:14 99:22
  274:19
**false** 72:15
**familiar** 80:18
  134:21 150:3
  213:23
**families** 40:14
**family** 4:9 21:20
  24:13 40:12 145:3
  214:10 215:2
  224:7,12,20
  225:13,18 246:5
**far** 23:9 46:14
  74:1 76:1 90:13
  102:8 121:19
  122:3 127:20
  137:16 147:5,6
  155:2 156:9
  195:16 197:12
  200:7 204:9
  224:23 243:16
  248:13 253:6
  259:11 274:3
**farfetched** 98:1
**farrell** 10:14
**farther** 75:13
**fashion** 88:10
  124:20 131:11
  133:2 136:24
  157:8
**fashionably**
  100:11
**fast** 179:21 272:1
**faster** 71:3
**fatal** 109:20

fathers 225:22
favor 52:10 68:11
  77:20 83:1 94:19
  126:9,17 169:16
  178:14
favorable 112:13
favored 98:8
fda 211:9 222:8
  222:10,13,18,21
  250:23
fear 213:1
fearsome 44:21
feasibility 185:2
  186:23
feasible 185:3
feature 45:18 92:1
  156:17
february 146:23
  148:16 222:7
federal 35:16 36:1
  46:23 47:4 57:21
  67:11 71:23 82:17
  147:12 151:18
  163:22 189:5,25
  190:11 255:11,24
  267:20
feeble 226:4
feed 204:24
feel 59:1 154:19
  181:7 207:24
  208:5 211:8,23
  213:20,21 221:15
feeling 210:16
feeney 10:15
fees 34:2,13 40:20
  70:14 153:17
  224:11
feinberg 220:12
feld 220:19
fellow 161:14,15
felt 117:19 154:15
  210:16 215:17,17
  271:12

femino 10:16
fentanyl 214:4,5,7
festers 104:4
fewer 19:11
fiduciaries 246:20
fiduciary 39:25
  41:15 74:18
  148:10 171:12
fielding 232:25
fifth 8:11 176:15
fifty 98:2
fight 94:20 117:21
  181:11
fighting 44:14
  45:19
figure 42:9 47:1
  152:15 188:14
  260:10
figuring 77:5
file 62:21 70:23
  133:1 152:8
  154:12,15 156:6
  157:12,24 158:15
  158:21 162:3,10
  178:17 271:18
filed 18:13 20:2
  21:17 34:6 39:25
  40:4 43:3 62:8,22
  62:23 85:15 93:4
  93:5 122:5 124:25
  131:13 142:15
  146:2,22,23,25
  153:7,11,21
  154:15 156:4,11
  157:17 161:22
  176:23,24 177:12
  177:16,25 180:10
  185:18 204:20,22
  205:5 215:8,14
  217:17 218:14
  224:13,17 225:17
  228:15 229:21
  257:6 272:25

filing 62:25 63:13
  85:6 120:16
  122:25 123:1
  124:13,19 136:8
  148:24 161:24
  185:11 205:15
filings 270:14
final 17:3 18:4
  44:3 78:19 87:4
  102:10 133:6
  185:24
finalized 257:19
  271:15
finally 42:24 79:5
  161:24 225:13
  246:2
financial 94:6
find 58:18 79:18
  89:17 104:18
  136:4 143:4 148:3
  151:17 154:5
  182:6 189:15
  192:6 195:17
  198:19 228:17
finding 58:2 170:7
  173:12,15,24
  174:8,9 181:16,18
  182:5,5 184:14
  185:5,9 186:3
  191:24 193:1
  198:16 199:1
findings 29:5
  163:8,24 164:1,6
  164:15 166:19
  167:15,19 168:4
  168:22 169:13
  170:24 171:2,4
  172:5,11 173:8,10
  176:6,19,20
  178:19,23 179:6
  181:14 183:24
  184:9 185:4,7
  186:13,24 193:22

193:25 195:4,19
  196:22 200:10
  201:7,17 202:13
  203:14,19 204:10
finds 255:4
fine 28:3 32:2
  52:22 68:16 84:8
  141:18 144:2
  161:15 167:9
  175:3 199:24
  201:20 204:7
  210:25 218:23
  219:7 227:6
  228:20 230:7
  257:14 264:18
fineburg 129:14
fines 153:17
finigan 148:19
finigan's 159:20
finzi 10:17
firefighter 85:2
firm 24:10,15
  25:4,5 120:22
  176:1 181:4
  201:17 228:11,11
  228:11
firm's 227:17
firms 44:21,22
  224:6,12
first 5:17 19:19
  20:16 21:25 23:10
  25:15 28:1 31:14
  50:7 53:14 69:13
  75:8 80:15,19,25
  87:6 88:7,14,17
  89:6,11 90:7 97:7
  98:5 100:21 105:1
  112:22,22 116:10
  119:23 120:24
  121:6 122:20
  123:24 124:4,13
  124:23 126:3,20
  127:7 130:6 131:9

133:9 137:5
138:17 140:12,18
141:3 143:22
146:9 155:6 156:2
159:14 160:14
162:19 164:9
168:22 172:2
174:21 175:9
176:25 178:19,24
178:25 179:10
181:17 182:1,12
187:23 191:6,12
191:21 192:23
193:22 196:4
197:15 205:3
207:1 217:9 220:6
221:23 224:16
229:18 230:13,16
233:5,8,9,21
240:9 241:9
242:10,15 255:13
257:17 264:23
266:3 267:24
**firstborn** 220:1
**fit** 24:12 130:18
130:20 255:3
**fitch** 7:2 146:4,15
146:25 150:1
155:5
**fitzsimmons**
10:18
**five** 35:25 36:1
48:19 72:12,21
76:8 176:13
261:10
**fix** 18:7 93:15
111:2 196:1,2
261:23 262:6,18
**fixed** 89:14,20
92:6 196:21
261:17
**fixing** 262:10

**flatly** 87:18
**flaw** 109:20
**flawed** 105:6
**fletcher** 10:19
**flexibility** 80:22
158:9
**flies** 130:14
**flipping** 187:5
**flooded** 207:8
**flooding** 160:20
**floor** 6:9 18:4
68:1
**florida** 96:25
143:12 244:18
245:25 255:11
**flow** 46:1 72:8
74:14 109:15
137:18,20,22
**focus** 49:17 90:13
109:2 110:22
111:7 187:6 194:5
244:8 266:18
**focused** 53:13
60:23 61:2,3
108:18 151:12
176:8
**focusing** 188:15
191:7
**fogelman** 6:12
239:24,25 240:1
241:5,12,16
242:22,25 249:5,7
249:21 250:9
252:7,11,13,17,20
252:23,25 253:3,5
253:13,22,25
254:12,19 255:6
255:19,23 256:2,5
256:7,15 258:10
**folding** 128:1
**folks** 28:11 161:18
**follow** 16:17
29:24 212:17

**followed** 162:19
177:23
**following** 144:16
183:8 194:16
220:8
**follows** 100:6
**footnote** 83:6
157:21 158:8
232:2 235:13,25
236:2,3
**forced** 79:12
**forces** 212:20
**foreclosure** 56:24
**foregoing** 82:1
194:18 276:3
**foreign** 120:3
128:1,8,15 132:7
134:23 135:22
136:2,6,14,22
143:2,13 144:9
**forfeiture** 35:12
35:21
**forget** 34:17 66:17
**forgive** 218:20
**forgot** 233:10
**form** 123:17
206:24 273:21
**formally** 20:17
154:11 174:4
204:5 274:15
**former** 153:9
243:11 266:20
270:10
**forms** 135:2,3
159:18 272:1
**formula** 105:6,11
105:19 106:11
108:6,8,23 110:23
111:8 112:16
248:20 264:6
**formulas** 213:6
**formulated**
208:20

**forth** 34:24 80:20
85:5 87:2 97:18
120:13 159:19
160:1 161:25
200:10 228:10
240:3 262:15
**fortunate** 20:21
**fortune** 225:14
**forward** 54:24
60:18 65:17,25
107:10,14 111:4
156:15 158:23
**foster** 85:10
**found** 111:5
163:19 215:7
227:15 238:9
275:4
**foundational**
230:12
**foundations**
223:22
**four** 35:11 36:1
48:20 76:8 103:10
130:5,7 225:2
**fourth** 18:1 94:1
98:17 100:3 103:8
103:9 225:13
**fraidin** 10:20
**frame** 136:23
**framework** 48:25
80:16 164:18
**francisco** 81:21
**frank** 7:1 136:4
146:7 149:24
**frankel** 4:15
**franklin** 7:6 13:13
**frankly** 28:10
59:24 79:23 89:17
90:12 91:5 114:12
123:21 128:21
129:16 136:10
138:23 154:18
171:12 175:19,22

178:1,11 190:20
197:19 199:16
201:18 244:22
245:22 263:22
**fraud** 25:20,22,23
25:23,25 26:1,2
135:1 240:8 241:1
241:1 254:3,5
**fraudulent** 26:2
42:8 63:23 267:25
268:1 269:10,21
269:22 270:2
**frazier** 10:21
**frederick** 14:13
**free** 47:24 151:12
151:15 152:6
153:15 165:21
**frenetic** 38:16
**frequently** 108:16
243:9
**friday** 21:5 225:2
273:10,19 275:12
**friedman** 10:22
**front** 84:22 111:6
180:1 185:13,21
185:22 193:8
**fruition** 48:4
**frustrate** 166:4
171:11
**frustrated** 119:17
170:14
**frustrating**
171:18
**full** 28:13,15 97:3
120:13 135:24
155:18 182:9,9
184:6,6 186:20,20
189:24 190:9
220:23 226:19
230:18 239:19
**fully** 70:6 190:19
210:20 226:20
228:10

**fun** 265:6
**function** 208:15
230:3 269:1,7
**fund** 100:24 102:5
105:13 106:12
107:5 108:3
109:12,24 110:12
112:1 114:1 115:6
116:9,16 117:4
206:21
**fundamental**
139:25 143:21
146:17 200:17
244:12
**fundamentally**
135:7 136:21
141:20 142:9
175:25
**funded** 199:11
261:25
**funding** 212:23
**funds** 37:14 101:2
106:21 223:19
225:11 262:2
**funnel** 213:3
**funny** 138:11
**furnish** 204:3
**further** 17:13
18:15 22:5 24:25
25:13 46:6 79:19
92:17 94:5 134:7
143:25 191:6
193:15 226:24
229:7,16,21,25
254:13 256:16
258:18 261:2
262:23 268:5
271:23
**furthers** 47:22
**futility** 94:4
**future** 23:4 107:2
195:10 196:24

**g**

**g** 9:23 10:3 16:1
237:23 243:17
**gabe** 9:17
**gain** 94:13 158:11
158:14
**galle** 10:23
**gamble** 94:13
**game** 157:8
**gange** 10:24
**ganged** 98:3
**gap** 45:16
**garden** 168:23
169:20
**garrity** 50:2
**gartrell** 10:25
**gary** 11:9
**gate** 246:3,8
**gatekeeping**
245:24 246:3,7
269:1,6,12,15
**gates** 246:7
**gaurisankaran**
37:5
**gears** 95:4 263:23
**geldreich** 11:1
**general** 5:2 6:1
41:17 82:10 88:8
90:20,24 91:13
92:8 96:24 97:23
101:18 102:3
104:14 114:7
148:1 215:15
221:1,2,11 223:4
223:24 224:1
225:17
**general's** 97:1
**generally** 49:19
114:20 123:7
134:10 147:12
151:4 152:15
167:21 237:11

**generals** 225:8
**general's** 5:1
**generated** 224:3
**generative** 219:24
**generics** 182:17
**gentle** 161:15
162:1
**genuinely** 138:19
**geoffrey** 11:7
**george** 221:2,9,11
**gerard** 3:12 4:13
9:20 21:19 145:3
246:4
**gerry** 80:2
**getting** 28:22
29:17 35:9,21
36:2 45:17 60:14
64:18 70:18,22
96:17 101:2,2
114:25 119:9
130:9,10,11
133:19,21 138:8
138:23 156:9
162:11 209:13
225:10 236:7
251:21 256:14
**gibson** 11:2
**giddens** 11:3,4
**gift** 269:17,20
**gilbert** 7:16 11:5
167:11 176:1
201:17
**gill** 11:1
**gillian** 13:22
**give** 18:8 20:15
21:25 26:14 27:21
67:25 116:13
118:12 150:20
170:5,22 171:11
202:8 204:6
209:12,15 214:23
218:2 225:1 229:8
241:22 242:9

**given**  33:13 51:7
  51:18 58:19 64:15
  66:8 79:24 91:15
  109:25 112:7
  122:25 130:4,13
  158:8 159:10
  177:18 178:2
  197:12 204:25
  253:16 264:25
  271:12 273:13
**gives**  45:8
**giving**  56:13
  207:23 241:23
  253:11
**glad**  123:20
  154:20
**gleit**  5:14 227:2,2
  227:7 228:23
**global**  35:9 123:8
  132:4 246:22
  247:5
**gloria**  221:8
**glove**  211:19
**go**  21:23 26:13,24
  33:23 37:16,22
  48:25 50:23 52:1
  52:9 54:24 60:17
  64:23 65:25 73:22
  75:6 76:23 79:12
  83:14 90:2 93:22
  100:20 108:24
  109:8 110:13
  111:22 112:3
  120:10,20 122:22
  128:22 131:15
  139:16 141:16
  146:8 152:1
  156:10 157:18
  162:19 167:3

249:5 250:14
260:20 265:20
269:19 273:11,23
274:5,6

170:2 177:14
178:7,8 179:22
180:25 185:4
193:21 197:1,24
201:1,21 202:23
205:7 211:5 212:6
213:6,11 216:10
217:15 232:20
233:8,8 235:19
237:20 238:18
245:25 246:8
254:13 264:23
265:8 273:15
**god**  215:18
**goes**  25:10 47:9
  60:21 70:18 90:15
  103:24 144:23
  152:10 167:2
  177:13 178:23
  180:10 189:6
  191:24 192:19
  199:16 209:19
  229:15 265:25
**going**  17:12 21:8
  30:16 41:7,8
  65:17 72:7 73:19
  74:4 89:14 96:24
  102:3 104:11
  105:3 106:21
  108:24,25 109:15
  110:13 111:3,17
  116:13 117:20
  118:10 121:23
  122:10 124:11,14
  130:22 131:1,22
  138:1 144:16
  146:8,9 149:9
  154:11 155:22
  156:15,17,21
  161:17,22,23
  162:13,23 167:6
  172:24 177:12
  178:16 179:24

180:21 182:3
183:20 185:11,20
188:7,10 189:22
190:19 191:4
192:24 193:6,8
196:5,6,7 203:7
203:24 206:19
207:18,25 209:24
210:3,20,23
211:14 212:6
213:1,2,3,5,20
214:24 215:20
216:3 217:6,16
218:6,6 219:3
228:22 235:15
236:7,13 238:4
243:25 247:6
248:14 249:18
253:12,14,15
254:10,11,20,21
255:16 258:7,13
259:11,19 260:20
265:18 266:17
273:18
**gold**  9:2 46:20
  76:20 87:24 88:1
  88:2,6,13 89:9,11
  90:9,23 91:3,5,18
  91:22 92:1,19
  94:22 216:13
**gold's**  42:17
**goldman**  4:6 28:2
  48:7,9,15,19,23
  49:21 50:7,10,13
  51:1,25 52:2,17
  52:19,22 53:20,24
  54:5,14,17 55:25
  56:3,10,16 57:24
  58:5,8 59:7,18,21
  60:1,6 61:2,5,7
  62:18 63:18 64:10
  65:1,4,10 67:16
  67:20,25 68:2,3

73:17 75:11 76:13
76:20,21 77:3,22
78:10,14 79:17
261:4,6,6 262:21
263:4,7,11,15,25
264:11 266:16,22
**goldman's**  69:24
  72:2 74:22 79:13
**goldstein**  11:6
**good**  16:2,11,19
  23:24 37:4 48:24
  67:3,6 96:14 97:5
  97:8,10 98:19
  103:24 106:17
  107:3,18 108:2
  109:2 110:9
  113:23 114:19
  116:12,14,21,25
  131:3 134:9
  145:18,23 152:4
  162:25 167:10,23
  181:21 212:6,6
  215:3 229:23
  233:7 239:25
  256:25 266:12,17
**goodman**  11:7
**gostin**  11:8
**gotten**  75:1
  225:14 230:9
**gotto**  11:9
**gov't**  7:17
**governance**  207:3
**governed**  21:12
  125:23
**governing**  80:19
**government**  35:16
  47:4 67:11 82:17
  87:14 204:24
  261:21
**governmental**
  3:16 36:2 46:2
  50:11 62:10,10
  84:10,19 85:9

86:13 91:14 95:9
95:15 125:20,23
127:22 137:8
143:2,17 162:20
167:12
**governments**
37:11 46:23 80:14
82:3 83:25 84:13
84:16,22 85:4
86:3,10 87:9,15
87:21 88:17 94:23
217:13
**governor** 215:15
218:1
**grab** 106:25
109:23 110:16
**grace** 99:17,19
**grant** 274:16
**granted** 129:22
**granting** 247:23
**granular** 81:11
**graph** 142:18
**grateful** 19:22
20:5 104:14
110:24
**gravamen** 254:23
**grave** 105:7
**great** 41:21,21
80:22 142:2 157:4
216:6 221:17
246:6 265:16
**greater** 33:5
**greatly** 33:23
131:5 140:1
**green** 11:10,11
**greenberg** 5:16
120:23
**greenspan** 11:12
**greenwich** 64:13
**greville** 223:3,23
**grim** 7:22 11:13
163:7 166:25
167:5,10,11 170:1

170:3,16,20,22
174:23 175:24
179:1 180:15
181:2,7 182:5
184:11 185:21
190:25 197:7
200:24 201:2
202:1,15,17
**grossly** 96:8
**ground** 18:4 47:3
104:20 147:20
181:3 213:4
274:21
**grounds** 57:20,21
57:22
**group** 3:16 6:15
7:9 34:18 50:11
84:6,10 86:8
88:18 93:20
112:18 148:11
155:15 221:7
253:10
**groups** 39:24
44:18 47:19 98:25
112:17 137:12
217:23
**growing** 103:10
**grows** 213:13
**gruff** 275:1
**guarantee** 37:13
44:23
**guaranty** 220:16
**guard** 11:14 96:25
97:15 101:7
111:14 112:5
116:12 203:6
**guard's** 97:12
101:10
**guess** 27:3 60:21
67:12 94:16 95:2
122:22 123:2
139:4 187:6
193:21 218:16

233:24 246:8
251:19 259:24
267:9 268:17
274:4,13
**guidance** 45:10
238:20 271:20
**guidelines** 206:24
**guilty** 79:8
**gulf** 19:6
**gump** 220:18
224:24
**gun** 85:25
**guys** 211:2

## h

**h** 10:12 15:17
24:10 52:15 106:1
182:15 185:6
**haberkorn** 11:15
**habit** 175:8
**hadley** 4:8
**hale** 8:1 175:1
**half** 34:13 42:15
44:24 58:11 96:16
101:1 195:18
224:16
**hallmarks** 29:3
**hampshire** 53:5
**hampton** 220:13
**hand** 17:17 51:13
132:15,18 133:13
157:6 160:5,10
211:19 217:14
226:12 237:11
259:15 262:12
269:25
**handcuffed** 140:9
**handcuffing**
139:6
**handed** 70:22
**handle** 104:11
**handled** 90:5
**handling** 87:25
225:9 275:8

**hanover** 150:19
**happen** 78:1
127:23 133:22
214:16 238:11
253:12,14,15
**happened** 76:23
125:12 141:6
178:5 247:8
**happening** 108:20
155:21
**happens** 132:3
189:17 196:14
209:22 210:18
213:8
**happier** 224:22
**happy** 16:17
20:12 26:24,25
67:20 136:18
187:3,5 203:20
205:4,16 228:18
230:4 233:4 246:2
264:19
**hard** 17:9 58:8
116:22 118:21
126:24 154:5
274:23
**harder** 230:18
**harm** 84:15 159:1
214:24 226:15,18
226:19 251:10
**harold** 11:24
185:6
**hasn't** 146:25
156:8
**hate** 115:15,17,18
217:1
**hauer** 220:19
**haven't** 199:15
**hayden** 9:21
**hazard** 188:10
**head** 28:6 221:8
221:10

**headings** 184:12
**heads** 185:12
**heal** 209:9 210:19
  210:20
**healing** 211:6
**health** 105:16
  106:6 158:5 207:1
  218:1 220:14
  221:5 271:3
**healthcare** 85:10
  110:1,2 211:18
  215:2
**hear** 17:13 19:18
  20:12 22:19 78:10
  79:25 80:4 88:4
  93:17 95:11,14
  115:23 118:4
  120:5 131:3 141:8
  141:9 146:9 159:7
  162:21 174:21
  175:2 176:9,23
  178:4 179:5 205:4
  205:16 218:16
  229:19 233:5
  257:13,14 263:22
  263:25 266:22
**heard** 16:8 17:8
  25:3 68:22 76:2
  78:9 79:7 93:4
  96:15 155:19
  165:13,14 166:15
  204:1 206:2
  227:19 229:15
  237:10 239:11
  250:16 261:4
  273:13
**hearing** 2:1,1 16:7
  16:18 18:18 58:16
  74:12 95:21 98:18
  100:3 101:11
  104:18 120:15
  144:17 145:25
  148:21 153:23

159:23 161:9
  227:19 231:20
  236:11,16 240:5
  265:17 266:8
  270:22 271:1,5
  272:24
**hearings** 275:8
**heart** 18:17 68:10
  150:16 162:9
  212:17 220:8
  250:10
**heartache** 225:23
**heartbroken**
  225:15
**heartburn** 202:8
**heartfelt** 272:12
**heather** 10:21
**heathridge**
  223:11
**heaviest** 26:15
**heavily** 60:25
  113:14
**heavy** 87:10
**heitzenrater**
  11:16
**held** 42:2 56:4
  59:12 66:7 91:10
  91:14 93:23
  147:22 232:1
  262:19
**hell** 44:14 209:21
**help** 19:16 45:17
  48:4 109:21 110:9
  117:13,14 161:11
  161:12 187:5
  191:19 200:1
  209:3,15 221:3,6
  221:18 225:11
  226:4
**helped** 209:23
  213:20
**helpful** 22:11,19
  23:7 76:1 145:1

191:20 228:17
  230:2,6 250:9
  255:6 258:20
**helping** 37:4 46:6
  161:18 219:18
**helps** 145:16
  232:24
**herculean** 151:9
**here's** 189:19
**heroic** 17:5
**heroin** 216:1,4
**herring** 11:17
  67:2
**hesitate** 67:23
**hey** 248:7
**he's** 156:19 202:8
**hidden** 225:25
**high** 36:9 154:7
  222:22,25,25
  266:11
**higher** 132:2
**highest** 29:12
  112:2,4
**highlights** 38:20
**highly** 115:6
  142:1 208:14
  226:1
**highway** 115:2
**hippocratic**
  212:18
**hire** 59:4
**hired** 38:19 58:17
  59:3
**hirshman** 11:18
**history** 33:6 57:10
  58:2,7,10,13 59:8
  59:10 151:24
  175:14 214:14
  261:20 263:17
  271:2
**hit** 92:22
**hitting** 271:25

**hoc** 4:16 6:15 7:9
  7:17 50:11 95:9
  95:15 137:12
  148:11 155:15
  162:20 167:12
  169:15 202:22
**hold** 46:12 58:1
  82:12 118:9 123:7
  208:14 274:9
**holder** 49:7,12
  112:12 232:10,11
**holders** 61:9 62:4
  235:22 260:15,17
  260:18
**holding** 143:9
  222:18
**holdings** 32:3
  102:11
**holds** 82:9 223:6
  223:18
**hole** 38:6
**home** 67:11 73:23
  85:16,18 272:7
**homogenous**
  61:19
**hon** 1:22
**honestly** 97:10
**hong** 225:17
**honor** 16:6,19,22
  17:1,2 19:7 20:14
  21:7,15,19,21
  22:2,9,15 23:14
  24:12,25 25:12,14
  25:19,24 26:4,9
  26:14,21,24 27:23
  27:25 28:8,15,19
  29:19 30:15,20,24
  31:14 32:1 33:13
  37:18 38:25 42:4
  42:13,24 43:2,10
  43:12,22 44:3
  45:9,21 46:10,18
  46:20 47:1,13

48:1,9,16 51:25
53:25 56:11,16
58:9 60:1,6 61:7
63:3 65:4 67:7,16
67:21,25 68:3,4
68:21 69:13 70:6
70:16 72:6,6,9
73:11,12 75:5,23
76:20 78:19 80:2
80:4,7 82:19
83:20 84:5,9,11
84:12,21,24 85:1
85:13,14,20 86:2
86:7,14,18,24
87:4,12,19,21
88:1,3,11,13 89:9
89:17 90:3,23
91:18,24 92:17,19
92:22 93:6,18,19
93:21,25 94:8,13
95:13,20 96:22
97:15 98:6,13,20
101:3 103:12,18
103:20 104:8,13
107:9 109:21
110:24 111:12,18
114:16 115:16,24
117:15 118:2,13
118:20 119:3,13
119:17 120:7,8,21
122:9 124:17
126:10 129:2,7
130:21 131:14
133:24 138:10
140:18 141:8,17
142:9 143:6,25
144:4,15,25 145:4
145:11 146:11,17
148:15 149:24
152:10 154:13
155:8,14 157:3
159:3 160:14
162:25 163:3,11

165:11,14 167:8
167:11,14,18
170:16,20 171:7
173:7 174:18,23
174:25 175:2,4,8
175:10 176:7,18
176:19 177:8,10
177:22 178:10,18
179:8,15,16,23,25
180:19 181:5,11
182:6,9,13,22
183:3,4,8,18,23
184:2,7,17,24
185:2,6,9,24
186:1,11,11,16,19
187:3,4,14,21
188:3,6,23,24
189:6,12,22
190:11 191:17
192:3,21 193:6,8
193:8,12,19,20
194:5 195:13
196:2,20,22 197:1
197:16 198:3,11
198:25 199:18,20
200:6,14,21,24
202:1 203:8,18,23
203:25 204:8,17
205:17 218:9
226:5 227:2,7
228:9,13,18 229:1
229:23 230:4
232:24 233:7,7,22
234:19,22 238:22
239:15,23,25
240:2 241:5
242:21,22 243:3
244:10,22 246:4
246:11,15,24
247:12,19 248:3,4
248:11 249:5
250:9,12,15
251:11,17 252:7

252:11,13,18,25
253:5,13,22,25
254:13,16 255:19
255:23 256:2,5,25
257:3,4,13,16,21
258:3,7,19,22,23
259:7,17,21 260:1
260:3,8,23,25
261:3,4,11 262:21
263:7,25 264:13
264:15 265:19
266:22 267:2,13
267:20 268:23
269:24 270:12,13
271:14,19 272:9
272:11,24,25
**honor's** 114:14
115:13 118:4
140:13 141:22
227:22 231:19
240:7 256:15
264:25
**honorable** 225:19
**honor's** 159:9
198:23
**hope** 22:11 24:8
25:9 44:4 45:24
136:23 142:9
145:1 157:3 176:5
205:6 212:1
217:12,12 238:20
261:11 266:19
275:8
**hopeful** 232:23
**hopefully** 19:3
21:9 22:21 30:16
144:22 161:2
230:5
**horewitz** 182:23
**horrible** 47:20
**horrific** 104:22
**horse** 131:23
203:7

**hospital** 85:3
216:11
**hospitals** 41:20
217:13
**hotel** 175:6
**hour** 195:18 211:4
212:5 234:2
271:21
**hours** 78:4 144:13
144:21 212:7
214:5
**house** 151:23
**howard** 14:24
**hudson** 4:10
11:19
**huebner** 3:8 16:6
16:19,20 20:14,19
21:7 22:3 27:25
28:8 30:15 42:24
43:2,10,12 48:24
51:3 52:25 58:15
66:17 68:4 72:1,6
75:5,8,13,17,19
75:22 92:22 93:18
96:13 117:15
220:10 233:24
234:3 235:14
270:12 271:9
272:9,13,19
**huebner's** 52:6
**huebner's** 199:12
**huge** 77:23 213:2
**hugh** 12:25
**human** 207:2
214:13 275:6
**humanly** 272:1
**hundred** 180:20
190:3
**hundreds** 34:5
39:3,6,22 40:19
43:23 214:15
271:10

**hurley** 11:20
**hurt** 221:19
**husband's** 220:3
**hyde** 2:25 276:3,8
**hyder** 11:21
**hypothetical**
  30:23 33:2 42:10
  53:10 62:5 78:1
  89:21 249:3
**hypothetically**
  116:2
**hypotheticals**
  102:7

**i**

**i.e.** 204:21
**iac** 141:23
**iacs** 65:19 122:18
**idea** 50:14 66:4
  239:5 243:5 266:6
**ideas** 158:3
  266:13
**identical** 74:5
  81:5 99:16 100:7
**identically** 45:6
  45:14 70:4
**identified** 57:6
  62:5 63:3 238:24
  238:25 248:9
  273:2
**identify** 23:18
  55:14 62:22 259:4
  259:8
**identity** 150:22,24
**ignite** 222:8
**ignore** 51:11
  107:16 152:23
  265:12
**ignored** 72:10
**ignores** 63:7
**ii** 52:4
**illegal** 140:21,24
  208:10,24 212:13
  238:12

**illustrative** 81:14
**imagine** 40:19
  200:16
**imes** 11:22
**immediate** 67:3
**immediately**
  220:4
**immunities** 136:7
  136:14,22
**immunity** 120:3,3
  136:2 137:9 143:2
  143:10,14,17,21
  143:24
**impact** 166:10
  172:20 271:4
**impacted** 132:10
  132:11
**impaired** 30:22
  49:7 184:3
**impede** 201:15
**imperative** 28:18
**implement** 201:15
**implementation**
  134:13
**implemented**
  171:21
**implementing**
  237:3
**implication** 134:8
**implications**
  183:19
**implicitly** 29:12
  190:7
**implying** 75:9
**importance** 66:8
  100:18 109:6
  141:25 159:10
  160:9
**important** 19:3,4
  21:2 29:10 37:16
  65:23 68:9 77:9
  77:10 78:17 84:21
  87:1,16 95:23

107:6 111:2
  117:10 136:10
  141:20,21 142:1
  150:15 172:12
  174:7 199:25
  202:17,20 218:2,8
  231:8,17,18 232:4
  234:25 273:12,17
  274:9
**importantly**
  80:15 186:15
  241:19
**impose** 51:6 94:4
**imposed** 31:11
**imposes** 245:17
**impossible** 38:13
  94:12 133:11
  134:3 152:3
**impression**
  118:12
**improper** 92:16
  126:4 206:21
**improperly** 80:12
  198:9 227:12
  255:2
**improved** 119:10
**inability** 119:18
**inadequate**
  109:25
**inappropriate**
  17:25 93:11,13
  109:23 142:18
  186:21 234:10
**incapable** 58:22
**incarcerated**
  146:16 150:11
  151:15 154:4
  155:17,25 157:2
  157:23 158:4,13
  159:17 160:10
  208:25
**incentive** 171:13

**inception** 171:1
**incidents** 86:4
**include** 43:9
  46:19 50:22 55:5
  58:11 71:22 83:12
  128:1 177:13
  196:10 240:8
  244:3 260:15
**included** 77:15
  133:20 138:5
  167:14 172:5
  229:4 231:23
**includes** 119:5
  155:16 164:4
  204:14 217:21
  232:8,10 240:11
  251:21 258:25
**including** 18:9
  19:25 31:9,22
  33:14 70:8 82:13
  84:14,17 85:9
  86:5 98:12 101:25
  115:12 121:25
  128:9 133:3
  137:14 142:14
  143:2 155:17
  174:10,13 179:12
  180:17 182:1
  185:10 187:10,22
  190:24 192:10
  194:13,19,21,23
  194:25 195:2,4,10
  219:1 220:10,13
  224:7 226:24
  234:13 240:6,20
  240:22 249:9
  255:1 260:11
  268:6 271:9
  274:18
**inclusion** 165:3
**inclusive** 44:8
**income** 46:24
  65:16 145:13,14

223:20 224:2
**inconsistencies**
  101:13
**inconsistent** 92:14
  145:6 184:16
**incorporated**
  235:13,19
**incorporates**
  235:22 237:1
**incorporation**
  261:14
**incorrect** 80:17
**incorrectly** 25:20
**increase** 110:11
  116:15
**increased** 85:10
  85:10,11 103:4
**incredible** 157:14
**incredibly** 42:14
  87:17 129:16
**incumbent** 51:7
**incur** 37:8
**indelicato** 11:23
**indemnification**
  26:16
**independent**
  66:13 141:22
  231:15,16 237:20
  238:11 239:18
  249:17 250:5
  252:1 256:13
  268:20 269:15
**independently**
  234:11,12
**indicate** 166:9
  174:12
**indicated** 105:18
  105:22 208:7
  259:3
**indicates** 106:19
  107:20
**indication** 259:12

**indicative** 107:3
**indifference**
  221:19
**indirect** 137:24
**indiscernible** 18:7
  19:8 20:17 22:4
  23:20 32:24 35:6
  40:9 41:18,19
  42:3 43:20 98:19
  99:5 101:4 102:1
  102:12 103:2,3,18
  111:15 112:6
  114:11 115:9,10
  115:13 117:8
  118:6,13 121:1,1
  121:7,13 126:12
  126:14 131:1,2
  132:12 134:10,20
  134:22 139:13
  141:4,7,11,14
  144:17 150:14
  151:3 152:5,25
  153:2,12,25
  154:20 160:15
  162:5,13 163:5,18
  164:25 166:3,12
  166:23 171:25
  172:18 174:16
  180:5 182:5,6,8
  183:19 184:8,25
  185:23 189:4
  193:7 195:5
  210:14 216:25
  221:8 228:24
  232:19 240:18,20
  241:21,24 270:20
  271:11 272:3,12
  272:15,17 273:2
**individual** 7:9
  33:9 39:10,11
  40:11 45:4 62:8
  64:17,20 65:12
  69:15 73:16 76:3

76:7 94:2 112:8
  148:11 156:6
  158:8,14,23
  172:16,25 209:5
  242:8 247:25
  249:2 272:15
**individualized**
  156:18
**individually** 44:4
  183:1
**individuals**
  108:20 155:16,17
  155:25 156:14,14
  157:2,7,17,23
  158:4,13,25 205:4
  220:8 221:14
  238:25 272:13
**induced** 213:10
**industry** 211:19
  222:9 231:2
**inestimable** 32:6
**inevitable** 216:2
**inevitably** 238:5
**inextricably**
  169:6
**infirmity** 93:11
**info** 85:11
**information** 74:13
  74:23 79:11
  204:25 206:5
  222:16 251:21
**informer** 232:22
**infringes** 261:16
**inhabitants** 86:2
**inherently** 207:14
**initial** 28:4 81:4
**initiate** 225:21
**initiation** 189:3
**injunction** 20:11
  51:6,22 60:12
  63:1 74:16 75:2,9
  75:25 127:18
  137:10 206:24

227:12,23 228:5
  229:9 237:18,24
  238:9 258:6 263:8
  263:9 264:1,7
  273:1
**injunctive** 121:25
**injured** 225:12
**injury** 67:9,22
  79:4 132:19 153:1
  153:3 155:5,13,16
  156:13 209:8
  210:12 215:21
  216:21 228:4
**innuendo** 22:17
**input** 217:25
  218:2
**insanity** 266:5
**inside** 22:18
**insoluble** 140:3
**insolvent** 269:20
**instance** 122:20
  220:9 230:24
**instances** 101:20
**instant** 33:4
**instrument**
  223:18
**instrumentalities**
  266:1
**insulate** 164:11
**insurance** 8:2
  45:24 163:4,13,20
  163:24 165:11
  168:7,20 169:23
  170:7,25 173:13
  173:17,21 175:21
  176:14 177:4,16
  179:18 180:6,13
  180:16 181:25
  183:11 184:25
  186:17 187:20
  188:6,8 189:1
  191:14 194:13,13
  194:20,21,22,24

194:25 198:17
199:13 200:2
201:8,11 202:3
227:13,22,25
228:16 254:3
270:10
**insure** 164:1
**insured** 164:24,25
182:14 188:17
190:23 191:13
227:11 228:5
**insureds** 163:9
165:4,5 166:14
191:8 227:13
**insured's** 165:12
167:16
**insurer** 166:17
168:2 174:3
177:25 181:24
187:9,10,20,23
188:1,2,3,3,11
227:22
**insurers** 144:18
162:17 164:6,7,8
164:17 165:6,25
166:8 167:24
168:8 169:2,19
171:9,11,17 172:8
172:17 173:1,6,14
173:19,24 174:12
174:13,14 176:13
177:20 179:2,3
181:11 187:12
189:16 195:15
196:14,18 197:24
198:20,20 199:8
199:11,14 201:4
202:2,10,25 203:1
203:3,9
**insurers'** 164:22
171:16,22 173:8
174:1 190:18
198:6 200:9

201:24
**insurer's** 167:19
172:5 191:12
**integral** 137:13
228:6
**integrated** 227:23
**intellectual** 77:25
**intend** 21:5
273:10,11
**intended** 42:18
62:23 135:14
164:1 170:4
246:12 251:10,14
**intensity** 96:18
100:22,23,24
101:8,13 102:4
104:23 105:18
106:12 107:5,17
109:10,11,24
110:12 111:7
116:8,16 117:4
**intensity's** 107:6
**intent** 202:21,24
236:9
**intention** 106:17
**intentional** 23:25
**intentions** 97:10
107:3 170:14
**interacts** 214:13
**intercreditor**
34:10 40:24 72:25
**interest** 38:20
45:6 46:11 47:3,9
47:14 48:5,24
49:8 52:8,11 53:2
53:7 62:1 63:10
65:19,21 66:8,14
66:21 99:11
112:11,12 150:17
165:8 166:16
173:9 175:19
224:2

**interested** 22:3
138:19 226:17
**interesting** 28:9
**interestingly**
126:10 153:4
**interests** 28:2,6
28:24 29:9,22
30:3,12 31:16
38:22 39:16 42:16
43:13,24 47:22
63:13,15 68:10
80:20 98:2 99:2
112:18 138:17
212:17
**interfere** 86:1
166:11
**international**
122:24 129:3
**internecine** 39:2
**interpretation**
30:3,4,17 254:2
**interpretive** 237:2
**interrelated** 94:11
**interrupt** 74:21
105:23 114:18
169:25 170:10
234:16 241:4,6
**interrupting** 16:8
**intertwined** 169:6
**intervention**
176:4
**intolerable** 94:5
**intro** 207:23
**introduce** 212:2
**introduced**
208:13
**introducing** 216:4
**introduction**
210:6
**inuendo** 250:18
**invariably** 82:12
82:14

**investigated**
23:15 24:16
**investigation**
77:12,16 248:13
250:22
**investment** 34:6
**investments** 259:4
**invoked** 262:12
**involuntary** 63:9
134:22
**involved** 45:3
108:16 116:1
128:20 129:18,19
**involvement**
70:20 237:25
250:18
**involves** 200:2
234:13
**involving** 161:9
**ironic** 60:8
**ironically** 35:23
42:4 47:3 78:17
**irregardless**
121:3
**irrelevant** 83:23
102:11 133:16
172:9
**irrevocable** 42:7
223:15,24
**irve** 4:6 261:6
**island** 48:12 53:6
80:11 88:9 261:14
**isley** 11:8
**isn't** 160:7,11
186:22 199:10
**israel** 11:24
**issacharoff** 11:25
**issue** 23:12,12,23
24:8 25:12 32:18
48:14 51:10 58:19
58:21 59:13 66:25
72:9 95:7 96:22
98:19 102:3

104:16 106:20
107:18 108:19
110:7 111:1,11,24
113:8 115:25
116:21,22 118:10
118:19 119:22
122:23 125:25,25
127:11,20 128:3
131:7 133:7 134:8
134:18 135:12
136:23 150:3,13
152:20 153:20
154:1 155:20
158:12 159:10
160:15,22 162:12
168:10 169:5
172:10 173:11
174:2 178:11
179:20 180:24,25
181:12,15 182:13
184:5 188:20,23
189:5,13,14,24
191:15 192:12,18
193:12 196:24
197:25 222:16
223:16 224:1
229:11 231:17
233:25 234:4
235:11 236:1,14
236:20,21 238:23
238:23 245:19
254:14 273:1
274:8,10 275:3
issued 22:17
165:22 264:2
270:22
issues 27:17 36:21
41:25 81:1 101:7
101:12,15 102:22
104:17 105:7,17
107:12 111:7
115:18 148:24
157:6 161:19

169:9 171:25
172:3 173:5
175:17,22 176:3
187:4 191:19
195:15 197:8,9,17
198:12 227:1
230:5,12 240:4
271:3,20 272:21
it'd 67:23
item 19:5 28:1
80:6
iteration 165:3
it's 146:7,12
149:15 150:13
154:5 155:14,18
156:18 158:10
159:16 161:11,21
161:22 162:10,25
174:7,20 175:22
175:23,24 177:12
178:10 180:7,8,12
182:19 184:16
185:17 187:16
195:19 196:3
197:5 198:5 199:3
199:9,15 200:17
202:17,19 203:5
207:5,18
iv 249:9
ives 12:1
i'd 155:19 189:23
i'll 153:5 154:20
170:5 173:9
174:18,21 184:23
185:4 190:11
203:20
i'm 146:6 149:13
150:3 151:19
158:18 175:6
179:14,23 183:4
185:25 188:7,8,14
189:13 190:2
191:6 195:16,17

196:4 201:1,24
203:7,19,23 206:3
207:25
i've 200:8 206:1
208:8

j

j 3:11,13 5:22
7:14 8:21 9:2
12:15 13:8 14:2
15:4,9
jacquelyn 221:23
jail 160:25
james 3:10 5:7 7:6
11:11 13:13 14:9
15:16 175:9
221:21 222:1
jamie 15:22
january 147:3
221:12
jared 11:3,10
jasmine 9:10
jason 14:5
jay 9:9
jeff 227:2
jeffrey 5:14 12:17
14:2
jenna 11:19
jennifer 10:15
13:14
jepsen 221:2,9
jeremey 14:8
jeremy 12:7
jerome 15:2
jersey 41:24 64:9
64:23,24,24,25
78:2 183:22
jesse 10:6
jill 9:4
jja 181:16 187:7
187:15 199:19
jjb 186:2
job 41:17 42:19
48:24 215:3

john 10:9,10
11:14 12:19,20
96:25 97:12
116:11
johns 147:11,19
join 43:4 48:16
joinders 80:10
joined 43:1
118:16,17 146:5
155:11 261:13
joint 167:19 174:1
228:14
jonathan 4:20
13:5 95:14 223:3
223:23
jones 8:24
jordan 14:3 15:11
joseph 10:3 13:24
14:10,22 15:7
josephine 10:25
jr 9:13 11:11
15:18
juaire 220:15
judge 1:23 16:2
16:11 17:5,7,10
17:16,21 18:5
19:20 21:1 30:9
32:12,25 50:2,2,3
135:10 145:23
147:25 150:17
152:25 218:19
219:23 220:23
222:5 225:19
254:2 256:19
273:22
judgement 59:13
judges 43:10 50:4
judgment 39:13
59:19,23 60:4
64:22 69:4 71:19
75:1 77:19 265:13
judgments 33:6
60:19 63:8 65:13

66:1 69:11
**judicata** 196:23
**judicial** 70:2
  78:18 107:19
  196:16
**july** 44:10 86:17
  148:25 176:22
  220:23 224:24,25
  225:2,16
**jump** 265:11
**june** 146:24
  148:18,22
**jurisdiction** 43:16
  57:22 121:8,24
  122:4 134:15
  135:5
**jurisdictional**
  120:1 131:7 135:9
  136:22 142:24
  143:6
**jurisdictionally**
  122:20
**jurisdictions**
  43:16
**justice** 68:19
  74:18 102:6 112:4
**justifies** 93:11
  94:9
**justify** 96:10
**jx79** 81:15
**jx825** 81:21
**jx944** 81:15
**jx947** 81:21

**k**

**k** 11:17
**kami** 13:20
**kaminetzky** 3:9
  12:2 71:6 264:15
  264:16,19
**kane** 147:11,17
  148:8
**kaplan** 88:2

**kara** 220:17
**karavolas** 12:3
**karen** 12:4
**katherine** 10:23
  13:16
**kathleen** 13:7
**keep** 21:11 24:17
  47:8 73:11 75:9
  84:11 144:22
  161:5 164:10
  165:15 210:24
  216:12 234:25
  259:19
**kelly** 15:6
**kenan** 9:1
**kennedy** 12:4
**kenneth** 10:12
  118:3 220:12
**kentucky** 103:9
**kept** 215:19 216:1
  244:19
**kesselman** 12:5
**kevin** 3:20 10:4
  84:9 93:19
**key** 49:9 168:11
  240:10
**keyboard** 141:15
**kick** 190:8
**kills** 222:23
**kind** 28:24 36:23
  123:8 140:2 206:2
  206:5,8 208:10,25
  209:5,9,11 211:11
  211:23,25 213:7
  213:14 214:13
  215:16 216:2,13
  239:4
**klein** 12:6
**kleinberg** 88:2
**kleinman** 12:7
**knew** 92:12 216:3
**know** 16:23 19:6
  19:10,17,22 20:20

20:24 21:25 22:3
  22:13,15,17 26:14
  28:10,21 29:2,9
  29:16 31:25 34:13
  43:6,8,14 45:12
  49:20 58:2 62:7,9
  64:18 65:5,17
  68:7,8 69:8 70:11
  70:12 71:13 72:9
  73:12,19 74:10,19
  76:13,14,15 80:18
  91:9 92:20 96:23
  102:2 106:10
  113:21 114:12
  116:25 117:7,9
  118:15 122:15
  127:2 128:5
  129:17 130:2,8
  133:18 135:22
  137:21 141:2,10
  145:14,15 150:6,8
  150:12 154:18
  156:19 158:18
  160:17 161:1,2,5
  161:6,10,13,17,20
  162:9,13 175:15
  178:5 180:1 183:3
  183:5,7,8 186:4
  189:23 192:4,4
  195:15 196:5,16
  197:9,9 199:6
  200:15,19 202:1,7
  206:3,11 207:3
  208:8,9,11,19,23
  209:6,7,9 210:8
  210:10,15,20
  211:21,24 212:1,4
  212:5,11,15,17,20
  212:21,22,24
  213:3,5,11,12,14
  213:23,25 214:2
  214:11,12,14,15
  214:17,23 215:2,7

215:8,21 216:1,6
  216:11,18 218:4
  218:13,14 219:4,8
  226:25 229:7,16
  233:19 237:13,15
  237:21,23 238:14
  238:15,17 239:7
  243:10,20,22
  246:1,9,10,22
  247:2,24 248:8,12
  248:13,19 249:15
  250:6 252:7,8
  255:12 256:20
  257:20 259:18
  260:16 264:19
  265:4,8 266:24
  267:20 269:19
  270:24 273:11,18
  273:23 274:18
  275:3
**knowable** 33:18
  39:4 76:8,8
**knowing** 216:8
  226:18
**knowledge** 67:4
  67:14 79:15
  237:16 241:14,15
  248:24 249:15
**known** 92:7
  159:19 161:4
  214:14
**knows** 19:12 21:2
  22:15 30:21 76:19
  151:22 171:7
  173:7 183:4
**knudson** 221:24
  221:25 222:3
**kotler** 12:8
**kramer** 4:15 12:9
  95:14,19

**l**

**l** 8:18 9:24 10:22
  14:22 15:8 220:15
**l.p.** 1:7 5:10 16:3
  16:12
**la** 132:19
**label** 222:10
**labeling** 222:19
**labor** 241:2
**labovitz** 12:10
**labs** 28:16
**lack** 41:10 55:18
  74:23 147:8
  148:12 153:4
  181:12 200:5
**laid** 71:14 85:19
**land** 212:22
**language** 26:20
  27:3,18 49:6,9
  136:16 164:4
  165:4 166:8,21
  170:3 174:12
  176:10,11,13
  178:6,8,11,15
  179:5,9,19,25
  180:20 186:25
  187:7,25 189:7
  190:3,4,6 192:19
  193:24 195:23
  196:9 197:2,10,23
  199:8,19 200:8,16
  200:19 202:10,24
  203:25 204:14
  226:24 229:16
  237:1,23 239:13
  240:10 241:17
  242:2 243:4,16
  245:7 248:15
  250:2,4 252:3
  266:24 267:7
**languages** 178:13
**large** 40:3 51:14
  98:9,14 100:16

102:21,21 104:1
  106:22 151:10
  246:20 273:12
  274:24
**largely** 20:9 57:19
  57:20 85:17 121:9
  172:9
**larger** 31:22
  51:19 104:2
  134:14
**largest** 34:18,18
  34:19 106:22
**larry** 240:1
**lasalle** 45:11
**late** 154:12 157:17
  157:24 161:25
  162:3 176:24
**launch** 29:9,19
**launched** 223:10
  250:24
**laura** 10:16 12:24
**lauren** 15:21
**law** 7:1 36:15
  38:21 41:24 57:21
  69:24 78:2,3
  107:23 110:18,19
  114:22 115:6
  123:9 125:24
  135:17 136:4
  158:19 159:14
  163:7,9 164:5,17
  165:9,20 168:18
  173:18 182:2
  183:20,21,21,22
  183:22 188:13,24
  188:25,25 189:10
  189:11 195:2,20
  196:17,22 208:9
  224:4,6,12 238:17
  249:8 256:1,9,10
  256:19 261:22,23
  269:21,22

**lawrence** 6:12
  12:8
**laws** 142:4 240:24
  240:25 241:1,2,2
**lawsuit** 222:13
  270:4,5,5
**lawyer** 42:19 72:2
  72:3 73:4 79:16
  117:5 183:4,5
  188:8 206:3 253:9
  253:10 270:17
  275:10
**lawyers** 48:1
  67:22 204:21
  225:9 226:2,11
  247:6 253:15
  266:11,12 274:25
  275:2
**lay** 85:13
**layers** 236:8
**layn** 220:11
**lays** 36:7
**le** 173:15
**leaders** 212:1
**leading** 111:6
  121:2,4
**leads** 275:6
**leak** 151:15
**learn** 217:15
  218:7 220:4
**learning** 217:16
**leave** 41:3 47:21
  62:7 67:19,20
  129:25 178:10
  213:11,13 264:13
**leaving** 35:18
**lectern** 141:15
**led** 41:2 161:6
**ledanski** 2:25
  276:3,8
**lee** 220:17
**lees** 12:11

**left** 47:11 136:20
  140:10 213:5
  268:11
**legal** 40:20 70:14
  83:23 93:20 97:24
  125:25 142:20
  176:20 184:6
  190:1 224:6,11,14
  224:15 225:18
  251:12 276:20
**legally** 102:11
  133:17
**legislative** 261:20
  263:17
**legitimate** 80:24
  100:11 103:21
  107:16 116:18
  245:11,19 251:19
**legitimately** 101:3
  248:25
**lending** 57:2
**length** 181:22
**lengthy** 43:15
  132:23 273:15
**lennard** 12:12
**leonard** 12:13
**lessen** 209:10
**letter** 77:9 106:2
  220:22,23 222:1,5
  224:25 225:5
**letters** 215:14
  270:14
**letting** 68:7
  271:23
**let's** 181:14
  182:11 190:19
**level** 104:22 132:3
  161:4 209:17
**leventhal** 12:14
**levin** 4:15 95:14
  95:19
**levine** 12:15

**lexington** 3:5
**lexisnexis** 224:4
**li** 153:24
**liabilities** 23:2
  168:1,16,25 169:8
  169:18 171:8,10
  173:2 181:23
  182:24 185:15
  202:7 240:21,25
  255:24
**liability** 22:14,16
  22:21,24,24,25
  26:11 31:1 39:23
  143:14 144:9
  145:7 165:24
  168:13 186:8
  187:10,13,19
  188:17,18 190:22
  190:23 192:10,17
  199:17 237:13
  242:3,4,6 243:8
  246:13,23 247:2
  252:5,5,18 253:2
  253:11 265:6,10
  265:14 266:4
**liable** 243:11,23
  249:2
**lianna** 14:17
**lichtenfeld** 12:16
**lie** 18:17
**lien** 151:3
**lienholder** 152:23
**lienholders**
  152:11
**liens** 153:2
**liesenmer** 12:17
**life** 153:17 208:6
  221:15 224:2
  225:23
**lifetime** 208:8
  216:18
**lifland** 254:2

**light** 115:25 154:9
  229:11
**lightly** 60:23
**lights** 219:16
**likelihood** 66:2
  76:5 77:16,19
  118:9
**likewise** 35:14
  165:21
**limit** 166:3 203:1
  260:21
**limitation** 196:9
  231:7
**limitations** 194:20
  230:20
**limited** 25:23 26:1
  46:25 112:6 143:4
  196:3 223:5,11,12
  231:14
**limiter** 247:22
**limiters** 247:21
**limits** 191:2,2
  194:1 249:14
**linda** 11:22
**line** 20:5 21:23,23
  28:20 38:1 59:1
  71:5 76:16 117:8
  181:4 237:19
  238:4 242:15
  256:14 265:12
**lines** 84:22 160:2
  231:1
**link** 211:23
**liquidate** 31:4
  94:10 128:25
  263:2,19 264:4
**liquidated** 40:6
  49:13 62:11
  263:13
**liquidates** 172:16
**liquidating** 34:4,8
**liquidation** 29:14
  30:23 31:6 33:14

33:18,21,22 34:1
  34:4,23 35:18
  36:7,17 37:13
  42:12 44:7,17
  45:5 46:13,16
  47:10 48:2 53:12
  54:8,12 55:4
  61:10 63:22 69:20
  71:22 72:13,15
  73:6 139:10 140:4
  172:23
**lisovicz** 12:18
  220:21
**list** 23:19 44:18
  48:10 86:9 119:22
  167:18 205:6
  208:4 218:14
  238:25
**listed** 119:24
  154:6 202:4 242:1
**listen** 138:12
  248:11
**listening** 20:9
  118:16 207:12
**litany** 42:13 86:9
  86:11 94:14
**lite** 5:16 120:23
**literally** 43:25
  99:2 142:14
  235:12 240:13
**litig** 7:17
**litigable** 41:25
**litigants** 29:2
  147:12
**litigate** 172:20
  265:24
**litigated** 262:22
**litigating** 44:13
  264:25
**litigation** 34:10
  40:13 43:19 44:22
  47:24 53:10 57:8
  60:9 64:1 95:16

99:6 101:22
  102:15,17,18,19
  102:19 111:4
  164:9,16 167:13
  168:11 177:9
  232:14,16 233:13
  244:18 246:1
**little** 28:3 100:20
  140:11 144:21
  145:2,5 151:4
  152:7 188:7
  189:10 203:5
  230:18 267:19
**live** 108:25 176:10
  176:16 262:14
**lives** 47:21 99:2
**living** 153:9 197:8
  225:23
**livy** 13:3
**llc** 5:16 7:1 220:14
  220:15
**llp** 3:3 4:8,15 5:9
  6:14 7:8,16 8:8
  167:11 220:19
**local** 80:13 82:3
  83:25 84:12,16,22
  84:23 85:2,2,2,4,9
  86:3,10 87:9,14
  87:15,21 88:17
  94:23 142:21
  215:15 217:13
  218:1
**localities** 87:7
**located** 18:24
  228:12
**locked** 139:7
  153:12 217:10
**logic** 39:15 188:18
  188:19
**logical** 28:17
**lohmann** 220:15
**loneliness** 225:24

**long** 48:3 80:24
  87:12 100:10
  128:8 129:13
  152:14 177:20
  208:12,17 209:1,4
  209:13 210:4
  214:3 216:22
  222:22,24
**longer** 28:3
  111:13 143:13
  158:5 186:2 264:8
  266:3
**longmire** 12:19
**longstanding**
  165:19
**look** 25:24 26:13
  27:21 30:5,6
  32:11 51:7,14,20
  82:22 86:7 105:7
  108:7 110:1,1,3,4
  110:13 112:3
  113:6 116:2 117:7
  118:18,25 126:11
  129:18 133:5
  135:18 138:2
  140:4 172:14
  180:3,12 181:14
  190:19 191:5,5
  196:6 233:20
  238:6 246:6 247:6
  249:6 254:10
  256:18 260:19
  263:16 266:9,16
  267:24
**looked** 77:21
  104:21 105:15
  106:11 110:14
  135:19 175:12
  192:5 212:13
**looking** 62:1
  105:17 108:8,9
  122:5 127:12
  180:3 182:25

192:1 196:4
  214:20 242:23
**looks** 113:17
**loose** 274:3,4
**loosing** 103:11
**lord** 209:23
**lortab** 161:6
**lose** 91:1 272:21
  273:8
**loss** 44:24 214:18
**lost** 17:1 73:21
  177:24 209:25
  221:4 225:15
  245:21
**lot** 25:22 26:7
  37:3 101:24
  105:14 114:25
  127:4 151:9
  189:10 196:22
  197:22 208:19,24
  210:7 211:9 212:8
  212:24 215:25
  226:8 232:6 250:3
  250:16 255:17
**lots** 69:6 175:17
  190:18 273:6
**loud** 204:1
**louis** 9:14
**love** 45:10 117:9
  118:5
**loved** 225:15
**low** 153:16
**lowest** 99:22
**lowne** 12:20
**lp** 145:24 219:21
  223:6
**lp's** 221:22
**lts** 220:15
**lumped** 92:6
**lunch** 27:22
  144:14 145:15
  234:2

**luskin** 12:21 19:8
**lynchpin** 133:10

**m**

**m** 6:19 8:14,23
  12:10,25 13:1
  159:14
**ma'am** 218:23
**maclay** 3:20 84:5
  84:9,9 93:19,19
**madoff** 244:19,20
**maelstrom** 34:11
**magali** 11:4
**magnitude** 92:7
**mail** 159:21
  221:23 222:2
**mailings** 159:24
**main** 4:3 125:6
  178:11 225:3
  226:13
**maintain** 66:1
  264:11
**majority** 31:12
  52:9,9,13 95:25
  105:10 126:15
  224:14 225:10
**making** 43:13
  60:23 63:19 79:6
  110:10 128:7
  156:25 176:19
  191:23 192:22
  239:13
**man** 144:15
  155:11 159:8
  232:19 233:7
  234:21 236:1
  241:21,24 258:7
  258:10,22
**man's** 212:22
**manage** 209:5
  215:1 216:9,14
  273:2
**managed** 58:20
  216:20

**management**
  159:25 237:25
**mandate** 84:2
**mandatory** 51:16
  152:12 154:22
**manipulation**
  91:15
**manner** 110:22
  121:14 123:6
  124:1,20 132:4
  134:1
**manufacture**
  190:24
**manufactured**
  160:19 182:17
  222:25 240:20
**manufacturer**
  222:9,12
**manufacturers**
  111:5 222:18
  231:21
**manufactures**
  222:12
**manville** 147:11
  147:19 249:9
**mar** 220:11
**mara** 12:14
**marc** 3:13 12:5
  14:19 15:4 146:12
**march** 68:24
**margin** 47:18
**maria** 8:16
**mario** 9:25
**marion** 13:21
**mark** 9:19 10:5
  11:23 120:11
  140:19
**market** 45:5,10
  182:16 208:13
  210:7 216:5
  222:21
**marketed** 188:4
  192:17

| | | | |
|---|---|---|---|
| **marketing** 81:9 | 160:24 161:9 | **md** 6:4 | 113:21 274:6 |
| 207:7,20 239:2 | 170:13 196:15,17 | **mdp** 163:15 | **measures** 96:19 |
| 251:1 | 196:23 239:12 | **mdt** 167:4,17 | 100:22,23 101:8 |
| **markets** 141:24 | 246:7 273:12 | 168:7 169:17 | 101:13 |
| **marking** 234:14 | **matters** 19:14 | 170:25 173:1,16 | **mechanics** 93:8 |
| **markman** 11:8 | 51:3 79:24 82:13 | 173:21 180:6 | **mechanism** |
| **marshal** 169:7 | 99:17 107:19 | 194:13,21,25 | 242:13 243:25 |
| **marshall** 3:8 | 108:15 144:19 | 200:9 201:8 202:3 | 245:25 246:3,7 |
| 16:20 220:10 | 165:9 190:10 | **mdt's** 201:11 | 262:5 265:4 |
| **martin** 15:15,16 | 197:19,20 226:23 | **mean** 22:2 25:15 | 269:12,15 |
| **maryland** 6:1,2 | 242:8 | 52:8 54:2 59:24 | **mediate** 132:24 |
| 37:19 42:17 43:1 | **matthew** 9:2 | 60:10 63:13 64:23 | **mediated** 185:16 |
| 43:3 48:8,12 53:5 | 10:18 88:1 | 64:24,24 65:2 | **mediating** 183:12 |
| 78:2 80:9 88:9 | **maura** 13:7 | 67:8 73:7 74:1,2 | **mediation** 17:6,23 |
| 230:2 | **maxcy** 12:23 | 74:12 100:7 114:3 | 18:5,20 20:1,17 |
| **mass** 44:21 86:4 | **mayor** 218:1 | 114:3,17 125:24 | 20:17,25,25 21:11 |
| 93:23 163:19 | **ma'am** 205:8,16 | 127:9 135:14 | 22:5 34:10 82:4 |
| **massive** 33:18 | **mccarthy** 3:12 | 137:22 153:14 | 128:3 129:13,14 |
| 34:2,6 36:6 43:15 | 80:2,3,6 | 160:19 171:16 | 129:19 134:3 |
| **master** 163:12 | **mccarthy's** 93:13 | 188:3,19,21 | 138:4 183:9,15 |
| 194:23 228:1 | **mcclammy** 3:10 | 191:13 192:4 | **mediator** 19:20 |
| **masumoto** 12:22 | 221:21 222:1 | 194:2,2 195:25 | 273:22 |
| **matched** 57:7 | **mccloud** 12:24 | 196:13 197:7,20 | **mediators** 20:2,16 |
| 243:6 | **mccloy** 4:8 | 197:24 198:12 | 20:21 |
| **material** 24:2 | **mcdermott** 224:8 | 200:8 206:22 | **medical** 84:25 |
| 25:10 36:20 41:3 | **mcdonald** 12:25 | 211:11,14 212:14 | 158:14,17 215:21 |
| 42:2 73:5 114:8 | **mcgaha** 8:18 | 212:20 214:20 | 220:17 |
| 116:10 132:3 | 205:6,17,18,19,20 | 228:23 244:7 | **medications** 81:9 |
| 134:14 171:2 | 205:20,22 206:1 | 245:20 247:1,14 | **meet** 30:18,19 |
| **materiality** | 206:11,17 207:22 | 248:12,15 249:6 | 116:14,17 |
| 115:25 | 210:23 211:1,6 | 249:22 252:4,7 | **meetings** 222:18 |
| **materials** 206:14 | 213:18 216:25 | 253:5 255:21 | **megan** 14:6 |
| **math** 46:7 100:20 | 217:1,4,7 218:9 | 256:8,18 263:23 | **meises** 13:2 |
| 117:4,5 | 218:14 | **meaning** 49:25 | **melanie** 9:24 |
| **mathematical** | **mcgaha's** 205:15 | 135:21 | **melissa** 11:2 15:8 |
| 32:15 | **mckenzie** 239:8 | **means** 29:16 | **meltdown** 47:23 |
| **mathew** 10:14 | **mckinsey** 23:12 | 56:11 159:18 | **melted** 73:20 |
| **matter** 1:5 23:1 | 23:12,22 | 204:13 264:3 | **member** 69:15 |
| 81:4 82:10 85:17 | **mckinseys** 26:18 | **meant** 28:25 | 85:3 161:14 |
| 94:3 95:19 100:1 | **mcmahon** 256:20 | 36:21 54:14,15 | 248:17 269:16,18 |
| 108:17 126:16 | **mcnulty** 13:1 | 88:15 145:5,13 | 269:23 270:1,2,6 |
| 146:1 151:14 | **mcorp** 66:10 | **measure** 62:14 | **members** 40:11 |
| 152:20 153:14 | | 101:10 105:12 | 49:2 100:8 224:7 |

memory 21:9
214:17
men 154:4
mental 106:6
mention 83:22
85:16,16 104:15
104:20
mentioned 17:5
49:1 82:19 84:7
mentioning 216:1
239:4
merely 65:10
124:13 150:25
153:3
merit 61:19 95:5
meritorious 39:17
39:18,20
merits 39:9 96:12
178:4 190:7 265:5
266:17
messrs 129:13
met 73:10
meta 44:4
metaphor 246:9
metric 101:17
metrics 101:16
104:21
metromedia
28:12 29:6
mezei 13:3
michael 9:8 11:6
12:21 13:11 14:14
15:9
michele 11:18
13:2,19
microgram 214:4
microphone 21:16
middle 18:13
143:12
milbank 4:8 21:20
25:1,8 145:3
246:5

miles 73:10
millenium 29:6
30:8
millennium 28:16
miller 13:4
million 36:9 42:15
47:2 56:14,14,15
57:18 69:5 70:14
72:20,24 86:16
116:3 117:6
128:23 133:21
156:14 160:16
224:11,15
millions 40:20
116:9
mind 25:18
124:17 206:4
252:12,15
minds 19:17
mineola 276:23
minimal 107:5
minimize 171:14
minimum 40:16
116:15
minor 102:4
127:22 176:11,11
minority 52:20
minus 39:6
minute 74:9 102:2
266:7
minutes 28:2
30:16 70:3 127:19
130:25 202:18
222:8,10,15,17
261:10
miracle 127:23
miracles 209:3
mirrored 243:6
mis 205:22 215:4
miscellaneous
144:19 226:23
261:9

misconduct 23:24
26:5,5,8,11
235:17 240:16,17
241:8 247:7
249:16 255:16
260:4 267:8,17
268:8 269:3
misfeasance
245:12
misleading 87:18
misnomer 165:6
misrepresenting
93:15
missing 112:20
114:1,21 211:23
misstatements
56:23
mistake 41:14
93:14 139:14
mistakes 215:5
misunderstanding
38:21
misunderstandi...
230:10
misunderstood
235:6
misuse 37:6,9
mitchell 9:9 11:20
mitnick 13:5
mmes 212:25
mo 19:12
mode 20:9,9
model 105:9
138:22 142:10,16
142:18
modest 110:10
modify 49:16
173:14 194:12
mogul 163:22
189:6,25 190:12
mohican 129:5,5
molton 13:6

moment 177:10
197:2 246:11
moments 72:8
monaghan 13:7
242:21,22 243:3
243:14,19 244:10
244:22 245:4,7
monday 17:2 20:6
23:21 25:14 36:14
42:4 46:20 107:11
224:17 227:8
234:7
monday's 231:20
monetized 45:25
money 47:7,10
67:3,6 103:1
106:25 109:15,17
115:25 117:9
122:8 130:10
138:13,13,18,22
156:5 157:7,9,9
158:24 199:16
211:1,2 213:13,14
215:20 217:11
218:4 224:20
242:20 263:6
money's 117:9
212:3
moneys 110:14
monies 64:11
monitor 79:9
207:1,1 251:4
monitoring 79:10
monitors 207:6
month 184:1
214:6
months 129:13
265:3,3
moot 82:20
190:20
moral 188:10
morning 16:2,11
16:19 177:1 227:8

229:6,18,21 239:7
267:15 273:10,19
275:12
**morphine** 108:8
**morris** 102:3
181:4
**morrisey** 5:7
96:24 104:11,13
104:14 105:22,24
105:25 106:3,5,10
106:16 114:16,18
115:16,18,23,24
116:5,7
**morrisey's** 114:4
**mortimer** 223:9
223:14,16,21
224:1 259:3
**mothers** 221:3,7
225:22
**motion** 127:2
133:6 153:21
178:17 220:7,24
222:6
**motions** 57:19,20
86:12 93:4
**motivate** 161:12
**motivation** 113:7
114:7
**mouth** 114:4
**move** 65:9 79:20
91:2 95:6 109:5,9
109:11 134:15
141:13 176:6
178:19 259:20
270:25 273:12
**moved** 73:1
**movement** 119:18
**moving** 271:16
**msg** 41:18
**msge** 86:8 92:21
93:19
**muha** 13:8

**mullane** 150:19
**multi** 3:16 33:5
34:6 84:6,10
**multiple** 34:24
79:9 82:11 191:18
197:8 216:18
227:20 236:7
**multiplication**
53:18
**multiplier** 37:10
37:16 46:3,7
**municipal** 81:12
120:24 123:20,23
124:4,23 126:3
133:9
**municipalities**
39:21 80:13 81:2
88:25 89:4 92:10
119:23 121:6
124:13 125:8
127:7 132:7,8
135:4 138:17,24
140:22 141:1,3
142:7,12 143:22
225:9
**municipality** 5:17
124:24 125:4,5
137:23
**murray** 13:9
**musicland** 156:9
**mute** 16:10
141:13 155:10
165:15
**mvra** 152:14,24
**mvt** 227:22 228:5

**n**

**n** 3:1 16:1 45:11
276:1
**naacp** 129:19
133:3
**naftalis** 4:15
**name** 182:22
205:18 241:3

**named** 25:4,8
35:6 40:12 74:7
**narcotics** 213:21
**narrow** 18:15
198:13 227:11
240:18 248:16
**narrowed** 27:5
**narrowing** 17:13
145:2
**narrowly** 234:4
**nas** 157:21 158:9
**natasha** 12:10
**nathaniel** 13:4
**nation** 5:17
103:23 124:4,24
130:6 154:3
**nation's** 96:16
138:17
**national** 97:24
99:1,11 101:20,25
101:25 142:21
271:3
**nations** 120:24
121:6 123:24
124:13 126:3,20
127:7 133:9 141:3
143:22
**native** 125:21
130:6,12 138:1
**nature** 97:5 112:8
132:22 161:19
271:6
**navigating** 161:11
**navigators** 8:2
175:1 179:10
**navigators'**
162:21
**nbt** 257:23
**ncaa** 139:4
**ncsg** 93:7
**nearly** 85:18
151:25

**nebulous** 125:1
**necessarily** 21:23
103:1 134:6 252:1
**necessary** 24:21
59:11 153:18
158:6,16 167:16
170:24 177:13
211:1 213:7
216:22 228:7
**necessity** 29:4
58:13
**need** 25:4,5 33:16
38:4 42:21 73:4
81:11 93:17 95:21
102:23 109:16
111:13 120:14
152:8 157:7
158:16 161:11,19
174:8 186:3,17
193:14 201:7,16
203:17 207:24
208:12 210:4
211:13 213:4
225:20 236:17,25
244:1 246:15
258:10 260:21
272:19 273:2,7
**needed** 26:21 95:1
209:6
**needs** 16:7 29:23
107:23 108:1
142:23 162:8
190:4 195:24
236:14 246:8
249:19 274:10
275:4
**negate** 201:5
**negligence** 216:7
216:16 247:10,25
**negligent** 247:9
247:15
**negligently**
248:19

**negotiate** 115:19
164:21 246:20
**negotiated** 82:3
97:22,23 113:14
116:25 167:23
170:3,11 185:16
**negotiating** 168:6
**negotiation**
167:25 181:23
187:18
**negotiations** 19:8
97:17 98:1 112:7
112:8 167:25
181:22
**neiger** 13:10
**neither** 57:25 70:5
165:2 190:1
233:20
**nervous** 244:23
**net** 35:17 43:18
139:10
**network** 134:20
**neutral** 190:4
**neutrality** 165:4,5
166:1,8 176:14
186:25
**nevada** 128:10
**never** 22:12 23:5
23:6 43:10 68:22
69:7 76:2 78:9,20
93:4 108:24 125:2
125:12 131:13
134:4 138:11,14
148:23 178:3
208:8,9 210:16
215:3 226:19,20
**nevertheless**
19:22 119:1
207:15
**new** 1:2 3:6 4:11
4:18 5:12 6:10,17
7:12 8:4 17:23
53:5 57:15 64:24

64:25 69:1 85:20
85:22,24 86:18
103:9,10 129:5
178:13 183:21,21
206:18 220:20,20
221:10 222:21
224:8,12,18
225:21 235:13,14
257:9 260:6
**newark** 5:20
**newco** 45:25
273:1
**newman** 147:25
**newspaper**
185:13
**nice** 213:11
**nicholas** 13:18
**nickolas** 12:3
**nicole** 12:13
**niece's** 175:5
**night** 18:13,13
176:25 229:22
**nii** 102:11
**nimble** 272:4
**nine** 40:8 41:1
47:15 70:19 86:15
220:1,2
**ninth** 18:14 20:8
143:18 229:4
**nj** 5:20
**nn** 186:4
**noad** 139:9
172:24
**noat** 82:2 83:18
91:2 92:23,25
95:7 138:1 261:25
265:9,11
**non** 6:15 25:13
26:5,10,11 36:1
38:9 39:17 40:21
40:22 62:10 73:2
82:16 84:19
122:17 123:6

135:10 157:21
158:9 168:18
173:18 180:16
182:2 200:3 210:5
240:6,7,8,16,17
241:8 242:8,19
243:17 244:7,12
244:24 246:12
247:7 248:20
249:19,22 250:4
254:25 260:4
267:8,16 268:8,13
269:3 270:16
**noncompliance**
57:21
**nonconsensual**
29:3 135:6
**nonconsenting**
272:9
**nondischargeable**
35:15
**nonmaterial**
94:24
**normal** 151:20
196:16
**normally** 30:13
150:16 151:13
249:12
**norton** 24:12
224:8
**notable** 151:11
**notably** 163:21
**note** 24:25 46:18
51:10,11 66:4
69:2 88:7 89:11
100:1 109:12
137:10 140:7,19
142:13 148:14
159:11 203:25
228:13 260:10
270:25
**noted** 31:14 37:23
42:4 80:7 85:7

86:24 94:14 96:13
98:23 101:12
104:3 113:9
141:22 142:9
143:6 147:25
174:2 200:4
270:13
**notes** 20:15
143:16 151:16
181:2 182:15
210:1
**notice** 70:2 78:9
78:18 79:15
146:15,19 147:4
147:16,21,23
149:2 150:20
151:14 152:5
153:12 154:2
155:2 157:13,14
159:9,11,11,15,15
159:17,21 160:7
162:7 167:24
184:8,14 185:10
185:15 186:10
195:15,22,24
196:9,13,15,19,21
196:21 198:20
200:12 204:2
242:4
**noticed** 151:24
**notices** 151:5
**noticing** 148:16
148:20
**notification** 153:4
**notified** 173:20
**notify** 151:9
**noting** 75:8
**notion** 76:13
122:10 131:16,18
**notions** 83:25
**notwithstanding**
113:3 137:25
164:14,23 170:8

173:17 181:25
194:17
**november** 220:7
**nth** 45:3
**nuisance** 81:16,22
135:1 240:24
**number** 17:3,15
22:23 31:10 34:18
34:21 43:12,12
45:22 47:4 54:11
57:18 62:9 68:21
70:6 71:15,17
76:14 83:2,12,23
85:12 93:22
110:25 167:14
168:21 194:17
202:8 219:21
225:10,19 227:18
228:15 230:8,13
**numbers** 96:9,11
110:8 225:1
228:12
**numerosity**
126:15
**numerous** 85:9
202:20
**nurses** 216:11
**ny** 1:14 3:6 4:11
4:18 5:12 6:10,17
7:12 8:4 276:23

**o**

**o** 1:21 16:1 52:15
79:2 182:15 276:1
**oath** 71:1,6,23
73:4 78:11 212:18
**object** 96:3
117:25 166:11
173:20 180:7
198:6 201:6
203:10 225:1,20
**objected** 27:7
77:4 109:19
163:10 174:3

179:12 181:2
198:9 199:15
**objecting** 38:14
46:2 48:11 79:22
80:12,16 83:20,22
84:18 85:15 87:5
87:25 88:24 94:17
95:3 96:9 118:11
173:19,24 179:11
202:10 205:14
229:8,19 234:5
264:21
**objection** 18:18
19:7 31:13 35:23
39:16 42:15,16,20
43:3,5 47:16 48:5
48:16,17,21 49:16
70:9 78:6,8 80:14
83:9,21 93:5,8
95:8,12,22 97:6,7
98:9 99:12 100:5
100:6,12,13
102:13 104:8,12
117:22 118:17
119:23,24 120:13
121:20 124:8
125:16 130:17
137:2,3 144:18
146:18 147:4
148:14 149:10
152:10 154:14
155:6,19 156:23
156:25 164:11
174:5 180:9,10
181:3 185:6,25
190:5 200:4
204:11,22,25
205:5,12,16 217:2
218:15 219:20
226:13 227:11,14
257:6 261:13
**objections** 17:15
19:11 31:12 80:8

82:20 85:15 87:15
96:11 146:2,5,14
148:24 155:23
162:16 167:20
168:9 172:5 173:8
174:2 180:5 184:1
184:9 199:24
200:5,5 204:12,20
205:10 225:17
227:10
**objective** 101:9
**objector** 29:12
36:15,16,18 47:3
113:4 147:22
**objector's** 62:16
120:13
**objectors** 19:4
22:7 33:16 35:24
36:12 38:4,18,19
45:1,7 47:15
51:23 70:8 71:2
93:9 205:9 229:14
**obligated** 233:16
**obligation** 164:19
191:12 233:17
**obligations** 38:1
158:20 168:2
171:12,14 177:4,5
181:24 187:20
194:22 195:2
200:3 202:25
203:2
**obligatory** 31:22
**observations**
217:9 218:8
**observed** 52:3
**obstacle** 149:3
**obtain** 66:1
147:14 233:12
**obtained** 147:20
**obviate** 158:16
174:8

**obvious** 73:14
**obviously** 19:9,23
21:24 56:1 105:20
118:5,21 123:20
137:21 190:18
196:13 218:3
226:7 229:13
239:9 271:14,17
271:19 274:18
**occasion** 184:22
184:24
**occlusion** 169:21
**occur** 105:3 189:3
**occurred** 183:9
**occurring** 207:10
**odd** 103:7 271:1
**oddity** 140:20
**odds** 78:25
**offended** 273:25
**offense** 135:8
**offer** 35:10,22
**offered** 18:19 97:3
98:13,15 212:12
257:4
**offerings** 103:4
**office** 5:1 6:1,8
97:1 221:9 257:1
271:8
**officer** 78:15
238:1 243:21
248:18,21 249:1
250:6 251:21
252:16 254:8
268:17 270:10
**officers** 97:24
232:22 238:16
268:10
**offices** 88:9
**official** 74:16
77:13 220:18
225:4
**offshore** 63:10

**oh** 43:2 54:10
58:8 73:17 120:9
141:14 218:17,21
219:10,15,15,15
219:15 233:10
244:19
**okay** 19:18 21:18
27:24,25 28:7
48:6,13,18,22
50:25 52:2 54:16
60:5 61:6 68:2
72:8 75:7,21
79:20 84:8 87:24
88:6 89:10 91:1
91:21 94:16 96:6
104:10 106:15
111:10 115:15
118:1 119:19
120:18 129:20
130:24 131:24
134:16 140:15
144:12,24 145:18
145:23 149:8,21
149:23 155:10
159:2,13 160:13
162:5,14 163:2
167:9 170:21
174:20 175:2
180:3 192:7
193:14,17,18
195:12 200:7,7,22
200:22 202:16
204:18 205:19,21
205:25 206:17
207:22 210:23
211:6 213:17,25
217:4,7 218:12,17
219:8,10,20 227:6
227:7 228:20
229:2 230:7,8
233:2,19 235:7
239:16,21,21
245:6 256:18

257:15 258:21
259:22 260:2
261:1 264:14,18
266:23 267:12
268:3,25 270:11
271:7 273:9
**oklahoma** 57:17
69:2 183:22
**old** 202:23 226:4
276:21
**omitted** 236:6
**omitting** 171:1
**onboard** 17:4
**once** 34:9 68:22
106:8 108:2,6
116:10,13 209:6
238:8 260:9
**one's** 30:5 250:5,6
**ones** 59:20 66:9
179:12 225:15
239:1 245:11
**ongoing** 18:20
21:4
**online** 220:24
**onset** 82:19
**onus** 251:22
**op** 209:8
**open** 51:13 129:17
273:2
**operate** 181:24
187:19
**operating** 206:24
240:22
**operative** 25:24
200:13,13
**opiate** 206:20
211:13
**opiates** 206:5,20
208:12,17,18
210:10,12 212:19
216:3,23
**opinion** 102:14
131:9 147:10

221:15 223:2
**opioid** 25:13 26:5
26:10,11 37:6,9
48:4 81:9 84:14
84:23 86:5,17
87:17 102:21
104:4,16,20 109:1
110:3 154:3 161:3
163:14,18,25
168:16,25 169:18
181:20 187:8,10
187:13,24 188:5
188:16,18 191:8
191:10,14 192:2,4
192:10,17,20
202:7 217:24
222:8,22 224:10
232:9,14,16
235:24 240:8,16
240:17 241:8
242:8,19 243:17
244:12,13,16,24
245:15 246:13,13
247:2,7 248:20
249:19 250:4
254:25 259:12,14
260:4 267:8,16
268:6,8,13 269:3
**opioids** 84:25 85:1
107:21 115:7
153:9 160:18
182:16 192:17
207:9,9,18 222:11
222:24 234:14
244:7
**opium** 214:14
**opportunity** 20:8
36:13 69:19 99:18
104:15 107:7
110:24 131:18
138:21 167:24
172:20 173:1
185:14 186:13,14

189:24,24 196:6
200:24 203:10,11
218:10 229:10
257:4
**oppose** 110:17
138:24
**opposed** 43:5
49:18 61:24 68:12
91:12 113:18
128:22 148:8,9,10
160:25 194:6
244:25 261:9
**oral** 16:4,13 19:13
27:15 88:7 146:1
197:25 204:19
229:5 257:6
274:22
**order** 16:15,17
20:25 21:1,4,10
26:22 61:9 146:23
148:17,23 161:21
162:18 164:12
165:1 166:19
167:5,15 170:7,24
171:24 172:6
173:14 174:10
177:3,8,9,22
183:25 186:2
194:11 195:4,5
196:3,7,10 197:6
200:11 203:11,14
204:4,5 206:21
258:1,2,4,5,18
261:23 267:20
270:22 274:14,15
**orders** 92:7
165:18,19,21
195:10 271:19
**ordinary** 151:14
**oregon** 48:11,16
53:5 80:8 88:3
118:17

| | | | |
|---|---|---|---|
| **organizations** 159:25 | **overprescribed** 220:5 | **o'neill** 9:3 | **paper** 141:13 |
| **original** 20:23 178:15 224:25 | **override** 170:18 **overrides** 191:1,2 | **o'sullivan** 13:12 | **papers** 31:20 91:20,23 144:1 |
| **originally** 23:21 | **overruled** 48:5 80:14 83:21 | **p** | 149:17 156:13 160:12 173:9 |
| **ostriches** 185:12 | **overstate** 96:3 | **p** 3:1,1 11:15 15:14 16:1 52:15 | 227:15 228:22 229:1 |
| **ought** 19:19 | **overstated** 87:6 | **p.m.** 224:5,24 | **paperwork** 162:2 |
| **ourself** 25:6 28:20 | **overstates** 100:18 | **pa** 8:12 | **paragraph** 33:15 |
| **outcome** 34:12 68:14 98:11 103:6 134:12 171:19 186:22 274:7 | **overton** 146:3,6 **overview** 22:1 26:24 27:3 | **page** 28:20 29:6,7 42:20 55:4,7,11 70:9 71:5 93:21 98:17 99:8,19 | 34:15 42:5 48:17 77:10 83:9,10 86:8,11 97:18 100:12 185:5,7,8 |
| **outcomes** 68:15 | **overwhelming** 31:12 37:2 47:18 161:23 178:14 | 100:3,17 101:14 101:18,23 102:1 102:23 103:3,6 | 185:25 186:1,4 199:19 227:18 |
| **outlined** 36:5 212:8 | **overwhelmingly** 44:9 82:22 94:19 186:24 190:21 | 145:6 160:2 185:13 223:3 | **paragraphs** 83:16 **parallel** 147:18 |
| **outrageous** 216:17 | **overwritten** 189:12 | **pages** 28:11 31:19 97:19 99:10 | **parens** 87:5,6,10 **parent** 32:14 |
| **outreach** 159:24 159:24 | **owe** 270:21 **owned** 259:1 | 101:11 102:25 176:14 187:5 270:24 | **paris** 14:6 **park** 7:3 220:20 |
| **outset** 77:11 104:16 122:10 135:9 196:10 | **owner** 223:5,8 **owners** 76:19 268:11 | **paid** 28:13,15 32:15 57:16,17 69:1,3 211:2,4 | **parke** 24:14 **parse** 27:3 **part** 17:10 18:3 |
| **outside** 22:18 24:9 169:9 249:24 | **owning** 240:21 **oxycontin** 161:6 | 215:20 224:6,10 224:14 242:20 | 53:14 65:16 69:10 70:8 72:8 77:23 |
| **outsiders** 153:15 | 206:19 208:13,21 211:7,12,13 | **pain** 208:12 209:2 209:2,4,5,6,10,13 | 86:25 87:1 111:19 124:18 139:8 |
| **outstanding** 180:5 | 213:21 214:7 216:5 219:23 | 209:16,19,23 210:4,12,14,16,17 | 169:10 175:15 183:23 192:23 |
| **overall** 87:20 105:19 113:17 123:5 126:18 236:21 | 222:14,20 223:10 **ozment** 7:1,6 13:13 146:7,7,10 | 210:17 212:13 214:22 226:15,18 226:19 | 193:22 217:15 220:14 260:17 274:14 |
| **overarching** 84:22 120:1 | 147:5 148:6,23 149:23,24,25 | **painful** 35:1 47:20 **painfully** 41:2 | **partaking** 138:20 **partial** 206:20 |
| **overbreadth** 240:6 | 155:7,8 156:7,25 158:2 159:3,7,23 | **pale** 74:2 122:11 140:5 | **partially** 226:21 235:19 |
| **overcome** 97:13 153:11 | 160:14 **ozment's** 147:7,15 | **pamela** 10:19 15:3 | **participant** 231:1 **participate** 128:2 |
| **overdo** 213:25 | 149:19 160:6 | **pandemic** 151:25 218:25 | 128:2 129:22,25 133:1 136:9 138:4 |
| **overlap** 87:10 88:20 | **o'neil** 13:11 | **panel** 147:25 169:11 | 142:8 143:23 167:24 185:15 |
| **overly** 27:11 259:2 | | | |
| **overnight** 16:17 21:17 240:4 | | | |

participated
  79:10 123:21
  129:20 130:12
  133:3 235:23
participating
  113:15 123:1,19
  137:16 139:12
particular  59:20
  71:18 87:19 88:24
  105:8 106:21
  107:4 108:19
  110:3,7 112:11,12
  121:3 150:10
  152:7 182:14
  203:19 275:3
particularly  89:5
  112:7 115:7 121:5
  142:1 148:1 152:9
  186:21 251:16
parties  16:16,16
  17:18 18:8 19:24
  20:6,10 21:2 23:4
  24:22 30:10 31:10
  31:23 33:7 38:10
  38:17 43:5 44:19
  50:17,24 63:24
  64:5 69:4 71:16
  109:22 131:9
  133:12 147:5,9,24
  148:2 164:21
  172:19 180:9
  185:10 188:20
  224:22 226:17
  228:17 229:6,8,19
  230:4,21,24 231:9
  231:22 232:3
  233:5 234:8,8
  235:5,9,16 236:10
  240:15 242:17
  251:8 255:7
  257:11,19 258:1,8
  259:11 260:11,12
  260:13,15 266:20

268:16 270:20
271:24 272:1
273:10,17,20
274:5,11,17,20,23
275:3
parties'  170:13
partner  35:5,6,6
  223:5 224:24
partners  55:13
  57:5,12
partnership  46:25
parts  35:19
party  18:16 20:11
  23:17,19 24:3,7
  24:10,20 25:9
  29:14 31:7,10,15
  32:6,8,13,23 35:2
  36:19,20,23 40:13
  40:25 51:6,15,22
  54:22 58:25 61:10
  62:4 69:16,20
  92:11 104:19
  119:25 121:21
  137:6 148:1 165:8
  166:16 181:2
  229:9 231:4,14,23
  231:25 232:8,17
  234:18,21 235:1,3
  235:8 238:15,25
  239:19 245:21,23
  247:23 251:23
  269:9
party's  112:7
  237:25
pass  37:20 83:22
passed  37:19
patch  214:5
patches  214:4
patient  209:22
  216:14
patiently  125:12
patients  216:9

patriae  87:5,6,10
patrick  5:7 12:23
  13:11 104:14
paul  6:3 8:14 9:1
  14:4,18 163:1
  257:1
pause  174:17
  184:10
pay  40:15,19
  46:24 47:7 153:17
  153:17,18 182:1
  187:22 188:11
  191:6,12,14
  197:15,16 200:3
  223:20 255:16
payers  41:20
paying  252:10,12
  255:17,17
payment  220:7,24
  222:6 259:15
  263:20,21
payors  259:10
pays  172:16
peace  35:8,9
  246:22 247:5
  252:12,15 253:8
peacock  13:14
pediatric  41:19
peered  49:2
penalties  89:3
penalty  39:25
pending  57:8
  232:9
pennsylvania
  7:19 222:12
penny  40:10
pension  220:16
people  18:8,21,21
  18:22 27:7,13,16
  40:18 45:13,16
  46:4 68:11 69:10
  75:8 77:23,23
  78:4 98:17 108:25

110:4 115:19
129:18,18 136:18
144:16 145:14
146:5 151:9,12,13
151:21,23 153:8
154:5 157:12
158:20,21 160:25
161:3,12,17 162:8
165:15 204:20,21
204:23 207:2
208:11 209:3
211:20 212:3
213:4,11,13 216:9
216:20 217:15,22
217:22,23 222:23
225:15 226:9
234:11 242:14
244:19 248:7
251:5,18 260:22
271:10
people's  119:24
peradventure
  32:3
percent  32:16
  33:6 40:5,7 44:12
  45:14 47:13 52:7
  70:20 77:3 83:1,5
  83:11 96:16
  100:21,21,23,24
  101:1,2 102:9
  105:10,13,18,19
  105:20 106:13,21
  107:3,18 108:7
  109:11,12,12,13
  112:1 113:8 115:5
  116:1 117:4,4
  148:8 160:17
  180:20 188:23
  190:3,12 208:22
  223:5
percentage  72:17
  83:17 262:2

percentages 100:9
perception 132:4
  132:6
perdue 126:25
  127:14,17 142:5
  142:15 225:21,25
  238:15
perdue's 235:24
  239:2
perfect 16:19 44:9
  96:13 130:2
  264:22
perfectly 185:9
  187:1 251:19
perform 121:24
period 57:14
  121:2 151:24
  207:20 230:18
  239:19 253:12,14
perjury 40:1
permanent 25:1
  263:9
permissible 29:3
permission 19:15
permit 137:8
  164:17 203:1
  240:18
permitted 54:24
  60:17
perot's 175:10
person 46:24 85:1
  212:15 215:21
  218:17 219:12,13
  243:22 244:25
  245:18 247:25
  252:5 275:5
personal 40:11
  64:21 67:9,22
  132:19 153:1
  155:13,16 156:13
  215:20 221:19,20
  228:3 242:4,6

personally 110:25
  148:3 175:23
  212:9 221:7 275:9
perspective 116:8
  129:11 134:14
  153:15 272:25
persuade 129:12
  254:10,11,12
peter 10:1
petition 222:15
  250:24
petitioners 162:6
petroleum 134:20
pfizer 32:13,15
  59:9
pharma 1:7 5:10
  7:10 16:3,12
  142:5 145:24
  219:21 221:22
  223:6 224:6,9
  225:21
pharmaceutical
  142:2 210:5
  211:18,25 214:11
  224:9 231:1
  240:19,22
pharmaceuticals
  141:24
pharmacies 111:5
  231:21
pharmacology
  214:12
pharmacy 215:22
  238:15
phase 17:6 34:9
  82:4
phi 46:4 73:22
philip 8:6 9:7
  174:25
philips 129:14
phillips 220:11
phone 165:15

phrase 38:15
  187:17,18
physical 160:16
pi 34:17 74:13
  158:24 253:9
pick 23:25 26:16
  26:22 32:25
  246:12 248:3
picked 23:10
  25:19,22 247:14
  248:9
pickering 8:1
  175:1
picking 251:13
piece 108:1,5
  114:21,21 116:10
  216:13
piercing 237:13
  242:3 250:7 270:6
pill 216:11,12,12
pills 209:13 214:1
  214:21
pillsbury 6:14
pinhole 122:12
pis 38:3 77:24
pittman 6:14
pittsburgh 8:12
  166:2,6
place 6:3 75:9
  79:9,12 80:23
  90:7 153:7 242:10
  264:9
placement 131:25
places 70:19
  100:14 152:2
  213:12
plain 30:1 136:15
  137:7
plains 1:14
plaintiff 41:12
  147:1 269:11
plaintiffs 44:21
  86:19

plaintivist 46:11
plan 16:5,14,23
  18:14 20:8 21:6
  28:4 29:17,18
  30:11,22,24 31:9
  31:24 32:23 33:11
  34:20 37:12 38:7
  38:11,23 40:17,24
  41:16 44:16,19,25
  45:17 46:3,12
  47:17,21 49:3,3,8
  49:10,12 50:17
  51:8,17 52:7,10
  52:22 53:9,11,16
  53:22 54:13 56:18
  61:11 65:24 66:11
  66:13 68:17 69:21
  72:22 80:12 82:25
  83:5,10 84:17
  86:8,25 87:2,20
  90:2,24 94:2,19
  94:24,24 95:8,10
  96:8,12,13,17,18
  97:5,8,9,21 98:6
  98:12,16,20,23
  99:1,2,4,10,13,25
  99:25 100:2,2,14
  100:19 102:6,9,10
  102:12,17,18
  103:7,14,16,19,20
  103:25 104:7,7
  106:17 111:19,19
  111:20,21,21,21
  112:10 113:15
  114:8 117:22,23
  118:11 121:1,11
  121:14 122:13,23
  123:22 124:2,5,8
  124:8 125:10,17
  125:24 126:7,9,21
  127:18,21 130:4
  132:20 133:10,14
  133:23 134:11,13

137:5,12,13 139:5
142:10,13,16
143:8 147:9 148:4
155:22 156:2,3
162:17 163:6,11
163:18,23 164:1,1
164:4,10,11,12,21
165:1,10,18,20
166:4,17,21,22
167:22 168:5,6,9
168:12,15 169:4
169:15,16,22
170:4,6,11,14,23
171:1,3,15,21,23
172:5,6,12 173:2
174:9,11 176:5,12
176:15,24 177:2,2
177:7,7,11,13
178:9 181:21
184:1,9 185:1,3
186:1,24,25 189:8
193:23,24 194:6
194:11,11 195:3,3
195:9 196:3,5
197:3 200:8,11
201:6,7,13,15,23
202:5 203:3,10
204:4,21,22
205:10,14,16
206:15,18 211:24
217:10 218:6
225:17 226:17,25
227:10,20,21
228:4,6,7 229:4,9
230:22 232:4
233:14,18 236:24
245:24 246:16,17
250:2 253:6
256:21,22 259:16
261:16,24 262:1,3
262:7 263:3,21
264:3,10,21 267:3
267:4 268:2

plan's 84:18
planet 76:19
plans 51:5 99:9
  172:3 272:5
plan's 164:18
  168:15
play 84:16
played 123:2
plead 250:13
pleading 42:17
  78:12 245:16,19
pleadings 78:14
  79:16
please 70:23
  75:25 218:19,19
  220:24
pled 79:8
plenty 250:21,21
plimpton 224:14
plural 193:4,9
  199:4 204:13
plus 29:14 39:6,7
  206:4
pm 275:14
podium 18:25
  76:17 84:4 166:25
  228:19
podunk 212:4
pohl 13:15
poignant 162:9
point 21:8 27:10
  27:16 31:20 43:6
  44:4 45:7 49:20
  50:7 51:19 53:24
  56:17 57:25 58:10
  59:6,7,11,14,18
  60:7,22,22 61:7
  62:6,12,18 63:2,5
  64:16 66:18,22
  69:13 72:3 74:22
  75:20 78:21 79:24
  84:22 85:17 87:4
  92:21 93:12,17

99:22 102:4,10
103:13,13 105:13
112:19 114:15
115:14,22 116:11
117:3,15 118:3,3
118:6 120:1,2
124:9,12,16,17
130:1 134:7
139:20 140:18
141:2,19 142:7,24
143:21 146:17
149:2 150:4
152:17 153:5
155:2 156:2,25
159:6 160:4
172:24 174:5
176:10 177:8
178:24 179:23
180:10 183:2
184:23 185:17
188:15 190:5
191:7 192:22
196:13 201:2
203:8,17 204:15
204:16 205:2
206:13 210:22
211:16 215:10
221:15 226:7,13
227:16 229:7
233:10 237:11
241:19 245:21
248:16 257:12,17
259:8,20 260:8
262:24 264:1
266:7 267:19
268:24 269:8
273:9
pointed 58:15
  87:8,10 219:17
pointing 65:10
  118:18
points 36:4 49:16
  63:19 66:16 72:11

78:19 84:7 92:24
112:22 119:25
146:14 155:12,14
159:12 192:24
197:15 200:25
204:2,2 226:10
256:8 266:17
poised 65:5,7,9
police 236:23
  237:3 240:22
  261:17 263:18
policeman 85:2
policies 163:16
  164:20,22 167:3
  168:13,24 171:6
  173:17 177:17,19
  180:16 182:14
  188:7,9 189:1
  190:15,21 194:13
  194:14,21,21
  202:4,6,25 227:13
  227:25
policy 163:13,25
  168:3 170:8
  179:10 181:25
  182:1 183:7
  187:20 191:2,14
  192:9 194:24,25
  201:14
policy's 168:16
political 98:6
  101:5,5 107:7
  110:16,21
polk 3:3 16:20
  80:3 120:11 136:5
  140:19 146:12
  152:18 175:24
  220:11 221:21,24
  226:2,11 228:11
  229:24 264:16
polk's 227:18
  228:11

**poor** 220:3
**population** 37:7,8
  83:7,11 96:16
  100:14,18,20
  101:1,4,9,15,17
  101:21 103:8,9,10
  103:11,12 105:8
  105:10,11 108:7
  108:10,19,22
  109:3,9 111:14
  212:25 213:13
**populations** 154:3
**porter** 13:16
**portion** 37:14
  267:5
**position** 18:3 19:2
  44:11 140:1
  156:11 191:22
  198:23 234:9,10
  245:1
**positions** 31:11
**possible** 18:11
  31:5 69:23 111:24
  118:22 138:3
  145:15 199:16
  210:5 271:6
**possibly** 33:5 39:1
  40:9 43:14,17
  46:15 63:16 73:5
  118:21
**post** 21:10 65:15
  89:24 102:15,17
  169:12 172:4,16
  172:21,22 209:8
  263:1
**pot** 262:3,4
**potency** 222:25
**potent** 222:21
**potential** 18:4
  32:5 38:9 57:1
  63:12 71:12 77:17
  197:11 199:17
  254:23

**potentially** 65:20
  139:6
**power** 45:3 150:6
  236:23 261:17
  263:18
**powerful** 108:6
**powerless** 171:17
**powers** 87:6 237:3
**practical** 94:3
  153:14 160:24
  161:9
**practices** 56:25
  57:3 207:7
**pray** 207:25
**pre** 99:6 102:18
  113:16
**precedent** 109:7
  174:11 176:1
  180:18 200:1
  201:18
**preclude** 180:22
**precludes** 147:15
**precluding** 85:24
**predecessor** 24:14
  36:4 57:10 238:1
**predicate** 25:17
  25:17 180:8,23
  182:4 185:1 188:9
  201:10,11,14
**predict** 39:1
  129:21
**predominant**
  105:8
**preemption** 57:22
**preempts** 188:24
  188:25 201:14
**prefer** 31:21
**preferential** 47:5
**prefers** 100:2
  104:7 111:21
**preis** 8:25 79:6
  220:22 224:23

**prejudice** 229:13
**preliminary**
  60:12 62:25 74:15
  263:8 264:2
**prelitigation**
  100:15 102:7,15
**premised** 230:10
**premises** 157:11
**premium** 35:8
  253:8
**prepare** 53:25
**prepared** 176:10
  176:16
**preparing** 89:15
  145:15
**prepetition** 85:5
  164:3 189:4 203:1
**preposterous** 92:3
**prerequisite** 58:2
**prescribe** 214:9
  219:24
**prescribed** 211:20
  216:19 219:25
**prescriptions**
  207:21
**present** 8:20
  53:15,25 54:6
  58:20
**presentation**
  93:13 145:4
  199:12 234:1
**presentations**
  98:23
**presented** 54:18
  54:18 127:6
**presenting** 261:12
**presently** 150:11
**preserve** 124:14
  135:20,21,21
  167:16 168:15
  169:7 170:25
  192:12 201:7
  202:24

**preserved** 164:7
  171:24 172:3
  190:19
**preserving** 123:19
  228:5 240:2
**president** 111:3
**presidential**
  175:10
**presiding** 221:2
**press** 13:17 125:9
**pressing** 156:19
**presume** 64:14
  268:9
**presumed** 125:11
**presuming** 65:14
  139:7,10,13
**presumption**
  67:14 124:18
**presupposing**
  202:6
**pretty** 25:2 28:9
  32:21 96:14
  103:25 111:23,23
  117:18 127:22
  133:1 152:2 161:1
  201:3 238:17
  251:4 271:19
**prevail** 63:15
  66:19 78:21,24
  79:2 92:13
**prevailed** 47:24
**prevent** 171:17
  198:18 208:21
  209:14
**prevented** 60:11
  210:7
**previous** 207:23
  222:5 225:5
**previously** 173:20
  221:1,6
**prey** 13:18
**prices** 46:19

primarily 18:15
  61:3 198:13
  199:11
primary 60:22
prime 82:23 153:2
principal 31:12
principally 176:8
principle 105:16
  123:10 128:14
  165:17 198:4
  200:17 236:25
principles 196:19
prior 58:16
  145:17 165:3
  223:19 271:18
priority 35:15
  63:15 89:8 91:7
prison 151:13,18
  151:18,19 159:24
  160:1,25
prisoner 160:24
prisoners 152:7
  153:16 154:11
  161:11
prisons 151:22
  152:1 160:7,17
pristine 251:2
private 39:22
privilege 20:19
priya 9:11
pro 8:16,18
  112:15 133:21
  137:17 138:7
  144:18 204:20
  205:8 218:15
  225:6
probably 19:1
  23:24 24:21 104:6
  144:13 155:3
  159:10 160:18
  174:20 200:16
  215:8 219:1 247:8
  248:23 271:1

probation 200:20
problem 76:4
  85:25 104:4,5
  108:14,23 110:1
  110:15,22 122:21
  123:4 132:1 161:3
  162:7 184:22
  213:15 215:12,13
  242:13 243:16
  244:12 252:8
problems 103:15
  111:16 214:3
procedural 19:14
  57:20,21
procedure 136:20
procedures 57:1
  93:6 138:5 160:23
proceed 48:23
  51:25 75:25 88:6
  186:20 261:22
  269:13
proceeding 66:3
  139:19 140:11
  143:7,23 147:2,6
  152:18 154:19
  164:15 165:12,21
  168:20 184:5
  198:5,7
proceedings 1:12
  71:2 136:11 148:2
  165:18,23 168:1
  271:6 275:13
  276:4
proceeds 35:18
  45:24 163:17
  201:10
process 16:25
  93:3 98:10,14
  107:25 110:10
  123:1 129:13
  132:24 133:10,10
  150:20 157:6,9,25
  166:4 171:13,18

172:23 184:8,16
  186:12 202:18
  203:3,13 206:5
  272:18 273:3
  274:14
produced 234:14
produces 103:7
product 160:19
  190:24 226:14
  249:2,3
production 81:9
products 142:2
  177:18 178:2
  190:21 207:14
  226:14 240:8,19
professional 34:2
  34:7
professionals 25:2
program 137:17
  137:20,24 138:6
  148:16,17,20
  149:2 157:14
  218:7 222:17
programs 37:6
  138:18,20,22
  212:24 215:25
  217:10,15,18
prohibit 164:24
prohibited 207:16
project 55:2
projected 40:16
  73:2
promissory
  151:16
promote 86:1
promptly 171:8
  273:13
prone 97:6
prong 269:4
pronouncing
  205:7,22
proof 52:23 53:2
  54:23,25 55:18

56:4 61:23 66:7
  66:20,24 83:14
  98:13 134:25
  146:21,24,25
  153:20 155:20
  156:6,12 158:1,22
  158:24,25 161:24
  192:6 215:21
proofs 39:25 57:6
  57:7 126:24
  127:12 131:14
  153:8,11,22
  157:12 158:21,22
  192:5
proper 80:16
  82:17 89:13 99:21
  198:1 207:16
properly 69:18
  81:3 90:6 169:10
  198:8
property 49:11
  63:11,16 64:6
  65:22 81:6
proponent 16:24
  52:22 117:22
  132:20
proposal 112:14
  112:15 113:19
propose 173:24
  185:17
proposed 23:21
  27:14 30:24 50:24
  66:11,13 84:17
  86:25 97:8,10
  121:1 162:17
  167:15 174:12
  179:6,15,19
  183:25 193:22,25
  195:19 197:6
  199:8,11 204:9,14
  233:14
proposes 50:17

**proposing** 168:6
**proposition** 90:22
  97:25
**proprietary** 87:9
**prorata** 113:21
**prosecution** 137:6
**prospect** 41:6
**protect** 52:12,20
  170:4
**protected** 67:4
  238:13
**protection** 52:5
  64:15 81:18,19,24
  174:16 240:24
  255:8 261:22
  262:17
**protections**
  262:13
**prove** 36:22 39:11
  45:11 53:1 66:18
  66:22 73:9 89:12
**proved** 42:21
  154:1 163:21
**proverbial** 226:1
**provide** 37:10
  112:10 113:12
  163:14 167:22
  168:24 174:15
  177:17 189:8
  202:6 228:2
**provided** 54:25
  72:3 88:10 146:15
  146:19 151:14
  154:2 159:11,17
  159:20 167:18
  177:6 194:17
  203:14 262:18
**provides** 44:16
  47:22 143:1
  158:13 163:11
  223:18 237:23
  238:20 261:20

**providing** 160:9
  263:21
**province** 77:12
**provinces** 267:19
**provincial** 142:21
**proving** 28:24
**provision** 49:6
  50:1 123:12
  170:11 182:2
  185:24 187:11
  191:13 196:21
  197:2 201:22
  202:21 203:4
  230:16 231:25
  238:8 255:13
  263:20 267:2,4,5
  267:7,15,16
**provisions** 109:19
  121:25 157:16
  163:5 164:23
  166:12 168:17
  170:9,25 172:7
  173:18 177:15
  182:2 183:7
  187:23 189:11
  190:14,15,16,17
  195:20 199:20
  201:14 202:7
  227:24 228:16
  262:7
**proviso** 194:10
  195:7
**psychic** 209:21
**public** 17:10 37:3
  39:19 46:7 81:16
  81:22 105:16
  127:21,23 129:15
  131:16 132:25
  135:1 152:1
  175:19 225:25
  240:24
**publication**
  150:24 151:1,5

159:15,18
**publicity** 180:14
**publicized** 132:24
**publicly** 154:6
**pulggari** 13:19
**pull** 135:11
**pullman** 4:1 261:6
**pullo** 82:23 83:4
  151:7 152:4
**pullo's** 83:6
**purdue** 1:7 5:10
  7:10 16:3,12
  18:11 35:5 44:13
  44:15 46:22,24
  55:6 63:22 67:11
  69:1,2,3 76:18
  78:4 79:7 84:15
  107:1 113:16
  141:23 145:24
  160:19 173:17
  188:3 194:13,20
  194:24 207:8
  208:13 219:21
  221:22 223:5,6,8
  224:6,9 235:17
  248:19 253:20
  259:14 261:18
  267:6 269:17,18
  269:18,20 270:1,2
  270:2
**purdue's** 68:23
  74:19
**purdue's** 190:23
**purports** 82:9
**purpose** 52:11,18
  163:15 168:4
  171:6,11 236:3
  261:20
**purposes** 16:18
  32:23,25 33:1
  81:14 90:2 94:2
  125:22 135:16
  196:23 207:17

**pursuant** 143:13
  163:18 257:21
**pursue** 86:4 87:16
  123:3 163:16
**pursued** 69:21
**pursuing** 84:14
  269:7
**pursuit** 29:14
  62:15
**push** 127:10
**pushed** 208:14
  210:6
**pushing** 216:5
**put** 55:14 63:9
  71:8 75:9 96:11
  110:14 116:19
  124:4 152:5 157:5
  167:5 183:24
  185:12 212:16
  216:22 246:15
  248:19 250:15
  258:17 262:4
  264:5 267:22
**puts** 22:21
**putting** 114:4
  216:7 217:14
  251:22
**puzzled** 175:12

**q**

**quadruple** 194:16
**quadrupling**
  108:10
**qualification**
  116:20
**qualified** 196:13
**qualitative** 255:15
**quality** 110:19
  266:11
**quantifiable**
  33:18
**quantified** 56:2,7
**quantify** 43:14
  56:3

**quantitative**
160:14
**quantities** 216:17
216:19
**quarropas** 1:13
**quarters** 225:11
**question** 36:12
91:6 95:23 102:20
129:11 131:7
134:12 135:9
136:13 158:10,11
159:22 175:15
178:25 182:8
189:2 190:13
191:5,9 229:18
233:11 235:6
254:4 268:19
**questioner** 71:5
**questioning**
248:12 250:17
**questions** 26:25
71:9 84:5 92:17
95:20 102:22
143:25 149:18
154:20,23,25
155:7 166:24
167:1,2 173:10
174:17,22 178:18
186:12 189:2
193:20 199:20
203:18 205:23
227:5 228:9,18
230:8,25 232:25
237:2 260:25
**quick** 20:15 267:1
**quickly** 106:18
109:17 135:11
176:6 185:5 233:1
267:13
**quiet** 165:13
**quigley** 30:9
31:18 32:1,11
33:5 49:22 50:15

51:4 59:9 249:9
**quigley's** 32:13
**quinn** 13:20
**quirk** 13:21
**quite** 19:4,22
67:17 68:6 85:19
86:2 103:22
104:16 121:22
127:20 138:3
148:14 154:18
164:17 207:5
217:5 233:25
262:24 272:4
275:6
**quixotic** 33:19
**quote** 37:5 71:4
147:10 148:4
175:9 181:18

**r**

**r** 1:21 3:1 5:14
16:1 101:22
182:15 276:1
**race** 38:16 139:20
**races** 39:3
**rachael** 13:25
**raise** 41:25 96:24
99:22 102:3 113:4
134:7 137:1
146:18 169:20
174:22 197:24
202:9 267:2
**raised** 43:24
48:14 60:6 68:9
95:7 98:5 99:12
100:13 147:4
148:24 149:3
198:10 202:2
206:13 230:25
232:6 233:11
240:5 243:10
254:7 264:20
**raising** 70:8
147:15 175:14

180:11 234:5,6
**random** 111:15
**range** 99:23
**rata** 112:15
133:21 137:18
138:7
**rate** 41:20
**rational** 34:13
47:15 101:6
103:21 107:15
108:13,23 116:17
128:9,16,17
132:21
**ray** 145:3
**raymond** 4:9
21:20 223:7 246:5
**rdd** 1:3
**reach** 83:7,15,18
103:17 131:8
181:1 186:17
273:21 274:7
**reached** 86:16
131:13 181:19
183:15 227:9
264:4
**reaction** 241:7
**reactions** 241:8
**read** 25:21 42:14
70:19 91:6 93:24
150:16 167:20
179:24 217:2
220:23 241:7
259:24 270:18
274:17
**reading** 20:2
49:25 75:24 206:6
**reads** 247:7
**ready** 206:9
242:25
**real** 56:12 57:1
69:24 95:4 136:13
158:25,25 159:1
180:8

**realigned** 90:6
**realize** 145:4,12
253:15 262:9
274:6
**realized** 124:13
**realizing** 228:6
**reallocations** 36:5
**really** 18:14 19:25
20:20 23:25 24:2
26:2 29:10 32:20
33:16 51:21 52:20
63:5 67:9 68:16
70:13 78:8 79:5
83:12 95:23 97:21
100:1 102:12,15
104:1 113:23
115:3 116:21
121:19 124:1
127:5 130:5 133:1
134:19 135:13,14
135:17 136:17
137:4 142:25
143:20 150:7
170:19 172:10,25
174:15 185:5,17
189:2 191:4,7,9
197:10,19,20
198:7 199:9,22
204:15 209:23
210:4,8,13,15,16
210:18 211:11,13
212:6 213:4
214:24 218:11
221:19 237:16,19
238:3 244:20
247:1 249:4,10,19
249:20,22 251:25
266:12 275:9
**reargue** 203:24
**rearrange** 89:19
**rearranged** 90:1
**reason** 39:19
49:15 74:7 80:24

96:17 104:25
107:18 114:17,18
116:25 141:21
148:12 164:4
169:13 171:4,20
171:24 185:19
186:3,17 236:6
263:16
**reasonable** 97:5
98:16 100:1
126:19 167:23
172:19 181:21
182:20 188:16
198:20
**reasonableness**
99:23 173:3
184:13 191:24,25
192:13
**reasonably** 41:5
69:23 150:24
**reasoned** 85:23
**reasons** 31:23
33:19 34:24 43:22
44:4 69:3 80:15
83:20 87:18
100:25 104:8
107:22 141:21
168:21 176:1
**rebuttal** 36:18
68:1 120:6,17
140:17 146:13
149:7,18,21
174:19,22 228:21
**recalibrating**
18:10
**recall** 97:16
**receive** 30:22 49:3
49:4,9,13 53:8,9
53:11,12,16,22
54:6,7,11,12,13
54:19,24 62:2,5
100:16 125:20,21
125:21 152:16

163:12 221:18
**received** 67:1
83:18 100:8
124:10 126:23
138:15 147:23
221:6 230:21,22
233:14 269:10,16
**receiver** 40:17
**receives** 156:5
**recess** 145:22
**recharacterize**
93:13
**recipients** 233:15
**reckless** 25:16
241:14 251:9
**recklessly** 241:13
251:24
**reclassified** 95:1
**reclassify** 94:25
**recognition** 133:7
133:18 139:1
271:5
**recognize** 59:8
105:4 109:4
252:20
**recognized** 128:6
150:20 151:2
**recommended**
212:16
**recommends**
109:13
**recompact** 101:21
**reconsideration**
225:20
**record** 16:20
22:10,19 32:14,18
33:13 45:21 48:15
54:3 57:23,25
69:9 70:17 72:12
78:19 80:2 86:5
96:23 107:20
111:9,12,12,23
114:19 115:4

116:11 133:7
145:3,24 146:12
160:5,11 173:12
174:6 181:8
182:10,18,18
183:7 184:6
186:16,20 189:15
189:15,22 190:1
190:10 193:5
197:12 199:25
200:19 202:20
203:17 204:12
229:24 235:15
236:13 246:4,24
246:25 248:13
252:21,22 267:22
271:11 276:4
**records** 158:5,12
158:15,17 215:21
215:22
**recoup** 232:13
**recover** 31:2,3,6
33:11 34:22 37:15
39:12 40:10 42:1
43:18 45:5 53:1
55:3 62:3 66:22
66:24 69:19 76:18
81:13 99:17,18
122:6 127:16
139:7 164:2
216:20,21
**recoverability**
63:24
**recovered** 163:17
**recoveries** 31:8
32:5 33:17 34:1
37:21 38:2,7,9,23
45:24 51:15 79:13
139:1 163:16
**recovering** 41:6
82:2,6
**recovery** 29:13
30:10 34:3,21

36:24 39:1 45:8
49:18,18 60:25
61:4,12 62:3,16
65:19 66:20 73:6
76:7 100:9 128:13
131:18 132:22
137:13,14 139:8
153:10,16 201:9
216:21 263:3
**red** 67:2
**redline** 111:19
**redress** 70:13
**redressing** 85:25
**reduce** 33:23 37:6
99:8 199:17
**reduced** 34:21
**reed** 8:8,10 163:1
**refer** 101:10
144:9
**reference** 125:2
131:15 144:5
171:23 179:17
199:23
**referenced** 173:13
184:11
**references** 69:14
177:19 204:10
230:13
**referred** 187:8,14
239:7
**referring** 106:1
245:20 269:2
**refers** 90:14 144:8
**refilled** 46:15
**reflection** 275:2
**reflects** 35:8
**refused** 147:21
**regard** 42:13
88:14 121:5
134:12,17 136:1
137:8 159:8,8
170:14 191:7
197:15 227:14

259:23 260:3
272:22
**regarding** 129:15
155:12 160:6,22
173:22 202:2
229:14 231:20
232:7 260:6,7,9
**regardless** 104:17
168:3
**regards** 267:4
**regime** 142:3
**regimes** 142:20
**regulate** 150:6
211:10
**regulated** 142:1
207:13
**regulating** 67:10
**regulation** 67:13
142:3,4
**regulators** 207:15
**regulatory** 240:23
**reinjury** 210:2
**reiterate** 37:18
201:3
**reject** 49:24 83:1
83:10 104:8
**rejected** 49:22
55:23 56:2
**rejecting** 30:21
31:5,24 32:5
33:10 36:10 38:14
39:11,15,17 40:21
40:22,22 43:13
44:6 45:4
**relate** 187:10
231:9 240:23
**related** 24:20
25:13 57:7 77:14
77:17 84:25 85:1
85:11,25 86:4
115:7 122:23
171:25 181:20
187:8,13,24 188:5

188:17,18 191:8
191:11 192:2,20
230:24 231:5,12
232:14 234:7,8
235:5,9,16,17,24
237:24 240:10
244:24 245:15
249:20,22,23
253:19 258:25
259:12,14 268:6
**relates** 22:12 24:3
92:1 145:1 247:20
250:25 261:15,19
**relating** 183:6
240:12
**relation** 16:4
53:11
**relationship** 81:5
136:17 211:17
231:2,14
**relative** 34:8
**relatively** 68:5
**relatives** 217:25
**release** 20:11
22:25 23:1,5,7,10
23:13,20 24:7,7
24:22 25:2,3,4,5
27:6,8,9,10,18
28:15 51:6 119:25
121:21 134:18,23
135:6 145:2,7
165:20 168:12
186:9 204:15
226:24 229:9,12
229:14,16 231:25
234:11,17,18,20
234:21 235:1,3,8
236:10 240:9,11
242:19 243:6,16
244:2,2,11,23
245:12,14,15,17
246:21 247:20,22

247:23 248:22
250:1 253:2,12
254:24,25 255:5
255:16 257:11
266:24 268:1,4
**released** 22:24
50:24 61:11
177:20 230:15,18
231:3,4,9,12,13
231:13,16 232:3
234:9 235:18,18
235:24 236:2,22
239:18 243:24
244:15,16 245:21
247:9 248:9 251:8
255:7,18 257:19
259:11 260:11
267:9 269:9
**releasees** 24:23
26:10,10,18
**releases** 17:14
18:2,16 19:2
22:12,15,20 23:16
24:3 27:11 29:4
54:22 122:14
144:20 230:1,3,9
230:22 231:23
232:1,7,17 233:12
233:15 234:10
239:6,20 240:6,7
241:20 246:11,16
257:9 258:25
260:9,12,20
**releasing** 23:4
253:18 260:12,15
**relevance** 117:24
**relevant** 68:21
79:5 91:16 99:7
133:18 148:2
208:6 228:16
**relied** 212:16
**relief** 135:2,3,24
147:14 155:5

157:18 160:9,23
161:8 178:17
198:18 208:12
**relieve** 158:19
233:17
**relinquishing**
206:8
**relitigate** 198:21
**relitigating**
265:19
**reluctantly** 41:1
154:8
**rely** 58:6 150:25
247:6
**relying** 210:9
**rem** 35:15 42:7
**remain** 27:18
102:22 164:24
199:19 272:21
**remained** 21:12
**remaining** 35:23
100:23 144:19
174:19 226:25
**remains** 118:6
150:12
**remand** 249:10
**remarks** 120:4
187:12
**remedy** 89:3
91:10
**remember** 19:7
25:14 58:15 71:3
75:23 175:10
182:21 214:20
265:22
**remembers** 93:6
212:3
**remind** 53:3
74:15
**remote** 58:3,14
102:17
**remotely** 102:17
275:8

**removed** 24:19
**rendel** 13:22
**render** 173:22
**rendered** 77:19
**reopen** 133:11
**reorganization**
18:14 29:4 66:11
94:3 171:13
**repeat** 120:14
228:10
**repetition** 150:14
**replayed** 49:10
**replete** 86:5
**reply** 86:8 120:16
167:19 172:4
174:1 227:17
**report** 20:2 33:15
34:24 36:17
**reporting** 57:2
101:12,14
**reports** 217:16
**represent** 79:16
92:9 105:18
137:19 147:6
149:25 179:2,10
189:18 272:15
**representation**
181:6
**representations**
271:22
**representative**
22:20
**representatives**
207:3
**represented** 44:20
152:18 204:21
207:6
**representing** 88:2
**represents** 34:16
84:5 105:1
**request** 16:5,13
21:6 46:23 51:8
204:3 205:1

**require** 34:6 82:9
156:4 163:23
168:22,24,25
171:2 190:17
196:19 274:15
**required** 32:4
158:1 169:14
178:13
**requirement**
157:12
**requirements**
157:6
**requires** 28:12,21
28:22 30:9,21
49:1 53:7 62:1
72:1 150:20 165:3
170:6,23
**res** 196:23
**researching**
219:23
**resemble** 102:18
**reserve** 120:17
149:6 156:7 205:3
260:5
**reserved** 120:4
204:20 226:22
**reserving** 123:2
131:6 146:13
149:20
**resolution** 32:22
118:11 123:5
167:25 172:3
173:3 181:23
187:19
**resolve** 19:24
118:10 171:8
175:17 180:25
189:13 226:19
234:3 236:21
274:12
**resolved** 102:23
173:4 180:19
185:16,23 226:20

226:21 272:23
274:10
**resolves** 226:18
234:1
**resolving** 34:5,8
**resource** 107:23
**respect** 41:11,25
49:7 70:16 72:10
77:3 78:13 89:3,5
91:24 107:1,13,19
107:23 124:20
142:11,24 143:3,9
143:20 144:20
146:14 149:1,17
150:2,10 154:14
156:21 157:15
158:20 159:9
160:22 179:9,19
182:14 188:25
191:12 192:9
199:2 230:24
247:23 251:9
272:13
**respectfully** 154:8
**respectively** 81:15
81:21 228:13
**respects** 88:20
**respond** 27:17
50:13 74:2 92:21
155:12 205:3
264:16
**responders** 88:17
**responding** 91:18
**response** 49:20
71:9 72:5 76:15
91:22 101:19
120:12 133:6
159:22 231:19
**responses** 172:1
**responsibilities**
142:21
**responsible**
159:25 208:15

**responsive** 25:13
248:5
**rest** 31:20 119:10
144:1,10 149:6,17
160:12 227:14
228:22 229:1
**restate** 87:21
**restitution** 152:12
154:23
**restriction** 126:19
**restructuring**
219:21 224:19
225:3,21 271:20
**result** 34:25 47:23
60:10 83:15,19
98:20 139:5 140:3
185:14 275:7
**resulted** 153:4
**results** 37:10 83:8
89:15,15 103:2,7
**resuming** 47:24
**retain** 49:13 50:22
50:23 186:14
**retained** 49:10
**retaining** 50:16
**retired** 50:4
**return** 56:8
**revenue** 85:11
**review** 20:8 229:3
258:2
**reviewed** 154:22
205:10
**revised** 81:17
89:24 179:5 203:4
204:4 272:1,25
**revision** 231:19
**revisions** 229:10
229:11,25 230:21
**revisit** 152:21
**rewards** 77:6
**rewrite** 177:2
**rewriting** 130:1

**rewrote** 256:21,23
**rhetorical** 175:12
  175:15
**rhode** 53:5 80:11
  88:9 261:14
**rhodes** 48:12
  182:15,16 188:16
  191:15,18,22,24
  192:6,9,12,14,22
  193:1,12 199:2
**ricarte** 13:23
**rice** 13:24
**richard** 14:15,16
**ridiculous** 93:16
**right** 18:6,7 21:10
  25:25 28:21 29:15
  49:6 50:23 52:14
  52:16,18 65:3
  72:11 74:10,11
  76:16 79:6,7,20
  88:12 89:8 90:15
  90:19 91:25 92:4
  110:22 114:13
  117:5 119:18,21
  125:18 126:1,7
  127:16 128:20,23
  129:22 130:2
  131:22 132:14
  133:22 135:12
  137:22 138:8
  140:17 141:8
  144:10,12 145:19
  149:16,20,23
  153:3 156:8
  157:23 159:12
  162:5,14 170:13
  171:15 179:4,7
  180:13 187:13
  188:13 191:4
  194:8 195:10
  196:18 197:12
  198:5,22 202:14
  202:16 203:11

204:18 205:7
216:24 218:13
219:19 226:6,10
226:22 229:2
230:7 233:2
234:23,24 235:4,7
235:10,17 237:7
239:9,14,18,21
242:24 243:2
244:14 245:3,10
247:7,11,13,17
248:14,18 250:1
250:12 252:5
254:2,18 256:4,7
256:18 257:15
259:10,19,25
261:24 263:1,10
263:18 264:3
266:7,23 269:25
270:11
**rights** 50:17 79:11
  87:16 122:18
  123:2,19 124:15
  132:20 135:20
  147:8,13,16,23
  148:3,13 152:14
  152:24 161:18
  163:13,20 166:10
  167:17 169:17
  170:8,25 173:13
  173:21 177:4,5
  180:6 189:1,9
  190:18 194:22
  198:6 200:10
  201:8,11,12,24
  202:3,24 205:3
  227:12,25 256:10
  260:5 261:16
  262:6 263:13
  264:12
**rigorous** 30:13
  109:3

**rigueur** 98:7
**riled** 205:12
**ringer** 13:25
**rise** 56:25 216:2,4
  242:9
**risk** 29:20 78:24
  164:2 169:19,22
  170:4 210:2
**risks** 77:6
**rms** 143:11 144:5
  144:8
**road** 190:9,9
  276:21
**robbins** 93:25
**robert** 1:22 10:17
**robertson** 14:1
**robin** 94:14
**robinson** 9:3
**role** 16:23 19:6,23
  20:22,22,23 84:16
  137:13
**room** 1:13 5:4
**rose** 24:12 224:8
**rosen** 14:2
**rosenbaum** 14:3
**ross** 175:10
**rothstein** 14:4
**roughly** 83:11
  160:16,17
**round** 17:23
  20:16 96:7
**roxana** 9:5
**rubinstein** 14:5
**rug** 226:1
**rule** 21:5 84:1
  85:16,17,18 99:21
  100:4 147:14
  148:1 157:18
  168:23,24 189:13
  195:17 225:19
  273:10
**ruled** 59:24

**rules** 80:19,25
  130:1 196:16
**ruling** 159:9
  173:5,22 174:2
  176:18 190:7
  195:5 273:11,15
  273:18,23 274:5
  274:13
**rulings** 165:7
  168:10 195:10
**run** 28:3 160:25
  217:22,23
**rundlet** 14:6
**running** 219:12
**rural** 213:8
**russell** 14:7
**ruth** 12:16
**ryan** 14:8,21
  15:10 220:13

---

**s**

**s** 3:1 9:4 10:15
  11:7,11,23 12:6
  12:22 14:4 15:21
  16:1 52:15,15
  106:1,1 182:15
  193:9 220:15
  257:11,20
**s.ct.** 45:11
**sackler** 4:9 18:9
  21:20 22:19 40:12
  40:14 45:15 64:4
  64:20,21 76:22
  78:1 145:3 214:10
  223:7,10,14,16,25
  224:1,2,7,11,20
  225:13,18 243:21
  243:22 246:5
  247:2,8 259:3
  262:1 266:17
  272:23
**sackler's** 223:16
  223:21

sacklers  19:17
  23:14 26:17 31:7
  34:22,23 37:15
  39:2,10,21 40:2
  40:19,19 41:3,9
  42:2 44:14,15,25
  46:17,21,23,25
  47:6,21 54:25
  55:3,6,10 57:15
  60:12,24 61:16,18
  61:23,24 62:20,21
  62:24 63:4,9
  65:12 66:2 68:23
  68:25 69:2,4,11
  73:15,18,23,24
  74:5,7,23 75:10
  76:4,5,6,7,11,17
  77:14,17 78:5,21
  121:7,11 122:11
  122:19 140:10
  215:11,25 224:15
  226:2,11 250:18
  250:23 251:6,7,8
  251:14 253:10
  257:24 259:18
  265:23 268:11
saddle  17:9
safety  86:1 240:25
saint  6:3
sake  22:10
sale  56:19 81:9
  139:11 206:19
  234:14 251:1
salesforce  207:10
  207:11,21
salmons  220:17
salwen  14:9
sam  10:20
samantha  224:5
samhsa  106:3,4,5
  109:13
samsa  106:4

samuel  11:25
san  81:20
sand  95:4 185:12
  206:5 209:24
  263:23
sandra  221:10
sara  9:15 15:5
satisfaction  169:8
satisfied  52:8,24
satisfies  96:12
satisfy  35:20 66:7
satisfying  153:22
saval  14:10
save  174:18
saves  99:2
saving  18:19
saw  161:9 176:25
saying  54:17 64:4
  73:9 74:22,25
  78:16 94:22 115:2
  150:8,16 156:7
  162:7 165:9,17
  177:2 184:19
  194:10 198:13,21
  244:17,19 255:12
  262:24 263:4,7,8
  264:23 265:4,8,11
  265:23
says  29:25 49:6
  112:10 125:17,17
  135:13 138:12,12
  145:12 173:24
  180:4,7,8 186:6,6
  189:8 193:4 195:7
  196:7 199:3
  219:13 232:3
  241:10 243:20
  256:20 263:20
  267:7
scenario  28:23
  36:9 72:19 76:11
  172:17

scenarios  36:8
  72:16
schedule  24:11
  25:9 27:16 70:24
  202:3
scheme  142:8,11
schinfeld  14:11
schlecker  14:12
schmidt  14:13
scholarly  26:7
  28:9
school  117:8
  133:4
schwartzberg  9:1
  256:25 257:1,3,15
  258:3,14,19,23
  259:7,17,20,23
  260:1,3
scientific  222:23
scope  20:10
  123:10 159:11
  160:6 202:21
  232:7
score  99:5
scott  3:8 11:5
scrambled  90:6
screen  219:5,7
  229:20
script  207:24
se  7:19 8:16,18
  204:20 205:8
  218:15 225:6
search  250:19
seattle  81:15
second  16:4,12
  24:6 31:14 62:1
  80:22 82:19 98:9
  101:11 108:5
  111:13 113:1
  116:10 135:11
  147:10,17,21
  149:9,10 169:13
  169:25 172:8

181:14,16 183:2,3
  193:2,11,15 197:4
  197:5 218:24
  234:17 249:8,24
  256:11 267:12
secondly  20:7
  85:14 87:8 137:7
  159:22
seconds  18:25
secret  200:20
  222:18
secretary  207:2
section  29:23 30:8
  51:4 52:4 67:4
  80:20 97:9 122:22
  123:8,11 135:6,13
  135:19 136:3,16
  136:22 143:3,7,10
  143:13,16 150:7
  163:5,11,21 164:4
  165:22 166:22
  170:6,22 171:21
  184:10 186:5
  194:5 231:24
  232:2,4 237:23
  240:9 257:22
  258:15 261:19
sections  33:16
  81:23 130:18
see  17:11,20 18:21
  34:24 45:11 61:22
  95:13 109:20
  117:1 126:24
  129:16 144:22
  155:11 157:3
  174:21 187:4,15
  187:25 191:9,10
  191:13 192:20
  202:12 204:4,6
  205:7 209:24
  213:8,24 214:1
  219:6 229:19
  242:11,18,22

244:7,11 245:9
260:6 272:3
275:11
**seeing** 116:22
123:2 129:2
**seek** 79:13 84:18
89:3 143:23 156:8
157:18 164:1
165:25 166:8
169:2 172:12
173:14 178:17
183:13,24 184:17
184:21 186:2
201:5
**seeking** 86:21
121:16 156:20
164:25 165:6
167:4 184:14
191:17,21 192:9
194:4 198:18
201:17 202:13,13
**seemingly** 28:17
37:19 40:25 41:1
**seen** 19:10 129:2
177:11
**segment** 222:7,16
**seismic** 36:5
**seized** 98:14
**self** 64:11,14,14
76:25
**sell** 213:21
**selling** 207:18,19
**sells** 141:24
207:14
**semi** 26:7
**sense** 28:14 30:7
56:10 91:17 101:9
119:6 144:14
151:25 198:2
211:15 263:23
266:14
**sensible** 28:18

**sensitive** 112:7
**sent** 224:25
**sentence** 176:15
176:15,17 178:24
179:25 180:4
181:16,18 183:3
185:16 187:7,15
187:25 193:2,11
193:15
**sentences** 187:15
**sentencing** 152:21
154:17,25
**sentiments** 175:18
**separate** 84:3
89:16 90:1 128:6
130:3,4 132:21
135:22 141:20
142:3 238:11
239:10 240:16
249:16 252:18
254:3,5,7,15,23
255:3,24
**separately** 82:21
87:14 89:1 109:24
140:25 149:10
256:12 259:13
261:9 269:6
**separation** 246:23
**september** 62:25
265:18
**seq** 33:15
**series** 105:2
**serious** 42:19 47:5
**seriously** 20:23
78:13 95:22
**serve** 37:8 111:3
137:12 153:11
**service** 17:11
**services** 106:6
207:2 220:14
238:1
**ses** 144:18

**set** 18:4 21:1
29:22 45:6 46:24
48:25 80:20 85:5
87:2 113:10
120:13 123:18
159:19 160:1
166:21 181:8
187:23 200:10
206:23 228:10
240:3 262:15
**seth** 14:11
**sets** 34:24
**setting** 92:12
133:15 226:9
**settle** 40:21 41:13
69:3 168:17 172:7
182:1 187:22
188:12 189:11
190:14
**settled** 59:17,23
64:11,14,15 69:7
76:25 108:15
113:16 177:20
197:21,21,22
223:9 274:15
**settlement** 19:11
30:14 31:9 32:22
33:15 35:22 40:15
41:2,22 55:14
57:1,15,16 58:1,5
58:7,10,13 59:8
60:3,9,16,18
86:16 99:22
100:10 101:24
102:1,21,22
113:14,18 119:10
121:25 122:1,12
164:18 168:16
171:10 181:23
182:19 183:17
184:13 187:18
188:16 191:10
192:14 198:1,14

199:10 204:15
227:9 231:20
244:9 245:15
253:5 266:17
271:22 272:23
**settlements** 32:14
33:6 40:22 57:14
100:8 101:18,20
101:25 119:11
166:20 167:22
181:18 182:7
187:8 192:10,11
198:8,19 227:20
**settles** 164:21
**settling** 19:9
57:11 204:5
256:20
**settlors** 64:11
**setup** 92:3,6
**seven** 38:4 72:12
76:9 238:23
**severe** 104:17
**severity** 96:19
101:8,12 104:23
105:12,12 111:8
**shannon** 10:7
13:1
**share** 36:10 47:8
72:16,20 76:10
116:2 117:11
128:22 133:21
137:18 138:6,7
230:6 262:4
272:16
**shared** 47:11 93:1
257:18
**shareholder** 24:3
24:5 240:15 245:2
248:2 257:9,10,11
257:12,17,21
258:4
**shareholders**
41:16 71:16,17

271:21
**sharing** 72:22
**shaw** 6:14
**shepherd** 14:14
16:25
**shepherded** 272:2
**sheriff** 215:15
**shield** 23:4 220:13
**shields** 21:12
225:18
**shift** 52:24
**shifting** 66:20
**shira** 15:13
**shore** 7:14 8:21
14:15 34:16 72:25
155:11,14,15
**short** 40:14,16
87:12 121:2
208:18 209:15
210:24 211:14
238:12 248:15
**shortsighted**
87:17
**shot** 254:16
**should've** 214:14
215:8
**shouldn't** 173:22
187:25
**shoved** 226:1
**show** 30:18 39:12
39:13 90:3 185:19
251:23 252:21,22
252:24 253:1
255:10 265:9
**showed** 265:17
**shower** 266:14
**showing** 42:10
56:12 107:5
**showings** 158:16
**shown** 175:14
**shows** 45:23 97:25
**side** 18:9 54:9,21
95:24 96:8 97:2

97:11 116:23
127:21,22 129:15
178:13 180:15
182:4 214:17
216:8,15 223:6,7
225:6,8,13 242:14
259:1
**sides** 115:22
135:24 225:3
**sight** 272:21 273:8
**signature** 78:14
**signed** 78:12
204:24 205:9
257:22
**significant** 84:14
88:24 92:15 97:16
106:25 111:20
112:4
**significantly**
101:23
**silbert** 14:16
**silences** 78:17,18
**similar** 21:5 59:22
74:6 79:4 80:21
80:23 81:3,13
90:15 142:11
215:16 231:7
237:22
**similarly** 20:25
21:4 24:23 115:12
124:21 153:8
**simmonds** 14:17
**simple** 92:23
102:20 112:15
143:7 230:16
**simplify** 145:16
**simplistic** 36:14
**simply** 24:4,12
26:15 61:17,20
63:2 69:15 80:17
91:3,18 92:9
100:4 109:10
164:17 178:7

180:6,23 184:4
190:7 192:11
262:11 275:2
**sincerely** 138:16
138:17
**sincerity** 148:6
160:8
**singer** 8:14 14:18
162:25 163:1,3
165:14,17 167:2,7
167:10 175:23
176:9 184:11
190:25 197:8
218:24
**singer's** 196:13
**single** 39:5 40:25
50:19 72:10
176:15
**sir** 116:20
**sister** 73:22
**sisters** 225:22
**sit** 196:14
**site** 253:11,19
**sitting** 17:9
**situated** 24:23
45:6,14 69:16
70:4 115:12
124:21 153:8
**situation** 37:24
152:25 210:10
214:25 238:10
**six** 37:3 72:12,21
76:8 128:20
197:25 274:21
**sixth** 124:8 128:9
176:24
**size** 92:8 110:12
137:25
**sizeable** 82:12
**sizes** 92:15
**skapof** 14:19
**skip** 153:5

**skipped** 185:8
**skipping** 185:25
**skis** 188:8
**skorostensky**
14:20
**slated** 46:1 158:25
**slaugh** 14:21
**slice** 126:16
**slight** 181:15
**small** 17:3 31:10
76:14 98:11
100:16 106:20,22
112:1 113:25
116:8 117:8,15,24
256:22,22 268:12
273:12
**smaller** 40:9
94:23
**smith** 8:8,10
163:1
**sneak** 135:23,23
193:24
**sneaky** 32:21
**snow** 162:1
**snowball** 209:21
**social** 152:2
**socialize** 273:24
**sold** 213:24
**solely** 38:8 169:3
201:5,17
**solicitation**
178:12 194:7
**solicited** 178:8
**solution** 153:6
212:12,19 216:6
**solutions** 212:2,8
276:20
**solve** 39:5 108:14
108:23 109:25
110:15 142:22
250:15 251:15,16
**solved** 39:7

solving 110:22
somebody 23:17
  99:3 162:2 250:13
someday 37:15
someone's 248:25
somewhat 113:24
  152:10 154:8
son 219:24 226:3
son's 219:25
sonya 2:25 276:3
  276:8
sophistic 52:15
sophisticated
  44:20
sophistry 69:14
  70:5 73:7
sorokin 14:22
sorry 29:6 37:22
  54:10 76:21
  114:18 128:19
  146:6 149:13
  151:19 152:24
  170:2,17 201:1
  210:23 228:25
  233:8 234:16
  249:7,21 252:22
sort 16:23 30:10
  58:1 67:13 73:12
  76:21,21 79:14
  91:7 92:24 93:11
  120:1 130:17
  161:13 198:14
  236:6 251:5 272:1
sorted 18:3
sorts 35:25 51:15
  213:6 216:21
  219:2
sought 51:6 128:2
  129:22 135:3
  155:5 165:4
  183:17 184:9
  195:21

sounded 206:3
sounds 232:16
source 65:18
  228:2
sources 51:15
southern 1:2 52:3
  59:25 131:16
  224:18
sovereign 120:3,3
  123:14 136:6,14
  136:22 137:9
  143:1,10,14,17,20
  144:9
sovereign's
  134:23
sovereigns 135:22
sovereignty 84:1
  136:2
speak 74:3 113:6
  114:6 172:10
  205:1,3,5,9 208:5
  217:25 218:10,15
speakers 207:23
speaking 44:6
  93:12 162:23
  163:7 165:16
  167:21
speaks 208:1
  253:6 266:8
special 41:21
  77:24 131:12
  163:4,4 165:6
  223:20
specialty 8:2
specific 21:1 29:5
  32:4 34:3 49:5
  54:11 97:7 98:4,9
  108:20 112:9
  118:10,15 135:16
  136:15 159:24
  166:13 172:10
  173:8,10 182:13
  193:1 199:1

203:18
specifically 82:3
  134:11 135:13
  143:1 168:14
  170:4 179:20
  181:6 189:8 234:8
  241:5 270:16
specificity 158:3
specified 230:23
speculated 76:22
speculating 43:18
speculation 45:2
speculative 32:10
  32:18 33:2 37:1
  38:9 44:1 55:19
  58:3,13,22 66:6
  69:22 72:4
speed 271:16
spend 31:21
  224:14 250:3
  263:5
spending 99:7
  103:1,5 104:4
spendthrift 64:8
spent 36:20 77:5
  105:4 127:19
  157:9 212:3
  224:21
spilled 220:8
spillover 46:7
spirit 23:19
spoke 181:5
  183:16 233:19,20
  272:16
spoken 19:19 45:7
spokesman 41:15
sponsored 22:6
spouse 223:21
springer 14:23
squarely 55:22
stacey 146:3
  149:25

stacy 10:2
stage 59:16
  154:25 263:12
  264:4
stages 246:1
staggering 38:20
stake 164:19
  271:2,3
stakeholders
  16:24 17:4 18:12
  34:11,12
stand 148:7
standard 25:2
  29:1 40:17 68:13
  99:21 100:4
  116:14 251:25
standing 86:10
  147:8 148:1,12
  155:3 159:9
  166:11,14 213:7
standpoint 118:12
stands 39:18
  55:12 189:25
standstill 60:15
staple 70:23
stark 45:2 55:12
  105:20
start 16:10,22
  95:18 106:19
  176:5 182:4 209:9
  243:3
started 51:14
  132:2 134:4
  186:12 220:6
starting 202:22
state 3:16 4:2 5:2
  5:4 6:1,2 25:18
  46:23 57:15,17
  62:10,19 64:24
  67:11 69:1 73:2
  74:4 75:24 78:20
  81:12,12,12,15
  83:17 84:1,6,10

85:19 86:18 89:2
91:10 92:9 96:9
97:25 101:18
103:14 104:17
106:21,23 107:4,6
107:16,22 108:3,3
108:16,20,25
110:8 111:1 112:1
112:14 113:22,25
115:21 116:23
118:7,11 119:6
124:24 125:3
129:5 132:10
137:23 140:23
143:3 151:19
160:16 165:20,22
168:18 177:16
183:20 188:25
212:1,3 221:13,13
221:16 236:22
240:23,24,24,25
241:1,1,1,2,2
255:10 256:1
261:7 262:2,2
265:12
**state's** 116:2
**stated** 33:9 66:10
90:3 135:25 227:8
**statement** 35:1
66:5 71:14 89:25
90:10 93:8 100:15
106:18 148:23
154:13 182:15
226:13 227:3
240:3
**statements** 99:6
205:11
**states** 1:1,11 6:15
37:24 39:16,17,18
39:20 40:3,6
44:12,12,17 45:5
46:5,14 47:14,15
47:16,17 48:11,11

48:20 52:7 53:22
54:24 55:2 60:10
60:17,24,25 61:4
62:8,20,23 63:8
65:5,5,13,25 67:1
67:2,5,8 70:2,2,2
70:18,21 72:21
73:18,22 75:1
76:14 79:2,10,22
80:12,17 81:2
82:3,8,9,12,14,16
82:20,20,25 83:2
83:5,10,14,21,22
84:18 85:15 87:5
87:7,13,15,21,25
88:21,22,23,24
89:1,7,16 91:11
92:8,25 94:17,19
94:21 95:3,9,24
95:25 96:2 97:25
98:2,10,11,14
99:15,20 101:13
103:23 105:4,5
106:12,23 107:6
108:14,16 109:19
111:25 112:8,17
112:17 113:14,15
115:1,5,11,20
117:16 118:21
124:25 125:7
129:15 134:9
135:3 140:21,22
140:25 142:3,5
143:12,13 152:12
153:2 154:17
162:20 173:15
217:13 222:20
223:4,23 225:8
234:5 240:2
261:12,16,25
262:3,5,18 263:5
263:11 264:21
267:18 272:10

**stating** 222:3
**status** 35:12
152:23 155:18,23
**statute** 29:24,25
68:21 81:17,19
112:9 113:12
136:3 207:2
**statute's** 30:19,19
**statutes** 37:20,20
81:23,25 135:15
240:24
**statutory** 29:23
74:17 147:13
148:9
**stay** 73:23 179:15
181:10 199:9
261:23 262:19
263:11 264:8
265:19,21,22
266:1
**stayed** 186:19
**stays** 83:2
**steege** 8:22
**steel** 14:24
**step** 106:16
**stephanie** 10:11
**stephen** 13:15
**steven** 12:1 15:19
**stipulation** 64:2
228:14
**stockdale** 175:9
**stodola** 14:25
**stokes** 224:5
**stone** 217:10
**stop** 33:19 79:19
207:18 230:18
239:19
**stopped** 222:24
245:23
**stories** 162:10
270:16
**story** 67:24 87:12

**straight** 107:10,14
112:15
**straightforward**
80:19 267:3
**strategically** 18:2
**strauss** 220:19
**streamline** 274:23
**street** 1:13 4:3
5:19 6:9,16
212:13
**strength** 39:9
60:24 76:2
**stretch** 67:17
203:5
**stretching** 25:1
**stricken** 181:16
185:17 199:9
**strict** 206:23
**strictly** 30:12
243:11
**strike** 145:14
181:22 183:2
187:18 242:13
255:8
**strikeout** 193:2
**striking** 190:2,6
**string** 235:19
251:5
**strong** 17:2 79:8
84:13 117:18
**strongest** 42:6
52:5
**strongly** 18:9
**structure** 92:12
109:14 110:2
133:20 172:13
**structured** 122:24
124:2
**structures** 172:15
**stuck** 35:20
**stuff** 161:20
198:14 208:10,25
210:15 211:25

244:3,5 249:20,23
249:23
**subject** 17:14,15
24:15 26:11 65:15
66:3 99:15 127:5
142:2 174:14
195:1 229:4 270:7
272:22
**subjective** 101:9
111:16
**submission**
211:17
**submissions** 208:7
212:9 215:17
**submit** 63:7 66:14
66:23 92:2,16
154:8,9 254:16
262:13,16
**submits** 123:14
**submitted** 36:16
41:9 229:17
**submitting** 121:24
274:14
**subordinate**
67:15 73:1
**subpoenas** 233:16
**subsequent** 76:22
165:10
**subsequently**
131:6
**substance** 106:5
273:17
**substantial** 37:14
84:15 98:24
127:11 218:5
228:2
**substantially**
18:15 80:21 81:3
90:15 227:10
**substantiate**
158:6,17,22
**substantiated**
158:1

**subverted** 264:12
**succeed** 33:20
**succeeded** 151:10
**success** 77:16
165:23
**successful** 60:13
163:17
**successfully** 41:6
**sue** 73:18 74:4
76:14,17 269:23
**sued** 69:2,2 238:6
248:17,21 251:20
252:16 269:9
**sues** 221:13
**suffer** 65:13
**suffered** 44:24
79:3 84:15 217:24
260:13
**suffering** 151:23
214:22 216:15,15
**suffers** 209:23
**suffice** 79:11 84:1
**sufficient** 66:12
81:6 148:12
159:15 174:16
274:17
**suggest** 70:10
108:24 115:18
119:13 122:13
123:9 127:7
137:17 144:16
267:15
**suggested** 52:25
176:11 178:9
181:10
**suggesting** 122:12
178:15 190:8
262:25
**suggestion** 23:3
38:18 87:15 118:4
143:4 178:17
201:16

**suggestions** 22:23
**suggests** 94:20
115:4 199:12
**suing** 35:5 40:18
41:13 76:18 78:4
78:4 245:23
251:18,23 270:1
**suit** 85:24 141:11
242:13,15
**suite** 5:19 7:19
276:22
**suits** 46:16 69:6
255:8
**sullivan** 5:9 227:2
**sum** 92:9 103:20
157:8
**sums** 115:25
**super** 52:9 200:20
**supercomputers**
72:23
**superfund** 253:11
253:19
**superior** 44:16
**superpriority**
35:12
**superseded** 85:17
**supervise** 237:13
242:4 250:11
**supervision** 251:2
251:3
**supplement** 156:3
194:12
**supplements**
156:3
**support** 29:5
42:20 44:19 79:17
86:8 87:19 89:23
95:10,11 104:12
153:19 160:5
**supported** 55:20
74:16,20
**supporting**
137:12

**supports** 76:5
89:1
**suppose** 134:19
243:22
**supposed** 67:10
209:14 216:14
225:7 246:12,14
246:21
**supposedly** 225:7
**supreme** 45:10
249:10
**sure** 16:7 17:12
51:3 52:1 56:10
60:4 62:19 63:20
65:6 67:22 79:23
105:24 109:17
117:1 121:23
123:12 134:21
139:3 141:5 144:6
158:18 159:5
165:2 178:22
197:17 201:1
218:24 227:22
234:1 236:25
238:6 239:5 261:5
262:24 265:25
267:22 272:20
273:7,24 274:16
275:6
**surgeries** 216:18
**surgery** 216:20
**surprise** 17:12
20:4 85:12 197:10
**surprising** 87:14
110:6
**surprisingly**
85:14
**survival** 86:12
**survived** 55:15
57:19 208:17
**susceptible** 63:11
**swear** 76:17

swingle  15:1
sworn  35:2 46:8
symbiotic  211:17
symmetry  28:4
system  45:9 109:9
  109:10 211:18
systems  220:15

**t**

t  11:10 14:7 52:15
  220:15 276:1,1
table  76:9
tabulation  126:11
  126:12,13,14
tactic  109:11
tailor  18:16
tailoring  17:13
take  19:23 20:22
  20:22 22:1 25:24
  26:8 32:11 45:23
  46:19 67:6 69:21
  70:1,25,25 78:18
  95:22 96:20 100:9
  112:16 114:14
  115:13 124:16
  144:14 152:14,22
  153:7 154:16,20
  155:25 156:13
  157:1 158:24
  169:19,22 179:8
  188:2 199:18
  209:4,16 210:12
  210:13 211:3
  238:23 241:9,17
  246:6 250:10
  254:15 257:4
  261:10 262:3
taken  71:19
  114:24 124:16
  142:14 203:6
  208:16,25 241:10
  241:11 242:8
  248:1 250:20

takes  30:4 78:14
  96:18 158:5
  241:18 261:24
  270:15
talk  24:6 68:20
  70:16 179:5
  182:11 206:2
  215:11,25 243:4
  272:6
talked  36:14
  222:3 271:23
talking  106:22,25
  116:1,8,9 134:19
  134:20 136:16
  160:20 162:4
  188:12 195:18
  201:23 203:25
  209:2 215:19
  235:1,2 238:16
  242:16 243:17
  258:24 267:11
talks  222:11
tapley  15:2
targeted  142:16
task  60:20 105:16
  212:20 217:21
tautologies  69:14
tautology  70:5
tax  22:23,24,25
  23:2 67:1,6 85:11
  145:7,13,13
taxes  46:24 66:25
  67:12,14 82:13
  145:12
taxing  23:1
taxpayer  46:25
tdp  156:5,16,17
  157:13,13,16,21
  158:7,9,13,23
tdps  155:13,24
  156:2,24 157:3,11
  159:8

tech  219:13
technically  121:7
  255:25
tele  1:12
telephone  221:25
telephonically  3:8
  3:9,10,11,12,13
  3:20 4:6,13,20 5:7
  5:14,22 6:6,12,19
  7:6,14,22 8:6,14
  8:16,18,20
television  159:18
  222:7,17
tell  26:7 59:4 71:7
  154:14 172:11
  189:17 214:21
  215:18 270:16
telling  42:14
  47:17 253:17
tells  222:13
temporary  196:8
ten  41:5 106:12
tennessee  86:15
  255:11
tens  34:16 37:25
  78:3 79:3,3
tentative  21:8
  86:16
tenth  218:24
term  23:23,25
  26:6 165:5 188:9
  210:4 222:24
  232:8,15 249:11
  249:11 257:10
  259:4
terminal  45:25
terms  30:1 51:8
  63:13 65:12
  100:10 103:3
  104:1 126:15,18
  126:20 134:25
  135:5,16 137:7
  161:24 168:3

173:17 181:25
  194:12,19 195:3
  250:20 271:2,2,3
  273:16
terrible  33:20
  45:18
terribly  44:8
terrific  42:19
territories  83:4,13
test  28:16,24
  29:22,23 30:3,12
  38:22 43:24 48:24
  50:22 52:8,11,18
  52:24 53:14 62:1
  66:8,21
testified  37:5
  53:17 55:1 71:13
  71:23 76:21 82:23
  83:4 97:17 101:7
  108:12 111:14
  116:12 131:12
  137:25 148:19
  151:8 159:23
  215:12
testify  72:4,23
  114:23
testimony  35:3,4
  35:7 36:14 41:25
  55:7,11 63:23
  64:7 66:23 71:1
  77:7 79:14 96:15
  97:3,12,13,14,19
  99:10 101:10
  112:2,3 142:14
  152:4,6 160:1
  208:19 248:11
  253:7 257:18
tests  45:10
texas  103:8,8
thank  16:9 21:19
  27:20,24 68:2,3
  84:8,9 87:23 88:6
  92:18,19 93:18

95:13,18 104:9
111:10,21 118:1
119:20,21 120:7
120:19,21 140:16
140:17 141:10
144:2,11,12
145:18 149:22,24
155:8 159:2
162:14,14 163:3
167:8,10 174:23
174:25 175:3
193:19 200:6,14
200:21,22 202:16
204:8,17 205:17
205:21 206:17
207:22 217:8
218:9,12 219:3
226:5,6 227:7
228:20 233:2,22
239:23,25 256:17
257:3,15 258:19
271:7 272:8
274:20,25 275:11
**thanks** 16:10 48:6
87:24 104:10
174:24
**that's** 146:11
149:14 154:9
155:8 157:9,20
158:8 159:12
161:3 168:21
169:5,5 170:20
171:19,20 173:3
179:6 181:11,11
183:20 185:16
189:5,16,21,25
190:19 192:18
193:1 194:14
195:24 196:18,18
196:24 197:12,18
199:5,24,25
200:12 201:20
202:15 203:4

204:7 208:4
**theodore** 15:18
**theories** 81:13
251:12
**theory** 67:16
79:15 89:23
108:23 243:10
**therapy** 220:15
**thereof** 181:12
**theresa** 223:16
224:2
**thereunder** 195:3
**there's** 157:22
162:7 165:23
172:25 180:24
185:4 192:24
193:6 196:22
198:16
**they're** 190:17
194:3 195:17
198:13,16,18
**they've** 168:14
179:15 194:16
198:10 203:9
205:9
**thing** 18:15 34:12
77:25 93:10 134:9
138:11 150:15
198:21 204:19
213:19 266:12
270:12 271:14
**things** 16:22
17:24 18:24 19:19
22:4,11,13 25:22
35:19 41:22 45:11
47:11 62:17 68:5
68:6,20 69:7
77:13 82:13 109:7
132:11 144:21
145:16 149:4
161:19,25 177:24
182:11 186:10
199:14 215:16

216:21 217:3
219:2 237:14
242:1,6 243:8
244:3 270:17
271:15,17,25
272:18
**think** 17:1 18:5,16
18:21,22 19:1,11
19:19 21:21 22:10
22:17 24:2,17
25:1,21 26:1,6
27:13 29:1,8,15
29:21 30:6 35:20
41:23 42:5,18
43:6,6 45:14 48:7
48:13,23 49:15
50:5,14 51:4,13
51:19 52:6 53:23
59:22,24 60:22
62:6,9,12,21
63:19 64:4,11,22
65:23 67:2,8,9,18
68:4,7 71:20 73:6
73:9,17 74:21,25
75:11,14 76:1
77:22 78:10,16,17
87:24 91:1,16
94:8,22,23 95:8
96:5 98:25 99:6
102:14 103:16,17
104:11,18,23
106:5,17 107:10
108:5 109:16
111:13,14 113:16
114:3,12,20 115:8
115:9,21 116:21
116:21 117:17,18
117:23 118:4,15
119:22 120:2,25
121:22 122:19
123:7,10 124:17
125:25 126:11,15
126:23 127:5,25

128:2,4,5,19,19
129:1,12,20 130:2
130:13 131:10,25
132:6 133:5,7,11
133:24 134:13,14
135:7,8,16,18,18
135:24 136:13,21
137:4 138:10,13
140:3,8,13 141:1
141:13 142:24
143:19 144:1,2,7
144:18,20 146:8
149:15 150:6,9,15
152:4 154:5,23,24
154:25 155:2,6,20
156:3,23,24 158:3
161:10,17 162:16
162:22 165:13
167:1,5 170:16
171:18,19 172:2
174:7,20 175:11
175:13,25 176:7
176:18 177:10,19
177:20,22,24
179:13,15 180:12
180:16,18 183:10
184:4 185:7,8,18
185:19,24 188:15
188:23 189:15,20
189:21,22 190:4
191:18 192:8,10
193:3,14 194:3
195:9 196:2,20
197:12,14,19,19
198:4 199:8,9,14
199:23,23,24
200:2,4,8,19
201:3 202:8,12,17
202:19 203:5,8,21
203:21 204:1,22
205:3,14 206:14
207:1,5,7 209:3
210:6,14,21 211:6

211:16 216:7,7
217:2,2,20 218:2
218:4,17 226:4,9
226:12 228:23
229:3 230:2,10
231:8,18 233:23
234:25 236:6,12
236:14,16,17,24
236:25 237:2,5,9
238:7,11,24
239:10,11,14,17
241:18,25 243:24
243:24 245:8,9,10
245:12 246:2,10
246:15 248:15,16
248:21,23 249:18
249:24 250:2
251:25 252:2,4,14
252:17,23 253:25
254:13,20 255:7
255:15 256:7,13
257:23 259:4
260:4 264:2,21
266:8,9 268:1,24
269:22 270:20,24
272:5,14 273:17
**thinking** 69:6
189:19
**thinks** 72:3
**third** 18:16 20:11
24:3,7,9 25:9
28:17,25 29:1,14
29:15 31:7,9,15
32:6,8,13,23 33:7
38:10,17 40:12
44:3 50:17,24
51:6,15,22 54:22
61:10 62:4 68:13
69:16,20 71:15
72:19 111:16
119:25 121:21
137:6 147:23
148:1 160:4

163:21 166:5
171:4 180:18
187:7,14,16,17
229:9 231:23,25
232:17 234:18,21
235:1,2,8 237:25
238:14 239:19
242:17 259:11
268:16
**thomas** 3:17 9:3
**thompson** 222:12
222:20,22,24
**thoroughly** 23:15
23:15
**thought** 16:9
22:18 23:7 42:22
42:25 43:3 54:10
60:2 70:13 77:25
124:6 153:24
157:5 177:25
178:3,19 209:25
216:4 221:18
236:13
**thoughtful** 31:17
266:13
**thoughts** 17:16
**thousands** 34:5,17
37:25 39:4,4,6,22
40:8 43:20,24
78:3 79:3 266:2
270:23,23
**threads** 273:6
**threat** 150:12
**three** 17:4 31:12
36:8 39:15 43:6
43:23 44:23 63:8
72:16 77:22 86:18
128:19,19 144:13
144:21 146:22
148:7 150:2
200:22 209:7,7
212:7 225:11

**throw** 95:4 260:18
**throwing** 101:6
**thurmond** 15:3
**thwart** 147:9
**tie** 251:5
**tied** 37:3 107:20
204:15 231:10
251:25 269:5
**time** 16:15 19:10
20:23 21:9 27:6
27:14,15 31:21
36:20 37:18 75:23
79:25 91:4 94:4
104:3 106:9,9
110:21 116:22
120:4,6,17 121:2
127:5 144:20
146:13 149:4,6
150:17 153:7
160:24 161:21
173:9 174:19
175:9 176:25
177:8,12 196:7
199:7 204:19
205:13 209:16
213:3 214:4 215:3
218:5,11 226:22
233:20,25 250:3
251:22 253:16
256:17 262:10
272:20 274:17,19
**timely** 133:2
153:11 157:7,20
204:22 205:5
218:15
**times** 17:4 40:4
45:18 47:4 68:22
103:11 141:2
157:15 166:6
215:5,6 254:18
266:10
**timestamp** 146:21

**timing** 158:10
**tired** 29:7
**titanic** 143:11
144:5,8
**title** 49:14 262:8
**tobacco** 101:25
110:14
**tobak** 3:13 15:4
19:8 120:7,9,11
120:11 140:18,19
141:8,10,14,17,19
146:11,12 149:11
149:14,17,22
**today** 27:13,14,15
44:6 87:3 104:15
105:1 107:10
110:25 124:3
153:21 154:1
155:19,21 156:20
183:19 184:7
199:12 201:23
208:5 248:9
264:22
**today's** 16:18 27:7
79:21 93:9
**told** 33:1 34:17,19
91:7 140:12
221:13 273:9
274:18
**tolerance** 209:17
209:19,19
**ton** 162:2
**tones** 79:8
**tong** 221:12
**tonnesen** 15:5
**tool** 166:3
**tools** 171:20
**top** 97:24 98:15
127:19 199:13
**topic** 22:21 79:21
95:6 119:22 146:1
162:16 261:9

topics  16:15
torn  106:18
tort  44:21 86:4
  90:18 93:23
  163:20
total  38:6 40:16
  58:16 71:21
totality  52:13
  88:23
totally  34:3 93:11
  94:8 161:21
touched  162:12
  272:19
tower  220:19
towns  86:15
toys  101:22
tpps  41:20
track  32:14,18
  57:23,25 69:9
tracking  243:17
trade  8:3
trades  18:4
traditional  172:14
tragedies  221:20
tragedy  78:23
  220:9 221:20
trail  274:24
trained  214:12
trainor  220:17
transactions
  227:20
transcribed  2:25
transcript  28:11
  35:7 55:4 71:4
  160:2 273:15
  276:4
transfer  42:8
  63:23 163:15
  167:3 170:8
  173:16,21,23,25
  174:4 179:9,20
  180:5,21,22
  184:11,12 189:2,2

189:5,8 190:13
  197:13 201:10,12
  268:2 269:10,21
  269:22 270:3
transferee  67:3
  268:18,21
transferee's  47:5
transferred
  167:17 168:7
  173:16 228:1
transfers  47:6
translate  103:4
trauma  215:9
traumatized
  215:7
treated  75:3 90:24
  99:20 110:4
  124:11 153:22
treating  21:13
  205:15
treatment  82:2
  99:13,16 100:7,7
  103:3 110:19
  112:11,13,15
  113:12,18 116:22
  116:24 119:4,5
  126:4 130:4,15,15
  132:25 140:7
  155:13 156:8,20
  217:14,17
tremendous  78:13
  226:14
trial  36:14 75:25
  86:20,20 197:25
  203:12 207:12
  265:5,9 274:21
trials  265:24
  266:2
tribal  139:9
tribes  39:20 41:19
  125:21,23 127:8
  130:6,7,12 138:1

tricky  176:2
tried  22:5 23:9
  25:12 32:20 36:21
  56:3,3 109:18
  211:16 213:19
  244:10 254:14
tries  130:18
trigger  25:18
trillion  40:3,4
  73:1,2,3
troop  6:19 8:23
  272:3,8,9
trouble  208:9
true  35:1 37:21
  44:17 58:4 61:9
  86:24 122:15
  226:11 275:7
  276:4
truly  74:12
  237:20 254:23
  272:12 274:4
trump  136:15
  262:17
trumps  136:3
trust  63:7,15,22
  64:22 65:18 82:6
  121:12 125:22
  133:20 139:9
  158:24 160:20,22
  163:12 167:4
  172:13,14,15,16
  180:16,21 189:5
  194:23,24 223:4,9
  223:11,12,13,15
  223:15,17,18,24
  224:1 225:12
  228:2 261:25
  264:5
trustee  223:12,13
  223:18
trustee's  257:1
trustees  223:20

trusts  41:11,24
  42:3,6 63:10,14
  64:7,8,10,14,15
  76:24,25 123:22
  123:23 138:1
  139:12 223:4,24
trust's  172:19
truth  57:2
try  17:11,20 19:24
  21:22 26:7,8 38:8
  101:15 129:10,12
  130:22 138:24
  179:8 188:22
  191:19 200:9
  207:25 210:23
  245:8 254:16
trying  18:11 39:5
  42:10 76:10 93:15
  106:2 107:13
  108:14 153:3
  188:14 202:11
  207:21 212:10
  215:18 220:6
  225:14 236:21
  243:5 245:4 248:3
  248:4,5,5 250:15
  251:12,13,15
  252:2 254:12
  255:19 260:10,19
  263:25 270:9
tsai  15:6
tugging  162:9
turn  18:25 21:15
  21:16 60:14 84:4
  166:25 183:20
  243:19
turned  129:21
  248:19
turner  15:7 33:24
turning  226:16
tweak  176:11,11
  176:17 178:9

**tweaks** 182:12
**tweed** 4:8
**twice** 96:17
**two** 16:22 19:13
  19:19 20:15 32:10
  32:17,17 34:2,2
  36:8 43:5 47:16
  50:17 60:12 63:19
  67:12 70:6 72:15
  74:11 78:19 80:14
  81:24 83:16 96:25
  98:4,4 109:7,8
  110:10 113:15
  126:2 130:5
  136:17 144:13
  146:5,5,14 155:14
  155:23 158:2,3
  159:12 160:4
  171:25 182:11,11
  185:4 187:15
  189:2 192:24
  197:25 202:18
  204:1,22 217:9
  241:8 246:1
  265:12 272:16
  274:22
**type** 23:17 25:17
  57:23,24 61:20
  64:17 137:24
  212:14 242:12
  252:5 268:13
**types** 42:21 57:10
  91:12 128:13
  238:3 242:1 254:7
  255:15 270:7
**typical** 101:17
  163:19 168:18
  175:20
**typically** 172:15
  189:17 223:25
**tyson** 64:13

**u**

**u.s.** 1:23 83:3,11
  83:13 121:8,9
  123:22,23 125:5,7
  125:23,23 127:8
  128:8,25 129:23
  132:4,8 134:24
  139:8 140:5
  224:17 257:1
**ubiquitous** 85:18
**ucc** 41:17 77:9,24
  93:7
**ultimate** 92:13
  134:8 223:5,8
**ultimately** 51:3
  94:17 107:22
  109:5 125:11,12
  131:14 132:3
  134:2,6 136:1,2,6
  136:13 140:4,8,13
  152:20,21 154:24
  177:12 228:6
  245:17
**unabated** 261:22
**unassailable**
  44:10 73:14
**unavailable** 38:11
**uncertain** 34:3
  156:16
**unclear** 155:18
**unconscious**
  210:17
**unconstitutional**
  186:7
**uncontestable**
  33:22
**uncontested**
  33:21
**uncontroverted**
  36:6
**undergoing**
  224:19

**underlying**
  164:20 171:6
  198:4
**undermine**
  164:18
**underneath**
  141:15
**underscores**
  103:16
**understand** 18:21
  20:18 52:21 56:11
  56:16 62:18 63:20
  65:1,1 67:16 84:6
  90:12 91:5 103:13
  106:7 111:18
  112:1,13 113:11
  115:22 118:8,20
  129:7,9 131:18
  136:19 137:3
  139:22,25 170:10
  174:4 188:19
  193:15 195:8,14
  196:12 197:18
  198:23,24 199:14
  204:23 210:21
  211:12 248:16
  255:14 264:1
**understanding**
  123:11 161:20
  164:14 169:16
  206:12,18,21
  215:23 224:23
  230:3,6 235:14
  267:13
**understands** 41:1
  193:8 273:25
**understood** 125:8
  235:14 254:19
  255:23 256:2,3
  267:23 269:24
**undertakes**
  244:25

**undertaking**
  94:12
**underwood** 5:22
  120:2,5,8,10,19
  120:20,21,22,22
  121:17,18 122:2,7
  122:9 125:14,18
  126:6,8,10 127:4
  128:4 129:1,7,9
  130:21,25 131:2,5
  131:22,25 132:14
  132:17 133:24
  134:17 137:1
  138:10 139:3,22
  139:25 140:7,16
  141:25 144:4,7
  266:23 267:1,12
  268:3 269:2
**underwood's**
  119:24 120:15
**undisclosed** 23:12
  23:22
**undiscovered**
  23:11,22 239:7
  253:11
**unfair** 56:24 96:8
  123:7 130:15
  175:14
**unfavorable**
  155:24
**unfortunate**
  152:9
**unfortunately**
  20:7 121:10 275:4
**unfounded**
  203:13
**unicorn** 110:6
**unidentified**
  259:7
**unified** 88:10
**unique** 69:19
  115:5 116:24
  151:25 156:1

157:1 172:13

**uniquely** 214:11

**unit** 143:17
213:19

**united** 1:1,11
124:25 134:9
135:3 140:22
142:3,5 152:12
154:16 240:1
267:18

**universal** 55:9
174:13

**universe** 61:15
73:5

**university** 55:9

**unkindly** 74:13

**unknowable** 32:6
33:12 34:12 73:15
150:23

**unknown** 1:25
146:16 151:6
159:15

**unlawful** 25:25,25
26:1 230:14,15
237:16

**unliquidated** 57:4
59:9 126:22

**unmuting** 218:20
218:20

**unpunished**
103:24

**unquantifiable**
33:12

**unquestionably**
136:8

**unreasonably**
268:12

**unrelated** 233:13

**unresolved** 93:10
272:22

**unsecured** 74:17
81:5 90:19,20,24
91:13 148:10

151:5 220:18
225:4

**unsurprisingly**
239:17

**unthinkable**
44:25 93:3

**untied** 273:7

**untimely** 148:15
218:20

**untoward** 267:19

**unusual** 82:5

**updated** 24:11

**upended** 156:16

**upfront** 130:10

**upset** 109:24

**usa** 212:4

**usage** 209:10

**use** 40:21 60:14
138:22,22 154:3
160:18 161:3
164:18 171:7,13
190:8 212:10
217:24 222:10,24
225:14

**utilized** 101:18

**utterly** 38:13

**uzzi** 4:13 19:1,16
19:18 20:13 21:16
21:19,19 27:20,23
144:25 145:3,11
145:20 239:6
242:23 243:4
246:4,4 247:4,12
247:19 261:2

| v |
| --- |

**v** 26:15 64:13
128:10 147:11
150:19

**valid** 39:21 61:20
62:19 87:13

**validity** 39:9 76:3
173:25

**valium** 214:18

**valuable** 87:16

**value** 31:8 32:4,8
32:13,22 33:9,21
33:23 36:4 37:7
37:11,12 40:16
44:16 45:25 46:11
47:22 49:11 55:5
55:15 61:11 62:11
71:8,12,21 72:13
73:21 98:24,25
126:18,19,19,20
137:20,25 139:10
139:11 140:4
163:24 167:16
168:6 169:1,23
173:2 201:8 228:2
228:6 245:22

**valued** 60:15

**valuing** 172:25

**van** 15:8

**variables** 39:6

**variation** 81:12

**varied** 32:23

**variety** 69:3 135:2
168:23 169:20
230:21

**various** 62:16
71:15 87:7,7
94:10 97:25
112:17 178:5
218:25 223:17
233:24

**vary** 61:19 83:12

**vast** 105:10 121:7
123:6

**veil** 237:13 242:2
250:7 270:6

**venditto** 15:9

**vendors** 132:9

**veracity** 44:10

**verdicts** 86:21

**veritext** 276:20

**vermont** 48:12
53:6 80:11 88:10

**versus** 56:15
85:21

**vested** 42:7

**vesting** 173:16

**veteran's** 220:3

**veto** 171:14

**vicarious** 237:13
242:3 243:8

**vicariously**
243:11

**vice** 175:10

**vicious** 209:21

**victims** 7:9 34:11
34:11,17 48:4
70:12 148:11
152:11,12,13,24
153:1 154:3,7,23
155:16 225:12
272:15,16

**video** 1:12

**vietnam** 220:3

**view** 27:11 29:11
30:13 36:15
117:24 133:25
168:10 203:4
220:24 238:4

**viewed** 66:18
120:25 181:17,19
182:12 192:23,25
193:7 198:25

**views** 17:2 44:5
156:21 189:20
275:3

**vincent** 9:6

**vindicate** 74:19

**violate** 172:6
237:17

**violated** 183:6

**violates** 168:16
170:12

violation  97:8
  261:21
violations  89:3
  261:23
violence  85:25
virginia  5:1,3
  79:23 86:19 96:14
  96:15,19 97:3
  98:3,5,12,15
  99:12 100:5,12,13
  100:18,25 103:10
  103:11,12,15,24
  104:3,6,11,20,22
  110:6 113:4
  115:13 116:7,23
  117:6,11,14
  222:16
virginia's  95:8,11
  103:25 111:6
  112:14
virtual  84:4
virtually  40:25
  70:4 104:19,23
  124:7 225:7
virtue  245:1
vis  34:9,9 69:18
  69:18
vitiates  164:10
  180:22 201:13
voice  198:10
  218:10
voided  72:25
volumes  266:8
voluntary  69:5
volunteer  192:16
volunteers  161:13
vonnegut  3:11
  229:20,23,24
  230:8 232:21
  233:3,10,23 234:3
  236:15 237:10
  239:11,15,17
  247:21 268:23

269:1,24
vonnegut's  234:1
vote  41:16 79:24
  91:9,15 113:3
  133:16 162:6
  176:12 178:16
  206:9,14,15
  225:22
voted  52:13 82:25
  82:25 83:1,2,5
  94:19 110:7
  112:23 126:7,16
  126:21 133:14
  169:16 178:14
  186:24 206:7
voters  34:18
  89:25
votes  31:11 89:18
  89:21 90:5,11
  91:16 92:2,11
voting  44:12
  52:10 83:10 89:15
  92:13 93:24 94:2
  94:9 126:11 148:8
  161:18 206:1,7
vulnerable  64:12
  64:17 214:22

**w**

w  14:8
w.r.  99:16,19
wagner  4:20
  15:10 95:13,14,18
  96:7 111:11,22
  112:21 113:1,6
  114:2,6,10,14,20
  115:8 117:3,11
waited  89:18
  125:12
waiting  86:21
waive  256:9
waived  194:2
waiver  123:8
  143:24 184:20

walk  122:13 230:4
wall  101:7
walter  220:16
want  17:7 19:6
  25:7 27:16 28:5
  29:22 37:18 63:20
  66:17 67:9 88:14
  92:21 94:18,20
  95:18 96:3 115:20
  118:3,5,12,14
  119:13,17 127:4
  133:24 134:6
  146:13 149:8
  152:17 159:5,11
  162:1 174:5,22
  180:8,23 186:11
  187:17,23 190:3
  192:11,25 193:1,6
  193:21 197:17
  198:18 201:3,21
  202:5,19 205:4,8
  210:24 211:2
  212:5 213:25
  217:9 219:4,5,6
  228:13 233:8,8
  236:1 237:9
  242:11 243:4,15
  249:18 251:5,19
  253:8 265:4,24
  266:9 267:2,22
  268:5,15 271:7
  272:11 273:3,23
  274:16,20,25
wanted  51:10
  111:1 120:2 136:9
  136:9 145:16
  162:12 187:6
  213:18 236:19,20
  247:5 253:8 257:4
  257:8,12,17
  258:13 270:15,25
wanting  75:13

wants  152:22
  156:7 218:15
  265:23 272:6
wardwell  3:3
  16:21 220:11
  221:22,24 226:3
  229:24
warfare  39:3
  43:20
warp  271:16
warrants  67:13
  176:3
washington  3:18
  7:20 37:19 48:12
  48:16 53:6 75:24
  80:8 81:15,17,19
  83:8,15 88:3 89:2
  103:7 118:17
  220:12
wasn't  175:12
  181:10
waste  91:4 127:4
wasting  161:21
  254:18
way  25:10 32:25
  45:12 46:14 70:11
  70:12 82:22 84:2
  88:16 92:14 99:7
  110:22 115:2
  120:25 122:17,23
  132:7 135:18,19
  136:2,4 146:25
  160:9 170:12
  175:12 177:3
  189:13,23 190:7
  191:11,19 195:16
  207:19 208:11,21
  209:13,20,20
  211:8 212:23
  219:11 226:17
  236:4 244:11
  245:10 247:6
  254:6,22 264:22

265:16 270:21
271:6 272:21
273:3,14 274:11
**ways**  68:10
114:12 210:5
**we've**  20:20 22:5
23:5,9 24:11,18
25:16 26:22 73:9
88:11 93:4 106:11
109:18 111:5
116:15 140:10
217:3 227:19
230:9 231:7,24
232:2,25 233:23
246:21 249:3
254:14 259:10
264:20,25 265:2
265:17 267:10
271:12
**wealth**  40:11 41:3
47:21 121:8,9
**weber**  15:11
**webster's**  117:8
**wedded**  251:16
**wedding**  175:5
**week**  87:2 124:8
161:10 203:12
207:13 230:9
270:13
**weeks**  50:18 202:8
**weigh**  42:10
270:18
**weighing**  44:14
**weinberg**  15:12
**weiner**  15:13
**weintraub**  15:14
**weis**  15:15,16
**weiss**  15:17
**welcome**  20:3,10
145:20
**wells**  15:18
**wendy**  15:12

**went**  25:21 46:22
77:9 101:16 145:8
166:5 176:12,14
178:12 187:1
194:6,14 197:3
214:6 215:9 234:6
275:9
**west**  5:1,3 6:16
79:23 86:19 95:7
95:11 96:14,15,19
97:3 98:3,5,12,15
99:12 100:5,12,13
100:18,25 103:11
103:12,15,24,25
104:2,6,11,20,21
110:5 111:6
112:14 113:4
115:13 116:7,23
117:6,11,14 175:5
220:17 222:15
**we'll**  149:17
162:21 198:24
**we're**  150:16
160:20 161:8,17
162:4,5,7,13
186:5 189:19
191:18 195:18
196:6 197:17
199:6 200:2 201:4
202:10
**we've**  155:19
195:20 197:25
201:3,23 202:20
**whatsoever**  81:11
95:5 107:15
**what's**  182:3
187:7 193:25
196:5
**whereabouts**
150:23,24
**whichever**  270:21
**whitaker**  222:11

**white**  1:14 7:8
155:15 223:3,23
**wholly**  232:17
**wilamowsky**
15:19
**wild**  45:2
**wiles**  32:25
**willful**  23:24
24:20 26:5,8
**william**  14:7
15:14 221:12
225:16,17
**willing**  19:23
134:15 208:4
226:3
**wilmer**  8:1 175:1
**win**  38:5 67:23
76:6,6
**windsor**  129:4
**winning**  76:4
**winthrop**  6:14
**wiped**  33:25
**wipeout**  38:6
**wipes**  52:11
**wisdom**  181:12
**wish**  73:23 132:25
**wished**  149:1
**wishes**  155:12
**withdrawal**  174:8
199:24 200:4
204:11
**withdrawn**  174:5
179:17 181:3
**witness**  71:6 97:1
97:3 98:15 108:11
**witnesses**  96:25
203:12
**wolf**  15:20
**wolff**  88:2
**woman**  141:7
165:13 229:1
**women**  154:4

**won**  245:23
**wondering**  264:20
**won't**  167:20
**worcester**  5:9
227:3
**word**  25:24 26:1
49:14,25 50:19,22
51:11 98:8 145:14
167:20,20 200:15
206:23 207:5
**words**  26:22
29:24 30:14 81:10
114:4 145:6
181:17 192:23,25
194:17 198:24
208:1 264:25
**work**  17:13 20:10
44:13 78:3 109:18
117:16 140:1,13
154:9 201:19
208:7 224:7,15
230:11 236:17
237:8 273:4 274:2
**worked**  17:5 24:1
48:3 70:21 93:6
95:19 105:5
118:21 238:19
265:3 270:18
**working**  17:9,20
18:23 203:25
208:10 233:15
270:18 271:13
274:23
**workplace**  240:25
**works**  258:22
**world**  8:3 20:21
26:18 43:17
151:13,15,15
152:6 153:15
161:25 212:23
**worms**  51:14
**worried**  195:9

**worry** 219:2
258:10 267:11
**worse** 44:8 104:5
133:19 197:22
214:19 218:25
**worst** 45:18
**worth** 45:12 46:5
68:7 94:13 172:18
**would've** 119:6
126:21 129:21,23
133:3 212:14,15
213:19
**wouldn't** 151:17
191:16 195:24
201:19
**write** 220:6
**written** 154:13
163:6 207:25
215:14,16 223:19
**wrong** 37:22 43:8
43:10,11 47:14
87:18,25 118:12
179:14 243:5
256:10
**wrongdoers**
236:22
**wrongdoing**
23:25 237:15
238:12 239:10
**wrongful** 56:24
56:24 237:20
251:6
**wrote** 150:18
197:3 222:1 224:5
**wv** 5:5
**wyoming** 41:24

**x**

**x** 1:4,10 24:11
39:7 198:16 199:6
257:10,19 258:24
258:25 269:16

**y**

**y** 199:7
**yards** 4:10
**yeah** 21:7 59:20
114:14 141:9,12
170:16 219:17
241:5 243:13
268:18
**year** 32:14 34:6
44:24 58:11 106:8
106:9 147:3
148:22 224:3
225:12
**year's** 275:7
**years** 35:5 39:2
40:18 43:19 44:13
60:12 74:11 77:5
77:22 79:19 97:17
105:4 109:4
110:12 111:6
142:14,15 151:2
208:16 210:9
212:11 213:11
214:6,15 223:10
225:24 265:3,13
**yell** 165:13
**yesterday** 153:24
**york** 1:2 3:6 4:11
4:18 5:12 6:10,17
7:12 8:4 57:15
69:1 85:21,22,24
86:19 103:9,10
129:5 183:21
220:20,20 224:18
**you'd** 167:21
**you'll** 200:16
**you're** 149:20
155:10 156:17
161:21 187:4,11
188:10 190:6
**you've** 188:11
203:21 207:12

**z**

**z** 14:23
**zabel** 15:21
**zeevi** 15:22
**zero** 36:3,8 72:17
72:17,18 73:24,24
73:25 104:20
157:8
**zoom** 27:14
204:24 218:25
228:19 232:15
272:5 275:4
**zooms** 271:10
**zylberberg** 15:23

**,**

**'92** 175:11

**à**

**à** 34:9 69:18