**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

In re:

BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC,[1]

               Debtors.

Chapter 11

Case No. 20-10343 (LSS)

(Jointly Administered)

**Ref. D.I. 2295, 6212, 6213, 6215
Hearing Date: September 21, 2021 at 10:00 a.m. (ET)**

**DEBTORS' AMENDED OMNIBUS REPLY IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE
DISCLOSURE STATEMENT AND THE FORM AND MANNER OF NOTICE,
(II) APPROVING PLAN SOLICITATION AND VOTING PROCEDURES,
(III) APPROVING FORMS OF BALLOTS, (IV) APPROVING FORM, MANNER, AND
SCOPE OF CONFIRMATION NOTICES, (V) ESTABLISHING CERTAIN DEADLINES
IN CONNECTION WITH APPROVAL OF THE DISCLOSURE STATEMENT AND
<u>CONFIRMATION OF THE PLAN, AND (VI) GRANTING RELATED RELIEF</u>**

---

[1]      The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT ......................................................................... 2

REPLY .............................................................................................................. 7

I.  The Disclosure Statement Should Be Approved Under Section 1125 of the Bankruptcy Code. .................................................................................................. 7

    A.  The Disclosure Statement Provides Adequate Information as Required by Section 1125 of the Bankruptcy Code. ................................................................. 7

        1.  The Disclosure Statement Provides Adequate Information Concerning the Resolutions and Settlements Included in the Plan. ...................................... 8

        2.  The Disclosure Statement Provides Adequate Information Concerning the Assets and Contributions of the Debtors. ...................................... 9

        3.  The Disclosure Statement Provides Adequate Information Concerning the Assets and Liabilities of Local Councils. .................................... 10

        4.  The Disclosure Statement Provides Adequate Information Concerning the Debtors' Insurance Policies and the Disputes Surrounding such Policies. 12

        5.  The Disclosure Statement Provides Adequate Information Concerning the Channeling Injunction, Protected Parties and Limited Protected Parties. 13

        6.  The Disclosure Statement Provides Adequate Information Concerning the Trust Distribution Procedures, Including Treatment of Abuse Claims. ....14

II.  The Confirmation Objections Are Premature, Rendered Moot, and/or Meritless. ...........16

    A.  General Plan Confirmation Objections ................................................................ 18

        1.  The Plan was Proposed in Good Faith. ...................................................... 18

        2.  The Plan as Proposed Is Feasible. .............................................................. 24

        3.  Confirmation Objections Regarding Unfair Discrimination Are Premature and Without Merit. ...................................................................................... 26

        4.  Confirmation Objections Regarding Disparate Treatment. ....................... 27

        5.  Objection Regarding Non-Abuse Litigation Claim Settlements ............... 32

        6.  The Best Interests Test Does Not Apply to Non-Profit Debtors and, Even If It Does, It Cannot Be Determined at the Disclosure Statement Stage. ..33

    B.  Channeling Injunction and Release-Related Objections ...................................... 36

        1.  Objections to the Consensual Releases Are Premature, but the Releases Are Nonetheless Permissible. ................................................................... 36

2.      The Channeling Injunction and Related Non-Consensual Third-Party Releases Do Not Render the Plan Patently Unconfirmable.....................38

C.    Trust Distribution Procedures Objections............................................................40

1.      The Trust Distribution Procedures Do Not Violate Section 502 of the Bankruptcy Code. ..................................................................................40

2.      Allowance of Claims Against Chartered Organizations and Protected Parties under the Trust Distribution Procedures. .......................................42

3.      Tort Opt-Out ...........................................................................................44

4.      Powers of the Settlement Trustee ............................................................45

5.      Expedited Distribution Procedures ...........................................................47

6.      The Court Has Jurisdiction Pursuant to 28 U.S.C. § 157(b)(2)(B) to Make a "Fair and Reasonable" Finding Regarding the Trust Distribution Procedures.................................................................................................49

D.    Insurance-Related Objections ................................................................................51

1.      The Plan Does Not Impermissibly Modify Chartered Organizations' Rights to Insurance Proceeds and Provides for Appropriate Treatment of Indirect Abuse Claims................................................................................51

2.      There Is Sufficient Disclosure of Certain Insurance Coverage Disputes. ..53

3.      The Plan Does Not Violate "Insurance Neutrality.".................................54

4.      The Plan Contains Permissible Insurance Assignment Provisions............56

III.   The Solicitation and Procedural Objections Are Meritless or Have Been Addressed.......59

A.    The Debtors' Proposed Solicitation Period Provides Sufficient Time for Abuse Survivors to Vote on the Plan. ...............................................................................60

B.    The Debtors' Procedures with Respect to the Solicitation Directive Appropriately Incorporate the Instructions of Abuse Survivors on their Proofs of Claim. ..........60

C.    It Is Not Relevant or Feasible for the Debtors to Identify a Local Council on Each Ballot...................................................................................................................61

D.    The Temporary Allowance of Abuse Claims at $1.00 Solely for Voting Purposes Is Proper. ............................................................................................................62

E.    The Vote Tabulation Procedures Are Proper, and These Objections Are Functionally an Objection to the Plan...................................................................66

F.    The Use of Modern Forms of Distribution of the Solicitation Packages Is an Appropriate and Efficient Use of Estate Resources Given the Number of Claimants in the Voting Classes and Costs of Mailing ........................................68

G.    The Debtors Are Not Required to Weed Out Abuse Claims Prior to Soliciting Votes on the Plan. ...............................................................................................71

H.      The Debtors' Master Ballot Procedures Are Sufficient, and the Court Does Not Need to Require Counsel to Comply with Bankruptcy Rule 2019 Prior to Recording Abuse Survivor Clients' Votes on a Master Ballot. ............................74

I.      The Master Ballot and Related Procedures Do Not Improperly Disenfranchise Holders of Abuse Claims and Do Not Give Undue Influence to the Coalition Law Firms. .................................................................................................................76

    1.      The Certification on the Master Ballot Does Not Invite Manipulation of Voting. ..................................................................................................77

    2.      The Solicitation Procedures Do Not Give Undue Influence to Coalition Firms, and Coalition Firms Are Not Precluded from the Use of Master Ballots. ................................................................................................78

IV.     Other Miscellaneous Objections Are Meritless or Have Been Addressed. ......................79

A.      The Bar Date Notice to Indirect Abuse Claimants Was Sufficient and No Further Notice Is Necessary..............................................................................................79

B.      The Debtors' Proposed Confirmation Schedule Is Appropriate Under the Circumstances. ..............................................................................................80

**CONCLUSION** ..................................................................................................1

# <u>TABLE OF AUTHORITIES</u>

<div align="right"><u>Page(s)</u></div>

## FEDERAL CASES

*Ad Hoc Comm. Of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*,
    933 F.3d 918 (8th Cir. 2019) .............................................20

*Ad Hoc Committee of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.)*,
    412 B.R. 53 (S.D.N.Y. 2008)..........................................3, 28

*Azar v. THGH Liquidating LLC (In re THGH Liquidating LLC)*,
    No. 19-11689, 2020 U.S. Dist. LEXIS 164740 (D. Del. Sept. 9, 2020)...............20

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,
    321 B.R. 147 (D.N.J. 2005) .............................................75

*Begier v. IRS*,
    496 U.S. 53 (1990)....................................................29

*Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*,
    372 F.3d 154 (3d Cir. 2004)............................................49

*Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings Inc.)*,
    2021 U.S. Dist. LEXIS 138478 (D. Del. July 26, 2021) .......................29

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
    203 F.3d 203 (3d Cir. 2000)............................................38

*In re A.H. Robins Co., Inc.*,
    88 B.R. 742 (E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989)........65

*In re Abeinsa Holding, Inc.*,
    562 B.R. 265 (Bankr. D. Del. 2016) ....................................34

*In re Abengoa Bioenergy Biomass of Kan., LLC*,
    No. 16-10446, 2018 Bankr. LEXIS 1361 (Bankr. D. Kan. May 7, 2018)............41

*In re ACandS, Inc.*,
    311 B.R. 36 (Bankr. D. Del. 2004) ....................................41

*In re Acemla De P.R. Inc.*,
    No. 17-2021 ESL, 2019 Bankr. LEXIS 182 (Bankr. D.P.R. Jan. 22, 2019) .........59

*In re AgFeed USA, LLC*,
    No. 13-11761, 2015 Bankr. LEXIS 1403 ...............................72

*In re Albert Lindley Lee Mem'l Hosp.*,
  No. 09-30845, 2010 Bankr. LEXIS 4148 (Bankr. N.D.N.Y. July 15, 2010)..........................56

*In re Allegheny Health, Educ. & Research Found.*,
  252 B.R. 309 (W.D. Pa. 1999) ................................................................................................57

*In re Am. Cap. Equip., Inc.*,
  405 B.R. 415 (Bankr. W.D. Pa. 2009), *aff'd sub nom. Skinner Engine Co. v. Allianz Glob.
  Risk U.S. Ins. Co.*, No. BKY 01-23987, 2010 WL 1337222 (W.D. Pa. Mar. 29, 2010), *aff'd
  sub nom. In re Am. Cap. Equip., LLC*, 688 F.3d 145 (3d Cir. 2012)................................21, 22

*In re Am. Capital Equip., LLC*,
  688 F.3d 145 (3d Cir. 2012)..............................................................................................17, 39

*In re Armstrong World Indus.*,
  348 B.R. 223 (Bankr. D. Del. 2006) .......................................................................................49

*In re Broad Assocs. Ltd. P'ship*,
  No. 5-89-01070, 1989 Bankr. LEXIS 2248 (Bankr. D. Conn. Dec. 29, 1989) ......................17

*In re Colin*,
  44 B.R. 806 (Bankr. S.D.N.Y. 1984).......................................................................................34

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004)..............................................................................................19, 58

*In re Congoleum Corp.*,
  No. 03-51524, 2008 Bankr. LEXIS 2375 (Bankr. D.N.J. Sept. 2, 2008) ..........................41, 58

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bakr. D. Del. 2004) .........................................................................................68

*In re Dakota Rail, Inc.*,
  104 B.R. 138 (Bankr. D. Minn. 1989) .....................................................................................17

*In re DeSardi*,
  340 B.R. 790 (Bankr. S.D. Tex. 2006) ....................................................................................72

*In re Ditech Holding Corp.*,
  606 B.R. 544 (Bankr. S.D.N.Y. 2019) .....................................................................................33

*In re Diversified Invests. Fund XVII*,
  91 B.R. 559 (Bankr. C.D. Cal. 1988)......................................................................................34

*In re Dow Corning Corp.*,
  244 B.R. 634 (Bankr. E.D. Mich. 1999) *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and
  remanded*, 280 F.3d 648 (6th Cir. 2002) ...........................................................................29, 30

*In re Dow Corning Corp.*,
   255 B.R 445 (E.D. Mich. 2000).................................................................................29, 30

*In re Duro Dyne Nat'l Corp.*,
   No. 19-cv-15433-MAS (D.N.J. Oct. 23, 2020) ...........................................................58

*In re Emerge Energy Servs. LP*,
   No. 19-11563, 2019 Bankr. LEXIS 3717 (Bankr. D. Del. Dec. 5, 2019).........................19, 20

*In re Energy Future Holding Corp.*,
   527 B.R. 157 (D. Del. 2015)......................................................................................28

*In re Envirodyne Indus., Inc.*,
   1993 WL 566565 (Bankr. N.D. Ill. Dec. 20, 1993) ......................................................23

*In re Fed.-Mogul Glob.*,
   684 F.3d 355 (3d Cir. 2012)..................................................................................57, 58

*In re Fed.-Mogul Glob., Inc.*,
   385 B.R. 560 (Bankr. D. Del. 2008) ..........................................................................58

*In re Flintkote Co.*,
   486 B.R. 99 (Bankr. D. Del. 2012) ............................................................................24

*In re Frascella Enters., Inc.*,
   360 B.R. 435 (Bankr. E.D. Pa. 2007) .........................................................................68

*In re Grace Christian Ministries, Inc.*,
   287 B.R. 352 (Bankr. W.D. Pa. 2002) ........................................................................33

*In re Great Bay Hotel & Casino, Inc.*,
   251 B.R. 213 (Bankr. D. N.J. 2000) ...........................................................................19

*In re Hercules Offshore, Inc.*,
   565 B.R. 732 (Bankr. D. Del. 2016) ...........................................................................19

*In re Indianapolis Downs, LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013) ......................................................................24, 37

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) ..........................................................................65

*In re Kaiser Aluminum Corp.*,
   343 B.R. 88 (Bankr. D. Del. 2006) .............................................................................58

*In re Kiklis*,
   352 B.R. 355 (Bankr. D. Mass. 2006) .........................................................................60

*In re Lloyd E. Mitchell, Inc.*,
    373 B.R. 416 (Bankr. D. Md. 2007) ...................................................................74

*In re Machne Menachem, Inc.*,
    371 B.R. 63 (Bankr. M.D. Pa. 2006) .................................................................56

*In re Mandalay Shores Co-op. Hous. Ass'n, Inc.*,
    53 B.R. 609 (Bankr. M.D. Fla. 1985) ...............................................................33

*In re Maremont Corp.*,
    601 B.R. 1 (Bankr. D. Del. 2019) (finding that an asbestos personal injury trust agreement
    and trust distribution procedures attached to the plan were "valid, proper, and reasonable
    under the circumstances") ..................................................................................49

*In re Mem'l Med. Ctr., Inc.*,
    337 B.R. 388 (Bankr. N.M. 2005) ....................................................................33

*In re Milbourne*,
    557 B.R. 376 (Bankr. E.D. Pa. 2016) ...............................................................72

*In re Millennium Lab Holdings II, LLC*,
    575 B.R. 252 (Bankr. D. Del. 2017) .............................................................38, 39

*In re Monroe Well Serv. Inc.*,
    80 B.R. 324 (Bankr. E.D. Pa. 1987) ..............................................................7, 33

*In re Mulberry Phosphates, Inc.*,
    149 B.R. 702 (Bankr. M.D. Fl. 1993) ...............................................................24

*In re PPI Enterprises (U.S.), Inc.*,
    324 F.3d 197 (3d Cir. 2003)...............................................................................20

*In re Phoenix Petroleum Co.*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) ..................................................................7

*In re Prussia Assocs.*,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) ...............................................................24

*In re PTL Holdings LLC*,
    No. 11-12676, 2011 Bankr. LEXIS 4436 (Bankr. D. Del. Nov. 10, 2011) ...........20

*In re Quigley Co.*,
    346 B.R. 647 (Bankr. S.D.N.Y. 2006)...............................................................67

*In re Quigley Co.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007).....................................................17, 36, 67

*In re Quigley Co.*,
  437 B.R. 102 (Bankr. S.D.N.Y. 2010)...........................................................35, 74

*In re Resorts Int'l, Inc.*,
  145 B.R. 412 (Bankr. D.N.J. 1990) ..............................................................28, 68

*In re Roman Cath. Archbishop of Portland in Or.*,
  No. 04-37154, 2007 Bankr. LEXIS 1180 (Bankr. D. Or. Apr. 13, 2007) ..............................56

*In re Roman Cath. Church of the Diocese of Tucson*,
  No. 04-04721 (BMW) (Bankr. D. Ariz. Sep. 21, 2005), *Debtors' Third Amended and* .........48

*In re Rosenblum*,
  No. 18-17155-MKN, 2019 Bankr. LEXIS 2278 (Bankr. D. Nev. July 15, 2019)..................59

*In re Scioto Valley Mortg. Co.*,
  88 B.R. 168 (Bankr. S.D. Ohio 1988).................................................................7

*In re Tribune Co.*,
  476 B.R. 843 (Bankr. D. Del. 2012) .................................................................68

*In re Tribune Co.*,
  972 F.3d 228 (3d Cir. 2020)......................................................................26, 69

*In re U.S. Brass Corp.*,
  194 B.R. 420 (Bankr. E.D. Tex. 1996) ...............................................................18

*In re U.S. Truck Co.*,
  800 F.2d 581 (6th Cir. 1986) .......................................................................27

*In re W. Asbestos Co.*,
  313 B.R. 832 ....................................................................................19, 40

*In re W.P. Hickman Sys.*,
  No. 10-2289, 2012 Bankr. LEXIS 3301 (Bankr. W.D. Pa. July 13, 2012) ......................33, 35

*In re W.R. Grace & Co.*,
  468 B.R. 81 (D. Del. 2012)........................................................................31

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012)......................................................................24, 50

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013).......................................................................28

*In re Wabash Valley Power Ass'n*,
  77 B.R. 991 (Bankr. S.D. Ind. 1987) ...............................................................33

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) .......................................................28, 39

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .................................................................39

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988).................................................................24, 66, 72

*Menard-Sanford v. Mabey (In re A.H. Robins Co.)*,
    880 F.2d 694 (4th Cir. 1989) .....................................................................60, 65

*S. Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc.*,
    252 B.R. 373 (E.D. Tex. 2000).......................................................................33

## DOCKETED CASES

*In re 24 Hour Fitness Worldwide, Inc.*,
    No. 20-11558 (Bankr. D. Del. 2020) ...............................................................60

*In re Archdiocese of Milwaukee*,
    No. 11-20059 (Bankr. E.D. Wis. Oct. 5, 2015) ...............................................61

*In re Borders Grp., Inc.*,
    No. 11-10614 (Bankr. S.D.N.Y. Nov. 14, 2011) (MG) ....................................71

*In re Cath. Diocese of Wilmington, Inc.*,
    No. 09-13560 (Bankr. D. Del. Aug. 8, 2011) ........................................41, 48, 67

*In re Chaparral Energy Inc.*,
    No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) .......................................37

*In re The Christy Refractories*,
    No. 08-48541 (Bankr. E.D. Miss. June 13, 2011) ............................................41

*In re Diocese of Duluth*,
    No. 15-50792 (Bankr. D. Minn. Aug. 27, 2019) ..............................................61

*In re Draw Another Circle, LLC*,
    No. 16-11452 (KJC) (Bankr. D. Del. Dec. 19, 2016) .......................................70

*In re Dune Energy, Inc.*,
    No. 15-10336 (Bankr. W.D. Tex. Aug. 18, 2015) ............................................70

*In re Duro Dyne Nat'l Corp.*,
    No. 18-27963 (MBK) (Bankr. D.N.J. Nov. 20, 2018).......................................52

*In re Flintkote Co.*,
    No. 04-11300 (JKF) (Bankr. D. Del. July 3, 2008) .....................................35, 46

*In re Garlock Sealing Tech., LLC*,
No. 10-BK-31607 (Bankr. W.D.N.C. April 03, 2017) ............................................46

*In re Imerys Talc Am., Inc.*,
No. 19-10289 (Bankr. D. Del. 2019) .................................................35, 52, 61, 74

*In re Insys*,
19-11292 (Bankr. D. Del. 2020) ...............................................................60

*In re Insys Therapeutics, Inc.*,
No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) ...................................58, 61, 74

*In re Leslie Controls, Inc.*,
No. 10-12199 (CSS) (Bankr. D. Del. Oct. 28, 2010)........................................58

*In re Maremont Corp.*,
No. 19-10118 (KJC) (Bankr. D. Del. Jan. 23, 2019) .......................................74

*In re PG&E Corp.*,
No. 19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020)........................61, 67, 71, 74

*In re Purdue Pharma L.P.*,
Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 1, 2021) ................................55

*In re Remington Outdoor Co.*,
No. 20-81688 (Bankr. N.D. Ala. Mar. 12, 2021)...........................................41

*In re Roman Cath. Bishop of Great Falls*,
No. 17-60271 (Bankr. D. Mont. June 18, 2018) ...........................................67

*In re Specialty Prods. Holding Corp.*,
No. 10-11780 (PJW) (Bankr. D. Del. Oct. 23, 2014) ................................35, 46, 52

*In re TK Holdings Inc.*,
No. 17-11375 (BLS) (Bankr. D. Del. Feb. 20, 2018) ...........................58, 61, 67, 71

*In re United Gilsonite Labs.*,
No. 11-02032 (RNO) (Bankr. M.D. Pa. Sept. 30, 2014) [D.I. 2012] .....................35

*In re Yarway Corp.* ...........................................................................46, 52

*In re Z Gallerie, LLC*,
No. 19-10488 (LSS) (Bankr. D. Del. June 14, 2019) ......................................38

## FEDERAL STATUTES

11 U.S.C. § 303.................................................................................33

11 U.S.C. § 502(a) .........................................................40, 41, 72, 73, 75, 78

11 U.S.C. § 1112(c) ................................................................................................33

11 U.S.C. § 1125(a)(1) ..............................................................................................6

11 U.S.C. § 1129(a)(7) .......................................................................................34, 35

11 U.S.C. § 1141(a) ................................................................................................40

28 U.S.C. § 157(b)(2)(B) .........................................................................................48

28 U.S.C. § 157(c) ..................................................................................................49

11 USCS § 1129(a)(16) ......................................................................................56, 57

## FEDERAL RULES

Bankruptcy Rule 2002 .............................................................................................14

Bankruptcy Rule 2019 .................................................................................73, 75, 77

Bankruptcy Rule 3001 .....................................................................................75, 78

Bankruptcy Rule 3001(f) .........................................................................................72

Bankruptcy Rule 3018 .............................................................................................72

Bankruptcy Rule 3018(a) .......................................................................64, 66, 73, 75

Bankruptcy Rule 3018(c) .............................................................................74, 75, 77

Bankruptcy Rule 9010(c) .................................................................................74, 77

Fed. R. Bankr. P. 3018(a) ..................................................................................64, 73

Fed. R. Bankr. P. 9010(c) .......................................................................................74

Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), hereby submit this amended omnibus reply (this "Reply")[2] to the objections, supplemental objections, joinders, and reservations of rights (collectively, the "Objections") filed by the parties listed on **Exhibit A** hereto (collectively, the "Objectors") with respect to the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 2295] (the "Motion"),[3] which requests, among other things, entry of an order (as amended on September 15, 2021, and as may be further amended, the "Solicitation Procedures Order") approving the Disclosure Statement and the Solicitation Procedures. In support of this Reply and in further support of the approval of the Disclosure Statement and the Solicitation Procedures, the Debtors respectfully state as follows:

---

[2]     Unless otherwise indicated herein, this Reply amends and supersedes the *Debtors' Omnibus Reply in Support of Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 4105] (the "Initial Omnibus Reply") in its entirety.

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the *Disclosure Statement for the Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6213] (as may subsequently be amended or modified, the "Disclosure Statement"), or the *Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6212] (as may subsequently be amended or modified, the "Plan"), as applicable, or as the context otherwise requires.

## PRELIMINARY STATEMENT

1.      On February 18, 2020, the Debtors commenced these chapter 11 cases to achieve their dual restructuring objectives of providing equitable and timely compensation to abuse survivors and ensuring that the Debtors' congressionally chartered charitable mission will continue for future generations of American youth.  The Court established November 16, 2020, as the bar date for filing proofs of claim against the Debtors.  As of the bar date, approximately 82,200 unique abuse proofs of claim had been filed, and accounting for intervening withdrawals and amendments, this number now stands at approximately 82,200.  Moreover, as the Court is aware, since May 3, 2021, hundreds of letters have been filed by Abuse Survivors describing, among other things, the abuse they have recounted in their proofs of claim and their desire to have this matter resolved quickly.  The BSA appreciates survivors sharing their perspectives and experiences and acknowledges the courage of each survivor in sharing their story. As an organization dedicated to improving the lives of young people, the Debtors are devastated by the pain and suffering many of these claimants have described as youths in Scouting programs.  The Debtors understand that no monetary compensation can heal the anguish caused or restore the lives shattered by abuse, as recounted in the proofs of claim.  Nevertheless, the BSA believes that it is of paramount importance to continue to work to give Abuse Survivors the closure they desire by maximizing the value of the Settlement Trust under the Plan.

2.      Indeed, the Plan, filed on September 15, 2021,[4] described in the Disclosure Statement, which is proposed by the Debtors and supported by the Future Claimants'

---

[4]      The Plan no longer includes the BSA Toggle Plan as described in the *Third Amended Plan for Boy Scouts of America and Delaware BSA, LLC* [D.I. 5368].  As such, any and all Objections relating to the BSA Toggle Plan are moot and not addressed in this Reply.

Representative, the Creditors' Committee, the Coalition, and the Ad Hoc Committee[5] (collectively, the "Supporting Parties") memorializes resolutions and settlements with the representatives of a majority of the holders of Direct Abuse Claims. The Plan incorporates other settlements with JPM, Hartford,[6] and TCJC.[7] The Plan also includes a mechanism pursuant to which Chartered Organizations can benefit from the protections of the Channeling Injunction and Releases to the extent of their contributions of shared insurance rights, while preserving the shared insurance rights of Chartered Organizations that decide not to participate in the Plan.

3.      The Plan resolves many of the central disputes raised by the Debtors' key constituencies.   All of this information, in addition to other substantial disclosures further discussed below and in the Objection Response Chart attached hereto as **Exhibit B**, is set forth in the Disclosure Statement.

4.      Since the outset of these cases, the Debtors have advocated for a global resolution of Scouting-related sexual abuse claims to comprehensively address liabilities of the Debtors and the many non-debtor Local Councils and Chartered Organizations that carry out Scouting programming nationwide.  Negotiations increased in intensity during 2021 and have included countless hours of formal telephonic and video mediation sessions and formal in-person mediation led by Mediators appointed by the Court.[8] The Debtors entered into a settlement with

---

[5]      The Ad Hoc Committee of Local Councils is comprised of eight representative Local Councils (as defined in the Plan, the "Ad Hoc Committee").

[6]      The term sheets setting forth the principal terms of the settlements with Hartford and TCJC are attached as Exhibits A and B, respectively to the *Sixth Mediators' Report*, filed on September 14, 2021 [D.I. 6210].

[7]      All objections filed by the Future Claimants' Representative [D.I. 3565], the Coalition [D.I. 3569], TCJC [D.I. 3263; D.I. 6009], and Hartford [D.I. 6058] have been withdrawn [D.I. 6232, 6233, 6235, 6240] (collectively, the "Withdrawn Objections").  Accordingly, the Debtors will not address these Withdrawn Objections in this Reply, except to address any joinders thereto, to the extent they are still applicable.

[8]      In addition to numerous telephonic and video sessions, formal in-person mediation sessions were held on (i) March 30–April 1, 2021 in Miami; (ii) June 2–3, 2021 in Chicago; (iii) June 29–30, 2021 in Los Angeles; and (iv) May 4–6, May 26–27, June 7–10, August 3–5, August 18–24, September 1, and

the Creditors' Committee and JPM in March 2021. The Debtors also entered into a settlement with Hartford (the "Initial Hartford Settlement Agreement") in April 2021.[9]  Thereafter, negotiations continued with the other mediation parties. In those sessions, the Debtors made substantial progress toward a consensual plan of reorganization that would garner the support of the representatives of a majority of holders of Abuse Claims.

5.       On July 1, 2021, the Debtors entered into a restructuring support agreement [D.I. 5466, 5813, 5868] (together with all exhibits, including the term sheet attached thereto, the "Restructuring Support Agreement") with the Future Claimants' Representative, the Tort Claimants' Committee, the Coalition, and the State Court Counsel,[10] as well as the Ad Hoc Committee (together with the Debtors, the "RSA Supporting Parties"), and concurrently filed a motion to approve the Restructuring Support Agreement (the "RSA Motion"). The Restructuring Support Agreement provided for a plan of reorganization that would deliver global resolution in these Chapter 11 Cases, and the representatives of approximately 70,000 holders of Abuse Claims supported the plan as set forth in the term sheet attached to the Restructuring Support Agreement.

---

September 9–10, 2021 in New York City. See Article V.K herein for a further discussion on mediation throughout these Chapter 11 Cases, the Mediators, and the mediation parties.

[9]      The Initial Hartford Settlement Agreement was announced on April 16, 2021 [D.I. 2624] and incorporated into a prior version of the Plan filed on May 16, 2021 [D.I. 4107].

[10]     The Coalition was formed in connection with certain law firms ("State Court Counsel") representing holders of Abuse Claims. These firms are: (i) Slater Slater Schulman LLP, (ii) ASK LLP, (iii) Andrews & Thornton, (iv) Levin Papantonio Thomas Mitchell Rafferty & Procter P.A., (v) Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., (vi) Junell & Associates PLLC, (vii) Reich & Binstock LLP, (viii) Marc J. Bern & Partners LLP, (ix) Krause & Kinsman Law Firm, (x) Bailey Cowan Heckaman PLLC, (xi) Babin Law, LLC, (xii) Jason J. Joy & Associates, PLLC, (xiii) Motley Rice LLC, (xiv) Weller Green Toups & Terrell LLP, (xv) Colter Legal PLLC, (xvi) Christina Pendleton & Associates PLLC, (xvii) Forman Law Offices, P.A., (xviii) Danziger & De Llano LLP, (xix) Swenson & Shelley PLLC, (xx) Cohen Hirsch LP (formerly Brooke F. Cohen Law, Hirsch Law Firm), (xxi) Damon J. Baldone PLC, (xxii) Cutter Law PC, (xxiii) The Robert Pahlke Law Group, (xxiv) Napoli Shkolnik PLLC, (xxv) Porter & Malouf, P.A, (xxvi) The Moody Law Firm, and (xxvii) Linville Johnson & Pahlke Law Group [D.I. 1997].

6.      Under the terms of the plan of reorganization contemplated by the Restructuring Support Agreement, the incorporation of any settlement with Hartford was required to be on terms and conditions acceptable to the Debtors and the RSA Supporting Parties.  The terms and conditions of the Initial Hartford Settlement Agreement were not acceptable to the RSA Supporting Parties and were required to be removed from the plan of reorganization.  To comply with the Restructuring Support Agreement, the Debtors sought a determination from the Court that they had no obligations under the Initial Hartford Settlement Agreement.

7.      After a hearing on the RSA Motion on August 12, 13, and 16, the Court issued a bench ruling on August 19, 2021.  The Court ruled, among other things, that the Debtors were authorized to enter into the Restructuring Support Agreement but refrained from ruling as to whether the Debtors had any obligation to seek approval of the Initial Hartford Settlement Agreement.

8.      Without a clear path for removing the terms and conditions of the Initial Hartford Settlement Agreement from the plan of reorganization, the Debtors and RSA Supporting Parties continued to mediate regarding the terms of a Hartford settlement.  On August 27, 2021, in the midst of those negotiations, the Restructuring Support Agreement expired in accordance with its terms.  The Debtors and the RSA Supporting Parties continued to mediate with various parties in interest, including Insurance Companies and certain Chartered Organizations.    These negotiations yielded (1) a new settlement with Hartford, supported by the Debtors, the Future Claimants' Representative, the Coalition and certain State Court Counsel, and (2) a settlement with TCJC, supported by the same parties.  While the Tort Claimants' Committee supported the plan of reorganization as described in the expired Restructuring Support Agreement, the material

terms of which are incorporated into the Plan, the Tort Claimants' Committee does not support the settlements with Hartford and TCJC at this time.

9.     Pursuant to section 1125 of the Bankruptcy Code, the question at hand for the Court is whether the Disclosure Statement enables a "hypothetical investor typical of the holders of claims or interest in the case" to cast an informed vote on the Plan.  11 U.S.C. § 1125(a)(1).

10.     The Objections primarily fall into one of three categories: (a) objections as to the adequacy of the information contained in the Plan and Disclosure Statement ("Disclosure Objections"); (b) objections raising issues with respect to the confirmability of the Plan ("Confirmation Objections"); and (c) objections regarding the Debtors' proposed voting and solicitation procedures or other procedural concerns ("Solicitation and Procedural Objections"). For ease of reference, the Debtors have listed all of the Objectors in the chart attached hereto as **Exhibit A** and prepared a summary of the Objections and the Debtors' responses by subject matter, attached hereto as **Exhibit B** (the "Objection Response Chart").[11]

11.     The Debtors have worked diligently to attempt to address, to the extent practicable, the Disclosure Objections and Solicitation and Procedural Objections.  As detailed in the Objection Response Chart, the Debtors have addressed the Disclosure Objections—even where the Debtors believe that the requested disclosure extends beyond the scope of "adequate disclosure" under section 1125.  Prior to the Disclosure Statement hearing, the Debtors will continue to work toward consensual resolution of remaining Disclosure Objections.

12.     Most of the unresolved Objections are Confirmation Objections that are premature and should not be considered at the Disclosure Statement stage.    These

---

[11]     Objections not addressed in the body of this Reply are addressed in the Objection Response Chart and/or will be addressed at the Disclosure Statement hearing.

includeobjections to feasibility, Plan treatment and/or classification, third-party releases and other provisions contained in the Plan, and satisfaction of the best interests test and good faith requirements under section 1129(a).    None of these Confirmation Objections meets the significant burden of establishing that the Plan is "patently unconfirmable."  *See In re Monroe Well Serv. Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) (observing that the "patently unconfirmable" standard as requiring an objecting party to demonstrate that the Plan, on its face, "could not possibly be confirmed").    To the contrary, as the Debtors will demonstrate at confirmation, the Plan satisfies the applicable provisions of the Bankruptcy Code.  Although the Confirmation Objections should appropriately be deferred to and addressed at the Confirmation Hearing., the Debtors will briefly address the Objectors' confirmation-related concerns herein.

13.    For the reasons stated above and described in more detail in this Reply and exhibits hereto, the Debtors respectfully request that the Court overrule the Objections and enter the proposed Solicitation Procedures Order, authorizing the Debtors to solicit votes to accept or reject the Plan at this time.

## **REPLY**

**I.**    **The Disclosure Statement Should Be Approved Under Section 1125 of the Bankruptcy Code.**

**A.**    **The Disclosure Statement Provides Adequate Information as Required by Section 1125 of the Bankruptcy Code.**

14.    Courts have identified categories of information that generally should be included in a disclosure statement, while acknowledging that certain categories of information that are necessary in one case may be omitted in another.  *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170-71 (Bankr.

S.D. Ohio 1988).  The Disclosure Statement contains adequate information in each of those categories:[12]

- The Debtors' corporate history and structure, business operations, and prepetition capital structure and indebtedness (Article III);

- Events leading up to the Chapter 11 Cases, including the Debtors' pre-bankruptcy restructuring negotiations and significant events in the Chapter 11 Cases (Article IV);

- The classification and treatment of Claims and Interests under the Plan, including which Classes are entitled to vote and how to vote on the Plan (Article VI.C-E);

- Releases contemplated by the Plan that are integral to the Restructuring Transactions and overall settlement of Claims pursuant to the Plan (Article VI.Q);

- Certain important effects of Confirmation of the Plan (Article IX);

- Certain U.S. federal income tax consequences of the Plan (Article XI);

- Certain risk factors that Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article X); and

- The requirements for Confirmation of the Plan (Article IX).

15.    Notably, the unresolved Objections fail to identify *any* category of information required by case law or statute that the Debtors have failed to disclose.  Indeed, the majority of the remaining Objections are self-serving requests for unnecessary disclosure or tactics to delay the confirmation of these cases to the detriment of abuse claimants who deserve to be compensated for the harm they have experienced.

### 1.    The Disclosure Statement Provides Adequate Information Concerning the Resolutions and Settlements Included in the Plan.

16.    Since the Objections were lodged with respect to the Initial Hartford Insurance Settlement Agreement [D.I. 2739, 3284, 3526, 3565, 3569, 3285, 3856] the Debtors have entered

---

[12]    The Disclosure Statement also contains substantial information regarding (i) the extensive mediation sessions in these Chapter 11 Cases, including material settlements and resolutions therefrom (Article V) and (ii) the Settlement Trust and the Trust Distribution Procedures (Article VII).

into a new settlement with Hartford and a settlement with TCJC.  The Disclosure Statement lays out the salient information regarding settlements, including the benefits and considerations relevant to the settlements.  The Disclosure Statement includes information concerning the Hartford Insurance Settlement Agreement, pursuant to which Hartford will contribute $787 million to the Settlement Trust for the payment of Abuse Claims in exchange for the sale of the Hartford Policies to Hartford free and clear of the interests of all third parties, including any additional insureds under the Hartford Policies, pursuant to Section 363 of the Code, and that Hartford will be included as a Protected Party under the Plan, and receive the benefits of the Channeling Injunction. *See* Disclosure Statement, Art. V.R.3.

17.     Likewise, the Disclosure Statement includes information concerning the TCJC Settlement Agreement, pursuant to which TCJC will make a cash contribution of $250 million plus certain insurance rights to the Settlement Trust for payment of Abuse Claims related to TCJC that arose in connection with their sponsorship of one or more Scouting units.  TCJC will be included as a Protected Party under the Plan and receive the benefits of the Channeling Injunction.  *See* Disclosure Statement, Art. V.R.4.

## 2.     The Disclosure Statement Provides Adequate Information Concerning the Assets and Contributions of the Debtors.

18.     Certain Objections argue that the Disclosure Statement fails to provide sufficient description or basis for the value of the Debtors' contribution to the Settlement Trust.  *See, e.g.*, D.I. 2959, 3523, 3581, 3856, 5366.[13]  These objections are addressed by additional disclosures. Notably, the Disclosure Statement includes (i) a schedule of the BSA's retained assets and the property being transferred to the Settlement Trust [Disclosure Statement, Art. VII.A]; (ii) the

---

[13]     This list is not exhaustive.  Please refer to the Objection Responses Chart, attached hereto as **Exhibit B**, for the Objections and the Debtors' responses thereto.

value of the BSA's contributions to the Settlement Trust, including the value ascribed to Artwork, Oil and Gas Interests, the Warehouse and Distribution Center, Scouting University, among other assets [Disclosure Statement, Art. II.D]; (iii) the value of the BSA Settlement Trust Contribution over time through March 2022 [Disclosure Statement, Art. II.F]; and (iv) the BSA's Restricted Property, described in more detail in the Financial Projections Analysis [Disclosure Statement, Ex. E].

### 3. The Disclosure Statement Provides Adequate Information Concerning the Assets and Liabilities of Local Councils.

19. Certain Objections assert that the Disclosure Statement does not contain sufficient information regarding the assets and liabilities of the Local Councils. *See, e.g.*, D.I. 2449, 2497, 2500, 2580, 2586, 2642, 2741, 2960, 3276, 3256, 3523, 3565, 3856.[14] While the Debtors believe such disclosure is not necessary—particularly for the approval of the Disclosure Statement—this issue is also resolved through the additional disclosures. Specifically, the Debtors include (i) an aggregate summary of the Local Councils' assets and liabilities in the Disclosure Statement, (ii) the balance sheet for each Local Council (attached to the Disclosure Statement as Exhibit D-1), and (iii) the values of the real property held by the Local Councils (disclosed in Exhibit D-2 to the Disclosure Statement). The Debtors have also disclosed in Exhibit D-2 whether, based upon the Debtors' review of the Local Councils' records, the real properties are subject to enforceable restrictions on the sale or other disposition of such properties. Moreover, Exhibit F to the Disclosure Statement contains charts listing the Abuse Claims (i) by allegation type, (ii) counts by Local Council, (iii) counts by Local Council and allegation type, and (iv) counts by certain Chartered Organizations. *See* Disclosure Statement, Ex. F.

---

[14]     This list is not exhaustive. Please refer to the Objection Responses Chart, attached hereto as **Exhibit B**, for the Objections and the Debtors' responses thereto.

20.    The Plan has been amended and, as further described in the Disclosure Statement, the Local Councils agreed to contribute (a) $500 million, comprised of at least $300 million in Cash with the balance in property, exclusive of insurance rights, (b) the DST Note, a $100 million interest-bearing variable-payment obligation note issued by a Delaware statutory trust on or as soon as practicable after the Effective Date, and (c) the Local Council Insurance Rights. *See* Disclosure Statement, Art. II.D. A list of each Local Council's total expected contribution, including a specific break-down between the (i) cash contribution and (ii) property contribution, is attached to the Disclosure Statement as Exhibit C. *See* Disclosure Statement, Ex. C.

21.    Various parties argue that the Disclosure Statement (or the Liquidation Analysis) must include the contributions made by each Local Council and how such contributions will be utilized to compensate Abuse Survivors. *See, e.g.*, TCC Obj. [D.I. 3526, ¶ 97]; Plaintiff Law Firms Obj. [D.I. 5964, ¶ 18; D.I. 5366, ¶ 8].[15]  As further explained in the Disclosure Statement, the Debtors' Abuse Claims consultant, Bates White, provided an estimated valuation range that does not include valuations of Abuse Claims with respect to each individualized Local Council because such an exercise would not likely establish reliable estimates.  While it is possible to separately identify, at least in some instances, which Local Council(s) and Chartered Organization(s) may be involved with a given claim, the ability to provide a reasonable aggregate valuation range for all 82,200 Abuse Claims combined does not necessarily translate into a reasonable valuation for each distinct claim or with respect to each individual Local Council or Chartered Organization.[16]  Additional information may be needed to separately

---

[15]    This list is not exhaustive.  Please refer to the Objection Responses Chart, attached hereto as **Exhibit B**, for the Objections and the Debtors' responses thereto.

[16]    Notwithstanding, the Debtors believe that it is possible to determine aggregate potential liability ranges for certain Chartered Organizations.

identify which portion of the aggregate estimate should be attributed to the BSA and which portions may be attributed to the other related organizations. *See* Disclosure Statement, Art. V.N.

22.     The Disclosure Statement provides that Local Councils will make a substantial contribution to the Settlement Trust to resolve the Abuse Claims that may be asserted against them in exchange for being included as a Protected Party under the Plan and receiving the benefits of the Channeling Injunction.  Disclosure Statement, Art. II.D.  As further described in Article II.I of the Disclosure Statement, on the Effective Date of the Plan, the Settlement Trust will be established for the benefit of holders of Abuse Claims.  From and after the Effective Date, all Abuse Claims shall be channeled to the Settlement Trust, which will be funded by the Settlement Trust Assets.  The Settlement Trust will then administer the Settlement Trust Assets and process, liquidate, and pay Abuse Claims in accordance with the applicable Trust Distribution Procedures.  *See* Disclosure Statement, Art. VII.

### 4.     The Disclosure Statement Provides Adequate Information Concerning the Debtors' Insurance Policies and the Disputes Surrounding such Policies.

23.     Certain Objectors assert that the Disclosure Statement does not contain sufficient information regarding the Insurance Policies and, in certain instances, disputes with respect to the Insurance Policies. *See*, *e.g.*, D.I. 2449, 2960, 3263, 3273, 3478, 3526, 3523, 3549, 3856, 3579.[17]  These objections lack merit.

24.     The Disclosure Statement describes, at length, the structure and history of the Debtors' Insurance Policies and the nature of the Debtors' historical insurance program, including information about the Insurance Policies, the background of coverage in place from the

---

[17]     This list is not exhaustive. Please refer to the Objection Responses Chart, attached hereto as **Exhibit B**, for the Objections and the Debtors' responses thereto.

1930s to the Petition Date, deductibles, per-occurrence limits, aggregate limits, excess coverage, exhaustion of coverage, discovery concerning the policies issued prior to 1978, the First Encounter Agreement, and descriptions of disputes between the Debtors and certain Insurance Companies and among certain Insurance Companies with respect to certain Insurance Policies. *See* Disclosure Statement, Art. III.F; Art. X.A.22.

25.    Additionally, the Disclosure Statement describes how the Debtors' rights and obligations under the Insurance Policies, along with other assets as described in the Plan and Disclosure Statement, will be transferred to the Settlement Trust, which will have the exclusive responsibility for the liquidation and payment of Abuse Claims.  Disclosure Statement, Art. VII.A.3.  The Disclosure Statement also includes "Post-Petition Insurance Coverage Defenses Asserted by Insurance Companies" and identifies a total of 33 risk factors, including various insurance coverage risks.  Disclosure Statement Art., III.F.6 (listing the various grounds on which the Insurance Companies may deny or limit coverage relating to the Abuse Claims); *see also* Disclosure Statement, Art. X.A (including risk factors associated with distributions under the Trust Distribution Procedures).

     **5.**　　**The Disclosure Statement Provides Adequate Information Concerning the Channeling Injunction, Protected Parties and Limited Protected Parties.**

26.    Certain Objectors argue that the Disclosure Statement does not contain sufficient information regarding the Channeling Injunction or the procedures by which a party can become a Contributing Chartered Organization or Protected Party.  *See*, *e.g.*, D.I. 6032, 6039, 6067.  To the contrary, the Disclosure Statement now describes, in great detail, the Channeling Injunction and the mechanism by which Chartered Organizations can, by their election, become Contributing Chartered Organizations or Participating Chartered Organizations, and the treatment of each under the Plan.  Disclosure Statement, Art. II.E; Art. II.G.  Specifically, the

Disclosure Statement explains that Chartered Organizations can become Participating Chartered Organizations under the Plan (unless they elect not to or are chapter 11 debtors) through the assignment and transfer to the Settlement Trust of all of the post-1975 insurance rights in exchange for inclusion as a Limited Protected Party under the Plan.  Disclosure Statement, Art. II.E.  The Disclosure Statement also describes the pathway for Chartered Organizations to become "Contributing Chartered Organizations" under the Plan, by making further substantial contributions to the Settlement Trust to resolve Abuse Claims t in connection with their sponsorship of one or more Scouting units in exchange for being included as a Protected Party under the Plan and receiving the benefits of the Channeling Injunction.  *Id.*

27.    The Debtors have also compiled a list of potential Protected Parties and potential Limited Protected Parties under the Plan, including the identities of all Local Councils, Chartered Organizations, and Insurance Companies, which will be available on the Debtors' case website maintained by the Notice and Claims Agent.[18]

28.    The Objectors' remaining arguments, which concern the propriety of the Channeling Injunction and related issues, are premature and improperly raised at this stage.

      **6.**    **The Disclosure Statement Provides Adequate Information Concerning the Trust Distribution Procedures, Including Treatment of Abuse Claims.**

29.    Certain of the Objectors argue that the Disclosure Statement lacks adequate information concerning the Trust Distribution Procedures, including information related to the treatment and proposed valuation and estimation of Abuse Claims.  *See, e.g.*, D.I. 3526, 3231,

---

[18]    While this list includes *potential* Protected Parties and *potential* Limited Protected Parties, the Debtors are providing these disclosures because to the extent any such parties participate, they will be included in the definition of Protected Parties or Limited Protected Parties under the Plan and will benefit from the Channeling Injunction.  The Debtors will also notify any party that has requested notice pursuant to Bankruptcy Rule 2002 of any additional Settling Insurance Companies.

2959, 2739, 3276, 2370, 2533, 3523.  This issue has also been resolved through additional disclosures.  Specifically, the Disclosure Statement provides an adequate description of the function of the Trust Distribution Procedures, "Claims Matrix," and "Scaling Factors".  *See* Disclosure Statement, Article VII.B.7; *see also* Plan, Exhibit A, Trust Distribution Procedures. The Trust Distribution Procedures consider certain "Aggravating Scaling Factors," including, for example, extended duration or frequency of the Abuse, and "Mitigating Scaling Factors," including, for example, the absence of a putative defendant.  *See* Disclosure Statement, Article VII.B.7; *see also* Plan, Exhibit A, Trust Distribution Procedures, Articles VIII.D and VIII.E. The Disclosure Statement further explains the procedure for how an Abuse Claimant may request the Settlement Trustee reconsider the disallowance of his or her Submitted Abuse Claim or the Proposed Allowed Claim Amount.  *See* Disclosure Statement, Art. VII.B.6; *see also* Plan, Ex. A, Trust Distribution Procedures, Art. VII.G.

30.    Further, the Disclosure Statement provides adequate information regarding the estimated range of valuation of the Abuse Claims, which was established through the Bates White claim reconciliation process of approximately 82,200 unique, timely filed Proofs of Claims seeking personal injury damages on account of Abuse.  *See* Disclosure Statement, Art. V.N.  Bates White estimates the value of the Abuse Claims is between $2.4 billion and $7.1 billion.  *See id.*  To establish this value range, Bates White analyzed the Debtors' historically resolved Abuse Claims, with a focus on four factors that have affected the Claims' settlement value: (i) the possible monetary damages the abuse survivors could obtain in the tort system, (ii) the connection to Scouting during the alleged acts, (iii) certain legal considerations regarding the viability of the Claim, and (iv) the credibility of the Claim.  *See id.*  In addition to the Direct Abuse Claims, approximately 16,000 contingent and unliquidated indemnification and

contribution Claims have been filed against the Debtors, most of which were filed by Chartered Organizations and are included in the class of Indirect Abuse Claims.  *See id.*

31.    Finally, the Disclosure Statement adequately describes the treatment and estimated recovery of all Claims, including Abuse Claims and Claims not related to Abuse under the Plan, and provides a chart estimating the amount and approximate percentage recovery for each Class of Claims.[19]  *See* Disclosure Statement, Art. II.H.  The Disclosure Statement also sets forth a chart comparing estimated recoveries under the Plan against a hypothetical chapter 7 liquidation.  *See* Disclosure Statement, Art. IX.D.

32.    To the extent that the Objectors argue that the Trust Distribution Procedures fail to properly account for certain factors like the number of times abuse occurred, the Debtors' and Local Councils' knowledge of the abuser, and whether there were other victims involved, *see, e.g.*, D.I. 3276, such objections (which are erroneous) are to the substance of the Plan and Trust Distribution Procedures and are properly addressed at the Confirmation Hearing.

## II.    The Confirmation Objections Are Premature, Rendered Moot, and/or Meritless.

33.    Various Objectors assert that the Disclosure Statement cannot be approved because the Plan is "patently unconfirmable," citing, among other things, the third-party releases, the assignment of insurance rights to the Settlement Trust, the Trust Distribution Procedures,

---

[19]    As explained in footnote 39 of the Disclosure Statement:

The following calculation was used to determine the percentage recovery range under the Plan: ($219 million (BSA Settlement Contribution) plus $500 million (Local Council Contribution) plus $100 million (DST Note) plus Hartford Settlement Contribution minus the Hartford Administrative Expense Claim ($785 million) plus TCJC Settlement Contribution ($250 million)) divided by $2.4 billion - $7.1 billion (Estimated Abuse Claims Range).  The recovery percentages are net of assumed cost to operate the Settlement Trust.  Costs are estimated between 6 and 10% of total assets with costs expected to be at the high end of the range in a smaller trust and at or below the lower end of the range in a larger trust under the Plan.  The low end of the recovery range excludes both the Hartford and TCJC Settlement Contributions as some parties may object to the settlement amount and/or how the settlement amount is distributed to holders of Abuse Claims, thereby rendering these amounts unavailable to some or all creditors.

*See* Disclosure Statement, Art. II.H.

insurance provisions, the scope of the Channeling Injunction, and the treatment of Indirect Abuse Claims. *See generally* D.I. 3263, 3526, 3565, 3569, 6044, 6052, 6058, 6067. Many of these Objections have been resolved through modifications of the Plan. To the extent that any remain outstanding, they are all issues that will be determined at the Confirmation Hearing. Bankruptcy courts generally do not hear confirmation disputes at disclosure statement hearings because those hearings lack the evidentiary record necessary to determine confirmation issues. *See, e.g.*, *In re Broad Assocs. Ltd. P'ship*, No. 5-89-01070, 1989 Bankr. LEXIS 2248, at *7 (Bankr. D. Conn. Dec. 29, 1989) ("[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing") (internal citation omitted); *see also In re Quigley Co.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (approving the debtor's disclosure statement despite finding that questions existed regarding good faith, improper voter manipulation, and voter designation because such questions were "confirmation issues that require an evidentiary hearing"). For this reason, "[o]nly where the disclosure statement *on its face* relates to a plan that cannot be confirmed" is it appropriate to dismiss a proposed plan prior to the solicitation of votes; "otherwise, confirmation issues are left for later consideration." *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989) (emphasis in original).

34.     Courts in the Third Circuit find plans to be "patently unconfirmable" only "where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012) (internal quotations omitted). A party raising this objection bears the heavy burden of proving, as a matter of law, that the plan "is so fatally flawed that confirmation is impossible."

*In re U.S. Brass Corp.*, 194 B.R. 420, 428 (Bankr. E.D. Tex. 1996).  The Objectors fail to meet this high bar.

     **A.**    **General Plan Confirmation Objections**

     **1.**    **The Plan was Proposed in Good Faith.**

    35.    Certain Objectors, including Certain Insurers [D.I. 6052, ¶¶ 29-33], the Roman Catholic and United Methodist Ad Hoc Committees (collectively, the "Catholic and Methodist Committees") [D.I. 6067, ¶¶ 79-81], AIG Companies [D.I. 3523, ¶ 27] Century [D.I. 6065 at 16-21], and the U.S. Trustee [D.I. 3581, at ¶ 32], assert that the Plan is not proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code.[20]  Specifically, Certain Insurers allege that the following precludes a finding of good faith: (1) the Plan and the Trust Distribution Procedures "bear all of the hallmarks of an improper collusive deal," (2) the Expedited Distribution constitutes impermissible vote-buying to incentivize acceptance of the Plan, (3) Local Councils forced the Debtors into chapter 11 to negotiate a deal favorable for Local Councils, while providing no cognizable benefit to the Debtors other than a release and an end to the Chapter 11 Cases, and (4) the Debtors ceded "complete control" of these Chapter 11 Cases and administration of the Settlement Trust to the plaintiff representatives.  D.I. 6052 ¶¶ 4, 30-31. Additionally, the Catholic and Methodist Committees assert bad faith on the basis that the Plan's terms reflect the Debtors' "capitulation to the demands" of the plaintiff representatives and that the Plan denies due process to Chartered Organizations by providing them insufficient notice of the claims against them.  [D.I. 6067, ¶¶ 79-81]. Century argues that the Plan has "hallmarks of collusion" [D.I. 6065 at 16-21], and the U.S. Trustee argues that to the extent the expedited

---

[20]    Liberty explicitly reserved all rights to object to the Plan on the basis that the classification and treatment of Indirect Abuse Claims constitutes unfair treatment and bad faith on behalf of the Debtors, as well as a violation of applicable Third Circuit case law.  D.I. 6057 ¶ 29.

payment option is intended to manipulate voting, it is proposed in bad faith and should be excised from the Plan.  [D.I. 3581, ¶ 32].

36.    The Debtors' good faith in proposing the Plan is a factual matter to be addressed at the Confirmation Hearing, and the Objections alleging bad faith should be overruled as premature.  *See In re W. Asbestos Co.*, 313 B.R. 832, 848 (Bankr. N.D. Cal. 2003 (agreeing with the contention that the "issue of good faith should be reserved for the confirmation hearing").  Nonetheless, in the interest of resolving these Objections, the Debtors have made certain modifications to the Plan as further discussed in the Disclosure Statement.  In light of these changes, the majority of good faith objections to the Plan are now moot.

37.    Even without these modifications, the allegations of lack of good faith are meritless.[21]  Courts have concluded that a plan is proposed in "good faith" where it: (1) fosters a result consistent with the Bankruptcy Code's objectives; (2) has been proposed with honest and good intentions and with a basis for expecting that reorganization can be effected; or (3) is supportable based on the totality of the circumstances.  *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 237-38 (Bankr. D. N.J. 2000) (internal citations omitted); *see also In re Hercules Offshore, Inc.*, 565 B.R. 732, 764 (Bankr. D. Del. 2016) ("The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the

---

[21]    Section 1129(a)(3) of the Bankruptcy Code requires, as a condition to confirmation, that the "plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  Though "good faith" is undefined in the Bankruptcy Code, "the Third Circuit has found that 'the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives of the Bankruptcy Code." *In re Emerge Energy Servs. LP*, No. 19-11563, 2019 Bankr. LEXIS 3717, at *47 (Bankr. D. Del. Dec. 5, 2019) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 246 (3d Cir. 2004)).

Bankruptcy Code.") (internal quotations omitted).[22]  The Plan satisfies all these requirements and was proposed by the Debtors with honest and good intentions and the support of each of the Coalition, the Future Claimants' Representative, the Creditors' Committee, and the Ad Hoc Committee.  Most significantly, the Plan is structured to achieve the dual objectives that the Debtors set out to accomplish at the outset of these cases: (a) to timely and equitably compensate survivors of Abuse in Scouting and (b) to ensure that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission.

38.    Century's conclusory assertion that the Plan was a collusive deal lacks merit and defies logic.  *See e.g.*, Century Obj. [D.I. 6065 at 16-18].  As discussed in the Disclosure Statement, many of the material terms of the Plan were negotiated in connection with the Restructuring Support Agreement.  Since the expiration of the Restructuring Support Agreement, addition settlements have been reached with the assistance of the Mediators.  The Plan is the result of many hours of mediation and negotiations between the Debtors, Future Claimants' Representative, the Coalition, and other parties in interest, which were conducted in good faith, at arm's length, and overseen by Court-appointed mediators.[23]  *See* Order Appointing Mediators,

---

[22]    The good faith determination is "a fact-intensive, case-by-case inquiry." *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2003); *see also Azar v. THGH Liquidating LLC (In re THGH Liquidating LLC)*, No. 19-11689, 2020 U.S. Dist. LEXIS 164740, at *22-23 (D. Del. Sept. 9, 2020) (finding no error in the bankruptcy court's determination that the plan was proposed in good faith where "uncontroverted evidence attests that the Plan was proposed with the honest intention of maximizing value for the Debtors, their estates and their creditors"); *In re Emerge Energy Servs. LP*, No. 19-11563, 2019 Bankr. LEXIS 3717, *47-48 (Bankr. D. Del. Dec. 5, 2019) (finding good faith where the resulting out-of-court workout and proposed plan were the result of "arms-length, and meaningful negotiations among the Debtors' key stakeholders" and "rooted in the Debtors' sound business judgment"); *In re PTL Holdings LLC*, No. 11-12676, 2011 Bankr. LEXIS 4436, *38 (Bankr. D. Del. Nov. 10, 2011) (finding that the plan was submitted in good faith even in the absence of recovery for second-lien creditors).

[23]    *See* Discl. Stmt, Article II, fn. 9, "In addition to numerous telephonic and video sessions, formal in-person mediation sessions were held on (i) March 30–April 1, 2021 in Miami; (ii) June 2–3, 2021 in Chicago; (iii) June 29–30, 2021 in Los Angeles; and (iv) May 4–6, May 26–27, June 7–10, August 3–5, August 18–24, September 1, and September 9–10, 2021 in New York City.  See Article V.K herein for a further discussion on mediation throughout these Chapter 11 Cases, the Mediators, and the mediation parties."

D.I. 812; *see also Ad Hoc Comm. Of Non-Consenting Creditors v. Peabody Energy Corp.* (*In re Peabody Energy Corp.*), 933 F.3d 918 (8th Cir. 2019) (finding good faith where debtors mediated with creditors to resolve a dispute, where the negotiating parties had "major input," and where other parties had received notice and could have participated in the mediation).   No reasonable argument could be made that such broad mediated engagement constitutes collusion.

39.     Despite the evidence supporting the propriety of the Plan (which will be further demonstrated at confirmation), Century, citing *Skinner*, claims the Plan is a "product of collusion."   Century Obj. [D.I. 6065 at 14-21].   Century's reliance on *Skinner* is misleading and misguided.   *See In re Am. Cap. Equip., Inc.*, 405 B.R. 415, 419 (Bankr. W.D. Pa. 2009) ("Skinner"), *aff'd sub nom. Skinner Engine Co. v. Allianz Glob. Risk U.S. Ins. Co.*, No. BKY 01-23987, 2010 WL 1337222 (W.D. Pa. Mar. 29, 2010), *aff'd sub nom. In re Am. Cap. Equip., LLC*, 688 F.3d 145 (3d Cir. 2012).   *Skinner* was decided based on the unique facts of that case, which are distinguishable from the facts here.   In *Skinner*, the debtor was a defunct company, which entered into a settlement agreement with certain asbestos claimants over the objection of its insurers.   As part of that agreement, the asbestos claimants were given the right to participate in an alternative dispute resolution process, which the bankruptcy court found to be "indisputably procedurally much more favorable and, thus, advantageous to" the asbestos claimants.   *Skinner* at 422.   Additionally, claimants who participated in that process were required to pay 20% of any recoveries received from the debtor's insurers to the debtor's estate.   *Id.* at 422-23.   Given that the debtor was defunct, these kickbacks from successful claimants were the only way the debtor could fund its bankruptcy case.   The bankruptcy court found this settlement structure to be collusive and proposed in bad faith, as "the Debtor is nothing but financially incentivized to

sabotage its own defense or, more aptly, the Insurers' defense of itself vis-a-vis the Asbestos Claims." *Id.* at 423.

40.    The Plan is different from the *Skinner* plan in every material respect.  Here, the Debtors are not defunct, have not set up a procedurally slanted alternative dispute resolution process for claimants, and do not receive a kickback from claimants who succeed on their claims.  To the contrary, the Debtors are funding these cases and are contributing hundreds of millions of their own assets to a settlement trust that will fund claimants' recoveries.  *See* Disclosure Statement, Art. II.D (BSA Settlement Trust Contribution chart).  None of the facts that led to the bankruptcy court's finding of collusion and bad faith in *Skinner* are present here.

41.    Additionally, contrary to these Objectors' contentions, the Debtors did not "cede control" over the drafting of Plan documents to any party in these Chapter 11 Cases in violation of section 1129(a)(3).  As will be shown at the Confirmation Hearing, the Debtors have reviewed, negotiated, and provided input regarding the structure and content of the Plan and Plan Documents.

42.    Finally, Certain Insurers' argument that Local Councils "force[d] the Debtors into chapter 11 . . . to negotiate a deal that is extremely favorable to the Local Councils, while providing no cognizable benefit to the Debtors other than a release and an end to their Chapter 11 Cases, which the Debtors could achieve under the BSA Toggle Plan" is moot and without merit [D.I. 6052, ¶ 30].  Certain Insurers contend that the "Local Councils exercise complete and total control over the Debtors' corporate governance" and that this "inherent conflict alone warrants a finding of bad faith . . . ." [D.I. 6052, ¶ 30].  This was directly addressed in connection with the RSA Motion regarding allegations that there was a conflict of interest in the approval of the RSA by the Debtors due to connections with Local Councils.  The Court roundly rejected

these contentions during the August 19 hearing, where the Court found that the Debtors took appropriate "steps to avoid [potential conflicts with the Local Councils]," and that as of May 2020, "no member of the [National] Executive Committee was permitted to simultaneously serve on a Local Council Executive Board." Aug. 19, 2021 Hr'g Tr. 10:11-12, 24-25.  Article IV of the Disclosure Statement extensively explains the reasons and events leading to the Chapter 11 Cases, making clear that the Local Councils did not "force" the Debtors into chapter 11 to negotiate a deal favorable to Local Councils.[24]  Moreover, the Plan, which supersedes the BSA Toggle Plan, is supported by the Supporting Parties.

43.    Moreover, far from ignoring insurers' proposals, the Debtors have engaged in extensive discussions and participated in mediation sessions with insurers,[25] which are ongoing and have already yielded the Hartford Insurance Settlement Agreement.    Although certain insurers may not agree with the Plan, disagreement between parties in interest over specific provisions in a debtor's plan does not constitute evidence of bad faith.  *See, e.g.*, *In re Envirodyne Indus., Inc.*, 1993 WL 566565 (Bankr. N.D. Ill. Dec. 20, 1993) ("A plan has not

---

[24]    *See* Disclosure Statement, Art. IV.A ("Recent changes in state statutes of limitations led to a sharp increase in the number of Claims asserted against the BSA and placed tremendous financial pressure on the organization.  In addition to Pending Abuse Actions in state and federal courts across the United States, attorneys for Abuse survivors had provided information regarding approximately 1,400 additional Claims not yet filed, for a total of approximately 1,700 known asserted Abuse Claims.  In light of the increasing number of Claims asserted against the BSA, the BSA made the decision that it could not continue to address Abuse litigation in the tort system on a case-by-case basis.  The BSA spent more than $150 million on settlements would have resulted in the risk of inconsistent judicial outcomes and inequitable treatment of survivors.  For these reasons, beginning in late 2018, the BSA, with assistance of legal and financial advisors, began to explore strategic options for achieving an equitable global resolution of Abuse Claims.").

[25]    July 7, 2021 Hr'g Tr. 65:17-65:22 (The Debtors: "With respect to the arguments made by Mr. Rosenthal and Mr. Schiavoni, I just want to correct the record, Your Honor, with respect to the argument that insurers, the insinuation that they were not meaningfully involved in mediation. No one was shut out of the mediation, just to be clear."); July 7, 2021 Hr'g Tr. 10:13-10:15 (The Debtors: "The mediation remains ongoing and our mediators are continuing to actively engage with the insurers and chartered organizations as well as the debtors and other parties."); May 19, 2021 Hr'g Tr. 74:12-74:16 (The Tort Claimants' Committee: "And the way the mediation works, Your Honor, is you get invited to the mediation sessions. The mediators tell you who you're meeting with. You can ask to meet with certain people. That request is not always honored.").

necessarily been proposed in bad faith simply because a party does not like the treatment of its claims") (citing *In re Mulberry Phosphates, Inc.*, 149 B.R. 702, 708 (Bankr. M.D. Fl. 1993).

### 2. The Plan as Proposed Is Feasible.

44.     Certain Objectors, including Century and Certain Insurers, assert that the Plan may not be feasible, and thus cannot satisfy section 1129(a)(11) of the Bankruptcy Code because it would result in, among other things, liquidation of the Debtors. *See e.g.*, D.I. 6052, 6065.  In addition to being premature (as demonstrated by the Objections' reliance on section 1129), these Objections are without merit.

45.     The purpose of the feasibility test is to "protect against far-fetched visionary or speculative plans." *In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013). As such, feasibility does not require a debtor to guarantee success. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *In re W.R. Grace & Co.,* 475 B.R. 34, 115 (D. Del. 2012) ("In making this [feasibility] finding, the bankruptcy court need not require a guarantee of success, but rather only must find that the plan presents a workable scheme of organization and operation from which there may be reasonable expectation of success." (citation omitted)).  Rather, feasibility requires the debtor to provide only a reasonable assurance of success (*Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. at 139; *W.R. Grace & Co.*, 475 B.R. at 115), to a relatively low standard of proof. *See e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) ("[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal quotation marks omitted).  The Plan far surpasses this low threshold.

46.     The Objections focus on the prospect of declining (or speculative) membership trends and their effect on the BSA's ability to meet its financial obligations, issues related to

continuing relationships with Chartered Organizations, and the uncertainty concerning the Local Council Settlement Contribution.  D.I. 6052 ¶ 42-43; D.I. 3569 ¶ 55-57; D.I. 6065 at 25; D.I. 6065 at 21-22, 25.

47.     Although this objection is premature and the Debtors will fully address feasibility at the Confirmation Hearing,the Debtors have prepared projections for the calendar years 2021 through 2025, including management's related assumptions.   *See* Discl. Stmt, Ex. E (the "Financial Projections").   Those assumptions consider projected membership levels.   As reflected in the Financial Projections and as may be further supplemented for the Confirmation Hearing, the evidence will show that the Debtors will timely meet all of their collective obligations and will be financially viable after Confirmation of the Plan.  In addition, the Debtors will show at Confirmation that the Settlement Trust is adequately funded to liquidate Abuse Claims and pay its legal and administrative costs as set forth in the Trust Distribution Procedures.  Additionally, the Plan has been substantially revised as described herein to include a mechanism to allow Chartered Organizations to become Participating Chartered Organizations or Contributing Chartered Organizations, and thus benefit from s the Channeling Injunction as set forth in the Plan.  The Plan also includes a revised treatment for Indirect Abuse Claims pursuant to the Trust Distribution Procedures and judgment reduction provisions that entitles Chartered Organizations to certain ratable reductions on account of shared liabilities.The Debtors believe that the Plan, incorporating these improved provisions, will help strengthen their relationships with Chartered Organizations.

48.     Finally, since the filing of these Objections, Local Councils have executed letters of intent regarding their respective contributions to the Settlement Trust that are in an aggregate amount equal to the Local Council Settlement Contribution.  Those contributions are listed on

Exhibit C to the Disclosure Statement.  For all of the reasons set forth above, there should be no doubt that the Plan is feasible.

### 3. Confirmation Objections Regarding Unfair Discrimination Are Premature and Without Merit.

49.     Century and the Catholic and Methodist Committees and certain Chartered Organizations assert that the Plan is "patently unconfirmable" because it unfairly discriminates against their Indirect Abuse Claims (Class 9) by providing such claims with a smaller percentage of recovery than the Direct Abuse Claims (Class 8), General Unsecured Claims (Class 6), and Non-Abuse Litigation Claims (Class 7).   Century Obj. [D.I. 6065 at 25-27]; Catholic and Methodist Committee Obj. [D.I. 6067, ¶ 56].  These objections fail for several reasons.

50.     First, these objections are substantially moot.  In light of recent revisions to the proposed Trust Distribution Procedures, which make clear that Indirect Abuse Claims, including those sought pursuant to rights of subrogation or indemnification, are to be paid on par with Direct Abuse Claims.  *See* Trust Distribution Procedures § XI.A; *see also* Disclosure Statement Art. II.H (providing that Indirect Abuse Claims and Direct Abuse Claims are estimated to receive the same percentage of recovery).

51.     Second, these objections are unripe and premature confirmation objections.  The prohibition against unfair discrimination applies only to a dissenting class that is subject to cram-down under section 1129(b) of the Bankruptcy Code.  *See In re Tribune Co.*, 972 F.3d 228, 242 (3d Cir. 2020) ("Unfair discrimination applies . . . only to classes that dissent").  At this time, when no votes have been cast or tabulated, it is impossible to determine whether any class is a dissenting class.  Nevertheless, should the class of Indirect Abuse Claims vote against the Plan at the Confirmation Hearing, the Debtors will be prepared to show that the Plan does not unfairly discriminate against this class because, among other reasons, holders of Indirect Abuse Claims

are estimated to receive a recovery of up to 100% after accounting for contributions and insurance rights.  *See* Disclosure Statement Art. II.H.

### 4. Confirmation Objections Regarding Disparate Treatment.

52.    Certain Objectors argue that the Plan's classification and treatment of their respective claims violate the equal treatment mandate of section 1123(a)(4).  *See e.g.*, D.I. 3579, 5694, 6052.  Specifically, certain of the plaintiff groups argue that the Plan cannot compel the holders of Direct Abuse Claims to share pooled proceeds because some Direct Abuse Claims purportedly hold superior rights to others, given strong claims against more solvent or well-insured non-debtors. D.I. 5964 ¶ 15.  Similarly, Certain Insurers[26] claim that the Plan fails to provide the same treatment for all Direct Abuse Claims, ignoring the different economic rights and degree of consideration each claimant is providing in exchange for the same *pro rata* distribution as all other holders of Direct Abuse Claims.  D.I. 6052, ¶¶ 37-39.[27]  In addition, the Girl Scouts of the United States of America ("GSUSA") assert that they are receiving disparate treatment under the Plan, in contravention of section 1123(a)(4), as the other Non-Abuse

---

[26]    "Certain Insurers" include: The AIG Companies, The Continental Insurance Company and Columbia Casualty Company, Old Republic Insurance Company, Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company, Clarendon America Insurance Company, Maryland Casualty Company, Maryland American General Group, American General Fire & Casualty Company, Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company and Gulf Insurance Company, Arrowood Indemnity Company, Munich Reinsurance America, Inc., formerly known as American Re-Insurance Company (collectively, "Certain Insurers").

[27]    Certain Insurers also argue that the alleged disparate treatment of Direct Abuse Claims also renders the claims dissimilar and requires separate classification under section 1122 of the Bankruptcy Code. D.I. 6052, ¶ 39.  Section 1122 of the Bankruptcy Code affords debtors significant discretion to classify claims together, so long as "such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122; *In re U.S. Truck Co.*, 800 F.2d 581, 586-88 (6th Cir. 1986) (the bankruptcy court has "broad discretion to determine proper classification according to the factual circumstances of each individual case" and claims "need not be identical," so long as there is a reasonable basis for the classification scheme).  The Debtors' classification framework satisfies section 1122(a), as will be conclusively demonstrated at confirmation.

Litigation Claims (Class 7) will purportedly receive 100% recovery on their claims, while GSUSA will purportedly receive less than 100%. D.I. 3579 ¶¶ 26-27.

53.     As an initial matter, none of these Objections is properly raised in the context of disclosure statement approval, as they rely on section 1123(a)—which sets forth the required contents of a plan – not a disclosure statement.  But even if the Court were inclined to consider GSUSA's, the plaintiff groups' and the Certain Insurers' premature objections at this time, the Objections fail on the merits.

54.     Section 1123(a)(4) requires equal opportunity for recovery, not equality of result or distribution ultimately received.  *See e.g.*, *In re Energy Future Holding Corp.*, 527 B.R. 157, 168 (D. Del. 2015) ("[C]ourts have interpreted the same treatment requirement to mean that all claimants in a class must have the same opportunity for recovery.") (quoting *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)); *In re Wash. Mut., Inc.*, 442 B.R. 314, 355-56 (Bankr. D. Del. 2011) ("Providing different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123(a)(4) . . . What is important is that each claimant within a class have the same opportunity to receive equal treatment."); *Ad Hoc Committee of Personal Injury Asbestos Claimants v. Dana Corp.* (*In re Dana Corp.*), 412 B.R. 53, 62 (S.D.N.Y. 2008) ("Thezf key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity.").

55.     That certain holders of Abuse Claims may hold stronger or superior claims than other members of the same class does not invalidate the Plan's classification scheme nor contravene the requirements of equal treatment.  *In re Resorts Int'l, Inc.,* 145 B.R. 412, 448 (Bankr. D.N.J. 1990) (holding that class members with "stronger claims, or stronger defenses, than others . . . may be classified together so long as their claims are substantially similar and

their treatment is approximately equal."). Indeed, section 1123(a)(4) does not require a plan to provide strict proportional equality of payments within a class of unliquidated claims or the Court to weigh the strengths and weaknesses of each and every claim so that each claim receives equal value. *In re Dow Corning Corp.,* 255 B.R 445, 505 (E.D. Mich. 2000) ("Section 1123(a)(4) is not to be interpreted as requiring precise equality of treatment, but rather some approximate measure [of equality.]").

56.     Notably, third party payments or contributions do not affect this inquiry. *See Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc.* (*In re Exide Holdings Inc.*), 2021 U.S. Dist. LEXIS 138478, at *21 (D. Del. July 26, 2021). In *In re Exide Holdings*, the court held while the Bankruptcy Code requires creditors of equal priority to receive pro rata shares of the ***debtor's property***, the same does not hold true for settlement payments or substantial contributions made by a ***third party***. *Id.* at *21 (finding that "[n]othing in the Bankruptcy Code requires a third party to make settlement payments or provide substantial contributions to similarly situated creditors in equal or prorated amounts") (citing *Begier v. IRS*, 496 U.S. 53, 58 (1990)). *Id.* (In that case, the settlement amount from third parties could be allocated among members of the class without regard to section 1123(a)(4) of the Bankruptcy Code. *Id.*

57.     The plaintiff groups' reliance on *In re AOV Industries* is misguided and fails to acknowledge the obvious impracticalities of applying this approach in these Chapter 11 Cases with thousands of asserted Abuse Claims. *In re Dow Corning Corp.*, 244 B.R. 634, 668 (Bankr. E.D. Mich. 1999) *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002) (finding that "[a]ny attempt to practically apply the rule of *AOV* . . . would be unduly burdensome and would severely inhibit, if not eliminate the estate's ability to settle disputed and unliquidated claims"). In the context of a mass tort bankruptcy with thousands of personal

injury claims, the *Dow Corning* court specifically noted that the "impractical rigidity [of the *AOV* approach] . . . will be unworkable any time there is a class containing disputed and unliquidated claims." *Id.* ("Under this scenario, the precise value will not be known.  And short of actually liquidating the claims, there is no way to determine whether a proposed settlement is offering to pay claimants the same percentage recovery on their respective claims.").  Moreover, "[r]equiring a bankruptcy court to inquire as to the amount of consideration involved in each claim involving a disputed and unliquidated personal injury claim, especially in a mass tort situation, would be an unrealistic, unworkable and unduly burdensome position for the bankruptcy court to be in."  *In re Dow Corning*, 255 B.R. at 497.  To be sure, the Trust Distribution Procedures will allocate a portion of contributions from certain Chartered Organizations to be distributed specifically to holders of certain eligible Allowed Abuse Claims.  TRUST DISTRIBUTION PROCEDURES Art. IX.F ("Source Affected Weighting").  However, thus far, there is only one Contributing Chartered Organization that would be subject to this weighting provision, which is manageable.

58.    GSUSA's Objection is particularly improper because it is a member of the Creditors' Committee, which bargained extensively with the Debtors, at arm's length and in good faith, for the treatment afforded to unsecured creditors under the Plan.  The Creditors' Committee represented to the Debtors that its committee members—including GSUSA, which has asserted Non-Abuse Litigation Claims—were satisfied that the Debtors' insurance assets would be sufficient to satisfy anticipated Allowed Non-Abuse Litigation Claims.  More than *two months* after the Debtors entered into the JPM / Creditors' Committee settlement, GSUSA reversed course and objected to the fundamental terms of the deal it participated in negotiating and accepted.

59.    GSUSA's reversal of its position also lacks merit.  Nothing in the Plan's treatment of GSUSA's claim indicates that GSUSA was "earmarked for disparate treatment within Class [7]."  *In re W.R. Grace & Co.*, 468 B.R. 81, 170–71 (D. Del. 2012).  Nor has GSUSA proffered any evidence of such intent—because none exists.    Rather, the Plan provides the same opportunity for recovery to every member of Class 7, including GSUSA: it may elect Convenience Class treatment or "retain the right to recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (i) available Insurance Coverage or the proceeds of any insurance policy, including any Abuse Insurance Policy or Non-Abuse Insurance Policy, (ii) applicable proceeds of any Insurance Settlement Agreements, and (iii) co-liable non-debtors (if any) or their insurance coverage."  Plan Art. III.B.9.

60.    GSUSA does not (and cannot) dispute these facts.  Instead, GSUSA argues that the insurance available to it will yield a smaller recovery than the insurance available to other claimants in its class.  *See* D.I. 3579, ¶¶ 18-28 ("[I]nsurance policies that cover the claims by the Girl Scouts are not sufficient to cover all of the claims," while "insurance policies that cover the other Non-Abuse Litigation Claims are sufficient to cover all of such claims.").  That is not disparate treatment.  Every member of Class 7—including GSUSA—has the same opportunity to recover the full amount of their allowed claim against any insurance coverage *available to such claimant*.  Disclosure Statement, Art. VI.D; *see also* Disclosure Statement, Art. II.C.3, Plan Art. III.B.9.  That treatment comports with section 1123(a)(4), which allows debtors to group together claims with access to different or superior sources of recovery—such as, for example, litigation claims that will receive disparate money judgments.

### 5.    Objection Regarding Non-Abuse Litigation Claim Settlements

61.    Evanston objects to the Disclosure Statement on the basis that the Plan inappropriately impedes the prompt processing and payment of non-abuse claims because the Plan requires the Settlement Trust's consent to any post-Effective Date settlement of any Non-Abuse Litigation.  (Obj. ¶ 5).  First, as noted by Evanston, its objection is not an issue that should be raised at the Disclosure Statement phase.  (Obj. ¶ 2).  Evanston does not assert that the Plan is patently unconfirmable and any issues raised should be done so at the Confirmation Hearing.

62.    Second, any rights Evanston has to process, defend and settle claims under its policy are subject to the implied covenant of good faith and fair dealing. Evanston would not have the right to settle claims against the Named Insured for unreasonably high settlement values or entirely without a policyholder's knowledge or over its objection.  Here, the Plan provides Evanston the same rights that it otherwise had prepetition – the Settlement Trustee's consent is subject to the implied covenant of good faith and fair dealing, and the Plan itself notes that "such consent [from the Settlement Trustee is] not to be unreasonably withheld."  Plan, § IV.D.3.a.  Therefore, the concerns raised by Evanston about the Disclosure Statement are without merit as the implied covenant of good faith and fair dealing (a) limits the scope of Evanston's settlement rights under its policy, and (b) ensures that the Settlement Trustee will consent to reasonable settlements of Non-Abuse Litigation Claims.

63.    Lastly, consistent with what has been represented to the constituents of these Chapter 11 Cases, the Debtors are in the process of resolving any Non-Abuse Claims.  Therefore, Evanston's objection may be mooted by the time of the Confirmation Hearing.

**6.    The Best Interests Test Does Not Apply to Non-Profit Debtors and, Even If It Does, It Cannot Be Determined at the Disclosure Statement Stage.**

64.    The Debtors maintain that the best interests test under section 1129(a)(7)(A) does not apply to non-profit debtors.  Although this legal issue is not before the Court (and will not be until the Confirmation Hearing), the Debtors believe it is important to put voting creditors on notice that they will take this position at confirmation.[28]   The Debtors understand that the objecting parties dispute the Debtors' position and, if such parties prevail, the Debtors will be prepared to demonstrate at the Confirmation Hearing that the best interests test has been satisfied.

65.    Moreover, whether the "best interests" test would apply to a given creditor is not determined until the voting process has been completed—which necessarily occurs after the Disclosure Statement is approved and solicitation has occurred.  For this reason, courts have

---

[28]    The Bankruptcy Code bars the involuntary conversion of a non-profit corporation's chapter 11 case to chapter 7. 11 U.S.C. § 1112(c).  *In re Grace Christian Ministries, Inc.*, 287 B.R. 352, 355 (Bankr. W.D. Pa. 2002) ("A corporation . . . may not be an involuntary chapter 7 or 11 debtor if it is a not-for-profit corporation.").    Likewise, Congress prohibited an involuntary bankruptcy proceeding from being commenced against a non-profit corporation. 11 U.S.C. § 303.  H.R. Rep. No. 95-595, at 322 (1977) ("Section 303 governs the commencement of involuntary cases under title 11 . . . Eleemosynary institutions, such as churches, schools, and charitable organizations and foundations, likewise are exempt from involuntary bankruptcy."); *In re Mem'l Med. Ctr., Inc.*, 337 B.R. 388, 390 (Bankr. N.M. 2005) ("Courts interpreting this section consistently conclude that non-profit organizations are not subject to involuntary proceedings.").  The distinctions that the Bankruptcy Code makes with respect to non-profit debtors turns a hypothetical liquidation into a virtual impossibility.  The Objectors do not cite any authority to support the argument that non-profit debtors must satisfy the best interest test.  Rather, these parties cite cases involving for-profit debtors, non-profit debtors who chose to submit a liquidation analysis (even though they were not required to do so), and debtors whose plans were rejected for reasons other than failure to submit a liquidation analysis.  *In re Ditech Holding Corp.*, 606 B.R. 544, 553 (Bankr. S.D.N.Y. 2019) (discussing the liquidation analysis for a for-profit corporation); *S. Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc.*, 252 B.R. 373, 390–92 (E.D. Tex. 2000) (reversing the bankruptcy court's decision to confirm a nonprofit corporation's chapter 11 plan where bankruptcy court took an arbitrary discount of "30%" in the liquidation analysis without justification); *In re Wabash Valley Power Ass'n*, 77 B.R. 991, 993 (Bankr. S.D. Ind. 1987) (noting that the debtor and the creditor entered into stipulation that they would not address the liquidation value of the debtor at the valuation hearings); *In re Mandalay Shores Co-op. Hous. Ass'n, Inc.*, 53 B.R. 609, 615 (Bankr. M.D. Fla. 1985) (holding that the nonprofit debtor satisfied the requirement under section 1129(a)(7)(A) when the debtor sought to cramdown certain unsecured priority claims from former members because "there is serious doubt that in a voluntary chapter 7 case" the creditors would receive anything).

routinely held that objections that the debtors did not satisfy the best interests test are confirmation objections that are not ripe for consideration at the disclosure statement hearing. *See In re W.P. Hickman Sys.*, No. 10-2289, 2012 Bankr. LEXIS 3301, at *17 (Bankr. W.D. Pa. July 13, 2012) ("[T]he basis for an objection to a disclosure statement and its liquidation analysis would be that it contained inadequate information, not that the liquidation analysis was inaccurate"); *In re Monroe Well Serv.,* 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) (holding that objections arguing that the plan was not for the best interests of creditors were not ripe for consideration when approving a disclosure statement) ("Virtually all of the objections raised cannot be considered at this juncture in the case . . . there is no need at this point to address the absolute priority rule or the best interest of creditors test, other than to hold that these concepts are properly explained in the disclosure statement."); *In re Colin*, 44 B.R. 806, 809 (Bankr. S.D.N.Y. 1984) (holding that "[s]ince the 'best interests of creditors test' of § 1129(a)(7) only becomes applicable upon the casting of a negative vote against the plan, the committee's argument is premature even if this Court could accept its questionable statutory interpretation."). That in itself disposes of the objections to the Disclosure Statement based on the best interests test.

66.     Various parties object that the Disclosure Statement does not contain sufficient information to evaluate whether the best interests test is satisfied.  *See e.g.*, UST Obj. [D.I. 3581, ¶¶ 18-19, 21]; TCC Obj. [D.I. 3526, ¶¶ 35-38], Herman Law Claimants Obj. [D.I. 6032, ¶ 3]; Catholic and Methodist Committees Obj. [D.I. 6067, ¶ 25].  Assuming, *arguendo*, that the best interests test applies here, the Debtors' liquidation analysis is sufficient for purposes of disclosure and, in any event, has been amended to moot these objections.

67.     As noted above, the best interest cannot be determined at the disclosure statement stage.  Rather, the debtor should provide a liquidation analysis that allows creditors to compare what they will receive from a chapter 11 plan against a hypothetical recovery from a chapter 7 liquidation.  *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 275 (Bankr. D. Del. 2016); *In re Diversified Invests. Fund XVII*, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988) ("[T]he disclosure statement must contain a liquidation analysis which compares the proposed plan of reorganization with a Chapter 7 liquidation.").  In other words, at the disclosure statement phase, courts focus on whether a liquidation analysis has been performed rather than on the conclusions of that analysis.  *See In re W.P. Hickman*, 2012 Bankr. LEXIS 3301, at *17 ("[T]he basis for an objection to a disclosure statement and its liquidation analysis would be that it contained inadequate information, not that the liquidation analysis was inaccurate.").

68.     Here, the Liquidation Analysis filed by the Debtors, attached as <u>Exhibit D</u> to the Disclosure Statement, provides more than sufficient information.  Specifically, the Liquidation Analysis demonstrates that all impaired creditors are estimated to receive a recovery in a hypothetical chapter 7 liquidation that is less than or equal to the recovery under the Plan, and includes liquidation estimates for each Class under the Plan, including "Low," "Midpoint" and "High" estimates.  Disclosure Statement, Ex. D.   This analysis is consistent with, if not more informative than, the liquidation analyses provided in support of disclosure statements in other mass tort bankruptcies.[29]   Thus, the Debtors have met their burden and nothing else should be required.

---

[29]     *See In re Imerys Talc Am., Inc.*, No. 19-10289 (Bankr. D. Del. 2019) [D.I. 2616-4] (approving disclosure statement and the liquidation analysis that provides low, midpoint, and high estimates of recoveries); *In re Specialty Prods. Holding Corp.*, No. 10-11780 (PJW) (Bankr. D. Del. Oct. 23, 2014) [D.I. 5118-4] (liquidation analysis did not estimate chapter 11 plan recoveries and instead listed the analysis as "N/A"); *In re United Gilsonite Labs.*, No. 11-02032 (RNO) (Bankr. M.D. Pa. Sept. 30, 2014) [D.I. 2012]

69.     The best interests test only applies to the Debtors.  11 U.S.C. § 1129(a)(7) ("each

holder of a claim or interest of such class (i) has accepted the plan; or (ii) will receive or retain

under the plan on account of such claim or interest property of a value, as of the effective date of

the plan, that is not less than the amount that such holder would so receive or retain *if the debtor*

*were liquidated* under chapter 7 of this title on such date" (emphasis added)).  Certain Objectors

have suggested that *In re Quigley Co.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) compels what

would amount to a liquidation analysis of each Local Council and Chartered Organization.  That

is simply not the case.  First, *Quigley* is out-of-circuit and not binding on the Court.  Second,

even if the Court chooses to follow *Quigley,* a liquidation analysis is not required. Instead, the

*Quigley* court looked at the recoveries that claim holders would receive from non-debtors

receiving releases outside of bankruptcy. *Id.* at 144-46.  However, the Debtors have now

included liquidation analyses for the Local Councils. To the extent necessary, the Debtors will

show at confirmation that the Debtors have met or exceeded the *Quigley* standard.  The specific

disclosures regarding the Liquidation Analysis are addressed in the Objection Responses Chart.

B.      **Channeling Injunction and Release-Related Objections**

1.      **Objections to the Consensual Releases Are Premature, but the Releases Are Nonetheless Permissible.**

70.     Certain parties, including the U.S. Trustee, object to the third-party releases in the

Plan.[30]  With regard to third-party releases, the Objectors argue that the Disclosure Statement

lacks adequate information disclosing that the releases are not consensual because they bind

parties who are presumed to accept the Plan and parties who are entitled to vote on the Plan but

---

(liquidation analysis included a chapter 7 recovery estimate for asbestos claims, but listed the asbestos claimants' recovery under the plan as unknown); *In re Flintkote Co.*, No. 04-11300 (JKF) (Bankr. D. Del. July 3, 2008) [D.I. 3433] (listing a potential percentage of the amount of recoveries for asbestos personal injury claims, but failing to provide an exact figure).

[30]     Some of these objections are to the BSA Toggle Plan, which as noted above, is no longer applicable.

abstain from voting [D.I. 3581, ¶ 34].  The objections also challenge the substance of the third-party releases, namely (i) the broad scope of the third-party release that that allege is contrary to Third Circuit law [*see, e.g.*, D.I. 3856 at 3, 22; D.I. 6009 ¶ 34; D.I. 6052 ¶ 27-28]; (ii) the procedures allowing creditors who do not have claims against Local Councils and Chartered Organizations, and are unaffected by the release, to vote on whether  non-debtors should be released [*see, e.g.*, D.I. 5955 ¶ 10]; and (iii) the illusory protections afforded by the releases [*see, e.g.*, D.I. 6065 at 21-22].

71.    These Objections are moot, as the third-party releases in Article X.J.4 of the Plan have been modified to provide that holders of Unimpaired Claims may opt out of the consensual third-party releases by objecting to the releases.  Additionally, holders of impaired claims who vote to accept or reject the Plan may opt out of the releases.  Therefore, the third-party releases in Article X.J.4 are entirely consensual and parties affected by such releases may opt out of the release, thereby rendering these objections baseless.

72.    As the Debtors will argue at confirmation, the third-party releases in Article X.J.4 of the Plan are consensual in nature and appropriate in scope.  Courts in this district have found releases to be consensual where there is sufficient notice of a plan's release provisions and parties have an opportunity to object to the plan or opt out of the release.  Here, the Ballots and Confirmation Hearing Notice, among other documents, conspicuously state the third-party releases in Article X.J.4 of the Plan and describe the opt-out mechanism to any party that is entitled, and may decide, to opt out of those releases.  All voting creditors will receive comprehensive and detailed notice of the third-party releases in Article X.J.4, their impact on creditors and creditors' rights, the opportunity to opt out, and the right to object to confirmation of the Plan.  Similarly, creditors holding claims in unimpaired classes under the Plan, who are

presumed to accept the Plan, will receive a notice that includes the release in conspicuous writing and states that the release will be granted unless the claimholder objects.

73.     Courts in this jurisdiction routinely approve third-party releases where, as here, creditors in a voting class have an opportunity to opt out of the releases.  *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 305–06 (Bankr. D. Del. 2013) (approving ballots that had an opt-out mechanism for third-party releases); *see also In re Chaparral Energy Inc.*, No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) [D.I. 237] (approving disclosure statement and confirming plan that provided an opportunity for parties presumed to accept to affirmatively elect to "opt out"); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. June 14, 2019) [D.I. 384] Hr'g Tr. 48:9–11 ("With respect to third-party releases I'm prepared to find that they are consensual because of the opt-out box in the ballots.").  Thus, the releases under Article X.J.4 of the Plan are consensual as to all creditors and interest holders who do not object or affirmatively opt out.

74.     The Debtors intend to further establish the appropriateness of the consensual releases at the Confirmation Hearing, but, at this stage, the Court should overrule all objections to the third-party releases related to approval of the Disclosure Statement and Solicitation Procedures.

### 2.     The Channeling Injunction and Related Non-Consensual Third-Party Releases Do Not Render the Plan Patently Unconfirmable.

75.     Certain Objectors argue that the Plan is patently unconfirmable to the extent it provides non-consensual releases to the Local Councils and Chartered Organizations in connection with the Channeling Injunction.  *See* TCC Obj. [D.I. 3526, ¶¶ 113-118]; Plaintiff Law Firms Obj. [D.I. 5964, ¶ 2]; Herman Law Claimants Obj. [D.I. 6032, ¶¶ 3, 12]; UST Obj. [D.I. 3581, ¶ 12].  These objections fail.

76.     In the Third Circuit, non-consensual third-party releases are permissible if they satisfy the *Continental* hallmarks of "fairness and necessity to the reorganization," which must be supported by specific factual findings.  *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017) (citing *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000)).   In determining whether a non-consensual release meets this standard, courts apply five factors, known as the *Master Mortgage* factors, to the specific facts of the case:

> (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*Id.* (quoting *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)).  "These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *In re Washington Mut. Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011).

77.     It would be premature, at this stage, to determine whether the Channeling Injunction and releases satisfy the *Continental* hallmarks and the *Master Mortgage* factors.  Facts material to such a determination will continue to be developed after the approval of the Disclosure Statement.  Such facts include the outcome of the creditors' votes, the identity of each Protected Party, the value of contributions to be made to the Settlement Trust and, consequently, the total value of distributions to be made to affected creditors.  Indeed, the Plan expressly contemplates that additional parties may become Protected Parties by making substantial contributions to the Settlement Trust.

78.     Ignoring this reality, certain Objectors present objections based on presupposed facts tailored to fit their arguments.  Because these material facts are still in development, these Objectors have failed to show that the Channeling Injunction and non-consensual third-party releases render the Plan patently unconfirmable.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012) (finding that a plan is "patently unconfirmable" only "where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.").  The Debtors will demonstrate at confirmation that the non-consensual releases and Channeling Injunction are integral to the Debtors' restructuring under the Plan, and the Protected Parties and Limited Protected Parties will have made substantial contributions in exchange for the releases.

79.     While the Debtors believe the Channeling Injunction and non-consensual third-party releases will ultimately be found to satisfy *Continental*, such a determination should be made at the Confirmation Hearing.  Accordingly, the Court should overrule all Confirmation Objections relating to the Channeling Injunction and non-consensual third-party releases.

C.     **Trust Distribution Procedures Objections**

1.     **The Trust Distribution Procedures Do Not Violate Section 502 of the Bankruptcy Code.**

80.     Certain Insurers, including Century, assert that the Plan is unconfirmable because the Trust Distribution Procedures purportedly violate sections 502(a) and 502(b)(1) of the Bankruptcy Code by expressly permitting the payment of claims that are not compensable in the tort system without allowing parties in interest to file objections to such claims.  *See* D.I. 3856 at 42-43; D.I. 6052 ¶¶ 19-21.

81.     Bankruptcy courts consistently reject this argument.  For example, in *Western Asbestos*, the bankruptcy court overruled this objection (also by an insurer) and held that the plan and trust distribution procedures did not violate section 502(a) by assigning the rights to object to claims to the asbestos personal injury trust:

> In a chapter 11 case, 11 U.S.C. § 502(a) only governs the right of a party in interest to object to a claim until the plan is confirmed. Once a plan is confirmed, the terms of the plan govern who may object to the claim.  11 U.S.C. § 1141(a).  Generally, a plan assigns that right and duty either to the reorganized debtor or to the official creditors' committee.  In these cases, that duty is assigned to the Trust.  There is nothing inconsistent with the Bankruptcy Code in this provision.

*In re W. Asbestos Co.*, 313 B.R. 832, 845 (Bankr. N.D. Cal. 2003).

82.     In *In re Congoleum Corp.*, the bankruptcy court faced a similar objection from insurers that argued by channeling the asbestos-related personal injury claims to a trust, the plan eliminated their right to object to claims pursuant to section 502(a).  The *Congoleum* court overruled the objection, holding that this argument undermines the purpose of channeling injunctions and aims to circumvent the trust mechanisms.  *In re Congoleum Corp.*, No. 03-51524, 2008 Bankr. LEXIS 2375, at *29-30 (Bankr. D.N.J. Sept. 2, 2008).[31]  The same is true here.

83.     Indeed, numerous other mass tort cases have confirmed plans that assign the rights to object to claims exclusively to the personal injury trust.[32]

---

[31]     *See also In re ACandS, Inc.*, 311 B.R. 36, 42 (Bankr. D. Del. 2004) (rejecting an insurer's argument that the plan violated section 502(a) by limiting its rights to object to claims under the personal injury trust); *In re Abengoa Bioenergy Biomass of Kan., LLC*, No. 16-10446, 2018 Bankr. LEXIS 1361, at *7-8 (Bankr. D. Kan. May 7, 2018) (holding that it was appropriate to vest the rights to object to claims exclusively in a trustee and bar other parties in interest to object).

[32]     *See e.g.*, *In re Remington Outdoor Co.*, No. 20-81688 (Bankr. N.D. Ala. Mar. 12, 2021) [D.I. 1658] (confirming chapter 11 plan providing that the plan administrator has the exclusive right to prosecute any estate causes of action); *In re Cath. Diocese of Wilmington, Inc.*, No. 09-13560 (Bankr. D. Del. Aug. 8, 2011) [D.I. 1493] (confirming chapter 11 plan providing that the plan trust shall be vested with and may

### 2.    Allowance of Claims Against Chartered Organizations and Protected Parties under the Trust Distribution Procedures.

84.    Certain Objectors argue that the Plan is patently unconfirmable because the Plan and the Trust Distribution Procedures leave open the possibility that substantially more Abuse Claims will be filed in the future in complete disregard of the Bar Date Order, which also violates section 502(b) of the Bankruptcy Code.    Certain Insurers Obj. [D.I. 6052, ¶ 24]. According to Certain Insurers, permitting abuse claimants to submit their claims to the Settlement Trust after the Bar Date renders the Bar Date and Bar Date Order meaningless and would allow "every person in America —even those who never had any involvement with Scouting—to submit a future request for payment of a no-questions-asked Expedited Distribution of $3,500."    Certain Insurers Obj. [D.I. 6052, ¶ 25].    This Objection is completely baseless and fundamentally misconstrues the Bar Date Order and the Trust Distribution Procedures.    The Trust Distribution Procedures do not contravene the Bar Date Order and this Objection is completely baseless.

85.    Indeed, given the parameters of the Bar Date Order, the Debtors anticipate that the allowance of claims filed after the Bar Date would apply to an extremely limited number of potential claimants.

86.    First, the Trust Distribution Procedures do not contravene the Bar Date Order, which established the deadlines by which Proofs of Claims "against the Debtors *and/or the* Debtors *and* a Local Council or chartered organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, [Sexual Abuse in Scouting]."    Bar Date Order [D.I. 695, ¶ 3] (emphasis added).    While the Bar

---

"exclusively enforce and prosecute" any claims or causes of action that the debtor or the plan trust may have); *In re Christian Bros.' Inst.*, No. 11-22820 (Bankr. S.D.N.Y. Jan. 13, 2014) [D.I. 652] (same); *In re The Christy Refractories*, No. 08-48541 (Bankr. E.D. Miss. June 13, 2011) [D.I. 289] (same).

Date Order refers to Proofs of Claim alleging Sexual Abuse in Scouting against (i) the Debtors, (ii) the Debtors and Local Councils, and (iii) the Debtors and Chartered Organizations, it does not prevent claimants from filing suit against third-party non-debtors.  In other words, there is no applicable Bar Date Order for causes of action only against a Local Council or Chartered Organization involving Scouting that may be compensable under the Trust Distribution Procedures.  The Trust Distribution Procedures allow holders of Direct Abuse Claims (who satisfy the eligibility criteria of Article IV.A of the Trust Distribution Procedures) to potentially receive compensation from the Settlement Trust *only if* they allege abuse (connected to Scouting related to or sponsored by the BSA) against a Local Council or other Protected Party.  *See* Trust Distribution Procedures, Art. IV.A.(i), (ii).  These Abuse Claims may fall outside the parameters of the Bar Date Order, and are therefore not excluded from asserting claims against the Settlement Trust.  *See* Bar Date Order [D.I. 695 at 11] ("Nothing in this Order shall independently impair or affect, or be deemed to impair or affect, any claims including, without limitation, Sexual Abuse Claims that may be asserted against Local Councils or any entity or organization other than the Debtors.").

87.    Second, Certain Insurers exaggerate the effect of allowing eligible abuse claimants to assert claims against the Settlement Trust after the Bar Date.  Given how restrictive this subset of claims is (*i.e.*, Abuse Claims that are (i) asserted against a Local Council or Protected Party such as a Chartered Organization, (ii) connected to Scouting related to or sponsored by the BSA, but (iii) *not* asserted against the BSA), the Debtors anticipate that this procedure would apply to an extremely small subset of claimants, if any.  Moreover, the timeframe for a party to file a claim against a Local Council or Chartered Organization is limited

under the Trust Distribution Procedures the window where such claimant could have filed window where they could have filed a timely state law claim.

88.    Third, Certain Insurers fundamentally misunderstand the provisions of the Trust Distribution Procedures related to the Expedited Distribution.  Pursuant to Article VI of the Trust Distribution Procedures, the Expedited Distribution of $3,500 would only be available for holders of Direct Abuse Claims who have "timely submitted to the Settlement Trust a properly and substantially completed, non-duplicative Abuse Claim Proof of Claim or Future Abuse Claim."[33] *See* Trust Distribution Procedures, Art. VI.A.   Contrary to the Certain Insurers' assertion, not only is the subset of eligible holders of Abuse Claims that may assert a claim against the Settlement Trust after the Bar Date limited, such group is not eligible for the Expedited Distribution.

### 3.    Tort Opt-Out

89.    Lujan & Wolff LLP Claimants argue, among things, that the Disclosure Statement fails to explain why abuse survivors are not given an opportunity to opt-out from receiving compensation from non-debtor Protected Parties through the Settlement Trust and instead to pursue their claims in court against non-debtor Protected Parties.  D.I. 6039, ¶ 13.   Though framed as an objection to the Trust Distribution Procedures, this is actually an objection to Third-Party Releases.  As discussed in the Disclosure Statement, a Protected Party will receive the benefit of the Channeling Injunction and protection of the Third-Party Releases with respect to Abuse Claims (subject to Court approval) in exchange for its contribution of certain insurance-related rights to the Settlement Trust and a negotiated further substantial contribution to the Settlement Trust.   The Channeling Injunction and related Third-Party Releases are a core

---

[33]    Indeed, the only method by which this election may be made is on the Ballot prior to the Voting Deadline.

component of the Plan, without which no settlement or third-party contribution could exist. The ability for holders of Direct Abuse Claims to opt-out of the Third-Party Releases would render such releases, and accordingly, the Channeling Injunction and Plan, unworkable. As discussed in the Disclosure Statement, the Third-Party Releases are an essential component of the Plan, and any opt-out provision would undermine their purpose and would prohibit the Debtors from reaching third party contributions.

### 4.    Powers of the Settlement Trustee

90.    Several Objectors allege that the powers vested in the Settlement Trustee[34] are improper and exceed the authority of the Court by delegating its statutory authority and judicial duties to the Settlement Trustee and Settlement Trust Advisory Committee. Specifically, these Objectors argue that the post-confirmation addition of Protected Parties by the Settlement Trustee is unlawful. Herman Law Claimants Obj. [D.I. 6032]; Plaintiff Law Firms Obj. [D.I. 5955].

91.    In addition to being premature, these objections have been rendered substantially moot by the revised Plan. Pursuant to Articles IV.I and IV.K of the Plan, Post-Effective Date Chartered Organization Settlements and Post-Effective Date Insurance Settlements are now subject to notice and an objection period.[35] Also, Post-Effective Date Chartered Organization

---

[34]    Certain Objectors have also challenged the proposed Settlement Trustee, which is an issue that should be resolved at confirmation.

[35]    Section IV.K of the Plan provides with respect to Post-Effective Chartered Organization Settlements: "Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any Insurance Company that is a Non-Settling Insurance Company may, within twelve (12) months of the Effective Date (the "Insurance Settlement Period"), enter into an Insurance Settlement Agreement with the Settlement Trustee (a "Post-Effective Date Insurance Settlement"); provided, however, that the Settlement Trustee shall file a notice with the Bankruptcy Court within thirty (30) days of entering into any such Post-Effective Date Insurance Settlement, together with an amendment to Exhibit I including such Post-Effective Date Insurance Settlement, and such Insurance Company (and any related Persons or Representatives, as applicable) shall be deemed to be a Settling Insurance Company and a Protected Party for all purposes hereunder. The Post-Effective Date Insurance Settlement and amendment shall be deemed binding and

Settlements are only effective upon the Court's entry of a final order of approval.[36]  This ensures that parties in interest will have equivalent rights to be heard before approval of any post-effective date settlement.

92.    The Settlement Trustee's discretion under the Plan is in line with precedent trust agreements in other mass torts chapter 11 cases.[37]  The Settlement Trust Agreement under the Plan is not novel or unusual.[38]

---

effective absent objection by any Person within fifteen (15) calendar days.  The Settlement Trustee shall have the sole discretion, upon order of the Bankruptcy Court, to extend the Insurance Settlement Period."

[36]    Section IV.I of the Plan provides with respect to Post-Effective Date Insurance Settlements: "Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any Chartered Organization that is not a Contributing Chartered Organization as of the Effective Date may become a Protected Party if the Bankruptcy Court, after notice and an opportunity for parties in interest to be heard, approves a settlement agreement between such Chartered Organization and the Settlement Trustee (a "Post-Effective Date Chartered Organization Settlement").  After the Effective Date, the Settlement Trustee shall have the exclusive authority to seek approval of a Post-Effective Date Chartered Organization Settlement. Upon the Bankruptcy Court's entry of a Final Order approving a Post-Effective Date Chartered Organization Settlement, Exhibit C shall be amended by the Settlement Trustee to include such Chartered Organization, and such Chartered Organization (and any related Persons or Representatives, as applicable) shall be deemed to be a Contributing Chartered Organization and a Protected Party for all purposes hereunder.  A list of Chartered Organizations that may potentially become Contributing Chartered Organization may be accessed at https://omniagentsolutions.com/bsa-SAballots."

[37]    The Settlement Trust Agreement enumerates the Settlement Trustee's powers, duties, and limitations. These include, among others: the power to distribute assets of the Settlement Trust to holders of Abuse Claims pursuant to the terms and conditions and the procedures for distributions established in the Trust Distribution Procedures; to assist the Litigation Trustee to prosecute Settlement Trust Causes of Action, the Insurance Actions, and the Insurance Coverage Actions on behalf of holders of Abuse Claims; to enforce the Settlement Trust's rights in the Settlement Trust Assets, including through judicial proceedings or bankruptcy/insolvency proceedings; and to make, sign, execute, acknowledge, and deliver any documents that may be necessary or appropriate to effectuate the purposes of the Settlement Trust or to maintain and administer the Settlement Trust.  *See* Plan, Ex. B, Settlement Trust Agreement §§ 2.1-2.2.

[38]    *See, e.g.*, *In re Specialty Prods. Holding Corp.*, No. 10-11780 (PJW) (Bankr. D. Del. Oct. 23, 2014) [D.I. 5117-1] ("Subject to the Plan and this Trust Agreement, the Trustees shall have the power to take any and all actions that they may consider necessary, appropriate or desirable to fulfill the purpose of the Trust, including each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware."); *In re Flintkote Co.*, No. 04-11300 (JKF) (Bankr. D. Del. Feb. 9, 2015) [D.I. 8706-1] ("Except as required by applicable law, the Plan or this Trust Agreement, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder."); *In re Yarway Corp.*, No. 13-11025 (BLS) (Bankr. D. Del. April 8, 2015) [D.I. 859-1] ("Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of the Asbestos PI Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental hereto and any trust power

### 5.  Expedited Distribution Procedures

93.    Contrary to the objections of Certain Insurers, the Expedited Distribution does not guarantee payment for all abuse claimants or open the door to fraudulent or otherwise invalid claims.  *See* Century Obj. [D.I. 6065 at 3]; Certain Insurers Obj. [D.I. 6052]; AIG Companies Obj. [D.I. 3523]; Allianz Obj. [D.I. 3549]; Great American Assurance Obj. [D.I. 6056].

94.    To receive an Expedited Distribution under the Trust Distribution Procedures, the holders of Direct Abuse Claims must have timely submitted a "properly and substantially completed, non-duplicative Abuse Claim Proof of Claim or Future Abuse Claim" that the claimant has signed, "attesting to the truth of its contents under penalty of perjury" or supplemented "to provide such verification."  *See* Trust Distribution Procedures § VI.A.  The addition of the attestation requirement to the revised Trust Distribution Procedures further safeguards against fraud and abuse.  *See* Fourth Amended Plan [D.I. 5484], Ex. A (not requiring attestation).  Additionally, to properly make the Expedited Distribution Election, the claimant must not only have timely submitted a proof of claim under Article IV.A of the Plan, but the proof of claim must be properly and substantially complete.  Finally, to receive a payment the holder of a Direct Abuse Claim must execute a release, which shall include a release of the Settlement Trust, the Protected Parties, and all Chartered Organizations.  *See* Trust Distribution Procedures § IV.B.  This requirement, among other things, provides the Settlement Trust the ability to confirm the identity of the claimant that has properly and substantially completed a proof of claim under oath, and provides further safeguards against fraud and abuse.

---

now or hereafter permitted under the laws of the State of Delaware."); *In re Garlock Sealing Tech., LLC*, No. 10-BK-31607 (Bankr. W.D.N.C. April 03, 2017) [D.I. 5795-3] (same).

95.     As with other objections to the Trust Distribution Procedures, this Objection is a confirmation issue.  The Expedited Distribution will help reduce the administrative costs to the Settlement Trust that would otherwise reduce the amount available to compensate holders of Direct Abuse Claims, and likely substantially delay the time it will take for the Settlement Trust to evaluate and compensate Abuse Claims.   In short, the multi-step process of evaluating, validating and potentially reconsidering every Direct Abuse Claim will take time and cost money.  The sheer number of Direct Abuse Claims—approximately 82,200—presents enormous review and process challenges, and being able to pay holders that so elect a modest recovery to ease these challenges will help the Settlement Trust be more efficient and compensate holders of Abuse Claims faster.   Indeed, the Expedited Distributions preserve the Debtors' estates, including for holders of Abuse Claims who do not elect to participate in the Expedited Distribution, and Courts have approved similar provisions.  *See In re Roman Cath. Church of the Diocese of Tucson*, No. 04-04721 (BMW) (Bankr. D. Ariz. Sep. 21, 2005) [D.I. 887], *Debtors' Third Amended and Restated Plan of Reorganization*, ¶¶ 2.127, 12.4 (providing for payment of $15,000 for claims that had been objected to on statute of limitation grounds but were otherwise credible, without requiring evidentiary standards); s*ee also In re Cath. Diocese of Wilmington, Inc.*, No. 09-13560 (CSS) (Bankr. D. Del. Aug. 8, 2011) [D.I. 1493], *Conformed Second Amended Chapter 11 Plan of Reorganization of Cath. Diocese of Wilmington, Inc*., ¶ 10.6 (providing for payments of $75,000 or $25,000 for holders of abuse claims who had elected such treatment).  The Objections to the Expedited Procedures are thus not only premature, but also unfounded.

**6.** **The Court Has Jurisdiction Pursuant to 28 U.S.C. § 157(b)(2)(B) to Make a "Fair and Reasonable" Finding Regarding the Trust Distribution Procedures.**

96.     Certain Insurers, including the AIG Companies, object that Article IX of the Plan improperly requires a prospective finding "that the Allowed Claim Amount is 'fair and reasonable.'"    D.I. 6052 at ¶ 44.    That is wrong.    Rather, as a condition precedent to confirmation, Article IX of the Plan requires a finding that the procedures and criteria under the Trust Distribution Procedures—not, as the insurers contend, the ultimate Allowed Claim Amounts of individual Abuse Claims—are "fair and reasonable."[39]    *See* Plan, Art. IX.A.3.q. Those two findings are plainly different.    Moreover, the determination that the fair and reasonable procedures and criteria under the Trust Distribution Procedures will be based on the evidentiary record offered at the Confirmation Hearing.    Objectors can offer their own contradictory evidence at the Confirmation Hearing and litigate these issues. Additionally, similar findings are routinely included in other confirmation orders involving trust distribution procedures related to personal injury claims.    *See In re Maremont Corp.*, 601 B.R. 1, 36 (Bankr. D. Del. 2019) (finding that an asbestos personal injury trust agreement and trust distribution procedures attached to the plan were "valid, proper, and reasonable under the circumstances"); *cf. In re Armstrong World Indus.*, 348 B.R. 223, 233 (Bankr. D. Del. 2006) ("With respect to any Asbestos Personal Injury Claim that is allowed by the Asbestos PI Trust in accordance with the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, such allowance

---

[39]     Specifically, Article IX.A.3.q of the Plan requires a finding that:

> (i)     the procedures included in the Trust Distribution Procedures pertaining to the allowance of Abuse Claims and (ii) the criteria included in the Trust Distribution Procedures pertaining to the calculation of the Allowed Claim Amounts, including the Trust Distribution Procedures Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors (each as defined in the Trust Distribution Procedures), are fair and reasonable based on the evidentiary record offered to the Bankruptcy Court.

shall establish the amount of legal liability against the Asbestos PI Trust . . . .").  To the extent such a finding would fall outside of the Court's jurisdiction over core matters, which the Debtors do not concede, it would certainly fall within the Court's "related to" jurisdiction and be subject to inclusion in a final order entered by the district court.  *See* 28 U.S.C. § 157(c); *Binder v. Price Waterhouse & Co., LLP* (*In re Resorts Int'l, Inc.*), 372 F.3d 154, 164 (3d Cir. 2004) (holding that, prior to confirmation, bankruptcy courts have related to jurisdiction over a proceeding if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy") (internal citation omitted).  Indeed, the Plan contemplates that an Affirmation Order will be entered prior to the Effective Date of the Plan.  *See* Plan, Art. IX.B.1.

97.    Neither the Plan nor the Trust Distribution Procedures contemplate the adjudication of the Abuse Claims by the Court.  Instead, consistent with trust distribution procedures approved in other cases in this District, holders of Direct Abuse Claims will have the option to accept a Proposed Allowed Claim Amount calculated in accordance with the Trust Distribution Procedures.  *In re W.R. Grace & Co.*, 475 B.R. at 172 ("Similar to reaching a settlement, if a claimant under the Joint Plan in the instant litigation chooses this first option, he does so in lieu of a jury trial. Such a decision is entirely voluntary . . . .").  If, however, holder of a Direct Abuse Claim declines to accept a Proposed Allowed Claim Amount or is found to hold a Disallowed Claim, the Trust Distribution Procedures preserve such claimant's right to seek *de novo* determination of its Direct Abuse Claims by a court of competent jurisdiction.  Trust Distribution Procedures Art. XII.  Accordingly, this Objection should be overruled.

### D. Insurance-Related Objections

#### 1. The Plan Does Not Impermissibly Modify Chartered Organizations' Rights to Insurance Proceeds and Provides for Appropriate Treatment of Indirect Abuse Claims.

98.     Several Chartered Organizations[40] argue that the Plan is patently unconfirmable because it (a) impermissibly seeks to appropriate the rights of non-debtor insured parties under the BSA's and Local Councils' insurance policies to the Settlement Trust without those parties' consent or initiating an adversary proceeding and (b) may extinguish the BSA's indemnity obligations through the operation of vague and indeterminate trust distribution procedures. *See* D.I. 3263; 4092; 6009; 6014; 6044. The Guam Committee alleges further that any transfer of its rights as non-debtor insured to the Settlement Trust would violate the automatic stay imposed in its ongoing chapter 11 proceeding. Guam Committee Obj., D.I. 4321 at 2, D.I. 5842 ¶ 15. These objections are not only premature Confirmation Objections, but they are also entirely moot.

99.     The Debtors have now modified the Plan's proposed treatment of Chartered Organizations. *See* Plan Art.IV.I, Art. IV.J. Consequently, the Disclosure Statement describes revised treatment for the Chartered Organizations to which the objections regarding the "abrogation" or "seizure" of non-debtor insureds' property rights do not apply. *See, e.g.*, D.I. 6009, ¶ 34. This modification reflects the Debtors' ongoing efforts to resolve disputed issues with Chartered Organizations and other stakeholders in advance of the Confirmation Hearing. *See* Disclosure Statement, Art. II.D.

100.     The Plan provides three alternate paths for Chartered Organizations. A Chartered Organization may: (1) become a Contributing Chartered Organization and thereby become a

---

[40]     As noted above, in light of the TCJC Settlement, the objections filed by the TCJC are withdrawn. However, to the extent still applicable, the Debtors seek to address the joinders to the TCJC Objection, filed by the Roman Catholic Archbishop of Los Angeles and its related BSA-Chartered Organizations and the Roman Catholic Diocese of Brooklyn [D.I. 4092, 6044] and the Episcopal Church [D.I. 6014].

Protected Party and receive the full benefits and protections of the Channeling Injunction in exchange for its contribution of certain insurance-related rights to the Settlement Trust and a substantial monetary contribution to the Settlement Trust; (2) become a Participating Chartered Organization and receive certain limited benefits and protections of the Channeling Injunction as a Limited Protected Party in exchange for contribution of certain insurance-related rights to the Settlement Trust, or (3) decline to participate in the Plan.  A Chartered Organization that chooses not to participate in the Plan will receive no benefits and protections under the Plan from future litigation related to Abuse Claims and will retain any rights it may have under insurance policies issued to the BSA or Local Councils that provide coverage to Chartered Organizations for Abuse Claims. Any Chartered Organization that objects to plan confirmation or provides timely, written notice will not participate in the Plan.  *See* Art. II.E.

101.    This treatment creates a process by which Chartered Organizations may consent to participating in the Plan and contemplates certain contributions in exchange for Protected Party and Limited Protected Party status. This structure dispenses with the Chartered Organizations' concerns that the Plan "unilaterally extinguishes" their interests [D.I. 6009, ¶¶ 8-9; D.I. 6067, ¶¶ 29-31], or adjudicates their property rights without consent [D.I. 6067, ¶¶ 29-31].  Further, the Plan presumes that a Chartered Organization that is itself a debtor in a pending bankruptcy will not participate in the Plan, unless it affirmatively elects to do so. *See* Disclosure Statement, Art. II.E.  This avoids any issue with the automatic stay of a Chartered Organization debtor in another bankruptcy case.

102.    TCJC, which has withdrawn its Objection but to which joinders were filed, made further objections, which lack merit.  TCJC's claims that the Debtors may not extinguish the BSA's indemnity obligations are moot given that the Debtors have filed the revised Plan and

Trust Distribution Procedures, which make clear that Indirect Abuse Claims, including those sought pursuant to rights of subrogation or an indemnification, are to be paid on par with Direct Abuse Claims.  *See* Trust Distribution Procedures § XI.A.  This treatment comports with comparable trust distribution procedures.[41]

### 2.    There Is Sufficient Disclosure of Certain Insurance Coverage Disputes.

103.    As stated in the Disclosure Statement, there are coverage disputes between Debtors and the Insurers regarding who bears the responsibility for the first million dollars on each Direct Abuse Claim asserted between 1988 and 2007.  The resolution of this dispute is a matter for a state court to decide in coverage litigation.  As shown below, the coverage disputes are complicated and there are many permutations of the potential outcomes.  For purposes of the Disclosure Statement, it is sufficient for the Debtors to describe the nature of the dispute and the potential impact of an adverse resolution.  The Debtors have done so.  *See* Disclosure Statement, Art. III.F.1 and Art. X.A.23.  In fact, certain language in Section III.F.1 was negotiated directly with counsel for one of Debtors' excess insurance companies.  The fact that the Disclosure Statement language was negotiated with, and acceptable to, one of the Debtors' excess insurance companies (Agricultural Insurance Company/Agricultural Excess & Surplus Insurance Company) should establish that the Disclosure Statement language concerning this issue is acceptable.  Notwithstanding the foregoing, the Debtors have reasonable and good faith arguments to dispute the arguments proffered by the Insurance Companies.

---

[41]    *See, e.g. In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) [D.I. 2852-1]; *In re Specialty Prods. Holding Corp.*, No. 10-11780 (PJW) (Bankr. D. Del. Oct. 21, 2014) [D.I. 5117-3]; *In re Yarway Corp.*, No. 13-11025 (BLS) (Bankr. D. Del. Jan. 27, 2015) [D.I. 859-3]; *In re Duro Dyne Nat'l Corp.*, No. 18-27963 (MBK) (Bankr. D.N.J. Nov. 20, 2018) [D.I. 1295-4]; In re Flintkote Co., No. 04-11300 (JKF) (Bankr. D. Del. Feb. 9, 2015) [D.I. 8709].

104.    Notably, there are multiple insurance-coverage and policy-interpretation issues that would have to be resolved by the state court to determine who has responsibility for the first million dollars on each Direct Abuse Claim asserted between 1988 and 2007, including:

- whether the primary insurance policies require the insurers to pay the first million dollars on a per-occurrence basis;

- if the primary insurers have an aggregate limit of their deductible obligations, whether that aggregate limit applies to claims for personal injury;

- whether an endorsement in the umbrella policies – "the Retention Endorsement – Aggregate Exhaustion" – applies to the insured to the same extent as the insurer, limiting the insured's obligation for the first million dollars; and

- other, potential coverage issues that may impact the insureds' obligations for the first million dollars.

105.    In addition, these multiple insurance-coverage issues may require a state court to determine – based on the foregoing – that the insurance policies are ambiguous and, therefore, the Debtors should be entitled to inferences in favor of coverage. Ultimately, the interpretation of these insurance policies is a matter for coverage litigation and is not an issue to be litigated in the context of a Disclosure Statement or even during the Confirmation Hearing.  The Debtors have provided sufficient information in the Disclosure Statement regarding the existence and the ramifications of this dispute, and the Court should overrule any objections concerning this matter.

### 3.    The Plan Does Not Violate "Insurance Neutrality."

106.    Certain of the insurers and Century have objected on the grounds that the Plan is not insurance neutral, claiming that the Plan impermissibly rewrites or modifies the terms of, and

rights and obligations under, an insurance policy with respect to the administration of claims under the Plan.[42]

107.    First, this issue is properly addressed at the Confirmation Hearing as the Motion does not request approval of any insurance provisions of the Plan.  To the extent the insurers believe the Plan or Confirmation Order impermissibly impairs their rights under their policies, they are entitled to object to confirmation of the Plan.

108.    Second, the Plan need not be insurance neutral to be confirmable.  Indeed, there is no doctrine of insurance neutrality that insulates insurers from the impact of a debtor's bankruptcy and there are no cases that have held that a plan must be "neutral" to be confirmable.[43]   And to the extent that the Plan modifies the insurers' contractual rights, such modification is permissible under section 1123(a)(5) of the Bankruptcy Code.  The Debtors will further demonstrate the appropriateness of the insurance provisions of the Plan at the

---

[42]    *Great America's Objection to Debtors' Disclosure Statement for Second Amended Chapter 11 Plan of Reorganization and Joinder* [D.I. 3271] at 2 (the "<u>Great American Insurer Objection</u>"); *Argonaut Insurance Company's Objection to Debtors' Disclosure Statement for Second Amended Chapter 11 Plan of Reorganization and Joinder* [D.I. 3285], at 2 (the "<u>Argonaut Objection</u>"), [D.I. 3523], at 10–14 and D.I. 6052 ¶ 9 (together, the "<u>AIG Objection</u>"), *The AIG Companies' Objection to Motion for Approval of Debtors' Disclosure Statement* [D.I. 3549], at 4, 10–14 (the "<u>Allianz Objection</u>"), *Objection of Liberty Mutual Insurance Company to the Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 3578], at 4–5 (the "<u>Liberty Mutual Objection</u>"); *Joinder and Supplemental Objection of Liberty Mutual Insurance Company to the Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6057], at 2–3, ¶ 13 (the "<u>Liberty Mutual Supplemental Objection</u>"); *Evanston Insurance Company's Objection to Amended Disclosure Statement for the Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6038] ¶¶ 6–7 (the "<u>Evanston Objection</u>"); *Certain Insurers' Supplemental Objection to Motion for Approval of Debtors' Disclosure Statement*  [D.I. 6052], ¶ 9 ("<u>Certain Insurers' Supplemental Objection</u>");[D.I. 6057] ¶ 13; *Century Indemnity Company's Objections to the Debtors' Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization* ()*Century's Objection to the Debtors' Disclosure Statement for the Fourth Amended Plan, Solicitation Procedures and Form of Ballots* 6–7, [D.I. 6065] (the "<u>Century Objection</u>"), collectively, the "<u>Insurer Objections</u>").

[43]    Tr. of Judge Drain Bench Ruling 36:13-14, *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 1, 2021) ("There is no such concept or requirement that a plan be insurance neutral.").

Confirmation Hearing, but, at this stage, the Court should overrule any objection on insurance neutrality grounds as it relates to the approval of the Disclosure Statement.

109.    And to the extent that the Plan modifies the insurers' contractual rights, such modification is permissible under section 1123(a)(5) of the Bankruptcy Code.  The Debtors will further demonstrate the appropriateness of the insurance provisions of the Plan at the Confirmation Hearing, but, at this stage, the Court should overrule any objection on insurance neutrality grounds as it relates to the approval of the Disclosure Statement.

### 4.    The Plan Contains Permissible Insurance Assignment Provisions.

110.    In its Objection, Century asserts that the Plan cannot be confirmed because it is an "unconfirmable plan" that seeks to "override the anti-assignment clause in an insurance contract without the insurer's consent."  Century Obj. [D.I. 6065 at 8].

111.    To be clear, the Debtors do not seek approval of any insurance assignment provisions of the Plan at this time.  As such, this issue is not ripe for judicial consideration and should be addressed at the Confirmation Hearing.  Century is nevertheless incorrect.  As the Debtors will demonstrate at confirmation, the Court has the power to assign the Debtors' insurance policies despite any anti-assignment provisions thereof.

112.    Century also contends that section 1129(a)(16) bars assignment by the Debtors of their insurance rights.  As a threshold matter, the Century Objection is premised on a fundamental misreading of section 1129(a)(16).  Applicable case law makes clear that this section only applies to unique provisions of state law related to non-profit entities, not all state laws of general applicability. *See In re Machne Menachem, Inc.*, 371 B.R. 63, 66-8 (Bankr. M.D. Pa. 2006) (specifically referencing N.Y. Not-for-Profit Corp. Law §§ 509, 510 in determining that a plan, which provided for sale of all of assets of debtor, not-for-profit corporation, did not violate 11 USCS § 1129(a)(16)); *In re Roman Cath. Archbishop of Portland in Or.*, No. 04-

37154, 2007 Bankr. LEXIS 1180, at *26 (Bankr. D. Or. Apr. 13, 2007) (confirming a chapter 11 plan of nonprofit where it did not violate chapter 65 of Oregon state law which governs non-profit corporations and, therefore, complies with section 1129(a)(16) requirements*); In re Albert Lindley Lee Mem'l Hosp.*, No. 09-30845, 2010 Bankr. LEXIS 4148, at *15–16 (Bankr. N.D.N.Y. July 15, 2010) (confirming a plan where order provided that: "[t]he Debtor shall comply with the provisions of Section 509 or Section 510 of the New York Not-for-Profit Corporation Law, which govern such transfers by a not-for-profit corporation such as the Debtor.  As a result, the Amended Plan is in compliance with section 1129(a)(16) of the Bankruptcy Code."); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1129.02[16] (16th ed. 2021) ("It keeps in place the state law restrictions on such nonprofit entities . . . .").

113.    Legislative history also clarifies the proper application of § 1129(a)(16). Along with sections 363(d)(1) and 541(f), the provision cited by Century was "enacted in response to the conflict between the debtor-in-possession and the Pennsylvania State Attorney General in the Chapter 11 cases of *In re Allegheny, Health, Education & Research Foundation* and its affiliates. AHERF was a nonprofit hospital chain which disposed of assets in its Chapter 11 case without complying with applicable Pennsylvania law procedures for sale of assets of a nonprofit corporation."  Richard Levin & Alesia Ranney Marinelli, *The Creeping Repeal of Chapter 11: The Significant Business Provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 79 Am. Bankr. L.J. 603, 643 (2005) (citing *In re Allegheny Health, Educ. & Research Found.*, 252 B.R. 309, 315 (W.D. Pa. 1999)); *see also* H.R. Rep. No. 109-31, pt. 1 at 113 (2005) (discussing three-pronged approach for ensuring that nonprofit debtor's property transfers comply with law applicable to such nonprofit).

114.    Century cites no state non-profit corporation law that prohibits the transfer of insurance rights, and the Debtors are aware of no such law.  Accordingly, generally applicable state laws not specific to non-profit corporations are not implicated by section 1129(a)(16).

115.    In its objection, Century argues that the Debtors, as a non-profit organization, cannot rely on *Federal-Mogul*, which permits *for-profit* debtors to override anti-assignment clauses in debtor insurance contracts in limited circumstances.  Century Obj. [D.I. 6065 at 8-9] (citing *In re Fed.-Mogul Glob.*, 684 F.3d 355, 382 (3d Cir. 2012)).  The Third Circuit, however, did not differentiate between for-profit and non-profit debtors in *Federal-Mogul*, which Century relies on for the erroneous proposition that the Debtors cannot accomplish the insurance rights transfer contemplated by the Plan.  *See In re Fed.-Mogul Glob.,* 684 F.3d at 355.

116.    Numerous courts, including the Third Circuit, have held that the transfer of a debtor's insurance rights to a personal injury trust is valid and enforceable pursuant to section 1123(a)(5) of the Bankruptcy Code, notwithstanding any anti-assignment provisions in such insurance policies.[44]

117.    In *Federal-Mogul*, the Third Circuit held that the debtors' plan did *not* violate anti-assignment provisions in relevant insurance policies where there was no evidence of collusion, the insurers had "no economic incentive to prevent [the] assignment, particularly whereas here, the events creating exposure to asbestos liability ha[d] already occurred," and

---

[44]    *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004) (providing that "even if the subject insurance policies purported to prohibit assignment of [the debtor's] insurance proceeds, these provisions would not prevent the assignment of proceeds to the bankruptcy estate"); *In re Fed.-Mogul Glob., Inc.*, 385 B.R. 560, 567 (Bankr. D. Del. 2008) ("[Section] 1123(a)(5)(B) expressly contemplates that the debtor's interests in the policies may be assigned to a trust or other entity."); *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 94-95 (Bankr. D. Del. 2006) (holding that insurance policies are property of the estate under section 541 and "[s]ection 1123(a)(5)(B) of the Bankruptcy Code expressly permits the assignment of a debtor's interest in insurance policies to a trust or other entity, even if the subject insurance policies contain a prohibition on assignment"); *In re Congoleum Corp.*, No. 03-51524, 2008 Bankr. LEXIS 2375, at *6 (Bankr. D.N.J. Sept. 2, 2008) ("[A] plan of reorganization may assign insurance policies to a personal injury trust despite the existence of anti-assignment clauses in those policies.").

"there [would] be no additional risk to the insurance companies by virtue of the assignments." *Federal-Mogul*, 684 F.3d at 379. Indeed, numerous other mass tort cases have confirmed plans that assign rights under insurance policies containing anti-assignment provisions.[45]

118. Further, nothing in section 1123(a)(5) limits its preemptive scope to only debtor contracts. *See* § 1123(a)(5) (providing adequate means for a plan's implementation "notwithstanding any otherwise applicable nonbankruptcy law").[46] The Debtors will further demonstrate the appropriateness of the insurance assignment provisions of the Plan at the Confirmation Hearing, but, at this stage, the Court should overrule any objection to the insurance assignment provisions as it relates to the approval of the Disclosure Statement.

**III.   The Solicitation and Procedural Objections Are Meritless or Have Been Addressed.**

119. The Debtors have engaged in efforts to resolve Objections to the proposed solicitation and voting procedures, but certain issues remain outstanding. Accordingly, the Objection Responses Chart attached hereto as **Exhibit B** summarizes (a) each of the Objections related to solicitation and voting procedures and related procedural issues (including those that the Debtors believe are resolved or moot) and (b) the Debtors' proposed responses thereto. The Debtors supplement certain of these responses in greater detail below, and submit that any remaining Objections should be overruled.

---

[45]     *See In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) [D.I. 1115] (confirming chapter 11 plan where debtors' insurance rights and policies were assigned to a trust and any anti-assignment contractual provisions were preempted); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 20, 2018) [D.I. 2116] (same); *In re Duro Dyne Nat'l Corp.*, No. 18-27963 (MBK) (Bankr. D.N.J. Oct. 23, 2020) [D.I. 1332] (same); *In re Leslie Controls, Inc.*, No. 10-12199 (CSS) (Bankr. D. Del. Oct. 28, 2010) [D.I. 382] (same).

[46]     For further discussion of non-debtor assignment, see *Joint Reply of the Future Claimants' Representative and the Coalition of Abused Scouts for Justice in Support of Debtors' Disclosure Statement for the Fifth Amended Plan, Solicitation Procedures and Form of Ballots*, filed concurrently herewith.

### A.    The Debtors' Proposed Solicitation Period Provides Sufficient Time for Abuse Survivors to Vote on the Plan.

120.    The TCC objects that the voting period should be at least 60 days.  [D.I. 3526, ¶ 121].  Under the revised proposed dates set forth in the Proposed Solicitation Procedures Order [D.I. 6215], the Debtors are proposing a voting period of at least 43 days or more, as many Solicitation Packages will go out prior to the Solicitation Date.  As stated in the Motion, this time period aligns with or exceeds the voting period provided in other large mass tort bankruptcy cases with a large number of creditors.[47]  In particular, in both *PG&E* (approximately 80,000 fire victim claims) and *TK Holdings* (approximately 56,000 potential PSAN inflator claims), the court approved voting periods of 45 days and 28 days, respectively.  The Debtors also note that approximately 95% of abuse survivors submitted a proof of claim listing a law firm, and most of these survivors listed on the forms that communications with their counsel were permissible. The Debtors submit that the prominence of counsel representation in the vast majority of the Direct Abuse Claims will provide added efficiency to the voting process and lends support to the reasonableness of the voting period.

### B.    The Debtors' Procedures with Respect to the Solicitation Directive Appropriately Incorporate the Instructions of Abuse Survivors on their Proofs of Claim.

121.    Among other Objections, the Tort Claimants' Committee asserts that the Debtors' proposed procedures disenfranchise survivors by not taking into account the wishes of survivors

---

[47]    *See, e.g.*, *In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) [D.I. 2863] (asbestos case approving 52 day solicitation period); *In re PG&E Corp.*, No. 19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) [D.I. 6340] (mass tort case approving 45 day solicitation period); *In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. Dec. 4, 2019) [D.I. 952] (mass tort case approving 28 day solicitation period); *In re Diocese of Duluth*, No. 15-50792 (Bankr. D. Minn. Aug. 27, 2019) [D.I. 400] (approving 33 day solicitation period for chapter 11 case addressing sexual abuse claims); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [D.I. 1639] (mass tort case approving 28 day solicitation period); *In re Archdiocese of Milwaukee*, No. 11-20059 (Bankr. E.D. Wis. Oct. 5, 2015) [D.I. 3278] (approving 28 day solicitation period for chapter 11 case addressing sexual abuse claims).

with respect to whether a survivor would like to vote on the Plan via master ballot or direct ballot.  D.I. 3526 at 59.  The Debtors have worked with both the Tort Claimants' Committee and the Coalition on the solicitation directive process, and believe that the procedures appropriately incorporate the elections that survivors made on their filed proofs of claim.  Under the Master Ballot procedure proposed by the Debtors, counsel that abuse survivors expressly listed on their proofs of claim may submit a Master Ballot documenting the vote of each of their abuse survivor clients, along with a certification that such counsel is authorized to do so.  This procedure, by which the Debtors have requested each counsel's preference with respect to master balloting or direct solicitation, rather than contacting around 82,200 abuse survivors individually, is particularly appropriate given the way in which a large majority of applicable Direct Abuse Claims were asserted against the Debtors.  The Debtors estimate that approximately 95% of Direct Abuse Claims listed that a survivor was represented by counsel.  It follows that the Debtors would solicit the preferences of such counsel—and only in cases where a survivor indicated on their proof of claim that communications regarding their claim may occur with listed counsel—with respect to solicitation on the Plan.[48]

### C.    It Is Not Relevant or Feasible for the Debtors to Identify a Local Council on Each Ballot.

122.    The Tort Claimants' Committee also asserts that survivors need to understand the Local Council that he or she is being asked to release by voting to accept the Plan, and that such information should (a) be included on the Ballots, and (b) for the over 30,000 claims for which the associated proof of claim does not identify a Local Council, the Debtors should "research"

---

[48]    With respect to a subset of claims where abuse survivors listed that they were represented by counsel but did not indicate that communications with counsel were permissible, such counsel were required to provide written verification from their abuse survivor client(s) that such counsel was authorized to receive the Solicitation Package on their behalf.

this information prior to solicitation.  (D.I. 3526 at 60.)  Under the Plan, abuse survivors will be asked to release <u>all</u> Protected Parties – including all Local Councils – in exchange for their substantial contributions to the Settlement Trust.[49]  Thus, the individual Local Council potentially associated with a given claimant is thus irrelevant from a voting perspective, and will be conclusively determined by the Settlement Trust in evaluating each Claim pursuant to the terms of the Trust Distribution Procedures.

123.    This information, as requested by the Tort Claimants' Committee, is also not something the Debtors can accommodate from a logistical standpoint under the structure of the Solicitation Procedures and Ballots and would jeopardize the Debtors' solicitation process and case timeline due to the amount of time it would take to individually research and review approximately 30,000 claims.

**D.    The Temporary Allowance of Abuse Claims at $1.00 Solely for Voting Purposes Is Proper.**

124.    Various Objectors make arguments that center around the temporary allowance of Abuse Claims at $1.00 for voting purposes, as follows:

- Century and Certain Excess Insurers assert that the Solicitation Procedures improperly value all Abuse Claims at $1.00 for voting purposes, despite evidence that claims may be deficient or illegitimate, in violation of section 1126(c) of the Bankruptcy Code (D.I. 3857 at 25–26; D.I. 5214 at 7–8; D.I. 6056 ¶ 6);

- Plaintiff Law Firms, Pro Se Claimant 242, and Zalkin Plaintiffs similarly assert the Solicitation Procedures ignore the requirement of section 1126(c) of the Bankruptcy Code because the Debtors cannot assess the degree of actual creditor support from claimants with enforceable claims through a $1.00 voting mechanism (D.I. 5955 *et al.*, ¶¶ 6–9; D.I. 6027; D.I. 6031, ¶¶ 9–16);

---

[49]    The Disclosure Statement sets forth each Local Council's total expected contribution to the Settlement Trust, including a specific break-down between the (i) cash contribution and (ii) property contribution.  *See* Disclosure Statement [D.I. 6213], Ex. C.

- Similarly, Certain Insurers make the same section 1126(c) argument and add that the procedures should account for state law rights so that the Plan is not confirmed over the votes of the in-statute claimants that are more likely to have a legitimate economic stake in the outcome of the Chapter 11 Cases (D.I. 6052, ¶¶ 49–52); and

- Plaintiff Law Firms and Zalkin Plaintiffs assert that time-barred abuse claims should be segregated and weighted according to their TDP discount values/Mitigating Scaling Factors on Schedule 1 of the TDP to ameliorate voting distortions from a $1.00 voting protocol and to properly account for varying state law/statute of limitation rights of abuse claimants (D.I. 5955 *et al.*, ¶¶ 6–9; D.I. 6031, ¶¶ 9–16).

125.    As with the use of a master ballot, the temporary allowance of a large body of contingent or unliquidated personal injury claims for voting purposes is a standard practice and ensures equitable voting for a large number of claimants in these chapter 11 cases.  Pursuant to Bankruptcy Rule 3018(a), the "court after notice and hearing may temporarily allow [any] claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." Fed. R. Bankr. P. 3018(a).

126.    The proposed temporary allowance of these claims at $1.00 is proper:  it considers the contingent or unliquidated nature of both Direct and Indirect Abuse Claims and invites equitable participation in the solicitation process.  Courts in numerous other mass tort and personal injury cases have allowed claims temporarily for limited purposes, including allowing such claims at $1.00 for voting purposes, in order to facilitate voting on plans of reorganization and ensure the adequate representation of tort victims.  As noted by the court in *A.H. Robins*, the placement of a nominal value on each claim for voting purposes was appropriate, as "[a]ny attempt to evaluate each individual claim for purposes of voting on the Debtor's Plan of Reorganization would, as a practical matter, be an act of futility, and would be so time consuming as to impose on many, many deserving claimants further intolerable delay all not only to their detriment, but to the detriment of the financial well being of the estate as well." *In*

*re A.H. Robins Co., Inc.*, 88 B.R. 742, 747 (E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 631 (Bankr. S.D.N.Y. 1986) (fixing asbestos claims at $1.00 for voting purposes and holding that "[i]t has been the stated goal of this court and of the parties in interest . . . to ensure the protection and participation of the interests of the asbestos health victims").

127.     The Objectors challenge the proposed temporary allowance of Abuse Claims at $1.00, but, to the extent they propose alternatives to this procedure at all, the practical limitations specifically addressed by the court in *A.H. Robins* are ignored.  *A.H. Robins*, 88 B.R. at 747. Here, the realities encountered by the court in *A.H. Robins* are also true.  The Settlement Trust will evaluate each individual claim, and to pre-suppose that fact-intensive, litigation-derived process now, prior to solicitation, would be futile and lead to intolerable delay and harm to the Debtors' estates.  The Zalkin Plaintiffs recognize as much and the impossibility of assigning values to disputed personal injury claims asserted on account of sexual abuse, stating that "[t]here is no efficient or consistent way to distinguish claims on the basis of severity.  A meaningful weighting of votes based on the nature of a claimant's injury or damage poses significant difficulties when faced with 82,200 separate claims, even if just estimating for voting purposes."  D.I. 6031 at 6–10.

128.     Certain of the Objections focus on the Trust Distribution Procedures' "Mitigating Scaling Factors" that propose to value Abuse Claims for voting purposes based on the statute of limitation scaling factors in the Trust Distribution Procedures.  Setting aside the unworkability of engaging in this analysis for over 80,000 Direct Abuse Claims prior to solicitation, this argument places the cart before the horse. Utilizing only a portion of the claims review and valuation process contemplated in Trust Distribution Procedures —for example, the statute of limitations

criteria or a severity analysis—for this purpose would lead to a proxy claim allowance process based on procedures that have not yet been approved.  As recognized by the court in *Johns-Manville*: "[T]he assignment of a value of $1.00 per claim is merely the temporary allowance contemplated by Bankruptcy Rule 3018(a), with the right reserved to each claimant to seek actual damages from the Asbestos Health Trust." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 651 (2d Cir. 1988) (Miner, J., concurring).

129.    Here, at the appropriate time and if the Plan is confirmed, the Settlement Trust will be the appropriate forum for each Abuse Claim to be evaluated, with the Settlement Trustee utilizing the full suite of procedures set forth in the Trust Distribution Procedures.  Picking and choosing certain provisions of the Trust Distribution Procedures to use as a proxy for claim value for voting purposes is unworkable.  For these reasons, the proposed $1.00 voting procedure also does not violate section 1126(c) and the Debtors can assess whether there is sufficient creditor support from holders of Abuse Claims using this procedure.  Indeed, in order for the Debtors to obtain approval of certain of the releases under the Plan, they will need overwhelming support of abuse claimants.

130.    Certain of the Objections cite to *Quigley* in support of the argument that Abuse Claims must be temporarily allowed at different amounts for voting purposes.  *See*, *e.g.*, D.I. 6056, ¶ 6 (citing *In re Quigley Co.*, 346 B.R. 647, 658 (Bankr. S.D.N.Y. 2006)).  In *Quigley*, at confirmation after the solicitation was completed, the court weighed unliquidated, disputed asbestos personal injury claims in accordance with the Trust Distribution Procedures matrix values assigned to the "particular impairment" of asbestos claims under the plan.  *Quigley*, 346 B.R. at 649.  The matrix values in a case with asbestos personal injury claims is fundamentally different than personal injury claims based on sexual abuse.  Here, the proposed Trust

Distribution Procedures recognize that the severity of alleged sexual abuse is not a harm that can be assigned a categorical value as is possible with diseases related to asbestos exposure. For each "tier" of sexual abuse, there is a wide range of potential allowed claim amounts, from a base matrix value to a maximum value is presented. If the Trust Distribution Procedures are approved, the value in this range for a particular claim will depend on a large number of scaling factors to be considered by the Settlement Trustee before arriving at a claim value. This determination will necessarily be a costly, time-consuming and fact-intensive process, and attempting to employ it now to determine temporary voting amounts is infeasible for voting purposes.

131.    As set forth in the Motion, the procedures proposed by the Debtors are substantially similar to procedures employed by bankruptcy courts in other large mass tort chapter 11 cases.[50] And, like in *Quigley*, any argument with respect to section 1126(c) is not properly before this Court at this stage of the case and should only be evaluated in connection with confirmation.

### E.    The Vote Tabulation Procedures Are Proper, and These Objections Are Functionally an Objection to the Plan.

132.    The Plaintiff Law Firms make various objections to the vote tabulation procedures, asserting that:

- the vote tabulation procedures should distinguish among claimants based on which Local Councils will be co-liable with the Debtors because some Local

---

[50]    *See*, *e.g.*, *In re PG&E Corp.*, No. 19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) [D.I. 6340] (approving procedures temporarily allowing fire victim claims at $1.00 for voting purposes); *In re Roman Cath. Bishop of Great Falls*, No. 17-60271 (Bankr. D. Mont. June 18, 2018) [D.I. 382] (approving solicitation procedures temporarily allowing abuse claims at $1.00 for voting purposes); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [D.I. 1639] (approving procedures temporarily allowing tort claims relating to Debtors' defective airbag inflators, whether based on personal injury, wrongful death, or economic loss, at $1.00 for voting purposes); *In re Cath. Diocese of Wilmington, Inc.*, No. 09-13560 (CSS) [D.I. 1317] (Bankr. D. Del. May 20, 2011) (approving procedures temporarily allowing abuse personal injury claims at $1.00 for voting purposes).

Councils are financially strong while others are financially weak (D.I. 5955 *et al.*, ¶ 5);

- the Debtors must separately tabulate the votes of creditors that may be affected by any Chartered Organizations designated as Protected Parties under the Plan before the Channeling Injunction may issue (D.I. 5955 *et al.*, ¶ 5); and

- Plaintiff Law Firms assert that the Solicitation Procedures do not provide a mechanism to determine whether there is sufficient support for the Plan's proposed release of Local Councils and Chartered Organizations because abuse survivors who did not name a Local Council or Chartered Organization in their proofs of claim are allowed to vote (D.I. 5955, ¶¶ 10–12).

133.    The argument by the Plaintiff Law Firms and Zalkin Plaintiffs that the vote tabulation procedures should distinguish votes among claimants based on what Local Councils and any Chartered Organizations that may be Protected Parties they may have claims against is inappropriate.  (D.I. 5955 *et al.*, ¶ 5).  Pursuant to the Plan, all Protected Parties will enjoy the protection of the channeling injunction and claimants that vote on the Plan can vote to accept or reject the Plan based on, among other things, their collective contributions.  The claimants are not conditionally voting on the Plan with respect to a particular Local Council or other Protected Party.  There is thus no need to distinguish or separately count the votes of claimants against particular non-debtor Protected Parties.   The vote of all Direct Abuse Claims in Class 8 will be relevant to the question of whether the standard for approval of a third party release of Local Councils is met.  As stated by the court in *Tribune*, the proper analysis is how a claim relates to the assets of the debtor, not of various non-debtor third parties.

134.    In effect, the relief sought in these Objections is unnecessary and is essentially a classification objection disguised as a solicitation objection, which can be appropriately addressed at the Confirmation Hearing.[51]

**F.    The Use of Modern Forms of Distribution of the Solicitation Packages Is an Appropriate and Efficient Use of Estate Resources Given the Number of Claimants in the Voting Classes and Costs of Mailing**

135.    The U.S. Trustee objects to the Debtors' distribution procedures for the Solicitation Packages, indicating that the Debtors ask to send "only a notice" containing instructions to access the solicitation materials online.  D.I. 3581 at 17.  The Debtors are proposing to mail the cover letter, the Confirmation Hearing Notice, and the applicable Ballot to the Voting Classes, any letters that may be filed from an official committee or the Coalition, and are proposing to provide prominent website hyperlinks to the Plan, the Disclosure Statement, and the Solicitation Procedures Order and exhibits.  Additionally, the Debtors are proposing to cause Solicitation Packages (including Ballots) to be emailed to any holders of Direct Abuse Claims whose votes are not being solicited via Master Ballot and who expressly indicated on their proof of claim that the Debtors are authorized to communicate with these holders regarding their claims via email.  *See* Bar Date Order, Ex. 7.  Further, as is made apparent in the solicitation

---

[51]    The Bankruptcy Code does not require that all claimants in a class recover the same amount, so long as their claims are substantially similar.  *See e.g., In re Resorts Int'l*, 145 B.R. at 448 (finding that class members with "stronger claims, or stronger defenses, than others . . . may be classified together so long as their claims are substantially similar and their treatment is approximately equal").  Courts in the Third Circuit analyze the similarity of claims in a class by reviewing the legal attributes of a claim as it relates to the assets of the debtor, not the similarities of a potential eventual distribution to a given claimant.  *See In re Tribune Co.*, 476 B.R. 843, 856 (Bankr. D. Del. 2012) ("Courts in this Circuit have interpreted 'substantially similar' as a reflection of the 'legal attributes of the claims, not who holds them.'  This analysis focuses on how the 'legal character of [a] claim relates to the assets of the debtor' and whether the claims 'exhibit a similar effect on the debtor's bankruptcy estate.'" (quoting *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bakr. D. Del. 2004)); *In re Frascella Enters., Inc.*, 360 B.R. 435, 442 (Bankr. E.D. Pa. 2007) ("The similarity of claims is not judged by comparing creditor claims inter se.  Rather, the question is whether the claims in a class have the same or similar legal status in relation to the assets of the debtor.").

materials, any party that prefers paper or another format of these documents may contact the Solicitation Agent to obtain these materials at no cost.

136.    These procedures respect the express indications in the case of abuse survivors, and reflect the realities of administering voting in a bankruptcy case with over 100,000 timely filed Abuse and Non-Abuse Claims.  And such procedures are not without precedent.  The Debtors anticipate that the Plan, the Disclosure Statement, and the Solicitation Procedures Order and exhibits alone will total well over 1,000 pages.[52]  If each document in the Solicitation Package was printed in full, the Debtors estimate a mailing cost for each Solicitation Package of at least $45.00, even after shrinking multiple pages onto each printed page—an exorbitant cost to the Debtors' estate.  Similarly, the Debtors estimate that mailing a USB drive would add $5.00 in increased mailing costs to the mailing of each Solicitation Package.

137.    In addition to the increased cost of printing and mailing the Plan, the Disclosure Statement, and the Solicitation Procedures Order and exhibits in the Solicitation Package, the Debtors note the absence of any objection to these mailing procedures from the Tort Claimants' Committee, the Coalition, and any individual abuse survivors or law firms.  Providing hyperlinks to a subset of documents provides the same level or superior access to these documents and reflects the modern reality of how many parties review documents and materials.  Any parties who need physical copies of documents—such as, as the U.S. Trustee notes, elderly claimants, will have clear instructions on how to obtain physical copies of these materials at no cost to them.  Multiple bankruptcy courts in and outside of this District have approved the provision of electronic copies of the plan and disclosure statement via website links in the solicitation

---

[52]    The Tort Claimants' Committee even notes in its Objection that the Disclosure Statement alone weighs in at "approximately two pounds," and proposes the addition of hyperlinks to certain additional disclosure documents.  D.I. 3526 at 9, 20, 45, 46.

package. *In re Drone LC, Inc.* (f/k/a *Lily Robotics, Inc.*), No. 17-10426 (KJC) (Bankr. D. Del. Aug. 1, 2017) [D.I. 435] (authorizing the provision of electronic copies of the plan and disclosure statement on a website instead of including copies of such documents in the solicitation package); *In re Draw Another Circle, LLC*, No. 16-11452 (KJC) (Bankr. D. Del. Dec. 19, 2016) [D.I. 1067] (same); *In re Dune Energy, Inc.*, No. 15-10336 (Bankr. W.D. Tex. Aug. 18, 2015) [D.I. 453] (same); *In re Borders Grp., Inc.*, No. 11-10614 (Bankr. S.D.N.Y. Nov. 14, 2011) (MG) [D.I. 2122] (same).

138.    Other specialized procedures have been approved by bankruptcy courts with respect to noticing in mass tort cases with a significant number of creditors, and the Debtors submit that these procedures are appropriate here.  For example, in *TK Holdings*, the bankruptcy court approved the use of a single postcard-sized notice to millions of potential airbag inflator personal injury claimants that combined notice of the bar date, provided hyperlinks to access the plan and disclosure statement, provided notice of the potential free and clear sale of substantially all assets of the Debtors, and provided an email address opt-in.  *See In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Oct. 4, 2017) [D.I. 959, Ex. A-2].  If personal injury claimants did not opt in and register their email address, they were not entitled to receive any further notices of any kind in the chapter 11 cases.  *Id.*  Similarly, other recent mass tort and non-mass tort bankruptcy cases have approved the dissemination of solicitation package materials to creditors via email.  *See*, *e.g.*, *In re PG&E Corp.*, No.  19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) [D.I. 6340] (permitting the dissemination of solicitation packages to fire victims in email format); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [D.I. 1639] (approving solicitation materials to be distributed via email to holders of personal injury and wrongful death claims); *In re Drone LC, Inc.* (f/k/a *Lily Robotics, Inc.*), No. 17-10426 (KJC)

(Bankr. D. Del. Aug. 1, 2017) [D.I. 435] (authorizing the transmission of solicitation packages by email to over 60,000 customers entitled to vote).

> G.    **The Debtors Are Not Required to Weed Out Abuse Claims Prior to Soliciting Votes on the Plan.**

139.    Much of Century's "objection" to the solicitation and voting procedures is an attempt to repeat and rehash its Bankruptcy Rule 2004 and 2019 motions that it has already briefed and argued. D.I. 3857 at 3–11; 5214 at 4–5; 6065 at 42.  Century argues that the Debtors' procedures are flawed because they do not seek to vet Abuse Claims prior to commencing solicitation, asserting that the Debtors are in violation of section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3018.  (D.I. 3857 at 11–12.)  Century also objects that the Disclosure Statement prejudices claimants by failing to provide the criteria for the disallowance of abuse claims and the number of viable abuse claims.  *See* [D.I. 3856] at 6-8.  Thus, Century argues, the Disclosure Statement Hearing must be delayed until after the Court has ruled on Century's pending Rule 2004 and 2019 motions and its motion for relief from Local Rule 3007-1(f), and Century has been able to conduct discovery regarding the abuse claims and litigate its objections. *See id.*

140.    The Court has heard argument and ruled on Century's Bankruptcy Rule 2004 and 2019 motions.  *See* Aug. 30, 2021 Hr'g Tr. at 46:8–9.  The Court ruled that it was "denying . . . at this time" the Rule 2004 motion on discovery of individual abuse claimants, which included Century's request related to Local Rule 3007-1(f).  *Id.*  This Objection should be moot on this basis.  The determination of the validity and amount of the abuse claims will occur in due course pursuant to the Trust Distribution Procedures.  Century's objection to this standard and customary process, dressed up as objections to the Debtors' solicitation procedures and disclosure, fails.

141.    As this Court has already ruled and the District Court has affirmed (despite Century's continued appeals), a claim has the effect that the Bankruptcy Code gives it.[53]   The effects are governed by section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3001(f), which prescribe that a proof of claim constitutes prima facie evidence of the validity and amount of a claim.[54]   Ignoring these statutory starting points for analysis of claims, Century asserts that the Debtors are impermissibly dispensing with judicial scrutiny of Abuse Claims prior to solicitation.   This represents a flawed analysis of the mechanics of plan solicitation and claim objection procedures.

142.    Claim objections or related procedures are not required to be commenced before confirmation of a Plan, nor is "judicial scrutiny" of a claim a precursor to solicitation.   For example, in *Kane v. Johns-Manville Corp.*, the Second Circuit held that "objections to claims need not be resolved before voting on a plan may occur."   *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 646 (2nd Cir. 1988); *see also In re DeSardi*, 340 B.R. 790, 794 (Bankr. S.D. Tex. 2006) (noting that procedures for claim objection are distinct from plan confirmation procedures, and finding that claim objections may be resolved after a plan is confirmed).   Century asserts that Bankruptcy Rule 3018 grants the Court judicial scrutiny that the Debtors somehow abrogate, but fails to note the full context of the portion of Bankruptcy Rule 3018(a) upon which it relies: "*Notwithstanding objection to a claim* . . . , the court . . . may temporarily allow the claim . . . in an amount which the court deems proper for the purpose of accepting or rejecting a plan."   Fed.

---

[53]     *See* Memorandum Opinion at 4 ("[T]he return of [the] proof of claim form has the effect that the [Bankruptcy] Code gives it." (quoting D.I. 675, May 18, 2020 Hr'g Tr. at 70:2–6)).

[54]     *See In re Milbourne*, 557 B.R. 376, 388 (Bankr. E.D. Pa. 2016) ("A proof of claim is deemed allowed, unless a party in interest . . .  If properly filed, a proof of claim is prima facie evidence of the validity and amount of the claim, even if an objection is filed.") (citing 11 U.S.C. § 502(a)); *In re AgFeed USA, LLC*, No. 13-11761, 2015 Bankr. LEXIS 1403, at *9 (Bankr. D. Del. Mar. 11, 2015 ("The filing of a proof of claim constitutes prima facie evidence of the validity of the claim.")).

R. Bankr. P. 3018(a) (emphasis added).  As is discussed above, the Debtors do not violate section 502(a) by assigning the right to prosecute Abuse Claims exclusively to the Settlement Trust, and this has been approved over objection in other mass tort cases.  Similarly, temporarily allowing a large body of contingent, unliquidated Abuse Claims for voting purposes pursuant to Bankruptcy Rule 3018(a) is a standard procedure in similar bankruptcy cases and ensures that a large body of claimants may still participate in the voting process.

143.    For the same reasons noted above, Century inappropriately ties claim objection procedures to the confirmation process for a plan—these are independent processes that may be handled independently in a bankruptcy case, particularly one with a material number of contingent, unliquidated claims that the Debtors seek to exclusively channel to a trust.

144.    None of the cases cited by Century stand for the proposition that a disclosure statement cannot be approved until the debtor has investigated the merits of each unliquidated tort claim asserted against it.  *See In re Rosenblum*, No. 18-17155-MKN, 2019 Bankr. LEXIS 2278, at *16–17 (Bankr. D. Nev. July 15, 2019) (rejecting disclosure statement for failing to "disclose and account for" a proof of claim with liquidated secured and priority amounts); *In re Acemla De P.R. Inc.*, No. 17-2021 ESL, 2019 Bankr. LEXIS 182, at *60 (Bankr. D.P.R. Jan. 22, 2019) (rejecting disclosure statement for failing to mention a "contract that provides [debtor] the right to administer songs"); *In re Kiklis*, 352 B.R. 355, 360 (Bankr. D. Mass. 2006) (rejecting disclosure statement for failing to disclose treatment of mortgage creditors' undersecured claim). Indeed, contrary to Century's claims, "[t]here is no requirement in case law or statute that a disclosure statement estimate the value of specific unliquidated tort claims." *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 697 (4th Cir. 1989).  Likewise, there is no legal basis to permit Century to hold up the Debtors' cases while it investigates more than 82,200

claims and then litigates its claims objections.  In fact, in many cases the claims resolution process even extends past plan confirmation. *See e.g.*, *Remington Outdoor Company*, No. 20-81688 (Bankr. N.D. Ala. 2020) [D.I. 1370] (confirming chapter 11 plan providing for post-confirmation claims resolution process); *In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (Bankr. D. Del. 2020) [D.I. 1487] (same); *In re Insys*, 19-11292 (Bankr. D. Del. 2020) [D.I. 1115] (same).

> **H.      The Debtors' Master Ballot Procedures Are Sufficient, and the Court Does Not Need to Require Counsel to Comply with Bankruptcy Rule 2019 Prior to Recording Abuse Survivor Clients' Votes on a Master Ballot.**

145.    Century also objects to the Master Ballot procedure that the Debtors have proposed, arguing that the Debtors' procedures do not require a showing that counsel is authorized to cast votes on claimants' behalf and should require counsel to comply with Bankruptcy Rule 2019.  D.I. 3857 at 14-16.  The master ballot process in this case is an efficient procedure that accounts for the manner in which a large majority of Direct Abuse Claims have been asserted against the Debtors (i.e., by counsel working on behalf of individual claimants) as well as the significant number of Direct Abuse Claims that have been asserted (approximately 82,200 unique, timely filed Direct Abuse Claims).  Similar master ballot procedures have been approved by bankruptcy courts in connection with the solicitation of votes of tort claimants in other chapter 11 cases, and are appropriate here.[55]  *See*, *e.g.*, *In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 426 (Bankr. D. Md. 2007) ("The use of master ballots in mass tort cases is a long-standing procedural mechanism that has been employed almost as a matter of course.").

---

[55]     *See, e.g.*, *In re PG&E Corp.*, No. 19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) [D.I. 6340] (approving procedures to allow authorized counsel to submit master ballots documenting the votes of fire victims); *In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) [D.I. 952] (Bankr. D. Del. Dec. 4, 2019) (authorizing master and class ballots for tort claimants); *In re Maremont Corp.*, No. 19-10118 (KJC) (Bankr. D. Del. Jan. 23, 2019) [D.I. 30] (approving use of master ballots for attorneys of record for recording votes of asbestos personal injury claimants).

146. Despite Century's assertion that "[t]he Debtor's proposed procedures require no showing that counsel is authorized to cast votes on the claimants' behalf," the master ballots and related procedures in other cases, as in this case, have sufficient certification procedures in place. Law firms submitting votes on a Master Ballot are simply documenting the votes of their Abuse Survivor Clients in compliance with Bankruptcy Rule 3018(c), which provides that "[a]n acceptance or rejection shall . . . be signed by the creditor . . . or an authorized agent." The Master Ballot requires each law firm to certify that it has collected and recorded the votes of each of its abuse survivor clients through customary and accepted practices or that it has authority to under applicable law to vote to accept or reject the Plan on behalf of each of its clients. D.I. 2726, Ex. 2-5. Importantly, the master ballots preserve the Debtors' ability to request – from any or all firms submitting a master ballot – a valid power of attorney or other written documentation evidencing such authority.[56] *Id. See In re Quigley Co.*, 437 B.R. 102, 122 (Bankr. S.D.N.Y. 2010) (holding that master ballots were a valid method of submission as long as each attorney certified to its authority to vote on behalf of multiple claimants). Century's argument that there are no procedures to demonstrate that counsel is authorized to cast votes simply rehashes its earlier arguments that seek to deprive Direct Abuse Claims of *prima facie* validity under section 502(a) and Bankruptcy Rule 3001. Century objects to the Debtors' procedures because they do not require that counsel comply with Bankruptcy Rule 2019 prior to signing a Master Ballot. D.I. 3857 at 14. For the reasons just discussed, the Debtors' procedures comply with Bankruptcy Rule 3018(c), which governs the form for acceptance or rejection of the Plan.

---

[56] Bankruptcy Rule 9010(c) expressly excludes voting on a plan from the requirement that a power of attorney be submitted showing the authority of an agent. Fed. R. Bankr. P. 9010(c) ("The authority of any agent, attorney in fact, or proxy to represent a creditor for any purpose other than the . . . acceptance or rejection of a plan shall be evidenced by a power of attorney conforming substantially to the appropriate Official Form.").

147.    As recognized by the Court in *Baron & Budd*, "courts have described Rule 2019 as a 'disclosure provision' designed to ensure that lawyers involved in the Chapter 11 reorganization process adhere to certain ethical standards and approach all reorganization related matters openly and subject to the scrutiny of the court." *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 165 (D.N.J. 2005) (citing cases).    The "representation" requirement of Bankruptcy Rule 2019 does not include filing proofs of claim. *See* 9 Collier on Bankruptcy ¶ 2019.02 (16th ed. 2021).    Here, given the bar date procedures employed, the concerns raised in other cases involving asbestos liability in which there is nobar date and thus claimant representations and the body of creditors may be unknown are distinguished. .    Law firms and counsel have been disclosed on proof of claim forms in this case in connection with the bar date, and Century and other parties in interest have access to this claims information.

148.    Century also asserts that the procedures and Master Ballot fail to comply with Bankruptcy Rule 3018(a), which "confers on the Court . . . the authority to determine which claims are valid for voting purposes."    D.I. 3857 at 15.    But that is precisely why the Debtors have asked the Court, pursuant to the Motion, to temporarily allow Direct and Indirect Abuse Claims in the amount of $1.00 in the aggregate per claimant solely for voting purposes.    The Debtors seek the Court's authority on this procedure, in addition to the Court's approval of the Master Ballots—all of which are procedures that promote efficient and equitable procedures for abuse survivors and holders of Indirect Abuse Claims.

I.    **The Master Ballot and Related Procedures Do Not Improperly Disenfranchise Holders of Abuse Claims and Do Not Give Undue Influence to the Coalition Law Firms.**

149.    Century asserts that three features of the Solicitation Procedures give undue control over the voting process to claimant law firms that have already filed tens of thousands of

improper claims.  The first feature is that the procedures permit law firms to use Master Ballots, which will invite abuse and taint the solicitation process.  As the Debtors have relayed in detail above, the Master Ballot procedures are an appropriate and efficient procedure to employ in a case with approximately 82,200 unique, timely filed Direct Abuse Claims.  As discussed above, these claims have been appropriately filed on the proof of claim form approved by the Court and as such are prima facie evidence of the validity of the claims.

150.    Moreover, approximately 95% of abuse survivors submitted a proof of claim listing a law firm, and most of these survivors listed on the forms that communications with their counsel were permissible.  The Debtors are entitled to rely on this information and to correspond with counsel that abuse survivors have expressly disclosed to the Debtors—particularly given the realities of administering solicitation and voting procedures in a chapter 11 case with claims of this magnitude.  As discussed above, master ballots have been used in many similar mass tort reorganization cases.

**1.    The Certification on the Master Ballot Does Not Invite Manipulation of Voting.**

151.    Century's second argument with respect to undue influence by the Coalition is that the Master Ballot's certification feature is unlawful and will enable manipulation of voting. Century claims that the certification vitiates Bankruptcy Rule 2019, and adds that this Court should require law firms acting on behalf of multiple claimants to file evidence of their authority to vote for their clients on this specific Plan.  Century adds that the Court should then make a determination of the attorney's authority, and then allow parties in interest to object.  D.I. 3857 at 19-21.  An endless string of review of an attorney's authority to act exceeds the bounds of what is appropriate or necessary here.  The Debtors have discussed above the appropriateness of the certification on the Master Ballot and its compliance with Bankruptcy Rule 3018(c).  As such,

the Debtors are entitled to rely on the certifications of counsel representing holders of Direct Abuse Claims that they are authorized to record and submit their votes. As discussed above, Bankruptcy Rule 9010(c) expressly excepts an attorney voting on a plan from being required to submit a power of attorney, and in the Solicitation Procedures the Debtors specifically reserve the right to request evidence from any law firm submitting a Master Ballot of such firm's authority to act. This is sufficient for voting purposes.[57]

### 2.   The Solicitation Procedures Do Not Give Undue Influence to Coalition Firms, and Coalition Firms Are Not Precluded from the Use of Master Ballots.

152.    Finally, Century argues that the Solicitation Procedures give undue influence to the law firms that make up the Coalition, and the Coalition firms have various conflicts of interest and lack authority to use Master Ballots. D.I. 3857 at 25–26. This Objection appears to be based on a misunderstanding of the Master Ballot procedure, which is a matter of efficient case administration in a case with claims of this magnitude. The Master Ballot is simply a tool to aggregate the votes of a law firm's abuse survivor clients. As the Debtors state prominently in bold text in the Motion, while the Master Ballot and other special solicitation procedures proposed for holders of Abuse Claims "are intended to expedite and streamline the transmission of information to holders of Direct Abuse Claims, increase voter participation, and better ensure such claimants are empowered to make informed and meaningful decisions as to whether to accept or reject the Plan, each voting decision rests exclusively with the Abuse Survivor Client." Motion ¶ 40. As discussed above, the Debtors are entitled to rely on the submission of the proofs of claim, which were signed and submitted under penalty of perjury, as demonstrating

---

[57]    As a practical matter, given the sheer number of Direct Abuse Claims, there are significant administrative complexities to requiring law firms to submit a power of attorney for each claimant for which a firm intends to submit a vote via Master Ballot for review by the Court, in addition to confidentiality considerations.

their prima facie validity pursuant to section 502(a) and Bankruptcy Rule 3001. Sufficient safeguards are in place with respect to the Debtors' Solicitation Procedures.

## IV.     Other Miscellaneous Objections Are Meritless or Have Been Addressed.

### A.     The Bar Date Notice to Indirect Abuse Claimants Was Sufficient and No Further Notice Is Necessary.

153.    Certain of the Objectors argue in the Supplemental Objections that the Debtors' bar date notice was inadequate with respect to certain holders of Indirect Abuse Claims and denied the Chartered Organizations due process by not providing proper notice that they should file proofs of claim. *See*, *e.g.*, Abuse Claimant 242 Supp. Obj. [D.I. 6027, ¶ 9]; Catholic and Methodist Committees' Obj. [D.I. 6067, ¶ 81]. To the contrary, from June 10, 2020 to June 19, 2020, Debtors' Notice and Claims Agent ("**Omni**") served (i) the General Bar Date Notice and General Proof of Claim and Instructions to a comprehensive set of recipients on the Core/2002 Service List and Additional Service List, (ii) the Abuse Claims Bar Date Notice and Sexual Abuse Survivor Proof of Claim and Instructions to a comprehensive set of recipients on the Abuse Claims and Confidential Service List, and (iii) the Notice of Deadlines Requiring Filing of Proofs of Claim and the Official Form 410 to a comprehensive set of recipients on the Restoration Plan Service List, including Chartered Organizations. *See Aff. of Service* [D.I. 1112]. On July 2, 2020, Omni served the Supplemental Letter and Official Form 410 to a comprehensive set of recipients on the Supplemental Additional Service List, including Chartered Organizations. *Id.* From June 10, 2020 to June 19, 2020, Omni served the ScoutNet Email Notice to over 9 million employees, volunteers, and registered Scouting participants maintained in the electronic ScoutNet database maintained by the Debtors. *Id.* On July 6, 2020, Omni served the Community Outreach Letter and Abuse Claims Publication Notice to 66,926 parties via first-class mail and 3,523 parties via email. *Id.* Furthermore, on October 17, 2020,

Omni served the Notice of Deadlines Requiring Filing of Proofs of Claim and the Official Form 410 to a comprehensive set of recipients on the Service List. *See Suppl. Aff. of Service* [D.I. 1641]. Accordingly, Debtors have more than adequately provided sufficient notice of the bar date on all relevant parties and no further service or noticing is required.

**B.      The Debtors' Proposed Confirmation Schedule Is Appropriate Under the Circumstances.**

154.      Certain of the Objectors argue that the Confirmation Schedule is unreasonable. *See e.g.*, AIG Obj. ¶¶ 57-59. These Objections are unnecessary and ill-founded. As previously explained in the *Debtors' Omnibus Reply to Objections to Motion for Entry of Order (I) Scheduling Certain Dates and Deadlines in Connection with Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relief* [D.I. 4104] (the "Confirmation Scheduling Reply"),[58] the Debtors filed the Confirmation Scheduling Motion to jump-start the process of setting dates, deadlines, and related procedures in connection with confirmation, so that discovery and other pre-hearing proceedings can be conducted as fairly and efficiently as possible, with the goal of ensuring abuse survivors receive equitable compensation and the Debtors emerge from bankruptcy to continue their charitable mission as promptly as possible. The arguments now urged in the supplemental objections have already been addressed, including in the Confirmation Scheduling Reply, and the Debtors will not repeat arguments they have previously made in full herein. Nevertheless, for convenience, the Debtors will again clarify several key points.

155.      As an initial matter, the Confirmation Scheduling Motion is neither premature, outdated, nor unreasonably compressed, as urged by the objectors. First, it was and remains

---

[58]      Capitalized terms used in this Section III.L and not otherwise defined herein have the meanings set forth in the Confirmation Scheduling Reply.

entirely appropriate for the Debtors to raise the issue of confirmation scheduling alongside approval of the Disclosure Statement.  The Debtors are not asking that the Court set the schedule before then, but rather seeking to ensure that matters progress swiftly and without interruption. Second, with the intentionally flexible parameters of the Confirmation Scheduling Motion[59] and the recent filing of the further revised proposed order, *see Notice of Filing of Further Revised Proposed Confirmation Scheduling Order* [D.I. 6216], the scheduling request is not stale.  Third, the schedule is appropriate in light of the circumstances, including the fact that the parties have already had significant time to conduct confirmation-related discovery and the critical need for the Debtors to promptly emerge.

156.    Additionally, as previously explained, the Debtors' proposed schedule and protocols can be adjusted to address fair concerns, while still maintaining the schedule's integrity and the Debtors' key goals.  The Debtors have proposed a schedule and related procedures that they believe are appropriate under the circumstances and consistent with due process, while also making clear that they expect, appreciate, and are open to incorporating the feedback of other parties in interest, to reach an order that allows the process to properly progress.  Should any part of the procedures prove to truly be unmanageable, the proposed order specifically contemplate the parties' ability to work together to solve problems or come back to this Court for further intervention as needed.  And although the Debtors do not agree with the proposed alternative schedule contained in the *Certain Excess Insurers' Objections to the Debtors' Proposed Confirmation Schedule* [D.I. 6060], the Debtors remain willing to consider specific concerns and accommodations to reach as much consensus as possible.  Where consensus cannot be achieved,

---

[59]    *See, e.g.*, Confirmation Scheduling Reply ¶¶ 17, 22.

it is entirely ripe and appropriate for the Court to decide and enter a schedule that allows matters to move forward.

157.    Accordingly, the Court should grant the Debtors' Confirmation Scheduling Motion and set deadlines, procedures, and any related relief necessary to ensure that the confirmation proceedings progress in a fair and efficient manner, without undue delay.

## **CONCLUSION**

WHEREFORE, the Debtors request that the Court (i) overrule the Objections and approve the Disclosure Statement, as modified prior to the Disclosure Statement hearing and subject to such further modifications presented by the Debtors to, or ordered by, the Court at the Disclosure Statement hearing, (ii) enter the proposed Solicitation Procedures Order, (iii) grant such other and further relief as the Court deems just and proper.

Dated:  September 16, 2021
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Paige N. Topper*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@morrisnichols.com
      aremming@morrisnichols.com
      ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com
      blair.warner@whitecase.com

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION