**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Hearing Date**: **October 19, 2021 at 10:00 a.m. (ET)** **Objection Deadline**: **October 1, 2021 at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR PROTECTIVE ORDER AND RELATED RELIEF

Boy Scouts of America (the "**BSA**") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession (together, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), submit this motion (this "**Motion**")[2] pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, Rule 7026 of the Federal Rules of Bankruptcy Procedure and Delaware Local Bankruptcy Rule 9019-5(d), for entry of an order, substantially in the form attached hereto as **Exhibit B** (the "**Proposed Order**"). In support of this Motion, the Debtors state as follows:

## PRELIMINARY STATEMENT

1. The Insurers have repeatedly argued that (i) the Debtors have improperly withheld or redacted information based on mediation privilege, (ii) the need for a finding of good faith of the Debtors for confirmation will waive privilege, and (iii) documents that include privilege

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not defined in this Motion have the meanings ascribed to them in the *Fifth Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6212] (as it may be amended, modified or supplemented, the "**Plan**").

redactions are inadmissible.  The Insurers are wrong, and these issues threaten to predominate before and during the confirmation hearing and unnecessarily disrupt the hearing.  Additionally, the Insurers have repeatedly sought relief with respect to these issues on the eve of hearings, on shortened notice, creating unnecessary burden and distraction for the Court and the other parties in this case.  The Debtors seek to resolve these outstanding issues now (i) so that confirmation discovery can be streamlined and proceed efficiently without any further disputes about the information that can be sought and produced, (ii) to determine the appropriate bounds of discovery in connection with the confirmation hearing, (iii) so that the parties can present the Court with a sufficient and complete evidentiary record to resolve this case on the merits at confirmation, (iv) to ensure that the confirmation hearing proceeds in an efficient manner, and (v) to prevent unnecessary motions on shortened notice to address these matters or an additional matter before confirmation.

## **BACKGROUND**

2.      The Debtors commenced these cases on February 18, 2020 (the "**Petition Date**"), and they continue to operate their non-profit organization and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases are being jointly administered for procedural purposes only pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

3.      On March 5, 2020, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of tort claimants (the "**Tort Claimants' Committee**") and the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.  On April 24,

2020, the Court appointed James L. Patton, Jr. as the legal representative of future abuse claimants (the "**Future Claimants' Representative**") pursuant to sections 105(a) and 1109(b) of the Bankruptcy Code.  No trustee has been appointed in these chapter 11 cases.  On July 24, 2020, the Coalition of Abused Scouts for Justice (the "**Coalition**"), an ad hoc group representing the interests of Abuse survivors, filed its *Notice of Appearance and Request for Service of Notices and Documents* [D.I. 1040].

4.    On June 9, 2020, the Court entered the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation and (III) Granting Related Relief* [D.I. 812] (the "**Mediation Order**").  The Mediation Order appoints The Honorable Kevin Carey (Ret.), Paul Finn, and Timothy Gallagher as mediators "for the purpose of mediating the comprehensive resolution of issues and claims in BSA's chapter 11 case through a chapter 11 plan . . . includ[ing], without limitation, all matters that may be the subject of a motion seeking approval by the Court of solicitation procedures and/or forms of plan ballots, a disclosure statement, or confirmation of a chapter 11 plan."  Mediation Order ¶ 2.  The Mediation Order incorporates Local Rule 9019-5(d).  *Id.* ¶ 7.

5.    Following more than a year of mediation, on July 1, 2021, the Debtors entered into a Restructuring Support Agreement with the Tort Claimants' Committee, the Future Claimants' Representative, the Coalition, the Ad Hoc Committee of Local Councils, and certain State Court Counsel (as it may be subsequently amended, modified, or supplemented, the "**RSA**") and filed a motion to approve the RSA [D.I. 5466] (the "**RSA Motion**").[3]  The following day, the Debtors filed the *Fourth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and*

---

[3] On July 28, 2021, the Debtors filed the *First Amendment to Restructuring Support Agreement* [D.I. 5813].  On August 4, 2021, the Debtors filed a *Notice of Additional Joining Parties to the Restructuring Support Agreement* [D.I. 5868].

*Delaware BSA, LLC* [D.I. 5484] and an amended disclosure statement in connection with that plan [D.I. 5485].

6.    On July 23, 2021, certain of the Debtors' insurers (the "**Insurers**") filed the *Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* [D.I. 5729] (the "**First Motion to Compel**"), and on August 4, 2021, the Insurers filed the *Moving Insurers' Motion to Compel and for Additional Relief and in the Alternative Motion in Limine* [D.I. 5881] (the "**Second Motion to Compel**").  These motions were accompanied by motions to shorten notice, and were heard on only six days' and eight days' notice, respectively.  *See* D.I. 5732, 5883.  As the Court remarked: "[I]f this issue of mediation privilege and withholding of documents was evident on July 8th . . . it really should have been brought to me sooner . . . bringing issues to me at the last minute is not helpful." July 27, 2021 Hr'g Tr. at 24:1-7.

7.    The First and Second Motions to Compel sought to compel the production of documents prepared for the purpose of, and in the course of, the mediation that are protected by, among other things, the mediation privilege and the attorney-client privilege.  The Insurers also asked this Court to rule that the production of non-privileged information on related subjects affected a waiver.  Additionally, the Insurers requested that, if the Debtors were not compelled to produce the protected materials the Insurers sought, then the Debtors be precluded from offering certain non-privileged information into evidence.  *See* First Motion to Compel at 18-20; Second Motion to Compel at 10-18; *see also Hartford's Motion to Strike and/or in Limine to Exclude the Testimony of Roger C. Mosby* [D.I. 5771].  The Insurers repeated their requests for production of privileged materials or, in the alternative, the preclusion of certain non-privileged information at the hearing in connection with the RSA Motion.

8.      The Insurers and other parties in interest will raise the same privilege issues in connection with confirmation discovery.[4]  Indeed, Century has already emailed the Debtors seeking production of privileged materials, such as (i) "All Documents that refer or relate to any request that You support a motion, application or inclusion of a provision in a Plan of Reorganization that calls for the payment of money to Brown Rudnick LLP for their fees and/or costs," which arose entirely in the context of the mediation and relate to core terms of the agreed settlement between the Debtors and the Coalition reached in mediation, and (ii) "All Documents and Communications that BSA exchanged with any Chartered Organizations concerning the RSA, the Term Sheet, the TDPs, and/or the Hartford Settlement," which also arose entirely in the context of the mediation and relate to the Debtors' efforts to settle with the Chartering Organizations (including TCJC, which settlement has now been consummated in mediation).  *See* Exhibit A (September 16, 2021 Email from T. Schiavoni to M. Andolina).[5]  It is critical that the Debtors confirm the Plan as expeditiously as possible, both to timely and equitably compensate abuse survivors and to allow the charitable mission of the BSA to continue without further impediments. Delays in the confirmation discovery process due to parties' failure to promptly challenge the Debtors' privilege assertions—as the Insurers delayed in raising these issues on the RSA Motion—

---

[4] Counsel to the Roman Catholic and United Methodist Ad Hoc Committees also challenged the Debtors' instructions to Mr. Mosby at his deposition not to disclose any communications with counsel regarding the Debtors' indemnification obligations to the chartering organizations, if any.  *See* Aug. 16 Hr'g Tr. at 200:12-201:3.  Communications with counsel on this issue are plainly privileged, and counsel to the Roman Catholic and United Methodist Ad Hoc Committees did not offer any basis for seeking their disclosure.

[5] Century argues incorrectly that, pursuant to the Mediation Order, because the Debtors seek a good faith finding as required by section 1129, the mediation privilege has been waived.  *See* Ex. A. ("The mediation order is crystal clear what happens when a party puts good faith affirmatively at issue in this manner.").  To the contrary, the Mediation Order expressly provides that Local Rule 9019-5 governs the mediation, and carves out an exception only in a circumstance where "a Party puts at issue any good faith finding concerning the mediation *in a subsequent action concerning insurance coverage*".  Mediation Order ¶ 7 (emphasis added).  The Debtors are seeking a good faith finding in these Chapter 11 Cases (as the Bankruptcy Code requires), not in a subsequent action, and not in connection with insurance coverage.

will burden the Debtors' estates with unnecessary costs and unnecessarily burden the confirmation hearing.  In accordance with the Court's direction that the parties "think about how discovery is going to be conducted to promptly get us to a confirmation hearing," (Aug. 30, 2021 Hr'g Tr. at 47:2-3), the Debtors file this Motion to resolve the challenges to privilege over specific categories of documents, to ensure that only non-privileged information is pursued and provided in discovery, to ensure that the Court has a full and proper record at confirmation, and to provide for an efficient confirmation hearing that is not burdened with constant objections to questions and exhibits based on the same privilege challenges.

## **RELIEF REQUESTED**

9.      The Debtors request that the Court enter the Proposed Order substantially in the form attached hereto as **Exhibit B** (the "**Proposed Order**"),

(a) authorizing the Debtors to withhold, or redact where appropriate, on the basis of privilege, the following categories of documents, as reflected on **Exhibit 1** to the Proposed Order, and not to testify about those matters:

(1) meeting minutes of, or presentations to, the National Executive Committee, National Executive Board, and Bankruptcy Task Force where those minutes or presentations reveal attorney-client communications, attorney work product, or communications made or information provided in any of the mediation sessions;

(2) communications between mediation parties regarding the terms of the Hartford Insurance Settlement Agreement, TCJC Settlement Agreement, RSA, Plan, Trust Distribution Procedures ("**TDPs**"), and the mediated matters, including without limitation, other documents filed with the Plan; and

(3) drafts of settlement proposals exchanged between mediation parties, including, without limitation, the Hartford Insurance Settlement Agreement, TCJC Settlement Agreement, RSA, Plan, TDPs and other documents filed with the Plan (collectively, the "**Privileged Documents**");[6]

(b) providing that any documents containing privilege redactions in accordance with this paragraph shall not be precluded from being offered into evidence solely on the basis of those redactions; and

(c) precluding parties from objecting to the Plan pursuant to section 1129(a)(3) of the Bankruptcy Code on the grounds that the Debtors withheld or redacted the Privileged Documents in compliance with the Proposed Order.

## ARGUMENT

10.     The materials at issue are privileged.  Additionally, the invocation of privilege does not establish a waiver or otherwise allow for the extreme sanction of a preclusion order.

### A. Mediation Privilege Is an Important Policy Needed To Promote Candor and Settlements

11.     It is well recognized that mediation is an important vehicle to resolving disputes. *See, e.g.*, *Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 524 F.3d 1235, 1240, (11th Cir. 2008) (noting that mediation "help[s] the disputing parties reach a mutually agreeable solution" and "facilitates communication and negotiation between parties to assist them in reaching a voluntary agreement regarding their dispute").  As this Court has observed: "There is no question

---

[6] As they did with the TDP drafts, the Debtors are preparing privilege logs regarding communications between mediation parties exchanging drafts of the Hartford and TCJC Settlement Agreements and supporting documentation. The Debtors intend to file these logs with the Court and serve them on the parties before the start of the Disclosure Statement Hearing.

that mediation is an important process and we use it in bankruptcy not infrequently to come to consensual resolutions of cases." Aug. 12, 2021 Hr'g Tr. at 58:6-8.

12.     Courts in this district have long recognized that maintaining the confidentiality of communications in mediation is vital to effectively resolve disputes and promote settlement. *See, e.g.*, *In re Student Fin. Corp.*, No. 04-56423, 04-1551 JJF, 05-165-JJF, 2007 U.S. Dist. LEXIS 95882, at *5 (D. Del. May 25, 2007) ("The judicial system encourages the resolution of disputes by mediation and settlement.   It is axiomatic that the assurance of confidentiality for communications made during the course of settlement negotiations is a critical component of the process."); *Wilmington Hosp. v. New Castle Cnty.*, 788 A.2d 536, 541 (Del. Ch. 2001) ("Confidentiality of all communications between the parties or among them and the mediator serves the important public policy of promoting a broad discussion of potential resolutions to the matters being mediated.").

13.     "Without the expectation of confidentiality, parties would hesitate to propose compromise solutions out of the concern that they would later be prejudiced by their disclosure." *Id*.  As Judge Carey observed in *Tribune*: "Assuming they would even agree to participate in the mediation process absent confidentiality, participants would necessarily feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute.   The effectiveness of mediation would be destroyed, thereby threatening the well-established public needs of encouraging settlement and reducing court dockets."  *In re Tribune Co.*, No. 08-13141 (KJC), 2011 Bankr. LEXIS 299, at *29 (Bankr. D. Del. Feb. 3, 2011) (citations omitted); *see also Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 62 (Del. Ch. 2005) (citing "Delaware's recognition that confidentiality is vital to the effectiveness of mediation" and finding

that "[t]he process works best when parties speak with complete candor, acknowledge weaknesses, and seek common ground, without fear that, if a settlement is not achieved, their words will be later used against them in the more traditionally adversarial litigation process.").

14.     Importantly, mediation here is ongoing and active, as the Debtors work to gain consensus, so the protections allowing for open discussions, without fear that a party's candor and concessions could be used against it, are very important in this case.

## B.  The Fact Of, And Certain Information About, Mediation Is Admissible To Help Demonstrate That An Agreement Was Reached In Good Faith And Based On Arm's-Length Negotiations

15.     As a condition of plan confirmation, a debtor must propose a plan of reorganization "in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  The Code does not define "good faith" under § 1129(a)(3).  Courts in this Circuit, however, have held that "[g]ood faith is shown when the plan has been proposed for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate, and delivering that value to creditors."  *In re Emerge Energy Servs. LP*, No. 19-11563, 2019 Bankr. LEXIS 3717, at *48 (Bankr. D. Del. Dec. 5, 2019); *see also In re American Apparel, Inc*., No. 15-12055, 2016 Bankr. LEXIS 3331, at *39-41 (Bankr. D. Del. Jan. 27, 2016) (finding that the Plan and all "agreements necessary to implement the Plan," including a Restructuring Support Agreement, met § 1129(a)(3)'s good faith requirement under the "totality of the circumstances" because they was "negotiated and proposed with the intention of accomplishing a successful reorganization, and for no ulterior purpose . . . a result consistent with the objectives and purposes of the Bankruptcy Code").

16.     The Third Circuit has held that, for "purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re*

*PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000); *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012). Thus, bankruptcy courts make good faith findings under § 1129(a)(3) by looking to "the facts and record of the Reorganization Cases, the Disclosure Statement, the Declarations, and the record of the Confirmation Hearing and other proceedings held in the Reorganization Cases." *In re Int'l Aluminum Corp., No. 10-10003 (MFW)*, 2010 Bankr. LEXIS 3269, at *13-14 (Bankr. D. Del. Apr. 30, 2010) (finding good faith under § 1129(a)(3) and noting that the plan was developed after "many months of analysis and negotiations between the Debtors and the Senior Lenders, was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates and effectuating a successful reorganization of the Debtors").

17.    It will be demonstrated at the confirmation hearing that the Debtors propose the Plan in good faith based on its terms. Additionally, however, the Debtors can rely on the process used in reaching the settlements on which the Plan is based in part, because courts may consider both a party's participation in mediation and the outcome of the mediation in finding that a settlement was made in good faith. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 492 (S.D.N.Y. 2018) (finding that "the settlement resulted from good faith negotiation" where it was the product of "multiple rounds of mediation" and "protracted and extensive negotiations before mediators"); *In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 352 (E.D.N.Y. 2000) (concluding that settlement was the product of a "good faith, non-collusive" process where "arduous settlement discussions" occurred "over a lengthy period of time, and with the assistance of a highly experienced neutral mediator"); *In re A&T Reynolds & Sons, Inc.*, 452 B.R. 374, 383-84 (S.D.N.Y. 2011) (rejecting bankruptcy court's conclusion that party did not participate in mediation in good faith, finding that courts should weigh good faith by considering a party's "compliance with orders to attend mediation, provide pre-mediation memoranda, and, in

some cases, produce organizational representatives with sufficient settlement authority"); *Smith v. Wacker Neuson Corp.*, No. 09-CV-1064-DRH-DGW 2011 U.S. Dist. LEXIS 118052, at *3 (S.D. Ill. Oct. 13, 2011) (noting a settlement was "[made] in good-faith," citing both its terms and the fact that it "was reached as a result of extended negotiations, both in third-party mediation and in Court sponsored mediation settlement conferences and ongoing settlement conferences"); *McMillon v. Hawaii*, CIVIL NO. 08-00578 LEK 2011 U.S. Dist. LEXIS 17859, at *6 (D. Haw. Feb. 22, 2011) (finding "demonstrat[ion of] good faith and arms-length negotiations" where there were "numerous settlement discussions between the parties, and the parties also engaged in mediation"); *AT&T Corp. v. J&J Schlaegel, Inc.*, No. 3:19-cv-192 2020 U.S. Dist. LEXIS 239093, at *6 (S.D. Ohio Dec. 18, 2020) (finding no evidence to support assertion of lack of good faith, citing confidential nature of mediation proceedings and the magistrate judge's "failure to indicate a lack of good faith at the mediation").

18.     Here, since November 2020, the Debtors have participated in approximately 57 meditation sessions, including 27 in-person mediation sessions and over 30 virtual mediation sessions.  The parties were adverse and experienced.  These sessions were led by three highly qualified mediators: (i) Judge Kevin Carey (Ret.), who, during his 18 years as a bankruptcy judge, mediated numerous complex matters [D.I. 712]; (ii) Paul Finn, who has experience mediating sexual abuse claims in over a dozen separate matters [D.I. 710]; and (iii) Timothy Gallagher, who has mediated more than one thousand insurance cases, many of which involve claims asserted in chapter 11 bankruptcy cases [D.I. 711].  As part of the mediation, the Debtors and plaintiff representatives exchanged at least 50 drafts of TDP-related documents, as reflected in the TDP log the Debtors provided to the Insurers and the Court.  *See Declaration of Samuel P. Hershey in Support of Debtors' Objection to Moving Insurers' Motion to Compel and for Additional Relief*

*and in Alternative Motion in Limine* [D.I. 5904], Ex. 12 (the "**TDP Log**").  This and other non-privileged information about the mediation are admissible to show good faith.

### C.  The Information That The Insurers Seek Is Protected By Mediation Privilege

19.    The Insurers seek other information about the mediation that is plainly protected by privilege.  The Insurers have not offered, and cannot offer, any reasonable basis for seeking these materials.

### 1.  The Mediation Privilege Is Set Forth In Local Rule 9019-5 And This Court's Mediation Order

20.    Local Rule 9019-5(d)(i) provides that "no person shall seek discovery from any participant in the mediation with respect to any information disclosed during mediation."  Del. Bankr. L. R. 9019-5(d)(i).  The Rules also prohibit parties to a mediation from "divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation," including without limitation, "views expressed or suggestions made by a party with respect to a possible settlement of the dispute"; "statements or admissions made by a party in the course of the mediation"; and "documents prepared for the purpose of, in the course of, or pursuant to the mediation."  *Id.*  This rule is expressly incorporated into this Court's Mediation Order.  *See* Mediation Order ¶ 7 ("The provisions of Local Rule 9019-5d pertaining to 'Confidentiality of Mediation Proceedings' shall govern the Mediation[.]").

21.    This Court has correctly noted that the mediation privilege may not protect documents that demonstrate "What did the debtor consider? When did they consider it? What did they decide?" (July 27, 2021 Hr'g Tr. at 25:8-9), such as, in the case of the RSA, "board resolutions with respect to the RSA, presentations with respect to the board's consideration of the RSA, board minutes with respect to the resolution of the RSA."  *Id.* at 24:11-14.  The Debtors are not withholding any such information, other than the back and forth of the mediation.

22.     The Insurers have repeatedly requested mediation materials, as well as materials protected by the attorney-client privilege, demanding that the Debtors produce:

- "[D]iscovery into what has been going on in terms of negotiations, how the sausage was made." *See* Aug. 16, 2021 Hr'g Tr. at 96:1-3.

- "[W]hat was discussed at [the] meeting" between the Debtors' Bankruptcy Task Force and the mediators. *See* Ownby Dep. Tr. at 194:12-23.

- "[T]he complete board minutes" without redactions for mediation privilege or attorney-client privilege. *See* Aug. 12, 2021 Hr'g Tr. at 52:15-21.

- "[C]ommunications about the TDPs" among the mediation parties, including communications that "copy mediators." *See* Aug. 13, 2021 Hr'g Tr. at 8:14-9:16.

- Mr. Desai's emails with drafts of the RSA term sheet and TDPs. *See* Aug. 13, 2021 Hr'g Tr. at 49:18-24; 50:6-8.

- Documents showing how the Debtors negotiated TDPs and came to the final TDP terms, including communications among mediation parties. *See* Aug. 12, 2021 Hr'g Tr. at 15:1-17 ("[N]ow we have TDPs that were appended to the RSA and filed with the fourth amended plan . . . We need to know who asked for it, who pushed back on it, if anyone, what discussions took place."); Whittman Dep. Tr. at 94:20-22 ("[W]ere there negotiations – negotiations that took place, for example, over the amount of the expedited distribution?"); July 7, 2021 Hr'g Tr. at 45:24-45:1 ("We didn't get drafts of the TDPs before what we were given a week before when we were given the term sheet.").

- "[C]ommunications and the drafts of the RSA documents exchanged between and among the RSA parties." Aug. 12, 2021 Hr'g Tr. at 12:15-13:7; *see also* July 7, 2021 Hr'g Tr. at 44:20-24 ("As far as the discussing that preceded the drafting of this plan, the submission

of it, we didn't get drafts of the plan between the time it was filed and what was previously filed.  We didn't get any drafts.").

- Drafts of "the RSA, the Plan, the TDP and other documents" exchanged with mediation parties.  *See* Second Motion to Compel at 6-8.

- "All Documents Concerning Communications with State Court Counsel, the Coalition, TCC, FCR and/or their counsel Concerning the RSA, the Term Sheet, the TDPs, the Settlement Trust Documents, and/or the Hartford Settlement."  Propounding Insurers' Request for Production No. 7.

- "[A]ll communications with the Board and its members and BSA's officers about" the Hartford Settlement.  *See* Cocchiaro Decl. [D.I. 5731], Ex. 7 (June 22 email from Tancred Schiavoni to the Debtors).

- Communications that BSA advisor Brian Whittman "had with any [BSA] directors about the TDPs or how they considered them."  *See* Aug. 12, 2021 Hr'g Tr. at 107:8-25.

- "[A]ll the documents [Mr. Desai] received" from BSA General Counsel Steve McGowan, including drafts of the RSA and TDPs.  *See* Aug. 13, 2021 Hr'g Tr. at 50:18-51:3.

- Communications among mediation parties about how to make "sure that the toggle plan TDPs were insurance neutral."  *See* Mosby Dep. Tr. at 91:6-92:18.

- Communications among mediation parties regarding the payment of the Coalition's attorney fees.  *See* Aug. 12, 2021 Hr'g Tr. at 69:6-7 (seeking "communications with the claimants about those [Coalition's] requests for fees"); Mosby Dep. Tr. at 218:7-18 ("And whose idea was it to include in the restructuring support agreement terms for paying the coalition lawyers?"); Whittman Dep. Tr. at 125:9-11 ("Focusing on the monthly go-

forward fee which I think is 950,000 – up to $950,000 a month, how did the debtors and the Coalition come to agree to that number?").

- Communications between mediation parties at a March 25, 2021 meeting between the Bankruptcy Task Force and the Ad Hoc Committee of Local Councils. *See* Ownby Dep. Tr. at 210:1-212:19 ("Were the parameters of negotiating activity discussed with the Ad Hoc Committee of Local Councils on March 25th, 2021? . . . Did the BSA discuss with the Ad Hoc Committee of Local Councils the progress needed to be made at the March 30th, 31st and April 1st mediation when it met with the Ad Hoc Committee of Local Councils on March 25th? . . . At the meeting between the Bankruptcy Task Force and the Ad Hoc Committee of Local Councils on March 25, 2021, did you discuss with the Ad Hoc Committee of Local Councils coordinating at the upcoming mediation?").[7]

- Various mediation materials, including negotiations with mediation parties regarding key settlement terms and related proposals, which are the subject of renewed requests served by the Insurers on September 16, 2021. *See, e.g.*, Ex. A (seeking, among other things, (i) "All Documents that refer or relate to any request that You support a motion, application or inclusion of a provision in a Plan of Reorganization that calls for the payment of money to Brown Rudnick LLP for their fees and/or costs," which is a negotiated term in the settlement between the Debtors and the Coalition reached in mediation, (ii) "All Documents and Communications that BSA exchanged with any Chartered Organizations concerning the RSA, the Term Sheet, the TDPs, and/or the Hartford Settlement," which were exchanged entirely in the mediation in an effort to reach a settlement with the

---

[7] Counsel to AIG persisted in asking these questions even after he was advised that doing so violated Local Rule 9019 and the Mediation Order. *See* Ownby Dep. Tr. at 210:18-25, 212:7-14 (BSA Counsel objects to questions based on violation of mediation privilege, and AIG Counsel responds "Okay. I'm going to ask him anyway.").

Chartering Organizations (including TCJC, which recently reached a settlement in mediation), and (iii) "All Documents and Communications between or among You and the sponsoring organizations Concerning the POCs, the claims asserted therein, and the sponsoring organization's contribution towards the resolution of these claims," which implicates substantial communications between the Debtors and the sponsoring organizations in mediation regarding settlement).

### 2.   The Materials at Issue Are Privileged

### a.   The Mediation Proposals Are Protected By The Mediation Privilege

23.     The Insurers have repeatedly demanded draft settlement proposals, particularly the draft TDPs and now the drafts of the Hartford Insurance Settlement Agreement and supporting documentation.  *See supra* ¶ 22.  It is beyond dispute that the mediation privilege protects settlement proposals exchanged in the course of mediation.  *See* Del. Bankr. L. R. 9019-5(d)(i) ("No person may rely on or introduce as evidence in any arbitral, judicial or other proceeding, evidence pertaining to any aspect of the mediation effort, including, but not limited to: (A) views expressed or suggestions made by a party with respect to a possible settlement of the dispute . . . and (E) documents prepared for the purpose of, in the course of, or pursuant to the mediation."); *United States Fid. & Guar. Co. v. Dick Corp.*, 215 F.R.D. 503, 507 (W.D. Pa. 2003) (items protected by the "core" of mediation privilege include "documents such as mediation position papers and specific information prepared for mediation sessions.  Also included are other documents created by, and communications between the parties in preparation for the mediation sessions."); *In re Brizinova*, 565 B.R. 488, 498 (Bankr. E.D.N.Y. Mar. 3, 2017) (noting that "the settlement proposals made in a mediation" are protected from disclosure); *A&E TV Networks, LLC v. Pivot Point Entm't, LLC*, 10 Civ. 9422 (PGG) (JLC) 2011 U.S. Dist. LEXIS 149740, at *8

(S.D.N.Y. Dec. 20, 2011) (finding that "drafts of a settlement agreement" created during mediation process were protected from disclosure).  The Insurers have no plausible basis for seeking the draft proposals that the mediation parties exchanged, including drafts of the TDPs, drafts of the Hartford Insurance Settlement Agreement and the TCJC Settlement Agreement and supporting documentation.

### b. The Documents Recording Mediation Communications Are Protected By Mediation Privilege

24.     The Insurers have repeatedly demanded information about communications made in mediation.  *See supra* ¶ 22.  The mediation privilege protects mediation communications, including anything said for the purpose of, in the course of, or pursuant to, a mediation.  *See* Del. Bankr. L. R. 9019-5(d)(i) (protecting from disclosure "statements or admissions made by a party in the course of the mediation"); *Wilmington Hosp.*, 788 A.2d at 540-41 (applying mediation privilege to communications "made in or in connection with the mediation that relates to the controversy being mediated" even if "exchanged outside the context of a specific mediation conference"); *Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1179-80 (C.D. Cal. 1998) (adopting "a federal mediation privilege applicable to all communications made in conjunction with a formal mediation . . . In addition, communications in preparation for and during the course of a mediation with a neutral must be protected."), *aff'd*, 216 F.3d 1082 (9th Cir. 2000); *Sheldone v. Pa. Tpk. Comm'n*, 104 F. Supp. 2d 511, 517 (W.D. Pa. 2000) (holding that mediation privilege "protects from disclosure all written and oral communications made in connection with or during a mediation conducted before a neutral mediator.") (quotation marks and citation omitted).  Even the Insurers recognize that mediation communications are privileged. *See, e.g.*, May 19, 2021 Hr'g Tr. at 32:6-7 (Hartford Counsel raising "an objection to the extent it calls for disclosure of mediation communications[.]").

17

### c. The Information Redacted From Board Minutes Is Protected By The Mediation Privilege And Attorney-Client Privilege

25.     The Insurers demand unredacted board minutes and presentations. *See supra* ¶ 22. The Insurers have never offered any basis for challenging the privilege assertions. Indeed, the documents contain unredacted information demonstrating that what is redacted is privileged. *See, e.g.*, August 12, 2021 Hr'g Tr. at 27:20-28:7 (discussing Insurers' challenges to redactions in June 13, 2021 BTF Minutes, which "says exactly [] quote, 'Jessica Lauria advised,' and then there is a blank. So it is still demonstrating that that picks up privileged advice. Jessica Lauria is a lead attorney for the debtors . . . It's plainly privileged on its face. And I think using that as an example sort of demonstrates that there really is nothing here."); *see also Mid-State Auto., Inc. v. Harco Nat'l Ins. Co.*, CIVL ACTION No. 2:19-cv-00407 2020 WL 1488741, at *3–4 (S.D. W. Va. Mar. 25, 2020) (denying a motion to compel disclosure of un-redacted documents because redacted documents can "provide [] enough information to identify the nature of the documents and to assess [the] claim that the redacted portions are privileged") (quotations and citations omitted). And the Court has already overruled the Insurers' challenges to the Debtors' redactions of certain materials, including board minutes.[8]

26.     The Debtors' redactions for privilege are proper.

- The Insurers argue incorrectly that the Debtors improperly redacted the June 11, 2021 NEC and BTF Meeting Minutes. *See* August 12, 2021 Hr'g Tr. at 17:10-23. The minutes redact statements by BSA's General Counsel Steven McGowan about the bankruptcy update, which are protected under attorney-client privilege. *See* Debtors' RSA Hearing Ex. 31.

---

[8] *See* Aug. 13, 2021 Hr'g Tr. at 78:3-18 (admitting into evidence Debtors' Exhibits 8-34 (minutes of NEB, NEC and BTF meetings) over Insurers' objections) and holding that "[the board minutes] are going to be admitted and I don't think that, as I'm reading these Board minutes, the unredacted portion of the Board minutes, I don't -- I view them as a process issue, what was considered"); *see also* Aug. 12, 2021 Hr'g Tr. at 133:12-146:5 (admitting into evidence Debtors' Exhibit 42 (June 5, 2021 A&M Presentation) over Insurers' objections following *in camera* review).

Other redacted portions of the minutes are communications between mediation parties or attorney-client communications. For example, the redaction after "The issue of whether" in the first sentence of the minutes is clearly regarding the issues discussed at the meeting between BSA and BSA's General Counsel Steven McGowan. *See id*. Another redaction is a communication among mediation parties, evident by the reference to the "problem" of what the claimant constituents "see the BSA as" in the prior sentence. *See id*. (discussion of claimant constituents "problem" partly redacted as communication among mediation parties). Additionally, the Insurers' claim that the Debtors were inconsistent in their redactions because they did not redact discussions regarding a letter from the claimants is incorrect. That letter was not made in the context of mediation, and has been filed on the public docket, so it is not privileged and the Debtors could not redact it. *See* Decl. of Roger Mosby, Ex. 1 (June 9, 2021 letter from the Coalition, TCC, and FCC) [D.I. 5469-1].

- The Insurers argue that the June 13, 2021 BTF Meeting Minutes were improperly redacted into "little more than nonsense." *See* Second Motion to Compel at 6. The redacted information is advice from Debtors' lead restructuring attorney, Jessica Lauria, and the Debtors' insurance counsel, Haynes and Boone. *Id.* Other portions of the minutes are redacted for mediation privilege, which is clear from the face of the document. For example, the language "the Coalition, TCC and FCR [PRIVILEGED] Restructuring Support Agreement (RSA)" makes clear that what is redacted is protected by the mediation privilege. *See id.*

- The Insurers object to redactions in a June 5, 2021 email between mediation parties that clearly contains mediation-related material, as it attaches a "term sheet and RSA." *See*

Second Motion to Compel at 8. The Insurers claim this email *cannot* be privileged mediation material because the email was sent several weeks before the RSA was signed, and because "nothing indicates that the communication falls within the scope of the mediation." *Id.* Neither argument has merit. Mediation had been ongoing for months prior to signing the RSA, and there is no requirement that, in order to be covered by the mediation privilege, a document must be labeled "subject to mediation privilege." Century also objected to privilege redactions in the June 22, 2021 A&M presentation to the Board. *See* Aug. 12, 2021 Hr'g Tr. at 156:25-159:3. This presentation—the majority of which is not redacted—contains redactions that are carefully tailored to omit information that falls under the attorney-client and mediation privilege: "If the TCC is part of the deal, so there is essentially unanimous plaintiff support . . . TCC has indicated [redacted]; Coalition has indicated [redacted]." *See* RSA Hearing Ex. 46, BSA-RSA_00001399. And Hartford objected that the redactions on the June 5, 2021 A&M Presentation were overly broad. *See* Aug. 12, 2021 Hr'g Tr. at 133:12-134:2. Dispositively, the Court examined the fully un-redacted presentation in camera, and noted that the Debtors had redacted it appropriately for mediation and attorney-client privilege. *Id*. at 141:13-16.

27.     Although it is clear from the face of the documents that the redactions are proper, and the Insurers have not identified any basis for challenging the redactions, the Debtors are prepared to submit *in camera* any documents the Court might want to review.

### D.  None of the Debtors' Evidence Is Subject To the Extreme Sanction of Preclusion

28.     The Insurers have repeatedly argued for a preclusion order based on the Debtors' invocation of privilege. Precluding evidence is a drastic sanction, reserved for extreme misconduct. *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, Civil Action No. 09-290, 2012

U.S. Dist. LEXIS 193823, at *10 (W.D. Pa. Dec. 18, 2012) (citing *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997)) ("the exclusion of evidence at trial is an extreme sanction that is normally reserved for a showing of willful deception or flagrant disregard of a court order by the proponent of evidence[.]") (quotation marks omitted); *United States v. Kikumura*, 698 F. Supp. 546, 554 (D.N.J. 1988) ("The striking of testimony, however, is a drastic measure which should be imposed only in extreme circumstances."); *see also Prof'l Cleaning & Innovation Bldg. Servs., Inc., v. Kennedy Funding, Inc.*, 245 Fed. App'x 161, 165 (3d Cir. 2007) ("one of the basic objectives of the federal rules . . . [is] the determination of cases on their merits").[9]

29.    The Insurers do not, and cannot, identify any bad faith conduct by the Debtors. To the contrary, the Insurers rely solely on the invocation of privilege. A preclusion order is not available based on invocation of privilege. To the contrary, invocation of privilege is proper and allowed in every case.[10] *See, e.g., In re RNI Wind Down Corp.*, No. 06-10110(CSS), 936, 1305, 1343, 2007 Bankr. LEXIS 982, at *14 (Bankr. D. Del. Mar. 29, 2007) (admitting legal invoices into evidence in redacted form); *Nat'l Union Fire Ins. Co. v. Stauffer Chem. Co.*, 558 A.2d 1091, 1092 (Del. Super. Ct. 1989) (allowing Plaintiff to redact files to protect confidential information); *see also United States v. Pelullo*, 917 F. Supp. 1065, 1079-80 (D.N.J. 1995) ("If it were relevant in a legal proceeding and if by chance privileged information were disclosed in the recital of

---

[9] The case that the Insurers cite in support of a preclusion order—a magistrate judge's report and recommendation, which the district court adopted only because neither party submitted an objection and it contained "no clear error"— is inapt. *See Royal Park Investments SA/NV v. Deutsche Bank National Trust* Co., 14-CV-04394, *Report and Recommendation*, D.I. 471 (S.D.N.Y. Sept. 15, 2017) (cited in First Motion to Compel at 18); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-CV-4394 (AJN), 2018 U.S. Dist. LEXIS 61457, at *66 (S.D.N.Y. Mar. 29, 2018). That case has nothing to do with mediation or preclusion orders, but rather pertains to the rule that an advice of counsel defense requires disclosure of relevant attorney-client communications. *See generally Royal Park*, 14-CV-04394, *Report and Recommendation*, D.I. 471. The Debtors have not made an advice of counsel defense, and this case is therefore irrelevant.

[10] Relatedly, under the Delaware Rules of Evidence, no adverse inference can be drawn from the invocation of privilege. *See* Del. Unif. R. Evid. 512(a) ("The claim of a privilege . . . is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom.").

services rendered, a Court, no doubt, would redact such information and admit the balance of the statement."). The Insurers have not cited, and cannot cite, a single case issuing a preclusion order based on the invocation of privilege.

**E. The Documents That Include Privilege Redactions Are Admissible**

30.    The Insurers argue that documents that include privilege redactions are inadmissible, which would mean that minutes from Board meetings evaluating transactions would be excluded from the evidentiary record in essentially all cases, unless privilege was waived, because boards routinely receive legal advice and redact that advice from their minutes and presentations. The Insurers have not cited a single case remotely supporting their novel and incorrect position.

31.    This Court has recognized that the Insurers' cited authority in support of this position provides the opposite: that redacted materials are routinely admitted into evidence. *See* Aug. 13, 2021 Hr'g Tr. at 75:1-18 ("[T]he *Convergence* court, with a few exceptions, after a review *in camera*, said [the board minutes] were properly redacted. So, this is not unusual that Board minutes are redacted and produced in redacted form and, therefore admitted in redacted form.").

32.    Consistent with this Court's ruling, courts routinely hold documents redacted for privilege are admissible. *See LG Display Co. v. Au Optronics Corp.*, 265 F.R.D. 189, 197 (D. Del. 2010) (rejecting argument that "the redactions to the documents affect their admissibility" and "violate 'the rule of completeness,'" noting that "[q]uestions as to the documents' content and completeness bear upon the weight to be accorded the evidence"); *In re RNI Wind Down Corp.*, No. 06-10110(CSS), 936, 1305, 1343, 2007 Bankr. LEXIS 982, at *10 (Bankr. D. Del. Mar. 29, 2007) (invoices "which were heavily redacted for [attorney-client] privilege" admitted into evidence in redacted form); *see also Siemens v. Seagate Tech.*, SACV 06-788JVS (ANx) 2008

U.S. Dist. LEXIS 124045, at *23 (C.D. Cal. Sept. 23, 2008) ("[T]he Court does not believe that

the documents are inadmissible merely because they are redacted." ); *Walker v. Alcoa, Inc.*, Cause

No. 4:06-CV-120-JVB 2008 U.S. Dist. LEXIS 45684 at *9 (N.D. Ind. June 9, 2008) ("Simply

because the document is redacted does not mean that it is inadmissible.").

33.     In fact, the very purpose of redaction is to permit the production of non-privileged

information contained in a document while protecting any privileged information the document

also contains.  *See Renner v. Chase Manhattan Bank*, 98 Civ. 926 (CSH) 2001 U.S. Dist. LEXIS

17920, at *6 (S.D.N.Y. Nov. 2, 2001) ("If production of [] documents 'will necessarily reveal

client confidences,' then redactions will be ordered to protect the privileged material while

allowing discovery of the nonprivileged material.") (citing Edna Selan Epstein, *The Attorney-

Client Privilege and the Work-Product Doctrine* (Section of Litigation, American Bar Association,

4th ed. 2001) ("It is a long-standing habit that when privileged materials are intermingled with not

privileged ones in a single document, the privileged portion can be redacted to allow production

of not privileged communications while protecting privileged ones from discovery.")); *see also

Klein v. Facebook, Inc.*, No. 20-cv-08570-LHK (VKD) 2021 U.S. Dist. LEXIS 105516, at *21

(N.D. Cal. June 3, 2021) (finding that if a document "is capable of redaction to excise privileged

material, the party making the privilege claim must promptly make redactions to the document and

permit the witness to testify as to the non-privileged material in the document").  The Insurers have

not cited a single case excluding board minutes or other documents because they contain redactions

for privileged material.

**F.    A Request For A Finding That The Mediated Agreements Were Negotiated In Good Faith And At Arms-Length Does Not Effect An "At Issue" Waiver**

34.    The Insurers have claimed that, under the "at-issue" doctrine, the Debtors waived mediation and attorney-client privilege by placing the privileged material "at issue." The Insurers are wrong.

35.    *One*, to prove an at-issue waiver, the Insurers must show that the Debtors "partially disclose[d] privileged communications or affirmatively rel[ied] on privileged communications to support [their] claim or defense and then shield the underlying communications from scrutiny[.]" *In re Grand Jury Proc.*, 219 F.3d 175, 182 (2d Cir. 2000). Here, the Debtors have not disclosed or relied on privileged material or otherwise taken a sword and shield approach to disclosure. To the contrary, the Debtors have produced non-privileged information and redacted privileged information, regardless of how the information impacts the case. All of the Insurers' purported examples of the Debtors waiving privilege by placing privileged information "at issue" fail.

- The Insurers claim that the Debtors waived privilege by un-redacting two sentences in the May 14, 2021 NEC Meeting Minutes: (1) "the court could defer ruling on some of the issues until a confirmation hearing after the plan has been voted upon," and (2) "advisors have also been working to find ways for the BSA to reach agreement on BSA's contribution to the trust while minimizing the expense and risk of litigating issues while obtaining a global resolution." *See* Second Motion to Compel at 6. Neither sentence is privileged, nor do they advantage the Debtors. The first sentence is a textbook description of how a bankruptcy case progresses and does not reveal any legal strategy, legal advice, or attorney work product, and does not support the position of the Debtors or any other RSA parties. The same is true of the second sentence, which is merely a description of the Debtors' settlement process that has been discussed repeatedly in open court.

24

- The Insurers argue that the Debtors strategically un-redacted the following phrase from the May 14, 2021 BTF Meeting Minutes: the Local Councils "support the need for a global resolution."  *See* Second Motion to Compel at 8.  This is a matter that BSA advisors and other attorneys have frequently expressed in open court and, therefore, is not privileged. *See, e.g.*, Apr. 12, 2021, Hr'g Tr. at 17:13-18:9 (Attorney for the Ad Hoc Committee of Local Councils informs the Court that over 250 Local Councils have spent "thousands of [volunteer] hours . . . to try to determine the art of the possible in meeting the twin goals of the BSA case; that is, compensating victims and maintaining the scouting mission," and the AHCLC believes it is essential that the Local Councils be involved "if a global resolution is to be reached.").

- The Insurers argue that the Debtors waived privilege by un-redacting portions of a June 29, 2021 e-mail from BSA General Counsel Steve McGowan to BSA National Chair Dan Ownby and others.  *See* Second Motion to Compel at 7.  The Debtors redacted this document consistent with the information provided in a standard privilege log: the only visible information is (i) the time at which the email was sent, (ii) the parties that received it, and (iii) the names of the attached documents.  The Debtors left un-redacted two sentences that plainly are not privileged: "Attached are the most recent redline versions of the documents being prepared" and "If you have any questions or comments, please let me know."  Fay Decl. in Support of Second Motion to Compel, Ex. G, BSA-RSA_00001342 [D.I. 5882]; *see Miller v. Spencer*, CIVIL ACTION NO. 12-10504-JDG 2014 U.S. Dist. LEXIS 31202, at *12-13 (D. Mass. Mar. 11, 2014) (finding that language in letter describing enclosed items was not privileged); *Rexam Bev. Can Co. v. Bolger,* No. 06 C 2234 2008 U.S. Dist. LEXIS 22042, at *7-8 (N.D. Ill. Mar. 18, 2008) (finding that language

in email describing attachment "does not contain any request for legal advice, and does not reveal the substance of any legal consultation" and therefore was not privileged).

36.     Indeed, the Insurers have not cited a single case ever finding waiver on facts even close to those here at issue.  The sole case that Insurers cite regarding the "sword and shield" doctrine underscores the deficiency of the Insurers' allegations.  *See In re Welded Constr., L.P.*, No. 18-12378, 2021 WL 537406, at *3, 6 (Bankr. D. Del. Feb. 15, 2021) (cited in the Second Motion to Compel at 8-9).  Their case has nothing to do with mediation or the mediation privilege, arises in the context of a motion to reconsider, and involves specific documents that were "used . . . to make allegations, claims and defenses" in litigation.  *In re Welded Constr., L.P.*, 2021 WL 537406, at *6 ("Defendants cannot use OGCS's report as both a sword and a shield – Defendants cannot place the Audit at issue and claim that the Audit 'revealed wrongdoing' and then not give Welded the requisite information to test the validity of those statements.").  The case says nothing about mediated resolutions, which are commonplace in bankruptcy and other cases and routinely relied on to demonstrate good faith.  And the Debtors have not made any assertions about the content of the mediation, unlike in *Welded*, where the defendant relied not just on the fact of the audit, but its supposed finding of wrongdoing.

37.     The Insurers ask the Court to find that the Debtors have over-redacted documents, then ask for waiver by arguing the Debtors under-redacted documents.  Although the produced information is not privileged, the Insurers are wrong in arguing that the Debtors produced information as a sword, and the Debtors are prepared to redact the information identified by the Insurers.  Further, the Debtors have nothing to hide, and are also prepared to submit any and all privileged documents in-camera for the Court's review to confirm that the Debtors' redactions are appropriate.

38.    *Two*, the Insurers' are wrong that reliance on the fact of mediation and certain related information waives privilege.    Courts allow the fact that agreements resulted from mediation, such as the Debtors have produced, to show good faith without waiver.  *See supra* ¶ 17. The Insurers offer nothing to distinguish the authority or practice.    And the Insurers cite no authority for their contention that the introduction of the fact of mediation, the number of mediation sessions, the participants of mediation, a privilege log on mediations, or the results of mediation effects a waiver.  Notably, most of the cases the Insurers have cited do not even involve the "at-issue" waiver doctrine or the mediation privilege.  *See CP Kelco U.S. Inc. v. Pharmacia Corp*., 213 F.R.D. 176, 179 (D. Del. 2003) (holding that, under Fed. R. Civ. P. 26(b)(4)(B), testifying expert must disclose the materials he relied on for his opinion); *In re Unitrin, Inc. S'holders Litig*., Civil Action No. 13656, 1994 Del. Ch. LEXIS 159, *6 (Del. Ch. Sept. 8, 1994) (finding that anti-trust defendants had waived attorney-client privilege by introducing into the record "the actual advice given to them" by counsel); *In re Welded Constr., L.P.*, 2021 Bankr. LEXIS at *6 (holding that a party selectively waived privilege over a specific document because it "substantially relied" on that document in multiple court pleadings).    Two of the Insurers' cases support only the Debtors' position.  *See In re Grand Jury Proceedings,* 219 F.3d 175, 191 (2d Cir. 2000) (vacating order to produce privileged materials); *Tribune Co. v. Purcigliotti,* No. 93 CIV. 7222 (LAP) (THK), 1997 U.S. Dist. LEXIS 228, *28, *27 (S.D.N.Y. Jan. 10, 1997), *modified*, 1998 U.S. Dist. LEXIS 5155 (S.D.N.Y. Apr. 14, 1998) (unreported magistrate judge opinion whose findings regarding "at issue" waiver were substantially modified by the district court to protect the attorney-client privilege).  Only one case, *G. Angel*, involved waiver of the mediation privilege, and that case was decided under Florida law and is inapt because it concerned a party that was found to have waived mediation privilege by disclosing selective mediation communications to third

parties. *See G. Angel Ltd. v. Camper & Nicholsons USA, Inc.*, No. 08-60211-CIV, 2009 WL 10666975, at *2-3 (S.D. Fla. May 22, 2009) (magistrate judge opinion) (noting that "public policy also favors a mediation privilege" but finding examination of protected communications was permitted under Florida State statute).

39.    *Three*, the information the Insurers request is irrelevant.    The terms of the settlements (including the TDPs) are either reasonable or not on their own terms, regardless of negotiation history or the identity of the drafters or the content of the drafting history.    The issue that will be before the Court at the confirmation hearing is whether the Debtors' plan was proposed in good faith and not by any means forbidden by law.    11 U.S.C. § 1129(a)(3); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 246 (3d Cir, 2004).    This determination should be based on the final terms of the plan and the Plan, not the interim RSA proposals.    Consequently, it is irrelevant whether it was the Debtors, the Plaintiffs, or both who drafted the TDPs.    The Plan stands on its own merits.

40.    Additionally, the Insurers' premise for their argument that they need the materials is wrong.    The Insurers are incorrect in claiming that the Plaintiffs drafted the TDPs, and that the Debtors did not negotiate them.    *See* Hartford RSA Objection [D.I. 5681] at 41 ("TDPs drafted by the plaintiffs' lawyers"); July 7, 2021 Hr'g Tr. at 40:10-13 ("What these claimants have done, frankly, is they have cut a deal with the debtor and in exchange for letting the debtor get out of the case they have taken over the case . . . [and] prepared the TDP's[.]").    As addressed above, the TDPs are either appropriate or not, regardless of who drafted them.    The non-privileged record also demonstrates that the Debtors drafted the TDPs and, throughout May and June, the mediation parties exchanged at least 50 TDP drafts and proposed TDP language before the TDPs were finalized.    The Debtors have produced a privilege log to the Insurers, chronologically detailing all

email correspondence regarding the TDPs, including the exchange of drafts.  *See* TDP Log.  Thus, the Insurers are well aware that there were months of TDP negotiations among the Debtors and the plaintiff representatives, completely disproving their false narrative that the Debtors "turned over the pen" on the TDPs.

41.     *Four*, the introduction of non-privileged evidence does not affect an at-issue waiver where there is privileged material addressing the same matter.  Indeed, parties are entitled to redact privileged material, and doing so does not waive privilege, it preserves privilege.  *See Trs. of the Elec. Workers Loc. No. 26 Pension Tr. Fund v. Tr. Fund Advisors, Inc.*, 266 F.R.D. 1, 11 (D.D.C. 2010) ("Defendants' notion that I should also consider the disclosure of non-privileged information as a waiver by plaintiffs of privileged information that deals with the same subject matter is flat out wrong."); *United States v. Chevron Corp.*,  No. C-94-1885 SBA 1996 U.S. Dist. LEXIS 4154, at *12 (N.D. Cal. Mar. 12, 1996) (finding that the defendant did not "waive[] the privilege simply by disclosing non-privileged documents which are related to the same subject matter as the controverted documents."); *see also Aiossa v. Bank of Am., N.A.*, CV 10-01275 (JS) (ETB) 2011 U.S. Dist. LEXIS 102207, at *14 (E.D.N.Y. Sept. 12, 2011) ("'At issue' waiver is concerned  with the selective disclosure of privileged material, not the disclosure of non-privileged material and redaction or withholding of privileged material.").

42.     *Five*, no one can waive compliance with Local Rule 9019 and the Mediation Order. *ResCap Liquidation Tr. Mortg. Purchase Litig. v. HSBC Mortg. Corp. (USA) (In re Residential Cap., LLC)*, 536 B.R. 132, 148 (Bankr. S.D.N.Y. 2015) ("[T]he confidentiality provisions in a [mediation] order benefit all protected parties; one party's waiver does not sufficiently permit disclosure over the other parties' objections."); *Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 417 B.R. 197, 209 (Bankr. S.D.N.Y. 2009) ("The confidentiality provisions in the General

Mediation Order . . . belong to the parties and the mediator, and [defendant] cannot waive it on their behalf.").  The Insurers cite no authority to the contrary.

## NOTICE

43.     The Debtors will provide notice of this Motion to: (i) the U.S. Trustee; (ii) counsel to the Creditors' Committee; (iii) counsel to the Tort Claimants' Committee; (iv) counsel to the Future Claimants' Representative; (v) counsel to the Ad Hoc Committee of Local Councils; (vi) counsel to the Coalition of Abused Scouts for Justice; (vii) counsel to the Insurers; (viii) counsel to JPM; (ix) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B and 2012; and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request that the Court enter the Proposed Order attached as

**Exhibit B** and grant such further relief as the Court deems just and proper.

Dated: September 17, 2021
      Wilmington, Delaware

/s/ Paige N. Topper
MORRIS, NICHOLS, ARSHT & TUNNELL LLP

WHITE & CASE LLP
Glenn M. Kurtz (admitted *pro hac vice*)
Jessica C. Lauria (admitted *pro hac vice*)
Andrew Hammond (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email: gkurtz@whitecase.com
      jessica.lauria@whitecase.com
      ahammond@whitecase.com
      sam.hershey@whitecase.com

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
Michelle M. Fu (No. 6661)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email: dabbott@morrisnichols.com
      aremming@morrisnichols.com
      ptopper@morrisnichols.com
      mfu@morrisnichols.com

– and –

WHITE & CASE LLP

Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com
      blair.warner@whitecase.com