## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. D.I. 6222, 6225, 6227** |

**DEBTORS' OMNIBUS OBJECTION TO THE TCC'S MOTIONS TO (I) ADJOURN THE DISCLOSURE STATEMENT HEARING; (II) ENTER AN ORDER TERMINATING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE CODE; AND (III) SHORTEN NOTICE PERIOD AND SCHEDULING HEARING ON MOTION FOR ENTRY OF ORDER TERMINATING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A PLAN AND SOLICIT ACCEPTANCES THEREOF**

Boy Scouts of America ("**BSA**") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "**Debtors**"), file this omnibus objection to the following motions of the Official Committee of Tort Claimants (the "**TCC**"): (i) the *Motion to Adjourn the Hearing to Consider Approval of Disclosure Statement and Solicitation Procedures for the Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6222] (the "**Motion to Adjourn**"); (ii) the *Motion for Entry of an Order Terminating the Debtors' Exclusive Periods to File a Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [D.I. 6225] (the "**Motion to Terminate Exclusivity**"); and (iii) the *Motion to Shorten Notice Period and Schedule Hearing on the Motion of Official Committee of Tort Claimants for Entry of an Order Terminating*

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

*the Debtors' Exclusive Periods to File a Plan and Solicit Acceptances Thereof Pursuant to Section*

*1121 of the Bankruptcy Code* [D.I. 6227] (the "**Motion to Shorten Notice**" and, together with the

Motion to Adjourn and Motion to Terminate Exclusivity, the "**TCC Motions**").

## PRELIMINARY STATEMENT

1.      The Debtors are proposing to solicit votes on a plan of reorganization that provides

for contributions to the Settlement Trust of approximately $1.857 billion in cash and other

property, in addition to the contribution of valuable rights under insurance policies dating back as

far as the 1930s.[2]  Because these contributions are currently limited to the Debtors, Related Non-

Debtor Entities, Local Councils, Hartford, and TCJC, they represent only a "down payment"

toward what the Debtors anticipate will be a meaningfully larger Settlement Trust at emergence.

To this end, the Debtors and other mediation parties are continuing to work toward settlements

with additional Insurance Companies and Chartered Organizations that will increase the size of

the Settlement Trust.   Indeed, in their most recent report to the Court, the Mediators stated that

they "believe that [ongoing mediation] will likely lead to further settlements that will maximize

the value of the estates for the benefit of creditors."[3]

2.      Critically, the Plan is currently supported by the Future Claimants' Representative,

the Coalition, the Ad Hoc Committee, and attorneys representing holders of approximately *73%*

of Direct Abuse Claims.  If approved, the Plan will deliver equitable and timely compensation to

abuse survivors and ensure that the charitable mission of the Debtors continues for the benefit of

future generations of youth.  In sum, while there is more work to be done in mediation, both of the

Debtors'  restructuring  objectives  are  now  within  reach.    Moreover,  none  of  the  Debtors'

---

[2]     *See Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6212] (as the same may be amended or modified from time to time, the "**Plan**").  Capitalized terms used but not otherwise defined in this Objection have the meanings ascribed to such terms in the Plan.

[3]     *Sixth Mediators' Report* [D.I. 6210], at 3.

stakeholders or their representatives has suggested a viable alternative pathway to achieve these foundational objectives on a timeline that avoids administrative insolvency and liquidation.

3.      As the Court is aware, the Debtors have faced opposition to the Plan from TCJC, Hartford, and other parties.  The Debtors, with the assistance of the Mediators, the Coalition, the Future Claimants' Representative, and the Ad Hoc Committee, have put tremendous efforts toward resolving objections to the Plan and the Disclosure Statement and toward limiting the number of disputed issues.  The revised Plan and Disclosure Statement are the culmination of these efforts. Indeed, the changes to the Disclosure Statement and Plan principally relate to the following three settlements:

- A reconstituted settlement with Hartford, with an enhanced guaranteed contribution by Hartford to the Settlement Trust of $787 million (as compared to $650 million, subject to a most-favored-nation provision, under the April 15, 2021 Hartford settlement);[4]

- A settlement with TCJC, which provides for a total contribution by TCJC to the Settlement Trust of $250 million; and

- A settlement framework that offers Chartered Organizations the option to contribute to the Settlement Trust their rights under the Abuse Insurance Policies for the period from January 1, 1976 to the Petition Date in exchange for full and final releases from Abuse Claims arising during the same time period.

Each of these changes is value-accretive to the Settlement Trust.  The Hartford and TCJC settlements together provide for a cash contribution to the Settlement Trust of $1.037 billion.  The Chartered Organization settlement framework, moreover, will enable the Settlement Trust to take assignment of valuable rights under the Abuse Insurance Policies that are not the subject of Insurance Settlement Agreements free of any competing claims against such insurance, thereby maximizing the value of those rights for the benefit of abuse survivors.  Importantly, these changes

---

[4]    Hartford's contribution of $787 million is offset by an allowed $2 million administrative expense claim that will resolve Hartford's claims on account of alleged damages in connection with the April 15, 2021 settlement agreement, resulting in a net contribution of $785 million.

eliminated numerous objections to the Plan and Disclosure Statement that would have otherwise been before the Court. Indeed, courts in this Circuit have long recognized "the importance of compromise in bankruptcy." *Energy Future Holdings Corp. v. Del. Tr. Co.*, 648 F. App'x 277, 283 (3d Cir. 2016) (affirming bankruptcy court decision approving settlement agreement).

4.     The TCC, despite having supported the fourth amended version of the Plan filed on July 2, 2021 [D.I. 5484], including a litany of key deal terms that remain unchanged, now opposes the fifth amended version of the Plan filed on September 15, 2021. The TCC asserts, in essence, that the Plan short-changes abuse survivors. The Debtors emphatically reject this contention, which is based on the TCC's insupportable valuation of Abuse Claims in these cases. The TCC's estimate of the aggregate value of Abuse Claims is $102.7 billion, which is more than ***fourteen times*** the high end of the Debtors' estimated range of $2.4–7.1 billion.[5] As a purported remedy, the TCC is seeking, through the TCC Motions, to deprive the Debtors of the critical final month of their exclusive solicitation period, which the Court recently extended to October 18, 2021, and to detain the Debtors on the starting block of their long-planned solicitation process until the TCC can file a would-be competing plan and obtain approval of a disclosure statement.

5.     The TCC Motions should be denied. As an initial matter, the TCC has failed to establish any basis for an adjournment of the Disclosure Statement hearing, as the Plan and Disclosure Statement have been on file, in substantially their current form (subject to the September 15, 2021 amendments referenced above), since July 2, 2021—more than 80 days. The

---

[5]     *See The Official Committee of Tort Claimants' Objection to Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 2506], ¶¶ 3–4 (characterizing the TCC's $102.7 billion estimate as "extremely conservative" for "a number of reasons."). The TCC's insupportable valuation would yield an average recovery of $1,250,000 to *each* of the 82,200 holders of a Direct Abuse Claim, without regard to the underlying merits of the claim, including the nature of the abuse, whether the claim is barred by applicable statutes of limitation, and whether the claimant has identified an abuser. Recognizing that it will need to offer evidence to support its valuation at confirmation, the TCC on September 17, 2021—***nineteen months*** into these cases—filed an application to retain Claro Group, LLC to provide valuation services with respect to sexual abuse claims [D.I. 6287].

TCC has also failed to elucidate the type of extreme or unique circumstances that are required for a court to terminate a debtor's exclusive periods under section 1121(d). Rather than move the cases forward materially, terminating exclusivity to permit the TCC to propose the draconian plan structure of which it has offered a one-paragraph summary would unwind integral components of the Debtors' pathway to emergence and threaten the BSA's ability to carry out its charitable mission. The TCC's requested relief is inappropriate and unwarranted, and the Court should permit the Debtors to proceed on their Disclosure Statement as scheduled and to realize the full benefit of their exclusive solicitation period, consistent with the Court's order dated August 18, 2021.

## ARGUMENT

### I.    The Motion to Adjourn Should Be Denied

#### A.    The TCC's Recent Support for the RSA and the Fourth Amended Plan Undermine Its Request to Adjourn the Disclosure Statement Hearing

6.    On July 1, 2021, the Debtors moved the Court for entry of an order authorizing entry into the Restructuring Support Agreement [D.I. 5466] (the "**RSA**"), which set forth the terms of the fourth amended version of the Plan [D.I. 5484] (the "**Fourth Amended Plan**"). The TCC strenuously advocated for approval of the RSA and, by extension, the Fourth Amended Plan. *See* July 7, 2021 Hr'g Tr. at 24:2–8 (Counsel for TCC: "There is agreement here, Your Honor, among all the primary constituencies and . . . because there is an agreement [on the RSA] we need to move forward with the timeline and get the plan confirmation process rolling. It's imperative to the process and it's imperative to survivors that the process begin so that the plan confirmations can go through.").

7.    The Fourth Amended Plan and the current Plan are virtually identical in their structure and material terms. As noted above, the principal differences between the Fourth

Amended Plan and the current Plan—and the only differences that the TCC cites as its basis for opposing the current Plan—are the Hartford Insurance Settlement Agreement, TCJC Settlement Agreement, and the Participating Chartered Organization Insurance Assignment. *See* Mot. to Terminate Exclusivity ¶¶ 9–10, 19.

8.     But those settlements could not surprise the TCC, as they were contemplated by the RSA and the Fourth Amended Plan. Indeed, both the Fourth Amended Plan and the current Plan have at their core a structure for settling claims on an ongoing basis—even after the Effective Date. *Compare* Fourth Amended Plan Art. IV *with* Plan Art. IV.    This structure was also a key component of the RSA. The RSA expressly provided that the parties "shall work in good faith to develop a protocol for addressing participation by Chartered Organizations in the benefits of the Channeling Injunction." *See* D.I. 5466-2 (RSA Term Sheet) at 15–16. That is precisely what the Debtors achieved with the TCJC Settlement Agreement. Moreover, as the TCC recognizes, the RSA was meant to serve as a way to "put[] pressure on . . . insurance carriers . . . to meaningfully compensate survivors." *See* Mot. to Terminate Exclusivity ¶ 7. That is precisely what the Debtors achieved with the Hartford Insurance Settlement Agreement.

9.     Nonetheless, the TCC claims to be shocked by these settlements, and has cited them as a pretext for abandoning its prior position. More egregiously, the TCC has reversed its position on core components of the Plan that have not changed, such as the Local Council contribution, which the TCC now attacks as "leav[ing] [the Local Councils] with billions of dollars of cash and property in excess of their current need to fulfill their mission of Scouting." Mot. to Terminate Exclusivity ¶ 3. The TCC has offered no basis for this sudden about-face when it previously endorsed the $600 million Local Council Settlement Contribution.

10.     Straining for a pretext to abandon its prior commitments, the TCC claims that the RSA "was not approved."  Mot. to Terminate Exclusivity ¶¶  8, 25(c) ("[T]he Court refused to approve the RSA.").  That is incorrect.  *See* Aug. 19, 2021, Hr'g Tr. at 28:8-13 ("My conclusion: I have found that the entry into the RSA is a sound exercise of Debtor's business judgment. The parties can proceed with the RSA without the findings regarding the Hartford settlement agreement and fees for the coalition, or not. And of course, Debtors can file any plan they choose.").    The TCC cannot use its late and sudden reversal of its prior admissions—indeed, advocacy—on long-standing aspects of the Plan as a basis for delay.[6]

**B.     The TCC Has Failed to Articulate Any Valid Grounds for an Adjournment of the Disclosure Statement Hearing**

11.     The TCC claims that it does not have time to "adequately and appropriately analyze . . . the significant new settlements contained" in the Disclosure Statement and Plan.  *See* Mot. to Adjourn ¶ 8.  This claim lacks merit for at least four reasons.

12.     *First*, despite claiming that it has not had sufficient time to analyze the Hartford Insurance Settlement Agreement and TCJC Settlement Agreement, the TCC cites those agreements as the basis for withdrawing its prior support for the Debtors' plan and seeking to terminate exclusivity.  It defies logic that the TCC has had sufficient time with those agreements

---

[6]    Courts generally disfavor a party switching positions regarding a debtor's plan of reorganization without cause. For example, in the context of vote-switching, courts often bar parties from switching votes on a plan because "last-minute vote changing (to suit one creditor's interest) would invariably throw into doubt previous negotiations and arrangements between the debtor and its other creditors, creating the kind of chaos that Chapter 11's procedures were designed to avoid." *In re J.C. Householder Land Trust #1*, 502 B.R. 602, 607–08 (Bankr. M.D. Fla. 2013); *see also id.* at 609 ("[C]hanging a vote is legally sufficient under Rule 3018 if it promotes consensual negotiation and fair bargaining. Changing a previously cast ballot to block confirmation does not promote consensual negotiation or fair bargaining."); *In re Houser Shoes, Inc.*, 245 B.R. 486, 490 (W.D.N.C. 2000) ("[V]ote changing is the exception and not the rule."); *In re MPM Silicones, LLC*, 2014 Bankr. LEXIS 4062, at *5-6 (Bankr. S.D.N.Y. Sep. 17, 2014) (citing 9 Collier on Bankruptcy ¶ 3018.01[4]) ("cause" for a vote switch under Rule 3018(a) exists when there is either (i) a breakdown in communications at the voting entity for the creditor; (ii) a misreading of the terms of the plan; or (iii) execution of the ballot by someone who did not have authority, identified within a reasonable time by someone who did have such authority.).  This rule shows the high standard to which courts hold creditors that reverse their support for a plan.

to formulate an entirely new and oppositional position in these cases, but not to prepare for the Disclosure Statement hearing.

13.     *Second*, in deciding whether to approve a disclosure statement, courts assess whether the disclosure statement contains "adequate information" to allow a creditor to make an informed decision to vote to accept or reject the plan.  *See Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 293–94 (Bankr. D. Del. 2013).  By its own admission, the TCC has gleaned enough information from the Disclosure Statement to recommend to holders of Abuse Claims to reject the Plan (and, indeed, to propose a competing plan).  The Debtors have thus met the standard for approving a disclosure statement with respect to the TCC, and there is no valid reason to adjourn the Disclosure Statement hearing.

14.     *Third*, the "new settlements" that the TCC claims to not understand are, in fact, easily understood.  For example, the terms of the TCJC Settlement Agreement are laid out in a concise term sheet attached to the Plan.  *See* Plan Ex. J-1 (TCJC Settlement Agreement) [D.I. 6210-2].  The TCC does not identify any material term that it does not understand.  Additionally, the TCC's claims that is was "excluded" from settlement discussions rings hollow (Mot. to Terminate Exclusivity ¶ 8), given that the TCC has been an active participant in mediation for more than a year, including with Hartford and TCJC, and was made aware of the settlements with those parties weeks before the filing of the fifth amended version of the Plan.  Moreover, the Debtors have been negotiating a settlement with Hartford since March 2021, and the terms of, and obligations to, that settlement have been extensively briefed and argued, and have been the subject of extensive testimony.  The TCC actively participated in all aspects of that briefing, argument and testimony.

15.    *Fourth*, the TCC does not cite any authority supporting adjournment.  Instead, the TCC seeks to analogize to *In re Imerys Talc America, Inc., et al.*, Case No. 19-10289 (Bankr. D. Del.).  But the facts in *Imerys* are distinct in several key respects.  In *Imerys*, the Debtors' previous plan was never before the Court, meaning that, when the Debtors filed their new plan, the Court was unable to determine whether the Debtors' plan had materially changed.  *See* Oct. 7, 2020 Hr'g Tr. at 46:8-10 ("Whether [the October plan is] the same as the May plan, I don't know because I didn't read the May plan because it wasn't in front of me.").  No such issue exists here, where the Fourth Amended Plan (as its terms were embodied in the RSA) was the subject of a multi-day trial and extensive briefing. Additionally, in *Imerys*, the amended plan and disclosure statement were "thoroughly rewritten" over "hundreds of pages."  *See* Mot. to Adjourn Disclosure Statement Hearing Pursuant to Bankr. R. 3017(A) [D.I. 2301], *In re Imerys Talc America*.  Here, as the redline filed with the Plan demonstrates [D.I. 6214-1], the current Plan is virtually identical to the Fourth Amended Plan, and the changes are limited and discrete.  *Imerys* is therefore inapt.

## C.    The Motion to Adjourn Obscures the Longer and Highly Prejudicial Delay the TCC Actually Seeks

16.    The TCC does not dispute that "time is of the essence in these cases."  Mot. to Adjourn at 2, n.2.  Accordingly, the TCC purports to seek only a three-week adjournment of the Disclosure Statement hearing: two weeks for parties to review the Debtors' Plan and Disclosure Statement, and one week for the Court to consider objections.  *Id.*  This facially straightforward request is misleading.

17.    While the Motion to Adjourn purports to seek a three-week adjournment, the Motion to Terminate Exclusivity seeks the right to solicit a plan *alongside* the Debtors.  *See* Mot. to Terminate Exclusivity ¶ 1 ("[T]he Tort Claimants' Committee should be permitted to file its own proposed plan so that the Tort Claimants' Committee's plan may be solicited at the same time

as BSA's Fifth Plan.").  This demonstrates that the TCC actually wants to adjourn so that it can delay the Debtors' plan during their period of exclusivity, and then try to propose a plan. Additionally, the Local Rules require a party to seek a disclosure statement hearing on 35 days' notice.  *See* Local Rule 3017-1(a) ("The [disclosure statement] hearing date shall be at least thirty-five (35) days following service of the disclosure statement").  Thus, the adjournment the TCC seeks is actually ***at least five weeks***, and will be timed not from the date of the Disclosure Statement hearing, but from whenever the TCC is able to file its would-be competing plan, if ever.

> **D.    Any Alleged Emergency Is of the TCC's Own Making**

18.    After the RSA expired by its terms on August 27, 2021, the TCC had ample opportunity timely to file a motion to terminate exclusivity to be heard at the September 23, 2021 omnibus hearing, which has been on the Court's calendar for over three months.  *See* D.I. 5314. Yet the TCC failed to file its motion until September 15, 2021—nearly three weeks after the RSA expired, and less than one week before the start of the Disclosure Statement hearing.

19.    The TCC has not offered, and cannot offer, any justification for this prejudicial delay.  Indeed, the TCC has claimed that it was prepared to file a competing plan of reorganization since ***May 2021***.  *See* May 19, 2021 Hr'g Tr. at 98:3-9 (TCC counsel alleging the existence of "a term sheet between the Coalition and the tort claimants' committee . . . we'll have a plan on file in two weeks.").  But after four months, the Debtors have not seen any plan term sheet, much less a fully drafted plan.  And the TCC has offered nothing more than a meager one-paragraph summary in the Motion to Terminate Exclusivity.

## II.    The TCC States No Valid Basis for Terminating Exclusivity or Shortening Notice

> **A.    The TCC Has Failed to Demonstrate "Cause" to Terminate Exclusivity**

20.    A party seeking to terminate or modify a debtor's exclusivity period bears the burden of showing "cause" to do so.  *In re Dow Corning Corp.*, 208 B.R. 661, 663 (Bankr. E.D.

Mich. 1997). The TCC has failed to meet that burden, and the Motion to Terminate Exclusivity should be denied.

21. Contrary to the TCC's position, the principal factors that courts consider in deciding whether to terminate exclusivity favor the Debtors. These factors weigh heavily in support of allowing a debtor to retain the benefit of exclusivity to the extent it has demonstrated meaningful progress in achieving creditor support. *See In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997) (denying motion to terminate exclusivity); Mot. to Terminate Exclusivity at 13 (citing "good faith progress towards reorganization", "reasonable prospects for filing a viable plan", and "debtors' progress in negotiations with creditors" as factors courts consider in weighing exclusivity).[7] Here, the Debtors have just achieved hard-fought settlements with one of their primary insurers (Hartford) and the most significant historical Chartered Organization (TCJC). These settlements follow other settlements the Debtors have reached with other key constituencies, such as the Coalition, the Future Claimants' Representative, JPM and the Creditors' Committee. Hence, the TCC does not seek to advance emergence based on a delay in plan progress; it seeks to delay the plan process to advance its own reversed position. The TCC's dissatisfaction with the amounts of these settlements, or any other terms of the Plan, is insufficient to establish cause to terminate exclusivity.[8]

---

[7]   The other factors that courts consider, such as the "size and complexity of the case" and "whether the debtor is paying its debts as they come due," also favor the Debtors.

[8]   *See In re Geriatrics Nursing Home*, 187 B.R. 128, 134 (D.N.J. 1995) (holding that "the fact that one creditor constituency is not happy with the debtor's plan" did not constitute cause to terminate the exclusive periods); *In re Spansion, Inc.*, 426 B.R. 114, 140 (Bankr. D. Del. 2010) (noting that "a creditor constituency's unhappiness or dissatisfaction with a debtor's proposed plan, without more, does not constitute cause to end exclusivity and undermine the debtor's chance of obtaining confirmation of its plan during that period"); *In re Adelphia Communs. Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (denying motion to terminate exclusivity and noting that "displeasure with a plan on file . . . is not a basis for terminating exclusivity. Nor, without more, is creditor constituency unhappiness with a debtor's plan proposals[.]").

22.    In addition to the specific factors enumerated in *Dow Corning*, courts "draw back from the narrow focus on individual factors and scan the big picture." *Dow Corning*, 208 B.R. at 669. The "primary consideration" in determining whether to terminate exclusivity is whether termination "will move the case forward." *See Dow Corning*, 208 B.R. at 670; *Adelphia Commc'ns Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006). As articulated by Judge Gerber in *Adelphia*, this test examines "whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case." *Adelphia*, 352 B.R. at 590. Here, instead of moving the cases forward by building on the progress made to date, termination of exclusivity to allow the TCC to solicit a competing plan alongside the Plan would only delay these cases and unwind integral components of the Debtors' pathway to emergence.

23.    As in *Adelphia*, "[a] competing plans battle now" between the Debtors, the Coalition, the Future Claimants' Representative, the Ad Hoc Committee, JPM, and the Creditors' Committee, on the one hand, and the TCC, on the other, "might well jeopardize current fragile agreements between various stakeholders, re-ignite intercreditor disputes, and push this process back to square one." *See id.* Contrary to the TCC's unsupported assertions that its would-be competing plan will safeguard the future of Scouting, *see* Mot. to Terminate Exclusivity ¶¶ 26, 30, the TCC's alternative plan would achieve the polar opposite result. By unwinding the heavily negotiated and complex settlements that form the basis for the Plan and withholding the protections of the channeling injunction unless Local Councils, Chartered Organizations, and Insurance Companies make settlement contributions that correlate to the TCC's insupportable valuation of Abuse Claims, the TCC's plan would serve only to encourage the same piecemeal litigation that precipitated the Debtors' bankruptcy filing more than eighteen months ago. This result would be

a success only for the few plaintiffs (and their attorneys) who win the proverbial race to the courthouse and a loss for virtually every other stakeholder and for the Debtors' charitable mission.

24.    In terms of time, money, and momentum, the Debtors cannot afford to squander the important progress they have made to date.  If the Debtors' exclusive solicitation period is terminated, a competing plan process would only accelerate the Debtors' cash burn and truncate the time period within which they can confirm the Plan.  As set forth in the Disclosure Statement, the Debtors estimate that professional fees will equal or exceed $205 million by December 2021. Disclosure Statement Art. II.F.  As the Court has observed, every incremental dollar of professional fees at this stage decreases the amount of the Debtors' cash contribution to the Settlement Trust.  *See* Hr'g Tr. 49:19–21 (Mar. 17, 2021) (observing that "every dollar to professional fees is a dollar that comes out of some creditor's pocket"). Every delay in these cases has an attendant cost that reduces the amount of cash available for the Debtors to contribute to the Settlement Trust.  To invite the discovery and litigation that would accompany the premature termination of exclusivity also runs counter to the fundamental purpose of the Debtors' exclusive periods by frustrating the Debtors' efforts to reorganize.

25.    For these reasons, the Court should deny the Motion to Terminate Exclusivity.

**B.    The Court Should Not Allow the TCC's Lack of Diligence to Prejudice All Other Parties in Interest**

26.    The Court should also deny the Motion to Shorten Notice.  Courts deny motions to shorten notice where the purported need for expedited relief is the result of the movant's self-created emergency or lack of diligence.  *See In re EHT US1, Inc., et al.*, Case No. 21-10036 (CSS) (D.I. 217) (denying creditors' motion to shorten notice where the creditor had been familiar with the facts and circumstances asserted in the motion well in advance of filing the motion); *see also Equal Employment Opportunity Comm'n v. Tepro, Inc.,* No. 4:12-CV-75-HSM-SKL, 2014 WL

12562856, at *3 (E.D. Tenn. Aug. 29, 2014) ("[A] lack of planning or diligence, however, does not warrant the parties' filing of 'emergency' or 'expedited' motions.  There is no true emergency here.  To the contrary, these so-called emergency or expedited situations came about largely as a result of the parties' own dilatory conduct or imprudence[.]"); *Shrader v. Pape Trucks, Inc.*, 2019 WL 2410735, at *2 (E.D. Cal. June 7, 2019) (denying request to consider motion on an expedited basis where party's asserted need for expedited relief was "a product of . . . lack of diligence"); *Am. Motors Corp. v. Great Am. Surplus Lines Ins. Co.,* No. 87 C 2496, 1988 WL 2788, at *4 (N.D. Ill. Jan. 8, 1988) ("AMC's lack of diligence . . . goes against granting its motion for an expedited ruling").

27.    Here, as noted above, the TCC's nearly three-week delay in seeking to terminate exclusivity is an emergency of its own creation that, if allowed, will prejudice all other parties in interest by depriving them of a full and fair opportunity to consider the TCC's motion and formulate any objections.  Given the significant effect that terminating exclusivity would have on these cases, the Court should not allow the TCC's neglect to deprive parties of the full statutory notice period.

## CONCLUSION

Through the TCC Motions, the TCC is seeking to buy time—at the expense of the Debtors and the TCC's own constituents—to develop and solicit votes on a competing plan that would likely subject the Debtors' charitable mission to the same (or greater) risk that it faced immediately prior to commencing these cases.  Neither the Debtors nor any stakeholder in these cases should be forced to suffer significant delays and expenses because the TCC waited until this late hour to seek an adjournment and to terminate the Debtors' exclusive periods.  After nineteen months in bankruptcy and with a Disclosure Statement that has been on file for 80 days in substantially the same form, it is time to let creditors vote.  The Court should deny the TCC Motions.

Dated: September 20, 2021
       Wilmington, Delaware

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
Glenn M. Kurtz (admitted *pro hac vice*)
Andrew Hammond (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email: gkurtz@whitecase.com
        jessica.lauria@whitecase.com
        ahammond@whitecase.com
        sam.hershey@whitecase.com

– and –

WHITE & CASE LLP
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
        mlinder@whitecase.com
        laura.baccash@whitecase.com
        blair.warner@whitecase.com

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION

*/s/ Paige N. Topper*
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 351-9314
Email: dabbott@morrisnichols.com
        aremming@morrisnichols.com
        ptopper@morrisnichols.com