<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3                                      . Chapter 11
     IN RE:                             .
 4                                      . Case No. 20-10343 (LSS)
     BOY SCOUTS OF AMERICA AND          .
 5   DELAWARE BSA, LLC,                 .
                                        . Courtroom No. 2
 6                                      . 824 North Market Street
                                        . Wilmington, Delaware 19801
 7                                      .
                          Debtors.      . September 23, 2021
 8   . . . . . . . . . . . . . . . . . . 1:00 P.M.

 9         TRANSCRIPT OF TELEPHONIC DISCLOSURE STATEMENT HEARING
             BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                   UNITED STATES BANKRUPTCY JUDGE

11   TELEPHONIC APPEARANCES:

12
     For the Debtor:          Derek Abbott, Esquire
13                            MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                              1201 North Market Street, 16th Floor
14                            Wilmington, Delaware 19899

15                            - and -

16                            Jessica C. Lauria, Esquire
                              WHITE & CASE LLP
17                            1221 Avenue of the Americas
                              New York, New York 10020
18

19
     Audio Operator:          Brandon J. McCarthy, ECRO
20

21   Transcription Company:   Reliable
                              1007 N. Orange Street
22                            Wilmington, Delaware 19801
                              (302)654-8080
23                            Email:  gmatthews@reliable-co.com

24   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
25
</pre>

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For the Debtors:          Matthew E. Linder, Esquire
                               Laura Baccash, Esquire
 3                             WHITE & CASE LLP
                               111 South Wacker Drive
 4                             Chicago, Illinois 60606

 5
     For Century:             Tancred Schiavoni, Esquire
 6                            O'MELVENY & MYERS LLP
                              Times Square Tower
 7                            7 Times Square
                              New York, New York 10036
 8
     For the FCR:             Robert Brady, Esquire
 9                            Edwin Harron, Esquire
                              YOUNG CONAWAY STARGATT & TAYLOR LLP
10                            Rodney Square
                              1000 North King Street
11                            Wilmington, Delaware 19801

12
     For Tort Claimants:      James Stang, Esquire
13                            PACHULSKI STANG ZIEHL JONES LLP
                              919 North Market Street, 17th Floor
14                            Wilmington, Delaware 19801

15   For the Ad Hoc           Richard Mason, Esquire
     Committee of Local       WACHTELL, LIPTON, ROSEN & KATZ
16   Councils:                51 West 52nd Street
                              New York, New York 10019
17
     For the Coalition of     David Molton, Esquire
18   Abused Scouts for        BROWN RUDNICK LLP
     Justice:                 7 Times Square
19                            New York, New York 10036

20                            - and -

21
                              Eric Goodman, Esquire
22                            601 Thirteenth Street NW, Suite 600
                              Washington, D.C. 20005
23
     For the AIG Companies:   Michael Rosenthal, Esquire
24                            GIBSON, DUNN & CRUTCHER LLP
                              200 Park Avenue
25                            New York, New York 10166
```

```
 1  TELEPHONIC APPEARANCES (Cont'd):

 2  For the United Methodist  Jeremy Ryan, Esquire
    and Roman Catholic Ad     POTTER ANDERSON & CORROON LLP
 3  Hoc Committee:            Hercules Plaza
                              1313 North Market Street, 6th Floor
 4                            P.O. Box 951
                              Wilmington, Delaware 19801
 5
 6  For Numerous Firms and    Irwin Zalkin, Esquire
    Claimants:                THE ZALKIN LAW FIRM, P.C.
 7                            1441 Broadway, Suite 3147
                              New York, New York 10018
 8
    For Zurich Insurers:      Mark Plevin, Esquire
 9                            CROWELL & MORING LLP
                              3 Embarcadero Center, 26th Floor
10                            San Francisco, California 94111
11
    For Zalkin Law Firm:      Thomas Patterson, Esquire
12                            KTBS LAW LLP
                              1801 Century Park East, 26th Floor
13                            Los Angeles, California 90067
14
    For the Committee         Joseph Celentino, Esquire
15  Of Local Councils:        WACHTELL, LIPTON, ROSEN & KATZ
                              51 West 52nd Street
16                            New York, New York 10019
17
    For HMM Victims:          Evan Smola, Esquire
18                            HURLEY MCKENNA & MERTZ, P.C.
                              20 S. Clark Street, Suite 2250
19                            Chicago, Illinois 60603
20  For Guam Abuse            Delia Lujan Wolff, Esquire
    Survivors:                LUJAN & WOLFF LLP
21                            238 Archbishop FC Flores
                              Suite 300
22                            Hagatna, Guam 96910
23  For the Girl Scouts:      Eric Lopez Schnabel, Esquire
                              DORSEY & WHITNEY LLP
24                            300 Delaware Avenue, Suite 1010
25                            Wilmington, Delaware 19801
```

1  TELEPHONIC APPEARANCES (Cont'd):

2  For the U.S. Trustee:       David Buchbinder, Esquire
                               Hannah McCollum, Esquire
3                              UNITED STATES DEPARTMENT OF JUSTICE
                               OFFICE OF THE UNITED STATES TRUSTEE
4                              844 King Street, Suite 2207
                               Lockbox 35
5                              Wilmington, Delaware 19801

6
   For Hartford Financial:    Philip Anker, Esquire
7                              WILMERHALE
                               250 Greenwich Street
8                              New York, New York 10007

9                              - and -

10                             James Ruggeri, Esquire
                               SHIPMAN & GOODWIN LLP
11                             1875 K Street NW, Suite 600
                               Washington, DC 20036

12
   For the Church of Jesus    Adam Goldberg, Esquire
13 Christ of Latter Day       LATHAM & WATKINS LLP
   Saints:                    1271 Avenue of the Americas
14                             New York, New York 10020

15
   For Abuse Survivors:       Paul Mones, Esquire
16                             PAUL MONES, P.C.
                               13101 Washington Boulevard
17                             Los Angeles, California 90066

18

19

20

21

22

23

24

25

1  MATTERS GOING FORWARD:

2  1. Debtors' Motion for Entry of an Order (I) Approving the
3  Disclosure Statement and the Form and Manner of Notice, (II)
   Approving Plan Solicitation and Voting Procedures, (III)
4  Approving Forms of Ballots, (IV) Approving Form, Manner, and
   Scope of Confirmation Notices, (V) Establishing Certain
5  Deadlines in Connection with Approval of the Disclosure
   Statement and Confirmation of the Plan, and (VI) Granting
6  Related Relief (D.I. 2295, filed 3/2/21)

7  2. Debtors' Motion For Entry of Order (I) Scheduling Certain
   Dates and Deadlines in Connection with Confirmation of the
8  Debtors Plan of Reorganization, (II) Establishing Certain
   Protocols, and (III) Granting Related Relief (D.I. 2618, filed
9  4/15/21)

10 3. Motion for Leave to Exceed Page Limit Requirement for
   Objection of the Tort Claimants' Committee to Debtors' Motion
11 for Entry of an Order (I) Approving the Disclosure Statement
   and the Form and Manner of Notice, (II) Approving Plan
12 Solicitation and Voting Procedures, (III) Approving Forms of
   Ballots, (IV) Approving Form, Manner and Scope of Confirmation
13 Notices, (V) Establishing Certain Deadlines in Connection With
   Approval of the Disclosure Statement and Confirmation of the
14 Plan, and (VI) Granting Related Relief (D.I. 3529, filed
15 5/10/21)

16 4. Motion for Leave to Exceed Page Limit Requirement for (i)
   Objection of Century Indemnity Company to Debtors' Motion for
17 Entry of an Order (I) Approving the Disclosure Statement and
   the Form and Manner of Notice, (II) Approving Plan
18 Solicitation and Voting Procedures, (III) Approving Forms of
   Ballots, (IV) Approving Form, Manner and Scope of Confirmation
19 Notices, (V) Establishing Certain Deadlines in Connection with
   Approval of the Disclosure Statement and Confirmation of the
20 Plan, and (VI) Granting Related Relief and (ii) Century
   Indemnity Company's Objections to the Debtors' Solicitation
21 Procedures and Form of Ballots (D.I. 3858, filed 5/12/21)

22
   5. Motion for Leave to Exceed Page Limitations Regarding
23 Debtors' Reply in Further Support of Debtors' Third Motion for
   Entry of an Order Extending the Debtors' Exclusive Periods to
24 File a Chapter 11 Plan and Solicit Acceptances Thereof (D.I.
   4102, filed 5/16/21)
25 6. Motion for Leave to Exceed Page Limitations Regarding
   Debtors' Omnibus Reply in Support of Debtors' Motion for Entry

1  of an Order (I) Approving the Disclosure Statement and the
2  Form and Manner of Notice, (II) Approving Plan Solicitation
   and Voting Procedures, (III) Approving Forms of Ballots, (IV)
3  Approving the Form, Manner, and Scope of Confirmation Notices,
   (V) Establishing Certain Deadlines in Connection with Approval
4  of the Disclosure Statement and Confirmation of the Plan, and
   (VI) Granting Related Relief (D.I. 4111, filed 5/16/21)

5
6  7. Motion to Exceed Page Limitations with Respect to Certain
   Insurers' Supplemental Objection to Motion for Approval of
   Debtors' Disclosure Statement (D.I. 6054, filed 8/17/21)

7
8  8. Tort Claimants' Committees' Motion to Adjourn the Hearing
   to Consider Approval of Disclosure Statement and Solicitation
9  Procedures for the Fifth Amended Chapter 11 Plan of
   Reorganization for Boy Scouts of America and Delaware BSA, LLC
10 (D.I 6222, filed 9/15/21)

11 9. Motion for Leave to Exceed the Page Limits Regarding
   Debtors' Amended Omnibus Reply in Support of Debtors' Motion
12 for Entry of an Order (I) Approving the Disclosure Statement
   and the Form and Manner of Notice, (II) Approving Plan
13 Solicitation and Voting Procedures, (III) Approving Forms of
   Ballots, (IV) Approving the Form, Manner, and Scope of
14 Confirmation Notices, (V) Establishing Certain Deadlines in
   Connection with Approval of the Disclosure Statement and
15 Confirmation of the Plan, and (VI) Granting Related Relief
   (D.I. 6250, filed 5/16/21)
16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good afternoon, counsel.  This

2    is Judge Silverstein.  We're here for the continued

3    disclosure statement hearing on Boy Scouts of America,

4    case number 20-10343.  Turn it over to debtors'

5    counsel.

6          MS. LAURIA:  Mr. Abbott, you're muted.

7          THE COURT:  Mr. Abbott, I'm not hearing you.

8          MR. ABBOTT:  Sorry about that, Your Honor.

9    I guess I muted instead of unmuting.  So again, Derek

10   Abbott of Morris Nichols here for the debtors.  Your

11   Honor, we -- we wanted to just sort of organize a

12   little bit at the beginning of the hearing if we

13   might.

14         From the debtors' perspective, Your Honor,

15   there are, I think, four things that we need to do,

16   you know, between today and maybe sometime next week.

17   The first is, obviously Your Honor expressed an

18   interest in hearing some limited discussion on the

19   confirmation issues as a -- as a preview, I guess.

20   Second, we -- we obviously need to -- to work through

21   the voting and solicitation procedures that were

22   proposed.

23         The third thing, Your Honor, is to talk

24   about a schedule to get to confirmation, assuming that

25   the Court ultimately approves the disclosure

1   statement.  And the fourth is just a final review and

2   -- and -- and final getting Your Honor to call balls

3   and strikes on whatever remaining disputes there are

4   on the disclosure documents.  The parties are

5   currently in -- you know, began last night, and I

6   think we'll be working today and probably through the

7   day and -- and evening to -- to get those documents

8   squared away.

9          It makes sense to the debtors, Your Honor,

10  that that final check of the documents probably occur

11  Tuesday or Wednesday.  Ideally, we would -- we would

12  ask the Court for whatever Your Honor can give us on

13  Tuesday with some spillover Wednesday, if needed, just

14  for that final document discussion.

15         The other two things that we think are

16  critical today are -- are the -- obviously the voting

17  and solicitation but then, also, Your Honor, to

18  address scheduling to get to confirmation.  The reason

19  we think this is critical today, Your Honor, is that

20  the debtors have proposed a schedule, and Mr. Kurtz

21  and will go into greater detail on it.  You know,

22  candidly, we don't expect that it will be uniformly

23  embraced, Your Honor, so we thought that some early

24  discussion would be good.

25         Today is important to us, Your Honor,

Page 9

 1  because that proposed schedule has some things that

 2  start to happen in the next few business days of next

 3  week -- or early next week.  So we thought it would

 4  make sense to touch on that.  Again, I think Mr. Kurtz

 5  will drive the train on that when -- when it's time.

 6  But those are at least the debtors' thoughts and

 7  priorities, Your Honor, for -- for what it's worth.

 8  And obviously, we stand ready to procedure however the

 9  Court wishes.

10          THE COURT:  Thank you.  Those things were

11  all on my list.  I would like to start with -- and I

12  -- and first of all, I do agree that any, you know,

13  review and discussion of the disclosure statement

14  documents should happen next week so the parties have

15  an opportunity to review them.  And I did ask Ms.

16  Johnson this morning to take a look at my next week,

17  and I will consult with her during a break so that we

18  know exactly what is available.  I would like to start

19  with voting and solicitation.

20          MR. O'NEILL:  Great, Your Honor.  Good

21  afternoon.  This is Andrew O'Neill, White & Case, on

22  behalf of the debtors.  I guess I drew the -- the

23  short straw or the long straw, depending on your point

24  of view, and get to address these issues.  Before I

25  jump in, I would just like to thank Your Honor, again,

1  for accommodating us over these last couple of days

2  and then stay again.  It's been a bit of marathon, and

3  that's on the heels of your -- your marathon Monday in

4  the Imerys case, which I suspect we'll hear about

5  today.

6           I just want to let you know we're grateful

7  for your time and your role in this to forge ahead on

8  solicitation while we, you know, parallel path, iron

9  out the disclosure fixes and -- and augment that

10  document that we've discussed with Your Honor over the

11  last couple of days.

12          You know, usually I'm accustomed to

13  solicitation procedures being a little bit of an

14  afterthought.  I think most people on this, you know,

15  hearing probably feel the same way.  But -- but

16  obviously given what -- what happened on Monday and --

17  and what you instructed us last night, you know, that

18  -- that's different in this case, and we understand

19  and appreciate your focus on these issues.

20          With -- with that, Your Honor, you know, I'd

21  just like to say, you know, although I wasn't involved

22  in the Imerys hearing, and I know that others on this

23  -- on this hearing will have been directly involved, I

24  think we have a handle and understand some of the

25  issues that are bothering Your Honor based on that

1  hearing and some of the issues that have arisen in

2  that case.

3        All that said, we do think and -- and we'd

4  like to tell you about -- and I'll tell you about some

5  of the major differences between our case procedurally

6  and the solicitation materials in our case.  And --

7  and by that, I mean that I'm -- mostly mean the proof

8  of claim process here, Your Honor, and the master

9  ballot before you, which is fundamentally different

10 than the master ballot in a couple respects from

11 Imerys.  It has additional certifications and

12 protections.

13       You know, we -- we know, though, that Your

14 Honor has been putting a lot of thought into this, as

15 well, when -- whenever you have some time in your

16 schedule, given -- given the hearings this week.  And

17 -- and you may have suggestions for us, and we're

18 ready to listen.  So I -- I'm -- first and foremost

19 I'd like to -- to offer that.  So you can stop me at

20 any point if there are things that you want to suggest

21 to us based on your review of the solicitation

22 procedures.  And I don't often open a hearing with

23 that --

24       THE COURT:  Don't worry.

25       MR. ABBOTT:  Yeah, okay.  Good.  You won't

1    disappoint me, it sounds like, which is great.

2    Because this is very important, Your Honor.  We want

3    to get this vote right.  The estates have been waiting

4    a long time to send out materials.  And, you know, I

5    don't want to be presumptuous, but -- but we think we

6    have a confirmable plan, obviously, that provides a

7    lot of values to -- a lot of value to survivors and to

8    other creditors in these cases and also continues the

9    vital mission of the BSA.

10           And we -- we want to get this solicitation

11   started.  I think you even said that yesterday or the

12   day before.  So once we've made these revisions to the

13   DS, you know, in a -- in an agreeable fashion, we want

14   to get these packages out.  It's a complicated case.

15   As you know, there's over 82,000 unliquidated

16   nonduplicative abuse claims.  We need to solicit those

17   folks in a way that -- that makes sense and -- and is

18   not overly burdensome on the estate, but -- but also

19   protects the estate from any fraud or -- or misdoings

20   that -- that some may wish to undertake.  So we think

21   we can do that.

22           So what I would like to do, Your Honor, is

23   start with a little background on some of the earlier

24   case milestones that sort of impact the solicitation

25   and have impacted our procedures and how they have

1    been developed, some of the clay we have to work with

2    here, if you will.  And then I'll describe some of the

3    critical features of the procedures in the master

4    ballot from the debtors perspective and -- and how we

5    think they'll help insulate the integrity of the vote.

6              After that, you know, probably sadly to you

7    or some on the phone, I'll jump back into our handy

8    110-page chart to address the remaining solicitation

9    objections.  But -- but I think in this case, it'll

10   only be the last ten pages or so.  So that's how I

11   plan to proceed, Your Honor, but if -- but if you'd

12   like to -- to do something differently, please let me

13   know.  I'd -- I'd be happy to --

14             THE COURT:  That's fine.

15             MR. ABBOTT:  Okay.  Fantastic.  So, Your

16   Honor, unlike many asbestos cases or asbestos and talc

17   in the Imerys case, we did have a bar date established

18   in this case, as Your Honor well knows.  May 2020, our

19   date order was approved, setting November 16th as the

20   date for abuse survivors.  And you approved a

21   customized proof of claim form to use for -- with

22   special confidentiality provisions for the submission

23   of those claims.

24             Pursuant to the bar date order, the debtors

25   conducted a multi-million dollar advertising program

Page 14

1   involving TV, print media, and others that was

2   designed to reach the maximum number of men over the

3   age of 50, which is the primary target audience.  We

4   think we reached over 95 percent of those men.  During

5   the claim's filing period, Your Honor, the TCC filed a

6   motion to -- to supplement the bar date order to

7   clarify the admissibility of electronic signatures.

8   The debtors did not oppose this relief.

9          However, the -- on September 30th, the

10  coalition filed a motion to revise the bar date order

11  to permit the authority for attorneys to sign claim

12  forms on behalf of abuse survivors.  We -- we did

13  oppose that relief.  However, that was permitted and

14  also clarifying that electronic signatures were

15  permitted.

16         Unlike cases with no bar date, like Imerys

17  and like so many of the asbestos cases where any party

18  purporting to have a claim could vote, here only

19  claimants that there is a proof of claim on file on or

20  before the bar date can vote.

21         As Your Honor know, these proofs of claim

22  all contain three serious requirements or penalties, a

23  certification that I have examined the information in

24  this sexual abuse survivor proof of claim and have a

25  reasonable belief that the information is true and

1   correct, a declaration under penalty of perjury that

2   the foregoing statements are true and correct, and a

3   potential penalty for fraudulent claim of up to

4   $500,000 or imprisonment for up to five years.  Those

5   are heavy, heavy requirements and penalties, Your

6   Honor.

7             As of the November 16 bar date,

8   approximately 82,500 unique timely filed abuse claims

9   have been filed by abuse survivors on account of

10   sexual abuse.  This number is now approximately 82,200

11   after accounting for withdrawals.  Importantly, Your

12   Honor, I think it's important for the Court to know --

13   and we checked with our claims agent Omni last

14   night -- that, as you probably suspect but -- but

15   maybe didn't know, there have been a significant

16   number of amendments to these claims in the

17   intervening months since the Bar Date.

18             Specifically, there have been approximately

19   24,000 total amendments, and that includes

20   approximately 17,000 amendments since February 16,

21   2021, which is the -- the date that the last of the

22   declarations of Mr. Schiavoni's proof of claim

23   evaluators were -- were filed.  And of course, the

24   amendment standard being what -- what it is in

25   Delaware, there are more amendments coming all the

1  time, and we expect there to be significant amendments

2  all the way up until, you know, the -- the -- the

3  confirmation hearing.  So, Your Honor, that sets the

4  table on the bar date.

5          There -- there's also been other activity in

6  this case.  And I won't belabor this, but -- but, you

7  know, I think it's important because in this context,

8  there's going to be evidence presented about, you

9  know, handwriting experts and proofs of claim and what

10  they're missing or we're missing or -- or, you know,

11  lazy or nefarious -- call it what you will --

12  signatures that have been affixed or -- or printed or

13  photocopied.

14          But much of this is -- has already been -- I

15  hesitate to say litigated -- but has been brought

16  before this Court in the 2004 and 2019 context.  And

17  as Your Honor, you know, obviously knows, the -- the

18  2004 motion seeking to serve discovery on a sampling

19  of actual claimants, and what we're worried about here

20  are the claimants, not necessarily the attorneys and

21  the aggregators because I think, as Your Honor

22  identified, you've looked back and although, you know,

23  other case have -- have, you know, identified issues

24  with the attorneys and aggregators, no one has really

25  prevented somebody from voting because of their --

1  their -- the way their vote was called or the way it

2  was produced by their attorney.

3          But in any event, there -- there has not

4  been 2004 discovery on -- on the claimants.  We do

5  know that -- that Your Honor obviously approved some

6  of the 2004 with respect to certain claims aggregators

7  and then ordered the 2019 statement to be filed by the

8  Kosnoff firm.

9          Your Honor, after the bar date in service of

10  this solicitation, the debtors endeavored to create

11  what we call the solicitation directive.  And the

12  important part about the directive was -- was to get

13  back in touch with the attorneys for these 80,000-plus

14  abuse claimants and try to figure out a way to -- to

15  solicit in an effective and administratively efficient

16  manner, and then the best way to get those folks, the

17  claimants, the actual voice to vote.

18          On the bar -- or on the proof of claim form,

19  rather, Your Honor, there was an ability for the

20  claimant to note its law firm and -- and to accept or

21  to allow the debtors to communicate with their law

22  firm.  And the debtors did that through the directive

23  to ask what their preferred mode -- mode of

24  solicitation would be.

25          Just as a note, the directive also went out

1   to some claimants where the communications with the

2   firm box was not checked, but in those instances in

3   order to respond on behalf of the claimant, the law

4   firm was required to submit written verification of

5   their authorization from the abuse survivor client to

6   receive the solicitation package on his or her behalf.

7            Those directives, Your Honor, specifically

8   asked if they would prefer to receive a direct ballot

9   or receive -- on behalf of their clients -- or receive

10  a master ballot to vote on behalf of their clients in

11  one centralized document.

12           The directive requested that the law firms

13  voluntarily informed the debtors of their preference,

14  and many firms did.  Importantly, Your Honor, because

15  I think this will come up later in the context of

16  whether or not a 2019 is now required for a firm to

17  vote its master ballot.

18           These directive did themselves contain,

19  actually, pretty extensive certifications.  Among

20  other things, the directive certification provided

21  that by signing below, I hereby certify that I have

22  authority under law and I have duly valid and

23  enforceable authorizations to vote to accept or reject

24  the plan on behalf of my abuse survivor clients in

25  accordance with my firm's customary practices.

1              Further, it provides I represent each of the

2    abuse survivor clients set forth on the Excel

3    spreadsheet that lists the claim numbers' names,

4    mailing addresses, emailing addresses, and other

5    information regarding my survivor clients that I have

6    received from the solicitation.

7              So Your Honor, it provided more, as well,

8    but I won't continue to read from the certification.

9    But the point is that that directive was sort of an

10   intermediate step for the -- the estates to liaise

11   with these firms that represent the clients and try to

12   understand and confirm that they represented this

13   group of clients and that they would prefer to vote

14   via master ballot.

15             THE COURT:  Mr. O'Neill, is that -- is that

16   certification on file -- the format, the template for

17   the certification on file with the Court somewhere?

18             MR. O'NEILL:  Yes, Your Honor.  It is.  And

19   I'm getting a docket cite.  Oh, it's Exhibit 11, Your

20   Honor, to the order.

21             THE COURT:  Okay.  Thank you.

22             MR. O'NEILL:  Sure, and I -- you know, happy

23   to have you read along or you can read at your leisure

24   without me having to belabor it on the Zoom vid.  So

25   I'll continue going -- do you want to go over it, Your

Page 20

```
 1   Honor?  I'll wait.
 2          THE COURT:  I don't recall seeing it, but
 3   obviously, I'm reading a lot of documents.  But the --
 4   but what you're telling -- is what you're telling me
 5   that the -- that these certifications have already
 6   gone out and been filled out and been returned?
 7          MR. O'NEILL:  Correct, Your Honor.  Yes.
 8   This happened back in April.  And just to clarify one
 9   point, if the directive went out and did not come
10   back, the debtors will be sending direct ballots to
11   those claimants.
12          THE COURT:  Okay.
13          MR. O'NEILL:  So meaning if the firm was
14   unable to certify to these things, their clients are
15   going to get direct ballots, and they can send them
16   in.
17          So Your Honor, one of the effects of that is
18   that working with Omni, the estate has been able to
19   utilize this information to help support and validate
20   the master balloting process.  And as a result, we
21   plan to send a total of approximately 19,000 direct
22   abuse claim solicitation packages instead of
23   approximately 82.200, which, depending on where we end
24   up with Mr. Buchbinder later on the form of packaging,
25   in any event, it saves the estate significant money.
```

1    But if we have to mail hard copies, we're talking -- I

2    can't do the math in my head, but millions of dollars,

3    if not tens of millions of dollars.

4           So Your Honor, so moving to solicitation and

5    what we're asking for from Your Honor today, we filed

6    disclosure statements, as people have been wont to

7    point out over the last couple days, and rightfully

8    so, as well as four versions of the solicitation

9    procedures order and related materials, including the

10   version currently before the Court.

11          While the plan and DS (phonetic) have

12   evolved significantly, as you might suspect, the

13   solicitation procedures, in large part, have remained

14   the same, especially the versions filed on July 2 and

15   last week.  There were very few changes, but we've

16   provided red lines to these documents, and they're in

17   your document binder under Exhibit B, and that begins

18   at Page 244 of the PDF numbering to the extent you

19   want to reference the documents.

20          The voting procedures and forms of nonabuse

21   claimants are standard for nonabuse claimants, Your

22   Honor, and have raised a couple of objections that are

23   kind of catch-all objections from the U.S. Trustee's

24   office.

25          But given the nature of the survivor claims

1   pool, as Your Honor well knows, we're stuck with some

2   special procedures for that class, just in order to

3   deal with 80,000-plus unliquidated claimants and how

4   to solicit a group that large with -- with little

5   visibility on the actual claims.  So we've -- we've

6   done what most debtors in this position have done, but

7   we've added a few critical tweaks.  And I'll -- I'll

8   walk through those with you, Your Honor, just to --

9   just to give you an idea.

10          First, as noted above, we submitted a

11  voluntary directive intended to streamline the

12  transmission of the solicitation information.  Not

13  only has this put us in a position to solicit more

14  effectively and -- and administratively more

15  efficiently, but it created another layer of defense

16  to confirm which of these firms represents the

17  claimants.  It took the proof of claim information,

18  put it to these firms, and they had to certify that

19  there were willing to vote on behalf of those folks.

20          Second, given the -- the large number of

21  abuse claimants represented by counsel, we're -- we're

22  going to use the master balloting process.  And this

23  is typical.  But beyond that, it's important here to

24  give the number of claimants administrative

25  convenience and -- and also, Your Honor, our ballot --

1   our master ballot is not typical.  You know, I'm not

2   going to sit here and tell you everybody's done this,

3   so we need to do this.  That -- that may or may not be

4   true, but in fact, we're using a master ballot that's

5   a little bit different and unique in a good way.

6           First of all, it's specifically tied to the

7   claimant's proof of claim that that firm -- that are

8   those firm's clients.  So the Excel spreadsheet that's

9   attached has a specific dropdown for each client, you

10  know, to vote in the release election and the

11  expedited election.  And then a law firm must fill out

12  this box for each client.

13          And second, there will be a claim number for

14  which a claim has been submitted under penalty of

15  perjury for each claim on the exhibit that is mailed

16  to each law firm, along with claimant name, last four

17  of Social Security, and month and year of birth.  Law

18  firms will not be able to add claimants to the master

19  ballot.  This is not an ad hoc process, Your Honor,

20  were a firm goes through its files and pulls out, you

21  know, 2,000 new claimants so it can juice the vote.

22  That can't happen here.  It's -- it's based on the bar

23  date and submission of proofs of claim.

24          And, you know, as I alluded to earlier, Your

25  Honor, in our certification section -- and we -- we

1   can talk about whether this is beefy enough -- but we

2   have eight certifications rather than the three that

3   were on the Imerys master ballot.

4           And -- and if Your Honor would like, we can

5   turn to them now.  But I'll -- I'll just submit to you

6   that this includes a robust additional collection of

7   representation regarding representation, the

8   collection of ballots, and the authority to vote on

9   the plan.  The plan is defined as the plan, so it

10  means our plan.  And a representation that the

11  disclosure statement has been provided to that abuse

12  survivor client.  I think you'll find, Your Honor --

13  and we don't need to read through them together

14  with -- with all these, you know, folks on the hearing

15  and on the call -- but I think you'll find that

16  they're materially different and improved.

17          THE COURT:  Let me ask -- let me ask a

18  question, Mr. O'Neill.  I do have the certifications

19  and acknowledgements in front of me.  I happen to be

20  looking at the clean copy.  I realized after I started

21  I wasn't working at -- looking at the red line, and I

22  can find that if that's what other people have been

23  looking at.  But -- and I'm specifically looking at

24  the master ballot for Class A, direct abuse claim

25  master ballot.  And I think I have a couple of

Page 25

1  questions before the certifications, but with

2  respect --

3          MR. STANG:  Your -- Your Honor?  Your Honor,

4  could you tell us the docket number you're looking at

5  so we can all pull it up?

6          THE COURT:  Yes, I --

7          MR. STANG:  Because some of us have the red

8  line up.

9          THE COURT:  I'm at Document 60 --6215.

10          MR. STANG:  Okay.  Sorry to interrupt.

11  Thank you, Your Honor.

12          THE COURT:  That's okay.  Thank you.  6215,

13  I'm in dash 1.

14          MR. STANG:  Got it.

15          MR. O'NEILL:   And if you're on the red

16  line, you're in dash 2.  Sorry -- sorry to interrupt,

17  Your Honor, but that might be helpful.

18          THE COURT:  And I'm on Page 116 of 240.

19          MR. O'NEILL:   Okay, Your Honor, would you

20  like me to highlight the -- the --

21          THE COURT:  Let me ask -- let me ask some

22  questions.  I'm just making sure everybody has time to

23  get to it.

24          MR. O'NEILL:   Got it.

25          THE COURT:  I don't --

1          MR. O'NEILL:   Sorry.

2          THE COURT:  Good for y'all that can do that

3    on computer.  The -- and I do think it's an important

4    distinction that you've raised that in Imerys, I did

5    not have the benefit -- or some may say not benefit,

6    but I didn't have the benefit of a bar date order, so

7    I didn't have a universe of claims in front of me,

8    regardless of what you think of those claims.  I

9    didn't have a universe of claims in front of me.  And

10   so we were in situation where the master ballots went

11   out to law firms, and -- and law firms were -- well,

12   the number of claims that they -- that they returned

13   was a stranger -- a stranger basically to the Court,

14   in terms of what number they -- they returned on their

15   ballots.

16          So there certainly was less clarity about

17   what -- where -- how ballots were generated and the

18   source and the basis for the claims on those ballots.

19   So I -- I do acknowledge that that's quite frankly a

20   material difference.  I really do think it is a

21   difference.  And let me ask a couple of questions with

22   respect to the certification.

23          First question I have is it's -- it says

24   the -- the -- the prefatory language is, by signing

25   this master ballot, the undersigned certifies on

1  information and belief that the following statements

2  are true and correct.  And some of these statements --

3  maybe all but at least some of these -- I don't think

4  should be on information and belief.  I think -- not

5  the way I think of it as a pleading kind of -- how you

6  would use that in a pleading.  Some of these things

7  are true or they're not true, and they're -- and they

8  should be able to be validated, the easiest one, for

9  example, seven: I've provided the disclosure statement

10  in hard copy, flash drive, or electronic format to my

11  abuse survivor clients.

12           The attorney did that or didn't do that and

13  can verify that.  And I recognize maybe his assistant

14  did it or something, but nonetheless, I think that's

15  something that should not be on information and

16  belief.  That's the statement.  They did it or they

17  didn't do it.  And actually, I like the fact that they

18  had to do it, so I appreciate that.  The abuse

19  survivor may be overwhelmed by -- by getting that

20  document, but I think that's appropriate.  So --

21           MR. O'NEILL:   And -- and we -- we --

22           THE COURT:   -- I'm wondering what -- the

23  base -- why -- do we need information and belief?  And

24  on which one of these do we need information and

25  belief?

1           MR. O'NEILL:   I think we're -- the debtors

2    are prepared to just strike that entirely, Your Honor,

3    and not monkey with which of it applies to -- what

4    does it apply to and what doesn't it apply to.

5           THE COURT:  Okay.  The -- another question I

6    have, then, with respect to what this certification

7    could be -- and quite frankly, I'm up to hearing

8    discussion about it because I haven't had to think

9    through these issues before.

10          To the extent -- and -- and I have

11   conflicting views on this.  Should this certification

12   be made as an Officer of the Court?  These are being

13   made by attorneys.  As an Officer of the Court

14   pursuant to -- let me say it this way.  Should it be

15   expressly made -- these certifications be expressly

16   made as an Officer of the Court pursuant to and

17   subject to all applicable rules of professional

18   conduct that any attorney may be subject to?

19          And the reason I'm asking this is because I

20   think those kinds of statements convey to the signer

21   the seriousness with which this document is being

22   signed and reminds the signer -- and let me say right

23   here.  I do not believe every attorney perhaps needs

24   to be reminded.  But it reminds the signer of the

25   import of what they're signing.

1                 And on the other hand, I could make the

2    argument that when the attorney is signing for the

3    client, they are acting as the client, not necessarily

4    as the lawyer.  And therefore, I think that has

5    ramifications in terms of down the line discovery

6    or -- or subjecting yourself to questions that your

7    client would have to answer.

8                 So I'm -- I'm throwing it out there.  I

9    recognize you don't realize what questions I'm going

10   to ask.  But it -- the thought I had as I read this as

11   to the capacity in which the lawyer, employing the

12   master ballot, is certifying -- and in this instance,

13   I do think he's certifying as a lawyer and perhaps

14   should be reminded of the seriousness of which I would

15   take such a certification.

16                MR. O'NEILL:   And -- and, Your Honor, I --

17   my reaction to that is, if that is what Your Honor

18   thinks -- or rather, if that would make Your Honor

19   more comfortable with our process and the eradication

20   of any fraud or bad behavior, then I think that the

21   estates would be comfortable with that, that the

22   debtors would be comfortable adding language to that

23   effect.  I -- I -- I understand entirely your thrust

24   here, which is to put some more seriousness behind it

25   so you're not just signing something.  You're doing it

```
1    as an Officer of the Court, and the expectations of
2    that weight of being an Officer of the Court are
3    therefore on you when you sign this.
4              I -- I -- I think it's a -- it's sort of a
5    middle ground between making this subject to penalty
6    of perjury.  And, you know, I think this could be an
7    appropriate middle ground.  Obviously, we're happy to
8    hear from others if anybody thinks it's inappropriate,
9    but seems to me that Your Honor has been contemplating
10   this since Monday, and it's not coming out of the blue
11   on this -- this call, so --
12             THE COURT:  Yes, but contemplating this
13   since all of Monday and -- the other way to look at
14   it.  So I don't know if this has been done in any
15   other circum -- any other cases.  Again, whether it
16   has or hasn't is not influential, necessarily.  But
17   it's a -- it's a thought I had.
18             MR. O'NEILL:   I mean --
19             THE COURT:  I don't know if any others have
20   thoughts on this and want to weigh in or not.
21             MR. STANG:  Your Honor, I have my hand --
22   it's Mr. Stang.  I have my hand up.
23             THE COURT:  Mr. Stang?
24             MR. STANG:  Your Honor, we are definitely
25   living in a post-Imerys hearing world.  There's no
```

```
1   doubt about it.  And this order with -- with all due
2   respect to everyone on this call, was done with some
3   maybe less awareness of some the problems that can
4   arise in these situations.  Certainly, for me this --
5   what happened in Imerys at the hearing that I -- we
6   represent -- we have representation of Imerys.  While
7   I wasn't on the call, Ms. Grassgreen participated in
8   the hearing, and I heard about it in details.
9              I think the word that stood out from all of
10  Mr. O'Neill's presentation was integrity.  We have got
11  to be sure that the process has integrity, but as
12  important -- and this is critical to Mr. -- Dr.
13  Kennedy, Mr. Humphrey, and the seven other committee
14  members.  This will be probably the only instance,
15  other than maybe the proof of claim process, where a
16  survivor can truly say, I have been heard.  This is --
17  this is the time.  This is probably the last time in
18  this case where they will be able to have -- speak
19  their own voice.  And so integrity is really
20  important.
21             And so I think the highest standard -- I
22  mean, I didn't hear you say Officer of the Court as
23  some kind of middle ground to penalty of perjury, the
24  way Mr. O'Neill stated it, but we should have layer
25  upon layer upon layer here.
```

1           And I want to make one thing absolutely

2    clear.  While the TCC opposes this plan, this has

3    nothing to do with my comments on the first day about

4    mass tort lawyers and what impact it may have on the

5    case.  This is about survivors.  And we need to be

6    sure that whoever is submitting a master ballot using

7    a process that does not bear that client's signature

8    on the ballot has every level of protection that their

9    voice is being accurately heard.

10          So I have lots of comments on the

11   certification part, Your Honor.  I will hold back on

12   that, but as for this Officer of the Court, applicable

13   rules of professional conduct, thumbs up, thumbs up.

14   Penalty of perjury, thumbs up.  This has got to be

15   rock solid as we can make it as far as the

16   certifications are concerned.  Thank you, Your Honor.

17          THE COURT:  Thank you.  Mr. Schiavoni?  You

18   need to unmute.

19          MR. SCHIAVONI:  So I'm not quite sure how

20   you intend to proceed here.  I thought you were going

21   to hear proponents of the form of order and then

22   opponents of it.  I mean, I'm happy to proceed on this

23   line-by-line however, but --

24          THE COURT:  Well --

25          MR. SCHIAVONI:  -- I would like to be heard

1  at some point in a --

2          THE COURT:  Of course.

3          MR. SCHIAVONI: -- (inaudible) way.  And --

4  and I'd like to make a proffer of evidence, and I'd

5  like to offer evidence, also, as part of that, so --

6          THE COURT:  We'll get to that, and, you

7  know, that's a good question about exactly how this

8  part should proceed.  But I will absolutely give you

9  an opportunity to speak.  I'm throwing out some --

10  some thoughts out there.  And I realize that some

11  people have question -- all types of issues with

12  respect to voting, and we're going to get to those.

13          MR. SCHIAVONI:  So let me, then, take your

14  invitation and just comment on this, on whether or not

15  -- you know, Your Honor, I did sit through and listen

16  to Tom Bevan's testimony.  I know Tom Bevan from other

17  matters, and we've read his prior depositions from

18  other cases.  You know, I don't know how you could

19  listen to -- well, let me put it differently.  My case

20  --

21          THE COURT:  Let's be careful because he's

22  not here.

23          MR. SCHIAVONI:  That's -- that's fair

24  enough.  That's fair enough.

25          THE COURT:  Okay?

1          MR. SCHIAVONI:  I think -- here we -- here's

2   my concern, without making it specific to him, but

3   it's -- it's, like, I think that there are -- there

4   are lawyers who think that there's nothing wrong at

5   all with what they did.  And that the description that

6   we sort of heard when you asked him about, you know,

7   what was done to vet the claims, and his -- and the

8   responses we got about, well, all I needed was sort of

9   a thought that it was possible we had a claim, if you

10  remember that as part of the vetting.

11          And then it was even looser than that, a

12  sort of good-faith sort of basis for it.  And then

13  questioning about, well, gosh, did you get any, you

14  know, conflict waivers?  And it's like, no, of course

15  not, okay?

16          Does anyone think really that the

17  certification would have changed the vote from that

18  fellow?  I -- it -- you know, or not -- not with

19  respect to him personally, but does Your Honor -- I

20  think you have to sit back and think about this, about

21  whether or not fundamentally self-certification to a

22  lawyer who's going to take 40 percent as -- as part of

23  a locked-up coalition, you know, of the money here

24  wasn't going to change anything.

25          It's, like -- you know, Your Honor, as part

1  of the, you know, the decision about -- and the advice

2  Your Honor gave to the parties about how they should

3  sign the proofs of claim.  Your Honor admonished folks

4  that the proofs of claim should, you know, really be

5  signed by the claimants.  Your Honor was going to

6  allow attorneys to do it, but if they did it, they

7  were admonished on the record that, like, they really

8  needed to vet the claims.  And you have the evidence

9  before you on what happened.  Does -- you know, you

10  can -- you can put belt and suspenders on the

11  certification, but if it's -- at the end of the day,

12  it's a self-certification that doesn't allow any

13  testing by the Court.  Does it get us anywhere?  Does

14  it change anything?

15           THE COURT:  It's a fair question.  It's a

16  fair question.  Then the -- the situation might be do

17  we allow master ballots at all, but the -- I'm not

18  sure what the in-between position is, but I hear that.

19  I hear that, and it's a fair question, and something

20  I've thought of.  And that's why I'm having this

21  discussion because I thought of this since all of

22  Monday, okay?

23           MR. SCHIAVONI:  I think this --

24           THE COURT:  And I'm not sure what exactly to

25  do with this.  So --

Page 36

1          MR. SCHIAVONI:  (Inaudible).

2          THE COURT:  -- Mr. Rose -- oh, I'm sorry.

3          MR. SCHIAVONI:  I'm sorry, I thought

4   yesterday Your Honor was half maybe suggesting or

5   maybe I'm reading too much into it that the history of

6   these master ballots and, you know, I think, you know,

7   it is true that they've been used in mass tort cases

8   for some time.

9          There's been a couple of cases where the --

10  those issues were tested, not as broadly as here, to

11  be clear, and when I get an opportunity to make my

12  overall presentation, I'd like to talk about those.

13  But the real background on this is that this process

14  sort of start, like, it was used by indentured

15  trustees --

16         THE COURT:  Um-hum.

17         MR. SCHIAVONI:  -- you know, who have --

18  it's an entirely different kind of background where

19  they have --

20         THE COURT:  Right.

21         MR. SCHIAVONI:  -- you know, a contractual

22  obligation, you know, delegated authority, and they

23  would, like, the practice was for them to use master

24  ballots.  And it was picked up, you know, by some here

25  in some of these mass tort cases and used, and then,

1    there were some challenges to it.  But there, you

2    know, there has not been a court that's looked behind

3    it.

4              I don't know that there's any precedent for

5    someone trying to change their vote so that it would

6    kind of reveal kind of what was happening or

7    precedent, frankly, for what we have here as far as,

8    you know, the evidence on the proofs of claim.

9              So yeah, you are going to hear me argue that

10   master ballots should not be used here or at least not

11   used in particular circumstances.

12             THE COURT:  You're back, okay, I'm sorry.  I

13   was frozen there for a bit.  I don't know if everybody

14   else was or not.  I'm familiar generally with master

15   ballots in the context of indentured trustees, with

16   master ballots in the context of shareholders, equity,

17   a proxy fight in CD and Co (phonetic) and that kind of

18   thing.  I don't know how they got imported.  I'm sure

19   some enterprising mass tort lawyer said, here's

20   something we can use to help in a particular case.

21             But I hear the point.  I'd like some others'

22   thoughts on it.  I will say sort of connected to this

23   whole idea, especially in a situation where there's

24   actually going to be, if this ballot is approved, a

25   party can elect into a $3,500 settlement, in essence,

Page 38

1    of their claim.

2            That's a whole other level of complication

3    here, to make certain that the client understands that

4    they've settled their claim and that the lawyer has

5    authority to settle their claim for $3,500.  And I

6    recognize, again, people have issues that, but to

7    throw things out there, that, to me, is another level

8    of complication to this.

9            MR. SCHIAVONI:  Your Honor --

10           THE COURT:  (Inaudible), oh.

11           MR. SCHIAVONI:  Yeah, just, you know,

12   another that's -- and you'll hear me talk about this,

13   but another thing that flows into is the fact that the

14   voting bloc for which the master ballots are really

15   going to be used, the attorneys' fees are being -- are

16   embedded in the plan, so that the -- it creates, I

17   think, a conflict between the lawyers and their voting

18   clients.

19           You heard Mr. Molton yesterday talk about

20   what's in his letter, but I think he came at it from

21   the wrong side because his retention letter, if you

22   remember, went out to the Coalition, all their

23   clients, okay?  And you know, they claim there's,

24   like, 50,000 of those clients.  Most of them, the vast

25   bulk of them, affirmatively opted out of retaining Mr.

1  Molton.

2          So it's like the statement in the letter,

3  retention letter, that says you may seek a substantial

4  contribution claim, that could bind the actual

5  technical Coalition members, but there's a relatively

6  small number of those.  I forget whether it's 14 or

7  17,000 is the claim.  The bulk of them affirmatively

8  opted out, so now, we have the debtor putting that in

9  the plan, encouraging -- and it's pretty clear, it's

10  to lock up the votes of the voting Coalition members

11  to deliver this vote that they're talking about.

12          And when we objected to the fees in

13  connection with the RSA we set out for Your Honor, we

14  gave you all the case law about the conflict that

15  poses, really, for a lawyer, you know, when he has a

16  direct self-interest in something -- to inject that

17  into the balloting, it does inject yet another level

18  of complication for the Coalition to use master

19  ballots.

20          THE COURT:  Mr. Rosenthal, you've had your

21  hand up for a while.

22          MR. ROSENTHAL:  Thank you, Your Honor.

23  Michael Rosenthal of Gibson Dunn on behalf of the AIG

24  companies.  Your Honor, I want to address the specific

25  question you raised.  And while I don't think my

1  answer is directly on point, I think by analogy it may

2  be.

3          I fully support that these certifications

4  should be -- either as Officers of the Court or more

5  appropriately, I think, under penalty of perjury.  We

6  have some examples of this in the asbestos context.

7  You know, the Court may know as the case law has

8  developed as the years have gone by that courts

9  hearing asbestos cases, including your colleague,

10  Judge Cary, when he was on the bench, you know, have

11  insisted on fraud prevention measures to prevent

12  fraudulent claims from being asserted.

13          Now, that was not in the context of voting,

14  but it was in the context of asserting claims against

15  trust.  But I think it has the same impact.  Those

16  fraud prevention measures include certifications, but

17  they also include audit rights, and they include the

18  ability to hold a lawyer to account for filing claims

19  that are inappropriate.

20          And it is that last mechanism that causes, I

21  think, the lawyers to pause before they submit claims

22  that they don't believe are appropriate or that they

23  don't have support for.  And that's, you know, that

24  panoply of fraud prevention measures is what Judge

25  Cary ordered in the Miramonte case.

Page 41

```
 1              THE COURT:  Miramonte?

 2              MR. ROSENTHAL:  Um-hum.  And what have been

 3   ordered in any number of cases dating to the original

 4   case that set this up was the Garlock case out of the

 5   Western District of North Carolina.  So I offer that,

 6   and I think that here requiring that does make these

 7   lawyers stand back and have certainty or at least

 8   investigate these claims enough to be able to say,

 9   yes, I'm entitled to both these claims.  I'm entitled

10   to make the election because I've spoken to my client

11   about it.  I am committing them for something.

12              THE COURT:  I'm aware generally of Miramonte

13   and the issues that the United States Trustee and

14   others have been raising in the various cases.  And I

15   assumed this was an issue we would get to with respect

16   to TDPs.  I do wonder whether there's something we can

17   borrow from it to put in the ballots.  And I don't

18   view the fact that this issue was not something I drew

19   attention to specifically at proof-of-claim time,

20   although I do recall admonishing lawyers of their

21   responsibilities in signing the proof of claim.

22              I don't consider, you know, the horse out of

23   the barn.  This is another -- this is another step,

24   and I think we should impose appropriate admonitions

25   here.  And I want to say, again, particularly because
```

Page 42

1   I know I have members of the plaintiffs' bar on this

2   Zoom cast, and I'm not impugning the integrity of any

3   particular plaintiff's lawyer, and I don't want to

4   suggest that I'm doing that.

5           I'm addressing an issue that I've not had to

6   address before and, quite frankly, haven't really seen

7   in my 35 years of practice of how we should be

8   handling the ballots, particularly in this master

9   ballot situation where we do have lawyers voting for

10  their clients.  And here, perhaps resolving a claim in

11  that very same vote.

12          MR. STANG:  Your Honor, just on that

13  element, there are retainer agreements that are on

14  file with the Court that -- some of which talk

15  about -- and I had put aside the certification that

16  was done earlier in the case, the retainer agreements

17  sometimes, and I had the authority to settle the case.

18          But we all know from the rules of

19  professional conduct that you have to consult with

20  your client regarding a settlement.  The client has to

21  have informed consent, and you know, this idea of the

22  $3,500 election, as you've pointed out, is a whole new

23  wrinkle.

24          Someone's got to talk to the client about

25  that.  I don't think you can rely on something that

Page 43

1   was done in April -- I think it was April -- when the

2   $3,500 expedited payment wasn't even in most people's

3   constellations.  It certainly wasn't there at the time

4   of the execution of the retainer agreement.

5          So I think you're right.  The different

6   elections, be it 3,500, the releases, whatever after

7   check-the-boxes are going to be, adds a complication

8   on the informed consent aspect of this.

9          THE COURT:  Mr. Smola?

10          MR. SMOLA:  Thank you, Your Honor.  I just

11   wanted to give the Court plaintiffs' lawyers'

12   perspective on this for just a moment.

13          THE COURT:  Um-hum.

14          MR. SMOLA:  This plan and the impact of a

15   yes vote is significant.  It potentially compromises

16   that individual's rights against a local council.  It

17   potentially compromises that individual's rights

18   against a charter.  It presumably turns down an offer

19   of $3,500.  All of these things have to be conveyed

20   under all of the rules of ethics to every client, and

21   it needs to be signed off on by every client.

22          And it's particularly important in this case

23   because a yes vote from a victim doesn't just impact

24   that victim.  This court's going to be deciding issues

25   involving non-consensual third-party releases.  So

1    those yes votes, that consent, and the integrity of

2    that consent is absolutely critical.

3         So I would endorse every possible mechanism

4    this Court seeks to employ to ensure the integrity of

5    the vote.  Thank you, Your Honor.

6         THE COURT:  Thank you.  Okay.

7         MR. GOODMAN:  Your Honor.  Do you see my

8    hand up?

9         THE COURT:  Oh, I'm sorry, Mr. Goodman.  I

10   hear you.  There you are.  Okay.

11        MR. GOODMAN:  Thank you, Your Honor.  Eric

12   Goodman, Brown Rudnick, on behalf of the Coalition.

13   Your Honor, I would just like to state our

14   understanding as to how this is supposed to work so

15   there's no ambiguity on these issues.  And before I

16   even get into that, I did want to correct a statement

17   that Mr. Schiavoni said earlier, and I've heard him

18   say this several times, and it is not true that, you

19   know, tens of thousands of clients represented by

20   Coalition firms affirmatively opted out of being part

21   of the Coalition.  That is false.  You know, to my

22   knowledge, I'm not aware of any "opt-outs."  You know,

23   so I just wanted to correct the record on that point.

24        Your Honor, if you look at the master ballot

25   solicitation method, there are really two parts of it.

1   I don't know if the Court has -- what you have in

2   front of you.  I'm looking at Docket number 6215-1.

3   This is on Page 7.  It's Section 5A, and

4   notwithstanding my tendency as a draftsman to go from

5   number to letter to number, there's a 5AA in the whole

6   and then a 5AB.

7           As Coalition counsel, I'm really not

8   terribly focused on 5B.  That's the provision that

9   would have firms claiming that they have authority

10  under applicable law to vote.  I'm actually --

11          THE COURT:  Sorry, Mr. Goodman.  I'm not

12  following you.  You're in document 6215-1, and what

13  page are you on?

14          MR. GOODMAN:  I'm on Page 24 of 240.

15          THE COURT:  Ah, in the -- I got you, Page

16  24.

17          MR. GOODMAN:  Yeah, I just want to

18  correct --

19          THE COURT:  Okay.

20          MR. GOODMAN:  -- I think there's a -- so I'm

21  looking at 5AA.

22          THE COURT:  Um-hum.

23          MR. GOODMAN:  And it's --

24          THE COURT:  I have AA, yeah.

25          MR. GOODMAN:  Yeah, and that's -- I'm

1    actually not terribly thrilled or concerned about B.

2    I'm much more focused on A.  From our perspective, the

3    master ballot solicitation method permits law firms

4    to, first, find out from the client how they want to

5    vote.  Second, cast the votes based on that direction

6    as provided by the client.  Third, report that vote on

7    a master ballot, and then, submit the master ballot to

8    Omni.

9            Under these procedures, Omni is to send the

10   disclosure statement package to each law firm, but

11   each law firm must transmit and make those materials

12   available to the client.  The client decides how they

13   will vote.  The language in 5A, which describes the

14   master ballot solicitation method, states that each of

15   the survivor shall have indicated to the firm his or

16   her informed decision on such vote.

17           That's something we added.  That's something

18   the Coalition insisted on.  Unless a firm has clear

19   authority to vote on behalf of its abuse survivor

20   clients, and I'm not saying any do, each survivor must

21   communicate to his or her firm how he or she is

22   voting.  And the votes must be cast in strict

23   accordance with the client's instructions.

24           The Coalition firms will recommend that

25   their clients vote yes, but -- and I want to be very

1    clear on this -- we will not and do not guarantee that

2    100 percent will vote yes.  There have been multiple

3    filings in this case where the Coalition has stated

4    that it would use reasonable efforts to advise and

5    recommend.  You've seen phrases like meaningful and

6    informed participation on voting decisions.  That's

7    our language.  That came from us.

8              Survivors are entitled to make their own

9    decision.  I don't know how many times I have to say

10   that, and I will keep saying it.  Votes should be cast

11   based on the survivor's decision.  Now, why is this

12   important here?  We are trying to avoid

13   disenfranchisement.  When you make firms a voting hub

14   or a polling location, to use a modern analogy, the

15   result is a process that runs more efficiently than

16   any alternative that I have seen.  It works.

17             And we would not be here supporting

18   procedures if they were not efficient and if they were

19   not designed to be implemented in a way that would be

20   successful in this particular case.  We're trying to

21   use the best tools at hand.

22             If survivors have questions, and I think

23   almost all of them will, they can and they will

24   contact their attorneys.  And despite the time spent

25   on the disclosure statement, I must say, respectfully,

Page 48

1   it's a challenging document for a layperson to

2   understand and so may be the plan summary.

3          I think a lot of the survivors here are

4   going to look to their attorneys for help in figuring

5   out what to do.  And when the Coalition firms say, as

6   they have, that they support the plan and will

7   recommend that their clients vote yes, that is real

8   value in a mass tort case.  All of the progress in

9   this case hinges on that.  The Hartford settlement,

10  the TCJC settlement, future settlements with insurers,

11  the plan architecture for chartering organization all

12  depend on survivors voting to accept the plan.

13         Otherwise, there can be no (inaudible)

14  injunction, and without that, this entire plan fails.

15  So we do want to use the best tools available, and we

16  also know that if and when we get to plan

17  confirmation, dissatisfied parties, and I know there

18  are a number of them who are here today, are going to

19  object, and they may challenge the vote.

20         We understand that going in.  You would have

21  to be crazy not to, and we know that this has to be

22  done right.  We know that every I has to be dotted, we

23  know that every T has to be crossed, and we expect

24  that this will be an issue at confirmation.  And we're

25  going to be prepared for it.

1          Last point I want to make, Your Honor, there

2     was a bar date in this case as Mr. O'Neill noted at

3     the beginning of his presentation.  The proofs of

4     claim here were filed under penalty of perjury, and

5     those claim forms make it abundantly clear that the

6     claims asserted are for sexual abuse.  They're not

7     generic claims.

8          And I will note that many, many of the

9     amendments that Mr. O'Neill mentioned that have been

10    filed since February were filed to add clients'

11    signatures to the claim form.  I think it's premature,

12    frankly, for any party to be challenging votes at this

13    stage or even bringing up that issue for the simple

14    reason that we don't know who is going to show up and

15    vote.

16         Even in cases with very, very robust voter

17    turnout have never seen 100 percent tort victim

18    participation.  And if past events are any indication

19    of future events, I would expect that the survivors

20    that put the most time, the most effort into

21    completing the claim forms are the ones that are the

22    mostly likely to vote.  That is true in most mass tort

23    cases, and I have no reason to expect a different

24    result here.

25         I'm happy to answer any questions the Court

1  may have, but we feel very strongly that solicitation

2  procedures like these are necessary, extremely helpful

3  in a case like this, and you know, these are things

4  that should be done with the utmost integrity.  And

5  anyone who's suggesting otherwise, I respectfully

6  disagree.  Thank you.

7          MR. O'NEILL:  Your Honor, this is Andrew

8  O'Neill, I seemed to have started a cavalcade of sort

9  of opening statements, and I would like to get back to

10  my presentation, if we could do that.  And I, you

11  know, if Your Honor, you know, wanted to continue to

12  talk about the certification, that's fine, but it

13  seems like we'll get to it in other parts of the

14  discussion when we get to some of the objections.  So

15  if I could continue, Your Honor?

16          MR. STANG:  Your Honor, in that regard, I

17  just -- you have not, I think, actually ever spoken to

18  my partner, Debra Grassgreen.  She would like the

19  address the Court on the issue of the use of master

20  ballots, and Ms. Grassgreen has the unique status that

21  she was a personal -- she was a creditor of PG&E.

22          Her home was burned down, and she can tell

23  you something about how master ballots worked in that

24  case and the experience of an actual fire victim as to

25  the master ballot process vis a vis her lawyer.  So if

1  you want to do that now, she's ready.  If you want to

2  put that off, I just want you to know that she'd like

3  to address the Court on that personal experience she

4  had.

5          THE COURT:  Well, Ms. Grassgreen, I'm sorry,

6  I thought Mr. Stang was going to say that your

7  experience was in some case.  I'm sorry it was as a

8  personal creditor of PG&E.  I will hear you.  I am

9  hearing -- because I did ask the questions yesterday

10  about the use of master ballots, and so I will

11  certainly hear you.  I will say that I've -- no, I

12  won't say that.  The -- but let me know because I

13  don't want to forget this.

14          I'm glad -- I'll ask Mr. Goodman.  I'm glad

15  Mr. Goodman referred us to paragraph 5AA because I

16  think the language in there is more -- and I do recall

17  reading it -- I think it's more -- it's phrased

18  differently than the certifications, and I think it's

19  actually helpful language.  And it may be that we can

20  take parts of that and use it, as well.

21          Ms. Grassgreen?  And then, we will get back

22  to Mr. O'Neill.

23          MS. GRASSGREEN:  Good morning, Your Honor.

24  Debra Grassgreen, Pachulski Stang, and, yes, my family

25  lost its home and my husband and my son were trapped

1   in the fire, so it's a pretty personal issue to me.

2   But the experience that I had with respect to a lawyer

3   who had multiple clients who had actually signed an

4   RSA in that case was not on the committee I think it's

5   just important to share so that we can figure out as

6   we go through this process how we communicate with the

7   clients of firms that have, you know, multiple

8   clients.

9           Because what happened to me was that I

10  opposed the plan in PG&E.  I voted against it, but I

11  had an attorney who had signed an RSA and agreed to

12  recommend it and not oppose the plan.  So I was in the

13  situation where I had a lawyer who could not take my

14  instructions.

15          Now, I was unusual because I was involved in

16  the case, and I understood the case, and I'm an

17  experienced bankruptcy lawyer who's appeared before

18  Judge Moncalli (phonetic) many times, and I was able

19  to represent my own family's interests individually.

20          But -- and an unsophisticated client who is

21  a client of a lawyer who makes a recommendation, how

22  are we going to communicate to them what do they do

23  and how the lawyers are going to deal with that

24  ethical problem.  It wasn't addressed in PG&E, and

25  what happened in PG&E was there were lots of clients

1   who voted yes, voted no, but if they had the same

2   lawyer, there was a conflict, and their voices weren't

3   heard.

4           My voice was only heard because of who I am,

5   so I just wanted to share that experience with you.  I

6   mean, it happened to me, you know, and I called my

7   lawyer, and my lawyer said I agreed not to oppose the

8   plan, and oh, if I oppose the plan for you, this

9   person, client, wants me to support the plan.

10          So how are we going to help survivors

11  understand that the decision isn't being made for

12  them, either in reality or effectively, because of the

13  master ballot process and because of the joint

14  representation.  That's what I wanted to share, that

15  particular personal experience.  It's a very difficult

16  one, Your Honor, but that's what happened to me.

17          THE COURT:  Well, I think there's a -- if I

18  heard you correctly, if you -- agreeing to recommend

19  the plan is not agreeing to deliver a yes vote.

20  That's how I view it.  And if a client instructed

21  their lawyer that their vote was no and their lawyer

22  refused to check the no box, I think that lawyer --

23          MS. GRASSGREEN:  So it's a different --

24          THE COURT:  -- has an issue.

25          MS. GRASSGREEN:  My vote was accurately

1    recorded as a no vote.  It's not the voting, but I had

2    an objection to the plan.  I had an objection.  And so

3    the clients, somehow we need to, under the appropriate

4    rules of professional conduct, make sure that they

5    understand that just because they're part of a group

6    that's represented by one lawyer, and it doesn't --

7    this isn't at all unique to the Coalition.  It's

8    unique -- it's for any lawyers that are representing

9    multiple clients -- that if they --

10            THE COURT:  Right.

11            MS. GRASSGREEN:  -- want them to raise an

12   objection, if they disagree with the recommendation,

13   that the lawyer may not be able to represent them in

14   that disagreement.  I think that's the concern and how

15   do we communicate that.

16            MR. STANG:  Your Honor, I would add that in

17   the RSA, which I acknowledge has expired, but I have

18   no idea what the agreements are between the FCR, the

19   Coalition on the issue.  The RSA had a specific

20   negative -- two negative covenants.  One was the firms

21   could not object or take any other action to interfere

22   with the acceptance of the plan and could not solicit

23   approval or acceptance of, encourage proposed file,

24   any vote that was for anything other than the admitted

25   plan.

Page 55

```
1                So it's not just the recommendation part.
2     There were negative covenants in the RSA.  And again,
3     I don't know what the terms are of whatever agreement
4     that now exists between the Coalition and the FCR and
5     the debtor, but it was in the original RSA.  Thank
6     you, Your Honor.
7                MS. GRASSGREEN:  And it may be as simple,
8     Your Honor, as in the communications that go out to
9     survivors to explain to them that if your lawyer is
10    representing more than one survivor and those clients,
11    some want to support the plan and some want to oppose
12    the plan, you may have to get a different lawyer.
13                I mean, I don't know what else you can say,
14    but I don't think an unsophisticated survivor would
15    understand that.  I understood it, obviously, I'm not
16    your normal victim in a mass tort case.
17                THE COURT:  Okay.  Thank you.  This raises
18    issues that are not unique to the mass tort case.
19    Every lawyer who's ever had multiple clients has
20    conflict rules to work through and issues to work
21    through with respect to multiple representations,
22    hopefully worked out in the beginning of the
23    representations, but I have -- and lawyers have their
24    state law ethical duties.
25                Whether I can be -- and I think I cannot --
```

1    be the personal guarantor that every client has chosen

2    the right lawyer and that every lawyer is respecting

3    their professional obligations is something that I

4    said probably at other points in this case and

5    certainly in other cases that there are state law

6    rules, there are disciplinary council, there's all

7    kind of structures surrounding that.

8              So I have to give this some thought.  I

9    think we've talked about this as much as we can.

10   Let's move on, see what other issues we have, and I

11   will be giving all of this some thought, but I, of

12   course, appreciate what I'm hearing on this call,

13   which is that each individual survivor's vote needs to

14   be appropriately reflected in a ballot, counted

15   appropriately.

16             And what I'm going to be giving thought to,

17   and I'm sure it's going to come up in other aspects of

18   this, is can we take a vote so that at confirmation,

19   challenges of whatever nature people want to raise,

20   there's an ability to do so and have a vote that we

21   can look at to apply those challenges to.  So that's

22   what I'm trying to think about, as well, as we go

23   through this process.

24             For example, there is challenge to the

25   $3,500 expedited distribution and questions about

1   whether that is going to sway the vote and whether it

2   should.  Well, we're going to know the answer to that

3   question when we get the vote and whether the votes of

4   the survivors who choose the $3,500 distribution swing

5   the class.  We'll know that.  There are things we can

6   know once we see the vote and who's voted.

7            There may be -- and that's what I'm thinking

8   about.  Is there a way that at confirmation, if people

9   are going to challenge the vote, that we have the

10  information necessary to answer the questions that

11  will arise?  So I'm thinking about that, as well, in

12  connection with how the vote goes out and the

13  information that we ask for in the ballot.

14           I'm going to go back to Mr. O'Neill.

15           MR. O'NEILL:  Thank you, Your Honor.  And we

16  agree with much of what you said, and you'll hear me

17  actually iterate that, I think, throughout this

18  discussion.  You know, there are a lot of things that

19  people have raised that we just don't believe are a

20  today issue or are a front-end solicitation issue.  It

21  might well be a back-end issue with the voting report

22  or, you know, a matter of slicing and dicing the

23  information in connection with confirmation

24  objections.

25           We think we are position to do that at that

1    point, but again, our theme is we would like to begin

2    the solicitation, and we have procedures in place,

3    including the master ballot, which allow us to do

4    that.  Mr. Goodman hit on this, but remember, it's the

5    claimants that gave us the ability to contact their

6    law firms and have their law firms select the method

7    of voting.

8              We are pro-suffrage, we are also wanting to

9    do this the right way, but we acknowledge that people

10   get to choose how they want to vote.  So we're trying

11   to sort of juggle all those balls, Your Honor, and I

12   think we've done a good job as we'll discuss.

13             So I don't want to set off another round of

14   discussion with this very talkative crew on the

15   certifications at this point.  I just -- my last point

16   on the certifications is that it has a built-in audit

17   procedure for the debtors to require a power of

18   attorney or other written documents be provided to the

19   debtors.

20             So you know, and we talk about this, Your

21   Honor, but perhaps, you know, we can use that on the

22   backend to, you know, just double check in a couple

23   instances what, you know, what certifications have

24   been made and if there's a valid authorization for the

25   attorney for be voting.

Page 59

```
 1              So Your Honor, in sum on my opening remarks,
 2   I think the debtors submit these procedures are
 3   appropriate and protective given the unliquidated
 4   claims pool that we're dealing with in this case.  And
 5   again, I think what we've provided in our procedures
 6   are the only way that we are going to get to
 7   confirmation on the schedule that we've proposed.  Our
 8   schedule is typical in these matters.
 9              Again, you know, there's an objection on
10   that from the TCC, though I'm not sure it's live, I'm
11   not sure what their objections are, given their
12   involvement in the RSA.  But it seems that there may
13   be some.  So in any event, with that, Your Honor, what
14   I'd like to do, and my idea was to sort of imitate
15   yesterday's hearing and the day before where we go
16   through this chart and discuss the outstanding
17   objections because that seemed like a fairly orderly
18   way to do it.  And although I'm, to be completely
19   candid, a little bit loathe to have multiple people
20   jumping in, I guess, you know, that's the process by
21   which we can do this.
22              I know Mr. Schiavoni noted before that he
23   has some evidence that he would like to proffer or
24   other evidence that he will be providing.  The main
25   Century objection, Your Honor, comes at sort of the
```

1   end of the chart, which is to say that they have some

2   other objections, but number 67, which is kind of at

3   the very end of the chart, I think we probably could

4   wait until then for the evidence to come in and you

5   know, we'll see what happens when the evidence does

6   come in.

7           I think we'll have something to say, and

8   others might, as well.  Or we could do it now, at the

9   front end, and just get it out of the way and then

10  move into the objections.

11          THE COURT:  Why don't we go through the

12  chart.

13          MR. O'NEILL:  Very good.  Okay.  Thanks,

14  Your Honor.  So the first -- and it's number 60 on my

15  master chart, that's page 107.  And you'll see the

16  title is solicitation procedures master ballot

17  procedures.  That may sound a lot like what we've just

18  been discussing for the last 45 minutes, but in fact,

19  it's more specific than that and tailored.

20          The main thrust of this objection is that

21  there's a problem with ballots -- master ballots being

22  submitted by the same firms that have the same

23  plaintiffs on them.  And we actually have a procedure

24  that deals with this, Your Honor.  First of all, it's

25  not likely to happen very much, just given the way

1  that we've designed the master ballot where specific

2  proofs of claim will be provided on their attachment

3  with the ballot that they actually get to vote.

4           But in the event there is overlap and

5  there's a conflicting vote that Omni will do research

6  on the proofs of claim, they'll go back and double

7  check everything.  And in the event that that's not

8  sufficient, then they will require both firms to show

9  proof that they actually represent that client and

10 have the authority to make the vote.

11          And based on that, the debtors will be able

12 to determine which is the valid vote.  To the extent

13 that we can't, the vote will not count.  So that's the

14 procedure.  We think it's the best way to proceed in

15 these limited instances where there'll actually be a

16 conflicting vote.

17          Really, the other objection under this

18 category, Your Honor, it's actually from Century but

19 it's not going to implicate the evidence is that we

20 forfeited the obligation to police the solicitation

21 process.

22          I think that's probably a general comment.

23 It sounds familiar from what we've heard.  But this

24 isn't specifically with respect to requiring the last

25 four digits of the Social Security number.  That

Page 62

1    actually is a part of the ballot in an attachment to

2    the ballot.  So we are requiring that.

3            The next objection, Your Honor, on the chart

4    --

5            THE COURT:  Well, let's wait, and let's see

6    if there are any further outstanding objections with

7    respect to those two issues.

8            Mr. Stang?

9            MR. STANG:  Your Honor, I'm not sure if --

10   the way this is broken up, the objections, I'm not

11   quite sure when to address paragraph 5A because it

12   contains a number of things.  I have some very

13   specific comments about the exact wording of 5A, and

14   you know, some -- I'm just not sure which pigeonhole

15   that would fit into as we go along.  But if you want

16   me to go through 5A, there are about three or four

17   things I would comment on.  They don't go to whether

18   or not there should be a master ballot.  We're past

19   that one.

20           THE COURT:  Mr. O'Neill, does 5A fall

21   anywhere within here or the order fall anywhere within

22   here?

23           MR. O'NEILL:  I'm not aware of what that

24   objection would be.  We haven't seen any language from

25   Mr. Stang, so I'm not sure what exactly he's referring

1   to.

2           THE COURT:  Okay.  Why don't we put at the

3   end of this the form of order?  And that way,

4   everybody can comment on whatever issues they have

5   with the form of order.

6           MR. O'NEILL:  Very good, Your Honor.  And it

7   sounds like the form of order, which will approve the

8   solicitation procedures hopefully, and will have some

9   emendations or something with respect to language in

10  certain sections.

11          MR. STANG:  Yeah, I guess it's -- Your

12  Honor, it's actually a solicit -- 5A is in the

13  solicitation procedures, which is an exhibit to the

14  order.  I just have comments on 5A.  Whenever it's

15  time for me to make those specific comments, I'll do

16  it.  I just --

17          THE COURT:  Well, I went through the form of

18  order and the solicitation procedures, and I've got

19  some markups, too, so we're going to get to that.

20          MR. STANG:  Okay.

21          THE COURT:  So that will be the time when

22  everyone can comment on the form of order.

23          MR. STANG:  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          MR. O'NEILL:  Thank you, Your Honor, and I

```
1    apologize to Mr. Stang and the Court.  There was one
2    more sort of objection in this category, and that's
3    just a timing issue, which is that if there are
4    duplicative votes on master ballots, that the parties
5    have 14 days instead of 10 days to resolve the
6    dispute.
7              And the reason it's 10 days rather than 14,
8    Your Honor, is that 14 is the entire amount of time
9    that Omni is going to have to generate its report.  So
10   there needs to be some time on the backend to just do
11   the final product.  I'm not even sure that Mr. Stang
12   is pursuing that anymore, again, but it is here on the
13   chart, so I thought I --
14             THE COURT:  Is that an issue for anyone?  I
15   don't hear anything.  Let's go to the next issue.
16             MR. O'NEILL:  Great.  So the next category
17   is called solicitation procedures proposed dates and
18   timelines.  Again, I think I just don't know if the
19   TCC is pursuing this at this point.  But certainly,
20   the U.S. Trustee's objection here that Labor Day is
21   implicate and therefore, it's not a good schedule is
22   mooted at this point, sadly.
23             So the thrust of the TCC objection, Your
24   Honor, was that 43-plus days that we've afforded for
25   people to vote is not enough.  We certainly think it
```

1  is.  Again, most of the population of voters will get

2  substantially more than the 43 days, up to -- well,

3  I'm looking at my colleague, but 50 or so.  In any

4  event, we don't think additional time is necessary.

5            And again, as Your Honor knows, and I'll

6  come back to this siren song again, is that we need to

7  get this going and our schedule is tight.  So that's

8  why we're doing this on the schedule we're doing.  But

9  also footnote that and say this is a completely normal

10  solicitation period.

11            THE COURT:  Mr. Schiavoni?

12            MR. SCHIAVONI:  So Your Honor, this -- I

13  will come back to this when we get to make our general

14  objections, but if you just think about this for a

15  second as a practical matter, okay?  The Coalition

16  firms, which are locked up in this bloc to vote, many

17  of them are very small firms with only three or four

18  lawyers, but they have thousands and thousands of

19  claims.

20            In the 2004 motions, we brought this out

21  about just, like, temporally, how they were voting

22  hundreds of claims a day and how putting aside, you

23  know, the testimony we haven't obtained from those

24  lawyers yet, but just the impossibility of vetting the

25  claim in that period of time.

1              Apply that here to the use of a master

2    ballot, instead of individually just handing them each

3    ballot and express their views, they're going to poll,

4    you know, a firm with two or three lawyers is going to

5    poll thousands and -- like, 7,000 claimants in a

6    matter of 43 days and get their individual views.

7              I mean it just masks what's really going to

8    go on here.  You know, it's, like, the lawyers for the

9    Coalition are going to vote as a bloc.

10             THE COURT:  Mr. Rosenthal?

11             MR. ROSENTHAL:  Yes, Your Honor.  I don't

12   want to repeat what Mr. Schiavoni said, but I think

13   there are two issues implicated here.  One is the

14   schedule generally, and obviously, we want to talk to

15   you about the schedule generally.  We think that there

16   should be significantly more time allowed.

17             But I agree with Mr. Schiavoni that because

18   of the two-step process required in a master ballot

19   situation and all of the communications that have to

20   go between not just the debtor and the law firm, but

21   the law firm and each of it multiple clients and the

22   explanations and everything, this is why in a master

23   ballot situation, you generally give, you know, more

24   time in any event, and certainly in this particular

25   case, you would think that it would take quite a bit

Page 67
1   of time for people to vote hundreds if not thousands

2   of claims in a master ballot format on a fully

3   informed basis.

4           THE COURT:  Mr. Stang?

5           MR. STANG:  Thank you, Your Honor.  I'm

6   looking at it from the perspective of actual

7   survivors, and while I appreciate Mr. O'Neill's need

8   for moving this case along, you know, if he'd listened

9   to Mr. Molton and me and Mr. Patton (phonetic) about

10  the original Hartford deal, the BSA wouldn't be in the

11  time crunch they're in.  But that's an aside the

12  point.

13          THE COURT:  You have the second point.

14  Let's move on and let's stay with the issues.

15          MR. STANG:  I will, but he keeps on invoking

16  it, so that's important to understand.  You have

17  untold numbers of letters from prisoners who have

18  explained to you the difficulties in getting mail and

19  sending mail out.  People should have as much as time

20  as is reasonable, and 60 days is reasonable.

21          Likewise, I am told by state court counsel

22  from time to time that their clients don't use email,

23  they use snail mail.  They can be hard to get ahold

24  of.  You've had some exposure already through the

25  letters to some of the communication issues that

Page 68

1  survivors have.  We need to afford these folks a

2  reasonable period of time.

3          Just remember the mission of the Boy Scouts

4  and this case includes and fair and equitable

5  treatment of survivors.  We shouldn't for over 13 days

6  deprive those folks of an opportunity to make a

7  meaningful vote.  Thank you, Your Honor.

8          THE COURT:  Thank you.  This --

9          MR. O'NEILL:  Your Honor, understood, and

10  look, we understand Mr. Schiavoni's role here,

11  obviously, and Mr. Stang.  You know, we'll leave that

12  one alone, but I think, you know, part of this is what

13  the schedule's going to be.  Mr. Rosenthal is right,

14  and I think, you know, if we can keep it on the right

15  side of, in our view, 60 days, that would be best,

16  obviously, but we're willing to be flexible on this,

17  obviously, as it pleases the Court.

18          THE COURT:  Okay.  I was going to say, we

19  can consider this with the overall schedule, but I

20  will say, this is a complicated case, and counsel need

21  time to speak with their clients and for their clients

22  to have an ability to understand what they're doing

23  and determine their -- what their vote's going to be.

24          And I actually am aware of the prisoner

25  issue, as well, because I've noticed several of those

1    letters.  I'm not sure exactly how to do this to make

2    certain they all get the mail appropriately.  But I

3    think 60 days is probably more in the ballpark for the

4    additional time.  But we're going to consider this in

5    the context of an entire schedule.

6              And as for lawyers with small shops, they

7    took on the clients.  They're going to have to figure

8    out how to appropriately represent them.

9              MR. O'NEILL:  Thank you, Your Honor, and

10   agreed, they can work the phones, and we'll take this

11   up in conjunction with the scheduling.

12             The rest of the objections up until the U.S.

13   Trustee are in the order of sort of me, too -- the TC

14   wanting to get access or be part of the process when

15   votes are looked at for irregularities.  And we think

16   we've addressed all of these with language in the

17   solicitation procedures, but I'll defer to Mr. Stang

18   to see if they have any outstanding objections of this

19   ilk.

20             MR. STANG:  Your Honor, to the contrary.

21   There are a whole number of paragraphs that originally

22   had us, the Coalition, and the FCR having rights

23   regarding extension of deadlines to vote.  I mean I

24   can go through each subparagraph, but there was a host

25   of things that collectively the Plaintiffs' interests

1   and the debtor had to coordinate on, like, extending

2   the bar date, dealing with votes that seem to be

3   invalid.

4          And they changed all that to just being the

5   debtor.  So we can go through each subparagraph, but I

6   felt like they were trenched.  Maybe they have an

7   agreement with the Coalition and the FCR as to what to

8   do because they're now supporters of the plan, but I

9   thought it was actually retrenchment.

10          MR. O'NEILL:  Your Honor, I think what we've

11   defaulted to instead of parties participating in the

12   process is to make a voting report -- it available in

13   the voting report.  And then, I believe there are

14   notice provisions to be heard for parties on that

15   voting report.

16          But you know, this again, I think is

17   something we can talk about with Mr. Stang.  I think

18   that neither the TCC nor the Coalition nor the FCR are

19   directly included.  So that's currently the state of

20   play.

21          THE COURT:  The issue that this raises is

22   another issue I've been thinking about recently in

23   connection with solicitation procedures, which is how

24   much discretion should the plan proponent be given to

25   vary dates, extend deadlines, accept a late ballot,

1    permit withdrawal of a ballot, and what's the role of

2    -- and should the voting and the solicitation agent

3    be, like, a third party neutral, or is there some

4    advocacy, if you will.

5              And this was something that certainly became

6    highlighted, as well, in Imerys is how does a debtor

7    use their discretion?  Are they using it selectively

8    or not?  Are they using it to favor the outcome they

9    want?  And is it okay if a debtor does that, to

10   promote confirmation of a plan?

11             MR. O'NEILL:  So Your Honor, that's a great

12   question,  and I didn't articulate it well at all

13   before, but I think what I meant to say was what we

14   landed on is for full disclosure of these decisions in

15   the voting report, so that parties are put on notice

16   and can see what was done and it can be discussed

17   about, you know, discussed in an open forum.

18             So instead of going through the TCC and the

19   Coalition and others who obviously get the flavor on

20   this hearing, they're not going to agree on anything.

21   Maybe, hopefully, they will be by then, but at this

22   point, we don't know how a process could work with

23   that dynamic.  So instead we've decided to put it in

24   the voting report, and then, people can have at it.

25             And that's part of this back-end process

Page 72

1   that I think Your Honor favors and is part of

2   transparency in this.

3           THE COURT:  I'm not sure if I favor it or

4   not.  I think that's where it ends up sometimes.  No,

5   front end would be better so that we're not dealing

6   with these issues on the back end.  But including it

7   in the report is a minimum, and I've required that

8   since I've been on the bench.

9           There are no undisclosed extensions,

10  decision-making, anything that requires discretion.

11  Nothing should be within the sole discretion of the

12  debtor.  Everything has to be subject to reporting and

13  court approval, if necessary.  Should others have an

14  opportunity to weigh in?  I don't know if it makes it

15  more or less difficult because each party's going to

16  weigh in.

17          Presumably if people are weighing in, it's

18  not neutral, it's not becoming neutral.  It's become

19  partisan, if you will.  Why should people disagree?

20  If someone wants to file a late ballot, what are the

21  reasons people are disagreeing over that?  It's

22  because it doesn't serve their interest.

23          So I'm not ready to cut it out because,

24  again, I haven't had the benefit of thinking this

25  through.  I don't know that I want every late-filed-

1   ballot issue coming in front of me.  I don't know that

2   that's an effective use of time or it needs to happen.

3   And so it's this balancing act, only becoming an issue

4   in -- well, this in particular, is it neutral or not,

5   is something I've been thinking about for well over a

6   year in different contexts.

7          But I shouldn't be solving a singular issue,

8   you know, with a sledgehammer.  It's not to procedures

9   and practices, and I recognize that.  So --

10         MR. O'NEILL:  And I'll add to that, Your

11  Honor, the sledgehammer, again, it's voting.  We don't

12  know what's going to happen or which of these issues

13  will be implicated.  That's part of the trick here,

14  and so the sledgehammer, you know, might be the wrong

15  approach, although I --

16         THE COURT:  Absolutely.

17         MR. O'NEILL:  -- take Your Honor's points

18  about, you know, certainly looking backwards with the

19  benefit of Imerys on parties' interests.  So I think

20  our proposed procedures do give that period for people

21  to come in and challenge what was done, and I think

22  that that's an appropriate way to do this, not that

23  Your Honor wants to deal with one-off issues, but

24  that's currently how it's constructed.

25         If there's a better mousetrap to vet that,

1  we can continue to think about that.  But we don't

2  think it's a free-for-all with 1,000 professionals

3  each looking at a ballot that came in, you know, for

4  some really good reason it was late, but it should be

5  accepted.  It's not a, you know, this is going to

6  make-my-case or kill-my-case issue that people, you

7  know, are thinking about it that way.

8           And again, that's why Omni in the first

9  instance has the decision-making on many of these

10 issues.

11          THE COURT:  Just want to make sure Omni has

12 a fulsome report as to what has -- votes they've

13 counted, votes they haven't counted, and why.  Any

14 extensions, anything that varies from the approved

15 process needs to be accurately reported.

16          MR. O'NEILL:  Understood, Your Honor, and we

17 will make sure that happens.  So Your Honor, -- oh,

18 Mr. Stang's hand.

19          THE COURT:  Mr. Stang?

20          MR. STANG:  Your Honor, I really appreciate

21 what you just said.  At the beginning of the case, we

22 had a little tiff with Omni because a certain

23 communication was included with the notice of the

24 commencement of the case that we thought was an

25 inappropriate communication by the debtor to

Page 75

1  creditors.

2          And Omni informed me that in that

3  circumstance they were an agent of the debtor, and the

4  debtor told them to include the letter from BSA with

5  the notice of commencement of the case, and that's

6  what they did.  So they have a capacity where they are

7  working as your claims agent.

8          THE COURT:  They do.

9          MR. STANG:  I don't know if it's noticing

10 agent, claims agent where they said to me, we're an

11 agent of the debtor, and I pointed out they have

12 responsibilities as an entity doing the clerk's work,

13 if you will.  But I appreciate what you just said

14 because Omni needs to really understand that, you

15 know, they are not to be taking instructions from the

16 debtor in making decisions on this.  At least that's

17 my read on what you said.

18          THE COURT:  Well, that's the question.  So

19 it used be before there were claims agents, right,

20 that ballots went to the debtor, you know.  There's

21 this whole cottage industry that sprang up, but it

22 used to be ballots went to the debtor, and the debtor

23 reported.  And that's why I say when I've been

24 thinking about these issues, you know, is the

25 balloting -- I'm not sure that Omni is a -- is acting

1   in a clerk's capacity when it's doing balloting.

2          Think about it in the nonbankruptcy context,

3   in a proxy statement, right?  The company hires

4   somebody to do the balloting.  So I'm raising issues.

5   I'd love the benefit of thoughts people have.  I'm

6   really serious about that because I think these are

7   all issues that we've taken for granted over the

8   years, but then, occasionally, there is a problem.

9          On the other hand, if it's a singular

10  problem, I don't want to hit it with a sledgehammer.

11  But it used to be, of course, that ballots went to the

12  debtors.  They solicited, they reported, they

13  presumably made decisions that we maybe knew or didn't

14  know anything about.

15         Mr. Rosenthal?

16         MR. ROSENTHAL:  I'm sorry, Your Honor, I'm

17  very confused because I'm an old-time bankruptcy

18  lawyer.  You know, I don't understand why a voting

19  deadline doesn't mean a voting deadline, and ballots

20  that come in by the voting deadline get counted.  You

21  can -- we've always been able to change your vote, and

22  the last vote you make counts if it's in before the

23  voting deadline.  And then, why is that any different

24  from a bar date?

25         THE COURT:  Bar date.

1          MR. ROSENTHAL:  Yeah, you can file a claim

2    after the bar date, but you have to show some

3    excusable neglect.  You have to show some basis for

4    not getting it in timely.  I just think if you go away

5    from it -- look, I'm speaking more generally than

6    specifically on this case, but you asked for views.

7          THE COURT:  Um-hum.

8          MR. ROSENTHAL:  I think if you go away from

9    having a voting deadline that's a pretty hard

10   deadline, you're just asking for mischief because

11   people, you know, people end up saying, well, she's

12   not going to kick it out anyway, I'll file it, you

13   know, I'll file it five days before the hearing, or

14   I'll see what the general tendency is, and then, I'll

15   file something.  I think that's asking for more

16   problems than it solves.

17         THE COURT:  I think that's a fair point.

18         MR. O'NEILL:  I think it is a fair point,

19   and I think that is what we're proposing to solve for

20   with our voting report and having to account for what

21   that would be.  And I agree with Mr. Rosenthal,

22   generally, on late-filed claims.

23         So Your Honor, I think moving along from

24   that topic to the rest of the objections in this

25   section, 62.  There are some old objections from the

1    U.S. Trustee's Office that I believe are not -- no

2    longer live.

3            I'll let Mr. Buchbinder speak to that, but

4    we have been exchanging emails with his office on what

5    we understand to be his last couple of comments, and

6    one objection, which they will be pursuing, and it's

7    later in the agenda.

8            So I -- unless Mr. Buchbinder says

9    otherwise, I'll move on.

10           THE COURT:  Mr. Buchbinder?

11           MR. BUCHBINDER:  Thank you, Mr. O'Neill, for

12   letting me speak for myself.  One issue that I have

13   remaining here on number 62 was the Rudy Sweetwater

14   issue, and you can see what the debtor wrote in that

15   column, Your Honor, by revising it to be subject to

16   the entry of the confirmation order.  It's a minor

17   point, and if you want to punt it to the confirmation

18   hearing, I'll defer to your discretion.

19           THE COURT:  If it's really a confirmation

20   issue, let's push it.  I'm looking for it.

21           MR. BUCHBINDER:  It's the Rudy Sweetwater

22   issue.  We can do it now or we can do it later.  I'll

23   leave it to you, Your Honor.  And I doubt it will

24   actually be raised here as a practical matter.

25           THE COURT:  Well, do you want to remind me

Page 79

1   what the issue is?  I'm sorry.

2          MR. BUCHBINDER:  The issue is if no one in a

3   class votes --

4          THE COURT:  Ah.

5          MR. BUCHBINDER:  -- (inaudible), the class

6   is deemed to consent to the plan.

7          THE COURT:  Yeah, isn't there language that

8   qualifies that, that if the plan is confirmed with

9   that in it -- I don't generally approve that in

10  advance.  You have to ask for it, and I thought there

11  was -- I thought I read language that said subject to

12  a confirmation order approving this.

13         MR. BUCHBINDER:  They revised it to that,

14  Your Honor.  If you're fine with that for today and

15  move it to the confirmation hearing, I'm fine, too.

16         THE COURT:  I'm fine with that today, and we

17  can move that to the confirmation hearing.  Thank you.

18         Mr. Patterson, I saw your hand was up.

19         MR. PATTERSON:  Thank you, Your Honor.  I'm

20  on the West Coast.  I'm three hours behind everybody,

21  but I just wanted to go back to the voting deadline

22  issue, and I'm looking at 6215-1 at page 33.  And this

23  is the order, and I guess we're ultimately going to

24  talk about the order and the procedures.  But I just

25  wanted to note that 6215-1, page 33, paragraph 8, and

1   --

2           THE COURT:  I've got that circled, yeah.

3           MR. PATTERSON:  Okay.  Then, we're going to

4   get to it, Your Honor.  I'll reserve.

5           THE COURT:  What's your concern, though?

6           MR. PATTERSON:  Well, it seems to me that a

7   change of vote, withdrawal, or modification should

8   really be pursuant to court order.  And the voting --

9   the request for confirmation can include a request for

10  deviations from the vote as tabulated by the voting

11  agent and the debtor can make its case why some should

12  be in, and some should be out, and why they should be

13  modified.

14          But to Mr. Rosenthal's point, I think, you

15  know, presumptively, we're using the voting deadline

16  as the voting deadline.  So that's my thought on that

17  one, Your Honor.

18          THE COURT:  Thank you.  Those are the words

19  I had circled in that provision, and Rule 3018 tells

20  us how to deal with -- actually, doesn't even say

21  after voting, but in my mind, I've sort of made that

22  line of demarcation, that you can do what you want

23  ahead of time, but afterwards, you shouldn't be able

24  to change it without coming to the Court.

25          MR. PATTERSON:  Right, and that's not -- and

1    with respect to changes that take place prior to the

2    voting deadline, I assume that the voting report will

3    also reflect that, but --

4              THE COURT:  It should.

5              MR. PATTERSON:  -- I agree with Your Honor.

6    It's where the votes lay at the voting deadline that

7    is presumptively the vote tabulation that the agent

8    provides.

9              THE COURT:  I think that's correct, and it

10   results in the least mischief, and parties just

11   shouldn't wait till the last minute to vote.

12             MR. O'NEILL:  We can make an appropriate

13   change to accommodate that, Your Honor.

14             THE COURT:  Thank you.  Mr. Schiavoni?

15             MR. SCHIAVONI:  Your Honor, I just wanted to

16   deal with this issue about the voting agent.  I mean I

17   do think you've got some visibility in sort of some of

18   the things that's happened with -- as this voting

19   agent cottage industry has developed, you know,

20   there's a lot of money behind it.  They're picked by

21   the debtors.  There's a lot of, you know, world series

22   tickets get exchanged and you know, lot of -- you

23   know, all that kind of stuff goes on.

24             But the main thing is the voting agents

25   have, you know, really feel beholden to the debtors

Page 82

1   and they, you know, increasingly feel beholden to an

2   outcome.  They should be independent in how they're

3   handling things.  But whatever one's view is on that,

4   you know, transparency, sunlight is the answer to a

5   lot of things on this.

6          One particular issue here, you know, just to

7   show you where there's a problem is this whole sort of

8   like procedure to elect to use a master ballot, you

9   know, we wrote the debtor and said, gees, you know,

10  we'd like -- you know, and I think we separately may

11  have written Omni, saying, you know, we'd like to see

12  copies of, you know, the elections, particularly with

13  regard to AIS.

14         You know, Your Honor's aware that there's

15  particular concerns about AIS, with conflicting 2019

16  statements about it.  We had Mr. Kosnoff making public

17  statements that he controls those, you know, that

18  those votes should not be voted on a master ballot,

19  and we would have liked to have had those documents,

20  so we could have had an informed discussion here

21  about, you know, in a practical, direct way how those

22  decisions are being made.

23         Is someone like -- you know, it's the

24  largest single bloc of Coalition votes.  It shows up

25  in all of their representations that have been made in

1   connection with the LDS and the Hartford settlement

2   and the restructuring support agreement that one law

3   firm is going to deliver the entire group of those and

4   represents -- they represent all of them.

5           And you know, we've put before the Court

6   written statements by Mr. Kosnoff, granted in the form

7   of tweets about his views otherwise, but also in the

8   form of his 2019 statement on this, and you know,

9   we -- but we don't have the documents that would have

10  shed light on it, you know, the documents exchanged

11  with the voting agent, you know, with respect to that.

12          So I can't have an informed discussion on

13  that right now.  We could take from the Coalition how

14  -- what's the answer on that, how that's come down.

15  Are they are going to vote by master ballot or not?

16          MR. O'NEILL:  Yeah, Your Honor, first of

17  all, I just want to clear the record that Mr.

18  Schiavoni did receive those directives, so you know,

19  what you just heard is completely inaccurate and --

20          MR. SCHIAVONI:  No, we don't have the

21  responses from the Coalition.  We don't have, like,

22  Mr. Kosnoff's submission -- response, we don't have

23  that.

24          MR. O'NEILL:  My understanding is that you

25  do, Mr. Schiavoni.  So maybe there's some confusion on

Page 84

1    your end.

2            I think, Your Honor, what Mr. Schiavoni's

3    inadvertently done is led us into the next objection,

4    which is about the solicitation procedures directive.

5            THE COURT:  Okay.

6            MR. O'NEILL:  And you know, this was from

7    the TCC, and again, I'm not sure this is a live

8    objection.  I know we helped, or we worked with the

9    TCC to craft the directive, and they were involved in

10   that.  But maybe Mr. Stang has a different view.

11           THE COURT:  Mr. Stang, any --

12           MR. STANG:  Your Honor, I apologize.

13           THE COURT:  -- (inaudible) this?

14           MR. STANG:  Mr. Lucas, in my office, was

15   really involved in this, and I think he's going to

16   have answer whether we still have an issue with this.

17           THE COURT:  Mr. Lucas?

18           MR. LUCAS:  Yeah, I'm sorry, Mr. O'Neill,

19   could you state that one more time?  I apologize.

20           MR. O'NEILL:  Oh, sure, Mr. Lucas.  How are

21   you?  I was just saying that there's -- it could be an

22   old and cold objection from the TCC because I know you

23   all worked on the directive.

24           MR. LUCAS:  Yes.

25           MR. O'NEILL:  (Inaudible) indication of the

1    survivors' proof of claim or whether the debtor should

2    contact the debtor.  I think essentially -- well, hold

3    on, let me just read it carefully.  The debtors'

4    procedures involve an attorney solicitation.

5          It appears that you were objecting to the

6    directive, that -- rather than take the word of the

7    attorney on whether they should get the master ballot

8    on account of the claimant, we should go back to the

9    proofs of claim to review and see if they were one of,

10   I think, 95 percent that said they were represented by

11   counsel and wanted communications distributed to

12   counsel and defer to that for master balloting

13   purposes.

14         MR. LUCAS:  I believe that we worked that

15   out because I think that the default was that the

16   master ballot, along with the survivors who would be

17   listed on any master ballot, would be sent to the

18   attorney to the extent that the proof of claim

19   reflected that the survivor said that the attorney may

20   be contacted instead of the survivor.  So that is

21   correct.

22         MR. O'NEILL:  Right, that was sort of the

23   follow up.  Got it.  Okay.  Thanks, Mr. Lucas, for

24   clearing that up.  So I think, Your Honor, that that

25   answers that question.  I think -- I don't know if Mr.

Page 86

1   Lucas or Mr. Stang, I still see Mr. Lucas loud and

2   clear here.

3         But the next objection --

4         MR. STANG:  Hold it.  If this was leading

5   into my objection, Your Honor, could we have an

6   answer, then, to is AIS voting on a master ballot or

7   not?  I mean putting aside the representation I've

8   been given the documents, which I can't find, but

9   it's, like, is AIS voting on a master ballot?  I mean

10  if you're --

11        THE COURT:  Well, I think that conversation

12  should take off offline.  I think it's -- I don't see

13  why there should be any lack of transparency over

14  which firms are going to use a master ballot.  Those

15  directives are there.  If Mr. O'Neill says they've

16  been shared, if you can't find them, share them again,

17  and let's find out.

18        But I don't know that that's something that

19  has to be here in the disclosure statement hearing.

20        MR. LUCAS:  Your Honor, this is John Lucas.

21  I'd just like to state for the record that the TCC

22  would like copies of the results from the directives.

23  If they were shared with others, the TCC would like

24  them, too, please.

25        THE COURT:  Again, it seems to me there's no

1    reason why they should not be shared.  If there's

2    confidential information in them, people can deal with

3    that appropriately as they have with other things, but

4    -- meaning the survivors' confidential information.

5            MR. LUCAS:  Well, for what it's worth, Your

6    Honor, you know, obviously, the TCC or the counsel to

7    the TCC, my firm, has full access to all the proofs of

8    claims.  We've seen the proofs of claims, and so with

9    respect to a survivor's name and all that sort of

10   stuff, you know, we have been authorized by the Court

11   to see all that information.

12           But obviously, if there's something else,

13   we're willing to discuss it.  We're not looking to get

14   an advantage, but we would like to see how the

15   directive process resulted or how it turned out, and

16   to make sure all the steps are being followed.

17           THE COURT:  Okay.  Again, I'm not sure

18   that's a disclosure statement issue, but you've heard

19   my views that I think -- I don't see a reason why

20   those directives would not be shared in an appropriate

21   way.

22           MR. O'NEILL:  That's fine, Your Honor, and

23   the debtors have no problem with that, obviously,

24   subject to the confidentiality issues you described,

25   which may not apply to Mr. Lucas and the TCC.  We're

1  obviously happy to share with Mr. Buchbinder at the

2  U.S. Trustee's Office and others.  So --

3         MR. SCHIAVONI:  But Your Honor, if I may, I

4  mean just most respectfully with regard to this, if

5  we're going to discuss what procedures are proper

6  here, isn't it directly illustrative of how they work

7  to know whether the largest bloc of votes here, which

8  is hotly disputed among their own lawyers in

9  conflicting 2019 statements, are going to be voted,

10 you know, under what's been already submitted as a

11 master ballot or not?  Because it'll give great

12 guidance on how this procedure's going to apply

13 otherwise.

14        THE COURT:  Why not, for purposes of your

15 argument you're going to make to me, just assume

16 they're going to vote by bloc and let's -- we'll talk

17 about it by master ballot?

18        MR. O'NEILL:  Your Honor, again, it's clear

19 that Mr. Schiavoni has some issues with the AIS.  And,

20 you know, he's got rights down the line to potentially

21 designate those votes, also.  So there are options

22 here, and we don't think it's indicative of anything

23 with respect to our general procedures and our form of

24 master ballot or the process to use master ballots.

25        So we can -- I'm sure he will talk about it

Page 89

1    later in his larger presentation.  So I'd like to,

2    then, move along, Your Honor, if that's --

3            THE COURT:  That's fine.

4            MR. O'NEILL:  Thank you.  So Your Honor, the

5    next item on the chart is 64, and that is on page 111.

6    And this is -- is or was or still is from the TCC, and

7    it, I think, dovetails with a lot of what we heard

8    from Mr. Stang over the last couple days about

9    isolating information, about local councils, and

10   figuring out what the claim amounts are for particular

11   local councils.

12           Essentially, the objection wants us to, I

13   think, go out and try to research and find out for the

14   holders of proofs of claim that haven't listed their

15   local council, what that is for purposes of their

16   ballot, which, you know, as a general matter, we're

17   just -- we're not in a position to do that.

18           We had a proof of claim process.  It was

19   very fulsome.  The TCC participated, and you know, if

20   people didn't list a local council, they didn't list a

21   local council.  If that comes up later during the TDP

22   process, it can come up during that process, when

23   their claim is allowed and valued under the TDP.

24           But you know, to require additional work and

25   I'm not even sure what that work would be, short of a

1    new bar date or something along those lines, this is

2    inappropriate.  We also don't see any need, Your

3    Honor, to list local councils or do any upfront work

4    to try to segregate claims into different silos based

5    on local council.

6          So the ballot is a ballot for the BSA

7    bankruptcy case, and they are voting on the BSA

8    bankruptcy plan.  And so the Debtors are not inclined

9    to do anything with respect to the ballot in terms of

10   adding local councils or charitable organizations, for

11   that matter, which, I think, is another objection that

12   may be placed in a different category, but the same

13   argument applies.

14         THE COURT:  Mr. Stang?

15         MR. STANG:  Thank you, Your Honor.  This is

16   one of the important ones.  Certainly -- and Mr.

17   Patterson will have a lot of say about this, and I'm

18   not going to step on his agenda or -- I shouldn't say

19   agenda, his issues.  But the Debtor -- the proof of

20   claim form did ask for local councils.  I don't think

21   it asked for chartered organizations, but we think

22   that should be included, too.

23         I'm not asking the Boy Scouts to go out and

24   research my claim.  If I had put down my local

25   council, then, tell me which one it is.  But if

1   they're going to use preprinted ballots for people

2   with barcodes and all that kind of good stuff, they

3   could fill that in for someone.

4           From my perspective -- and we could, when we

5   get the claim  form, check my ballot against my claim

6   form to see if I did put down the local council.  But

7   it's really important to know the local council for

8   the creditor and the charter for the creditor.  Mr.

9   Patterson will explain to you why.

10          But as Mr. O'Neill has pointed out, there

11  have been lots of amendments.  I think he said there

12  were thousands and thousands of amendments.  We get

13  questions every day.  I have more information, do I

14  need to amend my claim now, when do I need to amend my

15  claim now.  So we don't know if everyone is sensitive

16  to adding more information than is necessary for the

17  best analysis of how the voting turns out.  This is

18  what Mr. Patterson's going to talk about.

19          So it's not a big -- I don't know why it's a

20  big deal to ask a survivor to put down the name of

21  their local council, if they know it, and to put down

22  the name of the chartered organization, if they know

23  it.  I am not suggesting that if I don't know the name

24  of my local council that my ballot doesn't count.  I'm

25  not saying that.  But for people where this has been a

1   -- I think someone sometimes uses the term iterative

2   process, and people are going up to the attic to find

3   the box to see if they have their Boy Scout card that

4   might have the name of the local council on it.  I

5   mean, people should be able to update the information

6   on something like this.

7           Now, Mr. Patterson, I think will --

8           THE COURT:  Okay.  I'm unclear -- I guess

9   I'm unclear.  I thought the objection was you wanted

10  the debtor to put information on the ballot.  Now, I'm

11  hearing you want the survivor to be able to put

12  information on the ballot it returns.  Which is it?

13          MR. STANG:  If the debtor -- I think it

14  would be simplest if the debtor knows the local

15  council information and if it is doing some kind of

16  individualized ballot that it should carry that

17  information over from Bates White (phonetic) and put

18  in on my ballot, so that it's clear.

19          I don't have to go take the ballot and go

20  check the proof of claim to see what my local council

21  is.  If they know it and they can technologically do

22  it, it would be a  nice gesture on their part of

23  include it, so that all of us, as we're looking at the

24  ballots from different perspectives, will have it

25  right then and there.

1           If they don't have the information because

2    it's not on the proof of claim, I'm not asking Mr.

3    O'Neill to go do a search for my local council, but if

4    that is already in their database, put it on.  If it's

5    not in their database, leave it blank, and let the

6    survivor fill it in, if the survivor, since the filing

7    of the proof of claim, which was November of last

8    year, has since discovered the name of his local

9    council.  That's what I'm asking for.

10           THE COURT:  And what's the import of that if

11   they do?  Let's say --

12           MR. STANG:  I --

13           THE COURT:  -- the proof of claim didn't

14   have that information, and now, the survivor has

15   figured it out or remembered, what's the import of

16   that?

17           MR. STANG:  I could tell you, but Your

18   Honor, this is something that Mr. Patterson it's near

19   and dear to his heart, and we share his views on this,

20   so could I kick it over to him?

21           THE COURT:  Yes.  Mr. Patterson?

22           MR. PATTERSON:  Thank you, Your Honor, Tom

23   Patterson for Zalkin and (inaudible) firms.  The issue

24   that we're talking about right now is kind of the

25   endpoint of a series of issues, not the starting

Page 94

1   point, so that's why, I think, in part, your

2   discussion with Mr. Stang was somewhat awkward because

3   you're wondering why are we talking about this.

4         So here's our issue.  Because of the nature

5   of the BSA liability, we talked about this yesterday

6   with the exemplar claims and so forth, it is not a

7   situation like the standard mass tort case where I,

8   Tom Patterson, have a claim against the debtor, and in

9   the opioid case, all of the manufacturers of opioids,

10  because I took a bunch, and all of the drug stores,

11  because I went to CVS and Rite Aid and Walgreens and

12  so forth.  That's not this case.

13        What this case is is a survivor has a claim

14  against a local council, against a chartered

15  organization, and against the BSA.  So for purposes of

16  master mortgage, when this Court assesses whether or

17  not the release provisions are approved by the vast

18  majority of the affected creditors, the affected

19  creditors have to be, for those purposes, measured by

20  people who claims against a particular local council

21  or a particular charted organization.

22        And that's particularly true where they are

23  themselves being treated differently.  Local councils

24  are making different contributions, they have

25  different kinds of a liabilities, they have different

Page 95

1   asset bases.

2          And so a creditor making a decision whether

3   to release the Orange County council is making a

4   different decision from the creditor in Ohio, who's

5   making a decision whether or not to release the

6   applicable Columbus, Ohio, local council that they

7   feel was responsible for the abuse they suffered.

8          And so our view is that this isn't a

9   classification issue, but our view is that when the

10  debtor tabulates the votes, when Omni tabulates the

11  votes, it's important that the report reflect the yea

12  or nay votes for the plan divided by the affected

13  local councils and chartered organizations, if

14  applicable.

15         And the reason for that is even more

16  significant because there are -- we talked about

17  Exhibit F yesterday, Your Honor.  Exhibit F was the

18  very long report that had the unique and timely claims

19  and the non-barred unique and timely claims.

20         THE COURT:  Yes.

21         MR. PATTERSON:  That was at Docket 6213,

22  page 369.  And I think the debtor was doing to -- the

23  Court had some modifications to that report.  I

24  believe it was going to updated and modified.  But if

25  the Court just looks at an example of that.  For

1    example, so with regard to the Greater St. Louis area,

2    I'm just picking, I think, the fifth or sixth one

3    down.

4              There are 921 unique and timely filed

5    claims, and 64 non-barred unique and timely filed

6    claims.  So when we ask who voted in favor of the plan

7    and who didn't vote in favor of the plan, for master

8    mortgage purposes, there's a lot of information that's

9    important to know.

10              First, who's affected by that local council

11    release?  And second, what was the vote among the 64

12    people, if I'm still on the right line, the 64 people

13    who actually have preserved the claim against the

14    local council?  Because again, if what we got was

15    52,000 votes in favor of releasing the Greater St.

16    Louis council, it's meaningless.  If what we got was

17    850 votes in favor of releasing the Greater St. Louis

18    council, that's meaningless.

19              What's really meaningful and who's really

20    affected by that release, who is making a judgment

21    about I'm going to give up something to get something?

22    It's someone who has preserved a timely claim in the

23    tort system or still has the right to file a valid

24    claim in the tort system.

25              The person who doesn't have a claim against

1  that local council because they weren't in that

2  geographic area or the person who let their claim

3  against that local council lapse and didn't file it

4  and now it's time barred, their decision is should I

5  get something for nothing or should I not get

6  something for nothing.  Something for nothing sounds

7  better than not something for nothing.  So I'll take

8  something for nothing.

9       And the real master mortgage question is the

10  people who are giving up something for something and

11  that's why the vote tabulation has to reflect this.

12  Now, the issue that you were talking to Mr. Stang

13  about, it's kind of the backend of that issue because,

14  as has been reported, a great number of claimants

15  didn't name their local council when they filled out a

16  proof of claim.  And so we have kind of a backend

17  question -- what to do with that.

18       We could, as Mr. O'Neill said, if they

19  didn't list a local council, they didn't list a local

20  council.  Their vote would not be tabulated, recorded,

21  or reflected for purposes of figuring this test out.

22  We can do it that way.  That's one way to do it.

23       Another way to do it is to say, well, you

24  filled out your proof of claim form, but now -- and

25  you weren't asked to list this information, but we're

1  going to give you another chance to provide that

2  information because we're using it in a different

3  context, and if you want to name it now, you can name

4  it now.

5          But -- and you know, I'm happy to discuss

6  that issue with the Court, but that issue is sort of

7  the backend issue.  The front-end issue is really the

8  key to the case, which is are people who are adversely

9  affected by the release of the local council the ones

10 who are voting in favor of releasing local council.

11         And now, we can disagree at confirmation

12 over the importance of this information.  The debtor

13 can tabulate, but we can't disagree over the

14 importance of this information at confirmation if we

15 don't have it at confirmation.

16         And so it seems to me that this is an

17 important piece of information that the Court should

18 have, and I assume the debtor would want.  If all the

19 classes come in and all the people who have preserved

20 their timely claims against local councils are 100

21 percent in favor of giving up those rights in favor of

22 this plan, then, that's meaningful information for the

23 Court.  And if they're not, that's meaningful

24 information.

25         We can argue about whether it's dispositive

1   and all the rest of it, but that's tomorrow.  I think

2   the key is today to make sure that we put in place

3   structures that give us that relevant information.

4              THE COURT:  Thank you.  Let me hear a

5   response from the Debtors.

6              MR. O'NEILL:  Yeah, thank you, Your Honor.

7   I think the response is this.  Mr. Patterson has laid

8   out one of his confirmation objections.  He's spoken

9   passionately about it and what he thinks the

10  information will be that he'll use to support it.

11             The information is already there, Your

12  Honor.  We're getting votes on the plan, and then, on

13  the backend, if we need this information, if Your

14  Honor thinks that this is a valid argument and it's

15  something that the Court needs to look into, we will

16  have all the proofs of claim, and at that point, they

17  will all be amended with the latest and greatest

18  information reflecting not just local council but, you

19  know, 1 of the 41,000 chartered organizations.

20             And the Court can choose to use that

21  information how it likes, and the Debtors will be able

22  to slice and dice it how it likes.  But to add a new

23  ability to select the local council or chartered org

24  in a ballot is inappropriate, it's expensive, and it's

25  not necessary.  We carefully built a bar date program

1   and bar date notice and bar date for folks to file

2   their claims and name their local council or chartered

3   org if applicable.

4           I don't think we now need to add a line item

5   on a ballot that would have them do that further.  I

6   think it creates confusion in addition to all the

7   issues I just noted before.  If parties want to, you

8   know, amend their ballot, they can do that.  Mr.

9   Patterson can advise his clients that haven't filled

10  out that portion of their ballot -- I'm sorry, their

11  proof of claim to do so.

12          And then, at the end of the cases or I

13  should say at the end of solicitation, in conjunction

14  with confirmation, if this is going to be an issue, we

15  can try to create a matrix with 250 local council and

16  41,000 chartered organizations and how people in those

17  -- with -- that marked their proofs of claim -- by the

18  way, which will not be validated, vetted, allowed, or

19  evaluated claims.  That will happen under the TDP by

20  the Trust, how those should be evaluated.

21          Your Honor, we don't think this is

22  necessary.  I think actually Mr. Patterson got

23  frontend and backend issues mixed up.  So we disagree,

24  and we think the ballots are fine as is.

25          THE COURT:  Okay.  I can hear everyone, but

1   I can't see anyone anymore.  We're working on that.

2   Let me ask this question because this goes to sort of

3   what I said before, are we going to have the

4   information -- thank you -- are we going to have the

5   information we need to have, in the event we need it,

6   at confirmation, and are we going to have an ability

7   to -- for people to make the arguments they need to

8   make and have the data they need it to be based on?

9           And is what I'm hearing is that the debtor

10  has a database that it will -- that it can slice and

11  dice and come up with these -- the categorization and

12  the vote by categorization if need be?

13          MR. O'NEILL:  Oh, to be clear, Your Honor,

14  we don't think that will be necessary, but we have,

15  though Omni, the database of the proofs of claim and

16  as they'll be amended at the time of confirmation,

17  which have a line for local council and a line for

18  chartered organization.  And then, you'll have a

19  voting report that lists by proof of claim who voted

20  yea, who voted nay.  So necessarily, we have that

21  information.

22          And the question of whether we need it,

23  whether Your Honor wants to see it is a question for

24  another day, we feel.  We dispute the legal premise,

25  but we acknowledge that it's a confirmation issue.

1  But we will, I think, be in a position to have what we

2  need.

3          THE COURT:  And for others to have what they

4  need.  So that'll be a discovery issue where if people

5  want that information, it will be provided to them.

6          MR. O'NEILL:  Correct.

7          THE COURT:  Mr. Zalkin?

8          MR. ZALKIN:  Thank you, Your Honor.  I just

9  want to point out to the Court that -- and I'm sure

10  you understand -- that many, many, many of these

11  survivors cannot remember what their council -- who

12  their council was or --

13          THE COURT:  Yes.

14          MR. ZALKIN:  -- or who was the chartered

15  organization.  And one of the things, when we filled

16  out the proof of claims and those were filed, we were

17  told that we would be able to get rosters from the

18  local councils or from the BSA that would help our

19  clients remember or identify councils and sponsoring

20  organizations.

21          That hasn't happened.  We've had a great

22  deal of difficulty with getting that kind of

23  information.  So I would ask that the Court please

24  ensure that there be a process where that kind of

25  data, to the extent it exists, to the extent it can be

1   provided, will be provided as we were told it would

2   be, so that we can help our clients to the best of our

3   ability and their ability identify these local

4   councils and these sponsors.  Thank you.

5         THE COURT:  Thank you.  Mr. Patterson.

6         MR. PATTERSON:  Your Honor, the issue of

7   whether or not -- they should have led with -- was

8   this issue of whether people should be given the

9   ability to put the name on the ballot at this point.

10  And I mean it just really seems to me that what we're

11  trying to do is ensure at the confirmation process

12  that we have the highest quality of information that

13  we can with respect to who the folks are and who

14  they're not.

15        And a situation I don't want to get into is

16  a situation where we don't ask for this information

17  now.  We have, as we know, 20,000-odd ballots that --

18  or pardon me -- claims that didn't list a local

19  council.  And then, the debtor has a metric for

20  saying, well, here's who they really are.  We know who

21  they are because we know what their geographic area

22  is, and we're going to assign them to a local council.

23        So if the debtor doesn't want to ask for

24  that information now, then, it seems to me that's it.

25  We're not going to, then, ask for it later when they

```
1    need it or come up with a second-best alternative
2    later on when the debtor thinks they need it or want
3    it.  This is the time to find out whether we're going
4    to get that information.
5              MR. MASON:  Your Honor?  Ricky Mason on -- I
6    don't know if you can see me.
7              THE COURT:  I can.
8              MR. MASON:  Okay.  I didn't want to cut my
9    friend, Mr. Patterson, off, and I apologize.  I just
10   want to briefly respond.  First of all, we do disagree
11   vehemently with Mr. Patterson's statement of the
12   standard for a master mortgage determination of
13   whether the local council releases, assuming the plan
14   is voted in favor of, whether that's satisfied.
15             It sounds to me like he wants to create,
16   frankly, not just 250 subclasses, one for each local
17   council, but potentially thousands of additional
18   subclasses, depending upon the chartered organization
19   releases.  And we don't think that's appropriate.
20   That's obviously an issue for confirmation, but I
21   didn't want to let the moment pass by being silent and
22   having folks assume that we agree.
23             I also think that if we have additional
24   lines on the ballot, we're doing two things.  We're
25   sort of heading in the opposite direction of what, I
```

1  think, Your Honor has appropriately tried to do, which

2  is simplify things.  I really do worry that the

3  debtors or Omni getting ballots with local council

4  information filled in, what happens if there's a

5  conflict between the information on the ballot and

6  what's in the proof of claim?

7           The proof of claim is really where the

8  action occurs with respect to the identification of

9  the local council.  As Your Honor heard, the proofs of

10  claim are being amended as people find additional

11  evidence of which local council is involved in the

12  alleged abuse.  That's the process by which a local

13  council should be identified, if it's necessary at the

14  confirmation hearing.  And I think we heard Mr.

15  O'Neill say that the debtor has that information

16  available should the Court decide that it's required.

17          With respect to Mr. Zalkin's statement about

18  rosters, we've had numerous iterations of roster

19  requirements on the part of local councils and

20  certifications and providing information to the extent

21  that folks have it into a database.

22          So I'm not sure if Mr. Zalkin has access to

23  that, but local councils with -- working with the TCC

24  and others have undertaken over a year's worth of

25  effort in that regard.  And frankly, that roster

1    information, together with the proof of claim

2    information, ought to obviate the need to have the

3    information on the ballot, as well.  Thank you, Your

4    Honor.

5              THE COURT:  Thank you.

6              MR. LUCAS:  Your Honor, may I just jump in

7    here really quick because I want to follow up with

8    something that was just said by Mr. Mason.

9              THE COURT:  Yes.

10             MR. LUCAS:  Because I think it's important.

11   Under the third and fourth stipulations extending the

12   preliminary injunction, there were processes or

13   procedures put in place to deal with the limited

14   production of rosters.  And so while the TCC worked

15   hard with the debtors here to try to arrange a

16   process, we were unable to address, I think, sort of

17   the point that Mr. Zalkin was raising.

18             For example, a survivor just doesn't know,

19   doesn't recall, you know, when he was abused when he

20   was ten years old.  You know, it wasn't impressed upon

21   him by his parents to remember his local council.  And

22   so in that context, there aren't rosters being

23   searched for for that individual because the process

24   that's set up, it's, you know, survivor, you know, the

25   survivor says, I list local council X, and then, so

1    the proof of claim is sent to local council X, and

2    local council X is looking for the roster that has

3    that survivor's name on it, if it exists.

4            But when the survivor doesn't know, then,

5    there's no search being done, and no search has ever

6    been done for that right there.  And so there is a big

7    gap and there's a big hole there,  and I think that's

8    what -- and I'm putting words in Mr. Zalkin's mouth,

9    but I think that's one of the big limitations here

10   about trying to locate rosters, which the TCC has been

11   asking for and trying to work to get since the

12   committee's appointment in March of 2020.

13           THE COURT:  Okay.  Well, I don't remember

14   this issue being brought in front of me.  I remember

15   hearing about it here and there.  I don't remember it

16   ever being brought in front of me.  So I think the

17   question in front of me now is am I going to require

18   the Debtors to put a line on the -- to include a line

19   on the ballot for local -- for survivors to add

20   information to about their claim.

21           And I'm not going to require it.  And one of

22   the reasons I'm not going to require it is because I

23   don't want some survivor to think that they have

24   amended their proof of claim by doing that.

25           MALE VOICE:  Exactly.

1          THE COURT:  Okay?  And that they therefore

2    don't have to provide any further information to

3    perhaps the settlement trustee, perhaps somebody else

4    to help validate their claim.  I don't want them to be

5    under any misapprehension about what -- and that's why

6    I asked what's the import of putting that information

7    on a ballot, and I think the answer's going to be

8    none.

9          So I don't want there to be any

10   misunderstandings out there.  So I'm not going to

11   require it.  But what I am hearing, of course, number

12   1, is a dispute over the relevant standard of what I

13   will have to decide at confirmation with respect to

14   third-party releases.  But to the extent that this

15   information is relevant to my decision, if the Debtors

16   don't have it, they don't have it.  And that would be

17   problematic.

18          So I'm not going to require it.  I will also

19   say that once -- and I even hate -- hesitate to say

20   this -- once I approve a disclosure statement, as far

21   as I'm concerned, it could start now.  Once

22   discovery's open on confirmation, it's open on any

23   information that is relevant to confirmation.  People

24   can seek discovery.

25          Okay.  Next issue.

1          MR. O'NEILL:  Thank you, Your Honor, and we

2    appreciate that.  I think that also when we get there,

3    we can discuss it, but I think that also addressed a

4    couple of later objections that are down in number 65

5    of the same nature or ilk.  So thank you for that.

6          I'll ask a question to the Court, if Your

7    Honor would like to take a break for five or ten

8    minutes or keep going.  We've been at it for two-and-

9    a-half hours.

10          THE COURT:  Let's take a ten-minute break.

11          MR. O'NEILL:  Okay.  Very good, Your Honor.

12          THE COURT:  Good idea.

13          MR. O'NEILL:  Okay.

14          THE COURT:  And parties can look through and

15    see what additional specific disclosure statement

16    objections remain outstanding.  Thank you.  What time

17    is it?  I've got 3:31.  Why don't we just say 3:45

18    we'll be back?  Thank you.

19          (Whereupon a recess was taken)

20          THE COURT:  This is Judge Silverstein.

21    Going back on the record.

22          MR. O'NEILL:  Hello, Judge Silverstein.

23    Thank you.  Is everybody back, or should we wait a

24    couple more minutes, I see?  I guess we have who we

25    have.  Should we get started?

Page 110

 1                THE COURT:  Yeah, we can get started.

 2                MR. O'NEILL:  Okay.  Thank you, Your Honor.

 3     I think the next item is Item 65 on Page 111 of the

 4     chart.  And excepting the sort of objections at the

 5     bottom that we discussed with respect -- or in respect

 6     of Number 64, just prior to the break, the idea behind

 7     these objections is that instead of temporarily

 8     valuing the claims at $1 for voting purposes that the

 9     Court should create some sort of proxy value based on

10     the TDPs or otherwise to value the claims for voting

11     purposes in that manner.

12                And of course, the objectors use 1126 as the

13     justification for doing so, arguing that we can't

14     properly determine amount of voting for -- for

15     confirmation purposes.

16                You know, as Your Honor knows, I think, you

17     know, this started in H. Robinson (phonetic) and Johns

18     Manville (phonetic), and it's been a long-used

19     mechanism, where you have, like here, tens of

20     thousands of unliquidated claims that are not going to

21     be evaluated by the estate for allowance but rather by

22     the trust, which is going to be administered by a

23     trustee post-effective date.

24                There are some arguments made about various

25     ways you could do it.  I'd submit to Your Honor that

1    they're all premature, given that the TDPs have not

2    even been approved, and many of the same, you know,

3    parties to this objection and on the phone or on the

4    screen plan to object vociferously to those TDPs.

5           So picking and choosing one or another

6    scaling factors or a base amount or some other proxy

7    for value for claims, which again, haven't been fully

8    evaluated and are not complete, as we discussed --

9    many are amending their claims, as we speak, and will

10   going forward -- is not a good way to do that.  And we

11   submit there is no good way to do that.  That's why

12   the $1 proxy is commonly used.

13          So Your Honor, I can allow others to give

14   you their point of view, but you know, I just leave

15   you with -- and I know that all the precedent in this

16   area, you know, is -- is not perfect, as we've

17   identified earlier in this -- in this discussion.  But

18   in this case, there -- there really is no other way to

19   do it.

20          The one case that's cited by the objectors

21   for this proposition is Quigley, and of course, in

22   Quigley, the evaluated at confirmation because it felt

23   it had to do that because it wasn't abundantly clear

24   from the voting percentages that, you know, in

25   addition to numerosity, which was clear, that the

1   amount would be satisfied.  Here, we hope to be in the

2   good position of -- of not having ambiguity on that

3   point, but I would submit that, you know, again, if --

4   if necessary, this could possibly be done at

5   confirmation with more information at that point.  But

6   right now, the $1 proxy is the way to go out with

7   these station procedures.

8           THE COURT:  Okay.  Mr. Patterson?

9           MR. PATTERSON:  Right, Your Honor.  I still

10  think I'm right, but I haven't got anybody interested

11  in this in this case.  And so we concede this point.

12  But I still think I'm right.

13          And to Mr. O'Neill's point that I spoke

14  passionately, I felt a little remonstrated for that.

15  I think it's because I talk a lot with my hands.  My

16  sister once said that the way to shut me up was to tie

17  my hands, and so I apologize for that.  I try to

18  maintain appropriate decorum.  But on this issue, Your

19  Honor, we're down to a dollar a claim it is.

20          THE COURT:  Okay.  Okay, so it sounds like

21  that issue is not a today issue, in any event.

22          MR. SCHIAVONI:  Your Honor, you have our

23  written objection to this, and we stand on that --

24          THE COURT:  Ah.

25          MR. SCHIAVONI:  Sorry.  We stand on our

1  written objection.  I'm not going to belabor it.  I

2  think Judge Gerber's observations are directly on

3  point.  There's clearly going to be a vote that is

4  close here, no matter what, and you know, what Gerber

5  observed, Judge Gerber observed, was that, you know,

6  when that's the case, you've got to basically, you

7  know, wait the votes.

8           The acknowledgement -- admission, I'll call

9  it -- that the estate has done nothing to "evaluate

10  the claims" that you just heard, they certainly -- and

11  in the subsequent statement that they haven't "fully

12  evaluated the claims" is the situation we have here.

13  The debtor's done nothing to evaluate the claims.  And

14  that's being used as the base to vote when there's

15  clearly evidence that there's a systematic problem

16  with the -- with the proofs of claim.

17           So we stand on our written objections.  I do

18  think, in a way, the way the debtor has sort of broken

19  up this sort of way to argue it, you kind of missed

20  the forest in the trees, and I'm going to save my

21  remarks for the next -- next of their bullet points,

22  our bigger picture points.

23           THE COURT:  Okay.  Well, let me say this,

24  which is that I -- given where we are, I will approve

25  it with the dollar going out.  But that is not to say

1   that people are precluded from raising the issues at

2   confirmation about whether that's the appropriate way

3   for me to -- for the votes to be counted.

4           And -- but I'll make another observation, at

5   least, with respect to the insurance companies.  My

6   understanding is different than in Imerys.  My

7   recollection is that, here, the insurance companies

8   are placed in a separate class.  And so their

9   individual vote will not be overrun, if you will, by

10  the votes of the survivors.

11          So certainly for purposes of voting, I'm not

12  sure whether insurers will have the ability to raise

13  that particular issue in -- on that -- raise the

14  dollar issue on voting issues.  Maybe for something

15  else, and I'm going to hear from you, Mr. Schiavoni.

16  But I'll -- I'll point that out, and that is different

17  than in Imerys, where they were lumped together so

18  that -- so that personal injury claimant's votes, in

19  fact, are going to -- could outstrip and control the

20  class.  That doesn't happen here.

21          MR. SCHIAVONI:  Thank you, Your --

22          THE COURT:  Mr. Patterson's client's

23  obviously in a different situation.  They're in the

24  same class.  Mr. O'Neill?

25          MR. O'NEILL:  Thank you, Your Honor, and I'm

1  -- I won't respond to much of what Mr. Schiavoni said,

2  but I'll just say there were no admissions there.  I

3  was just stating what everybody knows here, which is

4  that the TDP process by the trust is going to be the

5  only full evaluation of these claims during these

6  cases.

7          So Your Honor, moving on to 66, I don't know

8  that we have an issue with the TCC at all on this

9  cover letter, but I'm -- as I sit here, and I could

10  have missed it, given what's been going on this

11  afternoon, but I -- I don't know that we have a letter

12  from them.

13          But I think that we are not opposed to it

14  pursuant to the -- the discussions over the last two

15  days, but we -- we obviously need a draft of something

16  before it can be agreed to.

17          So that leaves Mr. Buchbinder's objection,

18  Your Honor.  You know, I guess -- I guess I'll start

19  by saying, you know, there's -- I'll state the

20  obvious.  There's a lot of claimants in this case, and

21  even with the -- the procedure with the master ballot,

22  which -- which saves us from sending, you know, a full

23  package to tens of thousands of people, Mr.

24  Buchbinder's office is still saying that we should

25  send a full package of paper, over 1,000 pages, to the

1    voting parties in these cases.

2            To us, this is not just a case of, you know,

3    administrative or expense savings for the estate, but

4    it's also just wasteful.  Sending over 1,000 pages to

5    people in this day and age is not appropriate.  It's

6    not the trend in the case.  Mr. Buchbinder backs that

7    up, I think, with a -- with a request for not a CDROM

8    but a -- a thumb drive, which is what some courts have

9    done.

10           We think the link is perfectly sufficient,

11   Your Honor.  It's how most of us access documents

12   these days, well, at least, you know, us people

13   sitting in conference rooms on a, you know, hours-long

14   court hearings.  But I think the vast majority of the

15   population is in that same boat.

16           I don't want to belabor this point too much,

17   Your Honor.  I think maybe you have a perspective.  So

18   I'll just defer to Mr. Buchbinder if he wants to argue

19   this.

20           THE COURT:  Mr. Buchbinder.

21           MR. BUCHBINDER:  Thank you, Your Honor.

22   David Buchbinder on behalf of the U.S. Trustee.

23   Frankly, Mr. O'Neill, in his tone and his attitude,

24   expresses his entire lack of understanding for the

25   82,500 abuse claimants in this case.  I'll start with

1    that.

2           Bankruptcy Rule of Procedure 3017(d) is

3    quite explicit.  And it reads in part, except to the

4    extent that the Court orders otherwise with respect to

5    one or more unimpaired classes of creditors or equity

6    security holders, the debtor in possession shall.  And

7    then it goes on to say mail the solicitation package

8    to all of the impaired creditors.  There's no

9    exception here for cost savings.  There's no exception

10   here for the fact that they're going to get master

11   ballots from attorneys.

12           And let's go back to that issue and the

13   certification for a moment.  It would appear that in

14   the certification, the debtor is attempting to pass

15   off its duty to serve hard copies of the solicitation

16   package to the abuse claimants through the attorneys

17   who are going to recommend to them to vote for the

18   plan.  I don't have a problem with that, but the

19   problem I have with that, as was pointed out by many

20   of the other parties in the earlier discussion this

21   afternoon, was despite the certification and despite

22   the comments about additions to the certification to

23   act as a deterrent, there isn't going to be any real

24   practical way to police that these personal injury

25   attorneys have actually sent the solicitation package

1    in some form to their clients.  That's the debtor's

2    responsibility.

3              And it's one thing to propose a master

4    ballot where the attorney who represents multiple

5    clients will report the votes of his or her clients.

6    But it's another thing to say that that means that

7    those clients received the materials they needed to

8    analyze to determine how to tell their attorney how to

9    vote.

10             Bankruptcy Rule 3017(d) authorizes

11   summaries, but it doesn't authorize them in lieu of a

12   solicitation package.

13             Additionally here, many of the abuse

14   claimants, based upon the hundreds of letters that

15   have been sent to the Court, are incarcerated

16   prisoners.  Outside of those letters, other prisoners

17   have from time to time filed pleadings, indicating to

18   the Court how difficult it is for them to receive

19   materials or to send them back.  The incarcerated

20   prisoners among other issues have limited or no access

21   to computers, or when they do, they only have limited

22   time periods where they can access the screen.  Those

23   folks have to have hard copies of the materials.

24             Additionally, many of the abuse claimants

25   are elderly.  Many of them are computer-illiterate.

1    They still read pieces of paper.  The debtor here has

2    told us that it's going to cost millions of dollars to

3    send these packages to people.  Frankly, that's

4    poppycock.   They try to compare this case to Takata

5    and to PG&E.  I was involved in both of those cases,

6    and each of those cases had millions of creditors, not

7    82,500 plus the trade creditors and insurance

8    companies.  There are many ways in which the debtor

9    could print the solicitation package to economize its

10   expenses.  It could be printed on newsprint.  The

11   pages could be printed two up, back to back, and it

12   would be -- look like a prospectus in its material,

13   but that would be the least expensive way to produce

14   it and to mail it, and everyone would have their hard

15   copy.  They would get their summaries.  They'll get

16   their letters from whoever's going to tell them to

17   vote for or against the plan, but they'll have all the

18   information that the code and the rules entitle them

19   to.  And we can't pass this off to the third-party

20   attorneys for all the various reasons stated by other

21   counsel.

22            Finally, Your Honor, if the debtor thinks it

23   can't afford to comply with the requirements of the

24   Bankruptcy Rules of Procedure in this regard, then

25   maybe it ought to be rethinking the chapter it is in.

1   Thank you.

2           THE COURT:  Thank you.  Mr. Stang.

3           MR. STANG:  Thank you, Your Honor.  I just

4   wanted to point out that if we do put in a letter,

5   that letter per the procedures goes to the attorneys,

6   who will then communicate only the disclosure

7   statement to their clients, not the entire

8   solicitation package.  So this may be what we do at

9   the end, when we go through the order, but since we

10  were talking about the letter, the way they've done

11  it, the letter doesn't have to go to the -- to the

12  clients.  Only the disclosure statement goes to the

13  clients if it's done through the attorneys.

14          The attorneys get it, but they only have to

15  send out the disclosure statement, which of course has

16  the plan, you know, attached.

17          THE COURT:  Okay, thank you.  Response, Mr.

18  O'Neill?

19          MR. O'NEILL:  Yeah.  No, thank you, Mr.

20  Stang.  We can make that clarification.  That

21  certainly wasn't the intent to -- to prevent the

22  letter from going along with the disclosure statement.

23          To Mr. Buchbinder, what we're hearing from

24  Omni is that this would cost the estate over $3

25  million to send paper.  I think maybe we could, you

1    know, quibble about that number based on different

2    methods of printing.  But I think what's more

3    important here is that everybody in this case, all

4    claimants are getting the notice of confirmation

5    hearing.  And on that notice, printed writ large, is a

6    phone number, and they can call Omni, and they can

7    request a paper copy to be delivered to them free of

8    charge.

9            Nobody is relying on the attorneys, although

10   they have that obligation if they're going to certify

11   to the vote, to show their clients the disclosure

12   statement in order to -- to Mr. Stang's point, the

13   entire solicitation package.

14           We are giving people the option to self-

15   help, if they want a paper copy.  But for the vast

16   majority of people -- and we think it is the vast

17   majority that aren't going to do that -- we think the

18   current mode of solicitation is sufficient, Your

19   Honor.

20           THE COURT:  Okay.  Mr. Buchbinder, let me

21   ask you a question, and as parties will know, I fit --

22   apparently, I fit into the old category because I'm a

23   paper person.

24           The -- I see the rule.  I'm looking at it.

25   But I know that in the past, I have been asked to

1  approve -- and I'm sure I have approved -- used to be

2  CDROMs.  Then it used to be a flash drive.  I don't

3  know what else you can put it on these days, you know,

4  pair of glasses you could send somebody.  I don't

5  know.

6        But I've been asked to do different things,

7  right?  And as long as there's an option for someone

8  to request paper and it is free to them, and maybe we

9  could even make certain that it gets sent out by

10  overnight so there's not a loss of time to review the

11  papers, are we meeting the spirit of the rule, which

12  was obviously drafted at some prior point in time?

13        And I've also, I should say, then had

14  situations where the ballot, probably the letter from

15  the committee, I forget, the notice, certain other

16  things, certain portions were sent by paper, and then

17  the rest was either on some electronic format or you

18  could request paper.

19        Are we not meeting the spirit of the rule?

20  And I'm with you in terms of paper for anybody who

21  wants it.  And I want to make sure they get it timely

22  and in enough time to review it.  But I recognize I'm

23  a dinosaur.  So if there are people who, in fact,

24  would review it online or would review it in some

25  other fashion, are we not meeting the spirit of the

1   rule?

2           MR. BUCHBINDER:  Thank you, Your Honor.  I'm

3   also a dinosaur, and in most cases, I wouldn't

4   disagree with a word that you've said.  But we need to

5   look at the nature of the abuse claimants in this

6   case.  Many thousands of them are elderly, very

7   elderly, in their 60s, 70s, and 80s.  Many of them, as

8   we've noted, are incarcerated.  Many of the elderly

9   ones, I would venture to guess, may live in assisted

10  living or other types of facilities where they don't

11  have access to computers, where they -- or where they

12  can easily request the paper copies.

13          And, as Mr. Humphrey pointed out to us

14  yesterday, there are 82,500 individuals who are going

15  to be mistrusting this entire process if they don't

16  get the papers.  This is a different mix of creditors

17  here.  This is a unique class of claims, and they need

18  to be served with hard copies for all of these

19  reasons.

20          There has been no declaration filed as to

21  the cost, but you know what, the cost to these

22  individuals over the decades that they have suffered

23  is immeasurable.  And so the debtor can afford to pay

24  the bill for them.  Thank you.

25          THE COURT:  Okay.  I'm convinced.  Mr.

1  Buchbinder is correct.  I think the unique mix of

2  creditors here, which does, at least has been

3  represented to me, skewed towards older and would make

4  sense, given that the debtor has consistently said

5  that its more current measures to prevent abuse means

6  that there are less victims who are younger.  I'm

7  going to require paper.  It is an expense, but quite

8  frankly, 3 million in this case -- it sounds horrible

9  -- it's a small number in this case.  Mr. Ryan?

10          MR. RYAN:  Your Honor --

11          THE COURT:  You need to unmute.

12          MR. RYAN:  Yeah, can you hear me now, Your

13  Honor?

14          THE COURT:  Yes.

15          MR. RYAN:  I wasn't sure when to raise this,

16  but now that we're on the topic of putting things in

17  the mail is just the issue of -- of those who aren't

18  creditors -- you know, the charter organizations who

19  aren't creditors whose rights are getting affected,

20  and I wasn't sure when Your Honor wanted to address

21  that part of -- of solicitation or notice.

22          THE COURT:  We're going to have to deal with

23  that, and, Mr. O'Neill, when did you plan to deal with

24  that?

25          MR. O'NEILL:  Your Honor, we had

1    communications with Mr. Ryan.  I'm not sure exactly

2    what he's referring to, but I think what we assumed

3    was that in the communication that we were putting

4    together with -- with the assistance of Mr. Ryan, that

5    that would contain all the -- the necessary

6    disclosures and other things that he was looking for.

7    We plan to have that, you know, prepared and then

8    approved as part of the order, as part of the

9    solicitation materials so that we could have it sent

10   out to the relevant parties as part of this process.

11           MR. RYAN:  And that's the issue, Your Honor.

12   It's to whom are they going to send because it's --

13   the procedures right now were drafted, you know, with

14   a different -- a different -- a different world.  And

15   so there's a call to send out solicitation packages to

16   indirect abuse creditors, which there are 16,600.  But

17   there are 40,000 chartered organizations who are going

18   to, whether they're creditors or not, their rights are

19   going to be affected by this plan or -- or purported

20   to be affected by this plan by -- by moving them into

21   certain categories and -- and affecting their rights

22   as additional insureds, and giving them releases.  So

23   I think they need to know.

24           THE COURT:  There's going to have to be some

25   notice to them directly.  Anyone whose rights are

1   going to be affected by that.

2           MR. O'NEILL:  We agree, Your Honor, and all

3   41,000 chartered orgs will be getting the

4   communication that we are working on with Mr. Ryan,

5   which -- which will be comprehensive.  We devoted

6   quite a bit of time to this over the last couple days,

7   discussing what will be in it, and we plan to work in

8   good faith to make it plain English and to make it

9   useful, and all 41,000 will get it.

10          MR. RYAN:  That sounds perfect, Your Honor.

11  I just wasn't sure when to raise and just make sure

12  that we had the -- the mailing part of the mechanics

13  done.

14          THE COURT:  Thank you.  Well, if your crew

15  skews younger and you want to suggest a different

16  method, I will consider that for you.  Mr. Lucas.

17          MR. RYAN:  I was going to say, Your Honor,

18  it may be -- it may be that -- that for -- for -- for

19  -- I don't know how -- how young church elders skew.

20  I won't pretend to know that for -- for -- for all

21  these churches.  But it may be that a hybrid of

22  sending out a paper notice and a link so we're not

23  adding another million eight to -- to the expense cost

24  is -- is something that I think is probably a good --

25  maybe a very good solution for -- for -- for the

1   chartered organizations and not ring up, you know, a

2   forest of dead trees that the Boy Scouts could

3   otherwise preserve.

4          THE COURT:  Mr. Lucas.

5          MR. LUCAS:  Thank you, Your Honor.  I wanted

6   to follow up on something that Mr. Buchbinder was

7   saying, and it goes into the Court's ruling just now,

8   and I think it's important to understand.

9          As we've said before, my firm receives calls

10  and inquiries -- calls, emails, and inquiries from

11  just a great number of prisoners, people who are

12  incarcerated who are survivors.  There are

13  approximately at least 2,000 survivors that have filed

14  proofs of claim that are incarcerated.  And so when

15  this paper is going to be sent to them, the

16  solicitation package, in addition to putting the exact

17  address and the prisoner number, which you know, I

18  obviously -- debtors can only supply to the extent

19  it's on the proof of claim.

20         In addition to that, it's important to say

21  that there are legal materials inside on the cover.

22  When my firm communicates and asks questions, we put

23  that so that it gets to the survivor.  Otherwise,

24  sometimes it's -- it's stopped, it takes -- there's

25  delay, and it doesn't go directly to him or her, and

1    it takes a while.  And so that's -- again, that's

2    maybe something that we could talk with the BSA's

3    counsel about just to ensure, as has happened with the

4    number of communications that we have had.

5            And then I had a follow-up question about

6    the paper ruling, Your Honor.  The solicitation -- you

7    know, under the master ballot process, it's -- it's

8    the Plaintiff lawyers or -- or their state court

9    counsel, if you will, that are going to be sending the

10   solicitation packages.  Does that mean that the

11   Plaintiff's lawyers are sending the solicitation

12   packages in paper to their respective clients?

13           THE COURT:  Well, I would think it -- on a

14   normal master ballot, CD kind of thing, bond issuance

15   kind of thing, I think the ballots are -- the paper is

16   given to the -- to the agent, who then follows it on.

17   But the packages are delivered.  I don't know.  Y'all

18   can work on that and how you want it done, but that's

19   how I think it's normally supplied.  I think the

20   debtor's supposed to do it.

21           It may be that it's duplicative and we

22   should not task the Plaintiff's lawyers with doing it.

23   We should think about that.  If the -- I certainly

24   don't think that they should be getting two packages,

25   one from the debtor and one from the -- their

1  attorneys.  That's a waste, and that's confusing, and

2  they shouldn't get two packages.  So if you want to

3  talk further about which you think is better or how

4  that should work, that's fine.

5          In terms of the prisoners, please work with

6  debtor's counsel and then with Omni.  I have seen some

7  of those letters.  I have seen the -- the issue about

8  sufficiently noting legal documentation.  Some prisons

9  may -- may do it differently.  So notwithstanding

10  everyone's best effort, it still may not get there.  I

11  understand that notice issue.  It's a problem.  But

12  let's do the best we can to get the information to

13  that -- to everyone, and we have to hope the Bureau of

14  Prisons on the federal level and whatever state

15  equivalents there are is going to get the information

16  to these -- to these parties.  We can -- have to do

17  the best we can.  Mr. Smola.

18          MR. SMOLA:  Your Honor, I just -- to follow

19  up on Mr. Lucas' point, there are many, many men in

20  this case who have not told their families about their

21  abuse.  And if they receive a solicitation package to

22  their home that is focused on abuse, that is going to

23  harm them further.  We specifically have in our firm a

24  way in which we keep track of which men find mail to

25  their home acceptable and which do not.  And I will

1    tell you the vast majority do not.

2            THE COURT:  Do not.

3            MR. SMOLA:  So -- so the -- the problem I

4    foresee is hundreds, if not thousands, of phone calls

5    about why an individual -- an individual's spouse who

6    they haven't told about their abuse just received a

7    solicitation package about their sexual abuse.  Thank

8    you.

9            THE COURT:  So Mr. Buchbinder, does this --

10   does -- I find that somewhat compelling.

11           MR. BUCHBINDER:  I'm giving it serious

12   thought.  I did have a couple of suggestions before

13   Mr. Smola's comment.  One would be to take the

14   attorney certification -- take the service of the

15   solicitation package out of the certification -- out

16   of the attorney certification, and the second would be

17   to put on -- a legend on the envelop legal documents.

18           But Mr. Smola seems have a -- have made a

19   good point.  And this is a very difficult issue

20   because he's -- this is one where, you know, I'm

21   thinking back to Fiddler on the Roof, and the scene in

22   Fiddler on the Roof where all of the men are talking,

23   and Reb Tevye looks at the first one.  He says, you

24   know, you're right.  And the second guy says

25   something, and then Reb Tevye says, you know, you're

1   right, too.

2            Everyone's right here.  The rules are the

3   rules, and Mr. Smola is not wrong.  And we need to

4   find a -- we need to find a viable compromise that

5   works for everyone because we do have, as I indicated,

6   the many thousands of elderly people, some of whom may

7   or may not be in Mr. Smola's category, who still would

8   want to get paper copies.  So we have a difficult

9   quandary here, and I do understand Mr. Smola's well-

10  made statement.

11           MR. SMOLA:  So I -- I would just point out

12  to the Court that we have about 4,000 clients, about

13  800 to 900 fall into the category of not capable of

14  using email.  And -- and we have clearly are --

15  defined those clients in our firm, and they'll receive

16  a paper copy from us if they want one.  So but even

17  within that group, some don't want mail.  They only

18  want to communicate via phone, so it's -- it's a very

19  complicated issue.

20           THE COURT:  Thank you.  Mr. Patterson?

21           MR. PATTERSON:  Your Honor, I wasn't going

22  to address myself to this issue, so I'll let this

23  issue go.  I'd like to be heard subsequently.

24           THE COURT:  Okay.  I -- I'd like the parties

25  to talk and present me hopefully with some kind of

1   agreed way to do this.  I -- I am sensitive to the --

2   to the fact that many of the survivors are older, and

3   therefore, maybe not be as technologically savvy.  But

4   I think Mr. Smola's point is excellent, well taken,

5   and we don't want to create more angst for the

6   survivors by sending something to their home which

7   they do not want sent to their home, invading their

8   privacy further.  And -- but we have to make certain

9   that they get appropriate notice.

10          So I'd like the parties who understand these

11  issues to talk.  I'm not trying to avoid making a

12  call.  I'm just trying to make sure I'm sufficiently

13  informed in giving the parties who really understand

14  the concerns -- the issue.  I am willing to break from

15  the rule in this circumstance, and make sure -- but I

16  want to make sure that the survivors get what they

17  need to make the decisions.  I see Mr. Beckett, who

18  has his hand up.

19          MR. BECKETT:  Yes, Your Honor.  Richard

20  Beckett on top of -- or representing about 165

21  Claimants.  In addition to the matters that Mr. Smola

22  brought forth, we also have a couple of Claimants who

23  are homeless, and we're able to get in contact with

24  them because we have means of getting a hold of them.

25  But if they go out in the mail, I don't think they'll

1    ever receive the materials.

2           THE COURT:  So another complication.  Well,

3    it certainly looks like the lawyers need to be

4    involved in this process, and I think that's what has

5    to happen.  And to the extent that we need some

6    separate type -- and maybe it's a separate type of

7    certification of how they reach their clients, then

8    maybe that's what we do.  And they can indicate

9    whether they were able to do it by mail or email or

10   phone or whatever.  But we'll know that they have

11   reached their clients, and I would like some subset of

12   you, including Mr. Smola and Mr. Beckett if you're

13   interested, speaking with Mr. Buchbinder and the

14   debtors' counsel, and let's come up with the best we

15   can do under the circumstances, mindful of the rule

16   but mindful of the privacy concerns and mindful of the

17   need to reach these men.

18           MR. BECKETT:  Thank you, Your Honor.

19           THE COURT:  Thank you.  Oh, Mr. Lucas?

20           MR. LUCAS:  Just, Your Honor, a thought.  We

21   will work with debtors' counsel and the others that

22   you referenced earlier, but I -- as I'm looking

23   through some things here, I just wanted to let the

24   Court know, I think that there are ways in using the

25   proof of claim to substantially narrow the issues and

1   to ensure that the communication or the disclosure of

2   the notice or how -- whatever it's going to be -- gets

3   to the survivor and the survivor, his or herself, as

4   opposed to somebody in his or her family that might

5   not know about the abuse.  And so I -- I do think that

6   there are ways -- you know, we might not be able to

7   deal with every single person, but I do think that

8   there are ways to substantially narrow this problem.

9             THE COURT:  Okay, thank you.

10            MR. O'NEILL:   And -- and, Your Honor, we

11   pledge to work with Mr. Lucas and Mr. Beckett and Mr.

12   Smola and also Mr. Buchbinder to figure this out.  I

13   think it's -- it's complicated.  There are people who

14   have opted out for confidentiality purposes, law

15   communications.  So there's a whole bunch of

16   categories of people that would -- not similarly

17   impacted by this.  So we appreciate Your Honor's, you

18   know, thoughts on this, and we'll -- we'll work to put

19   together a sensible protocol based on what we've

20   heard.

21            THE COURT:  Thank you.

22            MR. O'NEILL:  Okay.  Your Honor, I think

23   with that we're -- we're to Number 67 on the chart on

24   Page 113, which is the sort of string of Century

25   objections, which -- which Mr. Schiavoni has referred

1  to.  I -- I believe that he has the intent to put on

2  witnesses, so I think with that, I'll let him proceed

3  to that, and we'll -- we'll deal accordingly on the

4  debtors' side and any other parties that want to cross

5  or otherwise deal with these witnesses.

6          THE COURT:  Mr. Schiavoni?

7          MR. PATTERSON:  Your Honor, may I -- I

8  apologize for interrupting, but just before we get to

9  that, could I finish off our prior discussion with a

10 couple --

11         THE COURT:  Oh, I'm sorry.  Yes.

12         MR. PATTERSON:  No, no, it's -- thank you,

13 Your Honor.  When we talked about the master mortgage

14 and what would need to be shown, I may have said but

15 may have neglected to say that it may also be relevant

16 with regard to chartered organizations, particularly

17 those that have become contributing chartered

18 organizations, now that those amounts are going to be

19 earmarked, to know who of the claimants who are -- who

20 have viable commission against that entity and then

21 what percentages are those claimants in particular

22 voting to give a chartered organization a release.  So

23 I may have said that, but if I didn't, I wanted to

24 ensure it.

25         Second, Your Honor, the plan, as Your Honor

1    has indicated, has a provision allowing claimants to

2    elect for the $3,000 or so distribution, similar to

3    the general and secured creditors, although for them I

4    think it's $50,000.  Our view is that people who make

5    this election are fundamentally in a different

6    position from those whose claims are going to go

7    through the TDP and be subject to the settlement trust

8    and so forth.

9            And so our view is that that group should be

10   separately classified.  I would urge the debtor to do

11   that because I think it's an obvious case.  It's an

12   administrative convenience class.  The code provides

13   for it.  Encourage the debtor to do it, but if the

14   debtor doesn't do it, we'll file an appropriate motion

15   to be heard at confirmation to designate the people

16   who make the election as a separate class so that

17   those people's votes, again, are not counted towards

18   the various other provisions that the rest of the

19   creditors are going to be tied up with.

20           THE COURT:  Thank you.  And I'm not

21   surprised to hear that, having read the papers.  But

22   as I said, we'll know who that is, and that's sort of

23   the objective is to -- to make sure the people have

24   the information they need to make the arguments that

25   they will -- will make.

1            MR. PATTERSON:  Thank you, Your Honor.

2            THE COURT:  Mr. Moxley, I see your hand.

3            MR. MOXLEY:  Good afternoon, Your Honor.

4    I'm Cameron Moxley of Brown Rudnick on behalf of the

5    Coalition.  Your Honor, given Mr. O'Neill's comment

6    that he would be turning the podium over to Mr.

7    Schiavoni, who, I understand, intends to call

8    witnesses, we do just want to note for the Court that

9    we have some very limited objections to the witness --

10   to the witnesses that may be called.  I don't want to

11   interrupt Mr. Schiavoni's presentation if he is

12   calling witnesses at the top but to be heard, if I

13   could, Your Honor.  Or if he plans on presenting some

14   things, you know, before witnesses are called, I will

15   be heard before the witnesses are called.  Thank you,

16   Your Honor.

17           THE COURT:  Okay.  Well, I'm going to let

18   Mr. Schiavoni make his presentation, and we'll see

19   where you fit in, Mr. Moxley.

20           MR. MOXLEY:  Thank you, Judge.

21           MR. SCHIAVONI:  So, thank you, Your Honor.

22   Tancred Schiavoni for Century Indemnity.  Your Honor,

23   I do think there is -- although the -- the Circuit has

24   not directly address the -- the use of master ballots,

25   they have -- they have, in fact, touched on it in a

1    very important way that I think gives guidance in the

2    Combustion Engineering decision.  In that decision,

3    the Court reversed -- even though there was a majority

4    vote in favor of the plan -- the Court reversed and

5    remanded for several reasons, but including an

6    1129(a)(3) reason for good faith based upon how the

7    balloting went forward in that case.

8              And if you remember from the facts of the

9    case, there was an effort there by the debtor to put

10   together a -- a bloc group of claimants in advance of

11   the bankruptcy and then bring them into the bankruptcy

12   to bring about a yes vote.  And the group they put

13   together, so the Circuit says, were claimants that

14   were either unimpaired or had only "slightly impaired"

15   claims.  They refer to them as "stub claims."

16             And that ended up being the voting majority

17   in the case.  They happen to control in that case the

18   -- the official committee, and there was an ad hoc

19   committee in the position effectively of -- of where

20   the official committee is here, made up of Mr. Cassin

21   (phonetic) and some other groups of claimants who

22   represented mesothelioma claimants.  And they appealed

23   the plan, and they appealed it on, you know, among

24   other reasons on how the balloting was done.

25             And the Third Circuit, in looking at the

Page 139

1    balloting in that case, observed that the

2    consequence -- the consequence, you know, of the

3    "debtor" balloting in the manner that they did was

4    that it -- that a group of Claimants that

5    "represented" a voting majority, despite holding in

6    many cases only a slightly impaired stub claims, were

7    the ones that carried the vote at the end of the day.

8    That's on 244 of the decision, which is 391 F.3.  The

9    Court found that, accordingly, the monitoring function

10   of 1129(a) I think (10), which requires that at least

11   one class of impaired Claimants must accept the plan

12   "may have been weakened."  And -- and then it went on

13   to say enabling a manipulation of the voting process,

14   and that's on Page 243.

15            And then the Circuit went on to talk about

16   "the chief concern with such conduct is that it

17   potentially allows a debtor to manipulate the Chapter

18   11 confirmation process by -- by engineering literal

19   compliance with the code while avoiding opposition to

20   the -- to a reorganization by truly impaired

21   claimants."

22            Here -- and then -- and then the Court, as

23   part of -- as part of the remand specifically directed

24   as part of the remand that discovery be directed at

25   that issue or -- or the Court be able to develop a

1    full record with respect to it.

2           It is very hard, Judge, to look at this

3    record that you have before you and not see that

4    guidance called directly into play.  The Court has

5    before it in evidence, based on prior proceedings, the

6    email from the head of the coalition at the time the

7    coalition was formed that was submitted to the U.S.

8    Trustee by the official committee.

9           That -- that email is blunt, it's direct,

10   it's to the point about why the coalition was formed.

11   It's -- it's disparaging in its nature to the

12   claimants themselves and to the members of the

13   committee, and it talks specifically about how the

14   purpose of the coalition was to form a voting bloc --

15   a voting bloc in favor of -- of -- of basically

16   gaining control of the case.  I think that's the exact

17   words that Mr. Kosnoff used, gaining control of the

18   case.  And that's what they did.  They gained control

19   of the case.

20          And we now have -- that -- that's the fact

21   pattern that we sort of start with here, the voting,

22   the solicitation procedures, and the plan that's

23   resulted from this, from the -- from the claims that

24   they generated -- and if you remember in that proof of

25   -- in that -- in that email, he goes on to say how

1    they're going to focus, you know, on generating these

2    claims.

3            And then Mr. -- Mr. Kosnoff has since

4    submitted a sworn 2019 statement acknowledging that

5    the point of what he was doing was trying to generate

6    invalid claims from statute of limitations states.  He

7    doesn't call them invalid, but he says he was directly

8    trying to solicit claims from -- from states where the

9    statute of limitations had run.

10           So that's -- that's the sort of base that we

11   start with here.  Then what -- the result that comes

12   from it, the plan and the solicitation procedures, are

13   exactly what you would -- that flow -- and it's very

14   similar to what the Circuit saw.  The Circuit saw in

15   the Combustion Engineering case a use of master

16   ballots by this ad hoc group to deliver the bloc that

17   they promised pre-petition and that they promised to

18   get the -- get the plan done, and they got a plan that

19   they wanted and a plan that favored disproportionately

20   paying those kinds of claimants.

21           Here, we have a plan and solicitation

22   procedures that calls for claimants to get paid,

23   curiously a number that's a -- you know, somewhat --

24   you know, two to three times above what the

25   advertisements were for the cost of buying one of

1    these claims early on, 30 -- this $3,500 number, to

2    vote and be completely, you know, un -- unreviewed.

3    There's no scrutiny on the $3,500 claims.

4           So you have that class going into the vote.

5    You also have going into it the -- a plan designed by

6    these folks that is specifically directed at the kinds

7    of claims that they -- they put together.  It has very

8    low scrutiny, and there'll be evidence, if Mr. Green

9    stays in, that there's a -- the trustee put in has a

10   close connection, we believe it will show to the group

11   that was put in to basically approve their claims.

12          The other thing it's going to have is it's

13   going to have imbedded in the plan, just like it was

14   imbedded in the RSA, requirements that the fees

15   incurred by the Coalition -- even if that's really

16   what it is -- but at least $10 million as a lump sum

17   is going to be paid in fees, and then a mill -- almost

18   $950,000 a month on a going forward basis.  By the

19   way, it's going forward post-confirmation for at least

20   some period of time, I believe, how that is phrased.

21          You heard that I misrepresented somehow that

22   there -- how folks opted out.  I didn't.  Go back.

23   It's in the record.  It's in the record of the 2019

24   submission by the coalition where they were

25   specifically proffering what the evidence was that

1    Brown Rudnick, in fact, represented these groups.

2            And what they had to do as part of that, is

3    they had to go out -- the firms that were part of the

4    "coalition" purportedly represented somewhere in the

5    neighborhood of 50-or-60,000 Claimants as a result of

6    the advertising campaign.  They had to go out to those

7    folks, and they had to get affirmative consent to the

8    Brown Rudnick engagement.  And they -- they -- they

9    post they have a sort of consent letter that they

10   have, and they told you as part of the 2019 submission

11   that they had obtained a certain amount of consents

12   and that they were still getting others and that they

13   were going to make a secondary submission on it.  And

14   they did.  They did just that.

15           And what they did was, they went out to

16   those folks, that 50-to-60,000, and they said, will

17   you agree to this?  Will you agree to be a part of the

18   "coalition" and in essence fund the Brown Rudnick

19   fees?  The coalition, as it's now represented, doesn't

20   have 50,000/60,000 members in it.  It has a much

21   smaller number, and that's represented by the most

22   recent 2019 statements that they filed.  It's a number

23   -- I don't have it on the tip of my tongue, but

24   it's -- it's somewhere below 20,000.  I think it's

25   17,000 or some -- somewhere in that neighborhood.

1   That means that the other 40-to-50,000 Claimants that

2   that group represented turned down the request to --

3   to, you know, be members of the coalition and agree to

4   pay these fees.

5           What the plan does in putting those fees

6   into it is that it -- it overrides -- it's, like,

7   these -- these lawyers all represented people who were

8   asked, do you want to pay?  Do you not want to pay?

9   And they're told in the letter that if you say no, it

10  won't be part of what you're going to pay.  And large

11  numbers of them, the vast majority of them, said no.

12  And they've now put in a plan a provision that

13  requires them to vote yes, so that -- it's, like, that

14  is both a secondary provision that's going to tie

15  directly into what I believe the Circuit looked at as

16  far as the inducements here to create a situation

17  where you have a minority -- where you have these

18  lesser impaired claims taking control of the case and

19  voting and raising a good faith challenge.

20          Now, we've put before the Court, in

21  connection with the RSA, specific case law about the

22  conflict posed by having a lawyer both getting --

23  being offered a financial inducement as part of

24  something as well as making recommendations to their

25  client.  And although it's a little sort of worded

1  differently from the RSA, we're in exactly the same

2  situation.  It's like here, the Coalition is going to

3  make a recommendation to support the plan, and they're

4  -- and they have a financial inducement, those

5  lawyers, to do so.

6          And there's no mistake about why that was

7  arranged that way.  It was arranged exactly that way,

8  I think you will in evidence confirmation, for the

9  very reasons that the voting bloc group was arranged

10 in -- in the Combustion Engineering case.  And in

11 fact, you'll find some of the same lawyers involved.

12 Mr. Rice was involved in that case, and you'll find

13 Mr. Rice is involved in this case in the Coalition.

14          So it's some of the same reasons.  It's

15 something that really -- it affects the vote.  It has

16 the potential to taint where the case is going to go

17 overall.

18          You have here -- the Court, remember, in

19 Combustion Engineering, referred the matter back to

20 say let's -- we're remanding for further record

21 developed on that.  Here, the Court has a record.

22 It's like we developed a record in connection with the

23 2004 process, showing -- I think we made more than a

24 prima facie case that there was significant problems

25 with how the proofs of claim were put together.  I

Page 146

1    think there's some acknowledgement of that, perhaps.

2    I don't want to put words in your Judge's -- in Your

3    Honor's mouth, but to the extent there's a ruling

4    about the 2004 case is a basis for them to go forward.

5    I think there's a recognition that what we put forward

6    was legitimate evidence that there's a significant

7    problem here.  Putting aside the fact that we're

8    dealing with a case where the claims went from 245 in

9    the tort system and maybe another 1,000 or 1,500

10   asserted to the -- to the -- whatever that number is.

11   My math is bad, but 2,000 claims to over 82,000 claims

12   and allegations such as $100 billion now of liability

13   generated by a process controlled by the people who

14   generated these claims and generate them through an

15   advertising system that was found to have fundamental

16   misrepresentations made in connection with it.

17              The claims that we put before Your Honor on

18   evidence that was uncontested in the prior proceedings

19   was that attorneys submitted proofs of claim affixing

20   electronic signatures that had nothing to do with that

21   claimant.  There's examples of handwritten signatures

22   that are completely forged or -- well, I guess forged

23   is the right word.  They're the same signature on

24   hundreds and hundreds of claims.

25              There's other evidence of -- that -- that we

1   put before the Court, showing that the aggregator

2   itself was the one that was affixing signatures and --

3   and reviewing the claims.  That -- that evidence, we

4   asked for the ability, we were cautious, we were

5   careful about how we proceeded on this.  We asked for

6   2004 discovery before going on and making further

7   conclusions.  It was targeted, what we were after.

8           And Your Honor, we didn't sit on our rights.

9   We brought this early.  We brought it up at every

10  single opportunity that we thought this was an

11  important issue.  It was an important issue to us

12  especially because the -- the -- the concern that

13  these very claimants, this very bloc was generating a

14  plan that was set to kind of create liability where

15  liability didn't exist and would infect the process of

16  creating -- of creating the plan.

17          Well, we have the plan that it generated,

18  and we never got really to test those claims.  We --

19  you know, Your Honor gave us the right to issue the

20  discovery to the -- to the aggregators.  We did so as

21  fast as we could after the -- within 48 hours of the

22  orders being issued.  That discovery is going to come

23  back, you know, the document portion of it next week.

24  Your Honor asked us to hold off on the specific

25  discovery directed at the lawyers that were -- you

1  know, that we revealed what they were engaged in, and

2  that was based upon -- you know, like we didn't just

3  run off and issue subpoenas to them.  We put before

4  the Court very specific evidence about what was going

5  on.

6           Further, we put before the Court the results

7  of what was coming out of these claims on the back

8  end, and Your Honor has all that.  We needed that

9  further discovery to sort of tie some other links

10 together.  We did not want to run out and file, you

11 know, large numbers of objections to proofs of claim

12 without having more specificity.  We tried to be

13 careful about this.  And you know, we now are where we

14 are.

15          We would -- we don't think that the

16 solicitation procedure should go forward or

17 solicitation without some effort to vet the claims.  I

18 mean, the entire solicitation process is supposed to

19 be one under 502, where the claims are presented and

20 there's an ability really to legitimately test them.

21          You know, despite what Mr. O'Neill said --

22 and granted, you know, I -- whether he speaks for the

23 whole debtor or not, it's an admission of candor here

24 that there was no evaluation by the debtor of these

25 claims.  And there was no need to.  Once they reached

Page 149

1    a deal to cap their liability, it's like there was no

2    -- there was no need to.  And in fact, the whole plan

3    was to basically work with the Coalition to come

4    forward.  That is what it is, and if that's acceptable

5    to the Court, so be it.  But that's a situation we

6    face them now.

7          The procedures that they've put forward, I

8    mean, we would say that the solicitation shouldn't go

9    forward until our discovery gets to go forward and

10   complete itself.  And we'd be prepared to move as fast

11   as possible to do that, but we can't move faster than

12   what the rules provide us on when we could serve the

13   subpoenas.

14         You know, on the -- on the -- you know, some

15   of the lawyer depositions, it's like we would have

16   started with Mr. Kosnoff, who made specific

17   allegations and didn't identify some of the people

18   that he was referring to as a way to go forward.  We

19   do think that discovery is necessary.  Mr. Kosnoff

20   actually posted a tweet, saying why is it taking so

21   long for someone to serve a subpoena on me.  If one --

22   I mean, that is among the more crazy tweets he's

23   issued, but I don't think -- it's like there's any --

24   he's so over the line at this point that there's any

25   reason to hold back from that.

1           As far as the procedures that you have in

2    the face of the evidence that you have before you,

3    what we effectively have through these procedures is a

4    self-certifying process, a process whereby, you know,

5    the -- the councils certify that they've complied.

6    And Your Honor, I don't think that complies,

7    ultimately, with the gatekeeping function that you

8    really have under 3018.

9           The ballots allow anybody to claim -- any

10   one of these lawyers to claim that they're authorized

11   agents but without any proof to establish that in any

12   of these cases.

13          We know from looking -- in the Coalition's

14   case, the -- the -- you know, the ballots -- the

15   retention agreements have been produced.  In the case

16   of AIS, there's direct -- there's actually a 2019 on

17   file, saying that the AIS lawyers do not have

18   authority to use a master ballot.  But these

19   procedures -- you asked me to assume how they're done.

20   The procedures allow self-certification that they can

21   go ahead -- one of the three firms can go ahead and

22   ballot them.  It's -- the self-certifying nature of

23   the procedures is just inconsistent with how this

24   should work.  Whatever's done should be transparent so

25   that the Court -- if they're going to vote a master

1   ballot, they should provide the proof that they could

2   get to vote, each one of these -- each one of these

3   clients, so it can be tested by both the Court and the

4   other parties.

5          There's no requirement of showing that

6   counsel's authorized to cast the votes on any of these

7   votes here.  There's no requirement that any of the

8   counsel comply with Rule 2019, and Your Honor, that is

9   a mechanism that when I said that some courts have

10  touched on this, Judge Fitzgerald towards the -- maybe

11  the second half of her tenure in these cases started

12  to issue rulings that she would only accept ballots if

13  there was, I believe, an individual proxy for the

14  specific case.  And she also required Rule 2019

15  submissions in those cases.

16         There's a -- there's a -- I don't have the

17  ruling right in front of me, but there's a ruling on

18  this, I believe, in federal Mogul (phonetic).  It was

19  -- it was a sort of unusual ruling because it required

20  these submissions to be made, but then you had to make

21  a showing in order to see them.  So it's like -- but

22  they're -- but they were -- but they were made, the

23  Rule 2019 submissions.  It allowed the Court to assess

24  itself whether or not they had proof.

25         We don't think that's the way to go here, to

1   be clear.  We think that there's sufficient evidence

2   before the Court on, in this case, like when the

3   Coalition came back and asked that the -- that the

4   certification process for the proofs of claim be

5   changed to allow lawyers to certify instead of

6   claimants, there was significant back-and-forth

7   argument about whether that should happen or not.

8           And as part of that, the record is robust

9   with the Court -- and with an exchange among the

10  parties -- let me put it that way -- including the

11  Court that, you know, basically, the use of the

12  attorney proofs of claim signatures should -- I don't

13  know how -- it's not exactly what Your Honor said --

14  but should be the exception rather than the rule.  And

15  that by doing so, among other things, the lawyer was

16  putting themselves at risk that they would -- they

17  would -- they would waive any privilege over what they

18  did to vet the claims.  That was the basis of the 2004

19  submission, that by -- by -- in large blocs, the

20  lawyers doing this, they were exposing themselves to

21  being questioned about what they, in fact, did to vet

22  the claims.  And given the enormous volumes of claims

23  and the small number of lawyers --

24          (First audio ends)

25          (Second audio begins)

1          MR. SCHIAVONI:  -- almost a prima facie

2   suggestion that it was impossible for them to have

3   vetted the claims, that besides the fact of like the

4   rapid fire submission of them.  But with that evidence

5   before the Court to -- for the debtor to suggest that

6   just more certification is adequate in this situation,

7   it just -- it -- it's -- it's in context of this case,

8   it just doesn't make sense.  It doesn't hold water.

9          It's, I think, a little like what you saw in

10  Emeris (phonetic).  It's the situation that the Third

11  Circuit that the Third Circuit in W.R. Grace

12  (phonetic) referred to, that the Court shouldn't hide

13  its eyes to what's right before it, that large numbers

14  of lawyers in this coalition, you know, or large

15  numbers of proofs of claim were signed by lawyers who

16  didn't really -- who -- who either gave their

17  signature page to an aggregator or the aggregator

18  signed the -- signed it.

19          Meanwhile, the attestation under oath of

20  what they did was made under oath.  It wasn't even --

21  it wasn't a certification or as a member of the bar.

22  It was under oath, and -- and it came with a warning

23  and the admonition of the Court about the importance

24  at that point of doing it.

25          And with all of those warnings, we still got

1    the result we did.  I don't think further

2    certifications is what would deliver what you need to

3    have here.  Of all the -- all the stuff you've heard

4    about these solicitation procedures, the one is you

5    haven't really gotten any kind of, like there's no

6    evidence before you or anything else to suggest what's

7    the problem with sending out ballots to individually

8    balloting these folks?

9            From everything I've heard, it's almost more

10   laborious and more intensive to do a master ballot and

11   go through various hoops in the process than to just

12   send out individual ballots to the individual

13   claimants and get back the results, whatever they are.

14   And the one thing I think you've sort of seen, or I've

15   seen, or I thought I've seen from these proceedings,

16   from the several claimants who have spoken pro se is

17   there really is like a wide view on -- on how they

18   would come out on things.

19           So I don't know how if I was a lawyer

20   representing them I could individually poll them

21   otherwise, or recommend that they all vote one way or

22   the other.  I think it's -- they've got -- the ballots

23   should go out individually, and if Your Honor is not

24   going to do it that way I think the self-certification

25   doesn't work for those firms who haven't provided

1    direct evidence to the Court that can be tested that

2    they really have authority to do what they're doing.

3              AIS would be one example of that, but others

4    would be those firms that we have the retention

5    agreements from all of them in evidence before the

6    court on the 2019 submissions, and the bulk of them

7    don't contain a joint engagement waiver or a joint

8    engagement description of the risks.

9              And, you know, I -- I did hear Your Honor

10   and I took it to heart that this is not the court to

11   address ethics issues or what -- what not among the

12   parties, but 3018 vests this Court with the -- with

13   the gatekeeping function of deciding who should get to

14   vote.  And here when you have the engagement letters

15   directly in front of you, and they don't contain

16   waivers, it's -- I -- I think you can make that

17   decision.  It's not a close call.  It's like that --

18   those -- those waivers are required in every state.

19             So, Your Honor, with those -- with all of

20   that, you know, you've heard our argument that we

21   think that, you know, some discovery further ought to

22   go forward on the claims and that master ballots ought

23   not to be used.  If we had been permitted to complete

24   the discovery, we would -- just to make a short

25   proffer, Your Honor, we would -- we would have

1   proffered the results of what we got from the -- from

2   the aggregator firms.  We would have proffered the

3   results of the testimony from them and the testimony

4   from the lawyers associated with the filings of the

5   proofs of claim.  We have before Your Honor in these

6   prior matters concerning the proofs of claim, the

7   declaration of Eric Specland (phonetic).  That's at

8   1975-4.  That was admitted into evidence, and of Paul

9   Hinkland (phonetic), which is 1975.3.  That, I

10   believe, was also admitted into evidence.  We would

11   move into evidence Mr. Cosanov's (phonetic) verified

12   statements, which is 5917 and 5919.

13          If there's no objections, I would -- I would

14   move those statements into evidence.

15          THE COURT:  Thank you.  Okay.  Let me hear

16   from others.

17          MR. SCHIAVONI:  Your Honor, --

18          THE COURT:  Okay.  You're not (inaudible).

19          MR. SCHIAVONI:  -- hold on.  I'm -- so, Your

20   Honor, I'm just not sure about -- it's like is the --

21   is there no objection to the move of the --

22          THE COURT:  Is there any objection to what

23   Mr. Schiavoni wants me to review, which is the

24   declarations of Mrs. Specland (phonetic), Hinton

25   (phonetic), and, too, Cosanov (phonetic) statements,

1    the 2019s.

2                MR. SCHIAVONI:  I think the -- the --

3                THE COURT:  Or the declarations.

4                MR. SCHIAVONI:  -- the two declarations I

5    referred to were already in evidence in connection --

6                THE COURT:  They were --

7                MR. SCHIAVONI:  Right.

8                THE COURT:  -- in connection with the Rule

9    2004.  I recall them.  They're still sitting on my

10   desk somewhere.

11               MR. SCHIAVONI:  And I -- so what I -- I'm

12   moving afresh, and I -- I ask to make that part of the

13   record here, but I'm moving afresh with regard to Mr.

14   Cosonov's (phonetic) verified statements.

15               THE COURT:  Yes.

16               MR. SCHIAVONI:  5917 and 5919.

17               THE COURT:  Mr. -- Mr. Moxley?

18               MR. MOXLEY:  Yes, Your Honor.  Good

19   afternoon, Cameron Moxley, again, Judge, from

20   (inaudible) for the Coalition.

21               Your Honor, we would object to the Court's

22   consideration of Mr. Specland (phonetic) and the other

23   declarations that Mr. Schiavoni had previously raised

24   in the 2004 context and seeks to now raise in

25   connection with the disclosure statement (inaudible)

1   procedures hearing.

2           Your Honor, there are a few reasons.  They

3   all go to relevance.  I'll be very, very brief, Judge.

4   First, these declarations were all submitted and --

5   and made in January and February of 2021, more than

6   seven months ago, Your Honor.  As you heard from Mr.

7   O'Neil, at the beginning of the solicitation procedure

8   presentation today, Judge, there have been thousands

9   of amendments to the proofs of claim in the

10  intervening seven months.

11          Those declarations, Judge, frankly, are now

12  stale because many of those amendments, as you heard

13  throughout the proceedings today, involved a change

14  where the signature previously of a lawyer is now the

15  claimant's signature.  So those declarations are

16  simply outdated and mooted, Judge, by intervening

17  events.

18          To the extent, and I understand, as I

19  mentioned previously, that I understand Mr. Schiavoni

20  intends to or is considering at least calling one or

21  more of those witnesses to testify today.  Your Honor,

22  to the extent that those witnesses have updated

23  analysis or opinions that they wish to share with the

24  Court in the course of this hearing, we would suggest,

25  Judge, that -- that they not be allowed to do so and

Page 159

1   object to their doing so because those witnesses would

2   have failed to update their expert written reports in

3   accordance with Rule 26(a)(2)(b)(1), Judge, which

4   requires that experts provide a written report, which

5   sets forth all of that expert's opinions including all

6   of the reasons and bases for those opinions.

7           So on the one hand, Judge, just to

8   summarize, on the one hand the prior declarations, if

9   being admitted now, they're mooted.  They have very

10  little evidentiary value.  If there's updated

11  opinions, those updated opinions have not been shared

12  with the parties and shouldn't be heard on the fly

13  today, Your Honor.

14          Your Honor, more fundamentally, we would

15  just note that none of these witnesses, which, you

16  know, Your Honor may recall from the earlier 2004

17  proceedings, these -- these -- these opinions go to

18  analyses of, you know, handwriting experts or meta

19  data analyses of signatures and when those signatures

20  were put on a document, those types of things.

21          None of those declarations, Judge, set forth

22  an opinion that any of the proofs of claim should be

23  disallowed.  They don't -- they don't actually serve

24  any relevant purpose other than the purpose of -- of -

25  - of -- that Mr. Schiavoni has argued that there needs

1    to be sort of further investigation.  But Century in

2    its own pleadings, Judge, and I would just point Your

3    Honor to Docket 5214 where Century itself said that

4    this is not the time to disallow any particular proofs

5    of claim.  So it's just not the right forum, Judge,

6    for these issues to be raised, and we don't think that

7    there's a basis for the Court to consider these

8    declarations now or to hear from these witnesses in

9    the course of this proceeding.  Thank you, Your Honor.

10            MR. SCHIAVONI:  Your Honor, briefly, of

11    course, there's no evidence at all that anything's

12    been amended, let alone any of the proofs of claim

13    reviewed by our experts.  So I don't think you can --

14    I don't think the coalition can moot the relevancy of

15    a witness through non-presentation of evidence.  Okay?

16    It's like plus and besides that, look, the testimony

17    is being offered for what happened.  It's like the

18    same lawyers are going to be asked to self-certify

19    here, so I -- it's like it's directly relevant to

20    what's before the Court on procedures and what

21    procedures ought to be put in place.

22            THE COURT:  Thank you.

23            MR. SCHIAVONI:  I take it there's no -- but

24    I do take it there's no objection from -- from the --

25    from Brown Rudnick (phonetic) to the -- Mr. Cosonov's

1    statements coming into evidence.

2              THE COURT:  Mr. Moxley?

3              MR. MOXLEY:  Your Honor, we don't take a

4    position on Mr. Cosonov's statements.  We are

5    concerned with respect to the experts that Century

6    wishes to move into evidence.

7              THE COURT:  Thank you.  Mr. Kurtz, I've seen

8    your hand up.  Do you have an objection to the

9    evidence?  I'm sure you have other things to say, too.

10             MR. KURTZ:  Yeah, no thank you, Your Honor.

11   Glenn Kurtz, White and Katz (phonetic) on behalf of

12   the debtors.  I'm only raising my hand on the

13   evidentiary issue Mr. O'Neil will be handling the

14   substance here.  We have a slightly different

15   objection.  We don't have an objection to the

16   introduction.  We don't have any objection, by the

17   way, to the verified statements of Cosonov (phonetic).

18             We have an objection, a limited objection to

19   the use of the expert declarations.  I wanted to give

20   a little background on how they got here.  They

21   weren't -- they weren't produced for or appended to

22   the objections to the voting solicitations procedure.

23   They were cited to some extent but only as -- mostly

24   at least as a historical matter for 2004 and in 2019

25   applications.

1          And we had -- it wasn't briefed.  There was

2    no explanation how it would be relevant to the voting

3    procedures.  It looked to us as if it was an effort to

4    disallow claims, although they specifically disavowed

5    that in papers, alternatively, maybe, to designate

6    votes, but the votes haven't been cast yet.  So that

7    would be premature.  We don't know who will vote, and

8    we don't know what the bonafides will be of anybody at

9    the time that they come to vote.

10          The debtors certainly have an interest in

11   ensuring that only valid claims are voted.  That can

12   be assessed only after the votes are cast, and then,

13   of course, that will have to be noticed to the

14   specific abuse victims so that they can be heard on

15   the issue.  That has not happened in this motion.  No

16   one has joined issue on this proof.  There's been no

17   discovery on it.  It came up for the first time last

18   Friday when Mr. Schiavoni indicated this should be on

19   a witness list.

20          So notwithstanding what we think would be

21   valid objections to introduction, we're only -- we're

22   only offering a limited objection to using it for

23   anything other than the belief of Century that they've

24   uncovered potentially invalid claims.  We don't think

25   it would be appropriate for the court to actually make

1  findings with respect to the validity of proofs of

2  claims or with respect to the issues of voting unless

3  we have votes and then only subject to a hearing that

4  has noticed the right parties.  We think that's all

5  premature.

6          So I'm not even positive Century is asking

7  for findings, but it sounded like it was at least

8  brushing up on that subject.  And so we object to the

9  use for -- for -- for that purpose.  We don't think it

10 would be appropriate to make factual findings that

11 there were invalid votes.

12         We don't think that there's anything about

13 the -- the investigation, which sounds like it's still

14 going on and therefore may be a little premature that

15 -- that has to do with the procedures themselves, as

16 opposed to instances where we have claims.  We would

17 ask that it be limited to the use of -- of -- of -- of

18 just Century's views on -- on potential defenses to

19 certain proof of claims that will have to be raised

20 later if at all.

21         MR. SCHIAVONI:  Your Honor, the declarations

22 I cited are in our solicitation objection.  You can --

23 they can be found at Docket Number -- I think it's --

24 if I read -- yeah, Docket 3857 on Page 10 of that

25 docket number, page 11, page 12.  Mr. Kurtz, you can

Page 164

1    find them there.  They're discussed at great length

2    over three or four pages there, and in the argument

3    section.  And they were provided within the rules, you

4    know, at the -- at the time they were admitted into

5    evidence without objection by Mr. Kurtz's client or

6    anyone else.  And those declarations were also and

7    those witnesses were specifically noticed on the

8    agenda in accord with the Court's, you know,

9    requirements for scheduling witnesses.

10          THE COURT:  Okay.  Let me interject here.  I

11   -- I -- I recall the testimony and the -- and the --

12   from the previous hearing.  I don't necessarily thing

13   that because it was introduced in a previous hearing

14   that it gets introduced here.  I don't consider

15   discreet issues to be rolling.  Like this isn't like a

16   rolling evidentiary record from the beginning of the

17   case until now.

18          But let me -- let me say this.  One of the

19   reasons I didn't grant the Rul3e 2004 motion with

20   respect to the depositions of the individual

21   claimants, well, there were several reasons, but one

22   of them was I needed a context in which that discovery

23   should be taken.  And I didn't think the Rule 2004

24   openness gave me a context in which it -- in -- in

25   which it should be taken.

1                I also said that I didn't think that the

2    movants had shown that the -- I forget what they're

3    called now, but the subgroups, the population

4    subgroups, the six to seven population subgroups would

5    give a basis to file mass claim objections, which is

6    one of the reasons that those motions was filed.  And

7    that the case law related to surrounding and I'm

8    remembering Judge Fagone's (phonetic) decision out of

9    Maine, the case law surrounding what to do with, for

10   example, a proof of claim that was -- where the

11   signature was an issue.  And his cases I think had to

12   do with signatures in mortgage cases in the 2008

13   mortgage, you know, debacle.

14               The -- the result wasn't disallow a claim.

15   That was not the result of those cases where there was

16   issues where the signatory did not have knowledge,

17   supposedly.  It wasn't disallow the claim.  So there

18   were many reasons why I didn't permit the discovery at

19   that time.  We're having a context now.  We're having

20   a context in connection with confirmation where if

21   there are issues for voting purposes we can have that

22   discussion, and I permitted some discovery to start.

23   And once confirmation discovery starts, you can take

24   confirmation discovery.

25               So I think that's where -- that's where we

1   are.  We don't know who is going to vote.  We don't

2   know how the vote's going to turn out.  We don't know

3   if the counsel who have said they can deliver certain

4   votes can deliver them.  We don't know.

5            I've already heard argument, you know, we

6   shouldn't let the $3,500 expedited discovery be the

7   tail that wags the dog.  Can probably make that

8   argument without any discovery, but you can see how

9   much of the coalition group is in the 3500.  We're

10  going to have that information, and I think it would

11  be appropriate for appropriate parties to be able to

12  do that discovery.

13           Now, I'll say this again because I have to

14  think about it.  The insurance company is not going to

15  be voting in that group.  Their vote is not going to

16  be decided by the votes of the survivors.  So I need

17  to think about the context in which the insurers can

18  use that information.  There may be another context in

19  which you can use that information.  But I understand

20  the issue.  I did have an expressed some concern about

21  the way some of these claims were generated.  I've

22  permitted discovery with respect to the aggregators to

23  understand how it was generated.

24           And if it creates a problem for the vote,

25  once we get the vote in, although you don't have to

1  wait to take discovery, if you don't want to, until we

2  get the vote in, we're going to have to deal with it.

3  But maybe the vote won't be influenced that way.  I

4  don't know.  I just don't know, but I think the

5  context matters.  I think we need to understand these

6  arguments in the context in which they're going to

7  arise when it comes to voting, which is the combustion

8  engineering issue, the Quigley (phonetic) issue.

9  Let's -- let's -- let's consider it.

10         And if there needs to be discovery around

11 the certifications that counsel are going to file with

12 respect to their master ballots, so be it.  I would

13 hope we don't get into side issues, but if we're going

14 to go there, we'll go there.  So I'm -- I'm -- I'm not

15 going to stop the master ballots from going out.  I'm

16 going to see where they end up, and that could delay

17 things.  I don't know.  But the debtor has decided to

18 go out with master ballots.  People are saying we

19 should.  I do have some concern about going out with

20 individual ballots given the discussion we just had

21 about ways to deliver the ballots to individual

22 survivors and to ensure their confidentiality.  So I

23 do have concerns about individual ballots at least in

24 some circumstances.

25         So I understand the issues, but in terms of

1   I'm looking at what you -- the relief you want from

2   it.  I'm not going to go with individual ballots here.

3   I -- I -- that could leave us in a situation where we

4   have problems at confirmation.  But it's what the

5   debtors requested.  Given the discussion we just had,

6   I'm not going to in the first instance send out those

7   individual ballots.

8          If there's a separate, and maybe there needs

9   to be, as I said before, some separate certification

10   page that we need to do to get more information from

11   law firms that are sending out the master ballots or

12   that are submitting the master ballots, I'm okay with

13   that.

14          And, yes, I recognize that I cannot police

15   people's ethical -- whether they follow their ethical

16   obligations or not, but there may be a consequence if

17   what I see in front of me suggests that we had a

18   problem.  And I'm going to deal with it on voting.

19          MR. SCHIAVONI:  Your Honor, I'm not going to

20   -- I'm not rearguing anything, but just, you know, I -

21   - so I hear your ruling on the master ballots.  You

22   know, the alternative step you could take is to

23   require that everyone who files a master ballot by

24   doing so is 2019.

25          THE COURT:  I actually think that's fine.

1          MR. SCHIAVONI:  And -- and --

2          THE COURT:  I don't have a problem with

3    2019.

4          MR. SCHIAVONI:  -- and has to file a

5    complaint 2019 statement.

6          THE COURT:  I have no problem with that.

7    They should file a 2019 if you're going to do a master

8    ballot.  I think that's perfectly acceptable, and I

9    see no reason why a law firm should have a problem

10   doing that.

11         MR. SCHIAVONI:  Your Honor, just to try your

12   patience on just one further thing, okay, the -- look,

13   I -- I hear why the -- the claimant 2004 was denied.

14   Okay?  The whole concept of us filing at that time the

15   two different 2004s were they were coming at this from

16   the two ends of the pipeline.  The one was -- that was

17   denied was let's see what comes out and test certain

18   proofs of claim.  And -- and Your Honor found

19   statistically that didn't work or wasn't -- wasn't --

20   didn't provide sufficient support and denied it.

21         But the other one was still getting at the

22   same point of what proof of claim challenges could be

23   filed but in a different way.  It was trying to

24   identify the sources of the proofs of claim, okay, by

25   who was generating them and where the problems were to

1   target objections at that.

2          Now, you're -- you know, we're not before

3   you on a request to file an omnibus relief there, but

4   in part that was the point of that discovery, to file

5   clusters of it.  So we're pursuing the aggregator

6   discovery.  We'll pursue it with light speed, but Your

7   Honor said we have to come back to you on some of the,

8   you know, on the other part of it with lawyers, and

9   I've got the -- the problem with lawyers, deposing

10  them, okay, but to get at the problem faster if we

11  could have relief from two or three, to allow two or

12  three to go forward, that would just allow us to move

13  at a quicker speed and get at the answer I think

14  quicker.

15         THE COURT:  I don't think you need my

16  permission to proceed with confirmation discovery.  So

17  you should proceed with it, and if parties have

18  problems, they can file a motion for a protective

19  order.  I want it all brought on quickly, and I'll

20  deal with it, but recognize, again, that the case law

21  even around -- am I going to throw out people's proofs

22  of claim because they hired the wrong lawyer?  That's

23  a good question.  And -- and the case law that I read

24  in any event, doesn't suggest that.  It would give

25  parties an opportunity to amend their claims, and I

1   understand I don't have evidence.  But there's

2   representations in front of me that some 20,000 I

3   think was the -- was the number plus have amended

4   claims.

5          My guess is because of the signature lines,

6   some of the lawyers corrected that.  So that's the

7   issue I'm struggling with is what would I do with the

8   information that you gave me, and I'm not saying I

9   can't be convinced.  I'm saying we looked at the law,

10  and we -- at the time, and we independently, and we

11  didn't see case law that suggested that you could

12  disallow these claims, which was really the basis for

13  the motions, as I recall.

14         Now, if there's an issue, I understand the

15  issue with voting.  That's perhaps a little bit of a

16  different issue, but, again, disenfranchising

17  claimants because of an action their lawyer took or

18  didn't take, assuming, of course, the underlying

19  validity of the claim.  And that's the -- you know,

20  that's the -- the issue.  If somebody has a valid

21  claim, would I throw it out because their lawyer mass

22  produced a signature.

23         MR. SCHIAVONI:  Your Honor, I -- I

24  understood that is how you focused on it, but that was

25  really not the direction we were going in there.  It's

1   like the context was -- to give context to it, was we

2   did subsequently give you this declaration of Verona

3   Stensonson (phonetic) who was one of the people who

4   worked in the boiler rooms.

5           THE COURT:  I do recall that.

6           MR. SCHIAVONI:  And the point here was not

7   to disallow -- like I got it, a big fish net could go

8   out and it could pick up some valid claimants and it

9   could be picked up in a bad why by an aggregator or

10  something, but the guy could still have a valid claim.

11  I understand that, but the point is that somebody

12  working at $15 an hour, it's like that's where the bad

13  claims may be concentrated.  That's what -- that's

14  what we were trying to get at.

15          THE COURT:  And I'm going to let you do it

16  now.

17          MR. SCHIAVONI:  All right.  Thank you, Your

18  Honor.

19          THE COURT:  Later than you want, but I'm

20  going to let you do it now, and we'll see how the vote

21  comes back.

22          MR. O'NEILL:  Thank you, Your Honor.  So if

23  I -- if I'm following correctly, and I don't want to

24  give you more than you need because I feel like you

25  kind of got to the conclusion already.

1            So I was going to correct the record on

2    quite a few things that Mr. Schiavoni said, but I'm --

3    I'm not going to do that, not just because I take

4    visual cues like somebody shaking their head no, but

5    because it was my inclination.

6            So I think what we'd propose, Your Honor, is

7    we have some work to do to clean up the certification,

8    and I think the order.  We have several people that

9    are in on the discussion about how to properly

10   distribute packages, vis-à-vis paper packages versus

11   other options versus no option, if somebody opted for

12   confidentiality.  And we will take all of that on and

13   move it along, Your Honor.

14           On -- on a general matter we heard you loud

15   and clear that -- that we'll proceed with the master

16   ballots and that you expect firms that submit master

17   ballots to submit a 2019 statement, either before or -

18   - or -- or when they submit that master ballot.

19           THE COURT:  No later than contemporaneously.

20           MR. O'NEILL:  Okay.  Thank you for that

21   clarification, Your Honor.  We'll get to work on that,

22   but I think just for the wake of completeness, there

23   were two more objections on the chart.  One is Ms.

24   Wolff, and I think this is number 68 at page 115.

25           And I believe this is moot, Your Honor,

Page 174

1    because it's -- it's about the (inaudible) plan.

2              THE COURT:  Okay.  Is Ms. Wolff on the

3    phone?  I haven't seen her today.

4              MR. O'NEILL:  Okay.  We'll -- we'll move

5    along, Your Honor, and then 69 was from a pro se

6    claimant, and I'm not sure if that person is on the

7    phone, pro se claimant 242.  And this was Docket

8    Number 6027.  And this is about the bar date notice by

9    publication in the Prison Legal News.

10             I think, you know, our view is that the bar

11   date noticing procedures were -- were sufficient.  I

12   think we've taken some counsel on this call from Mr.

13   Buchbinder, which is good counsel about prisoners and

14   their unique needs in terms of receiving  materials.

15             So we'll endeavor to -- to make the packages

16   that they get going forward marked with something that

17   -- that notes the urgency of the contents, Your Honor,

18   so hopefully that fixes this going forward.

19             THE COURT:  Which objection was that?

20             MR. O'NEILL:  This is Number 69, Your Honor,

21   on Page 115.

22             Oh, you know what, Your Honor, it's been

23   pointed out to me that this is listed number 70 as

24   well, and it's been resolved.

25             THE COURT:  Was it resolved?

1          MR. O'NEILL:  Apologies, again.  This piece

2     that I'm talking to you about has not been resolved,

3     the part under Number 70 miscellaneous has been

4     resolved.  But you've heard the debtor's position.

5     I'm not sure anyone is on the phone on this topic.

6          THE COURT:  Okay.  Was our -- the pro se

7     claimant who filed the objection, did he use his name?

8          MR. O'NEILL:  We might have it, but we think

9     it was redacted, Your Honor.

10          THE COURT:  Okay.  If there is a pro se

11    person, someone representing themselves who filed this

12    objection with respect to notification to men in

13    prison, I'm happy to hear from you.  I'm not hearing

14    anyone.  Mr. Lucas, I see your hand.

15          MR. LUCAS:  Thank you, Your Honor.  I -- I'm

16    sorry for the -- sort of the process question, just

17    going forward with respect to the Court's ruling about

18    the 2019 statements, but I -- I just sometimes foresee

19    some of the -- nothing is simple, I think, sometimes

20    unfortunately.

21          Should the counsel presume that they can

22    file the list of their client's names under seal, or

23    just file the list of the proofs of claim numbers or

24    something like that to identify the list of their

25    clients?

1           THE COURT:  Don't we -- do we have -- didn't

2    we go through this before in this case about 2019

3    statements.

4           MALE VOICE:  This is (redacted name).

5           THE COURT:  (Redacted name.)  Yes.

6           MALE VOICE:  I am Abuse Claimant 242, and I

7    -- I mentioned this objection to re-publish the bar

8    date notice in Prison Legal News in my filing.

9           THE COURT:  Okay.  And your concern I take

10   it is that certain men in prison did not receive the

11   previous notice?

12          MALE VOICE:  That's correct.  I cited a

13   letter to Your Honor that was previously on the docket

14   to that effect.  And so I don't know how widespread

15   that actually is, but it -- I -- based on the filings

16   and other public discussion it seems plausible that it

17   may have happened.

18          THE COURT:  Thank you.  I do recall

19   receiving at least a couple of letters with respect to

20   -- from men in prison with respect to notice issues.

21   I'm going to say this, that to be effective notice, it

22   may be that it needed to be received by a man in

23   prison.  And there may be an argument that, in fact,

24   notice wasn't appropriate.  And there might not be

25   that would have an effect.  Let's put it that way.

1  Claims may not be channeled.  They may have

2  outstanding claims post reorganization.  It will

3  depend on the circumstance and their particular notice

4  issue.

5          I probably would not be the first judge to

6  recognize that persons who are incarcerated have

7  difficulty getting notice, and I would suggest that

8  the debtor consider along with others here whether any

9  further or different notice might be preferable so

10 that they don't end up post-confirmation with any

11 significant number of notice issues.

12         So I appreciate your bringing that forward,

13 (redacted name).  And as to whether there should be

14 any kind of notification if the -- if -- which I

15 assume, but I don't recall, that you're going to do

16 publication notice of confirmation hearing, et cetera,

17 you might consider publishing that in the Prison Legal

18 News.

19         MR. O'NEILL:  Thank you, Your Honor.

20         MALE VOICE:  Thank you.

21         THE COURT:  Thank you.  Thank you, (redacted

22 name).

23         I thought I saw another hand before.  Mr.

24 Patterson?

25         MR. PATTERSON:  Your Honor, I'm just not

1    sure where we ended up with certification.  I gather

2    the debtor is going to work on it, but I thought it

3    might be helpful just to round out that discussion

4    with a couple of other views.  It -- it really seems

5    to us that, one, because the certification is going to

6    cover voting potentially settling the claim with the

7    $3,500 election, potentially opting out or not opting

8    out of a release, this certification now covers a

9    number of very important decisions and it really seems

10   to us that the appropriate way to deal with it is to

11   require a power of attorney specifying that the

12   attorney has the right to make -- vote with respect to

13   each of those three issues in order for it to be

14   valid.

15            There are -- there are -- the way the

16   certification is worded, it is self-certification, but

17   it's also self-certification in the sense that the

18   person represents that they -- they have the

19   authority.  And I can see situations where people say,

20   well, I thought I did have the authority.  I thought I

21   had it under applicable law, or I had it under this

22   argument or that argument.  And now we're sort of in a

23   situation where the Court is upset because the person

24   didn't have the authority.  They're upset because they

25   thought they did.  There's a question about it, and it

1   just seems to me that the proper way to deal with this

2   to seal it all off is to just require up front that

3   master ballot requires a power of attorney from the

4   applicable client with regard to each of the three

5   items.

6           MR. O'NEILL:  Yeah, Your Honor, this is

7   Andrew O'Neill for the debtors.  We think that -- we

8   appreciate Mr. Patterson and his ideas about ways to -

9   - to beef up the certification.

10          Rule 9010(c) does not require a power of

11  attorney to vote.  The -- the -- the election of your

12  treatment under a plan is tantamount to part of the

13  plan voting process.  So is giving releases.  This --

14  this strikes me as something that we don't need.

15  Furthermore, we already have, which I described

16  earlier, the audit available to the debtor, where we

17  can request authorization to see the power of attorney

18  or authorization that attorneys have to vote on behalf

19  of their clients.  So we think we're already covered

20  here, Your Honor.

21          MR. GOODMAN:  Your Honor, this is Eric

22  Goodman.  I don't know if you can see my hand up or

23  not.

24          THE COURT:  Yes.

25          MR. GOODMAN:  I just wanted to point out

1  again I'm back to my favorite paragraph 5(a)(a), and,

2  again, I'm annoyed that it doesn't go 5(a) and then

3  (1), but it is what it is.

4          Firms that are reporting, sorry, under

5  section B to have the authority to vote, which, again,

6  is very different than authority to cast a vote that

7  the client is making, would require a power of

8  attorney.  That's already in the procedures, but if a

9  firm is simply transmitting the vote as cast by the --

10  or as made by the survivor client serving as sort of a

11  voting hub if you will, that that does not require a

12  power of attorney.  Nor do we think that it should

13  under the procedures.

14          The other thing that I would like to just

15  call to the Court's attention, these -- these

16  procedures were put together back in the -- I think in

17  the May/June timeframe, the coalition, the debtors,

18  and the TCC all having input onto these issues.  And I

19  -- I think that on -- on this point we did get it

20  right, that if you are simply communicating the vote

21  to -- to Omni from the clients that that would not be

22  something we required.

23          Mr. Smola?

24          MR. SMOLA:  Your Honor, I'm just going to

25  harken back to what I said earlier.  A yes vote

1   compromises a client's rights against their local

2   counsel, compromises a client's votes against a

3   charter, and it waives, presuming they don't elect the

4   $3,500 option.  It -- it declines an offer, so a power

5   of attorney is sort of a -- a -- normally in a

6   conventional personal injury case, you would want that

7   in writing.

8           You would want a release of the local

9   counsel claim.  You would want a release of the

10  charter claim.  Your client would sign off on that.

11  You could never sign off on that as -- as the attorney

12  for the client.  The client has to sign off on that.

13  Here we're in a different setting where a yes vote

14  effectively waives those rights and sort of almost

15  doubles as a release.  I think a power of attorney is

16  sort of a bare minimum here, and I think it should be

17  required.

18          THE COURT:  Mr. Schiavoni?

19          MR. SCHIAVONI:  Yeah, I mean, Your Honor, to

20  the extent we ever were to become a settled insurer,

21  it would be very important for us to have a power of

22  attorney to know that these releases have effect.  And

23  it -- it makes it more difficult to become a settled

24  insurer without having that power of attorney.  That's

25  one.

1           Two, I -- like I'm completely mystified by

2    this description in the solicitation procedures about

3    how individual claimants provide the ballot to the

4    balloting hub, and then -- and then they sign a master

5    ballot.  If -- to the extent they have it, I -- I just

6    don't even understand what that means.  If -- if they

7    have a ballot from the individuals, that should just

8    be -- like why isn't that just made part of -- it

9    could be bundled up by the voting hub law firm and --

10   and given to the -- you know, to the claims agent as

11   proof of the vote.  It's like to -- to demonstrate it.

12           I -- I don't even understand what's

13   contemplated by a communication of voting that doesn't

14   get produced.  I mean that would seem to be part of

15   it, and then, third, this audit right, to make it like

16   the only person who gets to see the audit is the

17   debtor who is self-interested in the outcome, it --

18   like it would seem to me that should be transparent

19   and part of the report by the -- by the agent, you

20   know, what was found and -- and then those -- those

21   results produced as part of the report.

22           [crosstalk]

23           THE COURT:  I will tell you what I'm

24   intrigued by is that the -- the parties that are

25   suggesting and supporting the power of attorney are

1  Plaintiff's lawyers.

2          MALE VOICE:  Right.

3          THE COURT:  So they don't seem to have a

4  problem with it.

5          MR. O'NEILL:  Well, Your Honor, it's -- it's

6  required under the certification.  I just want to be

7  clear because I think the waters got a little muddy

8  here.  It's -- it's required.

9          THE COURT:  What's required?

10          MR. O'NEILL:  A power --

11          THE COURT:  A power of attorney?

12          MR. O'NEILL:  We're just not requiring them

13  to provide it with every -- as with respect to every

14  vote that they're providing.

15          THE COURT:  Oh, well, if it's required, why

16  shouldn't they provide it?  Why shouldn't it be in the

17  backup?

18          MR. SCHIAVONI:  Your Honor, it's not

19  required.  It's not what the order says.  5(A) says a

20  power of attorney or other written documentation to

21  that effect may be requested by the debtors in the

22  debtors' discretion.  It doesn't say it has to be a

23  power of attorney.

24          THE COURT:  Mr. Zalkin?

25          MR. ZALKIN:  I would just like -- I -- I'm

1   just echoing what Mr. Smola said.  I think this is too

2   vital and too critical and as -- as an attorney

3   representing the survivors in this case, I -- I agree.

4   I think a power of attorney should be required, and we

5   would have no problem with that.

6            THE COURT:  Mr. Goodman?

7            MR. GOODMAN:  Your Honor, I just wanted to

8   point out something that -- it's obvious to me, and I

9   just want to make sure that it's clear to the Court.

10  There are a number of state court firms involved in

11  this case that are supportive of the plan.

12           There also are a number of firms in this

13  case that want nothing more than for the plan to be

14  voted down and will be objecting to the plan, and will

15  be taking whatever course of action they deem

16  appropriate to prevent the Boy Scouts from confirming

17  a plan that includes a channeling injunction for the

18  benefit of the local counsels and chartering

19  organizations.

20           The attorneys that you have heard speak in

21  favor of this are all a part of the opposition to the

22  plan.  So I think, you know, the fact that they are

23  speaking up in unison with the insurance companies on

24  this issue I think speaks to sort of their collective

25  interest and what they're trying to accomplish at this

1   point in the case.  So I don't want the Court to be

2   under the impression that the state court counsel that

3   you haven't heard from necessarily agree with Mr.

4   Smola on this issue.

5          THE COURT:  Okay.  Well, let me hear from

6   anybody who disagrees.  Mr. Goodman, does the

7   coalition disagree, and if so, why?

8          MR. GOODMAN:  Again, Your Honor, on the

9   power of attorney issue, if law firms are purporting

10  to be acting as the voter, if they are voting for the

11  client, a power of attorney is unequivocally required

12  under the procedures as proposed.

13         THE COURT:  Show me where.  Show me where

14  that is.

15         MR. GOODMAN:  That's in 5(A)(B).

16         THE COURT:  Okay.  So if it's required, but

17  -- but -- but the discretion is simply to -- for the

18  debtors to -- for the debtors to request it, and if

19  it's required, then why can't we just have it attached

20  as back-up to the master ballot?

21         MR. GOODMAN:  Again, Your Honor, not all law

22  firms who use the master ballot and I would say

23  probably most of the coalition firms are not

24  purporting to be voting for their clients.  This is

25  under the 5(A)(A) section.  The firms that are simply

1  collecting and recording the votes that are conveyed

2  to them by the survivors and filing out a master

3  ballot that may say that 80 percent or 82 percent or

4  85 percent of their clients are voting yes, and the

5  other portion of their clients are voting not, you

6  know, the folks who are transmitting the vote,

7  collecting the vote, communicating with their clients

8  about what the plan means and offering the

9  recommendation, answering questions, those people

10  under 5(A)(A) in performing that function are not

11  required to require every single one of their clients

12  to execute a valid power of attorney in order for them

13  to perform that function.

14         And -- and -- and, frankly, Your Honor, I

15  think that the request to try to impose that

16  obligation on the firms in these cases is really

17  intended -- intended, that may be a little bit harsh.

18  I think it would have the effect of potentially

19  disenfranchising a lot of voters on these issues.  And

20  that's why I -- I don't think it would be appropriate

21  in that context.

22         THE COURT:  And why would it disenfranchise

23  them?

24         MR. GOODMAN:  Well, again, I -- I could back

25  to the -- you know, just the -- the nature of the

1  claimants, the challenges that exist in terms of

2  communicating with certain survivors.

3        I mean if you go back to the statements made

4  earlier about survivors being in prison, what this

5  would do is it would say, look, I can get my client on

6  the phone.  The client can tell me how he or she wants

7  to vote on the plan, and I could record that.  If I

8  have to take the additional step of requiring that

9  claimant to sign a valid power of attorney in order

10  for me to record their vote, as it is conveyed to me

11  as -- as the attorney, I do think that would have a

12  chilling effect.

13        THE COURT:  Okay.  So what if the lawyer

14  then had to keep a log of its communications so that

15  it could show that, in fact, it had received

16  instruction from its client?

17        MR. GOODMAN:  Your Honor, you're speaking my

18  language.  As I -- I said earlier, we know what we're

19  up against in this case.  We know what the various

20  parties' objectives are, and, you know, to think that

21  someone would be coming into this without dotting

22  every "i", crossing every "t" and maintaining an

23  appropriate record, if and when this is challenged, I

24  think you can definitely expect that a lot of firms

25  are going to do that for -- for that very reason.

1           THE COURT:  Mr. Smola?

2           MR. SMOLA:  Your Honor, I was going to -- I

3    was going to echo that.  This Court will have

4    affidavits from me and the lawyers in my firm about

5    the communications we had with homeless clients.  It

6    will have the dates, the times, the instructions we

7    provided them, the advice we provided them, the

8    options they had, and it will say how they instructed

9    us to vote on their behalf.

10          And for those clients that require that, we

11   will have affidavits from lawyers.  Otherwise, we will

12   have power or attorneys.

13          THE COURT:  Thank you.  Mr. Stang?

14          MR. STANG:  Thank you, Your Honor.  Just --

15   I assume at some point we will go back through the

16   order because there would be some miscellaneous things

17   we pick up, but two things.  I can't tell from 5(A)

18   how the firm shows that it was the hub, using Mr.

19   Goodman's terminology, or actually exercising, or --

20   or -- or voting?  It -- it's not clear to me now one

21   differentiates that so we know whether a valid power

22   of attorney is necessary.  That's point number one.

23          Point number two is it allows the firm to

24   collect and record the votes through customary and

25   accepted practices.  We saw when the coalition went

1   back initially contacted its constituency that it did

2   it on a negative notice.  You're a member the

3   coalition unless you tell us you're not.

4           So I don't know what each -- and I'm

5   speaking about all the law firms.  I am not picking on

6   the coalition law firms.  I simply don't know whether

7   law firms say to their clients, I'm going to assume

8   you're going to vote per my recommendation or vote no

9   per my recommendation unless I hear from you

10  otherwise.  I mean I don't know what their custom and

11  practice is.

12          So I laud Mr. Smola, not just because he has

13  a client on the creditors committee, but because he's

14  right.  There needs to be a record here.  There are

15  references throughout this order that people can

16  communicate with their clients by phone and record

17  their votes that way, by talking to someone.  Now, if

18  it's a homeless person, maybe there needs to be an

19  affidavit that you don't -- the person doesn't have an

20  address, but I can't really on the firm's customs and

21  practices, and a negative notice vote on this plan

22  should be addressing and tell people, I think, today

23  whether that's an appropriate way of soliciting votes.

24          THE COURT:  Okay.  Well, I did actually

25  circle those words, through customary and accepted

1  practices.  I don't know what means.  I think there's

2  a balance, and I'm not sure it's my place to interfere

3  with communications that lawyers have with their

4  clients in all kinds of different ways.

5         MR. SCHIAVONI:  I -- I just think a negative

6  (inaudible).

7         THE COURT:  I do think there needs to be --

8  there needs to be because of this plan, which has

9  multiple parts as Mr. Smola has said and as I said at

10  the very beginning of this -- of today's hearing, that

11  this has settlement authority for $3,500.  It grants

12  releases, not only to the debtor but to third parties

13  if approved.  There was something else I said in the

14  beginning.  I don't remember anymore, but these --

15  this isn't just a vote yes or no on a plan.  It's,

16  essentially, authority to settle a claim or not -- or

17  not to accept an offer.  I mean that's -- it's one of

18  the other.

19         So if parties want to do it by power of

20  attorney, that might be the appropriate way to do it.

21  If they want to -- I think there needs to be a record.

22  That's what this suggests.  They're going to collect

23  and record, collect and record is an affirmative

24  obligation.  I'm going to reach out to my client.  I'm

25  going to collect a vote, and I will therefore vote the

1  way my client tells me to do.  I'm not voting for him

2  with the power of attorney.  And if you're going to

3  reach out and collect and record a vote, I think it's

4  an affirmative vote.

5          MR. GOODMAN:  Your Honor, I'm sorry I didn't

6  want to interrupt.

7          MR. SCHIAVONI:  Your Honor, does --

8          THE COURT:  Mr. Goodman?

9          MR. SCHIAVONI:  -- affirmative mean

10  expressed?  Is that what you mean by an affirmative

11  vote, an expressed vote, not negative notice.

12          THE COURT:  I think they need to talk to

13  their client.  I think they need to talk or reach out

14  to their client and find out how their client wants to

15  vote.

16          Mr. Goodman?

17          MR. GOODMAN:  Your Honor, just to clarify a

18  few points, I think Mr. Stang's comment was

19  inaccurate.  There is no one who is a member of the

20  coalition on negative notice.

21          THE COURT:  Great.

22          MR. STANG:  No, initially.  Initially, Mr.

23  Goodman, that's the way it was done initially.

24          THE COURT:  I recall how this -- I recall

25  how this played out.

1           MR. STANG:  Yeah, I said initially.

2           MR. GOODMAN:  All right.  Well, so long as

3    we're clear on that point.  Your Honor, again, the --

4    the language that we inserted in here, and it's

5    important from our standpoint it's clear that people

6    have to make an informed decision on this plan.

7    Survivors are entitled to make an informed decision,

8    and that means to me that they are providing

9    affirmative guidance to their counsel as to how they

10   want to vote.

11          So I do not support and I would not support

12   negative notice in this context.

13          THE COURT:  Okay.  It seems like we're in

14   agreement.  That's a first.

15          MR. SCHIAVONI:  But -- but -- but, Your

16   Honor, how is -- how is that to be documented? Is that

17   like a document that gets turned over to the

18   (inaudible) agent?

19          THE COURT:  I think there should be some

20   kind of backup to the master ballot that has some kind

21   of chart that references how they got the affirmative

22   vote from their client, that they are recording, or if

23   they are voting on behalf of their client, their power

24   of attorney.

25          MR. O'NEILL:  Your Honor, I think we may be

1  able to accommodate that on the exhibit to the ballot,

2  and figure out a nifty and thoughtful way to do that.

3          THE COURT:  Yeah, I'm not going to get into

4  the weeds on that.  I think we have agreement now on

5  how to proceed and I'll let the parties figure out how

6  to document it.

7          MR. O'NEILL:  Okay.  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MR. O'NEILL:  Thank you for your time.  I

10  think we're at the end of the agenda.

11          THE COURT:  I think --

12          MR. O'NEILL:  Or am I wrong?

13          THE COURT:  -- Mr. Stang had some concerns

14  with the order --

15          MR. STANG:  We were going to go back to the

16  order.

17          THE COURT:  -- we haven't gone through.

18          MR. O'NEILL:  Oh, I apologize.  I apologize.

19          MR. STANG:  Your Honor, we may have touched

20  upon them, but you had also done your own circling you

21  just said a moment ago.

22          THE COURT:  Yeah, I'm looking.

23          MR. STANG:  So I think a lot of the things I

24  was going to say have been picked up in the course of

25  this.  I just -- I don't know how you want to proceed.

1          MR. PATTERSON:  Well are we also talking

2    about the schedule at this point, Your Honor?

3          THE COURT:  We haven't done that.

4          MR. STANG:  Your Honor, we also had the

5    issues about some discussion of confirmation issues,

6    as they may relate to the solicitation going out.  I

7    know you addressed that in part, but you did say I

8    thought late yesterday you would consider limited time

9    argument on that.  I don't know if people still want

10   to pursue that.

11         MR. ABBOTT:  Your Honor, Derrick Abbot.  If

12   I may be heard quickly.  We had talked a little bit

13   about hat at the beginning of the hearing.  Obviously,

14   we are at the Court's pleasure, but it is critical to

15   talk about scheduling and how we get from now to

16   confirmation in terms of discovery and those sorts of

17   things.  And I know Mr. Kurtz is anxious to address

18   those, and I'm not sure which the Court would prefer

19   to do first.

20         THE COURT:  We're going to take scheduling,

21   and I'm looking through the order.

22         MR. PATTERSON:  The confirmation schedule,

23   Your Honor, is at Document 6216 and the red line page

24   5 of 7.

25         MALE VOICE:  Well, wait a minute, are we on

1  scheduling or are we on the solicitation order review

2  as a final kind of recap?

3          THE COURT:  I think let's finish up with the

4  solicitation order and the solicitation procedures,

5  which I think also include the timing.  I know I

6  reviewed it somewhere.  It's here on page 5 of the

7  order.

8          MR. SCHIAVONI:  You had suggested that you

9  might entertain an hour or something of argument on

10  the -- the legal merits, Your Honor.  It's like we do

11  think there's a direct link between some of the legal

12  merit issues on what's going to be done, what findings

13  are going to be pursued, and the -- the schedule.

14  Like the two things are linked, just like how you

15  addressed with what ended up being a sort of core

16  issue with the RSA, that, you know, it's like where

17  you admonished us and we probably should have listened

18  to you about let's focus on what we're doing here, so

19  to speak.

20          I don't know you probably have a more

21  articulate way to put it, I'll hand it to you, okay,

22  but I do think that maybe scheduling is not a 6:00

23  argument for tonight, that like if it would -- we

24  could have that hour discussion after an hour on the

25  legal merits.  You might find that we -- like there's

1    a lot of efficiency built into it.  It's -- it's not a

2    delaying measure, but it's like I do think there's a

3    link between, you know, how broad like what we're

4    doing is and what -- what time we need to do it.  So,

5    you know, doing the two together might make some

6    sense.

7              Ms. LAURIE:  Your Honor, this is Jessica

8    Laurie (phonetic) if I may step in for just a moment

9    with a couple of thoughts on that.  One, the reason we

10   encouraged the Court to raise the scheduling today is

11   because the debtors' schedule that we put out, and we

12   understand that Your Honor is inclined to grant a 60-

13   day solicitation period, so there may be some

14   adjustments to that.  But the schedule that the debtor

15   put out does contemplate that document discovery

16   requests I believe are due the 27th, so four days from

17   now.

18             And I do think also in light of Your Honor's

19   statements today concerning, you know, we need to get

20   confirmation discovery up and running, it is -- it is

21   open now that we provide some guidance with respect to

22   that issue before we go into the weekend.  So that is

23   why we had suggested that confirmation scheduling be -

24   - be addressed today.  I think as Mr. Abbott said at

25   the outset of today's hearing, we have a lot of work

1  to do still on the disclosure statement, including

2  communications with parties, including working through

3  some of the plain English disclosures.

4          We do envision ourselves coming back before

5  the court.  We would love to have Tuesday with

6  potential overflow for Wednesday.  But I do think

7  we're not suggesting that we're closing things out

8  tonight.  We just wanted to address some issues that

9  are particularly timely.

10          MR. SCHIAVONI:  But, Your Honor, it begs the

11  question to know what discovered issue as to what --

12  what is going to be at issue.  It's like the two

13  things are directly tied.  This is like a friend of

14  mine as a trial lawyer once said if I had a little bit

15  more time to pack, I would pack less, and, you know,

16  having this argument four days from now or three days

17  from now, it's like I just think you're more likely to

18  get a more efficient.  We can send out blunderbuss

19  discovery as fast as possible, I suppose, but it's

20  like I think just we're talking three or four days

21  here to have a discussion that might make it a lot

22  more logical about what discovery is sought.

23          MS. LAURIE:  And, again, Your Honor, I think

24  that's my point.  Right now we don't -- we may not

25  need a deadline of next week with respect to

1    discovery, but we do think we should broach the issue

2    from a timing perspective so that parties actually

3    have the ability to refine discovery based upon the

4    timeline.  That's all we're suggesting.

5            MR. SCHIAVONI:  But the discovery is driven

6    by what the substance is, not by the timeline.  It's

7    like what discovery is going to be needed.

8            THE COURT:  And you think that we're going

9    to narrow the view on that?  I thought the position

10   was the plan should not go out or the plan should go

11   out.

12           MR. SCHIAVONI:  Well, Your Honor, I thought

13   you made it clear that you were going to rule on

14   solicitation, on the disclosure statement and to the

15   extent you're going to issue it you're going to issue

16   it.  But you were going to entertain an hour on -- on

17   argument about what was -- whether or not the plan

18   should go out or not, and that would involve pure

19   legal issues about what the -- what is really going to

20   be in the plan, what findings are going to be sought

21   and what not.  You know, if you remember with the RSA,

22   it's like as Your Honor focused the parties on this is

23   what the -- this is what the finding would be, and as

24   it narrowed, it lessened the discovery.  There's some

25   issues here about the findings that are required that

1  would -- would -- would require tremendous amounts of

2  discovery and that if they're going to be -- it's like

3  I think we would want to be heard as part of that hour

4  discussion, substantively on whether those are

5  appropriate or not.  But if they're deemed not to be

6  appropriate, I think you ought to hear as part of that

7  argument the discovery associated with them because

8  the -- the two are tied together.

9          It's like if, in fact, it's like as in the

10  coalition's pleadings all insurance issues are going

11  to be decided in this case and that, you know, broad

12  and comprehensive findings are going to be made in

13  that regard, you know, no surprise we're going to need

14  a lot of discovery.  Okay?  And we're going to need

15  some time for that.  If it's going to be narrower than

16  that, and, no, contrary to what the coalition has said

17  in its papers, we're not going to be seeking --

18  they're not going to be seeking findings on binding us

19  on all insurance issues, less discovery and less time

20  is needed.  And I'm not asking you to decide that

21  issue right now in a five-minute back and forth.

22          But I am suggesting that hearing us on an

23  hour on that would be use -- it ties right into what

24  this discovery is and what the schedule will be.

25  Otherwise, the scheduling discussion is just going to

1    be in the abstract.  The Boy Scouts want to get out as

2    fast as possible, and how can we do it before the year

3    is done?  It's going to be a discussion in the

4    abstract and not tied to what actually needs to be

5    done in the case.

6             THE COURT:  Okay.  I see Mr. Brown.  I see

7    your hand.

8             MR. BROWN:  Thank you, Your Honor, and good

9    afternoon.  Thank you for staying long and late, a

10   long day.  Just contextually, I thought it might be

11   helpful and Ms. Laurie (phonetic) referenced this.

12   The -- the current scheduling order, and I also think

13   there was -- there's a couple before you.  The one

14   that was referenced was 6216, but then there was an

15   amended one filed, which is 6320.  I think the debtor

16   is proposing the later one, which has even shorter and

17   more brutal deadlines, but we'll deal with that when

18   we deal with that.

19             But in any event, the thing that I just

20   wanted to highlight is what is -- is put an

21   exclamation point on what Ms. Laurie (phonetic) said.

22   These were all -- all the dates in the debtor's

23   proposed scheduling order for plan discovery and the

24   like were based on a much shorter solicitation period,

25   which I think the Court has already indicated is not

1  going to pass muster.  So right now the current

2  scheduling for the solicitation date is October 4, and

3  the voting deadline is November 16.

4          So we're already completely blown out of

5  what the debtor is proposing just based on the

6  solicitation timeframe alone.  And so I think that's

7  -- it's important to view what -- what's being said

8  here in terms of the wisdom of understanding what's

9  going to be at issue and how taking a little more time

10  to consider that is really a non-issue in terms of the

11  overall timing of this because we're already not

12  anywhere, we're already out of the land of the

13  debtor's proposed order.

14          THE COURT:  Mr. Kurtz?

15          MR. KURTZ:  Thank you, Your Honor.  I think

16  you put your -- your finger on it when you said don't

17  we already know what they're going to be seeking in

18  discover?  The plan is the plan.  Everybody knows what

19  the objections are.  We've been hearing about them for

20  a long time.  We've been hearing about them for a

21  week.  Mr. Schiavoni has confirmed their ability to

22  get their requests out.  If they believe by something

23  that happens next week that they can limit some of

24  that discovery, we would be very pleased to hear that.

25  I don't really expect to receive a call like that.

1            The schedule is really critical at this

2    point, and before I address what the schedule should

3    be and why we think it's more than enough time because

4    it will be modified.  What's on record will be

5    modified based on the 60-day solicitation period here.

6    I just want to highlight why the timing here is so

7    important, and that's that the debtors are running out

8    of cash.

9            By the end of the first quarter, the debtors

10   are projected to no longer have the cash necessary to

11   fund a full financial contribution to the plan.  If we

12   had a December 31 emergence, and I realize that's

13   pretty aggressive at this point, but maybe still

14   achievable, the debtors contribute $59 million in

15   cash.

16           By the time we get to March, the end of

17   March, the contribution drops to 26 million.  By the

18   time we get to May 1st, the contribution is at zero.

19   So delay here impairs recovery for abuse victims and

20   also may render the plan not feasible without

21   adjustments that would require further concessions to

22   a deal that was lengthy in achieving, difficult and

23   hard fought, in -- in mediation.

24           So the schedule is basically case critical

25   here, and although I am sure that the parties

1  legitimately would like to have some more time to

2  engage in discovery notwithstanding their request that

3  we delay this discussion until next week.  I'm also

4  sure that delay is a goal for the objectors because if

5  the objectors can get delay and they can time out the

6  plan, they don't have to win on the merits.

7         So delay is -- is -- is -- is also a goal in

8  and of itself.  Now, I recognize that the plan that we

9  have the schedule on the plan that we had proposed,

10  was not maybe overly generous with the calendar, and

11  the good news is it's going to get longer based on the

12  Court's remarks about a 60-day solicitation.  I think

13  we're going from two and a half months or so to

14  approximately three and a half months.  So everybody

15  gets more time without even having to fight about it.

16         And -- and those objecting to relief almost

17  always want more time, but I know that everybody

18  always completes the work they have to complete within

19  the time period that's provided.  That's true in every

20  case.  That's certainly been true in this case.  The

21  objectors have repeatedly told this Court that they

22  didn't have enough time to object, only to file

23  absolutely comprehensive objections and argued

24  absolutely comprehensive objections within the

25  scheduled time, and without failing to raise any one

Page 204

1  of their objections.  So we can get there.

2           It's important to note we're not starting

3  from scratch.  The debtors have provided a substantial

4  amount of discovery in this case.  We've produced a

5  lot of documents.  We've provided depositions.  The

6  objectors have been working on their objections.

7  Frankly, for months, we've heard about them.  We've

8  heard about them this week.  And we are confident that

9  the objectors will mount the same challenges in the

10  same way on any schedule, whether it's two and a half,

11  now three and a half months or two and a half or three

12  and a half years, we're going to see the same

13  challenges.

14           And we believe that the three and a half

15  months or so that we would be proposing now coupled

16  with the discovery they've already had, and the fact

17  that they have been free to seek confirmation

18  discovery and, in fact, they have done that to some

19  extent is adequate.

20           It will keep the cases on track to

21  paraphrase Your Honor from this week, and, frankly,

22  when parties have deadlines, they tend to get to

23  resolutions leading up to or at the date of the

24  deadline.  And that tends to mean that matters will

25  resolve faster if we have a tighter schedule than they

Page 205

1    will otherwise.  So I would submit that maybe some

2    pressure here would actually help, but in any case I

3    understand why the objectors would want more time even

4    without the interest in delay.  But I would submit

5    that when you balance the relevant interests and

6    consequences to a delay, it is -- it's better to have

7    the lawyers work hard than it is to -- to -- to have

8    reduced recoveries to abuse victims and potentially a

9    step backwards where we have to restart with a plan.

10            We had suggested a number of interim dates

11    that were directed towards a confirmation hearing on

12    December 9.  That's no longer, I think, on the table.

13    We would reset those interim dates working backwards

14    from a confirmation hearing that we would hope to get

15    as soon as we could after the -- after the

16    solicitation period.  We can talk to everybody about

17    it.  We tried to have a dialog about interim dates

18    before.  We got no, no, no -- we got objections to the

19    timeline but no suggestions on how to allocate the

20    work within the timeframe we were proposing.  But

21    we'll give people another crack at that.  We'll try to

22    be flexible.  We think we -- we know the best way to

23    sort of leave enough room to get it done, but we think

24    there's more than enough time.  I think everybody on

25    this hearing has probably tried a confirmation case on

Page 206

1    less than three and a half months even without getting

2    all of the discovery they've had so far.  And given

3    the cash drain here, we think it should be set, and it

4    should be set as soon as it can be.

5            THE COURT:  Okay.  Well, Mr. Kurtz, are you

6    -- I heard two things there I think at the end.  One,

7    we'll work with everybody to come to a schedule, and,

8    two, we should schedule it as soon as possible.  So is

9    there -- is there a proposal?  And I will confess I

10   don't have the right document in front of me so I'm

11   going to need to take a break if I need to get it.

12   But I'm -- I guess I need clarification on where you

13   were there at the end.

14           MR. KURTZ:  Right.  So -- so what I -- what

15   I would like to impose, in effect, on the objectors,

16   is a confirmation hearing date from which we can work

17   backwards.  Where I think we can work with people if

18   they'll work with us this time, they didn't last time

19   would be to populate the dates between now and then.

20           THE COURT:  On the interim dates.

21           MR. KURTZ:  So as to allow for the -- the

22   work to be done in a productive way.

23           THE COURT:  Okay.  Thank you.

24           Mr. Ryan?  It's frozen to me. I'll come

25   back.

1           Mr. Rosenthal?

2           MR. ROSENTHAL:  Yes, Your Honor.  I think

3   Mr. Plevin is going to talk about the -- the

4   scheduling issues, but I -- I do want to correct the

5   record.  Mr. Kurtz spends a lot of time talking about

6   delay, delay, and how he gave the insurers an

7   opportunity to participate, the objectors, and no one

8   said anything.  I -- I asked him a very specific

9   question.  Is your December 9 date inflexible?  And he

10  said, yes, it's inflexible.  That period of time, Your

11  Honor, at that point it was just a question from his

12  perspective of moving an already impossible schedule

13  and moving things around that already impossible

14  schedule.

15          We need more time to do discovery, and just

16  because the debtor delayed in filing the plan and is

17  where it is in the case does not mean, Your Honor,

18  that the Court can ignore the due process rights of

19  the objectors and prevent the parties from taking the

20  discovery they need to present their case.  So I'll

21  leave it there because I know Mr. Plevin wants to

22  address the specifics of the schedule.

23          THE COURT:  Mr. Plevin?

24          MR. PLEVIN:  Your Honor, my first question

25  is whether we're talking about the schedule now or

1   whether we're talking about when we're talking about

2   the schedule because I'm a little confused about which

3   we're doing.

4          THE COURT:  I guess we're somewhat -- we're

5   somewhat talking about the schedule.

6          MR. PLEVIN:  Because one of the -- the

7   reason I ask that is we have -- if we're going to dig

8   into the schedule and talk about the debtors'

9   schedule, as compared to the schedule that we proposed

10  in our papers, and by the way I never heard from Mr.

11  Kurtz even though I sent in the brief that had the

12  insurer's proposed schedule.

13         So I don't know who he was wanting to have

14  dialogue with, because I never heard from him, but we

15  proposed a very specific schedule keyed to the

16  approval of the disclosure statement, and I can walk

17  through our proposed schedule and the debtors'

18  proposed schedule and explain why theirs is not

19  workable and ours is.  And I'm prepared to do that

20  now, but I do know it's 6 p.m. and I don't think this

21  is going to be over any time soon.  And I really don't

22  see what the difference is between arguing this today

23  or tomorrow.

24         I do agree with Mr. Schiavoni that one of

25  the things I was going to say is it's important to

1    know what we're litigating here, and there were some

2    comments made yesterday by Your Honor that suggest we

3    may have a lot more litigation on our hands than we

4    hoped and that has ramifications for the schedule.  So

5    if the Court can give me some guidance as to whether I

6    should just dive in for the next half-hour or not, I'd

7    appreciate that.

8           THE COURT:  Okay.  The question with respect

9    to what discovery is necessary, and I guess what I'll

10   need some more input on is probably around the

11   findings related to the insurance that the debtors

12   seek in the plan, and whether they're really legal

13   issues we're talking about because some of them I view

14   that way, and -- or whether they're factual issues.

15   And I say that because, for example, and I don't have

16   the findings right in front of me -- well, but I

17   probably do, but not in the way that I marked them is

18   -- and I think we've had this discussion before, you

19   know, whatever the words, magic words are, fair and

20   reasonable around the -- the values in the TDPs,

21   whatever that finding is.

22           There's an argument as to what one should be

23   able to do with that finding, right, but that's more a

24   legal issue to me than an actual factual issue.  So I

25   would want to understand why people think that's a

1  factual issue rather than a legal issue because I'm

2  not, as I said, going to be interpreting someone's

3  policy that says here's the loss language in their

4  policy and, in fact, whatever number I come up --

5  whatever number's in the TDP is -- equates to whatever

6  the definition is in the policy that says here's what

7  the debtor bought.  Okay?

8           So those are the kinds of things I'm trying

9  to get my head around, but that's an easier one for me

10 because an insurance policy is here is the insurance

11 the debtor wants, here's the insurance the debtor got.

12 That's what they bargain for.  It's the contract.  If

13 someone has a contract that says, for example, what

14 I'm covering is the distribution amount in a

15 bankruptcy proceeding and not the allowed -- not the

16 full value of someone's claim who doesn't get paid.

17 Well, then that's the insurance that the debtor

18 bought.  They bought a product, and that's what it

19 was.

20          So I'm not going to be making those

21 decisions.  So I'm at somewhat of a loss of what

22 people think those findings mean and what they think

23 that they're going to then equate to.  So those are

24 the kinds of things I've been thinking about in terms

25 of the findings that people are asking me to make, and

1   I am not on a policy-by-policy basis going to be

2   making those decisions.  I don't see it.  Maybe I

3   could be convinced that I'm misunderstanding

4   something, but those are the kinds of things I don't

5   see.  And I don' think that either increases or

6   decreases the coverage that's available.  I think it's

7   what it is.

8          And that's my goal, what it is.  I don't

9   call that insurance neutrality.  Forget that term.  I

10  think it's been misused.  I recognize I'm a newcomer

11  in this field, but I think it's confusing and it's

12  been misused.  And I look at it, and I see, yes, can I

13  decide, perhaps, that the values for confirmation that

14  are contained in the TDP are appropriate?  Yeah, I

15  think I can decide that.

16         If you want to morph it into something else,

17  I'm not sure I get to do that, or that that's

18  appropriate.  So those are the kinds of issues I'm

19  talking about.  Probably shouldn't talk off the cuff,

20  but that's the easiest one to -- to talk about, and

21  now all the hands are raised.  So that's -- there's

22  some thoughts.

23         Here's what I'd like to do.  I'd like to

24  take a few minutes break here.  I'd like to get the

25  relevant document in front of me with the scheduling

Page 212

1  order, which for some reason I don't have.  My

2  apologies.  I'd like to make sure I have, which I

3  thought I did, Mr. Plevin's filing, because I do

4  remember seeing an alternate schedule.

5          So if you could tell me what docket item

6  that -- the two documents I need are to have in front

7  of me, I would like to get them during the break so I

8  can be more intelligent on the scheduling.  But in

9  that context, broader context of these findings, what

10  are the factual issues that are really in dispute

11  versus the legal issues?

12          MR. SCHIAVONI:  Your Honor, can you see why

13  we wanted to tie this to our one-hour argument on the

14  legal merits of the plan.  It's like that's really the

15  reason.  It's to tie the two together.  We just

16  thought it would be more efficient, and it's -- and

17  maybe not doing it when everybody is, you know, tired.

18  But that was the thought.  It wasn't going to delay --

19  like we weren't looking for a lot of delay on that.

20  It's just we though the two would tie together.

21          MR. ROSENTHAL:  And I think, Your Honor, it

22  -- I'm sorry to bug in, but I think it will also give

23  you a sense of the answer to the question you just

24  asked because the findings are one thing, but some of

25  the other arguments relate to whether -- whether the

Page 213

1   TDP values and criteria are actually fair and

2   reasonable and/or improperly inflate the value of the

3   debtors' abuse liability, which is -- which is

4   somewhat of a factual issue.  And so I think if you

5   understand the full scope of what we're trying to say,

6   whether you decide that it's patently unconfirmable or

7   not, I think you've already given us your -- your --

8   your initial perspective on that.

9           But I think we were trying through some of

10  these -- some of the argument that you said you would

11  listen to, to set a framework for you and provide some

12  -- some guidance on things that would relate to these

13  scheduling issues.

14          MR. PELVIN:  Your Honor, while I agree with

15  both Mr. Schiavoni and Mr. Rosenthal, I can I think

16  try to answer your question on a go forward basis when

17  we come back.  One question I can answer quite easily

18  for you is that our scheduling brief with the proposed

19  schedule is Docket Number 6060.

20          MR. KURTZ:  And, Your Honor, Glen Kurtz.  I

21  can direct you to our schedule at Docket Entry 6320.

22          THE COURT:  6320 and 6060.

23          MR. KURTZ:  Yeah, 6320.

24          THE COURT:  Okay.  Let's take -- let's take

25  ten minutes.

1          MR. RYAN:  Your Honor, can I make one

2   suggestion for the break?

3          THE COURT:  Mr. Ryan?

4          MR. RYAN:  Is we also look at Your Honor's

5   calendar.  We've already added 17 days.  I think 17

6   days is a December 26th trial start date.  That's not

7   going to happen.  So I think a rational discussion

8   about a -- what our schedule is also involves Your

9   Honor looking at her calendar and it's in January at

10  this point.

11         THE COURT:  Yeah, which is not a good

12  calendar, but I'm going to pull it out.

13         Okay.  Let's take ten minutes.  We're in

14  recess.

15         (A recess was taken from 6:15 p.m. to 6:26

16         p.m.)

17         THE COURT:  Okay.  This is Judge

18  Silverstein.  I've got the two different schedules

19  now, which, obviously, are nowhere in harmony and or

20  for that matter close.

21         And if we weren't virtual, I'd have you in

22  chambers to have a discussion.  But that's not an

23  option.  I'm -- I had thought maybe -- maybe just

24  wishful thinking that from the discussion earlier

25  today that maybe we weren't going to be meeting

1    tomorrow and that we were going to be continuing until

2    sometime next week and take up further issues with the

3    exception of the scheduling issue and et cetera.

4    Maybe that -- maybe that -- as I say maybe that was

5    wishful thinking.

6            I think I probably need to hear argument on

7    some of these issues, and provide some preliminary

8    thoughts on them, and I'm not going to start that

9    tonight.  The -- but I also think it's necessary to

10   get this matter scheduled for confirmation, and it's

11   not going to be in -- let's see.

12           MALE VOICE:  December 7th.

13           THE COURT:  Well, it's not going to be on

14   December 7th.  It's not going to be --

15           MALE VOICE:  9th, 9th.

16           THE COURT:  It's not going to be 217 days

17   after approval of the disclosure statement either,

18   which is what I think is in the insurer request.

19           MR. KURTZ:  Your Honor, I don't know if you

20   have any -- any room in your schedule for January.

21   That would leave some substantial time and we can -- I

22   don't want to -- I don't want to argue right now about

23   the time --

24           THE COURT:  Right.

25           MR. KURTZ:  -- but we all know that people

1   can get the work done with whatever time period we

2   have but we have to work backwards.

3           THE COURT:  I do agree that people can get

4   stuff done in the amount of time that you give them.

5           MR. KURTZ:  Right.

6           THE COURT:  Believe it or not, I have an

7   insurance coverage trial in January, which some of you

8   are involved in, which quite frankly I had moved to

9   accommodate where I thought Boy Scouts might fall when

10  we were looking at this many months ago.  So it's been

11  moved once already, and I've got to give this some

12  thought.

13          What I'd like the parties to think about,

14  and I think every party has acknowledged that this is

15  one of, if not the, most complex cases that they've

16  probably dealt with in their bankruptcy careers, as it

17  brings together many issues, many challenging issues,

18  each one of which on their own would make any case

19  complex.  And to the extent that people are adding on

20  sort of the wish list of what they would like to an

21  already complex case, it not only adds that many

22  layers of complication but increases, quite frankly,

23  the time that the parties and the Court need to

24  prepare for the case, as well as ultimately to decide

25  it.

```
1                      And while I'd like to give you some guidance
2     on every issue because -- and try to narrow things
3     down before we get to confirmation, because some of
4     these issues don't get decided every day, because they
5     are complex, it's hard to do that and still permit
6     people to make appropriate arguments on issues, which
7     could go either way.
8                      So I think people really need to think about
9     what it is they need to accomplish from the
10    bankruptcy, and -- and I'll see if there's some
11    guidance that I can give you on issues.
12                     The third-party release issue alone, we all
13    know, we've heard the arguments, it's challenging
14    enough.  But it's been a crux of this case from the
15    beginning.  Everybody knew this was going to be an
16    issue.
17                     When you start adding to that already very
18    complex, and it's both factual and legal issues, and
19    we have very able lawyers here that are going to be
20    arguing it and putting on the evidence.  And when you
21    glom onto that issues that perhaps are not regularly
22    decided in the context of confirmation and maybe don't
23    need to be decided in the context of confirmation,
24    then it takes longer time.
25                     So I don't know.  Were people planning on
```

1    coming back tomorrow/  What was the -- what was the

2    thought, Ms. Laurie (phonetic) when you thought about

3    this, or Mr. Abbott at the beginning of the day?

4                MS. LAURIE:  I'll tell you what our original

5    vision was, but, obviously, we'll take guidance from

6    Your Honor.  I think we had hoped to get through

7    solicitation and scheduling issues today.  We've heard

8    other people's views on that.  I think our view had

9    been we would work on the documents and then come back

10   subject to your schedule on Tuesday, split Tuesday

11   between the confirmation-type arguments that you may

12   need to hear and then clean up on the disclosure

13   statement document itself to the extent that there are

14   lingering issues.

15               THE COURT:  That's kind of what I thought.

16               MR. SCHIAVONI:  Judge, could I plead for

17   Friday off?

18               THE COURT:  Well, that's what Ms. Laurie

19   (phonetic) had thought we -- and that's where I

20   thought we were going to so.

21               MR. KURTZ:  I mean, Your Honor, I don't

22   think the debtors have any dire need for -- for -- for

23   Friday subject to getting some schedule plugged in.  I

24   think if there's some way that Your Honor can find

25   time in your schedule for a confirmation hearing, we

1  can probably then at least have a dialogue with --

2  with the objectors on how to populate the interim

3  dates.  We'll either get somewhere or we won't, and we

4  can resubmit.  But, you know, I don't know that we

5  have to tie them.  I think we need a schedule no

6  matter what happens, no matter what kind of guidance

7  we get, which we'll appreciate, of course, but it's a

8  little -- we're probably sort of in a standstill until

9  we know what we're working against.

10         MR. PLEVIN:  But, Your Honor, I would ask

11  you not to pre-judge at this point when the

12  confirmation hearing is going to be until you hear the

13  arguments about the discovery that's needed and the

14  sequencing of events.  Obviously, you can have a date

15  in mind, but I would urge you to have an open mind and

16  not tell us what that date is so we can argue to you

17  how much time we need and why.

18         MR. KURTZ:  I mean the debtors are burning

19  cash.  It just doesn't work to --

20         THE COURT:  I understand that.  I understand

21  that, and there's more people that want the debtor to

22  pay for them, so you know.

23         MR. KURTZ:  Right.

24         THE COURT:  Maybe that shouldn't be the

25  case.  I don't know.

1           MR. KURTZ:  With or without those numbers

2     the cash is going out the door.  So the calendar

3     matters, and I know that there's an interest in delay

4     but it's not in the interest of the estate.  And all

5     we're looking for is dates.  If it has to move because

6     somebody convinces Your Honor of something, so be it,

7     but I don't think that's what's going to happen.

8           MR. RYAN:  Your Honor, with all respect,

9     it's not about delay.  Mr. Kurtz is just inflaming

10    everything.  There's no reason -- a schedule is a

11    schedule, and it leads to a confirmation hearing.  You

12    may not agree that it should be a 200-day schedule.

13    You may agree that it should be, you know, whatever,

14    somewhere between where the debtor has proposed and --

15    and -- and -- and where the insurers have proposed.

16           But at least hear the various arguments

17    about how to effectuate a timely schedule that -- that

18    -- you know, that doesn't put -- it's not about making

19    the lawyers work too hard.  I mean the lawyers will

20    have to work as hard as they have to work, but some of

21    these things are just unrealistic deadlines that --

22    that need to be changed to accommodate an orderly

23    process.

24           MR. BROWN:  Your Honor, this is Ken

25    (inaudible).  Not to get into the weeds --

1           MR. KURTZ:  Your Honor, I've literally tried

2    cases.

3           MR. BROWN:  -- on this, and if I could

4    speak, Mr. Kurtz, because you've been saying a lot in

5    generalities and you've been casting some aspersions

6    about people doing this just to slow down the process.

7    Your Honor, just by way of example, and there's a

8    reason that Mr. Kurtz is only speaking in generalities

9    and hasn't referenced a single actual thing that the

10   debtor is trying to impose on folks here, but just as

11   an example, the order that you have in front of you,

12   the one that the debtor was trying to get you to

13   impose on everyone sets the last date to serve written

14   discovery as September 27, and then the last day to

15   respond to that discovery four days later on October

16   1.

17           That is just one example of the breakneck,

18   nauseating pace that the debtor is trying to impose on

19   everyone.  This is not about scheduling, as much as it

20   is about not allowing people to have the time to do

21   what they need to get due process here.  All you have

22   to do is look at this order to see the multiple -- the

23   multiple examples of just completely unrealistic

24   deadlines.  But four days after you propound discovery

25   to respond to it?  That's heading one.

1                MR. KURTZ:  Your Honor, it doesn't take four

2    days to take your prior objections and reintroduce

3    them into a new document.  It's a little silly to talk

4    about due process.  I've literally tried cases from

5    complaint to trial in 20 days, and I'm sure other

6    people have as well.  Chrysler was a major case.  I

7    think we went -- in 18 days we had that trial.  We

8    were in the Second Circuit within a few days after

9    that and the Supreme Court after that.

10               It's not hard, and there's no generalities.

11   I put in all the dates that seemed appropriate when we

12   work backwards from a confirmation hearing date.  I

13   said we'll resubmit with new interim dates working

14   backward from a new confirmation hearing date, but

15   these are all doable, and primarily the discovery is

16   going to be coming from the debtors and we'll comply

17   with it.

18               MR. PLEVIN:  Your Honor, the discovery won't

19   all be coming from the debtors.  It will be coming

20   from other parties.  We're going to propound discovery

21   on other parties, and just by way of one other example

22   in addition to what Mr. Brown said, we're supposed to

23   have rebuttal experts reports submitted nine days

24   after the affirmative reports.

25               The idea that you can get a -- you can get

1   an affirmative expert report, review it, decide who to

2   -- what kind of rebuttal you need, recruit a rebuttal

3   expert and have that rebuttal expert turn a report and

4   do all of that in nine days is just not -- it's not

5   feasible.  It's not practical.  It doesn't happen that

6   way.

7            MALE VOICE:  Can we -- can we resume on

8   Tuesday?  Because I think the weekend, cooler heads

9   will think about this over the weekend about how if

10  you glom on less, less discovery is necessary.  It's

11  like I think we have some guidance on that, and

12  Tuesday may be we have a-- you know, a little bit more

13  time, we pack less, more efficient.  It's like we're

14  going to achieve something on Tuesday.

15           THE COURT:  Okay.  I'm -- can tell you at

16  this moment in January I don't have three days for

17  this confirmation hearing.  So I cannot give the

18  debtor something in January today.

19           What I'm going to do is assuming you guys

20  can still hear me because I can't see anybody.

21           MIXED VOICES:  We can hear you.

22           THE COURT:  Okay.  What I'm going to do is

23  I'm not going to give a schedule, a date today,

24  because, debtors, I can't give you what you want.

25           I'm going to look at my schedule.  I'm going

1   to consider the filings, and I'd like the parties to

2   think about, again, what kind of findings they need

3   because I think that can make a difference in what the

4   discovery is going to be.

5          So we're going to resume -- I also think

6   parties need time to take a look at what we've done to

7   date on the disclosure statement and get all of that

8   resolved.

9          So looking at my schedule, on Tuesday I can

10  have you back here.  I do believe I have a couple --

11  well, I do have a couple of things schedule.  I will

12  see if I can move them.  One might just be a status

13  conference.  We'll take a break, but I'll have you

14  back here at 10:00 on Tuesday, and we can carry over

15  on Wednesday probably starting around noon.

16         I have something I do not think I can change

17  that morning, and then I do understand that you guys

18  are in mediation, some of you, Thursday and Friday.

19  So I would suggest you use that time well.  That's

20  what we're going to do.

21         I will entertain argument, I guess, first,

22  and --

23         MR. PLEVIN:  Your Honor, argument on the

24  scheduling or on the --

25         THE COURT:  On the issues that you think

1  that I can resolve and get out of the way for

2  confirmation or that will convince me that I should

3  not send this plan out at all.

4         MR. RYAN:  Understood.

5         THE COURT:  So I'll take that first, and

6  I'll have ideas on scheduling assuming you don't

7  convince me.

8         Mr. Rosenthal, I will keep an open mind.

9         MR. ROSENTHAL:  Thank you.

10        THE COURT:  Mr. Patterson, I see your hand.

11        MR. ROSENTHAL:  But I think, Your Honor, one

12 thing you said is very -- is -- is -- is interesting,

13 and I would hope the parties would think about it.  I

14 think you're absolutely right, if you can still hear

15 me.

16        THE COURT:  I can.

17        MR. ROSENTHAL:  You're kind of frozen, but

18 to the -- that one of the things that drives the

19 schedule are the findings.  And if those findings

20 weren't required there would be less time required,

21 and so, you know, fairness and reasonableness are

22 evidentiary issues about the TDPs and the values, and

23 the like, and they -- they will take required

24 discovery.  And that's one of the things that is

25 driving the longer schedule.

```
 1                THE COURT:  Okay.  Mr. Patterson?
 2                MR. PATTERSON:  Your Honor, I just wanted to
 3    say that we're kind of new to the litigation fight
 4    here.  We have not taken substantial discovery from
 5    anybody.  We haven't received any, although my guess
 6    is that something will come our way, so we just hope
 7    you'll keep an open mind that we -- it's not that
 8    we're sitting here with reams of information that
 9    we've, you know, deposed people or had document
10    discovery from anybody.  We'll do the best we can, and
11    we -- we appreciate, Your Honor.
12                THE COURT:  Thank you.  Mr. Harron?
13                (crosstalk)
14                THE COURT:  Oh, I'm sorry.
15                MR. BROWN:  It's Ken Brown.
16                MR. HARRON:  I think Mr. Rosenthal is
17    suggesting a false premise, which I just couldn't let
18    sit.  Implicit in his comment is absent the findings
19    and with some form of neutrality this case resolves
20    quickly.  And Mr. Rosenthal and I both know that we
21    have a case exactly like that in North Carolina,
22    completely insurance neutral, claims are passed
23    through to the insurers and Mr. Rosenthal is taking
24    stuff to the Fourth Circuit.  Eliminating the fight
25    over the findings will not eliminate the insurers
```

1    fights.

2          MR. ROSENTHAL:  Well, obviously, we disagree

3    with that, Your Honor, but that's for another day.

4          THE COURT:  Okay.

5          MALE VOICE:  (inaudible) Circuit apparently.

6          MR. HARRON:  We couldn't be more neutral in

7    that case, and we're at the Fourth Circuit.

8          THE COURT:  I'm really worried about what's

9    going to be in front of me and what parties are going

10   to request that I have to decide.

11         Mr. Brown?

12         MR. BROWN:  Something, again, we can pick up

13   on Tuesday, but one of the things that we're very

14   concerned about in terms of the timing here is, you

15   know, the debtor has referred to all the documents

16   that they've already produced and why normal discovery

17   timelines don't matter because of that.  The thing

18   that is important to keep in mind as we go through

19   this is that that was produced in the context of, much

20   of it, in mediation, and there's a data room.  And

21   virtually everything in the data room has been

22   designated confidential.

23         We have been trying since last week to go

24   through the process with the debtor to get this stuff

25   undesignated so it can be used in some practical way,

1  but we haven't gotten anywhere.  And you would think

2  that a debtor who is trying to impose breakneck

3  deadlines would be going out of its way to deal with

4  things like that.  And we feel like all we're getting

5  is stone-walled.  Right now, we can't use any of the

6  so-called, you know, discovery that has thus far been

7  propounded.  (inaudible) is going to be filed under

8  seal and we're going to have a sealed courtroom.

9          MR. SCHIAVONI:  Well, let's take a break for

10 the day.

11         THE COURT:  Okay.

12         MR. KURTZ:  Your Honor, that's -- that's

13 just not true.  We didn't produce the discovery.  My

14 understanding is we've been requested to help

15 facilitate a discussion with other parties that may

16 have designated materials as confidential.  We said we

17 would do that.  They then sent us literally hundreds

18 of pages of documents that we haven't yet had an

19 opportunity to even go through.  The debtors have not

20 done that, and it's just an inaccurate statement that

21 was just made.

22         THE COURT:  Okay.  We're going to adjourn

23 until Tuesday at 10:00, and parties should use the

24 time well to turn documents that the disclosure

25 statement and other documents that need to be turned,

Page 229

1   and I know people are worked around the clock to do

2   that.  And should consider what we can achieve.

3            I, last August, not this past, the year

4   before, had two complete valuation trials with parties

5   had about three weeks to prepare for.  On the other

6   hand, I've got some cases where the discovery disputes

7   get in the way, and they prolong things.  And that's

8   not bad faith discovery disputes.  That's just regular

9   old discovery disputes.  So we're going to find a

10  happy median.  We're going to recognize that this

11  debtor is burning cash, and I have no reason at all to

12  believe that Ms. Lauria or whoever told me that, it's

13  probably Mr. Kurtz, is inaccurate in what they're

14  saying, no reason to believe that.

15           And I don't think that benefits anybody, so

16  we're going to balance, clearly the due process rights

17  of all parties against what's necessary in this case.

18  And that's where we're going to leave it.

19           So thank you very much.  Enjoy your Friday

20  away from here.  I will see you Tuesday morning.

21           MALE VOICE:  Thank you, Your Honor.  Have a

22  nice weekend.

23           THE COURT:  Thank you.

24           MALE VOICE:  Thank you, Your Honor.

25           THE COURT:  Thank you.

Page 230

1    MALE VOICE:  Thank you, Your Honor.

2    (Whereupon the hearing adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 231

CERTIFICATE

      I, Wendy Sawyer, do hereby certify that I was authorized to and transcribed the foregoing recorded proceedings and that the transcript is a true record, to the best of my ability.

      DATED this 24th day of September, 2021.

_____

WENDY SAWYER, CDLT