UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                .  Chapter 11
                                .
IN RE:                          .
                                .  Case No. 20-10343(LSS)
                                .
BOY SCOUTS OF AMERICA AND       .
DELAWARE BSA, LLC,              .
                                .  824 Market Street
                                .  Wilmington, Delaware 19801
                     Debtors.   .  Thursday, April 23, 2021
. . . . . . . . . . . . . . . .    10:01 a.m. to 11:28 a.m.
```

TRANSCRIPT OF VIDEO HEARING RE: OMNIBUS
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:   (On the Record)

For the Debtors:            Derek C. Abbott, Esq.
                            MORRIS, NICHOLS, ARSHT
                             & TUNNELL, LLP

                            Matthew E. Linder, Esq.
                            WHITE & CASE, LLP

For the Knight Claimants:   Kristi Doughty, Esq.
                            SCHNADER, HARRISON, SEGAL
                             & LEWIS, LLP

                            Jed Manton, Esq.
                            HARRIS LOWRY MANTON, LPP

For the Tort Claimants
Committee:                  James O'Neill, Esq.
                            PACHULSKI, STANG, ZIEHL & JONES


(Appearances Continued)


Audio Operator:             Electronically Recorded
                            by Brandon J. McCarthy, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA ZOOM:  (On the Record - Continued)

For Marco Romero, Jr.:      Patrick Jackson, Esq.
                            Laura Appleby, Esq.
                            FAEGRE, DRINKER, BIDDLE
                             & REATH, LLP

Also Appearing:             Lonnie Washburn, *Pro Se*

INDEX

                                                        Page


MOTION TO APPROVE SETTLEMENT RE:  KNIGHT CLAIMANTS        7

MOTION TO APPROVE SETTLEMENT RE:  MARCO ROMERO, JR.   15,36

ARGUMENT BY MR. WASHBURN                                 18

FURTHER ARGUMENT BY MR. LINDER                           29

ARGUMENT BY MR. O'NEILL                                  31

COMMENTS BY MR. JACKSON                                  35

COURT DECISION                                           39




EXHIBIT                                                EVID.

Dial Declaration                                          9
Hanke Declaration                                         9
Hanke Declaration                                        17

1          (Proceedings commence at 10:01 a.m.)

2          MR. ABBOTT:  Your Honor, it's Derek Abbot.  We have

3    hired a report, so that we could have live feed on the

4    hearing today, so it's not an official transcript, obviously,

5    but something that the parties are interested in getting some

6    realtime feedback.

7          THE COURT:  Okay.

8          MR. ABBOTT:  When we tested audio earlier, it

9    sounded like the Court's volume was a little low to us.  I'm

10   not sure if there's an adjustment that could be made.

11         THE COURT:  I don't know.  Is this better?

12         MR. LINDER:  Sounds great on my end, Your Honor.

13         THE COURT REPORTER:  Well, we'll go forward if

14   you'd like to.

15         THE COURT:  Yeah, I would.  I mean, my ECRO is

16   saying he's hearing everything clearly.  Mr. Linder is

17   hearing clearly.

18         THE COURT REPORTER:  Okay.

19         THE COURT:  Do you think there's anything I can do

20   on this end.

21         THE COURT REPORTER:  Okay.  Judge, if your ECRO

22   wouldn't mind emailing me a copy of his audio at the end of

23   the day, that will do fine by me, and I'll put myself on mute

24   and be a robot.

25         THE COURT:  Well, I don't know that I can do

1     anything further than that, but certainly, we can make that

2     happen.  That won't give parties a realtime transcript,

3     though.

4                THE COURT REPORTER:  No, but I'll be doing my job

5     as we go along, Judge.  Thank you.

6                THE COURT:  Okay.  Thank you.

7                THE COURT REPORTER:  My email address for your ECRO

8     is rtreporter@gmail.com.  Thank you, everyone.

9                THE COURT:  Okay.  This is Judge Silverstein.

10    We're here in the Boy Scouts of America bankruptcy, Case 20-

11    10343, on the ten o'clock agenda.

12                Let me turn it to the debtors' counsel.

13                MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

14    of Morris Nichols.

15                Mr. Linder from White & Case will be dealing with

16    the two matters before the Court today, so I'll turn it over

17    to him.

18                THE COURT:  Good morning, Mr. Linder.

19                MR. LINDER:  Good morning, Your Honor.  It's good

20    to be back before you again.  We have a -- again, Matt

21    Linder, White & Case, for the debtors, for the record.

22                We have a brief agenda for the omnibus hearing

23    today.  We saw this morning that Your Honor entered orders

24    granting the first two motions listed on the agenda; those

25    were motions to extend the -- or the period to remove civil

1    actions, as well as the Lehr settlement.

2            THE COURT:  Uh-huh.

3            MR. LINDER:  Thank you for approving those.  Those

4    were unopposed motions and that streamlines our agenda.

5            We still have remaining, Your Honor, two opposed

6    motions; those are motions to approve settlements with the

7    holder of a wrongful death claim and the holder of a personal

8    injury claim, respectively.

9            So, if I may, Your Honor, I'd like to just jump

10   right in to the Knight settlement motion.

11           THE COURT:  Before we do that -- and I don't see my

12   list of who's on the Zoom call here.  Is Mr. Washburn on the

13   call or at the hearing, Lonnie Washburn?

14       (No verbal response)

15           THE COURT:  Give me one moment, please.  I want to

16   see if he registered.  Washburn, W-a-s-h-b-u-r-n.  Okay.

17   Thank you.  I do not -- I understand that he hasn't

18   registered.

19           Is there any -- was there any other objector, Mr.

20   Linder?  I want to make sure that I'm aware of everyone, and

21   that, if that person is on the call, I've got them.

22           MR. LINDER:  There was not, Your Honor.  We

23   received one objection to each of these two motions, both

24   filed by Mr. Washburn.

25           THE COURT:  Okay.  Thank you.  You --

1           (Court and court personnel confer)

2                THE COURT:  Oh, I'm sorry.  He -- they are

3      registered.

4           (Court and court personnel confer)

5                THE COURT:  Okay.  Give me five minutes, I want to

6      check with Mrs. Johnson on Mr. Washburn's lack of appearance

7      here.

8                MR. LINDER:  Yes, Your Honor.

9                THE COURT:  We're going to take five minutes.

10               MR. LINDER:  Thank you.

11          (Recess taken at 10:06 a.m.)

12          (Proceedings resume at 10:11 a.m.)

13               THE COURT:  Okay.  This is Judge Silverstein.

14     We're back on the record.

15               I've checked with my courtroom deputy, and she has

16     not had any communications from Mr. Washburn, which is what I

17     wanted to check, to see if he was having some difficulty

18     getting on the Zoom link, but we've had no communications

19     from him, so we will go forward.

20               Mr. Linder.

21               MR. LINDER:  Thank you, Your Honor.

22               The first motion that we'll be going forward on is

23     the Knight settlement motion, filed at Docket Number 6154.

24               This is a motion to approve a settlement with the

25     Knight claimants.  They hold a claim for the wrongful death

of their minor son in -- when, in 2018, a tree fell on his

tent during a scouting event in Covington, Georgia, and that

was on June 25th, 2018.

There is one objection, as I noted, filed by Mr.

Washburn at Docket Number 20 -- 6236.  There are no other

objections to the motion.

Your Honor, after the death of their son, the

Knights brought a wrongful death lawsuit in Georgia State

Court, that was commenced prior to the petition date under

Georgia's Wrongful Death Act.

After the commencement of these cases, the Knights

filed a motion for relief from stay and they obtained relief

from stay on July 8th, 2020, by order of the Court, at Docket

989.  That order, consistent with the other orders, Your

Honor, that we've had, permitted the claimants to proceed

with negotiation or settlement negotiations on their claim,

on the condition that any payment proposed to be made to the

claimants would be the subject of a further court order.

The debtors and the Knights, in consultation with

the debtors' insurance companies, engaged in what I

understand were lengthy settlement negotiations, which

resulted in the agreement that is appended to the settlement

motion.

The settlement motion is supported by declarations

from Mr. Jad Dial, who was defense counsel in the Knights'

1     state court action, on behalf of the Boy Scouts of America,

2     the Atlanta area counsel, as well as the declaration

3     submitted by Elizabeth Hanke with KCIC, which is debtors'

4     insurance consultant.

5          Your Honor, Mr. Dial and Ms. Hanke should be on the

6     Zoom today, they are available for cross-examination if Mr.

7     Washburn appears at the hearing.  I'd propose, Your Honor,

8     based on their declarations appended to the motion, to move

9     those into evidence at this time.

10          THE COURT:  I'll double check.  Is Mr. Washburn --

11     has he joined?

12          (No verbal response)

13          THE COURT:  I hear no one.  I will admit the

14     declarations.

15          (Dial Declaration received in evidence)

16          (Hanke Declaration received in evidence)

17          MR. LINDER:  Thank you, Your Honor.

18          Turning to the settlement agreement, the agreement

19     provides that, in exchange for a settlement payment in the

20     amount of $7.1 million, the Knights will fully release their

21     claims against the debtors and the Atlanta Area Council, as

22     well as their respective related parties and insurers.

23          Each of the defendants that -- again, that being

24     Boy Scouts of America and the Atlanta Area Council, are

25     insureds under the Old Republic policies for the 2018 policy

1    year.

2         The entirety of the settlement is proposed to be

3    paid from the proceeds of the Old Republic primary and

4    umbrella policies for the 2018 policy year.  The effective of

5    those payments would be that the Old Republic umbrella policy

6    would be close to exhaustion.  Again, the way the insurance

7    works for these years is that there's a one-million-dollar

8    per occurrence policy.  And on top of that, it's a nine-

9    million-dollar umbrella policy, and that $9 million is an

10   aggregate limit.

11        The balance of the debtors' insurance for the 2018

12   policy year above -- that attaches above the Old Republic

13   umbrella policy will be left intact, and there are

14   approximately $200 million of available excess insurance

15   limits for that year.  The available limits are the subject

16   of Ms. Hanke's declaration.

17        As to the relevant legal standard, Your Honor, for

18   approval of a settlement such as the instant settlement, of

19   course settlements are favored in bankruptcy as a means for

20   minimizing litigation and expediting administration of the

21   estate.

22        The debtors believe that this settlement is fair

23   and equitable and should be approved, in light of the

24   standard articulated by the Third Circuit in the Martin case,

25   with which your court -- this Court is familiar.

1       The relevant factors for approval of the settlement

2  are threefold:  Probability of success in litigation; the

3  complexity of the litigation involved, and the expense,

4  including incident to delay necessarily attending the

5  litigation; as well as the paramount interests of creditors.

6       To touch on each of the factors briefly, Your

7  Honor, beginning with the probability of success, as Mr. Dial

8  states in his declaration in support of the motion, the

9  Georgia Trial Court has entered an issue preclusion sanction

10  that established negligence and violations of BSA policy, as

11  well as the foreseeability of the storm that caused the

12  decedent's death as a matter law, so liability is effectively

13  determined in the underlying state court (indiscernible)

14       In addition, as Mr. Dial has attested, the

15  precedent of the case is brought under the Georgia Wrongful

16  Death Act.  Plaintiffs seeking damages on similar facts

17  routinely recover judgments in excess of the settle amount --

18  settlement amount proposed here.  This factor, for those

19  reasons, Your Honor, we would submit weighs in favor of

20  approving the settlement.

21       Second, Your Honor, the complexity of the

22  litigation.  The Knight case has not proceeded to trial and

23  the costs of the trial would be likely significant, even if

24  it were predominantly a trial focused on damages, as opposed

25  to liability.  Of course, in addition, there's the

1    uncertainty and risk of a materially higher judgment, as well

2    as costs attendant to the litigation.

3         The consequence of these higher costs, Your Honor,

4    is that it would increase the risk that the excess policies

5    that attach above the Old Republic policies would be further

6    eroded, and then that would thereby reduce the available

7    insurance to pay holders of other claims, including both non-

8    abuse litigation claims and abuse claims.

9         Finally, the settlement is squarely within the

10   paramount interests of creditors, including abuse claimants

11   such as Mr. Washburn.

12        One of the important changes that the debtors made

13   to the plan that was filed on July 2nd was negotiated at

14   length with the creditors' committee, the TCC, the FCR, the

15   coalition, and the ad hoc committee.  And that was a

16   structure that would permit holders of non-abuse litigation

17   claims, such as the Knights, to be paid during these cases,

18   subject to an order of the Court, from available insurance,

19   as well as after the cases from available insurance for -- if

20   insurance proves to be unavailable from insurance proceeds

21   generated by the trust.

22        This construct, Your Honor, allows and actually, in

23   our view, incentivizes the debtors to enter into reasonable

24   settlements with all holders of compensable non-abuse

25   litigation claims, such that, when the rights under the

1    insurance policies that respond to non-abuse litigation

2    claims -- which are defined in the plan as the specified

3    insurance policies -- when those policy rights are

4    transferred to the trust, the trust will have the ability to

5    monetize these settlements for what will hopefully be the

6    predominant or perhaps even the sole benefit of abuse

7    claimants.  So, unlike other aspects of this case, Your

8    Honor, this is one context in which each of the major

9    creditor groups and stand behind this approach to non-abuse

10   settlements.

11           Based on that and based on the record before Your

12   Honor, we would submit that the settlement is fair and

13   equitable and should be approved under Bankruptcy Rule 9019.

14   And that concludes my comments, Your Honor.

15           THE COURT:  Thank you.

16           Let me ask again whether Mr. Washburn has joined

17   the Zoomcast.

18      (No verbal response)

19           THE COURT:  I do not hear him.

20           Does anyone else wish to comment on the Knight

21   settlement?

22           MS. DOUGHTY:  Good morning, Your Honor.  Kristi

23   Doughty on behalf of the Knights, Delaware counsel.  On the

24   line, on the call is also Jed Manton, who has been admitted

25   *pro hac vice*.

1        And we are fully in support of this motion,

2   obviously, and are available if the Court should have any

3   questions.

4        THE COURT:  Thank you, Ms. Doughty.

5        Anyone else?

6      (No verbal response)

7        THE COURT:  Okay.  I've reviewed the motion, and I

8   think Mr. Linder thoroughly explained it.

9        I also reviewed Mr. Washburn's objection, and I

10   understand his concern, as expressed in the objection, that

11   he wants to ensure that no one creditor is receiving an

12   advantage over another.

13        But I think it's clear under the circumstances of

14   the non-abuse claims -- which have been discussed previously

15   in connection with stipulations and as are embodied in the

16   Knight stipulation -- that these settlements with these

17   claimants are appropriate.  I think they were appropriate

18   before and they're appropriate now.

19        As Mr. Linder indicated, it's consistent with plan

20   treatment.  And even though I have not approved the plan yet,

21   this is an aspect of the plan in which all parties, to my

22   knowledge, are agreed.  And I note that none of the official

23   or unofficial committees that have -- that are in this case

24   have opposed this particular relief, and I think that

25   evidences the conclusion that the way these settlements are

1  structured and the policies against which -- under which they

2  are being paid is beneficial for all creditors.

3        The -- Mr. Washburn did not actually object to the

4  amount of the settlement or really attack the bona fides of

5  an arm's length settlement between the parties.  And I find

6  that this settlement, given the circumstances here,

7  particularly the entry of an issue preclusion sanction which

8  establishes, in effect, liability, that this settlement is

9  well above the lowest rung on the ladder of possibilities of

10  settlement.

11        And for those reasons, I will approve it.

12  Recognize, please, that I have considered Mr. Washburn's

13  objection, notwithstanding that he has not appeared today for

14  the hearing.  That one is approved.

15        MS. DOUGHTY:  Thank you, Your Honor.

16        MR. LINDER:  Thank you, Your Honor.

17        We'd propose to move on to the last agenda item for

18  this omnibus hearing, which is the -- a motion to approve a

19  settlement Mr. Marco Romero, Jr.

20        Mr. Romero holds a claim for injuries sustained

21  being struck with an arrow while attending a scouting event

22  in Beatty, Nevada on February 6th, 2016.

23        This -- the motion to approve this settlement, Your

24  Honor, we filed it on September 2nd at Docket Number 6155.

25        Again, like the Knight motion, there is exactly one

1  objection to the motion filed by Mr. Washburn at Docket 6237.

2  No other party-in-interest and non of the official or

3  unofficial groups have filed an objection to the motion.

4       I'll walk through, briefly, Your Honor, the history

5  of this claim and, again, walk briefly through the factors

6  that support the settlement.

7       Prior to commencement of the bankruptcy cases, Mr.

8  Romero filed a lawsuit against the BSA, the Boy Scouts of

9  America National Foundation, and the Las Vegas Area Council

10  on account of these injuries.

11       After the petition date, Mr. Romero sought from

12  this Court and obtained an order at Docket Number 1341

13  granting relief from the automatic stay, permitting him to

14  proceed with litigation or settlement negotiations on his

15  claim, but again, subject to the condition that any payment

16  to Mr. Romero would be subject to further order of the Court.

17       The parties subsequently engaged in settlement

18  negotiations, which resulted in the agreement appended to the

19  settlement motion.  The motion is supported by a declaration

20  from -- again, from Ms. Hanke with KCIC, which is the

21  debtors' insurance consulted.

22       As before, Your Honor, Ms. Hanke is on the line via

23  Zoom, she is available for cross-examination, to the extent

24  Mr. Washburn has joined, and I take it he has not.  Subject

25  to that, Your Honor, I would move -- I'd like to move that

1    declaration into evidence.

2            THE COURT:  Okay.  Thank you.  I'll ask again:  Has

3    Mr. Washburn joined?

4        (No verbal response)

5            THE COURT:  I hear no one.

6            Ms. Hanke's declaration is admitted.

7        (Hanke Declaration received in evidence)

8            MR. LINDER:  Thank you, Your Honor.

9            The settlement agreement itself provides that, in

10   exchange for a settlement --

11           THE COURT:  Okay.  Excuse me.  Mr. Washburn was on

12   -- is on the phone, and he could not unmute.  Mr. Washburn?

13       (No verbal response)

14           THE COURT:  I'm still not hearing him.

15       (Court and court personnel confer)

16           UNIDENTIFIED:  You know, Your Honor, it's possible

17   he may be on the public -- there's sort of a separate phone

18   line for the public that doesn't have audio, and it's

19   possible he's on the wrong line.

20           THE COURT:  Ah, okay.  We're going to take five

21   minutes and see if we can get Mr. Washburn on the line.

22           MR. LINDER:  Thank you, Your Honor.

23       (Recess taken at 10:24 a.m.)

24       (Proceedings resume at 10:29 a.m.)

25           THE COURT:  Okay.  This is Judge Silverstein.

1    We're back on the record.

2            I understand we have Mr. Washburn now on a phone

3    line, oh, and also in the Zoom link.

4            Mr. Washburn, welcome.  I'm sorry about the

5    inability to get you on the line.  My understanding is that

6    you have been able to hear the hearing today.  Is that

7    correct?

8        (No verbal response)

9            THE COURT:  Well, now you need to unmute.

10           MR. WASHBURN:  That is correct.

11           THE COURT:  Okay.  So I'm going to give you an

12   opportunity -- notwithstanding that I ruled, I'm going to

13   give you an opportunity to go ahead and make your argument,

14   so that I can hear it from you directly.

15           MR. WASHBURN:  Is there any point in it, frankly?

16   Because like I had -- I have serious issues with it, and I

17   think it has long-ranging consequences.

18           And for the record, the link that I was sent is not

19   a valid link.  I have screenshotted [sic] that, so you can

20   see it.  I can tell you what -- you said you referred to

21   going to the -- checking with the deputy, which I did leave a

22   message there.  But like, if I'm just going through this

23   whole thing to make me feel better, let's just skip it.  I'm

24   sure people have better things to do.

25           THE COURT:  Well, I do appreciate your concern

1    about that.  I did review the papers ahead of time, I did

2    review your objection.  And I do feel, based on the way this

3    is being resolved, that it's appropriate.  Although, as I

4    said, I do understand the concern.

5              I just think, here, creditors are not at a

6    disadvantage, and in fact, being advantaged by permitting

7    this settlement.

8              MR. WASHBURN:  See, I don't -- I don't want to get

9    into argument or anything.  I guess I would like to explain

10   my situation, explain --

11             THE COURT:  Yes.

12             MR. WASHBURN:  -- my (indiscernible) I'd like to

13   make it so at least like you hear what it is.  And I'm very

14   flustered at this point on trying to get through.  It was --

15   it was horrible.  But let me go ahead and pull my papers up

16   here, and I'll tell you what I had to say about it.

17             I am referring to there -- the omnibus -- the last

18   motion that was filed, the omnibus reply of the debtors in

19   further support.

20             THE COURT:  Yes.

21             MR. WASHBURN:  And if you go to the second page,

22   Page 2 at the top of the page, Paragraph 1, it states -- I

23   mean, they're just -- it states that the settlement agreement

24   are in the interest of all creditors, as -- particularly

25   including me -- or not particularly, but including me.  I --

1    that, in and of itself, is disingenuous because we don't even

2    know -- we're not able to do the best interests of the

3    creditor test, so we don't know what's in the best interests,

4    other than they say so.

5         But then it goes on to say the debtors would

6    potentially remain exposed to uncapped liabilities if -- if

7    you don't do this and -- in connection with the claims,

8    including their defense costs arising from the discovery and

9    whatnot.

10        This is something that they created.  Had they

11   treated everybody equal, they would have put them in the --

12   it would have been channeled in and they wouldn't have to be

13   dealing with them in court.  So the fact that they treated

14   people differently and unequally and unequitably -- and I --

15   so they took that group of 40 or 50 people, and they stuck

16   them over there by themselves.

17        And I suggest that the reason they did that was so

18   that they could get a class of impaired voters and push this

19   through.  That's why this whole thing is important because

20   they're going to get their class of voters now because

21   they're going to be assumed to have -- vote for their plan

22   because -- I am probably too flustered to make this.

23        THE COURT:  Would you like to -- I'm understanding

24   what you're saying.  If you would like us to take a few

25   minutes' break, so -- because of all of the -- all of the

1   confusion about your getting on, I'm happy to do that.

2           MR. WASHBURN:  I would appreciate it.  Let me

3   gather my thoughts.  Let me get this together.  And I would

4   like -- I just want to present the -- because it -- I would

5   just like to present it and so at least I make my case and

6   that's --

7           THE COURT:  Yes.

8           MR. WASHBURN:  -- good enough.

9           THE COURT:  And I'm happy to let you do that.  So,

10  if I give you ten minutes, is that good?

11          MR. WASHBURN:  Yeah, yeah.

12          THE COURT:  Okay.  So we're going to take a --

13  we're going to take a recess for ten minutes, I've got 10:34.

14  We're going to reconvene at 10:45.  Okay?

15          MR. WASHBURN:  Sounds good.

16          THE COURT:  And --

17          MR. WASHBURN:  I'll be here.

18          THE COURT:  That's fine.  And we'll start again.

19  And I do understand that it can be frustrating to try to get

20  on, so we apologize for that.  Okay.  Thank you.  We're in

21  recess until 10:45.

22      (Recess taken at 10:35 a.m.)

23      (Proceedings resume at 10:47 a.m.)

24          THE COURT:  Okay.  This is Judge Silverstein.

25          Mr. Washburn.

1          MR. WASHBURN:  Yes.

2          THE COURT:  I'd like to give you -- I know I asked

3     if you had heard Mr. Linder's presentation.  Do you need to

4     hear any part of that again or are you prepared to --

5          MR. WASHBURN:  No.

6          THE COURT:  -- just go ahead and make your

7     argument?

8          MR. WASHBURN:  I'll go ahead and make the argument

9     because I based it upon his original motion, as well as his

10    response to my objection.  So, if you --

11         THE COURT:  Thank you.

12         MR. WASHBURN:  If it wasn't too far off from that,

13    I think it will be okay.

14         THE COURT:  Okay.  It wasn't.

15         MR. WASHBURN:  Okay.  So, like I said, this whole -

16    - we don't know what the best interest is yet, and so I don't

17    -- I don't see how we can really meaningfully say that we do

18    or that this is good or anything.

19         But the more important thing is that this situation

20    has occurred only because of how they chose to create that

21    class of substantially the same people and how they treated

22    it.  That is why these cases are still out there in the

23    courts and that's why they're still out there going forward.

24    Had they treated them the same as us, that would not be the

25    same situation.

1          And then they make mention of all of these people

2     are on board in supporting these things.  Two of those

3     groups, the -- I think it was the tort claims committee and

4     the future claimants representative -- both filed objections

5     against -- against those as well, and they were just recently

6     -- recently withdrawn.  And the reason that is, is because

7     they all joined that pack called the -- it's the thing that

8     expired on the 21st of August --

9               THE COURT:  The RSA?

10              MR. WASHBURN:  That's it, thank you.

11              THE COURT:  Uh-huh.

12              MR. WASHBURN:  So they all joined that and they all

13     made these agreements that they were going to push these

14     through.

15              And I think that's interesting, that he says, on

16     Page 5, the first paragraph, about halfway down, he says the

17     restructuring support agreement that debtors will use -- will

18     use their best efforts to obtain Bankruptcy Court approval on

19     as many settlements of non-abuse litigations claims as

20     possible.  That's the motivation.  It's not to seek justice

21     for some particular case, it's to get as many of those

22     through, passed as they possibly can.

23              And the reason for that is, like I said before,

24     they've created this class, impaired them, and then they're

25     going to push them through, so that they can -- so that the

1   vote automatically counts towards them and they can pass

2   their plan.  That, I suggest, is the whole purpose for that.

3          And I'm not sure if that's like frowned upon your

4   circuit.  I read that some circuits allow it; some circuits

5   don't.  They call that "artificial impairment" or something.

6   But that, whether it's the intention or not, that's the end

7   result of this.  And that whole plan is -- can now be pushed

8   through, giving those same -- the 40 or 50 cases the exact

9   same weight as 65,000 people.  It's not right, but that's the

10  result of what's going on here.

11         I don't think they met the standard; obviously, you

12  do.  But I don't think, according to -- according to what the

13  standard is, that they showed any -- and this part I have to

14  say because I -- or why this is, why it's necessary, why -- I

15  don't think they've given any reasons to show why these

16  people should be catapulted to the front at the expense of

17  the rest of us, particularly with the result that's going to

18  happen because of it.  Let me just ...

19         (Pause in proceedings)

20         MR. WASHBURN:  I think that -- I mean, if we're

21  going to have a stay in place, the -- it should -- the --

22  lifting it and modifying it should be the exception and not

23  the rule, in which case they've asked for it to be there.

24  You know, you've put it in.  I can't go file a case against

25  anybody.  I can't -- I can't do anything.  And it's certainly

not right that I can't, but they can just because they were

poked in the eye with a stick instead of poked somewhere else

with a stick, like I was.  That's the only difference in our

case.

And also, they also said that they hadn't even

entered into discovery with Mr. Romero.  That's stunning to

me, that they're settling this case with all that money.  And

that means I have submitted more documents than they have,

than Mr. Romero did.  But because of this injunction and this

channeling injunction, we're treated horribly different.

I do not think that the other people were in

support of this, I don't think it's right.  I mean, because

they've joined this RSA -- and I know they claim it's expired

or whatnot.  But he also goes on to say that they continue to

follow its principles, basically.  That, to me -- I mean, it

-- to be a hundred percent honest with you, you guys are the

lawyers; I'm not.  I've never been inside of a courtroom

hardly for anything.  But it sounds like they got together

and conspired to deprive us of our -- of our own -- of our

own rights.

We -- there's nothing -- there should be nothing

that stops us from negotiating or settling our own cases, at

this point.  But they've all agreed to not talk to us.  They

-- I have sent a couple of communications, a couple of

emails, trying to -- trying to do my own settlement.  And

they've all agreed with each other not to talk to people.
that, I think, is important.

On Page 30 of -- it was a motion they filed for
relief with the Court on July 1st.  And on Page 30 -- I'll
just read it to you real quick -- they say that they have
agreed, as part of this RSA, to not settle a single case of
the sexual abuse people.  And they go on to say they must --
they cannot even speak to or associate with another counsel
who represents a sex abuse victim.

I think it's stunning to me that the same people
who, in one case, are the abusers and the defendants on sex
abuse cases are now in charge of making the classes of
creditors and populating those because that's what's happened
here.  And I submit that, if you blame this group of people
for your bankruptcy, that you're not going to treat them
fairly if you make these categories.  And I think that,
combined with the complaints already made about the RSA and
how they -- how they intended to treat people really goes to
show that that is the purpose of this whole thing, pushing
these cases through, so that they get counted as voting for
their plan.

And the plan -- I hope you've ready it -- is
stunningly horrible.  They provide that no liability will
follow the reorganized group, but they've set it -- they've
set the -- they put a lot of little pitfalls in there, traps

1    or whatever, and it's purposely vague, and to basically give

2    -- to deny people their claims.  Yet it says at the end all

3    the money in the trust that's left over, if any, will be

4    reverted back to the Boy Scouts.

5         Now that is just a total setup.  If they don't have

6    liability, they should not have access to the assets, in my

7    opinion.  And it just looks to me like they've set it up to

8    make it difficult to get the money after they've denied

9    whoever they're going to deny, everybody or whatever.  Then

10   it's just incentive for them to deny these claims because

11   they're going to get whatever is left over.  It's not right.

12        And like it's stunning to me that nobody looks at

13   any of this.  Everyone is just like, oh, yeah, the Boy Scouts

14   are -- I saw this morning the Boy Scouts are about to get

15   their -- they're another step closer to getting their claims

16   settled, to getting their payments.  Maybe, but nobody is

17   looking at anything else and it's very frustrating.

18        And given that they are all not even talking to any

19   lawyers, they're not going to talk to lawyers that represent

20   any sex abuse victims, I think that really shows where

21   they're coming from.  I can't imagine that, when he says

22   their goal is to push as many of these through as possible,

23   it's -- I think it's shameful.

24        And I -- it's very frustrating that I didn't get

25   there in time to at least say it when there was still some

1    chance of affecting anything.  I mean, I knew right there,

2    when you were ruling, that this is done.

3         But I do want to show, for the record -- because I

4    think this is important -- that this was not some error of me

5    trying to log on.  If -- you probably can't see it, but it

6    says that that link that was sent is not valid.  I followed

7    the link that was directly sent to me, all you have to do is

8    click on it.  I didn't retype it or anything.  I did it many

9    times.  It says it's not valid.  And here, we're -- you know,

10   we're trying to unring the bell, basically.  But that's my

11   inarticulate, angry presentation.

12        THE COURT:  Mr. Washburn, I do not think you were

13   inarticulate, and I appreciate your presentation and I am

14   going t consider it and I'm going to give the debtors a

15   response to it.  I apologize, I'm very sorry that the link

16   did not work for you.  And if -- I don't know why and I

17   understand the frustration with that.  But we're going to

18   address your particular issues head on, and I'm going to give

19   Mr. Linder, who's the debtors' counsel, an opportunity to

20   respond to the arguments that you've made because I am going

21   to consider them.

22        Mr. Linder.

23        MR. LINDER:  Thank you, Your Honor.  Again, Matt

24   Linder of White & Case for the debtors.

25        Your Honor, we're certainly sympathetic.  Mr.

1    Washburn is -- with the claims he's asserted against the Boy

2    Scouts of America.  In this instance, however, I would just

3    like to briefly respond to his arguments and to counter his

4    assertions that the manner in which we classified claims or

5    our approach to settling non-abuse litigation claims has a

6    nefarious motive, which it certainly does not; indeed, quite

7    the opposite.

8         This issue is a difficult one due to the fact that

9    abuse claims and non-abuse claims are both covered by the

10   same -- the very same insurance policies.  We've had several

11   dozen non-abuse litigation claims related to instances of

12   personal injury and wrongful death filed against the BSA

13   prior to the bar date.  When you compare the several dozen to

14   the 82,000, there's a large disparity there.  And it's a

15   challenge to come up with a treatment that works and is fair

16   to the holders of abuse claims, while at the same time

17   accounting for the fact that the holders of non-abuse claims

18   also need their claims resolved and liquidated and,

19   ultimately, paid.

20        And what we've done in this instance -- and to step

21   back for just one minute, the precipitating factor,

22   obviously, with these cases is the abuse claims.  It is those

23   claims that are proposed to be channeled to a settlement

24   trust under the plan.  We are not seeking to channel non-

25   abuse litigation claims to the trust in the same way that you

would typically think of a channeling injunction.  We're not seeking non-consensual releases with respect to holders of non-abuse litigation claims.

We had extensive negotiations, as Mr. Washburn pointed out, in the context of the restructuring support agreement with the other constituents, and we reached a resolution which would enable us to pursue settlements during the case and after the cases, with the express objective of ensuring that we were able to enter into reasonable settlements to mitigate the risk that there would ultimately be judgments entered with respect to certain of these non-abuse claims that would have an impact, greater impact on abuse claims.  And our goal here really is to maximize the value of the settlement trust by minimizing the drain on the insurance proceeds that created from the non-abuse litigation claims.

The second category of objections, Your Honor, relates to the classification under the plan.  There are, I believe, at least four, perhaps five other impaired classes under the plan.  So we certainly did not need to separately classify non-abuse litigation claims in order to satisfy the confirmation standards for having an impaired consenting class.

And in Delaware, as Your Honor is aware, to separately classify a class of claims that's substantially

1    similar, a reasonable justification is required.  I think

2    there is plainly a reasonable justification in this instance

3    for classifying abuse claimants separately from holders of

4    personal injury and wrongful death claimants that are

5    unrelated to abuse.  There's legitimate differences between

6    those claims, although they both have recourse for the same

7    insurance.

8         We, the debtors, firmly stand behind our approach

9    to this issue.  We are continuing to work in good faith to

10   settle as many of these claims as possible for reasonable

11   amounts.  Again, we're trying to do that because we're trying

12   to maximize the value of the settlement trust for the benefit

13   of abuse claimants.

14        THE COURT:  Okay.  Is there anyone else?  I see --

15   Mr. O'Neill, I see your hand up.

16        MR. O'NEILL:  Yes.  Good morning, Your Honor.  Can

17   you hear me okay?

18        THE COURT:  I can.

19        MR. O'NEILL:  Good morning, Your Honor.  James

20   O'Neill of Pachulski, Stang, Ziehl & Jones on behalf of the

21   tort claimants committee.

22        And good morning, Mr. Washburn.  You did a good job

23   articulating your objection.  Thank you for that, it was easy

24   to understand.

25        I just wanted to kind of chime in today to say that

1    the tort claimants committee does review these settlements.

2    The tort claimants committee does understand that this is a

3    non-abuse settlement.  And for many of the same reasons

4    stated by Mr. Linder, we consider these a different category

5    than the abuse claimants.  And we did not object to this

6    settlement, and that's the reason why.

7            You may know Mr. Washburn, and I think the parties

8    on the Zoom know and Judge Silverstein knows, as well, that

9    the tort claimants committee does not support the plan as

10    currently put forward by the debtors.  I just wanted to let -

11    - make sure that you knew that.  We view the plan as

12    different than supporting this particular settlement.  So I

13    just wanted you to know that the tort claimants committee is

14    active in these cases, is reviewing these situations, is

15    aware of the issues that you raised.

16            With respect to this particular settlement, the

17    Knight settlement and the Romero settlement, we did not

18    object for the reasons I've stated and some of the reasons

19    that Mr. Linder stated.  But as I said, for many of the

20    reasons that you've addressed, Mr. Washburn, we do not

21    support the plan as it is currently put forward.

22            Today is not the hearing on confirmation of the

23    plan.  You may ob -- you may choose to object to confirmation

24    of the plan independently, based on some of the reasons that

25    you've articulated.  We may choose to object to the plan for

1  those reasons and for more.

2       I just wanted you to know that we recognize that

3  you're our constituent and we are available and can discuss

4  your issues, should you wish to engage with us at any time.

5  I'm not sure whether any of the emails that you were speaking

6  about before were addressed to any of the team, this -- for

7  the tort claimants committee.  But we are available if you

8  have any questions, and we can take that offline and

9  communicate with you directly, we don't need to communicate

10 through this process.

11      But I just wanted to mention today that, you know,

12 we understand what you're saying, you've said it well.  We

13 chose not to object to these two settlements, we do not

14 object to these two settlements for the reasons we've stated.

15 But we definitely have other issues similar to the ones that

16 you have raised in connection with the plan process and

17 moving forward.  So thank you for voicing those.

18      MR. WASHBURN:  Sure.  But you do acknowledge that

19 there were these -- others of these settlements that the tort

20 claims committee objected to and then withdrew right at the -

21 - right about that same time as you joined the RSA, correct,

22 or do you deny that?

23      MR. O'NEILL:  We -- there was a settlement which

24 was approved earlier today, which was the Lehr settlement,

25 which we objected and we did withdraw the objection to that.

1    We did not object to these two settlements.

2              MR. WASHBURN:  Okay.  And do you -- but I think it

3    was the claimants -- future claimants representative.  Other

4    people had objected to these settlements.  And do you see

5    how, given your pact -- like it's very hard to me believe

6    that you're going to represent me in any credible way when

7    you have joined a pack that says that says you will make sure

8    that no abuse settlement is settled and you will make sure

9    you've agreed not to touch any representative of any claim

10   abuse -- or any sexual abuse representative or victim.  You

11   understand how that makes you look very fishy, correct?

12             MR. O'NEILL:  Well, I'm not going to -- I'm not

13   going to engage in a back-and-forth with you on that

14   particular topic.  I will say that the restructuring support

15   agreement was not approved, that it lapsed or expired under

16   its own terms.  But I am happy to speak with you regarding

17   that topic or other members, of the tort claimants' counsel

18   team can speak with you outside of this hearing to address

19   any concerns that you have.

20             THE COURT:  Thank you, Mr. O'Neill.

21             And Mr. Washburn, I would tell you that, for the

22   last two days, I've been having hearings with respect to the

23   disclosure statement hearing, and Mr. O'Neill's partner, Mr.

24   Stang, has voiced vociferously his objection to the current

25   plan on behalf of the tort claimants committee and the, I

1    believe it is nine abuse victims who serve -- who are the

2    members of that committee.

3            Mr. Jackson?

4            MR. JACKSON:  (Indiscernible)

5            THE COURT:  You need to unmute, Mister --

6            MR. JACKSON:  Good morning.  Patrick Jackson,

7    Faegre, Drinker, Biddle & Reath.

8            I just wanted to let you know my firm represents

9    Mr. Romero, the settling plaintiff for the second motion.

10   With me on the line is my colleague Laura Appleby.

11           I just wanted to let you know we're here.  We're

12   obviously supportive of the settlement.  I don't have

13   anything to add to what Mr. Linder said, but I just wanted to

14   let you now we're.  And to the extent you had any questions

15   of us, I would defer to my colleague Ms. Appleby to answer

16   them for you.

17           THE COURT:  Thank you.  I'm not sure that we

18   presented the second motion yet.  I think we were beginning

19   the second motion --

20           MR. LINDER:  In the middle --

21           THE COURT:  -- when I realized --

22           MR. LINDER:  -- of it, yeah, that's --

23           THE COURT:  -- that Mr. Washburn was trying to

24   connect.  So, Mr. Linder, I'd like you to present that second

25   motion.  Mr. Washburn, I will consider your objection that

1   you've articulated to both.  And then I will rule, and I will

2   -- I'm, in essence, reconsidering, giving you the opportunity

3   to address the Knight objection, and then I'll rule on both.

4   But I would like the second one presented, so we have a

5   record at the hearing.

6          MR. LINDER:  Thank you, Your Honor, I'm happy to

7   present it.  And if the Court is amenable to it, I'll just

8   start from the beginning --

9          THE COURT:  Please.

10         MR. LINDER:  -- for the benefit of Mr. Washburn.

11         The second motion, in addition to the Knight

12  motion, Your Honor, is a motion to approve a settlement with

13  Marco Romero, Jr., who holds a claim for injuries related to

14  being struck in the eye with an arrow while attending a

15  scouting event in Nevada on February 6th, 2016.

16         The motion to approve the settlement was filed by

17  the debtors on September 2nd, at Docket Number 6155.  Mr.

18  Washburn is the sole objection; no other party has objected

19  to the settlement, including the official and unofficial

20  groups of creditors that have appeared in the cases.

21         Prior to the commencement of the cases, Mr. Romero

22  brought a lawsuit against the BSA, the Boy Scouts of America

23  National Foundation, and the Las Vegas Area Council.  After

24  the petition date, Mr. Romero sought relief from the Court

25  and obtained an order at Docket Number 1341, granting relief

1    from the stay.  That order permitted Mr. Romero to proceed

2    with his litigation and pursue settlement discussions, but it

3    was conditioned on returning to the Court for authority to

4    actually consummate a settlement and receive payment on

5    account of that settlement, and that's what we're before the

6    Court on now.

7          Subsequent to the entry of the lift-stay order,

8    Your Honor, that I have just referenced, the parties engaged

9    in settlement negotiations.  Those negotiations resulted in

10   the agreement that's appended to the settlement motion.  The

11   settlement motion is supported by -- again, by a declaration

12   from Ms. Hanke from KCIC.  She is, again, the debtors'

13   insurance consultant.  I believe Your Honor admitted her

14   declaration into evidence.  I'm not sure if I need to move

15   that again into evidence, but we'll leave it to your Court's

16   discretion.

17          THE COURT:  It's admitted.

18          MR. LINDER:  Turning to the settlement agreement

19   itself, Your Honor, the agreement provides that, in exchange

20   for a settlement payment in the amount of $2.5 million, Mr.

21   Romero will fully release his claims against the debtors, the

22   BSA National Foundation, the Las Vegas Area Council, and

23   their respective related parties and insurers.

24          Each of the defendants is an insured, the same as

25   the Knight claim, Your Honor, is an insured under the Old

1     Republic policies, the primary and the umbrella policies for

2     the 2015 policy year.

3          The entirety of the settlement will be paid from

4     the proceeds of the Old Republic primary and umbrella

5     policies.  This will leave intact approximately $7 million

6     remaining within the aggregate limits of the Old Republic

7     umbrella policy, as well as the $200 million of additional

8     available excess insurance for that policy year, which has

9     not yet been eroded.  The particular facts with respect to

10    the insurance available for this policy year are set forth in

11    Ms. Hanke's declaration.

12         Turning to the settlement approval standards, Your

13    Honor, first, probability of success in litigation.  Again,

14    Your Honor, there is risk that, if this case proceeds through

15    discovery, through trial, that there will be an unfavorable

16    judgment, in addition to costs that will be incurred in

17    connection with that litigation.  We would submit that this

18    factor weighs in favor of approving the settlement.

19         With respect to the complexity of litigation,

20    unlike the Knight case, the Romero case has not yet completed

21    discovery, it has not proceeded to trial.  The cost would

22    certainly be significant if the defendants were to continue

23    to address this claim in State Court, as opposed to entering

24    into an arm's length settlement.  These facts weigh in favor

25    of approving the settlement.

1      In addition, as with all non-abuse claims, these

2  costs and the risk of a judgment in excess of the settlement

3  amount would increase the risk that the remaining limits, the

4  $7 million I mentioned a minute ago, of the Old Republic

5  umbrella policy, would continue to be eroded by this claim,

6  and that the excess policies that attach above the Old

7  Republic umbrella policy would also begin to be implicated at

8  a point that is sooner in time than they would otherwise be

9  in the context of this settlement.

10      Finally, Your Honor, again, we submit that this

11  settlement is in the paramount interest of creditors for the

12  same reason as the Knight settlement.  Settling these types

13  of lawsuits during the pendency of these cases will allow the

14  insurance policies that respond to non-abuse litigation

15  claims and the abuse litigation claims to be maximized

16  through the trust will enable the trust to more effectively

17  monetize those policies for the predominant benefit of abuse

18  claimants.

19      And we would submit, Your Honor, that, based on the

20  record before you, this settlement is fair and equitable and

21  should be approved under Bankruptcy Rule 9019.

22      THE COURT:  Thank you.

23      Okay.  Well, I -- as I said, I appreciate Mr.

24  Washburn's objection and his position.  And I think you have,

25  as I said already, articulated it very well.  I do understand

1    your position.  And quite frankly, for a layperson, reading

2    through and being involved in this case is not the easiest,

3    so I commend you for that.

4         But I am going to approve these settlements for

5    multiple reasons:

6         First, because I do think they meet the Martin

7    standard, which is the standard for approval of a settlement

8    with respect to these matters.  As I indicated before, with

9    respect to the Knight matter -- well, first let me mention

10   both of these cases were stayed, but the parties came in and

11   asked for relief from stay to continue with their cases, and

12   I granted those motions.  So they were permitted to -- they

13   were permitted to proceed.  And now they are back in front of

14   me for approval of the settlements.

15        The non-abuse settlements and the way those claims

16   are going to be resolved, whether now or after any plan which

17   may be confirmed, would -- is, at least under the current

18   plan, different than how abuse claims will be resolved.

19   Abuse claims are subject to a procedure that parties have

20   negotiated, which I have not yet approved, which will address

21   the very challenging issue of how to fairly and equitably

22   resolve 82,500 claims, as opposed to all related to abuse,

23   different levels of abuse, as opposed to the 50 or so, as I

24   understand it, non-abuse claims, which are very different in

25   nature, both unfortunate, more than unfortunate.  And so they

1   are addressed differently on how they are going to be

2   liquidated, the -- and come up with a value.

3         The -- and I believe that the negotiations of these

4   two settlements that are in front of me meet the standard

5   that Martin talks about, with respect to complexity of

6   litigation and possibilities -- ultimate possibilities of

7   outcome.  And I really don't hear a challenge to that and

8   that aspect of the amounts that these claims are being

9   settled for and there's no question they are complex

10         As to the stage of the cases in which they are

11   settled, cases are settled at various different stages.  But

12   the debtors have very, very sophisticated counsel, defense

13   counsel, insurance counsel, and the plaintiff's bar is

14   knowledgeable, as well.  And there's no suggestion that this

15   wasn't hard-fought negotiations over the amount of the

16   settlement.

17         There is also no dispute, quite frankly, that if

18   the cases continue on, defense expenses will continue to

19   accrue, that they will be at that expense.  And any

20   settlements above and beyond the settlements that have been

21   reached, any resolutions above and beyond the settlements

22   that have been reached, would further deplete the insurance

23   assets.  And the further depletion of the insurance assets is

24   a further depletion of all parties.  So I believe it meets

25   the Martin standards.

1      Mr. Washburn, with respect to your specific concern

2 that the non-abuse claimants' class in the plan was created

3 to an impaired accepting class, and that this was artificial

4 impairment, I understand that argument.  And if I thought

5 that were the case, I would give that some serious

6 consideration.  And I'm not ruling on the plan.

7      But as Mr. Linder noted -- and I do have the plan

8 in front of me because we've been dealing with for the last

9 two days and we'll be dealing with it later today -- there

10 are -- in addition to the non-abuse litigation claims class,

11 there are -- one, two, three, four, five, six -- at least six

12 other classes that are impaired.  And I can tell you that

13 some of those classes, it's my understanding, are classes in

14 which parties who support this plan will vote.

15      I do not think that this particular class was

16 created to obtain an impaired accepting class.  How the vote

17 on this plan will come out, I don't know.  I think that's

18 really clearer over the past couple of days, that we have

19 abuse survivors, who are represented by counsel, who support

20 this plan, and we have abuse survivors that are represented

21 by counsel who do not support this plan.  And so I don't know

22 what the vote is going to be and I don't know whether this

23 plan will be confirmed or not.  But I do not view the

24 creation of this class, based on what I know to date and what

25 I have observed over the course of the year and a half I've

been presiding over this case, I don't believe that this

class was created to impair claims, have an impaired class,

accepting class.  And so I'm going to approve these

settlements.

Let me make an observation, another I think very

insightful observation that you've made.  You've questioned

why a debtor, who gets to, in the first instance, create the

plan and put forth the classes and the treatment of

creditors.  And that is a question that creditors have, I

think regardless of whether it's a mass tort case or not.

They say why do -- why does the debtor get to continue on in

bankruptcy and be a debtor-in-possession and still remain in

charge and get to decide things.  And that is the structure

of our Code.  And so, at least for the first year and a half,

they get exclusivity, and they get to remain in charge,

unless the Court says otherwise.  And some restructuring and

insolvency rubrics are not that, it's not the way it works in

every country, but it is the way it works here.

So I think you, as I said, have been very

articulate.  You have grasped some issues that many people

would not grasp, and I appreciate your comments.  And these

aren't just platitudes.  I've listened to you, I understand

the concern, I understand why you will disagree with my

decision.  I encourage you to participate, to continue to

participate in this case, if you choose to.  And I would be -

1    - I will, of course, listen to any other objections you have

2    to any other matters in this case.

3         And as usual, I find that parties who are

4    unrepresented in a case can make a very substantial

5    contribution to the case, in terms of their insight and their

6    concerns, and I appreciate them.  So thank you.

7         Okay.  I am going to enter the two orders.  And is

8    there anything else that we're doing on this morning's

9    hearing?

10        MR. LINDER:  There's nothing further, Your Honor.

11   Thank you.

12        THE COURT:  Mr. O'Neill, I see your hand.

13        MR. O'NEILL:  Yes, Your Honor.  I just wanted to

14   very kind of quickly express my thanks, also, to Mr.

15   Washburn.  The plan issues, and particularly the ones that he

16   has raised, are ones which also concern the TCC.  And as you

17   noted, we will continue our review of the plan over the next

18   couple of days.

19        So I just wanted to reiterate that and also to

20   thank Your Honor for indulging us to be able to get Mr.

21   Washburn on the line.  It's hard enough for those of us who

22   have to do this every day to make the Zoom work and get where

23   we're supposed to get, so certainly, we appreciate his

24   participation today and we appreciate the Court's patience in

25   making that happen.

1          THE COURT:  Oh, of course.  And Mr. Washburn, I

2     would encourage you to reach out to Mr. O'Neill and Mr.

3     Stang.  You will find out that they are quite passionate in

4     their advocacy for abuse victims.  So I would encourage you

5     to reach out to them.

6          MR. WASHBURN:  Okay.

7          THE COURT:  Thank you.

8          MR. WASHBURN:  Thank you.

9          THE COURT:  Okay.  Thank you, everyone.  We are

10    adjourned.  We will meet again at one o'clock for the

11    continued disclosure statement hearing.  We're adjourned.

12          MR. LINDER:  Thank you, Your Honor.

13       (Proceedings adjourned at 11:28 a.m.)

14                              *****

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3       transcript from the electronic sound recording of the

4       proceedings in the above-entitled matter to the best of my

5       knowledge and ability.

6

7

8

9

10      _____        September 27, 2021

11      Coleen Rand, AAERT Cert. No. 341

12      Certified Court Transcriptionist

13      For Reliable