<pre>
 1                  UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA AND     .
     DELAWARE BSA, LLC,            .  (Jointly Administered)
 5                                 .
                                   .  Courtroom 2
 6                                 .  824 Market Street
             Debtor.              .  Wilmington, Delaware 19801
 7                                 .
                                   .  Tuesday, September 28, 2021
 8   . . . . . . . . . . . . . . . 10:11 a.m.

 9                  TRANSCRIPT OF ZOOM HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10               CHIEF UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Derek Abbott, Esquire
                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13                             1201 North Market Street
                               16th Floor
14                             Wilmington, Delaware 19899

15                             - and -

16                             Jessica C. Lauria, Esquire
                               Glenn M. Kurtz, Esquire
17                             WHITE & CASE LLP
                               1221 Avenue of the Americas
18                             New York, New York 10020

19   (APPEARANCES CONTINUED)

20   Electronically
     Recorded By:              Madaline Dungey, ECRO
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone: (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
</pre>

1   APPEARANCES (CONTINUED):

2   For the Debtors:          Matthew E. Linder, Esquire
                              WHITE & CASE, LLC
3                             111 South Wacker Drive
                              Chicago, Illinois 60606

4                             -and-

5
                              Adrian C. Azer, Esquire
6                             HAYNES & BOONE, LLP
                              800 17TH Street, NW
7                             Suite 500
                              Washington, DC 20006

8
    For the Tort Claimants'
9   Committee:                John W. Lucas, Esquire
                              Kenneth H. Brown, Esquire
10                            PACHULSKI STANG ZIEHL & JONES, LLP
                              150 California Street
11                            15th Floor
                              San Francisco, California 94111

12
                              James I. Stang, Esquire
13                            10100 Santa Monica Boulevard
                              11th Floor
14                            Los Angeles, California 90067

15  For AIG Companies:        Michael A. Rosenthal, Esquire
                              GIBSON, DUNN & CRUTCHER, LLP
16                            200 Park Avenue
                              47th Floor
17                            New York, New York 10166

18  For Century Indemnity
    Company:                  Tancred Schiavoni, Esquire
19                            O'MELVENY & MYERS, LLP
                              Times Square Tower
20                            7 Times Square
                              New York, New York 10036

21
    For American Zurich
22  Insurance Company:        Mark D. Plevin, Esquire
                              CROWELL & MORING, LLP
23                            Three Embarcadero Center
                              26th Floor
24                            San Francisco, California 94111

25

1  APPEARANCES (CONTINUED):

2  For Pfau Cochran
   Vertetis Amala and
3  The Zalkin Law Firm:        Thomas E. Patterson, Esquire
                               KTBS LAW, LLP
4                              1801 Century Park East
                               26th Floor
5                              Los Angeles, California 90067

6  For the Future Claimants'
   Representative:             Kami E. Quinn, Esquire
7                              GILBERT, LLP
                               700 Pennsylvania Avenue SE
8                              Suite 400
                               Washington, DC 20003

9                              -and-

10                             Edwin J. Harron, Esquire
11                             Robert S. Brady, Esquire
                               YOUNG CONAWAY STARGATT & TAYLOR, LLP
12                             The Brandywine Building
                               1000 West Street
13                             17th Floor
                               Wilmington, Delaware 19899
14
   For the Coalition of
15 Abused Scouts for
   Justice:                    Eric R. Goodman, Esquire
16                             BROWN RUDNICK, LLP
                               601 Thirteenth Street, NW
17                             Suite 600
                               Washington, DC 20005
18

19                             David J. Molton, Esquire
                               Seven Times Square
20                             New York, New York 10036

21                             -and-

22                             Kenneth M. Rothweiler, Esquire
                               EISENBERG, ROTHWEILER, WINKLER,
23                               EISENBERG & JECK, P.C.
                               1634 Spruce Street
24                             Philadelphia, Pennsylvania 19103

25

1    <u>APPEARANCES (CONTINUED)</u>:

2    For United Methodist
     Ad Hoc Committee:          Jeremy W. Ryan, Esquire
3                               POTTER, ANDERSON & CORROON, LLP
                                1313 North Market Street
4                               6th Floor
                                Wilmington, Delaware 19801
5
     For the HMM Claimants:     Evan M. Smola, Esquire
6                               HURLEY MCKENNA & MERTZ, P.C.
                                20 South Clark Street
7                               Suite 2250
                                Chicago, Illinois 60603
8
     For Claimant Sexual
9    Abuse Victims:             Paul Mones, Esquire
                                PAUL MONES, PC
10                              13101 Washington Boulevard
                                Suite 103
11                              Los Angeles, California 90066

12   For The Church of Jesus
     Christ of Latter-day
13   Saints:                    Jeffrey E. Bjork, Esquire
                                LATHAM & WATKINS, LLP
14                              335 South Grand Avenue
                                Suite 100
15                              Los Angeles, California 90071

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    MOTIONS:                                              PAGE

3    Agenda
     Item 1:    Debtors' Motion for Entry of an Order (I)
4               Approving the Disclosure Statement and the
                Form and Manner of Notice, (II) Approving Plan
5               Solicitation and Voting Procedures, (III)
                Approving Forms of Ballots, (IV) Approving
6               Form, Manner, and Scope of Confirmation Notices,
                (V) Establishing Certain Deadlines in Connection
7               with Approval of the Disclosure Statement and
                Confirmation of the Plan, and (VI) Granting
8               Related Relief
                (D.I. 2295, filed 3/2/21).
9
                Court's Ruling:
10
     Agenda
11   Item 2:    Debtors' Motion For Entry of Order (I)
                Scheduling Certain Dates and Deadlines in
12               Connection with Confirmation of the Debtors Plan
                of Reorganization, (II) Establishing Certain
13               Protocols, and (III) Granting Related Relief
                (D.I. 2618, filed 4/15/21).
14
                Court's Ruling:
15
     Agenda
16   Item 3:    Motion for Leave to Exceed Page Limit
                Requirement for Objection of the Tort Claimants'
17               Committee to Debtors' Motion for Entry of an
                Order (I) Approving the Disclosure Statement
18               and the Form and Manner of Notice, (II)
                Approving Plan Solicitation and Voting
19               Procedures, (III) Approving Forms of Ballots,
                (IV) Approving Form, Manner and Scope of
20               Confirmation Notices, (V) Establishing Certain
                Deadlines in Connection With Approval of the
21               Disclosure Statement and Confirmation of the
                Plan, and (VI) Granting Related Relief
22               (D.I. 3529, filed 5/10/21).

23               Court's Ruling:

24

25

1                                    INDEX

2    MOTIONS:                                                        PAGE

3    Agenda
     Item 4:    Motion for Leave to Exceed Page Limit
4               Requirement for (i) Objection of Century
                Indemnity Company to Debtors' Motion for Entry
5               of an Order (I) Approving the Disclosure
                Statement and the Form and Manner of Notice,
6               (II) Approving Plan Solicitation and Voting
                Procedures, (III) Approving Forms of Ballots,
7               (IV) Approving Form, Manner and Scope of
                Confirmation Notices, (V) Establishing Certain
8               Deadlines in Connection with Approval of the
                Disclosure Statement and Confirmation of the
9               Plan, and (VI) Granting Related Relief and (ii)
                Century Indemnity Company's Objections to the
10              Debtors' Solicitation Procedures and Form of
                Ballots (D.I. 3858, filed 5/12/21).
11
                Court's Ruling:
12
     Agenda
13   Item 5:    Motion for Leave to Exceed Page Limitations
                Regarding Debtors' Reply in Further Support of
14              Debtors' Third Motion for Entry of an Order
                Extending the Debtors' Exclusive Periods to File
15              a Chapter 11 Plan and Solicit Acceptances Thereof
                (D.I. 4102, filed 5/16/21).
16
                Court's Ruling:
17
     Agenda
18   Item 6:    Motion for Leave to Exceed Page Limitations
                Regarding Debtors' Omnibus Reply in Support of
19              Debtors' Motion for Entry of an Order (I)
                Approving the Disclosure Statement and the Form
20              and Manner of Notice, (II) Approving Plan
                Solicitation and Voting Procedures, (III)
21              Approving Forms of Ballots, (IV) Approving the
                Form, Manner, and Scope of Confirmation Notices,
22              (V) Establishing Certain Deadlines in Connection
                with Approval of the Disclosure Statement and
23              Confirmation of the Plan, and (VI) Granting
                Related Relief (D.I. 4111, filed 5/16/21).
24
                Court's Ruling:
25

1                                INDEX

2    MOTIONS:                                            PAGE

3    Agenda
     Item 7:    Motion to Exceed Page Limitations with Respect
4               to Certain Insurers' Supplemental Objection to
                Motion for Approval of Debtors' Disclosure
5               Statement (D.I. 6054, filed 8/17/21).

6               Court's Ruling:

7    Agenda
     Item 8:    Motion for Leave to Exceed the Page Limits
8               Regarding Debtors' Amended Omnibus Reply in
                Support of Debtors' Motion for Entry of an
9               Order (I) Approving the Disclosure Statement
                and the Form and Manner of Notice, (II)
10              Approving Plan Solicitation and Voting
                Procedures, (III) Approving Forms of Ballots,
11              (IV) Approving the Form, Manner, and Scope of
                Confirmation Notices, (V) Establishing Certain
12              Deadlines in Connection with Approval of the
                Disclosure Statement and Confirmation of the
13              Plan, and (VI) Granting Related Relief
                (D.I. 6250, filed 5/16/21).
14
                Court's Ruling:
15
     Transcriptionist's Certificate                      275
16

17

18

19

20

21

22

23

24

25

1              (Proceedings commence at 10:11 a.m.)

2              THE COURT:  Good morning.  This is Judge

3    Silverstein.  We're here on the continued disclosure

4    statement hearing in Boy Scouts of America; Case 20-10343.

5              I would remind everyone who is not speaking to

6    please make sure your audio is muted.  And I will turn it

7    over to debtor's counsel.

8              MR. ABBOTT:  Thank you, Your Honor.  Derek Abbot

9    of Morris Nichols Arsht & Tunnell for the debtors.

10             Your Honor, we appreciate the break we had gotten

11   in the hearing.  I think the parties had been hard at work.

12   I'm going to turn it over to Ms. Lauria to detail that for

13   you and get the hearing started if I may.

14             THE COURT:  Thank you.

15             Ms. Lauria?

16             MS. LAURIA:  Thank you, Your Honor.  Jessica

17   Lauria, White & Case, on behalf of the debtors.

18             Your Honor, we just wanted to provide you with a

19   brief update of what the parties have been up to since we

20   last saw you on Thursday of last week.  In particular, as we

21   indicated at that hearing, on Friday afternoon we circulated

22   to the objecting party's revisions to the disclosure

23   statement as well as disclosure statement exhibits that were

24   intended to address the court's statements on the record last

25   week as well as various concessions and agreements that were

1  made during the course of last week's hearing.  That was

2  Friday.

3         On Saturday we circulated to the parties the plan

4  English chartered organization summary that had been

5  discussed at length last week.  Then on Sunday we distributed

6  to the parties revisions to the solicitation procedures.

7         We received comments from parties on Friday,

8  throughout the weekend.  We were on the phone with the TCC

9  until very late last night in an effort to try to continue to

10  narrow the issues that would show-up back before the court.

11  We did, in fact, as you probably saw, filed a number of

12  documents in the early morning hours this morning.  Again, we

13  had wanted to file those earlier, but also wanted to give

14  folks the opportunity to comment on them and try to reflect

15  those comments as much as we possibly could.

16         Walking through, sort of the, what I will call,

17  baskets of documents that are left with respect to the

18  disclosure statement we believe we have substantially

19  resolved the objections to the disclosure statement.  I

20  believe we saw an email from the TCC early this morning or

21  maybe it was late last night indicating that we still have

22  four or five issues outstanding with them.  There may be some

23  cats and dogs with other objectors.  Your Honor, it's our

24  intention to work during the breaks today and, frankly,

25  throughout the course of today to try to narrow those even

1  further so that we can minimize or eliminate what comes back

2  in front of the court.

3          On the chartered organization plain English

4  document I know Mr. Ryan is still reviewing that document.

5  We also received a number of comments from insurer parties.

6  I don't believe that all of those have been incorporated as

7  of yet.  So we will continue to work today on addressing

8  those comments and making sure that we communicate with Mr.

9  Ryan during breaks to get all of his feedback.

10          Finally, Your Honor, on the solicitation

11  procedures you may have seen the TCC filed an emergency

12  motion with respect to one change the debtors are proposing

13  there.  So we do have one significant issue outstanding that

14  will likely need to come back in front of you at an

15  appropriate time today or tomorrow and that's pertaining to

16  the $3,500 expedited distribution.

17          I think after listening to argument last week and

18  having a greater understanding of the complications that

19  would present to particularly individuals that represent

20  hundreds if not thousands of claimants in terms of advising

21  those claimants whether to accept a settlement in the context

22  of a ballot.  We thought it made sense to remove it, but you

23  will be hearing argument, I'm sure, on that point either,

24  again, later today or tomorrow whenever the court would like

25  to hear that argument.

1          Other than that the TCC did file their own

2    alternative version of the solicitation documents. I hope I

3    am not going out on a limb by saying I don't think that so

4    much reflective of the distance between the parties other

5    than the point I just noted versus the fact that there was a

6    lot of material being passed back and forth yesterday and we

7    just didn't have the opportunity to drill down on all of the

8    issues on solicitation procedures.

9          So I think we're also hopeful that we can narrow

10   the issues on the solicitation procedures.  So what comes

11   before the court ultimately is something much less then may

12   have been reflected in the filings.  So that is where we're

13   at on the documents.

14         As far as today goes, I mean, we heard the court

15   last week I think we have, sort of, three big things coming

16   up.

17         One is to the extent the court would like to hear

18   a preview of some of the confirmation objections I think we

19   heard you last week, Your Honor, to suggest that certainly

20   with respect to insurance issues you would like to hear some

21   argument around that because of the impact that may have on

22   the confirmation schedule.  We think that many, if not all,

23   of the other confirmation objections were teased out during

24   the course of our three days together last week.  So it's

25   really the insurance ones that the court will need to hear,

1  but, obviously, defer to Your Honor on what would be useful

2  for you to hear today.

3          We also have scheduling.  We would propose to go

4  to that after the confirmation objections, again, simply

5  because we're still working through some of the document

6  issues and would like to close out some of that before we

7  come back to the court.

8          Finally, whatever remaining document issues and

9  certainly the expedited distributions placement on the ballot

10 or not and the classification issues will need to be

11 addressed at some point.

12         So that is where I think we see ourselves this

13 Tuesday morning.

14         THE COURT:  Okay.  Well, I appreciate the work

15 that has, obviously, been done over the course of the last

16 few days.  I have not had an opportunity to review everything

17 that was filed last night.  I have quickly run through the

18 redline of the plan and disclosure statement, but that is

19 about it.

20         So I think we should start with the confirmation

21 objections, in particular the insurance issues.  I don't know

22 if the insurers have coordinated.  I would say that in

23 looking at some of that over the weekend it seemed to me that

24 the insurers were not necessarily aligned on all issues.  I

25 could be wrong, but I think there were a few cross issues.

1  So I think I will hear from insurers, hopefully have

2  coordinated some.

3          Mr. Lucas, I see your hand.

4          MR. LUCAS:  Thank you, Your Honor.  I just wanted

5  to confirm one thing that Ms. Lauria said that the TCC did

6  file its alternative version of the solicitation procedures,

7  but after reviewing the debtor's markup that was set late

8  last night I just wanted to let the court know that the

9  issues have been narrowed substantially and that if there is

10 a break today hopefully we could resolve the rest of them.

11         As Ms. Lauria said, there is the 3013 issue which

12 does go to the procedures to some extent and that is still

13 outstanding.  But a lot of the issues have been narrowed and

14 I haven't been able to confirm that with White & Case yet

15 today, and wanted to, at least, convey to the court and to

16 White & Case that there has been progress.

17         THE COURT:  Fabulous.  Thank you.

18         Mr. Rosenthal?

19         MR. ROSENTHAL:  Good morning, Your Honor.  Michael

20 Rosenthal of Gibson Dunn for the AIG Companies.

21         Your Honor, in response to your question the

22 insurers have coordinated to a great extent.  I think that

23 what you are going to hear is a presentation from me followed

24 by one from Mr. Schiavoni, and then Mr. Plevin; however,

25 there may be others that want to lend their voice.  We

1  have -- hopefully we won't be duplicating for Your Honor.

2             THE COURT:  Okay, thank you.

3             Let's go ahead then and get started.

4             Mr. Rosenthal?

5             MR. ROSENTHAL:  Thank you, Your Honor.  First, let

6  me say we appreciate all -- can you hear me?

7             THE COURT:  Excuse me, yes.

8        (Off record discussion)

9             THE COURT:  Mr. Rosenthal?

10            MR. ROSENTHAL:  Thank you.  Your Honor, we

11 appreciate all the time Your Honor has devoted to this case,

12 not just last week but since the inception of it.  I have to

13 say I agree with Your Honor, the statement you made last week

14 that at least from my perspective and over 40 years of

15 bankruptcy practice I haven't seen a case as complicated and

16 also as gut wrenching as this case.

17            We are truly witness to an American tragedy.  The

18 abuse of children by trust Boy Scout leaders across the

19 country.  We agree with statements that Your Honor has made

20 that scouting is a mission that should be preserved, but that

21 doesn't mean, Your Honor, that the debtor gets a free pass to

22 ignore the requirements of the bankruptcy code or applicable

23 law.  I know it's tempting to approve the disclosure

24 statement and move this case along, but there are some

25 factors I hope that you would consider before you do that.

1          First, Your Honor, as a prudential matter, we

2    don't believe it's wise for the debtors to send out a vote on

3    a plan that does not represent anything close to a global

4    consensus.  This plan is opposed by the insurers, most of the

5    insurers, the TCC, many of the chartered organizations, and a

6    significant number of claimants.

7          There is just too much uncertainty including about

8    the vote at this point.  This may result in the debtors have

9    well less than the requisite support they need to obtain

10   acceptance of the plan and the entry of the channeling

11   injunction. If that is the case the debtors would have wasted

12   tens of millions of dollars in administrative fees and months

13   on an overall confirmation process.

14         The ultimate resolution may be a new plan, but it

15   also may be a liquidation of the debtors; therefore, it's a

16   scheduling matter.  We believe that it might make sense for

17   the court to delay approval of the disclosure statement for

18   two to three weeks to allow further mediation to occur.  That

19   mediation might result in additional settlements perhaps,

20   Your Honor, in light of guidance you may be willing to

21   provide today or tomorrow or in a more comprehensive deal

22   with chartered organizations.

23         Importantly, though, those deals may require

24   amendments to the plan and additional disclosures.  And if

25   solicitation has already begun re-solicitation may be

1  required which will delay the process further.  And, Your

2  Honor, we do not believe that a short delay on entry of the

3  disclosure statement order will actually delay the case.

4         Even if you took the disclosure statement order

5  under advisement for a couple of weeks we could begin

6  discovery now so it wouldn't delay the overall confirmation

7  hearing.  And even under a January or February confirmation

8  hearing scheduled, and you will hear more about the schedule

9  later, there still would be ample time for a 60 day voting

10 window that Your Honor indicated was appropriate.

11        Second overview point, Your Honor, is I know you

12 don't believe that you are ruling on the terms of the plan at

13 this time, and I heard your statement that you don't intend

14 to decide coverage issues even at confirmation, but the

15 proposed plan findings you are being asked to make by the

16 debtors and the supporters of the plan tell a different

17 story.

18        These findings, coupled with the criteria for

19 allowance of claims by the trust, are an attempt to alter the

20 insurance contracts and obtain awards through this bankruptcy

21 far in excess of what could be expected in the tort system.

22 We will talk more about that later.

23        I fully realize, Your Honor, that this is your

24 courtroom and you can allow the disclosure statement to go

25 forward without telling us whether you will make the required

1  plan findings, but in doing so you should understand that,

2  among other things, its sending a clear message to the

3  claimant professionals that you might enter these findings

4  and that will embolden them to take even more unreasonable

5  stances in this case including in mediation.

6       One of the principal reasons for that, Your Honor,

7  is that the plaintiffs' representatives see in this case the

8  opportunity to use Your Honor to overturn decades of

9  insurance neutrality precedent which they can then trump not

10 just in this case, but in every subsequent mass tort case.

11 That strategy, Your Honor, makes it extremely difficult to

12 reach a global settlement because many insurers like AIG are

13 only willing to do a deal that is both economically sensible

14 and insurance neutral.  It doesn't create a precedent that

15 could be used against them in other cases.

16      In order to  put these Chapter 11 cases back on

17 track toward a global resolution, Your Honor, we believe the

18 claimants representatives need to hear a clear no from  Your

19 Honor on your willingness to enter the findings.  We will

20 talk about the findings more.

21      Third, Your Honor, allowing the debtors to move

22 forward with a plan that contains the disputed findings will

23 alter the confirmation timeline.  Mr. Plevin will talk about

24 how that will extend the timeline.  Basically, Your Honor,

25 the debtors and the other supporters of the plan have chosen

1  to put this before you and that has consequences.  One of the

2  consequences is that additional discovery will be necessary.

3          Finally, Your Honor, I can get to the crux of

4  what, you know, I told you I wanted to talk to you about.  I

5  had hoped to be able to persuade you that approval of the

6  disclosure statement is sending us all down a futile and

7  expensive path which is exactly what the Third Circuit's

8  decision in American Capital Equipment sought to prevent.

9          I recognize this is likely to be an unpersuasive

10  argument today, but alternatively what I'd like to do, Your

11  Honor, is provide you a roadmap for what to look for when

12  reviewing the plan.  And when considering this roadmap ask

13  you to keep an open mind about what you can tell the parties

14  today about what you are willing or unwilling to do at

15  confirmation.

16          So let's talk about the principal confirmation

17  defects of the plan.  They fit into three buckets.

18          The first is the coalition fees.  The plan

19  contemplates, as we discussed last week, without requiring

20  any showing of substantial contribution, the payment of the

21  coalition's fees. Your Honor said that this was inappropriate

22  when you denied the RSA, the RSA provisions that dealt with

23  it.  The plan proponents have chosen to ignore your ruling

24  and a question that I would ask Your Honor is how does one

25  evaluate duplication of effort and substantial contribution

1  where the coalition and the TCC both have incurred fees on

2  behalf of the same constituents, but in furtherance of

3  countervailing interests.

4          Second principal defect, Your Honor, relates to

5  third-party releases.  There are a number of issues

6  concerning the discharge of non-debtors such as the propriety

7  of the channeling injunction and third-party releases under

8  Section 105 in the Third Circuit's Continental Airlines

9  decision which will require close scrutiny of the non-debtors

10 contributions to the trust.

11         Among other things, in this plan there are not

12 only the usual issues with third-party releases, but also the

13 unusual issue that the abuse here occurred not at the hands

14 of the debtors, but by perpetrators who were directly

15 overseen by the non-debtor local councils and chartered

16 organizations.  So really the debtor's abuse liabilities are

17 derivative of these non-debtor entities as opposed to the

18 other way around which is the usual way this arises in mass

19 tort cases.

20         Third, and getting to the heart of the insurers'

21 objection, the plan impermissibly alters the contractual

22 rights of the insurers and requires you to decide coverage

23 issues at the confirmation hearing as it attempts to bind the

24 insurers to liability for abuse claims now despite Your

25 Honor's repeated statements that you would not be deciding

1  coverage issues, despite the fact that this court has no

2  jurisdiction to determine personal injury claims, and despite

3  the fact that the actual determination of the claim values is

4  going to be made way down the road by the settlement trustee

5  applying in his sole discretion and within wide ranges the

6  criteria and values that you are being asked to approve.

7        The attempt to alter insurance contracts and

8  binding insurers is accomplished in three ways; by assigning

9  non-debtor insurance interest, by inflating the debtor's

10  abuse liability, and through the insurance prejudicial

11  findings.

12        Turning to that first aspect the plan requires the

13  assignment of non-debtor rights under insurance policies in

14  violation of any assignment clauses in those policies.  We

15  are not aware of any case law or rule that permits this

16  assignment absent consent.  The debtors haven't sited any.

17        In Combustion Engineering the Third Circuit

18  plainly held that the assignment of such non-debtor

19  contractual rights is not permitted under Section 1123(a)(5)

20  or any other code section over any assignment clause.  The

21  debtors have cited Federal-Mogul, but in Federal-Mogul the

22  Third Circuit expressly distinguished Combustion Engineering

23  because unlike in Combustion Engineering, Federal-Mogul dealt

24  with debtor insurance rights only.

25        The debtors claim that they have fixed this with a

1  savings clause that allows the non-debtor insureds to retain

2  their insurance and pursue their rights on behalf of

3  claimants and then turn over the proceeds to the trust.  But

4  to the extent that these work at all, and it's unclear they

5  do, this is merely a de facto assignment of insurance rights

6  and an impermissible work around that contravenes the

7  applicable Third Circuit law.

8          THE COURT:  Why is that?  Why would that be an

9  impermissible workaround?

10         MR. ROSENTHAL:  Because we think it accomplishes

11 the same thing, Your Honor.  It's the same -- its effectively

12 assigning the rights to the insurance to the trust.  It's

13 just a different way to do it.

14         THE COURT:  Well sometimes there are different

15 ways to do things that make them permissible.  And if we're

16 talking about a technical assignment versus a workaround

17 assignment if a party decides that they are going to go and

18 pursue the insurance and then provide the proceeds to the

19 trust what is wrong with that workaround?

20         MR. ROSENTHAL:  Your Honor, I think it gets us to

21 the same goal, but I hear Your Honor's statement and it may

22 be that the way it ends up being structured may actually be

23 an acceptable workaround.

24         The final issue, Your Honor -- the second point I

25 want to raise, Your Honor, in addition to non-assignment of

1  the -- the assignability of the non-debtor rights relates to

2  the inflation of abuse liability.

3          The TDP's are expressly designed to inflate the

4  debtor and local councils abuse claim liability and then pass

5  those inflated claims onto the insurers for payment.  This

6  strategy was rejected by the Third Circuit in Global Industry

7  Technologies which expressly found that by inflating claims

8  well above historical norms the debtors were, effectively,

9  modifying their prepetition insurance policies by altering

10  the debtor's risk profile.

11          The insurers aren't attempting to limit their

12  liability, Your Honor.  Rather, their argument is entirely

13  different.  Their argument, consistent with GIT is that

14  bankruptcy doesn't expand their liability and that a plan

15  that does so is unconfirmable.  I want to give you some

16  examples of how the TDP's inflate the liability.

17          Let's start with the expedited distribution.  The

18  expedited distribution has now been increased from $1,500 to

19  $3,500 and it's available simply by signing a proof of claim

20  without any additional showing of proof and most importantly

21  without any of the ability of the settlement trustee to go

22  behind and investigate the proof of claim.  That is a process

23  accepting a claim at face value with absolutely no party

24  having the right to contest it, that's wholly inconsistent

25  with Section 502.  Even the trustee, even the settlement

1  trustee, Your Honor, doesn't have the right to object to

2  these claims.

3          THE COURT:  So let me ask you, Mr. Rosenthal, is

4  your objection there, and I realize you may have some points

5  on that, that the $3,500 is being offered or that the $3,500

6  would be binding on the insurance company in some future

7  coverage action?

8          MR. ROSENTHAL:  It's that it would be binding on

9  the insurance companies in a future coverage action.  So what

10 we're basically saying, Your Honor, is that these claims are

11 subject -- should be subject to objections.  Some of these

12 claims may be fraudulent claims.  They shouldn't be paid the

13 $3,500.

14         What is happening here is that the trust may be

15 paying tens of thousands of claims that would not be

16 compensable in a tort system at all and that this court would

17 disallow if there was no -- you know, if an objection was

18 filed and the court found that there is no basis for the

19 claim.

20         THE COURT:  But from a practical perspective

21 perhaps paying $3,500 for a claim, a no look claim, might be

22 less expensive then evaluating that claim for the trustee to

23 evaluate that claim, and make a determination, and then pay

24 the valid claims, and then not pay the not valid claims.  So

25 this is, I view it, through convenience class kind of issue.

1          MR. ROSENTHAL:  Perhaps, Your Honor, but giving

2  the trustee even a right to object to the claim, even a right

3  to object to the claim would have some -- would have value in

4  terms of causing people to be, I think, more honest about the

5  claims that they assert.

6          You know, one of the things that we talked about

7  before were the fraud prevention measures in Maremont.  So

8  those measures aren't applied to every single claim.  The --

9  you have to prove some things, you have to provide some

10 information when you file your claim, but the value of the

11 measures is that there are audit rights.

12         So to somebody who gives you information and if

13 you randomly check it and you find out that it's not

14 appropriate you can actually -- you have remedies -- you have

15 an audit right and you have remedies.  Here, the failure to

16 allow the objection means that all those claims just get

17 paid.

18         THE COURT:  I think it's a fair comment.  What I

19 am trying to tease out from it is, I guess, two things.  One,

20 I hear the antifraud concerns.  That is something I am

21 concerned about.  So I hear that.  Second, what I think I'm

22 also hearing is the insurers don't want to be stuck with

23 $3,500 times 10,000 claims for which the settlement trustee

24 is going to seek coverage and argue that you are bound by the

25 $3,500 -- your client is bound by the $3,500 figure.

1          MR. ROSENTHAL:  That's correct, Your Honor.  And

2    it gets even worse with the next example I am going to give

3    you.

4          THE COURT:  This example, though, I think is a

5    fair comment to say, I think it would be hard-pressed to, for

6    me to say that $3500 is recoverable absolutely under an

7    insurance policy on -- it might be a fair settlement.  I

8    don't know.

9          In that sense, I suspect I would be approving this

10   because of the convenience class factor, and whether a

11   convenience class factor could bind an insurance company, you

12   know, you may get a fair and reasonable finding, but I don't

13   see how that binds an insurance company down the line, given

14   the basis on which I think I would approve that.  So, I think

15   there are two issues there that the insurance companies are

16   fairly raising.

17         MR. ROSENTHAL:  We'll talk about some of that with

18   the findings.

19         THE COURT:  Uh-huh.

20         MR. ROSENTHAL:  Let me go to the second example of

21   how the TDPs lead to inflated claim amounts.  And it relates

22   to what must be shown to have an allowed claim, and we're

23   talking not about the $3500.

24         So, in the tort system, BSA sex abuse claims would

25   require a showing of negligence on the part of the debtors or

1   another protected party.  That would mean that if this Court

2   were reviewing the claim under Section 502, you could not

3   allow it without a showing of negligence.  This follows from

4   the uncontroversial bankruptcy principle that, by and large,

5   bankruptcy relies on underlying state law to determine

6   whether a claim should be allowed or disallowed.

7           Not so under the TDPs.  Under the TDPs, a showing

8   of negligence is not required to obtain a base recovery.

9   And, remember, base recoveries can be significant.  So, the

10  base recovery for a penetration claim, for example, is

11  $600,000.

12          Instead, under the TDPs, a claimant receives an

13  enhanced recovery from the base if it's capable of showing

14  negligence.  When combined with the requested finding that

15  the TDPs are fair and reasonable, based on the evidence

16  presented, how can this not be an attempt to alter the

17  insurance contracts?

18          Effectively, this makes the TDPs a strict-

19  liability TDP when the underlying tort is not a strict-

20  liability tort; it requires negligence.

21          Before the debtors entered into the agreement with

22  the coalition and the FCR, the debtors -- the TDPs actually

23  required the settlement trustee to disallow a claim if he

24  found that the evidence submitted does not support a viable

25  claim against a protected party in the tort system.  The

1  coalition and the FCR completely re-drafted the TDPs so that

2  now a showing that a claim would be compensable in the tort

3  system is no longer a threshold requirement.

4         Instead, the trustee must now pay claimants, even

5  if they can't demonstrate negligence.  And what had been a

6  requirement for a claim is now an aggravating scaling factor,

7  which would increase recoveries.

8         The next area in which -- and if you have

9  questions, Your Honor, let me know.

10        THE COURT:  Well, somewhere over the weekend, I

11 had written down a note to myself that said, well, what do

12 the insurance companies want that will get them to not object

13 to this plan?

14        Is this the list that I'm getting or is this just

15 the objections that I'm going to hear, but even if you get

16 all this, you're still going to object, your clients are

17 still going to object to the plan?

18        MR. ROSENTHAL:  Your Honor, I can't --

19        THE COURT:  Maybe not a fair question to ask --

20        MR. ROSENTHAL:  I can't commit --

21        THE COURT:  -- but this is the sort of a lens for

22 which I'm hearing objections.

23        MR. ROSENTHAL:  I hear that and I can't commit to

24 that now; obviously, that's a client decision.

25        THE COURT:  Sure.

1          MR. ROSENTHAL:  But also obviously, what you're

2    hearing from me are the principal concerns of my, you know,

3    of my client and of other insurers.

4          THE COURT:  Fair enough.

5          MR. ROSENTHAL:  And to the extent that those

6    concerns are addressed, I think, you know, the client will

7    have to evaluate what their position is.

8          THE COURT:  Fair enough answer.

9          MR. ROSENTHAL:  So, the third area, Your Honor,

10   deals with the treatment of claims that are barred by the

11   statute of limitations.  Under the TDPs, the trustee is not

12   permitted to zero out time-barred claims.  This is despite

13   the fact that the debtors' claims expert, Bates White,

14   believes that approximately 59,000 claims are presumptively

15   barred by the statute of limitations and not entitled to a

16   recovery.

17         Again, Your Honor, I want to draw the difference

18   between the TDPs and Section 502 and how would you apply it.

19   You, Your Honor, I think, would be duty-bound not to allow a

20   claim that was barred by the statute of limitations.  Here,

21   those claims are allowed.

22         Federal District Court Judge Watson of the

23   Southern District of Ohio just ruled last Wednesday in a case

24   involving abuse at Ohio State University that although there

25   was no question that unspeakable abuse had been inflicted on

1  over 300 victims, the cases could not move forward because

2  the statute of limitations had expired.

3          So, the allowance of claims that are otherwise

4  time-barred, effectively, allows claims that would not be

5  compensable in the tort system and that would not be

6  allowable by Your Honor if you were reviewing these claims.

7          THE COURT:  Did Judge Watson do that on an

8  aggregate basis or did he do that on a claim-by-claim basis?

9          MR. ROSENTHAL:  I think he did it -- I don't know,

10 Your Honor.  I don't know.  But I know it was 300 claims that

11 were the subject of that.

12         Finally, Your Honor, separate and apart from the,

13 you know, allowance of claims that would not be allowed in

14 the tort system, the insurers have an issue with the broad

15 discretion granted to the trustee to increase claim values

16 based on aggravating factors.  Now, he can also decrease

17 factors, based on mitigating factors, but there's a nuance,

18 but important difference in the trustee's discretion in this

19 regard that, effectively, will result in increasing the

20 claims, more than in decreasing them.

21         In the case of aggravating factors, the trustee is

22 almost directed to increase this claim value somewhere

23 between an established range.  So, you have to increase it by

24 somewhere between X and Y.

25         With respect to decreases, however, the trustee

1  has almost unlimited discretion to decide not to decrease the

2  claim value at all from the base matrix value.  There's no

3  recommended -- you know, there's no range that he has to

4  decrease a certain amount if this mitigating factor comes

5  into play.

6        The only instance where there is a range relates

7  to statute of limitations.  So, there is a recommended range

8  for a decrease with statute of limitations, but in some

9  states, the reduction based on a "statute of limitations" bar

10 is as low as 30 percent.  So, while there's a reduction, he's

11 still allowing the claim at a considerable amount.

12       In one of the --

13       THE COURT:  Do you think there can be no scaling

14 factors for the statute of limitations at all for states

15 which currently do not have an open window?

16       MR. ROSENTHAL:  I think that there, I think that

17 the proper way to handle those claims is to defer them, the

18 way this plan does, to see if the window opens.  If the state

19 passes survivor legislation.

20       If, however, it does not, I think the proper way

21 to handle it is either to disallow them entirely or to allow

22 them with a significant reduction, a very significant

23 reduction, over 90-percent reduction.  And I think a

24 claimant --

25       THE COURT:  And I haven't, and I'm not sure it's

1   in the disclosure statement, to know the basis upon which

2   each state was placed in a category, but -- and that's, I

3   assume, information that I would get at confirmation, but I

4   hear you on the "statute of limitations" issue, which is why

5   I asked if it's a binary yes-or-no or if there could be some

6   kind of scaling factors, but I hear you on that.

7           MR. ROSENTHAL:  One of the mitigating, scaling

8   factors the trustee can consider is allocating responsibility

9   between protected parties and other responsible, non-

10  protected parties.  This is really sort of an apportionment

11  issue.  You know, these -- it's sad to say, but some of these

12  claimants have suffered abuse unrelated to Boy Scouts and

13  applicable law would apportion liability so that claimants

14  are not paid more than once for the same claim.

15          Here, the trustee has discretion to apportion, but

16  no requirement to do so.  And at least so far, there is no

17  provision that actually requires a claimant to certify what

18  other defendants the claimant might have recovered from or

19  have a claim against, so that the trustee can even attempt to

20  determine BSA's allocable share.

21          And this is, Your Honor, one of the crux issues in

22  the asbestos context, where claimants file claims against a

23  debtor and they have also filed claims against other non-

24  bankrupt defendants and against other trusts created by

25  debtors who previously went into bankruptcy, and it's the

1  failure to disclose those which makes it difficult to

2  appropriately value the share of the debtor.

3          So, all these factors, Your Honor, we believe will

4  expand the quantum of abuse liability well beyond the actual

5  abuse liability and any of the projections produced by Bates

6  White.  So, they value abuse liability between 2.4 billion

7  and 7.1 billion, based on their opinion that only roughly 20

8  percent of the claims filed to date are entitled to a

9  recovery at all, much less than the 100 percent that are

10  entitled to recovery under the TDPs.

11          And under GIT, this inflation of plans alters the

12  debtors' risk profile and is clearly a modification of

13  insurance contracts, which this Court does not have the power

14  to approve.

15          THE COURT:  So, I thought I had the Global

16  Industrial case out here with me -- I don't -- but my

17  recollection of Global Industrial is that at the circuit

18  level, the Court was looking at appellate standing.  No, I'm

19  sorry, the Court wasn't looking at appellate standing; the

20  Court was looking at Bankruptcy Court standing and the

21  Bankruptcy Court had determined that the insurers did not

22  have standing to raise certain confirmation objections.

23          And the Third Circuit, looking at bankruptcy

24  standing, said a couple things, but the quantum of liability

25  raised by the silica-based claims, which had increased from a

1  couple hundred to 6,000 or something like that, meant that

2  the bankruptcy judge should have permitted the insurance

3  companies to participate in confirmation and raised issues

4  regarding whatever they wanted to raise issues on, but, in

5  particular, I think there were fraud issues, and remanded for

6  that purpose, notwithstanding that the bankruptcy judge

7  apparently had made extensive findings, based on other

8  parties' objections, very similar objections.

9           I don't think the Third Circuit said that the

10  potential for an increase in liabilities means a plan is not

11  confirmable or that, or necessarily that -- well, I don't

12  think they said it was not confirmable.  I think they said

13  the insurance company had to be able to participate and raise

14  the issues and then Global Industrial doesn't end up in front

15  of the Third Circuit again, so I think the insurance

16  companies end up settling, as I recall.  We did take a look

17  at what the subsequent history was to see what happened,

18  because it would have been interesting.

19           So, I think the insurance companies are using

20  Global Industrial a little bit differently than I read it.  I

21  read it to give the insurance companies bankruptcy standing

22  to raise the issues they were not permitted to raise below in

23  Global Industrial, but it doesn't mean that there's no

24  confirmable plan out there simply because there may be some

25  increase in quantum.

1          But I view that differently as I think what you're

2   going to argue to me on findings, so where am I wrong on

3   that, Mr. Rosenthal?

4          MR. ROSENTHAL:  Well, I think on the point that

5   you were just raising, one of the statements you made the

6   other day was you think insurance neutrality is a misused

7   term or maybe a misunderstood term.

8          You know, I conflate two concepts.  I conflate

9   standing, and I think I've said this to you before, I

10  conflate standing with the principle that you are altering

11  the insurers' rights, and that if you -- and that what was

12  really happening in GIT was that the Court said you're

13  increasing the quantum of liability.  In that case it was

14  silica.

15         In this case, the increase is from 1700 claims to

16  82,000 claims, something like that.

17         But it's not that increase that we're complaining

18  about.  It's actually not that increase.  Those are claims

19  filed (indiscernible) bankruptcy, right.

20         It's more the alteration of the contracts, the

21  standards by which claims are evaluated.  And so, it goes to

22  the specific points we were talking about when we were going

23  through the specific items of allowing items that are time-

24  barred, of allowing claims that don't prove the essential

25  elements of a cause of action:  negligence.

1           THE COURT:  Okay.

2           MR. ROSENTHAL:  Okay.  Now, let's talk about

3    insurance findings.  Your Honor, however the Court defines

4    "insurance neutrality," we think the plan turns it on its

5    head and requires the Court to make confirmation findings

6    that, (A), are unnecessary to confirmation, and, (B), strip

7    away key, contractual rights and coverage defenses of the

8    insurance.

9           Quite simply, Your Honor, the findings seek this

10   Court's blessing today for inflated claim determinations that

11   Mr. Green or some other settlement trustee will make down the

12   road with respect to each abuse claim.  These findings will

13   be used to support the inevitable argument by the settlement

14   trustee to the coverage court that this Court effectively

15   entered a judgment about the validity and amount of each

16   claim, a judgment that, as you know, you are not making --

17   you told us that -- and that you're jurisdictionally

18   incapable of making about a personal injury claim.

19          You know, so I would (indiscernible) the finding

20   issue or the CliffsNotes version of that is that none of the

21   findings are required and all alter the insurers' rights,

22   which this Court has no authority to do.

23          So, let me go over the three insurance findings

24   that are problematic.

25          THE COURT:  Yeah, let me get my ...

1          (Pause)

2               THE COURT:  Where can I most easily find them?

3               I had them marked in my RSA, which I don't have

4    here.

5               MR. ROSENTHAL:  In the plan --

6               THE COURT:  Uh-huh.

7               MR. ROSENTHAL:  -- if you go to the conditions

8    preceding the confirmation and then --

9               THE COURT:  Okay.

10              MS. LAURIA:  Your Honor, if you have the

11   blacklines that were filed last night, I can give you the

12   precise page preference if that would be helpful.

13              Sorry, Mr. Rosenthal.

14              It's Docket 6385-1.

15              THE COURT:  Uh-huh.  Okay.

16              MR. ROSENTHAL:  And, Your Honor --

17              MS. LAURIA:  In the PDF, it's 107.

18              THE COURT:  They're in the conditions preceding.

19         (Pause)

20              MR. ROSENTHAL:  So, the first finding, Your Honor,

21   if you've found it, is Finding R.  I think it's R.  It's a

22   finding that the TDP allowance procedures are fair and

23   reasonable, based on the evidence presented to the Court and,

24   specifically, the finding is, you know, the procedures

25   including the trust, the TDPs, pertaining to the allowance of

1 claims and the criteria included in the TDPs pertaining to

2 the calculation of the claim amounts, including the claims

3 matrix, base values, maximum matrix values, and scaling

4 factors are fair and reasonable, based on the evidentiary

5 record offered to the Court.

6          To us, at least, it's clear how this, that this

7 finding alters the insurers' rights and how it will be used

8 against the insurers.  The settlement trustee will bring a

9 State Court coverage action and argue that the Bankruptcy

10 Court, based on evidence presented to it, because it's got to

11 be based on the evidentiary record, found that the procedures

12 and criteria for allowance are fair and reasonable and that,

13 therefore, the determination of claim amounts that flow from

14 those procedures and criteria, you also blessed and bind all

15 non-settling insurers to whatever number the settlement

16 trustee has determined is the appropriate amount of a

17 particular claim.

18          This finding an effectively a determination that

19 every personal injury claim allowed by the trustee has your

20 stamp of approval, because you've approved the procedures,

21 the criteria, they're fair and reasonable, you've had a

22 record.

23          But, Your Honor, as you know, you don't

24 constitutionally have the jurisdiction to do anything of the

25 sort.  And it's also clear why, even if you were inclined to

 1  make this finding and had authority to make it, substantial

 2  discovery would be required.

 3          They're asking you to make the finding based on

 4  the evidence.  At a minimum, you can't possibly make the

 5  evidentiary finding without, as a matter of fairness and due

 6  process, giving objectors a reasonable opportunity to gather

 7  and provide their evidence in opposition to the evidence that

 8  we know will be presented by the coalition and the FCR.

 9          If you move to the next finding, Your Honor, this

10  really fortifies; Finding S fortifies the first one.  That

11  finding is that an abuse claimant's right to payment is the

12  amount at which such abuse claim is allowed under the TDPs.

13          And in my outline, I have highlighted "is the

14  amount at which is allowed."  So, effectively, this finding

15  confirms that from your perspective, the claimant's right to

16  payment is the amount determined by the settlement trustee;

17  that's what it says, "claimant's right to payment is the

18  amount at which it is allowed."

19          And you made it a point to say, last week, that

20  you weren't going to be evaluating individual insurance

21  policies in determining whether an insurer right or might not

22  have to pay a, as a result of the bankruptcy.  But if you

23  look at this finding, Your Honor, it's asking you to make

24  precisely that determination.  It's asking you to determine

25  now that a claimant is entitled to be paid the amount at

1  which its abuse claim is allowed under the TDPs.

2           THE COURT:  Well, don't I have to find that?

3  Don't I have to make a finding that relative among claimants,

4  at least, right, that the amount that the settlement trustee

5  determines is the allowed amount of their claim -- "allowed

6  amount" is, I guess, a loaded term -- is the amount of the

7  claim so that, in fact, a *pro rata* distribution can be made?

8           MR. ROSENTHAL:  I don't think you have to, Your

9  Honor.  I don't think you have to make that as a confirmation

10  finding.  I think this is an agreement -- what the TDP is, is

11  an agreement among the claimants and the FCR as to how

12  they're going to allocate whatever value comes into the

13  trust.  And I don't think that your stamp of approval on that

14  can be -- is inappropriate and can be terribly misused.

15           THE COURT:  Well, this is the Fuller-Austin issue,

16  right, this second one here?

17           MR. ROSENTHAL:  This is the Fuller-Austin issue,

18  but the way the finding is structured, it's more than the

19  Fuller-Austin issue, because it's not just -- because the way

20  it is structured, in conjunction with the first finding

21  you're talking about is, you know, is the amount at which

22  it's allowed under the TDPs.

23           It really does -- let me give you an example, and

24  there's another -- T is a different finding, you know, that

25  the plan and trust distributions procedures were proposed in

1  good faith.  But what I really want you to focus on, I think,

2  is if you suspend reality for a second and you take yourself

3  off of this bench and you put yourself on a --

4           THE COURT:  Can I do that?  Can I really do that?

5           MR. ROSENTHAL:  Well, you may not want the second

6  part of my assumption.

7       (Laughter)

8           THE COURT:  Okay.

9           MR. ROSENTHAL:  And you put yourself on a state

10  coverage court bench --

11       (Laughter)

12           MR. ROSENTHAL:  -- where, you know, you are

13  looking at bankruptcy.  And what you see in bankruptcy --

14  because you're not a bankruptcy lawyer -- is a confusing

15  amaze of Code provisions that is, you know, overseen by a

16  bankruptcy judge, a thoughtful bankruptcy judge.

17           Now, from that seat, Your Honor, can you honestly

18  tell me that after reviewing the findings that you would have

19  entered if you agree with the proponents, you would not be

20  inclined to conclude that the Bankruptcy Court had stamped

21  its approval on the claim values.  I think you would conclude

22  that you stamped your approval on the claim values.

23           And that's precisely why the coalition and the

24  FCR, with the support of the debtors, want these findings.

25  And it's also why the insurers think it's important not only

1 that the plan, you know, be insurance-neutral, but that you

2 give direction to that Court to say, yes, I am confirming the

3 plan.  I am doing my job.  I am approving the plan under the

4 confirmation requirements, but I am not, I am not determining

5 whether any insurer is liable for them.  I am not actually

6 determining the claim values.  I am not finding that the TDPs

7 represent judgments.

8            Remember that Mr. Zalkin told the Court that he

9 had been told by the claimants' representatives that what

10 they were trying to do is, and what they thought they would

11 get out of this case, is get Your Honor to issue findings and

12 orders that effectively represented judgments, with respect

13 to the claims.

14            THE COURT:  So, what do you think I can do?

15            MR. ROSENTHAL:  I think you can approve the plan.

16 If you believe it's appropriate, I think you can confirm the

17 plan.  And, you know, say the plan has been proposed in good

18 faith, the plan complies with the provisions of the

19 Bankruptcy Code that are in 1129, but not bless the claim

20 determinations that come out of the TDPs.  You know, that,

21 Your Honor, is something that should be reserved for -- the

22 TDPs can do whatever they want, but when they go to collect

23 from insurers, they will have to demonstrate that those

24 claims are entitled to be covered under the policies.  And

25 they shouldn't be able to rely on your findings in any way,

1  shape, or form, to make that argument.

2          Now, you raised a good question.  Is there an

3  intermediate position that you might be able to take, the

4  plan treats everyone the same, you know, that treats

5  substantially similar claimants the same?

6          Maybe.  But I think if you did that, you would

7  have to make it very clear that that was the extent to which

8  you were going.  You were not putting your stamp of approval

9  on the amounts that came out of those TDPs or that they were

10  covered by insurance.

11          I'm not even sure you need to do that.  This is

12  not a 524(g) case.  You don't have to make 524(g) findings.

13  That would be required in 524(g), but this is not a 524(g)

14  case.

15          THE COURT:  Well, I have to say that I don't know

16  that sitting here, I know every finding I need to make to

17  confirm a plan, because I don't know exactly what objections

18  are going to be posed to me in what fashion, and that's hard

19  to know until we see them, until we know what the vote is,

20  until we see what issues are raised.  And so, that's why it's

21  hard to anticipate -- I wouldn't say there's a vacuum -- I've

22  heard a lot of confirmation objections, but I haven't heard

23  them in the context of a solicited, voted plan that's in

24  front of me.

25          And I can anticipate that I would need to make

1  some findings for confirmation purposes and on a record

2  that's built at confirmation with respect to the TDPs and

3  maybe the values in the TDPs, depending on the objections

4  that I get.

5  　　　　　MR. ROSENTHAL:  If you are going to make the

6  findings, I would think you would need to consider all the

7  evidence, but, I mean, this goes to the point that, you know,

8  we don't think that these findings truly have anything to do

9  with confirmation and they bring with them, a total, in terms

10  of timing and cost.  And, you know, they put you, frankly,

11  right in the middle of claim determinations, with respect to

12  personal injury claims, which I don't see how you can do.

13  　　　　　I mean, if you make a finding that the, you know,

14  that $600,000 is the appropriate base amount and that the

15  range for -- and that that should be allowed, notwithstanding

16  no finding of negligence, and that the range for a

17  demonstration of negligence should increase that by X or Y,

18  and you're giving the trustee full discretion to determine

19  whether it's X or Y or somewhere in between, Your Honor, I

20  think you are effectively putting your finger on these claims

21  in a way that certainly a coverage court may very well think

22  you've made the determination now, even though the actual

23  determination of the amount is not going to be made later by

24  the trustee.

25  　　　　　And I think that's the opposite -- I think that

1  alters the insurers' rights, to -- that alters the insurers'

2  rights, and it is something that Your Honor cannot do in

3  bankruptcy and does not need to do.

4      THE COURT:  Well, I don't see how I would be

5  determining and fixing the amount of any particular claim,

6  but I do think, again, depending on the objections I get,

7  that I may have -- that I have to determine that the TDPs set

8  up an appropriate process for the settlement trustee to

9  exercise his discretion within.  It's not grammatically

10  great, but okay.

11      So, because we don't send the claims to a trust

12  with no guidance on how to evaluate them; there has to be

13  guidance on how to evaluate them, so that all of those claims

14  are evaluated consistently and share appropriately from the

15  pot.  So, I can't just say, hand them over and say, figure it

16  out, with no guidance; with no guidelines, nobody

17  understands.

18      Well, maybe I could -- I don't know -- I guess

19  that's what a judge does all the time, but I don't think

20  that's the way this is historically done.

21      MR. ROSENTHAL:  I don't think courts get down into

22  the weeds and say -- I mean, are you going to get down and

23  say that the base value should be X for this kind of abuse

24  and Y for the other kind of abuse?  Are you going to make a

25  judgment about the amount of the uplift or down lift that

1  occurs for certain factors?

2        Because if you get it, if you think that you can

3  or should get into that, I think you're, with respect, Your

4  Honor, I think you're going far beyond what you are -- not

5  just what you're permitting to do, because I -- but I

6  think -- not what you're constitutionally permitted to do,

7  jurisdictionally permitted to do, but what you're permitted

8  to do under the Bankruptcy Code.

9        Because you said it a couple times, you can't

10  alter the rights of the insurers.  The insurers have the

11  right, you know, under their contracts they have many rights,

12  including the right to, you know, participate in settlements

13  and approve settlements, the right to take over the defense

14  of these claims.  You know, they -- what you're effectively

15  doing is forcing them to come, because they don't know what

16  effect a State Court will have, based on what you rule, but

17  they have a strong suspicion.  My example is exactly what a

18  State Court would do.  They have to come here and litigate

19  not only the appropriateness of what you're being asked to

20  do, separate and apart from the values, but also the values.

21        THE COURT:  Well, would you agree with me that I

22  may have to determine an aggregate number, an aggregate value

23  for the claims in some context at confirmation?

24        MR. ROSENTHAL:  Why do you think you need that?

25  No one has asked you for that.

1              THE COURT:  I kind of thought somebody had.

2              MR. ROSENTHAL:  They had before, but I don't think

3   there's anything currently on the table for that.

4              THE COURT:  Okay.

5              MR. ROSENTHAL:  Look, I think --

6              THE COURT:  This is why it's hard to have a

7   discussion in the abstract.

8              MR. ROSENTHAL:  Do you know how the TDPs, how most

9   TDPs work?

10             Most TDPs, well, I'll -- most TDPs, you know, they

11  apply similar criteria.  Most TDPs that we know recently are

12  asbestos-related, but, obviously, you know, there are other

13  mass torts that have become more prominent in terms of cases.

14             So, what the TDPs generally do is they do treat

15  everyone similarly situated in a similar manner.  That's

16  something that 524 would require.  But, at the same time,

17  they do that and they don't need, necessarily, to have

18  estimates of the overall value, because they pay to the

19  claimant, they do an assessment of what the assets are at the

20  time, and they pay to the claimant a payment percentage --

21  not the full amount of the claim -- but a payment percentage,

22  based on the assets at the time.

23             And if they subsequently collect additional assets

24  from additional insurance or if they had other real property

25  assets and they sold that real property and they subsequently

1  are able to pay a supplemental distribution on account of

2  that claim, then they would make another assessment three

3  months down the road or a year down the road and say, okay,

4  we paid the claimant 10 cents on the dollar, because that's

5  all we had on day one.  We thought we were going to have, you

6  know, 80,000 claims.  We had a claims expert.  We thought we

7  were going to have 80,000 claims and based on the information

8  that we got from the claims expert, we were able to make an

9  initial distribution of X percent on the dollar.  As further

10 monies come in, we can supplement that distribution.

11        So, while there are determinations made by the

12 trust from time to time about what the claims would be, and

13 those are used for determining the payment percentage,

14 primarily, so, you know, in some cases, Your Honor, courts do

15 make estimates of claim values.  In other cases, they do not.

16        In that, you know, Garlock case from six or seven

17 years ago, and it turns out to be a lot longer now, the

18 parties, there was a huge fight about what the claims

19 estimates were, because the parties were worlds apart.  And

20 the debtor pressed for an estimation and there was a lengthy

21 estimation process in that case.  The result of the

22 estimation actually led to a settlement, but that's not the

23 case in every case.

24        So, Your Honor, let me just -- I thank you for

25 your time.  I know it's taken quite a bit of time, and I am

1  happy to answer any more questions you have, but I will just

2  say in closing, we agree with the debtors that further

3  mediation may very well bear fruit, but, unlike the debtors,

4  we believe that so long as the possibility exists that Your

5  Honor might embrace the insurance prejudicial provisions and

6  findings, the claimant representatives have every incentive

7  to be, frankly, unreasonable, even at the expense of outcomes

8  that would be better for everyone in the case, because their

9  desires, and I mentioned this at the outset, I believe their

10  desires exceed the four corners of this case.  They want to

11  make new precedent that they can use in other cases.

12         But without a true global settlement, these cases

13  will drag on for months, possibly years, through appeals, and

14  during that time, legitimate claimants will suffer the

15  consequences as they wait for meaningful compensation.

16         So, we believe that approval of the disclosure

17  statement and commencement of solicitation, without at least

18  a strong admonition that the proposed findings render the

19  plan unconfirmable, not only imposes an obstacle to a global

20  resolution and a quick exit, but it leads the debtors down a

21  costly and expensive path to solicit votes on a plan that's

22  not confirmable, in our view.

23         Your Honor, thank you for your time.  I appreciate

24  your thoughtful questions.

25         THE COURT:  Thank you.

1          Mr. Schiavoni?

2          MR. SCHIAVONI:  Your Honor, I was candidly going

3  to rely upon, stand on my papers, but if you could just hear

4  me for 10 minutes, I would appreciate that.

5          THE COURT:  Okay.

6          MR. SCHIAVONI:  There is an overlay I would just

7  like to put on Mr. Rosenthal's comments.  I would like to

8  bring Your Honor back to my argument about Combustion

9  Engineering and the reversal that took place in Combustion

10  Engineering, because I think it's important in how one looks

11  at this case as one goes forward.

12          Your Honor, in Combustion Engineering, what the

13  Court -- there's a key phrase in there, from my perspective,

14  that the Court talked about, and what it talked about there

15  in giving guidance on how to look at these kinds of cases is

16  it looked at the elaborate steps that the debtor had taken

17  with this group of claimants that had, as it terms, either

18  stub claims or weak claims or potentially non-compensable

19  claims, in order to sort of jimmy up a majority vote for a

20  plan.

21          And what the Court said in there was something to

22  the effect -- I don't have the exact quote in front of me --

23  was that one could, by, you know, individually, you know,

24  take steps that look like they comply with the Code, but

25  overall, those steps combined, were -- in that case, the

1  Court was concerned -- were really intended to avoid the

2  purpose of the overall Code.  And in there, what they were

3  focused on was the importance of an affirmative vote by an

4  impaired class and whether they really had an impaired class

5  there or not; in other words, an individual, if you just

6  looked at it step-by-step, they might comply and on other

7  things, not comply.

8          Your Honor has earned a well-founded reputation as

9  a balls-and-strike judge who takes each issue presented to

10  her and tries to call it fairly, and that's appreciated by

11  everyone.  But if you look at how these different steps over

12  time combined, and then you look at the result on the back

13  end, which is what you hear from the TCC talking about a

14  hundred-billion-dollar payout here.  And you see it in

15  various other papers and it's inflamed the claimants.

16          It's like, and then you compare it to with what we

17  started here, which was a Defendant in the tort system, which

18  had definite problems and, you know, even if there was only

19  one abuse claimant, it was a horrendous problem, but when

20  they filed, they had 275 claims and a thousand alleged, and

21  within just a few months, they generated 80-plus-thousand

22  claims through the use of these, you know, for-profit

23  aggregators.

24          And now, we're on a path where they're saying

25  they're going to get a -- it's like they think they've got a

1  plan where they're basically saying they're going to hand it

2  to a trustee at the end of the case and he's going to prove-

3  up claims and, you know, you've heard it from the TCC,

4  there's a hundred billion dollars that's going to come out

5  the back end.  And if that happens, that will cause enormous

6  damage, enormous damage beyond the scope of this case.  The

7  notion that one can just print money and it not have an

8  impact is wrong.  It will have tremendous damage.

9          But let's just look at some of the components on

10 how we got there.  But as a starting point, just in some of

11 the exchanges that you had with Mr. Rosenthal, I want you to

12 think about how this term "TDP" evolved and really what it

13 is, okay.  It's a trust distribution procedure.  It's just

14 that.  It's how a settlement trust, you know, allocates money

15 out among its claimants.

16         It's not too different from in regular District

17 Court litigation where you have class actions, money is paid,

18 and then the settlement trust makes and allocates out the

19 money.  And the Plaintiffs' lawyers can have wide discretion

20 in sort of how they make those allocations, how they spread

21 the money around among their various claimants.

22         They can, in that sort of situation, if that's all

23 that's happening, they can have the trustee, you know, make

24 various presumptions in their favor and, you know, they have

25 wide discretion on how they might allocate money.

1        What these are, and what the word "TDP," it means

2    trust distribution procedure.  It doesn't mean trust

3    adjudication procedure.

4        It's like the findings that Your Honor is being

5    asked to make and what's embedded in the TDP, itself -- and,

6    you know, there's various texts in there that they want you

7    to approve -- converts this into just that, from just an

8    allocation procedure among the claimants about how they're

9    going to allocate the money among their claimants, into a

10   trust adjudication procedure where, effectively, you know, a

11   gentleman selected by the claimants with procedures picked by

12   the claimants is then going to, quote, determine the

13   liability of the debtor.

14       And it's utterly and completely at odds, that

15   process, with what's contemplated by the insurance contracts

16   here.  In large measure, it explains the entire difference

17   between why there were 275 claims in the tort system when the

18   case started and why there's 80-plus-thousand claims right

19   now.

20       In the tort system, and under the policies, there

21   was a process, whereby, someone with a stake in the game

22   would first make an assessment about, you know, whether or

23   not the claim should be settled or not.  If it wasn't settled

24   immediately, it would be, then, presented in the tort system,

25   where the burdens of proof would be placed on the Plaintiff

1 and various levels of proof would be required and good claims

2 would be, you know, vetted out from bad claims.  That's a

3 process that's tied to, and built into, how the insurance

4 contracts work.

5          This trust distribution procedure, if all the

6 Court is approving is, look, this is how they're going to

7 pass the money out among the claimants -- fine -- but if it's

8 converted into a trust adjudication procedure, it's

9 completely different from the tort world.  No amount of

10 presenting evidence about what a particular claim might get

11 or might not get in the tort system changes the fundamental

12 nature of this, which is, there is not an independent, you

13 know, judicial official with the Rules of Evidence and the

14 burden requirements set in the tort system, making an

15 adjudication of what the claims are worth.

16          The TDP specifically, basically, makes the --

17 flips the presumptions and the burdens of proofs on their

18 head.  There's even a provision in the TDP that says that if

19 the trustee effectively determines that there's no evidence

20 at all supporting a claim, the claim (indiscernible) be

21 dismissed; instead, the claimant shall be given an

22 opportunity to sort of rummage through the Boy Scouts' files

23 that are turned over to try to, then, come up with some

24 evidence to make a claim out of what he finds in the files of

25 the Boy Scouts.

1          It's utterly and completely a different procedure

2    than in the tort system.  It's not an adjudication procedure

3    at all; it's an allocation procedure.  And what the claimants

4    have tried to do in drafting these TDPs is flip it around

5    into an adjudication procedure.

6          Now, when I say Your Honor calls balls and strikes

7    going through, I think you did, you know, and let's walk

8    through some of those.  When the bar date order was presented

9    to the Court, the Court, you know, looked at that order, I

10   think, strictly under the Code and Your Honor made decisions

11   and approved the proofs of claim as it went forward.

12          But what happened?

13          It's like the proof-of-claim form, in fact, only

14   has a few questions about the claims.  There's a number of --

15   you know, there's like 15 questions in total.  There may be a

16   little more, you know, I'm not -- I don't want to bind myself

17   to 15, exactly, right -- but the bulk of the questions,

18   numerically, are things like:  Where did you go to college?

19   Where do you live?  Things like that.

20          The questions about the claims only come down to a

21   couple.  As we argued then and we've argued on appeal, there

22   was no requirement in the proof of claim that sufficient

23   facts be laid out in order to establish the elements of the

24   fact a claim against the debtor in the various states in the

25   union.

1          And as you heard from Mr. Rosenthal, it's like,

2 that's not insubstantial because there is not strict

3 liability for these types of claims.  One has to establish in

4 the different states, different levels of evidence, including

5 negligence, and there's not strict liability.

6          I think what Your Honor, in a show of your further

7 diligence, I think you said at one point you looked at, you

8 pulled some random proofs of claim to look at yourself.  And,

9 you know, I have every sense that you looked at a variety of

10 them.  They tell different stories and different levels of

11 detail, but the bulk of them really just lay out that the

12 person, you know, to the extent they do this -- by the way,

13 many don't even assert abuse by Boy Scouts or in Boy Scouts.

14 There's a whole package of claims that just talk about abuse

15 in their families.

16          But the ones that do talk about Boy Scouts or say

17 something about it, you know, many of them just laid out

18 that, in fact, the person was abused and not much further.

19 So, the proofs of claim, themselves, you know, provided the

20 most bare-bones, you know, setout of what the claim was

21 about.

22          Overlay on that, that there was, you know,

23 extremely comprehensive confidentiality put over the claims

24 so that, you know, one is effectively, completely prohibited

25 from -- there's no way that we can take the information even

1  in the proof of claim and we can't speak to spouses or family

2  members or others, you know, referred to in the proof of

3  claim, because all of the contents of the proof of claim are

4  deemed confidential.

5        So, the ability of third parties and the debtor

6  to, you know, but mostly third parties, to investigate the

7  claim, based upon what the proof of claim, you know, the

8  contents of it, which, to begin with, are incredibly bare-

9  bones, is incredibly restricted.  You know, we tried, Your

10 Honor.

11       You know, even if the proof of claim said that I

12 was abused, you know, in a public spot where others were

13 witnesses, we couldn't take the proof of claim and send a

14 private investigator to speak to other people and say, look,

15 this was asserted in a proof of claim that this happened on

16 this day by Mr. Johnson, did it happen?

17       We would breach confidentiality under the proof of

18 claim to, you know, even pursue that investigation.  So, the

19 ability to investigate the claims on this very sketchy proof

20 of claim was incredibly restricted.

21       We tried to deal with that in a responsible manner

22 by the 2004 motions that we brought before the Court and

23 trying, selectively, to get at groups of claims, how they

24 were prepared and to get at individual claimants, you know,

25 to establish, you know, some of the *bona fides* of the proofs

1   of claim.

2          We've not been able to take depositions.  And, you

3   know, I've got it, Your Honor is sort of suggesting perhaps

4   maybe now we can do it, but it's like we have not been able

5   to do any testing of the proofs of claim directly and the

6   ability to test the proofs of claim for what they say is

7   incredibly harshly restricted by the confidentiality

8   provisions.

9          So, what do --

10          THE COURT:  Let me ask this question.  Let me ask

11   this question, Mr. Schiavoni:  Isn't the insurance companies'

12   involvement with the proofs of claim inconsistent with the

13   position that the trust distribution procedures don't matter,

14   that they shouldn't matter to the insurance companies,

15   because they should be insurance-neutral, that I shouldn't be

16   making any decisions.

17          Because if I'm not making any decisions with

18   respect to the trust distribution procedures, why do the

19   insurance companies care about what's in a proof of claim?

20          MR. SCHIAVONI:  So, Your Honor, I think I'm sort

21   of building to that kind of -- to give you the answer to that

22   question.

23          THE COURT:  Okay.

24          MR. SCHIAVONI:  Because the bottom line, is the

25   proofs of claim are completely untested at all.  It's like,

1   we then -- and this goes to, again, Combustion Engineering,

2   that each step along the way might, might have been proper,

3   but in combination, what does it give us, okay?

4           It's like, so the next step here is the Court, you

5   know, decides to send these out, you know, with each claim,

6   with each proof of claim getting one vote without any of them

7   tested.  And a key element of 502, the whole thought on how

8   502 would work was that if proofs of claim are out there and

9   then people vote based on it, that, in essence, there's some

10  validity to the vote because all parties in interest would

11  have had an opportunity to kind of test who's voting, so to

12  speak, right.  That's like a core element of 502 was that the

13  reason why you get a vote, like, votes would be allowed is

14  because people could object to the people voting, okay.

15          But if there's been no ability to test the votes

16  and then, you know, we then have the vote going out without

17  any of these, it's like without really knowing whether this

18  is a good vote or not, because no one has really been able to

19  test the votes.

20          And what's happened is like what's happened, I

21  think, in Combustion Engineering.  The debtor has aligned

22  itself with a group that purports to, you know, bring about

23  the majority vote and it's then an untested vote, based on

24  the proofs of claim, because we didn't have the ability to

25  test it.

1          And what, then, is embedded in that?

2          Exactly what the Circuit was sending back for

3   discovery in Combustion Engineering; a plan comes out that

4   has incredibly loose distribution procedures.  Again, I don't

5   think they're adjudication procedures; they're distribution

6   procedures.

7          The claimants didn't embed in here, and the

8   debtors certainly didn't, requirements that, you know,

9   strongly encourage the vetting out of good claims and bad

10  claims.  That's not -- it's like you'll hear evidence on what

11  these proofs of claim do, but that's not what they do.

12         It's not like they've appointed, you know, a

13  former head of the FBI to run the trust; they've appointed

14  someone who you'll hear evidence about, and if it's somebody

15  else, it's someone still, nonetheless, who effectively is

16  going to be controlled under these governance procedures by

17  the so-called TAC in how they're going to make decisions.

18         This is -- it's -- the procedure that ends up

19  coming out of the plan, you know, is one that approves these

20  lesser claims.  And again, this is the complaint,

21  fundamentally, that was being made by the Kazan claimants,

22  who prevailed in Combustion Engineering, that the plan

23  process then was hijacks by who was being allowed to vote.

24  And you know, so that's the sort of -- I don't know if we're

25  on the third of fourth step here that combines together on,

1  you know, a path where one might have said -- again, each one

2  of these was, you know, in good faith, decided by the Court.

3  But where does it leave us, you know, ultimately, and sort of

4  where the result takes us.

5         So, you know, then what happens is the debtor

6  also, as part of the plan, in agreement with the coalition,

7  to get their vote, agrees to assign their -- all of their

8  rights to object under 502 to the -- to this trustee.  They

9  do it without the consent of the insurers.  And that -- you

10 know, in an insurance coverage court, like that would be like

11 a really, really important, you know, right of ours.

12         In writing these contracts, the contracts directly

13 tie the consent to settle, you know, to -- you know, to

14 the -- it's an essential right to the contract.  It's like,

15 when folks issued insurance policies, they didn't issue a

16 blank check machine to their policy holders to settle cases

17 willy-nilly, any way they wanted.  It -- they said, to the

18 extent they took on a defense obligation and an indemnity

19 obligation, it was -- it's absolutely tied in the contract

20 that it's we would get -- it's like we can make a decision to

21 settle or we get to defend the case.

22         We didn't say you can -- you could settle

23 eighty -- you could create a system where you could get out

24 from your liability and create a system where you have -- you

25 could then willy-nilly, you know, settle 82,000 cases for any

1  dollar volume you have.  But that's embedded in the plan,

2  that, without our consent, they're assigning all of their

3  objections to the claimants, to the claimants' appointed

4  trustee, to impose and -- or decide.

5       And how is he doing it?  Well, I don't think

6  anyone can look at those trust distribution procedures, at

7  the end of the day -- and again, I don't think the focus,

8  frankly, should be whether X amount for this kind of claim or

9  Y amount is a fair amount.  I think it ought to be on how the

10 decision is made to determine that, if it's going to -- if

11 it's going to, you know, bind us and apply to us because

12 it's -- the procedure is not any -- you know, again, it's

13 nothing like what's in -- we would anticipate in the tort

14 system.  It's simply the plaintiffs themselves basically

15 applying procedures that they have blessed, agreed upon, I

16 would say drafted if we had the evidence, you know, to

17 confirm that, that the trustee presumptively will give them a

18 claim for almost anything.

19      Even on the statute of limitations, by the way,

20 he's given really sort of wide-ranging ability to basically

21 deem the statute of limitations as set aside.  You know, and

22 it's not just a scaling factor down.  It's like he can set it

23 aside, but -- in very -- you know, based upon the exercise of

24 his judgment.  That's not at all what would happen in the

25 ordinary course.

1          And it's like -- now there's two other things I'd
2    just like to build into this before we come to the end.  And
3    it's like, yeah, you're going to be asked to make good faith
4    findings in connection with the plan itself and how the
5    debtor and local councils acted.  And we did talk about this
6    a little bit in connection with the disclosure statement.
7    But look at -- it's like you will get evidence that you will
8    see about what -- when they were negotiating with their money
9    on the line -- and they had money on the line because the
10   policies for half the period of time have significant
11   retained limits and/or deductibles, where they were directly
12   liable, the nondebtors, the nondebtor local councils and the
13   Boy Scouts.

14         And what's the deal they struck?  The deal they
15   struck that they was at arm's length was they settled the --
16   they settled this volume of claims somewhere -- if you -- I
17   don't think this is a fair way to sort of analyze like how
18   the money is changing hands, in some ways.  But it's like
19   three to $6,000 a claim, if you just -- if you spread it
20   equally.  And that's what they paid, that's what they
21   negotiated at arm's length when their money was at issue.

22         And you saw it when we walked through for the
23   individual local councils that many of them are not even
24   contributing a single retained limit/deductible -- whatever
25   one wants to call it -- for, you know, even one policy that

1  falls in those periods.  It's like that would reflect what
2  they thought the claims were really worth.

3  But when they turned the pen over and gave it to
4  the claimants to say go draft a TDP, okay, it's like they
5  generate something that, you know, theoretically, from what
6  they say, generated a hundred-billion-dollar outcome.  That's
7  not consistent with -- it's in no way consistent with, you
8  know, looking at those TDPs as, quote, an "adjudication" of
9  their liability.

10  It's like I -- you know, you'll hear evidence from
11  this on us [sic], but it's like I don't think one can say
12  that, if the local councils settled for $3,000, and as part
13  of that capped its liability, and then turned around to the
14  trust -- the claimants and said, okay, draft a TDP and pick
15  your trustee to decide what the insurers should pay, that the
16  Court can turn around and enter a finding that says that that
17  trust adjudication procedure represents what the debtor is
18  liable for or what the local councils were liable for.  If it
19  was, they should be putting a lot more money in.

20  And you know, you heard some argument before that
21  this was us arguing out of, you know, two sides out of our
22  mouth about what they all ought to pay.  Hopefully, you've
23  heard a little bit more about this and you understand now
24  what I'm talking about.  It's like they can't be saying that,
25  if they paid not even a full deductible or retained limit,

1  you know, to resolve their claims in total, that somehow

2  it -- you know, what they're giving the trustee represents

3  their, quote, "actual liability."

4          So, yes, that finding is completely toxic to us

5  because of how we think the plan here has, step by step, you

6  know, abused what the Code is really intending.  And there's

7  a series of bankruptcy objections that are built into how

8  these steps sort of combine, you know, including that we

9  think the vote will fundamentally be bad at the end of the

10  day, but that make these findings just terribly toxic.

11          And they do something else.  It's like it's

12  created this specter you have in front of you of not just the

13  insurers objecting, okay, because of -- like it's made the

14  case virtually impossible to settle with the claimants if

15  they are to think that they, themselves, will decide what all

16  the claims are worth.  I mean, one can imagine, you know,

17  what that kind of discussion would be like.

18          And Judge, God knows we've tried -- we have worked

19  to settle this case.  I mean, Mr. Ryan and I worked very hard

20  in the Blitz case and we settled a very difficult case

21  together.  And as I know, your patience with me as an

22  adversary has been epic, and I appreciate that.  But I

23  just -- trust me that we've -- you know, we've worked very

24  hard to try to resolve the case.  It's made almost impossible

25  by this dynamic.

1           And it's not just us, it's the claimants
2  themselves are at each other's throats over this because
3  there's no process by which -- you know, none of them --
4  neither constituency is able, really, to stand up and say we
5  need an aggressive procedure here to whittle down the claims
6  or to focus the money on the more high-value claims.  They're
7  almost institutionally -- and I'm not -- in some ways, I'm
8  not even faulting them for this.  But it's against -- you
9  know, it's like they'll be called traitors by their own
10 constituency if they do it, but it's like they're unable to
11 do it.

12          The U.S. Trustee we've reached out to on this.
13 And I mean no fault, the U.S. Trustee is doing a fine job.
14 But they're not going to step forward into that role.  You
15 know, so there's no one else in that role in the tort system.
16 It would be us doing that.

17          And to be clear, the debtor had that option.  All
18 right?  You know, you heard in Imerys how, at one point,
19 Imerys -- J&J stepped forward and said, you know, lift the
20 stay, let the cases go forward in the tort system.  There
21 were CIPs before the debtor.  You know, you heard, I think,
22 even some evidence during the RSA how Hartford put forward,
23 you know, a claims procedures that just passed the claims --
24 the tort system.  All of those were rejected because this is
25 just more favorable, letting the claimants decide what their

1  own claims are worth and having the Court issue a finding

2  that hey get to adjudicate -- that that adjudication then is

3  binding on the insurers.

4         And yes, it's like will a subsequent state court

5  case -- court be confused about that?  Absolutely.  It's like

6  absolutely.  And that was -- you know, in some ways, it's one

7  of the teachings of that Fuller-Austin decision is just sort

8  of, you know, how the trial court there was confused in the

9  first instance by, you know, 1129 findings, you know, without

10 any description of really what they were about being

11 presented to the, you know, court there.

12        So, look, that's an overlay on what Mr. Rosenthal

13 said.  I -- you know, it's -- it makes -- all of this

14 infects, you know, what's necessary for discovery because,

15 you know, it's like the claimants are asserting that

16 basically all coverage issues need to be side -- decided

17 here.  It creates a nest of complex evidentiary issues.

18 It -- you know, for instance, like the complete blocking of

19 us from getting any evidence at all about how the TDPs were

20 negotiated, if that's even, quote, the right word to be

21 applied here, when they otherwise were going to seek findings

22 on the -- you know, that they were not in good faith.  It's

23 like we'll have motions on all of those issues and just --

24 it's just making it incredibly difficult to deal with this in

25 a three-month period.

1            I mean, in three months, to package these issues,

2   for them to them come out and say there's a hundred billion

3   dollars' worth of liability on the back end, it's like these

4   findings are just utterly unnecessary.  They're

5   unprecedented, really, because other courts have looked at

6   this as distribution procedures and not adjudication

7   procedures.

8            And if you go back through most of the mass tort

9   cases that have been decided, yes, it's true that like, by

10  the time they got to confirmation, the cases -- more or less,

11  many of them had resolved themselves to the extent appeals

12  were taken.  You know, not many of them got through to like

13  post-claim, you know, adjudication.

14           What's made this one just particularly difficult

15  to -- you know, to reach any settlement is that the claimants

16  are taking a strong run at like having this Court decide that

17  these are adjudication procedures.  And it's like just made

18  it impossible for folks to decide things.  So that's an

19  overlay.

20           I have one brief argument I'd like you to consider

21  on -- you know, on -- I do think some of the findings should

22  be dropped, you know, or the Court should have encourage them

23  to be dropped because it's going to infect discovery going

24  forward.  We'd ask you to -- perhaps to keep an open mind on

25  that until you hear the discovery schedule argument.

1          But there's just one other thing that I think --
2    and it's not really an insurance issue, per se, but this
3    thing about the coalition fees.  I know Your Honor probably
4    feels that all of the issues we've talked about can be dealt
5    with at confirmation.  You know, you've heard, respectfully,
6    why we disagree on that.  But you know, we -- you know, we
7    all listen to the Court very closely.

8          But there's an issue that can't be -- the bell
9    can't be unrung on, that I would suggest that there -- you
10   know, it might make sense to address, you know, now.  We
11   might even try to bring a summary judgment motion to do it --
12   if that's what Your Honor wants, before solicitation.  But
13   that is, again, this issue about the fees being put back into
14   the plan.

15         I just think having those -- the coalition fees in
16   the plan is -- it's going to raise issues about tainting of
17   the vote, one way or the other, no matter what, and that --
18   it's like, consistent with your pre -- the Court's prior
19   order, as I seem to -- as I understood it, was that basically
20   the coalition would be free at the end of the case to bring a
21   motion on to seek its fees, and that that motion would make
22   its -- you know, present its case on whether they had, quote,
23   "made a substantial contribution" or not, and that they would
24   present evidence, et cetera, along those lines.

25         I see no prejudice to the coalition being to --

1  you know, that that's the way to do it and that it shouldn't

2  be in the plan.  It's like having it in the plan, you know,

3  creates this whole specter that the vote is tainted by what

4  we believe to be a conflict associated here.  And we will

5  argue that there is a conflict because of how the majority of

6  the coalition clients declined to be Brown Rudnick paying

7  claimants.  And now Brown Rudnick is imposing, in essence,

8  those fees on them through the plan itself.

9         And we think, as we've said, that that's tied

10  directly to the master ballot issue and how they're trying

11  to, you know, basically, you know, get the claimant lawyers

12  themselves, who are, in fact, taking 40 percent of the money

13  here, to, you know, bring about that master ballot vote.  So

14  we think that should come out because it can't -- that bell

15  can't be unrung.

16         We also think that's -- although it's the tail

17  that's wagging the dog, it's one that is just -- is

18  encouraging the case not to settle because it's promising

19  them another $900,000 every month that they litigate the

20  case, instead of trying to work to resolve the case, so I'd

21  ask you to consider that.

22         And thank you very much, Your Honor, otherwise,

23  for hearing us.

24         THE COURT:  Thank you.

25         Mr. Plevin.

1          MR. PLEVIN:  Your Honor, I will be very brief, and

2    I'm not going to veer into scheduling at this point.  I just

3    want to tie together a couple of things that Mr. Rosenthal

4    and Mr. Schiavoni said.

5          Mr. Schiavoni said the policies here are not check

6    writing machines.  And why is that?  If Your Honor were to

7    look at the actual policy language, you would see that the

8    insurers have to pay in only two circumstances:

9          First, when there's a judgment after an actual

10   trial.  Obviously, "actual trial" means a trial, an adversary

11   event with people on both sides putting in evidence.  There's

12   case law that says that a settlement by a debtor with its

13   creditors is not an actual trial.  That should be self-

14   evident, but that's the first time that an insurer has to

15   pay.  And obviously, a judgment after an actual trial carries

16   certain -- it shows that it's a real result because a jury or

17   a judge has made a decision based on evidence presented in a

18   contested proceeding.

19         The other instance in which an insurer has to pay

20   under the policy language is where there is a settlement in

21   writing, agreed to by the insured, the claimant, and the

22   insurance company because, as Mr. Schiavoni pointed out, the

23   insurers have the right to defend claims, and that includes

24   the right to settle claims.  And so, if an insurer settles a

25   claim, it takes on an obligation to make a payment pursuant

1  to a settlement agreement.

2           Those are the only circumstances in which an

3  insurer has to pay.  And when you talk about what Mr.

4  Schiavoni called the "trust adjudication procedures," versus

5  trust distribution procedures, you see that.

6           Now how does this play out in the coverage

7  context?  You asked Mr. Rosenthal a question about this.

8  What would happen outside of the bankruptcy context is, if an

9  insured settles without the consent of the insurance company,

10  often they'll do so because they'll say the insurer isn't

11  defending or the insurer is not -- hasn't accepted a

12  reasonable settlement offer and is hanging the insured out to

13  dry.

14           But if they settle on their own and then seek

15  insurance coverage, the insurer has the opportunity to

16  litigate in the coverage case whether the settlement was

17  reasonable because courts will often allow an insured to

18  settle, notwithstanding the insurer's right to be involved,

19  if the settlement is reasonable.  And then, in that case, the

20  coverage case -- the coverage court looks at how the

21  settlement was entered into, was it at arm's length, how does

22  it relate to the amounts being sought, what were the defenses

23  that were being asserted, and can make a determination as to

24  whether the settlement is actually reasonable.

25           That's not the situation that we would have here

1  because, in that litigation, it's the -- the arguments are

2  being made by the insured on the one hand and the insurance

3  company on the other hand.  And the insured says I think this

4  is reasonable and here's why; the insurance company says I

5  think it's not reasonable and here's why.

6        But the one thing that the insured doesn't get to

7  do in that circumstance is to say, not only do I think it's

8  reasonable, but here's a confirmation order by a Federal

9  Judge, a Federal Bankruptcy Judge, who says she thinks it's

10  reasonable, too.  And that gets presented to the trier of

11  fact in the coverage case.

12        What they're trying to do, Your Honor, is have you

13  put your thumb on the scale and allow the insured, in that

14  context, to make the argument to the jury or the trier -- or

15  the bench, depending on how the coverage case is being

16  litigated, and to say we think this is reasonable, and part

17  of the reason is because the Bankruptcy Judge said so.

18        And remember, as Mr. Rosenthal pointed out, you're

19  being asked basically to make decisions about the

20  reasonableness of determinations by the settlement trustee,

21  who hasn't been appointed yet, who is going to be make

22  those -- going to be making those decisions after

23  confirmation of the plan.  And so that illustrates, I think,

24  why, as Mr. Schiavoni put it, these findings are toxic and

25  they're prejudicial.  And you know, we just can't abide them.

1     And with that, I'm going to just say I have lots

2  of things to say about scheduling, but I'm going to defer

3  those until later.  Thank you.

4          THE COURT:  Thank you, thank you.

5          Okay.  I'm going to give the plan proponents an

6  opportunity to respond -- not the plan proponents, I'm

7  sorry -- the debtor and/or the FCR or the coalition an

8  opportunity to respond to these arguments.  But I really do

9  want a focus on why these findings are necessary and

10  appropriate, the import of them as to how they will be used,

11  and why aren't the trust distribution procedures just an

12  intra-creditor -- and by that I mean intra, I guess, abuse

13  claim creditor -- allocation mechanism.

14          And that goes along with questions I've had and

15  somewhat posed, probably not in this case, about the genesis

16  of the trust distribution procedures and why there's even a

17  trust advisory committee made up of plaintiffs' lawyers and

18  why the settlement trustee is often chosen by those lawyers

19  and why -- I understand why the FCR, certainly in an asbestos

20  case, gets a role because I think it's required in the

21  statute.  But given how these procedures, the trust

22  distribution procedures -- I don't know if they've evolved or

23  they've always been that way.

24          But it does seem curious that the beneficiaries of

25  the trust influence the procedures under which they receive a

1  distribution, if it's binding on others.  And if you go back

2  to just general trust law, a settlor chooses a trustee, a

3  settlor decides the provisions of the trust, and the

4  beneficiary is just a beneficiary.

5       So I'm -- we're going to take a break, we're going

6  to take about 15 minutes, and I'd like to hear a response.

7       But I think I said back in May I don't anticipate

8  making any coverage decisions, and I still do not intend to

9  make any decisions that are properly decided in a coverage

10  action.  And perhaps juxtaposed against this is that this is

11  a collective procedure.  And I don't have however many days

12  of a hearing and then it has no impact, right?  It has to

13  have an impact.  But it shouldn't have an impact beyond

14  what's necessary for me to decide confirmation issues.  So I

15  want to see that.

16       Mr. Patterson?

17       MR. PATTERSON:  Your Honor, before you turn to the

18  debtor, I wanted to address some of the issues that

19  Mr. Rosenthal and his colleagues addressed, and it might be

20  helpful if I do that before that.  I'm happy to do it right

21  after the break.  It should be about five or ten minutes,

22  Your Honor.

23       THE COURT:  Yes, I'll hear people in response, and

24  that can go beyond the debtors and the FCR and the coalition.

25  I'm happy to hear from others.

1          MR. PATTERSON:   Thank you.

2          THE COURT:   But those are the -- those are the

3   issues that I see, the big picture issues.   That's apart

4   from, I guess, the initial comments Mr. Rosenthal made about

5   some uncertainty we still have in this plan.   But I'm more

6   interested in the bigger picture issues of the trust

7   distribution procedures.

8          So we're going to take 15 minutes.   I don't know

9   what time it is.   It's 12:06.   Come back at 12:20.   We're in

10  recess.

11       (Recess taken at 12:06 p.m.)

12       (Proceedings resume at 12:22 p.m.)

13         THE COURT:   This is Judge Silverstein.   We're back

14  on the record.

15         Ms. Lauria.

16         MS. LAURIA:   Thank you, Your Honor.

17         I was just going to briefly outline how we had

18  allocated responsibilities on the debtor/FCR/coalition side

19  of the ledger, so that you're not hearing repeated arguments.

20         With respect to the insurance and trust issues

21  that you raised, Ms. Quinn, whose hand is up, as well as

22  members of the coalition, will be taking the lead role on

23  those arguments, so I'm going to pass the podium off to them

24  or the virtual podium.

25         I also heard issues from Mr. Rosenthal and

1  Mr. Schiavoni concerning the timing uncertainty point,

2  coalition fees, the third-party releases, thirty-five-

3  hundred-dollar expedited distribution, "liquidation of claims

4  for voting purposes" -- those are my words, not

5  Mr. Schiavoni's, but I'm trying to boil that down -- issues

6  with the proofs of claim and good faith.  All of those types

7  of issues, I will be taking on in responding to those.

8          But Your Honor, my sense was you wanted to dive

9  right into the insurance issues.  So, if it's okay, I'll

10 table that laundry list that I just mentioned.  I would like

11 to come back to those and respond to those, to the extent you

12 think it would be helpful.  And in the meantime, I'm going to

13 hand it off to -- I see Ms. Quinn, Mr. Molten, and

14 Mr. Goodman, so one of them I think are going to take the

15 lead on the insurance issues.  Maybe Ms. Quinn is first up.

16          THE COURT:  Ms. Quinn.

17          MR. STANG:  Your Honor, I'm sorry.  I thought

18 Mr. Patterson was going to address the Court.

19          THE COURT:  Mr. Patterson, the only thing I want a

20 response to is -- right now, is the insurance issues.  So I

21 don't actually really care, in particular, what order they go

22 in, but that's what I am -- the findings and the insurance

23 issue.

24          MR. PATTERSON:  I can limit my remarks to that

25 topic at this point, Your Honor.

1        THE COURT:  Okay.

2        MR. PATTERSON:  Thank you, Your Honor.  Tom

3  Patterson.

4        Our concern with the findings is that they do lie

5  at the heart of the architecture of the plan, and one of the

6  principal reasons for that is because of the involvement of

7  the local council settlements.

8        Mr. Rosenthal alluded to the <u>Combustion</u>

9  <u>Engineering</u> case, which dealt with the assignability of

10  nondebtor insurance under a plan and said that the Bankruptcy

11  Code powers do not extend to that extent.  And the Court

12  asked whether or not the savings language that has now been

13  introduced to the plan would be sufficient to eliminate that

14  defense on the part of the insurers.  And the answer is, for

15  a couple of reasons, that it's not.

16        One reason is the reason that Mr. Plevin

17  articulated, which is that, even apart from assignability of

18  insurance rights, the local council settlement and

19  contributions represent -- has the potential to trigger a

20  variety of coverage defenses, including consent to settlement

21  and the cooperation clause.

22        And the risk is that entering in a settlement

23  without consent can, in some jurisdictions, limit coverage or

24  void coverage.  It can limit coverage to the amount of the

25  settlement that was paid -- in this case, that could be the

1  amount of the local council contribution -- or it could void

2  coverage in other circumstances.

3          Second, Your Honor, the savings language provides

4  an additional coverage defense that is not otherwise present

5  because -- and by the way, I mean, it -- I have a full

6  appreciation for the irony that I'm articulating coverage

7  defenses, but I am articulating ones that the insurers have

8  passed on to me, so I do not feel that I am providing any

9  insights that they don't have.

10          But with regard to the assignment issue, if a

11  debtor -- well, a nondebtor in this case -- channels its

12  liability to a trust, then you have separated the liability

13  on the claim from the insurance, and there is a significant

14  coverage defense that the insurer has at that juncture, in

15  fact, if sued by the local council, that the local council no

16  longer has an indemnity right because it no longer has the

17  liability on the underlying claim.

18          And so, you know, our feeling is that these

19  coverage defenses are significant, at a minimum.  They would

20  take a considerable amount of time to resolve through,

21  likely, appellate decisions in more than one jurisdiction,

22  and that they provide an incentive, given the architecture of

23  the plan, for those who are advancing this plan at this point

24  to settle insurance at almost any price to avoid the flaw

25  that the settlement has a tendency -- has had a tendency to

1  create.

2  So I had other comments that I wanted to make that

3  keyed off things that Mr. Rosenthal and others have said, but

4  Your Honor asked me specifically with regard to insurance,

5  and so I'm limiting my comments to that at this point.

6  THE COURT:  Okay.  Thank you.

7  Ms. Quinn.

8  MS. QUINN:  Good afternoon again, Your Honor.

9  Kami Quinn, insurance counsel for the FCR.  And I am going to

10  respond to some of the insurance issues that were raised this

11  morning.

12  First, very briefly on neutrality, because I think

13  it's very clear that Your Honor has heard this, has read the

14  briefs, has read the cases, has considered this issue very

15  carefully.  There is no requirement that any plan be, quote,

16  "insurance neutral."  Insurance neutrality is a standing

17  doctrine that just has no relevance in a case where insurers

18  are being heard on every issue.

19  In the case -- in the neutrality cases, debtors

20  and plan supporters voluntarily made a strategic choice to

21  carve out insurers from otherwise generally applicable

22  provisions, but that sort of choice is not mandated anywhere.

23  And as an aside, Your Honor, remembered the GIT case and the

24  holding there exactly correctly.  So neutrality isn't an

25  issue that needs to be reached in this case because no one

1  has sought to deny the insurers standing.

2          Instead, because of that, the insurers have

3  pivoted to the idea that these findings impermissibly alter

4  their contract rights.  They don't.  But Your Honor has

5  expressed some concern about these findings and we -- and the

6  insurers have raised them today, and so we can talk about --

7  let's talk about these findings one by one.

8          And I don't intend to argue the truth of the

9  findings.  I just want -- this argument is to make clear

10 that, if we are able to convince you of their truth through

11 evidence and legal argument between now and confirmation that

12 these findings are appropriate for you to make in this

13 context and that they are not coverage determinations.

14          So I will start by being very clear.  We have

15 heard you.  We do not intend to issue coverage rulings in

16 this case.  The findings do not ask you to.  They don't ask

17 you to interpret a state law coverage issue, to review a

18 single policy, to single out insurers for any particular

19 treatment.  They don't ask you to determine the impact of

20 your findings on subsequent coverage litigation, nor do they

21 ask you to determine what impact or rulings will not have.

22 And they don't ask you to determine that any insurer has an

23 obligation to pay any particular claim.

24          All of the arguments about what the policies cover

25 or, as Your Honor has characterized, what product the debtor

1  bought, including all of the issues raised in pre-petition

2  litigation, remain wholly unaffected; issues like the number

3  of occurrences, whether and for which carriers the first

4  encounter is the appropriate trigger, whether SIRs and

5  deductibles apply, whether there's intentional conduct

6  related limitations to the policies.  All of those are

7  preserved for coverage litigation.

8          But the honor -- but the insurers have

9  characterized these findings as "coverage findings."  Indeed,

10  Mr. Schiavoni went so far last week to say that the findings

11  require you to find that there is coverage for the claims.

12  And today, you said that all coverage needs to be decided

13  here.  These findings unequivocally do no such thing.

14          So I will take each of the findings that

15  Mr. Rosenthal raised in turn, and we can go through them.

16  And the first is the assignment -- is the insurance

17  assignment.  This is -- courts in this circuit have been

18  making this finding in the context of mass tort cases with

19  respect to debtors' coverage for almost a decade now.  It is

20  settled bankruptcy law and uncontroversial on the point of

21  the debtors' coverage.

22          The insurers have argued that it's not appropriate

23  to extend this finding to nondebtors.  Your Honor noted that

24  the finding actually only requires you to find it -- to find

25  that the assignment is appropriate to the extent of

1  applicable law, that there is a savings here, to the extent

2  that applicable law -- which we're not asking to determine --

3  doesn't permit this finding, doesn't permit this assignment.

4         And so we think it's an appropriate finding.  We

5  think that there is no question that findings about the

6  validity and the applicability of a transfer of the insurance

7  rights under a plan is the appropriate finding for a

8  Bankruptcy Court to make in the context of confirmation.  And

9  we either will or we won't convince you that this assignment

10 is appropriate, or that the finding is appropriate to make to

11 the extent that -- of applicable law and to the extent that a

12 nondebtor policy can be assigned under applicable state law

13 (indiscernible)

14      (Participants speak simultaneously)

15         THE COURT:  Excuse me.  Please check your audio.

16         Ms. Quinn.

17         MS. QUINN:  Okay.  So that's assignment.  Unless

18 Your Honor has any questions on that, I'll go on to the TDPs.

19         THE COURT:  No.  I will confess that I hate these

20 provisions in an order that say "to the extent of applicable

21 law" because it just leaves issues open.  But I take it the

22 arguments that would be made are the ones I've seen in the

23 papers about being able to -- the conduct has already

24 happened.

25         MS. QUINN:  Correct.

1          THE COURT:  Okay.

2          MS. QUINN:  That is exactly correct, yes.

3          THE COURT:  Okay.

4          MS. QUINN:  Okay.  So the TDP.  The TDP finding

5   says:

6          "The procedures included in the trust distribution

7   procedures pertaining to the allowance of abuse claims and

8   the criteria are fair and reasonable, based on the

9   evidentiary record offered to the Bankruptcy Court."

10         So we spent hours this morning listening to

11  arguments which boiled down to the insurance position -- the

12  insurers' position that the TDPs are not, in fact, fair and

13  reasonable.  I'm not going to address whether or not they are

14  fair and reasonable because that is a question that we need

15  evidence, as it says in the finding.  We will get -- we will

16  find -- we will get evidence, we will argue these issues.  If

17  we can't convince you of the truth of the finding, then,

18  obviously, you won't make the finding.  But that's a

19  different question than whether or not it is appropriate to

20  make this finding in the context of your confirmation order.

21         So I'm -- and on this one, I think you put this

22  exactly right last week, when you said that of course Your

23  Honor can find that a settlement embodied in a plan is fair

24  and reasonable in the context of a confirmation order.  Of

25  course you can.  But that you -- but that you will not be

1  finding whether the insurance policies that the debtor

2  bought, whether the product that they purchased covers that

3  settlement.  That's perfect.  That's -- and we agree

4  completely.

5          THE COURT:  So is the -- what's the 1129 standard?

6  Is there an 1129 standard that these findings go to or is

7  this -- you're considering this a settlement?

8          MS. QUINN:  We're considering this a settlement.

9          THE COURT:  So it's not an 1129 standard, not part

10 of the 1129 standards.  So this is a settlement.  And who is

11 it a settlement among?

12         MS. QUINN:  It is a settlement among the abuse

13 claimants and the debtor and the local councils and, to

14 the -- and potentially others, to the extent that there are

15 separate provisions relating to chartering orgs, such as

16 TCJC, who have their own issues.

17         THE COURT:  Okay.

18         MS. QUINN:  So -- and I will point out that

19 Mr. Rosenthal raised the issue of, you know, these will

20 create all -- this terrible precedent.  Unfortunately, the

21 horse is out of that barn.  These findings that a TDP is fair

22 and reasonable have been made in Brower, Christy, Western

23 Asbestos; all of them included those findings.  This is

24 not -- this is not brand new.

25         And because it's a recent case, where confirmation

1  findings were disputed by insurers in a mass tort case, I can

2  talk about, if you're interested, the findings that Judge

3  Drain just made in Purdue on these issues, I can compare and

4  contrast a little.

5           Judge Drain made a finding that the settlements

6  reached between the debtors and the opioid claimants, as

7  embodied in the plan, are fair, equitable, and reasonable,

8  and were entered into in good faith, based on arm's length

9  negotiations, and the various intercreditor allocation

10 agreements and settlements are fair, equitable, and

11 reasonable.  And that's essentially what we're asking for

12 here.

13          Judge Drain went on to say some more stuff,

14 including that such negotiation, settlement, and resolution

15 of liabilities will not operate to excuse any insurer from

16 its obligations under any insurance policy, notwithstanding

17 its terms, including consent to settle or pay first or other

18 provisions in non-bankruptcy law.  That's not in our finding,

19 not what we're asking Your Honor to find, and an issue that

20 will be determined in the coverage litigation.

21          What the insurers are asking you to -- go ahead.

22          THE COURT:  Is that in the form of order?  Is that

23 where those findings come from?

24          MS. QUINN:  Judge Drain's?

25          THE COURT:  Yes.

1          MS. QUINN:  Uh-huh, yes.

2          THE COURT:  Okay.

3          MS. QUINN:  What the insurers are asking you to do

4   is prejudge how a coverage court will use a finding that the

5   TDPs are fair and reasonable.  They're asking you to

6   determine what their -- what the rights to defend under a

7   policy -- insurance policy are, what circumstances they get

8   to exercise those rights.  And they are asking you to say

9   what a coverage court can and cannot do this -- with that

10  finding.

11          Mr. Plevin said, well, in the tort system, we

12  would get to litigate whether the settlement is reasonable in

13  a coverage action.  But nobody is precluding Mr. Plevin from

14  litigating whether this settlement is fair and reasonable.  I

15  mean, we're just saying he only gets to do it once.  The

16  insurers are definitely going to litigate whether these TDPs

17  are fair and reasonable; indeed, I think they started today.

18  They just don't get to do it twice.

19          But this doesn't -- but a finding of fair and

20  reasonable TDP doesn't require you to determine that that's

21  the standard by which insurance policies pay, that insurance

22  policies pay fair and reasonable settlements entered into

23  without their consent, that fair and reasonable means the

24  same thing here that it means in a coverage court.  All

25  it's -- the findings say what they say.  And all of the

1  insurers' concerns about how they might be used are just

2  that.

3         I mean, they're free to make those arguments to

4  the coverage court about why it would not be appropriate to

5  use that finding for that purpose here, or why that findings

6  doesn't mean that they have a coverage obligation.  Nothing

7  about that finding says insurers have to pay any claim.  It

8  says the TDPs are fair and reasonable.

9         THE COURT:  For purposes of 9019.  Is that the

10  right -- is that the right standard of 9019?

11         MS. QUINN:  I think so.  I think fair and

12  reasonable with respect to all parties.

13         If the insurers come in and -- if the insurers

14  come in and litigate for days in front of Your Honor about

15  whether the TDPs are fair and reasonable as to them -- which

16  is what they will litigate, which is the issue they're

17  litigating, right?  Then they should be bound by the results

18  of that litigation.  They don't get to try it once then and

19  then determine -- and then, if they lose, try again somewhere

20  else.

21         THE COURT:  Well, but I thought I heard you say --

22  well, I guess the question is:  Does the 9019 standard --

23  assuming I approved a settlement, does the 9019 standard meet

24  whatever standard one would use to determine if there was a

25  coverage obligation?

1          MS. QUINN:  I don't know.  I mean, that's an issue

2  I think that will be decided by a coverage court, right?

3  Because the standard doesn't require you to define -- to find

4  that it meets the standard of an insurance policy,.  It

5  requires you to find that it's fair and reasonable.

6          THE COURT:  I don't know if that's the 9019

7  standard or not, but I'll take a look at the 9019 standard.

8  I think that's the standard, the four-part Martin standard.

9  I'm not sure it's fair and reasonable.  It's sort of the same

10  question I asked with respect to the RSA.  What does "good

11  faith" mean in this context?  Is that part of the standard?

12          And that's why I asked you what part of the 1129

13  standard is this because I'm going to be deciding

14  confirmation issues at confirmation.  And I don't know that I

15  have to determine what effect my ruling has down the line.  I

16  don't know --

17          MS. QUINN:  We --

18          THE COURT:  -- that I could --

19          MS. QUINN:  We agree.

20          THE COURT:  -- or that I should.

21          MS. QUINN:  Right.

22          THE COURT:  But I'll be looking at the settlement

23  standard then --

24          MS. QUINN:  Right.

25          THE COURT:  -- because that's what you're telling

1  me this is, a settlement.

2          MS. QUINN:  Well, I think that -- I think that it

3  may be the case -- and I'll defer to some of my bankruptcy

4  lawyer colleagues on the coalition who are going to talk next

5  about, you know, whether or not there's other bases for this

6  finding of fair and reasonableness.  But the finding is fair

7  and reasonable, and it is not a finding that fair and

8  reasonable is a coverage standard or that fair and reasonable

9  means that an insurance company has to pay.

10          THE COURT:  Okay.

11          MS. QUINN:  And the same goes, essentially, for

12  the third finding, which is the right to payment.  And I

13  can -- I will, again, you know, defer a little bit to my

14  bankruptcy brethren to talk about the specifics of this.  But

15  this is a statement of what the right to payment is under the

16  Code.  This is -- what this is, is a statement of how

17  claimants' claims will be liquidated.  And Your Honor

18  mentioned that this is something that goes to how assets will

19  be distributed amongst these claimants.

20          And this finding is -- it's necessary for the

21  plan.  And the reason why that it -- the reason why it's

22  necessary, to be clear here, to make this finding is in order

23  to describe appropriately what the settlement is that's being

24  reached in this plan.

25          Let me just take a step back here.  The debtors

1   here, they -- in the negotiation between the debtors and the

2   claimants, the debtors looked at this big liability and said

3   we think insurance coverage covers most of it, so we will

4   give you, trust claimants -- you have the right to pursue

5   coverage for the claims, the same as we would have had,

6   because, absent this bankruptcy, we think insurance would

7   have covered most of this, and then we'll negotiate with you,

8   you know, based on our ability to pay and a whole bunch of

9   other factors of, you know -- and the insurance has some

10  holes and, you know, gaps and whatever, and we're going to

11  negotiate with you a number 200 million or so, and that's the

12  amount we're going to give you to fill those holes and gaps

13  and that should work.  And that's the settlement that was

14  reached.

15          Absent this finding, there is a danger that the

16  settlement is interpreted as something else, which is that

17  the debtors paid $200 million to resolve what is, by their

18  own estimates, almost seven -- up to potentially $7 billion

19  in liability, and according to the -- you know, to the

20  victims' representatives, a whole heck of a lot more.  And

21  the -- so they settled the whole liability, the whole

22  billion -- multi-billion-dollar liability for 200 million and

23  maybe the right to pursue their reimbursement claim for that.

24          And that's not a deal that the claimants would

25  have agreed to.  And so what the need, the necessary for this

1  finding is, is to make clear what deal was reached in this

2  court.  And we think that this is the only -- this is, of

3  course, the Court that is appropriate to make clear what the

4  nature of the settlement in the plan is, the plan settlement

5  that is reached in this Court.

6          Again, it does not require the Court to say that

7  the policies cover any of this settlement.  If, as Your Honor

8  posited last week, the policies say we only cover the amounts

9  contributed by a debtor to a trust in bankruptcy, they still

10 say that and a coverage court will enforce that.  That's what

11 it says that they pay.  If the policies don't cover any of

12 the claims at all, they don't cover any of the claims.

13         But this is a clarification of what the deal is,

14 which is that the debtors are transferring their rights to

15 pursue coverage for the claims, not their right for

16 reimbursements of the amount paid and not limited to their

17 right to pursue reimbursement of the amounts paid to the

18 trust, that they paid to the trust, because that wasn't the

19 settlement of the whole liability, and that's it.  Those are

20 the -- those are the three findings.

21         THE COURT:  Well, isn't there an easier way to say

22 that, that doesn't use words like "allowed" and things like

23 that, that get interpreted certain ways?

24         MS. QUINN:  Is there is an easier way -- well, I

25 mean, there -- is there -- there's an almost infinite number

1 of ways to say it, so possibly yes.

2      (Pause)

3           THE COURT:  Yeah, I think this one is an -- well,

4 this is interesting because I would think this should not be

5 so controversial, but it is, apparently, relative to

6 insurance coverage issues.  And this is not the only context

7 in which we see this issue arise; and, yet, it seems to --

8 it's an issue for insurance coverage.  Cases are coming out

9 different ways on it, not bankruptcy cases, non-bankruptcy

10 cases.  Okay.

11      (Pause)

12           THE COURT:  Okay.  Ms. Quinn?

13           MS. QUINN:  And that's all I've got, unless you

14 have additional questions for me.  I can turn it over to

15 Mr. Goodman, who's going to talk some more about the

16 bankruptcy basis for some of these and the need for

17 discovery.

18           THE COURT:  Okay.  Thank you.

19           Mr. Goodman.

20           MR. GOODMAN:  Good afternoon, Your Honor.  Eric

21 Goodman, Brown Rudnick, counsel for the coalition.

22           To answer the last question, the standard under

23 Bankruptcy Rule 9019 is fair and equitable.  This comes from

24 the 1968 Supreme Court decision in Anderson, which held that

25 the rule that plans of reorganization be both fair and

1  equitable applies to compromises in a bankruptcy case.  We

2  can quibble over "equitable" and "reasonable," but I think

3  the import of both words are roughly the same in this

4  context.

5          With that answer provided, Your Honor, I would

6  like to come back to a question, beginning -- that you posed

7  at the last hearing because, frankly, that's what I'm

8  prepared to talk about first, which is:  Which of the

9  findings are legal issues, which are factual issues, and what

10 discovery is necessary, and how does all of this relate to

11 plan confirmation?  And I'm going to try to do my best to

12 answer those questions very directly.

13         There are five findings in the plan that were in

14 the restructuring support agreement.  They appear on

15 different paragraphs in the plan, in Article 9(a)(3).  I'm

16 going to refer to them as "Findings 1 through 5," for the

17 sake of simplicity.

18         Two findings that I'll discuss in a moment are

19 purely legal issues, two are obviously factual issues, and

20 the third is hybrid because it has to do with appropriately

21 documenting or clearly documenting what our settlement is.

22         I'll start with the two legal issues, and I'm not

23 going to spend a lot of time on the first because I think

24 this has been already discussed at length, which is:

25         Finding 1 appears in Article 9(a)(3-Q), which is

1  that the plan be binding on all parties-in-interest.  This

2  finding, obviously, does not require this Court to interpret

3  any insurance policies or make any coverage determinations,

4  nor does it require the Court or even ask the Court to

5  rewrite any insurance policies.  This finding is about basic

6  principles of res judicata and collateral estoppel, as they

7  have been applied in bankruptcy cases for years.

8             Judge Drain did address this exact issue last

9  month in Purdue.  He held, and I quote:

10             "There is no concept or requirement that a plan be

11  insurance neutral."

12             I presume that Judge Drain read Combustion

13  Engineering and Global Industrial because the same insurance

14  lawyers in this case cited those cases to him and argued that

15  issue in front of Judge Drain.  Obviously, they lost.

16             I would go further and say that, because the

17  bank -- because of the Bankruptcy Code, the plan here

18  actually has to be binding on the insurers.  The insurers,

19  including Century, claim that they are creditors.

20  Section 1141(a) mandates, therefore, that they be bound by

21  the confirmation order.  So, as to Century, there's just

22  simply no way that they could not be bound.

23             In addition to that, the insurers here have

24  notice.  They are active participants in the case.  If we

25  were to pull all of the transcripts at the end of this case

1  and see who spoke the most, I would put my money on

2  Mr. Schiavoni.  Third Circuit case law requires that, when a

3  party appears, litigates, objects, and an order is entered,

4  that order is binding on that party.  This is a legal issue,

5  not a factual issue, so I don't think there is any discovery

6  needed for this.

7           So that moves on now to Finding Number 2, that is

8  the insurance assignment must be authorized.  This is in

9  Article 9(a)(3-J) of the plan.  And this also is a purely

10  legal issue and one that does not require the Court to

11  interpret any insurance policies or make any coverage

12  determinations or rewrite the terms of any insurance

13  contracts.  Parties are free to argue that the insurance

14  rights are or are not assignment at plan confirmation.  I

15  think we have the better argument under Third Circuit law

16  that this is a legal issue on which discovery is not

17  necessary.

18           Before I move on, I want to make a very keen

19  observation, which is this:

20           As the Court well knows, sometimes parties change

21  their mind during a bankruptcy case.  You hear counsel for

22  AIG and Century say last week and again today that their

23  clients simply cannot settle unless they get finality.

24  Finality.  That is an important word, "finality."  Let me

25  explain what I think they mean by "finality."

1          Many of the insurers want to settle.  The BSA

2    policies that they issued years ago have multiple insureds.

3    In some years, it's the BSA and the local councils; in other

4    years, it's the chartered organizations are also insureds.

5    That's why 1976 is so magical, not just because it's a

6    bicentennial year, but chartered organizations are not

7    additional insureds under the BSA policies pre 1976.

8          The chartered org proposal that you've heard so

9    much about and will probably hear more about is entirely

10   insurance driven.  When the insurers say that they are

11   settling, what they want is to buy back the policies, which

12   means that you have to collect all of the rights from all of

13   the insureds.  It's kind of like a game of monopoly.  You

14   have to own all three properties before you can build a

15   hotel.  There are the BSA rights, there are the local council

16   rights, and there are the chartered org rights.  You put all

17   three together, assign those rights to the settlement trust,

18   and then you can settle with the insurers.

19         The insurers that want all of the rights -- there

20   are insurers that want to settle and they want all of the

21   rights to be assigned to the settlement trust.  The insurers

22   that have not settled may stand up today and say, Judge, you

23   cannot approve these assignments.  But they may be standing

24   before you at plan confirmation saying, Judge, you absolutely

25   have to approve these assignments, we consent, I changed my

1  mind.

2         I mention this today only because this Court does

3  not know, right now, if any insurers are actually going to

4  appear at confirmation and object to the assignment.  We are

5  here on a disclosure statement.  This is clearly a

6  confirmation issue and one that I don't even know how you

7  sort out today.

8         Finding Number 3 is the finding that the, quote,

9  "right to payment" that the holder of an abuse claim has

10  against the debtors is the allowed value of the abuse claim.

11  This is in Article 9(a)(3-F) of the plan.  This finding is

12  based on quotes from and is worded entirely based on the

13  definition of "claim" set forth in Section 101(5) of the

14  Bankruptcy Code.

15         As a legal matter, a survivor's right to payment

16  from the debtors is not what the debtors can afford to pay.

17  If that were true, no debtor would ever be insolvent.

18         Now I want to be clear on one point.  We are not

19  asking the Court to rule on what the insurers must pay.  If

20  you look very carefully at this finding, you'll see that the

21  word "insurer" does not appear anywhere in this finding.  I

22  would very much like to put a finding like this in front of

23  the Court that said the insurers must pay, but I think I know

24  what the Court's answer would be.

25         This finding, the one that is actually in the

1  plan, as opposed to the one that is invented, doesn't say

2  anything about insurers being liable.  Insurers can and will

3  argue post-confirmation that their policies do not require

4  them to pay any of the claims determined under the TDP.  What

5  we are doing is making it clear what the terms of our

6  settlement are and what we are agreeing to.

7           We believe and what the plan settlement reflects

8  is that the debtors will fund a trust.  That trust will

9  assume liability for and will be responsible for paying abuse

10  claims.  The debtors are making a contribution to the trust.

11  That contribution is not the same thing as the liability that

12  the debtors estimate to be between 2.4 and $7 billion.

13  Rather, it is just a contribution.  The trust will pursue and

14  liquidate the trust assets and the trust will make

15  distributions to survivors based on their claims.  And as the

16  Court noted, those distributions must be made on a pro rata

17  basis, based on the allowed amount of the claims.

18           The settlement that we support and will recommend

19  to tens of thousands of survivors to vote in favor of is the

20  settlement reflected in the plan, which does not wipe out or

21  extinguish billions of dollars in liability for a mere

22  $220 million.

23           We have to be clear about what we are agreeing to.

24  I don't want anyone to say that we agreed to a settlement

25  that we did not, in fact, agree to.  Neither you, nor I can

1  control what a coverage court does with the confirmation

2  order, no question.  But I learned years ago from a veteran

3  banking attorney at Sullivan & Cromwell that sometimes you

4  have to use very clear language on issues that are obvious to

5  you, in order to make aspects of a deal clear to parties that

6  haven't lived it.

7          We have to be very clear about what we are

8  agreeing to.  I don't want anyone to say that the right to

9  payment that the abuse -- holders of abuse claims have is the

10  $220 million that the debtors are contributing to the trust,

11  and I don't want anyone to say that we supported a plan or a

12  settlement that meant that.  Parties that settle have a right

13  to know what the settlement is.

14          And I'll note this is a confirmation issue for us

15  because we don't support a plan of reorganization that is

16  intended to effectuate a discharge of the insurers' potential

17  liability, whatever that may be.

18          I will also note that, if the plan is delivering

19  or is intended to deliver a, quote, "Fuller-Austin result," I

20  don't see how the Court could approve a channeling injunction

21  under Millennium.  Fuller-Austin, in my view, was incorrectly

22  decided, but it was incorrectly decided because of ambiguous

23  language in the plan and the confirmation order.  That is not

24  a mistake we care to repeat.  This is a confirmation issue

25  and it goes to the heart of the plan because of the

1  channeling injunction and our need to know what our

2  settlement is, and it's clearly stated.

3          So that leaves Finding Number 5.  This is that the

4  TDPs are fair and reasonable based on the evidentiary record

5  offered to Bankruptcy Code at the confirmation hearing.  This

6  is set forth in Article 9(a)(3)(R) of the plan.  This is -- I

7  call it the lightning rod.  This is the one that gets all the

8  attention, Your Honor, so let's talk about it.

9          This finding does not ask this Court to interpret

10  any insurance policies or make any coverage determinations.

11  And I'm going to be very, very clear on what I'm about to

12  say.  No one is asking you to find that the insurers must pay

13  the $3500, we are not asking for that finding.  No one is

14  asking you to find that the insurers must pay any claim

15  determined under the TDP; we are not asking you for that

16  finding.  And no one is asking you to find that the insurers

17  must pay time-barred claims, we are not asking for that

18  finding.  Those are straw man arguments.

19          We want an evidence-based TDP.  What does that

20  mean?  We want a TDP that is based on and mirrors the

21  debtors' historical settlement practices and experience in

22  the tort system.  Under what circumstances did the debtors

23  agree to settle abuse claims prior to the bankruptcy?  And

24  there are a lot of them.  What did they agree to pay?  What

25  did the insurers agree was a reasonable settlement?  What

1  evidence has to be produced by the survivors?  That is what

2  we're trying to do.

3         We want the Court to approve a process that's fair

4  and reasonable and equitable based on the evidence.  A couple

5  things follow from this.

6         First, this is obviously a confirmation issue, not

7  a disclosure statement issue.  The evidence in question has

8  not been offered.  The insurers are entitled to produce their

9  own evidence, we hope they do, but the Court cannot judge the

10 evidence until we get the plan confirmation.

11        Second, discovery.  The evidence needed on this

12 topic is in the debtors' possession, custody, and control,

13 and I know this because this evidence has already been

14 produced.  The debtors know their own settlement practices

15 and they know how much they have paid to settle abuse claims.

16 And the insurers have all of this information too because

17 they approved the settlements and they also have been given

18 access to the same information.

19        There was the discussion last week about the Bates

20 White report and the TDPs.  The Bates White report is based

21 on an analysis of the settlement data.  In terms of timing,

22 in terms of which came first, the chicken or the egg, the

23 Bates White report came first, the TDPs followed by several

24 months.  And the point of the TDPs was to reflect the

25 debtors' own historical practices and settlement values.  The

1 data the debtors have already shared and was used to create

2 the TDPs doesn't need months and months of discovery,

3 everyone has it.

4             And I'm going to make this point because I think

5 it's obvious, but it needs to be said, discovery from

6 survivors or law firms would not be relevant to this finding

7 at all.

8             I want to be clear on another point:  this finding

9 does not ask the Court to determine how many valid claims

10 there are.  The findings and orders put the reasonableness

11 and the fairness of the matrix values and the procedures

12 before the Court, they do not put a --

13             THE COURT:  Well, what 1129 standard does that go

14 to?

15             MR. GOODMAN:  This goes to the 9019 standard that

16 Ms. Quinn mentioned, Your Honor.

17             THE COURT:  Okay, so this is another 9019 issue.

18             MR. GOODMAN:  Yes, it is.

19             THE COURT:  And why -- and who is it a settlement

20 among?

21             MR. GOODMAN:  Again, it would be a settlement

22 among the abuse survivors and the debtors.

23             THE COURT:  Why is the debtor a party to that

24 settlement?

25             MR. GOODMAN:  Because they are the party who is

1  liable for the abuse claims and they are the proponent of the

2  plan.

3         THE COURT:  Well --

4         MR. GOODMAN:  I also think it would be --

5         THE COURT:  -- but -- but they --

6         MR. GOODMAN:  -- I'm actually --

7         THE COURT:  -- are providing a number, they're

8  providing an amount, they're making a contribution and then

9  they're gone, not unlike many debtors, mass tort or not, not

10  unlike many debtors.  The settlement with the debtors is

11  their contribution.  So how is this a settlement among the

12  debtors and the abuse survivors?

13         MR. GOODMAN:  Well, Your Honor, I think the Court

14  could entertain the settlement of a claim under 9019.  Here

15  we have --

16         THE COURT:  A claim.

17         MR. GOODMAN:  -- here we -- yes.  I mean, if there

18  was a claim filed against a debtor, let's just say you had an

19  ordinary trade claim filed for a million dollars, the debtors

20  were to file an objection to that claim, the parties

21  negotiated and agreed on a settlement of that claim, I

22  believe that would be brought before the Court under 9019.

23         And I will amend my prior response, Your Honor.

24  Actually, that also is 1129, because the 1129 fair and

25  equitable is actually what informs the 9019 issue.  So I

1  actually think that it's both 1129 and 9019.

2           THE COURT:  I find --

3           MR. GOODMAN:  We can get more --

4           THE COURT:  -- I find -- I have said on any number

5  of occasions that I do not believe a plan to be a settlement.

6  The plan gets imposed on people, it's not a settlement.  And

7  I get asked to make all kinds of findings at confirmation

8  that I don't find are appropriate.  So far, nobody has been

9  able to convince me I'm wrong on that one point, but that's

10 why I want to understand what the finding is and who is the

11 settlement among.  I get the intra-abuse creditor nature of

12 the settlement.  I'm not sure I understand at this point how

13 the debtor -- the debtors' interest in the allocation of

14 funds that it has contributed and to which it has no more

15 liability, it's contributed, it's done.

16          MR. GOODMAN:  Well, the liability here is being

17 assumed by the trust, so it's not --

18          THE COURT:  Uh-huh.

19          MR. GOODMAN:  -- disappearing, it continues on and

20 that liability has to then be determined post-confirmation in

21 accordance with the procedures.  Again --

22          THE COURT:  Well, an allocation does, yeah.  An

23 allocation does, which goes back to my question about why, in

24 fact if the debtor was on the other side of this issue, why

25 does it leave it to a trustee it didn't choose and a trust

1  advisory committee made up of plaintiffs' lawyers?

2          MR. GOODMAN:  Oh, I see the issue.  Yeah, I think

3  the concern that you're raising is that, once this process

4  goes into effect and the debtor steps away post-confirmation,

5  the debtor can't really control what happens in that process.

6  And, you know, the insurers have painted a picture of all of

7  the tort lawyers in this case effectively settling with

8  themselves and, you know, presenting inflated claims.  No, I

9  hear that point.  I don't know, though, how this issue is

10  really before the Court on this one.  I mean, it's the

11  debtors who have proposed the plan; it is the debtors who

12  have put forth the TDP based on their own historical

13  settlement practices and values.

14          So, given that the debtors are the plan proponent,

15  I don't think that they can absolve themselves of

16  responsibility on this one until the confirmation order is

17  entered.

18          THE COURT:  I hear you, but the concern I have I

19  want directly addressed, the concern I have in this case and

20  others, and it's how are these trust distribution procedures

21  negotiated and who is it a settlement among or is it really

22  just an allocation among claimants.  And, again, it's really

23  no different than any bankruptcy case in which the debtor

24  makes a contribution and then they don't care how it gets

25  whacked up, right?  Here's -- I get to give this amount and I

1  walk away, I get my discharge, I don't care how it's whacked

2  up.

3          This is -- the trust distribution procedures are

4  in essence the whack-up, right?  That's what it is.  Maybe I

5  have to rule on them and maybe I don't, but that's what I'm

6  trying to figure out.  And then, of course, what's going to

7  be done with them later on down the line.  Maybe I need to

8  know, maybe I don't, but what 1129 standard is it that I have

9  to make these findings on.  And if it's not an 1129 standard,

10  if it's a 9019 settlement, then who is the settlement among,

11  for real.  And those are the questions I have.

12          MR. GOODMAN:  Your Honor, thank you, and normally

13  I'm prepared for everything, but on this one I actually think

14  I want to go back and do some more research and homework on

15  this in terms of what 1129, 1123, and 9019 say on these

16  issues.

17          But I would note this point, because I was

18  recently dealing with a similar issue in front of the Ninth

19  Circuit where a party contended that a specific provision in

20  trust distribution procedures simply had to be struck down

21  because the trustee could go rogue and not comply with it.

22  And, you know, my response to that was, wait a second, you're

23  not really objecting to the procedures, what you're claiming

24  in advance is you think that people won't comply with them,

25  you think people won't follow the procedures, and that's

1  really not fair.  I mean, I think what you're doing is you're

2  sort of prejudging or assuming ahead of time that the trust

3  distribution procedures won't be followed, that the trustee

4  won't do his job; that the parties administering the claims

5  won't do so with integrity in regard to their fiduciary

6  obligations.

7        I don't begin my day with those assumptions.  I

8  think that we have to assume that if procedures are

9  propounded or put forth by the debtors in terms of what they

10  think is fair and reasonable based on their historical

11  settlement practices, if that is being imposed on the

12  survivors here, because the survivors are not free to

13  allocate among themselves how this gets divvied up, you know,

14  here, Your Honor, it's different.  It's not as though all of

15  the tort lawyers are getting in a room and deciding how these

16  funds get allocated among themselves and, you know, how the

17  claims are allowed, that would be a negotiated TDP, this is

18  an evidence-based one.  This is where the debtors are coming

19  in and saying these are our practices, these are the values

20  where we settled claims, this is what we required before we

21  would enter into a settlement with an abuse victim and

22  they're imposing that process on us.

23        We're accepting it because the debtors have a need

24  and I think they have an obligation to put forth procedures

25  that are fair and reasonable, as opposed to ones that are

1  just arbitrary and capricious.  That obviously wouldn't work
2  in a bankruptcy case.

3         So I do think that the debtors have an interest in
4  this.  I will argue now and argue, I believe, in the future
5  that the debtors are a part of this from a settlement
6  standpoint because right now they have the liability for
7  these claims and they are trying to resolve the abuse claims
8  in this bankruptcy case.  If we don't resolve the abuse
9  claims, Your Honor, a lot of money has been spent here for
10  nothing.  That is something that we have to achieve and I
11  think that this goes to the heart of that resolution.

12         And if I did not answer your question, Your Honor,
13  I'll be back and I will read more cases.

14         THE COURT:  I'm not sure it's in the cases.  I've
15  been looking for this.

16         MR. GOODMAN:  I appreciate that.

17         The last finding, Your Honor, good faith.  No one
18  has talked about this, at least the insurers didn't.  That's
19  in Article 9(a)(3)-T of the plan.  The Court obviously has to
20  make a good faith finding in order to confirm a plan, that's
21  what Section 1129(a)(3) says.  This is also a factual issue.
22  And I raise it -- you know, a few things.

23         First, we can't avoid this.  This isn't really
24  coming from the findings, this is also coming from
25  1129(a)(3).

1          Regarding discovery, my understanding is that the

2    insurers want to pierce the mediation privilege and take

3    discovery on how the TDP was negotiated; I think that would

4    be wrong.  Whether the TDPs and the plan were proposed in

5    good faith I think follows from what those documents say.  I

6    don't think the mediation discussions would necessarily

7    inform that, but that issue, the reason I'm flagging it now,

8    is going to be one on which there are going to be discovery

9    disputes.  Obviously, there are things that the insurers are

10   going to want that the debtors are probably going to oppose.

11   If the debtors were successful in piercing the mediation

12   privilege, there will be a lot of discovery that I'll want

13   from the insurers that they probably will then oppose.

14          So I'm just flagging that issue, Your Honor, now

15   because I know that one of the things that we are trying to

16   get through for purposes of today or this week is an

17   appropriate schedule going forward on discovery issues.

18          THE COURT:  How does this finding -- and I think

19   1129(a)(3), good faith, is what the Third Circuit says it is

20   for confirmation, not some other good faith standard that

21   might be out there or not a general good faith standard, but

22   good faith as the Third Circuit defines it in collection with

23   1129(a)(3).

24          But how does this, if at all, since you've brought

25   up mediation privilege, how does this align with the position

1  that the -- that we just discussed with respect to finding R

2  that the debtors' part of the settlement of the TDPs, that

3  they were involved, is this involved with the good faith

4  finding, is that something I have to be concerned about

5  breaking mediation privilege on?  How do those two -- and I

6  don't know, I'm asking -- how do those two findings mesh, or

7  are they separate?

8         MR. GOODMAN:  My answer to the question posed is

9  that those two findings are separate and distinct, but I do

10 think that there is going to be some overlap, and I think

11 that they are the two factual issues that will be before the

12 Court at plan confirmation and, therefore, I think it follows

13 that those are the two issues on which there's going to need

14 to be discovery.

15        And I don't know that I can go much further than

16 that at this point other than to flag those issues, but I

17 will say this -- and we'll get there later when we talk about

18 scheduling -- if you think in terms of are the trust

19 distribution procedures reasonable based on the debtors'

20 historical practices.  If you asked the question, you know,

21 about the plan itself being proposed in good faith, the

22 discovery necessary to inform the Court and for the Court to

23 rule on those issues I don't think is going to be this six-

24 to-eighteen-month-long circus that would involve going out

25 and deposing thousands of abuse survivors, because I just

1 | don't know what -- I mean, I would -- I think the Court
2 | should hear from the abuse survivors at plan confirmation, I
3 | don't want to be glib on that issue, I think what they have
4 | to say is extremely valuable and important.
5 | I listened to the hearing last week, Your Honor,
6 | and I heard Mr. Washburn speak.  I thought he did so very
7 | eloquently and I appreciate the time that this Court afforded
8 | to him in listening to him and considering his views on these
9 | issues.  So those are obviously extremely important.  But in
10 | terms of the issues before the Court and getting through the
11 | 1129 issues, good faith and the fair and reasonable I think
12 | are what will -- what are and should inform the discovery
13 | that's necessary to get through plan confirmation.
14 | And I hate the fact that I did not give you a
15 | direct answer to your question, it's just that I feel as
16 | though I need to give a little more thought to that before I
17 | come back with an answer.
18 | THE COURT:  Thank you.
19 | MR. GOODMAN:  Your Honor, I have nothing further,
20 | unless you have more questions for me.
21 | THE COURT:  No.  Thank you.
22 | MR. MOLTON:  Your Honor, may I go next?
23 | THE COURT:  Do you have a separate topic from Mr.
24 | Goodman?
25 | MR. MOLTON:  I do, Your Honor.  I didn't expect

1 to, but I didn't expect to be involved in this afternoon's

2 discussion.  But Your Honor has asked about trustee selection

3 and TAC, which is something that I know a little about.  So

4 I'd like to talk about that, Your Honor, and address those

5 issues, which are separate from the insurance and the

6 findings issue.  So I'm not going to repeat anything that

7 you've heard from Ms. Quinn or Mr. Goodman, and I'm going to

8 be concise, Your Honor, and I'm going to cut to the chase

9 pretty quickly.

10         Your Honor, with respect to trustee selection,

11 there's nothing remarkable or unusual with respect to how

12 trustees are picked in mass tort cases.  As Your Honor noted

13 at the date of confirmation -- or the date the debtor emerges

14 from bankruptcy, I think you just said then they're gone and

15 that's true, and that's true of the debtors here and the

16 local councils here.

17         This is not like a charitable trust, Your Honor,

18 where the settler and the settler's wishes remain primary,

19 and the settler needs to retain control over those wishes.

20 Here, Your Honor, it's something even greater than that, it's

21 Your Honor's confirmation order and the plan and the plan

22 documents, which include -- and I'll get to this in a

23 minute -- the trust agreement, which will be approved by Your

24 Honor, and the TDP -- again, which will be approved by Your

25 Honor.

1          Indeed, Your Honor, contrary here to settlement

2   trusts or other assorted private trusts, family trusts, in

3   the mass tort context it is usually the settler, the settler

4   itself -- himself, itself -- that is at fault for the wrong

5   for which the bankruptcy occurred and which led to the

6   creation of the trust.

7          The beneficiaries here, Your Honor -- and here we

8   understand we're at about 80,000 beneficiaries, at least as

9   we count them now -- need to be assured and to be comforted

10  that the person, he or she, that's in charge of the trust

11  understand his or her job, have absolute independence -- and

12  I'll use that again -- subject, subject to what I just

13  mentioned, what I call the constitutional documents, because

14  I do represent trusts, Your Honor, in major mass tort cases,

15  and the constitutional documents for a trust and for the

16  trustee is Your Honor's confirmation order and the plan.

17         So somebody that has independence with integrity,

18  *bona fides*, expertise, and a reputation for getting these

19  very, very -- in this case, as Your Honor remarked, perhaps

20  one of the most challenging cases done.  Your Honor should be

21  advised that it's been my experience that never is a trustee

22  selected for which the debtor doesn't have input, doesn't

23  have a say, whether it be express, you know, conditional

24  approval or otherwise.  And this was a plan, Your Honor, that

25  contains a trustee selection that is being put forward by the

1  debtor.  So I just want to say that.

2         Some recent examples, Your Honor, you know, that

3  show exactly what I'm saying is PG&E, where the Honorable

4  John Trotter, appellate -- retired appellate judge from

5  California, was named a trustee under similar circumstances.

6  In Purdue, I know there are -- I won't say dozens, but a

7  multitude of trusts that are in the process of either having

8  been created or will be created that this process is

9  undergoing.

10         In Takata, Your Honor, in this very court, the

11  trustee came out of the TCC process, I think, with a

12  nomination or selection in which the TCC participated and is

13  operating those trusts.

14         I'm going to get back to the point, though.  The

15  point is what Mr. Goodman identified, is what's to stop a

16  trustee, as Your Honor said or suggests, from going rogue,

17  being in the bad, doing whatever he or she feels is

18  appropriate under the circumstances.  It's Your Honor's

19  confirmation order and Your Honor -- and the plan, which

20  contains the trust agreement and contains the TDP, which are

21  approved by the Court after notice, opportunity to object,

22  and a determination by the Court about what's right or what's

23  wrong in it.  That's as tight as it gets, Judge.

24         I think, you know, somebody used the word -- you

25  know, I forget what -- it was (indiscernible) -- but this

1   whole issue on trustee selection, I'll use a French word,

2   actually a Yiddish word -- I always say, here's a French

3   word -- boogie monster, it's the boogie monster in the

4   room -- because at the end of the day, Your Honor, if Your

5   Honor takes a look and I've asked for -- I didn't expect to

6   talk on this, Your Honor, at this length today, so I don't

7   have the docket number of the most recent trust agreement

8   that's been filed with Your Honor for Your Honor's

9   consideration, but I do want to note a couple of things in

10  it, Your Honor.

11          Section 1.7 of the trust agreement -- and these

12  are really tight -- from my perspective, Judge, a lot of work

13  went into this trust agreement and from all of the parties,

14  and that includes the TCC -- paragraph 1.7, "Jurisdiction.

15  The bankruptcy court shall have continuing jurisdiction with

16  respect to the trust; provided, however, the Courts of the

17  State of Delaware, including any Federal Court located

18  therein, shall also have jurisdiction shall also have

19  jurisdiction over the trust."  That's our Stern v. Marshall

20  proviso, I gather.

21          In any event, Your Honor, the ability to run rogue

22  is proscribed by a -- what would be a court-approved trust

23  agreement which contains at Section 8.5 -- and I hope I'm

24  reading the most recent provisions -- "Modification.

25  Material modifications to this trust agreement, including the

1  exhibits hereto" -- which are the TDP -- "may be made only

2  with the consent of the trustee, a majority of the STAC" --

3  which is the equivalent of what folks call the TAC -- "and

4  the FCR, which consent in each case shall not be unreasonably

5  withheld, conditioned, or delayed, and subject to the

6  approval of the bankruptcy court; provided, however, that the

7  trustee may amend this trust agreement from time to time

8  without the consent of approval or other authorization of,

9  but with notice to the bankruptcy court to make minor

10  corrective or clarifying amendments necessary to enable the

11  trustee to effectuate the provisions of this trust agreement,

12  provided such minor corrective or clarifying amendments shall

13  not take effect until ten days after notice to the bankruptcy

14  court," therefore giving anybody in the world who's following

15  your docket an ability to put their hand in the air and say,

16  no, no, no, no, no, that's not a clarifying amendment or a

17  minor corrective change, that is a substantive modification.

18         "Except as permitted pursuant to the preceding

19  sentence," it goes on, "the trustee shall not modify this

20  trust agreement in any manner that is inconsistent with the

21  plan or the confirmation order without the approval of the

22  bankruptcy court.  The trustee shall file notice of any

23  modification of this trust agreement with the bankruptcy

24  court and post such notice on the trust website."

25         Your Honor, that's the answer to your question, I

1  respectfully submit.

2          Second, the TAC, Your Honor asked about the TAC,

3  what we call the STAC.  If Your Honor looks at the trust

4  agreement, you will see they have absolutely -- by the way,

5  I'll go back a second.  Judge, how many times in a week when

6  I get a question on some of the other cases that I represent

7  trusts on, which include Takata and include PG&E, I get a

8  question and the first thing we do is let's go to the -- you

9  know, not let's go to the videotape, let's go to our

10  constitutional documents.  That's the answer to your

11  question.

12          Our trust agreement, Your Honor, prohibits, does

13  not allow, does not contemplate, does not envision any of the

14  TAC members from having a role in claims administration,

15  that's not what they're there for.  They're there to provide

16  their experience, expertise, ideas, et cetera, in a

17  cooperative, consultive way in order to make the trust work.

18          We articulate in the trust agreement, Your Honor,

19  those matters requiring consultation by the trustee with the

20  TAC, what's called the STAC in the FCR -- and that's

21  paragraph 5.13, Your Honor, of the trust agreement -- stuff

22  that folks who -- folks who have an overriding interest in

23  seeing beneficiaries treated fairly arguably should be

24  consulted on it.

25          And by the way, Your Honor, you know, I tried to

1  find it in the time, but my understanding is the trust

2  agreement -- and I could come back to this because I know

3  it's in others -- say that the TAC members have a

4  fiduciary  -- they don't become a TAC member without

5  accepting this -- a fiduciary obligation to the

6  beneficiaries.

7          So 5.13, "Matters requiring consultation.  The

8  trustee shall consult with the STAC and the FCR on the

9  following:  the selection or replacement of the claims

10 processor; two, the forms of a release to be executed by a

11 beneficiary; an annual estimate of the budget of trust-

12 operating expenses" -- always an issue -- "and the

13 administration investment of assets of and expenses to be

14 charged against the future abuse claims reserve."

15         Again, all issues in which you would think that

16 folks acting in an advisory fashion as fiduciaries for the

17 beneficiaries might have views on and might help -- help --

18 the trustee with its, his or her, independent decision-

19 making.

20         Section 5.14, Judge, then articulates the matters

21 requiring the consent of the STAC or the FCR with respect to

22 decisions of the trustee, "(a) the determination of the

23 initial payment percentage and any subsequent adjustment of

24 the payment percentage."  That's the amount, the pro rata

25 payment based on the corpus of distributable assets in the

1  trust that will go to claimants.  Clearly, the bedrock rule

2  of bankruptcy is pro rata, pro rata, pro rata, nobody wants

3  to be in a position where too much money is being given,

4  thereby leaving folks later on who are later in the

5  submission of their claims, have more difficult claims, and

6  their determination is made later from not getting the same

7  pro rata amount.

8          So that's A, consent for that, consent of the TAC

9  for any proposed modification of the indemnification

10  provisions of the trust agreement.  That's clear because they

11  are indemnified parties as fiduciaries.

12          "(c) any proposed sale, transfer, or exchange of

13  trust assets above bracket a certain amount," and that's

14  going to have to be determined.  Any proposed sale of trust

15  assets below that amount shall not require the STAC or the

16  FCR consent.

17          Next, 4, "Any apportionment, appointment, or

18  retention of the special reviewer or any successful special

19  reviewer in the event of a vacancies."  The special reviewer,

20  Your Honor, is a position -- and I don't want to get too much

21  in the weeds but will have appellate-like overview of any

22  what I call insurer -- post-effective date insurer or

23  chartered organization settlements by the trustee."

24          And then also with respect to -- again, I don't

25  want to get too much in the weeds -- there's various way in

1    which folks who -- beneficiaries can exit into the tort

2    system whether or not they exit.

3            "Consent," item 5, "any proposed material

4    modification to the trust agreement or the TDP, if and as

5    required by the consent provisions set forth herein."

6            And of course, that would of course at the end of

7    the day require Your Honor's final approval.

8            Next, "Any proposed increase or decrease in the

9    size of the future abuse claims reserve," again, another

10   unremarkable instance in which the TAC would have consent

11   rights over the independence of the trustee.

12           And, lastly -- and this is the special situation I

13   talked about -- "the commencement or continuation of a

14   lawsuit by a direct abuse claimant against the trust pursuant

15   to a tort election"  -- and I'm not going to get too far in

16   the weeds on that, Your Honor -- "and approval and execution

17   of any global settlement subject to the terms of another

18   provision of the trust."

19           All of those are pretty unremarkable.  You know,

20   it's the same thing, Your Honor, with respect to what I would

21   call a non-ordinary course -- non-ordinary course sale by the

22   debtor, it's going to -- the debtor just doesn't get to do

23   it, it's going to have to require further approval here by

24   the TAC, under certain circumstances and in accordance with

25   the trust agreement.  And there's specific provisions as to

1  how that happens and, again, it's pretty detailed and I'm not

2  going to get into it.

3          So that's my, hopefully, not too long answer to

4  Your Honor's questions.  And if Your Honor gives me leave, I

5  would just like to -- since I guess I'm batting clean-up

6  here -- just address just a number of other points that were

7  made earlier in the day that don't necessarily relate to

8  those issues but relate to a few others.  I promise, Your

9  Honor, I'm going to be very brief.  May I?

10         THE COURT:  Well, I thought I was going to hear

11  from Ms. Lauria on those.  Let me hear from Mr. Harron on

12  these specific issues, I want to finish this out.

13         MR. MOLTON:  Okay.  Thank you, Judge.

14         MR. HARRON:  Thank you, Your Honor.

15         THE COURT:  Mr. Harron.

16         MR. HARRON:  For the record, Ed Harron for the

17  Future Claimants' Rep.

18         I want to address three issues that Your Honor has

19  been focused on:  the specific issue of the structure of the

20  trust and the trust administration, why the findings are

21  appropriate, and why the findings don't render the plan

22  unconfirmable.

23         First a simple point on the trust structure.  This

24  trust structure follows a structure with which Your Honor is

25  well familiar, the non-mass tort cases.  As Your Honor is

1  aware, in the non-mass tort cases where there's a settlement

2  trust or litigation trust, it's almost always the case that

3  the beneficiaries of the trust are the unsecured creditors

4  and that trust -- that the trustee is selected by the

5  creditors committee and the oversight of that trust is

6  handled by an analog to the creditors committee comprised of

7  the same or a subset of the members.

8          So, really, there's nothing different here.  And

9  the reason that you have -- the only real difference is you

10  have an FCR and that's in part because of the long-tail

11  nature of the trust.  And really, for example, the payment

12  percentage is a spot where an FCR is helpful to provide a

13  counterbalance to the committee representing the interests of

14  current claimants, when the trustee is forced to evaluate the

15  payment percentage.  The current claimants, obviously, always

16  want the trust to pay out as much as reasonably possible as

17  soon as reasonably possible.  It's incumbent upon the future

18  claimants' rep to make sure that the payouts are consistent

19  with our view of the trust's future liabilities.

20          So, really, these trusts follow the same structure

21  that you see in the non-mass tort cases except for the

22  addition of the future's rep, which we think is appropriate

23  based on the application of a payment percentage and the

24  long-tail nature of many of the torts.

25          That's all I have on that topic, Your Honor,

1  unless you had questions.

2        THE COURT:  No.  I mean, I think that's a fair

3  analogy, but I think it -- it's again because the debtor is

4  out of the equation and you have a liquidating trust that's

5  for the benefit of creditors.  So, yes, I think it's --

6  you're right and I think it follows that.

7        MR. HARRON:  But keep in mind, Your Honor, that

8  it's not only the creditors that want the debtors to be out

9  of the equation, the debtor wants to be out of the equation.

10       THE COURT:  Yes.

11       MR. HARRON:  The debtor wants to be fully and

12 finally resolved of this issue and, therefore, it walks away,

13 but as part of that walk-away the parties with a financial

14 stake need some reasonable assurance that the trust is going

15 to work and that the trust will operate in a way that it

16 preserves the value of the estate assets, and that's all

17 we're asking for here.

18       So, you're right, the debtor has a stake in making

19 sure that the trust serves its purpose and obtains the

20 support of the survivors and meets the requirements of the

21 bankruptcy code, primarily because they want the finality of

22 the injunction.  But really during the case the debtor has a

23 strong interest in making sure the trust is appropriate and

24 satisfies all those concerns.  It's not until the case is

25 over on the effective date when the debtor really has -- no

1  longer has an interest in it.

2          So I don't think it's fair for anyone to suggest

3  that the debtor has no interest in how these procedures work.

4  The debtors want to vote and the debtors want the procedures

5  to comply with the bankruptcy code.  The claimants want the

6  procedures to work in a way that maximizes the value of the

7  assets or, at a minimum, doesn't diminish the value of the

8  estate assets, and that takes me to my second point.

9          Your Honor, insurance is a significant asset,

10 particularly for future claimants.  Our future claimants

11 primarily are those claimants right now who are under 18.  In

12 our view, they'd have full access to insurance to cover their

13 claims -- and these are claims for which Century does not

14 provide coverage -- absent the bankruptcy, they'd be paid in

15 full.  Even were the Scouts to liquidate, these future

16 claimants could go out and sue the chartered orgs and access

17 this very same coverage.  We don't need the Scouts, we don't

18 need the bankruptcy to get paid from insurance.

19         So, in our view, we want assurances that when this

20 case is over the bankruptcy has done no harm to the ability

21 of claimants to recover insurance, the Boy Scouts' insurance,

22 to the very same extent they could before the bankruptcy.

23         For example, Your Honor, and as I've mentioned,

24 it's important to the BSA that they kind of put this issue

25 behind them.  And one of the things for which they've

1  negotiated is that the claims will be resolved pursuant to a

2  trust.  Subject to some limited exceptions, claimants no

3  longer will name Boy Scouts or other participating parties

4  when they seek to get paid on their claims.

5          You may recall, Mr. Plevin mentioned earlier today

6  that it's his view -- and, anecdotally, he's asking you to

7  make a coverage finding when he suggests to you what the

8  policies say, but it's his view that the insurers don't have

9  to pay a thing until the Boy Scouts or other parties are

10  named in a lawsuit.  We have to reconcile these interests,

11  the interests of the claimants in preserving the insurance

12  asset and the interest of the Boy Scouts in no longer being

13  named as defendants in lawsuits, and we have to do it in a

14  way that doesn't allow lawyers like Mr. Plevin to argue in

15  the future that, hey, because the injunction doesn't allow

16  claimants to name the Boy Scouts, you no longer have

17  coverage, that's what we're trying to do.

18          So, Your Honor, there's a fair and equitable

19  component in Section 524(g).  As Mr. Rosenthal noted, this is

20  not an asbestos case, but I think even Mr. Rosenthal would

21  concede that analogies are drawn from 524(g) in non-asbestos

22  mass tort cases.

23          The 524(g) provision to which I allude is Section

24  524(g)(4)(B)(ii) where it talks about the relief --

25  "identifying the debtors and other third parties in an

1  injunction with respect to such demands, i.e. future

2  claimants, is fair and equitable with respect to the persons

3  that might subsequently assert demands."

4         And that's our point, Your Honor, we think this

5  plan is only fair and equitable if it doesn't prejudice our

6  ability to obtain insurance to the same extent we could

7  access that insurance pre-bankruptcy.  In our view, that's

8  what the findings do.  They don't expand the estate's rights,

9  they just make sure that the insurers don't opportunistically

10  utilize the bankruptcy to create defenses to coverage that

11  didn't exist before the bankruptcy occurred.  And, as I

12  mentioned a few days ago, we believe that's consistent with

13  Section 524(e) of the bankruptcy code, which makes clear that

14  the discharge of the debtor shall not release co-liable third

15  parties.

16         Your Honor, to my final point, you know, and

17  essentially why this plan should go out with our proposed

18  findings, the standard for denying a disclosure statement

19  based on the terms of a plan is basically the plan could not

20  possibly be confirmed.  It's often referred to as un-

21  confirmable on its face.  Your Honor, I'd suggest to you that

22  if you review the insurers' arguments in opposition to the

23  findings, their premised almost exclusively on factual

24  conjecture.  They speculate about the plan proponents'

25  motivations, they speculate about the quality of the claims

1    to be resolved by the trust, they speculate about the manner

2    in which Boy Scouts resolved claims prior to the bankruptcy,

3    they speculate that they're only liable if cases are taken to

4    judgment when we all know that they paid plenty of cases in

5    settlements and not judgments, they speculate about how we

6    might want to use these findings in other cases.  When Mr.

7    Rosenthal told you that the only party that's conceded that

8    they're opposing these findings for purposes of other cases

9    is Mr. Rosenthal and his clients, when he told you we won't

10   settle because of this precedent.

11        So, Your Honor, we'd suggest that if they need to

12   rely on factual speculation that supports our suggestion,

13   that we be allowed to make a factual record and that we'll

14   refute each and every one of the things they said, and we'd

15   like to do it at confirmation.  As a matter of law, that

16   would suggest that these findings are inappropriate, but

17   we've explained as a matter of law why they are.

18        Now, Your Honor, one thing you did not hear from

19   the insurers at all today was how these findings prejudice

20   their interests as creditors of the estate, not one mention

21   of it.  They're here today arguing in their capacity as

22   debtors of the debtors and debtors to the claimants.

23        And why do I mention that, Your Honor?  Well, I

24   get the sense that Your Honor is struggling with how best to

25   move this case forward, how best to do it quickly,

1  efficiently, and in a manner that preserves Scouting, and

2  you're wondering whether these findings will bring the

3  insurers to the table or prolong confirmation.  And I would

4  suggest to Your Honor that with the limited time you have to

5  hear from all of us and review our pleadings, you know, I'm

6  very sympathetic, that's a tough position for you to be in,

7  and I think the more appropriate route is just to defer to

8  the law and the bankruptcy code and what renders a plan not

9  confirmable on its face.

10           And I would also add, Your Honor, that the estate

11  fiduciaries, the debtor, the future rep, we have no

12  independent financial incentive, which is unlike the

13  incentives of the insurers.  The debtor; the future rep; the

14  Coalition, to the extent they're a fiduciary, which I believe

15  they are; and the TCC, who supported these findings when we

16  negotiated the term sheet -- I'm not certain today whether

17  Mr. Stang supports them still, but when he signed the RSA he

18  did -- all of the estate fiduciaries view these findings as

19  part of a package, which we believe is the most efficient and

20  appropriate way to get this case to confirmation.  And we

21  would suggest that our role as estate fiduciaries should

22  entitle us to more deference than what you're hearing from

23  insurers acting in their capacity as debtors of the debtor.

24           Thank you, Your Honor.

25           THE COURT:  Thank you.

1          Okay, we're going to take a break at 2 o'clock.

2   Mr. Stang, you have the floor between now and 2:00 --

3   Eastern, because you're on the West Coast.

4          (Laughter)

5          MR. STANG:  Thank you, Your Honor.  I just -- this

6   might in the nature of the cleanup.  You had asked earlier in

7   the hearing whether you were going to be asked or have you

8   been asked to determine the value of the claims and will you

9   be asked to do that.  And I think you said, well, no one has

10  asked me yet.  And there was an allusion, it may have been by

11  Mr. Rosenthal, to the aborted estimation motion.  We do think

12  that you're going to have to value the claims in the context

13  of determining whether Master Mortgage has been met, whether

14  the Hartford TCJC settlements are fair to meet the 9019

15  standard or whatever conditional standards may exist because

16  they're in the plan, and also the best interests test.

17         We have filed an application to employ a valuation

18  expert.  That application is pending, that is why we sought

19  to employ that firm, and we think that you will be asked to

20  value the claims, at least in the context of those three

21  matters, if not others.

22         Thank you, Your Honor.

23         THE COURT:  Thank you.

24         Okay, Mr. Rosenthal, you have like 11 minutes.

25         MR. ROSENTHAL:  Your Honor, I was wondering if you

1  wanted a response or if we wanted to take a break.  I'm fine

2  with --

3          THE COURT:  No, let me hear from you,

4  Mr. Rosenthal.

5          MR. ROSENTHAL:  Okay.  First, Your Honor, I tried

6  to write down things as they were said, but I would say to

7  Your Honor, just to address sort of the fundamental point, I

8  have never thought of the TDPs as a settlement.  I think what

9  we have here is a plan.  As Your Honor correctly indicates,

10  the settlement between the debtor -- is between the debtors

11  as to how much they will have to contribute to the plan, and

12  that settlement is measured -- because that's what all plans

13  do -- that settlement is measured by the 1129 standards.

14          As you were saying, it's not really a settlement

15  with the debtor.  What really happened here is that the

16  claimants went out and they reached a deal with the debtor to

17  resolve the debtors' liability for an agreed amount of money

18  that the debtor thought was a pretty good deal and, in

19  exchange, the TDPs and the -- you know, the drafting of the

20  TDPs to the claimants, so that they could, as you were

21  saying, whack up whatever money came into that trust in

22  whatever way they thought appropriate.  I don't think the

23  debtors had anything to say about that, I don't think they

24  had a dog in that fight.

25          One of the things that you heard people say is

1  that, you know, this -- these TDPs reflect what the debtor

2  was doing in the tort system in historical norms.  That is

3  absolutely not true.  There were very few cases in the tort

4  system.  The historical norms, on average, were substantially

5  lower than what's being allowed here.  This is no different

6  than in an asbestos where the debtor -- you know, the debtor

7  turns over, you know, the keys to the trust to the claimants

8  and they figure out how to -- you know, how to distribute it.

9  In some cases, for example, in asbestos, meso claimants, they

10  don't get treated the same as other claimants in the trust,

11  they get a disproportionately high recover because that's a

12  negotiation that has occurred between the claimants' lawyers

13  themselves.

14          So I think the appropriate way to look at this is

15  as a confirmation issue, the appropriate standards are the

16  1129 standards.

17          There was some discussion, Your Honor, about a

18  trustee, why it wasn't chosen by the debtors and why a TAC.

19  So just a little background there.  Obviously, this is --

20  this comes from, originally, from the bankruptcy context.

21          When the debtors struck their deal, they didn't

22  really care what the deal looked like.  They didn't care how

23  the money was distributed, so they didn't care who was

24  distributing it.  I'm betting, Your Honor, that if you have

25  cases where, in fact, the debtor has an ongoing or a parent

1  company has an ongoing obligation to fund, that they would be

2  extremely interested in who the trustee would be.

3        In many of these cases we have three trustees to

4  represent various interests that sort of play off of one

5  another.  Here, we have one trustee that has connections to

6  the, you know, has connections to the claimants, including

7  the FCR, and is given wide discretion to allow claims

8  pursuant to these procedures.

9        The TAC is a typical, you know, the trust advisory

10  committee is a typical mechanism for a trust.  Their role is

11  really to sort of be the watchdog of what the trustee does,

12  and I think that's the same here.

13        One of the things that was pointed out, I think,

14  by Mr. Molton, in terms of the modification, is that they

15  have to come back to the Court for any modification.  I would

16  suggest to you that this is, again, this is exactly what Mr.

17  Molton said.  This is, again, the claimants wanting

18  safeguards against themselves.  They made this decision to

19  whack it up a certain way and they don't want the trustee to

20  change that decision, either without their consent or without

21  coming back to the Court, and that's the purpose, in this

22  TDP, of that provision.

23        Just briefly on Ms. Quinn's remarks, she had

24  argued that the findings don't really make determinations;

25  obviously, Your Honor, I disagree, and I think they can be

1   misused to imply that they, and suggest that you made

2   determinations, and certainly can be done to do unless you

3   clarify exactly what you're doing and what you're not doing.

4           And I think she or one of the others went on to

5   say that the insurers shouldn't get two bites at the apple.

6   I think this was made whether in response to one of my

7   comments or Mr. Plevin's, but this is exactly the point I was

8   making.  This is intended to be determinative.  Their view is

9   she couldn't get two bites at the apple.

10          The first bite is this Court's determination, and

11  then they're going to go to a coverage court and say, you

12  already decided it, Your Honor.  They shouldn't get two bites

13  at the apple.

14          One of the things that was mentioned by, I think,

15  Mr. Goodman is that I hadn't talked about the good faith

16  finding.  I was about to talk about that, but we got waylaid

17  at the time.  I agree that 1129(a)(3) requires a good faith

18  finding, but it requires a good faith finding with respect to

19  the plan, and they want to extend that finding to the trust

20  distribution procedures, which we think is not appropriate,

21  and it's inappropriate for all the reasons that I've been

22  discussing, which is to say, these weren't negotiated

23  procedures.  And so, what went on while the claimants were

24  deciding how they wanted to whack up these values isn't

25  proper for this Court to consider or opine on.

1          There was a reference, Your Honor, Ms. Quinn tried

2    to say -- and I knew she was going to do this because she was

3    very active in Purdue -- she tried to argue that, you know,

4    the horse is out of the barn, that Judge Drain had decided

5    that, you know, a plan should not be insurance-neutral.  I

6    don't think that's what Judge Drain decided, Your Honor.

7          As Ms. Quinn, herself, argued to Judge Drain, the

8    Purdue case was *sui generis* and didn't have a broader impact.

9    There were, in fact, no findings in Purdue that approved TDPs

10   or liquidations of values.  What was involved there was a

11   settlement, similar to the sort of the settlement between the

12   estate and, you know, between the debtors -- with the

13   debtors.

14          This time, though, it was a settlement, it was a

15   third-party settlement with the Sackler (phonetic) family.

16   So, I don't think that Purdue is analogous to this case, nor

17   do I think that it opens the door.  But if it does, Your

18   Honor, I think it goes back to a point that I was making,

19   that they're trying to use this Court to build on that case

20   to change the insurance neutrality doctrine or the doctrine

21   that you shouldn't -- in my view, that's the doctrine that

22   you shouldn't be altering the contractual rights of insurers

23   to something different, that you are able to alter the

24   contractual rights of insurers.

25          You had mentioned something about one of the

1  findings, I think it was T, something like that, that the

2  finding about, you know, is any amounts -- they use loaded

3  words.  In each of these findings they're using loaded

4  words -- allowed -- whatever.  Of course, the reason, I

5  think, Your Honor, they're using these loaded words is

6  because they want to squeeze them within the parameters of

7  allowed claims.

8         You know, the normal way you might -- you would do

9  something like this in an asbestos context, for example, is

10 their treatment, the treatment would be, you know, the

11 treatment of the asbestos claimants here, abuse claimants is

12 the treatment they get in the TDP, period.  That's the

13 treatment.

14        Let me -- I have a couple more things and then

15 I'll let us break.  One of the questions you asked me was

16 about expedited distributions and saying isn't this really

17 just a convenience payment?

18        I don't think it is, Your Honor.  First, we don't

19 make $3500 convenience payments in these situations.  We,

20 generally, would make smaller payments, and, of course, this

21 is in addition to the comment I made about no ability of the

22 trustee to object.

23        But I think another equally important point is

24 that these claims would never have been brought in the tort

25 system.  You know, for $3500 even, how many of these claims

1  would make it to the tort system?

2        It costs more than that to put the litigation

3  together and bring the claims.  So, these claims, and this is

4  more of an observation, you know, many of these claims would

5  never have been brought, and so this $3500 times 10,000 or

6  20,000 or 30,000 is a lot of money.

7        You had asked me on Ohio State, the Ohio State

8  decision, whether it was decided on an aggregate basis and I

9  got about a hundred emails from the insurers, some of the

10 insurers over the last 30 minutes saying it was that the

11 abuse was in, I think, 1998 and there was a two-year abuse

12 statute relevant there, and, you know, this was 20 years

13 later.

14        So, one more thing -- no, I don't think I have

15 anything further.  Thank you very much for the time, Your

16 Honor.

17        THE COURT:  Thank you.  We are going to take a

18 break, because, while I could continue, my staff needs a

19 break and they're, as we know, the most important people that

20 we have to be concerned about here, so we're going to take a

21 break.

22        But let me ask you one question, Mr. Rosenthal.  I

23 mean, you would agree that the settlement that the debtor is

24 making in this case is not just their contribution; it's also

25 the assignment, contribution, whatever you want to call it,

1  their right to insurance or insurance proceeds or their

2  whatever rights they have under the policy to the trust.

3           MR. ROSENTHAL:  I would.

4           THE COURT:  Okay.  We're going to take a break.

5  It's two o'clock.  We're going to take a break until 3:00 and

6  we'll be back.

7           We're in recess.

8           COUNSEL:  Thank you, Your Honor.

9       (Recess taken at 2:00 p.m.)

10      (Proceedings resumed at 3:03 p.m.)

11          THE COURT:  This is Judge Silverstein.  We're back

12 on the record in Boy Scouts.

13          MR. ABBOTT:  Thank you, Your Honor.  Ms. --

14          THE COURT:  I --

15          MS. ABBOTT:  Go ahead.  Your Honor, do you have a

16 desire about how we proceed from here?

17          THE COURT:  So I have thoughts about what I've

18 heard to date.  Mr. Schiavoni, I see your hand is up.  I'll

19 give you five minutes.

20          MR. SCHIAVONI:  Just, what if I just do it in a

21 minute because what I'm --

22          THE COURT:  Better.

23          MR. SCHIAVONI:  Better, good.  Here's what I'm

24 going to suggest to Your Honor if you could, you know, please

25 give some thought to in essence reserving decision or -- or

 1   discussion here until you hear now argument on the schedule

 2   because I think you've gotten a flavor, like one of the

 3   things we suggested the other day when -- or I did when we

 4   talked about this argument was how together with the -- with

 5   the -- one informs the other so to speak.  Okay?

 6            Whether or not Your Honor determines that a

 7   particular finding can or could not be made, and you may well

 8   decide the more prudent thing to do is to await confirmation

 9   and make that decision.  There's a secondary issue with

10   regard to each one of these, but, you know, frankly, I would

11   suggest that you've got to really look at them collectively.

12            And that is how they impact discovery, okay, and

13   the schedule because I think you've gotten a flavor that this

14   is -- these are not pure issues of law, that these are driven

15   by, I think, intense analysis of what happened.  The notion

16   that you're going to make a finding clarifying what the deal

17   is without having any of the documents before you of what the

18   deal is, in fact, right that was actually discussed among the

19   parties, how you're going to make findings that are very

20   broad on good faith instead of limited without having the

21   documents about the transaction, how you're going to make

22   some sort of finding that these are procedures that would

23   adjudicate 82,000 claims without actually having claimant

24   discovery and what not, it all implicates discovery.  And,

25   you know, the flip side of all of this is that, you know, the

1  debtor is saying do this discovery.  You're going to hear it

2  in 60 days and that you serve one set of discovery requests

3  and that's it.  And it's like, you know, we -- we get it all

4  done before Christmas.  It's like when, you know, bottom line

5  when this hits the circuit, it's like if, in fact, it's

6  presented just because I got -- I'm almost at the minute

7  mark, it's like what comes out is that like in some 60-day

8  proceeding, we generated an adjudicated result for 82,000

9  claims, you know, exceeding $100 billion or $200 billion, or

10  whatever the number is now.  You know, that tells its own

11  story.  This is not -- this is -- it's com- -- this is off

12  the rails as far as what the ask is for the findings and what

13  the -- the -- the discussion is on the discovery.

14          THE COURT:  Okay.  Thank you.  Okay.  Well, let me

15  give some thoughts and let me say this wasn't part of what I

16  was thinking about, but in terms of the appellate process

17  it's an important part of any case.  And it is a part of a

18  case.  And I think my job is to do -- is to make the best

19  decision that I can make, and then if parties disagree with

20  that decision, they take it up, and that's part of the

21  process.  I've said this in other cases.  It doesn't offend

22  me.  It's part of the process.  It's how it works.  My job is

23  to make the best decision that I can make based on the

24  presentations, factual and legal arguments that are presented

25  to me.

1        But I do have some thoughts because I think these

2   findings have clearly been a focus of many hearings before

3   me, and they are a focus of the parties and not -- in terms

4   of sending the plan out, not in the sense that a plan would

5   be patently unconfirmable as a matter of law without these

6   findings, but that people are telling me that -- people,

7   the -- the -- in particular, I guess, I'm hearing it from the

8   coalition, the FCR, are telling me that these findings are

9   necessary for their clients to support the settlement.

10       That's what I'm hearing.  It's not hearing as a

11  matter of law there's some patently unconfirmable plan in

12  front of me but that these findings are necessary.

13       So let me -- I'm not going to satisfy everybody,

14  but let's walk through some of them and I will give you some

15  thoughts.

16       The first one, and I am looking in the plan,

17  Article 9, paragraph 3, J was the first condition precedent.

18  The insurance assignment is authorized as provided in the

19  plan, notwithstanding any terms of the policy or provisions

20  of non-bankruptcy law and that the settlement trust is a

21  proper defendant for abuse claims to assert the liability of

22  the protected parties to trigger, I guess that's an insurance

23  concept, such insurance rights, et cetera.

24       I will be making a decision on the insurance

25  assignment for the debtor's policies, for sure.  That's a

1  matter of law, and I believe there's law in the Third Circuit

2  with respect to it.  And I will respect that law and apply

3  that law with respect to the debtor's policies.

4         And it strikes me that the settlement trust has to

5  be an appropriate person to assert rights with respect to the

6  debtor's policies or else we couldn't be here and no mass

7  tort claim -- no mass tort case would work.  It just doesn't

8  make any sense.

9         With respect to non-debtor policies, I understand

10  that that is a different issue, and the debtors have proposed

11  a workaround.  And we'll see if that workaround works.

12  That's what people have suggested.  It might.  As I said,

13  it's not a workaround that I particularly care for,

14  generally, on principle, but nonetheless it's what's being

15  put in front of me, and I think I can probably rule on that.

16         With respect to "Q," the plan, the plan documents,

17  and the confirmation order shall be binding on all parties in

18  interest, I will say there what I say oftentimes in the

19  context of a confirmation order, a sale order, et cetera.

20         This provision really tells us who a plan binds,

21  and the code and the case law tell -- case law explains it.

22  Okay?  That's who I can bind.  I don't think I can do

23  anything other than that, and that includes the code 1141,

24  case law interpreting 1141, doctrines of res judicata,

25  collateral estoppel, doctrines of a plan as a contract, et

1  cetera.

2           So mirror the code.  Okay?  Some -- some judges

3  used to say, yeah, here's my two-page confirmation order.  I

4  confirmed your plan.  Okay?  And then all of the effects that

5  it has, it has.  But here is a mirror the code.

6           I'm going to skip down to T.  The plan and the

7  trust distribution procedures were proposed in good faith and

8  sufficient to satisfy the requirements of 1129(a)(3).  I'm

9  going to apply 1129(a)(3) in accordance with Third Circuit

10  law.  Whether you can sweet the trust distribution procedures

11  into that or not, I don't know.  But I'm not sure I should be

12  doing that.  It's the -- the -- the requirement of 1129(a)(3)

13  is with respect to -- let me make sure I'm right, the plan,

14  which might encompass a lot of things.

15          The plan has been proposed in good faith and not

16  by any means forbidden by law.  That's what I am supposed to

17  find, and what was interesting, when I went back and looked

18  at these conditions precedent, is many of them contain a

19  specific reference to a code section or 9019.  They give me a

20  frame of reference as to what I am supposed to be guided by.

21  Some of these do, and some of these that we're looking at

22  don't, but I think it's interesting that it highlights the

23  fact that for certain of these findings there's no reference

24  to the code or any provision of the rules.

25          Okay.  I think those three are pretty, quite

1  frankly, easy, and they're within my -- the general bailiwick

2  of a confirmation hearing.  And I don't think those are

3  different than what I would have to find, except for the

4  insurance assignment, obviously.  The insurance assignment

5  is -- is specific to here, but the bindingness of the plan,

6  1129(a)(3), that is the same as any other plan that is put in

7  front of me than where I have to contend with it on

8  confirmation.

9          Finding or condition precedent R, the procedures

10  included in the trust distribution procedures pertaining to

11  the allowance of abuse claims, and the criteria, et cetera,

12  are fair and reasonable.  I'm still not sure what this falls

13  under in terms of a plan confirmation standard.

14          If I have to find because it's contested, if it

15  is, that the trust distribution procedures or the claims

16  amounts in the matrices are appropriate, acceptable, I don't

17  know, part of a negotiation.  I don't know what I'm going to

18  find out there, I may make that kind of a finding.  But it's

19  certainly going to be constrained by the type of hearing that

20  I have and the purpose of the hearing.  And that's the

21  context in which I will make any such findings.

22          I don't know if fair and reasonable is the

23  standard, nor, quite frankly, do I know how that could

24  possibly impact anybody -- any insurance company's

25  obligations under a plan -- under their policies.  I don't

1  know if those are magic words or not magic words.  I suspect

2  they are not the words in the policy.

3          With respect to condition precedent S, the right

4  to payment that the holder of an abuse claim has against the

5  debtors, or another protected party, is the allowed value of

6  such abuse claim, as liquidated in accordance with the

7  distribution procedures, and is not the initial or

8  supplemental payment percentage or the contributions made by

9  the debtors.  Again, I don't know what standard this would

10 fall within, but I think there's some general things we can

11 say about this.

12          A claimant's right to payment, and that does come,

13 someone said this, right from the definition of a claim.

14 Somebody has a claim.  There are other contexts in which we

15 look at what their claim is, which might be analogous here, I

16 don't know.  But if someone is adjudicated to have a claim

17 for $1,000 and there's a bankruptcy distribution of 10 cents

18 on the dollar, it doesn't mean their claim is $100.  Their

19 claim is still $1,000.  Whether they will be ever able to

20 collect that amount from anybody else is a different issue.

21 Maybe there's a guarantor who will pay them the other $900.

22 Maybe that guarantor doesn't have to pay them the other $900

23 because their contract of guarantee limits it.

24          But we know that there are bank -- we know that

25 rarely do creditors receive 100 cents.  They get some sort of

1    bankruptcy distribution, and I think anybody looking at a

2    bankruptcy distribution would not say that that person didn't

3    have a claim for the full amount of their claim, whatever it

4    is.  I would hope that's not controversial.

5            What I think is controversial about this paragraph

6    is how can -- is -- is -- how does that work in the insurance

7    coverage context?  What does a policy provide for?  What does

8    it say it covers?  What product did the debtors buy?  And so

9    this paragraph is probably the one I find most concerning in

10   terms of not knowing how it might be used later on down the

11   line, but I think there's some -- ought to be some

12   fundamental universal first principles about claims that I

13   think parties could probably agree to.

14           And then some other court looks at it and applies

15   it to particular contracts and a particular context.  But I

16   will say that that paragraph S to the extent it has to be in

17   the form that is in this condition precedent is something

18   that I might not feel comfortable with in the way it's

19   written.  And, as I said, the most troubling in that regard,

20   and I don't think anyone should be surprised by this, are

21   condition precedent R and S.  But I think that there are some

22   fundamental principles behind some of this, particularly S,

23   that parties presumably could agree on.

24           And that's the guidance that I can give.

25           Other than that, I think, again, context matters.

1  I don't know what's going to be put in front of me.  Somebody

2  says parties are on, you know, shifting.  I would say a lot

3  of the parties have shifted their positions, depending on

4  whether they're in agreement in a particular time with what's

5  going forward or not.  So -- and that's not surprising.  It

6  happens in cases, and that's where we are in this case.

7          So I don't know if that was helpful or unhelpful,

8  but that's the best I can do at this point in time.  I do

9  think, though, that to the extent that these particular

10 findings are gating issues for somebody who is supportive of

11 this plan, you need to give some thought to my comments.

12 Okay.  Let's move on.

13          Ms. Lauria?

14          MS. LAURIA:  Thank you, Your Honor.

15          Appreciate that feedback, and presumably we may

16 have another break today and we'll circle up with the other

17 co-proponents to determine what their reaction is or their

18 initial reaction to Your Honor's remarks.  But we appreciate

19 that very much.

20          Your Honor, by my count we had another six or

21 seven issues that were raised in Mr. Rosenthal's remarks.  I

22 didn't see any of them as rising to the level of patently

23 unconfirmable.  I'm happy to address any or all of them.  I

24 do think, importantly, we should address the timing and the

25 uncertainty point that he raised because I feel that is an

1  issue that we've been confronting regularly.  And as

2  Mr. Kurtz said last week it's something that is critically

3  important to the debtors and so I want to get that on the

4  table.

5            And then, again, happy to respond to, and I can

6  list them again, the handful of other issues that he

7  mentioned.

8            You know, Mr. Rosenthal opened his remarks today

9  by saying, you know, we don't think that this disclosure

10 statement should be sent out now for solicitation, that we

11 should hold off a couple of weeks because right now we don't

12 have anything close to global consensus.  And as Your Honor,

13 and probably more particularly your chambers, is painfully

14 aware, there have been multiple times during this case that

15 due to where we're at in mediation we have contacted chambers

16 and we've asked chambers to push something off so that we can

17 continue to mediate.

18            We have done that when we have felt we are on the

19 brink of something that could be, you know, a game changer

20 with respect to the case itself.

21            We are not there, Your Honor.  This is -- we are

22 at the point where we have a plan that is substantially

23 mature, and it is ready to go out for solicitation.  No

24 amount of mediation is going to change the core and

25 fundamental principles of this plan of reorganization,

1    subject, of course, to the remarks that Your Honor just made,

2    which we want to circle up with our colleagues about.

3           I didn't hear anything that necessarily should

4    change folks' minds, but right now I think we have a core

5    plan that is ready for solicitation.  Importantly, from the

6    continued mediation perspective, we think mediation should

7    continue.  We will continue to mediate with the chartered

8    organizations.  We will continue to mediate with

9    Mr. Rosenthal and the other insurers.  In fact, the nice

10   thing about this plan, now that we have one very significant

11   insurer on sides, that's Hartford, and one very significant

12   chartered organizations on sides, that's -- that's LDS or

13   TCJC, we've had someone wearing the hat of an insurer and the

14   hat of a chartered organization review the plan and comment

15   on those terms.

16          So as we look forward, additional settlements are

17   really bolt-ons to the structure that we already have and

18   that were already contemplated by the plan of reorganization

19   itself.  No amount of time is going to change that, and, in

20   fact, as you heard from Mr. Kurtz last week and myself at the

21   outset of the hearing last week, time is not the debtor's

22   friend.

23          By the time we get to March, our trust

24   distribution is going to go down to zero from a cash

25   perspective, and the rest of the plan becomes significantly

1  infeasible if not infeasible and would have to be recut.  So

2  time is not our friend, and we are ready to launch.

3           In terms of there's too much uncertainty, I can

4  tell you, Your Honor, there are numerous members of the

5  coalition law firms or in state court counsel that I think

6  are here to tell you today that it's not uncertain, that

7  state court counsel representing 81 percent of abuse

8  claimants are here in support of the plan.

9           The coalition lawyers and state court counsel

10  affiliated with them have worked incredibly hard through the

11  mediation process.  They have literally shown up at every

12  mediation session for the last year, probably before that.

13  These were hard fought negotiations through mediation that

14  the coalition and FCR and debtors worked very, very, very

15  hard for.  So to suggest there's some sort of uncertainty or

16  a lack of global consensus, I think we have numerous

17  individuals on the line today, Your Honor, that will tell you

18  that's just not the case.

19           Have we reached agreement with all of our

20  insurers?  Clearly not, and we are looking forward to

21  continuing to negotiate with them.  We clearly have not

22  reached agreement with all of the chartered organizations,

23  and we're looking forward to continuing to negotiate with

24  them.  But that doesn't change the fact that we have a huge

25  ground swell of support for this plan today and, again, Your

1   Honor, I haven't heard anything that renders this plan

2   patently unconfirmable under American Capital Equipment that

3   should prohibit it from going out the door and being

4   solicited and getting that process started.

5          We also think it's critically important, and

6   you'll hear from Mr. Kurtz on this later in today's

7   presentation that we think it's critically important that the

8   timeline for confirmation discovery get kicked off

9   immediately.

10         So that, I think, was something that was very

11  important for me to address with the Court, Your Honor.  In

12  terms of the other issues, I'm going to tick them off just to

13  see if there's something that you want to hear more about.

14         We heard about the coalition legal fees.  In

15  short, we thought it was appropriate at the RSA phase given

16  the amount of energy that the coalition put into this, we

17  heard Your Honor at the RSA say it's premature for me to

18  endorse this today.  Let's see where this case comes out.

19  That's why it's baked into the plan because that's at the

20  tail end.  That's when you know when these cases come out.

21  They've worked hard.

22         They're continuing to work hard, and the debtors

23  thought it was appropriate.

24         On third-party releases, and I believe

25  Mr. Patterson also referenced this in one of his pleadings,

1  Mr. Rosenthal indicated that we've got it backwards, that the

2  debtor's claims are indeed derivative of local councils and

3  chartered organizations, not the reverse.  That's just wrong,

4  Your Honor.

5          As you know from the first day of this case, the

6  Boy Scouts of America was congressionally chartered with the

7  mission of scouting in 1916 pursuant to an act of Congress.

8  It is only the national organization that has the ability to

9  grant charters to provide scouting throughout the United

10  States.

11          National controls the delivery of scouting at a

12  local level, and so these are, in fact, we are the scouts, we

13  are the scouting movement, we hold the congressional charter,

14  and no one has asserted, and, in fact, we haven't seen any

15  complaints where the national organization is getting accused

16  of some sort of vicarious liability on the part of the local

17  councils or on the part of chartered organizations.

18          In fact, you'll remember, Your Honor, I think it

19  was three months into this case, I think it was our first

20  contested hearing on the preliminary injunction, pre-

21  bankruptcy case, these complaints defined scouting as

22  scouting, national local counsel and at the local

23  organization unit level.  But that's a factual issue.  That's

24  not an unconfirmable on its face, Your Honor.

25          But I did -- it's an important legal issue that

1  you will hear a lot about and a factual issue to the extent

2  there's issues with the third-party releases.

3         You've heard a lot about the $3,500 expedited

4  distribution.  That's going to come up, again, when we deal

5  with the committee's motion.  Mr. Rosenthal raised issues

6  concerning whether there would be an adequate basis to pay

7  out on those $3,500 claims.  Again, I don't want to belabor

8  that point now.  I'm just going to make two observations.

9  One, the expedited distribution has been tossed around a lot

10 over the last four days of court.

11        Two important things:  One, in order to receive

12 the expedited distribution, the party had to have

13 substantially completed their proof of claim form.  And, two,

14 the individual had to sign their proof of claim form.  It

15 could not have been signed by an attorney.  The TDP has

16 always said it had to have been actually signed by the

17 claimant itself to be eligible.

18        I have to correct the record from Mr. Schiavoni

19 who suggested that the majority of the proof of claim form

20 was background information concerning the individual.  That's

21 just not true.  It's 12 pages.  8 of those pages pertain to

22 questions related to abuse, scouting, chartered

23 organizations, the relationship with the abuser.  There's one

24 page on background, two pages on instructions, one signature

25 page.

1        And then, finally, I think you heard a lot about

2  good faith.  That is clearly a factual issue.  Whether it's

3  in the 1129(a)(3) context or not, we will be prepared at the

4  confirmation hearing to demonstrate that the debtor satisfies

5  all of the 1129 standards for receiving confirmation of the

6  plan, including 1129(a)(3), and that's just not a reason to

7  prevent the plan and the disclosure statement from going out

8  for solicitation.

9        So that was a very fast canvassing of the issues

10  that you heard about.  We're happy to go into more of them

11  now, later, but we don't think there's anything here that

12  should prevent this plan from being solicited.

13        As I said, Your Honor, I know there's coalition

14  folks here that may want to be heard.  In fact, I see

15  Mr. Rothweiler has raised his hand, but unless you've got

16  questions for me, that's where -- where I think we see the

17  world.

18        THE COURT:  Thank you.  No, I don't have any

19  questions from you.  I am going to want to hear more about

20  the $3,500 expedited distribution in the context of the

21  committee motion or the change to the plan, and so we'll deal

22  with that.  But, no, I don't need anything further on the

23  other issues you ticked off quickly for me.

24        MS. LAURIA:  Thank you, Your Honor.

25        THE COURT:  Okay.  I do see Mr. Rothweiler.

1           MR. ROTHWEILER:  Your Honor, can you hear me?

2           THE COURT:  I can.

3           MR. ROTHWEILER:  Very good.  Thank you, Your

4    Honor.  I appreciate the opportunity to speak.  Let me just

5    introduce myself since I haven't been before the Court

6    before.  My name is Ken Rothweiler.  I am a cofounder of the

7    firm of Eisenberg, Rothweiler, Winkler, Eisenberg, and Jeck.

8           I think I need to tell you a little bit about my

9    background, Your Honor, because it may be relevant to some of

10   the comments that I will be making so that you know a little

11   bit about my history.  I am here in Philadelphia.  I have

12   been a trial lawyer for 40 years, and when I say I've been a

13   trial lawyer, I've actually tried cases.  I've tried cases

14   from my first day out of law school, and I -- I've never been

15   in the practice of trying automobile cases or slip and fall

16   cases.  I've tried cases that are catastrophic injury cases.

17   My clients are brain-damaged individuals, paraplegics.

18          The most severely injured amongst all claimants

19   are the claimants I've represented for 40 years.

20          I've also represented sex abuse clients that I'll

21   tell you more about.  In my career, Your Honor, I've tried

22   over a hundred trials to verdict, so I have extensive

23   experience in a courtroom.  I don't have extensive experience

24   in a courtroom like this, Your Honor, so I'm unfamiliar with

25   bankruptcy court but I've learned a lot over the last 19

1   months.  It's a whole different way of practicing law, and I

2   must say just as an aside that you have amazing stamina and

3   patience because some of these hearings go extremely law and

4   it tests my own stamina and patience.  So I just wanted to

5   say that to you.

6          THE COURT:  Well, welcome to the Wild West, which

7   is what my former partners who were litigators thought about

8   whenever I asked them to come into bankruptcy court.

9          MR. ROTHWEILER:  That's what I've heard.

10         Your Honor, I'm -- I'm one of those lawyers that

11  you would say I try one case at a time.  I represent one

12  client at a time.  It's very unusual for me to represent any

13  more than one client.  The only exception was I was one of

14  the counsel that represented the Amtrak victims that got

15  hurt, severely hurt and killed here in Philadelphia a number

16  of years ago.  I represented a dozen or so of those Amtrak

17  clients to a successful conclusion, and that's probably my

18  only example of representing more than one client in -- in

19  any litigation.

20         I should tell you that I'm a proud member of the

21  Plaintiff's Bar here in Philadelphia.  I have served as

22  president of the Philadelphia Trial Lawyers Association and

23  also of the Pennsylvania Trial Lawyers Association.  I've

24  represented, you know, over 15,000 plaintiffs trial lawyers

25  before the Harrisburg legislature fighting tort reform and

1  other issues that came before the Plaintiffs Bar over the
2  last 40 years.

3           So I'm steeped in the tradition of a plaintiffs
4  trial lawyer, Your Honor.  I'm proud to be one, and I've
5  heard -- on these hearings I've heard some innuendo about and
6  insinuation about plaintiffs' trial lawyers.  I can tell you
7  that that hurts.  It comes -- it comes as an offense to me
8  because those of us that try cases risk everything going into
9  a courtroom representing clients with by the way no guarantee
10  of ever being paid.  I work on cases for years, years without
11  any guarantee of ever being paid.

12           I spend hundreds of thousands of dollars on cases
13  and through the workings of other lawyers in my office and
14  through discovery and through the different things that we
15  have to do.  We hopefully are successful at the end of the
16  day.

17           So just a little bit of editorial comment there,
18  Your Honor, but I just think that I needed to say that.  I
19  have to tell you, Your Honor, that I did not intend to speak
20  during any of these hearings.  That was not my goal.  I have
21  very able counsel with Mr. Molton and Mr. Goodman to speak
22  for us, which they have done.

23           But hearing some of the objectors, I felt I needed
24  to speak and address some issues and to provide the Court
25  with context.

1          And to start off with, Your Honor, I would just

2    like to respond to one thing that Mr. Rosenthal said earlier

3    today, and I -- and I wrote it down when he said it, and he

4    said many survivors oppose the plan.

5          I don't know what Mr. Rosenthal's definition of

6    "many" is, but I can cite some facts for you.  In the RSA, 41

7    firms supported the RSA, 70,347 survivors supported the RSA.

8    And, Your Honor, that was before the Hartford deal, and that

9    was before the LDS deal.

10          What was in the RSA at that time was $850 million

11   that was coming from the BSA and the local councils.  Through

12   the hard work of a lot of people, we've now increased that

13   amount to $1.9 billion, and we're not done yet.  We're

14   nowhere near done, and as we put more money into that trust,

15   the amount of people that agree with the plan and will vote

16   for the plan goes up, because as you can tell a lot of the

17   survivors if you talk to them, the ones that are opposed,

18   they're opposed because they believe there's not enough money

19   to fund the trust.  Well, we're working on that every day.

20          Your Honor, for the last 19 months, I've done

21   nothing other than work on this 24/7.  I've not worked on one

22   other case other than this case.  Through the last 19 months,

23   I've suffered through COVID.  I got COVID.  My mother died as

24   a result of COVID.  It's been, you know, a very traumatic

25   experience for me and for my law firm.  So people are hard at

1  work, and we're hard at work because we believe that these

2  survivors need to be compensated and they need to put this

3  behind them.  And time is not their friend.

4         During the pendency of this bankruptcy, I've had

5  clients that have died.  I've had clients that have committed

6  suicide.  Time is not the friend of survivors, and I believe

7  the Court, you know, needs to know that and needs to hear

8  that.

9         With regard to the objectors, last week, Your

10 Honor, I heard two -- and we call them state court lawyers in

11 bankruptcy court, but, you know, in my world we call them

12 plaintiffs lawyers.  State court lawyers is a little bit of a

13 different term for me.

14        But I heard two state court lawyers speak, and

15 they're both prominent state court lawyers and I have a lot

16 of respect for both of them, but they do not speak for the

17 majority of the survivors.

18        My firm represents over 16,800 survivors.  We

19 represent the largest group of survivors in the bankruptcy.

20 Your Honor, the amount of survivors that my firm represents

21 is twice as many survivors then the entire TCC combined.  So

22 we believe that we have a loud voice in this bankruptcy.

23        We also believe that we have a fiduciary right,

24 you know, obligation here.  I know that the TCC is -- has

25 been appointed by the U.S. trustee and serves as the

1  fiduciary, but with the amount of clients that we represent,

2  Your Honor, we believe that we have that same fiduciary

3  obligation.

4              I think I need to give Your Honor some context of

5  how we got here.  Why so many cases?  You know, Mr. Schiavoni

6  said how did there become such a case explosion?  And when he

7  has said that and when he has been before this Court, there

8  was always at least from my perspective an implication by

9  Mr. Schiavoni that somehow plaintiffs' lawyers were the cause

10 of the explosion in cases.

11             Let me make this clear for everybody listening.

12 Pedophiles are the cause of the explosion.  Pedophiles is the

13 reason why there are so many cases, not plaintiffs' lawyers,

14 and that needs to be said because plaintiffs' lawyers are

15 just representing those survivors.  It's the pedophiles that

16 are the enemy, not the Plaintiffs Bar, not plaintiffs' trial

17 lawyers.

18             We're doing our best to do what we can for the

19 survivors.

20             And I think I need to tell Your Honor how I became

21 involved in this -- this -- this litigation, and how it

22 progressed for me.  And I need to tell you we need to go back

23 to 2013 for that description and that story because a young

24 man walked into my office and sat right there in my couch in

25 my office, 24 years old.  He told me a very compelling story

1  about being abused by his scout master when he was 12 years

2  old.

3          And as he told me the story, tears down his face

4  and down my face.  He told me about for 12 years he kept it

5  to himself, never told his mother, never told his best

6  friend, never told his girlfriend, and he was married at the

7  time, never told his wife.

8          Told me he was suicidal during that time period.

9  But he told me he needed to get his story out, and he thought

10 I was the lawyer to take on the case.  Well, we worked on the

11 case, we took depositions, and the case settled as it was

12 coming up for trial.  It was a very, very compelling case,

13 and it was a significant settlement, probably the largest

14 settlement of any single case that the Boy Scouts have ever

15 paid on.  And that's probably still true today.

16         And to be honest with, Your Honor, I thought it

17 was a single case.  I thought it was just another one of the

18 cases that of a plaintiff that I represented in my forty

19 years' practice, but it wasn't.  It wasn't, and -- and two

20 years later, Your Honor, CNN Did a ten- minute feature on

21 that case, and if anyone is interested you can still see that

22 case on YouTube on the internet, and as a result of that case

23 getting some publicity, I started to get referrals for,

24 again, single cases from around the country.  I got them from

25 the West Coast, from the East Coast and from all over.

1          And every one of those cases, Your Honor, we

2     settled, and some of those cases had very significant statute

3     of limitations issues, but you know what good lawyers can

4     figure out arguments to overcome things like -- problems like

5     statute of limitation problems.  And the BSA paid on every

6     single one of those cases.

7          And then the bankruptcy occurred.  And why was

8     there this explosion, Your Honor?  Why all of the sudden did

9     it go, as Mr. Schiavoni said, from 200 cases or maybe 1,000

10    cases to this 82,000 cases?  You know and I wrestled with

11    that question myself, and you know the answer I came up with.

12    People that have suffered sexual abuse who have suffered in

13    science now realized that there was a whole community of

14    people out there that the same thing happened to them over

15    the decades, and it gave them comfort.  If you listen to the

16    survivors, they will tell you that the most comforting thing

17    in this whole saga has been that there are tens of thousands

18    of other men that it happened to and they also suffered but

19    now they were a community together.

20         Mr. Buchbinder, when we were interviewing for the

21    TCC committee, he heard hundreds of those stories.

22         I sat in a room with him while he listened to

23    those stories, you know, and -- and they're compelling and

24    they're unbelievable that this kind of thing, you know, has

25    gone on in America where there's been tens of thousands of

1  pedophiles that have caused this situation.

2          Then what happened, Your Honor, we -- we formed

3  the TCC.  When I say we formed it, I was on the TCC, and my

4  firm was on the TCC, and we had a representative, a survivor,

5  on the TCC.  And I came to know the people on the TCC, who I

6  very much respect.

7          And I came to know two other firms on the TCC,

8  Andrews and Thornton, and Ann Andrews, who was one of the

9  people I got to know.  Slater, Slater and Schulman from New

10  York City.  I got to know Adam Slater very well, and we

11  started to understand, Your Honor, that between our three

12  firms, we represented over 40,000 survivors.  And we

13  understood what goes on in bankruptcy court where there has

14  to be votes at the end, and we understood that we had a

15  big -- big position in the bankruptcy because of all of the

16  clients that we represented.

17          After five months of being on the TCC, Your Honor,

18  we realized that we had unresolvable differences in

19  philosophy with the TCC, and what we decided to do, our three

20  firms, is we decided to form an ad hoc committee called the

21  coalition.

22          And I have to tell you, Your Honor, this is - -

23  this took a lot of thought and a lot of consideration from

24  all of our firms.  I mean I have a firm of ten lawyers.  I

25  don't have a big firm.  We handle big cases, but it's not a

1  lot of lawyers that make up my firm.  We knew that we were

2  going to have to assume the financial burden of going forward

3  as an ad hoc committee.  That means paying the -- the

4  bankruptcy lawyers, paying all of the professionals, the

5  financial advisor and everybody that we would need in order

6  to go through the bankruptcy.  And it was a big decision, but

7  between Ann Andrews, Adam Slater, and myself, we said to

8  represent the survivors the way the survivors need to be

9  represented, we need to band together in order to represent

10 the survivors.  And, hence, the coalition was formed.

11         Your Honor, we now represent over 65,000 survivors

12 between all of the members of the coalition committee and

13 it's not just our three firms.  Other firms have joined us as

14 well with thousands of clients that they also represent.

15         Your Honor, by contrast, the TCC represents about

16 6,800 survivors.  So they represent 6,800, and we represent

17 65,000.  And we actually represent more than that when you

18 add all of the survivors and the survivors' lawyers that are

19 not part of the coalition per se but are people that support

20 the coalitions' positions.

21         And, Your Honor, I think it's important for you to

22 realize that the three firms rallied around a common goal and

23 mission.  And here is our common goal and mission:  No

24 survivor would be left behind.  All survivors would be

25 compensated.  Philosophically what we thought, Your Honor, is

1  if someone was sexually abused by a Boy Scout leader in New

2  York, which is an open state, and if someone was sexually

3  abused by a scout leader in Alabama, which is a closed state,

4  it shouldn't make a difference.  It shouldn't make a

5  difference.  Sexual abuse is sexual abuse.  Their lives were

6  still as scarred whether they lived in New York or they lived

7  in Alabama.  And we took a pact that we were going to

8  represent them equally.

9            Our second common goal and mission was that the

10  survivors need to be compensated in their lifetimes.  Most of

11  my clients, Your Honor, are between 60 and 70 years old.

12  Time is not their friend, as I said before.  As I said

13  before, clients have died.

14            Time, time, time is important, and what I've

15  realized in this bankruptcy is time keeps moving on, and for

16  the survivors it's just not something we can tolerate.  We

17  get calls every day about when is it going to be over, when

18  is it going to be over.  It's been a year and a half.  It's

19  hard to give them an answer, Your Honor, because as I said,

20  you know, I'm a plaintiffs' state court lawyer.  We normally

21  know the timeframe.  If a case comes into my office today, I

22  can look the client in the eye and say you're going to have a

23  trial in two years.  Put it in your -- put it in your

24  calendar right now.  We're going to be trying your case in

25  two years, and they get resolution to their case in two

1  years.

2          And that's a wonderful thing.  It's just not quite

3  the same that I've learned in bankruptcy court.

4          Your Honor, there's been some criticism of what

5  people have called the mass tort lawyers and let me just take

6  two seconds and talk about that.  I've never really dealt

7  with mass tort lawyers because that's not my practice.  These

8  are some of the most outstanding lawyers I have ever dealt

9  with.  You talk about committed lawyers?  Most of these

10 people are working 24/7, and this is their only case, as it's

11 my only case.  That's how strongly we feel about the

12 dedication that we need to have for the survivors.

13          They deserve nothing less than that.  I've learned

14 a lot from these lawyers who have been in bankruptcy court

15 and understand what needs to be done.

16          And I have to tell you, and I'll say it publicly,

17 I really appreciate it because there's a lot that I didn't

18 know and they've opened my eyes.

19          But there's been some criticism about that, you

20 know, mass tort lawyers about the contact they have with

21 clients.  Well, I can tell you, and this is true for all of

22 the people in the coalition, that contact with clients is

23 constant.  With my firm, we have -- we get over 2,000 calls a

24 month where we advise clients as to what's going on.  We have

25 monthly updates with them.  We send out to them a written

1  monthly update every month.  There's been 18 of them so far.

2         We have phone calls daily, like I said, and we

3  have Zoom calls and we have video discussions with them, and

4  we plan on having, we plan on expanding that, Your Honor, so

5  that we have more planned Zoom calls so we get a bigger

6  audience and we get them to see what we're doing and we get

7  the opportunity to answer those questions.

8         There's a TCC survivors committee, and I know a

9  lot of people on that committee, Your Honor, because like I

10 said I was on that committee for five months.

11        And those survivors are really no different than

12 every other survivor.  They all have their own story, and

13 they're all compelling, and they're all very sad.  But we put

14 together our own survivors' advisory committee.  As a matter

15 of fact, last night we had a meeting of that committee.

16 They're from California and from New York and New Jersey and

17 Texas, from all over the country.

18        And we listen to them.  What are your concerns?

19 What do you -- what do you need more from us so you can

20 weather the storm, as we go through this bankruptcy?  And

21 it's -- it's a very tough thing to tell them that they have

22 to wait, and I don't like using that word when I say to them

23 you have to wait.

24        Now the question has been, Your Honor, what has --

25 you know, what has the -- what has the coalition's goal been

1  in this bankruptcy?  Well, the goal is very simple.  It's to

2  formulate a confirmable plan to compensate all survivors.

3           Well, let's talk about that a little bit.

4           What has the coalition done to move that goal?

5  Well, there's been the BSA deal.  The coalition was

6  instrumental in getting that deal done, Your Honor.

7           You can ask Ms. Lauria and Mr. Andolina the

8  coalition's participation because it was daily and we worked

9  and we worked and we worked on it.

10           And then there was the local counsel deal.

11           The coalition was instrumental in getting that

12  deal done.  You can ask Mr. Mason about that because he saw

13  what the participation was from the coalition.  Then there

14  was the Hartford deal, tough deal, tough deal, and when I saw

15  it was daily, it was -- it was daily and it was -- it really

16  was 24/7.  We needed to get that -- and you can ask

17  Mr. Ruggeri and you can ask Mr. Anker about the coalition's

18  participation in getting that deal done because it was

19  significant.  And I dare say that that Hartford deal would

20  have never gotten done but for the coalition.

21           The LDS deal, you can ask Mr. Bjork and

22  Mr. Austin, the LDS deal, the coalition was instrumental in

23  getting that deal done.  Because, again, Your Honor, going

24  back to what I said before, time is not the friend of the

25  survivors.  And you know what, as a plaintiff's lawyer, I

1    know, you know what, if I stretch it out, maybe I can get

2    more money, maybe I'll have more leverage.  But that takes

3    time.

4              Appeals, litigation is not the friend of

5    survivors, at all.

6              We've put together, Your Honor, $1.9 billion

7    that's going to go into a trust, and we're just getting

8    started.  We spent all day in New York yesterday with

9    Century.  We're trying to work on getting deals done.  It's a

10   difficult process, probably the most difficulty in my 40-year

11   career.  But I know it can get done because there's a lot of

12   talent.  On this screen, as I see all these lawyers, these

13   are some of the most talented lawyers I have ever dealt with

14   in my entire career.  And I know it can get done.

15             So we're talking with Century.  We're talking with

16   AIG and Mr. Rosenthal.  We're talking with the Catholic

17   Church, and we're talking with the Methodists, and we're

18   talking with the Episcopals, and we're talking with the

19   charters.  We're going up to New York again.  I just got back

20   from New York.  We're going back up.  I'm going back up

21   tomorrow, again, for two days of mediation where we're going

22   to be talking with some of the charters and some of the

23   insurance companies.  So we plan on that $1.9 billion that a

24   lot of people will criticize yet, and they use the math and

25   they say it's so much per -- per survivor.  Well, that's

1  really kind of an inadequate description of the amount of

2  money that we're getting into the trust because as we talked

3  about different people will get different amounts depending

4  upon, you know, the criteria, whether they satisfy the

5  criteria or not.

6           And we intend to at least double that number, Your

7  Honor.  I'm going out on a limb by saying that, but that's

8  the goal because our goal is to get as much money into that

9  trust as possible.  Now, there's been some objectors out in

10 the public forum in the media that have criticized the

11 coalitions as sellouts, and I take that as an extreme

12 offense.

13          For the record, Your Honor, the coalition along

14 with the FCR and the BSA has to date put together the largest

15 compensation fund for survivors of sexual abuse in the

16 history of the United States.  Let me repeat that.  The

17 coalition along with the FCR and BSA has to date put together

18 the largest compensation fund for survivors of sexual abuse

19 in the history of the United States.  That's a true

20 statement, and we're only halfway there.

21          In contrast, Your Honor, the TCC has put together

22 no deals with insurers or chartered organizations.  They just

23 have been in the position of objecting to everything the

24 coalition has done.  And I would suggest to the TCC that as

25 fiduciaries of all the survivors, they spend the time helping

1  to enlarge the compensation fund rather than objecting and

2  creating roadblocks for the survivors.

3  Your Honor, the -- there's many lawyers on the TCC

4  that are my friends.  I've developed friendships with them

5  over the course of this 19 months.  I've spent a lot of time

6  working with them, and when I formed the coalition with Ann

7  Andrews and Adam Slater, I still reached out to the TCC

8  because I didn't consider us to competing forces.  I

9  considered us to be all working for survivors because we are

10  all working for survivors.  So I arranged Zoom calls with the

11  TCC and with other members of the coalition to see where we

12  could drive together and work together for the benefit of the

13  survivors.  I arranged a meeting in New York where we all --

14  everybody flew in.  We had dinner together, the TCC and the

15  coalition.  We broke bread together to come to agreements so

16  that we could move this forward and so there wouldn't be

17  roadblocks.  We met in Chicago, and I -- I -- I still today

18  consider many of the TCC lawyers are my friends.  But we're

19  all working in the same direction, Your Honor.  We're working

20  for survivors.  We're all in this together.  I invite all

21  objectors to come join us to build the largest fund for all

22  survivors so they can be properly compensated.  They deserve

23  it, Your Honor.  These survivors have suffered enough.  They

24  don't need to wait any longer, and I hope this process

25  concludes quickly.

1          Thank you very much for giving me the time, Your

2   Honor.  I really appreciate it.

3          THE COURT:  Thank you, Mr. Rothweiler.  Okay.  I

4   see hands.  Mr. Stang, I will let you speak.  I'm sure you

5   want to respond.  I don't think -- but let's realize it's

6   4:00.  There are things we need to get done today, and over

7   the course of any number of hearings now, I've heard from all

8   sides of all issues.  And I recognize that you and members of

9   your committee may disagree with much of what Mr. Rothweiler

10  has said.  So please appreciate that I understand that.

11         MR. STANG:  Thank you, Your Honor.

12         THE COURT:  Mr. Stang?

13         MR. ABBOTT:  Your Honor, may I be heard briefly --

14         MR. STANG:  Thank you, Your Honor.

15         MR. ABBOTT:  -- before we get to Mr. Stang, Your

16  Honor, just briefly on timing?

17         THE COURT:  Mr. Abbott?

18         MR. ABBOTT:  Your Honor, we have spent, obviously

19  a number of days in front of the Court, and I appreciate

20  Mr. Rothweiler's passion.  I appreciate the passion that he

21  has aroused in other folks who are on this Zoom call.  But it

22  is critical, Your Honor, that we get to the scheduling

23  process.

24         THE COURT:  We're going to get to it.

25         MR. ABBOTT:  I just want to make that clear.

1  Mr. Kurtz has been waiting patiently, Your Honor.

2            THE COURT:  And I have views on it.

3            MR. ABBOTT:  Okay.  Thank you.

4            THE COURT:  Yes.  Thank you.

5            MR. STANG:  Thank you, Your Honor.  I had to take

6  a really deep breath during Mr. Rothweiler's prepared

7  comments.  For someone who was not anticipating speaking, he

8  certainly read off his script explaining why his -- he and

9  his other law firm coalition members are entitled to a

10  substantial contribution so that the fees that Mr. Molton has

11  incurred are reimbursed to them or perhaps never having to be

12  paid by them.

13            And what he has said really reflects a

14  misunderstanding of what the TCC is about and how survivors

15  are to be treated in this case.  He said I was on the TCC,

16  referring to himself.  He was not on the TCC.  Mr. Kennedy,

17  Mr. Humphrey, and seven other survivors are on the TCC.  They

18  are the fiduciaries.

19            He said the TCC represents 6,800 people.  Again,

20  he doesn't understand the role of the TCC or for that matter

21  his role or for that matter I'll pick out one of my state --

22  one of the state court counsel who represents committee

23  members, Mr. Modus' role.  The -- Mr. Humphrey, Mr. Douglas,

24  Mr. Kennedy represent the constituency.  No attorney

25  represents the constituency.

1        He said the TCC met with the coalition in Chicago.

2    No, it didn't.  Mr. Kennedy did not appear at that meeting.

3    Mr. Humphrey was not at that meeting.

4        Mr. Greer (phonetic) was not at that meeting.  Mr.

5    Tabone (phonetic) was not.  He met with other lawyers because

6    this is about control.  He told you how they represent

7    upwards of what, 70,000 people.  Well, he may, but this is

8    about them thinking that they should run the case because

9    they think -- think they have the votes.

10       They thought they should have had control of the

11   committee, but Mr. Buchbinder and his staff appointed one

12   committee member, if you -- if you look at it from this

13   perspective, one committee per law firm, and that really

14   torqued them.  They couldn't stand that because as they

15   started amassing clients, I believe Mr. Molton referred to

16   them as inventory last week, they thought, wow, this really

17   isn't fair.  We've got survivors making decisions for

18   survivors.  We represent all of these people.  We should be

19   making decisions for the survivors.

20       And then he criticizes the TCC for not making any

21   deals.  Well, you know what, I could make a deal with

22   Mr. Schiavoni in five minutes.  I just have to meet his

23   number.  I could make a deal with Mr. Ruggeri in three

24   minutes.  I just have to match his number.  So if I want to

25   race to the bottom, I'm faster than anybody, but that's not

1  the TCC's goal.  The TCC's goal is to get as much as possible

2  for survivors.

3        You know how much someone who was anally

4  penetrated is going to get in an open state using their

5  current settlement number?  $57,000, that's how much -- and

6  our chart that's going to go into the disclosure statement is

7  going to say that.  You know how much you're going to get in

8  the next lower-tiered state, Judge?  $34,600.  You know what?

9  I'll double that.

10       I'll take Mr. Rothweiler at his word and say he's

11  going to double that.  $68,000 for multiple penetration

12  claims in Oregon or Washington.  Well, congratulations.  You

13  all did a great job.  That is not the goal of the TCC.  The

14  TCC opposed the settlements that have been reached because

15  they are race to the bottom settlements.  And the Mass Tort

16  Bar, the lawyers who have multiple clients have an agenda

17  that is beyond simply in my opinion maximizing the return to

18  clients because at some point a third or 40 percent of a big

19  number is a big number, and it doesn't matter how much each

20  person gets.  But if I had experienced sodomy in California

21  and you tell me I'm getting $58,000, I'm not accepting that

22  settlement.

23       And we will see how many people accept that kind

24  of settlement.  So I may be right.  I may be wrong, but to

25  hear a 15-minute presentation that was an opening statement

1  for a substantial contribution claim, frankly, was

2  inappropriate.  It shouldn't have been done, and I hope we

3  don't have to hear it again before we get to the -- before

4  the hearing on their substantial contribution motion.  Thank

5  you, Your Honor.

6            THE COURT:  Okay, thank you.

7            We're going to get to scheduling now, and I don't

8  have my calendar.  So we're going to take five minutes.  I'm

9  going to get my calendar, and we're going to talk scheduling.

10            We're in recess.

11            UNIDENTIFIED:  Thank you, Your Honor.

12        (Recess taken at 4:02 p.m.)

13        (Proceedings resumed at 4:06 p.m.)

14            THE COURT:  This is Judge Silverstein.  I'm not

15  sure if I'm a minute or so early.  So let's give people time

16  to get back on.

17        (Pause)

18            THE COURT:  Mr. Kurtz, I have some thought about

19  scheduling, but I will hear from you initially.

20            MR. KURTZ:  Thank you.  Thank you very much, Your

21  Honor.  Glenn Kurtz, White and Case, on behalf of the

22  debtors.

23            Hopefully, this will be a little less energetic,

24  but interestingly enough, we have some similar impact on

25  abuse victims because as the Court well knows time is money

1  here not just in the traditional sense of having less cash on

2  the balance sheet, but in the direct sense of having reduced

3  cash contributions to the trust, which is in effect the

4  proverbial melting ice cube.  And so we really have something

5  to -- to work hard at here in addition to feasibility issues

6  and the like.

7          It struck me that the request for a lengthy period

8  of time between solicitation and confirmation was unusual.

9  We did a little research on that.  We looked at Delaware

10 confirmation cases, big -- what we thought were larger cases,

11 and confirmed that the average time period between

12 solicitation and the confirmation hearing is 46 days.  And

13 Hertz was 42 days, and so we think, of course, the request

14 for six months and five months, which are 3.5 to 4 times more

15 than the normal period of time is pretty excessive.

16         We also don't think as much time is needed here

17 for a couple of reasons.  One, we're not starting from

18 scratch.  I mentioned this before, but I went back and

19 confirmed that we started producing information to -- to the

20 objectors in March of 2020.  We have produced information

21 relating to historical claims, local councils' information

22 related to the debtor's insurance, financial condition, it's

23 organization, board minutes, and other documents and we've

24 also produced for deposition the CEO, the chairman of the

25 board, and the financial restructuring expert here.  So we're

1 pretty far down the line the way we see it.

2          We also believe that in addition to the normal

3 interests and simply having more time, which is fairly common

4 place in most cases and particularly for somebody that is

5 seeking to avoid relief, there does seem to be I think pretty

6 clearly an independent interest in having some delay.  And I

7 think even this exercise has reflected that because the time

8 you have for discovery is from a start date to an end date.

9          And so, therefore, everybody should be looking for

10 a very early start date because the earlier you start the

11 more you can get done, and here we've had a lot of

12 resistance.  We've been raising this for a while now, and the

13 objectors won't agree to a start date.  They didn't even want

14 Your Honor to hear confirmation scheduling until this week.

15          So -- so there's a lot -- there's sort of a lot of

16 indications including all of the requests for adjournments or

17 not to set schedules that we think are kind of transparent

18 here.

19          Also, if the objectives were really concern about

20 the amount of time that they needed in order to complete

21 discovery, then, of course, they would be starting just as

22 soon as they could, as opposed to resisting the start.  I

23 think there's a certain amount of vigilance that should be

24 expected of a party that's complaining about timing here.

25          They have known that we had intended to proceed,

1  and I know we're not getting that anymore, but we had

2  intended to proceed on December 9th and yet we didn't have

3  any document requests or any discovery requests.  They

4  haven't been propounded even though it was at least

5  conceivable we would have been successful on that.

6         Your Honor stated at least as of the August 30

7  hearing that, quote, "Think about how discovery is going to

8  be conducted to promptly get us to a confirmation hearing."

9  So the parties have been on -- on notice for a few weeks now

10  that we really needed to get moving on it.  You stated more

11  than once last week that there's nothing that would keep

12  people from pursuing discovery now, and -- and the only thing

13  I really heard is we don't have an approved disclosure

14  statement.  That -- that's language.  The deal terms are what

15  they are.  The objections are what they are.

16         They are free to and needed to serve and pursue

17  discovery kind of vigilantly, I think, before they watch the

18  ice cube melt a little more.  There was certainly no reason

19  they couldn't serve discovery.  If it turned out that

20  something got mooted, then we simply wouldn't have produced

21  it, or we could have made a motion for a protective order,

22  which is something that Your Honor raised last week as well.

23         I think you're going to hear that there is some

24  need for a substantial amount of discovery.  I don' think

25  there is any more need for discovery here in -- in any

1    greater volumes than in most cases.  As I said, we've already

2    given a lot of the discovery.  I think a lot of the issues

3    Your Honor is going to need to grapple with to the extent

4    they don't get resolved between now and confirmation are

5    largely legal.  And insurance neutrality, probably largely --

6              THE COURT:  Excuse me, please.  Excuse me,

7    Mr. Kurtz.  Please check your audio.

8              MR. KURTZ:  I think insurance neutrality is

9    largely a legal issue.  I think third-party releases is

10   largely a legal issue.  Certainly, there will be some

11   questions about good faith.  There will be some questions

12   about the TDPs, but nothing that is not manageable within the

13   normal time period, much less what I think is already going

14   to be somewhat extended.

15             I guess the last issue is how do you populate the

16   schedule once we have a hearing date, and I think the best

17   way to deal with that is wait for Your Honor to give us

18   something on the schedule, and then we can work something

19   out.  I don't know how difficult that should be.  I think

20   there's more than enough time, if we were fortunate enough to

21   get January, which would leave close to four months, there's

22   plenty of time for us to take discovery.  Get all of the

23   objections on file.  Get all of the replies and proceed.

24             So I -- I -- I do want to express appreciation for

25   the accommodations Your Honor has given us through the course

1  of the case.  I appreciate your schedule is very busy.  I

2  appreciate January is particular busy.  As fiduciaries of the

3  estate, dealing with maybe a melting ice cube trust, we sort

4  of feel compelled to just ask for the earliest possible date,

5  especially since we still have a period of time before

6  emergence even after a confirmation approval assuming that

7  one is forth coming, during which time, of course, we are

8  continuing to kind of burn off cash.

9        So we're hoping that there's some flexibility

10  there, Your Honor.  We'll do everything we can on our end to

11  expedite matters, and -- and -- and we appreciate any

12  accommodation you could afford us.

13        THE COURT:  Thank you.  I do have some things in

14  mind.

15        Mr. Plevin?  Mr. Plevin, you are muted.

16        MR. PLEVIN:  Thank you, Your Honor.

17        Let me first start by responding to some of the

18  points that Mr. Kurtz made, and then I want to talk about the

19  impact of the findings and what we heard earlier today about

20  the insistence on going forward with those and the factual

21  nature of several of the findings and how that impacts

22  discovery.

23        Mr. Kurtz ended by saying that what he was

24  suggesting the Court do is pick a date, and then we'll fit

25  the schedule to it, and then to me that's just completely

1  upside down as to how we ought to proceed, and it's contrary

2  to what Your Honor has said not only in this case but in

3  other cases about the need for due process.

4           To just fit litigation deadlines into a date, a

5  confirmation hearing date that's chosen for no reason other

6  than for convenience, makes little sense.  You need to look

7  at what are the issues, what are the discovery needs, how

8  quickly can the parties move, and build the schedule out

9  based on that.

10          This is not -- Mr. Kurtz gave a couple of

11  examples.  This is not a case that's a pre-pack where there's

12  not going to be a contested evidentiary proceeding.  This is

13  not a case in which the debtor simply sells its assets and

14  disappears in which there's not a contested evidentiary

15  confirmation hearing.  This is a different kind of case, and

16  it needs to be treated as such.

17          Mr. Kurtz talked about some information that had

18  been made available.  He talked about the fact that some

19  information had been produced.  AS Your Honor heard last

20  week, almost all that information is locked up in mediation

21  confidentiality and can't be used.

22          He said they made people available for

23  depositions, and that's true but that was with respect to the

24  RSA, not with respect to confirmation issues, which are

25  completely different.  So maybe there's a little bit of

1  streamlining that can be done because we don't have to ask

2  people about their background when they've already been asked

3  about that, but it's not a substitute for discovery.

4           So in setting the schedule here, Your Honor, the

5  real question is what do we need to litigate, and we've

6  pointed out in our objections and you heard robust argument

7  today about the required findings under the plan, which we

8  think are purposefully designed to prejudice the insurers,

9  and I'm not going to repeat that except I want to make one

10 point that I -- I didn't have a chance to make earlier today,

11 and that's with respect to 10M of the plan or X.M, which is

12 the insurance neutrality clause.

13          And what makes that so important, Your Honor, is

14 that that clause said that the -- that the policies are

15 subject to the findings of the Court and the terms of the

16 plan.  So when you heard argument earlier today about how

17 there was no effort to modify the policies or seek insurance

18 coverage rulings, the plan itself in Section X.M tells you

19 that that's wrong, that what the debtors and their supporters

20 are trying to do is use the confirmation order and the plan

21 to modify the terms of the insurance policy.

22          And that means that we have to have the right to

23 contest those findings, because if we were simply to go away

24 and not participate in the confirmation hearing and evidence

25 were presented and Your Honor issued the plan with their

1  findings, our policies will have been modified in a

2  prejudicial way.  And so I -- I needed to point out Section

3  X.M to the Court.

4       I also heard Ms. Lauria say that they would circle

5  up and I guess the 5-minute break we just had probably wasn't

6  long enough for them to do that about reactions to Your

7  Honor's discussion of the proposed findings.

8       Before Ms. Lauria, earlier today we heard from

9  Mr. Harron, from Ms. Quinn, that they were -- they believe

10  the findings are appropriate, they are entitled to them.

11  Mr. Goodman explained in some detail how some of these

12  findings were evidentiary based, there had to be a record

13  made under the terms of the findings, and he -- he

14  acknowledged that some of these findings required evidence.

15       So we have a situation where the debtors and the

16  plan supporters want findings that are based on evidence that

17  we believe are highly prejudicial, and you can't deny us

18  consistent with due process the right to go get that

19  evidence.

20       So the debtors really - there are two basic

21  pathways here, Your Honor, and they have a choice of which

22  path to go down.  One is the path of an expressly insurance-

23  neutral plan, one that does not include these findings, does

24  not prejudice the insurers.  If we go down that path, then

25  maybe Mr. Kurtz can have the confirmation hearing he wants in

1   January because there would not be a need by the insurers to

2   contest the findings in the plan, but if the plan -- if the

3   debtors and the plan supporters want to go down the other

4   path, which is the one that we believe prejudices the

5   insurers, then we need discovery.  And what do we need

6   discovery on and what do we need to litigate?

7           We need to litigate insurance neutrality.  We need

8   to litigate the reasonableness of the values in the TDPs, the

9   base claim values, the maximum claim values.  We need to

10  litigate the process by which the TDPs came into being.  We

11  need to litigate the impact of the TDPs on the insurers.  We

12  need to litigate the role and the discretion of the

13  settlement trustee.  We need to determine whether the

14  settlement trustee has conflicts.  We need to litigate

15  whether the settlement trustee ought to be selected by the

16  debtors or by other parties or by the court.  We need to

17  determine whether his -- if we could, to what extent the

18  settlement trustee's future decisions on claims that have not

19  been fully presented are reasonable or could be reasonable.

20  We need to talk about and litigate the plan's goal to

21  preclude insurers from raising effective coverage defenses.

22          And, Your Honor, if you want to know how this is

23  being set up to prejudice the insurers, you need only look at

24  the proposed letter from the coalition and the FCR that is --

25  that was filed, I believe last night, to go out with the --

1    with the plan and the disclosure statement where they explain
2    in so many words that the purpose of the plan is to put the
3    screws to the insurers and make them pay more.

4                So that's what we need to do.  The items we would
5    be seeking in discovery include the following:  Documents
6    related to the formulation of the plan and the settlement of
7    claims thereunder.  We were told earlier today that the TDPs
8    are an evidence-based plan.  We -- we seem to think that --
9    we tend to think that's completely wrong because when claims
10   were settled before bankruptcy, they were settled, as I
11   mentioned earlier today, in an adversary process in a court
12   with people on opposite sides with the Boy Scouts seeking to
13   either establish they're not liable or if they are liable,
14   that they're liable in a lesser amount than the plaintiff
15   wanted.

16               That is not the structure that is being proposed
17   here.  So if it is going to be an evidence- based TDP
18   structure and that's the contention, then we need to find out
19   what happened all along in the history of the Boy Scouts
20   settling claims.  And it may be -- Mr. Goodman said the
21   insurers have that information.

22               My clients are an excess insurer.  We were only
23   involved in a very, very small number of claims before
24   bankruptcy.  We don't have access to all that information.
25   So we need to find out what the course of dealing was and how

1  the settlements took place.

2        We need to get the documents relating to abuse

3  cases that were dismissed or resolved without payment.  What

4  defenses were asserted?  How were they successful?  Why were

5  they successful?  We need to get documents related to Eric

6  Green's relationship with parties in this case, and

7  communications related to his selection as trustee.  We need

8  to get information regarding the negotiation and history of

9  the current version of the TDPs, the debtor's input into

10 those issues, the evidence of the roles of the various

11 parties in the drafting of the TDPs, and the basis for the

12 values in the TDPs.

13        And we need to get the information about the

14 course of dealing.  We need to get information not only

15 regarding the debtor's own liabilities as a historical

16 matter, but we're being told that these values to some extent

17 may wrap in sex abuse settlements from other cases.  If

18 that's the case, we'd want to know if that's the contention.

19 We'd need discovery on that.

20        I mentioned course of dealing.  One thing you

21 might look at is the combustion engineering case where the

22 Third Circuit looked at the course of dealing in terms of how

23 claims were handled pre-bankruptcy.  We would need to

24 establish the insurer's non-involvement in the creation of

25 the TDPs.  We would need financial information regarding the

1  claims against and assets of the parties who would become

2  protected parties under the plan, which could include issues

3  regarding which assets are restricted and not available for

4  contribution to the trust, something that several weeks ago

5  we heard Mr. Brown talk about at great length.

6          Some of these requests, Your Honor, will

7  predictably become enmeshed in issues of mediation privilege,

8  particularly when we talk about good faith.  The debtors

9  acknowledge this.  They have filed a motion, which I think of

10  at least as sort of an abstract motion that is not tethered

11  to any specific discovery in the confirmation context, and

12  that motion is calendared for hearing on October 19th.

13          We know that no matter what discovery requests we

14  make now, the debtors are going to object to producing

15  anything they feel is subject to that privilege.

16          Depending on the outcome of the Court's ruling on

17  that, we could get a significant additional production on

18  October 19.  I'm sure that it makes no sense in anybody's

19  mind to start depositions before October 19 and then re-start

20  them and take them over, again, after October 19.  So that's

21  a problem.  This whole issue of mediation privilege, which

22  was highlighted in the RSA context has to be addressed.

23          The schedule that the debtors proposed in

24  connection with their fourth amended plan was not only too

25  compressed but it was also illogical.  And I -- I sort of

1  hear them now saying they're not going with that schedule,

2  maybe they are.  They certainly didn't propose one since last

3  week.

4        We submitted a revised proposal.  We heard the

5  Court say 217 days is not going to do it.  We went through

6  our proposal and shut out about 35 days, which I think is

7  cutting it to the bone.

8        The TCC did the same thing with their -- well,

9  actually they submitted a new proposal.  Their proposal ends

10  up roughly the same time as ours, roughly a little bit

11  earlier, but I'm going to talk about some of the respects in

12  which their proposal is not logical.  But the debtors haven't

13  given us anything to chew on, only a request that you set it

14  for the earliest possible date, and somehow we're going to

15  figure it out later.

16        But they don't put any effort into deciding what

17  it is that we need to -- that we need to litigate or why.

18        So our -- our proposal, and I realize, Your Honor,

19  we may have done a disservice to the Court a little bit

20  because we started in a different place than the TCC.  We

21  based all of our days on days after approval of the

22  disclosure statement, but we didn't assume a date for that.

23  They did assume a date, and so they went with October 1st.

24        So I put together our schedule and tried to

25  compare it with theirs to see where we came out.

 1          There's a lot of similarities between the two

 2   proposals but let me just talk about some of the differences

 3   that we think that doesn't make sense.

 4          The TCC has a deadline to depose fact witness --

 5   let me start one other place.  We put in a deadline to serve

 6   initial written discovery, and I think that's clear -- that's

 7   important, Your Honor, because we're prepared and will be

 8   prepared to submit comprehensive document requests, as

 9   comprehensive as we can make them based on what we know now.

10   But that can't be the last time we're entitled to serve

11   discovery requests.

12          Things come up in depositions.  Things come up in

13   discovery.  One of the things we know, one of the lessons

14   from Imerys is that voting issues came up once the vote

15   tabulation was done.  So the debtors had a deadline in their

16   proposal for written discovery.  Ours is for initial written

17   discovery, and I think that's appropriate.

18          When we get to the deadline to depose fact

19   witnesses, we said 75 days after approval of the disclosure

20   statement.  If you take the TCC's assumption that October 1

21   is the date, then our 75 days ends December 15, which is 33

22   days after our proposed date for completion of document

23   production.  So that would mean the comprehensive document

24   requests go out.

25          They're responded to much more quickly than the

1  federal rules require.

2           We get the documents, we have a chance to look at

3  them, schedule depositions, we have 33 days to take

4  depositions.  The TCC, as I read their proposal has set up a

5  9-day deposition window.  We have experience with deposition

6  windows in Imerys and they just don't work.  Everyone tries

7  to go to the end of the window, and then we end up taking

8  depositions after the window is over.

9           I had emails today about what's happening with

10 expert depositions in Imerys where there's going to be at

11 least one if not two or three depositions taken after the

12 window by agreement.

13          So but even so their -- the TCC's deposition

14 period is December 14 to 23.  Our deposition deadline would

15 actually be in the first part of that range, December 15th.

16          The TCC shaves some time off their schedule by

17 having initial expert reports due on December 17, which is

18 right in the middle of the fact deposition window.  So to me

19 that makes no sense.  I think you need to finish the fact

20 depositions before you can have initial expert reports, and

21 we provided 15 days after the end of depositions for fact

22 depositions, rather for expert reports.

23          Rebuttal expert reports, I mentioned last week the

24 eight days allowed by the debtors in their schedule just is

25 undoable, unworkable.  It's not enough time to figure out

1  even what rebuttal expert you need, let along go out and

2  recruit one and have that person prepare a report.  The TCC

3  gives 28 days for rebuttal reports.  Our proposal gave 25

4  days.  I think that is probably the irreducible minimum for

5  that.

6           Deadline to depose expert witnesses, the TCC

7  shaves that down to seven days after rebuttal reports are

8  due.  We gave 20 days for that.  Again, I don't think that's

9  an unusual or too long a figure for expert reports.  The TCC

10 has us filing motions in limine before deposition

11 designations, so we wouldn't even know what the deposition

12 designations are when the motions in limine would be due.

13          And the TCC's proposal ends on February 28th, Your

14 Honor.  Ours ends on March the 30th.  So -- and I should say

15 a couple of things, Your Honor.  There's no explicit.

16 There's no explicit time in our proposal for voting-related

17 discovery, which -- which could happen.  It may be necessary

18 as -- as I heard the colloquy's last week a lot of the issues

19 about the voting are going to be decided at the back end.  So

20 it's reasonable to think you may need some time for discovery

21 of voting issues.  We certainly did in Imerys.  There is no

22 time in this proposal for any delays caused by motions to

23 compel or motions for protective order.  And as Your Honor

24 pointed out last week, there's not only the perhaps more

25 exotic discovery issues but the regular discovery issues that

1  pop up that may have to be addressed by the -- by the Court.

2          I think there needs to be some time, obviously

3  we've got this mediation motion that's set up for October 19.

4  But that's as I said, an abstract thing that may not work.

5          So that's our proposal, Your Honor.  We think that

6  ending up where we propose is as I said the irreducible

7  minimum, this would be the end of March.

8          You know, I've -- I've -- I'm not going to go

9  through my biography the way some others do, but I litigated

10  pre-packs in the asbestos world 20 years ago, and I used to

11  tell people then that we were litigating at the speed of

12  sound, just to give them an idea of how crazy it was.  This

13  schedule that we've proposed is litigating at the speed of

14  light.  It's much faster.

15          It's hard for me to envision as a litigator how we

16  are actually going to get through this schedule.  I think the

17  experience we've seen in Imerys is instructive in that, you

18  know, we set an aggressive schedule and even though the

19  debtors wanted to keep the schedule, they have come to the

20  court and asked for relief sometimes just because it wasn't

21  working.

22          I think what we've proposed is something that has

23  a chance of working, and if the parties work hard we could

24  stick to it.  But the main point I want to leave Your Honor

25  with is the schedule ought to be driven by the issues that

1  need to be litigated.  And if we're going to have to litigate

2  the findings, the factual basis for the findings, as

3  Mr. Goodman acknowledged earlier today, and the impact on the

4  insurers of those findings, I think we can't do this in --

5  in -- in January or even February.  I just don't think those

6  dates are workable.  Thank you, Your Honor.

7        THE COURT:  Okay.  Thank you.  Let me note one

8  difference between Imerys and this case, and there are many,

9  but one significant difference is that Imerys is not

10  operating anymore and Boy Scouts is.

11        Mr. Brown?

12        MR. BROWN:  Thank you, Your Honor.  For the tort

13  committee.  Much of what the committee and its professionals

14  are so concerned about has been articulated by Mr. Plevin.

15  There are a couple of additional issues that I wanted to

16  highlight for the Court.  I mean I think the -- the overall

17  concern is that certainly the proposed schedule that we saw

18  last week was far more than a scheduling order.  And whether

19  it was intentional or -- or not, and I'm going to try not to

20  pass judgment on that.  But it was going to have the impact

21  of imposing unworkable limitations on the committee's

22  professionals and its experts to discover and put before the

23  court what needs to be discovered and put before the court in

24  order for the survivors who do not support this plan and do

25  not want to be bound by a non-consensual third-party release

1  and a channeling injunction, it will deny them the

2  opportunity to make that case to you, as to why the national

3  mortgage factors are not met here.

4         And, in particular, Mr. Plevin highlighted I think

5  a lot of what the insurers need to do from their perspective

6  in terms of investigating the underlying claims.  And there

7  is a massive amount of data and discovery that needs to be

8  obtained and analyzed and synthesized.

9         As Mr. Stang mentioned earlier today, we have a

10 pending application for our experts on that.  We've had

11 extensive discussions with them about how much time they will

12 need after they get the data in order to file their expert

13 report.

14        And the sequencing proposed by the debtor was

15 just -- was shocking.  I mean it was a matter of days.

16        I mean and that's never been done in a case.  I

17 mean you look at Imerys, you look at Purdue, the timeframes

18 that are allotted from the time that documents are produced

19 to when expert reports are due, in this case I believe they

20 are -- well, initially it was a matter of expert reports were

21 due November 8, four days after fact discovery is completed.

22        That's what the debtor's initial proposal was.

23 That -- I mean I just think that's exemplary of what the

24 debtor is trying to do to the committee and their ability

25 to -- to put on an effective showing at confirmation.

1          This idea of -- well, the issue you -- I think you

2   asked, am I going to be required to make an aggregate

3   determination of claims.  And there was discussion about,

4   well, the estimation motion is off so maybe you don't.  But

5   you clearly will.  I -- one of the master mortgage factors is

6   whether or not the plan pays all or substantially all of the

7   claims of the class that's going to be impacted by the

8   channeling injunction and release.

9          So if there's going to be non-consensual releases

10  in this case, we're going to have to know what the claims

11  are.  Our experts --

12          THE COURT:  Doesn't the committee know what the

13  claims are?  The committee has been telling me what the

14  claims are.

15          MR. BROWN:  I think we have -- we are retaining

16  experts to tell me what the claims are.

17          THE COURT:  When are those on?  I don't recall

18  seeing any of -- of a motion, but when did you schedule those

19  for a hearing?

20          MR. BROWN:  I'm going to defer, if I may,

21  because -- to Mr. Stang or Mr. Lucas on that.

22          THE COURT:  Fair enough, but -- okay, go ahead.

23          MR. BROWN:  So the same -- the same issue with

24  respect to claims is going to come up with respect to the

25  best interest test, and it's going to come up at least a

1  subset of the claims in connection with the Hartford

2  settlement.

3          It's a great deal of the same data.  It all

4  funnels into what the -- what our expert is going to say on

5  this and how much time it's going to take to gather the data,

6  how much time it's going to take for them to synthesize it,

7  put it in an expert report, have their depositions taken.

8  There's going to be another - - you know, this is going to be

9  a battle because the debtors are going to have their own

10 experts and we're going to have to rebut those.  Maybe it

11 will be the same expert.  Maybe there will be a different

12 expert, I don't know yet, but that's a huge concern of ours

13 here is time to do discovery, time to get the expert reports

14 done, time to get the rebuttal reports done.

15         Some of the things, also, that are going to come

16 up here, I mentioned last time and I got a lot of pushback

17 from Mr. Kurtz, about -- but whether I accurately

18 characterized it or not, but the fundamental truth is we have

19 been trying for -- since early last week to address the issue

20 of the local counsel designations confidentiality.  Virtually

21 everything they produced has been designated confidential.

22         Clearly, it's not all confidential.

23         BSA has -- the protective order requires BSA to

24 facilitate this -- this declassification.  We're not getting

25 where we need to get.  We don't have the issue resolved.

1          It's likely going to require a motion, and that's

2   going to take time, and it may require additional discovery

3   to get documents that were not -- that have only been

4   produced in the context of mediation and for which a

5   mediation privilege is being claimed.

6          There's the mediation privilege issue, and I -- I

7   think that this is -- this was raised by Mr. Plevin, but that

8   the issue really boils down to BSA and Hartford and any other

9   parties that are going to settle, they are seeking a good

10  faith determination with respect to the plan.  They're

11  seeking a 9019 determination with respect to fair and

12  equitable.

13         Are they going to offer the mediation at the --

14  the fact of mediation as evidence of good faith and

15  reasonableness?  If they do, then is that not a waiver of the

16  mediation privilege?  You can't use that privilege as both a

17  sword and a shield, and if they're going to advance the

18  mediation as evidence of reasonableness or good faith, then

19  they can't hide discovery.  They can't preclude discovery on

20  how the sausage was made.

21         I think that's similar to what Mr. Plevin was

22  saying, but we have the very same concerns because -- and so

23  that motion is going to be heard, that -- not until

24  October 19th.  Then there will be fights over the mediation,

25  over the mediation privilege, and what the nature of the

1  discovery is.

2          There is no discussion in the debtor's version of

3  a schedule for any discovery on voting integrity, and we

4  think that issue has been raised.

5          It's come up.  We've built it into our schedule,

6  and we think it is critical that there is time allotted for

7  that, and that's not something that can be done right away.

8          And I also just want to point out that, you know,

9  in Mr. Kurtz's initial statements he was critical of all the

10  objectors for not having already launched their discovery.

11          Yet, I have a recollection that Century was just

12  stopped in its tracks on doing discovery that hadn't yet been

13  teed up because the disclosure statement hadn't been approved

14  and the plan wasn't at issue.

15          So, you know, you can't have it both ways.  I

16  think everybody has been holding their powder on discovery

17  because of what happened with Century.  This isn't at issue

18  yet.  I mean technically I thought what the Court said was

19  the plan isn't yet a contested matter.

20          THE COURT:  I don't think I said that.

21          MR. BROWN:  No, you didn't say -- so I think that

22  is how it was interpreted.

23          So in any event, it hasn't been a foot- dragging

24  exercise.  There was concern that plan discovery was not yet

25  ripe.

1          So if you have any questions, I am happy to answer

2    them, Your Honor, but those are, I think, you know, those

3    reflect some profound concerns that we have.  And I just

4    think as somebody -- well, for all of us who are going to be

5    impacted by this schedule, there is just, you know, there -

6    there's an element of what's doable and what's -- you know,

7    what is humanly possible and what the debtor is proposing,

8    had initially proposed, it's just not humanly possible to do

9    what needs to be done in this very complex case with multiple

10   issues in anything that resembles a competent way in the

11   timeframe that the debtor is proposing.

12         THE COURT:  I agree that competing time concerns

13   are an issue, but what nobody has really disputed is that BSA

14   is going to run out of money if we don't get this thing

15   going, that the contribution from the BSA clearly goes down

16   every month that we continue to have -- that we don't have a

17   resolution of this matter, and, you know, this debtor doesn't

18   make a product.  It's not -- it's a different kind of entity,

19   and we can't lose sight of that.

20         I'll hear from Mr. Ryan and then maybe we should

21   take some break.  I forgot about the need to caucus about my

22   thoughts with respect to the findings.  But I'll hear from

23   Mr. Ryan first.

24         MR. BROWN:  Well, Your Honor, just before --

25   before that, just I wanted to answer your question about

1  our -- our expert.  It was -- the expert is Claro (phonetic)

2  and the application was filed on September 17th.  So I'm

3  sorry, I just wanted to address your prior question.

4        THE COURT:  Thank you.  When's it going to be

5  heard?  Not until the 19th?  We may be able to speed that up.

6        MR. LUCAS:  Well, Your Honor, this is John Lucas.

7  It was filed, and the objection period runs on the -- I don't

8  have my glasses on, the objection period runs on the first, I

9  believe, of October.  And so assuming there are no objections

10  and we don't receive anything, we'll be able to submit an

11  order under COC.

12        THE COURT:  Okay.  Thank you.  Mr. Ryan?

13        MR. RYAN:  Thank you, Your Honor.  Jeremy Ryan on

14  behalf of the Catholic and Methodist Ad Hoc Committees.  I'll

15  be brief, Your Honor, I just -- as we're discussing these

16  30,000-foot issues, I didn't want people and Your Honor to

17  lose sight of this isn't Hertz.  This isn't a plan that

18  leaves creditors unimpaired, and in fact, to the contrary

19  here, Your Honor, you have a plan where you have 24,000

20  chartered organizations who didn't file proofs of claims who

21  aren't creditors of the estate and you have a plan that

22  proposes to strip them of their property rights and insurance

23  policies, proposes them to deem them to grant releases.  It

24  proposes to do a lot of things to people who aren't creditors

25  of this Court, who are not participants in this proceeding,

1  and whether that can ultimately be done or not is going to be

2  left for another day.  But there is a substantial question of

3  how much due process do people, who aren't creditors whose

4  property rights are being taken away under a plan need to get

5  in all of this and the notices of what's going to happen to

6  them.

7          How much due process do we need for the 16,000

8  chartered organizations who filed proofs of claims, who

9  aren't sophisticated parties?  They don't have access to the

10 unlimited budget many of the parties here have, and how long

11 do they need to have to get to understand and receive these

12 things and have a long enough period to vote.

13         So as we're taking about due process and the

14 timeline of this, and we're certainly not advocating for a

15 March -- a March confirmation date, but I don't want to lose

16 sight of the fact that this is not a 42- day case or a 50-day

17 case or a 60-day case.

18         Now, as Your Honor noted last week, there's at

19 least 60 days that you have to give notice to people.  And we

20 need to be cognizant of the tremendous amount of people who

21 aren't sophisticated parties and who aren't even creditors

22 whose rights are being taken away under this plan.  So I just

23 think we need to have that -- have that perspective, as we

24 look at trial dates, and as we look at a calendar and when

25 things go out for solicitation and for notice and when people

1  have to object and respond by.  Thank you.

2         THE COURT:  Okay.  Thank you.

3         Ms. Lauria, how much time do you want to caucus

4  with the FCR and the coalition about my remarks with respect

5  to the findings and what you're hearing in terms of discovery

6  that is generated from certain of those findings?

7         MS. LAURIA:  Your Honor, I'm just looking at my

8  clock right now.  I see it's 4:50.  I know we've had a long

9  day, but I think we want to achieve as much as we can today.

10  So I would say we come back in 15 or 20 minutes if that works

11  for the Court.

12         THE COURT:  That's fine.  Let's take 20 minutes

13  and let's see -- let's see where we -- where we are, and,

14  again, I think the two findings that in my mind create the

15  most issues are the condition precedent R and S, as they are

16  currently drafted.  We're in recess.

17         MS. LAURIA:  Thank you.

18      (Recess taken at 4:50 p.m.)

19      (Proceedings resumed at 5:12 p.m.)

20         THE COURT:  This is Judge Silverstein.  Ready to

21  get back on the record?

22         MS. LAURIA:  Your Honor, this is Jessica Lauria.

23  We were just gathering.  I see folks from the coalition and

24  FCR back on the line, so I think we are ready from our

25  perspective.

1          THE COURT:  Okay.

2          MS. LAURIA:  So we spent the last 15 or 20

3   minutes, Your Honor, specifically focusing on R and S

4   although we take your remarks on the other provisions as

5   helpful.  And I guess what I would say is this:  We do think

6   there may be a mechanism to tighten the language with respect

7   to R.  We certainly take your point that any findings you

8   make do need to be limited by the type of hearing that you

9   are hearing those findings, and certainly we think that's in

10  the 1129 context, 1129(a)(1), which I think could incorporate

11  in 1123(a)(3).

12          There may necessitate a 9019 standard.  I don't

13  know that we need to make a determination right now.  It

14  sounds like this could even be an issue that needs to be

15  briefed but suffice it to say I think the parties certainly

16  understand that you're only making a ruling under the legal

17  regime that is presented to you, that this Court has the

18  power to decide and not some other legal regime.

19          With respect to S, Your Honor, certainly

20  appreciate what I will call your Fuller-Austin observations,

21  that the fact that the debtor is, for example, contributing

22  $220 million, bankruptcy dollars, to the trust doesn't

23  necessarily mean that that is establishing the aggregate

24  claim liability.

25          I think, as you noted, this one is controversial,

1  and it's also complicated for us to -- and it was a little
2  too complicated for us to determine in the 10 or 15 minutes
3  how we were going to address the Court's rulings.  But I
4  think I don't necessarily want to speak for the others, but
5  I'll speak for the debtor.  We heard you loud and clear, and
6  we understand that this language needs to be tightened for
7  the purposes of the proceeding and for what is in front of
8  the Court and not for other purposes.  I don't know if the
9  FCR Coalition would like to weigh in on that.

10         THE COURT:  Okay.  I'll -- I'll make one other
11  comment, which maybe I shouldn't, but I will.  I wrote this
12  down when Mr. Rothweiler was speaking.  He said they had a --
13  this is my word, sort of a fundamental principle, no survivor
14  left behind.  A very laudable goal and a -- and a call that I
15  think the survivors can make.  But I don't know that
16  that's -- that that's a -- a deal that the insurance
17  companies made when they issued policies.

18         So, again, and it's not the first time by the way
19  that I've heard that -- that sentiment or in the papers
20  somewhere.  Okay?

21         Listen, here are my thoughts on -- on scheduling.
22  We need to get this on the calendar.  Parties need to get
23  going on discovery.  There's going to need to be abbreviated
24  time frames to determine issues and that I recognize also
25  puts quite frankly pressure on me as well to decide things in

1 a timely fashion of disputes that get put in front of me.

2          But this is not, as I've already said, this isn't

3 Imerys.  It's not Purdue.  Okay?  Those are very different

4 cases.

5          This is case of a not-for-profit entity that as I

6 recall is right now going through its fundraising season

7 while it's in bankruptcy.  It's going through its membership-

8 raising season while it's in bankruptcy, and I think Boy

9 Scouts, but as importantly, and I'll stress that, as

10 importantly, survivors need to know is there a resolution

11 here or not.  So this needs to be scheduled, and I'm looking

12 at starting a trial on January 24th.

13          I recognize that is an incredibly tight schedule.

14 That does not go -- I'm not -- it's not lost on me.  That

15 will mean that, again, timeframes need to be shortened for

16 production of documents.  Time frames will need to be

17 shortened to resolve discovery disputes.  If there's going to

18 be an assertion of media privilege that is getting in the way

19 of documents and I have not seen what the debtors have filed

20 yet, that's got to be resolved.

21          I will tell you, as I think I've said in this

22 case, I'm sure I did because I had it here.  I probably had

23 it in some other cases recently.  There's got to be a balance

24 in the mediation privilege when you want certain findings at

25 confirmation.  Not everything is going to be able to be

1  protected, and we're going to have to find the balance.

2         It is hard to decide these privilege issues in the

3  abstract.  I did that recently in Imerys.  Then I get

4  documents in front of me, and it makes me have to rethink

5  what I did.  It's very hard to do it in the abstract, but I

6  will take a look at that motion.  We're going to start on the

7  24th of January.

8         I will give the parties an opportunity to see if

9  they can arrange a schedule.  If not, I will hear that

10  promptly, and I'll impose a schedule.  But in the first

11  instance, I'm going to let the parties see if they can work

12  it out.

13         I think it's an appropriate schedule.  I think

14  it's a doable schedule with cooperation.  I recognize it's a

15  tight schedule, and -- but I think all parties agreed at

16  various points in this case that from their different

17  perspectives there needs to be an -- an endpoint where we

18  know whether there's a confirmable plan or not.  And we'll

19  see.

20         MR. KURTZ:  Thank you very much, Your Honor,

21  for -- for setting the schedule.  Glenn Kurtz.  We will be

22  seeing you somewhat shortly on the motion for a protective

23  order.  I tried not to make it abstract.  Tried to tie it to

24  specific documents, which will be pulled and available for *in

25  camera* review if Your Honor chooses to do so or at least by

1  very specific categories.

2         So we look forward to resolving that.  I hear you

3  on the balance.  Ultimately, we have to figure out what that

4  is.  We don't have anything to hide.  IF it's protected and

5  it doesn't have to go out, we're happy with that.  If it's

6  not protected and it does have to go out, we're happy with

7  that as well, Your Honor.

8         MR. SCHIAVONI:  Your Honor, we have before you a

9  motion to shorten notice on the motion to compel the

10  documents withheld by Mr. Green on the assertion of the in

11  preparation for mediation privilege, as yet to be recognized,

12  and another motion to compel on shortened notice against the

13  debtor with respect to the documents that concern the

14  modified plan.  We didn't sit on our rights in those regards

15  at all.  All of the third-party aggregators have failed to

16  comply with the subpoenas.

17         I -- you know, the coalition partners of those

18  folks are not cooperating.  We'll bring motions on shortened

19  notice if necessary to try to move those along.  You know,

20  cooperation is sort of like the hallmark of, you know, moving

21  on an expedited schedule.  So we need that from the

22  coalition.

23         THE COURT:  It is.  I will take a look at those,

24  and we'll get a hearing scheduled on those.  Hopefully I can

25  announce it tomorrow when we're going to have a hearing on

1  those matters, but that's going to be the hallmark is parties

2  cooperating and getting documents and other discovery out.

3          Okay.  Ms. Lauria?

4          MS. LAURIA:  Thank you, Your Honor, and we will,

5  obviously, work on putting together a proposed scheduling, as

6  Mr. Kurtz suggested.  I think what that leaves for purposes

7  of rounding out the disclosure and solicitation process are

8  three issues.  And maybe I would propose to go in this order,

9  just because of the impact that the issues may have on the

10  documents.

11          The first is how to treat that $3,500 expedited

12  distribution election because that flows through the ballots

13  and the plan and the disclosure statements, and I do believe

14  it is one of the truly remaining substantive issues left it

15  may make sense to take that first.

16          Next, we have, and I think Mr. Ollinder (phonetic)

17  will go through with you anything that may remain on the

18  disclosure statement.  Knock on wood, we've been

19  communicating with folks during the course of today, and I'm

20  hoping that those are relatively limited issues.  And then,

21  finally, I believe Mr. O'Neal will pick back up with the

22  solicitation procedures, everything other than that $3,500

23  expedited distribution.  Also, I understand that he's had

24  some constructive conversations with the TCC Today, so

25  hopefully we've rounded those out as well.

1           I'm not sure if you want to turn to any of that

2   tonight, Your Honor.  I'm ready to go on the $3,500 expedited

3   distribution issue and why the change was made to the ballot

4   over the weekend if that makes sense.

5           THE COURT:  Yes, let's do that.

6           MS. LAURIA:  Thank you, Your Honor, and what I'd

7   like to do is just give you --

8           MR. STANG:  Excuse me, Your Honor, that is our

9   motion.  I think that's our motion.  I don't know why

10  Ms. Lauria is addressing something that we filed.  It's not

11  an order shortening time.  We haven't had a ruling on it, and

12  it's -- if you think that the $3,500 issue and our

13  classification motion are the same thing, we're the ones that

14  filed it.

15          MS. LAURIA:  Your Honor, we --

16          THE COURT:  Okay, well, the debtors have made a

17  change -- the debtors have made a change to their plan, so

18  I'm going to hear both of you.

19          MR. STANG:  Okay.

20          THE COURT:  Don't worry about it.  No one gets an

21  advantage over the other, but there's a change in the plan.

22  I noticed it in the plan, and let's talk about it.

23          MR. STANG:  Okay.

24          MS. LAURIA:  Your Honor, and I certainly didn't

25  mean to cut the TCC off in that regard.  We did make the

1  change to the plan.  I thought it would make sense to explain

2  why.  Also, we didn't file a written objection simply because

3  we haven't had the time to do it.  So I thought it might make

4  sense to put some perspective on this.  What I'd like to do

5  is just give a brief, a very brief history of the $3,500

6  expedited distribution and then go into why it is that we

7  made the change over the weekend to the plan and the ballots.

8           And I guess I would chalk this up to the category

9  of no good deed goes unpunished in this case.  You know,

10  throughout 2021, this literally the entirety of this year

11  we've had various conversations with parties on all sides of

12  this proceeding concerning some sort of expedited

13  distribution mechanic.  That includes both folks on the

14  survivor side and folks on the -- on the insurer side.

15           And when we came to resolution around the RSA with

16  the TCC and the coalition, we all agreed to a $3,500

17  expedited distribution.  And that was embodied in both the

18  fourth amended plan, the RSA, as well as the plan that we

19  went forward on, the fifth amended plan.

20           When we came to that understanding, speaking for

21  the debtors and really for myself in particular, because I

22  probably was at the middle of this decision, we were

23  contemplating two different mechanisms for soliciting -- I'm

24  using that in the little "s" sense of the word -- soliciting

25  the elections on the expedited distribution.  The first was

1   just getting those indications through the trust process

2   itself, and, in fact, as I mentioned earlier in the hearing,

3   there is a mechanism in the TDP and this existed, you know,

4   well before this weekend where the trustee would, in fact,

5   review the proof of claim, insure that the proof of claim was

6   substantially complete, and insure that the individual itself

7   signed the proof of claim form, not just the attorney, but

8   the individual itself signed the proof of claim form.  So we

9   thought about doing an election mechanism in connection with

10  the TDP.

11          The second option was in connection with the

12  balloting process, and that is what we elected to do, again

13  going back to the fourth amended plan.  The logic behind

14  that, Your Honor, was really one of efficiency and ease of

15  administration for both the claimants themselves as well as

16  the trust.  Our view was we were going to be sending out a

17  massive solicitation to 82,000 individuals, and with that

18  touchpoint with those individuals we should gather as much

19  information as we possibly could, including whether or not

20  those individuals wanted to take the $3,500 election.

21          As you undoubtedly saw in the confirm- -- in the

22  disclosure statement objections, we received a ton of

23  objections from the insurers to the $3,500 election.  And

24  those were along the lines of some of what you heard from

25  Mr. Rosenthal and Mr. Schiavoni today that the debtors were

1   attempting to do vote buying by putting the $3,500 election

2   on the ballot, that we were trying to carry the class by

3   buying votes with respect to that election.  And I can assure

4   you, Your Honor, that is absolutely not what our intention

5   was ever with respect to that $3,500 election.

6            But we proceeded to keep it on the ballot as we

7   went into last week's hearing.  And as we sat there, and I

8   think it was on the 23rd, when we got to the solicitation

9   procedures, we heard Mr. Stang and Mr. Smola describe very

10  convincingly the complications with the balloting process

11  here, and in particular the fact that we included on the

12  ballot this election to settle a claim, you know, not just

13  whether or not you're going to vote up or down on the plan

14  but actually settle a claim.

15           And, you know, when we went back and looked at the

16  transcript, Mr. Stang made a very impassioned speech about

17  the fact that due to rules of professional conduct an

18  attorney has an obligation to consult with its client about

19  the settlement of any claim.

20           And as we heard Mr. Smola further describe the

21  difficulties that many of the plaintiff lawyers have in

22  communicating with their clients due to confidentiality

23  concerns and the sensitive nature of the claim, it struck us

24  as, you know, we had added that to the ballot to try to ease

25  the administrative burden on both the plaintiffs and the

1  trust, but it became apparent after last week that we were,

2  in fact, increasing the burden, maybe unnecessarily so, on

3  the plaintiff lawyers.

4          In fact, we have 70 to 75,000 individuals that are

5  represented by counsel.  Whether those individuals are

6  completing master ballots or not, that's a lot of people.

7  That ranges from lawyers representing one person or a few

8  hundred persons to, I think, Mr. Smola indicated he

9  represents 4,000 persons, to Mr. Rothweiler who said his firm

10 of 10 lawyers represent 16 to 17,000 people.

11         As you know, and we just heard, we're on a very

12 tight timeframe.  We are contemplating a 60-day solicitation

13 period, and from our perspective for those lawyers to advise,

14 based on what I heard last week on whether you could or

15 should elect the option, it depends on a couple of things.

16         One, first you have to determine whether your

17 client is eligible, so whether they did complete a proof of

18 claim and whether they signed it.  We've now heard that, I

19 think, 20,000 amendments have been made to the proofs of

20 claim.  A big number of those are to substitute individual

21 signatures for attorney signatures, but that sort of part one

22 is assessing that.

23         And, next, you need to assess whether or not the

24 client should, in fact, take the $3,500 election.

25         So it struck us that we were maybe asking for too

1  much on the ballot given the timeframe and given the number

2  of claimants that are indeed represented by counsel and given

3  their ability to determine eligibility versus, you know,

4  whether or not they should even take the settlement.

5       So we thought in the face of that, and I think

6  Your Honor said last week, the expedited distribution is

7  turning into the tail that's wagging dog.  That is never what

8  we intended with the expedited distribution, so if that's

9  going to be a hardship on plaintiffs, I think our view was

10  take that off the ballot.

11       The TCC we now understand didn't like that.  They

12  want that on the ballot.  I think that from our perspective,

13  you know, there may be a balance where it can remain on the

14  ballot but rather than jam people with the voting deadline

15  and particularly those individuals who are represented by

16  counsel who needs to advise all of their clients whether

17  they're eligible and whether to accept you can have it on the

18  ballot and then also have an opportunity to take the election

19  via the trust process or via the trustee, we don't like that.

20  That sounds kind of confusing to me.

21       But at the end of the day I think we were just

22  simply trying to strike the balance between making the ballot

23  less complicated, not forcing individual lawyers to feel like

24  they needed to provide individual advice to clients on

25  eligibility and whether or not to settle and sort of delink

1    it from that process and, again, also delink it from the

2    accusations that we're trying to do some sort of vote buying

3    because that was certainly never the intention.

4         I have looked at the TCC's classification motion.

5    I'm happy to respond to that now, too.  We don't think it's

6    appropriate, and we think it's legally wrong.  But just to be

7    clear, when we made that change to the ballot believing that

8    change was really in the wake of I think what we all heard

9    last week in terms of extreme complications around the voting

10   process itself.  That was the genesis for the change.

11        You know, under bankruptcy rule 3013, one, we

12   don't have an accepted plan yet.  3013 speaks to an accepted

13   plan and whether we need to look at classification in the

14   context of an accepted plan.  God willing we get to an

15   accepted plan, but those aren't the facts before us today,

16   and, secondly, we think classifying the direct abuse claims

17   in the same class is appropriate.

18        1122(a) says substantially similar claims go

19   [interposing] the same class.  As I read the committee's

20   pleading, I think maybe what they're talking about is

21   disparate treatment within the class.  And the cases that

22   have evaluated disparate treatment under 1123(a)(4) have all

23   concluded that so long as you give everyone an equal -- first

24   of all, it specifically speaks to giving a creditor the

25   opportunity to take less.

1        And it, second, speaks to the case law that is

2   speaks to sort of an equal opportunity that the opportunity

3   to take an election is given equally to all class members.

4   So we don't think it's appropriate now.  We don't think it's

5   correct to separately classify them.  We're happy to brief

6   that more fully in connection with the confirmation hearing,

7   but we really don't think that's an issue that pertains to

8   the ballot or not or trying to deconfuse the ballot.  I think

9   they're simply suggesting that there is some difference

10  between, I don't -- big claims and small claims.  And we just

11  don't think that's appropriate under the law to distinguish

12  folks on that basis.

13        So, again, happy to do a hybrid if people think

14  that's more appropriate.  I think that's confusing.  We

15  thought the ballot was over burdening people, but that's the

16  background, and that's how we found ourselves here today on

17  that issue.

18        THE COURT:  Thank you.

19        Mr. Stang?

20        MR. STANG:  Thank you, Your Honor.  Today's my

21  birthday, and so I maybe as a present I can get an extra five

22  minutes.

23        MR. GOODMAN:  Your Honor, I don't mean to

24  interrupt Mr. Stang, but there are others who may want to

25  speak in support of this and I think Mr. Stang is going to

1  speak in opposition.  I wasn't sure if you wanted me to go

2  now or wait until later.

3          THE COURT:  Mr. Stang, what would you prefer?

4  It's your birthday.

5          MR. STANG:  Let's hear it all at once, Your Honor.

6          THE COURT:  Mr. Goodman?

7          MR. GOODMAN:  Okay.  I was right, to be fair.

8          Again, Eric Goodman, (inaudible) counsel for the

9  coalition.  The plan, as filed by the debtors back in April,

10  provided for a $1,500 expedited distribution.  That was under

11  the global resolution plan but not the toggle plan.  That's,

12  you know, April, so many months ago.

13          That did change under the plan filed in July.  The

14  amount of the expedited distribution went up from 1,500 to

15  3,500.  We also insisted on upping the standard.  The

16  requirement changed so that the proof of claim must be

17  complete and signed by the survivor under penalty of perjury.

18  That was added by the coalition and the TCC.

19          The TCC back in July supported the expedited

20  distributed.  Since the RSA terminated, the TCC has made it

21  clear that this was going to become a significant voting and

22  plan confirmation issue for them.

23          In addition, the insurers I think have always

24  consistently suggested that they would argue that the

25  expedited distribution was the equivalent of buying votes.

1          I will fight very, very hard on issues that I

2     think are major issues, issues that I care about, issues that

3     are important to survivors and the survivors receiving a fair

4     recovery in this case.

5          I don't agree with the insurers.  I don't agree

6     with the TCC, but I also know a distraction when I see one.

7     I think that the trustee should be able to pay nuisance

8     values, especially when the payment is less than the cost of

9     reviewing the claim.

10         I also think that it might be a bit unfair at this

11    point for people to make the election of 3,500.

12         You heard from Mr. Rothweiler that the amount of

13    funding in the trust could go up significantly in the coming

14    months.  So it may be, you know, unfair to even ask people to

15    make that election right now.

16         Given those factors, we support the debtor's

17    change in this regard.  I do think it gets rid of an issue of

18    potential distraction.  Given the current state of affairs, I

19    do think it makes sense for this to be something that is done

20    later and not at the voting stage.  Thank you, Your Honor.

21              THE COURT:  Thank you.

22              Mr. Patterson?

23              MR. PATTERSON:  I was going to defer to Mr. Stang,

24    Your Honor.  I'm on Mr. Stang's side.

25              THE COURT:  All right.  Okay.

1    Mr. Stang?

2    MR. STANG:  Thank you, Your Honor.  Your Honor,

3  this is not an example of no deed -- no good deed goes

4  unpunished.  This is an example of no self- serving deed goes

5  un noticed because that's really what's happening here.

6    This is not a gesture by the debtor to relieve

7  over-burdened state court counsel from actually getting the

8  informed consent of their clients.  Not a single person at

9  the hearings last week said that they couldn't effectively

10  communicate with their client regarding this election.

11    In fact, the debtor's schedule, the abbreviated

12  schedule you just heard about was on file.  No one said they

13  couldn't accomplish this.  For all of my differences with

14  Mr. Rothweiler, he said just within the last two hours that

15  they are in constant contact with their clients, fielding

16  thousands of phone calls a month, regularly communicating

17  with them in some fashion.

18    So this idea that the debtor is doing the

19  plaintiffs' bar a favor, it's a favor no one asked for.  And

20  so I really think that we need to look at this from two

21  perspectives.

22    One is should it be a separate class.  That's the

23  subject of our motion, and should it be on the ballot because

24  those could be two different things.

25    Now, you said last week that it was important to

1  understand the voting, to see where this -- on this issue

2  where the support was coming from.  That's how I interpreted

3  your comments, and we cited to the transcript in our motion.

4         The elimination of the $3,500 election from the

5  ballot makes it impossible to track who's voting for this

6  plan as -- if you think of them as people who elect for the

7  3,500 and people that will go into the TDP either to litigate

8  their claims if that's permitted under the TDP or through the

9  TDP process.

10        If you don't make people indicate their election

11 on the ballot, we will never know the level of support that's

12 being given to the class by those folks because one thing --

13 everyone talks about we've got to put this stuff in context.

14 Here's the context.  No court since these abuse cases started

15 being filed in 2002, I think, has ever crammed down on a

16 survivor class.  No one.  But what is going on here is that

17 the plan proponents want that class to be as big as possible

18 and to get them all to vote yes.

19        If this is a separate class, those yes votes, the

20 people electing for the 3,500 don't count towards the vote

21 tallies on the impaired class.  They don' want that.  This is

22 in effect kind of stuffing the ballot box.  I thought it was

23 gerrymandering, but it's really stuffing the ballot box.

24 They want as many yes votes in there as possible, and that's

25 a creditor who is going to get 2,500.  They want that person

1   to vote yes.  And you'll come out with the 80+ percent

2   approval rating of this by that class.

3          But if those people who are getting at least below

4   $3,500 under the TDP and when you look at the chart that we

5   have proposed and the debtor has accepted for inclusion in

6   the disclosure statement, there are a lot of people $3,500

7   and under and there are a lot of people in that -- in a

8   higher number, maybe 5,000, 7,000 who will take the 3,500 and

9   not take the risks and the delay associated with being in the

10  TDP.

11         So that's what's really going on here.  They want

12  to maximize the people in the class, get them to vote yes,

13  and then those people may elect the 3,500 but they have in

14  effect they've impacted the voting, and, frankly, I think

15  they have distorted the voting.

16         When I spoke to this issue last week, and I think

17  I -- Mr. Smola will speak for himself.  We didn't say that it

18  was too complicated or that the professionals couldn't do it.

19  We talked about integrity, the integrity of the voting

20  system, making sure that counsel who was signing the master

21  ballot were acting in the first capacity as Mr. Goodman

22  described it as kind of collectors of the ballots.  And that

23  there were no shenanigans going on with people not accurately

24  recording their client's vote.  Or in the second capacity,

25  actually making the decision themselves, which would be

1  backed up by power of attorney, which issue I think we've

2  resolved as we'll get through the solicitation motion.  But

3  no one opposed the idea that they couldn't communicate with

4  their clients effectively to get an informed consent on what

5  to do.

6          I don't think the hybrid that Ms. Lauria was

7  suggesting really makes sense because it doesn't give you

8  that measure of who is supporting the plan in that class.

9  Whose money is really at risk?  Who's rolling the dice and

10  who is not?  Because the $3,500 if you take that election,

11  you're not rolling the dice.  And while it is true that the

12  trustee does have to check to make sure that the signature is

13  on the claim form and that it is substantially completed,

14  that's not really a -- in my opinion a substantive review

15  process.  That's checking a signature block and seeing how

16  many answers were given.  It's not even looking at the

17  answers.

18          I don't think is an issue of vote buying because

19  if you put those people in a separate class, and every plan

20  that I've had any experience with has always had the

21  convenience class, the nuisance class, as someone described

22  it as a separate class.  Well, if they're in a separate

23  class, they're not -- the vote buying is not an issue because

24  they're not tilting the impaired class to acceptance.

25          So I think that if you have separate

1  classification this concern about vote buying goes away.

2         3013 does not deal with a, quote, "accepted plan."

3  It's not what the language says.  It says for the purposes of

4  the plan and its acceptance, the court may on motion direct

5  determine classes or creditors.

6         It doesn't say after the plan has been accepted or

7  after voting is completed.  This is the time to do it.  This

8  is the time to make the plan accurately reflect what is going

9  on in the case.

10         And everyone will have the opportunity to take the

11  election.  There will be no discrimination amongst abuse

12  survivors, but if you take the election, you're in an

13  unimpaired class and you're deemed to have voted yes.  Well,

14  you're unimpaired.  I guess you're -- you're not voting at

15  all, I'm sorry.  You're not voting at all.  I get an -- I

16  get -- I get an erasure on that one because it's my birthday.

17         I made a mistake, and so to me this is about

18  integrity of the voting system, being able to keep track of

19  who is voting how and how that is really going to affect your

20  view of where the support is coming from in the plan, and if

21  you do it any other way, we will never know if, in fact, the

22  survivors whose claims are really at risk are supporting

23  this.

24         People have called this the tail wagging the dog.

25  I don't -- you may have -- I think you may have used that

1  expression, Judge.  We don't know that.

2          There could be 10,000, 15,000, we estimate using

3  our chart the TDP values that we're talking about that

4  possibly as many as 25,000 people might be making that

5  election because under the distribution scheme and given the

6  current plan settlements, that's about how many people it

7  might make sense to take that election.  It cries to the

8  inadequacy of the settlements, please.  We won't get started

9  on that, but this is not the tail wagging the dog.  This may

10  be the dog.

11          So, Your Honor, we think it makes sense.  It

12  reflects the concerns you expressed last week.  We think

13  keeping it on the ballot absolutely is necessary so we can

14  track where the support of the survivors really is and whose

15  money is at risk here, if you will, and we think it should be

16  in a separate class to avoid the issue of vote buying, and we

17  think it makes it cleaner.  So that's all, Your Honor.

18          THE COURT:  Thank you.

19          Mr. Patterson?

20          MR. PATTERSON:  Thank you, Your Honor.  I lack the

21  history that so many people here have, and so I look at it

22  very, very simply.  This is a plan that provides for

23  alternative treatments.  The two alternative treatments give

24  the claimant a fundamentally different interest or stake in

25  the outcome of the plan.

1          One, reduces the claim if pertinent or actually

2     potentially increase their distribution to $3,500.  Accepts

3     that, executes the required releases and moves on with life.

4          The second is going to be tied up with the TDP

5     process, payment percentages, hold backs, whatever set aside

6     there is for the futures and all the rest of that

7     architecture for many, many years and except getting more

8     money overtime, hopefully, maybe not, but agreeing to take

9     that risk in exchange for potentially a greater distribution.

10          *Ex ante*, leaving everything else aside, leaving

11     this case aside, ex ante, those are two different classes,

12     and that is why the first time I think I drafted a plan and I

13     had a little nifty -- I thought I could collapse it and I put

14     in my little trade class, this is what you get, but if you

15     agree to reduce your claim, then you get this little amount

16     of money, and I thought I had made an efficient move.  And we

17     went to a disclosure statement hearing, it was a small case,

18     and the partners let me kind of run with it so I could get my

19     nose bloodied and learn how to practice law.  And I did.  The

20     judge said those are two classes, Mr. Patterson.  Those

21     people have different rights.  Those are different classes.

22     Read 1122 before you come back.  And so that's -- that is the

23     correct analysis.

24          Now, this Court need not resolve the 3013 motion

25     in the sense of deciding they're separate classes today, but

1   this goes back to what the history that I am familiar with,

2   which was last week.  And I raised this issue because I

3   wanted to make sure, we were talking about a number of issues

4   related to how we're going to count the votes, how we're

5   going to measure the votes for master mortgage, and I said

6   and by the way, Your Honor, I just want you to know we may

7   bring a 3013 motion because we think these people are

8   fundamentally in a different class.

9           And, Your Honor, said -- you know, I think I'm not

10  surprised given the papers that that is something someone is

11  going to do, and we'll have all the information.  And I was

12  completely satisfied with that because having the information

13  is the important part here.  At the end of the day, the Court

14  can decide the 3013 motion later, but the balloting issue is

15  really the key issue.

16          And I don't think you need a starker case than to

17  look at combustion engineering, and when that case went up to

18  the Third Circuit and the fact that the vast majority of the

19  votes have been delivered by people whose rights were

20  fundamentally different.

21          They, in that case they were receiving some money

22  from one trust and had a spillover claiming to the other

23  trust in a small amount.

24          And the Third Circuit -- in that case it was an

25  artificial impairment case, but the principle is really the

1  same.  And the debtor is given a certain amount of discretion

2  with regard to classification and treatment, but when the

3  purpose or when the underlying effect of that is to conceal

4  what the real support is for the plan by people who have a

5  real and meaningful economic state in it, or to separate out

6  people who have a different economic stake in it, then that

7  is improper classification or improper treatment.

8          Your Honor, I think this issue of eligibility and

9  the other little things, that's a complete red herring.  The

10 election can be I elect to take this treatment, but I

11 understand that I have to comply with the requirements of the

12 trust in order to receive it.

13         That -- this is not something that ought to get in

14 the way.  We heard loud and clear from the coalition lawyers

15 that they were able to do all the solicitation necessary, and

16 the idea that there has been a revisiting of this principle

17 with regard to the 3,500, frankly, it doesn't really -- it

18 doesn't really hold water.

19         Finally, Your Honor, with respect to the point

20 that the integrity of the balloting could be put at issue,

21 first, no one has said that.  That's speculation.  I think

22 it's a red herring, but even leaving that aside, this is an

23 election that's going to have to be made at some point.  And

24 a 60-day balloting period that we have for this purpose given

25 the focus that people are going to have on this process,

1 given the materials that they are going to be receiving,

2 given the communications that all of the lawyers are going to

3 be making with their clients, there is no better time to

4 ascertain what the claimant's preference is in this regard

5 than now.

6          This is the time when they are focused on the

7 issue.  To suggest that they would get a standalone piece of

8 paper at some point in the future that advises them about it,

9 that wouldn't be meaningful.  This is the time that they are

10 focused on it.  This is the time that people are in

11 communication with them.

12          Your Honor, I was a little disappointed to see the

13 switch about.  I understand that the debtor wants to have a

14 valid vote and a meaningful vote to record the votes on the

15 plan and really gauge the support, and I think if they really

16 want to do that, they would want to know are people who are

17 accepting this plan truly the people who are impacted by the

18 insurance settlements, who are impacted by the third- party

19 releases, who are impacted by the loss of their rights in the

20 tort system?  And that's what this gauges, Your Honor.

21          I'm happy to answer any questions the Court has.

22          THE COURT:  Thank you.  I don't have any

23 questions.

24          Mr. Smola?

25          MR. SMOLA:  Thank you, Your Honor.  Can you hear

1  me okay?

2          THE COURT:  I can.

3          MR. SMOLA:  I'll just be very brief.  With respect

4  to Ms. Lauria's point about the $3,500, frankly, that is the

5  least of a plaintiff's lawyer's concern for the informed

6  consent they need to obtain for their clients.  A yes vote in

7  this case, as I have sort of said three or four times now,

8  potentially compromises a case against a third party, a local

9  counsel, and potentially compromises a case against another

10 third-party non-debtor, a chartering organization, and every

11 lawyer that votes yes in this case is going to have to get

12 affirmative consent from their clients in order to execute

13 that vote and is going to have to inform their clients that

14 they are potentially compromising those other cases.

15          Certainly, the $3,500 was an additional

16 consideration, but it's really those first two considerations

17 that drive the communication we as plaintiff's lawyers have

18 to get from our clients in order to compromise their claims

19 by way of a yes vote.

20          Thank you, Judge.

21          THE COURT:  Thank you.

22          Ms. Lauria?

23          MS. LAURIA:  Thank you, Your Honor, and I will

24 also be brief.  I want to just put some meat to the bones of

25 something that Mr. Goodman said, which is from the

1  plaintiff's perspective, as the settlement amounts increase

2  in this case, so do their recovery percentages under the TDP

3  matrix.

4          And I'm going to point the Court to the blackline

5  disclosure statement that we filed in the overnight hours.

6  It's docket 6385-2, and I'm going to ask the Court to turn

7  to -- it's page 40 of 507 of the PDF or page 33 of the

8  disclosure statement itself.

9          And while you're getting there, Your Honor, I just

10  want to set the stage for what this is.  Mr. Stang has

11  referenced multiple times that they prepared a recovery

12  chart.  It provides for pittance of recoveries, and that the

13  debtors endorsed it, apparently, by putting it in the

14  disclosure statement, and, therefore, that proves that a huge

15  number of folks may take the $3,500 under our plan.

16          That's simply not the case.  What Mr. Stang failed

17  to mention was that the debtors provided their own recovery

18  chart where we took the TDP values.  We applied the scaling

19  factors as they pertain to the -- and, again, Your Honor,

20  it's page 33 of the black line, page 40 of 507 of docket

21  number 6385-2.  We applied the scaling factors for the

22  statute of limitations, and then we applied various recovery

23  percentages at both the base claim amount under the TDP, as

24  well as the max claim amount.  The base claim amount of 10

25  percent we calculated based on the Bates White estimation of

1  a 7.1 billion trust applying the Hartford distribution, the

2  distribution from the local councils, as well as the $100

3  million Delaware Statutory Trust note, as well as the debtors

4  own contribution.  The 63 percent recovery is assuming the

5  valuation is at Bates White's low end, which is $2.4 billion,

6  but, again, utilizing the same assumptions and then it is our

7  contention, of course, that claimants may receive up to a 100

8  percent recovery as additional insurance settlements come in

9  the door based on the Bates White estimation.

10        And if you just glance through this chart, you

11  will see whether you're talking about in-statute claims for

12  non-touching that appears on page 35, or out-of-statute

13  claims versus various states in the scaling factors, the

14  difference between a 10 percent recovery or a 63 percent

15  recovery could formulate the difference between electing a

16  $3,500 expedited distribution or not.  You see that

17  repeatedly including even in the more severe abuse claim

18  category types.

19        So we do think that more information, and, again,

20  this is just to add to Mr. Goodman's point, there is a

21  dramatic difference between recovery percentages depending

22  upon the dollars that are in the trust and also depending

23  upon the ultimate value of the -- the liabilities that the

24  trust is confronting.

25        Beyond that, Your Honor, I will say that as we

1  said, I guess it was last week, we think many of the voting

2  issues can be dealt with on the back end.  Maybe we

3  misinterpreted the statements of counsel last week at the

4  hearing, but at the end of the day we felt like this truly

5  was turning into the tail that was wagging the dog and that

6  it was appropriate to remove it from the ballot.

7          Thank you, Your Honor.  Unless you have any

8  questions for me, that concludes our views of this topic.

9          MR. STANG:  Your Honor, may I make one comment

10  about this issue of the moving target of the settlements?

11          THE COURT:  Yes.

12          MR. STANG:  I think this works, I think this might

13  work.  The notion that I heard was essentially let people opt

14  into it later at some undefined period of time after the

15  effective date.  And that, of course, is the problem that I

16  tried to identify.  I thought Mr. Patterson made it as well,

17  that we just don't know if the people voting yes really have

18  skin in the game.

19          But you could have an approach that says you have

20  to make the election, and you can opt out later.

21          If it turns out that on the effective date of the

22  plan they've doubled, just to use Mr. Rothweiler's hopeful

23  example or even, you know more than doubled the settlements,

24  people might go, you know what, maybe I shouldn't have taken

25  that election.  But we don't know.  There could be no more

1  settlements.  I have no idea who Mr. Schiavoni is talking

2  about talking to in settlements.  I thought he was talking to

3  us, but apparently not because he met with the coalition

4  yesterday, but we don't know.  The settlement numbers might

5  not change at all, so the idea that someone makes the

6  election, we know they are electing, and they can, in effect,

7  opt out of that election so that they are not damaged by an

8  increasing pot of money.  Maybe that is a resolution to this,

9  but we really feel the need to keep track of who's making

10  this election so we can see if it's skewing the voting, and

11  the idea that we could take up the classification issue at

12  the confirmation hearing is interesting.  Maybe that's a way

13  of doing it, but we really need to identify these folks so we

14  can see whether people with significant interest in the

15  issues that Mr. Patterson identified are voting yes or not.

16          THE COURT:  Mr. Goodman?

17          MR. GOODMAN:  Thank you, Your Honor.  Eric

18  Goodman, counsel for the coalition.  I'd just like to speak

19  on one issue.  1122(a) provides that a plan may place a claim

20  or interest in a particular class only if such claim or

21  interest is substantially similar to the other claims or

22  interest.  I think we satisfy that here plainly because all

23  of the claims in Class 8 are survivor claims.  On the

24  treatment issue, that's actually an 1123(a)(4), not 1122, and

25  1123(a)(4) provides that the plan shall provide the same

1   treatment for each claim or interest of a particular class

2   unless the holder of a particular claim or interest agrees to

3   a less favorable treatment of such particular claim or

4   interest.

5           The plan does provide for the same treatment.  It

6   provides the same options, you know, what people decide to do

7   later on if -- if they decide to accept less favorable

8   treatment for reasons that are personal to them, I don't

9   think that impacts the analysis under 1122 or 1123 at all.

10  That's my only point, Your Honor.

11          THE COURT:  So I haven't read the motion yet.

12  That's my -- I have to confess when I heard it was under

13  3013, I said what rule is that, but the but I see it's there,

14  and my gut reaction is it's not a classification issue

15  because all of the holders in the class have the same legal

16  rights *vis-à-vis* the debtors, and because they all have the

17  same options.  They all have the same opportunities with

18  respect to their recoveries, depending, of course, on what

19  abuse they suffered.

20          But -- so I don't know if it's a classification

21  issue, but my gut reaction is it's not.  But the reason I

22  thought this information would be helpful had more to do with

23  the channeling injunction request and the third-party release

24  request that I'm going to be -- that I'm being asked to make.

25  And not necessarily a cram down issue, although I guess I

1  hear that, too.  But or the channeling injunction and the

2  third-party releases appropriate under the relevant

3  standards?

4          And in that regard, I thought it would be helpful

5  to know who was voting and what their choice is.  Of course,

6  I could have been in a situation where there was no choice.

7  You just -- there's no convenience class.  You just are

8  funneled into the trust, and if you end up with, you know,

9  $19 for a non- touching claim on a 10 percent recovery, then

10 you get $19.  You don't have the option to get $3,500.  But

11 I'll confess I hadn't -- I did note these charts.  I hadn't

12 thought about this issue in connection with the charts.

13         I do think counsel is going to have to have

14 communication with their clients with respect to voting on

15 this plan, and it's a complicated plan and it does - - even

16 whether one accepts it or rejects it is a complicated

17 decision, much less whether one accepts the particular offer

18 of $3,500.

19         I don't know if it's a classification issue, but I

20 think it's important to understand the vote.  I don't know

21 about an opt out.  I don't know if that's something the

22 debtors or anyone else would accept.  So I think it needs to

23 stay on the ballot.

24         MR. PATTERSON:  Thank you, Your Honor.

25         THE COURT:  Thank you.

1           MS. LAURIA:  Your Honor, we will conform the

2   ballots and the other documents back to the format that they

3   were in on this topic previously.

4           THE COURT:  What else can we accomplish this

5   evening?  There were two -- two other topics, Ms. Lauria.

6   Let me see my notes.

7           MS. LAURIA:  Yes, Your Honor, it was sort of

8   clean-up on the actual disclosures on the disclosure

9   statements and then resolution of any open issues with

10  respect to the solicitation procedures.

11          Both of those topics are being handled by the team

12  in the White and Case conference room, which I cannot see.  I

13  might as Mr. Linder if he is somewhere near the camera to let

14  us know if one or both of those topics are a size that can be

15  dealt with still this evening.

16          MR. LINDER:  Good afternoon, Your Honor, White and

17  Case.  As for the disclosure statement itself, we're

18  certainly a long way off from where we were with 170

19  objections last week.  I think we're -- we're down to maybe

20  four issues that I have on my list.  So I think that's

21  something discreet enough that we might be able to accomplish

22  in the time remaining today.

23          THE COURT:  Okay.  Let's see if we can knock those

24  out.

25          MR. LINDER:  Great.  Thank you, Your Honor.

1            As Ms. Lauria mentioned, we've been working

2   extremely hard since we broke last week -- I think it was

3   last Thursday -- to revise the disclosure statement, the

4   plan, the solicitation materials and the various exhibits and

5   schedules to account for the revisions that the debtors

6   agreed to make during the hearing last week as well as the

7   items that the Court directed us to include in a revised

8   version of the documents.

9            We've also worked to reconcile our comments with

10  the numerous objectors' comments, and we believe that the

11  draft we filed in the early morning hours today at Docket

12  Number 6385-2 that's the redline is very close to resolving

13  all of the disclosure statement objections.

14           Again, as I mentioned, I believe there are four

15  categories of issues that I'm aware of so I would propose to

16  just walk through each of those in turn, starting, Your

17  Honor, with the future claims disclosures.

18           Your Honor will recall that certain of the

19  objectors asked for disclosures with respect to an estimate

20  of the future abuse claims so that they could better

21  understand what effect if any those claims may have in terms

22  of dilution, potential dilution of their recoveries, vis-à-

23  vis future abuse claims.

24           We have conferred with the FCR's counsel over the

25  weekend, Your Honor, and the FCR has preliminarily estimated

1  that future abuse claims in number are projected to equal

2  approximately 14 percent of the number of abuse survivors

3  that are not future abuse claims.  And in value, Your Honor,

4  are projected by the FCR to equal approximately 21 percent of

5  the value attributable to abuse claims that are not future

6  abuse claims.

7           Your Honor, from the debtors' perspective, those

8  numbers I just want to be clear do not comport with our view

9  or our analysis.  We're continuing to engage in discussions

10  with the FCR's representatives with respect to their

11  preliminary projections, but regardless, Your Honor, we will

12  continue to confer with the FCR and include -- we would

13  propose to include in a further revised version of the

14  disclosure statement what I suppose would be the solicitation

15  version those estimates.

16          And, specifically, in the version that we filed

17  last night, Your Honor, the main provision that we included

18  is on page 96 of the redline, and what that essentially has

19  is a placeholder for the projected amount and value that I

20  just recited.  And, again, that's on page 96 of the redline.

21  It indicates both the FCR's forecast and our dispute of those

22  forecasts based on our own valuation expert's analysis of

23  future abuse claims.

24          We've also added, Your Honor, risk factors to

25  emphasize that there is a risk, that the projected value of

1  claims is higher than the debtors range or that the types

2  of -- or that the claims that could be allowed in amounts

3  higher than the total projected ranges for each type of

4  claim, which could also reduce recoveries for holders of

5  compensable claims.  That risk factor is on page 275 to 276.

6          So with those changes, Your Honor, we believe that

7  that is sufficient disclosure on the topic of future abuse

8  claims.  And we propose to memorialize that in a further

9  revised version of the DS.

10          MR. SCHIAVONI:  Your Honor, our just -- our one

11  concern about that is that there's no explanation of the

12  methodology that was -- that's applied to come up with the 14

13  to 21 percent.

14          MR. MONES:  Your Honor, this is Paul Mones.  May I

15  speak?

16          THE COURT:  Yes.

17          MR. MONES:  Thank you, Your Honor.  I am and have

18  been since the beginning of this future claims, since a

19  future claims representative has participated been very, very

20  concerned about the methodology of arriving at this number

21  considering the on-the-ground reality of states which allow

22  repressed memory and the number of juveniles who -- people

23  under the age of 18, who are -- would not have filed given

24  the nature of the criminal justice system as it's been

25  applied in the last 3 to 5 years with regard to

1  organizational -- abuse in organizations like the Boy Scouts
2  whereas back in the 60s, 70s, 80s, 90s, the numbers of
3  reports of sexual abuse that were -- that were reported to
4  law enforcement were less, the numbers now according to law
5  enforcement research, et cetera, at least in institutions,
6  not in family matters has significantly been altered.  So I
7  hope we would have a -- echoing perhaps Mr. Schiavoni's
8  comments we would have an opportunity in some way to have an
9  evidentiary hearing on the way in which this number was
10 formulated because, again, purely in my opinion I think those
11 numbers are way, way off.
12           MR. LINDER:  Your Honor, if I could briefly
13 respond.  Our understanding is that this analysis, again, is
14 preliminary.  Ankura is the FCR's valuation expert.  With
15 respect to substantiating the value, that's obviously
16 something that we would expect to happen at confirmation.
17           THE COURT:  I think there will be discovery on it.
18           MR. MONES:  Thank you, Your Honor.
19           MR. STANG:  Your Honor, may I make a comment on
20 this?
21           THE COURT:  Yes, Mr. Stang.
22           MR. STANG:  Your Honor, first of all, whatever is
23 going to be expressed in terms of the FCR's opinion should
24 not be in percentages, it should be dollar amounts or number
25 of people.  One shouldn't have to go back and compute

1  percentages.  There's just no reason.  But we received a

2  draft redline of the plan a little past midnight on Monday.

3         It was not marked confidential.  It was not marked

4  subject to the mediation privilege, and that e-mail or in

5  that draft redline, it said that the FCR estimates there are

6  11,300 future claims and 5.055 billion dollars in value.

7         Now, I'm not a math whiz but 5 billion dollars is

8  more than 21 percent of the high-end range of the debtor's

9  estimates at 7 billion.  So when they say percentage of

10  value, I have no idea what the value means.

11         And I have a communication.  I presume it came

12  from the debtor that the FCR was estimating these claims at

13  11,300 people and 5.055 billion dollars.

14         Would someone please explain to me how we got from

15  Monday at 12:40 a.m. with those numbers to what we just

16  heard?

17         MR. LINDER:  Your Honor, before the FCR responds,

18  what I would note is that my understanding is the FCR does

19  not adopt the debtor's estimation.  It does not adopt our

20  range of values, just to respond to Mr. Stang's comment.  But

21  with respect to the propriety of how the estimation is

22  expressed, I would defer to the FCR.

23         MR. SMOLA:  Your Honor, can I just be heard for

24  just very briefly?  I think this should be a very simple

25  disclosure.  How many future claims are projected in terms of

1  numbers?  How many of those are repressed memory claims,

2  meaning claims that can come from policies in the 70s and

3  80s?  How many of them are minor claims?  We heard the FCR

4  earlier saying they felt many of these were minor claims that

5  would be fully insured.  Is it 8,000 minor claims?  Is it 200

6  minor claims?  What is the projection, and what is the total

7  estimate for future liability?

8          It's relevant for two reasons in disclosure.  One

9  is where do these claims fall in the insurance picture?  Are

10 they for minors who were abused in the last decade, or are

11 they going back to the Hartford era, Century era, and other

12 non-aggregate limits?  And, two, it may dictate how the FCR

13 discovery goes.  If there is 11,000 claims, that discovery

14 may need to be robust.  If it's much less than that, it may

15 not need to be so robust.  So I think a simple disclosure

16 will -- will put us on the right path in my view.

17         MR. BRADY:  Your Honor, Robert Brady for the FCR.

18 Both of those statements are correct, what Mr. Stang saw in a

19 black line and what the debtors propose to put in now.  So we

20 can express this in either way.

21         I think the debtor preferred percentages.

22         But we do expect this to be the subject of

23 discovery, and we are prepared to sit down with the TCC, the

24 coalition, and anyone else who wants to understand the

25 methodology and we'll present that to them.  But we always

1  expect that this would be a confirmation issue, and we're

2  making the disclosure now because the Court asked us to.  And

3  we understood that the Court asked us to list the number of

4  claims and the amount.

5           The fact is Mr. Stang has said these claims are

6  worth over $100 billion.  The debtor believes they are

7  somewhere between 2 and 7, and the FCR has his own view as to

8  what the value of the claims are.

9           THE COURT:  Okay.  So let's --

10          MR. LINDER:  Your Honor, just to be clear on the

11 percentage versus the dollar amount, the reason the debtors

12 prefer the only apples-to-apples comparison that can be made

13 is with respect to numbers of claims given the disparity

14 between the FCR's valuation number and the debtor's valuation

15 number.  Doing a percentage allows an apples-to-apples

16 comparison to be made.

17          MR. STANG:  Your Honor, I'm just not sure what the

18 apples are.  It's 14 percent of the value if it's $5 billion.

19 If my math is right, it's $25 billion in claims because

20 that's 20 percent, 5 percent is 20 -- that's the math, I

21 guess.  I guess I just don't understand what the value means.

22          I understand the people because we know there's

23 82,200 some odd.  That's easy.  I just don't understand the

24 value side of it.  Just give us the number like Mr. Smola

25 suggested.

1          THE COURT:  I don't understand it either.  I wrote

2  it down, but I wasn't quite sure what it -- what it meant or

3  what it was correlated to.  And so, Mr. Brady, it's 21

4  percent of value, whatever that value happens to be?  Is

5  that -- is that what Ankura's opinion is, or do they have an

6  opinion on a number?

7          MR. BRADY:  They have run the claims through the

8  TDPs, and they have an opinion on the value of the claims run

9  through the TDPs.

10          THE COURT:  So it's as run through the TDPs?

11          MR. BRADY:  Correct.

12          THE COURT:  Okay with some, I suppose analysis as

13  to what they think are the appropriate scaling factors?

14          MR. BRADY:  Correct.

15          THE COURT:  Just explain that in a sentence and

16  give out the numbers.

17          MR. LINDER:  We will work with the FCR, Your

18  Honor, to do that.

19          THE COURT:  Thank you.

20          MR. ROSENTHAL:  So, Your Honor?

21          THE COURT:  Mr. Rosenthal?

22          MR. ROSENTHAL:  Yes, it's Michael Rosenthal of

23  Gibson Dunn.  So what the FCR is going to give is -- is -- is

24  an aggregate number, a percentage, and the actual -- the

25  actual number of claims, an aggregate value and the

1  percentage of that value to a total value, all three of those

2  things.  Is that what we're looking for?  I heard 11,300

3  claims.  I heard $5 billion, and I heard $5 billion

4  represents 21 percent of something.

5         THE COURT:  That sounds -- you could put the

6  percentages in.  That's fine, and that one sentence or so on

7  just what Mr. Brady explained.  Then it's discovery.

8         MR. LINDER:  With that, Your Honor, I propose to

9  move on to the next, the second of the four categories.

10         THE COURT:  Yes.

11         MR. LINDER:  That is the plain English summary

12  document.  This is -- this is a document that was actually

13  appended to the revised solicitation procedures order that we

14  filed, docket 6386-1.  I'm raising it in the context of the

15  disclosure statement, Your Honor, because Mr. Ryan had

16  suggested that it would be an efficient means, an effective

17  means of communicating with charter organizations with

18  respect to information contained in the disclosure statement.

19         And, Your Honor, this was exhibit 12, and that

20  starts at page 243 of 256 if you're looking at the stamp at

21  the top.

22         THE COURT:  Page 243, okay.

23         MR. LINDER:  Your Honor, we spent a good portion

24  of our day on Friday and Saturday, the debtors did, working

25  with the ad hoc committee of local councils preparing the

1  draft that is appended to the revised solicitation procedures

2  order.  We sent this draft in substantially this form to all

3  of the objecting parties including Mr. Ryan and the other

4  representatives of charter organizations.  We sent that on

5  Saturday afternoon.  We then sent a further revised version

6  to all parties including Mr. Ryan on Monday.

7          Last night at about 7 p.m. Central Time we

8  received preliminary comments from Mr. Ryan, and we made good

9  faith efforts after we received those to incorporate as many

10  comments as we could, given the time constraints and the

11  number of documents we were working to file.

12          The document that's before Your Honor is -- it's

13  about a ten-page document, and it's comprised of four items.

14  The first is -- is about nine pages of frequently asked

15  questions regarding the treatment, I don't know if treatment

16  is the right word, but the effect of the plan on charter

17  organizations with respect to what we view as their three

18  options under the plan.

19          The first is to become a participating charter

20  organization, and that is the "default" option.  The second

21  is to negotiate a settlement by which they can become a

22  contributing chartered organization, and then the last is to

23  opt out of that treatment assuming that the charter

24  organization is not a debtor in bankruptcy.

25          So we've set forth several FAQ on each of those

1  options, a table at the back of the document that attempts to

2  summarize the three options on a single page, as best we can

3  in terms of what the contribution that's required to be made

4  by those charter organizations and the protections that the

5  charter organizations would receive under the plan for each

6  option.

7         There's also an opt out election form.  Mr. Ryan

8  had requested that rather than the more informal method of

9  contacting the debtors to opt out of becoming a participating

10  (inaudible) that there actually be something that looked more

11  like a ballot that could be opted out, that could be

12  submitted as an opt out.

13         We've prepared that.  That would be -- that is

14  proposed to be remitted to our claims and noticing agent.

15         And, finally, we would propose to append to the

16  summary and FAQ a confirmation hearing notice so that parties

17  know what the relevant objection deadlines are and the

18  proposed date for the hearing on confirmation of the plan.  I

19  understand from communications with Mr. Ryan during the

20  hearing, Your Honor, that there are a number of items that he

21  would propose be added to this document.  We've been trying

22  to balance the desire, Your Honor, to have this be a concise

23  and effective summary against what we view as a risk of this

24  taking on a life of its own and becoming in essence a mini

25  version of the disclosure statement.  The disclosure

1  statement has already been heavily negotiated.

2              So what I'd propose to do, Your Honor, is to in an

3  attempt to make sure all the information that Mr. Ryan

4  believes should be included in this document is included is

5  to add a section perhaps before the chart that and some of

6  the examples of what Mr. Ryan would like articulated in this

7  document are voting, means by which holders of indirect abuse

8  claims, most of which are charter organizations can vote

9  their claims be effective, the releases and injunctions on

10 charter organizations, et cetera.

11             What I would propose to do would be to add a

12 section that bullet points out some of those items and cross-

13 references the disclosure statement and where those -- where

14 all of those items, all of which have been articulated in the

15 disclosure statements can be found.

16             All of the indirect claim holders, indirect abuse

17 claim holders who are charter organizations will be receiving

18 the disclosure statement as part of their solicitation

19 package, so from our perspective, we think that is an

20 appropriate way to balance the charter organization's desire

21 for a one stop shop for all of this information against this

22 document again taking on a life of its own.

23             THE COURT:  Mr. Ryan?

24             MR. RYAN:  Thank you, Your Honor.  We do -- we

25 do -- first, we commend a lot of effort went into getting

1   something into -- an effort to put into plain English.  You

2   know, what our hope is and what we thought the Court agreed

3   with was that charter organizations need something that gives

4   them the entirety of what they're being asked to decide on in

5   plain English.  And there's -- there's two components to

6   that.  One is the three options for the releases and the

7   treatment with respect to all chartered organizations, and

8   also the creditors, and there are 16,000 creditors needed to

9   understand that part of the disclosure statement in plain

10  English as well.

11          So, addressing half of -- half the loaf, and then

12  giving them a key that points them back to the disclosure

13  statement in our view is -- just falls a little short.  I

14  understand the concern of not wanting a 50-page document,

15  but, you know, we gave them a turn that we think has a lot of

16  those concepts in 10 pages.  We think it can be done.  We

17  think we're losing the goal of plain English if we say, hey,

18  there's going to be some maybe consensual, maybe not

19  consensual third- party releases.  Here, go look in the

20  disclosure statement for where they're discussed, and then

21  you're going to find a whole lot of defined terms that you're

22  going to have to go into a plan to understand.  It's just

23  leading them down the rabbit hole that we're trying to avoid,

24  which is these are not sophisticated people who don't

25  understand legal documents and not to have them wade through

1  a disclosure statement which requires page flipping back to a

2  plan to read one definition, to read another definition.

3          We think we can get this all in there in plain

4  English simply.  There are a lot of very important concepts

5  that aren't in right now.  Most notably, it doesn't speak

6  anything about the 16,000 charter organizations that have to

7  vote, that are entitled to vote.

8          It doesn't say anything about the third-party

9  releases, consensual or non-consensual and those things need

10 to be in a plain English document.  Those are some of the

11 most important things that are going to be going on with

12 respect to a chartered organization.  There's a whole list of

13 other things, Your Honor, that I could run through at a high

14 level that it doesn't have.  I think probably, Your Honor,

15 and I'm expecting that based on where this was in the revised

16 proposed solicitation procedures order, you haven't looked at

17 what the debtors have done either.

18         Perhaps the simplest thing to do to save everyone

19 a lot of time on this is you have what the debtor submitted.

20 We'll be happy to -- to send something over to the Court

21 under a notice of filing of what we think can be done, and

22 Your Honor can take a look at those two.  And if you have

23 some discreet questions between the two, you know, this thing

24 is not getting printed tomorrow.  We have time tomorrow.  We

25 can have a much more discreet hearing with less than 260

1  people.  This is not an issue that affects the vast majority

2  of people who are on this line, and that gives the Court the

3  time to not have us negotiate line by line but just see two

4  different presentations.  Ultimately, both of them asked and

5  say that it's a court-approved document, so let the Court --

6  you know, we'll live with what the Court chooses.

7       THE COURT:  Okay.  Why don't you submit what you

8  want and I'll take a look at it, but are the chartered

9  organizations with their creditor hat on going to receive

10 another plain English document that --

11      MR. RYAN:  No.

12      THE COURT:  -- deals with --

13      MR. RYAN:  No, Your Honor, this is the only - -

14 that -- and that is part of the problem.  This is the only

15 plain English document the debtor is proposing to send out.

16 And the genesis of this was chartered organizations need to

17 know everything that affects them in plain English.  So,

18 again, that is my half a loaf comment is telling them about

19 the options under the plan with respect to releases, and

20 claims, and channeling, and contributions, it completely

21 doesn't tell them about their -- their rights as creditors,

22 the effect of signing the ballot, what happens if they don't

23 opt out of the consensual releases.

24      None of that's in there in plain English, and

25 that's exactly the kinds of things that we think creditors

1  need to know.  Chartered organizations need to know as

2  creditors casting a ballot.

3          THE COURT:  Okay.  I'll take a look at what you

4  submit.

5          MR. RYAN:  Thank you, Your Honor.

6          THE COURT:  Mr. Schiavoni?

7          MR. SCHIAVONI:  Your Honor, I'm happy that maybe

8  I'll have an opportunity to give my final round of comments

9  to Mr. Ryan this evening, and then either he'll include them

10 or you can look at them.  Two critical elements of this

11 that's not really there is really an explanation of in the

12 Hartford settlement there's a clause that says that

13 Hartford's coverage is going to be released.  There's just no

14 disclosure really of what that means in this settlement.

15          There's the same thing with regard to in the

16 Hartford settlement the deemed release that's to be part of

17 the TDP that's a condition of the Hartford settlement,

18 there's no disclosure of what that means here either.  And

19 it's like the most fundamental thing that strikes me as wrong

20 with that is that you've really got to go to Page 4 of what

21 is a dense single- spaced document to realize that you're not

22 getting, you're left un protected and that there's 35,000

23 claims going to be coming at you and no one is representing

24 you in the bankruptcy.

25          I mean Mr. Ryan is like carrying a big load, but

1  there's no committee, there's no one representing them, and

2  you know to the extent some of these folks maybe think, you

3  know, I don't want anybody to be pointing at like the

4  carriers are representing them.

5         So I think it should be clear that they're un --

6  you know, they're unrepresented, and the net result of this

7  death trap provision is that they're -- it's like even under

8  the election or the -- the -- the negative assignment,

9  they're left uncovered, you know, for all these claims.

10        So it's just, you know, it seems like the very

11 first question is, is the effect of the plan, will it release

12 me, and the answer is no.  Local counsels get full release,

13 and you don't.  You don't have counsel in the case, but I

14 will give those comments to Mr. Ryan and we'll see what

15 happens.

16        MR. RYAN:  And, Your Honor, we'll welcome those

17 from Mr. Schiavoni.  I will say, I didn't want to go into

18 this, but the lack of disclosures regarding the Hartford

19 settlement are one of our biggest concerns.

20        You know, the document right now doesn't tell

21 people, it says, hey, you'll have your insurance rights.  It

22 doesn't tell them the Hartford rights are gone.  It doesn't,

23 you know, and there's been a substantial movement in some of

24 the things, Your Honor, but we know from Boy Scouts own --

25 they've taken positions on pre- 1976 local counsel insurance

1    coverage and whether it -- it covered chartered

2    organizations.  If you look at the first version of the

3    latest disclosure statement, it said there's no coverage for

4    you guys.

5            You know, we know from the Boy Scouts own

6    documents that 300 local councils participated over an eight-

7    year period in a blanket policy that covered charter

8    organizations.  So there's concerns about that.  Now, that

9    has been fixed, but one of our concerns has been that there's

10   been a lack of adequate diligence into some of the things

11   that under the rubric of the Boy Scouts believe -- well, the

12   Boy Scouts believed until we pointed them to their own data

13   room that there was very little coverage for local -- for

14   chartered organizations under the local counsel policies.

15           You know, Mr. Linder had said to you last week

16   that, you know, the Boy Scouts never agreed to defend and

17   indemnify chartered organizations.  There is a resolution of

18   Boy Scouts in response to the handling of sexual abuse claims

19   that says Boy Scouts shall defend and indemnify against

20   claims, and that was specifically enacted with respect to

21   abuse claims.  And it was not a go forward defend and

22   indemnify.  It was any claim regardless of when time was

23   occurred.

24           So there is that kind of lack of Folsom disclosure

25   that concerns us that is -- we only know what we know as far

1  as what beliefs are there.  I mean there's a whole

2  representation as to what the Boy Scouts believe chartered

3  organizations thought 60 years ago about a charitable

4  doctrine of immunity.

5        Things like that don't need to be in there, but,

6  you know, I think if you look at the evolution, there's been

7  some improvement but that shouldn't have to be the parties

8  say, hey, your own documents.

9        There's a corporate resolution that says, you will

10  defend and indemnify.  It should just say we agree to defend

11  and indemnify you, and as Mr. Schiavoni mentions, we want to

12  make clear that people -- just saying you're still exposed to

13  lawsuits in the court system, people need to know you can't

14  defend on boy scouts to honor their prior promises.  Those

15  things need to be clear.

16        That's not a -- that's not a belief.  Those are

17  facts, and those need to be prominently disclosed to people

18  because they've always been subject to sexual abuse claims.

19  But what they need to know is that the Boy Scouts are no

20  longer going to defend and indemnify them.

21        Those kinds of things need to be made clear that

22  they won't have insurance from the Hartford.

23        That's what we need to get out to these people in

24  plain English.  Thank you.

25        MR. LINDER:  Your Honor, I would just ask that

1  if -- if there's going to be a submission by Mr. Ryan that we

2  impose some parameters on when that -- when that might be

3  filed, just in the interest of finalizing our documents.

4          THE COURT:  Well, I don't know.  Everything is

5  last minute.  People are working as quickly as they can.

6  Debtors are.  Other people are.  He said he'd do it at some

7  point tonight.  We'll look at it tomorrow.  That's all I can

8  ask.

9          MR. ROSENTHAL:  And, Your Honor, I only have my

10 hand up because I would hope that Mr. Ryan would include us

11 in those discussions, please.

12         MR. RYAN:  Absolutely, Mr. Rosenthal.

13         THE COURT:  This is clearly an important issue,

14 and it's -- and it's an issue that really only surfaced in

15 court in a significant way recently so --

16         MR. RYAN:  And, Your Honor, I know I said tonight,

17 but I'm already looking at 6:40, so it may be tomorrow

18 morning.  I will tell you that.

19         THE COURT:  I'm not staying up waiting for it,

20 so --

21         MR. RYAN:  I appreciate that.  You know, our

22 clients have the resources they have.  We don't have, you

23 know, go to trial in 20 day resources like some of the other

24 people on this call.

25         THE COURT:  I know, but, no, my only point is this

1  is a very important issue, these chartered organizations and

2  their ability to understand what's happening, especially

3  given the way this is structured.  And as with many things in

4  this case, it's complex and I don't know that there's a lot

5  of precedent for this.

6         So communications with the chartered organizations

7  really need to be helpful.  That doesn't mean add another 50

8  pages to it.  I don't know that that makes it helpful, but

9  they need -- it needs to be helpful so that they understand

10  what's going on.

11         MR. MONES:  Your Honor, could I have 30 seconds,

12  please?

13         THE COURT:  Mr. Mones?

14         MR. MONES:  I would just refer the Court to Dale

15  versus Boy Scouts of America, which is a 2000 United States

16  Supreme Court decision that gave the Boy Scouts of America

17  the right to exclude gay scout leaders.

18         Part of that decision was that the Boy Scouts of

19  America control the hiring, firing, and even to that point,

20  sexual preference of the scout leaders gave no discretion to

21  the charter organizations or to the counsels in this regard

22  with regard to the Boy Scout's control over the core issue of

23  scouting, which is the identity of the scout leaders.

24         So I would just offer to the Court in evaluating

25  this in the future because it's been a centerpiece of the Boy

1  Scout's liability over the last 16 to 18 years in state court

2  litigation that the United States Supreme Court at least has

3  decided at least partially about this issue about the duty

4  owed by and the control of the Boy Scouts of America over

5  their charter organizations since the charter organizations

6  do select the scout leader.  Thank you, Your Honor.

7            THE COURT:  Okay.  Next?

8            MR. LINDER:  Next, Your Honor, we have the third

9  issue, which is that we've been advised by Mr. Patterson that

10 the revised description of the source (inaudible) waiting is

11 in his view not clear and appears to be contrary to the

12 representation that only affected claimants would receive

13 shares of non-BSA- sourced assets.  Your Honor, the language

14 that he's referencing is on page 240 of the red-line

15 document.

16            MR. PATTERSON:  It's on page 6385-2, yeah,

17 page 240.  Thank you, yeah.

18            THE COURT:  I have to switch documents.

19            Okay, thank you.

20            MR. LINDER:  And you'll recall, Your Honor, that

21 last week it was noted that the language only used the term

22 in part with respect to the non-BSA-sourced assets.  It only

23 referenced part of those assets being allocated among holders

24 of claims that relate to the -- the source of the assets

25 being attributed.

1              And -- and -- and we were specifically we were

2    discussing the TCJC settlement.  We've revised that, Your

3    Honor, to provide that it's either all or in part those

4    assets are being contributed to the trust and then being used

5    to pay holders of claims, again, that relate to the

6    contributor in question.  I think that is now clear.  The

7    only instance in which the TCJC contribution under this

8    revised provision, which just parenthetically, Your Honor, is

9    really a recitation of what is now in the revised trust

10   distribution procedures on the same topic.

11             The only instance in which the funds would be used

12   to pay claimants other than TCJC claimants is if as a

13   predicate all TCJC claimants were -- their claims were all

14   satisfied in full from those proceeds, and then the

15   overage -- I think it's the last sentence of this -- this

16   provision in blue, if there's a remainder after the

17   satisfactions of all relevant holders, then that remainder

18   shall be distributed to all holders of abuse, allowed abuse

19   claims in accordance with their payment percentage.

20             THE COURT:  Okay.  So I get that sentence, that

21   last sentence, but what does all or in part mean?

22             MR. RYAN:  Your Honor, what I understand it to

23   mean is that we really don't know what the terms of a future

24   settlement with another organization might provide for.  So

25   this is intended to permit flexibility with respect to

1 further settlements.  The TCJC settlement is predicated on

2 those proceeds going only to TCJC claims with the remainder

3 being distributed to other claimants if there is any.  But

4 this is intended to preserve that flexibility in the event

5 that further settlements provide for different terms.

6          THE COURT:  Mr. Patterson, what's your concern?

7          MR. PATTERSON:  Well, is there a statement

8 somewhere in the disclosure statement that the TCJC proceeds

9 will be used only to pay TCJC claimants up to the full value

10 of their claims?

11          MR. RYAN:  Your Honor, I believe where we put that

12 and for the front we have summary bullets.  This is on page

13 14 of the redline, and it is at the top of page 14 there is

14 a -- a new sentence that states that the TCJC contribution

15 will pay claimants with a claim against TCJC in addition to a

16 *pro rata* share of trust expenses.

17          MR. PATTERSON:  I didn't read that to be

18 exclusive, and then when I read the source affected waiting

19 language that said in whole or in part, I read them as

20 consistent with each other.  But if the intent is on page 14

21 that -- that it's only, then I would ask that it's TCJC's

22 contribution will go to pay only abuse claimants with a claim

23 against TCJC.

24          MR. RYAN:  That's fine with us, Your Honor.  We're

25 happy to make that change to clarify.

1          MR. PATTERSON:  But with that, I understand there

2    is no flexibility with regard to TCJC other than with regard

3    to an overage, and there is flexibility with regard to any

4    future settlement.

5          THE COURT:  That's how I understand it now.  Okay.

6    I think that fixes that problem.

7          MR. RYAN:  Correct.

8          And, Your Honor, that brings us just to the last

9    category, which is really a catch-all.  We would just note

10   for the record that we've been conforming changes to the

11   disclosure statement to reflect changes to the solicitation

12   procedures, and we'll continue to do that.  And so there may

13   be further changes on that front.  It's not really a disputed

14   category, but I wanted to note it for the record that our

15   further revised version of the disclosure statement will --

16   will account for anything else that's discussed on the record

17   today or tomorrow.

18         THE COURT:  Okay.  So what do we have for

19   tomorrow?

20         MR. PATTERSON:  Your Honor, I just -- before we

21   finish, I had one other comment regarding the plan and

22   disclosure statement.

23         THE COURT:  Okay.

24         MR. PATTERSON:  And it goes to -- the easiest

25   place to see it is I'm in document 6385-1, PDF page 12 of

1  416.  And it's the definition of abuse claim.

2          THE COURT:  So that's in the plan?

3          MR. PATTERSON:  Yeah, it's in the plan, Your

4  Honor.

5          THE COURT:  Okay.  I don't have the docket items

6  on here.  Plan page 12?

7          MR. PATTERSON:  Your Honor, it's definition 18.

8  It's on page 4 of my version.

9          THE COURT:  Definition 18, abuse.  Okay.

10         MR. PATTERSON:  So I'm -- my concern with regard

11 to this definition is two-fold, and this deals with whether

12 or not the release, which uses the term "abuse claim" is

13 broader than the Court indicated as being confined to

14 scouting-related activities.

15         So my first concern is that and the architecture

16 of this definition is that the first 12 or so lines down to

17 the provided, however, those first 12 lines that's just --

18 that is what applies to the debtor, and then the proviso

19 introduces the concept of what this application of this

20 definition of abuse to protected parties, chartered

21 organizations and so forth or just chartered organization --

22 contributing chartered organizations to begin with.

23         And the way that proviso works is it says that

24 provided, however, with respect to a contributing chartered

25 organization, abuse claim is limited to and then there was a

1  whole series of provisions.  It's limited to a claim that's

2  attributable to, arises from or based upon in whole or in

3  part abuse that took place occurred prior to the petition

4  date.  And I'm concerned with that in whole or in part

5  because of some of the claims, and this is, ultimately, Your

6  Honor, a confirmation issue.  But we're going to get to

7  confirmation and we're going to be making this argument, and

8  I just want to be clear if this is the release that the

9  debtor wants to go out with, then that's the definition they

10  want to go out with.

11        So that's the first concern.  And the second is

12  when it says that is limited to a claim that's attributable

13  to --

14        UNIDENTIFIED:  Do you need the papers to deal with

15  this or --

16        THE COURT:  Excuse me, Mr. Patterson.  I'm hearing

17  somebody's cross conversation, we're all hearing it.

18        Mr. Patterson, yeah?

19        MR. PATTERSON:  Thank you, Your Honor.  It has a

20  series of includings, so the first one is about five lines

21  down, including a claim that seeks monetary damages,

22  including fraud and the inducement, including negligent

23  hiring, including any theory, and this is the key one,

24  including any theory based on public policy or failure to act

25  by a protected party and so on and so forth, or for whom a

1  protected party or limited protected party is alleged to be

2  responsible in connection in whole or in part with the

3  contributing charter organizations involvement in or

4  sponsorship of one or more scouting units.  The -- as I read

5  the grammar of this section, the limitation of involvement in

6  the scouting units is applicable only to the prior including

7  any theory based upon, but not applicable to the entire

8  *proviso.*

9          THE COURT:  Okay.  Well, I had to write on

10  something like this once.  I think it was on a dip document,

11  what did the proviso mean, and what did it relate back to,

12  and, you know, pulling out Scalia's book on -- shoot, what's

13  the one he and Garner have on different --

14          UNIDENTIFIED:  Yeah.

15          THE COURT:  Yeah, that one, and, you know, we

16  don't want to end up in that situation.  So I would ask the

17  parties to look at the definition of abuse claim to make sure

18  that it or its use in the releases is clear that there is no

19  non-BSA-related activity or conduct that is being released

20  here because I think that is just basic to what we're doing.

21          And if there is a protected party that has

22  exposure or liability and I'm not prejudging any of that, but

23  they have exposure in more than one capacity in a BSA-related

24  and a non-BSA- related, that the non-BSA-related conduct is

25  not being released.  It's not being included here.

1          MR. PATTERSON:  And just given the way that these

2    documents inter-relate with each other, I mean it's

3    frequently the case that you put a sentence like that in.

4          THE COURT:  Yeah.  It may be the -- I hate these

5    sentences, too, for the avoidance of doubt or notwithstanding

6    the above, or, you know, all the sentences we hate that are

7    qualified, but it might be very necessary in this context to

8    be clear on that.

9          MR. LINDER:  I think what I'd propose to do, Your

10   Honor, and I'm happy to work with Mr. Patterson on this is to

11   move that qualification relating to involvement in or

12   sponsorship of scouting units that key nexus between the

13   abuse and scouting, to move that up to maybe right after the

14   *proviso* to make it apply to everything that comes after or

15   otherwise to make it -- make it work better because we

16   certainly don't want any implication that we're hiding the

17   ball or otherwise constructing this provision to accomplish

18   something that I think you represented last week we're not

19   trying to accomplish.  We're only (inaudible) in scouting-

20   related claims.

21         MR. PATTERSON:  That certainly helps, and it takes

22   away my opportunity to argue the -- the rule of the prior

23   antecedent or the last antecedent.

24         THE COURT:  Yeah, whatever that is.

25         MR. PATTERSON:  Whatever that is, exactly.

1           But -- but even with that, Your Honor, when we

2   have these terms that say arises from, is based upon, results

3   from in whole or in part, directly or indirectly, or relates

4   in any way, that -- we -- we -- I think we would benefit from

5   having the stop sign as well because this definition can take

6   you a long way before you stop if you don't understand the

7   Court's intention that this is not intended to apply to non-

8   scouting-related abuse.

9           THE COURT:  Right.  I -- I do think that it would

10  be helpful.  You know, you -- this is one sentence that's a

11  page, and I think it would be helpful if -- well, fix this

12  however best grammatically it works to accurately reflect

13  what we're talking about.  But I also think it would be

14  helpful to have a separate sentence from this definition that

15  makes it crystal clear that no non-BSA-related conduct is

16  being released.  I think that is really helpful, and it will

17  be helpful down the line, and I think it's non-

18  controversial.  So let's just make sure it says that.

19          MR. BJORK:  Your Honor, may I be heard very

20  briefly?  Jeff Bjork from Latham and Watkins.

21          THE COURT:  Mr. Bjork?

22          MR. BJORK:  Hi.  Here on behalf of TCJC.  I'm

23  happy to look at the language because I think in part it's

24  our language that we've been working with the debtor on.  I

25  would just say that in terms of the unrelated to scouting

1  absolutely is not covered, not intended to be covered by the

2  scope of the TCJC injunction.  But the settlement does

3  encompass any allocated liability that relates to scouting-

4  related conduct.

5           All I'm raising, Your Honor, is it's complicated

6  because it's -- it's claim by claim, fact by fact, and I

7  don't want to get into it right now because it's late for you

8  especially.  But it is something that I was going to call

9  Mr. Patterson about and we're speaking to Mr. Smola about

10 because it's not -- it has to encompass our allocated share

11 as part of the settlement.  And so there's mixed facts

12 depending upon the claimant and the claim.  Every claim that

13 was filed in this case asserts it's BSA related.

14          And they may also, certain claims, assert that

15 there is some church connection as well.

16          THE COURT:  Yes.

17          MR. BJORK:  That's fact-specific.

18          THE COURT:  Yes.

19          MR. BJORK:  So I'm not trying to prejudge it now.

20 I'm just saying it's something that we would want to brief to

21 you and -- and -- and argue at the appropriate time.

22          MR. PATTERSON:  If that's the case, that could be

23 fairly straightforward, because then you would take out in

24 whole or in part, and you would just define the -- allocable

25 liability.  And keep in mind, Your Honor, I'm not consenting

1  to any of this.  I'm just trying to make it accurate or

2  understandable for -- for someone like me.

3          MR. BJORK:  I think our concern, Mr. Patterson

4  is --

5          THE COURT:  He says modestly.  So I'll let the two

6  of you all speak and --

7          MR. BJORK:  Okay.

8          THE COURT: -- loop in the debtors obviously on

9  this, but, yes, we had sort of a similar discussion I guess

10 it was last week that about allocable shares.  And I -- that

11 concept I fully appreciate, and, yes, if some jury were to

12 say 10 percent is allocable to BSA and 70 percent is

13 allocable to the church, and, you know, whatever is left, 20

14 percent is allocable to some family member, that's -- I

15 understand those distinctions, and I think that is what this

16 needs to reflect.

17          But, yes, the allocable share of the church's

18 liability that's BSA-related, I understand to be being

19 released, and I don't think Mr. Patterson disagrees with

20 that.  So it just has to be accurately reflected.

21          Hopefully I didn't confuse things more on that.

22          MR. PATTERSON:  Crystal clear.

23          MR. BJORK:  Tom, I'll call you shortly.

24          THE COURT:  Okay.  What else?

25          MR. LINDER:  I think that's it, Your Honor, on

1 disclosure statement.

2          THE COURT:  Okay.  So --

3          MR. SCHIAVONI:  I'm sorry, Mr. -- Your Honor,

4 there was a schedule of insurance policies that was going to

5 be added to the disclosure statement.  I'm just not sure

6 whether you ended up adding the -- a column for the SIRs and

7 the deductibles to it.

8          MR. LINDER:  Your Honor, we did file revised

9 schedules to -- those are schedules to the plan, schedule 2

10 and schedule 3.  We made extensive modifications to those

11 schedules.

12          THE COURT:  I would ask that you take a look at

13 it, Mr. Schiavoni.  I do remember quickly thumbing through

14 schedules that had changes to them.  Why don't you take a

15 look, and if there's any issue contact Mr. Linder.

16          MR. LINDER:  I think the issue on that, Your

17 Honor, and I'm recalling that correspondence that we had with

18 Mr. Schiavoni, is that the SIRs and deductibles as opposed to

19 the other projected information that's set forth on that

20 chart are disputed.

21          So I believe what we did is we dropped footnotes

22 in an appropriate place indicating that those are disputed

23 issues among debtors and certain carriers.  So from our

24 perspective I don't believe it would be appropriate to try to

25 shoehorn that into the chart that was just intended to

1  contain objective information with regards to the policy.

2          MR. SCHIAVONI:  But, Your Honor, it's my

3  understanding and it's like I -- it's like I'm reading as

4  fast as I can, but it's my understanding that a change was

5  made to the plan or maybe it was the disclosure statement, in

6  connection with Zurich and others that modified the

7  description of the SIRs and then sort of adopted the -- that

8  there are, in fact, SIRs.

9          So if that's the case, and, again, we can try to

10  look at it overnight and deal with Mr. Linder tomorrow about

11  it, but they should be described and if just to, quote,

12  dispute whether other things are SIRs or deductibles.  It

13  seems like if you're going to present, you know, occurrence

14  limits, you might as well, it's like it's totally misleading

15  not to present the retain limits and the deductibles.  It --

16  it -- it gives a completely misleading presentation of the

17  chart.

18          MR. LINDER:  I would note, Your Honor, that my

19  colleague, Adrian Azer, who is with Hanes and Boone, BSA's

20  insurance coverage counsel is available to address this issue

21  as well to the extent --

22          MR. AZER:  Your Honor, may I be heard briefly on

23  this?

24          THE COURT:  Mr. Azer?

25          MR. AZER:  Going to Mr. Schiavoni's point, we and

1  the FCR and the coalition did negotiate language with Zurich

2  and certain insurers on this issue.  I don't think there was

3  any concession as to the existence of the SIR.  Again, going

4  to Mr. Schiavoni's point and Your Honor's comment, to the

5  extent, Mr. Schiavoni you would like to talk about it we are

6  certainly happy to go off line and address that language and

7  address any comments you have to the schedule and try to work

8  through it and come to some resolution that's acceptable.

9          But, yeah, I'm not sure the language we negotiated

10  with Zurich made that concession.

11          Ms. Quinn -- I don't know if Ms. Quinn has any

12  further addition on that.

13          THE COURT:  Okay.  Well, Mr. Schiavoni, I'll let

14  you talk to Mr. Azer about this.  I want to make sure you

15  have a chance to look at the language and look at the chart,

16  which I'm looking at, and let's see if that can be worked

17  out.

18          MR. SCHIAVONI:  Terrific.

19          THE COURT:  If not, I'll address it tomorrow.

20          MR. SCHIAVONI:  Great.

21          MR. LINDER:  Now I think we're done, Your Honor.

22          THE COURT:  Okay.  So tomorrow we may have some

23  cats and dogs disclosure statement, but I also have

24  confidence that you all are going to resolve all of this

25  overnight, and then what else?

1          MR. LINDER:  I Believe the last remaining category

2    is -- is the solicitation procedures order, Your Honor.

3          THE COURT:  Okay.  So that, the solicitation

4    procedures order, and the plain English, which might be

5    included in that, the plain English charter -- chartering

6    organization issues we've talked through?

7          MR. LINDER:  Correct, Your Honor.

8          THE COURT:  Okay.  Okay.

9          MR. STANG:  Your Honor?

10         THE COURT:  Mr. Stang?

11         MR. STANG:  The TCC, on its own behalf, and the

12   FCR and the coalition jointly have filed proposed letters.  I

13   am extremely sensitive to editing someone's letter because I

14   don't want them to edit mine, but there is one statement in

15   the FCR coalition letter that I think is really inaccurate.

16         And I don't know if you want to -- it's literally

17   one sentence.  And if you wanted to do that now, we could, or

18   if that's part of the solicitation, tomorrow.

19         THE COURT:  Have you all discussed it?  Have you

20   discussed it with them?

21         MR. STANG:  We -- we -- I have not, Your Honor.

22         THE COURT:  Then I'd like you to discuss it with

23   them first.

24         MR. STANG:  Okay.

25         THE COURT:  Okay.  I'm just making a list.

1          So the proposed letters, the plain English,

2   chartering organizations, the solicitation procedures,

3   meaning disclosure statement.  That should be it.  Okay.

4          MR. ABBOTT:  Your Honor, Derek Abbott, as long as

5   we're talking about tomorrow, Ms. Johnson had asked us to

6   remind all of the parties that the Zoom information that they

7   used for today's hearing is what they should use for

8   tomorrow.

9          We understood the Court had reserved noon on in

10  the afternoon, but there might be some greater specificity

11  that the Court could share with us at this point.

12         THE COURT:  Yeah.  I've got a morning evidentiary

13  hearing so we're going to start at 1:30.

14         And I think I will be on time.  If I find out that

15  I am going to be significantly late, I will let you know, but

16  I think that should do it from what counsel in the matter is

17  telling me and my own guestimation.

18         MR. ABBOTT:  Very well.  Thank you, Your Honor.

19  Much appreciated.

20         THE COURT:  So you'll have some additional time,

21  not to come up with more issues but to resolve the issues we

22  have on the table that are remaining.  No more new issues.

23         MR. RYAN:  Your Honor, the only -- the only thing

24  I would say is some of us are going to have to leave

25  relatively mid-afternoon to late afternoon to catch flights

1  for the mediation in New York.

2            THE COURT:  Okay.  Shoot.  Okay.  Let's -- let's

3  say 12:30, instead of 1:30.  That gives us an additional

4  hour, but I'm hoping that should be enough.

5            MR. RYAN:  Thank you.

6            THE COURT:  Because I certainly want people to get

7  on their planes.

8            MR. SCHIAVONI:  I was holding out hope that Your

9  Honor was going to say get a good night's sleep and stuff.

10            THE COURT:  No.  I don't get one, you don't get

11  one.  Okay.

12            MR. SCHIAVONI:  That was an attempt at humor, Your

13  Honor.  I'm sorry.

14            THE COURT:  It's been what?

15            MR. SCHIAVONI:  It was an attempt at humor.  I --

16            THE COURT:  I'm smiling.

17            Okay.  Okay, counsel.  Well, thank you.  That

18  concludes tonight.

19            I will see you tomorrow at 12:30.

20        (Proceedings concluded at 7:08 p.m.)

21

22

23

24

25

1                         CERTIFICATION

2          I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9    /s/ William J. Garling                September 29, 2021

10   William J. Garling, CET**D-543

11   Certified Court Transcriptionist

12   For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25