```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3                                      .   Chapter 11
      IN RE:                            .
 4                                      .   Case No. 20-10343 (LSS)
      BOY SCOUTS OF AMERICA AND         .
 5    DELAWARE BSA, LLC,                .
                                        .   Courtroom No. 2
 6                                      .   824 North Market Street
                                        .   Wilmington, Delaware 19801
 7                                      .
                          Debtors.      .   September 29, 2021
 8    . . . . . . . . . . . . . . . .   12:30 P.M.

 9         TRANSCRIPT OF TELEPHONIC DISCLOSURE STATEMENT HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                  UNITED STATES BANKRUPTCY JUDGE

11    TELEPHONIC APPEARANCES:

12
      For the Debtor:          Derek Abbott, Esquire
13                             MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                               1201 North Market Street, 16th Floor
14                             Wilmington, Delaware 19899

15                             - and -

16                             Jessica C. Lauria, Esquire
                               WHITE & CASE LLP
17                             1221 Avenue of the Americas
                               New York, New York 10020
18

19
      Audio Operator:          Dana L. Moore, ECRO
20
      Transcription Company:   Reliable
21                             1007 N. Orange Street
                               Wilmington, Delaware 19801
22                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
23

24    Proceedings recorded by electronic sound recording; transcript
      produced by transcription service.
25
```

TELEPHONIC APPEARANCES (Cont'd):

For the Debtors:          Matthew E. Linder, Esquire
                          Andrew O'Neill, Esquire
                          WHITE & CASE LLP
                          111 South Wacker Drive
                          Chicago, Illinois 60606

                          - and -

                          Adrian Azer, Esquire
                          HAYNES & BOONE LLP
                          800 17th Street NW, Suite 500
                          Washington, DC 20006

For Century:              Tancred Schiavoni, Esquire
                          O'MELVENY & MYERS LLP
                          Times Square Tower
                          7 Times Square
                          New York, New York 10036

For the FCR:              Robert Brady, Esquire
                          Edwin Harron, Esquire
                          YOUNG CONAWAY STARGATT & TAYLOR LLP
                          Rodney Square
                          1000 North King Street
                          Wilmington, Delaware 19801

For Tort Claimants:       James Stang, Esquire
                          PACHULSKI STANG ZIEHL JONES LLP
                          919 North Market Street, 17th Floor
                          Wilmington, Delaware 19801

                          - and -

                          Debra Grassgreen, Esquire
                          John Lucas, Esquire
                          150 California Street, 15th Floor
                          San Francisco, California 94111

For the Coalition of      Eric Goodman, Esquire
Abused Scouts for         601 Thirteenth Street NW, Suite 600
Justice:                  Washington, D.C. 20005

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For Zurich Insurers:      Mark Plevin, Esquire
                              CROWELL & MORING LLP
3                             3 Embarcadero Center, 26th Floor
                              San Francisco, California 94111
4

5   For Zalkin Law Firm:      Thomas Patterson, Esquire
                              KTBS LAW LLP
6                             1801 Century Park East, 26th Floor
                              Los Angeles, California 90067
7

8   For HMM Victims:          Evan Smola, Esquire
                              HURLEY MCKENNA & MERTZ, P.C.
9                             20 S. Clark Street, Suite 2250
                              Chicago, Illinois 60603
10

11  For the U.S. Trustee:     David Buchbinder, Esquire
                              Hannah McCollum, Esquire
12                            UNITED STATES DEPARTMENT OF JUSTICE
                              OFFICE OF THE UNITED STATES TRUSTEE
13                            844 King Street, Suite 2207
                              Lockbox 35
14                            Wilmington, Delaware 19801

15  For Hartford Financial:   Philip Anker, Esquire
                              WILMERHALE
16                            250 Greenwich Street
                              New York, New York 10007
17

18  The Church of Jesus       Jeff Bjork, Esquire
    Christ of Latter Day      LATHAM & WATKINS LLP
19  Saints:                   355 South Grand Avenue, Suite 100
                              Los Angeles, California 90071
20
    For Numerous Firms and    Irwin Zalkin, Esquire
21  Claimants:                THE ZALKIN LAW FIRM, P.C.
                              1441 Broadway, Suite 3147
22                            New York, New York 10018

23  For the AIG Companies:    Michael Rosenthal, Esquire
                              GIBSON, DUNN & CRUTCHER LLP
24                            200 Park Avenue
                              New York, New York 10166
25
```

1    TELEPHONIC APPEARANCES (Cont'd):

2    For Plaintiffs:          Sean Higgins, Esquire
                              ANDERSON THORNTON
3                             4701 Von Karman Avenue, Suite 300
                              Newport Beach, California 92660
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  MATTERS GOING FORWARD:

2  1. Debtors' Motion for Entry of an Order (I) Approving the
   Disclosure Statement and the Form and Manner of Notice, (II)
3  Approving Plan Solicitation and Voting Procedures, (III)
   Approving Forms of Ballots, (IV) Approving Form, Manner, and
4  Scope of Confirmation Notices, (V) Establishing Certain
   Deadlines in Connection with Approval of the Disclosure
5  Statement and Confirmation of the Plan, and (VI) Granting
   Related Relief (D.I. 2295, filed 3/2/21)
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings commence at 12:42 p.m.)

2         THE COURT:  Good afternoon, Counsel.  This is Judge

3  Silverstein.  We're here in the Boy Scouts of America

4  continued disclosure statement hearing, Case 20-10343.

5         I'll turn it over to debtors' counsel.

6         MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

7  of Morris Nichols, here for the debtors, joined by my

8  colleagues at White & Case.

9         Your Honor, I think probably the best way to

10  proceed is to turn it over to Mr. Linder, who can track

11  through the progress we've made overnight, et cetera, on

12  revising the disclosure documents, so I'll turn it over to him

13  now.

14         THE COURT:  Mr. Linder.

15         MR. LINDER:  Good morning, Your Honor.  Matt Linder

16  of White & Case for the debtors.

17         We have worked overnight and this morning, Your

18  Honor, and we believe we have either resolved or are extremely

19  close to resolving all of the open issues and all of the

20  issues that we identified yesterday at the hearing as items

21  that the debtors would need to supplement or revise in the

22  disclosure statement and the plan, as well as with respect to

23  the solicitation procedures.

24         And on the solicitation procedures, again, I'll be

25  handing the baton to my colleague Mr. O'Neill, after we walk

1  through the disclosure statement and plan changes.

2          I recognize, Your Honor, that some of the parties

3  may not have had a great deal of time to review the documents,

4  given that we filed them only a short time ago.  So I -- what

5  I would propose to do for the Court and the parties is to

6  start with the disclosure statement and to walk through the

7  redline that was filed at Docket Number 6418.  And what I

8  would propose to do is just to hit on what we view as the

9  material changes, and I can walk through and we can hear from

10 anyone who believes that there are still unresolved issues.

11         THE COURT:  Sounds like a plan.

12         MR. LINDER:  Okay.  Your Honor, the -- I recognize

13 there's a time line page.  The -- I propose to circle back to

14 that, after we go through the line edits to the DS and plan

15 because there may be a little bit more context to put around

16 the dates, so we want to skip past that and go forward to

17 starting on Page 17 of the redline.  Again, for the parties,

18 this is Docket Number 6418, Page 17 of the redline.  I'm

19 looking at the numbers on the bottom of the page.

20         MR. BUCHBINDER:  This is --

21         MR. LINDER:  Did I hear Mr. Buchbinder?

22         MR. BUCHBINDER:  Yes.  May I be recognized, Your

23 Honor?

24         THE COURT:  Yes.  I'm sorry, I didn't hear you, but

25 yes.

1              MR. BUCHBINDER:  Thank you, Your Honor.

2              With all due respect to counsel, these pleadings

3  were filed in the 15 minutes before the hearing started.  We

4  barely have had time to download them, let alone look at them.

5  If we could have a few minutes to look at them, that might be

6  extremely helpful, and I'm sure there are others who might

7  agree.  Thank you, Your Honor.

8              THE COURT:  Well, my concern is that this hearing

9  needs to end and I'm not sure what time it needs to end

10  because I'm not sure what time people have to get on planes.

11  Let's see how -- let's see if we can walk through them.  And

12  then, if people need some -- a little additional time to go

13  back, I'm happy to do it.  But let's see what these big

14  changes, the material changes are.

15              MR. LINDER:  Very good, Your Honor.  And again, I

16  will be pausing on each of what we view as the material

17  changes, and parties can certainly respond in real time.

18              THE COURT:  And I'm looking at them for the first

19  time, so we're all sort of in the same boat.  Okay.

20              MR. LINDER:  The first change, Your Honor, on Page

21  17, pertains to a definition.  We had an exchange that

22  included Mr. Patterson yesterday on the record with regard to

23  the definition of "abuse claims."  There are related

24  definitions that include similar language.  We have revised

25  each of those definitions:  "Abuse claim," "future abuse

1  claim," and "post 1975 chartered organization abuse claim."

2          What I'd like to orient Your Honor to, in

3  particular, as you suggested, was we have added a final

4  sentence to the end of each of these definitions that makes

5  clear that, quote:

6          "For the avoidance of doubt, no claim alleging

7  abuse shall be a post 1975 chartered organization abuse claim"

8  --

9          And parenthetically, Your Honor, we've done the

10 same for "abuse claim" and "future abuse claim."

11         And picking back up with the quote, against a

12 participating chartered organization in this context:

13             "-- if such claim is wholly unrelated to scouting."

14         These definitions, Your Honor, we believe that

15 these address the concern that the channeling injunction

16 should not extend to claims that are unrelated to scouting.

17 All of the parties agree with that proposition.  And so we've

18 worked with counsel to the TCJC to formulate these revised

19 definitions.

20             THE COURT:  Okay.

21             MR. LINDER:  Your Honor, the next change we have --

22             MR. PATTERSON:  Your Honor, may I be heard with

23 respect to that?  I thought I had my hand up, but I --

24             THE COURT:  Oh --

25             MR. PATTERSON:  -- I may not have.

1        THE COURT:  Yes.

2        MR. PATTERSON:  Thank you, Your Honor.

3        We raised a number of points yesterday with regard

4   to the definition of "abuse claim."  And I would just note

5   that the avoidance of doubt sentence at the end does limit

6   abuse claims to scouting, as applied to contributing chartered

7   organizations or participating chartered organizations, but

8   the word "wholly" is extremely problematic.

9        Now this isn't our plan, Your Honor; this is their

10  plan.  And if they want to solicit on the basis of this plan,

11  that's ultimately their choice.  We intend to object at

12  confirmation.  We believe this is over-broad, impermissible,

13  not supported by applicable authority.  So we'll have a

14  conversation about that later, and whatever effect that has on

15  the manner in which they solicit it on the basis of this

16  definition will have whatever effect it has.  They're acutely

17  aware of the objection that we've made.

18        THE COURT:  Thank you.

19        MR. LINDER:  We are aware of it, Your Honor, and we

20  -- Mr. Patterson's rights and other parties' rights with

21  respect to the channeling injunction are preserved.

22        Skipping forward to Page 31 of the redline, one of

23  the other major items that we discussed yesterday was with

24  respect to the future claimants representative's estimation fo

25  the potential liability and number of holders of future abuse

1  claims.

2          We have -- the principal revision -- and we might

3  as well address it now.  The principal revision on this topic

4  is really on Page 97 of the redline.  I was trying to go in

5  order, in page order, but we might as well go to the --

6  really, the operative provision on this topic, which is on

7  Page 97.  And I'll give Your Honor a few seconds to flip.

8          So that -- we've revised the provision about the

9  future abuse claims forecast to state that Ankura -- which is

10  a consultant to the future claimants representative --

11  currently forecasts the number of compensable future abuse

12  claims that may be asserted against the settlement trust at

13  approximately 11,300, or approximately 14 percent of the total

14  number of direct abuse claims.  And the amount of the debtors'

15  liability for such future abuse claims is approximately $5

16  billion or approximately 21 percent of the total value of

17  direct abuse claims as calculated by Ankura, applying what, in

18  their view, are the procedures and criteria set forth in the

19  BSA's trust distribution procedures as of July 2nd.

20          We have accompanied this recitation with the

21  debtors' dispute of the future abuse -- future claimants

22  representative's forecast.  We believe the number and value

23  estimated by the FCR is substantially higher than the actual

24  liability for certain key reasons, which we outlined in our

25  revised insert.

1    THE COURT:  Does anyone have any comments?  This

2  does seem consistent with the discussion we had yesterday on

3  the record.

4    (No verbal response)

5    THE COURT:  Okay.

6    MR. LINDER:  And then, with that, Your Honor, we

7  really don't need to -- Page 31 has a similar recitation of

8  that estimate, as does Page 35.  Based on that representation,

9  I think we can skip ahead to a different portion of the

10  disclosure statement.  And where I'd propose to flip is Page

11  62.

12    These -- the changes on Pages 62 and 63 are

13  comments we received from Hartford.  On Page 62, the changes

14  relate to the applicable limits of these insurance policies.

15  We've set forth in this insert the debtors' contention that

16  the aggregate limits of many of the policies are inapplicable

17  to these claims, meaning that the policies will respond up to

18  their limits on a per occurrence basis.  And then we've also

19  made clear that certain insurers have not agreed that the

20  aggregate limits do not apply to abuse claims.

21    We've also added a footnote, Your Honor, on the

22  same page.  Again, this is Page 62 of the redline, Footnote

23  64.  We've qualified the statement that the per occurrence

24  policies, and specifically the policies between 1935 and 1982,

25  where there were per occurrence or per person limits of

1  liability, we've qualified the statement that these per

2  occurrence policies generally had applicable aggregate limits

3  that pertained to products completed operations claims.

4         We've stated that not all insurers agree with this

5  assertion.  In particular, Hartford contends that certain of

6  its policies issued to the debtors, including within certain

7  years of primary coverage, include general aggregate limits

8  that apply to all claims, including abuse claims.

9         MR. LUCAS:  Your Honor?

10        THE COURT:  Mr. Lucas.

11        MR. LUCAS:  I appreciate what we're doing here and

12 I understand the limited of time -- limited amount of time.  I

13 am one of the people that need to get on an airplane today.

14 But like I need to rely on my insurance partner with respect

15 to these provisions.  And so I'm happy to go through them, but

16 I, frankly, don't know whether or not these changes are okay.

17        MR. LINDER:  Your Honor, all we're doing --

18        THE COURT:  This is disclosure.

19        MR. LINDER:  All we're doing is disclosing the

20 BSA's --

21        THE COURT:  And we're stating the debtors' position

22 and we're stating that the insurers disagree with it.  We're

23 not stating the TCC's position, unless it's already been in

24 here.  That -- if it's in here, that's not being changed, I

25 take it.

1          MR. LUCAS:  Yeah, I --

2          THE COURT:  What, in particular, are you looking

3  at?  I -- listen, I understand the time crunch, but we've all

4  dealt with this before.

5          MR. LUCAS:  Well, I --

6          THE COURT:  We're more at --

7          MR. LUCAS:  Your Honor --

8          THE COURT:  -- at the end of a disclosure statement

9  --

10          MR. LUCAS:  Your Honor --

11          THE COURT:  -- where we've vetted a lot of issues.

12          MR. LUCAS:  But Your Honor, whether or not we've

13  dealt with this before, I actually don't think that that's the

14  right way to deal with this.  I mean, we got this 30 minutes

15  before the hearing started.

16          THE COURT:  Yeah, and I'm looking at it right here

17  and I understand what it says.

18          MR. LUCAS:  Okay.  Well, I don't, Your Honor.  I

19  don't.  For the record --

20          THE COURT:  Okay.

21          MR. LUCAS:  -- I don't.

22          THE COURT:  Okay.

23          MR. LINDER:  Okay.  The next changes, Your Honor,

24  are on Page 63.  These also pertain to insurance.  We have

25  made, again, changes in the second-to-last paragraph that

1  relate to Hartford.

2          In particular, we've added specific dates of the

3  commencement of the terms of these policies in reference to

4  the period -- the beginning of the period in 1971 and the end

5  period January 1, 1978.

6          We've also added a reference right here, Your

7  Honor, to the settlement, the 2011 settlement between the BSA

8  and Hartford.  This was already referenced in the risk

9  factors.

10          THE COURT:  Uh-huh.

11          MR. LINDER:  And (indiscernible) we just added a

12  reference here and specifically made clear Hartford's

13  contention that, under this settlement, any rights to coverage

14  for abuse claims have been released for those two years in

15  question.  I believe it was 1976 and '77.  And again, that's -

16  -

17          THE COURT:  Consistent with what I've heard.

18          MR. STANG:  Your Honor, this is Mr. Stang.  May I

19  make a comment on this change?

20          THE COURT:  Yes.

21          MR. STANG:  I -- maybe Mr. Linder can direct us to

22  the risk factor.  But I don't believe the disclosure statement

23  describes what the settlement agreement was intended to cover.

24  And so creditors reading this here, the Hartford contention

25  that all rights were released for all abuse claims -- I assume

1   that's what this is -- this inter-lineation is meant to say,

2   that Hartford says it has no liability at all for any year.

3   And that's a pretty significant factor when you consider the

4   Hartford settlement.  I think that the debtors should be

5   telling creditors, in summary fashion, what it thinks the

6   settlement agreement covered.

7              MR. LINDER:  Your Honor, I'd direct you to Page 285

8   of the redline.

9              MR. STANG:  Okay.  Let's take a look at Page 285.

10             MR. LINDER:  There's a risk that's entitled "Risk

11  Related to 1976" --

12             MR. STANG:  Hold on.

13             MR. LINDER:  -- and I --

14             MR. STANG:  Mr. Linder, could you just hold on for

15  one second?  Is it at the bottom, 285, the numbered page?

16             THE COURT:  Yes.

17             MR. STANG:  Okay.  Let me just scroll to it, Your

18  Honor.  Okay.  I'm there.

19             MR. LINDER:  What I think it -- what it says, Your

20  Honor, is directly responsive to the issue that Mr. Stang has

21  asked for disclosure on.  It states, quote:

22             "In 2011, the BSA and Hartford entered into a

23  settlement agreement which released Hartford for claims

24  related to sexual abuse.  The 1976 and 1977 policies are

25  included in such settlement agreement.  Certain parties-in-

1  interest, including the local councils and chartered

2  organizations, have taken the position that the BSA sold the

3  1976 and '77 policies back to Hartford; and, therefore, these

4  policies are not property of the estate."

5          And Your Honor, I would note parenthetically that

6  is -- when it says the chartered organizations and local

7  councils, I would also add that Ms. Lujan Wolff has also

8  raised this issue in connection with the Guam bankruptcy.

9          The 2011 settlement agreement -- I think we back it

10  up with the text -- released claims with respect to sexual

11  abuse; it did not release all of the BSA's interests in the

12  policies.  Our position, therefore, is that these are still

13  policies that are property of the estate.

14          Continuing on to Page 286 of the redline, that

15  continues:

16          "Certain parties-in-interest have taken the

17  position that the 2011 settlement was only between the BSA and

18  Hartford.  For that reason, the local councils and chartered

19  organizations retain rights under these policies."

20          Hartford's contention is that the definition under

21  the 2011 agreement also picks up past, present, and future

22  affiliates; and, therefore, its position is that the

23  settlement was binding on all parties.

24          So, with that --

25          THE COURT:  That's pretty --

1      MR. LINDER:  -- (indiscernible)

2      THE COURT:  -- fulsome.

3      MR. LINDER:  With that -- words right out of my

4  mouth, Your Honor.

5      MR. STANG:  Your Honor, I guess I'm not

6  understanding BSA's position on this.  Is it BSA's position

7  that the 2011 agreement only dealt with the '76 and '77

8  policies?

9      MR. LINDER:  Yes.

10     MR. STANG:  It doesn't -- I don't think that's

11 actually said anywhere.  You talk about the local councils

12 taking this position, certain parties taking that position.

13 I'm not sure I see where BSA takes that position.

14     MR. LINDER:  Well --

15     MR. STANG:  Well, I just don't see it.  And if I'm

16 missing it, please inform me, but I --

17     MR. LINDER:  (Indiscernible)

18     MR. STANG:  -- (indiscernible)

19     MR. LINDER:  And it states in pertinent part that,

20 in 2011, we answered -- entered into a settlement agreement

21 that released Hartford for claims related to sexual abuse.

22 The 1976 and '77 Hartford policies are included in such

23 settlement agreement.

24     MR. STANG:  Well, I understand -- I read that and I

25 understood it and I don't think Hartford would dispute that.

1   They're contending that more than just those two policies are

2   included in the settlement agreement.  So I just think that

3   creditors who are considering the Hartford settlement should

4   know what BSA's position is, *vis-a-vis* the scope of the 2011

5   settlement agreement because, otherwise, the way it reads now,

6   Hartford says everything is gone and you've got some, what

7   I'll politely call "secondary parties" saying, oh, no, no, no,

8   you know, it wasn't that broad, but I don't have BSA saying

9   that, if that, in fact, is BSA's position.

10          MR. LINDER:  Your Honor, I would -- to take a step

11  back, I think Your Honor cautioned us yesterday that we should

12  confine our discussion today to issues that were new.  This

13  risk factor has not changed.  I think we discussed it last

14  week.  So I -- you know, I really think there's no ambiguity

15  in this risk factor, so I think we --

16          THE COURT:  I don't think there is, either.  And if

17  you believe there is some ambiguity, you can take discovery.

18          Mr. Rosenthal.

19          MR. ROSENTHAL:  I just put my hand up because I

20  have a comment on the next paragraph.

21          THE COURT:  On -- what page are we on?

22          MR. ROSENTHAL:  63, 63.

23          THE COURT:  Back on --

24          MR. ROSENTHAL:  Back --

25          THE COURT:  -- 63.

1          MR. ROSENTHAL:  Back to 63.  I -- very minor.  The

2   second and third sentences, I think it should be one.  I think

3   they're two incomplete sentences, but --

4          "Because Century and Hartford provided the debtors

5   with several decades, the debtors believe" --

6          And I think that's what you're trying to say.

7       (Pause in proceedings)

8          MR. LINDER:  Your Honor, we're happy to correct

9   this.  It is an incomplete sentence.

10          THE COURT:  Okay.

11          MR. LINDER:  So thank you.

12          THE COURT:  Thank you.

13          MR. LINDER:  Thank you for pointing that out, Mr.

14   Rosenthal.

15          Your Honor, the last change on Page 63, just for

16   completeness, we've recited that Hartford did file an

17   adversary complaint against the BSA last year, asserting that

18   Hartford's coverage obligations were limited or eliminated

19   because Hartford had already paid the applicable limits of

20   liability under the policies in full.  Hartford asserted in

21   that complaint that it was relieved of its obligations under

22   the policies because BSA had breached obligations under those

23   policies.

24          And we also recite here, for completeness, that

25   there was a stay of that matter granted in October of last

1  year; and that, accordingly, the hart -- the allegations that

2  Hartford raised concerning unavailability of coverage remains

3  unresolved.

4           THE COURT:  Okay.  That seems pretty clear.

5           Any questions?

6       (No verbal response)

7           THE COURT:  Okay.

8           MR. LINDER:  With that, we skip forward, Your

9  Honor, to Page 66.  We are still in Hartford -- the Hartford

10  change category.

11          On Page 66, in the middle of the page, we've added

12  a description of Hartford's contention that some of the

13  policies, as we mentioned before, contained general aggregate

14  limits that are inclusive of abuse claims.  This is consistent

15  with the other change that we discussed a few minutes ago.

16          THE COURT:  Yes, it seems like some of the same

17  concept, but as to those policies.

18          MR. LINDER:  Right.

19          The next change is on Page 67.  We've noted that

20  Hartford disagrees with certain of the references to the

21  insurance policies listed on Schedule 3 to the plan.  That,

22  just for the benefit of the parties, is the schedule that

23  lists local council insurance policies.

24          In addition to disputing the issuance, existence,

25  and terms and conditions of the policies that we've alleged

1  exist, based on secondary evidence, Hartford contends that BSA

2  has incorrectly identified aggregate limits; and that, in

3  addition, some or all of the policies, by their terms, do not

4  provide coverage for abuse claims.

5        There are changes, Your Honor, that we are working

6  with Hartford on, on Schedule 2 and Schedule 3.  We're

7  continuing to work through those.  So we would propose, Your

8  Honor, to file revised versions of those schedules reflecting

9  the resolution of those issues with Hartford following the

10 hearing.

11       THE COURT:  Okay.  Any questions on that?  I recall

12 those --

13       MR. ROSENTHAL:  Yes.

14       THE COURT:  -- charts.

15       MR. ROSENTHAL:  Yes, Your Honor.

16       THE COURT:  Yes, Mr. Rosenthal.

17       MR. ROSENTHAL:  Michael Rosenthal of Gibson Dunn on

18 behalf of AIG.

19       I just wonder if I can ask Mr. Linder:  Mr. Linder,

20 the -- there are other insurance companies, including AIG,

21 that have some of these same issues.  I -- is there -- I

22 thought we had agreed on a general paragraph that dealt with

23 this on a more general basis.  Is that -- did that make it in

24 here?

25       MR. LINDER:  Your Honor, my general understanding

1  is that's correct.  And I -- apologies if I misstated it as

2  only an issue between the debtors and Hartford.  I -- you

3  know, there were calls that I was not a part of this morning

4  on this issue.  So I'll accept Mr. Rosenthal's representation

5  --

6           MR. ROSENTHAL:  Well, this --

7           MR. LINDER:  -- (indiscernible)

8           MR. ROSENTHAL:  This reference is to the Hartford

9  Company.  So I'm assuming that somewhere else in the

10  disclosure statement or in the schedule there's the same

11  thing.  I think there was a general, two-or-three-sentence

12  paragraph that I actually drafted, and I think Ms. Lauria or -

13  - I know White & Case commented on it.  I think there was -- I

14  think there was general agreement on it.  I just don't know --

15           MR. AZAR:  Your Honor?

16           MR. ROSENTHAL:  -- where it may be in the document.

17           MR. AZAR:  Your Honor, this is Adrian Azar from

18  Haynes and Boone, coverage counsel to the debtor.  May I be

19  heard?

20           THE COURT:  Yes.

21           MR. AZAR:  Mr. Rosenthal, that ledger was included

22  in Schedule 2 and 3.  So, if you look at the very top, there's

23  the language that basically reserves the rights of the

24  insurers to dispute the accuracy and all the factual

25  statements made, and basically just says this is the debtors'

1  view as to the coverage.

2           MR. ROSENTHAL:  Okay.  So that's actually in the

3  schedule itself.

4           MR. AZAR:  Yep, it's at the very top of both

5  Schedule 2 and Schedule 3; Schedule 2 being BSA policies,

6  Schedule 3 being local council policies.

7           MR. ROSENTHAL:  Great.  Thank you.

8           THE COURT:  Thank you.

9           MR. LINDER:  Thank you, Your Honor.  As you can

10 tell, there are a lot of moving parts here, so I appreciate

11 your patience as we navigate through the changes.

12          The next change (indiscernible) is on Page 73.

13 This is really this theme, the same set of changes -- or

14 rather, a similar set of changes that we discussed in the

15 context of post 1975 chartered organization abuse claims.

16 We've made what we view as similar changes or substantially

17 similar changes to the definition of "future abuse claims" in

18 the plan, and this -- these revisions on this page pick that

19 up.

20      (Pause in proceedings)

21          THE COURT:  Okay.  Does anyone have any questions

22 on that language?  It seems parallel to the language we looked

23 at before.

24          MR. ROSENTHAL:  I'm sorry.

25          THE COURT:  Mr. Rosenthal?

1        MR. ROSENTHAL:  I'm sorry.  We had discussed this a

2  little bit in some calls before, but I -- so, in this

3  language, it says "and is wholly unrelated to scouting," with

4  an initial cap on scouting.  Is -- I don't see a definition of

5  "scouting."  Is that --

6        MR. LINDER:  That's correct, Your Honor.  We have

7  actually made a slight change to the plan in recognition of

8  the fact that there is no -- even though we all that are

9  working on this case, at least on the BSA side, we all know

10 what "scouting" is, and we think it's a commonly understood

11 term.

12       We've added to Article 1(b) of the plan -- let me

13 just pull out my plan redline, if you could give me a moment,

14 Your Honor.  This is on page ...

15     (Pause in proceedings)

16       MR. LINDER:  This is on Page 43 of the redline that

17 was filed at Docket 6417, again, that's the plan redline.

18       We have added to the application of definitions

19 section a clause within Subclause (8) that states that, in

20 additional to capitalized terms that are not defined in the

21 plan having the meaning set forth in the Code or the rules, if

22 terms are not defined in the Code or the rules, the terms

23 shall be ascribed their commonly understood meaning or the

24 meaning set forth in commonly used dictionaries.

25       Your Honor, if you look up the word -- if you look

1  up "scouting" in the Webster Dictionary, I believe it uses

2  something along the lines of activities relating to Boy Scouts

3  or Girl Scouts.  I think it essentially -- that's just a short

4  form articulation of it.  We never sought to define it.  I

5  think certain parties have asked us if we could define it, and

6  that's something we're certainly willing to do.  But on the

7  expedited time frame this morning, as we were preparing for

8  the hearing, that's not something we were able to put

9  together.

10          MR. ROSENTHAL:  So I'll defer to Mr. Bjork on that

11  because he and I have had some discussions, and I see his hand

12  is up.

13          THE COURT:  Mr. Bjork.

14          MR. BJORK:  Yes, Your Honor.  Jeff Bjork from

15  Latham & Watkins on behalf of the TCJC.  Can you hear me?

16          MR. LINDER:  I can.

17          MR. BJORK:  Okay.  We had provided some language, a

18  definition, to Mr. Linder.  And I accept the fact that we're

19  moving very quickly.  I think that we'll continue to work with

20  the debtor to see if we can come up with a definition.  And

21  our view would be that could be incorporated into the

22  confirmation order as the defined term, or some other plan

23  supplement, if you will.

24          I think, for now, we're satisfied with the general

25  definition of "scouting" and the general usage, as Mr. Linder

1  has laid out.  But we have provided specific language to

2  define it, and I've shared that language with Mr. Rosenthal,

3  and I'm happy to share it with others, as well.

4           THE COURT:  Okay.  I think this is a sufficiently

5  important enough issue that it needs to be a defined term --

6           MR. LINDER:  Could I --

7           THE COURT:  -- and --

8           MR. LINDER:  I'm sorry, Your Honor.

9           THE COURT:  -- you know, and it should appear in

10 the definition section, so we all understand what "scouting"

11 means.  And if it takes a little bit more time, that's fine.

12 But I think we shouldn't leave that to a dictionary

13 definition.

14           MR. LINDER:  May I, Your Honor, give the parties a

15 preview of what we've been formulating?  The definition of

16 "scouting," as the BSA understands it, is the programs offered

17 by the Boy Scouts of America, pursuant to its charter and

18 through organizations that provide the BSA's programming --

19 I'm sorry -- and through organizations that the BSA has

20 authorized to provide such programming.  So, again, the

21 programs offered by the -- by Boy Scouts of America, pursuant

22 to its charter and through organizations that the BSA has

23 authorized to provide its programs.

24           THE COURT:  It sounds like you're along the right

25 lines of where that kind of definition should go.  I would

1   just ask you to share it.  There are people who have raised

2   it.  I know -- excuse me.  I know Mr. Patterson has raised it,

3   in particular; I think Mr. Rosenthal probably has; Mr. Bjork

4   obviously has.  I would share it with the committees -- the

5   committee.  But it sounds to me like that's along the right

6   path that you're heading there.

7          MR. LINDER:  Would you -- just so we're -- I'm

8   clear, Your Honor.  Would you like that to be added prior to

9   solicitation?

10         THE COURT:  If we can get it done.

11         MR. LINDER:  Thank you, Your Honor.

12         THE COURT:  Thank you.

13         MR. LINDER:  So, if we're moving on, then I think

14  the next change in the disclosure statement is -- and I'm --

15  again, I'm skipping over the FCR change, I'm not -- on Page

16  97, we've already addressed that.  This is on Page 122 of the

17  disclosure statement.

18         It's an initial term relating to the TCJC

19  settlement.  What it provides -- and the TDP has been revised

20  to provide this, as well -- that, as a condition to payment

21  from the settlement trust, the holder of an abuse claim shall

22  be required to execute a full and complete written release in

23  favor of all contributing chartered organizations with respect

24  to his abuse claim, including, as a condition to receiving any

25  proceeds from the TCJC settlement contribution, a full and

1  complete written release in favor of TCJC.

2            THE COURT:  Any questions?  Mr. Smola.

3            MR. SMOLA:  Yes, Your Honor.  This is a major

4  change, and I'm just going to use the hypothetical that I used

5  for the Court previously, which is not really a hypothetical,

6  it's a real case I have, a young man abused by his TCJC Sunday

7  School teacher for a period of time prior to any involvement

8  in scouting.

9            This would require that claimant, in order to get

10 any money contributed by BSA or local councils, to provide a

11 complete written release for TCJC.  I don't know if that

12 release is available anywhere within the plan.  But I would

13 not be inclined to release the unrelated claims against TCJC

14 in exchange for a trust payment in that setting.

15           MR. LINDER:  Your Honor --

16           MR. SMOLA:  That --

17           MR. SMOLA:  -- considering -- I'm sorry, Mr. Smola.

18           MR. SMOLA:  Well, I think a full and complete

19 written release in favor of TCJC is a very broad term and a

20 very broad release.

21           THE COURT:  Yeah, I -- Mr. Linder?

22           MR. LINDER:  Your Honor, I think what we can say is

23 this full and complete written release needs to relate to the

24 claim itself, the scouting related abuse claim that's being

25 treated under the TDP.

1          THE COURT:  Yes.

2          MR. LINDER:  But I take Mr. Smola's point, and

3  we're happy to work with Mr. Bjork to formulate language

4  that's acceptable to them, but also takes into account Mr.

5  Smola's concern, given the way that's drafted.

6          MR. BJORK:  Your Honor, may I be heard on this,

7  just --

8          THE COURT:  Yes.

9          MR. BJORK:  -- very briefly?

10          The intention here is that, to the extent there are

11  any TCJC eligible claims under the TDPs that could essentially

12  recover from our settlement proceeds, that we will want an

13  individual full and complete written release from each

14  claimant.  This is a litigation settlement.  And to the extent

15  that claimants are going to receive our funds, it's customary

16  and appropriate to get a full written release.

17          Secondly, the plan has a carveout for fraud, gross

18  negligence, wilful misconduct in the release section.  We need

19  to button that up because we can't be having settlements where

20  parties can then turn around and sue us on that basis or on

21  those grounds.

22          So it's not intended, as Mr. Smola indicated, to

23  somehow result in inadvertent release, if you will.  But to

24  the extent that they want to recover and are entitled to

25  recover from our settlement proceeds, assuming the Court

1 confirms this plan with this settlement, they would need to

2 provide a full written release.

3          MR. SMOLA:  Well, I take --

4          THE COURT:  Yes, but --

5          MR. SMOLA:  I take Mr. Bjork's point.  But this

6 requires them to provide a release for any trust payment.  So,

7 in the scenario I previously raised, that individual should be

8 able to get a trust payment relative to his BSA portion, his

9 local council portion.  And if he doesn't want to release the

10 TCJC, he shouldn't have to.  But it shouldn't preclude him

11 from getting the other -- the pay -- the trust payments.

12          THE COURT:  Okay.  So that's a scenario we haven't

13 discussed.

14          MR. BJORK:  I -- from my --

15          THE COURT:  But the debtors --

16          MR. BJORK:  -- perspective --

17          THE COURT:   I understand the --

18          MR. BJORK:  Yes, the debtors --

19          THE COURT:  I understand --

20          MR. BJORK:  But the -- yeah.

21          THE COURT:  -- the church's position on that.

22          So BSA's position on that?

23          MR. LINDER:  Your Honor, I think that the scenario

24 Mr. Smola is outlining -- and correct me if I'm wrong -- is

25 that, if there were a distribution from the trust on account

1  of a claim that did not relate to TCJC, but the holder of that

2  claim also was seeking recovery from TCJC -- is that correct?

3            MR. BJORK:  No, no.  The scenario is he has a -- in

4  any Boy Scout abuse claim, you could really file three

5  separate complaints, if you wanted to:  You could file one

6  against the BSA, one against the local council, and one

7  against the TCJC.  You know, you could settle the BSA piece

8  and you could settle the local council piece, and you could

9  reserve your TCJC allegations separately.  I don't think

10 recovery of the BSA contributions and the local council

11 contributions should require the release of the chartered

12 organization.

13            THE COURT:  Yes.

14            MR. SMOLA:  I understand --

15            THE COURT:  Yeah.

16            MR. SMOLA:  -- the chartered --

17            THE COURT:  So his --

18            MR. SMOLA:  -- organization wants a release, but --

19            THE COURT:  Right.  So his question is:  If

20 somebody has a TCJC claim, but doesn't want a recovery from

21 the TCJC settlement proceeds, can they take the BSA trust

22 payment and opt out, in essence, of the TCJC settlement

23 because they want to continue to see, and they don't want to

24 give their B-S -- unrelated BSA claims?

25            MR. LINDER:  Your Honor --

1          UNIDENTIFIED:  That -- oh, go ahead.

2          MR. LINDER:  My understanding, Your Honor, is that

3  there is no -- there is no ability to opt out under this plan.

4  If you filed a proof of claim that alleges scouting related

5  abuse that occurred in the TCJC context, those claims are

6  being channeled to the trust.  There's no opt-out to pursue

7  TCJC in the tort system on account of that claim.

8          THE COURT:  Yeah, I guess I understand that.  But I

9  did not understand that the person couldn't pursue TCJC for

10  unrelated, non-scouting claims, like we've just been talking

11  about.

12          MR. LINDER:  They certainly can, Your Honor.  I'm

13  distinguishing -- and maybe I'm --

14          THE COURT:  Not according to Mr. Bjork, they can't.

15          MR. BJORK:  No.  Your Honor, to the extent that

16  there are claims against the church that are wholly unrelated

17  to scouting, those are not being channeled, they're not

18  enjoined.  This is a release that's regarding scouting related

19  claims.  That would include every proof of claim filed in this

20  case.  That would include claims that are asserted

21  subsequently against the trust, established pursuant to this

22  plan.

23          To the extent that a claimant makes a BSA claim,

24  abuse claim, that implicates the church, and to the extent

25  that party wants to get any recovery from our settlement

1  proceeds, that was the released I was talking about --

2              MR. SMOLA:  So shouldn't --

3              MR. BJORK:  -- and that's what --

4              MR. SMOLA:  -- this just read a written release in

5  favor of the TCJC for scouting related claims only.

6              MR. LINDER:  What I think we're missing in looking

7  at this language, again, on Page 122 of the redline, is that

8  the language refers to this individual granting the release as

9  being the holder of a, capitalized A, "Abuse claim."  That

10 claim is necessarily a claim that relates to scouting against

11 TCJC in this context.

12             THE COURT:  I think it's the language that says "a

13 full and complete written release in favor of TCJC,"

14 unqualified.  So there's no --

15             MR. SMOLA:  Exactly.

16             THE COURT:  -- no reason --

17             MR. BJORK:  Let's --

18             THE COURT:  -- in the release --

19             MR. BJORK:  All right.

20             THE COURT:  -- why you can't release for multiple

21 types of claims, and this would be suggest that you're being

22 released -- you're giving a release for more than just your

23 scouting related claim.  I think that's a fair reading.

24             MR. LINDER:  The only thing I would (indiscernible)

25 in respect to that is it is a consensual release that we're

1 talking about.

2          THE COURT:   Right.   But that's Mr. Smola's point.

3          MR. LINDER:   Uh-huh.

4          THE COURT:   He's being asked -- he's being asked --

5 and I think we need to clarify, and I guess now I'm unsure,

6 even by your last comment.   I am unsure what people -- what

7 holders of TCJC claims will be required to release in order to

8 get the payment.

9          MR. BJORK:   I think we can -- I think we can tie

10 this back to the "abuse claim" definition that's reflected in

11 the plan.   Would that address your concern, Your Honor?

12 That's what being channeled, that's what this settlement is

13 about.   But we want to make sure that it's covering any and

14 all theories of liability that is tied to a BSA related claim.

15          MR. ANKER:   Your Honor --

16          THE COURT:   I don't think there's an issue there,

17 so -- but yes, it needs to be tied to the BSA related claim.

18          MR. LINDER:   I think --

19          MR. ANKER:   Your Honor ---

20          MR. LINDER:   -- what we might be able to do, Your

21 Honor -- and this is just a suggestion -- is delete the last

22 clause of this provision and end the sentence with:

23          "-- including, as a condition to receiving proceeds

24 from the TCJC settlement contribution."

25          And then I don't think there's any question that

1  we're talking about a distribution to a holder of an abuse

2  claim.  And by the changes we've made to the definition, we've

3  tied that only to scouting relating abuse.

4         So I think if we could say that, as a condition to

5  payment, the holder will be required to execute the full and

6  complete written release in favor of all contributing

7  chartered organizations with respect to that abuse claim,

8  including as a condition to receiving any proceeds from the

9  TCJC settlement contribution, period, I think that eliminates

10 any ambiguity.

11        MR. ANKER:  Your Honor, this is Mr. Anker.  May I

12 be heard on this?

13        THE COURT:  Yes.

14        MR. ANKER:  Thank you, Your Honor.

15        I do think this is a question of just drafting on

16 the fly.  I don't think there's really disagreement here.

17        I do think,, if the release is applicable with

18 respect to abuse claims, and "abuse claims" is defined as

19 claims -- as exclusive of claims wholly unrelated to scouting,

20 we get to the point where the release is covering scouting

21 claims.  And if there are claims completely unrelated to

22 scouting, they are not covered.

23        I only raised my hand to say two things:

24        First, apropos of your comment earlier, we did have

25 a discussion with Mr. Linder today about the definition of

1   "scouting."  We agree it should be in there.  That was the

2   discussion he was referencing.  We're happy to work with him

3   and others on that.

4          And on this provision -- and I apologize, Mr.

5   Linder.  I didn't follow on the page you were on.  But our

6   termsheet and our agreement has a similar provision; that is,

7   it provides that any claimant who obtains a distribution from

8   the trust shall be required to give, and belt-and-suspenders

9   shall be deemed to give a release to Hartford of any abuse

10  related claim; and, again, "abuse related claim" being

11  scouting.  So, if this language is going to be there, it

12  should apply -- you know, the "including" should cover

13  Hartford, as well.

14         And I'm confident -- I see Mr. Rosenthal has raised

15  his hand.  I'm confident that every other -- I don't speak for

16  any other insurer.  I will bet dollars to donuts every other

17  insurer will want similar protections in their agreement, and

18  so the language can be made more generic and applicable to

19  everyone.  Again, I don't think there's any disagreement in

20  substance here.

21         THE COURT:  Okay.  That's fine.  I didn't think we

22  had any disagreement from before and -- but I agree that this

23  language as drafted unintentionally creates the specter of a

24  greater release.  And we've all looked at releases before for

25  our clients, and some are general releases that release

1  everything and not just the claim in front of us that we're

2  dealing with.  So we need to make sure that we are

3  appropriately addressing it.  And I'm hearing consensus on

4  where we end up, so we need to have the right language.

5          MR. BJORK:  We can spend --

6          THE COURT:  Mr. Bjork.

7          MR. BJORK:  -- time, Your Honor, working through

8  the language.

9          I do want to make one point, that the release that

10 we are contemplating, the consensual release, will cover

11 fraud, wilful, misconduct, gross negligence, even though the

12 plan releases carve that out.  It's going to be a general

13 release.

14         THE COURT:  I understand that.

15         MR. BJORK:  Okay.

16         THE COURT:  A general release of the BSA related

17 claims --

18         MR. BJORK:  Uh-huh.

19         THE COURT:  -- not a general release of every claim

20 anybody has in whatever context or capacity, other than BSA.

21 And I think that was Mr. Smola's concern.

22         MR. SMOLA:  Yes, Your Honor.

23         THE COURT:  Mr. Zalkin

24         MR. ZALKIN:  Thank you, Your Honor.

25         My concern is a little bit -- is over what is a

1  related to claim.  And that -- in a hypothetical where, for

2  example, an introduction is made through a scouting

3  relationship, but then abuse occurs beyond or outside of the

4  scouting relationship, is that related to or is that not

5  related to?  And I think that -- we -- these are the things,

6  the circumstances -- or this is a circumstance, as an example,

7  that I see could become problematic with the type of language

8  that we're discussing.

9          We -- I think we -- I believe it's the Court's view

10 -- it certainly seems it would be our position that any

11 conduct, even if the connection was initiated through scouting

12 or any conduct that takes place completely outside of

13 scouting, is not related to scouting, is independent of

14 scouting, and is not being released.

15         THE COURT:  That's my understanding, so we just

16 need to get the language there.

17         MR. ZALKIN:  (Indiscernible)

18         MR. PATTERSON:  Your Honor, can I --

19         THE COURT:  Mr. Patterson.

20         MR. PATTERSON:  Yeah, can I suggest something in

21 the practical?  I mean, we're -- this form of consensual

22 release that's been thrown in there, I think it would

23 alleviate a lot of concerns and satisfy everybody if it was

24 disclosed.  Just attach it, a release in the form attached.

25 If this is -- we spend all this time working on the exact

1  language for the injunctions, and then someone comes in and

2  says and you have to execute a release that may or may not

3  quite conform to the injunctions that we've all sort of, you

4  know, studied over.  So just attach it.

5            MR. LINDER:  Your Honor --

6            THE COURT:  If it exists, it could be attached, but

7  I suspect it doesn't exist --

8            MR. PATTERSON:  Well, then --

9            THE COURT:  -- so ...

10           MR. PATTERSON:  Then maybe the plan isn't ready for

11  solicitation.  I mean, I think that's a very important --

12           MR. LINDER:  We've --

13           MR. PATTERSON:  -- piece of --

14           MR. LINDER:  We've already --

15           MR. PATTERSON:  -- information.

16           MR. LINDER:  We've already agreed, Your Honor, that

17  the form -- that the form of TCJC settlement agreement --

18  which, to be clear, does not exist -- will be filed with the

19  plan supplement. and that will include the forms of releases.

20           THE COURT:  Okay.  And we'll make certain, if we

21  get to confirmation and I confirm a plan, that it's consistent

22  and the releases are consistent and any language changes that

23  need to be made to the plan at that point are consistent, that

24  we are giving the appropriate releases in this case, assuming

25  that I approve them.  Okay.

1          MR. LINDER:  Okay, Your Honor.  With that, we'll

2    move on to the -- what I hope will be a less contentious

3    change.  This is on Page 139 of the redline.

4          We have reformulated the provision of the direct

5    abuse claims treatment relating to the expedited distribution.

6    It will be going back on the ballot.  And my understanding is

7    we've made conforming changes to the solicitation materials to

8    set that change that we made two days ago.

9          THE COURT:  Okay.  Thank you.

10         MR. LINDER:  The next provision, Your Honor, is

11   material, and I'd like to -- I'd like to just pause on it.

12   It's on Page 150.

13         And this relates to the participating chartered

14   organizations' settlement contribution.  The initial

15   requirement by the parties with whom we negotiated the

16   participating chartered organization treatment, they had

17   insisted that we -- that the settlement trust retain the

18   ability to pursue independent chartered organization

19   insurance, to the extent available, if the amount of proceeds

20   available from other insurance, BSA and local council

21   insurance rights (indiscernible) contributed by participating

22   chartered organizations was insufficient to satisfy a

23   particular plan in full.  And so we were not able to represent

24   to the chartered organizations that, if they elected to become

25   participating chartered organizations, that they would have a

1   full and complete release for post 1975 abuse claims.

2        We've been continuing to engage the FCR and the

3   coalition and dialogue on this point.  It has been a point of

4   great debate and consternation from the chartered

5   organizations who are in the mediation, that this is a term of

6   the proposed treatment that was unacceptable to them.

7        We're happy to report that the coalition and the

8   FCR have agreed to remove this concept from the participating

9   chartered organization treatment.  The settlement trust will

10  now no longer have recourse to participating chartered

11  organizations' own insurance, and so they will, under our

12  proposal, receive full and complete protection from post 1975

13  abuse claims in exchange for the contribution of their own --

14  their insurance rights under the BSA and local council

15  insurance policies.  We think this is a very favorable change.

16       THE COURT:  Okay.  Any questions?  To me, this is a

17  deal point.  Mr. Smola.

18       MR. SMOLA:  Your Honor, this is a very significant

19  change that I believe should -- needs to be accompanied by

20  additional disclosure.  And I'll give the Court an example.

21       I believe it's 1977 has roughly 3,000 claims that

22  fall in that time frame and about $20 million to be

23  distributed for 3,000 claims.  The only thing, the only thing

24  that a participating chartered organization is contributing is

25  those insurance rights.  It is now -- victims now do not have

1  the ability to pursue the insurance that the independent

2  chartered organization may have to cover its independent

3  liability.

4       I think it's going to be very difficult for this

5  Court to value the property rights that that chartered

6  organization has to a 1976 policy without details, and it's

7  impossible for survivors to evaluate those property rights

8  without those details in the plan.  Previously, this seemed an

9  acceptable sort of common ground, where, to the extent there

10 was additional insurance that could be pursued.  Now that's no

11 longer the case.

12      I think the property rights of -- the value of the

13 property rights that the chartered organization is

14 contributing relative to its insurance rights should be

15 disclosed.  Thank you, Judge.

16      THE COURT:  Thank you.

17      MR. LINDER:  Your Honor, two reactions.  I think we

18 previously discussed that, with respect to any third parties

19 proposed to be a protected party, we haven't undertaken any

20 analysis about their assets.

21      The sufficiency of a contribution in exchange for

22 the benefits of the channeling injunction is going to be

23 determined at confirmation.  That's the first response.

24      The second is:  To the extent that anyone is

25 concerned that there are independent liabilities that these

1  participating chartered organizations have for abuse unrelated

2  to scouting, those rights are preserved against those

3  chartered organizations and their respective independent

4  insurance policies.  And in fact, that was the principal

5  reason that these chartered organizations objected tot his

6  term, was that they need that insurance to satisfy their other

7  obligations and liabilities.

8          MR. SMOLA:  Your Honor, to give you an example, in

9  the '70s, a -- the Boy Scouts required chartered organizations

10 to register adult leaders, so that they could be checked

11 against ineligible volunteer files.  If a chartered

12 organization didn't do that, that is the chartered

13 organization's liability, right?  They didn't follow a BSA

14 policy.

15         All they are contributing in this case is about

16 $10,000 worth of insurance for a claim like that, which would

17 be their rights under 1977 and the terms I gave you

18 previously.  I think that that should be disclosed, that that

19 is a *de minimis* contribution by that chartered organization,

20 particularly if they have other policies that could cover that

21 type of claim.

22         THE COURT:  I think it's a confirmation issue.

23         Mr. Rosenthal.

24         MR. ROSENTHAL:  I have -- I just want to make sure

25 we don't have a disagreement here.  I expect that most

1   insurers will say that, if they are settling their liability

2   for Boy Scout related activities, that they expect that

3   settlement to be inclusive of liability they have under Boy

4   Scout policies, local council policies, and chartered

5   organization policies.  I suspect -- I know AIG is of the view

6   that we're not going to pay out of our left pocket and then

7   have somebody reach into our right pocket for the exact same

8   liability.

9           So the way I read this change and the way I'm

10  hearing this discussion, it seems as if the chartered

11  organizations would keep their insurance, notwithstanding the

12  fact that they had settled and that their insurer might have

13  settled; and that, in that context, they could -- the claimant

14  could get a distribution from the trust and could separately

15  sue under the chartered organization insurance for a

16  distribution from the chartered organization related to the

17  same scouting activity.  And I don't -- that's -- I don't

18  think you're going to get any insurers to settle on that

19  basis.  But it's certainly a -- at minimum, a disclosure

20  issue.

21          MR. LINDER:  From our perspective, Your Honor, this

22  is -- that's really a deal point in settlement negotiations

23  with BSA's insurers.

24          MR. ROSENTHAL:  It may be a -- it may be a deal

25  point.  But one of the things I said yesterday was that I --

1  you know, one of the arguments --

2       (Pause in proceedings)

3            UNIDENTIFIED:  Mr. Rosenthal, we can't hear you.

4            THE COURT:  I've -- yes, Mr. Rosenthal, but I had

5  everybody frozen for a minute.

6       (Pause in proceedings)

7            THE COURT:  I'm trying to see if it's on our end.

8       (Court and court personnel confer)

9            THE COURT:  Okay.  Let's see if Mr. Rosenthal comes

10 back on.

11      (Court and court personnel confer)

12           THE COURT:  Is there someone who's trying to

13 communicate with Mr. Rosenthal?

14           MR. ANKER:  Your Honor, this is Mr. Anker.  I sent

15 him an email saying we lost him, so --

16           THE COURT:  Thank you.

17           MR. ANKER:  -- I assume he got it.

18           UNIDENTIFIED:  Your Honor, I just spoke to Mr.

19 Rosenthal.  He's trying to fix the problem at his end.

20           THE COURT:  Yes.  Thank you.

21      (Pause in proceedings)

22           THE COURT:  And I will confess, while we're waiting

23 for Mr. Rosenthal, that the participating chartered

24 organization settlement is probably the aspect of the plan and

25 disclosure statement I've spent the least time on because it

1  was the most recent to us, so -- and I certainly recognize

2  that it's going to be a confirmation issue, there's no

3  question about that, but --

4           MR. ROSENTHAL:  I'm sorry.  I got cut off.  It's

5  Michael --

6           THE COURT:  Okay.  It happens.

7           MR. ROSENTHAL:  Did -- I'm not sure how much you

8  heard.  What I had been saying -- I don't know how much you

9  heard, but what I had been saying is one of the points I made

10 yesterday is that, you know, we should try to take a little

11 time to maybe think about these concepts.

12          My concern here is that, as a disclosure matter, I

13 don't want to have to go back and re-solicit if this, in fact,

14 becomes an issue and somebody says, hey, this was never

15 disclosed.

16          So this is one of those points that I think, if

17 there is a possibility of this happening -- and I would

18 suggest that there is a high possibility -- just as Mr. Anker

19 said there's a very high possibility that any future settling

20 insurer will want the same kind of releases that Hartford and

21 LDS is obtaining -- that we should at least put placeholders

22 in this plan and disclosure statement for that possibility.

23          THE COURT:  Okay.  I saw another hand before I get

24 back to the debtor.  Mr. Goodman.

25          MR. GOODMAN:  Thank you, Your Honor.  Eric Goodman,

1  Brown Rudnick, on behalf of the coalition.

2           I just wanted to make clear for the Court that this

3  was and is a concession by us, no question.  Chartered

4  organizations that do not object or opt out do get the benefit

5  of protected party status for post 1976 abuse claims.  They

6  lose insurance, but they gain something better, and that's by

7  design.

8           Certain chartered organizations are currently

9  engaging in a campaign against the scouts.  We view that as

10 very, very unfortunate, and we are trying to help the Boy

11 Scouts maintain their existing relationships with various

12 churches and various organizations.

13          This was a concession, you know, by -- made by us

14 to help the scouts in that endeavor.  And I'll also add it's

15 also a concession by us to make future settlements with

16 insurers possible.  Chartered organizations that do not opt

17 out are assigning their insurance rights to the settlement

18 trust.  This goes back to my Monopoly example yesterday.  Your

19 Honor, I want that third card, so that I can negotiate and

20 reach settlements with additional insurers and help bring this

21 case to a successful conclusion.

22          So, while I appreciate Mr. Rosenthal's comments, I

23 do think that, ultimately, this will help his client if, in

24 fact, they want to reach a settlement.  Thank you, Your Honor.

25          MR. LINDER:  Your Honor --

1          THE COURT:  Okay.  Yes, go ahead.

2          MR. ROSENTHAL:  Your Honor?

3          THE COURT:  Okay, yes.  Go ahead.

4          MR. LINDER:  Your Honor, I'm just following up on

5   your comment that this is one of the aspects of the plan that

6   you have not focused the most on.  The participating chartered

7   organizations, the default option for a chartered organization

8   is that they will be deemed under the plan to contribute to

9   the trust their rights not under their own policies, but their

10  rights under BSA insurance and under local council insurance

11  to the extent it provides coverage for chartered

12  organizations.

13          Those are rights to policies issued on or after

14  January 1st, 1976.  In return they are proposed to receive the

15  benefit of the channeling injunction with respect to abuse

16  claims alleged to have first occurred on or after that same

17  date.

18          Mr. Rosenthal's suggestion that there needs to be

19  an initial disclosure around this point we're having a hard

20  time with it, I think, on the debtor's side because I think

21  what he's suggesting is that there should be disclosure that

22  potentially there may be settlements that would try to

23  incorporate you as a chartered organization and seek your

24  consent to release rights under your independent policies.  By

25  their nature the structure of those settlements needs to be

1  one that is consensual.  Those are independent third-party

2  insurance policies.  So from a perspective of disclosure I

3  don't think it's necessary.

4         MR. ROSENTHAL:  Your Honor, I would just mention to

5  Mr. Linder we had a discussion about the plain English version

6  of the chartered organization presentation and I thought we

7  had agreement on it.  And I had added just some language --

8  there is language in there that I thought we agreed on which I

9  think handles this whole point.  It said there may be

10 settlements -- I'm not sure I can bring it up immediately, but

11 it said something to the effect of there may be -- let's see,

12 what is the language we agreed on.

13        MR. LINDER:  We said, in effect, Your Honor, and I

14 don't have a copy of it --

15        MR. ROSENTHAL:  Yeah, we -- BSA may enter

16 settlements with those carriers that may limit or remove the

17 rights of chartered organizations under such policies and

18 their own insurers' policies with such insurers, and our

19 claims of chartered organizations against such insurers.

20        I am not asking -- I agree, it is a separate

21 settlement.  It would be a separate settlement with BSA.  No

22 one is suggesting anything to the contrary.  It's just a

23 question of disclosure so that we can say if that occurs that

24 there is disclosure of it.  We don't have to go back and

25 resolicit.  We don't have a notice issue.

1           Part of 100 percent or 95 percent of what we are

2   trying to do in disclosure statements, I think, is resolve

3   potential notice issues to give people enough information so

4   they can make an informed decision about what may or may not

5   happen.

6           MR. LINDER:  We did have a conversation about it

7   this morning in the context of the plan English chartered

8   organization summary which I am happy to report is completely

9   resolved.  That language, Your Honor, is in there.  It

10  discloses the fact that there might be settlements that could

11  potentially effectuate a release of independent chartered

12  organization policies.

13          From our perspective, Your Honor, I don't see how

14  that could be done in a non-consensual manner.  So all I am

15  saying is I don't think that disclosure is even necessary.  To

16  the extent its appropriate it's already in the summary that's

17  going out to each of the chartered --

18          MR. ROSENTHAL:  But it's not in the main disclosure

19  statement.  The summary is a summary of the main disclosure

20  statement.

21          THE COURT:  Why can't the language be in some

22  footnote in the disclosure statement somewhere?  This language

23  that you already agreed to.

24          MR. LINDER:  Your Honor?

25          THE COURT:  I take it the issue is that insurance

1   companies may have separately issued a policy directly to a

2   chartered organization and so AIG may have separately issued a

3   policy to a chartered organization and isn't going to resolve

4   BSA related claims in this trust without also resolving any

5   liability they may have on a separate policy issued to a

6   chartered organization.

7          UNIDENTIFIED SPEAKER:  For those claims.  Yes, your

8   right, Your Honor.

9          THE COURT:  For the same claims.

10         MR. ROSENTHAL:  Your Honor, briefly.  Mr. Linder is

11  correct and we have agreement on the plain English.  One of

12  the things we had discussed is that we're going to -- some of

13  those changes in that language needs to flow through the

14  disclosure statement.  We're going to get to that.

15         I think as Mr. Rosenthal says we have language we

16  like that we have all agreed upon, I will say that, in the

17  plain English version because the plain English version says

18  that differences between the disclosure and the plain English

19  the disclosure statement controls we're going to go back and

20  filter in some of the language changes that are in that agreed

21  disclosure in the disclosure statement.

22         So I think a lot of these things, rather than

23  taking court time -- you know, there is going to be some

24  further changes to the disclosure statement just to reflect

25  agreements that are getting reached and we can deal with it

1  that way.

2          THE COURT:  Okay.  I understand the issue and it

3  sounds like there is a way that this is going to be dealt

4  with.

5          Next?

6          MR. LINDER:  Your Honor, we're getting to short

7  strokes here I promise.  Moving onto, this is Article 10 of

8  the -- I'm sorry, it's the releases and injunction which is

9  Article 10 of the plan, but it begins on -- the changes begin

10 on page 188 of the redline.  We made a few conforming changes,

11 Your Honor, really cleanup changes, to the release provisions.

12 These provisions are in the latest redline version of the plan

13 as well.

14         The first is making clear that the releases -- and

15 these releases, I believe, are holders of claims generally not

16 abuse claims.  The releases shall not be construed to release

17 claims against local councils, chartered organizations other

18 than contributing chartered organizations.  We're just

19 clarifying that they're carved out of that proviso.  That is

20 the change on page 188.

21         The changes on page 189, this is within the context

22 of the releases among contributing chartered organizations and

23 what we call the settlement parties which are, as the name

24 suggests, parties with the debtors.  The claim that are the

25 subjects of these mutual releases are claims relating to the

1  debtors or the related non-debtor entities.  They are not

2  claims generally against the settling parties.  So we are just

3  clarifying the scope of releases.

4           The next change, Your Honor, is on page 190.  This

5  provision reflects what I believe is Article 10(j)(6) of the

6  plan and it's just making clear that the releases being given

7  by settlement parties to and in favor of settling insurance

8  companies and certain other parties and the releases being

9  given by the settling insurance companies are being

10 incorporated by reference into the plan.  Again, these are the

11 releases that are contained, for example, in the Hartford

12 settlement agreement.  So we are just making clear that it's a

13 mutual release, it's not a one-sided release.

14           THE COURT:  Okay.  Questions?

15      (No verbal response)

16           THE COURT:  Okay.

17           MR. LINDER:  The next change is on page 223.  This

18 is simply informing to our dilution of what we proposed with

19 respect to expedited distributions. We have added language

20 (indiscernible).

21           The language on page 238, Your Honor, is the next

22 change and this is language we have discussed at length today

23 with respect to the release in favor of TCJC.  It is the same

24 language we discussed and per our discussion we will be

25 proposing language to revise this provision.

1          THE COURT:  Yes.

2          MR. LINDER:  The only other changes, Your Honor, in

3 terms of what is material are beginning on page 248 and 249.

4 These are changes that are intended to memorialize changes

5 we've made to the solicitation procedures.  So I would propose

6 to defer that discussion to that order.

7          THE COURT:  Okay.

8          MR. LINDER:  With that I would then circle back to

9 what I indicated would initially be what's on page 1 of the

10 disclosure statement which is the "important" dates.  This is

11 really the confirmation timeline. It is a bankruptcy timeline

12 and does not incorporate the discovery schedule that we're

13 proposing be overlaid on top of this bankruptcy timeline.

14          These dates, Your Honor, given the expedited manner

15 in which we're approaching confirmation are pretty much

16 hardwired within the time it takes for our claims and noticing

17 agent to conduct the solicitation and our anticipated

18 discovery dates.  We -- I am happy to walk through it, Your

19 Honor, if it's necessary, but what I would like to do is just

20 to address the manner in which we're proposing to handle the

21 discovery schedule because that is not clear and it's not set

22 forth in the disclosure statement.

23          On that topic, Your Honor, we're going to be

24 reaching out to the other parties today or tomorrow to propose

25 a meet and confer with respect to that discovery schedule.

1  We're very hopeful that we can reach consensus on what that

2  schedule can and should be.  And I think what we would like to

3  do, Your Honor, is to establish a date next week that we might

4  be able to be back before Your Honor in the event that there

5  are issues with respect to that schedule that need to be

6  adjudicated.

7          THE COURT:  I do not have my calendar, but we will

8  get it.

9          MR. LINDER:  Your Honor, I think we've covered --

10  should we wait for your calendar, Your Honor, or would you

11  like me to proceed?

12          THE COURT:  I'm seeing if it magically appears and

13  if not I will get off the bench and get it.

14          MR. LINDER:  Okay.

15          THE COURT:  It's not magically appearing.  Give me

16  a minute.

17      (Pause)

18          THE COURT:  Okay.

19          MR. LINDER:  We're proposing, Your Honor, just for

20  the parties benefit, that the meet and confer take place this

21  week.  I think Friday is the best date for our team.  And so

22  we know its short notice, so we're happy to take whatever time

23  Your Honor has available next week if necessary.

24          THE COURT:  Well I have time Monday afternoon and I

25  have -- I probably have some time on Wednesday, but I don't

1  know exactly what time.  I will have to look at another
2  schedule to see that.  And I have time Friday, anytime Friday.
3          MR. LINDER:  I think, Your Honor, given -- we're
4  going to send out a proposed discovery schedule as soon as
5  possible, hopefully today to the parties.  We're hopeful that
6  we can engage in productive discussions this week culminating
7  the meet and confirm on Friday.  So I think if Your Honor has
8  Monday available I think we'd like to lock that in.
9          THE COURT:  One o'clock.
10          MR. PATTERSON:   Your Honor, could I make a request
11  for Wednesday.  We have all moved around our schedules in
12  order to accommodate this, but I've got a conflict on Monday.
13  My colleague who will be covering has a conflict on Monday
14  because of a hearing in another case.  We would request
15  Wednesday if that is convenient.
16          MR. PLEVIN:  Your Honor, this is Mark Plevin. I
17  can't do Wednesday because I have an Imerys expert deposition
18  that is after the expert deposition window which we are trying
19  to fit in before confirmation objections are due on October
20  15th.  So I can do Monday afternoon.  I could also accommodate
21  Friday.
22          MR. LINDER:  Again, Your Honor, I think we really
23  just want to do this sooner rather than later.  We really
24  would -- we can do Monday, we can do Wednesday.  I think
25  Friday is just too late.  If we know what the disagreements

1  are, you know, on Friday there is no reason that we should be

2  waiting a week to get back before the court.  I think Monday

3  is the preference for the debtors.

4          THE COURT:  Let's keep going -- well, Mr. Plevin is

5  not available Wednesday.

6          UNIDENTIFIED SPEAKER:  Monday doesn't really leave

7  any time to confer.

8          THE COURT:  I'll get back to this.  Let's keep

9  going. I'll find a time.  Maybe I can rearrange something, I'm

10 not sure.

11         MR. LINDER:  Thank you, Your Honor.  We appreciate

12 it.

13         I think the last point that we would encourage the

14 parties to begin to serve whatever confirmation discovery they

15 believe is appropriate as soon as possible notwithstanding

16 that we -- even notwithstanding that we don't have a timeline

17 that's been agreed upon yet.  We know that Your Honor has

18 scheduled a tight confirmation timeline and we think we're

19 certainly willing to work on that expedited timeframe that we

20 would appreciate other parties working to do the same.

21         The last item, Your Honor, is the plan.  I think

22 there is no need to walk through the plan.  We have addressed

23 all the changes we have made in the plan as we walked through

24 the disclosure statement.  What I will indicate is that we

25 know that there are several items that we need to revise in

1  the disclosure statement as we discussed.  What the debtors

2  are intending to do is to file solicitation versions of the

3  plan and disclosure statement tonight so that we can begin the

4  process of launch a solicitation as soon as possible.

5          I will let my colleague, Mr. O'Neill, step into

6  address solicitation procedures.  I just wanted to make Your

7  Honor aware of our intent with respect to the filing of

8  solicitation versions.

9          MR. PLEVIN:  Your Honor, this is Mark Plevin.  Just

10 one very quick note.  We -- the Zurich insurers, who I

11 represent and other insurers who objected to the disclosure

12 statement withdrew our objections in exchange for agreed

13 language.  And I think just because of a glitch some of the

14 language, basically, there are four words that we had agreed

15 to put into the plan didn't get in.

16          I have had emails while this hearing has been going

17 on from counsel for the coalition and debtors that they would

18 make that previously agreed change.  So I just wanted to put

19 that on the record.

20          THE COURT:  Thank you.

21          MR. LINDER:  We will be making that change.  It was

22 an oversight, Your Honor.

23          Thank you, Mr. Plevin, for noting it for us.

24          MR. SCHIAVONI:  Your Honor, can I just know what

25 section that is because I didn't get a copy.

1          MR. LINDER:  I believe its Section 4(d)(1) of the

2   plan.  And we will be sure to provide you with a copy of that

3   change, Mr. Schiavoni.

4          I'm prepared to cede the podium, Your Honor, to Mr.

5   O'Neill.  I'm not sure if you would like to take a short

6   recess or we're happy to keep going.

7          THE COURT:  Let's keep going.

8          MR. LINDER:  Okay.  Thank you, Your Honor.

9          MR. O'NEILL:  Good afternoon, Your Honor.  Andrew

10  O'Neill, White & Case, for the debtors.  Good to see you

11  again.  It's been a bit since our last solicitation

12  discussion.

13         We took Your Honor's advice.  We did talk to a lot

14  of folks in conjunction with some of the changes.  We, in the

15  first instance, let Mr. Buchbinder and Mr. Smola run wiht some

16  of the adjustments to how the packages will be delivered,

17  paper copies, while with a mind to protecting the plaintiffs

18  preferences in terms of how they received mail and other

19  materials, and also looking out for the incarcerated

20  claimants, Your Honor; making sure that their packages will

21  get through.

22         Then we also had extensive discussions with Century

23  and with the TCC.  I am happy to report that after a couple of

24  very late nights as of this morning we're in agreement with

25  the TCC on all of the changes that are reflected in your

1  redlines under Docket No. 6420.  We did receive an email from

2  Mr. Schiavoni with a couple more comments.  We're happy to

3  address a couple of those and then as I go through what we did

4  and then I think at the end if he wants to press anymore of

5  those he can do so.

6            So what I would propose to do, Your Honor --

7            THE COURT:  Excuse me, I don't have that document.

8  So I need to get it.

9            MR. O'NEILL:  Okay.

10           THE COURT:  Its 6420?

11           MR. O'NEILL:  Yes.

12           THE COURT:  Okay, let's take five minutes.

13           MR. O'NEILL:  Thank you, Your Honor.

14       (Recess taken at 2:04 p.m.)

15       (Proceedings resumed at 2:08 p.m.)

16           THE COURT:  Okay.  Are we ready to begin?

17           MR. O'NEILL:  I'm ready, Your Honor.

18           THE COURT:  We're missing a lot of people.  Hold

19  on.

20           Let me throw out another possibility for next week

21  and this is only for discovery schedule that's it, right?

22           MR. LINDER:  Yes.

23           THE COURT:  Tuesday at 2:30.

24           MR. LINDER:  Sounds good, Your Honor. That will

25  work for the debtors.

1          (A chorus of "Thank you, Your Honor")

2          THE COURT:  And we will hope that my schedule --

3  I'm making certain assumptions, but with broad leeway.  So

4  hopefully that will stick.  2:30 Tuesday.

5          MR. O'NEILL:  Very good.  Thanks, Your Honor.

6          If Your Honor has the documents in front of you I

7  think we can get started.  What I would like to do is go

8  through the order, then the procedures, and then the master

9  ballot.  Many of these changes are reflected in each of the

10  documents.  So for efficiency sake I won't go over them twice,

11  I will just go over them in the document in which they first

12  appear in that order.

13          So with that, Your Honor, starting with the redline

14  order the first major change other than the schedule that Mr.

15  Linder showed you is in paragraph 8.  And as I said, this

16  reflects the distribution protocol that Mr. Buchbinder, and

17  Mr. Smola and many other parties chipped in on.  It protects

18  the claimants that opted not to receive information directly

19  and incorporates the protections for incarcerated holders.

20          I think this is what we discussed last week and

21  what the parties came to over the weekend.  So I will wait to

22  see if anybody raises their hand, but I think this is

23  straight-forward.

24      (No verbal response)

25          MR. O'NEILL:  Your Honor, stop me if you want to

1  stop and --

2          THE COURT:  I'm still looking at this, yes.

3          MR. BUCHBINDER:  Once I get a chance to look at it

4  and the concurrent distribution procedures I may comment.

5  Until then I am holding off on comment.  I am not ready to

6  comment yet.  Thank you.

7          MR. O'NEILL:  Thank you, Mr. Buchbinder.

8          THE COURT:  Okay.

9          MR. O'NEILL:  The next paragraph I would direct

10 Your Honor towards is 28.  This is what I will refer to as the

11 directive amendment provision.  We discussed the directive at

12 some length, Your Honor, where firms were given the ability to

13 choose to do master ballot and signed a certification to

14 certain things in connection with that.

15          Given the changes to the master ballot we thought

16 it made sense to give firms the ability to choose again

17 whether they would like to use the master ballot or the direct

18 solicitation method.  So this will go out as a negative notice

19 via email from Omni to the firms.  They will have the ability

20 to switch under A to a direct solicitation procedure.  And the

21 reason A is longer then B is because it incorporates some of

22 the distribution mechanics with respect to parties getting

23 hard copies or other forms of the solicitation materials

24 pursuant to their choice or in the alternative B it also gives

25 firms the ability to switch to a master ballot method if they

1  now prefer that.

2          THE COURT:  Okay.  Well I don't think that should

3  be controversial.  If they want to change their direction they

4  can change their direction.

5          MR. O'NEILL:  Thank you, Your Honor.  Yes, we

6  agree.  It wasn't controversial among the parties.

7          The next major change, and this is a direct outgrow

8  from the hearing last week, last Thursday, we've added in

9  paragraph 29 that the 2019 will be required from firms that do

10  choose to submit a master ballot.

11          Mr. Schiavoni did have one additional comment.  I

12  don't want to call it additional, he may have provided it

13  before so I don't want to be mischaracterized in how I'm

14  describing it, but he sent a comment again this morning that

15  we should say that if they do not file the 2019, via the

16  deadline, then the master ballot will not be counted.  We're

17  okay adding that additional language for Mr. Schiavoni.

18          Mr. Schiavoni, that's 1(a) in your email from this

19  morning.

20          MR. SCHIAVONI:  Thank you very much, Mr. O'Neill.

21          MR. O'NEILL:  Yes, no problem.

22          Moving on, Your Honor, I'm going to just note that

23  on the exhibits we now have the chartered organization summary

24  and the plan summary FAQ for abuse survivors included as an

25  exhibit to the solicitation order.  Of course, the chartered

1  organization summary I think is still moving a little bit per

2  the discussion on the disclosure statement.

3         So with that, Your Honor, I will move onto the

4  procedures.

5              THE COURT:  Okay.  Does anybody have any comments

6  to the order?

7         (No verbal response)

8              THE COURT:  Okay.  I don't hear anyone.  Ah, Mr.

9  Buchbinder, I'm sorry.

10         (No verbal response)

11             THE COURT:  Mr. Buchbinder, I can't hear you.

12             MR. BUCHBINDER:  I was muted, Your Honor, I'm

13  sorry.

14             Paragraph 8 of the proposed order has a

15  parenthetical slipped into it that although the court said

16  individuals would get the entire package and we negotiated the

17  resolution to be incarcerated persons and persons who are

18  represented by counsel with a master ballot that seemed to be

19  a reasonable compromise of the problems that we discussed and

20  Mr. Smola brought up.

21             If you look at Paragraph 8 of the order it has a

22  parenthetical slipped into it that the solicitation package

23  that is going to be served to all these folks is going to

24  exclude the exhibits to the disclosure statement.  That should

25  be removed.

1          MR. O'NEILL:  Are you referring to the third line

2  in eight, Mr. Buchbinder, the excluding (indiscernible) --

3          MR. BUCHBINDER:  Be there in a moment.  Yes, except

4  the solicitation procedure.  What exhibits are you excluding?

5  The whole package is the whole package, not part of the

6  package.

7          THE COURT:  What is being excluded?

8          MR. O'NEILL:  Its -- well we can go through the

9  exhibits to the order, but it's the notice exhibits, Your

10  Honor, and then other forms of ballot.

11          MR. BUCHBINDER:  Is it the notice to the

12  solicitation procedures order, sir, or is it the exhibits to

13  the disclosure statement itself.  That is what is not clear?

14          MR. O'NEILL:  Yeah, I --

15          MR. BUCHBINDER:  If it's the former I don't think

16  that's a problem. If it's the latter it is.

17          MR. O'NEILL:  It's the former.  It's just the

18  solicitation procedures order, not the disclosure statement.

19          MR. BUCHBINDER:  Maybe that could be tweaked

20  slightly to clarify that.

21          MR. O'NEILL:  We'd be happy to do that.

22          MR. BUCHBINDER:  It seems to suggest that no

23  exhibits to the disclosure statement would be included.

24          MR. O'NEILL:  It's certainly not the intent.  We

25  can clean that up, Mr. Buchbinder.

1        MR. BUCHBINDER:  Thank you.

2        THE COURT:  Thank you.

3        MR. BUCHBINDER:  The same comment applies in the

4 same area of the procedures where the same place is listed.

5 So I won't raise it again.

6        MR. O'NEILL:  Thank you.  I will just note for the

7 purposes of the hearing, you know, we will -- anything we're

8 agreeing to make we're agreeing to make to every document

9 where it's implicated.

10        THE COURT:  Okay.

11        MR. O'NEILL:  So with that, Your Honor, can we move

12 onto the procedures?

13        THE COURT:  Yes.

14        MR. O'NEILL:  The first thing I have tabbed is a

15 material change that wasn't in the disclosure statement order

16 -- I'm sorry, the order that we already discussed, the

17 solicitation order.  It's the option A and option B

18 certification that we discussed at length last week, Your

19 Honor.  We worked with the TCC in particular to forge language

20 and we think it captures what was discussed on the record last

21 week.

22        The option A certification, as discussed, there is

23 no negative notice option here.  It has to be affirmative

24 consent and that affirmative consent has to be indicated on

25 the master ballot or how that master consent was obtained.

1  This also now requires firms to keep a contemporaneous record

2  of the responses that they received from their abuse survivor

3  clients.

4          The option B certification, Your Honor, is the

5  power of attorney.  And this now provides that if option B is

6  the method by which to vote is given on the master ballot then

7  the attorneys will provide the power of attorney.  So we think

8  that covered off on most of what was discussed last week.  Mr.

9  Schiavoni asked for additional language that in addition to

10 collecting the responses or maybe instead of, but what we

11 would propose is it says each firm shall collect the responses

12 through customary and accepted practices.  We would propose to

13 add consistent with applicable rules of professional conduct

14 after that which we think addresses the substance of Mr.

15 Schiavoni's comment to us this morning.

16          THE COURT:  Any questions on that?

17     (No verbal response)

18          THE COURT:  Okay.

19          MR. SMOLA:  Your Honor, just for clarity sake a

20 firm can do both option A and option B if it's reaching out to

21 its clients in a (indiscernible) format, right?

22          THE COURT:  Yes.

23          MR. O'NEILL:  Yes, Mr. Smola.  And the next thing

24 that I am getting to is where you record that and I will

25 explain that a little bit further.

1            MR. SCHIAVONI:  Your Honor, honestly, I have no

2   idea what customary and accepted practices really means.  We

3   just suggested that that just be replaced with in accordance

4   with the applicable rules of professional conduct.

5            MR. O'NEILL:  It's meant to mean however they

6   communicate with their clients, Your Honor, that's customary.

7            THE COURT:  I think there are enough protections

8   built into this now that I don't feel I need to define that;

9   although, I agree, it's a somewhat open term.  I think there

10  are enough protections with respect to master ballots.

11           MR. O'NEILL:  Thank you, Your Honor.

12           The next thing I would point Your Honor to is on

13  page 12 of the redline, solicitation procedures.  This is the

14  chart that's, basically, imported from the ballot, but since

15  we're going through this document first I will address it

16  here.

17           Per Mr. Smola's question in the ballot or the

18  exhibit to the ballot, rather, will contain a drop down with

19  additional options including the type of authority for the

20  vote and what that means is, you know, option A or option B.

21  Then we have also noted the method of service of solicitation

22  documents.  This goes to, you know, how the documents were

23  provided by counsel to their clients.  So we think this, you

24  know, provides additional information on the master ballot

25  process and how the information was obtained consistent with

1  our discussions last week.

2          The next thing I will move to generally, Your

3  Honor, is the voting and tabulation procedures.  That is on

4  page 18 of the redline.  There are a number of changes in

5  here, but I think the headline change which we have discussed

6  with the TCC at pretty great length was contained at the end

7  of this section on page 22.  It is what I will call the

8  extension or waiver protocol.  It's called changes to the

9  solicitation procedures, but, effectively, this is new section

10 6 on page 22.

11         Effectively what this does, Your Honor, is it is

12 meant to be a process which addresses the issues we were

13 discussing last night where you will remember the TCC was

14 asking about, you know, parties abilities to, you know,

15 comment on the voting deadline changing or the debtors making

16 waivers of rules for particular parties after the deadline.

17         What we have agreed to is basically a notice

18 protocol where, you know, the debtors will memorialize the

19 changes in the voting report, file a notice and then parties

20 in interest shall have five days to object.  Then if no party

21 objects then, you know, the ballots will not be impacted or

22 the voting report for that matter.  And if a party objects we

23 will address at the confirmation hearing.

24         So we thought that this was a neat way to both

25 give, you know, the debtors -- require the debtors to put out

1  on notice what they did and explain it, also give the parties

2  a period to comment or object, but then in keeping without

3  timeline and our scheduled hearing it would be settled at the

4  confirmation hearing and not put further stress on the

5  schedule.

6           MS. GRASSGREEN:  Your Honor, this is Debra

7  Grassgreen of Pachulski Stang on behalf of the TCC.

8           I just wanted to comment that Mr. Lucas had to

9  leave for the airport so I'm pinch-hitting here.  But this

10 language was proposed by the TCC and is acceptable to the TCC.

11          THE COURT:  Thank you.

12          MR. O'NEILL:  Your Honor, that is the last item I

13 was going to go through on the procedures before moving onto

14 the master ballot itself.

15          THE COURT:  Give me one second.  I have a question.

16          MR. O'NEILL:  Yes, Your Honor.

17          THE COURT:  In paragraph 20(i) these are ballots

18 that are not being counted in determining the acceptance or

19 rejection of a plan.

20          MR. O'NEILL:  Your Honor, I am told that that's a

21 mistake and shouldn't be in there.

22          THE COURT:  Okay.

23          MR. O'NEILL:  Thank you for doing our work for us,

24 but that is -- I don't know if that is a carry-over from the

25 election and I think that is what it is.  So we will delete

1  that in the final version.

2          THE COURT:  Okay.

3          MR. SCHIAVONI:  Your Honor, if I may.  I'm not

4  certain this came out or not, but for option A and B, the

5  certifications, I think there was a requirement that they

6  maintain a record of how they obtained the affirmance of the

7  vote.  And I thought, Your Honor, there was some discussion

8  back and forth when the solicitation was argued that, in

9  essence, that record, that piece of evidence, whether it was a

10 log or what not would be provided to the balloting agent as an

11 exhibit to the ballot to, you know, basically, prove-up the

12 votes themselves.  It seemed like a simple process.  It had

13 transparency across the board.

14         We made a comment, you know, saying that that

15 should be done.  I don't think that is in here, Mr. O'Neill.

16 If I've missed it, you know, I apologize, but I don't think

17 that comment got adopted.

18         MR. O'NEILL:  No.  I mean what we have done here is

19 the firms have to make it clear, check the box, representation

20 of how they communicated with their client.  We think that is

21 enough in the exhibit under these procedures.  They also have

22 to make the extensive certification in order to submit the

23 master ballot.

24         THE COURT:  Where is the how they communicated with

25 their client?  Is that what you are saying is method of

1   service of solicitation?

2        MR. O'NEILL:  Yes.  Well that is how -- we don't

3   have that in the drop down.  Apologies if there was confusion

4   there.  Its type of authority to vote would be, you know, via

5   phone or -- yeah, option A or option B, but then they keep the

6   record, Your Honor, under option A certification.  It says,

7        "However, if an abuse survivor provides his

8   responses orally or via telephone the firm shall

9   contemporaneously maintain a record of the responses of the

10  firm's abuse survivor clients."

11       MR. SCHIAVONI:  So, Judge, all we were asking for

12  is that be exhibited.  You know, that gives -- that provides

13  the only kind of, you know, substance to this really.  In

14  transparency it's the log of -- and if alternatively they sent

15  back -- y o know, they sent back a letter or something then

16  that and that be given to the agent.  That, you know, provides

17  the transparency rather than just checking the box.

18       THE COURT:  I thought we did talk about that.

19       MR. O'NEILL:  We talked about it, Your Honor, and

20  our recollection was that you sort of said all of this, you

21  know, may be subject to discovery and people can seek to

22  discover, but I didn't think that we were going to -- and Mr.

23  Smola brought up what he would do if it were him was file an

24  affidavit with a list of how he got in touch with his clients.

25  I didn't think that we had or agreed on an explicit, sort of,

1  attachment or exhibit or form of other disclosure on how the

2  firm's communicated with their clients.

3          I mean, again, it's going to say that they did it

4  per Mr. Schiavoni's language pursuant to applicable rules of

5  professional conduct and then we have the extensive

6  certifications on the master ballot which requires them under

7  penalty of perjury to, you know, certify a whole laundry  list

8  of things that they did in connection with submitting the

9  master ballot.

10          If the answer is that they need to submit more

11  paper and put tougher more exhibits -- and I will also note we

12  have the 2019 requirement now.  We're certainly willing to

13  listen to Your Honor.  In the debtors' view there is simply

14  enough protections on a master ballot with all of these

15  additions.

16          THE COURT:  And what does the drop-down for type of

17  authority for vote, what are the options?

18          MR. O'NEILL:  Yeah, that is for option A or option

19  B. I mean I suppose, Your Honor, we could add a further drop-

20  down which I was insinuating wasn't the case where they select

21  call, you know, letter, etc., but --

22          MR. SCHIAVONI:  This is the main protection that

23  follows through the individual voters intent is, in fact,

24  consistent with the ballot.  I don't -- you know, just adding

25  more of those -- the certifications on their own, you know,

1  it's hard to really say how it's a lot different then what

2  happened in Imerys.  Those boxes were all checked.  You know,

3  these have a little more meat on them, but the real substance

4  of it is having, you know, the log or whatever the

5  documentation that the firm would maintain they provided that

6  that gives it teeth.  It gives it --

7          MR. O'NEILL:  Your Honor, they have to have that

8  pursuant to this.  And if there is a reason for discovery and

9  Mr. Schiavoni, you know, shows that he needs to have that we

10 can, you know, -- he will have the ability to get it.

11         MR. SCHIAVONI:  (Indiscernible) do exactly, serve

12 80 subpoenas to determine whether the firm has complied.  It's

13 like I -- that doesn't really make a lot of sense. It's like

14 the process should be transparent.

15         You know, after all, it's really ultimately not

16 that hard for people to individually fill out the ballots.  A

17 huge amount of effort has gone here to, sort of, escape from

18 having the individual confirmation.

19         MR. O'NEILL:  You know, Your Honor, again, we

20 agreed on this language with the TCC. I think that they are,

21 as a fiduciary to the survivors here, Your Honor, have -- Mr.

22 Schiavoni is not taking into account like the survivors might

23 just want to be called by their client and consulted.  This is

24 really about whether we want to add additional paperwork, and

25 records, and other burdens that, you know, they are already

1  representing -- for things they already represented they did.

2          MR. SCHIAVONI:  It would just be a phone log then.

3  It's like there is no extra burden on the survivors.

4          THE COURT:  So the option A is certification or the

5  option B is certification described and defined above.  What

6  does that mean?

7          MR. O'NEILL:  I'm turning back to the language,

8  Your Honor.  Are you in the option A certification on page 8?

9          THE COURT:  No.  I was looking at the exhibit to

10  the ballot.  Okay, page 8.  Oh, okay, so option A is just did

11  the -- option A is did the client instruct me and option B is

12  am I using a power of attorney?

13          MR. O'NEILL:  Yes, Your Honor.

14          MS. GRASSGREEN:  Your Honor, when you have a moment

15  I'm happy to speak on behalf of the TCC on this point.

16          THE COURT:  I think that they -- I think that

17  anyone using a master ballot should know that they need to be

18  keeping a log and I don't know that that is clear here.

19  Whether it's attached to the master ballot or it might be

20  subject of discovery, but I don't think that's clear.  I think

21  that needs to be clear.

22          MR. O'NEILL:  Your Honor, are you asking us to add

23  that it be attached to the exhibit or should it just be clear

24  that it may be used for discovery because it does say --

25          THE COURT:  Let's say it should be clear that they

1  may be subject to discovery.

2         MR. O'NEILL:  Okay.  We can do that, Your Honor.

3         THE COURT:  I'm not tainting all of plaintiffs'

4  counsel with one counsel in Imerys, but I think that

5  plaintiff's counsel should be aware that they may be subject

6  to discovery.  So they should do what they think is

7  appropriate to make certain that if that is a problem they're

8  prepared.

9         MS. GRASSGREEN:  Your Honor, may I be heard on this

10 for a moment on behalf of the TCC?

11        Things are moving very quickly, obviously, and we

12 did work through, but after hearing this discussion and

13 considering it we think it should be attached.  And as it

14 happened in Imerys, as you know, the counsel there was subject

15 to discovery and declined to answer any of the questions in

16 the deposition on the basis of attorney/client privilege.

17        So we're moving very quickly, we need a fully

18 transparent process so that everyone knows exactly what is

19 happening here so that we have integrity.  We would support

20 the proposal by Mr. Schiavoni.

21        THE COURT:  Mr. Rosenthal?

22        MR. ROSENTHAL:  Yes, Your Honor.  I would say that

23 I'm glad Ms. Grassgreen said that because it just seems to me

24 that if we wanted to make this somewhat similar to the master

25 ballot process, you know, in the bond context that evidence of

1   the vote actually received that was accumulated in the master

2   ballot would be something that would be submitted to the

3   balloting agent.  So that would be in the hands of Omni.

4           Then, you know, if there were discovery the initial

5   discovery would be with Omni to see what had been -- what the

6   vote was and how they reflected -- how they had obtained it,

7   whether it was by phone or whether there was a writing on it.

8   Then if there needed to be further discovery, obviously, that

9   would go to the actual firms.

10          THE COURT:  Is that how it's done in the bond

11  context?

12          MR. ROSENTHAL:  I know that those who collect, the

13  indenture trustees who collect the votes need to retain for

14  themselves.  Whether they actually have to turn it over I

15  don't know.  Remember, there are only -- I mean even in the

16  most complicated cases there may be five of those indenture

17  trustees.  I think it may actually go both ways depending on

18  the case whether you actually turn it over to the solicitation

19  agent or not.

20          THE COURT:  Yeah, and I know when your soliciting

21  from equity holders through DTC I'm sure they keep a record.

22  I have no doubt they keep a record.  I don't know what they do

23  with it, but I have no doubt in my mind they keep a record.

24          MR. ROSENTHAL:  I mean I know very many cases where

25  we actually had -- I know some cases where we actually had to

1  provide evidence of that.  And I know DTC has that

2  information.

3          THE COURT:  Well, I am not hearing anyone object to

4  this except the debtor saying they don't think it's necessary,

5  but I'm not hearing anybody saying that it can't be provided

6  and it's a hindrance in any way.  So I guess I'm changing my

7  mind again, it should be attached.

8          MR. O'NEILL:  Very well, Your Honor, we'll make

9  that change.

10          So I was going to move on to the master ballot

11  next, Your Honor, unless --

12          MR. PATTERSON:  I had one comment --

13          THE COURT:  Mr. Patterson.

14          MR. PATTERSON:  -- remaining comment, Your Honor,

15  with regard to the procedures.

16          THE COURT:  Yes.

17          MR. PATTERSON:  Tom Patterson on behalf of the

18  Zalkin and Pfau firm.  I'm on page 17 of the procedures notice

19  and I'm in paragraph 8.

20      (Pause)

21          THE COURT:  I'm sorry, what paragraph?

22          MR. PATTERSON:  Eight.  It's the ECF page 36 of

23  256.

24          THE COURT:  Okay, thank you.

25          MR. PATTERSON:  Paragraph 8 deals with modifying

1  ballots after the voting deadline.  And I thought we had

2  resolved it that the Court would determine those and what the

3  debtor has built in is in effect a two-stage filter that a

4  ballot cannot be withdrawn or modified without the consent of

5  the debtors, and then, if there's a notice, then pursuant to

6  an order of the Court.  And what this suggests is that if the

7  debtor does not itself consent as a preliminary basis that

8  this Court doesn't have the jurisdiction or the power to

9  approve that modification or withdrawal.  I don't think that's

10  what was intended, I think the Court should be making those

11  determinations.

12          MR. O'NEILL:  Your Honor, under paragraph 17 it

13  says that, subject to Bankruptcy Rule 3018(a), "a voter may

14  withdraw a valid ballot."

15          MR. PATTERSON:  Well, I'm talking about after the

16  voting deadline now in paragraph 8.

17          MR. O'NEILL:  I guess I'm confused, Mr. Patterson.

18  Are you -- you're just saying that after the voting deadline a

19  party should be able to seek relief from the Court to withdraw

20  their ballot?

21          MR. PATTERSON:  Yes, or modify it.

22          THE COURT:  Yes, they could.

23          MR. O'NEILL:  Yeah, we don't have a problem with

24  that.

25          THE COURT:  That's what the rule -- there's a rule

1  for this.

2              MR. PATTERSON:  Thank you, Your Honor.

3              MR. O'NEILL:  That wasn't --

4              MR. PATTERSON:  I just wanted that clarification.

5              MR. O'NEILL:  -- it got caught up in the wash of

6  adding language.

7              THE COURT:  Okay.  Anything else on that, on the

8  procedures?

9              MR. O'NEILL:  Okay, Your Honor.  I mean, hearing

10 none, I'll move on to the certifications page on page 18 and

11 19 of the master ballot.  And this is just we sought to

12 incorporate all of the changes that were discussed last week

13 at the hearing on Thursday.  So there's a number of changes.

14 The lead-in to the certifications now includes that the

15 certifications now includes that the certifications are being

16 made under penalty of perjury, and then we've done away with

17 some verbiage by referencing the Option A certification and

18 the Option B certification.  And then a couple of other

19 language tweaks.

20             I think in 4, Mr. Schiavoni had a comment, this

21 language "a form of reasonable belief" meant to track the

22 official bankruptcy Form 410, proof of claim -- I'm sorry,

23 ballot, and so we think that that is sufficient.  And he may

24 argue that he wants different language there, but --

25             THE COURT:  What are you looking at?

1          MR. O'NEILL:  I'm looking at romanette (iv) under

2     the certification, heading 3 on page 19 of the redline of the

3     master ballot.

4          MR. PATTERSON:  Your Honor, could we get a PDF

5     number on that?  I'm having a little trouble with all the

6     pagination starting over and over again.

7          THE COURT:  132 of 280.

8          MR. PATTERSON:  Thank you.

9       (Pause)

10          MR. SCHIAVONI:  Your Honor, I'm not -- maybe I'm

11    just almost worn out, but I forgot exactly what Mr. O'Neill

12    said.  If he's agreed with me, I feel stupid making -- saying

13    anything, but I think what we were suggesting there was that

14    "a form of reasonable belief" be replaced with "basis in

15    fact."

16          MR. O'NEILL:  Right.  And what I said about that,

17    Mr. Schiavoni, was that we're just tracking the language from

18    the official Form 410 ballot.  And, in conjunction with the

19    fact that this now is under penalty of perjury, we think that

20    that is sufficient.

21          MR. SCHIAVONI:  It just -- I mean, conditioning the

22    penalty of perjury just on reasonable belief instead of having

23    some basis in actual fact, you know, it sort of guts the

24    requirement.

25       (Pause)

1    THE COURT:  Okay.  So you're saying this tracks the

2  proof of claim form?  What does this track?

3    MR. O'NEILL:  Form 410, Your Honor.  I thought it

4  was form of ballot.

5    THE COURT:  It's a ballot form?

6    MR. O'NEILL:  Oh, proof of claim.  Sorry, yeah.

7    (Pause)

8    THE COURT:  Well, we may have to argue about what a

9  reasonable belief is.  What language do you want, Mr.

10  Schiavoni?

11    MR. SCHIAVONI:  "Basis in fact."  This was

12  something that there was actually specific testimony on, you

13  know, in Imerys, you know.  And, if you remember, the

14  testimony was about someone suggesting that they just thought

15  mere possibility, you know, something along those lines was

16  enough and hadn't even looked at the database itself.  So, you

17  know, I mean, this requires someone to actually look at it, to

18  look into it.  So "basis in fact" is the suggestion.

19    MR. BRADY:  Your Honor, I'm confused on a point.

20  Is Mr. Schiavoni suggesting that the requirement to do the

21  ballot is heightened or beyond the Form 410 requirement?

22    MR. SCHIAVONI:  When a claimant is -- sorry.

23    THE COURT:  Go ahead.

24    MR. SCHIAVONI:  So when the actual claimant is

25  signing the proof of claim under penalty of perjury, he's

1  doing it on basis of fact.  In here, the claimant isn't

2  signing the ballot, okay?  It's by stepping one level back and

3  having the attorney sign, you lose all the protections that

4  you otherwise would have from the claimants on the master

5  ballot who's signing the proof of claim.

6            MR. BRADY:  I'm sorry, what page of the PDF are you

7  on, the redline?

8            THE COURT:  132.

9            MR. SCHIAVONI:  It's page 19 -- oh, 132.

10           MR. BRADY:  I think this ignores that the attorney

11  can sign the claim form, doesn't it?

12           THE COURT:  Well, I think there's an issue as to

13  what it means when an attorney signs it upon reasonable

14  belief.  It can't just be "I believe."  There clearly has to

15  be some discussion with the client before you would file a

16  proof of claim form, before you would sign it, right?  It

17  can't just be some abstract "I believe."  So --

18           MR. O'NEILL:  We do have the additional language,

19  Your Honor, that they have conducted the diligence necessary

20  to form that reasonable belief.  I think in --

21           THE COURT:  I think that does make a difference and

22  I'm going to -- I don't think there should be a footnote on

23  what the diligence is, though.  Okay?  So I think it should

24  just say, "I've conducted the diligence necessary to form a

25  reasonable belief."  And if we get into it, we get into it;

1  hopefully, we won't.

2          MR. O'NEILL:  Thank you, Your Honor, very good.

3  That's the last item I had on the ballots.  I'm not sure if

4  Mr. Schiavoni or others have any additional comments or

5  suggestions.

6          MR. SCHIAVONI:  Your Honor, when you look at that

7  footnote, I hadn't even seen it.  You know, what the footnote

8  equates reasonable diligence with is knowing that the proof of

9  claim was timely filed and given the evidence before the Court

10 that --

11         THE COURT:  Which is why I'm taking it out.

12         MR. SCHIAVONI:  Yeah.

13         THE COURT:  It's not -- I'm taking it out.  I think

14 lawyers do have an obligation to inform themselves, they

15 should follow their professional responsibilities.  I don't

16 think I should have to dictate what those are, nor do I know

17 that I could in every instance, but I'm not, therefore, going

18 to state what it is.

19         MR. O'NEILL:  Your Honor, with that, that's what we

20 had in terms of the major changes, material changes.  Like Mr.

21 Linder said, we plan to incorporate everything that we just

22 went over during this hearing, during the course of the day,

23 and get these documents on file tonight with the disclosure

24 statement for printing, since we'll be doing quite a bit of

25 printing in connection with the solicitation.

1          THE COURT:  Okay.  Ms. Grassgreen, I see you have

2   your hand up.

3          MS. GRASSGREEN:  Thank you, Your Honor, two points.

4   One, we discussed yesterday the 3500 election and that we did

5   get the documents last night and some further this morning

6   reflecting that in both the plan and the TDP.  We do have one

7   proposed change to the TDP.  It's a section of the TDP with

8   respect to amendments, to just make it clear that the TDP

9   cannot be amended to allow that later election without your

10  approval since you've ordered that the election be made on the

11  ballot.  So we will send that language over, so that is one

12  comment.

13          And then I apologize, because it was Mr. Lucas who

14  was handling this and he had to go to the airport, but I think

15  Mr. Stang had one more comment on the document we were just

16  talking about that also relates to the 3500 election and I was

17  just trying to get to that page, but perhaps Mr. Stang can

18  just provide that.

19          MR. STANG:  Yes, Your Honor, on Exhibit -- I'm

20  sorry, Document 6420-1, page 31 of 264.  The paragraph starts,

21  "Expedited distribution election."  That's -- I'm just wait

22  for a moment when you tell me you're there.

23          THE COURT:  I'm there --

24          MR. STANG:  Okay.

25          THE COURT:  -- but let's give others a moment.

1        MR. STANG:  Our -- I'll tell you what our concern
2   is -- our concern is that people who are making this election
3   need to make it on the ballot and should not believe that they
4   can do it after the balloting is completed.
5        And so if you go down to the third line of that
6   paragraph, it says, "The bankruptcy court" --
7        MS. GRASSGREEN:  I apologize, Mr. Stang, can you
8   repeat what page number you're on of --
9        MR. STANG:  Sure.
10        MR. GRASSGREEN:  -- Docket 6420-1?
11        MR. STANG:  Sure.  I'm on Docket 6420-1 and at the
12   top of the document it says page X of 264, this is page 31 of
13   264.
14        MS. GRASSGREEN:  Thank you.
15        MR. STANG:  Okay.  So, Your Honor, the focus is on
16   the word "may elect."  This suggests that the election to take
17   the $3500 can be done otherwise.  We would ask that the word
18   "may" be replaced as "shall."
19        THE COURT:  Which line down?
20        MR. STANG:  The third line down, Your Honor.  And
21   if we eliminated all the verbiage it would say, "Each holder
22   of a properly completed, non-duplicative proof of claim shall
23   elect on his or her ballot to receive an expedited
24   distribution," not "may elect."  Obviously, they're not
25   required to take the $3500, but --

1          THE COURT:  That's what it sounds like.

2          MR. STANG:  Right.

3          THE COURT:  That's what it makes it sound like.

4          MR. STANG:  Well --

5          THE COURT:  So that doesn't work.

6          MS. GRASSGREEN:  I think we can go with "may only

7    elect," may only elect.  Does that work?

8          MR. STANG:  Or "may elect only on his or her

9    ballot."

10          MS. GRASSGREEN:  Yeah, that's the concept.

11          MR. STANG:  That's the same -- that perhaps sounds

12    better.

13          THE COURT:  Okay, I don't know if that change is

14    necessary, but if there's some agreed-upon language, you can

15    put it in.

16          MR. STANG:  I guess I'm asking the debtor if

17    they'll -- well, I don't know if you want to do it now, Judge.

18    We're all here, but whatever you'd like.

19          MR. O'NEILL:  We're happy to work on any language

20    to further clarify, Your Honor.  We think it's perfectly clear

21    as is, but we'll talk to the TCC about it.

22          MR. STANG:  Your Honor, counsel can --

23          THE COURT:  What I think -- what I think would be

24    helpful is on the ballot itself, particularly the ballot for

25    Class A direct abuse claims -- and I don't know if it flows

1  over into any other ballot or not, but I think it would be

2  helpful to identify this ballot is being used for multiple

3  things.  So it's a ballot to accept or reject the plan, it's

4  an election -- it's, you know, you can -- well, it's releases,

5  right?  Opt in, opt out, opt out of the releases, and it's a -

6  - if you want to elect the $3500 expedited distribution.

7          So I think right on the front, maybe even before

8  your box, that you say 1, 2, 3, here's the three things you've

9  got to do on this ballot, so people know that there's three

10  things you can do on this ballot -- I think there's only

11  three.  If there's a fourth, put the fourth, but I think it

12  should be real boom, boom, boom, here's what this piece of

13  paper does, it's more than a ballot.

14          MR. O'NEILL:  We can certainly do that, Your Honor.

15  And, just for clarity's sake, would you like that on the

16  master ballot as well or given that the firms are more likely

17  to --

18          THE COURT:  You can put it on the master ballot, it

19  won't hurt.  I don't know if it needs to go on any other

20  ballot, but this is something that I commonly do with my

21  ballots is I make sure people know, it's usually an opt-out

22  release or whatever, given a release that here, here's

23  something, so that they don't forget to read the ten pages and

24  do what it says at the end.

25          MR. O'NEILL:  Understood.  Thank you, Your Honor.

1          THE COURT:  Okay.

2      (Pause)

3          THE COURT:  Let me see if I had any other comment

4  from before.

5      (Pause)

6          THE COURT:  Okay.  Does anyone else have any

7  comments on the ballots?

8      (No verbal response)

9          THE COURT:  Okay.  What's next?

10         MR. O'NEILL:  I believe that's all, Your Honor.  As

11  I represented earlier, you know, we'll endeavor to get all

12  these documents on the docket tonight in final form for

13  solicitation.

14         THE COURT:  Okay.  Well, thank you, then.  I

15  appreciate all the juggling people have done to be able to get

16  on the Zoomcast for these hearings.  I appreciate your work on

17  this and again recognize that, not unlike many cases, these

18  documents turn quickly and at the last minute, but I do think

19  I have very sophisticated counsel on this Zoomcast who are

20  used to dealing with these situations and can assimilate an

21  incredible amount of information in a small period of time.

22         Mr. Higgins, I see your hand is up.

23         MR. HIGGINS:  Yes.  Good afternoon, Your Honor,

24  Sean Higgins from Anderson Thornton, state court counsel.  My

25  partner, Anne Andrews, is a member of a Coalition.

1          I have a question, slash, concern.  Did I hear that
2  an election can only be made for the easy payment -- or
3  advance payment, rather, on the ballot?  Because, if that's
4  what I heard, my concern is about people who abstain from
5  voting, for example, and whether that's really rewriting the
6  TDP, because the TDP does not require a vote one way or
7  another on the plan in order to collect the easy payment.  So
8  what you're doing is forcing people to vote in a way that
9  directly contradicts their rights under the TDP.
10          So it's one thing, if they do vote, they make the
11  election, but if they don't vote -- all kinds of reasons
12  people don't vote, can't be located, people move -- there are
13  all kinds of legitimate reasons people won't vote or can't
14  vote and they shouldn't be prejudiced by their failure to
15  vote.
16          MR. STANG:  Your Honor, as far as Mr. Higgins'
17  concern is, you're not required to vote to make the election.
18  You don't have to vote yes or no, you could just make the
19  election and that election would count if the plan is
20  confirmed.
21          MR. HIGGINS:  But the TDP requires that election to
22  be made in a claim form as part of a claims process.  It is an
23  entirely separate process from the voting.  As I said, people
24  may not appear, may not know they need to appear to make an
25  election in the next 60 days.

1          THE COURT:  That's why we're going to change the

2   caption of the ballot to make certain that people know up

3   front this is your chance to do it.  And I agree that they

4   don't have to vote yes or no, I guess they can just return the

5   ballot.  It's being used in multiple ways.

6          If that's inconsistent with the TDPs -- which no

7   one has mentioned before, so thank you for raising that, Mr.

8   Higgins -- then that needs to be corrected.

9          Mr. Brady?

10          MR. BRADY:  Yes, Your Honor.  Just to clarify for

11   the FCR, we had negotiated that future claimants when they

12   came to the trust could make a trust submission to elect the

13   expedited distribution.  So, obviously, they don't vote, but I

14   just wanted to confirm that that would remain the same for

15   future claimants.

16          MR. STANG:  Your Honor, it would not -- the TCC's

17   position is that, when a future claimant comes forward, they

18   should be able to make the $3500 election at that time.

19          THE COURT:  That makes sense because they are not a

20   current claimant and they do not have the possibility of

21   making that election.

22          MR. STANG:  Right.

23          THE COURT:  So that makes sense.

24          MR. HIGGINS:  What if -- Your Honor, what if a

25   voter doesn't feel comfortable making an election until they

1  know what the final version of the plan is?  Because,

2  obviously, one of the biggest and hardest things for a lawyer

3  to give informed consent to his client on whether to take the

4  3500 is what the final deal is.  So the numbers in the TDP are

5  nice, but are they real, as we sit here today, and how real

6  are they?  So how could we give informed consent -- and this

7  is particularly true for the lower classifications of the

8  grid, if you will, the ones that will come closer to the 3500,

9  how can we tell the client whether they are likely to fair

10  better than that under the TDP when we're in the middle of

11  mediations and there's all these outstanding issues?

12              I don't think this is the appropriate time to

13  require the election and every other mass tort that I've seen

14  this, it's all part of the claims process, because it's only

15  after confirmation that an attorney can really get the

16  informed consent on that $3500 election and that's after

17  confirmation.  So I worry that we're asking people to make

18  decisions in the dark on the 3500 and it's sort of a fiction.

19              MR. STANG:  Well, Your Honor, this is --

20              MS. LAURIA:  Your Honor, if I may?  I know Mr.

21  Stang has been heard a few times on this.

22              MR. STANG:  Well --

23              MS. LAURIA:  This is exactly the concern that I

24  raised yesterday that at the time of the -- that counsel is

25  providing advice to their clients, they would not have full

1  and complete information to make the election.  I guess I

2  would again go back to the hybrid approach that I mentioned

3  yesterday, whether that's a preliminary election followed by a

4  final election or, you know, your first shot at what direction

5  you're going depending on where the plan is at then.

6         MR. STANG:  Your Honor, we are revisiting what I

7  thought was decided yesterday and you know what our concerns

8  are and why we feel the need and you expressed the need to

9  know who is voting the -- who -- of the people, how many were

10  taking the $3500 election.  I suggested to do exactly what Mr.

11  Higgins is raising now, which he didn't raise -- which he

12  didn't raise yesterday, is an opt-out.  You say you want the

13  3500 and at some time, if the landscape changes, you can opt

14  out of that, but going into the vote when we know what the

15  settlements are, we should know to what extent people electing

16  the $3500 are voting for a plan that, in effect, they don't

17  have the same level of skin in, if you will.

18         This is really important and we can't not know

19  this.

20         MS. LAURIA:  Your Honor, I would only respond,

21  again, it surprises me that we have a difference of opinion

22  with the TCC.  I don't know why they would not want survivors

23  to have an additional opportunity to get a recovery in this

24  case and not be bound by a ballot that incidentally, as we saw

25  in the disclosure statement, is going to be due December 14th,

1  rather than -- you know, I understand that that can provide us

2  some visibility, but they should also have the opportunity to

3  revisit this election in connection with the TDP.  It should

4  not be a use-it-or-lose-it balloting situation.

5          MR. STANG:  Well, perhaps Ms. Lauria doesn't

6  understand what I mean by opt out, we're not in conflict.  If

7  the circumstances change and the settlement amount -- the

8  global settlement reaches $15 billion, yeah, people are going

9  to have a different thought about the 3500, but when they

10  vote, they will know what the settlement amount is and their

11  counsel can advise them as to the pluses or minuses of making

12  the election.  I didn't say people were locked in forever, I

13  didn't say that.  I said -- I got very short shrift yesterday

14  when I suggested this.  So I was trying to give people

15  flexibility --

16          MR. HIGGINS:  But you're --

17          MR. STANG:  -- (indiscernible) --

18          MS. LAURIA:  Well, you're locking them into the

19  initial election --

20          MR. STANG:  No --

21          MS. LAURIA:  -- without full information.

22          MR. HIGGINS:  You're saying --

23          MR. STANG:  -- no --

24          MR. HIGGINS:  -- (indiscernible) --

25          MR. STANG:  -- that's not what's happening at all.

1  They're not locked in.

2           THE COURT:  Okay, hold on.  I think I said

3  yesterday that, if you all could work this out, maybe it would

4  work, but we did have this discussion yesterday.

5           So let me ask this question:  is there anyone who

6  objects to an opt-out?

7           MR. HIGGINS:  Your Honor, if I may?  I think the

8  problem for me with this approach, the opt-out itself isn't a

9  problem, it's the reverse.  It's telling survivors who don't

10  vote that they can't opt-in and that's --

11           THE COURT:  No, they can opt in.  They don't have

12  to vote to accept or reject, they can just send in their

13  ballot with the opt-in on the $3500.  If they don't want to

14  accept or reject the plan, they can -- just like you can -- I

15  don't know what this one says -- opt out of a release even if

16  you don't vote.

17           MR. HIGGINS:  But it's also a timing issue.  The

18  voting period is a very discrete 60-day period and the claims

19  process, which is when this is done in every other mass tort

20  I've seen -- I've never seen that election be forced upon

21  people in the voting ballot, whether they vote or not -- is

22  there are all kinds of legitimate reasons people will not

23  appear to get -- you know, to make an election on the ballot.

24  When you set a deadline for a claims process, that is the part

25  of the process that the claimants are working with their

1  lawyers and they know the elections are going to need to be

2  made.  I just don't see why --

3           THE COURT:  This is different.

4           MR. HIGGINS:  What's that?

5           THE COURT:  This is different.

6           MR. HIGGINS:  How is it different?

7           THE COURT:  Because the plan is different --

8           MR. HIGGINS:  I think --

9           THE COURT:  -- because we're making it different.

10          MR. HIGGINS:  I think certain interests are making

11 it different because they really want to disenfranchise people

12 and survivors and what happened to them if they make the

13 election when making the election has nothing to do with the

14 extent of their abuse.  I just don't think now is an

15 appropriate time to make the election.

16          THE COURT:  I understand that, but there are many

17 concerns that have been raised here and we've already been

18 through this.  If people want an opt-out, I don't know -- I

19 haven't heard a lot of discussion about that.  I think I said

20 go talk about that.  So --

21          MR. PATTERSON:  We have no objection to the opt-

22 out, Your Honor.  And I would just add that this issue of

23 whether or not to make the election because there may be

24 additional settlements and so forth, well, that's the very

25 same issue that applies to voting on the plan.  I mean, you

1   know, people may want to wait and see what happens, vote late,

2   they may change their vote depending on what happens.  There

3   could be a number of circumstances, but the $3500 election is

4   really no different in that regard from voting on the plan.  I

5   think --

6                THE COURT:  I think it's --

7                MR. PATTERSON:  -- the Court had it right --

8                THE COURT:  -- I think it's no different than many

9   cases where in fact settlements happen after confirmation and

10  you don't know, and you vote on the plan and you decide what

11  you do.

12               MR. PATTERSON:  Yep.

13               THE COURT:  Mr. Goodman?

14               MR. GOODMAN:  Yes, Your Honor, Eric Goodman on

15  behalf of Brown Rudnick.  I do -- Eric Goodman, Brown Rudnick,

16  on behalf of the Coalition.  Sorry, it's been a very long,

17  long several days and Your Honor's observations are correct,

18  we have all been working nights and weekends on this case to

19  get to where we are today.

20               I just wanted to offer this observation and I take

21  the Court's prior ruling as it is, but I do think that putting

22  this on the ballot in a way where a survivor has to make this

23  election when they vote is going to result in most survivors

24  not taking the 3500.  And I think the fear is that, if they

25  do, that their votes won't be counted or, if they are counted,

1  they won't be given the same weight.  And I think survivors

2  wants to be heard, they want their voices to be heard, and any

3  thought that that in fact would not occur as a result of

4  taking the 3500, I think, will result in people just simply

5  not taking that option.

6         I will note that the trust distribution procedures

7  I don't think need to be changed.  Article 6(b) explicitly

8  states that abuse claimants who have properly elected to

9  receive the expedited distribution in accordance with the plan

10 and confirmation order, you know, would be entitled to receive

11 that payment.  So the trust distribution procedures already

12 defer to the plan on this issue.  So, if the plan or these

13 procedures are changed, I think that would flow through.

14        But, given that, the concern that I raise now and I

15 continue to have is that, by taking this away, it does limit

16 the flexibility that the trustee will have.  Thirty five

17 hundred dollars is likely more -- I'm sorry, 3500 is

18 significantly less than I think the cost of reviewing a claim

19 would end up being and by taking this path away for a lot of

20 folks who decide, you know, at the voting stage that they want

21 their vote to count and they don't want anyone to come in and

22 suggest that their vote doesn't count the same as other

23 survivors, it may mean that just we end up in a world where

24 very, very few people have taken this option.  And because it

25 had to be done at the voting stage, it means that the

1  trustee's hands are tied and he can't make this option

2  available for claimants.

3          So I don't think that that's a good outcome, but I

4  accept that that's where we are.  I wanted to note that I

5  thought the TDP is already intact on this issue.

6          Thank you, Your Honor.

7          MR. STANG:  Your Honor, do you need any further

8  argument on this?

9          THE COURT:  I don't think so.  Let me suggest this.

10 I don't know where people come up with the idea that someone

11 who takes a $3500 election's vote will not be counted.  That

12 is a misimpression.  And if people want to go out and sell it

13 that way, that's on them, but that is not what is happening

14 here.

15          But I also think, given the relief that has been

16 requested by the debtors that's supported by certain

17 constituencies and not supported by others, that it's

18 important to know, it's important to know in connection, as

19 I've said, at least with the channeling injunction and the

20 releases, it's important to know how many people want the

21 $3500 election.  That does not mean their votes do not count.

22          MR. GOODMAN:  Your Honor --

23          THE COURT:  So --

24          MR. GOODMAN:  I'm sorry.

25          THE COURT:  -- but if people are going to go out

1  and sell it that way, I can't do anything about that.  I think

2  it would be a misimpression that people would be conveying and

3  that would be a shame; that would just be a shame.

4          MR. GOODMAN:  Your Honor, if I may just briefly

5  respond further?  The fear -- and if the TCC wants to correct

6  me on this issue, I would appreciate them doing so, but my

7  understanding is that the intent of certain parties that

8  oppose the confirmation of this plan is to ask the Court to

9  move everyone who elects the 3500 into a separate class, in a

10  sense that -- and, therefore, excluding them when it comes

11  time to do the overall vote as to whether or not the holders

12  of direct abuse claims have voted to accept or reject the plan

13  under 1126.

14          And I think the intent, again, for folks who want

15  to defeat the plan is that, if they can pull out the $3500

16  expedited distribution voters, that the voters left will not

17  meet the threshold.  I obviously don't know if that in fact

18  will occur -- the voting hasn't happened yet, so that may not

19  make a difference -- but I think that that is one of the

20  attacks that people who are opposed to this plan are intent on

21  launching, and I think that's where the concern comes from.

22          THE COURT:  You can have all the concerns you want.

23  Okay?  But people who are advising their clients should advise

24  them on the strength of their claims and the plan, and their

25  recoveries as they see them to date.  And it is not unusual to

1  not know what your recoveries are going to be when you vote on

2  a plan or to have a range that's significantly large enough

3  that you don't know what your recoveries are going to be.

4          So this is not an unusual situation and, if parties

5  start putting information out there, it will snowball and

6  people will vote on misinformation then.  I can't control

7  that.  If people want an opt-in, I haven't heard anyone

8  suggest that's not possible, then that would be the plan.

9  Okay?

10         So -- but we also don't want to get to a situation

11 where we're at confirmation and we need certain information

12 and we don't have it because then the plan may not be

13 confirmed.

14         So I'm not revisiting the election on the ballot.

15 If the parties want to add an opt-in -- and I think there's

16 unanimous -- I'm not hearing anybody object to that -- they're

17 saying it in different ways, but I'm not hearing anybody

18 object to that -- then --

19         MS. GRASSGREEN:  Excuse me, opt out, Your Honor;

20 opt out.

21         MR. PATTERSON:  Opt out, Your Honor, opt out.

22         THE COURT:  Well, I'm sorry, an opt out.  I'm not

23 hearing anyone object to that.

24         MR. PATTERSON:  No objection.

25         THE COURT:  If that's the plan that people want to

1 put in front of me, that's fine.

2      MS. GRASSGREEN:  Your Honor, we'll go ahead and

3 send the language over.  With respect to Mr. Goodman's

4 comment, we do think that the amendment section of the TDP

5 needs to make it clear that this can't be changed without your

6 consent because, as written, it would allow it to be changed.

7 So we'll point that out and hopefully we can work out that

8 language.

9      MS. LAURIA:  Your Honor, I would just ask Ms.

10 Grassgreen to make sure they get that over to us ASAP, so we

11 can get the documents on file --

12      MS. GRASSGREEN:  It's already been sent --

13      MS. LAURIA:  Great.  Thank you.

14      MS. GRASSGREEN:  -- it's already been sent.

15      THE COURT:  Thank you.

16      MS. GRASSGREEN:  We got the TDP redline five

17 minutes after 9:00 my time, 12:05 this morning, so this was

18 being done during the hearing as quickly as we could.

19      THE COURT:  Okay.  Anything else?

20    (No verbal response)

21      THE COURT:  I had two thoughts, which I didn't jot

22 -- well, I jotted down, but I don't have them in front of me,

23 from yesterday.

24      One is that I'm confirming a plan or not, beginning

25 -- with the hearing beginning at the end of January, it's the

1  plan that's being put in front of me.  I will be using the

2  confirmation standards.  That is -- which doesn't mean, quite

3  frankly, it's the best plan, it doesn't mean it's the only

4  plan that could be put in front of me, it means it's either a

5  confirmable plan or it's not a confirmable plan.

6          So keep that in mind, we're looking at the

7  standard, and keep that in mind in all kinds of contexts.

8          And the second thing -- and I did give some thought

9  to this -- the Coalition fees, I will decide that on a motion,

10  on an appropriate motion unrelated to the plan.  Okay?  Not in

11  connection with the plan.  I'm not going to glom on something

12  additional to the plan that doesn't need to be decided in that

13  context.  It may -- a plan may also be an appropriate vehicle

14  for a debtor to request certain relief, like 363 is an

15  appropriate vehicle.  But I'm going to be judging that issue

16  on all appropriate factors at the appropriate time and we're

17  not going to glom that onto confirmation.

18          MR. SCHIAVONI:  Your Honor, is that a suggestion it

19  shouldn't be in the plan itself or --

20          THE COURT:  I'm not going to approve it as part of

21  the plan.  If it's a condition precedent, somebody better

22  waive it.  And I did notice, by the way, because I looked,

23  that all of the conditions precedent, including the five we

24  spoke about yesterday, are waivable under certain

25  circumstances with certain consents, again, making this plan

1  not patent unconfirmable.

2          MR. GOODMAN:  Your Honor --

3          THE COURT:  Mr. Goodman.

4          MR. GOODMAN:  -- yeah, on the -- yes, good, I'm not

5  on mute -- Eric Goodman, again.  Your Honor, if the Court

6  wants us to proceed by motion, obviously, we'll proceed by

7  motion.  I would just like to note that I don't want us to be

8  prejudiced in any way on account of that.  1129(a)(4), which

9  was the subject of considerable discussion and rulings by

10  Judge Drain in Purdue, we believe sets forth the applicable

11  standard.  I understand the Court's ruling, but I don't think

12  that we should be precluded from arguing 1129(a)(4) by virtue

13  of the fact that we're moving forward pursuant to a separately

14  filed motion.

15          So we could include language in the plan that says

16  that we will file a motion, but I do think that the, you know,

17  standard is somewhat different, as Judge Dorsey recognized in

18  Mallinckrodt and Judge Drain recognized in Purdue --

19          THE COURT:  They said 363 was a vehicle for the

20  debtors to bring it on.

21          MR. GOODMAN:  Correct, Your Honor, but if the -- if

22  that provision can't remain in the plan, I think that it will

23  give objectors, you know, a leg up because, in a sense, you

24  might be eliminating our ability to argue that we fall under

25  the plain language of 1129(a)(4).

1          So, again, we're happy to file a motion, Your

2   Honor, but I don't want the procedure that the Court has just

3   suggested to be something that is limiting or prejudicing us

4   on that respect because I don't think that's fair.

5          And I would also note, Your Honor --

6          THE COURT:  I don't know that I agree that the

7   reasonable standard is what I'm going to be adjudicating it

8   by.  I'm not hemming myself into that standard.

9          MR. GOODMAN:  Your Honor, I respect that, but at

10  the same time I respectfully think that that's what 1129(a)(4)

11  says.  So, in terms of putting a record together on these

12  issues, at this point in time I don't think it's appropriate,

13  you know, to preclude us from arguing under 1129(a)(4).  If

14  the Court is intending to impose the standard that would apply

15  on a motion for substantial contribution in the context where,

16  you know, a debtor had not sought this -- and in fact I would

17  note, under the plan, the language currently reads as the

18  reorganized debtor that is seeking to make that payment -- you

19  know, again, I think that that is the correct standard and we

20  would like the opportunity to brief that to the Court.

21         You can brief it, but I think there are a lot of

22  issues in this case that are not the same as issues you would

23  see in other cases.

24         MR. SCHIAVONI:  We've seen this struck in other

25  cases, Your Honor, Judge.  I mean, Thorp was an example where

1  individual committee members tried to bring claims under this

2  and say that they had reasonable fees, and it was bounced from

3  the plan at the bankruptcy court level.  I mean, this is just

4  --

5            THE COURT:  I'll --

6            MR. SCHIAVONI:  -- I mean, this --

7            THE COURT:  -- I'll decide this issue separately

8  from the plan.  Mr. Goodman, you can make whatever argument

9  you want to make at that point in time and I will decide it.

10 But I also think that it is best if lawyers who are looking to

11 have their counsel paid have that issue divorced from the plan

12 and a vote on the plan and the recommendation of their lawyer.

13            Okay.  Anything else?

14       (No verbal response)

15            THE COURT:  Then thank you.  We're adjourned.  Use

16 the next two days very wisely.

17            COUNSEL:  Thank you, Your Honor.

18            THE COURT:  Thank you.

19       (Proceedings concluded at 3:27 p.m.)

20

21

22

23                      CERTIFICATE

24

25

1      We certify that the foregoing is a correct transcript

2  from the electronic sound recording of the proceedings in the

3  above-entitled matter.

4
   /s/Mary Zajaczkowski            September 30, 2021
5  Mary Zajaczkowski, CET**D-531

6
   /s/Coleen Rand                  September 30, 2021
7  Coleen Rand, AAERT Cert. No. 341

8
   /s/ Tracey J. Williams          September 30, 2021
9  Tracey J. Williams, CET-914

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25