*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

## AMENDED DISCLOSURE STATEMENT FOR THE MODIFIED FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

WHITE & CASE LLP
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email:  mandolina@whitecase.com
         mlinder@whitecase.com
         laura.baccash@whitecase.com
         blair.warner@whitecase.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@morrisnichols.com
         aremming@morrisnichols.com
         ptopper@morrisnichols.com

*Attorneys for the Debtors and Debtors in Possession*

Dated: September 30, 2021
       Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## TABLE OF CONTENTS

Page

ARTICLE I. IMPORTANT DATES ...................................................................................1

ARTICLE II. INTRODUCTION.....................................................................................5

A.      Background ...........................................................................................................5
B.      The BSA.................................................................................................................8
C.      Voting and Confirmation ......................................................................................9
D.      Settlements and Resolutions ...............................................................................11
E.      Treatment of Chartered Organizations Under the Plan.......................................17
F.      Timeline ..............................................................................................................21
G.      The Channeling Injunction .................................................................................23
H.      Summary and Description of Classes and Treatment .........................................25
I.      Illustrative Recovery Charts for Direct Abuse Claims under the Trust Distribution
        Procedures...........................................................................................................32
J.      The Settlement Trust...........................................................................................38
K.      Further Information Regarding Non-Abuse Litigation Claims ...........................39
L.      Description of Certain Insurance Provisions of the Plan ....................................40
M.      Modification and Amendments...........................................................................41

ARTICLE III. ORGANIZATION OVERVIEW AND CORPORATE HISTORY ................42

A.      Organization Overview .......................................................................................42
B.      Corporate Structure ............................................................................................49
C.      Revenue Sources and Assets...............................................................................52
D.      Prepetition Capital Structure...............................................................................54
E.      Local Councils and Chartered Organizations .....................................................59
F.      Insurance Coverage for Abuse Claims ...............................................................59

ARTICLE IV. EVENTS LEADING TO THE CHAPTER 11 CASES...................................70

A.      The BSA's Prepetition Global Resolution Efforts and Prepetition Claims Against
        the BSA................................................................................................................71
B.      The Impact of Statutes-of-Limitation Changes on Claims against the BSA and
        Non-Debtor Stakeholders....................................................................................72

ARTICLE V. THE CHAPTER 11 CASES .......................................................................73

A.      Commencement of the Cases and First Day Relief .............................................73
B.      Procedural Motions.............................................................................................74
C.      Critical Vendors and Shared Services..................................................................75
D.      Retention of Chapter 11 Professionals................................................................75
E.      Appointment of Fee Examiner.............................................................................76
F.      Appointment of Statutory Committees, Ad Hoc Committee, and Future
        Claimants' Representative ...................................................................................76
G.      Filing of Schedules of Assets and Liabilities and Statements of Financial Affairs.....79
H.      Exclusivity ..........................................................................................................79
I.      Removal ..............................................................................................................80

J.      Preliminary Injunction ........................................................................80
K.      Mediation .............................................................................................82
L.      Evaluation of Estate Assets.................................................................84
M.      Bar Dates and Body of Claims.............................................................85
N.      Description of Abuse Claims and the Valuation of Abuse Claims.............90
O.      Future Claimants' Representative's Future Abuse Claims Forecast .........95
P.      Assumption and Rejection of Unexpired Leases and Executory Contracts ...............95
Q.      Stay Relief Matters .............................................................................96
R.      Other Litigation...................................................................................97
S.      Material Settlements and Resolutions.................................................104
T.      TCC / FCR Joint Standing Motion ...................................................122
U.      Other Relevant Filings & Hearings....................................................123

ARTICLE VI. OVERVIEW OF THE PLAN ....................................................124

A.      General .................................................................................................124
B.      Distributions.........................................................................................124
C.      Treatment of Unclassified Claims ......................................................124
D.      Classification of Claims and Interests Summary ................................127
E.      Treatment of Claims and Interests ......................................................131
F.      Elimination of Vacant Classes ............................................................139
G.      Cramdown.............................................................................................140
H.      Means for Implementation of the Plan................................................140
I.      Vesting of Assets in the Reorganized BSA .......................................159
J.      Retention of Certain Causes of Action ...............................................159
K.      Compensation and Benefits Programs ................................................159
L.      Restoration Plan and Deferred Compensation Plan............................160
M.      Workers' Compensation Programs .....................................................160
N.      Treatment of Executory Contracts and Unexpired Leases .................160
O.      Provisions Governing Distributions....................................................165
P.      Procedures for Resolving Contingent, Unliquidated, and Disputed Claims..............170
Q.      Discharges, Channeling Injunction, Releases, Exculpations and Injunctions;
        Survival of Indemnification and Exculpation Obligations .........................173
R.      Reservation of Rights...........................................................................186
S.      Disallowed Claims ..............................................................................186
T.      No Successor Liability ........................................................................186
U.      Indemnities...........................................................................................186
V.      The Official Committees and the Future Claimants' Representative ........187
W.      Retention of Jurisdiction .....................................................................188
X.      Miscellaneous Provisions....................................................................192

ARTICLE VII. THE SETTLEMENT TRUST AND TRUST DISTRIBUTION
        PROCEDURES...........................................................................197

A.      The Settlement Trust............................................................................197
B.      Trust Distribution Procedures .............................................................211

ARTICLE VIII. SOLICITATION PROCEDURES AND REQUIREMENTS ....238

A.      Voting Summary and Deadline............................................................238

B.      Solicitation Procedures ............................................................................240
C.      Classes Entitled to Vote on the Plan .......................................................245
D.      Certain Factors to Be Considered Prior to Voting ...................................248

ARTICLE IX. CONFIRMATION PROCEDURES .............................................................249

A.      Hearing on Plan Confirmation .................................................................249
B.      Requirements for Confirmation of the Plan .............................................250
C.      Acceptance by an Impaired Class ............................................................250
D.      Best Interests of Creditors / Liquidation Analysis ..................................251
E.      Feasibility.................................................................................................255
F.      Conditions Precedent to Confirmation of the Plan ..................................256
G.      Conditions Precedent to the Effective Date .............................................259
H.      Waiver of Conditions Precedent ..............................................................260
I.      Substantial Consummation of the Plan ....................................................260
J.      *Vacatur* of Confirmation Order; Non-Occurrence of Effective Date ........261

ARTICLE X. RISK FACTORS.........................................................................................261

A.      Risks Relating to the Debtors' Operations, Financial Condition, and Certain
        Bankruptcy Law Considerations...............................................................261
B.      Additional Factors....................................................................................280

ARTICLE XI. CERTAIN UNITED STATES FEDERAL INCOME TAX
        CONSEQUENCES OF THE PLAN..........................................................281

A.      The Settlement Trust.................................................................................282
B.      Holders of Claims .....................................................................................282
C.      Holders that are Non-United States Persons .............................................284

ARTICLE XII. CONCLUSION AND RECOMMENDATION ...........................................284

## **Table of Exhibits**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Local Council Form of Letter of Intent

EXHIBIT C    Expected Local Council Settlement Trust Contributions

EXHIBIT D    Liquidation Analysis

    EXHIBIT D-1    Individual Local Council Balance Sheets

    EXHIBIT D-2    Local Council Property Value Information

EXHIBIT E    Financial Projections Analysis

    EXHIBIT E-1    Retained Property List

EXHIBIT F    Abuse Claims List Composite

EXHIBIT G    Tort Claimants' Committee's Local Council Abuse Claims Valuations

    EXHIBIT G-1    Debtors' Response to Tort Claimants' Committee's Local Council Abuse Claims Valuations

EXHIBIT H    Connections with Proposed Settlement Trustee

## ARTICLE I. IMPORTANT DATES[2] [3]

| Event[4] | Date |
|---|---|
| Voting Record Date | October 1, 2021 |
| Deadline to Mail Solicitation Packages and Related Notices | October 15, 2021 |
| Rule 3018(a) Motion Deadline | November 1, 2021 |
| Deadline to File Plan Supplement | November 30, 2021 |
| Voting Resolution Event Deadline | December 14, 2021 or as otherwise ordered by the Bankruptcy Court |
| Voting Deadline | December 14, 2021 at 4:00 p.m. (Eastern Time) |
| Preliminary Voting Report Deadline | December 21, 2021 |
| Final Voting Report Deadline | January 4, 2022 |
| Plan Objection Deadline | January 7, 2022 at 4:00 p.m. (Eastern Time) |
| Confirmation Brief/Reply Deadline | January 17, 2022 |
| Confirmation Hearing | January 24, 2022 at 10:00 a.m. (Eastern Time)[5] |

---

[2]    Certain of these proposed dates are subject to the Bankruptcy Court's availability.

[3]    The Debtors filed a motion to establish a timeline and protocol for discovery related to confirmation of the Plan.  The dates requested in such motion, as may be amended, shall thereafter be incorporated herein.

[4]    Capitalized terms used in this summary of "Important Dates" and not otherwise defined herein or in the Plan shall have the meaning ascribed to them in the Solicitation Procedures Motion (as defined below).

[5]    The Confirmation Hearing is being proposed to be held on **January 24, 2022 at 10:00 a.m. (Eastern Time)** and shall continue to the extent necessary on such additional dates as the Court may designate.

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING VOTES TO ACCEPT, AND OBTAINING CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.

ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS ATTACHED EXHIBITS, INCLUDING THE PLAN, IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN, AND DOCUMENTS INCLUDED IN THE PLAN SUPPLEMENT, WHICH CONTROL OVER THE DISCLOSURE STATEMENT IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, BY ORDER OF THE BANKRUPTCY COURT OR IN ACCORDANCE WITH APPLICABLE LAW.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY DOCUMENTS APPROVED AS A PART OF THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO SOLICITATION OF VOTES MAY BE MADE UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT AND THE DEBTORS HAVE DISTRIBUTED THIS DISCLOSURE STATEMENT IN ACCORDANCE WITH THE SOLICITATION PROCEDURES.  NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE INFORMATION

CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

THE DEBTORS' MANAGEMENT, WITH THE ASSISTANCE OF THE DEBTORS' FINANCIAL ADVISORS, PREPARED THE FINANCIAL PROJECTIONS APPENDED TO THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY SENIOR LEADERSHIP OF THE DEBTORS AT THE TIME OF PREPARATION, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT OPERATIONAL, ECONOMIC, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE DEBTORS' OR REORGANIZED BSA'S CONTROL.  THE DEBTORS CAUTION THAT THEY CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE DEBTORS' OR REORGANIZED BSA'S ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.  THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE X, "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  THE DEBTORS AND THE REORGANIZED BSA DO NOT UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD- LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.  THE HISTORICAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS

BEEN OBTAINED FROM SUCH REPORTS AND OTHER SOURCES OF INFORMATION AS ARE AVAILABLE TO THE DEBTORS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN FURTHERANCE OF A SETTLEMENT OF SUCH CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, NOR SHALL THIS DISCLOSURE STATEMENT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS OR REORGANIZED BSA. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

## ARTICLE II.  INTRODUCTION

A.    Background

This Disclosure Statement is being furnished by the Debtors in connection with the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (as such may be amended, altered, modified or supplemented from time to time, the "Plan"),[6] dated September 29, 2021, pursuant to section 1125 of the Bankruptcy Code, and in connection with the solicitation of votes to accept or reject the Plan.

The Plan described in this Disclosure Statement is proposed by the Debtors and supported by the Future Claimants' Representative, the Creditors' Committee, the Coalition, and the Ad Hoc Committee[7] (collectively, the "Supporting Parties"). The Plan further incorporates settlements with JPM, Hartford, and TCJC.

Since the outset of these cases, the Debtors have advocated for a global resolution of Scouting-related sexual abuse claims that would comprehensively address liabilities of the Debtors and the many non-debtor Local Councils and Chartered Organizations that administer and carry out Scouting programming nationwide.  Negotiations increased in intensity during 2021 and have occurred in the context of informal negotiations, countless hours of formal telephonic and video mediation sessions, and formal in-person mediation with the support of three Mediators appointed by the Bankruptcy Court.[8]  The Debtors entered into a settlement with the Creditors' Committee and JPM in March 2021.  The Debtors also entered into a settlement with Hartford (the "Initial Hartford Settlement Agreement") in April 2021.[9]  Thereafter, negotiations continued with the other mediation parties.  In those sessions, the Debtors made substantial progress toward a consensual plan of reorganization that would garner the support of the representatives of a majority of holders of Abuse Claims.

On July 1, 2021, the Debtors entered into a restructuring support agreement [D.I. 5466, 5813. 5868] (together with all exhibits, including the term sheet attached thereto and as may be amended or modified from time to time in accordance with the terms thereof, the "Restructuring Support Agreement")[10] with the Future Claimants' Representative, the Tort Claimants' Committee, the Coalition, and the State Court Counsel,[11] as well as the Ad Hoc Committee

---

[6]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

[7]    The Ad Hoc Committee of Local Councils is comprised of eight representative Local Councils (as defined in the Plan, the "Ad Hoc Committee").

[8]    In addition to numerous telephonic and video sessions, formal in-person mediation sessions were held on (i) March 30–April 1, 2021 in Miami; (ii) June 2–3, 2021 in Chicago; (iii) June 29–30, 2021 in Los Angeles; and (iv) May 4–6, May 26–27, June 7–10, August 3–5, August 18–24, September 1, and September 9–10, 2021 in New York City.  See Article V.K herein for a further discussion on mediation throughout these Chapter 11 Cases, the Mediators, and the mediation parties.

[9]    The Initial Hartford Settlement Agreement was announced on April 16, 2021 [D.I. 2624] and incorporated into a prior version of the Plan filed on May 16, 2021 [D.I. 4107].

[10]    Capitalized terms in this Article II.A not otherwise defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement.

[11]    The Coalition was formed in connection with certain law firms ("State Court Counsel") representing holders of Abuse Claims. These firms are: (i) Slater Slater Schulman LLP, (ii) ASK LLP, (iii) Andrews & Thornton, (iv) Levin Papantonio Thomas Mitchell Rafferty & Procter P.A., (v) Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., (vi) Junell & Associates PLLC, (vii) Reich & Binstock LLP, (viii) Marc J. Bern & Partners LLP, (ix) Krause & Kinsman Law Firm, (x) Bailey Cowan Heckaman PLLC, (xi) Babin Law, LLC, (xii) Jason J. Joy & Associates, PLLC, (xiii) Motley Rice LLC, (xiv) Weller Green

(together with the Debtors, the "RSA Supporting Parties"), and concurrently filed a motion to approve the Restructuring Support Agreement (the "RSA Motion"). The Restructuring Support Agreement provided for a plan of reorganization that would deliver global resolution in these Chapter 11 Cases, and the representatives of approximately 70,000 holders of Abuse Claims supported the plan as set forth in the term sheet attached to the Restructuring Support Agreement.

Under the terms of the plan of reorganization contemplated by the Restructuring Support Agreement, the incorporation of any settlement with Hartford was required to be on terms and conditions acceptable to the Debtors and the RSA Supporting Parties. The terms and conditions of the Initial Hartford Settlement Agreement were not acceptable to the RSA Supporting Parties and were required to be removed from the plan of reorganization. To comply with the Restructuring Support Agreement, the Debtors sought a determination from the Bankruptcy Court that they had no obligations under the Initial Hartford Settlement Agreement.

After holding a hearing on the RSA Motion on August 12, 13, and 16, the Bankruptcy Court issued a bench ruling on August 19, 2021. The Bankruptcy Court ruled, among other things, that the Debtors were authorized to enter into the Restructuring Support Agreement but refrained from ruling with respect to whether the Debtors have any obligation to seek approval of the Initial Hartford Settlement Agreement.

Without a clear path for removing the terms and conditions of the Initial Hartford Settlement Agreement from the plan of reorganization, the Debtors and RSA Supporting Parties continued to engage in mediated negotiations regarding the terms of a settlement with Hartford that would be acceptable to representatives of holders of Direct Abuse Claims. On August 27, 2021, during those negotiations, the Restructuring Support Agreement expired in accordance with its terms. The Debtors and the RSA Supporting Parties continued to mediate with various parties in interest, including Insurance Companies and certain Chartered Organizations. After further mediation, negotiations yielded an improved settlement with Hartford, supported by the Debtors, the Future Claimants' Representative, the Coalition and certain State Court Counsel, and a settlement with TCJC.[12]

On September 14, 2021, the Debtors filed the *Sixth Mediators' Report*, which stated that the Debtors, Hartford, the Future Claimants' Representative, the Coalition, and the Ad Hoc Committee had agreed in principle on settlement terms that will result in an additional $1.037 billion of cash contributions to the Settlement Trust, in addition to the contributions of up to approximately $820 million that will be made by the Debtors and the Local Councils [D.I. 6210]. [13] Specifically, such parties have agreed on: (1) as a result of negotiations led on behalf of Abuse

---

Toups & Terrell LLP, (xv) Colter Legal PLLC, (xvi) Christina Pendleton & Associates PLLC, (xvii) Forman Law Offices, P.A., (xviii) Danziger & De Llano LLP, (xix) Swenson & Shelley PLLC, (xx) Cohen Hirsch LP (formerly Brooke F. Cohen Law, Hirsch Law Firm), (xxi) Damon J. Baldone PLC, (xxii) Cutter Law PC, (xxiii) The Robert Pahlke Law Group, (xxiv) Napoli Shkolnik PLLC, (xxv) Porter & Malouf, P.A, (xxvi) The Moody Law Firm, and (xxvii) Linville Johnson & Pahlke Law Group [D.I. 1997].

[12] While the Tort Claimants' Committee supported the plan of reorganization as described in the expired Restructuring Support Agreement, the material terms of which are incorporated into the Plan, the Tort Claimants' Committee does not support the settlements with Hartford and TCJC.

[13] As of the date of the filing of this Disclosure Statement, every Local Council has submitted a non-binding letter of intent reflecting each Local Council's intent to contribute the amounts listed on Exhibit C to this Disclosure Statement. A form of the non-binding letter of intent is attached as Exhibit B hereto.

Survivors by the Coalition, the Future Claimants' Representative, and their respective professionals, the terms of a modified settlement with Hartford, with State Court Counsel supporting and agreeing to be bound by such terms; and (2) a settlement with TCJC.[14]  The modified Hartford settlement, the principal terms of which are set forth in the term sheet attached to the Plan as Exhibit I-1 and which will be the subject of a definitive settlement agreement which will be filed with the Bankruptcy Court and included in the Plan Supplement (the "Hartford Insurance Settlement Agreement"), supersedes and, upon the Effective Date, renders the Initial Hartford Settlement Agreement void.[15]  In exchange for Hartford's $787 million cash contribution to the Settlement Trust,[16] Debtors will sell to Hartford, under the Plan, all liability insurance policies issued by Hartford to the BSA as the first named insured, free and clear of all interests in such policies.  Hartford will be designated as a Settling Insurance Company and a Protected Party under the Plan and, subject to Bankruptcy Court approval, will receive the Hartford Administrative Expense Claim in the amount of $2 million, to be paid in accordance with the terms of the Hartford Insurance Settlement Agreement.  Notably, the Hartford Settlement Contribution is not subject to reduction based on the terms of settlements with other insurers.[17]  Moreover, in exchange for TCJC's (1) $250 million cash contribution to the Settlement Trust, (2) rights under applicable insurance policies owned by the Debtors and the Local Councils, and (3) subordinate and/or waiver, release and expungement of TCJC's claims against the Debtors, TCJC will be designated as a Contributing Chartered Organization and Protected Party under the Plan.  As consideration for such contributions by Hartford and TCJC, both parties will be entitled to the benefits of the Channeling Injunction and third-party releases under the Plan with respect to Abuse Claims, subject to Bankruptcy Court approval.

This Disclosure Statement describes the Plan, which incorporates the material terms set forth in the expired Restructuring Support Agreement and additionally incorporates the new settlements with Hartford and TCJC, as well as the JPM / Creditors' Committee Settlement.  The Plan allows the Debtors to achieve the dual objectives that the Debtors set out to accomplish at the outset of these cases: (a) to timely and equitably compensate survivors of Abuse in Scouting and (b) to ensure that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission.

---

[14]    The Hartford term sheet is attached as Exhibit A and TCJC term sheet is attached as Exhibit B to the *Sixth Mediators' Report* [D.I. 6210].

[15]    Under the Plan, Hartford would be granted an Allowed Administrative Expense Claim in the amount of $2 million relating to the Initial Hartford Settlement Agreement.

[16]    The modified Hartford Insurance Settlement Agreement provides for an increased cash contribution to the Settlement Trust of $137 million as compared to the Initial Hartford Settlement Agreement.

[17]    The Initial Hartford Settlement Agreement included a reduction provision based upon any future contribution amount from Century to the Settlement Trust.

> **THE DEBTORS AND THE SUPPORTING PARTIES (INCLUDING THE CREDITORS' COMMITTEE, THE FUTURE CLAIMANTS' REPRESENTATIVE, THE COALITION, AND THE AD HOC COMMITTEE) SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.  THE DEBTORS AND THE SUPPORTING PARTIES BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL CREDITORS AND IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.**

The Plan provides the framework for global resolution of Abuse Claims against the Debtors, Related Non-Debtor Entities, and Local Councils, as well as any Participating Chartered Organizations and Contributing Chartered Organizations and Settling Insurance Companies that may make  contributions to the Settlement Trust for the benefit of survivors of Abuse (collectively, "Abuse Survivors").  The Plan has been designed to maximize and expedite recoveries to Abuse Survivors.  The Debtors and the Supporting Parties strongly encourage all holders of Claims in the Voting Classes, including Direct Abuse Claims, to vote in favor of the Plan.

By order dated September 30, 2021, the Bankruptcy Court approved this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code and found that it contained "adequate information" sufficient to enable a hypothetical investor of the relevant Class to make an informed judgment about the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan.  **Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the accuracy or completeness of the information contained herein nor an endorsement by the Bankruptcy Court as to the fairness or merits of the Plan.**  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.

A copy of the Plan is attached hereto as **Exhibit A**.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.  **Please note that if any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern in all respects.**

B.       The BSA

The BSA's charitable mission is to prepare young men and women for life by instilling in them the values of the Scout Oath and Law and encouraging them to be trustworthy, kind, friendly and helpful. The BSA also trains young men and women in responsible citizenship, character development, and self-reliance through participation in a wide range of outdoor activities, educational programs, and, at older ages, career-oriented programs in partnership with community organizations.  Indeed, since its inception more than 110 years ago, more than 130 million young men and women have participated in the BSA's youth programs, and at least 35 million adult volunteers have helped carry out the BSA's mission.[18]  Today, the BSA remains one of the largest youth organizations in the United States and one of the largest Scouting organizations in the world, with approximately 762,000 registered youth participants and approximately 320,000 adult volunteers.  The BSA's alumni are legion among our nation's business, political, and cultural

---

[18]     *See* BSA, *About the BSA*, https://www.scouting.org/about/.

leaders. Their legacy is the creation and support of Scouting units in virtually every corner of America and at U.S. military bases worldwide.

The BSA welcomes all young men and women, regardless of gender, race, ethnic background, sexual orientation, disability, or gender identification, who are willing to accept Scouting's values and meet the other requirements of membership. A Scout subscribes to the following oath: "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."[19] Scouts are expected to conduct themselves in accordance with the Scout Law: to be "trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."[20]

The BSA cares deeply about all survivors of child abuse. The BSA understands that no apology can repair the damage caused by abuse or take away the pain that survivors have endured. The BSA is steadfast in its commitment to continually improve all of its policies to prevent abuse.

C.    <u>Voting and Confirmation</u>

**<u>Article VIII</u> of this Disclosure Statement specifies the deadlines, procedures, and instructions for voting to accept or reject the Plan, as well as the applicable standards for tabulating ballots and master ballots, used in voting on the Plan (each, generally referred to herein as a "<u>Ballot</u>"). The following is an overview of certain information related to voting that is contained in <u>Article VIII</u> of this Disclosure Statement and elsewhere in this Disclosure Statement.**

This Disclosure Statement is being transmitted in order to provide adequate information to enable holders of Claims in Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims), which Claims in such Classes are Impaired and entitled to vote on the Plan, to make an informed judgment in exercising their right to vote to accept or reject the Plan.

Each Class of Claims entitled to vote shall have accepted the Plan pursuant to the requirements of section 1126(c) of the Bankruptcy Code if at least two-thirds (2/3) in amount and more than one-half (1/2) in number of those voting in each such Class voted to accept the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled for January 24, 2022, at 10:00 a.m. (Eastern Time) before the Bankruptcy Court. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation

---

[19]    *Id.*

[20]    *Id.*

Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  Any objection or response to Confirmation of the Plan must: (i) be in writing; (ii) state the name and address of the objecting party and the nature and amount of the Claim of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan and include any evidentiary support therefor; and (iv) be filed with the Bankruptcy Court, 824 North Market Street, Third Floor, Wilmington, Delaware 19801 together with proof of service **on or before <u>January 7, 2022 at 4:00 p.m. (Eastern Time)</u>** (the "<u>Plan Objection Deadline</u>"), and served on the Debtors and certain other parties in interest in accordance with the Solicitation Procedures Order (defined below) so that they are received on or before the Plan Objection Deadline.

The Debtors have engaged Omni Agent Solutions (the "<u>Solicitation Agent</u>" or "<u>Notice and Claims Agent</u>") to assist in the voting process.

The Solicitation Agent will provide additional copies of all materials and will process and tabulate the Ballots, as defined in the *Debtors' Motion for Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 2295] (the "<u>Solicitation Procedures Motion</u>"), filed on March 2, 2021, for Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8, and 9, as applicable.  You may obtain these documents from the Solicitation Agent free of charge by: (a) calling the Debtors' toll-free restructuring hotline at (866) 907-2721, (b) visiting the Debtors' restructuring website at https://omniagentsolutions.com/bsa, (c) writing to Boy Scouts of America, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367, or (d) emailing BSAballots@omniagnt.com.  You may also access from these materials for a fee via PACER at http://www.deb.uscourts.gov/.

**As further described in the Solicitation Procedures (which are annexed to the Solicitation Procedures Order as Exhibit 1), to be counted, your Ballot indicating acceptance or rejection of the Plan must be received by the Solicitation Agent no later than 4:00 p.m. (Eastern Time) on December 14, 2021 (the "<u>Voting Deadline</u>")**, unless the Debtors, in their sole discretion, extend the period during which votes will be accepted on the Plan, in which case the term "Voting Deadline" shall mean the last date on, and time by which, such period is extended. Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as an acceptance or rejection and will not count toward the tabulations required pursuant to either section 1129 of the Bankruptcy Code.

Prior to deciding whether and how to vote on the Plan, each holder of a Claim entitled to vote should consider carefully all of the information in this Disclosure Statement, including <u>Article X</u> entitled "Risk Factors."  **Each holder of a Claim entitled to vote on the Plan should review this Disclosure Statement and the Plan and all Exhibits hereto and thereto before submitting**

**a Ballot. This Disclosure Statement contains a summary of certain provisions of the Plan and certain other documents and financial information. The Debtors believe that these summaries are fair and accurate as of the date hereof and provide adequate information with respect to the documents summarized; however, such summaries are qualified to the extent that they do not set forth the entire text of those documents and as otherwise provided herein.**

D.      Settlements and Resolutions

To both maximize distributions to holders of Direct Abuse Claims and continue the BSA's long tradition of Scouting, the Debtors and Supporting Parties seek approval of a plan of reorganization under chapter 11 of the Bankruptcy Code that provides a framework for global resolution, which, if confirmed and consummated, will allow the Debtors, as Reorganized BSA, to emerge from bankruptcy, having fulfilled their dual restructuring goals of (a) providing an equitable, streamlined, and certain process by which Abuse Survivors may obtain compensation for Abuse and (b) ensuring that the Reorganized BSA has the ability to continue its vital charitable mission.

The Plan incorporates certain of the material terms and provisions of the expired Restructuring Support Agreement. Additionally, as described above and in more detail below, the Plan incorporates the JPM / Creditors' Committee Settlement, which, subject to its terms and the effectiveness of the Plan, resolves all issues and objections that could be asserted by the Creditors' Committee with respect to confirmation of the Plan and prospective lien challenges, and all claims or causes of action that might be brought by or on behalf of the Debtors' Estates. As described more fully below and set forth in the Plan, the JPM / Creditors' Committee Settlement provides for substantial benefits to the Debtors' Estates, including distributions to holders of Allowed Convenience Claims, Allowed General Unsecured Claims, and Allowed Non-Abuse Litigation Claims, in addition to extensions of the maturity dates of the Prepetition Debt and Security Documents, including a two year moratorium on principal, which allows the Debtors to increase their contributions to the Settlement Trust. The JPM / Creditors' Committee Settlement also contemplates the Allowance of JPM's Claims by amending and restating the Prepetition Debt and Security Documents in the manner described in the Plan.

The BSA's charitable mission of Scouting is supported by certain Entities that are not Debtors in these Chapter 11 Cases, including Local Councils and Chartered Organizations. As described in this Disclosure Statement, the Local Councils serve geographic areas of varying size across the United States and facilitate the delivery of the Scouting program at the local level. Chartered Organizations are typically local organizations—such as faith-based institutions, clubs, civic associations, educational institutions, businesses, and groups of citizens—that sponsor local Scouting units. Under the Plan, substantial contributions to the Settlement Trust by the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies will be made in exchange for the treatment of the foregoing Entities as Protected Parties under the Channeling Injunction. Additionally, Participating Chartered Organizations will agree to assignment and transfer to the Settlement Trust of their BSA insurance related rights and actions in exchange for treatment as Limited Protected Parties under the Channeling Injunction. The foregoing settlements are intended to provide for the fair and equitable resolution of Abuse Claims.

To continue the mission of Scouting through these non-Debtors, the Plan provides for the settlement of Abuse Claims against the BSA, Local Councils, any Participating Chartered Organizations, Contributing Chartered Organizations, and Settling Insurance Companies, by "channeling" all such Claims to the Settlement Trust (with respect to Participating Charted Organizations, Post-1975 Chartered Organization Abuse Claims), which shall have the exclusive responsibility for processing, liquidating and paying Abuse Claims. To obtain the benefits of the Channeling Injunction, Local Councils, Participating Chartered Organizations, Contributing Chartered Organizations, and Settling Insurance Companies will make substantial financial and/or insurance contributions to the Settlement Trust.

These contributions to the Settlement Trust, along with the BSA's contributions, will be used to fund significant recoveries for holders of compensable Direct Abuse Claims in accordance with the terms of the Trust Distribution Procedures. The Trust Distribution Procedures will establish the methodology for resolution of Abuse Claims, establish the process by which Abuse Claims will be reviewed by the Settlement Trust, and will specify liquidated values for compensable Claims based on the nature of the underlying Abuse.

Within this framework, the Plan also incorporates the terms and provisions of the Hartford Insurance Settlement Agreement and the TCJC Settlement Agreement. As described more fully below, these settlements contemplate, among other things, cash contributions to the Settlement Trust from Hartford and TCJC in exchange for the treatment of the foregoing Entities as Protected Parties under the Plan.

The assets contributed to the Settlement Trust will be administered by the Settlement Trustee and used to resolve Abuse Claims in accordance with the Settlement Trust Documents, including the Settlement Trust Agreement and the Trust Distribution Procedures. The Trust Distribution Procedures will specify the methodology for processing, liquidating, and paying Abuse Claims.

Generally, the features of settlements as incorporated in the Plan are as follows:

- The BSA will contribute to the Settlement Trust, among other things, (a) Net Unrestricted Cash and Investments; (b) the BSA's right, title, and interest in and to (i) the Artwork, (ii) the Oil and Gas Interests, and (iii) the Warehouse and Distribution Center (the value of which is subject to the Leaseback Requirement); (c) the net proceeds of the sale of Scouting University; (d) certain of the Debtors' rights under applicable insurance; (e) the Settlement Trust Causes of Action; (f) the assignment of any and all Perpetrator Indemnification Claims held by the BSA; and (g) the BSA Settlement Trust Note;

- The BSA Settlement Trust Note to be issued on the Effective Date to the Settlement Trust by the Reorganized BSA in the principal amount of $80 million, which will bear interest from the Effective Date at a rate of 5.5% per annum and be payable semi-annually. Principal payments under the BSA Settlement Trust Note shall be payable in annual installments due on February 15 of each year during the term of the BSA Settlement Trust

Note, commencing on February 15 with certain minimum payment requirements.[21]  The BSA Settlement Trust Note may be prepaid at any time without penalty;

- Local Councils are expected to make a substantial contribution to the Settlement Trust to resolve the Abuse Claims that may be asserted against them in exchange for being included as a Protected Party under the Plan and receiving the benefits of the Channeling Injunction, consisting of (a) $500 million, comprised of at least $300 million in Cash with the balance in property, exclusive of insurance rights, (b) the DST Note, a $100 million interest-bearing variable-payment obligation note issued by a Delaware statutory trust on or as soon as practicable after the Effective Date, and (c) the Local Council Insurance Rights.  A list of each Local Council's total expected contribution, including a specific break-down between the (i) cash contribution and (ii) property contribution, is attached hereto as **Exhibit C**.

- Each Local Council's commitment to make its respective contribution to the Settlement Trust is dependent upon, among other things, an acceptable resolution of insurance and indemnity issues with respect to Chartered Organizations. Local Councils have currently memorialized their intent to contribute to the Settlement Trust on non-binding letters of intent, substantially conforming to the form attached hereto as **Exhibit B**.  According to the letters of intent, the commitment of each Local Council to make its share of the $500 million contribution is expressly contingent on a resolution related to Chartered Organizations that is acceptable to such Local Council.  To date, no Local Council has publicly expressed satisfaction or dissatisfaction with the treatment afforded to Chartered Organizations.  The Debtors and the Ad Hoc Committee believe that, notwithstanding the contingencies currently reflected in Local Council letters of intent, Local Councils will ultimately contribute the aggregate amount required under the Plan; references throughout this Disclosure Statement to the aggregate Local Council contribution therefore assume that Local Councils will collectively achieve the Local Council Settlement Contribution amount.

- The assignment and transfer to the Settlement Trust of all of the insurance rights of all of the BSA, Local Councils and Contributing Chartered Organizations under insurance policies of the Debtors, Local Councils and such Contributing Chartered Organizations, thereby providing the potential for substantial insurance recoveries to holders of Direct Abuse Claims;

- TCJC will make a cash contribution of $250 million plus certain insurance rights to the Settlement Trust for payment of Abuse Claims related to TCJC that arose in connection with their sponsorship of one or more Scouting units which shall be channeled to the Settlement Trust; TCJC will be included as a Protected Party under the Plan, and receive

---

[21]   In accordance with the Plan, such annual principal payments shall be equal to the sum of the following calculation: (a) $4.5 million; plus (b) $3.50 multiplied by the aggregate number of Youth Members as of December 31 of the preceding year up to the forecasted number of Youth Members for such year as set forth in the Debtors' five-year business plan; plus (c) $50 multiplied by the aggregate number of High Adventure Base Participants during the preceding calendar year; plus (d) $50 multiplied by the aggregate number of Youth Members in excess of the forecast set forth in the Debtors' five-year business plan; plus (e) $150 multiplied by the aggregate number of High Adventure Base Participants in excess of the forecasted number of High Adventure Base Participants for such year as set forth in the Debtors' five-year business plan.  The forecast for years after 2025 shall be deemed to be the forecast for calendar year 2025.

the benefits of the Channeling Injunction.  TCJC's contribution will go to pay Abuse Claimants with a claim against TCJC, in addition to pro rata share of Settlement Trust expenses, unless there are excess funds which will go to other Abuse Claimants;

- A mechanism by which other Chartered Organizations can become Participating Chartered Organizations (unless they elect not to or are chapter 11 debtors) through the assignment and transfer to the Settlement Trust of all of the post-1975 insurance rights of such Participating Chartered Organization in exchange for inclusion as a Limited Protected Party under the Plan, thereby providing the potential for substantial recoveries to holders of Abuse Claims.  The mechanism also includes a pathway for other Chartered Organizations to make further substantial contributions to the Settlement Trust to resolve Abuse Claims that may be asserted against them related to Abuse that arose in connection with their sponsorship of one or more Scouting units, including those that arose prior to January 1, 1976, in exchange for being included as a Protected Party under the Plan and receiving the benefits of the Channeling Injunction, thereby becoming "Contributing Chartered Organizations" under the Plan.  The Debtors shall continue to work in good faith with other parties involved in these Chapter 11 Cases to increase participation by Chartered Organizations;

- A proposed settlement by and among the BSA, JPM (the BSA's senior Secured lender), and the Creditors' Committee, under which JPM has agreed that, in full and final satisfaction of its Allowed Claims and in exchange for the Creditors' Committee's agreement not to pursue certain alleged estate causes of action, it shall enter into the Restated Debt and Security Documents as of the Effective Date.  The Restated Debt and Security Documents will contain terms that are substantially similar to the Prepetition Debt and Security Documents except that, among certain other modifications, the maturity dates under the Restated Debt and Security Documents shall be the date that is ten (10) years after the Effective Date and principal under the Restated Debt and Security Documents shall be payable in installments beginning on the date that is two (2) years after the Effective Date;

- The proposed JPM / Creditors' Committee Settlement referenced above provides for the BSA's assumption of its prepetition Pension Plan and satisfaction of Allowed Convenience Claims, Allowed General Unsecured Claims, and Allowed Non-Abuse Litigation Claims, which are held by creditors who are core to the Debtors' charitable mission or whose Allowed Claims were incurred in furtherance of the Debtors' charitable mission;

- The JPM / Creditors' Committee Settlement also contemplates a term loan from the National Boy Scouts of America Foundation (as defined in the Plan, the "Foundation"), in the principal amount of $42.8 million, which will be used by Reorganized BSA for working capital and general corporate purposes.  This Foundation Loan will permit the Debtors to contribute a substantial amount of consideration in Cash to the Settlement Trust on the Effective Date;

- Hartford is expected to make a contribution of $787 million to the Settlement Trust for the payment of Abuse Claims in exchange for the sale of the Hartford Policies to Hartford free and clear of the interests of all third parties, including any additional insureds under the

Hartford Policies, which interests will be channeled to the Settlement Trust; Hartford will be included as a Settling Insurance Company and Protected Party under the Plan, and receive the benefits of the Channeling Injunction. Hartford's contribution is subject to resolution of Chartered Organization rights to Hartford policies in a manner that is acceptable to Hartford. All references throughout this Disclosure Statement to Hartford's contribution assume that Hartford is satisfied with the Plan's treatment of Chartered Organizations as it impacts Hartford Policies; and

- A mechanism by which other Insurance Companies may enter into Insurance Settlement Agreements and provide sum-certain contributions to the Settlement Trust in exchange for being included as a Protected Party under the Plan and receiving the benefits of the Channeling Injunction, thereby becoming "Settling Insurance Companies" under the Plan.

The following chart illustrates the BSA Settlement Trust Contribution under the Plan:

| **BSA Settlement Trust Contribution** | **Source** | **Estimated Amount** |
|---|---|---|
| Net Unrestricted Cash and Investments[22] [23] | Cash | $58.9 million |
| Warehouse and Distribution Center[24] | Real Property | $11.6 million |
| Scouting University (net sale proceeds)[25] | Cash | $1.9 million |
| Artwork | Asset | $59.0 million[26] |
| Oil and Gas Interests | Asset | $7.6 million |
| BSA Settlement Trust Note | Note Payable | $80.0 million |
| **Total Estimated BSA Settlement Trust Non-Insurance Contribution** | | **$219 million[27]** |

The Debtors and the Supporting Parties are committed to working with other Chartered Organizations and Settling Insurance Companies (other than Hartford and TCJC, which are described herein) to increase participation and contributions to the Settlement Trust, and will work in good faith with other parties involved in these Chapter 11 Cases to further negotiate terms to foster participation and further contributions to the Settlement Trust.  When any new Chartered Organization or other Settling Insurance Company agrees to a settlement, the Debtors will file a notice on the case docket for these Chapter 11 Cases for distribution to any party that has requested notice pursuant to Bankruptcy Rule 2002, stating the name of the Contributing Chartered Organization or Settling Insurance Company and the amount of its contribution.  The Debtors will also notify any party that has requested notice pursuant to Bankruptcy Rule 2002 of any additional

---

[22]  Reflects Unrestricted Cash and Investments on the Effective Date, after giving effect to the Foundation Loan of $42.8 million, above $39 million as of December 31, 2021 less the JPM Exit Fee, Allowed Administrative Expense Claims, the Hartford Administrative Expense Claim, Professional Fee Reserve, Creditor Representative Fee Cap, and Allowed Priority, Secured, and Convenience Claims.  The Debtors believe that pursuing potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions, would not yield a net return.

[23]  Represents estimated Settlement Trust contributions assuming an Effective Date of December 31, 2021 per the financial projections in the Disclosure Statement. The actual Cash Settlement Trust contribution is uncertain and subject various risks, including timing of emergence, amount of professional fees incurred, and performance of the organization through the Effective Date.

[24]  Estimated value based on a third-party broker opinion of value from November 2020 which is further supported by current negotiations with a potential purchaser, both of which contemplate a leaseback to BSA at current market rates with 3% annual increases.

[25]  Represents net proceeds from the sale of the Scouting University building held in a segregated bank account for the benefit of the BSA Settlement Trust.

[26]  Estimated value based on a third-party fine arts appraisal report prepared by Geolat in March 2012.

[27]  Assuming a December 31, 2021 Effective Date, as reflected in the chart above, the amount of Net Unrestricted Cash and Investments is estimated to be approximately $58.9 million and as a result the total BSA Settlement Trust Contribution is valued at approximately $219 million.  The BSA Settlement Trust Contribution value could be higher or lower than $219 million depending on (a) timing of emergence, (b) performance of BSA's underlying business between now and emergence, (c) the level of professional fees incurred, and (d) the realizable value of the non-cash components of the BSA Settlement Trust Contribution.

Settling Insurance Companies.  The Debtors will also post a notice of any new Contributing Chartered Organizations and Settling Insurance Companies at https://omniagentsolutions.com/bsa.

The Debtors and Supporting Parties are affirmatively seeking to reach further mediated settlements of disputed issues with Chartered Organizations and Insurance Companies, and other related matters, which may result in the amendment or modification of the Plan to propose additional settlements pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019.  The Debtors and Supporting Parties believe that resolution of these controversies in advance of the Confirmation Hearing will facilitate the favorable resolution of these Chapter 11 Cases and maximize distributions to holders of Allowed Claims and Abuse Claims under the Settlement Trust.

E.    Treatment of Chartered Organizations Under the Plan

The Plan provides three alternate paths for Chartered Organizations.  As explained below, a Chartered Organization may: (1) become a Contributing Chartered Organization and thereby become a Protected Party and receive the full benefits and protections of the Channeling Injunction in exchange for its contribution of certain insurance-related rights to the Settlement Trust in addition to a substantial monetary contribution to the Settlement Trust;  (2) become a Participating Chartered Organization and receive certain limited benefits and protections of the Channeling Injunction as a Limited Protected Party in exchange for contribution of certain rights under the Abuse Insurance Policies to the Settlement Trust, or (3) refrain from participating in the Plan.  A Chartered Organization that chooses not to participate in the Plan will receive no benefits and protections under the Plan from future litigation related to Abuse Claims and will retain any rights it may have under insurance policies issued to the BSA or Local Councils that provide coverage to Chartered Organizations for Abuse Claims.  One exception to the ability of non-participating Chartered Organizations to retain their insurance rights under the Abuse Insurance Policies is that the Hartford Insurance Settlement Agreement provides that the Hartford Policies are being purchased by Hartford free and clear of all interests of the estate and any person or entity other than the estate, pursuant to sections 363, 1123 and/or 1141 of the Bankruptcy Code.

1.  *Chartered Organizations Included in the Plan*

The "Chartered Organizations" referenced in the Plan encompasses each and every chartering partner of the BSA, including each civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, that are presently or were formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.  As discussed further herein, the Chartered Organizations play an important role in the Debtors' charitable mission by facilitating Scouting units across the country.

2.  *The Effect of the Channeling Injunction on Abuse Claims Against Chartered Organizations*

The Channeling Injunction to be issued as a part of the Plan will permanently and forever stay, bar, and enjoin holders of Abuse Claims from pursuing such claims against the Debtors and other non-Debtors that are Protected Parties, including Contributing Chartered Organizations. Additionally, the Channeling Injunction will likewise permanently and forever stay, bar, and

enjoin holders from pursuing certain, but not all, Abuse Claims against Limited Protected Parties, including Participating Chartered Organizations. The Channeling Injunction will not protect Chartered Organizations unless they are either a Contributing Chartered Organization or Participating Chartered Organization.

As explained more fully below in Article III.F.3 below, it is the BSA's position that Chartered Organizations were not named or additional insureds under any of the BSA Insurance Policies prior to 1976. Therefore, neither the BSA nor the Insurance Companies have any obligation to defend or indemnify, *i.e.*, pay settlements or judgments, with regard to Chartered Organizations for any Abuse Claims prior to 1976 in connection with such policies. Therefore, with respect to Participating Chartered Organizations, Abuse Claims prior to 1976 will not be channeled to the Settlement Trust. The Abuse Claims related to the Limited Protected Parties that will be channeled to the Settlement Trust are called "Post-1975 Chartered Organization Abuse Claims." Such claims include any Abuse Claim against a Participating Chartered Organization that relates to Abuse alleged to have first occurred on or after January 1, 1976; *provided, however*, that the term "Post-1975 Chartered Organization Abuse Claims" shall be limited to any Claim against a Participating Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from Abuse that occurred in connection, in whole or in part, with the Participating Contributing Chartered Organization's or its personnel's or affiliates' involvement in, or sponsorship of, one or more Scouting units. (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases), including any proportionate or allocable share of liability based thereon. For the avoidance of doubt, no Claim alleging Abuse shall be a "Post-1975 Chartered Organization Abuse Claim" against a Participating Chartered Organization if such Claim is wholly unrelated to Scouting.

On the Effective Date of the Plan, the Settlement Trust shall assume the liabilities, obligations, and responsibilities, financial or otherwise, of (a) the Protected Parties for all Abuse Claims and (b) the Limited Protected Parties for all Post-1975 Chartered Organization Abuse Claims. Holders of Abuse Claims that are not Post-1975 Chartered Organization Abuse Claims shall maintain the right to assert such Abuse Claims against any Limited Protected Party (unless such Chartered Organization becomes a Contributing Chartered Organization). Likewise, any Chartered Organization that decides not to become a Participating Chartered Organization or Contributing Chartered Organization will not benefit from the Channeling Injunction in any manner and will retain its respective insurance rights and liabilities with respect to Abuse Claims (except insurance rights or interests, if any, in the Hartford Policies, which will be sold to Hartford pursuant to sections 363, 1123 and/or 1141 of the Bankruptcy Code).

### 3. *Participating Chartered Organizations*

Most Chartered Organizations will be treated as "Participating Chartered Organizations" under the Plan unless the Chartered Organization elects to opt out of this treatment or becomes a Contributing Chartered Organization as explained below. This general treatment enables a Chartered Organization to benefit from some of the protections under the proposed Channeling Injunction (described in greater detail below) in exchange for contribution to the Settlement Trust of rights under Abuse Insurance Policies issued on or after January 1, 1976. This assignment is called the "Participating Chartered Organization Insurance Assignment" and involves the

18

assignment and transfer to the Settlement Trust of the Participating Chartering Organizations' rights in and to (a) the Participating Chartered Organization Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, and (d) all other rights, claims, benefits, or Causes of Action under or with respect to the Abuse Insurance Policies (but not the policies themselves).

Generally, Chartered Organizations that are not Contributing Chartered Organizations will be automatically deemed to be Participating Chartered Organizations unless a Chartered Organization:

- objects to confirmation of the Plan, or

- completes the opt-out election form provided by the Debtors indicating that it does not wish to make the Participating Chartered Organization Insurance Assignment (discussed below) on or before the Plan Objection Deadline, or

- is a debtor in a pending bankruptcy.

A Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date will not be a Participating Chartered Organization unless it elects to be treated as a Participating Chartered Organization by advising Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment.

All Participating Chartered Organizations shall be treated as "Limited Protected Parties" under the Plan, allowing them limited benefits of the Channeling Injunction, including the channeling of all Abuse Claims against them that relate to Abuse alleged to have first occurred on or after January 1, 1976.  The Settlement Trust will resolve all such Post-1975 Chartered Organization Abuse Claims in accordance with the Trust Distribution Procedures.

### 4.  *Effect of Expedited Distribution Election on Chartered Organizations*

If a holder of an Abuse Claim elects to receive the Expedited Distribution, such claim holder will be required to execute a release, substantially in the form attached to Exhibit A of the Trust Distribution Procedures, of all Chartered Organizations with respect to the Abuse Claim. The number of holders of Abuse Claims who ultimately elect to take the Expedited Distributions and provide the release in the foregoing sentence cannot be ascertained at this time.

### 5.  *Contributing Chartered Organizations*

A Chartered Organization may receive the full benefits and protections of the Channeling Injunction as a "Protected Party" if it becomes a "Contributing Chartered Organization" under the Plan.  In order to become a Contributing Chartered Organization and receive the full benefits of the Channeling Injunction, a Chartered Organization should seek to become a party to the mediation to further negotiate the contributions necessary to be granted these protections, and may contact bankruptcy counsel for the Debtors with this request.  Pursuant to the Mediation Order [D.I. 812] (as defined herein), (i) all of the mediation parties must agree to include any additional party or parties in the mediation and (ii) the Mediators must agree that the participation of such additional party or parties is necessary or would be beneficial to the mediation.

Through mediation, a Chartered Organization must enter into a settlement with the BSA that includes a substantial contribution to the Settlement Trust that will resolve Abuse Claims that may be asserted related to Abuse that arose in connection with the Chartered Organization's involvement in Scouting prior to the Petition Date regardless of time period (as opposed to Participating Chartered Organizations, which only include claims that arose after January 1, 1976). The BSA believes that a substantial contribution is necessary for the Bankruptcy Court to approve treatment as a Protected Party under the Plan and receiving the benefits of the Channeling Injunction, thereby becoming a "Contributing Chartered Organization." As a part of such substantial contribution, each Contributing Chartered Organization will agree to take part in the Insurance Assignment, which includes (x) the assignment and transfer to the Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, and (d) all other rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves) and (y) the Participating Chartered Organization Insurance Assignment. A Participating Chartered Organization cannot become a Contributing Chartered Organization and receive the full protections of the Channeling Injunction based solely on the Participating Chartered Organization Insurance Assignment.

Each Contributing Chartered Organization/Protected Party will receive the benefit of the channeling of Abuse Claims to the Settlement Trust under the Channeling Injunction, which means that holders of such claims will be required to resolve their claims against such Contributing Chartered Organization with the Settlement Trust. The claims that will be channeled are only with respect to any Abuse Claim that is attributable to, arises from, is based upon, relates to, or results from, Abuse that occurred prior to the Petition Date in connection with the Contributing Chartered Organization's sponsorship of one or more Scouting units.

Because Contributing Chartered Organizations will be Protected Parties under the Channeling Injunction, the Debtors believe that no Insurance Settlement Agreement, including the Hartford Insurance Settlement Agreement, will impair the rights of any Contributing Chartered Organization.

*The BSA encourages Chartered Organizations to become parties to the Bankruptcy Court-approved mediation process to discuss and negotiate such a settlement in order to become a Contributing Chartered Organization and receive the full benefits of the Channeling Injunction.*

### 6. *Treatment of Chartered Organizations That Are Neither a Participating Chartered Organization Nor a Contributing Chartered Organization*

If a Chartered Organization does not become a Participating Chartered Organization or a Contributing Chartered Organization under the Plan, it will not receive the benefit of the Channeling Injunction with respect to Post-1975 Chartered Organization Abuse Claims and will retain its rights, if any, under the BSA Insurance Policies, ***unless,*** pursuant to an Insurance Settlement Agreement, such as the Hartford Insurance Settlement Agreement, the Debtors sell to a Settling Insurance Company one or more BSA Insurance Policies issued by such Settling Insurance Company pursuant to sections 363, 1123 and/or 1141 of the Bankruptcy Code. In that case, the rights, if any, of any Chartered Organizations under such BSA Insurance Policies will be

treated in accordance with sections 363 and 1141 of the Bankruptcy Code and other applicable law.

### 7. *Potential Effect of Insurance Settlement Agreements on Chartered Organizations*

If an insurer of a Chartered Organization enters into an Insurance Settlement Agreement with the Debtors to become a Settling Insurance Company under the Plan, it may be a component of such settlement that the Debtors and such Settling Insurance Company seek to obtain, or a condition of such settlement that there be, the release of the Chartered Organization's rights in the Chartered Organization's own insurance policies issued by such Settling Insurance Company to the extent of coverage for Abuse Claims.

Additionally, the ability of a Participating Chartered Organization to retain its rights under Abuse Insurance Policies issued prior to January 1, 1976 and the ability of a Chartered Organization that is not a Participating Chartered Organization to retain its rights under Abuse Insurance Policies is subject, in each case, to the terms of any proposed Insurance Settlement Agreement, which may provide that such Abuse Insurance Policies are being purchased by the Insurance Company free and clear of all interests of the estate and any person or entity other than the estate, including such Chartered Organizations, pursuant to sections 363, 1123 and/or 1141 of the Bankruptcy Code.

### F.    Timeline

As the Debtors have stated throughout these Chapter 11 Cases, emergence from bankruptcy as soon as possible is critical.  There are several reasons for this.  The Debtors' membership dropped significantly in 2020 as a result of the COVID-19 pandemic.  In order to rebuild membership, the Debtors must emerge from the cloud of these Chapter 11 Cases as soon as possible.  If the number of new members and returning members is substantially reduced from current projections, the Debtors could lack the means to meet their operational needs or otherwise emerge from bankruptcy.  Timely emergence from Chapter 11 is essential to the Debtors' ability to improve their operations.

Finally, substantial professional fees will continue to accrue until a plan is confirmed and becomes effective.  At this time, the Debtors' bankruptcy estate bears the burden for the fees of the professionals and advisors to the Debtors, the Tort Claimants' Committee, the Future Claimants' Representative, the Creditors' Committee, and JPM.  Moreover, pursuant to the Plan and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(b)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, the Debtors will also pay certain fees incurred by the Coalition.  Such fees are substantial and to date the Debtors have incurred more than $146 million[28] in professional fees related to this restructuring.  By the end of December 2021, the Debtors estimate the professional fees in the Chapter 11 Cases will equal or exceed $205 million.[29]  Each successive month is expected to cost the estate approximately $10 million or more.  The Debtors believe this

---

[28]    Amount through August 31, 2021, excluding bar noticing fees.

[29]    Amount excludes bar noticing fees.

is wholly inappropriate for a non-profit chapter 11 proceeding and believe emergence from bankruptcy as soon as possible is essential to stop the accrual of additional professional fees.

Until recently, there had not been sufficient support for a plan of reorganization from the survivor constituencies to facilitate a global resolution that would accomplish the dual goals of this restructuring. However, now the Debtors have incorporated the material terms and provisions of the expired Restructuring Support Agreement, which the Debtors believe will result in the holders of Direct Abuse Claims voting to accept the Plan. As discussed, above, the Plan also incorporates the terms and provisions of the Hartford Insurance Settlement Agreement, which is supported by the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and the attorneys representing holders of Direct Abuse Claims listed on Schedule 1 to the Hartford Insurance Settlement Agreement term sheet. However, with the exception of Hartford, the Debtors do not yet have support for the Plan from their other insurers. Without the support of the Debtors' other insurers, confirmation of this Plan may not occur until late 2021, which will place a further financial burden on the Debtors. The potential for protracted litigation with Insurance Companies other than those that settle with the Debtors under the Plan is great and will cause increased costs and expenses to the Debtors, including with respect to professional fees. In light of these circumstances and the delayed emergence from the Chapter 11 Cases, the Debtors have worked with their advisors to take steps to mitigate the financial impact.

If emergence were to occur in December 2021, the BSA estimates that the Net Unrestricted Cash and Investments under the Plan would be approximately $58.9 million resulting in a value of BSA Settlement Trust Contribution of approximately $219 million; however, assuming a March 31, 2022 emergence, as reflected in the chart below, the amount of Net Unrestricted Cash and Investments drops to $26 million and, as a result, the total BSA Settlement Trust Contribution is valued at approximately $186 million. The BSA Settlement Trust Contribution value could be higher or lower than the amounts reflected in the chart depending on (a) timing of emergence, (b) performance of BSA's underlying business between now and emergence, (c) the level of professional fees incurred, and (d) the realizable value of the non-cash components of the BSA Settlement Trust Contribution.

The following chart reflects the value of the BSA Settlement Trust Contribution over time:

| ($ in millions) | 12/31/21 | 1/31/22 | 2/28/22 | 3/31/22 |
|---|---|---|---|---|
| Unrestricted Cash & Investments after Foundation Loan Proceeds | $165.0 | $181.9 | $165.7 | $180.1 |
| Less: | | | | |
| Unrestricted Cash & Investments Retained by BSA[30] | (39.0) | (56.0) | (40.0) | (54.0) |
| Professional Fees Paid from 12/1/21 Forward[31] | (44.6) | (54.8) | (64.6) | (75.0) |

---

[30] Minimum retained Unrestricted Cash and Investments is $39 million if the Effective Date occurs in December 2021. Beginning on January 1, 2022, the minimum retained Unrestricted Cash and Investments increases based on cumulative estimated monthly net cash flows. For example, if the BSA has an Effective Date of January 31, 2022, the minimum retained cash increases from $39 million to $56 million based on an estimated monthly cash flow of $17 million during the month of January.

[31] Includes all professional fees paid from December 1, 2021 onward, including the Professional Fee Reserve Amount and ordinary professional fee payments, if applicable.

| | | | | |
|---|---|---|---|---|
| Coalition Restructuring Expenses[32] | (15.3) | (16.2) | (17.2) | (18.1) |
| Other Deductions[33] | (7.3) | (7.2) | (7.3) | (7.3) |
| Net Unrestricted Cash & Investments (to Settlement Trust) | $58.9 | $47.6 | $36.7 | $25.7 |
| Value of Other Cash and Non-Cash Contributions to Settlement Trust[34] | 160.1 | 160.1 | 160.1 | 160.1 |
| **Total Estimated Contributions to Settlement Trust** | **$219** | **$207.7** | **$196.8** | **$185.8** |

G.    The Channeling Injunction

The Channeling Injunction to be issued as a part of the Plan will permanently and forever stay, bar, and enjoin holders of Abuse Claims from taking any action for the purpose of directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Abuse Claim other than pursuant to the Settlement Trust Agreement and the Trust Distribution Procedures.  Each holder of an Abuse Claim will have no right whatsoever at any time to assert its Abuse Claim against any Protected Party or any property or interest in property of any Protected Party.  For the avoidance of doubt, Abuse Claims include Indirect Abuse Claims.

The Protected Parties include: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies, including Hartford; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party.  Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "Abuse Claim."

Additionally, the Limited Protected Parties (i.e., Participating Chartered Organizations) shall enjoy the benefit of the Channeling Injunction, with respect to Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties as provided for in Article X.F of the Plan.

The Debtors have compiled a list of all potential Protected Parties and potential Limited Protected Parties under the Plan, including the identities of all Local Councils, Chartered Organizations, and Insurance Companies.  To the extent any such parties participate, they will be included in the definition of Protected Parties and will benefit from the Channeling Injunction.  This list of potential Protected Parties and Limited Protected Parties will be made

---

[32]    Assumed to be $15.3 million for a December 31, 2021 Effective Date and an additional $950,000 per month thereafter.

[33]    Consists of amounts of cash (a) equal to the JPM Exit Fee, (b) sufficient to fund all unpaid Allowed Administrative Expense Claims, including the Allowed Hartford Administrative Expense Claim, (c) equal to the Creditor Representative Fee Cap, (d) estimated to be required to satisfy Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Claims, and Allowed Convenience Claims, and (e) sufficient to fund all accrued but unpaid interest and reasonable fees and expenses of JPM as of the Effective Date.

[34]    Consists of the net sale proceeds from the Scouting University building, the value of the Artwork, the Oil and Gas Interests, and the Warehouse and Distribution Center, subject to the Leaseback Requirement, and the $80 million BSA Settlement Trust Note.

available at https://omniagentsolutions.com/bsa-SAballots and https://omniagentsolutions.com/bsa-ballots. **This list only includes** *potential* **Protected Parties and** *potential* **Limited Protected Parties for disclosure purposes—it does not mean that any such party will in fact become a Protected Party or potential Limited Protected Party, as applicable, under the Plan; however, the Plan assumes, with limited exceptions, that all of the parties listed as potential Limited Protected Parties will in fact become Limited Protected Parties unless such party opts out.**[35]

The difference between the release in Article X.J.4 of the Plan and the Channeling Injunction in Article X.F of the Plan is that the release in Article X.J.4 of the Plan is consensual while the Channeling Injunction is non-consensual. Specifically, the parties that vote to accept or reject the Plan may opt out of the release provisions in Article X.J.4 of the Plan. Additionally, holders of Unimpaired Claims are deemed to grant the releases in Article X.J.4 of the Plan unless they object to the releases. In contrast, the Channeling Injunction, which benefits not only the BSA, but also Local Councils, Participating Chartered Organizations, Contributing Chartered Organizations and Settling Insurance Companies, will apply regardless of consent to the Plan, if the Bankruptcy Court finds, after evaluating certain factors, that such non-debtor third parties made a substantial contribution of assets to the Reorganized BSA and/or Settlement Trust. That determination will be made at Confirmation.

Additionally, any Chartered Organization that is not a Contributing Chartered Organization as of the Effective Date may become a Protected Party after the Effective Date if the Bankruptcy Court, after notice and an opportunity for parties in interest to be heard, approves a settlement agreement between such Chartered Organization and the Settlement Trustee. Any Chartered Organization that is not a Participating Chartered Organization as of the Effective Date may become a Participating Chartered Organization after the Effective Date by agreement with the Settlement Trustee and without further order of the Bankruptcy Court; provided, however, that the Settlement Trustee shall file a notice with the Bankruptcy Court within thirty (30) days of entering into any agreement with a Chartered Organization that deems such Chartered Organization to be a Limited Protected Party, together with an amendment to Exhibit K of the Plan removing such Chartered Organization from the list of Chartered Organizations that are not Participating Chartered Organizations. Finally, within twelve months of the Effective Date,[36] any Insurance Company that is a Non-Settling Insurance Company as of the Effective Date may become a Protected Party if it executes a settlement with the Settlement Trustee after notice filed with the Bankruptcy Court and an opportunity for parties in interest to object. Such settlement will be deemed binding absent objection by any party in interest within fifteen calendar days of such notice.

The Channeling Injunction only applies to Abuse Claims, while the release in Article X.J.4 of the Plan applies to Claims other than Abuse Claims. The Channeling Injunction does not mean that an Abuse Claim is being extinguished. Rather, the Abuse Claims are being channeled to the Settlement Trust, and will be reviewed and paid pursuant to the Trust Distribution Procedures.

---

[35]   The Debtors are providing these disclosures because such parties may be included in the definition of Protected Parties and will likely be Limited Protected Parties, as applicable, under the Plan and thereby benefit from the Channeling Injunction.

[36]   This period can be extended in the sole discretion of the Settlement Trustee upon order of the Bankruptcy Court.

The Channeling Injunction is necessary to channel Abuse Claims to the Settlement Trust, creating a swift and efficient means to liquidate valid Abuse Claims pursuant to the Trust Distribution Procedures, while at the same time ensuring that the Reorganized BSA can continue to carry out its charitable mission.  The Channeling Injunction and related non-consensual third-party releases as crafted are necessary to effect a meaningful and final resolution of Abuse Claims that will benefit holders of such Claims.

H.    Summary and Description of Classes and Treatment

Except for Administrative Expense Claims and Priority Tax Claims, which are not required to be classified, all Claims and Interests are divided into Classes under the Plan.  The following chart summarizes the projected distributions to holders of Allowed Claims against and Interests in each of the Debtors under the Plan and Abuse Claims that will be resolved by the Settlement Trust in accordance with the Trust Distribution Procedures.  This chart is only a summary of such classification and treatment and reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.  The ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation of the Plan and meet the conditions to Confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement, including, but not limited to, holders of Direct Abuse Claims providing a sufficient number of votes to accept the Plan.

Moreover, although every reasonable effort was made to be accurate, the projections of estimated recoveries are only an estimate.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received.  The projected recoveries set forth below may change based upon changes in the amount of Allowed Claims and Abuse Claims resolved by the Settlement Trust in accordance with the Trust Distribution Procedures, as well as other factors related to the Debtors' operations and general economic conditions.  The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

The summary of classification and treatment of Claims against and Interests in the Debtors is as follows:

| Class | Designation[37] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[38] and Approximate Percentage Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive: (i) payment in | Unimpaired | Estimated Allowed Amount: Less than $0.1 million |

---

[37]   The Debtors reserve the right to eliminate any Class of Claims in the event they determine that there are no Claims in such Class.

[38]   Figures with respect to the Allowed amounts of the Claims set forth in this chart are based upon the Debtors' best estimates of such Claims as of the date of this Disclosure Statement.  These estimates are based on various assumptions.  The actual amounts of Allowed Claims may differ significantly from these estimates should one or more underlying assumptions prove to be incorrect.  Such differences may adversely affect the percentage of recovery to holders of Allowed Claims under the

| Class | Designation[37] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[38] and Approximate Percentage Recovery |
|---|---|---|---|---|
| | | Cash in an amount equal to such Allowed Other Priority Claim; or (ii) satisfaction of such Allowed Other Priority Claim in any other manner that renders the Allowed Other Priority Claim Unimpaired, including Reinstatement. | **Not Entitled to Vote** (Presumed to Accept) | Estimated Percentage Recovery: 100% |
| 2 | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall receive: (i) payment in Cash in an amount equal to the Allowed amount of such Claim; (ii) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including Reinstatement; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim. | Unimpaired<br><br>**Not Entitled to Vote** (Presumed to Accept) | Estimated Amount: $0<br><br>Estimated Percentage Recovery: 100% |
| 3A | 2010 Credit Facility Claims | Each holder of an Allowed 2010 Credit Facility Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2010 Credit Facility Claim. | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $80,762,060<br><br>Estimated Percentage Recovery: 100% |
| 3B | 2019 RCF Claims | Each holder of an Allowed 2019 RCF Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $61,542,720<br><br>Estimated Percentage Recovery: 100% |

Plan.  Moreover, the estimated recoveries set forth herein are necessarily based on certain assumptions, the realization of which are beyond the Debtors' control.

| Class | Designation[37] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[38] and Approximate Percentage Recovery |
|---|---|---|---|---|
| | | holder's Allowed 2019 RCF Claim. | | |
| 4A | 2010 Bond Claims | Each holder of an Allowed 2010 Bond Claim shall receive a Claim under the Restated 2010 Bond Documents in an amount equal to the amount of such holder's Allowed 2010 Bond Claim. | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $40,137,274<br><br>Estimated Percentage Recovery: 100% |
| 4B | 2012 Bond Claims | Each holder of an Allowed 2012 Bond Claim shall receive a Claim under the Restated 2012 Bond Documents in an amount equal to the amount of such holder's Allowed 2012 Bond Claim. | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $145,662,101<br><br>Estimated Percentage Recovery: 100% |
| 5 | Convenience Claims | Each holder of an Allowed Convenience Claim shall receive Cash in an amount equal to 100% of such holder's Allowed Convenience Claim. | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $2.3 million – $2.9 million<br><br>Estimated Percentage Recovery: 100% |
| 6 | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim shall receive, subject to the holder's ability to elect Convenience Claim treatment on account of the Allowed General Unsecured Claim, its Pro Rata Share of the Core Value Cash Pool up to the full amount of such Allowed General Unsecured Claim in the manner described in <u>Article VII</u> of the Plan. | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $26.5 million – $33.5 million<br><br>Estimated Percentage Recovery: 75 – 95% |

| Class | Designation[37] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[38] and Approximate Percentage Recovery |
|---|---|---|---|---|
| 7 | Non-Abuse Litigation Claims | Each holder of an Allowed Non-Abuse Litigation Claim shall, subject to (i) the holder's ability to elect Convenience Claim treatment as provided in the following sentence and (ii) the terms and conditions of Article IV.D.3 of the Plan (as applicable), retain the right to recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (x) available insurance coverage or the proceeds of any Insurance Policy, including any Abuse Insurance Policy or Non-Abuse Insurance Policy, (y) applicable proceeds of any Insurance Settlement Agreements, and (z) co-liable non-debtors (if any) or their insurance coverage. Solely to the extent that the holder of an Allowed Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on account of such Allowed Claim after exhausting its remedies in respect thereof, such holder may elect to have the unsatisfied portion of its Allowed Claim treated as an Allowed Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied | Impaired<br><br>**Entitled to Vote** | Estimated Amount: Undetermined[39]<br><br>Estimated Percentage Recovery: 100% |

---

[39]  This class is comprised of approximately fifty-five (55) wrongful death or personal injury claims as well as seven (7) other litigation claims.  None of these claims have been liquidated.

| Class | Designation[37] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[38] and Approximate Percentage Recovery |
|---|---|---|---|---|
| | | portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000. | | |
| 8 | Direct Abuse Claims[40] | Pursuant to the Channeling Injunction set forth in <u>Article X.F</u> of the Plan, each holder of a Direct Abuse Claim shall have such holder's Direct Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Direct Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.<br><br>Pursuant to the Channeling Injunction set forth in <u>Article X.F</u> of the Plan, each holder of a Post-1975 | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $2.4 billion – $7.1 billion<br><br>Estimated Percentage Recovery at $7.1 billion: 10 – 21% *plus* additional insurance rights, **expected to yield up to 100% recovery**<br><br>Estimated Percentage Recovery at $2.4 billion: 31 – 63% *plus* additional insurance rights, **expected to yield up to 100% recovery**[41]**Error! Bookmark not defined.** |

---

[40]  Under the Plan, "Direct Abuse Claim" means an Abuse Claim that is not an Indirect Abuse Claim.

[41]  The following calculation was used to determine the percentage recovery range under the Plan: ($219 million (BSA Settlement Contribution) plus $500 million (Local Counsel Contribution) plus $100 million (DST Note) plus Hartford Settlement Contribution minus the Hartford Administrative Expense Claim ($785 million)) divided by $2.4 billion - $7.1 billion (Estimated Abuse Claims Range).  The recovery percentages are net of assumed cost to operate the Settlement Trust.  Costs are estimated between 6 and 10% of total assets with costs expected to be at the high end of the range in a smaller trust and at or below the lower end of the range in a larger trust under the Plan.  The low end of the recovery range excludes the Hartford Settlement Contribution as some parties may object to the settlement amount and/or how the settlement amount is distributed to holders of Abuse Claims, thereby rendering these amounts unavailable to some or all creditors.  The TCJC Settlement Contribution is not reflected in the recovery ranges for Direct Abuse Claims because such contribution by TCJC may not be available to all holders of Direct Abuse Claims under the Trust Distribution Procedures.  Abuse Claims that relate to TCJC may have a higher recovery than the ranges set forth above.  In addition, the Bates White estimated range of $2.4 billion to $7.1 billion estimates the value of Abuse Claims, which would include Future Abuse Claims, to the extent viable.  The Future Claimants' Representative asserts that the forecast of the Future Abuse Claims should be higher than reflected in the Debtors' range. The Debtors do not agree with the forecast of the Future Abuse Claims asserted by the Future Claimants' Representative and believe that the Bates White range is a more accurate range of the value for all Abuse Claims, including Future Abuse Claims.  Therefore, the Bates White range provides a better basis on which to formulate projected recoveries on account of Abuse Claims, including Direct Abuse Claims (which include Future Abuse Claims).

| Class | Designation[37] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[38] and Approximate Percentage Recovery |
|---|---|---|---|---|
| | | Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. | | **Under the Expedited Distribution**:[42] Estimated Amount: $3,500.00 |
| 9 | Indirect Abuse Claims[43] | Pursuant to the Channeling Injunction set forth in Article X.F of the Plan, each holder of an Indirect | Impaired **Entitled to Vote** | Estimated Amount: Unknown[44] |

---

[42]    Pursuant to Article III.B.10 of the Plan, under the Plan, each holder of a properly completed non-duplicative proof of claim asserting a Direct Abuse Claim who filed such Claim by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim may elect on his or her Ballot to receive an Expedited Distribution in exchange for a full and final release in favor of the Debtors, the Related Non-Debtor Entities, the Local Councils, Contributing Chartered Organizations, and the Settling Insurance Companies.  Under the Plan, "Expedited Distribution" means a one-time Cash payment from the Settlement Trust in the amount of $3,500.00, conditioned upon satisfaction of the criteria set forth in the Trust Distribution Procedures.

[43]    Under the Plan, "Indirect Abuse Claim" means a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract.

[44]    The Debtors are unable to estimate with certainty the recovery amount for Indirect Abuse Claims under the Plan since they are unliquidated and contingent and subject to objection under section 502(e) of the Bankruptcy Code.  However, to the extent the Indirect Abuse Claims become liquidated in the future, Indirect Abuse Claimants have the ability, pursuant to the Plan, to bring a claim for reconsideration under section 502(j) of the Bankruptcy Code and may be able to recover, on account of such claim, against the Settlement Trust Assets.  Pursuant to the Trust Distribution Procedures, recoveries on account of Indirect Abuse Claims that are liquidated, non-contingent, and meet the criteria set forth in the Trust Distribution Procedures shall be subject to the same liquidation and payment procedures as the Settlement Trust would have afforded the holders of the underlying valid Direct Abuse Claims as liquidated under the Trust Distribution Procedures.  The Bates White estimated range of $2.4 billion to $7.1 billion estimates the value of Abuse Claims, which would include Indirect Abuse Claims, to the extent viable.

| Class | Designation[37] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[38] and Approximate Percentage Recovery |
|---|---|---|---|---|
| | | Abuse Claim shall have such holder's Indirect Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Indirect Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.<br><br>Pursuant to the Channeling Injunction set forth in Article X.F of the Plan, each holder of a Post-1975 Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. | | Estimated Percentage Recovery at $7.1 billion: 10 – 21% *plus* additional insurance rights, **expected to yield up to 100% recovery**<br><br>Estimated Percentage Recovery at $2.4 billion: 31 – 63% *plus* additional insurance rights, **expected to yield up to 100% recovery** |

| Class | Designation[37] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[38] and Approximate Percentage Recovery |
|---|---|---|---|---|
| 10 | Interests in Delaware BSA | Interests in Delaware BSA shall be deemed cancelled without further action by or order of the Bankruptcy Court and shall be of no further force or effect, whether surrendered for cancellation or otherwise. | Impaired<br><br>**Not Entitled to Vote**<br>(Deemed to Reject) | Estimated Amount: N/A<br><br>Estimated Percentage Recovery: 0% |

I.      Illustrative Recovery Charts for Direct Abuse Claims under the Trust Distribution Procedures

While both the Debtors and the Tort Claimants' Committee have estimates regarding the recovery to holders of Direct Abuse Claims, the actual recovery will depend on a number of factors including (a) the number and severity of Abuse Claims allowed under the Trust Distribution Procedures, including Future Abuse Claims, which have been estimated by the Future Claimants' Representative to be approximately $5 billion (or approximately 21% of the total value of Direct Abuse Claims as calculated by Ankura applying the procedures and criteria set forth in the Trust Distribution Procedures dated July 2, 2021), (b) any additional proceeds that may be recovered by the Debtors prior to the Effective Date or the Settlement Trust after the Effective Date from Insurance Companies and Chartered Organizations, and (c) the costs of running the Settlement Trust.

The Debtors and the Tort Claimants' Committee have each provided illustrative examples (set forth below) of what holders of Direct Abuse Claims would recover under different scenarios with different assumptions. ***The Debtors and the Tort Claimants' Committee disagree regarding which estimate reflects the most likely recovery to holders of Direct Abuse Claims***.

The Debtors' examples use their expert's value for the claims pool (as described in Article V.N) and show potential recoveries on the base and maximum values in the Trust Distribution Procedures for both in-statute Abuse Claims and for Abuse Claims subject to statute of limitations or repose defenses.

The Tort Claimants' Committee's examples use an illustrative value of the claims pool if ***all*** the Direct Abuse Claims that are currently asserted are allowed at the base value in the Trust Distribution Procedures ***and*** adjusted in the manner provided in the proposed Trust Distribution Procedures for statutes of limitations defenses. The Tort Claimants' Committee has not adjusted for any other factors that would impact the validity and valuation of the Direct Abuse Claims under the Trust Distribution Procedures because the Tort Claimants' Committee does not believe that there is sufficient evidence to do so.

Neither the Debtors' nor the Tort Claimants' Committee's illustrations reflect the option for claimants to accept the $3,500 "Expedited Distribution" prior to the Settlement Trust's review of their Direct Abuse Claim.

So that holders of Direct Abuse Claims are informed of the differing views of the projected recoveries, both illustrations are set forth below:

### 1. *Debtors' Illustrative Direct Abuse Claim Recoveries under the Trust Distribution Procedures*

Under the Plan, the Debtors estimate that holders of Direct Abuse Claims will receive between 10-63% of the value of such Claims. To calculate these recovery percentages, the Debtors took the known value being contributed to the Settlement Trust, excluding the TCJC Settlement Contribution,[45] as of September 23, 2021 ($1.604 billion) less estimated costs to operate the Settlement Trust and divided such amount by the Debtors' estimate of the aggregate value of Abuse Claims which is between $2.4 billion and $7.1 billion (as described in Article V.N.). The low end of the recovery range excludes the Hartford Settlement Contribution as some parties may object to the settlement amount and/or how the settlement amount is distributed to holders of Abuse Claims, thereby rendering these amounts unavailable to some or all creditors. This recovery percentage will increase with additional insurance recoveries and the potential addition of Contributing Chartered Organizations. The Debtors believe these increases may provide up to a 100% recovery.

The chart below sets forth the Debtor's estimated recovery by type of Direct Abuse Claim as well whether the claim is presumed to be within or outside of the applicable statute of limitations or repose based on the "Mitigating Scaling Factors" addressed in the next paragraph. For claims presumed subject to a defense based on of statute of limitation or repose, illustrative recoveries are shown based on the mid-point of the scaling factors. **Individual claimant recoveries will be different based on the Settlement Trustee's full review of each individual's claim and the application of all of the factors laid out in the Trust Distribution Procedures.**

The Trust Distribution Procedures contain certain Mitigating Scaling Factors that the Settlement Trustee may assign to eliminate or decrease the recovery of a Direct Abuse Claim, including the passage of a statute of limitations or a statute of repose. Below are the scaling factors and a summary of the tiers into which the Debtors, in consultation with the Coalition and Future Claimants' Representative, have classified each state:

| Tier | Closed | Gray 3 | Gray 2 | Gray 1 | Open |
|---|---|---|---|---|---|
| **Scaling Factor** | .01 - .10 | .10 - .25 | .30 - .45 | .50 - .70 | 1 |
| **States** | Alabama | Alaska | Iowa | Connecticut | Arizona |
| | Kansas | Florida | Minnesota | DC | Arkansas |
| | Oklahoma | Idaho | New Hampshire | Delaware | California |
| | Puerto Rico | Indiana | North Dakota | Georgia | Colorado |
| | South Dakota | Kentucky | Ohio | Illinois | Guam |

---

[45]    The TCJC Settlement Contribution is not reflected in the recovery ranges for Direct Abuse Claims because such contribution by TCJC is only expected to be available to certain claimants under the Trust Distribution Procedures.

| Utah | Maryland | Pennsylvania | Massachusetts | Hawaii |
| Wyoming | Michigan | South Carolina | New Mexico | Louisiana |
| Unknown / Federal | Mississippi | Tennessee | Oregon | Maine |
| | Missouri | West Virginia | Washington | Montana |
| | Nebraska | | | New Jersey |
| | Nevada | | | New York |
| | Rhode Island | | | North Carolina |
| | Texas | | | Vermont |
| | Virgin Islands | | | |
| | Virginia | | | |
| | Wisconsin | | | |

### Debtors Illustrative Distribution Examples By Type of Direct Abuse Claim

#### Penetration Claim

| Recovery Range | Out-of-Statute Claims | | | | In-Statute in Any State |
| --- | --- | --- | --- | --- | --- |
| | Closed (5.5%) | Gray 3 (17.5%) | Gray 2 (37.5%) | Gray 1 (60%) | Open (100%) |
| **Base Claim Amount** | | | | | **$ 600,000** |
| 10% Recovery | $ 3,300 | $ 10,500 | $ 22,500 | $ 36,000 | $ 60,000 |
| 63% Recovery | $ 20,790 | $ 66,150 | $ 141,750 | $ 226,800 | $ 378,000 |
| 100% Recovery | $ 33,000 | $ 105,000 | $ 225,000 | $ 360,000 | $ 600,000 |
| **Max Claim Amount** | | | | | **$ 2,700,000** |
| 10% Recovery | $ 14,850 | $ 47,250 | $ 101,250 | $ 162,000 | $ 270,000 |
| 63% Recovery | $ 93,555 | $ 297,675 | $ 637,875 | $ 1,020,600 | $ 1,701,000 |
| 100% Recovery | $ 148,500 | $ 472,500 | $ 1,012,500 | $ 1,620,000 | $ 2,700,000 |

#### Oral Sex Claim

| Recovery Range | Out-of-Statute Claims | | | | In-Statute in Any State |
| --- | --- | --- | --- | --- | --- |
| | Closed (5.5%) | Gray 3 (17.5%) | Gray 2 (37.5%) | Gray 1 (60%) | Open (100%) |
| **Base Claim Amount** | | | | | **$ 450,000** |
| 10% Recovery | $ 2,475 | $ 7,875 | $ 16,875 | $ 27,000 | $ 45,000 |
| 63% Recovery | $ 15,593 | $ 49,613 | $ 106,313 | $ 170,100 | $ 283,500 |
| 100% Recovery | $ 24,750 | $ 78,750 | $ 168,750 | $ 270,000 | $ 450,000 |
| **Max Claim Amount** | | | | | **$ 2,025,000** |
| 10% Recovery | $ 11,138 | $ 35,438 | $ 75,938 | $ 121,500 | $ 202,500 |
| 63% Recovery | $ 70,166 | $ 223,256 | $ 478,406 | $ 765,450 | $ 1,275,750 |
| 100% Recovery | $ 111,375 | $ 354,375 | $ 759,375 | $ 1,215,000 | $ 2,025,000 |

#### Masturbation Claim

| Recovery Range | Out-of-Statute Claims | In-Statute in Any State |
| --- | --- | --- |

|  | Closed (5.5%) | Gray 3 (17.5%) | Gray 2 (37.5%) | Gray 1 (60%) | Open (100%) |
|---|---|---|---|---|---|
| **Base Claim Amount** |  |  |  |  | $ 300,000 |
| 10% Recovery | $ 1,650 | $ 5,250 | $ 11,250 | $ 18,000 | $ 30,000 |
| 63% Recovery | $ 10,395 | $ 33,075 | $ 70,875 | $ 113,400 | $ 189,000 |
| 100% Recovery | $ 16,500 | $ 52,500 | $ 112,500 | $ 180,000 | $ 300,000 |
| **Max Claim Amount** |  |  |  |  | $ 1,350,000 |
| 10% Recovery | $ 7,425 | $ 23,625 | $ 50,625 | $ 81,000 | $ 135,000 |
| 63% Recovery | $ 46,778 | $ 148,838 | $ 318,938 | $ 510,300 | $ 850,500 |
| 100% Recovery | $ 74,250 | $ 236,250 | $ 506,250 | $ 810,000 | $ 1,350,000 |

**Touching Unclothed Claim**

| Recovery Range | Out-of-Statute Claims | | | | In-Statute in Any State |
|---|---|---|---|---|---|
|  | Closed (5.5%) | Gray 3 (17.5%) | Gray 2 (37.5%) | Gray 1 (60%) | Open (100%) |
| **Base Claim Amount** |  |  |  |  | $ 150,000 |
| 10% Recovery | $ 825 | $ 2,625 | $ 5,625 | $ 9,000 | $ 15,000 |
| 63% Recovery | $ 5,198 | $ 16,538 | $ 35,438 | $ 56,700 | $ 94,500 |
| 100% Recovery | $ 8,250 | $ 26,250 | $ 56,250 | $ 90,000 | $ 150,000 |
| **Max Claim Amount** |  |  |  |  | $ 675,000 |
| 10% Recovery | $ 3,713 | $ 11,813 | $ 25,313 | $ 40,500 | $ 67,500 |
| 63% Recovery | $ 23,389 | $ 74,419 | $ 159,469 | $ 255,150 | $ 425,250 |
| 100% Recovery | $ 37,125 | $ 118,125 | $ 253,125 | $ 405,000 | $ 675,000 |

**Touching Clothed Claim**

| Recovery Range | Out-of-Statute Claims | | | | In-Statute in Any State |
|---|---|---|---|---|---|
|  | Closed (5.5%) | Gray 3 (17.5%) | Gray 2 (37.5%) | Gray 1 (60%) | Open (100%) |
| **Base Claim Amount** |  |  |  |  | $ 75,000 |
| 10% Recovery | $ 413 | $ 1,313 | $ 2,813 | $ 4,500 | $ 7,500 |
| 63% Recovery | $ 2,599 | $ 8,269 | $ 17,719 | $ 28,350 | $ 47,250 |
| 100% Recovery | $ 4,125 | $ 13,125 | $ 28,125 | $ 45,000 | $ 75,000 |
| **Max Claim Amount** |  |  |  |  | $ 337,500 |
| 10% Recovery | $ 1,856 | $ 5,906 | $ 12,656 | $ 20,250 | $ 33,750 |
| 63% Recovery | $ 11,694 | $ 37,209 | $ 79,734 | $ 127,575 | $ 212,625 |
| 100% Recovery | $ 18,563 | $ 59,063 | $ 126,563 | $ 202,500 | $ 337,500 |

**Non-Touching Claim**

| Recovery Range | Out-of-Statute Claims | | | | In-Statute in Any State |
|---|---|---|---|---|---|
|  | Closed (5.5%) | Gray 3 (17.5%) | Gray 2 (37.5%) | Gray 1 (60%) | Open (100%) |
| **Base Claim Amount** |  |  |  |  | $ 3,500 |
| 10% Recovery | $ 19 | $ 61 | $ 131 | $ 210 | $ 350 |
| 63% Recovery | $ 121 | $ 386 | $ 827 | $ 1,323 | $ 2,205 |
| 100% Recovery | $ 193 | $ 613 | $ 1,313 | $ 2,100 | $ 3,500 |

| Max Claim Amount | | | | | | | | | | $ | 8,500 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10% Recovery | $ | 47 | $ | 149 | $ | 319 | $ | 510 | $ | 850 |
| 63% Recovery | $ | 295 | $ | 937 | $ | 2,008 | $ | 3,213 | $ | 5,355 |
| 100% Recovery | $ | 468 | $ | 1,488 | $ | 3,188 | $ | 5,100 | $ | 8,500 |

### 2. *Tort Claimants' Committee's Illustrative Direct Abuse Claim Recoveries under the Trust Distribution Procedures*

The Tort Claimants' Committee has a different view than the Debtors about the value of Abuse Claims. The Tort Claimants' Committee also took the known value being contributed to the Settlement Trust, excluding the TCJC Settlement Contribution, as of September 23, 2021 ($1.604 billion) less estimated costs to operate the Settlement Trust (projected at 10%).  After adjustment for administrative expenses, $1.444 billion would be distributable to the holders of Allowed Abuse Claims.

The Tort Claimants' Committee calculated the range of values of all asserted Abuse Claims is $13.5 billion to $73.2 billion taking into account the Base and Maximum Claim values under the Trust Distribution Procedures and the range of statute of limitations discounts.  For purposes of this illustration, the Tort Claimants' Committee estimated the total claims amount assuming *all* the Abuse Claims are allowed at the base value in the Trust Distribution Procedures.  The Abuse Claims were then adjusted using the median of the statutes of limitations discount range.[46]  This results in an estimated recovery of 9.63%.  The Tort Claimants' Committee did not discount for lack of information in the claim filings, in part because claimants will have the opportunity to supplement that information.

The chart below sets forth the projected recovery on a base claim by Abuse type after applying the median discounts for statutes of limitations required under the Trust Distribution Procedures based on the applicable state law.  *These amounts will be further reduced on account of recoveries for holders of Future Abuse Claims, which claims have been estimated by the Future Claimants' Representative to be approximately $5 billion or approximately 21% of the total value of Direct Abuse Claims as calculated by Ankura applying the procedures and criteria set forth in the Trust Distribution Procedures dated July 2, 2021.*

---

[46]    The references in the chart below to "closed" "Grey 1-3" and "open" are references to the tiers for statute of limitations adjustments in the Trust Distribution Procedures as noted above and as set forth on Schedule 1 to the Trust Distribution Procedures.

## Penetration Claim

**Base Claim Amount: $600,000**

**% Of Base Claim Payment: 9.63%**

**Payment Range: $3,177 - $57,771**

### Base Payment After Statute Of Limitation Adjustments

| Closed $3,177 | Gray 3 $10,110 | Gray 2 $21,664 | Gray 1 $34,663 | Open (or in-statute in any State) $57,771 |
|---|---|---|---|---|

## Oral Sex Claim

**Base Claim Amount: $450,000**

**% Of Base Claim Payment: 9.63%**

**Payment Range: $2,383 - $43,328**

### Base Payment After Statute Of Limitation Adjustments

| Closed $2,383 | Gray 3 $7,582 | Gray 2 $16,248 | Gray 1 $25,997 | Open (or in-statute in any State) $43,328 |
|---|---|---|---|---|

## Masturbation Claim

**Base Claim Amount: $300,000**

**% Of Base Claim Payment: 9.63%**

**Payment Range: $1,589 - $28,886**

### Base Payment After Statute Of Limitation Adjustments

| Closed $1,589 | Gray 3 $5,055 | Gray 2 $10,832 | Gray 1 $17,331 | Open (or in-statute in any State) $28,886 |
|---|---|---|---|---|

## Touching Unclothed Claim

**Base Claim Amount: $150,000**

**% Of Base Claim Payment: 9.63%**

**Payment Range: $794 - $14,443**

### Base Payment After Statute Of Limitation Adjustments

| Closed $794 | Gray 3 $2,527 | Gray 2 $5,416 | Gray 1 $8,666 | Open (or in-statute in any State) $14,443 |
|---|---|---|---|---|

## Touching Clothed Claim

**Base Claim Amount: $75,000**

**% Of Base Claim Payment: 9.63%**

**Payment Range: $397 - $7,221**

### Base Payment After Statute Of Limitation Adjustments

| Closed $397 | Gray 3 $1,264 | Gray 2 $2,708 | Gray 1 $4,333 | Open (or in-statute in any State) $7,221 |
|---|---|---|---|---|

## Non-Touching Claim

**Base Claim Amount: $3,500**

**% Of Base Claim Payment: 9.63%**

**Payment Range: $19 - $337**

### Base Payment After Statute Of Limitation Adjustments

| Closed $19 | Gray 3 $59 | Gray 2 $126 | Gray 1 $202 | Open (or in-statute in any State) $337 |
|---|---|---|---|---|

### 3. *Tort Claimants' Committee's Analysis of Local Council Contributions*

The Tort Claimants' Committee encourages holders of Direct Abuse Claims to review the detailed chart at Exhibit G, which shows that the Local Councils' aggregate contribution pays 1.27% of the maximum Trust Distribution Procedure claim value – which represents approximately 28% of their book value of unrestricted net assets – to fund the proposed settlement.

Exhibit G does not include the $100 million DST Note as that is not allocated between the Local Councils and, as noted in the risk factor at Article X.A.19 of this Disclosure Statement, the payment of the DST Note is not assured and there is no security for the DST Note.

Exhibit G includes the following information:

- Name of the Local Council and number of Abuse Claims that implicate a Local Council.
- Valuation of the Abuse Claims against each Local Council using the Trust Distribution Procedures (Base) with the highest statute of limitation discount (resulting in the "Low" value) and the Trust Distribution Procedures (Max) with the lowest statute of limitation discount (resulting in the "High" value).
- The total value contributed by each Local Council.
- The value of each Local Council's unrestricted net assets.

The Debtors do not agree with the Tort Claimants' Committee's analysis on Exhibit G and have included their specific response to the analysis on Exhibit G-1.

J.    The Settlement Trust

On the Effective Date of the Plan, the Settlement Trust will be established for the benefit of holders of Abuse Claims. From and after the Effective Date, all Abuse Claims shall be channeled to the Settlement Trust, which will be funded by the Settlement Trust Assets. As further described in Article VII of this Disclosure Statement, the Settlement Trust will administer the Settlement Trust Assets and process, liquidate, and pay Abuse Claims in accordance with the applicable Trust Distribution Procedures.

The purpose of the Settlement Trust is to assume liability for all Abuse Claims, to administer the Settlement Trust Assets, and to direct the processing, liquidation, and payment of all compensable Abuse Claims. The Settlement Trust will resolve Abuse Claims through the Trust Distribution Procedures, which are summarized in Article VII.B of this Disclosure Statement and attached to the Plan as Exhibit A. The Trust Distribution Procedures are designed to permit the Settlement Trustee to provide substantially similar treatment to holders of legally valid and factually supported, similar Abuse Claims and will be the sole and exclusive method by which the holder of an Abuse Claim may seek allowance and resolution of his or her Abuse Claim. **The Debtors will demonstrate at the Confirmation Hearing that the Settlement Trust will resolve Abuse Claims in accordance with the Settlement Trust Documents in such a way that holders of Abuse Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such Claims, and otherwise comply in all respects with the requirements of the Bankruptcy Code.**

The Trust Distribution Procedures are discussed further in <u>Article VII.B</u> herein. Additionally, the Settlement Trust Agreement is attached to the Plan as Exhibit B.

K.    <u>Further Information Regarding Non-Abuse Litigation Claims</u>

The Debtors' insurance coverage for years 2013 and later may provide coverage for both Abuse Claims and Non-Abuse Litigation Claims, but there is a negligible risk that the Debtors will exhaust all of their insurance coverage for such years on account of Non-Abuse Litigation Claims.  The Debtors have identified approximately sixty-two (62) active out of seventy-two (72) total Non-Abuse Litigation Claims, all of which appear to have arisen in 2013 or later (to the extent the date of the alleged incident is known).  The Debtors believe that at least eleven (11) of the active Claims will be disallowed through the Claims reconciliation process.  In addition, one (1) claim has been withdrawn, six (6) have been satisfied, and three (3) have been previously disallowed.  The Debtors have approximately $200 million of available insurance coverage in each year after 2013, in addition to primary insurance policies issued by Old Republic Insurance Company that have $1 million in per-occurrence limits, but no applicable aggregate limit.  It is likely that a material number of the Non-Abuse Litigation Claims will not exceed the $1 million per-occurrence limit of the primary policies issued by Old Republic Insurance Company or Evanston Insurance Company.  As such, the Debtors expect that there will be ample insurance coverage for Non-Abuse Litigation Claims.

The Debtors will use their best efforts to obtain Bankruptcy Court approval of as many settlements of Non-Abuse Litigation Claims as possible prior to the Effective Date.  While the Settlement Trust has the power to settle or release the Specified Insurance Policies, prior to the exercise of that right, any Non-Abuse Litigation Claim may recover for its claim from any available Specified Insurance Policy.

Moreover, prior to the Effective Date the Creditors' Committee will retain consent rights with respect to any proposed settlement between the Debtors and its primary insurers Old Republic (Specified Insurance Policies from 2013-19) and Evanston/Markel (Specified Insurance Policies from 2019-20), unless that settlement does not release the applicable insurer for liability arising from Non-Abuse Litigation Claims.  With respect to any proposed pre-Effective Date settlement of a Specified Insurance Policy that is an excess policy (above the Old Republic umbrella layer for the period 2013-19, or above the Evanston/Markel umbrella layer for the period 2019-20), the Creditors' Committee will have consultation rights.

Post Effective Date, if and when the Settlement Trust settles any Specified Insurance Policies, the Settlement Trust shall have consent over any post-emergence settlement of Non-Abuse Litigation Claims, such consent not to be unreasonably withheld.  Each holder of a Non-Abuse Litigation Claim shall remain entitled to recover up to $1 million of its claim under primary Specified Insurance Policies.  Any amounts exceeding $1 million shall be recoverable in the first instance from any available, unsettled umbrella or excess Specified Insurance Policies.  Subject to a review of the details concerning the Non-Abuse Litigation Claims by the Settlement Trustee, to the extent that the holder of a Non-Abuse Litigation Claim cannot recover the full amount of any judgment or settlement of their claim consented to by the Settlement Trust (such consent not to be unreasonably withheld) from any Specified Insurance Policy as a result of the Settlement Trust's release of the Specified Insurance Policy, any unpaid amounts (up to applicable policy limits) shall

be submitted to the Settlement Trust, which shall pay such amounts out of the proceeds of Specified Insurance Policies.  Release of the Non-Abuse Litigation Claim against the Debtors, Local Councils, and any other insureds under applicable Specific Insurance Policies shall be a condition of such payment of a Non-Abuse Litigation Claim by the Settlement Trust.

The Settlement Trustee will have a duty to treat Direct Abuse Claims and Non-Abuse Litigation Claims that implicate the Specified Insurance Policies fairly and equally.  In negotiating any settlements involving Specified Insurance Policies, the Settlement Trust will agree to bear in mind the interests of both abuse and non-abuse claimants in structuring any settlement and use best efforts to maximize recoveries for both constituencies.

With respect to any Non-Abuse Litigation Claim that has been asserted against any Local Council, notice of which is provided to the Debtors, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative prior to the Effective Date, the rights of the Local Council to recover for such Non-Abuse Litigation Claim under the Specified Insurance Policies shall be preserved; *provided*, *however*, that if the holder of a Non-Abuse Litigation Claim provides a full and complete written release of any claims that such holder of a Non-Abuse Litigation Claim may have against the Local Council related to the Non-Abuse Litigation Claim, then the Local Council will be deemed to have waived any rights it may have against the Specified Insurance Policy with respect to such Non-Abuse Litigation Claim.

L.     Description of Certain Insurance Provisions of the Plan

Article X.M of the Plan sets forth certain provisions related to the treatment of Insurance Policies under the Plan and specifically, in relation to the Settlement Trust. On May 19, 2021, the Bankruptcy Court held a hearing to consider, among other things, the Exclusivity Motion (defined below) and the related objections.  During the arguments related thereto, there was robust discussion related to the insurance neutrality provisions of the prior version of the Plan and the reach of such insurance neutrality provisions in general.  Although the Bankruptcy Court indicated that it would require guidance from all parties at the appropriate time with respect to insurance neutrality, the Bankruptcy Court provided preliminary direction with respect to what it believed were the bounds of the Bankruptcy Court's authority to modify the rights and obligations of Insurance Companies under their Insurance Policies through a plan of reorganization or related documents.  In particular, the Bankruptcy Court observed that (i) it does not view an insurance policy any differently than any other contract, in the sense that a plan of reorganization should not modify the terms and provisions of the policy except as allowed under the Bankruptcy Code, and (ii) to the extent a plan of reorganization is not insurance-neutral, insurers have the right to participate and object to such plan and are then bound by the Bankruptcy Court's rulings with respect thereto.

As a result of the robust discussion at the May 19, 2021 hearing and this guidance from the Bankruptcy Court as well as the objections that were filed, the Debtors modified the insurance provisions of the Plan. As set forth therein, or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order or the findings made by the District Court in the Affirmation Order, it shall not "modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any

Insurance Policy or rights and obligations under an Insurance Policy to the extent such rights and obligations are otherwise available under applicable law. . . ."

A more fulsome description of the modified insurance provisions of the Plan can be found in Article VII.A.30 of this Disclosure Statement.

M.    Modification and Amendments

**Mediation and settlement negotiations with various parties are on-going and will continue after the date of this Disclosure Statement.  Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors one or more times including after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.**

**For the avoidance of doubt, such modification(s) may include a settlement pursuant to Bankruptcy Rule 9019 to resolve any unresolved controversies, including but not limited to those described in this Disclosure Statement.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.**

**If the Bankruptcy Court finds, after a hearing on notice to the parties in interest in the Chapter 11 Cases, that the proposed modification does not materially and adversely change the treatment of the Claim or Interest of any holder thereof who has not accepted in writing the proposed modification, the Bankruptcy Court may deem the Plan to be accepted by all holders of Claims or Interests who have previously accepted the Plan.  Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.**

**For the avoidance of doubt, any and all rights of holders of Claims against the Debtors or Interests in the Debtors are expressly reserved under Bankruptcy Rule 3019 and any other applicable provisions under the Bankruptcy Rules, Local Rules of the Bankruptcy Court, or Bankruptcy Code.**

## ARTICLE III. ORGANIZATION OVERVIEW AND CORPORATE HISTORY

A.    Organization Overview

### 1.    *The Boy Scouts of America*

The BSA was incorporated in the District of Columbia on February 8, 1910, and subsequently chartered by Congress as a non-profit corporation under Title 36 of the United States Code on June 15, 1916. 36 U.S.C. §§ 30901-08. The Congressional Report in Support of the Act to Incorporate the Boy Scouts of America provides that the Scouting program "is intended to supplement and enlarge established modern educational facilities in activities in the great and healthful out of doors where may be the better developed physical strength and endurance, self-reliance, and the powers of initiative and resourcefulness, all for the purpose of establishing through the boys of today the very highest type of American citizenship." H.R. Rep. No. 64-130 at 245 (1916). Consistent with this charitable intention, the BSA's congressional charter states that the purpose of the organization is to "promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts." BSA Charter, § 3; *see also* BSA Bylaws, § 2 ("In achieving this purpose, emphasis shall be placed upon its educational program and the oaths, promises, and codes of the Scouting program for character development, citizenship training, leadership, and mental and physical fitness."). These mandates have been the guiding light for the BSA's work for over a century.

As a non-profit corporation, the BSA is required to adopt and carry out a charitable, religious, educational, or other philanthropic mission. It is the BSA's mission "to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law."[47] Unlike a profit-seeking corporation, the BSA's senior leadership owes fiduciary duties to the Scouting mission, not the generation of profits. The successful delivery of this mission to youth in America is the BSA's fiduciary obligation. To that end, all Scouting policies, practices, and programming are specifically designed to train Scouts in responsible citizenship, character development, and self-reliance, in a manner consistent with the BSA's mission. Thus, to be eligible for Scouting, individuals must subscribe to, and conduct themselves in accordance with, the Scout Oath and the Scout Law:

- **Scout Oath.** "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."[48]

- **Scout Law.** "A Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."[49]

---

[47]    BSA, *Mission & Vision*, https://www.scouting.org/legal/mission/.

[48]    BSA, *What are the Scout Oath and Law?*, https://www.scouting.org/discover/faq/question10/.

[49]    BSA, *About the BSA*, https://www.scouting.org/about/.

At all levels of Scouting, these fundamental tenets of the BSA's mission are taught to Scouts so they can successfully develop into our nation's next generation of great leaders.

In support of its mission, the BSA has long facilitated the spread of Scouting in the United States through units chartered by local partners and has also designed and implemented an array of its own outdoor activities, educational and skill-building programs, and career training. Since its inception, more than 130 million Scouts have participated in the BSA's programming, and more than 35 million adult leaders have helped carry out the BSA's mission. The BSA has grown to be one of the largest youth organizations in the country, as well as one of the largest Scouting organizations in the world. In 2019, nearly three million Scouts and adult leaders were involved in Scouting and helped deliver more than 13 million Scouting service hours to communities across the country.

Throughout its 110-year history, the BSA has continually looked for ways to offer Scouting to more young men and women. In 1912, the BSA formed the Camp Fire Girls as a sister organization. In the 1930s, the BSA introduced Cub Scouts as a program for younger participants. Other past and current BSA programs include Air Scouts, Sea Scouts, Exploring, Venturing, and STEM Scouts. In 2018, the BSA welcomed girls into Cub Scouts, and in 2019, the BSA began chartering girl units to join Scouts BSA, the program previously known as Boy Scouts. Since 2017, over 200,000 girls have participated in Scouting, including approximately 130,000 in Cub Scouts, 30,000 in Scouts BSA, and 65,000 in Venturing, Sea Scouts, and Exploring. The BSA has also organized affiliated organizations and affinity groups—such as Learning for Life, Order of the Arrow, and National Eagle Scout Association—to provide additional educational, civic, and developmental programs for Scouts, as well as engagement opportunities for Scouting alumni and supporters.

The BSA also provides other services critical to continued Scouting opportunities for America's young men and women, including core program content, such as events and other activities at high adventure facilities; the procurement and sale of uniforms and equipment; information technology and digital resources; training of professional Scouters to serve in Local Councils; communications and publications including magazines and online content for Scouts and adult leaders; training development and delivery; national events; registration systems; and other quality control services. In addition, every four years, the BSA hosts a National Jamboree, where tens of thousands of Scouts from around the country gather to celebrate Scouting, learn about teamwork and leadership, and develop lifelong friendships.

The Headquarters of the BSA is in Irving, Texas. The BSA has approximately 1,155 employees, all of whom are located in the United States and its territories. The BSA's employees are located at its Headquarters; at the BSA's national Warehouse and Distribution Center in Charlotte, North Carolina; at approximately 145 official BSA Scout Shops located throughout the country; and at the BSA's four high adventure facilities located in Florida and the U.S. Virgin Islands, New Mexico, West Virginia, and Minnesota and parts of Canada. The BSA's sources of funding include membership fees, high adventure facility fees, supply sales at Scout Shops, on its website, and directly to Local Councils, donor contributions, legacies, bequests, corporate sponsorships, and grants from foundations. In 2020, the BSA's total gross revenues were approximately $187 million. Of this total, approximately 28% was attributable to supply sales, approximately 47% to membership fees, approximately 8% to high adventure facility operations,

approximately 2% to investments, approximately 4% to contributions, approximately 1% to event fees, and approximately 10% to other.

The BSA is governed by an executive board and an executive committee, which are responsible for managing the organization's affairs and electing officers. The executive board is comprised of 72 total members and is led by the National Chair. The board is made up of 64 regular members and the executive committee, which is a twelve-member delegation of the executive board that is also led by the National Chair. The executive committee includes, among others, the National "Key 3," who are responsible for guiding the BSA organization as a whole: the National Chair (Daniel G. Ownby), National Commissioner (W. Scott Sorrells), and Chief Executive Officer and President (Roger C. Mosby). The National Chair and National Commissioner are volunteer positions. The executive committee has formed a bankruptcy task force to direct the Debtors' restructuring strategy in connection with these Chapter 11 Cases.

### 2. *The Scouting Experience*

Delivery of the Scouting mission is the fiduciary obligation of the BSA. Local Councils and Chartered Organizations, and the Scouting units that they sponsor, operationalize this mission. Through these organizations, Scouts learn the values embodied in the Scout Oath and Scout Law. From the beginner-level Cub Scouts to the most advanced offerings at high adventure facilities, all Scouting programming is intended to instill in the next generation of leaders the fundamental tenets of the BSA's mission.

### a. **Cub Scouts**

The gateway to the Scouting program is Cub Scouts, where younger participants (kindergarten through fifth grade) first build character, learn citizenship, and develop personal skills and physical fitness. The den—a small group of six to eight children who are the same grade and gender—is the cornerstone of Cub Scouting. In the den, Cub Scouts make friends, develop new skills and interests, and learn respectfulness, sportsmanship, and citizenship. Several dens in the same community form a pack. At pack meetings, Cub Scouts engage in a wide range of fun and interactive activities, including games, arts and crafts, skits, and songs. Packs also hold special events and activities, such as advancement banquets, field trips, community service projects, and, most famously, the Pinewood Derby. Cub Scouts attend camp outings and participate in other local outdoor activities, such as hiking, biking, swimming, sledding, and a variety of team sports, all of which help instill in them a life-long respect for the environment, a core principle of the Scouting mission. Many of these outdoor adventures are held at Local Council-owned properties specifically developed and maintained for the purpose of delivering the Scouting program. Cub Scout programming is family-oriented, and adult volunteers, many of whom are parents of participating Cub Scouts, play an active role in den and pack leadership.

### b. **Scouts BSA**

After Cub Scouts, youth participants progress to Scouts BSA. The Scouts BSA program focuses on service to others, community engagement, leadership development, respect for the environment, and personal and professional growth. In Scouts BSA, adult volunteers take a back seat, and Scouts themselves assume important leadership roles at their own meetings and activities.

Scouts BSA units, known as "troops," are single-gender and composed of several smaller groups called "patrols." At patrol and troop meetings, Scouts engage in knowledge- and skill-based challenges, team building exercises, and community service projects, such as cleaning parks and other public spaces, enhancing nature preserves, building trails in wildlands, constructing playgrounds, creating libraries, collecting meals for food banks, visiting with the sick or elderly, or responding to national emergencies.

In Scouts BSA, every Scout is able to take on a leadership role in his or her patrol, which provides one of the unique experiences in Scouting that inspires young people from all backgrounds, experiences, and capabilities to see themselves as a leader and hone skills that will last a lifetime. In addition, Scouts are encouraged to participate in a wider suite of outdoor activities, including weekend camping trips, summer camps, and themed-camporees where they are exposed to more advanced Scouting programming and skill-building in diverse areas, such as first aid, rock climbing, forestry, conservation, and environmental awareness. At these events, Scouts from different troops work together and form life-long bonds. Local Council camps and other facilities are the hub for many of these outdoor adventures.

Central tenets of Scouts BSA programming are rank advancement and merit badges. Young men and women begin their journey in Scouts BSA at the rank of Scout. As they master skills and learn important life lessons, they progress to the ranks of Tenderfoot, Second Class, First Class, Star, and then Life. Along the way, Scouts earn merit badges that recognize hard work and achievement in sports, arts, sciences, trades, personal finance, and future careers. At this time, there are more than 135 merit badges, and any Scout, or any qualified Venturer or Sea Scout may earn any of them at any time. In 2019, young men and women earned more than 1.7 million merit badges that represent skills that will help them succeed throughout their lives.

Scouts who successfully complete this rigorous program, serve as a leader in their troop for a designated period of time, and design and lead a significant service project, are awarded Scouts BSA's highest rank of Eagle. Less than 8% of Scouts achieve the Eagle Scout rank, and past Scouts achieving this honor permeate our nation's government, economy, and culture, including President Gerald Ford, astronaut Neil Armstrong, civil rights leader Percy Sutton, and entrepreneurs Sam Walton and Ross Perot, to name a few.

c.    **Advanced Scouting**

In addition to Scouting's core Cub Scouts and Scouts BSA offerings, older Scouts participate in other advanced programs. In Venturing, co-ed groups form their own Scout-led "crews" that design and carry out specialized programming and activities. The opportunities available through Venturing are endless: A Scout interested in the outdoors can join a Venturing crew that backpacks in state or national parks and kayaks in local or remote rivers; a Scout interested in the sciences can join one that builds robots or volunteers at planetariums and museums; and a Scout interested in community service can join one that volunteers at soup kitchens or rebuilds homes in the wake of natural disasters. Venturing crews instill in their members the importance of adventure, leadership, personal growth, and service, all of which are fundamental to the Scouting mission.

Other advanced programs for older Scouts include Sea Scouts, where Scouts learn boating skills and water safety, and also study maritime heritage.  Sea Scouts participate in boating and other water-based excursions, such as scuba diving off the Florida Keys and kayaking in the Everglades.  Another program, Exploring, is the BSA's preeminent workforce development program.  Through Exploring, Scouts join career-specific clubs sponsored by local businesses, government agencies, and community organizations.  Scouts develop important personal and professional skills through immersive, on-the-job training.  And STEM Scouts offers the Scouting experience with less emphasis on the outdoors.  Participating young men and women learn about and nurture a lifelong interest in science, technology, engineering, and math through creative, hands-on activities, educational field trips, and interaction with STEM professionals.

### d.    High Adventure Facilities

The apex of the Scouting program is found at the four iconic high adventure facilities operated by the BSA.  At these facilities, Scouts experience the truest embodiment of what Congress envisioned when it chartered the organization more than a century ago—unparalleled facilities hosting outdoor activities, educational programs, and leadership training.  As Scouts progress through Scouting, these high adventure facilities provide them with opportunities to implement the knowledge and training that they gained through Cub Scouts and Scouts BSA at locations and in programs that are not available anywhere else in the country.  Not surprisingly, there is strong demand for these high adventure facilities—more than 50,000 Scouts and Scouters participate in the programs and events held there every year, and more than two million have done so since their openings.  Since 2010, scout high adventure base attendance has increased from approximately 40,000 to approximately 50,000 per year despite declines in overall membership.  As their storied histories portend, these facilities and the programming they allow play a critical role in the BSA's delivery of the Scouting program to young Americans.

### (i)    Northern Tier

The BSA opened the Northern Tier high adventure facility ("Northern Tier")—located on the boundary waters between Minnesota and Canada—as its first high adventure facility in 1923.  For nearly a century, the BSA has maintained several wilderness canoe bases at Northern Tier from which generations of Scouts have explored millions of acres of lakes, rivers, forests, and wetlands of northern Minnesota, northwestern Ontario, and southeastern Manitoba.  Scouts at Northern Tier embark on canoe treks covering up to 150 miles and lasting as long as two weeks.  Along the way, Scouts camp at remote, unstaffed campgrounds, where they must learn and implement Scouting's philosophy of self-sufficiency.  In the winter, Northern Tier transforms into a cold-weather camping outpost, where Scouts can engage in winter activities such as cross-country skiing, dog sledding, snow shoeing, and ice fishing.  Over the years, the BSA has hosted almost 250,000 Scouts and Scouters at Northern Tier.[50]

### (ii)    Philmont Scout Ranch

The BSA's largest high adventure facility, Philmont Scout Ranch ("Philmont"), was opened in 1938 on nearly 150,000 acres of rugged mountain wilderness in the Sangre de Cristo

---

[50]    *See generally* BSA, *About Northern Tier*, https://www.ntier.org/about/.

range of the Rocky Mountains in northeastern New Mexico.  At Philmont, Scouts have access to a labyrinth of backpacking trails, as well as 35 staffed camps and 55 trail camps, spread across mountainous terrain ranging in elevation from 6,500 to 12,500 feet.  In addition, the BSA's programming at Philmont features the best of the Old West—horseback riding, burro packing, gold panning, chuckwagon dinners, and interpretive history—along with physical challenges such as rock climbing, mountain biking, and sport shooting.  These experiences teach Scouts about our nation's frontier history and instill in them a lifelong sense of adventure and confidence in challenging situations.  In addition, Philmont hosts a series of leadership training programs for adult leaders.  Well over a million Scouts and Scouters have experienced the unique and diverse offerings of Philmont.[51]

### (iii)    Florida Sea Base

Florida Sea Base ("Sea Base") was commissioned by the BSA as its third high adventure facility in 1980.  At several facilities in south Florida and the U.S. Virgin Islands, Scouts swim, snorkel, scuba dive, and fish.  Scouts also participate in boating and sailing adventures throughout the Caribbean, as well as primitive camping on several island-based settlements.  Through Sea Base's programming, Scouts learn to trust one another and work as a team, and also learn the importance of conservation and the preservation of our environment.  Since opening its doors, the BSA has provided aquatic adventures to nearly 300,000 Scouts and Scouters at Sea Base.[52]

### (iv)    Summit Bechtel Reserve

Most recently, in 2013, the BSA opened the Summit Bechtel Reserve ("Summit") in the wilds of West Virginia.  It is the preeminent summer camp, high adventure facility, and leadership training center for the millions of Scouts and adult leaders involved in Scouting now and for generations to come.  At the Summit, Scouts explore the New River Gorge region through white-water rafting, kayaking, canyoneering, and advanced orienteering.  Scouts also participate in more modern adventures, such as skateboarding, ATV riding, freestyle BMXing, and zip-lining.  This programming pushes Scouts past their comfort zones, where they can better develop and master the leadership, character, citizenship, and fitness that are core to the BSA's mission.  In addition to its regular programming, the BSA hosts a National Jamboree at the Summit every four years.  In 2019, the BSA hosted the largest World Jamboree ever, with over 45,000 attendees Scouts in attendance from 167 countries.  It was the first such event held in the United States in over 50 years.  All told, approximately 200,000 Scouts and Scouters have experienced the wonders of the Summit since it opened less than a decade ago.[53]

### 3.    *Delivery of the Scouting Programs*

Local Councils and Chartered Organizations work closely together to carry out the mission of Scouting.  Each of these entities plays a vital role in training Scouts in responsible citizenship, character development, and self-reliance.  Despite their common purpose, the BSA, Local Councils, and Chartered Organizations are legally independent entities.  Each Local Council is a

---

[51]    *See generally* BSA, *About Philmont*, https://www.philmontscoutranch.org/about/.

[52]    *See generally* BSA, *About Sea Base*, https://www.bsaseabase.org/about/.

[53]    *See generally* BSA, *The Summit Story*, https://www.summitbsa.org/about-us/summit-story/.

non-profit corporation under the laws of its respective state and exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Each Local Council also maintains its own senior management and independent volunteer board of directors. The BSA does not hold any equity interest in any Local Council, Chartered Organization, or Scouting unit, and only the BSA and its wholly owned subsidiary, Delaware BSA, LLC, are Debtors in these Chapter 11 Cases.[54]

####    a.    **Local Councils**

In furtherance of its mission, the BSA charters independently incorporated Local Councils to facilitate the delivery of the Scouting program. Local Councils are not agents of the BSA, and they have no authority to bind the organization.

There are currently 251 Local Councils covering geographic areas of varying size, population, and demographics. Although they are legally independent of the BSA, Local Councils are required to organize, operate, and promote Scouting in a manner that is consistent with the BSA's mission and with the BSA's Charter, bylaws, rules and regulations, policies, and guidelines. Local Councils generally do not receive financial support from the BSA; instead, they rely upon their own fundraising through donations, product sales, special events, and corporate gifts. The BSA does, however, provide certain corporate and administrative support to the Local Councils in exchange for shared services and other fees and reimbursements, as well as for the assistance of Local Councils in delivering the Scouting mission. This support includes human resources, access to training facilities, marketing services, and general liability Insurance Coverage.

The BSA is responsible for developing and disseminating the structure and content of the Scouting program, owns and licenses intellectual property, and provides training and support services, including corporate services such as human resources, marketing and legal functions, and information technology. The BSA, in addition to holding the power to grant charters to Local Councils, may also revoke a Local Council's charter for failing to meet national standards. Local Councils, for their part, play a key role in delivering the Scouting program. Local Councils also serve the vital function of collecting member fees and remitting such funds to the BSA. Each of these Local Councils is crucial to the BSA's ability to carry out its mission.

The most important functions served by Local Councils are their recruiting of Chartered Organizations and their oversight of the operation of the Scouting units that those Chartered Organizations create. Local Councils also provide other services essential to Scouting, including: funding of local Scouting programs and initiatives; recruiting of Scouts and volunteer leaders; providing Scout and volunteer training; offering opportunities for rank advancement; locally enforcing the BSA's policies, rules, and regulations; and registering members and leaders. In addition, many Local Councils own and operate service centers, camps, and other facilities that provide the local resources necessary for a successful Scouting program.

Local Councils own and operate hundreds of unique camps and other properties that host outdoor activities, educational programs, and leadership training for youth involved in BSA's Scouting programs. Certain Local Councils also own office buildings used for their program staff

---

[54]    In addition to Local Councils and Chartered Organizations, the BSA is also affiliated with several non-stock Entities, each of which is related to, but legally independent of, the BSA. Several of these affiliated, non-stock Entities are directly involved in delivering the Scouting program, while others, such as the Foundation, serve the BSA's mission in other ways.

and approximately 145 Scout Shops, which the BSA leases from these Local Councils to sell retail merchandise and other products. Certain Local Councils also own various other properties including vacant land and/or properties that are not in use.

A corps of qualified and trained professional and volunteer Scouters is essential for Local Councils to provide these services. To that end, each of the Local Councils hires a professional Scout executive and other key staff from a pool of professionals—pre-commissioned by the BSA—who have demonstrated the moral, educational, and emotional qualities necessary for leadership. Those commissioned professionals and other staff members support the Local Councils in connection with day-to-day operations, recruitment of new Chartered Organizations, management of fundraising, maintenance of program facilities, and numerous other services. Thousands of volunteers also donate their time and resources to support the Local Councils, including through assistance with programming, such as unit leadership, unit activities, merit badge colleges, youth and adult leader training and advancement opportunities, and fundraising events.

### b.    Chartered Organizations

There are currently more than 41,000 Chartered Organizations in the United States. They are typically local organizations—such as faith-based institutions, clubs, civic associations, educational institutions, businesses, and groups of citizens—that sponsor the more than 50,000 local Scouting units throughout the country. Some Chartered Organizations are actively involved with the units that they sponsor and encourage Scouting as a means to further in their own mission or serve their broader communities. In addition, Chartered Organizations support the selection of adult leaders and other volunteers, and provide meeting space to the packs and troops that they sponsor along with storage space, use of equipment, and other monetary and in-kind support.

Unfortunately, relationships with some of these Chartered Organizations have deteriorated or been terminated. For example, as of December 31, 2019, TCJC concluded its 105-year relationship as a Chartered Organization with all Scouting programs around the world, including the BSA—which is estimated to have resulted in approximately 525,000 fewer participants in the BSA's Scouting programs.[55]

### B.    Corporate Structure

### 1.    *Delaware BSA, LLC*

Debtor Delaware BSA, LLC ("Delaware BSA"), of which the BSA is the sole member, is a non-profit limited liability company that was incorporated under the laws of Delaware on July 11, 2019. Delaware BSA is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Delaware BSA has pledged substantially all of its assets to secure the obligations of the BSA and Arrow under the 2019 RCF Agreement, the Prepetition Security Agreement (2020), the 2010 Bond Agreement, and the 2012 Bond Agreement. Delaware BSA's principal asset is a depository account located in Delaware.

---

[55]    TCJC has not indicated an intention to become a Chartered Organization with Scouting again.

## 2.    BSA Asset Management, LLC and BSA Commingled Endowment Fund, LP

The BSA receives services from certain specialized non-Debtor Affiliates, which are wholly-owned by, or subject to the control of, the BSA (each, a "Related Non-Debtor Entity"). While the Local Councils facilitate the Debtors' mission and are vital in reaching participants at a local level, the Related Non-Debtor Entities provide specialized services under shared services arrangements that are necessary to facilitate the BSA's national reach, including, among other things, investment and foundation management, management of national programs, lease transactions, and conference and training support functions.  BSA Asset Management, LLC ("BSAAM") is a Delaware limited liability company of which the BSA is the sole member.  The BSA receives investment management and advisory services from BSAAM, which oversees management of the funds making up the various benefits programs and trusts of the BSA, along with providing management and investment services for the BSA's unrestricted endowment and donations to the BSA.  BSAAM manages the BSA's and certain Local Councils' investments through the BSA Commingled Endowment Fund, LP (the "Endowment Fund"), which is a Delaware limited partnership and investment vehicle open only to the BSA, the Local Councils, and their affiliates for investing long-term funds.  BSAAM is the general partner of the Endowment Fund.  The BSA and certain Local Councils are limited partners of the Endowment Fund.  Each limited partner receives units of partnership interest in proportion to, and in exchange for, its financial contributions to the Endowment Fund.  In addition to its role as general partner of the Endowment Fund, BSAAM is the settlor of the BSA Endowment Master Trust.

## 3.    BSA Endowment Master Trust

Related Non-Debtor Entity, BSA Endowment Master Trust (the "Master Trust"), is a non-profit 501(c)(3) Delaware trust established under the laws of Delaware exclusively for the purpose of investing funds contributed to the Endowment Fund by the BSA and participating Local Councils.  The Master Trust is a multiple pooled account trust arrangement established to provide economies of scale and efficiency of administration to eligible Entities that elect to invest their funds in the Master Trust.  Global Trust Co. is the trustee of the Master Trust as of the Petition Date.  In addition, the Master Trust is also a limited partner of the Endowment Fund.

## 4.    National Boy Scouts of America Foundation

The Foundation, a Related Non-Debtor Entity, is a non-stock, non-profit corporation organized under the laws of the District of Columbia and exempt from federal income taxes under section 501(c)(3) of the Internal Revenue Code.  The Foundation was formed in 1997 and exists to help secure the future of Scouting, and partners with the Local Councils and donors by providing support for major-gift fundraising efforts across the BSA organization.[56]  The balance of major gifts net of associated liabilities at the end of 2020 totaled approximately $66 million.  The Foundation also manages the distribution of donor-advised funds such as scholarships, funds for rebuilding camps and high adventure facilities including after the occurrence of natural disasters, and funding for major Scouting events such as the National Jamboree.

---

[56]    *See* BSA National Foundation, *About Us*, www.bsafoundation.org/about-us/.

### 5.      *Learning for Life*

Related Non-Debtor Entity Learning for Life is a non-stock, non-profit corporation organized under the laws of the District of Columbia that is exempt from federal income taxes under section 501(c)(3) of the Internal Revenue Code.  The mission of Learning for Life is to empower students to build exceptional character and leadership skills by guiding them through an innovative, research-based curriculum that enhances the learning experience and teaches the skills necessary to succeed both academically and throughout their lives.  Learning for Life also administers the Exploring club career education program for young men and women.  The Exploring program teaches important life and career skills to young people from all backgrounds through immersive career experiences and mentorship provided by thousands of local, regional and national businesses and organizations, which offer career-specific posts or clubs that help youth pursue their special interests, grow, and develop.

### 6.      *Arrow WV, Inc.*

Arrow WV, Inc. ("Arrow") is a non-stock, non-profit corporation organized under the laws of West Virginia that is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  Arrow was formed in 2009 to facilitate the acquisition and development of the Summit.  Arrow owns the real property and improvements that comprise the Summit and leases the Summit to BSA for nominal consideration.  Construction of the Summit was accomplished with the proceeds from the 2010 Bond and the 2012 Bond to the BSA from Fayette County, West Virginia.  The bonds were purchased by JPM.  The BSA provided funding for the construction of the facility, utilizing donations and pledges to the BSA and other BSA financial support, and the BSA provides the necessary services required to operate Summit.

### 7.      *Atikaki Youth Ventures Inc. and Atikokan Youth Ventures Inc.*

Related Non-Debtor Entities Atikaki Youth Ventures Inc. ("Atikaki") and Atikokan Youth Ventures Inc. ("Atikokan") are non-share capital corporations formed under the laws of Canada, with registered addresses in Winnipeg, Manitoba.  Atikaki and Atikokan provide certain services to the BSA related to the operation of Northern Tier.  Atikaki maintains the Bissett, Manitoba base for the Northern Tier high adventure facility, which offers canoe trips into the Atikaki Provincial Park and Woodland Caribou Provincial Park.  Atikokan maintains the Don Rogert Canoe Base for the Northern Tier high adventure facility in Atikokan, Ontario, Canada, which offers canoe trips into the Quetico and Crown Lands.

### 8.      *Dissolution of Inactive Entities*

As of the Petition Date, two of the Debtors' subsidiaries—NewWorld19, LLC ("New World") and Texas BSA, LLC ("Texas BSA")—had no operations or material assets and remained inactive after the filing.  Because the BSA no longer had a need to maintain NewWorld or Texas BSA as subsidiaries, on July 16, 2020, the Debtors filed a motion to dissolve NewWorld and Texas BSA [D.I. 1022].  On August 3, 2020, the Bankruptcy Court entered an order authorizing the dissolution of these entities [D.I. 1063].

C.    Revenue Sources and Assets

1.    *Revenues*

As a non-profit organization, the focus of the BSA's operations is to carry out its charitable mission.  The BSA has historically funded the work to carry out the mission, in part, through the generation of revenue from sources such as member fees and donations.  Specifically, the BSA relies on revenue generated from membership registration fees, high adventure facility fees, supply sales at Scout shops, on its website, and directly to Local Councils, donor contributions, legacies and bequests, corporate sponsorships, and grants from foundations.

In 2019, the BSA's total gross revenues were approximately $394 million.  Of this total, approximately 30% was attributable to supply sales, approximately 16% to membership fees, approximately 15% to high adventure facility operations, approximately 13% to investments, approximately 8% to contributions, approximately 8% to event fees, and approximately 10% to other.  The BSA's estimated total 2020 gross revenues were approximately $187 million.

Although registration and renewal numbers are not yet finalized, the Debtors believe that Cub Scouts and Scouts BSA, in aggregate, have already met the combined retention levels as set forth in the financial projections of approximately 650,000 and will likely exceed those levels after unit rechartering is complete.[57]  Cub Scouts, including the Scoutreach program, and Scouts BSA represent approximately 93% of youth members, and therefore are an effective indicator of overall membership levels.

2.    *Assets*

The BSA intends to contribute the following non-cash, non-insurance assets as part of the BSA Settlement Trust Contribution:

- The BSA's collection of Artwork listed on Schedule 1 to the Plan, which has an approximate appraised value of $59.0 million, and the rights to any insurance or proceeds thereof with respect to missing, damaged, or destroyed Artwork, if any.  The BSA owns over 300 pieces of artwork that has been acquired or contributed from various sources.

- The Warehouse and Distribution Center, which is a parcel of real property owned by the BSA in Charlotte, North Carolina that is used as the BSA's main hub for receiving and shipping all supplies, merchandise, and apparel for Scout Shops, online customers, wholesale distributors, and to Local Councils.  The Warehouse and Distribution Center has an approximate value of $11.6 million.

- Oil and Gas Interests representing mineral or royalty interests owned by the BSA of approximately 1,027 properties located in Alabama, Arkansas, California, Florida, Georgia, Illinois, Louisiana, Michigan, Mississippi, Nebraska, New Mexico, North

---

[57]    The membership figures herein and in the Financial Projections accurately reflect the Debtors' records and projections as of the date of the filing of the Disclosure Statement.

Dakota, Oklahoma, Oregon, Texas, South Dakota and Wyoming. The Oil and Gas Interests have an approximate value of $7.6 million.

- Scouting University, which is a nearly 10,000 square foot building located on approximately 1.72 acres of real property in Westlake, Texas with a value of approximately $1.8 million. Historically, Scouting University served as a multipurpose facility with traditional offices located adjacent to large training spaces. The Debtors ceased operations at the facility prior to the Petition Date. On June 16, 2021, the Debtors received approval from the Bankruptcy Court to authorize the sale of Scouting University to a third-party purchaser for net proceeds of approximately $1.9 million [D.I. 5326].

### 3.     *Identified Property*

The Debtors believe that certain property listed on the BSA's balance sheet (the "Identified Property") is legally protected under applicable laws governing charities and other non-profit organizations and, therefore, not available to satisfy certain creditors' Claims. The Debtors have provided a schedule of the property the Debtors intend to retain after the Effective Date that specifically delineates such property as Identified Property or property of the Estate (the "Retained Property List"). The Retained Property List is appended to the Financial Projections attached as **Exhibit E-1** hereto and the Financial Projections are further described in Article IX.E of this Disclosure Statement. The Debtors assert that the Identified Property is not available to satisfy certain Claims against the Debtors for one or more of the following reasons: (i) it is subject to donors' restrictions on use and purpose; (ii) it is core to the BSA's charitable mission and Scouting program; (iii) it is held in an implied charitable trust; (iv) it is part of a charitable trust that can only be used in fulfillment and furtherance of the BSA's charitable mission; (v) selling or liquidating the Identified Property would violate the D.C. Nonprofit Corporation Act; (vi) selling or liquidating the Identified Property contradicts the Bankruptcy Code's treatment of charitable organizations; or (vii) it is otherwise not property of the estate under applicable law.

Specifically, it is the Debtors' position that certain of the Identified Property was donated with a restriction as to use or purpose rather than for general charitable purposes and is therefore, pursuant to section 541 of the Bankruptcy Code, not property of a debtor's estate. Moreover, to the extent that a donor made a restricted donation, the Debtors are contractually obligated to effectuate the donor's intent, and selling or liquidating the Identified Property to satisfy Abuse Claims would likely violate such intent. Even if certain Identified Property was found to be unrestricted, both unrestricted and restricted donations made to a charity are impressed with a charitable trust that cannot be diverted and used in contravention of the nonprofit's charitable mission. The same is true under the D.C. Nonprofit Corporation Act, which states that if any of the Identified Property was donated for the nonprofit's charitable mission, it cannot be diverted away from its original purpose by sales, leases, repayment of debt, or other transfers of the property.

Additionally, it is the Debtors' position that certain of the Identified Property is core and indispensable to carrying out the BSA's mission. The Identified Property not only enables the BSA to administer programming that trains today's youth in the values of the Scout Oath and Law, but some of the Identified Property, such as the BSA's high adventure facilities, animates the

purpose for which Congress originally chartered the organization.  As such, it is the Debtors' position that it cannot be available to satisfy Abuse Claims.

Most of the Identified Property also generates revenues necessary for the BSA to carry out its mission and it is the Debtors' position that such property is essential to the Debtors' ability to meet its business plan.  It is likewise the Debtors' position that the sale or liquidation of the Identified Property runs contrary to the Bankruptcy Code's treatment of non-profits and contrary to case law holding that a charity may retain assets notwithstanding the lack of full payment of its creditors since the absolute priority rule does not apply in a restructuring of a charitable organization.  Finally, JPM holds valid and properly perfected liens on certain of the Identified Property, and JPM has not agreed to release its liens on its prepetition collateral.  *See* ¶¶ D(viii) and D(xvii) of the Cash Collateral Order.

The Tort Claimants' Committee has argued that the Identified Property may be used to satisfy Abuse Claims against the Debtors and, as described in more detail in Article V.Q.2 below, has filed an adversary complaint seeking a determination that the Identified Property is not subject to legal restrictions and should be used to satisfy Abuse Claims (the "Restricted Assets Adversary").  The Debtors dispute the Tort Claimants' Committee's causes of action relating to the Identified Property.[58]  On July 16, 2021, the Court approved a stipulation with the Tort Claimants' Committee staying the Restricted Assets Adversary pending the outcome of the confirmation hearing [TCC Case, D.I. 42].  The stay contemplated by such stipulation is still in effect and shall only terminate (a) by mutual agreement or (b) upon the occurrence of any of the following: (i) the Bankruptcy Court's entry of an order denying the approval of the Restructuring Support Agreement; (ii) the Tort Claimants' Committee or Debtors' exercise of its or their respective rights to terminate the Restructuring Support Agreement based on the "fiduciary out" provision of section IV.C or section V.C of the Restructuring Support Agreement, as applicable; or (iii) the Bankruptcy Court's entry of an order denying confirmation of the Plan.

D.    Prepetition Capital Structure

   1.    *The Prepetition Debt and Security Documents*

The following is an overview of the BSA's capital structure and approximate outstanding obligations (collectively, the "Prepetition Obligations") arising under the Prepetition Debt and Security Documents as of the Petition Date, which include the following:

---

[58]    *See* Article V.Q.2 herein for further detail on the adversary proceeding relating to Identified Property.

| Description | Amount[59] | Interest Rate | Maturity |
|---|---:|:---:|:---:|
| **2019 RCF Agreement** | | | |
| -    2019 Revolver | $0 | L + 125 | March 21, 2021 |
| -    2019 Letters of Credit | $61,542,720 | N/A | N/A |
| **2010 Credit Agreement** | | | |
| -    2010 Revolver | $25,212,317 | L + 125 | March 2, 2020 |
| -    2010 Term Loan | $11,250,000 | L + 100 | March 2, 2022 |
| -    2010 Letters of Credit | $44,299,743 | N/A | N/A |
| **2012 Bond Agreement** | $145,662,101 | 2.94% | March 9, 2022 |
| **2010 Bond Agreement** | $40,137,274 | 3.22% | November 5, 2020 |
| **Total Secured Debt** | **$328,104,155**[60] | | |

Under each of the above-referenced agreements, the BSA is the borrower and JPM is the sole secured lender or holder, as the case may be.  Collectively, the Debtors' Prepetition Obligations totaled approximately $328,104,155 as of the Petition Date.  The Prepetition Obligations are secured by the same collateral (collectively, the "Prepetition Collateral"), which consists of (i) a first-priority lien and security interest in the accounts (including certain property arising out of or otherwise relating to such accounts, but excluding certain amounts payable the source of which is certain donor-restricted funds), deposit accounts, securities accounts and investment property (each as defined in Article 9 of the Uniform Commercial Code), and proceeds and products of any or all of the foregoing, of the Debtors and Arrow, (ii) a security interest and mortgage in and to (a) the BSA's Headquarters in Texas and (b) certain of the BSA's high adventure facilities, including Sea Base in Florida, Philmont in New Mexico, and Northern Tier in Minnesota, and (iii) a collateral assignment of the Arrow Intercompany Note and Arrow Deed of Trust (which grants a security interest and mortgage in and to the Summit in West Virginia).

In accordance with the Cash Collateral Order, the Debtors have been authorized to pay prepetition and postpetition interest with respect to the Prepetition Obligations.

a.    **2010 Credit Agreement**

On August 11, 2010, the BSA entered into the 2010 Credit Agreement with JPM, pursuant to which JPM made loans and other extensions of credit to the BSA.  Arrow is a guarantor under the facility.  The 2010 Credit Agreement has been amended seven times, most recently in conjunction with the entry into the 2019 RCF Agreement on March 21, 2019.

The 2010 Credit Agreement has two components, a $75,000,000 revolving credit component (the "2010 Revolver") and a $25,000,000 term loan component (the "2010 Term

---

[59]    Includes estimated amounts as of February 18, 2020.  Since the Petition Date, $20,000,000 was drawn on the 2019 Letters of Credit (defined below), resulting in corresponding increases and decreases in the 2019 Revolver (defined below) and the 2019 Letters of Credit, respectively.

[60]    These amounts include contingent, undrawn letters of credit under the 2019 RCF Agreement and the 2010 Credit Agreement totaling $105,842,463.

Loan"). The 2010 Credit Agreement also allowed the BSA to request the issuance of letters of credit by JPM (the "2010 Letters of Credit"). The 2010 Revolver matured on March 2, 2020, while the 2010 Term Loan is scheduled to mature on March 2, 2022.

As of the Petition Date, pursuant to the 2010 Credit Agreement, the Debtors were truly, justly, and lawfully indebted and liable to JPM for $25,212,317 in respect of the 2010 Revolver, $11,250,000 in respect of the 2010 Term Loan, and $44,299,743 in respect of undrawn 2010 Letters of Credit.

b.    **2010 Bond Agreement**

On November 5, 2010, the BSA and Arrow entered into the 2010 Bond Agreement, pursuant to which the Bond Issuer issued the Series 2010A Bonds in an aggregate principal amount of $50,000,000 and the Series 2010B Bonds in an aggregate principal amount of $50,000,000 (collectively, the "Series 2010 Bonds"), the proceeds of which were loaned to the BSA. The loans from the Bond Issuer to the BSA were evidenced by that certain Promissory Note – 2010A and that certain Promissory Note – 2010B, each executed by the BSA and payable to the order of the Bond Issuer, each in the original principal amount of $50,000,000, and each pledged by the Bond Issuer to JPM to secure the repayment of the Series 2010 Bonds. On November 5, 2015, the BSA repaid the Series 2010A Bonds in full.

As of the Petition Date, pursuant to the 2010 Bond Agreement, the Debtors were truly, justly, and lawfully indebted and liable to JPM for $40,137,274 in respect of the remaining outstanding Series 2010 Bonds.

c.    **2012 Bond Agreement**

On March 9, 2012, the BSA and Arrow entered into the 2012 Bond Agreement, pursuant to which the Bond Issuer issued the Series 2012 Bonds (the "Series 2012 Bonds") in an aggregate principal amount not to exceed $175,000,000, the proceeds of which were loaned to the BSA. The loans from the Bond Issuer to the BSA were evidenced by that certain Promissory Note – 2012, executed by the BSA and payable to the order of the Bond Issuer in the principal amount of $175,000,000 and pledged by the Bond Issuer to JPM to secure the repayment of the Series 2012 Bonds.

As of the Petition Date, pursuant to the Series 2012 Bonds, the Debtors were truly, justly, and lawfully indebted and liable to JPM for $145,662,101 in respect of the remaining outstanding Series 2012 Bonds.

d.    **2019 RCF Agreement**

On March 21, 2019, the BSA entered into the 2019 RCF Agreement, with Arrow as a guarantor, pursuant to which JPM agreed to make revolving loans and other extensions of credit to the BSA. The 2019 RCF Agreement, which matures on March 21, 2021, is a secured facility with a revolving component (the "2019 Revolver") and a component under which the BSA can request the issuance of letters of credit by JPM, together in a maximum amount not to exceed $71,500,000 (the "2019 Letters of Credit").

As of the Petition Date, pursuant to the 2019 RCF Agreement, the Debtors were truly, justly, and lawfully indebted and liable to JPM for $0 in respect of the 2019 Revolver and $61,542,720 in respect of undrawn 2019 Letters of Credit.

e.    **Prepetition Security Agreement (2019)**

The BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019 RCF Agreement are secured *pari passu* by the "Collateral," as defined under the Prepetition Security Agreement (2019), pursuant to which the BSA and Arrow granted collateral to JPM, which collateral as of such date included a first-priority lien and security interest in their accounts (including certain property arising out of or otherwise relating to such accounts, but excluding certain amounts payable the source of which is certain donor-restricted funds), deposit accounts, securities accounts and investment property (each as defined in Article 9 of the Uniform Commercial Code), and proceeds and products of any or all of the foregoing.

f.    **Mortgages, Assignments, and Deeds of Trust**

In addition to the Prepetition Security Agreement (2019), the BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019 RCF Agreement are secured *pari passu* by the Florida Sea Base Mortgage, the Florida Sea Base Assignment, the Headquarters Deed of Trust, the Headquarters Assignment, the Northern Tier Mortgage, the Northern Tier Assignment, the Philmont Mortgage, and the Philmont Assignment.

g.    **Collateral Assignment of Arrow Intercompany Note and Arrow Deed of Trust**

Also on March 21, 2019, the BSA executed the Arrow Collateral Assignment, pursuant to which the BSA assigned to JPM, as collateral securing the BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019 RCF Agreement, its right, title and interest in and to the Arrow Intercompany Note and Arrow Deed of Trust.

h.    **Prepetition Security Agreement (2020)**

On February 3, 2020, in connection with a capital contribution by the BSA to Delaware BSA, the BSA, Delaware BSA, and JPM entered into the Prepetition Security Agreement (2020), pursuant to which Delaware BSA pledged its accounts (including certain property arising out of or otherwise relating to such accounts, but excluding certain amounts payable the source of which is certain donor-restricted funds), deposit accounts, securities accounts and investment property (each as defined in Article 9 of the Uniform Commercial Code), and all proceeds and products of any or all of the foregoing, as security for the Prepetition Obligations.

2.    *Trade Payables, Retirement Benefits, and Other Liabilities*

The BSA incurs debt with numerous vendors in connection with its ordinary course organizational operations.  In addition, the BSA is obligated to pay employment related benefits

to current and former employees, including, but not limited to, retirement benefits in connection with (a) the Restoration Plan, a non-qualified defined benefit retirement plan under section 457(f) of the Internal Revenue Code, which provides supplemental retirement benefits to certain current and former employees of the Debtors or Local Councils and (b) the Pension Plan, a single-employer, qualified, defined benefit Pension Plan that is subject to the Employee Retirement Income Security Act of 1974, as amended, and the Internal Revenue Code, of which BSA is the sponsor.

### 3.    *Pension Plans*

The BSA offers the same comprehensive health and welfare and retirement benefits available to eligible employees of the BSA to eligible full-time employees of the Local Councils and their dependents, as well as their eligible survivors and retirees.  As further described in the Wages Motion, the BSA has historically offered two retirement plans to full-time and seasonal employees: (1) a defined benefit pension plan, which is a qualified retirement plan subject to sections 401(a)(17) and 415 of the Internal Revenue Code (the "Pension Plan") and (2) a 403(b) defined contribution retirement plan, which is available to employees of exempt organizations and similar to a 401(k) retirement plan (the "Match Savings Plan").

Prior to the Petition Date, the Debtors also offered a non-qualified defined benefit retirement plan under section 457(f) of the Internal Revenue Code, which provides supplemental retirement benefits to certain current and former employees of the Debtors or Local Councils (the "Restoration Plan").  Pursuant to the Plan, the Restoration Plan will be terminated and therefore, there is no ongoing expense associated with the Restoration Plan.

The Pension Plan was originally established by the BSA in 1938 and certain of the full-time employees with at least one year of service and retirees participate in the Pension Plan.[61]  On December 31, 2018, entry into the Pension Plan was frozen and no employees have been permitted to become active participants under the Pension Plan after such date.  On and after January 1, 2019, the Pension Plan was amended to become a two-tiered plan.  Pursuant to the amendment, "grandfathered employees" with fifteen years of service and age plus service equal to sixty years were permitted to continue to participate in the Pension Plan, while "non-grandfathered employees" were automatically enrolled into the Match Savings Program.  These "grandfathered" employees participating in the Pension Plan are required to contribute 4.25% of their salary to the Pension Plan, while the BSA makes discretionary contributions.  The Pension Plan is managed by the BSA and is administered by Morneau Shepell.  All eligible employees may also enroll in the Match Savings Plan, which enables the employees to make pre-tax deductions up to limits set by the Internal Revenue Code.  The Match Savings Plan is managed by Fidelity Workplace Services.

The Debtors have a limited matching program under the Match Savings Plan (the "Employer Matching Obligation").  For "grandfathered" employees receiving benefits under the Pension Plan, the BSA matches 50% of employee contributions up to 6% of pay.  As of the Petition Date, with respect to "non-grandfathered" employees under the Match Savings Plan, the BSA made an automatic contribution of 1.75% of an employee's pay regardless of whether an employee made an employee contribution, and matched 100% of employee contributions up to 6% of pay.

---

[61]    Employees hired on or before May 31, 2004 working 21 or more hours per week are also eligible.

The Debtors paid approximately $6.5 million in 2019 on account of the Employer Matching Obligation.

In August 2020, the Debtors implemented a series of changes to the two retirement programs to bolster the strength of the Pension Plan. The Pension Plan was amended to freeze accruals for "grandfathered" participants. The 4.25% required employee contribution ceased as a result of this change. Simultaneously, the Match Savings Plan was amended to decrease the Employer Matching Obligation for "non-grandfathered" participants; with respect to "non-grandfathered" employees under the Match Savings Plan, the BSA no longer automatically contributes 1.75% of an employee's contributions, but rather matches 50% of employee contributions up to 6% of pay, replacing the 100% match of up to 6% of pay previously in place.

E.     Local Councils and Chartered Organizations

As discussed above, several organizations work together to deliver the Scouting program, including Local Councils that are independently incorporated and chartered by the BSA and Chartered Organizations which partner with the Local Councils to form the packs, troops, and other units at which the program is delivered. Historically, Claims against the BSA, Local Councils, and Chartered Organizations, including approximately 275 civil actions asserting personal injury Claims against the BSA and certain Local Councils and Chartered Organizations as of the Petition Date (collectively, the "Pending Abuse Actions"), generally were litigated and administered solely by the BSA. The unique relationship between the BSA and these Entities, as discussed above, had led the BSA to take a leading role in administering such litigation. In practice, the BSA coordinated with Local Councils and Chartered Organizations to efficiently respond to and manage such cases, while minimizing the risk of inconsistent treatment of actions and survivors of Abuse.

Although applicable Local Councils are named defendants in the Pending Abuse Actions as well, the consistent resolution of the Pending Abuse Actions required the BSA to pay careful attention to a wide variety of litigation matters, including, for example, responses to broad discovery requests, the overwhelming majority of which were directed at the BSA as opposed to Local Council or Chartered Organization defendants. Through this approach, the BSA had, among other things, facilitated the retention of joint defense counsel, responded to the vast majority of discovery requests, coordinated with insurance carriers, and authorized and funded the payment of any settlement amounts related to the Pending Abuse Actions or similar, previously resolved, Claims. Given the complexity of the issues involving the Pending Abuse Actions, and the BSA's central role in litigating them, prior to filing these Chapter 11 Cases, the organization had retained national coordinating counsel to oversee the handling of Claims against it and the Local Councils and Chartered Organizations.

F.     Insurance Coverage for Abuse Claims

The BSA has historically procured commercial, general-liability insurance ("CGL") policies from multiple insurers to protect itself from a myriad of risks, including Claims of Abuse or sexual misconduct. These Insurance Policies date back to the 1930s and over time came to include both primary and excess Insurance Coverage that provides substantial limits of liability in many years, including certain primary policies that the Debtors contend are not subject to

aggregate limits, though certain insurers, including Hartford, may disagree.  While the amount of coverage remains substantial in many years, the insolvency of certain Insurance Companies and the resolution of Abuse and other Claims have either eroded, or exhausted the liability limits for certain Insurance Policies.  In some instances, the availability of certain Insurance Policies remains contingent upon the resolution of active pending litigation between the BSA and some of the Insurance Companies.  Nonetheless, with respect to most (if not all) policy years, at least some level of Insurance Coverage under the CGL policies is available for bodily injury Claims, including Claims arising out of Abuse.

At this time, the BSA is not able to calculate the total amount of Insurance Coverage that is available to fund Abuse Claims because of the structure of the BSA's insurance program.  As discussed in more detail below, many of the BSA's Insurance Policies are per-occurrence policies, meaning that those Insurance Policies will pay up to their limits of liability for each Abuse Claim (assuming that the Abuse Claim is valued at such an amount).  Thus, the BSA needs several data points in order to analyze the total Insurance Coverage available for Abuse Claims, including the value of each individual Abuse Claim, the Insurance Policies that will respond to each Abuse Claim, whether those Policies are not insolvent, exhausted or settled, and how the Abuse Claims will be distributed among the BSA's various Insurance Policies.  As such, the Debtors cannot calculate the total amount of insurance coverage under these Insurance Policies absent liquidation of the Abuse Claims and allocation of those claims to the Insurance Policies.

The Debtors' insurance coverage for years 2013 and later may be applicable to Abuse Claims and Non-Abuse Litigation Claims, but there is a negligible risk that the Debtors will exhaust all of their insurance coverage for such years on account of Non-Abuse Litigation Claims.  The Debtors have identified approximately sixty-two (62) active out of seventy-two (72) total Non-Abuse Litigation Claims, all of which appear to have arisen in 2013 or later (to the extent the date of the alleged incident is known).  The Debtors believe that at least eleven (11) of the active Claims will be disallowed through the Claims reconciliation process.  In addition, one (1) claim has been withdrawn, six (6) have been satisfied, and three (3) have been disallowed as the date hereof.  The Debtors have approximately $200 million of available insurance coverage in each such year.  Moreover, it is possible that a material number of these claims will not exceed the $1 million per-occurrence limit of the primary policies issued by Old Republic (as defined below) for the years 2013-19 or Evanston Insurance Company for 2019-20.  The Old Republic primary policies have no aggregate limit; accordingly, it is the Debtors' position that they cannot be exhausted.  As such, the Debtors do not believe that they will use all of the post-2013 insurance coverage for Non-Abuse Litigation Claims.

Moreover, while the BSA has substantial Insurance Coverage, especially post-1986, some of the excess policies are implicated only where hundreds of millions of dollars of liability is incurred in a single policy year, such that, many of the excess policies may not contribute to Abuse Claims.  Additionally, many of these high limits of coverage are in the late 1990s and 2000s, years in which there are significantly fewer Abuse Claims.  Lastly, the Insurance Policies may be further limited given deductibles, exhaustion, insolvency and settled coverage.  As such, the BSA is not able to provide a specific amount of coverage available under its Insurance Policies; however, the BSA has provided a detailed description of the Insurance Policies and the coverage afforded.

To the extent that non-Debtor third parties have rights under the Insurance Policies, those non-Debtors can assert their rights against the Settlement Trust as Indirect Abuse Claims.

### 1.    *Overview of the BSA's Insurance Program*

> **Further information regarding the BSA Insurance Policies is included in <u>Schedule 2</u> to the Plan, which provides policy information concerning: (1) the issuing insurance company; (2) policy number; (3) policy start date; (4) policy end date; (5) limits of liability; (6) aggregate limits, if any; (7) whether there is a sexual abuse exclusion; and (8) type of evidentiary support.[62]**

The type of coverage provided for by the BSA's insurance program has varied over the last six decades.    Insurance policies have what are known as "per-occurrence limits" and "aggregate limits."    These limits determine the amount that a policy will pay towards claims.    A per-occurrence limit is how much an insurance policy will pay for any one occurrence.    An aggregate limit determines how much an insurance policy will pay for all occurrences that result in injury during the policy period.    Most of BSA Insurance Policies contain both a per-occurrence limit and an aggregate limit.    The Debtors contend that the aggregate limits in many of these policies are inapplicable to Abuse Claims, meaning that those policies will respond, up to its limits, on a per-occurrence basis.    Certain of the insurers have not agreed that aggregate limits are inapplicable to Abuse Claims.

Between at least 1935 and 1982, the BSA acquired Insurance Policies where each Claim of bodily injury allowed the BSA to access the per-person or per-occurrence limit of liability under the applicable Insurance Policies.[63]    These per-occurrence policies generally only had aggregate limits that pertained to products-completed operations claims.[64]    Therefore, the Debtors believe that these aggregate limits, i.e., caps on the amount to be paid out, did not impact claims for bodily injury (sexual-abuse claims).    The Insurance Policies between 1962 and 1982 generally had a per-occurrence limit of $500,000. Beginning in 1969, the BSA also began to procure excess Insurance Policies that provided $2 million per-occurrence in coverage on top of the $500,000 per-occurrence primary policies.    These excess policies also only contained per-occurrence limits with no aggregate limits for sexual abuse claims.

Although the BSA does not have copies of the Insurance Policies between 1935 and 1962, the BSA has strong secondary evidence that Insurance Policies were issued.    The BSA believes that, if forced to do so, the BSA could prove the existence of these Insurance Policies and the insurers' obligations.    However, the insurers, mainly Century (as defined below)—the issuer of

---

[62]    The Debtors have prepared this chart based on their own analysis based on information available as of September 27, 2021. Schedule 2 and the views expressed herein do not necessarily represent the views of, and do not bind, the Settlement Trustee, the Tort Claimants' Committee, the Coalition, the Future Claimants' Representative regarding BSA's insurance program. In addition, Insurance Companies may disagree, and in some cases have expressed disagreement, with the Debtors' conclusions regarding the existence or terms of the policies listed therein. This chart should not therefore be interpreted as an admission on the part of any Insurance Company as to the existence or terms of any policy. On the contrary, each Insurance Company has reserved the right to dispute the existence or terms of any policy listed.

[63]    For purposes of simplicity, this analysis is limited to the BSA's primary Insurance Policies.

[64]    Not all insurers agree with this assertion.  Hartford contends that certain of its policies issued to the Debtors, including certain years of primary coverage, include general aggregate limits that apply to all Claims, including Abuse Claims.

these Insurance Policies, have disputed the existence of these Insurance Policies. Starting in 1962, there is no dispute regarding the existence of coverage with the BSA's insurers.

Insurance Company of North America, now known as Century Indemnity Company ("Century"),[65] issued primary and umbrella policies to the BSA from approximately 1935 to 1971. The Hartford Accident and Indemnity Company issued primary and some umbrella policies to the BSA from September 21, 1971 to January 1, 1978. The Debtors believe that the Hartford Policies issued to BSA in 1976 and 1977 have some ambiguity as to whether Chartered Organizations are additional insureds. A complete list of Chartered Organizations is available at https://omniagentsolutions.com/bsa-SAballots and https://omniagentsolutions.com/bsa-ballots. Beginning in 1978, Century issued primary policies to the BSA until 1983. In addition, BSA entered into a settlement agreement with Hartford in 2011; Hartford contends that, pursuant to that settlement, any rights to coverage for Abuse Claims have been released.

Beginning in 1972, the BSA began to procure additional excess insurance policies from various insurers, including Argonaut, AIG, Hartford Accident and Indemnity Company, and others. Because Century and Hartford Accident and Indemnity Company provided the BSA with several decades of primary coverage under Insurance Policies for which the Debtors believe that the aggregate limits are inapplicable, the Debtors believe that Century and Hartford Accident and Indemnity Company have substantial insurance coverage exposure relating to the Abuse Claims, and, as discussed above, Century has substantially more exposure for Abuse Claims given the periods it issued Insurance Coverage to the BSA. Both Hartford and Century have disagreed with the Debtors' position. On May 15, 2020, Hartford filed an adversary complaint against BSA asserting that Hartford's coverage obligations to BSA were limited or eliminated because Hartford had already paid the applicable limits of liability under its policies in full. Hartford also asserted that it was relieved of any obligation under its policies because BSA had breached its obligations under those policies. On October 16, 2020, the Bankruptcy Court entered an order granting an agreed-upon stay of the adversary proceeding, which remains stayed. Accordingly, Hartford's allegations concerning the unavailability of coverage under its policies remains unresolved.

Beginning in 1983, the BSA shifted its insurance program to Insurance Policies that contained overall aggregate limits of liability. Unlike the per-occurrence policies, each payment towards the settlement of a Claim erodes the Insurance Policy's aggregate limit until it is exhausted and no longer responds to Claims. The BSA purchased these types of Insurance Policies from 1983 to the end of 1985. As a counterbalance to the imposition of aggregate limits, the BSA's towers of insurance in 1983 through 1985 included significantly higher limits of liability and excess layers of coverage. For example, in 1983, the BSA procured excess Insurance Policies with $50 million in aggregate limits. The excess and umbrella policies were issued by various insurers. However, even given the high aggregate limits, a majority of the Insurance Policies during this time period have been exhausted by pre-Petition settlements and defense costs.

The BSA again altered its insurance program beginning in 1986, and continuing through 2018, procuring a primary Insurance Policy and a first-layer excess Insurance Policy where the

---

[65]    Century is acting in these Chapter 11 Cases as successor to CCI Insurance Company, Insurance Company of North America. Indemnity Insurance Company of North America, Ace Insurance Group Westchester Fire Insurance Company, Westchester Fire Insurance Company, and Westchester Surplus Lines Insurance Company. All of these Entities are generally referred to as "Century" herein.

deductible matches the Insurance Policy's limit of liability. More specifically, between 1986 and 2002, the BSA has primary Insurance Policies with $1 million in limits of liability per year and umbrella Insurance Policies with $1 million in limits of liability per year. Between 2002 and 2008, the BSA has primary Insurance Policies with $1 million in limits of liability per year, but with increased umbrella obligations. And between 2008 and 2018, the BSA maintained primary Insurance Policies with $1 million in limits of liability per year, and umbrella Insurance Policies with $9 million in limits of liability per year. Because of the high deductibles in the 1990 to 2018 Insurance Policies, the BSA has not accessed many of the excess Insurance Policies in those years. There are, however, a few excess Insurance Policies that have been eroded or exhausted by pre-Petition settlements and defense costs. Nevertheless, the BSA still has substantial excess Insurance Coverage during this time period.

The Debtors contend[66] that their primary insurance policies at least between 1986 and 2008 have a $1 million per-occurrence deductible. The BSA's obligation to pay the deductibles for the Insurance Policies between 1986 and 2008 versus the Insurance Company's obligation to pay such deductibles is subject to the terms of such Insurance Policies. However, it is the BSA's and other parties' position that when the BSA cannot or does not pay the deductible, the primary Insurance Policies issued between 1986 and 2008 require the Insurance Company to pay. Certain insurers believe that this is a different position than reflected by how the BSA and certain of its primary insurers operated and performed for many years.

A dispute exists as to whether the obligation on the primary insurer to pay the deductible on behalf of the BSA is subject to an aggregate limit of liability. The primary insurers have asserted that a $1 million aggregate applies to this obligation, and that, upon exhaustion, BSA must satisfy a self-insured retention of $1 million per occurrence before triggering coverage under the excess policies. Other insurers have asserted that the primary insurers' obligation to pay the deductible is not subject to any aggregate, and that the aggregate limit of liability only applies to those damages in excess of the deductible. Several other insurers have not taken this position. In the event that the aggregate limit of liability does apply to the payment of the deductibles under the primary Insurance Policies, a related dispute exists as to whether the BSA and other insured parties can directly access the excess insurance policies issued between 1986 and 2008 or whether the BSA or other insured parties must continue to pay that deductible on an ongoing basis for each claim.[67]

For BSA's insurance coverage towers in the years 1988 to 2008, the BSA's first layer excess policies include a "Retention Endorsement – Aggregate Exhaustion" endorsement, which states that "in the event of the exhaustion of the aggregate underlying limit of liability [of the underlying primary policy] the Insured will retain the amount indicated below [$1,000,000 Each Occurrence] of any claim or loss on the same basis that coverage would have been provided under [the underlying primary policy] but for the exhaustion of any applicable aggregate." There is a legal dispute among the BSA and certain carriers about whether the aggregate limits under certain primary policies apply to Abuse Claims. If the aggregate limits do apply (such that a deductible

---

[66]   The Coalition and the Future Claimants' Representative do not necessarily agree with all of the Debtors' coverage positions with respect to the Insurance Policies.

[67]   Between 2008 and 2018, there is no dispute that the primary Insurance Policies between 2008 and 2018 are not subject to an aggregate limit of liability.

no longer applies), the BSA and certain carriers agree that the excess carriers likely would only be responsible for the portion of Abuse Claims that exceed the unexhausted amount of the applicable retention.  Accordingly, the retentions could limit the amount recoverable from excess carriers.

In 2019, the BSA again changed its insurance program to avoid the deductibles noted above, which it has kept current and expects to continue in 2021.  Throughout the years of Scouting operations, the BSA has eroded certain of the Insurance Policies referenced above.  The BSA has also entered into settlement agreements pertaining to certain policies that may limit the extent of coverage available.

## 2.    *The BSA's Insurance Coverage for the Local Councils*

> **Further information regarding the Local Council Insurance policies is included in Schedule 3 to the Plan, which provides policy information concerning: (1) Local Council; (2) the issuing insurance company; (3) policy number; (4) policy start date; (5) policy end date; (6) limits of liability; (7) aggregate limits, if any; (8) whether there is a sexual abuse exclusion; and (9) type of evidentiary support.[68]**

As noted, the BSA operates Scouting through the Local Councils and the Chartered Organizations.  Prior to 1971, each Local Council was required to procure Insurance Policies that would provide coverage, for among other things, the types of Abuse Claims alleged herein.

Over the course of the Chapter 11 Cases, the Debtors and the Local Councils have gone through extensive insurance archeology efforts and discovery to obtain evidence of policies issued to the Local Councils prior to 1978.  To date, the BSA and Local Councils have been able to locate either copies of a number of the Insurance Policies it believes were issued to Local Councils or secondary evidence of their existence; however, some of the secondary evidence does not provide specific terms of the Insurance Policies, such as limits or the policy period.  Discovery is ongoing in that regard.

From these insurance archeology efforts, the BSA and Local Councils have also learned that several Insurance Companies issued specific Insurance Policies to the Local Councils.  For example, from 1965 to 1971, Century created an insurance program for the Local Councils.  Likewise, from 1975 to 1976, the Debtors believe that the New Hampshire Insurance Company ("New Hampshire") also created an insurance program through a broker, R.F. Lyons, that issued a significant number of New Hampshire Insurance Policies to Local Councils.  The Debtors believe that New Hampshire also issued a substantial amount of Insurance Policies to Local Council as early as the 1940s.  Other insurers such as Travelers Insurance Company, Continental Insurance Company, and Hartford also issued policies to Local Councils.

---

[68]    The Debtors have prepared this chart based on their own analysis based on information available as of September 27, 2021. Schedule 2 and the views expressed herein do not necessarily represent the views of, and do not bind, the Settlement Trustee, the Tort Claimants' Committee, the Coalition, the Future Claimants' Representative regarding BSA's insurance program.  In addition, Insurance Companies may disagree, and in some cases have expressed disagreement, with the Debtors' conclusions regarding the existence or terms of the policies listed therein. This chart should not therefore be interpreted as an admission on the part of any Insurance Company as to the existence or terms of any policy. On the contrary, each Insurance Company has reserved the right to dispute the existence or terms of any policy listed.

Of the Insurance Policies that were issued specifically to Local Councils, the terms and limits vary from Insurance Policy to Insurance Policy. For example, some Local Council Insurance Policies only provide for $25,000 in coverage on a per-occurrence basis for Abuse Claims while other Local Council Insurance Policies may provide up to $1 million in coverage per-occurrence for Abuse Claims. Hartford contends some of the policies contain general aggregate limits that limit the amount of coverage for all claims, including Abuse Claims, or provide coverage only for specific premises, such as council office buildings. Thus, the amount of coverage available based on the insurance policies issued to Local Councils is uncertain.

Starting in 1971, the BSA began adding certain Local Councils as additional insureds under its CGL policies. Then, in 1978, the BSA formalized this practice through the implementation of a General Liability Insurance Program ("GLIP"), whereby the BSA agreed to procure general liability insurance for all Local Councils by including them in the definition of "Named Insured" in all of the BSA CGL Insurance Policies. Similarly, starting in 1978, the BSA began to provide Insurance Coverage under its CGL policies to certain Chartered Organizations.

Schedule 3 to the Plan sets forth the various Insurance Policies that the BSA alleges afford the Local Councils Insurance Coverage on account of Abuse Claims. Columbia Casualty Company; The Continental Insurance Company as successor in interest to certain policies issued by Harbor Insurance Company; The Continental Insurance Company successor by merger to Niagara Fire Insurance Company; and The Continental Insurance Company (collectively, "Continental Insurance Company") disagree with Schedule 3's allegation that certain policies issued by Continental Insurance Company or related entities afford the Local Councils any Insurance Coverage with respect to Abuse Claims, and Continental Insurance Company intends to vigorously defend this position.

National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), Lexington Insurance Company, Landmark Insurance Company, The Insurance Company of the State of Pennsylvania and their affiliated entities (collectively with New Hampshire referred to herein, the "AIG Companies") also disagree with certain information contained in Schedule 3 to the Plan and the Debtors' representations that certain policies allegedly issued by an AIG Company or related entity afford the Local Councils any Insurance Coverage with respect to Abuse Claims. Specifically, while Schedule 3 to the Plan identifies approximately 300 Local Council Insurance Policies that were allegedly issued by New Hampshire and 800 Local Council Insurance Policies that were allegedly issued by National Union, the AIG Companies have not been able to locate full and complete copies of the vast majority of these alleged policies (the "Alleged Lost AIG Policies"). The AIG Companies dispute whether there is conclusive evidence of the existence, terms, and coverage of the Alleged Lost AIG Policies. The AIG Companies dispute the existence of the Alleged Lost AIG Policies and dispute that they are bound by the terms of any Alleged Lost AIG Policy. The AIG Companies intend to vigorously defend this position, and the outcome of this coverage dispute—including any finding that the Alleged Lost AIG Policies cannot be enforced, in whole or in part—may potentially reduce coverage available under the Insurance Policies below what is currently contemplated.

Jefferson Insurance Company of New York ("Jefferson") also disputes the references to insurance policies it allegedly issued to certain Local Councils as stated on Schedule 3 to the Plan. To date, Jefferson has not located any of those alleged insurance policies. Jefferson reserves

its right to dispute issuance of each alleged insurance policy attributed to it on Schedule 3 to the Plan, as well as each of those policies' respective limits, periods, terms, conditions and exclusions. In addition, if any of the scheduled Jefferson policies are later proven, Jefferson reserves its right to dispute whether coverage exists for Abuse Claims under each such policy.

The Hartford companies (Hartford Fire Insurance Company, Hartford Accident and Indemnity Company, Hartford Casualty Company and New England Insurance Company) also disagree with the references to the insurance policies identified on Schedule 3. In addition to disputing the issuance, existence and terms and conditions of the policies that BSA has alleged through the existence of purported secondary evidence, Hartford contends that BSA has incorrectly identified Hartford's aggregate policy limits; in addition, some or all of the confirmed policies by their terms do not provide coverage for Abuse Claims.

### 3.    *Chartered Organizations' Rights Under the BSA Insurance Policies*

It is the BSA's position that, starting in or around 1978, the BSA specifically included Chartered Organizations as insureds on its Insurance Policies. While not specifically naming Chartered Organizations, the 1976 and 1977 primary policies include "sponsors" as insureds under the Insurance Policies. Additionally, Chartered Organizations may be insureds under the Local Council Insurance Policies. Hartford contends that certain rights under the 1976 and 1977 policies were released as part of a 2011 settlement agreement.

It is the BSA's position that the BSA's Insurance Policies prior to 1976 do not name either Chartered Organizations or "sponsors" as insureds under the Insurance Policies. For example, the pre-1976 insurance policies generally include an endorsement that names the person insured under the Insurance Policies as "any employee, executive officer, trustee, volunteer leader, boy scout leader or committee member of the National Council of the Boy Scouts of America…" It is the BSA's position that the endorsement was added to provide coverage to employees, volunteers, and leaders of *the BSA*, not Chartered Organizations. As such, the BSA believes that Chartered Organizations do not qualify as either an employee, executive officer, trustee, or volunteer leader under the pre-1976 Insurance Policies. Some Chartered Organizations, however, have argued that they believe Chartered Organizations are insureds as "volunteers" under the pre-1976 Insurance Policies. The BSA disputes this contention.

To the extent that the Chartered Organizations have rights to the BSA's post-1976 Insurance Policies, those rights are subject to the terms of the Insurance Policies that may have deductible obligations (as noted above), aggregate limits, exhausted limits, settlements, exclusions, etc.

For example, it is the position of certain insurers that the BSA's 1978 Insurance Policy includes a deductible endorsement that requires a $250,000 deductible be met for each occurrence; therefore, it is the position of certain insurers that Chartered Organizations access to the 1978 to 1980 Insurance Policies is limited by the required deductible obligation. The Chartered Organizations' access to the BSA's 1980 to 1982 Insurance Policies may likewise be limited given that many of these policies are either insolvent, exhausted or released through settlement. Further, the BSA's 1983 to 1985 Insurance Policies are also subject to aggregate limits, many of which have been substantially eroded based on pre-petition settlements and payments.

Additionally, in 1984, the Insurance Policies included an endorsement that expressly provided that the Insurance Policies would be primary insurance for Chartered Organizations. However, prior to 1984, there was no such endorsement or language in the BSA policies. Therefore, the Debtors believe that for all pre-1984 claims, Chartered Organizations would not have primary access to the BSA's Insurance Policies.  Certain of the Chartered Organizations disagree with this position.  It is the Debtors' position that Chartered Organizations would similarly be responsible for the high deductibles on all post-1986 Insurance Policies. Certain of the Chartered Organizations disagree with this position and believe that they would not be responsible for the payment of deductibles as a condition of obtaining Insurance Coverage.

4.      **The First Encounter Agreement and Subsequent Endorsement in the BSA Policies**

As noted above, Century provided the BSA with primary Insurance Coverage for several decades.  In 1996, the BSA and Century engaged in an effort to minimize disputes regarding Insurance Coverage, specifically in regard to Abuse Claims.  As a result of those discussions, on or about May 24, 1996, the BSA and certain Century Entities executed the "Settlement Agreement Regarding Sexual Molestation Claims."  This settlement is often referred to as the "First Encounter Agreement" ("FEA").  For the avoidance of doubt, the FEA only applies to Abuse Claims based on the definitions set forth therein, and neither the BSA nor Century has contended otherwise.

Pursuant to the FEA, the BSA and Century agreed that "the date of 'occurrence' pertaining to any Sexual Molestation Claim shall be the date when the first act of Sexual Molestation took place, even if additional acts of Sexual Molestation or additional Personal Injuries arising therefrom also occurred in subsequent policy periods; and all damages arising out of such additional acts of Sexual Molestation or additional Personal Injuries shall be deemed to have incurred during the policy year when the first act of Sexual Molestation took place."  The BSA and Century were the only parties to the FEA, and accordingly, certain of the Chartered Organizations have argued that the agreement as the date of "occurrence" between the BSA and Century in the FEA does not apply to insurance rights of Chartered Organizations.  However, several of the BSA's other Insurance Companies ascribe to this agreement and provide coverage according to the first alleged year the Abuse occurred.  Certain parties contend that the FEA is applicable only to Century; however, the Debtors disagree as the BSA and certain of the BSA's Insurance Companies have adjusted Abuse Claims in a manner consistent with the FEA since 1996.

Beginning around 2008, the BSA's primary and excess Insurance Policies include the "Date of Exposure for Molestation Claims" endorsement.  Similar to the FEA, the endorsement provides that any alleged sexual molestation occurrence involving the same claimant would be allocated to the policy year in which the first alleged act of Abuse occurred.

5.      **Prepetition Insurance Coverage Actions**

Prior to the Petition Date, the BSA's Insurance Companies generally defended and indemnified the BSA against Abuse Claims.  In certain years in which the BSA's Insurance Policies were exhausted, insolvent or settled, the BSA would fund the settlement of Abuse Claims. While the Insurance Companies reserved the right to do so with respect to many Abuse Claims, in

the last four years the BSA's Insurance Companies have only denied coverage in connection with a very limited number of underlying lawsuits.

The denials related to these lawsuits prompted the following Insurance Coverage Actions: (a) *Boy Scouts of America, et al. v. Insurance Company of North America et al.*, Case No. DC-18-11896, pending in the 192nd Judicial District Court of Dallas County, Texas; (b) *Boy Scouts of America, et al. v. Hartford Accident and Indemnity Co., et al.*, Case No. DC-18-07313, pending in the 95th Judicial District Court of Dallas County, Texas; (c) *National Surety Corp. v. Boy Scouts of America, et al.*, Case No. 2017-CH-14975, pending in the Circuit Court of Cook County, Illinois, Chancery Division. Hartford Accident and Indemnity Company also initiated an adversary proceeding in these Chapter 11 Cases styled *Hartford Accident and Indemnity Co. and First State Ins. Co. v. Boy Scouts of America, et al.*, Adv. Pro. No. 20-50601 (LSS). The majority of the Insurance Coverage Actions are currently stayed by operation of the automatic stay; however, the parties to the Hartford Accident and Indemnity Company actions have agreed to stay the entirety of the adversary proceeding and the corollary state court action.

The Insurance Coverage Actions involved several of the BSA's Insurance Companies, including Century, Hartford Accident and Indemnity Company, National Surety Corporation ("National Surety") and Allianz Insurance ("Allianz"). The Insurance Companies in the Insurance Coverage Actions asserted that the BSA and Local Councils were not entitled to coverage for specific sexual abuse claims based on various coverage defenses, including, but not limited to, the number of "occurrences" that were triggered by the Abuse Claims, the expected and intended language in the Insurance Policies precluded Insurance Coverage, and that the BSA had failed to cooperate with its Insurance Companies. The Debtors believe that such defenses or limitations to the scope of Insurance Coverage are without merit.

National Surety and Allianz believe that their coverage defenses have merit and that coverage for sexual abuse claims against BSA will be barred by various terms, conditions, exclusions and attachment points found in the policies and at law. In addition, National Surety and Allianz have contested the jurisdiction of the Texas court in the Coverage Action filed by the BSA described in (a), above. Pre-petition, the Fifth District Dallas Court of Appeals granted National Surety and Allianz's emergency motion for a stay of trial court proceedings and ordered merits briefing on National Surety and Allianz's Petition for Writ of Mandamus. *In re National Surety Corp. et al.*, No. 05-19-01119-CV (Tex. App. – Dallas 2019). The Petition for Writ of Mandamus was fully briefed but not decided prior to the BSA's bankruptcy filing.

In the spirit of reaching consensus with the Insurance Companies, the BSA is currently participating in mediation with its Insurance Companies to resolve certain disputes regarding the Debtors' rights to Insurance Coverage under the Insurance Policies.[69]

Under the Plan, the Insurance Coverage Actions (along with Insurance Actions) will be contributed to the Settlement Trust. It is difficult to quantify the value of the Insurance Coverage Actions and Insurance Actions as the resolution of these Actions is dependent on the interpretation

---

[69] Pursuant to the Bankruptcy Court's *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 812] entered on June 9, 2020 (the "Mediation Order"), the mediations are currently before the Bankruptcy Court-appointed Mediators, the Honorable Kevin Carey (Ret.), Paul Finn, and Timothy Gallagher for the purpose of mediating the comprehensive resolution of issues and Claims in the Chapter 11 Cases through a chapter 11 plan.

of certain terms, provisions, and exclusions in the Insurance Policies.  However, if the BSA and the Settlement Trust are successful in defeating the coverage defenses that have been, or may be asserted in the Insurance Coverage Actions and Insurance Actions (which the BSA believes is probable), the proceeds of these Actions could represent a substantial contribution to the Settlement Trust.

### 6.    *Post-Petition Defenses Asserted by Insurance Companies*

The BSA tendered the Abuse Claims that were the subject of the Proofs of Claim to the BSA's Insurance Companies under the Insurance Policies.  The BSA's Insurance Companies have challenged various aspects of the Plan and Trust Distribution Procedures and reserved rights to deny or limit coverage relating to the Abuse Claims under the Insurance Policies on various grounds, including but not limited to:

- The BSA may have failed to cooperate in the defense and investigation of the Abuse Claims;

- The BSA may not settle the Abuse Claims in violation of the Voluntary Payment provision under the Insurance Policies;

- The Plan seeks to bind the Insurance Companies to certain findings, including that the Trust Distribution Procedures are "fair and reasonable";

- That the BSA has not exhausted underlying coverage and/or applicable self-insured retentions;

- Certain insurance policies have been exhausted or impaired;

- Any payment obligations under the Insurance Policies are limited to the amount that the Settlement Trust can afford to pay, and not to the amount allowed under the Trust Distribution Procedures;

- Many of the Abuse Claims are not compensable under the Insurance Policies because of statute of limitations issues and/or because they were untimely filed;

- The BSA, Local Councils, and Chartered Organizations expected and intended the injuries subject to the Abuse Claims;

- The anti-assignment provisions in the Insurance Policies preclude the BSA, Local Councils and Chartered Organizations from assigning Debtor and non-Debtor insurance rights to the Trust;

- Certain of the proposed terms of the Plan and Trust Distribution Procedures violate the terms and conditions of the Insurance Policies, including selection of the proposed Settlement Trustee; the Settlement Trustee has alleged insufficient discretion to authorize the Settlement Trust to reduce or deny certain Abuse Claims; and vesting sole authority in the Settlement Trustee to evaluate and settle Abuse

Claims without the discovery procedures or insurer participation to which the insurers assert they are entitled;

- The Expedited Distribution is impermissible; and

- Liberty Mutual contends that, because under the Insurance Policies it wrote, the deductibles and SIRs match the limits of liability, a court may rule that Liberty does not owe any coverage obligations to the BSA or the Settlement Trust absent satisfaction in full of the applicable deductible or SIR.  Other parties, including other insurers, do not agree with Liberty's contention. Neither the Plan nor any other Plan Document, including the Trust Distribution Procedures, resolves or seeks to resolve this issue.  How deductibles and SIRs will be satisfied is a matter to be decided in separate coverage litigation.

The BSA strongly contests the characterization and the merits of these coverage defenses.  Further, the Debtors believe there is no merit to any contention by the BSA's Insurance Companies that the BSA cannot assign rights to the Insurance Policies to the Settlement Trust.  As noted above, the BSA is actively working with the Insurance Companies to resolve these disputes.

### 7.    *Insurer Letters of Credit*

In connection with its insurance program, BSA posted certain letters of credit issued by JPM to secure obligations arising under certain of BSA's Insurance Policies (such letters of credit, the "Insurer LCs").  Except as provided for in an Insurance Settlement Agreement, neither any provision of the Plan nor the occurrence of the Effective Date shall alter, amend, or otherwise impair the rights and obligations of the Debtors, Reorganized BSA, JPM, or any applicable Insurance Company holding one or more letters of credit issued by JPM to secure obligations arising under one or more BSA Insurance Policies.  Without limiting the foregoing, nothing in the Plan or the Confirmation Order shall preclude any such Insurance Company from exercising any applicable rights on any such letter of credit issued, or other security provided, for the benefit of the Insurance Company in accordance with the terms and conditions of the documents governing such letter of credit or other security, or applying amounts therefrom to any Claim secured by such letter of credit or other security, the Debtors, Reorganized BSA, and JPM reserve any and all rights with respect to such Insurance Company's exercise of any applicable rights.

### 8.    *Direct Actions Against BSA Insurance Companies*

Some Abuse Claimants have objected to the Plan on the basis that, in certain jurisdictions, claimants have direct action rights against the BSA Insurance Companies, and the BSA cannot sell or dispose of direct actions claimants' rights to pursue the BSA Insurance Policies.  The Debtors believe that the Bankruptcy Court can approve an injunction barring such claims against third party insurers.

### ARTICLE IV. EVENTS LEADING TO THE CHAPTER 11 CASES

The safety of children in its programs is the most important priority of the BSA.  The BSA today enforces a robust set of multilayered policies and procedures to protect the young men and women involved in Scouting.  These measures are informed by respected experts in the fields of

child safety, law enforcement, and child psychology.  The BSA is committed to the protection of its Scouts, and that commitment is integral to the BSA's identity and mission as it seeks to continue instilling values of leadership, service, and patriotism in millions of children who participate in Scouting programs across the country.

A.      The BSA's Prepetition Global Resolution Efforts and Prepetition Claims Against the BSA

As widely reported, as of the Petition Date, the BSA was a defendant in numerous lawsuits related to historical Abuse in its programs.  Indeed, many Abuse survivors had taken legal action against the BSA and Local Councils in the civil tort system.  As explained further below, recent changes in state statutes of limitations led to a sharp increase in the number of Claims asserted against the BSA and placed tremendous financial pressure on the organization.  In addition to Pending Abuse Actions in state and federal courts across the United States, attorneys for Abuse survivors had provided information regarding approximately 1,400 additional Claims not yet filed, for a total of approximately 1,700 known asserted Abuse Claims.

In light of the increasing number of Claims asserted against the BSA, the BSA made the decision that it could not continue to address Abuse litigation in the tort system on a case-by-case basis.  The BSA spent more than $150 million on settlements and legal and related professional costs from 2017 to 2019 alone.  In addition to the unsustainable financial cost of continuing to engage in piecemeal litigation across the country, continuing this process would have resulted in the risk of inconsistent judicial outcomes and inequitable treatment of survivors.  For these reasons, beginning in late 2018, the BSA, with assistance of legal and financial advisors, began to explore strategic options for achieving an equitable global resolution of Abuse Claims.

In connection with these strategic efforts, the BSA recognized that it would ultimately need to structure a settlement around a plan of reorganization that provides for a channeling injunction with respect to both current and potential Future Abuse Claims.[70]  Accordingly, the BSA determined, in consultation with its advisors, that it was necessary and appropriate to engage an independent third-party Representative for holders of Future Abuse Claims.  After considering possible candidates for the role, the BSA selected James L. Patton, Jr. in early 2019 to serve as future claimants' representative (the "Future Claimants' Representative").[71]  Future Abuse Claims include any Direct Abuse Claim against any Protected Party or Limited Protected Party that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained eighteen (18) years of age, or (b) was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose; *provided, however*, that with

---

[70]   Unlike a future Claim in other mass tort contexts, there is no latency period for Abuse.  In the Abuse context, a future Claim is properly understood as a Claim related to Abuse that has already occurred but which is held by an individual who (a) has not attained 18 years of age, or (b) was not aware of such Abuse Claim as a result of "repressed memory," such that he or she is not aware that he or she holds an Abuse Claim, to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the Abuse arose.

[71]   As noted in Article V.F herein, the Bankruptcy Court appointed Mr. Patton as the Future Claimants' Representative on April, 24, 2020, *nunc pro tunc* to the Petition Date.

respect to any Contributing Chartered Organization or Participating Chartered Organization, the term "Future Abuse Claim" shall be limited to any Direct Abuse Claim that satisfies either (a) or (b) in connection, in whole or in part, with the Contributing Chartered Organization's, Participating Chartered Organization's, or its respective personnel's or affiliates' involvement in, or sponsorship of, one or more Scouting units., including any proportionate or allocable share of liability based thereon; provided further, however, that with respect to any Participating Chartered Organization, the term "Future Abuse Claim" shall be limited to Post-1975 Chartered Organization Abuse Claims that satisfy either (a) or (b). For the avoidance of doubt, no Claim alleging Abuse shall be a "Future Abuse Claim" against a Contributing Chartered Organization or a Participating Chartered Organization if such Claim is wholly unrelated to Scouting.  For the avoidance of doubt, Direct Abuse Claims include Future Abuse Claims and their treatment under the Plan is the same.

In addition, the BSA engaged in discussions with several groups, including an ad hoc group of attorneys representing numerous holders of Abuse Claims advised by James Stang of Pachulski Stang Ziehl & Jones LLP, and certain of its insurers.

One of the strategic options that the BSA explored throughout 2019 included efforts to reach a settlement with a substantial number of Abuse survivors that could be implemented through a prearranged chapter 11 proceeding.  Those efforts involved several meetings with attorneys representing many Abuse survivors, including a two-day mediation in early November 2019.  The mediation was attended by a Future Claims Representative and some of the BSA's Insurance Companies.  Unfortunately, the mediation was unsuccessful.  It became apparent that attorneys for Abuse survivors believed that certain Local Councils with significant Abuse liabilities had significant assets that could be used to compensate survivors.  Further, it became clear that attorneys for Abuse survivors would only accept information about the nature and extent of the BSA's available assets if provided through a court-supervised process.  Accordingly, the BSA recognized in late 2019 that there were no meaningful prospects for a prearranged global resolution.  Under those conditions, the Debtors commenced these Chapter 11 Cases to achieve dual objectives:  (a) timely and equitably compensate survivors of Abuse in Scouting and (b) ensuring that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission.

B.      The Impact of Statutes-of-Limitation Changes on Claims against the BSA and Non-Debtor Stakeholders

The number of Abuse Claims against the BSA has increased dramatically over the past twenty years due to changes to state statutes of limitations governing Causes of Action alleging child Abuse.  Since 2002, twenty-one (21) states have enacted legislation allowing individuals to bring Claims that would otherwise have been barred by the applicable limitations period.  Most of these jurisdictions (including California, Delaware, Georgia, Hawaii, Minnesota, New Jersey, and North Carolina) have implemented revival windows that temporarily eliminate the civil statutes of limitations for survivors of Abuse whose Claims have already expired.  These revival windows have allowed older survivors of child Abuse to bring lawsuits decades after the Abuse occurred, including against private organizations, such as the BSA and Local Councils.  Other jurisdictions (including Vermont) have fully eliminated limitations periods going forward and revived expired Abuse Claims.  Additionally, more states are considering opening statute of limitation windows,

extending statutes of limitations, or even removing statutes of limitations for survivors of child sexual Abuse.

The trend of retroactive revisions to limitations periods for Abuse Claims accelerated in 2019, when more than a dozen states (including Arizona, California, District of Columbia, Montana, New Jersey, New York, and North Carolina) revised their limitations periods to allow survivors of Abuse to bring Claims that would otherwise have been time-barred.  Shortly before the Petition Date, a group of plaintiffs filed suit in the U.S. District Court for the District of Columbia alleging that the District's recent revival-window legislation permits plaintiffs to bring previously time-barred Claims, regardless of where the Abuse occurred or where the plaintiff resides.[72]  In addition, prior to the Petition Date, plaintiffs began pursuing a theory that the recently opened New Jersey statute of limitations allowed the filing of any Claim that arose prior to 1979, regardless of where the Abuse occurred, since the BSA was headquartered in New Jersey prior to that date, before its Headquarters moved to Irving, Texas.

These changes in statutes of limitations have dramatically altered the legal landscape for Abuse Claims.  Specifically, the number of suits alleging Claims from earlier years that would otherwise have been barred by the applicable limitations period has surged, which is reflected in the filing of tens of thousands of Abuse Claims in these Chapter 11 Cases.  These suits have forced the BSA to look backward—past the decades of progress and leadership in youth protection—to the mid- to late-twentieth century, when the vast majority of the Abuse in Scouting occurred. Claims alleging Abuse within the last thirty years make up a small fraction of total known Abuse Claims.[73]  The vast majority of the Claims the BSA is now facing alleged Abuse from the 1960s to the 1980s.  Fairly compensating survivors that were abused during this period placed tremendous financial pressure on the BSA and its local partners.

## ARTICLE V. THE CHAPTER 11 CASES

A.    Commencement of the Cases and First Day Relief

On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  As of the date hereof, the Debtors have continued, and will continue until the Effective Date, to operate their organization as Debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

Also on the Petition Date, the Debtors filed a number of motions seeking typical "first day" relief in chapter 11 cases authorizing the Debtors to maintain their operations in the ordinary course (collectively, the "First Day Motions").  This relief was designed to ensure a seamless transition into the chapter 11 process and allow the Debtors to maintain their operations in the ordinary course so as to function smoothly while their cases progressed.  The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various interim and final orders authorizing the Debtors to, among other things:

---

[72]    *See Does 1-8 v. Boy Scouts of America*, Case No. 20–00017 (D.D.C.).

[73]    Of the approximately 95,200 pending or asserted Abuse Claims against the BSA, approximately 65,000 claims have ascertainable dates.  Of the approximately 65,000 dated Claims, approximately 80% involve Claims alleging Abuse that occurred before 1988.

- Continue paying employee wages and benefits [D.I. 295];[74]

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [D.I. 381];

- Continue the use of certain cash collateral and the granting of adequate protection with respect to the use of such cash collateral [D.I. 433];

- Continue customer, scout and donor programs, and honor related prepetition obligations [D.I. 279];

- Pay certain prepetition taxes and assessments [D.I. 366];

- Pay certain prepetition obligations for essential vendors, foreign vendors, shippers, warehousemen, and other Lien claimants [D.I. 275];

- Pay certain prepetition obligations under shared services arrangements with the Local Councils and Related Non-Debtor Entities and authorize the Debtors to continue performing or paying under shared services arrangements with the Local Councils and Related Non-Debtor Entities [D.I. 369]; and

- Establish procedures for utility providers to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [D.I. 273].

B.    Procedural Motions

The Debtors filed various motions on the Petition Date regarding procedural issues common to chapter 11 cases of similar size and complexity. The Bankruptcy Court granted substantially all of the relief requested in such motions and entered various orders authorizing the Debtors to, among other things:

- Establish procedures for interim compensation and reimbursement of expenses of chapter 11 professionals [D.I. 341], as amended by the *Order Amending the Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief* entered by the Bankruptcy Court on August 6, 2021 [D.I. 5899]; and

- Retain and compensate certain professionals utilized by the Debtors in the ordinary course of their non-profit operations [D.I. 354].

---

[74]    The Bankruptcy Court's order granted the Debtors' motion for authorization to pay prepetition wages, salaries, employee benefits, and other compensation and maintain employee benefits programs and pay related administrative obligations (the "Wages Motion").

C.    Critical Vendors and Shared Services

As described above, the Debtors filed various First Day Motions, two of which were motions to pay prepetition Claims of critical vendors [D.I. 7] (the "Critical Vendor Motion") and prepetition obligations under shared services arrangements [D.I. 15] (the "Shared Services Motion"). Pursuant to the Critical Vendor Motion, the Debtors obtained authorization to pay, in the ordinary course of the Debtors' non-profit operations, prepetition Claims of essential vendors, foreign vendors, 503(b)(9) vendors, and other Lien claimants. Pursuant to the Shared Services Motion, the Debtors obtained authorization to pay prepetition obligations under shared organizational services agreements related to the Local Councils and Related Non-Debtor Entities and to continue performing under such arrangements. As explained in detail in the Shared Services Motion, the BSA provides benefits programs, liability insurance, and administrative services to Local Councils, such as accounting, human resources, information technology, member recruitment, fundraising, marketing, leadership training, and other related support (the "Shared Services Arrangements"). Without these Shared Services Arrangements, the Debtors would be incapable of providing Scouting programs nationwide and Local Councils would be unable to operate their organization.

D.    Retention of Chapter 11 Professionals

On March 17, 2020, the Debtors filed applications to retain (i) Sidley Austin LLP ("Sidley Austin"), as the Debtors' bankruptcy counsel; (ii) Morris, Nichols, Arsht & Tunnell LLP, as the Debtors' bankruptcy co-counsel; (iii) Alvarez & Marsal North America, LLC, as financial advisor; (iv) Bates White, LLC, as Abuse Claims consultant ("Bates White"); (v) KCIC, LLC, as insurance and valuation consultant; (vi) Omni Agent Solutions, as administrative agent; (vii) Haynes and Boone, LLP, as special insurance counsel; and (viii) Ogletree, Deakins, Nash, Smoak & Stewart, P.C., as special litigation counsel [D.I. 204, 205, 206, 207, 208, 209, 210, and 220]. In April 2020, the Bankruptcy Court entered orders authorizing the retention of all the Debtors' listed Estate Professionals, except for Sidley Austin [D.I. 339, 340, 353, 355, 364, 372, and 463]. On May 29, 2020, the Bankruptcy Court issued a bench ruling overruling the objection to the Debtors' application to retain Sidley Austin as bankruptcy counsel filed by Century [D.I. 755]. On June 2, 2020, the Bankruptcy Court entered an order granting Sidley Austin's retention [D.I. 758].[75]

Thereafter, the Debtors filed additional applications to retain (i) PricewaterhouseCoopers LLP, as independent auditor and tax compliance services provider to the Debtors; (ii) Appraisers of the Keys, Inc.; JFW Ranch Consulting, LLC; Hotel & Leisure Advisors; F.I. Salter, Inc.; Dawn M. Powell Appraisals Inc.; and BW Ferguson & Associates Ltd., as appraisers with respect to the Debtors' four high adventure facilities, discussed in greater detail herein; (iii) Quinn Emanuel Urquhart & Sullivan, LLP as special litigation counsel; and (iv) JLL Valuation & Advisory Services, LLC ("JLL") as appraiser with respect to certain Local Council real properties [D.I. 796, 868, 1125, and 1762]. The Bankruptcy Court entered orders approving the Debtors' retention

---

[75]    On June 11, 2020, Century filed a Notice of Appeal [D.I. 837] of the Bankruptcy Court's order authorizing the Debtors' retention of Sidley Austin.  On May 7, 2021, the U.S. District Court for the District of Delaware issued a final order affirming the Bankruptcy Court's decision to authorize the retention of Sidley Austin [D.I. 3292] (Civil Action No. 20-cv-798, BAP No. 20-14).  On May 26, 2021 Century filed a notice of appeal to the U.S. Court of Appeals for the Third Circuit of the District Court's order affirming the Bankruptcy Court's approval of Sidley Austin's retention [D.I. 36] (Appellate Case No. 21-2035). The appeal is pending.

applications on June 24, 2020, July 8, 2020, September 18, 2020, and December 14, 2020, respectively [D.I. 889, 984, 1343, and 1841].

On October 22, 2020, the Debtors filed an application requesting authorization to retain White & Case LLP ("White & Case") as bankruptcy counsel because core members of their restructuring team had transitioned their practices to White & Case from Sidley Austin [D.I. 1571]. The Debtors' restructuring team who transitioned have led the Debtors' restructuring efforts for the past two years and are familiar with the numerous stakeholders that are actively participating in these Chapter 11 Cases.  The Bankruptcy Court entered an order authorizing the retention of White & Case on November 8, 2020 [D.I. 1698], over the objection of Century [D.I. 1637].[76]

E.      Appointment of Fee Examiner

Given the size and complexity of the Chapter 11 Cases, on September 18, 2020, the Bankruptcy Court entered an order appointing Justin H. Rucki of Rucki Fee Review, LLC as Fee Examiner [D.I. 1342].

F.      Appointment of Statutory Committees, Ad Hoc Committee, and Future Claimants' Representative

1.      *Ad Hoc Committee of Local Councils*

Prior to the Petition Date, the BSA assisted in the formation of the Ad Hoc Committee comprised of eight Local Councils[77] of various sizes from regions across the country.  The primary purpose of the Ad Hoc Committee is to allow Local Councils to participate in negotiations regarding a global resolution of Abuse Claims and other issues important to them, including the treatment of their shared insurance with the BSA.  The Ad Hoc Committee has also been instrumental in coordinating the BSA's ongoing efforts to collect and organize Local Council asset information.  The individual members of the Ad Hoc Committee are all volunteers.  The volunteer chair is Richard G. Mason of the Wachtell, Lipton, Rosen & Katz law firm.  Mr. Mason is the volunteer president of the Greater New York Council.

2.      *Unsecured Creditors Committee*

On March 5, 2020, the United States Trustee appointed the Committee of Unsecured Trade Creditors (the "Creditors' Committee"), which consists of five members [D.I. 141].  The Creditors' Committee represents the interests of all non-Abuse-related unsecured creditors, including former employees, litigation claimants, and other non-Abuse unsecured creditors.  The members of the Creditors' Committee are (1) Pension Benefit Guaranty Corporation, represented by Tom Taylor; (2) Girl Scouts of the United States of America, represented by Jennifer Rochon; (3) Roger A.

---

[76]    On December 2, 2020, Century filed a Notice of Appeal [D.I. 1771] of the Bankruptcy Court's order authorizing the Debtors' retention of White & Case.  The appeal was before the U.S. District Court for the District of Delaware (Civil Action No. 20-cv-1643, BAP No. 20-58) (the "W&C Retention Appeal").  On February 26, 2021, Century filed its *Stipulation of Dismissal of Bankruptcy Appeal* stipulating to the dismissal of the W&C Retention Appeal.

[77]    The members are: (1) Andrew Jackson Council; (2) Atlanta Area Council; (3) Crossroads of America Council; (4) Denver Area Council; (5) Grand Canyon Council; (6) Greater New York Councils; (7) Mid-America Council; and (8) Minsi Trails Council.

Ohmstede; (4) Pearson Education, Inc., represented by Karen Abraham; and (5) Lion Brothers Inc., represented by Susan Ganz.

### 3.    *Tort Claimants' Committee*

On March 5, 2020, the United States Trustee also appointed the Tort Claimants' Committee (together with the Creditors' Committee, the "Committees"), which consists of nine individual members who hold Abuse Claims against the Debtors [D.I. 142].

To date, the Debtors have cooperated with the Committees, creditors, and other stakeholders on complex diligence and informal discovery issues, including participation in meet-and-confer calls, question-and-answer sessions, and the review and production of a significant volume of responsive documents and other information.

### 4.    *Future Claimants' Representative*

On March 18, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Appointing James L. Patton, Jr., as Legal Representative for Future Claimants, Nunc Pro Tunc to the Petition Date* [D.I. 223].  On April, 24, 2020, the Bankruptcy Court appointed Mr. Patton as the legal representative of Future Claimants [D.I. 486] (the "Future Claimants' Representative"), *nunc pro tunc* to the Petition Date.

On May 5, 2021, the Future Claimants' Representative filed his *Fourth Supplemental Declaration of James L. Patton, Jr.* [D.I. 3146].  The declaration provided that as the Future Claimants' Representative, Patton has continued to monitor any potential conflicts and remains independent, disinterested, and without interests materially adverse to the Future Claimants. Likewise, on May 5, 2021, Young Conaway Stargatt & Taylor, LLP filed its *Third Supplemental Declaration of Edwin J. Harron* [D.I. 3147].  This declaration provides that as the legal representative to the Future Claimants' Representative, Edwin J. Harron has continued to monitor any potential conflicts and remains independent, disinterested, and without interests materially adverse to the Future Claimants.

### 5.    *Coalition of Abused Scouts for Justice*

On July 24, 2020, the Coalition of Abused Scouts for Justice (the "Coalition"), an ad hoc group representing the interests of Abuse survivors, filed its *Notice of Appearance and Request for Service of Notices and Documents* [D.I. 1040].  The Coalition was formed in connection with State Court Counsel representing holders of Abuse Claims.  The Coalition is made up of approximately 18,000 Abuse survivors having signed an "Affirmative Consent" which consents to becoming a member of the Coalition and authorizes their respective State Court Counsel to instruct the Coalition's professionals in connection with these Chapter 11 Cases.  Additionally, the Coalition has asserted that the State Court Counsels represent approximately 65,000 Abuse survivors collectively and many of such additional Persons are expected to sign "Affirmative Consents."

As part of their *Supplement to Amended Verified Statement of the Coalition of Abused Scouts for Justice Pursuant to Bankruptcy Rule 2019* [D.I. 1510] (the "Supplement to Amended Verified Statement"), the Coalition acknowledged that it would not charge back the fees of the

Coalition Professionals to individual Abuse Survivors, <u>provided</u>, <u>however</u>, that the Coalition expressly reserved its right to seek a substantial contribution claim and/or seek reimbursement for the fees and expenses incurred by Coalition Counsel under a chapter 11 plan. Pursuant to the Plan and subject to to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(b)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, the Debtors will pay certain fees and expenses incurred by the Coalition, as contemplated under the Supplement to Amended Verified Statement. Further, nothing in the Supplement to Amended Verified Statement was intended to prejudice or limit the Coalition's right to seek such claim or reimbursement. The Debtors previously requested authorization to reimburse the Coalition Restructuring Expenses in connection with their motion to approve the Restructuring Support Agreement, but the Bankruptcy Court declined to approve such relief at that time and deferred the issue.[78]

On January 29, 2021, the Coalition filed a *Third Amended Verified Statement of Coalition of Abused Scouts of Justice Pursuant to Bankruptcy Rule 2019* [D.I. 1996 and 1997], and provides information regarding its members (with certain personal information redacted), and supplemented this third amended verified statement on May 18, 2021 [D.I. 4657, 4658]. The Coalition is represented by Monzack Mersky and Browder, P.A., and Brown Rudnick LLP.

### 6.    *United Methodist Ad Hoc Committee*[79]

In late 2020, 49 United Methodist Annual Conferences supported the formation of an ad hoc group (the "<u>United Methodist Ad Hoc Committee</u>") to advance the interests generally of United Methodist local churches and other United Methodist organizations that serve or have served as Chartered Organizations to the BSA. The United Methodist Ad Hoc Committee, comprising of twelve members, has retained Bradley and Potter Anderson & Corroon LLP to represent it in these Chapter 11 Cases. The United Methodist Ad Hoc Committee also participates in the mediation regarding issues in connection with a global resolution of Abuse Claims. On January 6, 2021, the United Methodist Ad Hoc Committee filed a verified statement pursuant to Bankruptcy Rule 2019, detailing certain information relating to its members [D.I. 1901].

### 7.    *Roman Catholic Ad Hoc Committee*[80]

The Catholic Mutual Relief Society of America ("<u>Catholic Mutual</u>") filed a notice of appearance in these Chapter 11 Cases on February 25, 2021 [D.I. 2269]. Catholic Mutual is a non-profit corporation that operates as a self-protection fund of the Roman Catholic Church in the United States and Canada, with 112 of the 195 United States Catholic archdioceses and dioceses being members. On June 25, 2021, representatives of Catholic Mutual and certain of its member dioceses and archdioceses filed the *Verified Statement of the Roman Catholic Ad Hoc Committee*

---

[78]    *See* Aug. 19, 2021 Hr'g Tr. 28:8-28:12 (The Bankruptcy Court: "My conclusion: I have found that the entry into the RSA is a sound exercise of Debtor's business judgment. The parties can proceed with the RSA without the findings regarding the Hartford settlement agreement and fees for the coalition, or not.").

[79]    The involvement of the United Methodist Ad Hoc Committee in these Chapter 11 Cases is not an indication that all Chartered Organizations with such religious affiliation are represented by, or share the views of, the United Methodist Ad Hoc Committee.

[80]    The involvement of the Roman Catholic Ad Hoc Committee in these Chapter 11 Cases is not an indication that all Chartered Organizations with such religious affiliation are represented by, or share the views of, the Roman Catholic Ad Hoc Committee.

*Pursuant to Bankruptcy Rule 2019* [D.I. 5421], disclosing that they had formed the Roman Catholic Ad Hoc Committee to protect and advance their common interests in these Chapter 11 Cases. The Roman Catholic Ad Hoc Committee has retained Schiff Hardin and Potter Anderson to represent it.

G.    Filing of Schedules of Assets and Liabilities and Statements of Financial Affairs

On February 19, 2020, the Bankruptcy Court entered an order extending the deadline by which the Debtors must file their Schedules and Statements of Financial Affairs with the Bankruptcy Court [D.I. 67]. In accordance with that order and pursuant to Bankruptcy Rule 1007 and Local Rule 1007-19(b), the Debtors filed their Schedules and Statements on April 8, 2020 [D.I. 375, 376, 377, and 378]. The Schedules provide summaries of the assets held by each of the Debtors as of the Petition Date, as well as a listing of the Debtors' liabilities, including Secured, unsecured priority, and unsecured non-priority Claims pending against each of the Debtors during the period prior to the Petition Date.

H.    Exclusivity

On June 16, 2020, the Debtors sought an extension of the periods during which they may exclusively propose and solicit acceptances of a chapter 11 plan beyond the initial 120-day and 180-day periods (together, the "Exclusive Periods") for plan proposal and solicitation set forth in section 1121 of the Bankruptcy Code. The Tort Claimants' Committee and the Creditors' Committee each filed statements in response [D.I. 915, 947]. On July 9, 2020, the Bankruptcy Court entered an order granting the relief requested in the Debtors' motion [D.I. 996], extending the exclusive period for the Debtors to file and solicit votes on a chapter 11 plan by 120 days and 180 days, respectively. On October 14, 2020, the Debtors sought and obtained an unopposed second extension of the periods during which they may exclusively propose and solicit acceptances of a chapter 11 plan [D.I. 1519, 1606].

On March 18, 2021, the Debtors filed a third motion to extend the period during which they may exclusively propose a plan of reorganization and the solicitation period for acceptances of such plan [D.I. 2411] (the "Third Exclusivity Motion"). This motion sought to extend the Debtors' exclusive periods to (a) file a chapter 11 plan to August 18, 2021 and (b) solicit votes thereon to October 18, 2021. On April 1, 2021, the Tort Claimants' Committee filed an objection to the Third Exclusivity Motion, arguing that the exclusivity should be terminated to permit the Tort Claimants' Committee to propose its own plan that permits reorganization and relies on insurance to compensate survivors, among other things [D.I. 2506]. The Tort Claimants' Committee also asserted that the Plan is patently unconfirmable, the Local Council and Chartered Organization contributions are inadequate, and there is insufficient support from survivors of Abuse.

On April 22, 2021, the Coalition and the Future Claimants' Representative filed a joint objection to the Third Exclusivity Motion, asserting that they should be permitted to propose a plan with the Tort Claimants' Committee [D.I. 2672]. The Coalition and Future Claimants' Representative also argued that the Plan does not equitably compensate survivors and objected to the Hartford Settlement Contribution. The Bankruptcy Court heard argument on the Third

Exclusivity Motion at the hearing held on May 19, 2021, after which it was taken under advisement and remains pending.

On August 18, 2021, the Bankruptcy Court entered an order granting the relief requested in the Debtors' Third Exclusivity Motion, extending the exclusive period for the Debtors to file and solicit votes on a chapter 11 plan by 152 days and 153 days, respectively [D.I. 6076].

I.      Removal

Concurrently with the commencement of the Chapter 11 Cases, the Debtors began taking measures to consolidate and stay all pending Abuse litigation against the BSA, Local Councils, and Chartered Organizations.  In particular, the BSA removed to federal district court (or bankruptcy court, depending upon the applicable local rules) all Abuse Claims pending in state courts throughout the country against the BSA and/or the Local Councils and Chartered Organizations.

Because there are a number of actions that name the BSA as a defendant and that allege Claims substantially similar to those asserted in the Pending Abuse Actions (collectively, the "Further Abuse Actions") and dozens of additional non-Abuse actions that remain pending against the BSA in various state courts, on May 15, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Under 28 U.S.C. § 1452 and Fed. R. Bankr. P. 9006(b) and 9027, Extending the Period Within which the Debtors May Remove Civil Actions and Granting Related Relief* [D.I. 653] requesting that the deadline to remove such actions be extended to the later of: (a) September 15, 2020; and (b) the date that is forty-five (45) days after the occurrence of the Termination Date (as defined below).  The Bankruptcy Court granted the motion on June 3, 2020 [D.I. 769].

Subsequently, there have been multiple extensions of the removal period without objection [D.I. 1316, 1393, 1876, 2720].  On September 23, 2021, the Bankruptcy Court granted the Debtors' fifth motion to extend the removal period from September 10, 2021 to the later of: (a) January 10, 2022; and (b) the date that is forty-five (45) days after the occurrence of the Termination Date (as defined below) [D.I. 6347].

J.      Preliminary Injunction

On the Petition Date, the Debtors initiated an adversary proceeding by filing the *Verified Complaint for Injunctive Relief,* Adv. Pro. No. 20-50527 (LSS) [A.D.I. 1 (sealed); A.D.I. 5 (redacted)] (the "Complaint").  In connection with the Complaint, the Debtors filed *The BSA's Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* [A.D.I. 6] (the "Preliminary Injunction Motion").

In the Preliminary Injunction Motion and related pleadings, the Debtors sought to extend the automatic stay to enjoin the prosecution of the Pending Abuse Actions.  The Pending Abuse Actions comprise Claims filed in state and federal courts against the BSA, Non-Debtor Related Entity Learning for Life, Local Councils that are separate non-profit Entities independently incorporated under the applicable laws of their respective states, and non-Debtor Chartered Organizations, consisting of community and religious organizations, businesses and groups of individuals that organize Scouting units. Each of the Pending Abuse Actions alleges Abuse arising out of the survivor's involvement or connection with the BSA.

As the result of an agreement reached between and among the Debtors and the Committees, on March 30, 2020, the Bankruptcy Court entered the *Consent Order Pursuant To 11 U.S.C. §§ 105(a) and 362 Granting the BSA's Motion for a Preliminary Injunction* [A.D.I. 54] and subsequent stipulations (the "Consent Order").

The Consent Order, among other things, stayed certain Pending Abuse Actions and Further Abuse Actions with respect to the Debtors and other BSA Related Parties (as defined in the Consent Order) up to and including May 19, 2020 (the "Termination Date"). The time period from the Petition Date to and including the Termination Date, as extended from time to time, is referred to as the "Standstill Period." As part of the agreement with the Committees, the Debtors agreed to provide financial and other information that the Committees had identified as being relevant. To that end, the Debtors provided the Committees' advisors with access to a secure data room containing organizational documents, financial statements, shared services agreements, documents reflecting asset and liability information, Insurance Policies, and other relevant documents.

In accordance with the Consent Order, the Debtors have filed amended version of Schedule 1 to the Consent Order that include additional Further Abuse Actions subject to the Consent Order (each, an "Amended Schedule"). Each Amended Schedule reflects the pending abuse actions against non-debtor defendant(s), for which the Debtors have a record. The Debtors have filed Amended Schedules on each of April 30, 2020 [A.D.I. 68], July 2, 2020 [A.D.I. 81], August 7, 2020 [A.D.I. 91], September 11, 2020 [A.D.I. 96], October 13, 2020 [A.D.I. 101], November 23, 2020 [A.D.I. 118], December 23, 2020 [A.D.I. 133], February 8, 2021 [A.D.I. 141], April 14, 2021 [A.D.I. 169], June 7, 2021 [A.D.I. 174]. Most recently, the Debtors filed an Amended Schedule on August 17, 2021 [A.D.I. 189].

Likewise, the Debtors filed amended versions of Schedule 2 to the Consent Order identifying the then-current BSA Related Parties on August 7, 2020 [A.D.I. 92], September 25, 2020 [A.D.I. 97], December 30, 2020 [A.D.I. 135], February 8, 2021 [A.D.I. 142], April 19, 2021 [A.D.I. 171], June 7, 2021 [A.D.I. 175], and August 26, 2021 [A.D.I 191].

On May 18, 2020, the Bankruptcy Court entered the *Stipulation and Agreed Order By and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Extending the Termination Date of the Standstill Period Under the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to U.S.C. §§ 105(a) and 362* [A.D.I. 72], which extended the Termination Date and Standstill Period up to and including June 8, 2020.

On June 9, 2020, the Bankruptcy Court entered the *Second Stipulation and Agreed Order By and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Modifying the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(A) and 362 and Further Extending the Termination Date of the Standstill Period* [A.D.I. 77], which, among other things, further extended the Termination Date through and including November 16, 2020.

On November 18, 2020, the Termination Date and Standstill Period were once again extended with entry of the *Order Approving Third Stipulation by and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured*

*Creditors Modifying the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362 and Further Extending the Termination Date of the Standstill Period* [A.D.I. 116] (the "Order Approving Third Stipulation").  As a result, the Termination Date was extended through and including March 19, 2021.

On November 4, 2020, three plaintiffs ("Movants") in certain state court actions regarding Abuse Claims filed a motion to modify the preliminary injunction to permit the Movants to proceed against certain non-debtor defendants [A.D.I. 109] (the "Motion to Modify").  Despite not objecting initially to the entry of the Consent Order, which stayed the Movants' respective state court actions, the Movants argued that their Claims as against select non-Debtor defendants could be litigated separately without affecting the BSA.  On January 11, 2021, the Movants withdrew the Motion to Modify without prejudice [A.D.I. 138].

On February 22 and 23, 2021, the Debtors filed their *Motion to Extend Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362* [A.D.I. 144] (the "Injunction Extension Motion") and opening brief in support of the Injunction Extension Motion [A.D.I. 145], requesting an extension of the Termination Date to July 19, 2021.

On March 17, 2021, the Bankruptcy Court entered the *Order Approving Fourth Stipulation by and among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and The Official Committee Of Unsecured Creditors Modifying The Consent Order Granting The BSA's Motion For A Preliminary Injunction Pursuant To 11 U.S.C. §§ 105(A) And 362 And Further Extending The Termination Date Of The Standstill Period* [A.D.I. 162] (the "Order Approving Fourth Stipulation").  As a result, the Termination Date has now been consensually extended to July 19, 2021.

The Fourth Stipulation incorporates a disclosure and reporting protocol by which the Local Councils will send to the BSA rosters located through a reasonable good faith search of all rosters in the Local Councils' possession, custody, or control that identify Abuse Survivors on a Local Council's claims list.  Under the roster protocol, the BSA has also conducted a reasonable good faith search of electronic registration information in its possession, custody, or control with respect to Abuse Survivors who filed Sexual Abuse Survivor Proofs of Claim alleging Abuse that occurred after 1999.

On June 24, 2021, the Debtors, the Tort Claimants' Committee, and the Creditors' Committee entered into a fifth stipulation seeking to further extend the Termination Date up to and including the earlier of (a) October 28, 2021, and (b) the date of the first omnibus hearing after the Bankruptcy Court issues its decision confirming or denying confirmation of the Plan, approval of which is pending before the Bankruptcy Court [A.D.I. 179].

K.    Mediation

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [D.I. 17] (the "Mediation Motion") requesting that the Bankruptcy Court appoint a sitting bankruptcy judge to mediate any and all issues related to the comprehensive resolution of Claims relating to historical acts of Abuse in the BSA's Scouting programs through

a chapter 11 plan of reorganization, and referring such matters to mandatory mediation.  In response to a number of limited objections to the Mediation Motion filed by various parties [D.I. 161, 164, 166, 316, 388, 617, 646, 647, 648, 650, 652, 658, 664, 710, 711, 712, 713, 756, 757, 759, 761, 762, 771, 772 and 773], the Debtors filed the *Debtors' Reply in Support of Their Motion for Entry of an Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 782].

On June 9, 2020, the Bankruptcy Court entered the Mediation Order described above, appointing Judge Kevin Carey (Ret.), Mr. Paul Finn, and Mr. Timothy V.P. Gallagher as Mediators.  The Debtors subsequently successfully defended the Mediation Order against a motion for reconsideration filed by Century, which the Bankruptcy Court denied on July 14, 2020— thereby enabling the Mediators to move forward with the substantial task of mediating these large and complex cases.  The original mediation parties consisted of (a) the Debtors; (b) the Ad Hoc Committee; (c) the Future Claimants' Representative; (d) the Tort Claimants' Committee, including its members, Professionals, and the individual members' professionals; (e) the Creditors' Committee, including each parties' members, professionals, and the individual members' professionals; and (f) the following insurers: The Chubb Group of Insurance Companies, The Hartford Companies, Allianz Global Risks US Insurance Company, National Surety Corporation, Liberty Mutual Insurance Company, and American International Group, Inc. Entities.

On August 26, 2020, the Coalition moved to participate in the mediation [D.I. 1161], arguing that the Coalition was a necessary and indispensable party to the Mediation Order and should be permitted to participate in, and would add value to, efforts to reach a global resolution.  On September 2, 2020, various parties filed objections to the Coalition's motion, including Hartford Accident and Indemnity Company and certain other insurers [D.I. 1222], Allianz Global Risks U.S. Insurance Company and National Surety Corporation [D.I. 1224], the Tort Claimants' Committee [D.I. 1229], and Century [D.I. 1230].  On October 23, 2020, the Bankruptcy Court overruled these objections and entered an order allowing the Coalition to participate in the mediation and designating the Coalition as a mediation party [D.I. 1573].

The Debtors have subsequently engaged in extensive discussions and negotiations with the mediation parties regarding complex legal and factual issues that must be addressed in connection with a global resolution of Abuse Claims.  Numerous additional parties have joined the mediation subsequent to the Coalition's designation as a mediation party.  Such parties include JPM, the Corporation of the President of TCJC, the United Methodist Ad Hoc Committee, Agricultural Insurance Company, Aspen Insurance Holdings, Limited, AXA XL Insurance, CNA Insurance Companies, General Star Indemnity Company, Markel Insurance Company, Arrowood Indemnity Company, Old Republic Insurance Company, Travelers Indemnity Company, Colony Insurance Company, Argonaut Insurance Company, Clarendon America Insurance Company, American Zurich Insurance Company, Maryland Casualty Company, Maryland American General Group, and American General Fire & Casualty Company, Munich Re, Traders and Pacific Insurance Company, Endurance American Specialty Insurance Company, and Endurance American Insurance Company, the Roman Catholic Ad Hoc Committee, Catholic Mutual Relief Society of America, The Episcopal Church, the Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America, Roman Catholic Diocese of Brooklyn, New York, Roman Catholic Archbishop of Los Angeles, a corporation sole, Roman Catholic Diocese of Dallas, a Texas non-profit corporation, Archdiocese of Galveston-Houston, and Diocese of

Austin, and Zalkin Law Firm, P.C. and Pfau Cochran Vertetis Amala PLLC.  As of the filing of this Disclosure Statement, intensive formal mediation is continuing in an effort to resolve outstanding controversies, including issues relating to the terms of the Plan.

On March 1, 2021, the Debtors filed the *First Mediators' Report* [D.I. 2292], which detailed that mediation had resulted in the Debtors, JPM, and the Official Committee of Unsecured Creditors agreeing to a settlement term sheet.  The JPM / Creditors' Committee Term Sheet is attached to the *First Mediators' Report* as Exhibit A.  The Tort Claimants' Committee filed a response on March 2, 2021 [D.I. 2297] noting that it did not consent to or agree with the JPM / Creditors' Committee Term Sheet attached to the *First Mediators' Report*, to which the Future Claimants' Representative and Coalition joined [D.I. 2305, 2319].

 On April 16, 2021, the Debtors filed the *Second Mediators' Report* [D.I. 2624], which included a proposed settlement between the Debtors and Hartford.  The Initial Hartford Settlement Agreement is attached to the Second Mediators' Report as Exhibit A.  As stated in the report, the Mediators remained confident that the Mediation would continue to foster constructive discussion between and among the Debtors and other mediation parties.

On June 3, 2021, the Debtors filed the *Third Mediators' Report* [D.I. 5219], in which the Mediators noted that while the continued mediation sessions had not yet resulted in a formal settlement and key issues remained open, progress towards a settlement was being made.  On June 9 and June 11, 2021, the Debtors filed the *Fourth Mediators' Report* and the *Fifth Mediators' Report*, respectively, pursuant to which the Mediators provided certain updates to the Bankruptcy Court regarding upcoming hearings in light of ongoing settlement discussions [D.I. 5284, 5287].

On September 14, 2021, the Debtors filed the *Sixth Mediators' Report*, explaining, among other things, that the Debtors, Hartford, the Future Claimants' Representative, the Coalition, and the Ad Hoc Committee, had agreed in principle on settlement terms that will result in an additional $1.037 billion of cash contributions to the Settlement Trust, in addition to the contributions of up to approximately $820 million that will be made by the Debtors and the Local Councils [D.I. 6210].

L.     Evaluation of Estate Assets

On June 18, 2020, the Debtors filed the *Debtors' Omnibus Application for Entry of an Order Authorizing the Retention and Employment of Appraisers for the Debtors and Debtors in Possession, Nunc Pro Tunc to June 18, 2020* [D.I. 868], seeking to retain five different appraisers—Appraisers of the Keys, Inc.; Hotel & Leisure Advisors; F.I. Salter, Inc.; Dawn M. Powell Appraisals Inc.; and BW Ferguson & Associates Ltd. (collectively, the "Appraisers")—to provide appraisal services for the high adventure facilities located in Florida, Minnesota, and parts of Canada, New Mexico, and West Virginia.  Due to the differences in geographic location, property type, acreage, and land use of each high adventure facility, the Debtors retained Appraisers for each of the following: Sea Base; Philmont and Summit; the portion of Northern Tier located in Minnesota; the portion of Northern Tier located in Ontario, Canada; and the remainder of Northern Tier located in Manitoba, Canada (collectively, the "Subject Properties").  The Bankruptcy Court entered an order authorizing the retention and employment of the Appraisers on July 8, 2020 [D.I. 984].

Pursuant to their engagement letters, the Appraisers provided the following during their appraisal process: (a) a highest and best use analysis, consideration, and determination of which is a standard and requisite component of property valuation; (b) physical viewing, inspection, and measurement of structures on the Subject Properties, observation of the condition of improvements, characterization of land use, and consideration of other conditions of the properties that may impact market values; (c) consideration of the number, type, sizes, uses, and conditions of structures on the Subject Properties; (d) research and consideration of rights restrictions and zoning restrictions on the Subject Properties; and (e) consideration of other requirements and restrictions specific to certain of the Subject Properties, including growth ordinance requirements, marinas draft depth and access channels, property composition, comparable sales data, water rights, property damage, and mineral rights.

As noted above, on November 30, 2020, in connection with the Debtors' ongoing efforts to evaluate Estate and non-Estate assets to fund the Settlement Trust and the Plan, the Debtors filed an application to retain JLL [D.I. 1762], which the Bankruptcy Court approved on December 14, 2020 [D.I. 1841]. The Debtors have retained JLL to provide broker opinions of market value, in consultation with certain of their stakeholders, of certain Local Council properties, which are ongoing as of the date hereof. Because many Local Councils lack significant unrestricted liquid assets, any contribution from Local Councils in the aggregate may need to include real property and improvements as a component, and any Local Councils that desire to participate in any potential negotiated resolution may wish to value potential real property that they seek to contribute. The Debtors are continuing to work with JLL to appraise approximately 300 of the approximately 1,000 Local Council real properties.

Concurrently with the filing of the Debtors' application to retain JLL, the Tort Claimants' Committee filed an application to retain CBRE, Inc. to provide desktop appraisals of additional of the Local Council real properties described above [D.I. 1785]. The Bankruptcy Court approved the application on December 15, 2020 [D.I. 1846]. The Debtors and the Tort Claimants' Committee have agreed to coordinate with respect to the appraisal of the Local Council properties to avoid unnecessary duplication of services.

M.      Bar Dates and Body of Claims

On the Petition Date, the Debtors filed the *Debtors' Motion, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof, (III) Approve Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Victims, and (IV) Approve Confidentiality Procedures for Abuse Victims* [D.I. 18]. On May 4, 2020, the Debtors filed the declaration of Shannon R. Wheatman, Ph.D, in support of the Bar Date Order [D.I. 556] and the *Supplement to Debtors' Bar Date Motion* [D.I. 557], which described the Supplemental Notice Plan, to provide extensive supplemental noticing to known and unknown survivors of Abuse.

After extensive negotiations regarding the Bar Date Order and the noticing program with parties in interest, on May 26, 2020, the Bankruptcy Court entered an order approving the Bar Date Motion over the remaining objections of certain parties in interest [D.I. 695] (the "Bar Date Order"). The Supplemental Notice Plan approved by the Bankruptcy Court was a carefully tailored

and highly negotiated multi-million dollar Bar Date noticing program, comprised of an advertising campaign that utilized television, radio, magazines, newspapers, and online media.  As described in detail in the declarations of Dr. Wheatman, the Debtors' primary target audience for the Supplemental Notice Plan was men 50 years of age or older.  As described in the declaration from Dr. Wheatman regarding the implementation of the Supplemental Notice Plan [D.I. 1758], the Debtors delivered notice of the Bar Dates to the Debtors' primary target audience of men 50 years of age or older with a reach (the estimated percentage of a target audience reached through a combination of media vehicles) of 95.8%, and an average estimated frequency (the estimated average number of opportunities an audience member has to see a notice) of 6.5 times.[81]

### 1.    *Establishment of Bar Dates*

By the Bar Date Order, the Debtors established (a) November 16, 2020 as the last date by which claimants could assert any prepetition Claims against the Debtors (the "Bar Date"), other than holders of Abuse Claims, (b) November 16, 2020 as the last date by which any holder of an Abuse Claim could assert any Claim arising from Abuse occurring prior to the Petition Date, and (c) August 17, 2020 as the deadline for Governmental Units to assert any prepetition Claims against the Debtors.

### 2.    *Non-Abuse Liabilities of the Debtors*

The Non-Abuse Claims and Non-Abuse Litigation Claims filed against the Debtors include, but are not limited to, various employee and benefits related Claims; indemnification Claims; non-Abuse personal injury and litigation Claims; and contract claims.  In addition, numerous Non-Abuse Claims and Non-Abuse Litigation Claims were included in the Debtors' Schedules.  The scheduled Claims fall into categories including, but not limited to, employment, personal injury, environmental Claims, service and utility claims, trade payments, unclaimed property, surety bonds, deferred compensation, Restoration Plan, and workers' compensation.

Further, the Debtors believe that they were generally current on their known prepetition trade payables as of the Petition Date.

Particular parties may attempt to file additional Claims notwithstanding the passage of the Bar Dates and seek allowance of such Claims by the Bankruptcy Court to be treated as timely filed.  Additionally, claimants may amend certain existing Claims to seek increased amounts.

### 3.    *Supplemental Bar Date Order*

On August 25, 2020, the Debtors filed the *Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and ¶ 27 of the Bar Date Order for Entry of an Order (I) Supplementing the Bar Date Order and (II) Granting Related Relief* [D.I. 1145] (the "Supplemental Bar Date Motion"), requesting that the Bankruptcy Court supplement the Bar Date Order to prevent potential Abuse survivors from being misled or confused regarding the Bar Date and Claims process.  In the Supplemental Bar Date Motion and in supplemental briefing [D.I. 1260], the Debtors alleged that certain law firms had engaged in their own false and misleading advertising

---

[81]    As discussed further below, Century filed a Notice of Appeal [D.I. 803] of the Bar Date Order on June 9, 2020.  The appeal was dismissed on March 29, 2021.

to solicit Claims from Abuse survivors, and that certain advertising contained false and misleading statements and was inconsistent with the content approved by the Bankruptcy Court in the Bar Date Order.

The Coalition objected to the Supplemental Bar Date Motion [D.I. 1190, 1264], arguing that the Debtors' proposed supplement sought an overly-broad, content-based prior restraint of speech. After negotiations between the Debtors and the Coalition following a hearing on the Supplemental Bar Date Motion, on September 16, 2020, the Bankruptcy Court entered an order: (i) ruling that certain specific statements in plaintiffs' law firm advertising regarding the Debtors' Chapter 11 Cases was false and misleading; (ii) directing that the false and misleading statements be removed; (iii) directing that certain clarifying information be added to such law firms' advertising to prevent confusion and prejudice of sexual abuse survivors; and (iv) approving procedures for the Debtors to seek expedited relief with respect to additional false and misleading law firm advertising [D.I. 1331].

### 4.    *Claims Reconciliation and Objections*

At the time of the Bar Date, approximately 15,000 Claims (other than Direct Abuse Claims) were timely filed on the general Claims Register.

The Debtors continue to review and analyze the proofs of Claim filed to date, and reconcile these Proofs of Claim with the Debtors' scheduled Claims. On February 3, 2021, the Debtors filed their *First Omnibus (Non-Substantive) Objection to Certain (I) Exact Duplicate Claims, (II) Amended and Superseded Claims, and (III) Incorrect Debtor Claims (Non-Abuse Claims)* [D.I. 2019], which was sustained on March 5, 2021 [D.I. 2323]; *Second Omnibus (Substantive) Objection to Certain (I) Cross-Debtor Duplicate Claims, (II) Substantive Duplicate Claims, (III) No Liability Claims, (IV) Misclassified Claims, and (V) Reduce and Allow Claims (Non-Abuse Claims)* [D.I. 2020]; and *First Notice of Satisfaction of Claims and/or Scheduled Amounts (Non-Abuse Claims)* [D.I. 2021]. The Debtors will continue to file objections and may seek stipulations with respect to certain of these Claims.

On March 5, 2021, the Bankruptcy Court entered the *Order Sustaining Debtors' First Omnibus (Non-Substantive) Objection to Certain (I) Exact Duplicate Claims and (II) Amended and Superseded Claims and (III) Incorrect Debtor Claims (Non-Abuse Claims)* [D.I. 2323], disallowing and expunging certain exact duplicate claims, and amended and superseded Proofs of Claim. This order also reassigned certain Claims incorrectly filed against one Debtor to the correct Debtor against whom the claims should have been asserted.

On April 26, 2021, the Bankruptcy Court entered the *Order Sustaining the Debtors' Second Omnibus (Substantive) Objection to Certain (I) No Liability Claims, (II) Misclassified Claims, and (III) Reduce and Allow Claims (Non-Abuse Claims)* [D.I. 2686], disallowing and expunging certain no liability claims. The order also reclassified certain misclassified claims, which remain subject to the Debtors' further objections on any substantive or non-substantive grounds and further order of the court, and it reduced certain allowed claims.

### 5.    *Estimation of Claims*

On March 16, 2021, the Future Claimants' Representative, the Tort Claimants' Committee, and the Coalition filed a motion requesting binding estimation proceedings [D.I. 2391] (the "Estimation Motion").  These parties requested an estimation of aggregate liability for Abuse Claims, using a valuation scale for different types of Abuse, on a year-by-year basis, and identifying applicable Local Councils and Chartered Organizations.  These moving parties argued that this estimation would resolve the disputes with respect to the amount that should be contributed to the Settlement Trust in order to fairly compensate Abuse Survivors.  *Id.* at 6.

On March 17, 2021, the Future Claimants' Representative, the Tort Claimants' Committee, and the Coalition filed a motion requesting that the District Court for the District of Delaware withdraw the reference to the Bankruptcy Court [D.I. 2399] to hear the Estimation Motion (Civil Action No. 21-cv-00392) ("Withdrawal of Reference Proceedings"), which motion was subsequently docketed with the District Court.  The Future Claimants' Representative, Tort Claimants' Committee, and the Coalition requested that the reference be withdrawn so that the District Court could conduct estimation proceedings, instead of the Bankruptcy Court.

On April 15, 2021, certain parties filed objections to the Estimation Motion, which include:

- *Objection of The Church of Jesus Christ of Latter-Day Saints* [D.I. 2610], claiming that estimation of non-debtor claims is not permitted under the Bankruptcy Code and asserting that estimation would lead to a lengthy and unworkable discovery process as it relates to the non-debtors.  The United Methodist Ad Hoc Committee joined this objection [D.I. 2681].

- *Opposition of Certain Insurers* [D.I. 2611], arguing that there is no basis under the Bankruptcy Code to conduct an estimation proceeding to determine a debtor's aggregate liability for all mass-tort claims; the Estimation Motion was filed with the intent to prejudice insurers in state-court coverage litigation; and the proposed estimation procedures are improper.  The following insurance companies were parties to this objection: First State Insurance Company; Hartford Accident and Indemnity Company; Twin City Fire Insurance Company; Liberty Mutual Insurance Company; Travelers Casualty and Surety Company; St. Paul Surplus Lines Insurance Company; Gulf Insurance Company; General Star Indemnity Company; American Zurich Insurance Company; American Guarantee and Liability Insurance Company; Steadfast Insurance Company; AIG Companies; Arrowood Indemnity Company; Allianz Global Risks US Insurance Company; National Surety Corporation; Interstate Fire & Casualty Company; Agricultural Insurance Company; Agricultural Excess and Surplus Insurance Company; Great American E&S Insurance Company; Clarendon America Insurance Company; The Continental Insurance Company; and Columbia Casualty Company.

- *Debtors' Objection* [D.I. 2612], objecting to the moving parties' proposed procedures.  Specifically, the Debtors contend that the procedures provided in the Estimation Motion are unduly burdensome and neither necessary nor appropriate.  The Debtors' have proposed a non-binding estimation under the Plan, see Plan

<u>Article V.T</u>, and that certain additional discovery and related procedures be set though the *Debtors' Motion For Entry of Order (I) Scheduling Certain Dates and Deadlines In Connection With Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relief* [D.I. 2618]. Such motion was filed the same day as the Debtors' Objection.

- *Old Republic Insurance Company's Objection* [D.I. 2613], joining the legal arguments raised in the *Opposition of Certain Insurers* [D.I. 2611].

- *Century's Opposition* [D.I. 2614], objecting to the Estimation Motion because estimation of the aggregate liability of the debtor and non-debtors is devoid of any precedent; there is no basis for estimation of the Abuse Claims under the Bankruptcy Code; the Estimation Motion is an improper attempt to prejudice insurers in state-court coverage litigation; and the procedures proposed in the Estimation Motion are improper.

On April 15, 2021, certain insurers[82] also filed an *Opposition to Motion of the Coalition, TCC and FCR for Withdrawal of the Reference of Proceedings Involving the Estimation of Personal Injury Claims* [Withdrawal of Reference Proceedings, D.I. 14]. The insurers argue that if estimation were to take place it should remain with the Bankruptcy Court because it is a core proceeding, the estimation does not involve the trial of any personal injury claims such that the Bankruptcy Court cannot estimate, and the Bankruptcy Court is the best forum suited to decide the Estimation Motion. On April 15, 2021, the Debtors also filed an answering brief in opposition to the motion to withdraw the reference [Withdrawal of Reference Proceedings, D.I. 15]. The Debtors argued that the estimation contemplated in the Estimation Motion is a core proceeding that should remain with the Bankruptcy Court. In addition, the Debtors maintain that the Bankruptcy Court is the proper forum for estimation because it will promote uniformity, discourage forum shopping, avoid undue delay, conserve the parties' resources, and expedite the bankruptcy process. The Debtors argued that withdrawal of the reference is not mandatory and that all of the factors weigh in favor of keeping proceedings centralized before the Bankruptcy Court.

On April 16, 2021, Century filed an *Opposition to Motion of the Coalition, TCC and FCR to Withdraw the Reference of Proceedings Involving the Estimation of Personal Injury Claims* [Withdrawal of Reference Proceedings, D.I. 17], arguing that Estimation Motion would cause undue delay, there is no basis for estimation especially regarding claims against non-debtors, and the Estimation Motion was not for the liquidation or estimation of particular injury claims for the purpose of distribution.

---

[82]    The insurers that filed the opposition are (1) First State Insurance Company, Hartford Accident and Indemnity Company and Twin City Fire Insurance Company, (2) Liberty Mutual Insurance Company, (3) Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company and Gulf Insurance Company, (4) General Star Indemnity Company, (5)  American Zurich Insurance Company, American Guarantee and Liability Insurance Company, and Steadfast Insurance Company, (6) AIG Companies, (7) Arrowood Indemnity Company, formerly known as Royal Indemnity Company, (8) Allianz Global Risks US Insurance Company, (9) National Surety Corporation and Interstate Fire & Casualty Company, (10) Agricultural Insurance Company, Agricultural Excess and Surplus Insurance Company, and Great American E&S Insurance Company, (11) Clarendon America Insurance Company, and (12) The Continental Insurance Company and Columbia Casualty Company.

On April 22, 2021, the Future Claimants' Representative, the Tort Claimants' Committee, and the Coalition filed a reply brief in support of their motion to withdraw the reference [Withdrawal of Reference Proceedings, D.I. 29]. The movants maintain that the District Court should conduct proceedings because they are non-core, other relevant factors weigh in favor of withdrawal, and withdrawal of reference is required by the Bankruptcy Code under the circumstances.

On April 27, 2021, the Future Claimants' Representative, the Tort Claimants' Committee, and the Coalition filed a *Request for Oral Argument* [Withdrawal of Reference Proceedings, D.I. 30]. To date, no District Court hearing has been scheduled.

On May 14, 2021, the Tort Claimants' Committee, the Coalition, and the Future Claimants' Representative filed an omnibus reply to Estimation Motion objections filed by the (i) Debtors, (ii) Century Indemnity Company, (iii) certain insurers, (iv) TCJC, joined by (v) the United Methodist Ad Hoc Committee, and (vi) Old Republic Insurance Company [D.I. 4089]. They argued the Bankruptcy Court should grant the Estimation Motion with leave for the parties to advise the District Court of the disposition of the Estimation Motion in connection with the District Court's determination of the pending motion to withdraw reference. The Estimation Motion was taken under advisement by the Bankruptcy Court at the May 19, 2021 hearing.

N.    Description of Abuse Claims and the Valuation of Abuse Claims

During its claim reconciliation process, Bates White established that there are approximately 82,200 unique, timely Proofs of Claims seeking personal injury damages on account of Abuse. As described in the Bar Date Order, these Proofs of Claim relate to Abuse associated with the BSA or Scouting, which is broadly defined to include claims against the BSA and those against third parties such as Local Councils or organizations that sponsored a troop or pack. Bates White estimates the value of the Abuse Claims is between $2.4 billion and $7.1 billion.[83] To establish this value range, Bates White analyzed BSA's historically resolved Abuse Claims, with a focus on four factors that have affected the Claims' settlement value: (i) the possible monetary damages the Abuse Survivor could obtain in the tort system, (ii) the connection to Scouting during the alleged acts, (iii) certain legal considerations regarding the viability of the Claim, and (iv) the credibility of the Claim.

The matrix values in the Trust Distribution Procedures and the values used to develop Bates White's Abuse Claim range of $2.4 billion to $7.1 billion are both based upon BSA's historically resolved Abuse Claims, and publicly available information related to potentially comparable settlements.

The actual valuation of the Abuse Claims could fall outside the estimated valuation range of $2.4 to $7.1 billion if the actual facts regarding the Claims materially differ from the information submitted in connection with the Proofs of Claim or the historical data used to derive potential values related to Abuse Claims proves unreliable. For example, if more than half of the Abuse

---

[83]    The number of unique, timely Proofs of Claim that Bates White evaluated is less than the total number of timely Proofs of Claim submitted in the Chapter 11 Cases because some Survivors filed multiple Proofs of Claim. The count of unique, timely Proofs of Claim has fallen since prior disclosures primarily because some Proofs of Claim have since been withdrawn or voided.

Claims that have been identified as presumptively time-barred are, in fact, not time barred, or if a significantly greater number of the Survivors asserting Abuse Claims identifies their abusers as serial abusers within Scouting, the valuation could exceed $7.1 billion.  In contrast, if more than half of the Abuse Claims that currently identify an abuser by name are deemed insufficient or otherwise subject to disallowance, or if the BSA's responsibility for the abuse is found to be less significant than was assumed in the valuation model, the valuation of Abuse Claims could be less than $2.4 billion.[84]    The Coalition, Tort Claimants' Committee and Future Claimants' Representative disagree with the methodology employed by Bates White and its estimated valuation range, and believe that the potential value of the Abuse Claims is materially higher than $7.1 billion.  Century and other Insurance Companies disagree with the Bates White valuation of the Abuse Claims and believe the potential value is materially lower.

The Debtors' estimated valuation range of $2.4 billion to $7.1 billion is based upon current information included in the Proofs of Claim submitted to date, BSA's historically resolved Abuse Claims, and publicly available information related to potentially comparable settlements.  The estimated valuation range is broad due to a number of factors.

To arrive at the valuation range, Bates White considered multiple scenarios arising from four categories of attributes that would affect the value of the Abuse Claims: (i) those that affect the amount of damages, (ii) those that affect the degree of accountability of the BSA based on any alleged connection with Scouting, (iii) those that affect legal considerations regarding the viability of the claim, and (iv) those that affect the allowance and credibility of the Abuse Claim.  While there is some variation in how Bates White tested various scenarios, all of the scenarios are based on a frequency and severity valuation model where the number of current Abuse Claims (frequency) alleging a particular Abuse (severity) is measured against the attributes described above, which, when combined with historical data regarding resolution of Abuse Claims, allows Bates White to project the value of the Claims.

To evaluate the possible value of damages related to an Abuse Claim, Bates White assigned a score based on the most severe Abuse alleged across all of the relevant submissions for each Survivor using the categories specified on the Proof of Claim form.  For example, in certain scenarios, Claims were divided pursuant to the following categories, in descending order of severity: (i) those alleging sex acts involving penetration, oral sex, or masturbation; (ii) those alleging physical acts of groping and touching with clothing on or off; and (iii) those with unknown or missing allegations.  According to historical settlement amounts and other publicly available data, tort claimants generally obtain higher damage recoveries based on the severity of Abuse alleged.  Additional damages were considered, and corresponding scores were assigned, in at least some scenarios based upon a Survivor's age at the time of the first alleged act of Abuse and, where applicable, the number of instances of Abuse alleged in the Proof of Claim.

To evaluate the BSA's possible degree of liability, Bates White considered the alleged connection to Scouting, and corresponding scores were assigned based on whether (i) the Survivor had an affiliation with Scouting; (ii) the Survivor indicated having had another relationship with

---

[84]    The valuation range reported here is based the data available as of the prior July 2, 2021. Since that time, due to amendments and other changes, the number of claims that are not presumptively barred and identify, by name an alleged abuser has risen from 14,000 to 16,600. The valuation range has not been adjusted because this increase is within the range contemplated in Bates White's evaluation of the earlier data.

the abuser outside of Scouting (*e.g.*, through church or school contact); (iii) the alleged abuser was an adult or minor; and (iv) the abuser is alleged to have abused others involved in Scouting.

To evaluate the degree of legal liability, Bates White focused on whether the claim would be presumptively time-barred based on applicable law in the jurisdiction or jurisdictions in which each Survivor alleges abuse.

To evaluate the level of credible support for the Abuse Claims, Bates White examined factors such as (i) the amount of information the Survivor provided relating to the nature of the Abuse, (ii) whether the Survivor indicated that anyone else knew of the Abuse; (iii) whether the Survivor named at least one abuser; and (iv) whether the Survivor indicated that the Abuse was reported to Scouting, law enforcement, or any other party. While trying to be as comprehensive as possible, the foregoing list of attributes is not perfect and certain Survivors may not be able to identify their abusers. Moreover, a lack of prior reporting does not necessarily correspond to a lack of Abuse. Accordingly, Bates White also considered simplified scenarios where such attributes were modeled through a rejection rate (*i.e.*, an assumption that a portion of the Claims would be disallowed, withdrawn, or found not to meet the criteria set out to receive compensation under the Trust Distribution Procedures related to the Settlement Trust or in the tort system).

All of Bates White's valuation scenarios are based on the data currently provided in the Proofs of Claim. To eliminate duplicative or defective Proofs of Claims, Bates White first considered Abuse Claims that were submitted prior to the Bar Date (or properly amended thereafter) and claimant personal identification. Specifically, for individuals who made at least one timely submission, Bates White incorporated information from post-bar date amendments and supplemental submissions into one Claim. Duplicate submissions from individuals identified on the basis of certain key personal identifying information on the Proof of Claim, including name, last four digits of Social Security Number, and birthday, were also consolidated into one, comprehensive Claim. Withdrawn and voided Proof of Claim submissions were removed.

While there are approximately 82,200 unique, timely Abuse Claims, Bates White viewed the majority of these claims as presumptively barred and many more as failing to provide key information that Bates White concluded would be necessary to establish payment within the tort system or potentially under the Trust Distribution Procedures and Settlement Trust Agreement. Within this set, Bates White focused its valuation on the approximately 16,600 claims that are not presumptively barred and identify, by name, either in full or in part, an alleged abuser. These claims are the most similar to those that were resolved by the BSA, often in conjunction with its Insurance Companies, prior to these Chapter 11 Cases. There are multiple reasons, however, why the eventual number of compensable Abuse Claims could differ from this current core Claim count.

To determine which Claims might be presumptively time barred, Bates White analyzed the location where the Claimant alleges the Abuse occurred and the relevant law in the applicable state or territory. Bates White also considered the age of majority for which a Claim is allowed in each state as compared to the Claimant's age as of the Bar Date and whether the last date of Abuse alleged is within the time window in which a Claim is allowed in each state. For purposes of determining the applicable criteria under each state or territory, Bates White relied upon information provided by Debtors' defense counsel. For example, under the Bates White

evaluation, a Claim alleging Abuse that took place in New Jersey, which is currently subject to a reviver statute under which claims are not time barred, would be considered not presumptively barred.  In contrast, a Claim alleging Abuse that took place in Pennsylvania would not be presumptively barred for a Survivor who is 55 years old or younger, but would be presumptively barred for a Survivor who is older than 55 years.

The number of Abuse Claims that might not be considered presumptively barred could grow for multiple reasons.  The recorded abuse location or locations currently available in the analytical data and used for purposes of the presumptively barred evaluation are not complete and may be supplemented—which could lead to further Abuse Claims being removed from the presumptively barred category.  In addition, virtually all states recognize that abuse claims can be filed after the statutory limitations period has run under select circumstances, which vary from state to state.  Over the last several years, multiple states have implemented revival windows under which previously barred Claims were allowed to be pursued.  Bates White's prior analysis identified the potential for more states to implement revival windows or otherwise allow older claims as a risk factor. This risk has manifested during the pendency of these Chapter 11 Cases in several states—Arizona, Colorado, Kentucky, Louisiana, and Maine—which have passed legislation that would either eliminate their statute of limitations or lengthen the window in which a Claim is allowed.  Those changes, along with amendments providing supplemental information filed by individuals who had previously already filed a timely Proof of Claim in this matter, have resulted in an increase in the number of claims that are not presumptively barred and identify, by name, either in full or in part, an alleged abuser as compared to prior disclosures.

The valuation range could change based on which Abuse Claims are allowed and compensated in accordance with the trust distribution procedures.  Bates White expects that some portion of submitted Abuse Claims will (i) be disallowed for containing insufficient or deficient information, (ii) not meet the criteria set out to receive compensation pursuant to the Trust Distribution Procedures, or (iii) be withdrawn.  Further, the BSA's insurers have questioned the validity of certain of the Abuse Claims based on the manner in which large groups of the Abuse Claims were recruited.   While Bates White attempted to account for these issues via the implementation of various assumed claim rejection rates, the actual rejection rate is not certain.

The Bates White analysis of the value of the claims asserted against the BSA draws on the BSA's historical data related to resolutions of Abuse liability.  With the shift in Survivor behavior in the past two years—for example, the scale of the post-petition claims relative to those BSA received pre-petition—there is significant uncertainty regarding how historical settlements align with the currently filed Abuse Claims.  In a context such as this, where Survivor behavior has shifted, the Claims that were historically resolved may not be representative of the Abuse Claims comprising the current population.

Across mass torts, there is significant selection bias regarding which cases are filed relatively early in the lifespan of the tort, when costs to plaintiffs are generally higher, and which cases are pursued as the tort is more developed, when costs to plaintiffs are lower.  The significant increase in claims filed against the BSA represents a structural break in this process.  Relative to the current pool of Abuse Claims, the BSA's historical data related to Abuse liability resolutions was stronger on observable, and likely also unobservable, characteristics.  With this being the case, there is substantial uncertainty regarding how Claim values for the current pool of Abuse Claims,

even those with similar characteristics, such as the particular type of abuse allegation, may differ from historical data.  For example, an ongoing analysis has shown that the majority of the BSA's roughly 260 historical sexual abuse case resolutions over the last four years relate to Claims that named abusers who appear multiple times in that data set.  Further, the data shows—as one would expect given that it relates to the BSA's potential accountability—that on average, Claims alleging Abuse against individuals who abused multiple people in connection with Scouting were paid more than similarly situated claims for which the alleged abuser is only identified by one individual.  Within the Proof of Claim data, however, a supermajority of the Claims name abusers who appear unique.  While we have some ability to control for this valuation factor, there are other factors that may also impact the value of the Abuse Claims—particularly with regards to issues of credibility and accountability—which may differ across the pools.

The chart below provides a breakdown of the Abuse Claims.  Of the approximately 82,200 unique and timely Abuse Claims, approximately 77,400 are not missing key fields.  Of these claims, approximately 27,200 are not presumptively barred by statute of limitations and approximately 50,200 are presumptively barred by statute of limitations.   Of those not presumptively barred, approximately 16,600 named an abuser, either in full or in part.

| Abuser Name Category | Count |
| --- | --- |
| Name Provided | 10,498 |
| Partial Name Provided | 6,107 |
| Physical Description Only | 3,741 |
| Unknown | 6,856 |

Additionally, attached hereto as **Exhibit F** are charts listing the Abuse Claims (i) by allegation type, (ii) counts by Local Council, (iii) counts by Local Council and allegation type, and (iv) counts by Chartered Organizations.  Some parties have asserted that Bates White's estimated valuation range should include valuations of Abuse Claims with respect to each individual Local Council and Chartered Organization.  Without significant additional review and analysis, however, performing such an exercise would not likely establish reliable estimates due to the data currently available.  The aggregate range of $2.4 billion to $7.1 billion is based upon current information included in the Abuse Claim Proofs of Claim submitted to date, BSA's historically resolved Abuse Claims, and publicly available information related to potentially comparable settlements.  Critically, those historical BSA resolutions involved payments for releases covering all BSA-related parties.  So while that data provides an empirical foundation for an aggregate projection of a value of the current Abuse Claims against all BSA-related parties, it does not, on its own, in many instances, provide an empirical basis upon which to partition that aggregate value among different related parties, such as Local Councils.  While it is possible to separately identify, in many instances, which Local Council(s) and Chartered Organization(s) may be involved with a given claim, the ability to provide a reasonable aggregate valuation range for all 82,200 Abuse Claims combined does not necessarily translate into a reasonable valuation for each distinct claim

or with respect to each individual Local Council or Chartered Organization. Given the number of entities involved, oftentimes with a combination of Local Councils and Chartered Organizations, many of the potential valuation groupings involve only a single claim or a handful of claims. Moreover, even in the case of Local Council and Chartered Organization combinations involving sufficient numbers of claims, additional information or analysis may be needed to separately identify which portion of the aggregate estimate should be attributed to the BSA and which to the other related organizations.

In addition to Direct Abuse Claims, approximately 14,000 contingent and unliquidated indemnification and contribution Claims have been filed against the Debtors, most of which would be included in the Class of Indirect Abuse Claims. The majority were filed by Chartered Organizations.[85] Among others, TCJC has asserted claims for indemnification and contribution from the BSA relating to the defense and resolution of Abuse Claims that have been and may be asserted against TCJC in the tort system. Pursuant to the terms of the TCJC Settlement, TCJC agreed to waive all claims against, among others, the Debtors and Reorganized BSA.

O.  Future Claimants' Representative's Future Abuse Claims Forecast

Ankura Consulting Group, LLC, consultant to the Future Claimants' Representative ("Ankura"), currently forecasts that the number of compensable Future Abuse Claims that may be asserted against the Settlement Trust is approximately 11,300 or approximately 14% of the total number of Direct Abuse Claims and the amount of the Debtors' liability for such Future Abuse Claims is approximately $5 billion or approximately 21% of the total value of Direct Abuse Claims as calculated by Ankura applying the procedures and criteria set forth in the Trust Distribution Procedures dated July 2, 2021.

The Debtors dispute the Future Claimants' Representative's forecast and believe that the number and value of Future Abuse Claims that will be asserted against the Settlement Trust will be substantially lower for two key reasons: (1) the multi-million dollar advertising campaign that occurred prior to the Bar Date was highly effective in reaching victims who came forward and filed Claims, and (2) the BSA's expert-informed youth protection programs, which are among the most stringent of any youth-serving organization, have been in place during the period correlating to Future Abuse Claims. The Debtors believe that the Bates White estimated range of $2.4 billion to $7.1 billion is a more accurate valuation of all Abuse Claims, including Future Abuse Claims, and is the better basis on which to formulate projected recoveries on account of Abuse Claims.

P.    Assumption and Rejection of Unexpired Leases and Executory Contracts

Since the commencement of these Chapter 11 Cases, the Debtors have strategically reviewed their contractual obligations and sought to weed out contractual agreements that do not provide a significant value to the Debtors' Estates going forward. Consistent with this goal, on March 31, 2020, the Debtors filed a motion seeking entry of an order authorizing the Debtors to reject that certain Personal Services Agreement by and between Pearson Education, Inc.

---

[85]  Certain Chartered Organizations have asserted contractual indemnity rights against the BSA for Scouting-related Abuse Claims. The Debtors dispute the validity of such purported indemnification Claims. While the Debtors do not believe any such valid indemnification Claims exist, any such purported indemnification Claims would be channeled to the Settlement Trust on the Effective Date.

("Pearson") and the BSA whereby Pearson agreed to provide various services to the BSA, including providing publishing and communications channels, marking communications, program materials, and saleable literature [D.I. 318]. That same day, the Debtors filed an omnibus motion seeking authority to reject three additional Executory Contracts, including a sublease for office space in New York, New York and a letter agreement for hotel accommodations in connection with a regional conference the BSA had planned but was ultimately canceled [D.I. 319]. The Bankruptcy Court entered orders approving both motions on April 15 and 17, 2020, respectively [D.I. 440, 449].

On June 16, 2020, the Debtors filed a motion seeking an order extending the 120-day period for the Debtors to assume or reject Unexpired Leases of nonresidential real property by ninety (90) days, to September 15, 2020 [D.I. 857]. On July 6, 2020, the Bankruptcy Court entered an order granting the motion [D.I. 954].

In June of 2020, the Debtors filed motions seeking entry of orders (a) rejecting the lease of nonresidential real property with Dheera Limited Company, LLC effective as of June 30, 2020 [D.I. 865], and (b) rejecting an Executory Contract with Oracle America, Inc. effective as of June 30, 2020 [D.I. 906]. The Bankruptcy Court entered orders approving both of these motions [D.I. 981, 982].

On August 26, 2020, the Debtors filed their first omnibus motion seeking entry of an order approving assumption of various Unexpired Leases of nonresidential real property and fixing the cure amount with respect thereto [D.I. 1168]. Several days later, the Debtors entered into stipulations with lease counterparties extending the deadline to assume or reject until June 30, 2021 and filed those stipulations with the Bankruptcy Court [D.I. 1298]. On September 11, 2020, the Bankruptcy Court entered two orders approving the Debtors' omnibus motion to assume Unexpired Leases and extending the deadline to assume or reject to June 30, 2021 [D.I. 1310, 1311].

On July 1, 2021, the Bankruptcy Court entered an order approving stipulations the Debtors entered into with lease counterparties to further extend the deadline to assume or reject Unexpired Leases to and including the earlier of: (a) the Confirmation Date; and (b) December 31, 2021 [D.I. 5464].

Q.    Stay Relief Matters

1.    *Old Republic*

On May 21, 2020, Old Republic Insurance Company filed *Old Republic Insurance Company's Motion Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 4001 for an Order Modifying the Automatic Stay to Permit Payments of Claims Against Non-Debtor Insureds and Related Defense Costs Under Insurance Policies* [D.I. 678] requesting entry of an order modifying the automatic stay, to the extent it applies, to allow Old Republic and ESIS to pay losses and expenses which are incurred in conjunction with the investigation, defense, adjustment or settlement of certain non-stayed Claims or suits on behalf Non-Debtor Insureds under certain Old Republic Insurance Policies.

On July 7, 2020, the Bankruptcy Court entered the *Order Granting Old Republic Insurance Company's Motion Pursuant to Section 362 of the Bankruptcy Code and Bankruptcy Rule 4001 for an Order Modifying the Automatic Stay to Permit Payments of Claims Against Non-Debtor Insured Parties and Related Defense Costs Under Insurance Policies* [D.I. 985], which modified the automatic stay, to the extent it applies, to allow Old Republic Insurance Company and its Affiliates (collectively, "Old Republic") and ESIS, Inc. ("ESIS") to administer, handle, provide for the payment of defense costs and to pay any judgments or settlements in connection with Claims or Causes of Action, not subject to the automatic stay against non-Debtor Entities that are covered by an Old Republic Primary Policy and by an Old Republic Excess Policy.  With respect to settlements or judgments against non-Debtor Entities covered by an Old Republic Excess Policy, the automatic stay was modified to allow Old Republic and ESIS to pay any judgments or settlements on behalf of the insured non-Debtor Entities in connection with any Claims and Causes of Action against non-Debtor Entities pursuant to a notice protocol set forth therein.

## 2. *Evanston*

On May 22, 2020, Evanston Insurance Company filed the *Evanston Insurance Company's Motion for Entry of an Order Pursuant to Section 362 of the Bankruptcy Code and Bankruptcy Rule 4001, Modifying the Automatic Stay to Permit Payments of Claims Against Non-Debtor Insured Parties and Related Defense Costs Under Insurance Policies* [D.I. 686] requesting entry of an order modifying the automatic stay, to the extent it applies, to allow Evanston to pay losses and expenses which are incurred in conjunction with the investigation, defense, adjustment, or settlement of certain non-stayed Claims or suits on behalf Non-Debtor Insureds under certain Evanston Insurance Policies.

On July 8, 2020, the Bankruptcy Court entered the *Order Granting Evanston Insurance Company's Motion Pursuant to Section 362 of the Bankruptcy Code and Bankruptcy Rule 4001 for an Order Modifying the Automatic Stay to Permit Payments of Claims Against Non-Debtor Insured Parties and Related Defense Costs under Insurance Policies* [D.I. 987], which modified the automatic stay to allow Evanston to pay any judgments or settlements in connection with any Non-Stayed Claims against Non-Debtor Insureds pursuant to a notice protocol set forth therein.

## R. Other Litigation

## 1. *Trademark Action*

On November 6, 2018, Girl Scouts of the United States of America ("GSUSA") filed a complaint in the United States District Court for the Southern District of New York, Case No. 18-cv-10287, against the BSA, alleging trademark infringement, dilution and tortious interference in connection with the BSA welcoming female members in into its youth programs  (the "Trademark Action").  On February 18, 2020, the Debtors filed these Chapter 11 Cases, thereby staying the Trademark Action.  On March 10, 2020, GSUSA filed a motion for relief from stay to resume prosecution of the Trademark Action [D.I. 155], and on April 24, 2020, the Bankruptcy Court entered an order granting limited relief from the stay [D.I. 485].  Pursuant to the order, the stay relief period ended on July 22, 2020 with respect to the Trademark Action.  The BSA and GSUSA were unable to reach a resolution, and on July 23, 2020, the automatic stay was lifted to permit the Trademark Action to proceed.  On September 18, 2020 the Bankruptcy Court entered an order authorizing the retention and employment of Quinn Emanuel Urquhart & Sullivan, LLP as special

litigation counsel to the Debtors pursuant to section 327(e) of the Bankruptcy Code, *nunc pro tunc* to August 1, 2020, to represent the Debtors in the Trademark Action [D.I. 1343].

The Trademark Action remains ongoing, and the Debtors believe that they have sufficient insurance to cover any and all remaining defense costs and liability that may arise in connection therewith. Specifically, the Debtors have three policies that remain available: (1) a primary Directors and Officers Liability insurance policy issued by RSUI; (2) an umbrella Directors and Officer Liability policy issued by Markel; and (3) a cyber-insurance policy issued by Beazley. The RSUI policy has aggregate limits of liability of $10 million, of which approximately $5 million in limits are remaining. The Markel policy has aggregate limits of liability of $10 million, which is fully available. And the Beazley policy has aggregate limits of liability of $15 million, of which approximately $10 million in limits are remaining. RSUI and Beazley are presently providing the BSA coverage for its defense counsel.

## 2. *Adversary Proceedings and Appeals*

On May 15, 2020, Hartford Accident and Indemnity Company and First State Insurance Company ("Hartford and State") filed an adversary complaint against the Debtors, certain Local Councils, and other insurers seeking declaratory judgment and contribution relating to Claims for Insurance Coverage for all underlying Abuse Claims against BSA and certain of its Local Councils (Adv. Pro. No. 20-50601). On August 14, 2020, the Debtors and the named Local Councils filed a motion to dismiss Hartford and State's adversary proceeding [D.I. 22]. The Debtors subsequently successfully negotiated a stay of the entirety of the Hartford and State adversary proceeding.

On June 9, 2020, Century filed an appeal (Civil Action No. 20-cv-00774) (the "Century Bar Date Appeal") of the Bar Date Order, alleging that the Proof of Claim form for Abuse claimants approved in the Bar Date Order was not properly before the Bankruptcy Court and was not designed to elicit sufficient information to establish the prima facie validity of Claims. On June 22, 2020, the Debtors filed a motion to dismiss the Century Bar Date Appeal [Century Bar Date Appeal, D.I. 4], and additionally prepared and filed extensive briefing in support of the motion to dismiss. On March 29, 2021, the District Court entered an order dismissing Century's appeal and closing the case [D.I. 2466]. The District Court concurrently issued a *Memorandum Opinion* [D.I. 2466-1], finding that the Bar Date Order is interlocutory and does not otherwise warrant immediate review under 28 U.S.C. § 1292(b).

On January 8, 2021, the Tort Claimants' Committee filed the Restricted Assets Adversary (the "TCC Case") (Adv. Pro. No. 21-50032), seeking a determination that approximately $667 million of the Debtors' total approximately $1 billion in assets are not restricted and, as such, that they should be available to satisfy creditors' Claims [D.I. 1913].[86] The Tort Claimants' Committee alleged that the Debtors failed to show that there are any specific donation-related restrictions or others on the assets that would make the assets unavailable to satisfy creditor Claims. Further, the Tort Claimants' Committee asserted that the Debtors failed to trace the restricted assets that were

---

[86] The Debtors are contributing substantial assets to the BSA Settlement Trust Contribution, above those which were previously proposed at the time this action was filed, in order to resolve any and all disputes regarding the Debtors' designation of assets as "restricted" or "core," including the claims asserted in this action.

commingled with unrestricted assets and to demonstrate that those assets were not used, spent, or transferred.

On April 14, 2021, the Bankruptcy Court issued an *Order Approving Stipulation for Further Extension of Time* [TCC Case, D.I. 13], extending the day in which the Debtors must answer, or otherwise respond to the complaint.[87]   On April 23, 2021, JPM filed a *Motion to Intervene* [TCC Case, D.I. 15], arguing that its rights may be affected by the adversary proceeding because some, if not all, of the disputed property is its prepetition collateral.  On April 26, 2021, the Debtors filed its *Answer to the Tort Claimants' Committee's Complaint for Declaratory Judgment* [TCC Case, D.I. 16], explaining that the complaint fails to state a cause of action on which relief can be granted.  The answer also explains that the identified property is not property of the estate, and is not available for distribution to general unsecured creditors.  On April 27, 2021, JPM filed a *Corporate Ownership Statement Pursuant to Federal Rule of Bankruptcy Procedure 7007.1* [TCC Case, D.I. 17].  On May 14, 2021, JPM filed a certification of counsel regarding the motion to intervene, stating that JPM has prepared a revised proposed order in response to informal comments received from the Tort Claimants' Committee; JPM also requested the Bankruptcy Court enter the revised proposed order granting the motion to intervene without further notice or hearing [TCC Case, D.I. 22].

On July 16, 2021, the Bankruptcy Court approved a stipulation with the Tort Claimants' Committee staying the Restricted Assets Adversary pending the outcome of the confirmation hearing [TCC Case, D.I. 42]. The stay contemplated by such stipulation is still effect and shall only terminate (a) by mutual agreement or (b) upon the occurrence of any of the following: (i) the Bankruptcy Court's entry of an order denying the approval of the Restructuring Support Agreement; (ii) the Tort Claimants' Committee or Debtors' exercise of its or their respective rights to terminate the Restructuring Support Agreement based on the "fiduciary out" provision of section IV.C or section V.C of the Restructuring Support Agreement, as applicable; or (iii); the Bankruptcy Court's entry of an order denying confirmation of the Plan.

### 3.    *Rule 2004 Exam Motions*

On September 29, 2020, the Tort Claimants' Committee filed the *Motion of the Official Tort Claimants' Committee Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1 for an Order Authorizing the Issuance of Subpoenas for Discovery from Debtors and Certain Local Councils* [D.I. 1379] (the "TCC 2004 Motion"), requesting entry of an order authorizing the Tort Claimants' Committee to issue subpoenas to and directing discovery from the Debtors, Ad Hoc Committee Members, and the Local Council listed on Exhibit B thereto.  The Debtors, the Ad Hoc Committee, and various Local Councils objected to the TCC 2004 Motion, and the Tort Claimants' Committee ultimately withdrew the TCC 2004 Motion on November 25, 2020 [D.I. 1735].

On January 22, 2021, Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company (collectively, "Hartford et al."), and Century filed *Hartford and Century's Motion for an Order (I) Authorizing Certain Rule 2004 Discovery and (II) Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections* [D.I. 1972] (the "Hartford and Century's Rule 2004 Motion"), which requested entry

---

[87]   The Bankruptcy Court retained jurisdiction over this adversary proceeding (Adv. Pro. No. 21-50032).

of an order (i) authorizing Hartford et al. and Century to serve subpoenas, written discovery, including interrogatories and document requests, and deposition notices pursuant to Rule 2004 on a sampling of Persons who have filed Abuse Claims in these Chapter 11 Cases and (ii) providing relief from the requirements of Local Rule 3007-1(f) to permit (but not require) parties in interest in these Chapter 11 Cases to file omnibus Claim objections raising common legal issues to multiple Claims and that may, most efficiently, be subject to resolution if heard together.

On January 22, 2021, Hartford et al. and Century also filed *Hartford and Century's Motion for Entry of an Order Authorizing Filing Under Seal of Certain Documents Relating to Hartford and Century's Motion for an Order (I) Authorizing Certain Rule 2004 Discovery and (II) Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections* [D.I. 1973] ("Motion to Seal"), which requested entry of an order (i) authorizing Hartford et al. and Century to file under seal certain portions of Hartford and Century's Rule 2004 Motion and certain supporting documents (the "Supporting Documents"); (ii) directing that information contained in the redacted portions of Hartford and Century's Rule 2004 Motion and the Supporting Documents (collectively, the "Confidential Information") shall remain under seal and confidential pursuant the Bar Date Order [D.I. 695] (entered by the Bankruptcy Court on May 26, 2020) and shall not be made available to anyone, except to the Bankruptcy Court, the Office of the United States Trustee for the District of Delaware, and the Permitted Parties (as defined in the Bar Date Order); and (iii) granting related relief.

On January 25, 2021, Agricultural Insurance Company filed a joiner in support of Hartford and Century's Rule 2004 Motion [D.I. 1979]. On February 2, 2021, Hartford et al. and Century filed a revised proposed redacted version of their Rule 2004 Motion, which resolved the U.S. Trustee's informal comments to Hartford and Century's Motion to Seal [D.I. 2007]. On February 2, 2021, Travelers Casualty and Surety Company, Inc., St. Paul Surplus Lines Insurance Company, and Gulf Insurance Company filed a joiner in support of Hartford and Century's Rule 2004 Motion [D.I. 2008] with several other parties subsequently filing joinders.[88]

On February 5, 2021, the Coalition filed an objection to Hartford and Century's Rule 2004 Motion, asserting: (I) there is no evidence that the law firms violated Rule 9011 or committed fraud, (II) claim discovery is premature, (III) the insurers lack standing to seek Rule 2004 discovery, (IV) the insurers failed to establish good cause for the proposed discovery, (V) signing a Proof of Claim does not constitute a privilege waiver or make an attorney a fact witness, and (VI) the insurers' request for discovery is designed to prevent a reorganization [D.I. 2043].[89] That same day, Claimant 40573 similarly filed an objection to Hartford and Century's Rule 2004 Motion, stating that Claimant 40573 has a legitimate, timely submitted Claim and that the proposed

---

[88]   The following parties also filed joinders in support of Hartford and Century's Rule 2004 Motion: (a) Allianz Global Risks U.S. Insurance Company, National Surety Corporation, and Interstate Fire & Casualty Company [D.I. 2026]; (b) Columbia Casualty Company, The Continental Insurance Company as successor in interest to certain policies issued by Harbor Insurance Company, The Continental Insurance Company successor by merger to Niagara Fire Insurance Company, and The Continental Insurance Company [D.I. 2065]; (c) National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, The Insurance Company of the State of Pennsylvania, and their affiliated entities (collectively, "AIG") [D.I. 2070]; (d) General Star Indemnity Company [D.I. 2136]; and (e) Liberty Mutual Insurance Company, together with its affiliates and subsidiaries [D.I. 2168].

[89]   On February 5, 2021, there were numerous joinders to the Coalition's objection filed by various law firms and claimants [D.I. 2054, D.I. 2060, D.I. 2062, D.I. 2069, D.I. 2074, D.I. 2077, D.I. 2078, D.I. 2079, D.I. 2080, D.I. 2081, D.I. 2082, D.I. 2084, D.I. 2087, D.I. 2089, D.I. 2090, D.I. 2091, D.I. 2093, D.I. 2094, D.I. 2098, D.I. 2101, D.I. 2102, D.I. 2108, and D.I. 2117].

discovery instruments are redundant of the Claim form [D.I. 2066]. Claimants known by Claim numbers 18867, 43995, and 50263, also filed an objection to Hartford and Century's Rule 2004 Motion stating, among other things, that while Rule 2004 discovery may be justified in instances where claimants provided inadequate information, these three claimants already provided, under penalty of perjury, the same information sought in the insurers' proposed discovery [D.I. 2085].

On February 5, 2021, claimants 3675, 18787, 28206, 32230, 38281, 48081, 48446, 60443, and 63751, by and through their undersigned counsel (the "PCVA Claimants"), filed an objection to Hartford and Century's Rule 2004 Motion on the ground that (1) the insurers failed to meet and confer before filing their motion, (2) they fail to establish good cause for their requested Rule 2004 examinations, and (3) during a meet and confer that took place *after* they filed their motion, the insurers agreed to narrow the scope of their requested Rule 2004 examinations [D.I. 2088]. Subsequently, claimant 5502 [D.I. 2099] and claimant 54540 [D.I. 2107] filed joinders to the PCVA Claimants' objection. On February 16, 2021, the PCVA Claimants withdrew their objection to Hartford and Century's Rule 2004 Motion after the movants agreed to withdraw their motion as to the PCVA Claimants [D.I. 2212].

On February 5, 2021, claimants represented by the law firm of Crew Janci LLP objected to Hartford and Century's Rule 2004 Motion on the grounds that (1) the movants failed to meet and confer before filing the motion; (2) the requested discovery is overly broad by design; (3) the requested discovery is unduly burdensome and seeks information that is largely duplicative of that already provided; and (4) the requested discovery is inappropriate because of underlying pending litigation [D.I. 2092]. On February 16, 2021, the claimants represented by Crew Janci LLP withdrew their objection [D.I. 2205].

Also on February 5, 2021, Andrews & Thornton, Attorneys at Law ("A&T") and ASK LLP ("ASK") filed a motion seeking entry of an order (i) authorizing A&T and ASK to file under seal certain portions of their objection to Hartford and Century's Rule 2004 Motion; (ii) directing that information contained in the redacted portions of the objection remain under seal and confidential pursuant to the terms of the Bar Date Order; and (iii) granting related relief [D.I. 2083].

On February 11, 2021, Century filed a sealed declaration of Erich J. Speckin, who was retained by Century to examine the handwriting and signatures on the Proofs of Claim submitted by claimants in these Chapter 11 Cases [D.I. 2175]. Mr. Speckin indicated, among other things, that for some claimants, the claimant signature in the Proof of Claims does not match the claimant's signature found in public records. *Id.* at 5. On February 11, 2021, Hartford et al. and Century also filed *Insurers' Reply Brief in Support of Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim* [D.I. 2180]. Among other things, the reply stated that insurers have standing to seek discovery under Rule 2004, and discovery is necessary for Confirmation. That same day, the Coalition filed a supplement to its objection to Hartford and Century's Rule 2004 Motion, asserting that the insurers refuse to disclose the Claims information they already possess and the insurers do not have a statistical model that would permit them to draw inferences on the entire pool of Abuse Claims [D.I. 2184].

On February 15, 2021, the Coalition filed a motion to authorize the Coalition to file a Sur Reply for the limited purpose of addressing the new legal argument and factual representations and omissions raised in the *Insurers' Reply Brief in Support of Motion for an Order Authorizing*

*Rule 2004 Discovery of Certain Proofs of Claim* [D.I. 2196].  The D. Miller & Associates PLLC [D.I. 2197], Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. [D.I. 2201], and Timothy D. Kosnoff, Esquire [D.I. 2207], filed joinders to the Coalition's motion to file a Sur Reply to the insurers' reply brief.

On February 16, 2021, Timothy D. Kosnoff, Esquire filed a motion to strike *Insurers' Reply Brief in Support of Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim*, stating the reply brief contains arguments and factual material that should have been included in their original motion [D.I. 2204].  On the same day, Century et al. and Hartford filed an opposition to Timothy Kosnoff's (i) motion to strike insurer's reply brief and (ii) Sur-Reply in support of objection to insurers' motion to authorize Rule 2004 discovery of certain Proofs of Claim [D.I. 2230].  Century et al. and Hartford's opposition asserts that Mr. Kosnoff's brief does not offer facts to challenge Mr. Erich J. Speckin's conclusions regarding Proofs of Claim and Mr. Speckin is a competent and skilled forensics practitioner, who is a qualified witness [D.I. 2230].

On February 16, 2021, Century et al. filed a declaration of Larry F. Stewart, an expert retained by Century et al., in support of the motion for discovery under Rule 2004, which stated that Mr. Stewart has observed numerous irregularities in thousands of Proofs of Claim regarding their creation and has found thousands of examples of incorrect forms that require additional scrutiny, before deeming them authentic [D.I. 2232].

On February 19, 2021, the Bankruptcy Court entered an order authorizing Century et al. and Hartford's motion to file under seal certain documents relating to the motion for an order (I) authorizing certain Rule 2004 discovery and (II) granting leave from local Rule 3007-1(f) to permit the filing of substantive omnibus objections [D.I. 2247].

On March 4, 2021, Century et al. and Hartford filed a statement regarding the plan and pending Rule 2004 motions [D.I. 2316], stating that the discovery the insurers seek will shed light on the increase in pending Abuse Claims and, by allowing all parties to uncover the facts, pave the way toward building consensus.  On March 8, 2021, Allianz Global Risks U.S. Insurance Company, National Surety Corporation, and Interstate Fire & Casualty Company filed a joinder to *Century and Hartford's Statement Regarding the Recently-Filed Plan of Reorganization and Pending Rule 2004 Motions* [D.I. 2331].

On March 17, 2021, the Bankruptcy Court took under advisement the insurers' sealed motion for an order authorizing Rule 2004 discovery of certain Proofs of Claims [D.I. 1974, 1975], and Century et al. and Hartford's sealed motion for an order (I) authorizing certain Rule 2004 discovery and (II) granting leave from local Rule 3007-1(f) to permit the filing of substantive omnibus objections [D.I. 1971, 1972].  *See* Mar. 17, 2021 Hr'g Tr. 51:9–52:13.  On August 30, 2021, the Bankruptcy Court denied the certain insurers' motion seeking discovery of individual claimants.  *See* Aug. 30, 2021 Hr'g Tr. 43:2–46:9.  The Bankruptcy Court permitted depositions of the claims aggregators listed in the later-filed sealed Rule 2004 motion.  *Id.* at 46:10–46:21.  On September 9, 2021, the Bankruptcy Court entered an order incorporating the August 30, 2021 ruling and granting the later-filed discovery motion in part. *See Order Granting In Part Insurers' Motion for an Order Authorizing Certain Rule 2004 Discovery* [D.I. 6184].

### 4.  *Rule 2019 Motions*

On August 24, 2020, the Coalition filed a motion requesting authorization to redact and file under seal certain information in connection with its Rule 2019 statement (the "2019 Motion") [D.I. 1144].  Two days later, Century and Hartford filed a joint motion to compel the Coalition to submit disclosures required by Bankruptcy Rule 2019 (the "Joint Motion to Compel") [D.I. 1164].[90]  On September 4, 2020, the Coalition filed an omnibus reply to the various objections in support of its 2019 Motion, arguing that it had disclosed its authorizing documents as required by Rule 2019(c)(4) and was not required to produce 12,000 engagement letters in order to comply with Rule 2019(c)(4) [D.I. 1257].  At the September 9, 2020 hearing, the Bankruptcy Court granted in part and denied in part the Coalition's 2019 Motion, and required that all relevant Rule 2019 information in the Coalition's statement be filed in an unredacted form, except for the personally identifiable information of the Abuse victims.[91]

On October 7, 2020, the Coalition filed an amended Rule 2019 statement and supplemental brief in support of its 2019 Motion [D.I. 1429, 1432].  Additionally, on the same day, the Court entered an *Order Granting in Part and Continuing in Part Motion of the Coalition of Abused Boy Scouts for Justice for (I) an Order Authorizing the Coalition to File Under Seal Exhibit A to the Amended 2019 Statement and (II) Approving the Sufficiency of the Amended 2019 Statement* [D.I. 1435].  The order authorized the Coalition to file Exhibit A of its amended 2019 statement with the personally identifiable information filed under seal; however, the Coalition shall provide copies of the personally identifiable information to certain parties, such as the U.S. Trustee, Century, Hartford, and others, upon request.

On October 13, 2020, the Coalition filed a supplement to its amended Rule 2019 statement and, on October 23, 2020, the Court entered an *Order Approving the Adequacy and Sufficiency of the Amended Verified Rule 2019 Statement Filed by the Coalition for Abused Scouts for Justice* [D.I. 1510, 1572].  On October 29, 2020, the Coalition filed its *Final Redacted Version of Revised Exhibit A to the Second Amended Rule 2019 Statement* [D.I. 1600].  Thereafter, on January 29, 2021, the Coalition filed its *Third Amended Verified Statement* pursuant to Rule 2019 [D.I. 1996].

On February 3, 2021, Century filed a motion to compel both the Coalition and Abused in Scouting to submit supplemental Rule 2019 disclosures (the "Century Motion") [D.I. 2030].  On the same day, Hartford also filed a motion to compel Abused in Scouting to submit the disclosures required by Rule 2019 (the "Hartford Motion") [D.I. 2028].  On February 10, 2021, Abused in Scouting filed an omnibus response to the Century Motion and Hartford Motion, arguing that Abused in Scouting is a "collaboration of law firms promoting a message" and is not required to submit disclosure pursuant to Rule 2019 [D.I. 2143].  On May 18, 2021, the Coalition filed a supplement to its third amended Rule 2019 statement and its *Final Redacted Version of Supplement to Third Amended Verified Statement* [D.I. 4657, 4658].

---

[90]  Numerous parties filed joinders to the Joint Motion to Compel and objections to the Coalition's 2019 Motion, including Allianz, the Tort Claimants' Committee, and the U.S. Trustee [D.I. 1177, 1218, 1219, 1220, 1223, 1224, 1227, 1228, 1248, 1261, 1499].

[91]  Transcript of Hearing at 122:12-25, 123:1-22, *In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (LSS) (Bankr. D. Del. Sept. 9, 2020) [D.I. 1307].

At the July 29, 2021 hearing, the Court ordered Abused in Scouting to file a Rule 2019 statement to disclose whom they represent, and on August 9, 2021 the Court issued its *Order Granting (I) Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company's Motion to Compel Abused in Scouting and Kosnoff Law PLLC to Submit Rule 2019 Disclosures; and (II) Century's Motion to Compel Abused in Scouting, Kosnoff Law PLLC and the Coalition to Submit the Disclosures Required by Federal Rule of Bankruptcy Procedure 2019* [D.I. 5902]. On August 9, 2021, Abused in Scouting filed its *Verified Statement of Abused in Scouting Pursuant to Rule of Bankruptcy Procedure 2019*, explaining that Abused in Scouting is a cooperative effort by three law firms (i.e., Kosnoff Law, PLLC; AVA Law Group, Inc. and Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C.) to act as co-counsel for the claimants who have engaged them in the Chapter 11 Cases [D.I. 5917, 5923].  Abused in Scouting's Rule 2019 verified statement disclosed that the three law firms represent 15,103 Abuse Survivors, of which 3,054 are also members of the Coalition.  That same day, Kosnoff Law, PLLC ("Kosnoff Law") filed its *Verified Statement of Kosnoff Law, PLLC Pursuant to Rule of Bankruptcy Procedure 2019* [D.I. 5919, 5924].  In its Rule 2019 verified statement, Kosnoff Law disclosed that it represents 15,103 Abuse Survivors, of which 3,054 are also members of the Coalition.

### 5.   *Personal Injury Settlement Motions*

The Debtors filed motions for entry of orders approving various settlements in connection with personal injury and wrongful death actions (the "Personal Injury Settlements")[92] and lifting the automatic stay, to the extent necessary, to permit payments of the settlement amount by applicable insurance.  The Bankruptcy Court entered orders approving the settlement agreements, and modifying the automatic stay of 11 U.S.C. § 362(a) for the parties to consummate the settlement agreements [D.I. 1292, 1842, 1843, 1942, 1949, 2309, 6350, 6351].

### S.   Material Settlements and Resolutions

In addition to the agreement by the Debtors to make the BSA Settlement Trust Contribution to the Settlement Trust and the agreement of the Local Councils to make the Local Council Settlement Contribution to the Settlement Trust, each as described fully above, the following settlements are incorporated into the Plan.

### 1.   *JPM / Creditors' Committee Settlement*

As of the filing of this Disclosure Statement, the Plan (as further described in Article VI of this Disclosure Statement and Article V.S of the Plan), effectuates a settlement among (i) the Debtors, (ii) the Creditors' Committee, and (iii) JPM (the "JPM / Creditors' Committee Settlement").  The JPM / Creditors' Committee Settlement represents a good-faith agreement negotiated at arm's length that provides significant value to the holders of Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims and provides the Debtors with more

---

[92]   These include, but are not limited to, approving Qian Settlement Agreement [D.I. 1123], Wilson Settlement Agreement [D.I. 1596], Worley Settlement Agreement [D.I. 1598], Gordon Settlement Agreement [D.I. 1880], Henderson Settlement Agreement [D.I. 1881], Neyrey Settlement Agreement [D.I. 1986], Lehr Settlement Agreement [D.I. 6348], Romero Settlement Agreement [D.I. 6351], and Knight Settlement Agreement [D.I. 6350], and to lift the automatic stay, to the extent necessary, to permit payments of the settlement amount by applicable insurance.

favorable terms under the amended and restated debt facilities provided by JPM on and after the Effective Date under the Restated Debt and Security Documents.

Specifically, the JPM / Creditors' Committee Settlement provides, among other things, the following terms with respect to general unsecured creditors (other than Abuse Claims):

- General Unsecured Claims (other than Abuse Claims), which are held by creditors who are core to the Debtors' mission or creditors whose Claims, if Allowed, were incurred in furtherance of the Debtors' mission, shall be classified into three Classes: (i) General Unsecured Claims; (ii) Convenience Claims; and (iii) Non-Abuse Litigation Claims; Cash under the Plan to satisfy Allowed General Unsecured Claims and Convenience Claims will be made from Cash relating to the BSA's core assets.

- Holders of Allowed General Unsecured Claims (including holders of Claims under the Restoration Plan, the Deferred Compensation Plan, holders of trade Claims, and holders of Rejection Damages Claims) will receive, on account of such Claims, their Pro Rata Share of the Core Value Cash Pool, which shall be funded by reorganized BSA in four semi-annual installments of $6,250,000, beginning 180 days after the Effective Date and concluding two years after the Effective Date. Any Cash remaining in the Core Value Cash Pool after all Allowed General Unsecured Claims have been satisfied in full, shall be first used to fund any shortfall in payments from the BSA's available insurance and co-liable non-Debtors on account of any Non-Abuse Litigation Claims, and then be transferred to and vest in Reorganized BSA.

- Holders of General Unsecured Claims or Non-Abuse Litigation Claims (subject to Article IV.B.4 of the Plan, as applicable, including first seeking to recover from insurance, and having exhausted all remedies with respect to such applicable insurance policy) that have an Allowed Claim of $50,000 or less and shall become Convenience Class Claims, which are paid by Reorganized BSA in full, using Cash on hand, on the Effective Date of the Plan or, if such Claim becomes allowed after the Effective Date, as soon as reasonably practicable after Allowance. Any holder of a General Unsecured Claim or Non-Abuse Litigation Claim that is Allowed in an amount greater than $50,000 may elect to have its claim treated as a Convenience Claim and receive payment of $50,000 in Cash in full and final satisfaction of such Claim.

- Holders Non-Abuse Litigation Claims will, upon the liquidation of such Non-Abuse Litigation Claim following the Effective Date, be satisfied from the BSA's available insurance and from any non-Debtor party or parties that may be determined to be co-liable with the Debtors on account of such Non-Abuse Litigation Claim and as provided for in Article IV.D.3 of the Plan, as applicable. No holder of an allowed Non-Abuse Litigation Claim shall be entitled to recover from the Core Value Cash Pool on account of such Claim, unless and until all allowed General Unsecured Claims have been paid in full. Solely, in the event any Non-Abuse Litigation Claim is not covered by applicable BSA Insurance Policies or there is a shortfall in BSA's applicable insurance for such Non-Abuse Litigation Claim, following the exhaustion of remedies with respect to applicable insurance and any co-liable non-Debtor, in the case of the holder of an Allowed Non-Abuse Claim that is a Claim for personal injury or wrongful death, the terms and conditions of Article IV.D.3 of

the Plan (as applicable), the holder of an Allowed Non-Abuse Litigation Claim may elect to have such Claim treated as a Convenience Claim and receive Cash in an amount equal to the lesser of (a) the amount of its Allowed Non-Abuse Litigation Claim and (b) $50,000.

- A Creditor Representative, to be selected by the Creditors' Committee with the consent of the Debtors shall be appointed to assist with the reconciliation of General Unsecured Claims.

- The Pension Plan shall continue to be maintained, sponsored, and assumed.

The JPM / Creditors' Committee Settlement also provides, among other things, the following terms with respect to JPM:

- JPM will enter into amended and Restated Debt and Security Documents on the Effective Date in principal amounts equal to the amounts of unpaid principal and accrued interest and fees as of the Effective Date and containing substantially the same terms as the Prepetition Debt and Security Documents, except that:

  o The maturity date on the principal under the amended and restated 2010 Bond Documents and the 2012 Bond Documents was extended to ten (10) years after the Effective Date and the Debtors were given a two (2) year payment holiday such that monthly principal installments for the first two (2) years are deferred until maturity;

  o The maturity date on the principal under the amended and restated 2010 Credit Facility Documents and the 2019 RCF Documents (with the revolving credit facilities under each being frozen and termed out under the amended and Restated Debt and Security Documents) was extended to ten (10) years after the Effective Date and the Debtors were given a two (2) year payment holiday such that monthly principal installments for the first two (2) years are deferred until maturity;

  o Pursuant to the amended and Restated Debt and Security Documents, the principal amounts payable will be reduced, on a pro rata basis amongst the facilities, by an amount equal to the Unrestricted Cash and Investments, if any, that have been remitted to JPM under the Excess Cash Sweep (as described below); and

  o Beginning on December 31 two (2) years after the Effective Date and continuing each successive calendar year the calendar year that is immediately prior to the calendar year of the Maturity Date, Reorganized BSA shall remit to JPM twenty-five percent (25%) of its Unrestricted Cash and Investments in excess of $75,000,000, if any, as of such date with the payment due within 45 days (the "Excess Cash Sweep"), and JPM shall apply any such amounts on a Pro Rata basis to the unpaid principal balances under the amended and Restated Debt and Security Documents. However, no payments shall be made on account of the Excess Cash

Sweep until the last Distribution is made on account of General Unsecured Claims two years after the Effective Date.[93]

- JPM was also granted Allowed Claims in the following amounts, plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order:

  - o on account of the 2010 Credit Facility Claims, an aggregate principal amount not less than $80,762,060 (including $44,299,743 of undrawn amounts under letters of credit issued under the 2010 Credit Facility Documents);

  - o on account of the 2019 RCF Claims, an aggregate principal amount not less than $61,542,720 (including $41,542,720 of undrawn amounts under letters of credit issued under the 2019 RCF Documents);

  - o on account of the 2010 Bond Claims, an aggregate principal amount not less than $40,137,274; and

  - o on account of the 2012 Bond Clams, an aggregate principal amount not less than $145,662,101.

In exchange for the agreements in the JPM / Creditors' Committee Settlement, the following term are also provided:

- Certain releases, including with respect to JPM as well as Debtor releases of all preference and other avoidance action Claims against holders of General Unsecured Claims and Convenience Claims.

- The Creditors' Committee's agreement to not seek standing, or otherwise pursue any prepetition avoidance-related Claim that could be asserted on behalf of the Debtors' Estates against JPM or others, or to challenge the allowance of certain of the Claims of JPM.

### 2.    *Restructuring Support Agreement*

The Debtors and RSA Supporting Parties entered into the Restructuring Support Agreement pursuant to which the parties thereto agreed to take certain actions to support the prosecution and consummation of the Plan on the material terms and conditions set forth in the Restructuring Support Agreement.  As described above, the Restructuring Support Agreement expired by its own terms on August 27, 2021. However, the material terms and provisions of the term sheet attached to the Restructuring Support Agreement have been incorporated into the Plan.

In summary, the following are incorporated in the Plan pursuant to the term sheet attached to the now expired Restructuring Support Agreement:

(a)    the BSA agreed to contribute all Unrestricted Cash and Investments, which are forecast to total approximately $60 million subject to variance based on the

---

[93]    Pursuant to the Debtors' Financial Projections, no payments are expected through 2025.

Effective Date and the BSA's cash flow performance up to and including the Effective Date, to the Settlement Trust;

(b)     the BSA agreed to contribute the BSA Settlement Trust Note to the Settlement Trust, which will provide a second-lien security interest in the principal amount of $80 million;

(c)     the BSA agreed to contribute the Artwork, with a mutually agreed value of $59 million, to the Settlement Trust;

(d)     the BSA agreed to contribute an estimated $11.6 million from sale-leaseback of the Warehouse and Distribution Center to the Settlement Trust;

(e)     the BSA agreed to contribute the Oil and Gas Interests, at a mutually agreed value of $7.6 million, to the Settlement Trust;

(f)     the BSA agreed to contribute the $1.902 million of net proceeds from the sale of Scouting University to the Settlement Trust;

(g)     the Local Councils agreed to contribute at least $600 million to the Settlement Trust, comprised of $300 million of cash, $200 million of property, and a $100 million interest-bearing variable-payment obligation note formed through a special purpose vehicle; and

(h)     the BSA agreed to make certain other non-monetary commitments related to its Youth Protection programs and discovery support.

The Property Contribution shall be structured as follows. The relevant Local Councils shall agree to (a) retain title to the property (and pay insurance, property taxes, other associated ownership costs and any yet unremoved debt), subject to, at the election, cost, and expense of the Settlement Trust, a mortgage in favor of the Settlement Trust, (b) post the property for sale within thirty days following the Effective Date, (c) present any written sale offer to the Settlement Trust for approval, (d) present to the Settlement Trust for its review and approval all final proposed terms of any sale and purchase offers (including price, timing and other terms) ("Proposed Final Terms"); *provided that* if any Proposed Final Terms would impose additional costs on the Local Council and the Settlement Trust accepts such Proposed Final Terms, at the Local Council's option any such additional costs shall be deducted from the proceeds or paid by the Settlement Trust, and not by the Local Council,[94] (e) remit the proceeds of the sale to the Settlement Trust at closing net of posting/listing/marketing fees, escrow fees, sales commissions, and other typical costs of sale.[95]

The Settlement Trust may review the marketing and sales efforts undertaken by the Local Council and request that the Local Council make changes to such marketing and sales efforts as are appropriate and lawful; *provided that* any costs associated with such changes will be paid, at the option of the Local Council, by the Settlement Trust or out of the proceeds of any sale. If the

---

[94]   By way of non-exclusive example, if the Proposed Final Terms requires the Local Council to retrofit a water system and the Settlement Trust accepts the Proposed Final Terms, the costs of the retrofit will, at the Local Council's option be paid (or reimbursed) out of the sale proceeds or paid by the Settlement Trust.

[95]   For the avoidance of doubt, the proceeds of the sale shall be first applied to any debt or liens remaining on the property, which debt shall have already been reflected in the Appraised Value of the property as described below.

Settlement Trust is unsatisfied with the sales and marketing effort, the Settlement Trust shall have the right to require the Local Council to promptly transfer the property to the Settlement Trust by quitclaim deed. If there is a shortfall or surplus of net proceeds as compared to Appraised Value, the Settlement Trust shall bear the risk of the shortfall and keep the surplus. If the property is not sold on or before the third anniversary of the Effective Date, the Local Council and the Settlement Trust each shall have the right to require the prompt transfer of the property to the Settlement Trust by quitclaim deed. If the Local Council receives a cash offer for the property the value of which is at least equal to its Appraised Value, the Settlement Trust shall accept the offer if no superior offer is made within thirty days (or, if a lesser time is specified in an offer received, then such lesser time) or accept a quitclaim deed for the property. The Debtors have also included appropriate provisions in the Plan to eliminate any transfer tax liabilities of the Settlement Trust per section 1146(a) of the Bankruptcy Code.

On the Effective Date, at the request of the Ad Hoc Committee, solely to facilitate payments from the LC Reserve Account, the DST shall be established as of the Effective Date pursuant to the terms of the Plan, and the DST shall issue the DST Note in favor of the Settlement Trust in the principal amount of $100 million. Local Councils shall make monthly contributions into an account (and any replacement thereof) owned by the DST (the "LC Reserve Account") in an amount equal to the Required Percentage of the Local Councils' respective payrolls. Until the DST Note is extinguished, the LC Reserve Account shall be used only to fund contributions to the Pension Plan in accordance with the next sentence and, to the extent of any excess, to pay any Payment Amounts due under the DST Note. If at any time (including the end of any Plan Year) (a) the present value of the accumulated benefits for the Pension Plan, as determined in accordance with the requirements set forth in the definition of "Excess Balance" below for the most recently ended Plan Year, exceeds (b) the market value of the assets of the Pension Plan (clause (a) minus clause (b) being the "Shortfall Amount"), funds in the LC Reserve Account will be deposited into the Pension Plan up to the lesser of the Local Councils' collective pro rata share of the Shortfall Amount or the balance in the LC Reserve Account.

The DST Note shall be: (i) interest bearing at a rate of 1.5% per annum from the Effective Date and without recourse except as to the LC Reserve Account; (ii) secured by a lien on the LC Reserve Account; (iii) payable on each Payment Date in an amount equal to the applicable Payment Amount; and (iv) prepayable in whole or in part at any time without premium or penalty. The unpaid balance of the DST Note (if any) remaining on the Payment Date that is the fifteenth anniversary of the First Payment Date (the "DST Note Maturity Date") shall be automatically extinguished and shall be considered forgiven and satisfied after giving effect to any required payment on such date. Other than the lien on the LC Reserve Account, the Settlement Trust shall have no other recourse for payment under the DST Note.

3.    *Hartford Insurance Settlement Agreement*

*On September 14, 2021, the Debtors, Hartford, the Ad Hoc Committee, the Future Claimants' Representative, and Coalition, with the support of certain State Court Counsel, agreed in principle on settlement terms as memorialized in the Hartford Insurance Settlement*

*Agreement,[96] the approval of which is incorporated into the Plan.  Subject to approval of the Hartford Insurance Settlement Agreement and to its terms and conditions, the Hartford Insurance Settlement Agreement will supersede the Initial Hartford Settlement Agreement.*

On April 15, 2021, the Debtors entered into the Initial Hartford Settlement Agreement, which was opposed by the Coalition, Tort Claimants' Committee, Future Claimants' Representative, and certain holders of Direct Abuse Claims and their respective representatives. Among other things, the Initial Hartford Settlement Agreement provided that Hartford would make a contribution of up to $650 million to the Settlement Trust for the payment of Abuse Claims.  In return, the Initial Hartford Settlement Agreement provided, in pertinent part, for (i) the Debtors' sale of the Hartford Policies to Hartford free and clear of the interests of all third parties, including any additional or other named insureds under the Hartford Policies, with such interests to be channeled to the Settlement Trust; (ii) the release of claims against Hartford by the Debtors and Local Councils; and (iii) the channeling of all present and future claims against Hartford relating to its provision of insurance coverage for Abuse Claims to the Settlement Trust.

The Debtors believed that the Initial Hartford Settlement Agreement was fair and reasonable and was in the best interests of their estates at the time they entered into the agreement. After the announcement of the Initial Hartford Settlement Agreement on April 16, 2021, the Tort Claimants' Committee, Coalition, and Future Claimants' Representative expressed vehement opposition to the settlement in numerous filings, statements and appearances before the Bankruptcy Court.  Although the Debtors were hopeful that continued mediation sessions would result in a resolution of the issues between Hartford, on the one hand, and the Tort Claimants' Committee, Coalition, and Future Claimants' Representative, on the other, after six weeks of additional mediation, the parties had not wavered in their opposition to the Initial Hartford Settlement Agreement.  On June 9, 2021, the Debtors and Ad Hoc Committee received a letter from the Coalition, Tort Claimants' Representative, and Future Claimants' Representative informing the Debtors that the holders of Abuse Claims whom they represent would not support— and would affirmatively vote to reject—any plan of reorganization that includes the terms of the Initial Hartford Settlement Agreement, under any circumstances.

In light of the opposition to the Initial Hartford Settlement Agreement, it appeared to the Debtors that a plan of reorganization would not be confirmed to the extent it included the Initial Hartford Settlement Agreement unless modifications were made to the Initial Hartford Settlement Agreement that were agreeable to the representatives of the majority of holders of Direct Abuse Claims.  Accordingly, the Debtors filed the RSA Motion seeking entry of an order authorizing entry into the Restructuring Support Agreement, and also determining that the Debtors had no obligation to seek approval of, and had no obligations under, the Initial Hartford Settlement Agreement.  As discussed above, while granting the RSA Motion in part, the Bankruptcy Court declined to make the Debtors' requested determination with respect to the Initial Hartford Settlement Agreement.

---

[96]    The "Hartford Insurance Settlement Agreement" means such settlement terms as memorialized in the term sheet appended to the Sixth Mediators' Report [D.I. 6210] filed on September 14, 2021, as such terms may be subsequently set forth in greater detail in a definitive written settlement agreement that is consistent with such term sheet and executed by all of the parties thereto and any additional joining parties and that will be included in the Plan Supplement.

Without a clear path for removing the Initial Hartford Settlement Agreement from the Plan, the Debtors, the Ad Hoc Committee, Hartford, the Coalition, the Future Claimants' Representative and the Tort Claimants' Committee continued to engage in mediated negotiations regarding the terms of a settlement with Hartford that would be acceptable to the parties. On August 27, 2021, during those negotiations, the Restructuring Support Agreement expired in accordance with its terms.

These further mediation sessions produced an agreement in principle on new settlement terms (the Hartford Insurance Settlement Agreement) with Hartford that is supported by the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and State Court Counsel. Those terms and conditions are set forth in the Hartford Insurance Settlement Agreement, which is incorporated into the Plan. The terms of the Hartford Insurance Settlement Agreement are summarized below and in the term sheet appended to the *Sixth Mediators' Report* [D.I. 6210] filed on September 14, 2021, which remains subject to definitive documentation in a definitive written settlement agreement that is consistent with such term sheet and executed by all of the parties thereto and any additional joining parties (and which will be attached to the Plan as Exhibit I-1 following such execution and will also be included in the Plan Supplement). In the event of any inconsistency, the terms set forth in the Hartford Insurance Settlement Agreement (including as set forth in any such definitive written settlement agreement) shall control over the summary of those terms set forth herein.

a.     **BSA/Hartford Background**

Hartford issued primary and certain umbrella policies to the BSA for the period from September 21, 1971 to January 1, 1978. Prior to the Petition Date, the BSA and Hartford were engaged in litigation over the scope of coverage provided under the Hartford Policies. In that litigation, Hartford raised a number of defenses that, if successful, would substantially reduce or even eliminate coverage for the Abuse Claims, including that the BSA has breached conditions to coverage; that the Abuse Claims arise out of a single occurrence under applicable law, which Hartford believes is New Jersey law under its primary policies; and that the BSA and the Local Councils expected or intended the injuries for which they seek coverage.

Hartford has also contended, outside of litigation, that the BSA's access to certain of its policies is significantly limited, including that the BSA released and extinguished its primary policies for January 1, 1976 to January 1, 1978 through a prepetition settlement; that it has no coverage obligations for Abuse Claims that are barred by the applicable statute of limitations; and that at least one of the Hartford primary policies has an applicable aggregate limit for Abuse Claims.

While the Debtors dispute many, if not all, of those contentions, continuing to litigate against Hartford would not only drain the Debtors' limited resources but could also create a substantial risk that Hartford would ultimately pay significantly less toward Abuse Claims than it would under the Hartford Insurance Settlement Agreement—and some risk that Hartford would pay nothing.

The resolution of the coverage dispute reflected in the Hartford Insurance Settlement Agreement was the product of extensive, arm's-length negotiations between the Debtors, the Ad

Hoc Committee, the Coalition, the Future Claimants' Representative, State Court Counsel, and Hartford, with the active assistance of the Mediators. It represents a good-faith settlement and compromise of complex disputes and will avoid the costs, risks, uncertainty, and delay associated with protracted litigation, while providing payment on account of Abuse Claims.

A summary of the key terms and conditions of the Hartford Insurance Settlement Agreement, which has been incorporated into the Plan, is set forth below:

b.    **The Hartford Settlement Contribution and Release Date**[97]

The Hartford Insurance Settlement Agreement provides for a total contribution of $787 million to the Settlement Trust (the "Hartford Settlement Contribution") in exchange for treatment as a Settling Insurance Company under the Plan, including all benefits afforded Protected Parties with respect to the Channeling Injunction. On (or as soon as reasonably practicable after) the Effective Date of the Plan, Hartford shall make the Hartford Settlement Contribution in the following manner: (i) pay $137 million to the Settlement Trust (the "Initial Payment") and (ii) transfer $650 million into an interest-bearing escrow account (the "Additional Payment"), which shall be released to the Settlement Trust on the Release Date (defined below).

Hartford shall pay the Initial Payment to the Settlement Trust on, or as soon as reasonably practicable after, the date all conditions to the effectiveness of the Plan have been satisfied (including the entry of the Confirmation Order and Affirmation Order, which Confirmation Order shall not be subject to any stay and shall be in full force and effect) and the Effective Date of the Plan has occurred.

Additionally, on (or as soon as reasonably practicable after) the Effective Date, Hartford shall also pay the Additional Payment into an escrow account (the "Escrow Account"), to be administered by an independent escrow agent. The Additional Payment (and all income earned thereon minus (a) the fees of the escrow agent, and (b) any taxes that are payable and other costs of the Escrow Account, which amounts in (a) and (b) shall be paid from the corpus of the Escrow Account (such income (or loss) minus such amounts, the "Net Income")) shall remain in the Escrow Account until the Confirmation Order shall become final and no longer subject to any further appeal or petition for rehearing or certiorari ("Final and Non-Appealable"), on which date the Additional Payment, plus any Net Income, shall be released from the Escrow Account to the Trust (the "Release Date"); provided, however, that, at its election, Hartford may authorize the payment of the Additional Payment directly to the Settlement Trust on the Effective Date or may authorize the release of the Additional Payment (and any Net Income) from the Escrow Account to the Trust at any time thereafter before the Confirmation Order becomes Final and Non-Appealable, in which event the date on which Hartford authorizes the payment or release of the Additional Payment to the Settlement Trust shall be the Release Date. The Settlement Trust will have investment discretion with respect to the Additional Payment while it is in the Escrow Account, subject to Hartford's reasonable approval of the investment protocol under which the Additional Payment may be invested by the Settlement Trust; provided, however, that the Settlement Trust will bear all risks associated with any such investment of the Additional Payment

---

[97] In the event of a conflict between the summary herein, on the one hand, and the terms and conditions of the Hartford Insurance Settlement Agreement Term Sheet or the Plan, on the other hand, the terms of the Hartford Insurance Settlement Agreement Term Sheet or the Plan shall control.

and that no loss or failure to achieve desired investment returns on the Additional Payment while it is in the Escrow Account shall require Hartford to increase the Settlement Amount it is paying (or increase the amount of BSA's contribution to the Settlement Trust); *provided further*, *however*, that the Debtors, Reorganized BSA, the Local Councils and Chartered Organizations shall have no liability or obligations to Hartford or the Settlement Trust, the Settlement Trust shall have no liability or obligations to Hartford, and Hartford shall have no liability or obligations to the Settlement Trust (or any other party to the Hartford Insurance Settlement Agreement), whatsoever for any loss or failure to achieve desired investment returns on the Additional Payment while it is in the Escrow Account.

Certain parties may contend that the Hartford Insurance Settlement Agreement impairs other of the BSA's Insurance Companies' contribution rights; the BSA disagrees. Most of the Abuse Claims that involve alleged Abuse during the years Hartford provided insurance coverage to the BSA do not involve alleged Abuse during the years other insurers provided insurance coverage to the BSA. Some of the other insurers assert that only policies in effect at the time of the first instance of Abuse are implicated by the Abuse Claims. And, for the vast majority of the years Hartford provided the BSA Insurance Coverage, the Insurance Companies will not have contribution claims against Hartford as Hartford provided both the primary and excess Insurance Policies that would be implicated by the Abuse Claims.

### c.    **Hartford Administrative Expense Claim**

The Hartford Insurance Settlement Agreement provides that, in accordance with the Plan, and in compromise of its claims and in consideration of the releases and other consideration it is providing, Hartford shall be granted an allowed administrative expense claim in the amount of $2 million (the "Hartford Administrative Expense Claim") on account of Hartford's alleged damages under or relating to the Initial Hartford Settlement Agreement. The Debtors shall pay the Hartford Expense Administrative Claim in full in cash to Hartford on, or as soon as reasonably practicable after, the Effective Date. Fifty percent ($1 million) of the Hartford Administrative Expense Claim shall be treated as an administrative expense claim in the calculation of the Net Unrestricted Cash and Investments under the Plan; the other fifty percent shall reduce the Unrestricted Cash and Investments otherwise reserved for Reorganized BSA upon emergence from bankruptcy on the Effective Date.

In addition, if the Debtors (1) exercise a Fiduciary Out (as defined below), (2) do not seek confirmation of the Plan or to have the Plan become effective, or (3) do not take all reasonable actions to defend Confirmation of the Plan against any appeals or other challenges (whether the Debtors take any such action before or after the Effective Date) (each of the actions or inactions referenced in clauses (1)–(3), a "Specified Action"), Hartford may assert, and other parties to the Hartford Insurance Settlement Agreement and State Court Counsel agree not to object to the assertion by Hartford of, an administrative expense claim, which shall be reserved for prior distributions to unsecured creditors, in addition to the Hartford Administrative Expense Claim, of $23.61 million (the "Agreed Amount" with such claim being the "Hartford Additional Administrative Expense Claim");[98] *provided*, *however*, that if the occurrence of a Specified Action

---

[98]    The Hartford Additional Administrative Expense Claim of $23.61 million which specifically relates to Hartford's alleged damages under or relating to the Initial Hartford Settlement Agreement, represents 3% of the $787 million Hartford Settlement Contribution.

is due to the enactment of congressional legislation prohibiting non-debtor releases, the parties to the Hartford Insurance Settlement Agreement and State Court Counsel agree that Hartford may not assert the Additional Hartford Administrative Claim. If BSA takes a Specified Action, Hartford shall not seek any claim other than the Hartford Administrative Expense Claim (and the Hartford Administrative Claim), and shall not seek the Hartford Additional Administrative Expense Claim in an amount greater than the Agreed Amount, and other parties to the Hartford Insurance Settlement Agreement and State Court Counsel shall not object to the Hartford Additional Administrative Expense Claim or argue that it should be allowed in an amount less than the Agreed Amount unless they reasonably contend that no Specified Action has occurred. Upon the Effective Date, Hartford shall release the Debtors from any administrative expense claim arising out of the Debtors' failure to seek approval of the Initial Hartford Settlement Agreement other than (1) the Hartford Administrative Claim and (2) in the event that BSA exercises a Fiduciary Out or takes another Specified Action, the Hartford Additional Administrative Expense Claim. Said release shall survive any Reversal (as defined below) and any termination of the Hartford Insurance Settlement Agreement. BSA shall, prior to exercising a Fiduciary Out, timely consult with the Coalition and Future Claimants' Representative.

d.    **Termination of Initial Hartford Settlement Agreement**

Upon the Effective Date, and upon payment by the Debtors of the Hartford Administrative Expense Claim, the Initial Hartford Settlement Agreement shall be deemed terminated, null, void and of no further force and effect; *provided, however*, that in the event that BSA exercises its Fiduciary Out (defined below) or takes another Specified Action (as defined below), the Initial Hartford Settlement Agreement shall remain in effect solely to the extent necessary to permit Hartford to assert its Additional Administrative Claim, as further described below.

e.    **Sale of Hartford Policies**

On the Release Date, in exchange for and upon receipt of the Additional Payment by the Settlement Trust, the Hartford Policies shall be sold by the Debtors and their Estates to Hartford, free and clear of all interests of the Estates and any person or entity other than the Estates, pursuant to sections 363, 1123 and/or 1141 of the Bankruptcy Code, under the Plan, provided that the rights, if any, of Chartered Organizations under the Hartford Policies shall be treated under the Plan in accordance with sections 363 and 1141 of the Bankruptcy Code and other applicable law. Without limiting the foregoing, although the parties to the Hartford Insurance Settlement Agreement do not believe that such sale would constitute a violation of the automatic stay of any Chartered Organization that is a debtor in bankruptcy and that asserts an interest in one or more Hartford Policies, to the extent the Bankruptcy Court (or other court with jurisdiction) determines that the sale would constitute such a violation, then the parties to the Hartford Insurance Settlement Agreement shall seek a determination from the Bankruptcy Court that they may proceed with the sale or relief from such stay to effectuate the sale of the Hartford Policies.

f.    **Release by Hartford**

Upon the Release Date, and following its receipt of payment in full of the Hartford Administrative Expense Claim, Hartford shall release the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, other Protected Parties, Limited Protected Parties, Settling

Insurance Companies, the Future Claimants' Representative, the Coalition and the Settlement Trust from all Causes of Action and Claims relating to (1) Abuse Insurance Policies, (2) the Debtors' bankruptcy proceedings, (3) the Plan, (4) the Initial Hartford Settlement Agreement, (5) the 2010 BSA-Hartford settlement agreement, (6) the 2011 BSA-Hartford settlement agreement, (7) (a) Abuse Claims against the Protected Parties and (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, and/or (8) any Claims asserted by Hartford against the Debtors or any of the Releasing Parties (as defined below), or by the Debtors or any of the Releasing Parties against Hartford, in the Debtors' Chapter 11 Cases; *provided*, *however*, that the foregoing release by Hartford of the Limited Protected Parties in clause (1) of the foregoing shall apply only with respect to Abuse Insurance Policies that are the subject of the Participating Chartered Organization Insurance Assignment.  Nothing with respect to the foregoing releases precludes Hartford from enforcing the terms of the Hartford Insurance Settlement Agreement and the Plan.

### g.    **Release of Hartford**

Upon the Release Date, the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, other Protected Parties, Limited Protected Parties, Settling Insurance Companies, the Future Claimants' Representative, the Coalition and the Settlement Trust (the "Releasing Parties") shall release Hartford from all Causes of Action and Claims relating to (1) Abuse Insurance Policies, (2) the Debtors' bankruptcy proceeding, (3) the Debtors' Plan, (4) the Initial Hartford Settlement Agreement, (5) the 2010 BSA-Hartford settlement agreement, (6) the 2011 BSA-Hartford settlement agreement, (7) (a) Abuse Claims against the Protected Parties and (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, and/or (8) any Claims asserted by Hartford against the Debtors or any of the Releasing Parties, or by the Debtors or any of the Releasing Parties against Hartford, in the Debtors' Chapter 11 Cases; *provided*, *however*, that the foregoing release by the Limited Protected Parties of Hartford in clause (1) of the foregoing shall apply only with respect to Abuse Insurance Policies that are the subject of the Participating Chartered Organization Insurance Assignment.  In addition, the Trust Distribution Procedures will require, as a condition to receive payment from the Settlement Trust, that the Abuse Claim holder be deemed to have given a release in favor of Hartford.  If another Settling Insurance Company receives broader releases of Causes of Action and Claims under its Abuse Insurance Policies than those provided to Hartford in the Hartford Insurance Settlement Agreement or Plan, then Hartford shall receive the benefit of those broader releases with respect to Causes of Action and Claims under Abuse Insurance Policies issued by Hartford.

Notwithstanding anything else to the contrary contained herein, as a condition precedent to receiving any proceeds from the Settlement Trust, a holder of an Abuse Claim shall be required to execute (and shall be deemed to have granted) a full and complete written release in favor of each Settling Insurance Company, including Hartford, with respect to such Abuse Claim, which release shall be in form and substance acceptable to each Settling Insurance Company, a copy of which form shall be filed with the Plan Supplement.

### h.    **Chartered Organizations**

Under the Plan, the Debtors, the Coalition, the Future Claimants' Representative and the Settlement Trust shall secure an assignment to the Settlement Trust of, or otherwise resolve to the

satisfaction of the parties to the Hartford Insurance Settlement Agreement, Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford. The Debtors, the Coalition and the Future Claimants' Representative shall use their best efforts to settle with the Chartered Organizations.

i.      **Judgment Reduction**

In the event that any other insurer obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Hartford as a result of a Cause of Action for contribution, subrogation, indemnification or other similar Cause of Action against Hartford for Hartford's alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation for any Abuse Claim or for any Cause of Action released in the Hartford Insurance Settlement Agreement, the Settlement Trust shall voluntarily reduce its judgment or Cause of Action against, or settlement with, such other insurer(s) to the extent necessary to eliminate such contribution, subrogation, indemnification or other similar Cause of Action against Hartford.  To ensure that such a reduction is accomplished, Hartford shall be entitled to assert such paragraph in the Hartford Insurance Settlement Agreement as a defense to any action against it for any such portion of the judgment or Cause of Action and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Hartford from any liability for the judgment or Cause of Action.

j.      **Fiduciary Obligations of the Debtors and the Future Claimants' Representative**

Notwithstanding anything in the Hartford Insurance Settlement Agreement to the contrary, no term or condition of the Hartford Insurance Settlement Agreement shall require the Debtors or the Future Claimants' Representative to take or refrain from taking any action that it determines in good faith would be inconsistent with its fiduciary duties under applicable law (the right to take or refrain from taking such any action, a "Fiduciary Out"); provided, however, that the Debtors and the Future Claimants' Representative each understands that the Tort Claimants' Committee is not a party to the Hartford Insurance Settlement Agreement and that the Tort Claimants' Committee may object to the Hartford Insurance Settlement Agreement and to the Plan and that the Debtors and the Future Claimants' Representative nevertheless believe that entering into the Hartford Insurance Settlement Agreement is an appropriate exercise of their respective fiduciary duty.

k.      **Effect of Reversal of Confirmation Order Following the Effective Date**

In the event that the Confirmation Order is reversed or vacated on appeal following the Effective Date, such that the Release Date does not occur (a "Reversal"), the parties to the Hartford Insurance Settlement Agreement and State Court Counsel agree that Hartford shall (a) nevertheless be entitled to retain the $2 million to be paid to it in respect of the Hartford Administrative Expense Claim and (b) be entitled to a credit against any liability Hartford may have under any Abuse Insurance Policies issued to the Debtors or any Local Council, which credit shall be equal to the amount of the Initial Payment plus, if Hartford has authorized the payment or release of the Additional Payment to the Settlement Trust, the amount of the Additional Payment (the "Credit");

116

*provided, however*, that if Hartford has not authorized the payment or release of the Additional Payment, then the Additional Payment and all Net Income accrued thereon in the Escrow Account (or, if there is a loss as a result of investment of the Additional Payment, then the funds remaining in the Escrow Account) shall be released from the Escrow Account to Hartford promptly following the Reversal (or any exercise of a Fiduciary Out by the Debtors or the occurrence of a Specified Action).  The parties to the Hartford Insurance Settlement Agreement and State Court Counsel have agreed to cooperate in good faith to ensure that Hartford may obtain the benefit of the Hartford Administrative Expense Claim and the Credit.  The foregoing provisions of Hartford Insurance Settlement Agreement shall survive any Reversal, any exercise of any Fiduciary Out, and any termination of the Hartford Insurance Settlement Agreement.

### l.    Other Provisions of the Hartford Insurance Settlement Agreement

Pursuant to the Hartford Insurance Settlement Agreement, Hartford agreed to refrain from objecting to the Plan, the Disclosure Statement, the Solicitation Procedures, the Settlement Trust Agreement, or the Trust Distribution Procedures (and to withdraw any pending objections) as well as the findings and orders included in the expired Restructuring Support Agreement so long as it is included as a Settling Insurance Company and Protected Party under the Plan and this Disclosure Statement and the Plan are otherwise consistent with the terms of the Hartford Insurance Settlement Agreement.  Hartford's agreement not to object to such findings and orders does not indicate Hartford's support for such findings and orders; rather, Hartford will be treated as a Settling Insurance Company and Protected Party under the Plan, and as a result, it takes no position on such findings and orders or on the Trust Distribution Procedures.

### m.    Channeling Injunction and Releases in Favor of Hartford as a Settling Insurance Company and Protected Party under the Plan

Hartford will be a Settling Insurance Company and a Protected Party under the Plan and will be provided all benefits and protections afforded to Settling Insurance Companies and Protected Parties, including (a) the Channeling Injunction set forth in Article X.F of the Plan, which will permanently enjoin any person or entity from asserting any Abuse Claim against Hartford and will channel all such present and future Abuse Claims against Hartford to the Settlement Trust, and (b) the Releases and related Injunction set forth in Articles X.J and Article X.L of the Plan, which will (i) provide releases of certain claims against Hartford by the Debtors and their Estates and by holders of Abuse Claims, and (ii) permanently enjoin all holders of claims released under Article X.J of the Plan from asserting such released claims against Hartford.  The Channeling Injunction and the Releases and related Injunction set forth in Articles X.F, X.J, and X.L of the Plan are further described in Article VI.Q of this Disclosure Statement.

4.     *TCJC Settlement Agreement*[99]

a.     **BSA/TCJC Background**

Historically, the TCJC and the BSA shared a close and long-standing relationship in Scouting.    TCJC had been an important Chartered Organization and partner of the BSA until December 31, 2019, when TCJC concluded its 105-year relationship as a Chartered Organization with all Scouting programs around the world, including the BSA.    Since 1959, TCJC's participation in Scouting steadily increased until the termination of its affiliation with the BSA. For at least a part of the time during which TCJC was a Chartered Organization, it shared certain co-insurance rights with the BSA under the BSA's Insurance Policies, as described in greater detail above.  TCJC has asserted indemnification claims against the Debtors for liabilities incurred prior to the Petition Date in a liquidated amount of over $62 million and has asserted unliquidated indemnification claims against the Debtors for Abuse Claims that may be asserted against TCJC.

Of the more than 82,200 unique timely Direct Abuse Claims filed in these Chapter 11 Cases, the Debtors have identified approximately 7,700 such claims that could potentially be attributable to TCJC's involvement with Scouting.  The 7,700 claims initially identified by the Debtors included (i) approximately 2,850 such claims that directly identify TCJC, (ii) approximately 650 such claims that contain information tied to other Abuse Claims attributable to TCJC, and (iii) approximately 4,200 such claims relating to Local Councils with more than fifty percent (50%) of their membership historically comprised of TCJC members.  The Debtors' process for identifying these 7,700 claims involved identifying information included on the face of the timely filed Direct Abuse Claims that could potentially relate to or implicate TCJC.

TCJC fundamentally disagrees with the number of potentially TCJC-related claims asserted by the Debtors.  Upon receiving the 7,700 claims and related data, TCJC asserts that it performed an extensive and thorough statistical sampling analysis.  This analysis involved a methodical review of the claims and underlying facts instead of focusing solely on facially-present criteria or key terms.  As a result of this analysis, TCJC reached the conclusion that the vast majority of the 7,700 claims identified by the Debtors were invalid as to TCJC based on a variety of factors.  Namely, TCJC reviewed the 7,700 claims for duplicates, whether any of the claims were previously settled, whether there was a legitimate connection to TCJC, whether the claims were barred by statutes of limitations, whether the claims should be covered by insurance, and whether the alleged perpetrator is or was affiliated with TCJC, among other factors.  Out of the 7,700 claims identified by the Debtors, TCJC's analysis found that only 324 claims may potentially have value in the tort system.

Based on this analysis, TCJC engaged in significant negotiation and routinely exchanged information with the Debtors, the Coalition, the Tort Claimants' Committee, the Future Claimants' Representative, the Ad Hoc Committee, and other mediation parties, with the assistance of the Court-approved Mediators.  In addition to sharing the results and underlying data of the aforementioned analysis conducted by TCJC, TCJC also provided the relevant mediation parties with an overview of its historical settlements and an analysis relating to potential tort system values

---

[99]    Capitalized terms used but not defined in this summary shall have the meanings ascribed to such terms in the TCJC Settlement Agreement or the Plan, as applicable.

for certain Direct Abuse Claims.  As a result of these negotiations within the context of mediation, and based upon the extensive work performed by TCJC, the parties arrived at the TCJC Settlement, the terms of which are described herein.

The Coalition and the Tort Claimants' Committee believe that holders of Abuse Claims have valuable Claims against the TCJC; however, as noted above, TCJC has significant and potentially meritorious defenses to Abuse Claims that pose impediments to obtaining recoveries on behalf of holders of Abuse Claims.  As previously stated, TCJC maintains that the vast majority of the claims identified by the Debtors have no connection to TCJC or are invalid for other reasons. Additionally, TCJC predominantly participated in Scouting in states that currently have "closed" statutes of limitation, such as Utah, but also participated in Scouting in other states with different statutes of limitation.  The Settlement Trust would necessarily expend significant time and Settlement Trust assets pursuing such Claims against TCJC.  Moreover, as a Chartered Organization, TCJC was a beneficiary under the BSA Insurance Policies since 1976, and TCJC asserts that it is a beneficiary of BSA Insurance Policies issued prior to 1976 and of Local Council Insurance Policies.  TCJC has also filed various objections[100] to the Disclosure Statement, further highlighting the fact that TCJC holds valuable claims against the insurance companies arising under the BSA Insurance Policies and the Local Council Insurance Policies, as well as contractual indemnity rights against BSA and certain Local Councils arising from Scouting-related Claims. Additionally, TCJC's alleged indemnification claims could, if allowed, potentially reduce any recoveries on account of such Abuse Claims.  Further, the cooperation of TCJC is critical to accessing important and valuable insurance rights.  Pursuant to the TCJC Settlement, the Settlement Trust's access to recoveries from TCJC will be immediate and will provide $250 million of additional Cash to the Settlement Trust as set forth in the TCJC Settlement, as opposed to lengthy litigation that would otherwise be necessary to obtain recoveries. There is also a substantial risk that TCJC would ultimately pay significantly less toward Abuse Claims than it would under the TCJC Settlement Agreement.  As such, by virtue of TCJC's thorough analyses shared with all relevant parties in Mediation, TCJC maintains that not only is the TCJC Settlement fully supported by the facts underlying the claims, in addition to historical settlement values, the TCJC Settlement also represents a significant premium above what the facts support.

The resolution of the liability dispute reflected in the TCJC Settlement Agreement was the product of extensive, good faith and arm's-length negotiations among the Debtors, the Coalition, the Future Claimants' Representative, State Court Counsel, TCJC, and other mediation parties with the active assistance of the Court-appointed Mediators.  The TCJC Settlement represents a good-faith settlement and compromise of complex disputes and will avoid the costs, risks, uncertainty, and delay associated with protracted litigation, while providing payment on account of Abuse Claims.  The Debtors, Coalition and Future Claimants Representative fully support the

---

[100]   *See Objection of The Church of Jesus Christ of Latter-day Saints, a Utah Corporation Sole, to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* filed on May 6, 2021 [D.I. 3263]; *Supplemental Objection of The Church of Jesus Christ of Latter-day Saints, a Utah Corporation Sole, to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* filed on August 16, 2021 [D.I. 6009].

TCJC Settlement and recommend that holders of Abuse Claims vote in favor of this Plan which incorporates the TCJC Settlement, among other resolutions. The terms of the TCJC Settlement are summarized in the term sheet appended to the *Sixth Mediators' Report* [D.I. 6210] filed on September 14, 2021 and below. In the event of any inconsistency, the terms set forth in the TCJC Settlement shall control over the summary of those terms set forth herein.

b. **TCJC Settlement Terms**

The TCJC Settlement constitutes a compromise and settlement of all TCJC Abuse Claims, the TCJC Claims, and disputes relating to the Plan, including, among other things, the TCJC Insurance Rights. Pursuant to the TCJC Settlement Agreement, "TCJC Abuse Claims" refers to any Abuse Claim in connection, in whole or in part, with TCJC's involvement in, or sponsorship of, one or more Scouting units (including any Claim that has been asserted or may be amended to assert in a proof of claim alleging abuse, whether or not timely filed, in the Chapter 11 Cases) while "TCJC Claims" all Causes of Action and Claims relating to (1) Abuse Claims, (2) the Chapter 11 Cases, (3) the Plan, and/or (4) any Claims that were or could have been asserted by TCJC against the Debtors or the other Releasing Parties, including any Indirect Abuse Claims. "TCJC Insurance Rights" refers to all of TCJC's its rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Abuse Insurance Policies, the Abuse Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries. Notwithstanding anything else to the contrary contained herein, to the extent a holder of an Abuse Claim is entitled to receive payment from the TCJC Settlement Contribution pursuant to the Plan and Settlement Trust Documents, as a condition precedent to receiving any proceeds from the TCJC Settlement Contribution, such holder shall be required to execute (and shall be deemed to have granted) a full and complete written release in favor of TCJC with respect to such Abuse Claim, which release shall be in form and substance acceptable to TCJC and a copy of which form shall be filed with the form of TCJC Settlement Agreement filed in the Plan Supplement.

On the date that the Confirmation Order and Affirmation Order become Final Orders, TCJC will (i) contribute $250 million in Cash from the escrow described below to the Settlement Trust, and (ii) consent to the waiver, release, and expungement of the TCJC Claims and agree not to assert any claim against, among others, the Debtors, Reorganized BSA or the Settlement Trust. Additionally, on the Effective Date of the Plan, TCJC will deposit $250 million in Cash into escrow and consent, pursuant to the Plan, to the assignment and transfer by the Debtors, the Local Councils, and any other co-insureds of any and all rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Abuse Insurance Policies, the Abuse Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries. TCJC will further agree to transfer and assign the TCJC Insurance Rights to the Settlement Trust.

In exchange for TCJC's contributions to the Settlement Trust described above, TCJC will (i) become a Protected Party under the Plan, with all the benefits and protections of the Channeling Injunction. Pursuant to the Channeling Injunction, any claim that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim in connection, in whole or in part, with TCJC's involvement in, or sponsorship of, one or more Scouting units, including any Claim that has been asserted or may be amended to assert in a proof of claim.   TCJC Abuse Claims shall be permanently channeled to the Settlement Trust under the Plan and such TCJC Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust, and may not proceed in any manner against TCJC in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such TCJC Abuse Claim solely against the Settlement Trust, and shall be processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.

TCJC will receive, at minimum, equivalent legal protections (including releases, findings, indemnities, and injunctions, and any other relevant terms of orders in connection with the Plan or any settlement related to the Plan) and treatment of the TCJC Abuse Claims as provided to any other non-Debtor Protected Party (other than the limited indemnity provided to Local Councils).

c.      <strong>Settlement Trust Enforcement of Channeling Injunction</strong>

In the event that any litigation asserting a TCJC Abuse Claim is filed naming TCJC as a defendant in violation of the terms of the Confirmation Order, the Settlement Trust shall, at the request of TCJC, promptly appear (1) before the Bankruptcy Court to obtain entry of an order enforcing the Channeling Injunction and (2) in such litigation and seek the dismissal of the case. Under no circumstances shall the Settlement Trust be required to reimburse or indemnify TCJC for any claims, liabilities, losses, actions, suits, proceedings, third-party subpoenas, damages, costs, and expenses, including any liabilities related to, arising out of, or in connection with any TCJC Abuse Claim.

d.      <strong>Waiver and Release of TCJC Claims</strong>

Future Claimants' Representative On the date that the Confirmation Order and Affirmation Order become Final Orders, TCJC shall waive and release the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, other Protected Parties, Limited Protected Parties, Settling Insurance Companies, the Future Claimants' Representative, the Coalition, and the Settlement Trust (the "Releasing Parties") from all Causes of Action and Claims relating to TCJC Claims; provided, however, that the Indirect Abuse Claims (Claim Nos. 1248 and 12530) filed by TCJC relating to the payment of costs to defend and resolve Abuse Claims shall be subordinated and not otherwise receive distributions until the date that the Confirmation Order and Affirmation Order become Final Orders. TCJC agrees to not file or assert any claim against the Settlement Trust, the Debtors or Reorganized BSA arising from any act or omission of the Debtors on or prior to the date that the Confirmation Order and Affirmation Order become Final Orders except in accordance with the Plan.

On the date that the Confirmation Order and Affirmation Order become Final Orders, the Debtors, Reorganized BSA, Related Non-Debtor Entities, Local Councils, other Protected Parties, Limited Protected Parties, Settling Insurance Companies, the Future Claimants' Representative, the Coalition, the Settlement Trust, and all parties that accept the Plan, or do not accept the Plan and do not opt-out of releases, shall waive and release TCJC from all TCJC Claims. The Debtors, Reorganized

121

BSA, Related Non-Debtor Entities, Local Councils, other Protected Parties, Limited Protected Parties, Settling Insurance Companies, the Future Claimants' Representative, the Coalition, and the Settlement Trust agree to not file or assert any claim against TCJC arising from any act or omission of TCJC on or prior to the date that the Confirmation Order and Affirmation Order become Final Orders except in accordance with the Plan.

e.    **Release of Claims Against Settling Insurance Companies**

TCJC will release all Settling Insurance Companies from all Causes of Action relating to Abuse Insurance Policies issued by such Settling Insurance Companies. All Settling Insurance Companies will also release TCJC from all claims against TCJC relating to Abuse Insurance Policies issued by such Settling Insurance Companies.

f.    **Consent Rights**

TCJC will have consent rights with respect to any modifications to the Plan, the Settlement Trust Documents, and the Confirmation Order relating to the Channeling Injunction, releases by holders of Abuse Claims, and related definitional terms including, for the avoidance of doubt, "Abuse," "Abuse Claim," and "Protected Parties," but only to the extent that such modifications would affect TCJC.

g.    **Other Provisions of the TCJC Settlement Agreement**

So long as TCJC is included as a Protected Party and the Disclosure Statement and the Plan are otherwise consistent with the terms of the TCJC Settlement Agreement, TCJC shall support, and shall not object to, the approval of the Disclosure Statement, the confirmation of the Plan, and the approval of the Plan Documents, including the Settlement Trust Agreement and the Trust Distribution Procedures.

h.    **Fiduciary Obligations of the Debtors, the Tort Claimants' Committee and the Future Claimants' Representative**

Notwithstanding anything in the TCJC Settlement Agreement to the contrary, no term or condition of the TCJC Settlement Agreement shall require the Debtors or the Future Claimants' Representative to take or refrain from taking any action that either party determines in good faith would be inconsistent with their fiduciary duties under applicable law.

T.    TCC / FCR Joint Standing Motion

On March 12, 2021, the Tort Claimants' Committee and Future Claimants Representative filed a joint motion (the "TCC / FCR Joint Standing Motion"), which requested standing for the Tort Claimants' Committee and Future Claimants' Representative to prosecute the following claims on behalf of the Debtors' bankruptcy estate: (1) declaratory judgment that the Intercompany Note be characterized as an equity or capital contribution made by BSA to Arrow or, in the alternative, an order avoiding certain transfers made under the Intercompany Note by BSA to Arrow; (2) declaratory judgment that certain property of the Debtors is not subject to the liens or security interests granted to the prepetition lender, JPM; (3) avoidance of certain unperfected liens and security interests asserted by JPM against certain property of the Debtors; and (4) an order reversing certain components of the Debtors' Final Cash Collateral Order [D.I. 2364].

On April 29, 2021, JPM and the Debtors filed an objection to the TCC / FCR Joint Standing Motion [D.I. 2732, 2733], which the Creditors' Committee joined on a limited basis [D.I. 2737]. On May 27, 2021, the Bankruptcy Court entered an order adjourning the TCC / FCR Joint Standing Motion to consideration after the conclusion of the Confirmation Hearing [D.I. 5073].

U.    <u>Other Relevant Filings & Hearings</u>

- On March 4, 2021, Century and Hartford filed *Century and Hartford's Statement Regarding the Recently-Filed Plan of Reorganization and Pending Rule 2004 Motions* [D.I. 2316], stating that the plan has not garnered sufficient support.

- On March 8, 2021, Allianz Insurers' filed a joinder in support of Century and Hartford's statement regarding the plan and pending Rule 2004 Motions [D.I. 2331].

- On March 16, 2021, the Tort Claimants' Committee filed the *Official Tort Claimants' Committee's Case Status Report* [D.I. 2388], outlining issues that it informally objected to with respect to the Debtors' proposed plan.  Through the status report, the Tort Claimants' Committee also asserted that various issues should be further addressed including, among other things, claims of the estate; restricted assets; Local Councils; and Chartered Organizations.

- On April 9, 2021, the Tort Claimants' Committee filed its second case status report, detailing, among other things, pending contested matters and unresolved issues [D.I. 2566]. The Tort Claimants' Committee stated that judicial resolution of issues might be necessary to reach a consensual plan and reiterated its assertion that the Tort Claimants' Committee should be permitted the opportunity to propose its own plan of reorganization in addition to the Debtors' Plan.  *Id.* at 7.

- On April 9, 2021, Century filed a motion to adjourn the Disclosure Statement hearing scheduled for April 29, 2021, to a later date after the Debtors file the Settlement Trust Agreement and Trust Distribution Procedures [D.I. 2568] (the "<u>Century Motion to Adjourn</u>").[101]

- On April 12, 2021, the Bankruptcy Court held a status conference regarding, among other things, the status of Mediation, the Plan and Disclosure Statement, and the Century Motion to Adjourn.  At that time, the Bankruptcy Court continued the hearing to approve the Disclosure Statement to May 19, 2021.

- On April 23, 2021, the Coalition, the Future Claimants' Representative, and the Tort Claimants' Committee filed two notices of discovery on Century and Hartford [D.I. 2682, 2683] (the "<u>Century Discovery Request</u>" and "<u>Hartford Discovery Request</u>," respectively).

- On May 5, 2021, Century filed a *Motion to Amend the Court's Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Retained Professionals*

---

[101]    Clarendon American Insurance Company ("<u>Clarendon</u>") and Travelers Casualty and Surety Company joined Century's motion to adjourn.  *Id.* at 1 n.2.  Clarendon formally filed a joinder to Century's motion on April 12, 2021 [D.I. 2572].

*and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief* [D.I. 3161], to which the Debtors and the Tort Claimants' Committee have filed responses proposing certain modifications to the relief requested by Century. On August 6, 2021, the Bankruptcy Court amended the order approving procedures for interim compensation and reimbursement of expenses of chapter 11 professionals [D.I. 5899].

## ARTICLE VI. OVERVIEW OF THE PLAN

A.    General

This Article of the Disclosure Statement summarizes certain relevant provisions of the Plan. The confirmation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for treating claims against, and equity interests in, a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes it binding on the debtor, any person or Entity acquiring property under the plan, and any creditor of, or equity interest holder in, the debtor, whether or not such creditor or equity interest holder has accepted the plan or received or retains any property under the plan. Subject to certain limited exceptions and other than as provided in a plan itself or in a confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan of reorganization.

Pursuant to <u>Article V</u> of the Plan, on or after the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions consistent with the Plan as may be necessary or appropriate to enable them to implement the provisions of the Plan before, on, or after the Effective Date, including the creation of the Settlement Trust and the preparations for the transfer of the Settlement Trust Assets to the Settlement Trust.

**YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

B.    Distributions

One of the key concepts under the Bankruptcy Code is that only Claims and interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, that the Claim (other than an Abuse Claim), and the amount thereof, is in fact a valid obligation of the Debtors. Similarly, with respect to Abuse Claims, such Claims will be channeled to, as well as allowed and resolved by, the Settlement Trust in accordance with the Trust Distribution Procedures. A detailed discussion of the treatment and anticipated means of satisfaction for each Class of Allowed Claims and the Class of Abuse Claims that are channeled to the Settlement Trust and allowed pursuant to terms of the Trust Distribution Procedures is set forth in <u>Article VII</u> of this Disclosure Statement.

C.    Treatment of Unclassified Claims

The treatment of unclassified Claims are as follows:

124

| Class | Designation | Treatment under the Plan | Impairment and Entitlement to Vote |
|-------|-------------|--------------------------|------------------------------------|
| N/A | Administrative Expense Claims | Each holder of an Allowed Administrative Expense Claim shall receive payment of Cash in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim. | Unimpaired<br><br>**Not Entitled to Vote** (Presumed to Accept) |
| N/A | Professional Fee Claims | Each holder of an Allowed Professional Fee Claim shall receive payment in Cash from funds held in the Professional Fee Reserve. | Unimpaired<br><br>**Not Entitled to Vote** (Presumed to Accept) |
| N/A | Priority Tax Claims | Each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim. | Unimpaired<br><br>**Not Entitled to Vote** (Presumed to Accept) |

### 1.    *Administrative Expense Claims Generally*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with respect to such Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims, which are governed by Article II.A.2 of the Plan) shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Claim, payment of Cash in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim, or such amounts and on other such terms as may be agreed to by the holders of such Claims, on or as soon as reasonably practicable after the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; (c) such other date(s) as such holder and the Debtors or Reorganized BSA shall have agreed; or (d) such other date ordered by the Bankruptcy Court; *provided, however*, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' non-profit operations during the Chapter 11 Cases may be paid by the Debtors or Reorganized BSA in the ordinary course of operations and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of operations, or customary practice.  Notwithstanding anything to the contrary in the Plan or in the Cash Collateral Order, no Claim on account of any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) (as each such capitalized term is defined in the Cash Collateral Order) from and after the Petition Date shall be Allowed unless such Claim is Allowed by a Final Order of the Bankruptcy Court.  The Hartford Administrative Claim shall be an Allowed Administrative Expense Claim and shall be paid in full in cash to Hartford on, or as soon as reasonably practicable after, the Effective Date.

**HOLDERS OF ADMINISTRATIVE EXPENSE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE EXPENSE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE EXPENSE CLAIMS AGAINST THE DEBTORS**

**OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE EXPENSE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

###### 2.    *Professional Fee Claims*

(a) <u>Final Fee Applications</u>.  All Professionals or other Persons requesting the final Allowance and payment of compensation and/or reimbursement of expenses pursuant to sections 328, 330, 331 and/or 503(b) or under Article V.T of the Plan, for services rendered during the period from the Petition Date to and including the Effective Date shall file and serve final applications for Allowance and payment of Professional Fee Claims on counsel to the Debtors and the United States Trustee no later than the first Business Day that is forty-five (45) days after the Effective Date.  Objections to any Professional Fee Claim must be filed and served on Reorganized BSA and the applicable Professional within twenty-one (21) calendar days after the filing of the final fee application that relates to the Professional Fee Claim (unless otherwise agreed by the Debtors or Reorganized BSA, as applicable, and the Professional requesting Allowance and payment of a Professional Fee Claim).  The Fee Examiner shall continue to act in its appointed capacity unless and until all Professional Fee Claims have been approved by order of the Bankruptcy Court, and Reorganized BSA shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

(b) <u>Professional Fee Reserve</u>.  On the Effective Date, the Debtors shall establish and fund the Professional Fee Reserve with Cash in an amount equal to the Professional Fee Reserve Amount plus a reasonable cushion amount determined by the Debtors.  Funds held in the Professional Fee Reserve shall not be considered property of the Debtors' Estates, Reorganized BSA, the Settlement Trust, or the Core Value Cash Pool.  Professional Fees owing on account of Allowed Professional Fee Claims shall be paid in Cash from funds held in the Professional Fee Reserve as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court or authorized to be paid under the Compensation Procedures Order; *provided, however*, that Reorganized BSA's obligations with respect to Allowed Professional Fee Claims shall not be limited by or deemed limited to the balance of funds held in the Professional Fee Reserve.  To the extent the funds held in the Professional Fee Reserve are insufficient to satisfy the Allowed Professional Fee Claims in full, each holder of an Allowed Professional Fee Claim shall have an Allowed Administrative Expense Claim for any deficiency, which shall be satisfied in accordance with <u>Article II.A.2</u> of the Plan.  No Liens, Claims, interests, charges, or other Encumbrances or liabilities of any kind shall encumber the Professional Fee Reserve in any way.  When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Reserve, if any, shall be transferred to the Settlement Trust.

(c) <u>Professional Fee Reserve Amount</u>.  To be eligible for payment for Accrued Professional Fees incurred up to and including the Effective Date, Professionals shall estimate their Accrued Professional Fees as of the Effective Date and deliver such estimate to the Debtors at least five (5) Business Days prior to the anticipated Effective Date, and Coalition Professionals shall provide the Debtors a reasonable estimate of total Coalition Restructuring Expenses in accordance with Article V.T of the Plan.  If a Professional or

126

Coalition Professional does not provide such estimate, the Debtors may estimate the unbilled fees and expenses of such Professional or Coalition Professional. The total amount so estimated will constitute the Professional Fee Reserve Amount, provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional or Coalition Professional.

(d) <u>Post-Effective Date Fees and Expenses</u>. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 or 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of operations without any further notice to or action, order, or approval of the Bankruptcy Court. The reasonable and documented fees and expenses incurred by the Professionals to the Creditors' Committee after the Effective Date until the complete dissolution of the Creditors' Committee for all purposes in accordance with <u>Article X.R</u> of the Plan will be paid by Reorganized BSA in the ordinary course of business (and not later than thirty (30) days after submission of invoices).

### 3.  *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtors or Reorganized BSA, as applicable: (1) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; *provided, however*, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (2) regular installment payments in Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

### D.  <u>Classification of Claims and Interests Summary</u>

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes the classification, treatment, voting rights, and Claims and Interests, by Class, under the Plan.

| Class | Designation[102] | Treatment under the Plan | Impairment and Entitlement to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive: (i) payment in Cash in an amount equal to such Allowed Other Priority Claim; or (ii) satisfaction of such Allowed Other Priority Claim in any other manner that renders the Allowed Other Priority Claim Unimpaired, including Reinstatement. | Unimpaired<br><br>**Not Entitled to Vote** (Presumed to Accept) |
| 2 | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall receive: (i) payment in Cash in an amount equal to the Allowed amount of such Claim; (ii) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including Reinstatement; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim. | Unimpaired<br><br>**Not Entitled to Vote** (Presumed to Accept) |
| 3A | 2010 Credit Facility Claims | Each holder of an Allowed 2010 Credit Facility Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2010 Credit Facility Claim. | Impaired<br><br>**Entitled to Vote** |
| 3B | 2019 RCF Claims | Each holder of an Allowed 2019 RCF Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2019 RCF Claim. | Impaired<br><br>**Entitled to Vote** |
| 4A | 2010 Bond Claims | Each holder of an Allowed 2010 Bond Claim shall receive a Claim under the Restated 2010 Bond Documents in an amount equal to the amount of such holder's Allowed 2010 Bond Claim. | Impaired<br><br>**Entitled to Vote** |
| 4B | 2012 Bond Claims | Each holder of an Allowed 2012 Bond Claim shall receive a Claim under the Restated 2012 Bond Documents in an amount equal to the amount of such holder's Allowed 2012 Bond Claim. | Impaired<br><br>**Entitled to Vote** |
| 5 | Convenience Claims | Each holder of an Allowed Convenience Claim shall receive Cash in an amount equal to 100% of such holder's Allowed Convenience Claim. | Impaired<br><br>**Entitled to Vote** |

---

[102]    The Debtors reserve the right to eliminate any Class of Claims in the event they determine that there are no Claims in such Class.

| Class | Designation[102] | Treatment under the Plan | Impairment and Entitlement to Vote |
|-------|------------------|--------------------------|-------------------------------------|
| 6 | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim shall receive, subject to the holder's ability to elect Convenience Claim treatment on account of the Allowed General Unsecured Claim, its Pro Rata Share of the Core Value Cash Pool up to the full amount of such Allowed General Unsecured Claim in the manner described in Article VII of the Plan. | Impaired<br><br>**Entitled to Vote** |
| 7 | Non-Abuse Litigation Claims | Each holder of an Allowed Non-Abuse Litigation Claim shall, subject to (i) the holder's ability to elect Convenience Claim treatment as provided in the following sentence and (ii) the terms and conditions of Article IV.D.3 of the Plan (as applicable), retain the right to recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (x) available insurance coverage or the proceeds of any Insurance Policy, including any Abuse Insurance Policy or Non-Abuse Insurance Policy, (y) applicable proceeds of any Insurance Settlement Agreements, and (z) co-liable non-debtors (if any) or their insurance coverage.  Solely to the extent that the holder of an Allowed Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on account of such Allowed Claim after exhausting its remedies in respect thereof, such holder may elect to have the unsatisfied portion of its Allowed Claim treated as an Allowed Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000. | Impaired<br><br>**Entitled to Vote** |
| 8 | Direct Abuse Claims[103] | Pursuant to the Channeling Injunction set forth in Article X.F of the Plan, each holder of a Direct Abuse Claim shall have such holder's Direct Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Direct Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and | Impaired<br><br>**Entitled to Vote** |

---

[103]  Under the Plan, "Direct Abuse Claim" means an Abuse Claim that is not an Indirect Abuse Claim.

| Class | Designation[102] | Treatment under the Plan | Impairment and Entitlement to Vote |
|-------|------------------|--------------------------|-------------------------------------|
| | | processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.<br><br>Pursuant to the Channeling Injunction set forth in Article X.F of the Plan, each holder of a Post-1975 Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. | |
| 9 | Indirect Abuse Claims[104] | Pursuant to the Channeling Injunction set forth in Article X.F of the Plan, each holder of an Indirect Abuse Claim shall have such holder's Indirect Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Indirect Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.<br><br>Pursuant to the Channeling Injunction set forth in Article X.F of the Plan, each holder of a Post-1975 Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim shall thereafter be | Impaired<br><br>**Entitled to Vote** |

---

[104]   Under the Plan, "Indirect Abuse Claim" means a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract.

| Class | Designation[102] | Treatment under the Plan | Impairment and Entitlement to Vote |
|---|---|---|---|
| | | asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. | |
| 10 | Interests in Delaware BSA | Interests in Delaware BSA shall be deemed cancelled without further action by or order of the Bankruptcy Court and shall be of no further force or effect, whether surrendered for cancellation or otherwise. | Impaired<br><br>**Not Entitled to Vote** (Deemed to Reject) |

E.    <u>Treatment of Claims and Interests</u>

Holders of Claims and Interests shall receive the treatment as set forth below:

**1.    *Class 1—Other Priority Claims***

(i)    <u>Classification</u>: Class 1 consists of all Other Priority Claims.

(ii)    <u>Treatment</u>: Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim, in full and final satisfaction of such Allowed Other Priority Claim, at the sole option of Reorganized BSA: (i) each such holder shall receive payment in Cash in an amount equal to such Allowed Other Priority Claim, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the date on which the holder of such Allowed Other Priority Claim and the Debtors or Reorganized BSA, as applicable, shall otherwise agree in writing; or (ii) satisfaction of such Allowed Other Priority Claim in any other manner that renders the Allowed Other Priority Claim Unimpaired, including Reinstatement.

(iii)    <u>Voting</u>: Class 1 is Unimpaired, and each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

**2.    *Class 2—Other Secured Claims***

(i)    <u>Classification</u>: Class 2 consists of all Other Secured Claims.  To the extent that Other Secured Claims are Secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving Plan Distributions under the Plan.

(ii)    <u>Treatment</u>: Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction of such Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim will receive, at the sole option of Reorganized BSA: (i) Cash in an amount equal to the Allowed amount of such Claim, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the date on which the holder of such Allowed Other Secured Claim and the Debtors or Reorganized BSA, as applicable, shall otherwise agree in writing; (ii) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including Reinstatement; or (iii) return of the applicable collateral on the Effective Date or as soon as reasonably practicable thereafter in satisfaction of the Allowed amount of such Other Secured Claim.

(iii)   <u>Voting</u>: Class 2 is Unimpaired, and each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

**3.**     *Class 3A—2010 Credit Facility Claims*

(i)    <u>Classification</u>: Class 3A consists of all 2010 Credit Facility Claims.

(ii)    <u>Allowance</u>: On the Effective Date, all 2010 Credit Facility Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount not less than $80,762,060 (including $44,299,743 of undrawn amounts under letters of credit issued under the 2010 Credit Facility Documents, provided such letters of credit are not drawn on or before the Effective Date), plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order. Because all 2010 Credit Facility Claims are deemed fully Secured, there are no unsecured 2010 Credit Facility Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2010 Credit Facility Claims.

(iii)   <u>Treatment</u>: Except to the extent that a holder of an Allowed 2010 Credit Facility Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Credit Facility Claim, each holder of an Allowed 2010 Credit Facility Claim shall receive a Claim under the Restated Credit

Facility Documents in an amount equal to the amount of such holder's Allowed 2010 Credit Facility Claim.

(iv)     Voting: Class 3A is Impaired, and each holder of an Allowed 2010 Credit Facility Claim is entitled to vote to accept or reject the Plan.

4.     *Class 3B—2019 RCF Claims*

(i)     Classification: Class 3B consists of all 2019 RCF Claims.

(ii)     Allowance: On the Effective Date, all 2019 RCF Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount not less than $61,542,720 (including $41,542,720 of undrawn amounts under letters of credit issued under the 2019 RCF Documents, provided such letters of credit are not drawn on or before the Effective Date), plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Because all 2019 RCF Claims are deemed fully Secured, there are no unsecured 2019 RCF Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2019 RCF Claims.

(iii)     Treatment: Except to the extent that a holder of an Allowed 2019 RCF Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2019 RCF Claim, each holder of an Allowed 2019 RCF Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2019 RCF Claim.

(iv)     Voting: Class 3B is Impaired, and each holder of an Allowed 2019 RCF Claim is entitled to vote to accept or reject the Plan.

5.     *Class 4A—2010 Bond Claims*

(i)     Classification: Class 4A consists of all 2010 Bond Claims.

(ii)     Allowance: On the Effective Date, all 2010 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of not less than $40,137,274 plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order. Because all 2010 Bond Claims are deemed fully Secured, there are no unsecured 2010 Bond Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2010 Bond Claims.

(iii) <u>Treatment</u>: Except to the extent that a holder of an Allowed 2010 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Bond Claim, each holder of an Allowed 2010 Bond Claim shall receive a Claim under the Restated 2010 Bond Documents in an amount equal to the amount of such holder's Allowed 2010 Bond Claim.

(iv) <u>Voting</u>: Class 4A is Impaired, and each holder of an Allowed 2010 Bond Claim is entitled to vote to accept or reject the Plan.

6. *Class 4B—2012 Bond Claims*

(i) <u>Classification</u>: Class 4B consists of all 2012 Bond Claims.

(ii) <u>Allowance</u>: On the Effective Date, all 2012 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of not less than $145,662,101 plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order. Because all 2012 Bond Claims are deemed fully Secured, there are no unsecured 2012 Bond Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2012 Bond Claims.

(iii) <u>Treatment</u>: Except to the extent that a holder of an Allowed 2012 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2012 Bond Claim, each holder of an Allowed 2012 Bond Claim shall receive a Claim under the Restated 2012 Bond Documents in an amount equal to the amount of such holder's Allowed 2012 Bond Claim.

(iv) <u>Voting</u>: Class 4B is Impaired, and each holder of an Allowed 2012 Bond Claim is entitled to vote to accept or reject the Plan.

7. *Class 5—Convenience Claims*

(i) <u>Classification</u>: Class 5 consists of all Convenience Claims.

(ii) <u>Treatment</u>: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, an Allowed Convenience Claim, each holder of an Allowed Convenience Claim shall receive, on the Effective Date or within thirty (30) days following the date that such Convenience Claim becomes Allowed (if such Claim becomes Allowed after the Effective Date), each holder of an Allowed Convenience Claim shall receive Cash in an amount equal to 100% of such holder's Allowed Convenience Claim.

(iii) <u>Voting</u>: Class 5 is Impaired, and each holder of a Convenience Claim is entitled to vote to accept or reject the Plan.

**8.**     ***Class 6—General Unsecured Claims***

(i) <u>Classification</u>: Class 6 consists of all General Unsecured Claims.

(ii) <u>Treatment</u>: Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, subject to the holder's ability to elect Convenience Claim treatment on account of the Allowed General Unsecured Claim, its Pro Rata Share of the Core Value Cash Pool up to the full amount of such Allowed General Unsecured Claim in the manner described in <u>Article VII</u> of the Plan.

(iii) <u>Voting</u>: Class 6 is Impaired, and each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

**9.**     ***Class 7—Non-Abuse Litigation Claims***

(iv) <u>Classification</u>: Class 7 consists of all Non-Abuse Litigation Claims.

(v) <u>Treatment</u>: Except to the extent that a holder of an Allowed Non-Abuse Litigation Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Non-Abuse Litigation Claim, each holder thereof shall, subject to (i) the holder's ability to elect Convenience Claim treatment as provided in the following sentence and (ii) the terms and conditions of <u>Article IV.D.3</u> of the Plan (as applicable), retain the right to recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (x) available insurance coverage or the proceeds of any Insurance Policy, including any Abuse Insurance Policy or Non-Abuse Insurance Policy, (y) applicable proceeds of any Insurance Settlement Agreements, and (z) co-liable non-debtors (if any) or their insurance coverage.  Solely to the extent that the holder of an Allowed Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on account of such Allowed Claim after exhausting its remedies in respect thereof, such holder may elect to have the unsatisfied portion of its Allowed Claim treated as an Allowed Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000.

(vi) <u>Voting</u>: Class 7 is Impaired, and each holder of a Non-Abuse Litigation Claim is entitled to vote to accept or reject the Plan.

10.    *Class 8—Direct Abuse Claims*

(i)    <u>Classification</u>: Class 8 consists of all Direct Abuse Claims.

(ii)    <u>Treatment</u>:

a.  The Settlement Trust shall receive, for the benefit of holders of Abuse Claims, the BSA Settlement Trust Contribution, the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, the Participating Chartered Organization Settlement Contribution, the Hartford Settlement Contribution (subject to the terms and conditions set forth in the Hartford Insurance Settlement Agreement), and the proceeds of any other applicable Insurance Settlement Agreements.  In addition, each holder of a properly completed non-duplicative proof of claim asserting a Direct Abuse Claim who filed such Claim by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim may elect on his or her Ballot receive an Expedited Distribution, subject to criteria set forth in the Trust Distribution Procedures, in exchange for providing a full and final release in favor of the Settlement Trust, the Protected Parties, and the Chartered Organizations. The Settlement Trust shall make the Expedited Distributions on one or more dates occurring on or as soon as reasonably practicable after the latest to occur of (a) the Effective Date, (b) the date the applicable holders of Direct Abuse Claims who have elected to receive an Expedited Distribution have satisfied the criteria set forth in the Trust Distribution Procedures, and (c) the date upon which the Settlement Trust has sufficient Cash to fund the full amount of the Expedited Distributions while retaining sufficient Cash reserves to fund applicable Settlement Trust Expenses, as determined by the Settlement Trustee.

b.  As of the Effective Date, the Protected Parties' liability for all Direct Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents.  Pursuant to the Channeling Injunction set forth in <u>Article X.F</u> of the Plan, each holder of a Direct Abuse Claim shall have such holder's Direct Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Direct Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Direct Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Direct Abuse Claims against any of the Protected Parties and may not proceed in any manner against any of the Protected Parties in any forum whatsoever, including

any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Direct Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

c.  As of the Effective Date, the Limited Protected Parties' liability for all Post-1975 Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents.  Pursuant to the Channeling Injunction set forth in <u>Article X.F</u> of the Plan, each holder of a Post-1975 Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Post-1975 Chartered Organization Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Post-1975 Chartered Organization Abuse Claim against any of the Limited Protected Parties and may not proceed in any manner against any of the Limited Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Post-1975 Chartered Organization Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

d.  For the avoidance of doubt, the Protected Parties shall include: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations, including TCJC; (f) the Settling Insurance Companies, including Hartford; and (g) all of such Persons' Representatives.  The Limited Protected Parties shall include the Participating Chartered Organizations.

(iii)  <u>Voting</u>: Class 8 is Impaired, and each holder of a Direct Abuse Claim is entitled to vote to accept or reject the Plan.

**11.  *Class 9—Indirect Abuse Claims***

(i)  <u>Classification</u>: Class 9 consists of all Indirect Abuse Claims.

(ii)  <u>Treatment</u>:

a.  As of the Effective Date, the Protected Parties' liability for all Indirect Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents solely to the extent that an Indirect Abuse Claim has not been deemed withdrawn with prejudice, irrevocably waived, released and expunged in connection with the Local Council Settlement Contribution, the Contributing Chartered Organization Trust Contribution, the Participating Chartered Organization Trust Contribution, or the Hartford Insurance Settlement Agreement.  Pursuant to the Channeling Injunction set forth in <u>Article X.F</u> of the Plan, each holder of an Indirect Abuse Claim shall have such holder's Indirect Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Indirect Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Indirect Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Abuse Claims against any of the Protected Parties and may not proceed in any manner against any the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Indirect Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

b.  As of the Effective Date, the Limited Protected Parties' liability for all Post-1975 Chartered Organization Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents.  Pursuant to the Channeling Injunction set forth in <u>Article X.F</u> of the Plan, each holder of a Post-1975 Chartered Organization Abuse Claim shall have such holder's Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Post-1975 Chartered Organization Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Post-1975 Chartered Organization Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Post-1975 Chartered Organization Abuse Claims against any of the Limited Protected Parties and may not proceed in any manner against any the Limited Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Post-1975 Chartered Organization Abuse Claims solely

against the Settlement Trust as provided in the Settlement Trust Documents.

c. For the avoidance of doubt, the Protected Parties shall include: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations, including TCJC; (f) the Settling Insurance Companies, including Hartford; and (g) all of such Persons' Representatives. The Limited Protected Parties shall include the Participating Chartered Organizations.

(iii) Voting: Class 9 is Impaired, and each holder of an Indirect Abuse Claim is entitled to vote to accept or reject the Plan.

**HOLDERS OF ABUSE CLAIMS (OTHER THAN FUTURE ABUSE CLAIMS) WERE REQUIRED TO SUBMIT A PROOF OF CLAIM ON OR BEFORE THE ABUSE CLAIMS BAR DATE IN ACCORDANCE WITH THE BAR DATE ORDER. HOLDERS OF ABUSE CLAIMS MAY ALSO BE REQUIRED TO SUBMIT ADDITIONAL DOCUMENTATION REGARDING SUCH CLAIMS IN ACCORDANCE WITH THE TRUST DOCUMENTS.**

12. *Class 10—Interests in Delaware BSA*

(i) Classification: Class 10 consists of all Interests in Delaware BSA.

(ii) Treatment: On the Effective Date, Interests in Delaware BSA shall be deemed cancelled without further action by or order of the Bankruptcy Court and shall be of no further force or effect, whether surrendered for cancellation or otherwise.

(iii) Voting: Class 10 is Impaired, and each holder of an Interest in Delaware BSA shall be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Interests in Delaware BSA are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Interests in Delaware BSA.

F. Elimination of Vacant Classes

Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

G.    Cramdown

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (a) seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims are, or any class of Claims is, impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H.    Means for Implementation of the Plan

### 1.    *Operations of the Debtors between Confirmation and the Effective Date*

The Debtors shall continue to operate as debtors and debtors in possession during the period from the Confirmation Date to the Effective Date.

### 2.    *BSA Governance Documents*

From and after the Effective Date, Reorganized BSA shall be governed pursuant to the BSA Charter and the Amended BSA Bylaws.  The Amended BSA Bylaws shall contain such provisions as are necessary to satisfy the provisions of the Plan, subject to further amendment thereof after the Effective Date, as permitted by applicable law.  Under the BSA Charter, the BSA has no power to issue certificates of stock, its object and purpose being solely of a charitable character and not for pecuniary profit; accordingly, the requirement of section 1123(a)(6) does not apply to the BSA.

### 3.    *Continued Legal Existence of BSA*

The BSA shall continue to exist on and after the Effective Date, with all of the powers it is entitled to exercise under applicable law and pursuant to the BSA Charter and the Amended BSA Bylaws, subject to further amendment of the Amended BSA Bylaws after the Effective Date, as permitted by applicable law.

### 4.    *Reorganized BSA's Directors and Senior Management*

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent that there are anticipated changes in Reorganized BSA's directors and officers, the Debtors will identify any such changes in the Plan Supplement.  On and after the Effective Date, the Amended BSA Bylaws, as such may be amended thereafter from time to time, shall govern the designation and election of directors of Reorganized BSA.

### 5.    *Dissolution of Delaware BSA*

On the Effective Date, Delaware BSA's members, directors, officers and employees shall be deemed to have resigned, and Delaware BSA shall be deemed to have dissolved for all purposes and be of no further legal existence under any applicable state or federal law, without the need for any further action or the filing of any plan of dissolution, notice, or application with the Secretary of State of the State of Delaware or any other state or government authority, and without the need

to pay any franchise or similar taxes to effectuate such dissolution. Any Allowed Claims against Delaware BSA will be treated as set forth in <u>Article III.B</u> of the Plan.

### 6. *Due Authorization*

As of the Effective Date, all actions contemplated by the Plan that require corporate action of the Debtors, or either of them, including actions requiring a vote of the National Executive Board or the National Executive Committee of the BSA or the sole member of Delaware BSA, and execution of all documentation incident to the Plan, shall be deemed to have been authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by the Bankruptcy Court, members, officers, or directors of the Debtors, Reorganized BSA, or any other Person.

### 7. *Cancellation of Interests*

As of the Effective Date, in accordance with <u>Article III.B.12</u> of the Plan, Interests in Delaware BSA shall be deemed cancelled without further action by or order of the Bankruptcy Court and shall be of no further force or effect.

### 8. *Restatement of Indebtedness*

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, and subject to the treatment afforded to holders of Allowed Claims in Class 3A, 3B, 4A, or 4B under <u>Article III</u> of the Plan, on the Effective Date, all Prepetition Debt and Security Documents, including all agreements, instruments, and other documents evidencing or issued pursuant to the 2010 Credit Facility Documents, the 2019 RCF Documents, the 2010 Bond Documents, the 2012 Bond Documents, or any indebtedness or other obligations thereunder, and any rights of any holder in respect thereof, shall be deemed amended and restated in the form of the Restated Debt and Security Documents on the terms set forth herein.

Any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the satisfactions, Injunctions, Releases, Discharges and other transactions provided for in the Plan shall be deemed null and void and shall be of no force or effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court, including the Confirmation Order.

### 9. *Cancellation of Liens*

Except as otherwise provided in the Plan, on the Effective Date, any Lien securing any Allowed Secured Claim (other than a Lien securing any Allowed Secured Claim that is Reinstated pursuant to the Plan, including, for avoidance of doubt, the liens securing the Restated Debt and Security Documents) shall be deemed released and the holder of such Allowed Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such holder and to take such actions as may be requested by the

Debtors (or Reorganized BSA, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or Reorganized BSA, as the case may be).

**10.** *Effectuating Documents and Further Transactions*

The Chief Executive Officer and President, the Chief Financial Officer, and the General Counsel of the BSA are authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan in the name of and on behalf of Reorganized BSA, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

**11.** *Sources of Consideration for Plan Distributions*

Distributions under the Plan shall be funded from the following sources:

1.    the Debtors shall fund Distributions on account of and satisfy Allowed General Unsecured Claims exclusively from the Core Value Cash Pool;

2.    the Settlement Trust shall fund distributions on account of and satisfy compensable Abuse Claims in accordance with the Trust Distribution Procedures from (a) the BSA Settlement Trust Contribution, (b) the Local Council Settlement Contribution, (c) the Contributing Chartered Organization Settlement Contribution, (d) the Participating Chartered Organization Settlement Contribution, (e) the Hartford Settlement Contribution, and (f) any and all funds, proceeds or other consideration contributed to the Settlement Trust under the terms of any Insurance Settlement Agreement;

3.    the Debtors shall satisfy 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims, and 2012 Bond Claims in accordance with the terms of the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents, as applicable; and

4.    the Debtors shall fund Distributions on account of and satisfy all other Allowed Claims with Unrestricted Cash and Investments on hand on or after the Effective Date in accordance with the terms of the Plan and the Confirmation Order.

**12.** *Calculation of Minimum Unrestricted Cash and Investments*

The minimum amount of Unrestricted Cash and Investments to be retained by Reorganized BSA on the Effective Date shall be:

1.    $25,000,000 if the Effective Date occurs on or before September 30, 2021;

2.     $37,000,000 if the Effective Date occurs on or after October 1, 2021 but before November 1, 2021;

3.     $36,000,000 if the Effective Date occurs on or after November 1, 2021 but before December 1, 2021;

4.     $40,000,000 if the Effective Date occurs on or after December 1, 2021 but before January 1, 2022;

5.     $57,000,000 if the Effective Date occurs on or after January 1, 2022 but before February 1, 2022;

6.     $41,000,000 if the Effective Date occurs on or after February 1, 2022 but before March 1, 2022;

7.     $55,000,000 if the if the Effective Date occurs on or after March 1, 2022 but before April 1, 2022; and

8.     $54,000,000 if the Effective Date occurs on or after April 1, 2022.

Without limiting the foregoing, in accordance with the Hartford Insurance Settlement Agreement and the Allowance of the Hartford Administrative Expense Claim under the Plan, the Net Unrestricted Cash and Investments shall be reduced on a dollar-for-dollar basis equal to fifty percent (50%) of the Allowed Hartford Administrative Expense Claim, or $1,000,000.

### 13.  *Resolution of Abuse Claims*

All Abuse Claims shall be channeled to and resolved by the Settlement Trust in accordance with the Trust Distribution Procedures; *provided,* that any Non-Settling Insurance Company may, subject to Article X.M of the Plan, raise any valid Insurance Coverage Defense in response to a demand by the Settlement Trust, including any right of such Non-Settling Insurance Company to assert any defense that could, but for the Settlement Trust's assumption of the liabilities, obligations, and responsibilities of the Protected Parties for Abuse Claims, have been raised by the Debtors or other applicable Protected Party with respect to such Claim.

**If the Plan is confirmed, the Plan shall provide for the global resolution of Abuse Claims against the Debtors, Related Non-Debtor Entities, Local Councils, Contributing Chartered Organizations, Settling Insurance Companies, and their respective Representatives.**

### 14.  *Funding by the Settlement Trust*

The Settlement Trust shall have no obligation to fund costs or expenses other than those set forth in the Plan or the Settlement Trust Documents, as applicable.

15.    *Core Value Cash Pool*

Reorganized BSA shall deposit Cash into the Core Value Cash Pool by making four semi-annual installment payments equal to $6,250,000. Reorganized BSA shall make the first deposit six (6) months after the Effective Date; the second installment on the first anniversary after the Effective Date; the third installment eighteen (18) months after the Effective Date; and the fourth installment on the second anniversary of the Effective Date.

16.    *Creditor Representative; Disbursing Agent*

The Creditor Representative shall be appointed as of the Effective Date. The Creditor Representative shall be responsible for assisting Reorganized BSA and its professionals in their efforts to efficiently reconcile Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims. The identity of the Creditor Representative shall be determined by the Creditors' Committee, with the consent of the Debtors (such consent not to be unreasonably withheld). The Debtors or Reorganized BSA, as applicable, will use commercially reasonable efforts to assist the Creditor Representative in reconciling Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims on or before the applicable Claims Objection Deadline. The reasonable fees and actual and necessary costs and expenses of the Creditor Representative shall be paid by Reorganized BSA up to the Creditor Representative Fee Cap, and Reorganized BSA shall have no obligation to compensate or reimburse the costs or expenses of the Creditor Representative beyond the amount of the Creditor Representative Fee Cap. The Disbursing Agent shall have the rights, powers and responsibilities provided in Article VII of the Plan. The reasonable fees and actual and necessary costs and expenses of the Disbursing Agent, if any, shall be paid by Reorganized BSA.

17.    *Residual Cash in Core Value Cash Pool*

To the extent any Cash remains in the Core Value Cash Pool after all Allowed General Unsecured Claims have been satisfied in full, such remaining Cash shall: (1) first, on account of any Allowed Non-Abuse Litigation Claims that shall not have elected to be treated as an Allowed Convenience Claim under Article III.B.9 of the Plan to satisfy any deficiency in payments of such Allowed Claims (a) from available insurance coverage, including Abuse Insurance Policies and Non-Abuse Insurance Policies, (b) from applicable proceeds of any Insurance Settlement Agreements, and (c) from co-liable non-debtors (if any) or their insurance coverage; (2) second, to pay interest to holders of Allowed General Unsecured Claims in accordance with Article VII.L of the Plan; and (3) third irrevocably re-vest in Reorganized BSA.

18.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan and the Plan Documents, as of the Effective Date, the provisions of the Plan, including the Abuse Claims Settlement, the Hartford Insurance Settlement, the JPM / Creditors' Committee Settlement, the TCJC Settlement, and the Settlement of Restricted and Core Asset Disputes set forth in Article V.S of the Plan, shall constitute good-faith compromises and settlements of Claims, Interests, and controversies among the parties thereto relating to the contractual, legal, equitable and

subordination rights that holders of Claims or Interests may have with respect to any Claim or Interest under the Plan or any Distribution to be made on account of an Allowed Claim. The Plan shall be deemed a motion, proposed by the Debtors and joined by the parties to the Abuse Claims Settlement, the Hartford Insurance Settlement Agreement, the JPM / Creditors' Committee Settlement, the TCJC Settlement, and the Settlement of Restricted and Core Asset Disputes, respectively, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies among the parties thereto, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable and reasonable.

1.      Abuse Claims Settlement.  The treatment provided for Abuse Claims, including Post-1975 Chartered Organization Abuse Claims, under the Plan incorporates and reflects a proposed compromise and settlement of all Scouting Released Claims, including all Abuse Claims against the Protected Parties and all Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties (the "Abuse Claims Settlement"), and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Abuse Claims Settlement. The following constitute the provisions and conditions of the Abuse Claims Settlement:

a.      Local Council Settlement Contribution.  The Local Councils shall make, cause to be made, or be deemed to have made, as applicable, the Local Council Settlement Contribution, as set forth in Exhibit F of the Plan and as defined in the Plan, meaning:

(i)      the contributions to the Settlement Trust by the Local Councils, as set forth in Exhibit F to the Plan;

(ii)      to the maximum extent under applicable law, any and all of the Local Councils' rights, titles privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, interest, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the BSA Insurance Policies, the Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof (but not the policies themselves); (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries; *provided, however*, that the transfer set forth in the Plan will not include the Local Council Reserved Rights;

(iii)      to the maximum extent permitted under applicable law, any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed,

fixed or contingent, arising under or attributable to: (i) the Local Council Insurance Policies, the Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries; *provided, however*, that the transfer set forth in the Plan will not include the Local Council Reserved Rights;

(iv)    the waiver, release, and expungement from the Claims Register of any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Local Council, including any Indirect Abuse Claims, without any further notice to or action, order or approval of the Bankruptcy Court, and the agreement of each Local Council not to file or assert any Claim or Claims against the Debtors or Reorganized BSA arising from any act or omission of the Debtors on or prior to the Confirmation Date;

(v)    the Local Councils' Settlement Trust Causes of Action; and

(vi)    the assignment of any and all Perpetrator Indemnification Claims held by the Local Councils.

(vii)    Further, if a Local Council is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) Insurance Actions, and (iii) the Insurance Action Recoveries (the "Local Council Insurance Rights"), then the Local Council shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Local Council Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Local Council Insurance Rights; *provided, however*, that while any such amounts are held by or under the control of any Local Council, such amounts shall be held for the benefit of the Settlement Trust.

b.    Contributing Chartered Organization Settlement Contribution. The Contributing Chartered Organizations, including TCJC, shall make, cause to be made, or be deemed to have made, as applicable, the Contributing Chartered Organization Settlement Contribution, including the TCJC Settlement Contribution. If a Contributing Chartered Organization is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, if any, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or

unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof, (ii) the Insurance Actions, and (iii) the Insurance Action Recoveries (the "Contributing Chartered Organization Insurance Rights"), then the Contributing Chartered Organization shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Contributing Chartered Organization Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Contributing Chartered Organization Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Contributing Chartered Organization, such amounts shall be held for the benefit of the Settlement Trust.

c.     Participating Chartered Organization Settlement Contribution.  The Participating Chartered Organizations shall make, cause to be made, or be deemed to have made, as applicable, the Participating Chartered Organization Settlement Contribution.  If a Participating Chartered Organization is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, if any, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to (i) the Abuse Insurance Policies, (excluding the Chartered Organization Reserved Policies), the Insurance Settlement Agreements, and claims thereunder and proceeds thereof, (ii) the Insurance Actions, and (iii) the Insurance Action Recoveries (the "Participating Chartered Organization Insurance Rights"), then the Participating Chartered Organization shall, at the sole cost and expense of the Settlement Trust: (a) take such actions reasonably requested by the Settlement Trustee to pursue any of the Participating Chartered Organization Insurance Rights for the benefit of the Settlement Trust; and (b) promptly transfer to the Settlement Trust any amounts recovered under or on account of any of the Participating Chartered Organization Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Participating Chartered Organization, such amounts shall be held for the benefit of the Settlement Trust.

d.     Claims Deemed Withdrawn with Prejudice.  On the Effective Date, any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Local Council, Participating Chartered Organization, Contributing Chartered Organization, or Settling Insurance Company shall be deemed withdrawn with prejudice and irrevocably waived, released and expunged from the Claims Register without any further notice to or action, order, or approval of the Bankruptcy Court, except that any withdrawal, waiver, release or expungement of any Claims asserted by Hartford or TCJC shall be governed by the terms and conditions of the Hartford Insurance Settlement Agreement and the TCJC Settlement Agreement, respectively. Further, no Local Council, Participating Chartered Organization, Contributing Chartered Organization, or Settling

Insurance Company shall file or assert any Claim or Claims against the Debtors or Reorganized BSA arising from any act or omission of the Debtors prior to the Confirmation Date, except as provided otherwise in the Hartford Insurance Settlement Agreement (including with respect to the Hartford Additional Administrative Expense Claim, if applicable).

e.    <u>Entitlement to Become a Protected Party</u>.  Notwithstanding anything to the contrary set forth in the Plan or any other document filed with the Bankruptcy Court: (i) no Local Council shall be treated as a Protected Party under the Plan if any part of the Cash or Property Contribution (as defined on Exhibit F of the Plan) components of the Local Council Settlement Contribution is not contributed to the Settlement Trust on the Effective Date as described on Exhibit F of the Plan, it being understood that the Property contribution shall be deemed to have been contributed on the Effective Date for Purposes of this provision when all individual Local Councils that are to make a Property Contribution have provided a notice of intent to contribute property to the Settlement Trust in accordance with the terms of the Property Contribution set forth on Exhibit F of the Plan; (ii) no Contributing Chartered Organization shall be treated as a Protected Party under the Plan until its Contributing Chartered Organization Settlement Contribution shall have been made; (iii) no Settling Insurance Company shall be treated as a Protected Party under the Plan until such Settling Insurance Company shall have made its contribution to the Settlement Trust pursuant to an Insurance Settlement Agreement, except that Hartford shall be treated as a Settling Insurance Company and Protected Party upon the payment of the Initial Payment to the Settlement Trust and the payment of the Additional Payment into the Escrow Account (as such capitalized terms are defined in the Hartford Insurance Settlement Agreement); and (iv) no Participating Chartered Organization shall be treated as a Protected Party solely based on the Participating Chartered Organization Insurance Assignment.

f.    <u>Entitlement to Become a Limited Protected Party</u>.  Notwithstanding anything to the contrary set forth in the Plan or any other document filed with the Bankruptcy Court, no Chartered Organization shall be treated as a Limited Protected Party under the Plan if it objects to Confirmation of the Plan or informs Debtors' counsel in writing on or before the deadline to object to Confirmation of the Plan that it does not wish to make the Chartered Organization Insurance Assignment.  Notwithstanding the foregoing, no Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date (including the Archbishop of Agaña, a Corporation Sole), shall be treated as a Participating Chartered Organization unless it advises Debtors' counsel in writing that it wishes to make the Chartered Organization Insurance Assignment.

2.    <u>The JPM / Creditors' Committee Settlement</u>.  The treatment provided for under the Plan for Allowed 2010 Credit Facility Claims, Allowed 2019 RCF Claims, Allowed 2010 Bond Claims, Allowed 2012 Bond Claims, Allowed Convenience Claims, Allowed General Unsecured Claims, and Allowed Non-Abuse Litigation Claims, together with the terms and conditions of the JPM / Creditors' Committee Term Sheet, reflects a proposed compromise and settlement by and among the Debtors, the Creditors' Committee

and JPM (the "JPM / Creditors' Committee Settlement").[105]  The following constitutes the provisions and conditions of the JPM / Creditors' Committee Settlement:

> a.   Allowance and Treatment of 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims and 2012 Bond Claims.  The 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims and the 2012 Bond Claims shall be Allowed in the amounts set forth in Article III.B of the Plan and receive the treatment afforded to such Claims thereunder.  The Debtors acknowledge and agree that the Claims held by JPM (the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims and the 2012 Bond Claims), are core to the Debtors' charitable mission and were incurred in furtherance of the Debtors' charitable mission.

> b.   Treatment of Convenience Claims, General Unsecured Claims, and Non- Abuse Litigation Claims.  Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims shall receive the treatment afforded to such Claims under Article III.B of the Plan.  The Debtors acknowledge and agree that General Unsecured Claims, Convenience Claims, and Non-Abuse Litigation Claims are held by creditors who are core to the Debtors' charitable mission or creditors whose Claims in such Classes, if Allowed, were incurred in furtherance of the Debtors' charitable mission; accordingly, payments by Reorganized BSA under the Plan on account of such Allowed Claims, if applicable, will be made from Cash relating to Reorganized BSA's core assets.

> c.   Challenge Period.  As of the Effective Date, (i) the Challenge Period (as defined in the Cash Collateral Order) shall be deemed to have expired with respect to the Creditors' Committee; (ii) the Stipulations (as defined in the Cash Collateral Order) and other admissions, agreements and releases set forth in the Cash Collateral Order shall be final and binding on the Creditors' Committee.  The ability of any other party to bring a Challenge Proceeding (as defined in the Cash Collateral Order) shall be governed by the terms and conditions of the Cash Collateral Order.

> 3.    Settlement of Restricted and Core Asset Disputes.    As a proposed compromise and settlement of any and all disputes concerning the Debtors' restricted and/or core assets, including the claims asserted in the complaint filed by the Tort Claimants' Committee in the adversary proceeding entitled *Official Tort Claimants' Committee of Boy Scouts of America and Delaware BSA, LLC v. Boy Scouts of America and Delaware BSA, LLC*, Adv. Pro. No. 21-50032 (LSS) (the "Settlement of Restricted and Core Asset Disputes"), the Debtors shall: (a) reduce the minimum amount of Unrestricted Cash and Investments to be retained by Reorganized BSA on the Effective Date from $75,000,000 to $25,000,000 (subject to potential variance as set forth in Article V.M of the Plan); and (b) issue the BSA Settlement Trust Note to the Settlement Trust as of the Effective Date in accordance with Article V.X of the Plan.  As further consideration

---

[105]   In the event of a conflict between the terms and conditions of the Plan, on the one hand, and the terms and conditions of the JPM / Creditors' Committee Term Sheet, on the other hand, the terms of the Plan shall control.

in connection with the Settlement of Restricted and Core Asset Disputes, the Debtors have agreed under the Plan to: (i) fund the Core Value Cash Pool, in the amount of $25,000,000; and (ii) make the BSA Settlement Trust Contribution, including all of the Net Unrestricted Cash and Investments.  The proceeds of the Foundation Loan, in the amount of $42,800,000 (which Reorganized BSA will use exclusively for working capital and general corporate purposes), will permit the Debtors to contribute to the Settlement Trust a substantial amount of core value consideration in Cash on the Effective Date.

4.      Hartford Insurance Settlement Agreement.  The Plan incorporates the Hartford Insurance Settlement Agreement, which, upon its execution by all of the parties thereto, shall be filed with the Plan Supplement and is attached to the Plan as Exhibit I-1, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and sale of the Hartford Policies set forth in the Hartford Insurance Settlement Agreement (the "Hartford Insurance Settlement"), pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, including approval of (i) the Hartford Insurance Settlement Agreement, (ii) the sale by the Debtors, their Estates, and the purchase by Hartford, of the Hartford Policies, free and clear of all Interests of any Person or Entity (as such terms are defined in the Hartford Insurance Settlement Agreement; for the avoidance of doubt, the term "Interests" as used in Article V.S.4 of the Plan shall have the meaning given to the term "Interests" in the Hartford Insurance Settlement Agreement, rather than as such term is defined in Article I of the Plan), *provided* that the Interests, if any, of Chartered Organizations under the Hartford Policies shall, to the extent such Chartered Organizations are not beneficiaries of the Channeling Injunction, attach to the proceeds of the sale of the Hartford Policies, (iii) the settlement, compromise and release of the Hartford Released Claims (as defined in the Hartford Insurance Settlement Agreement) as provided in the Hartford Insurance Settlement Agreement, and (iv) the Allowance of the Hartford Administrative Expense Claim.  The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and Allowance of the Hartford Administrative Expense Claim and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to Hartford, including findings and conclusions designating Hartford as a good-faith purchaser of the Hartford Policies.

5.      TCJC Settlement.  The Plan incorporates the TCJC Settlement Agreement, which, upon its execution by all of the parties thereto, shall be filed with the Plan Supplement and attached to the Plan as Exhibit J-1, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements set forth in the TCJC Settlement Agreement (the "TCJC Settlement") pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, including, as provided in the TCJC Settlement Agreement, payment of the TCJC Settlement Contribution to the Settlement Trust as a compromise and settlement of all TCJC Abuse Claims, TCJC Claims, and disputes relating to the Plan, including the TCJC Insurance Rights (as such terms are defined in the TCJC Settlement Agreement). The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to TCJC.

19.    *Payment of Coalition Restructuring Expenses*

On or as soon as reasonably practicable after the Effective Date, and subject to the Bankruptcy Court granting a motion filed pursuant to sections 363(b), 1129(b)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law, Reorganized BSA shall reimburse state court counsel for amounts they have paid to the Coalition Professionals for, and/or pay the Coalition Professionals for amounts payable by state court counsel but not yet paid to Coalition Professionals for, reasonable, documented, and contractual professional advisory fees and expenses incurred by the Coalition Professionals (the "Coalition Restructuring Expenses") from the Coalition's inception up to and including the Effective Date, up to a maximum amount equal to (a) $950,000 per month for the period from August 16, 2021 up to and including the Effective Date (pro-rated for any partial month), plus (b) $10,500,000; provided, however, that, without limiting the foregoing, under no circumstance shall the Debtors or Reorganized BSA have any obligation to (i) pay or reimburse the Coalition, any of its members, or any Persons affiliated with the Coalition for any costs, fees or expenses other than the Coalition Restructuring Expenses or (ii) pay or reimburse any Coalition Restructuring Expenses that constitute transaction, success or similar contingent fees.  The Coalition shall provide the Debtors a reasonable estimate of the total Coalition Restructuring Expenses as of the Effective Date no later than the date that is five (5) Business Days before the anticipated Effective Date.  Notwithstanding anything to the contrary in the Plan, Coalition Restructuring Expenses shall be subject to the terms of Article II.A.2 of the Plan, with the following modifications: (x) Coalition Professionals shall comply with the procedures and processes set forth in Article II.A.2 of the Plan by filing final fee application(s), which, for attorneys or law firms who are Coalition Professionals, shall include time entry detail, which may be redacted for privilege; and (y) payment or reimbursement of Coalition Restructuring Expenses shall be subject to the review and procedure of the Fee Examiner.  For the avoidance of doubt, the Coalition Professionals shall not be considered retained professionals of the Debtors, the Creditors' Committee, the Tort Claimants' Committee, or the Future Claimants' Representative, and the retention of the Coalition Professionals shall not have been required to satisfy the standards for retention set forth in sections 327, 328 or 1103 of the Bankruptcy Code. The requirement that a separate motion be filed with the Bankruptcy Court shall not in any way prejudice or limit the payment of the Coalition Restructuring Expenses under the Plan and/or pursuant to sections 363(b), 1129(a)(4) and 503(b) of the Bankruptcy Code, Bankruptcy Rule 9019, or otherwise applicable bankruptcy and non-bankruptcy law.

20.    *Good-Faith Compromise and Settlement*

The Plan (including its incorporation of the Abuse Claims Settlement, the Hartford Insurance Settlement, the JPM / Creditors' Committee Settlement, the TCJC Settlement, and the Settlement of Restricted and Core Asset Disputes), the Plan Documents, and the Confirmation Order constitute a good-faith compromise and settlement of Claims, Interests and controversies based upon the unique circumstances of these Chapter 11 Cases, and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court

or any other court of competent jurisdiction. The Plan, the Abuse Claims Settlement, the Hartford Insurance Settlement, the JPM / Creditors' Committee Settlement, the TCJC Settlement, the Settlement of Restricted and Core Asset Disputes, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, Reorganized BSA, the Protected Parties, or the Settlement Trust is a party.

### 21. *Restated Debt and Security Documents*

On the Effective Date, the Prepetition Debt and Security Documents shall be amended and restated in the form of the Restated Debt and Security Documents, and Reorganized BSA, JPM and Arrow shall, and shall be authorized, to execute, deliver and enter into the Restated Debt and Security Documents as of such date, in principal amounts equal to the Allowed amounts set forth in Article III.B.3, Article III.B.4, Article III.B.5, and Article III.B.6 of the Plan without the need for any further corporate action or any further notice to or order of the Bankruptcy Court. The Debtors or Reorganized BSA, as applicable, JPM, and Arrow shall take all actions necessary to continue the Debtors' obligations under the Prepetition Debt and Security Documents, as amended and restated by the Restated Debt and Security Documents and to give effect to the Restated Debt and Security Documents, including surrendering any debt instruments or securities that are no longer applicable under the Restated Debt and Security Documents to the Debtors or Reorganized BSA. Entry of the Confirmation Order shall be deemed approval of the JPM Exit Fee, and Reorganized BSA is authorized and directed to pay the JPM Exit Fee to JPM on the Effective Date

Except as otherwise modified by the Restated Debt and Security Documents, all Liens, mortgages and security interests securing the obligations arising under the Restated Debt and Security Documents that were collateral securing the Debtors' obligations under the Prepetition Debt and Security Documents as of the Petition Date are unaltered by the Plan, and all such Liens, mortgages and security interests are reaffirmed and perfected with respect to the Restated Debt and Security Documents to the same extent, in the same manner and on the same terms and priorities as they were under the Prepetition Debt and Security Documents, except as the foregoing may be modified pursuant to the Restated Debt and Security Documents. All Liens and security interests granted and continuing pursuant to the Restated Debt and Security Documents shall be (a) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law; (b) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (c) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law. The Debtors, Reorganized BSA, Arrow, and JPM are authorized to make, and to the extent required by the Restated Debt and Security Documents, the Debtors, Reorganized BSA, Arrow will make, all filings and recordings, and obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Debt and Security Documents) to establish, attach and perfect such Liens and security interests under any applicable law (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. For purposes of all mortgages and

deposit account control agreements that secured the obligations arising under the Prepetition Debt and Security Documents, the Restated Debt and Security Documents are deemed an amendment and restatement of the Prepetition Debt and Security Documents, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure Reorganized BSA's obligations under the Restated Debt and Security Documents, except as expressly set forth therein.

    1.    The definitive terms of the Restated Debt and Security Documents shall be (x) acceptable to JPM and the BSA, (y) reasonably acceptable to the Creditors' Committee, and (z) substantially the same as the Prepetition Debt and Security Documents, except that, as to be specified in the Restated Debt and Security Documents:

    a.    the maturity dates under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents, and the Restated Credit Facility Documents will be the Restated Maturity Date;

    b.    principal under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be payable in monthly installments, in the same monthly amounts as the prepetition periodic amortization amounts, beginning on the date that is two (2) years after the Effective Date and ending on the Restated Maturity Date; *provided*, that the scheduled principal amounts payable under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be reduced, on a pro rata basis, by an amount equal to the Excess Cash and Investments, if any, that are remitted to JPM under the Excess Cash Sweep;

    c.    interest under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be payable in monthly installments, at the currently applicable existing rates in the 2010 Bond Documents and the 2012 Bond Documents, beginning on the date that is one month after the Effective Date and ending on the Restated Maturity Date;

    d.    principal under the Restated Credit Facility Documents shall be payable in quarterly installments, set at 1/40th of the outstanding balance on the Effective Date, beginning on the date that is two (2) years after the Effective Date and ending on the Restated Maturity Date; *provided*, that the principal amounts payable under the Restated Credit Facility Documents shall be reduced, on a pro rata basis, by an amount equal to the Excess Cash and Investments, if any, that are remitted to JPM under the Excess Cash Sweep;

    e.    interest under the Restated Credit Facility Documents shall be payable in quarterly installments at the applicable existing rates in the Prepetition Debt and Security Documents, beginning on the date that is three (3) months after the Effective Date and ending on the Restated Maturity Date;

f.    all of the obligations of Reorganized BSA under the Restated Debt and Security Documents shall be secured by first-priority liens on and security interests in all of the assets of Reorganized BSA;

g.    all of the obligations of Reorganized BSA under the Restated Debt and Security Documents shall be guaranteed by Arrow; and

h.    beginning on December 31 of the calendar year that is two (2) years after the Effective Date and continuing on December 31 of each successive calendar year until December 31 of the calendar year that is immediately prior to the calendar year of the Restated Maturity Date, Reorganized BSA shall remit to JPM, as soon as reasonably practicable but in no case later than thirty (30) days of such date, twenty-five percent (25%) of the Excess Cash and Investments in excess of $75,000,000, if any, as of such date, measured on a pro forma basis after having given effect to the principal payment, if any, due on February 15 of the following year under the BSA Settlement Trust Note, if applicable (the "Excess Cash Sweep"), and JPM shall apply any such amounts on a pro rata basis to the unpaid principal balances under the Restated Debt and Security Documents.  For the avoidance of doubt, no payments shall be made on account of the Excess Cash Sweep until the last Distribution is made on account of Allowed General Unsecured Claims.

2.    Except as provided for in an Insurance Settlement Agreement, neither any provision of the Plan nor the occurrence of the Effective Date shall alter, amend, or otherwise impair the rights and obligations of the Debtors, Reorganized BSA, JPM, or any applicable Insurance Company holding one or more letters of credit issued by JPM to secure obligations arising under one or more BSA Insurance Policies. Without limiting the foregoing, nothing in the Plan or the Confirmation Order shall preclude any such Insurance Company from exercising any applicable rights on any such letter of credit issued, or other security provided, for the benefit of the Insurance Company in accordance with the terms and conditions of the documents governing such letter of credit or other security, or applying amounts therefrom to any Claim secured by such letter of credit or other security, and the Debtors, Reorganized BSA, and JPM reserve any and all rights with respect to such Insurance Company's exercise of any applicable rights.

### 22.    *Foundation Loan*

On the Effective Date, the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan shall be executed and delivered, and Reorganized BSA shall be authorized to execute, deliver and enter into, the Foundation Loan Agreement and related documentation governing the Foundation Loan without the need for any further corporate action or any further notice to or order of the Bankruptcy Court.

As of the Effective Date, upon the granting of Liens in accordance with the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan, all of the Liens and security interests granted thereunder (a) shall be deemed to have been

granted, (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral as of the Effective Date in accordance with the respective terms of the Foundation Loan Agreement and related documentation, subject to the Liens and security interests set forth in the Restated Debt and Security Documents, as permitted under the Foundation Loan Agreement and related documentation. All Liens and security interests granted pursuant to the Foundation Loan Agreement and related documentation shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (c) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law. The Debtors, Reorganized BSA, Arrow WV, Inc., and the Foundation are authorized to make, and to the extent contemplated by the Foundation Loan Agreement and related documentation, the Debtors, Reorganized BSA, Arrow WV, Inc. will make, all filings and recordings, and obtain all governmental approvals and consents necessary to establish, attach and perfect such Liens and security interests under any applicable law (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.

23.    *BSA Settlement Trust Note*

On the Effective Date, Reorganized BSA shall execute, issue and deliver the BSA Settlement Trust Note to the Settlement Trust and execute and deliver any related documentation governing the BSA Settlement Trust Note, including any related security agreement, without the need for any further corporate action or any further notice to or order of the Bankruptcy Court. The BSA Settlement Trust Note will commence on the Effective Date and will be due ninety-one (91) days after the date that is ten (10) years after the Effective Date and shall bear interest from the Effective Date at a rate of 5.5% per annum, payable semi-annually, subject to a payment-in-kind election for the eighteen (18) months immediately following the Effective Date. The obligations of Reorganized BSA under the BSA Settlement Trust Note shall be secured by second-priority liens on and security interests in inventory, accounts receivable (except the Arrow Intercompany Note), Cash and the Headquarters. Principal under the BSA Settlement Trust Note shall be payable in annual installments due on February 15 of each year during the term of the BSA Settlement Trust Note, commencing on February 15 of the second year following the Effective Date. Such annual principal payments shall be equal to the sum of the following calculation: (a) $4,500,000; plus (b) $3.50 multiplied by the aggregate number of Youth Members as of December 31 of the preceding year up to the forecasted number of Youth Members for such year as set forth in the Debtors' five-year business plan; plus (c) $50 multiplied by the aggregate number of High Adventure Base Participants during the preceding calendar year; plus (d) $50 multiplied by the aggregate number of Youth Members in excess of the forecasted number of Youth Members for such year, excluding the portion of the excess that is comprised of members under the ScoutReach program, as set forth in the Debtors' five-year business plan; plus (e) $150 multiplied by the aggregate number of High Adventure Base Participants, excluding those attending events with a registration fee of less than $300 (*e.g.*, for non-typical High Adventure Base activities), in excess of the forecasted number of High Adventure Base Participants for such

year as set forth in the Debtors' five-year business plan. The forecasted numbers of Youth Members and High Adventure Base Participants referenced in clauses (b), (d) and (e) of the foregoing sentence are included in the Financial Projections attached to the Disclosure Statement. The forecast for years after 2025 shall be deemed to be the forecast for calendar year 2025. The BSA Settlement Trust Note may be prepaid at any time without penalty.

24.    *DST*

The DST shall be established on the Effective Date in accordance with the DST Agreement. The purposes of the DST shall be to: (1) issue the DST Note to the Settlement Trust as of the Effective Date; (2) collect, manage and invest Cash contributed by Local Councils on a monthly basis to an account (and any replacement thereof) owned by the DST in accordance with the DST Note Mechanics; and (3) make annual payments (a) to the Pension Plan or (b) toward principal and interest on the DST Note, as determined in accordance with the DST Note Mechanics and the DST Agreement. In the event of a conflict between the terms or provisions of the Plan and the DST Agreement, the terms of the Plan shall control.

25.    *Pension Plan*

No provision contained in the Plan, Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases shall be construed to exculpate, discharge, release or relieve the Debtors, the Local Councils, or any other party, in any capacity, from any liability or responsibility to any Person with respect to the Pension Plan under any law, governmental policy, or regulatory provision. The Pension Plan shall not be enjoined or precluded from enforcing any such liability or responsibility as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims against the Debtors), the Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases. The Settlement Trust shall not have any liability to any Person on account of the Pension Plan, including liability as a member of a "Controlled Group" as defined in 29 U.S.C. § 1301(a)(14)(A) or on any other basis whatsoever.

As of the Effective Date, Reorganized BSA shall assume and continue the Pension Plan to the extent of its obligations under the Pension Plan and applicable law, including, as applicable, (1) satisfaction of the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, (2) payment of all required Pension Benefit Guaranty Corporation premiums in accordance with 29 U.S.C. §§ 1306 and 1307, and (3) administration of the Pension Plan in all material respects in accordance with the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301 *et seq.*, and the Internal Revenue Code. Notwithstanding the foregoing, Reorganized BSA reserves all of its rights under the Pension Plan. All Proofs of Claim filed by the Pension Benefit Guaranty Corporation with respect to the Pension Plan shall be deemed withdrawn on the Effective Date.

26.    *Single Satisfaction of Allowed General Unsecured Claims*

In no event shall any holder of an Allowed General Unsecured Claim recover more than the full amount of its Allowed General Unsecured Claim from the Core Value Cash Pool, and to

the extent that the holder of an Allowed General Unsecured Claim has received, or in the future receives, payment on account of such Allowed General Unsecured Claim from a party that is not a Debtor or Reorganized BSA, such holder shall repay, return, or deliver to the Core Value Cash Pool any Distribution held by or transferred to such holder to the extent the holder's total recovery on account of its Allowed General Unsecured Claim from the third party and from the Core Value Cash Pool exceeds the amount of such holder's Allowed General Unsecured Claim.

### 27.   *Exemption from Certain Transfer Taxes and Recording Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code and applicable law, any transfers of property pursuant to the Plan, including any transfers to the Settlement Trust by the Debtors, the Local Councils, the Contributing Chartered Organizations, and the Settling Insurance Companies, and payments by Reorganized BSA to or from the Core Value Cash Pool, shall not be taxed under any law imposing a stamp tax or similar tax.

### 28.   *Non-Monetary Commitments*

The Debtors shall take the following actions to promote healing and reconciliation and to continue the Debtors' efforts to prevent Abuse from occurring in Scouting in the future:

   a.   The Debtors shall form a committee (the "Child Protection Committee") of members from the BSA, Local Councils, the Tort Claimants' Committee, and the Coalition (including survivors).   The functions of the Child Protection Committee include the following:

   (i)   No later than six months after the Effective Date, the BSA will present to the Committee on the BSA's current Youth Protection Program (the "Youth Protection Program").  The BSA will report to the Child Protection Committee regarding the Youth Protection Program and any changes thereto on an annual basis for a period of three years following the Effective Date.

   (ii)   Following that presentation, the BSA and Child Protection Committee will work with an entity engaged by the BSA that is selected with the consultation of the Child Protection Committee that is not currently affiliated with the BSA to evaluate the Youth Protection Program (the "Evaluating Entity").   The Evaluating Entity will have expertise in the prevention of youth sexual abuse.

   (A)   Any evaluation will be comprehensive in nature and include input from current BSA volunteers and professionals, survivors of sexual abuse while involved with Scouting, the members of the Child Protection Committee, and the Evaluating Entity.

   (B)   The Evaluating Entity will report to the Child Protection Committee assessing the current Youth Protection Program and make specific recommendations for reasonable

157

improvements to the Youth Protection Program that may include mechanisms for the elimination of abuse and accurate and annual reporting regarding the results of the Youth Protection Program, including confirmed instances of sexual abuse that is made available to the public (the "Prospective Reporting").

(C)     The BSA will engage with the Evaluating Entity, and the Child Protection Committee, and will take appropriate steps as necessary to improve the Program. Changes to the Youth Protection Program will be reported on the BSA's Youth Protection Program website and training will be reasonably adjusted to reflect changes.

**(iii)**     The BSA will propose and the Child Protection Committee will consider a protocol for the review and publication of information in the Volunteer Screening Database and the Prospective Reporting, which will take into account factors including: (i) the desire to make public credibly identified perpetrators of sexual abuse in Scouting; (ii) adequate protections for survivor identities; (iii) consideration regarding the protection of third parties, including survivor family members and volunteers; (iv) a notification process regarding any publication; (v) issues related to privacy and liability related to publication; and (vi) the potential appointment or retention of an appropriate neutral party to supervise the evaluation and review of the Volunteer Screening Database (the "Neutral Supervisor"). If the BSA and Child Protection Committee are unable to reach an agreement on the above protocol, the Neutral Supervisor shall mediate the dispute to resolution. In accordance with the process outlined above, information from the Volunteer Screening Database and Prospective Reporting shall be published annually after agreement among the parties or determination by the Neutral Supervisor.

**(iv)**     After consultation and recommendations from the Evaluating Entity, the Child Protection Committee may propose and the BSA will in good faith consider other issues relating to child protection, including: (i) special BSA Scouting programs for survivors; and (ii) participation and leadership in a comprehensive reporting program to include other youth-serving organizations.

**(v)**     The BSA will engage with the Child Protection Committee and consider all appropriate measures proposed by the Child Protection Committee to improve transparency and accountability with respect to any future instances of sexual abuse, including the dissemination of information relating to abuse statistics, consistent with practices

of other youth-serving organizations, including what information may be publically available on the BSA's website.

I.    Vesting of Assets in the Reorganized BSA

In accordance with Article X.A of the Plan, and except as explicitly provided in the Plan (including with respect to the Core Value Cash Pool and the Restated Debt and Security Documents), on the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all property comprising the Estates, other than the BSA Trust Contributions, shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, interests, charges, other Encumbrances and liabilities of any kind unless expressly provided by the Plan or the Confirmation Order. On and after the Effective Date, each Reorganized BSA may continue is operations and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

J.    Retention of Certain Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code and Article XI.B of the Plan, subject to the transfer of the Debtors' Settlement Trust Causes of Action to the Settlement Trust under Article IV.D of the Plan and the Debtors' and their Estates' Release of certain Estate Causes of Action under Article X.J of the Plan, all Causes of Action that a Debtor may hold against any Person shall vest in Reorganized BSA on the Effective Date. Thereafter, subject to Article IV.D and Article X.J of the Plan, Reorganized BSA shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or Reorganized BSA, as applicable, will not pursue any and all available Causes of Action. The Debtors or Reorganized BSA, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

K.    Compensation and Benefits Programs

Other than those Compensation and Benefits Programs assumed by the Debtors prior to entry of the Confirmation Order, if any, all of the Compensation and Benefits Programs entered into before the Petition Date and not since terminated shall be deemed to be, and shall be treated as though they are, Executory Contracts under the Plan. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of Reorganized BSA's assumption and continued maintenance and sponsorship of each of such Compensation and Benefits Plan under sections 365 and 1123 of the Bankruptcy Code, and the Debtors' and Reorganized BSA's obligations under the Compensation and Benefits Programs shall survive and remain unaffected by entry of the

Confirmation Order and be fulfilled in the ordinary course of the Debtors' and Reorganized BSA's non-profit operations. Compensation and Benefits Programs assumed by the Debtors prior to entry of the Confirmation Order shall continue to be fulfilled in the ordinary course of the Debtors' non-profit operations from and after the date of any order of the Bankruptcy Court authorizing the assumption of such Compensation and Benefits Program. All Claims filed on account of an amounts asserted to be owed under Compensation and Benefits Programs shall be deemed satisfied and expunged from the Claims Register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

L.      Restoration Plan and Deferred Compensation Plan

On the Effective Date the Restoration Plan and the Deferred Compensation Plan shall be terminated and, to the extent applicable, shall be deemed rejected by Reorganized BSA pursuant to section 365 of the Bankruptcy Code and Article VI of the Plan. Claims arising from the Debtors' rejection of the Restoration Plan and the Deferred Compensation Plan shall be treated as General Unsecured Claims hereunder. Holders of Allowed Claims arising from such rejection shall be entitled to a recovery from the Core Value Cash Pool in accordance with the applicable terms of the Plan.

M.      Workers' Compensation Programs

As of the Effective Date, the Debtors and the Reorganized BSA shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Program. All Proofs of Claims on account of the Workers' Compensation Program shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided, however*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized BSA's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; *provided further, however*, that nothing in the Plan shall be deemed to impose any obligations on the Debtors or their Insurance Companies in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

N.      Treatment of Executory Contracts and Unexpired Leases

**1.      *Assumption and Rejection of Executory Contracts and Unexpired Leases***

As set forth in Article VI of the Plan, on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed by Reorganized BSA without the need for any further notice to or action, order, or approval of the Bankruptcy Court under sections 365 or 1123 of the Bankruptcy Code, except for Executory Contracts or Unexpired Leases:

a.      that are identified on the Rejected Contracts and Unexpired Leases Schedule;

b.      that previously expired or terminated pursuant to their terms;

c. that the Debtors have previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court;

d. that are the subject of a motion to reject that remains pending as of the Effective Date;

e. as to which the effective date of rejection will occur (or is requested by the Debtors to occur) after the Effective Date; or

f. as to which the Debtors or Reorganized BSA, as applicable, determine, in the exercise of their reasonable business judgment, that the Cure Amount, as determined by a Final Order or as otherwise finally resolved, would render assumption of such Executory Contract or Unexpired Lease unfavorable to Debtors or Reorganized BSA;

*provided* that the Debtors reserve the right to seek enforcement of an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including seeking an order of the Bankruptcy Court rejecting such Executory Contract or Unexpired Lease for cause.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of Executory Contracts or Unexpired Leases pursuant to the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code. Except as otherwise set forth in the Plan, the assumption or rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be effective as of the Effective Date; *provided*, that the rejection of an Unexpired Lease shall be effective as of the later of: (a) the Effective Date; and (b) the date on which the leased premises are unconditionally surrendered to the non-Debtor counterparty to the rejected Unexpired Lease. Reorganized BSA is authorized to abandon any De Minimis Assets at or on the premises subject to an Unexpired Lease that is rejected pursuant to the Plan, and the non-Debtor counterparty to such Unexpired Lease may dispose of any such De Minimis Assets remaining at or on the leased premises on the applicable lease rejection date.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or a Final Order of the Bankruptcy Court shall re-vest in and be fully enforceable by Reorganized BSA in accordance with its terms, except as such terms may have been modified by the provisions of the Plan, the Confirmation Order, or any Final Order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by Reorganized BSA.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash on the Effective Date or in the ordinary course of the Debtors' or Reorganized BSA's non-profit operations, subject to the limitation described in the Plan.

Except as otherwise provided in the Plan, the Debtors shall, on or before the date of filing of the Plan Supplement, cause Cure and Assumption Notices to be served on affected

counterparties to Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan. Any objection by a non-Debtor counterparty to an Executory Contract or Unexpired Lease to the assumption, assumption and assignment, the related Cure Amount, or adequate assurance, must be filed, served, and actually received by the Debtors on or prior to the deadline for filing objections to the Plan (or such later date as may be provided in the applicable Cure and Assumption Notice); *provided*, that each counterparty to an Executory Contract or Unexpired Lease (a) that the Debtors later determine to assume or (b) as to which the Debtors modify the applicable Cure Amount, must object to the assumption or Cure Amount, as applicable, by the earlier of (i) fourteen (14) days after the Debtors serve such counterparty with corresponding Cure and Assumption Notice; and (ii) the Confirmation Hearing. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease shall be forever barred, estopped, and enjoined from contesting the Debtors' assumption of the applicable Executory Contract or Unexpired Lease and from requesting payment of a Cure Amount that differs from the amounts paid or proposed to be paid by the Debtors or Reorganized BSA, in each case without the need for any objection by the Debtors or Reorganized BSA or any further notice to or action, order, or approval of the Bankruptcy Court. Reorganized BSA may settle any dispute regarding a Cure Amount without any further notice to or action, order, or approval of the Bankruptcy Court.**

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed, or assumed and assigned, pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or would be deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any change of control or similar provision), then such provision shall be deemed preempted and modified such that neither the Debtors' assumption or assumption and assignment of the Executory Contract or Unexpired Lease nor any of the transactions contemplated by the Plan shall entitle the non-debtor counterparty to terminate or modify such Executory Contract or Unexpired Lease or to exercise any other purported default-related rights thereunder.

**The Debtors' assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and payment of any applicable Cure Amount in accordance with the procedures set forth in <u>Article VI.C</u> of the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of: (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption; (b) the effective date of such assumption; or (c) the Effective Date, in each case without the need for any objection by the Debtors or Reorganized BSA or any further notice to or action, order, or approval of the Bankruptcy Court.**

In the event of a timely filed objection regarding: (1) a Cure Amount; (2) the ability of Reorganized BSA or any assignee to provide adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease

to be assumed; or (3) any other matter pertaining to assumption or the requirements of section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or Reorganized BSA, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors or Reorganized BSA, applicable, shall pay the applicable Cure Amount as soon as reasonably practicable after entry of a Final Order resolving such dispute and approving such assumption, or as may otherwise be agreed upon by the Debtors or Reorganized BSA, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  To the extent that a dispute regarding the applicable Cure Amount is resolved or determined unfavorably to the Debtors, the Debtors may, in their discretion, reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect any earlier assumption or assumption and assignment.  Under no circumstances shall the status of payment of a Cure Amount required by section 365(b)(1) of the Bankruptcy Code following the entry of a Final Order resolving the dispute and approving the assumption prevent or delay implementation of the Plan or the occurrence of the Effective Date.

### 2. *Rejection Damages Claims*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim for Rejection Damages Claims, if any, shall be filed within thirty (30) days after the latest to occur of: (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) the effective date of the rejection of such Executory Contract or Unexpired Lease; or (3) the Effective Date (as applicable, the "Rejection Damages Bar Date").  Claims arising from the rejection of an Executory Contract or an Unexpired Lease shall be classified as General Unsecured Claims and subject to the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.  **Any holder of a Rejection Damages Claim that is required to file a Proof of Claim in accordance with Article VI.B of the Plan but fails to do so on or before the Rejection Damages Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting or Distributions, and such Rejection Damages Claim shall be automatically Disallowed, forever barred from assertion, and unenforceable against the Debtors, their Estates, Reorganized BSA, or its or their respective property, whether by setoff, recoupment, or otherwise, without the need for any objection by the Debtors or Reorganized BSA or further notice to, or action, order, or approval of the Bankruptcy Court, and such Rejection Damages Claim shall be deemed fully satisfied, released, and discharged.**

### 3. *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by the BSA, including any Executory Contracts and Unexpired Leases assumed by BSA, will be performed by the BSA or Reorganized BSA in the ordinary course of its charitable non-profit operations.  Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

### 4. *Insurance Policies*

Notwithstanding anything to the contrary herein, all Insurance Policies issued or entered into prior to the Petition Date shall not be considered Executory Contracts and shall neither be assumed nor rejected by the Debtors; *provided, however,* that to the extent any Insurance Policy is determined to be an Executory Contract, then, subject to <u>Article IV.V</u> of the Plan, and notwithstanding anything contained in the Plan to the contrary, the Plan will constitute a motion to assume such Insurance Policy and pay all future obligations, if any, in respect thereof and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtors, their respective Estates and all parties in interest. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to any Insurance Policy; and prior payments for premiums or other charges made prior to the Petition Date under or with respect to any Insurance Policy shall be indefeasible. Moreover, as of the Effective Date, all payments of premiums or other charges made by the Debtors on or after the Petition Date under or with respect to any Insurance Policy shall be deemed to have been authorized, approved, and ratified in all respects without any requirement of further action by the Bankruptcy Court. Notwithstanding anything to the contrary contained herein, Confirmation shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

Notwithstanding anything to the contrary contained in the Plan, entry of the Confirmation Order shall not discharge, impair, or otherwise modify any indemnity obligations assumed as a result of the foregoing assumption of the Insurance Policies that are D&O Liability Insurance Policies (and related documents), and each such indemnity obligations will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

Other than the permissibility of the Insurance Assignment, or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order or the findings made by the District Court in the Affirmation Order, the rights and obligations of the parties under the Insurance Policies, including the question of whether any breach has occurred, shall be determined under applicable law.

### 5. *Gift Annuity Agreements and Life-Income Agreements*

The Gift Annuity Agreements and Life-Income Agreements shall be deemed to be, and shall be treated as though they are, Executory Contracts under the Plan, and entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of such Executory Contract.

### 6.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless the Debtors reject or repudiate any of the foregoing agreements.  Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 7.    *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Schedules, a Cure and Assumption Notice, or the Rejected Executory contracts and Unexpired Leases Schedule, nor anything contained in any Plan Document, shall constitute an admission by the Debtors that a contract or lease is in fact an Executory Contract or Unexpired Lease or that Reorganized BSA has any liability thereunder.  If there is a dispute as of the Confirmation Date regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors, or, after the Effective Date, Reorganized BSA, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

O.    Provisions Governing Distributions

### 1.    *Applicability*

None of the terms or provision of <u>Article VII</u> of the Plan shall apply to Abuse Claims, which shall be exclusively processed, liquidated and paid by the Settlement Trust in accordance with the Settlement Trust Documents.

### 2.    *Distributions Generally*

The Disbursing Agent shall make all Distributions to appropriate holders of Allowed Claims in accordance with the terms of the Plan.

### 3.    *Distributions on Account of Certain Claims Allowed as of the Effective Date*

Except as otherwise provided in the Plan, on or as soon as practicable after the Effective Date, the Disbursing Agent shall make Distributions in Cash in amounts equal to all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed Convenience Claims.

4.      *Distributions on Account of Allowed General Unsecured Claims*

On each Distribution Date, the Disbursing Agent shall Distribute to each holder of an Allowed General Unsecured Claim an amount equal to such holder's Pro Rata Share of (1) the total balance of the Core Value Cash Pool as of such date, less (2) the balance of the Disputed Claims Reserve.

5.      *Distributions on Account of Disputed Claims Allowed After the Effective Date*

Distributions on account of any Disputed Claim shall be made to the extent such Claim is Allowed in accordance with the provisions of <u>Article VIII</u> of the Plan.  Except as otherwise provided in the Plan, the Confirmation Order, another order of the Bankruptcy Court, or as agreed to by the relevant parties, Distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

6.      *Rights and Powers of Disbursing Agent*

The Disbursing Agent shall make all Distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan, including <u>Article VII</u> of the Plan.  Except as otherwise ordered by the Bankruptcy Court, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.  The Disbursing Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns for all taxable periods through the date on which final Distributions are made.

7.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

(a)      <u>Claims Record Date</u>.  As of the close of business on the Claims Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors or their agents shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to a Distribution under the Plan, and there shall be no further changes in the record holders or the permitted designees with respect to such Claims.  The Debtors or Reorganized BSA, as applicable, shall have no obligation to recognize any transfer or designation of such Claims occurring after the close of business on the Claims Record Date.  With respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor Reorganized BSA shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the close of business on the Claims Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)    Delivery of Distributions.  If a Person holds more than one Claim in any one Class, in the Disbursing Agent's sole discretion, all such Claims will be aggregated into one Claim and one Distribution will be made with respect to the aggregated Claim.

(c)    Special Rules for Distributions to Holders of Disputed Claims.  Except as otherwise provided in the Plan or agreed to by the relevant parties: (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Person that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on account of the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Disputed Claims have been Allowed or expunged.  Any Distributions arising from property Distributed to holders of Allowed Claims in a Class and paid to such holders under the Plan shall also be paid, in the applicable amounts, to any holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such Distributions were earlier paid to holders of Allowed Claims in such Class.

## 8.    *Undeliverable and Non-Negotiated Distributions*

(a)    Undeliverable Distributions.  If any Distribution to a holder of an Allowed Claim is returned to Reorganized BSA as undeliverable, no further Distributions shall be made to such holder unless and until Reorganized BSA is notified in writing of such holder's then-current address or other necessary information for delivery, at which time such previously undeliverable Distribution shall be made to such holder within ninety (90) days of receipt of such holder's then-current address or other necessary information; *provided, however*, that any such undeliverable Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days after the date of the initial attempted Distribution.  After such date, all unclaimed property or interests in property shall revert to Reorganized BSA automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred; *provided*, that Distributions made from the Core Value Cash Pool and returned as undeliverable shall revert to the Core Value Cash Pool.

(b)    Non-Negotiated Distributions.  If any Distribution to a holder of an Allowed Claim is not negotiated for a period of 180 days after the Distribution, then such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and re-vest in Reorganized BSA or re-vest in the Core Value Cash Pool if such Distribution was made from the Core Value Cash Pool.  After such date, all non-negotiated property or interests in property shall revert to Reorganized BSA automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred.

### 9.    *Manner of Payment under the Plan*

Except as otherwise specifically provided in the Plan, at the option of Reorganized BSA, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of Reorganized BSA.

### 10.    *Satisfaction of Claims*

Except as otherwise specifically provided in the Plan, any Distributions to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 11.    *Minimum Cash Distributions*

Reorganized BSA shall not be required to make any Distribution of Cash less than twenty dollars ($20) to any holder of an Allowed Claim; *provided, however,* that if any Distribution is not made pursuant to Article VII.K of the Plan, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.

### 12.    *Postpetition Interest*

Except as provided in the Cash Collateral Order or in the following sentence, interest shall not accrue on Impaired Claims; no holder of an Impaired Claim shall be entitled to interest accruing on or after the Petition Date on any such Impaired Claim, and interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.  Notwithstanding the foregoing, each holder of an Allowed General Unsecured Claim shall accrue interest on the Allowed amount of such Claim at the federal judgment rate applicable on the Effective Date; *provided*, that such interest shall be payable to each such holder only from the Core Value Cash Pool and only to the extent that the Core Value Cash Pool shall have been sufficient: (1) first, to satisfy the full amount of all Allowed General Unsecured Claims; and (2) second, on account of any Allowed Non-Abuse Litigation Claims that shall not have elected to be treated as an Allowed Convenience Claim under Article III.B.9 of the Plan, to satisfy any deficiency in payments of such Allowed Claims (a) from available insurance coverage, including Abuse Insurance Policies and Non-Abuse Insurance Policies, (b) from applicable proceeds of any Insurance Settlement Agreements, and (c) from co-liable non-debtors (if any) or their insurance coverage.  Neither the Debtors nor Reorganized BSA shall have any independent obligation to pay interest for or on account of any Allowed General Unsecured Claims other than from the Core Value Cash Pool in accordance with the terms of Article VII.L of the Plan.

### 13.    *Setoffs*

The Debtors and Reorganized BSA may, pursuant to the applicable provisions of the Bankruptcy Code, or applicable non-bankruptcy law, set off against any applicable Allowed Claim (before any Distribution is made on account of such Claim) any and all claims, rights, Causes of Action, debts or liabilities of any nature that the Debtors or Reorganized BSA may hold against the holder of such Allowed Claim; *provided, however*, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, Causes of Action, debts or liabilities.

14.    *Claims Paid or Payable by Third Parties*

(a)    <u>Claims Paid by Third Parties</u>.  A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized BSA.  To the extent a holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized BSA on account of such Claim, such holder shall repay, return, or deliver any Distribution held by or transferred to such holder to Reorganized BSA to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

(b)    <u>Non-Abuse Litigation Claims Payable from Insurance</u>.  Subject to <u>Article IV.D.3</u> of the Plan, no Distributions under the Plan shall be made on account of any Allowed Non-Abuse Litigation Claim that is payable pursuant to an Insurance Policy until the holder of such Allowed Non-Abuse Litigation Claim has exhausted all remedies with respect to such insurance policy, including pursuing such insurance through litigation and obtaining entry of a final, non-appealable order.  To the extent that one or more of the Insurance Companies satisfies in full or in part an Allowed Non-Abuse Litigation Claim, then immediately upon such satisfaction, the portion of the Claim so satisfied may be expunged from the Claims Register by the Notice and Claims Agent without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

15.    *Compliance with Tax Requirements and Allocations*

In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other mechanisms it believes are reasonable and appropriate.

For tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claim.

P.     <u>Procedures for Resolving Contingent, Unliquidated, and Disputed Claims</u>

**1.**     *Applicability*

All Disputed Claims against the Debtors, other than Administrative Expense Claims, shall be subject to the provisions of <u>Article VIII</u> of the Plan.  All Administrative Expense Claims shall be determined and, if Allowed, paid in accordance with <u>Article II</u> of the Plan.  None of the terms or provision of <u>Article VIII</u> of the Plan shall apply to Abuse Claims, which shall be exclusively processed, liquidated and paid by the Settlement Trust in accordance with the Settlement Trust Documents.

**2.**     *Allowance of Claims*

After the Effective Date, Reorganized BSA shall have and retain any and all rights and defenses that the Debtors, or either of them, had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim becomes Allowed by Final Order of the Bankruptcy Court or by agreement between the Debtors or Reorganized BSA, on the one hand, and the holder of such Claim, on the other.

**3.**     *Claims Administration Responsibilities*

(a)     Except as otherwise expressly provided in the Plan, from and after the Effective Date, Reorganized BSA shall have the authority (1) to file, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

(b)     Reorganized BSA shall consult with the Creditor Representative in connection with the reconciliation, settlement and administration of Convenience Claims, General Unsecured Claims and Non-Abuse Litigation Claims and shall use commercially reasonable efforts to resolve such Claims before the applicable Claims Objection Deadline.

**4.**     *Estimation of Claims*

The Debtors (before the Effective Date) or Reorganized BSA (on and after the Effective Date) may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any Person.  If the estimated amount of a Claim constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or Reorganized BSA (on and after the Effective Date) may elect to pursue any supplemental

proceedings to object to any ultimate Distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 5.    *No Distributions Pending Allowance*

No Distributions or other consideration shall be paid with respect to any Claim that is a Disputed Claim unless and until all objections to such Disputed Claim are resolved and such Disputed Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court or agreement between the Debtors or Reorganized BSA, on the one hand, and the holder of such Claim, on the other.

### 6.    *Distributions After Allowance*

To the extent that a Disputed Claim (or a portion thereof) becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.

### 7.    *Disputed Claims Reserve*

The provisions of <u>Article VIII.G</u> of the Plan apply only to the extent that any General Unsecured Claims remain Disputed as of any Distribution Date.

(a)    If any General Unsecured Claims remain Disputed as of any Distribution Date, the undistributed portion of the Core Value Cash Pool shall be held in a segregated account. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination from the IRS, the Disbursing Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtors, Reorganized BSA, the Disbursing Agent, and holders of General Unsecured Claims) shall be required to report for tax purposes in a manner consistent with the foregoing. The Disputed Claims Reserve shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.

(b)    The Debtors or Reorganized BSA, as applicable, with the consent of the Creditor Representative, shall determine the amount of the Disputed Claims Reserve, if applicable, as of the initial Distribution Date, based on the least of: (a) the asserted amount of the Disputed General Unsecured Claims in the applicable Proofs of Claim; (b) the amount, if any, estimated by the Bankruptcy Court pursuant to (i) section 502(c) of the Bankruptcy Code or (ii) <u>Article VIII.D</u> of the Plan if, after the Effective Date, a motion is filed by Reorganized BSA to estimate such Claim; (c) the amount otherwise agreed to by the Debtors (or Reorganized BSA, if after the Effective Date) and the holders of such Disputed General Unsecured Claims; or (d) any amount otherwise approved by the Bankruptcy Court. Upon each Distribution Date, Reorganized BSA shall deposit into the Disputed Claims Reserve an amount of Cash equal to the amount sufficient to make the

Distributions to which holders of Disputed General Unsecured Claims would be entitled under the Plan as of the applicable Distribution Date if the Disputed General Unsecured Claims were Allowed Claims as of such date.

(c)     If a Disputed General Unsecured Claim becomes an Allowed Claim after the first Distribution Date, the Disbursing Agent shall, on the next Distribution Date after the Disputed General Unsecured Claim becomes an Allowed Claim (or, if the Disputed General Unsecured Claim becomes an Allowed Claim after the final Distribution Date, as soon as practicable after Allowance), Distribute to the holder of such Claim, exclusively from the Disputed Claims Reserve, the amount of Cash that such holder would have received in that Distribution and all prior Distributions (if any) if such holder's General Unsecured Claim had been Allowed as of the Effective Date, net of any allocable taxes imposed thereon or otherwise payable by the Disputed Claims Reserve.

(d)     If a Disputed Claim is Disallowed, in whole or in part, then on the Distribution Date next following the date of Disallowance, Cash shall be released from the Disputed Claims Reserve and placed in the Core Value Cash Pool, which Cash shall then be unreserved and unrestricted, and which shall be available for Distribution to holders of Allowed General Unsecured Claims.

(e)     If any assets remain in the Disputed Claims Reserve after all Disputed General Unsecured Claims have been resolved, such assets shall be placed in the Core Value Cash Pool and distributed Pro Rata to all holders of Allowed General Unsecured Claims on the next Distribution Date (or, if all Disputed General Unsecured Claims are resolved after the final Distribution Date, as soon as practicable thereafter).

**8.      *Adjustment to Claims Register without Objection***

Any duplicate Proof of Claim that has been paid or satisfied, or any Proof of Claim that is clearly marked as amended or superseded by a subsequently filed Proof of Claim that remains on the Claims Register, may be adjusted or expunged on the Claims Register by the Notice and Claims Agent at the direction of Reorganized BSA upon stipulation between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**9.      *Time to File Objections to Claims***

Any objections to Claims must be filed on or before the applicable Claims Objection Deadline, as such deadline may be extended from time to time.  The expiration of the Claims Objection Deadline shall not limit or affect the Debtors' or Reorganized BSA's rights to dispute Claims asserted in the ordinary course of the Debtors or Reorganized BSA's non-profit operations other than through a Proof of Claim.

**10.     *Treatment of Untimely Claims***

Except as provided herein or otherwise agreed, any and all creditors that have filed Proofs of Claim after the applicable Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting and distribution.

Q.    Discharges, Channeling Injunction, Releases, Exculpations and Injunctions; Survival of Indemnification and Exculpation Obligations

1.    *Discharge*

a.    Discharge of the Debtors

Except as expressly provided in the Plan or the Confirmation Order, the treatment of Claims under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, termination and release of, all Claims and Interests of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, and, as of the Effective Date, each of the Debtors shall be deemed discharged and released, and each holder of a Claim or Interest and any successor, assign, and Affiliate of such holder shall be deemed to have forever waived, discharged and released each of the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities, and all debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, in each case whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been Disallowed by order of the Bankruptcy Court, or (d) the holder of a Claim based upon such debt is deemed to have accepted the Plan.  Notwithstanding the foregoing, nothing in Article X.E of the Plan shall be construed to modify, reduce, impair or otherwise affect the ability of any holder of an Allowed Non-Abuse Litigation Claim to recover on account of such Allowed Claim in accordance with Article III.B.9 and Article IV.D.3 of the Plan.

b.    Discharge Injunction

From and after the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all holders of Claims or Interests of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date that are discharged pursuant to the terms of the Plan shall be precluded and permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims and Interests: (a) commencing or continuing any action or other proceeding of any kind against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; (b) enforcing, attaching, collecting, or recovering by any manner or means of judgment, award, decree or other against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; (c) creating, perfecting or enforcing any Lien or Encumbrance of any kind against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; or (d) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  The foregoing injunction shall extend to the successors and assigns of the Debtors (including Reorganized BSA) and its and their respective properties and interests in property.  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims,

Interests and other debts and liabilities against or in the Debtors pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time to the extent such judgment relates to a discharged Claim or Interest.

    **2.**    *Channeling Injunction*

    a.    **Terms**

    **(i)**    **Notwithstanding anything to the contrary in the Plan, to preserve and promote the settlements contemplated by and provided for in the Plan, including the Abuse Claims Settlement, the Hartford Insurance Settlement, and the TCJC Settlement, and to supplement, where necessary, the injunctive effect of the Discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in <u>Article X</u> of the Plan, pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, (a) the sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party, and (b) the sole recourse of any holder of a Post-1975 Chartered Organization Abuse Claim against a Limited Protected Party on account of such Post-1975 Chartered Organization Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party; accordingly, on and after the Effective Date, all Persons that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Abuse Claim against the Protected Parties, or any of them, or any Post-1975 Chartered Organization Abuse Claim against the Limited Protected Parties, or any of them, shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment, satisfaction, or recovery from any Protected Party with respect to any such Abuse Claim or from any Limited Protected Party with respect to any such Post-1975 Chartered Organization Abuse Claim, other than from the Settlement Trust pursuant to the Settlement Trust Documents, including:**

    **1.**    **commencing, conducting, or continuing, in any manner, whether directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or Limited Protected Party or any property or interest in property of any Protected Party or Limited Protected Party;**

    **2.**    **enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against or**

affecting any Protected Party or Limited Protected Party or any property or interest in property of any Protected Party or Limited Protected Party;

3.      creating, perfecting, or otherwise enforcing in any manner, whether directly or indirectly, any Encumbrance of any kind against any Protected Party or Limited Protected Party or any property or interest in property of any Protected Party or Limited Protected Party;

4.      asserting, implementing or effectuating any setoff, right of reimbursement, subrogation, indemnity, contribution, reimbursement, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party or Limited Protected Party or any property or interest in property of any Protected Party or Limited Protected Party; or

5.      taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents or the Settlement Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Settlement Trust, except in conformity and compliance with the Settlement Trust Documents with respect to any such Abuse Claim or Post-1975 Chartered Organization Abuse Claim.

b.      **Reservations**

Notwithstanding anything to the contrary in **Article X.F** of the Plan, the Channeling Injunction shall not enjoin:

(i)      the rights of holders of Abuse Claims or Post-1975 Chartered Organization Abuse Claims to assert such Abuse Claims solely against the Settlement Trust in accordance with the Trust Distribution Procedures, including the ability to pursue the Settlement Trust in the tort system as described in **Article XII** of the Trust Distribution Procedures;

(ii)      the rights of holders of Abuse Claims to assert such Abuse Claims against anyone other than a Protected Party or, in the case of Post-1975 Chartered Organization Abuse Claims, against anyone other than a Limited Protected Party;

(iii)      prior to the date that an Entity (other than an Insurance Company) becomes a Protected Party under **Article IV.I** of the Plan, the right of holders of Abuse Claims to assert such Abuse Claims against such Entity;

(iv)      prior to the date that a Chartered Organization becomes a Limited Protected Party under **Article IV.J** of the Plan, the right of holders of Post-

**1975 Chartered Organization Abuse Claims to assert such Abuse Claims against such Entity;**

**(v)      the rights of holders of Abuse Claims that are not Post-1975 Chartered Organization Abuse Claims to assert such Abuse Claims against any Limited Protected Party (unless such Limited Protected Party becomes a Protected Party under <u>Article IV.I</u> of the Plan);**

**(vi)      the right of any Person to assert any Claim, debt, obligation or liability for payment of Settlement Trust Expenses solely against the Settlement Trust in accordance with the Settlement Trust Documents;**

**(vii)      the Settlement Trust from enforcing its rights under the Plan and the Settlement Trust Documents; or**

**(viii)      the rights of the Settlement Trust to prosecute any action against any Non-Settling Insurance Company based on or arising from Abuse Insurance Policies that are not the subject of an Insurance Settlement Agreement, subject to any Insurance Coverage Defenses.**

**3.      *Provisions Relating to Channeling Injunction***

    a.      **Modifications**

Subject to post-Effective Date settlements between the Settlement Trustee and Chartered Organizations or Insurance Companies under the applicable provisions of Article IV of the Plan, there can be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

    a.      **Non-Limitation.**

Nothing in the Plan or the Settlement Trust Documents shall or shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction or the Settlement Trust's assumption of all liability with respect to Abuse Claims.

    b.      **Bankruptcy Rule 3016 Compliance**

The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute or be deemed to constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

    c.      **Enforcement**

Any Protected Party or Limited Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party or Limited Protected Party that is enjoined under the Plan as to such Protected Party or Limited Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.

d.    **Contribution Claims**

If a Non-Settling Insurance Company asserts that it has rights, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation or other similar claims directly or indirectly arising out of or in any way relating to such Non-Settling Insurance Company's payment of loss on behalf of one or more of the Debtors in connection with any Abuse Claim against a Settling Insurance Company (collectively, "Contribution Claims"), (a) such Contribution Claims may be asserted as a defense or counterclaim against the Settlement Trust in any Insurance Action involving such Non-Settling Insurance Company, and the Settlement Trust may assert the legal or equitable rights (if any) of the Settling Insurance Company, and (b) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such Non-Settling Insurance Company to the Settlement Trust shall be reduced by the amount of such Contribution Claims.

e.    **No Duplicative Recovery**

In no event shall any holder of an Abuse Claim or a Post-1975 Chartered Organization Abuse Claim be entitled to receive any duplicative payment, reimbursement, or restitution from any Protected Party or Limited Protected Party under any theory of liability for the same loss, damage, or other Claim that is reimbursed by the Settlement Trust or is otherwise based on the same events, facts, matters, or circumstances that gave rise to the applicable Abuse Claim or Post-1975 Chartered Organization Abuse Claim.

f.    **District Court Approval**

The Debtors shall seek entry of the Affirmation Order, which shall approve (a) the Channeling Injunction and the Settlement Trust's assumption of all liability with respect to Abuse Claims and (b) the releases by holders of Abuse Claims for the benefit of the Protected Parties and the Limited Protected Parties, each as set forth in Article X of the Plan.

**4.    *Insurance Entity Injunction***

a.    **Purpose**

**To facilitate the Insurance Assignment, protect the Settlement Trust, and preserve the Settlement Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue the injunction set forth in Article X.H of the Plan (the "Insurance Entity Injunction"); *provided, however*, that the Insurance Entity Injunction is not issued for the benefit of any Insurance Company, and no Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Insurance Settlement Agreement.**

b.    **Terms Regarding Claims against Insurance Companies**

**Subject to the terms of Article X.E and Article X.F of the Plan, and except for any Chartered Organization that is not a Participating Chartered Organization or a Contributing Chartered Organization, all Persons that have held or asserted, that hold or**

assert, or that may in the future hold or assert any claim or cause of action (including any Abuse Claim or any claim for or respecting any Settlement Trust Expense) against any Insurance Company based upon, attributable to, arising out of, or in any way connected with any Abuse Insurance Policy, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim or cause of action, including:

> (i)     commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Insurance Company, or against the property of any Insurance Company, with respect to any such claim, demand, or cause of action (including, for the avoidance of doubt, directly pursuing any suit, action, or other proceeding with respect to any such claim, demand, or cause of action against any Insurance Company);

> (i)     enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Insurance Company, or against the property of any Insurance Company, with respect to any such claim or cause of action;

> (ii)     creating, perfecting, or enforcing in any manner, directly or indirectly, any Lien or Encumbrance against any Insurance Company, or the property of any Insurance Company, with respect to any such claim or cause of action; and

> (iii)     except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Insurance Company, or against the property of any Insurance Company, with respect to any such claim or cause of action;

*provided, however,* that: (i) the injunction set forth in <u>Article X.H</u> of the Plan shall not impair in any way any (a) actions brought by the Settlement Trust against any Non-Settling Insurance Company, (b) actions brought by Local Councils in connection with any Local Council Reserved Rights, (c) actions brought by holders of Non-Abuse Litigation Claims consistent with <u>Article IV.D.3</u> of the Plan, (d) the rights, if any, of any Chartered Organization that is not a Participating Chartered Organization under any Chartered Organization Reserved Policy, or (e) the rights of any co-insured of the Debtors (x) under any Non-Abuse Insurance Policy and (y) as specified under any Final Order of the Bankruptcy Court approving an Insurance Settlement Agreement; and (ii) the Settlement Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in <u>Article X.H</u> of the Plan with respect to any Non-

Settling Insurance Company, in accordance with the Settlement Trust Documents, upon express written notice to such Non-Settling Insurance Company, except that the Settlement Trust shall not have any authority to terminate, reduce or limit the scope of the injunction herein with respect to any Settling Insurance Company so long as, but only to the extent that, such Settling Insurance Company complies fully with its obligations under any applicable Insurance Settlement Agreement.

c.    **Reservations**

Notwithstanding anything to the contrary in <u>Article X.H</u> of the Plan, the Insurance Entity Injunction shall not enjoin:

(i)    the rights of any Person to the treatment accorded them under the Plan, as applicable, including the rights of holders of Abuse Claims to assert such Claims, as applicable, in accordance with the Trust Distribution Procedures, and the rights of holders of Non-Abuse Litigation Claims to assert such Claims, as applicable in accordance with <u>Article IV.D.3</u> of the Plan;

(ii)    the rights of any Person to assert any claim, debt, obligation, cause of action or liability for payment of Settlement Trust Expenses against the Settlement Trust;

(iii)    the rights of the Settlement Trust to prosecute any action based on or arising from Abuse Insurance Policies;

(iv)    the rights of any Person to assert or prosecute (i) an Abuse Claim against any Entity other than a Protected Party, or (ii) a Post-1975 Chartered Organization Abuse Claim against any Entity other than a Limited Protected Party;

(v)    the rights of the Settlement Trust to assert any claim, debt, obligation, cause of action or liability for payment against an Insurance Company based on or arising from the Abuse Insurance Policies; or

(vi)    the rights of any Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any Non-Settling Insurance Company.

**5.**    *Injunction Against Interference with Plan*

Upon entry of the Confirmation Order, all holders of Claims and Interests shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

6.      *Releases*

    a.      **Releases by the Debtors and the Estates of the Released Parties**

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate and implement the reorganization of the Debtors and settlements embodied in the Plan, including the Abuse Claims Settlement, the JPM / Creditors' Committee Settlement, the Hartford Insurance Settlement, and the TCJC Settlement, as an integral component of the Plan, the Debtors, Reorganized BSA, and the Estates shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Estate Causes of Action that do not constitute Settlement Trust Causes of Action, any and all other Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtors and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Cases, any of the Plan Documents, the JPM / Creditors' Committee Settlement, the Hartford Insurance Settlement, the TCJC Settlement, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the negotiation, formulation, preparation or implementation thereof, the pursuit of Confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in <u>Article X.J.1</u> of the Plan shall not, and shall not be construed to: (a) release any Released Party from Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct; or (b) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan.**

    b.      **Releases by the Debtors and the Estates of Certain Avoidance Actions**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of Creditors' Committee and its members in their respective capacities as such in facilitating and implementing the reorganization of the**

Debtors, as an integral component of the Plan, the Debtors, Reorganized BSA, and the Estates shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all holders of General Unsecured Claims, Non-Abuse Litigation Claims, and Convenience Claims of and from any and all Avoidance Actions.

     c.     **Releases by the Debtors and the Estates of the Local Councils, the Contributing Chartered Organizations, and the Participating Chartered Organizations**

In furtherance of the Abuse Claims Settlement, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, on their own behalf and as representatives of their respective Estates, and Reorganized BSA, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Local Councils, the Contributing Chartered Organizations and the Participating Chartered Organizations of and from any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Debtors, their Estates, or Reorganized BSA have, had, may have, or may claim to have: (a) against any of the Local Councils and Contributing Chartered Organizations with respect to any Abuse Claims and (b) against any of the Participating Chartered Organizations with respect to any Post-1975 Chartered Organization Abuse Claims (collectively, the "<u>Scouting Released Claims</u>").

     d.     **Releases by Holders of Abuse Claims**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Protected Parties and the Limited Protected Parties to facilitate and implement the reorganization of the Debtors, including the settlements embodied in the Plan, including the Abuse Claims Settlement and the Settlement, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release: (a) each and all of the Protected Parties and their respective property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims; and (b) each and all of the Limited Protected Parties and their respective property and successors and assigns of and from all Post-1975 Chartered Organization Abuse Claims and any and all Claims and Causes of Action

whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Post-1975 Chartered Organization Abuse Claims; *provided, however*, that the releases set forth in <u>Article X.J.3</u> of the Plan shall not, and shall not be construed to: (i) release any Protected Party or Limited Protected Party from Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct; (ii) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; or (iii) modify, reduce, impair or otherwise affect the ability of any holder of an Abuse Claim to recover on account of such Claim in accordance with Article III.B.10 or Article III.B.11 of the Plan, as applicable.

e.      **Releases by Holders of Claims**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate and implement the reorganization of the Debtors and the settlements embodied in the Plan, including the JPM / Creditors' Committee Settlement, the Hartford Insurance Settlement, and the TCJC Settlement, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all Releasing Claim holders shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtors and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Cases, any of the Plan Documents, the JPM / Creditors' Committee Settlement, the Hartford Insurance Settlement, the TCJC Settlement, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the negotiation, formulation, preparation or implementation thereof, the pursuit of Confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the

foregoing; *provided, however*, that the releases set forth in <u>Article X.J.4</u> of the Plan shall not, and shall not be construed to: (a) release any Released Party from Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct; (b) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; or (c) modify, reduce, impair, or otherwise affect the ability of any holder of an Allowed Non-Abuse Litigation Claim to recover on account of such Allowed Claim in accordance with <u>Article III.B.9</u> of the Plan.  Notwithstanding the foregoing or anything to the contrary herein, (i) with respect to holders of Allowed General Unsecured Claims or Allowed Non-Abuse Litigation Claims, nothing in the Plan or the release set forth in <u>Article X.J.4</u> of the Plan shall, or shall be construed to, release any claims or Causes of Action against any Local Council, Chartered Organization (other than a Contributing Chartered Organization), or Non-Settling Insurance Company (subject to <u>Article IV.D.3</u>) and (ii) nothing the Plan or the release set forth in <u>Article X.J.4</u> of the Plan shall, or shall be construed to, release any claims or Causes of action asserted by Century Indemnity Company against Sidley Austin related to Sidley Austin's representation of the Debtors prior to the Petition Date.

    f.  **Releases Among Contributing Chartered Organizations and Settlement Parties**

   **In furtherance of the Abuse Claims Settlement, as of the date that the Confirmation Order and Affirmation Order become Final Orders, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Confirmation Order, and the terms of the TCJC Settlement Agreement, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Contributing Chartered Organizations, including TCJC, shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge the Debtors, Reorganized BSA, the Related Non-Debtor Entities, the Local Councils, the other Protected Parties, the Limited Protected Parties, the Settling Insurance Companies, including Hartford, the Future Claimants' Representative, the Coalition, the Settlement Trust, and each of its and their respective Representatives (collectively, the "<u>Settlement Parties</u>"), of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the date that the Confirmation Order and Affirmation Order become Final Orders (including before the Petition Date) in connection with or related to (i) Abuse Claims, (ii) the Chapter 11 Cases, (iii) the Plan, or (iv) any Claims relating to the Debtors or the Related Non-Debtor Entities that were or could have been asserted by the Contributing Chartered Organizations against the Settlement Parties or any of them.**

   **In furtherance of the Abuse Claims Settlement, as of the date that the Confirmation Order and Affirmation Order become Final Orders, except for the rights that remain in**

effect from and after the Effective Date to enforce the Plan, the Confirmation Order, and the terms of the TCJC Settlement Agreement, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Settlement Parties shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each of the Contributing Chartered Organizations, including TCJC, of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the date that the Confirmation Order and Affirmation Order become Final Orders (including before the Petition Date) in connection with or related to (i) Abuse Claims, (ii) the Chapter 11 Cases, (iii) the Plan, or (iv) any Claims relating to the Debtors or the Related Non-Debtor Entities that were or could have been asserted by the Settlement Parties against the Contributing Chartered Organizations or any of them.

g.       **Releases Relating to Settling Insurance Companies.**

The releases of Settling Insurance Companies and certain other parties, and the releases by Settling Insurance Companies, each as set forth in the Insurance Settlement Agreements, including the Hartford Insurance Settlement Agreement, are incorporated by reference as if fully set forth in the Plan.

7.    *Exculpation*

From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance occurring on or before the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases, the negotiation of the Plan Documents, JPM / Creditors' Committee Settlement, the Hartford Insurance Settlement Agreement, the TCJC Settlement Agreement, the Releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be Distributed under the Plan, or the management or operation of the Debtors (except for any liability that results primarily from such Exculpated Party's gross negligence, bad faith or willful misconduct).  In all respects, each and all such Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the matters referenced in the preceding sentence.  Notwithstanding the foregoing or any provision of the Plan to the contrary, Sidley Austin shall not be an Exculpated Party with respect to any Claims that Century asserts against Sidley Austin related to Sidley Austin's representation of the Debtors prior to the Petition Date.

8. *Injunctions Related to Releases and Exculpation*

a. **Injunction Related to Releases**

As of the Effective Date, all holders of Claims that are the subject of <u>Article X.J</u> of the Plan are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under <u>Article X.E</u> of the Plan or released under <u>Article X.J</u> of the Plan; *provided, however*, that the injunctions set forth in <u>Article X.L.1</u> of the Plan shall not, and shall not be construed to, enjoin any holder of a Claim that is the subject of <u>Article X.J</u> of the Plan from taking any action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct.

b. **Injunction Related to Exculpation**

As of the Effective Date, all holders of Claims that are the subject of <u>Article X.K</u> of the Plan are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under <u>Article X.E</u> of the Plan or released under <u>Article X.J</u> of the Plan; *provided, however*, that the injunctions set forth in <u>Article X.L.2</u> of the Plan shall not, and shall not be construed to, enjoin any Person that is the subject of <u>Article X.K</u> of the Plan from taking any action arising out of, or related to, any act or omission of a Exculpated Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct.

R.    Reservation of Rights

Notwithstanding any other provision of the Plan to the contrary, no provision of Article X of the Plan shall be deemed or construed to satisfy, discharge, release or enjoin claims by the Settlement Trust, the Reorganized BSA, or any other Person, as the case may be, against (1) the Settlement Trust for payment of Abuse Claims in accordance with the Trust Distribution Procedures, (2) the Settlement Trust for the payment of Settlement Trust Expenses, or (3) any Insurance Company that has not performed under an Insurance Policy or an Insurance Settlement Agreement.

S.    Disallowed Claims

On and after the Effective Date, the Debtors and Reorganized BSA shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any order Disallowing a Claim that is not a Final Order as of the Effective Date solely because of a Person's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

T.    No Successor Liability

Except as otherwise expressly provided in the Plan, Reorganized BSA does not, pursuant to the Plan or otherwise, assume, agree to perform, pay or indemnify any Person, or otherwise have any responsibility for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on or after the Effective Date. Neither the Debtors, Reorganized BSA, nor the Settlement Trust is, or shall be deemed to be, a successor to any of the Debtors by reason of any theory of law or equity (except as otherwise provided in Article IV.C of the Plan), and none shall have any successor or transferee liability of any kind or character; *provided, however*, that Reorganized BSA and the Settlement Trust shall assume and remain liable for their respective obligations specified in the Plan and the Confirmation Order.

U.    Indemnities

**1.    *Indemnification Obligations***

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by Reorganized BSA effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, except for any Indemnification Obligation that is or is asserted to be owed to or for the benefit of any Perpetrator. Subject to the foregoing sentence, each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose. For the avoidance of doubt, Article VI.J of the Plan affects only the obligations of the Debtors and Reorganized BSA with respect to any Indemnification Obligations owed to or for the benefit of past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, and shall have no effect on nor in any way discharge or reduce, in whole or in part, any

obligation of any other Person owed to or for the benefit of such directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors.

All Proofs of Claim filed on account of an Indemnification Obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

### 2. *Prepetition Indemnification and Reimbursement Obligations*

The respective obligations of the Debtors to indemnify and reimburse Persons who are or were directors, officers or employees of the Debtors on the Petition Date or at any time thereafter up to and including the Effective Date, against and for any obligations pursuant to the bylaws, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, shall, except with respect to any Perpetrator: (a) survive Confirmation of the Plan and remain unaffected thereby; (b) be assumed by Reorganized BSA as of the Effective Date; and (c) not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date. In furtherance of, and to implement the foregoing, as of the Effective Date, Reorganized BSA shall obtain and maintain in full force insurance for the benefit of each and all of the above-indemnified directors, officers and employees, at levels no less favorable than those existing as of the date of entry of the Confirmation Order, and for a period of no less than three (3) years following the Effective Date.

### 3. *Plan Indemnity*

In addition to the matters set forth above and not by way of limitation thereof, Reorganized BSA shall indemnify and hold harmless all Persons who are or were officers or directors of the Debtors on the Petition Date or at any time thereafter up to and including the Effective Date on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including attorneys' fees) on account of claims or Causes of Action threatened or asserted by any third party against such officers or directors that seek contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtors' Estates.

### 4. *Limitation on Indemnification*

Notwithstanding anything to the contrary set forth in the Plan or elsewhere, neither the Debtors, Reorganized BSA, the Local Councils, nor the Contributing Chartered Organizations, as applicable, shall be obligated to indemnify or hold harmless any Person for any claim, cause of action, liability, judgment, settlement, cost or expense that results primarily from (i) such Person's bad faith, gross negligence or willful misconduct or (ii) an Abuse Claim.

V.    The Official Committees and the Future Claimants' Representative

Except as otherwise described in the Settlement Trust Documents with respect to the Future Claimants' Representative, the Official Committees and the Future Claimants' Representative

shall continue in existence until the Effective Date, and after the Effective Date for the limited purposes of: prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date. The Debtors shall pay the reasonable fees and actual and necessary expenses incurred by the Official Committees and the Future Claimants' Representative up to the Effective Date, and after the Effective Date solely for the purposes set forth in the preceding sentence, in accordance with the Compensation Procedures Order, the Fee Examiner Order, and the terms of the Plan, including Article II of the Plan. As of the Effective Date, the members of the Creditors' Committee shall be released and discharged from all further authority, duties, responsibilities, liabilities, and obligations involving the Chapter 11 Cases. Upon the closing of the Chapter 11 Cases, the Official Committees shall be dissolved. Neither the Debtors nor Reorganized BSA have any obligation to pay fees or expenses of any Professional retained by the Official Committees or the Future Claimants' Representative that are earned or incurred before the Effective Date to the extent such fees or expenses (or any portion thereof) qualify as Settlement Trust Expenses, in which case such fees and expenses (or the applicable portion thereof) shall be paid by the Settlement Trust in accordance with the Settlement Trust Documents.

W.    Retention of Jurisdiction

Until the Chapter 11 Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out. Except as otherwise provided in the Plan or the Settlement Trust Agreement, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce the Insurance Actions, the Settlement Trust Causes of Action, and all other Causes of Action which may exist on behalf of the Debtors. Nothing contained herein shall prevent Reorganized BSA or the Settlement Trust, as applicable, from taking such action as may be necessary in the enforcement of any Estate Cause of Action, Insurance Action, Settlement Trust Cause of Action, or other Cause of Action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which actions or other Causes of Action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein. Nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (1) the Bankruptcy Court in fact has jurisdiction with respect to any Insurance Action, (2) any such jurisdiction is exclusive with respect to any Insurance Action, or (3) abstention or dismissal of any Insurance Action pending in the Bankruptcy Court or the District Court as an adversary proceeding is or is not advisable or warranted, so that another court can hear and determine such Insurance Action(s). Any court other than the Bankruptcy Court that has jurisdiction over an Insurance Action shall have the right to exercise such jurisdiction.[106]

1.    *General Retention*

Following Confirmation of the Plan, the administration of the Chapter 11 Cases will continue until the Chapter 11 Cases are closed by a Final Order of the Bankruptcy Court. The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claims and

---

[106] The Allianz Insurers and certain other Insurance Companies contest the Debtors' retention of jurisdiction provisions under Article VI(w) of the Disclosure Statement and Article XI of the Plan that purport to provide the Bankruptcy Court or the District Court with jurisdiction over the Insurance Coverage Actions.

the re-examination of Claims which have been Allowed for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claims. The failure by the Debtors or Reorganized BSA to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the rights of the Debtors, Reorganized BSA, or the Settlement Trust, as the case may be, to object to or reexamine such Claim in whole or part.

## 2. *Specific Purposes*

In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction, as enumerated in <u>Article XI.C</u> of the Plan, over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan, including jurisdiction to:

(a)     modify the Plan after Confirmation pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b)     correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance in the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(c)     assure performance by the Settlement Trust and the Disbursing Agent of their respective obligations to make distributions under the Plan;

(d)     enforce and interpret the terms and conditions of the Plan, the Plan Documents, the Settlement Trust Documents, the DST Agreement, and any Insurance Settlement Agreements;

(e)     enter such orders or judgments, including injunctions (a) as are necessary to enforce the title, rights and powers of Reorganized BSA, and the Settlement Trust, (b) to execute, implement, or consummate the provisions of the Plan, the Confirmation Order, and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or the Confirmation Order, and (c) as are necessary to enable holders of Claims to pursue their rights against any Person that may be liable therefor pursuant to applicable law or otherwise;

(f)     hear and determine any and all motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(g)     hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters, including

contested matters arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Chapter 11 Cases;

(h)    hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code;

(i)    hear and determine any Causes of Action arising during the period from the Petition Date to the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtors, Reorganized BSA, the Settlement Trust, the DST, and their respective Representatives;

(j)    determine any and all motions for the rejection, assumption or assignment of Executory Contracts or Unexpired Leases and the Allowance of any Claims resulting therefrom;

(k)    hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)    hear and determine the Allowance and/or Disallowance of any Claims, including Administrative Expense Claims, against or Interests in the Debtors or their Estates, including any objections to any such Claims or Interests, and the compromise and settlement of any Claim, including Administrative Expense Claims, against or Interest in the Debtors or their Estates;

(m)    hear and resolve disputes concerning any reserves under the Plan or the administration thereof;

(n)    hear and determine all questions and disputes regarding title to the assets of the Debtors or their Estates, or the Settlement Trust;

(o)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan or under the Settlement Trust Documents are enjoined or stayed;

(p)    hear and determine all questions and disputes regarding, and to enforce, the Abuse Claims Settlement;

(q)    hear and determine the Insurance Actions, any Settlement Trust Cause of Action and any similar claims, Causes of Action or rights of the Settlement Trust to construe and take any action to enforce any Abuse Insurance Policy, and to issue such orders as may be necessary for the execution, consummation and implementation of any Abuse Insurance Policy, and to determine all questions and issues arising thereunder; *provided*, that such retention of jurisdiction shall not constitute a waiver of any right of a Non-

Settling Insurance Company to seek to remove or withdraw the reference of any Insurance Action filed after the Effective Date;

(r)     hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Cases;

(s)     resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, the Bar Date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(t)     enter in aid of implementation of the Plan such orders as are necessary, including the implementation and enforcement of the Injunctions, Releases, and Discharges described in the Plan, including the Channeling Injunction;

(u)     hearing a petition for relief by a Specified Person or any other party in interest in the event that a court or tribunal hearing an Abuse Cause of Action fails to apply the judgment reduction provisions of Article X.N of the Plan;

(v)     approve any Post-Effective Date Chartered Organization Settlement and determine the adequacy of notice of a motion by the Settlement Trustee to approve such a settlement;

(w)     approve any extension of the Insurance Settlement Period, approve any Post-Effective Date Insurance Settlement and determine the adequacy of notice of a Post-Effective Date Insurance Settlement provided by the Settlement Trustee;

(x)     hear and determine any questions and disputes pertaining to, and to enforce, the Abuse Claims Settlement, including the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, including the TCJC Settlement Contribution, the Participating Chartered Organization Settlement Contribution, and the Hartford Settlement Contribution;

(y)     hear and determine any questions and disputes pertaining to, and to enforce, the JPM / Creditors' Committee Settlement;

(z)     hear and determine any questions and disputes pertaining to, and to enforce, the Hartford Insurance Settlement;

(aa)    hear and determine any questions and disputes pertaining to, and to enforce, the TCJC Settlement;

(bb)    hear and determine all questions and disputes regarding matters pertaining to the DST Agreement;

(cc)    enter a Final Order or decree concluding or closing the Chapter 11 Cases; and

(dd)    to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Settlement Trust, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, to violate, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Abuse Insurance Policies; *provided, however*, that (a) such orders shall not impair the Insurance Coverage Defenses or the rights, claims, or defenses, if any, of any Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other Final Orders entered in the Debtors' Chapter 11 Cases, (b) this provision does not, in and of itself, grant this Court jurisdiction to hear and decide disputes arising out of or relating to the Abuse Insurance Policies, and (c) all interested parties, including any Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

As of the Effective Date, notwithstanding anything in <u>Article XI</u> of the Plan to the contrary, the Restated Debt and Security Documents and any documents related thereto shall be governed by the jurisdictional provisions thereof and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

### 3.    *Courts of Competent Jurisdiction*

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in <u>Article XI</u> of the Plan shall be deemed to be replaced by the "District Court." If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

X.    <u>Miscellaneous Provisions</u>

### 1.    *Closing of Chapter 11 Cases*

After each Chapter 11 Case has been fully administered, Reorganized BSA shall file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case.

### 2.    *Amendment or Modification of the Plan*

(a)    <u>Plan Modifications</u>. Subject to the terms of the JPM / Creditors' Committee Term Sheet, the Debtors reserve the right, in accordance with the Bankruptcy Code and the

Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and after entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code unless section 1127 of the Bankruptcy Code requires additional disclosure.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  All amendments to the Plan (a) must be reasonably acceptable to JPM and the Creditors' Committee to the extent they pertain to the treatment of the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims, or the 2012 Bond Claims (in the case of JPM) or Convenience Claims, General Unsecured Claims, or Non-Abuse Litigation Claims (in the case of the Creditors' Committee), (b) shall not be inconsistent with the terms of the Hartford Insurance Settlement Agreement, and (c) shall not be inconsistent with the terms of the TCJC Settlement Agreement.  The designation of Chartered Organizations as Contributing Chartered Organizations or Participating Chartered Organizations and the designation of Non-Settling Insurance Companies as Settling Insurance Companies after the Effective Date in accordance with Article IV.I, Article IV.J, or Article IV.K of the Plan shall not be a modification or amendment to the Plan and instead is an act that may be done to effectuate the terms of the Plan.

(b)    Other Amendments.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

**3.    *Revocation or Withdrawal of the Plan***

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Plan has been revoked or withdrawn prior to the Effective Date, or if Confirmation of the Plan or the occurrence of the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, including the Settlement Trust Documents, shall be deemed null and void (except that the Hartford Insurance Settlement Agreement shall remain in full force and effect to the extent provided in such agreement in accordance with its terms); and (3) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim against, or any Interest in, the Debtors or any other Person; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission of any sort by the Debtors or any other Person.

4.      *Request for Expedited Determination of Taxes*

The Debtors and Reorganized BSA, as applicable, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date to and including the Effective Date.

5.      *Non-Severability of Plan Provisions*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or Reorganized BSA (as the case may be), and (3) nonseverable and mutually dependent.

6.      *Notices*

All notices, requests, and demands to or upon the Debtors or Reorganized BSA to be effective shall be in writing (including by email transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

> Boy Scouts of America
> 1325 W. Walnut Hill Lane
> Irving, Texas 75015
> Attn:  Steven McGowan, General Counsel
> Email: Steve.McGowan@scouting.org
>
> with copies to:
>
> White & Case LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> Attn:  Jessica C. Lauria
> Email:  jessica.lauria@whitecase.com
>
> – and –
>
> White & Case LLP

111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Attn: Michael C. Andolina
Matthew E. Linder
Email: mandolina@whitecase.com
        mlinder@whitecase.com

– and –

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Attn: Derek C. Abbott
Email: dabbott@morrisnichols.com

### 7. *Notices to Other Persons*

After the occurrence of the Effective Date, Reorganized BSA has authority to send a notice to any Person providing that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Person must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided, however*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, Reorganized BSA is authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those Persons that have filed such renewed requests.

### 8. *Governing Law*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or any other Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof; *provided, however*, that governance matters relating to Reorganized BSA shall be governed by the laws of the District of Columbia.

### 9. *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of any Person named or referred to in the Plan and the successors and assigns of such Person.

### 10. *Timing of Distributions or Actions*

In the event that any payment, Distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then such payment, Distribution,

act or deadline shall be deemed to occur on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day, shall be deemed to have been completed or to have occurred as of the required date.

### 11.   *Deemed Acts*

Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of the Plan or the Confirmation Order without any further act by any Person.

### 12.   *Entire Agreement*

The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings and documents.   No Person shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

### 13.   *Plan Supplement*

Any and all exhibits, lists, or schedules referred to herein but not filed with the Plan shall be contained in the Plan Supplement to be filed with the Clerk of the Bankruptcy Court prior to the Confirmation Hearing on the Plan, and such Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein.   The Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours, at the website maintained by the Notice and Claims Agent (https://omniagentsolutions.com/BSA), and at the Bankruptcy Court's website (ecf.deb.uscourts.gov).

### 14.   *Withholding of Taxes*

The Disbursing Agent, the Settlement Trust or any other applicable withholding agent, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

### 15.   *Payment of Quarterly Fees*

All Quarterly Fees due and payable prior to the Effective Date shall be paid on or before the Effective Date. The Reorganized Debtors shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Cases, and shall comply with all applicable statutory reporting requirements.

### 16.   *Effective Date Actions Simultaneous*

Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

### 17. *Consent to Jurisdiction*

Upon default under the Plan, Reorganized BSA, the Settlement Trust, the Settlement Trustee, the Official Committees, the Future Claimants' Representative, and the Protected Parties, or any successor thereto, respectively, consent to the jurisdiction of the Bankruptcy Court, and agree that it shall be the preferred forum for all proceedings relating to any such default.

### 18. *Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)*

If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VII. THE SETTLEMENT TRUST AND TRUST DISTRIBUTION PROCEDURES

A.    The Settlement Trust

### 1. *Establishment and Purpose of the Settlement Trust*

The Settlement Trust shall be established on the Effective Date. The Settlement Trust shall be administered and implemented by the Settlement Trustee as provided in the Trust Documents. The purposes of the Settlement Trust shall be to assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to direct the processing, liquidation and payment of all compensable Abuse Claims in accordance with the Settlement Trust Documents. The Settlement Trust Assets include (i) the BSA Settlement Trust Contribution; (ii) the Local Council Settlement Contribution; (iii) the Chartered Organization Settlement Contribution; and (iv) any and all other funds, proceeds or other consideration otherwise contributed to the Settlement Trust pursuant to the Plan or the Confirmation Order or other Final Order of the Bankruptcy Court.

The Settlement Trust shall resolve Abuse Claims in accordance with the Settlement Trust Documents in a fair, consistent, equitable manner, and on a pro rata basis, in compliance with the terms of the Settlement Trust Documents and to the extent of available Settlement Trust Assets. From and after the Effective Date, the Abuse Claims shall be channeled to the Settlement Trust pursuant to the Channeling Injunction set forth in Article X.F of the Plan and may be asserted only and exclusively against the Settlement Trust.

In the event of any ambiguity or conflict between the terms of the Settlement Trust Agreement or any related document required or provided for under the Settlement Trust Documents (other than the Confirmation Order), on the one hand, and the terms of the Plan and the Confirmation Order, on the other hand, the terms of the Plan and the Confirmation Order shall control, notwithstanding that the Settlement Trust Agreement and related documents required or provided for under the Settlement Trust Documents may be incorporated in or annexed to the Plan or the Confirmation Order.

2. ***Transfer of Claims to the Settlement Trust***

On the Effective Date or as otherwise provided herein, and without further action of any Person, the Settlement Trust shall assume the liabilities, obligations, and responsibilities, financial or otherwise, of (a) the Protected Parties for all Abuse Claims and (b) the Limited Protected Parties for all Post-1975 Chartered Organization Abuse Claims. These assumptions by the Settlement Trust shall not affect (i) the application of the Discharge Injunction or the Channeling Injunction or (ii) any Non-Settling Insurance Company's obligation under any Abuse Insurance Policy or applicable law.

Except as otherwise expressly provided in the Plan, the Settlement Trust Agreement, or the Trust Distribution Procedures, the Settlement Trust shall have control over the Settlement Trust Causes of Action and the Insurance Actions, and the Settlement Trust shall thereby become the estate representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right (except as otherwise provided in Article IV.D.4 of the Plan) to enforce each of the Settlement Trust Causes of Action and the Insurance Actions, and the proceeds of the recoveries on any of the Settlement Trust Causes of Action or the Insurance Actions shall be deposited in and become the property of the Settlement Trust, and the Settlement Trust shall have the right to enforce the Plan and any of the other Plan Documents (including the Document Agreement) according to their respective terms, including the right to receive the Settlement Trust Assets as provided in the Plan; *provided, however*, that (a) the Settlement Trust shall have no other rights against the Protected Parties except to enforce the Plan and any of the other Plan Documents; (b) the Settlement Trust shall have no other rights against the Limited Protected Parties with respect to Post-1975 Chartered Organization Abuse Claims; (c) the Settlement Trust Causes of Action, the Insurance Actions, and the Participating Chartered Organization Insurance Actions shall not include any Claims or Interests fully and finally released, compromised, or settled pursuant to the Plan or any Plan Documents, or any Claims against Hartford released, compromised and settled under the Hartford Insurance Settlement Agreement; and (d) for the avoidance of doubt, the Settlement Trust Causes of Action, the Insurance Actions, and the Participating Chartered Organization Insurance Actions do not include any rights of the Protected Parties or the Limited Protected Parties arising under the Channeling Injunction or any of the Injunctions, Releases, or Discharges granted under the Plan and the Confirmation Order.

3. ***Transfer of Settlement Trust Assets to the Settlement Trust***

On the Effective Date, subject to Article IV.D.2 of the Plan, all right, title, and interest in and to the Settlement Trust Assets and any proceeds thereof shall be automatically, and without further act or deed, transferred to, vested in, and assumed by the Settlement Trust free and clear of all Encumbrances or Claims or other interests of any Person, subject to the Channeling Injunction and other provisions of the Plan. Notwithstanding the foregoing, the Settlement Trust shall satisfy, to the extent required under the relevant policies and applicable law and in accordance with the Trust Distribution Procedures, any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies. The Debtors and the Local Councils shall establish an appropriate escrow mechanism to ensure that the Cash to be paid to the Settlement Trust by Local Councils on the Effective Date can be paid in a timely manner.

To the extent any of the Settlement Trust Assets are not transferred to the Settlement Trust by operation of law on the Effective Date pursuant to the Plan, then when such assets accrue or become transferable subsequent to the Effective Date, they shall automatically and immediately transfer to the Settlement Trust free and clear of all Encumbrances and Claims or other interests of any Person, subject to the Channeling Injunction and other provisions of the Plan.  To the extent any Artwork is not physically transferred to the Settlement Trust on the Effective Date, the Debtors or Reorganized BSA and the Settlement Trust shall mutually agree on the terms of the storage and subsequent physical transfer thereof.  For the avoidance of doubt, title to the Artwork (and the risk of loss thereof) will transfer to the Settlement Trust on the Effective Date.  To the extent that any action of a Protected Party or Limited Protected Party is required to effectuate such transfer, such Protected Party or Limited Protected Party shall promptly transfer, assign, and contribute, such remaining Settlement Trust Assets to the Settlement Trust.  In the event a Protected Party or Limited Protected Party breaches any obligation contained in this section, the Settlement Trust will have no adequate remedy at law and shall be entitled to preliminary and permanent declaratory and injunctive relief.  Article IV.D.2 of the Plan applies, without limitation, to (a) that portion of the Local Council Settlement Contribution required to be contributed to the Settlement Trust after the Effective Date and (b) the transfer to the Settlement Trust of the Warehouse and Distribution Center, subject to the Leaseback Requirement.

### 4.     *The Settlement Trust Distribution Procedures*

On the Effective Date, the Settlement Trust shall implement the applicable Trust Distribution Procedures in accordance with the terms of the Settlement Trust Agreement.  From and after the Effective Date, the Settlement Trustee shall have the authority to administer, amend, supplement, or modify the Trust Distribution Procedures solely in accordance with the terms thereof and the Settlement Trust Agreement.

### 5.     *Post-Effective Date Contributing Chartered Organizations*

Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any Chartered Organization that is not a Contributing Chartered Organization as of the Effective Date may become a Protected Party if the Bankruptcy Court, after notice and an opportunity for parties in interest to be heard, approves a settlement agreement between such Chartered Organization and the Settlement Trustee (a "Post-Effective Date Chartered Organization Settlement").  After the Effective Date, the Settlement Trustee shall have the exclusive authority to seek approval of a Post-Effective Date Chartered Organization Settlement.  Upon the Bankruptcy Court's entry of a Final Order approving a Post-Effective Date Chartered Organization Settlement, Exhibit D of the Plan shall be amended by the Settlement Trustee to include such Chartered Organization, and such Chartered Organization (and any related Persons or Representatives, as applicable) shall be deemed to be a Contributing Chartered Organization and a Protected Party for all purposes hereunder.  **A list of Chartered Organizations that may potentially become Contributing Chartered Organization may be accessed at https://omniagentsolutions.com/bsa-SAballots.**

Any Chartered Organization that becomes a Protected Party in accordance with Article IV.I of the Plan shall have all of the rights, remedies and obligations of a Protected Party under the

Plan, including under the Channeling Injunction, notwithstanding that such Chartered Organization was not a Protected Party under the Plan as of the Effective Date.

### 6.    *Post-Effective Date Participating Chartered Organizations*

Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any Chartered Organization that is not a Participating Chartered Organization as of the Effective Date may become a Participating Chartered Organization by agreement with the Settlement Trustee and without further order of the Bankruptcy Court; provided, however, that the Settlement Trustee shall file a notice with the Bankruptcy Court within thirty (30) days of entering into any agreement with a Chartered Organization that deems such Chartered Organization to be a Limited Protected Party, together with an amendment to Exhibit K of the Plan removing such Chartered Organization from the list of Chartered Organizations that are not Participating Chartered Organizations.

Any Chartered Organization that becomes a Limited Protected Party in accordance with Article IV.J of the Plan shall have all of the rights, remedies and obligations of a Limited Protected Party under the Plan, including under the Limited Channeling Injunction, notwithstanding that such Chartered Organization was not a Limited Protected Party under the Plan as of the Effective Date.

### 7.    *Post-Effective Date Settling Insurance Companies*

Notwithstanding any present exclusionary language in the Plan, after the Effective Date, any Insurance Company that is a Non-Settling Insurance Company may, within twelve (12) months of the Effective Date (the "Insurance Settlement Period"), enter into an Insurance Settlement Agreement with the Settlement Trustee (a "Post-Effective Date Insurance Settlement"); provided, however, that the Settlement Trustee shall file a notice with the Bankruptcy Court within thirty (30) days of entering into any such Post-Effective Date Insurance Settlement, together with an amendment to Exhibit I of the Plan including such Post-Effective Date Insurance Settlement, and such Insurance Company (and any related Persons or Representatives, as applicable) shall be deemed to be a Settling Insurance Company and a Protected Party for all purposes hereunder. The Post-Effective Date Insurance Settlement and amendment shall be deemed binding and effective absent objection by any Person within fifteen (15) calendar days. The Settlement Trustee shall have the sole discretion, upon order of the Bankruptcy Court, to extend the Insurance Settlement Period.

Any Insurance Company that becomes a Protected Party in accordance with Article IV.K of the Plan shall have all of the rights, remedies and obligations of a Protected Party under the Plan, including under the Channeling Injunction, notwithstanding that such Insurance Company was not a Protected Party under the Plan as of the Effective Date.

### 8.    *The Settlement Trust Agreement*

The Settlement Trust is formed through the Settlement Trust Agreement, executed by and between BSA, the Settlement Trustee, the Future Claimants' Representative, the Delaware

Trustee, and the STAC.[107]  The Settlement Trust Agreement describes and dictates the purpose, scope, function, and funding of the Settlement Trust.  Namely, the Settlement Trust Agreement provides that the Settlement Trust is (i) to assume all liability for the Channeled Claims, (ii) administer the Channeled Claims and (iii) make distributions to holders of compensable Abuse Claims, in each case in accordance with the Trust Distributions Procedures for Abuse Claims.  Settlement Trust Agreement § 1.2.  The Settlement Trust Agreement provides that the Settlement Trust will be funded through irrevocable transfers of the Trust Assets.  *Id.* § 1.3.

To operate the Settlement Trust, the Settlement Trust Agreement appoints a Settlement Trustee and enumerates the Settlement Trustee's powers, duties, and limitations.  These include, among others: the power to administer the Trust, the Trust Assets, and any other amounts to be received under the terms of the Trust Documents in accordance with the purposes set forth in the Settlement Trust Agreement and in the manner described by the Trust Documents; the power to take any and all actions that in the judgment of the Settlement Trustee are necessary or advisable to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in the Settlement Trust Agreement, and any power reasonably incidental thereto and any trust power permitted under the laws of the State of Delaware; take any and all actions appropriate or necessary in order to carry out the terms of the Trust Documents; and except as otherwise expressly provided in the Trust Documents, exercise any other powers now or hereafter conferred upon or permitted to be exercised by a trustee under the laws of the State of Delaware.  Settlement Trust Agreement § 2.1.  The Settlement Trustee is required under the Settlement Trust Agreement to consult with a Settlement Trust Advisory Committee ("STAC") and the Future Claimants' Representative on certain matters set forth in the Settlement Trust Agreement.  The Settlement Trustee shall also obtain the consent of the STAC and the Future Claimants' Representative prior to taking action with respect to certain matters.  *Id.* § 2.1(g).

In line with the Settlement Trust's objective, the Settlement Trust Agreement mandates that the Settlement Trust qualify as a "qualified settlement fund" within the meaning of § 468B of the Tax Code and § 468B's associated regulations.  Settlement Trust Agreement § 8.4.  To accomplish this, the Settlement Trust Agreement empowers the Settlement Trustee to take all actions as the Settlement Trustee deems necessary to reasonably ensure that the Settlement Trust qualifies as, and remains, a "qualified settlement fund."  *Id.* §2.1(a).  This includes authorizing the Settlement Trustee to unilaterally and without court order, amend, either in whole or in part, any administrative provision of the Settlement Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.  *Id.* § 2.1(a).  Reorganized BSA shall make a "grantor trust" election under Treasury Regulation section 1.468B-1(k) with respect to the Settlement Trust for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.  *Id.* § 8.4(a).  The Settlement Trustee as "administrator" of the Trust within the meaning of Section 1.468B-2(k)(3) of the Treasury Regulations shall report consistently with such grantor trust election and otherwise satisfy all requirements necessary to qualify and maintain qualification of Trust as a qualified settlement fund and a grantor trust.  *Id.* § 8.4.

---

[107]  Capitalized terms used but not defined in this section have the meanings ascribed to them in the Settlement Trust Agreement.  In the event of any discrepancy between this summary and the Settlement Trust Agreement, the Settlement Trust Agreement shall control in all respects.

Lastly, the Settlement Trust Agreement sets forth the Settlement Trust's termination and associated procedures.  Specifically, the Settlement Trust shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of the Trust because (i) all reasonably expected assets have been collected by the Trust, (ii) all distributions have been made to the extent set forth in the Trust Distribution Procedures, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Trust obligations and Trust Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court.  Settlement Trust Agreement § 8.2(b).  After termination of the Settlement Trust and solely for the purpose of liquidating and winding up its affairs, the Settlement Trustee shall continue to act as Settlement Trustee until its duties under the Settlement Trust Agreement have been fully performed.  Upon termination of the Settlement Trust and accomplishment of all activities described in the Settlement Trust Agreement, the Settlement Trustee and its professionals shall be discharged and exculpated from liability (except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law or fraud of the Settlement Trustee or his agents or representatives).  *Id.* § 8.29(e).

### 9.    *Discharge of Liabilities to Holders of Abuse Claims*

Except as provided in the Plan, the transfer to, vesting in and assumption by the Settlement Trust of the Settlement Trust Assets as contemplated by the Plan shall, as of the Effective Date, discharge all obligations and liabilities of and bar any recovery or action against the Protected Parties for or in respect of all Abuse Claims, including all Indirect Abuse Claims (and the Confirmation Order shall provide for such discharge).  The Settlement Trust shall, as of the Effective Date, assume sole and exclusive responsibility and liability for all Abuse Claims and such Claims shall be paid by the Settlement Trust from the Settlement Trust Assets or as otherwise directed in the Settlement Trust Documents.

### 10.    *Imposition of Channeling Injunction*

From and after the Effective Date, all Abuse Claims shall be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Plan and the Confirmation Order.  From and after the Effective Date, the Protected Parties shall not have any obligation with respect to any liability of any nature or description arising out of, relating to, or in connection with any Abuse Claims.

### 11.    *Insurance Assignment*

As of the Effective Date, the Insurance Assignment shall be completed, which includes an assignment and transfer to the Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, and (d) all other rights, claims, benefits, or Causes of Action of the Debtors, Related Non-Debtor Entities, Local Councils, Participating Chartered Organizations or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies (but not the policies themselves).  The Insurance Assignment does not include (i) any rights, claims, benefits, or Causes of Action under or with respect to any Non-Abuse Insurance Policies and D&O Liability Insurance Policies, (ii) any Local Council Reserved Rights, or (iii) any rights, claims, benefits, or Causes of Action of any Chartered

Organization that is not a Participating Chartered Organization or a Contributing Chartered Organization under or with respect to any Abuse Insurance Policy.

      **12.**      *Specified Insurance Policies and Non-Abuse Litigation Claims*

The Settlement Trust shall have consent over any post-Effective Date settlement of any Non-Abuse Litigation Claim (such consent not to be unreasonably withheld) that is entitled to a recovery from proceeds of Specified Insurance Policies. A condition of payment of a Non-Abuse Litigation Claim by the Settlement Trust from a Specified Insurance Policy shall be a release by the holder of such Non-Abuse Litigation Claim of the Debtors, the Local Councils, and any other insureds under applicable Specified Insurance Policies. Before the Settlement Trust settles any Specified Insurance Policy(ies) under which the holder of a Non-Abuse Litigation Claim is seeking to recover, the holder of a Non-Abuse Litigation Claim may recover up to the full amount of such Claim in the first instance from any such available unsettled Specified Insurance Policy(ies) or unsettled Specified Excess Insurance Policy(ies). If and when the Settlement Trust settles one or more Specified Insurance Policies under which the holder of a Non-Abuse Litigation Claim is seeking to recover: (a) the holder of such Non-Abuse Litigation Claim shall remain entitled to recover up to $1,000,000 of such Claim under any such Specified Primary Insurance Policy(ies); and (b) any amounts exceeding $1,000,000 shall be recoverable in the first instance from any available Specified Excess Insurance Policies. Subject to a review of the details concerning a Non-Abuse Litigation Claim by the Settlement Trustee, to the extent that the holder of a Non-Abuse Litigation Claim cannot, as a result of the Settlement Trust's release of such Specified Insurance Policy(ies), recover the full amount of any judgment or settlement of such Claim consented to by the Settlement Trust (such consent not to be unreasonably withheld) from any Specified Insurance Policy(ies) under which the holder of a Non-Abuse Litigation Claim is seeking to recover, then any unpaid amounts (up to applicable policy limits) shall be submitted to the Settlement Trust, which shall pay such amounts out of the proceeds of the Specified Insurance Policies.

The Settlement Trustee shall have a duty to treat Direct Abuse Claims and Non-Abuse Litigation Claims that implicate the Specified Insurance Policies fairly and equally. In negotiating any settlements involving Specified Insurance Policies, the Settlement Trustee shall bear in mind the interests of both Direct Abuse Claims and Non-Abuse Litigation Claims in structuring any settlement and use best efforts to maximize recoveries for both constituencies.

Notwithstanding anything to the contrary in the Plan, with respect to any Non-Abuse Litigation Claim that has been asserted or could be asserted against any Local Council, notice of which is provided to the Debtors, the Coalition, the Tort Claimants' Committee, and the Future Claimants' Representative prior to the Effective Date, the rights of the Local Council to recover for such Non-Abuse Litigation Claim under the Specified Insurance Policies up to the applicable coverage limits shall be preserved; *provided, however*, that if the holder of a Non-Abuse Litigation Claim provides a full and complete written release of any claims that such holder of a Non-Abuse Litigation Claim may have against the Local Council related to the Non-Abuse Litigation Claim, then the Local Council will be deemed to have waived any rights it may have against the Specified Insurance Policy with respect to such Non-Abuse Litigation Claim.

13.    *Settlement Trust Causes of Action*

The transfer of the Settlement Trust Causes of Action to the Settlement Trust, insofar as they relate to the ability to defend against or reduce the amount of Abuse Claims, shall be considered the transfer of a non-exclusive right enabling the Settlement Trust to defend itself against asserted Abuse Claims, which transfer shall not impair, affect, alter, or modify the right of any Person, including the Protected Parties, the Limited Protected Parties, an insurer or alleged insurer, or co-obligor or alleged co-obligor, sued on account of an Abuse Claim or on account of any asserted right relating to any Abuse Insurance Policy, to assert each and every defense or basis for claim reduction such Person could have asserted had the Settlement Trust Causes of Action not been assigned to the Settlement Trust (including any defense or basis for claim reduction that any Insurance Company or other insurer or alleged insurer could have asserted under section 502 of the Bankruptcy Code, applicable non-bankruptcy law, or any Abuse Insurance Policy or other agreement with respect to (a) any alleged liability of the BSA or any Local Council, Contributing Chartered Organization, Participating Chartered Organization, or any other insured Person for any Abuse Claim or (b) any alleged liability of any Insurance Company or other insurer or alleged insurer to provide indemnity or defense relating to any Abuse Claim or any alleged extracontractual liability of any Insurance Company or other insurer or alleged insurer relating to any Abuse Claim).

14.    *Reimbursement by Settlement Trust*

From and after the Effective Date, the Settlement Trust shall reimburse, to the fullest extent permitted by applicable law, Reorganized BSA and each of the Local Councils for any documented out-of-pocket, losses, costs, and expenses (including judgments, attorneys' fees, and expenses) incurred by Reorganized BSA or any Local Council after the Effective Date attributable to the defense of a Direct Abuse Claim that is channeled to the Settlement Trust if the holder of such Direct Abuse Claim seeks to hold Reorganized BSA or such Local Council liable for such Direct Abuse Claim in violation of the terms of the Plan or the Confirmation Order; *provided* that the Settlement Trust's reimbursement obligations to Reorganized BSA and any Local Council for any Direct Abuse Claim shall be capped at and shall not exceed the amount actually payable by the Settlement Trust to the holder of such Direct Abuse Claim under the Trust Distribution Procedures (*i.e.*, the amount paid based on the Settlement Trust payment percentage) and shall be deducted on a dollar-for-dollar basis against such holder's distribution from the Settlement Trust on account of such Direct Abuse Claim. Reorganized BSA and any Local Council shall provide notice to the Settlement Trust within ten (10) business days of the service of any claim or lawsuit filed by a holder of an Abuse Claim that could result in any reimbursement obligations by the Settlement Trust under this provision. In the event that any litigation asserting an Abuse Claim is filed naming Reorganized BSA or any Local Council as a defendant in violation of the terms of the Plan or the Confirmation Order, the Settlement Trust shall, at the request of Reorganized BSA or such Local Council, promptly appear (1) before the Bankruptcy Court to obtain entry of an order enforcing the Channeling Injunction and (2) in such litigation and seek the dismissal of the case. Other than this limited reimbursement obligation, the Settlement Trust shall not be required to reimburse or indemnify any Protected Parties or Limited Protected Parties for any claims, liabilities, losses, actions, suits, proceedings, third-party subpoenas, damages, costs and expenses, including any liabilities related to, arising out of, or in connection with any Abuse Claim. Except for the right to seek reimbursement or indemnity set forth in <u>Article IV.M</u> of the Plan, the Debtors, the Local

Councils, the Contributing Chartered Organizations, the Participating Chartered Organizations and any other Person that is or becomes a Protected Party shall be forever barred from seeking compensation from the Settlement Trust for or on account of any Claims arising prior to the Petition Date.

15.    *Trust Defense of TCJC Settlement*

In the event that any litigation in any forum asserting an Abuse Claim is filed naming TCJC as a defendant in violation of the terms of the Plan or the Confirmation Order, the Settlement Trust shall, at the request of TCJC, promptly appear (1) before the Bankruptcy Court to obtain entry of an order enforcing the Channeling Injunction and (2) in such litigation seek the dismissal of the case. Under no circumstances shall the Settlement Trust be required to reimburse or indemnity TCJC for any claims, liabilities, losses, actions, suits, proceedings, third-party subpoenas, damages, costs, and expenses, including any liabilities related to, arising out of, or in connection with, any Abuse Claim.

16.    *Assignment of Claims and Defenses*

Notwithstanding anything herein to the contrary, on the Effective Date, the Debtors, the Local Councils and any other party that is or becomes a Protected Party or a Limited Protected Party shall be deemed to assign any and all Claims and defenses to the Settlement Trust that arise from or relate to Abuse Claims, including any Claims and defenses against co-defendants; provided, however, that with respect to Limited Protected Parties, the foregoing assignment shall be limited to Claims and defenses that arise from or relate to Post-1975 Chartered Organization Abuse Claims.

17.    *Excess Assets in Settlement Trust*

To the extent any Settlement Trust Assets remain at such time as the Settlement Trust is dissolved under the terms of the Settlement Trust Documents, any remaining Settlement Trust Assets shall be distributed to Reorganized BSA.

18.    *Investment Guidelines*

All monies held in the Settlement Trust shall be invested, subject to the investment limitations and provisions enumerated in the Settlement Trust Agreement.

19.    *Settlement Trust Expenses*

The Settlement Trust shall pay all Settlement Trust Expenses from the Settlement Trust Assets. The Settlement Trust shall bear sole responsibility with respect to the payment of the Settlement Trust Expenses. Additionally, the Settlement Trust shall promptly pay all reasonable and documented Settlement Trust Expenses incurred by any Protected Party for any and all liabilities, costs or expenses as a result of taking action on behalf of or at the direction of the Settlement Trust following the transfer to the Settlement Trust of copies of all records and documents in such Persons' possession, custody or control pertaining to Abuse Claims in accordance with the Document Agreement. To the maximum extent permitted by applicable law, the Settlement Trustee shall not have or incur any liability for actions taken or omitted in his or

her capacity as Settlement Trustee, or on behalf of the Settlement Trust, except those acts found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or omissions in his or her capacity as Settlement Trustee, or on behalf of the Settlement Trust, except for any actions or omissions found by Final Order to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of the Settlement Trustee shall be satisfied only from the Settlement Trust Assets.

### 20.  *Settlement Trustee*

There shall be one Settlement Trustee. The initial Settlement Trustee shall be Eric D. Green. Any successor Settlement Trustee shall be appointed in accordance with the terms of the Settlement Trust Agreement. For purposes of any Settlement Trustee performing his or her duties and fulfilling his or her obligations under the Settlement Trust and the Plan, the Settlement Trust and the Settlement Trustee shall be deemed to be, and the Confirmation Order shall provide that he or she is, a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code. The Settlement Trustee shall be the "administrator" of the Settlement Trust as such term is used in Treas. Reg. Section 1.468B-2(k)(3).

As explained in <u>Article V.K</u> herein, the Debtors filed the Mediation Motion, requesting the appointment a sitting bankruptcy judge as a mediator if the relevant parties were unable to agree on a mediator before the hearing on the motion [D.I. 17]. After more than two months of negotiations among the Debtors, the Tort Claimants' Committee, the Creditors' Committee, the Future Claimants' Representative, and the Ad Hoc Committee, the Debtors filed a revised mediation order, including the identities of the Debtors' proposed mediators: Paul Finn, Timothy Gallagher, and Eric Green [D.I. 782]. Each of the proposed mediators filed declarations, disclosing their respective connections to parties-in-interest in the Chapter 11 Cases [D.I. 710, 711, 712]. Certain insurers objected to the Debtors' proposed mediators asserting, among other things, that Mr. Green must be disqualified because the Future Claimants' Representative, James L. Patton, or his law firm, have represented Mr. Green in his capacity as future claimants' representative in certain mass-tort cases [D.I. 658, 759, 646, 761, 648, 756]. Hartford and Century objected to the Debtors' proposed mediators and filed declarations from the Honorable Kevin J. Carey (Ret.) and Kenneth Feinberg as their proposed mediators [D.I. 771, 773]. While the Debtors maintained that Eric Green was well qualified to serve as a neutral mediator, the Debtors expressed that they would welcome the appointment of Judge Carey as the sole or lead mediator if the Court deemed such appointment appropriate [D.I. 782]. Ultimately, the Bankruptcy Court entered the Mediation Order appointing Judge Kevin Carey (Ret.), Paul Finn, and Timothy Gallagher as Mediators [D.I. 812]. Known connections between Eric D. Green, White & Case, the Coalition, and the Future Claimants' Representative, respectively, are listed in **<u>Exhibit H</u>** attached hereto.

### 21.  *The Settlement Trust Advisory Committee*

The Settlement Trust Advisory Committee shall be established pursuant to the Settlement Trust Agreement. The initial STAC shall be composed of seven (7) members, five (5) of which shall be selected by the Coalition and two (2) of which shall be selected by the Tort Claimants' Committee, subject to discussion between and the consent of the Coalition and the Tort Claimants'

Committee.  The STAC members shall be reasonably acceptable to the Debtors and shall have the functions, duties, and rights provided in the Settlement Trust Agreement.  Each STAC member shall serve in accordance with the terms and conditions of the Settlement Trust Agreement.

The commencement or continuation of a STAC Tort Election Claim (as defined in Article XII.B of the Trust Distribution Procedures) and the approval of any global settlement after the Effective Date that causes an Insurance Company or a Chartered Organization to become a Protected Party must be approved by the Settlement Trustee, the Future Claimants' Representative and the majority of the STAC, *provided*, *however*, that the refusal of any of the foregoing to (a) authorize the commencement or continuation of a STAC Tort Election Claim or (b) approve a global settlement after the Effective Date that causes an Insurance Company or a Chartered Organization to become a Protected Party shall be subject to immediate review under the standard set forth in the Settlement Trust Agreement by the Special Reviewer if three (3) members of the STAC so require.

## 22.    *Compensation of Settlement Trustee and Retention of Professionals*

The Settlement Trustee shall be entitled to compensation as provided for in the Settlement Trust Agreement.  The Settlement Trustee may retain and reasonably compensate, without Bankruptcy Court approval, counsel and other professionals as reasonably necessary to assist in their duties as Settlement Trustee, subject to the terms of the Settlement Trust Agreement.  All fees and expenses incurred in connection with the foregoing shall be payable from the Settlement Trust as provided for in the Settlement Trust Agreement.

## 23.    *Future Claimants' Representative*

The Settlement Trust Agreement shall provide for the continuation of the Future Claimants' Representative to represent the interests of holders of Future Abuse Claims.  The initial Future Claimants' Representative shall be James L. Patton, Jr. so long as he is the Future Claimants' Representative in the Chapter 11 Cases as of the Effective Date.

## 24.    *Consent Rights of the Debtors and the Reorganized BSA*

The Settlement Trust Documents may not be amended or modified without the consent of the Debtors or the Reorganized BSA, as applicable, which shall not be unreasonably withheld. The Debtors shall also have consent rights with respect to any successor Settlement Trustee and Trust Advisory Committee members, which consent shall not be unreasonably withheld. Notwithstanding any of the foregoing, the Indemnification Obligations of the Settlement Trust described in Article IV.I of the Plan may not be amended or modified without the consent of the Protected Party that is otherwise entitled to indemnification pursuant to those provisions.

## 25.    *Document Agreement*

Reorganized BSA, the Local Councils, the Contributing Chartered Organizations and the Settlement Trust shall enter into the Document Agreement on the Effective Date, substantially in the form contained in the Plan Supplement.  The Document Agreement shall provide for copies of certain documents, books, and records of Reorganized BSA, the Local Councils, and any

Contributing Chartered Organizations to be transferred to the Settlement Trust.  The parties to the Document Agreement shall be bound by the terms thereof.

As is customary, the Document Agreement, under which parties thereto shall provide the Settlement Trust with documents, witnesses, or other information, will be submitted in connection with the Plan Supplement.

### 26.    *First Encounter Agreement*

The Debtors' rights and obligations, if any, in the FEA will be assigned to the Settlement Trust.  However, the Settlement Trust retains the ability to dispute its applicability.

### 27.    *Privileged Information*

The transfer or assignment of any Privileged Information to the Settlement Trustee shall not result in the destruction or waiver of any applicable privileges pertaining thereto.  Further, with respect to any privileges: (1) they are transferred to or contributed for the purpose of enabling the Settlement Trustee to perform his or her duties to administer the Settlement Trust; (2) they are vested solely in the Settlement Trustee and not in the Settlement Trust, the STAC, the Future Claimants' Representative, the Special Reviewer, the SASAC (as defined in the Settlement Trust Agreement), any other Person, committee or subcomponent of the Settlement Trust, or any other Person (including counsel and other professionals) who has been engaged by, represents, or has represented any holder of an Abuse Claim; and (3) the Settlement Trustee shall keep, handle and maintain such Privileged Information in accordance with the terms of the Document Agreement.  The Settlement Trustee shall succeed to and hold all rights to and interest in and related to the Debtors', Local Councils' and Contributing Chartered Organizations' privileges, including the attorney-client privilege, any Common-Interest Communications with Insurers, and any protection granted by joint defense, common interest, and/or confidentiality agreement, as to all documents, communications, and other information, including any information transferred pursuant to the Document Agreement.  The Settlement Trustee shall be permitted to use Privileged Information for any purpose related to the administration of the Settlement Trust and the settlement of Abuse Claims and shall be permitted to share Privileged Information with any professional retained by the Settlement Trust; *provided, however*, that the Settlement Trustee shall not share Privileged Information with the STAC or any holder of an Abuse Claim except as required by law or as the Settlement Trustee determines in good faith is required by law.  Notwithstanding the foregoing, nothing herein shall preclude the Settlement Trustee from providing Privileged Information to any Insurance Company as necessary to preserve, secure, or obtain the benefit of any rights under any Abuse Insurance Policy.

### 28.    *No Liability*

The Protected Parties and the Limited Protected Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance in connection with or related to the Settlement Trust, the Settlement Trustee, or the Settlement Trust Documents, including the administration of Abuse Claims and the distribution of Settlement Trust Assets by the Settlement Trust, or any related agreement.

### 29.    *U.S. Federal Income Tax Treatment of the Settlement Trust*

The Settlement Trust shall be a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.  Reorganized BSA shall make a "grantor trust" election under Treasury Regulation section 1.468B-1(k) with respect to the Settlement Trust for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.  All parties shall report consistently with such grantor trust election.  The Settlement Trust shall file (or cause to be filed) statements, returns, or disclosures relating to the Settlement Trust that are required by any Governmental Unit.  The Settlement Trustee shall be responsible for the payment of any taxes imposed on the Settlement Trust or the Settlement Trust Assets, including estimated and annual U.S. federal income taxes in accordance with the terms of the Settlement Trust Agreement.  The Settlement Trustee may request an expedited determination of taxes on the Settlement Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Settlement Trust for all taxable periods through the dissolution of the Settlement Trust.

### 30.    *Institution and Maintenance of Legal and Other Proceedings*

As of the Effective Date, the Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Settlement Trust, including the Insurance Actions, Abuse Claims, and the Settlement Trust Causes of Action.  Without limiting the foregoing, on and after the Effective Date, the Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions, in the name of the Debtors or Reorganized BSA, if deemed necessary or appropriate by the Settlement Trust.  The Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred on or after the Effective Date arising from, relating to, or associated with any legal action or other proceeding which is the subject of Article IV.V of the Plan and shall pay Indirect Abuse Claims, in accordance with the Trust Distribution Procedures, that may arise from deductibles or other charges.  Furthermore, without limiting the foregoing, the Settlement Trust shall be empowered to maintain, administer, preserve, or pursue the Insurance Coverage Actions and the Insurance Action Recoveries.

### 31.    *Notation on Claims Register Regarding Abuse Claims*

On the Effective Date, all Abuse Claims filed against the Debtors in the Chapter 11 Cases shall be marked on the Claims Register as "Channeled to the Settlement Trust" and resolved exclusively in accordance with the Trust Distribution Procedures.

### 32.    *Insurance Provisions*

As provided in Article X.M of the Plan, the following shall apply to all Entities, including all Insurance Companies:

Except for the Insurance Assignment, or as otherwise provided in the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order or the findings made by the District Court in the Affirmation Order, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights or obligations under an Insurance Policy to the extent such rights

and obligations are otherwise available under applicable law, and the rights and obligations, if any, of any Non-Settling Insurance Company relating to or arising out of the Plan Documents, including the Plan, the Confirmation Order, and the Affirmation Order, or any provision thereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.[108]

No provision of the Plan, other than those provisions contained in the applicable Injunctions contained in <u>Article X</u> of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Insurance Company by the Channeling Injunction.

Nothing in <u>Article X.M</u> of the Plan is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Person

### 33.    *Judgment Reduction*

Without limiting the Discharges, Releases and Injunctions set forth above, if any Person, including a holder of an Abuse Claim ("<u>Plaintiff</u>"), asserts a Cause of Action against any other Person arising from or relating to Abuse that is the subject of a proof of claim filed against the Debtors in the Chapter 11 Cases, regardless of whether such Cause of Action may be asserted pursuant to the Bankruptcy Code or is in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever (each such Cause of Action, an "<u>Abuse Cause of Action</u>"), and such Abuse Cause of Action results in a determination by the court or tribunal hearing the Abuse Cause of Action (including by a jury empaneled by such court or tribunal) that any Person who is not a Protected Party or a Limited Protected Party (each, a "<u>Specified Person</u>") is liable in damages to Plaintiff, then, prior to final entry of any judgment, order or arbitration award ("<u>Judgment</u>") in such Abuse Cause of Action, Plaintiff shall provide notice and a copy of the Confirmation Order to the Trial Court.  Such court or tribunal shall determine whether the Abuse Cause of Action gives rise to any Cause of Action on which any Protected Party or Limited Protected Party would have been liable to Plaintiff in the absence of the Plan and Confirmation Order.  The court or tribunal shall reduce any Judgment against a Specified Person by an amount equal to the "<u>Judgment Reduction Amount</u>," which shall equal the greatest amount such Specified Person would be entitled, under applicable non-bankruptcy law, to set off against the Judgment if such Protected Party or Limited Protected Party were not entitled to the benefits of the Discharges, Releases, or Injunctions set forth herein.  For the avoidance of doubt, a Limited Protected Party may be a Specified Person entitled to the judgment reduction provided for in <u>Article X.N</u> of the Plan with respect to an Abuse Cause of Action arising from or relating to Abuse that is not the subject of a Post-1975 Chartered Organization Abuse Claim:

Nothing in the Plan shall prejudice or operate to preclude the right of any Specified Person to (a) provide notice of the Confirmation Order to any court or tribunal hearing an Abuse Cause of Action, (b) raise any issues, claims or defenses regarding the Judgment Reduction Amount, including the contractual liability and/or relative or comparative fault of any Person, including any Protected Party or Limited Protected Party, in any court or tribunal hearing any Abuse Cause of Action in accordance with applicable law or procedure, or (c) take discovery of Protected Parties or Limited Protected Parties in accordance with applicable law or procedure; <u>provided</u>, <u>however</u>,

---

[108]    The Debtors believe this provision is not inconsistent with the Bankruptcy Court's statements on the record at the May 19, 2021 hearing and will resolve the objections of the various survivor groups to the insurance provisions of the Plan.

that nothing herein shall in any way modify or affect the Discharges, Releases or Injunctions. For the avoidance of doubt, nothing herein shall (i) be deemed to entitle a Plaintiff to more than a single satisfaction with respect to any Abuse Cause of Action or (ii) prejudice or operate to preclude the rights of any Specified Person to assert any claims or causes of action that have not been discharged, released, or enjoined under the Plan or Confirmation Order.

Each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any Specified Person in a manner that fails to conform to the terms of Article X.N of the Plan.

If any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to an Abuse Cause of Action, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Abuse Cause of Action with respect to such settlement.

B.    Trust Distribution Procedures

The Plan provides that the Settlement Trust will resolve Abuse Claims through the Trust Distribution Procedures under the Plan, which are summarized herein and are attached to the Plan as Exhibit A.[109] **Please note that if there are any inconsistencies between this summary and the Trust Distribution Procedures, the Trust Distribution Procedures shall govern in all respects.**

The Trust Distribution Procedures are designed to permit the Settlement Trustee to provide substantially similar treatment to holders of similar, legally valid, and supported Abuse Claims. The procedures set forth in the Trust Distribution Procedures will be the sole and exclusive method by which the holder of an Abuse Claim may seek allowance and resolution of his or her Abuse Claim. With respect to payment of claimants pursuant to the Trust Distribution Procedures, the Settlement Trustee will be provided broad discretion to determine the allocation of funds in the Settlement Trust to pay (1) each claimant, (2) administrative fees, and (3) legal fees. This includes discretion regarding how to allocate proceeds received from both Settling Insurance Companies and Non-Settling Insurance Companies. The process for submission of Abuse Claims to the Settlement Trust, review of such Claims by the Settlement Trustee, and the treatment of the valid Claims under the Trust Distribution Procedures are summarized below.[110]

**1.    *Purpose and General Guidelines***

a.    **Purpose**

To achieve maximum fairness and efficiency, and recoveries for holders of Allowed Abuse Claims, the Trust Distribution Procedures are founded on the following principles:

1.    objective Claim eligibility criteria;

---

[109]    Capitalized terms used in this summary of the Trust Distribution Procedures and not otherwise defined herein or in the Plan shall have the meaning ascribed to them in the Trust Distribution Procedures.

[110]    Schedule 1 to the Trust Distribution Procedures (Mitigating Scaling Factor Ranges for Statutes of Limitation or Repose as Mitigating Scaling Factors by State) was negotiated without the input of the Insurance Companies.

2.  clear and reliable proof requirements;

3.  administrative transparency;

4.  a rigorous review and evidentiary process that requires the Settlement Trustee to determine Allowed Claim Amounts in accordance with applicable law;

5.  prevention and detection of any fraud; and

6.  independence of the Settlement Trust and Settlement Trustee.

### b.  **Payment of Allowed Abuse Claims and Insurance Recoveries**

Pursuant to the terms of the Plan, the Settlement Trust has assumed the Debtors' legal liability for, and obligation to pay, Allowed Abuse Claims.  The Settlement Trust Assets, including the proceeds of the assigned insurance rights, shall be used to fund distributions to Abuse Claimants under the Trust Distribution Procedures.  The amounts that Abuse Claimants will ultimately be paid on account of their Allowed Abuse Claims will depend on, among other things, the Settlement Trust's ability to liquidate and recover the proceeds of the assigned insurance rights. The amount of any installment payments, initial payments, or payment percentages established under the Trust Distribution Procedures or the Settlement Trust Agreement are not the equivalent of (i) any Abuse Claimant's Allowed Claim Amount or (ii) the right to payment that the holder of an Allowed Abuse Claim has against the Debtors and/or Protected Parties, as assumed by the Settlement Trust.

### c.  **Sole and Exclusive Method**

The Trust Distribution Procedures and any procedures designated in the Trust Distribution Procedures shall be the sole and exclusive methods by which an Abuse Claimant may seek allowance and distribution on an Abuse Claim with respect to the Protected Parties.

### d.  **Interpretation**

The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of the Trust Distribution Procedures.

### e.  **Confidentiality**

All submissions to the Settlement Trust by an Abuse Claimant shall be treated as confidential and shall be protected by all applicable state and federal privileges, including those directly applicable to settlement discussions.  The Settlement Trust will preserve the confidentiality of such submissions, and shall disclose the contents thereof only to such persons as authorized by the Abuse Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware state court, the United States District Court for the District of Delaware or any other court of competent jurisdiction.  Notwithstanding anything in the foregoing to the contrary, the Settlement Trust may disclose information, documents, or other materials reasonably necessary in the Settlement Trust's judgment to preserve, obtain, litigate, resolve, or

settle insurance coverage, or to comply with an applicable obligation under an Insurance Policy, indemnity, or settlement agreement. Nothing in the Trust Distribution Procedures shall be construed to authorize the Settlement Trustee to waive privilege or disseminate documents to any Abuse Claimants or their respective counsel, except as provided for in the Document Agreement.

### 2. *Trust Distribution Procedures Administration*

#### a. **Administration**

Pursuant to the Plan and the Settlement Trust Agreement, the Settlement Trust and the Trust Distribution Procedures shall be administered by the Settlement Trustee in consultation with the STAC and the Future Claimants' Representative, which represents the interests of holders of present Abuse Claims in the administration of the Settlement Trust, and the Future Claimants' Representative, who represents the interests of holders of Future Abuse Claims. The Claims Administrator shall assist the Settlement Trustee in the resolution of Abuse Claims in accordance with the Trust Distribution Procedures and provide information necessary for the Settlement Trustee to implement the Trust Distribution Procedures.

#### b. **Powers and Obligations**

The powers and obligations of the Settlement Trustee, the STAC, the Future Claimants' Representative, and the Claims Administrator are set forth in the Settlement Trust Agreement. The STAC and the Future Claimants' Representative shall have no authority or ability to modify, reject, or influence any claim allowance or Allowed Claim Amount determination under the Trust Distribution Procedures.

#### c. **Consent Procedures**

The Settlement Trustee shall obtain the consent of the STAC and the Future Claimants' Representative on any amendments to the Trust Distribution Procedures pursuant to Article XIII.B of the Trust Distribution Procedures, and on such matters as are otherwise required below and in Section 1.6 of the Settlement Trust Agreement. Such consent shall not be unreasonably withheld.

### 3. *Claimant Eligibility*

#### a. **Direct Abuse Claims**

To be eligible to potentially receive compensation from the Settlement Trust on account of a Direct Abuse Claim, a Direct Abuse Claimant must:

(i)    have a Direct Abuse Claim;

(ii)   have timely submitted an Abuse Claim Proof of Claim or Trust Claim Submission to the Settlement Trust as provided below; and

(iii)  submit supporting documentation and evidence to the Settlement Trust as provided below.

Direct Abuse Claims can only be timely submitted as follows:

(i)         a Direct Abuse Claim for which a Proof of Claim was filed in the Chapter 11 Cases before the Bar Date or if determined timely by the Bankruptcy Court shall, without any further action by the Abuse Claimant, be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust;

(ii)       a Direct Abuse Claim alleging abuse against a Local Council (alleged to be connected to Scouting related to or sponsored by the BSA) (a) for which, as of the time the Claim is submitted to the Settlement Trust in accordance with the Settlement Trustee's designated procedures, a pending state court action had been timely filed under state law naming the Local Council as a defendant or (b) which is submitted to the Settlement Trust at a time when the Claim would be timely under applicable state law if a state court action were filed against the Local Council on the date on which the Direct Abuse Claim is submitted to the Settlement Trust, shall be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust; or

(iii)     a Direct Abuse Claim alleging abuse against any Protected Party other than a Local Council (alleged to be connected to Scouting related to or sponsored by the BSA) (a) for which, as of the time the Claim is submitted to the Settlement Trust in accordance with the Settlement Trustee's designated procedures, a pending state court action had been timely filed under state law naming the Protected Party as a defendant or (b) which is submitted to the Settlement Trust at a time when the Claim and would be (x) timely under applicable state law if a state court action were filed against the Protected Party on the date on which the Direct Abuse Claim is submitted to the Settlement Trust and (y) meets any applicable deadline that may be set by the Bankruptcy Court in connection with such Protected Party becoming a Protected Party in accordance with the Plan and Confirmation Order, shall be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust.

Any Direct Abuse Claim that is not timely submitted based on the foregoing shall be deemed untimely and Disallowed.

### b.     **Indirect Abuse Claims**[111]

To be eligible to receive compensation from the Settlement Trust, an Indirect Abuse Claimant:

(iv)     must have an Indirect Abuse Claim that satisfies the requirements of the Bar Date Order;

(v)      must establish to the satisfaction of the Settlement Trustee that the claim is not of a nature that it would be otherwise subject to disallowance under section 502 of the Bankruptcy Code, including subsection (e) thereof (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under section 502(j) of the

---

[111] For the avoidance of doubt, Indirect Abuse Claims may include claims for the payment of defense costs, deductibles, or indemnification obligations.

Bankruptcy Code), or subordination under sections 509(c) or 510 of the Bankruptcy Code; and

(vi)    must establish to the satisfaction of the Settlement Trustee that:

   (A)    such Indirect Abuse Claimant has paid in full the liability and/or obligation of the Settlement Trust to a Direct Abuse Claimant to whom the Settlement Trust would otherwise have had a liability or obligation under the Trust Distribution Procedures (and which has not been paid by the Settlement Trust);

   (B)    the Indirect Abuse Claimant and the person(s), to whose claim(s) the Indirect Abuse Claim relates, have forever and fully released the Settlement Trust and the Protected Parties from all liability for or related to the subject Direct Abuse Claim (other than the Indirect Abuse Claimant's assertion of its Indirect Abuse Claim);

   (C)    the Indirect Abuse Claim is not otherwise barred by a statute of limitations or repose or by other applicable law; and

   (D)    the Indirect Abuse Claimant does not owe the Debtors, Reorganized Debtors, or the Settlement Trust an obligation to indemnify the liability so satisfied.

In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment. In addition, no Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Claimant in respect of such claim for which the Settlement Trust would have liability. Further, in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim.

c.    **Future Abuse Claims**

To be eligible to potentially receive compensation from the Settlement Trust on account of a Future Abuse Claim, a Future Abuse Claimant must:

(i)    have a Direct Abuse Claim that arises from Abuse that occurred prior to the Petition Date; and

(ii)    as of the date immediately preceding the Petition Date, had not attained eighteen (18) years of age or was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose;

(iii)    submit the Future Abuse Claim to the Settlement Trust in accordance with the Trust Distribution Procedures (i) at a time when the Claim would be timely under applicable state law if a state court action were filed on the

date on which the Future Abuse Claim is submitted to the Settlement Trust, or (ii) if the Future Abuse Claim is not timely under (i) above, it will be eliminated or decreased in accordance with Article VIII.E(iii) of the Trust Distribution Procedures; and

(iv)    have not filed a Chapter 11 Proof of Claim.

Future Abuse Claims that meet the foregoing eligibility criteria shall be treated as Direct Abuse Claims hereunder.

### 4.    *General Trust Procedures*

#### a.    **Document Agreement**

As more fully described in the Document Agreement, the Settlement Trustee may require other parties to the Document Agreement to provide the Settlement Trust with documents, witnesses, or other information as provided therein.

#### b.    **Document Access**

The Settlement Trust shall afford access for Direct Abuse Claimants to relevant, otherwise discoverable non-privileged documents obtained by the Settlement Trust pursuant to the Document Agreement to facilitate their submissions with respect to their Direct Abuse Claims, including access to IV files (the Volunteer Screening Database) and to all Troop Rosters in the possession, custody or control of the Debtors, each Protected Party or the Settlement Trust. A court of competent jurisdiction shall be able to determine whether allegedly privileged documents should be required to be produced by the Settlement Trust. The Settlement Trust also may perform any and all obligations necessary to recover assigned proceeds under the assigned insurance rights in connection with the administration of the Trust Distribution Procedures.

#### c.    **Assignment of Insurance Rights**

The Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order, and the Settlement Trust has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves) in accordance with the Bankruptcy Code. Nothing in the Trust Distribution Procedures shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under an Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of any Non-Settling Insurance Company relating to or arising out of the Trust Distribution Procedures, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law. Notwithstanding the foregoing, the Settlement Trust shall satisfy, to the extent required under the relevant policies and applicable law, any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies. In the event that a Non-Settling Insurance Company pays such self-insured retention and is entitled to reimbursement from

the Settlement Trust under applicable law, such Non-Settling Insurance Company shall receive that reimbursement in the form of a set-off against any claim for coverage by the Settlement Trust against that Non-Settling Insurance Company with respect to the relevant Abuse Claim.

### d.    **Deceased Abuse Survivor**

The Settlement Trustee shall consider, and if an Allowed Claim Amount is determined, pay under the Trust Distribution Procedures, the claim of a deceased Direct Abuse Claimant without regard to the Direct Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

### e.    **Statute of Limitations or Repose**

The statute of limitations, statute of repose, and the choice of law determination applicable to an Abuse Claim against the Settlement Trust shall be determined by reference to the tort system where such Abuse Claim was pending on the Petition Date (so long as the Protected Party was subject to personal jurisdiction in that location), or where such Abuse Claim could have been timely and properly filed as asserted by the Abuse Claimant under applicable law.

### 5.    *Expedited Distributions*

### a.    **Minimum Payment Criteria**

A Direct Abuse Claimant who meets the following criteria may elect to resolve his or her Direct Abuse Claim for an Expedited Distribution of $3,500: (i) the Direct Abuse Claimant elects to resolve his or her Direct Abuse Claim for the Expedited Distribution in accordance with the Plan and Confirmation Order (the "Expedited Distribution Election"); (ii) in connection with the Expedited Distribution Election, the Direct Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed, non-duplicative Chapter 11 POC or Future Abuse Claim; and (iii) the Direct Abuse Claimant has personally signed his or her Proof of Claim or Future Abuse Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such verification. Direct Abuse Claimants that make the Expedited Distribution Election will not have to submit any additional information to the Settlement Trust to receive payment of the Expedited Distribution from the Settlement Trust.

### b.    **Process and Payment of Expedited Distributions**

Direct Abuse Claimants who have properly made the Expedited Distribution Election and who met the criteria set forth in Article VI.A(ii) and (iii) of the Trust Distribution Procedures, shall be entitled to receive their Expedited Payment upon executing an appropriate release, which shall include a release of the Settlement Trust, the Protected Parties, and all Chartered Organizations. The form of release agreement that a Direct Abuse Claimant who makes the Expedited Distribution Election must execute is attached to the Trust Distribution Procedures as Exhibit A. A Direct Abuse Claimant who does not make the Expedited Distribution Election and a Future Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the deadlines and procedures established by the Settlement Trust may not later elect to receive the Expedited Distribution. A Direct Abuse Claimant who makes the Expedited Distribution Election (or Future

Abuse Claimant who elects to receive the Expedited Distribution) shall have no other remedies with respect to any Direct Abuse Claim he or she has against the Settlement Trust, Protected Parties, Chartered Organizations, or any Non-Settling Insurance Company.   Direct Abuse Claimants that make the Expedited Distribution Election (or Future Abuse Claimant who elects to receive the Expedited Distribution) will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to the Trust Distribution Procedures.

### 6.    *Claims Allowance Process*

#### a.    **Trust Claim Submissions**

Each Abuse Claimant that does not make the Expedited Distribution Election and instead elects to pursue recovery from the Settlement Trust pursuant to the Trust Distribution Procedures must submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee pursuant to the requirements set forth herein.  In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (i) complete under oath a questionnaire to be developed by the Settlement Trustee and submitted to the STAC and the Future Claimants' Representative for approval; (ii) produce all records and documents in his or her possession, custody or control related to the Abuse Claim, including all documents pertaining to all settlements, awards, or contributions already received or that are expected to be received from a Protected Party or other sources; and (iii) execute an agreement to be provided or made available by the Settlement Trust with the questionnaire (1) to produce any further records and documents in his or her possession, custody or control related to the Abuse Claim reasonably requested by the Settlement Trustee, (2) consent to and agree to cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee); and (3) consent to and agree to cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee.  The date on which an Abuse Claimant submits (i), (ii) and (iii) above to the Settlement Trust shall be the "Trust Claim Submission Date". The Abuse Claimant's breach or failure to comply with the terms of his or her agreement made in connection with his or her Trust Claim Submission shall be grounds for disallowance or significant reduction of his or her Abuse Claim.  To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission, the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the Document Obligations and shall consider supplemental information timely provided by the Abuse Claimant, including information obtained pursuant to the Document Obligations.  Non-material changes to the claims questionnaire may be made by the Settlement Trustee with the consent of the STAC and the Future Claimants' Representative.

#### b.    **Claims Evaluation**

The Settlement Trustee shall evaluate each Trust Claim Submission individually and will follow the uniform procedures and guidelines set forth in the Trust Distribution Procedures to determine, based on the evidence obtained by the Settlement Trust, whether or not a Submitted Abuse Claim should be allowed.  After a review of the documentation provided by the Abuse Claimant in his or her Proof of Claim, Trust Claim Submission, materials received pursuant to the Document Obligations, and any follow-up materials or examinations (including, without

limitation, any Trustee Interview), the Settlement Trustee will either find the Abuse Claim to be legally valid and an Allowed Abuse Claim, or legally invalid and a Disallowed Claim.

### c.    Settlement Trustee Review Procedures

The Settlement Trustee must evaluate each Submitted Abuse Claim, including the underlying Proof of Claim, the Trust Claim Submission and/or the Trustee Interview or any other follow-up, and documents obtained through the Document Obligations, and determine whether such Claim is a legally valid Allowed Abuse Claim, based on the following criteria:

1.    **Initial Evaluation Criteria**.  The Settlement Trustee shall perform an Initial Evaluation of a Submitted Abuse Claim to determine whether:

(A)    the Abuse Claimant's Proof of Claim or Trust Claim Submission is substantially and substantively completed and signed under penalty of perjury;

(B)    the Direct Abuse Claim was timely submitted to the Settlement Trust under Article IV.A of the Trust Distribution Procedures; and

(C)    the Submitted Abuse Claim had not previously been resolved by litigation and/or settlement involving a Protected Party.

If any of these criteria are not met, then the Submitted Abuse Claim shall be a Disallowed Claim.

2.    **General Criteria for Evaluating Submitted Abuse Claims**.  To the extent a Submitted Abuse Claim is not disallowed based on the Initial Evaluation, then the Settlement Trustee will evaluate the following factors to determine if the evidence related to the Submitted Abuse Claim is credible and demonstrates, by a preponderance of the evidence, that the Submitted Abuse Claim is entitled to a recovery and should be allowed:

(A)    Alleged Abuse.  The Abuse Claimant has identified alleged acts of Abuse that he or she suffered;

(B)    Alleged Abuser Identification.  The Abuse Claimant has either (i) identified an alleged abuser (*e.g.*, by the full name or last name) or (ii) provided specific information (*e.g.*, a physical description of an alleged abuser combined with the name or location of the Abuse Claimant's troop) about the alleged abuser such that the Settlement Trustee can make a reasonable determination that the alleged abuser was an employee, agent or volunteer of a Protected Party, the alleged abuser was a registered Scout, or the alleged abuser

participated in Scouting or a Scouting activity and the Abuse was directly related to Scouting activities;

(C) <u>Connection to Scouting</u>. The Abuse Claimant has provided information showing (or the Settlement Trustee otherwise determines) that the Abuse Claimant was abused during a Scouting activity or that the Abuse resulted from involvement in Scouting activities;

(D) <u>Date and Age</u>. The Abuse Claimant has either: (i) identified the date of the alleged abuse and/or his or her age at the time of the alleged Abuse, or (ii) provided additional facts (*e.g.*, the approximate date and/or age at the time of alleged Abuse coupled with the names of additional scouts or leaders in the troop) sufficient for the Settlement Trustee to determine the date of the alleged Abuse and age of the Abuse Claimant at the time of such alleged Abuse; and

(E) <u>Location of Abuse</u>. The Abuse Claimant has identified the venue or location of the alleged Abuse.

3. **<u>Submitted Abuse Claims That Satisfy the General Criteria</u>**. To the extent that a Submitted Abuse Claim meets the evidentiary standard set forth in the General Criteria and the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are deceptive or fraudulent, the Submitted Abuse Claim will be, and will be deemed to be, an Allowed Abuse Claim.

4. **<u>Submitted Abuse Claims That Do Not Satisfy the General Criteria</u>**. If the Settlement Trustee determines that any Submitted Abuse Claim materials provided by an Abuse Claimant include fraudulent and/or deceptive information, the Submitted Abuse Claim will be, and will be deemed to be, a Disallowed Claim. To the extent that a Submitted Abuse Claim—after an opportunity for the Abuse Claimant to discover information from the Settlement Trust as provided in the Trust Distribution procedures—does not meet the evidentiary standard set forth in the General Criteria, the Settlement Trustee can disallow such Claim, or request further information from the Abuse Claimant in question necessary to satisfy the General Criteria requirements. If the Settlement Trustee finds that any of the factors set forth in <u>Article VII.C.2(a)-(c)</u> of the Trust Distribution Procedures with respect to any Submitted Abuse Claim are not satisfied, the Claim will be *per se* disallowed and will be, and will be deemed to be, a Disallowed Claim.

### d.    **Disallowed Claims**

If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee shall provide written notice of its determination to the relevant Abuse Claimant. If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee will not perform the Allowed Abuse Claim valuation analysis described in Article VIII of the Trust Distribution Procedures.  Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Disallowed Claim Notice as described in Article VII.G of the Trust Distribution Procedures.

### e.    **Allowed Abuse Claims**

If the Settlement Trustee finds that a Submitted Abuse Claim is an Allowed Abuse Claim, the Settlement Trustee shall utilize the procedures described in Article VIII of the Trust Distribution Procedures to determine the proposed Claims Matrix tier and Scaling Factors for such Abuse Claim, and provide written notice of allowance and the Proposed Allowed Claim Amount to the Abuse Claimant as set forth in Article VII.F of the Trust Distribution Procedures.

### f.    **Claims Determination**

If the Abuse Claimant accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth in Article VII.G of the Trust Distribution Procedures has been exhausted (and no further action has been taken by the Abuse Claimant in the tort system pursuant to Article XII of the Trust Distribution Procedures), the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Claim, and the holder of such Allowed Abuse Claim shall receive payment in accordance with Article IX of the Trust Distribution Procedures, subject to the Abuse Claimant executing the form of release set forth in Article IX.D of the Trust Distribution Procedures.

### g.    **Reconsideration of Settlement Trustee's Determination**

An Abuse Claimant may make a request for reconsideration of (i) the disallowance of his or her Submitted Abuse Claim, or (ii) the Proposed Allowed Claim Amount within thirty (30) days of receiving a Disallowed Claim Notice or an Allowed Claim Notice.  Any Abuse Claimant who fails to submit a Reconsideration Request to the Settlement Trust by the Reconsideration Deadline shall be deemed to accept the disallowance of the Abuse Claim or the Proposed Allowed Claim Amount.  Each Reconsideration Request must be accompanied by a check or money order for $1,000 as an administrative fee for reconsideration.  The Abuse Claimant may submit further evidence in support of the Submitted Abuse Claim with the Reconsideration Request.  The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request.  The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

If the Reconsideration Request is denied, the administrative fee will not be returned, and the Settlement Trustee will notify the Abuse Claimant within thirty (30) days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in Article XII of the Trust Distribution Procedures.

If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within thirty (30) days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.  The Settlement Trustee will then reconsider the Submitted Abuse Claim—including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Trustee Interview—and will have the discretion to maintain the prior determination or find that the Submitted Abuse Claim in question is an Allowed Abuse Claim or should receive a new Proposed Allowed Claim Amount.

If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is an Allowed Abuse Claim and/or should receive a new Proposed Allowed Claim Amount, the Settlement Trustee will deliver an Allowed Claim Notice and return the administrative fee to the relevant Abuse Claimant.  If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is a Disallowed Claim, or that the Claim in question is not deserving of a new Proposed Allowed Claim Amount, the Settlement Trustee's earlier allowance determination and/or Proposed Allowed Claim Amount shall stand and the Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within ninety (90) days of the Settlement Trust having sent notice that it was reconsidering the Abuse Claimant's Submitted Abuse Claim.  Thereafter, the Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described below in Article XII of the Trust Distribution Procedures.

### h.    Claim Determination Deferral

For a period of up to twelve (12) months from the Effective Date, and by an election exercised at the time of the Trust Claim Submission, Direct Abuse Claimants whose Direct Abuse Claims may be substantially reduced by the Scaling Factor described in Article VIII.E.(iii)(a) of the Trust Distribution Procedures (statute of limitations defense) may elect to defer the determination of their Proposed Allowed Claim Amounts to see if statute of limitations revival legislation occurs, *provided*, *however*, that this claim determination deferral window shall close for all Direct Abuse Claims twelve (12) months from the Effective Date at which time such Submitted Abuse Claims shall be determined based on then applicable Scaling Factors.

### i.    Prevention and Detection of Fraud

The Settlement Trustee shall work with the Claims Administrator to institute auditing and other procedures to detect and prevent the allowance of Abuse Claims based on fraudulent Trust Claim Submissions.  Among other things, such procedures will permit the Settlement Trustee or Claims Auditor to conduct random audits to verify supporting documentation submitted in randomly selected Trust Claim Submissions, as well as targeted audits of individual Trust Claim Submissions or groups of Trust Claim Submissions, any of which may include Trustee Interviews. Trust Claim Submissions must be signed under the pains and penalties of perjury and to the extent of applicable law, the submission of a fraudulent Trust Claim Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in the Federal Courts.

7.    *Claims Matrix and Scaling Factors*

a.    **Claims Matrix and Scaling Factors**

The Trust Distribution Procedures establish certain criteria for unliquidated claims seeking compensation from the Settlement Trust, a Claims Matrix below that schedules six types of Abuse and designates for each Abuse Type a Base Matrix Value, and Maximum Matrix Value, and certain Scaling Factors identified below to apply to the Base Matrix Values to determine the liquidated values for certain unliquidated Abuse Claims. The Abuse Types, Scaling Factors, Base Matrix Values, and Maximum Matrix Values that are set forth in the Claims Matrix have all been selected and derived with the intention of achieving a fair and reasonable Abuse Claim valuation range in light of the best available information, considering the settlement, verdict and/or judgments that Abuse Claimants would receive in the tort system against the Protected Parties absent the bankruptcy. The Settlement Trustee shall utilize the Claims Matrix and Scaling Factors as the basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim that does not receive an Expedited Distribution or become a STAC Tort Election Claim. The Proposed Allowed Claim Amount agreed to by the Direct Abuse Claimant as the Allowed Claim Amount for an Allowed Abuse Claim shall be deemed to be the Protected Parties' liability for such Direct Abuse Claim (*i.e.*, the claimant's right to payment for his or her Direct Abuse Claim), irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in Article IX of the Trust Distribution Procedures. In no circumstance shall the amount of a Protected Party's legal obligation to pay any Direct Abuse Claim be determined to be any payment percentages hereunder or under the Settlement Trust Agreement (rather than the liquidated value of such Direct Abuse Claim as determined under the Trust Distribution Procedures).

b.    **Claims Matrix**

The Claims Matrix establishes six tiers of Abuse Types, and provides the range of potential Allowed Claim Amounts assignable to an Allowed Abuse Claim in each tier. The first two columns of the Claims Matrix delineate the six possible tiers to which an Allowed Abuse Claim can be assigned based on the nature of the abuse. The Base Matrix Value column for each tier represents the default Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier, in each case based on historical abuse settlements and litigation outcomes which included release for all BSA-related parties, including the BSA and all other putative Protected Parties to such actions, prior to application of the Scaling Factors described in Article VIII.D of the Trust Distribution Procedures. The Maximum Claims Matrix Value column for each tier represents the maximum Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier after Claims Matrix review and application of the Scaling Factors described in Article VIII.C of the Trust Distribution Procedures. The ultimate distribution(s) to the holder of an Allowed Abuse Claim that has received a Final Determination may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the holder's Allowed Claim Amount based on the payment percentages determined by the Settlement Trustee. If an Allowed Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier. An Abuse Claimant cannot have multiple Allowed Abuse Claims assigned to different tiers. Commencing on the second anniversary of the Effective Date, the Settlement Trust shall adjust the valuation amounts for yearly inflation based

on the CPI-U.  The CPI-U adjustment may not exceed 3% annually, and the first adjustment shall not be cumulative.

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|------|---------------|-------------------|----------------------|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $600,000 | $2,700,000 |
| 2 | Oral Contact by Adult Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina.<br><br>Anal or Vaginal Penetration by a Youth Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $450,000 | $2,025,000 |
| 3 | Masturbation by Adult Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant.<br><br>Oral Contact by a Youth Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. | $300,000 | $1,350,000 |
| 4 | Masturbation by Youth Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant.<br><br>Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator. | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator.<br><br>Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation.<br><br>Exploitation for child pornography. | $75,000 | $337,500 |
| 6 | Sexual Abuse-No Touching.<br><br>Adult Abuse Claims. | $3,500 | $8,500 |

c.    **Scaling Factors**

After the Settlement Trustee has assigned an Allowed Abuse Claim to one of the six tiers in the Claims Matrix, the Settlement Trustee will utilize the Scaling Factors described below to

determine the Proposed Allowed Claim Amount for each Allowed Abuse Claim. The Scaling Factors are based on evidence regarding the BSA's and other putative Protected Parties' historical abuse settlements, litigation outcomes, and other evidence supporting the Scaling Factors. Each Allowed Abuse Claim will be evaluated for each factor by the Settlement Trustee through his or her review of the evidence obtained through the relevant Proof of Claim, Trust Claim Submission and any related or follow-up materials, interviews or examinations, as well as materials obtained by the Settlement Trust through the Document Obligations. These scaling factors can increase or decrease the Proposed Allowed Claim Amount for an Allowed Abuse Claim depending on the severity of the facts underlying the Claim. By default, the value of each scaling factor is one (1), meaning that in the absence of the application of the scaling factor, the Base Matrix Value assigned to a Claim is not affected by that factor. In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Allowed Abuse Claim is 1.5, the Proposed Allowed Claim Amount for the Allowed Abuse Claim will be increased by 50%, the result of multiplying the Base Matrix Value of the Allowed Abuse Claim by 1.5. The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base Matrix Value of the Allowed Abuse Claim. *See* Article VII.F of the Trust Distribution Procedures for illustrative example.

**Aggravating Scaling Factors**. The Settlement Trustee may assign upward Scaling Factors to each Allowed Abuse Claim based on the following categories:

(i) **Nature of Abuse and Circumstances**. To account for particularly severe Abuse or aggravating circumstances, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5 to each Allowed Abuse Claim. The hypothetical base case scenario for this scaling factor would involve a single incident of Abuse with a single perpetrator with such perpetrator having accessed the victim as an employee or volunteer within BSA-sponsored scouting. The hypothetical base case is incorporated into the Base Matrix Value in the Claims Matrix tiers and would not receive an increase on account of this factor. By way of example, aggravating factors that can give rise to a higher scaling factor include the following factors:

1. Extended duration and/or frequency of the Abuse;

2. Exploitation of the Abuse Claimant for child pornography;

3. Coercion or threat or use of force or violence, stalking; and

4. Multiple perpetrators involved in sexual misconduct.

(ii) **Abuser Profile**. To account for the alleged abuser's profile, the Settlement Trustee may assign an upward Scaling Factor of up to 2.0 to an Allowed Abuse Claim. This factor is to be evaluated relative to a hypothetical base case scenario involving a perpetrator as to whom there is no other known allegations of Abuse. The hypothetical base case is incorporated into the Base Matrix Value in the Claims Matrix tiers and would not receive an increase on account of this factor. An upward Scaling Factor may be

applied for this category as follows (the Settlement Trustee may only apply the scaling factor of the single highest applicable category listed below):

1.      1.25 if the abuser was accused by at least one (1) other alleged victim of Abuse;

2.      1.5 if the abuser was accused by five (5) or more other alleged victims of Abuse;

3.      2.0 if the abuser was accused by ten (10) or more other alleged victims of Abuse; and

4.      1.25 to 2.0 if there is evidence of negligence of a Protected Party (*e.g.*, the inclusion of the perpetrator in the IV files (Volunteer Screening Database) for abuse reasons).

(iii)   **Impact of the Abuse**.  To account for the impact of the alleged Abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged Abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5.  This factor is to be evaluated relative to a hypothetical base case scenario of a victim of Abuse who suffered the typical level of Abuse-related distress within the tier to which the Allowed Abuse Claim was assigned.  The hypothetical base case is incorporated into the Base Matrix Values in the Claims Matrix tiers and would not receive an increase on account of this factor.  The Settlement Trustee will consider, along with any and all other relevant factors, whether the Abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

1.      Mental Health Issues:  This includes anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation, suicide attempts, and hospitalization or receipt of treatment for any of the foregoing.

2.      Physical Health Issues:  This includes physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of Abuse, reproductive damage, self-cutting, other

226

self-injurious behavior, and hospitalization or receipt of treatment for any of the foregoing.

3.    <u>Interpersonal Relationships</u>:  This includes problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation, damage to family relationships, and fear of children or parenting.

4.    <u>Vocational Capacity</u>:  This includes under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feelings of unworthiness, or guilt related to financial success.

5.    <u>Academic Capacity</u>:  This includes school behavior problems.

6.    <u>Legal Difficulties</u>:  This includes criminal difficulties, bankruptcy, and fraud.

**<u>Mitigating Scaling Factors</u>**.  The Settlement Trustee may assign a mitigating Scaling Factor in the range of 0 to 1.0 except as specifically provided below to each Allowed Abuse Claim to eliminate or decrease the Proposed Allowed Claim Amount for such Claim.  Each mitigating factor is to be evaluated relative to a hypothetical base case scenario of a timely asserted Abuse Claim with supporting evidence that demonstrates, by a preponderance of the evidence, Abuse by a perpetrator that accessed the victim as an employee, agent or volunteer of a Protected Party, as a registered Scout or as a participant in Scouting within BSA-sponsored Scouting.  If statute of limitations revival legislation occurs in a particular jurisdiction, the Settlement Trustee may modify the applicable Scaling Factor (as described below) relevant thereto on a go-forward basis and determine Proposed Allowed Claim Amounts for Abuse Claims in such jurisdiction thereafter based on such modified Scaling Factor.  Included in the hypothetical base case scenario is that the applicable period under a statute of limitations or repose for timely asserting such Abuse Claim against any potentially responsible party will not have passed.  The hypothetical base case is incorporated into the Base Matrix Values in the Claims Matrix tiers and would not receive a decrease on account of these factors.  Such factors may include the following:

(i)    **Absence of Protected Party Relationship or Presence of a Responsible Party that Is Not a Protected Party**.

(A)    <u>Familial Relationship</u>.  A Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated where the perpetrator also had a familial relationship with the Abuse Claimant.  Familial Abuse—even if the perpetrator was an employee, agent or volunteer of a Protected Party, and the Abuse occurred in connection with BSA-related Scouting—should result in a significant reduction of the Proposed Allowed Claim Amount.

(B)    <u>Other Non-Scouting Relationship</u>.  A Protected Party's responsibility for a perpetrator may be factually or legally attenuated

227

or mitigated where the perpetrator also maintained a non-familial relationship with the Abuse Claimant through a separate affiliation, such as a school, or a religious organization, even if the perpetrator was an employee, agent or volunteer of a Protected Party, or the Abuse occurred in settings where a Protected Party did not have the ability or responsibility to exercise control.  Factors to consider include how close the relationship was between the perpetrator and the victim outside of their Scouting-related relationship, whether Abuse occurred and the extent of such Abuse outside of their Scouting relationship, and applicable law related to apportionment of liability.  In such event, the Settlement Trustee shall determine and apply a mitigating Scaling Factor that accounts for such other relationship and the related Abuse.  By way of example, if the Settlement Trustee determines after evaluation of an Allowed Abuse Claim and application of all of the other Scaling Factors that the perpetrator, who was an employee, agent or volunteer of a Protected Party for BSA-related Scouting, also was the primary teacher (at a non-Protected Party entity or institution) of the Abuse Claimant outside of BSA-related Scouting, and if numerous incidents of Abuse occurred outside of Scouting before one incident of BSA-related Scouting Abuse occurred, the Settlement Trustee shall apply a mitigating Scaling Factor as a material reduction of the Proposed Allowed Claim Amount.

(C)   <u>Other Responsible Non-Protected Party</u>.  The Abuse Claimant may have a cause of action under applicable law for a portion of his or her Direct Abuse Claim against a responsible entity, such as a Chartered Organization, that is not a Protected Party.  By way of example, if the Settlement Trustee determines after evaluation of a Submitted Abuse Claim that (i) a Chartered Organization that is not a Protected Party is responsible under applicable law for a portion of the liability and (ii) a Protected Party(ies) are not also liable for the same portion of the liability (taking into account the relevant jurisdiction's prevailing law on apportionment of damages), the Settlement Trustee shall apply a final Scaling Factor to account for such non-Protected Party's portion of the liability.

(ii)   **Other Settlements, Awards, Contributions, or Limitations**.   The Settlement Trustee may consider any further limitations on the Abuse Claimant's recovery in the tort system.  The Settlement Trustee also should consider the amounts of any settlements or awards already received by the Abuse Claimant from other, non-Protected Party sources as well as agreed and reasonably likely to be received contributions from other, non-Protected Party sources that are related to the Abuse.  By way of example, the Settlement Trustee should assign an appropriate Scaling Factor to Allowed Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the Abuse occurred.  Notwithstanding the foregoing,

where an Abuse Claimant has obtained a recovery based on the independent liability of a third party for separate instances of Abuse that occurred without connection to Scouting activities, no mitigating factor or reduction in value will be applied based on that recovery.

(iii)    **Statute of Limitations or Repose and BSA's Discharge**.  If the evidence provided by the Abuse Claimant or otherwise obtained by the Settlement Trustee results in the Settlement Trustee concluding that the subject Direct Abuse Claim could be dismissed or denied in the tort system as to all Protected Parties against whom the Direct Abuse Claim was timely submitted (as set forth in Article IV.A of the Trust Distribution Procedures) due to the passage of a statute of limitations or a statute of repose, the Settlement Trustee shall apply an appropriate Scaling Factor based on the ranges set forth in Schedule 1 of the Trust Distribution Procedures; *provided*, *however,* the Settlement Trustee will weigh the strength of any relevant evidence submitted by the Abuse Claimant to determine whether the statute of limitations could be tolled under applicable law, and may apply a higher Scaling Factor if such evidence demonstrates to the Settlement Trustee that tolling would be appropriate under applicable state law.

(iv)    **Absence of a Putative Defendant.**  If the Direct Abuse Claim could be diminished because such claim was not timely submitted against BSA or another Protected Party (as set forth in Article IV.A of the Trust Distribution Procedures), such that in a suit in the tort system, such Direct Abuse Claim would be burdened by an "empty chair" defense due to the absence of a Missing Party(ies), the Settlement Trustee shall apply a mitigating Scaling Factor to account for a Missing Party's absence.  By way of example, where a timely submitted Direct Abuse Claim was not timely submitted against BSA (*i.e.*, the Abuse Claimant failed to timely file a Chapter 11 POC) but was only timely submitted against the Local Council and/or another Protected Party (as set forth in Articles IV.A(ii) and (iii) of the Trust Distribution Procedures), such absence of the BSA due to BSA's discharge would be the basis for such a substantial reduction.  Any Direct Abuse Claim that is reduced due to the absence of the BSA under this mitigating Scaling Factor shall only be payable, as reduced, from Settlement Trust Assets contributed by the applicable Local Council or Chartered Organization, pro rata with all other Direct Abuse entitled to share in the Settlement Trust Assets contributed by such Local Council or Chartered Organization.

d.    **Allowed Abuse Claim Calculus**

After the Settlement Trustee assigns an Allowed Abuse Claim to a Claims Matrix tier and determines the appropriate Scaling Factors that apply to the Claim, the Proposed Allowed Claim Amount for the Allowed Abuse Claim is the product of the Base Matrix Value of the Claim and

the Scaling Factors applied to the Claim. In no event can an Allowed Abuse Claim's Proposed Allowed Claim Amount (or Allowed Claim Amount) exceed the Maximum Matrix Value for the Claim's assigned Claims Matrix tier. By way of example, if an Allowed Abuse Claim is determined by the Settlement Trustee to be a tier 1 claim (Base Matrix Value of $600,000) with a Scaling Factor of 1.5 for the nature and circumstances of the abuse, and a mitigating Scaling Factor of 0.75, and no other Scaling Factors, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $675,000, calculated as $600,000 x 1.5 x 0.75 = $675,000. As a further example, if, in addition to the above Scaling Factors, the same Allowed Abuse Claim had an additional aggravating Scaling Factor of 2.0 on account of the abuser's profile, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $1,350,000 (calculated as $600,000 x 1.5 x .75 x 2.0).

#### e.    **Optional Chartered Organization Release**

To have the opportunity to exclusively share in any settlement proceeds received from a Chartered Organization that becomes a Protected Party as provided in Article IX.F of the Trust Distribution Procedures, a Direct Abuse Claimant must execute either (i) the conditional release of the Chartered Organization(s) against whom the Abuse Claimant has an Abuse Claim, that will become effective as to that Abuse Claimant if the Chartered Organization(s) against whom the Abuse Claimant conditionally released becomes a Protected Party(ies), in the form attached as Exhibit B to the Trust Distribution Procedures, or (ii) the non-conditional release of all Chartered Organizations in the form attached as Exhibit C to the Trust Distribution Procedures.

#### 8.    *Payment of Final Determination Allowed Abuse Claim*

#### a.    **Payment Upon Final Determination**

Only after the Settlement Trustee has established an Initial Payment Percentage in accordance with Section 4.1 of the Settlement Trust Agreement, then once there is a Final Determination of an Abuse Claim pursuant to Article VII.F of the Trust Distribution Procedures, the Claimant will receive a payment of such Final Determination based on the Payment Percentage then in effect as described in Articles IX.B and IX.C of the Trust Distribution Procedures. For the purpose of payment by the Settlement Trust, a Final Judicial Determination (as defined in Article XII.H of the Trust Distribution Procedures) shall constitute a Final Determination.

#### b.    **Initial Payment Percentage**

After the Claimant accepts the Proposed Allowed Claim Amount and there is a Final Determination of the Abuse Claim, the Settlement Trust shall pay an Initial Distribution based on the Initial Payment Percentage established by the Settlement Trustee in accordance with the Settlement Trust Agreement.

#### c.    **Supplemental Payment Percentage**

When the Settlement Trustee determines that the then-current estimates of the Settlement Trust's assets and its liabilities, as well as then-estimated value of then-pending Abuse Claims, warrant additional distributions on account of the Final Determinations, the Settlement Trustee shall set a Supplemental Payment Percentage in accordance with the Settlement Trust Agreement.

Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage. Claimants whose Abuse Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the then existing payment percentage. For the avoidance of doubt, the Allowed Claim Amount of each Allowed Abuse Claim after Final Determination shall be deemed to be the Protected Parties' liability for such Allowed Abuse Claim irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in <u>Article IX</u> of the Trust Distribution Procedures. For example if the Allowed Claim Amount for an Allowed Abuse Claim that has received a Final Determination is $1,350,000, even if the Settlement Trust distributes less than $1,350,000 to the Abuse Claimant on account of such Allowed Abuse Claim based on application of the Initial Payment Percentage and any Subsequent Payment Percentage(s), the Allowed Claim Amount for the Abuse Claim is still $1,350,000.

### d.    **Release**

In order for an Allowed Abuse Claim to receive a Final Determination and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit, as a precondition to receiving any payment from the Settlement Trust, an executed form of release to be developed, in each case, by the Coalition and the Future Claimants' Representative, in consultation with the BSA (which form(s) of release shall provide a full and final release, in form and substance acceptable to Hartford, of the Hartford Protected Parties in accordance with the Hartford Insurance Settlement Agreement). Notwithstanding anything else to the contrary contained herein, to the extent a holder of an Abuse Claim is entitled to receive payment from the TCJC Settlement Contribution pursuant to the Plan and Settlement Trust Documents, as a condition precedent to receiving any proceeds from the TCJC Settlement Contribution, such holder shall be required to execute (and shall be deemed to have granted) a full and complete written release in favor of TCJC with respect to such Abuse Claim, which release shall be in form and substance acceptable to TCJC and a copy of which form shall be filed with the form of TCJC Settlement Agreement filed in the Plan Supplement. Notwithstanding anything else to the contrary contained herein, as a condition precedent to receiving any proceeds from the Settlement Trust, a holder of an Abuse Claim shall be required to execute (and shall be deemed to have granted) a full and complete written release in favor of each Settling Insurance Company, including Hartford, with respect to such Abuse Claim, which release shall be in form and substance acceptable to each Settling Insurance Company, a copy of which form shall be filed with the Plan Supplement. The form of release agreement that a Direct Abuse Claimant who makes the Expedited Distribution Election must execute is attached as Exhibit A to the Trust Distribution Procedures. The form of the Settling Chartered Organization Release applicable to an Abuse Claimant who has elected to provide a conditional release to certain Chartered Organizations shall be substantially in the form of Exhibit B to the Trust Distribution Procedures. The form of the Voluntary Chartered Organization Release applicable to an Abuse Claimant who has selected a Final Determination based on the Proposed Allowed Claim Amount shall be substantially in the form of Exhibit C to the Trust Distribution Procedures. The form of the release applicable to an Abuse Claimant who has selected a Final Determination based on the Proposed Allowed Claim Amount but who does not elect to execute the Voluntary Chartered Organization Release shall be substantially in the form of Exhibit D to the Trust Distribution Procedures.

e.    **FIFO Claims Process Queuing and Exigent Health Claims**

The Settlement Trust shall review all Trust Claim Submissions for processing purposes on a FIFO basis as set forth in the Trust Distribution Procedures, except as otherwise provided in the Trust Distribution Procedures with respect to Expedited Distributions, Exigent Health Claims, or Submitted Abuse Claims electing to defer determination of their Allowed Claim Amounts for up to twelve (12) months from the Effective Date pursuant to Article VII.H of the Trust Distribution Procedures.  An Abuse Claimant's position in the FIFO Processing Queue shall be determined as of the Abuse Claimant's Trust Claim Submission Date.  If any Trust Claim Submissions are filed on the same date, an Abuse Claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the claimant's date of birth, with older Abuse Claimants given priority over younger Abuse Claimants.  An Abuse Claimant that seeks recovery on account of an Exigent Health Claim based on an Allowed Claim Amount determined through the matrix shall be moved in front of the FIFO Processing Queue no matter what the order of processing otherwise would have been under the Trust Distribution Procedures.  Following receipt of a Final Determination on account of an Exigent Health Claim, the holder of an Exigent Health Claim shall receive an Initial Distribution from the Settlement Trust (subject to the payment percentages then in effect), within thirty (30) days of executing the release as set forth in Article IX.D of the Trust Distribution Procedures.

f.    **Source Affected Weighting**

Notwithstanding the Initial Payment Percentage and the Supplemental Payment Percentages applied hereunder, Non-BSA Sourced Assets shall be allocated (after deducting an estimated pro rata share of Settlement Trust expenses and direct expenses related to the collection of such Non-BSA Sourced Assets) all or in part (the "Source Allocated Portion") only among the holders of Allowed Abuse Claims that (1) could have been satisfied from the source of such Non-BSA Assets absent the Plan's Discharge and Channeling Injunction and (2) are held by Direct Abuse Claimants that execute a conditional release, the form of which is attached as Exhibit B to the Trust Distribution Procedures, releasing all claims against all Chartered Organizations if the Settlement Trust enters into a global settlement making such Chartered Organization a Protected Party.  The Settlement Trustee shall establish separate payment percentages (each, a "Source Allocated Payment Percentage") in accordance with the Settlement Trust Agreement to effectuate the distribution of the Source Allocated Portions of any Non-BSA Sourced Assets.  For the avoidance of doubt, irrespective of the establishment of any Source Allocated Payment Percentage under Article IX.F of the Trust Distribution Procedures and the Settlement Trust Agreement that allocates Source Allocated Portions of Non-BSA Assets to holders of certain eligible Allowed Abuse Claims, the maximum payment that an Abuse Claimant can recover from the Settlement Trust before all other Allowed Abuse Claims are paid in full is the Final Determination Allowed Abuse Claim Amount for his or her Claim.  If there is a remainder of a Source Allocated Portion after satisfaction of all holders of applicable eligible Allowed Abuse Claims, then that remainder shall be distributed to all holders of Allowed Abuse Claims pursuant to the applicable payment percentage.

### 9. *Rights of Settlement Trust Against Non-Settling Insurance Companies*

Pursuant to the Plan, the Settlement Trust has taken an assignment of BSA's and any other Protected Party's (to the extent provided for in the Plan) rights and obligations under the Insurance Policies. For any Abuse Claim that the Settlement Trustee determines is an Allowed Abuse Claim pursuant to Article VII of the Trust Distribution Procedures, the Settlement Trustee will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and in the materials obtained through the Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim. The Settlement Trustee may determine that multiple Non-Settling Insurance Companies have responsibility for an Insured Abuse Claim. The Settlement Trustee shall seek reimbursement for each Insured Abuse Claim that is an Insured Abuse Claim, including the Proposed Allowed Claim Amount, from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law. The Settlement Trustee shall have the ability to exercise all of the rights and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan, including the right to resolve any disputes with a Non-Settling Insurance Company regarding their obligation to pay some or all of an Insured Abuse Claim. The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust. The Settlement Trustee will have the ability to request further information from Abuse Claimants in connection with seeking reimbursement for Insured Abuse Claims.

### 10. *Indirect Claims*

#### a. **Claims**

To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Abuse Claim must satisfy Article IV.B of the Trust Distribution Procedures. Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with Article IX of the Trust Distribution Procedures and shall be subject to the same liquidation and payment procedures as the Settlement Trust would have afforded the holders of the underlying valid Direct Abuse Claims pursuant to Articles VIII and IX of the Trust Distribution Procedures.

#### b. **Offset**

The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any related Direct Abuse Claim that might be subsequently asserted against the Settlement Trust as being against any Protected Party(ies) whose liability was paid by the Indirect Abuse Claimant.

### 11. *Tort System Alternative*

#### a. **Remedies after Disallowance or Exhaustion of Claims Allowance Procedures**

Within thirty (30) days after a Direct Abuse Claimant receives an Allowed Claim Notice or Claim Notice following a Reconsideration Request in accordance with Article VII.G of the Trust Distribution Procedures, a Direct Abuse Claimant may notify the Settlement Trust of his or her intention to seek a *de novo* determination of its Direct Abuse Claim by a court of competent

jurisdiction, subject to the limitations set forth in Article XII of the Trust Distribution Procedures. Such notification shall be made by submitting a written notice to the Settlement Trustee by the Tort Election Deadline. Unless the Settlement Trustee agrees to extend the Tort Election Deadline, Abuse Claimants who fail to so submit and/or file a Judicial Election Notice by the Tort Election Deadline shall be deemed to accept the disallowance of their Abuse Claims or the Proposed Abuse Claim Amounts (as applicable) and shall have no right to seek any further review of their Abuse Claims. An Abuse Claimant that asserts a Trust Distribution Procedures Tort Election Claim may not seek costs or expenses against the Settlement Trust in the lawsuit filed and the Settlement Trust may not seek costs or expenses against the Abuse Claimant. Any recoveries for a Trust Distribution Procedures Tort Election Claim from outside the Settlement Trust in respect of a Protected Party's liability are payable to the Settlement Trust and the Abuse Claimant shall be paid in accordance with Articles XII.G and IX of the Trust Distribution Procedures.

> b.   **Supporting Evidence for Trust Distribution Procedures Tort Election Claims**

Trust Distribution Procedures Tort Election Claims in the federal courts shall be governed by the rights and obligations imposed upon parties to a contested matter under the Federal Rules of Bankruptcy Procedure, *provided*, *however*, that an Abuse Claimant that prosecutes in any court a Trust Distribution Procedures Tort Election Claim after seeking reconsideration from the Settlement Trust shall not have the right to introduce into evidence to the applicable court any information or documents that (i) were requested by the Settlement Trustee and (ii) were in the possession, custody or control of the Abuse Claimant at the time of a request by the Settlement Trust, but which the Abuse Claimant failed to or refused to provide to the Settlement Trust in connection with the claims evaluation process in the Trust Distribution Procedures. The Abuse Claimant's responses to requests by the Settlement Trustee for documents or information shall be subject to Rule 37 of the Federal Rules of Civil Procedure, as applicable under the Federal Rules of Bankruptcy Procedure, and/or any comparable State Rule of Civil Procedure. An Abuse Claimant shall not have the right to disclose any Proposed Abuse Claim Amount received from the Settlement Trust to any court in connection with a Tort Election Claim. Subject to the terms of any protective order entered by a court, the Settlement Trustee shall be permitted to introduce as evidence before a court all information and documents submitted to the Settlement Trust under the Trust Distribution Procedures, and the Abuse Claimant may introduce any and all information and documents that he or she submitted to the Settlement Trust under the Trust Distribution Procedures.

> c.   **Authorization of Settlement Trustee and Settlement Trust Advisory Committee**

The Settlement Trustee may authorize the commencement or continuation of a lawsuit by a Direct Abuse Claimant in any court of competent jurisdiction against the Settlement Trust to obtain the Allowed Claim Amount of a Direct Abuse Claim. STAC Tort Election Claims shall not be required to exhaust any remedies under the Trust Distribution Procedures before commencing or continuing such lawsuit. No Abuse Claimant may pursue a STAC Tort Election Claim without the prior written approval of the Settlement Trustee in accordance with the Settlement Trust Agreement. Fifty percent (50%) (or less if determined by the Settlement Trustee) of any amounts paid with respect to a judgment for, or a settlement of, a STAC Tort Election Claim by a Non-

Settling Insurance Company, as to a policy as to which a Protected Party has assigned relevant insurance rights to the Settlement Trust, shall be paid over to the Settlement Trust.

### d.     Tender to Non-Settling Insurance Company

If an Abuse Claimant is authorized to file suit against the Settlement Trust as provided in Articles XII.A and XII.C of the Trust Distribution Procedures, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission and materials received in connection with the Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to the lawsuit. The Settlement Trustee may determine that there are multiple Non-Settling Insurance Companies that have responsibility to defend an Insured Lawsuit. The Settlement Trustee shall provide notice, and if applicable, seek defense, of any Insured Lawsuit to each Non-Settling Insurance Company from whom the Settlement Trustee determines insurance coverage may be available in accordance with the terms of each applicable Insurance Policy.

### e.     Parties to Lawsuit

Any lawsuit commenced under Article XII of the Trust Distribution Procedures must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. The Abuse Claimant may assert its Abuse Claim against the Settlement Trust as if the Abuse Claimant were asserting such claim against either the Debtors or another Protected Party and the discharge and injunctions in the Plan had not been issued. The Abuse Claimant may name any person or entity that is not a Protected Party, including Non-Settling Insurance Companies to the extent permitted by applicable law. Abuse Claimants may pursue in any manner or take any action otherwise permitted by law against persons or entities that are not Protected Parties so long as they are not an additional insured or an Insurance Company as to an Insurance Policy issues to the BSA.

### f.     Defenses

All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors or Protected Parties, except as otherwise provided in the Plan) shall be available to both sides (which may include any Non-Settling Insurance Company) at trial.

### g.     Settlement Trust Liability for Tort Election Claims

An Abuse Claimant who pursues a Tort Election Claim shall have an Allowed Claim Amount equal to zero if the litigation is dismissed or claim denied. If the matter is litigated, the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system less any payments actually received and retained by the Abuse Claimant, *provided that*, exclusive of amounts payable pursuant to Article XII.C of the Trust Distribution Procedures (in the event such amounts exceed the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix), any amount of such Allowed Claim Amount for a Tort Election Claim in excess of the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all Direct Abuse Claims that are Allowed Abuse Claims as liquidated under the Trust Distribution Procedures (excluding Article XII). By way of example, presume (1)

there is an Abuse Claimant asserting tier one abuse that achieves a $5 million verdict for his or her STAC Tort Claim against the Settlement Trust, and (2) a Non-Settling Insurance Company pays $750,000 in coverage under a policy providing primary coverage, $375,000 of which is paid directly to the Abuse Claimant and $375,000 of which is paid over to the Settlement Trust pursuant to Article XII.C of the Trust Distribution Procedures.  Although the unpaid amount of such Allowed Abuse Claim would be $4,625,000, the maximum total payment that the Abuse Claimant can recover from the Settlement Trust (before the non-subordinated portion of all other Direct Abuse Claims that are Allowed Abuse Claims are paid in full) is $2,700,000 (the Maximum Matrix Value in tier one), or an additional $2,325,000, paid pursuant to the terms of Article IX of the Trust Distribution Procedures.  For the avoidance of doubt, the limit on the Settlement Trust liability under Article XII.G of the Trust Distribution Procedures shall not apply or inure to the benefit of any Non-Settling Insurance Company, and the Settlement Trust shall be able to obtain coverage, subject to Article X of the Trust Distribution Procedures, for the full Allowed Claim Amount obtained by the Abuse Claimant through a Tort Election Claim.

### h.    Settlement or Final Judgment

If the Settlement Trust reaches a global settlement making a Protected Party of a Non-Settling Insurance Company or other person or entity involved in a Tort Election Claim or obtains a final judgment in a suit against such person or entity terminating liability for such person or entity to the Abuse Claimant, the Abuse Claimant shall be entitled to proceed with the Tort Election Claim for any reason (*e.g.*, if there are persons or entities that are not Protected Parties to collect from).  Alternatively, the Abuse Claimant can elect to terminate the Tort Election Claim without prejudice and have its Abuse Claim determined through the Trust Distribution Procedures (*i.e.*, as if no STAC Tort Election Claim had been made), in which event the Abuse Claimant may submit relevant evidence from the Tort Election Claim that the Settlement Trustee shall take into account in evaluating the Abuse Claim under the Trust Distribution Procedures.  Such Abuse Claimant may be provided other alternatives by the Settlement Trust if it had been pursuing a STAC Tort Election Claim.

### i.    Payment of Judgments by the Settlement Trust

Subject to Article XII.G of the Trust Distribution Procedures, if and when an Abuse Claimant obtains a final judgment or settlement against the Settlement Trust in the tort system, such judgment or settlement amount shall be treated for purposes of distribution under the Trust Distribution Procedures as the Abuse Claimant's Final Determination, and such Allowed Claim Amount shall also constitute the applicable Protected Parties' liability for such Abuse Claim. Within thirty (30) days of executing the release as set forth in Article IX.D of the Trust Distribution Procedures, the Abuse Claimant shall receive an Initial Distribution from the Settlement Trust (assuming an Initial Payment Percentage has been established by the Settlement Trust at that time). Thereafter, the Abuse Claimant shall receive any subsequent distributions based on any applicable Payment Percentage as determined by the Settlement Trust.

### j.    Litigation Results and Other Abuse Claims

To the extent that a Final Judicial Determination of an Abuse Claim or changes in applicable law implicate the appropriateness of the Scaling Factors or General Criteria, the

Settlement Trustee, subject to the terms of the Trust Distribution Procedures and the Settlement Trust Agreement and the approval of the Bankruptcy Court or District Court, after appropriate notice and opportunity to object, may appropriately modify the Scaling Factors or General Criteria on a go-forward basis for use in evaluation of Future Abuse Claims and other Abuse Claims as to which no Allowed Claim Amount Final Determination had previously been made.

### k.    Tolling of Limitations Period

The running of the relevant statute of limitation shall be tolled as to each Abuse Claimant's Abuse Claim against each Protected Party from the earliest of (A) the actual filing of the claim against the Protected Party prior to the Petition Date, whether in the tort system or by submission of the claim to the Protected Party pursuant to an administrative settlement agreement; (B) the tolling of the claim against a Debtor prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (C) the Petition Date, and shall continue until one (1) year following release of the Abuse Claim into the tort system hereunder.

### 12.    *Miscellaneous Provisions*

### a.    Non-Binding Effect of Settlement Trust and/or Litigation Outcome

Notwithstanding any other provision of the Trust Distribution Procedures, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.

### b.    Amendments

Except as otherwise provided in the Trust Distribution Procedures, the Settlement Trustee may not amend, modify, delete, or add to any provisions of the Trust Distribution Procedures without the written consent of the STAC and the Future Claimants' Representative, as provided in the Settlement Trust Agreement, including amendments to modify the system for Tort Election Claims.  Nothing in the Trust Distribution Procedures is intended to preclude the STAC and/or the Future Claimants' Representative from proposing to the Settlement Trustee, in writing, amendments to the Trust Distribution Procedures.  Notwithstanding the foregoing, absent Bankruptcy Court or District Court approval after appropriate notice and opportunity to object, neither the Settlement Trustee nor the STAC or Future Claimants' Representative may amend the Trust Distribution Procedures in a material manner, including (i) to provide for materially different treatment for Abuse Claims, (ii) to materially change the system for Tort Election Claimants, or (iii) to add an opportunity to make an Expedited Distribution Election for a claim represented by a Chapter 11 POC after the Voting Deadline, (iv) in a manner that is otherwise materially inconsistent with the Confirmation Order or Plan.  Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC or the Future Claimants' Representative may amend any of the forms of release set forth in Article IX.D of the Trust Distribution Procedures without the consent of Reorganized BSA, or remove the requirement of a release in connection with an Expedited Distribution.

#### c.    **Severability**

Should any provision contained in the Trust Distribution Procedures be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Trust Distribution Procedures.

#### d.    **Offsets**

The Settlement Trust shall have the right to offset or reduce the Allowed Claim Amount of any Allowed Abuse Claim, without duplication as to the mitigating factors (*e.g.*, as to other responsible parties) on a dollar for dollar basis based on any amounts paid, agreed, or reasonably likely to be paid to the holder of such Claim on account of such Claim as against a Protected Party (or that reduces the liability thereof under applicable law) from any source other than the Settlement Trust.

#### e.    **Governing Law**

The Trust Distribution Procedures shall be interpreted in accordance with the laws of the State of Delaware.  Notwithstanding the foregoing, the evaluation of Abuse Claims under the Trust Distribution Procedures and the law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in Article XII of the Trust Distribution Procedures or the jurisdiction where such Abuse Claim could have been filed under applicable law.

## ARTICLE VIII. SOLICITATION PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a Claim entitled to vote should carefully review the Plan.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

A.    Voting Summary and Deadline[112]

The Bankruptcy Court entered an order in these Chapter 11 Cases [D.I. 6438] (the "Solicitation Procedures Order") that, among other things, approved certain procedures governing the solicitation of votes to accept or reject the Plan from holders of Claims against the Debtors, including setting the deadline for voting, specifying which holders of Claims are eligible to receive Ballots to vote on the Plan, and establishing other voting and tabulation procedures attached to the Solicitation Procedures Order as Exhibit 1 (the "Solicitation Procedures").

**THE SOLICITATION PROCEDURES ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.  YOU SHOULD READ THE SOLICITATION PROCEDURES ORDER, THE SOLICITATION PROCEDURES, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH**

---

[112] Capitalized terms used in this Article VIII and not otherwise defined herein or in the Plan shall have the meanings ascribed to such terms in the Solicitation Procedures Motion, Solicitation Procedures Order, or Solicitation Procedures, as applicable.

**IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.**

The Plan, though proposed jointly and consolidated for purposes of making distributions to holders of Claims under the Plan, constitutes a separate Plan proposed by each Debtor. Therefore, the classifications set forth in the Plan apply separately with respect to each Plan proposed by, and the Claims against and Interests in, each Debtor.  Your vote will count as votes for or against, as applicable, each Plan proposed by each Debtor.

| | |
|---|---|
| **Voting Classes:** | The Debtors are soliciting votes to accept or reject the Plan from the holders of Claims in Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8, and 9. |
| **Voting Record Date:** | The Voting Record Date is October 1, 2021.  Only holders in the Voting Classes as of this date will be entitled to vote to accept or reject the Plan. The Debtors reserve the right to set a later Voting Record Date if the Debtors decide to extend the Voting Deadline. |
| **Voting Deadline; Extension:** | The Voting Deadline is December 14, 2021 at 4:00 p.m. (Eastern Time), unless the date by which the Ballots will be accepted is extended in accordance with the Solicitation Procedures. If the Voting Deadline is extended, the term "Voting Deadline" will mean the time and date that is designated. Any extension of the Voting Deadline will be followed as promptly as practicable by notice of the extension in accordance with the Solicitation Procedures. |
| **Solicitation Procedures:** | If you are a holder of a Claim in the Voting Classes, you should deliver a properly completed Ballot to the Solicitation Agent.  Ballots must be received by the Solicitation Agent on or before the Voting Deadline.  To be counted as a vote to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered by (1) the electronic Ballot submission platform on the Solicitation Agent's website (the "E-Ballot Platform"), (2) mail, (3) overnight delivery, or (4) personal delivery, so that it is *actually received*, in each case, by the Solicitation Agent no later than the Voting Deadline.  Specifically, each Ballot must be returned through the E-Ballot Platform at (a) https://omniagentsolutions.com/bsa-SAballots for Direct Abuse Claim Ballots and Master Ballots or (b) https://omniagentsolutions.com/bsa-ballots for all other Ballots, by mail using the envelope included in the Solicitation Package, as applicable, or by overnight or personal delivery to the following address: Boy Scouts of America Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367.  **You are highly encouraged to submit your Ballot via the E-Ballot Platform.** |
| **Revocation or Withdrawal of Ballots:** | After the Voting Deadline, a Ballot may only be withdrawn or modified pursuant to an order of the Bankruptcy Court authorizing such withdrawal or modification; *provided*, that prior to the Voting Deadline, a voter may withdraw a valid Ballot by delivering a written notice of withdrawal to the Solicitation Agent.  The withdrawal must be signed by the party who signed the Ballot, and the Debtors reserve the right to contest any withdrawals, |

| | |
|---|---|
| | rightand any such withdrawal shall be detailed in the Voting Report filed by the Solicitation Agent. |
| **Solicitation Agent:** | The Debtors have retained Omni Agent Solutions as the Solicitation Agent in connection with the solicitation of votes on the Plan.  Deliveries of Ballots should be directed to Omni Agent Solutions as set forth herein and pursuant to the instructions contained in the Ballots. |

The following instructions for voting to accept or reject the Plan, together with the instructions contained in the Ballot and the Solicitation Procedures, constitute the voting instructions.  Only holders of Claims in Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8, and 9 (the "Voting Classes") as of the Voting Record Date are entitled to vote on the Plan.  To vote, you, or in the case of certain holders of Direct Abuse Claims, your attorney, must fill out and sign the Ballot enclosed in the Solicitation Package (as defined below).

B.    Solicitation Procedures

    **1.**    ***Vote Required for Acceptance by a Class of Claims***

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims in such class that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims in such class that have voted.

    **2.**    ***Solicitation Package***

The package of materials (the "Solicitation Package") sent to the Voting Classes contains:

    (a)    a cover letter describing the contents of the Solicitation Package and instructions to obtain access, free of charge, to the Plan, the Disclosure Statement, and the Solicitation Procedures Order, and urging holders of Claims in the Voting Classes to vote to accept the Plan;

    (b)    the *Notice of Hearing to Consider Confirmation of Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, substantially in the form annexed to the Solicitation Procedures Order as Exhibit 3 (the "Confirmation Hearing Notice");

    (c)    the Disclosure Statement with all exhibits, including the Plan and all exhibits (to the extent such exhibits are filed with the Bankruptcy Court before the Solicitation Date), which shall be provided in the formats set forth in the Solicitation Procedures Order and are also available via https://omniagentsolutions.com/bsa-SAballots (Direct Abuse Claims) or https://omniagentsolutions.com/bsa-ballots (all other Claims);

(d)     the Solicitation Procedures Order, including the Solicitation Procedures but excluding all other exhibits, which shall be provided in the formats set forth in the Solicitation Procedures Order and is also available via https://omniagentsolutions.com/bsa-SAballots or https://omniagentsolutions.com/bsa-ballots;

(e)     an appropriate form of Ballot with return instructions and a return envelope, as applicable;

(f)     a letter from any official committee and the Coalition, substantially in the form filed in these Chapter 11 Cases before the Disclosure Statement Hearing (and as may be modified, amended, or supplemented from time to time); and

(g)     any other materials ordered by the Bankruptcy Court to be included as part of the Solicitation Package.

The Debtors have distributed the Solicitation Packages to holders of Claims in the Voting Classes as of the Solicitation Date. In addition, the Plan, this Disclosure Statement, the Solicitation Procedures Order, and, once they are filed, all exhibits to the three documents (including the Plan Supplement) will be made available online at no charge at the website maintained by the Solicitation Agent, Omni Agent Solutions, at https://omniagentsolutions.com/bsa-SAballots or https://omniagentsolutions.com/bsa-ballots. In addition, the Debtors will provide parties in interest (at no charge) with a flash drive or paper format of the Plan and/or Disclosure Statement, as well as any exhibits thereto, upon request to the Solicitation Agent by (1) calling the Debtors' toll-free restructuring hotline at (866) 907-2721; (2) visiting the Debtors' restructuring website at https://omniagentsolutions.com/bsa; (3) writing to Boy Scouts of America Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; or (4) emailing BSAballots@omniagnt.com.

If you are a holder of a Claim or represent a holder of a Direct Abuse Claim who is entitled to vote on the Plan and you or your attorney did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Solicitation Agent by (1) emailing BSAballots@omniagnt.com, (2) calling the Debtors' toll-free restructuring hotline at (866) 907-2721, or (3) writing to Boy Scouts of America, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367.

The Solicitation Procedures set forth a process by which known attorneys representing holders of Direct Abuse Claims (collectively, the "Firms"), received copies of the Abuse Claim Solicitation Notice, an Abuse Survivor Plan Solicitation Directive, and Client List. The Abuse Claim Solicitation Notice notified the Firms of the two options proposed for soliciting votes on the Plan in respect of Direct Abuse Claims, and the Debtors requested that each Firm voluntarily return a completed Abuse Survivor Plan Solicitation Directive and confirmed Client List in order to streamline and expedite the delivery of information to holders of Direct Abuse Claims and ensure that holders of Direct Abuse Claims can make informed and meaningful decisions regarding whether to accept or reject the Plan.

Pursuant to the Abuse Survivor Plan Solicitation Directive, or through a directive amendment as set forth in subsection c below, each Firm voluntarily selected or may update its

preferred method for the Solicitation Agent to solicit votes on the Plan from its clients who hold Direct Abuse Claims (collectively, the "<u>Abuse Survivor Clients</u>") according to one of the following proposed methods:

a. **Master Ballot Solicitation Method.**  A Firm may direct the Solicitation Agent to serve the Firm with one Solicitation Package and one Master Ballot on which to record the votes of all of its Abuse Survivor Clients to accept or reject the Plan and any other applicable voting elections (the "<u>Master Ballot Solicitation Method</u>") if the Firm certifies that:

   i. "<u>**Option (a) Certification**</u>": The Firm shall distribute (as required by the Solicitation Procedures) the Solicitation Package (without a Ballot) to each of its Abuse Survivor Clients and ask each client to provide his or her affirmative vote to accept or reject the Plan (along with any other responsive election to be reflected on the Exhibit to the Master Ballot) and the Firm shall record the affirmative responses on the Master Ballot and reflect that the vote and other responses were collected by means of an Option (a) Certification.  For the avoidance of doubt, a Firm may not rely on providing any of its Abuse Survivor Clients negative notice when completing the Master Ballot on behalf of any Abuse Survivor Client if such client did not affirmatively respond with an express answer for each applicable election.  Each Firm shall collect the responses through customary and accepted practices in accordance with applicable rules of professional conduct (including telephone, email, and other standard communication methods) from each Abuse Survivor Client and shall submit a log of the responses it has received to the Solicitation Agent contemporaneously with its Master Ballot submission, which may be subject to discovery.  For the avoidance of doubt, if an Abuse Survivor Client provides his or her responses orally or via telephone, the Firm shall contemporaneously maintain a record of the responses of the Firm's Abuse Survivor Clients, and shall include these responses with the log; or

   ii. "<u>**Option (b) Certification**</u>": If the Firm has the authority under a power of attorney to vote to accept or reject the Plan (in addition to the other elections under the Master Ballot) on behalf of its Abuse Survivor Clients, the Firm shall complete the Master Ballot in accordance with the power granted to the Firm and reflect that the vote and other elections were collected by means of an Option (b) Certification.  For any Abuse Survivor Clients whose elections on the Master Ballot were completed by utilizing the Option (b) Certification, the Firm shall supply the power(s) of attorney concurrently with the Master Ballot and Exhibit that provided the Firm with the authorization to act on behalf of such Abuse Survivor Client(s).

b. **Direct Solicitation Method.**  A Firm may direct the Solicitation Agent to solicit votes on the Plan directly from each of the Firm's Abuse Survivor Clients by distributing a Solicitation Package (including a Ballot) directly to each of the Firm's Abuse Survivor Clients via U.S. mail at the street address specified on the Firm's Client List (the "<u>Direct Solicitation Method</u>").  Under the Direct Solicitation

Method, each Abuse Survivor Client must return his or her completed Ballot to the Solicitation Agent so that it is received by the Voting Deadline. **For the avoidance of doubt, the Debtors intend to solicit votes to accept or reject the Plan from each holder of a Direct Abuse Claim who cannot be matched to a Firm or who is not included in any Client List to be solicited via the Direct Solicitation Method**.

In addition to the foregoing certification, each Firm that selects the Master Ballot Solicitation Method must provide the Solicitation Package materials (excluding a ballot), in hard copy, flash drive, or electronic format, to its Abuse Survivor Clients. Any Firm that elects the Master Ballot Solicitation Method must return the Master Ballot to the Solicitation Agent so that it is received by the Voting Deadline. Each Firm must also file a verified statement with the Bankruptcy Court pursuant to Bankruptcy Rule 2019 prior to or concurrently with the submission of its Master Ballot containing the following (each, a "Rule 2019 Statement"): (i) the facts and circumstances concerning the Firm's representation of Abuse Survivor Clients in these chapter 11 cases; (ii) a list of the names, addresses, and claim numbers of all Abuse Survivor Clients that the such Firm represents; and (iii) an exemplar of the engagement letter used to engage the Abuse Survivor Clients. The Firm may redact pricing, compensation amounts or percentages, and personal identifying information of holders of Direct Abuse Claims. For the avoidance of doubt, personal identifying information related to holders of Direct Abuse Claims on such Rule 2019 Statement shall be filed under seal in accordance with the *Final Order (I) Authorizing Debtors to File (A) a Consolidated List of Counsel Representing the Largest Numbers of Abuse Victims and (B) a Consolidated List of Other Unsecured Creditors of the Debtors, (II) Authorizing and Approving Special Noticing and Confidentiality Procedures, and (III) Granting Related Relief* [D.I. 274] and the Bar Date Order; *provided* that copies of such information shall be made available to "Permitted Parties" as defined in the Bar Date Order. Each Firm must submit a copy of the Rule 2019 Statement with unredacted personal identifying information with its Master Ballot and Exhibit submission to the Solicitation Agent.

      c.    **Directive Amendment**. After entry of the Solicitation Procedures Order, the Solicitation Agent shall email each Firm that is listed on Direct Abuse Claims in Class 8 to confirm whether any updates are needed to the Abuse Survivor Plan Solicitation Directive previously submitted by each Firm. A Firm must respond in writing to the Solicitation Agent within five (5) days of receipt of the email in order to change its preference pursuant to (i) or (ii) below. If the Solicitation Agent does not receive a response from a Firm within this time period, the Solicitation Agent will honor the solicitation method that Firm previously indicated on the Abuse Survivor Plan Solicitation Directive.

          i.    If a Firm that previously elected the Master Ballot Solicitation Method on its Abuse Survivor Plan Solicitation Directive would like to have each of its clients who hold Direct Abuse Claims cast their own vote to accept or reject the Plan, such Firm may elect to have the Solicitation Agent deliver the Solicitation Package (including Ballots) to the Firm, which will, in turn, deliver the Solicitation Packages (including Ballots) to each of its clients who hold Direct Abuse Claims in hard copy, flash drive, or electronic format. In this case, Solicitation Packages shall be delivered to clients who hold Direct Abuse

Claims in accordance with their preferences (*i.e.*, clients who do not want to receive written communications via regular mail shall receive the Solicitation Package materials electronically). The Solicitation Agent shall deliver the Solicitation Package (including Ballots) to each Firm in hard copy, flash drive, or electronic format, depending on the preference specified by each Firm in its response to the email from the Solicitation Agent. Clients who hold Direct Abuse Claims will complete a Ballot and such Ballot will be returned to the Solicitation Agent.

ii.    If a Firm previously elected the Direct Solicitation Method on its Abuse Survivor Plan Solicitation Directive, that Firm can indicate that it will have its clients vote via the Master Ballot Solicitation Method instead and will receive the Solicitation Package directly from the Solicitation Agent.

**3.**    ***Solicitation Procedures, Ballots, and Voting Deadline***

If you are entitled to vote to accept or reject the Plan, one or more Ballot(s) has been enclosed in your Solicitation Package for the purpose of voting on the Plan. Please vote and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s).

You should carefully review (1) the Plan, (2) this Disclosure Statement, (3) the Solicitation Procedures Order (including the Solicitation Procedures), (4) the Confirmation Hearing Notice, and (5) the detailed instructions accompanying your Ballot prior to voting on the Plan.

After carefully reviewing these materials, including the detailed instructions accompanying your Ballot(s), please indicate your acceptance or rejection of the Plan by completing the Ballot(s). All votes to accept or reject the Plan with respect to any Class of Claims entitled to vote on the Plan must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class. Holders of Claims or their Firms (as applicable) voting on the Plan should complete and sign the Ballot(s) in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept (vote in favor of) the Plan" or "Reject (vote against) the Plan." In addition, if any holder of a Claim elects not to grant the releases contained in Article X.J.4 of the Plan, then it should check the appropriate box on its Ballot and follow the instructions contained in the Ballot. Eligible holders of General Unsecured Claims and Direct Abuse Claims that wish to make the optional elections for Convenience Class treatment or an Expedited Distribution, as such elections are more fully described herein and in the Plan, must carefully follow the instructions set forth in their Ballots. In order for your vote to be counted, you must complete and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s) on or before the Voting Deadline. Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you.

**In order for the holder of a Claim in the Voting Class to have such holder's Ballot counted as a vote to accept or reject the Plan, such holder's Ballot must be properly completed, executed, and delivered by (1) the electronic Ballot submission platform on the Solicitation Agent's website (the "E-Ballot Platform"), (2) mail, (3) overnight delivery, or**

**(4) personal delivery, so that such holder's Ballot is <u>actually received by the Solicitation Agent on or before the Voting Deadline, *i.e.*, December 14, 2021 at 4:00 p.m. (Eastern Time)</u>.**

**Specifically, each Ballot must be returned through the E-Ballot Platform at (a) https://omniagentsolutions.com/bsa-SAballots for Direct Abuse Claim Ballots and Master Ballots or (b) https://omniagentsolutions.com/bsa-ballots for all other Ballots, by mail using the envelope included in the Solicitation Package, as applicable, or by overnight or personal delivery to the following address:**

| |
|---|
| **Boy Scouts of America Ballot Processing**<br>**c/o Omni Agent Solutions**<br>**5955 De Soto Avenue, Suite 100**<br>**Woodland Hills, CA 91367** |

**YOU ARE HIGHLY ENCOURAGED TO SUBMIT YOUR BALLOT USING THE E-BALLOT PLATFORM.  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM IN THE VOTING CLASSES BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

**EACH HOLDER OF A CLAIM IN THE VOTING CLASSES MUST VOTE ALL OF ITS CLAIMS WITHIN SUCH CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  IF A HOLDER OF A CLAIM SUBMITS MORE THAN ONE INCONSISTENT BALLOT RECEIVED BY THE SOLICITATION AGENT ON THE SAME DAY, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

**IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.**

C.    <u>Classes Entitled to Vote on the Plan</u>

Under the Bankruptcy Code, holders of Claims and Interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Holders of Claims in Classes 1 and 2 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Interests in Class 10 shall not receive or retain property on account of such interests and are, therefore, deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, no holders of Claims or Interests in such Classes shall be entitled to vote to accept or reject the Plan.

Each of Classes Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims) are Impaired and the holders of Claims in Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8 and 9 are entitled to vote to accept or reject the Plan.

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package, including a Ballot setting forth detailed voting instructions.  If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions included in the Ballot.  Please use only the Ballot or Master Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors otherwise provided to you.

## 1. *Holders of Claims Entitled to Vote*

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or equity interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy or defaults of a kind that do not require cure), (b) reinstates the maturity of such claim or equity interest as it existed before the default, (c) compensates the holder of such claim or equity interest for any damages from such holder's reasonable reliance on such legal right to an accelerated payment, (d) if such claim or such interest arises from a failure to perform nonmonetary obligations, other than a default arising from a failure to operate a nonresidential real property lease, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

The following table sets forth a simplified summary of which Classes are entitled to vote on the Plan and which are not and the voting status for each of the separate Classes of Claims and Interests provided for in the Plan.

| Class | Claim or Interest | Entitled to Vote |
|:---:|---|---|
| 1 | Other Priority Claims | No—Presumed to Accept |
| 2 | Other Secured Claims | No—Presumed to Accept |
| 3A | 2010 Credit Facility Claims | Yes |
| 3B | 2019 RCF Claims | Yes |
| 4A | 2010 Bond Claims | Yes |
| 4B | 2012 Bond Claims | Yes |
| 5 | Convenience Claims | Yes |
| 6 | General Unsecured Claims | Yes |
| 7 | Non-Abuse Litigation Claims | Yes |
| 8 | Direct Abuse Claims | Yes |
| 9 | Indirect Abuse Claims | Yes |
| 10 | Interests in Delaware BSA | No—Deemed to Reject |

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Voting Classes are Impaired under the Plan and, to the extent Claims in the Voting Classes are deemed Allowed or subject to the distributions under the Trust Distribution Procedures, the holders of such Claims will receive distributions under the Plan.  As a result, the holders of Claims in each of these Classes are entitled to vote to accept or reject the Plan.

Holders of Claims in Classes 1 and 2 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, no holders of Claims or Interests in such Classes shall be entitled to vote to accept or reject the Plan.

Accordingly, the Debtors are only soliciting votes on the Plan from holders of Claims, in Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8, and 9.  If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package or a Ballot.  If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions included in the Ballot.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors otherwise provided to you.

**Holders of Claims under the Plan are deemed to consent to provide the releases contained in Article X.J.4 of the Plan under the following scenarios: (1) if they vote to accept the Plan and do not opt out of the release provision of the Plan, (2) if they vote to reject the Plan but do not opt out of the release provision of the Plan, and (3) with respect to holders of Claims that are presumed to accept the Plan, except for holders of such Claims that file a timely objection to the releases set forth in Article X.J.4 of the Plan.  Holders of Claims voting to accept or reject the Plan may check the box on their Ballot to opt out of the releases in Article X.J.4 of the Plan.  Please be advised that the Plan also contains injunction and exculpation provisions,**

**certain of which are set forth in the Ballot. If the Plan is confirmed by the Bankruptcy Court, these injunction and exculpation provisions will be binding on holders of Claims whether or not they elect to opt out of the releases in Article X.J.4 of the Plan by their Ballot. For a full description of these provisions, see Article VI.Q of this Disclosure Statement and Article X of the Plan, which sets forth the terms of each of these provisions.**

If you have filed a Proof of Claim that is subject to an objection, other than a "reclassify" or "reduce and allow" objection, that is filed with the Bankruptcy Court on or before the Solicitation Date (a "Disputed Claim"), you are not entitled to vote on the Plan. If you seek to challenge the disallowance or estimation of your Disputed Claim for voting purposes, you must file with the Bankruptcy Court a motion for an order, pursuant to Bankruptcy Rule 3018(a), temporarily allowing such Claim for purposes of voting to accept or reject the Plan (a "Rule 3018(a) Motion"). **As set forth in the Confirmation Hearing Notice and the Solicitation Procedures, any Rule 3018(a) Motion shall be filed with the Bankruptcy Court and served on the Debtors on or before November 1, 2021. If a holder of a Disputed Claim files a timely Rule 3018(a) Motion, such holder's Ballot shall not be counted unless a Resolution Event occurs with respect to such Disputed Claim on or prior to December 14, 2021 or as otherwise ordered by the Bankruptcy Court.** For the avoidance of doubt, any Claim that is subject to an objection other than a "reclassify" or "reduce and allow" objection that is filed with the Bankruptcy Court *after* the Solicitation Date shall be deemed temporarily allowed solely for voting purposes in accordance with the Solicitation Procedures, without further action by the Debtors or the holder of the Claim, and without further order of the Bankruptcy Court, unless the Debtors and claimant agree to other treatment for voting purposes or the Bankruptcy Court orders otherwise.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Solicitation Procedures also set forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases and how votes will be counted under various scenarios.

**Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of a plan of reorganization, notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.

D.      Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all holders of Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors, which may impact recoveries under the Plan, include the following:

1.      unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

2.      although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

3.      the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

4.      any delays of either Confirmation or the occurrence of the Effective Date could result in, among other things, increased Administrative Expense Claims and Professional Fee Claims.

**Additionally, the Plan may be modified to include one or more settlements pursuant to Bankruptcy Rule 9019 to resolve any unresolved controversies, including but not limited to those described in this Disclosure Statement.** While these factors, including the incorporation of any settlements, could affect distributions available to holders of Allowed Claims or Abuse Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to <u>Article X</u> of this Disclosure Statement, entitled "Risk Factors."

## ARTICLE IX.  CONFIRMATION PROCEDURES

A.      <u>Hearing on Plan Confirmation</u>

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, shall hold a hearing to confirm a plan of reorganization.  The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on **<u>January 24, 2022 at 10:00 a.m. (Eastern Time)</u>**, before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge for the District of Delaware, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Wilmington, Delaware.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  Any objection to Confirmation of the Plan must: (i) be made in

writing; (ii) state the name and address of the objecting party and the nature and amount of the Claim or Interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan and include any evidentiary support therefor; and (iv) be filed with the Bankruptcy Court, 824 North Market Street, Third Floor, Wilmington, Delaware 19801 together with proof of service **on or before the Plan Objection Deadline (January 7, 2022 at 4:00 p.m. (Eastern Time))**, and served so as to be actually received by the notice parties set forth in the Confirmation Hearing Notice before the Plan Objection Deadline, which service may be through the CM/ECF system, with courtesy copies by email.

B.    Requirements for Confirmation of the Plan

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (C) feasible.

C.    Acceptance by an Impaired Class

The Bankruptcy Code requires, as a condition to confirmation, that each class of claims or interests that is impaired under a plan of reorganization, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  As stated above, the Voting Classes are Impaired Classes and are comprised of the holders of Claims in Class 3A, Class 3B, Class 4A, Class 4B, Class 5, Class 6, Class 7, Class 8, and Class 9.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as an affirmative vote of more than one-half in number of total allowed claims in such class that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims in such class that have voted.  Thus, the Voting Classes described herein will have voted to accept the Plan only if one-half of the holders of Allowed Claims and Abuse Claims, as applicable, with at least two-thirds of the total dollar amount of the Allowed Claims and Abuse Claims, as applicable, vote on the Plan to accept.

**AS EXPLAINED IN ARTICLE VI.G OF THIS DISCLOSURE STATEMENT, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES.   THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.**

D.    Best Interests of Creditors / Liquidation Analysis

Section 1112(c) of the Bankruptcy Code provides that non-profit Entities such as the Debtors, cannot have their chapter 11 cases converted into chapter 7 cases involuntarily.[113]  A liquidation under chapter 7 of the Bankruptcy Code is—unlike in the context of for-profit debtors—a path that can be chosen only by the non-profit debtor.  Because the Chapter 11 Cases could not be involuntarily converted to a chapter 7 liquidation, the Debtors submit they are not required to satisfy the requirements of section 1129(a)(7) in connection with Confirmation of the Plan.

Although the Debtors do not believe they are required to satisfy the "best interests of creditors" test embodied in section 1129(a)(7), the Debtors do believe a liquidation analysis will be helpful to holders of Claims as they evaluate their proposed treatment under the Plan.  Accordingly, the Debtors are providing the Liquidation Analysis attached as **Exhibit D** hereto.

Exhibit D to the Disclosure Statement contains three sets of analyses.  The first section contains the Liquidation Analysis applicable to the Debtors and Related Non-Debtor Entities.  The second section provides a similar analysis in relation to the Local Councils.  Although the Debtors do not believe they are required to satisfy the best-interests test as it relates to the Local Councils, the Debtors have consented to including this analysis.

The Debtors' submission of the Liquidation Analysis shall not be construed as or deemed to constitute a waiver or admission of any kind.  The Debtors reserve all rights to oppose the applicability of the best interests test in the Chapter 11 Cases.

The Liquidation Analysis considers whether holders of Impaired Claims will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Nine Classes of Impaired Claims, Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims), are Impaired under the Plan.

To calculate the probable distribution to holders of each Impaired Class of Claims and interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Debtors were in cases under chapter 7 of the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a sale of the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors and interest holders would be reduced by the Claims of any Secured creditors to the extent of the value of their collateral, by the costs and expenses of liquidation, and by other administrative expenses and costs of both the chapter 7 cases and the Chapter 11 Cases.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals

---

[113]    11 U.S.C. § 1112(c) ("The court may not convert a case under [chapter 11] to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.").

retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in the Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, and any Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

Once the Bankruptcy Court ascertains the recoveries in liquidation of Secured creditors and priority claimants, if any, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

Nine Classes of Impaired Claims, Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims), are Impaired under the Plan. If the Debtors were liquidated under chapter 7 of the Bankruptcy Code, holders of Convenience Claims (Class 5), General Unsecured Claims (Class 6), and Abuse Claims (Classes 8 and 9) would receive lesser distributions than under the Plan, as explained in detail in the Liquidation Analysis. In addition, holders of Claims in all other Classes will receive at least as much under the Plan as they would in a liquidation and, moreover, the Plan provides much more certain, efficient, and timely recoveries to holders of these Claims.

The following chart reflects the estimated recoveries under a hypothetical chapter 7 liquidation as compared to the recoveries under the Plan:[114]

| Class | Designation[115] | Estimated Amount[116] and Approximate Percentage Recovery | Estimated Recovery in Chapter 7 |
|---|---|---|---|
| 1 | Other Priority Claims | Estimated Allowed Amount: Less than $0.1 million | Estimated Allowed Amount: $0.1 million |

---

[114]  As set forth in the Liquidation Analysis, Exhibit D hereto, under a chapter 7 liquidation, it is likely that the BSA's defined benefit pension plan would be terminated and the PBGC would pursue its Claim of approximately $1.1 billion against all members of the controlled group, which are jointly and severally liable for such amounts and include the Related Non-Debtor Entities and Local Councils. As detailed in the Liquidation Analysis, the Debtors believe the PBGC would be able to assert a lien against each member of the controlled group not currently in bankruptcy. The Debtors further believe that in the event the PBGC was unable to assert a secured claim or its security interest was invalidated, the PBGC would still have an unsecured claim against each member of the controlled group. The Debtors' belief that this fact would not materially change the outcome of the Liquidation Analysis because such Claim would be asserted jointly against members of the controlled group, including Local Councils. Therefore, the PBGC is expected to recover in full on account of its Claim. The ability of the PBGC to recover in full in this circumstance is due to the significant size of its claim, which would be asserted in full against each member of the controlled group, as compared to the other claims against such entities, and the fact that the aggregate assets of the controlled group exceed the PBGC claim. The Debtors understand the Tort Claimants' Committee disagrees with both the view that the PBGC would be able to assert a lien and the view that the treatment of the PBGC claims as an unsecured claim would not materially change the result of the liquidation analysis.

[115]  The Debtors reserve the right to eliminate any Class of Claims in the event they determine that there are no Claims in such Class.

[116]  Figures with respect to the Allowed amounts of the Claims set forth in this chart are based upon the Debtors' best estimates of such Claims as of the date of this Disclosure Statement. These estimates are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from these estimates should one or more underlying assumptions prove to be incorrect. Such differences may adversely affect the percentage of recovery to holders of Allowed Claims under the

| Class | Designation[115] | Estimated Amount[116] and Approximate Percentage Recovery | Estimated Recovery in Chapter 7 |
|---|---|---|---|
| | | Estimated Percentage Recovery: 100% | Estimated Percentage Recovery: 100% |
| 2 | Other Secured Claims | Estimated Amount: $0 <br><br> Estimated Percentage Recovery: 100% | Estimated Amount: $1.1 billion [117] <br><br> Estimated Percentage Recovery: 100% |
| 3A | 2010 Credit Facility Claims | Estimated Amount: $80,762,060 <br><br> Estimated Percentage Recovery: 100% | Estimated Amount: $80,762,060 <br><br> Estimated Percentage Recovery: 100% |
| 3B | 2019 RCF Claims | Estimated Amount: $61,542,720 <br><br> Estimated Percentage Recovery: 100% | Estimated Amount: $61,542,720 <br><br> Estimated Percentage Recovery: 100% |
| 4A | 2010 Bond Claims | Estimated Amount: $40,137,274 <br><br> Estimated Percentage Recovery: 100% | Estimated Amount: $40,137,274 <br><br> Estimated Percentage Recovery: 100% |
| 4B | 2012 Bond Claims | Estimated Amount: $145,662,101 <br><br> Estimated Percentage Recovery: 100% | Estimated Amount: $145,662,101 <br><br> Estimated Percentage Recovery: 100% |
| 5 | Convenience Claims | Estimated Amount: $2.3 million – $2.9 million <br><br> Estimated Percentage Recovery: 100% | Claims are included in General Unsecured Claims in Class 6 |
| 6 | General Unsecured Claims | Estimated Amount: $26.5 million – $33.5 million <br><br> Estimated Percentage Recovery: 75 – 95% | Estimated Amount: $3.16 million <br><br> Estimated Percentage Recovery: 8 – 21% |
| 7 | Non-Abuse Litigation Claims | Estimated Amount: Undetermined[118] | Estimated Amount: Undetermined |

Plan.  Moreover, the estimated recoveries set forth herein are necessarily based on certain assumptions, the realization of which are beyond the Debtors' control.

[117]  Represents the PBGC claim related to pension termination, a portion of which is assumed to be asserted as a secured claim against each and every member of the controlled group not currently in bankruptcy and result in a full recovery against both the secured and unsecured portion.

[118]  This class is comprised of approximately fifty-five (55) wrongful death or personal injury claims as well as seven (7) other litigation claims.  None of these claims have been liquidated.

| Class | Designation[115] | Estimated Amount[116] and Approximate Percentage Recovery | Estimated Recovery in Chapter 7 |
|---|---|---|---|
|  |  | Estimated Percentage Recovery: 100% | Estimated Percentage Recovery: 100% |
| 8 | Direct Abuse Claims[119] | Estimated Amount: $2.4 billion – $7.1 billion<br><br>Estimated Percentage Recovery at $7.1 billion:<br>10 – 21% *plus* additional insurance rights, **expected to yield up to 100% recovery**<br><br>Estimated Percentage Recovery at $2.4 billion:<br>31 – 63% *plus* additional insurance rights, **expected to yield up to 100% recovery[120]**<br><br>**Under the Expedited Distribution**:[121]<br>Estimated Amount: $3,500.00 | Estimated Amount: $2.4 billion – $7.1 billion<br><br>Estimated Percentage Recovery at $7.1 billion: 5 – 6%[122]<br><br>Estimated Percentage Recovery at $2.4 billion: 15 – 16% |

---

[119]   Under the Plan, "Direct Abuse Claim" means an Abuse Claim that is not an Indirect Abuse Claim.

[120]   The following calculation was used to determine the percentage recovery range under the Plan: ($219 million (BSA Settlement Contribution) plus $500 million (Local Counsel Contribution) plus $100 million (DST Note) plus Hartford Settlement Contribution minus the Hartford Administrative Expense Claim ($785 million)) divided by $2.4 billion - $7.1 billion (Estimated Abuse Claims Range).  The recovery percentages are net of assumed cost to operate the Settlement Trust.  Costs are estimated between 6 and 10% of total assets with costs expected to be at the high end of the range in a smaller trust and at or below the lower end of the range in a larger trust under the Plan.  The low end of the recovery range excludes the Hartford Settlement Contribution as some parties may object to the settlement amount and/or how the settlement amount is distributed to holders of Abuse Claims, thereby rendering these amounts unavailable to some or all creditors.  The TCJC Settlement Contribution is not reflected in the recovery ranges for Direct Abuse Claims because such contribution by TCJC may not be available to all holders of Direct Abuse Claims under the Trust Distribution Procedures.  Abuse Claims that relate to TCJC may have a higher recovery than the ranges set forth above.  In addition, the Bates White estimated range of $2.4 billion to $7.1 billion estimates the value of Abuse Claims, which would include Future Abuse Claims, to the extent viable.  The Future Claimants' Representative asserts that the forecast of the Future Abuse Claims should be higher than reflected in the Debtors' range. The Debtors do not agree with the forecast of the Future Abuse Claims asserted by the Future Claimants' Representative and believe that the Bates White range is a more accurate range of the value for all Abuse Claims, including Future Abuse Claims.  Therefore, the Bates White range provides a better basis on which to formulate projected recoveries on account of Abuse Claims, including Direct Abuse Claims (which include Future Abuse Claims).

[121]   Pursuant to Article III.B.10 of the Plan, each holder of a properly completed non-duplicative proof of claim asserting a Direct Abuse Claim who filed such Claim by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim may elect on his or her Ballot to receive an Expedited Distribution in exchange for a full and final release in favor of the Debtors, the Related Non-Debtor Entities, the Local Councils, Contributing Chartered Organizations, and the Settling Insurance Companies.  Under the Plan, "Expedited Distribution" means a one-time Cash payment from the Settlement Trust in the amount of $3,500.00, conditioned upon satisfaction of the criteria set forth in the Trust Distribution Procedures.

[122]   Recoveries in a hypothetical chapter 7 liquidation include the Hartford Administrative Expense Claim and Additional Hartford Administrative Claim (as defined in the Hartford Insurance Settlement Agreement) but do not include recoveries on BSA's Insurance Policies as such recoveries are uncertain and are expected to be lower in a liquidation due to the difficulty of obtaining insurance recoveries in such a scenario because, in large part, many of the BSA's Insurance Policies are subject to the rights of co-insured, non-Debtors, including Local Councils, under those policies and because obtaining recoveries would likely require significant litigation.

| Class | Designation[115] | Estimated Amount[116] and Approximate Percentage Recovery | Estimated Recovery in Chapter 7 |
|---|---|---|---|
| 9 | Indirect Abuse Claims[123] | Estimated Amount: Unknown[124]<br><br>Estimated Percentage Recovery at $7.1 billion:<br>10 – 21% *plus* additional insurance rights, **expected to yield up to 100% recovery**<br><br>Estimated Percentage Recovery at $2.4 billion:<br>31 – 63% *plus* additional insurance rights, **expected to yield up to 100% recovery** | Estimated Amount: Unknown<br><br>Estimated Percentage Recovery: Unknown |
| 10 | Interests in Delaware BSA | Estimated Amount: N/A<br><br>Estimated Percentage Recovery: 0% | Estimated Amount: N/A<br><br>Estimated Percentage Recovery: 0% |

E.    Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet obligations under the Plan.  The Debtors, with the assistance of their advisors, have prepared projections for the calendar years 2021 through 2025, including management's assumptions related thereto, attached hereto as **Exhibit E** (the "Financial Projections").  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.   The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects so long as the Effective Date occurs before December 31, 2021.  As reflected in the Financial Projections, the Debtors anticipate that they will timely

---

[123]    Under the Plan, "Indirect Abuse Claim" means a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract.

[124]    The Debtors are unable to estimate with certainty the recovery amount for Indirect Abuse Claims under the Plan and hypothetical chapter 7 liquidation since they are unliquidated and contingent and subject to objection under section 502(e) of the Bankruptcy Code.  However, to the extent the Indirect Abuse Claims become liquidated in the future, Indirect Abuse Claimants have the ability, pursuant to the Plan, to bring a claim for reconsideration under section 502(j) of the Bankruptcy Code and may be able to recover, on account of such claim, against the Settlement Trust Assets.  Pursuant to the Trust Distribution Procedures, recoveries on account of Indirect Abuse Claims that are liquidated, non-contingent, and meet the criteria set forth in the Trust Distribution Procedures shall be subject to the same liquidation and payment procedures as the Settlement Trust would have afforded the holders of the underlying valid Direct Abuse Claims as liquidated under the Trust Distribution Procedures.  The Bates White estimated range of $2.4 billion to $7.1 billion estimates the value of Abuse Claims, which would include Indirect Abuse Claims, to the extent viable.

meet all of their collective obligations and will be financially viable after Confirmation of the Plan. Accordingly, the Debtors believe that Confirmation is not likely to be followed by liquidation or the need for further reorganization.

F.     Conditions Precedent to Confirmation of the Plan

Confirmation of the Plan shall not occur unless the following conditions precedent have been satisfied, or are otherwise waived, in accordance with Article IX.C of the Plan:

1.     The Bankruptcy Court shall have entered the Disclosure Statement Order, in form and substance reasonably acceptable to the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, Hartford, the Creditors' Committee, and JPM;

2.     The Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, and Hartford shall have approved of or accepted the Confirmation Order, and the Creditors' Committee, and JPM shall have approved of or accepted the Confirmation Order in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet incorporated by reference in Article I.D of the Plan;

3.     The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order in conjunction therewith, in form and in form and substance acceptable to the Debtors, in accordance with the requirements of the JPM / Creditors' Committee Term Sheet.[125]   These findings and determinations are designed, among other things, to ensure that the Injunctions, Releases and Discharges set forth in Article X of the Plan shall be effective, binding and enforceable and shall, among other things, provide that:

> a.     the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not be procured by fraud;
>
> b.     the Channeling Injunction and the Insurance Entity Injunction are to be implemented in connection with the Settlement Trust and shall be in full force and effect on the Effective Date;
>
> c.     upon the Effective Date, the Settlement Trust shall assume the liabilities of the Protected Parties with respect to Abuse Claims and the liabilities of the Limited Protected Parties with respect to Post-1975 Chartered Organization

---

[125]   The findings and determinations set forth in Article IX.A.3.j, Article IX.A.3.q, Article IX.A.3.r, Article IX.A.3.s, and Article IX.A.3.t of the Plan shall not be binding on Hartford to the extent that Hartford is a Settling Insurance Company and the transactions contemplated in the Hartford Insurance Settlement Agreement, including the release of the Hartford Settlement Contribution to the Settlement Trust, are fully consummated. Hartford's agreement in the Hartford Insurance Settlement Agreement not to object to entry of such findings and determinations in the Confirmation Order does not indicate Hartford's support for such findings and determinations, and no party shall argue that Hartford agreed to or acquiesced in such findings and determinations in any proceeding. Rather, Hartford is designated as a Settling Insurance Company and Protected Party under the Plan, and as a result, Hartford takes no position on such findings and determinations or on the Trust Distribution Procedures.

Abuse Claims and have exclusive authority as of the Effective Date to satisfy or defend such Abuse Claims;

d. the Settlement Trust will be funded with the Settlement Trust Assets;

e. the Settlement Trust will use the Settlement Trust Assets to resolve Abuse Claims;

f. the terms of the Discharge Injunction, the Channeling Injunction, the Release Injunction, and the Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement;

g. the Future Claimants' Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction and the Insurance Entity Injunction for the purpose of, among other things, protecting the rights of persons who might subsequently assert Abuse Claims of the kind that are addressed in the Channeling Injunction and the Insurance Entity Injunction, which will be transferred to and assumed by the Settlement Trust;

h. the Plan complies with section 105(a) of the Bankruptcy Code to the extent applicable;

i. the Injunctions are essential to the Plan and the Debtors' reorganization efforts;

j. the Insurance Assignment is authorized as provided in the Plan, notwithstanding any terms of any policies or provisions of non-bankruptcy law that is argued to prohibit the delegation, assignment, or other transfer of such rights, and the Settlement Trust (i) is a proper defendant for Abuse Claims to assert the liability of the Protected Parties to trigger such insurance rights and (ii) is a proper defendant for Post-1975 Chartered Organization Abuse Claims to assert the liability of the Limited Protected Parties to trigger such insurance rights;

k. the Insurance Settlement Agreements are approved, and any Insurance Company that has contributed funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement is designated as a Settling Insurance Company;

l. the Abuse Claims Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

m. the JPM / Creditors' Committee Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors'

Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

n.      the Settlement of Restricted and Core Asset Disputes represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

o.      the Hartford Insurance Settlement, including the sale of the Hartford Policies free and clear of all Interests of any Person or Entity (as such terms are defined in the Hartford Insurance Settlement Agreement) and the Allowance of the Hartford Administrative Expense Claim is approved in accordance with sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code, Bankruptcy Rule 9019, and the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to <u>Article V.S.4</u> of the Plan;

p.      the  TCJC Settlement is approved in accordance with findings of fact and conclusions of law made by the Bankruptcy Court pursuant to <u>Article V.S.5</u> of the Plan;

q.      the Plan, the Plan Documents, and the Confirmation Order shall be binding on all parties in interest;

r.      (i) the procedures included in the Trust Distribution Procedures pertaining to the allowance of Abuse Claims and (ii) the criteria included in the Trust Distribution Procedures pertaining to the calculation of the Allowed Claim Amounts, including the Trust Distribution Procedures' Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors (each as defined in the Trust Distribution Procedures), are fair and reasonable based on the evidentiary record offered to the Bankruptcy Court;

s.      the right to payment that the holder of an Abuse Claim has against the Debtors or another Protected Party or a Limited Protected Party is the allowed value of such Abuse Claim as liquidated in accordance with the Trust Distribution Procedures and is not (i) the initial or supplemental payment percentages established under the Trust Distribution Procedures to make distributions to holders of allowed Abuse Claims or (ii) the contributions made by the Debtors or any Protected Party to the Settlement Trust; and

t.      the Plan and the Trust Distribution Procedures were proposed in good faith and are sufficient to satisfy the requirements of section 1129(a)(3) of the Bankruptcy Code.

G.    <u>Conditions Precedent to the Effective Date</u>

The Effective Date of the Plan shall not occur unless the following conditions precedent have been satisfied or waived in accordance with <u>Article IX.C</u> of the Plan:

1.    (a) the Confirmation Order shall have been submitted to the District Court for affirmation; (b) the District Court shall have entered the Affirmation Order in form and substance acceptable to (i) the Debtors, the Ad Hoc Committee, the Coalition, the Future Claimants' Representative and Hartford and (ii) the Creditors' Committee and JPM, consistent with the JPM / Creditors' Committee Term Sheet; (c) at least fifteen (15) days shall have passed following entry of the Confirmation Order and the Affirmation Order; (d) no court shall have entered an order staying the occurrence of the Effective Date pending an appeal of the Confirmation Order or the Affirmation Order; and (e) no request for a stay of the occurrence of the Effective Date shall be pending;

2.    the Settlement Trust Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided herein, be transferred to, vested in, and assumed by the Settlement Trust in accordance with <u>Article IV</u> and <u>Article V</u> of the Plan;

3.    the Settlement Trust Documents and other applicable Plan Documents necessary or appropriate to implement the Plan shall have been executed, delivered and if applicable, filed with the appropriate governmental authorities in compliance with the JPM / Creditors' Committee Term Sheet;

4.    the Restated Debt and Security Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness thereof shall have been satisfied or duly waived in writing in accordance with the terms of the Restated Debt and Security Documents, the closing shall have occurred thereunder, and Reorganized BSA shall have paid the JPM Exit Fee to JPM;

5.    the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness thereof shall have been satisfied or duly waived in writing in accordance with the terms of the Foundation Loan Agreement and related documentation, and the closing shall have occurred thereunder;

6.    the Debtors shall have adequately funded the Professional Fee Reserve so as to permit the Debtors to make Distributions on account of Allowed Professional Fee Claims in accordance with <u>Article II</u> of the Plan;

7.      the Debtors shall have obtained all authorizations, consents, certifications, approvals, rulings, opinions or other documents that are necessary to implement and effectuate the Plan;

8.      all payments required to be made pursuant to the terms of the Cash Collateral Order shall have been paid;

9.      all actions, documents, and agreements necessary to implement and effectuate the Plan shall have been effected or executed;

10.     the transactions to be implemented on the Effective Date shall be materially consistent with the Plan Documents and the JPM / Creditors' Committee Term Sheet; and

11.     the Debtors shall have filed a notice of occurrence of the Effective Date.

H.      <u>Waiver of Conditions Precedent</u>

To the fullest extent permitted by law, each of the conditions precedent in <u>Article IX</u> of the Plan may be waived or modified, in whole or in part, in the sole discretion of the Debtors; *provided, however*, that (1) the Creditors' Committee's consent (not to be unreasonably withheld) is required to the extent any such waiver or modification by the Debtors impacts the treatment of General Unsecured Claims, Non-Abuse Litigation Claims, or Convenience Claims; (2) the conditions precedent set forth in <u>Article IX.B.4</u> and <u>Article IX.B.8</u> may be waived or modified by the Debtors only with the prior written consent of JPM; (3) the condition precedent set forth in <u>Article IX.A.3.o</u> of the Plan may be waived or modified by the Debtors only with the prior written consent of Hartford; (4) the condition precedent set forth in <u>Article IX.A.3.p</u> of the Plan may be waived or modified by the Debtors only with the prior written consent of TCJC; (5) for <u>Article IX.A.3.j</u>, <u>Article IX.A.3.p</u>, <u>Article IX.A.3.r</u>, <u>Article IX.A.3.s</u>, <u>Article IX.A.3.t</u> of the Plan, and any waiver or modification that impacts the treatment of Abuse Claims, the prior written consent of the Coalition and the Future Claimants' Representative shall be required as a condition to waiver or modification by the Debtors; and (6) the conditions precedent in <u>Article IX.B.1</u> and <u>Article IX.B.6</u> of the Plan may be waived or modified by the Debtors only with the prior written consent of the Ad Hoc Committee, the Coalition and the Future Claimants' Representative.  Any waiver or modification of a condition precedent under <u>Article IX</u> of the Plan may be effectuated at any time, without notice, without leave or order of the Bankruptcy Court or the District Court, and without any other formal action other than proceedings to Confirm or consummate the Plan.  The failure to satisfy or waive any condition precedent to the Effective Date may be asserted by the Ad Hoc Committee, the Coalition, the Future Claimants' Representative, Hartford, the Creditors' Committee or JPM regardless of the circumstances giving rise to the failure of such condition to be satisfied or waived.

I.      <u>Substantial Consummation of the Plan</u>

On the Effective Date, the Plan shall be deemed to substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

J.     *Vacatur* of Confirmation Order; Non-Occurrence of Effective Date

If the Confirmation Order is vacated or the Effective Date does not occur within 180 days after entry of the Confirmation Order (subject to extension by the Debtors in their sole discretion), the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall (1) constitute a waiver or release of any Causes of Action by or Claims against or Interests in the Debtors or any Person; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Person; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of a Claim or Interest, or any other Person in any respect; or (4) be used by the Debtors or any other Person as evidence (or in any other way) in any litigation, including with respect to the strengths and weaknesses of positions, arguments or claims of any of the parties to such litigation.

## ARTICLE X. RISK FACTORS

**HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR INCORPORATED BY REFERENCE, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE MATERIALLY DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENT.**

A.     Risks Relating to the Debtors' Operations, Financial Condition, and Certain Bankruptcy Law Considerations

**1.     *There is a Risk that the Plan Will Not Be Confirmed***

If confirmed and consummated, the Debtors believe the Plan will accomplish two core objectives: (a) provide an equitable, streamlined, and certain process by which Abuse Survivors may obtain compensation for their Abuse Claims and (b) ensure that the BSA has the ability to continue its vital charitable mission. If the Plan cannot be Confirmed, or if the Bankruptcy Court otherwise finds that conditions necessary for Confirmation cannot be met, the Debtors may be required to liquidate and/or voluntarily convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. In this event, the Debtors believe that neither of the Debtors' core objectives would be accomplished. Abuse Survivors would not have a certain, streamlined way to recover on account of their Claims, and there would be a material risk that the BSA's mission could not continue to be carried out.

The Debtors believe that the best mechanism for the Debtors to achieve these two core objectives is Confirmation of the Plan which provides for substantial contributions by the Debtors, by Local Councils, by Contributing Chartered Organizations (including TCJC), and by Settling Insurance Companies (including Hartford) to the Settlement Trust in exchange for the protection of the Channeling Injunction and Releases under the Plan.  Even if there is sufficient support for Confirmation of the Plan, the commitments contemplated by the Plan will not be realized if the Plan is not Confirmed.  Without an agreement by a substantial majority of creditors to support the Plan, the Debtors will be unable to meet the requirements necessary to Confirm the Plan as currently contemplated with respect to the Channeling Injunction and Releases.  The Channeling Injunction and Releases are a necessary component of the Plan, without which the Local Council Contribution and the Contributing Chartered Organization Contribution will not be made to the Settlement Trust.

### 2.    *The Pension Benefit Guaranty Corporation Could Assert Contingent Claims*

On October 29, 2020, the Pension Benefit Guaranty Corporation ("PBGC") filed a contingent Proof of Claim in the amount of $1,102,200,000 against the BSA (the "Unfunded Benefit Liability Claim") based on the unfunded benefit liabilities of the Pension Plan. Contemporaneously, the PBGC also filed a contingent Proof of Claim with respect to PBGC premiums, including an amount of $51,862,500 against the BSA that may become due upon termination of the Pension Plan (the "Termination Premiums Claims").  Finally, the PBGC contemporaneously asserted a claim in an unspecified amount with respect to any failure to make minimum funding contributions (the "Minimum Funding Contribution Claims").  The Unfunded Benefit Liability Claims and the Termination Premiums Claims are contingent on the termination of the Pension Plan, and for purposes of such claims, it is assumed that the Pension Plan terminated on October 1, 2020.  It is asserted that the Pension Plan is a single employer plan and that all of these liabilities are joint and several among the BSA and each Local Council that is a member of the BSA's "controlled group" on account of statutory liability under 29 USC §§ 1082, 1307, 1362. The PBGC, as a result, believes that it can assert the full amount of any and all of its Claims against each and every member of the controlled group upon termination.  In addition, if the Unfunded Benefit Liability Claim is not paid to the PBGC on demand, it is asserted that a statutory lien arises in favor of the PBGC on the assets of the plan sponsor and the members of the plan sponsor's controlled group.  The amount of this lien would be the lesser of the Unfunded Benefit Liability Claim and 30% of the collective net worth of the controlled group.  The Plan does not contemplate termination of the Pension Plan.  However, if the Plan is not confirmed and consummated and the Debtors' Pension Plan is terminated, the PBGC's contingent Unfunded Benefit Liability Claims and the Termination Premiums Claims against the BSA and Local Councils within its "controlled group" may become due and would significantly dilute any recoveries available to satisfy creditors from both the BSA and the Local Councils within the controlled group.

As discussed above, if certain conditions precedent are met, the DST Note will be issued. Until the DST Note is extinguished, the LC Reserve Account will only be used to fund contributions to the Pension Plan and, to the extent of any excess, to pay any amounts due under the DST Note.  Thus, to the extent that there are excess funds in a given year, such funds would not be available to fund shortfalls in future years with respect to the Local Councils' obligations to contribute to the Pension Plan.

### 3.    *The Tort Claimants' Committee Disputes the PBGC's Contingent Claims*

The Tort Claimants' Committee disputes the PBGC's Unfunded Benefit Liability Claim as being too high because it is, among other things, not based on current PBGC interest rate assumptions for this purpose and on the current value of Plan assets.

The Tort Claimants' Committee also disputes the Unfunded Benefit Liability Claim would ever be secured because terminating the Pension Plan is not an immediate or straightforward process. The PBGC has to obtain authorizations from multiple levels of its internal bureaucracy (Office of Gen. Counsel, Trusteeship Working Group, Dir. of PBGC) and likely in a case this size from its Board: the Secretaries of Labor, Commerce and Treasury. Those authorizations would not be easy under this factual scenario (*i.e.*, an overfunded pension). However, assuming that the authorizations were granted, the PBGC would have to send the Local Councils a 90-day termination notice. If the issue was not resolved prior to the expiration of the 90-day notice, the PBGC would have to go to the District Court to obtain authorization to terminate the Pension Plan (and the Local Councils would have notice of this and have a chance to oppose). Assuming the court granted the request, the PBGC would terminate the Pension Plan and then send a payment demand to the Local Councils. If the claim was not paid, only then would a lien arise in favor of the PBGC. In this context, if the Local Councils were in distress to the extent that it caused the PBGC to initiate the above process, it is not realistic or reasonable to assume the Local Councils would not commence a bankruptcy case to avoid the imposition of lien.

Furthermore, the Tort Claimants Committee believes it is unreasonable to assume that, if the PBGC were anticipated to recover the bulk of its claim (whether it is secured or unsecured) via a joint & several assessment of liability to each Local Council, a chapter 7 trustee would not then pursue a less expensive standard termination of the Pension Plan. It is the Tort Claimants' Committee' view that there are very strong arguments that the Local Councils and the Debtors do not comprise a controlled group, and that therefore the Pension Plan is a multiple employer plan, and that therefore the PBGC's claim would have to be allocated among the BSA and the Local Councils, rather than being assessed jointly & severally against all the entities.

The Debtors, the Creditors' Committee, and the PBGC disagree with the Tort Claimants' Committee's assumptions and analysis set forth above, including the Tort Claimants' Committee's unqualified contention that the Pension Plan is "overfunded" and the assertions that the Debtors and the Local Councils do not comprise a controlled group and the Pension Plan may be a multiple employer plan rather than a single employer plan. The Debtors, the Creditors' Committee, and the PBGC believe that there are strong arguments and past practices that support control group liability for the Debtors and the Local Councils.

### 4.    *Debtors May be Impacted by the Continuing COVID-19 Pandemic*

The COVID-19 pandemic has presented issues and caused disruptions to the entire organization and Scouting as a whole.  Beginning in late February 2020, the BSA began to face unprecedented operational challenges associated with the spread of COVID-19 in the United States.  As the pandemic spread through North America, the BSA was forced to temporarily close its Headquarters, distribution center, and virtually all of its scout shops, consistent with governmental health guidelines and directives.  The BSA was also ultimately forced to cancel

summer programming at Philmont, its largest high adventure base, and limit programming at its other three high adventure bases.  Local Councils also significantly curtailed activity throughout 2020 which impacted the BSA's retail sales and fall recruiting season.  Throughout 2020, as the global pandemic gradually worsened, the BSA undertook a number of critical cost-saving initiatives, including initially furloughing and later permanently reducing staff, eliminating all non-essential spending, negotiating concessions with suppliers and local vendors, and canceling a number of revenue generating events due to social gathering concerns.

The impact of COVID-19 has been devastating to the BSA.  Membership recruitment in 2020 ground to a halt with school closures and other social distancing measures resulting in an 81% decline versus 2019, which will impact 2021 membership revenue.  Supply revenue declined 57% driven by the several months of retail locations being closed and poor recruiting driving lower uniform sales.  High adventure facility revenue declined 74% driven by the temporary closure of Philmont and shortened seasons and/or reduced capacity at the other facilities.  The BSA further expects to have lower retention of existing members when annual memberships renew in early 2021 due to significant curtailment of programing throughout 2020.

The continued spread of COVID-19 could have a significant impact on the Debtors' activities in the future and, in turn, the functions of Scouting at every level.  This includes the ability to have pack and troop meetings in-person, restricted or limited use of the BSA or Local Council properties such as summer camps and high adventure facilities.  It remains unclear the extent and duration that restrictions will remain in place in response to the pandemic, which could bar or limit engaging in fundamental Scouting activities such as camping, service projects, meetings, and other group activities that help build the bonds of fellowship essential to the BSA's mission.  Moreover, the health, social, and economic impact the pandemic will have in the future is unknown.  As such, there can be no assurance that the uncertainties caused by the spread of COVID-19 will not negatively impact the Debtors in the future and, therefore, affect the underlying financial projections contained in this Disclosure Statement.

### 5.    *Pending and Future Litigation*

As discussed in this Disclosure Statement, the Debtors are involved in various litigation, including but not limited to, the Trademark Action with the GSUSA—which so long as it remains unresolved represents a reputational issue, a potential challenge to welcoming female members into Scouting, and potential Claim for monetary damages.  Additionally, there is a risk of future litigation.  Such litigation could be brought in connection with the BSA's operations, including its high adventure facilities, or otherwise.  Pending litigation or future litigation could result in a material judgment against the Debtors or the Reorganized BSA.  Such litigation, and any judgment in connection therewith, could have a material negative effect on the Debtors or the Reorganized BSA.

### 6.    *Risk of Non-Confirmation of the Plan*

Although the Debtors believe that the Plan satisfies all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors

can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects or is deemed to reject the Plan, the Bankruptcy Court may exercise discretion as a court of equity and choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests would ultimately receive with respect to their Claims or Interests in a subsequent plan of reorganization, a liquidation, or other proceedings.

### 7.    *Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization*

Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization.  However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court, or it may expire under the applicable provisions of the Bankruptcy Code.  If such an order were to be entered or such expiration were to occur, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If other parties in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to the Debtors, their Estates, and their stakeholders.  In addition, if there were competing plans of reorganization, the Chapter 11 Cases would likely become longer, more complicated, and more expensive, thereby reducing recoveries to holders of Claims.

### 8.    *Non-Consensual Confirmation*

If any Impaired Class of Claims does not accept or is deemed not to accept a plan of reorganization, a Bankruptcy Court may nevertheless confirm such plan at the proponent's request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  If any Class votes to reject or is deemed to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class.  The Debtors believe that the Plan satisfies these requirements.

### 9.    *Parties in Interest May Object to the Debtors' Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class.  Parties in interest may object to the classification of certain claims and interests both on the grounds that certain claims and interests have been improperly placed in the same Class and/or that certain claims and interests have been improperly placed in different Classes.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements of the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Interests that are substantially similar to similarly classified Claims or Interests.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same

conclusion.  Parties in interest may object to the classification of certain Claims and Interests both on grounds that certain Claims and Interests have been improperly placed in the same Class and/or that certain Claims and Interests have been improperly placed in different Classes.

10.     *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection may, therefore, not receive its expected share of the estimated distributions described in this Disclosure Statement.

11.     *The Conditions Precedent to Plan Confirmation and the Effective Date of the Plan May Not Occur*

As more fully set forth in Article IX of the Plan, Plan Confirmation and the Effective Date are subject to a number of conditions precedent.  If such conditions precedent are not satisfied or waived, Plan Confirmation, the Effective Date, or both will not occur.

12.     *The Recovery to Holders of Allowed Claims, Abuse Claims, and Interests Cannot Be Stated with Absolute Certainty*

Due to the inherent uncertainties associated with projecting financial results, litigation outcomes, and the projected of number and amount of Abuse Claims that will be liquidated pursuant to the Trust Distribution Procedures, the projections contained in this Disclosure Statement should not be considered assurances or guarantees of the amount of Claims that may be allowed in the various Classes or amounts that will be paid by the Settlement Trust on account of Abuse Claims.  While the Debtors believe that the projections and estimates contained in this Disclosure Statement are reasonable, including with respect to the number and valuation range related to Abuse Claims, which includes Indirect and Future Abuse Claims, certain parties, such as the Tort Claimants' Committee, the Coalition and Future Claimants' Representative have indicated that they believe that the projected number and value of Future Abuse Claims is much higher than the Debtors have projected. To the extent that Claims, including Abuse Claims, are allowed at numbers or amounts that are higher than the total projected number or valuation ranges for each Class, distributions/recoveries to holders of Claims, including Abuse Claim may be lower, and there can be no assurance that the distributions/recoveries set forth in the projections in the Disclosure Statement will be realized.  Also, because the Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to holders of Allowed Claims and Abuse Claims satisfied by the Settlement Trust in accordance with the Trust Distribution Procedures, if applicable, may be affected by many factors that cannot be predicted.

13.     *Appointment of Different Settlement Trustee and/or Different Members of the Settlement Trust Advisory Committee for the Settlement Trust*

Prior to the Confirmation Hearing, the Plan Supplement shall identify the initial members of the Settlement Trust Advisory Committee.  The proposed initial Settlement Trustee is Eric D. Green, as set forth in the Plan.  Parties-in-interest, however, may object to the proposed Settlement

Trustee, or one or more of the proposed members of the Settlement Advisory Committee. In that case, an alternate Settlement Trustee and/or alternative proposed members of the Settlement Trust Advisory Committee would have to be nominated, potentially resulting in significant delays in the occurrence of the Confirmation Date and Effective Date. The Debtors do not believe that the identity of the Settlement Trustee will impact creditor recoveries under the Plan, but other parties disagree.

### 14.     *Distributions under the Trust Distribution Procedures*

Abuse Claims, including both Direct Abuse Claims and Indirect Abuse Claims, will be resolved pursuant to the Settlement Trust Documents, and their treatment will be based upon, among other things, estimates of the number, types, and amount of Abuse Claims, the value of the assets of the Settlement Trust, the liquidity of the Settlement Trust, the Settlement Trust's expected future income and expenses, and other matters. There can be no certainty as to the precise amounts that will be distributed by the Settlement Trust in any particular time period or when Settlement Claims will be resolved by the Settlement Trust. The Debtors believe that Indirect Abuse Claims are unliquidated, contingent, and subject to objection. The outcome of such objections and ultimate allowance of Indirect Abuse Claims, could have a dilutive effect on Abuse Claims as a whole including Direct Abuse Claims.

### 15.     *Participation by Local Councils, Participating Chartered Organizations, Contributing Chartered Organizations, and Settling Insurance Companies*

The Plan contemplates participation by the Local Councils, Participating Chartered Organizations, Contributing Chartered Organizations, and Settling Insurance Companies including through the Local Council Settlement Contribution, Participating Chartered Organization Settlement Contribution, Contributing Organization Settlement Contribution, and any contributions of Settling Insurance Companies to the Settlement Trust. However, there can be no assurance that the Local Councils, Chartered Organizations, or Settling Insurance Companies will make such contributions as set forth in the letters of intent, with respect to Local Councils, or as agreed upon, with respect to Chartered Organizations or Settling Insurance Companies, or that the level of contributions, including those Participating Chartered Organizations, will be acceptable to all other parties in these Chapter 11 Cases or satisfy the requirements for obtaining approval of the Channeling Injunction by the Bankruptcy Court. In addition, the letters of intent include provisions indicating that such letters of intent are non-binding and that nothing in the letters of intent create a binding obligation with respect to such contributions.

At this time, all Local Councils have submitted letters of intent, the form of which is attached as Exhibit B to the Plan, indicating their intent to contribute to the Settlement Trust in the amounts listed on Exhibit C to the Disclosure Statement. All of the Local Councils' letters of intent are conditioned on, among other things, "[a]cceptable resolution of insurance and indemnity issues with respect to our chartered partners, to be negotiated." If a Local Council determines that the treatment of Chartered Organizations under the Plan is not "acceptable," the Local Council may decline to contribute its share of the Cash Contribution and Property Contribution on the Effective Date. If the Local Council Settlement Contribution does not equal $500 million in the aggregate on the Effective Date, comprised of at least $300 million of Cash and $200 million

(calculated as provided in the Plan) of unrestricted properties (reduced on a dollar-for-dollar basis by any Cash Contribution in excess of $300 million), then no Local Council shall be treated as a Protected Party under the Plan. The Local Council Settlement Contribution is calculated in the aggregate and any individual Local Council's failure to make the contribution provided in <u>Exhibit C</u> shall not prevent the Local Council from becoming a Protected Party so long as the aggregate amount of the Local Council Settlement Contribution is contributed on the Effective Date as provided in the Plan. There can be no assurance that any Local Council will contribute the amount listed on Exhibit C, and, if an individual Local Council fails to contribute the amount on <u>Exhibit C</u>, there can be no assurance that other Local Councils will make a sufficient financial contribution on behalf of such Local Council to meet the aggregate Local Council Settlement Contribution.

The Hartford Insurance Settlement Agreement provides that "the Debtors, the Coalition, the FCR and the Trust shall secure an assignment to the Trust of, or otherwise resolve to the Parties' satisfaction, Chartered Organizations' rights or claims to coverage under Abuse Insurance Policies issued by Hartford." If the Debtors, the Coalition and the Future Claimants' Representative are unable to resolve claims by Chartered Organizations under Abuse Insurance Policies issued by Hartford, there can be no assurance that Hartford will make the Hartford Settlement Contribution.

At this time, one Chartered Organization has agreed to make substantial contributions and become a Contributing Chartered Organization. Similarly, one Insurance Company has agreed to make substantial contributions and become a Settling Insurance Company.

Any failure to contribute by the Local Councils, Contributing Chartered Organizations, and/or Settling Insurance Company and/or objections to the level of the Contributing Chartered Organizations and/or objections to the level of the Local Council Settlement Contribution, Participating Chartered Organizations Settlement Contribution, the Contributing Organization Settlement Contribution, and any contributions by Settling Insurance Companies could materially affect the Plan, resulting in significant delays to the occurrence of the Confirmation Date and Effective Date, amendments to the Plan, and/or significant alterations to the current structure and distributions to holders of Claims contemplated by the Plan.

Certain Insurance Companies have indicated that it may be difficult to reach settlements with any Insurance Company if the Debtors cannot reach agreements with Chartered Organizations to become Contributing Chartered Organizations or another resolution regarding Abuse Claims, because it may not be possible to protect Insurance Companies from Abuse Claim exposure absent settlements with such Chartered Organizations. Accordingly, absent such settlements the Debtors may not be able to settle with Insurance Companies or may be forced to settle at lower amounts because the Channeling Injunctions may not provide the Settling Insurance Companies with complete protection from Abuse Claim exposure.

Several parties have raised concerns regarding the adequacy of contributions by certain of the Protected Parties. There can be no assurance that the Bankruptcy Court will determine that the requirements for obtaining approval of the Channeling Injunction are met with respect to contributions made by Protected Parties.

16. *U.S. Federal Income Tax Risks*

For a discussion of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims and Interests, see Article XI of this Disclosure Statement.

17. *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged. Any delay to the Confirmation Date may materially negatively impact the Debtors' business and may result in a liquidation.

18. *Amendment of Plan Prior to Confirmation by the Debtors*

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for confirmation. The potential impact of any such amendment or waiver on holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

19. *Financial Projections*

The Debtors have prepared financial projections on a consolidated basis with respect to the Reorganized BSA and Related Non-Debtor Entities based on certain assumptions, as set forth in **Exhibit E** hereto. The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or the Reorganized BSA, including the timing, Confirmation, and consummation of the Plan, continued engagement with Scouting and the Reorganized BSA, and the ability of the Local Councils to continue to support the Debtors' membership. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant economic, and operational risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material. The Debtors' projections reflect expectations of continued

donor support.  However, the Debtors cannot state with certainty that such donation programs will achieve their targeted results.

### 20.    *There Is No Assurance That the DST Note Will Be Fully Funded*

On the Effective Date, pursuant to the terms of the Plan, the DST shall issue the DST Note in favor of the Settlement Trust in the principal amount of $100 million.  Local Councils shall make monthly contributions into the LC Reserve Account, which will be owned by the DST, in an amount equal to the Required Percentage of the Local Councils' respective payrolls. The funds in the LC Reserve Account shall be used to fund the DST Note in accordance with the terms thereof until the DST Note is extinguished unless certain circumstances described above in Article V.S.2 of the Disclosure Statement occur, in which case such funds shall be deposited into the Pension Plan. Because the determination of whether the contributions from the LC Reserve Account are deposited into the Pension Plan or used to fund the DST Note depends upon market performance, there can be no assurance that the DST Note will be fully funded.

### 21.    *Potential Settlements*

As set forth in <u>Article II.D</u> of this Disclosure Statement, the Debtors have been in negotiations with the mediation parties in hopes of resolving certain controversies related to the structure of the Plan, level of contributions by Chartered Organizations and insurance-related issues, and the level of contribution by Insurance Companies, which may result in additional settlements pursuant to Bankruptcy Rule 9019 and may be included in the Plan.  If a Settlement Agreement is reached, the Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions.  The potential impact of any such settlements or resolutions on holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  As explained herein, the Debtors have reached settlements with TCJC, the Creditors' Committee, JPM and Hartford.  The Plan incorporates the terms and conditions of such settlements.

However, certain parties may object to such settlements, including with respect to the contribution amounts in such settlements.  Additionally, there can be no assurance the Bankruptcy Court will approve the Plan, including such settlements over objections.  If the settlements are not approved, the amounts contributed to the Settlement Trust (and therefore available to distribute to holders of Claims) will be reduced.

Pursuant to the Plan, Chartered Organizations can enter into settlements to become Contributing Chartered Organization and receive the protections of the Channeling Injunction before and after the Effective Date.  However, with more than 41,000 Chartered Organizations, it is unlikely that all Chartered Organization will become Contributing Chartered Organizations. Therefore, it is likely that the treatment of each Chartered Organization will vary depending on whether such Chartered organization becomes a Contributing Chartered Organization, a Participating Chartered Organization, or opts not to participate.  The rights of such Chartered Organizations and third party rights against those Chartered Organizations will likewise vary based on what type of participation a specific Chartered Organization elects, assuming that the Bankruptcy Court approves the treatment of Chartered Organizations.

Moreover, if the Debtors reach settlements with other insurers, in addition to the Hartford Insurance Settlement Agreement, such insurers will provide contributions to the Settlement Trust in order to be treated as a "Settling Insurance Company" under the Plan. It is likely that such settlements may involve the sale of BSA Insurance Policies issued by such Settling Insurance Company back to such Settling Insurance Company in exchange for a contribution to the Settlement Trust. The rights, if any, of Chartered Organizations under such insurance policies will be treated in accordance with section 363 and 1141 of the Bankruptcy Code and other applicable law.

## 22.    *Insurance Contributions*

If the Debtors are unable to reach agreement on the terms of Insurance Settlement Agreements with the Insurance Companies, there is a risk that the Settlement Trust may not realize contributions from Insurance Companies, or that the Settlement Trust's efforts to realize recoveries on account of the Insurance Coverage will be the subject of litigation that is expensive and time-consuming and in which Non-Settling Insurance Companies could raise meritorious coverage defenses that may reduce the amount of coverage available under the Insurance Policies.

## 23.    *Insurance Coverage Actions*

In accordance with the Plan, the BSA will contribute to the Settlement Trust, among other things, rights to the Insurance Actions, which includes the pending Insurance Coverage Actions. It is not currently known whether the Insurance Coverage Actions will result in a favorable outcome for the Settlement Trust. Even if a favorable outcome is realized, the amounts awarded and the costs associated with pursuing such litigation cannot be determined at this time. Therefore, the ultimate value of the Insurance Coverage Actions being contributed to the Settlement Trust is unknown.

## 24.    *Insurance Coverage Risks – Insurance Neutrality and Trust Distribution Procedures*

The Debtors' Insurance Companies contend that the Plan and the Trust Distribution Procedures are not confirmable, which the Debtors have disputed. Specifically, the Debtors' Insurance Companies assert that the Plan and the Trust Distribution Procedures are not confirmable due to a lack of "insurance neutrality" (i.e. because Insuance Companies contend that the Plan, among other things, is an attempt by the Debtors, the Future Claimants' Representative and the Coalition to misuse the bankruptcy process to derogate the rights of the Debtors' insurers under their insurance policies in order to unduly inflate insurer exposure). The Debtors' Insurance Companies contend that, unless the Plan is revised so that it no longer impairs existing insurer rights and coverage defenses, the Plan cannot be confirmed because it lacks "insurance neutrality"

and was not proposed in "good faith."  The Debtors' Insurance Companies contend that the Plan is not insurance neutral and lacks "good faith" for various reasons, including:

1.      Confirmation of the Plan would materially increase the "quantum of liability" that the Debtors' Insurance Companies would face when compared that which would have existed in the tort system;

2.      The Plan and the Trust Distribution Procedures alter various rights that the Debtors' Insurance Companies purport to have under the insurance policies, including:

a.      The right to defend Abuse Claims in an adversarial setting in which legal judgments are entered following discovery and consideration of evidence;

b.      The right to participate in the settlement of Abuse Claims and to limit the applicable Insurance Company's obligation to pay Abuse Claims stemming from settlements entered into without the consent of the applicable Insurance Company;

c.      The right to receive the cooperation of any insureds under the Insurance Policies;

d.      The right to limit payment of Abuse Claims only to situations where there is an entry of judgment against the insured by a court of competent jurisdiction or a settlement to which the insurance company has expressly consented; and

e.      The right to settle non-Abuse Claims without the consent of the Settlement Trust.

3.      The Debtors' Insurance Companies argue that the Plan improperly permits the payment of non-compensable claims because:

a.      The Plan and the Trust Distribution Procedures appoint a Settlement Trustee that the Debtors' Insurance Companies maintain is not disinterested in a process that prevents the Debtors' Insurance Companies from objecting to claims and taking discovery in the manner they assert they are entitled to;

b.      The Plan and the Trust Distribution Procedures do not provide the Settlement Trustee with sufficient authority to reduce the value of Direct Abuse Claims based on certain mitigating factors and have no ability to disallow Direct Abuse Claims based on such factors;

c.      The Plan and the Trust Distribution Procedures allow the Settlement Trustee to base decisions regarding the applicable statute of

limitations or choice of law based on considerations that are not appropriate;

d. The Plan and the Trust Distribution Procedures allow Abuse Claimants to defer the determination of the Proposed Allowed Claim for up to 12 months to see if there are changes to the applicable statute of limitations law;

e. The Plan and the Trust Distribution Procedures do not require a showing of even negligence on the part of any Protected Party to establish the validity of a Direct Abuse Claim to be allowed at a Base Matrix Value and that, for these and other reasons, the Plan and Trust Distribution Procedures require the Settlement Trustee to allow Abuse Claims that would not be entitled to any recovery either in the tort system or under section 502 of the Bankruptcy Code; and

f. The Plan and the Trust Distribution Procedures guarantee that every Abuse Claim may receive a distribution through the Expedited Distribution, which certain of the Debtors' Insurance Companies have alleged allows payment of Abuse Claims even if such Abuse Claim was fraudulent, time-barred, or otherwise defensible in the tort system.

4. The Plan requires the Bankruptcy Court to make findings in the Confirmation Order that the Settlement Trustee's future determinations of Allowed Claim Amounts based on vague criteria in the Trust Distribution Procedures are fair, reasonable, and in good faith, with the goal of precluding insurers from arguing that any yet to be taken actions by the Settlement Trust or Settlement Trustee is a basis to limit or deny insurance coverage;

5. The Plan inappropriately requires the Bankruptcy Court to make other findings expressly designed to set insurer liability at whatever amount the Settlement Trust unilaterally allows Abuse Claims at in the future with the goal of removing, to the greatest extent possible, all insurer coverage defenses in violation of prepetition insurance policies

6. The Plan and the Trust Distribution Procedures are unconfirmable because they leave open the possibility that Claims will be presented to the Settlement Trust that were not filed prior to the Bar Date Order;

7. The Plan interferes with the Debtors' Insurance Companies rights to seek subrogation or contribution from other non-debtors; and

8. The Plan improperly requires the consent of the Settlement Trust over any post-Effective Date settlements of any Non-Abuse Litigation claims that are entitled to any recovery from the proceeds of a Specified Insurance Policy.

The Insurance Companies have asserted that (a) the Plan may not be confirmed based on these objections, (b) the Plan may be subsequently altered or revised to address these objections,

and/or (c) rights to payment with respect to such Insurance Policies related to Abuse Claims could be reduced or barred entirely post-Confirmation based on purported breaches of the insurance policies  The Debtors maintain that Plan and the Trust Distribution Procedures are confirmable notwithstanding the objections of the Debtors' Insurance Companies.  Specifically, the Debtors, the Coalition, and the Future Claimants' Representative assert, among other things, that (a) the Insurance Companies have no right to an insurance "neutral" Plan, and, in any event, the Insurance Companies mischaracterize what an "insurance neutral" Plan would require; (b) the effect of the Plan on the Debtors' Insurance Companies' "quantum of liability" is not a relevant consideration for Plan confirmation; (c) that the Plan and the Trust Distribution Procedures do not prejudicially impact the Debtors' Insurance Companies' rights under any insurance policies, (d) the Plan does not improperly permit the payment of any non-compensable claims in violation of the Bankruptcy Code; (e) the findings sought in connection with the confirmation of the Plan are appropriate and necessary for Plan confirmation; (f) the use of a Settlement Trustee to administer the Trust Distribution Procedures does not improperly prejudice the insurers' coverage defenses or prejudice Debtors' Insurance Companies' rights under prepetition insurance policies, (g) the fact that certain claimants with Abuse Claims against non-Debtors can bring claims for a period after the Bar Date Order does not render the Plan and the Trust Distribution Procedures unconfirmable, (h) the Plan does not prejudicially interfere with Debtors' Insurance Companies' subrogation or contribution rights; and (i) requiring the consent of the Settlement Trust over any post-Effective Date settlements on Non-Abuse Litigation Claims does not prejudice the rights of any of Debtors' Insurance Companies.

The Debtors dispute that the Plan is prejudicial to the Debtors' Insurance Companies and maintain that the Plan has been proposed in good faith and through a means permitted by law.

### 25.    *Insurance Coverage Risks – Retentions and Deductibles*

As set forth in Article III.F of this Disclosure Statement, the Debtors' Insurance Companies have reserved rights to contest various Abuse Claims tendered to them based on various coverage defenses.  While the Debtors believe these defenses have no merit and are working to resolve these disputes, to the extent any of these defenses prevail, rights to payment with respect to such Insurance Policies related to Abuse Claims could be reduced or barred entirely.

Additionally, as set forth in Article III.F of this Disclosure Statement, the obligation to pay certain deductibles under the certain Insurance Policies is disputed.  However, it is the BSA's position that when the BSA cannot or does not pay the deductible, the primary Insurance Policies issued between 1986 and 2008 require the insurer to pay.  A dispute exists as to whether the obligation on the primary insurer to pay the deductible on behalf of the BSA is subject to an aggregate limit of liability.  The primary insurers have asserted that a $1 million aggregate applies to this obligation.  Other insurers have asserted that the primary insurers' obligation to pay the deductible is not subject to any aggregate, and that the aggregate limit of liability only applies to those damages in excess of the deductible.  In the event that the aggregate limit of liability does apply to the payment of the deductibles under the primary Insurance Policies, a related dispute exists as to whether the BSA can directly access the excess insurance policies issued between 1986 and 2008 or whether the BSA must continue to pay that deductible on an ongoing basis for each claim.

The excess insurers' policies sit above primary policies, which have deductibles. To the extent that the primary policies' aggregate limits are eroded by Abuse Claims, including by the payment of deductibles thereon, the excess policies add self-insured retentions ("SIRs"). BSA takes the position that to the extent that aggregate limits are eroded and an unexhausted SIR applies to Abuse Claims, then the excess insurers are only obligated to pay for the portion of the Abuse Claims that exceeds such SIR. In such event, the Settlement Trust would be obligated, in accordance with the Trust Distribution Procedures, to satisfy the SIR to the extent required by the relevant policies and applicable law.

Certain insurers also contend that, even if the Debtors are not obligated to pay deductibles, certain non-Debtors who will be Protected Parties are improperly avoiding their obligations for such deductibles. The Debtors disagree and contend that pursuant to the Channeling Injunction, all Abuse Claims against Protected Parties are channeled to the Settlement Trust and liquidated pursuant to the Trust Distribution Procedures.

In addition to the foregoing disputes with the Insurance Companies, certain Insurance Companies may not have the ability to pay part or all of the amounts that are believed to be owed under certain per-occurrence Insurance Policies. As noted above, certain Insurance Policies have been exhausted and, therefore, amounts may not be available to pay claims under such Insurance Policies.

Any of the forgoing disputes could potentially reduce or eliminate the right to payment under certain Insurance Policies. Moreover, defenses, disputes, and other relevant circumstances could arise that could potentially reduce or eliminate the right to payment under certain Insurance Policies.

26.    *Insurance Assignment Risks*

Pursuant to the Plan, the insurance rights of the BSA, Local Councils and Contributing Chartered Organizations under their Insurance Policies will be assigned and transferred to the Settlement Trust to be used to satisfy Abuse Claims in accordance with the Trust Distribution Procedures. Certain parties in interest, including certain of the Debtors' Insurance Companies, contest the ability of the BSA to assign those rights under these Insurance Policies to the Settlement Trust without insurer consent. Certain parties in interest also contest the ability of non-Debtors, including Local Councils and Contributing Chartered Organizations as applicable, to assign their rights under the Insurance Policies to the Settlement Trust without insurer consent. To the extent that such assignment is not allowed, the assets contributed to the Settlement Trust to satisfy Abuse Claims will be reduced or insurance coverage may be voided by the assignment.

27.    *Risk Related to 1976 and 1977 Hartford Policies*

As set forth in Article III.F.1, Hartford issued primary insurance coverage to the BSA for several years in the 1970s, including in 1976 and 1977. In 2011, the BSA and Hartford entered into a settlement agreement which released Hartford for claims related to sexual-abuse. The 1976 and 1977 Hartford policies are included in such settlement agreement. Certain parties in interest, including Local Councils and Chartered Organizations, have taken the position that the BSA sold the 1976 and 1977 policies back to Hartford and, therefore, these policies are not property of the

BSA's estate.  The 2011 settlement agreement released only claims with respect to sexual-abuse claims, but did not release all of the BSA's interests in the policies.  These interests are still property of the BSA's estate.

Moreover, certain parties in interest, including Local Councils, Chartered Organizations and certain Insurance Companies have taken the position that the 2011 settlement was only between the BSA and Hartford, and therefore, the Local Councils and Chartered Organizations still have the right to access coverage under the 1976 and 1977 Hartford policies for the Abuse Claims.  Hartford contends that the definition of BSA under the 2011 settlement agreement includes, inter alia, each of the BSA's past, present, and future affiliates.  Therefore, Hartford argues that "affiliates" includes Local Councils and Chartered Organizations.

### 28.    *Risk Related to Insurance Provisions in Article X.M of the Plan*

The provisions of the Plan related to insurance included in Article X.M of Plan conform to the Bankruptcy Court's statements at the May 19, 2021 hearing, as described more fully above in Article II.K and Article VII.A.30 of this Disclosure Statement.  However, there is a risk that there will be extensive litigation concerning the provisions of the Plan and the Bankruptcy Court's findings and conclusions in support of confirmation.  This litigation is likely to be extremely costly and time-consuming, and as described in Article X.A.30 of this Disclosure Statement, any delay beyond the winter in confirming the Plan may have extreme, negative consequences on the Debtors' ability to reorganize successfully.  The Debtors believe they have mitigated some of this risk by structuring Net Unrestricted Cash and Investments to take into account the potentially prolonged time in bankruptcy and costs associated therewith as described in Article X.A.30 of this Disclosure Statement, but actual results of operations are far from certain.  In addition to litigation before the Bankruptcy Court, it is likely that if the Plan is confirmed with the current insurance provision found in Article X.M of the Plan, the Bankruptcy Court's Confirmation Order will be appealed.  Appeal of the Confirmation Order could be costly and time-consuming, and there is a risk that the Confirmation Order will be overturned on appeal.  Conversely, it is possible that the Bankruptcy Court will not confirm the Plan with Article X.M as currently drafted and will require that the Debtors include amended insurance neutrality language prior to confirmation of the Plan.

### 29.    *Insurance Risk Relating to Negative Notice Assignment*

So long as a Chartered Organization (i) does not object to Confirmation, (ii) does not elect to opt out, (iii) is not a debtor in bankruptcy, or (iv) does not becomes a Contributing Chartered Organization,[126] such Chartered Organization will automatically be treated as a Participating Chartered Organization under the Plan and will have its insurance rights under Abuse Insurance Policies assigned to the Settlement Trust in connection with the Participating Chartered Organization Insurance Assignment.  Parties in interest, including certain Insurance Companies, have contended that because the Debtors are not receiving affirmative consent from Chartered Organizations or Insurance Companies, there is a risk that the Participating Chartered Organization Insurance Assignment violates applicable law, potentially impairing or voiding the Insurance Policies subject to such assignment.

---

[126]    The treatment of Chartered Organizations under the Plan and the differences between a Participating Chartered Organization versus a Contributing Chartered Organization is explained in Article II.E herein.

30.     ***Risk that the Allocation of Settlement Trust Assets for the Payment of Abuse Claims in Accordance with the Plan and Trust Distribution Procedures Will Not Be Approved***

Under the Plan, Chartered Organizations and Non-Settling Insurance Companies can make contributions to the Settlement Trust before and after the Effective Date in order to become Protected Parties and receive the benefits of the Channeling Injunction.  The Plan and Trust Distribution Procedures provide for the allowance, valuation and payment of Abuse Claims as set forth therein and further described in <u>Article VII</u> herein.  Pursuant to the terms of the Trust Distribution Procedures, all assets contributed to the Settlement Trust by the BSA, Local Councils and Settling Insurance Companies are pooled for the benefit of all holders of Abuse Claims, irrespective of whether they have a valid claim against a Local Council or if their Abuse Claim is insured.  Furthermore, the Trust Distribution Procedures provide that a portion, and not all, of the contributions to the Settlement Trust by Chartered Organizations that become Protected Parties will be allocated to holders of Abuse Claims against that particular Chartered Organization that meet certain requirements.  Certain parties have objected to this structure.  They argue that claim determinations and distributions of Settlement Trust Assets to Abuse Survivors should be allocated–at least in part–based upon the non-Debtor parties liable for such Abuse Claims, and those parties' contribution, if any, of assets to the Settlement Trust.  The Debtors believe that the structure proposed in the Trust Distribution Procedures is appropriate and consistent with applicable law.  However, there a risk that the Plan and Trust Distribution Procedures may not be approved or will need to be modified with respect to this issue, and that certain of the Settlement Trust Assets will be allocated only to holders of Abuse Claims against particular Protected Parties, which may result in holders of Abuse Claims against other Protected Parties or parties that have not become Protected Parties receiving a lower recovery on their claim.

31.     ***Failure to Obtain Approval of Releases, Injunctions, and Exculpation, Including the Channeling Injunction***

As set forth in <u>Article VI.Q</u> of this Disclosure Statement, the Plan provides for certain Releases, Injunctions (including the Channeling Injunction), and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors, the Reorganized BSA, the other Released Parties and their respective Related Parties, Protected Parties or Limited Protected Parties, as applicable.  The Releases, Injunctions, and exculpations (including, the Channeling Injunction) provided in the Plan are subject to objection by parties in interest and may not be approved.

In the Third Circuit, non-consensual third-party releases are permissible if they satisfy the *Continental* hallmarks of "fairness and necessity to the reorganization," which must be supported by specific factual findings. *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017) (citing *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000)).  In determining whether such a release satisfies this standard, courts apply the *Master Mortgage* factors:  (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the

injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction. *Id.* (quoting *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)). "These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *In re Washington Mut. Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011).

If the Releases are not approved, including the non-consensual third party releases, certain parties may not be considered Released Parties, Limited Protected Parties, or Protected Parties, and certain of these parties could withdraw their support for the Plan and/or contributions to the Settlement Trust based on the Plan's failure, absent such releases, to release and enjoin claims against such parties.

### 32.    *The Channeling Injunction*

The Channeling Injunction, which, among other things, bars the assertion of any Abuse Claims against the Protected Parties or Limited Protected Parties, as applicable, is a necessary element of the Plan. Although the Plan, the Settlement Trust Agreement, and the Trust Distribution Procedures all have been drafted with the intention of complying with the Bankruptcy Code, there is no guarantee that the validity and enforceability of the Channeling Injunction or the application of the Channeling Injunction to Abuse Claims will not be challenged, either before or after Confirmation of the Plan.

While the Debtors believe that the Plan satisfies the requirements of the Bankruptcy Code, certain objections might be lodged on grounds that the requirements of the Bankruptcy Code cannot be met given the unique facts of the Chapter 11 Cases.  At this juncture, the Debtors believe that the Plan provides a sufficient basis for the issuance of the Channeling Injunction under section 105(a) of the Bankruptcy Code.

### 33.    *Voting Requirements*

If sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Abuse Claims satisfied by the Settlement Trust in accordance with the Trust Distribution Procedures as those proposed in the Plan.

### 34.    *Timeline Risk*

There is a material risk that failure to emerge from these Chapter 11 Cases in a timely manner could endanger the future of the BSA.  In order to rebuild membership and ensure successful recruiting and retention of existing members, the Debtors must emerge from the cloud of these Chapter 11 Cases.  The recruiting and the ultimate enrollment of new members may be hampered by the fact that the cloud of bankruptcy remains during the fall recruiting season—potentially eroding faith in the long term prospects of the BSA.  If the number of new members and returning members is substantially reduced from projections, the BSA could lack the means to meet their operational needs or otherwise emerge from bankruptcy.  Timely emergence from Chapter 11 is essential to the Debtors' ability to improve their operations.

Substantial professional fees will continue to accrue until a plan is confirmed and becomes effective. At this time, the Debtors' bankruptcy estate bears the burden for the fees of the professionals and advisors to the Debtors, the Tort Claimants' Committee, the Future Claimants' Representative, the Unsecured Creditors' Committee, and JPM. Such fees are substantial and to date the Debtors have incurred more than $146 million[127] in professional fees related to this restructuring. By the end of December 2021, the Debtors estimate the professional fees in the Chapter 11 Cases will equal or exceed $205 million.[128] Each successive month is expected to cost the estate approximately $10 million or more. The Debtors believe this is wholly inappropriate for a non-profit chapter 11 proceeding and believe emergency from bankruptcy as soon as possible is essential to stop the accrual of additional professional fees. The potential for protracted litigation with Insurance Companies under the Plan is great and will cause increased costs and expenses to the Debtors, including with respect to professional fees. If such litigation ensues, there is a material risk that professional fees could be much higher than the Debtors anticipate or are able to pay.

### 35.    *Conversion into Chapter 7 Cases*

If no plan of reorganization can be confirmed, the Debtors may choose to convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. Under section 1112(c) of the Bankruptcy Code, the Chapter 11 Cases may not be converted to cases under chapter 7 without the Debtors' consent.

### 36.    *Dismissal of the Chapter 11 Cases*

If the Plan is not confirmed, the Debtors or other parties in interest may seek dismissal of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code. Without limitation, dismissal of the Chapter 11 Cases would terminate the automatic stay and might allow certain creditors to file lawsuits against the Debtors or take other action to pursue their Claims against the Debtors. Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases would significantly reduce the value of the Debtors' remaining assets.

### 37.    *Parties in Interest May Object to the Plan Based on Section 1129(a)(7) of the Bankruptcy Code*

The Debtors may need to satisfy the "best interests of creditors" test, embodied in section 1129(a)(7) of the Bankruptcy Code. As a threshold matter, the Debtors do not believe the best interests test applies to non-profit organizations such as the Debtors in light of the restrictions on the forced sale of a non-profit's assets under the Bankruptcy Code and applicable state law. If the Bankruptcy Court disagrees with this position, then the best interests test should apply only with respect to recoveries of claimants on account of their claims against the Debtors in a hypothetical liquidation of the Debtors, and not with respect to recoveries against Protected Parties in such a scenario. However, to the extent the Bankruptcy Court determines that the Plan must satisfy the best interests test with respect to Protected Parties, the Debtors will be prepared at confirmation to address those standards, including through the Liquidation Analysis, which shows that the Debtors

---

[127]    Amount excludes bar noticing fees.

[128]    Amount excludes bar noticing fees.

and Local Councils satisfy the test, and/or through other expert testimony related to whether holders of Impaired Claims will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive in a liquidation under chapter 7. If the Bankruptcy Court determines that the Plan does not satisfy the requirements of the best interests test, to the extent it applies, the Plan may not be Confirmed or may only be Confirmed with modifications, including potential modifications to the nonconsensual third party releases included in the Plan. If the Plan cannot be Confirmed because of this issue, the Debtors' options going forward may be limited to: (1) reaching agreement on a fully consensual plan; (2) satisfying the best interest of creditors test; (3) voluntary or involuntary dismissal; and, (4) voluntary conversion to Chapter 7.

B.    Additional Factors

> **1.    *Debtors Could Withdraw the Plan***

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

> **2.    *Debtors Have No Duty to Update***

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

> **3.    *No Representations Outside this Disclosure Statement Are Authorized***

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

> **4.    *No Legal or Tax Advice Is Provided by this Disclosure Statement***

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

> **5.    *This Disclosure Statement May Contain Forward Looking Statements***

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative

thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analysis, distribution projections or other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims and Abuse Claims satisfied by the Settlement Trust in accordance with the Trust Distribution Procedures may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

6.     *No Admission Made*

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

## ARTICLE XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan and is for general information purposes only.  This summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  The discussion below is not binding upon the IRS or any court.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  No representations or assurances are being made to the holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.  Except as specifically set forth below, this discussion addresses only holders of Claims or Interests that are "United States persons" (within the meaning of Section 7701(a)(30) of the Code).

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON**

**THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.    The Settlement Trust

On the Confirmation Date, the Settlement Trust shall be established in accordance with the Trust Documents.  The Settlement Trust is intended to qualify as a "qualified settlement fund" ("QSF") pursuant to Treasury Regulation section 1.468B-1.   The Protected Parties are the "transferors" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Settlement Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).  The Trust Documents, including the Settlement Trust Agreement, are incorporated herein by reference.

Reorganized BSA shall make a "grantor trust" election under Treasury Regulation section 1.468B-1(k) with respect to the Settlement Trust for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.  By making such election, the Settlement Trust is effectively treated as an extension of Reorganized BSA.  All parties shall report consistently with such grantor trust election.

B.    Holders of Claims

The federal income tax consequences to a holder of a Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the claimants' method of accounting, and their own particular tax situation.  Because each claimant's tax situation differs, claimants should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

Among other things, the federal income tax consequences of a distribution to a claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose.  For example, a distribution in repayment of the principal amount of a loan is generally not included in the claimant's gross income.  A distribution to a holder of an Abuse Claim may not be taxable as it may be considered compensation for personal injuries.  The federal income tax consequences of a distribution to a claimant may also depend on whether the item to which the distribution relates has previously been included in the claimant's gross income or has previously been subject to a loss or bad debt deduction.  For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the claimant's trade or business, and the claimant had previously included the amount of such receivable distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the claimant but may, as discussed below, result in a loss.

Conversely, if the claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the claimant generally would be required to include the amount of the distribution in income when received.

A claimant receiving a distribution in satisfaction of his or her Claim generally may recognize taxable income or loss measured by the difference between (i) the amount of Cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the claimant's trade or business for the performance of services or for the sale of goods or merchandise. In addition, if a claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the claimant as a result of receiving a distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed. Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the claimant's hands.

Subject to the qualifications and limitations set forth above:

1.  A holder of a Class 3A, 3B, 4A, or 4B Claim may recognize gain or loss pursuant to the Plan depending on whether the receipt of the Claim under the Restated Credit Facility Documents or under the Restated Bond Documents, as applicable, in satisfaction of its existing Claim is treated as a taxable exchange for U.S. federal income tax purposes. The tax treatment of the receipt of such Claim pursuant to the Plan is unclear – although it seems likely under applicable law that the receipt of the Claims would be treated as a taxable exchange. Holders of Class 3A, 3B, 4A, or 4B Claims are strongly urged to consult their own tax advisors regarding the specific tax consequences of the transactions described in the Plan.

2.  A holder of a Class 5 Claim generally will recognize gain or loss measured by the difference between (i) the amount of the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Convenience Claim.

3.  A holder of a Class 6 Claim generally will recognize gain or loss measured by the difference between (i) the U.S. dollar value of such holder's Pro Rata Share of the Core Value Cash Pool received and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the General Unsecured Claim.

4.  A holder of a Class 7 Claim generally will recognize gain or loss measured by the difference between (i) the amount of cash received from (a) available Insurance Coverage, (b) applicable proceeds of any Insurance Settlement Agreements, and (c) co-liable non-debtors (if any) or their insurance coverage, and (ii) its adjusted tax basis in the Non-Abuse Litigation Claim, unless such holder elects to have its Claim treated as an Allowed Convenience Claim. A holder of a Class 7 Claim that elects to have its Claim treated as an Allowed Convenience Claim generally will recognize gain or loss measured by the difference between (i) the amount of the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Non-Abuse Litigation Claim.

5.    The United States federal income tax treatment of a Class 8 Claim will depend on several factors, including the nature of the Abuse that forms the basis for the relevant Claim.  As a result, certain holders of Class 8 Claims generally will recognize gain or loss measured by the difference between (i) the amount of the cash and the fair market value (if any) of the property received and (ii) their adjusted tax basis in the Direct Abuse Claim, while other holders will not be required to include the amount of such cash or the value of such property in their gross income for U.S. federal income tax purposes.  Holders of Class 8 Claims are urged to consult their tax advisors concerning the tax consequences of the Plan.

6.    A holder of a Class 9 Claim generally will recognize gain or loss measured by the difference between (i) the amount of the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Indirect Abuse Claim.

C.    <u>Holders that are Non-United States Persons</u>

Holders of Claims that are not "United States persons" (within the meaning of Section 7701(a)(30) of the Code) generally will not be subject to U.S. federal income tax with respect to property (including Cash) received in exchange for such Claims, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

## ARTICLE XII.  CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors and the Supporting Parties, the Plan is preferable to all other available alternatives and provides for a larger and more timely distribution to the Debtors' creditors than would otherwise result from any other scenario.  Any alternative to Confirmation of the Plan, moreover, could result in extensive delays, increased administrative expenses, reduced financial performance, and a potential liquidation.  Accordingly, the Debtors and the Supporting Parties believe that the Plan provides the best available recovery to their stakeholders and urge the holders of Claims in the Voting Classes to vote in favor thereof.  The Debtors and the Supporting Parties support confirmation of the Plan and recommend that holders of Claims in the Voting Classes vote to accept the Plan.

Dated:  September 30, 2021

Boy Scouts of America
Delaware BSA, LLC

*/s/ Roger C. Mosby*
Roger C. Mosby
Chief Executive Officer and President

# **EXHIBIT A**

## **PLAN OF REORGANIZATION**

*See Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* **filed at D.I. 6443.**

# **EXHIBIT B**

## **LOCAL COUNCIL FORM OF LETTER OF INTENT**

July __, 2021

<u>Via E-mail</u>

Boy Scouts of America
1325 West Walnut Hill Lane
P.O. Box 152079
Irving, Texas 75015-2079

Re:    *In re Boy Scouts of America & Delaware BSA LLC*,
        Case No. 20-10343 (Bankr. D. Del.) (the "Bankruptcy Case")

To Whom It May Concern:

We hereby express our intent to make a contribution to a settlement trust (the "Settlement Trust") created under a Boy Scouts of America ("BSA") Chapter 11 plan of reorganization (a "Plan").

In addition to our rights under applicable insurance policies (subject to agreed treatment for non-abuse-related claims), our Local Council intends to contribute cash and/or real property to the Settlement Trust under a BSA "global resolution" Plan as set forth below.

Our contribution, if any, of real property would be valued (the "Appraised Value") as provided for in the term sheet filed as part of docket number 5466-2 in the Bankruptcy Case (the "Term Sheet"). Other mechanics regarding our council's real property contribution, if any, are described in the Term Sheet.

Our contribution would be subject to the following principal conditions:

(a) Final approval of our board of trustees or similar governing body (no such approval has been obtained as of the date hereof) and approval by any relevant governmental authority, if needed;

(b) Entry of a channeling injunction and releases covering our Local Council (including any predecessors to our Local Council, and any trusts or entities that support Local Council operations), our Local Council's board members, volunteers and employees (other than alleged perpetrators);

(c) Acceptable resolution of insurance and indemnity issues with respect to our chartered partners, to be negotiated, including through the use of a channeling injunction and/or voluntary releases;

(d) Contributions of cash and real property into the Settlement Trust by or on behalf of all other Local Councils which, together with our Local Council's contribution, will total $500 million (comprised of at least $300 million of cash);

Boy Scouts of America
Page 2

(e) Continuation of the Bankruptcy Court's preliminary injunction regarding abuse-related claims until the effective date of the Plan;

(f) the Plan, all relevant court orders and all other definitive documentation being in form and substance satisfactory to us and to the Ad Hoc Committee of Local Councils of the Boy Scouts of America.

This letter is a non-binding letter of intent.  Nothing herein creates any obligation whatsoever, including to contribute to the Settlement Trust.  Nothing herein is an admission with respect to any matter or any factual or legal issue of any kind, including any liability for or in respect of any abuse claim.

Sincerely,

X _____

By:    _____

Title:    _____

Local Council Name:    _____

Local Council No.:    _____

[Contribution amount / form(s) indicated on next page(s)]

Boy Scouts of America
Page 3


Local Council Name:   _____

Local Council No.:   _____


Total contribution (per Ad Hoc Committee framework):  $_____

Cash to be contributed:  $_____

Number of real properties to be contributed (if any):   _____

Total Appraised Value of all contributed real properties (if any):   _____

    (If real property will be contributed, please complete one copy of the next page for *each* piece of property to be contributed.  The "Total Appraised Value" line above should refect the combined total of all of these real properties.)

Boy Scouts of America
Page 4

Local Council Name and Number: _____

Real property number _____ of _____ total properties intended to be contributed by the council.

| | |
|---|---|
| Description (including acres) | |
| Entire property or portion thereof? | |
| If a portion, description of portion (including acres and approximate percentage of total): | |
| If an *entire property* and valued based on CBRE/Keen/JLL desktop appraisals (a.k.a. "restricted appraisal reports" or "broker opinions of value"),[1] the Appraised Value: | $ |
| If a Qualified On-Site Appraisal[2] will be used,[3] but has not been completed by the date that this Letter of Intent is executed, the Local Council's good faith estimate[4] of the likely Appraised Value: | $ |
| If a Qualified On-Site Appraisal[2] will be used,[3] and has been completed by the date that this Letter of Intent is executed, the Appraised Value: | $ |

---

[1]    This valuation method can be used where a council is contributing an entire property that either (1) is not subject to a Lower Tier Restriction (as defined in the Term Sheet) or (2) is subject to a Lower Tier Restriction but such restriction is taken into account in the desktop appraisal. See Term Sheet at pages 10-11 for further details.

[2]    See Term Sheet at 12 for definition of "Qualified On-Site Appraisal."

[3]    This valuation method can be used: (1) where a council is contributing a portion of a property, (2) where a council is contributing an entire property that is not subject to a Lower Tier Restriction (subject to averaging with any CBRE/Keen/JLL desktop appraisals), or (3) where a council is contributing an entire property that is subject to a Lower Tier Restriction that is not reflected in any CBRE/Keen/JLL desktop appraisal of the property. See Term Sheet at pages 10-11 for further details.

[4]    Note that, if the council intends to rely on a Qualified On-Site Appraisal, the council *may* need to designate replacement property or adjust its cash contribution if the completed Qualified On-Site Appraisal does not result in an Appraised Value equal to the good faith estimate indicated on this form.

# **EXHIBIT C**

**EXPECTED LOCAL COUNCIL SETTLEMENT TRUST CONTRIBUTIONS**

**Boy Scouts of America**
Local Council Settlement Trust Contribution [2]

The amounts on this chart reflect only the Cash Contribution and Property Contribution components of the Local Council Settlement Trust Contribution. In addition to the $500 million aggregate Cash and Property Contributions, Local Councils are contributing approximately $100 million in the form of the DST Note, as well as their insurance rights. Neither the $100 million DST Note nor the value of Local Council insurance rights is reflected in the individual Local Council contributions below. As a result, these numbers do not include a material portion of the value of each Local Council's contribution.

| Local Council Number | Local Council Name [1] | Total Contribution [2] | Cash Contribution | Property Contribution [3] |
|---|---|---|---|---|
| 001 | Greater Alabama | $ 3,685,328 | $ 2,364,428 | $ 1,320,900 |
| 003 | Alabama-Florida | 114,311 | 114,311 | - |
| 004 | Mobile Area | 34,897 | 34,897 | - |
| 005 | Tukabatchee Area | 832,901 | 459,151 | 373,750 |
| 006 | Black Warrior | 767,974 | 687,974 | 80,000 |
| 010 | Grand Canyon | 7,007,972 | 2,366,672 | 4,641,300 |
| 011 | Catalina | 1,080,484 | 1,049,521 | 30,963 |
| 013 | De Soto Area | 130,903 | 130,903 | - |
| 016 | Westark Area | 942,308 | 942,308 | - |
| 018 | Quapaw Area | 4,616,045 | 4,616,045 | - |
| 023 | Golden Gate Area | 8,000,000 | 8,000,000 | - |
| 027 | Sequoia | 567,536 | 497,036 | 70,500 |
| 030 | Southern Sierra | 148,908 | 122,997 | 25,911 |
| 031 | Pacific Skyline | 2,905,055 | 2,905,055 | - |
| 032 | Long Beach Area | 4,262,425 | 2,042,425 | 2,220,000 |
| 033 | Greater Los Angeles Area | 8,000,000 | 5,300,000 | 2,700,000 |
| 035 | Marin | 1,030,344 | 1,030,344 | - |
| 039 | Orange County | 13,008,500 | - | 13,008,500 |
| 041 | Redwood Empire | 197,221 | 197,221 | - |
| 042 | Piedmont | 541,098 | 541,098 | - |
| 045 | California Inland Empire | 1,154,569 | 1,154,569 | - |
| 047 | Golden Empire | 1,320,000 | 1,320,000 | - |
| 049 | San Diego-Imperial | 2,661,800 | - | 2,661,800 |
| 051 | Western Los Angeles County | 1,250,000 | 975,000 | 275,000 |
| 053 | Los Padres | 1,834,155 | 634,155 | 1,200,000 |
| 055 | Silicon Valley Monterey Bay | 10,000,000 | 7,570,000 | 2,430,000 |
| 057 | Ventura County | 325,018 | 325,018 | - |
| 058 | Verdugo Hills | 973,434 | 973,434 | - |
| 059 | Greater Yosemite | 2,200,000 | - | 2,200,000 |
| 060 | Pikes Peak | 1,718,941 | 1,718,941 | - |
| 061 | Denver Area | 6,000,000 | - | 6,000,000 |
| 062 | Longs Peak | 2,936,807 | 2,936,807 | - |
| 063 | Rocky Mountain | 11,492 | 11,492 | - |
| 066 | Connecticut Rivers | 4,083,054 | 4,083,054 | - |
| 067 | Greenwich | 802,477 | 802,477 | - |
| 069 | Housatonic | 235,901 | 235,901 | - |
| 070 | Old North State | 4,767,600 | 341,969 | 4,425,631 |
| 072 | Connecticut Yankee | 2,581,836 | 1,131,836 | 1,450,000 |
| 081 | Del-Mar-Va | 2,241,287 | 2,241,287 | - |
| 082 | National Capital Area | 8,000,000 | 4,804,000 | 3,196,000 |
| 083 | Central Florida | 1,224,354 | 1,224,354 | - |
| 084 | South Florida | 3,163,180 | 3,163,180 | - |
| 085 | Gulf Stream | 1,170,000 | - | 1,170,000 |
| 087 | North Florida | 5,284,701 | 5,284,701 | - |
| 088 | Southwest Florida | 2,121,962 | 2,121,962 | - |
| 089 | Greater Tampa Bay Area | 6,052,120 | 1,052,120 | 5,000,000 |
| 091 | Chattahoochee | 937,997 | 937,997 | - |
| 092 | Atlanta Area | 8,000,000 | 8,000,000 | - |
| 093 | Georgia-Carolina | 326,070 | 326,070 | - |
| 095 | Flint River | 766,174 | 766,174 | - |
| 096 | Central Georgia | 299,458 | 299,458 | - |
| 098 | South Georgia | 436,247 | 436,247 | - |
| 099 | Coastal Georgia | 2,584,395 | 2,584,395 | - |
| 100 | Northwest Georgia | 802,019 | 561,019 | 241,000 |
| 101 | Northeast Georgia | 2,138,766 | 1,947,991 | 190,775 |
| 104 | Aloha | 1,338,358 | 1,338,358 | - |
| 106 | Mountain West | 2,020,156 | 2,020,156 | - |

**Boy Scouts of America**
Local Council Settlement Trust Contribution [2]

The amounts on this chart reflect only the Cash Contribution and Property Contribution components of the Local Council Settlement Trust Contribution. In addition to the $500 million aggregate Cash and Property Contributions, Local Councils are contributing approximately $100 million in the form of the DST Note, as well as their insurance rights. Neither the $100 million DST Note nor the value of Local Council insurance rights is reflected in the individual Local Council contributions below. As a result, these numbers do not include a material portion of the value of each Local Council's contribution.

| Local Council Number | Local Council Name [1] | Total Contribution [2] | Cash Contribution | Property Contribution [3] |
|---|---|---|---|---|
| 107 | Grand Teton | 1,091,207 | 1,091,207 | - |
| 117 | Prairielands | 467,331 | 467,331 | - |
| 127 | Three Fires | 1,601,000 | 1,601,000 | - |
| 129 | Northeast Illinois | 2,190,574 | 2,190,574 | - |
| 133 | Illowa | 783,586 | 783,586 | - |
| 138 | W.D. Boyce | 1,045,115 | 1,045,115 | - |
| 141 | Mississippi Valley | 989,191 | 989,191 | - |
| 144 | Abraham Lincoln | 1,568,064 | 1,192,064 | 376,000 |
| 145 | Hoosier Trails | 757,931 | 757,931 | - |
| 156 | Buffalo Trace | 553,341 | 481,841 | 71,500 |
| 157 | Anthony Wayne Area | 1,309,804 | 1,309,804 | - |
| 160 | Crossroads of America | 4,321,870 | 4,321,870 | - |
| 162 | Sagamore | 1,149,115 | 1,149,115 | - |
| 165 | LaSalle | 1,319,467 | 654,467 | 665,000 |
| 172 | Hawkeye Area | 446,691 | 446,691 | - |
| 173 | Winnebago | 723,157 | 723,157 | - |
| 177 | Mid-Iowa | 2,502,671 | 2,502,671 | - |
| 178 | Northeast Iowa | 678,374 | 678,374 | - |
| 192 | Coronado Area | 856,886 | 856,886 | - |
| 194 | Santa Fe Trail | 203,382 | 203,382 | - |
| 197 | Jayhawk Area | 345,573 | 345,573 | - |
| 198 | Quivira | 975,000 | - | 975,000 |
| 204 | Blue Grass | 110,356 | 110,356 | - |
| 205 | Lincoln Heritage | 3,632,563 | 3,632,563 | - |
| 209 | Calcasieu Area | 442,315 | 442,315 | - |
| 211 | Istrouma Area | 680,000 | - | 680,000 |
| 212 | Evangeline Area | 167,830 | 167,830 | - |
| 213 | Louisiana Purchase | 1,167,454 | 1,167,454 | - |
| 214 | Southeast Louisiana | 1,877,632 | 577,632 | 1,300,000 |
| 215 | Norwela | 2,936,807 | 2,936,807 | - |
| 216 | Katahdin Area | 275,157 | 16,357 | 258,800 |
| 218 | Pine Tree | 904,025 | 904,025 | - |
| 220 | Baltimore Area | 4,317,564 | 4,317,564 | - |
| 221 | Mason-Dixon | 345,990 | 345,990 | - |
| 224 | Cape Cod and Islands | 844,020 | 844,020 | - |
| 227 | Spirit of Adventure | 3,840,767 | 2,338,442 | 1,502,325 |
| 230 | Heart of New England | 1,406,503 | 1,406,503 | - |
| 234 | Western Massachusetts | 664,939 | 664,939 | - |
| 250 | Northern Star | 7,223,055 | 6,537,055 | 686,000 |
| 251 | Mayflower | 5,035,539 | 5,035,539 | - |
| 283 | Twin Valley | 783,963 | 783,963 | - |
| 286 | Voyageurs Area | 510,201 | 510,201 | - |
| 296 | Central Minnesota | 276,941 | 276,941 | - |
| 299 | Gamehaven | 321,630 | 330 | 321,300 |
| 302 | Choctaw Area | 519,164 | 519,164 | - |
| 303 | Andrew Jackson | 1,512,001 | 955,001 | 557,000 |
| 304 | Pine Burr Area | 330,068 | 330,068 | - |
| 306 | Ozark Trails | 2,241,929 | 1,326,929 | 915,000 |
| 307 | Heart of America | 6,971,313 | 3,971,313 | 3,000,000 |
| 311 | Pony Express | 1,015,000 | 615,000 | 400,000 |
| 312 | Greater St. Louis Area | 7,986,838 | 7,986,838 | - |
| 315 | Montana | 3,181,676 | 3,181,676 | - |
| 322 | Overland Trails | 468,988 | 468,988 | - |
| 324 | Cornhusker | 356,000 | 356,000 | - |
| 326 | Mid-America | 4,280,708 | 4,280,708 | - |
| 328 | Las Vegas Area | 3,385,736 | 3,250,736 | 135,000 |
| 329 | Nevada Area | 2,506,435 | 2,506,435 | - |

**Boy Scouts of America**
Local Council Settlement Trust Contribution [2]

The amounts on this chart reflect only the Cash Contribution and Property Contribution components of the Local Council Settlement Trust Contribution. In addition to the $500 million aggregate Cash and Property Contributions, Local Councils are contributing approximately $100 million in the form of the DST Note, as well as their insurance rights. Neither the $100 million DST Note nor the value of Local Council insurance rights is reflected in the individual Local Council contributions below. As a result, these numbers do not include a material portion of the value of each Local Council's contribution.

| Local Council Number | Local Council Name [1] | Total Contribution [2] | Cash Contribution | Property Contribution [3] |
|---|---|---|---|---|
| 330 | Daniel Webster | 3,525,762 | 1,600,762 | 1,925,000 |
| 333 | Northern New Jersey | 3,064,566 | 3,064,566 | - |
| 341 | Jersey Shore | 386,141 | 386,141 | - |
| 347 | Monmouth | 3,170,811 | 1,990,811 | 1,180,000 |
| 358 | Patriots' Path | 3,704,240 | 1,804,199 | 1,900,041 |
| 364 | Twin Rivers | 2,595,200 | 2,046,700 | 548,500 |
| 368 | Baden-Powell | 1,371,787 | 1,371,787 | - |
| 373 | Longhouse | 840,707 | - | 840,707 |
| 375 | Five Rivers | 831,968 | 21,968 | 810,000 |
| 376 | Iroquois Trail | 342,546 | 117,546 | 225,000 |
| 380 | Greater Niagara Frontier | 1,537,485 | - | 1,537,485 |
| 382 | Allegheny Highlands | 899,358 | 333,992 | 565,366 |
| 386 | Theodore Roosevelt | 3,989,485 | 3,989,485 | - |
| 388 | Greater Hudson Valley | 6,367,835 | 6,367,835 | - |
| 397 | Seneca Waterways | 8,000,000 | 8,000,000 | - |
| 400 | Leatherstocking | 4,493,457 | 1,093,457 | 3,400,000 |
| 404 | Suffolk County | 1,717,800 | 1,717,800 | - |
| 405 | Rip Van Winkle | 240,016 | 240,016 | - |
| 412 | Great Southwest | 116,570 | 116,570 | - |
| 413 | Conquistador | 1,950,432 | 1,948,098 | 2,334 |
| 414 | Daniel Boone | 656,424 | 656,424 | - |
| 415 | Mecklenburg County | 2,920,183 | 2,920,183 | - |
| 416 | Central North Carolina | 1,840,659 | 1,400,000 | 440,659 |
| 420 | Piedmont | 2,785,859 | 2,785,859 | - |
| 421 | Occoneechee | 1,946,429 | 1,013,429 | 933,000 |
| 424 | Tuscarora | 858,650 | 858,650 | - |
| 425 | Cape Fear | 1,044,895 | 126,895 | 918,000 |
| 426 | East Carolina | 1,940,873 | 1,045,873 | 895,000 |
| 427 | Old Hickory | 1,084,223 | 1,084,223 | - |
| 429 | Northern Lights | 1,915,148 | 1,915,148 | - |
| 433 | Great Trail | 3,059,259 | 3,059,259 | - |
| 436 | Buckeye | 2,614,529 | 1,945,529 | 669,000 |
| 438 | Dan Beard | 4,064,829 | 4,064,829 | - |
| 439 | Tecumseh | 653,395 | 493,395 | 160,000 |
| 440 | Lake Erie | 6,546,918 | 6,546,918 | - |
| 441 | Simon Kenton | 2,659,872 | 2,416,872 | 243,000 |
| 444 | Miami Valley | 1,255,126 | - | 1,255,126 |
| 449 | Black Swamp Area | 1,681,202 | 1,681,202 | - |
| 456 | Pathway to Adventure | 7,225,067 | 7,225,067 | - |
| 460 | Erie Shores | 4,161,154 | 4,161,154 | - |
| 467 | Muskingum Valley | 513,391 | 513,391 | - |
| 468 | Arbuckle Area | 572,866 | 572,866 | - |
| 469 | Cherokee Area | 315,366 | 315,366 | - |
| 474 | Cimarron | 282,652 | 282,652 | - |
| 480 | Last Frontier | 3,646,048 | 3,646,048 | - |
| 488 | Indian Nations | 2,637,142 | 1,972,142 | 665,000 |
| 491 | Crater Lake | 320,470 | 55,470 | 265,000 |
| 492 | Cascade Pacific | 10,000,000 | 10,000,000 | - |
| 497 | Juniata Valley | 421,504 | 421,504 | - |
| 500 | Moraine Trails | 1,196,485 | 204,485 | 992,000 |
| 501 | Northeastern Pennsylvania | 687,262 | 687,262 | - |
| 502 | Minsi Trails | 2,580,916 | 2,580,916 | - |
| 504 | Columbia-Montour | 260,931 | 260,931 | - |
| 509 | Bucktail | 260,931 | 260,931 | - |
| 512 | Westmoreland-Fayette | 1,367,518 | 1,083,676 | 283,842 |
| 524 | Pennsylvania Dutch | 1,054,371 | 1,054,371 | - |
| 525 | Cradle of Liberty | 6,806,713 | 376,313 | 6,430,400 |

**Boy Scouts of America**
Local Council Settlement Trust Contribution [2]

The amounts on this chart reflect only the Cash Contribution and Property Contribution components of the Local Council Settlement Trust Contribution. In addition to the $500 million aggregate Cash and Property Contributions, Local Councils are contributing approximately $100 million in the form of the DST Note, as well as their insurance rights. Neither the $100 million DST Note nor the value of Local Council insurance rights is reflected in the individual Local Council contributions below. As a result, these numbers do not include a material portion of the value of each Local Council's contribution.

| Local Council Number | Local Council Name [1] | Total Contribution [2] | Cash Contribution | Property Contribution [3] |
|---|---|---|---|---|
| 527 | Laurel Highlands | 5,972,147 | 5,972,147 | - |
| 528 | Hawk Mountain | 1,636,124 | 1,636,124 | - |
| 532 | French Creek | 699,673 | 699,673 | - |
| 533 | Susquehanna | 453,846 | 453,846 | - |
| 538 | Chief Cornplanter | 260,931 | 260,931 | - |
| 539 | Chester County | 1,559,680 | 1,559,680 | - |
| 544 | New Birth of Freedom | 2,713,971 | 2,713,971 | - |
| 546 | Narragansett | 6,440,530 | 6,440,530 | - |
| 549 | Palmetto | 165,998 | 165,998 | - |
| 550 | Coastal Carolina | 216,987 | 141,987 | 75,000 |
| 551 | Blue Ridge | 1,058,966 | - | 1,058,966 |
| 552 | Pee Dee Area | 889,440 | 264,440 | 625,000 |
| 553 | Indian Waters | 556,559 | 556,559 | - |
| 556 | Cherokee Area | 1,180,000 | - | 1,180,000 |
| 557 | Great Smoky Mountain | 1,193,687 | 1,088,687 | 105,000 |
| 558 | Chickasaw | 2,045,752 | 2,045,752 | - |
| 559 | West Tennessee Area | 140,520 | - | 140,520 |
| 560 | Middle Tennessee | 3,586,493 | 3,586,493 | - |
| 561 | Texas Trails | 627,654 | 627,654 | - |
| 562 | Golden Spread | 2,133,734 | 2,133,734 | - |
| 564 | Capitol Area | 4,196,142 | 4,196,142 | - |
| 567 | Buffalo Trail | 1,148,568 | - | 1,148,568 |
| 571 | Circle Ten | 7,989,824 | 7,989,824 | - |
| 573 | Yucca | 684,194 | 684,194 | - |
| 574 | Bay Area | 1,019,611 | 1,019,611 | - |
| 576 | Sam Houston Area | 7,968,144 | 7,968,144 | - |
| 577 | South Texas | 372,925 | 372,925 | - |
| 578 | Three Rivers | 802,596 | 802,596 | - |
| 583 | Alamo Area | 4,241,105 | 2,441,105 | 1,800,000 |
| 584 | Caddo Area | 506,208 | 506,208 | - |
| 585 | East Texas Area | 1,505,910 | 1,505,910 | - |
| 587 | Northwest Texas | 529,586 | 529,586 | - |
| 590 | Crossroads of the West | 4,413,897 | 3,082,897 | 1,331,000 |
| 592 | Green Mountain | 802,732 | 590,661 | 212,071 |
| 595 | Colonial Virginia | 347,149 | 347,149 | - |
| 596 | Tidewater | 621,354 | 570,769 | 50,585 |
| 598 | Shenandoah Area | 188,673 | 188,673 | - |
| 599 | Blue Ridge Mountains | 739,330 | 739,330 | - |
| 602 | Heart of Virginia | 2,067,014 | 1,517,014 | 550,000 |
| 604 | Blue Mountain | 673,098 | 98,098 | 575,000 |
| 606 | Mount Baker | 2,150,000 | - | 2,150,000 |
| 609 | Chief Seattle | 7,517,262 | 7,517,262 | - |
| 610 | Great Alaska | 579,090 | 579,090 | - |
| 611 | Inland Northwest | 164,963 | 164,963 | - |
| 612 | Pacific Harbors | 2,260,810 | 2,260,810 | - |
| 614 | Grand Columbia | 254,101 | 118,414 | 135,688 |
| 615 | Mountaineer Area | 527,717 | 416,717 | 111,000 |
| 617 | Buckskin | 1,890,783 | 1,890,783 | - |
| 619 | Ohio River Valley | 895,582 | 835,582 | 60,000 |
| 620 | Glacier's Edge | 615,218 | 615,218 | - |
| 624 | Gateway Area | 328,075 | 328,075 | - |
| 627 | Samoset | 744,921 | 714,142 | 30,780 |
| 635 | Bay-Lakes | 2,876,230 | 2,876,230 | - |
| 636 | Three Harbors | 3,685,039 | 3,685,039 | - |
| 637 | Chippewa Valley | 411,891 | 411,891 | - |
| 638 | Greater Wyoming | 405,893 | 405,893 | - |
| 640 | Greater New York | 9,000,000 | 9,000,000 | - |

**Boy Scouts of America**

Local Council Settlement Trust Contribution [2]

The amounts on this chart reflect only the Cash Contribution and Property Contribution components of the Local Council Settlement Trust Contribution. In addition to the $500 million aggregate Cash and Property Contributions, Local Councils are contributing approximately $100 million in the form of the DST Note, as well as their insurance rights. Neither the $100 million DST Note nor the value of Local Council insurance rights is reflected in the individual Local Council contributions below. As a result, these numbers do not include a material portion of the value of each Local Council's contribution.

| Local Council Number | Local Council Name [1] | Total Contribution [2] | Cash Contribution | Property Contribution [3] |
|---|---|---|---|---|
| 651 | Potawatomi Area | 560,174 | 560,174 | - |
| 653 | Great Rivers | 420,000 | - | 420,000 |
| 660 | Blackhawk Area | 1,611,059 | 142,059 | 1,469,000 |
| 661 | Puerto Rico | 233,059 | 233,059 | - |
| 662 | Longhorn | 1,619,485 | 1,619,485 | - |
| 664 | Suwannee River Area | 224,459 | 224,459 | - |
| 690 | Garden State | 3,890,626 | 2,118,437 | 1,772,189 |
| 691 | Pushmataha Area | 83,882 | 83,882 | - |
| 694 | South Plains | 755,075 | 755,075 | - |
| 695 | Black Hills Area | 160,573 | 160,573 | - |
| 696 | Midnight Sun | 1,023,336 | 1,023,336 | - |
| 697 | Oregon Trail | 3,141,676 | 3,141,676 | - |
| 702 | Rainbow | 759,968 | 566,968 | 193,000 |
| 713 | Sequoyah | 796,698 | 796,698 | - |
| 733 | Sioux | 524,247 | 524,247 | - |
| 741 | Texas Southwest | 221,936 | 221,936 | - |
| 748 | Yocona Area | 291,074 | 291,074 | - |
| 763 | Virginia Headwaters | 287,066 | 287,066 | - |
| 773 | Gulf Coast | 140,734 | 140,734 | - |
| 775 | Rio Grande | 562,009 | 562,009 | - |
| 777 | Washington Crossing | 1,390,180 | 1,390,180 | - |
| 780 | Michigan Crossroads | 7,983,003 | 5,819,003 | 2,164,000 |
| 802 | Transatlantic | 447,138 | 447,138 | - |
| 803 | Far East | 778,355 | 778,355 | - |
| **Real Property Appraisal Contingency** | | **(19,588,545)** | **-** | **(19,588,545)** |
| **Total** | | **$ 500,000,000** | **$ 408,391,763** | **$ 91,608,237** |

**Footnotes:**

*[1] Longs Peak (LC #062) and Greater Wyoming (LC #638) merged on May 1, 2021; however, the councils submitted a single letter of intent reflecting separate contribution numbers for each council.*

*[2] As of the date of the filing of this Disclosure Statement, all Local Councils have submitted letters of intent reflecting each Local Council's intent to contribute the amounts listed on this schedule. A form of letter of intent is attached as Exhibit B to the Disclosure Statement. The contributions for each Local Council, listed herein as set forth in each Local Council's respective letter of intent, total approximately $519 million. This amount exceeds the $500 million Local Council Settlement Contribution amount to account for the possibility that certain Local Councils are ultimately unable to meet the contribution amount set out in their letter of intent on the Effective Date, including in the event that certain properties or portions of properties that may be contributed to the Trust are valued at less than the estimated property value as the result of a Qualified On-Site Appraisal. The total amount and composition of each Local Council's contribution is subject to material change, provided that the value of the Local Councils' contributions of cash and property shall equal $500 million in the aggregate and that the cash portion shall be no less than $300 million in the aggregate.*

*[3] The values of certain Local Council properties are subject to change pending the completion of Qualified On-Site Appraisals and, as such, the value of each Local Council property for purposes of the Local Council Settlement Contribution is subject to material change, provided that, as noted above, the value of the Local Councils' contributions of cash and property shall equal precisely $500 million in the aggregate and that the cash portion shall be no less than $300 million in the aggregate.*

**<u>EXHIBIT D</u>**

**LIQUIDATION ANALYSIS**

**Boy Scouts of America**

**Exhibit D**

**Liquidation Analysis[1]**

   This hypothetical liquidation analysis (this "<u>Liquidation Analysis</u>") is based on certain estimates and assumptions that the Debtors have developed, with the assistance of their advisors, and which the Debtors consider to be reasonable under the circumstances of the Chapter 11 Cases. These estimates and assumptions are inherently subject to significant economic, operational, legal, and other uncertainties and contingencies that are outside of the Debtors' control. Accordingly, the Debtors cannot provide any assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo the liquidation discussed herein, and actual results in the event of a liquidation could vary materially from this Liquidation Analysis.

   In summary, the Liquidation Analysis estimates that a maximum of $451.1 million would be available to unsecured creditors of which $384.4 million to $421.9 million would be available to Abuse Claims depending on the amount of Allowed Abuse Claims. As discussed below, the Liquidation Analysis excludes any proceeds from insurance or from recoveries from any contribution claims against Chartered Organizations, on the basis that recoveries from such proceeds are assumed to be materially the same or greater under a plan of reorganization that provides for a global resolution of Abuse Claims than under a chapter 7 liquidation.[2]

## 1)   Introduction

   The Debtors, with the assistance of their legal and financial advisors, have prepared this Liquidation Analysis in connection with the Plan and the Disclosure Statement. As described in <u>Article IX.D</u> of the Disclosure Statement, section 1112(c) of the Bankruptcy Code provides that the chapter 11 cases of non-profit corporations such as the Debtors may not be involuntarily converted to cases under chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 1112(c) ("The court may not convert a case under [chapter 11] to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion."). Because the Chapter 11 Cases could not be involuntarily converted a chapter 7 liquidation, the Debtors submit that they are not required to satisfy the requirements of section 1129(a)(7) in connection with confirmation of the Plan. Although the Debtors do not believe they are required to satisfy the "best interests of creditors" test embodied in section 1129(a)(7), the Debtors do believe that this Liquidation Analysis will be helpful to holders of Claims as they evaluate their proposed treatment under the Plan. This Liquidation Analysis shall not be construed as or deemed to constitute a waiver or admission of any kind. The Debtors reserve all rights to oppose the applicability of the best interests test in the Chapter 11 Cases, including any arguments that the Local Councils must be included in the Liquidation Analysis.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them the Plan or Disclosure Statement, as applicable.

[2] The Debtors have not conducted an analysis or independent investigation of Chartered Organizations' assets nor do they believe one is required for purposes of satisfying the best interests of creditors test.

The Liquidation Analysis permits holders of Impaired Claims to evaluate whether they will receive or retain value under the Plan on account of their Claims of a value, as of the Effective Date, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To calculate the probable distribution to holders of Claims in each Impaired Class if the Debtors were liquidated under chapter 7, the Liquidation Analysis:

i)    estimates the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee (the "Trustee") would generate if the Chapter 11 Cases were converted to cases under chapter 7 on the Effective Date and the assets of the Debtors' Estates and the Related Non-Debtor Entities were liquidated;

ii)   determines the distribution each holder of an Impaired Claim would receive from the Liquidation Proceeds under the statutory priority scheme that applies in a case under chapter 7; and

iii)  compares each holder's distribution from the Liquidation Proceeds to the distribution such creditor would receive under the Plan if it were confirmed and consummated.

This Exhibit D to the Disclosure Statement contains three sets of analyses.  The first section contains the Liquidation Analysis applicable to the Debtors and Related Non-Debtor Entities.  The second section provides a similar analysis in relation to the Local Councils.  Although the Debtors do not believe they are required to satisfy the best-interests test as it relates to the Local Councils, the Debtors have consented to including this analysis to address objections to the Disclosure Statement asserted by the Tort Claimants' Committee and various individuals holding Class 8 Direct Abuse Claims.   Third and finally, this Exhibit D contains an analysis depicting a combination of the Liquidation Analysis pertaining to the Debtors and Related Non-Debtor Entities and the analysis pertaining to the hypothetical liquidation of the Local Councils.  As noted above, this Liquidation Analysis shall not be construed as or deemed to constitute a waiver or admission of any kind.  The Debtors reserve all rights to oppose the applicability of the best interests test in the Chapter 11 Cases.

**2)    Liquidation Analysis of Debtors and Related Non-Debtor Entities**

**i)       Process and Assumption Overview**

This Liquidation Analysis was prepared on a consolidated basis and assumes that the Debtors and all of the Related Non-Debtor Entities with material assets (specifically, National Boy Scouts of America Foundation, Arrow WV, Inc., BSA Asset Management, LLC, and Learning for Life) would be liquidated on a jointly administered but nonconsolidated basis.  This Liquidation Analysis has been prepared assuming that the Chapter 11 Cases are converted to chapter 7 on or about December 31, 2021 (the "Conversion Date") and that Related Non-Debtor Entities file for chapter 7 liquidation at that time.  Certain of the Related Non-Debtor Entities are not subsidiaries of the BSA but rather are independently incorporated non-stock, non-profit entities.  Accordingly, the Liquidation Analysis does not consider any defenses that could be raised by the Related Non-Debtor Entities as to whether their assets would be available to the BSA's creditors, which

defenses, if successful, would reduce the recoveries set forth herein. The Debtors have assumed that the liquidation would occur over an approximately six-month time period. This assumption is consistent with assumptions utilized for hypothetical liquidations analyses in other chapter 11 cases. In the Debtors' view, six months is the minimum time period that would be required to complete the sale of substantially all of the Debtors' unrestricted assets,[3] monetize and collect receivables and other unrestricted assets of the Debtors and Related Non-Debtor Entities, and administer and wind-down the estates. Except as otherwise noted herein, the Liquidation Analysis is based upon the Debtors' and Related Non-Debtor Entities' unaudited pro forma consolidated balance sheets as of February 28, 2021, and those values are assumed to be representative of the Debtors' and Related Non-Debtor Entities' assets and liabilities as of the Conversion Date unless otherwise noted. Any projected balance sheet amounts presented in this Liquidation Analysis are intended to be a proxy for actual balances on the Conversion Date (the "Liquidation Balances"). In addition, this Liquidation Analysis incorporates certain adjustments to account for the effects of the chapter 7 liquidation process, including costs of winding down the Debtors' and Related Non-Debtor Entities' estates, employee-related costs, and professional and Trustee fees.

It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint the Trustee, who would sell the unrestricted assets of the Debtors' and Related Non-Debtor Entities' bankruptcy estates and distribute the Liquidation Proceeds, net of liquidation-related costs, to creditors in accordance with the statutory priority scheme provided for under section 726 of the Bankruptcy Code. To maximize recoveries in an expedited process, this Liquidation Analysis assumes that the Trustee's initial step would be to develop a liquidation plan to generate Liquidation Proceeds from the sale of the Debtors' and Related Non-Debtor Entities' unrestricted assets for distribution to creditors. This Liquidation Analysis assumes the appointed Trustee will retain legal and financial advisors and real estate and other brokers to assist in the liquidation.

This Liquidation Analysis assumes that a Trustee would immediately begin the wind-down process following a conversion to chapter 7, with minimal employee and operating costs continuing during the liquidation process. The Debtors' and Related Non-Debtor Entities' unrestricted assets would be marketed on an accelerated timeline, and asset sales would generally occur within the six-month wind-down period. Asset values in the liquidation process are assumed to be driven by, among other factors:

- the accelerated time frame in which the assets are marketed and sold;

- the loss of key personnel;

- negative public sentiment and damage to the BSA's brand; and

---

[3] For purposes of this Exhibit D, a "restricted" asset is an asset that is subject to enforceable use restrictions under applicable law or an asset that the Debtors, the Related Non-Debtor Entities or the Local Councils hold in a fiduciary capacity for the sole benefit of donors, their intended beneficiaries, or members of the public who have entrusted the Debtors, Related Non-Debtor Entities or Local Councils to carry out their respective charitable missions. The Bankruptcy Code recognizes and enforces these state-law restrictions in bankruptcy cases of charitable non-profit corporations under sections 363(d)(1) and 541(d) of the Bankruptcy Code.

- the general forced nature of the sale.

The cessation of operations in a liquidation would likely trigger certain Claims that otherwise would not exist under a Plan absent a liquidation. Examples of these kinds of Claims include, without limitation, potential employee Claims (such as severance or WARN Act Claims) and executory contract and unexpired lease rejection damages Claims. The amounts of these Claims could be material and certain of these Claims could be entitled to administrative or priority payment status under the relevant provisions of the Bankruptcy Code. Administrative and priority Claims would be paid in full from the Liquidation Proceeds before the balance of such proceeds would be made available to holders of allowed general unsecured Claims. Estimates of certain of these potential additional Claims have been included in the Liquidation Analysis.

Except as described below with respect to the Debtors' restricted investments, no recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions. The Debtors believe that the vast majority of the payments made to creditors in the 90 days preceding the chapter 11 proceedings (including one year for insiders) were in the ordinary course of business and when weighed against, among other issues, the cost of such litigation, the uncertainty of the outcome thereof and anticipated disputes regarding these matters, the outcome of such litigation is unlikely to affect materially the outcome of the Liquidation Analysis. Additionally, this analysis does not include estimates for tax consequences, either federal or state, that may be triggered upon the liquidation and sale of assets; these tax consequences could be material. Finally, the Liquidation Analysis assumes that there will not be any proceeds from the Debtors' directors and officers liability insurance available to satisfy creditors generally because the Debtors are unaware of any legally viable causes of action that could be asserted on behalf of the general creditor body that would recover from the Debtors' directors and officers liability insurance.

A substantial amount of the Debtors' and certain of the Related Non-Debtors Entities' assets are subject to valid and enforceable donor-imposed restrictions on use or disposition of such assets.[4] Under applicable law, restricted assets do not constitute property of the estate and would not be available to creditors in a chapter 7 liquidation.[5] The Liquidation Analysis excludes the value of those assets in calculating the gross Liquidation Proceeds unless specifically noted. Moreover, certain of the Debtors' and Local Councils' properties may be less marketable due to

---

[4] The Debtors are continuing to assess their restricted assets in connection with the adversary complaint filed by the Tort Claimants' Committee on January 8, 2021 (Adv. Pro. No. 21-50032).

[5] In a chapter 7 liquidation of a charitable non-profit corporation, courts often apply the *cy pres* doctrine to carry out a donor's intent rather than distribute a restricted donation to creditors. For example, in *Salisbury v. Ameritrust Tex. N.A. (In re Bishop College)*, 151 B.R. 394 (Bankr. N.D. Tex. 1993), the trustee of a testamentary trust declined to continue to pay trust income to a defunct private college that had commenced chapter 7 proceedings on the basis that the original purpose of the gift—providing scholarships—had become impossible to fulfill. *Id.* at 396. The bankruptcy court denied the chapter 7 trustee's turnover action, holding that, "[u]nder Texas law, where the particular charitable purpose for which the trust was created becomes impossible of achievement or illegal or impracticable, the trust does not fail if the settlor has shown a general intention that his property shall be used for charitable purposes." *Id.* at 400. In this situation, the court reasoned, "the court will exercise its *cy pres* power to authorize that the property be applied to some other some other particular charitable purpose falling within the general intention of the settlor," and that "the court will choose the public charity which is as near as possible to the one designated by the settlor." *Id.*

disputes over their classification as being restricted or unrestricted, limitations on their use including requirements to be used in the same manner, or restrictions on commercial development.[6]

In addition, certain other factors could materially diminish the Liquidation Proceeds due to the nature of the Debtors' status as non-profit entities. The Debtors will be required to comply with the applicable non-bankruptcy law that governs non-profit entities in connection with the disposition of their assets. These obligations vary among jurisdictions, but can require, *inter alia*, consent from a state's attorney general or other governmental authorities. State attorneys general may intervene or, depending upon state law, be compelled to intervene, in a chapter 7 liquidation to ensure that the intent of donors is carried out and that the restricted donations are not distributed to creditors.[7] The costs that attend these potential disputes and related delays and uncertainty regarding the same are not factored into this Liquidation Analysis and could reasonably be expected to negatively impact the Liquidation Proceeds.

Under a chapter 7 liquidation, moreover, it is likely that the BSA's defined benefit pension plan would be terminated and the Pension Benefit Guarantee Corporation (the "PBGC") would pursue its Claim of approximately $1.1 billion against all members of the controlled group, which are jointly and severally liable for such amounts and include the Related Non-Debtor Entities and Local Councils. The Debtors expect that under section 4068(a) of ERISA, the PBGC would successfully assert a lien arising as of the termination date against each member of the controlled group in an amount not to exceed 30% of the "collective net worth" of all members of the controlled group combined. However, for any member of the controlled group that has filed for bankruptcy prior to the termination, the automatic stay will generally prevent perfection of any lien under ERISA. The PBGC's Claim could therefore be asserted jointly and severally against each member of the controlled group in the full amount of the approximately $1.1 billion Claim, provided that the PBGC's Claim, to the extent not secured by a lien under ERISA, would likely be treated as a General Unsecured Claim. The Liquidation Analysis assumes that the lien on Related Non-Debtor Entity and Local Council assets would represent 30% of Liquidation Proceeds remaining for all of the Debtors, Related Non-Debtor Entities, and Local Councils combined after wind down costs and secured debt, if any. In the event the PBGC was unable to assert a secured claim or its security interest was invalidated, the PBGC would still have an unsecured claim against each member of the controlled group. As such Claim would be asserted jointly against members of the controlled group, including Local Councils, the PBGC is expected to recover in full on account of its Claim. The ability of the PBGC to recover in full in this circumstance is due to the significant size of its claim, which would be asserted in full against each member of the controlled group, as compared to the other claims against such entities, and the fact that the aggregate assets of the controlled group exceed the PBGC claim. Thus, in the event that the PBGC's Claim is not treated as a secured claim, the recoveries discussed herein will not materially change.

---

[6] *In re Save Our Springs (S.O.S.) All., Inc.*, 388 B.R. 202, 239 (Bankr. W.D. Tex. 2008) (finding, in a non-profit chapter 11 case, that "the evidence offered by the debtor regarding its assets and their values . . . [was] credible and substantial" and that such evidence was sufficient to meet the best interests test, "considering the unique nature of the Debtor as a non-profit organization dependent on contributions that are voluntary and may be restricted, and of the Debtor's other assets . . .").

[7] *See In re Bishop College*, 151 B.R. at 397 (observing that the Texas attorney general intervened in the chapter 7 trustee's turnover action, which under Texas law "is required in all disputes involving charitable trusts").

Approximately 82,500 non-duplicative Claims alleging Abuse were timely filed against the BSA in the Chapter 11 Cases. The BSA and certain Local Councils have procured commercial general liability policies from multiple insurers since the 1930s to protect themselves from losses including Abuse Claims. This Liquidation Analysis does not account for any recovery from insurance proceeds (irrespective of whether an insured Claim relates to Abuse) on the basis that recoveries from such proceeds are assumed to be materially the same or greater under a plan of reorganization that provides for a global resolution of Abuse Claims than under a chapter 7 liquidation.[8] In addition, the Liquidation Analysis does not account for any potential recovery from Chartered Organizations, as potential co-liable parties under the Abuse Claims, on the basis that recoveries from such proceeds are assumed to be materially the same or greater under a plan of reorganization that provides for a global resolution of Abuse Claims than under a chapter 7 liquidation.

ii)     **Distribution of Net Proceeds to Claimants**

Any available net proceeds would be allocated to holders of Claims in accordance with the priority scheme of section 726 of the Bankruptcy Code:

- Liquidation Adjustments / Super Priority Claims – includes estimated fees paid to the U.S. Trustee and Clerk of the Bankruptcy Court, wind-down costs and certain Professional Fees and broker fees;

- Secured Claims – includes 2010 Bond Claims, 2012 Bond Claims, 2010 Credit Facility Claims, 2019 RCF Claims, and the secured portion of the PBGC's Claim consistent with section 4068(a) of ERISA and PBGC guidance under 29 CFR § 4062.4;

- Chapter 11 Administrative and Priority Claims – includes estimated Claims held by creditors that are able to assert liens on particular assets, including certain trade vendors in addition to Claims for post-petition accounts payable, post-petition accrued expenses including professional fees, taxes, employee obligations, Claims arising under section 503(b)(9) of the Bankruptcy Code, and Unsecured Claims entitled to priority under section 507 of the Bankruptcy Code; and

- General Unsecured Claims – includes prepetition trade Claims, prepetition rejection damages Claims, and other types of prepetition liabilities; Abuse and non-Abuse litigation Claims; and unsecured and unrecovered PBGC Claims.

Under the absolute priority rule, no junior creditor would receive any distributions until all senior creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

iii)    **Conclusion**

This Liquidation Analysis was prepared before the completion of the reconciliation and

---

[8] The Debtors believe the value of its insurance policies will be maximized under the Plan, in part because the Local Councils are additional or named insureds under many of the policies.

allowance process for Claims against the Debtors and without any deadline for filing Claims against the Related Non-Debtor Entities' chapter 7 estates in a hypothetical liquidation, and so the Debtors have not had an opportunity to fully evaluate Claims against the Debtors or to adjudicate such Claims before the Bankruptcy Court.  Accordingly, the amount of the final Allowed Claims against the Debtors' estates may differ from the Claim amounts used in this Liquidation Analysis. Additionally, asset values discussed herein may be different than amounts referred to in the Plan, which presumes the reorganization of the Debtors' assets and liabilities under chapter 11 of the Bankruptcy Code.  The estimated liquidation recoveries and proceeds waterfall are presented herein as a consolidated summary of each individual liquidating estate with their estimated recoveries.

The Debtors determined, as summarized in the following analysis, upon the Effective Date, the Plan will provide all creditors with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and thus the Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code, if the Bankruptcy Court determines that such requirement is applicable to non-profits debtors in chapter 11.

The following Liquidation Analysis should be reviewed with the accompanying notes.

iv)    **General Liquidation Summary and Detail – Debtors and Related Non-Debtor Entities**

*Liquidation Proceeds*

A.    Cash and Cash Equivalents – Represents Cash and Cash equivalents of the Debtor and Related Non-Debtor Entities as of the Conversion Date based on the BSA's most recent financial projections, segregated between restricted and unrestricted balances. Restricted cash balances reflect donor imposed restrictions on use and disposition and accordingly such amounts are excluded from the Liquidation Proceeds (see Note B below).  The Debtors estimate a 100% recovery on the unrestricted cash balances.

- Cash Securing Letters of Credit – Reflect cash held by JPM to secure letters of credit issued for the benefit of Old Republic Insurance ("ORIC").  ORIC is assumed to draw on the letters of credit in full and JPM is assumed to be able to recover against this cash collateral in full.  The cash is included in the Liquidation Proceeds and in the recovery to JPM.

B.    Investments – Represents investments of the Debtor and Related Non-Debtor Entities as of the Conversion Date based on the BSA's most recent financial projections, segregated between restricted and unrestricted, and excluding non-controlling interest in the BSA Commingled Endowment Fund, LP (*i.e.*, the limited partnership interests owned by the Local Councils).  Restricted investment balances reflect donor imposed restrictions on use and disposition and accordingly such amounts are excluded from the Liquidation Proceeds.[9]    There is the potential for litigation related to asset restrictions in a liquidation, which could result in certain unrestricted investments being determined to

---

[9]   These amounts are subject to the adversary proceedings currently pending before the Bankruptcy Court further discussed in Article V.J.2 of the Disclosure Statement.

be restricted or certain restricted investments being determined to be unrestricted. The Tort Claimants' Committee has commenced an adversary proceeding relating to the restriction of certain of the Debtors' assets. Although the Debtors believe the action is meritless, for illustrative purposes, the Liquidation Analysis assumes $25 million of currently restricted investments could be available to creditors in a liquidation. The Plan includes a proposed means to resolve any and all disputes regarding the Debtors' designation of assets as "restricted" or "core," including the claims asserted in the complaint filed by the Tort Claimants' Committee in the adversary proceeding entitled *Official Tort Claimants' Committee of Boy Scouts of America and Delaware BSA, LLC v. Boy Scouts of America and Delaware BSA, LLC*, Adv. Pro. No. 21-50032 (LSS). To achieve this, the cash to be contributed to the Settlement Trust has been increased by $50 million by lowering the amount of Unrestricted Cash and Investments retained by the Reorganized BSA. After careful evaluation, the Debtors determined they are able to fund this substantial increase in assets to be contributed because certain restricted investments could be used in a manner consistent with their applicable restrictions on use and disposition to support activities included in the Debtors' financial projections. This would not be the case in a liquidation. The Debtors estimate a 100% recovery on unrestricted investments plus the $25 million of restricted investments.

C.    Accounts Receivable – Accounts receivable are comprised of invoiced and accrued third party receivables, including receivables from the Local Councils, and other non-trade receivables and deposits. Accounts Receivable is presented based on the BSA's most recent financial statements and is assumed to be materially consistent as of the Liquidation Date. Estimated recovery percentages for accounts receivable are between approximately 33% and 35%.

D.    Investment Income Receivables – Comprised of accrued investment earnings primarily from the BSA's restricted investment holdings. These amounts are based on the BSA's recent financial statements and balances are assumed to be materially consistent with balances as of the liquidation date. Investment income receivables are excluded from the Liquidation Proceeds.

E.    Pledges Receivable – Pledges receivables reflect unconditional donor pledges at estimated net present collectable value. As the pledges are both donor restricted and highly unlikely to be enforceable in a liquidation they are valued at zero. Additional pledges not reflected on the financial statements are conditional and thus could not be collected in a liquidation.

F.    Related Party Receivables – Interfund receivables are comprised of amounts due to/from Related Non-Debtor Entities. These amounts are consolidated and eliminated within this Liquidation Analysis. The most significant Related Party Receivable is a note receivable due from Arrow, which is secured by a deed of trust in the Summit high adventure facility, Arrow's only asset, and which note is pledged to JPM under the BSA's credit agreements. In lieu of showing a recovery on this line in the schedule, the recovery from the liquidation of the Summit is reflected as part of Land Building & Equipment below. Gross recoveries on this note total $35 million. Proceeds from the intercompany note via the sale of Arrow's assets are assumed to satisfy JPM's Secured

Claims.

G.    <u>Inventory</u> – Inventory is primarily comprised of branded and non-branded Boy Scout apparel, High Adventure Base general inventory stock, and other miscellaneous inventory items.  Inventory is presented based on the BSA's most recent financial statements.  Inventory is assumed to be materially consistent as of liquidation date as in the BSA's current financial statements.  Estimated recoveries are based on liquidation assumptions that include only sellable apparel and stock at substantially discounted values.  Inventory reserves are not contemplated within this analysis.

H.    <u>Prepaid and Deferred Charges</u> – Primarily comprised of prepaid Insurance Policies, professional fees, and deferred expenses.  Prepaids are presented based on the BSA's most recent financial statements.  Prepaid insurance recoveries are estimated to be $0 based on a detailed breakdown of 2021-2022 plan year Insurance Policies, assuming no additional prepayments during the liquidation period through June 30, 2022.  Prepaid professional fees are assumed to be recovered 100% and applied against administrative professional fee Claims in a liquidation scenario.  Deferred charges are recovered at 0% of current financial statement balances.

I.    <u>Land, Building, and Equipment (net)</u> – Primarily comprised of the BSA's national headquarters, High Adventure Bases, distribution center, various furniture and fixtures, and software and computers.  Land, building, and equipment balances are presented based on the Debtor and Related Non-Debtor Entities most recent financial statements.  Pro forma balances represent the following:

- National HQ, National Distribution Center, the High Adventure Bases (Philmont, Sea Base, and Northern Tier), and Summit are presented based on valuations conducted by third party experts during the course of this bankruptcy and reflect estimates of the fair market value of the respective properties.  Scouting U is presented based on the proceeds expected to be generated from a pending sale of the property.  The BSA also owns a portfolio of Oil and Gas Interests.  These rights, and the value of the rights, are not included within the financial statements, however, are included in the pro forma fair market value balance of land, building, and equipment based on a recent third party valuation report.

- The remaining balance of land, building, and equipment which primarily includes furniture, fixtures, capital and project improvements, and software and computers is estimated to be materially consistent to the BSA's most recent financial statements.

- Pro forma balances are presented before depreciation and amortization.

After a review of the assets, the Debtors and their advisors concluded that the forced sale of the Debtors' assets in the compressed timeframe that typically occur during a chapter 7 liquidation would likely result in a valuation discount relative to "fair value."  The liquidation value of land, buildings, and equipment is stratified based on estimated recoveries ranging from 80% to 85% recovery on brokers opinion of value of the national headquarters ($11.6 million) and distribution center ($7.3 million), fair market

value appraisals of each of the High Adventure Bases (Philmont South Ranch $153 million, Sea Base $29 million, and Northern Tier $8.4 million including the Summit ($42.8 million), and an appraisal of the Oil and Gas Interests ($7.6 million).  For the former Scouting U building ($2.0 million), recoveries are presented at 100% of pending sale price less commissions and other closing costs. Recoveries on remaining assets are expected to be minimal based on the nature of the assets and the circumstances of a chapter 7 liquidation.  Total land, building, and equipment recoveries range from 58% to 63% of pro forma values.

Certain of the BSA's properties are collateral for JPM's Secured debt.  These properties include the national headquarters, Philmont Scout Ranch, and the High Adventure Bases at Sea Base and Northern Tier.  Liquidation proceeds from these properties are assumed to satisfy JPM's Secured debt first, with any remaining proceeds made available to creditors based on priority.  As noted above, the value of the Summit which flows to BSA through a note receivable is also reflected in the value of land, building and equipment and is subject to JPM's security interest.

The sale of certain of the High Adventure Bases and other properties could be disputed by third parties, potentially driving down their value or barring them from sale entirely if determined to be restricted property and non-alienable under applicable law; however, that issue is not addressed herein given the JPM lien.  Similarly the High Adventure Bases are core to the mission of scouting and as such may not be subject to liquidation or the proceeds may not be available to all creditors.

J.   Other Assets – Other assets are primarily comprised of miscellaneous equipment located at the Summit property, pooled and gift annuity investments, and off-balance sheet art. Balances are presented based on BSA's most recent financial statements with the exception of the Artwork balances which is reflected at an estimated fair market value of $59 million based primarily on a 2012 appraisal.  Recoveries are assumed between 50% and 80% for Artwork given indications that the value of the Artwork would be significantly depressed in a sale over a compressed timeframe as well as the impact of the BSA bankruptcy and Abuse Claims on the value of the Artwork, while the remaining balance of other assets is assumed to recover 100% for pooled and gift annuity investments and between 5% and 25% for Summit assets.  Note that it is possible that the beneficiaries of the annuities and pooled investments would try to assert some type of priority to those assets which would reduce the liquidation value.  In addition some of these assets are core to the mission of scouting as such may not be available to all creditors.

There is no value attributed to the Debtors' intellectual property given that it derives from a congressional charter that is non-transferable and thus it is unclear if any value could be derived.

*Liquidation Distributions*

K.    Operational Wind Down Costs represent an estimate of the costs incurred during a liquidation of the assets of the Debtor and Related Non-Debtor Entities and reflect BSA and its advisor's most recent budget for operational expenses during 2021 under a wind down scenario.  Wind down costs primarily include payroll, and related expenses, costs to maintain the BSA's supply and distribution center, high adventure base operating costs, general liability and other Insurance Policies, and other non-high adventure base operating expenses.  Operating expenses are assumed to reduce significantly during a liquidation between 25% and 75% of projected monthly costs.  Further, wind down expenses are reduced on a month to month basis during the liquidation period to account for expected closures of facilities and further reductions in labor force as the liquidation process progresses.

L.    Chapter 7 Trustee Fees would be limited to the fee guidelines in Section 326(a) of the Bankruptcy code.  The Debtors assumed that trustee fees are approximately 3% of entity gross Liquidation Proceeds.

M.    Chapter 7 Professional Fees include the estimated cost for financial advisors, attorneys and other professionals retained by the Trustee.  In the Liquidation Analysis, chapter 7 professional fees are estimated to be approximately 1.5% of gross Liquidation Proceeds excluding current cash on-hand.  These fees are applied on an individual basis across each liquidating entity based on the estimated Liquidation Proceeds available to each Estate excluding current Cash on-hand.  The amount of professional fees is estimated based on our best estimate based on the size and nature of the case; however, this amount can fluctuate based on length and complexity of the wind-down process and could be substantially greater than the amounts assumed herein which would further reduce recoveries to creditors.

N.    Claims Processing Costs include an estimate of the costs of administering Claims to various claimants, primarily Abuse litigation claimants.  Estimates reflect a minimum of $1 million.

O.    Secured Lender Professional Fees are estimated between $700,000 and $1 million during the liquidation period.

P.    Broker Fees include the estimated cost to market and dispose of substantially all of the BSA's land, building, equipment and Artwork.  In the Liquidation Analysis, chapter 7 broker fees are estimated to be approximately 2.0% of gross Liquidation Proceeds from these asset classes.

### Claims

Q.    Secured Claims

- The Liquidation Analysis assumes that all letters of credit are drawn and as a result the outstanding funded debt totals $328 million.  Debt is assumed to be Secured by the gross Liquidation Proceeds of certain of the BSA's real property assets, unrestricted Cash, unrestricted investments, and certain accounts receivable balances including the note receivable from Arrow WV which is Secured by the Summit high

adventure facility. In addition the debt benefits from replacement liens pursuant to the Cash Collateral Order to the extent of any diminution in value of the collateral. Secured debt is estimated to be recovered at 100% of total Claims.

- The Liquidation Analysis assumes that a portion of the PBGC Claim, asserted against Related Non-Debtor Entities, is Secured by a lien in the amount of 30% of Liquidation Proceeds remaining for all members of the control group combined after wind down costs and Secured debt, if any. The Secured PBGC Claim is estimated between $466 million and $497 million.

R.    Administrative and Priority Claims

- The Liquidation Analysis assumes that priority Claims consist of priority employee benefits pursuant to Section 507(a)(4) of the Bankruptcy code which are estimated to be $20 million as of the Conversion Date, comprised primarily of accrued employee benefit costs, severance, seasonal and part time payroll costs, and 503(b)(9) Claims. Full time salaried employees assumed to be paid current immediately prior to the Conversion Date.

- Post-Petition Professional Fees as of the Conversion Date are estimated to be $45.9 million. Post-Petition Trade Claims are estimated to be $18.0 million as of the Conversion Date based on BSA's most recent financial projections.

- Other Administrative Claims of $25.6 million are estimated based on the potential for Hartford to receive a claim for $2 million plus 3% of the proposed settlement amount of $787 million. This assumes that the Debtors exercise their fiduciary out which triggers the potential 3% claim. To the extent the fiduciary out is not triggered or the court does not allow such claim, there would be additional value available for general unsecured creditors, including abuse claimants.

- Administrative and priority Claims are estimated to recover between 93% and 100% in the Liquidation Analysis.

S.    General Unsecured Claims

- The below chart reflects the aggregation of individual Liquidation Analyses of the Debtors and, independently, the Related Non-Debtor Entities. Certain general unsecured claims presented in the Liquidation Analysis recover a greater percentage than the pro rata share of proceeds available for these unsecured claims due to the recoveries within individual Debtor and Related Non-Debtor Entity Liquidations.

- The Liquidation Analysis estimates that there will be between $0 and $22.5 million of proceeds available to satisfy General Unsecured Claims. As some of these proceeds may be from assets that are core to the mission of Scouting, it is possible that some or all of this value may only be available for certain core creditor Claims including that of the PBGC.

- General Unsecured Claims are assumed to include estimated Abuse Claims, unrecovered unsecured PBGC Claim, employee-related Claims (primarily Restoration Plan Claims), contract rejection Claims, and pre-petition trade payables and accrued liabilities.

- Non-Abuse litigation Claims are assumed to recovery from applicable insurance and are not contemplated in the Liquidation Analysis.

- An estimate of the remaining unrecovered asserted PBGC Claim of $1.1 billion is included in the General Unsecured Claims pool.

- As described in Article V.N of the Disclosure Statement, Abuse Claims are estimated to be between $2.4 and $7.1 billion and the Liquidation Analysis presents Abuse Claim recoveries under both a high ($7.1 billion) and low ($2.4 billion) assumption. As noted in the Disclosure Statement in Article V.N, this aggregate estimation of liability takes into account a number of different factors including assumptions concerning the estimated number of time-barred Abuse Claims. The range used in the Disclosure Statement and this Liquidation Analysis is merely an estimate of the Debtors' aggregate liability, which could be significantly greater or lower depending upon, among other things, changes to the assumptions concerning the number of time-barred claims or the accuracy and sufficiency of information provided by the Abuse Claimants on their Proof of Claim submissions. As applied to individual Abuse Claims, the Liquidation Analysis provides an estimate of the percent-on-the-dollar recovery that individual claimants would receive in a hypothetical liquidation. However, the value of any particular individual claim that this percentage applies to is highly dependent on the facts and circumstances of the individual claim. For example, although the same percentage recovery applies to all claims whether or not time-barred, the average value of time-barred claims is significantly less (and in many cases may not have any value) in comparison to the average value of claims that are not time-barred.

- Contract rejection Claims are estimated to be $8 million and do not include any estimates for additional executory contract rejection Claims arising as a result of the liquidation.

- General Unsecured Claims recover between 0.0% and 0.3% in the Debtor and Related Non-Debtor Entity Liquidation Analysis based on high Abuse Claims ($7.1 billion) and between  0.0% and  0.6% based on low Abuse Claims ($2.4 billion).

## *Summary Liquidation Analysis – Debtors and Related Non-Debtor Entities*

| | Note | Book Value at 2/28/2120 | Adjustments to BV | Pro Forma BV / FMV | Low | Mid | High | Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **Asset Values** | | | **Estimated Recovery (%)** | | | **Estimated Recovery ($ 000s)** | | |
| **Assets** | | | | | | | | | | |
| Cash and Cash Equivalents | A | $ 111,518 | $ 56,729 | $ 168,247 | 100% | 100% | 100% | $ 168,247 | $ 168,247 | $ 168,247 |
| Cash and Cash Equivalents: Restricted | A | 32,627 | (10,128) | 22,499 | 0% | 0% | 0% | - | - | - |
| Investments | B | 127,462 | (110,632) | 16,830 | 100% | 100% | 100% | 16,830 | 16,830 | 16,830 |
| Investments: Restricted | B | 174,782 | 3,968 | 178,750 | 14% | 14% | 14% | 25,000 | 25,000 | 25,000 |
| Accounts Receivable | C | 16,762 | 218 | 16,980 | 33% | 34% | 35% | 5,573 | 5,736 | 5,899 |
| Investment Income Receivable | D | 653 | - | 653 | 0% | 0% | 0% | - | - | - |
| Pledges Receivable | E | 17,207 | - | 17,207 | 0% | 0% | 0% | - | - | - |
| Related Party Receivables | F | - | - | - | 0% | 0% | 0% | - | - | - |
| Inventory | G | 56,407 | 16,944 | 73,350 | 8% | 9% | 10% | 5,731 | 6,448 | 7,164 |
| Prepaid and Deferred Charges | H | 63,036 | - | 63,036 | 5% | 5% | 5% | 3,101 | 3,101 | 3,101 |
| Land, Building, and Equipment (Net) | I | 476,143 | (111,500) | 364,643 | 58% | 61% | 63% | 212,291 | 221,358 | 230,425 |
| Other | J | 17,353 | 59,337 | 76,690 | 48% | 60% | 72% | 36,909 | 46,222 | 55,536 |
| **Total Gross Liquidation Proceeds** | | $ 1,093,950 | $ (95,066) | $ 998,884 | 47% | 49% | 51% | $ 473,680 | $ 492,941 | $ 512,202 |
| **( - ) Less Cost of Liquidation** | | | | | | | | | | |
| ( - ) Liquidation Wind-Down Expenses | K | | | | | | | $ (13,262) | $ (15,603) | $ (17,943) |
| ( - ) Chapter 7 Trustee Fees | L | | | | | | | (15,259) | (15,868) | (16,476) |
| ( - ) Trustee's Professional Fees | M | | | | | | | (4,117) | (4,844) | (5,570) |
| ( - ) Claims Processing Costs | N | | | | | | | (1,000) | (1,000) | (1,000) |
| ( - ) Secured Lender Professional Fees | O | | | | | | | (715) | (842) | (968) |
| ( - ) Broker Fees | P | | | | | | | (4,836) | (5,194) | (5,552) |
| **Total Liquidation Costs** | | | | | | | | $ (39,190) | $ (43,350) | $ (47,510) |
| **Total Net Liquidation Proceeds** | | | | | | | | $ 434,491 | $ 449,591 | $ 464,692 |

| | Note | Estimated Claims Pool (High) | Low | Mid | High | Low | Mid | High |
|---|---|---|---|---|---|---|---|---|
| | | | **Estimated Recovery (%)** | | | **Estimated Recovery ($ 000s)** | | |
| **Secured Claims** | | | | | | | | |
| JPMorgan Funded Debt | | $ 232,262 | 100% | 100% | 100% | $ 232,262 | $ 232,262 | $ 232,262 |
| JPMorgan Letters of Credit | | 95,842 | 100% | 100% | 100% | 95,842 | 95,842 | 95,842 |
| PBGC Termination Claim | | 495,531 | 1% | 1% | 1% | 6,138 | 6,152 | 6,166 |
| **Total Secured Claims** | Q | $ 823,635 | 41% | 41% | 41% | $ 334,242 | $ 334,256 | $ 334,270 |
| **Proceeds Available After Secured Claims** | | | | | | $ 100,249 | $ 115,335 | $ 130,422 |
| **Administrative / Other Administrative Claims** | | | | | | | | |
| Other Administrative Claims | | $ 25,610 | 93% | 100% | 100% | $ 23,796 | $ 25,610 | 25,610 |
| Employee Related Claims | | 19,651 | 93% | 100% | 100% | 18,259 | 19,651 | 19,651 |
| Professional Fee Claims | | 44,653 | 93% | 100% | 100% | 41,491 | 44,653 | 44,653 |
| Post-Petition Trade Claims | | 17,975 | 93% | 100% | 100% | 16,702 | 17,975 | 17,975 |
| **Total Administrative / Other Administrative Claims** | R | $ 107,889 | 93% | 100% | 100% | $ 100,249 | $ 107,889 | $ 107,889 |
| **Proceeds Available for General Unsecured Creditors** | | | | | | $ - | $ 7,446 | $ 22,533 |
| **General Unsecured Claims (High)** | | | | | | | | |
| Trade Payables and Accrued Expenses | | $ 5,350 | 0.0% | 0.1% | 0.3% | $ - | $ 5 | $ 15 |
| Employee Related Claims | | 22,689 | 0.0% | 0.1% | 0.3% | - | 21 | 62 |
| Real Property & Equipment Lease Rejection Damages | | 8,000 | 0.0% | 0.1% | 0.3% | - | 7 | 22 |
| Abuse Claims | | 7,100,000 | 0.0% | 0.1% | 0.3% | - | 6,419 | 19,425 |
| PBGC Termination Claim | | 1,093,834 | 0.0% | 0.1% | 0.3% | - | 995 | 3,009 |
| **Total General Unsecured Claims (High)** | S | $ 8,229,873 | 0.0% | 0.1% | 0.3% | $ - | $ 7,446 | $ 22,533 |
| **Proceeds Available After General Unsecured Claims** | | | | | | $ - | $ - | $ - |
| **General Unsecured Claims (Low)** | | | | | | | | |
| Trade Payables and Accrued Expenses | | $ 5,350 | 0.0% | 0.2% | 0.6% | $ - | $ 11 | $ 34 |
| Employee Related Claims | | 22,689 | 0.0% | 0.2% | 0.6% | - | 48 | 145 |
| Real Property & Equipment Lease Rejection Damages | | 8,000 | 0.0% | 0.2% | 0.6% | - | 17 | 51 |
| Abuse Claims | | 2,400,000 | 0.0% | 0.2% | 0.6% | - | 5,054 | 15,294 |
| PBGC Termination Claim | | 1,093,834 | 0.0% | 0.2% | 0.6% | - | 2,316 | 7,010 |
| **Total General Unsecured Claims (Low)** | S | $ 3,529,873 | 0.0% | 0.2% | 0.6% | $ - | $ 7,446 | $ 22,533 |
| **Proceeds Available After General Unsecured Claims** | | | | | | $ - | $ - | $ - |

Note: Recovery percentages are based on a) asset proceeds recovered divided by pro forma asset balances and b) claims recoveries based on the low, mid, and high ranges of estimated claims

**3)    General Liquidation Summary and Detail – Local Councils**

As noted above, although the Debtors do not believe they are required to satisfy the best interests test as it relates to the non-debtor Local Councils, various parties have objected to the Disclosure Statement, including the Tort Claimants' Committee, and the Debtors have agreed to provide a hypothetical analysis depicting the liquidation of the Local Councils utilizing the same assumptions as the Liquidation Analysis for the Debtors and Related Non-Debtor Entities. Accordingly, the following analysis depicts an aggregated summary of hypothetical Local Council liquidations on an aggregate basis, which are assumed to occur independently during an orderly liquidation process over six months after the Conversion Date. Local Council liquidation analysis is based on the unaudited pro forma financial statements of Local Councils as of February 28, 2021 (refer to Exhibit D-1: Individual Local Council Balance Sheets below). While the Debtors have significant financial information related to the Local Councils, including balance sheets and property valuations (refer to Exhibit D-2: Local Council Property Value Information below), there is a significantly higher degree of variability and potential for market saturation associated with the liquidation of approximately 251 independent entities and thus greater risk that the actual recoveries would be less than the projected recoveries set forth herein.

Although this analysis assumes that all entities in the organization are liquidated substantially concurrently as part of a hypothetical liquidation of the Boy Scouts organization, the analysis assumes each local council is liquidated separately from BSA, that each local council is rendered insolvent due to the magnitude of the joint and several pension termination liability, and any excess value after satisfying the pension termination liability and other local council obligations (including pension contribution claims) flows to BSA for further distribution to creditors, including Abuse Claims.

***Liquidation Proceeds***

A.    <u>Cash and Cash Equivalents</u> – Represents Cash and Cash equivalents of the Local Councils as of February 28, 2021, excluding "custodial cash" that is either (a) cash held on account of registration fees payable to BSA, as that amount is included in BSA's forecasted cash at the Conversion Date or (b) cash held on behalf of units that are legally distinct from the Local Councils. The Debtors estimate a 100% recovery on the February 2021 cash balances which are representative of balances anticipated as of the Conversion Date.

B.    <u>Investments</u> – Represents investments of the Local Councils as of February 28, 2021, segregated between restricted and unrestricted. Restricted investment balances reflect donor imposed restrictions on use and disposition and accordingly such amounts are generally excluded from the Liquidation Proceeds; however, the Debtors prepared the Local Council liquidation analysis assuming that Local Councils would be able to recover approximately the same share of restricted investments (19%) as the Debtors in their Liquidation Analysis as described above. It is possible that recoveries at the Local Council level would be even less due to the scrutiny of donors and state attorneys' general that would occur in a liquidation. The Debtors estimate a 100% recovery on unrestricted investments and 19% recovery on restricted investments.

C.  <u>Land, Building, and Equipment (net)</u> – Primarily comprised of Local Councils' camp properties, land, office and store structures and other miscellaneous real property.  Book value of land, building, and equipment balances are presented based on Local Council balance sheets as of February 28, 2021 and are not disaggregated based on restricted and unrestricted book value.  Pro forma balances represent the following:

- Unrestricted Land, Building, and Equipment – Represents a) real property asserted by Local Councils as unrestricted, plus b) certain real property asserted as restricted by Local Councils that the BSA has determined, based on its legal analysis of the asserted restrictions, is capable of being sold with the proceeds available for distribution to general unsecured creditors of the Local Councils. Pro forma balances of unrestricted land, building, and equipment are presented at fair market value based on recent broker opinion of values conducted by third party real estate advisors (or the average thereof if multiple valuations were conducted on the same property).[10]

- Restricted Land Building, and Equipment – Represents real property asserted by Local Councils as restricted such that the restriction would preclude a sale of the property or require reversion of the proceeds based on donor restriction documentation, as validated by BSA's legal analysis. Pro forma balances of restricted land, building, and equipment are presented at fair market value based on recent broker opinion of values conducted by third party real estate advisors (or the average thereof if multiple valuations were conducted on the same property).

After a review of the assets, the Debtors, with the assistance of their advisors, concluded that the sale of Local Council assets in the compressed timeframes that typically occur during a chapter 7 liquidation would likely result in a valuation discount relative to "fair value." Further BSA believes a larger discount for the Local Councils than the BSA properties described above is appropriate for a number of reasons.  First, the Local Council properties were valued through broker opinions of value, which are inherently more limited and provide less certainty than full appraisals used for the principal Debtor properties.  Second, the broker opinions of value also generally did not take into account limitations on use driven, for example, by conservation easements, which would further reduce the value of the properties. Third, the Debtors expect that the proceeds derived from the sale of Local Council properties would be suppressed due to the market being saturated with a large number of similar camp properties, which are often located in relatively close proximity to one another.  The liquidation value of land, buildings, and equipment is estimated based on recoveries of 60% of unrestricted real property. Restricted real property is excluded from liquidation proceeds.

D.  <u>Other Assets</u> – Other assets are primarily comprised of miscellaneous inventory, prepaid expenses, contributions and pledges receivable, beneficial interests in trusts, and notes receivable held by the Local Councils.  Balances are presented based on Local Council balance sheets as of February 28, 2021. Recoveries of other assets are estimated to be

---

[10] Any property for which a valuation was not obtained is assumed to have limited value in the Liquidation Analysis and is factored into the 60% recovery.  Approximately 895 of 1,183 properties were valued and approximately 75 of the unvalued properties are restricted. Self-reported indications of value from the Local Councils of the remaining unrestricted properties, which are a mix of mainly book and tax assessed amounts, total less than $40 million.

5% of book value balances as these assets either have little sellable or recoverable value via a chapter 7 liquidation or in some cases are restricted based on donor stipulations.

### *Liquidation Distributions*

E.  <u>Operational Wind Down Costs</u> represent an estimate of the costs incurred during a liquidation of the assets of the individual Local Councils. Wind down costs are assumed to include payroll and related expenses, costs to maintain Local Council real property until liquidated, and other operating expenses during the wind down period. Operating expenses are assumed to reduce significantly during a liquidation and are estimated at 3.5% of gross liquidation proceeds.

F.  <u>Chapter 7 Trustee Fees</u> would be limited to the fee guidelines in Section 326(a) of the Bankruptcy code. The Debtors assumed that trustee fees are approximately 3% of gross Liquidation Proceeds.

G.  <u>Chapter 7 Professional Fees</u> include the estimated cost for financial advisors, attorneys and other professionals retained by the Trustee. In the Liquidation Analysis, chapter 7 professional fees are estimated to be approximately 3.5% of gross Liquidation Proceeds excluding current cash on-hand. These fees are applied on an individual basis across each liquidating Local Council based on the estimated Liquidation Proceeds available to each Estate excluding current cash on-hand. However, this amount can fluctuate based on length and complexity of the wind-down process and could be substantially greater than the amounts assumed herein.

H.  <u>Claims Processing Costs</u> include an estimate of the costs of administering Claims to various claimants, primarily Abuse litigation claimants. Estimates reflect approximately 2.5% of Settlement Trust recoveries, consistent with a US Chamber of Commerce publication on trust distributions dated March 2018.

I.  <u>Broker Fees</u> include the estimated cost to market and dispose of substantially all of the Local Councils' land, building, equipment. In the Liquidation Analysis, chapter 7 broker fees are estimated to be approximately 4% of gross Liquidation Proceeds from these asset classes.

### *Claims*

J.  <u>Secured Claims</u>

- The Liquidation Analysis assumes that approximately 50% of the debt on Local Council balance sheets as of February 28, 2021, is secured debt based on a review of a selection of approximately 80% of the total Local Council debt. Secured debt related Local Council Claims are estimated to recover in full.

- The Liquidation Analysis assumes that a portion of the PBGC Claim, asserted against each individual Local Council, is Secured by a lien in the amount of 30% of

Liquidation Proceeds remaining for all members of the control group after wind down costs and Secured debt, if any.  The Secured PBGC Claim is estimated to be between $466 million and $497 million, asserted against each individual Local Council. The Liquidation Analysis assumes that the PBGC recovers 100% of its $1.1 billion Claim between the Local Councils and proceeds from the Debtor and Related Non-Debtor Entity Liquidation Analysis.  In the event the PBGC was unable to assert a secured claim or its security interest was invalidated, the PBGC would have an unsecured claim against each member of the controlled group and would still receive recoveries on account of such claims.

K.    <u>Administrative and Priority Claims</u>

- The Liquidation Analysis assumes that priority Claims consist of priority employee benefits pursuant to Section 507(a)(4) of the Bankruptcy code which are estimated to be $17.7 million as of the Conversion Date, comprised primarily of accrued employee payroll and benefit costs and severance.

- Administrative and priority Claims are estimated to recover 62% in the aggregate.

L.    <u>General Unsecured Claims</u>

- The below chart reflects the aggregation of individual Liquidation Analyses of the Local Councils.  Certain Secured and Administrative Expense Claims of individual Local Councils are deficient in the mid-range recovery scenario, and no proceeds remain available for General Unsecured Claims for those Local Councils. Certain other Local Councils have estimated liquidation proceeds that exceed the estimated value of all Claims after application of contribution claims that such Local Councils could assert against other Local Councils on account of payment on the joint and several pension liability.   All such value is distributed to BSA and redistributed to creditors.

- The Liquidation Analysis estimates that there will be approximately $ 429 million of proceeds available to satisfy General Unsecured Claims.  As some of these proceeds may be from assets that are core to the mission of Scouting, it is possible that some or all of this value may only be available for certain core creditor Claims.

- General Unsecured Claims are assumed to include estimated Abuse Claims, contract rejection Claims, unsecured debt, and pre-petition trade payables and accrued liabilities.  Solely for purposes of this analysis, the estimated aggregate Abuse Claim liability is allocated to each council based on number of Abuse Claims as a proportion of all non-duplicative Abuse Claims that identify a local council. We believe this allocation method results in a higher aggregate recovery for Abuse Claims.

- Non-Abuse Litigation Claims are assumed to recovery from applicable insurance and are not contemplated in the Liquidation Analysis.

- Contract rejection Claims are estimated to be 5% of unrestricted net assets per Local Council balances sheets as of February 28, 2021.

### *Summary Liquidation Analysis – Local Council Organizations*

| | Note | Asset Values | | | Estimated Recovery (%) | Estimated Recovery ($ 000s) |
|---|---|---|---|---|---|---|
| | | Book Value at 2/28/2021 | Adjustments to BV / FMV | Pro Forma BV / FMV | Mid | Mid |
| **Assets** | | | | | | |
| Cash and Cash Equivalents | A | $ 310,794 | $ (22,224) | $ 288,570 | 100% | $ 288,570 |
| Investments | B | 1,650,838 | (1,081,145) | 569,693 | 100% | 569,693 |
| Investments: Restricted | B | - | 1,081,145 | 1,081,145 | 19% | 201,646 |
| Land, Building, and Equipment (Net) | C | 1,294,850 | (89,103) | 1,205,747 | 60% | 723,448 |
| Land, Building, and Equipment (Net): Restricted | C | - | 585,709 | 585,709 | 0% | - |
| Other | D | 280,853 | - | 280,853 | 5% | 14,088 |
| **Total Gross Liquidation Proceeds** | | $ 3,537,334 | $ 474,381 | $ 4,011,716 | **45%** | $ 1,797,444 |
| **( - ) Less Cost of Liquidation** | | | | | | |
| ( - ) Liquidation Wind-Down Expenses | E | | | | | $ (62,911) |
| ( - ) Chapter 7 Trustee Fees | F | | | | | (53,930) |
| ( - ) Trustee's Professional Fees | G | | | | | (52,811) |
| ( - ) Claims Processing Costs | H | | | | | (9,519) |
| ( - ) Broker Fees | I | | | | | (28,938) |
| **Total Liquidation Costs** | | | | | | $ (208,107) |
| **Total Net Liquidation Proceeds** | | | | | | $ 1,589,337 |

| | Note | Estimated Claims Pool | Recovery (%) Mid | Recovery ($ 000s) Mid |
|---|---|---|---|---|
| **Secured Claims** | | | | |
| Secured Local Council Debt | | $ 59,157 | 100% | $ 59,054 |
| Priority Claims (PBGC) | | 1,090,825 | 100% | 1,090,825 |
| **Total Secured Claims** | J | $ 1,149,982 | **100%** | $ 1,149,879 |
| **Proceeds Available After Secured Claims** | | | | $ 439,458 |
| **Administrative / Other Administrative Claims** | | | | |
| Employee Related Claims | | $ 17,655 | 62% | $ 10,863 |
| **Total Administrative / Other Administrative Claims** | K | $ 17,655 | **62%** | $ 10,863 |
| **Proceeds Available After Administrative / Other Administrative Claims** | | | | $ 428,595 |
| **General Unsecured Claims (High)** | | | | |
| Trade Payables and Accrued Expenses | | $ 115,885 | 8% | $ 9,171 |
| Employee Related Claims | | 8,237 | 8% | 660 |
| Real Property & Equipment Lease Rejection Damages | | 93,538 | 13% | 12,101 |
| Secured Local Council Debt | | 59,157 | 7% | 4,129 |
| Abuse Claims | | 7,100,000 | 5% | 389,346 |
| PBGC Termination Claim | | - | 0% | - |
| **Total General Unsecured Claims** | L | $ 7,376,816 | **6%** | $ 415,408 |
| **Residual Scouting Interest** | | | | $ 13,188 |
| **General Unsecured Claims (Low)** | | | | |
| Trade Payables and Accrued Expenses | | $ 115,885 | 19% | $ 21,685 |
| Employee Related Claims | | 8,237 | 18% | 1,496 |
| Real Property & Equipment Lease Rejection Damages | | 93,538 | 28% | 26,172 |
| Secured Local Council Debt | | 59,157 | 16% | 9,637 |
| Abuse Claims | | 2,400,000 | 14% | 337,681 |
| PBGC Termination Claim | | - | 0% | - |
| **Total General Unsecured Claims** | L | $ 2,676,816 | **15%** | $ 396,671 |
| **Residual Scouting Interest** | | | | $ 31,925 |

Note: Recovery percentages are based on a) asset proceeds recovered divided by pro forma asset balances and b) claims recoveries based on estimated claims. "Residual Scouting Interest" assumed to be reallocated to BSA for further distribution to creditors; however, the Debtors

understand that various parties, including Local Councils, would assert that such value should be utilized for scouting purposes in local jurisdiction.

### 4) *Combined Debtors, Related Non-Debtor Entities and Local Councils*

As noted above, in addition to the separate analysis of the Debtor and Related Non-Debtors on the one hand and the Local Councils on the other, we have created an analysis depicting a combination of the Liquidation Analysis pertaining to the Debtors and Related Non-Debtor Entities and the analysis pertaining to the hypothetical liquidation of the Local Councils.  The analysis is simply the addition of each of the prior sections of this document, plus showing any excess proceeds at individual local councils distributed to BSA resulting in incremental recovery to Claims against BSA including Abuse claims, without any other changes in assumptions.

### *Summary Liquidation Analysis – Debtors, Related Non-Debtor Entities, and Local Councils*

| | Asset Values | | | Estimated Recovery (%) | | | Estimated Recovery ($ 000s) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Book Value at 2/28/2120 | Adjustments to BV | Pro Forma BV / FMV | Low | Mid | High | Low | Mid | High |
| **Assets** | | | | | | | | | |
| Cash and Cash Equivalents | $ 422,312 | $ 34,505 | $ 456,817 | 100% | 100% | 100% | $ 456,817 | $ 456,817 | $ 456,817 |
| Cash and Cash Equivalents: Restricted | 32,627 | (10,128) | 22,499 | 0% | 0% | 0% | - | - | - |
| Investments | 1,778,300 | (1,191,777) | 586,523 | 100% | 100% | 100% | 586,523 | 586,523 | 586,523 |
| Investments: Restricted | 174,782 | 1,085,113 | 1,259,895 | 18% | 18% | 18% | 226,646 | 226,646 | 226,646 |
| Accounts Receivable | 16,762 | 218 | 16,980 | 33% | 34% | 35% | 5,573 | 5,736 | 5,899 |
| Investment Income Receivable | 653 | - | 653 | 0% | 0% | 0% | - | - | - |
| Related Party Receivables | - | - | - | 0% | 0% | 0% | - | - | - |
| Pledges Receivable | 17,207 | - | 17,207 | 0% | 0% | 0% | - | - | - |
| Inventory | 56,407 | 16,944 | 73,350 | 8% | 9% | 10% | 5,731 | 6,448 | 7,164 |
| Prepaid and Deferred Charges | 63,036 | - | 63,036 | 5% | 5% | 5% | 3,101 | 3,101 | 3,101 |
| Land, Building, and Equipment (Net) | 1,770,993 | (200,604) | 1,570,389 | 60% | 60% | 61% | 935,738 | 944,805 | 953,872 |
| Land, Building, and Equipment (Net): Restricted | - | 585,709 | 585,709 | 0% | 0% | 0% | - | - | - |
| Other | 298,206 | 59,337 | 357,543 | 14% | 17% | 19% | 50,996 | 60,310 | 69,624 |
| **Total Gross Liquidation Proceeds** | $ 4,631,284 | $ 379,316 | $ 5,010,600 | 45% | 46% | 46% | $ 2,271,124 | $ 2,290,385 | $ 2,309,646 |
| **( - ) Less Cost of Liquidation** | | | | | | | | | |
| ( - ) Liquidation Wind-Down Expenses | | | | | | | $ (76,173) | $ (78,513) | $ (80,854) |
| ( - ) Chapter 7 Trustee Fees | | | | | | | (69,189) | (69,797) | (70,406) |
| ( - ) Trustee's Professional Fees | | | | | | | (56,928) | (57,654) | (58,381) |
| ( - ) Claims Processing Costs | | | | | | | (10,519) | (10,519) | (10,519) |
| ( - ) Secured Lender Professional Fees | | | | | | | (715) | (842) | (968) |
| ( - ) Broker Fees | | | | | | | (33,774) | (34,132) | (34,490) |
| **Total Liquidation Costs** | | | | | | | $ (247,297) | $ (251,457) | $ (255,617) |
| **Total Net Liquidation Proceeds** | | | | | | | $ 2,023,827 | $ 2,038,928 | $ 2,054,029 |

| | Estimated Claims Pool (High) | Estimated Recovery (%) | | | Estimated Recovery ($ 000s) | | |
|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High |
| **Secured Claims** | | | | | | | |
| JPMorgan Funded Debt | $ 232,262 | 100% | 100% | 100% | $ 232,262 | $ 232,262 | $ 232,262 |
| JPMorgan Letters of Credit | 95,842 | 100% | 100% | 100% | 95,842 | 95,842 | 95,842 |
| Secured Local Council Debt | 59,157 | 100% | 100% | 100% | 59,054 | 59,054 | 59,054 |
| PBGC Termination Claim | 1,096,991 | 100% | 100% | 100% | 1,096,963 | 1,096,977 | 1,096,991 |
| **Total Secured Claims** | $ 1,484,252 | 100% | 100% | 100% | $ 1,484,121 | $ 1,484,134 | $ 1,484,148 |
| **Proceeds Available After Secured Claims** | | | | | $ 539,707 | $ 554,794 | $ 569,880 |
| **Administrative / Other Administrative Claims** | | | | | | | |
| Other Administrative Claims | $ 25,610 | 93% | 100% | 100% | $ 23,796 | $ 25,610 | $ 25,610 |
| Employee Related Claims | 37,306 | 78% | 82% | 82% | 29,122 | 30,513 | 30,513 |
| Professional Fee Claims | 44,653 | 93% | 100% | 100% | 41,491 | 44,653 | 44,653 |
| Post-Petition Trade Claims | 17,975 | 93% | 100% | 100% | 16,702 | 17,975 | 17,975 |
| **Total Administrative / Other Administrative Claims** | $ 125,544 | 89% | 95% | 95% | $ 111,111 | $ 118,752 | $ 118,752 |
| **Proceeds Available for General Unsecured Creditors** | | | | | $ 428,595 | $ 436,042 | $ 451,128 |
| **General Unsecured Claims (High)** | | | | | | | |
| Trade Payables and Accrued Expenses | $ 121,235 | 7.6% | 7.6% | 7.6% | $ 9,181 | $ 9,186 | $ 9,196 |
| Employee Related Claims | 30,926 | 2.3% | 2.3% | 2.5% | 702 | 722 | 764 |
| Real Property & Equipment Lease Rejection Damages | 101,538 | 11.9% | 11.9% | 12.0% | 12,116 | 12,123 | 12,138 |
| Unsecured Local Council Debt | 59,157 | 7.0% | 7.0% | 7.0% | 4,129 | 4,129 | 4,129 |
| Abuse Claims | 7,100,000 | 5.7% | 5.8% | 5.9% | 402,467 | 408,886 | 421,892 |
| PBGC Termination Claim | 3,009 | 0.0% | 33.0% | 100.0% | - | 995 | 3,009 |
| **Total General Unsecured Claims (High)** | $ 7,415,865 | 5.8% | 5.9% | 6.1% | $ 428,595 | $ 436,042 | $ 451,128 |
| **Proceeds Available After General Unsecured Claims** | | | | | $ - | $ - | $ - |
| **General Unsecured Claims (Low)** | | | | | | | |
| Trade Payables and Accrued Expenses | $ 121,235 | 17.9% | 18.0% | 18.0% | $ 21,755 | $ 21,766 | $ 21,789 |
| Employee Related Claims | 30,926 | 5.8% | 6.0% | 6.3% | 1,793 | 1,841 | 1,938 |
| Real Property & Equipment Lease Rejection Damages | 101,538 | 25.9% | 25.9% | 25.9% | 26,277 | 26,293 | 26,328 |
| Unsecured Local Council Debt | 59,157 | 16.3% | 16.3% | 16.3% | 9,637 | 9,637 | 9,637 |
| Abuse Claims | 2,400,000 | 15.4% | 15.6% | 16.0% | 369,133 | 374,187 | 384,427 |
| PBGC Termination Claim | 7,010 | 0.0% | 33.0% | 100.0% | - | 2,316 | 7,010 |
| **Total General Unsecured Claims (Low)** | $ 2,719,865 | 15.8% | 16.0% | 16.6% | $ 428,595 | $ 436,042 | $ 451,128 |
| **Proceeds Available After General Unsecured Claims** | | | | | $ - | $ - | $ - |

Note: Recovery percentages are based on a) asset proceeds recovered divided by pro forma asset balances and b) claims recoveries based on estimated claims.

### *Consolidating Mid-Point Recoveries of Debtors, Related Non-Debtor Entities, and Local Councils*

**Estimated Mid-Point Recovery ($ 000s)**

| Assets | BSA Debtors | Foundation | Arrow | BSAAM | Learning for Life | Interco | Consolidated Debtors & Related Non-Debtors | Local Councils | Residual Scouting Interest | Total BSA + LCs |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | $ 168,246 | $ - | $ - | $ - | 0 | $ - | $ 168,247 | $ 288,570 | $ - | $ 456,817 |
| Cash and Cash Equivalents: Restricted | - | - | - | - | - | - | - | - | - | - |
| Investments | 10,556 | 6,274 | - | - | - | - | 16,830 | 569,693 | - | 586,523 |
| Investments: Restricted | 25,000 | - | - | - | - | - | 25,000 | 201,646 | - | 226,646 |
| Accounts Receivable | 5,631 | 105 | - | - | - | - | 5,736 | - | - | 5,736 |
| Investment Income Receivable | - | - | - | - | - | - | - | - | - | - |
| Pledges Receivable | - | - | - | - | - | - | - | - | - | - |
| Related Party Receivables | 33,520 | - | - | - | - | (33,520) | - | - | - | - |
| Inventory | 6,448 | - | - | - | - | - | 6,448 | - | - | 6,448 |
| Prepaid and Deferred Charges | 3,101 | - | - | - | - | - | 3,101 | - | - | 3,101 |
| Land, Building, and Equipment (Net) | 185,958 | 90 | 35,310 | - | - | - | 221,358 | 723,448 | - | 944,805 |
| Other | 46,222 | - | - | - | - | - | 46,222 | 14,088 | - | 60,310 |
| **Total Gross Liquidation Proceeds** | **$ 484,682** | **$ 6,469** | **$ 35,310** | **$ -** | **0** | **$ -** | **$ (33,520) $ 492,941** | **$ 1,797,444** | **$ -** | **$ 2,290,385** |

| (-) Less Cost of Liquidation | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ( - ) Liquidation Wind-Down Expenses | $ (15,603) | $ - | $ - | $ - | (0) | $ - | $ (15,603) | $ (62,911) | $ - | $ (78,513) |
| ( - ) Chapter 7 Trustee Fees | (14,565) | (219) | (1,084) | - | - | - | (15,868) | (53,930) | - | (69,797) |
| ( - ) Trustee's Professional Fees | (4,747) | (97) | - | - | - | - | (4,844) | (52,811) | - | (57,654) |
| ( - ) Claims Processing Costs | (1,000) | - | - | - | - | - | (1,000) | (9,519) | - | (10,519) |
| ( - ) Secured Lender Professional Fees | (842) | - | - | - | - | - | (842) | - | - | (842) |
| ( - ) Broker Fees | (4,486) | (2) | (706) | - | - | - | (5,194) | (28,938) | - | (34,132) |
| **Total Liquidation Costs** | **$ (41,242)** | **$ (317)** | **$ (1,790)** | **$ -** | **(0)** | **$ -** | **$ (43,350)** | **$ (208,107)** | **$ -** | **$ (251,457)** |

| **Total Net Liquidation Proceeds** | **$ 443,440** | **$ 6,151** | **$ 33,520** | **$ -** | **0** | **$ -** | **$ (33,520) $ 449,591** | **$ 1,589,337** | **$ -** | **$ 2,038,928** |

**Estimated Claims Recovery ($ 000s)**

| Secured Claims | BSA Debtors | Foundation | Arrow | BSAAM | Learning for Life | Intercompany | Consolidated Debtors & Related Non-Debtors | Local Councils | Residual Scouting Interest | Subtotal BSA + LCs |
|---|---|---|---|---|---|---|---|---|---|---|
| JPMorgan Funded Debt | $ 232,262 | $ - | $ - | $ - | $ - | $ - | $ 232,262 | $ - | $ - | $ 232,262 |
| JPMorgan Letters of Credit | 95,842 | - | - | - | - | - | 95,842 | - | - | 95,842 |
| Secured Local Council Debt | - | - | - | - | - | - | - | 59,054 | - | 59,054 |
| BSA Secured Intercompany Note | - | - | 33,520 | - | - | (33,520) | - | - | - | - |
| PBGC Termination Claim | - | 6,151 | - | 0 | - | - | 6,152 | 1,090,825 | - | 1,096,977 |
| **Total Secured Claims** | **$ 328,104** | **$ 6,151** | **$ 33,520** | **$ -** | **0** | **$ -** | **$ (33,520) $ 334,256** | **$ 1,149,879** | **$ -** | **$ 1,484,134** |

| **Proceeds Available After Secured Claims** | **$ 115,335** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 115,335** | **$ 439,458** | **$ -** | **$ 554,794** |

| Administrative / Other Administrative Claims | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Other Administrative Claims | $ 25,610 | $ - | $ - | $ - | $ - | $ - | $ 25,610 | $ - | $ - | 25,610 |
| Employee Related Claims | 19,651 | - | - | - | - | - | 19,651 | 10,863 | - | 30,513 |
| Professional Fee Claims | 44,653 | - | - | - | - | - | 44,653 | - | - | 44,653 |
| Post-Petition Trade Claims | 17,975 | - | - | - | - | - | 17,975 | - | - | 17,975 |
| **Total Administrative / Other Administrative Claims** | **$ 107,889** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 107,889** | **$ 10,863** | **$ -** | **$ 118,752** |

| **Proceeds Available for General Unsecured Creditors** | **$ 7,446** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 7,446** | **$ 428,595** | **$ -** | **$ 436,042** |

| General Unsecured Claims (High) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Trade Payables and Accrued Expenses | $ 5 | $ - | $ - | $ - | $ - | $ - | $ 5 | $ 9,171 | $ 10 | $ 9,186 |
| Employee Related Claims | 21 | - | - | - | - | - | 21 | 660 | 42 | 722 |
| Real Property & Equipment Lease Rejection Damages | 7 | - | - | - | - | - | 7 | 12,101 | 15 | 12,123 |
| Unsecured Local Council Debt | - | - | - | - | - | - | - | 4,129 | - | 4,129 |
| Abuse Claims | 6,419 | - | - | - | - | - | 6,419 | 389,346 | 13,121 | 408,886 |
| PBGC Termination Claim | 995 | - | - | - | - | - | 995 | - | - | 995 |
| **Total General Unsecured Claims (High)** | **$ 7,446** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 7,446** | **$ 415,408** | **$ 13,188** | **$ 436,042** |

| **Proceeds Available After General Unsecured Claims (High)** | **$ 0** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 13,188** | **$ (13,188)** | **$ -** |

| General Unsecured Claims (Low) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Trade Payables and Accrued Expenses | $ 11 | $ - | $ - | $ - | $ - | $ - | $ 11 | $ 21,685 | $ 70 | $ 21,766 |
| Employee Related Claims | 48 | - | - | - | - | - | 48 | 1,496 | 297 | 1,841 |
| Real Property & Equipment Lease Rejection Damages | 17 | - | - | - | - | - | 17 | 26,172 | 105 | 26,293 |
| Unsecured Local Council Debt | - | - | - | - | - | - | - | 9,637 | - | 9,637 |
| Abuse Claims | 5,054 | - | - | - | - | - | 5,054 | 337,681 | 31,452 | 374,187 |
| PBGC Termination Claim | 2,316 | - | - | - | - | - | 2,316 | - | - | 2,316 |
| **Total General Unsecured Claims (Low)** | **$ 7,446** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 7,446** | **$ 396,671** | **$ 31,925** | **$ 436,042** |

| **Proceeds Available After General Unsecured Claims (Low)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 31,925** | **$ (31,925)** | **$ -** |

Note: Recovery percentages are based on a) asset proceeds recovered divided by pro forma asset balances and b) claims recoveries based on estimated claims.

## **EXHIBIT D-1**

**INDIVIDUAL LOCAL COUNCIL BALANCE SHEETS**

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

**As of February 28, 2021**

| Council # | 1 | 3 | 4 | 5 | 6 | 10 | 11 | 13 | 16 | 18 | 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Greater Alabama | Alabama-Florida | Mobile Area | Tukabatchee Area | Black Warrior | Grand Canyon | Catalina | De Soto Area | Westark Area | Quapaw Area | Golden Gate Area Council |
| Assets | | | | | | | | | | | |
| Cash & Equivalents | $ 4,420,229 | $ 77,704 | $ 68,499 | $ 702,265 | $ 816,010 | $ 2,166,111 | $ 521,021 | $ 51,096 | $ 1,000,123 | $ 747,092 | $ 1,013,701 |
| Land, Buildings, and Equipment | 4,773,209 | 306,180 | 457,226 | 2,372,696 | 681,838 | 5,752,921 | 1,426,868 | 622,104 | 3,384,867 | 3,055,534 | 10,360,288 |
| Long-Term Investments | 8,560,125 | 249,811 | 31,206 | 2,224,425 | 3,318,947 | 6,223,695 | 2,077,190 | 371,276 | 1,604,652 | 11,659,187 | 12,094,041 |
| Other Assets | 2,159,016 | 81,723 | 37,242 | 152,343 | 321,508 | 115,989 | 58,185 | 105,845 | 273,838 | 303,974 | 9,065,552 |
| **Total Assets** | **19,912,578** | **715,419** | **594,174** | **5,451,729** | **5,138,304** | **14,258,716** | **4,083,265** | **1,150,321** | **6,263,480** | **15,765,787** | **32,533,582** |
| Liabilities | | | | | | | | | | | |
| Debt | 469,985 | 254,951 | 124,457 | 110,700 | - | 448,968 | 204,900 | 39,000 | 153,975 | 355,574 | 2,093,295 |
| Other Liabilities | 164,017 | 87,339 | 73,031 | 231,185 | 49,807 | 589,200 | 157,723 | 54,831 | 884,808 | 174,269 | 1,531,284 |
| **Total Liabilities** | **634,002** | **342,290** | **197,488** | **341,885** | **49,807** | **1,038,168** | **362,623** | **93,831** | **1,038,783** | **529,843** | **3,624,578** |
| Unrestricted Net Assets | 5,858,141 | 162,947 | 76,647 | 3,625,053 | 2,273,695 | 9,582,089 | 2,930,433 | 734,154 | 1,737,613 | 12,824,556 | 10,325,190 |
| Restricted Net Assets | 13,420,435 | 210,182 | 320,039 | 1,484,791 | 2,814,802 | 3,638,459 | 790,208 | 322,337 | 3,487,085 | 2,411,388 | 18,583,815 |
| **Total Net Assets** | **$ 19,278,576** | **$ 373,129** | **$ 396,686** | **$ 5,109,844** | **$ 5,088,496** | **$ 13,220,548** | **$ 3,720,641** | **$ 1,056,490** | **$ 5,224,697** | **$ 15,235,944** | **$ 28,909,004** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 27 | 30 | 31 | 32 | 33 | 35 | 39 | 41 | 42 | 45 | 47 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Sequoia | Southern Sierra | Pacific Skyline | Long Beach Area | Greater Los Angeles Area | Marin | Orange County | Redwood Empire | Piedmont | California Inland Empire | Golden Empire |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 363,998 | $ 166,493 | $ 1,049,042 | $ 1,521,513 | $ 1,206,870 | $ 194,699 | $ 1,744,481 | $ 16,543 | $ 158,281 | $ 1,174,736 | $ 1,615,343 |
| Land, Buildings, and Equipment | 8,611,598 | 438,736 | 3,464,343 | 2,562,923 | 27,931,097 | 1,767,871 | 38,048,572 | 5,112 | 103,788 | 1,439,339 | 4,980,341 |
| Long-Term Investments | 628,386 | 362,115 | 5,143,646 | 9,078,698 | 20,836,692 | 3,360,496 | 9,876,894 | 541,048 | 8,455,480 | 1,716,399 | 2,400,206 |
| Other Assets | 2,534,179 | 112,141 | 1,350,848 | 154,886 | 5,257,609 | 128,263 | 647,797 | 1,494,191 | 33,871 | 97,602 | 493,682 |
| **Total Assets** | **12,138,161** | **1,079,485** | **11,007,880** | **13,318,021** | **55,232,268** | **5,451,329** | **50,317,744** | **2,056,893** | **8,751,419** | **4,428,076** | **9,489,572** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 299,518 | 154,807 | 632,038 | 209,976 | 452,695 | 136,088 | 4,625,565 | 44,167 | - | 148,055 | 414,000 |
| Other Liabilities | 316,905 | 223,702 | 135,626 | 157,216 | 1,094,625 | 81,665 | 1,338,299 | 81,886 | (9,008) | 497,235 | 464,080 |
| **Total Liabilities** | **616,423** | **378,509** | **767,664** | **367,192** | **1,547,320** | **217,753** | **5,963,864** | **126,053** | **(9,008)** | **645,290** | **878,080** |
| Unrestricted Net Assets | 9,912,453 | (249,930) | 7,927,061 | 5,122,574 | 31,726,269 | 3,474,055 | 38,005,058 | 1,412,193 | 5,544,891 | 2,893,220 | 6,551,803 |
| Restricted Net Assets | 1,609,286 | 950,906 | 2,313,155 | 7,828,255 | 21,958,679 | 1,759,521 | 6,348,822 | 518,648 | 3,215,536 | 889,566 | 2,059,689 |
| **Total Net Assets** | **$ 11,521,738** | **$ 700,976** | **$ 10,240,216** | **$ 12,950,829** | **$ 53,684,948** | **$ 5,233,576** | **$ 44,353,880** | **$ 1,930,841** | **$ 8,760,428** | **$ 3,782,786** | **$ 8,611,492** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

**As of February 28, 2021**

| Council # | 49 | 51 | 53 | 55 | 57 | 58 | 59 | 60 | 61 | 62 | 63 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | San Diego-Imperial | Western Los Angeles County | Los Padres | Silicon Valley Monterey Bay | Ventura County | Verdugo Hills | Greater Yosemite | Pikes Peak | Denver Area | Longs Peak | Rocky Mountain |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 2,371,701 | $ 2,914,717 | $ 784,742 | $ 2,872,971 | $ 185,481 | $ 3,660,215 | $ 707,574 | $ 501,234 | $ 5,774,502 | $ 565,123 | $ (268,841) |
| Land, Buildings, and Equipment | 2,760,209 | 8,146,416 | 12,449,400 | 20,424,463 | 1,594,642 | 527,161 | 936,663 | 4,199,752 | 19,006,862 | 2,512,537 | 1,102,615 |
| Long-Term Investments | 800,269 | 5,861,050 | 4,675,327 | 23,125,556 | 655,726 | 3,098,253 | 2,522,680 | 5,532,283 | 32,022,359 | 7,728,187 | 320,068 |
| Other Assets | 4,181,339 | 664,285 | 344,889 | 327,022 | 213,282 | 240,182 | 24,008 | 89,192 | 1,830,530 | 678,728 | 177,779 |
| **Total Assets** | **10,113,517** | **17,586,468** | **18,254,358** | **46,750,012** | **2,649,131** | **7,525,811** | **4,190,925** | **10,322,461** | **58,634,253** | **11,484,574** | **1,331,621** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 492,757 | 663,400 | 422,822 | 469,448 | 366,302 | 150,286 | 56,228 | 628,000 | 847,910 | 302,433 | 234,274 |
| Other Liabilities | 1,267,988 | 1,220,676 | 148,402 | 564,288 | 175,401 | 678,601 | 103,897 | 100,924 | 1,215,596 | 175,377 | 30,593 |
| **Total Liabilities** | **1,760,745** | **1,884,076** | **571,224** | **1,033,736** | **541,703** | **828,887** | **160,125** | **728,924** | **2,063,506** | **477,810** | **264,867** |
| Unrestricted Net Assets | (566,856) | 9,690,805 | 14,453,991 | 33,397,061 | 1,437,344 | 6,230,000 | 3,753,019 | 5,605,495 | 21,140,913 | 4,722,329 | 659,135 |
| Restricted Net Assets | 8,919,628 | 6,011,587 | 3,229,143 | 12,319,215 | 670,084 | 466,924 | 277,781 | 3,988,043 | 35,429,834 | 6,284,435 | 407,619 |
| **Total Net Assets** | **$ 8,352,772** | **$ 15,702,392** | **$ 17,683,135** | **$ 45,716,276** | **$ 2,107,428** | **$ 6,696,924** | **$ 4,030,800** | **$ 9,593,538** | **$ 56,570,747** | **$ 11,006,764** | **$ 1,066,753** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

As of February 28, 2021

| Council # | 66 | 67 | 69 | 70 | 72 | 81 | 82 | 83 | 84 | 85 | 87 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Connecticut Rivers | Greenwich | Housatonic | Old North State | Connecticut Yankee | Del-Mar-Va | National Capital Area | Central Florida | South Florida | Gulf Stream | North Florida |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 1,072,720 | $ 609,159 | $ 84,880 | $ 1,642,775 | $ 1,033,695 | $ 860,907 | $ 3,777,073 | $ 1,836,823 | $ 1,028,488 | $ 1,114,401 | $ 1,216,530 |
| Land, Buildings, and Equipment | 3,750,125 | 5,186,704 | 787,570 | 5,005,038 | 4,743,693 | 10,538,102 | 27,153,840 | 8,122,735 | 12,827,584 | 3,601,059 | 5,324,767 |
| Long-Term Investments | 9,352,286 | 4,652,101 | 669,333 | 10,032,419 | 6,147,302 | 5,318,522 | 14,597,402 | 1,269,850 | 7,754,991 | 1,947,828 | 14,301,717 |
| Other Assets | 240,241 | 100,022 | 138,310 | 474,197 | 1,220,412 | 3,716,552 | 1,327,749 | 837,149 | 1,051,104 | 148,864 | 359,039 |
| **Total Assets** | **14,415,372** | **10,547,986** | **1,680,092** | **17,154,429** | **13,145,103** | **20,434,084** | **46,856,064** | **12,066,557** | **22,662,167** | **6,812,152** | **21,202,053** |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Debt | 505,647 | 201,907 | 68,733 | 249,200 | 2,000,035 | 518,917 | - | - | 521,205 | 373,668 | 264,546 |
| Other Liabilities | 396,463 | 268,572 | 104,876 | 228,116 | 456,193 | 372,842 | 1,230,381 | 1,492,854 | 218,528 | 769,470 | 470,684 |
| **Total Liabilities** | **902,110** | **470,478** | **173,610** | **477,316** | **2,456,228** | **891,759** | **1,230,381** | **1,492,854** | **739,733** | **1,143,138** | **735,230** |
| | | | | | | | | | | | |
| Unrestricted Net Assets | 6,164,604 | 8,182,865 | 1,224,069 | 10,589,939 | 4,716,717 | 12,402,191 | 33,820,605 | 8,604,279 | 14,275,784 | 3,129,806 | 7,459,145 |
| Restricted Net Assets | 7,348,658 | 1,894,643 | 282,413 | 6,087,174 | 5,972,158 | 7,140,133 | 11,805,079 | 1,969,424 | 7,646,649 | 2,539,208 | 13,007,678 |
| **Total Net Assets** | **$ 13,513,262** | **$ 10,077,508** | **$ 1,506,483** | **$ 16,677,113** | **$ 10,688,875** | **$ 19,542,325** | **$ 45,625,683** | **$ 10,573,703** | **$ 21,922,433** | **$ 5,669,014** | **$ 20,466,823** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

As of February 28, 2021

| Council # | 88 | 89 | 91 | 92 | 93 | 95 | 96 | 98 | 99 | 100 | 101 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Southwest Florida | Greater Tampa Bay Area | Chattahoochee | Atlanta Area | Georgia-Carolina | Flint River | Central Georgia | South Georgia | Coastal Georgia | Northwest Georgia | Northeast Georgia |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 1,646,901 | $ 3,696,307 | $ 489,084 | $ 8,022,593 | $ 512,709 | $ 476,466 | $ 64,424 | $ 504,402 | $ 2,049,111 | $ 554,932 | $ 3,135,952 |
| Land, Buildings, and Equipment | 3,109,957 | 5,855,613 | 6,300,214 | 24,014,830 | 2,347,710 | 5,653,014 | 1,357,412 | 1,496,551 | 8,029,446 | 877,179 | 3,650,021 |
| Long-Term Investments | 10,608,194 | 11,901,098 | 2,140,098 | 61,313,295 | 590,527 | 1,906,489 | 811,765 | 822,126 | 8,161,339 | 2,517,640 | 6,922,350 |
| Other Assets | 193,361 | 1,578,453 | 260,828 | 2,195,961 | 124,685 | 627,295 | 98,893 | 126,361 | 225,181 | (87,901) | 797,130 |
| **Total Assets** | **15,558,413** | **23,031,471** | **9,190,223** | **95,546,679** | **3,575,632** | **8,663,265** | **2,332,493** | **2,949,440** | **18,465,076** | **3,861,850** | **14,505,454** |
| **Liabilities** | | | | | | | | | | | |
| Debt | - | 365,663 | 710,030 | 7,125,358 | 323,544 | 176,300 | 149,900 | - | 756,173 | 90,729 | 339,904 |
| Other Liabilities | 410,440 | 310,274 | 110,692 | 2,510,148 | 63,249 | 70,768 | 85,205 | 27,160 | 81,879 | 53,678 | 1,030,839 |
| **Total Liabilities** | **410,440** | **675,937** | **820,722** | **9,635,505** | **386,793** | **247,068** | **235,105** | **27,160** | **838,052** | **144,407** | **1,370,743** |
| Unrestricted Net Assets | 7,997,609 | 18,192,495 | 6,082,594 | 58,149,032 | 1,786,314 | 6,970,107 | 1,392,435 | 1,952,636 | 17,382,082 | 1,600,467 | 6,396,650 |
| Restricted Net Assets | 7,150,364 | 4,163,039 | 2,286,908 | 27,762,142 | 1,402,525 | 1,446,090 | 704,953 | 969,644 | 244,942 | 2,116,975 | 6,738,061 |
| **Total Net Assets** | **$ 15,147,973** | **$ 22,355,534** | **$ 8,369,501** | **$ 85,911,174** | **$ 3,188,839** | **$ 8,416,197** | **$ 2,097,388** | **$ 2,922,281** | **$ 17,627,025** | **$ 3,717,442** | **$ 13,134,711** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

**As of February 28, 2021**

| Council # | 104 | 106 | 107 | 117 | 127 | 129 | 133 | 138 | 141 | 144 | 145 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Aloha | Ore-Ida | Grand Teton | Prairielands | Three Fires | Northeast Illinois | Illowa | W.D. Boyce | Mississippi Valley | Abraham Lincoln | Hoosier Trails |
| Assets | | | | | | | | | | | |
| Cash & Equivalents | $ 1,318,714 | $ 339,883 | $ 240,542 | $ 248,593 | $ 1,252,923 | $ 1,973,973 | $ 447,695 | $ 1,112,827 | $ 1,364,170 | $ 1,146,215 | $ 290,658 |
| Land, Buildings, and Equipment | 7,963,108 | 2,502,604 | 3,841,902 | 1,202,993 | 4,853,884 | 6,101,517 | 2,065,469 | 2,092,790 | 1,536,295 | 2,311,524 | 1,171,515 |
| Long-Term Investments | 2,061,777 | 6,165,464 | 3,369,606 | 1,373,902 | 4,063,435 | 5,718,214 | 1,859,785 | 1,960,433 | 2,377,304 | 9,887,281 | 2,794,151 |
| Other Assets | 3,604,904 | 34,090 | 187,567 | 86,719 | 638,035 | 1,238,208 | 239,919 | 212,194 | 2,366,475 | 137,186 | 560,955 |
| **Total Assets** | **14,948,504** | **9,042,041** | **7,639,617** | **2,912,207** | **10,808,277** | **15,031,911** | **4,612,868** | **5,378,244** | **7,644,245** | **13,482,207** | **4,817,279** |
| Liabilities | | | | | | | | | | | |
| Debt | 505,815 | - | 132,500 | 94,388 | 3,073,410 | 236,704 | 261,600 | 371,313 | 135,047 | - | 136,543 |
| Other Liabilities | 462,200 | 130,940 | 117,923 | 57,789 | 767,132 | 330,115 | 149,383 | 246,979 | 86,053 | 62,929 | 343,069 |
| **Total Liabilities** | **968,015** | **130,940** | **250,423** | **152,177** | **3,840,542** | **566,819** | **410,983** | **618,291** | **221,099** | **62,929** | **479,612** |
| Unrestricted Net Assets | 5,975,712 | 7,578,672 | 6,775,425 | 2,252,777 | 2,454,029 | 8,230,332 | 3,364,933 | 3,004,490 | 3,795,781 | 2,458,695 | 1,988,860 |
| Restricted Net Assets | 8,004,777 | 1,332,429 | 613,769 | 507,253 | 4,513,707 | 6,234,760 | 836,952 | 1,755,462 | 3,627,364 | 10,960,582 | 2,348,807 |
| **Total Net Assets** | **$ 13,980,489** | **$ 8,911,101** | **$ 7,389,194** | **$ 2,760,030** | **$ 6,967,736** | **$ 14,465,093** | **$ 4,201,885** | **$ 4,759,953** | **$ 7,423,145** | **$ 13,419,277** | **$ 4,337,667** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

As of February 28, 2021

| Council # | 156 | 157 | 160 | 162 | 165 | 172 | 173 | 177 | 178 | 192 | 194 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Anthony Wayne | Crossroads of | | | | | | | | |
| Council Name | Buffalo Trace | Area | America | Sagamore | LaSalle | Hawkeye Area | Winnebago | Mid-Iowa | Northeast Iowa | Coronado Area | Santa Fe Trail |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 286,282 | $ 1,332,065 | $ 7,210,534 | $ 233,472 | $ 2,094,254 | $ 566,415 | $ 915,209 | $ 355,767 | $ 726,239 | $ 547,171 | $ 45,375 |
| Land, Buildings, and Equipment | 2,476,302 | 2,149,931 | 17,269,868 | 2,014,140 | 1,836,061 | 1,156,723 | 483,701 | 11,007,290 | 1,305,793 | 2,718,311 | 1,501,238 |
| Long-Term Investments | 1,690,202 | 3,907,296 | 25,287,079 | 3,633,365 | 2,555,790 | 907,055 | 1,772,366 | 8,028,206 | 2,048,404 | 2,790,611 | 664,522 |
| Other Assets | 109,630 | 267,521 | 5,739,982 | 3,272,618 | 217,188 | 63,397 | 210,823 | 1,071,824 | 100,831 | 94,744 | 1,189 |
| **Total Assets** | **4,562,416** | **7,656,813** | **55,507,464** | **9,153,595** | **6,703,293** | **2,693,590** | **3,382,099** | **20,463,088** | **4,181,266** | **6,150,837** | **2,212,324** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 103,442 | 137,347 | 740,406 | 123,112 | 137,100 | 140,485 | - | 378,527 | - | 280,199 | 342,655 |
| Other Liabilities | 145,162 | 183,652 | 1,023,455 | 91,331 | 211,562 | 316,256 | 79,724 | 328,018 | 158,302 | 88,496 | 166,164 |
| **Total Liabilities** | **248,604** | **320,999** | **1,763,861** | **214,443** | **348,662** | **456,741** | **79,724** | **706,545** | **158,302** | **368,694** | **508,820** |
| Unrestricted Net Assets | 2,586,680 | 3,604,204 | 24,178,049 | 4,861,534 | 5,790,020 | 1,100,691 | 2,670,485 | 16,033,550 | 2,452,014 | 2,710,907 | 762,886 |
| Restricted Net Assets | 1,727,132 | 3,731,610 | 29,565,553 | 4,077,618 | 564,612 | 1,136,158 | 631,889 | 3,722,993 | 1,570,950 | 3,071,236 | 940,618 |
| **Total Net Assets** | **$ 4,313,812** | **$ 7,335,814** | **$ 53,743,602** | **$ 8,939,152** | **$ 6,354,632** | **$ 2,236,849** | **$ 3,302,375** | **$ 19,756,543** | **$ 4,022,964** | **$ 5,782,143** | **$ 1,703,505** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 197 | 198 | 204 | 205 | 209 | 211 | 212 | 213 | 214 | 215 | 216 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Jayhawk Area | Quivira | Blue Grass | Lincoln Heritage | Calcasieu Area | Istrouma Area | Evangeline Area | Louisiana Purchase | Southeast Louisiana | Norwela | Katahdin Area |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 54,055 | $ 695,946 | $ 9,662 | $ 970,193 | $ 168,519 | $ 517,588 | $ 79,539 | $ 304,501 | $ 998,544 | $ 1,895,587 | $ 200,037 |
| Land, Buildings, and Equipment | 1,799,637 | 4,476,661 | 1,937,158 | 10,807,450 | 750,970 | 2,765,407 | 779,568 | 1,835,519 | 1,656,710 | 2,284,911 | 352,030 |
| Long-Term Investments | 1,082,538 | 1,768,187 | 196,366 | 16,917,542 | 1,791,903 | 1,274,299 | 383,852 | 3,009,183 | 4,690,961 | 9,395,687 | 704,882 |
| Other Assets | 6,691,333 | 356,678 | 122,826 | 1,146,391 | 48,879 | 190,108 | 1,301,089 | 102,627 | (785,642) | 174,662 | 5,713,385 |
| **Total Assets** | 9,627,563 | 7,297,473 | 2,266,012 | 29,841,576 | 2,760,271 | 4,747,402 | 2,544,048 | 5,251,829 | 6,560,573 | 13,750,847 | 6,970,334 |
| **Liabilities** | | | | | | | | | | | |
| Debt | 254,000 | 793,997 | 306,375 | 475,826 | 22,075 | - | 299,427 | 93,000 | 202,737 | 285,697 | 109,582 |
| Other Liabilities | 116,606 | 620,458 | 306,750 | 344,691 | 54,101 | 277,475 | 106,643 | 69,257 | 110,244 | 153,569 | 123,584 |
| **Total Liabilities** | 370,606 | 1,414,455 | 613,125 | 820,516 | 76,176 | 277,475 | 406,070 | 162,257 | 312,981 | 439,266 | 233,166 |
| Unrestricted Net Assets | 1,777,238 | 4,157,657 | 1,520,150 | 12,521,252 | 2,310,197 | 2,688,810 | 243,363 | 4,170,751 | 5,729,971 | 12,640,310 | 386,862 |
| Restricted Net Assets | 7,479,719 | 1,725,360 | 132,737 | 16,499,808 | 373,898 | 1,781,117 | 1,980,767 | 918,821 | 517,621 | 671,271 | 6,350,306 |
| **Total Net Assets** | $ 9,256,957 | $ 5,883,018 | $ 1,652,887 | $ 29,021,060 | $ 2,684,095 | $ 4,469,927 | $ 2,224,130 | $ 5,089,572 | $ 6,247,592 | $ 13,311,581 | $ 6,737,168 |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

**As of February 28, 2021**

| Council # | 218 | 220 | 221 | 224 | 227 | 230 | 234 | 250 | 251 | 283 | 286 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Cape Cod and | Spirit of | Heart of New | Western | | | | |
| Council Name | Pine Tree | Baltimore Area | Mason-Dixon | Islands | Adventure | England | Massachusetts | Northern Star | Mayflower | Twin Valley | Voyageurs Area |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 562,463 | $ 947,489 | $ 576,014 | $ 362,422 | $ 639,462 | $ 1,018,531 | $ 215,388 | $ 8,257,833 | $ 409,480 | $ 428,757 | $ 1,084,791 |
| Land, Buildings, and Equipment | 4,999,319 | 5,519,418 | 4,716,985 | 2,066,437 | 3,826,607 | 1,570,750 | 933,097 | 35,607,213 | 6,597,503 | 1,343,368 | 65,489 |
| Long-Term Investments | 2,018,761 | 9,836,148 | 717,782 | 3,652,027 | 9,757,494 | 2,801,859 | 1,595,767 | 47,909,279 | 17,960,921 | 2,543,159 | 785,889 |
| Other Assets | 243,219 | 1,628,074 | 295,229 | 297,733 | 693,617 | 141,281 | 286,876 | 7,933,619 | 894,318 | 291,222 | 132,879 |
| **Total Assets** | **7,823,761** | **17,931,129** | **6,306,010** | **6,378,619** | **14,917,180** | **5,532,421** | **3,031,128** | **99,707,945** | **25,862,223** | **4,606,506** | **2,069,048** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 1,424,886 | 405,092 | 1,347,574 | 60,000 | 1,833,653 | 300,043 | 551,372 | 10,545,035 | - | 49,820 | 98,620 |
| Other Liabilities | 163,224 | 978,100 | 142,349 | 623,139 | 606,957 | 353,859 | 150,680 | 1,489,502 | 320,647 | 173,020 | 152,611 |
| **Total Liabilities** | **1,588,110** | **1,383,192** | **1,489,923** | **683,139** | **2,440,610** | **653,902** | **702,052** | **12,034,536** | **320,647** | **222,841** | **251,231** |
| Unrestricted Net Assets | 3,651,504 | 12,242,788 | 3,737,266 | 4,903,912 | 8,058,233 | 1,876,850 | 1,514,624 | 45,643,422 | 22,562,733 | 3,706,565 | 1,210,218 |
| Restricted Net Assets | 2,584,146 | 4,305,149 | 1,078,822 | 791,568 | 4,418,337 | 3,001,568 | 814,453 | 42,029,986 | 2,978,842 | 677,100 | 607,600 |
| **Total Net Assets** | **$ 6,235,651** | **$ 16,547,937** | **$ 4,816,087** | **$ 5,695,480** | **$ 12,476,570** | **$ 4,878,419** | **$ 2,329,076** | **$ 87,673,408** | **$ 25,541,575** | **$ 4,383,665** | **$ 1,817,817** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

As of February 28, 2021

| Council # | 296 | 299 | 302 | 303 | 304 | 306 | 307 | 311 | 312 | 315 | 322 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Central Minnesota | Gamehaven | Choctaw Area | Andrew Jackson | Pine Burr Area | Ozark Trails | Heart of America | Pony Express | Greater St. Louis Area | Montana | Overland Trails |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 784,881 | $ 681,787 | $ 231,242 | $ 224,234 | $ 259,941 | $ 152,709 | $ 5,962,869 | $ 744,672 | $ 6,479,036 | $ 28,228 | $ 502,968 |
| Land, Buildings, and Equipment | 3,892,149 | 1,385,663 | 1,619,712 | 3,804,780 | 2,542,278 | 4,020,259 | 16,178,880 | 3,656,201 | 22,665,733 | 28,360,122 | 1,051,452 |
| Long-Term Investments | 1,373,337 | 398,904 | 2,221,484 | 4,026,367 | 671,467 | 6,208,975 | 27,853,951 | 3,184,473 | 58,568,744 | 12,277,125 | 1,421,864 |
| Other Assets | 77,360 | 555,568 | 159,159 | 809,513 | 176,483 | 196,154 | 2,333,076 | 358,815 | 9,064,631 | 537,770 | 139,973 |
| **Total Assets** | **6,127,727** | **3,021,922** | **4,231,597** | **8,864,895** | **3,650,169** | **10,578,097** | **52,328,775** | **7,944,161** | **96,778,145** | **41,203,245** | **3,116,257** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 119,098 | 258,188 | 95,701 | 525,006 | 230,937 | 152,184 | 970,791 | 114,145 | 1,363,600 | 363,482 | 446,367 |
| Other Liabilities | 114,594 | 79,991 | 96,098 | 1,516,027 | 72,302 | 232,120 | 3,282,618 | 216,649 | 2,541,834 | 607,913 | 75,703 |
| **Total Liabilities** | **233,692** | **338,179** | **191,799** | **2,041,033** | **303,239** | **384,304** | **4,253,409** | **330,794** | **3,905,434** | **971,395** | **522,070** |
| Unrestricted Net Assets | 2,483,885 | 1,393,364 | 3,394,222 | 1,519,057 | 2,911,447 | 5,368,753 | 18,738,579 | 4,430,970 | 31,740,144 | 33,748,789 | 1,325,334 |
| Restricted Net Assets | 3,410,150 | 1,290,379 | 645,576 | 5,304,805 | 435,483 | 4,825,041 | 29,336,787 | 3,182,396 | 61,132,567 | 6,483,061 | 1,268,853 |
| **Total Net Assets** | **$ 5,894,035** | **$ 2,683,743** | **$ 4,039,798** | **$ 6,823,862** | **$ 3,346,929** | **$ 10,193,793** | **$ 48,075,366** | **$ 7,613,366** | **$ 92,872,710** | **$ 40,231,850** | **$ 2,594,187** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 324 | 326 | 328 | 329 | 330 | 333 | 341 | 347 | 358 | 364 | 368 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Cornhusker | Mid-America | Las Vegas Area | Nevada Area | Daniel Webster | Northern New Jersey | Jersey Shore | Monmouth | Patriots' Path | Twin Rivers | Baden-Powell |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 192,230 | $ 1,683,284 | $ 1,783,981 | $ 1,604,923 | $ 768,132 | $ 717,530 | $ 187,458 | $ 3,506,925 | $ 1,794,561 | $ 951,362 | $ 524,789 |
| Land, Buildings, and Equipment | 3,631,366 | 8,058,199 | 5,322,454 | 2,070,030 | 4,819,321 | 3,390,077 | 1,193,174 | 3,856,997 | 6,532,252 | 1,167,745 | 1,555,244 |
| Long-Term Investments | 1,023,162 | 21,734,964 | 6,688,727 | 8,496,786 | 12,097,762 | 6,630,536 | 882,984 | 5,102,999 | 6,121,537 | 5,364,320 | 3,306,743 |
| Other Assets | 1,407,892 | 714,130 | 307,328 | 219,199 | 1,791,125 | 376,071 | 650,123 | 193,229 | 1,232,418 | 48,086 | 239,104 |
| **Total Assets** | **6,254,651** | **32,190,576** | **14,102,491** | **12,390,937** | **19,476,340** | **11,114,215** | **2,913,739** | **12,660,150** | **15,680,767** | **7,531,513** | **5,625,879** |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Debt | 298,475 | 607,900 | 253,763 | 127,800 | 448,553 | 513,818 | 244,657 | - | 2,021,717 | 136,862 | 134,700 |
| Other Liabilities | 90,995 | 588,809 | 1,986,405 | 119,737 | 1,392,322 | 450,210 | 234,921 | 1,045,622 | 1,416,778 | 225,247 | 161,102 |
| **Total Liabilities** | **389,470** | **1,196,709** | **2,240,168** | **247,537** | **1,840,875** | **964,027** | **479,577** | **1,045,622** | **3,438,495** | **362,109** | **295,802** |
| | | | | | | | | | | | |
| Unrestricted Net Assets | 3,827,718 | 8,289,589 | 4,968,407 | 9,478,814 | 10,286,304 | 6,863,268 | 1,120,096 | 10,212,112 | 7,830,214 | 4,229,406 | 4,015,196 |
| Restricted Net Assets | 2,037,463 | 22,704,277 | 6,893,916 | 2,664,586 | 7,349,160 | 3,286,921 | 1,314,065 | 1,402,416 | 4,412,059 | 2,939,948 | 1,314,882 |
| **Total Net Assets** | **$ 5,865,181** | **$ 30,993,867** | **$ 11,862,323** | **$ 12,143,400** | **$ 17,635,465** | **$ 10,150,188** | **$ 2,434,162** | **$ 11,614,527** | **$ 12,242,272** | **$ 7,169,354** | **$ 5,330,078** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

**As of February 28, 2021**

| Council # | 373 | 375 | 376 | 380 | 382 | 386 | 388 | 397 | 400 | 404 | 405 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Longhouse | Five Rivers | Iroquois Trail | Greater Niagara Frontier | Allegheny Highlands | Theodore Roosevelt | Greater Hudson Valley [4] | Seneca Waterways | Leatherstocking | Suffolk County | Rip Van Winkle |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 280,020 | $ 558,295 | $ 299,480 | $ 1,229,752 | $ 107,959 | $ 709,735 | $ 2,104,925 | $ 1,620,867 | $ 436,795 | $ 1,116,272 | $ 95,290 |
| Land, Buildings, and Equipment | 415,410 | 1,395,865 | 631,999 | 2,391,802 | 510,736 | 3,954,447 | 7,684,448 | 4,410,981 | 3,161,833 | 1,067,734 | 121,335 |
| Long-Term Investments | 2,224,122 | 2,207,693 | 1,007,846 | 2,611,445 | 2,399,359 | 8,710,101 | 12,980,057 | 21,420,436 | 13,191,054 | 3,622,866 | 1,040,462 |
| Other Assets | 806,032 | 92,480 | 53,989 | 287,515 | 56,086 | 431,073 | 1,026,117 | 617,266 | 411,850 | 402,031 | 56,551 |
| **Total Assets** | **3,725,584** | **4,254,333** | **1,993,314** | **6,520,513** | **3,074,139** | **13,805,356** | **23,795,547** | **28,069,550** | **17,201,532** | **6,208,903** | **1,313,638** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 438,312 | 285,573 | 224,973 | 352,107 | 46,228 | 237,048 | 463,363 | 451,329 | 65,295 | 453,375 | 55,000 |
| Other Liabilities | 184,915 | 89,960 | 257,080 | 261,678 | 18,809 | 344,456 | 2,006,837 | 371,915 | 627,166 | 313,003 | 143,993 |
| **Total Liabilities** | **623,227** | **375,533** | **482,053** | **613,785** | **65,036** | **581,503** | **2,470,200** | **823,244** | **692,461** | **766,378** | **198,993** |
| Unrestricted Net Assets | 1,581,633 | 2,972,059 | 283,246 | 3,346,922 | 2,113,548 | 9,905,508 | 11,731,515 | 11,797,728 | 11,828,471 | 1,329,216 | 121,824 |
| Restricted Net Assets | 1,520,724 | 906,741 | 1,228,014 | 2,559,806 | 895,555 | 3,318,344 | 9,593,832 | 15,448,578 | 4,680,600 | 4,113,309 | 992,821 |
| **Total Net Assets** | **$ 3,102,357** | **$ 3,878,800** | **$ 1,511,261** | **$ 5,906,728** | **$ 3,009,103** | **$ 13,223,853** | **$ 21,325,347** | **$ 27,246,306** | **$ 16,509,071** | **$ 5,442,525** | **$ 1,114,645** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 412 | 413 | 414 | 415 | 416 | 420 | 421 | 424 | 425 | 426 | 427 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Great Southwest | Conquistador | Daniel Boone | Mecklenburg County | Central North Carolina | Piedmont | Occoneechee | Tuscarora | Cape Fear | East Carolina | Old Hickory |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 625,892 | $ 4,717,232 | $ 1,409,077 | $ 1,317,642 | $ 1,821,922 | $ 1,813,939 | $ 909,031 | $ 447,991 | $ 1,199,248 | $ 720,724 | $ 717,983 |
| Land, Buildings, and Equipment | 2,967,510 | 2,295,565 | 4,883,770 | 8,010,323 | 2,562,270 | 5,687,967 | 6,389,314 | 1,259,585 | 3,603,106 | 3,523,022 | 3,506,031 |
| Long-Term Investments | 715,451 | 22,184,750 | - | 8,843,571 | 4,365,393 | 6,828,683 | 3,943,180 | 3,306,709 | 2,061,800 | 4,793,130 | 1,814,759 |
| Other Assets | 285,814 | 8,846,036 | 2,606,752 | 1,218,614 | 259,250 | 327,751 | 1,914,536 | 109,310 | 26,125 | 464,760 | 269,873 |
| **Total Assets** | 4,594,667 | 38,043,584 | 8,899,599 | 19,390,150 | 9,008,835 | 14,658,340 | 13,156,062 | 5,123,596 | 6,890,279 | 9,501,636 | 6,308,646 |
| **Liabilities** | | | | | | | | | | | |
| Debt | 466,703 | - | - | 1,069,040 | 357,770 | 264,101 | 1,303,136 | 258,900 | - | - | 315,233 |
| Other Liabilities | 427,986 | 97,160 | 408,334 | 466,708 | 90,584 | 219,604 | 560,902 | 105,692 | 256,215 | 376,449 | 343,634 |
| **Total Liabilities** | 894,689 | 97,160 | 408,334 | 1,535,748 | 448,354 | 483,705 | 1,864,038 | 364,592 | 256,215 | 376,449 | 658,867 |
| Unrestricted Net Assets | 1,275,497 | 2,700,824 | 7,829,640 | 11,248,480 | 5,199,820 | 9,801,687 | 6,056,221 | 1,365,311 | 5,557,337 | 5,040,234 | 5,253,957 |
| Restricted Net Assets | 2,424,480 | 35,245,600 | 661,624 | 6,605,923 | 3,360,662 | 4,372,949 | 5,235,803 | 3,393,693 | 1,076,727 | 4,084,954 | 395,821 |
| **Total Net Assets** | $ 3,699,977 | $ 37,946,424 | $ 8,491,265 | $ 17,854,403 | $ 8,560,481 | $ 14,174,636 | $ 11,292,024 | $ 4,759,005 | $ 6,634,063 | $ 9,125,187 | $ 5,649,778 |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| | 429 | 433 | 436 | 438 | 439 | 440 | 441 | 444 | 449 | 456 | 460 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council # | Northern Lights | Great Trail | Buckeye | Dan Beard | Tecumseh | Lake Erie | Simon Kenton | Miami Valley | Black Swamp Area | Pathway to Adventure | Erie Shores |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 771,071 | $ 1,124,027 | $ 1,553,281 | $ 1,597,005 | $ 223,906 | $ 590,852 | $ 1,040,499 | $ 1,132,918 | $ 1,637,474 | $ 3,144,373 | $ 980,978 |
| Land, Buildings, and Equipment | 9,386,593 | 7,414,131 | 4,930,248 | 9,677,263 | 1,469,337 | 5,238,945 | 5,992,765 | 3,473,289 | 2,957,373 | 4,753,960 | 6,118,616 |
| Long-Term Investments | 5,390,335 | 6,584,428 | 6,288,750 | 8,180,394 | 1,935,848 | 15,733,339 | 5,504,076 | 2,385,682 | 8,842,891 | 17,728,863 | 18,358,600 |
| Other Assets | 917,348 | 1,784,543 | 973,509 | 3,200,930 | 217,210 | 1,052,085 | 598,035 | 206,429 | 805,068 | 2,080,668 | 1,450,368 |
| **Total Assets** | 16,465,347 | 16,907,129 | 13,745,788 | 22,655,593 | 3,846,301 | 22,615,222 | 13,135,375 | 7,198,317 | 14,242,807 | 27,707,864 | 26,908,562 |
| **Liabilities** | | | | | | | | | | | |
| Debt | 236,759 | 330,000 | 271,360 | 630,100 | 81,985 | 953,095 | 395,467 | 268,200 | 219,807 | 590,082 | 364,185 |
| Other Liabilities | 217,589 | 471,478 | 543,270 | 645,477 | 72,496 | 604,487 | 454,867 | 138,414 | 322,642 | 805,787 | 664,007 |
| **Total Liabilities** | 454,348 | 801,478 | 814,630 | 1,275,577 | 154,481 | 1,557,582 | 850,334 | 406,614 | 542,449 | 1,395,869 | 1,028,192 |
| Unrestricted Net Assets | 13,766,368 | 9,525,356 | 6,322,015 | 13,233,734 | 2,799,022 | 11,269,256 | 8,647,700 | 5,399,371 | 7,775,738 | 15,824,269 | 22,222,575 |
| Restricted Net Assets | 2,244,631 | 6,580,296 | 6,609,144 | 8,146,281 | 892,798 | 9,788,384 | 3,637,340 | 1,392,331 | 5,924,620 | 10,487,726 | 3,657,796 |
| **Total Net Assets** | $ 16,011,000 | $ 16,105,652 | $ 12,931,159 | $ 21,380,016 | $ 3,691,820 | $ 21,057,639 | $ 12,285,041 | $ 6,791,703 | $ 13,700,358 | $ 26,311,995 | $ 25,880,370 |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

**As of February 28, 2021**

| Council # | 467 | 468 | 469 | 474 | 480 | 488 | 491 | 492 | 497 | 500 | 501 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Muskingum Valley | Arbuckle Area | Cherokee Area | Cimarron | Last Frontier | Indian Nations | Crater Lake | Cascade Pacific | Juniata Valley | Moraine Trails | Northeastern Pennsylvania |
| Assets | | | | | | | | | | | |
| Cash & Equivalents | $ 994,915 | $ 225,859 | $ 279,747 | $ 141,286 | $ 1,662,260 | $ 1,351,481 | $ 276,839 | $ 3,560,525 | $ 215,306 | $ 719,498 | $ 174,534 |
| Land, Buildings, and Equipment | 1,718,688 | 1,396,180 | 1,274,793 | 775,070 | 12,020,085 | 26,026,563 | 398,392 | 17,691,798 | 2,208,844 | 2,327,757 | 1,385,917 |
| Long-Term Investments | 1,042,986 | 3,621,375 | 4,131,368 | 1,407,164 | 8,898,943 | 12,182,992 | 653,717 | 31,832,255 | 1,333,391 | 6,244,895 | 2,241,631 |
| Other Assets | 123,077 | 1,294,117 | 122,735 | 86,823 | 2,946,628 | 1,747,635 | 1,275,858 | 2,943,413 | 57,807 | 41,410 | 172,836 |
| **Total Assets** | **3,879,666** | **6,537,531** | **5,808,642** | **2,410,343** | **25,527,916** | **41,308,670** | **2,604,805** | **56,027,991** | **3,815,348** | **9,333,560** | **3,974,918** |
| Liabilities | | | | | | | | | | | |
| Debt | 96,085 | 70,200 | 0 | 148,500 | 402,800 | 418,742 | 135,618 | 617,197 | 149,900 | 24,306 | - |
| Other Liabilities | 115,649 | 13,807 | 23,253 | 111,326 | 739,372 | 224,941 | 77,760 | 2,088,899 | 215,934 | 28,295 | 185,583 |
| **Total Liabilities** | **211,733** | **84,007** | **23,253** | **259,826** | **1,142,172** | **643,683** | **213,377** | **2,706,096** | **365,834** | **52,601** | **185,583** |
| Unrestricted Net Assets | 2,934,099 | 4,618,434 | 5,014,481 | 1,932,008 | 6,594,443 | 28,426,208 | 681,197 | 34,421,289 | 1,893,688 | 6,858,072 | 2,988,316 |
| Restricted Net Assets | 733,834 | 1,835,090 | 770,908 | 218,508 | 17,791,302 | 12,238,779 | 1,710,231 | 18,900,606 | 1,555,826 | 2,422,886 | 808,059 |
| **Total Net Assets** | **$ 3,667,933** | **$ 6,453,524** | **$ 5,785,389** | **$ 2,150,517** | **$ 24,385,744** | **$ 40,664,987** | **$ 2,391,428** | **$ 53,321,895** | **$ 3,449,513** | **$ 9,280,958** | **$ 3,796,375** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 502 | 504 | 509 | 512 | 524 | 525 | 527 | 528 | 532 | 533 | 538 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Columbia- | | Westmoreland- | Pennsylvania | Cradle of | Laurel | | | | Chief |
| Council Name | Minsi Trails | Montour | Bucktail | Fayette | Dutch | Liberty | Highlands | Hawk Mountain | French Creek | Susquehanna | Cornplanter |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 905,176 | $ 259,583 | $ 77,551 | $ 190,973 | $ 888,276 | $ 3,393,012 | $ 3,424,538 | $ 994,296 | $ 131,538 | $ 363,013 | $ 105,349 |
| Land, Buildings, and Equipment | 5,602,276 | 714,128 | 912,932 | 855,345 | 3,694,468 | 7,177,031 | 11,781,383 | 2,691,323 | 833,259 | 1,840,202 | 182,408 |
| Long-Term Investments | 9,522,804 | 859,340 | 912,545 | 4,950,860 | 2,903,975 | 15,960,222 | 23,901,725 | 6,132,428 | 2,215,183 | 1,179,203 | 957,394 |
| Other Assets | 716,777 | 61,597 | 50,702 | 201,577 | 1,615,535 | 1,086,575 | 1,575,900 | 360,156 | 2,184,608 | 205,224 | 154,223 |
| **Total Assets** | **16,747,032** | **1,894,648** | **1,953,730** | **6,198,755** | **9,102,255** | **27,616,840** | **40,683,547** | **10,178,203** | **5,364,589** | **3,587,642** | **1,399,374** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 149,999 | 272,751 | 200,521 | 135,412 | 1,453,304 | - | - | 387,500 | 110,448 | 86,500 | - |
| Other Liabilities | 1,517,184 | 84,847 | 66,426 | 249,592 | 83,049 | 655,809 | 3,260,525 | 390,551 | 137,280 | 145,846 | 33,515 |
| **Total Liabilities** | **1,667,183** | **357,598** | **266,947** | **385,004** | **1,536,353** | **655,809** | **3,260,525** | **778,051** | **247,728** | **232,346** | **33,515** |
| Unrestricted Net Assets | 6,716,274 | 675,522 | 520,567 | 1,621,221 | 5,329,855 | 14,249,730 | 23,961,119 | 6,589,184 | 2,525,616 | 2,649,064 | 417,106 |
| Restricted Net Assets | 8,363,576 | 861,529 | 1,166,216 | 4,192,530 | 2,236,047 | 12,711,300 | 13,461,902 | 2,810,968 | 2,591,245 | 706,232 | 948,753 |
| **Total Net Assets** | **$ 15,079,849** | **$ 1,537,051** | **$ 1,686,783** | **$ 5,813,752** | **$ 7,565,902** | **$ 26,961,031** | **$ 37,423,022** | **$ 9,400,152** | **$ 5,116,861** | **$ 3,355,296** | **$ 1,365,859** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 539 | 544 | 546 | 549 | 550 | 551 | 552 | 553 | 556 | 557 | 558 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Chester County | New Birth of Freedom | Narragansett | Palmetto | Coastal Carolina | Blue Ridge | Pee Dee Area | Indian Waters | Cherokee Area | Great Smoky Mountain | Chickasaw |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 2,072,859 | $ 60,972 | $ 3,173,244 | $ 186,943 | $ 77,228 | $ 622,469 | $ 352,496 | $ 537,921 | $ 426,886 | $ 983,109 | $ 2,356,093 |
| Land, Buildings, and Equipment | 8,177,607 | 4,741,387 | 12,702,487 | 1,276,841 | 453,698 | 3,049,033 | 1,700,544 | 889,480 | 1,030,388 | 4,847,886 | 5,653,270 |
| Long-Term Investments | 4,121,451 | 8,295,169 | 18,346,906 | 378,568 | 423,921 | 2,381,888 | 2,779,479 | 3,070,000 | 1,035,067 | 2,039,245 | 7,961,577 |
| Other Assets | 797,907 | 663,924 | 962,721 | 1,320,455 | 130,979 | 1,290,510 | 1,240,867 | 259,697 | 354,912 | 3,437,032 | 410,901 |
| **Total Assets** | **15,169,823** | **13,761,452** | **35,185,358** | **3,162,807** | **1,085,825** | **7,343,899** | **6,073,386** | **4,757,099** | **2,847,253** | **11,307,271** | **16,381,842** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 335,444 | 248,938 | 513,600 | 260,643 | 198,495 | 259,075 | 218,216 | 798,536 | 350,054 | - | 312,465 |
| Other Liabilities | 433,507 | 620,570 | 750,071 | 127,056 | 167,572 | 155,349 | 47,311 | 320,700 | 163,613 | 247,105 | 45,737 |
| **Total Liabilities** | **768,951** | **869,507** | **1,263,671** | **387,698** | **366,067** | **414,424** | **265,527** | **1,119,236** | **513,667** | **247,105** | **358,202** |
| Unrestricted Net Assets | 6,856,711 | 7,383,106 | 18,836,603 | 442,822 | 317,720 | 4,681,093 | 2,207,773 | 1,296,106 | 1,947,397 | 5,869,902 | 4,733,366 |
| Restricted Net Assets | 7,544,161 | 5,508,839 | 15,085,084 | 2,332,286 | 402,039 | 2,248,382 | 3,600,087 | 2,341,756 | 386,189 | 5,190,264 | 11,290,273 |
| **Total Net Assets** | **$ 14,400,872** | **$ 12,891,945** | **$ 33,921,688** | **$ 2,775,109** | **$ 719,759** | **$ 6,929,475** | **$ 5,807,860** | **$ 3,637,862** | **$ 2,333,587** | **$ 11,060,166** | **$ 16,023,639** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | | 559 | 560 | 561 | 562 | 564 | 567 | 571 | 573 | 574 | 576 | 577 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | | West Tennessee Area | Middle Tennessee | Texas Trails | Golden Spread | Capitol Area | Buffalo Trail | Circle Ten | Yucca | Bay Area | Sam Houston Area | South Texas |
| Assets | | | | | | | | | | | | |
| Cash & Equivalents | $ | (20,484) $ | 5,452,578 $ | 101,464 $ | 949,559 $ | 2,153,076 $ | 156,864 $ | 3,674,800 $ | 2,157,005 $ | 341,876 $ | 14,808,272 $ | 243,597 |
| Land, Buildings, and Equipment | | 614,253 | 15,232,842 | 1,192,983 | 5,227,855 | 22,294,248 | 2,144,026 | 28,358,740 | 68,610 | 2,122,433 | 74,632,476 | 4,914,389 |
| Long-Term Investments | | 521,929 | 20,454,936 | 2,336,378 | 8,025,325 | 25,424,549 | 2,718,573 | 44,251,837 | 27,350 | 3,884,879 | 82,600,926 | 1,145,434 |
| Other Assets | | 108,437 | 3,028,705 | 163,502 | 936,818 | 1,326,505 | 175,749 | 16,196,952 | 148,411 | 106,011 | 7,795,945 | 160,634 |
| **Total Assets** | | 1,224,135 | 44,169,062 | 3,794,328 | 15,139,557 | 51,198,378 | 5,195,212 | 92,482,329 | 2,401,376 | 6,455,199 | 179,837,619 | 6,464,055 |
| Liabilities | | | | | | | | | | | | |
| Debt | | 378,591 | 626,890 | 320,906 | 195,208 | 662,726 | 324,034 | 1,248,050 | 85,381 | 88,356 | - | 347,410 |
| Other Liabilities | | 222,711 | 473,123 | 58,496 | 117,546 | 726,240 | 234,720 | 735,198 | 57,446 | 155,606 | 3,449,002 | 122,779 |
| **Total Liabilities** | | 601,302 | 1,100,013 | 379,402 | 312,754 | 1,388,967 | 558,754 | 1,983,248 | 142,827 | 243,963 | 3,449,002 | 470,189 |
| Unrestricted Net Assets | | 135,786 | 20,265,491 | 1,567,414 | 8,879,958 | 45,026,850 | 2,331,639 | 1,828,738 | 1,572,425 | 2,643,449 | 88,569,253 | 4,777,870 |
| Restricted Net Assets | | 487,047 | 22,803,557 | 1,847,512 | 5,946,845 | 4,782,561 | 2,304,819 | 88,670,343 | 686,123 | 3,567,787 | 87,819,364 | 1,215,995 |
| **Total Net Assets** | $ | 622,833 $ | 43,069,049 $ | 3,414,926 $ | 14,826,803 $ | 49,809,411 $ | 4,636,458 $ | 90,499,081 $ | 2,258,548 $ | 6,211,236 $ | 176,388,617 $ | 5,993,865 |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

**As of February 28, 2021**

| | 578 | 583 | 584 | 585 | 587 | 590 | 592 | 595 | 596 | 598 | 599 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council # | | | | East Texas | Northwest | Crossroads of | | | | Shenandoah | Blue Ridge |
| Council Name | Three Rivers | Alamo Area | Caddo Area | Area | Texas | the West | Green Mountain | Colonial Virginia | Tidewater | Area | Mountains |
| Assets | | | | | | | | | | | |
| Cash & Equivalents | $ 779,934 | $ 11,864,069 | $ 637,927 | $ 793,667 | $ 1,744,281 | $ 3,239,353 | $ 415,267 | $ 803,883 | $ 493,787 | $ 162,845 | $ 116,942 |
| Land, Buildings, and Equipment | 868,287 | 12,814,929 | 504,838 | 2,644,075 | 1,228,601 | 28,328,333 | 391,186 | - | 1,433,086 | 1,088,647 | 5,619,448 |
| Long-Term Investments | 1,935,067 | - | 1,285,582 | 4,335,882 | 383 | 10,655,065 | 2,137,505 | 659,530 | 1,291,625 | 653,105 | 2,310,992 |
| Other Assets | 720,063 | 5,015,408 | 136,954 | 267,214 | 736,903 | 3,344,424 | 152,742 | 70,888 | 467,717 | 168,826 | (23,789) |
| **Total Assets** | **4,303,350** | **29,694,406** | **2,565,301** | **8,040,839** | **3,710,167** | **45,567,175** | **3,096,700** | **1,534,300** | **3,686,215** | **2,073,423** | **8,023,593** |
| Liabilities | | | | | | | | | | | |
| Debt | 166,717 | 554,600 | - | 161,879 | 18,125 | - | 257,824 | 256,718 | 214,813 | 251,200 | 3,980,810 |
| Other Liabilities | 136,348 | 1,081,361 | 91,357 | 161,036 | 91,063 | 2,702,273 | 135,608 | 52,973 | 455,059 | 137,251 | 306,796 |
| **Total Liabilities** | **303,065** | **1,635,961** | **91,357** | **322,915** | **109,188** | **2,702,273** | **393,432** | **309,691** | **669,872** | **388,451** | **4,287,606** |
| Unrestricted Net Assets | 1,071,295 | 15,476,476 | 2,309,301 | 3,605,254 | 1,551,351 | 36,894,524 | 1,652,225 | 581,632 | 861,184 | 902,224 | 2,199,821 |
| Restricted Net Assets | 2,928,990 | 12,581,969 | 164,643 | 4,112,670 | 2,049,628 | 5,970,377 | 1,051,043 | 642,977 | 2,155,159 | 782,748 | 1,536,166 |
| **Total Net Assets** | **$ 4,000,286** | **$ 28,058,446** | **$ 2,473,944** | **$ 7,717,924** | **$ 3,600,979** | **$ 42,864,901** | **$ 2,703,268** | **$ 1,224,609** | **$ 3,016,343** | **$ 1,684,972** | **$ 3,735,987** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

As of February 28, 2021

| Council # | 602 | 604 | 606 | 609 | 610 | 611 | 612 | 614 | 615 | 617 | 619 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Heart of Virginia | Blue Mountain | Mount Baker | Chief Seattle | Great Alaska | Inland Northwest | Pacific Harbors | Grand Columbia | Mountaineer Area | Buckskin | Ohio River Valley |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 1,825,330 | $ 64,290 | $ 945,995 | $ 4,797,437 | $ 440,214 | $ 510,730 | $ 706,885 | $ 271,322 | $ 451,570 | $ 1,231,022 | $ 397,215 |
| Land, Buildings, and Equipment | 8,282,095 | 450,632 | 4,577,996 | 14,932,380 | 7,566,023 | 195,476 | 1,698,729 | 2,899,402 | 2,124,264 | 5,509,776 | 1,034,238 |
| Long-Term Investments | 4,312,441 | 2,332,590 | 5,496,435 | 23,300,784 | 1,299,648 | - | 5,603,841 | 536,763 | 727,846 | 5,112,232 | 3,194,533 |
| Other Assets | 894,263 | 72,657 | 604,919 | 423,855 | 7,089,134 | 103,859 | 641,508 | 127,706 | 1,033,937 | 1,526,580 | 374,803 |
| **Total Assets** | **15,314,128** | **2,920,168** | **11,625,345** | **43,454,457** | **16,395,019** | **810,065** | **8,650,963** | **3,835,193** | **4,337,617** | **13,379,609** | **5,000,790** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 670,665 | 77,600 | 416,500 | - | 261,025 | 212,079 | 183,870 | 64,213 | 225,300 | 131,905 | 157,389 |
| Other Liabilities | 481,758 | 42,933 | 139,006 | 846,633 | 179,697 | 220,798 | 146,369 | 44,959 | 86,616 | 235,466 | 475,698 |
| **Total Liabilities** | **1,152,422** | **120,533** | **555,506** | **846,633** | **440,723** | **432,877** | **330,239** | **109,172** | **311,916** | **367,371** | **633,087** |
| Unrestricted Net Assets | 6,509,720 | 510,479 | 7,795,644 | 33,363,479 | 6,710,102 | 118,020 | 5,353,855 | 2,956,830 | 3,466,293 | 9,024,883 | 2,925,194 |
| Restricted Net Assets | 7,651,986 | 2,289,157 | 3,274,195 | 9,244,344 | 9,244,195 | 259,168 | 2,966,869 | 769,190 | 559,408 | 3,987,356 | 1,442,509 |
| **Total Net Assets** | **$ 14,161,706** | **$ 2,799,636** | **$ 11,069,839** | **$ 42,607,823** | **$ 15,954,297** | **$ 377,188** | **$ 8,320,724** | **$ 3,726,020** | **$ 4,025,701** | **$ 13,012,239** | **$ 4,367,703** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** (1), (2), (3)

As of February 28, 2021

| Council # | 620 | 624 | 627 | 635 | 636 | 637 | 638 | 640 | 651 | 653 | 660 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Glacier's Edge | Gateway Area | Samoset | Bay-Lakes | Three Harbors | Chippewa Valley | Greater Wyoming | Greater New York | Potawatomi Area | Great Rivers | Blackhawk Area |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 353,220 | $ 206,726 | $ 1,614,176 | $ 667,003 | $ 1,236,467 | $ 416,837 | $ 438,019 | $ 1,494,300 | $ 1,207,714 | $ 306,660 | $ 310,974 |
| Land, Buildings, and Equipment | 3,903,691 | 1,786,398 | 2,807,331 | 8,083,634 | 4,292,134 | 4,083,805 | 776,046 | 5,630,537 | 1,835,782 | 3,352,871 | 1,832,040 |
| Long-Term Investments | 1,767,849 | 809,357 | 6,296,782 | 24,486,659 | 14,850,327 | 876,082 | 2,411,309 | 13,729,490 | 2,490,382 | 765,289 | 3,989,290 |
| Other Assets | 365,391 | 87,526 | 407,639 | 515,196 | 2,289,467 | 12,184,278 | 215,537 | 2,598,496 | 432,512 | 588,843 | 5,881,177 |
| **Total Assets** | **6,390,151** | **2,890,007** | **11,125,928** | **33,752,492** | **22,668,395** | **17,561,002** | **3,840,910** | **23,452,823** | **5,966,391** | **5,013,663** | **12,013,480** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 1,052,426 | 551,591 | 234,175 | 1,965,457 | 221,470 | 155,600 | 63,500 | 1,983,276 | 190,200 | 25,000 | 457,366 |
| Other Liabilities | 183,990 | 102,076 | 148,014 | 688,011 | 213,132 | 140,551 | 134,805 | 565,079 | 209,563 | 278,715 | 178,242 |
| **Total Liabilities** | **1,236,416** | **653,668** | **382,189** | **2,653,468** | **434,602** | **296,151** | **198,305** | **2,548,355** | **399,763** | **303,715** | **635,608** |
| Unrestricted Net Assets | 3,107,723 | 1,295,142 | 4,149,307 | 12,448,113 | 17,038,431 | 4,663,116 | 2,035,401 | 10,041,590 | 2,395,254 | 2,031,475 | 5,023,665 |
| Restricted Net Assets | 2,046,012 | 941,197 | 6,594,433 | 18,650,911 | 5,195,362 | 12,601,735 | 1,607,204 | 10,862,878 | 3,171,374 | 2,678,473 | 6,354,208 |
| **Total Net Assets** | **$ 5,153,735** | **$ 2,236,339** | **$ 10,743,740** | **$ 31,099,024** | **$ 22,233,793** | **$ 17,264,851** | **$ 3,642,605** | **$ 20,904,468** | **$ 5,566,628** | **$ 4,709,948** | **$ 11,377,873** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 661 | 662 | 664 | 690 | 691 | 694 | 695 | 696 | 697 | 702 | 713 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Suwannee River | | Pushmataha | | | | | | |
| Council Name | Puerto Rico | Longhorn | Area | Garden State | Area | South Plains | Black Hills Area | Midnight Sun | Oregon Trail | Rainbow | Sequoyah |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 439,115 | $ 2,713,841 | $ 214,021 | $ 865,260 | $ 287,641 | $ 524,323 | $ 217,906 | $ 266,375 | $ 1,347,126 | $ 119,116 | $ 323,392 |
| Land, Buildings, and Equipment | 7,061,994 | 3,126,846 | 986,763 | 3,913,886 | 414,242 | 805,283 | 668,300 | 2,289,523 | 2,521,835 | 1,832,618 | 4,636,500 |
| Long-Term Investments | 243,640 | 2,025,600 | 590,907 | 8,248,664 | - | 3,737,464 | 491,979 | 5,947,002 | 6,442,855 | 2,423,436 | 2,828,703 |
| Other Assets | 135,702 | 1,498,859 | 142,020 | 396,305 | (6,740) | 236,175 | 132,863 | 718,620 | 304,925 | 156,376 | 2,340,942 |
| **Total Assets** | **7,880,451** | **9,365,146** | **1,933,711** | **13,424,115** | **695,144** | **5,303,245** | **1,511,049** | **9,221,520** | **10,616,741** | **4,531,546** | **10,129,538** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 277,340 | 726,046 | 157,655 | 236,398 | 44,614 | 153,248 | 175,333 | 111,542 | 139,200 | 240,198 | 176,700 |
| Other Liabilities | 267,911 | 474,806 | 548,811 | 262,010 | 35,127 | 55,813 | 169,872 | 72,528 | 184,594 | 141,169 | 2,025,243 |
| **Total Liabilities** | **545,251** | **1,200,852** | **706,466** | **498,408** | **79,741** | **209,061** | **345,205** | **184,070** | **323,794** | **381,367** | **2,201,943** |
| Unrestricted Net Assets | 6,883,357 | 6,059,764 | (238,956) | 9,300,738 | 415,595 | 583,361 | 664,784 | 2,126,874 | 8,408,697 | 3,812,852 | 4,270,519 |
| Restricted Net Assets | 451,842 | 2,104,530 | 1,466,201 | 3,624,969 | 199,807 | 4,510,823 | 501,060 | 6,910,577 | 1,884,250 | 337,328 | 3,657,076 |
| **Total Net Assets** | **$ 7,335,199** | **$ 8,164,294** | **$ 1,227,245** | **$ 12,925,707** | **$ 615,402** | **$ 5,094,184** | **$ 1,165,843** | **$ 9,037,450** | **$ 10,292,948** | **$ 4,150,180** | **$ 7,927,595** |

EXHIBIT 1

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

**As of February 28, 2021**

| Council # | 733 | 741 | 748 | 763 | 773 | 775 | 777 | 780 | 802 | 803 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Sioux | Texas Southwest | Yocona Area | Stonewall Jackson Area | Gulf Coast | Rio Grande | Washington Crossing | Michigan Crossroads | Transatlantic | Far East | **GRAND TOTAL** |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 1,320,790 | $ 124,087 | $ 217,749 | $ 228,421 | $ 402,098 | $ 364,477 | $ 628,447 | $ 8,235,359 | $ 567,842 | $ 670,682 | **$ 310,794,081** |
| Land, Buildings, and Equipment | 2,104,654 | 723,088 | 992,495 | 1,072,888 | - | 6,029,080 | 2,012,185 | 21,428,581 | - | - | **1,294,849,955** |
| Long-Term Investments | 835,041 | 655,538 | 814,461 | 1,394,178 | - | 1,798,169 | 3,423,224 | 31,637,398 | 662,887 | 2,200,977 | **1,650,837,634** |
| Other Assets | 932,377 | 96,120 | 91,413 | 2,490,208 | 7,693 | 1,550,593 | 389,536 | 5,786,383 | 399,052 | 188,738 | **280,852,608** |
| **Total Assets** | **5,192,862** | **1,598,832** | **2,116,118** | **5,185,695** | **409,791** | **9,742,319** | **6,453,392** | **67,087,721** | **1,629,782** | **3,060,397** | **3,537,334,278** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 201,463 | 88,060 | 70,583 | 612,700 | 395,300 | 618,600 | 263,300 | 7,415,844 | - | - | **118,313,912** |
| Other Liabilities | 713,191 | 37,265 | 93,756 | 353,484 | 99,011 | 105,973 | 358,690 | 11,358,441 | 208,902 | 73,474 | **115,884,679** |
| **Total Liabilities** | **914,653** | **125,325** | **164,339** | **966,184** | **494,311** | **724,573** | **621,990** | **18,774,285** | **208,902** | **73,474** | **234,198,591** |
| Unrestricted Net Assets | 1,496,185 | 916,498 | 863,638 | 217,980 | (292,475) | 1,906,030 | 3,906,611 | 25,109,723 | 966,036 | 2,886,174 | **1,870,754,935** |
| Restricted Net Assets | 2,782,024 | 557,010 | 1,088,141 | 4,001,531 | 207,677 | 7,111,716 | 1,924,791 | 23,203,713 | 454,843 | 100,750 | **1,432,473,515** |
| **Total Net Assets** | **$ 4,278,209** | **$ 1,473,507** | **$ 1,951,779** | **$ 4,219,511** | **$ (84,798)** | **$ 9,017,746** | **$ 5,831,402** | **$ 48,313,436** | **$ 1,420,880** | **$ 2,986,924** | **$ 3,303,228,450** |

Footnote:
(1) Figures presented are unaudited and preliminary and are as reported by each individual local council in the financial accounting system maintained by BSA. Some local council balance sheets may be incomplete. All figures are subject to material change
(2) Restricted and unrestricted classifications are reflected according to GAAP and generally does not include restrictions related to real property. Classification may not reflect all legal restrictions.
(3) The local councils are independent legal entities not controlled by BSA. The information reflected herein is aggregated for presentation purposes only.
(4) Greater Hudson Valley (#388) reflects Greater Hudson Valley 2/28/2021 and Hudson Valley (#374) 12/31/2020 balance sheets as the merger between Hudson Valley Council and Westchester-Putnam Council effective 1/1/2021 is not yet reflected on 'Greater Hudson Valley's system-generated balance sheet

**<u>EXHIBIT D-2</u>**

**LOCAL COUNCIL PROPERTY VALUE INFORMATION**

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

EXHIBIT 2

September 21, 2021
($ in actuals)

| | Property Information | | | | Property Value Information [2] | | | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 1 | Greater Alabama | 001 | French Farms Pavillion Lot | Other | CBRE | $ 512,500 | - | $ - | CBRE | $ 512,500 | U |
| 2 | Greater Alabama | 001 | Comer Scout Reservation | Camp | CBRE | 2,987,500 | - | - | CBRE | 2,987,500 | U |
| 3 | Greater Alabama | 001 | Camp Jackson | Camp | CBRE | 1,900,000 | - | - | CBRE | 1,900,000 | R |
| 4 | Greater Alabama | 001 | Clayton Service Center | Office/Store | CBRE | 3,000,000 | - | - | CBRE | 3,000,000 | U |
| 5 | Greater Alabama | 001 | Lot in Fort Payne | Other | JLL | 94,500 | - | - | JLL | 94,500 | U |
| 6 | Greater Alabama | 001 | Lot in Mentone | Other | JLL | 27,300 | - | - | JLL | 27,300 | U |
| 7 | Greater Alabama | 001 | Land near Monte Sano State Park | Other | JLL | 330,000 | - | - | JLL | 330,000 | U |
| 8 | Greater Alabama | 001 | Lot in Central Heights | Other | JLL | 19,500 | - | - | JLL | 19,500 | U |
| 9 | Greater Alabama | 001 | Two Lot's near Camp Winnataska | Other | JLL | 240,000 | - | - | JLL | 240,000 | U |
| 10 | Greater Alabama | 001 | Lot in River Park Subdivision | Other | JLL | 3,600 | - | - | JLL | 3,600 | U |
| 11 | Greater Alabama | 001 | Lot in Talladega County | Other | JLL | 69,500 | - | - | JLL | 69,500 | U |
| 12 | Greater Alabama | 001 | Lot in Talladega County | Other | JLL | 31,000 | - | - | JLL | 31,000 | U |
| 13 | Greater Alabama | 001 | Cedar Bluff-Gaylesville Property | Other | JLL | 10,400 | - | - | JLL | 10,400 | U |
| 14 | Alabama-Florida | 003 | Camp Alaflo | Camp | JLL | 1,160,000 | - | - | JLL | 1,160,000 | L |
| 15 | Mobile Area | 004 | Camp Maubila | Camp | CBRE | 925,000 | - | - | CBRE | 925,000 | R |
| 16 | Tukabatchee Area | 005 | Highway 80 Property | Other | JLL | 525,000 | CBRE | 222,500 | JLL / CBRE | 373,750 | U |
| 17 | Tukabatchee Area | 005 | Camp Tukabatchee | Camp | CBRE | 2,000,000 | - | - | CBRE | 2,000,000 | L |
| 18 | Tukabatchee Area | 005 | S. Montgomery Co. Property | Other | CBRE | 48,000 | - | - | CBRE | 48,000 | U |
| 19 | Black Warrior | 006 | Camp O'Rear | Camp | JLL | 530,000 | - | - | JLL | 530,000 | U |
| 20 | Black Warrior | 006 | The Leroy McAbee Sr Service Center | Office/Store | JLL | 473,000 | - | - | JLL | 473,000 | U |
| 21 | Black Warrior | 006 | Camp Horne | Camp | CBRE | 1,662,500 | - | - | CBRE | 1,662,500 | U |
| 22 | Grand Canyon | 010 | R-C Scout Camp | Camp | CBRE | 2,250,000 | - | - | CBRE | 2,250,000 | U |
| 23 | Grand Canyon | 010 | Camp Geronimo | Camp | CBRE | 4,641,300 | - | - | CBRE | 4,641,300 | U |
| 24 | Grand Canyon | 010 | Camp Raymond | Camp | CBRE | 3,810,443 | - | - | CBRE | 3,810,443 | R |
| 25 | Grand Canyon | 010 | Heard Scout Pueblo | Camp | JLL | 7,350,000 | CBRE | 8,140,000 | JLL / CBRE | 7,745,000 | U |
| 26 | Grand Canyon | 010 | Little Grand Canyon Ranch | Council | 1,510,000 | - | - | Council | 1,510,000 | U |
| 27 | Catalina | 011 | Double VV | Camp | CBRE | 14,059,125 | - | - | CBRE | 14,059,125 | R |
| 28 | Catalina | 011 | Property Held for Resale | Other | JLL | 66,419 | - | - | CBRE | 66,419 | U |
| 29 | Catalina | 011 | Council Office | Office/Store | JLL | 360,000 | - | - | JLL | 360,000 | U |
| 30 | De Soto Area | 013 | Camp De Soto | Camp | CBRE | 1,106,892 | - | - | CBRE | 1,106,892 | U |
| 31 | De Soto Area | 013 | Council Service Center | Office/Store | JLL | 200,000 | - | - | JLL | 200,000 | U |
| 32 | Westark Area | 016 | Rogers Scout Reservation | Camp | CBRE | 5,418,336 | - | - | CBRE | 5,418,336 | R |
| 33 | Westark Area | 016 | Camp Orr High Adventure Base | Camp | JLL | 660,000 | - | - | JLL | 660,000 | L |
| 34 | Quapaw Area Council | 018 | Camp Rockefeller | Camp | CBRE | 8,439,664 | - | - | CBRE | 8,439,664 | L |
| 35 | Golden Gate Area Council | 023 | YLTC | Office/Store | CBRE | 5,400,000 | - | - | CBRE | 5,400,000 | U |
| 36 | Mt Diablo Silverado | 023 | Camp Herms | Camp | CBRE | 1,500,000 | - | - | CBRE | 1,500,000 | L |
| 37 | Golden Gate Area Council | 023 | Rancho Los Mochos | Camp | CBRE | 3,275,000 | - | - | CBRE | 3,275,000 | R |
| 38 | Golden Gate Area Council | 023 | Camp Royaneh | Camp | CBRE | 1,900,000 | - | - | CBRE | 1,900,000 | U |
| 39 | Golden Gate Area Council | 023 | Wente Scout Reservation | Camp | CBRE | 4,700,000 | - | - | CBRE | 4,700,000 | U |
| 40 | Mt Diablo Silverado | 023 | Council Service Center | Office/Store | JLL | 2,690,000 | - | - | JLL | 2,690,000 | U |
| 41 | Sequoia | 027 | Lot, undeveloped | Other | JLL | 15,700 | - | - | JLL | 15,700 | U |
| 42 | Sequoia | 027 | Shaver Lake Ranger House | Other | JLL | 320,000 | - | - | CBRE | 320,000 | L |
| 43 | Sequoia | 027 | Visalia Office | Office/Store | JLL | 725,000 | - | - | JLL | 725,000 | L |
| 44 | Sequoia | 027 | Fresno Office | Office/Store | JLL | 660,000 | - | - | JLL | 660,000 | L |
| 45 | Sequoia | 027 | 147 acres at Shaver Lake, inundated by Shaver Lake (under v | Other | JLL | 32,500 | - | - | JLL | 32,500 | L |
| 46 | Southern Sierra | 030 | Scout Service Center | Office/Store | JLL | 450,000 | - | - | JLL | 450,000 | U |
| 47 | Pacific Skyline | 031 | Boulder Creek Scout Reservation | Camp | CBRE | 4,525,000 | - | - | CBRE | 4,525,000 | U |
| 48 | Pacific Skyline | 031 | Cutter Scout Reservation | Camp | CBRE | 855,000 | - | - | CBRE | 855,000 | L |
| 49 | Pacific Skyline | 031 | Foster City Service Center | Office/Store | JLL | 5,100,000 | - | - | JLL | 5,100,000 | U |
| 50 | Long Beach Area | 032 | Service Center | Office/Store | JLL | 2,220,000 | - | - | JLL | 2,220,000 | U |
| 51 | Long Beach Area | 032 | Camp Tahquitz | Camp | CBRE | 14,269,275 | - | - | CBRE | 14,269,275 | U |
| 52 | Greater Los Angeles | 033 | Trask Scout Reservation | Camp | CBRE | 3,536,985 | - | - | CBRE | 3,536,985 | R |
| 53 | Greater Los Angeles | 033 | Firestone Scout Reservation | Camp | CBRE | 512,433 | - | - | CBRE | 512,433 | TBD |
| 54 | Greater Los Angeles | 033 | Cushman Watt Scout Center | Office/Store | CBRE | 9,667,350 | - | - | CBRE | 9,667,350 | TBD |
| 55 | Greater Los Angeles | 033 | Hubert Eaton Scout Reservation | Camp | CBRE | 31,590,825 | - | - | CBRE | 31,590,825 | R |
| 56 | Greater Los Angeles | 033 | Remnant Parcels | Other | CBRE | 129,062 | - | - | CBRE | 129,062 | U |
| 57 | Marin | 035 | Camp Tamarancho | Camp | CBRE | 1,907,500 | - | - | CBRE | 1,907,500 | L |
| 58 | Marin | 035 | Camp Marin Sierra | Camp | CBRE | 775,000 | - | - | CBRE | 775,000 | L |
| 59 | Orange County | 039 | Schoepe Scout Reservation at Lost Valley | Camp | JLL | 2,940,000 | CBRE | 13,008,500 | JLL / CBRE | 7,974,250 | U |
| 60 | Orange County | 039 | William Lyons Homs Center for Scouting | Office/Store | CBRE | 9,184,000 | - | - | CBRE | 9,184,000 | U |
| 60 | Orange County | 039 | William Lyons Homs Center for Scouting | Office/Store | CBRE | - | - | - | CBRE | - | U |
| 61 | Orange County | 039 | Irvine Range Outdoor Education Center | Camp | CBRE | 9,461,700 | - | - | CBRE | 9,461,700 | R |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

EXHIBIT 2

September 21, 2021
($ in actuals)

| | Property Information | | | | Property Value Information [3] | | | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 61 | Orange County | 039 | Irvine Ranch Outdoor Education Center | Camp | CBRE | - | - | - | CBRE | - | U |
| 62 | California Inland Empire | 045 | Land | Other | CBRE | 19,120 | - | - | CBRE | 19,120 | U |
| 63 | California Inland Empire | 045 | Jack Dembo Scout Center | Office/Store | CBRE | 1,652,490 | - | - | CBRE | 1,652,490 | U |
| 64 | California Inland Empire | 045 | Camp Emerson | Camp | CBRE | 2,693,075 | - | - | CBRE | 2,693,075 | R |
| 65 | Golden Empire | 047 | Norcal Adventure Area | Camp | CBRE | 587,500 | - | - | CBRE | 587,500 | L |
| 66 | Golden Empire | 047 | Camp Lassen | Camp | CBRE | 207,500 | - | - | CBRE | 207,500 | U |
| 67 | San Diego-Imperial | 049 | Camp Mataguay | Camp | CBRE | 10,054,699 | - | - | CBRE | 10,054,699 | U |
| 68 | Western Los Angeles County | 051 | Sand Canyon land | Other | CBRE | 275,257 | - | - | CBRE | 275,257 | U |
| 69 | Western Los Angeles County | 051 | Camp Josepho | Camp | CBRE | 2,485,350 | - | - | CBRE | 2,485,350 | R |
| 70 | Los Padres | 053 | Rancho Alegre | Camp | CBRE | 3,805,200 | - | - | CBRE | 3,805,200 | R |
| 71 | Silicon Valley Monterey Bay | 055 | Council Service Center | Office/Store | JLL | 3,700,000 | - | - | JLL | 3,700,000 | U |
| 72 | Silicon Valley Monterey Bay | 055 | Camp Chesebrough | Camp | CBRE | 10,720,000 | Council | 6,350,000 | CBRE / Council | 8,535,000 | U |
| 73 | Silicon Valley Monterey Bay | 055 | Camp Hi-Sierra | Camp | CBRE | 2,827,500 | - | - | CBRE | 2,827,500 | U |
| 74 | Silicon Valley Monterey Bay | 055 | Camp Pico Blanco | Camp | CBRE | 3,100,000 | - | - | CBRE | 3,100,000 | L |
| 75 | Ventura County | 057 | Council Service Center | Office/Store | JLL | 740,000 | - | - | JLL | 740,000 | U |
| 76 | Ventura County | 057 | Camp Three Falls | Camp | CBRE | 877,976 | - | - | CBRE | 877,976 | U |
| 77 | Ventura County | 057 | Camp Willett | Camp | CBRE | 5,366,500 | - | - | CBRE | 5,366,500 | R |
| 78 | Verdugo Hills | 058 | Council Service Center | Office/Store | JLL | 5,750,000 | - | - | JLL | 5,750,000 | U |
| 79 | Greater Yosemite | 059 | Camp McConnell | Camp | CBRE | 240,000 | - | - | CBRE | 240,000 | R |
| 80 | Greater Yosemite | 059 | Camp Mensinger | Camp | CBRE | 225,000 | - | - | CBRE | 225,000 | R |
| 81 | Greater Yosemite | 059 | Camp Ison | Other | CBRE | 85,500 | - | - | CBRE | 85,500 | R |
| 82 | Pikes Peak | 060 | Camp Alexander | Camp | CBRE | 1,513,200 | - | - | CBRE | 1,513,200 | L |
| 83 | Pikes Peak | 060 | Council Office | Office/Store | CBRE | 1,766,400 | - | - | CBRE | 1,766,400 | L |
| 84 | Pikes Peak | 060 | Donated Land | Other | CBRE | 941,847 | - | - | CBRE | 941,847 | L |
| 85 | Denver Area | 061 | Hamilton Scout Headquarters | Camp | CBRE | 3,746,220 | - | - | CBRE | 3,746,220 | U |
| 86 | Denver Area | 061 | Tahosa High Adventure Base | Camp | CBRE | 2,579,182 | - | - | CBRE | 2,579,182 | L |
| 87 | Denver Area | 061 | Peaceful Valley Scout Ranch | Camp | CBRE | 6,341,966 | - | - | CBRE | 6,341,966 | U |
| 88 | Longs Peak | 062 | Patiya | Camp | JLL | 1,830,000 | - | - | JLL | 1,830,000 | U |
| 89 | Longs Peak Council | 062 | Ben Delatour Scout Ranch | Camp | JLL | 7,000,000 | CBRE | 6,770,884 | JLL / CBRE | 6,885,442 | L |
| 90 | Longs Peak | 062 | Camp Laramie Peak | Camp | JLL | 1,810,000 | - | - | JLL | 1,810,000 | U |
| 91 | Rocky Mountain | 063 | Rocky Mountain High Adventure Base | Other | JLL | 488,000 | - | - | JLL | 488,000 | U |
| 92 | Rocky Mountain | 063 | Boy Scout Resident Camp San Isabel Scout Ranch | Camp | CBRE | 1,455,074 | - | - | CBRE | 1,455,074 | L |
| 93 | Connecticut Rivers | 066 | Camp Workcoeman | Camp | CBRE | 3,263,440 | - | - | CBRE | 3,263,440 | U |
| 94 | Connecticut Rivers | 066 | Camp Mattatuck | Camp | CBRE | 2,656,100 | - | - | CBRE | 2,656,100 | U |
| 95 | Connecticut Rivers | 066 | June Norcross Webster Scout Reservation | Camp | CBRE | 4,822,700 | - | - | CBRE | 4,822,700 | R |
| 96 | Connecticut Rivers | 066 | Barbour Scout Reservation | Camp | CBRE | 526,500 | - | - | CBRE | 526,500 | R |
| 97 | Greenwich | 067 | Seton Scout Reservation | Camp | CBRE | 17,750,000 | - | - | CBRE | 17,750,000 | TBD |
| 98 | Housatonic | 069 | Bakeless Property | Camp | CBRE | 204,188 | - | - | CBRE | 204,188 | L |
| 99 | Housatonic | 069 | Edmund D. Strang Scout Reservation | Camp | CBRE | 2,418,000 | - | - | CBRE | 2,418,000 | U |
| 100 | Old North State | 070 | Woodfield Scout Preservation | Camp | CBRE | 4,600,000 | CBRE | 4,251,263 | JLL / CBRE | 4,425,631 | U |
| 101 | Old North State | 070 | Royce Reynolds Family Scout Service Center | Office/Store | CBRE | 2,343,750 | - | - | CBRE | 2,343,750 | U |
| 102 | Old North State | 070 | Hagan Sea Base | Other | CBRE | 645,000 | - | - | CBRE | 645,000 | R |
| 103 | Old North State | 070 | Cherokee Scout Reservation | Camp | CBRE | 8,758,805 | - | - | CBRE | 8,758,805 | U |
| 104 | Connecticut Yankee | 072 | Camp Pomperaug | Camp | JLL | 1,450,000 | - | - | JLL | 1,450,000 | U |
| 105 | Connecticut Yankee | 072 | Hoyt Scout Reservation | Camp | JLL | 420,000 | - | - | JLL | 420,000 | U |
| 106 | Connecticut Yankee | 072 | Demrick Property | Other | JLL | 308,000 | - | - | JLL | 308,000 | U |
| 107 | Connecticut Yankee | 072 | Catamount Cabin | Other | JLL | 53,000 | - | - | JLL | 53,000 | U |
| 108 | Connecticut Yankee | 072 | Guilford | Other | JLL | 19,500 | - | - | JLL | 19,500 | U |
| 109 | Connecticut Yankee | 072 | Monroe | Other | JLL | 195,000 | - | - | JLL | 195,000 | U |
| 110 | Connecticut Yankee | 072 | North Branford | Other | JLL | 349,000 | - | - | JLL | 349,000 | U |
| 111 | Connecticut Yankee | 072 | Southbury | Other | JLL | 21,800 | - | - | JLL | 21,800 | U |
| 112 | Connecticut Yankee | 072 | Wallingford | Other | JLL | 280,000 | - | - | JLL | 280,000 | U |
| 113 | Connecticut Yankee | 072 | Deer Lake Scout Reservation | Camp | CBRE | 3,964,500 | - | - | CBRE | 3,964,500 | L |
| 114 | Connecticut Yankee | 072 | Wah Wah Taysee Scout Reservation | Camp | CBRE | 140,448 | - | - | CBRE | 140,448 | L |
| 115 | Connecticut Yankee | 072 | Council Service Center | Office/Store | CBRE | 2,757,600 | Council | 3,300,000 | CBRE / Council | 3,028,800 | U |
| 116 | Connecticut Yankee | 072 | Camp Sequassen | Camp | CBRE | 2,705,600 | - | - | CBRE | 2,705,600 | U |
| 117 | Del-Mar-Va | 081 | Akridge Scout Reservation | Camp | CBRE | 2,611,350 | - | - | CBRE | 2,611,350 | L |
| 118 | Del-Mar-Va | 081 | Hensen Scout Reservation | Camp | CBRE | 4,605,000 | - | - | CBRE | 4,605,000 | U |
| 119 | National Capital Area | 082 | Marriott Scout Service Center | Office/Store | CBRE | 4,620,000 | - | - | JLL | 4,620,000 | U |
| 120 | National Capital Area | 082 | Howard M Wall Boy Scout Camp | Camp | JLL | 3,340,000 | - | - | JLL | 3,340,000 | U |
| 121 | National Capital Area | 082 | Goshen Scout Reseration | Camp | CBRE | 14,745,758 | - | - | CBRE | 14,745,758 | U |
| 122 | National Capital Area | 082 | Camp William B. Snyder | Camp | CBRE | 3,310,000 | - | - | CBRE | 3,310,000 | U |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

EXHIBIT 2

September 21, 2021
($ in actuals)

| | Property Information | | | | Property Value Information [2] | | | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 123 | Central Florida | 083 | Scout Service Center | Office/Store | JLL | 2,640,000 | - | - | JLL | 2,640,000 | U |
| 124 | Central Florida | 083 | Camp La-No-Che | Camp | CBRE | 4,900,000 | - | - | CBRE | 4,900,000 | L |
| 125 | South Florida | 084 | Tatham Scout Service Center | Office/Store | CBRE | 2,650,000 | - | - | CBRE | 2,650,000 | U |
| 126 | South Florida | 084 | Camp Elmore (Seminole) | Camp | CBRE | 14,300,000 | - | - | CBRE | 14,300,000 | R |
| 127 | South Florida | 084 | Camp Jackson Sawyer | Camp | CBRE | 5,350,000 | - | - | CBRE | 5,350,000 | R |
| 128 | Gulf Stream | 085 | Oklawaha - Unrestricted | Camp | JLL | 1,070,000 | - | - | JLL | 1,070,000 | U |
| 129 | Gulf Stream | 085 | Oklawaha - Restricted | Camp | JLL | 7,500 | - | - | JLL | 7,500 | L |
| 130 | Gulf Stream | 085 | Tanah Keeta | Camp | CBRE | 24,000,000 | - | - | CBRE | 24,000,000 | L |
| 131 | North Florida | 087 | St. Johns Riverbase at Echockotee | Camp | JLL | 2,630,000 | CBRE | 2,875,000 | JLL / CBRE | 2,752,500 | U |
| 132 | North Florida | 087 | Council Service Center | Office/Store | JLL | 990,000 | - | - | JLL | 990,000 | U |
| 133 | North Florida | 087 | Baden Powell Scout Reservation | Camp | CBRE | 3,550,000 | - | - | CBRE | 3,550,000 | L |
| 134 | North Florida | 087 | Brown Donated Property | Other | CBRE | 137,500 | - | - | CBRE | 137,500 | L |
| 135 | Southwest Florida | 088 | SWFL Council Volunteer Service Center | Office/Store | JLL | 1,710,000 | - | - | JLL | 1,710,000 | U |
| 136 | Southwest Florida | 088 | Camp Flying Eagle | Camp | CBRE | 4,475,000 | - | - | CBRE | 4,475,000 | L |
| 137 | Greater Tampa Bay Area | 089 | Camp Souel | Camp | JLL | 4,130,000 | CBRE | 3,250,000 | JLL / CBRE | 3,690,000 | U |
| 138 | Greater Tampa Bay Area | 089 | Camp Flaming Arrow - Unrestricted | Camp | JLL | 1,680,000 | - | - | JLL | 1,680,000 | U |
| 139 | Greater Tampa Bay Area | 089 | Camp Flaming Arrow - Restricted | Camp | JLL | 404,000 | - | - | JLL | 404,000 | L |
| 140 | Greater Tampa Bay Area | 089 | Council Office | Office/Store | CBRE | 3,650,000 | Council | 3,530,000 | CBRE / Council | 3,590,000 | U |
| 141 | Greater Tampa Bay Area | 089 | Camp Brorein | Camp | CBRE | 4,625,000 | - | - | CBRE | 4,625,000 | TBD |
| 142 | Greater Tampa Bay Area | 089 | Camp Alafia | Camp | CBRE | 3,225,000 | - | - | CBRE | 3,225,000 | U |
| 143 | Greater Tampa Bay Area | 089 | Camp Sand Hill | Camp | CBRE | 12,250,000 | - | - | CBRE | 12,250,000 | R |
| 144 | Chattahoochee | 091 | Chattahoochee Council, Inc. BSA George & Jo Jeter Scout Ser | Office/Store | CBRE | 1,344,000 | - | - | CBRE | 1,344,000 | U |
| 145 | Chattahoochee | 091 | Camp Pine Mountain | Camp | CBRE | 227,757 | - | - | CBRE | 227,757 | R |
| 146 | Atlanta Area | 092 | Volunteer Service Center | Office/Store | CBRE | 7,629,878 | - | - | CBRE | 7,629,878 | R |
| 147 | Atlanta Area | 092 | Bert Adams Scout Camp | Camp | CBRE | 4,511,698 | - | - | CBRE | 4,511,698 | U |
| 148 | Atlanta Area | 092 | Woodruff Scout Camp | Camp | CBRE | 8,191,680 | - | - | CBRE | 8,191,680 | R |
| 149 | Georgia-Carolina | 093 | Scout Service Center | Office/Store | JLL | 610,000 | - | - | JLL | 610,000 | U |
| 150 | Georgia-Carolina | 093 | Robert E Knox Scout Reservation | Camp | CBRE | 2,165,940 | - | - | CBRE | 2,165,940 | R |
| 151 | Flint River | 095 | Gerald Lawhorn Scouting Base | Camp | CBRE | 6,426,150 | - | - | CBRE | 6,426,150 | R |
| 152 | Flint River | 095 | Tilman T Blakely Scout Service Center | Office/Store | CBRE | 669,840 | - | - | CBRE | 669,840 | U |
| 153 | Central Georgia | 096 | Council Service Center | Office/Store | JLL | 600,000 | - | - | JLL | 600,000 | U |
| 154 | Central Georgia | 096 | Camp Benjamin Hawkins | Camp | CBRE | 1,822,500 | - | - | CBRE | 1,822,500 | U |
| 155 | South Georgia | 098 | Camp Patten | Camp | CBRE | 346,500 | - | - | CBRE | 346,500 | U |
| 156 | South Georgia | 098 | Camp Osborn | Camp | CBRE | 3,088,440 | - | - | CBRE | 3,088,440 | R |
| 157 | Coastal Georgia | 099 | Camp Tolochee | Camp | CBRE | 4,200,000 | - | - | CBRE | 4,200,000 | R |
| 158 | Coastal Georgia | 099 | Black Creek Scout Reservation | Camp | CBRE | 874,576 | - | - | CBRE | 874,576 | U |
| 159 | Northwest Georgia | 100 | Camp Sidney Dew | Camp | CBRE | 1,145,529 | - | - | CBRE | 1,145,529 | R |
| 160 | Northwest Georgia | 100 | Dalton Service Center | Office/Store | JLL | 103,000 | - | - | JLL | 103,000 | U |
| 161 | Northwest Georgia | 100 | Birdsong Property | Other | JLL | 138,000 | - | - | JLL | 138,000 | U |
| 162 | Northeast Georgia | 101 | Camp Rainey Mountain | Camp | CBRE | 2,628,560 | - | - | CBRE | 2,628,560 | TBD |
| 163 | Northeast Georgia | 101 | House for Ranger at Scoutland and Easement to Army Corp o | Other | CBRE | 221,760 | - | - | CBRE | 221,760 | U |
| 164 | Northeast Georgia | 101 | Drew Road | Other | CBRE | 190,775 | - | - | CBRE | 190,775 | L |
| 165 | Aloha | 104 | Camp Pupekea | Camp | CBRE | 875,000 | - | - | CBRE | 875,000 | L |
| 166 | Aloha | 104 | Camp Honokaia | Camp | CBRE | 440,000 | - | - | CBRE | 440,000 | L |
| 167 | Aloha | 104 | Camp Maluhia | Camp | CBRE | 825,000 | - | - | CBRE | 825,000 | U |
| 168 | Aloha | 104 | Camp Alan Faye | Camp | CBRE | 397,500 | - | - | CBRE | 397,500 | L |
| 169 | Aloha | 104 | Aloha Council Service Center | Office/Store | JLL | 4,440,000 | CBRE | 3,925,000 | JLL / CBRE | 4,182,500 | U |
| 169 | Aloha | 104 | Aloha Council Service Center | Office/Store | JLL | - | - | - | JLL | - | U |
| 170 | Mountain West (file name Ore | 106 | Camp Mertaugh | Camp | JLL | 389,000 | - | - | JLL | 389,000 | U |
| 171 | Mountain West (file name Ore | 106 | Salmon River High Adventure Base Camp | Camp | JLL | 485,000 | - | - | JLL | 485,000 | U |
| 172 | Mountain West (file name Ore | 106 | Camp Bradley | Camp | JLL | 128,000 | - | - | JLL | 128,000 | U |
| 173 | Mountain West (file name Ore | 106 | Mountain West Council Office | Office/Store | JLL | 1,200,000 | - | - | JLL | 1,200,000 | U |
| 174 | Mountain West (file name Ore | 106 | MWC Satelite Office | Office/Store | JLL | 239,000 | - | - | JLL | 239,000 | U |
| 175 | Grand Teton Council | 107 | Pocatello Service Center | Office/Store | CBRE | 451,500 | - | - | CBRE | 451,500 | U |
| 176 | Grand Teton Council | 107 | Dougherty Salmon River HAB | Camp | Council | 450,000 | - | - | Council | 450,000 | U |
| 177 | Grand Teton Council | 107 | Krupp Scout Hollow | Camp | JLL | 383,000 | - | - | JLL | 383,000 | L |
| 178 | Grand Teton Council | 107 | Idaho Falls Service Center | Office/Store | JLL | 4,250,000 | - | - | JLL | 4,250,000 | L |
| 179 | Prairielands | 117 | Camp Drake | Camp | CBRE | 1,216,608 | - | - | CBRE | 1,216,608 | U |
| 180 | Prairielands | 117 | Lee Service Center | Office/Store | JLL | 350,000 | - | - | JLL | 350,000 | U |
| 181 | Prairielands | 117 | Danville Office | Office/Store | JLL | 57,800 | - | - | JLL | 57,800 | U |
| 182 | Three Fires | 127 | Camp Big Timber | Camp | CBRE | 769,800 | - | - | CBRE | 769,800 | R |
| 183 | Three Fires | 127 | Camp Freeland Leslie | Camp | Council | 2,000,000 | - | - | Council | 2,000,000 | U |

**Boy Scouts of America**                                                                                                                                                 EXHIBIT 2
Local Council Property Value Information [1]
Disclosure Statement

September 21, 2021
($ in actuals)

| | | | | Property Information | | Property Value Information [2] | | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 184 | Northeast Illinois | 129 | Ma-Ka-Ja-Wan Scout Reservation | Camp | CBRE | 2,932,820 | - | - | CBRE | 2,932,820 | U |
| 185 | Northeast Illinois | 129 | Camp Sol R Crown | Camp | CBRE | 1,037,190 | - | - | CBRE | 1,037,190 | L |
| 186 | Northeast Illinois | 129 | Camp Oakarro | Camp | CBRE | 441,830 | - | - | CBRE | 441,830 | L |
| 187 | Northeast Illinois | 129 | Kasperson Center for Scouting at Morrison Park | Office/Store | JLL | 1,000,000 | - | - | JLL | 1,000,000 | U |
| 188 | Illowa | 133 | Service Center | Office/Store | JLL | 1,150,000 | - | - | JLL | 1,150,000 | U |
| 189 | Illowa | 133 | Camp Loud Thunder | Camp | JLL | 2,470,000 | - | - | JLL | 2,470,000 | U |
| 190 | W.D. Boyce | 138 | Ingersoll Scout Reservation | Camp | CBRE | 3,466,769 | - | - | CBRE | 3,466,769 | U |
| 191 | W.D. Boyce | 138 | Peoria Scout Service Center | Office/Store | CBRE | 225,000 | - | - | CBRE | 225,000 | U |
| 192 | Mississippi Valley | 141 | Saukenauk Scout Reservation | Camp | CBRE | 2,729,250 | - | - | CBRE | 2,729,250 | L |
| 193 | Mississippi Valley | 141 | Camp Eastman | Camp | CBRE | 911,808 | - | - | CBRE | 911,808 | R |
| 194 | Mississippi Valley | 141 | Burlington Service Center | Office/Store | JLL | 68,600 | - | - | JLL | 68,600 | U |
| 195 | Mississippi Valley | 141 | Quincy Service Center | Office/Store | JLL | 273,000 | - | - | JLL | 273,000 | U |
| 196 | Abraham Lincoln Council | 144 | Camp Bunn | Camp | CBRE | 2,167,076 | - | - | CBRE | 2,167,076 | U |
| 197 | Hoosier Trails | 145 | Maumee Scout Reservation | Camp | CBRE | 1,934,400 | - | - | CBRE | 1,934,400 | U |
| 198 | Hoosier Trails | 145 | Council Service Center | Office/Store | JLL | 645,000 | - | - | JLL | 645,000 | U |
| 199 | Buffalo Trace | 156 | Eykamp Scout Center | Office/Store | CBRE | 2,991,360 | - | - | CBRE | 2,991,360 | R |
| 200 | Buffalo Trace | 156 | Santa Claus property | Other | JLL | 71,500 | - | - | JLL | 71,500 | U |
| 201 | Buffalo Trace | 156 | Old Ben Scout Reservation | Camp | JLL | 680,000 | - | - | JLL | 680,000 | U |
| 202 | Anthony Wayne Area | 157 | Anthony Wayne Area Council Service Center | Office/Store | JLL | 2,140,000 | - | - | JLL | 2,140,000 | U |
| 203 | Anthony Wayne Area | 157 | Anthony Wayne Scout Reservation | Camp | CBRE | 2,717,853 | - | - | CBRE | 2,717,853 | U |
| 204 | Crossroads of America | 160 | Camp Kikthawenund | Camp | CBRE | 917,080 | - | - | CBRE | 917,080 | U |
| 205 | Crossroads of America | 160 | Camp Belzer | Camp | CBRE | 4,518,800 | - | - | CBRE | 4,518,800 | U |
| 206 | Crossroads of America | 160 | Golden-Burke Scout Service Center | Office/Store | CBRE | 4,568,020 | - | - | CBRE | 4,568,020 | U |
| 206 | Crossroads of America | 160 | Indianapolis Technology | Office/Store | CBRE | - | - | - | CBRE | - | U |
| 207 | Crossroads of America | 160 | Muncie Scout Service Center | Office/Store | JLL | 66,500 | - | - | JLL | 66,500 | U |
| 208 | Crossroads of America | 160 | Terre Haute Muncie Service Center | Office/Store | JLL | 358,000 | - | - | JLL | 358,000 | U |
| 209 | Crossroads of America | 160 | Ransburg Scout Reservation | Camp | JLL | 3,750,000 | - | - | JLL | 3,750,000 | U |
| 210 | Crossroads of America | 160 | Camp Krietenstein | Camp | JLL | 1,480,000 | - | - | JLL | 1,480,000 | U |
| 211 | Sagamore | 162 | Camp Buffalo - Restricted | Camp | JLL | 19,700 | - | - | JLL | 19,700 | L |
| 212 | Sagamore | 162 | Camp Buffalo - Unrestricted | Camp | JLL | 2,050,000 | - | - | JLL | 2,050,000 | U |
| 213 | LaSalle | 165 | Wood Lake Scout Resvation | Camp | CBRE | 1,340,460 | - | - | CBRE | 1,340,460 | U |
| 214 | LaSalle | 165 | Ranger House | Other | CBRE | 120,960 | - | - | CBRE | 120,960 | U |
| 215 | LaSalle | 165 | Topeneebee | Camp | JLL | 1,480,000 | - | - | JLL | 1,480,000 | U |
| 216 | LaSalle | 165 | Rice Woods | Camp | JLL | 665,000 | - | - | JLL | 665,000 | U |
| 217 | Hawkeye | 172 | Hawkeye Area Council Service Center | Office/Store | JLL | 980,000 | - | - | JLL | 980,000 | U |
| 218 | Hawkeye | 172 | Howard H Cherry Reservation Camp | Camp | CBRE | 1,377,051 | - | - | CBRE | 1,377,051 | L |
| 219 | Winnebago | 173 | Winnebago Scout Service Center | Office/Store | JLL | 379,000 | - | - | JLL | 379,000 | U |
| 220 | Winnebago | 173 | Ingawanis Adventure Base | Camp | JLL | 3,210,000 | - | - | JLL | 3,210,000 | U |
| 221 | Mid-Iowa | 177 | Foster Access | Camp | JLL | 230,000 | - | - | JLL | 230,000 | U |
| 222 | Mid-Iowa | 177 | Grinell Scout Land | Camp | JLL | 319,000 | - | - | JLL | 319,000 | U |
| 223 | Mid-Iowa | 177 | Maytag Scout Center | Office/Store | JLL | 3,190,000 | CBRE | 5,797,190 | JLL / CBRE | 4,493,595 | U |
| 224 | Mid-Iowa | 177 | Mitigwa Scout Reservation | Camp | CBRE | 1,188,772 | - | - | CBRE | 1,188,772 | U |
| 225 | Northeast Iowa | 178 | Camp C.S. Klaus - Restricted | Camp | JLL | 42,000 | - | - | JLL | 42,000 | L |
| 226 | Northeast Iowa | 178 | Camp C.S. Klaus - Unrestricted | Camp | JLL | 760,000 | - | - | JLL | 760,000 | U |
| 227 | Coronado | 192 | Dane G Hansen Scout Reservation | Camp | CBRE | 387,750 | - | - | CBRE | 387,750 | U |
| 228 | Coronado | 192 | Brown Memorial Camp | Camp | JLL | 1,630,000 | - | - | JLL | 1,630,000 | U |
| 228 | Coronado | 192 | Brown Memorial Camp | Camp | JLL | - | - | - | JLL | - | U |
| 229 | Coronado | 192 | William H. Graves Scout Service Center | Office/Store | JLL | 200,000 | - | - | JLL | 200,000 | U |
| 230 | Santa Fe Trail | 194 | Spanish Peaks Scout Ranch | Camp | CBRE | 863,955 | - | - | CBRE | 863,955 | U |
| 230 | Santa Fe Trail | 194 | Spanish Peaks Scout Ranch - Equipment | Camp | CBRE | - | - | - | CBRE | - | U |
| 231 | Jayhawk Area | 197 | Falley Scout Reservation | Camp | JLL | 476,000 | - | - | JLL | 476,000 | U |
| 232 | Quivira | 198 | Camp Kanza | Camp | JLL | 975,000 | - | - | JLL | 975,000 | U |
| 233 | Quivira | 198 | Quivira Scout Ranch | Camp | CBRE | 5,905,200 | - | - | CBRE | 5,905,200 | U |
| 234 | Quivira | 198 | Council Office | Office/Store | JLL | 1,130,000 | - | - | JLL | 1,130,000 | U |
| 235 | Blue Grass | 204 | McKee Scout Reservation | Camp | JLL | 900,000 | - | - | JLL | 900,000 | U |
| 236 | Lincoln Heritage | 205 | Sam Swope Scout Center | Office/Store | JLL | 2,350,000 | - | - | JLL | 2,350,000 | U |
| 237 | Lincoln Heritage | 205 | Pfeffer Scout Reservation | Camp | CBRE | 2,762,505 | - | - | CBRE | 2,762,505 | R |
| 238 | Lincoln Heritage | 205 | Tunnel Mill Scout Reservation | Camp | CBRE | 800,508 | - | - | JLL | 800,508 | U |
| 239 | Lincoln Heritage | 205 | Harry S. Frazier Jr. Scout Reservation | Camp | CBRE | 2,305,868 | - | - | CBRE | 2,305,868 | R |
| 240 | Calcasieu Area | 209 | Camp Edgewood | Camp | CBRE | 561,755 | - | - | CBRE | 561,755 | U |
| 241 | Istrouma Area Council | 211 | Avondale Scout Reservation | Camp | CBRE | 8,195,545 | - | - | CBRE | 8,195,545 | U |
| 242 | Istrouma Area Council | 211 | Pennington Service Center | Office/Store | JLL | 680,000 | - | - | JLL | 680,000 | U |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

September 21, 2021
($ in actuals)

EXHIBIT 2

| | | | | | Property Information | | Property Value Information [2] | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 243 | Evangeline Area | 212 | Lost Bayou | Camp | JLL | 855,000 | CBRE | 1,256,168 | JLL / CBRE | 1,055,584 | U |
| 244 | Evangeline Area | 212 | Camp Steen (2) | Camp | JLL | 30,000 | - | - | JLL | 30,000 | U |
| 245 | Evangeline Area | 212 | Service Center | Office/Store | JLL | 540,000 | - | - | JLL | 540,000 | U |
| 246 | Louisiana Purchase Council | 213 | Camp TL James | Camp | JLL | 400,000 | - | - | JLL | 400,000 | U |
| 247 | Southeast Louisiana | 214 | Salmen Scout Reservation | Camp | CBRE | 4,337,706 | - | - | CBRE | 4,337,706 | U |
| 248 | Norwela | 215 | Office | Office/Store | JLL | 620,000 | - | - | JLL | 620,000 | U |
| 249 | Katahdin Area | 216 | Milo Property | Other | JLL | 146,000 | - | - | JLL | 146,000 | U |
| 250 | Katahdin Area | 216 | Lincoln Property | Other | JLL | 41,300 | - | - | JLL | 41,300 | R |
| 251 | Katahdin Area | 216 | Lincoln Property | Other | JLL | 71,500 | - | - | JLL | 71,500 | R |
| 252 | Katahdin Area | 216 | Egg Pond | Other | JLL | 69,500 | - | - | JLL | 69,500 | L |
| 253 | Pine Tree | 218 | Camp Hinds | Camp | CBRE | 3,617,170 | - | - | CBRE | 3,617,170 | U |
| 253 | Pine Tree | 218 | Messer Training Center | Office/Store | CBRE | - | - | - | CBRE | - | U |
| 253 | Pine Tree | 218 | Tenny River | Camp | CBRE | - | - | - | CBRE | - | L |
| 254 | Baltimore Area | 220 | Shapiro Scout Service Center | Office/Store | CBRE | 1,414,050 | - | - | CBRE | 1,414,050 | R |
| 255 | Baltimore Area | 220 | Broad Creek Memorial Scout Reservation | Camp | CBRE | 7,290,000 | - | - | CBRE | 7,290,000 | L |
| 256 | Mason-Dixon | 221 | Camp Sinoquipe | Camp | CBRE | 1,050,546 | - | - | CBRE | 1,050,546 | U |
| 257 | Cape Cod and Islands | 224 | Camp Greenough | Camp | CBRE | 8,195,276 | - | - | CBRE | 8,195,276 | R |
| 258 | Cape Cod and Islands | 224 | Lot | Other | CBRE | 112,488 | - | - | CBRE | 112,488 | U |
| 259 | Cape Cod and Islands | 224 | Lot | Other | CBRE | 47,580 | - | - | CBRE | 47,580 | U |
| 260 | Spirit of Adventure | 227 | Plymouth Land | Other | JLL | 178,000 | - | - | JLL | 178,000 | U |
| 261 | Spirit of Adventure | 227 | T.L. Storer Scout Reservation | Camp | CBRE | 2,014,614 | - | - | CBRE | 2,014,614 | L |
| 262 | Spirit of Adventure | 227 | Lone Tree Scout Reservation | Camp | CBRE | 1,479,086 | Council | 1,270,000 | CBRE / Council | 1,374,543 | L |
| 263 | Spirit of Adventure | 227 | Wah-tut-ca Scout Reservation | Camp | CBRE | 1,517,970 | - | - | CBRE | 1,517,970 | L |
| 264 | Spirit of Adventure | 227 | Lone Tree Land | Other | CBRE | 204,720 | Council | 190,000 | CBRE / Council | 197,360 | U |
| 265 | Spirit of Adventure | 227 | New England Base Camp (Camp Sayer) | Camp | JLL | 1,140,000 | - | - | JLL | 1,140,000 | L |
| 266 | Heart of New England Council | 230 | Treasure Valley Scout Reservation | Camp | CBRE | 3,781,425 | - | - | CBRE | 3,781,425 | R |
| 267 | Heart of New England | 230 | Camp Split Rock | Camp | JLL | 375,000 | - | - | JLL | 375,000 | L |
| 268 | Heart of New England Council | 230 | Camp Wanocksett | Camp | JLL | 375,000 | - | - | JLL | 375,000 | L |
| 269 | Heart of New England | 230 | Council Office | Office/Store | JLL | 635,000 | - | - | JLL | 635,000 | U |
| 270 | Western Massachusetts | 234 | Horace A. Moses Scout Reservation | Camp | CBRE | 3,654,235 | - | - | CBRE | 3,654,235 | U |
| 271 | Northern Star | 250 | Many Point Scout Camp | Camp | CBRE | 3,432,042 | - | - | CBRE | 3,432,042 | U |
| 271 | Northern Star | 250 | MP Moberg Property | Other | JLL | - | - | - | CBRE | - | U |
| 272 | Northern Star | 250 | Stearns Scout Camp | Camp | CBRE | 3,054,205 | - | - | CBRE | 3,054,205 | U |
| 273 | Northern Star | 250 | Base Camp | Camp | CBRE | 8,710,000 | - | - | CBRE | 8,710,000 | U |
| 274 | Northern Star | 250 | Robert C Wood Property | Other | JLL | 126,000 | - | - | JLL | 126,000 | U |
| 275 | Northern Star | 250 | Gronholm Property | Other | JLL | 560,000 | - | - | JLL | 560,000 | U |
| 276 | Northern Star | 250 | Phillippo Scout Reservation | Camp | JLL | 2,890,000 | - | - | JLL | 2,890,000 | U |
| 277 | Northern Star | 250 | Rum River Scout Camp | Camp | JLL | 1,060,000 | - | - | JLL | 1,060,000 | U |
| 278 | Mayflower | 251 | Service Center | Office/Store | JLL | 1,100,000 | - | - | JLL | 1,100,000 | U |
| 279 | Mayflower | 251 | Camp Nobscot - Restricted | Camp | JLL | 545,000 | - | - | JLL | 545,000 | L |
| 280 | Mayflower | 251 | Camp Resolute | Camp | CBRE | 1,640,655 | - | - | CBRE | 1,640,655 | U |
| 281 | Mayflower | 251 | Camp Squanto | Camp | CBRE | 2,780,619 | - | - | CBRE | 2,780,619 | L |
| 282 | Mayflower | 251 | Camp Nobscot - Unrestricted | Camp | JLL | 128,000 | - | - | JLL | 128,000 | U |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | 1,623,000 | CBRE | 1,678,352 | JLL / CBRE | 1,650,676 | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | L |
| 284 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | U |
| 284 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | - | - | JLL | - | U |
| 285 | Twin Valley | 283 | Norseland Scout Camp | Camp | JLL | 805,000 | - | - | JLL | 805,000 | U |
| 286 | Twin Valley | 283 | Council Service Center | Office/Store | JLL | 990,000 | - | - | JLL | 990,000 | U |
| 287 | Voyageurs Area | 286 | Council Service Center | Office/Store | JLL | 211,000 | - | - | JLL | 211,000 | U |
| 288 | Central Minnesota | 296 | Parker Scout Camp | Camp | CBRE | 941,250 | - | - | CBRE | 941,250 | U |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

September 21, 2021
($ in actuals)

EXHIBIT 2

| | | | | Property Information | | Property Value Information [2] | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 289 | Central Minnesota | 296 | CMC Service Center | Office/Store | JLL | 610,000 | - | - | JLL | 610,000 | U |
| 290 | Gamehaven | 299 | Gamehaven Scout Reservation | Camp | CBRE | 1,049,680 | - | - | CBRE | 1,049,680 | L |
| 291 | Choctaw Area Council | 302 | Choctaw Area Council Office | Office/Store | CBRE | 338,000 | - | - | JLL | 338,000 | U |
| 292 | Choctaw Area Council | 302 | Camp Binachi | Camp | CBRE | 1,182,500 | - | - | CBRE | 1,182,500 | L |
| 293 | Andrew Jackson | 303 | Eight Undeveloped Small Residential Lots | Other | JLL | 189,000 | - | - | JLL | 189,000 | U |
| 294 | Andrew Jackson | 303 | Port Amsterdam Farm Property (not on Council asset list) | Other | CBRE | 2,765,220 | Council | 2,700,000 | CBRE / Council | 2,732,610 | L |
| 295 | Andrew Jackson | 303 | Hood Scout Reservation | Camp | CBRE | 3,717,375 | - | - | CBRE | 3,717,375 | L |
| 296 | Andrew Jackson | 303 | Council Service Center | Office/Store | JLL | 368,000 | - | - | JLL | 368,000 | L |
| 297 | Pine Burr Area Council | 304 | Camp Tiak | Camp | CBRE | 2,657,525 | - | - | CBRE | 2,657,525 | U |
| 298 | Ozark Trails | 306 | Timmons Wildlife Area | Camp | JLL | 126,000 | Council | 100,000 | JLL / Council | 113,000 | U |
| 299 | Ozark Trails | 306 | Frank Childress Scout Reservation | Camp | CBRE | 789,750 | Council | 1,480,000 | CBRE / Council | 1,134,875 | U |
| 300 | Ozark Trails | 306 | Beaumont Scout Reservation | Camp | CBRE | 1,123,740 | Council | 2,150,000 | CBRE / Council | 1,636,870 | U |
| 301 | Ozark Trails | 306 | Springfield Scout Service Center | Office/Store | CBRE | 2,160,500 | Council | 2,000,000 | CBRE / Council | 2,080,250 | L |
| 302 | Heart of America Council | 307 | Theodore Naish Scout Reservation | Camp | CBRE | 10,269,875 | - | - | CBRE | 10,269,875 | L |
| 303 | Heart of America Council | 307 | H. Roe Bartle Scout Reservation | Camp | CBRE | 6,395,290 | - | - | CBRE | 6,395,290 | L |
| 304 | Heart of America Council | 307 | Scout Office | Office/Store | CBRE | 2,090,000 | Council | 1,803,500 | CBRE / Council | 1,946,750 | U |
| 305 | Pony Express | 311 | Camp Geiger | Camp | CBRE | 1,305,000 | - | - | CBRE | 1,305,000 | R |
| 306 | Greater St. Louis Area | 312 | Camp Vandeventer | Camp | JLL | 101,000 | - | - | JLL | 101,000 | U |
| 307 | Greater St. Louis Area | 312 | Camp Warren Levis | Camp | CBRE | 1,218,048 | - | - | CBRE | 1,218,048 | L |
| 308 | Greater St. Louis Area | 312 | Beaumont Scout Reservation | Camp | CBRE | 5,943,900 | - | - | CBRE | 5,943,900 | L |
| 309 | Greater St. Louis Area | 312 | S bar F Scout Ranch | Camp | CBRE | 11,554,920 | - | - | CBRE | 11,554,920 | L |
| 310 | Greater St. Louis Area | 312 | Rhodes France Scout Camp | Camp | JLL | 1,210,000 | - | - | JLL | 1,210,000 | L |
| 311 | Greater St. Louis Area | 312 | Camp Lewallen | Camp | JLL | 411,000 | - | - | JLL | 411,000 | U |
| 312 | Montana | 315 | Libby Property | Other | JLL | 21,400 | - | - | JLL | 21,400 | U |
| 313 | Montana | 315 | Bozeman Office | Office/Store | JLL | 350,000 | - | - | JLL | 350,000 | U |
| 314 | Montana | 315 | Melita - Landing 1 | Camp | CBRE | 380,080 | - | - | CBRE | 380,080 | U |
| 314 | Montana | 315 | Melita - Landing 2 | Camp | CBRE | - | - | - | CBRE | - | U |
| 314 | Montana | 315 | Melita - Landing 3 | Camp | CBRE | - | - | - | CBRE | - | U |
| 315 | Montana | 315 | K-M Munski | Camp | CBRE | 7,861,190 | - | - | CBRE | 7,861,190 | R |
| 315 | Montana | 315 | K-M 2 | Camp | CBRE | - | - | - | CBRE | - | U |
| 315 | Montana | 315 | K-M 3 | Camp | CBRE | - | - | - | CBRE | - | U |
| 315 | Montana | 315 | K-M Possible Mine | Camp | CBRE | - | - | - | CBRE | - | R |
| 315 | Montana | 315 | K-M 4 | Camp | CBRE | - | - | - | CBRE | - | U |
| 315 | Montana | 315 | K-M Kendall Original Townsite | Camp | CBRE | - | - | - | CBRE | - | R |
| 315 | Montana | 315 | K-M Kendall Original Townsite 2 | Camp | CBRE | - | - | - | CBRE | - | R |
| 315 | Montana | 315 | K-M Kendall Original Townsite 3 | Camp | CBRE | - | - | - | CBRE | - | R |
| 315 | Montana | 315 | K-M Kendall Original Townsite 4 | Camp | CBRE | - | - | - | CBRE | - | R |
| 315 | Montana | 315 | K-M Daisy Fraction Mine | Camp | CBRE | - | - | - | CBRE | - | R |
| 315 | Montana | 315 | K-M Butterfly Mine | Camp | CBRE | - | - | - | CBRE | - | U |
| 315 | Montana | 315 | K-M Wedge Mine | Camp | CBRE | - | - | - | CBRE | - | U |
| 315 | Montana | 315 | K-M Emmitt Mine | Camp | CBRE | - | - | - | CBRE | - | U |
| 315 | Montana | 315 | K-M Saddle Mine | Camp | CBRE | - | - | - | CBRE | - | R |
| 315 | Montana | 315 | K-M Evening Star Mine | Camp | CBRE | - | - | - | CBRE | - | R |
| 315 | Montana | 315 | K-M Chandler Easement 1 | Camp | CBRE | - | - | - | CBRE | - | U |
| 315 | Montana | 315 | K-M Chandler Easement 2 | Camp | CBRE | - | - | - | CBRE | - | U |
| 316 | Montana | 315 | Grizzly Base Camp | Camp | CBRE | 986,850 | - | - | CBRE | 986,850 | U |
| 317 | Montana | 315 | Great Falls HQ Property | Office/Store | CBRE | 850,816 | - | - | CBRE | 850,816 | R |
| 318 | Montana | 315 | Melita - Lot 001 | Camp | CBRE | 680,685 | - | - | CBRE | 680,685 | R |
| 318 | Montana | 315 | Melita - Lot 002 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 003 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 004 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 005 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 006 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 007 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 008 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 009 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 010 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 011 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 012 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 013 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 014 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 015 | Camp | CBRE | - | - | - | CBRE | - | R |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

EXHIBIT 2

September 21, 2021
($ in actuals)

| | | | | Property Information | | Property Value Information [2] | | | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 318 | Montana | 315 | Melita - Lot 016 | Camp | CBRE | - | - | - | CBRE | - | R |
| 318 | Montana | 315 | Melita - Lot 017 | Camp | CBRE | - | - | - | CBRE | - | R |
| 319 | Montana | 315 | Clark Fork Property | Other | CBRE | 21,450 | - | - | CBRE | 21,450 | U |
| 320 | Montana | 315 | Billings Scout Acres | Other | CBRE | 619,300 | - | - | CBRE | 619,300 | R |
| 321 | Montana | 315 | Missouri River Property | Other | CBRE | 31,750 | - | - | CBRE | 31,750 | R |
| 322 | Montana | 315 | Camp Arcola | Camp | CBRE | 960,000 | - | - | CBRE | 960,000 | L |
| 323 | Overland Trails | 322 | Camp Augustine | Camp | CBRE | 187,000 | CBRE | 544,192 | JLL / CBRE | 365,596 | U |
| 324 | Overland Trails | 322 | Scout Office | Office/Store | JLL | 336,000 | - | - | JLL | 336,000 | U |
| 325 | Overland Trails | 322 | Scout 40 | Camp | JLL | 60,000 | Council | 115,000 | JLL / Council | 87,500 | U |
| 326 | Cornhusker | 324 | Camp Cornhusker | Camp | JLL | 865,000 | - | - | JLL | 865,000 | U |
| 327 | Cornhusker | 324 | Outdoor Education Center | Office/Store | JLL | 1,150,000 | - | - | JLL | 1,150,000 | U |
| 328 | Mid-America | 326 | Covered Wagon Scout Reservation | Camp | CBRE | 2,891,196 | - | - | CBRE | 2,891,196 | R |
| 329 | Mid-America | 326 | Little Sioux Scout Ranch | Camp | CBRE | 4,837,525 | - | - | CBRE | 4,837,525 | R |
| 330 | Las Vegas Area | 328 | Kimball Scout Reservation | Camp | JLL | 4,660,000 | CBRE | 13,642,080 | JLL / CBRE | 9,151,040 | U |
| 331 | Las Vegas Area | 328 | Sacramento Valley Ranch | Other | JLL | 90,000 | - | - | JLL | 90,000 | U |
| 332 | Nevada Area Council | 329 | Council Office and Trading Post | Office/Store | JLL | 1,220,000 | - | - | JLL | 1,220,000 | U |
| 333 | Nevada Area Council | 329 | Dog Valley Land | Other | JLL | 393,000 | - | - | JLL | 393,000 | U |
| 334 | Nevada Area Council | 329 | RAE Land | Other | JLL | 200,000 | - | - | JLL | 200,000 | U |
| 335 | Nevada Area Council | 329 | Fuller Lake Land | Other | JLL | 555,000 | - | - | JLL | 555,000 | U |
| 336 | Daniel Webster | 330 | The Unity Program Center | Camp | JLL | 625,000 | - | - | JLL | 625,000 | U |
| 337 | Daniel Webster | 330 | DWC Office Bld | Office/Store | JLL | 1,300,000 | - | - | JLL | 1,300,000 | U |
| 338 | Daniel Webster | 330 | Griswold Scout Reservation | Camp | CBRE | 2,089,011 | - | - | CBRE | 2,089,011 | L |
| 338 | Daniel Webster | 330 | Griswold Scout Reservation | Camp | CBRE | - | - | - | CBRE | - | L |
| 338 | Daniel Webster | 330 | Griswold Scout Reservation | Camp | CBRE | - | - | - | CBRE | - | L |
| 339 | Daniel Webster | 330 | Camp Carpenter | Camp | CBRE | 3,369,520 | - | - | CBRE | 3,369,520 | R |
| 340 | Daniel Webster | 330 | Camp Whip-O-Will | Camp | CBRE | 310,500 | - | - | CBRE | 310,500 | R |
| 341 | Daniel Webster | 330 | Pierre Hoge Scout Camp | Camp | CBRE | 204,750 | - | - | CBRE | 204,750 | R |
| 342 | Northern New Jersey | 333 | NNJC Service Center | Office/Store | CBRE | 2,730,000 | - | - | CBRE | 2,730,000 | U |
| 343 | Northern New Jersey | 333 | Camp Conklin | Camp | CBRE | 350,000 | - | - | CBRE | 350,000 | R |
| 344 | Northern New Jersey | 333 | Camp Turrell | Camp | CBRE | 2,615,000 | - | - | CBRE | 2,615,000 | L |
| 345 | Northern New Jersey | 333 | Camp Nobebosco | Camp | CBRE | 1,665,000 | - | - | CBRE | 1,665,000 | L |
| 346 | Northern New Jersey | 333 | Floodwood Mtn Scout Reservation | Camp | CBRE | 820,000 | - | - | CBRE | 820,000 | L |
| 347 | Jersey Shore | 341 | Clayton Service Center | Office/Store | JLL | 1,150,000 | - | - | JLL | 1,150,000 | U |
| 348 | Jersey Shore | 341 | Joseph A. Citta Scout Reservation | Camp | CBRE | 1,989,038 | - | - | CBRE | 1,989,038 | L |
| 349 | Monmouth | 347 | Sea Bright Beach | Other | JLL | 1,180,000 | - | - | JLL | 1,180,000 | U |
| 350 | Monmouth | 347 | Forestburg Scout Reservation | Camp | CBRE | 3,200,000 | - | - | CBRE | 3,200,000 | U |
| 351 | Monmouth | 347 | Quail Hill Scout Camp | Camp | CBRE | 995,000 | - | - | CBRE | 995,000 | L |
| 352 | Monmouth | 347 | Council Service Center | Office/Store | CBRE | 2,600,000 | - | - | CBRE | 2,600,000 | U |
| 353 | Patriots' Path Council | 358 | Cedar Knolls Service Center | Office/Store | CBRE | 2,030,000 | - | - | CBRE | 2,030,000 | U |
| 354 | Patriots' Path Council | 358 | Sabattis Adventure Camp | Camp | CBRE | 1,585,000 | - | - | CBRE | 1,585,000 | L |
| 355 | Patriots' Path Council | 358 | Winnebago Scout Reservation | Camp | CBRE | 935,000 | - | - | CBRE | 935,000 | R |
| 356 | Patriots' Path Council | 358 | Mount Allamuchy Scout Reservation | Camp | CBRE | 3,475,000 | - | - | CBRE | 3,475,000 | L |
| 357 | Twin Rivers | 364 | Council Office | Office/Store | JLL | 471,000 | - | - | JLL | 471,000 | U |
| 358 | Twin Rivers | 364 | Rotary Scout Reservation | Camp | Keen | 4,800,000 | - | - | Keen | 4,800,000 | U |
| 359 | Twin Rivers | 364 | Camp Wakpominee | Camp | Keen | 6,425,000 | - | - | Keen | 6,425,000 | U |
| 360 | Twin Rivers | 364 | Camp Bedford | Camp | Keen | 337,500 | - | - | Keen | 337,500 | R |
| 361 | Baden-Powell | 368 | Baden-Powell Council Service Center | Office/Store | JLL | 188,000 | - | - | JLL | 188,000 | U |
| 362 | Baden-Powell | 368 | Camp Barton | Camp | Keen | 650,000 | - | - | Keen | 650,000 | U |
| 363 | Baden-Powell | 368 | Tuscarora Scout Reservation | Camp | Keen | 3,300,000 | - | - | Keen | 3,300,000 | L |
| 364 | Longhouse | 373 | Land, Town of Brutus | Other | JLL | 9,750 | - | - | JLL | 9,750 | U |
| 365 | Longhouse | 373 | Camp Woodland | Camp | CBRE | 3,005,000 | - | - | CBRE | 3,005,000 | L |
| 366 | Longhouse | 373 | Sabattis Scout Reservation | Camp | CBRE | 1,910,000 | - | - | CBRE | 1,910,000 | L |
| 367 | Five Rivers | 375 | Camp Gordon | Camp | CBRE | 1,090,000 | - | - | CBRE | 1,090,000 | U |
| 368 | Five Rivers | 375 | Camp Brule | Camp | CBRE | 701,350 | - | - | CBRE | 701,350 | L |
| 369 | Five Rivers | 375 | Dorman Property | Camp | Council | 199,900 | - | - | Council | 199,900 | U |
| 370 | Iroquois Trail | 376 | Camp Dittmer | Camp | CBRE | 1,115,000 | - | - | CBRE | 1,115,000 | U |
| 371 | Iroquois Trail | 376 | Camp Sam Wood | Camp | CBRE | 1,095,000 | - | - | CBRE | 1,095,000 | U |
| 372 | Greater Niagara Frontier | 380 | Schoellkopf Scout Reservation | Camp | JLL | 555,000 | - | - | JLL | 555,000 | U |
| 373 | Greater Niagara Frontier | 380 | Camp Stone Haven | Camp | JLL | 494,000 | - | - | JLL | 494,000 | U |
| 374 | Greater Niagara Frontier | 380 | Camp Scouthaven | Camp | Council | 427,974 | - | - | Council | 427,974 | U |
| 375 | Allegheny Highlands | 382 | Camp Merz | Camp | CBRE | 1,810,000 | - | - | CBRE | 1,810,000 | L |
| 376 | Allegheny Highlands | 382 | Elk Lick Scout Reserve | Camp | CBRE | 641,650 | - | - | CBRE | 641,650 | U |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

EXHIBIT 2

September 21, 2021
($ in actuals)

| | | | Property Information | | Property Value Information [2] | | | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 377 | Theodore Roosevelt | 386 | Council Program Center | Office/Store | JLL | 1,480,000 | - | - | JLL | 1,480,000 | U |
| 378 | Theodore Roosevelt | 386 | John M. Schiff Scout Reservation | Camp | Keen | 4,000,000 | - | - | Keen | 4,000,000 | L |
| 379 | Theodore Roosevelt | 386 | Onteora Scout Reservation | Camp | Keen | 1,225,000 | - | - | Keen | 1,225,000 | U |
| 380 | Hudson Valley | 388 | Council Center | Office/Store | JLL | 620,000 | - | - | JLL | 620,000 | U |
| 381 | Hudson Valley | 388 | Camp Nooteeming | Camp | CBRE | 3,805,000 | - | - | CBRE | 3,805,000 | L |
| 382 | Hudson Valley | 388 | Camp Bullowa | Camp | CBRE | 3,440,000 | - | - | CBRE | 3,440,000 | L |
| 383 | Westchester-Putnam | 388 | Curtis S. Read Scout Reservation | Camp | CBRE | 3,255,000 | - | - | CBRE | 3,255,000 | U |
| 384 | Westchester-Putnam | 388 | Service Center | Office/Store | CBRE | 1,000,000 | - | - | CBRE | 1,000,000 | TBD |
| 385 | Westchester-Putnam | 388 | Agatha Durland Scout Reservation | Camp | CBRE | 11,770,000 | - | - | CBRE | 11,770,000 | L |
| 386 | Seneca Waterways | 397 | Scout Service Center | Office/Store | JLL | 1,960,000 | - | - | JLL | 1,960,000 | U |
| 387 | Seneca Waterways | 397 | J Warren Cutler Scout Reservation | Camp | CBRE | 2,560,000 | - | - | CBRE | 2,560,000 | U |
| 388 | Seneca Waterways | 397 | Babcock Hovey Scout Camp | Camp | CBRE | 1,340,000 | - | - | CBRE | 1,340,000 | L |
| 389 | Seneca Waterways | 397 | Massaweple Scout Reservation | Camp | CBRE | 3,210,000 | - | - | CBRE | 3,210,000 | U |
| 390 | Leatherstocking | 400 | Oneonta Office | Office/Store | JLL | 293,000 | - | - | JLL | 293,000 | U |
| 391 | Leatherstocking | 400 | Camp Kingsley | Camp | CBRE | 1,070,000 | - | - | CBRE | 1,070,000 | U |
| 392 | Leatherstocking | 400 | Cedarlands Scout Reservation | Camp | CBRE | 3,400,000 | - | - | CBRE | 3,400,000 | L |
| 393 | Leatherstocking | 400 | Henderson Scout Reservation | Camp | CBRE | 1,870,000 | - | - | CBRE | 1,870,000 | U |
| 394 | Suffolk County | 404 | Baiting Hollow Scout Camp | Camp | Keen | 2,925,000 | - | - | Keen | 2,925,000 | L |
| 395 | Suffolk County | 404 | Service Center | Office/Store | CBRE | 1,982,200 | Council | 1,660,000 | CBRE / Council | 1,821,120 | U |
| 396 | Rip Van Winkle | 405 | Camp Tri-Mount | Camp | JLL | 1,365,000 | - | - | JLL | 1,365,000 | L |
| 397 | Great Southwest | 412 | Campbell Scout Ranch | Camp | CBRE | 335,764 | - | - | CBRE | 335,764 | R |
| 398 | Conquistador Council | 413 | Dowling Aquatic Base | Camp | CBRE | 451,075 | - | - | CBRE | 451,075 | R |
| 399 | Conquistador Council | 413 | Camp Jim Murray | Camp | CBRE | 222,664 | - | - | CBRE | 222,664 | R |
| 400 | Conquistador Council | 413 | S.P. Yates Scout Service Center | Office/Store | CBRE | 391,377 | - | - | CBRE | 391,377 | U |
| 401 | Conquistador Council | 413 | Wehinahpay Mountain Camp | Camp | CBRE | 709,916 | - | - | CBRE | 709,916 | U |
| 402 | Conquistador Council | 413 | Tatum Lot | Other | CBRE | 2,334 | - | - | CBRE | 2,334 | U |
| 403 | Daniel Boone | 414 | Camp Tatham | Camp | JLL | 545,000 | - | - | JLL | 545,000 | U |
| 404 | Daniel Boone | 414 | Service Center | Camp | JLL | 950,000 | - | - | JLL | 950,000 | U |
| 405 | Daniel Boone | 414 | Camp Daniel Boone | Camp | CBRE | 5,277,825 | - | - | CBRE | 5,277,825 | U |
| 406 | Mecklenburg County | 415 | Belk Scout Camp | Camp | CBRE | 4,960,942 | - | - | CBRE | 4,960,942 | U |
| 407 | Mecklenburg County | 415 | Mecklenburg Scout Reservation | Camp | CBRE | 4,117,463 | - | - | CBRE | 4,117,463 | U |
| 408 | Central North Carolina | 416 | Central Office | Office/Store | JLL | 414,000 | - | - | JLL | 414,000 | U |
| 409 | Central North Carolina | 416 | Camp John J. Barnhardt | Camp | CBRE | 2,964,195 | - | - | CBRE | 2,964,195 | L |
| 410 | Piedmont | 420 | C.C. Kimbrell Scout Service Center | Office/Store | JLL | 1,252,560 | - | - | JLL | 1,252,560 | L |
| 411 | Piedmont | 420 | Piedmont Scout Reservation | Camp | CBRE | 5,175,638 | - | - | CBRE | 5,175,638 | L |
| 412 | Occoneechee | 421 | Occoneechee Scout Reservation | Camp | JLL | 8,300,000 | CBRE | 9,786,603 | JLL / CBRE | 9,043,301 | U |
| 413 | Occoneechee | 421 | Council Office | Office/Store | CBRE | 1,681,198 | - | - | CBRE | 1,681,198 | U |
| 414 | Tuscarora Council | 424 | Camp Tuscarora | Camp | CBRE | 1,615,898 | - | - | CBRE | 1,615,898 | U |
| 415 | Cape Fear | 425 | Cape Fear Scout Reservation | Camp | JLL | 885,000 | CBRE | 6,033,555 | JLL / CBRE | 3,459,278 | U |
| 415 | Cape Fear | 425 | Land Scout Reservation | Camp | JLL | - | - | - | JLL | - | U |
| 416 | East Carolina | 426 | Farmville | Other | JLL | 895,000 | - | - | JLL | 895,000 | U |
| 417 | East Carolina | 426 | Camp Bonner North | Camp | CBRE | 2,927,340 | - | - | CBRE | 2,927,340 | R |
| 418 | East Carolina | 426 | Camp Charles | Camp | CBRE | 287,520 | - | - | CBRE | 287,520 | R |
| 419 | East Carolina | 426 | East Carolina Scout Reservation | Camp | CBRE | 3,983,670 | - | - | CBRE | 3,983,670 | L |
| 420 | East Carolina | 426 | Camp Sam Hatcher | Camp | CBRE | 1,192,880 | - | - | CBRE | 1,192,880 | L |
| 421 | Old Hickory | 427 | Land west of Wilderness Cabin | Other | JLL | 530,000 | - | - | JLL | 530,000 | R |
| 422 | Old Hickory | 427 | Camp Raven Knob | Camp | CBRE | 5,966,950 | - | - | CBRE | 5,966,950 | R |
| 423 | Northern Lights | 429 | Camp Wilderness | Camp | CBRE | 3,985,110 | - | - | CBRE | 3,985,110 | R |
| 424 | Northern Lights | 429 | Jon L Wanzek Center for Scouting | Office/Store | CBRE | 2,546,375 | - | - | CBRE | 2,546,375 | L |
| 425 | Great Trail | 433 | Scout Service Center | Office/Store | JLL | 751,000 | - | - | JLL | 751,000 | U |
| 426 | Great Trail | 433 | Manatoc Scout Reservaton | Camp | CBRE | 3,078,548 | - | - | CBRE | 3,078,548 | U |
| 427 | Buckeye | 436 | Seven Ranges Scout Reservation | Camp | CBRE | 2,897,018 | - | - | CBRE | 2,897,018 | U |
| 428 | Buckeye | 436 | Hoover Scout Service Center | Office/Store | JLL | 620,000 | - | - | JLL | 620,000 | U |
| 429 | Buckeye | 436 | Camp McKinley | Camp | JLL | 469,000 | - | - | JLL | 469,000 | U |
| 430 | Dan Beard | 438 | Dan Beard Scout Reservation (also known as Camp Friedlanc | Camp | CBRE | 5,896,530 | - | - | CBRE | 5,896,530 | R |
| 431 | Dan Beard | 438 | Camp Michaels | Camp | CBRE | 3,247,250 | - | - | CBRE | 3,247,250 | R |
| 432 | Tecumseh | 439 | Camp Hugh Taylor Birch | Camp | JLL | 665,000 | - | - | JLL | 665,000 | L |
| 433 | Tecumseh | 439 | Patton Service Center | Office/Store | JLL | 160,000 | - | - | JLL | 160,000 | U |
| 434 | Lake Erie | 440 | Council Service Center | Office/Store | JLL | 1,060,000 | - | - | JLL | 1,060,000 | U |
| 435 | Lake Erie | 440 | Beaumont Scout Reservation - Unrestricted | Camp | JLL | 2,430,000 | CBRE | 3,410,550 | JLL / CBRE | 2,920,275 | U |
| 436 | Lake Erie | 440 | Firelands Scout Reservation | Camp | JLL | 1,100,000 | - | - | JLL | 1,100,000 | L |
| 437 | Lake Erie | 440 | Beaumont Scout Reservation - Restricted | Camp | JLL | 307,000 | - | - | JLL | 307,000 | L |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

EXHIBIT 2

September 21, 2021
($ in actuals)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Property Information | | | | | Property Value Information [2] | | | | Restriction Review [3] |
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 438 | Simon Kenton | 441 | Leadership Development Center | Office/Store | JLL | 3,240,000 | - | - | JLL | 3,240,000 | U |
| 439 | Simon Kenton | 441 | Camp Oyo | Camp | JLL | 288,000 | - | - | JLL | 288,000 | U |
| 439 | Simon Kenton | 441 | CIP - Camp Oyo | Camp | JLL | - | - | - | JLL | - | U |
| 440 | Simon Kenton | 441 | Camp Madison Lake | Camp | JLL | 243,000 | - | - | JLL | 243,000 | U |
| 441 | Simon Kenton | 441 | Camp Lazarus - Unrestricted | Camp | JLL | 1,590,000 | - | - | JLL | 1,590,000 | U |
| 442 | Simon Kenton - Restricted | 441 | Camp Lazarus - Restricted | Camp | CBRE | 259,000 | - | - | JLL | 259,000 | L |
| 443 | Simon Kenton | 441 | Chief Logan Scout Reservation | Camp | CBRE | 834,976 | - | - | CBRE | 834,976 | R |
| 444 | Simon Kenton | 441 | Camp Falling Rock | Camp | CBRE | 1,791,216 | - | - | CBRE | 1,791,216 | U |
| 445 | Miami Valley | 444 | Cricket Holler Camp | Camp | JLL | 1,200,000 | - | - | JLL | 1,200,000 | U |
| 446 | Miami Valley | 444 | Woodland Trails Boy Scout Camp | Camp | JLL | 2,490,000 | - | - | JLL | 2,490,000 | U |
| 447 | Black Swamp | 449 | Camp Lakota | Camp | JLL | 890,000 | - | - | JLL | 890,000 | U |
| 448 | Black Swamp | 449 | Camp Berry | Camp | CBRE | 1,377,225 | - | - | CBRE | 1,377,225 | R |
| 449 | Pathway to Adventure | 456 | Steve Fossett Center for Scouting | Office/Store | JLL | 3,430,000 | CBRE | 5,481,280 | JLL / CBRE | 4,455,640 | U |
| 450 | Pathway to Adventure | 456 | Des Plaines Valley Center for Scouting. | Office/Store | JLL | 610,000 | - | - | JLL | 610,000 | U |
| 451 | Pathway to Adventure | 456 | Camp Lakota | Camp | CBRE | 1,120,420 | - | - | CBRE | 1,120,420 | U |
| 452 | Pathway to Adventure | 456 | Robert J Welsh Center for Scouting. | Office/Store | CBRE | 631,805 | - | - | CBRE | 631,805 | L |
| 453 | Pathway to Adventure | 456 | Owasippe Scout Ranch | Camp | CBRE | 7,333,632 | - | - | CBRE | 7,333,632 | U |
| 454 | Pathway to Adventure | 456 | Camp Napowan | Camp | CBRE | 1,215,961 | - | - | CBRE | 1,215,961 | U |
| 455 | Erie Shores | 460 | Camp Miakonda | Camp | JLL | 3,820,000 | - | - | JLL | 3,820,000 | U |
| 456 | Erie Shores | 460 | Pioneer Scout Reservation | Camp | CBRE | 3,045,845 | - | - | CBRE | 3,045,845 | U |
| 457 | Muskinghum Valley | 467 | Muskingum Valley Scout Reservtion | Camp | CBRE | 1,915,950 | - | - | CBRE | 1,915,950 | L |
| 458 | Arbuckle Area Council | 468 | Arbuckle Office | Office/Store | JLL | 215,000 | - | - | JLL | 215,000 | U |
| 459 | Arbuckle Area Council | 468 | Camp Simpson | Camp | JLL | 2,450,000 | - | - | JLL | 2,450,000 | U |
| 460 | Cherokee | 469 | Camp McClintock | Camp | CBRE | 412,500 | - | - | CBRE | 412,500 | L |
| 461 | Last Frontier | 480 | Dripping Springs | Camp | JLL | 102,000 | - | - | JLL | 102,000 | U |
| 462 | Last Frontier | 480 | Diamond H | Camp | CBRE | 7,900,000 | - | - | CBRE | 7,900,000 | R |
| 463 | Last Frontier | 480 | John Nichols | Camp | CBRE | 4,848,000 | - | - | CBRE | 4,848,000 | TBD |
| 464 | Last Frontier | 480 | Kerr Scout Ranch | Camp | JLL | 3,400,000 | - | - | JLL | 3,400,000 | U |
| 465 | Last Frontier | 480 | Camp George Thomas | Camp | CBRE | 480,000 | - | - | CBRE | 480,000 | R |
| 466 | Indian Nations | 488 | Cherokee Nation Scout Ranch | Camp | JLL | 424,000 | - | - | JLL | 424,000 | U |
| 467 | Indian Nations | 488 | Graves Scout Reservation | Camp | JLL | 471,000 | - | - | JLL | 471,000 | U |
| 468 | Indian Nations | 488 | Hale Scout Reservation | Camp | JLL | 1,480,000 | - | - | JLL | 1,480,000 | L |
| 469 | Indian Nations | 488 | Donald W. Reynolds Scout Resource Center | Office/Store | JLL | 1,480,000 | - | - | JLL | 1,480,000 | U |
| 470 | Indian Nations | 488 | Mabee Scout Reservation | Camp | CBRE | 1,175,000 | - | - | CBRE | 1,175,000 | U |
| 471 | Crater Lake | 491 | Camp McCaleb | Camp | CBRE | 540,498 | - | - | CBRE | 540,498 | L |
| 472 | Crater Lake | 491 | Central Point Office | Office/Store | JLL | 170,000 | - | - | JLL | 170,000 | U |
| 473 | Crater Lake | 491 | Eureka Office | Office/Store | JLL | 265,000 | - | - | JLL | 265,000 | U |
| 474 | Cascade Pacific | 492 | Lewis | Camp | CBRE | 558,650 | - | - | CBRE | 558,650 | R |
| 475 | Cascade Pacific | 492 | Butte Creek | Camp | CBRE | 3,354,010 | - | - | CBRE | 3,354,010 | L |
| 476 | Cascade Pacific | 492 | Cooper | Camp | CBRE | 1,195,644 | - | - | CBRE | 1,195,644 | R |
| 477 | Cascade Pacific | 492 | Meriwether | Camp | CBRE | 6,477,425 | - | - | CBRE | 6,477,425 | L |
| 478 | Cascade Pacific | 492 | Baldwin | Camp | CBRE | 896,000 | - | - | CBRE | 896,000 | L |
| 479 | Cascade Pacific | 492 | Ireland | Camp | CBRE | 525,000 | - | - | CBRE | 525,000 | R |
| 480 | Cascade Pacific | 492 | Portland Office | Office/Store | CBRE | 4,900,000 | - | - | CBRE | 4,900,000 | L |
| 481 | Juniata Valley | 497 | Seven Mountains Scout Camp | Camp | CBRE | 723,750 | - | - | CBRE | 723,750 | R |
| 482 | Moraine Trails | 500 | Camp Agawam | Camp | CBRE | 987,804 | - | - | CBRE | 987,804 | R |
| 483 | Moraine Trails | 500 | Camp Bucoco | Camp | CBRE | 1,145,503 | - | - | CBRE | 1,145,503 | U |
| 484 | Northeastern Pennsylvania | 501 | NEPA Scout Service and Training Center | Office/Store | JLL | 362,000 | - | - | JLL | 362,000 | U |
| 485 | Northeastern Pennsylvania | 501 | vacant land across road from SSTC | Other | JLL | 262,000 | - | - | JLL | 262,000 | R |
| 486 | Northeastern Pennsylvania | 501 | Camp Acahela | Camp | JLL | 699,884 | - | - | JLL | 699,884 | L |
| 487 | Northeastern Pennsylvania | 501 | Goose Pond Scout Reservation | Camp | CBRE | 1,652,343 | - | - | CBRE | 1,652,343 | L |
| 488 | Minsi Trails | 502 | Camp Minsi, Deed Book 170, Page 524 | Camp | JLL | 2,100,000 | CBRE | 4,200,900 | JLL / CBRE | 3,150,450 | U |
| 488 | Minsi Trails | 502 | Camp Minsi   19/4/1/2 | Camp | JLL | - | - | - | JLL | - | U |
| 488 | Minsi Trails | 502 | Camp Minsi   19/4/1/2-1C | Camp | JLL | - | - | - | JLL | - | U |
| 488 | Minsi Trails | 502 | Camp Minsi 19/4/1/2-2C | Camp | JLL | - | - | - | JLL | - | U |
| 488 | Minsi Trails | 502 | Camp Minsi 03/14/1/3 | Camp | JLL | - | - | - | JLL | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation  13/9/1/5 | Camp | JLL | 1,970,000 | CBRE | 2,582,247 | JLL / CBRE | 2,276,124 | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 119, Page 184 | Camp | JLL | - | - | - | JLL | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 121, Page 346 | Camp | JLL | - | - | - | JLL | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 217, Page 600 | Camp | JLL | - | - | - | JLL | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 226, Page 120 | Camp | JLL | - | - | - | JLL | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 315, Page 1107 | Camp | JLL | - | - | - | JLL | - | U |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

EXHIBIT 2

September 21, 2021
($ in actuals)

| | | | | Property Information | | Property Value Information [2] | | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation PA 534, 13/10/1/6-2 | Camp | JLL | - | - | - | JLL | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 113, Page 627 | Camp | JLL | - | - | - | JLL | - | U |
| 490 | Columbia-Montour | 504 | Ranger House and Pole Barn | Camp | JLL | 625,000 | - | - | JLL | 625,000 | U |
| 490 | Columbia-Montour | 504 | Camp Lavigne | Camp | JLL | - | - | - | JLL | - | U |
| 491 | Columbia-Montour | 504 | Council Office | Office/Store | JLL | 252,000 | - | - | JLL | 252,000 | U |
| 492 | Bucktail | 509 | Camp Mountain Run | Camp | CBRE | 704,900 | - | - | CBRE | 704,900 | R |
| 493 | Westmoreland-Fayette | 512 | Scout Service Center | Office/Store | JLL | 390,000 | - | - | JLL | 390,000 | U |
| 494 | Westmoreland-Fayette | 512 | Camp Tenacharison | Camp | CBRE | 574,275 | - | - | CBRE | 574,275 | U |
| 495 | Pennsylvania Dutch | 524 | Bashore Scout Reservation | Camp | JLL | 350,000 | CBRE | 1,233,288 | JLL / CBRE | 791,644 | U |
| 495 | Pennsylvania Dutch | 524 | Bashore Scout Reservation | Camp | JLL | - | - | - | JLL | - | R |
| 495 | Pennsylvania Dutch | 524 | Bashore Scout Reservation | Camp | JLL | - | - | - | JLL | - | R |
| 495 | Pennsylvania Dutch | 524 | Bashore Scout Reservation | Camp | JLL | - | - | - | JLL | - | R |
| 496 | Pennsylvania Dutch | 524 | J. Edward Mack | Camp | CBRE | 3,592,900 | - | - | CBRE | 3,592,900 | L |
| 497 | Cradle of Liberty | 525 | Seltzer Property | Other | JLL | 750,000 | - | - | JLL | 750,000 | U |
| 498 | Cradle of Liberty | 525 | Firestone Scout Service Center | Office/Store | JLL | 1,560,000 | - | - | JLL | 1,560,000 | L |
| 499 | Cradle of Liberty | 525 | Camp Hart | Camp | CBRE | 1,890,769 | - | - | CBRE | 1,890,769 | L |
| 500 | Cradle of Liberty | 525 | Camp Garrison | Camp | CBRE | 624,952 | - | - | CBRE | 624,952 | L |
| 501 | Cradle of Liberty | 525 | Camp Delmont | Camp | CBRE | 3,978,500 | - | - | CBRE | 3,978,500 | L |
| 502 | Cradle of Liberty | 525 | East Camp | Camp | CBRE | 139,800 | - | - | CBRE | 139,800 | L |
| 503 | Cradle of Liberty | 525 | Resica Falls Scout Reservation | Camp | CBRE | 3,965,794 | - | - | CBRE | 3,965,794 | L |
| 503 | Cradle of Liberty | 525 | Resica Falls Scout Reservation | Camp | CBRE | - | - | - | CBRE | - | L |
| 504 | Laurel Highlands | 527 | Camp Potomac | Camp | JLL | 920,000 | - | - | JLL | 920,000 | U |
| 505 | Laurel Highlands | 527 | Camp Anawanna | Camp | JLL | 1,180,000 | - | - | JLL | 1,180,000 | U |
| 506 | Laurel Highlands | 527 | Camp Guyasuta | Camp | JLL | 9,200,000 | CBRE | 1,882,274 | JLL / CBRE | 5,541,137 | L |
| 507 | Laurel Highlands | 527 | Camp Baker | Camp | CBRE | 311,600 | Council | 640,000 | CBRE / Council | 475,800 | R |
| 508 | Laurel Highlands | 527 | Heritage Reservation | Camp | CBRE | 6,938,508 | - | - | CBRE | 6,938,508 | U |
| 509 | Laurel Highlands | 527 | Flag Plaza | Office/Store | CBRE | 2,097,810 | - | - | CBRE | 2,097,810 | U |
| 510 | Hawk Mountain | 528 | Hawk Mountain Scout Reservation | Camp | CBRE | 2,162,160 | - | - | CBRE | 2,162,160 | U |
| 511 | Hawk Mountain | 528 | Hawk Mountain Council, BSA | Office/Store | CBRE | 524,905 | - | - | CBRE | 524,905 | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | CBRE | 906,604 | - | - | CBRE | 906,604 | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | CBRE | - | - | - | CBRE | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | CBRE | - | - | - | CBRE | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | CBRE | - | - | - | CBRE | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | CBRE | - | - | - | CBRE | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | CBRE | - | - | - | CBRE | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | CBRE | - | - | - | CBRE | - | U |
| 513 | French Creek | 532 | Moss Woods - part of Custaloga Town Scout Reservation | Camp | CBRE | 160,000 | - | - | CBRE | 160,000 | R |
| 514 | Susquehanna | 533 | Camp Karoondinha | Camp | CBRE | 735,000 | CBRE | 1,360,800 | JLL / CBRE | 1,047,900 | U |
| 515 | Chief Cornplanter | 538 | Camp Olmsted | Camp | CBRE | 784,000 | - | - | CBRE | 784,000 | U |
| 516 | Chester County | 539 | Program, Activities, and Resource Campus (PARC) | Camp | JLL | 4,940,000 | - | - | JLL | 4,940,000 | U |
| 517 | Chester County | 539 | Horseshoe Scout Reservation (Camp John H. Ware, 3rd ) | Camp | CBRE | 540,120 | - | - | CBRE | 540,120 | L |
| 518 | Chester County | 539 | Horseshoe Scout Reservation (Camp Horseshoe) | Camp | CBRE | 4,075,000 | - | - | CBRE | 4,075,000 | L |
| 519 | New Birth of Freedom | 544 | Mechanicsburg Service Center (KAC Service Center) | Office/Store | JLL | 487,000 | - | - | JLL | 487,000 | U |
| 520 | New Birth of Freedom | 544 | Camp Tuckahoe | Camp | CBRE | 1,573,090 | - | - | CBRE | 1,573,090 | U |
| 521 | New Birth of Freedom | 544 | Hidden Valley Scout Reservation | Camp | CBRE | 1,857,862 | - | - | CBRE | 1,857,862 | U |
| 522 | New Birth of Freedom | 544 | York Service Center (YAC Service Center) | Office/Store | JLL | 610,184 | Council | 830,000 | CBRE / Council | 720,092 | U |
| 523 | Narragansett | 546 | Camp Cachalot | Camp | JLL | 910,000 | - | - | JLL | 910,000 | L |
| 523 | Narragansett | 546 | Camp Cachalot | Camp | JLL | - | - | - | JLL | - | L |
| 523 | Narragansett | 546 | Camp Cachalot | Camp | JLL | - | - | - | JLL | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | 3,996,701 | - | - | CBRE | 3,996,701 | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

EXHIBIT 2

September 21, 2021
($ in actuals)

| | | | Property Information | | Property Value Information [2] | | | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | CBRE | - | L |
| 525 | Palmetto | 549 | Camp Bob Hardin | Camp | CBRE | 877,100 | - | - | CBRE | 877,100 | U |
| 526 | Palmetto | 549 | Glendale Outdoor Leadership School | Other | CBRE | 340,416 | Council | 305,000 | CBRE / Council | 322,708 | U |
| 527 | Blue Ridge | 551 | Blue Ridge Council | Office/Store | JLL | 2,520,000 | - | - | JLL | 2,520,000 | U |
| 528 | Blue Ridge | 551 | Camp Reservation Property | Camp | CBRE | 3,400,763 | - | - | CBRE | 3,400,763 | R |
| 529 | Blue Ridge | 551 | Land Donation | Other | JLL | 15,000 | - | - | JLL | 15,000 | U |
| 530 | Blue Ridge | 551 | Land Donation | Other | JLL | 5,000 | - | - | JLL | 5,000 | U |
| 531 | Pee Dee | 552 | 14 Lots of Wetlands | Other | JLL | 625,000 | - | - | JLL | 625,000 | L |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | 720,000 | CBRE | 1,577,688 | JLL / CBRE | 1,148,844 | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | JLL | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | JLL | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | JLL | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | JLL | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | JLL | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | JLL | - | U |
| 533 | Indian Waters | 553 | Scout Camp and Office | Office/Store | Council | 820,000 | - | - | Council | 820,000 | U |
| 534 | Cherokee | 556 | I75 Donated Property | Other | JLL | 1,180,000 | - | - | JLL | 1,180,000 | U |
| 535 | Cherokee | 556 | Skymont Camp | Camp | CBRE | 1,428,000 | - | - | CBRE | 1,428,000 | U |
| 536 | Great Smoky Mountain | 557 | Camp Pellissipi | Camp | JLL | 565,000 | - | - | JLL | 565,000 | L |
| 537 | Great Smoky Mountain | 557 | Camp Buck Toms | Camp | CBRE | 2,437,500 | - | - | CBRE | 2,437,500 | L |
| 538 | Great Smoky Mountain | 557 | Buzzard's Roost | Camp | JLL | 105,000 | - | - | JLL | 105,000 | L |
| 539 | Chickasaw | 558 | Kia Kima Scout Reservation | Camp | JLL | 1,610,000 | - | - | JLL | 1,610,000 | TBD |
| 540 | West Tennessee Area Council | 559 | Service Center | Office/Store | JLL | 201,000 | - | - | JLL | 201,000 | U |
| 541 | West Tennessee Area Council | 559 | Camp Mack Morris | Camp | JLL | 1,110,000 | CBRE | 1,211,100 | JLL / CBRE | 1,160,550 | U |
| 542 | Middle Tennessee Council, Inc | 560 | Boxwell Scout Reservation | Camp | CBRE | 5,351,500 | - | - | CBRE | 5,351,500 | R |
| 543 | Middle Tennessee Council, Inc | 560 | Jet Potter Scout Service Center | Office/Store | CBRE | 5,469,285 | - | - | CBRE | 5,469,285 | L |
| 544 | Middle Tennessee Council, Inc | 560 | Latimer High Adventure Scout Reservation | Camp | CBRE | 3,540,250 | - | - | CBRE | 3,540,250 | L |
| 545 | Texas Trails Council | 561 | Camp Billy Gibbons | Camp | CBRE | 500,000 | - | - | CBRE | 500,000 | R |
| 546 | Texas Trails Council | 561 | Camp Tonkawa | Camp | CBRE | 683,213 | - | - | CBRE | 683,213 | R |
| 547 | Golden Spread | 562 | Scout Service Center | Office/Store | JLL | 770,000 | CBRE | 1,731,600 | JLL / CBRE | 1,250,800 | U |
| 548 | Golden Spread | 562 | Camp Don Harrington | Camp | CBRE | 1,628,585 | - | - | CBRE | 1,628,585 | R |
| 549 | Golden Spread | 562 | Camp M.K.Brown | Camp | CBRE | 744,000 | - | - | CBRE | 744,000 | U |
| 550 | Capitol Area Council | 564 | Frank Fickett Scout Training and Service Center | Office/Store | CBRE | 8,755,000 | - | - | CBRE | 8,755,000 | L |
| 551 | Capitol Area Council | 564 | Lost Pines Scout Reservation | Camp | CBRE | 6,772,625 | - | - | CBRE | 6,772,625 | R |
| 552 | Capitol Area Council | 564 | Griffith League Ranch | Camp | CBRE | 24,237,500 | - | - | CBRE | 24,237,500 | L |
| 553 | Capitol Area Council | 564 | Camp Alma McHenry | Camp | CBRE | 1,379,290 | - | - | CBRE | 1,379,290 | TBD |
| 554 | Capitol Area Council | 564 | Green Dickson | Camp | CBRE | 1,691,750 | - | - | CBRE | 1,691,750 | R |
| 555 | Capitol Area Council | 564 | Smilin V | Camp | CBRE | 1,956,500 | - | - | CBRE | 1,956,500 | L |
| 556 | Capitol Area Council | 564 | Roy D Rivers | Camp | CBRE | 2,770,320 | - | - | CBRE | 2,770,320 | R |
| 557 | Buffalo Trail | 567 | Midland Scout Service Center | Office/Store | JLL | 595,000 | - | - | JLL | 595,000 | U |
| 558 | Buffalo Trail | 567 | Buffalo Trail Scout Ranch | Camp | CBRE | 4,182,300 | - | - | CBRE | 4,182,300 | U |
| 559 | Buffalo Trail | 567 | Pecos Property | Other | CBRE | 425,000 | - | - | CBRE | 425,000 | L |
| 560 | Circle Ten Council | 571 | Clements Scout Ranch | Camp | CBRE | 10,290,000 | - | - | CBRE | 10,290,000 | R |
| 561 | Circle Ten Council | 571 | Camp Wisdom | Camp | CBRE | 4,498,690 | - | - | CBRE | 4,498,690 | R |
| 562 | Circle Ten Council | 571 | Murchison Scouting Center | Office/Store | CBRE | 9,082,500 | - | - | CBRE | 9,082,500 | U |
| 562 | Circle Ten Council | 571 | STEM van | Other | CBRE | - | - | - | CBRE | - | U |
| 563 | Circle Ten Council | 571 | Bobby Lyle/Billy Gamble Scouting Center | Office/Store | CBRE | 2,483,460 | - | - | CBRE | 2,483,460 | R |
| 564 | Circle Ten Council | 571 | Camp Constantin | Camp | CBRE | 8,865,350 | - | - | CBRE | 8,865,350 | TBD |
| 565 | Bay Area | 574 | Camp Karankawa | Camp | CBRE | 2,715,850 | - | - | CBRE | 2,715,850 | TBD |
| 566 | Sam Houston Area | 576 | Camp Strake | Camp | CBRE | 16,846,542 | - | - | CBRE | 16,846,542 | R |
| 567 | Sam Houston Area | 576 | Cockrell Scout Center | Office/Store | CBRE | 13,650,000 | - | - | CBRE | 13,650,000 | L |
| 568 | Sam Houston Area | 576 | Bovay Scout Ranch | Camp | CBRE | 5,951,004 | - | - | CBRE | 5,951,004 | R |
| 569 | Sam Houston Area | 576 | Camp Brosig | Camp | CBRE | 974,505 | - | - | CBRE | 974,505 | R |
| 570 | Three Rivers | 578 | Dishman Service Center | Office/Store | JLL | 484,000 | - | - | JLL | 484,000 | U |
| 571 | Three Rivers | 578 | Scott Scout Ranch | Camp | CBRE | 1,574,694 | - | - | CBRE | 1,574,694 | U |
| 572 | Alamo Area | 583 | Lake Property | Camp | JLL | 1,950,000 | - | - | JLL | 1,950,000 | U |
| 572 | Alamo Area | 583 | Scoutreach Leadership Development Center | Office/Store | JLL | - | - | - | JLL | - | U |
| 573 | Alamo Area | 583 | Bear Creek Scout Reservation | Camp | CBRE | 10,951,270 | - | - | CBRE | 10,951,270 | L |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

**EXHIBIT 2**

September 21, 2021
($ in actuals)

| | | | | Property Information | | Property Value Information [3] | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 574 | Alamo Area | 583 | McGimsey Scout Park | Camp | CBRE | 24,652,250 | - | - | CBRE | 24,652,250 | R |
| 575 | Alamo Area | 583 | Mays Family Scout Ranch | Camp | CBRE | 809,297 | - | - | CBRE | 809,297 | R |
| 576 | Caddo Area | 584 | Camp Preston Hunt | Camp | CBRE | 663,948 | - | - | CBRE | 663,948 | U |
| 577 | East Texas Area Council | 585 | Land-Camp | Camp | JLL | 1,300,000 | CBRE | 2,029,423 | JLL / CBRE | 1,664,712 | U |
| 577 | East Texas Area Council | 585 | 2005 Chevrolet Silverado | Camp | JLL | - | - | - | JLL | - | U |
| 577 | East Texas Area Council | 585 | 2016 Dump Trailer | Camp | JLL | - | - | - | JLL | - | U |
| 577 | East Texas Area Council | 585 | 2007 Legend Craft flat boat w/ trailer | Camp | JLL | - | - | - | JLL | - | U |
| 577 | East Texas Area Council | 585 | 2006 Glastron ski boat w/ trailer | Camp | JLL | - | - | - | JLL | - | U |
| 577 | East Texas Area Council | 585 | Aquatic Equipment | Camp | JLL | - | - | - | JLL | - | U |
| 577 | East Texas Area Council | 585 | Land Improvements-Camp | Camp | JLL | - | - | - | JLL | - | U |
| 577 | East Texas Area Council | 585 | Camp Buildings | Camp | JLL | - | - | - | JLL | - | U |
| 577 | East Texas Area Council | 585 | Camp Furniture/Fixtures | Camp | JLL | - | - | - | JLL | - | U |
| 578 | Northwest Texas | 587 | Service Center | Office/Store | CBRE | 772,950 | - | - | CBRE | 772,950 | U |
| 579 | Northwest Texas | 587 | Camp Perkins | Camp | CBRE | 1,049,724 | - | - | CBRE | 1,049,724 | R |
| 579 | Northwest Texas | 587 | Camp Perkins - Ikeler | Camp | CBRE | - | - | - | CBRE | - | U |
| 580 | Crossroads of the West Counc | 590 | Fife | Camp | JLL | 985,000 | - | - | JLL | 985,000 | U |
| 581 | Crossroads of the West Counc | 590 | Kiesel/Browning | Camp | JLL | 2,230,000 | - | - | JLL | 2,230,000 | U |
| 582 | Crossroads of the West Counc | 590 | Maple Dell | Camp | JLL | 2,280,000 | - | - | JLL | 2,280,000 | U |
| 583 | Crossroads of the West Counc | 590 | Thunder Ridge | Camp | JLL | 4,430,000 | - | - | JLL | 4,430,000 | R |
| 584 | Crossroads of the West Counc | 590 | Ogden Canyon | Other | JLL | 286,000 | - | - | JLL | 286,000 | U |
| 585 | Crossroads of the West Counc | 590 | Logan Service Center | Office/Store | JLL | 585,000 | - | - | JLL | 585,000 | U |
| 586 | Crossroads of the West Counc | 590 | Meyerhoffer | Other | JLL | 260,000 | - | - | JLL | 260,000 | U |
| 587 | Crossroads of the West Counc | 590 | Tifie | Camp | JLL | 2,880,000 | CBRE | 5,410,990 | JLL / CBRE | 4,145,495 | U |
| 588 | Crossroads of the West Counc | 590 | Ogden Service Center | Office/Store | JLL | 1,130,000 | - | - | JLL | 1,130,000 | U |
| 589 | Crossroads of the West Counc | 590 | Hobble Creek | Other | JLL | 670,000 | - | - | JLL | 670,000 | U |
| 590 | Crossroads of the West Counc | 590 | Bear Lake Aquatics | Camp | CBRE | 2,097,936 | - | - | CBRE | 2,097,936 | R |
| 591 | Crossroads of the West Counc | 590 | Hinckley Scout Ranch & East Fork of the Bear Scout Reservat | Camp | CBRE | 8,687,540 | - | - | CBRE | 8,687,540 | U |
| 592 | Crossroads of the West Counc | 590 | Teton High Adventure Base | Camp | CBRE | 675,150 | - | - | CBRE | 675,150 | U |
| 593 | Crossroads Of The West | 590 | Camp Tracy | Other | CBRE | 1,299,780 | - | - | CBRE | 1,299,780 | U |
| 594 | Crossroads of the West Counc | 590 | Lake Park | Other | CBRE | 2,010,750 | - | - | CBRE | 2,010,750 | U |
| 595 | Crossroads of the West Counc | 590 | Hunt | Camp | Council | 1,000,000 | - | - | Council | 1,000,000 | U |
| 596 | Crossroads of the West Counc | 590 | Schofield | Camp | CBRE | 233,800 | - | - | CBRE | 233,800 | R |
| 597 | Green Mountain | 592 | Barre Town Property | Other | CBRE | 10,925 | - | - | CBRE | 10,925 | U |
| 598 | Green Mountain | 592 | Camp Sunrise | Camp | CBRE | 1,102,350 | - | - | CBRE | 1,102,350 | U |
| 599 | Green Mountain | 592 | Mt Norris Scout Reservation | Camp | CBRE | 1,989,788 | - | - | CBRE | 1,989,788 | L |
| 600 | Green Mountain | 592 | Georgia Property | Other | CBRE | 22,421 | - | - | CBRE | 22,421 | U |
| 601 | Green Mountain | 592 | Middlesex Propety | Other | CBRE | 3,900 | - | - | CBRE | 3,900 | U |
| 602 | Green Mountain | 592 | Townshend Property | Other | CBRE | 11,250 | - | - | CBRE | 11,250 | U |
| 603 | Green Mountain | 592 | Council Service Center | Office/Store | JLL | 499,000 | CBRE | 410,000 | JLL / CBRE | 454,500 | U |
| 604 | Green Mountain | 592 | Bradford Property | Other | JLL | 306,000 | CBRE | 21,150 | JLL / CBRE | 163,575 | U |
| 605 | Tidewater | 596 | Pipsico Scout Reservation | Camp | CBRE | 5,725,000 | - | - | CBRE | 5,725,000 | L |
| 606 | Shenandoah | 598 | Armstrong Scout Service Center | Office/Store | JLL | 735,000 | - | - | JLL | 735,000 | U |
| 607 | Shenandoah Area | 598 | Camp Rock Enon | Camp | CBRE | 2,850,250 | - | - | CBRE | 2,850,250 | U |
| 608 | Blue Ridge Mountains | 599 | New Mexico prop | Other | Council | 18,516 | - | - | Council | 18,516 | U |
| 609 | Blue Ridge Mountains | 599 | Reservation | Camp | CBRE | 16,415,000 | - | - | CBRE | 16,415,000 | L |
| 610 | Blue Ridge Mountains | 599 | Claytor Lake | Camp | CBRE | 4,256,063 | - | - | CBRE | 4,256,063 | L |
| 611 | Heart of Virginia | 602 | Finley Bright Scout Reservation | Camp | CBRE | 5,194,600 | Council | 2,730,000 | CBRE / Council | 3,962,300 | R |
| 612 | Heart of Virginia | 602 | Cub & Webelos Adventure Camp | Camp | CBRE | 468,708 | - | - | CBRE | 468,708 | L |
| 613 | Heart of Virginia | 602 | Camp T. Brady Saunders | Camp | CBRE | 3,877,431 | - | - | CBRE | 3,877,431 | L |
| 614 | Heart of Virginia | 602 | Highwoods Site | Other | Council | 390,000 | - | - | Council | 390,000 | L |
| 615 | Blue Mountain | 604 | Franklin County Property | Other | JLL | 575,000 | - | - | JLL | 575,000 | U |
| 616 | Blue Mountain | 604 | Camp Wallowa | Camp | CBRE | 450,000 | - | - | CBRE | 450,000 | R |
| 617 | Blue Mountain | 604 | Randall and Marie Martin Scout Ranch | Camp | CBRE | 2,384,382 | - | - | CBRE | 2,384,382 | R |
| 618 | Mount Baker | 606 | Everett Service Center | Office/Store | JLL | 2,150,000 | - | - | JLL | 2,150,000 | U |
| 619 | Mount Baker | 606 | Fire Mountain | Camp | CBRE | 1,752,930 | - | - | CBRE | 1,752,930 | L |
| 620 | Chief Seattle | 609 | Service Center | Office/Store | JLL | 8,230,000 | CBRE | 8,359,560 | JLL / CBRE | 8,294,780 | U |
| 621 | Chief Seattle | 609 | Snoqualmie Pass | Other | JLL | 1,360,000 | - | - | JLL | 1,360,000 | U |
| 622 | Chief Seattle | 609 | Camp Parsons | Camp | CBRE | 1,966,302 | - | - | CBRE | 1,966,302 | U |
| 623 | Chief Seattle | 609 | Cascade Scout Reservation | Camp | CBRE | 2,689,103 | - | - | CBRE | 2,689,103 | L |
| 624 | Great Alaska | 610 | Eagle River Scout Camp | Camp | JLL | 324,000 | CBRE | 804,195 | JLL / CBRE | 564,098 | U |
| 625 | Great Alaska | 610 | Camp Carlquist #2 | Camp | Council | 1,050,000 | - | - | Council | 1,050,000 | U |
| 626 | Great Alaska | 610 | Camp Gorsuch | Camp | CBRE | 862,500 | - | - | CBRE | 862,500 | R |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

EXHIBIT 2

September 21, 2021
($ in actuals)

| | | | | | Property Information | | Property Value Information [2] | | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | | Restriction Status: BSA Review |
| 627 | Great Alaska | 610 | Denali High Adventure Scout Base | Camp | CBRE | 701,600 | - | - | CBRE | 701,600 | | L |
| 628 | Inland Northwest Council | 611 | Service Center | Office/Store | JLL | 890,000 | - | - | JLL | 890,000 | | L |
| 629 | Inland Northwest Council | 611 | Camp Easton | Camp | CBRE | 3,244,025 | - | - | CBRE | 3,244,025 | | R |
| 630 | Inland Northwest Council | 611 | Camp Grizzly | Camp | CBRE | 1,540,000 | - | - | CBRE | 1,540,000 | | R |
| 631 | Inland Northwest Council | 611 | Cowles Scout Reservation | Camp | CBRE | 2,699,646 | - | - | CBRE | 2,699,646 | | L |
| 632 | Pacific Harbors | 612 | Camp Thunderbird | Camp | JLL | 2,380,000 | CBRE | 1,385,230 | JLL / CBRE | 1,882,615 | | U |
| 633 | Pacific Harbors | 612 | Camp Delazenne | Camp | CBRE | 124,383 | - | - | CBRE | 124,383 | | R |
| 634 | Pacific Harbors | 612 | Camp Hahobas | Camp | JLL | 575,000 | CBRE | 333,108 | JLL / CBRE | 454,054 | | L |
| 635 | Grand Columbia | 614 | Camp Fife | Camp | CBRE | 1,617,788 | - | - | CBRE | 1,617,788 | | R |
| 636 | Grand Columbia | 614 | Summit Lake | Camp | CBRE | 125,000 | - | - | CBRE | 125,000 | | U |
| 636 | Grand Columbia | 614 | Camp Bonaparte | Camp | CBRE | 97,500 | - | - | CBRE | 97,500 | | U |
| 637 | Grand Columbia | 614 | Scout-Avista | Camp | CBRE | 335,855 | - | - | CBRE | 335,855 | | U |
| 638 | Mountaineer Area | 615 | Service Center | Office/Store | JLL | 111,000 | - | - | JLL | 111,000 | | U |
| 639 | Buckskin | 617 | Camp Kootaga | Camp | CBRE | 511,250 | - | - | CBRE | 511,250 | | R |
| 640 | Ohio River Valley | 619 | Sandcrest Scout Reservation | Camp | JLL | 60,000 | - | - | JLL | 60,000 | | U |
| 641 | Ohio River Valley | 619 | Fort Steuben Scout Reservation | Camp | CBRE | 1,673,848 | - | - | CBRE | 1,673,848 | | U |
| 642 | Glacier's Edge | 620 | Camp Indian Trails | Camp | JLL | 795,000 | - | - | JLL | 795,000 | | U |
| 643 | Gateway Area | 624 | Gamp Decorah | Camp | CBRE | 1,340,403 | - | - | CBRE | 1,340,403 | | U |
| 644 | Samoset | 627 | Camp Phillips | Camp | JLL | 344,000 | - | - | JLL | 344,000 | | U |
| 645 | Samoset | 627 | Camp DuBay | Camp | JLL | 2,630 | - | - | JLL | 2,630 | | U |
| 646 | Samoset | 627 | Crystal Lake Scout Reservation | Camp | JLL | 2,640,000 | - | - | JLL | 2,640,000 | | U |
| 647 | Bay-Lakes | 635 | Scout Center/Office | Office/Store | JLL | 515,000 | CBRE | 630,753 | JLL / CBRE | 572,876 | | L |
| 648 | Bay-Lakes | 635 | Bear Paw Scout Camp | Camp | JLL | 1,020,000 | CBRE | 1,280,000 | JLL / CBRE | 1,150,000 | | U |
| 649 | Bay-Lakes | 635 | Gardner Dam Scout Camp | Camp | CBRE | 762,411 | - | - | CBRE | 762,411 | | R |
| 650 | Bay-Lakes | 635 | Camp Rokilio | Camp | CBRE | 1,128,900 | - | - | CBRE | 1,128,900 | | L |
| 651 | Bay-Lakes | 635 | Strebel Property | Other | CBRE | 129,600 | - | - | CBRE | 129,600 | | U |
| 652 | Three Harbors | 636 | Milwaukee Scout Service Center | Office/Store | JLL | 1,400,000 | CBRE | 2,541,000 | CBRE | 1,970,500 | | R |
| 653 | Three Harbors | 636 | Oh-Da-Ko-Ta | Camp | CBRE | 1,178,520 | - | - | CBRE | 1,178,520 | | R |
| 654 | Three Harbors | 636 | Indian Mound Scout Reservation | Camp | CBRE | 2,019,430 | - | - | CBRE | 2,019,430 | | R |
| 655 | Chippewa Valley | 637 | Camp Brunswick | Camp | JLL | 390,000 | - | - | JLL | 390,000 | | U |
| 656 | Chippewa Valley | 637 | Council Office Building | Office/Store | JLL | 545,000 | - | - | JLL | 545,000 | | U |
| 657 | Chippewa Valley | 637 | I. E. Phillips Scout Reservation | Camp | CBRE | 3,490,536 | - | - | CBRE | 3,490,536 | | U |
| 658 | Greater New York | 640 | Ten Mile River Scout Camps | Camp | Council | 14,050,000 | Keen | 26,250,000 | Council / Keen | 20,150,000 | | U |
| 659 | Greater New York | 640 | Alpine Scout Camp | Camp | Keen | 175,000,000 | - | - | Keen | 175,000,000 | | R |
| 660 | Greater New York | 640 | William H. Pouch Scout Camp | Camp | Council | 3,750,000 | Keen | 27,125,000 | Council / Keen | 15,437,500 | | U |
| 661 | Potawatomi Area | 651 | Camp Long Lake | Camp | JLL | 880,000 | CBRE | 1,146,600 | JLL / CBRE | 1,013,300 | | U |
| 662 | Potawatomi Area | 651 | Council Service Center | Office/Store | JLL | 1,200,000 | - | - | JLL | 1,200,000 | | U |
| 663 | Great Rivers | 653 | Great Rivers Council Service Center | Office/Store | JLL | 420,000 | - | - | JLL | 420,000 | | U |
| 664 | Blackhawk Area | 660 | Camp Lowden | Camp | CBRE | 1,010,000 | - | - | CBRE | 1,010,000 | | L |
| 665 | Blackhawk Area | 660 | Canyon Camp | Camp | CBRE | 1,668,940 | - | - | CBRE | 1,668,940 | | L |
| 666 | Blackhawk Area | 660 | Crystal Lake Sevice Center | Office/Store | JLL | 510,000 | - | - | JLL | 510,000 | | U |
| 667 | Blackhawk Area | 660 | Tumilowicz Center | Office/Store | JLL | 755,000 | - | - | JLL | 755,000 | | L |
| 668 | Blackhawk Area | 660 | Program Center | Other | JLL | 317,000 | - | - | JLL | 317,000 | | U |
| 669 | Puerto Rico | 661 | Camp Guajataka | Camp | CBRE | 913,685 | - | - | CBRE | 913,685 | | R |
| 669 | Puerto Rico | 661 | Camp Guajataka - Buildings | Camp | CBRE | - | - | - | CBRE | - | | R |
| 669 | Puerto Rico | 661 | Camp Guajataka - Basketball Court | Other | CBRE | - | - | - | CBRE | - | | R |
| 669 | Puerto Rico | 661 | Camp Guajataka - Buildings | Other | CBRE | - | - | - | CBRE | - | | R |
| 670 | Heart of Texas d.b.a. Longhorn | 662 | Camp Tahuaya | Camp | JLL | 650,000 | - | - | JLL | 650,000 | | U |
| 670 | Heart of Texas d.b.a. Longhorn | 662 | Camp Tahuaya | Camp | JLL | - | - | - | JLL | - | | U |
| 670 | Heart of Texas d.b.a. Longhorn | 662 | Camp Tahuaya | Camp | JLL | - | - | - | JLL | - | | U |
| 671 | Heart of Texas d.b.a. Longhorn | 662 | Camp Klondike | Camp | CBRE | 69,795 | - | - | CBRE | 69,795 | | R |
| 672 | Suwannee River Area | 664 | Wallwood Boy Scout Reservation | Camp | CBRE | 1,725,000 | - | - | CBRE | 1,725,000 | | L |
| 673 | Garden State | 690 | Rental House - Elmer | Other | JLL | 16,800 | - | - | JLL | 16,800 | | U |
| 674 | Garden State | 690 | Pill Hill Scout Reservation | Camp | JLL | 1,600,000 | CBRE | 820,849 | JLL / CBRE | 1,210,424 | | U |
| 675 | Garden State | 690 | Camp Grice | Camp | CBRE | 205,931 | - | - | CBRE | 205,931 | | L |
| 676 | Garden State | 690 | Rowan Training Center | Office/Store | CBRE | 769,005 | - | - | CBRE | 769,005 | | R |
| 677 | Garden State | 690 | Halgas Scout Reservation | Camp | CBRE | 561,764 | - | - | CBRE | 561,764 | | L |
| 678 | Garden State | 690 | Camp Roosevelt | Camp | CBRE | 731,400 | - | - | CBRE | 731,400 | | L |
| 679 | Garden State | 690 | land | Other | CBRE | 13,878 | - | - | CBRE | 13,878 | | U |
| 680 | Garden State | 690 | Riggins Service Center | Office/Store | CBRE | 438,190 | - | - | CBRE | 438,190 | | L |
| 681 | Garden State | 690 | Pine Tree Education and Environmental Center | Camp | CBRE | 560,282 | - | - | CBRE | 560,282 | | L |
| 682 | Garden State | 690 | Rental House - Vineland | Other | CBRE | 112,500 | - | - | CBRE | 112,500 | | U |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

EXHIBIT 2

September 21, 2021
($ in actuals)

| | | | | Property Information | | Property Value Information [2] | | | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 683 | Garden State | 690 | Rowan Resource Center | Office/Store | CBRE | 592,250 | - | - | CBRE | 592,250 | R |
| 684 | Pushmataha Area | 691 | Camp Seminole | Camp | JLL | 383,000 | - | - | JLL | 383,000 | U |
| 685 | South Plains | 694 | Lott Scout Service Center | Office/Store | JLL | 338,000 | - | - | JLL | 338,000 | U |
| 686 | South Plains | 694 | CW Post Scout Camp | Camp | CBRE | 1,022,558 | - | - | CBRE | 1,022,558 | R |
| 687 | South Plains | 694 | Camp Haynes | Camp | CBRE | 160,000 | - | - | CBRE | 160,000 | R |
| 688 | Black Hills Area | 695 | Medicine Mountain Scout Ranch - Family Camp | Camp | JLL | 330,000 | - | - | JLL | 330,000 | U |
| 689 | Black Hills Area | 695 | Medicine Mountain Scout Ranch | Camp | JLL | 480,000 | - | - | JLL | 480,000 | U |
| 690 | Midnight Sun | 696 | Earl & Pat Cook Service Center | Office/Store | JLL | 340,000 | - | - | JLL | 340,000 | U |
| 691 | Oregon Trail | 697 | Camp Mooney | Camp | CBRE | 735,138 | - | - | CBRE | 735,138 | U |
| 692 | Oregon Trail | 697 | Herb Nill Family & Guaranty Scout Center | Office/Store | CBRE | 1,800,000 | - | - | CBRE | 1,800,000 | U |
| 693 | Oregon Trail | 697 | Camp Murnane | Camp | CBRE | 412,895 | - | - | CBRE | 412,895 | R |
| 694 | Oregon Trail | 697 | Camp Baker | Camp | CBRE | 1,450,175 | - | - | CBRE | 1,450,175 | U |
| 695 | Oregon Trail | 697 | Camp Salholm | Camp | CBRE | 184,664 | - | - | CBRE | 184,664 | U |
| 696 | Oregon Trail | 697 | Camp Kitson | Camp | CBRE | 346,426 | - | - | CBRE | 346,426 | U |
| 697 | Rainbow | 702 | Camp Theakiki | Camp | JLL | 193,000 | - | - | JLL | 193,000 | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Camp | CBRE | 3,197,403 | - | - | CBRE | 3,197,403 | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | - | - | CBRE | - | U |
| 699 | Sequoyah | 713 | Service Center | Office/Store | JLL | 685,000 | CBRE | 876,760 | JLL / CBRE | 780,880 | U |
| 700 | Sequoyah | 713 | Camp Davy Crockett | Camp | CBRE | 3,672,000 | - | - | CBRE | 3,672,000 | U |
| 701 | Sioux | 733 | Camp Iyataka | Camp | JLL | 214,000 | - | - | JLL | 214,000 | U |
| 702 | Sioux | 733 | Center for Scouting Service Center | Office/Store | JLL | 1,620,000 | - | - | JLL | 1,620,000 | U |
| 703 | Sioux | 733 | Lewis and Clark Scout Camp | Camp | CBRE | 777,392 | - | - | CBRE | 777,392 | U |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

EXHIBIT 2

September 21, 2021
($ in actuals)

| | | | | | Property Information | | Property Value Information [2] | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Fair Market Value: Source | Fair Market Value: Adjusted Value | Restriction Status: BSA Review |
| 704 | Sioux | 733 | Newton Hills Scout Camp | Camp | Council | 980,000 | - | - | Council | 980,000 | U |
| 705 | Sioux | 733 | Camp Shetek | Camp | CBRE | 1,270,000 | - | - | CBRE | 1,270,000 | U |
| 706 | Texas Southwest | 741 | Camp Fawcett | Camp | CBRE | 355,573 | - | - | CBRE | 355,573 | R |
| 707 | Texas Southwest | 741 | Camp Sol Mayer and Sol Mayer Ranch | Camp | CBRE | 12,883,579 | - | - | CBRE | 12,883,579 | R |
| 708 | Yocona Area | 748 | Camp Yocona | Camp | JLL | 730,000 | - | - | JLL | 730,000 | U |
| 709 | Virginia Headwaters (formerly | 763 | Camp Shenandoah (Preserve) | Camp | JLL | 3,300,000 | CBRE | 1,732,800 | JLL / CBRE | 2,516,400 | U |
| 709 | Virginia Headwaters (formerly | 763 | Camp Shenandoah (Preserve) | Camp | JLL | - | - | - | JLL | - | U |
| 710 | Gulf Coast | 773 | Spanish Trail Scout Reservation | Camp | JLL | 193,000 | - | - | JLL | 193,000 | U |
| 711 | Gulf Coast | 773 | Scout Service Center | Office/Store | Council | 580,000 | - | - | Council | 580,000 | U |
| 712 | Rio Grande | 775 | Office Property | Other | CBRE | 98,194 | - | - | CBRE | 98,194 | R |
| 712 | Rio Grande | 775 | Scout Office | Office/Store | CBRE | - | - | - | CBRE | - | R |
| 713 | Rio Grande | 775 | Camp Charles F. Perry | Camp | CBRE | 477,225 | - | - | CBRE | 477,225 | R |
| 714 | Washington Crossing | 777 | Ockanickon Scout Reservation | Camp | CBRE | 1,207,656 | - | - | CBRE | 1,207,656 | L |
| 715 | Washington Crossing | 777 | Council Service Center | Office/Store | Council | 900,000 | - | - | Council | 900,000 | R |
| 716 | Michigan Crossroads | 780 | DeVos Center for Scouting | Office/Store | JLL | 4,290,000 | - | - | JLL | 4,290,000 | U |
| 717 | Michigan Crossroads | 780 | Dauch Service Center | Office/Store | JLL | 1,960,000 | CBRE | 4,900,000 | JLL / CBRE | 3,430,000 | U |
| 718 | Michigan Crossroads | 780 | Traverse City Service Center | Office/Store | JLL | 635,000 | - | - | JLL | 635,000 | U |
| 719 | Michigan Crossroads | 780 | Ann Arbor Service Center | Office/Store | JLL | 1,230,000 | - | - | JLL | 1,230,000 | U |
| 720 | Michigan Crossroads | 780 | Auburn Service Center | Office/Store | JLL | 320,000 | CBRE | 1,299,500 | JLL / CBRE | 809,750 | U |
| 721 | Michigan Crossroads | 780 | Cole Canoe Base | Camp | CBRE | 1,929,200 | - | - | CBRE | 1,929,200 | U |
| 722 | Michigan Crossroads | 780 | D-Bar-A Scout Ranch | Camp | CBRE | 5,695,000 | - | - | CBRE | 5,695,000 | U |
| 723 | Michigan Crossroads | 780 | Paul Bunyan Scout Res | Camp | CBRE | 1,376,000 | Council | 1,300,000 | CBRE / Council | 1,338,000 | U |
| 724 | Michigan Crossroads | 780 | Gerber Scout Reservation | Camp | CBRE | 1,824,933 | - | - | CBRE | 1,824,933 | R |
| 725 | Michigan Crossroads | 780 | Lost Lake Scout Res | Camp | Council | 1,100,000 | - | - | Council | 1,100,000 | U |
| 726 | Michigan Crossroads | 780 | Camp Munhacke | Camp | CBRE | 608,160 | Council | 1,275,000 | CBRE / Council | 941,580 | L |
| 727 | Michigan Crossroads | 780 | Camp Teetonkah | Camp | CBRE | 952,560 | - | - | CBRE | 952,560 | U |
| 728 | Michigan Crossroads | 780 | Rota-Kiwan Scout Reservation | Camp | Council | 2,000,000 | - | - | Council | 2,000,000 | U |

| | |
|---|---|
| Unrestricted | 719,844,924 |
| Limitations | 430,299,745 |
| Restricted | 585,708,830 |
| TBD | 55,601,833 |
| Total | $ 1,791,455,332 |

**Footnotes**

[1] The exhibit includes those properties owned by the Local Councils which were valued by JLL , CBRE, Keen Summit, or in limited cases other appraisers retained directly by the individual local councils.

By order and approval of the United States Bankruptcy Court for the District of Delaware, JLL was retained by Boy Scouts of America and CBRE / Keen Summit retained by The Official Committee of Tort Claimants, respectively, to provide opinions of value for certain real property assets owned by certain Local Councils.

To minimize costs, the valuations were completed on a desktop basis and no site inspections were conducted.

These opinions of value are concise and were developed using the best information available at the time of completion. The valuations do not reflect legal restrictions on the sale of the property. In some cases the valuations may reflect certain limitations on the use of the property.

The Debtors' and local councils' work and review of local council properties remains ongoing and subject material change. The Debtors and local councils reserve all rights to update or amend as necessary.

Approximately 895 of 1,183 Local Council properties were valued and are included in the above schedule. Of the remaining 288 unvalued properties, approximately 75 are restricted. Self-reported indications of value from the Local Councils of the remaining 213 unrestricted properties, which are a mix of mainly book and tax assessed amounts, total less than $40 million.

[2] Certain properties are pending sale or may have been sold after the valuation was completed. Nothing herein is an admission that the property is still owned by the Council.

CBRE reported high and low values for properties it valued, the average of which is included herein

[3] Certain properties owned by the local councils are subject to legal or other restrictions which may impact the value of the property and/or the ability to sell the property or use the proceeds of the property to satisfy claims against the local council. Restrictions based on BSA Review reflects the Debtors' good faith effort to review documents provided by the applicable local council and assess the validity and nature of the asserted restriction. Local councils have continued to provide additional documents evidencing potential restrictions since the BSA began its review. The Debtor's review may not be complete and may also not reflect other parties' view of such restrictions. The restriction designations is based on the Debtors' review of the properties and may not reflect the view of the local councils and the local council and additional properties are subject to restriction.

U: Unrestricted - No restriction on the property was asserted or confirmed

L: Limitations - Documents support existence of use limitations or sale limitations such as conservation easements which may impact the value of the property. In some cases, such limitations may reduce the marketable value to zero; in other cases, such limitations may have a minimal impact on value

R: Restricted - Assertion of or documents supporting legal restrictions including donor restrictions to the sale of property and/or requiring the reversion of property or proceeds to an unrelated party.

TBD: Assertion of restriction remains subject to review and/or additional documentation

**<u>EXHIBIT E</u>**

**FINANCIAL PROJECTIONS ANALYSIS**

**Boy Scouts of America**

**Exhibit E**

**Financial Projections[1]**

## Overview / Basis of Projections

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code (*see* Article IX of the Disclosure Statement), as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors under the Plan. In connection with the development of the Plan and to determine whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors prepared consolidated condensed financial projections herein (the "Financial Projections") based on, among other things, the projected results of operations, financial position, free cash flow and balance sheet of the Debtors and the Related Non-Debtor Entities. With the assistance of the Debtors' advisors, the Debtors' management team developed and refined the business plan and prepared consolidated financial projections for the fiscal years ending December 31, 2021 through December 31, 2025.

Although the Financial Projections represent the Debtors' commercially reasonable estimates and good faith judgment (for which the Debtors' management team believes it has a reasonable basis) of the results of future operations, financial position, and cash flows of the Debtors, the Financial Projections are only estimates and actual results may vary considerably from the Financial Projections. Consequently, the Financial Projections should not be regarded as a representation by the Debtors, the Debtors' advisors or any other person that the projected results of operations, financial position, or free cash flow of the Debtors will be achieved. The Financial Projections are based on forecasts that may be significantly impacted by, among other factors, the prolonged impact of COVID-19, changes in demand for the Debtors' programming, member and youth preferences, and changes in terms with material suppliers and vendors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material operational, economic, and other uncertainties.

The Financial Projections have been prepared by management, with the assistance of their advisors, using accounting policies that are generally consistent with those applied in the Debtors' historical financial statements. The Financial Projections were not, however, prepared with a view toward compliance with guidelines established by the American Institute of Certified Public Accountants, or the Financial Accounting Standards Board. The Financial Projections have not been examined or compiled by independent accountants.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

The Financial Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below, as well as the assumptions, qualifications and explanations set forth in the Disclosure Statement. *See* Article X of the Disclosure Statement – Risk Factors.

THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, MAINTAINING GOOD EMPLOYEE, MEMBER, AND DONOR RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENT BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, ORGANIZATIONAL-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE X OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS"), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT OPERATIONAL, ECONOMIC, REGULATORY AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL AND WILL BE BEYOND REORGANIZED BSA'S CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THE REORGANIZED BSA'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INACCURATE. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED BSA, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL

PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

> **THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN ARE NOT LIKELY TO BE FOLLOWED BY THE LIQUIDATION OR FURTHER REORGANIZATION OF REORGANIZED BSA OR ITS SUCCESSORS.  ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PLAN SATISFIES THE FEASIBILITY REQUIREMENT OF SECTION 1129(A)(11) OF THE BANKRUPTCY CODE.**

## Accounting Policies

The Financial Projections have been prepared using accounting policies that are consistent with those applied in the Debtors' historical financial statements.

Upon emergence from chapter 11, Reorganized BSA will implement "fresh start" reporting pursuant to Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," as codified in Accounting Standards Codification ("ASC") Topic 852, "Reorganization."  The main principles of fresh start reporting require that the value of the emerging entity be allocated to all of the entity's assets in conformity with the procedures specified by Statement of Financial Accounting Standards ("SFAS") No. 141R, "Business Combinations," as codified in ASC Topic 805, "Business Combinations," and any portion of the value that cannot be attributed to specific tangible or identifiable intangible assets of the emerging entity is required to be reported as goodwill.

## Assumptions and Methodologies to the Financial Projections

### General Assumptions

The Financial Projections were developed on a consolidated basis for the Debtors and the Related Non-Debtor Entities and take into account the assumptions noted below, as well as the current environment in which the Debtors operate, including many economic and financial forces that are beyond the control of the Debtors.  The Debtors are a not-for-profit entity providing outdoor-focused youth programming in the United States, its territories and certain locations outside of the United States, both directly at four high adventure facilities owned or operated by the BSA and indirectly through approximately 251 Local Councils which collectively charter more than 50,000 Cub Scout, Scouts BSA and affiliated programs units.  Economic growth or slowdowns on a national or regional basis, including continuing impacts from COVID-19, may

3

impact the Debtors' and Reorganized BSA's revenues and expenses.  In addition, general trends and changes within the market for youth programming and the ability of the BSA and the Local Councils to raise donations to support their programming may impact performance.

- **Plan and Effective Date:** The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated on or about December 31, 2021, and that Reorganized BSA will continue to conduct operations substantially similar to their businesses currently.

- **Forecast Period:** The Debtors prepared the Financial Projections based on, among other things, the anticipated future financial condition and results of operations of Reorganized BSA and the terms of the Plan.  The Debtors prepared consolidated Financial Projections of the Boy Scouts of America for the years ending December 31, 2021, through December 31, 2025.

- **Foundation Loan:** The Financial Projections assume the Debtors receive proceeds from a second-lien term loan made on the Effective Date by the Foundation in the amount of $42.8 million (the "Foundation Loan").  The Foundation Loan will provide for equal quarterly amortization over the 10-year period following the Effective Date with an annual interest rate of 6.5%.

- **BSA Settlement Trust Contribution:** The Financial Projections assume the Debtors contribute to the Settlement Trust on the Effective Date all of the Unrestricted Cash and Investments as of the Effective Date, after Reorganized BSA has received the proceeds of the Foundation Loan, less (i) $39,000,000, which shall be funded first from the proceeds of the Foundation Loan, (ii) an amount of Cash equal to the JPM Exit Fee, (iii) an amount of Cash sufficient to fund all unpaid Allowed Administrative Expense Claims, including the Allowed Hartford Administrative Expense Claim, (iv) without duplication, an amount of Cash sufficient to fund the Professional Fee Reserve, (v) an amount of Cash equal to the Creditor Representative Fee Cap,  (vi) the amount of Cash estimated to be required to satisfy Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Claims, and Allowed Convenience Claims, and (vii) an amount of Cash sufficient to fund all accrued but unpaid interest and reasonable fees and expenses of JPM as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Additionally, the Financial Projections assume the Debtors contribute to the Settlement Trust on the Effective Date the net proceeds from the sale of the Scouting University building and all of the BSA's right, title and interest in and to (a) the Artwork, (b) the Oil and Gas Interests, and (c) the Warehouse and Distribution Center, subject to the Leaseback Requirement, or the proceeds of a third-party sale-leaseback of the Warehouse and Distribution Center for fair market value.

- **Proposed Resolution of Restricted and Core Asset Disputes:**  The Plan includes a proposed resolution of all disputes regarding the Debtors' designation of assets as "restricted" or "core," including the claims asserted in the complaint filed by the Tort Claimants' Committee in the adversary proceeding entitled *Official Tort Claimants' Committee of Boy Scouts of America and Delaware BSA, LLC v. Boy Scouts of America*

4

*and Delaware BSA, LLC*, Adv. Pro. No. 21-50032 (LSS) by the BSA reallocating $50 million of restricted investments to fund operations, thereby allowing the BSA to make the corresponding increased contribution to the Settlement Trust, reflected in the BSA Settlement Trust Contribution above.  The Financial Projections assume these investments are released  in equal monthly amounts from January 1, 2022 to April 30, 2023, but timing of release and use of funds is subject to their applicable restrictions.

- **BSA Settlement Trust Note:**  A second-lien secured promissory note is assumed to be issued by the Reorganized BSA to the Settlement Trust on the Effective Date with a principal amount of $80,000,000. The note will bear interest at a rate of 5.5% per annum, payable semi-annually, subject to a payment-in-kind election for the eighteen (18) months immediately following the Effective Date. Principal under the BSA Settlement Trust Note shall be payable in annual installments due on February 15 of each year during the term of the BSA Settlement Trust Note, commencing on February 15 of the second year following the Effective Date.  Such annual principal payments shall be equal to the sum of the following calculation: (a) $4,500,000; plus (b) $3.50 multiplied by the aggregate number of Youth Members as of December 31 of the preceding year up to the forecasted number of Youth Members for such year as set forth in the Debtors' Financial Projections; plus (c) $50 multiplied by the aggregate number High Adventure Base Participants during the preceding calendar year; plus (d) $50 multiplied by the aggregate number of Youth Members in excess of the forecasted number of Youth Members for such year, excluding the portion of the excess that is comprised of members under the ScoutReach program, as set forth in the Debtors' Financial Projections; plus (e) $150 multiplied by the aggregate High Adventure Base Participants, excluding those attending events with a registration fee of less than $300 (e.g., for non-typical High Adventure Base activities), in excess of the forecasted number of High Adventure Base Participants for such year as set forth in the Debtors' Financial Projections, if applicable.  Refer to the table in the Projected Consolidated Unrestricted Income Statement section for forecasted Youth Members and High Adventure Base Participants.

- **Core Value Cash Pool:** The Financial Projections assume that holders of Allowed General Unsecured Claims will be paid a total of $25 million in four equal semi-annual installments over the 24-month period following the Effective Date; a liability has therefore been established on Reorganized BSA's balance sheet for such obligation.  The Financial Projections also assume amortization under the Restated Debt Documents will not be payable until 24 months after the Effective Date.

## Projected Income Statement

Operating Surplus / (Deficit) After Restriction Release is not a measure of financial performance under GAAP, and is not intended to represent cash flow from operations under GAAP.  However, Operating Surplus is utilized as a measure of operations and the Debtors' ability to meet indebtedness service requirements.  The Projected Consolidated Statements of Operations do not reflect potential impacts from fresh start accounting.  Certain restructuring expenses related

to financing may be capitalized and amortized over time; however, are reflected herein as expensed when incurred.

### Revenue Assumptions

a. <u>Membership Levels</u> – Membership levels are assumed to decrease in 2021 by 13%, primarily due to the impact of COVID-19 on programing, but are forecasted to stabilize between 2023 to 2024 and achieve modest growth in 2024 and 2025 driven by the following factors:
  - Adjustments to programming and operations to account for reduced membership, including the departure of Scouts affiliated with the Church of Jesus Christ of Latter-day Saints.
  - Channeling all Abuse Claims to the Settlement Trust, which will remove a significant impediment to the Debtors' continued operational success.
  - Broadening program access for girls and young women, thus potentially doubling total potential participants in Cubs Scouts and Scouts BSA age groups.
  - Reimaging public relations campaign to bolster positive visibility and move the organization past bankruptcy, which can generate new interest in Scouting and generate increased donations.
  - Improving the organization's online registration system.
  - Improving the rechartering system for Local Councils and Chartered Organizations.
  - Expanding delivery methods that make it easier for individuals who might not have access to a local Scouting unit to participate through lone Cub Scouting and increasing these Scouts' virtual experience.
  - Gradual restoration of Local Council resources / refocus on membership growth.

b. <u>Registration Fees</u> – Consist of membership fees and joining fees for youth members and adult volunteers.  Assumes marginal annual fee increases for traditional youth members from 2021-2025, roughly corresponding to an inflationary rate.

c. <u>Supply Operations</u> – Consist of retail and wholesale sales of apparel, badges, equipment, and other merchandise sold at Scout Shops, online, and to Local Councils and third parties.  Assumes COVID-19 impacts are largely diminished by the summer of 2021 and the traditionally high sales season in the fall is not anticipated to be significantly impacted.  Assumes annual price increases from 2021-2025 to offset inflation and sales volume fluctuates with membership.

d. <u>High Adventure Facilities ("HAF")</u> – Consist of registration fees to attend the facilities, trading post sales, and other revenues.  Assumes the BSA retains all four HAFs and all HAFs return to normal operations for the summer of 2021.  Assumes modest annual price increases for 2021-2025.  Attendance is assumed to be slightly reduced in 2023 due to the assumption that the National Jamboree (as described below) is held, but is anticipated to stabilize in 2024 and beyond.

e.  <u>National Jamboree</u> – Consist of fees from Scouts and volunteers for a large-scale Scout event typically held every four years.  Assumes events to be held in 2023 and 2026, with revenue largely recorded in such years.

f.  <u>Other Revenues</u> – Consist of service fees paid from Local Councils, other event fees, unrestricted contributions, unit charter fees, and other miscellaneous revenues.  Other revenues are largely consistent with preliminary 2020 results.  Oil and gas royalties cease as the Effective Date as the underlying rights are contributed to the Settlement Trust on the Effective Date.

**Expense Assumptions**

a.  <u>Payroll & Benefits</u> – Expenses forecasted to decline in 2021 driven by annualizing the impact of headcount reductions implemented in 2020, slightly offset by an increase in the retirement policy for defined benefit pension and 403(b) funding from 7.75% to 12% of eligible wages.  Assumes 2.5% annual wage increases and 3.5% annual benefits inflation from 2021-2025.

Note that the BSA provides certain benefits to Local Council employees at cost and also collects contributions to the defined benefit pension plan on the same percentage of wages.  These amounts are not reflected in the projections as they are as passed through.  The contributions to the defined benefit pension plan from the retirement policy by both the BSA and the Local Councils are expected to be sufficient to avoid any other contributions to the plan during the forecast period.  Pursuant to the Plan, the Restoration Plan, a non-qualified retirement plan, is terminated and therefore there is no ongoing expense.  The Financial Projections include approximately $5 million contributed into the pension plan on behalf of the BSA each year. Depending on performance of the pension plan, the BSA may not be required to make this entire contribution to the pension. If lower pension contributions are made, cash would increase from what is currently projected.

b.  <u>Supply Operating Expenses</u> – Assumes 2.5% annual wage increases for full-time employees from 2021-2025.  Assumes cost of goods sold, part-time wages and other operating costs are largely variable based on sales volume.  Assumes the National Distribution Center is contributed to the Settlement Trust on the Effective Date, and space is leased-back to the BSA.

c.  <u>High Adventure Facilities Expenses</u> – Assumes 2.5% annual wage increases for full-time employees from 2021-2025.  Assumes seasonal employees and some operating costs are variable based on revenue and scout attendance.

d.  <u>GLIP Expenses</u> – Predominately consist of insurance premiums and 2021 estimates reflect the current assessment of the insurance renewal process, which are slightly reduced from 2020 amounts.  Insurance premiums are assumed to increase 4% annually from 2022-2025.  Assumes no changes in the current insurance programs.  Expenses also include some legal and administrative fees, which are assumed to remain stable throughout the projection period.

e. <u>Other Expenses</u> – Consist of external services, operating, information technology, travel, marketing, facilities, non-GLIP insurance, National Jamboree-related, and other expenses. 2021 is assumed to be relatively stable to 2020 with additional cost cuts offsetting areas of higher post-COVID activity.  National Jamboree expenses are expected to drive 2023 expense increases.

**Free Cash Flow Assumptions**

a. <u>Debt Service</u> – Assumes the Prepetition Obligations, owed to JPM, are amended and restated on the Effective Date on terms that are substantially the same as the terms of the Prepetition Debt Documents, except that (i) the obligations under the Restated Debt Documents will be secured by a blanket lien on all of the BSA's assets; (ii) the maturity dates under the Restated Debt Documents are extended ten years after the Effective Date; (iii) there is a 24-month amortization holiday under the Restated Debt Documents, with deferred amortization amounts to be paid at maturity; (iv) the revolving credit facility provided under the 2019 RCF Documents will be frozen and converted to a term loan; and the Restated Debt Documents will provide for the Excess Cash Sweep (as discussed below).  As the financial statements are presented on a consolidated basis, the Foundation Loan is an intercompany payable from the BSA to the Foundation and thus eliminated on the balance sheet, such amortization and interest is shown as debt service for illustrative purposes.

b. <u>BSA Settlement Trust Note Debt Service</u> – Assumes a note with a principal amount of $80 million is issued to the Settlement Trust on the Effective Date with an annual interest rate of 5.5%, payable semi-annually, which is assumed to be paid-in-kind through June 30, 2023, Annual principal amounts, including a fixed $4.5 million and variable amounts as described above, commence for the fiscal year 2022 and are payable on February 15th of each year, with the first such payment being due and payable on February 15  of the second year following the Effective Date.  For simplicity, the Financial Projections reflect these amounts as if they were paid on December 31 of the applicable year.

c. <u>Capital Expenditures</u> – Reflect estimate for capital projects for the High Adventure Facilities, IT systems, and Supply operations.  Assumes roughly stable spending over the forecast period.

d. <u>Other Working Capital Changes</u> – Changes in working capital reflect usage of inventory in relation to Supply sales, changes to unearned income related to estimated HAF attendance, increases in insurance premium prepaid amounts, and timing of payments for the National Jamboree.

e. <u>Excess Cash Sweep</u> – The Financial Projections assume that 25% of the Excess Cash and Investments in excess of $75 million after accounting for principal due under the BSA Settlement Trust Note on the following February 15th, if any, will be applied pro rata by facility to outstanding JPM debt principal balances under the Restated Debt Documents on December 31, 2023, December 31, 2024, and December 31, 2025.  Such principal

payments are additional to the regularly scheduled amortization payments and will reduce the balloon principal amounts due at maturity.  There are no Excess Cash Sweep payments forecasted through 2025.


## Projected Consolidated Unrestricted Income Statement

| ($ in millions) | Actual | Preliminary | Financial Projections | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| Year | 2019 [1] | 2020 [1] | 2021 | 2022 | 2023 | 2024 | 2025 | 2021 - 2025 |
| Year-end Estimated Youth Members | 2,118,449 | 1,199,425 | 1,050,200 | 994,403 | 977,733 | 983,773 | 1,010,898 | |
| *Scoutreach Members in Above* | | | 95,000 | 93,100 | 93,100 | 94,031 | 94,971 | |
| Year-end Estimated HAF Attendees | 50,816 | 13,211 | 58,696 | 52,500 | 49,800 | 54,350 | 55,150 | |
| *High Adventure Base Participants in Above* | | | 54,696 | 47,000 | 43,800 | 47,850 | 47,650 | |
| *Other HAF Participants in Above [2]* | | | 4,000 | 5,500 | 6,000 | 6,500 | 7,500 | |
| **Revenues** | | | | | | | | |
| Registration Fees | $    65 | $    88 | $    74 | $    74 | $    75 | $    79 | $    83 | $    385 |
| Supply Operations (Gross) | 119 | 51 | 83 | 80 | 80 | 82 | 87 | 412 |
| High Adventure Facilities (Gross) | 58 | 15 | 63 | 60 | 61 | 71 | 73 | 328 |
| National Jamboree Fees | - | - | - | 4 | 16 | - | 4 | 24 |
| Other Revenues [3] | 181 | 33 | 32 | 39 | 39 | 40 | 41 | 191 |
| **Total Revenues** | 423 | 187 | 252 | 257 | 271 | 272 | 288 | 1,340 |
| **Operating Expenses** | | | | | | | | |
| Payroll and Benefits (Excluding Supply & HAF) [4] | 68 | 56 | 42 | 44 | 45 | 46 | 47 | 225 |
| Supply Operating Expenses [4] | 99 | 57 | 69 | 68 | 68 | 70 | 72 | 347 |
| High Adventure Facilities Operating Expenses [4] | 47 | 30 | 50 | 48 | 48 | 51 | 51 | 247 |
| GLIP Expenses (Gross) [5] | 112 | 39 | 41 | 42 | 43 | 45 | 46 | 217 |
| Other Expenses [3] | 185 | 36 | 29 | 33 | 49 | 31 | 35 | 178 |
| **Total Expenses** | 511 | 218 | 231 | 235 | 243 | 243 | 252 | 1,214 |
| **Operating Surplus / (Deficit)** | $    (89) | $    (31) | $    21 | $    22 | $    18 | $    29 | $    36 | $    126 |
| (before Debt Service, Capex, Depreciation and Restructuring) | | | | | | | | |
| Net Assets Released from Restrictions | 12 | 8 | 8 | 41 | 16 | 4 | 4 | 73 |
| **Operating Surplus / (Deficit) After Restriction Release** | $    (77) | $    (23) | $    29 | $    63 | $    34 | $    33 | $    40 | $    199 |
| **Cash Flow Items** | | | | | | | | |
| Debt Service - Interest [6] | (7) | (7) | (7) | (10) | (10) | (10) | (9) | (46) |
| Debt Service - Principal [6] | (11) | (2) | - | (4) | (4) | (18) | (19) | (46) |
| Debt Service - BSA Settlement Trust Note - Interest [7] | - | - | - | - | (2) | (4) | (3) | (9) |
| Debt Service - BSA Settlement Trust Note - Principal [7] | - | - | - | (10) | (10) | (10) | (10) | (42) |
| Excess Cash Sweep [8] | - | - | - | - | - | - | - | - |
| Capital Expenditures (Non-Summit) | (16) | (5) | (4) | (4) | (4) | (4) | (4) | (21) |
| Other Working Capital Changes | 52 | 57 | 16 | (2) | 0 | 1 | 3 | 17 |
| **Cash Flow Items** | 18 | 43 | 4 | (32) | (31) | (46) | (42) | (146) |
| **Estimated Unrestricted Free Cash Flow** | $    (59) | $    20 | $    33 | $    32 | $    3 | $    (13) | $    (3) | $    53 |
| (before Depreciation, Restructuring, Creditor Settlements / Contributions) | | | | | | | | |
| Core Value Cash Pool Payments [9] | | | - | (13) | (13) | - | - | (25) |
| **Estimated Unrestricted Cash Flow** | | | $    33 | $    19 | $    (9) | $    (13) | $    (3) | $    28 |
| (before Depreciation, Restructuring, Effective Date Creditor Contributions) | | | | | | | | |

Footnotes:

(1). 2019 results are unaudited and 2020 results are preliminary and unaudited

(2) Primarily consists of non-traditional HAF activities that include adult attendees, such as attendees at the Philmont Training Center and family camp programs. Figures do not include attendees for third party events or National Jamborees

(3) 2019 Other Revenue and Other Expenses are increased due to the World Scout Jamboree, which was a one-time large event

(4) Payroll and benefits represent G&A/corporate expenses. Payroll related to High Adventure Facilities ("HAF") and Supply is captured in HAF and Supply operating expenses

(5) Excludes $10 million of expenses recorded to the GLIP program in both 2020 and 2021 related to letter of credit draws and conversion to funded debt. Such expenses are treated as restructuring-related herein

(6) Includes quarterly principal and interest for the JPM funded debt and Foundation Loan

(7) Assumes paid-in-kind election made for first 18 months

(8) Reflects 25% of estimated unrestricted cash and investments above $75 million as of December 31, if any, to be applied to JPMs principal balances beginning in 2023

(9) Reflects semi-annual payments to holders of Allowed General Unsecured Claims beginning six months after the Effective Date

## Projected Pro Forma Consolidated Balance Sheet – December 31, 2021

| ($ in millions) | Pre-Emergence 12/31/2021 | | Reorganization Adjustments | | | Post-Emergence 12/31/2021 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and Cash Equivalents | | | | | | |
| Cash and cash equivalents - Unrestricted | $ | 105 | $ | (83) | (a.) | $ | 22 |
| GAAP Restricted Cash - LC Cash Collateral | | 63 | | (63) | (b.) | | - |
| Donor Restricted Cash | | 22 | | - | | | 22 |
| Total cash and cash equivalents | | 191 | | (146) | | | 45 |
| Investments, at fair value | | | | | | |
| Investments - Unrestricted | | 17 | | - | | | 17 |
| Investments - Donor Restricted | | 179 | | (43) | (c.) | | 136 |
| Total Investments, at fair value | | 196 | | (43) | | | 153 |
| Accounts receivable | | 12 | | - | | | 12 |
| Pledges receivable | | 17 | | - | | | 17 |
| Other receivables | | 1 | | - | | | 1 |
| Gift annuities | | 6 | | - | | | 6 |
| Prepaid expenses | | 15 | | - | | | 15 |
| Inventories | | 46 | | - | | | 46 |
| Land, buildings, and equipment, net | | 465 | | (3) | (d.) | | 462 |
| Other | | 12 | | - | | | 12 |
| **Total Assets, excluding Non-Controlling Interests** | **$** | **960** | **$** | **(192)** | | **$** | **768** |
| **Liabilities** | | | | | | |
| Accounts payable and accrued liabilities | $ | 95 | $ | (65) | (e.) | $ | 30 |
| Core Value Claims Payable | | - | | 25 | (f.) | | 25 |
| Gift annuities | | 6 | | - | | | 6 |
| Unearned fees and subscriptions | | 51 | | - | | | 51 |
| Notes payable including line of credit | | | | | | |
| Secured funded debt | | 242 | | 19 | (g.) | | 261 |
| BSA Settlement Trust Note | | - | | 80 | (h.) | | 80 |
| Total Notes payable including line of credit | | 242 | | 99 | | | 341 |
| Insurance reserves | | 239 | | (232) | (i.) | | 7 |
| **Total liabilities** | **$** | **633** | **$** | **(174)** | **(j.)** | **$** | **458** |
| **Net Assets** | | | | | | |
| Unrestricted Net Assets - controlling interest | $ | 116 | $ | 25 | | $ | 141 |
| Restricted Net Assets - controlling interest | | 212 | | (43) | | | 169 |
| **Total Net Assets, excluding Non-Controlling Interests** | **$** | **327** | **$** | **(17)** | **(k.)** | **$** | **310** |
| **Total Net Assets and Liabilities, excluding Non-Controlling Interests** | **$** | **960** | **$** | **(192)** | | **$** | **768** |
| Estimated Unrestricted Liquidity | $ | 122 | $ | (83) | | $ | 39 |

## Notes to Projected Pro Forma Balance Sheet

The pro forma balance sheet adjustments contained herein account for (i) the reorganization and related adjustments pursuant to the Plan and (ii) the estimated impact from the implementation of fresh start accounting pursuant to ASC Topic 852, "Reorganization."

The Debtors have not yet completed their fresh start reporting analysis. The Financial Projections have limited fresh start accounting adjustments and the values ultimately used by the

Debtors in implementing fresh start reporting may differ from this estimate.  Likewise, the Debtors' allocation of values to individual assets and liabilities is based upon preliminary estimates that are subject to change upon the formal implementation of fresh start reporting and could result in material differences to the allocated values included in these Financial Projections.  For purposes of estimating the impact of fresh start accounting, the Debtors' have assumed that the book value of all of their assets are adjusted to fair market value.  Also contained herein is Exhibit 1: Retained Property List.

a.  <u>Exit Costs / Cash Contributions</u> – The net change in unrestricted cash of $(83) million is comprised of the following components:

- <u>Professional Fee Reserve</u> – Restructuring professional fees outstanding as of the Effective Date, which is estimated to be approximately $60 million are reserved and not part of Reorganized BSA's assets. This amount includes approximately $15 million in Coalition Restructuring Expenses.

- <u>Proceeds of the Foundation Loan</u> – The Foundation is assumed to issue a $42.8 million loan to Reorganized BSA on the Effective Date, which is to be transferred from the Foundation's restricted investments.

- <u>Administrative Expense Claims Reserve</u> – Administrative claims, estimated as approximately $450,000, are assumed to be paid on the Effective Date.

- <u>Creditor Representative Fee Cap</u> – Reorganized BSA will reserve on the Effective Date $100,000, which is the maximum amount of reasonable fees and actual and necessary costs and expenses payable by Reorganized BSA to the Creditor Representative.

- <u>Allowed Priority Tax Claims</u> – Priority tax claims, estimated as less than $100,000 are assumed to be paid on the Effective Date.

- <u>Allowed Other Priority Claims</u> – Other priority claims, estimated as less than $100,000 are assumed to be paid on the Effective Date.

- <u>Allowed Convenience Claims</u> – Convenience claims, estimated as approximately $2.6 million, are assumed to be paid on the Effective Date.

- <u>JPM Exit Fee</u> – The facility exit fee is assumed to be approximately $1.3 million and to be paid on the Effective Date.

- <u>Accrued and Unpaid JPM Interest</u> – Estimated unpaid interest of approximately $700,000 is assumed to be paid on the Effective Date.

- <u>Allowed Hartford Administrative Expense Claim</u> – Estimated to be approximately $2 million.

- <u>Trust Contributions</u> – The Financial Projections assume that the Net Unrestricted Cash and Investments which are estimated at approximately $59 million, will be contributed to the Settlement Trust.

b.  <u>Cash Collateral</u> – Assumes substantially all letters of credit are drawn on the Effective Date and are converted to funded debt.  Approximately $63 million cash collateral is assumed to be used to partially reimburse JPM for such draws.

c.  <u>Restricted Investments</u> – Reflects, from a consolidated BSA perspective, the transfer of cash from the Foundation's restricted investments as loaned to Reorganized BSA.

11

d.  <u>Land, Buildings and Equipment</u> – The Scouting University building and the Warehouse and Distribution Center are assumed to be contributed to the Settlement Trust as of the Effective Date.  No changes assumed in remaining values or depreciation expense pending fresh start accounting.

e.  <u>Accounts Payable</u> – Assumes outstanding restructuring professional fees, inclusive of Coalition professional fees, (estimated to be approximately $60 million) are reserved on the Effective Date.  Additionally, accrued and unpaid JPM interest and fees of approximately $700,000 are assumed to be paid on the Effective Date.  All prepetition trade liabilities, which are estimated to be approximately $5 million, will be settled in accordance with the terms of the Plan.  Note that the other General Unsecured Claims comprised of Restoration Plan Claims and Deferred Compensation claims were not recorded on the Debtor's pre-emergence balance sheet and thus no reduction for the resolution of those claims is reflected.

f.  <u>Core Value Claims Payable</u> – Reflects the establishment of a new $25 million liability for the Core Value Cash Pool to be paid to Allowed General Unsecured Claims over 2 years.

g.  <u>First Lien Debt</u> – The Plan contemplates a restructured capital structure for the Debtors consisting of (a) $40 million of 2010 Notes, (b) $146 million of 2012 Notes, (c) a $64 Revolving Credit Facility, (d) an $11 million Term Loan, and (e) $5 million of undrawn letters of credit, which are off balance sheet.  Assumes approximately $81 million of letters of credit are drawn on the Effective Date and converted to secured funded debt, which are partially reimbursed by the $63 million of cash collateral outstanding.  Note that while the Foundation Loan is to be issued on the Effective Date, it is treated as an intercompany loan and not funded debt.

h.  <u>BSA Settlement Trust Note</u> – Assumes a new $80 million promissory note is issued to the Settlement Trust on the Effective Date.

i.  <u>Insurance Reserves</u> – Prepetition liability amounts are assumed to be eliminated on the Effective Date as Abuse Claims will be channeled to the Settlement Trust and Non-Abuse Litigation Claims will recover from available Insurance Coverage.  Post-emergence amounts relates to non-general liability insurance.

j.  The defined benefit Pension Plan assets and liabilities are not reflected on the balance sheet.

k.  Represents the net accounting loss from completion of the reorganization, primarily due to Settlement Trust contributions and the issuance of the BSA Settlement Trust Note.

## Projected Consolidated Balance Sheet [1]

| ($ in millions) | Actual [1][2] | Preliminary [1][2] | Financial Projections [1][3] | | | | |
|---|---|---|---|---|---|---|---|
| Year Ending | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| **Assets** | | | | | | | |
| _Cash and Cash Equivalents_ | | | | | | | |
| Cash and cash equivalents - Unrestricted | $ 94 | $ 55 | $ 22 | $ 37 | $ 27 | $ 14 | $ 12 |
| GAAP Restricted Cash - LC Cash Collateral | 63 | 63 | - | - | - | - | - |
| Donor Restricted Cash | 42 | 33 | 22 | 22 | 22 | 22 | 22 |
| Total cash and cash equivalents | 199 | 151 | 45 | 59 | 50 | 37 | 34 |
| _Investments, at fair value_ | | | | | | | |
| Investments - Unrestricted | 130 | 132 | 17 | 17 | 17 | 17 | 17 |
| Investments - Donor Restricted | 148 | 167 | 136 | 110 | 109 | 119 | 130 |
| Total Investments, at fair value | 277 | 299 | 153 | 127 | 126 | 136 | 147 |
| Accounts receivable | 22 | 10 | 12 | 12 | 12 | 12 | 12 |
| Pledges receivable | 36 | 17 | 17 | 17 | 17 | 17 | 17 |
| Other receivables | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Gift annuities | 7 | 6 | 6 | 6 | 6 | 6 | 6 |
| Prepaid expenses | 28 | 15 | 15 | 16 | 16 | 16 | 16 |
| Inventories | 67 | 59 | 46 | 46 | 46 | 46 | 46 |
| Land, buildings, and equipment, net | 497 | 480 | 462 | 448 | 434 | 420 | 405 |
| Other | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| **Total Assets, excluding Non-Controlling Interests** | **$ 1,147** | **$ 1,050** | **$ 768** | **$ 743** | **$ 718** | **$ 702** | **$ 696** |
| **Liabilities** | | | | | | | |
| Accounts payable and accrued liabilities | $ 106 | $ 63 | $ 30 | $ 31 | $ 28 | $ 28 | $ 31 |
| Core Value Claims Payable [4] | - | - | 25 | 13 | - | - | - |
| Gift annuities | 7 | 6 | 6 | 6 | 6 | 6 | 6 |
| Unearned fees and subscriptions | 43 | 53 | 51 | 48 | 51 | 52 | 52 |
| _Notes payable including line of credit_ | | | | | | | |
| Secured funded debt | 225 | 232 | 261 | 261 | 261 | 247 | 232 |
| BSA Settlement Trust Note | - | - | 80 | 74 | 66 | 55 | 45 |
| Total notes payable including line of credit | 225 | 232 | 341 | 335 | 326 | 302 | 277 |
| Insurance reserves | 235 | 239 | 7 | 7 | 7 | 7 | 7 |
| **Total liabilities** | **$ 615** | **$ 593** | **$ 458** | **$ 438** | **$ 418** | **$ 394** | **$ 373** |
| **Net Assets** | | | | | | | |
| Unrestricted Net Assets - controlling interest | $ 309 | $ 257 | $ 141 | $ 162 | $ 159 | $ 156 | $ 161 |
| Restricted Net Assets - controlling interest | 223 | 200 | 169 | 143 | 142 | 152 | 163 |
| **Total Net Assets, excluding Non-Controlling Interests** | **$ 533** | **$ 457** | **$ 310** | **$ 305** | **$ 300** | **$ 308** | **$ 323** |
| **Total Net Assets and Liabilities, excluding Non-Controlling Interests** | **$ 1,147** | **$ 1,050** | **$ 768** | **$ 743** | **$ 718** | **$ 702** | **$ 696** |
| Estimated Unrestricted Liquidity [5] | $ 224 | $ 188 | $ 39 | $ 53 | $ 44 | $ 31 | $ 29 |

Footnotes:
(1)  Presented excluding non-controlling interests
(2)  2019 is unaudited.  2020 reflects preliminary, unaudited results. Amounts are subject to change
(3)  Financial Projections reflect limited fresh start accounting assumptions and do not include any significant revaluation of assets
(4)  Reflects the establishment of a new $25 million liability for the Core Value Cash Pool on the Effective Date, which is to be paid to Allowed General Unsecured Claims
     in semi-annual installments over a 24-month period
(5)  Consists of unrestricted cash & equivalents and unrestricted investments

## Projected Consolidated Statement of Cash Flows

| ($ in millions) | Preliminary [1] | Financial Projections | | | | |
|---|---|---|---|---|---|---|
| Year Ending | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| **Operating Surplus / (Deficit) After Restriction Release** | $ (23) | $ 29 | $ 63 | $ 34 | $ 33 | $ 40 |
| | | | | | | |
| Interest Expense - JPM & Foundation Loan | (7) | (7) | (10) | (10) | (10) | (9) |
| Interest Expense - BSA Settlement Trust Note | - | - | - | (2) | (4) | (3) |
| Cash Restructuring / Reorganization Expenses [2] | (56) | (221) | (5) | - | - | - |
| Core Value Cash Pool Payments | - | - | (13) | (13) | - | - |
| Changes in Assets & Liabilities | | | | | | |
| Unearned Income and Prepaid Expenses | 23 | (2) | (3) | 3 | 1 | 0 |
| Accounts receivable | 12 | (1) | (0) | - | - | - |
| Pledges receivable | 19 | - | - | - | - | - |
| Other receivables | 0 | - | - | - | - | - |
| Gift annuities | 1 | - | - | - | - | - |
| Inventories | 9 | 13 | - | - | - | - |
| Other | 1 | - | - | - | - | - |
| Accounts payable and accrued liabilities (excluding restructuring) | (26) | (3) | 1 | (3) | - | 3 |
| Gift annuities | (1) | - | - | - | - | - |
| Other / Adjustments [3] | 14 | 6 | - | - | - | - |
| **Cash Flow from Operating Activities** | **(35)** | **(187)** | **33** | **10** | **20** | **31** |
| | | | | | | |
| Capital Expenditures | (11) | (8) | (8) | (8) | (8) | (8) |
| Investment Transfers / Disbursements [4] | - | 158 | - | - | - | - |
| Donor Restricted Cash Usage (Summit Capital Expenditures) | 9 | 4 | 4 | 4 | 4 | 4 |
| **Cashflow from Investing Activities** | **(2)** | **154** | **(4)** | **(4)** | **(4)** | **(4)** |
| | | | | | | |
| Amortization - JPM & Foundation Loan | (2) | - | (4) | (4) | (18) | (19) |
| Amortization - BSA Settlement Trust Note | - | - | (10) | (10) | (10) | (10) |
| Excess Cash Sweep | - | - | - | - | - | - |
| **Cashflow from Financing Activities** | **(2)** | **-** | **(15)** | **(15)** | **(29)** | **(29)** |
| | | | | | | |
| **Total Change in Unrestricted Cash** (excluding unrestricted investments) | $ (39) | $ (33) | $ 14 | $ (9) | $ (13) | $ (2) |
| | | | | | | |
| Beginning Unrestricted Cash Balance (excluding investments) | 94 | 55 | 22 | 37 | 27 | 14 |
| Ending Unrestricted Cash Balance (excluding investments) | 55 | 22 | 37 | 27 | 14 | 12 |

Footnotes:
(1) 2020 reflects preliminary, unaudited results. Amounts are subject to change
(2) Includes estimated cash restructuring fees paid and contributions to trust on the Effective Date
(3) Includes non-cash working capital adjustments, such as reserves for inventory and pledge receivables in 2020
(4) Reflects transfers from unrestricted investment account to cash for restructuring and operating expenses, as well as proceeds from the Foundation Loan via Foundation's restricted investments

**<u>EXHIBIT E-1</u>**

**RETAINED PROPERTY LIST**

**Boy Scouts of America**
**Retained Property List**

EXHIBIT 1

($ in millions)

| | Estimated BSA Only Assets Immediate Post Effective Date [1] | | |
|---|---|---|---|
| | Total Balance | Restricted and/or Core Property | Unrestricted Property |
| **ASSETS** | | | |
| **Cash & Equivalents** | | | |
| Cash & Equivalents | $ 45 | $ 22 | $ 22 |
| LC Collateral (JPM) [2] | - | - | - |
| **Total Cash** | 45 | 22 | 22 |
| | | | |
| **Investments** | | | |
| General Investments [3] | 121 | 111 | 10 |
| Order of the Arrow | - | - | - |
| **Total Investments** | 121 | 111 | 10 |
| | | | |
| **Land & Buildings** | | | |
| National Headquarters [4] | 11 | - | 11 |
| Scouting University Building [5] | - | - | - |
| Warehouse and Distribution Center [5] | - | - | - |
| **Subtotal Land & Buildings** | 11 | - | 11 |
| High Adventure Facilities: [6] | | | |
| Philmont Scout Ranch [4] | 153 | 153 | - |
| Florida Sea Base [4] | 29 | 29 | - |
| Northern Tier [4] | 8 | 8 | - |
| **Subtotal Adventure Bases** | 190 | 190 | - |
| **Total Land & Buildings** | 201 | 190 | 11 |
| | | | |
| **Furniture & Equipment** | 28 | - | 28 |
| | | | |
| **Accounts Receivable** | 12 | - | 12 |
| | | | |
| **Pledges Receivable (NPV, net of allowances)** | | | |
| Donor Restricted Pledges Receivable, net | 15 | 15 | - |
| Unrestricted Receivable, net | - | - | - |
| **Total Pledge Receivable** | 15 | 15 | - |
| | | | |
| **Inventory** | 46 | - | 46 |
| | | | |
| **Prepaids & Deferred Charges** | 15 | - | 15 |
| | | | |
| **Other Assets** | | | |
| Misc. Summit Assets | 5 | 5 | - |
| Gift Annuity & Pooled Income Investments | 7 | 7 | - |
| **Total Other Assets** | 11 | 11 | - |
| | | | |
| **Other Receivables** | | | |
| Note Receivable from Arrow WV [6] | 43 | 43 | - |
| Other Interfund Rec/(Pay) | (11) | - | (11) |
| **Total Interfund Receivable** | 32 | 43 | (11) |
| | | | |
| **TOTAL ASSETS [7]** | $ 527 | $ 393 | $ 134 |

(1)  Represents property that was Identified Property and 541 Property respectively during the chapter 11 process that is retained by Reorganized

(2)  Assumes substantially all letters of credit are drawn by the Effective Date and ~$63 million cash collateral is utilized to reimburse JPM for such

(3)  Approximately $6.5 million of non-Debtor unrestricted investments are included in unrestricted operating cash retained on the Effective Date but excluded in the Debtor amounts above.

(4)  Reflects amounts based on appraisals for high adventure bases as of August 2020 and broker opinion of value for National HQ.  Value is assumed consistent throughout the period as no appraisal is expected on the Effective Date

(5)  Net sale proceeds of Scouting University building and value of the Warehouse and National Distribution Center to be contributed to the Trust, along with the Artwork and Oil & Gas Leases (not shown), on the Effective Date

(6)  The Summit high adventure facility is in a separate legal entity, Arrow WV.  BSA has a note receivable due from Arrow, which was $361 million as of 6/30/21. Amount based on appraisals / projected sale proceeds per third party appraisal for Summit

(7)  Total assets do not tie to the estimated pro forma consolidated balance sheet because (a) this schedule represents BSA-only assets, (b) pro forma balance sheet reflects limited fresh start accounting, and (c) property values and Arrow intercompany balance reflect appraisal values vs. book values

## **EXHIBIT F**

**ABUSE CLAIMS LIST COMPOSITE**

## Unique and Timely Abuse Claim Count by Allegation

| Most Severe Allegation | Unique & Timely Abuse Claim Count | Percent of Total |
|---|---|---|
| 1. Penetration | 24,539 | 30% |
| 2. Oral Sex | 18,856 | 23% |
| 3. Masturbation | 13,022 | 16% |
| 4. Groping | 17,138 | 21% |
| 5. Touching-Unclothed | 1,879 | 2% |
| 6. Touching-Clothed | 1,294 | 2% |
| 7. Unknown/Unconfirmed | 3,817 | 5% |
| 8. Missing | 1,664 | 2% |
| **Total** | **82,209** | **100%** |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| 001 | GREATER ALABAMA | 445 | 13 | 0 |
| 003 | ALABAMA-FLORIDA | 65 | 2 | 0 |
| 004 | MOBILE AREA | 132 | 4 | 0 |
| 005 | TUKABATCHEE AREA | 124 | 1 | 0 |
| 006 | BLACK WARRIOR | 73 | 1 | 0 |
| 010 | GRAND CANYON | 544 | 522 | 115 |
| 011 | CATALINA | 218 | 215 | 69 |
| 013 | DE SOTO AREA | 30 | 29 | 0 |
| 016 | WESTARK AREA | 115 | 112 | 1 |
| 018 | QUAPAW AREA | 392 | 378 | 3 |
| 023 | GOLDEN GATE AREA | 759 | 736 | 1 |
| 027 | SEQUOIA | 260 | 251 | 0 |
| 030 | SOUTHERN SIERRA | 156 | 150 | 0 |
| 031 | PACIFIC SKYLINE | 109 | 106 | 0 |
| 032 | LONG BEACH AREA | 165 | 159 | 0 |
| 033 | GREATER LOS ANGELES | 1,328 | 1,300 | 2 |
| 035 | MARIN | 35 | 34 | 0 |
| 039 | ORANGE COUNTY | 402 | 390 | 0 |
| 041 | REDWOOD EMPIRE | 66 | 65 | 1 |
| 042 | PIEDMONT 042 | 7 | 7 | 0 |
| 045 | CALIFORNIA INLAND EMPIRE | 508 | 494 | 2 |
| 047 | GOLDEN EMPIRE | 467 | 453 | 2 |
| 049 | SAN DIEGO - IMPERIAL COUNCIL | 443 | 430 | 2 |
| 051 | WESTERN LOS ANGELES COUNTY | 273 | 267 | 2 |
| 053 | LOS PADRES | 91 | 87 | 0 |
| 055 | SILICON VALLEY MONTEREY BAY | 321 | 313 | 1 |
| 057 | VENTURA COUNTY | 97 | 95 | 0 |
| 058 | VERDUGO HILLS | 75 | 75 | 0 |
| 059 | GREATER YOSEMITE | 215 | 210 | 0 |
| 060 | PIKES PEAK | 101 | 94 | 0 |
| 061 | DENVER AREA | 370 | 333 | 1 |
| 062 | LONGS PEAK COUNCIL | 124 | 94 | 0 |
| 063 | ROCKY MOUNTAIN | 83 | 69 | 0 |
| 066 | CONNECTICUT RIVERS | 307 | 39 | 4 |
| 067 | GREENWICH | 4 | 1 | 0 |
| 069 | HOUSATONIC | 10 | 3 | 0 |
| 070 | OLD NORTH STATE | 177 | 171 | 4 |
| 072 | CONNECTICUT YANKEE | 249 | 40 | 13 |
| 081 | DEL-MAR-VA | 140 | 24 | 0 |
| 082 | NATIONAL CAPITAL AREA | 630 | 160 | 5 |
| 082 | DIRECT SERVICE | 13 | 2 | 0 |
| 083 | CENTRAL FLORIDA | 321 | 14 | 1 |
| 084 | SOUTH FLORIDA COUNCIL | 553 | 11 | 0 |
| 085 | GULF STREAM | 177 | 3 | 0 |
| 087 | NORTH FLORIDA | 307 | 14 | 2 |
| 088 | SOUTHWEST FLORIDA | 125 | 4 | 0 |
| 089 | GREATER TAMPA BAY AREA | 487 | 19 | 1 |
| 091 | CHATTAHOOCHEE | 126 | 0 | 0 |
| 092 | ATLANTA AREA | 470 | 26 | 0 |
| 093 | GEORGIA-CAROLINA | 89 | 3 | 0 |
| 095 | FLINT RIVER | 72 | 6 | 0 |
| 096 | CENTRAL GEORGIA | 94 | 3 | 0 |
| 098 | SOUTH GEORGIA | 90 | 6 | 0 |
| 099 | COASTAL GEORGIA | 128 | 6 | 1 |
| 100 | NORTHWEST GEORGIA | 44 | 1 | 0 |
| 101 | NORTHEAST GEORGIA | 119 | 12 | 10 |
| 104 | ALOHA | 196 | 188 | 85 |
| 106 | MOUNTAIN WEST | 143 | 5 | 1 |
| 107 | GRAND TETON | 84 | 4 | 0 |
| 117 | PRAIRIELANDS | 83 | 10 | 0 |
| 127 | THREE FIRES | 149 | 18 | 0 |
| 129 | NORTHEAST ILLINOIS | 108 | 11 | 0 |
| 133 | ILLOWA | 126 | 9 | 0 |
| 138 | W.D. BOYCE | 151 | 18 | 0 |
| 141 | MISSISSIPPI VALLEY | 40 | 3 | 0 |
| 144 | ABRAHAM LINCOLN | 53 | 6 | 0 |
| 145 | HOOSIER TRAILS | 79 | 3 | 0 |
| 156 | BUFFALO TRACE | 113 | 3 | 0 |
| 157 | ANTHONY WAYNE AREA | 103 | 3 | 0 |
| 160 | CROSSROADS OF AMERICA | 442 | 12 | 0 |
| 162 | SAGAMORE | 117 | 5 | 0 |
| 165 | LASALLE | 130 | 3 | 0 |
| 172 | HAWKEYE AREA | 59 | 3 | 2 |
| 173 | WINNEBAGO | 61 | 1 | 0 |
| 177 | MID-IOWA | 159 | 3 | 0 |
| 178 | NORTHEAST IOWA COUNCIL | 28 | 2 | 0 |
| 192 | CORONADO AREA | 67 | 4 | 0 |
| 194 | SANTA FE TRAIL | 19 | 2 | 0 |
| 197 | JAYHAWK AREA | 41 | 1 | 0 |
| 198 | QUIVIRA | 275 | 10 | 1 |
| 204 | BLUE GRASS | 207 | 7 | 0 |
| 205 | LINCOLN HERITAGE | 429 | 13 | 8 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| 209 | CALCASIEU | 85 | 80 | 0 |
| 211 | ISTROUMA AREA | 158 | 149 | 0 |
| 212 | EVANGELINE AREA | 86 | 84 | 0 |
| 213 | LOUISIANA PURCHASE | 122 | 119 | 0 |
| 214 | SOUTHEAST LOUISIANA | 370 | 346 | 0 |
| 215 | NORWELA | 104 | 99 | 0 |
| 216 | KATAHDIN AREA | 55 | 54 | 1 |
| 218 | PINE TREE | 192 | 178 | 1 |
| 220 | BALTIMORE AREA | 488 | 22 | 1 |
| 221 | MASON-DIXON | 38 | 1 | 0 |
| 224 | CAPE COD & ISLANDS | 39 | 3 | 0 |
| 227 | SPIRIT OF ADVENTURE | 709 | 34 | 4 |
| 230 | HEART OF NEW ENGLAND | 183 | 12 | 0 |
| 234 | WESTERN MASSACHUSETTS | 200 | 4 | 0 |
| 250 | NORTHERN STAR | 352 | 323 | 0 |
| 251 | MAYFLOWER | 238 | 8 | 1 |
| 283 | TWIN VALLEY | 48 | 47 | 0 |
| 286 | VOYAGEURS AREA | 44 | 36 | 0 |
| 296 | CENTRAL MINNESOTA | 31 | 29 | 0 |
| 299 | GAMEHAVEN | 60 | 59 | 7 |
| 302 | CHOCTAW AREA | 41 | 1 | 0 |
| 303 | ANDREW JACKSON | 207 | 12 | 0 |
| 304 | PINE BURR AREA | 181 | 6 | 0 |
| 306 | OZARK TRAILS | 181 | 13 | 1 |
| 307 | HEART OF AMERICA | 665 | 26 | 1 |
| 311 | PONY EXPRESS | 62 | 5 | 0 |
| 312 | GREATER ST. LOUIS AREA | 921 | 64 | 3 |
| 315 | MONTANA | 143 | 139 | 17 |
| 322 | OVERLAND TRAILS | 52 | 4 | 0 |
| 324 | CORNHUSKER | 57 | 8 | 0 |
| 326 | MID-AMERICA | 272 | 16 | 1 |
| 328 | LAS VEGAS AREA | 196 | 58 | 39 |
| 329 | NEVADA AREA | 122 | 49 | 0 |
| 330 | DANIEL WEBSTER | 190 | 18 | 1 |
| 333 | NORTHERN NEW JERSEY | 525 | 495 | 34 |
| 341 | JERSEY SHORE | 109 | 103 | 6 |
| 347 | MONMOUTH | 109 | 107 | 9 |
| 358 | PATRIOTS' PATH | 229 | 220 | 21 |
| 364 | TWIN RIVERS | 227 | 216 | 60 |
| 368 | BADEN POWELL | 104 | 96 | 27 |
| 373 | LONGHOUSE | 194 | 188 | 62 |
| 375 | FIVE RIVERS | 77 | 66 | 12 |
| 376 | IROQUOIS TRAIL | 42 | 40 | 19 |
| 380 | GREATER NIAGARA FRONTIER | 250 | 240 | 88 |
| 382 | ALLEGHENY HIGHLANDS | 68 | 56 | 11 |
| 386 | THEODORE ROOSEVELT | 194 | 190 | 67 |
| 388 | WESTCHESTER-PUTNAM | 214 | 209 | 61 |
| 388 | HUDSON VALLEY | 132 | 128 | 33 |
| 397 | SENECA WATERWAYS | 235 | 227 | 76 |
| 400 | LEATHERSTOCKING | 92 | 90 | 24 |
| 404 | SUFFOLK COUNTY | 196 | 185 | 24 |
| 405 | RIP VAN WINKLE | 26 | 26 | 6 |
| 412 | GREAT SOUTHWEST | 265 | 30 | 35 |
| 413 | CONQUISTADOR | 65 | 4 | 0 |
| 414 | DANIEL BOONE | 61 | 60 | 0 |
| 415 | MECKLENBURG COUNTY | 97 | 94 | 0 |
| 416 | CENTRAL NORTH CAROLINA | 94 | 93 | 0 |
| 420 | PIEDMONT 420 | 144 | 140 | 0 |
| 421 | OCCONEECHEE | 214 | 200 | 1 |
| 424 | TUSCARORA | 42 | 37 | 0 |
| 425 | CAPE FEAR | 100 | 99 | 0 |
| 426 | EAST CAROLINA | 179 | 174 | 0 |
| 427 | OLD HICKORY | 119 | 114 | 1 |
| 429 | NORTHERN LIGHTS | 108 | 38 | 0 |
| 433 | GREAT TRAIL | 255 | 15 | 1 |
| 436 | BUCKEYE | 179 | 8 | 2 |
| 438 | DAN BEARD | 381 | 23 | 0 |
| 439 | TECUMSEH | 79 | 6 | 0 |
| 440 | LAKE ERIE | 494 | 23 | 1 |
| 441 | SIMON KENTON | 390 | 30 | 0 |
| 444 | MIAMI VALLEY | 153 | 6 | 0 |
| 449 | BLACK SWAMP AREA | 78 | 9 | 0 |
| 456 | PATHWAY TO ADVENTURE | 1,519 | 162 | 2 |
| 460 | ERIE SHORES | 176 | 7 | 0 |
| 467 | MUSKINGUM VALLEY | 47 | 2 | 0 |
| 468 | ARBUCKLE AREA | 35 | 1 | 0 |
| 469 | CHEROKEE AREA 469 | 31 | 1 | 0 |
| 474 | CIMARRON | 61 | 4 | 0 |
| 480 | LAST FRONTIER | 326 | 6 | 0 |
| 488 | INDIAN NATIONS | 215 | 10 | 0 |
| 491 | CRATER LAKE COUNCIL | 138 | 68 | 1 |
| 492 | CASCADE PACIFIC | 565 | 94 | 8 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| 497 | JUNIATA VALLEY | 26 | 3 | 1 |
| 500 | MORAINE TRAILS | 54 | 4 | 0 |
| 501 | NORTHEASTERN PENNSYLVANIA | 73 | 9 | 1 |
| 502 | MINSI TRAILS | 114 | 19 | 0 |
| 504 | COLUMBIA-MONTOUR | 8 | 0 | 0 |
| 509 | BUCKTAIL | 23 | 1 | 0 |
| 512 | WESTMORELAND-FAYETTE | 71 | 2 | 0 |
| 524 | PENNSYLVANIA DUTCH | 78 | 8 | 0 |
| 525 | CRADLE OF LIBERTY | 599 | 82 | 1 |
| 527 | LAUREL HIGHLANDS | 383 | 20 | 0 |
| 528 | HAWK MOUNTAIN | 82 | 6 | 1 |
| 532 | FRENCH CREEK | 102 | 12 | 1 |
| 533 | SUSQUEHANNA | 49 | 4 | 0 |
| 538 | CHIEF CORNPLANTER | 8 | 1 | 0 |
| 539 | CHESTER COUNTY | 50 | 3 | 0 |
| 544 | NEW BIRTH OF FREEDOM | 179 | 6 | 0 |
| 546 | NARRAGANSETT | 402 | 14 | 0 |
| 549 | PALMETTO | 85 | 24 | 0 |
| 550 | COASTAL CAROLINA | 162 | 11 | 0 |
| 551 | BLUE RIDGE | 153 | 16 | 0 |
| 552 | PEE DEE AREA | 89 | 8 | 0 |
| 553 | INDIAN WATERS | 143 | 14 | 1 |
| 556 | CHEROKEE AREA 556 | 99 | 2 | 0 |
| 557 | GREAT SMOKY MOUNTAIN | 185 | 5 | 0 |
| 558 | CHICKASAW | 377 | 63 | 0 |
| 559 | WEST TENNESSEE AREA | 64 | 0 | 0 |
| 560 | MIDDLE TENNESSEE | 272 | 4 | 0 |
| 561 | TEXAS TRAILS | 74 | 1 | 0 |
| 562 | GOLDEN SPREAD | 128 | 11 | 0 |
| 564 | CAPITOL AREA | 135 | 11 | 0 |
| 567 | BUFFALO TRAIL | 95 | 5 | 0 |
| 571 | CIRCLE TEN | 586 | 39 | 0 |
| 573 | YUCCA | 182 | 8 | 0 |
| 574 | BAY AREA | 98 | 6 | 0 |
| 576 | SAM HOUSTON AREA | 826 | 54 | 0 |
| 577 | SOUTH TEXAS | 135 | 6 | 0 |
| 578 | THREE RIVERS | 144 | 4 | 0 |
| 583 | ALAMO AREA | 309 | 12 | 0 |
| 584 | CADDO AREA | 61 | 46 | 0 |
| 585 | EAST TEXAS AREA | 120 | 5 | 0 |
| 587 | NORTHWEST TEXAS | 74 | 0 | 0 |
| 590 | CROSSROADS OF THE WEST | 686 | 25 | 6 |
| 592 | GREEN MOUNTAIN | 101 | 99 | 0 |
| 595 | COLONIAL VIRGINIA | 105 | 6 | 0 |
| 596 | TIDEWATER | 232 | 23 | 0 |
| 598 | SHENANDOAH AREA | 28 | 2 | 0 |
| 599 | BLUE RIDGE MOUNTAINS | 111 | 6 | 1 |
| 602 | HEART OF VIRGINIA | 161 | 7 | 2 |
| 604 | BLUE MOUNTAIN | 67 | 3 | 0 |
| 606 | MOUNT BAKER | 151 | 5 | 2 |
| 609 | CHIEF SEATTLE | 356 | 12 | 9 |
| 610 | GREAT ALASKA | 98 | 96 | 0 |
| 611 | INLAND NORTHWEST | 174 | 7 | 1 |
| 612 | PACIFIC HARBORS | 241 | 5 | 2 |
| 614 | GRAND COLUMBIA | 94 | 1 | 0 |
| 615 | MOUNTAINEER AREA | 41 | 2 | 0 |
| 617 | BUCKSKIN | 284 | 30 | 2 |
| 619 | OHIO RIVER VALLEY | 55 | 4 | 0 |
| 620 | GLACIER'S EDGE | 105 | 0 | 0 |
| 624 | GATEWAY AREA | 29 | 3 | 0 |
| 627 | SAMOSET COUNCIL | 32 | 2 | 0 |
| 635 | BAY-LAKES | 171 | 3 | 0 |
| 636 | THREE HARBORS | 275 | 5 | 0 |
| 637 | CHIPPEWA VALLEY | 55 | 0 | 0 |
| 638 | GREATER WYOMING | 31 | 0 | 0 |
| 640 | GREATER NEW YORK | 1,600 | 1,567 | 428 |
| 651 | POTAWATOMI AREA | 32 | 1 | 0 |
| 653 | GREAT RIVERS | 73 | 7 | 0 |
| 660 | BLACKHAWK AREA | 155 | 17 | 0 |
| 661 | PUERTO RICO | 81 | 2 | 0 |
| 662 | LONGHORN | 429 | 21 | 0 |
| 664 | SUWANNEE RIVER AREA | 53 | 1 | 0 |
| 690 | GARDEN STATE | 263 | 248 | 18 |
| 691 | PUSHMATAHA AREA | 54 | 2 | 0 |
| 694 | SOUTH PLAINS | 98 | 4 | 0 |
| 695 | BLACK HILLS AREA | 35 | 1 | 0 |
| 696 | MIDNIGHT SUN | 24 | 23 | 0 |
| 697 | OREGON TRAIL | 164 | 31 | 4 |
| 702 | RAINBOW | 87 | 17 | 0 |
| 713 | SEQUOYAH | 77 | 0 | 0 |
| 733 | SIOUX | 48 | 7 | 0 |
| 741 | TEXAS SOUTHWEST | 51 | 1 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| 748 | YOCONA AREA | 62 | 3 | 0 |
| 763 | VIRGINIA HEADWATERS | 39 | 1 | 0 |
| 773 | GULF COAST | 191 | 6 | 0 |
| 775 | RIO GRANDE | 96 | 10 | 0 |
| 777 | WASHINGTON CROSSING | 79 | 17 | 2 |
| 780 | MICHIGAN CROSSROADS | 1,736 | 67 | 0 |
| 802 | TRANSATLANTIC | 176 | 4 | 0 |
| 803 | FAR EAST | 58 | 1 | 0 |
| Multiple | CENTRAL NEW JERSEY; WASHINGTON CROSSING | 54 | 48 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; GREATER LOS ANGELES | 46 | 41 | 0 |
| Multiple | NORTHERN NEW JERSEY; PATRIOTS' PATH | 45 | 40 | 0 |
| Multiple | GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 35 | 35 | 0 |
| Multiple | CENTRAL NEW JERSEY; PATRIOTS' PATH | 33 | 31 | 0 |
| Multiple | NORTHERN LIGHTS; NORTHERN STAR | 32 | 31 | 0 |
| Multiple | ALOHA; DIRECT SERVICE | 28 | 25 | 0 |
| Multiple | COLONIAL VIRGINIA; TIDEWATER | 27 | 1 | 0 |
| Multiple | GOLDEN EMPIRE; GOLDEN GATE AREA | 26 | 25 | 0 |
| Multiple | GREATER NEW YORK; NORTHERN NEW JERSEY | 25 | 24 | 0 |
| Multiple | GREATER NIAGARA FRONTIER; IROQUOIS TRAIL | 25 | 25 | 0 |
| Multiple | DANIEL WEBSTER; SPIRIT OF ADVENTURE | 24 | 0 | 0 |
| Multiple | CIRCLE TEN; LONGHORN | 23 | 2 | 0 |
| Multiple | CONNECTICUT RIVERS; CONNECTICUT YANKEE | 23 | 7 | 0 |
| Multiple | GREAT TRAIL; NORTHERN NEW JERSEY | 23 | 0 | 0 |
| Multiple | GREATER ALABAMA; MOBILE AREA | 21 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; ORANGE COUNTY | 21 | 21 | 0 |
| Multiple | BALTIMORE AREA; NATIONAL CAPITAL AREA | 20 | 3 | 0 |
| Multiple | NORTHEAST ILLINOIS; PATHWAY TO ADVENTURE | 20 | 4 | 0 |
| Multiple | CHIPPEWA VALLEY; NORTHERN STAR | 19 | 8 | 0 |
| Multiple | GOLDEN GATE AREA; GREATER YOSEMITE | 19 | 19 | 0 |
| Multiple | GREATER NEW YORK; THEODORE ROOSEVELT | 19 | 19 | 0 |
| Multiple | SUFFOLK COUNTY; THEODORE ROOSEVELT | 19 | 19 | 0 |
| Multiple | BUCKEYE; LAKE ERIE | 17 | 3 | 0 |
| Multiple | CIRCLE TEN; WESTERN LOS ANGELES COUNTY | 17 | 17 | 0 |
| Multiple | CROSSROADS OF AMERICA; DEL-MAR-VA | 17 | 1 | 0 |
| Multiple | GREATER NEW YORK; HUDSON VALLEY | 17 | 15 | 0 |
| Multiple | MAYFLOWER; SPIRIT OF ADVENTURE | 17 | 0 | 0 |
| Multiple | ATLANTA AREA; NORTHEAST GEORGIA | 16 | 1 | 0 |
| Multiple | PACIFIC SKYLINE; SILICON VALLEY MONTEREY BAY | 16 | 16 | 0 |
| Multiple | CENTRAL NEW JERSEY; MONMOUTH | 15 | 15 | 0 |
| Multiple | GREATER ALABAMA; TUKABATCHEE AREA | 15 | 0 | 0 |
| Multiple | ALAMO AREA; SAM HOUSTON AREA | 14 | 1 | 0 |
| Multiple | CROSSROADS OF AMERICA; HOOSIER TRAILS | 14 | 0 | 0 |
| Multiple | LAS VEGAS AREA; NEVADA AREA | 14 | 3 | 0 |
| Multiple | CHIEF SEATTLE; PACIFIC HARBORS | 13 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; LONG BEACH AREA | 13 | 12 | 0 |
| Multiple | CONNECTICUT YANKEE; GREENWICH | 12 | 2 | 0 |
| Multiple | GOLDEN EMPIRE; GREATER YOSEMITE | 12 | 12 | 0 |
| Multiple | NORTHERN STAR; VOYAGEURS AREA | 12 | 12 | 0 |
| Multiple | CENTRAL MINNESOTA; NORTHERN STAR | 11 | 11 | 0 |
| Multiple | CRATER LAKE COUNCIL; LOS PADRES | 11 | 11 | 0 |
| Multiple | JUNIATA VALLEY; LAUREL HIGHLANDS | 11 | 0 | 0 |
| Multiple | LASALLE; PATHWAY TO ADVENTURE | 11 | 0 | 0 |
| Multiple | MAYFLOWER; NARRAGANSETT | 11 | 0 | 0 |
| Multiple | BAY-LAKES; MICHIGAN CROSSROADS | 10 | 1 | 0 |
| Multiple | CATALINA; GRAND CANYON | 10 | 9 | 0 |
| Multiple | CENTRAL FLORIDA; NORTH FLORIDA | 10 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; PACIFIC SKYLINE | 10 | 10 | 0 |
| Multiple | GREAT TRAIL; LAKE ERIE | 10 | 3 | 0 |
| Multiple | GULF COAST; SOUTH TEXAS | 10 | 0 | 0 |
| Multiple | IROQUOIS TRAIL; LEATHERSTOCKING | 10 | 10 | 0 |
| Multiple | CROSSROADS OF AMERICA; SAGAMORE | 9 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; PATHWAY TO ADVENTURE | 9 | 0 | 0 |
| Multiple | NORTH FLORIDA; SUWANNEE RIVER AREA | 9 | 0 | 0 |
| Multiple | SOUTHERN SIERRA; WESTERN LOS ANGELES COUNTY | 9 | 9 | 0 |
| Multiple | BLACK WARRIOR; GREATER ALABAMA | 8 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; REDWOOD EMPIRE | 8 | 8 | 0 |
| Multiple | GREAT RIVERS; HEART OF AMERICA | 8 | 0 | 0 |
| Multiple | LONGHORN; SAM HOUSTON AREA | 8 | 0 | 0 |
| Multiple | MECKLENBURG COUNTY; PIEDMONT 420 | 8 | 7 | 0 |
| Multiple | PATHWAY TO ADVENTURE; RAINBOW | 8 | 2 | 0 |
| Multiple | PATHWAY TO ADVENTURE; THREE FIRES | 8 | 0 | 0 |
| Multiple | BALTIMORE AREA; DEL-MAR-VA | 7 | 1 | 0 |
| Multiple | BLUE GRASS; LINCOLN HERITAGE | 7 | 0 | 0 |
| Multiple | CIRCLE TEN; SAM HOUSTON AREA | 7 | 0 | 0 |
| Multiple | CRATER LAKE COUNCIL; REDWOOD EMPIRE | 7 | 6 | 0 |
| Multiple | GOLDEN EMPIRE; NEVADA AREA | 7 | 7 | 0 |
| Multiple | GOLDEN GATE AREA; NEVADA AREA | 7 | 6 | 0 |
| Multiple | LONG BEACH AREA; ORANGE COUNTY | 7 | 6 | 0 |
| Multiple | MIAMI VALLEY; TECUMSEH | 7 | 0 | 0 |
| Multiple | POTAWATOMI AREA; THREE HARBORS | 7 | 0 | 0 |
| Multiple | ATLANTA AREA; COASTAL GEORGIA | 6 | 0 | 0 |
| Multiple | CENTRAL NORTH CAROLINA; MECKLENBURG COUNTY | 6 | 6 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | CRADLE OF LIBERTY; WASHINGTON CROSSING | 6 | 2 | 0 |
| Multiple | DENVER AREA; LONGS PEAK COUNCIL | 6 | 6 | 0 |
| Multiple | FIVE RIVERS; SENECA WATERWAYS | 6 | 5 | 0 |
| Multiple | GARDEN STATE; JERSEY SHORE | 6 | 6 | 0 |
| Multiple | GARDEN STATE; NORTHERN NEW JERSEY | 6 | 3 | 0 |
| Multiple | GREATER NEW YORK; SUFFOLK COUNTY | 6 | 6 | 0 |
| Multiple | HEART OF AMERICA; QUIVIRA | 6 | 0 | 0 |
| Multiple | HEART OF VIRGINIA; TIDEWATER | 6 | 2 | 0 |
| Multiple | ISTROUMA AREA; SOUTHEAST LOUISIANA | 6 | 5 | 0 |
| Multiple | KATAHDIN AREA; PINE TREE | 6 | 6 | 0 |
| Multiple | MISSISSIPPI VALLEY; SPIRIT OF ADVENTURE | 6 | 0 | 0 |
| Multiple | SAM HOUSTON AREA; THREE RIVERS | 6 | 0 | 0 |
| Multiple | ALAMO AREA; CAPITOL AREA | 5 | 0 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; SENECA WATERWAYS | 5 | 5 | 0 |
| Multiple | ANDREW JACKSON; PINE BURR AREA | 5 | 0 | 0 |
| Multiple | BAY AREA; SAM HOUSTON AREA | 5 | 1 | 0 |
| Multiple | BAY-LAKES; PATHWAY TO ADVENTURE | 5 | 0 | 0 |
| Multiple | CHEROKEE AREA 469; QUAPAW AREA | 5 | 0 | 0 |
| Multiple | CHIEF SEATTLE; MOUNT BAKER | 5 | 1 | 0 |
| Multiple | DANIEL BOONE; PIEDMONT 420 | 5 | 5 | 0 |
| Multiple | DANIEL WEBSTER; HEART OF NEW ENGLAND | 5 | 0 | 0 |
| Multiple | ERIE SHORES; LAKE ERIE | 5 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; GREATER LOS ANGELES | 5 | 5 | 0 |
| Multiple | GREAT RIVERS; GREATER ST. LOUIS AREA | 5 | 0 | 0 |
| Multiple | GREAT SOUTHWEST; SAM HOUSTON AREA | 5 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; SAM HOUSTON AREA | 5 | 2 | 0 |
| Multiple | GREATER LOS ANGELES; VERDUGO HILLS | 5 | 5 | 0 |
| Multiple | GREATER TAMPA BAY AREA; GULF COAST | 5 | 0 | 0 |
| Multiple | GREATER TAMPA BAY AREA; SOUTH FLORIDA COUNCIL | 5 | 0 | 0 |
| Multiple | GULF STREAM; SOUTH FLORIDA COUNCIL | 5 | 0 | 0 |
| Multiple | HEART OF AMERICA; MID-AMERICA | 5 | 0 | 0 |
| Multiple | HEART OF NEW ENGLAND; MAYFLOWER | 5 | 0 | 0 |
| Multiple | LAUREL HIGHLANDS; MORAINE TRAILS | 5 | 0 | 0 |
| Multiple | LEATHERSTOCKING; LONGHOUSE | 5 | 5 | 0 |
| Multiple | NATIONAL CAPITAL AREA; TIDEWATER | 5 | 0 | 0 |
| Multiple | ALAMO AREA; TEXAS SOUTHWEST | 4 | 0 | 0 |
| Multiple | ANDREW JACKSON; PUSHMATAHA AREA | 4 | 3 | 0 |
| Multiple | ATLANTA AREA; FLINT RIVER | 4 | 0 | 0 |
| Multiple | BLUE RIDGE MOUNTAINS; TIDEWATER | 4 | 0 | 0 |
| Multiple | BUCKEYE; GREAT TRAIL | 4 | 0 | 0 |
| Multiple | BUCKSKIN; MOUNTAINEER AREA | 4 | 0 | 0 |
| Multiple | CALCASIEU; LOUISIANA PURCHASE | 4 | 4 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; WESTERN LOS ANGELES COUNTY | 4 | 4 | 0 |
| Multiple | CAPE FEAR; DEL-MAR-VA | 4 | 3 | 0 |
| Multiple | CAPITOL AREA; SAM HOUSTON AREA | 4 | 2 | 0 |
| Multiple | CASCADE PACIFIC; PINE TREE | 4 | 3 | 0 |
| Multiple | CHESTER COUNTY; CRADLE OF LIBERTY | 4 | 0 | 0 |
| Multiple | CHESTER COUNTY; WESTCHESTER-PUTNAM | 4 | 4 | 0 |
| Multiple | CORONADO AREA; JAYHAWK AREA | 4 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; MINSI TRAILS | 4 | 0 | 0 |
| Multiple | CROSSROADS OF AMERICA; CROSSROADS OF THE WEST | 4 | 0 | 0 |
| Multiple | DAN BEARD; MIAMI VALLEY | 4 | 0 | 0 |
| Multiple | DANIEL BOONE; MECKLENBURG COUNTY | 4 | 4 | 0 |
| Multiple | DENVER AREA; PIKES PEAK | 4 | 4 | 0 |
| Multiple | GOLDEN EMPIRE; SILICON VALLEY MONTEREY BAY | 4 | 4 | 0 |
| Multiple | GOLDEN GATE AREA; SILICON VALLEY MONTEREY BAY | 4 | 4 | 0 |
| Multiple | GREAT ALASKA; MIDNIGHT SUN | 4 | 4 | 0 |
| Multiple | GREAT RIVERS; OZARK TRAILS | 4 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; HEART OF AMERICA | 4 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; MISSISSIPPI VALLEY | 4 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; PRAIRIELANDS | 4 | 2 | 0 |
| Multiple | GREATER YOSEMITE; SILICON VALLEY MONTEREY BAY | 4 | 4 | 0 |
| Multiple | HEART OF AMERICA; OZARK TRAILS | 4 | 0 | 0 |
| Multiple | HEART OF NEW ENGLAND; HUDSON VALLEY | 4 | 4 | 0 |
| Multiple | ISTROUMA AREA; LOUISIANA PURCHASE | 4 | 4 | 0 |
| Multiple | LAUREL HIGHLANDS; WESTMORELAND-FAYETTE | 4 | 0 | 0 |
| Multiple | LONG BEACH AREA; SILICON VALLEY MONTEREY BAY | 4 | 4 | 0 |
| Multiple | LONGHORN; TEXAS TRAILS | 4 | 0 | 0 |
| Multiple | MECKLENBURG COUNTY; PALMETTO | 4 | 2 | 0 |
| Multiple | MID-AMERICA; MID-IOWA | 4 | 0 | 0 |
| Multiple | MINSI TRAILS; NORTHEASTERN PENNSYLVANIA | 4 | 0 | 0 |
| Multiple | MINSI TRAILS; NORTHERN NEW JERSEY | 4 | 4 | 0 |
| Multiple | NORTHEAST ILLINOIS; SAMOSET COUNCIL | 4 | 0 | 0 |
| Multiple | OLD HICKORY; OLD NORTH STATE | 4 | 4 | 0 |
| Multiple | PATHWAY TO ADVENTURE; THREE HARBORS | 4 | 0 | 0 |
| Multiple | RAINBOW; THREE FIRES | 4 | 3 | 0 |
| Multiple | VERDUGO HILLS; WESTERN LOS ANGELES COUNTY | 4 | 4 | 0 |
| Multiple | ALABAMA-FLORIDA; GREATER ALABAMA | 3 | 0 | 0 |
| Multiple | ATLANTA AREA; CENTRAL GEORGIA | 3 | 0 | 0 |
| Multiple | ATLANTA AREA; CHATTAHOOCHEE | 3 | 0 | 0 |
| Multiple | ATLANTA AREA; SOUTH GEORGIA | 3 | 0 | 0 |
| Multiple | BADEN POWELL; CRADLE OF LIBERTY | 3 | 0 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | BADEN POWELL; SUSQUEHANNA | 3 | 2 | 0 |
| Multiple | BADEN POWELL; TUSCARORA | 3 | 3 | 0 |
| Multiple | BLACKHAWK AREA; RAINBOW | 3 | 1 | 0 |
| Multiple | BLUE GRASS; SEQUOYAH | 3 | 0 | 0 |
| Multiple | BLUE RIDGE; PALMETTO | 3 | 0 | 0 |
| Multiple | BUCKEYE; SIMON KENTON | 3 | 0 | 0 |
| Multiple | BUFFALO TRACE; LINCOLN HERITAGE | 3 | 0 | 0 |
| Multiple | CADDO AREA; QUAPAW AREA | 3 | 3 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; ORANGE COUNTY | 3 | 3 | 0 |
| Multiple | CAPITOL AREA; NATIONAL CAPITAL AREA | 3 | 1 | 0 |
| Multiple | CASCADE PACIFIC; CRATER LAKE COUNCIL | 3 | 0 | 0 |
| Multiple | CASCADE PACIFIC; PACIFIC HARBORS | 3 | 0 | 0 |
| Multiple | CENTRAL MINNESOTA; VOYAGEURS AREA | 3 | 3 | 0 |
| Multiple | CENTRAL NEW JERSEY; MINSI TRAILS | 3 | 3 | 0 |
| Multiple | CENTRAL NORTH CAROLINA; OCCONEECHEE | 3 | 3 | 0 |
| Multiple | CHATTAHOOCHEE; FLINT RIVER | 3 | 1 | 0 |
| Multiple | CHATTAHOOCHEE; GREATER ALABAMA | 3 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; HEART OF NEW ENGLAND | 3 | 1 | 0 |
| Multiple | CONNECTICUT YANKEE; HOUSATONIC | 3 | 0 | 0 |
| Multiple | CONQUISTADOR; GREAT SOUTHWEST | 3 | 0 | 0 |
| Multiple | CRATER LAKE COUNCIL; OREGON TRAIL | 3 | 1 | 0 |
| Multiple | CROSSROADS OF AMERICA; MIAMI VALLEY | 3 | 0 | 0 |
| Multiple | CROSSROADS OF AMERICA; SIMON KENTON | 3 | 0 | 0 |
| Multiple | CROSSROADS OF THE WEST; GRAND TETON | 3 | 0 | 0 |
| Multiple | CROSSROADS OF THE WEST; MOUNTAIN WEST | 3 | 0 | 0 |
| Multiple | DAN BEARD; SIMON KENTON | 3 | 1 | 0 |
| Multiple | DANIEL WEBSTER; GREATER ST. LOUIS AREA | 3 | 0 | 0 |
| Multiple | EAST CAROLINA; OCCONEECHEE | 3 | 3 | 0 |
| Multiple | EAST TEXAS AREA; THREE RIVERS | 3 | 0 | 0 |
| Multiple | GARDEN STATE; THEODORE ROOSEVELT | 3 | 3 | 0 |
| Multiple | GOLDEN GATE AREA; MARIN | 3 | 3 | 0 |
| Multiple | GRAND COLUMBIA; INLAND NORTHWEST | 3 | 0 | 0 |
| Multiple | GRAND TETON; MOUNTAIN WEST | 3 | 0 | 0 |
| Multiple | GREAT SMOKY MOUNTAIN; MIDDLE TENNESSEE | 3 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; GREATER YOSEMITE | 3 | 3 | 0 |
| Multiple | GREATER NEW YORK; GREATER NIAGARA FRONTIER | 3 | 3 | 0 |
| Multiple | GREATER NEW YORK; SENECA WATERWAYS | 3 | 3 | 0 |
| Multiple | GREATER NEW YORK; WESTCHESTER-PUTNAM | 3 | 3 | 0 |
| Multiple | GREATER NIAGARA FRONTIER; SENECA WATERWAYS | 3 | 3 | 0 |
| Multiple | GREATER ST. LOUIS AREA; NORTHEAST ILLINOIS | 3 | 0 | 0 |
| Multiple | GREATER YOSEMITE; SOUTHERN SIERRA | 3 | 3 | 0 |
| Multiple | HEART OF AMERICA; JAYHAWK AREA | 3 | 0 | 0 |
| Multiple | HEART OF NEW ENGLAND; WESTCHESTER-PUTNAM | 3 | 3 | 0 |
| Multiple | HUDSON VALLEY; WESTCHESTER-PUTNAM | 3 | 3 | 0 |
| Multiple | INLAND NORTHWEST; PACIFIC HARBORS | 3 | 0 | 0 |
| Multiple | LAUREL HIGHLANDS; NATIONAL CAPITAL AREA | 3 | 0 | 0 |
| Multiple | LONGHORN; NORTHWEST TEXAS | 3 | 0 | 0 |
| Multiple | LOS PADRES; SEQUOIA | 3 | 3 | 0 |
| Multiple | LOS PADRES; SOUTHERN SIERRA | 3 | 3 | 0 |
| Multiple | MAYFLOWER; WESTCHESTER-PUTNAM | 3 | 3 | 0 |
| Multiple | MICHIGAN CROSSROADS; NORTHEAST ILLINOIS | 3 | 0 | 0 |
| Multiple | MID-AMERICA; OVERLAND TRAILS | 3 | 0 | 0 |
| Multiple | NEVADA AREA; PACIFIC SKYLINE | 3 | 3 | 0 |
| Multiple | NEW BIRTH OF FREEDOM; PENNSYLVANIA DUTCH | 3 | 0 | 0 |
| Multiple | NORTHEAST GEORGIA; NORTHWEST GEORGIA | 3 | 0 | 0 |
| Multiple | NORTHEAST ILLINOIS; THREE FIRES | 3 | 0 | 0 |
| Multiple | NORTHERN NEW JERSEY; WASHINGTON CROSSING | 3 | 3 | 0 |
| Multiple | NORTHERN STAR; TWIN VALLEY | 3 | 2 | 0 |
| Multiple | OCCONEECHEE; OLD HICKORY | 3 | 3 | 0 |
| Multiple | ORANGE COUNTY; SAN DIEGO - IMPERIAL COUNCIL | 3 | 3 | 0 |
| Multiple | QUAPAW AREA; WESTARK AREA | 3 | 3 | 0 |
| Multiple | SENECA WATERWAYS; TWIN RIVERS | 3 | 2 | 0 |
| Multiple | SEQUOIA; SOUTHERN SIERRA | 3 | 3 | 0 |
| Multiple | TIDEWATER; VIRGINIA HEADWATERS | 3 | 0 | 0 |
| Multiple | VENTURA COUNTY; WESTERN LOS ANGELES COUNTY | 3 | 3 | 0 |
| Multiple | ABRAHAM LINCOLN; GREATER ST. LOUIS AREA | 2 | 0 | 0 |
| Multiple | ABRAHAM LINCOLN; PATHWAY TO ADVENTURE | 2 | 0 | 0 |
| Multiple | ABRAHAM LINCOLN; W.D. BOYCE | 2 | 0 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; BALTIMORE AREA | 2 | 0 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; BUCKSKIN | 2 | 0 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; GREAT TRAIL | 2 | 1 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; GREATER NIAGARA FRONTIER | 2 | 2 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; LAUREL HIGHLANDS | 2 | 0 | 0 |
| Multiple | ALOHA; FAR EAST | 2 | 2 | 0 |
| Multiple | ANDREW JACKSON; CHICKASAW | 2 | 0 | 0 |
| Multiple | ANTHONY WAYNE AREA; CROSSROADS OF AMERICA | 2 | 0 | 0 |
| Multiple | ARBUCKLE AREA; LAST FRONTIER | 2 | 0 | 0 |
| Multiple | ATLANTA AREA; JERSEY SHORE | 2 | 0 | 0 |
| Multiple | ATLANTA AREA; NORTHWEST GEORGIA | 2 | 1 | 0 |
| Multiple | ATLANTA AREA; PATHWAY TO ADVENTURE | 2 | 1 | 0 |
| Multiple | BADEN POWELL; CROSSROADS OF AMERICA; DEL-MAR-VA | 2 | 0 | 0 |
| Multiple | BADEN POWELL; JUNIATA VALLEY | 2 | 1 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | BADEN POWELL; TWIN RIVERS | 2 | 2 | 0 |
| Multiple | BAY-LAKES; GLACIER'S EDGE | 2 | 0 | 0 |
| Multiple | BAY-LAKES; NORTHEAST ILLINOIS | 2 | 0 | 0 |
| Multiple | BAY-LAKES; SAMOSET COUNCIL | 2 | 0 | 0 |
| Multiple | BLACK SWAMP AREA; BUCKEYE | 2 | 1 | 0 |
| Multiple | BLACK SWAMP AREA; ERIE SHORES | 2 | 1 | 0 |
| Multiple | BLACK SWAMP AREA; SIMON KENTON | 2 | 0 | 0 |
| Multiple | BLACKHAWK AREA; NORTHEAST ILLINOIS | 2 | 0 | 0 |
| Multiple | BLACKHAWK AREA; PATHWAY TO ADVENTURE | 2 | 0 | 0 |
| Multiple | BLUE GRASS; LAUREL HIGHLANDS | 2 | 0 | 0 |
| Multiple | BLUE GRASS; SIMON KENTON | 2 | 0 | 0 |
| Multiple | BLUE MOUNTAIN; CASCADE PACIFIC | 2 | 1 | 0 |
| Multiple | BLUE MOUNTAIN; INLAND NORTHWEST | 2 | 0 | 0 |
| Multiple | BLUE RIDGE MOUNTAINS; HEART OF VIRGINIA | 2 | 0 | 0 |
| Multiple | BLUE RIDGE; DANIEL BOONE | 2 | 2 | 0 |
| Multiple | BLUE RIDGE; OCCONEECHEE | 2 | 1 | 0 |
| Multiple | BUCKEYE; GREAT TRAIL; LAKE ERIE | 2 | 0 | 0 |
| Multiple | BUCKSKIN; SIMON KENTON | 2 | 0 | 0 |
| Multiple | BUFFALO TRAIL; TEXAS TRAILS | 2 | 0 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; GOLDEN EMPIRE | 2 | 2 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; LONG BEACH AREA | 2 | 2 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; SAN DIEGO - IMPERIAL COUNCIL | 2 | 2 | 0 |
| Multiple | CASCADE PACIFIC; MOUNT BAKER | 2 | 0 | 0 |
| Multiple | CASCADE PACIFIC; SAN DIEGO - IMPERIAL COUNCIL | 2 | 2 | 0 |
| Multiple | CENTRAL FLORIDA; GREATER TAMPA BAY AREA | 2 | 0 | 0 |
| Multiple | CENTRAL FLORIDA; ORANGE COUNTY | 2 | 0 | 0 |
| Multiple | CENTRAL GEORGIA; COASTAL GEORGIA | 2 | 0 | 0 |
| Multiple | CENTRAL GEORGIA; SOUTH GEORGIA | 2 | 0 | 0 |
| Multiple | CENTRAL NORTH CAROLINA; OLD NORTH STATE | 2 | 2 | 0 |
| Multiple | CHEROKEE AREA 469; INDIAN NATIONS | 2 | 0 | 0 |
| Multiple | CHEROKEE AREA 556; GREAT SMOKY MOUNTAIN | 2 | 0 | 0 |
| Multiple | CHEROKEE AREA 556; NORTHWEST GEORGIA | 2 | 0 | 0 |
| Multiple | CHIEF SEATTLE; INLAND NORTHWEST | 2 | 0 | 0 |
| Multiple | CIRCLE TEN; EAST TEXAS AREA | 2 | 0 | 0 |
| Multiple | CIRCLE TEN; GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 2 | 2 | 0 |
| Multiple | CIRCLE TEN; VENTURA COUNTY; WESTERN LOS ANGELES COUNTY | 2 | 2 | 0 |
| Multiple | COASTAL CAROLINA; PEE DEE AREA | 2 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; NARRAGANSETT | 2 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; SENECA WATERWAYS | 2 | 1 | 0 |
| Multiple | CRADLE OF LIBERTY; LAUREL HIGHLANDS | 2 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; SUSQUEHANNA | 2 | 0 | 0 |
| Multiple | CRATER LAKE COUNCIL; GOLDEN EMPIRE | 2 | 2 | 0 |
| Multiple | CROSSROADS OF AMERICA; GREATER ST. LOUIS AREA | 2 | 0 | 0 |
| Multiple | CROSSROADS OF AMERICA; MICHIGAN CROSSROADS | 2 | 0 | 0 |
| Multiple | CROSSROADS OF AMERICA; MINSI TRAILS | 2 | 1 | 0 |
| Multiple | CROSSROADS OF THE WEST; LAS VEGAS AREA | 2 | 1 | 0 |
| Multiple | DANIEL BOONE; EAST CAROLINA | 2 | 2 | 0 |
| Multiple | DANIEL WEBSTER; GREEN MOUNTAIN | 2 | 1 | 0 |
| Multiple | DANIEL WEBSTER; MAYFLOWER | 2 | 0 | 0 |
| Multiple | DENVER AREA; GREAT SOUTHWEST | 2 | 2 | 0 |
| Multiple | DIRECT SERVICE; NATIONAL CAPITAL AREA | 2 | 0 | 0 |
| Multiple | EAST CAROLINA; INDIAN WATERS | 2 | 1 | 0 |
| Multiple | EAST CAROLINA; MECKLENBURG COUNTY | 2 | 2 | 0 |
| Multiple | EAST CAROLINA; PIEDMONT 420 | 2 | 2 | 0 |
| Multiple | EAST CAROLINA; TUSCARORA | 2 | 2 | 0 |
| Multiple | EAST TEXAS AREA; SAM HOUSTON AREA | 2 | 0 | 0 |
| Multiple | EVANGELINE AREA; SOUTHEAST LOUISIANA | 2 | 2 | 0 |
| Multiple | FIVE RIVERS; GREATER NEW YORK | 2 | 1 | 0 |
| Multiple | FIVE RIVERS; IROQUOIS TRAIL; SENECA WATERWAYS | 2 | 2 | 0 |
| Multiple | FIVE RIVERS; OHIO RIVER VALLEY | 2 | 0 | 0 |
| Multiple | FRENCH CREEK; LAUREL HIGHLANDS | 2 | 0 | 0 |
| Multiple | GAMEHAVEN; NORTHERN STAR | 2 | 2 | 0 |
| Multiple | GARDEN STATE; WASHINGTON CROSSING | 2 | 2 | 0 |
| Multiple | GOLDEN EMPIRE; GREATER YOSEMITE; REDWOOD EMPIRE; SILICON VALLEY MONTEREY BAY | 2 | 2 | 0 |
| Multiple | GOLDEN EMPIRE; NARRAGANSETT | 2 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; NORTHERN STAR | 2 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; SEQUOIA | 2 | 2 | 0 |
| Multiple | GOLDEN GATE AREA; PATRIOTS' PATH | 2 | 2 | 0 |
| Multiple | GOLDEN GATE AREA; PIEDMONT 042 | 2 | 2 | 0 |
| Multiple | GOLDEN SPREAD; LAST FRONTIER | 2 | 0 | 0 |
| Multiple | GOLDEN SPREAD; SAM HOUSTON AREA | 2 | 0 | 0 |
| Multiple | GRAND CANYON; GREAT SOUTHWEST | 2 | 0 | 0 |
| Multiple | GRAND COLUMBIA; MOUNT BAKER | 2 | 0 | 0 |
| Multiple | GREAT RIVERS; PONY EXPRESS | 2 | 0 | 0 |
| Multiple | GREATER ALABAMA; GULF COAST | 2 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; LONG BEACH AREA; WESTERN LOS ANGELES COUNTY | 2 | 2 | 0 |
| Multiple | GREATER LOS ANGELES; PATHWAY TO ADVENTURE | 2 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; SAN DIEGO - IMPERIAL COUNCIL | 2 | 2 | 0 |
| Multiple | GREATER NEW YORK; IROQUOIS TRAIL | 2 | 2 | 0 |
| Multiple | GREATER NEW YORK; RIP VAN WINKLE | 2 | 2 | 0 |
| Multiple | GREATER ST. LOUIS AREA; ILLOWA | 2 | 0 | 0 |
| Multiple | GREATER YOSEMITE; SEQUOIA | 2 | 2 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | GREEN MOUNTAIN; WESTERN MASSACHUSETTS | 2 | 2 | 0 |
| Multiple | HAWK MOUNTAIN; MASON-DIXON | 2 | 0 | 0 |
| Multiple | HAWKEYE AREA; WINNEBAGO | 2 | 0 | 0 |
| Multiple | HEART OF AMERICA; TWIN RIVERS | 2 | 0 | 0 |
| Multiple | HEART OF NEW ENGLAND; WESTERN MASSACHUSETTS | 2 | 0 | 0 |
| Multiple | HOOSIER TRAILS; MUSKINGUM VALLEY | 2 | 0 | 0 |
| Multiple | HOOSIER TRAILS; QUAPAW AREA | 2 | 2 | 0 |
| Multiple | ILLOWA; MISSISSIPPI VALLEY | 2 | 0 | 0 |
| Multiple | ILLOWA; PRAIRIELANDS | 2 | 0 | 0 |
| Multiple | INDIAN NATIONS; LAST FRONTIER | 2 | 0 | 0 |
| Multiple | INDIAN WATERS; PALMETTO | 2 | 0 | 0 |
| Multiple | INLAND NORTHWEST; MONTANA | 2 | 2 | 0 |
| Multiple | ISTROUMA AREA; NORWELA | 2 | 2 | 0 |
| Multiple | LAKE ERIE; SIMON KENTON | 2 | 0 | 0 |
| Multiple | LASALLE; SAGAMORE | 2 | 0 | 0 |
| Multiple | LAUREL HIGHLANDS; OHIO RIVER VALLEY | 2 | 0 | 0 |
| Multiple | LAUREL HIGHLANDS; SUSQUEHANNA | 2 | 0 | 0 |
| Multiple | LEATHERSTOCKING; TWIN RIVERS | 2 | 0 | 0 |
| Multiple | LONG BEACH AREA; VERDUGO HILLS | 2 | 2 | 0 |
| Multiple | LONGHORN; PACIFIC HARBORS | 2 | 0 | 0 |
| Multiple | LONGHOUSE; PATRIOTS' PATH | 2 | 2 | 0 |
| Multiple | LONGHOUSE; SENECA WATERWAYS | 2 | 2 | 0 |
| Multiple | LONGS PEAK COUNCIL; PIKES PEAK | 2 | 2 | 0 |
| Multiple | LOS PADRES; SILICON VALLEY MONTEREY BAY | 2 | 2 | 0 |
| Multiple | LOS PADRES; WESTERN LOS ANGELES COUNTY | 2 | 2 | 0 |
| Multiple | MARIN; PACIFIC SKYLINE | 2 | 0 | 0 |
| Multiple | MARIN; WESTERN LOS ANGELES COUNTY | 2 | 2 | 0 |
| Multiple | MAYFLOWER; TRANSATLANTIC | 2 | 0 | 0 |
| Multiple | MECKLENBURG COUNTY; NATIONAL CAPITAL AREA | 2 | 2 | 0 |
| Multiple | MECKLENBURG COUNTY; OCCONEECHEE | 2 | 0 | 0 |
| Multiple | MECKLENBURG COUNTY; OLD HICKORY | 2 | 2 | 0 |
| Multiple | MIAMI VALLEY; SIMON KENTON | 2 | 2 | 0 |
| Multiple | MICHIGAN CROSSROADS; NORTHERN LIGHTS | 2 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; SENECA WATERWAYS | 2 | 0 | 0 |
| Multiple | MID-AMERICA; NATIONAL CAPITAL AREA | 2 | 0 | 0 |
| Multiple | MID-AMERICA; NORTHERN STAR | 2 | 2 | 0 |
| Multiple | MID-IOWA; TWIN RIVERS | 2 | 0 | 0 |
| Multiple | MIDDLE TENNESSEE; WEST TENNESSEE AREA | 2 | 0 | 0 |
| Multiple | MINSI TRAILS; PATRIOTS' PATH | 2 | 2 | 0 |
| Multiple | MONMOUTH; NORTHERN NEW JERSEY | 2 | 2 | 0 |
| Multiple | MONMOUTH; PATRIOTS' PATH | 2 | 2 | 0 |
| Multiple | NARRAGANSETT; SUFFOLK COUNTY | 2 | 0 | 0 |
| Multiple | NATIONAL CAPITAL AREA; VIRGINIA HEADWATERS | 2 | 0 | 0 |
| Multiple | NEW BIRTH OF FREEDOM; NORTHEASTERN PENNSYLVANIA | 2 | 0 | 0 |
| Multiple | NEW BIRTH OF FREEDOM; SUSQUEHANNA | 2 | 0 | 0 |
| Multiple | NORTH FLORIDA; SOUTH FLORIDA COUNCIL | 2 | 0 | 0 |
| Multiple | NORTHEAST ILLINOIS; POTAWATOMI AREA | 2 | 0 | 0 |
| Multiple | NORTHEAST IOWA COUNCIL; WINNEBAGO | 2 | 0 | 0 |
| Multiple | NORTHERN NEW JERSEY; PINE BURR AREA | 2 | 0 | 0 |
| Multiple | NORTHERN NEW JERSEY; SAM HOUSTON AREA | 2 | 0 | 0 |
| Multiple | NORTHERN NEW JERSEY; SPIRIT OF ADVENTURE | 2 | 2 | 0 |
| Multiple | OCCONEECHEE; OLD NORTH STATE | 2 | 2 | 0 |
| Multiple | OLD HICKORY; PIEDMONT 420 | 2 | 2 | 0 |
| Multiple | OLD NORTH STATE; PIEDMONT 420 | 2 | 2 | 0 |
| Multiple | ORANGE COUNTY; WESTERN LOS ANGELES COUNTY | 2 | 2 | 0 |
| Multiple | OZARK TRAILS; QUIVIRA | 2 | 0 | 0 |
| Multiple | PACIFIC HARBORS; TRANSATLANTIC | 2 | 0 | 0 |
| Multiple | PACIFIC SKYLINE; REDWOOD EMPIRE | 2 | 2 | 0 |
| Multiple | PALMETTO; PIEDMONT 420 | 2 | 0 | 0 |
| Multiple | PATHWAY TO ADVENTURE; SAMOSET COUNCIL | 2 | 0 | 0 |
| Multiple | SAM HOUSTON AREA; SOUTH TEXAS | 2 | 0 | 0 |
| Multiple | SEQUOIA; SEQUOYAH | 2 | 0 | 0 |
| Multiple | SHENANDOAH AREA; TIDEWATER | 2 | 0 | 0 |
| Multiple | SILICON VALLEY MONTEREY BAY; TWIN RIVERS | 2 | 2 | 0 |
| Multiple | SOUTH GEORGIA; SUWANNEE RIVER AREA | 2 | 0 | 0 |
| Multiple | ABRAHAM LINCOLN; BAY-LAKES; GREATER ST. LOUIS AREA; VOYAGEURS AREA | 1 | 0 | 0 |
| Multiple | ABRAHAM LINCOLN; DAN BEARD | 1 | 0 | 0 |
| Multiple | ABRAHAM LINCOLN; RAINBOW | 1 | 0 | 0 |
| Multiple | ABRAHAM LINCOLN; THREE FIRES | 1 | 0 | 0 |
| Multiple | ALABAMA-FLORIDA; GULF COAST | 1 | 0 | 0 |
| Multiple | ALABAMA-FLORIDA; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | ALABAMA-FLORIDA; TUKABATCHEE AREA | 1 | 0 | 0 |
| Multiple | ALAMO AREA; BAY AREA; CIRCLE TEN; LONGHORN | 1 | 0 | 0 |
| Multiple | ALAMO AREA; CAPITOL AREA; SAM HOUSTON AREA | 1 | 0 | 0 |
| Multiple | ALAMO AREA; FAR EAST | 1 | 0 | 0 |
| Multiple | ALAMO AREA; GREATER NEW YORK | 1 | 1 | 0 |
| Multiple | ALAMO AREA; GREATER TAMPA BAY AREA | 1 | 0 | 0 |
| Multiple | ALAMO AREA; LONGHORN | 1 | 0 | 0 |
| Multiple | ALAMO AREA; PINE BURR AREA | 1 | 0 | 0 |
| Multiple | ALAMO AREA; RIO GRANDE | 1 | 0 | 0 |
| Multiple | ALAMO AREA; SIMON KENTON | 1 | 1 | 0 |
| Multiple | ALAMO AREA; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | ALAMO AREA; SOUTH TEXAS | 1 | 0 | 0 |
| Multiple | ALAMO AREA; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | ALAMO AREA; WESTARK AREA | 1 | 0 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; BADEN POWELL | 1 | 1 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; BLACK SWAMP AREA | 1 | 0 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; BUCKTAIL | 1 | 0 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; CHICKASAW | 1 | 0 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; GREATER NIAGARA FRONTIER; IROQUOIS TRAIL | 1 | 1 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; LEATHERSTOCKING | 1 | 1 | 0 |
| Multiple | ALLEGHENY HIGHLANDS; LOS PADRES; VENTURA COUNTY | 1 | 1 | 0 |
| Multiple | ALOHA; CROSSROADS OF THE WEST | 1 | 1 | 0 |
| Multiple | ALOHA; GOLDEN GATE AREA | 1 | 1 | 0 |
| Multiple | ALOHA; MICHIGAN CROSSROADS; NORTHEAST ILLINOIS; THREE HARBORS | 1 | 0 | 0 |
| Multiple | ALOHA; PACIFIC SKYLINE | 1 | 1 | 0 |
| Multiple | ALOHA; TEXAS SOUTHWEST; TRANSATLANTIC | 1 | 1 | 0 |
| Multiple | ALOHA; WESTERN LOS ANGELES COUNTY | 1 | 1 | 0 |
| Multiple | ANDREW JACKSON; GREATER LOS ANGELES | 1 | 1 | 0 |
| Multiple | ANDREW JACKSON; ISTROUMA AREA | 1 | 0 | 0 |
| Multiple | ANDREW JACKSON; LAST FRONTIER | 1 | 0 | 0 |
| Multiple | ANDREW JACKSON; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | ANDREW JACKSON; PEE DEE AREA | 1 | 0 | 0 |
| Multiple | ANTHONY WAYNE AREA; ERIE SHORES | 1 | 0 | 0 |
| Multiple | ANTHONY WAYNE AREA; LASALLE | 1 | 0 | 0 |
| Multiple | ANTHONY WAYNE AREA; LONGS PEAK COUNCIL | 1 | 1 | 0 |
| Multiple | ANTHONY WAYNE AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | ANTHONY WAYNE AREA; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | ANTHONY WAYNE AREA; SAGAMORE | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; BLUE GRASS | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; CENTRAL GEORGIA; JERSEY SHORE; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; COASTAL CAROLINA; SOUTH GEORGIA | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; DAN BEARD; GULF COAST; NORTH FLORIDA | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; DANIEL BOONE | 1 | 1 | 0 |
| Multiple | ATLANTA AREA; GEORGIA-CAROLINA | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; GREAT SOUTHWEST | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; GREAT TRAIL | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; GREATER ALABAMA | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; GREATER ST. LOUIS AREA | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; LAKE ERIE | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; NEVADA AREA | 1 | 1 | 0 |
| Multiple | ATLANTA AREA; NORTH FLORIDA | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 | 0 |
| Multiple | ATLANTA AREA; SUWANNEE RIVER AREA | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; THREE FIRES | 1 | 0 | 0 |
| Multiple | ATLANTA AREA; TUKABATCHEE AREA | 1 | 0 | 0 |
| Multiple | BADEN POWELL; CONNECTICUT RIVERS; GREATER NEW YORK; PATRIOTS' PATH | 1 | 1 | 0 |
| Multiple | BADEN POWELL; CRADLE OF LIBERTY; CROSSROADS OF AMERICA | 1 | 0 | 0 |
| Multiple | BADEN POWELL; DEL-MAR-VA | 1 | 0 | 0 |
| Multiple | BADEN POWELL; GARDEN STATE | 1 | 1 | 0 |
| Multiple | BADEN POWELL; GREATER NEW YORK | 1 | 1 | 0 |
| Multiple | BADEN POWELL; IROQUOIS TRAIL; LEATHERSTOCKING | 1 | 1 | 0 |
| Multiple | BADEN POWELL; LAST FRONTIER | 1 | 0 | 0 |
| Multiple | BADEN POWELL; LAUREL HIGHLANDS | 1 | 0 | 0 |
| Multiple | BADEN POWELL; LONGHOUSE; THREE FIRES | 1 | 1 | 0 |
| Multiple | BADEN POWELL; MAYFLOWER; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | BADEN POWELL; NATIONAL CAPITAL AREA | 1 | 1 | 0 |
| Multiple | BADEN POWELL; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |
| Multiple | BALTIMORE AREA; CHESTER COUNTY | 1 | 0 | 0 |
| Multiple | BALTIMORE AREA; CHIEF SEATTLE; NATIONAL CAPITAL AREA | 1 | 1 | 0 |
| Multiple | BALTIMORE AREA; COLONIAL VIRGINIA | 1 | 0 | 0 |
| Multiple | BALTIMORE AREA; DE SOTO AREA | 1 | 1 | 0 |
| Multiple | BALTIMORE AREA; GRAND CANYON | 1 | 1 | 0 |
| Multiple | BALTIMORE AREA; GREATER ST. LOUIS AREA | 1 | 0 | 0 |
| Multiple | BALTIMORE AREA; LAUREL HIGHLANDS | 1 | 0 | 0 |
| Multiple | BALTIMORE AREA; LINCOLN HERITAGE | 1 | 0 | 0 |
| Multiple | BALTIMORE AREA; MASON-DIXON | 1 | 0 | 0 |
| Multiple | BALTIMORE AREA; MID-AMERICA | 1 | 0 | 0 |
| Multiple | BALTIMORE AREA; NATIONAL CAPITAL AREA; PATRIOTS' PATH | 1 | 1 | 0 |
| Multiple | BAY-LAKES; CASCADE PACIFIC | 1 | 0 | 0 |
| Multiple | BAY-LAKES; CROSSROADS OF AMERICA; HOOSIER TRAILS | 1 | 0 | 0 |
| Multiple | BAY-LAKES; GATEWAY AREA; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | BAY-LAKES; LAUREL HIGHLANDS | 1 | 0 | 0 |
| Multiple | BAY-LAKES; NORTHERN STAR | 1 | 1 | 0 |
| Multiple | BAY-LAKES; OREGON TRAIL | 1 | 0 | 0 |
| Multiple | BAY-LAKES; PACIFIC HARBORS | 1 | 0 | 0 |
| Multiple | BAY-LAKES; POTAWATOMI AREA | 1 | 0 | 0 |
| Multiple | BAY-LAKES; RAINBOW | 1 | 0 | 0 |
| Multiple | BAY-LAKES; REDWOOD EMPIRE | 1 | 1 | 0 |
| Multiple | BAY-LAKES; THREE FIRES | 1 | 0 | 0 |
| Multiple | BAY-LAKES; THREE HARBORS | 1 | 0 | 0 |
| Multiple | BAY-LAKES; TWIN RIVERS | 1 | 1 | 0 |
| Multiple | BLACK HILLS AREA; CIRCLE TEN | 1 | 0 | 0 |
| Multiple | BLACK HILLS AREA; GREATER ALABAMA | 1 | 0 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | BLACK HILLS AREA; MONTANA | 1 | 0 | 0 |
| Multiple | BLACK HILLS AREA; SIOUX | 1 | 0 | 0 |
| Multiple | BLACK SWAMP AREA; GREATER ST. LOUIS AREA | 1 | 0 | 0 |
| Multiple | BLACK SWAMP AREA; JAYHAWK AREA | 1 | 0 | 0 |
| Multiple | BLACK SWAMP AREA; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 |
| Multiple | BLACK WARRIOR; TUKABATCHEE AREA | 1 | 0 | 0 |
| Multiple | BLACKHAWK AREA; BUCKEYE | 1 | 0 | 0 |
| Multiple | BLACKHAWK AREA; CASCADE PACIFIC | 1 | 0 | 0 |
| Multiple | BLACKHAWK AREA; CONNECTICUT RIVERS; CONNECTICUT YANKEE | 1 | 0 | 0 |
| Multiple | BLACKHAWK AREA; CROSSROADS OF AMERICA | 1 | 0 | 0 |
| Multiple | BLACKHAWK AREA; THREE FIRES | 1 | 0 | 0 |
| Multiple | BLACKHAWK AREA; THREE RIVERS | 1 | 0 | 0 |
| Multiple | BLACKHAWK AREA; W.D. BOYCE | 1 | 0 | 0 |
| Multiple | BLUE GRASS; BUCKEYE | 1 | 1 | 0 |
| Multiple | BLUE GRASS; DAN BEARD | 1 | 0 | 0 |
| Multiple | BLUE GRASS; OCCONEECHEE | 1 | 1 | 0 |
| Multiple | BLUE MOUNTAIN; PATRIOTS' PATH | 1 | 1 | 0 |
| Multiple | BLUE MOUNTAIN; SOUTHEAST LOUISIANA | 1 | 1 | 0 |
| Multiple | BLUE RIDGE MOUNTAINS; CASCADE PACIFIC | 1 | 0 | 0 |
| Multiple | BLUE RIDGE MOUNTAINS; CROSSROADS OF AMERICA | 1 | 0 | 0 |
| Multiple | BLUE RIDGE MOUNTAINS; MOUNTAINEER AREA | 1 | 0 | 0 |
| Multiple | BLUE RIDGE MOUNTAINS; NEW BIRTH OF FREEDOM | 1 | 0 | 0 |
| Multiple | BLUE RIDGE MOUNTAINS; OLD NORTH STATE | 1 | 1 | 0 |
| Multiple | BLUE RIDGE MOUNTAINS; SHENANDOAH AREA | 1 | 0 | 0 |
| Multiple | BLUE RIDGE; BLUE RIDGE MOUNTAINS | 1 | 0 | 0 |
| Multiple | BLUE RIDGE; CENTRAL FLORIDA; DANIEL BOONE; PIEDMONT 420 | 1 | 1 | 0 |
| Multiple | BLUE RIDGE; CHICKASAW | 1 | 0 | 0 |
| Multiple | BLUE RIDGE; CIMARRON | 1 | 0 | 0 |
| Multiple | BLUE RIDGE; EAST CAROLINA | 1 | 1 | 0 |
| Multiple | BLUE RIDGE; INDIAN WATERS | 1 | 1 | 0 |
| Multiple | BLUE RIDGE; MOUNTAINEER AREA | 1 | 0 | 0 |
| Multiple | BLUE RIDGE; SAMOSET COUNCIL | 1 | 1 | 0 |
| Multiple | BUCKEYE; GREEN MOUNTAIN | 1 | 1 | 0 |
| Multiple | BUCKEYE; HEART OF AMERICA | 1 | 0 | 0 |
| Multiple | BUCKEYE; LAKE ERIE; MAYFLOWER; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | BUCKEYE; LAKE ERIE; NORTHEAST GEORGIA | 1 | 0 | 0 |
| Multiple | BUCKEYE; MUSKINGUM VALLEY | 1 | 0 | 0 |
| Multiple | BUCKEYE; TUSCARORA | 1 | 0 | 0 |
| Multiple | BUCKSKIN; COASTAL GEORGIA | 1 | 1 | 0 |
| Multiple | BUCKSKIN; DAN BEARD | 1 | 0 | 0 |
| Multiple | BUCKSKIN; DENVER AREA; PIKES PEAK | 1 | 1 | 0 |
| Multiple | BUCKSKIN; GREATER ALABAMA | 1 | 0 | 0 |
| Multiple | BUCKSKIN; HAWK MOUNTAIN | 1 | 0 | 0 |
| Multiple | BUCKSKIN; MECKLENBURG COUNTY | 1 | 0 | 0 |
| Multiple | BUCKSKIN; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | BUCKSKIN; PACIFIC SKYLINE | 1 | 1 | 0 |
| Multiple | BUCKSKIN; SENECA WATERWAYS | 1 | 1 | 0 |
| Multiple | BUCKTAIL; EAST TEXAS AREA; NORWELA | 1 | 1 | 0 |
| Multiple | BUCKTAIL; GEORGIA-CAROLINA | 1 | 0 | 0 |
| Multiple | BUCKTAIL; LAUREL HIGHLANDS | 1 | 0 | 0 |
| Multiple | BUFFALO TRACE; BUFFALO TRAIL | 1 | 0 | 0 |
| Multiple | BUFFALO TRACE; CROSSROADS OF AMERICA | 1 | 0 | 0 |
| Multiple | BUFFALO TRACE; GREATER ST. LOUIS AREA | 1 | 0 | 0 |
| Multiple | BUFFALO TRACE; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | BUFFALO TRACE; SAGAMORE | 1 | 0 | 0 |
| Multiple | BUFFALO TRAIL; DIRECT SERVICE | 1 | 0 | 0 |
| Multiple | BUFFALO TRAIL; LONGHORN | 1 | 0 | 0 |
| Multiple | BUFFALO TRAIL; SOUTH PLAINS | 1 | 0 | 0 |
| Multiple | CADDO AREA; CHICKASAW; DE SOTO AREA; QUAPAW AREA; WESTARK AREA | 1 | 1 | 0 |
| Multiple | CADDO AREA; CIRCLE TEN | 1 | 0 | 0 |
| Multiple | CADDO AREA; CIRCLE TEN; EAST TEXAS AREA; RIO GRANDE | 1 | 1 | 0 |
| Multiple | CADDO AREA; DE SOTO AREA | 1 | 0 | 0 |
| Multiple | CADDO AREA; EAST TEXAS AREA | 1 | 0 | 0 |
| Multiple | CADDO AREA; NORWELA | 1 | 1 | 0 |
| Multiple | CALCASIEU; EVANGELINE AREA | 1 | 1 | 0 |
| Multiple | CALCASIEU; GOLDEN GATE AREA | 1 | 1 | 0 |
| Multiple | CALCASIEU; INDIAN NATIONS | 1 | 1 | 0 |
| Multiple | CALCASIEU; NORWELA | 1 | 1 | 0 |
| Multiple | CALCASIEU; SOUTHEAST LOUISIANA | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; CATALINA | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; CENTRAL FLORIDA | 1 | 0 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; CROSSROADS OF THE WEST | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; DANIEL WEBSTER | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; DENVER AREA | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; GREATER LOS ANGELES; ORANGE COUNTY | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; GREATER LOS ANGELES; SPIRIT OF ADVENTURE | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; LAS VEGAS AREA | 1 | 1 | 0 |
| Multiple | COUNTY; VERDUGO HILLS; WESTERN LOS ANGELES COUNTY | 1 | 1 | 0 |
| Multiple | VERDUGO HILLS; WESTERN LOS ANGELES COUNTY | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; LONGS PEAK COUNCIL | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; RIO GRANDE | 1 | 0 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; SOUTHERN SIERRA | 1 | 1 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | CALIFORNIA INLAND EMPIRE; TEXAS SOUTHWEST | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; VENTURA COUNTY | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; VERDUGO HILLS | 1 | 1 | 0 |
| Multiple | CALIFORNIA INLAND EMPIRE; YUCCA | 1 | 1 | 0 |
| Multiple | CAPE COD & ISLANDS; FAR EAST | 1 | 0 | 0 |
| Multiple | CAPE COD & ISLANDS; FAR EAST; LAS VEGAS AREA | 1 | 0 | 0 |
| Multiple | CAPE COD & ISLANDS; GREATER NEW YORK | 1 | 1 | 0 |
| Multiple | CAPE COD & ISLANDS; HEART OF NEW ENGLAND | 1 | 0 | 0 |
| Multiple | CAPE COD & ISLANDS; HEART OF NEW ENGLAND; MAYFLOWER | 1 | 0 | 0 |
| Multiple | CAPE COD & ISLANDS; MAYFLOWER | 1 | 0 | 0 |
| Multiple | CAPE COD & ISLANDS; MAYFLOWER; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | CAPE COD & ISLANDS; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | CAPE COD & ISLANDS; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | CAPE COD & ISLANDS; SAGAMORE | 1 | 0 | 0 |
| Multiple | CAPE COD & ISLANDS; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | CAPE COD & ISLANDS; TWIN RIVERS | 1 | 1 | 0 |
| Multiple | CAPE FEAR; CENTRAL NORTH CAROLINA; EAST CAROLINA | 1 | 1 | 0 |
| Multiple | CAPE FEAR; DANIEL BOONE | 1 | 1 | 0 |
| Multiple | CAPE FEAR; EAST CAROLINA | 1 | 1 | 0 |
| Multiple | CAPE FEAR; EAST CAROLINA; NATIONAL CAPITAL AREA | 1 | 1 | 0 |
| Multiple | CAPE FEAR; MECKLENBURG COUNTY | 1 | 1 | 0 |
| Multiple | CAPE FEAR; OCCONEECHEE | 1 | 1 | 0 |
| Multiple | CAPE FEAR; OLD HICKORY | 1 | 1 | 0 |
| Multiple | CAPE FEAR; PIEDMONT 420 | 1 | 1 | 0 |
| Multiple | CAPITOL AREA; CENTRAL NORTH CAROLINA; SAM HOUSTON AREA | 1 | 1 | 0 |
| Multiple | CAPITOL AREA; CIRCLE TEN; LONGHORN | 1 | 0 | 0 |
| Multiple | CAPITOL AREA; DENVER AREA | 1 | 1 | 0 |
| Multiple | CAPITOL AREA; GREATER LOS ANGELES; GREATER NEW YORK | 1 | 1 | 0 |
| Multiple | CAPITOL AREA; LONGHORN | 1 | 0 | 0 |
| Multiple | CAPITOL AREA; TEXAS TRAILS | 1 | 0 | 0 |
| Multiple | CAPITOL AREA; THREE RIVERS | 1 | 0 | 0 |
| Multiple | CASCADE PACIFIC; CHIEF SEATTLE; PACIFIC HARBORS | 1 | 0 | 0 |
| Multiple | CASCADE PACIFIC; GOLDEN EMPIRE | 1 | 1 | 0 |
| Multiple | CASCADE PACIFIC; GRAND COLUMBIA | 1 | 0 | 0 |
| Multiple | CASCADE PACIFIC; GREATER NEW YORK | 1 | 1 | 0 |
| Multiple | CASCADE PACIFIC; GREATER ST. LOUIS AREA | 1 | 1 | 0 |
| Multiple | CASCADE PACIFIC; GREEN MOUNTAIN | 1 | 1 | 0 |
| Multiple | CASCADE PACIFIC; INDIAN NATIONS | 1 | 0 | 0 |
| Multiple | CASCADE PACIFIC; LONGHORN | 1 | 1 | 0 |
| Multiple | CASCADE PACIFIC; MID-AMERICA | 1 | 0 | 0 |
| Multiple | CASCADE PACIFIC; MONTANA | 1 | 1 | 0 |
| Multiple | CASCADE PACIFIC; MOUNT BAKER; PACIFIC HARBORS | 1 | 0 | 0 |
| Multiple | CASCADE PACIFIC; OREGON TRAIL | 1 | 0 | 0 |
| Multiple | CASCADE PACIFIC; PEE DEE AREA | 1 | 0 | 0 |
| Multiple | CASCADE PACIFIC; PENNSYLVANIA DUTCH | 1 | 0 | 0 |
| Multiple | CATALINA; GREATER LOS ANGELES | 1 | 1 | 0 |
| Multiple | CATALINA; HEART OF AMERICA | 1 | 1 | 0 |
| Multiple | CATALINA; LAS VEGAS AREA | 1 | 1 | 0 |
| Multiple | CATALINA; LONGHORN | 1 | 1 | 0 |
| Multiple | CATALINA; LONGHORN; PACIFIC HARBORS | 1 | 1 | 0 |
| Multiple | CATALINA; LONGS PEAK COUNCIL | 1 | 1 | 0 |
| Multiple | CATALINA; ORANGE COUNTY | 1 | 1 | 0 |
| Multiple | CATALINA; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 | 0 |
| Multiple | CENTRAL FLORIDA; GREATER NEW YORK | 1 | 1 | 0 |
| Multiple | CENTRAL FLORIDA; GREATER TAMPA BAY AREA; NORTH FLORIDA | 1 | 0 | 0 |
| Multiple | CENTRAL FLORIDA; GULF COAST | 1 | 1 | 0 |
| Multiple | CENTRAL FLORIDA; GULF STREAM | 1 | 0 | 0 |
| Multiple | CENTRAL FLORIDA; NORTH FLORIDA; PIEDMONT 420 | 1 | 0 | 0 |
| Multiple | CENTRAL FLORIDA; NORTHERN STAR | 1 | 1 | 0 |
| Multiple | CENTRAL FLORIDA; SIMON KENTON | 1 | 0 | 0 |
| Multiple | CENTRAL FLORIDA; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |
| Multiple | CENTRAL FLORIDA; SOUTHWEST FLORIDA | 1 | 0 | 0 |
| Multiple | CENTRAL GEORGIA; GEORGIA-CAROLINA | 1 | 0 | 0 |
| Multiple | CENTRAL GEORGIA; NORTHEAST GEORGIA | 1 | 0 | 0 |
| Multiple | CENTRAL GEORGIA; ORANGE COUNTY | 1 | 0 | 0 |
| Multiple | CENTRAL MINNESOTA; GAMEHAVEN; NORTHERN STAR | 1 | 1 | 0 |
| Multiple | CENTRAL MINNESOTA; GATEWAY AREA | 1 | 1 | 0 |
| Multiple | CENTRAL MINNESOTA; GREATER NEW YORK; NORTHERN STAR | 1 | 1 | 0 |
| Multiple | CENTRAL MINNESOTA; NORTHERN LIGHTS | 1 | 1 | 0 |
| Multiple | CENTRAL MINNESOTA; NORTHERN STAR; VOYAGEURS AREA | 1 | 1 | 0 |
| Multiple | CENTRAL MINNESOTA; SIOUX | 1 | 1 | 0 |
| Multiple | CENTRAL NEW JERSEY; DANIEL BOONE; PATRIOTS' PATH | 1 | 1 | 0 |
| Multiple | CENTRAL NEW JERSEY; GARDEN STATE; WASHINGTON CROSSING | 1 | 1 | 0 |
| Multiple | CENTRAL NEW JERSEY; MONMOUTH; WASHINGTON CROSSING | 1 | 1 | 0 |
| Multiple | CENTRAL NEW JERSEY; NORTHERN NEW JERSEY; WASHINGTON CROSSING | 1 | 1 | 0 |
| Multiple | CENTRAL NORTH CAROLINA; PATRIOTS' PATH | 1 | 1 | 0 |
| Multiple | CENTRAL NORTH CAROLINA; PIEDMONT 420 | 1 | 1 | 0 |
| Multiple | CHATTAHOOCHEE; COASTAL GEORGIA | 1 | 0 | 0 |
| Multiple | CHATTAHOOCHEE; NORTHEAST GEORGIA | 1 | 0 | 0 |
| Multiple | CHATTAHOOCHEE; SIMON KENTON | 1 | 0 | 0 |
| Multiple | CHATTAHOOCHEE; SUWANNEE RIVER AREA | 1 | 0 | 0 |
| Multiple | CHEROKEE AREA 469; CIMARRON | 1 | 0 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | CHEROKEE AREA 556; GREAT RIVERS | 1 | 0 | 0 |
| Multiple | CHEROKEE AREA 556; MIDDLE TENNESSEE; NORTH FLORIDA | 1 | 0 | 0 |
| Multiple | CHEROKEE AREA 556; NATIONAL CAPITAL AREA | 1 | 1 | 0 |
| Multiple | CHEROKEE AREA 556; NORTH FLORIDA | 1 | 0 | 0 |
| Multiple | CHEROKEE AREA 556; SAM HOUSTON AREA | 1 | 0 | 0 |
| Multiple | CHESTER COUNTY; CRADLE OF LIBERTY; WESTCHESTER-PUTNAM | 1 | 1 | 0 |
| Multiple | CHESTER COUNTY; DEL-MAR-VA | 1 | 0 | 0 |
| Multiple | CHESTER COUNTY; FRENCH CREEK | 1 | 0 | 0 |
| Multiple | CHESTER COUNTY; GREATER ST. LOUIS AREA | 1 | 0 | 0 |
| Multiple | CHESTER COUNTY; HEART OF VIRGINIA | 1 | 0 | 0 |
| Multiple | WASHINGTON CROSSING | 1 | 1 | 0 |
| Multiple | CHESTER COUNTY; NORTHEASTERN PENNSYLVANIA | 1 | 0 | 0 |
| Multiple | CHICKASAW; CHOCTAW AREA | 1 | 0 | 0 |
| Multiple | CHICKASAW; GREATER ALABAMA | 1 | 0 | 0 |
| Multiple | CHICKASAW; GREATER NEW YORK | 1 | 1 | 0 |
| Multiple | CHICKASAW; HEART OF AMERICA | 1 | 0 | 0 |
| Multiple | CHICKASAW; MIDDLE TENNESSEE | 1 | 0 | 0 |
| Multiple | CHICKASAW; MOBILE AREA | 1 | 0 | 0 |
| Multiple | CHICKASAW; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | CHICKASAW; NEW BIRTH OF FREEDOM | 1 | 0 | 0 |
| Multiple | CHICKASAW; PINE BURR AREA; PUSHMATAHA AREA; YOCONA AREA | 1 | 0 | 0 |
| Multiple | CHICKASAW; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 | 0 |
| Multiple | CHICKASAW; WEST TENNESSEE AREA | 1 | 0 | 0 |
| Multiple | CHICKASAW; YOCONA AREA | 1 | 0 | 0 |
| Multiple | CHIEF CORNPLANTER; GREAT TRAIL | 1 | 0 | 0 |
| Multiple | CHIEF SEATTLE; CROSSROADS OF THE WEST | 1 | 0 | 0 |
| Multiple | CHIEF SEATTLE; GRAND COLUMBIA; PACIFIC HARBORS | 1 | 0 | 0 |
| Multiple | CHIEF SEATTLE; GREATER YOSEMITE | 1 | 1 | 0 |
| Multiple | CHIEF SEATTLE; INDIAN NATIONS | 1 | 0 | 0 |
| Multiple | CHIEF SEATTLE; OREGON TRAIL | 1 | 0 | 0 |
| Multiple | CHIEF SEATTLE; SAM HOUSTON AREA | 1 | 0 | 0 |
| Multiple | CHIEF SEATTLE; SILICON VALLEY MONTEREY BAY | 1 | 1 | 0 |
| Multiple | CHIPPEWA VALLEY; MID-AMERICA; NORTHERN STAR | 1 | 0 | 0 |
| Multiple | CHIPPEWA VALLEY; VOYAGEURS AREA | 1 | 0 | 0 |
| Multiple | CHOCTAW AREA; PINE BURR AREA | 1 | 0 | 0 |
| Multiple | CIMARRON; INDIAN NATIONS | 1 | 0 | 0 |
| Multiple | CIMARRON; QUIVIRA | 1 | 0 | 0 |
| Multiple | CIMARRON; SOUTH PLAINS | 1 | 0 | 0 |
| Multiple | CIMARRON; TWIN RIVERS | 1 | 1 | 0 |
| Multiple | CIRCLE TEN; CROSSROADS OF THE WEST | 1 | 0 | 0 |
| Multiple | CIRCLE TEN; EAST TEXAS AREA; LONGHORN | 1 | 0 | 0 |
| Multiple | CIRCLE TEN; GREAT TRAIL | 1 | 0 | 0 |
| Multiple | CIRCLE TEN; HEART OF VIRGINIA; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | CIRCLE TEN; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | CIRCLE TEN; ORANGE COUNTY; WESTERN LOS ANGELES COUNTY | 1 | 1 | 0 |
| Multiple | CIRCLE TEN; SEQUOIA | 1 | 1 | 0 |
| Multiple | CIRCLE TEN; THREE RIVERS | 1 | 0 | 0 |
| Multiple | CIRCLE TEN; TUKABATCHEE AREA | 1 | 0 | 0 |
| Multiple | COASTAL CAROLINA; COASTAL GEORGIA | 1 | 0 | 0 |
| Multiple | COASTAL CAROLINA; EAST TEXAS AREA | 1 | 0 | 0 |
| Multiple | COASTAL CAROLINA; ERIE SHORES | 1 | 0 | 0 |
| Multiple | COASTAL CAROLINA; GOLDEN SPREAD | 1 | 0 | 0 |
| Multiple | COASTAL CAROLINA; PALMETTO | 1 | 0 | 0 |
| Multiple | COASTAL CAROLINA; PIEDMONT 420 | 1 | 1 | 0 |
| Multiple | COASTAL GEORGIA; GREATER TAMPA BAY AREA | 1 | 0 | 0 |
| Multiple | COASTAL GEORGIA; GREATER YOSEMITE | 1 | 1 | 0 |
| Multiple | COASTAL GEORGIA; MIDDLE TENNESSEE | 1 | 0 | 0 |
| Multiple | COASTAL GEORGIA; NORTH FLORIDA | 1 | 0 | 0 |
| Multiple | COASTAL GEORGIA; NORTHEAST GEORGIA | 1 | 0 | 0 |
| Multiple | COASTAL GEORGIA; PACIFIC HARBORS | 1 | 0 | 0 |
| Multiple | COASTAL GEORGIA; SHENANDOAH AREA | 1 | 0 | 0 |
| Multiple | COASTAL GEORGIA; SOUTH GEORGIA | 1 | 0 | 0 |
| Multiple | COASTAL GEORGIA; TUSCARORA | 1 | 1 | 0 |
| Multiple | COLONIAL VIRGINIA; ERIE SHORES | 1 | 0 | 0 |
| Multiple | COLONIAL VIRGINIA; HEART OF VIRGINIA | 1 | 0 | 0 |
| Multiple | COLONIAL VIRGINIA; HEART OF VIRGINIA; TIDEWATER | 1 | 0 | 0 |
| Multiple | COLONIAL VIRGINIA; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | COLONIAL VIRGINIA; PINE BURR AREA | 1 | 0 | 0 |
| Multiple | COLUMBIA-MONTOUR; LEATHERSTOCKING | 1 | 0 | 0 |
| Multiple | COLUMBIA-MONTOUR; LINCOLN HERITAGE | 1 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; DAN BEARD; HEART OF NEW ENGLAND; OREGON TRAIL | 1 | 1 | 0 |
| Multiple | CONNECTICUT RIVERS; DANIEL WEBSTER | 1 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; DANIEL WEBSTER; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; GREENWICH | 1 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; HEART OF AMERICA | 1 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; HOUSATONIC | 1 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; HUDSON VALLEY | 1 | 1 | 0 |
| Multiple | CONNECTICUT RIVERS; LONGHORN | 1 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; MAYFLOWER; WESTCHESTER-PUTNAM | 1 | 1 | 0 |
| Multiple | CONNECTICUT RIVERS; MONMOUTH | 1 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; SEQUOYAH | 1 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; SUFFOLK COUNTY | 1 | 1 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | CONNECTICUT RIVERS; THEODORE ROOSEVELT | 1 | 1 | 0 |
| Multiple | CONNECTICUT RIVERS; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; WASHINGTON CROSSING | 1 | 0 | 0 |
| Multiple | CONNECTICUT RIVERS; WESTCHESTER-PUTNAM | 1 | 1 | 0 |
| Multiple | CONNECTICUT RIVERS; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | CONNECTICUT YANKEE; HEART OF NEW ENGLAND | 1 | 0 | 0 |
| Multiple | CONNECTICUT YANKEE; HUDSON VALLEY | 1 | 1 | 0 |
| Multiple | CONNECTICUT YANKEE; MIAMI VALLEY; SIMON KENTON | 1 | 0 | 0 |
| Multiple | CONNECTICUT YANKEE; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | CONNECTICUT YANKEE; SUWANNEE RIVER AREA | 1 | 0 | 0 |
| Multiple | CONQUISTADOR; CROSSROADS OF THE WEST | 1 | 0 | 0 |
| Multiple | CONQUISTADOR; FAR EAST; YUCCA | 1 | 0 | 0 |
| Multiple | CONQUISTADOR; YUCCA | 1 | 0 | 0 |
| Multiple | CORNHUSKER; GREATER YOSEMITE | 1 | 1 | 0 |
| Multiple | CORNHUSKER; PRAIRIELANDS | 1 | 0 | 0 |
| Multiple | CORNHUSKER; QUIVIRA | 1 | 0 | 0 |
| Multiple | CORONADO AREA; GREAT SOUTHWEST | 1 | 0 | 0 |
| Multiple | CORONADO AREA; GREATER NEW YORK | 1 | 0 | 0 |
| Multiple | CORONADO AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; CROSSROADS OF AMERICA; MINSI TRAILS | 1 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; FRENCH CREEK | 1 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; GREAT SOUTHWEST | 1 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; HAWK MOUNTAIN; NORTHEASTERN PENNSYLVANIA | 1 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; HUDSON VALLEY; MINSI TRAILS; NORTHEASTERN PENNSYLVANIA | 1 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; JERSEY SHORE | 1 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; JUNIATA VALLEY | 1 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; MINSI TRAILS; NORTHERN NEW JERSEY | 1 | 1 | 0 |
| Multiple | CRADLE OF LIBERTY; NEW BIRTH OF FREEDOM | 1 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; NORTHEASTERN PENNSYLVANIA | 1 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; NORTHERN NEW JERSEY | 1 | 0 | 0 |
| Multiple | CRADLE OF LIBERTY; PATRIOTS' PATH | 1 | 1 | 0 |
| Multiple | CRADLE OF LIBERTY; QUIVIRA | 1 | 1 | 0 |
| Multiple | CRADLE OF LIBERTY; SPIRIT OF ADVENTURE | 1 | 1 | 0 |
| Multiple | CRATER LAKE COUNCIL; LOS PADRES; VENTURA COUNTY | 1 | 1 | 0 |
| Multiple | CRATER LAKE COUNCIL; MICHIGAN CROSSROADS | 1 | 1 | 0 |
| Multiple | CRATER LAKE COUNCIL; WESTERN LOS ANGELES COUNTY | 1 | 1 | 0 |
| Multiple | CROSSROADS OF AMERICA; DAN BEARD | 1 | 0 | 0 |
| Multiple | CROSSROADS OF AMERICA; DAN BEARD; HOOSIER TRAILS | 1 | 0 | 0 |
| Multiple | CROSSROADS OF AMERICA; DEL-MAR-VA; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | CROSSROADS OF AMERICA; GARDEN STATE | 1 | 1 | 0 |
| Multiple | CROSSROADS OF AMERICA; GREATER NEW YORK | 1 | 0 | 0 |
| Multiple | CROSSROADS OF AMERICA; KATAHDIN AREA; NORTHERN NEW JERSEY | 1 | 0 | 0 |
| Multiple | CROSSROADS OF AMERICA; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | CROSSROADS OF AMERICA; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | CROSSROADS OF AMERICA; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 | 0 |
| Multiple | CROSSROADS OF AMERICA; TUKABATCHEE AREA | 1 | 1 | 0 |
| Multiple | CROSSROADS OF THE WEST; DENVER AREA | 1 | 0 | 0 |
| Multiple | CROSSROADS OF THE WEST; GREATER WYOMING | 1 | 0 | 0 |
| Multiple | CROSSROADS OF THE WEST; GREATER WYOMING; NORTHEAST ILLINOIS | 1 | 0 | 0 |
| Multiple | CROSSROADS OF THE WEST; INLAND NORTHWEST | 1 | 0 | 0 |
| Multiple | CROSSROADS OF THE WEST; LINCOLN HERITAGE | 1 | 0 | 0 |
| Multiple | CROSSROADS OF THE WEST; MIDDLE TENNESSEE | 1 | 0 | 0 |
| Multiple | CROSSROADS OF THE WEST; MONTANA | 1 | 0 | 0 |
| Multiple | CROSSROADS OF THE WEST; NORTHERN NEW JERSEY | 1 | 1 | 0 |
| Multiple | CROSSROADS OF THE WEST; SAM HOUSTON AREA | 1 | 1 | 0 |
| Multiple | CROSSROADS OF THE WEST; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 | 0 |
| Multiple | CROSSROADS OF THE WEST; SOUTH GEORGIA | 1 | 0 | 0 |
| Multiple | DAN BEARD; DEL-MAR-VA; SIMON KENTON; TECUMSEH | 1 | 0 | 0 |
| Multiple | DAN BEARD; GREAT RIVERS; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |
| Multiple | DAN BEARD; GREATER LOS ANGELES | 1 | 1 | 0 |
| Multiple | DAN BEARD; GREATER ST. LOUIS AREA | 1 | 0 | 0 |
| Multiple | DAN BEARD; HOOSIER TRAILS | 1 | 0 | 0 |
| Multiple | DAN BEARD; LASALLE | 1 | 0 | 0 |
| Multiple | DAN BEARD; LAST FRONTIER | 1 | 0 | 0 |
| Multiple | DAN BEARD; LINCOLN HERITAGE | 1 | 0 | 0 |
| Multiple | DAN BEARD; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | DAN BEARD; QUAPAW AREA | 1 | 1 | 0 |
| Multiple | DAN BEARD; SIMON KENTON; TECUMSEH | 1 | 0 | 0 |
| Multiple | DANIEL BOONE; MOBILE AREA | 1 | 1 | 0 |
| Multiple | DANIEL BOONE; PEE DEE AREA | 1 | 1 | 0 |
| Multiple | DANIEL BOONE; TIDEWATER | 1 | 1 | 0 |
| Multiple | DANIEL BOONE; WESTERN MASSACHUSETTS | 1 | 1 | 0 |
| Multiple | DANIEL WEBSTER; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | DANIEL WEBSTER; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | DANIEL WEBSTER; NORTHERN NEW JERSEY | 1 | 1 | 0 |
| Multiple | DANIEL WEBSTER; PINE TREE | 1 | 0 | 0 |
| Multiple | DANIEL WEBSTER; TIDEWATER | 1 | 0 | 0 |
| Multiple | DE SOTO AREA; THREE HARBORS | 1 | 0 | 0 |
| Multiple | DE SOTO AREA; WESTARK AREA | 1 | 1 | 0 |
| Multiple | DEL-MAR-VA; GARDEN STATE | 1 | 1 | 0 |
| Multiple | DEL-MAR-VA; GREATER LOS ANGELES | 1 | 1 | 0 |
| Multiple | DEL-MAR-VA; NATIONAL CAPITAL AREA | 1 | 0 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | DEL-MAR-VA; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | DENVER AREA; GREATER ALABAMA | 1 | 0 | 0 |
| Multiple | DENVER AREA; GREATER NEW YORK | 1 | 1 | 0 |
| Multiple | DENVER AREA; GREATER ST. LOUIS AREA | 1 | 0 | 0 |
| Multiple | DENVER AREA; GREATER YOSEMITE | 1 | 1 | 0 |
| Multiple | DENVER AREA; HEART OF AMERICA | 1 | 0 | 0 |
| Multiple | DENVER AREA; INDIAN NATIONS | 1 | 0 | 0 |
| Multiple | DENVER AREA; INLAND NORTHWEST | 1 | 0 | 0 |
| Multiple | DENVER AREA; MOUNT BAKER | 1 | 1 | 0 |
| Multiple | DENVER AREA; NATIONAL CAPITAL AREA | 1 | 1 | 0 |
| Multiple | DENVER AREA; PACIFIC HARBORS | 1 | 0 | 0 |
| Multiple | DENVER AREA; SIMON KENTON | 1 | 1 | 0 |
| Multiple | DENVER AREA; THREE FIRES | 1 | 1 | 0 |
| Multiple | DIRECT SERVICE; GREATER ST. LOUIS AREA | 1 | 0 | 0 |
| Multiple | DIRECT SERVICE; GULF COAST | 1 | 0 | 0 |
| Multiple | EAST CAROLINA; ERIE SHORES | 1 | 1 | 0 |
| Multiple | EAST CAROLINA; FAR EAST | 1 | 1 | 0 |
| Multiple | EAST CAROLINA; GRAND CANYON | 1 | 0 | 0 |
| Multiple | EAST CAROLINA; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | EAST CAROLINA; NORTH FLORIDA | 1 | 1 | 0 |
| Multiple | EAST CAROLINA; OLD NORTH STATE | 1 | 1 | 0 |
| Multiple | EAST CAROLINA; TIDEWATER | 1 | 1 | 0 |
| Multiple | EAST CAROLINA; TWIN RIVERS | 1 | 1 | 0 |
| Multiple | EAST TEXAS AREA; GOLDEN EMPIRE | 1 | 1 | 0 |
| Multiple | EAST TEXAS AREA; LAS VEGAS AREA; NEVADA AREA | 1 | 0 | 0 |
| Multiple | EAST TEXAS AREA; LONGHORN | 1 | 0 | 0 |
| Multiple | EAST TEXAS AREA; MID-AMERICA; MID-IOWA | 1 | 0 | 0 |
| Multiple | ERIE SHORES; GREAT SOUTHWEST | 1 | 0 | 0 |
| Multiple | ERIE SHORES; GREAT TRAIL | 1 | 0 | 0 |
| Multiple | ERIE SHORES; GREATER LOS ANGELES; LAKE ERIE | 1 | 1 | 0 |
| Multiple | ERIE SHORES; GREATER ST. LOUIS AREA | 1 | 0 | 0 |
| Multiple | ERIE SHORES; MIAMI VALLEY | 1 | 1 | 0 |
| Multiple | ERIE SHORES; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | ERIE SHORES; QUAPAW AREA | 1 | 1 | 0 |
| Multiple | EVANGELINE AREA; GREATER ST. LOUIS AREA; SOUTHEAST LOUISIANA | 1 | 1 | 0 |
| Multiple | EVANGELINE AREA; ISTROUMA AREA | 1 | 1 | 0 |
| Multiple | EVANGELINE AREA; LOUISIANA PURCHASE | 1 | 1 | 0 |
| Multiple | EVANGELINE AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | EVANGELINE AREA; SAGAMORE | 1 | 0 | 0 |
| Multiple | FAR EAST; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | FIVE RIVERS; LAUREL HIGHLANDS | 1 | 0 | 0 |
| Multiple | FIVE RIVERS; MICHIGAN CROSSROADS | 1 | 1 | 0 |
| Multiple | FIVE RIVERS; NORTHEASTERN PENNSYLVANIA | 1 | 0 | 0 |
| Multiple | FIVE RIVERS; PENNSYLVANIA DUTCH | 1 | 0 | 0 |
| Multiple | FRENCH CREEK; GREATER NIAGARA FRONTIER | 1 | 0 | 0 |
| Multiple | FRENCH CREEK; MID-AMERICA | 1 | 0 | 0 |
| Multiple | FRENCH CREEK; MORAINE TRAILS | 1 | 0 | 0 |
| Multiple | GAMEHAVEN; GOLDEN EMPIRE; GOLDEN GATE AREA; MARIN; PACIFIC SKYLINE | 1 | 0 | 0 |
| Multiple | GAMEHAVEN; LONGHOUSE | 1 | 0 | 0 |
| Multiple | GAMEHAVEN; SENECA WATERWAYS | 1 | 0 | 0 |
| Multiple | GAMEHAVEN; TWIN VALLEY | 1 | 0 | 0 |
| Multiple | GARDEN STATE; JERSEY SHORE; WASHINGTON CROSSING | 1 | 0 | 0 |
| Multiple | GARDEN STATE; MONMOUTH | 1 | 0 | 0 |
| Multiple | GARDEN STATE; MORAINE TRAILS | 1 | 0 | 0 |
| Multiple | GARDEN STATE; PATRIOTS' PATH | 1 | 0 | 0 |
| Multiple | GATEWAY AREA; GLACIER'S EDGE; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | GATEWAY AREA; GREATER NEW YORK | 1 | 0 | 0 |
| Multiple | GEORGIA-CAROLINA; INDIAN WATERS | 1 | 0 | 0 |
| Multiple | GEORGIA-CAROLINA; MECKLENBURG COUNTY | 1 | 0 | 0 |
| Multiple | GEORGIA-CAROLINA; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | GEORGIA-CAROLINA; PALMETTO | 1 | 0 | 0 |
| Multiple | GEORGIA-CAROLINA; PINE TREE | 1 | 0 | 0 |
| Multiple | GEORGIA-CAROLINA; TIDEWATER; VIRGINIA HEADWATERS | 1 | 0 | 0 |
| Multiple | GLACIER'S EDGE; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | GLACIER'S EDGE; NORTHEAST ILLINOIS | 1 | 0 | 0 |
| Multiple | GLACIER'S EDGE; SAMOSET COUNCIL | 1 | 0 | 0 |
| Multiple | GLACIER'S EDGE; SIOUX | 1 | 0 | 0 |
| Multiple | GLACIER'S EDGE; THREE HARBORS | 1 | 0 | 0 |
| Multiple | GLACIER'S EDGE; W.D. BOYCE | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; GOLDEN GATE AREA; GREATER YOSEMITE | 1 | 0 | 0 |
| Multiple | EMPIRE; SEQUOIA; SILICON VALLEY MONTEREY BAY | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; GOLDEN GATE AREA; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; GOLDEN GATE AREA; PACIFIC SKYLINE | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; GOLDEN GATE AREA; REDWOOD EMPIRE | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; GREATER LOS ANGELES; NEVADA AREA; ORANGE COUNTY | 1 | 0 | 0 |
| Multiple | VALLEY MONTEREY BAY | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; HOOSIER TRAILS | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; INLAND NORTHWEST | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; LAKE ERIE; SOUTHWEST FLORIDA | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; LAS VEGAS AREA | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; MARIN | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; MARIN; REDWOOD EMPIRE | 1 | 0 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | GOLDEN EMPIRE; MIDDLE TENNESSEE | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; MORAINE TRAILS | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; OREGON TRAIL | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; PACIFIC SKYLINE | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; REDWOOD EMPIRE | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; SEQUOIA; SOUTHERN SIERRA | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; SIMON KENTON | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; SOUTHERN SIERRA | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; SOUTHWEST FLORIDA | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; VENTURA COUNTY | 1 | 0 | 0 |
| Multiple | GOLDEN EMPIRE; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; GREAT RIVERS | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; GREAT SOUTHWEST | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; GREATER LOS ANGELES | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; GREATER LOS ANGELES; GREATER YOSEMITE | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; GREATER YOSEMITE; SENECA WATERWAYS | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; GREEN MOUNTAIN | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; INLAND NORTHWEST | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; MARIN; SILICON VALLEY MONTEREY BAY | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; MONTANA | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; NORTHERN NEW JERSEY | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; ORANGE COUNTY | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; ORANGE COUNTY; SILICON VALLEY MONTEREY BAY | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; SANTA FE TRAIL | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; SEQUOIA | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; SOUTHERN SIERRA | 1 | 0 | 0 |
| Multiple | GOLDEN GATE AREA; WASHINGTON CROSSING | 1 | 0 | 0 |
| Multiple | GOLDEN SPREAD; GREAT SOUTHWEST | 1 | 0 | 0 |
| Multiple | GOLDEN SPREAD; GULF COAST; SOUTH TEXAS | 1 | 0 | 0 |
| Multiple | GOLDEN SPREAD; ISTROUMA AREA | 1 | 0 | 0 |
| Multiple | GOLDEN SPREAD; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |
| Multiple | GRAND CANYON; GREATER LOS ANGELES | 1 | 0 | 0 |
| Multiple | GRAND CANYON; LAS VEGAS AREA | 1 | 0 | 0 |
| Multiple | GRAND CANYON; LAUREL HIGHLANDS | 1 | 0 | 0 |
| Multiple | GRAND CANYON; LONGHORN | 1 | 0 | 0 |
| Multiple | GRAND CANYON; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | GRAND CANYON; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 |
| Multiple | GRAND CANYON; TIDEWATER | 1 | 0 | 0 |
| Multiple | GRAND COLUMBIA; LONG BEACH AREA | 1 | 0 | 0 |
| Multiple | GRAND COLUMBIA; PACIFIC HARBORS | 1 | 0 | 0 |
| Multiple | GRAND COLUMBIA; PIKES PEAK | 1 | 0 | 0 |
| Multiple | GRAND TETON; MONTANA | 1 | 0 | 0 |
| Multiple | GRAND TETON; ORANGE COUNTY | 1 | 0 | 0 |
| Multiple | GREAT ALASKA; MIDNIGHT SUN; NORTHERN LIGHTS | 1 | 0 | 0 |
| Multiple | GREAT ALASKA; MIDNIGHT SUN; ORANGE COUNTY | 1 | 0 | 0 |
| Multiple | GREAT RIVERS; INDIAN WATERS | 1 | 0 | 0 |
| Multiple | GREAT RIVERS; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | GREAT RIVERS; PACIFIC HARBORS | 1 | 0 | 0 |
| Multiple | GREAT RIVERS; PUSHMATAHA AREA | 1 | 0 | 0 |
| Multiple | GREAT SMOKY MOUNTAIN; INDIAN WATERS | 1 | 0 | 0 |
| Multiple | GREAT SMOKY MOUNTAIN; LAKE ERIE | 1 | 0 | 0 |
| Multiple | GREAT SMOKY MOUNTAIN; PALMETTO | 1 | 0 | 0 |
| Multiple | GREAT SMOKY MOUNTAIN; SAMOSET COUNCIL | 1 | 0 | 0 |
| Multiple | GREAT SMOKY MOUNTAIN; SEQUOYAH | 1 | 0 | 0 |
| Multiple | GREAT SMOKY MOUNTAIN; VENTURA COUNTY | 1 | 0 | 0 |
| Multiple | GREAT SOUTHWEST; LOS PADRES | 1 | 0 | 0 |
| Multiple | GREAT SOUTHWEST; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | GREAT SOUTHWEST; NORTHERN STAR | 1 | 0 | 0 |
| Multiple | GREAT SOUTHWEST; OLD HICKORY; SEQUOYAH | 1 | 0 | 0 |
| Multiple | GREAT SOUTHWEST; SEQUOYAH | 1 | 0 | 0 |
| Multiple | GREAT SOUTHWEST; SOUTH PLAINS | 1 | 0 | 0 |
| Multiple | GREAT TRAIL; LAKE ERIE; THREE FIRES; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | GREAT TRAIL; LAKE ERIE; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | GREAT TRAIL; MIAMI VALLEY | 1 | 0 | 0 |
| Multiple | GREAT TRAIL; MONMOUTH; NORTHERN NEW JERSEY | 1 | 0 | 0 |
| Multiple | GREAT TRAIL; SIMON KENTON | 1 | 0 | 0 |
| Multiple | GREAT TRAIL; THREE FIRES | 1 | 0 | 0 |
| Multiple | GREAT TRAIL; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | GREATER ALABAMA; GREATER TAMPA BAY AREA | 1 | 0 | 0 |
| Multiple | GREATER ALABAMA; KATAHDIN AREA | 1 | 0 | 0 |
| Multiple | GREATER ALABAMA; MOBILE AREA; PUSHMATAHA AREA | 1 | 0 | 0 |
| Multiple | GREATER ALABAMA; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | GREATER ALABAMA; NORTH FLORIDA | 1 | 0 | 0 |
| Multiple | GREATER ALABAMA; SEQUOIA | 1 | 0 | 0 |
| Multiple | GREATER ALABAMA; SOUTH GEORGIA | 1 | 0 | 0 |
| Multiple | GREATER ALABAMA; WASHINGTON CROSSING | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; GREATER TAMPA BAY AREA | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; LAKE ERIE | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; LINCOLN HERITAGE | 1 | 0 | 0 |

**Unique and Timely Abuse Claim Count by Local Council**

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | GREATER LOS ANGELES; LONG BEACH AREA; ORANGE COUNTY | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; LONG BEACH AREA; ORANGE COUNTY; SAN DIEGO - IMPERIAL COUNCIL; VERDUGO HILLS | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; LOS PADRES | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; MIDDLE TENNESSEE | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; MOBILE AREA | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; MONTANA | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; PACIFIC SKYLINE | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; PATRIOTS' PATH | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; SIOUX | 1 | 0 | 0 |
| Multiple | GREATER LOS ANGELES; SOUTHERN SIERRA | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; INLAND NORTHWEST | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; JERSEY SHORE | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; LAKE ERIE | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; LEATHERSTOCKING | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; MAYFLOWER; TWIN RIVERS; WESTCHESTER-PUTNAM | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; MONTANA | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; NEW BIRTH OF FREEDOM | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; NORTHERN STAR | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; PATHWAY TO ADVENTURE; THREE HARBORS | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |
| Multiple | GREATER NEW YORK; WESTARK AREA | 1 | 0 | 0 |
| Multiple | GREATER NIAGARA FRONTIER; IROQUOIS TRAIL; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | GREATER NIAGARA FRONTIER; LONGHOUSE | 1 | 0 | 0 |
| Multiple | GREATER NIAGARA FRONTIER; NORTHERN LIGHTS | 1 | 0 | 0 |
| Multiple | GREATER NIAGARA FRONTIER; THREE FIRES | 1 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; INDIAN WATERS | 1 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; LINCOLN HERITAGE | 1 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; OREGON TRAIL; PALMETTO | 1 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; OZARK TRAILS | 1 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; SAM HOUSTON AREA | 1 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; SIMON KENTON | 1 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; THREE FIRES | 1 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; VOYAGEURS AREA | 1 | 0 | 0 |
| Multiple | GREATER ST. LOUIS AREA; W.D. BOYCE | 1 | 0 | 0 |
| Multiple | GREATER TAMPA BAY AREA; GREEN MOUNTAIN | 1 | 0 | 0 |
| Multiple | GREATER TAMPA BAY AREA; GULF COAST; LONGHORN | 1 | 0 | 0 |
| Multiple | GREATER TAMPA BAY AREA; GULF STREAM | 1 | 0 | 0 |
| Multiple | GREATER TAMPA BAY AREA; LEATHERSTOCKING | 1 | 0 | 0 |
| Multiple | GREATER TAMPA BAY AREA; QUAPAW AREA | 1 | 0 | 0 |
| Multiple | GREATER TAMPA BAY AREA; SOUTHWEST FLORIDA | 1 | 0 | 0 |
| Multiple | GREATER TAMPA BAY AREA; SUWANNEE RIVER AREA | 1 | 0 | 0 |
| Multiple | GREATER TAMPA BAY AREA; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | GREATER WYOMING; LONGS PEAK COUNCIL | 1 | 0 | 0 |
| Multiple | GREATER WYOMING; OZARK TRAILS | 1 | 0 | 0 |
| Multiple | GREATER YOSEMITE; PACIFIC SKYLINE | 1 | 0 | 0 |
| Multiple | GREATER YOSEMITE; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | GREEN MOUNTAIN; HEART OF NEW ENGLAND | 1 | 0 | 0 |
| Multiple | GREEN MOUNTAIN; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | GREEN MOUNTAIN; NORTHERN NEW JERSEY | 1 | 0 | 0 |
| Multiple | GREEN MOUNTAIN; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | GULF COAST; LAST FRONTIER | 1 | 0 | 0 |
| Multiple | GULF COAST; LONGHORN | 1 | 0 | 0 |
| Multiple | GULF COAST; NORTH FLORIDA | 1 | 0 | 0 |
| Multiple | GULF COAST; NORTHERN STAR | 1 | 0 | 0 |
| Multiple | GULF COAST; PINE BURR AREA | 1 | 0 | 0 |
| Multiple | GULF COAST; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |
| Multiple | GULF COAST; SOUTH TEXAS; YUCCA | 1 | 0 | 0 |
| Multiple | GULF STREAM; MECKLENBURG COUNTY | 1 | 0 | 0 |
| Multiple | GULF STREAM; MOUNTAINEER AREA | 1 | 0 | 0 |
| Multiple | GULF STREAM; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 |
| Multiple | GULF STREAM; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | HAWK MOUNTAIN; MINSI TRAILS | 1 | 0 | 0 |
| Multiple | HAWK MOUNTAIN; NEW BIRTH OF FREEDOM | 1 | 0 | 0 |
| Multiple | HAWK MOUNTAIN; NORTHEASTERN PENNSYLVANIA | 1 | 0 | 0 |
| Multiple | HAWK MOUNTAIN; PENNSYLVANIA DUTCH | 1 | 0 | 0 |
| Multiple | HAWK MOUNTAIN; SHENANDOAH AREA | 1 | 0 | 0 |
| Multiple | HAWK MOUNTAIN; WASHINGTON CROSSING | 1 | 0 | 0 |
| Multiple | HAWKEYE AREA; MID-AMERICA | 1 | 0 | 0 |
| Multiple | HAWKEYE AREA; MID-IOWA | 1 | 0 | 0 |
| Multiple | HEART OF AMERICA; HEART OF VIRGINIA | 1 | 0 | 0 |
| Multiple | HEART OF AMERICA; LAKE ERIE | 1 | 0 | 0 |
| Multiple | HEART OF AMERICA; LAUREL HIGHLANDS | 1 | 0 | 0 |
| Multiple | HEART OF AMERICA; ORANGE COUNTY | 1 | 0 | 0 |
| Multiple | HEART OF AMERICA; OREGON TRAIL | 1 | 0 | 0 |
| Multiple | HEART OF AMERICA; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | HEART OF AMERICA; PATRIOTS' PATH; WINNEBAGO | 1 | 0 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | HEART OF AMERICA; PONY EXPRESS | 1 | 0 | 0 |
| Multiple | HEART OF AMERICA; RIO GRANDE | 1 | 0 | 0 |
| Multiple | HEART OF AMERICA; SOUTH TEXAS | 1 | 0 | 0 |
| Multiple | HEART OF AMERICA; SOUTHEAST LOUISIANA | 1 | 0 | 0 |
| Multiple | HEART OF AMERICA; TWIN VALLEY | 1 | 0 | 0 |
| Multiple | HEART OF NEW ENGLAND; MAYFLOWER; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | HEART OF NEW ENGLAND; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | HEART OF NEW ENGLAND; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | HEART OF NEW ENGLAND; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | HEART OF NEW ENGLAND; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | HEART OF VIRGINIA; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | HEART OF VIRGINIA; PIKES PEAK | 1 | 0 | 0 |
| Multiple | HEART OF VIRGINIA; VIRGINIA HEADWATERS | 1 | 0 | 0 |
| Multiple | HOOSIER TRAILS; LASALLE | 1 | 0 | 0 |
| Multiple | HUDSON VALLEY; LEATHERSTOCKING | 1 | 0 | 0 |
| Multiple | HUDSON VALLEY; MAYFLOWER | 1 | 0 | 0 |
| Multiple | HUDSON VALLEY; NEW BIRTH OF FREEDOM | 1 | 0 | 0 |
| Multiple | HUDSON VALLEY; NEW BIRTH OF FREEDOM; SUSQUEHANNA | 1 | 0 | 0 |
| Multiple | HUDSON VALLEY; NORTHERN NEW JERSEY | 1 | 0 | 0 |
| Multiple | HUDSON VALLEY; THEODORE ROOSEVELT | 1 | 0 | 0 |
| Multiple | ILLOWA; MID-AMERICA | 1 | 0 | 0 |
| Multiple | ILLOWA; MISSISSIPPI VALLEY; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | ILLOWA; NORTHEAST ILLINOIS | 1 | 0 | 0 |
| Multiple | ILLOWA; NORTHEAST IOWA COUNCIL | 1 | 0 | 0 |
| Multiple | ILLOWA; THREE FIRES | 1 | 0 | 0 |
| Multiple | ILLOWA; WINNEBAGO | 1 | 0 | 0 |
| Multiple | INDIAN NATIONS; SAGAMORE | 1 | 0 | 0 |
| Multiple | INDIAN WATERS; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | INDIAN WATERS; PEE DEE AREA | 1 | 0 | 0 |
| Multiple | INDIAN WATERS; PIKES PEAK | 1 | 0 | 0 |
| Multiple | INDIAN WATERS; TIDEWATER | 1 | 0 | 0 |
| Multiple | INLAND NORTHWEST; MOUNT BAKER | 1 | 0 | 0 |
| Multiple | INLAND NORTHWEST; MOUNTAIN WEST | 1 | 0 | 0 |
| Multiple | INLAND NORTHWEST; NORTHERN STAR | 1 | 0 | 0 |
| Multiple | INLAND NORTHWEST; OREGON TRAIL | 1 | 0 | 0 |
| Multiple | INLAND NORTHWEST; POTAWATOMI AREA | 1 | 0 | 0 |
| Multiple | IROQUOIS TRAIL; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | IROQUOIS TRAIL; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | IROQUOIS TRAIL; SENECA WATERWAYS | 1 | 0 | 0 |
| Multiple | IROQUOIS TRAIL; SOUTHEAST LOUISIANA | 1 | 0 | 0 |
| Multiple | ISTROUMA AREA; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | JAYHAWK AREA; MID-IOWA | 1 | 0 | 0 |
| Multiple | JAYHAWK AREA; NORTHERN LIGHTS | 1 | 0 | 0 |
| Multiple | JAYHAWK AREA; OVERLAND TRAILS | 1 | 0 | 0 |
| Multiple | JAYHAWK AREA; QUIVIRA | 1 | 0 | 0 |
| Multiple | JERSEY SHORE; MINSI TRAILS | 1 | 0 | 0 |
| Multiple | JERSEY SHORE; MONMOUTH | 1 | 0 | 0 |
| Multiple | JERSEY SHORE; PATRIOTS' PATH | 1 | 0 | 0 |
| Multiple | JERSEY SHORE; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |
| Multiple | JERSEY SHORE; WASHINGTON CROSSING | 1 | 0 | 0 |
| Multiple | LAKE ERIE; LAUREL HIGHLANDS | 1 | 0 | 0 |
| Multiple | LAKE ERIE; MIAMI VALLEY | 1 | 0 | 0 |
| Multiple | LAKE ERIE; MUSKINGUM VALLEY | 1 | 0 | 0 |
| Multiple | LAKE ERIE; NORTHEAST ILLINOIS | 1 | 0 | 0 |
| Multiple | LAKE ERIE; PATRIOTS' PATH | 1 | 0 | 0 |
| Multiple | LAKE ERIE; QUIVIRA | 1 | 0 | 0 |
| Multiple | LAKE ERIE; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | LAS VEGAS AREA; MOUNTAIN WEST; NEVADA AREA | 1 | 0 | 0 |
| Multiple | LAS VEGAS AREA; PIKES PEAK | 1 | 0 | 0 |
| Multiple | LAS VEGAS AREA; SUFFOLK COUNTY | 1 | 0 | 0 |
| Multiple | LASALLE; MIAMI VALLEY | 1 | 0 | 0 |
| Multiple | LASALLE; MICHIGAN CROSSROADS | 1 | 0 | 0 |
| Multiple | LASALLE; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | LASALLE; OREGON TRAIL | 1 | 0 | 0 |
| Multiple | LASALLE; THREE HARBORS | 1 | 0 | 0 |
| Multiple | LAST FRONTIER; LONG BEACH AREA | 1 | 0 | 0 |
| Multiple | LAST FRONTIER; SAGAMORE | 1 | 0 | 0 |
| Multiple | LAST FRONTIER; TEXAS TRAILS | 1 | 0 | 0 |
| Multiple | LAUREL HIGHLANDS; LINCOLN HERITAGE | 1 | 0 | 0 |
| Multiple | LAUREL HIGHLANDS; MORAINE TRAILS; WESTMORELAND-FAYETTE | 1 | 0 | 0 |
| Multiple | LAUREL HIGHLANDS; MOUNTAINEER AREA | 1 | 0 | 0 |
| Multiple | LAUREL HIGHLANDS; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | LEATHERSTOCKING; LINCOLN HERITAGE | 1 | 0 | 0 |
| Multiple | LEATHERSTOCKING; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | LEATHERSTOCKING; RIP VAN WINKLE; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | LEATHERSTOCKING; SENECA WATERWAYS | 1 | 0 | 0 |
| Multiple | LEATHERSTOCKING; THEODORE ROOSEVELT | 1 | 0 | 0 |
| Multiple | LEATHERSTOCKING; WESTCHESTER-PUTNAM | 1 | 0 | 0 |
| Multiple | LINCOLN HERITAGE; SAGAMORE | 1 | 0 | 0 |
| Multiple | LINCOLN HERITAGE; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 |
| Multiple | COUNTY | 1 | 0 | 0 |
| Multiple | LONG BEACH AREA; OVERLAND TRAILS | 1 | 0 | 0 |

**Unique and Timely Abuse Claim Count by Local Council**

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | LONG BEACH AREA; PACIFIC SKYLINE | 1 | 0 | 0 |
| Multiple | LONG BEACH AREA; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 |
| Multiple | LONG BEACH AREA; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | LONG BEACH AREA; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 |
| Multiple | LONGHORN; LOUISIANA PURCHASE | 1 | 0 | 0 |
| Multiple | LONGHORN; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | LONGHORN; OZARK TRAILS | 1 | 0 | 0 |
| Multiple | LONGHORN; PACIFIC SKYLINE | 1 | 0 | 0 |
| Multiple | LONGHORN; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |
| Multiple | LONGHORN; SOUTH TEXAS; TEXAS SOUTHWEST | 1 | 0 | 0 |
| Multiple | LONGHORN; TEXAS TRAILS; THREE RIVERS | 1 | 0 | 0 |
| Multiple | LONGHORN; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | LONGHORN; WINNEBAGO | 1 | 0 | 0 |
| Multiple | LONGHOUSE; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | LONGS PEAK COUNCIL; NORTHEAST ILLINOIS | 1 | 0 | 0 |
| Multiple | LONGS PEAK COUNCIL; OVERLAND TRAILS | 1 | 0 | 0 |
| Multiple | LONGS PEAK COUNCIL; SAM HOUSTON AREA | 1 | 0 | 0 |
| Multiple | LONGS PEAK COUNCIL; SOUTHWEST FLORIDA | 1 | 0 | 0 |
| Multiple | LOS PADRES; VENTURA COUNTY | 1 | 0 | 0 |
| Multiple | MARIN; REDWOOD EMPIRE | 1 | 0 | 0 |
| Multiple | MARIN; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 |
| Multiple | MASON-DIXON; PEE DEE AREA | 1 | 0 | 0 |
| Multiple | MAYFLOWER; NARRAGANSETT; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | MAYFLOWER; QUAPAW AREA | 1 | 0 | 0 |
| Multiple | MECKLENBURG COUNTY; OLD NORTH STATE | 1 | 0 | 0 |
| Multiple | MIAMI VALLEY; MICHIGAN CROSSROADS; TECUMSEH | 1 | 0 | 0 |
| Multiple | MIAMI VALLEY; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; MID-AMERICA | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; NARRAGANSETT | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; NORTH FLORIDA | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; ORANGE COUNTY | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; OVERLAND TRAILS | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; PACIFIC HARBORS | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; PINE BURR AREA | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; QUAPAW AREA | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; RIO GRANDE | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; THREE FIRES | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; THREE FIRES; THREE HARBORS; THREE RIVERS | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; VERDUGO HILLS | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; WESTCHESTER-PUTNAM | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 |
| Multiple | MICHIGAN CROSSROADS; YOCONA AREA | 1 | 0 | 0 |
| Multiple | MID-AMERICA; OLD NORTH STATE | 1 | 0 | 0 |
| Multiple | MID-AMERICA; SIOUX | 1 | 0 | 0 |
| Multiple | MID-AMERICA; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | MID-IOWA; MISSISSIPPI VALLEY | 1 | 0 | 0 |
| Multiple | MID-IOWA; NORTHEAST IOWA COUNCIL | 1 | 0 | 0 |
| Multiple | MID-IOWA; W.D. BOYCE | 1 | 0 | 0 |
| Multiple | MID-IOWA; WINNEBAGO | 1 | 0 | 0 |
| Multiple | MIDDLE TENNESSEE; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | MIDDLE TENNESSEE; NORTH FLORIDA | 1 | 0 | 0 |
| Multiple | MIDDLE TENNESSEE; QUAPAW AREA | 1 | 0 | 0 |
| Multiple | MIDNIGHT SUN; OREGON TRAIL | 1 | 0 | 0 |
| Multiple | MINSI TRAILS; MORAINE TRAILS | 1 | 0 | 0 |
| Multiple | MINSI TRAILS; NEW BIRTH OF FREEDOM | 1 | 0 | 0 |
| Multiple | MINSI TRAILS; NORTHEAST GEORGIA | 1 | 0 | 0 |
| Multiple | MINSI TRAILS; WASHINGTON CROSSING | 1 | 0 | 0 |
| Multiple | MISSISSIPPI VALLEY; NORTHERN STAR | 1 | 0 | 0 |
| Multiple | MISSISSIPPI VALLEY; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | MISSISSIPPI VALLEY; PINE BURR AREA | 1 | 0 | 0 |
| Multiple | MISSISSIPPI VALLEY; THREE FIRES | 1 | 0 | 0 |
| Multiple | MOBILE AREA; PINE BURR AREA | 1 | 0 | 0 |
| Multiple | MONMOUTH; PIKES PEAK | 1 | 0 | 0 |
| Multiple | MONTANA; NORTH FLORIDA | 1 | 0 | 0 |
| Multiple | MONTANA; NORTHEASTERN PENNSYLVANIA | 1 | 0 | 0 |
| Multiple | MONTANA; NORTHERN LIGHTS | 1 | 0 | 0 |
| Multiple | MOUNTAIN WEST; NEVADA AREA | 1 | 0 | 0 |
| Multiple | MOUNTAINEER AREA; SIMON KENTON | 1 | 0 | 0 |
| Multiple | MUSKINGUM VALLEY; SIMON KENTON | 1 | 0 | 0 |
| Multiple | MUSKINGUM VALLEY; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | NARRAGANSETT; SAM HOUSTON AREA | 1 | 0 | 0 |
| Multiple | NARRAGANSETT; NATIONAL CAPITAL AREA | 1 | 0 | 0 |
| Multiple | NARRAGANSETT; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | NARRAGANSETT; THEODORE ROOSEVELT | 1 | 0 | 0 |
| Multiple | NARRAGANSETT; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | NATIONAL CAPITAL AREA; ORANGE COUNTY | 1 | 0 | 0 |
| Multiple | NATIONAL CAPITAL AREA; PACIFIC HARBORS | 1 | 0 | 0 |
| Multiple | NATIONAL CAPITAL AREA; RIP VAN WINKLE | 1 | 0 | 0 |
| Multiple | NATIONAL CAPITAL AREA; SHENANDOAH AREA | 1 | 0 | 0 |
| Multiple | NATIONAL CAPITAL AREA; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |
| Multiple | NATIONAL CAPITAL AREA; SOUTH PLAINS | 1 | 0 | 0 |
| Multiple | NATIONAL CAPITAL AREA; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 |

**Unique and Timely Abuse Claim Count by Local Council**

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | NEVADA AREA; OVERLAND TRAILS | 1 | 0 | 0 |
| Multiple | NEVADA AREA; OZARK TRAILS | 1 | 0 | 0 |
| Multiple | NEVADA AREA; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | NEVADA AREA; SEQUOIA; SILICON VALLEY MONTEREY BAY | 1 | 0 | 0 |
| Multiple | NEVADA AREA; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | NEVADA AREA; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 |
| Multiple | NEW BIRTH OF FREEDOM; TECUMSEH | 1 | 0 | 0 |
| Multiple | NEW BIRTH OF FREEDOM; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | NEW BIRTH OF FREEDOM; WASHINGTON CROSSING | 1 | 0 | 0 |
| Multiple | NORTH FLORIDA; SOUTHWEST FLORIDA | 1 | 0 | 0 |
| Multiple | NORTH FLORIDA; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | NORTH FLORIDA; THREE FIRES | 1 | 0 | 0 |
| Multiple | NORTH FLORIDA; YUCCA | 1 | 0 | 0 |
| Multiple | NORTHEAST ILLINOIS; PACIFIC HARBORS | 1 | 0 | 0 |
| Multiple | NORTHEAST ILLINOIS; RAINBOW; THREE FIRES | 1 | 0 | 0 |
| Multiple | NORTHEAST ILLINOIS; W.D. BOYCE | 1 | 0 | 0 |
| Multiple | NORTHEASTERN PENNSYLVANIA; NORTHERN NEW JERSEY | 1 | 0 | 0 |
| Multiple | NORTHEASTERN PENNSYLVANIA; SUSQUEHANNA | 1 | 0 | 0 |
| Multiple | NORTHERN NEW JERSEY; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | NORTHERN NEW JERSEY; QUIVIRA | 1 | 0 | 0 |
| Multiple | NORTHERN NEW JERSEY; SOUTHWEST FLORIDA | 1 | 0 | 0 |
| Multiple | NORTHERN NEW JERSEY; THREE RIVERS | 1 | 0 | 0 |
| Multiple | NORTHERN NEW JERSEY; TUSCARORA | 1 | 0 | 0 |
| Multiple | NORTHERN NEW JERSEY; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | NORTHERN STAR; PIKES PEAK | 1 | 0 | 0 |
| Multiple | NORTHERN STAR; PRAIRIELANDS | 1 | 0 | 0 |
| Multiple | NORTHWEST GEORGIA; OCCONEECHEE | 1 | 0 | 0 |
| Multiple | NORTHWEST TEXAS; QUIVIRA | 1 | 0 | 0 |
| Multiple | NORTHWEST TEXAS; SAM HOUSTON AREA | 1 | 0 | 0 |
| Multiple | OCCONEECHEE; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | OCCONEECHEE; TUSCARORA | 1 | 0 | 0 |
| Multiple | OHIO RIVER VALLEY; PATHWAY TO ADVENTURE | 1 | 0 | 0 |
| Multiple | OHIO RIVER VALLEY; SIMON KENTON | 1 | 0 | 0 |
| Multiple | OLD HICKORY; SEQUOYAH | 1 | 0 | 0 |
| Multiple | OLD HICKORY; TIDEWATER | 1 | 0 | 0 |
| Multiple | OLD NORTH STATE; SEQUOIA | 1 | 0 | 0 |
| Multiple | OLD NORTH STATE; WESTCHESTER-PUTNAM | 1 | 0 | 0 |
| Multiple | OLD NORTH STATE; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | ORANGE COUNTY; PACIFIC SKYLINE | 1 | 0 | 0 |
| Multiple | ORANGE COUNTY; SEQUOIA | 1 | 0 | 0 |
| Multiple | ORANGE COUNTY; VENTURA COUNTY | 1 | 0 | 0 |
| Multiple | OREGON TRAIL; OVERLAND TRAILS | 1 | 0 | 0 |
| Multiple | OREGON TRAIL; QUIVIRA | 1 | 0 | 0 |
| Multiple | OREGON TRAIL; SHENANDOAH AREA | 1 | 0 | 0 |
| Multiple | OZARK TRAILS; THREE FIRES | 1 | 0 | 0 |
| Multiple | PACIFIC HARBORS; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 |
| Multiple | PACIFIC HARBORS; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | PACIFIC SKYLINE; SEQUOIA; SILICON VALLEY MONTEREY BAY | 1 | 0 | 0 |
| Multiple | PATHWAY TO ADVENTURE; PRAIRIELANDS | 1 | 0 | 0 |
| Multiple | PATHWAY TO ADVENTURE; RIP VAN WINKLE | 1 | 0 | 0 |
| Multiple | PATHWAY TO ADVENTURE; SAGAMORE | 1 | 0 | 0 |
| Multiple | PATHWAY TO ADVENTURE; SENECA WATERWAYS | 1 | 0 | 0 |
| Multiple | PATHWAY TO ADVENTURE; THREE FIRES; THREE HARBORS | 1 | 0 | 0 |
| Multiple | PATHWAY TO ADVENTURE; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | PATHWAY TO ADVENTURE; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 |
| Multiple | PATRIOTS' PATH; VIRGINIA HEADWATERS | 1 | 0 | 0 |
| Multiple | PATRIOTS' PATH; WINNEBAGO | 1 | 0 | 0 |
| Multiple | PENNSYLVANIA DUTCH; SAM HOUSTON AREA | 1 | 0 | 0 |
| Multiple | PIEDMONT 420; SENECA WATERWAYS | 1 | 0 | 0 |
| Multiple | PONY EXPRESS; QUIVIRA | 1 | 0 | 0 |
| Multiple | PRAIRIELANDS; THREE FIRES | 1 | 0 | 0 |
| Multiple | PRAIRIELANDS; W.D. BOYCE | 1 | 0 | 0 |
| Multiple | PUSHMATAHA AREA; YOCONA AREA | 1 | 0 | 0 |
| Multiple | QUAPAW AREA; SEQUOYAH | 1 | 0 | 0 |
| Multiple | QUIVIRA; SANTA FE TRAIL | 1 | 0 | 0 |
| Multiple | QUIVIRA; TEXAS TRAILS | 1 | 0 | 0 |
| Multiple | RAINBOW; SAGAMORE | 1 | 0 | 0 |
| Multiple | RAINBOW; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 |
| Multiple | REDWOOD EMPIRE; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | RIO GRANDE; SOUTH TEXAS | 1 | 0 | 0 |
| Multiple | RIO GRANDE; TEXAS SOUTHWEST | 1 | 0 | 0 |
| Multiple | SAGAMORE; SPIRIT OF ADVENTURE | 1 | 0 | 0 |
| Multiple | SAGAMORE; THREE FIRES | 1 | 0 | 0 |
| Multiple | SAGAMORE; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | SAM HOUSTON AREA; TEXAS SOUTHWEST | 1 | 0 | 0 |
| Multiple | SAM HOUSTON AREA; TEXAS TRAILS | 1 | 0 | 0 |
| Multiple | SAM HOUSTON AREA; TIDEWATER | 1 | 0 | 0 |
| Multiple | SAM HOUSTON AREA; VOYAGEURS AREA | 1 | 0 | 0 |
| Multiple | SAM HOUSTON AREA; YUCCA | 1 | 0 | 0 |
| Multiple | SAN DIEGO - IMPERIAL COUNCIL; SEQUOIA | 1 | 0 | 0 |
| Multiple | SAN DIEGO - IMPERIAL COUNCIL; TIDEWATER | 1 | 0 | 0 |
| Multiple | SANTA FE TRAIL; SOUTHEAST LOUISIANA | 1 | 0 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows in white list Abuse Claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse Claims against more than one Local Council.

| Local Council # (1) | Local Council | All Unique & Timely Abuse Claims (2)* | All Unique, Timely & Not-Barred Abuse Claims (3)* | Count of Pending Lawsuits (4) |
|---|---|---|---|---|
| Multiple | SENECA WATERWAYS; SUFFOLK COUNTY | 1 | 0 | 0 |
| Multiple | SENECA WATERWAYS; THEODORE ROOSEVELT | 1 | 0 | 0 |
| Multiple | SENECA WATERWAYS; WESTCHESTER-PUTNAM | 1 | 0 | 0 |
| Multiple | SENECA WATERWAYS; WESTMORELAND-FAYETTE | 1 | 0 | 0 |
| Multiple | SEQUOIA; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 |
| Multiple | SILICON VALLEY MONTEREY BAY; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 |
| Multiple | SIMON KENTON; TECUMSEH | 1 | 0 | 0 |
| Multiple | SOUTH FLORIDA COUNCIL; SOUTH GEORGIA | 1 | 0 | 0 |
| Multiple | SOUTH FLORIDA COUNCIL; SOUTHWEST FLORIDA | 1 | 0 | 0 |
| Multiple | SOUTH PLAINS; TEXAS SOUTHWEST | 1 | 0 | 0 |
| Multiple | SOUTHEAST LOUISIANA; WEST TENNESSEE AREA | 1 | 0 | 0 |
| Multiple | SOUTHERN SIERRA; VENTURA COUNTY | 1 | 0 | 0 |
| Multiple | SOUTHERN SIERRA; VERDUGO HILLS | 1 | 0 | 0 |
| Multiple | SPIRIT OF ADVENTURE; TRANSATLANTIC | 1 | 0 | 0 |
| Multiple | SPIRIT OF ADVENTURE; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | SPIRIT OF ADVENTURE; YOCONA AREA | 1 | 0 | 0 |
| Multiple | SUFFOLK COUNTY; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | SUSQUEHANNA; WESTERN MASSACHUSETTS | 1 | 0 | 0 |
| Multiple | THEODORE ROOSEVELT; WASHINGTON CROSSING | 1 | 0 | 0 |
| Multiple | THREE FIRES; TWIN RIVERS | 1 | 0 | 0 |
| Multiple | THREE HARBORS; THREE RIVERS | 1 | 0 | 0 |
| Multiple | THREE HARBORS; YUCCA | 1 | 0 | 0 |
| Multiple | TUKABATCHEE AREA; WESTMORELAND-FAYETTE | 1 | 0 | 0 |
| Multiple | WEST TENNESSEE AREA; YOCONA AREA | 1 | 0 | 0 |
| N/A | CENTRAL NEW JERSEY (1a) | 34 | 32 | 10 |
| N/A | CENTRAL ESCARPMENT (1b) | 1 | 0 | 0 |
| N/A | GREATER TORONTO (1b) | 1 | 1 | 0 |
| N/A | UNKNOWN | 19,156 | 6,010 | 0 |
| N/A | MISSING | 10,358 | 2,847 | 0 |
| **Total** | | **82,209** | **27,987** | **1,603** |

**Footnotes:**

(1) Local Council # reflects merger activity through 2/28/2021. DIRECT SERVICE is a subsidiary of #082 NATIONAL CAPITAL AREA, and #374 HUDSON VALLEY merged with #388 WESTCHESTER-PUTNAM effective 1/1/2021 to form #388 GREATER HUDSON VALLEY.

(1a) CENTRAL NEW JERSEY was dissolved in 2014 and did not merge with any other Local Council.

(1b) CENTRAL ESCARPMENT and GREATER TORONTO are Local Councils of Scouts Canada and not BSA.

(2) The term "unique" with respect to Proofs of Claim accounts for the fact that some Abuse survivors filed multiple Proofs of Claim in these Chapter 11 Cases. To account for duplicative Proofs of Claim, Bates White considered claimant PII on the Proofs of Claim, including name, last four digits of Social Security number, birth month and year, as well as zip code, email address and cell phone number. On the basis of this information, Bates White consolidated duplicative Claims into one comprehensive Claim.

Timely Proofs of Claim are Proofs of Claim that were submitted on or before the Bar Date, as established by the Bar Date Order [D.I. 695]. For Abuse Survivors who made at least one timely submission, Bates White incorporated information from amendments or supplemental submissions whether filed before or after the Bar Date and consolidated that information such that the submissions count as one unique Claim.

(3) "Not-Barred" Proofs of Claim are Proofs of Claim that are not presumptively time-barred by an applicable statute of limitations. To identify presumptively barred Claims, Bates White analyzed the location of Abuse and applied the relevant law in the state or territory. Relying on information provided by Debtors' defense counsel, Bates White considered the age of majority for which a Claim is allowed in each state, as compared to the Claimant's age as of the Bar Date, and whether the last date of Abuse alleged is within the time window in which a Claim is allowed in each state. The number of Not-Barred Claims could increase for a variety of reasons. See Discl. Stmt. Art. V.N.

A "Unique, Timely, and Not-Barred" Claim refers to a Direct Abuse Claim that is not duplicative, had at least one submission on or before the Bar Date, and is not presumptively time-barred by relevant law in the applicable state or territory.

(4) "Count of Pending Lawsuits" indicates the number of times that a Local Council is named as a defendant in a pending lawsuit as of August 17, 2021. For the avoidance of doubt, for any pending lawsuit that names more than one Local Council as a defendant, such lawsuit is included in the count for each such Local Council." Lawsuits continue to be filed in accordance with the terms of the Consent Order.

* The Abuse Claim count listed in these columns is based on the claimants' responses to Part 4.I. on the Sexual Abuse Proof of Claim Form and does not account for references to the Local Council that may be located elsewhere in the Proof of Claim. The Abuse Claim count listed above also does not reflect any other analysis conducted by the Debtors to approximate the total number of Abuse Claims that implicate the Local Council.

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| 001 | GREATER ALABAMA | 134 | 111 | 74 | 100 | 10 | 4 | 10 | 2 | 445 |
| 003 | ALABAMA-FLORIDA | 24 | 13 | 11 | 15 | 0 | 1 | 1 | 0 | 65 |
| 004 | MOBILE AREA | 55 | 31 | 21 | 24 | 0 | 0 | 1 | 0 | 132 |
| 005 | TUKABATCHEE AREA | 31 | 24 | 23 | 37 | 5 | 2 | 2 | 0 | 124 |
| 006 | BLACK WARRIOR | 17 | 15 | 17 | 21 | 0 | 2 | 0 | 1 | 73 |
| 010 | GRAND CANYON | 181 | 131 | 92 | 110 | 6 | 8 | 14 | 2 | 544 |
| 011 | CATALINA | 79 | 54 | 28 | 41 | 4 | 3 | 9 | 0 | 218 |
| 013 | DE SOTO AREA | 12 | 6 | 4 | 8 | 0 | 0 | 0 | 0 | 30 |
| 016 | WESTARK AREA | 35 | 32 | 20 | 20 | 4 | 2 | 2 | 0 | 115 |
| 018 | QUAPAW AREA | 130 | 96 | 57 | 81 | 8 | 11 | 8 | 1 | 392 |
| 023 | GOLDEN GATE AREA | 223 | 177 | 132 | 179 | 18 | 11 | 17 | 2 | 759 |
| 027 | SEQUOIA | 100 | 56 | 34 | 55 | 6 | 2 | 7 | 0 | 260 |
| 030 | SOUTHERN SIERRA | 56 | 35 | 23 | 34 | 3 | 2 | 3 | 0 | 156 |
| 031 | PACIFIC SKYLINE | 29 | 26 | 18 | 27 | 3 | 3 | 3 | 0 | 109 |
| 032 | LONG BEACH AREA | 48 | 40 | 29 | 44 | 1 | 2 | 1 | 0 | 165 |
| 033 | GREATER LOS ANGELES | 474 | 304 | 208 | 281 | 21 | 19 | 20 | 1 | 1,328 |
| 035 | MARIN | 9 | 14 | 8 | 4 | 0 | 0 | 0 | 0 | 35 |
| 039 | ORANGE COUNTY | 130 | 85 | 83 | 76 | 9 | 7 | 12 | 0 | 402 |
| 041 | REDWOOD EMPIRE | 22 | 17 | 13 | 10 | 2 | 1 | 1 | 0 | 66 |
| 042 | PIEDMONT 042 | 2 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 7 |
| 045 | CALIFORNIA INLAND EMPIRE | 191 | 99 | 79 | 115 | 7 | 8 | 9 | 0 | 508 |
| 047 | GOLDEN EMPIRE | 153 | 105 | 81 | 95 | 13 | 8 | 10 | 2 | 467 |
| 049 | SAN DIEGO - IMPERIAL COUNCIL | 144 | 101 | 92 | 79 | 11 | 7 | 6 | 3 | 443 |
| 051 | WESTERN LOS ANGELES COUNTY | 105 | 52 | 46 | 58 | 3 | 2 | 6 | 1 | 273 |
| 053 | LOS PADRES | 33 | 22 | 14 | 20 | 0 | 1 | 1 | 0 | 91 |
| 055 | SILICON VALLEY MONTEREY BAY | 114 | 67 | 67 | 58 | 4 | 3 | 7 | 1 | 321 |
| 057 | VENTURA COUNTY | 31 | 19 | 10 | 23 | 3 | 0 | 1 | 1 | 97 |
| 058 | VERDUGO HILLS | 19 | 24 | 13 | 15 | 0 | 2 | 2 | 0 | 75 |
| 059 | GREATER YOSEMITE | 82 | 45 | 36 | 44 | 3 | 4 | 1 | 0 | 215 |
| 060 | PIKES PEAK | 31 | 22 | 18 | 20 | 3 | 1 | 2 | 1 | 101 |
| 061 | DENVER AREA | 120 | 78 | 81 | 68 | 9 | 4 | 7 | 3 | 370 |
| 062 | LONGS PEAK COUNCIL | 54 | 21 | 27 | 17 | 2 | 2 | 1 | 0 | 124 |
| 063 | ROCKY MOUNTAIN | 24 | 14 | 15 | 0 | 1 | 4 | 1 | 1 | 83 |
| 066 | CONNECTICUT RIVERS | 86 | 77 | 57 | 68 | 4 | 3 | 11 | 1 | 307 |
| 067 | GREENWICH | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| 069 | HOUSATONIC | 1 | 4 | 0 | 3 | 1 | 0 | 1 | 0 | 10 |
| 070 | OLD NORTH STATE | 64 | 33 | 30 | 37 | 4 | 2 | 6 | 1 | 177 |
| 072 | CONNECTICUT YANKEE | 75 | 63 | 29 | 61 | 4 | 7 | 10 | 0 | 249 |
| 081 | DEL-MAR-VA | 39 | 44 | 16 | 31 | 1 | 3 | 6 | 0 | 140 |
| 082 | NATIONAL CAPITAL AREA | 192 | 149 | 103 | 160 | 8 | 5 | 11 | 2 | 630 |
| 082 | DIRECT SERVICE | 2 | 5 | 2 | 2 | 2 | 0 | 0 | 0 | 13 |
| 083 | CENTRAL FLORIDA | 83 | 75 | 57 | 76 | 9 | 11 | 10 | 0 | 321 |
| 084 | SOUTH FLORIDA COUNCIL | 158 | 157 | 100 | 116 | 4 | 9 | 8 | 1 | 553 |
| 085 | GULF STREAM | 49 | 61 | 24 | 33 | 2 | 1 | 7 | 0 | 177 |
| 087 | NORTH FLORIDA | 112 | 68 | 42 | 68 | 8 | 4 | 5 | 0 | 307 |
| 088 | SOUTHWEST FLORIDA | 39 | 37 | 25 | 21 | 2 | 0 | 1 | 0 | 126 |
| 089 | GREATER TAMPA BAY AREA | 160 | 122 | 95 | 85 | 14 | 5 | 6 | 0 | 487 |
| 091 | CHATTAHOOCHEE | 33 | 38 | 19 | 30 | 2 | 1 | 2 | 1 | 126 |
| 092 | ATLANTA AREA | 164 | 104 | 81 | 96 | 12 | 6 | 7 | 0 | 470 |
| 093 | GEORGIA-CAROLINA | 26 | 13 | 15 | 29 | 3 | 1 | 2 | 0 | 89 |
| 095 | FLINT RIVER | 15 | 14 | 18 | 22 | 1 | 1 | 1 | 0 | 72 |
| 096 | CENTRAL GEORGIA | 26 | 24 | 21 | 15 | 2 | 3 | 3 | 0 | 94 |
| 098 | SOUTH GEORGIA | 22 | 20 | 15 | 30 | 1 | 0 | 2 | 0 | 90 |
| 099 | COASTAL GEORGIA | 50 | 29 | 23 | 20 | 2 | 2 | 2 | 0 | 128 |
| 100 | NORTHWEST GEORGIA | 18 | 6 | 10 | 8 | 0 | 0 | 2 | 0 | 44 |
| 101 | NORTHEAST GEORGIA | 46 | 25 | 19 | 21 | 4 | 1 | 3 | 0 | 119 |
| 104 | ALOHA | 70 | 53 | 32 | 33 | 5 | 1 | 2 | 0 | 196 |
| 106 | MOUNTAIN WEST | 55 | 34 | 17 | 32 | 2 | 1 | 2 | 0 | 143 |
| 107 | GRAND TETON | 29 | 11 | 15 | 20 | 5 | 3 | 1 | 0 | 84 |
| 117 | PRAIRIELANDS | 27 | 20 | 14 | 19 | 0 | 2 | 1 | 0 | 83 |
| 127 | THREE FIRES | 45 | 35 | 25 | 31 | 6 | 4 | 3 | 0 | 149 |
| 129 | NORTHEAST ILLINOIS | 33 | 22 | 20 | 24 | 0 | 4 | 4 | 1 | 108 |
| 133 | ILLOWA | 45 | 33 | 23 | 18 | 3 | 1 | 3 | 0 | 126 |
| 138 | W.D. BOYCE | 56 | 31 | 25 | 30 | 3 | 3 | 3 | 0 | 151 |
| 141 | MISSISSIPPI VALLEY | 13 | 11 | 10 | 6 | 0 | 0 | 0 | 0 | 40 |
| 144 | ABRAHAM LINCOLN | 20 | 17 | 5 | 9 | 1 | 1 | 0 | 0 | 53 |
| 145 | HOOSIER TRAILS | 29 | 18 | 14 | 16 | 1 | 0 | 1 | 0 | 79 |
| 156 | BUFFALO TRACE | 37 | 26 | 27 | 18 | 1 | 1 | 3 | 0 | 113 |
| 157 | ANTHONY WAYNE AREA | 39 | 24 | 18 | 14 | 3 | 1 | 4 | 0 | 103 |
| 160 | CROSSROADS OF AMERICA | 136 | 111 | 70 | 99 | 7 | 11 | 8 | 0 | 442 |
| 162 | SAGAMORE | 42 | 36 | 11 | 23 | 2 | 1 | 2 | 0 | 117 |
| 165 | LASALLE | 37 | 37 | 19 | 31 | 2 | 2 | 2 | 0 | 130 |
| 172 | HAWKEYE AREA | 17 | 14 | 13 | 11 | 1 | 2 | 1 | 0 | 59 |
| 173 | WINNEBAGO | 17 | 12 | 15 | 9 | 1 | 1 | 1 | 0 | 61 |
| 177 | MID-IOWA | 46 | 42 | 28 | 28 | 3 | 5 | 7 | 0 | 159 |
| 178 | NORTHEAST IOWA COUNCIL | 5 | 9 | 7 | 6 | 1 | 0 | 0 | 0 | 28 |
| 192 | CORONADO AREA | 22 | 19 | 8 | 15 | 1 | 0 | 1 | 1 | 67 |
| 194 | SANTA FE TRAIL | 8 | 3 | 2 | 4 | 0 | 1 | 1 | 0 | 19 |
| 197 | JAYHAWK AREA | 13 | 10 | 6 | 11 | 0 | 0 | 1 | 0 | 41 |
| 198 | QUIVIRA | 85 | 62 | 57 | 48 | 6 | 4 | 13 | 0 | 275 |
| 204 | BLUE GRASS | 78 | 62 | 24 | 33 | 2 | 4 | 4 | 0 | 207 |
| 205 | LINCOLN HERITAGE | 141 | 103 | 72 | 95 | 5 | 3 | 10 | 0 | 429 |
| 209 | CALCASIEU | 34 | 18 | 12 | 13 | 3 | 1 | 4 | 0 | 85 |
| 211 | ISTROUMA AREA | 44 | 44 | 34 | 27 | 5 | 3 | 1 | 0 | 158 |
| 212 | EVANGELINE AREA | 33 | 18 | 9 | 20 | 3 | 0 | 3 | 0 | 86 |
| 213 | LOUISIANA PURCHASE | 44 | 26 | 23 | 28 | 0 | 0 | 1 | 0 | 122 |
| 214 | SOUTHEAST LOUISIANA | 116 | 104 | 52 | 75 | 12 | 5 | 6 | 0 | 370 |
| 215 | NORWELA | 34 | 27 | 9 | 29 | 3 | 1 | 1 | 0 | 104 |
| 216 | KATAHDIN AREA | 13 | 14 | 15 | 10 | 1 | 0 | 2 | 0 | 55 |
| 218 | PINE TREE | 58 | 60 | 34 | 29 | 2 | 2 | 6 | 1 | 192 |
| 220 | BALTIMORE AREA | 159 | 124 | 64 | 108 | 7 | 8 | 18 | 0 | 488 |
| 221 | MASON-DIXON | 14 | 8 | 5 | 8 | 1 | 2 | 0 | 0 | 38 |
| 224 | CAPE COD & ISLANDS | 14 | 10 | 6 | 6 | 1 | 0 | 2 | 0 | 39 |
| 227 | SPIRIT OF ADVENTURE | 184 | 190 | 129 | 155 | 18 | 10 | 23 | 0 | 709 |
| 230 | HEART OF NEW ENGLAND | 50 | 60 | 32 | 35 | 2 | 1 | 3 | 0 | 183 |
| 234 | WESTERN MASSACHUSETTS | 54 | 51 | 30 | 51 | 3 | 3 | 8 | 0 | 200 |
| 250 | NORTHERN STAR | 108 | 72 | 66 | 81 | 9 | 5 | 9 | 2 | 352 |
| 251 | MAYFLOWER | 64 | 60 | 45 | 47 | 5 | 2 | 14 | 1 | 238 |
| 283 | TWIN VALLEY | 16 | 16 | 13 | 7 | 1 | 2 | 1 | 0 | 56 |
| 286 | VOYAGEURS AREA | 12 | 10 | 12 | 9 | 0 | 1 | 0 | 0 | 44 |
| 296 | CENTRAL MINNESOTA | 5 | 3 | 10 | 8 | 2 | 2 | 1 | 0 | 31 |
| 299 | GAMEHAVEN | 15 | 14 | 13 | 15 | 1 | 1 | 1 | 0 | 60 |
| 302 | CHOCTAW AREA | 15 | 11 | 9 | 4 | 1 | 0 | 1 | 0 | 41 |
| 303 | ANDREW JACKSON | 70 | 47 | 29 | 51 | 5 | 0 | 4 | 1 | 207 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| 304 | PINE BURR AREA | 62 | 46 | 23 | 42 | 5 | 0 | 2 | 1 | 181 |
| 306 | OZARK TRAILS | 65 | 40 | 23 | 39 | 4 | 3 | 7 | 0 | 181 |
| 307 | HEART OF AMERICA | 248 | 146 | 105 | 132 | 9 | 11 | 14 | 0 | 665 |
| 311 | PONY EXPRESS | 17 | 10 | 8 | 23 | 1 | 1 | 2 | 0 | 62 |
| 312 | GREATER ST. LOUIS AREA | 277 | 237 | 161 | 186 | 22 | 19 | 17 | 2 | 921 |
| 315 | MONTANA | 46 | 32 | 28 | 29 | 3 | 1 | 4 | 0 | 143 |
| 322 | OVERLAND TRAILS | 19 | 12 | 10 | 9 | 2 | 0 | 0 | 0 | 52 |
| 324 | CORNHUSKER | 23 | 9 | 6 | 10 | 3 | 1 | 5 | 0 | 57 |
| 326 | MID-AMERICA | 86 | 56 | 51 | 57 | 5 | 2 | 13 | 2 | 272 |
| 328 | LAS VEGAS AREA | 64 | 45 | 28 | 45 | 5 | 4 | 5 | 0 | 196 |
| 329 | NEVADA AREA | 42 | 30 | 17 | 27 | 1 | 2 | 3 | 0 | 122 |
| 330 | DANIEL WEBSTER | 73 | 49 | 33 | 24 | 1 | 2 | 8 | 0 | 190 |
| 333 | NORTHERN NEW JERSEY | 141 | 127 | 103 | 118 | 13 | 13 | 10 | 0 | 525 |
| 341 | JERSEY SHORE | 40 | 23 | 16 | 25 | 4 | 1 | 0 | 0 | 109 |
| 347 | MONMOUTH | 27 | 27 | 26 | 24 | 3 | 1 | 0 | 1 | 109 |
| 358 | PATRIOTS' PATH | 68 | 60 | 40 | 55 | 2 | 1 | 3 | 0 | 229 |
| 364 | TWIN RIVERS | 68 | 65 | 40 | 37 | 4 | 2 | 10 | 1 | 227 |
| 368 | BADEN POWELL | 27 | 30 | 21 | 23 | 1 | 0 | 2 | 0 | 104 |
| 373 | LONGHOUSE | 58 | 40 | 39 | 47 | 3 | 3 | 4 | 0 | 194 |
| 375 | FIVE RIVERS | 27 | 17 | 13 | 15 | 0 | 2 | 1 | 2 | 77 |
| 376 | IROQUOIS TRAIL | 13 | 10 | 8 | 8 | 0 | 0 | 3 | 0 | 42 |
| 380 | GREATER NIAGARA FRONTIER | 67 | 63 | 47 | 58 | 8 | 2 | 5 | 0 | 250 |
| 382 | ALLEGHENY HIGHLANDS | 21 | 11 | 19 | 15 | 1 | 0 | 0 | 1 | 68 |
| 386 | THEODORE ROOSEVELT | 50 | 38 | 41 | 48 | 8 | 4 | 5 | 0 | 194 |
| 388 | WESTCHESTER-PUTNAM | 54 | 48 | 43 | 54 | 7 | 5 | 3 | 0 | 214 |
| 388 | HUDSON VALLEY | 32 | 30 | 27 | 33 | 2 | 3 | 4 | 1 | 132 |
| 397 | SENECA WATERWAYS | 75 | 58 | 37 | 53 | 3 | 3 | 6 | 0 | 235 |
| 400 | LEATHERSTOCKING | 32 | 27 | 14 | 14 | 1 | 2 | 2 | 0 | 92 |
| 404 | SUFFOLK COUNTY | 53 | 46 | 32 | 52 | 6 | 3 | 4 | 0 | 196 |
| 405 | RIP VAN WINKLE | 6 | 7 | 2 | 6 | 3 | 0 | 1 | 1 | 26 |
| 412 | GREAT SOUTHWEST | 105 | 42 | 50 | 49 | 2 | 7 | 9 | 1 | 265 |
| 413 | CONQUISTADOR | 25 | 20 | 7 | 11 | 1 | 0 | 1 | 0 | 65 |
| 414 | DANIEL BOONE | 16 | 14 | 13 | 16 | 1 | 1 | 0 | 0 | 61 |
| 415 | MECKLENBURG COUNTY | 28 | 22 | 16 | 23 | 1 | 5 | 2 | 0 | 97 |
| 416 | CENTRAL NORTH CAROLINA | 27 | 19 | 20 | 21 | 2 | 2 | 3 | 0 | 94 |
| 420 | PIEDMONT 420 | 55 | 34 | 21 | 30 | 3 | 0 | 1 | 0 | 144 |
| 421 | OCCONEECHEE | 65 | 52 | 40 | 46 | 7 | 2 | 2 | 0 | 214 |
| 424 | TUSCARORA | 11 | 13 | 8 | 8 | 1 | 0 | 1 | 0 | 42 |
| 425 | CAPE FEAR | 37 | 22 | 13 | 21 | 1 | 2 | 4 | 0 | 100 |
| 426 | EAST CAROLINA | 62 | 51 | 30 | 27 | 3 | 4 | 2 | 0 | 179 |
| 427 | OLD HICKORY | 38 | 33 | 20 | 22 | 3 | 1 | 2 | 0 | 119 |
| 429 | NORTHERN LIGHTS | 29 | 28 | 22 | 22 | 5 | 1 | 1 | 0 | 108 |
| 433 | GREAT TRAIL | 78 | 63 | 38 | 60 | 6 | 5 | 5 | 0 | 255 |
| 436 | BUCKEYE | 51 | 44 | 35 | 33 | 7 | 1 | 8 | 0 | 179 |
| 438 | DAN BEARD | 125 | 89 | 70 | 70 | 13 | 6 | 4 | 4 | 381 |
| 439 | TECUMSEH | 28 | 20 | 11 | 16 | 1 | 1 | 1 | 1 | 79 |
| 440 | LAKE ERIE | 139 | 124 | 95 | 103 | 10 | 4 | 17 | 2 | 494 |
| 441 | SIMON KENTON | 139 | 86 | 66 | 78 | 6 | 5 | 9 | 1 | 390 |
| 444 | MIAMI VALLEY | 48 | 37 | 24 | 40 | 2 | 1 | 0 | 1 | 153 |
| 449 | BLACK SWAMP AREA | 16 | 28 | 9 | 19 | 2 | 0 | 4 | 0 | 78 |
| 456 | PATHWAY TO ADVENTURE | 431 | 386 | 248 | 378 | 31 | 16 | 26 | 3 | 1,519 |
| 460 | ERIE SHORES | 44 | 53 | 32 | 39 | 3 | 5 | 0 | 0 | 176 |
| 467 | MUSKINGUM VALLEY | 18 | 11 | 7 | 9 | 1 | 0 | 1 | 0 | 47 |
| 468 | ARBUCKLE AREA | 13 | 7 | 1 | 14 | 0 | 0 | 0 | 0 | 35 |
| 469 | CHEROKEE AREA 469 | 14 | 6 | 5 | 4 | 0 | 0 | 2 | 0 | 31 |
| 474 | CIMARRON | 17 | 16 | 10 | 12 | 2 | 2 | 1 | 1 | 61 |
| 480 | LAST FRONTIER | 109 | 72 | 59 | 67 | 3 | 3 | 13 | 0 | 326 |
| 488 | INDIAN NATIONS | 78 | 69 | 30 | 30 | 1 | 2 | 5 | 0 | 215 |
| 491 | CRATER LAKE COUNCIL | 50 | 31 | 22 | 22 | 3 | 1 | 9 | 0 | 138 |
| 492 | CASCADE PACIFIC | 182 | 123 | 109 | 125 | 7 | 5 | 12 | 2 | 565 |
| 497 | JUNIATA VALLEY | 6 | 6 | 7 | 4 | 1 | 2 | 0 | 0 | 26 |
| 500 | MORAINE TRAILS | 24 | 11 | 9 | 7 | 2 | 1 | 0 | 0 | 54 |
| 501 | NORTHEASTERN PENNSYLVANIA | 20 | 22 | 13 | 16 | 1 | 0 | 1 | 0 | 73 |
| 502 | MINSI TRAILS | 34 | 30 | 19 | 24 | 4 | 2 | 1 | 0 | 114 |
| 504 | COLUMBIA-MONTOUR | 4 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 8 |
| 509 | BUCKTAIL | 7 | 7 | 2 | 7 | 0 | 0 | 0 | 0 | 23 |
| 512 | WESTMORELAND-FAYETTE | 18 | 19 | 20 | 10 | 1 | 0 | 3 | 0 | 71 |
| 524 | PENNSYLVANIA DUTCH | 21 | 15 | 19 | 16 | 6 | 1 | 0 | 0 | 78 |
| 525 | CRADLE OF LIBERTY | 167 | 171 | 96 | 126 | 11 | 12 | 15 | 1 | 599 |
| 527 | LAUREL HIGHLANDS | 105 | 110 | 64 | 82 | 10 | 4 | 7 | 1 | 383 |
| 528 | HAWK MOUNTAIN | 22 | 12 | 16 | 0 | 1 | 1 | 0 | 0 | 82 |
| 532 | FRENCH CREEK | 20 | 31 | 22 | 20 | 4 | 0 | 5 | 0 | 102 |
| 533 | SUSQUEHANNA | 16 | 9 | 12 | 10 | 1 | 0 | 1 | 0 | 49 |
| 538 | CHIEF CORNPLANTER | 3 | 2 | 1 | 1 | 0 | 1 | 0 | 0 | 8 |
| 539 | CHESTER COUNTY | 22 | 11 | 8 | 9 | 0 | 0 | 0 | 0 | 50 |
| 544 | NEW BIRTH OF FREEDOM | 36 | 59 | 37 | 36 | 3 | 2 | 5 | 1 | 179 |
| 546 | NARRAGANSETT | 117 | 97 | 82 | 85 | 8 | 6 | 6 | 1 | 402 |
| 549 | PALMETTO | 25 | 22 | 7 | 26 | 5 | 0 | 0 | 0 | 85 |
| 550 | COASTAL CAROLINA | 57 | 29 | 33 | 29 | 3 | 3 | 8 | 0 | 162 |
| 551 | BLUE RIDGE | 50 | 41 | 26 | 26 | 5 | 2 | 2 | 1 | 153 |
| 552 | PEE DEE AREA | 20 | 24 | 12 | 23 | 6 | 2 | 1 | 1 | 89 |
| 553 | INDIAN WATERS | 53 | 33 | 22 | 30 | 2 | 1 | 2 | 0 | 143 |
| 556 | CHEROKEE AREA 556 | 28 | 25 | 20 | 17 | 3 | 4 | 2 | 0 | 99 |
| 557 | GREAT SMOKY MOUNTAIN | 74 | 39 | 30 | 36 | 1 | 0 | 5 | 0 | 185 |
| 558 | CHICKASAW | 124 | 80 | 62 | 90 | 7 | 6 | 7 | 1 | 377 |
| 559 | WEST TENNESSEE AREA | 20 | 18 | 6 | 15 | 1 | 2 | 2 | 0 | 64 |
| 560 | MIDDLE TENNESSEE | 74 | 81 | 43 | 69 | 2 | 1 | 1 | 1 | 272 |
| 561 | TEXAS TRAILS | 29 | 14 | 11 | 16 | 1 | 0 | 3 | 0 | 74 |
| 562 | GOLDEN SPREAD | 42 | 32 | 21 | 27 | 2 | 1 | 3 | 0 | 128 |
| 564 | CAPITOL AREA | 43 | 22 | 29 | 33 | 4 | 2 | 1 | 1 | 135 |
| 567 | BUFFALO TRAIL | 34 | 19 | 22 | 18 | 1 | 0 | 1 | 0 | 95 |
| 571 | CIRCLE TEN | 206 | 160 | 78 | 106 | 6 | 9 | 21 | 0 | 586 |
| 573 | YUCCA | 65 | 39 | 28 | 36 | 4 | 1 | 9 | 0 | 182 |
| 574 | BAY AREA | 30 | 23 | 14 | 28 | 1 | 1 | 1 | 0 | 98 |
| 576 | SAM HOUSTON AREA | 252 | 186 | 136 | 199 | 15 | 14 | 22 | 2 | 826 |
| 577 | SOUTH TEXAS | 61 | 30 | 21 | 16 | 1 | 3 | 3 | 0 | 135 |
| 578 | THREE RIVERS | 63 | 26 | 23 | 23 | 2 | 1 | 5 | 1 | 144 |
| 583 | ALAMO AREA | 98 | 71 | 57 | 68 | 4 | 4 | 7 | 0 | 309 |
| 584 | CADDO AREA | 14 | 19 | 12 | 12 | 1 | 1 | 2 | 0 | 61 |
| 585 | EAST TEXAS AREA | 41 | 29 | 20 | 24 | 3 | 1 | 1 | 1 | 120 |
| 587 | NORTHWEST TEXAS | 17 | 15 | 20 | 17 | 0 | 1 | 3 | 1 | 74 |
| 590 | CROSSROADS OF THE WEST | 255 | 132 | 137 | 129 | 8 | 13 | 11 | 1 | 686 |
| 592 | GREEN MOUNTAIN | 23 | 24 | 28 | 24 | 0 | 0 | 2 | 0 | 101 |
| 595 | COLONIAL VIRGINIA | 29 | 30 | 19 | 26 | 0 | 4 | 1 | 0 | 105 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | All Unique & Timely Claims (2)* |
|---|---|---|---|---|---|---|---|---|---|---|
| 596 | TIDEWATER | 75 | 56 | 45 | 45 | 3 | 2 | 4 | 2 | 232 |
| 598 | SHENANDOAH AREA | 7 | 8 | 1 | 9 | 0 | 1 | 2 | 0 | 28 |
| 599 | BLUE RIDGE MOUNTAINS | 45 | 22 | 11 | 26 | 3 | 2 | 2 | 0 | 111 |
| 602 | HEART OF VIRGINIA | 55 | 41 | 30 | 30 | 1 | 3 | 1 | 0 | 161 |
| 604 | BLUE MOUNTAIN | 24 | 11 | 13 | 14 | 2 | 0 | 3 | 0 | 67 |
| 606 | MOUNT BAKER | 52 | 30 | 32 | 32 | 2 | 1 | 1 | 1 | 151 |
| 609 | CHIEF SEATTLE | 112 | 95 | 67 | 65 | 5 | 3 | 8 | 1 | 356 |
| 610 | GREAT ALASKA | 39 | 26 | 12 | 15 | 1 | 2 | 3 | 0 | 98 |
| 611 | INLAND NORTHWEST | 63 | 32 | 32 | 37 | 2 | 2 | 5 | 1 | 174 |
| 612 | PACIFIC HARBORS | 77 | 49 | 54 | 53 | 1 | 1 | 6 | 0 | 241 |
| 614 | GRAND COLUMBIA | 37 | 19 | 18 | 16 | 2 | 0 | 2 | 0 | 94 |
| 615 | MOUNTAINEER AREA | 15 | 11 | 4 | 10 | 0 | 1 | 0 | 0 | 41 |
| 617 | BUCKSKIN | 100 | 67 | 37 | 62 | 6 | 7 | 3 | 2 | 284 |
| 619 | OHIO RIVER VALLEY | 20 | 8 | 11 | 15 | 1 | 0 | 0 | 0 | 55 |
| 620 | GLACIER'S EDGE | 23 | 20 | 28 | 25 | 3 | 3 | 3 | 0 | 105 |
| 624 | GATEWAY AREA | 7 | 7 | 7 | 5 | 1 | 0 | 2 | 0 | 29 |
| 627 | SAMOSET COUNCIL | 10 | 10 | 6 | 5 | 0 | 1 | 0 | 0 | 32 |
| 635 | BAY-LAKES | 42 | 39 | 38 | 44 | 2 | 1 | 4 | 1 | 171 |
| 636 | THREE HARBORS | 85 | 65 | 45 | 70 | 3 | 4 | 3 | 0 | 275 |
| 637 | CHIPPEWA VALLEY | 12 | 8 | 16 | 14 | 2 | 1 | 2 | 0 | 55 |
| 638 | GREATER WYOMING | 10 | 7 | 6 | 5 | 0 | 1 | 2 | 0 | 31 |
| 640 | GREATER NEW YORK | 512 | 357 | 275 | 356 | 39 | 25 | 36 | 0 | 1,600 |
| 651 | POTAWATOMI AREA | 6 | 12 | 5 | 5 | 0 | 1 | 3 | 0 | 32 |
| 653 | GREAT RIVERS | 25 | 17 | 19 | 7 | 2 | 0 | 3 | 0 | 73 |
| 660 | BLACKHAWK AREA | 42 | 44 | 19 | 42 | 5 | 1 | 2 | 0 | 155 |
| 661 | PUERTO RICO | 35 | 16 | 16 | 11 | 2 | 0 | 1 | 0 | 81 |
| 662 | LONGHORN | 151 | 92 | 76 | 82 | 8 | 8 | 12 | 0 | 429 |
| 664 | SUWANNEE RIVER AREA | 12 | 9 | 13 | 15 | 1 | 2 | 1 | 0 | 53 |
| 690 | GARDEN STATE | 85 | 71 | 50 | 49 | 2 | 2 | 4 | 0 | 263 |
| 691 | PUSHMATAHA AREA | 20 | 7 | 8 | 10 | 4 | 3 | 1 | 1 | 54 |
| 694 | SOUTH PLAINS | 34 | 17 | 17 | 23 | 1 | 3 | 3 | 0 | 98 |
| 695 | BLACK HILLS AREA | 11 | 7 | 11 | 4 | 0 | 0 | 2 | 0 | 35 |
| 696 | MIDNIGHT SUN | 8 | 8 | 4 | 2 | 1 | 1 | 0 | 0 | 24 |
| 697 | OREGON TRAIL | 66 | 36 | 25 | 31 | 0 | 2 | 4 | 0 | 164 |
| 702 | RAINBOW | 29 | 23 | 13 | 19 | 1 | 0 | 2 | 0 | 87 |
| 713 | SEQUOYAH | 28 | 24 | 11 | 11 | 1 | 0 | 2 | 0 | 77 |
| 733 | SIOUX | 13 | 11 | 9 | 8 | 4 | 1 | 2 | 0 | 48 |
| 741 | TEXAS SOUTHWEST | 17 | 12 | 12 | 9 | 1 | 0 | 0 | 0 | 51 |
| 748 | YOCONA AREA | 25 | 11 | 9 | 13 | 1 | 2 | 1 | 0 | 62 |
| 763 | VIRGINIA HEADWATERS | 10 | 10 | 8 | 9 | 0 | 2 | 0 | 0 | 39 |
| 773 | GULF COAST | 70 | 45 | 31 | 40 | 0 | 0 | 4 | 1 | 191 |
| 775 | RIO GRANDE | 32 | 16 | 18 | 19 | 3 | 4 | 4 | 0 | 96 |
| 777 | WASHINGTON CROSSING | 23 | 16 | 21 | 16 | 0 | 2 | 1 | 0 | 79 |
| 780 | MICHIGAN CROSSROADS | 551 | 416 | 277 | 385 | 38 | 25 | 39 | 5 | 1,736 |
| 802 | TRANSATLANTIC | 52 | 39 | 45 | 32 | 3 | 2 | 2 | 1 | 176 |
| 803 | FAR EAST | 23 | 15 | 10 | 5 | 2 | 0 | 2 | 1 | 58 |
| Multiple | CENTRAL NEW JERSEY; WASHINGTON CROSSING | 19 | 11 | 10 | 12 | 0 | 0 | 2 | 0 | 54 |
| Multiple | CALIFORNIA INLAND EMPIRE; GREATER LOS ANGELES | 20 | 9 | 8 | 6 | 0 | 1 | 2 | 0 | 46 |
| Multiple | NORTHERN NEW JERSEY; PATRIOTS' PATH | 7 | 31 | 5 | 2 | 0 | 0 | 0 | 0 | 45 |
| Multiple | GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 9 | 6 | 13 | 7 | 0 | 0 | 0 | 0 | 35 |
| Multiple | CENTRAL NEW JERSEY; PATRIOTS' PATH | 9 | 6 | 6 | 9 | 1 | 1 | 0 | 1 | 33 |
| Multiple | NORTHERN LIGHTS; NORTHERN STAR | 9 | 7 | 6 | 4 | 1 | 0 | 5 | 0 | 32 |
| Multiple | ALOHA; DIRECT SERVICE | 10 | 7 | 7 | 3 | 1 | 0 | 0 | 0 | 28 |
| Multiple | COLONIAL VIRGINIA; TIDEWATER | 7 | 11 | 3 | 4 | 0 | 0 | 2 | 0 | 27 |
| Multiple | GOLDEN EMPIRE; GOLDEN GATE AREA | 9 | 4 | 6 | 6 | 1 | 0 | 0 | 0 | 26 |
| Multiple | GREATER NEW YORK; NORTHERN NEW JERSEY | 10 | 3 | 5 | 6 | 0 | 1 | 0 | 0 | 25 |
| Multiple | GREATER NIAGARA FRONTIER; IROQUOIS TRAIL | 14 | 4 | 5 | 2 | 0 | 0 | 0 | 0 | 25 |
| Multiple | DANIEL WEBSTER; SPIRIT OF ADVENTURE | 10 | 4 | 8 | 2 | 0 | 0 | 1 | 0 | 25 |
| Multiple | CIRCLE TEN; LONGHORN | 13 | 5 | 3 | 1 | 1 | 0 | 0 | 0 | 23 |
| Multiple | CONNECTICUT RIVERS; CONNECTICUT YANKEE | 10 | 5 | 5 | 3 | 0 | 0 | 0 | 0 | 23 |
| Multiple | GREAT TRAIL; NORTHERN NEW JERSEY | 8 | 3 | 6 | 3 | 0 | 0 | 2 | 1 | 23 |
| Multiple | GREATER ALABAMA; MOBILE AREA | 5 | 7 | 3 | 3 | 0 | 0 | 3 | 0 | 21 |
| Multiple | GREATER LOS ANGELES; ORANGE COUNTY | 8 | 5 | 4 | 4 | 0 | 0 | 0 | 0 | 21 |
| Multiple | BALTIMORE AREA; NATIONAL CAPITAL AREA | 6 | 2 | 6 | 6 | 0 | 0 | 0 | 0 | 20 |
| Multiple | NORTHEAST ILLINOIS; PATHWAY TO ADVENTURE | 5 | 7 | 5 | 2 | 0 | 1 | 0 | 0 | 20 |
| Multiple | CHIPPEWA VALLEY; NORTHERN STAR | 5 | 4 | 4 | 3 | 1 | 1 | 1 | 0 | 19 |
| Multiple | GOLDEN GATE AREA; GREATER YOSEMITE | 7 | 6 | 0 | 3 | 1 | 0 | 2 | 0 | 19 |
| Multiple | GREATER NEW YORK; THEODORE ROOSEVELT | 6 | 6 | 2 | 3 | 0 | 1 | 1 | 0 | 19 |
| Multiple | SUFFOLK COUNTY; THEODORE ROOSEVELT | 6 | 5 | 2 | 4 | 1 | 0 | 1 | 0 | 19 |
| Multiple | BUCKEYE; LAKE ERIE | 8 | 3 | 3 | 0 | 0 | 0 | 3 | 0 | 17 |
| Multiple | CIRCLE TEN; WESTERN LOS ANGELES COUNTY | 8 | 2 | 2 | 2 | 1 | 0 | 0 | 0 | 17 |
| Multiple | CROSSROADS OF AMERICA; DEL-MAR-VA | 6 | 8 | 1 | 2 | 0 | 0 | 0 | 0 | 17 |
| Multiple | GREATER NEW YORK; HUDSON VALLEY | 3 | 5 | 4 | 4 | 0 | 0 | 1 | 0 | 17 |
| Multiple | MAYFLOWER; SPIRIT OF ADVENTURE | 6 | 5 | 3 | 3 | 0 | 0 | 0 | 0 | 16 |
| Multiple | ATLANTA AREA; NORTHEAST GEORGIA | 5 | 5 | 2 | 2 | 1 | 0 | 1 | 0 | 16 |
| Multiple | PACIFIC SKYLINE; SILICON VALLEY MONTEREY BAY | 1 | 5 | 5 | 5 | 0 | 0 | 0 | 0 | 16 |
| Multiple | CENTRAL NEW JERSEY; MONMOUTH | 4 | 4 | 2 | 4 | 0 | 0 | 0 | 0 | 15 |
| Multiple | GREATER ALABAMA; TUKABATCHEE AREA | 8 | 4 | 1 | 2 | 0 | 0 | 0 | 0 | 15 |
| Multiple | ALAMO AREA; SAM HOUSTON AREA | 6 | 3 | 3 | 2 | 0 | 0 | 0 | 0 | 14 |
| Multiple | CROSSROADS OF AMERICA; HOOSIER TRAILS | 7 | 3 | 2 | 2 | 0 | 0 | 0 | 0 | 14 |
| Multiple | LAS VEGAS AREA; NEVADA AREA | 6 | 2 | 3 | 1 | 1 | 0 | 1 | 0 | 14 |
| Multiple | CHIEF SEATTLE; PACIFIC HARBORS | 8 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 13 |
| Multiple | GREATER LOS ANGELES; LONG BEACH AREA | 2 | 3 | 3 | 3 | 1 | 1 | 0 | 0 | 13 |
| Multiple | CONNECTICUT YANKEE; GREENWICH | 3 | 3 | 3 | 2 | 1 | 0 | 0 | 0 | 12 |
| Multiple | GOLDEN EMPIRE; GREATER YOSEMITE | 3 | 0 | 5 | 2 | 2 | 0 | 0 | 0 | 12 |
| Multiple | NORTHERN STAR; VOYAGEURS AREA | 3 | 2 | 2 | 5 | 0 | 0 | 0 | 0 | 12 |
| Multiple | CENTRAL MINNESOTA; NORTHERN STAR | 3 | 4 | 2 | 2 | 0 | 0 | 0 | 0 | 11 |
| Multiple | CRATER LAKE COUNCIL; LOS PADRES | 3 | 3 | 1 | 1 | 1 | 0 | 0 | 0 | 11 |
| Multiple | JUNIATA VALLEY; LAUREL HIGHLANDS | 8 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 11 |
| Multiple | LASALLE; PATHWAY TO ADVENTURE | 3 | 3 | 0 | 2 | 1 | 1 | 0 | 0 | 11 |
| Multiple | MAYFLOWER; NARRAGANSETT | 5 | 3 | 1 | 1 | 1 | 0 | 0 | 0 | 11 |
| Multiple | BAY-LAKES; MICHIGAN CROSSROADS | 1 | 3 | 0 | 6 | 0 | 0 | 0 | 0 | 10 |
| Multiple | CATALINA; GRAND CANYON | 3 | 2 | 3 | 2 | 0 | 0 | 0 | 0 | 10 |
| Multiple | CENTRAL FLORIDA; NORTH FLORIDA | 1 | 2 | 2 | 4 | 0 | 0 | 1 | 0 | 10 |
| Multiple | GOLDEN GATE AREA; PACIFIC SKYLINE | 5 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 10 |
| Multiple | GREAT TRAIL; LAKE ERIE | 1 | 3 | 2 | 3 | 0 | 1 | 0 | 0 | 10 |
| Multiple | GULF COAST; SOUTH TEXAS | 3 | 1 | 5 | 1 | 0 | 0 | 0 | 0 | 10 |
| Multiple | IROQUOIS TRAIL; LEATHERSTOCKING | 3 | 1 | 3 | 3 | 0 | 0 | 0 | 0 | 10 |
| Multiple | CROSSROADS OF AMERICA; SAGAMORE | 3 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 9 |
| Multiple | MICHIGAN CROSSROADS; PATHWAY TO ADVENTURE | 1 | 4 | 2 | 1 | 0 | 0 | 1 | 0 | 9 |
| Multiple | NORTH FLORIDA; SUWANNEE RIVER AREA | 4 | 0 | 2 | 3 | 0 | 0 | 0 | 0 | 9 |
| Multiple | SOUTHERN SIERRA; WESTERN LOS ANGELES COUNTY | 5 | 0 | 1 | 2 | 0 | 0 | 1 | 0 | 9 |
| Multiple | BLACK WARRIOR; GREATER ALABAMA | 0 | 7 | 0 | 1 | 0 | 0 | 0 | 0 | 8 |
| Multiple | GOLDEN GATE AREA; REDWOOD EMPIRE | 1 | 4 | 2 | 1 | 0 | 0 | 0 | 0 | 8 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | GREAT RIVERS; HEART OF AMERICA | 3 | 2 | 1 | 1 | 0 | 1 | 0 | 0 | 8 |
| Multiple | LONGHORN; SAM HOUSTON AREA | 0 | 3 | 4 | 0 | 0 | 0 | 1 | 0 | 8 |
| Multiple | MECKLENBURG COUNTY; PIEDMONT 420 | 0 | 1 | 0 | 4 | 0 | 0 | 0 | 0 | 8 |
| Multiple | PATHWAY TO ADVENTURE; RAINBOW | 1 | 3 | 3 | 1 | 0 | 0 | 0 | 0 | 8 |
| Multiple | PATHWAY TO ADVENTURE; THREE FIRES | 3 | 3 | 1 | 0 | 0 | 0 | 1 | 0 | 8 |
| Multiple | BALTIMORE AREA; DEL-MAR-VA | 2 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 7 |
| Multiple | BLUE GRASS; LINCOLN HERITAGE | 4 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 7 |
| Multiple | CIRCLE TEN; SAM HOUSTON AREA | 2 | 0 | 2 | 1 | 2 | 0 | 0 | 0 | 7 |
| Multiple | CRATER LAKE COUNCIL; REDWOOD EMPIRE | 4 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 7 |
| Multiple | GOLDEN EMPIRE; NEVADA AREA | 3 | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 7 |
| Multiple | GOLDEN GATE AREA; NEVADA AREA | 2 | 2 | 1 | 1 | 0 | 1 | 0 | 0 | 7 |
| Multiple | LONG BEACH AREA; ORANGE COUNTY | 5 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 7 |
| Multiple | MIAMI VALLEY; TECUMSEH | 3 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 7 |
| Multiple | POTAWATOMI AREA; THREE HARBORS | 3 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 7 |
| Multiple | ATLANTA AREA; COASTAL GEORGIA | 5 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 6 |
| Multiple | CENTRAL NORTH CAROLINA; MECKLENBURG COUNTY | 2 | 2 | 1 | 0 | 0 | 0 | 1 | 0 | 6 |
| Multiple | CRADLE OF LIBERTY; WASHINGTON CROSSING | 3 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 6 |
| Multiple | DENVER AREA; LONGS PEAK COUNCIL | 4 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 6 |
| Multiple | FIVE RIVERS; SENECA WATERWAYS | 0 | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 6 |
| Multiple | GARDEN STATE; JERSEY SHORE | 0 | 3 | 1 | 2 | 0 | 0 | 0 | 0 | 6 |
| Multiple | GARDEN STATE; NORTHERN NEW JERSEY | 3 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 6 |
| Multiple | GREATER NEW YORK; SUFFOLK COUNTY | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| Multiple | HEART OF AMERICA; QUIVIRA | 1 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 6 |
| Multiple | HEART OF VIRGINIA; TIDEWATER | 3 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 6 |
| Multiple | ISTROUMA AREA; SOUTHEAST LOUISIANA | 2 | 1 | 0 | 2 | 1 | 0 | 0 | 0 | 6 |
| Multiple | KATAHDIN AREA; PINE TREE | 1 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| Multiple | MISSISSIPPI VALLEY; SPIRIT OF ADVENTURE | 1 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 6 |
| Multiple | SAM HOUSTON AREA; THREE RIVERS | 1 | 1 | 1 | 3 | 0 | 0 | 0 | 0 | 6 |
| Multiple | ALAMO AREA; CAPITOL AREA | 2 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 5 |
| Multiple | ALLEGHENY HIGHLANDS; SENECA WATERWAYS | 1 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| Multiple | ANDREW JACKSON; PINE BURR AREA | 1 | 2 | 0 | 1 | 0 | 0 | 1 | 0 | 5 |
| Multiple | BAY AREA; SAM HOUSTON AREA | 1 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 5 |
| Multiple | BAY-LAKES; PATHWAY TO ADVENTURE | 4 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 5 |
| Multiple | CHEROKEE AREA 469; QUAPAW AREA | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| Multiple | CHIEF SEATTLE; MOUNT BAKER | 3 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 5 |
| Multiple | DANIEL BOONE; PIEDMONT 420 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| Multiple | DANIEL WEBSTER; HEART OF NEW ENGLAND | 1 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 5 |
| Multiple | ERIE SHORES; LAKE ERIE | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 5 |
| Multiple | GOLDEN EMPIRE; GREATER LOS ANGELES | 1 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 5 |
| Multiple | GREAT RIVERS; GREATER ST. LOUIS AREA | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 5 |
| Multiple | GREAT SOUTHWEST; SAM HOUSTON AREA | 1 | 1 | 0 | 2 | 1 | 0 | 0 | 0 | 5 |
| Multiple | GREATER LOS ANGELES; SAM HOUSTON AREA | 2 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 5 |
| Multiple | GREATER LOS ANGELES; VERDUGO HILLS | 2 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 5 |
| Multiple | GREATER TAMPA BAY AREA; GULF COAST | 2 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 5 |
| Multiple | GREATER TAMPA BAY AREA; SOUTH FLORIDA COUNCIL | 2 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 5 |
| Multiple | GULF STREAM; SOUTH FLORIDA COUNCIL | 1 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 5 |
| Multiple | HEART OF AMERICA; MID-AMERICA | 2 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 5 |
| Multiple | HEART OF NEW ENGLAND; MAYFLOWER | 3 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 5 |
| Multiple | LAUREL HIGHLANDS; MORAINE TRAILS | 2 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 5 |
| Multiple | LEATHERSTOCKING; LONGHOUSE | 2 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 5 |
| Multiple | NATIONAL CAPITAL AREA; TIDEWATER | 2 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 5 |
| Multiple | ALAMO AREA; TEXAS SOUTHWEST | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | ANDREW JACKSON; PUSHMATAHA AREA | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 4 |
| Multiple | ATLANTA AREA; FLINT RIVER | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | BLUE RIDGE MOUNTAINS; TIDEWATER | 0 | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | BUCKEYE; GREAT TRAIL | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | BUCKSKIN; MOUNTAINEER AREA | 1 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 4 |
| Multiple | CALCASIEU; LOUISIANA PURCHASE | 1 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 4 |
| Multiple | CALIFORNIA INLAND EMPIRE; WESTERN LOS ANGELES COUNTY | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | CAPE FEAR; DEL-MAR-VA | 3 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | CAPITOL AREA; SAM HOUSTON AREA | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | CASCADE PACIFIC; PINE TREE | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | CHESTER COUNTY; CRADLE OF LIBERTY | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | CHESTER COUNTY; WESTCHESTER-PUTNAM | 0 | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | CORONADO AREA; JAYHAWK AREA | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | CRADLE OF LIBERTY; MINSI TRAILS | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | CROSSROADS OF AMERICA; CROSSROADS OF THE WEST | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | DAN BEARD; MIAMI VALLEY | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | DANIEL BOONE; MECKLENBURG COUNTY | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | DENVER AREA; PIKES PEAK | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | GOLDEN EMPIRE; SILICON VALLEY MONTEREY BAY | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | GOLDEN GATE AREA; SILICON VALLEY MONTEREY BAY | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | GREAT ALASKA; MIDNIGHT SUN | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 4 |
| Multiple | GREAT RIVERS; OZARK TRAILS | 1 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 4 |
| Multiple | GREATER ST. LOUIS AREA; HEART OF AMERICA | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | GREATER ST. LOUIS AREA; MISSISSIPPI VALLEY | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 4 |
| Multiple | GREATER ST. LOUIS AREA; PRAIRIELANDS | 1 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 4 |
| Multiple | GREATER YOSEMITE; SILICON VALLEY MONTEREY BAY | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 4 |
| Multiple | HEART OF AMERICA; OZARK TRAILS | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | HEART OF NEW ENGLAND; HUDSON VALLEY | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 4 |
| Multiple | ISTROUMA AREA; LOUISIANA PURCHASE | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | LAUREL HIGHLANDS; WESTMORELAND-FAYETTE | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 4 |
| Multiple | LONG BEACH AREA; SILICON VALLEY MONTEREY BAY | 0 | 1 | 0 | 2 | 1 | 0 | 0 | 0 | 4 |
| Multiple | LONGHORN; TEXAS TRAILS | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | MECKLENBURG COUNTY; PALMETTO | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | MID-AMERICA; MID-IOWA | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 4 |
| Multiple | MINSI TRAILS; NORTHEASTERN PENNSYLVANIA | 0 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 4 |
| Multiple | MINSI TRAILS; NORTHERN NEW JERSEY | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | NORTHEAST ILLINOIS; SAMOSET COUNCIL | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | OLD HICKORY; OLD NORTH STATE | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| Multiple | PATHWAY TO ADVENTURE; THREE HARBORS | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| Multiple | RAINBOW; THREE FIRES | 0 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 4 |
| Multiple | VERDUGO HILLS; WESTERN LOS ANGELES COUNTY | 1 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 4 |
| Multiple | ALABAMA-FLORIDA; GREATER ALABAMA | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | ATLANTA AREA; CENTRAL GEORGIA | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| Multiple | ATLANTA AREA; CHATTAHOOCHEE | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | ATLANTA AREA; SOUTH GEORGIA | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | BADEN POWELL; CRADLE OF LIBERTY | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | BADEN POWELL; SUSQUEHANNA | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | BADEN POWELL; TUSCARORA | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| Multiple | BLACKHAWK AREA; RAINBOW | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | BLUE GRASS; SEQUOYAH | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 3 |
| Multiple | BLUE RIDGE; PALMETTO | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | BUCKEYE; SIMON KENTON | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | BUFFALO TRACE; LINCOLN HERITAGE | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CADDO AREA; QUAPAW AREA | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CALIFORNIA INLAND EMPIRE; ORANGE COUNTY | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CAPITOL AREA; NATIONAL CAPITAL AREA | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 3 |
| Multiple | CASCADE PACIFIC; CRATER LAKE COUNCIL | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CASCADE PACIFIC; PACIFIC HARBORS | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CENTRAL MINNESOTA; VOYAGEURS AREA | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CENTRAL NEW JERSEY; MINSI TRAILS | 0 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 3 |
| Multiple | CENTRAL NORTH CAROLINA; OCCONEECHEE | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CHATTAHOOCHEE; FLINT RIVER | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CHATTAHOOCHEE; GREATER ALABAMA | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CONNECTICUT RIVERS; HEART OF NEW ENGLAND | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CONNECTICUT YANKEE; HOUSATONIC | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CONQUISTADOR; GREAT SOUTHWEST | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CRATER LAKE COUNCIL; OREGON TRAIL | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CROSSROADS OF AMERICA; MIAMI VALLEY | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 3 |
| Multiple | CROSSROADS OF AMERICA; SIMON KENTON | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 3 |
| Multiple | CROSSROADS OF THE WEST; GRAND TETON | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | CROSSROADS OF THE WEST; MOUNTAIN WEST | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 3 |
| Multiple | DAN BEARD; SIMON KENTON | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 3 |
| Multiple | DANIEL WEBSTER; GREATER ST. LOUIS AREA | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | EAST CAROLINA; OCCONEECHEE | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | EAST TEXAS AREA; THREE RIVERS | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GARDEN STATE; THEODORE ROOSEVELT | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GOLDEN GATE AREA; MARIN | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GRAND COLUMBIA; INLAND NORTHWEST | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GRAND TETON; MOUNTAIN WEST | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GREAT SMOKY MOUNTAIN; MIDDLE TENNESSEE | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GREATER LOS ANGELES; GREATER YOSEMITE | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GREATER NEW YORK; GREATER NIAGARA FRONTIER | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GREATER NEW YORK; SENECA WATERWAYS | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GREATER NEW YORK; WESTCHESTER-PUTNAM | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GREATER NIAGARA FRONTIER; SENECA WATERWAYS | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GREATER ST. LOUIS AREA; NORTHEAST ILLINOIS | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| Multiple | GREATER YOSEMITE; SOUTHERN SIERRA | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | HEART OF AMERICA; JAYHAWK AREA | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | HEART OF NEW ENGLAND; WESTCHESTER-PUTNAM | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | HUDSON VALLEY; WESTCHESTER-PUTNAM | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | INLAND NORTHWEST; PACIFIC HARBORS | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 3 |
| Multiple | LAUREL HIGHLANDS; NATIONAL CAPITAL AREA | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 3 |
| Multiple | LONGHORN; NORTHWEST TEXAS | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | LOS PADRES; SEQUOIA | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | LOS PADRES; SOUTHERN SIERRA | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | MAYFLOWER; WESTCHESTER-PUTNAM | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | MICHIGAN CROSSROADS; NORTHEAST ILLINOIS | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| Multiple | MID-AMERICA; OVERLAND TRAILS | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | NEVADA AREA; PACIFIC SKYLINE | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | NEW BIRTH OF FREEDOM; PENNSYLVANIA DUTCH | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | NORTHEAST GEORGIA; NORTHWEST GEORGIA | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 3 |
| Multiple | NORTHEAST ILLINOIS; THREE FIRES | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| Multiple | NORTHERN NEW JERSEY; WASHINGTON CROSSING | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | NORTHERN STAR; TWIN VALLEY | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | OCCONEECHEE; OLD HICKORY | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| Multiple | ORANGE COUNTY; SAN DIEGO - IMPERIAL COUNCIL | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| Multiple | QUAPAW AREA; WESTARK AREA | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | SENECA WATERWAYS; TWIN RIVERS | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 3 |
| Multiple | SEQUOIA; SOUTHERN SIERRA | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | TIDEWATER; VIRGINIA HEADWATERS | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | VENTURA COUNTY; WESTERN LOS ANGELES COUNTY | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| Multiple | ABRAHAM LINCOLN; GREATER ST. LOUIS AREA | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ABRAHAM LINCOLN; PATHWAY TO ADVENTURE | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ABRAHAM LINCOLN; W.D. BOYCE | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ALLEGHENY HIGHLANDS; BALTIMORE AREA | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ALLEGHENY HIGHLANDS; BUCKSKIN | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ALLEGHENY HIGHLANDS; GREAT TRAIL | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ALLEGHENY HIGHLANDS; GREATER NIAGARA FRONTIER | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 2 |
| Multiple | ALLEGHENY HIGHLANDS; LAUREL HIGHLANDS | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ALOHA; FAR EAST | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ANDREW JACKSON; CHICKASAW | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ANTHONY WAYNE AREA; CROSSROADS OF AMERICA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ARBUCKLE AREA; LAST FRONTIER | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ATLANTA AREA; JERSEY SHORE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ATLANTA AREA; NORTHWEST GEORGIA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ATLANTA AREA; PATHWAY TO ADVENTURE | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BADEN POWELL; CROSSROADS OF AMERICA; DEL-MAR-VA | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BADEN POWELL; JUNIATA VALLEY | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BADEN POWELL; TWIN RIVERS | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BAY-LAKES; GLACIER'S EDGE | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BAY-LAKES; NORTHEAST ILLINOIS | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BAY-LAKES; SAMOSET COUNCIL | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BLACK SWAMP AREA; BUCKEYE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BLACK SWAMP AREA; ERIE SHORES | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BLACK SWAMP AREA; SIMON KENTON | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BLACKHAWK AREA; NORTHEAST ILLINOIS | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BLACKHAWK AREA; PATHWAY TO ADVENTURE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BLUE GRASS; LAUREL HIGHLANDS | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BLUE GRASS; SIMON KENTON | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BLUE MOUNTAIN; CASCADE PACIFIC | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BLUE MOUNTAIN; INLAND NORTHWEST | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BLUE RIDGE MOUNTAINS; HEART OF VIRGINIA | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| Multiple | BLUE RIDGE; DANIEL BOONE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BLUE RIDGE; OCCONEECHEE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BUCKEYE; GREAT TRAIL; LAKE ERIE | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BUCKSKIN; SIMON KENTON | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BUFFALO TRAIL; TEXAS TRAILS | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CALIFORNIA INLAND EMPIRE; GOLDEN EMPIRE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CALIFORNIA INLAND EMPIRE; LONG BEACH AREA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CALIFORNIA INLAND EMPIRE; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CASCADE PACIFIC; MOUNT BAKER | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CASCADE PACIFIC; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CENTRAL FLORIDA; GREATER TAMPA BAY AREA | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 2 |
| Multiple | CENTRAL FLORIDA; ORANGE COUNTY | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CENTRAL GEORGIA; COASTAL GEORGIA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CENTRAL GEORGIA; SOUTH GEORGIA | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |

**Unique and Timely Abuse Claim Count by Local Council & Allegation**

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | CENTRAL NORTH CAROLINA; OLD NORTH STATE | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CHEROKEE AREA 469; INDIAN NATIONS | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CHEROKEE AREA 556; GREAT SMOKY MOUNTAIN | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CHEROKEE AREA 556; NORTHWEST GEORGIA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CHIEF SEATTLE; INLAND NORTHWEST | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CIRCLE TEN; EAST TEXAS AREA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CIRCLE TEN; GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CIRCLE TEN; VENTURA COUNTY; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | COASTAL CAROLINA; PEE DEE AREA | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CONNECTICUT RIVERS; NARRAGANSETT | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CONNECTICUT RIVERS; SENECA WATERWAYS | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CRADLE OF LIBERTY; LAUREL HIGHLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 2 |
| Multiple | CRADLE OF LIBERTY; SUSQUEHANNA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CRATER LAKE COUNCIL; GOLDEN EMPIRE | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CROSSROADS OF AMERICA; GREATER ST. LOUIS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| Multiple | CROSSROADS OF AMERICA; MICHIGAN CROSSROADS | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CROSSROADS OF AMERICA; MINSI TRAILS | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | CROSSROADS OF THE WEST; LAS VEGAS AREA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | DANIEL BOONE; EAST CAROLINA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| Multiple | DANIEL WEBSTER; GREEN MOUNTAIN | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | DANIEL WEBSTER; MAYFLOWER | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| Multiple | DENVER AREA; GREAT SOUTHWEST | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | DIRECT SERVICE; NATIONAL CAPITAL AREA | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | EAST CAROLINA; INDIAN WATERS | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| Multiple | EAST CAROLINA; MECKLENBURG COUNTY | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | EAST CAROLINA; PIEDMONT 420 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | EAST CAROLINA; TUSCARORA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | EAST TEXAS AREA; SAM HOUSTON AREA | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | EVANGELINE AREA; SOUTHEAST LOUISIANA | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | FIVE RIVERS; GREATER NEW YORK | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | FIVE RIVERS; IROQUOIS TRAIL; SENECA WATERWAYS | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | FIVE RIVERS; OHIO RIVER VALLEY | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | FRENCH CREEK; LAUREL HIGHLANDS | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GAMEHAVEN; NORTHERN STAR | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 2 |
| Multiple | GARDEN STATE; WASHINGTON CROSSING | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | BAY | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GOLDEN EMPIRE; NARRAGANSETT | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GOLDEN EMPIRE; NORTHERN STAR | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GOLDEN EMPIRE; SEQUOIA | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GOLDEN GATE AREA; PATRIOTS' PATH | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GOLDEN GATE AREA; PIEDMONT 042 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 2 |
| Multiple | GOLDEN SPREAD; LAST FRONTIER | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GOLDEN SPREAD; SAM HOUSTON AREA | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| Multiple | GRAND CANYON; GREAT SOUTHWEST | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GRAND COLUMBIA; MOUNT BAKER | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GREAT RIVERS; PONY EXPRESS | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GREATER ALABAMA; GULF COAST | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GREATER LOS ANGELES; LONG BEACH AREA; WESTERN LOS ANGELES COUNTY | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GREATER LOS ANGELES; PATHWAY TO ADVENTURE | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GREATER LOS ANGELES; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GREATER NEW YORK; IROQUOIS TRAIL | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GREATER NEW YORK; RIP VAN WINKLE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GREATER ST. LOUIS AREA; ILLOWA | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GREATER YOSEMITE; SEQUOIA | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | GREEN MOUNTAIN; WESTERN MASSACHUSETTS | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | HAWK MOUNTAIN; MASON-DIXON | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | HAWKEYE AREA; WINNEBAGO | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | HEART OF AMERICA; TWIN RIVERS | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | HEART OF NEW ENGLAND; WESTERN MASSACHUSETTS | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| Multiple | HOOSIER TRAILS; MUSKINGUM VALLEY | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | HOOSIER TRAILS; QUAPAW AREA | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| Multiple | ILLOWA; MISSISSIPPI VALLEY | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ILLOWA; PRAIRIELANDS | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | INDIAN NATIONS; LAST FRONTIER | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | INDIAN WATERS; PALMETTO | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | INLAND NORTHWEST; MONTANA | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ISTROUMA AREA; NORWELA | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | LAKE ERIE; SIMON KENTON | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | LASALLE; SAGAMORE | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | LAUREL HIGHLANDS; OHIO RIVER VALLEY | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | LAUREL HIGHLANDS; SUSQUEHANNA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | LEATHERSTOCKING; TWIN RIVERS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 2 |
| Multiple | LONG BEACH AREA; VERDUGO HILLS | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | LONGHORN; PACIFIC HARBORS | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | LONGHOUSE; PATRIOTS' PATH | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | LONGHOUSE; SENECA WATERWAYS | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | LONGS PEAK COUNCIL; PIKES PEAK | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | LOS PADRES; SILICON VALLEY MONTEREY BAY | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | LOS PADRES; WESTERN LOS ANGELES COUNTY | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MARIN; PACIFIC SKYLINE | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MARIN; WESTERN LOS ANGELES COUNTY | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MAYFLOWER; TRANSATLANTIC | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MECKLENBURG COUNTY; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MECKLENBURG COUNTY; OCCONEECHEE | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MECKLENBURG COUNTY; OLD HICKORY | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MIAMI VALLEY; SIMON KENTON | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MICHIGAN CROSSROADS; NORTHERN LIGHTS | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MICHIGAN CROSSROADS; SENECA WATERWAYS | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MID-AMERICA; NATIONAL CAPITAL AREA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MID-AMERICA; NORTHERN STAR | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MID-IOWA; TWIN RIVERS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 2 |
| Multiple | MIDDLE TENNESSEE; WEST TENNESSEE AREA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MINSI TRAILS; PATRIOTS' PATH | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MONMOUTH; NORTHERN NEW JERSEY | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | MONMOUTH; PATRIOTS' PATH | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | NARRAGANSETT; SUFFOLK COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| Multiple | NATIONAL CAPITAL AREA; VIRGINIA HEADWATERS | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | NEW BIRTH OF FREEDOM; NORTHEASTERN PENNSYLVANIA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | NEW BIRTH OF FREEDOM; SUSQUEHANNA | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | NORTH FLORIDA; SOUTH FLORIDA COUNCIL | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | NORTHEAST ILLINOIS; POTAWATOMI AREA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | NORTHEAST IOWA COUNCIL; WINNEBAGO | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | NORTHERN NEW JERSEY; PINE BURR AREA | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| Multiple | NORTHERN NEW JERSEY; SAM HOUSTON AREA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | NORTHERN NEW JERSEY; SPIRIT OF ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | OCCONEECHEE; OLD NORTH STATE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | OLD HICKORY; PIEDMONT 420 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | OLD NORTH STATE; PIEDMONT 420 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ORANGE COUNTY; WESTERN LOS ANGELES COUNTY | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | OZARK TRAILS; QUIVIRA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | PACIFIC HARBORS; TRANSATLANTIC | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | PACIFIC SKYLINE; REDWOOD EMPIRE | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | PALMETTO; PIEDMONT 420 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | PATHWAY TO ADVENTURE; SAMOSET COUNCIL | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | SAM HOUSTON AREA; SOUTH TEXAS | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 |
| Multiple | SEQUOIA; SEQUOYAH | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 |
| Multiple | SHENANDOAH AREA; TIDEWATER | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | SILICON VALLEY MONTEREY BAY; TWIN RIVERS | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Multiple | SOUTH GEORGIA; SUWANNEE RIVER AREA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Multiple | ABRAHAM LINCOLN; BAY-LAKES; GREATER ST. LOUIS AREA; VOYAGEURS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ABRAHAM LINCOLN; DAN BEARD | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ABRAHAM LINCOLN; RAINBOW | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ABRAHAM LINCOLN; THREE FIRES | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALABAMA-FLORIDA; GULF COAST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALABAMA-FLORIDA; TRANSATLANTIC | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALABAMA-FLORIDA; TUKABATCHEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; BAY AREA; CIRCLE TEN; LONGHORN | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; CAPITOL AREA; SAM HOUSTON AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; FAR EAST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; GREATER NEW YORK | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; GREATER TAMPA BAY AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; LONGHORN | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; PINE BURR AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; RIO GRANDE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; SIMON KENTON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; SOUTH TEXAS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; SPIRIT OF ADVENTURE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALAMO AREA; WESTARK AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALLEGHENY HIGHLANDS; BADEN POWELL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALLEGHENY HIGHLANDS; BLACK SWAMP AREA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | ALLEGHENY HIGHLANDS; BUCKTAIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALLEGHENY HIGHLANDS; CHICKASAW | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALLEGHENY HIGHLANDS; GREATER NIAGARA FRONTIER; IROQUOIS TRAIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALLEGHENY HIGHLANDS; LEATHERSTOCKING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALLEGHENY HIGHLANDS; LOS PADRES; VENTURA COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALOHA; CROSSROADS OF THE WEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALOHA; GOLDEN GATE AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALOHA; MICHIGAN CROSSROADS; NORTHEAST ILLINOIS; THREE HARBORS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALOHA; PACIFIC SKYLINE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALOHA; TEXAS SOUTHWEST; TRANSATLANTIC | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ALOHA; WESTERN LOS ANGELES COUNTY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ANDREW JACKSON; GREATER LOS ANGELES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ANDREW JACKSON; ISTROUMA AREA | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | ANDREW JACKSON; LAST FRONTIER | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ANDREW JACKSON; MICHIGAN CROSSROADS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ANDREW JACKSON; PEE DEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ANTHONY WAYNE AREA; ERIE SHORES | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ANTHONY WAYNE AREA; LASALLE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ANTHONY WAYNE AREA; LONGS PEAK COUNCIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ANTHONY WAYNE AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ANTHONY WAYNE AREA; PATHWAY TO ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ANTHONY WAYNE AREA; SAGAMORE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; BLUE GRASS | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; CENTRAL GEORGIA; JERSEY SHORE; TRANSATLANTIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; COASTAL CAROLINA; SOUTH GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; DAN BEARD; GULF COAST; NORTH FLORIDA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; DANIEL BOONE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; GEORGIA-CAROLINA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; GREAT SOUTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; GREAT TRAIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; GREATER ALABAMA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | ATLANTA AREA; GREATER ST. LOUIS AREA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | ATLANTA AREA; LAKE ERIE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; NEVADA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; NORTH FLORIDA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; SAN DIEGO - IMPERIAL COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; SUWANNEE RIVER AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; THREE FIRES | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ATLANTA AREA; TUKABATCHEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; CONNECTICUT RIVERS; GREATER NEW YORK; PATRIOTS' PATH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; CRADLE OF LIBERTY; CROSSROADS OF AMERICA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; DEL-MAR-VA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; GARDEN STATE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; GREATER NEW YORK | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; IROQUOIS TRAIL; LEATHERSTOCKING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; LAST FRONTIER | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; LAUREL HIGHLANDS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; LONGHOUSE; THREE FIRES | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; MAYFLOWER; SPIRIT OF ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; NATIONAL CAPITAL AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BADEN POWELL; SOUTH FLORIDA COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BALTIMORE AREA; CHESTER COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BALTIMORE AREA; CHIEF SEATTLE; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BALTIMORE AREA; COLONIAL VIRGINIA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BALTIMORE AREA; DE SOTO AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BALTIMORE AREA; GRAND CANYON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BALTIMORE AREA; GREATER ST. LOUIS AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BALTIMORE AREA; LAUREL HIGHLANDS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BALTIMORE AREA; LINCOLN HERITAGE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BALTIMORE AREA; MASON-DIXON | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BALTIMORE AREA; MID-AMERICA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BALTIMORE AREA; NATIONAL CAPITAL AREA; PATRIOTS' PATH | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BAY-LAKES; CASCADE PACIFIC | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BAY-LAKES; CROSSROADS OF AMERICA; HOOSIER TRAILS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BAY-LAKES; GATEWAY AREA; PATHWAY TO ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BAY-LAKES; LAUREL HIGHLANDS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BAY-LAKES; NORTHERN STAR | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | BAY-LAKES; OREGON TRAIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BAY-LAKES; PACIFIC HARBORS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BAY-LAKES; POTAWATOMI AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BAY-LAKES; RAINBOW | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | BAY-LAKES; REDWOOD EMPIRE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BAY-LAKES; THREE FIRES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BAY-LAKES; THREE HARBORS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BAY-LAKES; TWIN RIVERS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACK HILLS AREA; CIRCLE TEN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACK HILLS AREA; GREATER ALABAMA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACK HILLS AREA; MONTANA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACK HILLS AREA; SIOUX | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | BLACK SWAMP AREA; GREATER ST. LOUIS AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACK SWAMP AREA; JAYHAWK AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACK SWAMP AREA; WESTERN LOS ANGELES COUNTY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACK WARRIOR; TUKABATCHEE AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACKHAWK AREA; BUCKEYE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACKHAWK AREA; CASCADE PACIFIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACKHAWK AREA; CONNECTICUT RIVERS; CONNECTCUT YANKEE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACKHAWK AREA; CROSSROADS OF AMERICA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACKHAWK AREA; THREE FIRES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACKHAWK AREA; THREE RIVERS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLACKHAWK AREA; W.D. BOYCE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE GRASS; BUCKEYE | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Multiple | BLUE GRASS; DAN BEARD | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE GRASS; OCCONEECHEE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE MOUNTAIN; PATRIOTS' PATH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE MOUNTAIN; SOUTHEAST LOUISIANA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE MOUNTAINS; CASCADE PACIFIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE MOUNTAINS; CROSSROADS OF AMERICA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE MOUNTAINS; MOUNTAINEER AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE MOUNTAINS; NEW BIRTH OF FREEDOM | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE MOUNTAINS; OLD NORTH STATE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE MOUNTAINS; SHENANDOAH AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE; BLUE RIDGE MOUNTAINS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE; CENTRAL FLORIDA; DANIEL BOONE; PIEDMONT 420 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE; CHICKASAW | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE; CIMARRON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE; EAST CAROLINA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE; INDIAN WATERS | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE; MOUNTAINEER AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BLUE RIDGE; SAMOSET COUNCIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKEYE; GREEN MOUNTAIN | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKEYE; HEART OF AMERICA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKEYE; LAKE ERIE; MAYFLOWER; NARRAGANSETT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKEYE; LAKE ERIE; NORTHEAST GEORGIA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKEYE; MUSKINGUM VALLEY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKEYE; TUSCARORA | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Multiple | BUCKSKIN; COASTAL GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKSKIN; DAN BEARD | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKSKIN; DENVER AREA; PIKES PEAK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKSKIN; GREATER ALABAMA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKSKIN; HAWK MOUNTAIN | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKSKIN; MECKLENBURG COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKSKIN; NATIONAL CAPITAL AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKSKIN; PACIFIC SKYLINE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKSKIN; SENECA WATERWAYS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKTAIL; EAST TEXAS AREA; NORWELA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKTAIL; GEORGIA-CAROLINA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUCKTAIL; LAUREL HIGHLANDS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUFFALO TRACE; BUFFALO TRAIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUFFALO TRACE; CROSSROADS OF AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUFFALO TRACE; GREATER ST. LOUIS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUFFALO TRACE; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUFFALO TRACE; SAGAMORE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUFFALO TRAIL; DIRECT SERVICE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUFFALO TRAIL; LONGHORN | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | BUFFALO TRAIL; SOUTH PLAINS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CADDO AREA; CHICKASAW; DE SOTO AREA; QUAPAW AREA; WESTARK AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CADDO AREA; CIRCLE TEN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CADDO AREA; CIRCLE TEN; EAST TEXAS AREA; RIO GRANDE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CADDO AREA; DE SOTO AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CADDO AREA; EAST TEXAS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CADDO AREA; NORWELA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALCASIEU; EVANGELINE AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALCASIEU; GOLDEN GATE AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALCASIEU; INDIAN NATIONS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALCASIEU; NORWELA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALCASIEU; SOUTHEAST LOUISIANA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; CATALINA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; CENTRAL FLORIDA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; CROSSROADS OF THE WEST | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; DANIEL WEBSTER | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; DENVER AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; GREATER LOS ANGELES; ORANGE COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; GREATER LOS ANGELES; SPIRIT OF ADVENTURE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; LAS VEGAS AREA | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | COUNCIL; VENTURA COUNTY; VERDUGO HILLS; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | VENTURA COUNTY; VERDUGO HILLS; WESTERN LOS ANGELES COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; LONGS PEAK COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; RIO GRANDE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; SOUTHERN SIERRA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; TEXAS SOUTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; VENTURA COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; VERDUGO HILLS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CALIFORNIA INLAND EMPIRE; YUCCA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE COD & ISLANDS; FAR EAST | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | CAPE COD & ISLANDS; FAR EAST; LAS VEGAS AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE COD & ISLANDS; GREATER NEW YORK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE COD & ISLANDS; HEART OF NEW ENGLAND | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE COD & ISLANDS; HEART OF NEW ENGLAND; MAYFLOWER | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE COD & ISLANDS; MAYFLOWER | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE COD & ISLANDS; MAYFLOWER; NARRAGANSETT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE COD & ISLANDS; NARRAGANSETT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | CAPE COD & ISLANDS; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE COD & ISLANDS; SAGAMORE | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | CAPE COD & ISLANDS; SPIRIT OF ADVENTURE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE COD & ISLANDS; TWIN RIVERS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE FEAR; CENTRAL NORTH CAROLINA; EAST CAROLINA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE FEAR; DANIEL BOONE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE FEAR; EAST CAROLINA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE FEAR; EAST CAROLINA; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE FEAR; MECKLENBURG COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE FEAR; OCCONEECHEE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE FEAR; OLD HICKORY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPE FEAR; PIEDMONT 420 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPITOL AREA; CENTRAL NORTH CAROLINA; SAM HOUSTON AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPITOL AREA; CIRCLE TEN; LONGHORN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPITOL AREA; DENVER AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPITOL AREA; GREATER LOS ANGELES; GREATER NEW YORK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPITOL AREA; LONGHORN | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CAPITOL AREA; TEXAS TRAILS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | CAPITOL AREA; THREE RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; CHIEF SEATTLE; PACIFIC HARBORS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; GOLDEN EMPIRE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; GRAND COLUMBIA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; GREATER NEW YORK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; GREATER ST. LOUIS AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; GREEN MOUNTAIN | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; INDIAN NATIONS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; LONGHORN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; MID-AMERICA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; MONTANA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; MOUNT BAKER; PACIFIC HARBORS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; OREGON TRAIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; PEE DEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CASCADE PACIFIC; PENNSYLVANIA DUTCH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CATALINA; GREATER LOS ANGELES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CATALINA; HEART OF AMERICA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CATALINA; LAS VEGAS AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CATALINA; LONGHORN | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CATALINA; LONGHORN; PACIFIC HARBORS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CATALINA; LONGS PEAK COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CATALINA; ORANGE COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CATALINA; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL FLORIDA; GREATER NEW YORK | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL FLORIDA; GREATER TAMPA BAY AREA; NORTH FLORIDA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL FLORIDA; GULF COAST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL FLORIDA; GULF STREAM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL FLORIDA; NORTH FLORIDA; PIEDMONT 420 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL FLORIDA; NORTHERN STAR | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL FLORIDA; SIMON KENTON | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL FLORIDA; SOUTH FLORIDA COUNCIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL FLORIDA; SOUTHWEST FLORIDA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL GEORGIA; GEORGIA-CAROLINA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL GEORGIA; NORTHEAST GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL GEORGIA; ORANGE COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL MINNESOTA; GAMEHAVEN; NORTHERN STAR | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | CENTRAL MINNESOTA; GATEWAY AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL MINNESOTA; GREATER NEW YORK; NORTHERN STAR | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL MINNESOTA; NORTHERN LIGHTS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL MINNESOTA; NORTHERN STAR; VOYAGEURS AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL MINNESOTA; SIOUX | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL NEW JERSEY; DANIEL BOONE; PATRIOTS' PATH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL NEW JERSEY; GARDEN STATE; WASHINGTON CROSSING | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL NEW JERSEY; MONMOUTH; WASHINGTON CROSSING | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL NEW JERSEY; NORTHERN NEW JERSEY; WASHINGTON CROSSING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL NORTH CAROLINA; PATRIOTS' PATH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CENTRAL NORTH CAROLINA; PIEDMONT 420 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHATTAHOOCHEE; COASTAL GEORGIA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHATTAHOOCHEE; NORTHEAST GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHATTAHOOCHEE; SIMON KENTON | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHATTAHOOCHEE; SUWANNEE RIVER AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHEROKEE AREA 469; CIMARRON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHEROKEE AREA 556; GREAT RIVERS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHEROKEE AREA 556; MIDDLE TENNESSEE; NORTH FLORIDA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHEROKEE AREA 556; NATIONAL CAPITAL AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHEROKEE AREA 556; NORTH FLORIDA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHEROKEE AREA 556; SAM HOUSTON AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHESTER COUNTY; CRADLE OF LIBERTY; WESTCHESTER-PUTNAM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHESTER COUNTY; DEL-MAR-VA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHESTER COUNTY; FRENCH CREEK | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHESTER COUNTY; GREATER ST. LOUIS AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHESTER COUNTY; HEART OF VIRGINIA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | REDWOOD EMPIRE; WASHINGTON CROSSING | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHESTER COUNTY; NORTHEASTERN PENNSYLVANIA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; CHOCTAW AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; GREATER ALABAMA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; GREATER NEW YORK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; HEART OF AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; MIDDLE TENNESSEE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; MOBILE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; NEW BIRTH OF FREEDOM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; PINE BURR AREA; PUSHMATAHA AREA; YOCONA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; WEST TENNESSEE AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHICKASAW; YOCONA AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHIEF CORNPLANTER; GREAT TRAIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHIEF SEATTLE; CROSSROADS OF THE WEST | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHIEF SEATTLE; GRAND COLUMBIA; PACIFIC HARBORS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHIEF SEATTLE; GREATER YOSEMITE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHIEF SEATTLE; INDIAN NATIONS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHIEF SEATTLE; OREGON TRAIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHIEF SEATTLE; SAM HOUSTON AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHIEF SEATTLE; SILICON VALLEY MONTEREY BAY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHIPPEWA VALLEY; MID-AMERICA; NORTHERN STAR | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CHIPPEWA VALLEY; VOYAGEURS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | CHOCTAW AREA; PINE BURR AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIMARRON; INDIAN NATIONS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIMARRON; QUIVIRA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIMARRON; SOUTH PLAINS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIMARRON; TWIN RIVERS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIRCLE TEN; CROSSROADS OF THE WEST | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIRCLE TEN; EAST TEXAS AREA; LONGHORN | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIRCLE TEN; GREAT TRAIL | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | CIRCLE TEN; HEART OF VIRGINIA; TRANSATLANTIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIRCLE TEN; NARRAGANSETT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIRCLE TEN; ORANGE COUNTY; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIRCLE TEN; SEQUOIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIRCLE TEN; THREE RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CIRCLE TEN; TUKABATCHEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL CAROLINA; COASTAL GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL CAROLINA; EAST TEXAS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL CAROLINA; ERIE SHORES | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL CAROLINA; GOLDEN SPREAD | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL CAROLINA; PALMETTO | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL CAROLINA; PIEDMONT 420 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Multiple | COASTAL GEORGIA; GREATER TAMPA BAY AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL GEORGIA; GREATER YOSEMITE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL GEORGIA; MIDDLE TENNESSEE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL GEORGIA; NORTH FLORIDA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL GEORGIA; NORTHEAST GEORGIA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL GEORGIA; PACIFIC HARBORS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL GEORGIA; SHENANDOAH AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL GEORGIA; SOUTH GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COASTAL GEORGIA; TUSCARORA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COLONIAL VIRGINIA; ERIE SHORES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COLONIAL VIRGINIA; HEART OF VIRGINIA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COLONIAL VIRGINIA; HEART OF VIRGINIA; TIDEWATER | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COLONIAL VIRGINIA; NATIONAL CAPITAL AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COLONIAL VIRGINIA; PINE BURR AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COLUMBIA-MONTOUR; LEATHERSTOCKING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | COLUMBIA-MONTOUR; LINCOLN HERITAGE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; DAN BEARD; HEART OF NEW ENGLAND; OREGON TRAIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; DANIEL WEBSTER | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; DANIEL WEBSTER; NARRAGANSETT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; GREENWICH | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; HEART OF AMERICA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; HOUSATONIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; HUDSON VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; LONGHORN | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; MAYFLOWER; WESTCHESTER-PUTNAM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; MONMOUTH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; SEQUOYAH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; SUFFOLK COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; THEODORE ROOSEVELT | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; TRANSATLANTIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; WASHINGTON CROSSING | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; WESTCHESTER-PUTNAM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT RIVERS; WESTERN MASSACHUSETTS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT YANKEE; HEART OF NEW ENGLAND | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT YANKEE; HUDSON VALLEY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT YANKEE; MIAMI VALLEY; SIMON KENTON | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT YANKEE; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONNECTICUT YANKEE; SUWANNEE RIVER AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONQUISTADOR; CROSSROADS OF THE WEST | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONQUISTADOR; FAR EAST; YUCCA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CONQUISTADOR; YUCCA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CORNHUSKER; GREATER YOSEMITE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CORNHUSKER; PRAIRIELANDS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CORNHUSKER; QUIVIRA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CORONADO AREA; GREAT SOUTHWEST | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CORONADO AREA; GREATER NEW YORK | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CORONADO AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; CROSSROADS OF AMERICA; MINSI TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; FRENCH CREEK | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; GREAT SOUTHWEST | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; HAWK MOUNTAIN; NORTHEASTERN PENNSYLVANIA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; HUDSON VALLEY; MINSI TRAILS; NORTHEASTERN PENNSYLVANIA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; JERSEY SHORE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; JUNIATA VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; MINSI TRAILS; NORTHERN NEW JERSEY | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; NEW BIRTH OF FREEDOM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; NORTHEASTERN PENNSYLVANIA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; NORTHERN NEW JERSEY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; PATRIOTS' PATH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; QUIVIRA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRADLE OF LIBERTY; SPIRIT OF ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRATER LAKE COUNCIL; LOS PADRES; VENTURA COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRATER LAKE COUNCIL; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CRATER LAKE COUNCIL; WESTERN LOS ANGELES COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF AMERICA; DAN BEARD | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF AMERICA; DAN BEARD; HOOSIER TRAILS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF AMERICA; DEL-MAR-VA; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF AMERICA; GARDEN STATE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF AMERICA; GREATER NEW YORK | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF AMERICA; KATAHDIN AREA; NORTHERN NEW JERSEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF AMERICA; NATIONAL CAPITAL AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF AMERICA; PATHWAY TO ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF AMERICA; SAN DIEGO - IMPERIAL COUNCIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF AMERICA; TUKABATCHEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF THE WEST; DENVER AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF THE WEST; GREATER WYOMING | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF THE WEST; GREATER WYOMING; NORTHEAST ILLINOIS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF THE WEST; INLAND NORTHWEST | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF THE WEST; LINCOLN HERITAGE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF THE WEST; MIDDLE TENNESSEE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF THE WEST; MONTANA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | CROSSROADS OF THE WEST; NORTHERN NEW JERSEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF THE WEST; SAM HOUSTON AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | CROSSROADS OF THE WEST; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching- Unclothed | Touching Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | CROSSROADS OF THE WEST; SOUTH GEORGIA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DAN BEARD; DEL-MAR-VA; SIMON KENTON; TECUMSEH | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DAN BEARD; GREAT RIVERS; SOUTH FLORIDA COUNCIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DAN BEARD; GREATER LOS ANGELES | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DAN BEARD; GREATER ST. LOUIS AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DAN BEARD; HOOSIER TRAILS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DAN BEARD; LASALLE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DAN BEARD; LAST FRONTIER | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | DAN BEARD; LINCOLN HERITAGE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DAN BEARD; PATHWAY TO ADVENTURE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DAN BEARD; QUAPAW AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DAN BEARD; SIMON KENTON; TECUMSEH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DANIEL BOONE; MOBILE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DANIEL BOONE; PEE DEE AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DANIEL BOONE; TIDEWATER | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DANIEL BOONE; WESTERN MASSACHUSETTS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DANIEL WEBSTER; MICHIGAN CROSSROADS | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | DANIEL WEBSTER; NARRAGANSETT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DANIEL WEBSTER; NORTHERN NEW JERSEY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DANIEL WEBSTER; PINE TREE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DANIEL WEBSTER; TIDEWATER | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DE SOTO AREA; THREE HARBORS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DE SOTO AREA; WESTARK AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DEL-MAR-VA; GARDEN STATE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DEL-MAR-VA; GREATER LOS ANGELES | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DEL-MAR-VA; NATIONAL CAPITAL AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DEL-MAR-VA; WESTERN MASSACHUSETTS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; GREATER ALABAMA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; GREATER NEW YORK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; GREATER ST. LOUIS AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; GREATER YOSEMITE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; HEART OF AMERICA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; INDIAN NATIONS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; INLAND NORTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; MOUNT BAKER | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; PACIFIC HARBORS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; SIMON KENTON | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DENVER AREA; THREE FIRES | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DIRECT SERVICE; GREATER ST. LOUIS AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | DIRECT SERVICE; GULF COAST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST CAROLINA; ERIE SHORES | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST CAROLINA; FAR EAST | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST CAROLINA; GRAND CANYON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST CAROLINA; MICHIGAN CROSSROADS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST CAROLINA; NORTH FLORIDA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST CAROLINA; OLD NORTH STATE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST CAROLINA; TIDEWATER | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST CAROLINA; TWIN RIVERS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST TEXAS AREA; GOLDEN EMPIRE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST TEXAS AREA; LAS VEGAS AREA; NEVADA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST TEXAS AREA; LONGHORN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EAST TEXAS AREA; MID-AMERICA; MID-IOWA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ERIE SHORES; GREAT SOUTHWEST | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ERIE SHORES; GREAT TRAIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ERIE SHORES; GREATER LOS ANGELES; LAKE ERIE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ERIE SHORES; GREATER ST. LOUIS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ERIE SHORES; MIAMI VALLEY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ERIE SHORES; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ERIE SHORES; QUAPAW AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EVANGELINE AREA; GREATER ST. LOUIS AREA; SOUTHEAST LOUISIANA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EVANGELINE AREA; ISTROUMA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EVANGELINE AREA; LOUISIANA PURCHASE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EVANGELINE AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EVANGELINE AREA; SAGAMORE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | FAR EAST; TRANSATLANTIC | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | FIVE RIVERS; LAUREL HIGHLANDS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | FIVE RIVERS; MICHIGAN CROSSROADS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | FIVE RIVERS; NORTHEASTERN PENNSYLVANIA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | FIVE RIVERS; PENNSYLVANIA DUTCH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | FRENCH CREEK; GREATER NIAGARA FRONTIER | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | FRENCH CREEK; MID-AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | FRENCH CREEK; MORAINE TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GAMEHAVEN; GOLDEN EMPIRE; GOLDEN GATE AREA; MARIN; PACIFIC SKYLINE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GAMEHAVEN; LONGHOUSE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GAMEHAVEN; SENECA WATERWAYS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GAMEHAVEN; TWIN VALLEY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GARDEN STATE; JERSEY SHORE; WASHINGTON CROSSING | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GARDEN STATE; MONMOUTH | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GARDEN STATE; MORAINE TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GARDEN STATE; PATRIOTS PATH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GATEWAY AREA; GLACIER'S EDGE; PATHWAY TO ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GATEWAY AREA; GREATER NEW YORK | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GEORGIA-CAROLINA; INDIAN WATERS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GEORGIA-CAROLINA; MECKLENBURG COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GEORGIA-CAROLINA; NARRAGANSETT | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GEORGIA-CAROLINA; PALMETTO | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GEORGIA-CAROLINA; PINE TREE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GEORGIA-CAROLINA; TIDEWATER; VIRGINIA HEADWATERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GLACIER'S EDGE; MICHIGAN CROSSROADS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GLACIER'S EDGE; NORTHEAST ILLINOIS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GLACIER'S EDGE; SAMOSET COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GLACIER'S EDGE; SIOUX | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GLACIER'S EDGE; THREE HARBORS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GLACIER'S EDGE; W.D. BOYCE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; GOLDEN GATE AREA; GREATER YOSEMITE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PIEDMONT 042; REDWOOD EMPIRE; SEQUOIA; SILICON VALLEY MONTEREY BAY | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; GOLDEN GATE AREA; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; GOLDEN GATE AREA; PACIFIC SKYLINE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; GOLDEN GATE AREA; REDWOOD EMPIRE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; GREATER LOS ANGELES; NEVADA AREA; ORANGE COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | EMPIRE; SEQUOIA; SILICON VALLEY MONTEREY BAY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; HOOSIER TRAILS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; INLAND NORTHWEST | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |

**Unique and Timely Abuse Claim Count by Local Council & Allegation**

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | GOLDEN EMPIRE; LAKE ERIE; SOUTHWEST FLORIDA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; LAS VEGAS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; MARIN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; MARIN; REDWOOD EMPIRE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; MIDDLE TENNESSEE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; MORAINE TRAILS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; OREGON TRAIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; PACIFIC SKYLINE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; REDWOOD EMPIRE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; SAN DIEGO - IMPERIAL COUNCIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; SEQUOIA; SOUTHERN SIERRA | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; SIMON KENTON | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| Multiple | GOLDEN EMPIRE; SOUTHERN SIERRA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; SOUTHWEST FLORIDA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; VENTURA COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN EMPIRE; WESTERN LOS ANGELES COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; GREAT RIVERS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; GREAT SOUTHWEST | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; GREATER LOS ANGELES | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; GREATER LOS ANGELES; GREATER YOSEMITE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; GREATER YOSEMITE; SENECA WATERWAYS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; GREEN MOUNTAIN | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; INLAND NORTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; MARIN; SILICON VALLEY MONTEREY BAY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; MONTANA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; NORTHERN NEW JERSEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; ORANGE COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; ORANGE COUNTY; SILICON VALLEY MONTEREY BAY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; SAN DIEGO - IMPERIAL COUNCIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; SANTA FE TRAIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; SEQUOIA | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; SOUTHERN SIERRA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN GATE AREA; WASHINGTON CROSSING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN SPREAD; GREAT SOUTHWEST | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN SPREAD; GULF COAST; SOUTH TEXAS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN SPREAD; ISTROUMA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GOLDEN SPREAD; SOUTH FLORIDA COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GRAND CANYON; GREATER LOS ANGELES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GRAND CANYON; LAS VEGAS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GRAND CANYON; LAUREL HIGHLANDS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GRAND CANYON; LONGHORN | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GRAND CANYON; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GRAND CANYON; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GRAND CANYON; TIDEWATER | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GRAND COLUMBIA; LONG BEACH AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GRAND COLUMBIA; PACIFIC HARBORS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GRAND COLUMBIA; PIKES PEAK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GRAND TETON; MONTANA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT ALASKA; MIDNIGHT SUN; NORTHERN LIGHTS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT ALASKA; MIDNIGHT SUN; ORANGE COUNTY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT RIVERS; INDIAN WATERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT RIVERS; MICHIGAN CROSSROADS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT RIVERS; PACIFIC HARBORS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT RIVERS; PUSHMATAHA AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SMOKY MOUNTAIN; INDIAN WATERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SMOKY MOUNTAIN; LAKE ERIE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SMOKY MOUNTAIN; PALMETTO | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SMOKY MOUNTAIN; SAMOSET COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SMOKY MOUNTAIN; SEQUOYAH | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SMOKY MOUNTAIN; VENTURA COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SOUTHWEST; LOS PADRES | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SOUTHWEST; MICHIGAN CROSSROADS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SOUTHWEST; NORTHERN STAR | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SOUTHWEST; OLD HICKORY; SEQUOYAH | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SOUTHWEST; SEQUOYAH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT SOUTHWEST; SOUTH PLAINS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT TRAIL; LAKE ERIE; THREE FIRES; WESTERN MASSACHUSETTS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT TRAIL; LAKE ERIE; WESTERN MASSACHUSETTS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT TRAIL; MIAMI VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT TRAIL; MONMOUTH; NORTHERN NEW JERSEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT TRAIL; SIMON KENTON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT TRAIL; THREE FIRES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREAT TRAIL; WESTERN MASSACHUSETTS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ALABAMA; GREATER TAMPA BAY AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ALABAMA; KATAHDIN AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ALABAMA; MOBILE AREA; PUSHMATAHA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ALABAMA; NATIONAL CAPITAL AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ALABAMA; NORTH FLORIDA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ALABAMA; SEQUOIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ALABAMA; SOUTH GEORGIA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ALABAMA; WASHINGTON CROSSING | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; GREATER TAMPA BAY AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; LAKE ERIE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; LINCOLN HERITAGE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; LONG BEACH AREA; ORANGE COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; LONG BEACH AREA COUNCIL; VERDUGO HILLS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; LOS PADRES | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; MICHIGAN CROSSROADS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; MIDDLE TENNESSEE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; MOBILE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; MONTANA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; PACIFIC SKYLINE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; PATRIOTS' PATH | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | GREATER LOS ANGELES; SIOUX | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER LOS ANGELES; SOUTHERN SIERRA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | GREATER NEW YORK; INLAND NORTHWEST | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; JERSEY SHORE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; LAKE ERIE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; LEATHERSTOCKING | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; MAYFLOWER; THREE RIVERS; WESTCHESTER-PUTNAM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; MONTANA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | GREATER NEW YORK; NARRAGANSETT | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; NEW BIRTH OF FREEDOM | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; NORTHERN STAR | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; PATHWAY TO ADVENTURE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; PATHWAY TO ADVENTURE; THREE HARBORS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; SOUTH FLORIDA COUNCIL | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Multiple | GREATER NEW YORK; WESTARK AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NIAGARA FRONTIER; IROQUOIS TRAIL; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NIAGARA FRONTIER; LONGHOUSE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NIAGARA FRONTIER; NORTHERN LIGHTS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER NIAGARA FRONTIER; THREE FIRES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ST. LOUIS AREA; INDIAN WATERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ST. LOUIS AREA; LINCOLN HERITAGE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ST. LOUIS AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ST. LOUIS AREA; NATIONAL CAPITAL AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ST. LOUIS AREA; OREGON TRAIL; PALMETTO | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | GREATER ST. LOUIS AREA; OZARK TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ST. LOUIS AREA; SAM HOUSTON AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ST. LOUIS AREA; SIMON KENTON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ST. LOUIS AREA; THREE FIRES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ST. LOUIS AREA; VOYAGEURS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER ST. LOUIS AREA; W.D. BOYCE | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | GREATER TAMPA BAY AREA; GREEN MOUNTAIN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER TAMPA BAY AREA; GULF COAST; LONGHORN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER TAMPA BAY AREA; GULF STREAM | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | GREATER TAMPA BAY AREA; LEATHERSTOCKING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER TAMPA BAY AREA; QUAPAW AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER TAMPA BAY AREA; SOUTHWEST FLORIDA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER TAMPA BAY AREA; SUWANNEE RIVER AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER TAMPA BAY AREA; TWIN RIVERS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER WYOMING; LONGS PEAK COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER WYOMING; OZARK TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER YOSEMITE; PACIFIC SKYLINE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREATER YOSEMITE; WESTERN MASSACHUSETTS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREEN MOUNTAIN; HEART OF NEW ENGLAND | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREEN MOUNTAIN; NARRAGANSETT | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREEN MOUNTAIN; NORTHERN NEW JERSEY | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GREEN MOUNTAIN; TWIN RIVERS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GULF COAST; LAST FRONTIER | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GULF COAST; LONGHORN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GULF COAST; NORTH FLORIDA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GULF COAST; NORTHERN STAR | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GULF COAST; PINE BURR AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GULF COAST; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GULF COAST; SOUTH TEXAS; YUCCA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GULF STREAM; MECKLENBURG COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GULF STREAM; MOUNTAINEER AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GULF STREAM; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | GULF STREAM; TRANSATLANTIC | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | HAWK MOUNTAIN; MINSI TRAILS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HAWK MOUNTAIN; NEW BIRTH OF FREEDOM | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HAWK MOUNTAIN; NORTHEASTERN PENNSYLVANIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HAWK MOUNTAIN; PENNSYLVANIA DUTCH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HAWK MOUNTAIN; SHENANDOAH AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HAWK MOUNTAIN; WASHINGTON CROSSING | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HAWKEYE AREA; MID-AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HAWKEYE AREA; MID-IOWA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; HEART OF VIRGINIA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; LAKE ERIE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; LAUREL HIGHLANDS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; ORANGE COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; OREGON TRAIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; PATHWAY TO ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; PATRIOTS' PATH; WINNEBAGO | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; PONY EXPRESS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; RIO GRANDE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; SOUTH TEXAS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; SOUTHEAST LOUISIANA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF AMERICA; TWIN VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF NEW ENGLAND; MAYFLOWER; SPIRIT OF ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF NEW ENGLAND; NARRAGANSETT | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF NEW ENGLAND; SPIRIT OF ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF NEW ENGLAND; TRANSATLANTIC | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF NEW ENGLAND; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF VIRGINIA; NATIONAL CAPITAL AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF VIRGINIA; PIKES PEAK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HEART OF VIRGINIA; VIRGINIA HEADWATERS | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | HOOSIER TRAILS; LASALLE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HUDSON VALLEY; LEATHERSTOCKING | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HUDSON VALLEY; MAYFLOWER | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HUDSON VALLEY; NEW BIRTH OF FREEDOM | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HUDSON VALLEY; NEW BIRTH OF FREEDOM; SUSQUEHANNA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HUDSON VALLEY; NORTHERN NEW JERSEY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | HUDSON VALLEY; THEODORE ROOSEVELT | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ILLOWA; MID-AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ILLOWA; MISSISSIPPI VALLEY; SPIRIT OF ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ILLOWA; NORTHEAST ILLINOIS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ILLOWA; NORTHEAST IOWA COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ILLOWA; THREE FIRES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ILLOWA; WINNEBAGO | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | INDIAN NATIONS; SAGAMORE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | INDIAN WATERS; MICHIGAN CROSSROADS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | INDIAN WATERS; PEE DEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | INDIAN WATERS; PIKES PEAK | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | INDIAN WATERS; TIDEWATER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | INLAND NORTHWEST; MOUNT BAKER | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | INLAND NORTHWEST; MOUNTAIN WEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | INLAND NORTHWEST; NORTHERN STAR | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | INLAND NORTHWEST; OREGON TRAIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | INLAND NORTHWEST; POTAWATOMI AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | IROQUOIS TRAIL; MICHIGAN CROSSROADS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | IROQUOIS TRAIL; PATHWAY TO ADVENTURE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | IROQUOIS TRAIL; SENECA WATERWAYS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | IROQUOIS TRAIL; SOUTHEAST LOUISIANA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | ISTROUMA AREA; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | JAYHAWK AREA; MID-IOWA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | JAYHAWK AREA; NORTHERN LIGHTS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | JAYHAWK AREA; OVERLAND TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | JAYHAWK AREA; QUIVIRA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | JERSEY SHORE; MINSI TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | JERSEY SHORE; MONMOUTH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | JERSEY SHORE; PATRIOTS' PATH | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | JERSEY SHORE; SOUTH FLORIDA COUNCIL | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | JERSEY SHORE; WASHINGTON CROSSING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAKE ERIE; LAUREL HIGHLANDS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAKE ERIE; MIAMI VALLEY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAKE ERIE; MUSKINGUM VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAKE ERIE; NORTHEAST ILLINOIS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAKE ERIE; PATRIOTS' PATH | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAKE ERIE; QUIVIRA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAKE ERIE; WESTERN MASSACHUSETTS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAS VEGAS AREA; MOUNTAIN WEST; NEVADA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAS VEGAS AREA; PIKES PEAK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAS VEGAS AREA; SUFFOLK COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LASALLE; MIAMI VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LASALLE; MICHIGAN CROSSROADS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LASALLE; NARRAGANSETT | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LASALLE; OREGON TRAIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LASALLE; THREE HARBORS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | LAST FRONTIER; LONG BEACH AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAST FRONTIER; SAGAMORE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAST FRONTIER; TEXAS TRAILS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAUREL HIGHLANDS; LINCOLN HERITAGE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAUREL HIGHLANDS; MORAINE TRAILS; WESTMORELAND-FAYETTE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAUREL HIGHLANDS; MOUNTAINEER AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LAUREL HIGHLANDS; WESTERN MASSACHUSETTS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LEATHERSTOCKING; LINCOLN HERITAGE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LEATHERSTOCKING; NARRAGANSETT | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LEATHERSTOCKING; RIP VAN WINKLE; TWIN RIVERS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LEATHERSTOCKING; SENECA WATERWAYS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LEATHERSTOCKING; THEODORE ROOSEVELT | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | LEATHERSTOCKING; WESTCHESTER-PUTNAM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LINCOLN HERITAGE; SAGAMORE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LINCOLN HERITAGE; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | WESTERN LOS ANGELES COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONG BEACH AREA; OVERLAND TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONG BEACH AREA; PACIFIC SKYLINE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONG BEACH AREA; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONG BEACH AREA; TRANSATLANTIC | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONG BEACH AREA; WESTERN LOS ANGELES COUNTY | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | LONGHORN; LOUISIANA PURCHASE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGHORN; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGHORN; OZARK TRAILS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGHORN; PACIFIC SKYLINE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGHORN; SOUTH FLORIDA COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGHORN; SOUTH TEXAS; TEXAS SOUTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGHORN; TEXAS TRAILS; THREE RIVERS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGHORN; TRANSATLANTIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGHORN; WINNEBAGO | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGHOUSE; TWIN RIVERS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGS PEAK COUNCIL; NORTHEAST ILLINOIS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGS PEAK COUNCIL; OVERLAND TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGS PEAK COUNCIL; SAM HOUSTON AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LONGS PEAK COUNCIL; SOUTHWEST FLORIDA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | LOS PADRES; VENTURA COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MARIN; REDWOOD EMPIRE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MARIN; SAN DIEGO - IMPERIAL COUNCIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MASON-DIXON; PEE DEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MAYFLOWER; NARRAGANSETT; SPIRIT OF ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MAYFLOWER; QUAPAW AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MECKLENBURG COUNTY; OLD NORTH STATE | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Multiple | MIAMI VALLEY; MICHIGAN CROSSROADS; TECUMSEH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MIAMI VALLEY; SOUTH FLORIDA COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; MID-AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; NARRAGANSETT | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; NORTH FLORIDA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | MICHIGAN CROSSROADS; ORANGE COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; OVERLAND TRAILS | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; PACIFIC HARBORS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; PINE BURR AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; QUAPAW AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; RIO GRANDE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; THREE FIRES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; THREE FIRES; THREE HARBORS; THREE RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; VERDUGO HILLS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; WESTCHESTER-PUTNAM | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; WESTERN LOS ANGELES COUNTY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MICHIGAN CROSSROADS; YOCONA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MID-AMERICA; OLD NORTH STATE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MID-AMERICA; SIOUX | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MID-AMERICA; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MID-IOWA; MISSISSIPPI VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MID-IOWA; NORTHEAST IOWA COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MID-IOWA; W.D. BOYCE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MID-IOWA; WINNEBAGO | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MIDDLE TENNESSEE; NATIONAL CAPITAL AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MIDDLE TENNESSEE; NORTH FLORIDA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MIDDLE TENNESSEE; QUAPAW AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MIDNIGHT SUN; OREGON TRAIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MINSI TRAILS; MORAINE TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MINSI TRAILS; NEW BIRTH OF FREEDOM | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MINSI TRAILS; NORTHEAST GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MINSI TRAILS; WASHINGTON CROSSING | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MISSISSIPPI VALLEY; NORTHERN STAR | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Multiple | MISSISSIPPI VALLEY; PATHWAY TO ADVENTURE | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | MISSISSIPPI VALLEY; PINE BURR AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MISSISSIPPI VALLEY; THREE FIRES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MOBILE AREA; PINE BURR AREA | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | All Unique & Timely Claims (2) |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | MONMOUTH; PIKES PEAK | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MONTANA; NORTH FLORIDA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MONTANA; NORTHEASTERN PENNSYLVANIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MONTANA; NORTHERN LIGHTS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MOUNTAIN WEST; NEVADA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MOUNTAINEER AREA; SIMON KENTON | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MUSKINGUM VALLEY; SIMON KENTON | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | MUSKINGUM VALLEY; SPIRIT OF ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NARRAGANSETT; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NARRAGANSETT; SAM HOUSTON AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NARRAGANSETT; SPIRIT OF ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NARRAGANSETT; THEODORE ROOSEVELT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NARRAGANSETT; WESTERN MASSACHUSETTS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NATIONAL CAPITAL AREA; ORANGE COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NATIONAL CAPITAL AREA; PACIFIC HARBORS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NATIONAL CAPITAL AREA; RIP VAN WINKLE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NATIONAL CAPITAL AREA; SHENANDOAH AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NATIONAL CAPITAL AREA; SOUTH FLORIDA COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NATIONAL CAPITAL AREA; SOUTH PLAINS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NATIONAL CAPITAL AREA; WESTERN LOS ANGELES COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NEVADA AREA; OVERLAND TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NEVADA AREA; OZARK TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NEVADA AREA; PATHWAY TO ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NEVADA AREA; SEQUOIA; SILICON VALLEY MONTEREY BAY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NEVADA AREA; SPIRIT OF ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NEVADA AREA; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NEW BIRTH OF FREEDOM; TECUMSEH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NEW BIRTH OF FREEDOM; TRANSATLANTIC | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NEW BIRTH OF FREEDOM; WASHINGTON CROSSING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTH FLORIDA; SOUTHWEST FLORIDA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTH FLORIDA; SPIRIT OF ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTH FLORIDA; THREE FIRES | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTH FLORIDA; YUCCA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHEAST ILLINOIS; PACIFIC HARBORS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHEAST ILLINOIS; RAINBOW; THREE FIRES | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHEAST ILLINOIS; W.D. BOYCE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHEASTERN PENNSYLVANIA; NORTHERN NEW JERSEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHEASTERN PENNSYLVANIA; SUSQUEHANNA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHERN NEW JERSEY; PATHWAY TO ADVENTURE | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | NORTHERN NEW JERSEY; QUIVIRA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHERN NEW JERSEY; SOUTHWEST FLORIDA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHERN NEW JERSEY; THREE RIVERS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHERN NEW JERSEY; TUSCARORA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHERN NEW JERSEY; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHERN STAR; PIKES PEAK | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHERN STAR; PRAIRIELANDS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHWEST GEORGIA; OCCONEECHEE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHWEST TEXAS; QUIVIRA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | NORTHWEST TEXAS; SAM HOUSTON AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OCCONEECHEE; TRANSATLANTIC | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OCCONEECHEE; TUSCARORA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OHIO RIVER VALLEY; PATHWAY TO ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OHIO RIVER VALLEY; SIMON KENTON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OLD HICKORY; SEQUOYAH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OLD HICKORY; TIDEWATER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | OLD NORTH STATE; SEQUOIA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OLD NORTH STATE; WESTCHESTER-PUTNAM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OLD NORTH STATE; WESTERN MASSACHUSETTS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ORANGE COUNTY; PACIFIC SKYLINE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ORANGE COUNTY; SEQUOIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | ORANGE COUNTY; VENTURA COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OREGON TRAIL; OVERLAND TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OREGON TRAIL; QUIVIRA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OREGON TRAIL; SHENANDOAH AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | OZARK TRAILS; THREE FIRES | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PACIFIC HARBORS; SAN DIEGO - IMPERIAL COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PACIFIC HARBORS; WESTERN MASSACHUSETTS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PACIFIC SKYLINE; SEQUOIA; SILICON VALLEY MONTEREY BAY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PATHWAY TO ADVENTURE; PRAIRIELANDS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PATHWAY TO ADVENTURE; RIP VAN WINKLE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PATHWAY TO ADVENTURE; SAGAMORE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PATHWAY TO ADVENTURE; SENECA WATERWAYS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PATHWAY TO ADVENTURE; THREE FIRES; THREE HARBORS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PATHWAY TO ADVENTURE; TWIN RIVERS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PATHWAY TO ADVENTURE; WESTERN LOS ANGELES COUNTY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PATRIOTS' PATH; VIRGINIA HEADWATERS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PATRIOTS' PATH; WINNEBAGO | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PENNSYLVANIA DUTCH; SAM HOUSTON AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PIEDMONT 420; SENECA WATERWAYS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PONY EXPRESS; QUIVIRA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PRAIRIELANDS; THREE FIRES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | PRAIRIELANDS; W.D. BOYCE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | PUSHMATAHA AREA; YOCONA AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | QUAPAW AREA; SEQUOYAH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | QUIVIRA; SANTA FE TRAIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | QUIVIRA; TEXAS TRAILS | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Multiple | RAINBOW; SAGAMORE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | RAINBOW; SOUTH FLORIDA COUNCIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | REDWOOD EMPIRE; TRANSATLANTIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | RIO GRANDE; SOUTH TEXAS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | RIO GRANDE; TEXAS SOUTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SAGAMORE; SPIRIT OF ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SAGAMORE; THREE FIRES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Multiple | SAGAMORE; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SAM HOUSTON AREA; TEXAS SOUTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SAM HOUSTON AREA; TEXAS TRAILS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SAM HOUSTON AREA; TIDEWATER | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SAM HOUSTON AREA; VOYAGEURS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SAM HOUSTON AREA; YUCCA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SAN DIEGO - IMPERIAL COUNCIL; TIDEWATER | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SANTA FE TRAIL; SOUTHEAST LOUISIANA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SENECA WATERWAYS; SUFFOLK COUNTY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SENECA WATERWAYS; THEODORE ROOSEVELT | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows in white list Abuse claims against individual Local Councils. Rows in blue (with the exception of "UNKNOWN" and "MISSING") list Abuse claims against more than one Local Council.

| Local Council # (1) | Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching Clothed | Unknown/ Unconfirmed | Missing | All Unique & Timely Claims (2)* |
|---|---|---|---|---|---|---|---|---|---|---|
| Multiple | SENECA WATERWAYS; WESTCHESTER-PUTNAM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SENECA WATERWAYS; WESTMORELAND-FAYETTE | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Multiple | SEQUOIA; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SILICON VALLEY MONTEREY BAY; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SIMON KENTON; TECUMSEH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SOUTH FLORIDA COUNCIL; SOUTH GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SOUTH FLORIDA COUNCIL; SOUTHWEST FLORIDA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SOUTH PLAINS; TEXAS SOUTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SOUTHEAST LOUISIANA; WEST TENNESSEE AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SOUTHERN SIERRA; VENTURA COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SOUTHERN SIERRA; VERDUGO HILLS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SPIRIT OF ADVENTURE; TRANSATLANTIC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SPIRIT OF ADVENTURE; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SPIRIT OF ADVENTURE; YOCONA AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SUFFOLK COUNTY; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | SUSQUEHANNA; WESTERN MASSACHUSETTS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | THEODORE ROOSEVELT; WASHINGTON CROSSING | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Multiple | THREE FIRES; TWIN RIVERS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | THREE HARBORS; THREE RIVERS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | THREE HARBORS; YUCCA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | TUKABATCHEE AREA; WESTMORELAND-FAYETTE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Multiple | WEST TENNESSEE AREA; YOCONA AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| N/A | CENTRAL NEW JERSEY (2) | 9 | 4 | 7 | 9 | 1 | 0 | 4 | 0 | 34 |
| N/A | CENTRAL ESCARPMENT (3) | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| N/A | GREATER TORONTO (3) | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| N/A | UNKNOWN | 5,639 | 4,494 | 2,887 | 4,101 | 538 | 406 | 1,004 | 87 | 19,156 |
| N/A | MISSING | 1,910 | 1,807 | 1,025 | 2,011 | 334 | 161 | 1,631 | 1,479 | 10,358 |
| **Total** | | **24,539** | **18,856** | **13,022** | **17,138** | **1,879** | **1,294** | **3,817** | **1,664** | **82,209** |

**Footnotes:**

(1) Local Council # reflects merger activity through 2/28/2021. DIRECT SERVICE is a subsidiary of #082 NATIONAL CAPITAL AREA, and #374 HUDSON VALLEY merged with #388 WESTCHESTER-PUTNAM effective 1/1/2021 to form #388 GREATER HUDSON VALLEY.

(1a) CENTRAL NEW JERSEY was dissolved in 2014 and did not merge with any other Local Council.

(1b) CENTRAL ESCARPMENT and GREATER TORONTO are Local Councils of Scouts Canada and not BSA.

(2) The term "unique" with respect to Proofs of Claim accounts for the fact that some Abuse survivors filed multiple Proofs of Claim in these Chapter 11 Cases. To account for duplicative Proofs of Claim, Bates White considered claimant personal identifying information on the Proofs of Claim, including name, last four digits of Social Security number, birth month and year, as well as zip code, email address and cell phone number. On the basis of this information, Bates White consolidated duplicative claims into one comprehensive Claim.

Timely Proofs of Claim are Proofs of Claim that were submitted on or before the Bar Date, as established by the Bar Date Order [D.I 695]. For Abuse Survivors who made at least one timely submission, Bates White incorporated information from amendments or supplemental submissions whether filed before or after the Bar Date and consolidated that information such that the submissions count as one unique Claim.

* The abuse claim count listed in these columns is based on the claimants' responses to Part 4.I. on the Sexual Abuse Proof of Claim Form and does not account for references to the Local Council that may be located elsewhere in the proof of claim. The abuse claim count listed above also does not reflect any other analysis conducted by the Debtors to approximate the total number of abuse claims that implicate the Local Council.

## Unique and Timely Abuse Claim Count* by Top-20 Most Common Chartered Organizations

| Chartering Organization Group | Count** |
|---|---:|
| METHODIST CHURCH | 3,886 |
| BAPTIST CHURCH | 3,274 |
| CATHOLIC CHURCH | 3,213 |
| CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS | 2,481 |
| PRESBYTERIAN CHURCH | 1,687 |
| LUTHERAN CHURCH | 1,474 |
| ARMED FORCES*** | 704 |
| EPISCOPAL CHURCH | 597 |
| AMERICAN LEGION | 496 |
| YMCA | 488 |
| VFW | 410 |
| SALVATION ARMY | 252 |
| ELKS LODGE | 240 |
| LIONS CLUB | 224 |
| BOYS AND GIRLS CLUBS | 205 |
| KNIGHTS OF COLUMBUS | 181 |
| BOYS CLUB | 139 |
| KIWANIS CLUB | 121 |
| ROTARY CLUB | 95 |
| MOOSE LODGE | 88 |
| OTHER | 20,996 |
| UNKNOWN | 36,378 |
| MISSING | 4,928 |
| **Total** | **82,557** |

* The total Abuse Claim count in this table is slightly higher than the total count of unique and timely Abuse Claims to account for claimants that named multiple organizations.

** The abuse claim count listed in this column is based on the claimants' responses to Part 4.H. on the Sexual Abuse Proof of Claim Form and does not account for references to the Chartered Organization that may be located elsewhere in the proof of claim. The abuse claim count listed above also does not reflect any other analysis conducted by the Debtors to approximate the total number of abuse claims that implicate the Chartered Organization.

*** Abuse Claims flagged as "Armed Forces" named one of the following groups: Army, Navy, Marines, Air Force, Coast Guard, National Guard, or the generic US Military or US Armed Forces.

## EXHIBIT G

**TORT CLAIMANTS' COMMITTEE'S LOCAL COUNCIL ABUSE CLAIMS VALUATIONS**

**THE DEBTORS DO NOT AGREE WITH OR ENDORSE THE INFORMATION CONTAINED IN THIS EXHIBIT, WHICH WAS PREPARED BY THE TORT CLAIMANTS' COMMITTEE. PLEASE SEE EXHIBIT G-1 OF THE DISCLOSURE STATEMENT REGARDING THE DEBTORS' VIEWS ON THIS EXHIBIT G.**

| # | Local Council Name | LC State | Total Claims (Count) | Total Claims (Base Matrix Low Value) | Total Claims (Max Matrix High Value) | Total LC Contribution (DS Ex C) | Unrestricted Net Assets (DS Ex D / Ex 1) | Contribution / Base Low | Unrestricted Net Assets / Base Low | Contribution / Max High | Unrestricted Net Assets / Max High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Greater Alabama | AL | 373 | $ 3,514,365 | $ 71,713,350 | $ 3,685,328 | $ 5,858,141 | 104.86% | 166.69% | 5.14% | 8.17% |
| 2 | Alabama-Florida | AL | 54 | 383,320 | 10,666,700 | 114,311 | 162,947 | 29.82% | 42.51% | 1.07% | 1.53% |
| 3 | Mobile Area | AL | 101 | 480,035 | 19,575,850 | 34,897 | 76,647 | 7.27% | 15.97% | 0.18% | 0.39% |
| 4 | Tukabatchee Area | AL | 102 | 436,570 | 15,695,450 | 832,901 | 3,625,053 | 190.78% | 830.35% | 5.31% | 23.10% |
| 5 | Black Warrior | AL | 60 | 214,535 | 9,147,100 | 767,974 | 2,273,695 | 357.97% | 1059.82% | 8.40% | 24.86% |
| 6 | Grand Canyon | AZ | 444 | 163,453,850 | 738,992,875 | 7,007,972 | 9,582,089 | 4.29% | 5.86% | 0.95% | 1.30% |
| 7 | Catalina | AZ | 191 | 72,319,535 | 326,169,850 | 1,080,484 | 2,930,433 | 1.49% | 4.05% | 0.33% | 0.90% |
| 8 | De Soto Area | AR | 23 | 10,200,000 | 45,900,000 | 130,903 | 734,154 | 1.28% | 7.20% | 0.29% | 1.60% |
| 9 | Westark Area | AR | 99 | 38,166,500 | 172,268,500 | 942,308 | 1,737,613 | 2.47% | 4.55% | 0.55% | 1.01% |
| 10 | Quapaw Area | AR | 318 | 115,236,000 | 523,193,250 | 4,616,045 | 12,824,556 | 4.01% | 11.13% | 0.88% | 2.45% |
| 11 | Golden Gate Area Council | CA | 636 | 226,423,350 | 1,022,189,625 | 8,000,000 | 10,325,190 | 3.53% | 4.56% | 0.78% | 1.01% |
| 12 | Sequoia | CA | 213 | 79,136,000 | 358,450,750 | 567,536 | 9,912,453 | 0.72% | 12.53% | 0.16% | 2.77% |
| 13 | Southern Sierra | CA | 122 | 45,474,000 | 205,158,000 | 148,908 | (249,930) | 0.33% | -0.55% | 0.07% | -0.12% |
| 14 | Pacific Skyline | CA | 97 | 32,653,500 | 147,298,000 | 2,905,055 | 7,927,061 | 8.90% | 24.28% | 1.97% | 5.38% |
| 15 | Long Beach Area | CA | 141 | 53,869,500 | 243,700,500 | 4,262,425 | 5,122,574 | 7.91% | 9.51% | 1.75% | 2.10% |
| 16 | Greater Los Angeles Area | CA | 1,107 | 423,611,320 | 1,909,329,450 | 8,000,000 | 31,726,269 | 1.89% | 7.49% | 0.42% | 1.66% |
| 17 | Marin | CA | 30 | 12,156,000 | 54,945,000 | 1,030,344 | 3,474,055 | 8.48% | 28.58% | 1.88% | 6.32% |
| 18 | Orange County | CA | 352 | 128,653,500 | 580,838,250 | 13,008,500 | 38,005,058 | 10.11% | 29.54% | 2.24% | 6.54% |
| 19 | Redwood Empire | CA | 57 | 20,633,500 | 92,897,000 | 197,221 | 1,412,193 | 0.96% | 6.84% | 0.21% | 1.52% |
| 20 | Piedmont | CA | 7 | 2,700,000 | 12,150,000 | 541,098 | 5,544,891 | 20.04% | 205.37% | 4.45% | 45.64% |
| 21 | California Inland Empire | CA | 425 | 159,006,105 | 717,334,050 | 1,154,569 | 2,893,220 | 0.73% | 1.82% | 0.16% | 0.40% |
| 22 | Golden Empire | CA | 380 | 138,314,000 | 624,080,500 | 1,320,000 | 6,551,803 | 0.95% | 4.74% | 0.21% | 1.05% |
| 23 | San Diego-Imperial | CA | 380 | 141,045,500 | 637,521,250 | 2,661,800 | (566,856) | 1.89% | -0.40% | 0.42% | -0.09% |
| 24 | Western Los Angeles County | CA | 252 | 96,826,535 | 437,004,850 | 1,250,000 | 9,690,805 | 1.29% | 10.01% | 0.29% | 2.22% |
| 25 | Los Padres | CA | 83 | 31,875,500 | 144,323,500 | 1,834,155 | 14,453,991 | 5.75% | 45.35% | 1.27% | 10.01% |
| 26 | Silicon Valley Monterey Bay | CA | 273 | 104,832,000 | 472,496,500 | 10,000,000 | 33,397,061 | 9.54% | 31.86% | 2.12% | 7.07% |
| 27 | Ventura County | CA | 84 | 30,178,500 | 136,510,500 | 325,018 | 1,437,344 | 1.08% | 4.76% | 0.24% | 1.05% |
| 28 | Verdugo Hills | CA | 63 | 24,678,500 | 111,586,000 | 973,434 | 6,230,000 | 3.94% | 25.24% | 0.87% | 5.58% |
| 29 | Greater Yosemite | CA | 184 | 71,980,250 | 324,987,250 | 2,200,000 | 3,753,019 | 3.06% | 5.21% | 0.68% | 1.15% |
| 30 | Pikes Peak | CO | 81 | 29,210,000 | 68,635,250 | 1,718,941 | 5,605,495 | 5.88% | 19.19% | 2.50% | 8.17% |
| 31 | Denver Area | CO | 302 | 109,727,500 | 266,418,500 | 6,000,000 | 21,140,913 | 5.47% | 19.27% | 2.25% | 7.94% |
| 32 | Longs Peak | CO | 107 | 35,121,350 | 85,619,625 | 2,936,807 | 4,722,329 | 8.36% | 13.45% | 3.43% | 5.52% |
| 33 | Rocky Mountain | CO | 68 | 23,747,500 | 57,011,250 | 11,492 | 659,135 | 0.05% | 2.78% | 0.02% | 1.16% |
| 34 | Connecticut Rivers | CT | 256 | 54,545,750 | 310,347,900 | 4,083,054 | 6,164,604 | 7.49% | 11.30% | 1.32% | 1.99% |
| 35 | Greenwich | CT | 4 | 825,000 | 5,197,500 | 802,477 | 8,182,865 | 97.27% | 991.86% | 15.44% | 157.44% |
| 36 | Housatonic | CT | 9 | 1,743,500 | 9,694,750 | 235,901 | 1,224,069 | 13.53% | 70.21% | 2.43% | 12.63% |
| 37 | Old North State | NC | 144 | 52,122,500 | 235,567,000 | 4,767,600 | 10,589,939 | 9.15% | 20.32% | 2.02% | 4.50% |
| 38 | Connecticut Yankee | CT | 199 | 40,872,885 | 235,618,775 | 2,581,836 | 4,716,717 | 6.32% | 11.54% | 1.10% | 2.00% |
| 39 | Del-Mar-Va | DE | 107 | 16,059,085 | 100,408,500 | 2,241,287 | 12,402,191 | 13.96% | 77.23% | 2.23% | 12.35% |
| 40 | National Capital Area | MD | 506 | 42,284,135 | 315,178,150 | 8,000,000 | 33,820,605 | 18.92% | 79.98% | 2.54% | 10.73% |
| 41 | Central Florida | FL | 278 | 12,191,350 | 117,119,000 | 1,224,354 | 8,604,279 | 10.04% | 70.58% | 1.05% | 7.35% |
| 42 | South Florida | FL | 458 | 19,135,035 | 202,294,350 | 3,163,180 | 14,275,784 | 16.53% | 74.61% | 1.56% | 7.06% |
| 43 | Gulf Stream | FL | 148 | 6,081,600 | 65,521,500 | 1,170,000 | 3,129,806 | 19.24% | 51.46% | 1.79% | 4.78% |
| 44 | North Florida | FL | 258 | 11,097,600 | 116,399,625 | 5,284,701 | 7,459,145 | 47.62% | 67.21% | 4.54% | 6.41% |
| 45 | Southwest Florida | FL | 102 | 4,995,350 | 50,053,375 | 2,121,962 | 7,997,609 | 42.48% | 160.10% | 4.24% | 15.98% |
| 46 | Greater Tampa Bay Area | FL | 432 | 19,526,100 | 198,513,375 | 6,052,120 | 18,192,495 | 31.00% | 93.17% | 3.05% | 9.16% |
| 47 | Chattahoochee | GA | 104 | 12,366,750 | 82,907,850 | 937,997 | 6,082,594 | 7.58% | 49.19% | 1.13% | 7.34% |
| 48 | Atlanta Area | GA | 397 | 75,283,350 | 465,199,275 | 8,000,000 | 58,149,032 | 10.63% | 77.24% | 1.72% | 12.50% |
| 49 | Georgia-Carolina | GA | 73 | 11,534,250 | 71,770,350 | 326,070 | 1,786,314 | 2.83% | 15.49% | 0.45% | 2.49% |
| 50 | Flint River | GA | 59 | 9,620,000 | 59,108,150 | 766,174 | 6,970,107 | 7.96% | 72.45% | 1.30% | 11.79% |

| # | Local Council Name | LC State | Total Claims (Count) | Total Claims (Base Matrix Low Value) | Total Claims (Max Matrix High Value) | Total LC Contribution (DS Ex C) | Unrestricted Net Assets (DS Ex D / Ex 1) | Contribution / Base Low | Unrestricted Net Assets / Base Low | Contribution / Max High | Unrestricted Net Assets / Max High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 51 | Central Georgia | GA | 74 | 13,947,785 | 87,059,950 | 299,458 | 1,392,435 | 2.15% | 9.98% | 0.34% | 1.60% |
| 52 | South Georgia | GA | 71 | 11,721,285 | 73,716,800 | 436,247 | 1,952,636 | 3.72% | 16.66% | 0.59% | 2.65% |
| 53 | Coastal Georgia | GA | 108 | 22,458,500 | 137,779,400 | 2,584,395 | 17,382,082 | 11.51% | 77.40% | 1.88% | 12.62% |
| 54 | Northwest Georgia | GA | 33 | 6,160,750 | 39,155,950 | 802,019 | 1,600,467 | 13.02% | 25.98% | 2.05% | 4.09% |
| 55 | Northeast Georgia | GA | 106 | 22,925,250 | 134,047,850 | 2,138,766 | 6,396,650 | 9.33% | 27.90% | 1.60% | 4.77% |
| 56 | Aloha | HI | 175 | 69,713,750 | 314,910,450 | 1,338,358 | 5,975,712 | 1.92% | 8.57% | 0.42% | 1.90% |
| 57 | Ore-Ida | ID | 126 | 6,529,550 | 62,384,875 | 2,020,156 | 7,578,672 | 30.94% | 116.07% | 3.24% | 12.15% |
| 58 | Grand Teton | ID | 79 | 4,224,350 | 35,815,250 | 1,091,207 | 6,775,425 | 25.83% | 160.39% | 3.05% | 18.92% |
| 59 | Prairielands | IL | 75 | 15,362,100 | 89,669,325 | 467,331 | 2,252,777 | 3.04% | 14.66% | 0.52% | 2.51% |
| 60 | Three Fires | IL | 132 | 21,962,350 | 137,663,400 | 1,601,000 | 2,454,029 | 7.29% | 11.17% | 1.16% | 1.78% |
| 61 | Northeast Illinois | IL | 98 | 17,185,150 | 101,730,825 | 2,190,574 | 8,230,332 | 12.75% | 47.89% | 2.15% | 8.09% |
| 62 | Illowa | IA | 110 | 18,963,850 | 118,442,350 | 783,586 | 3,364,933 | 4.13% | 17.74% | 0.66% | 2.84% |
| 63 | W.D. Boyce | IL | 121 | 24,584,500 | 148,587,900 | 1,045,115 | 3,004,490 | 4.25% | 12.22% | 0.70% | 2.02% |
| 64 | Mississippi Valley | IL | 39 | 6,605,250 | 41,493,200 | 989,191 | 3,795,781 | 14.98% | 57.47% | 2.38% | 9.15% |
| 65 | Abraham Lincoln | IL | 44 | 10,542,000 | 62,538,750 | 1,568,064 | 2,458,695 | 14.87% | 23.32% | 2.51% | 3.93% |
| 66 | Hoosier Trails | IN | 61 | 2,970,000 | 29,362,500 | 757,931 | 1,988,860 | 25.52% | 66.96% | 2.58% | 6.77% |
| 67 | Buffalo Trace | IN | 99 | 6,186,950 | 53,959,575 | 553,341 | 2,586,680 | 8.94% | 41.81% | 1.03% | 4.79% |
| 68 | Anthony Wayne Area | IN | 86 | 3,253,400 | 36,998,500 | 1,309,804 | 3,604,204 | 40.26% | 110.78% | 3.54% | 9.74% |
| 69 | Crossroads of America | IN | 369 | 15,430,335 | 162,237,225 | 4,321,870 | 24,178,049 | 28.01% | 156.69% | 2.66% | 14.90% |
| 70 | Sagamore | IN | 99 | 5,089,850 | 50,762,125 | 1,149,115 | 4,861,534 | 22.58% | 95.51% | 2.26% | 9.58% |
| 71 | LaSalle | IN | 107 | 3,996,350 | 44,147,125 | 1,319,467 | 5,790,020 | 33.02% | 144.88% | 2.99% | 13.12% |
| 72 | Hawkeye Area | IA | 54 | 6,828,000 | 43,908,750 | 446,691 | 1,100,691 | 6.54% | 16.12% | 1.02% | 2.51% |
| 73 | Winnebago | IA | 52 | 5,453,550 | 36,841,950 | 723,157 | 2,670,485 | 13.26% | 48.97% | 1.96% | 7.25% |
| 74 | Mid-Iowa | IA | 136 | 14,685,750 | 99,716,625 | 2,502,671 | 16,033,550 | 17.04% | 109.18% | 2.51% | 16.08% |
| 75 | Northeast Iowa | IA | 26 | 2,985,000 | 20,081,250 | 678,374 | 2,452,014 | 22.73% | 82.14% | 3.38% | 12.21% |
| 76 | Coronado Area | KS | 56 | 2,119,605 | 15,616,300 | 856,886 | 2,710,907 | 40.43% | 127.90% | 5.49% | 17.36% |
| 77 | Santa Fe Trail | KS | 14 | 129,070 | 2,262,950 | 203,382 | 762,886 | 157.57% | 591.06% | 8.99% | 33.71% |
| 78 | Jayhawk Area | KS | 36 | 315,070 | 6,582,950 | 345,573 | 1,777,238 | 109.68% | 564.08% | 5.25% | 27.00% |
| 79 | Quivira | KS | 229 | 3,847,635 | 46,374,100 | 975,000 | 4,157,657 | 25.34% | 108.06% | 2.10% | 8.97% |
| 80 | Blue Grass | KY | 177 | 9,124,050 | 89,427,000 | 110,356 | 1,520,150 | 1.21% | 16.66% | 0.12% | 1.70% |
| 81 | Lincoln Heritage | KY | 349 | 15,248,835 | 155,622,225 | 3,632,563 | 12,521,252 | 23.82% | 82.11% | 2.33% | 8.05% |
| 82 | Calcasieu Area | LA | 65 | 25,660,850 | 115,452,625 | 442,315 | 2,310,197 | 1.72% | 9.00% | 0.38% | 2.00% |
| 83 | Istrouma Area | LA | 131 | 48,135,500 | 217,797,250 | 680,000 | 2,688,810 | 1.41% | 5.59% | 0.31% | 1.23% |
| 84 | Evangeline Area | LA | 67 | 26,413,000 | 119,087,000 | 167,830 | 243,363 | 0.64% | 0.92% | 0.14% | 0.20% |
| 85 | Louisiana Purchase | LA | 104 | 42,247,000 | 189,004,500 | 1,167,454 | 4,170,751 | 2.76% | 9.87% | 0.62% | 2.21% |
| 86 | Southeast Louisiana | LA | 303 | 107,862,700 | 490,898,375 | 1,877,632 | 5,729,971 | 1.74% | 5.31% | 0.38% | 1.17% |
| 87 | Norwela | LA | 86 | 32,780,000 | 147,563,500 | 2,936,807 | 12,640,310 | 8.96% | 38.56% | 1.99% | 8.57% |
| 88 | Katahdin Area | ME | 52 | 17,869,000 | 80,882,000 | 275,157 | 386,862 | 1.54% | 2.16% | 0.34% | 0.48% |
| 89 | Pine Tree | ME | 169 | 63,764,500 | 289,482,500 | 904,025 | 3,651,504 | 1.42% | 5.73% | 0.31% | 1.26% |
| 90 | Baltimore Area | MD | 407 | 20,692,385 | 195,014,125 | 4,317,564 | 12,242,788 | 20.87% | 59.17% | 2.21% | 6.28% |
| 91 | Mason-Dixon | MD | 29 | 2,544,750 | 18,984,375 | 345,990 | 3,737,266 | 13.60% | 146.86% | 1.82% | 19.69% |
| 92 | Cape Cod and Islands | MA | 34 | 8,793,000 | 48,026,250 | 844,020 | 4,903,912 | 9.60% | 55.77% | 1.76% | 10.21% |
| 93 | Spirit of Adventure | MA | 610 | 126,381,850 | 716,245,625 | 3,840,767 | 8,058,233 | 3.04% | 6.38% | 0.54% | 1.13% |
| 94 | Heart of New England | MA | 166 | 41,478,000 | 222,233,200 | 1,406,503 | 1,876,850 | 3.39% | 4.52% | 0.63% | 0.84% |
| 95 | Western Massachusetts | MA | 181 | 41,042,000 | 226,331,150 | 664,939 | 1,514,624 | 1.62% | 3.69% | 0.29% | 0.67% |
| 96 | Northern Star | MN | 298 | 32,022,800 | 216,728,425 | 7,223,055 | 45,643,422 | 22.56% | 142.53% | 3.33% | 21.06% |
| 97 | Mayflower | MA | 214 | 48,412,350 | 266,362,125 | 5,035,539 | 22,562,733 | 10.40% | 46.61% | 1.89% | 8.47% |
| 98 | Twin Valley | MN | 40 | 4,478,550 | 30,429,450 | 783,963 | 3,706,565 | 17.50% | 82.76% | 2.58% | 12.18% |
| 99 | Voyageurs Area | MN | 37 | 4,779,000 | 31,235,625 | 510,201 | 1,210,218 | 10.68% | 25.32% | 1.63% | 3.87% |
| 100 | Central Minnesota | MN | 28 | 2,401,050 | 16,507,575 | 276,941 | 2,483,885 | 11.53% | 103.45% | 1.68% | 15.05% |

| # | Local Council Name | LC State | Total Claims (Count) | Total Claims (Base Matrix Low Value) | Total Claims (Max Matrix High Value) | Total LC Contribution (DS Ex C) | Unrestricted Net Assets (DS Ex D / Ex 1) | Contribution / Base Low | Unrestricted Net Assets / Base Low | Contribution / Max High | Unrestricted Net Assets / Max High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 101 | Gamehaven | MN | 51 | 5,296,050 | 36,285,075 | 321,630 | 1,393,364 | 6.07% | 26.31% | 0.89% | 3.84% |
| 102 | Choctaw Area | MS | 40 | 2,130,050 | 20,418,750 | 519,164 | 3,394,222 | 24.37% | 159.35% | 2.54% | 16.62% |
| 103 | Andrew Jackson | MS | 174 | 9,513,950 | 84,288,625 | 1,512,001 | 1,519,057 | 15.89% | 15.97% | 1.79% | 1.80% |
| 104 | Pine Burr Area | MS | 145 | 8,221,085 | 73,075,975 | 330,068 | 2,911,447 | 4.01% | 35.41% | 0.45% | 3.98% |
| 105 | Ozark Trails | MO | 151 | 9,825,950 | 78,466,750 | 2,241,929 | 5,368,753 | 22.82% | 54.64% | 2.86% | 6.84% |
| 106 | Heart of America | MO | 558 | 22,252,780 | 228,855,300 | 6,971,313 | 18,738,579 | 31.33% | 84.21% | 3.05% | 8.19% |
| 107 | Pony Express | MO | 51 | 2,337,735 | 19,613,850 | 1,015,000 | 4,430,970 | 43.42% | 189.54% | 5.17% | 22.59% |
| 108 | Greater St. Louis Area | MO | 772 | 68,432,750 | 504,489,125 | 7,986,838 | 31,740,144 | 11.67% | 46.38% | 1.58% | 6.29% |
| 109 | Montana | MT | 122 | 45,414,500 | 205,976,500 | 3,181,676 | 33,748,789 | 7.01% | 74.31% | 1.54% | 16.38% |
| 110 | Overland Trails | NE | 48 | 2,445,350 | 22,433,375 | 468,988 | 1,325,334 | 19.18% | 54.20% | 2.09% | 5.91% |
| 111 | Cornhusker | NE | 49 | 3,436,750 | 25,378,125 | 356,000 | 3,827,718 | 10.36% | 111.38% | 1.40% | 15.08% |
| 112 | Mid-America | NE | 229 | 16,555,285 | 126,724,100 | 4,280,708 | 8,289,589 | 25.86% | 50.07% | 3.38% | 6.54% |
| 113 | Las Vegas Area | NV | 166 | 20,623,900 | 122,934,500 | 3,385,736 | 4,968,407 | 16.42% | 24.09% | 2.75% | 4.04% |
| 114 | Nevada Area | NV | 101 | 16,655,200 | 91,319,250 | 2,506,435 | 9,478,814 | 15.05% | 56.91% | 2.74% | 10.38% |
| 115 | Daniel Webster | NH | 158 | 22,167,900 | 142,349,675 | 3,525,762 | 10,286,304 | 15.90% | 46.40% | 2.48% | 7.23% |
| 116 | Northern New Jersey | NJ | 461 | 160,243,650 | 725,869,225 | 3,064,566 | 6,863,268 | 1.91% | 4.28% | 0.42% | 0.95% |
| 117 | Jersey Shore | NJ | 88 | 33,134,000 | 149,824,750 | 386,141 | 1,120,096 | 1.17% | 3.38% | 0.26% | 0.75% |
| 118 | Monmouth | NJ | 91 | 32,568,500 | 147,158,500 | 3,170,811 | 10,212,112 | 9.74% | 31.36% | 2.15% | 6.94% |
| 119 | Patriots' Path | NJ | 197 | 69,887,850 | 317,497,125 | 3,704,240 | 7,830,214 | 5.30% | 11.20% | 1.17% | 2.47% |
| 120 | Twin Rivers | NY | 189 | 71,576,035 | 323,925,350 | 2,595,200 | 4,229,406 | 3.63% | 5.91% | 0.80% | 1.31% |
| 121 | Baden-Powell | NY | 89 | 30,899,035 | 140,578,100 | 1,371,787 | 4,015,196 | 4.44% | 12.99% | 0.98% | 2.86% |
| 122 | Longhouse | NY | 153 | 53,544,000 | 242,755,500 | 840,707 | 1,581,633 | 1.57% | 2.95% | 0.35% | 0.65% |
| 123 | Five Rivers | NY | 63 | 19,695,550 | 91,449,575 | 831,968 | 2,972,059 | 4.22% | 15.09% | 0.91% | 3.25% |
| 124 | Iroquois Trail | NY | 34 | 12,609,250 | 57,583,450 | 342,546 | 283,246 | 2.72% | 2.25% | 0.59% | 0.49% |
| 125 | Greater Niagara Frontier | NY | 213 | 73,593,035 | 333,982,600 | 1,537,485 | 3,346,922 | 2.09% | 4.55% | 0.46% | 1.00% |
| 126 | Allegheny Highlands | NY | 56 | 17,086,050 | 79,890,075 | 899,358 | 2,113,548 | 5.26% | 12.37% | 1.13% | 2.65% |
| 127 | Theodore Roosevelt | NY | 162 | 54,401,500 | 246,215,000 | 3,989,485 | 9,905,508 | 7.33% | 18.21% | 1.62% | 4.02% |
| 128 | Greater Hudson Valley | NY | 316 | 106,022,500 | 481,629,875 | 6,367,835 | 11,731,515 | 6.01% | 11.07% | 1.32% | 2.44% |
| 129 | Seneca Waterways | NY | 211 | 76,106,100 | 342,290,875 | 8,000,000 | 11,797,728 | 10.51% | 15.50% | 2.34% | 3.45% |
| 130 | Leatherstocking | NY | 85 | 34,435,500 | 155,343,000 | 4,493,457 | 11,828,471 | 13.05% | 34.35% | 2.89% | 7.61% |
| 131 | Suffolk County | NY | 173 | 57,442,000 | 262,415,000 | 1,717,800 | 1,329,216 | 2.99% | 2.31% | 0.65% | 0.51% |
| 132 | Rip Van Winkle | NY | 15 | 4,507,000 | 20,267,000 | 240,016 | 121,824 | 5.33% | 2.70% | 1.18% | 0.60% |
| 133 | Great Southwest | NM | 225 | 47,600,500 | 270,630,750 | 116,570 | 1,275,497 | 0.24% | 2.68% | 0.04% | 0.47% |
| 134 | Conquistador | NM | 49 | 10,096,750 | 62,207,200 | 1,950,432 | 2,700,824 | 19.32% | 26.75% | 3.14% | 4.34% |
| 135 | Daniel Boone | NC | 49 | 16,608,500 | 75,406,000 | 656,424 | 7,829,640 | 3.95% | 47.14% | 0.87% | 10.38% |
| 136 | Mecklenburg County | NC | 80 | 26,750,000 | 121,770,250 | 2,920,183 | 11,248,480 | 10.92% | 42.05% | 2.40% | 9.24% |
| 137 | Central North Carolina | NC | 78 | 27,900,500 | 125,887,750 | 1,840,659 | 5,199,820 | 6.60% | 18.64% | 1.46% | 4.13% |
| 138 | Piedmont | NC | 122 | 48,401,000 | 219,586,000 | 2,785,859 | 9,801,687 | 5.76% | 20.25% | 1.27% | 4.46% |
| 139 | Occoneechee | NC | 184 | 67,372,535 | 306,113,350 | 1,946,429 | 6,056,221 | 2.89% | 8.99% | 0.64% | 1.98% |
| 140 | Tuscarora | NC | 36 | 12,219,500 | 56,371,000 | 858,650 | 1,365,311 | 7.03% | 11.17% | 1.52% | 2.42% |
| 141 | Cape Fear | NC | 77 | 29,485,000 | 133,194,500 | 1,044,895 | 5,557,337 | 3.54% | 18.85% | 0.78% | 4.17% |
| 142 | East Carolina | NC | 140 | 54,970,500 | 248,256,750 | 1,940,873 | 5,040,234 | 3.53% | 9.17% | 0.78% | 2.03% |
| 143 | Old Hickory | NC | 99 | 35,021,500 | 159,823,250 | 1,084,223 | 5,253,957 | 3.10% | 15.00% | 0.68% | 3.29% |
| 144 | Northern Lights | ND | 89 | 9,960,600 | 65,567,025 | 1,915,148 | 13,766,368 | 19.23% | 138.21% | 2.92% | 21.00% |
| 145 | Great Trail | OH | 227 | 26,783,250 | 176,261,625 | 3,059,259 | 9,525,356 | 11.42% | 35.56% | 1.74% | 5.40% |
| 146 | Buckeye | OH | 150 | 16,991,185 | 111,443,300 | 2,614,529 | 6,322,015 | 15.39% | 37.21% | 2.35% | 5.67% |
| 147 | Dan Beard | OH | 334 | 33,143,600 | 234,431,875 | 4,064,829 | 13,233,734 | 12.26% | 39.93% | 1.73% | 5.65% |
| 148 | Tecumseh | OH | 66 | 8,063,550 | 52,826,950 | 653,395 | 2,799,022 | 8.10% | 34.71% | 1.24% | 5.30% |
| 149 | Lake Erie | OH | 421 | 49,345,100 | 324,991,150 | 6,546,918 | 11,269,256 | 13.27% | 22.84% | 2.01% | 3.47% |
| 150 | Simon Kenton | OH | 331 | 38,549,650 | 260,654,050 | 2,659,872 | 8,647,700 | 6.90% | 22.43% | 1.02% | 3.32% |

| # | Local Council Name | LC State | Total Claims (Count) | Total Claims (Base Matrix Low Value) | Total Claims (Max Matrix High Value) | Total LC Contribution (DS Ex C) | Unrestricted Net Assets (DS Ex D / Ex 1) | Contribution / Base Low | Unrestricted Net Assets / Base Low | Contribution / Max High | Unrestricted Net Assets / Max High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 151 | Miami Valley | OH | 124 | 14,063,550 | 94,486,950 | 1,255,126 | 5,399,371 | 8.92% | 38.39% | 1.33% | 5.71% |
| 152 | Black Swamp Area | OH | 67 | 7,904,700 | 50,627,800 | 1,681,202 | 7,775,738 | 21.27% | 98.37% | 3.32% | 15.36% |
| 153 | Pathway to Adventure | IL | 1,246 | 202,433,390 | 1,248,613,525 | 7,225,067 | 15,824,269 | 3.57% | 7.82% | 0.58% | 1.27% |
| 154 | Erie Shores | OH | 151 | 16,231,835 | 109,257,800 | 4,161,154 | 22,222,575 | 25.64% | 136.91% | 3.81% | 20.34% |
| 155 | Muskingum Valley | OH | 40 | 4,506,600 | 30,585,150 | 513,391 | 2,934,099 | 11.39% | 65.11% | 1.68% | 9.59% |
| 156 | Arbuckle Area | OK | 28 | 997,500 | 8,977,500 | 572,866 | 4,618,434 | 57.43% | 463.00% | 6.38% | 51.44% |
| 157 | Cherokee Area | OK | 23 | 684,070 | 6,481,700 | 315,366 | 5,014,481 | 46.10% | 733.04% | 4.87% | 77.36% |
| 158 | Cimarron | OK | 52 | 996,070 | 11,814,200 | 282,652 | 1,932,008 | 28.38% | 193.96% | 2.39% | 16.35% |
| 159 | Last Frontier | OK | 279 | 3,608,730 | 59,171,225 | 3,646,048 | 6,594,443 | 101.03% | 182.74% | 6.16% | 11.14% |
| 160 | Indian Nations | OK | 167 | 4,429,140 | 44,546,850 | 2,637,142 | 28,426,208 | 59.54% | 641.80% | 5.92% | 63.81% |
| 161 | Crater Lake | OR | 114 | 31,891,500 | 161,419,950 | 320,470 | 681,197 | 1.00% | 2.14% | 0.20% | 0.42% |
| 162 | Cascade Pacific | OR | 475 | 101,809,000 | 585,241,050 | 10,000,000 | 34,421,289 | 9.82% | 33.81% | 1.71% | 5.88% |
| 163 | Juniata Valley | PA | 22 | 3,212,250 | 19,001,250 | 421,504 | 1,893,688 | 13.12% | 58.95% | 2.22% | 9.97% |
| 164 | Moraine Trails | PA | 47 | 7,062,750 | 44,347,500 | 1,196,485 | 6,858,072 | 16.94% | 97.10% | 2.70% | 15.46% |
| 165 | Northeastern Pennsylvania | PA | 64 | 9,361,050 | 57,108,825 | 687,262 | 2,988,316 | 7.34% | 31.92% | 1.20% | 5.23% |
| 166 | Minsi Trails | PA | 104 | 16,455,500 | 93,416,000 | 2,580,916 | 6,716,274 | 15.68% | 40.81% | 2.76% | 7.19% |
| 167 | Columbia-Montour | PA | 7 | 721,085 | 4,864,675 | 260,931 | 675,522 | 36.19% | 93.68% | 5.36% | 13.89% |
| 168 | Bucktail | PA | 18 | 2,196,000 | 14,782,500 | 260,931 | 520,567 | 11.88% | 23.71% | 1.77% | 3.52% |
| 169 | Westmoreland-Fayette | PA | 62 | 6,920,600 | 46,152,400 | 1,367,518 | 1,621,221 | 19.76% | 23.43% | 2.96% | 3.51% |
| 170 | Pennsylvania Dutch | PA | 73 | 9,855,000 | 60,665,625 | 1,054,371 | 5,329,855 | 10.70% | 54.08% | 1.74% | 8.79% |
| 171 | Cradle of Liberty | PA | 495 | 70,011,555 | 422,566,225 | 6,806,713 | 14,249,730 | 9.72% | 20.35% | 1.61% | 3.37% |
| 172 | Laurel Highlands | PA | 330 | 39,254,885 | 256,713,250 | 5,972,147 | 23,961,119 | 15.21% | 61.04% | 2.33% | 9.33% |
| 173 | Hawk Mountain | PA | 68 | 8,800,500 | 56,868,750 | 1,636,124 | 6,589,184 | 18.59% | 74.87% | 2.88% | 11.59% |
| 174 | French Creek | PA | 84 | 10,407,750 | 62,950,375 | 699,673 | 2,525,616 | 6.72% | 24.27% | 1.11% | 4.01% |
| 175 | Susquehanna | PA | 44 | 5,401,050 | 35,340,075 | 453,846 | 2,649,064 | 8.40% | 49.05% | 1.28% | 7.50% |
| 176 | Chief Cornplanter | PA | 7 | 765,750 | 5,197,500 | 260,931 | 417,106 | 34.08% | 54.47% | 5.02% | 8.03% |
| 177 | Chester County | PA | 45 | 5,295,000 | 36,585,000 | 1,559,680 | 6,856,711 | 29.46% | 129.49% | 4.26% | 18.74% |
| 178 | New Birth of Freedom | PA | 146 | 16,724,035 | 110,697,575 | 2,713,971 | 7,383,106 | 16.23% | 44.15% | 2.45% | 6.67% |
| 179 | Narragansett | RI | 343 | 44,527,100 | 280,801,825 | 6,440,530 | 18,836,603 | 14.46% | 42.30% | 2.29% | 6.71% |
| 180 | Palmetto | SC | 70 | 12,052,500 | 67,449,375 | 165,998 | 442,822 | 1.38% | 3.67% | 0.25% | 0.66% |
| 181 | Coastal Carolina | SC | 143 | 17,536,385 | 111,807,625 | 216,987 | 317,720 | 1.24% | 1.81% | 0.19% | 0.28% |
| 182 | Blue Ridge | SC | 131 | 18,837,600 | 116,681,400 | 1,058,966 | 4,681,093 | 5.62% | 24.85% | 0.91% | 4.01% |
| 183 | Pee Dee Area | SC | 78 | 9,992,100 | 61,162,650 | 889,440 | 2,207,773 | 8.90% | 22.10% | 1.45% | 3.61% |
| 184 | Indian Waters | SC | 115 | 16,139,150 | 98,991,850 | 556,559 | 1,296,106 | 3.45% | 8.03% | 0.56% | 1.31% |
| 185 | Cherokee Area | TN | 80 | 9,705,000 | 63,787,500 | 1,180,000 | 1,947,397 | 12.16% | 20.07% | 1.85% | 3.05% |
| 186 | Great Smoky Mountain | TN | 152 | 19,152,185 | 125,224,825 | 1,193,687 | 5,869,902 | 6.23% | 30.65% | 0.95% | 4.69% |
| 187 | Chickasaw | TN | 302 | 35,100,100 | 221,697,200 | 2,045,752 | 4,733,366 | 5.83% | 13.49% | 0.92% | 2.14% |
| 188 | West Tennessee Area | TN | 53 | 5,822,550 | 39,525,075 | 140,520 | 135,786 | 2.41% | 2.33% | 0.36% | 0.34% |
| 189 | Middle Tennessee | TN | 236 | 26,998,050 | 183,114,450 | 3,586,493 | 20,265,491 | 13.28% | 75.06% | 1.96% | 11.07% |
| 190 | Texas Trails | TX | 59 | 2,447,450 | 26,773,950 | 627,654 | 1,567,414 | 25.65% | 64.04% | 2.34% | 5.85% |
| 191 | Golden Spread | TX | 101 | 7,771,920 | 56,645,075 | 2,133,734 | 8,879,958 | 27.45% | 114.26% | 3.77% | 15.68% |
| 192 | Capitol Area | TX | 105 | 5,468,100 | 48,439,325 | 4,196,142 | 45,026,850 | 76.74% | 823.45% | 8.66% | 92.96% |
| 193 | Buffalo Trail | TX | 80 | 3,862,850 | 37,802,125 | 1,148,568 | 2,331,639 | 29.73% | 60.36% | 3.04% | 6.17% |
| 194 | Circle Ten | TX | 489 | 28,128,290 | 246,758,525 | 7,989,824 | 1,828,738 | 28.40% | 6.50% | 3.24% | 0.74% |
| 195 | Yucca | TX | 151 | 17,315,850 | 121,918,425 | 684,194 | 1,572,425 | 3.95% | 9.08% | 0.56% | 1.29% |
| 196 | Bay Area | TX | 80 | 3,684,385 | 34,917,350 | 1,019,611 | 2,643,449 | 27.67% | 71.75% | 2.92% | 7.57% |
| 197 | Sam Houston Area | TX | 700 | 32,854,450 | 309,850,875 | 7,968,144 | 88,569,253 | 24.25% | 269.58% | 2.57% | 28.58% |
| 198 | South Texas | TX | 116 | 6,087,700 | 60,534,875 | 372,925 | 4,777,870 | 6.13% | 78.48% | 0.62% | 7.89% |
| 199 | Three Rivers | TX | 117 | 6,463,650 | 60,781,325 | 802,596 | 1,071,295 | 12.42% | 16.57% | 1.32% | 1.76% |
| 200 | Alamo Area | TX | 252 | 12,006,750 | 116,241,625 | 4,241,105 | 15,476,476 | 35.32% | 128.90% | 3.65% | 13.31% |

| # | Local Council Name | LC State | Total Claims (Count) | Total Claims (Base Matrix Low Value) | Total Claims (Max Matrix High Value) | Total LC Contribution (DS Ex C) | Unrestricted Net Assets (DS Ex D / Ex 1) | Contribution / Base Low | Unrestricted Net Assets / Base Low | Contribution / Max High | Unrestricted Net Assets / Max High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 201 | Caddo Area | TX | 52 | 13,293,000 | 63,391,125 | 506,208 | 2,309,301 | 3.81% | 17.37% | 0.80% | 3.64% |
| 202 | East Texas Area | TX | 100 | 4,717,550 | 47,045,500 | 1,505,910 | 3,605,254 | 31.92% | 76.42% | 3.20% | 7.66% |
| 203 | Northwest Texas | TX | 66 | 2,578,050 | 27,175,125 | 529,586 | 1,551,351 | 20.54% | 60.18% | 1.95% | 5.71% |
| 204 | Crossroads of the West | UT | 586 | 10,840,550 | 143,583,550 | 4,413,897 | 36,894,524 | 40.72% | 340.33% | 3.07% | 25.70% |
| 205 | Green Mountain | VT | 91 | 29,207,850 | 133,635,375 | 802,732 | 1,652,225 | 2.75% | 5.66% | 0.60% | 1.24% |
| 206 | Colonial Virginia | VA | 89 | 4,512,700 | 40,673,000 | 347,149 | 581,632 | 7.69% | 12.89% | 0.85% | 1.43% |
| 207 | Tidewater | VA | 197 | 15,327,285 | 115,723,350 | 621,354 | 861,184 | 4.05% | 5.62% | 0.54% | 0.74% |
| 208 | Shenandoah Area | VA | 23 | 1,843,850 | 13,046,500 | 188,673 | 902,224 | 10.23% | 48.93% | 1.45% | 6.92% |
| 209 | Blue Ridge Mountains | VA | 93 | 5,344,850 | 47,758,375 | 739,330 | 2,199,821 | 13.83% | 41.16% | 1.55% | 4.61% |
| 210 | Heart of Virginia | VA | 143 | 6,962,600 | 69,375,250 | 2,067,014 | 6,509,720 | 29.69% | 93.50% | 2.98% | 9.38% |
| 211 | Blue Mountain | WA | 54 | 10,318,000 | 62,663,800 | 673,098 | 510,479 | 6.52% | 4.95% | 1.07% | 0.81% |
| 212 | Mount Baker | WA | 135 | 25,859,000 | 158,860,650 | 2,150,000 | 7,795,644 | 8.31% | 30.15% | 1.35% | 4.91% |
| 213 | Chief Seattle | WA | 295 | 57,396,285 | 357,083,750 | 7,517,262 | 33,363,479 | 13.10% | 58.13% | 2.11% | 9.34% |
| 214 | Great Alaska | AK | 89 | 4,115,900 | 42,651,625 | 579,090 | 6,710,102 | 14.07% | 163.03% | 1.36% | 15.73% |
| 215 | Inland Northwest | WA | 152 | 22,553,885 | 147,008,025 | 164,963 | 118,020 | 0.73% | 0.52% | 0.11% | 0.08% |
| 216 | Pacific Harbors | WA | 208 | 39,197,750 | 243,152,250 | 2,260,810 | 5,353,855 | 5.77% | 13.66% | 0.93% | 2.20% |
| 217 | Grand Columbia | WA | 76 | 14,460,500 | 91,774,750 | 254,101 | 2,956,830 | 1.76% | 20.45% | 0.28% | 3.22% |
| 218 | Mountaineer Area | WV | 34 | 4,860,000 | 31,151,250 | 527,717 | 3,466,293 | 10.86% | 71.32% | 1.69% | 11.13% |
| 219 | Buckskin | WV | 246 | 31,542,585 | 199,173,025 | 1,890,783 | 9,024,883 | 5.99% | 28.61% | 0.95% | 4.53% |
| 220 | Ohio River Valley | WV | 45 | 5,671,500 | 36,112,500 | 895,582 | 2,925,194 | 15.79% | 51.58% | 2.48% | 8.10% |
| 221 | Glacier's Edge | WI | 93 | 3,229,085 | 34,449,100 | 615,218 | 3,107,723 | 19.05% | 96.24% | 1.79% | 9.02% |
| 222 | Gateway Area | WI | 28 | 1,815,700 | 14,685,500 | 328,075 | 1,295,142 | 18.07% | 71.33% | 2.23% | 8.82% |
| 223 | Samoset | WI | 29 | 1,585,500 | 14,293,125 | 744,921 | 4,149,307 | 46.98% | 261.70% | 5.21% | 29.03% |
| 224 | Bay-Lakes | WI | 139 | 5,172,250 | 56,255,000 | 2,876,230 | 12,448,113 | 55.61% | 240.67% | 5.11% | 22.13% |
| 225 | Three Harbors | WI | 227 | 9,044,900 | 94,105,325 | 3,685,039 | 17,038,431 | 40.74% | 188.38% | 3.92% | 18.11% |
| 226 | Chippewa Valley | WI | 46 | 1,724,200 | 17,571,125 | 411,891 | 4,663,116 | 23.89% | 270.45% | 2.34% | 26.54% |
| 227 | Greater Wyoming | WY | 27 | 120,785 | 4,928,350 | 405,893 | 2,035,401 | 336.05% | 1685.14% | 8.24% | 41.30% |
| 228 | Greater New York | NY | 1,314 | 473,944,135 | 2,144,214,225 | 9,000,000 | 10,041,590 | 1.90% | 2.12% | 0.42% | 0.47% |
| 229 | Potawatomi Area | WI | 29 | 1,061,350 | 11,556,525 | 560,174 | 2,395,254 | 52.78% | 225.68% | 4.85% | 20.73% |
| 230 | Great Rivers | MO | 62 | 3,062,550 | 29,368,875 | 420,000 | 2,031,475 | 13.71% | 66.33% | 1.43% | 6.92% |
| 231 | Blackhawk Area | IL | 141 | 26,562,500 | 160,459,400 | 1,611,059 | 5,023,665 | 6.07% | 18.91% | 1.00% | 3.13% |
| 232 | Puerto Rico | PR | 72 | 1,006,535 | 16,740,850 | 233,059 | 6,883,357 | 23.15% | 683.87% | 1.39% | 41.12% |
| 233 | Longhorn | TX | 383 | 18,756,050 | 172,011,325 | 1,619,485 | 6,059,764 | 8.63% | 32.31% | 0.94% | 3.52% |
| 234 | Suwannee River Area | FL | 41 | 2,895,350 | 22,918,375 | 224,459 | (238,956) | 7.75% | -8.25% | 0.98% | -1.04% |
| 235 | Garden State | NJ | 221 | 81,914,570 | 372,517,450 | 3,890,626 | 9,300,738 | 4.75% | 11.35% | 1.04% | 2.50% |
| 236 | Pushmataha Area | MS | 48 | 3,141,350 | 25,685,875 | 83,882 | 415,595 | 2.67% | 13.23% | 0.33% | 1.62% |
| 237 | South Plains | TX | 81 | 4,598,550 | 40,814,500 | 755,075 | 583,361 | 16.42% | 12.69% | 1.85% | 1.43% |
| 238 | Black Hills Area | SD | 27 | 106,535 | 4,793,350 | 160,573 | 664,784 | 150.72% | 624.00% | 3.35% | 13.87% |
| 239 | Midnight Sun | AK | 21 | 960,750 | 10,091,250 | 1,023,336 | 2,126,874 | 106.51% | 221.38% | 10.14% | 21.08% |
| 240 | Oregon Trail | OR | 139 | 33,338,250 | 191,566,950 | 3,141,676 | 8,408,697 | 9.42% | 25.22% | 1.64% | 4.39% |
| 241 | Rainbow | IL | 76 | 16,896,750 | 96,404,450 | 759,968 | 3,812,852 | 4.50% | 22.57% | 0.79% | 3.96% |
| 242 | Sequoyah | TN | 66 | 5,781,250 | 44,524,325 | 796,698 | 4,270,519 | 13.78% | 73.87% | 1.79% | 9.59% |
| 243 | Sioux | SD | 41 | 1,180,570 | 11,662,325 | 524,247 | 1,496,185 | 44.41% | 126.73% | 4.50% | 12.83% |
| 244 | Texas Southwest | TX | 48 | 1,767,000 | 20,030,625 | 221,936 | 916,498 | 12.56% | 51.87% | 1.11% | 4.58% |
| 245 | Yocona Area | MS | 55 | 2,439,850 | 24,580,625 | 291,074 | 863,638 | 11.93% | 35.40% | 1.18% | 3.51% |
| 246 | Stonewall Jackson Area | VA | 30 | 1,650,000 | 14,681,250 | 287,066 | 217,980 | 17.40% | 13.21% | 1.96% | 1.48% |
| 247 | Gulf Coast | FL | 165 | 6,158,900 | 69,229,750 | 140,734 | (292,475) | 2.29% | -4.75% | 0.20% | -0.42% |
| 248 | Rio Grande | TX | 74 | 3,289,050 | 32,035,125 | 562,009 | 1,906,030 | 17.09% | 57.95% | 1.75% | 5.95% |
| 249 | Washington Crossing | PA | 64 | 11,347,500 | 63,770,625 | 1,390,180 | 3,906,611 | 12.25% | 34.43% | 2.18% | 6.13% |
| 250 | Michigan Crossroads | MI | 1,392 | 57,631,570 | 604,093,575 | 7,983,003 | 25,109,723 | 13.85% | 43.57% | 1.32% | 4.16% |

| # | Local Council Name | LC State | Total Claims (Count) | Total Claims (Base Matrix Low Value) | Total Claims (Max Matrix High Value) | Total LC Contribution (DS Ex C) | Unrestricted Net Assets (DS Ex D / Ex 1) | Contribution / Base Low | Unrestricted Net Assets / Base Low | Contribution / Max High | Unrestricted Net Assets / Max High |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 251 | Transatlantic | ZZ | 139 | 1,569,070 | 28,081,700 | 447,138 | 966,036 | 28.50% | 61.57% | 1.59% | 3.44% |
| 252 | Far East | ZZ | 50 | 808,570 | 12,084,200 | 778,355 | 2,886,174 | 96.26% | 356.95% | 6.44% | 23.88% |
| | | | 41,750 | $ 7,646,294,995 | $ 41,069,210,100 | $ 519,588,545 | $ 1,870,754,935 | 6.80% | 24.47% | 1.27% | 4.56% |

## EXHIBIT G-1

**DEBTORS' RESPONSE TO TORT CLAIMANTS' COMMITTEE'S
LOCAL COUNCIL ABUSE CLAIMS VALUATIONS**

> **The Debtors disagree with the accuracy and relevance of the Tort Claimants' Committee's Local Council Abuse Claims valuations and believe that there are misleading elements of such presentation.  For the reasons set forth below, the Debtors do not believe that creditors voting on the Plan should rely on Exhibit G in making their decision to vote to accept or reject the Plan.**

The Debtors do not believe that the claims against each Local Council can be valued at this time.  Moreover, the Debtors do not believe that such claims need to be valued in order to provide adequate disclosure to holders of Direct Abuse Claims or to satisfy the standards to obtain non-consensual third-party releases in favor of the Local Councils.  The Debtors **do not** believe that Exhibit G, which was prepared by the Tort Claimants' Committee and purports to show the liability of each Local Council, is accurate, nor do the Debtors believe that the comparison of such liability to the contributions being made by each Local Council and the assets of each Local Council is factually accurate or presents a full and accurate picture on which any decisions could be made by a holder of a Direct Abuse Claim voting on the Plan.  In particular, the Debtors note the following:

1. The Tort Claimants' Committee agreed to a $600 million contribution from the Local Councils prior to the expiration of the Restructuring Support Agreement.

2. The amount of the Local Council Settlement Contributions does not include the value of their insurance (both their own policies and their interests as an insured under the BSA Insurance Policies), which the Tort Claimants' Committee itself has indicated could be worth billions of dollars, and the Debtors believe, when combined with the Debtors' rights in such policies, may be sufficient to result in payment of up to 100% to holders of Abuse Claims. The Settlement Trust's ability to monetize the Abuse Insurance Policies and disburse such proceeds to Abuse Claimants could be significantly reduced without these Local Council insurance rights.

3. The Tort Claimants' Committee's numbers inaccurately attribute BSA and Chartered Organization liability to the Local Councils.  The Debtors' estimate of the value of Abuse Claims is $2.4 to $7.1 billion in the aggregate,[1] a range which certain of the Debtors' Insurance Companies believe inflates the aggregate value of Abuse Claims. The Tort Claimants' Committee appears to simply take the Trust Distribution Procedures' base and maximum values by tier of Abuse and apply them to Direct Abuse Claims against Local Councils without taking into account whether such claims are valid, which claims may take the Expedited Distribution, or the various factors set forth in the Trust Distribution Procedures that would increase or decrease the value of such claims (including to levels below the base amount), other than the statute of limitations factors in the Trust Distribution Procedures.  Regardless, the amounts reflected appear to be the value of the total claim rather than the portion of the liability that relates to a

---

[1]  As noted in Section V.N of the Disclosure Statement, the Coalition and Future Claimants' Representative (and Tort Claimants' Committee) believe that the value of the Abuse Claims is higher than the Debtors' estimate. Nonetheless, the Coalition and Future Claimants' Representative are supporting the settlements proposed in the Plan because they believe that the settling parties are paying the maximum amounts that they would pay absent complicated, expensive and protracted litigation.

Local Council as compared to other co-liable parties such as the Debtors and Chartered Organizations.

4.   The Tort Claimants' Committee further ignores that while the Trust Distribution Procedures assigns value to statute-barred claims based on the level of risk associated with the current state of the law, including potential future legislation, such claims may not be able to recover today outside of the Plan.

5.   The amount of the Local Council Settlement Contribution set forth on the chart does not include the $100 million DST Note, which will be paid by the Local Councils and used to fund distributions to holders of Abuse Claims.

6.   The amount of net unrestricted assets and the associated comparison of the Local Council Settlement Contribution as a percentage of net unrestricted assets is overstated, as such assets could likely only be accessed in a bankruptcy filing by the Local Councils.   In this context, the Local Councils would be subject to the $1.1 billion termination claim asserted by the PBGC, and the values realized on the assets would be reduced by litigation and liquidation costs.   In such a liquidation, the $100 million DST note would cease to exist and the BSA Settlement Trust Contribution would be substantially reduced.   Absent a bankruptcy proceeding, the Local Councils would need to retain a significant portion of their assets in order to have a feasible business.

# EXHIBIT H

**CONNECTIONS WITH PROPOSED SETTLEMENT TRUSTEE**

**Boy Scouts of America**

**Exhibit H**

**Eric D. Green Connections**

| Person Identified | Connection |
|---|---|
| James L. Patton, Jr. | James L. Patton, Jr. is the Future Claimants' Representative[1] in these Chapter 11 Cases. Mr. Patton, together with other attorneys at Young Conaway Stargatt & Taylor, represented Eric D. Green in his capacity as future claimants' representative in the following mass tort bankruptcy trusts:<br><br>(i)   The Bondex Asbestos Personal Injury Trust (established in 2016) (*see In re Specialty Products Holding Corp.*, No. 10-11780-LSS (Bankr. D. Del.) at Order Appointing Eric. D. Green as Legal Representative for Future Claimants (Oct. 28, 2010) [ECF No. 449];<br><br>(ii)   The Babcock & Wilcox Company Asbestos PI Trust (established in 2006) (s*ee In re Babcock & Wilcox Co.*, 274 B.R. 230 (Bankr. E.D. La. 2002);<br><br>(iii)   The Federal-Mogul Asbestos Personal Injury Trust (established in 2007) (*See In re Federal-Mogul Glob. Inc.*, 330 B.R. 133 (2005) (Mr. Patton also filed an *amicus curiae* brief on behalf of Mr. Green in the unrelated case of *In re Kensington International Ltd.*, 368 F.3d 289 (3d Cir. 2004));<br><br>(iv)   The DII Industries, LLC Asbestos PI Trust (established in 2005) (*see In re Mid-Valley*, 305 B.R. 425 (Bankr. W.D. Pa. 2004); |

---

[1]    All capitalized terms not otherwise defined herein shall have the meanings ascribed to them the Plan or Disclosure Statement, as applicable.

(v)   The DII Silica Trust (established in 2005) (*see In re Mid-Valley*, 305 B.R. 425 (Bankr. W.D. Pa. 2004); and

(vi)   The Met-Coil Systems Corporation TCE PI Trust (established in 2004) (*see In re Met-Coil Sys.*, No. 03-12676-MFW (Bankr. D. Del.) at Order Authorizing the Appointment of Eric D. Green as Legal Representative for Future Claimants (Oct. 20, 2003) [ECF No. 205].

Mr. Patton also represented Eric D. Green in his capacity as court-appointed Monitor in the following mortgage-backed securities consumer relief settlement agreements: matters:

(i)   Representation of Eric D. Green in his capacity as appointed Independent Monitor pursuant to The Settlement Agreements Between The Goldman Sachs Group, Inc., the Department of Justice and the Attorneys General of California, Illinois and New York (the "Goldman Sachs Monitorship");

(ii)   Representation of Eric D. Green in his capacity as appointed Independent Monitor pursuant to The Settlement Agreement Between Morgan Stanley & Co. and the Attorney General of the State of New York (the "Morgan Stanley Monitorship"); and

(iii)   Representation of Eric D. Green in his capacity as appointed independent Monitor pursuant to the Settlement Agreement between the United States acting through the United States Department of Justice, along with the States of California, Delaware, Illinois,

<table>
<tr><td></td><td>Maryland and New York, and the Commonwealth of Kentucky, acting through their respective Attorney Generals, and Bank of America Corporation, Bank of America, N.A., and Banc of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (the "<u>Bank of America Monitorship</u>"); and

(iv)  Representation of Eric D. Green in his capacity as appointed independent Monitor pursuant to the Settlement Agreement between RBS Financial Products, Inc. f/k/a Greenwich Capital Financial Products, Inc. ("<u>RBS</u>") and the Attorney General of the State of New York (the "<u>RBS Monitorship</u>").

Mr. Patton has also co-authored two law review articles with Professor Green. *See* Eric D. Green, *Future Claimant Trusts and "Channeling Injunctions" to Resolve Mass Tort Environmental Liability in Bankruptcy: The Met-Coil Model*, 22 Emory Bankr. Dev. J. 157 (2005) (with Patton and Harron*); Eric D. Green, *Prepackaged Asbestos Bankruptcies: Down But Not Out*, 63 NYU Annual Surv. of Am. L. 4 (2008) (with Fitzpatrick, Patton, Harron, and Turner).

Mr. Patton and Mr. Green are also social friends.</td></tr>
<tr><td>Young Conaway Stargatt & Taylor</td><td>Young Conaway Stargatt & Taylor ("<u>YCST</u>") is counsel to Mr. Patton in these Chapter 11 Cases. YCST has served as Eric D. Green's legal counsel in the matters listed below. These representations are unrelated to the Debtors.

(i)  The Bondex Asbestos Personal Injury Trust (*see* full case citation above);</td></tr>
</table>

3

| | |
|---|---|
| | (ii)  The Babcock & Wilcox Company Asbestos PI Trust (*see* full case citation above); |
| | (iii)  Federal Mogul U.S. Asbestos Personal Injury Trust (*see* full case citation above); |
| | (iv)  The DII Industries, LLC Asbestos PI Trust (*see* full case citation above); |
| | (v)  The DII Silica Trust (*see* full case citation above); |
| | (vi)  The Met-Coil Systems Corporation TCE PI Trust (*see* full case citation above); |
| | (vii)  The Goldman Sachs Monitorship; |
| | (viii)  The Morgan Stanley Monitorship; |
| | (ix)  The Bank of America Monitorship; and |
| | (x)  The RBS Monitorship. |
| Gilbert LLP | Gilbert LLP serves as special insurance counsel for Mr. Patton in his capacity as Future Claimants' Representative in these Chapter 11 Cases. Gilbert LLP is the insurance counsel for the Takata Airbag Tort Compensation Trust Fund (the "Takata Trust"). *See In re TK Holdings, Inc.,* No. 17-11375 (BLS) (Bankr. D. Del.). Mr. Green is the Trustee of the Takata Trust. <br><br> Mr. Green is a principal of Resolutions, LLC. Carmin C. Reiss, who is also a principal of Resolutions LLC, retained Gilbert LLP as insurance counsel for the Insys Victims Restitution Trust (the "VRT") (established in 2020). *See In re Insys Therapeutics, Inc.,* No. 19-11292 (JTD) (Bankr. D. Del.). Ms. Reiss is the Trustee of the VRT. For the avoidance of doubt, Mr. Green serves no role in the administration of the VRT. |
| Brown Rudnick LLP | Brown Rudnick LLP serves as bankruptcy counsel to the Coalition of Abused Scouts for Justice in these Chapter 11 Cases. Brown |

| | |
|---|---|
| | Rudnick LLP is the legal counsel for the Takata Trust and the OEM Claims Administrator. *See In re TK Holdings, Inc.,* No. 17-11375 (BLS) (Bankr. D. Del.). Mr. Green is the Trustee of the Takata Trust and serves as the OEM Claims Administrator. Brown Rudnick is also legal counsel to the Special Master of the Takata Restitution Funds. *See U.S. v. Takata Corp.*, 16-CR-20810-04 (GCS) (E.D. Mich.). Mr. Green is the Special Master of the Takata Restitution Funds.<br><br>Brown Rudnick LLP represents Mr. Green in his capacity as future claimants' representative in the Fuller-Austin Asbestos Settlement Trust (established in 1998). Brown Rudnick began serving as Mr. Green's counsel in June 2019. |
| White & Case LLP | White & Case LLP ("White & Case") is Debtors' counsel in these Chapter 11 Cases. Certain White & Case attorneys, including Jessica Lauria and Michael Andolina, served as counsel to Honda North America, Inc. and American Honda Motor Co., Inc. (collectively, "Honda") in the Takata chapter 11 bankruptcy cases prior to joining White & Case. *See In re TK Holdings, Inc.,* No. 17-11375 (BLS) (Bankr. D. Del. 2017). A channeling injunction order was entered in the Takata bankruptcy case that caused certain personal injury and wrongful death claims asserted against Honda to be channeled into the Takata Trust. Mr. Green is the Trustee of the Takata Trust. White & Case currently represents Honda in the Takata Trust. |
| Pachulski Stang Ziehl & Jones LLP | Pachulski Stang Ziehl & Jones LLP ("Pachulski") represents the Tort Claimants' Committee in these Chapter 11 Cases. Pachulski also represented the Tort Claimants' Committee in the Takata bankruptcy case. *See In re TK Holdings, Inc.,* No. 17-11375 (BLS) (Bankr. D. Del. 2017). Following confirmation of the Takata chapter 11 plan, Pachulski was retained by the Legacy Trustee of the Reorganized TK Holdings Trust. Mr. Green serves as Trustee of the Takata Trust, a second |

| | and separate trust created under the Takata chapter 11 plan of reorganization. |
|---|---|
| Insurance Carriers | Mr. Green has mediated or arbitrated numerous disputes in which one or more of the parties or counsel, including insurers or their counsel, involved in these Chapter 11 Cases have also participated either directly as a named party in mediation or arbitration or as the insurer or counsel for a named party. Although Resolutions does not maintain a complete detailed list of mediation parties and counsel that have participated in disputes that Mr. Green has mediated, especially insurers who are not named parties in the mediation but which may attend and be very much involved in settling the dispute, a cursory examination of Mr. Green's records reveals that he has mediated approximately 25 cases in which a Chubb entity has been involved as a party or insurer, approximately 25 cases in which an AIG entity has been a party or an insurer, and about a half-dozen cases in which a Hartford entity has been a party or an insurer. In addition, Mr. Green has appeared in a case as an expert witness for AIG. Mr. Green has also given numerous training programs on negotiation, ADR, and mediation to insurance companies or insurance conferences and associations that may have included attendees from the major insurance carriers in these Chapter 11 Cases. |
| Connections with Counsel from Mediation Work | Mr. Green has mediated dozens of disputes where a mediation party was represented by a law firm that also represents a major constituency in these Chapter 11 Cases. These law firms include (but are not limited to): <br> (i)  O'Melveny & Myers <br> (ii)  Wilmer Hale <br> (iii)  Gibson Dunn <br> (iv)  White & Case <br> (v)  Kramer Levin Naftalis & Frankel <br> (vi)  Brown Rudnick |