# EXHIBIT A

```
 1                  UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                     . Chapter 11
                                . Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA AND   .
     DELAWARE BSA, LLC,          . (Jointly Administered)
 5                               .
                                 . Courtroom 2
 6                               . 824 Market Street
              Debtor.           . Wilmington, Delaware 19801
 7                               .
                                 . Tuesday, September 28, 2021
 8   . . . . . . . . . . . . . . 10:11 a.m.

 9                  TRANSCRIPT OF ZOOM HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10             CHIEF UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Derek Abbott, Esquire
                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13                             1201 North Market Street
                               16th Floor
14                             Wilmington, Delaware 19899

15                             - and -

16                             Jessica C. Lauria, Esquire
                               Glenn M. Kurtz, Esquire
17                             WHITE & CASE LLP
                               1221 Avenue of the Americas
18                             New York, New York 10020

19   (APPEARANCES CONTINUED)

20   Electronically
     Recorded By:              Madaline Dungey, ECRO
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone: (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1  <u>APPEARANCES (CONTINUED)</u>:

2  For the Debtors:            Matthew E. Linder, Esquire
                               WHITE & CASE, LLC
3                              111 South Wacker Drive
                               Chicago, Illinois 60606
4
                               -and-
5
                               Adrian C. Azer, Esquire
6                              HAYNES & BOONE, LLP
                               800 17TH Street, NW
7                              Suite 500
                               Washington, DC 20006
8
    For the Tort Claimants'
9   Committee:                 John W. Lucas, Esquire
                               Kenneth H. Brown, Esquire
10                             PACHULSKI STANG ZIEHL & JONES, LLP
                               150 California Street
11                             15th Floor
                               San Francisco, California 94111
12
                               James I. Stang, Esquire
13                             10100 Santa Monica Boulevard
                               11th Floor
14                             Los Angeles, California 90067

15  For AIG Companies:         Michael A. Rosenthal, Esquire
                               GIBSON, DUNN & CRUTCHER, LLP
16                             200 Park Avenue
                               47th Floor
17                             New York, New York 10166

18  For Century Indemnity
    Company:                   Tancred Schiavoni, Esquire
19                             O'MELVENY & MYERS, LLP
                               Times Square Tower
20                             7 Times Square
                               New York, New York 10036
21
    For American Zurich
22  Insurance Company:         Mark D. Plevin, Esquire
                               CROWELL & MORING, LLP
23                             Three Embarcadero Center
                               26th Floor
24                             San Francisco, California 94111

25

1   APPEARANCES (CONTINUED):

2   For Pfau Cochran
    Vertetis Amala and
3   The Zalkin Law Firm:        Thomas E. Patterson, Esquire
                                KTBS LAW, LLP
4                               1801 Century Park East
                                26th Floor
5                               Los Angeles, California 90067

6   For the Future Claimants'
    Representative:             Kami E. Quinn, Esquire
7                               GILBERT, LLP
                                700 Pennsylvania Avenue SE
8                               Suite 400
                                Washington, DC 20003

9
                                -and-
10
                                Edwin J. Harron, Esquire
11                              Robert S. Brady, Esquire
                                YOUNG CONAWAY STARGATT & TAYLOR, LLP
12                              The Brandywine Building
                                1000 West Street
13                              17th Floor
                                Wilmington, Delaware 19899
14
    For the Coalition of
15  Abused Scouts for
    Justice:                    Eric R. Goodman, Esquire
16                              BROWN RUDNICK, LLP
                                601 Thirteenth Street, NW
17                              Suite 600
                                Washington, DC 20005
18

19                              David J. Molton, Esquire
                                Seven Times Square
20                              New York, New York 10036

21                              -and-

22                              Kenneth M. Rothweiler, Esquire
                                EISENBERG, ROTHWEILER, WINKLER,
23                                EISENBERG & JECK, P.C.
                                1634 Spruce Street
24                              Philadelphia, Pennsylvania 19103

25

1    APPEARANCES (CONTINUED):

2    For United Methodist
     Ad Hoc Committee:        Jeremy W. Ryan, Esquire
3                             POTTER, ANDERSON & CORROON, LLP
                              1313 North Market Street
4                             6th Floor
                              Wilmington, Delaware 19801
5
     For the HMM Claimants:   Evan M. Smola, Esquire
6                             HURLEY MCKENNA & MERTZ, P.C.
                              20 South Clark Street
7                             Suite 2250
                              Chicago, Illinois 60603
8
     For Claimant Sexual
9    Abuse Victims:           Paul Mones, Esquire
                              PAUL MONES, PC
10                            13101 Washington Boulevard
                              Suite 103
11                            Los Angeles, California 90066

12   For The Church of Jesus
     Christ of Latter-day
13   Saints:                  Jeffrey E. Bjork, Esquire
                              LATHAM & WATKINS, LLP
14                            335 South Grand Avenue
                              Suite 100
15                            Los Angeles, California 90071

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2    MOTIONS:                                          PAGE

3    Agenda
     Item 1:   Debtors' Motion for Entry of an Order (I)
4              Approving the Disclosure Statement and the
               Form and Manner of Notice, (II) Approving Plan
5              Solicitation and Voting Procedures, (III)
               Approving Forms of Ballots, (IV) Approving
6              Form, Manner, and Scope of Confirmation Notices,
               (V) Establishing Certain Deadlines in Connection
7              with Approval of the Disclosure Statement and
               Confirmation of the Plan, and (VI) Granting
8              Related Relief
               (D.I. 2295, filed 3/2/21).
9
               Court's Ruling:
10
     Agenda
11   Item 2:   Debtors' Motion For Entry of Order (I)
               Scheduling Certain Dates and Deadlines in
12             Connection with Confirmation of the Debtors Plan
               of Reorganization, (II) Establishing Certain
13             Protocols, and (III) Granting Related Relief
               (D.I. 2618, filed 4/15/21).
14
               Court's Ruling:
15
     Agenda
16   Item 3:   Motion for Leave to Exceed Page Limit
               Requirement for Objection of the Tort Claimants'
17             Committee to Debtors' Motion for Entry of an
               Order (I) Approving the Disclosure Statement
18             and the Form and Manner of Notice, (II)
               Approving Plan Solicitation and Voting
19             Procedures, (III) Approving Forms of Ballots,
               (IV) Approving Form, Manner and Scope of
20             Confirmation Notices, (V) Establishing Certain
               Deadlines in Connection With Approval of the
21             Disclosure Statement and Confirmation of the
               Plan, and (VI) Granting Related Relief
22             (D.I. 3529, filed 5/10/21).

23             Court's Ruling:

24

25

1                                 INDEX

2    MOTIONS:                                                      PAGE

3    Agenda
     Item 4:     Motion for Leave to Exceed Page Limit
4                Requirement for (i) Objection of Century
                 Indemnity Company to Debtors' Motion for Entry
5                of an Order (I) Approving the Disclosure
                 Statement and the Form and Manner of Notice,
6                (II) Approving Plan Solicitation and Voting
                 Procedures, (III) Approving Forms of Ballots,
7                (IV) Approving Form, Manner and Scope of
                 Confirmation Notices, (V) Establishing Certain
8                Deadlines in Connection with Approval of the
                 Disclosure Statement and Confirmation of the
9                Plan, and (VI) Granting Related Relief and (ii)
                 Century Indemnity Company's Objections to the
10               Debtors' Solicitation Procedures and Form of
                 Ballots (D.I. 3858, filed 5/12/21).
11
                 Court's Ruling:
12
     Agenda
13   Item 5:     Motion for Leave to Exceed Page Limitations
                 Regarding Debtors' Reply in Further Support of
14               Debtors' Third Motion for Entry of an Order
                 Extending the Debtors' Exclusive Periods to File
15               a Chapter 11 Plan and Solicit Acceptances Thereof
                 (D.I. 4102, filed 5/16/21).
16
                 Court's Ruling:
17
     Agenda
18   Item 6:     Motion for Leave to Exceed Page Limitations
                 Regarding Debtors' Omnibus Reply in Support of
19               Debtors' Motion for Entry of an Order (I)
                 Approving the Disclosure Statement and the Form
20               and Manner of Notice, (II) Approving Plan
                 Solicitation and Voting Procedures, (III)
21               Approving Forms of Ballots, (IV) Approving the
                 Form, Manner, and Scope of Confirmation Notices,
22               (V) Establishing Certain Deadlines in Connection
                 with Approval of the Disclosure Statement and
23               Confirmation of the Plan, and (VI) Granting
                 Related Relief (D.I. 4111, filed 5/16/21).
24
                 Court's Ruling:
25

1                              INDEX

2  MOTIONS:                                              PAGE

3  Agenda
   Item 7:   Motion to Exceed Page Limitations with Respect
4            to Certain Insurers' Supplemental Objection to
             Motion for Approval of Debtors' Disclosure
5            Statement (D.I. 6054, filed 8/17/21).

6            Court's Ruling:

7  Agenda
   Item 8:   Motion for Leave to Exceed the Page Limits
8            Regarding Debtors' Amended Omnibus Reply in
             Support of Debtors' Motion for Entry of an
9            Order (I) Approving the Disclosure Statement
             and the Form and Manner of Notice, (II)
10           Approving Plan Solicitation and Voting
             Procedures, (III) Approving Forms of Ballots,
11           (IV) Approving the Form, Manner, and Scope of
             Confirmation Notices, (V) Establishing Certain
12           Deadlines in Connection with Approval of the
             Disclosure Statement and Confirmation of the
13           Plan, and (VI) Granting Related Relief
             (D.I. 6250, filed 5/16/21).

14           Court's Ruling:

15
   Transcriptionist's Certificate                        275
16

17

18

19

20

21

22

23

24

25

1        (Proceedings commence at 10:11 a.m.)

2            THE COURT:  Good morning.  This is Judge

3    Silverstein.  We're here on the continued disclosure

4    statement hearing in Boy Scouts of America; Case 20-10343.

5            I would remind everyone who is not speaking to

6    please make sure your audio is muted.  And I will turn it

7    over to debtor's counsel.

8            MR. ABBOTT:  Thank you, Your Honor.  Derek Abbot

9    of Morris Nichols Arsht & Tunnell for the debtors.

10           Your Honor, we appreciate the break we had gotten

11   in the hearing.  I think the parties had been hard at work.

12   I'm going to turn it over to Ms. Lauria to detail that for

13   you and get the hearing started if I may.

14           THE COURT:  Thank you.

15           Ms. Lauria?

16           MS. LAURIA:  Thank you, Your Honor.  Jessica

17   Lauria, White & Case, on behalf of the debtors.

18           Your Honor, we just wanted to provide you with a

19   brief update of what the parties have been up to since we

20   last saw you on Thursday of last week.  In particular, as we

21   indicated at that hearing, on Friday afternoon we circulated

22   to the objecting party's revisions to the disclosure

23   statement as well as disclosure statement exhibits that were

24   intended to address the court's statements on the record last

25   week as well as various concessions and agreements that were

1 made during the course of last week's hearing.  That was

2 Friday.

3          On Saturday we circulated to the parties the plan

4 English chartered organization summary that had been

5 discussed at length last week.  Then on Sunday we distributed

6 to the parties revisions to the solicitation procedures.

7          We received comments from parties on Friday,

8 throughout the weekend.  We were on the phone with the TCC

9 until very late last night in an effort to try to continue to

10 narrow the issues that would show-up back before the court.

11 We did, in fact, as you probably saw, filed a number of

12 documents in the early morning hours this morning.  Again, we

13 had wanted to file those earlier, but also wanted to give

14 folks the opportunity to comment on them and try to reflect

15 those comments as much as we possibly could.

16          Walking through, sort of the, what I will call,

17 baskets of documents that are left with respect to the

18 disclosure statement we believe we have substantially

19 resolved the objections to the disclosure statement.  I

20 believe we saw an email from the TCC early this morning or

21 maybe it was late last night indicating that we still have

22 four or five issues outstanding with them.  There may be some

23 cats and dogs with other objectors.  Your Honor, it's our

24 intention to work during the breaks today and, frankly,

25 throughout the course of today to try to narrow those even

1  further so that we can minimize or eliminate what comes back

2  in front of the court.

3          On the chartered organization plain English

4  document I know Mr. Ryan is still reviewing that document.

5  We also received a number of comments from insurer parties.

6  I don't believe that all of those have been incorporated as

7  of yet.  So we will continue to work today on addressing

8  those comments and making sure that we communicate with Mr.

9  Ryan during breaks to get all of his feedback.

10          Finally, Your Honor, on the solicitation

11  procedures you may have seen the TCC filed an emergency

12  motion with respect to one change the debtors are proposing

13  there.  So we do have one significant issue outstanding that

14  will likely need to come back in front of you at an

15  appropriate time today or tomorrow and that's pertaining to

16  the $3,500 expedited distribution.

17          I think after listening to argument last week and

18  having a greater understanding of the complications that

19  would present to particularly individuals that represent

20  hundreds if not thousands of claimants in terms of advising

21  those claimants whether to accept a settlement in the context

22  of a ballot.  We thought it made sense to remove it, but you

23  will be hearing argument, I'm sure, on that point either,

24  again, later today or tomorrow whenever the court would like

25  to hear that argument.

1            Other than that the TCC did file their own

2   alternative version of the solicitation documents. I hope I

3   am not going out on a limb by saying I don't think that so

4   much reflective of the distance between the parties other

5   than the point I just noted versus the fact that there was a

6   lot of material being passed back and forth yesterday and we

7   just didn't have the opportunity to drill down on all of the

8   issues on solicitation procedures.

9            So I think we're also hopeful that we can narrow

10  the issues on the solicitation procedures.  So what comes

11  before the court ultimately is something much less then may

12  have been reflected in the filings.  So that is where we're

13  at on the documents.

14           As far as today goes, I mean, we heard the court

15  last week I think we have, sort of, three big things coming

16  up.

17           One is to the extent the court would like to hear

18  a preview of some of the confirmation objections I think we

19  heard you last week, Your Honor, to suggest that certainly

20  with respect to insurance issues you would like to hear some

21  argument around that because of the impact that may have on

22  the confirmation schedule.  We think that many, if not all,

23  of the other confirmation objections were teased out during

24  the course of our three days together last week.  So it's

25  really the insurance ones that the court will need to hear,

1   but, obviously, defer to Your Honor on what would be useful

2   for you to hear today.

3           We also have scheduling.  We would propose to go

4   to that after the confirmation objections, again, simply

5   because we're still working through some of the document

6   issues and would like to close out some of that before we

7   come back to the court.

8           Finally, whatever remaining document issues and

9   certainly the expedited distributions placement on the ballot

10  or not and the classification issues will need to be

11  addressed at some point.

12          So that is where I think we see ourselves this

13  Tuesday morning.

14          THE COURT:  Okay.  Well, I appreciate the work

15  that has, obviously, been done over the course of the last

16  few days.  I have not had an opportunity to review everything

17  that was filed last night.  I have quickly run through the

18  redline of the plan and disclosure statement, but that is

19  about it.

20          So I think we should start with the confirmation

21  objections, in particular the insurance issues.  I don't know

22  if the insurers have coordinated.  I would say that in

23  looking at some of that over the weekend it seemed to me that

24  the insurers were not necessarily aligned on all issues.  I

25  could be wrong, but I think there were a few cross issues.

1  So I think I will hear from insurers, hopefully have

2  coordinated some.

3          Mr. Lucas, I see your hand.

4          MR. LUCAS:  Thank you, Your Honor.  I just wanted

5  to confirm one thing that Ms. Lauria said that the TCC did

6  file its alternative version of the solicitation procedures,

7  but after reviewing the debtor's markup that was set late

8  last night I just wanted to let the court know that the

9  issues have been narrowed substantially and that if there is

10 a break today hopefully we could resolve the rest of them.

11         As Ms. Lauria said, there is the 3013 issue which

12 does go to the procedures to some extent and that is still

13 outstanding.  But a lot of the issues have been narrowed and

14 I haven't been able to confirm that with White & Case yet

15 today, and wanted to, at least, convey to the court and to

16 White & Case that there has been progress.

17         THE COURT:  Fabulous.  Thank you.

18         Mr. Rosenthal?

19         MR. ROSENTHAL:  Good morning, Your Honor.  Michael

20 Rosenthal of Gibson Dunn for the AIG Companies.

21         Your Honor, in response to your question the

22 insurers have coordinated to a great extent.  I think that

23 what you are going to hear is a presentation from me followed

24 by one from Mr. Schiavoni, and then Mr. Plevin; however,

25 there may be others that want to lend their voice.  We

1    have -- hopefully we won't be duplicating for Your Honor.

2              THE COURT:  Okay, thank you.

3              Let's go ahead then and get started.

4              Mr. Rosenthal?

5              MR. ROSENTHAL:  Thank you, Your Honor.  First, let

6    me say we appreciate all -- can you hear me?

7              THE COURT:  Excuse me, yes.

8         (Off record discussion)

9              THE COURT:  Mr. Rosenthal?

10             MR. ROSENTHAL:  Thank you.  Your Honor, we

11   appreciate all the time Your Honor has devoted to this case,

12   not just last week but since the inception of it.  I have to

13   say I agree with Your Honor, the statement you made last week

14   that at least from my perspective and over 40 years of

15   bankruptcy practice I haven't seen a case as complicated and

16   also as gut wrenching as this case.

17             We are truly witness to an American tragedy.  The

18   abuse of children by trust Boy Scout leaders across the

19   country.  We agree with statements that Your Honor has made

20   that scouting is a mission that should be preserved, but that

21   doesn't mean, Your Honor, that the debtor gets a free pass to

22   ignore the requirements of the bankruptcy code or applicable

23   law.  I know it's tempting to approve the disclosure

24   statement and move this case along, but there are some

25   factors I hope that you would consider before you do that.

1          First, Your Honor, as a prudential matter, we

2    don't believe it's wise for the debtors to send out a vote on

3    a plan that does not represent anything close to a global

4    consensus.  This plan is opposed by the insurers, most of the

5    insurers, the TCC, many of the chartered organizations, and a

6    significant number of claimants.

7          There is just too much uncertainty including about

8    the vote at this point.  This may result in the debtors have

9    well less than the requisite support they need to obtain

10   acceptance of the plan and the entry of the channeling

11   injunction. If that is the case the debtors would have wasted

12   tens of millions of dollars in administrative fees and months

13   on an overall confirmation process.

14         The ultimate resolution may be a new plan, but it

15   also may be a liquidation of the debtors; therefore, it's a

16   scheduling matter.  We believe that it might make sense for

17   the court to delay approval of the disclosure statement for

18   two to three weeks to allow further mediation to occur.  That

19   mediation might result in additional settlements perhaps,

20   Your Honor, in light of guidance you may be willing to

21   provide today or tomorrow or in a more comprehensive deal

22   with chartered organizations.

23         Importantly, though, those deals may require

24   amendments to the plan and additional disclosures.  And if

25   solicitation has already begun re-solicitation may be

1  required which will delay the process further.  And, Your

2  Honor, we do not believe that a short delay on entry of the

3  disclosure statement order will actually delay the case.

4           Even if you took the disclosure statement order

5  under advisement for a couple of weeks we could begin

6  discovery now so it wouldn't delay the overall confirmation

7  hearing.  And even under a January or February confirmation

8  hearing scheduled, and you will hear more about the schedule

9  later, there still would be ample time for a 60 day voting

10 window that Your Honor indicated was appropriate.

11          Second overview point, Your Honor, is I know you

12 don't believe that you are ruling on the terms of the plan at

13 this time, and I heard your statement that you don't intend

14 to decide coverage issues even at confirmation, but the

15 proposed plan findings you are being asked to make by the

16 debtors and the supporters of the plan tell a different

17 story.

18          These findings, coupled with the criteria for

19 allowance of claims by the trust, are an attempt to alter the

20 insurance contracts and obtain awards through this bankruptcy

21 far in excess of what could be expected in the tort system.

22 We will talk more about that later.

23          I fully realize, Your Honor, that this is your

24 courtroom and you can allow the disclosure statement to go

25 forward without telling us whether you will make the required

1  plan findings, but in doing so you should understand that,

2  among other things, its sending a clear message to the

3  claimant professionals that you might enter these findings

4  and that will embolden them to take even more unreasonable

5  stances in this case including in mediation.

6          One of the principal reasons for that, Your Honor,

7  is that the plaintiffs' representatives see in this case the

8  opportunity to use Your Honor to overturn decades of

9  insurance neutrality precedent which they can then trump not

10  just in this case, but in every subsequent mass tort case.

11  That strategy, Your Honor, makes it extremely difficult to

12  reach a global settlement because many insurers like AIG are

13  only willing to do a deal that is both economically sensible

14  and insurance neutral.  It doesn't create a precedent that

15  could be used against them in other cases.

16          In order to  put these Chapter 11 cases back on

17  track toward a global resolution, Your Honor, we believe the

18  claimants representatives need to hear a clear no from  Your

19  Honor on your willingness to enter the findings.  We will

20  talk about the findings more.

21          Third, Your Honor, allowing the debtors to move

22  forward with a plan that contains the disputed findings will

23  alter the confirmation timeline.  Mr. Plevin will talk about

24  how that will extend the timeline.  Basically, Your Honor,

25  the debtors and the other supporters of the plan have chosen

1   to put this before you and that has consequences.  One of the

2   consequences is that additional discovery will be necessary.

3           Finally, Your Honor, I can get to the crux of

4   what, you know, I told you I wanted to talk to you about.  I

5   had hoped to be able to persuade you that approval of the

6   disclosure statement is sending us all down a futile and

7   expensive path which is exactly what the Third Circuit's

8   decision in American Capital Equipment sought to prevent.

9           I recognize this is likely to be an unpersuasive

10  argument today, but alternatively what I'd like to do, Your

11  Honor, is provide you a roadmap for what to look for when

12  reviewing the plan.  And when considering this roadmap ask

13  you to keep an open mind about what you can tell the parties

14  today about what you are willing or unwilling to do at

15  confirmation.

16          So let's talk about the principal confirmation

17  defects of the plan.  They fit into three buckets.

18          The first is the coalition fees.  The plan

19  contemplates, as we discussed last week, without requiring

20  any showing of substantial contribution, the payment of the

21  coalition's fees. Your Honor said that this was inappropriate

22  when you denied the RSA, the RSA provisions that dealt with

23  it.  The plan proponents have chosen to ignore your ruling

24  and a question that I would ask Your Honor is how does one

25  evaluate duplication of effort and substantial contribution

1  where the coalition and the TCC both have incurred fees on

2  behalf of the same constituents, but in furtherance of

3  countervailing interests.

4        Second principal defect, Your Honor, relates to

5  third-party releases.  There are a number of issues

6  concerning the discharge of non-debtors such as the propriety

7  of the channeling injunction and third-party releases under

8  Section 105 in the Third Circuit's Continental Airlines

9  decision which will require close scrutiny of the non-debtors

10  contributions to the trust.

11        Among other things, in this plan there are not

12  only the usual issues with third-party releases, but also the

13  unusual issue that the abuse here occurred not at the hands

14  of the debtors, but by perpetrators who were directly

15  overseen by the non-debtor local councils and chartered

16  organizations.  So really the debtor's abuse liabilities are

17  derivative of these non-debtor entities as opposed to the

18  other way around which is the usual way this arises in mass

19  tort cases.

20        Third, and getting to the heart of the insurers'

21  objection, the plan impermissibly alters the contractual

22  rights of the insurers and requires you to decide coverage

23  issues at the confirmation hearing as it attempts to bind the

24  insurers to liability for abuse claims now despite Your

25  Honor's repeated statements that you would not be deciding

1  coverage issues, despite the fact that this court has no

2  jurisdiction to determine personal injury claims, and despite

3  the fact that the actual determination of the claim values is

4  going to be made way down the road by the settlement trustee

5  applying in his sole discretion and within wide ranges the

6  criteria and values that you are being asked to approve.

7        The attempt to alter insurance contracts and

8  binding insurers is accomplished in three ways; by assigning

9  non-debtor insurance interest, by inflating the debtor's

10  abuse liability, and through the insurance prejudicial

11  findings.

12        Turning to that first aspect the plan requires the

13  assignment of non-debtor rights under insurance policies in

14  violation of any assignment clauses in those policies.  We

15  are not aware of any case law or rule that permits this

16  assignment absent consent.  The debtors haven't sited any.

17        In Combustion Engineering the Third Circuit

18  plainly held that the assignment of such non-debtor

19  contractual rights is not permitted under Section 1123(a)(5)

20  or any other code section over any assignment clause.  The

21  debtors have cited Federal-Mogul, but in Federal-Mogul the

22  Third Circuit expressly distinguished Combustion Engineering

23  because unlike in Combustion Engineering, Federal-Mogul dealt

24  with debtor insurance rights only.

25        The debtors claim that they have fixed this with a

1  savings clause that allows the non-debtor insureds to retain

2  their insurance and pursue their rights on behalf of

3  claimants and then turn over the proceeds to the trust.  But

4  to the extent that these work at all, and it's unclear they

5  do, this is merely a de facto assignment of insurance rights

6  and an impermissible work around that contravenes the

7  applicable Third Circuit law.

8          THE COURT:  Why is that?  Why would that be an

9  impermissible workaround?

10          MR. ROSENTHAL:  Because we think it accomplishes

11 the same thing, Your Honor.  It's the same -- its effectively

12 assigning the rights to the insurance to the trust.  It's

13 just a different way to do it.

14          THE COURT:  Well sometimes there are different

15 ways to do things that make them permissible.  And if we're

16 talking about a technical assignment versus a workaround

17 assignment if a party decides that they are going to go and

18 pursue the insurance and then provide the proceeds to the

19 trust what is wrong with that workaround?

20          MR. ROSENTHAL:  Your Honor, I think it gets us to

21 the same goal, but I hear Your Honor's statement and it may

22 be that the way it ends up being structured may actually be

23 an acceptable workaround.

24          The final issue, Your Honor -- the second point I

25 want to raise, Your Honor, in addition to non-assignment of

1  the -- the assignability of the non-debtor rights relates to

2  the inflation of abuse liability.

3       The TDP's are expressly designed to inflate the

4  debtor and local councils abuse claim liability and then pass

5  those inflated claims onto the insurers for payment.  This

6  strategy was rejected by the Third Circuit in Global Industry

7  Technologies which expressly found that by inflating claims

8  well above historical norms the debtors were, effectively,

9  modifying their prepetition insurance policies by altering

10 the debtor's risk profile.

11      The insurers aren't attempting to limit their

12 liability, Your Honor.  Rather, their argument is entirely

13 different.  Their argument, consistent with GIT is that

14 bankruptcy doesn't expand their liability and that a plan

15 that does so is unconfirmable.  I want to give you some

16 examples of how the TDP's inflate the liability.

17      Let's start with the expedited distribution.  The

18 expedited distribution has now been increased from $1,500 to

19 $3,500 and it's available simply by signing a proof of claim

20 without any additional showing of proof and most importantly

21 without any of the ability of the settlement trustee to go

22 behind and investigate the proof of claim.  That is a process

23 accepting a claim at face value with absolutely no party

24 having the right to contest it, that's wholly inconsistent

25 with Section 502.  Even the trustee, even the settlement

1  trustee, Your Honor, doesn't have the right to object to

2  these claims.

3  THE COURT:  So let me ask you, Mr. Rosenthal, is

4  your objection there, and I realize you may have some points

5  on that, that the $3,500 is being offered or that the $3,500

6  would be binding on the insurance company in some future

7  coverage action?

8  MR. ROSENTHAL:  It's that it would be binding on

9  the insurance companies in a future coverage action.  So what

10  we're basically saying, Your Honor, is that these claims are

11  subject -- should be subject to objections.  Some of these

12  claims may be fraudulent claims.  They shouldn't be paid the

13  $3,500.

14  What is happening here is that the trust may be

15  paying tens of thousands of claims that would not be

16  compensable in a tort system at all and that this court would

17  disallow if there was no -- you know, if an objection was

18  filed and the court found that there is no basis for the

19  claim.

20  THE COURT:  But from a practical perspective

21  perhaps paying $3,500 for a claim, a no look claim, might be

22  less expensive then evaluating that claim for the trustee to

23  evaluate that claim, and make a determination, and then pay

24  the valid claims, and then not pay the not valid claims.  So

25  this is, I view it, through convenience class kind of issue.

1    MR. ROSENTHAL:  Perhaps, Your Honor, but giving

2  the trustee even a right to object to the claim, even a right

3  to object to the claim would have some -- would have value in

4  terms of causing people to be, I think, more honest about the

5  claims that they assert.

6       You know, one of the things that we talked about

7  before were the fraud prevention measures in Maremont.  So

8  those measures aren't applied to every single claim.  The --

9  you have to prove some things, you have to provide some

10  information when you file your claim, but the value of the

11  measures is that there are audit rights.

12       So to somebody who gives you information and if

13  you randomly check it and you find out that it's not

14  appropriate you can actually -- you have remedies -- you have

15  an audit right and you have remedies.  Here, the failure to

16  allow the objection means that all those claims just get

17  paid.

18       THE COURT:  I think it's a fair comment.  What I

19  am trying to tease out from it is, I guess, two things.  One,

20  I hear the antifraud concerns.  That is something I am

21  concerned about.  So I hear that.  Second, what I think I'm

22  also hearing is the insurers don't want to be stuck with

23  $3,500 times 10,000 claims for which the settlement trustee

24  is going to seek coverage and argue that you are bound by the

25  $3,500 -- your client is bound by the $3,500 figure.

1          MR. ROSENTHAL:  That's correct, Your Honor.  And

2   it gets even worse with the next example I am going to give

3   you.

4          THE COURT:  This example, though, I think is a

5   fair comment to say, I think it would be hard-pressed to, for

6   me to say that $3500 is recoverable absolutely under an

7   insurance policy on -- it might be a fair settlement.  I

8   don't know.

9          In that sense, I suspect I would be approving this

10  because of the convenience class factor, and whether a

11  convenience class factor could bind an insurance company, you

12  know, you may get a fair and reasonable finding, but I don't

13  see how that binds an insurance company down the line, given

14  the basis on which I think I would approve that.  So, I think

15  there are two issues there that the insurance companies are

16  fairly raising.

17         MR. ROSENTHAL:  We'll talk about some of that with

18  the findings.

19         THE COURT:  Uh-huh.

20         MR. ROSENTHAL:  Let me go to the second example of

21  how the TDPs lead to inflated claim amounts.  And it relates

22  to what must be shown to have an allowed claim, and we're

23  talking not about the $3500.

24         So, in the tort system, BSA sex abuse claims would

25  require a showing of negligence on the part of the debtors or

1  another protected party.  That would mean that if this Court

2  were reviewing the claim under Section 502, you could not

3  allow it without a showing of negligence.  This follows from

4  the uncontroversial bankruptcy principle that, by and large,

5  bankruptcy relies on underlying state law to determine

6  whether a claim should be allowed or disallowed.

7           Not so under the TDPs.  Under the TDPs, a showing

8  of negligence is not required to obtain a base recovery.

9  And, remember, base recoveries can be significant.  So, the

10  base recovery for a penetration claim, for example, is

11  $600,000.

12          Instead, under the TDPs, a claimant receives an

13  enhanced recovery from the base if it's capable of showing

14  negligence.  When combined with the requested finding that

15  the TDPs are fair and reasonable, based on the evidence

16  presented, how can this not be an attempt to alter the

17  insurance contracts?

18          Effectively, this makes the TDPs a strict-

19  liability TDP when the underlying tort is not a strict-

20  liability tort; it requires negligence.

21          Before the debtors entered into the agreement with

22  the coalition and the FCR, the debtors -- the TDPs actually

23  required the settlement trustee to disallow a claim if he

24  found that the evidence submitted does not support a viable

25  claim against a protected party in the tort system.  The

1  coalition and the FCR completely re-drafted the TDPs so that

2  now a showing that a claim would be compensable in the tort

3  system is no longer a threshold requirement.

4         Instead, the trustee must now pay claimants, even

5  if they can't demonstrate negligence.  And what had been a

6  requirement for a claim is now an aggravating scaling factor,

7  which would increase recoveries.

8         The next area in which -- and if you have

9  questions, Your Honor, let me know.

10        THE COURT:  Well, somewhere over the weekend, I

11  had written down a note to myself that said, well, what do

12  the insurance companies want that will get them to not object

13  to this plan?

14        Is this the list that I'm getting or is this just

15  the objections that I'm going to hear, but even if you get

16  all this, you're still going to object, your clients are

17  still going to object to the plan?

18        MR. ROSENTHAL:  Your Honor, I can't --

19        THE COURT:  Maybe not a fair question to ask --

20        MR. ROSENTHAL:  I can't commit --

21        THE COURT:  -- but this is the sort of a lens for

22  which I'm hearing objections.

23        MR. ROSENTHAL:  I hear that and I can't commit to

24  that now; obviously, that's a client decision.

25        THE COURT:  Sure.

1          MR. ROSENTHAL:  But also obviously, what you're

2    hearing from me are the principal concerns of my, you know,

3    of my client and of other insurers.

4          THE COURT:  Fair enough.

5          MR. ROSENTHAL:  And to the extent that those

6    concerns are addressed, I think, you know, the client will

7    have to evaluate what their position is.

8          THE COURT:  Fair enough answer.

9          MR. ROSENTHAL:  So, the third area, Your Honor,

10   deals with the treatment of claims that are barred by the

11   statute of limitations.  Under the TDPs, the trustee is not

12   permitted to zero out time-barred claims.  This is despite

13   the fact that the debtors' claims expert, Bates White,

14   believes that approximately 59,000 claims are presumptively

15   barred by the statute of limitations and not entitled to a

16   recovery.

17          Again, Your Honor, I want to draw the difference

18   between the TDPs and Section 502 and how would you apply it.

19   You, Your Honor, I think, would be duty-bound not to allow a

20   claim that was barred by the statute of limitations.  Here,

21   those claims are allowed.

22          Federal District Court Judge Watson of the

23   Southern District of Ohio just ruled last Wednesday in a case

24   involving abuse at Ohio State University that although there

25   was no question that unspeakable abuse had been inflicted on

1  over 300 victims, the cases could not move forward because

2  the statute of limitations had expired.

3         So, the allowance of claims that are otherwise

4  time-barred, effectively, allows claims that would not be

5  compensable in the tort system and that would not be

6  allowable by Your Honor if you were reviewing these claims.

7         THE COURT:  Did Judge Watson do that on an

8  aggregate basis or did he do that on a claim-by-claim basis?

9         MR. ROSENTHAL:  I think he did it -- I don't know,

10 Your Honor.  I don't know.  But I know it was 300 claims that

11 were the subject of that.

12        Finally, Your Honor, separate and apart from the,

13 you know, allowance of claims that would not be allowed in

14 the tort system, the insurers have an issue with the broad

15 discretion granted to the trustee to increase claim values

16 based on aggravating factors.  Now, he can also decrease

17 factors, based on mitigating factors, but there's a nuance,

18 but important difference in the trustee's discretion in this

19 regard that, effectively, will result in increasing the

20 claims, more than in decreasing them.

21        In the case of aggravating factors, the trustee is

22 almost directed to increase this claim value somewhere

23 between an established range.  So, you have to increase it by

24 somewhere between X and Y.

25        With respect to decreases, however, the trustee

1  has almost unlimited discretion to decide not to decrease the

2  claim value at all from the base matrix value.  There's no

3  recommended -- you know, there's no range that he has to

4  decrease a certain amount if this mitigating factor comes

5  into play.

6          The only instance where there is a range relates

7  to statute of limitations.  So, there is a recommended range

8  for a decrease with statute of limitations, but in some

9  states, the reduction based on a "statute of limitations" bar

10 is as low as 30 percent.  So, while there's a reduction, he's

11 still allowing the claim at a considerable amount.

12         In one of the --

13         THE COURT:  Do you think there can be no scaling

14 factors for the statute of limitations at all for states

15 which currently do not have an open window?

16         MR. ROSENTHAL:  I think that there, I think that

17 the proper way to handle those claims is to defer them, the

18 way this plan does, to see if the window opens.  If the state

19 passes survivor legislation.

20         If, however, it does not, I think the proper way

21 to handle it is either to disallow them entirely or to allow

22 them with a significant reduction, a very significant

23 reduction, over 90-percent reduction.  And I think a

24 claimant --

25         THE COURT:  And I haven't, and I'm not sure it's

1   in the disclosure statement, to know the basis upon which

2   each state was placed in a category, but -- and that's, I

3   assume, information that I would get at confirmation, but I

4   hear you on the "statute of limitations" issue, which is why

5   I asked if it's a binary yes-or-no or if there could be some

6   kind of scaling factors, but I hear you on that.

7           MR. ROSENTHAL:  One of the mitigating, scaling

8   factors the trustee can consider is allocating responsibility

9   between protected parties and other responsible, non-

10  protected parties.  This is really sort of an apportionment

11  issue.  You know, these -- it's sad to say, but some of these

12  claimants have suffered abuse unrelated to Boy Scouts and

13  applicable law would apportion liability so that claimants

14  are not paid more than once for the same claim.

15          Here, the trustee has discretion to apportion, but

16  no requirement to do so.  And at least so far, there is no

17  provision that actually requires a claimant to certify what

18  other defendants the claimant might have recovered from or

19  have a claim against, so that the trustee can even attempt to

20  determine BSA's allocable share.

21          And this is, Your Honor, one of the crux issues in

22  the asbestos context, where claimants file claims against a

23  debtor and they have also filed claims against other non-

24  bankrupt defendants and against other trusts created by

25  debtors who previously went into bankruptcy, and it's the

1  failure to disclose those which makes it difficult to

2  appropriately value the share of the debtor.

3          So, all these factors, Your Honor, we believe will

4  expand the quantum of abuse liability well beyond the actual

5  abuse liability and any of the projections produced by Bates

6  White.  So, they value abuse liability between 2.4 billion

7  and 7.1 billion, based on their opinion that only roughly 20

8  percent of the claims filed to date are entitled to a

9  recovery at all, much less than the 100 percent that are

10 entitled to recovery under the TDPs.

11         And under GIT, this inflation of plans alters the

12 debtors' risk profile and is clearly a modification of

13 insurance contracts, which this Court does not have the power

14 to approve.

15         THE COURT:  So, I thought I had the Global

16 Industrial case out here with me -- I don't -- but my

17 recollection of Global Industrial is that at the circuit

18 level, the Court was looking at appellate standing.  No, I'm

19 sorry, the Court wasn't looking at appellate standing; the

20 Court was looking at Bankruptcy Court standing and the

21 Bankruptcy Court had determined that the insurers did not

22 have standing to raise certain confirmation objections.

23         And the Third Circuit, looking at bankruptcy

24 standing, said a couple things, but the quantum of liability

25 raised by the silica-based claims, which had increased from a

1  couple hundred to 6,000 or something like that, meant that

2  the bankruptcy judge should have permitted the insurance

3  companies to participate in confirmation and raised issues

4  regarding whatever they wanted to raise issues on, but, in

5  particular, I think there were fraud issues, and remanded for

6  that purpose, notwithstanding that the bankruptcy judge

7  apparently had made extensive findings, based on other

8  parties' objections, very similar objections.

9          I don't think the Third Circuit said that the

10  potential for an increase in liabilities means a plan is not

11  confirmable or that, or necessarily that -- well, I don't

12  think they said it was not confirmable.  I think they said

13  the insurance company had to be able to participate and raise

14  the issues and then Global Industrial doesn't end up in front

15  of the Third Circuit again, so I think the insurance

16  companies end up settling, as I recall.  We did take a look

17  at what the subsequent history was to see what happened,

18  because it would have been interesting.

19          So, I think the insurance companies are using

20  Global Industrial a little bit differently than I read it.  I

21  read it to give the insurance companies bankruptcy standing

22  to raise the issues they were not permitted to raise below in

23  Global Industrial, but it doesn't mean that there's no

24  confirmable plan out there simply because there may be some

25  increase in quantum.

1           But I view that differently as I think what you're

2    going to argue to me on findings, so where am I wrong on

3    that, Mr. Rosenthal?

4           MR. ROSENTHAL:  Well, I think on the point that

5    you were just raising, one of the statements you made the

6    other day was you think insurance neutrality is a misused

7    term or maybe a misunderstood term.

8           You know, I conflate two concepts.  I conflate

9    standing, and I think I've said this to you before, I

10   conflate standing with the principle that you are altering

11   the insurers' rights, and that if you -- and that what was

12   really happening in GIT was that the Court said you're

13   increasing the quantum of liability.  In that case it was

14   silica.

15          In this case, the increase is from 1700 claims to

16   82,000 claims, something like that.

17          But it's not that increase that we're complaining

18   about.  It's actually not that increase.  Those are claims

19   filed (indiscernible) bankruptcy, right.

20          It's more the alteration of the contracts, the

21   standards by which claims are evaluated.  And so, it goes to

22   the specific points we were talking about when we were going

23   through the specific items of allowing items that are time-

24   barred, of allowing claims that don't prove the essential

25   elements of a cause of action:  negligence.

1          THE COURT:  Okay.

2          MR. ROSENTHAL:  Okay.  Now, let's talk about

3    insurance findings.  Your Honor, however the Court defines

4    "insurance neutrality," we think the plan turns it on its

5    head and requires the Court to make confirmation findings

6    that, (A), are unnecessary to confirmation, and, (B), strip

7    away key, contractual rights and coverage defenses of the

8    insurance.

9          Quite simply, Your Honor, the findings seek this

10   Court's blessing today for inflated claim determinations that

11   Mr. Green or some other settlement trustee will make down the

12   road with respect to each abuse claim.  These findings will

13   be used to support the inevitable argument by the settlement

14   trustee to the coverage court that this Court effectively

15   entered a judgment about the validity and amount of each

16   claim, a judgment that, as you know, you are not making --

17   you told us that -- and that you're jurisdictionally

18   incapable of making about a personal injury claim.

19         You know, so I would (indiscernible) the finding

20   issue or the CliffsNotes version of that is that none of the

21   findings are required and all alter the insurers' rights,

22   which this Court has no authority to do.

23         So, let me go over the three insurance findings

24   that are problematic.

25         THE COURT:  Yeah, let me get my ...

1        (Pause)

2            THE COURT:  Where can I most easily find them?

3            I had them marked in my RSA, which I don't have

4    here.

5            MR. ROSENTHAL:  In the plan --

6            THE COURT:  Uh-huh.

7            MR. ROSENTHAL:  -- if you go to the conditions

8    preceding the confirmation and then --

9            THE COURT:  Okay.

10           MS. LAURIA:  Your Honor, if you have the

11   blacklines that were filed last night, I can give you the

12   precise page preference if that would be helpful.

13           Sorry, Mr. Rosenthal.

14           It's Docket 6385-1.

15           THE COURT:  Uh-huh.  Okay.

16           MR. ROSENTHAL:  And, Your Honor --

17           MS. LAURIA:  In the PDF, it's 107.

18           THE COURT:  They're in the conditions preceding.

19       (Pause)

20           MR. ROSENTHAL:  So, the first finding, Your Honor,

21   if you've found it, is Finding R.  I think it's R.  It's a

22   finding that the TDP allowance procedures are fair and

23   reasonable, based on the evidence presented to the Court and,

24   specifically, the finding is, you know, the procedures

25   including the trust, the TDPs, pertaining to the allowance of

1  claims and the criteria included in the TDPs pertaining to

2  the calculation of the claim amounts, including the claims

3  matrix, base values, maximum matrix values, and scaling

4  factors are fair and reasonable, based on the evidentiary

5  record offered to the Court.

6          To us, at least, it's clear how this, that this

7  finding alters the insurers' rights and how it will be used

8  against the insurers.  The settlement trustee will bring a

9  State Court coverage action and argue that the Bankruptcy

10  Court, based on evidence presented to it, because it's got to

11  be based on the evidentiary record, found that the procedures

12  and criteria for allowance are fair and reasonable and that,

13  therefore, the determination of claim amounts that flow from

14  those procedures and criteria, you also blessed and bind all

15  non-settling insurers to whatever number the settlement

16  trustee has determined is the appropriate amount of a

17  particular claim.

18          This finding an effectively a determination that

19  every personal injury claim allowed by the trustee has your

20  stamp of approval, because you've approved the procedures,

21  the criteria, they're fair and reasonable, you've had a

22  record.

23          But, Your Honor, as you know, you don't

24  constitutionally have the jurisdiction to do anything of the

25  sort.  And it's also clear why, even if you were inclined to

1  make this finding and had authority to make it, substantial

2  discovery would be required.

3         They're asking you to make the finding based on

4  the evidence.  At a minimum, you can't possibly make the

5  evidentiary finding without, as a matter of fairness and due

6  process, giving objectors a reasonable opportunity to gather

7  and provide their evidence in opposition to the evidence that

8  we know will be presented by the coalition and the FCR.

9         If you move to the next finding, Your Honor, this

10 really fortifies; Finding S fortifies the first one.  That

11 finding is that an abuse claimant's right to payment is the

12 amount at which such abuse claim is allowed under the TDPs.

13        And in my outline, I have highlighted "is the

14 amount at which is allowed."  So, effectively, this finding

15 confirms that from your perspective, the claimant's right to

16 payment is the amount determined by the settlement trustee;

17 that's what it says, "claimant's right to payment is the

18 amount at which it is allowed."

19        And you made it a point to say, last week, that

20 you weren't going to be evaluating individual insurance

21 policies in determining whether an insurer right or might not

22 have to pay a, as a result of the bankruptcy.  But if you

23 look at this finding, Your Honor, it's asking you to make

24 precisely that determination.  It's asking you to determine

25 now that a claimant is entitled to be paid the amount at

1  which its abuse claim is allowed under the TDPs.

2           THE COURT:  Well, don't I have to find that?

3  Don't I have to make a finding that relative among claimants,

4  at least, right, that the amount that the settlement trustee

5  determines is the allowed amount of their claim -- "allowed

6  amount" is, I guess, a loaded term -- is the amount of the

7  claim so that, in fact, a *pro rata* distribution can be made?

8           MR. ROSENTHAL:  I don't think you have to, Your

9  Honor.  I don't think you have to make that as a confirmation

10  finding.  I think this is an agreement -- what the TDP is, is

11  an agreement among the claimants and the FCR as to how

12  they're going to allocate whatever value comes into the

13  trust.  And I don't think that your stamp of approval on that

14  can be -- is inappropriate and can be terribly misused.

15           THE COURT:  Well, this is the Fuller-Austin issue,

16  right, this second one here?

17           MR. ROSENTHAL:  This is the Fuller-Austin issue,

18  but the way the finding is structured, it's more than the

19  Fuller-Austin issue, because it's not just -- because the way

20  it is structured, in conjunction with the first finding

21  you're talking about is, you know, is the amount at which

22  it's allowed under the TDPs.

23           It really does -- let me give you an example, and

24  there's another -- T is a different finding, you know, that

25  the plan and trust distributions procedures were proposed in

1   good faith.  But what I really want you to focus on, I think,

2   is if you suspend reality for a second and you take yourself

3   off of this bench and you put yourself on a --

4           THE COURT:  Can I do that?  Can I really do that?

5           MR. ROSENTHAL:  Well, you may not want the second

6   part of my assumption.

7       (Laughter)

8           THE COURT:  Okay.

9           MR. ROSENTHAL:  And you put yourself on a state

10  coverage court bench --

11      (Laughter)

12          MR. ROSENTHAL:  -- where, you know, you are

13  looking at bankruptcy.  And what you see in bankruptcy --

14  because you're not a bankruptcy lawyer -- is a confusing

15  amaze of Code provisions that is, you know, overseen by a

16  bankruptcy judge, a thoughtful bankruptcy judge.

17          Now, from that seat, Your Honor, can you honestly

18  tell me that after reviewing the findings that you would have

19  entered if you agree with the proponents, you would not be

20  inclined to conclude that the Bankruptcy Court had stamped

21  its approval on the claim values.  I think you would conclude

22  that you stamped your approval on the claim values.

23          And that's precisely why the coalition and the

24  FCR, with the support of the debtors, want these findings.

25  And it's also why the insurers think it's important not only

1  that the plan, you know, be insurance-neutral, but that you

2  give direction to that Court to say, yes, I am confirming the

3  plan.  I am doing my job.  I am approving the plan under the

4  confirmation requirements, but I am not, I am not determining

5  whether any insurer is liable for them.  I am not actually

6  determining the claim values.  I am not finding that the TDPs

7  represent judgments.

8          Remember that Mr. Zalkin told the Court that he

9  had been told by the claimants' representatives that what

10 they were trying to do is, and what they thought they would

11 get out of this case, is get Your Honor to issue findings and

12 orders that effectively represented judgments, with respect

13 to the claims.

14         THE COURT:  So, what do you think I can do?

15         MR. ROSENTHAL:  I think you can approve the plan.

16 If you believe it's appropriate, I think you can confirm the

17 plan.  And, you know, say the plan has been proposed in good

18 faith, the plan complies with the provisions of the

19 Bankruptcy Code that are in 1129, but not bless the claim

20 determinations that come out of the TDPs.  You know, that,

21 Your Honor, is something that should be reserved for -- the

22 TDPs can do whatever they want, but when they go to collect

23 from insurers, they will have to demonstrate that those

24 claims are entitled to be covered under the policies.  And

25 they shouldn't be able to rely on your findings in any way,

1  shape, or form, to make that argument.

2          Now, you raised a good question.  Is there an

3  intermediate position that you might be able to take, the

4  plan treats everyone the same, you know, that treats

5  substantially similar claimants the same?

6          Maybe.  But I think if you did that, you would

7  have to make it very clear that that was the extent to which

8  you were going.  You were not putting your stamp of approval

9  on the amounts that came out of those TDPs or that they were

10 covered by insurance.

11         I'm not even sure you need to do that.  This is

12 not a 524(g) case.  You don't have to make 524(g) findings.

13 That would be required in 524(g), but this is not a 524(g)

14 case.

15         THE COURT:  Well, I have to say that I don't know

16 that sitting here, I know every finding I need to make to

17 confirm a plan, because I don't know exactly what objections

18 are going to be posed to me in what fashion, and that's hard

19 to know until we see them, until we know what the vote is,

20 until we see what issues are raised.  And so, that's why it's

21 hard to anticipate -- I wouldn't say there's a vacuum -- I've

22 heard a lot of confirmation objections, but I haven't heard

23 them in the context of a solicited, voted plan that's in

24 front of me.

25         And I can anticipate that I would need to make

1  some findings for confirmation purposes and on a record

2  that's built at confirmation with respect to the TDPs and

3  maybe the values in the TDPs, depending on the objections

4  that I get.

5           MR. ROSENTHAL:  If you are going to make the

6  findings, I would think you would need to consider all the

7  evidence, but, I mean, this goes to the point that, you know,

8  we don't think that these findings truly have anything to do

9  with confirmation and they bring with them, a total, in terms

10 of timing and cost.  And, you know, they put you, frankly,

11 right in the middle of claim determinations, with respect to

12 personal injury claims, which I don't see how you can do.

13           I mean, if you make a finding that the, you know,

14 that $600,000 is the appropriate base amount and that the

15 range for -- and that that should be allowed, notwithstanding

16 no finding of negligence, and that the range for a

17 demonstration of negligence should increase that by X or Y,

18 and you're giving the trustee full discretion to determine

19 whether it's X or Y or somewhere in between, Your Honor, I

20 think you are effectively putting your finger on these claims

21 in a way that certainly a coverage court may very well think

22 you've made the determination now, even though the actual

23 determination of the amount is not going to be made later by

24 the trustee.

25           And I think that's the opposite -- I think that

1  alters the insurers' rights, to -- that alters the insurers'

2  rights, and it is something that Your Honor cannot do in

3  bankruptcy and does not need to do.

4       THE COURT:  Well, I don't see how I would be

5  determining and fixing the amount of any particular claim,

6  but I do think, again, depending on the objections I get,

7  that I may have -- that I have to determine that the TDPs set

8  up an appropriate process for the settlement trustee to

9  exercise his discretion within.  It's not grammatically

10 great, but okay.

11      So, because we don't send the claims to a trust

12 with no guidance on how to evaluate them; there has to be

13 guidance on how to evaluate them, so that all of those claims

14 are evaluated consistently and share appropriately from the

15 pot.  So, I can't just say, hand them over and say, figure it

16 out, with no guidance; with no guidelines, nobody

17 understands.

18      Well, maybe I could -- I don't know -- I guess

19 that's what a judge does all the time, but I don't think

20 that's the way this is historically done.

21      MR. ROSENTHAL:  I don't think courts get down into

22 the weeds and say -- I mean, are you going to get down and

23 say that the base value should be X for this kind of abuse

24 and Y for the other kind of abuse?  Are you going to make a

25 judgment about the amount of the uplift or down lift that

1  occurs for certain factors?

2          Because if you get it, if you think that you can

3  or should get into that, I think you're, with respect, Your

4  Honor, I think you're going far beyond what you are -- not

5  just what you're permitting to do, because I -- but I

6  think -- not what you're constitutionally permitted to do,

7  jurisdictionally permitted to do, but what you're permitted

8  to do under the Bankruptcy Code.

9          Because you said it a couple times, you can't

10  alter the rights of the insurers.  The insurers have the

11  right, you know, under their contracts they have many rights,

12  including the right to, you know, participate in settlements

13  and approve settlements, the right to take over the defense

14  of these claims.  You know, they -- what you're effectively

15  doing is forcing them to come, because they don't know what

16  effect a State Court will have, based on what you rule, but

17  they have a strong suspicion.  My example is exactly what a

18  State Court would do.  They have to come here and litigate

19  not only the appropriateness of what you're being asked to

20  do, separate and apart from the values, but also the values.

21          THE COURT:  Well, would you agree with me that I

22  may have to determine an aggregate number, an aggregate value

23  for the claims in some context at confirmation?

24          MR. ROSENTHAL:  Why do you think you need that?

25  No one has asked you for that.

1            THE COURT:  I kind of thought somebody had.

2            MR. ROSENTHAL:  They had before, but I don't think

3   there's anything currently on the table for that.

4            THE COURT:  Okay.

5            MR. ROSENTHAL:  Look, I think --

6            THE COURT:  This is why it's hard to have a

7   discussion in the abstract.

8            MR. ROSENTHAL:  Do you know how the TDPs, how most

9   TDPs work?

10           Most TDPs, well, I'll -- most TDPs, you know, they

11  apply similar criteria.  Most TDPs that we know recently are

12  asbestos-related, but, obviously, you know, there are other

13  mass torts that have become more prominent in terms of cases.

14           So, what the TDPs generally do is they do treat

15  everyone similarly situated in a similar manner.  That's

16  something that 524 would require.  But, at the same time,

17  they do that and they don't need, necessarily, to have

18  estimates of the overall value, because they pay to the

19  claimant, they do an assessment of what the assets are at the

20  time, and they pay to the claimant a payment percentage --

21  not the full amount of the claim -- but a payment percentage,

22  based on the assets at the time.

23           And if they subsequently collect additional assets

24  from additional insurance or if they had other real property

25  assets and they sold that real property and they subsequently

1  are able to pay a supplemental distribution on account of

2  that claim, then they would make another assessment three

3  months down the road or a year down the road and say, okay,

4  we paid the claimant 10 cents on the dollar, because that's

5  all we had on day one.  We thought we were going to have, you

6  know, 80,000 claims.  We had a claims expert.  We thought we

7  were going to have 80,000 claims and based on the information

8  that we got from the claims expert, we were able to make an

9  initial distribution of X percent on the dollar.  As further

10  monies come in, we can supplement that distribution.

11          So, while there are determinations made by the

12  trust from time to time about what the claims would be, and

13  those are used for determining the payment percentage,

14  primarily, so, you know, in some cases, Your Honor, courts do

15  make estimates of claim values.  In other cases, they do not.

16          In that, you know, Garlock case from six or seven

17  years ago, and it turns out to be a lot longer now, the

18  parties, there was a huge fight about what the claims

19  estimates were, because the parties were worlds apart.  And

20  the debtor pressed for an estimation and there was a lengthy

21  estimation process in that case.  The result of the

22  estimation actually led to a settlement, but that's not the

23  case in every case.

24          So, Your Honor, let me just -- I thank you for

25  your time.  I know it's taken quite a bit of time, and I am

1  happy to answer any more questions you have, but I will just

2  say in closing, we agree with the debtors that further

3  mediation may very well bear fruit, but, unlike the debtors,

4  we believe that so long as the possibility exists that Your

5  Honor might embrace the insurance prejudicial provisions and

6  findings, the claimant representatives have every incentive

7  to be, frankly, unreasonable, even at the expense of outcomes

8  that would be better for everyone in the case, because their

9  desires, and I mentioned this at the outset, I believe their

10  desires exceed the four corners of this case.  They want to

11  make new precedent that they can use in other cases.

12          But without a true global settlement, these cases

13  will drag on for months, possibly years, through appeals, and

14  during that time, legitimate claimants will suffer the

15  consequences as they wait for meaningful compensation.

16          So, we believe that approval of the disclosure

17  statement and commencement of solicitation, without at least

18  a strong admonition that the proposed findings render the

19  plan unconfirmable, not only imposes an obstacle to a global

20  resolution and a quick exit, but it leads the debtors down a

21  costly and expensive path to solicit votes on a plan that's

22  not confirmable, in our view.

23          Your Honor, thank you for your time.  I appreciate

24  your thoughtful questions.

25          THE COURT:  Thank you.

1          Mr. Schiavoni?

2          MR. SCHIAVONI:  Your Honor, I was candidly going

3    to rely upon, stand on my papers, but if you could just hear

4    me for 10 minutes, I would appreciate that.

5          THE COURT:  Okay.

6          MR. SCHIAVONI:  There is an overlay I would just

7    like to put on Mr. Rosenthal's comments.  I would like to

8    bring Your Honor back to my argument about Combustion

9    Engineering and the reversal that took place in Combustion

10   Engineering, because I think it's important in how one looks

11   at this case as one goes forward.

12         Your Honor, in Combustion Engineering, what the

13   Court -- there's a key phrase in there, from my perspective,

14   that the Court talked about, and what it talked about there

15   in giving guidance on how to look at these kinds of cases is

16   it looked at the elaborate steps that the debtor had taken

17   with this group of claimants that had, as it terms, either

18   stub claims or weak claims or potentially non-compensable

19   claims, in order to sort of jimmy up a majority vote for a

20   plan.

21         And what the Court said in there was something to

22   the effect -- I don't have the exact quote in front of me --

23   was that one could, by, you know, individually, you know,

24   take steps that look like they comply with the Code, but

25   overall, those steps combined, were -- in that case, the

1  Court was concerned -- were really intended to avoid the

2  purpose of the overall Code.  And in there, what they were

3  focused on was the importance of an affirmative vote by an

4  impaired class and whether they really had an impaired class

5  there or not; in other words, an individual, if you just

6  looked at it step-by-step, they might comply and on other

7  things, not comply.

8          Your Honor has earned a well-founded reputation as

9  a balls-and-strike judge who takes each issue presented to

10  her and tries to call it fairly, and that's appreciated by

11  everyone.  But if you look at how these different steps over

12  time combined, and then you look at the result on the back

13  end, which is what you hear from the TCC talking about a

14  hundred-billion-dollar payout here.  And you see it in

15  various other papers and it's inflamed the claimants.

16          It's like, and then you compare it to with what we

17  started here, which was a Defendant in the tort system, which

18  had definite problems and, you know, even if there was only

19  one abuse claimant, it was a horrendous problem, but when

20  they filed, they had 275 claims and a thousand alleged, and

21  within just a few months, they generated 80-plus-thousand

22  claims through the use of these, you know, for-profit

23  aggregators.

24          And now, we're on a path where they're saying

25  they're going to get a -- it's like they think they've got a

1 plan where they're basically saying they're going to hand it

2 to a trustee at the end of the case and he's going to prove-

3 up claims and, you know, you've heard it from the TCC,

4 there's a hundred billion dollars that's going to come out

5 the back end.  And if that happens, that will cause enormous

6 damage, enormous damage beyond the scope of this case.  The

7 notion that one can just print money and it not have an

8 impact is wrong.  It will have tremendous damage.

9             But let's just look at some of the components on

10 how we got there.  But as a starting point, just in some of

11 the exchanges that you had with Mr. Rosenthal, I want you to

12 think about how this term "TDP" evolved and really what it

13 is, okay.  It's a trust distribution procedure.  It's just

14 that.  It's how a settlement trust, you know, allocates money

15 out among its claimants.

16             It's not too different from in regular District

17 Court litigation where you have class actions, money is paid,

18 and then the settlement trust makes and allocates out the

19 money.  And the Plaintiffs' lawyers can have wide discretion

20 in sort of how they make those allocations, how they spread

21 the money around among their various claimants.

22             They can, in that sort of situation, if that's all

23 that's happening, they can have the trustee, you know, make

24 various presumptions in their favor and, you know, they have

25 wide discretion on how they might allocate money.

1          What these are, and what the word "TDP," it means

2     trust distribution procedure.  It doesn't mean trust

3     adjudication procedure.

4          It's like the findings that Your Honor is being

5     asked to make and what's embedded in the TDP, itself -- and,

6     you know, there's various texts in there that they want you

7     to approve -- converts this into just that, from just an

8     allocation procedure among the claimants about how they're

9     going to allocate the money among their claimants, into a

10    trust adjudication procedure where, effectively, you know, a

11    gentleman selected by the claimants with procedures picked by

12    the claimants is then going to, quote, determine the

13    liability of the debtor.

14          And it's utterly and completely at odds, that

15    process, with what's contemplated by the insurance contracts

16    here.  In large measure, it explains the entire difference

17    between why there were 275 claims in the tort system when the

18    case started and why there's 80-plus-thousand claims right

19    now.

20          In the tort system, and under the policies, there

21    was a process, whereby, someone with a stake in the game

22    would first make an assessment about, you know, whether or

23    not the claim should be settled or not.  If it wasn't settled

24    immediately, it would be, then, presented in the tort system,

25    where the burdens of proof would be placed on the Plaintiff

1   and various levels of proof would be required and good claims

2   would be, you know, vetted out from bad claims.  That's a

3   process that's tied to, and built into, how the insurance

4   contracts work.

5         This trust distribution procedure, if all the

6   Court is approving is, look, this is how they're going to

7   pass the money out among the claimants -- fine -- but if it's

8   converted into a trust adjudication procedure, it's

9   completely different from the tort world.  No amount of

10  presenting evidence about what a particular claim might get

11  or might not get in the tort system changes the fundamental

12  nature of this, which is, there is not an independent, you

13  know, judicial official with the Rules of Evidence and the

14  burden requirements set in the tort system, making an

15  adjudication of what the claims are worth.

16        The TDP specifically, basically, makes the --

17  flips the presumptions and the burdens of proofs on their

18  head.  There's even a provision in the TDP that says that if

19  the trustee effectively determines that there's no evidence

20  at all supporting a claim, the claim (indiscernible) be

21  dismissed; instead, the claimant shall be given an

22  opportunity to sort of rummage through the Boy Scouts' files

23  that are turned over to try to, then, come up with some

24  evidence to make a claim out of what he finds in the files of

25  the Boy Scouts.

1          It's utterly and completely a different procedure

2    than in the tort system.  It's not an adjudication procedure

3    at all; it's an allocation procedure.  And what the claimants

4    have tried to do in drafting these TDPs is flip it around

5    into an adjudication procedure.

6          Now, when I say Your Honor calls balls and strikes

7    going through, I think you did, you know, and let's walk

8    through some of those.  When the bar date order was presented

9    to the Court, the Court, you know, looked at that order, I

10   think, strictly under the Code and Your Honor made decisions

11   and approved the proofs of claim as it went forward.

12         But what happened?

13         It's like the proof-of-claim form, in fact, only

14   has a few questions about the claims.  There's a number of --

15   you know, there's like 15 questions in total.  There may be a

16   little more, you know, I'm not -- I don't want to bind myself

17   to 15, exactly, right -- but the bulk of the questions,

18   numerically, are things like:  Where did you go to college?

19   Where do you live?  Things like that.

20         The questions about the claims only come down to a

21   couple.  As we argued then and we've argued on appeal, there

22   was no requirement in the proof of claim that sufficient

23   facts be laid out in order to establish the elements of the

24   fact a claim against the debtor in the various states in the

25   union.

1          And as you heard from Mr. Rosenthal, it's like,

2     that's not insubstantial because there is not strict

3     liability for these types of claims.  One has to establish in

4     the different states, different levels of evidence, including

5     negligence, and there's not strict liability.

6          I think what Your Honor, in a show of your further

7     diligence, I think you said at one point you looked at, you

8     pulled some random proofs of claim to look at yourself.  And,

9     you know, I have every sense that you looked at a variety of

10    them.  They tell different stories and different levels of

11    detail, but the bulk of them really just lay out that the

12    person, you know, to the extent they do this -- by the way,

13    many don't even assert abuse by Boy Scouts or in Boy Scouts.

14    There's a whole package of claims that just talk about abuse

15    in their families.

16         But the ones that do talk about Boy Scouts or say

17    something about it, you know, many of them just laid out

18    that, in fact, the person was abused and not much further.

19    So, the proofs of claim, themselves, you know, provided the

20    most bare-bones, you know, setout of what the claim was

21    about.

22         Overlay on that, that there was, you know,

23    extremely comprehensive confidentiality put over the claims

24    so that, you know, one is effectively, completely prohibited

25    from -- there's no way that we can take the information even

1   in the proof of claim and we can't speak to spouses or family

2   members or others, you know, referred to in the proof of

3   claim, because all of the contents of the proof of claim are

4   deemed confidential.

5          So, the ability of third parties and the debtor

6   to, you know, but mostly third parties, to investigate the

7   claim, based upon what the proof of claim, you know, the

8   contents of it, which, to begin with, are incredibly bare-

9   bones, is incredibly restricted.  You know, we tried, Your

10  Honor.

11         You know, even if the proof of claim said that I

12  was abused, you know, in a public spot where others were

13  witnesses, we couldn't take the proof of claim and send a

14  private investigator to speak to other people and say, look,

15  this was asserted in a proof of claim that this happened on

16  this day by Mr. Johnson, did it happen?

17         We would breach confidentiality under the proof of

18  claim to, you know, even pursue that investigation.  So, the

19  ability to investigate the claims on this very sketchy proof

20  of claim was incredibly restricted.

21         We tried to deal with that in a responsible manner

22  by the 2004 motions that we brought before the Court and

23  trying, selectively, to get at groups of claims, how they

24  were prepared and to get at individual claimants, you know,

25  to establish, you know, some of the *bona fides* of the proofs

1  of claim.

2          We've not been able to take depositions.  And, you

3  know, I've got it, Your Honor is sort of suggesting perhaps

4  maybe now we can do it, but it's like we have not been able

5  to do any testing of the proofs of claim directly and the

6  ability to test the proofs of claim for what they say is

7  incredibly harshly restricted by the confidentiality

8  provisions.

9          So, what do --

10          THE COURT:  Let me ask this question.  Let me ask

11  this question, Mr. Schiavoni:  Isn't the insurance companies'

12  involvement with the proofs of claim inconsistent with the

13  position that the trust distribution procedures don't matter,

14  that they shouldn't matter to the insurance companies,

15  because they should be insurance-neutral, that I shouldn't be

16  making any decisions.

17          Because if I'm not making any decisions with

18  respect to the trust distribution procedures, why do the

19  insurance companies care about what's in a proof of claim?

20          MR. SCHIAVONI:  So, Your Honor, I think I'm sort

21  of building to that kind of -- to give you the answer to that

22  question.

23          THE COURT:  Okay.

24          MR. SCHIAVONI:  Because the bottom line, is the

25  proofs of claim are completely untested at all.  It's like,

1  we then -- and this goes to, again, Combustion Engineering,

2  that each step along the way might, might have been proper,

3  but in combination, what does it give us, okay?

4          It's like, so the next step here is the Court, you

5  know, decides to send these out, you know, with each claim,

6  with each proof of claim getting one vote without any of them

7  tested.  And a key element of 502, the whole thought on how

8  502 would work was that if proofs of claim are out there and

9  then people vote based on it, that, in essence, there's some

10 validity to the vote because all parties in interest would

11 have had an opportunity to kind of test who's voting, so to

12 speak, right.  That's like a core element of 502 was that the

13 reason why you get a vote, like, votes would be allowed is

14 because people could object to the people voting, okay.

15         But if there's been no ability to test the votes

16 and then, you know, we then have the vote going out without

17 any of these, it's like without really knowing whether this

18 is a good vote or not, because no one has really been able to

19 test the votes.

20         And what's happened is like what's happened, I

21 think, in Combustion Engineering.  The debtor has aligned

22 itself with a group that purports to, you know, bring about

23 the majority vote and it's then an untested vote, based on

24 the proofs of claim, because we didn't have the ability to

25 test it.

1           And what, then, is embedded in that?

2           Exactly what the Circuit was sending back for

3   discovery in Combustion Engineering; a plan comes out that

4   has incredibly loose distribution procedures.  Again, I don't

5   think they're adjudication procedures; they're distribution

6   procedures.

7           The claimants didn't embed in here, and the

8   debtors certainly didn't, requirements that, you know,

9   strongly encourage the vetting out of good claims and bad

10  claims.  That's not -- it's like you'll hear evidence on what

11  these proofs of claim do, but that's not what they do.

12          It's not like they've appointed, you know, a

13  former head of the FBI to run the trust; they've appointed

14  someone who you'll hear evidence about, and if it's somebody

15  else, it's someone still, nonetheless, who effectively is

16  going to be controlled under these governance procedures by

17  the so-called TAC in how they're going to make decisions.

18          This is -- it's -- the procedure that ends up

19  coming out of the plan, you know, is one that approves these

20  lesser claims.  And again, this is the complaint,

21  fundamentally, that was being made by the Kazan claimants,

22  who prevailed in Combustion Engineering, that the plan

23  process then was hijacks by who was being allowed to vote.

24  And you know, so that's the sort of -- I don't know if we're

25  on the third of fourth step here that combines together on,

1   you know, a path where one might have said -- again, each one

2   of these was, you know, in good faith, decided by the Court.

3   But where does it leave us, you know, ultimately, and sort of

4   where the result takes us.

5          So, you know, then what happens is the debtor

6   also, as part of the plan, in agreement with the coalition,

7   to get their vote, agrees to assign their -- all of their

8   rights to object under 502 to the -- to this trustee.  They

9   do it without the consent of the insurers.  And that -- you

10  know, in an insurance coverage court, like that would be like

11  a really, really important, you know, right of ours.

12          In writing these contracts, the contracts directly

13  tie the consent to settle, you know, to -- you know, to

14  the -- it's an essential right to the contract.  It's like,

15  when folks issued insurance policies, they didn't issue a

16  blank check machine to their policy holders to settle cases

17  willy-nilly, any way they wanted.  It -- they said, to the

18  extent they took on a defense obligation and an indemnity

19  obligation, it was -- it's absolutely tied in the contract

20  that it's we would get -- it's like we can make a decision to

21  settle or we get to defend the case.

22          We didn't say you can -- you could settle

23  eighty -- you could create a system where you could get out

24  from your liability and create a system where you have -- you

25  could then willy-nilly, you know, settle 82,000 cases for any

1  dollar volume you have.  But that's embedded in the plan,

2  that, without our consent, they're assigning all of their

3  objections to the claimants, to the claimants' appointed

4  trustee, to impose and -- or decide.

5          And how is he doing it?  Well, I don't think

6  anyone can look at those trust distribution procedures, at

7  the end of the day -- and again, I don't think the focus,

8  frankly, should be whether X amount for this kind of claim or

9  Y amount is a fair amount.  I think it ought to be on how the

10 decision is made to determine that, if it's going to -- if

11 it's going to, you know, bind us and apply to us because

12 it's -- the procedure is not any -- you know, again, it's

13 nothing like what's in -- we would anticipate in the tort

14 system.  It's simply the plaintiffs themselves basically

15 applying procedures that they have blessed, agreed upon, I

16 would say drafted if we had the evidence, you know, to

17 confirm that, that the trustee presumptively will give them a

18 claim for almost anything.

19          Even on the statute of limitations, by the way,

20 he's given really sort of wide-ranging ability to basically

21 deem the statute of limitations as set aside.  You know, and

22 it's not just a scaling factor down.  It's like he can set it

23 aside, but -- in very -- you know, based upon the exercise of

24 his judgment.  That's not at all what would happen in the

25 ordinary course.

1          And it's like -- now there's two other things I'd

2     just like to build into this before we come to the end.  And

3     it's like, yeah, you're going to be asked to make good faith

4     findings in connection with the plan itself and how the

5     debtor and local councils acted.  And we did talk about this

6     a little bit in connection with the disclosure statement.

7     But look at -- it's like you will get evidence that you will

8     see about what -- when they were negotiating with their money

9     on the line -- and they had money on the line because the

10    policies for half the period of time have significant

11    retained limits and/or deductibles, where they were directly

12    liable, the nondebtors, the nondebtor local councils and the

13    Boy Scouts.

14          And what's the deal they struck?  The deal they

15    struck that they was at arm's length was they settled the --

16    they settled this volume of claims somewhere -- if you -- I

17    don't think this is a fair way to sort of analyze like how

18    the money is changing hands, in some ways.  But it's like

19    three to $6,000 a claim, if you just -- if you spread it

20    equally.  And that's what they paid, that's what they

21    negotiated at arm's length when their money was at issue.

22          And you saw it when we walked through for the

23    individual local councils that many of them are not even

24    contributing a single retained limit/deductible -- whatever

25    one wants to call it -- for, you know, even one policy that

1  falls in those periods.  It's like that would reflect what

2  they thought the claims were really worth.

3          But when they turned the pen over and gave it to

4  the claimants to say go draft a TDP, okay, it's like they

5  generate something that, you know, theoretically, from what

6  they say, generated a hundred-billion-dollar outcome.  That's

7  not consistent with -- it's in no way consistent with, you

8  know, looking at those TDPs as, quote, an "adjudication" of

9  their liability.

10          It's like I -- you know, you'll hear evidence from

11  this on us [sic], but it's like I don't think one can say

12  that, if the local councils settled for $3,000, and as part

13  of that capped its liability, and then turned around to the

14  trust -- the claimants and said, okay, draft a TDP and pick

15  your trustee to decide what the insurers should pay, that the

16  Court can turn around and enter a finding that says that that

17  trust adjudication procedure represents what the debtor is

18  liable for or what the local councils were liable for.  If it

19  was, they should be putting a lot more money in.

20          And you know, you heard some argument before that

21  this was us arguing out of, you know, two sides out of our

22  mouth about what they all ought to pay.  Hopefully, you've

23  heard a little bit more about this and you understand now

24  what I'm talking about.  It's like they can't be saying that,

25  if they paid not even a full deductible or retained limit,

1  you know, to resolve their claims in total, that somehow

2  it -- you know, what they're giving the trustee represents

3  their, quote, "actual liability."

4          So, yes, that finding is completely toxic to us

5  because of how we think the plan here has, step by step, you

6  know, abused what the Code is really intending.  And there's

7  a series of bankruptcy objections that are built into how

8  these steps sort of combine, you know, including that we

9  think the vote will fundamentally be bad at the end of the

10 day, but that make these findings just terribly toxic.

11         And they do something else.  It's like it's

12 created this specter you have in front of you of not just the

13 insurers objecting, okay, because of -- like it's made the

14 case virtually impossible to settle with the claimants if

15 they are to think that they, themselves, will decide what all

16 the claims are worth.  I mean, one can imagine, you know,

17 what that kind of discussion would be like.

18         And Judge, God knows we've tried -- we have worked

19 to settle this case.  I mean, Mr. Ryan and I worked very hard

20 in the Blitz case and we settled a very difficult case

21 together.  And as I know, your patience with me as an

22 adversary has been epic, and I appreciate that.  But I

23 just -- trust me that we've -- you know, we've worked very

24 hard to try to resolve the case.  It's made almost impossible

25 by this dynamic.

1          And it's not just us, it's the claimants

2    themselves are at each other's throats over this because

3    there's no process by which -- you know, none of them --

4    neither constituency is able, really, to stand up and say we

5    need an aggressive procedure here to whittle down the claims

6    or to focus the money on the more high-value claims.  They're

7    almost institutionally -- and I'm not -- in some ways, I'm

8    not even faulting them for this.  But it's against -- you

9    know, it's like they'll be called traitors by their own

10   constituency if they do it, but it's like they're unable to

11   do it.

12          The U.S. Trustee we've reached out to on this.

13   And I mean no fault, the U.S. Trustee is doing a fine job.

14   But they're not going to step forward into that role.  You

15   know, so there's no one else in that role in the tort system.

16   It would be us doing that.

17          And to be clear, the debtor had that option.  All

18   right?  You know, you heard in Imerys how, at one point,

19   Imerys -- J&J stepped forward and said, you know, lift the

20   stay, let the cases go forward in the tort system.  There

21   were CIPs before the debtor.  You know, you heard, I think,

22   even some evidence during the RSA how Hartford put forward,

23   you know, a claims procedures that just passed the claims --

24   the tort system.  All of those were rejected because this is

25   just more favorable, letting the claimants decide what their

1  own claims are worth and having the Court issue a finding

2  that hey get to adjudicate -- that that adjudication then is

3  binding on the insurers.

4      And yes, it's like will a subsequent state court

5  case -- court be confused about that?  Absolutely.  It's like

6  absolutely.  And that was -- you know, in some ways, it's one

7  of the teachings of that Fuller-Austin decision is just sort

8  of, you know, how the trial court there was confused in the

9  first instance by, you know, 1129 findings, you know, without

10  any description of really what they were about being

11  presented to the, you know, court there.

12      So, look, that's an overlay on what Mr. Rosenthal

13  said.  I -- you know, it's -- it makes -- all of this

14  infects, you know, what's necessary for discovery because,

15  you know, it's like the claimants are asserting that

16  basically all coverage issues need to be side -- decided

17  here.  It creates a nest of complex evidentiary issues.

18  It -- you know, for instance, like the complete blocking of

19  us from getting any evidence at all about how the TDPs were

20  negotiated, if that's even, quote, the right word to be

21  applied here, when they otherwise were going to seek findings

22  on the -- you know, that they were not in good faith.  It's

23  like we'll have motions on all of those issues and just --

24  it's just making it incredibly difficult to deal with this in

25  a three-month period.

1          I mean, in three months, to package these issues,

2    for them to them come out and say there's a hundred billion

3    dollars' worth of liability on the back end, it's like these

4    findings are just utterly unnecessary.  They're

5    unprecedented, really, because other courts have looked at

6    this as distribution procedures and not adjudication

7    procedures.

8          And if you go back through most of the mass tort

9    cases that have been decided, yes, it's true that like, by

10   the time they got to confirmation, the cases -- more or less,

11   many of them had resolved themselves to the extent appeals

12   were taken.  You know, not many of them got through to like

13   post-claim, you know, adjudication.

14         What's made this one just particularly difficult

15   to -- you know, to reach any settlement is that the claimants

16   are taking a strong run at like having this Court decide that

17   these are adjudication procedures.  And it's like just made

18   it impossible for folks to decide things.  So that's an

19   overlay.

20         I have one brief argument I'd like you to consider

21   on -- you know, on -- I do think some of the findings should

22   be dropped, you know, or the Court should have encourage them

23   to be dropped because it's going to infect discovery going

24   forward.  We'd ask you to -- perhaps to keep an open mind on

25   that until you hear the discovery schedule argument.

1           But there's just one other thing that I think --

2    and it's not really an insurance issue, per se, but this

3    thing about the coalition fees.  I know Your Honor probably

4    feels that all of the issues we've talked about can be dealt

5    with at confirmation.  You know, you've heard, respectfully,

6    why we disagree on that.  But you know, we -- you know, we

7    all listen to the Court very closely.

8           But there's an issue that can't be -- the bell

9    can't be unrung on, that I would suggest that there -- you

10   know, it might make sense to address, you know, now.  We

11   might even try to bring a summary judgment motion to do it --

12   if that's what Your Honor wants, before solicitation.  But

13   that is, again, this issue about the fees being put back into

14   the plan.

15          I just think having those -- the coalition fees in

16   the plan is -- it's going to raise issues about tainting of

17   the vote, one way or the other, no matter what, and that --

18   it's like, consistent with your pre -- the Court's prior

19   order, as I seem to -- as I understood it, was that basically

20   the coalition would be free at the end of the case to bring a

21   motion on to seek its fees, and that that motion would make

22   its -- you know, present its case on whether they had, quote,

23   "made a substantial contribution" or not, and that they would

24   present evidence, et cetera, along those lines.

25          I see no prejudice to the coalition being to --

1  you know, that that's the way to do it and that it shouldn't

2  be in the plan.  It's like having it in the plan, you know,

3  creates this whole specter that the vote is tainted by what

4  we believe to be a conflict associated here.  And we will

5  argue that there is a conflict because of how the majority of

6  the coalition clients declined to be Brown Rudnick paying

7  claimants.  And now Brown Rudnick is imposing, in essence,

8  those fees on them through the plan itself.

9          And we think, as we've said, that that's tied

10  directly to the master ballot issue and how they're trying

11  to, you know, basically, you know, get the claimant lawyers

12  themselves, who are, in fact, taking 40 percent of the money

13  here, to, you know, bring about that master ballot vote.  So

14  we think that should come out because it can't -- that bell

15  can't be unrung.

16          We also think that's -- although it's the tail

17  that's wagging the dog, it's one that is just -- is

18  encouraging the case not to settle because it's promising

19  them another $900,000 every month that they litigate the

20  case, instead of trying to work to resolve the case, so I'd

21  ask you to consider that.

22          And thank you very much, Your Honor, otherwise,

23  for hearing us.

24          THE COURT:  Thank you.

25          Mr. Plevin.

1          MR. PLEVIN:  Your Honor, I will be very brief, and

2    I'm not going to veer into scheduling at this point.  I just

3    want to tie together a couple of things that Mr. Rosenthal

4    and Mr. Schiavoni said.

5          Mr. Schiavoni said the policies here are not check

6    writing machines.  And why is that?  If Your Honor were to

7    look at the actual policy language, you would see that the

8    insurers have to pay in only two circumstances:

9          First, when there's a judgment after an actual

10   trial.  Obviously, "actual trial" means a trial, an adversary

11   event with people on both sides putting in evidence.  There's

12   case law that says that a settlement by a debtor with its

13   creditors is not an actual trial.  That should be self-

14   evident, but that's the first time that an insurer has to

15   pay.  And obviously, a judgment after an actual trial carries

16   certain -- it shows that it's a real result because a jury or

17   a judge has made a decision based on evidence presented in a

18   contested proceeding.

19         The other instance in which an insurer has to pay

20   under the policy language is where there is a settlement in

21   writing, agreed to by the insured, the claimant, and the

22   insurance company because, as Mr. Schiavoni pointed out, the

23   insurers have the right to defend claims, and that includes

24   the right to settle claims.  And so, if an insurer settles a

25   claim, it takes on an obligation to make a payment pursuant

1  to a settlement agreement.

2          Those are the only circumstances in which an

3  insurer has to pay.  And when you talk about what Mr.

4  Schiavoni called the "trust adjudication procedures," versus

5  trust distribution procedures, you see that.

6          Now how does this play out in the coverage

7  context?  You asked Mr. Rosenthal a question about this.

8  What would happen outside of the bankruptcy context is, if an

9  insured settles without the consent of the insurance company,

10 often they'll do so because they'll say the insurer isn't

11 defending or the insurer is not -- hasn't accepted a

12 reasonable settlement offer and is hanging the insured out to

13 dry.

14         But if they settle on their own and then seek

15 insurance coverage, the insurer has the opportunity to

16 litigate in the coverage case whether the settlement was

17 reasonable because courts will often allow an insured to

18 settle, notwithstanding the insurer's right to be involved,

19 if the settlement is reasonable.  And then, in that case, the

20 coverage case -- the coverage court looks at how the

21 settlement was entered into, was it at arm's length, how does

22 it relate to the amounts being sought, what were the defenses

23 that were being asserted, and can make a determination as to

24 whether the settlement is actually reasonable.

25         That's not the situation that we would have here

1  because, in that litigation, it's the -- the arguments are

2  being made by the insured on the one hand and the insurance

3  company on the other hand.  And the insured says I think this

4  is reasonable and here's why; the insurance company says I

5  think it's not reasonable and here's why.

6         But the one thing that the insured doesn't get to

7  do in that circumstance is to say, not only do I think it's

8  reasonable, but here's a confirmation order by a Federal

9  Judge, a Federal Bankruptcy Judge, who says she thinks it's

10  reasonable, too.  And that gets presented to the trier of

11  fact in the coverage case.

12         What they're trying to do, Your Honor, is have you

13  put your thumb on the scale and allow the insured, in that

14  context, to make the argument to the jury or the trier -- or

15  the bench, depending on how the coverage case is being

16  litigated, and to say we think this is reasonable, and part

17  of the reason is because the Bankruptcy Judge said so.

18         And remember, as Mr. Rosenthal pointed out, you're

19  being asked basically to make decisions about the

20  reasonableness of determinations by the settlement trustee,

21  who hasn't been appointed yet, who is going to be make

22  those -- going to be making those decisions after

23  confirmation of the plan.  And so that illustrates, I think,

24  why, as Mr. Schiavoni put it, these findings are toxic and

25  they're prejudicial.  And you know, we just can't abide them.

1          And with that, I'm going to just say I have lots

2    of things to say about scheduling, but I'm going to defer

3    those until later.  Thank you.

4          THE COURT:  Thank you, thank you.

5          Okay.  I'm going to give the plan proponents an

6    opportunity to respond -- not the plan proponents, I'm

7    sorry -- the debtor and/or the FCR or the coalition an

8    opportunity to respond to these arguments.  But I really do

9    want a focus on why these findings are necessary and

10   appropriate, the import of them as to how they will be used,

11   and why aren't the trust distribution procedures just an

12   intra-creditor -- and by that I mean intra, I guess, abuse

13   claim creditor -- allocation mechanism.

14         And that goes along with questions I've had and

15   somewhat posed, probably not in this case, about the genesis

16   of the trust distribution procedures and why there's even a

17   trust advisory committee made up of plaintiffs' lawyers and

18   why the settlement trustee is often chosen by those lawyers

19   and why -- I understand why the FCR, certainly in an asbestos

20   case, gets a role because I think it's required in the

21   statute.  But given how these procedures, the trust

22   distribution procedures -- I don't know if they've evolved or

23   they've always been that way.

24         But it does seem curious that the beneficiaries of

25   the trust influence the procedures under which they receive a

1   distribution, if it's binding on others.  And if you go back

2   to just general trust law, a settlor chooses a trustee, a

3   settlor decides the provisions of the trust, and the

4   beneficiary is just a beneficiary.

5           So I'm -- we're going to take a break, we're going

6   to take about 15 minutes, and I'd like to hear a response.

7           But I think I said back in May I don't anticipate

8   making any coverage decisions, and I still do not intend to

9   make any decisions that are properly decided in a coverage

10  action.  And perhaps juxtaposed against this is that this is

11  a collective procedure.  And I don't have however many days

12  of a hearing and then it has no impact, right?  It has to

13  have an impact.  But it shouldn't have an impact beyond

14  what's necessary for me to decide confirmation issues.  So I

15  want to see that.

16          Mr. Patterson?

17          MR. PATTERSON:  Your Honor, before you turn to the

18  debtor, I wanted to address some of the issues that

19  Mr. Rosenthal and his colleagues addressed, and it might be

20  helpful if I do that before that.  I'm happy to do it right

21  after the break.  It should be about five or ten minutes,

22  Your Honor.

23          THE COURT:  Yes, I'll hear people in response, and

24  that can go beyond the debtors and the FCR and the coalition.

25  I'm happy to hear from others.

1          MR. PATTERSON:  Thank you.

2          THE COURT:  But those are the -- those are the

3  issues that I see, the big picture issues.  That's apart

4  from, I guess, the initial comments Mr. Rosenthal made about

5  some uncertainty we still have in this plan.  But I'm more

6  interested in the bigger picture issues of the trust

7  distribution procedures.

8          So we're going to take 15 minutes.  I don't know

9  what time it is.  It's 12:06.  Come back at 12:20.  We're in

10 recess.

11      (Recess taken at 12:06 p.m.)

12      (Proceedings resume at 12:22 p.m.)

13          THE COURT:  This is Judge Silverstein.  We're back

14 on the record.

15          Ms. Lauria.

16          MS. LAURIA:  Thank you, Your Honor.

17          I was just going to briefly outline how we had

18 allocated responsibilities on the debtor/FCR/coalition side

19 of the ledger, so that you're not hearing repeated arguments.

20          With respect to the insurance and trust issues

21 that you raised, Ms. Quinn, whose hand is up, as well as

22 members of the coalition, will be taking the lead role on

23 those arguments, so I'm going to pass the podium off to them

24 or the virtual podium.

25          I also heard issues from Mr. Rosenthal and

1  Mr. Schiavoni concerning the timing uncertainty point,

2  coalition fees, the third-party releases, thirty-five-

3  hundred-dollar expedited distribution, "liquidation of claims

4  for voting purposes" -- those are my words, not

5  Mr. Schiavoni's, but I'm trying to boil that down -- issues

6  with the proofs of claim and good faith.  All of those types

7  of issues, I will be taking on in responding to those.

8          But Your Honor, my sense was you wanted to dive

9  right into the insurance issues.  So, if it's okay, I'll

10 table that laundry list that I just mentioned.  I would like

11 to come back to those and respond to those, to the extent you

12 think it would be helpful.  And in the meantime, I'm going to

13 hand it off to -- I see Ms. Quinn, Mr. Molten, and

14 Mr. Goodman, so one of them I think are going to take the

15 lead on the insurance issues.  Maybe Ms. Quinn is first up.

16          THE COURT:  Ms. Quinn.

17          MR. STANG:  Your Honor, I'm sorry.  I thought

18 Mr. Patterson was going to address the Court.

19          THE COURT:  Mr. Patterson, the only thing I want a

20 response to is -- right now, is the insurance issues.  So I

21 don't actually really care, in particular, what order they go

22 in, but that's what I am -- the findings and the insurance

23 issue.

24          MR. PATTERSON:  I can limit my remarks to that

25 topic at this point, Your Honor.

1          THE COURT:  Okay.

2          MR. PATTERSON:  Thank you, Your Honor.  Tom

3    Patterson.

4          Our concern with the findings is that they do lie

5    at the heart of the architecture of the plan, and one of the

6    principal reasons for that is because of the involvement of

7    the local council settlements.

8          Mr. Rosenthal alluded to the Combustion

9    Engineering case, which dealt with the assignability of

10   nondebtor insurance under a plan and said that the Bankruptcy

11   Code powers do not extend to that extent.  And the Court

12   asked whether or not the savings language that has now been

13   introduced to the plan would be sufficient to eliminate that

14   defense on the part of the insurers.  And the answer is, for

15   a couple of reasons, that it's not.

16         One reason is the reason that Mr. Plevin

17   articulated, which is that, even apart from assignability of

18   insurance rights, the local council settlement and

19   contributions represent -- has the potential to trigger a

20   variety of coverage defenses, including consent to settlement

21   and the cooperation clause.

22         And the risk is that entering in a settlement

23   without consent can, in some jurisdictions, limit coverage or

24   void coverage.  It can limit coverage to the amount of the

25   settlement that was paid -- in this case, that could be the

1  amount of the local council contribution -- or it could void

2  coverage in other circumstances.

3          Second, Your Honor, the savings language provides

4  an additional coverage defense that is not otherwise present

5  because -- and by the way, I mean, it -- I have a full

6  appreciation for the irony that I'm articulating coverage

7  defenses, but I am articulating ones that the insurers have

8  passed on to me, so I do not feel that I am providing any

9  insights that they don't have.

10          But with regard to the assignment issue, if a

11  debtor -- well, a nondebtor in this case -- channels its

12  liability to a trust, then you have separated the liability

13  on the claim from the insurance, and there is a significant

14  coverage defense that the insurer has at that juncture, in

15  fact, if sued by the local council, that the local council no

16  longer has an indemnity right because it no longer has the

17  liability on the underlying claim.

18          And so, you know, our feeling is that these

19  coverage defenses are significant, at a minimum.  They would

20  take a considerable amount of time to resolve through,

21  likely, appellate decisions in more than one jurisdiction,

22  and that they provide an incentive, given the architecture of

23  the plan, for those who are advancing this plan at this point

24  to settle insurance at almost any price to avoid the flaw

25  that the settlement has a tendency -- has had a tendency to

1  create.

2          So I had other comments that I wanted to make that

3  keyed off things that Mr. Rosenthal and others have said, but

4  Your Honor asked me specifically with regard to insurance,

5  and so I'm limiting my comments to that at this point.

6          THE COURT:  Okay.  Thank you.

7          Ms. Quinn.

8          MS. QUINN:  Good afternoon again, Your Honor.

9  Kami Quinn, insurance counsel for the FCR.  And I am going to

10  respond to some of the insurance issues that were raised this

11  morning.

12          First, very briefly on neutrality, because I think

13  it's very clear that Your Honor has heard this, has read the

14  briefs, has read the cases, has considered this issue very

15  carefully.  There is no requirement that any plan be, quote,

16  "insurance neutral."  Insurance neutrality is a standing

17  doctrine that just has no relevance in a case where insurers

18  are being heard on every issue.

19          In the case -- in the neutrality cases, debtors

20  and plan supporters voluntarily made a strategic choice to

21  carve out insurers from otherwise generally applicable

22  provisions, but that sort of choice is not mandated anywhere.

23  And as an aside, Your Honor, remembered the GIT case and the

24  holding there exactly correctly.  So neutrality isn't an

25  issue that needs to be reached in this case because no one

1  has sought to deny the insurers standing.

2            Instead, because of that, the insurers have

3  pivoted to the idea that these findings impermissibly alter

4  their contract rights.  They don't.  But Your Honor has

5  expressed some concern about these findings and we -- and the

6  insurers have raised them today, and so we can talk about --

7  let's talk about these findings one by one.

8            And I don't intend to argue the truth of the

9  findings.  I just want -- this argument is to make clear

10 that, if we are able to convince you of their truth through

11 evidence and legal argument between now and confirmation that

12 these findings are appropriate for you to make in this

13 context and that they are not coverage determinations.

14           So I will start by being very clear.  We have

15 heard you.  We do not intend to issue coverage rulings in

16 this case.  The findings do not ask you to.  They don't ask

17 you to interpret a state law coverage issue, to review a

18 single policy, to single out insurers for any particular

19 treatment.  They don't ask you to determine the impact of

20 your findings on subsequent coverage litigation, nor do they

21 ask you to determine what impact or rulings will not have.

22 And they don't ask you to determine that any insurer has an

23 obligation to pay any particular claim.

24           All of the arguments about what the policies cover

25 or, as Your Honor has characterized, what product the debtor

1  bought, including all of the issues raised in pre-petition

2  litigation, remain wholly unaffected; issues like the number

3  of occurrences, whether and for which carriers the first

4  encounter is the appropriate trigger, whether SIRs and

5  deductibles apply, whether there's intentional conduct

6  related limitations to the policies.  All of those are

7  preserved for coverage litigation.

8           But the honor -- but the insurers have

9  characterized these findings as "coverage findings."  Indeed,

10  Mr. Schiavoni went so far last week to say that the findings

11  require you to find that there is coverage for the claims.

12  And today, you said that all coverage needs to be decided

13  here.  These findings unequivocally do no such thing.

14           So I will take each of the findings that

15  Mr. Rosenthal raised in turn, and we can go through them.

16  And the first is the assignment -- is the insurance

17  assignment.  This is -- courts in this circuit have been

18  making this finding in the context of mass tort cases with

19  respect to debtors' coverage for almost a decade now.  It is

20  settled bankruptcy law and uncontroversial on the point of

21  the debtors' coverage.

22           The insurers have argued that it's not appropriate

23  to extend this finding to nondebtors.  Your Honor noted that

24  the finding actually only requires you to find it -- to find

25  that the assignment is appropriate to the extent of

1  applicable law, that there is a savings here, to the extent

2  that applicable law -- which we're not asking to determine --

3  doesn't permit this finding, doesn't permit this assignment.

4        And so we think it's an appropriate finding.  We

5  think that there is no question that findings about the

6  validity and the applicability of a transfer of the insurance

7  rights under a plan is the appropriate finding for a

8  Bankruptcy Court to make in the context of confirmation.  And

9  we either will or we won't convince you that this assignment

10  is appropriate, or that the finding is appropriate to make to

11  the extent that -- of applicable law and to the extent that a

12  nondebtor policy can be assigned under applicable state law

13  (indiscernible)

14      (Participants speak simultaneously)

15        THE COURT:  Excuse me.  Please check your audio.

16        Ms. Quinn.

17        MS. QUINN:  Okay.  So that's assignment.  Unless

18  Your Honor has any questions on that, I'll go on to the TDPs.

19        THE COURT:  No.  I will confess that I hate these

20  provisions in an order that say "to the extent of applicable

21  law" because it just leaves issues open.  But I take it the

22  arguments that would be made are the ones I've seen in the

23  papers about being able to -- the conduct has already

24  happened.

25        MS. QUINN:  Correct.

1          THE COURT:  Okay.

2          MS. QUINN:  That is exactly correct, yes.

3          THE COURT:  Okay.

4          MS. QUINN:  Okay.  So the TDP.  The TDP finding

5    says:

6          "The procedures included in the trust distribution

7    procedures pertaining to the allowance of abuse claims and

8    the criteria are fair and reasonable, based on the

9    evidentiary record offered to the Bankruptcy Court."

10          So we spent hours this morning listening to

11    arguments which boiled down to the insurance position -- the

12    insurers' position that the TDPs are not, in fact, fair and

13    reasonable.  I'm not going to address whether or not they are

14    fair and reasonable because that is a question that we need

15    evidence, as it says in the finding.  We will get -- we will

16    find -- we will get evidence, we will argue these issues.  If

17    we can't convince you of the truth of the finding, then,

18    obviously, you won't make the finding.  But that's a

19    different question than whether or not it is appropriate to

20    make this finding in the context of your confirmation order.

21          So I'm -- and on this one, I think you put this

22    exactly right last week, when you said that of course Your

23    Honor can find that a settlement embodied in a plan is fair

24    and reasonable in the context of a confirmation order.  Of

25    course you can.  But that you -- but that you will not be

1  finding whether the insurance policies that the debtor

2  bought, whether the product that they purchased covers that

3  settlement.  That's perfect.  That's -- and we agree

4  completely.

5          THE COURT:  So is the -- what's the 1129 standard?

6  Is there an 1129 standard that these findings go to or is

7  this -- you're considering this a settlement?

8          MS. QUINN:  We're considering this a settlement.

9          THE COURT:  So it's not an 1129 standard, not part

10  of the 1129 standards.  So this is a settlement.  And who is

11  it a settlement among?

12          MS. QUINN:  It is a settlement among the abuse

13  claimants and the debtor and the local councils and, to

14  the -- and potentially others, to the extent that there are

15  separate provisions relating to chartering orgs, such as

16  TCJC, who have their own issues.

17          THE COURT:  Okay.

18          MS. QUINN:  So -- and I will point out that

19  Mr. Rosenthal raised the issue of, you know, these will

20  create all -- this terrible precedent.  Unfortunately, the

21  horse is out of that barn.  These findings that a TDP is fair

22  and reasonable have been made in Brower, Christy, Western

23  Asbestos; all of them included those findings.  This is

24  not -- this is not brand new.

25          And because it's a recent case, where confirmation

1 findings were disputed by insurers in a mass tort case, I can

2 talk about, if you're interested, the findings that Judge

3 Drain just made in Purdue on these issues, I can compare and

4 contrast a little.

5          Judge Drain made a finding that the settlements

6 reached between the debtors and the opioid claimants, as

7 embodied in the plan, are fair, equitable, and reasonable,

8 and were entered into in good faith, based on arm's length

9 negotiations, and the various intercreditor allocation

10 agreements and settlements are fair, equitable, and

11 reasonable.  And that's essentially what we're asking for

12 here.

13          Judge Drain went on to say some more stuff,

14 including that such negotiation, settlement, and resolution

15 of liabilities will not operate to excuse any insurer from

16 its obligations under any insurance policy, notwithstanding

17 its terms, including consent to settle or pay first or other

18 provisions in non-bankruptcy law.  That's not in our finding,

19 not what we're asking Your Honor to find, and an issue that

20 will be determined in the coverage litigation.

21          What the insurers are asking you to -- go ahead.

22          THE COURT:  Is that in the form of order?  Is that

23 where those findings come from?

24          MS. QUINN:  Judge Drain's?

25          THE COURT:  Yes.

1          MS. QUINN:  Uh-huh, yes.

2          THE COURT:  Okay.

3          MS. QUINN:  What the insurers are asking you to do

4  is prejudge how a coverage court will use a finding that the

5  TDPs are fair and reasonable.  They're asking you to

6  determine what their -- what the rights to defend under a

7  policy -- insurance policy are, what circumstances they get

8  to exercise those rights.  And they are asking you to say

9  what a coverage court can and cannot do this -- with that

10  finding.

11          Mr. Plevin said, well, in the tort system, we

12  would get to litigate whether the settlement is reasonable in

13  a coverage action.  But nobody is precluding Mr. Plevin from

14  litigating whether this settlement is fair and reasonable.  I

15  mean, we're just saying he only gets to do it once.  The

16  insurers are definitely going to litigate whether these TDPs

17  are fair and reasonable; indeed, I think they started today.

18  They just don't get to do it twice.

19          But this doesn't -- but a finding of fair and

20  reasonable TDP doesn't require you to determine that that's

21  the standard by which insurance policies pay, that insurance

22  policies pay fair and reasonable settlements entered into

23  without their consent, that fair and reasonable means the

24  same thing here that it means in a coverage court.  All

25  it's -- the findings say what they say.  And all of the

1 insurers' concerns about how they might be used are just

2 that.

3          I mean, they're free to make those arguments to

4 the coverage court about why it would not be appropriate to

5 use that finding for that purpose here, or why that findings

6 doesn't mean that they have a coverage obligation.  Nothing

7 about that finding says insurers have to pay any claim.  It

8 says the TDPs are fair and reasonable.

9          THE COURT:  For purposes of 9019.  Is that the

10 right -- is that the right standard of 9019?

11          MS. QUINN:  I think so.  I think fair and

12 reasonable with respect to all parties.

13          If the insurers come in and -- if the insurers

14 come in and litigate for days in front of Your Honor about

15 whether the TDPs are fair and reasonable as to them -- which

16 is what they will litigate, which is the issue they're

17 litigating, right?  Then they should be bound by the results

18 of that litigation.  They don't get to try it once then and

19 then determine -- and then, if they lose, try again somewhere

20 else.

21          THE COURT:  Well, but I thought I heard you say --

22 well, I guess the question is:  Does the 9019 standard --

23 assuming I approved a settlement, does the 9019 standard meet

24 whatever standard one would use to determine if there was a

25 coverage obligation?

1          MS. QUINN:  I don't know.  I mean, that's an issue
2  I think that will be decided by a coverage court, right?
3  Because the standard doesn't require you to define -- to find
4  that it meets the standard of an insurance policy,.  It
5  requires you to find that it's fair and reasonable.
6          THE COURT:  I don't know if that's the 9019
7  standard or not, but I'll take a look at the 9019 standard.
8  I think that's the standard, the four-part Martin standard.
9  I'm not sure it's fair and reasonable.  It's sort of the same
10 question I asked with respect to the RSA.  What does "good
11 faith" mean in this context?  Is that part of the standard?
12          And that's why I asked you what part of the 1129
13 standard is this because I'm going to be deciding
14 confirmation issues at confirmation.  And I don't know that I
15 have to determine what effect my ruling has down the line.  I
16 don't know --
17          MS. QUINN:  We --
18          THE COURT:  -- that I could --
19          MS. QUINN:  We agree.
20          THE COURT:  -- or that I should.
21          MS. QUINN:  Right.
22          THE COURT:  But I'll be looking at the settlement
23 standard then --
24          MS. QUINN:  Right.
25          THE COURT:  -- because that's what you're telling

1  me this is, a settlement.

2          MS. QUINN:  Well, I think that -- I think that it

3  may be the case -- and I'll defer to some of my bankruptcy

4  lawyer colleagues on the coalition who are going to talk next

5  about, you know, whether or not there's other bases for this

6  finding of fair and reasonableness.  But the finding is fair

7  and reasonable, and it is not a finding that fair and

8  reasonable is a coverage standard or that fair and reasonable

9  means that an insurance company has to pay.

10          THE COURT:  Okay.

11          MS. QUINN:  And the same goes, essentially, for

12  the third finding, which is the right to payment.  And I

13  can -- I will, again, you know, defer a little bit to my

14  bankruptcy brethren to talk about the specifics of this.  But

15  this is a statement of what the right to payment is under the

16  Code.  This is -- what this is, is a statement of how

17  claimants' claims will be liquidated.  And Your Honor

18  mentioned that this is something that goes to how assets will

19  be distributed amongst these claimants.

20          And this finding is -- it's necessary for the

21  plan.  And the reason why that it -- the reason why it's

22  necessary, to be clear here, to make this finding is in order

23  to describe appropriately what the settlement is that's being

24  reached in this plan.

25          Let me just take a step back here.  The debtors

1   here, they -- in the negotiation between the debtors and the

2   claimants, the debtors looked at this big liability and said

3   we think insurance coverage covers most of it, so we will

4   give you, trust claimants -- you have the right to pursue

5   coverage for the claims, the same as we would have had,

6   because, absent this bankruptcy, we think insurance would

7   have covered most of this, and then we'll negotiate with you,

8   you know, based on our ability to pay and a whole bunch of

9   other factors of, you know -- and the insurance has some

10  holes and, you know, gaps and whatever, and we're going to

11  negotiate with you a number 200 million or so, and that's the

12  amount we're going to give you to fill those holes and gaps

13  and that should work.  And that's the settlement that was

14  reached.

15          Absent this finding, there is a danger that the

16  settlement is interpreted as something else, which is that

17  the debtors paid $200 million to resolve what is, by their

18  own estimates, almost seven -- up to potentially $7 billion

19  in liability, and according to the -- you know, to the

20  victims' representatives, a whole heck of a lot more.  And

21  the -- so they settled the whole liability, the whole

22  billion -- multi-billion-dollar liability for 200 million and

23  maybe the right to pursue their reimbursement claim for that.

24          And that's not a deal that the claimants would

25  have agreed to.  And so what the need, the necessary for this

1  finding is, is to make clear what deal was reached in this

2  court.  And we think that this is the only -- this is, of

3  course, the Court that is appropriate to make clear what the

4  nature of the settlement in the plan is, the plan settlement

5  that is reached in this Court.

6         Again, it does not require the Court to say that

7  the policies cover any of this settlement.  If, as Your Honor

8  posited last week, the policies say we only cover the amounts

9  contributed by a debtor to a trust in bankruptcy, they still

10 say that and a coverage court will enforce that.  That's what

11 it says that they pay.  If the policies don't cover any of

12 the claims at all, they don't cover any of the claims.

13        But this is a clarification of what the deal is,

14 which is that the debtors are transferring their rights to

15 pursue coverage for the claims, not their right for

16 reimbursements of the amount paid and not limited to their

17 right to pursue reimbursement of the amounts paid to the

18 trust, that they paid to the trust, because that wasn't the

19 settlement of the whole liability, and that's it.  Those are

20 the -- those are the three findings.

21        THE COURT:  Well, isn't there an easier way to say

22 that, that doesn't use words like "allowed" and things like

23 that, that get interpreted certain ways?

24        MS. QUINN:  Is there is an easier way -- well, I

25 mean, there -- is there -- there's an almost infinite number

1  of ways to say it, so possibly yes.

2          (Pause)

3              THE COURT:  Yeah, I think this one is an -- well,

4  this is interesting because I would think this should not be

5  so controversial, but it is, apparently, relative to

6  insurance coverage issues.  And this is not the only context

7  in which we see this issue arise; and, yet, it seems to --

8  it's an issue for insurance coverage.  Cases are coming out

9  different ways on it, not bankruptcy cases, non-bankruptcy

10  cases.  Okay.

11          (Pause)

12              THE COURT:  Okay.  Ms. Quinn?

13              MS. QUINN:  And that's all I've got, unless you

14  have additional questions for me.  I can turn it over to

15  Mr. Goodman, who's going to talk some more about the

16  bankruptcy basis for some of these and the need for

17  discovery.

18              THE COURT:  Okay.  Thank you.

19              Mr. Goodman.

20              MR. GOODMAN:  Good afternoon, Your Honor.  Eric

21  Goodman, Brown Rudnick, counsel for the coalition.

22              To answer the last question, the standard under

23  Bankruptcy Rule 9019 is fair and equitable.  This comes from

24  the 1968 Supreme Court decision in Anderson, which held that

25  the rule that plans of reorganization be both fair and

1   equitable applies to compromises in a bankruptcy case.  We

2   can quibble over "equitable" and "reasonable," but I think

3   the import of both words are roughly the same in this

4   context.

5           With that answer provided, Your Honor, I would

6   like to come back to a question, beginning -- that you posed

7   at the last hearing because, frankly, that's what I'm

8   prepared to talk about first, which is:  Which of the

9   findings are legal issues, which are factual issues, and what

10  discovery is necessary, and how does all of this relate to

11  plan confirmation?  And I'm going to try to do my best to

12  answer those questions very directly.

13          There are five findings in the plan that were in

14  the restructuring support agreement.  They appear on

15  different paragraphs in the plan, in Article 9(a)(3).  I'm

16  going to refer to them as "Findings 1 through 5," for the

17  sake of simplicity.

18          Two findings that I'll discuss in a moment are

19  purely legal issues, two are obviously factual issues, and

20  the third is hybrid because it has to do with appropriately

21  documenting or clearly documenting what our settlement is.

22          I'll start with the two legal issues, and I'm not

23  going to spend a lot of time on the first because I think

24  this has been already discussed at length, which is:

25          Finding 1 appears in Article 9(a)(3-Q), which is

1  that the plan be binding on all parties-in-interest.  This

2  finding, obviously, does not require this Court to interpret

3  any insurance policies or make any coverage determinations,

4  nor does it require the Court or even ask the Court to

5  rewrite any insurance policies.  This finding is about basic

6  principles of res judicata and collateral estoppel, as they

7  have been applied in bankruptcy cases for years.

8            Judge Drain did address this exact issue last

9  month in Purdue.  He held, and I quote:

10           "There is no concept or requirement that a plan be

11  insurance neutral."

12           I presume that Judge Drain read Combustion

13  Engineering and Global Industrial because the same insurance

14  lawyers in this case cited those cases to him and argued that

15  issue in front of Judge Drain.  Obviously, they lost.

16           I would go further and say that, because the

17  bank -- because of the Bankruptcy Code, the plan here

18  actually has to be binding on the insurers.  The insurers,

19  including Century, claim that they are creditors.

20  Section 1141(a) mandates, therefore, that they be bound by

21  the confirmation order.  So, as to Century, there's just

22  simply no way that they could not be bound.

23           In addition to that, the insurers here have

24  notice.  They are active participants in the case.  If we

25  were to pull all of the transcripts at the end of this case

1  and see who spoke the most, I would put my money on

2  Mr. Schiavoni.  Third Circuit case law requires that, when a

3  party appears, litigates, objects, and an order is entered,

4  that order is binding on that party.  This is a legal issue,

5  not a factual issue, so I don't think there is any discovery

6  needed for this.

7          So that moves on now to Finding Number 2, that is

8  the insurance assignment must be authorized.  This is in

9  Article 9(a)(3-J) of the plan.  And this also is a purely

10  legal issue and one that does not require the Court to

11  interpret any insurance policies or make any coverage

12  determinations or rewrite the terms of any insurance

13  contracts.  Parties are free to argue that the insurance

14  rights are or are not assignment at plan confirmation.  I

15  think we have the better argument under Third Circuit law

16  that this is a legal issue on which discovery is not

17  necessary.

18          Before I move on, I want to make a very keen

19  observation, which is this:

20          As the Court well knows, sometimes parties change

21  their mind during a bankruptcy case.  You hear counsel for

22  AIG and Century say last week and again today that their

23  clients simply cannot settle unless they get finality.

24  Finality.  That is an important word, "finality."  Let me

25  explain what I think they mean by "finality."

1          Many of the insurers want to settle.  The BSA

2     policies that they issued years ago have multiple insureds.

3     In some years, it's the BSA and the local councils; in other

4     years, it's the chartered organizations are also insureds.

5     That's why 1976 is so magical, not just because it's a

6     bicentennial year, but chartered organizations are not

7     additional insureds under the BSA policies pre 1976.

8          The chartered org proposal that you've heard so

9     much about and will probably hear more about is entirely

10    insurance driven.  When the insurers say that they are

11    settling, what they want is to buy back the policies, which

12    means that you have to collect all of the rights from all of

13    the insureds.  It's kind of like a game of monopoly.  You

14    have to own all three properties before you can build a

15    hotel.  There are the BSA rights, there are the local council

16    rights, and there are the chartered org rights.  You put all

17    three together, assign those rights to the settlement trust,

18    and then you can settle with the insurers.

19         The insurers that want all of the rights -- there

20    are insurers that want to settle and they want all of the

21    rights to be assigned to the settlement trust.  The insurers

22    that have not settled may stand up today and say, Judge, you

23    cannot approve these assignments.  But they may be standing

24    before you at plan confirmation saying, Judge, you absolutely

25    have to approve these assignments, we consent, I changed my

1  mind.

2          I mention this today only because this Court does

3  not know, right now, if any insurers are actually going to

4  appear at confirmation and object to the assignment.  We are

5  here on a disclosure statement.  This is clearly a

6  confirmation issue and one that I don't even know how you

7  sort out today.

8          Finding Number 3 is the finding that the, quote,

9  "right to payment" that the holder of an abuse claim has

10  against the debtors is the allowed value of the abuse claim.

11  This is in Article 9(a)(3-F) of the plan.  This finding is

12  based on quotes from and is worded entirely based on the

13  definition of "claim" set forth in Section 101(5) of the

14  Bankruptcy Code.

15          As a legal matter, a survivor's right to payment

16  from the debtors is not what the debtors can afford to pay.

17  If that were true, no debtor would ever be insolvent.

18          Now I want to be clear on one point.  We are not

19  asking the Court to rule on what the insurers must pay.  If

20  you look very carefully at this finding, you'll see that the

21  word "insurer" does not appear anywhere in this finding.  I

22  would very much like to put a finding like this in front of

23  the Court that said the insurers must pay, but I think I know

24  what the Court's answer would be.

25          This finding, the one that is actually in the

1  plan, as opposed to the one that is invented, doesn't say

2  anything about insurers being liable.  Insurers can and will

3  argue post-confirmation that their policies do not require

4  them to pay any of the claims determined under the TDP.  What

5  we are doing is making it clear what the terms of our

6  settlement are and what we are agreeing to.

7           We believe and what the plan settlement reflects

8  is that the debtors will fund a trust.  That trust will

9  assume liability for and will be responsible for paying abuse

10 claims.  The debtors are making a contribution to the trust.

11 That contribution is not the same thing as the liability that

12 the debtors estimate to be between 2.4 and $7 billion.

13 Rather, it is just a contribution.  The trust will pursue and

14 liquidate the trust assets and the trust will make

15 distributions to survivors based on their claims.  And as the

16 Court noted, those distributions must be made on a pro rata

17 basis, based on the allowed amount of the claims.

18           The settlement that we support and will recommend

19 to tens of thousands of survivors to vote in favor of is the

20 settlement reflected in the plan, which does not wipe out or

21 extinguish billions of dollars in liability for a mere

22 $220 million.

23           We have to be clear about what we are agreeing to.

24 I don't want anyone to say that we agreed to a settlement

25 that we did not, in fact, agree to.  Neither you, nor I can

1  control what a coverage court does with the confirmation

2  order, no question.  But I learned years ago from a veteran

3  banking attorney at Sullivan & Cromwell that sometimes you

4  have to use very clear language on issues that are obvious to

5  you, in order to make aspects of a deal clear to parties that

6  haven't lived it.

7          We have to be very clear about what we are

8  agreeing to.  I don't want anyone to say that the right to

9  payment that the abuse -- holders of abuse claims have is the

10  $220 million that the debtors are contributing to the trust,

11  and I don't want anyone to say that we supported a plan or a

12  settlement that meant that.  Parties that settle have a right

13  to know what the settlement is.

14          And I'll note this is a confirmation issue for us

15  because we don't support a plan of reorganization that is

16  intended to effectuate a discharge of the insurers' potential

17  liability, whatever that may be.

18          I will also note that, if the plan is delivering

19  or is intended to deliver a, quote, "Fuller-Austin result," I

20  don't see how the Court could approve a channeling injunction

21  under Millennium.  Fuller-Austin, in my view, was incorrectly

22  decided, but it was incorrectly decided because of ambiguous

23  language in the plan and the confirmation order.  That is not

24  a mistake we care to repeat.  This is a confirmation issue

25  and it goes to the heart of the plan because of the

1  channeling injunction and our need to know what our

2  settlement is, and it's clearly stated.

3           So that leaves Finding Number 5.  This is that the

4  TDPs are fair and reasonable based on the evidentiary record

5  offered to Bankruptcy Code at the confirmation hearing.  This

6  is set forth in Article 9(a)(3)(R) of the plan.  This is -- I

7  call it the lightning rod.  This is the one that gets all the

8  attention, Your Honor, so let's talk about it.

9           This finding does not ask this Court to interpret

10 any insurance policies or make any coverage determinations.

11 And I'm going to be very, very clear on what I'm about to

12 say.  No one is asking you to find that the insurers must pay

13 the $3500, we are not asking for that finding.  No one is

14 asking you to find that the insurers must pay any claim

15 determined under the TDP; we are not asking you for that

16 finding.  And no one is asking you to find that the insurers

17 must pay time-barred claims, we are not asking for that

18 finding.  Those are straw man arguments.

19           We want an evidence-based TDP.  What does that

20 mean?  We want a TDP that is based on and mirrors the

21 debtors' historical settlement practices and experience in

22 the tort system.  Under what circumstances did the debtors

23 agree to settle abuse claims prior to the bankruptcy?  And

24 there are a lot of them.  What did they agree to pay?  What

25 did the insurers agree was a reasonable settlement?  What

1  evidence has to be produced by the survivors?  That is what

2  we're trying to do.

3          We want the Court to approve a process that's fair

4  and reasonable and equitable based on the evidence.  A couple

5  things follow from this.

6          First, this is obviously a confirmation issue, not

7  a disclosure statement issue.  The evidence in question has

8  not been offered.  The insurers are entitled to produce their

9  own evidence, we hope they do, but the Court cannot judge the

10  evidence until we get the plan confirmation.

11          Second, discovery.  The evidence needed on this

12  topic is in the debtors' possession, custody, and control,

13  and I know this because this evidence has already been

14  produced.  The debtors know their own settlement practices

15  and they know how much they have paid to settle abuse claims.

16  And the insurers have all of this information too because

17  they approved the settlements and they also have been given

18  access to the same information.

19          There was the discussion last week about the Bates

20  White report and the TDPs.  The Bates White report is based

21  on an analysis of the settlement data.  In terms of timing,

22  in terms of which came first, the chicken or the egg, the

23  Bates White report came first, the TDPs followed by several

24  months.  And the point of the TDPs was to reflect the

25  debtors' own historical practices and settlement values.  The

1  data the debtors have already shared and was used to create

2  the TDPs doesn't need months and months of discovery,

3  everyone has it.

4          And I'm going to make this point because I think

5  it's obvious, but it needs to be said, discovery from

6  survivors or law firms would not be relevant to this finding

7  at all.

8          I want to be clear on another point:  this finding

9  does not ask the Court to determine how many valid claims

10  there are.  The findings and orders put the reasonableness

11  and the fairness of the matrix values and the procedures

12  before the Court, they do not put a --

13          THE COURT:  Well, what 1129 standard does that go

14  to?

15          MR. GOODMAN:  This goes to the 9019 standard that

16  Ms. Quinn mentioned, Your Honor.

17          THE COURT:  Okay, so this is another 9019 issue.

18          MR. GOODMAN:  Yes, it is.

19          THE COURT:  And why -- and who is it a settlement

20  among?

21          MR. GOODMAN:  Again, it would be a settlement

22  among the abuse survivors and the debtors.

23          THE COURT:  Why is the debtor a party to that

24  settlement?

25          MR. GOODMAN:  Because they are the party who is

1  liable for the abuse claims and they are the proponent of the

2  plan.

3          THE COURT:  Well --

4          MR. GOODMAN:  I also think it would be --

5          THE COURT:  -- but -- but they --

6          MR. GOODMAN:  -- I'm actually --

7          THE COURT:  -- are providing a number, they're

8  providing an amount, they're making a contribution and then

9  they're gone, not unlike many debtors, mass tort or not, not

10  unlike many debtors.  The settlement with the debtors is

11  their contribution.  So how is this a settlement among the

12  debtors and the abuse survivors?

13          MR. GOODMAN:  Well, Your Honor, I think the Court

14  could entertain the settlement of a claim under 9019.  Here

15  we have --

16          THE COURT:  A claim.

17          MR. GOODMAN:  -- here we -- yes.  I mean, if there

18  was a claim filed against a debtor, let's just say you had an

19  ordinary trade claim filed for a million dollars, the debtors

20  were to file an objection to that claim, the parties

21  negotiated and agreed on a settlement of that claim, I

22  believe that would be brought before the Court under 9019.

23          And I will amend my prior response, Your Honor.

24  Actually, that also is 1129, because the 1129 fair and

25  equitable is actually what informs the 9019 issue.  So I

1  actually think that it's both 1129 and 9019.

2          THE COURT:  I find --

3          MR. GOODMAN:  We can get more --

4          THE COURT:  -- I find -- I have said on any number

5  of occasions that I do not believe a plan to be a settlement.

6  The plan gets imposed on people, it's not a settlement.  And

7  I get asked to make all kinds of findings at confirmation

8  that I don't find are appropriate.  So far, nobody has been

9  able to convince me I'm wrong on that one point, but that's

10  why I want to understand what the finding is and who is the

11  settlement among.  I get the intra-abuse creditor nature of

12  the settlement.  I'm not sure I understand at this point how

13  the debtor -- the debtors' interest in the allocation of

14  funds that it has contributed and to which it has no more

15  liability, it's contributed, it's done.

16          MR. GOODMAN:  Well, the liability here is being

17  assumed by the trust, so it's not --

18          THE COURT:  Uh-huh.

19          MR. GOODMAN:  -- disappearing, it continues on and

20  that liability has to then be determined post-confirmation in

21  accordance with the procedures.  Again --

22          THE COURT:  Well, an allocation does, yeah.  An

23  allocation does, which goes back to my question about why, in

24  fact if the debtor was on the other side of this issue, why

25  does it leave it to a trustee it didn't choose and a trust

1  advisory committee made up of plaintiffs' lawyers?

2          MR. GOODMAN:  Oh, I see the issue.  Yeah, I think

3  the concern that you're raising is that, once this process

4  goes into effect and the debtor steps away post-confirmation,

5  the debtor can't really control what happens in that process.

6  And, you know, the insurers have painted a picture of all of

7  the tort lawyers in this case effectively settling with

8  themselves and, you know, presenting inflated claims.  No, I

9  hear that point.  I don't know, though, how this issue is

10  really before the Court on this one.  I mean, it's the

11  debtors who have proposed the plan; it is the debtors who

12  have put forth the TDP based on their own historical

13  settlement practices and values.

14          So, given that the debtors are the plan proponent,

15  I don't think that they can absolve themselves of

16  responsibility on this one until the confirmation order is

17  entered.

18          THE COURT:  I hear you, but the concern I have I

19  want directly addressed, the concern I have in this case and

20  others, and it's how are these trust distribution procedures

21  negotiated and who is it a settlement among or is it really

22  just an allocation among claimants.  And, again, it's really

23  no different than any bankruptcy case in which the debtor

24  makes a contribution and then they don't care how it gets

25  whacked up, right?  Here's -- I get to give this amount and I

1   walk away, I get my discharge, I don't care how it's whacked

2   up.

3          This is -- the trust distribution procedures are

4   in essence the whack-up, right?  That's what it is.  Maybe I

5   have to rule on them and maybe I don't, but that's what I'm

6   trying to figure out.  And then, of course, what's going to

7   be done with them later on down the line.  Maybe I need to

8   know, maybe I don't, but what 1129 standard is it that I have

9   to make these findings on.  And if it's not an 1129 standard,

10  if it's a 9019 settlement, then who is the settlement among,

11  for real.  And those are the questions I have.

12         MR. GOODMAN:  Your Honor, thank you, and normally

13  I'm prepared for everything, but on this one I actually think

14  I want to go back and do some more research and homework on

15  this in terms of what 1129, 1123, and 9019 say on these

16  issues.

17         But I would note this point, because I was

18  recently dealing with a similar issue in front of the Ninth

19  Circuit where a party contended that a specific provision in

20  trust distribution procedures simply had to be struck down

21  because the trustee could go rogue and not comply with it.

22  And, you know, my response to that was, wait a second, you're

23  not really objecting to the procedures, what you're claiming

24  in advance is you think that people won't comply with them,

25  you think people won't follow the procedures, and that's

1  really not fair.  I mean, I think what you're doing is you're

2  sort of prejudging or assuming ahead of time that the trust

3  distribution procedures won't be followed, that the trustee

4  won't do his job; that the parties administering the claims

5  won't do so with integrity in regard to their fiduciary

6  obligations.

7           I don't begin my day with those assumptions.  I

8  think that we have to assume that if procedures are

9  propounded or put forth by the debtors in terms of what they

10 think is fair and reasonable based on their historical

11 settlement practices, if that is being imposed on the

12 survivors here, because the survivors are not free to

13 allocate among themselves how this gets divvied up, you know,

14 here, Your Honor, it's different.  It's not as though all of

15 the tort lawyers are getting in a room and deciding how these

16 funds get allocated among themselves and, you know, how the

17 claims are allowed, that would be a negotiated TDP, this is

18 an evidence-based one.  This is where the debtors are coming

19 in and saying these are our practices, these are the values

20 where we settled claims, this is what we required before we

21 would enter into a settlement with an abuse victim and

22 they're imposing that process on us.

23           We're accepting it because the debtors have a need

24 and I think they have an obligation to put forth procedures

25 that are fair and reasonable, as opposed to ones that are

1  just arbitrary and capricious.  That obviously wouldn't work

2  in a bankruptcy case.

3        So I do think that the debtors have an interest in

4  this.  I will argue now and argue, I believe, in the future

5  that the debtors are a part of this from a settlement

6  standpoint because right now they have the liability for

7  these claims and they are trying to resolve the abuse claims

8  in this bankruptcy case.  If we don't resolve the abuse

9  claims, Your Honor, a lot of money has been spent here for

10 nothing.  That is something that we have to achieve and I

11 think that this goes to the heart of that resolution.

12        And if I did not answer your question, Your Honor,

13 I'll be back and I will read more cases.

14        THE COURT:  I'm not sure it's in the cases.  I've

15 been looking for this.

16        MR. GOODMAN:  I appreciate that.

17        The last finding, Your Honor, good faith.  No one

18 has talked about this, at least the insurers didn't.  That's

19 in Article 9(a)(3)-T of the plan.  The Court obviously has to

20 make a good faith finding in order to confirm a plan, that's

21 what Section 1129(a)(3) says.  This is also a factual issue.

22 And I raise it -- you know, a few things.

23        First, we can't avoid this.  This isn't really

24 coming from the findings, this is also coming from

25 1129(a)(3).

1          Regarding discovery, my understanding is that the

2   insurers want to pierce the mediation privilege and take

3   discovery on how the TDP was negotiated; I think that would

4   be wrong.  Whether the TDPs and the plan were proposed in

5   good faith I think follows from what those documents say.  I

6   don't think the mediation discussions would necessarily

7   inform that, but that issue, the reason I'm flagging it now,

8   is going to be one on which there are going to be discovery

9   disputes.  Obviously, there are things that the insurers are

10  going to want that the debtors are probably going to oppose.

11  If the debtors were successful in piercing the mediation

12  privilege, there will be a lot of discovery that I'll want

13  from the insurers that they probably will then oppose.

14          So I'm just flagging that issue, Your Honor, now

15  because I know that one of the things that we are trying to

16  get through for purposes of today or this week is an

17  appropriate schedule going forward on discovery issues.

18          THE COURT:  How does this finding -- and I think

19  1129(a)(3), good faith, is what the Third Circuit says it is

20  for confirmation, not some other good faith standard that

21  might be out there or not a general good faith standard, but

22  good faith as the Third Circuit defines it in collection with

23  1129(a)(3).

24          But how does this, if at all, since you've brought

25  up mediation privilege, how does this align with the position

1 that the -- that we just discussed with respect to finding R

2 that the debtors' part of the settlement of the TDPs, that

3 they were involved, is this involved with the good faith

4 finding, is that something I have to be concerned about

5 breaking mediation privilege on?  How do those two -- and I

6 don't know, I'm asking -- how do those two findings mesh, or

7 are they separate?

8 　　　　　　MR. GOODMAN:  My answer to the question posed is

9 that those two findings are separate and distinct, but I do

10 think that there is going to be some overlap, and I think

11 that they are the two factual issues that will be before the

12 Court at plan confirmation and, therefore, I think it follows

13 that those are the two issues on which there's going to need

14 to be discovery.

15 　　　　　　And I don't know that I can go much further than

16 that at this point other than to flag those issues, but I

17 will say this -- and we'll get there later when we talk about

18 scheduling -- if you think in terms of are the trust

19 distribution procedures reasonable based on the debtors'

20 historical practices.  If you asked the question, you know,

21 about the plan itself being proposed in good faith, the

22 discovery necessary to inform the Court and for the Court to

23 rule on those issues I don't think is going to be this six-

24 to-eighteen-month-long circus that would involve going out

25 and deposing thousands of abuse survivors, because I just

1  don't know what -- I mean, I would -- I think the Court

2  should hear from the abuse survivors at plan confirmation, I

3  don't want to be glib on that issue, I think what they have

4  to say is extremely valuable and important.

5            I listened to the hearing last week, Your Honor,

6  and I heard Mr. Washburn speak.  I thought he did so very

7  eloquently and I appreciate the time that this Court afforded

8  to him in listening to him and considering his views on these

9  issues.  So those are obviously extremely important.  But in

10  terms of the issues before the Court and getting through the

11  1129 issues, good faith and the fair and reasonable I think

12  are what will -- what are and should inform the discovery

13  that's necessary to get through plan confirmation.

14            And I hate the fact that I did not give you a

15  direct answer to your question, it's just that I feel as

16  though I need to give a little more thought to that before I

17  come back with an answer.

18            THE COURT:  Thank you.

19            MR. GOODMAN:  Your Honor, I have nothing further,

20  unless you have more questions for me.

21            THE COURT:  No.  Thank you.

22            MR. MOLTON:  Your Honor, may I go next?

23            THE COURT:  Do you have a separate topic from Mr.

24  Goodman?

25            MR. MOLTON:  I do, Your Honor.  I didn't expect

1  to, but I didn't expect to be involved in this afternoon's

2  discussion.  But Your Honor has asked about trustee selection

3  and TAC, which is something that I know a little about.  So

4  I'd like to talk about that, Your Honor, and address those

5  issues, which are separate from the insurance and the

6  findings issue.  So I'm not going to repeat anything that

7  you've heard from Ms. Quinn or Mr. Goodman, and I'm going to

8  be concise, Your Honor, and I'm going to cut to the chase

9  pretty quickly.

10          Your Honor, with respect to trustee selection,

11  there's nothing remarkable or unusual with respect to how

12  trustees are picked in mass tort cases.  As Your Honor noted

13  at the date of confirmation -- or the date the debtor emerges

14  from bankruptcy, I think you just said then they're gone and

15  that's true, and that's true of the debtors here and the

16  local councils here.

17          This is not like a charitable trust, Your Honor,

18  where the settler and the settler's wishes remain primary,

19  and the settler needs to retain control over those wishes.

20  Here, Your Honor, it's something even greater than that, it's

21  Your Honor's confirmation order and the plan and the plan

22  documents, which include -- and I'll get to this in a

23  minute -- the trust agreement, which will be approved by Your

24  Honor, and the TDP -- again, which will be approved by Your

25  Honor.

1          Indeed, Your Honor, contrary here to settlement

2    trusts or other assorted private trusts, family trusts, in

3    the mass tort context it is usually the settler, the settler

4    itself -- himself, itself -- that is at fault for the wrong

5    for which the bankruptcy occurred and which led to the

6    creation of the trust.

7          The beneficiaries here, Your Honor -- and here we

8    understand we're at about 80,000 beneficiaries, at least as

9    we count them now -- need to be assured and to be comforted

10   that the person, he or she, that's in charge of the trust

11   understand his or her job, have absolute independence -- and

12   I'll use that again -- subject, subject to what I just

13   mentioned, what I call the constitutional documents, because

14   I do represent trusts, Your Honor, in major mass tort cases,

15   and the constitutional documents for a trust and for the

16   trustee is Your Honor's confirmation order and the plan.

17         So somebody that has independence with integrity,

18   *bona fides*, expertise, and a reputation for getting these

19   very, very -- in this case, as Your Honor remarked, perhaps

20   one of the most challenging cases done.  Your Honor should be

21   advised that it's been my experience that never is a trustee

22   selected for which the debtor doesn't have input, doesn't

23   have a say, whether it be express, you know, conditional

24   approval or otherwise.  And this was a plan, Your Honor, that

25   contains a trustee selection that is being put forward by the

1 | debtor.  So I just want to say that.

2 | Some recent examples, Your Honor, you know, that

3 | show exactly what I'm saying is PG&E, where the Honorable

4 | John Trotter, appellate -- retired appellate judge from

5 | California, was named a trustee under similar circumstances.

6 | In Purdue, I know there are -- I won't say dozens, but a

7 | multitude of trusts that are in the process of either having

8 | been created or will be created that this process is

9 | undergoing.

10 | In Takata, Your Honor, in this very court, the

11 | trustee came out of the TCC process, I think, with a

12 | nomination or selection in which the TCC participated and is

13 | operating those trusts.

14 | I'm going to get back to the point, though.  The

15 | point is what Mr. Goodman identified, is what's to stop a

16 | trustee, as Your Honor said or suggests, from going rogue,

17 | being in the bad, doing whatever he or she feels is

18 | appropriate under the circumstances.  It's Your Honor's

19 | confirmation order and Your Honor -- and the plan, which

20 | contains the trust agreement and contains the TDP, which are

21 | approved by the Court after notice, opportunity to object,

22 | and a determination by the Court about what's right or what's

23 | wrong in it.  That's as tight as it gets, Judge.

24 | I think, you know, somebody used the word -- you

25 | know, I forget what -- it was (indiscernible) -- but this

1  whole issue on trustee selection, I'll use a French word,

2  actually a Yiddish word -- I always say, here's a French

3  word -- boogie monster, it's the boogie monster in the

4  room -- because at the end of the day, Your Honor, if Your

5  Honor takes a look and I've asked for -- I didn't expect to

6  talk on this, Your Honor, at this length today, so I don't

7  have the docket number of the most recent trust agreement

8  that's been filed with Your Honor for Your Honor's

9  consideration, but I do want to note a couple of things in

10 it, Your Honor.

11        Section 1.7 of the trust agreement -- and these

12 are really tight -- from my perspective, Judge, a lot of work

13 went into this trust agreement and from all of the parties,

14 and that includes the TCC -- paragraph 1.7, "Jurisdiction.

15 The bankruptcy court shall have continuing jurisdiction with

16 respect to the trust; provided, however, the Courts of the

17 State of Delaware, including any Federal Court located

18 therein, shall also have jurisdiction shall also have

19 jurisdiction over the trust."  That's our Stern v. Marshall

20 proviso, I gather.

21        In any event, Your Honor, the ability to run rogue

22 is proscribed by a -- what would be a court-approved trust

23 agreement which contains at Section 8.5 -- and I hope I'm

24 reading the most recent provisions -- "Modification.

25 Material modifications to this trust agreement, including the

1  exhibits hereto" -- which are the TDP -- "may be made only

2  with the consent of the trustee, a majority of the STAC" --

3  which is the equivalent of what folks call the TAC -- "and

4  the FCR, which consent in each case shall not be unreasonably

5  withheld, conditioned, or delayed, and subject to the

6  approval of the bankruptcy court; provided, however, that the

7  trustee may amend this trust agreement from time to time

8  without the consent of approval or other authorization of,

9  but with notice to the bankruptcy court to make minor

10  corrective or clarifying amendments necessary to enable the

11  trustee to effectuate the provisions of this trust agreement,

12  provided such minor corrective or clarifying amendments shall

13  not take effect until ten days after notice to the bankruptcy

14  court," therefore giving anybody in the world who's following

15  your docket an ability to put their hand in the air and say,

16  no, no, no, no, no, that's not a clarifying amendment or a

17  minor corrective change, that is a substantive modification.

18          "Except as permitted pursuant to the preceding

19  sentence," it goes on, "the trustee shall not modify this

20  trust agreement in any manner that is inconsistent with the

21  plan or the confirmation order without the approval of the

22  bankruptcy court.  The trustee shall file notice of any

23  modification of this trust agreement with the bankruptcy

24  court and post such notice on the trust website."

25          Your Honor, that's the answer to your question, I

1  respectfully submit.

2         Second, the TAC, Your Honor asked about the TAC,

3  what we call the STAC.  If Your Honor looks at the trust

4  agreement, you will see they have absolutely -- by the way,

5  I'll go back a second.  Judge, how many times in a week when

6  I get a question on some of the other cases that I represent

7  trusts on, which include Takata and include PG&E, I get a

8  question and the first thing we do is let's go to the -- you

9  know, not let's go to the videotape, let's go to our

10 constitutional documents.  That's the answer to your

11 question.

12        Our trust agreement, Your Honor, prohibits, does

13 not allow, does not contemplate, does not envision any of the

14 TAC members from having a role in claims administration,

15 that's not what they're there for.  They're there to provide

16 their experience, expertise, ideas, et cetera, in a

17 cooperative, consultive way in order to make the trust work.

18        We articulate in the trust agreement, Your Honor,

19 those matters requiring consultation by the trustee with the

20 TAC, what's called the STAC in the FCR -- and that's

21 paragraph 5.13, Your Honor, of the trust agreement -- stuff

22 that folks who -- folks who have an overriding interest in

23 seeing beneficiaries treated fairly arguably should be

24 consulted on it.

25        And by the way, Your Honor, you know, I tried to

1  find it in the time, but my understanding is the trust

2  agreement -- and I could come back to this because I know

3  it's in others -- say that the TAC members have a

4  fiduciary  -- they don't become a TAC member without

5  accepting this -- a fiduciary obligation to the

6  beneficiaries.

7           So 5.13, "Matters requiring consultation.  The

8  trustee shall consult with the STAC and the FCR on the

9  following:  the selection or replacement of the claims

10 processor; two, the forms of a release to be executed by a

11 beneficiary; an annual estimate of the budget of trust-

12 operating expenses" -- always an issue -- "and the

13 administration investment of assets of and expenses to be

14 charged against the future abuse claims reserve."

15          Again, all issues in which you would think that

16 folks acting in an advisory fashion as fiduciaries for the

17 beneficiaries might have views on and might help -- help --

18 the trustee with its, his or her, independent decision-

19 making.

20          Section 5.14, Judge, then articulates the matters

21 requiring the consent of the STAC or the FCR with respect to

22 decisions of the trustee, "(a) the determination of the

23 initial payment percentage and any subsequent adjustment of

24 the payment percentage."  That's the amount, the pro rata

25 payment based on the corpus of distributable assets in the

1  trust that will go to claimants.  Clearly, the bedrock rule

2  of bankruptcy is pro rata, pro rata, pro rata, nobody wants

3  to be in a position where too much money is being given,

4  thereby leaving folks later on who are later in the

5  submission of their claims, have more difficult claims, and

6  their determination is made later from not getting the same

7  pro rata amount.

8           So that's A, consent for that, consent of the TAC

9  for any proposed modification of the indemnification

10  provisions of the trust agreement.  That's clear because they

11  are indemnified parties as fiduciaries.

12           "(c) any proposed sale, transfer, or exchange of

13  trust assets above bracket a certain amount," and that's

14  going to have to be determined.  Any proposed sale of trust

15  assets below that amount shall not require the STAC or the

16  FCR consent.

17           Next, 4, "Any apportionment, appointment, or

18  retention of the special reviewer or any successful special

19  reviewer in the event of a vacancies."  The special reviewer,

20  Your Honor, is a position -- and I don't want to get too much

21  in the weeds but will have appellate-like overview of any

22  what I call insurer -- post-effective date insurer or

23  chartered organization settlements by the trustee."

24           And then also with respect to -- again, I don't

25  want to get too much in the weeds -- there's various way in

1  which folks who -- beneficiaries can exit into the tort

2  system whether or not they exit.

3           "Consent," item 5, "any proposed material

4  modification to the trust agreement or the TDP, if and as

5  required by the consent provisions set forth herein."

6           And of course, that would of course at the end of

7  the day require Your Honor's final approval.

8           Next, "Any proposed increase or decrease in the

9  size of the future abuse claims reserve," again, another

10 unremarkable instance in which the TAC would have consent

11 rights over the independence of the trustee.

12          And, lastly -- and this is the special situation I

13 talked about -- "the commencement or continuation of a

14 lawsuit by a direct abuse claimant against the trust pursuant

15 to a tort election"  -- and I'm not going to get too far in

16 the weeds on that, Your Honor -- "and approval and execution

17 of any global settlement subject to the terms of another

18 provision of the trust."

19          All of those are pretty unremarkable.  You know,

20 it's the same thing, Your Honor, with respect to what I would

21 call a non-ordinary course -- non-ordinary course sale by the

22 debtor, it's going to -- the debtor just doesn't get to do

23 it, it's going to have to require further approval here by

24 the TAC, under certain circumstances and in accordance with

25 the trust agreement.  And there's specific provisions as to

1  how that happens and, again, it's pretty detailed and I'm not

2  going to get into it.

3          So that's my, hopefully, not too long answer to

4  Your Honor's questions.  And if Your Honor gives me leave, I

5  would just like to -- since I guess I'm batting clean-up

6  here -- just address just a number of other points that were

7  made earlier in the day that don't necessarily relate to

8  those issues but relate to a few others.  I promise, Your

9  Honor, I'm going to be very brief.  May I?

10          THE COURT:  Well, I thought I was going to hear

11  from Ms. Lauria on those.  Let me hear from Mr. Harron on

12  these specific issues, I want to finish this out.

13          MR. MOLTON:  Okay.  Thank you, Judge.

14          MR. HARRON:  Thank you, Your Honor.

15          THE COURT:  Mr. Harron.

16          MR. HARRON:  For the record, Ed Harron for the

17  Future Claimants' Rep.

18          I want to address three issues that Your Honor has

19  been focused on:  the specific issue of the structure of the

20  trust and the trust administration, why the findings are

21  appropriate, and why the findings don't render the plan

22  unconfirmable.

23          First a simple point on the trust structure.  This

24  trust structure follows a structure with which Your Honor is

25  well familiar, the non-mass tort cases.  As Your Honor is

1  aware, in the non-mass tort cases where there's a settlement

2  trust or litigation trust, it's almost always the case that

3  the beneficiaries of the trust are the unsecured creditors

4  and that trust -- that the trustee is selected by the

5  creditors committee and the oversight of that trust is

6  handled by an analog to the creditors committee comprised of

7  the same or a subset of the members.

8         So, really, there's nothing different here.  And

9  the reason that you have -- the only real difference is you

10 have an FCR and that's in part because of the long-tail

11 nature of the trust.  And really, for example, the payment

12 percentage is a spot where an FCR is helpful to provide a

13 counterbalance to the committee representing the interests of

14 current claimants, when the trustee is forced to evaluate the

15 payment percentage.  The current claimants, obviously, always

16 want the trust to pay out as much as reasonably possible as

17 soon as reasonably possible.  It's incumbent upon the future

18 claimants' rep to make sure that the payouts are consistent

19 with our view of the trust's future liabilities.

20        So, really, these trusts follow the same structure

21 that you see in the non-mass tort cases except for the

22 addition of the future's rep, which we think is appropriate

23 based on the application of a payment percentage and the

24 long-tail nature of many of the torts.

25        That's all I have on that topic, Your Honor,

1  unless you had questions.

2          THE COURT:  No.  I mean, I think that's a fair

3  analogy, but I think it -- it's again because the debtor is

4  out of the equation and you have a liquidating trust that's

5  for the benefit of creditors.  So, yes, I think it's --

6  you're right and I think it follows that.

7          MR. HARRON:  But keep in mind, Your Honor, that

8  it's not only the creditors that want the debtors to be out

9  of the equation, the debtor wants to be out of the equation.

10          THE COURT:  Yes.

11          MR. HARRON:  The debtor wants to be fully and

12  finally resolved of this issue and, therefore, it walks away,

13  but as part of that walk-away the parties with a financial

14  stake need some reasonable assurance that the trust is going

15  to work and that the trust will operate in a way that it

16  preserves the value of the estate assets, and that's all

17  we're asking for here.

18          So, you're right, the debtor has a stake in making

19  sure that the trust serves its purpose and obtains the

20  support of the survivors and meets the requirements of the

21  bankruptcy code, primarily because they want the finality of

22  the injunction.  But really during the case the debtor has a

23  strong interest in making sure the trust is appropriate and

24  satisfies all those concerns.  It's not until the case is

25  over on the effective date when the debtor really has -- no

1  longer has an interest in it.

2         So I don't think it's fair for anyone to suggest

3  that the debtor has no interest in how these procedures work.

4  The debtors want to vote and the debtors want the procedures

5  to comply with the bankruptcy code.  The claimants want the

6  procedures to work in a way that maximizes the value of the

7  assets or, at a minimum, doesn't diminish the value of the

8  estate assets, and that takes me to my second point.

9         Your Honor, insurance is a significant asset,

10  particularly for future claimants.  Our future claimants

11  primarily are those claimants right now who are under 18.  In

12  our view, they'd have full access to insurance to cover their

13  claims -- and these are claims for which Century does not

14  provide coverage -- absent the bankruptcy, they'd be paid in

15  full.  Even were the Scouts to liquidate, these future

16  claimants could go out and sue the chartered orgs and access

17  this very same coverage.  We don't need the Scouts, we don't

18  need the bankruptcy to get paid from insurance.

19         So, in our view, we want assurances that when this

20  case is over the bankruptcy has done no harm to the ability

21  of claimants to recover insurance, the Boy Scouts' insurance,

22  to the very same extent they could before the bankruptcy.

23         For example, Your Honor, and as I've mentioned,

24  it's important to the BSA that they kind of put this issue

25  behind them.  And one of the things for which they've

1 negotiated is that the claims will be resolved pursuant to a

2 trust.  Subject to some limited exceptions, claimants no

3 longer will name Boy Scouts or other participating parties

4 when they seek to get paid on their claims.

5          You may recall, Mr. Plevin mentioned earlier today

6 that it's his view -- and, anecdotally, he's asking you to

7 make a coverage finding when he suggests to you what the

8 policies say, but it's his view that the insurers don't have

9 to pay a thing until the Boy Scouts or other parties are

10 named in a lawsuit.  We have to reconcile these interests,

11 the interests of the claimants in preserving the insurance

12 asset and the interest of the Boy Scouts in no longer being

13 named as defendants in lawsuits, and we have to do it in a

14 way that doesn't allow lawyers like Mr. Plevin to argue in

15 the future that, hey, because the injunction doesn't allow

16 claimants to name the Boy Scouts, you no longer have

17 coverage, that's what we're trying to do.

18          So, Your Honor, there's a fair and equitable

19 component in Section 524(g).  As Mr. Rosenthal noted, this is

20 not an asbestos case, but I think even Mr. Rosenthal would

21 concede that analogies are drawn from 524(g) in non-asbestos

22 mass tort cases.

23          The 524(g) provision to which I allude is Section

24 524(g)(4)(B)(ii) where it talks about the relief --

25 "identifying the debtors and other third parties in an

1   injunction with respect to such demands, i.e. future

2   claimants, is fair and equitable with respect to the persons

3   that might subsequently assert demands."

4          And that's our point, Your Honor, we think this

5   plan is only fair and equitable if it doesn't prejudice our

6   ability to obtain insurance to the same extent we could

7   access that insurance pre-bankruptcy.  In our view, that's

8   what the findings do.  They don't expand the estate's rights,

9   they just make sure that the insurers don't opportunistically

10  utilize the bankruptcy to create defenses to coverage that

11  didn't exist before the bankruptcy occurred.  And, as I

12  mentioned a few days ago, we believe that's consistent with

13  Section 524(e) of the bankruptcy code, which makes clear that

14  the discharge of the debtor shall not release co-liable third

15  parties.

16         Your Honor, to my final point, you know, and

17  essentially why this plan should go out with our proposed

18  findings, the standard for denying a disclosure statement

19  based on the terms of a plan is basically the plan could not

20  possibly be confirmed.  It's often referred to as un-

21  confirmable on its face.  Your Honor, I'd suggest to you that

22  if you review the insurers' arguments in opposition to the

23  findings, their premised almost exclusively on factual

24  conjecture.  They speculate about the plan proponents'

25  motivations, they speculate about the quality of the claims

1   to be resolved by the trust, they speculate about the manner

2   in which Boy Scouts resolved claims prior to the bankruptcy,

3   they speculate that they're only liable if cases are taken to

4   judgment when we all know that they paid plenty of cases in

5   settlements and not judgments, they speculate about how we

6   might want to use these findings in other cases.  When Mr.

7   Rosenthal told you that the only party that's conceded that

8   they're opposing these findings for purposes of other cases

9   is Mr. Rosenthal and his clients, when he told you we won't

10  settle because of this precedent.

11          So, Your Honor, we'd suggest that if they need to

12  rely on factual speculation that supports our suggestion,

13  that we be allowed to make a factual record and that we'll

14  refute each and every one of the things they said, and we'd

15  like to do it at confirmation.  As a matter of law, that

16  would suggest that these findings are inappropriate, but

17  we've explained as a matter of law why they are.

18          Now, Your Honor, one thing you did not hear from

19  the insurers at all today was how these findings prejudice

20  their interests as creditors of the estate, not one mention

21  of it.  They're here today arguing in their capacity as

22  debtors of the debtors and debtors to the claimants.

23          And why do I mention that, Your Honor?  Well, I

24  get the sense that Your Honor is struggling with how best to

25  move this case forward, how best to do it quickly,

1  efficiently, and in a manner that preserves Scouting, and

2  you're wondering whether these findings will bring the

3  insurers to the table or prolong confirmation.  And I would

4  suggest to Your Honor that with the limited time you have to

5  hear from all of us and review our pleadings, you know, I'm

6  very sympathetic, that's a tough position for you to be in,

7  and I think the more appropriate route is just to defer to

8  the law and the bankruptcy code and what renders a plan not

9  confirmable on its face.

10         And I would also add, Your Honor, that the estate

11 fiduciaries, the debtor, the future rep, we have no

12 independent financial incentive, which is unlike the

13 incentives of the insurers.  The debtor; the future rep; the

14 Coalition, to the extent they're a fiduciary, which I believe

15 they are; and the TCC, who supported these findings when we

16 negotiated the term sheet -- I'm not certain today whether

17 Mr. Stang supports them still, but when he signed the RSA he

18 did -- all of the estate fiduciaries view these findings as

19 part of a package, which we believe is the most efficient and

20 appropriate way to get this case to confirmation.  And we

21 would suggest that our role as estate fiduciaries should

22 entitle us to more deference than what you're hearing from

23 insurers acting in their capacity as debtors of the debtor.

24         Thank you, Your Honor.

25         THE COURT:  Thank you.

1          Okay, we're going to take a break at 2 o'clock.

2  Mr. Stang, you have the floor between now and 2:00 --

3  Eastern, because you're on the West Coast.

4          (Laughter)

5          MR. STANG:  Thank you, Your Honor.  I just -- this

6  might in the nature of the cleanup.  You had asked earlier in

7  the hearing whether you were going to be asked or have you

8  been asked to determine the value of the claims and will you

9  be asked to do that.  And I think you said, well, no one has

10  asked me yet.  And there was an allusion, it may have been by

11  Mr. Rosenthal, to the aborted estimation motion.  We do think

12  that you're going to have to value the claims in the context

13  of determining whether Master Mortgage has been met, whether

14  the Hartford TCJC settlements are fair to meet the 9019

15  standard or whatever conditional standards may exist because

16  they're in the plan, and also the best interests test.

17          We have filed an application to employ a valuation

18  expert.  That application is pending, that is why we sought

19  to employ that firm, and we think that you will be asked to

20  value the claims, at least in the context of those three

21  matters, if not others.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.

24          Okay, Mr. Rosenthal, you have like 11 minutes.

25          MR. ROSENTHAL:  Your Honor, I was wondering if you

1   wanted a response or if we wanted to take a break.  I'm fine

2   with --

3           THE COURT:  No, let me hear from you,

4   Mr. Rosenthal.

5           MR. ROSENTHAL:  Okay.  First, Your Honor, I tried

6   to write down things as they were said, but I would say to

7   Your Honor, just to address sort of the fundamental point, I

8   have never thought of the TDPs as a settlement.  I think what

9   we have here is a plan.  As Your Honor correctly indicates,

10  the settlement between the debtor -- is between the debtors

11  as to how much they will have to contribute to the plan, and

12  that settlement is measured -- because that's what all plans

13  do -- that settlement is measured by the 1129 standards.

14          As you were saying, it's not really a settlement

15  with the debtor.  What really happened here is that the

16  claimants went out and they reached a deal with the debtor to

17  resolve the debtors' liability for an agreed amount of money

18  that the debtor thought was a pretty good deal and, in

19  exchange, the TDPs and the -- you know, the drafting of the

20  TDPs to the claimants, so that they could, as you were

21  saying, whack up whatever money came into that trust in

22  whatever way they thought appropriate.  I don't think the

23  debtors had anything to say about that, I don't think they

24  had a dog in that fight.

25          One of the things that you heard people say is

1  that, you know, this -- these TDPs reflect what the debtor

2  was doing in the tort system in historical norms.  That is

3  absolutely not true.  There were very few cases in the tort

4  system.  The historical norms, on average, were substantially

5  lower than what's being allowed here.  This is no different

6  than in an asbestos where the debtor -- you know, the debtor

7  turns over, you know, the keys to the trust to the claimants

8  and they figure out how to -- you know, how to distribute it.

9  In some cases, for example, in asbestos, meso claimants, they

10 don't get treated the same as other claimants in the trust,

11 they get a disproportionately high recover because that's a

12 negotiation that has occurred between the claimants' lawyers

13 themselves.

14       So I think the appropriate way to look at this is

15 as a confirmation issue, the appropriate standards are the

16 1129 standards.

17       There was some discussion, Your Honor, about a

18 trustee, why it wasn't chosen by the debtors and why a TAC.

19 So just a little background there.  Obviously, this is --

20 this comes from, originally, from the bankruptcy context.

21       When the debtors struck their deal, they didn't

22 really care what the deal looked like.  They didn't care how

23 the money was distributed, so they didn't care who was

24 distributing it.  I'm betting, Your Honor, that if you have

25 cases where, in fact, the debtor has an ongoing or a parent

1   company has an ongoing obligation to fund, that they would be

2   extremely interested in who the trustee would be.

3          In many of these cases we have three trustees to

4   represent various interests that sort of play off of one

5   another.  Here, we have one trustee that has connections to

6   the, you know, has connections to the claimants, including

7   the FCR, and is given wide discretion to allow claims

8   pursuant to these procedures.

9          The TAC is a typical, you know, the trust advisory

10  committee is a typical mechanism for a trust.  Their role is

11  really to sort of be the watchdog of what the trustee does,

12  and I think that's the same here.

13         One of the things that was pointed out, I think,

14  by Mr. Molton, in terms of the modification, is that they

15  have to come back to the Court for any modification.  I would

16  suggest to you that this is, again, this is exactly what Mr.

17  Molton said.  This is, again, the claimants wanting

18  safeguards against themselves.  They made this decision to

19  whack it up a certain way and they don't want the trustee to

20  change that decision, either without their consent or without

21  coming back to the Court, and that's the purpose, in this

22  TDP, of that provision.

23         Just briefly on Ms. Quinn's remarks, she had

24  argued that the findings don't really make determinations;

25  obviously, Your Honor, I disagree, and I think they can be

1  misused to imply that they, and suggest that you made

2  determinations, and certainly can be done to do unless you

3  clarify exactly what you're doing and what you're not doing.

4        And I think she or one of the others went on to

5  say that the insurers shouldn't get two bites at the apple.

6  I think this was made whether in response to one of my

7  comments or Mr. Plevin's, but this is exactly the point I was

8  making.  This is intended to be determinative.  Their view is

9  she couldn't get two bites at the apple.

10       The first bite is this Court's determination, and

11  then they're going to go to a coverage court and say, you

12  already decided it, Your Honor.  They shouldn't get two bites

13  at the apple.

14       One of the things that was mentioned by, I think,

15  Mr. Goodman is that I hadn't talked about the good faith

16  finding.  I was about to talk about that, but we got waylaid

17  at the time.  I agree that 1129(a)(3) requires a good faith

18  finding, but it requires a good faith finding with respect to

19  the plan, and they want to extend that finding to the trust

20  distribution procedures, which we think is not appropriate,

21  and it's inappropriate for all the reasons that I've been

22  discussing, which is to say, these weren't negotiated

23  procedures.  And so, what went on while the claimants were

24  deciding how they wanted to whack up these values isn't

25  proper for this Court to consider or opine on.

1          There was a reference, Your Honor, Ms. Quinn tried

2     to say -- and I knew she was going to do this because she was

3     very active in Purdue -- she tried to argue that, you know,

4     the horse is out of the barn, that Judge Drain had decided

5     that, you know, a plan should not be insurance-neutral.  I

6     don't think that's what Judge Drain decided, Your Honor.

7          As Ms. Quinn, herself, argued to Judge Drain, the

8     Purdue case was *sui generis* and didn't have a broader impact.

9     There were, in fact, no findings in Purdue that approved TDPs

10    or liquidations of values.  What was involved there was a

11    settlement, similar to the sort of the settlement between the

12    estate and, you know, between the debtors -- with the

13    debtors.

14          This time, though, it was a settlement, it was a

15    third-party settlement with the Sackler (phonetic) family.

16    So, I don't think that Purdue is analogous to this case, nor

17    do I think that it opens the door.  But if it does, Your

18    Honor, I think it goes back to a point that I was making,

19    that they're trying to use this Court to build on that case

20    to change the insurance neutrality doctrine or the doctrine

21    that you shouldn't -- in my view, that's the doctrine that

22    you shouldn't be altering the contractual rights of insurers

23    to something different, that you are able to alter the

24    contractual rights of insurers.

25          You had mentioned something about one of the

1  findings, I think it was T, something like that, that the

2  finding about, you know, is any amounts -- they use loaded

3  words.  In each of these findings they're using loaded

4  words -- allowed -- whatever.  Of course, the reason, I

5  think, Your Honor, they're using these loaded words is

6  because they want to squeeze them within the parameters of

7  allowed claims.

8          You know, the normal way you might -- you would do

9  something like this in an asbestos context, for example, is

10  their treatment, the treatment would be, you know, the

11  treatment of the asbestos claimants here, abuse claimants is

12  the treatment they get in the TDP, period.  That's the

13  treatment.

14          Let me -- I have a couple more things and then

15  I'll let us break.  One of the questions you asked me was

16  about expedited distributions and saying isn't this really

17  just a convenience payment?

18          I don't think it is, Your Honor.  First, we don't

19  make $3500 convenience payments in these situations.  We,

20  generally, would make smaller payments, and, of course, this

21  is in addition to the comment I made about no ability of the

22  trustee to object.

23          But I think another equally important point is

24  that these claims would never have been brought in the tort

25  system.  You know, for $3500 even, how many of these claims

1  would make it to the tort system?

2          It costs more than that to put the litigation

3  together and bring the claims.  So, these claims, and this is

4  more of an observation, you know, many of these claims would

5  never have been brought, and so this $3500 times 10,000 or

6  20,000 or 30,000 is a lot of money.

7          You had asked me on Ohio State, the Ohio State

8  decision, whether it was decided on an aggregate basis and I

9  got about a hundred emails from the insurers, some of the

10  insurers over the last 30 minutes saying it was that the

11  abuse was in, I think, 1998 and there was a two-year abuse

12  statute relevant there, and, you know, this was 20 years

13  later.

14          So, one more thing -- no, I don't think I have

15  anything further.  Thank you very much for the time, Your

16  Honor.

17          THE COURT:  Thank you.  We are going to take a

18  break, because, while I could continue, my staff needs a

19  break and they're, as we know, the most important people that

20  we have to be concerned about here, so we're going to take a

21  break.

22          But let me ask you one question, Mr. Rosenthal.  I

23  mean, you would agree that the settlement that the debtor is

24  making in this case is not just their contribution; it's also

25  the assignment, contribution, whatever you want to call it,

1  their right to insurance or insurance proceeds or their

2  whatever rights they have under the policy to the trust.

3              MR. ROSENTHAL:  I would.

4              THE COURT:  Okay.  We're going to take a break.

5  It's two o'clock.  We're going to take a break until 3:00 and

6  we'll be back.

7              We're in recess.

8              COUNSEL:  Thank you, Your Honor.

9          (Recess taken at 2:00 p.m.)

10         (Proceedings resumed at 3:03 p.m.)

11             THE COURT:  This is Judge Silverstein.  We're back

12  on the record in Boy Scouts.

13             MR. ABBOTT:  Thank you, Your Honor.  Ms. --

14             THE COURT:  I --

15             MS. ABBOTT:  Go ahead.  Your Honor, do you have a

16  desire about how we proceed from here?

17             THE COURT:  So I have thoughts about what I've

18  heard to date.  Mr. Schiavoni, I see your hand is up.  I'll

19  give you five minutes.

20             MR. SCHIAVONI:  Just, what if I just do it in a

21  minute because what I'm --

22             THE COURT:  Better.

23             MR. SCHIAVONI:  Better, good.  Here's what I'm

24  going to suggest to Your Honor if you could, you know, please

25  give some thought to in essence reserving decision or -- or

1  discussion here until you hear now argument on the schedule

2  because I think you've gotten a flavor, like one of the

3  things we suggested the other day when -- or I did when we

4  talked about this argument was how together with the -- with

5  the -- one informs the other so to speak.  Okay?

6          Whether or not Your Honor determines that a

7  particular finding can or could not be made, and you may well

8  decide the more prudent thing to do is to await confirmation

9  and make that decision.  There's a secondary issue with

10  regard to each one of these, but, you know, frankly, I would

11  suggest that you've got to really look at them collectively.

12          And that is how they impact discovery, okay, and

13  the schedule because I think you've gotten a flavor that this

14  is -- these are not pure issues of law, that these are driven

15  by, I think, intense analysis of what happened.  The notion

16  that you're going to make a finding clarifying what the deal

17  is without having any of the documents before you of what the

18  deal is, in fact, right that was actually discussed among the

19  parties, how you're going to make findings that are very

20  broad on good faith instead of limited without having the

21  documents about the transaction, how you're going to make

22  some sort of finding that these are procedures that would

23  adjudicate 82,000 claims without actually having claimant

24  discovery and what not, it all implicates discovery.  And,

25  you know, the flip side of all of this is that, you know, the

1  debtor is saying do this discovery.  You're going to hear it

2  in 60 days and that you serve one set of discovery requests

3  and that's it.  And it's like, you know, we -- we get it all

4  done before Christmas.  It's like when, you know, bottom line

5  when this hits the circuit, it's like if, in fact, it's

6  presented just because I got -- I'm almost at the minute

7  mark, it's like what comes out is that like in some 60-day

8  proceeding, we generated an adjudicated result for 82,000

9  claims, you know, exceeding $100 billion or $200 billion, or

10 whatever the number is now.  You know, that tells its own

11 story.  This is not -- this is -- it's com- -- this is off

12 the rails as far as what the ask is for the findings and what

13 the -- the -- the discussion is on the discovery.

14            THE COURT:  Okay.  Thank you.  Okay.  Well, let me

15 give some thoughts and let me say this wasn't part of what I

16 was thinking about, but in terms of the appellate process

17 it's an important part of any case.  And it is a part of a

18 case.  And I think my job is to do -- is to make the best

19 decision that I can make, and then if parties disagree with

20 that decision, they take it up, and that's part of the

21 process.  I've said this in other cases.  It doesn't offend

22 me.  It's part of the process.  It's how it works.  My job is

23 to make the best decision that I can make based on the

24 presentations, factual and legal arguments that are presented

25 to me.

1          But I do have some thoughts because I think these

2     findings have clearly been a focus of many hearings before

3     me, and they are a focus of the parties and not -- in terms

4     of sending the plan out, not in the sense that a plan would

5     be patently unconfirmable as a matter of law without these

6     findings, but that people are telling me that -- people,

7     the -- the -- in particular, I guess, I'm hearing it from the

8     coalition, the FCR, are telling me that these findings are

9     necessary for their clients to support the settlement.

10          That's what I'm hearing.  It's not hearing as a

11     matter of law there's some patently unconfirmable plan in

12     front of me but that these findings are necessary.

13          So let me -- I'm not going to satisfy everybody,

14     but let's walk through some of them and I will give you some

15     thoughts.

16          The first one, and I am looking in the plan,

17     Article 9, paragraph 3, J was the first condition precedent.

18     The insurance assignment is authorized as provided in the

19     plan, notwithstanding any terms of the policy or provisions

20     of non-bankruptcy law and that the settlement trust is a

21     proper defendant for abuse claims to assert the liability of

22     the protected parties to trigger, I guess that's an insurance

23     concept, such insurance rights, et cetera.

24          I will be making a decision on the insurance

25     assignment for the debtor's policies, for sure.  That's a

1   matter of law, and I believe there's law in the Third Circuit

2   with respect to it.  And I will respect that law and apply

3   that law with respect to the debtor's policies.

4           And it strikes me that the settlement trust has to

5   be an appropriate person to assert rights with respect to the

6   debtor's policies or else we couldn't be here and no mass

7   tort claim -- no mass tort case would work.  It just doesn't

8   make any sense.

9           With respect to non-debtor policies, I understand

10  that that is a different issue, and the debtors have proposed

11  a workaround.  And we'll see if that workaround works.

12  That's what people have suggested.  It might.  As I said,

13  it's not a workaround that I particularly care for,

14  generally, on principle, but nonetheless it's what's being

15  put in front of me, and I think I can probably rule on that.

16          With respect to "Q," the plan, the plan documents,

17  and the confirmation order shall be binding on all parties in

18  interest, I will say there what I say oftentimes in the

19  context of a confirmation order, a sale order, et cetera.

20          This provision really tells us who a plan binds,

21  and the code and the case law tell -- case law explains it.

22  Okay?  That's who I can bind.  I don't think I can do

23  anything other than that, and that includes the code 1141,

24  case law interpreting 1141, doctrines of res judicata,

25  collateral estoppel, doctrines of a plan as a contract, et

1  cetera.

2          So mirror the code.  Okay?  Some -- some judges

3  used to say, yeah, here's my two-page confirmation order.  I

4  confirmed your plan.  Okay?  And then all of the effects that

5  it has, it has.  But here is a mirror the code.

6          I'm going to skip down to T.  The plan and the

7  trust distribution procedures were proposed in good faith and

8  sufficient to satisfy the requirements of 1129(a)(3).  I'm

9  going to apply 1129(a)(3) in accordance with Third Circuit

10  law.  Whether you can sweet the trust distribution procedures

11  into that or not, I don't know.  But I'm not sure I should be

12  doing that.  It's the -- the -- the requirement of 1129(a)(3)

13  is with respect to -- let me make sure I'm right, the plan,

14  which might encompass a lot of things.

15          The plan has been proposed in good faith and not

16  by any means forbidden by law.  That's what I am supposed to

17  find, and what was interesting, when I went back and looked

18  at these conditions precedent, is many of them contain a

19  specific reference to a code section or 9019.  They give me a

20  frame of reference as to what I am supposed to be guided by.

21  Some of these do, and some of these that we're looking at

22  don't, but I think it's interesting that it highlights the

23  fact that for certain of these findings there's no reference

24  to the code or any provision of the rules.

25          Okay.  I think those three are pretty, quite

1  frankly, easy, and they're within my -- the general bailiwick

2  of a confirmation hearing.  And I don't think those are

3  different than what I would have to find, except for the

4  insurance assignment, obviously.  The insurance assignment

5  is -- is specific to here, but the bindingness of the plan,

6  1129(a)(3), that is the same as any other plan that is put in

7  front of me than where I have to contend with it on

8  confirmation.

9          Finding or condition precedent R, the procedures

10 included in the trust distribution procedures pertaining to

11 the allowance of abuse claims, and the criteria, et cetera,

12 are fair and reasonable.  I'm still not sure what this falls

13 under in terms of a plan confirmation standard.

14          If I have to find because it's contested, if it

15 is, that the trust distribution procedures or the claims

16 amounts in the matrices are appropriate, acceptable, I don't

17 know, part of a negotiation.  I don't know what I'm going to

18 find out there, I may make that kind of a finding.  But it's

19 certainly going to be constrained by the type of hearing that

20 I have and the purpose of the hearing.  And that's the

21 context in which I will make any such findings.

22          I don't know if fair and reasonable is the

23 standard, nor, quite frankly, do I know how that could

24 possibly impact anybody -- any insurance company's

25 obligations under a plan -- under their policies.  I don't

1  know if those are magic words or not magic words.  I suspect

2  they are not the words in the policy.

3          With respect to condition precedent S, the right

4  to payment that the holder of an abuse claim has against the

5  debtors, or another protected party, is the allowed value of

6  such abuse claim, as liquidated in accordance with the

7  distribution procedures, and is not the initial or

8  supplemental payment percentage or the contributions made by

9  the debtors.  Again, I don't know what standard this would

10 fall within, but I think there's some general things we can

11 say about this.

12          A claimant's right to payment, and that does come,

13 someone said this, right from the definition of a claim.

14 Somebody has a claim.  There are other contexts in which we

15 look at what their claim is, which might be analogous here, I

16 don't know.  But if someone is adjudicated to have a claim

17 for $1,000 and there's a bankruptcy distribution of 10 cents

18 on the dollar, it doesn't mean their claim is $100.  Their

19 claim is still $1,000.  Whether they will be ever able to

20 collect that amount from anybody else is a different issue.

21 Maybe there's a guarantor who will pay them the other $900.

22 Maybe that guarantor doesn't have to pay them the other $900

23 because their contract of guarantee limits it.

24          But we know that there are bank -- we know that

25 rarely do creditors receive 100 cents.  They get some sort of

1  bankruptcy distribution, and I think anybody looking at a

2  bankruptcy distribution would not say that that person didn't

3  have a claim for the full amount of their claim, whatever it

4  is.  I would hope that's not controversial.

5          What I think is controversial about this paragraph

6  is how can -- is -- is -- how does that work in the insurance

7  coverage context?  What does a policy provide for?  What does

8  it say it covers?  What product did the debtors buy?  And so

9  this paragraph is probably the one I find most concerning in

10 terms of not knowing how it might be used later on down the

11 line, but I think there's some -- ought to be some

12 fundamental universal first principles about claims that I

13 think parties could probably agree to.

14          And then some other court looks at it and applies

15 it to particular contracts and a particular context.  But I

16 will say that that paragraph S to the extent it has to be in

17 the form that is in this condition precedent is something

18 that I might not feel comfortable with in the way it's

19 written.  And, as I said, the most troubling in that regard,

20 and I don't think anyone should be surprised by this, are

21 condition precedent R and S.  But I think that there are some

22 fundamental principles behind some of this, particularly S,

23 that parties presumably could agree on.

24          And that's the guidance that I can give.

25          Other than that, I think, again, context matters.

1  I don't know what's going to be put in front of me.  Somebody

2  says parties are on, you know, shifting.  I would say a lot

3  of the parties have shifted their positions, depending on

4  whether they're in agreement in a particular time with what's

5  going forward or not.  So -- and that's not surprising.  It

6  happens in cases, and that's where we are in this case.

7           So I don't know if that was helpful or unhelpful,

8  but that's the best I can do at this point in time.  I do

9  think, though, that to the extent that these particular

10  findings are gating issues for somebody who is supportive of

11  this plan, you need to give some thought to my comments.

12  Okay.  Let's move on.

13           Ms. Lauria?

14           MS. LAURIA:  Thank you, Your Honor.

15           Appreciate that feedback, and presumably we may

16  have another break today and we'll circle up with the other

17  co-proponents to determine what their reaction is or their

18  initial reaction to Your Honor's remarks.  But we appreciate

19  that very much.

20           Your Honor, by my count we had another six or

21  seven issues that were raised in Mr. Rosenthal's remarks.  I

22  didn't see any of them as rising to the level of patently

23  unconfirmable.  I'm happy to address any or all of them.  I

24  do think, importantly, we should address the timing and the

25  uncertainty point that he raised because I feel that is an

1  issue that we've been confronting regularly.  And as

2  Mr. Kurtz said last week it's something that is critically

3  important to the debtors and so I want to get that on the

4  table.

5        And then, again, happy to respond to, and I can

6  list them again, the handful of other issues that he

7  mentioned.

8        You know, Mr. Rosenthal opened his remarks today

9  by saying, you know, we don't think that this disclosure

10  statement should be sent out now for solicitation, that we

11  should hold off a couple of weeks because right now we don't

12  have anything close to global consensus.  And as Your Honor,

13  and probably more particularly your chambers, is painfully

14  aware, there have been multiple times during this case that

15  due to where we're at in mediation we have contacted chambers

16  and we've asked chambers to push something off so that we can

17  continue to mediate.

18        We have done that when we have felt we are on the

19  brink of something that could be, you know, a game changer

20  with respect to the case itself.

21        We are not there, Your Honor.  This is -- we are

22  at the point where we have a plan that is substantially

23  mature, and it is ready to go out for solicitation.  No

24  amount of mediation is going to change the core and

25  fundamental principles of this plan of reorganization,

1  subject, of course, to the remarks that Your Honor just made,

2  which we want to circle up with our colleagues about.

3         I didn't hear anything that necessarily should

4  change folks' minds, but right now I think we have a core

5  plan that is ready for solicitation.  Importantly, from the

6  continued mediation perspective, we think mediation should

7  continue.  We will continue to mediate with the chartered

8  organizations.  We will continue to mediate with

9  Mr. Rosenthal and the other insurers.  In fact, the nice

10 thing about this plan, now that we have one very significant

11 insurer on sides, that's Hartford, and one very significant

12 chartered organizations on sides, that's -- that's LDS or

13 TCJC, we've had someone wearing the hat of an insurer and the

14 hat of a chartered organization review the plan and comment

15 on those terms.

16         So as we look forward, additional settlements are

17 really bolt-ons to the structure that we already have and

18 that were already contemplated by the plan of reorganization

19 itself.  No amount of time is going to change that, and, in

20 fact, as you heard from Mr. Kurtz last week and myself at the

21 outset of the hearing last week, time is not the debtor's

22 friend.

23         By the time we get to March, our trust

24 distribution is going to go down to zero from a cash

25 perspective, and the rest of the plan becomes significantly

1   infeasible if not infeasible and would have to be recut.  So

2   time is not our friend, and we are ready to launch.

3              In terms of there's too much uncertainty, I can

4   tell you, Your Honor, there are numerous members of the

5   coalition law firms or in state court counsel that I think

6   are here to tell you today that it's not uncertain, that

7   state court counsel representing 81 percent of abuse

8   claimants are here in support of the plan.

9              The coalition lawyers and state court counsel

10  affiliated with them have worked incredibly hard through the

11  mediation process.  They have literally shown up at every

12  mediation session for the last year, probably before that.

13  These were hard fought negotiations through mediation that

14  the coalition and FCR and debtors worked very, very, very

15  hard for.  So to suggest there's some sort of uncertainty or

16  a lack of global consensus, I think we have numerous

17  individuals on the line today, Your Honor, that will tell you

18  that's just not the case.

19             Have we reached agreement with all of our

20  insurers?  Clearly not, and we are looking forward to

21  continuing to negotiate with them.  We clearly have not

22  reached agreement with all of the chartered organizations,

23  and we're looking forward to continuing to negotiate with

24  them.  But that doesn't change the fact that we have a huge

25  ground swell of support for this plan today and, again, Your

1  Honor, I haven't heard anything that renders this plan

2  patently unconfirmable under American Capital Equipment that

3  should prohibit it from going out the door and being

4  solicited and getting that process started.

5          We also think it's critically important, and

6  you'll hear from Mr. Kurtz on this later in today's

7  presentation that we think it's critically important that the

8  timeline for confirmation discovery get kicked off

9  immediately.

10         So that, I think, was something that was very

11  important for me to address with the Court, Your Honor.  In

12  terms of the other issues, I'm going to tick them off just to

13  see if there's something that you want to hear more about.

14         We heard about the coalition legal fees.  In

15  short, we thought it was appropriate at the RSA phase given

16  the amount of energy that the coalition put into this, we

17  heard Your Honor at the RSA say it's premature for me to

18  endorse this today.  Let's see where this case comes out.

19  That's why it's baked into the plan because that's at the

20  tail end.  That's when you know when these cases come out.

21  They've worked hard.

22         They're continuing to work hard, and the debtors

23  thought it was appropriate.

24         On third-party releases, and I believe

25  Mr. Patterson also referenced this in one of his pleadings,

1   Mr. Rosenthal indicated that we've got it backwards, that the

2   debtor's claims are indeed derivative of local councils and

3   chartered organizations, not the reverse.  That's just wrong,

4   Your Honor.

5            As you know from the first day of this case, the

6   Boy Scouts of America was congressionally chartered with the

7   mission of scouting in 1916 pursuant to an act of Congress.

8   It is only the national organization that has the ability to

9   grant charters to provide scouting throughout the United

10  States.

11           National controls the delivery of scouting at a

12  local level, and so these are, in fact, we are the scouts, we

13  are the scouting movement, we hold the congressional charter,

14  and no one has asserted, and, in fact, we haven't seen any

15  complaints where the national organization is getting accused

16  of some sort of vicarious liability on the part of the local

17  councils or on the part of chartered organizations.

18           In fact, you'll remember, Your Honor, I think it

19  was three months into this case, I think it was our first

20  contested hearing on the preliminary injunction, pre-

21  bankruptcy case, these complaints defined scouting as

22  scouting, national local counsel and at the local

23  organization unit level.  But that's a factual issue.  That's

24  not an unconfirmable on its face, Your Honor.

25           But I did -- it's an important legal issue that

1  you will hear a lot about and a factual issue to the extent

2  there's issues with the third-party releases.

3           You've heard a lot about the $3,500 expedited

4  distribution.  That's going to come up, again, when we deal

5  with the committee's motion.  Mr. Rosenthal raised issues

6  concerning whether there would be an adequate basis to pay

7  out on those $3,500 claims.  Again, I don't want to belabor

8  that point now.  I'm just going to make two observations.

9  One, the expedited distribution has been tossed around a lot

10 over the last four days of court.

11          Two important things:  One, in order to receive

12 the expedited distribution, the party had to have

13 substantially completed their proof of claim form.  And, two,

14 the individual had to sign their proof of claim form.  It

15 could not have been signed by an attorney.  The TDP has

16 always said it had to have been actually signed by the

17 claimant itself to be eligible.

18          I have to correct the record from Mr. Schiavoni

19 who suggested that the majority of the proof of claim form

20 was background information concerning the individual.  That's

21 just not true.  It's 12 pages.  8 of those pages pertain to

22 questions related to abuse, scouting, chartered

23 organizations, the relationship with the abuser.  There's one

24 page on background, two pages on instructions, one signature

25 page.

1          And then, finally, I think you heard a lot about
2    good faith.  That is clearly a factual issue.  Whether it's
3    in the 1129(a)(3) context or not, we will be prepared at the
4    confirmation hearing to demonstrate that the debtor satisfies
5    all of the 1129 standards for receiving confirmation of the
6    plan, including 1129(a)(3), and that's just not a reason to
7    prevent the plan and the disclosure statement from going out
8    for solicitation.

9          So that was a very fast canvassing of the issues
10   that you heard about.  We're happy to go into more of them
11   now, later, but we don't think there's anything here that
12   should prevent this plan from being solicited.

13         As I said, Your Honor, I know there's coalition
14   folks here that may want to be heard.  In fact, I see
15   Mr. Rothweiler has raised his hand, but unless you've got
16   questions for me, that's where -- where I think we see the
17   world.

18         THE COURT:  Thank you.  No, I don't have any
19   questions from you.  I am going to want to hear more about
20   the $3,500 expedited distribution in the context of the
21   committee motion or the change to the plan, and so we'll deal
22   with that.  But, no, I don't need anything further on the
23   other issues you ticked off quickly for me.

24         MS. LAURIA:  Thank you, Your Honor.

25         THE COURT:  Okay.  I do see Mr. Rothweiler.

1         MR. ROTHWEILER:  Your Honor, can you hear me?

2         THE COURT:  I can.

3         MR. ROTHWEILER:  Very good.  Thank you, Your

4   Honor.  I appreciate the opportunity to speak.  Let me just

5   introduce myself since I haven't been before the Court

6   before.  My name is Ken Rothweiler.  I am a cofounder of the

7   firm of Eisenberg, Rothweiler, Winkler, Eisenberg, and Jeck.

8         I think I need to tell you a little bit about my

9   background, Your Honor, because it may be relevant to some of

10  the comments that I will be making so that you know a little

11  bit about my history.  I am here in Philadelphia.  I have

12  been a trial lawyer for 40 years, and when I say I've been a

13  trial lawyer, I've actually tried cases.  I've tried cases

14  from my first day out of law school, and I -- I've never been

15  in the practice of trying automobile cases or slip and fall

16  cases.  I've tried cases that are catastrophic injury cases.

17  My clients are brain-damaged individuals, paraplegics.

18        The most severely injured amongst all claimants

19  are the claimants I've represented for 40 years.

20        I've also represented sex abuse clients that I'll

21  tell you more about.  In my career, Your Honor, I've tried

22  over a hundred trials to verdict, so I have extensive

23  experience in a courtroom.  I don't have extensive experience

24  in a courtroom like this, Your Honor, so I'm unfamiliar with

25  bankruptcy court but I've learned a lot over the last 19

1  months.  It's a whole different way of practicing law, and I

2  must say just as an aside that you have amazing stamina and

3  patience because some of these hearings go extremely law and

4  it tests my own stamina and patience.  So I just wanted to

5  say that to you.

6        THE COURT:  Well, welcome to the Wild West, which

7  is what my former partners who were litigators thought about

8  whenever I asked them to come into bankruptcy court.

9        MR. ROTHWEILER:  That's what I've heard.

10        Your Honor, I'm -- I'm one of those lawyers that

11  you would say I try one case at a time.  I represent one

12  client at a time.  It's very unusual for me to represent any

13  more than one client.  The only exception was I was one of

14  the counsel that represented the Amtrak victims that got

15  hurt, severely hurt and killed here in Philadelphia a number

16  of years ago.  I represented a dozen or so of those Amtrak

17  clients to a successful conclusion, and that's probably my

18  only example of representing more than one client in -- in

19  any litigation.

20        I should tell you that I'm a proud member of the

21  Plaintiff's Bar here in Philadelphia.  I have served as

22  president of the Philadelphia Trial Lawyers Association and

23  also of the Pennsylvania Trial Lawyers Association.  I've

24  represented, you know, over 15,000 plaintiffs trial lawyers

25  before the Harrisburg legislature fighting tort reform and

1  other issues that came before the Plaintiffs Bar over the

2  last 40 years.

3          So I'm steeped in the tradition of a plaintiffs

4  trial lawyer, Your Honor.  I'm proud to be one, and I've

5  heard -- on these hearings I've heard some innuendo about and

6  insinuation about plaintiffs' trial lawyers.  I can tell you

7  that that hurts.  It comes -- it comes as an offense to me

8  because those of us that try cases risk everything going into

9  a courtroom representing clients with by the way no guarantee

10 of ever being paid.  I work on cases for years, years without

11 any guarantee of ever being paid.

12         I spend hundreds of thousands of dollars on cases

13 and through the workings of other lawyers in my office and

14 through discovery and through the different things that we

15 have to do.  We hopefully are successful at the end of the

16 day.

17         So just a little bit of editorial comment there,

18 Your Honor, but I just think that I needed to say that.  I

19 have to tell you, Your Honor, that I did not intend to speak

20 during any of these hearings.  That was not my goal.  I have

21 very able counsel with Mr. Molton and Mr. Goodman to speak

22 for us, which they have done.

23         But hearing some of the objectors, I felt I needed

24 to speak and address some issues and to provide the Court

25 with context.

1        And to start off with, Your Honor, I would just

2   like to respond to one thing that Mr. Rosenthal said earlier

3   today, and I -- and I wrote it down when he said it, and he

4   said many survivors oppose the plan.

5        I don't know what Mr. Rosenthal's definition of

6   "many" is, but I can cite some facts for you.  In the RSA, 41

7   firms supported the RSA, 70,347 survivors supported the RSA.

8   And, Your Honor, that was before the Hartford deal, and that

9   was before the LDS deal.

10       What was in the RSA at that time was $850 million

11  that was coming from the BSA and the local councils.  Through

12  the hard work of a lot of people, we've now increased that

13  amount to $1.9 billion, and we're not done yet.  We're

14  nowhere near done, and as we put more money into that trust,

15  the amount of people that agree with the plan and will vote

16  for the plan goes up, because as you can tell a lot of the

17  survivors if you talk to them, the ones that are opposed,

18  they're opposed because they believe there's not enough money

19  to fund the trust.  Well, we're working on that every day.

20       Your Honor, for the last 19 months, I've done

21  nothing other than work on this 24/7.  I've not worked on one

22  other case other than this case.  Through the last 19 months,

23  I've suffered through COVID.  I got COVID.  My mother died as

24  a result of COVID.  It's been, you know, a very traumatic

25  experience for me and for my law firm.  So people are hard at

1  work, and we're hard at work because we believe that these

2  survivors need to be compensated and they need to put this

3  behind them.  And time is not their friend.

4          During the pendency of this bankruptcy, I've had

5  clients that have died.  I've had clients that have committed

6  suicide.  Time is not the friend of survivors, and I believe

7  the Court, you know, needs to know that and needs to hear

8  that.

9          With regard to the objectors, last week, Your

10  Honor, I heard two -- and we call them state court lawyers in

11  bankruptcy court, but, you know, in my world we call them

12  plaintiffs lawyers.  State court lawyers is a little bit of a

13  different term for me.

14          But I heard two state court lawyers speak, and

15  they're both prominent state court lawyers and I have a lot

16  of respect for both of them, but they do not speak for the

17  majority of the survivors.

18          My firm represents over 16,800 survivors.  We

19  represent the largest group of survivors in the bankruptcy.

20  Your Honor, the amount of survivors that my firm represents

21  is twice as many survivors then the entire TCC combined.  So

22  we believe that we have a loud voice in this bankruptcy.

23          We also believe that we have a fiduciary right,

24  you know, obligation here.  I know that the TCC is -- has

25  been appointed by the U.S. trustee and serves as the

1  fiduciary, but with the amount of clients that we represent,

2  Your Honor, we believe that we have that same fiduciary

3  obligation.

4         I think I need to give Your Honor some context of

5  how we got here.  Why so many cases?  You know, Mr. Schiavoni

6  said how did there become such a case explosion?  And when he

7  has said that and when he has been before this Court, there

8  was always at least from my perspective an implication by

9  Mr. Schiavoni that somehow plaintiffs' lawyers were the cause

10 of the explosion in cases.

11        Let me make this clear for everybody listening.

12 Pedophiles are the cause of the explosion.  Pedophiles is the

13 reason why there are so many cases, not plaintiffs' lawyers,

14 and that needs to be said because plaintiffs' lawyers are

15 just representing those survivors.  It's the pedophiles that

16 are the enemy, not the Plaintiffs Bar, not plaintiffs' trial

17 lawyers.

18        We're doing our best to do what we can for the

19 survivors.

20        And I think I need to tell Your Honor how I became

21 involved in this -- this -- this litigation, and how it

22 progressed for me.  And I need to tell you we need to go back

23 to 2013 for that description and that story because a young

24 man walked into my office and sat right there in my couch in

25 my office, 24 years old.  He told me a very compelling story

1  about being abused by his scout master when he was 12 years
2  old.

3          And as he told me the story, tears down his face
4  and down my face.  He told me about for 12 years he kept it
5  to himself, never told his mother, never told his best
6  friend, never told his girlfriend, and he was married at the
7  time, never told his wife.

8          Told me he was suicidal during that time period.
9  But he told me he needed to get his story out, and he thought
10 I was the lawyer to take on the case.  Well, we worked on the
11 case, we took depositions, and the case settled as it was
12 coming up for trial.  It was a very, very compelling case,
13 and it was a significant settlement, probably the largest
14 settlement of any single case that the Boy Scouts have ever
15 paid on.  And that's probably still true today.

16          And to be honest with, Your Honor, I thought it
17 was a single case.  I thought it was just another one of the
18 cases that of a plaintiff that I represented in my forty
19 years' practice, but it wasn't.  It wasn't, and -- and two
20 years later, Your Honor, CNN Did a ten- minute feature on
21 that case, and if anyone is interested you can still see that
22 case on YouTube on the internet, and as a result of that case
23 getting some publicity, I started to get referrals for,
24 again, single cases from around the country.  I got them from
25 the West Coast, from the East Coast and from all over.

1          And every one of those cases, Your Honor, we

2     settled, and some of those cases had very significant statute

3     of limitations issues, but you know what good lawyers can

4     figure out arguments to overcome things like -- problems like

5     statute of limitation problems.  And the BSA paid on every

6     single one of those cases.

7          And then the bankruptcy occurred.  And why was

8     there this explosion, Your Honor?  Why all of the sudden did

9     it go, as Mr. Schiavoni said, from 200 cases or maybe 1,000

10    cases to this 82,000 cases?  You know and I wrestled with

11    that question myself, and you know the answer I came up with.

12    People that have suffered sexual abuse who have suffered in

13    science now realized that there was a whole community of

14    people out there that the same thing happened to them over

15    the decades, and it gave them comfort.  If you listen to the

16    survivors, they will tell you that the most comforting thing

17    in this whole saga has been that there are tens of thousands

18    of other men that it happened to and they also suffered but

19    now they were a community together.

20         Mr. Buchbinder, when we were interviewing for the

21    TCC committee, he heard hundreds of those stories.

22         I sat in a room with him while he listened to

23    those stories, you know, and -- and they're compelling and

24    they're unbelievable that this kind of thing, you know, has

25    gone on in America where there's been tens of thousands of

1  pedophiles that have caused this situation.

2          Then what happened, Your Honor, we -- we formed

3  the TCC.  When I say we formed it, I was on the TCC, and my

4  firm was on the TCC, and we had a representative, a survivor,

5  on the TCC.  And I came to know the people on the TCC, who I

6  very much respect.

7          And I came to know two other firms on the TCC,

8  Andrews and Thornton, and Ann Andrews, who was one of the

9  people I got to know.  Slater, Slater and Schulman from New

10  York City.  I got to know Adam Slater very well, and we

11  started to understand, Your Honor, that between our three

12  firms, we represented over 40,000 survivors.  And we

13  understood what goes on in bankruptcy court where there has

14  to be votes at the end, and we understood that we had a

15  big -- big position in the bankruptcy because of all of the

16  clients that we represented.

17          After five months of being on the TCC, Your Honor,

18  we realized that we had unresolvable differences in

19  philosophy with the TCC, and what we decided to do, our three

20  firms, is we decided to form an ad hoc committee called the

21  coalition.

22          And I have to tell you, Your Honor, this is - -

23  this took a lot of thought and a lot of consideration from

24  all of our firms.  I mean I have a firm of ten lawyers.  I

25  don't have a big firm.  We handle big cases, but it's not a

1  lot of lawyers that make up my firm.  We knew that we were

2  going to have to assume the financial burden of going forward

3  as an ad hoc committee.  That means paying the -- the

4  bankruptcy lawyers, paying all of the professionals, the

5  financial advisor and everybody that we would need in order

6  to go through the bankruptcy.  And it was a big decision, but

7  between Ann Andrews, Adam Slater, and myself, we said to

8  represent the survivors the way the survivors need to be

9  represented, we need to band together in order to represent

10  the survivors.  And, hence, the coalition was formed.

11        Your Honor, we now represent over 65,000 survivors

12  between all of the members of the coalition committee and

13  it's not just our three firms.  Other firms have joined us as

14  well with thousands of clients that they also represent.

15        Your Honor, by contrast, the TCC represents about

16  6,800 survivors.  So they represent 6,800, and we represent

17  65,000.  And we actually represent more than that when you

18  add all of the survivors and the survivors' lawyers that are

19  not part of the coalition per se but are people that support

20  the coalitions' positions.

21        And, Your Honor, I think it's important for you to

22  realize that the three firms rallied around a common goal and

23  mission.  And here is our common goal and mission:  No

24  survivor would be left behind.  All survivors would be

25  compensated.  Philosophically what we thought, Your Honor, is

1  if someone was sexually abused by a Boy Scout leader in New

2  York, which is an open state, and if someone was sexually

3  abused by a scout leader in Alabama, which is a closed state,

4  it shouldn't make a difference.  It shouldn't make a

5  difference.  Sexual abuse is sexual abuse.  Their lives were

6  still as scarred whether they lived in New York or they lived

7  in Alabama.  And we took a pact that we were going to

8  represent them equally.

9          Our second common goal and mission was that the

10  survivors need to be compensated in their lifetimes.  Most of

11  my clients, Your Honor, are between 60 and 70 years old.

12  Time is not their friend, as I said before.  As I said

13  before, clients have died.

14          Time, time, time is important, and what I've

15  realized in this bankruptcy is time keeps moving on, and for

16  the survivors it's just not something we can tolerate.  We

17  get calls every day about when is it going to be over, when

18  is it going to be over.  It's been a year and a half.  It's

19  hard to give them an answer, Your Honor, because as I said,

20  you know, I'm a plaintiffs' state court lawyer.  We normally

21  know the timeframe.  If a case comes into my office today, I

22  can look the client in the eye and say you're going to have a

23  trial in two years.  Put it in your -- put it in your

24  calendar right now.  We're going to be trying your case in

25  two years, and they get resolution to their case in two

1   years.

2            And that's a wonderful thing.  It's just not quite

3   the same that I've learned in bankruptcy court.

4            Your Honor, there's been some criticism of what

5   people have called the mass tort lawyers and let me just take

6   two seconds and talk about that.  I've never really dealt

7   with mass tort lawyers because that's not my practice.  These

8   are some of the most outstanding lawyers I have ever dealt

9   with.  You talk about committed lawyers?  Most of these

10  people are working 24/7, and this is their only case, as it's

11  my only case.  That's how strongly we feel about the

12  dedication that we need to have for the survivors.

13           They deserve nothing less than that.  I've learned

14  a lot from these lawyers who have been in bankruptcy court

15  and understand what needs to be done.

16           And I have to tell you, and I'll say it publicly,

17  I really appreciate it because there's a lot that I didn't

18  know and they've opened my eyes.

19           But there's been some criticism about that, you

20  know, mass tort lawyers about the contact they have with

21  clients.  Well, I can tell you, and this is true for all of

22  the people in the coalition, that contact with clients is

23  constant.  With my firm, we have -- we get over 2,000 calls a

24  month where we advise clients as to what's going on.  We have

25  monthly updates with them.  We send out to them a written

1  monthly update every month.  There's been 18 of them so far.

2          We have phone calls daily, like I said, and we

3  have Zoom calls and we have video discussions with them, and

4  we plan on having, we plan on expanding that, Your Honor, so

5  that we have more planned Zoom calls so we get a bigger

6  audience and we get them to see what we're doing and we get

7  the opportunity to answer those questions.

8          There's a TCC survivors committee, and I know a

9  lot of people on that committee, Your Honor, because like I

10 said I was on that committee for five months.

11         And those survivors are really no different than

12 every other survivor.  They all have their own story, and

13 they're all compelling, and they're all very sad.  But we put

14 together our own survivors' advisory committee.  As a matter

15 of fact, last night we had a meeting of that committee.

16 They're from California and from New York and New Jersey and

17 Texas, from all over the country.

18         And we listen to them.  What are your concerns?

19 What do you -- what do you need more from us so you can

20 weather the storm, as we go through this bankruptcy?  And

21 it's -- it's a very tough thing to tell them that they have

22 to wait, and I don't like using that word when I say to them

23 you have to wait.

24         Now the question has been, Your Honor, what has --

25 you know, what has the -- what has the coalition's goal been

1  in this bankruptcy?  Well, the goal is very simple.  It's to

2  formulate a confirmable plan to compensate all survivors.

3            Well, let's talk about that a little bit.

4            What has the coalition done to move that goal?

5  Well, there's been the BSA deal.  The coalition was

6  instrumental in getting that deal done, Your Honor.

7            You can ask Ms. Lauria and Mr. Andolina the

8  coalition's participation because it was daily and we worked

9  and we worked and we worked on it.

10            And then there was the local counsel deal.

11            The coalition was instrumental in getting that

12  deal done.  You can ask Mr. Mason about that because he saw

13  what the participation was from the coalition.  Then there

14  was the Hartford deal, tough deal, tough deal, and when I saw

15  it was daily, it was -- it was daily and it was -- it really

16  was 24/7.  We needed to get that -- and you can ask

17  Mr. Ruggeri and you can ask Mr. Anker about the coalition's

18  participation in getting that deal done because it was

19  significant.  And I dare say that that Hartford deal would

20  have never gotten done but for the coalition.

21            The LDS deal, you can ask Mr. Bjork and

22  Mr. Austin, the LDS deal, the coalition was instrumental in

23  getting that deal done.  Because, again, Your Honor, going

24  back to what I said before, time is not the friend of the

25  survivors.  And you know what, as a plaintiff's lawyer, I

1  know, you know what, if I stretch it out, maybe I can get

2  more money, maybe I'll have more leverage.  But that takes

3  time.

4           Appeals, litigation is not the friend of

5  survivors, at all.

6           We've put together, Your Honor, $1.9 billion

7  that's going to go into a trust, and we're just getting

8  started.  We spent all day in New York yesterday with

9  Century.  We're trying to work on getting deals done.  It's a

10  difficult process, probably the most difficulty in my 40-year

11  career.  But I know it can get done because there's a lot of

12  talent.  On this screen, as I see all these lawyers, these

13  are some of the most talented lawyers I have ever dealt with

14  in my entire career.  And I know it can get done.

15           So we're talking with Century.  We're talking with

16  AIG and Mr. Rosenthal.  We're talking with the Catholic

17  Church, and we're talking with the Methodists, and we're

18  talking with the Episcopals, and we're talking with the

19  charters.  We're going up to New York again.  I just got back

20  from New York.  We're going back up.  I'm going back up

21  tomorrow, again, for two days of mediation where we're going

22  to be talking with some of the charters and some of the

23  insurance companies.  So we plan on that $1.9 billion that a

24  lot of people will criticize yet, and they use the math and

25  they say it's so much per -- per survivor.  Well, that's

1 | really kind of an inadequate description of the amount of
2 | money that we're getting into the trust because as we talked
3 | about different people will get different amounts depending
4 | upon, you know, the criteria, whether they satisfy the
5 | criteria or not.
6 | And we intend to at least double that number, Your
7 | Honor.  I'm going out on a limb by saying that, but that's
8 | the goal because our goal is to get as much money into that
9 | trust as possible.  Now, there's been some objectors out in
10 | the public forum in the media that have criticized the
11 | coalitions as sellouts, and I take that as an extreme
12 | offense.
13 | For the record, Your Honor, the coalition along
14 | with the FCR and the BSA has to date put together the largest
15 | compensation fund for survivors of sexual abuse in the
16 | history of the United States.  Let me repeat that.  The
17 | coalition along with the FCR and BSA has to date put together
18 | the largest compensation fund for survivors of sexual abuse
19 | in the history of the United States.  That's a true
20 | statement, and we're only halfway there.
21 | In contrast, Your Honor, the TCC has put together
22 | no deals with insurers or chartered organizations.  They just
23 | have been in the position of objecting to everything the
24 | coalition has done.  And I would suggest to the TCC that as
25 | fiduciaries of all the survivors, they spend the time helping

1  to enlarge the compensation fund rather than objecting and

2  creating roadblocks for the survivors.

3          Your Honor, the -- there's many lawyers on the TCC

4  that are my friends.  I've developed friendships with them

5  over the course of this 19 months.  I've spent a lot of time

6  working with them, and when I formed the coalition with Ann

7  Andrews and Adam Slater, I still reached out to the TCC

8  because I didn't consider us to competing forces.  I

9  considered us to be all working for survivors because we are

10  all working for survivors.  So I arranged Zoom calls with the

11  TCC and with other members of the coalition to see where we

12  could drive together and work together for the benefit of the

13  survivors.  I arranged a meeting in New York where we all --

14  everybody flew in.  We had dinner together, the TCC and the

15  coalition.  We broke bread together to come to agreements so

16  that we could move this forward and so there wouldn't be

17  roadblocks.  We met in Chicago, and I -- I -- I still today

18  consider many of the TCC lawyers are my friends.  But we're

19  all working in the same direction, Your Honor.  We're working

20  for survivors.  We're all in this together.  I invite all

21  objectors to come join us to build the largest fund for all

22  survivors so they can be properly compensated.  They deserve

23  it, Your Honor.  These survivors have suffered enough.  They

24  don't need to wait any longer, and I hope this process

25  concludes quickly.

1        Thank you very much for giving me the time, Your

2  Honor.  I really appreciate it.

3        THE COURT:  Thank you, Mr. Rothweiler.  Okay.  I

4  see hands.  Mr. Stang, I will let you speak.  I'm sure you

5  want to respond.  I don't think -- but let's realize it's

6  4:00.  There are things we need to get done today, and over

7  the course of any number of hearings now, I've heard from all

8  sides of all issues.  And I recognize that you and members of

9  your committee may disagree with much of what Mr. Rothweiler

10 has said.  So please appreciate that I understand that.

11       MR. STANG:  Thank you, Your Honor.

12       THE COURT:  Mr. Stang?

13       MR. ABBOTT:  Your Honor, may I be heard briefly --

14       MR. STANG:  Thank you, Your Honor.

15       MR. ABBOTT:  -- before we get to Mr. Stang, Your

16 Honor, just briefly on timing?

17       THE COURT:  Mr. Abbott?

18       MR. ABBOTT:  Your Honor, we have spent, obviously

19 a number of days in front of the Court, and I appreciate

20 Mr. Rothweiler's passion.  I appreciate the passion that he

21 has aroused in other folks who are on this Zoom call.  But it

22 is critical, Your Honor, that we get to the scheduling

23 process.

24       THE COURT:  We're going to get to it.

25       MR. ABBOTT:  I just want to make that clear.

1  Mr. Kurtz has been waiting patiently, Your Honor.

2           THE COURT:  And I have views on it.

3           MR. ABBOTT:  Okay.  Thank you.

4           THE COURT:  Yes.  Thank you.

5           MR. STANG:  Thank you, Your Honor.  I had to take

6  a really deep breath during Mr. Rothweiler's prepared

7  comments.  For someone who was not anticipating speaking, he

8  certainly read off his script explaining why his -- he and

9  his other law firm coalition members are entitled to a

10 substantial contribution so that the fees that Mr. Molton has

11 incurred are reimbursed to them or perhaps never having to be

12 paid by them.

13           And what he has said really reflects a

14 misunderstanding of what the TCC is about and how survivors

15 are to be treated in this case.  He said I was on the TCC,

16 referring to himself.  He was not on the TCC.  Mr. Kennedy,

17 Mr. Humphrey, and seven other survivors are on the TCC.  They

18 are the fiduciaries.

19           He said the TCC represents 6,800 people.  Again,

20 he doesn't understand the role of the TCC or for that matter

21 his role or for that matter I'll pick out one of my state --

22 one of the state court counsel who represents committee

23 members, Mr. Modus' role.  The -- Mr. Humphrey, Mr. Douglas,

24 Mr. Kennedy represent the constituency.  No attorney

25 represents the constituency.

1        He said the TCC met with the coalition in Chicago.

2    No, it didn't.  Mr. Kennedy did not appear at that meeting.

3    Mr. Humphrey was not at that meeting.

4        Mr. Greer (phonetic) was not at that meeting.  Mr.

5    Tabone (phonetic) was not.  He met with other lawyers because

6    this is about control.  He told you how they represent

7    upwards of what, 70,000 people.  Well, he may, but this is

8    about them thinking that they should run the case because

9    they think -- think they have the votes.

10       They thought they should have had control of the

11   committee, but Mr. Buchbinder and his staff appointed one

12   committee member, if you -- if you look at it from this

13   perspective, one committee per law firm, and that really

14   torqued them.  They couldn't stand that because as they

15   started amassing clients, I believe Mr. Molton referred to

16   them as inventory last week, they thought, wow, this really

17   isn't fair.  We've got survivors making decisions for

18   survivors.  We represent all of these people.  We should be

19   making decisions for the survivors.

20       And then he criticizes the TCC for not making any

21   deals.  Well, you know what, I could make a deal with

22   Mr. Schiavoni in five minutes.  I just have to meet his

23   number.  I could make a deal with Mr. Ruggeri in three

24   minutes.  I just have to match his number.  So if I want to

25   race to the bottom, I'm faster than anybody, but that's not

1  the TCC's goal.  The TCC's goal is to get as much as possible

2  for survivors.

3          You know how much someone who was anally

4  penetrated is going to get in an open state using their

5  current settlement number?  $57,000, that's how much -- and

6  our chart that's going to go into the disclosure statement is

7  going to say that.  You know how much you're going to get in

8  the next lower-tiered state, Judge?  $34,600.  You know what?

9  I'll double that.

10          I'll take Mr. Rothweiler at his word and say he's

11  going to double that.  $68,000 for multiple penetration

12  claims in Oregon or Washington.  Well, congratulations.  You

13  all did a great job.  That is not the goal of the TCC.  The

14  TCC opposed the settlements that have been reached because

15  they are race to the bottom settlements.  And the Mass Tort

16  Bar, the lawyers who have multiple clients have an agenda

17  that is beyond simply in my opinion maximizing the return to

18  clients because at some point a third or 40 percent of a big

19  number is a big number, and it doesn't matter how much each

20  person gets.  But if I had experienced sodomy in California

21  and you tell me I'm getting $58,000, I'm not accepting that

22  settlement.

23          And we will see how many people accept that kind

24  of settlement.  So I may be right.  I may be wrong, but to

25  hear a 15-minute presentation that was an opening statement

1 for a substantial contribution claim, frankly, was

2 inappropriate.  It shouldn't have been done, and I hope we

3 don't have to hear it again before we get to the -- before

4 the hearing on their substantial contribution motion.  Thank

5 you, Your Honor.

6           THE COURT:  Okay, thank you.

7           We're going to get to scheduling now, and I don't

8 have my calendar.  So we're going to take five minutes.  I'm

9 going to get my calendar, and we're going to talk scheduling.

10           We're in recess.

11           UNIDENTIFIED:  Thank you, Your Honor.

12      (Recess taken at 4:02 p.m.)

13      (Proceedings resumed at 4:06 p.m.)

14           THE COURT:  This is Judge Silverstein.  I'm not

15 sure if I'm a minute or so early.  So let's give people time

16 to get back on.

17      (Pause)

18           THE COURT:  Mr. Kurtz, I have some thought about

19 scheduling, but I will hear from you initially.

20           MR. KURTZ:  Thank you.  Thank you very much, Your

21 Honor.  Glenn Kurtz, White and Case, on behalf of the

22 debtors.

23           Hopefully, this will be a little less energetic,

24 but interestingly enough, we have some similar impact on

25 abuse victims because as the Court well knows time is money

1    here not just in the traditional sense of having less cash on

2    the balance sheet, but in the direct sense of having reduced

3    cash contributions to the trust, which is in effect the

4    proverbial melting ice cube.  And so we really have something

5    to -- to work hard at here in addition to feasibility issues

6    and the like.

7             It struck me that the request for a lengthy period

8    of time between solicitation and confirmation was unusual.

9    We did a little research on that.  We looked at Delaware

10   confirmation cases, big -- what we thought were larger cases,

11   and confirmed that the average time period between

12   solicitation and the confirmation hearing is 46 days.  And

13   Hertz was 42 days, and so we think, of course, the request

14   for six months and five months, which are 3.5 to 4 times more

15   than the normal period of time is pretty excessive.

16            We also don't think as much time is needed here

17   for a couple of reasons.  One, we're not starting from

18   scratch.  I mentioned this before, but I went back and

19   confirmed that we started producing information to -- to the

20   objectors in March of 2020.  We have produced information

21   relating to historical claims, local councils' information

22   related to the debtor's insurance, financial condition, it's

23   organization, board minutes, and other documents and we've

24   also produced for deposition the CEO, the chairman of the

25   board, and the financial restructuring expert here.  So we're

1  pretty far down the line the way we see it.

2         We also believe that in addition to the normal

3  interests and simply having more time, which is fairly common

4  place in most cases and particularly for somebody that is

5  seeking to avoid relief, there does seem to be I think pretty

6  clearly an independent interest in having some delay.  And I

7  think even this exercise has reflected that because the time

8  you have for discovery is from a start date to an end date.

9         And so, therefore, everybody should be looking for

10  a very early start date because the earlier you start the

11  more you can get done, and here we've had a lot of

12  resistance.  We've been raising this for a while now, and the

13  objectors won't agree to a start date.  They didn't even want

14  Your Honor to hear confirmation scheduling until this week.

15         So -- so there's a lot -- there's sort of a lot of

16  indications including all of the requests for adjournments or

17  not to set schedules that we think are kind of transparent

18  here.

19         Also, if the objectives were really concern about

20  the amount of time that they needed in order to complete

21  discovery, then, of course, they would be starting just as

22  soon as they could, as opposed to resisting the start.  I

23  think there's a certain amount of vigilance that should be

24  expected of a party that's complaining about timing here.

25         They have known that we had intended to proceed,

1  and I know we're not getting that anymore, but we had

2  intended to proceed on December 9th and yet we didn't have

3  any document requests or any discovery requests.  They

4  haven't been propounded even though it was at least

5  conceivable we would have been successful on that.

6          Your Honor stated at least as of the August 30

7  hearing that, quote, "Think about how discovery is going to

8  be conducted to promptly get us to a confirmation hearing."

9  So the parties have been on -- on notice for a few weeks now

10  that we really needed to get moving on it.  You stated more

11  than once last week that there's nothing that would keep

12  people from pursuing discovery now, and -- and the only thing

13  I really heard is we don't have an approved disclosure

14  statement.  That -- that's language.  The deal terms are what

15  they are.  The objections are what they are.

16          They are free to and needed to serve and pursue

17  discovery kind of vigilantly, I think, before they watch the

18  ice cube melt a little more.  There was certainly no reason

19  they couldn't serve discovery.  If it turned out that

20  something got mooted, then we simply wouldn't have produced

21  it, or we could have made a motion for a protective order,

22  which is something that Your Honor raised last week as well.

23          I think you're going to hear that there is some

24  need for a substantial amount of discovery.  I don' think

25  there is any more need for discovery here in -- in any

1  greater volumes than in most cases.  As I said, we've already

2  given a lot of the discovery.  I think a lot of the issues

3  Your Honor is going to need to grapple with to the extent

4  they don't get resolved between now and confirmation are

5  largely legal.  And insurance neutrality, probably largely --

6          THE COURT:  Excuse me, please.  Excuse me,

7  Mr. Kurtz.  Please check your audio.

8          MR. KURTZ:  I think insurance neutrality is

9  largely a legal issue.  I think third-party releases is

10  largely a legal issue.  Certainly, there will be some

11  questions about good faith.  There will be some questions

12  about the TDPs, but nothing that is not manageable within the

13  normal time period, much less what I think is already going

14  to be somewhat extended.

15          I guess the last issue is how do you populate the

16  schedule once we have a hearing date, and I think the best

17  way to deal with that is wait for Your Honor to give us

18  something on the schedule, and then we can work something

19  out.  I don't know how difficult that should be.  I think

20  there's more than enough time, if we were fortunate enough to

21  get January, which would leave close to four months, there's

22  plenty of time for us to take discovery.  Get all of the

23  objections on file.  Get all of the replies and proceed.

24          So I -- I -- I do want to express appreciation for

25  the accommodations Your Honor has given us through the course

1  of the case.  I appreciate your schedule is very busy.  I

2  appreciate January is particular busy.  As fiduciaries of the

3  estate, dealing with maybe a melting ice cube trust, we sort

4  of feel compelled to just ask for the earliest possible date,

5  especially since we still have a period of time before

6  emergence even after a confirmation approval assuming that

7  one is forth coming, during which time, of course, we are

8  continuing to kind of burn off cash.

9            So we're hoping that there's some flexibility

10  there, Your Honor.  We'll do everything we can on our end to

11  expedite matters, and -- and -- and we appreciate any

12  accommodation you could afford us.

13            THE COURT:  Thank you.  I do have some things in

14  mind.

15            Mr. Plevin?  Mr. Plevin, you are muted.

16            MR. PLEVIN:  Thank you, Your Honor.

17            Let me first start by responding to some of the

18  points that Mr. Kurtz made, and then I want to talk about the

19  impact of the findings and what we heard earlier today about

20  the insistence on going forward with those and the factual

21  nature of several of the findings and how that impacts

22  discovery.

23            Mr. Kurtz ended by saying that what he was

24  suggesting the Court do is pick a date, and then we'll fit

25  the schedule to it, and then to me that's just completely

1  upside down as to how we ought to proceed, and it's contrary

2  to what Your Honor has said not only in this case but in

3  other cases about the need for due process.

4         To just fit litigation deadlines into a date, a

5  confirmation hearing date that's chosen for no reason other

6  than for convenience, makes little sense.  You need to look

7  at what are the issues, what are the discovery needs, how

8  quickly can the parties move, and build the schedule out

9  based on that.

10        This is not -- Mr. Kurtz gave a couple of

11 examples.  This is not a case that's a pre-pack where there's

12 not going to be a contested evidentiary proceeding.  This is

13 not a case in which the debtor simply sells its assets and

14 disappears in which there's not a contested evidentiary

15 confirmation hearing.  This is a different kind of case, and

16 it needs to be treated as such.

17        Mr. Kurtz talked about some information that had

18 been made available.  He talked about the fact that some

19 information had been produced.  AS Your Honor heard last

20 week, almost all that information is locked up in mediation

21 confidentiality and can't be used.

22        He said they made people available for

23 depositions, and that's true but that was with respect to the

24 RSA, not with respect to confirmation issues, which are

25 completely different.  So maybe there's a little bit of

1  streamlining that can be done because we don't have to ask

2  people about their background when they've already been asked

3  about that, but it's not a substitute for discovery.

4            So in setting the schedule here, Your Honor, the

5  real question is what do we need to litigate, and we've

6  pointed out in our objections and you heard robust argument

7  today about the required findings under the plan, which we

8  think are purposefully designed to prejudice the insurers,

9  and I'm not going to repeat that except I want to make one

10  point that I -- I didn't have a chance to make earlier today,

11  and that's with respect to 10M of the plan or X.M, which is

12  the insurance neutrality clause.

13            And what makes that so important, Your Honor, is

14  that that clause said that the -- that the policies are

15  subject to the findings of the Court and the terms of the

16  plan.  So when you heard argument earlier today about how

17  there was no effort to modify the policies or seek insurance

18  coverage rulings, the plan itself in Section X.M tells you

19  that that's wrong, that what the debtors and their supporters

20  are trying to do is use the confirmation order and the plan

21  to modify the terms of the insurance policy.

22            And that means that we have to have the right to

23  contest those findings, because if we were simply to go away

24  and not participate in the confirmation hearing and evidence

25  were presented and Your Honor issued the plan with their

1  findings, our policies will have been modified in a

2  prejudicial way.  And so I -- I needed to point out Section

3  X.M to the Court.

4           I also heard Ms. Lauria say that they would circle

5  up and I guess the 5-minute break we just had probably wasn't

6  long enough for them to do that about reactions to Your

7  Honor's discussion of the proposed findings.

8           Before Ms. Lauria, earlier today we heard from

9  Mr. Harron, from Ms. Quinn, that they were -- they believe

10  the findings are appropriate, they are entitled to them.

11  Mr. Goodman explained in some detail how some of these

12  findings were evidentiary based, there had to be a record

13  made under the terms of the findings, and he -- he

14  acknowledged that some of these findings required evidence.

15           So we have a situation where the debtors and the

16  plan supporters want findings that are based on evidence that

17  we believe are highly prejudicial, and you can't deny us

18  consistent with due process the right to go get that

19  evidence.

20           So the debtors really - there are two basic

21  pathways here, Your Honor, and they have a choice of which

22  path to go down.  One is the path of an expressly insurance-

23  neutral plan, one that does not include these findings, does

24  not prejudice the insurers.  If we go down that path, then

25  maybe Mr. Kurtz can have the confirmation hearing he wants in

1   January because there would not be a need by the insurers to

2   contest the findings in the plan, but if the plan -- if the

3   debtors and the plan supporters want to go down the other

4   path, which is the one that we believe prejudices the

5   insurers, then we need discovery.  And what do we need

6   discovery on and what do we need to litigate?

7            We need to litigate insurance neutrality.  We need

8   to litigate the reasonableness of the values in the TDPs, the

9   base claim values, the maximum claim values.  We need to

10  litigate the process by which the TDPs came into being.  We

11  need to litigate the impact of the TDPs on the insurers.  We

12  need to litigate the role and the discretion of the

13  settlement trustee.  We need to determine whether the

14  settlement trustee has conflicts.  We need to litigate

15  whether the settlement trustee ought to be selected by the

16  debtors or by other parties or by the court.  We need to

17  determine whether his -- if we could, to what extent the

18  settlement trustee's future decisions on claims that have not

19  been fully presented are reasonable or could be reasonable.

20  We need to talk about and litigate the plan's goal to

21  preclude insurers from raising effective coverage defenses.

22            And, Your Honor, if you want to know how this is

23  being set up to prejudice the insurers, you need only look at

24  the proposed letter from the coalition and the FCR that is --

25  that was filed, I believe last night, to go out with the --

1  with the plan and the disclosure statement where they explain

2  in so many words that the purpose of the plan is to put the

3  screws to the insurers and make them pay more.

4        So that's what we need to do.  The items we would

5  be seeking in discovery include the following:  Documents

6  related to the formulation of the plan and the settlement of

7  claims thereunder.  We were told earlier today that the TDPs

8  are an evidence-based plan.  We -- we seem to think that --

9  we tend to think that's completely wrong because when claims

10  were settled before bankruptcy, they were settled, as I

11  mentioned earlier today, in an adversary process in a court

12  with people on opposite sides with the Boy Scouts seeking to

13  either establish they're not liable or if they are liable,

14  that they're liable in a lesser amount than the plaintiff

15  wanted.

16        That is not the structure that is being proposed

17  here.  So if it is going to be an evidence- based TDP

18  structure and that's the contention, then we need to find out

19  what happened all along in the history of the Boy Scouts

20  settling claims.  And it may be -- Mr. Goodman said the

21  insurers have that information.

22        My clients are an excess insurer.  We were only

23  involved in a very, very small number of claims before

24  bankruptcy.  We don't have access to all that information.

25  So we need to find out what the course of dealing was and how

1    the settlements took place.

2          We need to get the documents relating to abuse

3    cases that were dismissed or resolved without payment.  What

4    defenses were asserted?  How were they successful?  Why were

5    they successful?  We need to get documents related to Eric

6    Green's relationship with parties in this case, and

7    communications related to his selection as trustee.  We need

8    to get information regarding the negotiation and history of

9    the current version of the TDPs, the debtor's input into

10   those issues, the evidence of the roles of the various

11   parties in the drafting of the TDPs, and the basis for the

12   values in the TDPs.

13         And we need to get the information about the

14   course of dealing.  We need to get information not only

15   regarding the debtor's own liabilities as a historical

16   matter, but we're being told that these values to some extent

17   may wrap in sex abuse settlements from other cases.  If

18   that's the case, we'd want to know if that's the contention.

19   We'd need discovery on that.

20         I mentioned course of dealing.  One thing you

21   might look at is the combustion engineering case where the

22   Third Circuit looked at the course of dealing in terms of how

23   claims were handled pre-bankruptcy.  We would need to

24   establish the insurer's non-involvement in the creation of

25   the TDPs.  We would need financial information regarding the

1  claims against and assets of the parties who would become

2  protected parties under the plan, which could include issues

3  regarding which assets are restricted and not available for

4  contribution to the trust, something that several weeks ago

5  we heard Mr. Brown talk about at great length.

6          Some of these requests, Your Honor, will

7  predictably become enmeshed in issues of mediation privilege,

8  particularly when we talk about good faith.  The debtors

9  acknowledge this.  They have filed a motion, which I think of

10 at least as sort of an abstract motion that is not tethered

11 to any specific discovery in the confirmation context, and

12 that motion is calendared for hearing on October 19th.

13         We know that no matter what discovery requests we

14 make now, the debtors are going to object to producing

15 anything they feel is subject to that privilege.

16         Depending on the outcome of the Court's ruling on

17 that, we could get a significant additional production on

18 October 19.  I'm sure that it makes no sense in anybody's

19 mind to start depositions before October 19 and then re-start

20 them and take them over, again, after October 19.  So that's

21 a problem.  This whole issue of mediation privilege, which

22 was highlighted in the RSA context has to be addressed.

23         The schedule that the debtors proposed in

24 connection with their fourth amended plan was not only too

25 compressed but it was also illogical.  And I -- I sort of

1  hear them now saying they're not going with that schedule,

2  maybe they are.  They certainly didn't propose one since last

3  week.

4          We submitted a revised proposal.  We heard the

5  Court say 217 days is not going to do it.  We went through

6  our proposal and shut out about 35 days, which I think is

7  cutting it to the bone.

8          The TCC did the same thing with their -- well,

9  actually they submitted a new proposal.  Their proposal ends

10 up roughly the same time as ours, roughly a little bit

11 earlier, but I'm going to talk about some of the respects in

12 which their proposal is not logical.  But the debtors haven't

13 given us anything to chew on, only a request that you set it

14 for the earliest possible date, and somehow we're going to

15 figure it out later.

16         But they don't put any effort into deciding what

17 it is that we need to -- that we need to litigate or why.

18         So our -- our proposal, and I realize, Your Honor,

19 we may have done a disservice to the Court a little bit

20 because we started in a different place than the TCC.  We

21 based all of our days on days after approval of the

22 disclosure statement, but we didn't assume a date for that.

23 They did assume a date, and so they went with October 1st.

24         So I put together our schedule and tried to

25 compare it with theirs to see where we came out.

1         There's a lot of similarities between the two

2 proposals but let me just talk about some of the differences

3 that we think that doesn't make sense.

4         The TCC has a deadline to depose fact witness --

5 let me start one other place.  We put in a deadline to serve

6 initial written discovery, and I think that's clear -- that's

7 important, Your Honor, because we're prepared and will be

8 prepared to submit comprehensive document requests, as

9 comprehensive as we can make them based on what we know now.

10 But that can't be the last time we're entitled to serve

11 discovery requests.

12         Things come up in depositions.  Things come up in

13 discovery.  One of the things we know, one of the lessons

14 from Imerys is that voting issues came up once the vote

15 tabulation was done.  So the debtors had a deadline in their

16 proposal for written discovery.  Ours is for initial written

17 discovery, and I think that's appropriate.

18         When we get to the deadline to depose fact

19 witnesses, we said 75 days after approval of the disclosure

20 statement.  If you take the TCC's assumption that October 1

21 is the date, then our 75 days ends December 15, which is 33

22 days after our proposed date for completion of document

23 production.  So that would mean the comprehensive document

24 requests go out.

25         They're responded to much more quickly than the

1 federal rules require.

2          We get the documents, we have a chance to look at

3 them, schedule depositions, we have 33 days to take

4 depositions.  The TCC, as I read their proposal has set up a

5 9-day deposition window.  We have experience with deposition

6 windows in _Imerys_ and they just don't work.  Everyone tries

7 to go to the end of the window, and then we end up taking

8 depositions after the window is over.

9          I had emails today about what's happening with

10 expert depositions in _Imerys_ where there's going to be at

11 least one if not two or three depositions taken after the

12 window by agreement.

13          So but even so their -- the TCC's deposition

14 period is December 14 to 23.  Our deposition deadline would

15 actually be in the first part of that range, December 15th.

16          The TCC shaves some time off their schedule by

17 having initial expert reports due on December 17, which is

18 right in the middle of the fact deposition window.  So to me

19 that makes no sense.  I think you need to finish the fact

20 depositions before you can have initial expert reports, and

21 we provided 15 days after the end of depositions for fact

22 depositions, rather for expert reports.

23          Rebuttal expert reports, I mentioned last week the

24 eight days allowed by the debtors in their schedule just is

25 undoable, unworkable.  It's not enough time to figure out

1   even what rebuttal expert you need, let along go out and

2   recruit one and have that person prepare a report.  The TCC

3   gives 28 days for rebuttal reports.  Our proposal gave 25

4   days.  I think that is probably the irreducible minimum for

5   that.

6          Deadline to depose expert witnesses, the TCC

7   shaves that down to seven days after rebuttal reports are

8   due.  We gave 20 days for that.  Again, I don't think that's

9   an unusual or too long a figure for expert reports.  The TCC

10  has us filing motions in limine before deposition

11  designations, so we wouldn't even know what the deposition

12  designations are when the motions in limine would be due.

13         And the TCC's proposal ends on February 28th, Your

14  Honor.  Ours ends on March the 30th.  So -- and I should say

15  a couple of things, Your Honor.  There's no explicit.

16  There's no explicit time in our proposal for voting-related

17  discovery, which -- which could happen.  It may be necessary

18  as -- as I heard the colloquy's last week a lot of the issues

19  about the voting are going to be decided at the back end.  So

20  it's reasonable to think you may need some time for discovery

21  of voting issues.  We certainly did in Imerys.  There is no

22  time in this proposal for any delays caused by motions to

23  compel or motions for protective order.  And as Your Honor

24  pointed out last week, there's not only the perhaps more

25  exotic discovery issues but the regular discovery issues that

1  pop up that may have to be addressed by the -- by the Court.

2           I think there needs to be some time, obviously

3  we've got this mediation motion that's set up for October 19.

4  But that's as I said, an abstract thing that may not work.

5           So that's our proposal, Your Honor.  We think that

6  ending up where we propose is as I said the irreducible

7  minimum, this would be the end of March.

8           You know, I've -- I've -- I'm not going to go

9  through my biography the way some others do, but I litigated

10 pre-packs in the asbestos world 20 years ago, and I used to

11 tell people then that we were litigating at the speed of

12 sound, just to give them an idea of how crazy it was.  This

13 schedule that we've proposed is litigating at the speed of

14 light.  It's much faster.

15          It's hard for me to envision as a litigator how we

16 are actually going to get through this schedule.  I think the

17 experience we've seen in Imerys is instructive in that, you

18 know, we set an aggressive schedule and even though the

19 debtors wanted to keep the schedule, they have come to the

20 court and asked for relief sometimes just because it wasn't

21 working.

22          I think what we've proposed is something that has

23 a chance of working, and if the parties work hard we could

24 stick to it.  But the main point I want to leave Your Honor

25 with is the schedule ought to be driven by the issues that

1   need to be litigated.  And if we're going to have to litigate

2   the findings, the factual basis for the findings, as

3   Mr. Goodman acknowledged earlier today, and the impact on the

4   insurers of those findings, I think we can't do this in --

5   in -- in January or even February.  I just don't think those

6   dates are workable.  Thank you, Your Honor.

7            THE COURT:  Okay.  Thank you.  Let me note one

8   difference between Imerys and this case, and there are many,

9   but one significant difference is that Imerys is not

10  operating anymore and Boy Scouts is.

11           Mr. Brown?

12           MR. BROWN:  Thank you, Your Honor.  For the tort

13  committee.  Much of what the committee and its professionals

14  are so concerned about has been articulated by Mr. Plevin.

15  There are a couple of additional issues that I wanted to

16  highlight for the Court.  I mean I think the -- the overall

17  concern is that certainly the proposed schedule that we saw

18  last week was far more than a scheduling order.  And whether

19  it was intentional or -- or not, and I'm going to try not to

20  pass judgment on that.  But it was going to have the impact

21  of imposing unworkable limitations on the committee's

22  professionals and its experts to discover and put before the

23  court what needs to be discovered and put before the court in

24  order for the survivors who do not support this plan and do

25  not want to be bound by a non-consensual third-party release

1    and a channeling injunction, it will deny them the

2    opportunity to make that case to you, as to why the national

3    mortgage factors are not met here.

4              And, in particular, Mr. Plevin highlighted I think

5    a lot of what the insurers need to do from their perspective

6    in terms of investigating the underlying claims.  And there

7    is a massive amount of data and discovery that needs to be

8    obtained and analyzed and synthesized.

9              As Mr. Stang mentioned earlier today, we have a

10   pending application for our experts on that.  We've had

11   extensive discussions with them about how much time they will

12   need after they get the data in order to file their expert

13   report.

14             And the sequencing proposed by the debtor was

15   just -- was shocking.  I mean it was a matter of days.

16             I mean and that's never been done in a case.  I

17   mean you look at Imerys, you look at Purdue, the timeframes

18   that are allotted from the time that documents are produced

19   to when expert reports are due, in this case I believe they

20   are -- well, initially it was a matter of expert reports were

21   due November 8, four days after fact discovery is completed.

22             That's what the debtor's initial proposal was.

23   That -- I mean I just think that's exemplary of what the

24   debtor is trying to do to the committee and their ability

25   to -- to put on an effective showing at confirmation.

1          This idea of -- well, the issue you -- I think you

2   asked, am I going to be required to make an aggregate

3   determination of claims.  And there was discussion about,

4   well, the estimation motion is off so maybe you don't.  But

5   you clearly will.  I -- one of the master mortgage factors is

6   whether or not the plan pays all or substantially all of the

7   claims of the class that's going to be impacted by the

8   channeling injunction and release.

9          So if there's going to be non-consensual releases

10  in this case, we're going to have to know what the claims

11  are.  Our experts --

12          THE COURT:  Doesn't the committee know what the

13  claims are?  The committee has been telling me what the

14  claims are.

15          MR. BROWN:  I think we have -- we are retaining

16  experts to tell me what the claims are.

17          THE COURT:  When are those on?  I don't recall

18  seeing any of -- of a motion, but when did you schedule those

19  for a hearing?

20          MR. BROWN:  I'm going to defer, if I may,

21  because -- to Mr. Stang or Mr. Lucas on that.

22          THE COURT:  Fair enough, but -- okay, go ahead.

23          MR. BROWN:  So the same -- the same issue with

24  respect to claims is going to come up with respect to the

25  best interest test, and it's going to come up at least a

1  subset of the claims in connection with the Hartford

2  settlement.

3          It's a great deal of the same data.  It all

4  funnels into what the -- what our expert is going to say on

5  this and how much time it's going to take to gather the data,

6  how much time it's going to take for them to synthesize it,

7  put it in an expert report, have their depositions taken.

8  There's going to be another - - you know, this is going to be

9  a battle because the debtors are going to have their own

10 experts and we're going to have to rebut those.  Maybe it

11 will be the same expert.  Maybe there will be a different

12 expert, I don't know yet, but that's a huge concern of ours

13 here is time to do discovery, time to get the expert reports

14 done, time to get the rebuttal reports done.

15         Some of the things, also, that are going to come

16 up here, I mentioned last time and I got a lot of pushback

17 from Mr. Kurtz, about -- but whether I accurately

18 characterized it or not, but the fundamental truth is we have

19 been trying for -- since early last week to address the issue

20 of the local counsel designations confidentiality.  Virtually

21 everything they produced has been designated confidential.

22         Clearly, it's not all confidential.

23         BSA has -- the protective order requires BSA to

24 facilitate this -- this declassification.  We're not getting

25 where we need to get.  We don't have the issue resolved.

1          It's likely going to require a motion, and that's

2   going to take time, and it may require additional discovery

3   to get documents that were not -- that have only been

4   produced in the context of mediation and for which a

5   mediation privilege is being claimed.

6          There's the mediation privilege issue, and I -- I

7   think that this is -- this was raised by Mr. Plevin, but that

8   the issue really boils down to BSA and Hartford and any other

9   parties that are going to settle, they are seeking a good

10  faith determination with respect to the plan.  They're

11  seeking a 9019 determination with respect to fair and

12  equitable.

13         Are they going to offer the mediation at the --

14  the fact of mediation as evidence of good faith and

15  reasonableness?  If they do, then is that not a waiver of the

16  mediation privilege?  You can't use that privilege as both a

17  sword and a shield, and if they're going to advance the

18  mediation as evidence of reasonableness or good faith, then

19  they can't hide discovery.  They can't preclude discovery on

20  how the sausage was made.

21         I think that's similar to what Mr. Plevin was

22  saying, but we have the very same concerns because -- and so

23  that motion is going to be heard, that -- not until

24  October 19th.  Then there will be fights over the mediation,

25  over the mediation privilege, and what the nature of the

1  discovery is.

2          There is no discussion in the debtor's version of

3  a schedule for any discovery on voting integrity, and we

4  think that issue has been raised.

5          It's come up.  We've built it into our schedule,

6  and we think it is critical that there is time allotted for

7  that, and that's not something that can be done right away.

8          And I also just want to point out that, you know,

9  in Mr. Kurtz's initial statements he was critical of all the

10 objectors for not having already launched their discovery.

11         Yet, I have a recollection that Century was just

12 stopped in its tracks on doing discovery that hadn't yet been

13 teed up because the disclosure statement hadn't been approved

14 and the plan wasn't at issue.

15         So, you know, you can't have it both ways.  I

16 think everybody has been holding their powder on discovery

17 because of what happened with Century.  This isn't at issue

18 yet.  I mean technically I thought what the Court said was

19 the plan isn't yet a contested matter.

20         THE COURT:  I don't think I said that.

21         MR. BROWN:  No, you didn't say -- so I think that

22 is how it was interpreted.

23         So in any event, it hasn't been a foot- dragging

24 exercise.  There was concern that plan discovery was not yet

25 ripe.

1        So if you have any questions, I am happy to answer

2   them, Your Honor, but those are, I think, you know, those

3   reflect some profound concerns that we have.  And I just

4   think as somebody -- well, for all of us who are going to be

5   impacted by this schedule, there is just, you know, there -

6   there's an element of what's doable and what's -- you know,

7   what is humanly possible and what the debtor is proposing,

8   had initially proposed, it's just not humanly possible to do

9   what needs to be done in this very complex case with multiple

10  issues in anything that resembles a competent way in the

11  timeframe that the debtor is proposing.

12        THE COURT:  I agree that competing time concerns

13  are an issue, but what nobody has really disputed is that BSA

14  is going to run out of money if we don't get this thing

15  going, that the contribution from the BSA clearly goes down

16  every month that we continue to have -- that we don't have a

17  resolution of this matter, and, you know, this debtor doesn't

18  make a product.  It's not -- it's a different kind of entity,

19  and we can't lose sight of that.

20        I'll hear from Mr. Ryan and then maybe we should

21  take some break.  I forgot about the need to caucus about my

22  thoughts with respect to the findings.  But I'll hear from

23  Mr. Ryan first.

24        MR. BROWN:  Well, Your Honor, just before --

25  before that, just I wanted to answer your question about

1  our -- our expert.  It was -- the expert is Claro (phonetic)

2  and the application was filed on September 17th.  So I'm

3  sorry, I just wanted to address your prior question.

4           THE COURT:  Thank you.  When's it going to be

5  heard?  Not until the 19th?  We may be able to speed that up.

6           MR. LUCAS:  Well, Your Honor, this is John Lucas.

7  It was filed, and the objection period runs on the -- I don't

8  have my glasses on, the objection period runs on the first, I

9  believe, of October.  And so assuming there are no objections

10 and we don't receive anything, we'll be able to submit an

11 order under COC.

12          THE COURT:  Okay.  Thank you.  Mr. Ryan?

13          MR. RYAN:  Thank you, Your Honor.  Jeremy Ryan on

14 behalf of the Catholic and Methodist Ad Hoc Committees.  I'll

15 be brief, Your Honor, I just -- as we're discussing these

16 30,000-foot issues, I didn't want people and Your Honor to

17 lose sight of this isn't Hertz.  This isn't a plan that

18 leaves creditors unimpaired, and in fact, to the contrary

19 here, Your Honor, you have a plan where you have 24,000

20 chartered organizations who didn't file proofs of claims who

21 aren't creditors of the estate and you have a plan that

22 proposes to strip them of their property rights and insurance

23 policies, proposes them to deem them to grant releases.  It

24 proposes to do a lot of things to people who aren't creditors

25 of this Court, who are not participants in this proceeding,

1 | and whether that can ultimately be done or not is going to be
2 | left for another day.  But there is a substantial question of
3 | how much due process do people, who aren't creditors whose
4 | property rights are being taken away under a plan need to get
5 | in all of this and the notices of what's going to happen to
6 | them.

7 | How much due process do we need for the 16,000
8 | chartered organizations who filed proofs of claims, who
9 | aren't sophisticated parties?  They don't have access to the
10 | unlimited budget many of the parties here have, and how long
11 | do they need to have to get to understand and receive these
12 | things and have a long enough period to vote.

13 | So as we're taking about due process and the
14 | timeline of this, and we're certainly not advocating for a
15 | March -- a March confirmation date, but I don't want to lose
16 | sight of the fact that this is not a 42- day case or a 50-day
17 | case or a 60-day case.

18 | Now, as Your Honor noted last week, there's at
19 | least 60 days that you have to give notice to people.  And we
20 | need to be cognizant of the tremendous amount of people who
21 | aren't sophisticated parties and who aren't even creditors
22 | whose rights are being taken away under this plan.  So I just
23 | think we need to have that -- have that perspective, as we
24 | look at trial dates, and as we look at a calendar and when
25 | things go out for solicitation and for notice and when people

1  have to object and respond by.  Thank you.

2         THE COURT:  Okay.  Thank you.

3         Ms. Lauria, how much time do you want to caucus

4  with the FCR and the coalition about my remarks with respect

5  to the findings and what you're hearing in terms of discovery

6  that is generated from certain of those findings?

7         MS. LAURIA:  Your Honor, I'm just looking at my

8  clock right now.  I see it's 4:50.  I know we've had a long

9  day, but I think we want to achieve as much as we can today.

10  So I would say we come back in 15 or 20 minutes if that works

11  for the Court.

12         THE COURT:  That's fine.  Let's take 20 minutes

13  and let's see -- let's see where we -- where we are, and,

14  again, I think the two findings that in my mind create the

15  most issues are the condition precedent R and S, as they are

16  currently drafted.  We're in recess.

17         MS. LAURIA:  Thank you.

18     (Recess taken at 4:50 p.m.)

19     (Proceedings resumed at 5:12 p.m.)

20         THE COURT:  This is Judge Silverstein.  Ready to

21  get back on the record?

22         MS. LAURIA:  Your Honor, this is Jessica Lauria.

23  We were just gathering.  I see folks from the coalition and

24  FCR back on the line, so I think we are ready from our

25  perspective.

1          THE COURT:  Okay.

2          MS. LAURIA:  So we spent the last 15 or 20

3    minutes, Your Honor, specifically focusing on R and S

4    although we take your remarks on the other provisions as

5    helpful.  And I guess what I would say is this:  We do think

6    there may be a mechanism to tighten the language with respect

7    to R.  We certainly take your point that any findings you

8    make do need to be limited by the type of hearing that you

9    are hearing those findings, and certainly we think that's in

10   the 1129 context, 1129(a)(1), which I think could incorporate

11   in 1123(a)(3).

12          There may necessitate a 9019 standard.  I don't

13   know that we need to make a determination right now.  It

14   sounds like this could even be an issue that needs to be

15   briefed but suffice it to say I think the parties certainly

16   understand that you're only making a ruling under the legal

17   regime that is presented to you, that this Court has the

18   power to decide and not some other legal regime.

19          With respect to S, Your Honor, certainly

20   appreciate what I will call your Fuller-Austin observations,

21   that the fact that the debtor is, for example, contributing

22   $220 million, bankruptcy dollars, to the trust doesn't

23   necessarily mean that that is establishing the aggregate

24   claim liability.

25          I think, as you noted, this one is controversial,

1  and it's also complicated for us to -- and it was a little

2  too complicated for us to determine in the 10 or 15 minutes

3  how we were going to address the Court's rulings.  But I

4  think I don't necessarily want to speak for the others, but

5  I'll speak for the debtor.  We heard you loud and clear, and

6  we understand that this language needs to be tightened for

7  the purposes of the proceeding and for what is in front of

8  the Court and not for other purposes.  I don't know if the

9  FCR Coalition would like to weigh in on that.

10         THE COURT:  Okay.  I'll -- I'll make one other

11 comment, which maybe I shouldn't, but I will.  I wrote this

12 down when Mr. Rothweiler was speaking.  He said they had a --

13 this is my word, sort of a fundamental principle, no survivor

14 left behind.  A very laudable goal and a -- and a call that I

15 think the survivors can make.  But I don't know that

16 that's -- that that's a -- a deal that the insurance

17 companies made when they issued policies.

18         So, again, and it's not the first time by the way

19 that I've heard that -- that sentiment or in the papers

20 somewhere.  Okay?

21         Listen, here are my thoughts on -- on scheduling.

22 We need to get this on the calendar.  Parties need to get

23 going on discovery.  There's going to need to be abbreviated

24 time frames to determine issues and that I recognize also

25 puts quite frankly pressure on me as well to decide things in

1  a timely fashion of disputes that get put in front of me.

2            But this is not, as I've already said, this isn't

3  Imerys.  It's not Purdue.  Okay?  Those are very different

4  cases.

5            This is case of a not-for-profit entity that as I

6  recall is right now going through its fundraising season

7  while it's in bankruptcy.  It's going through its membership-

8  raising season while it's in bankruptcy, and I think Boy

9  Scouts, but as importantly, and I'll stress that, as

10 importantly, survivors need to know is there a resolution

11 here or not.  So this needs to be scheduled, and I'm looking

12 at starting a trial on January 24th.

13            I recognize that is an incredibly tight schedule.

14 That does not go -- I'm not -- it's not lost on me.  That

15 will mean that, again, timeframes need to be shortened for

16 production of documents.  Time frames will need to be

17 shortened to resolve discovery disputes.  If there's going to

18 be an assertion of media privilege that is getting in the way

19 of documents and I have not seen what the debtors have filed

20 yet, that's got to be resolved.

21            I will tell you, as I think I've said in this

22 case, I'm sure I did because I had it here.  I probably had

23 it in some other cases recently.  There's got to be a balance

24 in the mediation privilege when you want certain findings at

25 confirmation.  Not everything is going to be able to be

1  protected, and we're going to have to find the balance.

2            It is hard to decide these privilege issues in the

3  abstract.  I did that recently in Imerys.  Then I get

4  documents in front of me, and it makes me have to rethink

5  what I did.  It's very hard to do it in the abstract, but I

6  will take a look at that motion.  We're going to start on the

7  24th of January.

8            I will give the parties an opportunity to see if

9  they can arrange a schedule.  If not, I will hear that

10  promptly, and I'll impose a schedule.  But in the first

11  instance, I'm going to let the parties see if they can work

12  it out.

13            I think it's an appropriate schedule.  I think

14  it's a doable schedule with cooperation.  I recognize it's a

15  tight schedule, and -- but I think all parties agreed at

16  various points in this case that from their different

17  perspectives there needs to be an -- an endpoint where we

18  know whether there's a confirmable plan or not.  And we'll

19  see.

20            MR. KURTZ:  Thank you very much, Your Honor,

21  for -- for setting the schedule.  Glenn Kurtz.  We will be

22  seeing you somewhat shortly on the motion for a protective

23  order.  I tried not to make it abstract.  Tried to tie it to

24  specific documents, which will be pulled and available for *in*

25  *camera* review if Your Honor chooses to do so or at least by

1  very specific categories.

2         So we look forward to resolving that.  I hear you

3  on the balance.  Ultimately, we have to figure out what that

4  is.  We don't have anything to hide.  IF it's protected and

5  it doesn't have to go out, we're happy with that.  If it's

6  not protected and it does have to go out, we're happy with

7  that as well, Your Honor.

8         MR. SCHIAVONI:  Your Honor, we have before you a

9  motion to shorten notice on the motion to compel the

10  documents withheld by Mr. Green on the assertion of the in

11  preparation for mediation privilege, as yet to be recognized,

12  and another motion to compel on shortened notice against the

13  debtor with respect to the documents that concern the

14  modified plan.  We didn't sit on our rights in those regards

15  at all.  All of the third-party aggregators have failed to

16  comply with the subpoenas.

17         I -- you know, the coalition partners of those

18  folks are not cooperating.  We'll bring motions on shortened

19  notice if necessary to try to move those along.  You know,

20  cooperation is sort of like the hallmark of, you know, moving

21  on an expedited schedule.  So we need that from the

22  coalition.

23         THE COURT:  It is.  I will take a look at those,

24  and we'll get a hearing scheduled on those.  Hopefully I can

25  announce it tomorrow when we're going to have a hearing on

1  those matters, but that's going to be the hallmark is parties

2  cooperating and getting documents and other discovery out.

3          Okay.  Ms. Lauria?

4          MS. LAURIA:  Thank you, Your Honor, and we will,

5  obviously, work on putting together a proposed scheduling, as

6  Mr. Kurtz suggested.  I think what that leaves for purposes

7  of rounding out the disclosure and solicitation process are

8  three issues.  And maybe I would propose to go in this order,

9  just because of the impact that the issues may have on the

10 documents.

11         The first is how to treat that $3,500 expedited

12 distribution election because that flows through the ballots

13 and the plan and the disclosure statements, and I do believe

14 it is one of the truly remaining substantive issues left it

15 may make sense to take that first.

16         Next, we have, and I think Mr. Ollinder (phonetic)

17 will go through with you anything that may remain on the

18 disclosure statement.  Knock on wood, we've been

19 communicating with folks during the course of today, and I'm

20 hoping that those are relatively limited issues.  And then,

21 finally, I believe Mr. O'Neal will pick back up with the

22 solicitation procedures, everything other than that $3,500

23 expedited distribution.  Also, I understand that he's had

24 some constructive conversations with the TCC Today, so

25 hopefully we've rounded those out as well.

1          I'm not sure if you want to turn to any of that

2    tonight, Your Honor.  I'm ready to go on the $3,500 expedited

3    distribution issue and why the change was made to the ballot

4    over the weekend if that makes sense.

5          THE COURT:  Yes, let's do that.

6          MS. LAURIA:  Thank you, Your Honor, and what I'd

7    like to do is just give you --

8          MR. STANG:  Excuse me, Your Honor, that is our

9    motion.  I think that's our motion.  I don't know why

10   Ms. Lauria is addressing something that we filed.  It's not

11   an order shortening time.  We haven't had a ruling on it, and

12   it's -- if you think that the $3,500 issue and our

13   classification motion are the same thing, we're the ones that

14   filed it.

15         MS. LAURIA:  Your Honor, we --

16         THE COURT:  Okay, well, the debtors have made a

17   change -- the debtors have made a change to their plan, so

18   I'm going to hear both of you.

19         MR. STANG:  Okay.

20         THE COURT:  Don't worry about it.  No one gets an

21   advantage over the other, but there's a change in the plan.

22   I noticed it in the plan, and let's talk about it.

23         MR. STANG:  Okay.

24         MS. LAURIA:  Your Honor, and I certainly didn't

25   mean to cut the TCC off in that regard.  We did make the

1  change to the plan.  I thought it would make sense to explain

2  why.  Also, we didn't file a written objection simply because

3  we haven't had the time to do it.  So I thought it might make

4  sense to put some perspective on this.  What I'd like to do

5  is just give a brief, a very brief history of the $3,500

6  expedited distribution and then go into why it is that we

7  made the change over the weekend to the plan and the ballots.

8           And I guess I would chalk this up to the category

9  of no good deed goes unpunished in this case.  You know,

10 throughout 2021, this literally the entirety of this year

11 we've had various conversations with parties on all sides of

12 this proceeding concerning some sort of expedited

13 distribution mechanic.  That includes both folks on the

14 survivor side and folks on the -- on the insurer side.

15          And when we came to resolution around the RSA with

16 the TCC and the coalition, we all agreed to a $3,500

17 expedited distribution.  And that was embodied in both the

18 fourth amended plan, the RSA, as well as the plan that we

19 went forward on, the fifth amended plan.

20          When we came to that understanding, speaking for

21 the debtors and really for myself in particular, because I

22 probably was at the middle of this decision, we were

23 contemplating two different mechanisms for soliciting -- I'm

24 using that in the little "s" sense of the word -- soliciting

25 the elections on the expedited distribution.  The first was

1  just getting those indications through the trust process

2  itself, and, in fact, as I mentioned earlier in the hearing,

3  there is a mechanism in the TDP and this existed, you know,

4  well before this weekend where the trustee would, in fact,

5  review the proof of claim, insure that the proof of claim was

6  substantially complete, and insure that the individual itself

7  signed the proof of claim form, not just the attorney, but

8  the individual itself signed the proof of claim form.  So we

9  thought about doing an election mechanism in connection with

10  the TDP.

11          The second option was in connection with the

12  balloting process, and that is what we elected to do, again

13  going back to the fourth amended plan.  The logic behind

14  that, Your Honor, was really one of efficiency and ease of

15  administration for both the claimants themselves as well as

16  the trust.  Our view was we were going to be sending out a

17  massive solicitation to 82,000 individuals, and with that

18  touchpoint with those individuals we should gather as much

19  information as we possibly could, including whether or not

20  those individuals wanted to take the $3,500 election.

21          As you undoubtedly saw in the confirm- -- in the

22  disclosure statement objections, we received a ton of

23  objections from the insurers to the $3,500 election.  And

24  those were along the lines of some of what you heard from

25  Mr. Rosenthal and Mr. Schiavoni today that the debtors were

1    attempting to do vote buying by putting the $3,500 election

2    on the ballot, that we were trying to carry the class by

3    buying votes with respect to that election.  And I can assure

4    you, Your Honor, that is absolutely not what our intention

5    was ever with respect to that $3,500 election.

6              But we proceeded to keep it on the ballot as we

7    went into last week's hearing.  And as we sat there, and I

8    think it was on the 23rd, when we got to the solicitation

9    procedures, we heard Mr. Stang and Mr. Smola describe very

10   convincingly the complications with the balloting process

11   here, and in particular the fact that we included on the

12   ballot this election to settle a claim, you know, not just

13   whether or not you're going to vote up or down on the plan

14   but actually settle a claim.

15             And, you know, when we went back and looked at the

16   transcript, Mr. Stang made a very impassioned speech about

17   the fact that due to rules of professional conduct an

18   attorney has an obligation to consult with its client about

19   the settlement of any claim.

20             And as we heard Mr. Smola further describe the

21   difficulties that many of the plaintiff lawyers have in

22   communicating with their clients due to confidentiality

23   concerns and the sensitive nature of the claim, it struck us

24   as, you know, we had added that to the ballot to try to ease

25   the administrative burden on both the plaintiffs and the

1  trust, but it became apparent after last week that we were,

2  in fact, increasing the burden, maybe unnecessarily so, on

3  the plaintiff lawyers.

4          In fact, we have 70 to 75,000 individuals that are

5  represented by counsel.  Whether those individuals are

6  completing master ballots or not, that's a lot of people.

7  That ranges from lawyers representing one person or a few

8  hundred persons to, I think, Mr. Smola indicated he

9  represents 4,000 persons, to Mr. Rothweiler who said his firm

10  of 10 lawyers represent 16 to 17,000 people.

11          As you know, and we just heard, we're on a very

12  tight timeframe.  We are contemplating a 60-day solicitation

13  period, and from our perspective for those lawyers to advise,

14  based on what I heard last week on whether you could or

15  should elect the option, it depends on a couple of things.

16          One, first you have to determine whether your

17  client is eligible, so whether they did complete a proof of

18  claim and whether they signed it.  We've now heard that, I

19  think, 20,000 amendments have been made to the proofs of

20  claim.  A big number of those are to substitute individual

21  signatures for attorney signatures, but that sort of part one

22  is assessing that.

23          And, next, you need to assess whether or not the

24  client should, in fact, take the $3,500 election.

25          So it struck us that we were maybe asking for too

1  much on the ballot given the timeframe and given the number

2  of claimants that are indeed represented by counsel and given

3  their ability to determine eligibility versus, you know,

4  whether or not they should even take the settlement.

5          So we thought in the face of that, and I think

6  Your Honor said last week, the expedited distribution is

7  turning into the tail that's wagging dog.  That is never what

8  we intended with the expedited distribution, so if that's

9  going to be a hardship on plaintiffs, I think our view was

10 take that off the ballot.

11         The TCC we now understand didn't like that.  They

12 want that on the ballot.  I think that from our perspective,

13 you know, there may be a balance where it can remain on the

14 ballot but rather than jam people with the voting deadline

15 and particularly those individuals who are represented by

16 counsel who needs to advise all of their clients whether

17 they're eligible and whether to accept you can have it on the

18 ballot and then also have an opportunity to take the election

19 via the trust process or via the trustee, we don't like that.

20 That sounds kind of confusing to me.

21         But at the end of the day I think we were just

22 simply trying to strike the balance between making the ballot

23 less complicated, not forcing individual lawyers to feel like

24 they needed to provide individual advice to clients on

25 eligibility and whether or not to settle and sort of delink

1 it from that process and, again, also delink it from the

2 accusations that we're trying to do some sort of vote buying

3 because that was certainly never the intention.

4       I have looked at the TCC's classification motion.

5 I'm happy to respond to that now, too.  We don't think it's

6 appropriate, and we think it's legally wrong.  But just to be

7 clear, when we made that change to the ballot believing that

8 change was really in the wake of I think what we all heard

9 last week in terms of extreme complications around the voting

10 process itself.  That was the genesis for the change.

11       You know, under bankruptcy rule 3013, one, we

12 don't have an accepted plan yet.  3013 speaks to an accepted

13 plan and whether we need to look at classification in the

14 context of an accepted plan.  God willing we get to an

15 accepted plan, but those aren't the facts before us today,

16 and, secondly, we think classifying the direct abuse claims

17 in the same class is appropriate.

18       1122(a) says substantially similar claims go

19 [interposing] the same class.  As I read the committee's

20 pleading, I think maybe what they're talking about is

21 disparate treatment within the class.  And the cases that

22 have evaluated disparate treatment under 1123(a)(4) have all

23 concluded that so long as you give everyone an equal -- first

24 of all, it specifically speaks to giving a creditor the

25 opportunity to take less.

1          And it, second, speaks to the case law that is

2    speaks to sort of an equal opportunity that the opportunity

3    to take an election is given equally to all class members.

4    So we don't think it's appropriate now.  We don't think it's

5    correct to separately classify them.  We're happy to brief

6    that more fully in connection with the confirmation hearing,

7    but we really don't think that's an issue that pertains to

8    the ballot or not or trying to deconfuse the ballot.  I think

9    they're simply suggesting that there is some difference

10   between, I don't -- big claims and small claims.  And we just

11   don't think that's appropriate under the law to distinguish

12   folks on that basis.

13          So, again, happy to do a hybrid if people think

14   that's more appropriate.  I think that's confusing.  We

15   thought the ballot was over burdening people, but that's the

16   background, and that's how we found ourselves here today on

17   that issue.

18          THE COURT:  Thank you.

19          Mr. Stang?

20          MR. STANG:  Thank you, Your Honor.  Today's my

21   birthday, and so I maybe as a present I can get an extra five

22   minutes.

23          MR. GOODMAN:  Your Honor, I don't mean to

24   interrupt Mr. Stang, but there are others who may want to

25   speak in support of this and I think Mr. Stang is going to

1  speak in opposition.  I wasn't sure if you wanted me to go

2  now or wait until later.

3          THE COURT:  Mr. Stang, what would you prefer?

4  It's your birthday.

5          MR. STANG:  Let's hear it all at once, Your Honor.

6          THE COURT:  Mr. Goodman?

7          MR. GOODMAN:  Okay.  I was right, to be fair.

8          Again, Eric Goodman, (inaudible) counsel for the

9  coalition.  The plan, as filed by the debtors back in April,

10  provided for a $1,500 expedited distribution.  That was under

11  the global resolution plan but not the toggle plan.  That's,

12  you know, April, so many months ago.

13          That did change under the plan filed in July.  The

14  amount of the expedited distribution went up from 1,500 to

15  3,500.  We also insisted on upping the standard.  The

16  requirement changed so that the proof of claim must be

17  complete and signed by the survivor under penalty of perjury.

18  That was added by the coalition and the TCC.

19          The TCC back in July supported the expedited

20  distributed.  Since the RSA terminated, the TCC has made it

21  clear that this was going to become a significant voting and

22  plan confirmation issue for them.

23          In addition, the insurers I think have always

24  consistently suggested that they would argue that the

25  expedited distribution was the equivalent of buying votes.

1          I will fight very, very hard on issues that I

2   think are major issues, issues that I care about, issues that

3   are important to survivors and the survivors receiving a fair

4   recovery in this case.

5          I don't agree with the insurers.  I don't agree

6   with the TCC, but I also know a distraction when I see one.

7   I think that the trustee should be able to pay nuisance

8   values, especially when the payment is less than the cost of

9   reviewing the claim.

10         I also think that it might be a bit unfair at this

11  point for people to make the election of 3,500.

12         You heard from Mr. Rothweiler that the amount of

13  funding in the trust could go up significantly in the coming

14  months.  So it may be, you know, unfair to even ask people to

15  make that election right now.

16         Given those factors, we support the debtor's

17  change in this regard.  I do think it gets rid of an issue of

18  potential distraction.  Given the current state of affairs, I

19  do think it makes sense for this to be something that is done

20  later and not at the voting stage.  Thank you, Your Honor.

21              THE COURT:  Thank you.

22              Mr. Patterson?

23              MR. PATTERSON:  I was going to defer to Mr. Stang,

24  Your Honor.  I'm on Mr. Stang's side.

25              THE COURT:  All right.  Okay.

1       Mr. Stang?

2       MR. STANG:  Thank you, Your Honor.  Your Honor,

3  this is not an example of no deed -- no good deed goes

4  unpunished.  This is an example of no self- serving deed goes

5  un noticed because that's really what's happening here.

6       This is not a gesture by the debtor to relieve

7  over-burdened state court counsel from actually getting the

8  informed consent of their clients.  Not a single person at

9  the hearings last week said that they couldn't effectively

10  communicate with their client regarding this election.

11       In fact, the debtor's schedule, the abbreviated

12  schedule you just heard about was on file.  No one said they

13  couldn't accomplish this.  For all of my differences with

14  Mr. Rothweiler, he said just within the last two hours that

15  they are in constant contact with their clients, fielding

16  thousands of phone calls a month, regularly communicating

17  with them in some fashion.

18       So this idea that the debtor is doing the

19  plaintiffs' bar a favor, it's a favor no one asked for.  And

20  so I really think that we need to look at this from two

21  perspectives.

22       One is should it be a separate class.  That's the

23  subject of our motion, and should it be on the ballot because

24  those could be two different things.

25       Now, you said last week that it was important to

1  understand the voting, to see where this -- on this issue

2  where the support was coming from.  That's how I interpreted

3  your comments, and we cited to the transcript in our motion.

4           The elimination of the $3,500 election from the

5  ballot makes it impossible to track who's voting for this

6  plan as -- if you think of them as people who elect for the

7  3,500 and people that will go into the TDP either to litigate

8  their claims if that's permitted under the TDP or through the

9  TDP process.

10          If you don't make people indicate their election

11  on the ballot, we will never know the level of support that's

12  being given to the class by those folks because one thing --

13  everyone talks about we've got to put this stuff in context.

14  Here's the context.  No court since these abuse cases started

15  being filed in 2002, I think, has ever crammed down on a

16  survivor class.  No one.  But what is going on here is that

17  the plan proponents want that class to be as big as possible

18  and to get them all to vote yes.

19          If this is a separate class, those yes votes, the

20  people electing for the 3,500 don't count towards the vote

21  tallies on the impaired class.  They don' want that.  This is

22  in effect kind of stuffing the ballot box.  I thought it was

23  gerrymandering, but it's really stuffing the ballot box.

24  They want as many yes votes in there as possible, and that's

25  a creditor who is going to get 2,500.  They want that person

1  to vote yes.  And you'll come out with the 80+ percent

2  approval rating of this by that class.

3          But if those people who are getting at least below

4  $3,500 under the TDP and when you look at the chart that we

5  have proposed and the debtor has accepted for inclusion in

6  the disclosure statement, there are a lot of people $3,500

7  and under and there are a lot of people in that -- in a

8  higher number, maybe 5,000, 7,000 who will take the 3,500 and

9  not take the risks and the delay associated with being in the

10  TDP.

11          So that's what's really going on here.  They want

12  to maximize the people in the class, get them to vote yes,

13  and then those people may elect the 3,500 but they have in

14  effect they've impacted the voting, and, frankly, I think

15  they have distorted the voting.

16          When I spoke to this issue last week, and I think

17  I -- Mr. Smola will speak for himself.  We didn't say that it

18  was too complicated or that the professionals couldn't do it.

19  We talked about integrity, the integrity of the voting

20  system, making sure that counsel who was signing the master

21  ballot were acting in the first capacity as Mr. Goodman

22  described it as kind of collectors of the ballots.  And that

23  there were no shenanigans going on with people not accurately

24  recording their client's vote.  Or in the second capacity,

25  actually making the decision themselves, which would be

1  backed up by power of attorney, which issue I think we've

2  resolved as we'll get through the solicitation motion.  But

3  no one opposed the idea that they couldn't communicate with

4  their clients effectively to get an informed consent on what

5  to do.

6          I don't think the hybrid that Ms. Lauria was

7  suggesting really makes sense because it doesn't give you

8  that measure of who is supporting the plan in that class.

9  Whose money is really at risk?  Who's rolling the dice and

10  who is not?  Because the $3,500 if you take that election,

11  you're not rolling the dice.  And while it is true that the

12  trustee does have to check to make sure that the signature is

13  on the claim form and that it is substantially completed,

14  that's not really a -- in my opinion a substantive review

15  process.  That's checking a signature block and seeing how

16  many answers were given.  It's not even looking at the

17  answers.

18          I don't think is an issue of vote buying because

19  if you put those people in a separate class, and every plan

20  that I've had any experience with has always had the

21  convenience class, the nuisance class, as someone described

22  it as a separate class.  Well, if they're in a separate

23  class, they're not -- the vote buying is not an issue because

24  they're not tilting the impaired class to acceptance.

25          So I think that if you have separate

1  classification this concern about vote buying goes away.

2  3013 does not deal with a, quote, "accepted plan."

3  It's not what the language says.  It says for the purposes of

4  the plan and its acceptance, the court may on motion direct

5  determine classes or creditors.

6  It doesn't say after the plan has been accepted or

7  after voting is completed.  This is the time to do it.  This

8  is the time to make the plan accurately reflect what is going

9  on in the case.

10  And everyone will have the opportunity to take the

11  election.  There will be no discrimination amongst abuse

12  survivors, but if you take the election, you're in an

13  unimpaired class and you're deemed to have voted yes.  Well,

14  you're unimpaired.  I guess you're -- you're not voting at

15  all, I'm sorry.  You're not voting at all.  I get an -- I

16  get -- I get an erasure on that one because it's my birthday.

17  I made a mistake, and so to me this is about

18  integrity of the voting system, being able to keep track of

19  who is voting how and how that is really going to affect your

20  view of where the support is coming from in the plan, and if

21  you do it any other way, we will never know if, in fact, the

22  survivors whose claims are really at risk are supporting

23  this.

24  People have called this the tail wagging the dog.

25  I don't -- you may have -- I think you may have used that

1  expression, Judge.  We don't know that.

2          There could be 10,000, 15,000, we estimate using

3  our chart the TDP values that we're talking about that

4  possibly as many as 25,000 people might be making that

5  election because under the distribution scheme and given the

6  current plan settlements, that's about how many people it

7  might make sense to take that election.  It cries to the

8  inadequacy of the settlements, please.  We won't get started

9  on that, but this is not the tail wagging the dog.  This may

10 be the dog.

11         So, Your Honor, we think it makes sense.  It

12 reflects the concerns you expressed last week.  We think

13 keeping it on the ballot absolutely is necessary so we can

14 track where the support of the survivors really is and whose

15 money is at risk here, if you will, and we think it should be

16 in a separate class to avoid the issue of vote buying, and we

17 think it makes it cleaner.  So that's all, Your Honor.

18         THE COURT:  Thank you.

19         Mr. Patterson?

20         MR. PATTERSON:  Thank you, Your Honor.  I lack the

21 history that so many people here have, and so I look at it

22 very, very simply.  This is a plan that provides for

23 alternative treatments.  The two alternative treatments give

24 the claimant a fundamentally different interest or stake in

25 the outcome of the plan.

1          One, reduces the claim if pertinent or actually

2   potentially increase their distribution to $3,500.  Accepts

3   that, executes the required releases and moves on with life.

4          The second is going to be tied up with the TDP

5   process, payment percentages, hold backs, whatever set aside

6   there is for the futures and all the rest of that

7   architecture for many, many years and except getting more

8   money overtime, hopefully, maybe not, but agreeing to take

9   that risk in exchange for potentially a greater distribution.

10          *Ex ante*, leaving everything else aside, leaving

11  this case aside, ex ante, those are two different classes,

12  and that is why the first time I think I drafted a plan and I

13  had a little nifty -- I thought I could collapse it and I put

14  in my little trade class, this is what you get, but if you

15  agree to reduce your claim, then you get this little amount

16  of money, and I thought I had made an efficient move.  And we

17  went to a disclosure statement hearing, it was a small case,

18  and the partners let me kind of run with it so I could get my

19  nose bloodied and learn how to practice law.  And I did.  The

20  judge said those are two classes, Mr. Patterson.  Those

21  people have different rights.  Those are different classes.

22  Read 1122 before you come back.  And so that's -- that is the

23  correct analysis.

24          Now, this Court need not resolve the 3013 motion

25  in the sense of deciding they're separate classes today, but

1  this goes back to what the history that I am familiar with,

2  which was last week.  And I raised this issue because I

3  wanted to make sure, we were talking about a number of issues

4  related to how we're going to count the votes, how we're

5  going to measure the votes for master mortgage, and I said

6  and by the way, Your Honor, I just want you to know we may

7  bring a 3013 motion because we think these people are

8  fundamentally in a different class.

9           And, Your Honor, said -- you know, I think I'm not

10 surprised given the papers that that is something someone is

11 going to do, and we'll have all the information.  And I was

12 completely satisfied with that because having the information

13 is the important part here.  At the end of the day, the Court

14 can decide the 3013 motion later, but the balloting issue is

15 really the key issue.

16          And I don't think you need a starker case than to

17 look at combustion engineering, and when that case went up to

18 the Third Circuit and the fact that the vast majority of the

19 votes have been delivered by people whose rights were

20 fundamentally different.

21          They, in that case they were receiving some money

22 from one trust and had a spillover claiming to the other

23 trust in a small amount.

24          And the Third Circuit -- in that case it was an

25 artificial impairment case, but the principle is really the

1   same.  And the debtor is given a certain amount of discretion

2   with regard to classification and treatment, but when the

3   purpose or when the underlying effect of that is to conceal

4   what the real support is for the plan by people who have a

5   real and meaningful economic state in it, or to separate out

6   people who have a different economic stake in it, then that

7   is improper classification or improper treatment.

8           Your Honor, I think this issue of eligibility and

9   the other little things, that's a complete red herring.  The

10  election can be I elect to take this treatment, but I

11  understand that I have to comply with the requirements of the

12  trust in order to receive it.

13          That -- this is not something that ought to get in

14  the way.  We heard loud and clear from the coalition lawyers

15  that they were able to do all the solicitation necessary, and

16  the idea that there has been a revisiting of this principle

17  with regard to the 3,500, frankly, it doesn't really -- it

18  doesn't really hold water.

19          Finally, Your Honor, with respect to the point

20  that the integrity of the balloting could be put at issue,

21  first, no one has said that.  That's speculation.  I think

22  it's a red herring, but even leaving that aside, this is an

23  election that's going to have to be made at some point.  And

24  a 60-day balloting period that we have for this purpose given

25  the focus that people are going to have on this process,

1  given the materials that they are going to be receiving,

2  given the communications that all of the lawyers are going to

3  be making with their clients, there is no better time to

4  ascertain what the claimant's preference is in this regard

5  than now.

6          This is the time when they are focused on the

7  issue.  To suggest that they would get a standalone piece of

8  paper at some point in the future that advises them about it,

9  that wouldn't be meaningful.  This is the time that they are

10 focused on it.  This is the time that people are in

11 communication with them.

12         Your Honor, I was a little disappointed to see the

13 switch about.  I understand that the debtor wants to have a

14 valid vote and a meaningful vote to record the votes on the

15 plan and really gauge the support, and I think if they really

16 want to do that, they would want to know are people who are

17 accepting this plan truly the people who are impacted by the

18 insurance settlements, who are impacted by the third- party

19 releases, who are impacted by the loss of their rights in the

20 tort system?  And that's what this gauges, Your Honor.

21         I'm happy to answer any questions the Court has.

22         THE COURT:  Thank you.  I don't have any

23 questions.

24         Mr. Smola?

25         MR. SMOLA:  Thank you, Your Honor.  Can you hear

1    me okay?

2              THE COURT:  I can.

3              MR. SMOLA:  I'll just be very brief.  With respect

4    to Ms. Lauria's point about the $3,500, frankly, that is the

5    least of a plaintiff's lawyer's concern for the informed

6    consent they need to obtain for their clients.  A yes vote in

7    this case, as I have sort of said three or four times now,

8    potentially compromises a case against a third party, a local

9    counsel, and potentially compromises a case against another

10   third-party non-debtor, a chartering organization, and every

11   lawyer that votes yes in this case is going to have to get

12   affirmative consent from their clients in order to execute

13   that vote and is going to have to inform their clients that

14   they are potentially compromising those other cases.

15             Certainly, the $3,500 was an additional

16   consideration, but it's really those first two considerations

17   that drive the communication we as plaintiff's lawyers have

18   to get from our clients in order to compromise their claims

19   by way of a yes vote.

20             Thank you, Judge.

21             THE COURT:  Thank you.

22             Ms. Lauria?

23             MS. LAURIA:  Thank you, Your Honor, and I will

24   also be brief.  I want to just put some meat to the bones of

25   something that Mr. Goodman said, which is from the

1 plaintiff's perspective, as the settlement amounts increase

2 in this case, so do their recovery percentages under the TDP

3 matrix.

4          And I'm going to point the Court to the blackline

5 disclosure statement that we filed in the overnight hours.

6 It's docket 6385-2, and I'm going to ask the Court to turn

7 to -- it's page 40 of 507 of the PDF or page 33 of the

8 disclosure statement itself.

9          And while you're getting there, Your Honor, I just

10 want to set the stage for what this is.  Mr. Stang has

11 referenced multiple times that they prepared a recovery

12 chart.  It provides for pittance of recoveries, and that the

13 debtors endorsed it, apparently, by putting it in the

14 disclosure statement, and, therefore, that proves that a huge

15 number of folks may take the $3,500 under our plan.

16          That's simply not the case.  What Mr. Stang failed

17 to mention was that the debtors provided their own recovery

18 chart where we took the TDP values.  We applied the scaling

19 factors as they pertain to the -- and, again, Your Honor,

20 it's page 33 of the black line, page 40 of 507 of docket

21 number 6385-2.  We applied the scaling factors for the

22 statute of limitations, and then we applied various recovery

23 percentages at both the base claim amount under the TDP, as

24 well as the max claim amount.  The base claim amount of 10

25 percent we calculated based on the Bates White estimation of

1  a 7.1 billion trust applying the Hartford distribution, the

2  distribution from the local councils, as well as the $100

3  million Delaware Statutory Trust note, as well as the debtors

4  own contribution.  The 63 percent recovery is assuming the

5  valuation is at Bates White's low end, which is $2.4 billion,

6  but, again, utilizing the same assumptions and then it is our

7  contention, of course, that claimants may receive up to a 100

8  percent recovery as additional insurance settlements come in

9  the door based on the Bates White estimation.

10         And if you just glance through this chart, you

11  will see whether you're talking about in-statute claims for

12  non-touching that appears on page 35, or out-of-statute

13  claims versus various states in the scaling factors, the

14  difference between a 10 percent recovery or a 63 percent

15  recovery could formulate the difference between electing a

16  $3,500 expedited distribution or not.  You see that

17  repeatedly including even in the more severe abuse claim

18  category types.

19         So we do think that more information, and, again,

20  this is just to add to Mr. Goodman's point, there is a

21  dramatic difference between recovery percentages depending

22  upon the dollars that are in the trust and also depending

23  upon the ultimate value of the -- the liabilities that the

24  trust is confronting.

25         Beyond that, Your Honor, I will say that as we

1  said, I guess it was last week, we think many of the voting

2  issues can be dealt with on the back end.  Maybe we

3  misinterpreted the statements of counsel last week at the

4  hearing, but at the end of the day we felt like this truly

5  was turning into the tail that was wagging the dog and that

6  it was appropriate to remove it from the ballot.

7            Thank you, Your Honor.  Unless you have any

8  questions for me, that concludes our views of this topic.

9            MR. STANG:  Your Honor, may I make one comment

10  about this issue of the moving target of the settlements?

11            THE COURT:  Yes.

12            MR. STANG:  I think this works, I think this might

13  work.  The notion that I heard was essentially let people opt

14  into it later at some undefined period of time after the

15  effective date.  And that, of course, is the problem that I

16  tried to identify.  I thought Mr. Patterson made it as well,

17  that we just don't know if the people voting yes really have

18  skin in the game.

19            But you could have an approach that says you have

20  to make the election, and you can opt out later.

21            If it turns out that on the effective date of the

22  plan they've doubled, just to use Mr. Rothweiler's hopeful

23  example or even, you know more than doubled the settlements,

24  people might go, you know what, maybe I shouldn't have taken

25  that election.  But we don't know.  There could be no more

1  settlements.  I have no idea who Mr. Schiavoni is talking

2  about talking to in settlements.  I thought he was talking to

3  us, but apparently not because he met with the coalition

4  yesterday, but we don't know.  The settlement numbers might

5  not change at all, so the idea that someone makes the

6  election, we know they are electing, and they can, in effect,

7  opt out of that election so that they are not damaged by an

8  increasing pot of money.  Maybe that is a resolution to this,

9  but we really feel the need to keep track of who's making

10  this election so we can see if it's skewing the voting, and

11  the idea that we could take up the classification issue at

12  the confirmation hearing is interesting.  Maybe that's a way

13  of doing it, but we really need to identify these folks so we

14  can see whether people with significant interest in the

15  issues that Mr. Patterson identified are voting yes or not.

16           THE COURT:  Mr. Goodman?

17           MR. GOODMAN:  Thank you, Your Honor.  Eric

18  Goodman, counsel for the coalition.  I'd just like to speak

19  on one issue.  1122(a) provides that a plan may place a claim

20  or interest in a particular class only if such claim or

21  interest is substantially similar to the other claims or

22  interest.  I think we satisfy that here plainly because all

23  of the claims in Class 8 are survivor claims.  On the

24  treatment issue, that's actually an 1123(a)(4), not 1122, and

25  1123(a)(4) provides that the plan shall provide the same

1  treatment for each claim or interest of a particular class

2  unless the holder of a particular claim or interest agrees to

3  a less favorable treatment of such particular claim or

4  interest.

5          The plan does provide for the same treatment.  It

6  provides the same options, you know, what people decide to do

7  later on if -- if they decide to accept less favorable

8  treatment for reasons that are personal to them, I don't

9  think that impacts the analysis under 1122 or 1123 at all.

10  That's my only point, Your Honor.

11          THE COURT:  So I haven't read the motion yet.

12  That's my -- I have to confess when I heard it was under

13  3013, I said what rule is that, but the but I see it's there,

14  and my gut reaction is it's not a classification issue

15  because all of the holders in the class have the same legal

16  rights *vis-à-vis* the debtors, and because they all have the

17  same options.  They all have the same opportunities with

18  respect to their recoveries, depending, of course, on what

19  abuse they suffered.

20          But -- so I don't know if it's a classification

21  issue, but my gut reaction is it's not.  But the reason I

22  thought this information would be helpful had more to do with

23  the channeling injunction request and the third-party release

24  request that I'm going to be -- that I'm being asked to make.

25  And not necessarily a cram down issue, although I guess I

1    hear that, too.  But or the channeling injunction and the

2    third-party releases appropriate under the relevant

3    standards?

4            And in that regard, I thought it would be helpful

5    to know who was voting and what their choice is.  Of course,

6    I could have been in a situation where there was no choice.

7    You just -- there's no convenience class.  You just are

8    funneled into the trust, and if you end up with, you know,

9    $19 for a non- touching claim on a 10 percent recovery, then

10   you get $19.  You don't have the option to get $3,500.  But

11   I'll confess I hadn't -- I did note these charts.  I hadn't

12   thought about this issue in connection with the charts.

13           I do think counsel is going to have to have

14   communication with their clients with respect to voting on

15   this plan, and it's a complicated plan and it does - - even

16   whether one accepts it or rejects it is a complicated

17   decision, much less whether one accepts the particular offer

18   of $3,500.

19           I don't know if it's a classification issue, but I

20   think it's important to understand the vote.  I don't know

21   about an opt out.  I don't know if that's something the

22   debtors or anyone else would accept.  So I think it needs to

23   stay on the ballot.

24           MR. PATTERSON:  Thank you, Your Honor.

25           THE COURT:  Thank you.

1          MS. LAURIA:  Your Honor, we will conform the

2    ballots and the other documents back to the format that they

3    were in on this topic previously.

4          THE COURT:  What else can we accomplish this

5    evening?  There were two -- two other topics, Ms. Lauria.

6    Let me see my notes.

7          MS. LAURIA:  Yes, Your Honor, it was sort of

8    clean-up on the actual disclosures on the disclosure

9    statements and then resolution of any open issues with

10   respect to the solicitation procedures.

11         Both of those topics are being handled by the team

12   in the White and Case conference room, which I cannot see.  I

13   might as Mr. Linder if he is somewhere near the camera to let

14   us know if one or both of those topics are a size that can be

15   dealt with still this evening.

16         MR. LINDER:  Good afternoon, Your Honor, White and

17   Case.  As for the disclosure statement itself, we're

18   certainly a long way off from where we were with 170

19   objections last week.  I think we're -- we're down to maybe

20   four issues that I have on my list.  So I think that's

21   something discreet enough that we might be able to accomplish

22   in the time remaining today.

23         THE COURT:  Okay.  Let's see if we can knock those

24   out.

25         MR. LINDER:  Great.  Thank you, Your Honor.

1          As Ms. Lauria mentioned, we've been working

2   extremely hard since we broke last week -- I think it was

3   last Thursday -- to revise the disclosure statement, the

4   plan, the solicitation materials and the various exhibits and

5   schedules to account for the revisions that the debtors

6   agreed to make during the hearing last week as well as the

7   items that the Court directed us to include in a revised

8   version of the documents.

9          We've also worked to reconcile our comments with

10  the numerous objectors' comments, and we believe that the

11  draft we filed in the early morning hours today at Docket

12  Number 6385-2 that's the redline is very close to resolving

13  all of the disclosure statement objections.

14         Again, as I mentioned, I believe there are four

15  categories of issues that I'm aware of so I would propose to

16  just walk through each of those in turn, starting, Your

17  Honor, with the future claims disclosures.

18         Your Honor will recall that certain of the

19  objectors asked for disclosures with respect to an estimate

20  of the future abuse claims so that they could better

21  understand what effect if any those claims may have in terms

22  of dilution, potential dilution of their recoveries, vis-à-

23  vis future abuse claims.

24         We have conferred with the FCR's counsel over the

25  weekend, Your Honor, and the FCR has preliminarily estimated

1  that future abuse claims in number are projected to equal

2  approximately 14 percent of the number of abuse survivors

3  that are not future abuse claims.  And in value, Your Honor,

4  are projected by the FCR to equal approximately 21 percent of

5  the value attributable to abuse claims that are not future

6  abuse claims.

7             Your Honor, from the debtors' perspective, those

8  numbers I just want to be clear do not comport with our view

9  or our analysis.  We're continuing to engage in discussions

10  with the FCR's representatives with respect to their

11  preliminary projections, but regardless, Your Honor, we will

12  continue to confer with the FCR and include -- we would

13  propose to include in a further revised version of the

14  disclosure statement what I suppose would be the solicitation

15  version those estimates.

16             And, specifically, in the version that we filed

17  last night, Your Honor, the main provision that we included

18  is on page 96 of the redline, and what that essentially has

19  is a placeholder for the projected amount and value that I

20  just recited.  And, again, that's on page 96 of the redline.

21  It indicates both the FCR's forecast and our dispute of those

22  forecasts based on our own valuation expert's analysis of

23  future abuse claims.

24             We've also added, Your Honor, risk factors to

25  emphasize that there is a risk, that the projected value of

1  claims is higher than the debtors range or that the types

2  of -- or that the claims that could be allowed in amounts

3  higher than the total projected ranges for each type of

4  claim, which could also reduce recoveries for holders of

5  compensable claims.  That risk factor is on page 275 to 276.

6          So with those changes, Your Honor, we believe that

7  that is sufficient disclosure on the topic of future abuse

8  claims.  And we propose to memorialize that in a further

9  revised version of the DS.

10         MR. SCHIAVONI:  Your Honor, our just -- our one

11  concern about that is that there's no explanation of the

12  methodology that was -- that's applied to come up with the 14

13  to 21 percent.

14         MR. MONES:  Your Honor, this is Paul Mones.  May I

15  speak?

16         THE COURT:  Yes.

17         MR. MONES:  Thank you, Your Honor.  I am and have

18  been since the beginning of this future claims, since a

19  future claims representative has participated been very, very

20  concerned about the methodology of arriving at this number

21  considering the on-the-ground reality of states which allow

22  repressed memory and the number of juveniles who -- people

23  under the age of 18, who are -- would not have filed given

24  the nature of the criminal justice system as it's been

25  applied in the last 3 to 5 years with regard to

1  organizational -- abuse in organizations like the Boy Scouts

2  whereas back in the 60s, 70s, 80s, 90s, the numbers of

3  reports of sexual abuse that were -- that were reported to

4  law enforcement were less, the numbers now according to law

5  enforcement research, et cetera, at least in institutions,

6  not in family matters has significantly been altered.  So I

7  hope we would have a -- echoing perhaps Mr. Schiavoni's

8  comments we would have an opportunity in some way to have an

9  evidentiary hearing on the way in which this number was

10  formulated because, again, purely in my opinion I think those

11  numbers are way, way off.

12              MR. LINDER:  Your Honor, if I could briefly

13  respond.  Our understanding is that this analysis, again, is

14  preliminary.  Ankura is the FCR's valuation expert.  With

15  respect to substantiating the value, that's obviously

16  something that we would expect to happen at confirmation.

17              THE COURT:  I think there will be discovery on it.

18              MR. MONES:  Thank you, Your Honor.

19              MR. STANG:  Your Honor, may I make a comment on

20  this?

21              THE COURT:  Yes, Mr. Stang.

22              MR. STANG:  Your Honor, first of all, whatever is

23  going to be expressed in terms of the FCR's opinion should

24  not be in percentages, it should be dollar amounts or number

25  of people.  One shouldn't have to go back and compute

1  percentages.  There's just no reason.  But we received a

2  draft redline of the plan a little past midnight on Monday.

3         It was not marked confidential.  It was not marked

4  subject to the mediation privilege, and that e-mail or in

5  that draft redline, it said that the FCR estimates there are

6  11,300 future claims and 5.055 billion dollars in value.

7         Now, I'm not a math whiz but 5 billion dollars is

8  more than 21 percent of the high-end range of the debtor's

9  estimates at 7 billion.  So when they say percentage of

10  value, I have no idea what the value means.

11        And I have a communication.  I presume it came

12  from the debtor that the FCR was estimating these claims at

13  11,300 people and 5.055 billion dollars.

14        Would someone please explain to me how we got from

15  Monday at 12:40 a.m. with those numbers to what we just

16  heard?

17        MR. LINDER:  Your Honor, before the FCR responds,

18  what I would note is that my understanding is the FCR does

19  not adopt the debtor's estimation.  It does not adopt our

20  range of values, just to respond to Mr. Stang's comment.  But

21  with respect to the propriety of how the estimation is

22  expressed, I would defer to the FCR.

23        MR. SMOLA:  Your Honor, can I just be heard for

24  just very briefly?  I think this should be a very simple

25  disclosure.  How many future claims are projected in terms of

1  numbers?  How many of those are repressed memory claims,

2  meaning claims that can come from policies in the 70s and

3  80s?  How many of them are minor claims?  We heard the FCR

4  earlier saying they felt many of these were minor claims that

5  would be fully insured.  Is it 8,000 minor claims?  Is it 200

6  minor claims?  What is the projection, and what is the total

7  estimate for future liability?

8           It's relevant for two reasons in disclosure.  One

9  is where do these claims fall in the insurance picture?  Are

10 they for minors who were abused in the last decade, or are

11 they going back to the Hartford era, Century era, and other

12 non-aggregate limits?  And, two, it may dictate how the FCR

13 discovery goes.  If there is 11,000 claims, that discovery

14 may need to be robust.  If it's much less than that, it may

15 not need to be so robust.  So I think a simple disclosure

16 will -- will put us on the right path in my view.

17           MR. BRADY:  Your Honor, Robert Brady for the FCR.

18 Both of those statements are correct, what Mr. Stang saw in a

19 black line and what the debtors propose to put in now.  So we

20 can express this in either way.

21           I think the debtor preferred percentages.

22           But we do expect this to be the subject of

23 discovery, and we are prepared to sit down with the TCC, the

24 coalition, and anyone else who wants to understand the

25 methodology and we'll present that to them.  But we always

1  expect that this would be a confirmation issue, and we're

2  making the disclosure now because the Court asked us to.  And

3  we understood that the Court asked us to list the number of

4  claims and the amount.

5          The fact is Mr. Stang has said these claims are

6  worth over $100 billion.  The debtor believes they are

7  somewhere between 2 and 7, and the FCR has his own view as to

8  what the value of the claims are.

9          THE COURT:  Okay.  So let's --

10          MR. LINDER:  Your Honor, just to be clear on the

11  percentage versus the dollar amount, the reason the debtors

12  prefer the only apples-to-apples comparison that can be made

13  is with respect to numbers of claims given the disparity

14  between the FCR's valuation number and the debtor's valuation

15  number.  Doing a percentage allows an apples-to-apples

16  comparison to be made.

17          MR. STANG:  Your Honor, I'm just not sure what the

18  apples are.  It's 14 percent of the value if it's $5 billion.

19  If my math is right, it's $25 billion in claims because

20  that's 20 percent, 5 percent is 20 -- that's the math, I

21  guess.  I guess I just don't understand what the value means.

22          I understand the people because we know there's

23  82,200 some odd.  That's easy.  I just don't understand the

24  value side of it.  Just give us the number like Mr. Smola

25  suggested.

1          THE COURT:  I don't understand it either.  I wrote

2   it down, but I wasn't quite sure what it -- what it meant or

3   what it was correlated to.  And so, Mr. Brady, it's 21

4   percent of value, whatever that value happens to be?  Is

5   that -- is that what Ankura's opinion is, or do they have an

6   opinion on a number?

7          MR. BRADY:  They have run the claims through the

8   TDPs, and they have an opinion on the value of the claims run

9   through the TDPs.

10          THE COURT:  So it's as run through the TDPs?

11          MR. BRADY:  Correct.

12          THE COURT:  Okay with some, I suppose analysis as

13   to what they think are the appropriate scaling factors?

14          MR. BRADY:  Correct.

15          THE COURT:  Just explain that in a sentence and

16   give out the numbers.

17          MR. LINDER:  We will work with the FCR, Your

18   Honor, to do that.

19          THE COURT:  Thank you.

20          MR. ROSENTHAL:  So, Your Honor?

21          THE COURT:  Mr. Rosenthal?

22          MR. ROSENTHAL:  Yes, it's Michael Rosenthal of

23   Gibson Dunn.  So what the FCR is going to give is -- is -- is

24   an aggregate number, a percentage, and the actual -- the

25   actual number of claims, an aggregate value and the

1  percentage of that value to a total value, all three of those

2  things.  Is that what we're looking for?  I heard 11,300

3  claims.  I heard $5 billion, and I heard $5 billion

4  represents 21 percent of something.

5            THE COURT:  That sounds -- you could put the

6  percentages in.  That's fine, and that one sentence or so on

7  just what Mr. Brady explained.  Then it's discovery.

8            MR. LINDER:  With that, Your Honor, I propose to

9  move on to the next, the second of the four categories.

10           THE COURT:  Yes.

11           MR. LINDER:  That is the plain English summary

12  document.  This is -- this is a document that was actually

13  appended to the revised solicitation procedures order that we

14  filed, docket 6386-1.  I'm raising it in the context of the

15  disclosure statement, Your Honor, because Mr. Ryan had

16  suggested that it would be an efficient means, an effective

17  means of communicating with charter organizations with

18  respect to information contained in the disclosure statement.

19           And, Your Honor, this was exhibit 12, and that

20  starts at page 243 of 256 if you're looking at the stamp at

21  the top.

22           THE COURT:  Page 243, okay.

23           MR. LINDER:  Your Honor, we spent a good portion

24  of our day on Friday and Saturday, the debtors did, working

25  with the ad hoc committee of local councils preparing the

1  draft that is appended to the revised solicitation procedures

2  order.  We sent this draft in substantially this form to all

3  of the objecting parties including Mr. Ryan and the other

4  representatives of charter organizations.  We sent that on

5  Saturday afternoon.  We then sent a further revised version

6  to all parties including Mr. Ryan on Monday.

7         Last night at about 7 p.m. Central Time we

8  received preliminary comments from Mr. Ryan, and we made good

9  faith efforts after we received those to incorporate as many

10  comments as we could, given the time constraints and the

11  number of documents we were working to file.

12         The document that's before Your Honor is -- it's

13  about a ten-page document, and it's comprised of four items.

14  The first is -- is about nine pages of frequently asked

15  questions regarding the treatment, I don't know if treatment

16  is the right word, but the effect of the plan on charter

17  organizations with respect to what we view as their three

18  options under the plan.

19         The first is to become a participating charter

20  organization, and that is the "default" option.  The second

21  is to negotiate a settlement by which they can become a

22  contributing chartered organization, and then the last is to

23  opt out of that treatment assuming that the charter

24  organization is not a debtor in bankruptcy.

25         So we've set forth several FAQ on each of those

1 options, a table at the back of the document that attempts to

2 summarize the three options on a single page, as best we can

3 in terms of what the contribution that's required to be made

4 by those charter organizations and the protections that the

5 charter organizations would receive under the plan for each

6 option.

7          There's also an opt out election form.  Mr. Ryan

8 had requested that rather than the more informal method of

9 contacting the debtors to opt out of becoming a participating

10 (inaudible) that there actually be something that looked more

11 like a ballot that could be opted out, that could be

12 submitted as an opt out.

13          We've prepared that.  That would be -- that is

14 proposed to be remitted to our claims and noticing agent.

15          And, finally, we would propose to append to the

16 summary and FAQ a confirmation hearing notice so that parties

17 know what the relevant objection deadlines are and the

18 proposed date for the hearing on confirmation of the plan.  I

19 understand from communications with Mr. Ryan during the

20 hearing, Your Honor, that there are a number of items that he

21 would propose be added to this document.  We've been trying

22 to balance the desire, Your Honor, to have this be a concise

23 and effective summary against what we view as a risk of this

24 taking on a life of its own and becoming in essence a mini

25 version of the disclosure statement.  The disclosure

1  statement has already been heavily negotiated.

2           So what I'd propose to do, Your Honor, is to in an

3  attempt to make sure all the information that Mr. Ryan

4  believes should be included in this document is included is

5  to add a section perhaps before the chart that and some of

6  the examples of what Mr. Ryan would like articulated in this

7  document are voting, means by which holders of indirect abuse

8  claims, most of which are charter organizations can vote

9  their claims be effective, the releases and injunctions on

10 charter organizations, et cetera.

11          What I would propose to do would be to add a

12 section that bullet points out some of those items and cross-

13 references the disclosure statement and where those -- where

14 all of those items, all of which have been articulated in the

15 disclosure statements can be found.

16          All of the indirect claim holders, indirect abuse

17 claim holders who are charter organizations will be receiving

18 the disclosure statement as part of their solicitation

19 package, so from our perspective, we think that is an

20 appropriate way to balance the charter organization's desire

21 for a one stop shop for all of this information against this

22 document again taking on a life of its own.

23          THE COURT:  Mr. Ryan?

24          MR. RYAN:  Thank you, Your Honor.  We do -- we

25 do -- first, we commend a lot of effort went into getting

1  something into -- an effort to put into plain English.  You

2  know, what our hope is and what we thought the Court agreed

3  with was that charter organizations need something that gives

4  them the entirety of what they're being asked to decide on in

5  plain English.  And there's -- there's two components to

6  that.  One is the three options for the releases and the

7  treatment with respect to all chartered organizations, and

8  also the creditors, and there are 16,000 creditors needed to

9  understand that part of the disclosure statement in plain

10 English as well.

11          So, addressing half of -- half the loaf, and then

12 giving them a key that points them back to the disclosure

13 statement in our view is -- just falls a little short.  I

14 understand the concern of not wanting a 50-page document,

15 but, you know, we gave them a turn that we think has a lot of

16 those concepts in 10 pages.  We think it can be done.  We

17 think we're losing the goal of plain English if we say, hey,

18 there's going to be some maybe consensual, maybe not

19 consensual third- party releases.  Here, go look in the

20 disclosure statement for where they're discussed, and then

21 you're going to find a whole lot of defined terms that you're

22 going to have to go into a plan to understand.  It's just

23 leading them down the rabbit hole that we're trying to avoid,

24 which is these are not sophisticated people who don't

25 understand legal documents and not to have them wade through

1  a disclosure statement which requires page flipping back to a

2  plan to read one definition, to read another definition.

3          We think we can get this all in there in plain

4  English simply.  There are a lot of very important concepts

5  that aren't in right now.  Most notably, it doesn't speak

6  anything about the 16,000 charter organizations that have to

7  vote, that are entitled to vote.

8          It doesn't say anything about the third-party

9  releases, consensual or non-consensual and those things need

10  to be in a plain English document.  Those are some of the

11  most important things that are going to be going on with

12  respect to a chartered organization.  There's a whole list of

13  other things, Your Honor, that I could run through at a high

14  level that it doesn't have.  I think probably, Your Honor,

15  and I'm expecting that based on where this was in the revised

16  proposed solicitation procedures order, you haven't looked at

17  what the debtors have done either.

18          Perhaps the simplest thing to do to save everyone

19  a lot of time on this is you have what the debtor submitted.

20  We'll be happy to -- to send something over to the Court

21  under a notice of filing of what we think can be done, and

22  Your Honor can take a look at those two.  And if you have

23  some discreet questions between the two, you know, this thing

24  is not getting printed tomorrow.  We have time tomorrow.  We

25  can have a much more discreet hearing with less than 260

1   people.  This is not an issue that affects the vast majority

2   of people who are on this line, and that gives the Court the

3   time to not have us negotiate line by line but just see two

4   different presentations.  Ultimately, both of them asked and

5   say that it's a court-approved document, so let the Court --

6   you know, we'll live with what the Court chooses.

7          THE COURT:  Okay.  Why don't you submit what you

8   want and I'll take a look at it, but are the chartered

9   organizations with their creditor hat on going to receive

10  another plain English document that --

11         MR. RYAN:  No.

12         THE COURT:  -- deals with --

13         MR. RYAN:  No, Your Honor, this is the only - -

14  that -- and that is part of the problem.  This is the only

15  plain English document the debtor is proposing to send out.

16  And the genesis of this was chartered organizations need to

17  know everything that affects them in plain English.  So,

18  again, that is my half a loaf comment is telling them about

19  the options under the plan with respect to releases, and

20  claims, and channeling, and contributions, it completely

21  doesn't tell them about their -- their rights as creditors,

22  the effect of signing the ballot, what happens if they don't

23  opt out of the consensual releases.

24         None of that's in there in plain English, and

25  that's exactly the kinds of things that we think creditors

1  need to know.  Chartered organizations need to know as

2  creditors casting a ballot.

3        THE COURT:  Okay.  I'll take a look at what you

4  submit.

5        MR. RYAN:  Thank you, Your Honor.

6        THE COURT:  Mr. Schiavoni?

7        MR. SCHIAVONI:  Your Honor, I'm happy that maybe

8  I'll have an opportunity to give my final round of comments

9  to Mr. Ryan this evening, and then either he'll include them

10 or you can look at them.  Two critical elements of this

11 that's not really there is really an explanation of in the

12 Hartford settlement there's a clause that says that

13 Hartford's coverage is going to be released.  There's just no

14 disclosure really of what that means in this settlement.

15        There's the same thing with regard to in the

16 Hartford settlement the deemed release that's to be part of

17 the TDP that's a condition of the Hartford settlement,

18 there's no disclosure of what that means here either.  And

19 it's like the most fundamental thing that strikes me as wrong

20 with that is that you've really got to go to Page 4 of what

21 is a dense single- spaced document to realize that you're not

22 getting, you're left un protected and that there's 35,000

23 claims going to be coming at you and no one is representing

24 you in the bankruptcy.

25        I mean Mr. Ryan is like carrying a big load, but

1  there's no committee, there's no one representing them, and

2  you know to the extent some of these folks maybe think, you

3  know, I don't want anybody to be pointing at like the

4  carriers are representing them.

5          So I think it should be clear that they're un --

6  you know, they're unrepresented, and the net result of this

7  death trap provision is that they're -- it's like even under

8  the election or the -- the -- the negative assignment,

9  they're left uncovered, you know, for all these claims.

10          So it's just, you know, it seems like the very

11 first question is, is the effect of the plan, will it release

12 me, and the answer is no.  Local counsels get full release,

13 and you don't.  You don't have counsel in the case, but I

14 will give those comments to Mr. Ryan and we'll see what

15 happens.

16          MR. RYAN:  And, Your Honor, we'll welcome those

17 from Mr. Schiavoni.  I will say, I didn't want to go into

18 this, but the lack of disclosures regarding the Hartford

19 settlement are one of our biggest concerns.

20          You know, the document right now doesn't tell

21 people, it says, hey, you'll have your insurance rights.  It

22 doesn't tell them the Hartford rights are gone.  It doesn't,

23 you know, and there's been a substantial movement in some of

24 the things, Your Honor, but we know from Boy Scouts own --

25 they've taken positions on pre- 1976 local counsel insurance

1  coverage and whether it -- it covered chartered

2  organizations.  If you look at the first version of the

3  latest disclosure statement, it said there's no coverage for

4  you guys.

5          You know, we know from the Boy Scouts own

6  documents that 300 local councils participated over an eight-

7  year period in a blanket policy that covered charter

8  organizations.  So there's concerns about that.  Now, that

9  has been fixed, but one of our concerns has been that there's

10  been a lack of adequate diligence into some of the things

11  that under the rubric of the Boy Scouts believe -- well, the

12  Boy Scouts believed until we pointed them to their own data

13  room that there was very little coverage for local -- for

14  chartered organizations under the local counsel policies.

15          You know, Mr. Linder had said to you last week

16  that, you know, the Boy Scouts never agreed to defend and

17  indemnify chartered organizations.  There is a resolution of

18  Boy Scouts in response to the handling of sexual abuse claims

19  that says Boy Scouts shall defend and indemnify against

20  claims, and that was specifically enacted with respect to

21  abuse claims.  And it was not a go forward defend and

22  indemnify.  It was any claim regardless of when time was

23  occurred.

24          So there is that kind of lack of Folsom disclosure

25  that concerns us that is -- we only know what we know as far

1  as what beliefs are there.  I mean there's a whole

2  representation as to what the Boy Scouts believe chartered

3  organizations thought 60 years ago about a charitable

4  doctrine of immunity.

5            Things like that don't need to be in there, but,

6  you know, I think if you look at the evolution, there's been

7  some improvement but that shouldn't have to be the parties

8  say, hey, your own documents.

9            There's a corporate resolution that says, you will

10  defend and indemnify.  It should just say we agree to defend

11  and indemnify you, and as Mr. Schiavoni mentions, we want to

12  make clear that people -- just saying you're still exposed to

13  lawsuits in the court system, people need to know you can't

14  defend on boy scouts to honor their prior promises.  Those

15  things need to be clear.

16            That's not a -- that's not a belief.  Those are

17  facts, and those need to be prominently disclosed to people

18  because they've always been subject to sexual abuse claims.

19  But what they need to know is that the Boy Scouts are no

20  longer going to defend and indemnify them.

21            Those kinds of things need to be made clear that

22  they won't have insurance from the Hartford.

23            That's what we need to get out to these people in

24  plain English.  Thank you.

25            MR. LINDER:  Your Honor, I would just ask that

1 if -- if there's going to be a submission by Mr. Ryan that we

2 impose some parameters on when that -- when that might be

3 filed, just in the interest of finalizing our documents.

4        THE COURT:  Well, I don't know.  Everything is

5 last minute.  People are working as quickly as they can.

6 Debtors are.  Other people are.  He said he'd do it at some

7 point tonight.  We'll look at it tomorrow.  That's all I can

8 ask.

9        MR. ROSENTHAL:  And, Your Honor, I only have my

10 hand up because I would hope that Mr. Ryan would include us

11 in those discussions, please.

12        MR. RYAN:  Absolutely, Mr. Rosenthal.

13        THE COURT:  This is clearly an important issue,

14 and it's -- and it's an issue that really only surfaced in

15 court in a significant way recently so --

16        MR. RYAN:  And, Your Honor, I know I said tonight,

17 but I'm already looking at 6:40, so it may be tomorrow

18 morning.  I will tell you that.

19        THE COURT:  I'm not staying up waiting for it,

20 so --

21        MR. RYAN:  I appreciate that.  You know, our

22 clients have the resources they have.  We don't have, you

23 know, go to trial in 20 day resources like some of the other

24 people on this call.

25        THE COURT:  I know, but, no, my only point is this

1  is a very important issue, these chartered organizations and

2  their ability to understand what's happening, especially

3  given the way this is structured.  And as with many things in

4  this case, it's complex and I don't know that there's a lot

5  of precedent for this.

6            So communications with the chartered organizations

7  really need to be helpful.  That doesn't mean add another 50

8  pages to it.  I don't know that that makes it helpful, but

9  they need -- it needs to be helpful so that they understand

10 what's going on.

11           MR. MONES:  Your Honor, could I have 30 seconds,

12 please?

13           THE COURT:  Mr. Mones?

14           MR. MONES:  I would just refer the Court to Dale

15 versus Boy Scouts of America, which is a 2000 United States

16 Supreme Court decision that gave the Boy Scouts of America

17 the right to exclude gay scout leaders.

18           Part of that decision was that the Boy Scouts of

19 America control the hiring, firing, and even to that point,

20 sexual preference of the scout leaders gave no discretion to

21 the charter organizations or to the counsels in this regard

22 with regard to the Boy Scout's control over the core issue of

23 scouting, which is the identity of the scout leaders.

24           So I would just offer to the Court in evaluating

25 this in the future because it's been a centerpiece of the Boy

1  Scout's liability over the last 16 to 18 years in state court

2  litigation that the United States Supreme Court at least has

3  decided at least partially about this issue about the duty

4  owed by and the control of the Boy Scouts of America over

5  their charter organizations since the charter organizations

6  do select the scout leader.  Thank you, Your Honor.

7          THE COURT:  Okay.  Next?

8          MR. LINDER:  Next, Your Honor, we have the third

9  issue, which is that we've been advised by Mr. Patterson that

10 the revised description of the source (inaudible) waiting is

11 in his view not clear and appears to be contrary to the

12 representation that only affected claimants would receive

13 shares of non-BSA- sourced assets.  Your Honor, the language

14 that he's referencing is on page 240 of the red-line

15 document.

16         MR. PATTERSON:  It's on page 6385-2, yeah,

17 page 240.  Thank you, yeah.

18         THE COURT:  I have to switch documents.

19         Okay, thank you.

20         MR. LINDER:  And you'll recall, Your Honor, that

21 last week it was noted that the language only used the term

22 in part with respect to the non-BSA-sourced assets.  It only

23 referenced part of those assets being allocated among holders

24 of claims that relate to the -- the source of the assets

25 being attributed.

1           And -- and -- and we were specifically we were

2    discussing the TCJC settlement.  We've revised that, Your

3    Honor, to provide that it's either all or in part those

4    assets are being contributed to the trust and then being used

5    to pay holders of claims, again, that relate to the

6    contributor in question.  I think that is now clear.  The

7    only instance in which the TCJC contribution under this

8    revised provision, which just parenthetically, Your Honor, is

9    really a recitation of what is now in the revised trust

10   distribution procedures on the same topic.

11          The only instance in which the funds would be used

12   to pay claimants other than TCJC claimants is if as a

13   predicate all TCJC claimants were -- their claims were all

14   satisfied in full from those proceeds, and then the

15   overage -- I think it's the last sentence of this -- this

16   provision in blue, if there's a remainder after the

17   satisfactions of all relevant holders, then that remainder

18   shall be distributed to all holders of abuse, allowed abuse

19   claims in accordance with their payment percentage.

20          THE COURT:  Okay.  So I get that sentence, that

21   last sentence, but what does all or in part mean?

22          MR. RYAN:  Your Honor, what I understand it to

23   mean is that we really don't know what the terms of a future

24   settlement with another organization might provide for.  So

25   this is intended to permit flexibility with respect to

1 | further settlements.  The TCJC settlement is predicated on

2 | those proceeds going only to TCJC claims with the remainder

3 | being distributed to other claimants if there is any.  But

4 | this is intended to preserve that flexibility in the event

5 | that further settlements provide for different terms.

6 | THE COURT:  Mr. Patterson, what's your concern?

7 | MR. PATTERSON:  Well, is there a statement

8 | somewhere in the disclosure statement that the TCJC proceeds

9 | will be used only to pay TCJC claimants up to the full value

10 | of their claims?

11 | MR. RYAN:  Your Honor, I believe where we put that

12 | and for the front we have summary bullets.  This is on page

13 | 14 of the redline, and it is at the top of page 14 there is

14 | a -- a new sentence that states that the TCJC contribution

15 | will pay claimants with a claim against TCJC in addition to a

16 | *pro rata* share of trust expenses.

17 | MR. PATTERSON:  I didn't read that to be

18 | exclusive, and then when I read the source affected waiting

19 | language that said in whole or in part, I read them as

20 | consistent with each other.  But if the intent is on page 14

21 | that -- that it's only, then I would ask that it's TCJC's

22 | contribution will go to pay only abuse claimants with a claim

23 | against TCJC.

24 | MR. RYAN:  That's fine with us, Your Honor.  We're

25 | happy to make that change to clarify.

1          MR. PATTERSON:  But with that, I understand there

2    is no flexibility with regard to TCJC other than with regard

3    to an overage, and there is flexibility with regard to any

4    future settlement.

5          THE COURT:  That's how I understand it now.  Okay.

6    I think that fixes that problem.

7          MR. RYAN:  Correct.

8          And, Your Honor, that brings us just to the last

9    category, which is really a catch-all.  We would just note

10    for the record that we've been conforming changes to the

11    disclosure statement to reflect changes to the solicitation

12    procedures, and we'll continue to do that.  And so there may

13    be further changes on that front.  It's not really a disputed

14    category, but I wanted to note it for the record that our

15    further revised version of the disclosure statement will --

16    will account for anything else that's discussed on the record

17    today or tomorrow.

18          THE COURT:  Okay.  So what do we have for

19    tomorrow?

20          MR. PATTERSON:  Your Honor, I just -- before we

21    finish, I had one other comment regarding the plan and

22    disclosure statement.

23          THE COURT:  Okay.

24          MR. PATTERSON:  And it goes to -- the easiest

25    place to see it is I'm in document 6385-1, PDF page 12 of

1   416.  And it's the definition of abuse claim.

2            THE COURT:  So that's in the plan?

3            MR. PATTERSON:  Yeah, it's in the plan, Your

4   Honor.

5            THE COURT:  Okay.  I don't have the docket items

6   on here.  Plan page 12?

7            MR. PATTERSON:  Your Honor, it's definition 18.

8   It's on page 4 of my version.

9            THE COURT:  Definition 18, abuse.  Okay.

10            MR. PATTERSON:  So I'm -- my concern with regard

11   to this definition is two-fold, and this deals with whether

12   or not the release, which uses the term "abuse claim" is

13   broader than the Court indicated as being confined to

14   scouting-related activities.

15            So my first concern is that and the architecture

16   of this definition is that the first 12 or so lines down to

17   the provided, however, those first 12 lines that's just --

18   that is what applies to the debtor, and then the proviso

19   introduces the concept of what this application of this

20   definition of abuse to protected parties, chartered

21   organizations and so forth or just chartered organization --

22   contributing chartered organizations to begin with.

23            And the way that proviso works is it says that

24   provided, however, with respect to a contributing chartered

25   organization, abuse claim is limited to and then there was a

1  whole series of provisions.  It's limited to a claim that's

2  attributable to, arises from or based upon in whole or in

3  part abuse that took place occurred prior to the petition

4  date.  And I'm concerned with that in whole or in part

5  because of some of the claims, and this is, ultimately, Your

6  Honor, a confirmation issue.  But we're going to get to

7  confirmation and we're going to be making this argument, and

8  I just want to be clear if this is the release that the

9  debtor wants to go out with, then that's the definition they

10 want to go out with.

11          So that's the first concern.  And the second is

12 when it says that is limited to a claim that's attributable

13 to --

14          UNIDENTIFIED:  Do you need the papers to deal with

15 this or --

16          THE COURT:  Excuse me, Mr. Patterson.  I'm hearing

17 somebody's cross conversation, we're all hearing it.

18          Mr. Patterson, yeah?

19          MR. PATTERSON:  Thank you, Your Honor.  It has a

20 series of includings, so the first one is about five lines

21 down, including a claim that seeks monetary damages,

22 including fraud and the inducement, including negligent

23 hiring, including any theory, and this is the key one,

24 including any theory based on public policy or failure to act

25 by a protected party and so on and so forth, or for whom a

1  protected party or limited protected party is alleged to be

2  responsible in connection in whole or in part with the

3  contributing charter organizations involvement in or

4  sponsorship of one or more scouting units.  The -- as I read

5  the grammar of this section, the limitation of involvement in

6  the scouting units is applicable only to the prior including

7  any theory based upon, but not applicable to the entire

8  *proviso*.

9          THE COURT:  Okay.  Well, I had to write on

10  something like this once.  I think it was on a dip document,

11  what did the proviso mean, and what did it relate back to,

12  and, you know, pulling out Scalia's book on -- shoot, what's

13  the one he and Garner have on different --

14          UNIDENTIFIED:  Yeah.

15          THE COURT:  Yeah, that one, and, you know, we

16  don't want to end up in that situation.  So I would ask the

17  parties to look at the definition of abuse claim to make sure

18  that it or its use in the releases is clear that there is no

19  non-BSA-related activity or conduct that is being released

20  here because I think that is just basic to what we're doing.

21          And if there is a protected party that has

22  exposure or liability and I'm not prejudging any of that, but

23  they have exposure in more than one capacity in a BSA-related

24  and a non-BSA- related, that the non-BSA-related conduct is

25  not being released.  It's not being included here.

1        MR. PATTERSON:  And just given the way that these

2   documents inter-relate with each other, I mean it's

3   frequently the case that you put a sentence like that in.

4        THE COURT:  Yeah.  It may be the -- I hate these

5   sentences, too, for the avoidance of doubt or notwithstanding

6   the above, or, you know, all the sentences we hate that are

7   qualified, but it might be very necessary in this context to

8   be clear on that.

9        MR. LINDER:  I think what I'd propose to do, Your

10  Honor, and I'm happy to work with Mr. Patterson on this is to

11  move that qualification relating to involvement in or

12  sponsorship of scouting units that key nexus between the

13  abuse and scouting, to move that up to maybe right after the

14  *proviso* to make it apply to everything that comes after or

15  otherwise to make it -- make it work better because we

16  certainly don't want any implication that we're hiding the

17  ball or otherwise constructing this provision to accomplish

18  something that I think you represented last week we're not

19  trying to accomplish.  We're only (inaudible) in scouting-

20  related claims.

21        MR. PATTERSON:  That certainly helps, and it takes

22  away my opportunity to argue the -- the rule of the prior

23  antecedent or the last antecedent.

24        THE COURT:  Yeah, whatever that is.

25        MR. PATTERSON:  Whatever that is, exactly.

1          But -- but even with that, Your Honor, when we

2   have these terms that say arises from, is based upon, results

3   from in whole or in part, directly or indirectly, or relates

4   in any way, that -- we -- we -- I think we would benefit from

5   having the stop sign as well because this definition can take

6   you a long way before you stop if you don't understand the

7   Court's intention that this is not intended to apply to non-

8   scouting-related abuse.

9          THE COURT:  Right.  I -- I do think that it would

10  be helpful.  You know, you -- this is one sentence that's a

11  page, and I think it would be helpful if -- well, fix this

12  however best grammatically it works to accurately reflect

13  what we're talking about.  But I also think it would be

14  helpful to have a separate sentence from this definition that

15  makes it crystal clear that no non-BSA-related conduct is

16  being released.  I think that is really helpful, and it will

17  be helpful down the line, and I think it's non-

18  controversial.  So let's just make sure it says that.

19          MR. BJORK:  Your Honor, may I be heard very

20  briefly?  Jeff Bjork from Latham and Watkins.

21          THE COURT:  Mr. Bjork?

22          MR. BJORK:  Hi.  Here on behalf of TCJC.  I'm

23  happy to look at the language because I think in part it's

24  our language that we've been working with the debtor on.  I

25  would just say that in terms of the unrelated to scouting

1  absolutely is not covered, not intended to be covered by the

2  scope of the TCJC injunction.  But the settlement does

3  encompass any allocated liability that relates to scouting-

4  related conduct.

5           All I'm raising, Your Honor, is it's complicated

6  because it's -- it's claim by claim, fact by fact, and I

7  don't want to get into it right now because it's late for you

8  especially.  But it is something that I was going to call

9  Mr. Patterson about and we're speaking to Mr. Smola about

10  because it's not -- it has to encompass our allocated share

11  as part of the settlement.  And so there's mixed facts

12  depending upon the claimant and the claim.  Every claim that

13  was filed in this case asserts it's BSA related.

14           And they may also, certain claims, assert that

15  there is some church connection as well.

16           THE COURT:  Yes.

17           MR. BJORK:  That's fact-specific.

18           THE COURT:  Yes.

19           MR. BJORK:  So I'm not trying to prejudge it now.

20  I'm just saying it's something that we would want to brief to

21  you and -- and -- and argue at the appropriate time.

22           MR. PATTERSON:  If that's the case, that could be

23  fairly straightforward, because then you would take out in

24  whole or in part, and you would just define the -- allocable

25  liability.  And keep in mind, Your Honor, I'm not consenting

1  to any of this.  I'm just trying to make it accurate or

2  understandable for -- for someone like me.

3            MR. BJORK:  I think our concern, Mr. Patterson

4  is --

5            THE COURT:  He says modestly.  So I'll let the two

6  of you all speak and --

7            MR. BJORK:  Okay.

8            THE COURT: -- loop in the debtors obviously on

9  this, but, yes, we had sort of a similar discussion I guess

10  it was last week that about allocable shares.  And I -- that

11  concept I fully appreciate, and, yes, if some jury were to

12  say 10 percent is allocable to BSA and 70 percent is

13  allocable to the church, and, you know, whatever is left, 20

14  percent is allocable to some family member, that's -- I

15  understand those distinctions, and I think that is what this

16  needs to reflect.

17            But, yes, the allocable share of the church's

18  liability that's BSA-related, I understand to be being

19  released, and I don't think Mr. Patterson disagrees with

20  that.  So it just has to be accurately reflected.

21            Hopefully I didn't confuse things more on that.

22            MR. PATTERSON:  Crystal clear.

23            MR. BJORK:  Tom, I'll call you shortly.

24            THE COURT:  Okay.  What else?

25            MR. LINDER:  I think that's it, Your Honor, on

1  disclosure statement.

2          THE COURT:  Okay.  So --

3          MR. SCHIAVONI:  I'm sorry, Mr. -- Your Honor,

4  there was a schedule of insurance policies that was going to

5  be added to the disclosure statement.  I'm just not sure

6  whether you ended up adding the -- a column for the SIRs and

7  the deductibles to it.

8          MR. LINDER:  Your Honor, we did file revised

9  schedules to -- those are schedules to the plan, schedule 2

10  and schedule 3.  We made extensive modifications to those

11  schedules.

12          THE COURT:  I would ask that you take a look at

13  it, Mr. Schiavoni.  I do remember quickly thumbing through

14  schedules that had changes to them.  Why don't you take a

15  look, and if there's any issue contact Mr. Linder.

16          MR. LINDER:  I think the issue on that, Your

17  Honor, and I'm recalling that correspondence that we had with

18  Mr. Schiavoni, is that the SIRs and deductibles as opposed to

19  the other projected information that's set forth on that

20  chart are disputed.

21          So I believe what we did is we dropped footnotes

22  in an appropriate place indicating that those are disputed

23  issues among debtors and certain carriers.  So from our

24  perspective I don't believe it would be appropriate to try to

25  shoehorn that into the chart that was just intended to

1  contain objective information with regards to the policy.

2          MR. SCHIAVONI:  But, Your Honor, it's my

3  understanding and it's like I -- it's like I'm reading as

4  fast as I can, but it's my understanding that a change was

5  made to the plan or maybe it was the disclosure statement, in

6  connection with Zurich and others that modified the

7  description of the SIRs and then sort of adopted the -- that

8  there are, in fact, SIRs.

9          So if that's the case, and, again, we can try to

10 look at it overnight and deal with Mr. Linder tomorrow about

11 it, but they should be described and if just to, quote,

12 dispute whether other things are SIRs or deductibles.  It

13 seems like if you're going to present, you know, occurrence

14 limits, you might as well, it's like it's totally misleading

15 not to present the retain limits and the deductibles.  It --

16 it -- it gives a completely misleading presentation of the

17 chart.

18          MR. LINDER:  I would note, Your Honor, that my

19 colleague, Adrian Azer, who is with Hanes and Boone, BSA's

20 insurance coverage counsel is available to address this issue

21 as well to the extent --

22          MR. AZER:  Your Honor, may I be heard briefly on

23 this?

24          THE COURT:  Mr. Azer?

25          MR. AZER:  Going to Mr. Schiavoni's point, we and

1   the FCR and the coalition did negotiate language with Zurich

2   and certain insurers on this issue.  I don't think there was

3   any concession as to the existence of the SIR.  Again, going

4   to Mr. Schiavoni's point and Your Honor's comment, to the

5   extent, Mr. Schiavoni you would like to talk about it we are

6   certainly happy to go off line and address that language and

7   address any comments you have to the schedule and try to work

8   through it and come to some resolution that's acceptable.

9           But, yeah, I'm not sure the language we negotiated

10  with Zurich made that concession.

11          Ms. Quinn -- I don't know if Ms. Quinn has any

12  further addition on that.

13          THE COURT:  Okay.  Well, Mr. Schiavoni, I'll let

14  you talk to Mr. Azer about this.  I want to make sure you

15  have a chance to look at the language and look at the chart,

16  which I'm looking at, and let's see if that can be worked

17  out.

18          MR. SCHIAVONI:  Terrific.

19          THE COURT:  If not, I'll address it tomorrow.

20          MR. SCHIAVONI:  Great.

21          MR. LINDER:  Now I think we're done, Your Honor.

22          THE COURT:  Okay.  So tomorrow we may have some

23  cats and dogs disclosure statement, but I also have

24  confidence that you all are going to resolve all of this

25  overnight, and then what else?

1          MR. LINDER:  I Believe the last remaining category

2     is -- is the solicitation procedures order, Your Honor.

3          THE COURT:  Okay.  So that, the solicitation

4     procedures order, and the plain English, which might be

5     included in that, the plain English charter -- chartering

6     organization issues we've talked through?

7          MR. LINDER:  Correct, Your Honor.

8          THE COURT:  Okay.  Okay.

9          MR. STANG:  Your Honor?

10          THE COURT:  Mr. Stang?

11          MR. STANG:  The TCC, on its own behalf, and the

12     FCR and the coalition jointly have filed proposed letters.  I

13     am extremely sensitive to editing someone's letter because I

14     don't want them to edit mine, but there is one statement in

15     the FCR coalition letter that I think is really inaccurate.

16          And I don't know if you want to -- it's literally

17     one sentence.  And if you wanted to do that now, we could, or

18     if that's part of the solicitation, tomorrow.

19          THE COURT:  Have you all discussed it?  Have you

20     discussed it with them?

21          MR. STANG:  We -- we -- I have not, Your Honor.

22          THE COURT:  Then I'd like you to discuss it with

23     them first.

24          MR. STANG:  Okay.

25          THE COURT:  Okay.  I'm just making a list.

1         So the proposed letters, the plain English,

2   chartering organizations, the solicitation procedures,

3   meaning disclosure statement.  That should be it.  Okay.

4         MR. ABBOTT:  Your Honor, Derek Abbott, as long as

5   we're talking about tomorrow, Ms. Johnson had asked us to

6   remind all of the parties that the Zoom information that they

7   used for today's hearing is what they should use for

8   tomorrow.

9         We understood the Court had reserved noon on in

10  the afternoon, but there might be some greater specificity

11  that the Court could share with us at this point.

12        THE COURT:  Yeah.  I've got a morning evidentiary

13  hearing so we're going to start at 1:30.

14        And I think I will be on time.  If I find out that

15  I am going to be significantly late, I will let you know, but

16  I think that should do it from what counsel in the matter is

17  telling me and my own guestimation.

18        MR. ABBOTT:  Very well.  Thank you, Your Honor.

19  Much appreciated.

20        THE COURT:  So you'll have some additional time,

21  not to come up with more issues but to resolve the issues we

22  have on the table that are remaining.  No more new issues.

23        MR. RYAN:  Your Honor, the only -- the only thing

24  I would say is some of us are going to have to leave

25  relatively mid-afternoon to late afternoon to catch flights

1  for the mediation in New York.

2          THE COURT:  Okay.  Shoot.  Okay.  Let's -- let's

3  say 12:30, instead of 1:30.  That gives us an additional

4  hour, but I'm hoping that should be enough.

5          MR. RYAN:  Thank you.

6          THE COURT:  Because I certainly want people to get

7  on their planes.

8          MR. SCHIAVONI:  I was holding out hope that Your

9  Honor was going to say get a good night's sleep and stuff.

10          THE COURT:  No.  I don't get one, you don't get

11  one.  Okay.

12          MR. SCHIAVONI:  That was an attempt at humor, Your

13  Honor.  I'm sorry.

14          THE COURT:  It's been what?

15          MR. SCHIAVONI:  It was an attempt at humor.  I --

16          THE COURT:  I'm smiling.

17          Okay.  Okay, counsel.  Well, thank you.  That

18  concludes tonight.

19          I will see you tomorrow at 12:30.

20      (Proceedings concluded at 7:08 p.m.)

21

22

23

24

25

1                          CERTIFICATION

2           I certify that the foregoing is a correct

3  transcript from the electronic sound recording of the

4  proceedings in the above-entitled matter to the best of my

5  knowledge and ability.

6

7

8

9  /s/ William J. Garling                    September 29, 2021

10  William J. Garling, CET**D-543

11  Certified Court Transcriptionist

12  For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

```
 1                      UNITED STATES BANKRUPTCY COURT
                             DISTRICT OF DELAWARE
 2

                                        .    Chapter 11
 3    IN RE:                            .
                                        .    Case No. 20-10343 (LSS)
 4    BOY SCOUTS OF AMERICA AND         .
      DELAWARE BSA, LLC,                .
 5                                      .    Courtroom No. 2
                                        .    824 North Market Street
 6                                      .    Wilmington, Delaware 19801
                                        .
 7                      Debtors.        .    July 27, 2021
 8    . . . . . . . . . . . . . . . .   .    3:00 P.M.

 9            TRANSCRIPT OF TELEPHONIC DISCOVERY CONFERENCE
             BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                    UNITED STATES BANKRUPTCY JUDGE

11    TELEPHONIC APPEARANCES:

12    For the Debtor:          Derek C. Abbott, Esquire
                               Andrew R. Remming, Esquire
13                             Paige N. Topper, Esquire
                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
14                             1201 North Market Street, 16th Floor
                               Wilmington, Delaware 19899
15
                               - and -
16
                               Jessica C. Lauria, Esquire
17                             Glenn Kurtz, Esquire
                               WHITE & CASE LLP
18                             1221 Avenue of the Americas
                               New York, New York 10020
19
20    Audio Operator:          Brandon J. McCarthy, ECRO

21    Transcription Company:   Reliable
                               1007 N. Orange Street
22                             Wilmington, Delaware 19801
                               (302)654-8080
23                             Email: gmatthews@reliable-co.com

24
      Proceedings recorded by electronic sound recording; transcript
25    produced by transcription service.
```

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the Debtors:          Michael C. Andolina, Esquire
                              Matthew E. Linder, Esquire
3                             Laura E. Baccash, Esquire
                              Blair M. Warner, Esquire
4                             WHITE & CASE LLP
                              111 South Wacker Drive
5                             Chicago, Illinois 60606

6   For the Roman Catholic    Jeremy Ryan, Esquire
7   Ad Hoc Committee:         POTTER ANDERSON & CORROON LLP
                              Hercules Plaza
8                             1313 North Market Street, 6th Floor
                              P.O. Box 951
9                             Wilmington, Delaware 19801

10  For Century:              Daniel Shamah, Esquire
                              O'MELVENY & MYERS LLP
11                            Times Square Tower
                              7 Times Square
12                            New York, New York 10036

13
    For Hartford:             James Ruggeri, Esquire
14                            SHIPMAN & GOODWIN LLP
                              1875 K Street NW, Suite 600
15                            Washington, DC 20006

16  For Allianz Global        Harris Winsberg, Esquire
    Risks US Insurance:       TROUTMAN PEPPER HAMILTON SANDERS LLP
17                            600 Peachtree Street, NE
                              Suite 3000
18                            Atlanta, Georgia 30308

19

20

21

22

23

24

25
```

1        (Proceedings commenced at 3:06 p.m.)

2        THE COURT:  Good afternoon, counsel.  This is Judge

3   Silverstein.  We're here in the Boy Scouts of America

4   bankruptcy, Case No. 20-10343.

5        I asked for a status or a hearing conference in

6   connection with discovery disputes that have surfaced over the

7   past couple of days and related to our hearing on Thursday

8   with respect to the restructuring support agreement.  In

9   particular I want to hear if further production of documents

10  has mooted any of the disputes that were raised.  I'd also

11  like to hear whether or not -- I'd like to hear some more

12  about the mediation privilege and how it's being asserted in

13  connection with what items it's being asserted.

14        So let me hand it over to counsel for Century who

15  filed -- no, I'm wrong.  Its moving insurers, so let me double

16  check that.

17        MR. SHAMAH:  Your Honor, Daniel Shamah, O'Melveny,

18  on behalf of Century.  I will be speaking on behalf of the

19  moving insurers if that helps you.

20        THE COURT:  Thank you.  Yes, let me hear from you

21  please.

22        MR. SHAMAH:  Thank you, Your Honor.  Again, for the

23  record, Daniel Shamah, O'Melveny & Myers, on behalf of

24  Century.

25        Your Honor, can you hear me okay?

1          THE COURT:  I can.

2          MR. SHAMAH:  Okay.  And, Your Honor, I apologize.

3 My name in Zoom is not showing up as my name so I hope that

4 doesn't create any confusion for you.

5          THE COURT:  I found you.

6          MR. SHAMAH:  Thank you, Judge.

7          So first, Your Honor, I just want to thank the

8 court for hearing us on such short notice.  We very much

9 appreciate it.  We know you have a lot on your docket.  You

10 got a lot of paper over the last, you know, four or five days

11 and we know you're incredibly busy.  So we really do

12 appreciate Your Honor taking the time this afternoon.

13          Your Honor, I think the short answer to your first

14 question is the materials we got at 12:30 last night or early

15 this morning do not moot the issues at all from our

16 perspective. I think it's worth contextualizing how we got

17 here today and, sort of, the status quo where we are.  So if

18 you will indulge me a little bit, Your Honor, I just want to,

19 sort of, put the pieces together here to help frame the issues

20 for you.

21          So stepping back, Your Honor, the subject of our

22 motion to compel was to address the prejudice that the

23 insurers were facing by the debtors' decisions on how they

24 decided to conduct these proceedings.  Your Honor, if this was

25 about a stray instruction at a deposition not to answer or a

1  discreet document that may have been over-redacted I don't

2  think -- I would think we wouldn't be here today.

3          What became apparent throughout the discovery

4  process here is the debtors made the strategic decision to

5  blanket withhold everything.  We did not get any board

6  minutes.  They were redacted to the point of uselessness; all

7  they would say was date and attendees, and nothing else of

8  substance.  They did not produce any financial materials from

9  Alvarez & Marsal that was presented to the board in support of

10 the RSA; again, if they were produced they were redacted

11 entirely of substance.  And at depositions the witnesses were

12 instructed on a blanket basis not to testify about all of the

13 subject matters, the basic issue of what did the board

14 consider, when did it consider those matters.

15         What has become apparent, Your Honor, since over

16 the last 48 or 72 hours is the debtors, essentially, concede

17 that we were right when we raised these issues with them both

18 before, during and after depositions.  They have since

19 belatedly produced some materials.  They are still heavily

20 redacted.  We can get into specifics of what's still missing,

21 but we still don't have much substance when it comes to board

22 materials.  We do not have any written authorizations.  The

23 A&M materials are a little less redacted, but still very

24 heavily redacted.

25         More troublingly, they have now produced two new

1  declarations; one from an entirely new witness, Mr. Disi

2  [phonetic], and a supplemental declaration from Mr. Whittman

3  covering topics that they previously withheld on various

4  grounds of privilege.  And so Mr. Disi goes on at length about

5  the board process, the governance process, how the board is

6  constituted and when they met.

7          Mr. Whittman, you know, other than the coalition

8  fee issue, which I will come back to in a moment, goes on at

9  length about when the board met, how often they met, what he

10 presented to the board, what he discussed with the board; all

11 of these materials were withheld, witnesses were instructed

12 not to answer questions about these topics.  These were issues

13 that were apparent from the very beginning of these

14 proceedings that these were an issue.

15         I think this is the important thing, Judge, the

16 debtors put these topics at issue.  They are asking the court

17 to approve the RSA they contend is a reasonable exercise of

18 their business judgment.  What the board considered it, when

19 they considered it, that is the whole entire subject matter of

20 this litigation and they made a strategic decision not to

21 share those materials as part of the discovery process.

22         What has become apparent is confronted with a wide

23 range of objections that were filed last week; not just from

24 insurers, but from chartered organizations, from other

25 claimants, from the United States Trustee.  They're trying to

1  backfill the record.  They are trying to come up with

2  substance to fill that gap because they are concerned they may

3  lack an evidentiary basis.

4          Your Honor, I think it's improper. It's improper to

5  wait for a reply to put before the court materials, and

6  issues, and discovery that was fair game and well-known for

7  weeks that should have been there all along.  I think it's

8  unfair to us where we are now less than two days before a

9  hearing and we're getting midnight productions.

10         They are offering one witness tomorrow, Mr. Disi.

11 They have not offered to reopen the depositions of either Mr.

12 Whittman who now has eleven new pages of declaration testimony

13 or Mr. Ownby who, for all intents and purposes, was instructed

14 not to answer almost anything at his deposition.  And we

15 should be preparing for trial, but instead we're now dealing

16 with these issues at the eleventh hour.  It's simply improper

17 and unfair.

18         Your Honor, I think from -- we are not looking for

19 a delay.  We didn't file a motion to adjourn.  We think,

20 frankly, Your Honor, they should have to live with the record

21 they submitted.  That was their moving case.  They chose a

22 strategy on how they wanted to do it and they should have to

23 live with the consequences of that strategic decision.

24         Lastly, Your Honor, I know you asked about the

25 mediation privilege.  I don't want to overlook that or ignore

1  it.  It was interesting, the debtors spent a lot of time on

2  the mediation privilege in their opposition brief yesterday

3  which I thought was curious because it really wasn't the focus

4  of ours.  To be blunt, we are not seeking the production of

5  mediation materials.  We have not asked for communications

6  with the claimants, with the mediators or anything like that.

7  We are looking for the documents and discovery about what the

8  board considered and when it considered those issues which is

9  exactly what they have put at issue and we are entitled to ask

10  those questions and to have a reasonable amount of time to

11  consider those materials.

12       Your Honor, unless you have any questions for me

13  that is our position.  I believe other insurers may want to

14  add anything.  I do know Mr. Ryan, on behalf of the catholic

15  and Methodist ad hoc groups also wanted to address the court.

16       THE COURT:  Okay.  Thank you.

17       I will hear from others, but I am focused on this

18  particular issue. I did note, in particular, board minutes,

19  materials submitted to the board for consideration, board

20  resolutions.  These were categories that struck me as I read

21  through the filings that I'd like to hear from -- that I'd

22  like to hear about.  So I will hear from other insurer

23  counsel, but that is really what I am focused on.

24       MR. SHAMAH:  Your Honor, I wasn't sure if that was

25  addressed to me or other insurance counsel.  I apologize.

1           THE COURT:  That's addressed to other insurance

2    counsel.  Anyone want to address me?

3        (No verbal response)

4           THE COURT:  I'm not hearing anyone.

5           MR. RUGGERI:  Your Honor, James Ruggeri for

6    Hartford.  We would just support Century's counsel's comments

7    in that regard and just note that even with regard to the

8    Hartford specific issues of change in circumstances the record

9    has changed dramatically over the past couple of days as we

10   continue to get a little bit more by way of the board minutes

11   in dribs and drabs.

12          The court will hear, in a couple of days, about the

13   importance of a June 9th letter presumably and now we see that

14   the minutes are being produced in a way that, you know, now we

15   see it differently then maybe the way we saw it when they

16   first redacted in wholesale everything but, literally, the

17   dates of the meeting and who attended those meetings.

18          There is a prejudice here.  There is an issue here.

19   I do agree with counsel for Century that the debtors should be

20   required to present their case based on record as they

21   produced initially subject to all of the privilege claims that

22   they made throughout the course of the depositions.

23          Thank you, Your Honor.

24          THE COURT:  Thank you.

25          Anyone else?

1    MR. WINSBERG:  Your Honor, if I may.  Harris

2  Winsberg for the Allianz insurers.

3    Can you hear me?

4    THE COURT:  Mr. Winsberg, yes.

5    MR. WINSBERG:  Just real briefly, Your Honor.  In

6  the debtors' declaration, Docket 5469, at Paragraph 6 Mr.

7  Mosby, in his declaration, said that it was in his opinion and

8  the board's opinion that the path of the RSA is the most

9  realistic approach to achieve the debtors' objectives.  You

10  know in Mr. Ownby's deposition, as pointed out in the papers,

11  he was specifically asked a question.

12    We don't have the un-redacted board minutes, but

13  was asked the question about the RSA and in particular

14  focusing on what were the deal points.  What deal points did

15  you approve in connection with the RSA.  He was instructed not

16  to answer not on mediation privilege, but an attorney/client

17  privilege.  Those pages are in the deposition.  So I think

18  they're pages 50 through 52.

19    There were also instructions not to answer

20  questions from the bankruptcy task force, what was their

21  recommendation in connection with the RSA.  There was

22  instruction not to answer on attorney/client, that was on Page

23  58 and 59 of Mr. Ownby's deposition.

24    So it's hard when they put the issues in front of

25  Your Honor on approval of the RSA to ask Your Honor whether

1  it's the business judgement or some other like intrinsic

2  fairness that you're going to hear in a couple days.  It's

3  hard to understand if they won't give us the basis or the work

4  that was put behind, the board put behind the decision.  They

5  just instructed not to answer on attorney/client.  So it has

6  put the insurer group in a difficult position moving forward

7  with the hearing.

8           THE COURT:  Thank you.

9           MR. WINSBERG:  Thank you, Your Honor.

10           THE COURT:  Anyone else?

11      (No verbal response)

12           THE COURT:  Okay.  Let me hear from the debtors.

13           MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

14  of Morris Nichols here for the debtors.

15           Your Honor, I believe Mr. Kurtz is going to address

16  the discovery issues and at some point I believe Ms. Lauria

17  may want to update the court on some bigger picture items, but

18  let me turn it over now to Mr. Kurtz if I may.

19           THE COURT:  Please.  Mr. Kurtz?

20           MR. KURTZ:  Good afternoon, Your Honor.  Glenn

21  Kurtz on behalf of the debtors.  Thank you for letting me

22  appear here.  I have not had the opportunity to appear in this

23  case before you yet, Your Honor.

24           Let me start with how I would contextualize all of

25  this.  There was some effort made to suggest this isn't about

1   mediation.  I think that's exactly wrong.  I think this is

2   primarily about mediation.  We received document requests from

3   day one that were in clear violation of Your Honor's mediation

4   order on Local Rule 9019 and specifically asked for documents

5   reflecting the communications that were occurring among the

6   mediation parties in the mediation.

7           We got questions throughout the depositions asking

8   for the disclosure of mediation material including

9   conversations between the mediation parties.  We have been

10  trying to join issue on this since July 8th when we first

11  reached out and said these things look to be violating the

12  mediation order and the local rule.  Please confirm you will

13  either abide by these rules or talk to us if you have some

14  nuance interpretation that would allow us to get you more

15  information because mediation is a particularly important

16  privilege.  Its ongoing in this case as we try to get gain

17  more and more support for a consensual reorganization.

18          We had been ignored at every juncture.  We have set

19  numerous communications asking them to share a view on

20  mediation and, frankly, until right now, during this hearing,

21  I haven't heard anybody say that they don't really want

22  anything relating to mediation which seems belied by the

23  requests and by the questions at deposition.

24          The documents that are being withheld now.  Your

25  Honor asked what about the board materials.  I believe that

1   the materials have been forwarded now with fewer redactions

2   which would identify the grounds for the decision making.

3   What I believe to have been continued to be redacted fall

4   largely into a mediation privilege.  They're recording things

5   that happened in the mediation or attorney/client because

6   they're based on advice even some instances, perhaps, work

7   product where something was being created in connection with

8   the negotiations in this bankruptcy case or in connection with

9   advice.

10           The objectors have not identified a single document

11  where they have information and have carried some burden of

12  establishing that we have an improper redaction.  They're just

13  more interested in getting material without regard to whether

14  or not it's privileged.  I believe and I believe that its been

15  reviewed by a number of attorneys that what has been redacted

16  now after re-reviewing is all either mediation privilege or

17  attorney/client privilege; maybe work product, but at least

18  the first two.

19           With respect to the rebuttals this is not an issue

20  of backfilling a record.  There's no motion, by the way, to

21  preclude rebuttals, the replies.  The replies are going in

22  connection when and in connection with our reply papers as is,

23  of course, customary.  The notion that one can't address the

24  matters raised in an objection in the replies is, of course,

25  completely incorrect.  The law is abundantly clear that

1  replies can introduce new evidence that both address what was

2  put in originally and also more importantly here in particular

3  in opposition to the objections that had been raised and that

4  is exactly what we did.

5          It would be quite convenient if one could litigate

6  by raising objections in an opposition and claiming that the

7  movant had no right to address those matters.  They can't have

8  it both ways.  You can't have the insurers and the other

9  objectors raising matters and relying on evidence in the

10 opposition and then somehow prevent any kind of reply or

11 rebuttal.

12         The law is Black Letter on this.  We cited a number

13 of Delaware cases in our July 26th letter to the court.  It's

14 in Footnote 1.  You have no motion.  You also have a single

15 citation to a single case that was offered by the objectors by

16 Travellers; that, Your Honor, was an un-reported decision out

17 of Illinois and it did not address this.

18         In fact, it's interestingly a case where the party

19 had added a brand new supplement long after declining to raise

20 issues and the court allowed it in anyway in the interest of

21 justice.  There's some victa in a footnote about not being

22 able to raise brand new material in reply.  We haven't raised

23 brand new materials in replies.  It is the same material, same

24 subject matters as in the opening brief.  It is offered

25 specifically to address what was raised in the opposition.

1      THE COURT:  I think the concern I read, and I will

2  say I read these quickly, is that certain documents were not

3  produced, depositions were taken and there were instructions

4  not to answer.  They went to questions such as what did the

5  board consider.  What did the board resolve.  What did the

6  board take into consideration when it determined to enter into

7  the RSA.  All of those, in my mind, would have been fair game

8  not to be addressed subsequently in a reply, but right then at

9  a deposition.

10      Am I wrong in reading this and were these topics --

11 were deponents instructed not to answer those types of

12 questions?

13      MR. KURTZ:  Your Honor, it does look like there was

14 some instructions and I may defer at some point to Mr.

15 Andolina on the specifics. I didn't attend those depositions.

16 I appreciate Your Honor's observation about proper subject

17 matter.  I do believe that taken as a whole with the deponents

18 that were produced a pretty complete record was adduced about

19 what was taken into account and what was considered.  A lot of

20 those instructions were specifically asking about something

21 that occurred in the course of a mediation or something that

22 occurred in connection with receiving advice from counsel, but

23 that the core issues about what the board considered and how

24 they considered it had been addressed in discovery both from a

25 document production standpoint and through witnesses.

1    Additionally, we have offered the deposition of Mr.

2    Disi who is able to testify as to all these matters.  I don't

3    think there is any prejudice in having that deposition take

4    place now.  I don't think there is any new preparation as

5    needed.  Counsel -- the objectors' counsel had been pretty

6    clear, I think, that they fully prepared for and drafted

7    questions about these subject matters.  So they're sort of

8    ready to go right now and get them answered.

9    So I think on balance, Your Honor, we have given

10    them sufficient testimony and evidence about what was taken

11    into account, and what wasn't taken into account, and how.

12    And they have another opportunity, tomorrow, to get even more

13    evidence.  They have already pretty much comprehensively

14    addressed their objections and just as they're addressing them

15    today there is no doubt they will be raising these matters

16    before Your Honor on a hearing on the RSA.

17    So, you know, I get it that this was expedited and

18    I also -- counsel said we've admitted we were wrong. I don't

19    know that those are the words I would use, but I would say

20    that after re-reviewing materials we made additional

21    productions which is completely commonplace in any litigation

22    and particularly commonplace in expedited litigation.

23    We have been trying to get them to engage on this

24    since July 8th.  They raised it for the first time last

25    Thursday in the evening.  We met with them on Friday, the next

1  day following a deposition.  We committed to -- I personally

2  committed to have a re-review undertaken with respect to

3  everything they identify and to make a production over the

4  weekend, and to review all the instructions and to address

5  that as well.

6           We did that as soon as we got that information.

7  Had they raised this three weeks ago, two weeks ago, or one

8  week ago, or before the depositions were taken we could have

9  addressed it all in due course and we wouldn't even have to be

10 here.  They didn't raise it, but the moment they raised it I

11 personally took ownership over this and within -- the

12 commitments immediately they had documents over the weekend.

13          I don't think that, you know, the estate should,

14 sort of, be punished based on what looked to me to be not

15 really inadvertent delay, but maybe even advertant delay

16 because you have a whole slew of applications now all designed

17 to, sort of, take this off track.  Now maybe they shifted from

18 a delay to try and argue some evidentiary shortfall, but,

19 again, I don't believe they have the ability to raise defenses

20 and use evidence in opposition and then prevent the rebuttals.

21          It's Black Letter Law that we're entitled to

22 address their objections and that's all we're doing.

23          THE COURT:  Okay.  Thank you.

24          MR. WINSBERG:  Thank you, Your Honor.

25          MR. SHAMAH:  Your Honor, may I respond or do you

1  want to hear from others first?

2          THE COURT:  Is there anyone else who wants to be

3  heard before I permit a response?

4       (No verbal response)

5          THE COURT:  I don't hear anyone.

6          MR. SHAMAH:  Thank you, Your Honor.  I will be

7  very, very brief.  I think Your Honor hit the nail on the head

8  when you identified the fundamental concern which is that

9  topics that are fair game were not permitted to be the subject

10  of discovery or examination until this past weekend.  Your

11  Honor, I would just simply refer you to our motion to compel

12  where we identify scores of instances where basic questions

13  about the board process, what was considered, when it was

14  considered both in Mr. Ownby's deposition and Mr. Whittman's

15  deposition that were not permitted to answer.

16          I think Mr. Kurtz's -- I do appreciate his

17  willingness to revisit these decisions, but bringing him in at

18  this late hour is simply unfair.  These were issues that were

19  raised at the depositions and beforehand.

20          Your Honor, the last two points I want to make --

21  and I do know Mr. Ryan wants to say something because I see

22  his video is active now.  One, with respect to it being common

23  that these issues be brought up on reply they're not

24  responding to new legal arguments or factual arguments that

25  weren't previewed back in July when we first had the status

1  conference with Your Honor.  This is clearly topics that were

2  fair game from the beginning that they're now trying to

3  buttress on the eve of trial.

4         Lastly, Your Honor, the last point I want to make

5  with respect to additional documents this isn't -- again, this

6  isn't a scenario where they produced a stray email here or

7  there.  That happens in every litigation.  We understand that.

8  Here, they're producing the documents for all intents and

9  purposes for the first time.

10        On that point, Your Honor, I know you asked the

11  question earlier and I did want to address it while -- I did

12  take a quick look.  The board -- we do not have any board

13  authorizations.  We do not have any of the authorizations.

14  They have not been produced as far as we can tell.  We have

15  minutes that are still, for all intents and purposes, entirely

16  redacted other than an individual says and then it's just all

17  redacted.

18        So we have not -- we got these at one o'clock in

19  the morning.  So we haven't -- so, obviously, we have a lot

20  going on right now.  So I can't say that, you know, these

21  privilege assertions are valid or not, but from our review

22  this morning there does still seem to be fairly substantial

23  overbreadth in what has been redacted.

24             THE COURT:  Thank you.

25             Mr. Ryan?

1          MR. RYAN:  Thank you, Your Honor.  Jeremy Ryan on

2  behalf of the ad hoc committees for the United Methodist

3  Church and the Catholic Diocese.

4          We haven't propounded discovery, Your Honor.  We

5  haven't propounded discovery, Your Honor.  We did attend some

6  depositions and the reason we haven't done that is because we

7  are volunteer organizations who devote time, and resources,

8  and property to Boy Scouts that don't have the budgets or the

9  resources to engage in bare knuckle litigation that is taking

10  place.  We are, frankly, riding the coat tails of the

11  discovery the insurers are propounding because they're asking

12  the questions that our clients are interested in hearing too

13  and that we feel are relevant to the issues before the court.

14          We were hopeful that there would be a transparency

15  on the part of the Boy Scouts in providing the record as to

16  what went into the RSA.  We're deeply disappointed that we,

17  from afar, and looking at attending depositions haven't been

18  able to get those answers either.  There were a tremendous

19  amount of objections, a tremendous amount of instructions not

20  to answer.  And the fundamental questions as to what they

21  considered and when with respect to this weren't answered,

22  Your Honor.

23          My clients don't have the resources to attend

24  deposition after deposition and review hundreds of thousands

25  of pages or tens of thousands of pages.  We are depending upon

1  Boy Scouts to not drag us along in bare knuckle litigation.

2  We are depending on them to voluntarily provide a record that

3  was reasonably asked for with respect to what was considered

4  and going to the RSA.

5      From the position of my two clients, Your Honor,

6  you know, at this point we're not sure why we're going

7  forward.  We're being told that the RSA is not the end of the

8  line.  We're being told there will be further negotiations

9  specifically with the chartered organizations, with the

10 treatment in the RSA.  It is not the treatment that they

11 ultimately intend to solicit.

12     So from our perspective and the costs on the

13 estate, the costs on the individual parties who are paying

14 their own legal fees to be proceeding with an RSA hearing when

15 we're being told that the deal for which approval is sought is

16 not going to be the deal that is going to be solicited.  We're

17 left with the question as to what are we doing and what is

18 going to be gained.  Whey are out clients being dragged along

19 and forced to spend money objecting to things that aren't

20 going to be the end of the deal.

21     We would much prefer, as it has in the past, that a

22 stopped litigation be put.  If there are going to be

23 negotiations with chartered organizations lets have that.

24 Let's get to the deal that is ultimately going to be

25 solicited.  Maybe it's this deal because there is no deal with

1  chartered organizations, but as of this date, Your Honor,

2  there has not been one substantive mediation with chartered

3  organizations.

4           Boy Scouts doesn't exist without us; it's a plan

5  and simple fact.  So before we spend all this time and money

6  on litigations why don't we see if the plaintiffs, and the

7  scouts, and local counsels can come to an agreement with the

8  chartered organizations to allow us to continue the

9  relationship that they need to go forward.

10          That is all I have, Your Honor.

11          THE COURT:  Thank you.

12          MR. KURTZ:  Your Honor, may I take a minute or two

13  just to offer a very brief response?

14          THE COURT:  Mr. Kurtz?

15          MR. KURTZ:  As to Mr. Ryan I mean I want to be

16  clear, I mean we're not bare knuckling this at all.  I know

17  what bare knuckle litigation is.  We're the debtor and we're

18  not taking that approach.  I agree that the chartered

19  organizations are important.  My understanding is there is a

20  mediation coming with them, but it's kind of off-point for

21  today.  But I would just note that being able to reach an

22  agreement with the most important and largest creditor group

23  under the RSA doesn't have to wait for the agreements of

24  others which we hope will be forthcoming.

25          The only other comments I wanted to make is just a

1  practical one.  We're not talking about a failure to supply

2  information that is somehow relevant to the truth in any of

3  this.  What the objectors are looking to do here is to

4  identify purported deficiencies.  And every time that they get

5  the true evidence that they don't have those deficiencies

6  they're upset by it.

7          So it's not the failure to produce information that

8  would be problematic, it's the production of information that

9  is problematic to their objection.  Maybe the best example is

10  counsel referred to authorization.  That can't be a serious

11  contest here that the board of the Boy Scouts has authorized

12  the Boy Scouts to enter into the RSA.  So they're looking for

13  some sort of expedited discovery issue to say, well, we don't

14  have enough proof of that when that can't be a serious issue

15  in the case.

16          So I just wanted to note that we're not missing

17  information to get to the truth finding exercise here.  If

18  anything they're just concerned that we're giving them

19  information that undercuts the objections.

20          Thank you for your time, Your Honor.

21          THE COURT:  Mr. Kurtz, I think my response to that

22  is if it's helpful information than it should have been

23  produced in the first instance.  There shouldn't have been any

24  holding it back.  I am not persuaded by that argument.

25          Well I'm not going to take this off calendar, but I

1  am concerned by two things, I will just say.  One, if this

2  issue of mediation privilege and withholding of documents was

3  evident on July 8th, given the schedule that we had, it really

4  should have been brought to me sooner.  And I understand the

5  obligation under our local rules to meet and confer, but --

6  and, of course, I encourage all parties to meet and confer,

7  but bringing issues to me at the last minute is not helpful.

8        On the other hand while I haven't seen any of the

9  documents that the debtors have redacted, and I haven't read a

10 complete deposition of any of the witnesses that have been

11 deposed, on the surface it would seem to me that board

12 resolutions with respect to the RSA, presentations with

13 respect to the board's consideration of the RSA, board minutes

14 with respect to the resolution of the RSA are all fair game

15 and not part of mediation privilege.

16        If the particular documents, I suppose, contain

17 communications that only took place in connection with

18 mediation then perhaps some portion of those documents could

19 be redacted.  But providing -- but mediation doesn't clock

20 discovery and information that is, otherwise, discoverable

21 just because you also put it into the mediation process or

22 communicated information you have to the mediator or other

23 parties.

24        So I am concerned that the mediation privilege may

25 have been too broadly construed.  Again, I haven't seen a

1  document so I don't know, but intuitively those types of

2  documents don't seem to me to fall within the mediation

3  privilege and it would seem to me are very relevant to the

4  issues before the court which the parties have framed is, at

5  least, the debtors' business judgment.  I realize some parties

6  have said that there is an entirely fair standard, but at

7  least business judgment.

8         So I think its fair game.  What did the debtor

9  consider?  When did they consider it?  What did they decide?

10 What did they not consider?  All fair game.

11        So having said that, as I said, I'm not going to

12 take this off calendar.  We will see how the hearing goes.

13 But if I determine that the witnesses are now testifying about

14 topics from which they were precluded from testifying at

15 deposition I am unlikely to hear that testimony.

16        I know there was a separate motion by Hartford.  I

17 don't have enough information to know whether I am going to

18 strike Mr. Mosby's testimony.  We're going to deal with that

19 also at the hearing.  The debtors want to file a response to

20 that you can.  I don't think I've received one yet or if you

21 filed it, it hasn't gotten to my desk.

22        MR. KURTZ:  We have not filed yet, Your Honor.

23 Thank you.  We will file something.

24        THE COURT:  Okay.  That is all I had for today.

25 Let me also say that on Thursday we will be taking a break

1  around 12:10 till about 1:20, 1:30.  So factor that as your

2  lunch time and break time.

3          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott,

4  again, counsel for the debtors.

5          There is one other matter that I think Ms. Lauria

6  would like to bring to the court's attention.  So may I ask

7  the court's indulgence to hear one last bit from her.

8          THE COURT:  Ms. Lauria?

9          MS. LAURIA:  Thank you, Your Honor.  Jessica

10  Lauria, White & Case, on behalf of the debtors.

11          Your Honor, we did think it was our obligation to

12  bring one additional matter to the court's attention and that

13  is the following.  The restructuring support agreement that is

14  currently before the court provides that it terminates, by its

15  terms, tomorrow evening.  We have been in discussions with the

16  RSA parties to extend that termination deadline to actually

17  enable us to get to a hearing with respect to the RSA motion.

18  To date the RSA parties have been unwilling to extend.

19          Those negotiations concerning an extension beyond

20  tomorrow are in process.  They literally lasted until the

21  start of today's hearing and I suspect they will continue

22  tomorrow, but we did not think it was appropriate, Your Honor,

23  to not bring this to the court's attention in the event that

24  for some reason the RSA deadline is not extended tomorrow.

25          THE COURT:  Okay.  I changed my mind.  We're not

1  going forward with the RSA hearing on Thursday.  If the

2  parties -- the parties haven't agreed to extend the deadline.

3  I am not having people prepare.  I am not having people take

4  depositions.  I am not having people continue to discuss.  So

5  that hearing is canceled and if the debtors want to re-notice

6  that hearing they can ask for permission to do so.  I am not

7  going to make parties who are not party to the RSA to continue

8  to prepare for a hearing that may be meaningless.

9          So thank you, Ms. Lauria.  Yes, that was very

10  appropriate to bring it to my attention and that is my ruling.

11  So thank you, everyone.  We're adjourned.

12          (Proceedings concluded at 3:44 p.m.)

13

14

15

16

17                          CERTIFICATE

18

19      I certify that the foregoing is a correct transcript

20  from the electronic sound recording of the proceedings in the

21  above-entitled matter.

22
    /s/Mary Zajaczkowski              July 27, 2021
23  Mary Zajaczkowski, CET**D-531

24

25

# EXHIBIT C

1                    UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE
2

3                           .   Chapter 11
IN RE:                  .
4                         .   Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA AND   .
5  DELAWARE BSA, LLC,       .
                         .   Courtroom No. 2
6                         .   824 North Market Street
                         .   Wilmington, Delaware 19801
7                         .
              Debtors.   .   August 12, 2021
8  . . . . . . . . . . . . . . . . . .  10:00 A.M.

9                TRANSCRIPT OF TELEPHONIC HEARING
        BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10            UNITED STATES BANKRUPTCY JUDGE

11
  TELEPHONIC APPEARANCES:
12

13  For the Debtor:       Derek C. Abbott, Esquire
                      Andrew R. Remming, Esquire
                      Paige N. Topper, Esquire
14                   MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                      1201 North Market Street, 16th Floor
15                 Wilmington, Delaware 19899

16                 - and -

17                 Jessica C. Lauria, Esquire
                      Glenn Kurtz, Esquire
18                 Andrew Hammond, Esquire
                      WHITE & CASE LLP
19                 1221 Avenue of the Americas
                      New York, New York 10020
20

21  Audio Operator:       Brandon J. McCarthy, ECRO

22  Transcription Company:  Reliable
                      1007 N. Orange Street
23                 Wilmington, Delaware 19801
                      (302)654-8080
24                 Email:  gmatthews@reliable-co.com

25  Proceedings recorded by electronic sound recording; transcript
  produced by transcription service.

```
TELEPHONIC APPEARANCES (Cont'd):

For the Debtors:          Michael C. Andolina, Esquire
                          Matthew E. Linder, Esquire
                          Laura E. Baccash, Esquire
                          Blair M. Warner, Esquire
                          WHITE & CASE LLP
                          111 South Wacker Drive
                          Chicago, Illinois 60606

For Hartford:             James Ruggeri, Esquire
                          Joshua Weinberg, Esquire
                          SHIPMAN & GOODWIN LLP
                          1875 K Street NW, Suite 600
                          Washington, DC 20006

For Century:              Tancred Schiavoni, Esquire
                          O'MELVENY & MYERS LLP
                          Times Square Tower
                          7 Times Square
                          New York, New York 10036

For the AIG Companies:    James Hallowell, Esquire
                          GIBSON DUNN & CRUTCHER LLP
                          200 Park Avenue
                          New York, New York 10166

For the Coalition of      Eric Goodman, Esquire
Abused Scouts:            BROWN RUDNICK LLP
                          601 Thirteenth Street NW, Suite 600
                          Washington, DC 20005

                          - and -

                          Cameron Moxley, Esquire
                          7 Times Square
                          New York, New York 10036

For the U.S. Trustee:     David Buchbinder, Esquire
                          UNITED STATES DEPARTMENT OF JUSTICE
                          OFFICE OF THE UNITED STATES TRUSTEE
                          844 King Street, Suite 2207
                          Lockbox 35
                          Wilmington, Delaware 19801
```

TELEPHONIC APPEARNACES (Cont'd):

For the Committee          Joseph Celentino, Esquire
Of Local Councils:         WACHTELL, LIPTON, ROSEN & KATZ
                           51 West 52nd Street
                           New York, New York 10019

For the Roman Catholic     Jeremy Ryan, Esquire
Ad Hoc Committee:          POTTER ANDERSON & CORROON LLP
                           1313 N. Market Street, 6th Floor
                           Wilmington, Delaware 19801

For the TCC:               Thomas Patterson, Esquire
                           THE PATTERSON LAW FIRM, LLC
                           200 West Monroe, Suite 2025
                           Chicago, Illinois 60606

MATTERS GOING FORWARD:

1.  Debtors' Motion for Entry of an Order, Pursuant to
Sections 363(b) and 105(a) of the Bankruptcy Code, (I)
Authorizing the Debtors to Enter Into and Perform Under the
Restructuring Support Agreement, and (II) Granting Related
Relief [D.I. 5466; Filed 7/1/21]

     **Ruling:**

6. [SEALED] Moving Insurers' Motion to Compel and for
Additional Relief and in the Alternative Motion in Limine
[D.I. 5881; Filed 8/4/21]

     **Ruling:   57**

7. Century's Revised Motion for Entry of an Order Authorizing
Filing Under Seal Documents Relating to Century's Objections
to Debtor's Motion Relating to the Restructuring Support
Agreement and Moving Insurers' Motion to Compel [D.I. 5853;
Filed 8/2/21]

     **Ruling:**

10. [SEALED] Century's Motion in Limine to Bar the Debtors
from Offering Evidence in Support of Their Application for
Fees on Which They Have Refused to Provide Discovery [D.I.
5942; Filed 8/10/21]

     **Ruling:**


DEBTORS' WITNESS(s):

**BRIAN WHITTMAN**

     Direct Examination by Mr. Hammond          84

     Cross Examination by Schiavoni             160

     Cross Examination by Mr. Weinberg          196

     Cross Examination by Mr. Hallowell         207

     Cross Examination by Mr. Ryan              222

     Cross Examination by Mr. Goodman           229

1      Cross Examination by Mr. Buchbinder        240

2      Cross Examination by Mr. Patterson         243

3

4

5   EXHIBITS                        I.D.      REC'D

6   D1   RSA                                      112

7   D-1A                                          144

8   D42                                           146

9   Declaration of Brian Whittman                 202

10  Page 93 of Whittman Declaration               209

11  Page 179, Line 22 to Page 180, Line 12

12  Whittman Declaration                          216

13  AIG Exhibit                                   221

14  Paragraph 8 Whittman Declaration              246

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commence at 10:05 a.m.)

2            THE COURT:  Good morning, Counsel.  This is Judge

3  Silverstein.  We're here in the Boy Scouts of America

4  bankruptcy case, Case Number 20-10343.

5            And Mrs. Johnson put the agenda right in front of

6  me and I've already misplaced it, so -- but I don't think it's

7  necessary.

8            Let me turn it over to debtors' counsel.  Mr.

9  Abbott.

10        (No verbal response)

11            THE COURT:  Nobody is hearing me.

12            MR. ABBOTT:  Good morning, Your Honor.  Derek

13  Abbott of Morris Nichols for the debtors.  It looks like we

14  may still be gathering critical mass, so we're prepared to

15  proceed when the Court is ready.

16            THE COURT:  Okay.  I'm ready.  Can parties hear me?

17        (No verbal response)

18        (Pause in proceedings)

19            MR. ABBOTT:  Good morning, Your Honor.

20            THE COURT:  Good morning.  Can you hear me now?

21            MR. ABBOTT:  Yes, I can.  Thank you.  I'm sorry, I

22  couldn't before, for some reason.

23            THE COURT:  Yes, we're looking at that.  Okay.

24  Well, let's start again.

25            This is Judge Silverstein.  We're here in the Boy

1  Scouts of America bankruptcy case, Case Number 20-10343.   And

2  I'll turn it over to Mr. Abbott.

3          MR. ABBOTT:   Thank you, Your Honor.   Derek Abbott

4  of Morris Nichols, here for the debtors.   And I'm getting a

5  little bit of an echo, Your Honor.   I hope -- I'm not sure if

6  everyone else is.   I apologize for that.   But I'll try to work

7  through it.

8          THE COURT:   Okay.   I'm not getting any echo.   Can

9  everyone please make certain that they are muted, unless they

10 are speaking?

11         MR. RUGGERI:   And Your Honor (indiscernible) for

12 echo (indiscernible) speaking.

13         MR. ABBOTT:   Well, Your Honor, let me try to get

14 started and we'll see how it works.   Maybe others don't have

15 that problem.

16         MS. LAURIA:   Actually, Mr. Abbott, this is Jessica

17 Lauria.   The echo is pretty severe.   We don't hear it when the

18 Court speaks, but we do hear it when you speak, or Mr. Ruggeri

19 or -- I can hear it very loudly.

20         THE COURT:   Okay.   Let's ... here's what I'm going

21 to do.   I'm going to exit for a moment, please stay on.   I'm

22 going to have my IT people work with you.   But please, I want

23 you to stay on and be available, so we can find out of we're

24 getting this problem resolved.

25         MR. ABBOTT:   Thank you, Your Honor.

1       (Off the record at 10:09 a.m.)

2       (Proceedings resume at 10:32 a.m.)

3            THE COURT:  Okay.  Mr. Abbott.

4            MR. ABBOTT:  Thank you, Your Honor.  Appreciate it.

5  I think this is much better, and people will be able to

6  actually understand what's going on, so I appreciate it.

7            Your Honor, there's quite a lengthy agenda,

8  although it really falls into three buckets:

9            Item Number 1, Your Honor, is the debtors' motion

10 for the RSA.

11           There's another set, Items 2, 3, 4, 5, 8, 9, 11,

12 and 12, that I would sort of categorize as largely

13 administrative motions.  They're motions to exceed the page

14 limit, they're motions to seal documents in accordance with

15 the confidentiality obligations.

16           THE COURT:  Go ahead.

17           MR. ABBOTT:  Your Honor, and again, that's Items 2,

18 3, 4, 5, 8, 9, 11, and 12, on the second amended agenda.

19 They, I don't believe are the subject of any objection.  And I

20 would suggest maybe -- I would just ask the Court to grant

21 those generally to clear out the weeds on the agenda.

22           The next three items it probably makes sense to

23 take up before Item Number 1, Your Honor, are 6, 7, and 10,

24 which are the various discovery/motion to compel/motion in

25 limine items filed by the insurers and the Coalition; those

1  are Items 6, 7, and 10.  But that's my suggestion to sort of

2  deal with those first, obviously, before Item Number 1.  But

3  we're obviously at the Court's pleasure.

4          THE COURT:  Okay.  That makes sense.

5          As for all of the motions to exceed page

6  limitation, motions to seal, et cetera, those will all be

7  granted.

8          MR. ABBOTT:  Thank you, Your Honor.

9          With that, I guess we would move to Agenda Item

10  Number 6.  And so I'd ask the moving insurers to -- I'm not

11  sure which one is going to take the lead on that, but that's

12  their motion, so I'll cede the virtual podium, Your Honor.

13          THE COURT:  Thank you.

14          MR. RUGGERI:  Good morning, Your Honor.  James

15  Ruggeri for Hartford, if it pleases the Court.

16          THE COURT:  Mr. Ruggeri.

17          MR. RUGGERI:  Judge, there is one motion

18  (indiscernible) thank you, Judge.  There is one motion,

19  actually, we talked about at one of our prior hearings that I

20  did (indiscernible) on the motion, it deals with a motion to

21  strike the testimony of Mr. Mosby.  The Court said earlier

22  that it would hold that over and present that when we convene

23  for the RSA.  I do apologize for that not being added to the

24  agenda.

25          Your Honor, but this morning, I'd like to kick it

1  off by addressing Item 6 on the agenda, which is the motion to

2  compel.  And this is the motion to compel that the moving

3  insurers filed on August 4th, 2021.

4        What do we want?  The Court is aware of a prior

5  motion that was filed by certain insurers in July.  What we

6  actually want, Your Honor, through this motion, and what the

7  Court, I believe, told us is fair game on July 27th, and that

8  is we want to know what the debtors considered in approving

9  the restructuring support agreement, we want to know when they

10  considered it, and we want to know what the debtors didn't

11  consider.  Those were the items that the Court indicated were

12  fair game in connection with the RSA motion.

13        And from our perspective, Your Honor, that include

14  the Alvarez & Marsal PowerPoint presentations and financial

15  analyses submitted to the boards in evaluating the RSA.

16        Two, includes the authorizing minutes and

17  resolutions of the BSA boards.  We haven't received any

18  authorizing minutes or resolutions of the BSA boards.

19        Three, it includes the board minutes and

20  communications showing, again, what the boards considered in

21  approving the RSA.

22        Judge, if we don't have those communications, we

23  have no idea what the debtors actually considered in

24  exercising their business judgment.

25        Yesterday, the Court saw another round of filings

1 and it saw it in response to the certain supplemental

2 objections that the debtors promised at Paragraph 5, that they

3 would produce all of these materials.  They said, but they

4 didn't do that, Your Honor.  The productions are still heavily

5 redacted.

6            There's no discernible rhyme or reason that I can

7 find, except that it now appears that, with regard to board

8 minutes and the Alvarez & Marsal productions, the debtors

9 unredacted the information that they believe is useful to

10 their RSA motion.  I mean, why else, Judge, would the debtors

11 still be redacting from their documents, you know, statements

12 concerning the K-3s national road trip and meetings that the

13 had with non-mediating parties across the country.  And that's

14 attached as Exhibit J to the Erin Fay deposition, Docket 5882.

15 They redacted that.  There's no conceivable basis for a

16 privilege along those lines.

17            Judge, the fourth thing we want, because of the

18 manner in which the documents have been dribbled out and the

19 privilege logs have been provided, we want a real privilege

20 log.  The different productions and privilege logs give us no

21 comfort.  The redactions have been overly broad, they've been

22 misleading.

23            We attached as Exhibits E and F to the Fay

24 declaration, Your Honor, a couple of sequences of the document

25 productions, showing how they dribbled out in three

1  productions.  And you'll see that, in the first production,

2  the impression we were given is that the entirety of the

3  minutes was privileged advice given by Ms. Lauria and Mr.

4  Andolina.  Then we produced a couple of more lines, a couple

5  of weeks later.

6        And then the last production we saw, on August work

7  -- August 1st, they had these, again, still head-scratching

8  redactions in there.  And what they unredacted -- the

9  redactions when they wanted to tell us that, you know, Mr.

10  Andolino was saying something about the momentum gaining

11  toward a global resolution, the RSA.  Again, that's Exhibit 5

12  of the Fay declaration.  But when it came to Mr. Whittman's

13  PowerPoint presentations, the redactions remains.  We don't

14  have any confidence in the logs that we received, Your Honor.

15        We want -- and this is important, Judge, because it

16  really goes to the heart of what I think Your Honor was

17  talking about, the Court was talking about on the 27th.  We

18  also want the communications and the drafts of the RSA

19  documents exchanged between and among the RSA parties.  And I

20  don't know if Ms. Rolain has been given access to the document

21  share, but I would like to show on the screen an example of

22  the document I'm talking about.  It's Exhibit G to the Fay

23  declaration.

24        You'll see that this is an email from Mr. McGowan

25  to various people on the BSA side of the ledger.  They

1   produced a cover email.  But what you'll see is, in the

2   attachments, you'll see that there's an identification of

3   comparison documents between those worked by BSA and those

4   worked on by the other RSA parties.  We didn't get the

5   attachments, Judge, we didn't get a single attachment showing

6   any redline comparisons or anything, the communications back

7   and forth.

8           And it's troubling, Judge, because, in the RSA

9   motion, they have asked the Court to make a number of

10  findings.  They -- one, they want the Court to find and rule

11  that:

12          The parties engaged in arm's length negotiations.

13          Two, that the RSA was negotiated at arm's length

14  and in good faith.

15          Three, that the debtors undertood a thorough,

16  independent review of the RSA's -- parties' rights and

17  obligations under the RSA.

18          And fourth, that the debtors concluded that the RSA

19  was in the best interests of debtors and the creditors.

20          And they doubled down on this -- on these requested

21  findings again yesterday, in Paragraph 18.  They want this

22  Court to find that the RSA was the product of extensive arm's

23  length negotiations.  And just because they say so -- and the

24  Court knows better than I -- it doesn't mean it is so.

25          If we don't get the communications and drafts, I

1   don't know how the Court is in a position to make the rulings.

2   And certainly, I don't know how we're a participant -- in a

3   position to participate meaningfully in kicking the tires on

4   the requested finding.

5          You know, Judge, we had a conversation with

6   debtors' counsel a few days ago, and it really capsulized the

7   disagreement that we have with debtors' counsel.  I

8   appreciated the candor.  Debtors' counsel said, you, the

9   insurers, aren't entitled to discovery showing how the sausage

10  was made.  We are and we have to be because of the findings

11  that you're asking the Court to make.

12         In response to our motion, we saw some

13  contradiction.  They say we filed our motion too early in one

14  area, and then they say we filed it too late, that we waited a

15  couple of days after the Court's guidance on July 27th and

16  their promise to produce documents on the 29th.  Judge, we

17  didn't wait long at all.  The documents were produced on

18  August 1 and 2nd, and we filed our motion August 4th.

19         Again, our -- the real point of disagreement is I

20  do think we're entitled to know how the sausage was made, we

21  have to be from our perspective.  The Court knows we've been

22  clear about this.  We believe that, from what we know, it

23  looks like, once the debtors and the local councils were able

24  to negotiate their exit prices, they turned over the keys to

25  the TCC, the Coalition, and the future claims representative.

1              We know that, before they reached their agreement,

2    the debtor was responding trust distribution procedures and

3    telling the Court that they had to be insurance-neutral.  But

4    now we have TDPs that were appended to the RSA and filed with

5    the fourth amended plan that they probably say are the

6    opposite of insurance-neutral.  We need to know how that

7    happened.  We need to know who asked for it, who pushed back

8    on it, if anyone, what discussions took place.

9              And Judge, I submit that it's inappropriate to hide

10   behind privilege, mediation or otherwise.  Both parties cited,

11   you know, Former Judge Carey's ruling in the Tribune case.

12   And I think the point of it for me, in his epilogue, Former

13   Judge Carey said that there are limitations to privilege, and

14   you have to look at it from the perspective of the facts and

15   circumstances.  And here, given the findings they've asked

16   this Court to make -- not "asked" -- mandated the Court to

17   make, if they're going to go forward with the RSA, I think

18   they've placed them at issue.  And privilege does bend in

19   response to matters placed at issue.

20              They -- the debtors try to respond, Judge, by

21   telling us that their logs tell the story.  Their logs tell no

22   story at all.  I mean, I think the -- I've never seen a

23   categorical log in my 31 years of practice, Judge.  We have

24   thousands of pages of documents.  It was a two-page document,

25   it had three entries.  The entries were mediation privilege,

1  attorney/client communication, and work product.  There was no

2  document attached to any of those privileges, it was

3  wholesale.  And the date was kind of laughable.  The date

4  range was, quote, "inception of debtors to the present."

5  That's pretty darned broad.

6       The second log regarding the TDPs, again, it told

7  us nothing about who did any -- who proposed what, what they

8  said, how the back and forth went.  This case is qualitatively

9  different than any of the cases that the debtors cite to.

10  There's nothing in those logs that provide any sort of basis

11  for anyone, much less the Court, to make a good faith finding

12  about the negotiations, the alleged hard-fought negotiations

13  of the TDPs or otherwise.

14       THE COURT:  Mr. Ruggeri --

15       MR. RUGGERI:  Judge, they say they haven't shared -

16  -

17       THE COURT:  Mr. Ruggeri, let me ask you this

18  question.  And I was just looking for my proposed form of

19  order, which I thought -- the proposed form of order, which I

20  thought I had right in front of me.  But what's the -- what do

21  you think I have to find in the context of an RSA, what do you

22  think "good faith" means?

23       MR. RUGGERI:  Judge, I think there's a disagreement

24  on the standard regarding good faith, and I would defer that

25  argument to Mr. Schiavoni and Mr. Anker, who are closer to

1  that issue.  But I do think the Court needs to weigh and

2  balance.

3         But what I don't think the Court can do, Judge, is

4  I don't think it can even make the lowest finding that the RSA

5  parties asked the Court to make.  If we're being asked to make

6  this or the Court is being asked to make this in the context

7  of a black box -- and it's really what's happened here, is

8  that mediation has swallowed this whole case and everything is

9  now, you know, cloaked in mediation privilege.

10         And if I show you another document that they just

11  produced a couple of days ago, which shows, you know, my

12  personal frustration, we have a document here regarding a June

13  11th meeting, the National Executive Committee and Bankruptcy

14  Task Force legal update.  And if you scroll through a couple

15  of pages, you see there's a time line, litigation matters.

16  And then, okay, pending offer of privilege.  And then you go

17  again, it's Issue Number 1, and look what they unredacted:

18         "TCC SCR Coalition has sent BSA and AHCLC letter

19  confirming no plan with Hartford will be supported."

20         Huh, wonder why they share that, Judge?  Wonder

21  why.  But go again.  You go down to the next issue, privilege;

22  next issue, privilege.  So they produce one thing that they

23  believed went to their motion, and that was it.

24         They blame us, they kind of chastise us for not

25  telling them earlier that they improperly withheld

1   attachments.  That's not our job, Judge.  We do the best we

2   can do and we expect they will do the best that they can do.

3          You know, they filed a document yesterday, Page 41,

4   that said the debtors' interest is in presenting this Court

5   with a full evidentiary record in support of the RSA.  Judge,

6   we don't have -- we don't have the record, the discovery

7   record with which we could present the Court the Court with a

8   full evidentiary record.

9          They blame us for the depositions.  My position was

10  clear.  Until July 27th, they said they would present

11  deponents only once.  I said, look, you haven't given us what

12  the Judge kind of told me I think was fair game, what you

13  considered, when you considered it, what you didn't consider

14  it.  So, rather than have a round two of depositions, to be

15  followed by round three, I submitted that it made more sense

16  for all of the parties to bring this issue to the Court's

17  attention, where the Court could give us guidance, in terms of

18  what documents have been produced.

19         The big problem I have, Your Honor, is they haven't

20  produced the information that we believe is fair game.  We

21  agree with the Court.  And it provides no basis for us to

22  question or the Court to make the requested finding that they

23  haven't only asked for, they said the Court must make, if

24  they're going to go forward on the RSA.  Thank you, Your

25  Honor.

1          THE COURT:  Thank you.

2          Mrs. Johnson, Mr. Ruggeri is referring to something

3  filed yesterday, which I don't have.  So, if you could bring

4  that to me, I'd appreciate it.

5          Okay.  Let me hear -- let me hear a response.  And

6  I want addressed in the response the particular issues that

7  Mr. Ruggeri has raised.  I also want to understand what

8  findings -- how you think that I can make a good faith finding

9  without the discovery that -- the opportunity for the

10  discovery that Mr. Ruggieri is talking about.

11          MR. KURTZ:  Good morning, Your Honor.  Glenn Kirtz

12  from White & Case on behalf of the debtors.  Can you hear me?

13          THE COURT:  Yes, Mr. Kurtz.

14          MR. KURTZ:  Good morning again.  I will address all

15  those matters maybe in a broader context.

16          I'll try not to burden the Court with too much

17  duplication from what's in the briefs, including delay-related

18  issues, other than to note that we raised this mediation

19  position on July 8th, at the latest, more than a month ago.

20  We repeatedly raised it.  We asked the insurers to share their

21  position.  We asked to have a meet-and-confer, so that we

22  could try to resolve to the extent that there were any nuances

23  on what could be produced, if there were any other ways to

24  figure out how to get evidence in without violating the

25  mediation order.  They steadfastly refused to do so.  We

1  weren't aware of their specific position on privilege, in

2  fact, until they filed these papers more than a month after we

3  tried to engage.  So I think what's really happening is the

4  insurers are trying to raise an emergency of their own making

5  to claim prejudice, which just doesn't exist here, for reasons

6  that I'll get into.

7         For context, the insurers here are seeking to

8  preclude documents and testimony.  I think it's best maybe to

9  start with the testimony.

10        There was at least some specifics given today, and

11 I'm going to absolutely address those specifics.  But for the

12 most part, the papers have been a series of generalisms and

13 conclusory statements.  We tried to go through the actual

14 facts, the production dates, the source for the production,

15 what's been disclosed and how we dealt with the requests; we

16 put that into the papers (indiscernible) exhibits.  I won't

17 walk through it, but it does demonstrate that we've given the

18 discovery that's appropriate here.

19        And I think it is worth highlighting that the

20 insurers here are not creditors of the estate, they're not

21 objecting at least as creditors of the estate.  They're really

22 assets of the estates, they're the policies.  They don't share

23 the same interests, they're in conflict.

24        THE COURT:  Have they filed claims?

25        MR. KURTZ:  They're seeking very --

1          THE COURT:  Have they filed claims?

2          MR. KURTZ:  They have, Your Honor.

3          THE COURT:  Has the debtor --

4          MR. KURTZ:  And they --

5          THE COURT:  -- objected to them?

6          MR. KURTZ:  They have, Your Honor.

7          THE COURT:  Has the debtor objected to them?

8          MR. KURTZ:  I'm not sure of the answer to that

9    question, but -- and that's why I said how they're objecting

10   because I -- there's a couple of them that have had some

11   premium-related claims.  But they're not raising any

12   objections based on their creditor status or what they might

13   receive or not receive as creditors.  They're raising their

14   claims as policies, which are really assets of the estate.

15          I'm not suggesting they don't have every right to

16   be heard, it's not a standing issue, at least with respect to

17   the issues I'm addressing.  It's just a matter of who's trying

18   to act on behalf of the estate here, and who's trying to act

19   in a way that I think conflicts because the insurance policies

20   are assets of the estate, they're not claimants of the estate.

21          The relatively nominal premium claims will be

22   addressed in the ordinary course, but no one is claiming that

23   we've done something that's going to minimize that recovery or

24   impair it in any way.

25          I ought to probably note the standard here, which

1  is preclusion, is an extreme sanction, that it really isn't

2  typically imposed without some pretty good reason here.  Let

3  me start with the testimony.  It really goes initially to the

4  reply declarations.

5         And I think the first thing I ought to point out

6  is, you know, this effort to preclude testimony by trying to

7  strike the replies sort of ignores the fact that the debtors,

8  we believe, are entitled to show up today and tomorrow, put

9  witnesses on the stand, and produce any relevant evidence that

10 is otherwise admissible, regardless of whether they outlined

11 their -- the contents of their expected testimony in a reply

12 or otherwise.

13        And so there's sort of a premise here that the

14 evidence stops when you file the motion, which is not true,

15 and the insurers haven't addressed it.  We think, with or

16 without the replies, our witnesses who are here today will be

17 able to testify as to any appropriate matters in the

18 evidentiary hearing.  And we really gave them the benefit of

19 having an opportunity to see what we will present and who we

20 would present (indiscernible) so that they could take

21 depositions and they could prepare.

22        But getting past the fact that we don't think

23 there's any basis for precluding evidence, there's also no

24 basis for precluding the reply declarations.  I think the

25 position that somehow reply declarations aren't proper is

1  completely wrong, is inconsistent with the insurers' own

2  practice.  They have filed a number of motions seeking relief

3  from this Court affirmatively and in connection with those

4  motions, including motions for 2004 discovery for -- to

5  adjourn the disclosure statement hearing and the 2019 that

6  Your Honor recently heard.  They filed replies; and, in their

7  replies, they filed seven different declarations of fact

8  witnesses and expert witnesses.  So they recognize the normal

9  practice, and the rules don't change dependent upon whether

10  the insurers are movants or objectors.

11           In any case, the law is pretty clear, I think, and

12  consistent with practice that replies are proper under at

13  least two circumstances, reply declarations.

14           THE COURT:  I'm not --

15           MR. KURTZ:  One is where --

16           THE COURT:  That's --

17           MR. KURTZ:  -- it's within the scope --

18           THE COURT:  That's -- Mr. Kurtz, I don't need any

19  more on that.  I'm not convinced by the insurers' argument --

20           MR. KURTZ:  Okay.

21           THE COURT:  -- on that.  There was no -- I think

22  other courts have practiced by declaration, and that seems to

23  have filtered into several of my cases, but that's not the

24  practice here, it doesn't have to be the practice here.  You

25  can show up and put your witness on the stand.

1          So the question to me on the witness testimony is

2    not one I think we've heard yet argued by the insurers --

3    though they filed papers on it -- as to what happened at the

4    depositions, and should they be permitted to discuss on the

5    stand matters that they were precluded from testifying about

6    at the deposition.  But as far as being able to testify,

7    generally, that's not an issue for me.

8          MR. KURTZ:  Okay.  Well, thank you for the

9    guidance, Your Honor, so I don't waste any of your time.

10         And let me now respond to the issue that you did

11   raise as something you're interested in hearing about, which

12   is the deposition instructions.  We have two responses to

13   that:

14         The first is we put together a table demonstrating

15   that the insurers were, in fact, provided with testimony with

16   respect to the subjects they raise here.  We will continue to

17   complain about privilege, and I'm going to get to that.  But

18   we have Exhibit D to our objection, outlines very specifically

19   where there were objections and then where the testimony was

20   that responds to the questions that were asked, at least in

21   ways that we think are sufficient.

22         Most of the objections, I think, were -- there were

23   sort of three of them.  One was that they -- there was

24   instruction about answering the deal points that, quote, "make

25   up the RSA."  But of course, the RSA records everything single

1  deal point that's in there.  And we have provided testimony

2  and we have provided documents about the approvals and the

3  reasons for the approvals.

4         The objectors say that they were prevented from

5  obtaining testimony about the chartered organizations, that --

6  Your Honor, it seems (indiscernible) I've kind of lost -- I

7  heard a beep --

8         THE COURT:  I'm here.

9         MR. KURTZ:  -- and I've lost -- I'm sorry.  I see

10 you now.  I'm sorry, your screen moved.

11        About whether the charter organizations are

12 contractually indemnified by the Boy Scout Board.  That

13 doesn't even make sense because, of course, the boards don't

14 indemnify anyone.  But witnesses certainly answered questions

15 about how the board accounted for the chartered organizations

16 and the pathway forward, which is ongoing with the chartered

17 organizations.  And there are documents that were provided on

18 that subject, as well.

19        And then, lastly, it looks to me like the insurers

20 are complaining about not getting answers about the time that

21 the board spend deliberating on the RSA.  But there was ample

22 testimony on the subject, including with the specificity of

23 the number of meetings, to the extent that's important.

24        And then the second response is that we agreed to

25 reproduce each of the witnesses to answer the questions raised

1  here and also to answer related questions and to answer

2  questions that related to the supplemental document

3  productions.  We -- the insurers had repeatedly requested

4  those depositions.  They even moved the Court to compel them.

5  We agreed to them right after the hearing where Your Honor

6  made remarks about the extent of the discovery.

7           We proposed dates.  We spend five straight days,

8  maybe every day, asking them to please confirm the dates

9  because we had volunteer witnesses, they had travel issues,

10  and we wanted to lock it in.  We could not get an answer.  We

11  finally got, less than two days before one of the dates would

12  have gone forward, we had a meet-and-confer.  It took

13  considerable effort, but ultimately almost a negative vote.

14  We got the information that the insurers did not intend to

15  take the depositions.

16           And the law is that -- we think pretty clear, that,

17  if you decline an opportunity to continue a deposition, you

18  can't state any prejudice, certainly not the kind of prejudice

19  that we think that would support the extreme sanction of a

20  preclusion order.  We cited those cases on Pages 38 and 39 of

21  our objection.  And frankly, I would submit that, given the

22  repeated requests for the depositions, the motion to compel

23  the depositions, and then our offering them and a refusal even

24  to respond to us about that demonstrates that the insurers

25  weren't really looking to take the depositions; they were

1  looking to create a record that we wouldn't supply them.  But

2  we think we fixed it, and we think that that also fixes any

3  issue they have on it.

4          I think that takes me to the documents.  And we

5  found the motion a little bit puzzling, and still maybe find

6  it a little bit puzzling, in that what it actually seeks,

7  which is identified in the conclusion and then in the proposed

8  order, and really what was mentioned today, was A&M materials

9  and authorizing minutes and resolutions and the like.  And

10  those were all produced almost two weeks ago, and that is

11  simply a fact.

12          The insurers are claiming here, based on nothing

13  but speculation, that there continues to be non-privileged

14  material that has been redacted.  They don't discharge their

15  burden of demonstrating that, it's not so.  We would be happy

16  to submit in camera any documents that Your Honor might be

17  inclined to review to assess that, even though I don't think

18  there's been a showing that would justify it, but we're

19  certainly happy to do that.

20          I think their -- if you look at Page 6 of their

21  motion, you get a flavor of the kinds of challenges that

22  they're mounting here.  And given this is one that was

23  reproduced presumably, this is basically their best example,

24  complaining that this is a great showing that non-privileged

25  material was redacted.  And what the document says exactly is,

1    quote, "Jessica Lauria advised," and then there is a blank.

2    So it is still demonstrating that that picks up privileged

3    advice.  Jessica Lauria is a lead attorney for the debtors.

4    There is no argument made as to why that is not privileged.

5    It's plainly privileged on its face.  And I think using that

6    as an example sort of demonstrates that there really is

7    nothing here.

8           There seems to be just a generalized approach that,

9    if they want it, they should receive it.  And frankly, that's

10   a violation of Your Honor's mediation order and Local Rule

11   9019.  It's not the way it works.  It's not the way it works.

12   It's made it comp -- made discovery very complicated for us

13   because we're constantly dealing with demands for mediation,

14   which is time-consuming.

15          There's arguments here that they're -- you know,

16   they're entitled to the back-and-forth in the mediation.  They

17   quote me as saying we don't think they're entitled to the

18   sausage-making, and I will repeat that, that they're not

19   entitled to the sausage-making where the sausage was made

20   inside of a mediation.

21          So counsel points out that we've removed all the

22   attachments.  The attachments are the proposals made back and

23   forth in mediation.  That is core mediation privilege.  So it

24   doesn't -- it's a violation for them to ask, and it's frankly

25   a violation of the order and the rule to compel it.  But it

1  also -- they're offering no basis other than their general

2  interest in having it.

3        They kind of come back and say, well, you put it at

4  issue because you've asked for a good faith finding.  And I'll

5  respond to one of Your Honor's questions now, which is there's

6  no good faith finding required for the RSA.  It's not a 363

7  sale.  So good faith comes up only because, once we discharge

8  our burden of demonstrating a valid business justification for

9  the action, the debtors are entitled to the protections of

10 business judgment, and people can try to challenge that.  But

11 that does not let you violate orders and rules or violate

12 privilege.

13        THE COURT:  So explain --

14        MR. KURTZ:  The notion that the debtors can't --

15        THE COURT:  So explain to me, if good faith is not

16 required, if a good faith finding is not required in this

17 instance, why should I provide one?  Can't we get rid of this

18 whole issue by saying I won't make that finding, I don't --

19 the debtors don't need that finding --

20        MR. KURTZ:  Again --

21        THE COURT:  -- it's in appropriate?  And doesn't it

22 solve all these issues.

23        MR. KURTZ:  It may, and I probably, when I finish

24 commenting, maybe turn it over to Ms. Lauria to make sure that

25 what all the consequences might be for that.  She's a lot

1  closer to all the terms, but I will say, Your Honor, that a

2  good faith finding, even when one is required, can be made

3  based on the evidence that we are introducing today including

4  the basic deal terms, the reason for the deal terms, the

5  board's determination with respect to the deal terms without

6  regard to mediation at all.  Either these terms are

7  appropriate or they're not appropriate on their face.  How we

8  got there isn't a requirement to a good faith finding.

9          I will also say that the fact of the mediation is

10  often times been the predicate for a good faith finding.  It

11  is a factual issue that the parties reached an agreement as a

12  result of mediation.  Those findings are routinely made in

13  bankruptcy cases and in other cases to support a good faith

14  finding without negating the privilege.  In fact, I think

15  there's a substantial number of bankruptcy cases that everyone

16  on this call has been involved and ultimately went into

17  mediation resulting in a deal.  Nobody invaded the privilege

18  and the court made a finding of good faith nonetheless.

19          We cited a number of cases that said you don't have

20  to waive the privilege to demonstrate that it came out of

21  mediation and, therefore, its good faith.  So it's sort of a

22  faulty premise.  This at issue notion is really been --

23  there's not one case that any of the objectors, any of the

24  moving insurers have cited that have suggested, much less

25  held, that a good faith finding can't be made based on the

1  fact of a mediation without invading the mediation and

2  allowing for the production of mediation proposals.

3          Mediation is an important mechanism, its proven

4  effective here so far, its proven effective in a lot of cases,

5  and it's ongoing.  We have every optimistic view here that

6  it's going to allow us to generate some more general consensus

7  for the parties that are not on board yet.  I would be a

8  little worried about the chilling effect if people could

9  invade really without any basis.

10          I would say that we have absolutely nothing to

11  hide.  If Your Honor has an interest in seeing anything in

12  camera we'd be happy to provide it.  As I imagine you would

13  expect it was arm's length negotiations.  You have heard, and

14  I don't even know if anybody could even challenge that in a

15  premise.  I mean everybody has arm's length in here.  I think

16  the notion here that you're hearing is, well, wait a minute,

17  the debtors turned over the keys on the TDP. I will offer,

18  initially, that would be irrelevant.  The TDP either works or

19  it doesn't work and Your Honor is going to make that

20  determination no matter who has the pen.

21          We did provide a specific log when we had a meet

22  and confer.  We came out of the meet and confer, the insurers

23  were making a very big deal about the TDP drafting history.  I

24  am going to come back to the log, but they said the

25  categorical log doesn't give them what they need.  They want

1  to demonstrate that the debtors did not have a role.  So we

2  gave them a specific log on that specific issue they raised

3  and what it demonstrates is that there was a lot of back and

4  forth.  The original draft came out of the debtors, that's not

5  privileged.  There was a lot of back forth and that is not

6  privileged.

7        The specifics of the back and forth are privileged,

8  but, Your Honor, we don't have anything to hide on it, it's

9  just not something that could be or should be turned over.  It

10  violates the privilege.  The --

11        THE COURT:  Does the --

12        MR. KURTZ:  I don't think the -- I'm sorry, Your

13  Honor.

14        THE COURT:  So I'm trying to figure out, and maybe

15  someone should address it, but it seems pretty central to the

16  issue of what this hearing should encompass, what does a good

17  faith finding mean in this context if the debtors can just

18  say, well, it was a result of mediation.  Just look, as Mr.

19  Kurtz you said, there are cases that, at least, it's a factor.

20  So what does that mean?  What does a good faith finding get

21  anybody and what does it mean because I am not sure that I

22  know that in this context assuming that it's even appropriate

23  for me to make that finding.

24        I think what parties are concerned about is that

25  this finding spills over into other good faith aspects.  Quite

1 frankly, I think good faith can mean different things in

2 different circumstances and there are different standards in

3 different circumstances.  So what does it even mean here?

4          MR. KURTZ:  Thank you, Your Honor.  Maybe I can --

5 I'm sorry, Ms. Lauria, did you want to --

6          MS. LAURIA:  Yes, if I could just jump-in briefly,

7 Your Honor, to respond to your question concerning good faith.

8 First, Your Honor, and this echoes some comments that Mr.

9 Kurtz made, you're exactly right.  Good faith comes up in

10 different context in the bankruptcy code.  Under 363(m) of the

11 code parties seek findings that purchasers were -- that made

12 the purchase in good faith to bullet proof the purchase in the

13 event of appeal; that's not what we're talking about here.

14          Under 1129(a) of the Bankruptcy Code, in order to

15 confirm a plan, the court needs to find that the plan was

16 proposed by the proponents of the plan in good faith.

17 Similarly, we're not talking about that here and we were very

18 express, by the way, about that in the proposed form of order

19 in support of the RSA.

20          What we are talking about here is exactly what Mr.

21 Kurtz eluded to and that's the business judgment rule.  The

22 good faith finding goes hand and glove with the business

23 judgment determination of this court.  As the court is aware

24 the business judgment rule entitles the debtor to the

25 presumption that they acted on an informed basis and in good

1  faith.

2           The business judgment rule, and I don't mean to

3  raise the argument at this point in today's proceeding

4  concerning entire fairness versus business judgment, we will

5  get to that when we get to the argument on the RSA, but if we

6  were to assume that the business judgment rule, that judicial

7  presumption applies to today's proceeding, it suggests that if

8  the debtors are entitled to that business judgment and the

9  court isn't able to approve the RSA as a result of the

10 debtor's discharge of their fiduciary duties and adherence to

11 the business judgment rule the debtors are entitled to the

12 presumption that they acted on an informed basis and in good

13 faith.

14          Whether that means, Your Honor, that you have to

15 enter a separate ruling in connection with the RSA order that

16 all of the parties to the RSA acted in good faith, from the

17 debtors' position I don't think that is necessary.  What is

18 necessary is for the court to conclude that the business

19 judgment rule applies and that it was within the debtor's

20 business judgment to enter into the RSA.  And with that

21 follows the informed basis and the good faith of the

22 transaction.

23          MR. SCHIAVONI:  Your Honor, if I could be heard for

24 Century.

25          THE COURT:  Not yet.

1    MR. KURTZ:  Your Honor, I will say that I haven't

2    quite completed and maybe we should turn it over after I have

3    addressed a couple of points.

4    THE COURT:  Yeah, I'm not ready to hear from

5    anybody else yet.  So if the business judgment standard, as

6    it's applied in the Court of Chancery, means that there's a

7    presumption that the board acted on an informed basis and in

8    good faith what does that mean?  So if I am in the court -- if

9    I were a chancellor and someone were questioning the debtor's

10   business judgment what would the good faith mean there?  What

11   would that entitle parties to be able to challenge and what

12   would they be entitled to discover?

13   MR. KURTZ:  Your Honor, let me -- I can answer

14   that.  So in Chancery Court, which is really the most

15   developed body of law with respect to these concepts,

16   obviously, the (indiscernible) looks to it.  You just have to

17   identify a valid business justification for the steps you are

18   taking and then you were entitled to very broad protections of

19   the business judgement rule.  Practitioners will all say that

20   if you lose the challenger losers when its business judgment,

21   which is why everybody tries so hard to move it into entire

22   fairness.

23   The -- what the court's look at is process and

24   terms, price and process.  And so long as there is a valid or

25   diligent process, which here actually is a mediation, it's a

1  little bit different then a normal M&A, and you have fair

2  terms then they, sort of, it's taken together.  So the better

3  the process the less you need terms, the better the terms the

4  less you need process.

5           So here you have got deal terms that are before the

6  court.  I know this challenge is by the insurer, that's not

7  appropriate for today, they are really confirmation issues

8  about insurance neutrality and some other matters, and they

9  will be able to raise them.  They are either right or wrong

10  about that.  Obviously, we think they're wrong about it.

11          Really, the whole notion of challenging these

12  things is because its delude of potentially to

13  (indiscernible).  So, normally, that stockholder here is the

14  estate.  The notion is did you do something that took value

15  from the estate or the stockholders and transferred it to

16  another party.  That is just not the model here which is why

17  it's such -- it doesn't fit because here it's the parties that

18  are saying I don't want you to have bigger recoveries to the

19  estate because I'm paying for them.

20          Now they're complaining if anything the insurers

21  are sort of like the unsuccessful bidder that never has --

22  they don't have standing and they don't ever succeed,

23  obviously, when they challenge these cases in Chancery Court.

24  So I think the good faith is just you hear what the directors

25  relied on.  I think the fact of the mediation, most courts

1  draw some comfort that that made it even more (indiscernible)

2  then if it didn't have that kind of professional oversite, but

3  Your Honor will decide what you think is appropriate to rely

4  on.

5          It's not a preclusion issue.  It's a matter of

6  whether you believe that the debtors have submitted enough

7  evidence to demonstrate a valid business justification for the

8  transaction such as to be entitled to the protection of the

9  business judgment rule.

10          THE COURT:  Another difference from the Court of

11  Chancery is that the debtor is seeking may approval in

12  advance, in essence.  The debtor has to seek my approval.  The

13  code requires it, the bankruptcy code requires it.  When the

14  board is sitting in the board room making decisions about some

15  merger or some other action no court is going to bless that

16  before somebody challenges it.  We're in a different context.

17          So I have always had difficulty fitting the

18  business judgment rule into the correct context of bankruptcy

19  court where I am required to approve something, but your point

20  is that it's a process and terms.

21          MR. KURTZ:  Right.  And Your Honor makes an

22  excellent point.  You have a role, you have a bigger role then

23  the Chancery Court has because you have a role in protecting

24  the estate as well, but I don't think it changes the

25  substance.  I think it changes the timing.  So you get in

1  early and you get to determine whether anything is being

2  diverted in a way that harms the interest of the estate.

3  Whether that happens at this preliminary stage where we're

4  getting approval or seeking approval of the RSA or at the

5  final stage when it's a confirmation issue.  It still raises

6  exactly the same policies and exactly the same standards, and

7  that is really just to make sure that there is no leakage

8  here, inappropriate leakage.

9          There is a wide band of discretion on that as well.

10 You don't have to have the top dollar, you can consider things

11 like the consummation risk and other matters.  That is a broad

12 range for the directors to run their company, but what you

13 never have is the idea that your insurance policies are

14 unhappy.  They may have to pay something because that never

15 harms the stakeholder, that doesn't harm the stockholders in a

16 merger and that doesn't harm the estate here, any of the

17 creditors including themselves in that capacity.

18         THE COURT:  You're running a little further then I

19 think is appropriate on this.  I will note also that I've got

20 claimants who are objecting to the RSA.  So plaintiffs in

21 underlying lawsuits that are objecting.

22         Okay.  You had some -- I've gotten us off a little

23 track.  You've got something further with respect to the

24 discovery issues?

25         MR. KURTZ:  Right.  I will just be brief.  So two

1  last points.  One is on the privilege log.  So we provided a

2  categorical privilege log on, I think, July 9th, so more than

3  a month ago.  And so waiting to the week of the hearing, a

4  month after the fact we think is too much delay and, again,

5  we're a little worried about what that is about.

6         In terms of what a categorical log is I'm surprised

7  to hear counsel say he's never seen one.  We have then all the

8  time in cases I'm involved in.  It relates to privilege

9  because all you're looking for in a log is the ability to

10  challenge it.  We gave our position on mediation.  They can

11  challenge it at any point in time.  They finally have

12  challenged it.  It has nothing to do with the categories.

13         We did give them a line by line item log when they

14  specified their concern on TDP's.  So they do have that, but

15  they have not only waited more than a month, but they have

16  everything they need.  They say they should get the proposals

17  back and forth.  Those are mediation proposals.  They don't

18  get them.  They don't need the burden of pages and pages of

19  each document to know whether that is privileged or not.  So

20  we think they waited too long.

21         The last thing I want to say is just something

22  maybe kind of practical which is Your Honor is being asked,

23  effectively, to deal with competing interests here.  The

24  debtor's interests are in providing you with a complete

25  evidentiary record so that you can consider this milestone

1  agreement and event in the bankruptcy case.  That is, you

2  know, we think a pretty important interest.  The law is that

3  courts prefer to resolve matters on the merits as opposed to

4  through preclusion orders or rather impediments to an

5  evidentiary showing for truth finding and the like.

6        The insurers' interests, they didn't really argue

7  and we haven't really addressed it today, but it's, in large

8  part, been about timing.  And I don't want to deminimize that.

9  I believe that when someone projects dates that they should

10  comply with them more or less.  And so I am not -- you know,

11  I'm not criticizing the criticism, but I think it's mitigated

12  because they're not court ordered schedules, they're not even

13  agreed to schedules, they were the debtor's best efforts to

14  project compliance with production.

15        The original schedule was based on a hearing date

16  that got moved by two weeks.  It's not unusual to miss

17  projected dates and expedited matters. It's especially not

18  unusual where there's privilege issues.  Here there has been,

19  what we think are, really clear violations of a mediation

20  order and 9019 in demanding mediation materials which kind of

21  created more burden and more complexity.

22        So ultimately, and they got all the information,

23  frankly, they got it in furthering advance of these hearings

24  and the proposed depositions then they were going to have

25  under the original schedule.  Originally we had completed our

1  production on July 12th and depositions started on July 14th,

2  two days later.  Here we completed our supplemental production

3  four days before the first proposed deposition.  Under the

4  original schedule our production was done on July 26th.  The

5  hearing was for July 29th, three days later here we completed

6  the supplemental production on August 1st which was eleven

7  days before the hearing.

8           So they actually got more time.  They got

9  everything.  And we think that when balancing the interest and

10  given the heavy standard on the sanction remedy of a

11  preclusion order that we would just ask that the court deny

12  the motion. I hope I answered all your questions.  If I

13  didn't, though, I'm certainly available now to do so.

14           THE COURT:  Thank you.  You know, I read the

15  debtor's papers about how parties were violating the mediation

16  order by their document productions and I have to say I am not

17  persuaded by that.  I don't think the parties who ask for

18  documents, unless they say give me the documents you supplied

19  in mediation, are -- I don't think general requests for

20  production violate my order or the rule.

21           There has to be some balance in mediation.  Judge

22  Carey said that, former Judge Carey said that in Tribune.

23  That is where I am struggling.  But to ask for documents,

24  generally, that are relevant, the fact that they may have been

25  produced in mediation doesn't make a party violate a mediation

1 order for asking for it.

2          I think it is incumbent upon the responding part to

3 raise the objection.  I don't know how one is supposed to

4 anticipate in advance that the general documents you're asking

5 for were only available, were only part of the mediation and

6 that there aren't documents in general categories that were

7 not part of the mediation.  So I am not buying that argument.

8          Okay.  Let me hear --

9          MR. KURTZ:  Your Honor, I appreciate that.  I won't

10 press that.  I will just note that I was relying more on the

11 back and forth afterwards where we were saying we can't give

12 you mediation proposals.  Courts sometimes have different

13 tolerances on mediation.  Maybe I am a little scarred by a

14 recent case in Alabama where the judge literally said he would

15 take a baseball bat to anybody who requested any kind of a

16 proposal, but I appreciate your comments and we will certainly

17 not press that point anymore.

18          THE COURT:  Okay.  Thank you.

19          Mr. Ruggeri, why haven't -- I understand you don't

20 have all the documents you want.  And I understand some of

21 them were redacted, but the debtors did then file the

22 supplemental declarations, which are pretty fulsome, and you

23 had an opportunity to take the depositions, at least, based on

24 -- and question them about statements in their declarations,

25 and perhaps still press for documents.  Why isn't -- you're a

1  good litigator, everyone on here is a good litigator, why

2  aren't you prepared?  Why can't you cross-examine these

3  witnesses?

4          MR. RUGGERI:  Your Honor, I can cross-examine these

5  witnesses.  I'm not going to say that I can't.  I did it in

6  the first round, I will do it this round two.

7          My point, though, is and what I made clear to

8  debtors is that the information is so lacking, and I do want

9  to draw the court's attention to something which is the

10  debtors produced 408 documents on August 2nd.  Of those 280

11  were fully redacted; every single one of the attachments that

12  went back and forth between and among the restructuring

13  support agreement parties was withheld.  Those were the

14  redactions.  Every single one of those was redacted.

15          So we're pressing the motion.  What I told them is

16  in view of the obvious gap here and absence of information,

17  and I will also say that right on the first page of the

18  recitals on the RSA motion, and then right on the first

19  finding in their revised proposed order, document 5769-2, page

20  three of eight, they require the court to find, determine and

21  conclude that the RSA parties have engaged in extensive arm's

22  length negotiations.  Then Paragraph (b), the RSA was

23  negotiated at arm's length, in good faith does not constitute

24  a solicitation of an acceptance or rejected plan and does not

25  violate Section 1125 of the Bankruptcy Code.

1          Look, I understand that Ms. Lauria believes that

2    the good faith or arm's length is, sort of, a tag along to a

3    business judgement finding, it's not. It doesn't need to be

4    made, but I will tell you that even accepting or arguing under

5    the lowest standard of business judgment how in the world can

6    anyone validate someone's business judgment or the court if we

7    don't and the court doesn't know what they considered, when

8    they considered, and what they didn't consider.  That is what

9    is being withheld from us.

10         We're not in a position to -- I can't cross-examine

11   on those issues, Judge, because I don't have the documents. I

12   don't know what they considered.  I don't know what they -- I

13   don't know when they considered.  I don't know what they

14   pushed back on.  If the court wants to see, I didn't say that

15   I've never seen a categorical log; we've all seen those.  If

16   we could put up the categorical log, I've never seen one like

17   this.

18         This is the categorical log I got.  So first page

19   mediation privilege, all I got is March 1st, 2021 to present.

20   Then I got a second page.  Then I got attorney/client and work

21   product, inception to present.  That is not a categorical log

22   in the courts where I litigate, Judge.  You know, you've got

23   to give more than that, but that is what we're facing.

24         No one delayed bringing anything.  They were

25   producing their documents until August 2nd.  We were trying to

1  participate in a mediation.  We made ourselves available from

2  the mediation on August 3rd.  We filed our motion the very

3  next day.  That is the opposite of delay, and I did it, Judge,

4  not to say that I can't cross-examine the witnesses, because I

5  can, I did it because with the findings that they're

6  requesting the court to make the record is not there, I can't

7  cross-examine on the back and forth to which I am not privy.

8  I can't -- I wasn't given the documents that are fair game as

9  the court told all of us, and the debtor told the court two

10  days later on July 29th he took the words to heart that it was

11  going to make a full production; it didn't.  It said it and it

12  didn't.

13        Minor point, I am a creditor, Hartford is a

14  creditor.  We're a holder of an indirect abuse claim.  We have

15  filed proofs of claim, there has been no objection to our

16  proof of claim filed to date.  So I don't think that is going

17  to turn the court on the ruling, but to the extent that the

18  court was interested in that issue.

19        We did cite a Delaware Chancery Court case,

20  Unitrin, it's in our brief.  What the court did there again,

21  because they were asking for a good faith finding the court

22  said, you know, fairness and labor you put those at issue,

23  fairness requires you to produce those communications.  That

24  is the way it sort of plays out here.  So they can't just say

25  there are throw-away requests in here.  They go to the core of

1  this.

2          Is my antenna up about how these things can be used

3  against me; of course it is, of course it is.  It's not proper

4  though to insist that the court make, you know, all of these

5  very findings about good faith, arm's length, extensive

6  negotiations, and then tell me and the court we're not going

7  to show you what we negotiated or what went down.  That is the

8  crux of the issue, Judge.

9          THE COURT:  And which is the case that you cited,

10  the Chancery Court case?

11          MR. RUGGERI:  The Unitrin case.  Bear with me one

12  second, Judge, it is an oldie but a goodie; 1994 Westlaw 507

13  859, Delaware Chancery Court September 7th, 1994.  We studied

14  all their cases outside of Chancery Court including the

15  (indiscernible) case, but that was specifically from the

16  Delaware Chancery Court which made it clear you can't use

17  privilege, even mediation privilege as a (indiscernible)

18  issue.

19          Thank you, Your Honor.

20          THE COURT:  Thank you.

21          MR. SCHIAVONI:  Your Honor?

22          THE COURT:  Mr. Schiavoni?

23          MR. SCHIAVONI:  -- for Century, Your Honor.  Your

24  Honor, I won't duplicate anything Mr. Ruggeri had to say.  I

25  would like to just address your questions about the finding in

1  the standard and how those two tie together.

2      Your Honor, I would like to just start with the

3  basic point here and it should be underlined three times over.

4  You just heard the debtor say that they don't need a good

5  faith finding under 363.  I want to start with that point and

6  I want to end with that point because it really raises the

7  question about why this is being sought in the first place,

8  but, you know, we have provided the court with extensive

9  briefing on why we believe the business judgment standard

10  doesn't apply here.

11      I am not going to get into that now, but if the

12  business judgment standard applies the case law in Delaware

13  and out of the Delaware Chancery, and out of Delaware

14  Bankruptcy Courts is really crystal clear that the proponent

15  of applying the standard in the first instance of the business

16  judgment standard bears the burden of establishing that the

17  board complied with its duty of care and its critical to know,

18  in connection with whether or not the board complied with its

19  duty of care, what the board considered, how it informed

20  itself, and the deliberative process that the board underwent.

21      I tried several cases before former Chancellor

22  Strine.  It was always a pleasure.  An entertainment also, you

23  know, to argue before him.  I would say in each of those cases

24  he didn't even ask for briefs (indiscernible).  The very first

25  thing he would ask for is please submit to the court a set of

1  the board minutes and the board authorizing resolutions.  That

2  was the starting point, you know, to establish whether or not

3  the business judgement rule applied.

4         Chancellor Strine would review the board minutes. I

5  can't even imagine a case where I gave him -- where I would

6  hand-up board minutes that were entirely redacted or look at

7  them and tell them we don't have a resolution here authorizing

8  this act to show you.  It's all privileged, and that is

9  starkly the situation we have here.

10         You will not see a resolution that authorizes this

11  transaction, you won't see it.  It's what they've told us,

12  what the testimony was in the depositions was that the board

13  gave authorization for specific individual items to then be

14  pursued.  We don't have those.  That is critical to know what

15  they -- what specific items they approved.  And let me explain

16  why that it, why that is critical to know.

17         Why is it that they are seeking good faith findings

18  here, that they acknowledge that they don't need.  What we

19  have contended, Your Honor, as -- it's like there may -- it

20  may well be the case that there was arm's length negotiation

21  about what the Boy Scouts themselves were economically going

22  to contribute to this RSA, the dollar amount of what they were

23  going to put in.  They had an economic interest in that issue

24  obviously, whether it was, you know, one number or a higher

25  number.

1          They may have argued about that very extensively

2    for a better part of a year, but once they reached an

3    agreement with the coalition capping that, capping what their

4    economic contribution was they no longer had any economic

5    interest in what the claims were going -- what claims would be

6    allowed and what they would be allowed for, what the valuation

7    were.

8          Look, if it's not clear the whole case of

9    objections here is being driven by what we believe to be a

10   core deal that was fundamentally collusive.  It's not -- this

11   is not the first time the court has seen this particular kind

12   of group of plaintiffs act in this sort of way.  You have

13   before you the back and forth that's gone on in Imerys where

14   there was direct evidence, I think an admission that the

15   allowance and valuation procedures were turned over

16   exclusively to the tort claimants.  That is our belief on what

17   happened here because we weren't involved in it at all.  We

18   were excluded from all the meetings that concerned setting the

19   allowance and valuation proceedings.

20         So when you hear the debtor say that when the

21   business judgment standard applies you're to presume that the

22   board was informed and presume that they were -- that there is

23   good faith, that is not in line with the context of this case.

24   When these two parties went into a room together to finalize,

25   or prepare, or whatever one wants to call it, arrange a TDP to

1  set what claims would be allowed and how they were valued; the

2  debtor had no interest, no economic interest in the outcome of

3  that except whether or not it got an agreement on the cap on

4  the debtor's economic contribution.

5          Now we would say that in a coverage context and

6  other contexts that was collusion.  There's court cases on

7  this that, you know -- and by the way, a debtor, a party is

8  allowed to breach a contract.  They may have done that.  They

9  may have exercised their business judgment to bridge the

10  contract to get a deal on the debtor's assets, okay, but the

11  deal as far as whether that aspect of the deal agreeing on the

12  value and the allowance of the claims was in good faith.  It's

13  like it just couldn't be, it's like the case law on this is

14  really clear.  If the two parties are negotiating one doesn't

15  have an economic interest, they're not operating, you know, in

16  favor of their own interest, but whether or not --

17          THE COURT:  I'm not blessing the deal, Mr.

18  Schiavoni.  I think everybody should be clear on the fact that

19  I'm not blessing the deal, okay.  You're going to have all

20  your arguments, which I'm sure I'm going to hear again at

21  disclosure statement and then I'm going to hear if I approve a

22  disclosure statement at confirmation.  I am not, in any way,

23  at the conclusion of this hearing going to enter any order

24  that even suggests that I approve the deal, okay --

25          MR. SCHIAVONI:  Your Honor --

1          THE COURT:  -- which is why, I guess, I asked, in

2    part, what is this good faith finding about.  What could it

3    possibly mean in the context of this case.  I am not sure it

4    means anything, but I am not approving the deal.  And even --

5          MR. SCHIAVONI:  Your Honor, I'm going right --

6          THE COURT:  -- if I were to enter an order

7    permitting the debtor to go forward, which is, sort of, how I

8    view this, permitting the debtor to go forward to pursue this

9    plan I take Judge Glenn's statements to heart in ResCap where

10   he says something to the effect of but there's a lot of

11   challenges with respect to this plan.  There are a lot of

12   difficult issues with respect to this plan and I am not

13   approving any of them.

14          So that is the context of this hearing which I

15   think is much more limited, but go ahead, Mr. Schiavoni.

16          MR. SCHIAVONI:  I'm sorry to have interrupted Your

17   Honor, this video feed I have problems getting used to.

18          So, look, just to close out on the finding my point

19   is not what you are going to approve here or not, but this

20   finding is toxic.  I don't know how to put it, but it's toxic

21   to us.  It is what caused all of the discovery and the need

22   for it because they have said they don't need it.  The reason

23   they want it is to prejudice us in proceedings outside of this

24   court.  There is no other reason for it.

25          This is to draw a finding that they can waive in

1  front of a State Court and say, you see, a court found that

2  the negotiation of the TDP was at arm's length and it was in

3  good faith.  That is what they want it for.  You know, I think

4  the coalition in its papers that they submitted in support of

5  the RSA I think they're pretty clear in what they're seeking

6  and what they're trying to do.  They're saying now is the time

7  to bring out all insurance issues and we're going to try these

8  insurance issues in this case.  We're going to advocate at the

9  end of this that we don't think this good faith finding it

10  appropriate or necessary, and we'd ask that it not be made.

11        If I could just spend one minute on why this --

12  it's like Mr. Kurtz did, sort of, short thrift the importance

13  of the documents and I definitely like embrace my brother

14  Ruggeri's bravado that he can cross, he can cross anyone, but

15  the reason why we're at a significant disadvantage here is

16  that in Chancellery when the evidence that is presented to

17  establish in the first place that business judgment applies is

18  the evidence of you care and diligence.  It's the complete

19  board minutes so that you can -- these are the contemporaneous

20  documents that establish what the board considered, how they

21  deliberated and what they decided.

22        It's like what we're going to see happen here is

23  they're going to put on a witness who has never been deposed,

24  who only came in on reply and he's going to tell you that,

25  he's going to tell you what they deliberated about, what they

1  considered and what they resolved, but we won't have any of

2  the contemporaneous documents that establish that.  It's

3  remarkable that we don't have the enabling resolution or

4  minutes on what was established.  That, I think, all by itself

5  would knock out a business judgment ruling in chancery at the

6  start, but to hear it after the fact -- by the way, not from

7  somebody who was even at the negotiations, but this fellow,

8  Mr. Desi, they had to find a lawyer, you know, to testify

9  after the fact.  He is going to testify about this after the

10  fact when we'll have nothing to cross him on to present to the

11  court, well, here's what was done contemporaneously.

12         You got a preview of this already, Mr. Kurtz sort

13  of says, well, who cares about the fact that they didn't

14  actually authorize the RSA in its entirety, they just

15  authorized specific points, your points.  You want me to

16  cease, Your Honor, or you --

17         THE COURT:  I'm with you now.

18         MR. SCHIAVONI:  Okay.  It's like he, sort of,

19  glosses over the fact that he doesn't -- like who cares if the

20  board only authorized some specific point, but not the

21  agreement itself because -- and I'm sure that's what we'll

22  hear from Mr. Desi that all of a sudden (indiscernible) have

23  approved the agreement.  That is not what we heard when we

24  deposed Mr. Ownby, the chair.  He was like, no, there were

25  only specific points.

1          Your Honor, if we had those board minutes I'm sure

2    they would bear out our suspicion here that the points were

3    the dollar number that the Boy Scouts were going to contribute

4    and that there's nothing in there about setting TDP's that

5    have allowance procedures or valuation procedures that in any

6    way turn on what was realistic in the tort system; that's not

7    a deal point, that wouldn't be a deal point and we need to see

8    the resolutions to be able to cross on that.  Without them Mr.

9    Ruggeri will do a fine job asking questions, no doubt.  But he

10   won't have the benefit of having in front of him the

11   contemporaneous documents that show what actually was done and

12   there is nothing privileged about what the board actually

13   concluded.

14          THE COURT:  So let me ask you, Mr. Kurtz, were

15   there no board minutes and authorizations supplied?

16          MR. KURTZ:  That is not accurate, Your Honor.

17   There were board minutes that were supplied.  They -- there is

18   a number of them.  There was an agreement to recommend to the

19   board from the committee; that was, I think, on May 25th.

20   Then on June 5th is where the deal terms were approved by the

21   national executive board and that was supplied as well.

22          THE COURT:  Is there no board resolution?

23          MR. SCHIAVONI:  Not the terms themselves.

24          THE COURT:  Is there no board resolution approving

25   the RSA?

1          MR. KURTZ:  No.  I don't believe, Your Honor, there

2   is actually a formal resolution.  What happened is they

3   authorized the committee members to document the deal terms

4   that had been proposed.

5          THE COURT:  That is a little unusual, isn't it?

6   Isn't it a little unusual that a board doesn't actually

7   authorize the actual agreement?

8          MR. KURTZ:  Well I think the testimony will be that

9   they authorized the deal terms, they delegated the

10  documentation to the professionals.  There were members of the

11  board that are attorneys that then commented on the

12  documentation and ultimately it was approved and put forward,

13  but, Your Honor, I don't know that it was the world's most

14  formal procedure in terms of documenting the approval, but you

15  got a yes vote from all 72 board members on these deal terms.

16         I would note that Mr. Schiavoni is saying he's

17  entitled to see what happens and what they considered.  He is

18  and he can ask that.  What he is not entitled to is the back

19  and forth in the mediation, but what the board actually looked

20  at, what they relied on he can ask those questions and they

21  will tell him exactly that information.

22         There is no decision -- I mean I've also tried

23  cases before former Supreme Court Justice Strine and I've

24  never seen him violate a mediation privilege.  I recently

25  tried a case, maybe it came up under him, Vice Chancellor

1  Laster, mediation was a core issue in a multi-billion dollar

2  case.  He didn't invade it at all.

3        So, right, in the normal case where you don't

4  mediate because you're just doing a deal, you don't mediate an

5  M&A sale, you run a process through an investment bank.  Of

6  course the minutes are produced.  But when you are resolving

7  litigation in a mediation that doesn't get produced, that

8  doesn't prevent the court from evaluating the appropriateness

9  of the terms and it has not prevented prior courts from

10  relying on the fact of mediation to draw some comfort on the

11  extensive good faith negotiations.

12        I get it, Mr. Schiavoni says the debtors have no

13  economic interest in TDP's.  The law demonstrates that there

14  was a back and forth.  Who came up with the precise number

15  doesn't really matter.  You will get -- you will have, when

16  the time comes, and Your Honor correctly pointed out now is

17  not the time, you will get evidence on how that was produced

18  in terms of actuaries and the like, people that determine

19  claim amounts.  That is not relevant to today.

20        Mr. Schiavoni says that the debtors don't have an

21  economic interest and, therefore, it's, by definition he said,

22  collusive or something along those lines.  That is his

23  argument.  That doesn't require invasion of the mediation

24  privilege.  He is saying it lacks economic interest

25  (indiscernible), but, you know, good luck with the argument.

1  There is, obviously, nothing collusive.

2          If Your Honor has any concern that anyone appearing

3  before you in your court is being collusive, again, I would be

4  happy to submit, in camera, for review because that is really

5  a pretty outrageous allegation to make against the

6  professionals and the clients involved in this case.

7          THE COURT:  Okay.

8          MR. SCHIAVONI:  Your Honor, if you look at this log

9  --

10          THE COURT:  I think I've heard enough on this.

11  Here is what we're going to do, as to this motion we're going

12  to go forward.  I am going to hear the testimony.  I will make

13  a determination as to what information I need to make the

14  rulings I need to make and only the rulings I need to make

15  with respect to approval of the RSA.

16          I will, as I hear the testimony, consider these

17  objections to discovery.  I am a little surprised that there

18  wasn't a board authorization of the RSA especially given the

19  lawyer heavy consensus that the Boy Scouts seem to have on

20  many of these boards.  Grant it, they're not acting in their

21  lawyer capacity, necessarily, but it seems to be somewhat

22  lawyer heavy.  So I am a little surprised, but I'm going to

23  permit it to go forward and we will see what testimony we get

24  and we will see whether the debtor is able without an

25  authorization to convince me that they have met the business

1  judgment standard or they're entitled to business judgment

2  standard, and they have made informed decisions, and they've

3  made decisions.  So we're going to do that.

4         I will say with respect to mediation privilege this

5  is really the first case that I have had this issue come up.

6  Its, I think, a little perplexing.  There is no question that

7  mediation is an important process and we use it in bankruptcy

8  not infrequently to come to consensual resolutions of cases.

9  But being able to cloak everything in mediation privilege I am

10 finding difficult.

11         I think it is or it could play out differently in

12 different contexts as to whether a debtor can meet its burden

13 or not depending on how much its shielding and how much its

14 relying on that privilege.  So I will be thinking about this

15 and mediation privilege because it seems to be people arguing

16 almost an all or nothing concept; send us to mediation and let

17 us cloak everything in privilege or no mediation and then

18 perhaps no consensual resolution.  Neither of those seem

19 appropriate.  There seems to be something in between that.

20         So for purposes of today I am going to permit it to

21 go forward and if I feel after I've heard the testimony that

22 parties seeking discovery were to prejudge I will deal with

23 that.

24         I want to take five minutes so I make sure I have

25 the document in front of me that I don't have before we

1  continue again.  So we're in recess for five minutes.

2          MR. ABBOTT:  Your Honor, may I be heard quickly

3  before that?

4          THE COURT:  Mr. Abbott?

5          MR. ABBOTT:  Thank you, Your Honor. I think Your

6  Honor has now effectively ruled on item number 6.  7 and 10

7  are slightly different issues.  It wasn't clear to me whether

8  Your Honor was just going to get to the merits of number one

9  or wanted to hear 7 and 10 when the court returns.

10          MR. SCHIAVONI:  We could be heard briefly on 7,

11  Your Honor, or 10, maybe it's 10.

12          THE COURT:  Yeah, the Hartford --

13          MR. ABBOTT:  7 is the coalition's motion and 10 is

14  the insurers' motion.

15          THE COURT:  I will hear both of those, but from the

16  coalition's motion my understanding is Hartford isn't going to

17  put on a case on the merits of the Hartford agreement.  So I'm

18  not sure what we're arguing about, but, yeah, I will hear

19  briefly on both of those when we get back.  Thank you.

20          MR. ABBOTT:  Thank you, Your Honor.

21      (Recess taken at 11:52 a.m.)

22      (Proceedings resumed at 12:02 p.m.)

23          THE COURT:  Okay, counsel, this is Judge

24  Silverstein.  We're back on the record.

25          MR. ABBOTT:  Thank you, Your Honor.  I think that

1  leaves us at number 7 which is the coalition motion.  So I

2  will cede the podium to, I believe, Mr. Goodman.

3          MR. GOODMAN:  Thank you very much.  Good afternoon,

4  Your Honor.

5          If Hartford and the other insurers do not intend on

6  asking any questions or eliciting testimony regarding the

7  reasonableness of the Hartford settlement then our motion is

8  moot.  I don't know if they have committed themselves to that.

9  This came up at the deposition which is why we filed our

10  motion.

11          Your Honor, it's hard for us as litigants and the

12  court to evaluate an opinion when we don't know what it is

13  based on.  I asked Mr. Kenny if he thought the Hartford

14  settlement was reasonable.  Mr. Kenny, Hartford's vice

15  president, clearly loves the Hartford settlement.  The

16  Hartford settlement is a great deal for Hartford, that's not

17  in dispute.  But when I asked Mr. Kenny what his opinion was

18  based on he claimed privilege.

19          Hartford and the debtors --

20          THE COURT:  It seems to be what we do in this case,

21  right?

22          Okay.  Go ahead.

23          MR. GOODMAN:  Hartford and the debtors would not

24  have signed the Hartford settlement if they both thought it

25  was a terrible idea.  I thought it was a terrible idea, but I

1  couldn't the witnesses today will say they made a mistake.

2  But the question is, what to do with that testimony today.  Is

3  it even relevant to the RSA, and if it is relevant, and

4  Hartford seems to think it is, should it be considered?

5          If we don't have the information necessary to

6  evaluate, lay opinion testimony, should the Court consider it?

7          Bates White, the debtors' economic consultant is

8  not here today, neither is NERA Economic Consulting,

9  Hartford's advisor.  You won't hear from witnesses that are

10  experts in evaluating abuse claims.  No psychologists are on

11  deck to testify.

12          What may be offered, instead, would be opinions

13  from people that they've reviewed reports created by others.

14  We don't have those reports.  We don't have all the data that

15  those reports are based on and it's not for lack of effort,

16  Your Honor.

17          Just after the debtors announced their settlement

18  with Hartford, we served discovery.  By "we," I mean, the

19  coalition, the TCC, and the FCR, together.  We served three

20  parties:  Hartford, Century, and the debtors.  We knew that if

21  the day ever came that the Hartford settlement was before this

22  Court, we had to be ready to oppose it.

23          Hartford produced nothing.  They won't produce any

24  documents.  They refuse to answer even basic questions at

25  deposition.

1          Century was actually worst.  First, Century said we
2   need 30 days to respond, then they said they would produce
3   something.  Then they gave us several bankers boxes that
4   included the publicly filed financial statements that they
5   knew we already had.  When we asked for additional production,
6   they refused.  Century apparently gave some financial
7   information to the mediators, but Century has taken the
8   position that this means that their financial information is
9   now privileged and can't be produced.

10          We have also filed two letters with the Court at
11  Docket 5057 and 5835, requesting an order compelling Century
12  to produce the requested information.

13          The debtors have produced some, but not all of the
14  settlement data.  We have several years' worth, but not all of
15  it.  To be clear, we do have our own settlement data; we don't
16  dispute that.  We have also reached conclusions regarding the
17  Hartford settlement, based on that information, and we think
18  the Hartford settlement is well outside the range of
19  reasonableness.  But the information that has been withheld
20  creates a problem when it comes to assessing the opinion
21  testimony that may be offered today and tomorrow.

22          There are two blacks boxes regarding the Hartford
23  settlement that I want to talk about.  The first black box to
24  Century, no one knows what the Hartford settlement is worth.
25  Hartford has not agreed to pay anything.  The $650 million

1  referenced in the Hartford settlement is not what Hartford has

2  agreed or even offered to pay.  The $650 million is simply a

3  negotiated cap on Hartford's liability.

4          There's a clause in the Hartford settlement at

5  paragraph 2(e) and it says that if Century settles for less

6  than $1.3 billion, the Hartford number goes down.  Hartford

7  says, if Century pays less, then we pay less.  But if Century

8  gets pegged with a twenty-billion-dollar judgment, then we

9  only pay $650 million.  Heads, I win; tails, you lose.

10          Hartford could pay nothing.  It depends on Century.

11  But the rabbit hole actually gets deeper.  Century is in

12  what's called runoff.  Century is not an active insurance

13  company.  We can't tell from Century's publicly available

14  financial information if Century even has $1.3 billion in

15  available assets.  You are welcome to ask Mr. Schiavoni the

16  question, but I don't think he will tell you that Century has

17  the ability to pay $1.3 billion, which leads me to my next

18  point.

19          We don't think Century, alone, is liable here.

20  It's Chubb.  The twenty-billion-dollar elephant in the room is

21  Chubb.  Mr. Schiavoni represents Chubb.  Chubb is the largest

22  publicly traded property and casualty insurance company in the

23  world.  It's time everyone here gets comfortable with the fact

24  that they are in the room and have been for long time.

25          The insurance policies we're talking about were

 1 | issued by a company called IMA.  Back in the 1990s --

 2 |         THE COURT:  Mr. Goodman --

 3 |         MR. GOODMAN:  -- IMA and its subsidiaries underwent

 4 | a restructuring --

 5 |         THE COURT:  Mr. Goodman --

 6 |         MR. GOODMAN:  -- and purported to assign IMA's

 7 | liabilities to Century.  The Boy Scouts didn't consent to

 8 | this.  IMA is an active insurer and a subsidiary of Chubb.

 9 |         Now, Century and Chubb could give us the

10 | information --

11 |         THE COURT:  Mr. Goodman --

12 |         MR. GOODMAN:  -- that we've within requesting for

13 | months.

14 |         THE COURT:  Mr. Goodman --

15 |         MR. GOODMAN:  Yes, Your Honor?

16 |         THE COURT:  -- why is all this relevant?  Why am I

17 | hearing all this?

18 |         I have read the papers.  I understand that Chubb is

19 | out there.  I understand there's going to be an issue there.

20 | I understand all that.

21 |         What's it relevant to today?

22 |         MR. GOODMAN:  It's a gating issue, Your Honor, to

23 | the Hartford settlement.  We don't know if the Hartford

24 | settlement actually means anything.

25 |         THE COURT:  Okay.  So, the Hartford settlement --

1        MR. GOODMAN:  It's illusory from that standpoint.

2        THE COURT:  The Hartford settlement is not in front

3  of me today in terms of its merits, so what does it have to do

4  with today?

5        MR. GOODMAN:  Well, again, Your Honor, I don't

6  think the Court can or should credit testimony from anyone

7  that says the Hartford settlement is reasonable when no one

8  has any idea what Hartford will pay if it's approved.

9        Now, if that testimony isn't going to be offered or

10  elicited, then you're right.  As I said at the outset, if no

11  one is going to go there with their questioning, then this

12  motion is moot.

13        THE COURT:  The argument that I understand that

14  Hartford has today is that it has a binding agreement with the

15  debtors that the debtors are not performing.  And the debtors

16  tell me it's one or the other; the agreements are mutually

17  exclusive and that's what I have to deal with today.

18        But the merits of the Hartford settlement, as I

19  understand it, are not in front of me today, so let's find out

20  if that's the case.

21        Who's representing Hartford on this one?  Am I back

22  to you, Mr. Ruggeri?

23        MR. RUGGERI:  Back to me, Your Honor.  I thought I

24  was clear.  I wasn't asleep, but I was close when I responded

25  on August 5th at nearly eleven o'clock at night.  My email is

1  pretty darn clear.  The Court is exactly right what's before

2  the Court today and tomorrow was not before the Court today

3  and tomorrow.

4          There is no motion to approve the Hartford

5  settlement.  We are not going to elicit testimony on

6  reasonableness of the Hartford settlement.

7          I will say, just for the record, and we don't need

8  do get into it because it kind of went off on a tangent, Mr.

9  Goodman's recitation of the transcript and what happened is

10  entirely incorrect, but you don't want to hear that.  We can

11  deal with that if we have to, at the appropriate time.

12          You're exactly right in terms of what's before,

13  what's not before.  I said I could cross anyone.  I'd like to

14  think I can, but I really didn't have much of an opposition on

15  this one because the Court's right; we're not seeking to ask

16  the Court to approve the Hartford settlement or to argue its

17  reasonableness today or tomorrow.

18          Thank you, Judge.

19          THE COURT:  Thank you.

20          Are we good, Mr. Goodman?

21          MR. GOODMAN:  I am.  Nothing further, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          Okay.  Item 10, Mr. Schiavoni?

24          MR. SCHIAVONI:  I apologize, I had the mute on.

25          Your Honor, this *motion in limine* is directed at

1  the specific area of relief that's sought as part of the

2  motion to approve the RSA.  It's directed at the request to

3  pay the coalition $10 million and then $950,000 on a monthly

4  basis.

5          We served discovery requests, requests for

6  production on Brown Rudnick, as well as on the debtor that's,

7  you know, sought -- that's propounded multiple requests

8  directed specifically at the coalition/Brown Rudnick's demand

9  for payment of fees.  It was served on May 14th on Brown

10 Rudnick and a set was served around then on the debtor and

11 another set on July 3rd.

12         We propound specific requests, 1 through 3, for

13 instance, on Brown Rudnick.  We specifically asked for all

14 documents concerning the demand to be paid their paid fees,

15 whether in connection with these various demands made, in

16 connection with the plan and the TDPs.

17         We received, in response to that from Brown

18 Rudnick, a blanket objection not producing anything.  The

19 Brown Rudnick subpoena response asserts, as well as in the

20 multiple meet-and-confers that followed, that absolutely

21 everything that they have that they've exchanged with adverse

22 parties, whether in the mediation or otherwise, is privileged.

23         And the debtor, you know, largely gave us the same

24 response with regard to communications that had anything to do

25 with this request demand for monies to be paid to the state

1  court lawyers or to reimburse or pay Brown Rudnick.  It's an

2  absolute assertion of privilege.

3          And, you know, I use mediation all the time.  I use

4  it in bankruptcy.  You know, I'm a big proponent of it, but,

5  you know, to be clear, you have to look at everything in the

6  context of what happened here, not unlike in Imerys.  You

7  know, the negotiations took place between the debtor and the

8  claimants and there was this driving matter, we believe the

9  discovery would show if we had access to it, that a trade-off

10  was made about what the debtor contributed in exchange for a

11  free pad to draft an extraordinarily onerous and unrealistic

12  allowance procedures and valuation procedures.

13          And that would be a breach under our contract to do

14  that.  The only way we could achieve that is to go on and

15  continue the case, get a mandatory order imposing

16  confidentiality over all the meetings and discussions between

17  the coalition and the debtor, and then keep all of that

18  evidence from ever seeing the light of day.

19          And we think that's what happened.  I mean, we've

20  been very clear throughout these proceedings that we were,

21  although, you know, I was invited to sessions and sat on

22  different floors and I was fed, you know, at different breaks.

23  We were excluded from all the meetings between the debtor and

24  the coalition.  We didn't get any drafts of the TDPs and, you

25  know, we think what went on there was, really, not right.

1          But this demand for fees is a very specific request

2    on the *in limine*.  We think it tainted the discussions

3    throughout that there were, you know, demands for a *quid pro*

4    *quo* of paying the fees in connection with doing a deal.  And

5    it's black and white, that Brown Rudnick refused to produce

6    anything.  The debtor refused to produce any communications

7    with the claimants about those requests for fees.

8          As far as, you know, how we're entitled to this,

9    you know, we have argued that 503 applies here, substantial

10   contribution, and not 363.  But whether or not 363 or 503

11   apply, the proponent of a request for fees still carries the

12   burden.  And even if it's under a 363 standard, you know, and

13   even if the standard applies of business judgment, they still

14   have to make out the basic elements of proof that the Board

15   acted in due care, that they followed all procedures, that

16   they were diligent in what they reviewed.

17         And we asked for production of the documents they

18   got concerning the request for fees, the schedules, you know,

19   if there were any schedules or other documents that showed

20   what they considered and reviewed.  One would have thought

21   they would ask for time reports or time summaries or time

22   projections, all that sort of thing, to make some sort of

23   reasoned judgment.  One would have thought there would be

24   board minutes discussing the propriety of paying these kinds

25   of fees, especially in the context of this particular odd

1  instance where the deal, itself, the contract is one not with

2  the claimants, but with the lawyers who were asked to make

3  simultaneously, a recommendation of advice to their client.

4  And I'm not -- we'll save those arguments for later.

5           But, you know, we put before the Court the

6  decisions in Combustion Engineering and in Congoleum, where

7  courts found there were serious legal issues about paying a

8  lawyer to sign a contract to make a make a recommendation.

9  One would have thought they would be deliberative to have

10 (indiscernible) about this.  One would think there'd be a

11 resolution, you know, making the decision authorizing it.

12          Nothing.  It's like there's one four-word reference

13 to somehow this issue coming up in one of the board minutes

14 and that's it.  So, we don't have anything from the coalition

15 -- blank slate.

16          And, by the way, not just on this, but anything; no

17 termsheets, no production of, you know, even drafts of the

18 plan.  Absolutely nothing.

19          Mr. Goodman's position is everything they have done

20 is entirely subject to mediation privilege.  Convenient,

21 because we think, yes, that is (indiscernible) from what we

22 think would be evidence of what went on.

23          As far as, then, what the -- and those requests

24 that are attached, it's 8 and 9 and 18 and 19 of the debtors'

25 request -- of the request of the debtors, 1 through 3.  To

1  Brown Rudnick, it's Exhibit G and H is the response from the

2  coalition and the debtors to our supporting declaration.

3        The case law on this is a case that's really

4  directly on point.  It's not a circuit case, but the facts are

5  directly on point.  Royal Park v Deutsche, a Southern District

6  of New York case -- that's WL9802844 -- where it talks about

7  how distorted, really, a hearing would be if a party was able

8  to withhold all document concerning a matter and then later

9  sort of present testimony at hearing how both, inefficient

10  that is, how abusive it is to the process, about how you're

11  just sort of not able to do contemporaneous sort of, like,

12  cross without the contemporaneous documents.

13        What's, I think even a little bit more startling

14  about this, and, again, you know, Mr. Ruggeri's argument to

15  this motion, it covered a lot of things, so it's hard to sort

16  of grasp what's really going on here, but here, the only proof

17  they offer was that this very cursory declaration on the

18  moving papers from Mr. Whittman saying, basically, he sort of

19  thought the coalition was helpful in doing a settlement.

20        Then, on reply, after they had sort of seen what

21  the objection was, he puts in a little bit more robust where

22  he says, well, they gave one or two, you know, they gave some

23  documents here or there.  Of course, those documents were not

24  -- it's like they gave some documents on their claims; mind

25  you, that's the coalition's own claims, but those documents

1  weren't produced.

2          What's really important here is when we questioned

3  Mr. Whittman at his deposition, we asked him basic questions

4  like -- let me just read you one.  It's Exhibit J in our

5  declaration, but it's 125, 9 through 16 to Mr. Whittman's

6  deposition.  We asked:

7          "Focusing on the monthly go-forward fee, which I

8  think is 950, up to 950 a month, how did the debtors and the

9  coalition come to agree on that number and then

10  (indiscernible)?

11          " Objection, to the extent it requires you to

12  disclose any mediation privilege information.

13          If you can answer, go ahead.

14          "I cannot."

15          And then he's asked again.  He's asked about the

16  ten-million-dollar number.

17          Again, direction not to answer.  It's 127, 6

18  through 11.  Same instruction, no answer.

19          Again -- and these are quoted in our papers.  I

20  won't go through all of them -- he's asked, What did they do

21  to review -- this is Mr. Whittman -- what did he do?

22          It's like he just -- you know, he put in his

23  declaration saying, oh, this is reasonable.  What did you do

24  to review documents or invoices to ascertain their

25  reasonableness?

1        Directed not to answer, 162, line 21, and then it

2   carries on to the next page.

3        Now, there's another direction that, you know,

4   where he was asked, Did the coalition provide documentation to

5   the debtors to support their request?

6        They were directed not to answer.

7        Now, when we -- and that's 128, line 9 through 16 -

8   - we engaged in this process.  To Mister (indiscernible), we

9   said, look, it's like you're now proposing to put up

10  witnesses, but we don't have the documents.  And you know, his

11  view is sort of like, you can question the witnesses and maybe

12  we'll supplement.

13       What he did was he got back to us with a letter

14  where he told us directions he would drop, and here, we

15  attached that letter to our brief.  It's Exhibit K, I think,

16  here, and it withdraws certain directions.

17       They withdraw the direction to Mr. Whittman about,

18  you know, was the coalition, did they provide documents to the

19  debtors to support their request?

20       That's withdrawn, but the documents, themselves,

21  weren't produced, okay.  And they didn't withdraw the other

22  directions not to answer.

23       So, yeah, I can hear them say, well, like, we

24  should have gone ahead with more depositions of Mr. Whittman,

25  but what would we have been left with?

1          It's like they didn't produce the documents and

2    they stood on the directions not to answer on the

3    deliberations.  So, you know, will be hear later today from

4    Mr. Whittman, I'm sure, in particular, that all the different

5    ways he thinks, maybe after the fact, the coalition might be

6    helpful?

7          We could hear that, but we don't have any of the

8    documents that they actually exchanged at the time and that's

9    really critical here because the Court, in essence, has before

10   it the quid, but it doesn't have the pro quo, on how these

11   fees were demanded and what they were in connection with.  And

12   it doesn't have if we're right and the substantial

13   contribution standard applies, it doesn't have any evidence at

14   all that suggests that any of these fees, whatsoever, were

15   incurred in connection with an activity that wasn't just to

16   advance the coalition's own interests.

17         And those documents are really critical, you know,

18   to any evaluation of this issue at all, especially when in the

19   context of this, we asked Mr. Mosby at his deposition and Mr.

20   Ownby about this fee demand.

21         And, look, I got it that perhaps the dollar number

22   here seems to, like, be the tail wagging the dog where we have

23   people like Mr. Goodman going around saying that there's,

24   whatever he said today, that there's a ten-million or hundred-

25   million-dollar obligation here, but it isn't a tail wagging

1  the dog on how the deal came about and that demands were made

2  and what *quid pro quos* were made.  It has some real importance

3  there and the facts of it really go directly to the

4  substantial contributions standard.

5          But Mr. Ownby, he couldn't answer basic questions

6  about even who came up with the idea to propose these fees.

7  That's 118, 10 through 13 of his deposition.

8          And Mr. Mosby distanced himself entirely from the

9  entire issue, saying that he couldn't think of any analysis

10  they had done or, you know, things that they had reviewed.

11  That's 228, 8 through 17.

12          So, Your Honor, we don't think it's fair or they

13  should be permitted to now put on evidence through Mr.

14  Whittman about something about what the coalition allegedly

15  did to justify these fees when they withheld, essentially,

16  everything and most particularly, the communications that went

17  back and forth and whatever authorizing board minutes there is

18  that authorizes these, which we have yet to see.

19          Thank you, Your Honor.

20          THE COURT:  Thank you.

21          Who's responding?

22          MR. GOODMAN:  Your Honor, I'll take the first shot

23  at trying to respond to this one.

24          THE COURT:  Mr. Goodman?

25          MR. GOODMAN:  Mr. Schiavoni told us two months ago

1 that what he was really after were the draft termsheets and

2 the draft of the RSA.  Those are the communications that he's

3 been seeking.  Century's counsel sent a subpoena to my law

4 firm, Brown Rudnick.  The subpoena sought draft termsheets and

5 drafts of the RSA.

6          No deal had been reached at the time that we

7 reached that subpoena.  We were in the middle of mediation; in

8 fact, he went to the mediators.  The mediators informed us

9 that the drafts were privileged, that we should continue with

10 the mediation, and try to reach an agreement.  That (audio

11 interference) did.

12          We did not produce the termsheets marked as

13 mediation privilege because we couldn't do so.  The drafts of

14 the termsheet do not exist independent of the mediation.

15          THE COURT:  Okay.  That's --

16          MR. GOODMAN:  They were settled and proposals

17 exchanged.

18          THE COURT:  Okay.  But I don't --

19          MR. GOODMAN:  I'm sorry, Your Honor.

20          THE COURT:  That's not what I heard Mr. Schiavoni

21 asking for right here.  Here, what I heard him talking about

22 was Mr. Whittman's declaration, I mean his deposition, in

23 which he was instructed not to answer particular questions,

24 documents provided to the debtors so they could make a

25 determination with respect to the reasonableness of what I

1  assume was a request from the coalition for fees, about the

2  bills appeared the invoices, and any authorizing minutes.

3  That's what I'm hearing him talk about, not termsheets, not

4  stuff going back, but what happened recently and the

5  particulars of the RSA.

6            So, what about those issues?

7            MR. GOODMAN:  Okay.  Well, to level set, Your

8  Honor, we have not provided our invoices or our bills to the

9  debtors.

10            THE COURT:  Oh.

11            MR. GOODMAN:  We don't have them.

12            THE COURT:  Okay.

13            MR. GOODMAN:  Under the RSA -- I want that to be

14  very clear -- under the RSA, for the period preceding the

15  Court's approval, which I hope we obtain, of the RSA, we're

16  entitled to our documented and reasonable fees up to $10.5

17  million.  The debtors are not required to pay $10.5 million

18  unless our documented and reasonable fees are at or exceed

19  $10.5 million.  We have not substantiated our entitlement to

20  $10.5 million yet.

21            If our documented --

22            THE COURT:  So, how did you come up with a number?

23  How could anyone negotiate around a number when they don't ebb

24  know what anything is?

25            Go ahead.

 1          MR. GOODMAN:  Again, Your Honor, it would be a cap.

 2 So, if our documented and reasonable fees are below, we come

 3 in under budget, then we would be paid in full.  If the

 4 documented fees were, say, $11 million, then we're capped; we

 5 only get 10.5.

 6          The RSA requires the debtors to pay the documented

 7 reasonable fees up to a capped amount.  We don't just get

 8 $10.5 million.  Let me say that again.

 9          THE COURT:  I understand that.

10          MR. GOODMAN:  The approval of the RSA --

11          THE COURT:  I understand that.  I don't need an

12 explanation of that.

13          MR. GOODMAN:  Right.

14          THE COURT:  Okay.  We know the debtors got no

15 information from the coalition with respect to fees and

16 negotiated a number in the absence of any knowledge of that.

17 That's what you're telling me.

18          MR. GOODMAN:  I'm saying that they negotiated a cap

19 saying, we will agree to pay reimbursement, but only up to a

20 certain dollar amount.  If you go over, that's too bad.

21          THE COURT:  Okay.

22          MR. GOODMAN:  If you're under, then it can be paid

23 if they're reasonable, Your Honor.

24          THE COURT:  Okay.

25          MR. GOODMAN:  And, again, on a go-forward basis, I

1  think the arrangement is the same.  I think the nine hundred-

2  and-fifty-thousand-dollar number is a cap that the debtors

3  have imposed on us in terms of the reimbursement of our fees.

4  If we're over that amount, then there would be no

5  reimbursement.

6          Again, this is an RSA provision.  You know, our

7  position is we would like our professional fees paid in a

8  manner similar to how a bondholder committee would, in fact,

9  the language that we have taken --

10         THE COURT:  A bondholder committee is probably

11  different.  A bondholder committee is probably different, but

12  I'm not getting into argument.

13         What I'm trying to figure out, and you've now told

14  us, is that, as I understand it -- correct me if I'm wrong --

15  the coalition produced no documents to the debtors in

16  connection with negotiation, in mediation or not in mediation,

17  with respect to services it's provided to date, amounts billed

18  to date, et cetera, nothing.

19         MR. GOODMAN:  To be very candid, Your Honor, I

20  believe there was an Excel spreadsheet that would have

21  summarized, you know, amounts incurred to date, but beyond

22  that single, one-page document to give them a sense of where

23  we were, there was nothing else that was produced.

24         THE COURT:  Okay.

25         MR. GOODMAN:  So the debtors are not in any

1  position, Your Honor, where they have a box full of all of our

2  invoices and are refusing to produce them.  They don't have

3  those documents because, again, those have not been provided

4  yet.

5          If the RSA is approved, if we get to the end of the

6  case, if we get to the -- the plan is effective, then we

7  provide the documents.  Again, this is, I guess, the exact

8  same language, no different than what was utilized in the PG&E

9  case.  We assume since that was the insurer's position there

10 that maybe it would hold here, but perhaps not.

11         I just wanted to be clear on that issue, Your

12 Honor.

13         THE COURT:  Okay.  So, there are no documents, Mr.

14 Schiavoni.

15         MR. GOODMAN:  Well, again, Your Honor, the

16 documents -- Mr. Schiavoni knows this; we have explained this

17 to him -- the documents that he's pushing for, right, what he

18 is saying, when he says, I want the communications, the

19 documents that he's actually after are not the invoices,

20 because he knows that those have not been provided to the

21 debtors.  The documents that he keeps seeking and going after,

22 you know, trying to get from us again, and again, and again,

23 are draft termsheets that say at the top of them, mediation

24 privileged, FRE408, highly confidential, draft, exchanged

25 during the mediation process.  That is what they're trying to

1  get from us.

2          THE COURT:  Okay.  And there are no other documents

3  --

4          MR. SCHIAVONI:  Your Honor, what we're trying to

5  get --

6          THE COURT:  There are no other documents that were

7  provided outside of the mediation and outside of a termsheet.

8  There's no documents that talk about the requests by the

9  coalition, and, again, I'm assuming it was their request to

10 have their fees paid outside of whatever may be in a

11 termsheet.

12         MR. GOODMAN:  Correct.

13         THE COURT:  Okay.

14         MR. SCHIAVONI:  So, Your Honor, we know that -- we

15 now know that the Board couldn't have done any due

16 deliberation on this because nothing was provided.  As far as

17 what we asked for, I'm not going to debate it with Mr.

18 Goodman.  I am just a little disturbed by things he said now

19 and previously about Century's discovery, but we have, as

20 Exhibit G, the exchange of emails with Mr. Goodman show we

21 were asking for these fee communications, all right.

22         But, look, the one thing that is missing is

23 definitely the exchange of emails, you know, making these

24 demands that would show the *quid pro quo* and they didn't take

25 place exclusively in the context of a face-to-face mediation.

1           THE COURT:  Okay.  Well, I'm hearing there are no

2  communications that did not take place outside of the

3  mediation privilege, and for purposes of today, I have that

4  representation from counsel.  I'm accepting that

5  representation from counsel.

6           Mr. Schiavoni, you have your argument.

7           MR. SCHIAVONI:  Thank you for hearing me, Your

8  Honor.

9           THE COURT:  Thank you.

10          Okay.  Those are all the preliminaries, I believe.

11          MR. ABBOTT:  Yes, Your Honor.

12          Derek Abbott for the debtors.  I think that brings

13  us to Item 1 on the agenda, so I will cede the podium to Ms.

14  Lauria, Your Honor.

15          THE COURT:  Ms. Lauria?

16          MS. LAURIA:  Thank you, Your Honor.

17          Jessica Lauria of White & Case, on behalf of the

18  debtors.  Your Honor, as the Court, I believe is aware from

19  the agenda, the debtors intend to call four witnesses in

20  support of the motion for the RSA:  Mr. Brian Whittman, Mr.

21  Devang Desai, Mr. Roger Mosby, and Mr. Dan Ownby.  I also

22  understand that at least one other party, perhaps Hartford,

23  may have reserved the right to call a witness, as well.

24          Given just the volume of arguments that I think the

25  Court is going to be hearing and the necessity for the Court

1   to consider the evidence at the outset, what the debtors

2   propose to do is to dive right into the evidentiary portion of

3   our case, and then after the evidentiary portion concludes,

4   move to closing arguments, essentially, with respect to the

5   RSA.

6           Also, with respect to the witnesses, given the

7   nature of the -- I'm going to use the word "allegations" for

8   lack of a better word -- that came up in both, the pleadings,

9   as well as the argument that you heard this morning with

10  respect to the discovery motion, from the debtors'

11  perspective, we think it's important to put on brief direct

12  examinations of our witnesses.  We will also offer the

13  declarations into evidence and, of course, make those

14  witnesses available for cross-examination, but we have some

15  extraordinarily important matters before the Court today that

16  will impact the rest of this case.

17          And that's how the debtors would like to proceed,

18  Your Honor.  With that, Your Honor, you will be hearing from

19  three of my partners in connection with the examination of the

20  witnesses:  Mr. Andolina, who you know well; Mr. Kirk; and Mr.

21  Hammond, who appeared in front of you back in May at our May

22  19th hearing.

23          So, with that, I think I'm going to hand the podium

24  over, unless Your Honor wants to take a break or unless there

25  is anything else you'd like to do, Your Honor, I'd hand the

1  podium back over, actually, to Mr. Andolina, who will be

2  presenting our first witness, Mr. Brian Whittman.

3              THE COURT:  Let's take our first witness, Mr.

4  Whittman.

5              MR. HAMMOND:  Thank you, Your Honor.

6              This is Andrew Hammond, from White & Case, and I'll

7  be presenting, calling Mr. Whittman to the stand.

8              THE COURT:  Okay.  Mr. Whittman, I need to swear

9  you in.  Please raise your right hand.

10             BRIAN WHITTMAN, DEBTORS' WITNESS, AFFIRMED

11             THE WITNESS:  I do.

12             THE COURT:  Please state your full name and spell

13  your last name for the record.

14             THE WITNESS:  Brian Whittman, W-h-i-t-t-m-a-n.

15             THE COURT:  Thank you.  You may proceed.

16             MR. HAMMOND:  Thank you, Your Honor.

17                        DIRECT EXAMINATION

18  BY MR. HAMMOND:

19  Q    Mr. Whittman, could you please introduce yourself to the

20  Court.

21  A    I am a managing director with Alvarez & Marsal, which is

22  the restructuring and financial advisor to the debtors, and I

23  am the lead financial advisor to the debtors.

24  Q    And how long have you been employed at Alvarez & Marsal?

25  A    I've been at Alvarez & Marsal since 2002.

1    Q      And what are your duties and responsibilities as a

2    managing director at Alvarez & Marsal?

3    A      I have internal responsibilities related to staffing,

4    recruiting, training, marketing-type of activities and I'm

5    responsible for overseeing certain cases, including this

6    particular case.

7    Q      Did there come a time when Alvarez & Marsal was retained

8    by the Boy Scouts of America?

9    A      Yes.

10   Q      And when was that?

11   A      Alvarez & Marsal was retained in the fall of 2018.

12   Q      And what type of work does Alvarez & Marsal perform for

13   the Boy Scouts of America in connection with its retention?

14   A      We were retained to assist the Boy Scouts with a

15   potential restructuring and also with the Chapter 11 process,

16   and in that context, we have worked with the debtors around

17   their business plan, around cash flow forecasts and liquidity,

18   around the diligence of their assets and restricted assets.

19   We have assisted with the negotiations both, pre- and post-

20   petition with the various parties.  We have assisted with the

21   preparation for the bankruptcy filing and with reporting

22   matters since the filing of the bankruptcy, as well as with

23   the key financial analysis that has been required for the

24   planning process, including the five-year business plan and

25   liquidation analysis.

1  Q      Mr. Whittman, when did you personally start working on

2  the Boy Scouts of America matter?

3  A      In August 2019.

4  Q      Now, based on the work you've performed, have you had

5  the opportunity to engage with the decision-making bodies of

6  the Boy Scouts of America?

7  A      I have.

8  Q      And who are the decision-making bodies at the Boy Scouts

9  of America?

10 A      At the top there's a National Executive Board and

11 there's a National Executive Committee and then as it relates

12 to the bankruptcy process, there's a bankruptcy task force.

13 Q      Okay.  And just generally, what is the National

14 Executive Board, how many people are involved in it?

15 A      The National Executive Board is approximately 76

16 individuals and that is the ultimate Board of Directors of the

17 organization.

18 Q      And what is the National Executive Committee?

19 A      The National Executive Committee is 12 members on the

20 Board of Directors that are authorized to manage the day-to-

21 day affairs of the Boy Scouts, as part of their role within

22 the Board.

23 Q      And you had mentioned the bankruptcy task force, can you

24 explain to the Court what that is.

25 A      The bankruptcy task force is a subcommittee of the NEC

1   that was formed to advise on bankruptcy-related matters, to

2   oversee the day-to-day aspects of a Chapter 11 process and the

3   negotiations that occurred around the RSA and plan of

4   reorganization and advise the full NEC on any actions that

5   need to be taken, as well as provide guidance and oversight to

6   management and the estate advisors.

7   Q     And who are the members of the bankruptcy task force?

8   A     The members of the bankruptcy task force are Alison

9   Schuler, the chair; Dan Ownby; Devang Desai; Scott Sorrels;

10  Brad Tilden; and Roger Mosby, and the bankruptcy task force is

11  also attended by and advised by the other officers at BSA.

12  Q     Okay.  And what's your understanding of the bankruptcy

13  task force's role in connection with the restructuring?

14  A     The bankruptcy task force is the primary body delegated

15  by the Board to, as I said, oversee the day-to-day of the

16  bankruptcy process, get into the details of the negotiations,

17  and advise and give direction to the management team and the

18  advisors that are involved, day-to-day, in those negotiations.

19  Q     And how would you describe your level of interaction

20  with the bankruptcy task force since the Chapter 11 petition

21  was filed?

22  A     It has been very significant throughout and, in

23  particular, over the last eight or nine months.

24  Q     And how many times have you met with the bankruptcy task

25  force since March?

1  A     Since March, approximately 15 times prior to the entry

2  of the RSA and there's been a handful of times sense.

3  Q     And just, very generally, as a topical matter, what

4  subject matter is to be discussed with the bankruptcy task

5  force in your capacity as a lead financial advisor for Alvarez

6  & Marsal since March of 2021?

7  A     I've discussed with them, issues related BSA's

8  contribution to the abuse survivors trust in terms of the

9  amount and the formulation of that contribution.  I've

10  discussed matters related to the local council contribution to

11  the trust, including the BST notes and the interplay with

12  BSA's pension.  I've discussed other financial matters,

13  including the coalition professional fees, especially with the

14  RSA, as well as I've been involved in discussions around the

15  Hartford settlement, other insurance issues, including the

16  TDP, and the like.

17  Q     And in addition to your management of the bankruptcy

18  task force, have you also met with the National Executive

19  Committee since March?

20  A     I have.

21  Q     And about how many times?

22  A     I would say around 10 times.

23  Q     Okay.  And have you also met with the National Executive

24  Board since March?

25  A     Approximately three times since March.

1  Q    Okay.  Collectively, between the bankruptcy task force,

2  the National Executive Committee, and the National Executive

3  Board, how much time have you spent in meetings with these

4  bodies since March of 2021?

5  A    In excess of 40 hours.

6  Q    And did you prepare any written presentations to these

7  governing bodies of BSA?

8  A    I did, at least 10 over that period of time.

9  Q    Okay.  And were you present at any meetings of the

10  bankruptcy task force or National Executive Committee or

11  National Executive Board where other of BSA's advisors made

12  presentations?

13  A    I was.

14  Q    And what other advisors made presentations to the

15  governing bodies of BSA?

16  A    There were presentations made by White & Case, the

17  debtors' restructuring counsel, as well as Haynes & Boone, the

18  debtors' insurance counsel.

19  Q    And as a very general matter, just as topically, without

20  revealing the substance of any communication, can you just

21  generally describe what topics those presentations covered?

22            MR. SCHIAVONI:  Your Honor, I'm going to object.

23  It's like this gets directly into the waiver issue and the

24  documents that haven't been produced.  They're trying to offer

25  evidence of something without providing the documents.

1          THE COURT:  Let me have a response.

2          MR. HAMMOND:  Your Honor, in response, I was just

3   going to put on no more than what we've put on, on the

4   privileged log, Your Honor.  It's topically of the subject

5   matter of the (indiscernible) and who the recipients of those

6   communications were.

7          THE COURT:  And what do you want me to.

8          MR. SCHIAVONI:  Your Honor, the offer of proof --

9          MR. HAMMOND:  Your Honor, we're not relying on -- I

10  apologize -- we're not relying on advice of counsel here, Your

11  Honor; we're just discussing the subject matters that were

12  discussed.

13         MR. SCHIAVONI:  But, Your Honor, they're offering

14  this undoubtedly, to somehow establish that, actually,

15  diligence was done on these issues and I don't see how they

16  can cross that line without providing the documents,

17  themselves, about it.

18         MR. HAMMOND:  Your Honor, at the end of the day,

19  Mr. Schiavoni is attempting to inject himself into privileged

20  communications and we don't think that's appropriate,

21  particularly for this subject matter.  We're just establishing

22  the facts that these subject matters were discussed in front

23  of the Board, not the substance of what was discussed.

24         THE COURT:  And what do you want me to --

25         MR. SCHIAVONI:  How does anybody know they were

1  discussed without the actual documents?

2          THE COURT:  What do you want me to conclude from

3  that, that the topic was discussed, what do you want me to

4  conclude from that?

5          MR. HAMMOND:  That the subject matter was

6  discussed, Your Honor.

7          MR. RUGGERI:  Your Honor, James Ruggeri for

8  Hartford.  The other problem we have, of course, is that you

9  saw the one categorical log which didn't identify anything and

10  the only other log we've ever received is a TDP log.  That's

11  it.  Those are the logs.  If you want Mr. Schiavoni's

12  objection.

13          THE COURT:  I'm going to reserve on this.  You can

14  ask him the topics, but I'm going to reserve on whether I will

15  consider this, because documents were not produced, and

16  whether you are, in fact, putting at issue those documents and

17  the advice in those documents.

18          MR. HAMMOND:  Your Honor, this information I

19  believe was contained and also referenced in Mr. Whittman's

20  declaration.  (Indiscernible) as well as to the general

21  subject matter.

22          THE COURT:  Yes, but they objected --

23          MR. SCHIAVONI:  And that's precisely why we moved

24  on it.

25          THE COURT:  They've objected to that for the

1  reasons that I think at deposition, he was given some

2  instructions not to answer.  So, you can ask him those topics,

3  that question, if you want, and I will reserve on whether you

4  are waiving privilege in doing that.

5          MR. HAMMOND:  Thank you, Your Honor.

6          But to be clear, with respect to any instructions

7  to Mr. Whittman not to answer at deposition, there was one, a

8  singular instruction and that instruction, he had advised the

9  insurers.  They could have examined Mr. Whittman on that topic

10  and they chose not to.

11          THE COURT:  Okay.

12          MR. SCHIAVONI:  Your Honor, I gave four examples.

13  This is completely untrue that there was only one instruction;

14  there were multiple directions that he shouldn't reveal

15  privileged information and then he said he wasn't going to do

16  so.  I gave four examples of that.

17          THE COURT:  That's my recollection, that there --

18          MR. HAMMOND:  Your Honor, (indiscernible) --

19          THE COURT:  My recollection is there was more than

20  one, but I could be wrong.

21          MR. HAMMOND:  There was -- I apologize, Your Honor

22  -- there was one direction not to answer.  There was

23  cautionary language saying, to the extent that it would

24  require you to reveal privileged information, those are the

25  rest of the communications that (indiscernible).

1            THE COURT:  Did Mr. Whittman talk about --

2            MR. SCHIAVONI:  Then clearly the witness would say,

3  I'm not going to answer.

4            THE COURT:  Did Mr. Whittman, in his deposition,

5  identify the topics that you now want him to identify here?

6            MR. HAMMOND:  At the floor level, he was asked, for

7  example, about TDPs and things of that nature at his

8  deposition.  He did testify about that.

9            He didn't testify about, you know, Board-level

10  communications on that.

11            THE COURT:  Okay.  You can --

12            MR. SCHIAVONI:  He declined to testify about any

13  substance.

14            THE COURT:  I will take -- I will permit you to ask

15  him the question and I will take under advisement whether you

16  were waiving privilege, with respect to that.

17            Go ahead.

18  BY MR. HAMMOND:

19  Q    Mr. Whittman, at a very high level, just from a topical

20  perspective, what topics were discussed or just general

21  subject matter, with respect to those presentations?

22  A    There were discussions regarding the first proposed plan

23  of reorganization, alternative plan structures, the likelihood

24  of the success of various plans of reorganization.  There were

25  discussions related to the Hartford, proposed Hartford, and

1  the ultimate Hartford settlement.  There were discussions

2  related to other aspects of the RSA.  There were discussions

3  related to the trust distribution procedures and other

4  insurance matters.

5  Q    Now, during the meetings that you participated in with

6  the bankruptcy task force, did the members of the bankruptcy

7  task force ask questions of and engage in discussions with

8  their advisors?

9  A    They did.

10  Q    Okay.  And how long did those meetings typically last?

11  A    The bankruptcy task force meetings were almost always in

12  excess of 90 minutes; often times, greater than two hours.

13  Q    And were members of the National Executive Board and

14  National Executive Committee similarly engaged in the meetings

15  that you participated in?

16  A    They were, they were all very engaged.

17  Q    You've worked with a number of clients in your career on

18  restructuring matters?

19  A    I have.

20  Q    And how does the frequency of meetings with the BSA

21  compare with other clients?

22  A    The meetings were at least, if not more frequent.

23  Q    And based on the number of meetings and time that you

24  spent with the National Executive Board and the National

25  Executive Committee and bankruptcy task force, do you have a

1  view as to whether the BSA's board members generally sought to

2  inform themselves of the matters that they were considering?

3  A    I do, and I believe that they did inform themselves of

4  these matters.

5  Q    Mr. Whittman, I want to shift topics quickly.

6      During the course and scope of your work with the BSA,

7  did you participate in any mediated settlement discussions?

8  A    I did.

9  Q    And when did those discussions begin?

10 A    The mediation process began with some virtual

11 discussions late in 2020 and continued with more active

12 virtual mediation in early 2021 and really accelerated with

13 the commencement and the combination of in-person and virtual

14 mediation in late March 2021 through the present.

15 Q    All right.  And since the mediation started, how many

16 hours have you devoted to meeting with the various

17 stakeholders of the debtors?

18 A    Hundreds of hours.

19 Q    Mr. Whittman, I want to turn to the subject of the

20 Hartford settlement for a moment.

21 A    Okay.

22 Q    During the course (indiscernible) with your duties as

23 the lead financial advisor for the BSA, did there come a time

24 when the BSA engaged in settlement discussions with Hartford?

25 A    There did.

1  Q     And without relaying the contents of those discussions,

2  can you tell me the period of time over which such discussions

3  were held?

4  A     Discussions with Hartford, a large party in this case,

5  began early, but really picked up in early 2001 [sic] in

6  advance of the in-person mediation in March -- sorry, 2021 --

7  and really picked up in advance of the mediation in March of

8  2021 and continued through not only into the Hartford

9  agreement, but through to the present day.

10 Q     And did the BSA also ultimately reach an agreement with

11 Hartford?

12 A     We did in April, April 15th of 2021.

13 Q     Mr. Whittman, you have in front of you a binder that has

14 also been provided to the Court and I would ask you to turn to

15 Exhibit 5, which is the Hartford settlement, and I believe

16 it's on page 4, begins on page 4 of the document.

17 A     Okay.

18 Q     Can you tell me what this document is, Mr. Whittman.

19 A     This is the settlement agreement we were discussing that

20 was entered into between the BSA and Hartford on     April

21 15th, of 2021.

22 Q     Now, were there any conditions to the Hartford

23 settlement agreement becoming effective?

24 A     There were a number of conditions.

25 Q     Can you turn to page 7 of the agreement.

1       And under Roman numeral 1 where it says agreement
2  effective date, do you see that?
3  A    I do.
4  Q    Okay.  And does Section 1(a) discuss the conditions
5  under which the agreement would have to -- the conditions that
6  would have to occur before the agreement would become
7  effective?
8  A    It does.  Principally, that Hartford would need to
9  receive releases by the local councils, that the Bankruptcy
10 Court would have to enter into a confirmation order, and that
11 confirmation order would need to provide for a release and a
12 channeling injunction for the benefit of local councils, with
13 respect to these claims.
14 Q    And are you referring to Section 1(a)(2) on page 7 and
15 1(a)(4) on page 8?
16 A    I am.
17 Q    Now, based on your understanding, what would have to
18 happen for a release and channeling injunction to be issued?
19 A    My understanding is that we would need to receive
20 confirmation of a plan of reorganization that had the
21 affirmative support of the abused claimant class.
22 Q    Mr. Whittman, what was the amount of the Hartford
23 settlement?
24 A    The Hartford settlement was for $650 million, subject to
25 what's been called the "MSN provision" that would reduce the

1  amount of the settlement.

2  Q    Okay.  And just generally, what is the MSN provision?

3  A    The MSN provision ties the amount of the Hartford

4  settlement to any subsequent settlement with, between either

5  the debtors, pre-emergence, or the trust, post-emergence, and

6  Century Insurance and provides that if the settlement with

7  Century should occur and it is less than $1.3 billion, then

8  the amount paid by Hartford would be reduced by 50 percent of

9  the differential.

10 Q    Can you turn to the Section 2(c) of the agreement on

11 page 9, carrying over to page 10.

12 A    Okay.

13 Q    I'm at 2(e).  Is that the provision that you're

14 referring to?

15 A    2(e) on the bottom of page 10, that is correct.

16 Q    Now, with respect to the MSN provision, does that mean

17 that the total amount of the Hartford settlement would end up

18 being reduced?

19 A    It does.

20 Q    Okay.  And the six-hundred-and-fifty-million-dollar

21 payment that would be due under the Hartford settlement, would

22 that be the -- is that the ceiling of the amount that Hartford

23 would pay?

24 A    That is correct.

25 Q    Okay.  Mr. Whittman, do you know whether the debtors

1  have access to Century's financial records to assess Century's

2  wherewithal on the settlement?

3  A    We -- only the limited public information that exists.

4  Q    Did you discuss the contents of the Hartford settlement

5  with the decision-makers at the BSA?

6  A    I did.

7  Q    And as of April 15th, 2021, did you support the BSA

8  entering into the Hartford settlement?

9  A    I did.

10 Q    From April 15th to the present, have there been any

11 circumstances that have changed that would cause you to

12 reconsider your support for the Hartford settlement?

13 A    Yes, there have been two principal changes in

14 circumstance.

15 Q    And what are those changes in circumstance?

16 A    First, we have experienced the unified, intense, and

17 continued, and broad-based insistence of the (indiscernible)

18 constituents that they would never support a plan of

19 reorganization that includes the Hartford settlement.  And as

20 I mentioned earlier, absent plaintiff's support, that a plan

21 of reorganization could not be confirmed and renders the

22 Hartford settlement somewhat illusory.  And, second, that we

23 were, in fact, able to reach an agreement with the plaintiff

24 parties on a plan of reorganization that does provide for a

25 global resolution of abuse liabilities for BSA and/or counsel

1  in a framework to address the charter organizations.

2  Q    Mr. Whittman, leaving aside any communications that were

3  had in the context of mediation, how did you become aware that

4  the plaintiffs disapproved of the Hartford settlement?

5  A    Three principal points in time or methods became aware

6  outside of the mediation.  First, the various plaintiff

7  groups, the coalition, the TCC, and the FCR all expressed in

8  filings with the Bankruptcy Court at various stages, since

9  April 15th, their displeasure with the Hartford agreement.

10 Second, there have been numerous verbal presentations during

11 the court hearings and status conferences on their position

12 related to the Hartford settlement.  And, third, on, I believe

13 it was June 9th, we received a letter from all three of those

14 plaintiffs' constituents that formally documented, despite the

15 passage of almost two months and active mediation efforts, to

16 the contrary, that they would still not support a plan with

17 the Hartford settlement.

18 Q    Mr. Whittman, did the reaction of the plaintiffs

19 surprise you at all?

20 A    Their initial reaction did not surprise me, but their

21 continued and sustained reaction did.

22 Q    Mr. Whittman, can you turn to tab 1(a) in your binder.

23 This is (indiscernible) declaration of Mr. Mosby.

24 You had referenced a letter before in your testimony, a

25 June 9th letter?

1  A      I did.

2  Q      And what's been marked as Exhibit 1(a), is that the June

3  9th letter that you're referring to?

4  A      It is.

5  Q      Could you read the penultimate sentence of that letter

6  from -- first, who is this letter from and to?

7  A      This letter is from the counsel to the coalition, the

8  counsel to the tort claimants committee, and the counsel to

9  the future claimants representative to both, the BSA and the

10  ad hoc committee of local councils.

11  Q      And can you read the penultimate sentence of this

12  letter.

13  A      The sentence states:

14          "Our unequivocal view as a group comprising the two

15  estate fiduciaries for the survivors and ad hoc group of

16  thousands of those survivors, is that any plan of

17  reorganization that includes the Hartford settlement will be

18  overwhelmingly voted down by the survivor committee or

19  rejected by the Bankruptcy Court as a standalone

20  motion/settlement."

21  Q      Now, Mr. Whittman, aside from the objections of

22  plaintiffs, you also mentioned a second circumstance.

23  A      That's correct.  We reached a resolution with the

24  majority, the representatives of the majority of the claimants

25  in the form of the coalition, the TCC, and the FCR, related to

1  a plan of reorganization that would provide a, halfway for BSA

2  to emerge from bankruptcy, to provide protections for the

3  local councils, which provided the greatest chance of success

4  for reorganized BSA, and the greatest ability to continue the

5  mission of scouting going forward.

6  Q    Mr. Whittman, was that resolution documented in the

7  agreement?

8  A    It was.  It was documented in the restructuring support

9  agreement that's before the Court today.

10 Q    And which parties were involved in the negotiating the

11 restructuring support agreement?

12 A    The agreement was negotiated between the debtors, the ad

13 hoc committee of local councils, the tort claimants committee,

14 the coalition, and the future claimants representative.

15 Q    Were you personally involved in the negotiation of the

16 RSA?

17 A    I was.

18 Q    The RSA covers a wide range of topics.  What subject

19 matter were you responsible for negotiating?

20 A    I was directly responsible for negotiating the debtors'

21 financial contribution to the trust and the various aspects

22 associated with that contribution.  I was significantly

23 involved in the contribution of the local councils to the

24 trust and, in particular, with negotiations related to what

25 became known as the hundred-million-dollar DST note.  I had

1  involvement in other financial aspects, including the

2  provisions around the payment of coalition professional fees,

3  and I was aware of, and less involved in other aspects of the

4  agreement, including aspects related to the TDP and other

5  insurance issues.

6  Q     Given your role as lead financial advisor, did you also

7  have familiarity with other matters that were negotiated in

8  connection with the RSA?

9  A     I did.  I was generally familiar with all the matters in

10 the RSA.

11 Q     Over what period of time did the negotiations concerning

12 the RSA take place?

13 A     The negotiations on the RSA, while built on a foundation

14 of months of discussions among all the parties and diligence

15 of the parties on various issues, really took shape following

16 the entry of the Hartford settlement in the middle of April,

17 continuing through in-person mediation sessions that occurred

18 in May and June, and up until the morning of July 1st, when we

19 finally reached a resolution.

20 Q     And approximately how much, how many meetings were held

21 regarding the RSA?

22 A     There were dozens, if not more than a hundred meetings

23 and calls.

24 Q     And how would you, without revealing the substance or

25 content of any of the discussions, how would you characterize

1  those negotiations?

2  A    Those negotiations were --

3         MR. SCHIAVONI:  Objection.  No foundation, Your

4  Honor, and waiver.

5         THE COURT:  Can you give me the question again?

6  BY MR. HAMMOND:

7  Q    Without revealing the --

8         MR. HAMMOND:  -- do you want it read back or do you

9  want me to repeat it?

10         THE COURT:  You can repeat it.

11  BY MR. HAMMOND:

12  Q    Without revealing the content of any discussions, how

13  would you characterize those negotiations concerning the RSA?

14         THE COURT:  Overruled.  You can answer.

15         MR. SCHIAVONI:  Your Honor, the witness is being

16  asked essentially to give, you know, what they call in the

17  expert world a net opinion.  He's giving his opinion without

18  any of the foundation for it, which is all cloaked in

19  privilege.

20         THE COURT:  I thought the question was his opinion

21  based on his -- based on his involvement in the mediation.  So

22  I'm going to overrule it on that basis.

23         MR. HAMMOND:  Thank you, Your Honor.

24         THE WITNESS:  The negotiation around the RSA was

25  some of the most intense negotiation in any clients I've been

1  involved with.  The parties were very far apart.  There were

2  intense negotiations between the parties on a wide range of

3  issues, and those negotiations were robust and really came

4  down to the final moments prior to signing the agreement on

5  July 1st.

6  BY MR. HAMMOND:

7  Q     Without revealing the contents of any discussions, the

8  media was involved in the negotiations of the RSA?

9  A     They were.

10 Q     In your capacity as a negotiator for the BSA, what were

11 the objectives that you considered when negotiating the terms

12 of the RSA?

13 A     From a big picture perspective, we were focused on the

14 debtors' overall objectives, which was to preserve the mission

15 of Scouting, which requires us to get to a confirmable and

16 ultimately confirmed plan of reorganization, and to provide

17 for the equitable treatment to the abuse survivors.  Within

18 the context of those broad objectives, we were very focused on

19 the financial components of the settlement and the feasibility

20 of those in terms of the debtors' business plans.  We were

21 focused on many of the non-financial components or non-

22 directly debtor financial components of the settlement as to

23 whether those components would in fact put us on a path and

24 lead us to a confirmable plan of reorganization and not put us

25 back at square one.

1  Q     Mr. Whittman, were you aware of the TDPs?

2  A     I was.

3  Q     And what are the TDPs, just generally?

4  A     They're the trust distribution procedures, which in

5  general terms will be used by the trust established at

6  emergency bankruptcy to review the claims that have been

7  submitted in this case, to determine the validity of those

8  claims, and ultimately determine the amounts of money to be

9  paid to those claimants.

10 Q     Now, were you the lead negotiator in connection with the

11 TDPs?

12 A     I was not.

13 Q     Were you copied on some correspondence regarding the

14 TDPs in your capacity as the lead financial adviser?

15 A     I was.

16 Q     We've heard some argument earlier today about the

17 debtors' interests in the TDPs, did you believe the debtors

18 had an interest in the terms of the TDPs?

19           MR. SCHIAVONI:  Objection.

20           MR. HALLOWELL:  Objection, objection.  This is Jim

21 Hallowell, Gibson, Dunn & Crutcher, counsel for the AIG Member

22 Companies.  We object to this as leading.

23           THE COURT:  As what?

24           MR. SCHIAVONI:  It's also -- it's an improper

25 opinion, Your Honor, it lacks foundation.

1      MR. HALLOWELL:  We join that objection as well.

2      MR. HAMMOND:  Your Honor, I was simply trying to

3 elicit testimony on what the debtors' interests in negotiating

4 the terms of the TDPs were in light of the argument that was

5 advanced earlier as to the suggestion that the debtors had no

6 interest in the TDPs and turned over the (indiscernible) --

7      MR. SCHIAVONI:  Your Honor, we would --

8      MR. HAMMOND:  -- saying from an objective

9 perspective what -- have Mr. Whittman explain from an

10 objective perspective what interests the debtors had in the

11 TDPs.

12      MR. SCHIAVONI:  We were blocked from absolutely all

13 inquiry at Mr. Whittman's deposition about any communications

14 he had with any directors about the TDPs or how they

15 considered them.  It's just -- this is -- and, quite frankly,

16 the other witnesses also.  They all invoked privilege on these

17 issues.

18      MR. HALLOWELL:  And, Your Honor, I would simply add

19 that Mr. Hammond's further debate on this issue is further

20 leading to the witness.

21      MR. RUGGERI:  And, Judge, mine goes back to the

22 issue -- Jim Ruggeri for the Hartford -- what we talked about,

23 which is you can't have it both ways.  You can't close the

24 door and now we're talking about this witness' testimony about

25 the TDP negotiations, which it's uncontroverted has not been

1  provided to the carriers.  I object, Your Honor.

2            THE COURT:  I'm going to sustain this --

3            MR. HAMMOND:  Your Honor, I was not --

4            THE COURT:  Go ahead.

5            MR. HAMMOND:  -- to be clear, I was not talking

6  about the TDP negotiations, I was talking about the debtors'

7  interests in the TDPs, which are -- I believe are different

8  from --

9            MR. HALLOWELL:  Your Honor --

10           MR. HAMMOND:  -- the negotiations --

11           THE COURT:  How are you --

12           MR. HALLOWELL:  -- this witness has no foundation

13  to testify with regard to the debtors' interests.

14           THE COURT:  Yes, I'm going to sustain that

15  objection.  I haven't heard a foundation on that.

16           MR. HAMMOND:  Okay, Your Honor.  Thank you, Your

17  Honor, I'll move on.

18  BY MR. HAMMOND:

19  Q    Mr. Whittman, do the TDPs address -- strike that.

20           In terms of the assets of the Boy Scouts of America, do

21  you have a view as to how the insurance policies factor into

22  the assets of the Boy Scouts?

23           MR. HALLOWELL:  Objection, Your Honor, leading

24  again.

25           THE COURT:  Sustained.  Rephrase, please.

1     MR. HAMMOND:  Thank you, Your Honor.

2   BY MR. HAMMOND:

3   Q    Mr. Whittman, what are the -- among the assets -- well,

4   strike that.  What are the largest, most significant assets of

5   the Boy Scouts of America?

6   A    The significant assets of the Boy Scouts of America are

7   the insurance policies that the Boy Scouts of America have

8   related to abuse liability, followed by the various real and

9   personal property of the debtors' estates.

10  Q    And do you have a view as to whether the debtors have an

11  interest in ensuring that the insurance policies remain in

12  place?

13  A    I do.

14          MR. HALLOWELL:  Objection, leading.  Objection.

15          MR. HAMMOND:  I was just asking for his view, Your

16  Honor.

17          MR. SCHIAVONI:  And also this gets into privilege.

18  It's like they invoke privilege on communications between

19  Hammond and the directors and Boy Scouts at the deposition and

20  heavily redact his PowerPoint presentations -- I mean,

21  invocation of privilege about advice he gave and

22  communications he had with Boy Scouts -- and now basically

23  they're offering him to testify in a summary way that they're

24  going to offer as a foundation for findings without having

25  given any of the contemporaneous documents that would give us

1  an actual view of what really happened.

2          THE COURT:  What's --

3          MR. HAMMOND:  Your Honor, I mean, we have produced

4  Mr. Whittman's financial presentations, they are redacted in

5  some form with respect to mediation privilege; they're

6  contained in our binder, we can walk through them and show,

7  you know, the extent to which they've been redacted and what

8  they've been redacted for.  I don't think that would be a

9  useful exercise of our time right now, but if they want to

10 examine him on that topic, that's fine.

11         THE COURT:  Okay.  Well, I've got exhibit binders,

12 but so far there's not an exhibit in evidence.  So I haven't

13 reviewed the exhibits, I won't unless and until they get

14 introduced into evidence.  So -- but give me the question

15 again.  You're asking for his view of what he thinks?

16         MR. HAMMOND:  His view -- well, I think, Your

17 Honor, I was asking whether the insurance policies were -- I

18 started off with the insurance policies being a significant

19 asset of the debtors' estate, and then the second question was

20 whether the debtors have an interest in protecting the

21 insurance policies given they're a significant asset.

22         MR. HALLOWELL:  Your Honor, Mr. Hammond has just

23 repeated the questions that you sustained objections to.

24         THE COURT:  Yeah, I think I did.  So what's the

25 relevance of his view on this?

1    MR. HAMMOND:  I think, Your Honor, going back to

2  the debtors' interests, I was trying to get at it another way,

3  but I'm happy to move on from this subject if you don't think

4  it's meaningful.

5    THE COURT:  Is he speaking for the debtor?

6    MR. HAMMOND:  I think he can, Your Honor, in terms

7  of the debtors' objectives.

8    THE COURT:  Okay.  Move on to your next question.

9  I'm going to sustain the objection.

10    MR. HAMMOND:  Okay, I'll move on.  Can we turn to

11  Exhibit 6, please?

12  BY MR. HAMMOND:

13  Q    Mr. Whittman, are you familiar with what's been marked

14  as Exhibit 6?

15  A    Yes, this is the restructuring support agreement between

16  the debtors, the ad hoc committee of local councils, the TCC,

17  the Coalition, and the FCR -- and (indiscernible) state court

18  counsel before the Court today.

19    MR. HAMMOND:  And, Your Honor, I'd move Exhibit 6

20  into evidence.

21    THE COURT:  Any objections?

22      (No verbal response)

23    THE COURT:  I hear none.  It's admitted.

24    MR. SCHIAVONI:  May I just ask, is this a signed

25  copy?

1        THE COURT:  Yes.  Yes, it's a signed copy.  It's

2   admitted.

3        (Debtors' Exhibit 6 received in evidence)

4        MR. SCHIAVONI:  Thank you, Your Honor.  Sorry.

5   BY MR. HAMMOND:

6   Q    Mr. Whittman, what's the amount of the BSA's

7   contribution under the RSA?

8   A    Under the RSA, BSA's contribution is variable depending

9   on the timing of emergence, but we estimated it between 220

10  and $250 million, comprised of a mix of real and personal

11  property, cash, and an $80 million note payable to the trust.

12  Q    And what is the amount of the local councils'

13  contribution under the RSA?

14  A    The local councils' contribution is $600 million,

15  comprised of at least $300 million of cash, $200 million of

16  real property, and a $100 million -- supporting a $100 million

17  DST note.

18  Q    And can you just describe to the Court what the DST note

19  is?

20  A    The DST is a note to be issued by a special purpose

21  entity that would be funded based on -- from the local

22  councils based on the percentage of payroll held in trust and

23  then those funds would either be used to pay off the note or

24  contributed to the pension plan, depending on a formula based

25  on the funded status of that pension plan.

1    Q     What are the benefits the BSA receives under the RSA?

2    A     The BSA receives the benefit of having the support of

3    the majority of the plaintiffs, as well as the official

4    plaintiff representative, on a plan of reorganization.  As I

5    said earlier, the plan of reorganization that provides the

6    best opportunity for BSA to succeed in its mission post-

7    emergence is a plan of reorganization that protects not only

8    BSA, but provides the channeling injunction for the benefit of

9    the local councils, and that is only possible with the

10   affirmative support of the plaintiffs.

11        The RSA also provides the benefit of providing a

12   structure in which we can continue to address and negotiate

13   the concerns of our charter organization partners, and

14   provides a platform to continue to negotiate and reach

15   settlement with insurers either pre- or post-emergence.

16   Q     Now, does the RSA reference the Hartford settlement?

17   A     The RSA does reference the Hartford settlement.

18   Q     Can you turn to page 7 of the RSA?

19        (Pause)

20   A     I'm there.

21   Q     Can you turn to romanette (viii) on page 7?

22   A     Okay.

23   Q     And is that what you're referring to when you said the

24   RSA referenced the Hartford settlement?

25   A     That is correct.  This provision requires that BSA seek

1  -- or file a motion with the Court seeking a determination of

2  the bankruptcy court that the debtors have no obligations

3  under the Hartford settlement.

4  Q    Now, Mr. Whittman, based on the benefits that the BSA is

5  receiving under the terms of the RSA, do you have a view as to

6  whether the RSA is superior to the Hartford settlement from a

7  financial perspective for stakeholders of the estate?

8             MR. RUGGERI:  Objection to form.

9             THE WITNESS:  I do believe that the --

10            MR. RUGGERI:  Objection to form, Your Honor.

11            THE COURT:  Why, is it compound?  What is your

12 objection?

13            MR. RUGGERI:  There's no foundation.  I mean, is

14 Mr. Whittman being offered as an expert, is he being offered

15 as a percipient witness?  I don't know the context in which

16 he's being offered, but now he's making relative comparisons

17 between two plan structures to a separate body of creditors.

18 No foundation.

19            MR. HALLOWELL:  And, Your Honor, Your Honor, we'll

20 join the objection and, to the extent that there has been any

21 kind of analysis of this issue prepared by the debtor or its

22 financial adviser, it hasn't been produced.

23            THE COURT:  All right.  Let me hear a response.

24            MR. RUGGERI:  And I think that's correct, Your

25 Honor.  I think it really goes to the foundation of this is an

1  issue, again, they're claiming mediation privilege over any

2  and all foundation for any of the analyses and that has not

3  been provided.

4          THE COURT:  Let me hear a response.

5          MR. HAMMOND:  Your Honor, we can -- I mean, I guess

6  I can move through some of the minutes that have been produced

7  and we can cover it in that fashion, but I believe that Mr.

8  Whittman as a percipient witness is certainly capable of

9  answering the question whether he perceives the Hartford

10 settlement -- or the relative views of the Hartford settlement

11 and the benefits under the RSA given the express terms of

12 them, which are all (indiscernible) --

13         MR. HALLOWELL:  Your Honor, the further objection

14 based on that is that Mr. Whittman's view is irrelevant, it

15 has no bearing on this proceeding, and anything that he's

16 perceiving can be perceived by anybody else in the documents.

17         THE COURT:  Why isn't his analysis being informed

18 by everything he learned in mediation?

19         MR. HAMMOND:  Well, I think -- Your Honor, I think

20 there's two separate sets of time here, right?  What you're

21 evaluating is two baked deals, the baked deals that are

22 currently sitting on the table between the Hartford on --

23 Hartford on the one side and the other baked deal that's baked

24 into the RSA on the other.  And so you don't need to be

25 comparing the two, you can look at what the final product is.

1           MR. RUGGERI:  But, Your Honor, even under Rule 701

2  of the Rules of Evidence, if he's being offered as a -- to

3  give a lay opinion based on what he believes is his

4  rationally-based perception, we're entitled to the foundation

5  of those rationally-based perceptions.  It's not just looking

6  at two documents.  The witness has testified, testimony was

7  elicited from the witness about the length of time and the

8  hours that were spent in mediation to generate both the

9  Hartford settlement and now the RSA.  You can't have it this

10 way; it goes clearly to what they said we're not entitled to.

11          THE COURT:  Sustained.

12          MR. HALLOWELL:  And, Your Honor --

13          THE COURT:  I'm --

14          MR. HALLOWELL:  -- I'll just add for the AIG

15 Companies that Mr. Hammond would like you to consider what he

16 calls two baked deals, but he spent the last hour with Mr.

17 Whittman discussing the baking.

18          THE COURT:  Yes, he did.  Sustained.

19 BY MR. HAMMOND:

20 Q    Does the RSA potentially resolve pending litigation with

21 plaintiffs' representatives?

22 A    It does --

23          MR. HALLOWELL:  Objection, leading.

24          THE COURT:  Yeah, give me that question again.

25 BY MR. HAMMOND:

1  Q      Does the RSA potentially resolve pending litigation with

2  plaintiffs' representatives?

3              THE COURT:  Overruled.  It's leading, but I'll

4  overrule it.

5              THE WITNESS:  It does.

6  BY MR. HAMMOND:

7  Q      Can turn to page 10 of the RSA, please?  Can you look at

8  romanette (b)(iii), (iv) and (v)?

9  A      Yes.

10 Q      And, Mr. Whittman, can you tell me what potential

11 litigations would be stayed or potentially resolved as a

12 result of the RSA?

13 A      The RSA resolved the restricted asset adversary

14 proceeding before the Court; the estimation matters that are

15 before the Court; as well as objections to the exclusive

16 period for the debtors to file a plan, specifically, as well

17 as likely other objections that were to come.

18 Q      Do you have a view as to whether the RSA would likely

19 lead to lower litigation costs for the estate as a result of

20 these agreements?

21             MR. RUGGERI:  Your Honor, objection.

22             MR. HALLOWELL:  Objection.

23             MR. RUGGERI:  I do not think this witness is

24 competent now to give legal opinion testimony, which is what

25 he's being asked; he's a financial person.

1        MR. HAMMOND:  These are the same questions --

2        MR. HALLOWELL:  Your Honor, we object.  The

3   question is leading, the question lacks foundation, and

4   there's been nothing produced with regard to any analysis by

5   Alvarez & Marsal with regard to any of this.

6        THE COURT:  Let me hear a response.

7        MR. HAMMOND:  Your Honor, these questions were

8   certainly covered at his deposition, he was examined on this

9   subject matter and he answered questions on this subject

10  matter.  At the end of the day, being involved as the lead

11  financial adviser for the debtors, he's in a position to

12  understand what litigation was in the offing, what litigation

13  was being put off as a result of the RSA and, based on that, I

14  think he can render a view as to whether he believes that this

15  would likely lower litigation costs in this case.

16       MR. RUGGERI:  And, Your Honor, the Court

17  understands that asking questions at a deposition does not

18  cure foundational problems that may be raised when the witness

19  is tendered at the evidentiary hearing.  That's one of the

20  points of the deposition, so that doesn't get anywhere.  I

21  probably was slow on the last objection when now we're having

22  the witness go through and tell the Court the legal effect of

23  the restructuring support agreement, we're hearing from a

24  financial person, it's inappropriate, Your Honor.

25       THE COURT:  Okay.

1        MR. HAMMOND:  Your Honor, we haven't talked about
2   the --
3        MR. HALLOWELL:  Your Honor, we object --
4        MR. HAMMOND:  -- legal, but financial --
5        MR. HALLOWELL:  -- Your Honor -- Your Honor, we
6   continue to object to Mr. Hammond's speeches, which are still
7   further leading and coaching.
8        THE COURT:  Okay.  I'm going to sustain the --
9        MR. HAMMOND:  Your Honor, I'm asking it as a
10  question to the witness.
11       THE COURT:  I'm going to sustain the foundation and
12  the leading objections.
13  BY MR. HAMMOND:
14  Q    Mr. Whittman, prior to entering into the RSA, were the
15  debtors involved in several disputes with the plaintiffs'
16  representatives?
17  A    They were.
18  Q    What disputes with the plaintiffs' representatives were
19  they involved in?
20  A    They were involved in a dispute with primarily the TCC
21  regarding our restricted assets.  We were involved in a
22  dispute with several of the plaintiff parties related to
23  issues of estimation of claims liability, whether an
24  estimation proceeding was required and which court was
25  required to -- or had the authority to hear those proceedings.

 1 | We were also involved in disputes related to exclusivity which
 2 | were pending before the Court.
 3 | Q    Mr. Whittman, do you have a view as to whether those
 4 | disputes were -- strike that.
 5 |      Were those disputes a burden on the debtor, from your
 6 | perspective as the lead financial --
 7 |           MR. HALLOWELL:  Objection.  Objection, lacks
 8 | foundation, and vague.
 9 |           THE COURT:  And leading, but I'll let him -- I'll
10 | let him -- I'll let him give his view on it, for what it's
11 | worth.
12 |           THE WITNESS:  The debtors were incurring
13 | significant and increasing levels of cost both for its own
14 | professionals, as well as for the professionals of the
15 | statutory committees that it was responsible to pay, and we
16 | expected that those costs would continue to increase based on
17 | the matters and the necessary activities related to in
18 | particular the restricted asset adversary proceeding.
19 | BY MR. HAMMOND:
20 | Q    Mr. Whittman, do you believe that staying those
21 | litigations resulted in a cost savings for the debtors?
22 | A    I do.
23 |           MR. HALLOWELL:  Objection, Your Honor.
24 |           THE COURT:  Overruled.
25 | BY MR. HAMMOND:

1  Q      Mr. Whittman, did the RSA resolve issues with chartered

2  organizations?

3  A      The RSA provides a framework and a pathway to resolve

4  issues through continued negotiation with the chartered

5  organizations and the other RSA parties.

6  Q      Does the RSA address at all those chartered

7  organizations?

8  A      It does.

9  Q      Can you turn to page 77 of -- I guess it's page 15 of

10 the term sheet, which I believe is page 77 of the -- what is

11 Exhibit 6.

12 A      I'm there.

13 Q      Can you look at the bottom of the page?

14 A      Yes, this is the provision I was referring to relating

15 to the contributing chartered organization settlement.  It

16 states that the parties shall work in good faith to develop a

17 protocol for addressing participation by chartered

18 organizations and the benefits of the channeling injunction.

19 Q      And so is this the provision that you were referring to?

20 A      It is.

21 Q      And has there been any amendments to the RSA since July

22 1st, 2021 that address chartered organizations?

23 A      There was.  In particular, there was an amendment which

24 made clear something that I -- was always my understanding,

25 but made clear for all parties, that if the resolution of

1 │ chartered organization issues was unsatisfactory to the BSA or

2 │ to the ad hoc committee of local councils that they could

3 │ withdraw from the RSA.

4 │ Q      And are there discussions ongoing right now?

5 │          MR. RUGGERI:  Objection, Your Honor.

6 │          MR. HALLOWELL:  Objection.

7 │          MR. RUGGERI:  He can't -- those are what they say

8 │ is in the context of ongoing mediation, it's not appropriate.

9 │          MR. HAMMOND:  It's just a topical issue, Your

10 │ Honor; it's just is it happening.

11 │          MR. RUGGERI:  Your Honor.

12 │          MR. HAMMOND:  (Indiscernible) --

13 │          MR. RUGGERI:  Your Honor, we've got a number, we

14 │ have a half dozen topical issues which we're prepared to walk

15 │ right through that door because he's opened the door, but he

16 │ can't have it both ways.  I object unless it's clear that

17 │ there's been a waiver.  Thank you, Your Honor.

18 │          MR. HAMMOND:  Your Honor, we are not waiving

19 │ mediation privilege, but this is no more than you would put on

20 │ a privilege log if they asked.

21 │          MR. RUGGERI:  It is so.  It's asserting a fact,

22 │ it's asserting a fact.

23 │          THE COURT:  The question is, are you continuing to

24 │ talk, that's your question?

25 │          MR. HAMMOND:  That's my question, Your Honor.

1            MR. RUGGERI:  Judge, the problem is he's trying to

2   give a flavor that there's some hope for a resolution, it's

3   not appropriate.  Objection.

4            THE COURT:  I'm going to sustain the objection.

5            MR. HALLOWELL:  He also has narrowed it.  The

6   question is in --

7            MR. HAMMOND:  Thank you, Your Honor.

8            THE COURT:  Yeah, the question was, are you

9   continuing to talk about this.  I think that you're skating,

10  you are skating.  I'm sustaining the objection.

11           MR. HAMMOND:  Thank you, Your Honor.

12  BY MR. HAMMOND:

13  Q    Mr. Whittman, is there a provision in the RSA that

14  speaks to whether the BSA would be obligated to pay the

15  Coalition's attorneys' fees?

16  A    There is.

17  Q    Could you turn to page 7 of the RSA?

18       (Pause)

19  Q    I believe it's section -- you're at section 2(a)(vi)?

20  A    Yes, I see that.  This is the provision.

21  Q    Okay.  In your view, has the Coalition's work and

22  participation in this matter benefitted the estate?

23           MR. SCHIAVONI:  Objection, no foundation.  It calls

24  for an expert opinion on which there's no disclosure and, if

25  there is a foundation, it's based on information that's been

 1  withheld as privileged.

 2         MR. HAMMOND:  Your Honor, I disagree with that.  I

 3  mean, certainly he can discuss the fact that -- I'll try to

 4  avoid Mr. Hallowell's objection here.  Certainly he's

 5  permitted to discuss his interactions and what the Coalition

 6  has done, at least in terms of from an administrative

 7  perspective, for purposes of the estate.

 8         MR. SCHIAVONI:  All emails have been withheld on

 9  this basis, all emails from Mr. Whittman about the subject

10  matter have been withheld.

11         MR. RUGGERI:  Your Honor, we would love to hear

12  about the interactions and they have been fully withheld.

13         MR. HAMMOND:  Your Honor, I'm not talking about the

14  interactions, I'm talking about -- Mr. Whittman, could you

15  please step outside the room for a second?

16      (Pause)

17         MR. HAMMOND:  Your Honor, I'm not talking about the

18  interactions between the Coalition and the BSA for the BSA, I

19  was trying to elicit the fact that the Coalition represents a

20  number of abuse claimants.  Had they not existed, you would

21  have to deal with hundreds of lawyers and the like.

22         MR. SCHIAVONI:  That's argument.

23         MR. HAMMOND:  That is something --

24         THE COURT:  Yes.

25         MR. HAMMOND:  -- that is something that Mr.

1  Whittman can certainly speak to, without an expert testimony,

2  without an expert report, and without revealing mediation

3  privileged information.

4          MR. SCHIAVONI:  That wasn't the question, Your

5  Honor.

6          THE COURT:  I'm not sure it was.  I'm not sure that

7  was the question.  You can ask him that question.

8      (Pause)

9  BY MR. HAMMOND:

10 Q    Mr. Whittman, who does the Coalition represent?

11 A    The Coalition represents a large number of abuse

12 survivors that have claims in the Boy Scouts bankruptcy

13 process.

14 Q    From a practical perspective, has the ability to

15 negotiate with the Coalition provided any benefit to the

16 estate?

17 A    It has.

18          MR. HALLOWELL:  Objection.

19          THE COURT:  Someone posed an objection, who was

20 that?

21          MR. HALLOWELL:  Mr. Hallowell.  This lacks

22 foundation.  If he's testifying about a practical perspective,

23 anybody could testify to that and it's not relevant.

24          THE COURT:  I'll overrule that objection.  You can

25 respond.

1          THE WITNESS:  I'm sorry, I forgot the question.

2   BY MR. HAMMOND:

3   Q     Sure.  From a practical perspective, has the ability to

4   negotiate with the Coalition provided any benefit to the

5   estate?

6   A     Yes, I believe it has.  In particular, the ability to

7   speak with a single party that represents a large number of

8   claimants has been more efficient, it also has been

9   particularly important given the fact that, in order to

10  achieve the type of plan of reorganization we're looking to

11  achieve, we know that we need the affirmative support of the

12  plaintiffs group.

13  Q     And will that provide a benefit to the estate on a

14  going-forward basis?

15  A     I believe it will in that, again, as we continue to

16  negotiate settlement with various other parties, those

17  settlements could only be realized with the support of the

18  plaintiffs and having that group of plaintiffs at the table in

19  a single body allows us to have those negotiations in a

20  productive way.

21  Q     Mr. Whittman, did you support authorizing the payment of

22  the Coalition's attorneys' fees?

23  A     I did.

24          MR. HALLOWELL:  Objection.  Objection, it's not

25  relevant whether he supported it or not, and they haven't

1  provided us with any discovery with regard to whatever advice

2  he provided to his client with regard to that or any analysis

3  that he performed.

4          MR. HAMMOND:  Your Honor, I think to the extent

5  that Mr. Whittman prepared discussions on it and

6  communications with the board, that information has been

7  provided.

8          MR. SCHIAVONI:  There's not a single document, Your

9  Honor, not -- I defy Mr. Hammond to point us to a board minute

10  or one of Mr. Whittman's PowerPoint presentations where he

11  discusses the TDPs --

12          MR. HAMMOND:  We weren't talk about --

13          MR. SCHIAVONI:  -- and particularly --

14          MR. HAMMOND:  -- the TDPs, Mr. Schiavoni.

15          MR. SCHIAVONI:  -- sorry, or the fee issue --

16  frankly, either of those two issues.

17          MR. HALLOWELL:  And we have established at the

18  outset of this hearing, Your Honor, that not a single piece of

19  paper was provided to the debtor with regard to this.  So what

20  is he going to analyze?

21          MR. GOODMAN:  Your Honor, that's not accurate --

22          THE COURT:  Okay, this is --

23          MR. GOODMAN:  -- that we have not provided the full

24  --

25          THE COURT:  Okay, this isn't a free-for-all.  The

1  question is, yeah, why is this relevant, unless he advised

2  somebody about it, and you haven't provided what his advice is

3  to the board.  He can think what he wants, if he didn't advise

4  the board, why is this relevant?  What's it -- why are you

5  going to use this?

6          MR. HAMMOND:  Your Honor, I believe these are

7  documented in the minutes, but I will --

8      (Pause)

9  BY MR. HAMMOND:

10 Q    Well, let me skip over this.  Are there any limitations

11 on the Coalition's attorneys' fees in the RSA or in the

12 amendments to the RSA?

13 A    There are.

14         MR. HALLOWELL:  Objection, leading.

15         MR. HAMMOND:  I was going to point to them, Your

16 Honor; I was just directing him to it.

17         THE COURT:  Yeah, it is, but it's not harmful.  You

18 can answer the question.

19 BY MR. HAMMOND:

20 Q    And what are the limitations?

21 A    The limitations are, first, the aggregate the amount,

22 the -- there's a cap on the fees other than the go-forward

23 fees of ten and a half million dollars, there is the cap on

24 the monthly go-forward fees following the entry of the RSA,

25 entry of the confirmation of the plan, of $950,000 a month.

1   There's been subsequent additional provisions added as part of

2   the proposed form of order following discussions with the U.S.

3   Trustee regarding subjecting the go-forward fees to the same

4   review as other professionals in the case, including review by

5   the fee examiner; as well as some limitations on scope,

6   including not spending or being allowed to spend any money for

7   the $950,000 on matters that are adverse to the debtors.

8   Q     Mr. Whittman, in the subsequent amendments to the RSA

9   and the proposed order, is there any other limitation on the

10  fees on a go-forward basis?

11  A     The -- on the go-forward basis, there's the, as I said,

12  the limitation of $950,000 a month and the opportunity -- the

13  subjecting of the fees to the same review as other

14  professionals in the case.

15  Q     Mr. Whittman, did you ever discuss the relevant terms of

16  the RSA with the BSA's governing bodies?

17          MR. RUGGERI:  Objection to the form, Your Honor.  I

18  don't know what that question even asks.  Did you discuss the

19  relevant terms?  Relevant to whom?

20          THE COURT:  Why don't you rephrase the question?

21          MR. RUGGERI:  Improper question.

22          THE COURT:  Why don't you rephrase the question?

23  Sustained.

24  BY MR. HAMMOND:

25  Q     Did you ever discuss --

1        MR. HAMMOND:  -- I will, Your Honor --

2   BY MR. HAMMOND:

3   Q    -- did you ever discuss the terms of the RSA with the

4   BSA's governing bodies?

5   A    I did.

6   Q    All right.  Did you have any meetings with the

7   bankruptcy task force in NEC (ph) and the National Executive

8   Board on June 5th of 2021?

9   A    I did.

10  Q    Did you make any presentations at these meetings?

11  A    I did.

12  Q    Can you turn to Exhibit 42?

13       (Pause)

14  A    Okay.

15  Q    Can you explain to the Court what Exhibit 42 is?

16  A    Exhibit 42 is a presentation that was prepared by

17  Alvarez & Marsal at my direction related to the proposed BSA

18  trust contribution, as well as the expected liquidity of the

19  organization going forward as a result of that contribution

20  and the other obligations that BSA would be taking on in a

21  plan of reorganization.

22  Q    Mr. Whittman, can you turn --

23       MR. HAMMOND:  -- Your Honor, I'd move to introduce

24  Exhibit 42 into evidence.

25       THE COURT:  Any objections?

1          MR. RUGGERI:  Your Honor, my objection has to do

2    with the redactions.  I wouldn't have an objection if it

3    weren't redacted the way it is.  I have trouble understanding

4    how the, you know, blanks there are privileged given the

5    nature of the presentation and the role of Mr. Whittman in the

6    case.  So I have no objection to an un-redacted copy of this

7    being admitted into evidence.

8          MR. HAMMOND:  Your Honor, it's pretty clear from

9    looking at the columns here and (indiscernible) to focus on

10   what the actual objections are here.  One column says "Last

11   formal BSA offer," clearly made in mediation; one column says

12   "Coalition TCC formal position," clearly made in mediation.

13   Those seem to me to be squarely within mediation privilege.

14   I'm not sure I understand the real basis of this other than

15   they want to see the information.

16         MR. RUGGERI:  So, Your Honor, now the Court

17   obviously sees from this that we're being shielded from having

18   any of the foundational documents.  I forget the phrase that

19   Mr. Hammond used about the final agreements, right?  All you

20   get is that, you don't get anything more.  I don't think those

21   are, frankly, any more privileged than the other material on

22   the page.  If they want to admit the document, again, it

23   should be admitted in an un-redacted form.  This is a

24   financial adviser, he is providing information about

25   contributions and consideration and payments; they're just

1  blacking out those that they don't want us to see.  It's

2  inappropriate.

3          MR. HAMMOND:  No, Your Honor --

4          MR. HALLOWELL:  Your Honor -- Your Honor, this is

5  Mr. Hallowell for AIG and I would simply add to the objection

6  that, as has been established by the testimony here today,

7  this is material that the BSA board reviewed.  So this isn't

8  just back-and-forth, this is what they're trying to establish

9  is that all of this was part of the board's consideration with

10 regard to the RSA and yet they're not producing it.

11         MR. HAMMOND:  Your Honor, it would be a very odd

12 rule of privilege that you have to produce privileged

13 information that a board considered, that means there could

14 never be a privileged communication with a board.  That

15 exception would swallow the rule that Mr. Hallowell is

16 advocating for here.

17         MR. RUGGERI:  I think he's right, Judge, there is

18 something swallowing the rule, there's something swallowing

19 this whole proceeding and that's the claim of mediation

20 privilege, Your Honor.  Even under the business judgment test,

21 they have to meet their burden of proving the foundation and

22 by claiming privilege (indiscernible) privilege is that's a

23 burden they cannot met.

24         MR. SCHIAVONI:  I'm sorry, Your Honor, this is also

25 -- these are statements by a financial adviser about financial

1  issues.  This is not legal advice at all here, this is

2  financial advice.  And, look, it's noteworthy when you go

3  through the document, this is supposed to be the full

4  presentation to the board about the settlement, there's not a

5  single word about the TDPs anywhere in here or about the fees.

6  So if they're in the privileged information, we ought to see

7  them.

8         (Pause)

9         MR. HAMMOND:  Your Honor, I still don't understand

10  how you get by Rule 9019 given that this is clearly mediation

11  proposals.

12         MR. RUGGERI:  Your Honor, this goes back to your

13  instruction on July 27th, we're entitled to know what the

14  board considered, when it considered it, and what it did

15  consider.

16         MR. SCHIAVONI:  Tribune talks about maintaining

17  privilege of what happened in the mediation --

18         THE COURT:  Yep.

19         MR. SCHIAVONI:  -- this is what happened before the

20  board on a matter on which the debtor is affirmatively seeking

21  findings and has waived the rest of the document and,

22  arguably, waived through the testimony that we've heard

23  already from this witness, and they're going to offer into

24  evidence in some sort of findings.  Tribune doesn't go this

25  far.  You can't invoke mediation over everything from the

1  beginning of the case forward especially when you're putting

2  it at issue.

3        The case Mr. Ruggeri cited to the Court earlier

4  specifically addresses that, an instance where a party was

5  putting at issue something that they did in mediation, then

6  trying to seek a finding about it.

7        Your Honor, there's one other thing just as

8  significant in weighing like the back and forth that went on

9  in Tribune about this.  This is not -- you know, we were not a

10 mediation party to this discussion.  This isn't one mediation

11 party seeking to use a communication against the other; we

12 weren't part of this at all.  These thousands of meetings that

13 Mr. Whittman talked about, we weren't at those meetings.  It's

14 like -- so this isn't -- we're not using something that we

15 said or did in a mediation communication against them.

16        MR. HAMMOND:  Your Honor, I'm not sure what that

17 has to do with the question at hand here, which is whether to

18 admit this document or not, but -- and the objection that was

19 raised was privilege as to why the document -- what is non-

20 privileged in the document should be admitted.

21        THE COURT:  Well, yes, you're asking me to admit a

22 portion of a document and what I'm trying to figure out is

23 whether that's fair.  Okay?  But you're asking me to admit a

24 document that is redacted, redacted for what the debtor says

25 is privileged, and the question is, is that fair?

1          MR. HAMMOND:  Well, Your Honor, I think the answer

2  is, certainly I've heard no dispute that what the last formal

3  BSA offer is on the left-hand side is mediation privileged

4  material.  And the question on the right-hand side is whether

5  the Coalition/TCC formal proposal made in mediation is subject

6  to mediation privilege, which my understanding under Rule 9019

7  it is and my understanding under your order it is.

8          So can you reveal those privileged communications

9  in connection with the production of this document?  And I can

10  tell you there's certain other attorney-client privilege

11  issues down at the bottom of this page.

12          MR. RUGGERI:  No, Your Honor, the second column is

13  noteworthy because it says "likely resolution."  We're not

14  even getting the punch line here, we're getting an interim

15  report; he just doesn't want us to see the other interim

16  reports.  There's no more or less privilege to any portion of

17  this document than the portions that they're offering into

18  evidence.

19          THE COURT:  Well, I was looking at that column as

20  well trying to figure out what I would do with that, but --

21  yeah, in Tribune the court adopted an appropriate balance

22  between allowing discovery of potentially relevant information

23  and protecting the confidentiality of the mediation.  So it

24  doesn't mean that mediation privilege is always -- always

25  means that something can't be discovered or that you can

1  redact documents and use them in court.  And that's what I'm

2  struggling with is you want to use this document for a purpose

3  favorable to the debtors, but you don't want to provide the

4  entire document.  Forget any other document or the backup or

5  the analysis, you want to use this document.

6           MR. HAMMOND:  That's correct, Your Honor, but, I

7  mean, I view it no differently than you would have in the

8  circumstance where you're producing privileged board

9  materials, which happens all the time.  The question is

10 whether the material is privileged, that is the issue.

11 Clearly, it's a mediation position as reflected on the page

12 and we believe that under Rule 9019 of the local rules that is

13 mediation privilege, we believe it's mediation privilege under

14 your order, and --

15           THE COURT:  You know, don't throw --

16           MR. HAMMOND:  -- I believe the Tribune case --

17           THE COURT:  -- stop throwing --

18           MR. HAMMOND:  -- is probably --

19           THE COURT:  -- stop throwing the order back at me,

20 okay?  I --

21           MR. HAMMOND:  Well, Your Honor, I apologize --

22           THE COURT:  This is not -- the issue, even when

23 mediation privilege is recognized, in Tribune the court

24 permitted discovery of certain documents.  So it's not an

25 absolute and it makes a court hesitant to send something to

1  mediation.  Okay?  And mediation is important.

2              So I want to see this document.  Somebody needs to

3  -- we're going to take a break.  I had hoped to get through

4  Mr. Whittman's direct.  We're going to take a break now.

5              Mr. Whittman, you are not to talk to anybody about

6  your testimony.  You are in the middle of testimony.  I know

7  you understand that, I'm sure you've been in this situation

8  before.

9              I would like that emailed to my chambers, the un-

10 redacted document, so I can take a look at it.

11             MR. HAMMOND:  Your Honor, could I just take care of

12 one housekeeping matter before we break?

13             THE COURT:  Yes.

14             MR. HAMMOND:  And that was Exhibit 1A, which was

15 the letter from the -- it was attached to the Mosley

16 declaration, the June 9th letter, and I wanted to move that

17 into evidence.

18             THE COURT:  Anyone have any objection?

19             MR. HALLOWELL:  Objection, Your Honor.

20             THE COURT:  What's the objection?

21             MR. HALLOWELL:  Objection.  It's hearsay and it

22 cannot be established by this witness, he is not a sender or

23 recipient of that document.

24             THE COURT:  1A?

25         (Pause)

1           THE COURT:  What's your response?

2           MR. HAMMOND:  Your Honor, Mr. Whittman is the lead

3  financial adviser, certainly he came into possession of this

4  document during the course and scope of his duties as a -- as

5  the lead financial adviser to the BSA and in connection with

6  participating in these discussions.

7           THE COURT:  Okay.

8           MR. HAMMOND:  So I believe he has sufficient

9  knowledge.

10          THE COURT:  When we come back, you can lay the

11 foundation and you can ask him questions about the document,

12 and we'll see if it's admissible.

13          MR. HAMMOND:  Thank you, Your Honor.

14          THE COURT:  Okay.  We're going to take a recess.

15 It's 2 o'clock, we're going to take a recess until 3:00.

16 We're in recess.

17          COUNSEL:  Thank you, Your Honor.

18      (Recess taken at 2:01 p.m.)

19      (Proceedings commenced at 3:11 p.m.)

20          THE COURT:  This is Judge Silverstein.  We're back

21 on the record.  I would like -- okay, I would like to continue

22 a discussion without Mr. Whittman --

23          MR. KENNEDY:  Your Honor, this is Doug Kennedy, a

24 member of the Tort Claims Committee.  May I beg the indulgence

25 of two minutes of the Court's time, please?

1      THE COURT:  Not right this minute.  I would like

2  Mr. Whittman to go back out in the hallway so we can have a

3  discussion.  Thank you.

4      THE WITNESS:  Yes, Your Honor.

5    (Pause)

6      THE COURT:  During the break, I've given this some

7  thought.  Mr. Kurtz in his conversation on discovery said,

8  "The debtors' case is about two things:  process and terms."

9      I think the debtor is straying away from that and

10  that's creating issues.  And if the debtor is correct that its

11  case is about process and terms then it needs to limit its

12  discussion to that and then, within that, you can get within

13  the case that talk about business judgment and they talk about

14  whether or not, for example, debtors have sought legal advice;

15  not what the legal advice is, but whether they've sought it or

16  not.

17      And I happen to be looking at Vice Chancellor

18  Parson's decision in Comverge, Inc. Shareholders Litigation,

19  2013 W.L. 1455827, which I got after reading Unitrim (ph).

20  Unitrim I think is distinguishable because communications of

21  attorneys were put into evidence.  It wasn't an at-issue case,

22  okay?  But Judge -- or former Vice Chancellor Parsons speaks

23  to due care, whether the board acted in due care, with due

24  care.

25      So I think the debtor is straying from what Mr.

1  Kurtz said, in any event, that this is about process and

2  terms.  And I think one of the reasons the debtor may be

3  straying is because the order requests a finding that the RSA

4  was negotiated at arm's length and in good faith, and that

5  suggests I need to make a finding about everybody and

6  everybody's involvement -- and not just what the debtor did,

7  but everybody's involvement, and everybody's involvement and

8  what they did I think is -- for purposes of the RSA, is a much

9  broader set of circumstances.

10          And I started out with what does good faith mean in

11  the context of an RSA and what do I need to decide.  And I'm

12  still not sure I understand what good faith means in the

13  context of an RSA and I will acknowledge that some courts have

14  found good faith for specific parties in the RSA context, but

15  I think that requires a much different evidentiary basis than

16  just what I consider to be a small scope of this hearing,

17  which is basically should the debtors be able to go forward

18  here.  From the debtors' perspective, has it properly

19  exercised its business judgment?

20          So I don't think it's too much different from what

21  I said before.  What did the debtor consider?  What advice did

22  they consider, topics did they consider.  What did they not

23  consider?  I don't think that means that objectors get to go

24  behind those topics necessarily to explore advice that was

25  given unless people are relying on that advice as part of

1  their case and, quite frankly, I'm a little unclear on

2  debtors' case.

3         So I guess the question I would have -- and if the

4  debtors need to huddle, that's fine, or if all the RSA parties

5  need to huddle, that's fine -- is how are we going forward?

6  Are we insisting on a good faith finding?  Because, if we are,

7  then I'm going to find that the scope of what can come into

8  evidence is much broader.  And, if you're not, then I think

9  the testimony should be tailored and, if it goes beyond what

10 the debtors think they have to prove to me, which is process

11 and terms, then they may open the door to privileged

12 communications coming out in evidence.

13        I did look -- I will say, I did look at the

14 document that was sent to chambers.  Thank you very much.  I

15 do believe that the redactions are either probably mediation

16 privilege or attorney-client privilege.  If you want to use

17 the document, I guess the question is why are you using it?

18 Does it go to terms?  Does it go to process?

19        MR. HAMMOND:  Do you want a response, Your Honor,

20 to that discussion?

21        THE COURT:  This is --

22        MS. LAURIA:  Actually, Mr. Hammond -- this is

23 Jessica Lauria, Your Honor, may I just before we go back into

24 the evidentiary record respond to Your Honor's request about

25 whether we need the good faith findings in the order and the

1  arm's length negotiation?  I certainly can speak for the

2  debtor, but I have not consulted with the other RSA parties on

3  that topic.  It may streamline the rest of the evidentiary

4  presentation if we take a brief, ten-minute break and consult

5  with the other RSA parties concerning what their views are on

6  that subject matter and come back to the Court.

7         THE COURT:  I think that's fine, and I'll give you

8  15.  So I've got 3 --

9         MS. LAURIA:  Thank you, Your Honor.

10        THE COURT:  -- I've got 3:20, we'll reconvene at

11 3:35.  Thank you.  We're in recess.

12    (Recess taken at 3:20 p.m.)

13    (Proceedings resumed at 3:34 p.m.)

14        THE COURT:  Ms. Lauria.

15        MS. LAURIA:  Thank you, Your Honor.  Jessica

16 Lauria, White & Case, on behalf of the debtors.  Thank you for

17 accommodating us with that brief recess.  In the olden days, I

18 think we would have just gathered behind counsel table and had

19 that conversation, but we are where we are with our

20 technology.

21        I think I can speak on behalf of all of the RSA

22 parties that we are comfortable removing the good faith, arm's

23 length findings from the form of order or from the findings

24 that the Court would be making.  Of course, you will need to

25 decide that we've satisfied the applicable legal standard, we

1  think that standard is business judgment, but beyond that we

2  do not need the good faith, arm's length findings.

3          THE COURT:  Thank you.

4          Okay.  So we can recommence with our witness.

5          MR. HAMMOND:  Thank you, Your Honor.  We'll get

6  this working.

7      (Pause)

8          THE WITNESS:  Thank you, Your Honor.

9          MR. HAMMOND:  Your Honor, I think, from a

10 housekeeping perspective, we were on Exhibit 1A.  We can defer

11 that and I think, if we could start at -- and we had moved 1A

12 into evidence and there were several objections, that Mr.

13 Whittman didn't sign the document.  I think our view is that

14 the document can come in at a minimum under Rule 807, but if

15 you'd prefer us to (indiscernible) we're happy to do that as

16 well.

17         THE COURT:  It can come in -- I'm sorry --

18         MR. HAMMOND:  Is there any real objection that this

19 is an authentic document?

20         MR. HALLOWELL:  We object.  We object to -- there's

21 no foundation for the document, the document is hearsay, and

22 we don't understand how this communication is not subject to

23 the mediation objection but everything else communicated to

24 (indiscernible) --

25         THE COURT:  Excuse me for a moment.  Are you having

1  a little --

2           MR. HAMMOND:  Is this --

3           THE COURT:  -- hesitation here or is it just me?

4       (Pause)

5           THE COURT:  Okay.  Well, the document is hearsay.

6  I didn't hear your reason for why it should come in, just

7  under the more general --

8           MR. HAMMOND:  It can come in under the residual

9  exception --

10          THE COURT:  -- residual --

11          MR. HAMMOND:  -- (indiscernible) --

12          THE COURT:  Yeah, I'll permit it under the residual

13  exception.  It looks like what it is and I think it has enough

14  indicia of authenticity.

15      (Debtors' Exhibit 1A received in evidence)

16          MR. HAMMOND:  Thank you, Your Honor.

17          I think the next order of housekeeping here was

18  Exhibit 42 that we had moved into evidence and that's where we

19  left off our discussion.

20          THE COURT:  Okay.  And are --

21          MR. HAMMOND:  And bearing in mind -- I was just

22  going to say, bearing in mind Your Honor's comments, I think

23  this does go to process and it does go to terms to the extent

24  that it results -- it's discussing communication with the

25  National Executive Board concerning terms of the deal.

1        MR. HALLOWELL:  Your Honor, based on that

2   description, this document I do not believe was prepared for

3   the National Executive Board.

4        (Pause)

5            THE COURT:  It wasn't prepared for who?

6            MR. HALLOWELL:  The National Executive Board.

7        (Pause)

8            MR. HAMMOND:  I think you cut out.

9            MR. HALLOWELL:  Can you hear me now?

10           MR. HAMMOND:  Yes.

11           MR. HALLOWELL:  This is not a document that was

12  prepared for the National Executive (indiscernible) --

13           MR. HAMMOND:  I think Mr. Whittman's testimony was

14  to the contrary.

15       (Pause)

16           THE COURT:  Okay.  Can everyone who is not speaking

17  make sure you're muted?

18       (Pause)

19           THE COURT:  Well, I'm looking back at my notes and

20  I don't know that I have that.  Could you please ask Mr.

21  Whittman again what this was prepared for?

22           MR. HAMMOND:  Yes, Your Honor.  Thank you.

23                   CONTINUED DIRECT EXAMINATION

24  BY MR. HAMMOND:

25  Q    Mr. Whittman, I'm referring you to Exhibit 42, and you

1  previously had talked about presentations that you made for

2  the National Executive Committee, the Bankruptcy Task Force

3  and the National Executive Board, can you describe who this

4  presentation, the one dated June 5th of 2021, was prepared

5  for?

6  A     This presentation was provided both to a meeting, a

7  joint meeting of the BTF and the NEC, and later the same day

8  to a meeting of the National Executive Board.

9            THE COURT:  Okay.  I will admit the document.

10           (Debtors' Exhibit 42 received in evidence)

11           MR. HAMMOND:  Thank you, Your Honor.

12  BY MR. HAMMOND:

13  Q     Mr. Whittman, at this June 5th meeting, did you discuss

14  the financial contribution of the BSA that was contemplated

15  under the RSA?

16  A     We did.

17  Q     Okay.  And why did you prepare this document?

18  A     I prepared this document to provide the board with an

19  update on the negotiations between the parties and the --

20  where we expected the likely resolution as it related to BSA's

21  contribution to the settlement trust, so that the board could

22  consider that information and approve moving forward with a

23  settlement that included -- or was an RSA that included this

24  level of contribution, including both the aggregate

25  contribution and the associated debt component of the

1  contribution.

2  Q    And why was this presentation made to both the BTF and

3  the National Executive Committee on one side and then the

4  National Executive Board?

5  A    We made the presentation first to the BTF and the NEC,

6  so they could ask their questions, and then in turn we made

7  the presentation to the NEB.  The NEC was able to recommend to

8  the full board that they approve the settlement, these

9  settlement provisions.

10  Q    And what was the amount of the settlement contribution

11  that was contemplated here?

12  A    This contemplated a settlement of up to $250 million

13  with a component, a debt component being $80 million.

14  Q    And why were those two components presented to the

15  National Executive Board?

16  A    It is my understanding that the National Executive

17  Board, their authority was required for the organization to

18  take on additional debt and that, while many aspects of the

19  RSA were within the purview of the National Executive

20  Committee, committing the BSA to taking on additional debt

21  required approval of the National Executive Board.

22  Q    In connection with this presentation you made, did you

23  discuss with the National Executive Board factors that should

24  be considered to help them evaluate the financial contribution

25  of the BSA that was requested in the RSA?

1  A     We did.  We talked about all of the commitments that BSA

2  was undertaking in accord -- or under the plan of

3  reorganization, in the proposed plan of reorganization, how

4  those commitments would position BSA from their liquidity

5  position coming out of bankruptcy, and how those commitments

6  would unfold over the following ten-year period and the impact

7  they would have on BSA's liquidity.

8  Q     And can you turn to slide 2 in the presentation, please?

9  Mr. Whittman, did you present this slide 2 at the National

10 Executive Board meeting?

11 A     I did.

12 Q     And can you explain what is in slide 2?

13 A     Slide 2 provides a look at BSA's projected liquidity

14 over the next roughly two-year period through the end of 2023,

15 starting with an assumed effective date of a plan at August

16 30th -- or 31st of 2021, and how the liquidity would unfold

17 from that point.  It also provides some alternative scenarios,

18 one is a timing scenario, delaying emergence to March 31st of

19 2022, and the other is a downside scenario.

20 Q     And you had mentioned a $80 million note before?

21 A     I did.

22 Q     Did you discuss the terms of the $80 million note with

23 NEB when you did that?

24 A     We did.  We talked about the key terms that would be

25 authorized for the note, both in terms of the size, the

1  cadence of principal payments, the interest provisions, and so

2  forth.

3  Q    Can you turn to slide 6 in Exhibit 42, please?  And, Mr.

4  Whittman, can you explain to the Court what slide 6 reflects?

5  A    In particular, slide 6, as it relates to the $80 million

6  trust note, reflects the expected principal payments on the

7  note, which were divided into a fixed component and a variable

8  component, it also reflects the interest associated with that

9  note.  And then, moving down the page, it provides the board

10  the complete picture of the other obligations that BSA would

11  have at emergence, including a JPMorgan secured debt that

12  would be reinstated, the UCC -- sorry, the payment obligation

13  to the general unsecured creditors of $25 million that would

14  be paid out over the course of two years and the loan from the

15  foundation that is contemplated in the plan, and lays out all

16  those payments over time and the expected BSA liquidity

17  position both in terms of unrestricted liquidity and the

18  restricted cash and investment balance over that same period

19  of time.

20  Q    In connection with your presentation to the National

21  Executive Board on June 5th, did the National Executive Board

22  engage you in discussions?

23  A    They did.

24  Q    And, following this presentation, did you make any

25  recommendation to the National Executive Board as to whether

1  they should authorize a settlement contribution of up to $250

2  million with a note of up to $80 million?

3  A    I did make a recommendation and I recommended that they

4  move forward with approving that -- those settlement

5  provisions.

6  Q    Did the National Executive Board ultimately authorize a

7  settlement payment to the trust of up to $250 million and it

8  turning into an $80 million at this June 5th meeting?

9  A    They did.

10 Q    Can you turn to Exhibit 30, please?

11      (Pause)

12 Q    Mr. Whittman, are these the minutes of the National

13 Executive Board meeting held on June 5th?

14 A    They are.

15 Q    And if you turn to the last page, page 3, do you see at

16 the bottom of page 3 where it says, "Upon motion, unanimously

17 approved."  Without any abstentions, the board voted to

18 approve the proposed settlement package estimated at $250

19 million, including the additional $80 million note to the

20 victims' trust?

21 A    I do.

22 Q    Is that consistent with your recollection of that

23 meeting?

24 A    That is.

25 Q    Now, Mr. Whittman, between the National Executive Board

1  meeting that was held on June 5th and July 1st, when the BSA

2  entered into the RSA agreement, did you have any other

3  meetings with the National Executive Committee and Bankruptcy

4  Task Force?

5  A    Yes, I had several meetings with the Bankruptcy Task

6  Force and at least one with the National Executive Committee.

7  Q    And during those meetings did you discuss the local

8  councils' contributions under the RSA?

9  A    I did.

10 Q    Why were you discussing with the Bankruptcy Task Force

11 and the National Executive Committee local councils'

12 contributions under the RSA?

13 A    During that period of time there was negotiations

14 ongoing related to how much the local councils would

15 contribute and in fact on July -- sorry, on June 17th we filed

16 the third amended plan reflecting a $500 million contribution

17 from the local councils to the settlement trust.  From that

18 point, there were continued discussions and negotiations

19 related to the $100 million, what became known as the DST

20 note.  Those DST notes, there's an interplay between the

21 funding of that note from the local councils and the pension

22 plan of the debtors.  The debtors were keenly interested in

23 that structure of that note and I was heavily involved in the

24 negotiations of that note, and we had numerous discussions

25 related to that component of the local council contributions

1  both before and after June 17th and up until entry of the RSA.

2  Q    And if you'd turn to Exhibit 46, Mr. Whittman?

3  A    I'm here.

4  Q    Mr. Whittman, can you explain to me what Exhibit 46 is?

5  A    This was a presentation that was prepared at my

6  direction by my team at Alvarez & Marsal for a meeting with

7  the National Executive Committee on June 22nd, specifically

8  related to the local council trust contributions, including

9  the DST note.

10 Q    Mr. Whittman, can you turn to slide 2 of Exhibit 46?

11 A    I'm there.

12 Q    And can you explain what you were trying to convey to

13 the National Executive Committee in slide 2?

14 A    On slide 2, I'm conveying first that we have an

15 agreement where the ad hoc committee has signed on to raising

16 the $500 million from the local councils and the composition

17 of the $500 million in terms of the cash and the property, and

18 some of the specific terms around how the cash and property

19 would be contributed, and then I am conveying that in the

20 event that we are able to reach an RSA that includes the --

21 not only the Coalition, but the TCC, that we are going to be

22 including -- we have an agreement to include an additional

23 $100 million of consideration in the form of a nonrecourse

24 note, which ultimately becomes what I've called the DST note.

25 Q    If you'd turn to slide 3 for a moment, please?

1   A      Okay.

2   Q      And in slide 3, at the top, it refers to a $100 million

3   nonrecourse note, is that the DST note that you're referring

4   to?

5   A      That is.

6   Q      And what are the terms of that note?

7   A      The key terms I believe (indiscernible) with the board

8   is that the note would be a nonrecourse note issued by this

9   special purpose entity, that it would only be paid --

10  essentially, money from the local councils based on a formula,

11  a 12-percent-of-payroll formula would go into this special

12  purpose entity and, depending on the level of cushion in the

13  Defined Benefit Pension Plan at certain points in time,

14  payments would come from that account to pay the note, and if

15  there was insufficient cushion in the pension plan or the

16  pension plan was underfunded, then monies would go from that

17  account into the pension plan.

18  Q      Mr. Whittman, did the National Executive Committee ask

19  you any questions about your presentation on June 22nd?

20  A      They did.  We had a very robust discussion about this

21  issue.

22  Q      Do you believe that the National Executive Committee

23  understood the information that you were conveying to it at

24  the June 22nd meeting?

25  A      I do.

1          MR. SCHIAVONI:  Objection.

2          MR. HALLOWELL:  Objection.

3          THE COURT:  Sustained.

4          MR. HAMMOND:  I'm sorry, Your Honor, I didn't --

5          THE COURT:  I sustained that objection.

6          MR. HAMMOND:  I think at this time I'll pass the

7  witness.  But before I do, I do have some housekeeping matters

8  to address -- one housekeeping matter to address.  I wanted to

9  move in the two declarations that were submitted in connection

10  with the RSA motion.

11          MR. HALLOWELL:  We object to that, Your Honor.

12          MR. RUGGERI:  We join --

13          THE COURT:  Okay.  I take it these are the two

14  declarations --

15          MR. RUGGERI:  -- for the reasons stated in our

16  motion.

17          THE COURT:  -- declarations of Mr. Whittman?

18          MR. HAMMOND:  Yes, Your Honor, I believe it's 2 and

19  4 in the binders, and it's docket number 5470 and 5766.

20          MR. HALLOWELL:  Your Honor, the declarations are

21  obviously hearsay.  We've had several hours of direct

22  testimony from Mr. Whittman that has covered every possible

23  subject and there is no reason for the debtors to move these

24  hearsay documents into evidence -- and, if they do, we ask

25  that you strike the entirety of Mr. Whittman's direct

1  examination.

2          THE COURT:  Let me hear a response.

3      (Pause)

4          THE COURT:  Mr. Hammond --

5          MR. HAMMOND:  I'm sorry, Your Honor, I --

6          THE COURT:  -- Mr. Hammond, let me hear a response.

7          MR. HAMMOND:  Your Honor, we believe it's customary

8  to introduce these declarations.  They'll have a full

9  opportunity to cross-examine him on the points raised in the

10  declarations and I assume they will.  So we believe that it's

11  -- you know, Mr. Whittman is being made available, he's been

12  made available at depositions, they've been offered -- they've

13  been offered the opportunity to cross-examine him on it at

14  depositions that they've declined and now they'll have an

15  opportunity to examine him in open court.  So we believe it's

16  appropriate to introduce those declarations into evidence at

17  this time.

18          MR. RUGGERI:  Your Honor, James Ruggeri for

19  Hartford.  I apologize for being a little slow on the draw

20  here.  I do think the declarations actually go to the issue

21  that I think was -- as the case was narrowed, when we're just

22  looking at process and terms from the perspective of debtors,

23  if you look at the declarations in particular, the 726

24  declaration, it goes into the issues that caused all the mud

25  wrestling earlier today, they're hearsay.  I think that the

1  direct testimony has supplanted the need for any declarations

2  and I actually think that letting them -- admitting them in

3  evidence gets us into the mud wrestling exercise that we're

4  trying to avoid now.

5          Thank you, Judge.

6          THE COURT:  Okay.  My inclination is to not admit

7  the declarations.  We've had significant testimony from Mr.

8  Whittman, it was not just some additional testimony, but I

9  will give the debtors an opportunity to see if there's any

10 particular paragraph of these declarations that was not

11 testify to and that is germane to the scaled-down hearing that

12 we're having.

13         MR. HAMMOND:  Thank you, Your Honor.  And one last

14 thing, I believe -- I just wanted to make sure I did this, was

15 move to introduce Exhibit 46 into evidence as well.

16         MR. SCHIAVONI:  Your Honor, I would ask to be heard

17 on 46.  I'm getting a -- by the way, I'm getting a little

18 message saying you cannot start your video because the host

19 has stopped it, I think that's the Court, and maybe there's

20 good reasons not to see me and I'm okay with that, okay?  But

21 I'm not masking myself on purpose.  I just want you to know.

22         So, Your Honor, on this particular exhibit -- oh,

23 hold it, maybe they've fixed it there.  Ah, there I am.  Okay.

24 Well, for better or for worse, right?

25         So, Your Honor, on this exhibit, I know this In re

1  Comverge, Inc. case and I just took another look at it during

2  the break, and I think the exhibit you just saw illustrates

3  really the problem we have.  In In re Comverge, Inc., what the

4  court took comfort from -- and like the money, the money

5  quote, so to speak -- in the decision is a close examination

6  of the Comverge, Inc. defendant statements reveal that they

7  have adhered assiduously to assertions that the board only

8  sought, obtained, received, or considered the advice of

9  counsel.  That's not what you just listened to for ten minutes

10  of walking through this board minutes.  They walked through it

11  and it has multiple references in it to things that Mr.

12  Whittman, a financial adviser, not a lawyer, told the board.

13         And then Mr. Whittman, they had him elicit

14  information from that document and assert that information for

15  the truth of the matter asserted, affirmatively.  Meanwhile,

16  it's like the excising of it is very -- it's very deliberate,

17  it's very selective.  It's not just sections of it where it

18  says, "Ms. Lauria said," and then excised, Mr. Whittman's

19  statements are excised.

20         So we don't think the document should come in.  We

21  think there was affirmative waiver in connection with the use

22  of the document.  And, you know, this does go back to our

23  whole issue about how we're prejudiced about even just cross-

24  examining Mr. Whittman because the only documents they've

25  released contemporaneously are sections that they want in

1  evidence.

2          And just on that point, to be clear, the one thing

3  you don't see anywhere in this document is anything about the

4  TDPs or the fees.

5          MR. HAMMOND:  Your Honor, I think Mr. Schiavoni has

6  the wrong document.  Obviously, I said Exhibit 46; I think

7  he's referring to Exhibit 30.  So I'm not quite sure what his

8  objection is.

9          MR. SCHIAVONI:  I'm referring to Exhibit 30, which

10 was used.

11         MR. HAMMOND:  I didn't move to introduce it, so

12 what's your point?

13         MR. SCHIAVONI:  That by using it you waived

14 substantively the privilege.

15         MR. HAMMOND:  I think the subject matter at issue

16 was Exhibit 46.

17         THE COURT:  Okay.  Is there an objection to Exhibit

18 46?

19      (No verbal response)

20         MR. SCHIAVONI:  Mr. Hammond, which -- excuse me,

21 Your Honor -- Mr. Hammond, which exhibit is 46?

22         MR. HAMMOND:  46 was the A&M presentation, June

23 22nd, 2021.

24         MR. SCHIAVONI:  One second.

25      (Pause)

 1          MR. SCHIAVONI:  I have the same objection to the

 2   privilege assertions in it.

 3          THE COURT:  Okay, I'm going to deny admission of

 4   this exhibit.

 5          MR. HAMMOND:  Are we talking about exhibit -- Your

 6   Honor, just --

 7          THE COURT:  Exhibit 46.

 8          MR. HAMMOND:  -- to be clear for the record, are we

 9   talking about Exhibit 46?

10          THE COURT:  46.

11       (Pause)

12          THE COURT:  Okay --

13          MR. HAMMOND:  Okay.

14          THE COURT:  -- cross.  Who's going to take the

15   lead?

16          MR. SCHIAVONI:  It's our witness, Your Honor?

17          THE COURT:  Yes.

18          MR. SCHIAVONI:  I will.  If first I may just ask

19   the courtesy from Mr. Hammond of the May 25, 2021 statement,

20   the PowerPoint presentation, can you give me the exhibit

21   number of that, please, that you used so I can use the same

22   one?

23          MR. HAMMOND:  I don't believe I used the May 25th

24   presentation; I used the June 5th one.

25          MR. SCHIAVONI:  Ah, the June 5th, yes.  What's the

1  number on that?

2            MR. HAMMOND:  June 5th is Exhibit 42.

3            MR. SCHIAVONI:  Okay.

4                      CROSS-EXAMINATION

5  BY MR. SCHIAVONI:

6  Q     Mr. Whittman, you're a financial adviser, am I right?

7  A     I am.

8  Q     And you haven't provided any legal advice in this case,

9  have you?

10 A     I have not.

11 Q     And one of the things you offered testimony on as part

12 of your direct is the information you've provided to the board

13 in connection with its decision-making associated with aspects

14 of the RSA, am I right?

15 A     I have -- yes, I have testified as to advice I've given

16 to the board as part of their decision-making process.

17 Q     Am I right, Mr. Whittman, that at the time that you

18 provided your advice to the board about going forward with

19 aspects of the RSA you didn't provide a draft of the RSA to

20 the board?

21 A     I'm not sure --

22            MR. HAMMOND:  Objection to form.  I just -- what

23 are we talking -- which board are we talking about?

24 BY MR. SCHIAVONI:

25 Q     Oh, any of the boards, Mr. Whittman.  Did you provide a

1  copy of the draft RSA to the board, any of the boards, for

2  approval?

3  A     I believe that the board saw -- the board, NEB, the NEC,

4  and the BTF saw drafts of the RSA at different points in time.

5  I'm not sure which specific point in time you're referring to.

6  Q     Before it was executed.

7  A     Yes, before it was executed.

8  Q     Okay.  Can you point us to a board minute that refers to

9  the board being provided with a draft of the RSA before it was

10  signed?

11  A     I'm not sure that I could.  I'm not familiar with all of

12  the board minutes.

13  Q     Okay.  What you have in front of you, are those the

14  board minutes?

15  A     I believe some of these exhibits --

16        (Audio gap)

17  Q     -- Mr. Whittman, provide a copy of the RSA or draft of

18  it to the board before it was signed?

19  A     That would not have been my role to do so --

20  Q     Okay.  And, Mr. Whittman, can you testify under oath

21  based on your personal knowledge that the board was in fact

22  provided with a draft of the RSA or the completed agreement

23  before the board -- before it was signed?

24  A     Which board are you referring to?

25  Q     Well, let's start with the NEC.  Do you have a present

1  recollection of providing -- of the board in fact being

2  provided with a copy of the RSA before it was signed?

3  A    I did not provide anyone with a copy of the RSA, but I

4  do believe that the NEC and Bankruptcy Task Force saw copies

5  of the RSA prior to execution.

6  Q    Okay.  And that's what I'm just trying to tease out,

7  sir.  Do you just believe it or can you testify under oath

8  that in fact it happened, that the board was in fact given a

9  copy of the RSA before it was signed?

10 A    I am certain that the board was given a copy of the RSA

11 before it was signed.

12 Q    Okay.  Have you reviewed Mr. Ownby's testimony on that

13 issue?

14 A    I have not reviewed any of Mr. Ownby's testimony.

15 Q    And is he the chair of the board?

16 A    He is the chairman of the board, that is correct; not

17 the chairman of the Bankruptcy Task Force, but is the chairman

18 of the board.

19 Q    If in fact the board, any of the boards were presented a

20 copy of the RSA to review in advance of it being signed, is it

21 your expectation that that would be reflected in the board

22 minutes based on your dealings with the Boy Scouts boards?

23          MR. HAMMOND:  Objection, Your Honor.  I believe

24 that's an incomplete hypothetical.

25          THE COURT:  Overruled.  You can answer, if you can.

1           THE WITNESS:  The board had met on -- or the

2   National Executive Committee and Bankruptcy Task Force had met

3   on June 21st and June 22nd, I believe, as we covered a moment

4   ago, the RSA was executed on July 1st.  In that intervening

5   time, drafts would have been exchanged.  That was not done in

6   the context of a meeting and so, therefore, I don't believe

7   there would have been minutes reflecting such an exchange.

8   BY MR. SCHIAVONI:

9   Q    Were the boards convened in the interim period before

10  the RSA was signed?

11  A    I'm not aware of the board convening.  I understand that

12  the board -- there was email exchanges where the board gave

13  the final green light to entering into the RSA.

14  Q    Oh, can you tell us what date that email was issued on?

15  A    That was issued on June 30th.

16  Q    And would you expect the board -- the document itself to

17  reflect that a copy of the RSA was provided?

18           MR. HAMMOND:  Objection, Your Honor.  Now we're

19  asking Mr. Whittman about what he expects?

20           THE WITNESS:  I'm not actually sure I understood

21  the question.

22           THE COURT:  Yeah, sustained.

23           MR. SCHIAVONI:  Yeah, fair enough, that's fair

24  enough.  I'll --

25           THE COURT:  Sustained.

1    MR. SCHIAVONI:  -- withdraw the question.

2  BY MR. SCHIAVONI:

3  Q    So, Mr. Whittman, is it fair to say that the board

4  didn't convene for consideration of any draft or final copy of

5  the RSA before it was signed, am I right?

6  A    The board had been discussing elements of the RSA for a

7  number of weeks.  The board did not convene immediately prior

8  to the signing of the RSA.

9  Q    Okay.  And let's get into that, the elements that were

10  being discussed.  You provided a PowerPoint that was intended

11  -- was the intent of that PowerPoint that you provided to the

12  board to present the key points that the board was supposed to

13  approve?

14  A    I'm not sure which PowerPoint you're referring to.

15  Q    All right, fair enough.  The June 5, 2021 PowerPoint,

16  Exhibit 42.

17        (Pause)

18  A    The intent of the June 5 presentation was to update the

19  -- first the Bankruptcy Task Force and the National Executive

20  Committee, and later in the same day the National Executive

21  Board, where we stood as it related to the BSA component of

22  the trust contribution.  And, as I explained earlier, given

23  that the National Executive Board was the only body that had

24  the authority to authorize the entry into additional

25  indebtedness, to have the National Executive Board authorize

1  the BSA settlement contribution including the size of the note

2  to the trust.  There were separate presentations and

3  discussions about many other aspects of the RSA at various

4  points in time and there were other discussions with the

5  boards on June 5th; however, this particular document was

6  focused on that one element of the RSA.

7  Q    Were what the terms were that the board was asked to

8  approve, were those set forth in a summary of terms that you

9  provided to the board?

10 A    The National Executive Board received this PowerPoint

11 presentation which summarized the terms of the note.  I don't

12 recall if there were any other documents they received at the

13 time with additional summaries, but this document provided

14 them with the key terms that we reviewed with them that they

15 needed to know to approve the entry into the $80 million note.

16         MR. SCHIAVONI:  If I could just ask my colleague to

17 pull up on the screen Exhibit -- from our binder, tab SF (ph).

18 I will show it to you on the screen, Mr. Whittman, it's the

19 minutes from the May 25 meeting.

20         MR. HAMMOND:  Mr. Schiavoni --

21         MR. SCHIAVONI:  Do you have a paper copy of the May

22 25 meeting with you?

23         MR. HAMMOND:  Pardon me, Mr. Schiavoni, is this the

24 note that you circulated this morning, like while we -- when

25 we had started testimony, is this one of the 111 exhibits that

1  you circulated at that point in time?

2          MR. SCHIAVONI:  These are the May 25, 2021 board

3  minutes.

4          MR. HAMMOND:  Yeah, I'm asking you when you

5  circulated them because our understanding is -- my

6  understanding is you circulated all of this after we had

7  started testifying here.

8          MR. RUGGERI:  Mr. Schiavoni, if it helps, it's

9  actually tab 27 of the debtors' binder.  So it's actually a

10 document that they circulated.

11         MR. SCHIAVONI:  Oh, that's fine.

12 BY MR. SCHIAVONI:

13 Q    So, Mr. Whittman, if we could -- why don't we go -- have

14 you seen these minutes before?

15 A    I -- yes, as part of preparing for testimony, I did

16 review the minutes.  So I have --

17 Q    Okay.  Why don't we go to the last paragraph of them?

18      It says in that last paragraph, Mr. Whittman, that "Upon

19 motion, unanimously approved by the committee," the committee

20 -- sorry, "Upon motion, unanimously approved, the committee

21 agreed to recommend that the board grant authority to settle

22 with the claimant constituent, consistent with the terms in

23 the summary of terms provided by Brian Whittman, totaling up

24 to $250 million."

25      Have I read that correctly?

1  A      That is correct.

2  Q      Okay.  And is that what happened?  The committee was

3  provided with a summary of terms by you and that's what the

4  committee voted on?

5  A      That is correct.  There was a PowerPoint presentation

6  similar in sort of form and substance to the one we were just

7  looking at from the June 5th meeting that was prepared for the

8  May 25th meeting, which I believe is Exhibit 39 in the

9  debtors' binder here, and -- no, I don't think it's 39 --

10 well, one of the exhibits here, and -- but, again, it's a very

11 similar exhibit and that was presented to the NEC on May 25th.

12 Q      Okay.  And those were the terms that the board approved,

13 right, as reflected in your summary?

14 A      And just to complete my prior answer, it was Exhibit 41

15 that has the presentation that was made on May 25th.  And the

16 reason why -- no, I would say no to your question in that

17 that's why we reconvened on June 5th.  In between May 25th and

18 June 5th, there were additional negotiations, there was some

19 movement in terms of where the terms were at and, after having

20 initial discussions on May 25th and that initial approval,

21 there was then the final approval related to BSA's trust

22 contribution given on June 5th, with the updates to the terms,

23 still totaling $250 million.

24 Q      And you did a separate PowerPoint on that, that's

25 Exhibit 42, right?

1  A      That is Exhibit 42; that is correct.

2  Q      And what the board approved, as reflected in the board

3  minute you looked at, was they approved the summary of the

4  terms that you provided them in these PowerPoints, right?

5  A      Well, just to be clear, the minutes you read out from

6  May 25th are the minutes of the National Executive Committee,

7  that's what --

8  Q      Right.

9  A      -- the National Executive Committee was approving to

10 recommend to the National Executive Board approval, that

11 National Executive Board approval then occurred on June 5th

12 with those updated terms.

13 Q      So the committee approves it first, then the committee

14 recommends it to the full board and it approves it, right?

15 A      That's correct.

16 Q      And both times what the board is approving is the

17 summary of terms as presented by Mr. Whittman in his

18 PowerPoints, am right?

19 A      I believe so.

20 Q      Okay.  Now, let's look at the PowerPoint -- let's look

21 at the June 5 PowerPoint.  That would be the one that's the

22 last one in the series, am I right?

23 A      Exhibit 42, again, I believe is what you're referring

24 to?

25 Q      Yes.  Can you show me where it is in your PowerPoint

1  that you present the terms of the TDP?

2  A    The TDP was not a subject to this presentation, nor was

3  the TDP -- the TDP was still under negotiation at this point

4  in time.  So there was nothing to be approved as it related to

5  the TDP on June 5th.

6  Q    Thank you.  Now, let me ask you this, where was it -- is

7  it anywhere at all in exhibit 42 or the prior exhibit that

8  sets out your terms, where is the payment of the fee to the

9  Coalition discussed as something for the board to approve, can

10  you show us that line?

11  A    The payment to the Coalition was discussed at numerous

12  board meetings both by myself and other members of the team.

13  And there was -- I don't recall if there were written

14  presentations around that, I don't believe I made a written

15  presentation about it, but I did make -- have verbal

16  discussions with the Bankruptcy Task Force, the NEC, and the

17  NEB related to the payment of Coalition professional fees at

18  various points in time.

19  Q    Okay.  My question was simpler than that, Mr. Whittman.

20  Just simply, is it fair to say that nowhere in your PowerPoint

21  presentation that's Exhibit 42 or in the prior one that's

22  Exhibit -- the prior one, it's the May 25 PowerPoint, is there

23  any mention whatsoever of the Coalition fee, right?

24  A    That's not correct.  If you --

25  Q    All right.  Show me where it is --

1  A      Yes.

2  Q      -- show me where it is in Exhibit 42 --

3  A      If we go to --

4  Q      -- where does it --

5  A      -- slide 5 of Exhibit 42, which is titled "Sources and

6  uses at emergence," on this slide there is a reference about

7  five lines from the bottom that says "Coalition professional

8  fees."  In the column titled "Per disclosure statement," you

9  see TBD.  And then in the second column, "Proposed pending

10 offer," you see $10 million, and then a commentary in the box

11 to the right in terms of the fact that was a placeholder

12 pending outcome of negotiations.

13        So that was a point where the number -- that wasn't the

14 ultimate number, but it was a number at the time that was

15 noted and there were discussions that occurred around that

16 number.

17 Q      Now, is one of the things you're conveying there is that

18 the dollar amount of what the Coalition fee approval amount

19 might be would change depending upon the agreement on what the

20 Boy Scouts contributed?

21 A      No.  What I was conveying is that it was still subject

22 negotiation.  The second part of that comment about the Boy

23 Scouts' performance is pointing out the fact that the total

24 amount of the contribution to the trust is variable and,

25 depending on the Boy Scouts' performance between now and the

1  effective date of the plan, the contribution to the trust

2  could be higher or lower based on the amount of cash that's

3  available at that time.

4  Q    Am I right that from the very start of the discussions

5  with the Coalition, the Coalition was demanding that it be

6  paid its attorneys' fees?

7  A    That was a term that has been discussed for quite some

8  time.

9  Q    Well, are you suggesting here that it was the Boy

10 Scouts' idea to pay the Coalition from the beginning of the

11 negotiations?

12 A    No, I'm simply say that I don't know if I would

13 characterize it as something that the Coalition demanded from

14 -- I forget your words, but I think it was something like the

15 beginning of time or the beginning of negotiations, I simply

16 would note that at -- for any point in the negotiations this

17 came up and it was a point of negotiation for quite some time.

18 Q    Well, let me ask you like a little more broadly and

19 maybe politely, is it fair to say that the Coalition at all

20 times that they were negotiating with you were requesting that

21 their fees be paid as a condition to a deal?

22 A    I would say that it was definitely something that came

23 up early in negotiation.  I don't know that I would say, you

24 know, at all times.

25 Q    Well, you were in hundreds of hours of these

1  negotiations, right?

2  A      I was.

3  Q      Can you think of a time where the Coalition dropped its

4  demand or request, however you want to phrase it, to be paid

5  all its fees?

6  A      My point is that I don't exactly recall when the

7  Coalition was formed and became a mediation party, but it was

8  sometime prior to the bar date, back I think in the fall of

9  2020.  I recall having numerous conversations with the

10  Coalition before the issue of their professional fees came

11  into the conversation.  That's my only point in my response.

12  Q      Who was it that first raised the request or demand that

13  the Coalition fees be paid?

14  A      I don't recall who it was (indiscernible) --

15  Q      Was it the Boy Scouts or was it the Coalition?

16  A      It was the Coalition.

17  Q      And was it one of the Coalition members or was it Brown

18  Rudnick that was demanding that its fees be paid?

19  A      I don't know.

20  Q      Do you not remember that or did they not tell you or

21  were you not there?  Is it one of those three or is it

22  something else?

23  A      The request was made in a communication from the

24  Coalition, so I don't know how to classify in response to your

25  question who specifically made the request.  The request came

1  in communications from the Coalition.

2  Q    Did the Coalition also ask that specific state law --

3  state court lawyers be paid too?

4  A    I don't recall any such request.

5  Q    Did the coalition also ask that specific state law,

6  state court lawyers be paid too?

7  A    I don't recall any such request.

8  Q    Who was it, if not you, Mr. Whittman, who was for the

9  Boy Scouts chiefly involved in negotiating the fee demand from

10 the coalition?

11 A    It was negotiated by myself together with the debtor's

12 restructuring counsel at White & Case.

13 Q    And was anybody from the Boy Scouts, themselves, any

14 officer, or director, or employee involved in the negotiations

15 or discussions of paying the coalition?

16 A    Absolutely.

17 Q    And was Mr. Mosby directly involved in discussions with

18 the coalition about their request to be paid?

19 A    I'm not sure if he was directly involved in discussions

20 with the coalition on that topic, but he was certainly

21 invovlved in discussion that we had on the debtor side amongst

22 the advisors and the debtor's management team (indiscernible)

23 task force, the national executive committee and national

24 executive board regarding this topic.

25 Q    What were you given that allows you to differentiate

1 between costs that the (indiscernible) for its own -- to

2 advance its own specialized interests as opposed to costs that

3 they occurred to advance the interest of all claimants?

4 A    I am not aware of anything that would provide a

5 breakdown or what that breakdown would be.

6 Q    Now at this point in time in the case like one of the

7 things that you do is you track spending by the various

8 professionals.  Is that right?

9 A    Someone does that at my direction,  yes.

10 Q    Okay.  And is it fair to say that counsel for the TCC,

11 the Pachulski Firm, they've incurred about somewhere in the

12 neighborhood of $10 million of billed fees so far in the case?

13 A    I don't recall their fee amount off the top of my head.

14 That amount would not surprise me though.

15 Q    Okay.  In making the assessment that you are planning to

16 make about the amount of the coalition fees did you seek to

17 compare the $10 million requsted by the coalition as agains

18 the amount spent by the committee that has a fiduciary duty to

19 represent all claimants?

20         MR. HAMMOND:  Objection, Your Honor.  I think that

21 question is pretty vague and unclear.

22 BY MR. SCHIAVONI:

23 Q    The committee spent about $10 million, you think, right?

24 You think that is a fair number, right?

25 A    Well I think its not the committee.  Your statement a

1  moment ago was Pachulski.

2  Q    Right.

3  A    The committee has professionals that are assisting with

4  the --

5  Q    Right.  My point is just this, you have -- the Boy

6  Scouts ended up agreeing to a mumber of $10 million which is

7  just the coalition which equals the full amount that the TCC

8  debtor's counsel has incurred from the beginning of the case.

9  Is that right?

10 A    No.  Again, I don't think that's the right way to

11 approach that.  My approach, in looking at this, was what was

12 the aggregate spend of various parties in the case, so the

13 tort claimants committee, all their profesionals, the FCR, all

14 their professionals, not just actual claim incurred today, but

15 its (indiscernible) through emergence.  And putting the

16 request of the coalition in terms of their $10 million and

17 their $950,000 per month against that.  That to me is the

18 context in which I thought about thaet.

19 Q    I see.  So your views on this about the propriety of the

20 coalition's fees that was based on an assumption that they had

21 the same array of professionals behind them, other consultants

22 and other people working them that the TCC has, right?

23 A    Well I am aware that the coalition, in addition to

24 having lead restructuring counsel, has a financial advisor

25 that has been very active.  I believe, as a handful of other

1  professionals, those are the two that I have interfaced with

2  significantly.

3  Q    Alright, and you have a lot of expertise in this

4  financial advisory field, right?

5  A    I do.

6  Q    You have incurred approximately $10 million so far?

7            MR. HAMMOND:  Objection.

8  BY MR. SCHIAVONI:

9  Q    Your firm?

10 A    A&M has incurred approximately $10 million

11 (indiscernible), that is correct.

12 Q    The -- did you -- do you have any professional view

13 about whether the coalition's financial advisor has incurred

14 $10 million alos?

15 A    I would find that incredibly unlikely.

16 Q    Alright, so we're on the same page on that.

17            MR. HAMMOND:  Your Honor, may I just interpose an

18 objection here.  Are we now asking Mr. Whitmman about his

19 views?  Is that fair game because I thought that that was --

20            THE COURT:  If you want to object you should

21 object; otherwise --

22            MR. SCHIAVONI:  I'm asking about how we --

23            MR. HAMMOND:  He just opened the door.  I'm just

24 pointing it out, that's all.

25 BY MR. SCHIAVONI:

1  Q     Mr. Whittman, let's come back to the TDP.  So at the

2  time that the RSA was approved, when we talked about this just

3  a minute ago, that was for the -- strike that.

4        At the time that the deal points that were set out in

5  your June 5th powerpoint were approved the TDP, itself, was

6  still in flux, right?

7  A     That is correct.  The June 5th approval went to one

8  specific area of the restructuring support agreement, not all

9  components.

10 Q     And you modified your presentation, did you have to

11 modify it a little later when the numbers solidified to the

12 final number?

13 A     I'm sorry, which number are you referring to?

14 Q     Was that the final number on June 5th for the deal?

15 A     The BSA settlement contribution structure did not move

16 in the aggregate after June 5th.  There were negotiations

17 related to hwo that contribution would fluctuate depending on

18 timing of emergence.  And after that June 5th hearing and

19 based on expectations of how this process was moving we moved

20 the expected emergence date in our forecast, that were

21 disclosed in the third amended plan, to December 31st.

22       So numbers fluctuated as a result of that timing, but in

23 terms of the structure of BSA's trust contribution, in terms

24 of the $809 million note that did not change after that

25 approval on June 5th.

1  Q      But by having this after June 5th the TDP was

2  negotiated, right?

3              MR. HAMMOND:  Objection.

4              THE WITNESS:  I don't  understand your -- I don't

5  understand the connection between --

6              THE COURT:  What --

7  BY MR. SCHIAVONI:

8  Q      I'm not suggesting there is a connection. I'm just

9  saying that as of June 5th there was no agreement on a TDP, am

10  I right?

11  A      Yes.

12  Q      Okay.  And it was only later, after June 5th, that

13  agreement was reached on a TDP, am I right?

14  A      That is correct.

15  Q      Who was it for Boy Scouts, as far as a Boy Scouts

16  director or officer, who was most involved in the formulation

17  of the TDP?

18  A      The issues associated with the TDP's specifically and

19  the surrounding issues associated with insurance were

20  discussed numerous times with the bankruptcy task force, a

21  number of members of the bankruptcy task force are attorneys.

22  They would have a better understanding and a closer

23  understanding of those issues then some of the members that

24  were not attorneys.  I wouldn't say there was one particular

25  person who was (indiscernible) on that issue from a board

1  perspective.

2  Q    My question is a little different.  Who was it, who was

3  the Boy Scout officer, employee or director who directly

4  participated in the negotiations of the TDP who dealt with,

5  met with the claimants about this?

6          MR. HAMMOND:  Objection.  Who are you asking that

7  they met with?

8          MR. SCHIAVONI:  I'm asking Mr. Whittman whether he

9  knows.

10  BY MR. SCHIAVONI:

11  Q    Mr. Whittman, do you know who was the Boy Scout officer,

12  director or employee that met directly with the claimants to

13  negotiate the TDP or was there no such person?

14          MR. HAMMOND:  Mr. Schiavoni -- Your Honor, I'm not

15  sure if we're talking about claimants or plaintiffs. I think

16  there's a difference there.

17          MR. SCHIAVONI:  Alright, I will rephrase the

18  question.

19  BY MR. SCHIAVONI:

20  Q    Mr. Whittman, who was it who was a Boy Scout officer,

21  employee or director who communicated or met with, directly,

22  any of the claimant representatives in this case to negotiate

23  the TDP?

24  A    The TDP was negotiated over time and so different people

25  were parts of different meetings.  The debtor's CEO Arthur

1  Mosby and general counsel Steve McGowan were part of many fo

2  the in-person mediation session and likely the TDP was

3  discussed at some of those.  I believe that generally the more

4  detailed sessions that were focused on all the technicalities

5  of the TDP were handled by the attorneys both the

6  restructuring counsel and the insurance counsel which purports

7  back to BSA not with the direct involvement of an officer of

8  BSA in those discussions.

9  Q    Let's tease that out just a little bit, Mr. Whittman.

10 Can you testify, based on personal knowledge, that Mr. Mosby

11 was, in fact, personally involved in any communications

12 directly with the claimants' representatives about the TDP or

13 you just thinking thaet most likely happened?

14 A    Mr. Mosby was present at mediation sessions.  I believe

15 the TDP would have come up.  I do not believe those would have

16 detailed discussions about the TDP.

17 Q    Okay.  Its the word belief that's got me here.  Can you

18 testify that you saw with yoru own eyes or heard Mr. Mosby in

19 the same room talking about where the TDP's were being talked

20 about with the claimants?

21 A    I am --

22        MR. CLENTINO:  Objection, Your Honor.  Sorry, this

23 is Joe Celentino.  I am with Wachtell Lipton for the ad hoc

24 committee of local councils.  I've been trying to get in on

25 video, but have not been successful.

1    Your Honor, I would object to the extent Mr.

2  Schiavoni is asking Mr. Whittman to testify as to what

3  happened, the substance of conversations that happened in the

4  mediation.

5    MR. SCHIAVONI:  Actaully, I'm just asking whether,

6  in fact, Mr. Mosby participated in them.

7    THE COURT:  Yeah, I'm going to overrule that.  I am

8  just not sure this witness knows.  So you can answer if you

9  know whether he participated in that.

10    THE WITNESS:  Mr. Mosby participated in numerous

11  mediation sessions.  None of those sesssions, I believe, would

12  have been discussing TDP's in any great detail.  I am sure

13  that the TDP, in a general matter, came up in those

14  discussions.

15    MR. HALLOWELL:  Your Honor, this is Jim Hallowell.

16  At this point Mr. Whittman is opening the door to the

17  discussions that occurred in the mediation by describing what

18  occurred.

19    THE COURT:  Okay.  I don't think that's an

20  objection.

21    MR. SCHIAVONI:  Your Honor, I think the question

22  was --

23    THE COURT:  I don't think that's an objection.  So

24  we're just sticking here with testimony and if somebody has an

25  objection they have an objection.  If there is a consequence

1  to testimony we will deal with that when we deal with that,

2  but I am not sure why you would be objecting to the question.

3          Mr. Schiavoni, why don't you ask a new question so

4  that we're all on the same page.

5          MR. SCHIAVONI:  Okay, Your HONor.

6  BY MR. SCHIAVONI:

7  Q    Other then Mr. Mosby can you identify any other Boy

8  Scout executive, or officer, or director who you think -- not

9  who you think, but you, in fact, saw in a room talking about

10 the TDP's, where they were being dicussed?

11 A    As I believe I said earlier and I will say again Mr.

12 McGowan, debtor's general counsel, was also present in those

13 same mediation sessions.  So the same answer would apply to

14 Mr. McGowan.  Beyond that, no, I do not believe that -- no,

15 the debtor's officers were not involved in detail discussions

16 related to the TDP.

17 Q    Okay.  Were the Boy Scout officers involved directly in

18 discussions with the claimant representatives about the amount

19 of assets the Boy Scouts would have to contribute to a

20 settlement trust?

21 A    Not to any degree more significant then they were with

22 the TDP because those were delegated to myself as the lead

23 financial advisor.

24 Q    The TDP's were delegated to you?

25 A    No.  I said -- you were asking me about the contribution

1  of the Boy Scouts.  My response is that while they were,

2  again, in the room for some of those mediation sessions the

3  primary negotiation around the Boy Scouts contribution and

4  those discussions were lead by myself.

5  Q    Is there any mention of the word "TDP"  in any of your

6  powerpoint presentations?

7  A    I don't believe there is because that's not an area that

8  I was leading.

9  Q    Is it fair to say that the TDP is also an area where you

10  don't have any specialized skills?

11  A    I don't know if I would agree with that

12  characterization, but as I said that was not my primary area

13  of responsibility.

14  Q    Mr. Whittman, if you could go to -- if we could call up

15  what I have as the May 25th, 2021 board minutes.  They're in

16  Exhibit Binder CC.

17          UNIDENTIFIED SPEAKER:  We had these yesterday.  We

18  had them printed out, but unless you're referring to --

19          MR. SCHIAVONI:  Its the May 25th, 2021 board

20  minutes, powerpoint presentation by Mr. Whittman.  If we could

21  just go to Page 2 of it -- no, no, no, the second page.

22  BY MR. SCHIAVONI:

23  Q    Mr. Whittman, this is a powerpoint presentation your

24  office prepsared, is that right?

25  A    This is a presentation that I and my team prepared.

1  Q    Okay.  Is one of the things you did was that you

2  provided financial information to the board about the proposed

3  BSA trust contribution at the time?

4  A    Yes.

5  Q    And the information that's redacted on this page that is

6  the information that was actually given to the board, is that

7  right, about what was going to be contributed to the trust?

8            MR. HAMMOND:  Objection.

9            THE COURT:  What's your objection?

10           MR. HAMMOND:  My objection is the information is

11 privileged and asking Mr. Whittman about the privileged

12 information is (indiscernible) mediation of attorney/client

13 information.

14           THE COURT:  Sustained.

15 BY MR. SCHIAVONI:

16 Q    If we could go to the next page, please.  Is one of the

17 other things you did, Mr. Whittman, is prepare a feasibility

18 study for the debtors?

19 A    I prepared, together with the debtor's management team,

20 a five year business plan which is included in the disclosure

21 statement and the five year business plan is a key component

22 of showing the feasibility of the debtors.  I wouldn't

23 characterize it as a feasibility study, but I believe that is

24 what you are referring to.

25 Q    Yes.  Do the chartering orgnizations play an important

1  role for the Boy Scouts financial operations?

2  A      They do.

3  Q      And why is that?

4  A      The way that the Boy Scouts are structured is that the

5  members and the delivery of the program happen on a local

6  level.  And the way that program is delivered is that the

7  local councils enter into chartering agreements with

8  chartering organizations which could be churches, synagogues,

9  community servive organizastions, schools, government

10 agencies, etc., individual citizen groups and those charter

11 agreements are what then form the units so the cub scouts,

12 packs, or the Boy Scout troopos.

13 Q      And if to the extent the charters were subject to

14 continued lawsuits is there a threat that they would have to

15 withdraw or they would feel they would have to withdraw from

16 the Boy Scouts?

17 A      It is certainly a concern of us and the Boy Scouts that

18 the charter organization issues be addressed in the bankruptcy

19 in a way that is mutually satisfactory so that the chartered

20 organizations don't feel any need to withdraw; although, we

21 believe that the charter organizations are well served and

22 well protected on a go-forward basis regardless of historical

23 issues.

24 Q      How many of the chartering organizations have achieved

25 protective party status under the plan?

1  A    At this stage there have not been any.  We are really

2  just beginning that process at this point.

3  Q    I see.  Is one of the things you did with your economic

4  model was you were trying to -- you modeled how sensitive the

5  finances were to membership changes?

6  A    Yes.  We did, as typical in building out a business plan

7  and then looking at feasibility issues, we did look at

8  sensitivities.  One area, a key area for Boy Scouts on

9  sensitivity is membership.

10  Q    And is the Boy Scouts feasibility model or this economic

11  model, whatever you want to call it, is the Boy Scouts

12  viability very economicly sensitive to whether or not charters

13  would draw from the Boy Scouts?

14  A    That would be a key factor.

15  Q    Okay.  Now let me just understand, the boards that you -

16  - you consulted with the executive board and the national

17  board, right?

18  A    I had numerous meetings, as I said earlier, with the

19  national executive board, the national executive committee,

20  and the bankruptcy task force.

21  Q    Did those boards have any way to kind of understand the

22  intersts of the local councils?

23  A    I am not --

24          MR. HAMMOND:  Objection, Your Honor, I think that's

25  vague.

1           THE COURT:  Sustained.

2   BY MR. SCHIAVONI:

3   Q     Did the board members have any -- I will withdrawal the

4   question.

5         Did the board members have any mechanism or ability to

6   understand the concerns and issues of the local councils?

7   A     There were several channels of feedback to the board on

8   local council issues.

9   Q     Is it fair to say that most of the board members

10  actually came from the local councils whwere they had

11  previously held positions?

12  A     Most of the board members have been involved in scouting

13  for quite some time and I believe many of them have at a point

14  in time had involvement with local councils.  Again, that is

15  where scouting is delivered.  Maybe there have been volunteers

16  locally in their communities or perhaps had various positons

17  with local councils prior to being elected to the national

18  executive board.

19  Q     Do the bylaws actually provide that the board members

20  shodul be selected from people who were prior presidents of

21  local councils or held committee roles with the local

22  councils?

23           MR. HAMMOND:  Your Honor, I would just object.

24  This is beyond the scope of direct.

25           THE COURT:  Sustained.

1        MR. SCHIAVONI:  Your Honor, I don't think this

2  really applies unless we are separately in a position of

3  calling the witness ourselves separately.  So we could do

4  that, but I don't think the examination should be limited to

5  what is on the direct.

6        THE COURT:  Well it usually is, so I'm going to

7  sustain the objection.

8  BY MR. SCHIAVONI:

9  Q    Are the -- as part of the plan that was -- as part of

10 the RSA were the board members presented with the fact that

11 they would be made protected parties not just indibidually as

12 Boy Scout board members, but in their capacity as former

13 directors or officers of the local councils?

14 A    I am not aware of any discussion of that issue.

15 Q    Is that, in fact, how the RSA operates?

16 A    I am actually not sure that that is how it operates.  I

17 know that the board members would get relief as is typical

18 under the plan of reorganization.  I am not sure about your

19 comment on the local council piece.

20 Q    What mechanism is there in the RSA that allows for the

21 enforcement of the terms of the RSA against the coalition?

22 A    I believe there is various requirements of the coalition

23 to perform under the RSA and failure to perform would lead to

24 a termination event under the RSA.  I don't recall what other

25 enforcement mechanisms there might be.

1  Q     So none of the claimants for the coalition actually

2  signed the RSA, is that right?

3  A     None of the individual abuse claimants signed the RSA,

4  that is correct.

5  Q     So the lawyers sign it and they agree, as part of

6  signing it, to give certain advice to their clients, is that

7  right?

8  A     My general understaning that the attorneys, certainly

9  the attorneys for the coalition and then the state court

10  lawyers who are, themselves, the members of the coalition have

11  signed on and are committing themselves to, essentially, yes,

12  advise their clients to support the plan under the terms of

13  the RSA.

14  Q     I just really want to know a yes or no answer on this.

15  Did any lawyer give a written opinion to the board as to the

16  legal and ethical propriety of contracting with a lawyer to

17  give advice to his client and as part of the same agreement

18  agreeing to pay their fees?

19           MR. HAMMOND:  Objection, Your Honor, I think that

20  question is unintelligible.

21           THE COURT:  Can you rephrase it, please?

22           MR. SCHIAVONI:  Really?  Sure.

23  BY MR. SCHIAVONI:

24  Q     Mr. Whittman, are you aware whether or not any lawyer

25  gave a written opinion to the board as to the legal propriety

1  of entering into an agreement with the lawyers for the

2  coalition?

3  A    I am not aware.

4  Q    Sir, is one -- I think you testified that this was, I

5  forget exactly the words, but a difficult process, let's put

6  it that way, with coming to the RSA.  Do you remember

7  generally the question and answer with regard to exactly what

8  you said?

9  A    It was a hard-fought negotiation.  I don't recall my

10  exact words, but soemthign to that effect.

11  Q    Okay.  One of the problems that was encountered on the

12  way to the RSA was that at some point the TCC would agree to

13  some things, but no the coalition and vice versa?

14  A    Certainly, like any negotiation, there is five parties

15  that are parties to the RSA.  Many of those parties are multi-

16  headed parties.  So that was part of the process wrangling all

17  the parties together on all of the issues.

18  Q    But the Boy Scouts, at least, as part of this, they had

19  theoretically, at least, the option of doing a deal either

20  with the TCC or the coalition in going forward with it.  Am I

21  right?

22  A    As I said before, it was important to us to have a

23  confirmable plan of reorganization. It was important for us to

24  have a plan of reorganization as provided for the channeling

25  injunction for the benefit of the local councils that provided

1   the opportunity to (indiscernible) going forward.  That could

2   only happen with the affirmative vote of the plaintiffs.

3   Clearly having the coalition it was important, given the

4   number of votes, that they reprented.  The TCC was also

5   imporntn fivne that they are the official representative of

6   the claimant community at large.

7   Q    Okay.  So you're sort of saying its better to have both

8   of them sign, right?

9   A    Certainly.

10  Q    Okay, but was the fact that you had an option or, at

11  least, could threaten an option of going with one verses the

12  other was that helpful in bringing about a deal?

13             MR. HAMMOND:  Objection, Your Honor.  I think this

14  is straying awful close to mediation privilege.

15             THE COURT:  I don't think it crosses the line yet.

16  Overruled.

17             THE WITNESS:  Its always helpful to have multiple

18  parties to have discussions with them, negotiations.

19  BY MR. SCHIAVONI:

20  Q    Were you going to say play-off one against the other?

21  A    Those are your words, but I would agree with them.

22  Q    So am I right that the agreement you ended up signing,

23  this RSA, it had negative covenatns in it for the Boy Scouts?

24  A    It does.

25  Q    And is one of the negative covenants that on a going

1  forward basis settlements may only be arrived at if this

2  unanimous consent of the FCR, the coalition and the TCC?

3  A    It would help if you refer me to the document, although,

4  generally, that sounds right.

5  Q    That means, doenst it, Mr. Whittman, that a minority

6  group of claimants from either the TCC or the coalition could

7  actually block any deal with the charters going forward, isn't

8  that right?

9  A    I don't think that's quite right from the same point

10 that either the BSA or the ad hoc committee has the right to

11 terminate the RSA if the resolution of the chartered

12 organization issues is unsatisfactory to either one of us.

13 Q    So what you are saying is that you'd have to actually

14 invoke full fledged termination in order to do a settlement

15 with an individual charter if any minority group of either the

16 TCC or coalition disagreed with it?

17 A    I don't think that's correct either.  I am not exactly

18 sure how the coalition and the TCC operation, but I would

19 think it would be typical for a statutory committee that there

20 would be votes taken.  So I would think it would be a majority

21 vote.  So I am not sure that your statement is correct.

22 Q    The fact is at any one time either the coalition or the

23 TCC don't represent all the  claimants, some of them -- its

24 like one or the other is representing a minority group?

25 A    Neither of them represent all of the claimants, that is

1  correct.

2  Q     Have the charters told you that they feel that this term

3  will make it almost impossible to reach settlements on a going

4  forward basis?

5          MR. HAMMOND:  Your Honor, at this point I just want

6  to make sure that Mr. Whittman doesn't disclose any

7  communications we've had in the context of mediation.

8          THE COURT:  Okay.

9          MR. SCHIAVONI:  I will withdrawal the question.

10  BY MR. SCHIAVONI:

11  Q     Mr. Whittman, this clause, the negative covenant, will

12  make it significantly more difficult to reach settlemnts on a

13  going forward basis, won't it?

14  A     I disagree.

15  Q     And has that been your experience since you signed the

16  agreement?

17  A     We have had active mediation sessions.  Last week we had

18  mediation sessions scheduled for next week.  Like all aspects

19  in this case deals take time.  They have all taken time and I

20  expect these will take time; however, one of the key points,

21  and I mentioned this earlier, is that in order to confirm a

22  plan of reorganization that includes the relief that the

23  parties is looking for we need the affirmative vote of the

24  plaintiff groups.

25          So us negotiating those on our own, as the debtors,

1  would be somewhat illusory because we wouldn't deliver those

2  agreements.  We need to have the plaintiff support to deliver

3  the agreements.  So having the parties together, working

4  together under the RSA it can be very productive in terms of

5  those negotiations and the other parties, the chartered

6  organizations, understanding they're negotiating with the

7  parties that can't actually deliver on a deal.

8  Q    Mr. Whittman, we talked about the TDP's a little bit and

9  you claim to be in the room at some points when the TDP's were

10 being negotiated, is that right?

11 A    That is correct.  I was in the room for certain

12 sessions.  I know I was not in the room for all sessions by

13 any means.

14 Q    Can you identify who was it that drafted them?

15 A    The TDP's were drafted by the debtor's legal counsel.

16 There were significant negotitaions back and forth with the

17 counsel to the --

18         MR. HAMMOND:  Before we open this can of worms I

19 just want to caution you not to reveal any communications that

20 were had in the context of mediation.

21         MR. SCHIAVONI:  I asked him what he saw, what he

22 knew.

23         MR. HAMMOND:  I know.  I didn't object to the

24 question.  I just don't want to open the box.

25         THE WITNESS:  There were signficnat negotiations

1  back and forth with all of the parties on the document.

2  BY MR. SCHIAVONI:

3  Q     Do you remember me being in the room with you when you

4  were negotiating the TDP?

5  A     Let me clarify, all of the parties to the RSA.

6  Q     Okay.  So its fair to say that the insurers weren't part

7  of the negotiation of the TDP, right?

8  A     That is correct.  I believe the draft of the TDP's were

9  provided to the insurers at different points in time.  I know

10  they were provided to the insurers.  I don't recall as to how

11  many (indiscernible), but you were not in the room.

12  Q     Sir, they were only provided at the very end of the

13  process, isn't that right?  You didn't provide them, right?

14  The only one we got was at the very end.  Mr. Whittman, is

15  that right?

16  A     They were provided by counsel.  I was on a

17  (indiscernible).  I do not know.

18  Q     So you don't know one way or the other?

19  A     I don't know how many times or at what time.  I just

20  know they were provided at some point.

21          MR. SCHIAVONI:  Thank you, sir.  I have no further

22  questions, Your Honor, at this time.

23          THE COURT:  Thank you.

24          Any other cross?

25          MR. WEINBERG:  Your Honor, this is Joshua Weinberg

1  on behalf of Hartford.  I'm not going to represent that Mr.

2  Ruggeri needs a break, because I know he doesn't, but if the

3  court would permit I have a few questions.

4          THE COURT:  Yes, Mr. Weinberg.

5                    CROSS EXAMINATION

6  BY MR. WEINBERG:

7  Q    Good afternoon, Mr. Whittman.  If we could put up Tab 5

8  which I believe contains the Hartford settlement. I know that

9  Mr. Hammond showed you some provisions of this, but if we turn

10  to Page 7 -- I think this is Tab 5 of the debtor's binder, the

11  agreement.

12  A    I am there.

13  Q    I think that Section 1(a) Mr. Hammond pointed you to

14  earlier today, but you would agree with me that nowhere does

15  that provision say that -- nowhere does it say that it shall

16  be -- nowhere does it use the word "binding", correct?

17          UNIDENTIFIED SPEAKER:  Mr. Weinberg, we're going to

18  put the proper document on the screen now.  Here is the one

19  you are referring to.

20          MR. WEINBERG:  Thank you.

21          UNIDENTIFIED SPEAKER:  Our apologies, Your Honor.

22          THE WITNESS:  I don't see the word "binding" in

23  Section 1(a) if that's your question.

24  BY MR. WEINBERG:

25  Q    That's fine.  You know, I think that there are some

1  other provisions that Mr. Hammond may have walked you through

2  this morning, but there are some other provisions that he

3  didn't show you.  If we could turn to Page 14 of the -- I

4  think it's 14 of the agreement.  While we're turning there you

5  would agree, Mr. Whittman, that the Hartford agreement was

6  also negotiated intensely, wouldn't you?

7  A     I would.

8  Q     It was certainly at arm's length?

9  A     I agree.

10 Q     And there were terms that were hotly disputed and

11 negotiated very intensely, right?

12 A     There were.

13 Q     And if you would turn to Page 14 there's Section 3(i),

14 do you see that provision?

15 A     I do.

16 Q     And one of the terms in Section 3(i) states that under

17 the settlement agreement the debtors would not file a plan of

18 reorganization that's inconsistent with the terms of the BSA

19 Hartford settlement, correct?

20 A     Yes, I do see that sentence.

21 Q     Okay.  And under that same provision, this is Section

22 3(i), BSA is permitted to propose an alternative plan that

23 doesn't include a release and injunction for Hartford so long

24 as there are no other third-party releases or injunctions,

25 correct?

1  A      That is correct.

2  Q      And that was noted as the toggle plan, right?

3  A      That is correct.

4  Q      And the toggle plan provides BSA or the debtors with a

5  discharge, right?

6  A      It provides just the debtors with a discharge, that is

7  correct.

8  Q      And at the time that BSA entered into the BSA Hartford

9  settlement BSA believed the toggle plan to be confirmed,

10  correct?

11  A      At that time we believed that the toggle plan could be

12  confirmed, yes.

13  Q      And would provide the debtors with a path to emerge from

14  bankruptcy, correct?

15  A      A risky and not great, but, yes, a path.

16  Q      Now when you -- when BSA entered into the settlement

17  agreement and you testified that was on April 15th at that

18  time you knew that the claimant groups would oppose the

19  settlement, correct?

20  A      That is correct.

21  Q      And let's put up Tab 5 from Hartford's binder.  This is

22  -- we provided, Your Honor, a separate binder to the court

23  with a few documents.  This is one of the few that is not in

24  the debtor's binder, so I apologize.  And we did provide these

25  documents to the debtor yesterday afternoon.

1    THE COURT:  I got it.

2  BY MR. WEINBERG:

3  Q    In Tab 5 of that binder is a declaration that you

4  submitted earlier in this case, Mr. Whittman.  Do you see

5  that?

6  A    I do.

7  Q    And do you recognize that declaration?

8  A    I do.

9  Q    That is a declaration that you submitted in conjunction

10  with the debtor's motion to extend the exclusivity, right?

11  A    Correct.

12  Q    And now if we turn to Paragraph 7 of this declaration it

13  says, in the second sentence -- the first paragraph of the

14  Paragraph 7 says,

15      "The Hartford settlement is a product of extensive arm's

16  length negotiations conducted over a lengthy period between

17  the debtors and Hartford with the active assistance of the

18  mediators."

19      Do you see that?

20  A    I do.

21  Q    And the next sentence says,

22      "The debtors believe that the Hartford settlement is

23  reasonable and in the best interest of the estates and holders

24  of abuse claims, in large part, due to the risks associated

25  with continued coverage litigation with Hartford."

1    Do you see that?

2 A    I do.

3         MR. MOXLEY:  Your Honor, Cameron Moxley of Brown

4 Rudnick.  We object to the questions concerning the

5 reasonableness of the Hartford settlement agreement for

6 reasons that were set forth in our motion in limine.  At the

7 top of today's hearing we understood from the insurers they

8 wouldn't be eliciting such testimony.  They have now done so.

9 So we would just insert that objection, Your Honor, and raise

10 the points that we raised in our motion.

11        MR. WEINBERG:  I'm not asking him, Your Honor, to

12 provide any testimony about the reasonableness.  I'm just

13 asking to what he has attested to previously in his

14 declarations in this case.

15        MR. MOXLEY:  Your Honor, respectfully, the question

16 has now been affirmatively posed to elicit testimony as to his

17 views with respect to reasonableness.  We were advised that

18 the insurers would not be taking that step today.  They appear

19 to have just done so.  If the question is withdrawn that's

20 fine, Your Honor, but if the question remains we wish to

21 interpose an objection.

22        MR. WEINBERG:  If that's the case, Your Honor, I'm

23 happy to rephrase the question.

24        THE COURT:  Okay, why don't you do that.

25 BY MR. WEINBERG:

1  Q      With respect to the first sentence in Paragraph 7, Mr.

2  Whittman, when you executed this declaration you were aware at

3  the time that the claimants opposed the BSA Hartford

4  settlement, correct?

5  A      I was aware at the time that the -- give me a second

6  here, I just want to clarify specifically.  I was aware at the

7  time that we were unable to reach a three-way deal with -- we

8  were not able to reach a deal with any of the plaintiff groups

9  at that moment.  I was not aware that they objected, however,

10 because they haven't yet objected.

11 Q      You were aware, though, at the time that you executed

12 this declaration that the claimants did not agree with the BSA

13 Hartford settlement, correct?

14 A      I'm sorry.  I apologize, this is May 16th.  Yes, I was

15 aware at this time.  I apologize.

16 Q      And when you signed this declaration you made sure that

17 all of it was accurate, right?

18 A      Yes, the declaration is accurate.

19         MR. WEINBERG:  Your Honor, at this point I'd like

20 to offer the affidavit into evidence, this declaration which

21 is Docket 4101.

22         THE COURT:  Is there any objection?

23         MR. GOODMAN:  Your Honor, we would object for the

24 same reasons that the other affidavits were not introduced

25 into evidence.  I mean we're perfectly willing for them all to

1  come in, but I don't understand why this is being done

2  selectively.

3          THE COURT:  Well this is different.  Do you have an

4  objection to this declaration?  This is not his direct

5  testimony.

6          MR. GOODMAN:  Sorry, Your Honor.

7          MR. WEINBERG:  Your Honor, this also is an

8  admission of a party opponent.

9          THE COURT:  Yes, it is.  So that is why I'm asking.

10 This is different.

11         MR. GOODMAN:  Withdrawn.

12         MR. HAMMOND:  Your Honor, I would just object to

13 the extent it's beyond the scope of his direct, but other than

14 that I have no objection.

15         MR. RUGGERI:  Your Honor, Mr. Whittman offered for

16 support that there was (indiscernible) and they presented a

17 lot of testimony on direct.  This is not beyond the scope of

18 the direct.

19         THE COURT:  The objection is overruled.  It's

20 admitted.

21     (Whittman declaration received into evidence)

22 BY MR. WEINBERG:

23 Q    Mr. Whittman, so with respect to the June 9th letter

24 that you discussed earlier -- withdrawn.

25     I'd like to actually direct your attention, Mr.

1  Whittman, to Tab 30 in your notebook which I believe is the

2  June 5th meeting minutes that you discussed at some point

3  earlier.  Do you have those in front of you?

4  A      Just one moment.

5              THE COURT:  That is in the debtor's notebook?

6              MR. WEINBERG:  Yes, Your Honor.

7              THE COURT:  Okay.

8              THE WITNESS:  Yes.  I have in front of me the June

9  5th minutes from the national executive board meeting.

10  BY MR. WEINBERG:

11  Q      And you were present at this meeting, correct?

12  A      That is correct.

13  Q      Do you recall attending this meeting?

14  A      I do.

15  Q      Now I think that we looked at the end of Page 3 of these

16  notes.  There is a statement there that says the board voted

17  to approve the proposed settlement package estimated $250

18  million.  Do you see that?

19  A      I do.

20  Q      Now could you tell me what did the board approve there?

21  Hadn't the board already approved that package at the May 26th

22  meeting?

23              MR. HAMMOND:  Objection.  It mischaracterizes his

24  prior testimony, Your Honor.

25              THE COURT:  I'll sustain that objection and ask you

1  to rephrase your question.

2  BY MR. WEINBERG:

3  Q     Maybe I will do it this way, if we could take a look at

4  Debtor's Tab 28, which is the May 26th, 2021 national

5  executive board meeting minutes.  Do you have those in front

6  of you, Mr. Whittman?

7  A     I do.

8  Q     At the end of those, on Page 3, it says the board

9  approved the $250 million proposal including the additional

10 $80 million note to the victim's trust.  Do you see that

11 reference?

12 A     I do.

13 Q     I am confused, what additional steps were taken or what

14 were the proofs at the June 5th meeting?

15 A     My belief and recollection is that what occurred at the

16 meeting on the by the 26th is that we presented where we were,

17 where we thought things were going in terms of the overall

18 $250 million; however, at that point the composition was a

19 little bit different and the note wasn't actually $80 million

20 at that point in time.  I believe it was a somewhat different

21 composition of the $250 million settlement.

22       As a result, on June 5th, the board convened again and

23 approved the final composition, the $250 million headline

24 number had not changed, but the building blocks of it had

25 shifted.  That was when the $80 million note was approved.

1    Q    If that is the case, Mr. Whittman, why do the notes for

2    the May 26th meeting, again, we're looking at Tab 28, refer to

3    the $80 million note?

4    A    I don't know.

5    Q    So one of the two sets of meeting minutes is inaccurate,

6    is that what you are saying?

7    A    I believe that the $80 million reference at the end of

8    the 26th is not correct.

9    Q    Is there anything else that changed in the package

10   between the May 26th meeting and the June 5th meeting?

11   A    I don't believe there were substantive changes.  As I

12   said, it was still $250 million.  If anything, I believe the

13   settlement had simply solidified the terms of the settlement

14   which were more influx that May 26th had become more solid by

15   the time we reached June 5th.

16   Q    Now, Mr. Whittman, in your preparation for your

17   testimony did you review the version of the board minutes that

18   are in this notebook that you have in front of you?

19   A    I did.

20   Q    And based on the board minutes that had been produced to

21   us is there anywhere in those board minutes that discusses

22   whether the board voted to withdrawal or abandon the Hartford

23   settlement agreement?

24   A    I don't recall specifically reading in the minutes;

25   however, I recall specific conversations with -- numerous

1  conversations with the BTF and the NEC about where we were

2  with the RSA and where we were with Hartford, and the

3  interplay between those two issues.

4  Q    You would agree with me, Mr. Whittman, that that is not

5  reflected anywhere in the board minutes that the debtors have

6  provided to us, correct?

7  A    I disagree with you on that because I wasn't

8  specifically (indiscernible) board minutes from references to

9  Hartford withdrawal, but I don't know.

10  Q    Okay.  But as you're sitting here you don't recall any

11  such references, right?

12  A    I don't know if there are or not.

13  Q    So, Mr. Whittman, when you testified earlier today that

14  there was a opposition to the BSA Hartford settlement was one

15  of the changes in circumstances; just to be clear, the debtors

16  were  aware from the time they signed the settlement that

17  there was opposition to the settlement agreement, correct?

18  A    What I said earlier, and I will just say it again to be

19  clear, is that we expected opposition.  We were not surprised

20  that there was opposition.  What did surprise us was the

21  continued sustained intense and broad base opposition that all

22  these many months later still exist.

23         MR. WEINBERG:  Your Honor, I have no further

24  questions.

25         Thank you, Mr. Whittman.

1          THE WITNESS:  Thank you.

2          THE COURT:  Thank you.

3          MR. HALLOWELL:  Your Honor, I have a couple of

4   further questions.

5          THE COURT:  Yes.

6                    CROSS EXAMINATION

7   BY MR. HALLOWELL:

8   Q    Mr. Whittman, Jim Hallowell for the AIG Companies.  Can

9   you hear me okay?

10  A    I can, Mr. Hallowell.

11  Q    Mr. Whittman, the TDP's are not an area that you were

12  actively involved in with any detail, correct?

13  A    As I stated earlier it was not a primary area of

14  responsibility for me.  I was aware of the negotiations

15  generally, but it was not an area where I was specifically

16  deeply involved.

17  Q    Mr. Whittman, the TDP's were not an area that you were

18  actively involved in in any detail, correct?

19  A    I just said my description. If that's the way you want

20  to characterize it, okay.

21          MR. HALLOWELL:  Your Honor, I'd like to refer Mr.

22  Whittman to his deposition testimony.

23          THE COURT:  Okay.  Does he have it?

24          MR. HALLOWELL:  I'd like to refer him to deposition

25  Page 94, Lines 3 through 6.

1          THE WITNESS:  I'm sorry, you faded at the end.  I

2  heard Page 94, but I didn't hear the line.

3          MR. HALLOWELL:  Lines 3 through 6.

4          THE WITNESS:  Okay.

5  BY MR. HALLOWELL:

6  Q    Did you review that testimony, Mr. Whittman?

7  A    I am reviewing it right now.  Yes, those were words that

8  I used in my deposition.  It was not an area that I was

9  actively involved in any detail.  I have general familiarity.

10 Q    Mr. Whittman, the TDP --

11 A    Although, I would --

12 Q    Mr. Whittman.  Mr. Whittman, there is not a question

13 pending.

14 A    (Indiscernible).

15 Q    The TDP's were not an area that you were actively

16 involved in, in any detail, correct?

17 A    You were specifically asking me in my deposition, as the

18 question reflects, the differences between the TDP's and the

19 toggle plan, and the TDP's in the third-amended plan, and that

20 is the specific context in which I gave my answer.

21          MR. HALLOWELL:  Your Honor, we move to strike that

22 statement from Mr. Whittman and we move Page 93, Line 22,

23 through Page 94, Line 6 into evidence.

24          THE COURT:  What's the response?

25          MR. HAMMOND:  Your Honor, I think I can clean it up

1  on redirect, but we have no objection to moving Page 93, Line

2  22, Page 94, Line 6 into evidence.

3            THE COURT:  Okay.  Then it's admitted.

4        (Page 93 of Whittman declaration received into evidence)

5            MR. HALLOWELL:  Your Honor, there is -- thank you.

6  BY MR. HALLOWELL:

7  Q    Mr. Whittman, you testified earlier when Mr. Hammond was

8  asking you questions about some of the general topics that

9  were discussed in presentations that were made by the debtor's

10  advisors, correct?

11  A    That is correct.

12  Q    And you summarized some of those topics and you included

13  among them the Hartford settlement, chartered organizations,

14  various insurance issues and you also specifically mentioned

15  TDP's, correct?

16  A    I did.

17  Q    Mr. Whittman, I would like you to turn to your

18  supplemental declaration that has been authored by the

19  debtors, but not admitted into evidence in this case.  Let me

20  know when you have that?

21  A    I believe that's Exhibit 4.  I am there.

22  Q    Could you turn to Paragraph 8 on Page 3 carried over to

23  Page 4 of the supplemental declaration and read that

24  paragraph, Mr. Whittman?  Let me know when you are finished.

25  A    Read it aloud or read it to myself?

1  Q     You can read it to yourself.

2  A     Okay.

3  Q     Are you finished?

4  A     No, I'm not.  Okay, I have read it.

5  Q     This is the declaration that was prepared by White &

6  Case, correct?

7               MR. HAMMOND:  Objection.

8               THE WITNESS:  It was a declaration that --

9               THE COURT:  What is the objection?

10              MR. HAMMOND:  I think it's vague in terms of

11 prepared, Your Honor.

12              THE COURT:  Overruled.  You can answer the

13 question.

14              THE WITNESS:  The --

15 BY MR. HALLOWELL:

16 Q     Was it prepared by White & Case, yes or no?

17 A     The declaration was drafted by White & Case.  I reviewed

18 it and after I made edits to it I signed it.

19 Q     You will agree with me, Mr. Whittman, that Paragraph 8

20 also discusses the presentations that were made by the

21 debtor's advisors, correct?

22 A     It does.

23 Q     Paragraph 8 summarizes some of those topics including

24 chartered organizations, the Hartford settlement and various

25 insurance issues, correct?

1  A     Correct.

2  Q     And it says nothing about TDP's, correct?

3  A     TDP's is -- that is correct.  TDP's was fit into --

4  Q     Thank you.  Thank you.  Thank you.  Thank you, Mr.

5  Whittman.

6       Your Honor, at this time we would offer just Paragraph 8

7  of the supplemental declaration into evidence.

8            THE COURT:  Is there any objection?

9            MR. HAMMOND:  No objection other then, Your Honor,

10  if they're going to introduce 8 I think you need to introduce

11  -- I'd need to look at it to see if there is other contextual

12  information that needs to be (indiscernible).  Just give me a

13  moment.

14            THE COURT:  I will give you an opportunity to do

15  that.

16        (Pause)

17            MR. RUGGERI:  Your Honor, Jim Ruggeri for Hartford.

18  Wouldn't that be more appropriate to elicit the testimony on

19  redirect?  Again, this is offered because it's an admission by

20  a party opponent.  I don't think that the debtors now get to

21  go and poach from it.  I think they would have to do it on

22  redirect, Your Honor.

23            MR. HAMMOND:  Your Honor, I think under the rule of

24  completeness, under Rule 106, it's hard to segregate a piece

25  of a document from the remainder of the document.  If they

1  want some I think, in fairness, they should take all.

2           MR. RUGGERI:  Your Honor, we certainly disagree

3  with that.

4           THE COURT:  I disagree with that, but I will give

5  you an opportunity to see if there is anything else and you

6  can offer it on redirect.

7           MR. HAMMOND:  Thank you, Your Honor.

8  BY MR. HALLOWELL:

9  Q    Mr. Whittman, the RSA calls for paying coalition

10  professional fees up to $950 per month on a going forward

11  basis, correct?

12  A    $950,000 (indiscernible) per month, that is correct.

13  Q    This is an issue that you were actively involved in,

14  correct?

15  A    Correct.

16  Q    And you didn't consider any documentation from the

17  coalition in determining that $950,000 per month is

18  reasonable, correct?

19  A    I didn't consider a specific documentation from the

20  coalition, that is correct.

21  Q    And, in fact, you did not even request invoices from the

22  coalition when you were determining whether or not that amount

23  was reasonable, correct?

24  A    Well that was a prospective amount.  So I am not sure

25  why I would consider invoices in that amount.  I would

1  consider invoices in the future in authorizing the payment of

2  the amount, but not in entering into an agreement to pay

3  opposite that amount.

4  Q    Mr. Whittman, you did not request invoices from the

5  coalition when determining whether the $950,000 per month

6  amount on a going forward basis was reasonable, correct?

7  A    My answer was correct.

8  Q    Now the RSA also calls for paying up to $10.5 billion

9  for the fees of the coalition professionals that were incurred

10 prior to the RSA effective date?

11 A    That is correct only if the plan is ultimately confirmed

12 and goes effective.

13 Q    You did not request itemized invoices from the coalition

14 when determining the reasonableness of that amount, did you?

15 A    No, I didn't need to.

16 Q    And you did not believe it was necessary to do so,

17 correct?

18 A    I did not and I do not.

19 Q    Mr. Whittman, the coalition is a group of attorneys,

20 correct?

21 A    The coalition is a group of attorneys that it represents

22 these claimants in the case.

23 Q    Okay.  The coalition is not made up of the actual

24 claimants who have submitted proofs of claim, correct?

25 A    I don't believe that is correct.  I thought there were

1  individual claimants who signed onto something, but I'm not

2  certain.

3  Q    Okay.  You are not aware of anything that the debtors

4  (indiscernible) to confirm how many claimants the coalition

5  attorneys actually represent, correct?

6  A    The debtors have asked for representations from the

7  coalition in terms of how many claimants they represent and

8  there have been filings with the RSA and amendments to the RSA

9  to that effect.

10 Q    Have the debtors done anything to confirm that the

11 coalition represents (indiscernible)?

12 A    Nothing to my knowledge beyond what I described.

13 Q    Alvarez & Marsal has not done anything to confirm how

14 many claimants the coalition (indiscernible), correct?

15 A    That is correct.

16 Q    You don't know who all the attorney members of the

17 coalition are, do you?

18 A    I don't know them personally, but they are signatories

19 to the agreement?

20 Q    You don't know their identities, correct?

21 A    They are state law attorneys that are signatories to the

22 agreement.  I don't personally know them all.  I'm not sure if

23 I am getting your question.

24 Q    There is something called consenting state court counsel

25 who are signatories to the TCC, to the RSA, correct?

1  A      That is correct.

2  Q      Do you know who are consenting state court counsel and

3  who are attorney members of the coalition?

4  A      I believe that the majority of the state court counsel

5  are members of the coalition.  I do not know if they all are.

6  Q      And you don't know who are the consenting state court

7  counsel and who are the coalition, correct?

8  A      I don't.

9  Q      Mr. Whittman, you believe that the national executive

10  committee approved the RSA at its meeting on June 22nd, 2021,

11  correct?

12  A      Sorry, could you restate that question?

13  Q      Do you believe that the national executive committee

14  approved the RSA at its meeting on June 22nd, 2021?

15  A      The --

16  Q      Do you believe that or not, Mr. Whittman?

17  A      They approved it, elements of the RSA, at that time.

18  Final elements were approved immediately prior to entering

19  into the agreement.

20  Q      Mr. Whittman, I want to refer you again to your

21  deposition and, Your Honor, I'm referring to Page 179, Line 22

22  through 180, Line 12.

23         Mr. Whittman, have you had a chance to read that?

24  A      I did.  I have, yes.

25  Q      Did I ask you those questions and did you give those

1  answers?

2  A     I did.  I believe --

3         MR. HALLOWELL:  Your Honor, we move Mr. Whittman's

4  deposition Page 179, Line 22 to Page 180, Line 12 into

5  evidence.

6         MR. HAMMOND:  Your Honor, I object.  It's not an

7  impeachment.  Its -- he says I believe so on 180, Line 12.

8         MR. HALLOWELL:  I asked him if he believed it.

9         THE COURT:  Can someone get to the page?

10        UNIDENTIFIED SPEAKER:  And that occurred on June

11  22nd. He said I believe so.

12        MR. HAMMOND:  Your Honor, his deposition transcript

13  has been -- they are binary.  It's at Exhibit 52 if you want

14  to take a look at the hard copy.

15        THE COURT:  Thank you.  It's admitted.

16     (Page 179, Line 22 to Page 180, Line 12 of Whittman

17  declaration received into evidence)

18     (No verbal response)

19        THE WITNESS:  I believe Mr. Hallowell is muted.

20        MR. HALLOWELL:  I apologize.

21  BY MR. HALLOWELL:

22  Q    Mr. Whittman, you have represented that BSA's operations

23  will be significantly impeded unless the local councils

24  receive or release as part of the plan contemplated in the

25  RSA, correct?

1  A     I don't recall the exact words.  I'm sure you would

2  point me to them, but something to that effect.

3  Q     So you agree with me, correct?

4  A     It would be a definite negative impact on BSA if the

5  local councils were not covered by the channeling injunction,

6  yes, I agree.

7  Q     And without a release you expect some individual local

8  councils to file for bankruptcy, correct?

9  A     That is correct.

10 Q     And if individual local councils start filing for

11 bankruptcy that will significantly impede BSA's ability to

12 (indiscernible), right?

13 A     BSA would still be feasible and I believe it would have

14 a feasible business plan, but it would significantly harm BSA.

15 Q     With regard to the local councils you have conducted an

16 analysis to determine the aggregate unrestricted assets of the

17 local councils, correct?

18 A     I looked at -- I'm sorry, it was a long sentence there,

19 I was unpacking it.  I looked at the unrestricted assets of

20 the local council individually and in an aggregate, yes.

21 Q     And you have determined that the local councils have an

22 aggregate of over $2 billion in unrestricted assets, right?

23 A     That is correct.

24 Q     You also understand that BSA's operations depend on the

25 chartered organizations, right?

1  A    Chartered organizations are very important to the

2  operation of BSA.

3  Q    And as currently constructed there are no chartered

4  organizations that received a release under the RSA, correct?

5  A    I believe I answered that question with Mr. Schiavoni a

6  moment ago that that process has just begun in terms of those

7  negotiations.

8  Q    But to answer my question, as it stands today, no

9  chartered organizations have received a release under the RSA,

10 correct?

11 A    That is correct.

12 Q    And, in fact, under the RSA any settlement with

13 chartered organizations must be approved by all three, the

14 TCC, the FCR, and coalition, correct?

15 A    Under the RSA they would need to be approved by all

16 three of those parties.  That is correct.  I think I already

17 described my views on the benefits of the RSA.

18 Q    So you don't have to describe it again, Mr. Whittman.

19 You can just answer my question.

20        MR. HAMMOND:  Your Honor -- I don't mean to

21 interrupt you, Mr. Hallowell, but if there is a convenient

22 breaking point I think we could all use a few minutes to, you

23 know, kind of --

24        THE COURT:  Yes.  We will take a break in a moment.

25        Mr. Hallowell, how much longer do you have?

1          MR. HALLOWELL:  I really just have a few more

2    questions, Your Honor.

3          THE COURT:  Okay.  Then let's have those few more

4    questions and then we'll take a break.

5    BY MR. HALLOWELL:

6    Q    Mr. Whittman, the RSA selects Eric Green as the

7    settlement trustee, correct?

8    A    Eric Green is mentioned.  I don't know if "select" is

9    the right word -- I forgot the specific term, if you could

10   just point them to me -- but Eric Green is mentioned as the

11   settlement trustee.

12   Q    Eric Green, he is designated as the settlement trustee

13   under the RSA, right?

14   A    Can you give me an opportunity to look at the specific

15   provision that you're referring to?

16   Q    Sure.  I think it's going to be page 21 of the RSA

17   termsheet and that's Docket Number 5466, I understand

18   interested bidder two, page 83 of 118.

19          UNIDENTIFIED:  Your Honor, that's Exhibit 6 in our

20   binder if you'd like to take a look at the paper copy.

21          THE COURT:  Thank you.

22          THE WITNESS:  Yes, the settlement trustee shall be

23   Eric Green and will be appointed by the Bankruptcy Court.

24   That is correct.

25   BY MR. HALLOWELL:

1  Q    Okay.  So, that is pretty clear, right.

2       The settlement trustee shall be Eric Green, correct?

3  A    That's correct.

4  Q    You can't tell us how the Boy Scouts reached the

5  conclusion that the settlement trustee should be Mr. Green,

6  can you?

7  A    I believe I described in my deposition that Eric Green

8  is a party known to the Boy Scouts earlier in the case, that

9  was a party that came up amongst the RSA -- he's a party that

10 came up amongst the RSA parties to be named the trustee and

11 BSA has had some knowledge of Mr. Green and BSA says it was

12 acceptable.

13          MR. HALLOWELL:  Your Honor, I want to refer

14 Mr. Whittman to his deposition transcript, again.  I'm going

15 to refer him to page 154, line 23, to page 155, line 9.

16          THE WITNESS:  Okay.

17 BY MR. HALLOWELL:

18 Q    Mr. Whittman, during your deposition, were those

19 questions asked of you and did you give those answers?

20 A    Yes.

21          MR. HALLOWELL:  Your Honor, I'd offer page 154,

22 line 23, through page 155, line 9 of Mr. Whittman's deposition

23 into evidence.

24          THE COURT:  Any objection?

25          MR. HAMMOND:  No, Your Honor.

1                   THE COURT:  It's admitted.

2          (AIG Exhibit received into evidence)

3   BY MR. HALLOWELL:

4   Q    Mr. Whittman, you can't tell us if the debtors did any

5   kind of analysis to determine if Mr. Green is qualified to

6   serve in this role, can you?

7   A    No, I cannot.

8   Q    Okay.  And you don't if Mr. Green's previous

9   interactions with the FCR pose a conflict of interest for Mr.

10  Green to serve as the settlement trustee, do you?

11  A    I don't know the answer to that.

12  Q    And you don't know if anybody has looked into that

13  potential conflict of interest, do you?

14  A    I do not.

15                  MR. HALLOWELL:  Your Honor, I have no further

16  questions of this witness.

17                  THE COURT:  Thank you.

18                  Let's take a 10-minute break and then we'll resume.

19                  Can people tell me if there are any others who are

20  going to want to cross-examine?

21          (No verbal response)

22                  THE COURT:  I see Mr. Ryan's hand.

23                  MR. GOODMAN:  Your Honor, the coalition would like

24  to ask a few questions, too.

25                  MR. BUCHBINDER:  Your Honor, this is

1  Mr. Buchbinder.  I have a couple questions, as well.

2           MR. PATTERSON:  Tom Patterson, Your Honor.  We may

3  well have some questions, as well.

4           THE COURT:  Okay.  Let's take 10 minutes.

5           We're in recess.

6       (Recess taken at 5:43 p.m.)

7       (Proceedings resumed at 5:58 p.m.)

8           THE COURT:  This is just Silverstein.

9           And Mr. Ryan?

10          MR. RYAN:  Thank you, Your Honor.

11                      CROSS-EXAMINATION

12 BY MR. RYAN:

13 Q    Good afternoon, Mr. Whittman.

14      I'm Jeremy Ryan on behalf of the United Methodist ad hoc

15 committee and also the ad hoc committee of Catholic Diocese.

16 A    Good afternoon.

17 Q    In your declaration (indiscernible) with respect to

18 (indiscernible) organizations, your testimony, as a

19 consideration, was given to them at the time the RSA was

20 considered, correct?

21 A    That's correct.

22 Q    And in that consideration, as you set out in the initial

23 declaration, that the RSA provides a framework for the

24 resolving issues of the charter organizations?

25 A    That's correct.

1  Q      And it's only a framework because the RSA doesn't

2  actually resolve those issues, correct?

3  A      That is correct.  It's a starting point to begin to

4  negotiate those issues.

5  Q      And it's true that at the time of the entry into the

6  restructuring support agreement, Boy Scouts did not have a

7  plan to get charter organizations the benefit of the

8  channeling injunction?

9  A      I'm not sure necessarily what you mean by a plan.  As

10  you rightly state, the restructuring support agreement,

11  itself, did not resolve the chartered organization issues.

12  When you say you did not have a plan, we had a strategy to

13  first bring the plaintiffs onboard, have agreement with the

14  parties that were necessary to confirm a plan and necessary in

15  order to validate any deal and make sure that any deal with a

16  chartered organization would in fact get confirmed.

17  (Indiscernible) would be approved as part of the confirmed

18  plan of reorganization and then to move forward with those

19  negotiations, which we have started today.

20  Q      Okay.  So, are you aware of Mr. Mosby's testimony, sir?

21  A      I have not reviewed Mr. Mosby's testimony.

22  Q      Okay.  So, if Mr. Mosby testified that at the time of

23  the entry of the RSA and at the time of his deposition, there

24  wasn't a plan to get chartered organizations the benefit of

25  the channeling injunction that we could give them, correct?

1       MR. HAMMOND:  Objection, Your Honor.

2       Asking Mr. Whittman, who hasn't reviewed Mr.

3  Mosby's testimony, as to what Mr. Mosby said is improper.

4       THE COURT:  Overruled.

5       THE WITNESS:  Not knowing the context of the

6  questions asked of Mr. Mosby or what Mr. Mosby said, again, it

7  may come back to different people's view of the plan, the

8  debtors' professionals, and we had discussed amongst

9  ourselves, as well as together with the bank (indiscernible)

10  any fee, the chartered organization issues extensively and

11  we're prepared to move forward with negotiating chartered

12  organization issues and turning to those issues once we've

13  reached the RSA and that's exactly what we've done.

14  BY MR. RYAN:

15  Q    Okay.  So, Mr. Mosby was asked at page 189, line 6,

16  starting at line 6 of his deposition:

17       "Question:  Does the Boy Scouts have any plan or

18  intention to provide support to sponsoring organizations,

19  defending those lawsuits if the plan is confirmed?"

20  A    I don't have Mr. Mosby's deposition in front of me, so

21  I'm not sure if you're asking me to look at something --

22  Q    I'll represent to you his answer is, "We're not there

23  yet."  And that was in response to the prior question of if

24  the plan, in its current form is confirmed that -- without --

25  the chartered organizations would not have the benefit of the

1  channeling injunction.

2  A     Maybe we're saying the same thing in different ways.

3  Q     That's fine.  We'll take that up with Mr. Mosby, as

4  well, as to whether he thought he had a plan under the

5  restructuring support agreement.

6           UNIDENTIFIED:  Take that (indiscernible).  Take it.

7           THE COURT:  Everyone please make sure you're muted.

8           MR. RUGGERI:  And if it helps, Mr. Mosby's

9  deposition is tab 53 of the debtors' binder.

10          MR. RYAN:  Thank you, Mr. Ruggeri.  I think we'll

11  lay with that now.

12  BY MR. RYAN:

13  Q     Can you turn to Exhibit 42 of the debtors' binder,

14  page 2.

15  A     I am there.

16  Q     And this was the liquidity analysis that you prepared

17  for the Boy Scouts at the time that the restructuring support

18  agreement was being considered?

19  A     This was an analysis that I prepared for the, as I said

20  earlier, the bankruptcy task force, National Executive

21  Committee, and the National Executive Board around the BSA

22  trust contribution and how that trust contribution affected

23  BSA's liquidity going forward at the time that that component

24  of the RSA was being reviewed and approved by the National

25  Executive Board.

1    Q      Okay.  So, slide 2 is a liquidity analysis, correct?

2    A      Slide 2 is not.  Slide 2 provides -- I'm sorry,

3    slide 2 -- sorry, I'm looking at slide 1.

4    Q      Slide 2 is a liquidity forecast; is that right?

5    A      Yeah, slide 2 is a liquidity forecast, that is correct.

6    Q      Okay.  And footnote 2, can you read footnote 2 for me,

7    sir.

8    A      Delayed emergence to 3/31/22.  (Indiscernible) 25,000

9    lower-use additions in 2021 and lower, unrestricted

10   contributions, in addition to additional restructuring

11   professional fees.

12   Q      Okay.  And if we look at the chart, the estimated,

13   unrestricted liquidity (3/31/22 emergence) that reflects that

14   adjustment, correct?

15   A      The estimated unrestricted liquidity 3/31/22 emergence,

16   that line, which is -- this is a black-and-white copy -- but

17   the lighter line, the lower line says it ends up at $39

18   million at the end of the period.  That is what the note is

19   referring to.

20   Q      And that is materially lower than the estimate with the

21   (indiscernible), correct?

22   A      That is materially lower.  It is taking into account --

23   Q      Just yes-or-no, sir.  It's a yes-or-no question.

24          Is there anyone or slide 2 where there is any analysis

25   of what might happen if blocks of chartered organizations

1  withdraw their support and (indiscernible) is declined?

2  A    No, that is not on slide 2.

3  Q    Okay.  So, at the time of this presentation when the RSA

4  was entered into, the only forecast with results, sensitivity

5  forecast with results in this line, addressing (indiscernible)

6  was to add 25,000 more, correct?

7  A    I don't think you're quite describing it right, but that

8  is the only sensitivity that is, that the line you're

9  referring to, that's the only sensitivity that is on this

10  slide.

11  Q    There's no footnote that says what might happen at 25

12  percent of the current (indiscernible) left scouting, correct?

13  A    That is correct.

14  Q    Okay.  And as Boy Scouts' financial advisor, you're

15  aware that Boy Scouts has taken the position that chartered

16  organizations have certain rights under the Boy Scouts'

17  insurance policies, correct?

18  A    That is correct.

19  Q    Okay.  And you're familiar with the July 28th, 2021,

20  amendments to the restructuring support agreement that was

21  filed with the Court?

22  A    Yes, I am.

23  Q    Okay.  And as part of that amendment -- and we may have

24  covered this -- but if a termination event was added in favor

25  of the TCC, the FCR, the state court counsel, and the

1  coalition for the treatment of chartered organizations,

2  correct?

3  A    Well, I don't think that's a complete description of

4  what was added.  The, as I described earlier, what was added

5  was the rights of all the parties, including BSA and those ad

6  hoc committees local councils, which you neglected to mention,

7  to terminate the RSA if the chartered organization resolution

8  was unsatisfactory.

9  Q    Sir, I wasn't trying to ask for everybody; I was trying

10  to ask on the plaintiff's side of the ledger.  They were all

11  given veto rights, correct?

12  A    Each party of the RSA was given the opportunity to exit

13  the RSA if they were unhappy with the resolution of the

14  chartered organization issues.

15  Q    Okay.  And as part of Boy Scouts' due diligence in

16  respect of whether to enter into the restructuring support

17  agreement, did Boy Scouts or anyone working on their behalf

18  estimate the value of the chartered organizations' insurance

19  rates under BSA's insurance policies or the local councils'

20  policies?

21  A    I'm not aware of anything, no.

22  Q    Thank you.

23          MR. RYAN:  I have no more questions, Your Honor.

24          THE COURT:  Thank you.

25          Mr. Goodman?

1          MR. GOODMAN:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. GOODMAN:

4    Q    Mr. Goodman, you are a financial advisor, correct?

5    A    Correct.

6    Q    And how long have you been a financial advisor?

7    A    I've been advising companies in restructuring processes

8    for over 25 years.

9    Q    The coalition is an ad hoc group, correct?

10   A    That is correct.

11   Q    Have you been involved in bankruptcy cases before that

12   include ad hoc groups?

13   A    I have.

14   Q    What role do ad hoc groups usually serve in a bankruptcy

15   case.

16            MR. SCHIAVONI:  Objection, Your Honor; relevance,

17   beyond the scope of direct.

18            MR. RYAN:  And given the scope of the proceeding

19   now.

20            THE COURT:  Mr. Goodman?

21            MR. GOODMAN:  Your Honor, I'm just trying to lay

22   some foundation testimony.

23            MR. RYAN:  Your Honor, it's 6:10 p.m.  The witness

24   has been on the stand for the better part of the afternoon.

25   (Indiscernible) a little beyond a basic foundation which has

 1 already been laid.  Again, this is irrelevant to the issues in

 2 the scaled-down proceeding that we're in.

 3          THE COURT:  It might be, but I'll let you ask a few

 4 foundation questions and then let's get to the heart of your

 5 examination.

 6          MR. GOODMAN:  Of course.

 7 BY MR. GOODMAN:

 8 Q    Mr. Whittman, what role do ad hoc groups usually serve

 9 in a bankruptcy case?

10 A    They represent a constituent, often times, it's

11 bondholders, where they will gather a large portion, a class

12 of creditors, and often negotiate a resolution that can be

13 then support by, and during confirmation, bring -- I should

14 say, a positive vote or an affirmative vote of that class of

15 creditors in the plan process.

16 Q    Do you have an understanding as to who the coalition

17 represents?

18 A    I do.

19 Q    What is that understanding?

20 A    My understanding is the coalition represents the holders

21 of abused claimants in excess of 60,000 holders of abuse

22 claimants.

23          MR. SCHIAVONI:  Your Honor, that's inconsistent

24 with the 2019 submission.  They don't represent 60,000 --

25 we're not 60,000 coalition members.

1      THE COURT:  It is.

2      MR. SCHIAVONI:  Even Mr. Goodman would admit that.

3      THE COURT:  It is and I know that.

4      MR. SCHIAVONI:  We're only 18,000.

5      THE COURT:  Mr. Goodman?

6      It shows us what people know.

7  BY MR. GOODMAN:

8  Q    Mr. Whittman, are there any parties involved in the

9  debtors' cases, other than the coalition, that represent the

10 comparable creditor constituency?

11 A    There are no other parties that I'm aware of that

12 represent this magnitude of these claimants and this claimant

13 group is the largest creditor constituency.  Yes, I would say

14 yes, I agree.

15 Q    Did the coalition turn over abuse claimants' data to the

16 debtors?

17 A    Yes.

18 Q    And when did that occur?

19 A    Sometime in the fall of 2020.

20 Q    Do you know what volume of claims data was provided by

21 the coalition?

22 A    I don't recall.

23 Q    Okay.  Do you know how the debtors used that data?

24 A    I believe that data was used to help start to formulate

25 an understanding of claims population to inform negotiations

1  in advance of the bar date.

2  Q    And that was beneficial to the Boy Scouts, wasn't it?

3  A    It was helpful, yes.

4  Q    The Boy Scouts and the local councils are making

5  contributions to the settlement trust under the RSA; is that

6  correct?

7  A    That is correct.

8  Q    Did those contribution amounts change while the RSA was

9  being negotiated?

10  A    They did.

11  Q    How did they change?

12  A    The contribution of the Boy Scouts increased over time

13  from $120 million to a target of where between two hundred

14  twenty and $250 million, depending on the time of emergence.

15  The contribution of the local councils, depending on exactly

16  when you start the clock, increased from either 300 million to

17  $425 million up to the $500 million, plus the $100 million ESP

18  (indiscernible) for a total of $600 million.

19  Q    Did the coalition play a role in that increase?

20  A    They did.

21        MR. SCHIAVONI:  Objection.  I don't see how this

22  doesn't result in a broad and extensive waiver of any

23  communications between the coalition and the Boy Scouts.

24        MR. GOODMAN:  Your Honor, the changes that are

25  reflected appear in the publicly filed versions of the

1 debtors' plan in the case.  You can pull them from looking at

2 the docket on PACER and the Omni website.  I don't understand

3 Mr. Schiavoni's objection.

4          THE COURT:  That wasn't your question.

5          Your question was, did the coalition -- I don't

6 remember exactly -- play a role in that increase, in essence?

7          So, you want to get into negotiations or no?

8          MR. GOODMAN:  No, that's fine, Your Honor.

9 Understood.

10 BY MR. GOODMAN:

11 Q    Mr. Whittman, what work remains in the debtors' cases?

12 A    There's a lot of work that remains in the debtors'

13 cases.  As I mentioned, we are in the early stages of

14 negotiating resolutions of the concerns of the chartered

15 organizations.  We are still in negotiations with the

16 insurers.  We are heading towards a disclosure statement

17 hearing, hopefully, on August 25th and -- sorry -- yeah, 25th

18 and 27th and then from there, to the plan process

19 (indiscernible).

20 Q    And what is the debtors' current timeline for exiting

21 Chapter 11?

22 A    Yes, the current timeline, I believe it's for a

23 confirmation hearing in the late-October time frame and based

24 on all the moving parts from there, we've included a, in the

25 business plan that's attached to the disclosure statement, an

1  assumption of a December 31st emergence.

2  Q     And how does the coalition fit into that process?

3  A     I expect the coalition will be an active part of the

4  negotiations that I mentioned with chartering organizations

5  and its insurers and in supporting the plan process.

6  Q     Earlier, Mr. Schiavoni asked you about the payment of

7  the coalition's professional fees.  Do you recall that?

8  A     I do.

9  Q     And under the RSA, the Boy Scouts are agreeing to pay

10 the reasonable and documented fees of the coalition up to

11 certain limits; is that correct?

12 A     That is correct.

13 Q     Do those fee caps apply to the coalition professionals

14 as a collective group?

15 A     They do.

16 Q     The 10.5 million cap includes Brown Rudnick, correct?

17 A     It does.

18 Q     And it also includes Delaware counsel, correct?

19 A     It does.

20 Q     And it also includes insurance counsel, correct?

21 A     Correct.

22 Q     And it also includes the coalition's financial advisor,

23 correct?

24 A     Yes.

25 Q     And it also includes any experts retained by the

1  coalition, correct?

2  A    That's correct.

3  Q    And the $950,000 per month going forward, that also

4  includes all of the consolidation professionals, not just a

5  single law firm, correct?

6  A    That is correct.

7  Q    Did you evaluate the professional fee caps in the RSA

8  for the Boy Scouts?

9  A    I did.

10  Q    Did they appear out of line to you?

11  A    They did not.

12          MR. SCHIAVONI:  Objection.  There's no foundation

13  for what the standard is, given that the TCC has the same

14  exact people on the same exact roles.

15          MR. GOODMAN:  Your Honor, I think I began by asking

16  questions about how long he's been involved in the

17  restructuring field appeared his involvement in cases with ad

18  hoc groups and I was asking that foundation testimony for a

19  reason.

20          THE COURT:  He can give --

21          MR. GOODMAN:  I think that the witness can testify

22  based on his experience.

23          THE COURT:  The witness can give his thoughts that

24  he has.  Overruled.

25  BY MR. GOODMAN:

1  Q     I'll ask the question again.

2        Mr. Whittman, you said that you evaluated the

3  professional fee caps in the RSA for the Boy Scouts, correct?

4  A     Correct.

5  Q     Did they appear out of line to you?

6  A     They did not.

7  Q     And why is that?

8  A     They were in the range of what I would expect for the

9  nature of this case and the complexity of this case and it was

10 in comparison to other cases, as well as in comparison to

11 other professional groups in this case.

12 Q     Okay.  Do you think the professional fee caps on the

13 coalition's -- sorry, I'm going to try again.

14       Do you think the professional fee caps on the

15 coalition's professional fees are reasonable?

16 A     I do.

17 Q     Again, what do you base that on?

18 A     What I just described; my experience in other cases, as

19 well as the other professional groups and costs that have been

20 incurred and are expected to be incurred going forward in this

21 case.

22 Q     And did you consider anything else when you evaluated

23 the professional fee caps in the RSA?

24 A     I did not.

25 Q     Okay.  Did the Boy Scouts request a budget for

1   professional fees from the coalition?

2            MR. HALLOWELL:  Objection; leading.

3            THE COURT:  Sustained.

4            MR. HALLOWELL:  Mr. Goodman and the coalition

5   (indiscernible) aligned with the debtors here.

6            THE COURT:  Sustained.

7            MR. GOODMAN:  Let me rephrase.

8   BY MR. GOODMAN:

9   Q    Mr. Whittman, do you know if the Boy Scouts requested a

10  budget for professional fees from the coalition?

11           MR. HALLOWELL:  Same objection.

12           THE COURT:  Sustained.

13           MR. GOODMAN:  Your Honor, I'm not sure how that's

14  leading.

15           THE COURT:  Because you're suggesting the answer to

16  your next question.

17  BY MR. GOODMAN:

18  Q    Mr. Whittman, did the coalition provide a budget?

19           MR. HALLOWELL:  Objection; leading.

20           THE COURT:  I'll let him answer the question.

21           THE WITNESS:  Not to my knowledge.

22  BY MR. GOODMAN:

23  Q    Okay.  I believe you testified earlier in response to

24  questions from Mr. Hallowell that when indenture trustee came

25  to the professional fee provisions in the RSA, you did not

1  request a review of itemized invoices and that such invoices

2  were not important to you.

3       Do you recall that?

4  A    I do.

5  Q    Can you explain why itemized invoices were not important

6  to you?

7  A    As it related to the $950,000 fee cap going forward,

8  there would be a requirement that we were paying the

9  reasonable fees that were actually incurred going forward.

10      So, in terms of evaluating the cap, I was more

11  interested in was the cap amount reasonable and what I

12  described before, my experience in other cases, as well as the

13  professional spend by other groups in this case and the

14  consideration with the overall budget and cash flow forecasts

15  of the organization.

16      As it related to the ten-and-a-half-million-dollar

17  number, again, I was more interested in terms of how that

18  compared to those factors as opposed to getting into the

19  details of the (indiscernible) invoices.

20  Q    All right.  Do you think it's beneficial to the Boy

21  Scouts for them to pay the coalition's fees under the RSA?

22            MR. HALLOWELL:  Objection; leading.

23            THE COURT:  Sustained.

24  BY MR. GOODMAN:

25  Q    Mr. Whittman, do you know why the Boy Scouts agreed to

1  the professional fee provisions in the RSA?

2           MR. SCHIAVONI:  Calls for hearsay.

3           THE COURT:  Well, the first question doesn't;

4  that's a yes or no.

5  BY MR. GOODMAN:

6  Q    That's a yes-or-no question.

7  A    Yes.

8  Q    Why?

9           UNIDENTIFIED:  Objection; hearsay.

10           MR. RYAN:  I think, Judge, it also lacks foundation

11  because he has to tie it to someone at BSA in order to have a

12  foundation for giving the answer.

13           THE COURT:  Yes, it's foundation.

14           Can you provide a foundation.

15  BY MR. GOODMAN:

16  Q    Mr. Whittman, did you advise the Boy Scouts

17  restructuring task force on this issue?

18  A    I did advise the bankruptcy task force on this issue.

19  Q    Okay.  Do you know if any new law firms signed joinders

20  to the RSA since it was filed?

21  A    Yes, I do, and, yes, there were.

22  Q    Okay.  Do you know what role the coalition played in

23  getting new firms to sign?

24  A    It is my understanding that the coalition has been the

25  party driving getting additional firms to sign up.

1    Q      Thank you.

2              MR. GOODMAN:  Nothing further.

3              THE COURT:  Mr. Buchbinder?

4              MR. BUCHBINDER:  Thank you, Your Honor.  David

5    Buchbinder on behalf of the United States Trustee and I will

6    try to be very brief, everybody.

7                        CROSS-EXAMINATION

8    BY MR. BUCHBINDER:

9    Q    Mr. Whittman, you've participated in negotiating other

10   restructuring support agreements?

11   A      I have.

12   Q      Typically, they arise with groups of bondholders, don't

13   they?

14   A      That's the context (indiscernible) I'm familiar with it.

15   Q      And bondholders have an indenture, correct?

16   A      That is correct.

17   Q      And the indenture generally requires the attorneys' fees

18   and the professional fees of the parties of the indenture to

19   be paid, correct?

20   A      They definitely require the fees of the indenture trust

21   fees to be paid.  I don't know that it's correct that they

22   would require the fees of individual bondholders to pay.

23   Q      And the restructuring support agreements that you're

24   typically familiar with, isn't the attorneys' fees or

25   professional fees (indiscernible) in the indenture typically

1  just (indiscernible) for payment of fees of the ad hoc

2  bondholder committee?

3  A     It may be one of the justifications, yes.

4  Q     Are you aware of any contractual agreement here, other

5  than the RSA, between the coalition and the Boy Scouts?

6  A     No.

7  Q     Are you aware of any statutory obligation, other than

8  the RSA, or the Bankruptcy Code, that would obligate the Boy

9  Scouts to pay the fees of the coalition's attorneys?

10  A     No.

11  Q     The work that you described that the coalition's

12  attorneys have to do to complete the case, isn't that the work

13  that they would have to do to represent their clients if they

14  weren't getting their fees paid by the Boy Scouts?

15  A     (Audio interference) they would or would not do as it

16  relates to the representation of their clients.

17  Q     Okay.  Now, you're a retained professional in this case,

18  aren't you, sir?

19  A     I am.

20  Q     You're familiar with the monthly fee application

21  process?

22  A     I am.

23  Q     And how the fees of the professionals are carefully

24  scrutinized?

25  A     I am.

1  Q     And so why didn't you bother to even take the cursory

2  opportunity to examine the fees of Brown Rudnick and the other

3  coalition professionals, than simply take their word for it as

4  to the amounts?

5  A     Well, again, as to the

6  nine-hundred-and-fifty-thousand-dollar go forward amount, that

7  was go forward, right; there was nothing to scrutinize.  I did

8  expect and, in fact, this (indiscernible) occurred, they have

9  agreed to have those fees subject to the many of the

10 requirements of the other professionals in terms of their

11 review.

12      In terms of the payment of the $10.5 million, which was

13 for historic, as well as any excess in the future fees, from

14 my perspective, it was important to understand the

15 reasonableness of that in the overall case.  I was looking and

16 seeing a lot of work and a lot of activity from the firms.  It

17 wasn't surprising to me that they had incurred or they would

18 incur that type of amount.

19 Q     But you have a staff, don't you, sir?

20 A     I do.

21 Q     And couldn't you have had a low-level billing person

22 review the monthly invoices of Brown Rudnick before agreeing

23 to a number almost arbitrarily?

24 A     I could have, although, it's been my experience, many of

25 those types of groups provide a summary piece of paper and

 1  don't provide the debtor with details of their time

 2  descriptions.

 3          MR. BUCHBINDER:  I have no further questions.

 4          Thank you, Your Honor.

 5          THE COURT:  Thank you.

 6          Mr. Patterson, do you have any questions?

 7          MR. PATTERSON:  I do, Your Honor.  It's just a very

 8  small number.

 9                    CROSS-EXAMINATION

10  BY MR. PATTERSON:

11  Q    Mr. Whittman, my name is Tom Patterson and I represent

12  councils (indiscernible) represent certain claimants.

13      I believe you testified that the reason the debtors

14  negotiated with the coalition was because of the very

15  substantial number of claims that the attorney members of the

16  coalition were presented.

17      Do you recall that testimony?

18  A    Yes, that certainly was one of the reasons.

19  Q    Thank you.

20      Did the debtors or Alvarez & Marsal or yourself conclude

21  what percentage of claims the coalition represented when the

22  RSA was entered into?

23  A    The coalition represented, and there's signatures

24  attached of state court attorneys representing how many claims

25  they represent to the RSA.

1  Q     And do you have an estimate of the percentage that that

2  number represented, as against the 82,000 or so claims that

3  the disclosure statement says that are on file?

4  A     I believe that the time the RSA was filed, there was

5  around 60,000 signatures attached.  The RSA represented that

6  they represented approximately 60,000 of the 82,000 claims.

7  Q     And did you or the debtors conduct any analysis of the

8  severity of those claims as against the claims otherwise in

9  the full 82,000 claim pool?

10 A     That's not an analysis that I would have conducted and

11 I'm not -- there's been a lot of analysis around claims in

12 this case.  I'm not sure if that specific analysis has been

13 done or not.

14 Q     Was there any analysis performed about whether or not

15 the claims represented by the coalition had a greater or

16 lesser occurrence of being presumptively barred by the statute

17 of limitations than the pool as a whole?

18 A     My recollection is that it's not significantly different

19 from the pool, as a whole.

20 Q     How about with respect to claims against local councils,

21 do the claims represented by the coalition have a greater or

22 lesser occurrence, (indiscernible) of occurrence of claims

23 against applicable local councils?

24 A     I'm not sure I understand the question.

25 Q     It's been described in the disclosure statement that

1  thousands of claims did not name an applicable local council

2  in the proof of claim.  So, my question is, did the claims --

3  are the claims represented by the coalition, do they have a

4  greater or lesser (indiscernible) of occurrence of an

5  articulated claim against the local council, as opposed to --

6  as against the pool as a whole?

7  A    I'm not certain.

8  Q    The same question as to the chartered organizations, any

9  analysis of that?

10  A    I'm not certain.

11  Q    Okay.

12        MR. PATTERSON:  That's all my questions.  Thank

13  you.

14        THE WITNESS:  Thank you.

15        THE COURT:  Thank you.

16        Is there anyone else who has not asked questions on

17  cross that wishes to?

18     (No verbal response)

19        THE COURT:  I hear no one.

20        Redirect?

21        MR. HAMMOND:  Your Honor, if I could have just five

22  minutes to consult and wrap this up, hopefully, quickly?

23        THE COURT:  Yes, you may.

24        Yes, we're in recess for five minutes.

25        MR. HAMMOND:  Thank you.

1        (Recess taken at 6:29 p.m.)

2        (Proceedings resumed at 6:39 p.m.)

3            THE COURT:  Okay.  This is Judge Silverstein.

4            Are we ready to begin with redirect?

5            MR. HAMMOND:  No, Your Honor.  I think we aren't

6   going to redirect Mr. Whittman today.  We'll pass the witness.

7            I think there's one housekeeping item that we have

8   here and that was with respect to, I believe there was a

9   motion to introduce what was Mr. -- paragraph 8 of

10  Mr. Whittman's supplemental declaration and we didn't have any

11  other additions in terms of completeness to that.

12           THE COURT:  Thank you.

13           MR. HAMMOND:  Other than that, I think that

14  concludes (indiscernible).

15           THE COURT:  Thank you.  Then that single paragraph

16  is admitted.

17       (Whittman Declaration Paragraph 8 received in evidence)

18           THE COURT:  Okay.  And I'm sorry, are you going to

19  redirect?

20           MR. HAMMOND:  No, Your Honor.

21           THE COURT:  No, okay.

22           MR. HAMMOND:  There's no redirect of Mr. Whittman.

23           THE COURT:  Okay.  So, Mr. Whittman, your testimony

24  is concluded.

25           THE WITNESS:  Thank you, Your Honor.

1        (Witness excused)

2              THE COURT:  Okay.  It's 6:40.  We're not going to

3    start another witness tonight, obviously, so we'll commence

4    again, in the morning.

5              Ms. Boelter, do you have your hand up?

6              MS. BOELTER:  I do.  And I was just rubbing my

7    chin.

8              THE COURT:  Oh, no, I have this little hand

9    thing -- okay.  I'm sorry -- on the mouse here --

10             MS. BOELTER:  Oh, if I did, I did not mean to do

11   that.

12             THE COURT:  -- and it was hovering over you.

13             Okay.  So, we'll start tomorrow at ten o'clock.  I

14   expect that the debtors will be considering their witnesses

15   and the more slimmed-down hearing that we're having and making

16   appropriate decisions on direct and the goal, of course, is to

17   get the witnesses and argument done, but, certainly, to get

18   the witnesses done tomorrow.  So, as I said, we're going to

19   start at 10:00.

20             I am informed by Mrs. Johnson that you use the same

21   registration as you had today for Zoom.  You do not need to

22   re-register or do anything else.

23             And we are -- and I am also going to be using Zoom

24   tomorrow.  We are not going to try to go back to our system,

25   so hopefully, we will not have any issues in the morning and

1  we will start promptly.

2        Is there anything else we can accomplish this

3  evening?

4      (No verbal response)

5        THE COURT:  And thank you very much.

6        We're adjourned.  Have a good evening.

7        COUNSEL:  Thank you, Your Honor.

8      (Proceedings concluded at 6:42 p.m.)

9

10

11                    CERTIFICATE

12

13      We certify that the foregoing is a correct transcript

14  from the electronic sound recording of the proceedings in the

15  above-entitled matter.

16
   /s/Mary Zajaczkowski            August 13, 2021
17  Mary Zajaczkowski, CET**D-531

18
   /s/Coleen Rand                  August 13, 2021
19  Coleen Rand, AAERT Cert. No. 341

20
   /s/William J. Garling           August 13, 2021
21  William J. Garling, CE/T 543

22
   /s/ Tracey J. Williams          August 13, 2021
23  Tracey J. Williams, CET-914

24

25