# Exhibit C

**TCC's Requests for Production**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
|  | Re Docket Nos. 6443, 6445, and 6528 |

**THE OFFICIAL COMMITTEE OF TORT CLAIMANTS'
REQUESTS FOR PRODUCTION TO DEBTORS BOY SCOUTS
OF AMERICA AND DELAWARE BSA, LLC, REGARDING OBJECTION
TO PLAN CONFIRMATION AND  SOLICITATION PROCEDURES (SET ONE)**

1.     Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure (the "Civil Rules"), made applicable to these proceedings by Rules 9014, 7026, and 7034 of the Federal Rules of  Bankruptcy Procedure (the "Bankruptcy Rules"), and pursuant to the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Official Committee of Tort Claimants (the "TCC"), by and through its undersigned counsel, hereby serve the following requests for production of documents (the "Requests for Production") on Boy Scouts of America and Delaware BSA, LLC (together, the "Debtors"), in connection with the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6443], and any amendments, supplements, or modifications thereto, and any proceedings arising therefrom or related thereto in connection with the Debtors' chapter 11 cases.

---

[1]  The Debtors in these Chapter 11 Cases, together with the last four digits of the Debtors' respective federal tax identification numbers, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

2.      Please produce to TCC's undersigned counsel the documents and the production media no later than October 18, 2021.

## **DEFINITIONS**

3.      For the purposes of these Requests for Production, the following Definitions shall apply and capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

4.      The terms "all," "any," and "each" shall each be construed as encompassing any and all.  The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" means "including without limitation."  The present tense shall be construed to include the past tense, and the past tense shall be construed to include the present tense.

5.       "Abuse" shall have the meaning provided in the Plan.

6.      "Abuse Claim" means a liquidated or unliquidated Claim against one or more Abuse Parties that is attributable to, arises from, is based upon, relates to, results from, or is otherwise Concerned with, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, *respondeat superior*, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based on misrepresentation, concealment, or unfair practice, public or private nuisance, or any other theory, including any theory based on public policy or any act or failure to act by an Abuse Party or any other Person for whom any Abuse Party is alleged to be responsible.  The term "Abuse Claims" includes Direct Abuse Claims and Indirect Abuse Claims.

7.      "Abuse Party" means, individually and collectively, (a) the Debtors; (b)

Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Chartered

Organizations; (f) Insurance Companies; or (g) all or any of the foregoing Persons' Representatives.

8.      "BSA Membership Standards Group" shall have the meaning You ascribed to it in

Your Revised Responses and Objections to Century's Request to the Debtors for Production of

Documents, dated June 22, 2021 and attached as Exhibit 5 to Doc. No.5514.

9.      "Bankruptcy Court" shall mean the above-captioned United States Bankruptcy Court

for the District of Delaware presiding over these Chapter 11 Cases.

10.      "Channeling Injunction" shall have the meaning ascribed to it in the Plan.

11.      "Chapter 11 Cases" shall mean the above-captioned chapter 11 cases of Boy Scouts

of America and Delaware BSA, LLC, pending before the United States Bankruptcy Court for the

District of Delaware.

12.      "Chartered Organization" shall have the meaning provided in the Plan.

13.      "Claim" means any "claim," as defined in section 101(5) of the Bankruptcy

Code.

14.      "Coalition" shall mean the Coalition of Abused Scouts for Justice, an ad hoc

committee that filed a notice of appearance in the Chapter 11 Cases on July 24, 2020 at Docket No.

1040, and its members, agents, accountants, financial advisors, employees, experts, attorneys,

officers, directors, representatives, affiliates, subsidiaries, predecessors and/or successors.

15.      "Communications" shall mean all inquiries, discussions, conversations, negotiations,

agreements, understandings, meetings, telephone conversations, letters, notes, telegrams,

correspondence, memoranda, emails, facsimile transmissions, or other form of verbal, written,

mechanical, or electronic disclosure, in Your actual or constructive control or custody or in the control or custody of any current or former affiliates, representatives or advisors.

16.    "<u>Concerning</u>" means relating to, evidencing, supporting, negating, refuting, embodying, containing, memorializing, comprising, reflecting, analyzing, constituting, describing, identifying, referring to, referencing, discussing, indicating, connected with or otherwise pertaining in any way, in whole or in part, to the subject matter being referenced.

17.    "<u>Debtors</u>" means, collectively or individually, as context requires and to encompass responsive documents Boy Scouts of America and Delaware BSA, LLC, and each of their agents, accountants, financial advisors, employees, experts, attorneys, officers, directors, direct or indirect shareholders, members, representatives, affiliates, subsidiaries, predecessors and/or successors.

18.    "<u>Debtors' Data Site</u>" means the electronic site to which the Debtors have produced Documents in these Bankruptcy Cases for the TCC's counsel to access.

19.    "<u>Disclosure Statement</u>" shall mean the *Amended Disclosure Statement for the Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6445], as such Document may be amended, supplemented, or modified from time to time.

20.    "<u>Documents</u>" shall mean any writings, recordings, electronic files and mails, or photographs, whether original or duplicate, as defined in Federal Rule of Evidence 1001 and Federal Rule of Civil Procedure 34(a), inclusively, including (but not limited to) all Documents and information in Your possession, custody, or control, and includes: all and any written, recorded, or graphic material, however produced or reproduced, minutes, summaries, memoranda, transcripts, tapes, or other voice recordings, and all other Documents and tangible things, including booklets, brochures, pamphlets, circulars, notices, periodicals, papers, records, contracts, agreements,

4

photographs, minutes, memoranda, messages, appraisals, analyses, reports, files, interoffice memoranda, or interoffice communications of any description, calculations, invoices, accounting entries, diary entries, calendars, inventory sheets, ledgers, correspondence, emails, phone recordings, instant messages, text messages, telegrams, advertisements, press releases, notes, letters, diaries, working papers, schedules, projections, graphs, charts, films, tapes, printouts, and all other data, whether recorded by electronic or other means, and all drafts thereof.  If a Document was prepared in several copies, or if additional copies were thereafter made, and if any such copies are not identical in all respects or are no longer identical by reason of subsequent notation or modification of any kind whatsoever, including notes on the front or back, in the margins, or on any of the pages thereof, then each such non-identical copy is a separate Document and must be produced.  When examples of categories or types of Documents are given in a particular Request for Production by use of phrases such as "including," this shall always be interpreted as being for illustrative purposes only (*i.e.*, to be understood as "including without limitation") and in no way limits or narrows the scope of any Request for Production.   "Documents" always includes Communications, whether so stated in a particular Request for Production or not.

21.     "Effective Date" shall have the meaning provided in the Plan.

22.     "FCR" shall mean James L. Patton, Jr., the legal representative appointed by the Bankruptcy Court for holders of Future Abuse Claims, or any successor legal representative appointed by the Bankruptcy Court, and his agents, accountants, financial advisors, employees, experts, attorneys, representatives, affiliates, predecessors and/or successors.

23.     "Hartford Admin Claims" shall mean the Hartford Administrative Expense Claim and the Hartford Additional Administrative Expense Claim.

24.    "<u>Hartford Additional Administrative Expense Claim</u>" shall have the meaning provided in the Plan.

25.    "<u>Hartford Administrative Expense Claim</u>" shall have the meaning provided in the Plan.

26.    "<u>Hartford Insurance Settlement</u>" shall have the meaning provided in the Plan

27.    "<u>Hartford Insurance Settlement Agreement</u>" shall have the meaning ascribed to it in the Plan.

28.    "<u>Hartford Term Sheet</u>" shall mean that certain *Settlement Term Sheet* [Docket No. 6210-1].

29.    "<u>IV Files</u>" shall mean any Documents that identify individuals associated with the Debtors who have been accused of Abuse, and includes, but is not limited to, those records and files referred to as "ineligible volunteer" or "perversion files."

30.    "<u>Indirect Abuse Claims</u>" shall have the meaning provided in the Plan

31.    "<u>Insurance Company</u>" shall have the meaning provided in the Plan.

32.    "<u>Insurance Coverage Action</u>" shall have the meaning provided in the Plan.

33.    "<u>Insurance Policy</u>" shall have the meaning provided in the Plan, including all rights and benefits thereunder, and the proceeds thereof.

34.    "<u>Limited Protected Parties</u>" shall have the meaning provided in the Plan.

35.    "<u>Local Council Feedback Template</u>" shall have the meaning You ascribed to it in Your Revised Responses and Objections to Century's Request to the Debtors for Production of Documents, dated June 22, 2021 and attached as Exhibit 5 to Doc. No.5514.

6

36.     "<u>Local Council Reporting Procedures</u>" shall have the meaning You ascribed to it in Your Revised Responses and Objections to Century's Request to the Debtors for Production of Documents, dated June 22, 2021 and attached as Exhibit 5 to Doc. No.5514.

37.     "<u>Local Councils</u>" shall have the meaning provided in the Plan.

38.     "<u>Mandatory Reporting Procedures</u>" shall have the meaning You ascribed to it in Your Revised Responses and Objections to Century's Request to the Debtors for Production of Documents, dated June 22, 2021 and attached as Exhibit 5 to Doc. No.5514.

39.     "<u>Non-Abuse Claims</u>" shall have the meaning provided in the Plan.

40.     "<u>POC</u>" shall mean any proof of claim filed in these Chapter 11 Cases.

41.     "<u>Person</u>" shall have the meaning provided in the Plan.

42.     "<u>Petition Date</u>" shall mean February 18, 2020.

43.     "<u>Plan</u>" shall mean the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 6443], as such Document may be amended, supplemented, or modified from time to time.

44.     "<u>Prepetition</u>" shall mean occurring prior to the Petition Date.

45.     "<u>Related Non-Debtor Entities</u>" shall have the meaning provided in the Plan.

46.     "<u>Released Parties</u>" shall have the meaning provided in the Plan.

47.     "<u>Restricted Assets</u>" means certain assets that are subject to enforceable restrictions under applicable law, regulations, or accounting standards.

48.     "<u>Scouting Unit</u>" means an entity that conducts scouting for a Chartered Organization, including but not limited to a pack, den, troop, Sea Explorers, Air Explorers, Learning for Life,

7

Explorers, Venturing, crew, ship, chapter, and any associations that were predecessor associations of the foregoing.

49.     "<u>Settlement Trust</u>" shall have the meaning provided in the Plan.

50.     "<u>Solicitation Procedures</u>" shall have the meaning ascribed to it in the Disclosure Statement.

51.     "<u>TCJC Settlement</u>" shall have the meaning provided in the Plan.

52.     "<u>TCJC Settlement Agreement</u>" shall have the meaning provided in the Plan.

53.     "<u>TCJC Term Sheet</u>" shall mean that certain *The Church of Jesus Christ of Latter-day Saints Settlement Term Sheet* [Docket No. 6210-2].

54.     "<u>Third-Party Releases</u>" shall have the meaning provided at Section X.J. of the Plan.

55.     "<u>You</u>" or "<u>Your</u>" and variants thereof mean the Debtors or Each of them.

## <u>INSTRUCTIONS</u>

The preceding Definitions apply to each of these Instructions. For purposes of these Requests for Production, the following Instructions shall be followed:

1.     Civil Rule 34, made applicable to this proceeding pursuant to Bankruptcy Rules 7034 and 9014(c), is hereby incorporated by reference and applies to each of the following instructions.

2.     All responses shall comply with the requirements of the Civil Rules, the Bankruptcy Rules, and the Local Rules.

3.     Unless otherwise stated in a specific Request for Production, the relevant time period shall be the period from the inception of the Debtors to the present.

4.     These Requests for Production shall be deemed continuing in nature. In the event You become aware of or acquire additional information relating or referring to any of the following Requests for Production, such additional information is to be promptly produced.

5.      By these Requests for Production, the TCC does not ask the Debtors to produce again Documents that they have already produced to the Debtors' Data Site that contains Documents produced documents to the TCC.

6.      Produce all Documents and all other materials described below in Your actual or constructive possession, custody, or control, including Documents and all other materials in the possession, custody, or control of current or former employees, officers, directors, agents, agents' representatives, consultants, contractors, vendors, or any fiduciary or other third parties, wherever those Documents and materials are maintained, including on personal computers, PDAs, wireless devices, local area networks, application-based communications services (including, without limitation, Facebook Messenger, Instant Bloomberg, WeChat, Skype, KakaoTalk, WhatsApp, Signal, iMessage, etc.), web-based file hosting services (including, without limitation, Dropbox, Box, Apple iCloud, Google Drive, Hightail, etc.), or web-based email systems such as Gmail, Yahoo, etc.

7.      You must produce all Documents in Your possession, custody, or control, whether maintained in electronic or paper form and whether located on hardware owned and maintained by You, or hardware owned and/or maintained by a third party that stores data on Your behalf.  You must produce all such Documents even if they were deleted or in draft form. Without limitation, hardware where such data may be stored includes: servers; desktop, laptop, or tablet computers; cell and smart phones; PDA devices; scanners, fax machines, and copying machines; and mobile storage devices, such as thumb or external hard drives. Electronically-stored Documents include any computerized data or content stored on electromagnetic media. Without limitation, types of electronically stored Documents include email, voicemail, instant messages, intranet and internet system data, telephone and cellular telephone calling records, data compilations, spreadsheets, word

processing Documents, images, databases, digital photocopier memory, and any other information stored in memory storage devices.

8.      Produce the original or duplicate of each Document requested, as such terms are defined by Rule 1001 of the Federal Rules of Evidence, together with all non-identical copies and drafts of that Document. If a duplicate is produced, it should be legible, and bound or stapled in the same manner as the original.

9.      Documents not otherwise responsive to these Requests for Production should be produced: (a) if such Documents mention, discuss, refer to, explain, or concern one or more Documents that are called for by these Requests for Production; (b) if such Documents are attached to, enclosed with, or accompany Documents called for by these Requests for Production; or (c) if such Documents constitute routing slips, transmittal memoranda or letters, comments, evaluations, or similar materials.

10.     Documents attached to each other should not be separated; separate Documents should not be attached to each other.

11.     Documents should include all exhibits, appendices, linked Documents, or otherwise appended Documents that are referenced in, attached to, included with, or are a part of the requested Documents.

12.     If any Document, or any part thereof, is not produced based on a claim of attorney-client privilege, any other privilege, or work product protection, then in answer to such Request for Production or part thereof, for each such Document, You must:

       a.      Identify the type, title and subject matter of the Document;

       b.      State the place, date, and manner of preparation of the Document;

      c.     Identify all authors, addressees, and recipients of the Document, including information about such persons to assess the privilege asserted; and

      d.     Identify the legal privilege(s) or basis for withholding production, and the factual basis for that claim.

13.    Documents should not contain redactions unless such redactions are made to protect information subject to the attorney-client privilege and/or work product doctrine. In the event any Documents are produced with redactions, a log setting forth the information requested in Instruction 11 above must be provided.

14.    To the extent a Document was at one time, but is no longer, in Your actual or constructive possession, custody, or control, state whether it:  (a) is missing or lost; (b) has been destroyed; (c) has been transferred to others; and/or (d) has been otherwise disposed of. In each instance, identify the Document, state the time period during which it was maintained, state the circumstance and date surrounding authorization for such disposition, identify each person having knowledge of the circumstances of the disposition, and identify each person who had possession, custody, or control of the Document. Documents prepared prior to, but which relate or refer to, the time period covered by these Requests for Production are to be identified and produced.

15.    If any part of the following Requests for Production cannot be responded to in full, please respond to the extent possible, specifying the reason(s) for Your inability to respond to the remainder and stating whatever information or knowledge You have concerning the portion to which You do not respond.

16.    If You object to any of these Requests for Production, state in writing with specificity the grounds of Your objections. Any ground not stated shall be waived. If You object to a particular

portion of any Request for Production, You shall respond to any other portions of such Request for Production as to which there is no objection and state with specificity the grounds of the objection.

17.    The fact that an investigation is continuing or that discovery is incomplete shall not be a justification for failing to respond to these Requests for Production based on the knowledge or information that You possess at the time You respond to these Requests for Production. If an investigation is continuing or discovery is not complete with respect to the matter inquired into by any Request for Production, so state in Your response to that Request for Production.

18.    If the identity of Documents responding to a Request for Production is not known, then that lack of knowledge must be specifically indicated in the response. If any information requested is not in Your possession, but is known or believed to be in the possession of another person or entity, then identify that person or entity and state the basis of Your belief or knowledge that the requested information is in such person's or entity's possession.

## MANNER OF PRODUCTION

1.    All Documents produced to the TCC may be uploaded to the data site that the Debtors have previously established in these Bankruptcy Cases for the TCC to access but shall be specified in new folders indicating that the Documents are responsive to these Requests for Production.

2.    Otherwise, Documents shall be provided in either native file ("native") or single-page 300 dpi-resolution group IV TIF format ("tiff") format as specified below, along with appropriately formatted industry-standard database load files and accompanied by true and correct copies or representations of unaltered attendant metadata. Where Documents are produced in tiff format, each Document shall be produced along with a multi-page, Document-level searchable text file ("searchable text") as rendered by an industry-standard text extraction program in the case of electronic originals, or by an industry-standard Optical Character Recognition ("ocr") program in the

case of scanned paper Documents. Searchable text of Documents shall not be produced as fielded data within the ".dat file" as described below.

3.    <u>Database Load Files and Production Media Structure</u>: Database load files shall consist of: (i) a comma-delimited values (".dat") file containing: production Document identifier information, data designed to preserve "parent and child" relationships within Document "families," reasonably accessible and properly preserved metadata (or bibliographic coding in the case of paper Documents), custodian or Document source information; and (ii) an Opticon (".opt") file to facilitate the loading of tiff images. Load files should be provided in a root-level folder named "Data," images shall be provided within a root level "Images" folder containing reasonably structured subfolders, and searchable text files shall be provided in a single root-level "Text" folder.

4.    <u>Electronic Documents and Data, Generally</u>: Documents and other responsive data or materials created, stored, or displayed on electronic or electro-magnetic media shall be produced in the order in which the Documents are or were stored in the ordinary course of business, including all reasonably accessible metadata, custodian, or Document source information; and searchable text as to allow the through a reasonable and modest effort, to fairly, accurately, and completely access, search, display, comprehend, and assess the Documents' true and original content.

5.    <u>Emails and Attachments, and Other Email Account-Related Documents</u>: All Documents and accompanying metadata created and/or stored in the ordinary course of business within commercial, off-the-shelf email systems including but not limited to Microsoft Exchange™, Lotus Notes™, or Novell Groupwise™ shall be produced in tiff format, accompanying metadata, and searchable text files or, alternately, in a format that fairly, accurately, and completely represents each Document in such a manner as to make the Document(s) reasonably useable, manageable, and comprehendible by the TCC.

DOCS_LA:339994.3 85353/002

6.      <u>Documents and Data Created or Stored in or by Structured Electronic Databases</u>: With the exclusion of email and email account-related Documents and data, all Documents and accompanying metadata created and/or stored in structured electronic databases or files shall be produced in a format that enables the TCC to reasonably manage and import those Documents into a useable, coherent database. Documents must be accompanied by reasonably detailed documentation explaining the Documents' content and format including but not limited to data dictionaries and diagrams. Some acceptable formats, if and only if provided with definitive file(s), table(s), and field level schemas include:

   a.      XML format file(s);

   b.      Microsoft SQL database(s);

   c.      Access database(s); and/or

   d.      fixed or variable length ASCII delimited files.

7.      <u>Spreadsheets, Multimedia, and Non-Standard File Types</u>: All Documents generated or stored in software such as Microsoft Excel or other commercially available spreadsheet, database and/or statistical programs, as well as any multimedia files such as audio or video, shall be produced in their native format, along with an accompanying placeholder image in tiff format indicating a native file has been produced. A "Nativelink" entry shall be included in the .dat load file indicating the relative file path to each native file on the production media. To the extent You have other file types that do not readily or easily and accurately convert to tiff and searchable text, You may elect to produce those files in native format subject to the other requirements listed herein.  Native files may be produced within a separate root-level folder structure on deliverable media entitled "Natives."

8.      <u>"Other" Electronic Documents</u>: All other Documents and accompanying metadata and embedded data created or stored in unstructured files generated by commercially available software

systems (excluding emails, structured electronic databases, spreadsheets, or multimedia) such as, but not limited to, word processing files (such as Microsoft Word), image files (such as Adobe .pdf files and other formats), and text files shall be produced in tiff and searchable text format in the order the files are or were stored in the ordinary course of business.

9.      <u>Paper Documents</u>: Documents originally created or stored on paper shall be produced in tiff format. Relationships between Documents shall be identified within the.dat file utilizing document identifier numbers to express parent Document/child attachment boundaries, folder boundaries, and other groupings. In addition, the searchable text of each Document shall be provided as a multi-page text file as provided for by these Requests for Production.

## <u>DOCUMENT REQUESTS</u>

### *<u>General</u>*

1.      All Documents Concerning negotiations of the Plan, including, but not limited to, drafts of the Plan and other Documents Concerning the Plan that were not filed with the Bankruptcy Court in these Chapter 11 Cases.

2.      All Documents Concerning the Debtors' assertion of their good faith in proposing the Plan.

3.      All Documents Concerning the Debtors' formulation of Solicitation Procedures, including, but not limited to, any Communications relating to the solicitation, allowance, or estimation of Abuse Claims and Indirect Abuse Claims.

4.      All Documents Concerning the solicitation of votes for Abuse Claims.

### *<u>Insurance</u>*

5.      Since January 1, 2010, all Documents You produced or received in connection with any litigation Concerning insurance coverage for Abuse Claims and/or any Insurance Coverage Action.

6.      All Documents Concerning the defense and/or indemnification of Abuse Claims under all Insurance Policies for the period January 1, 2010 to the Petition Date, including, without limitation, the amounts paid and Documents sufficient to show the dollar amounts You and any other Person paid toward Your defense against Abuse Claims.

7.      All Insurance Policies You contend or have ever contended provide, may provide, or

should provide coverage to Debtors for the defense and/or indemnification of Abuse Claims.

8.     All agreements under which You promised, agreed, or otherwise undertook to defend, indemnify, insure, and/or hold harmless any Person for any liability or potential liability Concerning any Abuse Claims.

9.     All Documents Concerning the impairment or exhaustion of any Insurance Policy, the remaining available limits for the defense and/or indemnification of Abuse Claims under each Insurance Policy, and the individual amounts paid under any Insurance Policy in the defense and/or indemnification of every Abuse Claim, and the amount of non-Abuse Claims that any Person may allege reduces the insurance limits available for Abuse Claims.

### *Hartford Insurance Settlement*

10.     All Documents Concerning the Hartford Admin Claims, including, but not limited to, all Documents (a) that Concern the amount of the Hartford Admin Claims, and (b) that Concern Your belief that You are or may be entitled to payment of the Hartford Admin Claims.

11.     All Documents that You produced, received, reviewed, analyzed, considered, or that otherwise Concern the Hartford Term Sheet and the Hartford Insurance Settlement Agreement including, without limitation, any drafts thereof, and Concerning the negotiation and drafting thereof.

12.     All Documents relied upon or considered by the Debtors to support their contention that the Hartford Insurance Settlement represents a "good-faith compromise and settlement of Claims, Interests and Controversies."

13.     All Documents relied upon or considered by the Debtors that influenced Your decision to agree to less than available Hartford policy limits.

### *TCJC Settlement*

14.     All Documents that You produced, received, reviewed, analyzed, considered, or that otherwise Concern the TCJC Term Sheet and the TCJC Settlement Agreement including, without limitation, any drafts thereof and Concerning the negotiation and drafting thereof.

15.     All Documents You relied upon to support Your contention that the TCJC Settlement represents a "good-faith compromise and settlement of Claims, Interests and Controversies."

### *Abuse Claims*

16.     All Documents Concerning Your analysis of and valuation of the dollar amount of all Abuse Claims, including, but not limited to, methodology and data scoring.

17.     All Documents Concerning the methodology You employed to value the Abuse Claims, including, but not limited to, Your data scoring and valuation analysis for each Abuse Claim.

16

18.    All Documents Concerning the projected, potential, or estimated liability of the Debtors and/or any Related Non-Debtor Entities for Abuse Claims and Indirect Abuse Claims.

19.    All Documents Concerning any verdicts or settlements You considered or relied upon in determining the value of Abuse Claims.

20.    All Documents Concerning the Local Council Feedback Template and Mandatory Reporting Procedures for POCs filed in the Chapter 11 Cases.

21.    All Communications between or among the BSA Membership Standards Group and the representatives of the Local Councils Concerning the Local Council Reporting Procedures for any Abuse Claims, including but not limited to, questions regarding the verification of POC data.

22.    All scouting membership rosters and troop rosters from January 1, 1940 to the Current Date.

23.    All Documents Concerning Your analysis of the number of Persons who committed Abuse for which the Debtors may be legally responsible from the period January 1, 1940 to the Effective Date of the Plan and the number of Persons who were abuse by those Persons who committed Abuse during the period January 1, 1940 through the Effective Date of the Plan.

24.    All Documents Concerning the distributions to be made under the Plan to holders of fraudulent and time-barred Abuse Claims.

25.    All Documents Concerning the distributions to be made under the Plan to holders of fraudulent and time-barred Abuse Claims.

26.    All Documents Concerning the financial condition, as of the Effective Date, of each Person, including, but not limited to, Local Councils and Chartered Organizations, that are to receive Third-Party Releases or Channeling Injunctions under the Plan.

27.    All IV Files and all Documents that that evidence, interpret, constitute, refer, relate to, or otherwise Concern any IV Files.

### ***Best Interests of Creditors***

28.    All Documents that support the Debtors' contention in the Plan that each impaired claimholder will receive or retain, on account of its claim, property as of the Effective Date having a present value not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of Title 11 of the United States Code.

29.    All Documents Concerning the value of and ability of Chartered Organizations to contribute assets to support the Plan.

30.    All Documents Concerning the value of the Chartered Organizations' claims against their insurers, which would be released under the Plan.

31.    All Documents Concerning the value of and ability of Local Councils to support the

Plan, including, but not limited to, the value of Local Councils' assets that they assert are Restricted Assets.

32.    All Documents Concerning the value of the Local Councils' claims against their insurers, which would be released under the Plan.

33.    All Documents that identify the assumptions underlying Exhibits C, D, and E of the Disclosure Statement.

34.    All Documents You considered in formulating Exhibits C, D, and E of the Disclosure Statement.

35.    All Documents, including data and analyses that underlie or support the following statements in the "Liquidation Analysis" in the Disclosure Statement:

   a.    At pages 281-285 of the Disclosure Statement, the determination or calculation of the Total Contribution required from each Local Council;

   b.    At pages 281-285 of the Disclosure Statement, the specific properties (e.g., camps, service centers/scout shops, and others) included in Property Contribution;

   c.    At page 285 of the Disclosure Statement, each Local Council Letter of Intent;

   d.    At page 289 of the Disclosure Statement, the basis for the following statement: "The Debtors have assumed that the liquidation would occur over an approximately six-month time period. This assumption is consistent with assumptions utilized for hypothetical liquidations analyses in other chapter 11 cases."

   e.    At page 294, the basis for determining the percentages in the following statement: "Estimated recovery percentages for accounts receivable are between approximately 33% and 35%."

   f.    At page 295, "Estimated recoveries are based on liquidation assumptions that include only sellable apparel and stock at substantially discounted values."

   g.    At page 295, "After a review of the assets, the Debtors and their advisors concluded that the forced sale of the Debtors' assets in the compressed timeframe that typically occur during a chapter 7 liquidation would likely result in a valuation discount relative to "fair value.""

   h.    At page 295, the basis for determining the percentages in the following statement: "The liquidation value of land, buildings, and equipment is stratified based on estimated recoveries ranging from 80% to 85% recovery on brokers opinion of value of. . . ."

i. At page 296, the basis for determining the percentages in the following statement: "Total land, building, and equipment recoveries range from 58% to 63% of pro forma values."

j. At page 296, the basis for determining the percentages in the following statement: Determination of percentages: "Recoveries are assumed between 50% and 80% for Artwork given indications that the value of the Artwork would be significantly depressed in a sale over a compressed timeframe as well as the impact of the BSA bankruptcy and Abuse Claims on the value of the Artwork, while the remaining balance of other assets is assumed to recover 100% for pooled and gift annuity investments and between 5% and 25% for Summit assets."

k. At page 297, the basis for the statement and for determining the percentages in the following statement: "Operating expenses are assumed to reduce significantly during a liquidation between 25% and 75% of projected monthly costs. Further, wind down expenses are reduced on a month to month basis during the liquidation period to account for expected closures of facilities and further reductions in labor force as the liquidation process progresses."

l. At page 297, the basis for determining the percentages in the following statement: "The Debtors assumed that trustee fees are approximately 3% of entity gross Liquidation Proceeds."

m. At page 297, the basis for determining the percentages in the following statement: "In the Liquidation Analysis, chapter 7 professional fees are estimated to be approximately 1.5% of gross Liquidation Proceeds excluding current cash on-hand."

n. At page 297, "Claims Processing Costs...Estimates reflect a minimum of $1 million."

o. At page 297, "Secured Lender Professional Fees are estimated between $700,000 and $1 million during the liquidation period."

p. At page 297, the basis for determining the percentages in the following statement: "In the Liquidation Analysis, chapter 7 broker fees are estimated to be approximately 2.0% of gross Liquidation Proceeds from these asset classes."

q. At page 298, the determination of the specific amount referenced: "The Liquidation Analysis assumes that priority Claims consist of priority employee benefits pursuant to Section 507(a)(4) of the Bankruptcy code which are estimated to be $20 million as of the Conversion Date, comprised primarily of accrued employee benefit costs, severance, seasonal and part time payroll costs, and 503(b)(9) Claims."

r. At pages 298-99, all Documents sufficient to show the breakdown in dollar amounts or percentages of "employee-related Claims" as discussed in the following statement: "General Unsecured Claims are assumed to include

estimated Abuse Claims, unrecovered unsecured PBGC Claim, employee-related Claims (primarily Restoration Plan Claims), contract rejection Claims, and pre-petition trade payables and accrued liabilities."

s.  At page 299, all Documents sufficient to show the specific identification of all "Contract rejection Claims" including the amount provided as "estimated to be $8 million. . . ."

t.  At page 301, all of the "significant financial information related to the Local Councils, including balance sheets and property valuations (refer to Exhibit D-2: Local Council Property Value Information below)"

u.  At page 301, copies of each individual Local Council liquidation analysis: "the analysis assumes each local council is liquidated separately from BSA. . . ."

v.  At page 301, the Documents that provide the investments of the Local Councils as of February 28, 2021, segregated between restricted and unrestricted.'

w.  At page 301, the analyses for each individual Local Council Concerning segregation between restricted and unrestricted assets.

x.  At page 301, the specific Documents, data, or information relied upon in order to determine donor imposed restrictions: "Restricted investment balances reflect donor imposed restrictions on use and disposition and accordingly such amounts are generally excluded from the Liquidation Proceeds. . . ."

y.  At page 301, the basis for determining the percentage in the following statement: "[H]owever, the Debtors prepared the Local Council liquidation analysis assuming that Local Councils would be able to recover approximately the same share of restricted investments (19%) as the Debtors in their Liquidation Analysis as described above.

z.  At page 302, the Documents Concerning the Local Council assertions in the following statement: "Unrestricted Land, Building, and Equipment – Represents a) real property asserted by Local Councils as unrestricted, plus b) certain real property asserted as restricted by Local Councils that the BSA has determined, based on its legal analysis of the asserted restrictions, is capable of being sold with the proceeds available for distribution to general unsecured creditors of the Local Councils. Pro forma balances of unrestricted land, building, and equipment are presented at fair market value based on recent broker opinion of values conducted by third party real estate advisors (or the average thereof if multiple valuations were conducted on the same property)."

aa. At page 302, the Documents Concerning the Local Council assertions in the following statement:  Local Identification of each specific Local Council assertion, document, data or information relied upon in order to determine restricted real property: "Restricted Land Building, and Equipment – Represents real property asserted by Local Councils as restricted such that the restriction would preclude a

DOCS_LA:339994.3 85353/002

sale of the property or require reversion of the proceeds based on donor restriction documentation, as validated by BSA's legal analysis. Pro forma balances of restricted land, building, and equipment are presented at fair market value based on recent broker opinion of values conducted by third party real estate advisors (or the average thereof if multiple valuations were conducted on the same property)."

bb. At page 302, the basis for each statement and for determining the percentage: "Further BSA believes a larger discount for the Local Councils than the BSA properties described above is appropriate for a number of reasons. First, the Local Council properties were valued through broker opinions of value, which are inherently more limited and provide less certainty than full appraisals used for the principal Debtor properties. Second, the broker opinions of value also generally did not take into account limitations on use driven, for example, by conservation easements, which would further reduce the value of the properties. Third, the Debtors expect that the proceeds derived from the sale of Local Council properties would be suppressed due to the market being saturated with a large number of similar camp properties, which are often located in relatively close proximity to one another. The liquidation value of land, buildings, and equipment is estimated based on recoveries of 60% of unrestricted real property. Restricted real property is excluded from liquidation proceeds."

cc. At page 302, the Documents Concerning each specific Local Council assertion, in order to determine "self reported indications of value": "Footnote 9 - Any property for which a valuation was not obtained is assumed to have limited value in the Liquidation Analysis and is factored into the 60% recovery. Approximately 895 of 1,183 properties were valued and approximately 75 of the unvalued properties are restricted. Self-reported indications of value from the Local Councils of the remaining unrestricted properties, which are a mix of mainly book and tax assessed amounts, total less than $40 million."

dd. At page 302, Documents Concerning calculations of how each non-appraised property was "factored into the 60% recovery": "Footnote 9 - Any property for which a valuation was not obtained is assumed to have limited value in the Liquidation Analysis and is factored into the 60% recovery. Approximately 895 of 1,183 properties were valued and approximately 75 of the unvalued properties are restricted. Self-reported indications of value from the Local Councils of the remaining unrestricted properties, which are a mix of mainly book and tax assessed amounts, total less than $40 million."

ee. At page 302, Documents sufficient to identify the 1,183 properties (including indication of restricted or unrestricted): "Footnote 9 - Any property for which a valuation was not obtained is assumed to have limited value in the Liquidation Analysis and is factored into the 60% recovery. Approximately 895 of 1,183 properties were valued and approximately 75 of the unvalued properties are restricted. Self-reported indications of value from the Local Councils of the remaining unrestricted properties, which are a mix of mainly book and tax assessed amounts, total less than $40 million."

ff. At pages 302-03, the basis for determining the percentage in the following statement: "Recoveries of other assets are estimated to be 5% of book value balances as these assets either have little sellable or recoverable value via a chapter 7 liquidation or in some cases are restricted based on donor stipulations."

gg. At page 303, the basis for determining the percentage in the following statement: "Operating expenses are assumed to reduce significantly during a liquidation and are estimated at 3.5% of gross liquidation proceeds."

hh. At page 303, the basis for determining the percentage in the following statement: "In the Liquidation Analysis, chapter 7 professional fees are estimated to be approximately 3.5% of gross Liquidation Proceeds excluding current cash on-hand."

ii. At page 303, the basis for determining the percentage in the following statement and the U.S. Chamber of Commerce publication referenced in the following statement: "Estimates reflect approximately 2.5% of Settlement Trust recoveries, consistent with a US Chamber of Commerce publication on trust distributions dated March 2018."

jj. At page 303, the basis for determining the percentage in the following statement: "In the Liquidation Analysis, chapter 7 broker fees are estimated to be approximately 4% of gross Liquidation Proceeds from these asset classes."

kk. At page 303, the Local Council balance sheets referenced in the following statement: "The Liquidation Analysis assumes that approximately 50% of the debt on Local Council balance sheets as of February 28, 2021, is secured debt based on a review of a selection of approximately 80% of the total Local Council debt."

ll. At page 303, the basis for determining the percentage in the following statement: "The Liquidation Analysis assumes that approximately 50% of the debt on Local Council balance sheets as of February 28, 2021, is secured debt based on a review of a selection of approximately 80% of the total Local Council debt."

mm.    At page 304, the Documents sufficient to identify the breakdown of the $17.7 million into accrued employee payroll and benefit costs and severance: "The Liquidation Analysis assumes that priority Claims consist of priority employee benefits pursuant to Section 507(a)(4) of the Bankruptcy code which are estimated to be $17.7 million as of the Conversion Date, comprised primarily of accrued employee payroll and benefit costs and severance."

nn. At page 304, the basis for determining the percentage in the following statement: "Administrative and priority Claims are estimated to recover 62% in the aggregate."

oo. At page 304, the copies of each individual Local Council liquidation analysis referenced in the following: "The below chart reflects the aggregation of individual Liquidation Analyses of the Local Councils."

pp. At page 304, Documents sufficient to show the calculation of estimated aggregate Abuse Claims liability: "Solely for purposes of this analysis, the estimated aggregate Abuse Claim liability is allocated to each council based on number of Abuse Claims as a proportion of all non-duplicative Abuse Claims that identify a local council."

qq. At page 305, the basis for determining the percentage in the following statement: "Contract rejection Claims are estimated to be 5% of unrestricted net assets per Local Council balances sheets as of February 28, 2021."

rr. At pages 306-07, the basis for the statement ""Residual Scouting Interest assumed to be reallocated to BSA for further distribution to creditors; however, the Debtors understand that various parties, including Local Councils, would assert that such value should be utilized for scouting purposes in local jurisdiction."

ss. At page 354, "which collectively charter more than 50,000 Cub Scout, Scouts BSA and affiliated programs units"

tt. At page 357, the basis for the statement "Membership Levels – Membership levels are assumed to decrease in 2021 by 13%, primarily due to the impact of COVID-19 on programing, but are forecasted to stabilize between 2023 to 2024 and achieve modest growth in 2024 and 2025..."

uu. At page 362, that Documents providing the basis and breakdown for all amounts referenced as "Exit Costs / Cash Contributions."

### *PBGC Claim*

36.    All Documents Concerning the Debtors' potential pension liability.

37.    All Documents Concerning the Debtors' analysis of the validity and amount of the Pension Benefit Guaranty Corporation's asserted lien for unfunded benefits and premiums.

38.    From January 1, 2020 and forward, all Documents Concerning any bankruptcy filing of, involuntary bankruptcy against, or assignment for the benefit of creditors for any Local Councils.

39.    All Documents which support the contention that any or all of the Local Councils treat themselves as under common control for purposes of "permissive aggregation" under Treasury Regulation Section 1.414(c)-5(c).

40.    All Documents which support the contention that Debtors and any or all of the Local Councils have held themselves out as under common control, whether for purposes of "permissive aggregation" under Treasury Regulation Section 1.414(c)-5(c) or otherwise.

41.    All Documents which support the contention that Debtors and any or all of the Local Councils regularly coordinate their day-to-day exempt activities for purposes of "permissive aggregation" under Treasury Regulation Section 1.414(c)-5(c).

42.     All Documents that establish any audits the Debtors conducted of any Local Councils since January 1, 2015 in order to enforce the Local Councils' operations and promote scouting in a manner consistent with Debtors' mission, including, but not limited to, any final reports of the results of such audits, whether provided to the Local Councils or not.

43.     All Documents Concerning any occasion since January 1, 2015 when Debtors have revoked, or sought to revoke, the charter of any of the Local Councils, either because a Local Council did not meet Debtors' standards or because Debtors deemed the revocation in the best interests of the scouting movement.

### *Released Parties*

44.     All Documents Concerning any Released Party's indemnification rights against the Debtors.

45.     All Documents Concerning the determination of which parties would or could be included in the Plan as Protected Parties, Limited Protected Parties, and/or Released Parties.

46.     All Documents Concerning releases under the Plan granted to any Related Non-Debtor Entity or Local Council, including, but not limited to, any officers or directors of the Debtors.

47.     Since January 1, 2017, all Documents Concerning the daily operations of the Local Councils, including, but not limited to, employees, finances, pension obligations, and Scouting Unit activities.

48.     All Documents sufficient to show that a suit against any Released Party will deplete the assets of the Debtors' estates.

49.     All Documents Concerning Released Parties' indemnification rights against the Debtors.

50.     All Documents Concerning the Debtors' contention in the Plan that any Released Party and/or Protected Party under the Plan has made or will make a substantial contribution to the Debtors' reorganizations in these Chapter 11 Cases.

51.     All Documents sufficient to identify which Local Council is alleged to be co-liable, or jointly and severally liable, with the Debtors, for any liability; and the reasons for such co-liability, or joint and several liability.

52.     All Documents Concerning the Debtors' contention in the Plan that Hartford's contribution of $787 million to the Settlement Trust is sufficient to justify its release and inclusion as a Protected Party under the Plan.

53.     All Documents Concerning the Debtors' conclusion in the Plan that TCJC's contribution of $250 million to the Settlement Trust is sufficient to justify TCJC's release and inclusion as a Protected Party under the Plan.

24

54.     All Documents Concerning the impact, if any, to the Debtors' membership levels if any Protected Party is excluded from the Channeling Injunction.

55.     All Documents Concerning the impact, if any, to the Debtors' financial projections if any Protected Party is excluded from the Channeling Injunction.

56.     All Documents Concerning the Channeling Injunctions.

57.     All Documents supporting Your contention in the Plan that You require $25 million in liquidity at emergence from bankruptcy and Your previous contention that You required $75 million in liquidity at emergence from bankruptcy.

58.     All Documents Concerning the Debtors' contention that payments under the Plan will satisfy of all or substantially all of the claims of the classes affected by the Channeling Injunctions.

### *Payment to Lawyers to the Coalition*

59.     All Documents Concerning any payments to be made to, lawyers to the Coalition, including, but not limited to, the Debtors' conclusion that payment of the Coalition's legal fees is in the best interests of the Debtors' bankruptcy estates.

### *Settlement Trust, Settlement Trustee, and Settlement Trust Advisory Committee*

60.     All Documents relating to the BSA Settlement Trust Contributions, including, but not limited to, any Persons that is a Protected Party or Limited Protected Party.

61.     All Documents Concerning selection of Eric Green and any other Person as Settlement Trustee.

62.     All Documents Concerning Eric Green's personal and professional relationships with any other party in interest to these Chapter 11 Cases, or their counsel or professionals, including, but not limited to, David Molton, Esq., the law firm of Brown Rudnick LLP, the FCR, and the Young Conaway law firm where the FCR is a partner.

63.     All Documents Concerning the criteria, consideration, and selection of members of the Settlement Trust Advisory Committee.

64.     All Communications with or among any potential members of the Settlement Trust Advisory Committee.

65.     All Documents Concerning the selection of the Special Reviewer.

66.     All Documents Concerning the Foundation Loan, including, but not limited to, the value of the Foundation Loan, and the terms and conditions of the Foundation Loan.

### *Plan Feasibility*

67.     Documents sufficient to show the number of Boy Scouts for each year from January 1, 2010 to the Petition Date.

68.     All Documents Concerning the Boy Scouts' projected membership from and after the projected Effective Date of the Plan for a period of five (5) years.

69.     All Documents sufficient to show Local Councils' obligations to make contributions to the Settlement Trust.

70.     All Documents sufficient to show that Chartered Organizations can generate Scouting memberships.

71.     All Documents sufficient to show that any Chartered Organization will withdraw from scouting if they are not Protected Parties.

[remainder of page left intentionally blank]

26

72.     All Documents sufficient to show that any Chartered Organization will become insolvent if it withdraws from scouting.

Dated:  October 8, 2021
        Wilmington, DE

PACHULSKI STANG ZIEHL & JONES LLP

/s/ *James E. O'Neill*
James I. Stang (CA Bar No. 94435) (admitted pro hac vice)
Iain A.W. Nasatir (CA Bar No. 148977)
(admitted pro hac vice)
Kenneth H. Brown (CA Bar No. 100396)
(admitted pro hac vice)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No. 271038)
(admitted pro hac vice)
Steven W. Golden (DE No. LP 0127)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email:  jstang@pszjlaw.com
        inasatir@pszjlaw.com
        kbrown@pszjlaw.com
        joneill@pszjlaw.com
        jlucas@pszjlaw.com
        sgolden@pszjlaw.com

        -and-

PASICH LLP

Kirk Pasich (CA Bar No. 94242)
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone:  (424) 313-7850
KPasich@PasichLLP.com

        -and-

Jeffrey L. Schulman (NY Bar No. 3903697)
757 Third Avenue, 20th Floor
New York, New York 10017
Telephone:  (212) 686-5000
JSchulman@PasichLLP.com

Counsel for the Official Committee of Tort Claimants