```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3    IN RE:                       .  Chapter 11
                                  .  Case No. 20-10343 (LSS)
4    BOY SCOUTS OF AMERICA AND    .
     DELAWARE BSA, LLC,           .  (Jointly Administered)
5                                 .
                                  .  Courtroom 2
6                                 .  824 Market Street
              Debtor.            .  Wilmington, Delaware 19801
7                                 .
                                  .  Tuesday, October 19, 2021
8    . . . . . . . . . . . . . .  10:12 a.m.

9                        - PUBLIC VERSION -
                        TRANSCRIPT OF ZOOM HEARING
10        BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
               CHIEF UNITED STATES BANKRUPTCY JUDGE
11
     APPEARANCES:
12
     For the Debtors:          Derek Abbott, Esquire
13                             MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                               1201 North Market Street
14                             16th Floor
                               Wilmington, Delaware 19899
15
                               - and -
16
                               Glenn M. Kurtz, Esquire
17                             WHITE & CASE LLP
                               1221 Avenue of the Americas
18                             New York, New York 10020

19
     (APPEARANCES CONTINUED)
20
     Electronically
21   Recorded By:              Brandon J. McCarthy, ECRO

22   Transcription Service:    Reliable
                               1007 N. Orange Street
23                             Wilmington, Delaware 19801
                               Telephone: (302) 654-8080
24                             E-Mail: gmatthews@reliable-co.com

25   Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the Coalition of
   Abused Scouts for
3  Justice:              David J. Molton, Esquire
                         BROWN RUDNICK, LLP
4                        Seven Times Square
                         New York, New York 10036
5

6  For Hartford Accident
   and Indemnity Company: Philip D. Anker, Esquire
7                         WILMER CUTLER PICKERING HALE
                            and DORR, LLP
8                         7 World Trade Center
                          250 Greenwich Street
9                         New York, New York 10007

10

   For Century Indemnity
11 Company:               Tancred Schiavoni, Esquire
                          O'MELVENY & MYERS, LLP
12                        Times Square Tower
                          7 Times Square
13                        New York, New York 10036

14 For the Future
   Claimants'
15 Representative:        Robert S. Brady, Esquire
                          YOUNG CONAWAY STARGATT & TAYLOR, LLP
16                        The Brandywine Building
                          1000 West Street
17                        17th Floor
                          Wilmington, Delaware 19899
18

19 For the Tort
   Claimants' Committee:  James E. O'Neill, Esquire
20                        PACHULSKI STANG ZIEHL & JONES, LLP
                          919 North Market Street
21                        17th Floor
                          Wilmington, Delaware 19801
22
                          Kenneth H. Brown, Esquire
23                        150 California Street
                          15th Floor
24                        San Francisco, California 94111

25

1   APPEARANCES (CONTINUED):

2   For AIG Companies:          James L. Hallowell, Esquire
                                GIBSON, DUNN & CRUTCHER, LLP
3                               200 Park Avenue
                                47th Floor
4                               New York, New York 10166

5
    For American Zurich
6   Insurance Company:          Mark D. Plevin, Esquire
                                CROWELL & MORING, LLP
7                               Three Embarcadero Center
                                26th Floor
8                               San Francisco, California 94111

9
    For The Church of Jesus
10  Christ of Latter-day
    Saints:                     Adam J. Goldberg, Esquire
11                              LATHAM & WATKINS, LLP
                                1271 Avenue of the Americas
12                              New York, New York 10020

13
    For Claimant Sexual
14  Abuse Victims:              Paul Mones, Esquire
                                PAUL MONES, PC
15                              13101 Washington Boulevard
                                Suite 103
16                              Los Angeles, California 90066

17
    For Paul Mones, P.C.:       Sally E. Veghte, Esquire
18                              KLEHR HARRISON HARVEY BRANZBURG, LLP
                                919 North Market Street
19                              Suite 1000
                                Wilmington, Delaware 19801
20

21  For Eric Green and
    Resolutions, LLC:           Rachael A. Rowe, Esquire
22                              KEATING MUETHING & KLEKAMP, PLL
                                One East Fourth Street
23                              Suite 1400
                                Cincinnati, Ohio 45202
24

25

1    APPEARANCES (CONTINUED):

2    For Marc J. Bern &
     Partners, LLC:            William D. Sullivan, Esquire
3                              SULLIVAN HAZELTINE ALLINSON, LLC
                               919 North Market Street
4                              Suite 420
                               Wilmington, Delaware 19801
5

6    For Slater Slater
     Schulman, LLP:            Justin R. Alberto, Esquire
7                              COLE SCHOTZ, P.C.
                               500 Delaware Avenue
8                              Suite 1410
                               Wilmington, Delaware 19801
9

10   For Timothy Kosnoff,
     Interested Party:         David E. Wilks, Esquire
11                             WILKS LUKOFF & BRACEGIRDLE, LLC
                               4250 Lancaster Pike
12                             Suite 200
                               Wilmington, Delaware 19806
13

14   ALSO APPEARING:

15   In Propria Persona:       Paul Hale, *Pro Se*

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:                                              PAGE

3    Agenda
     Item 4:    Moving Insurers' Motion to Compel Documents    104
4               Withheld by Eric Green and Resolutions, LLC
                for the Disclosure Statement Hearing
5               (D.I. 6282, filed 9/17/21)

6               Court's Ruling:                            ---

7
     Agenda
8    Item 5:    Debtors' Motion for Protective Order and      8
                Related Relief
9               (D.I. 6288, filed 9/17/21)

10              Court's Ruling:                            ---

11
     Agenda
12   Item 6:    [SEALED AND FILED UNDER SEPARATE COVER]    ---

13
     Agenda
14   Item 7:    Motion of Zurich Insurers for Authority to    127
                Join in Rule 2004 Subpoenas or, in the
15              Alternative, Issue Identical Subpoenas as
                Previously Served by Other Insurers Relating
16              to Claims Aggregators
                (D.I. 6342, filed 9/22/21)
17

18   Agenda
     Item 8:    [SEALED AND FILED UNDER SEPARATE COVER]    ---
19

20   Agenda
     Item 9:    Motion of Marc J. Bern & Partners LLC to      128
21              Quash Subpoena to Produce Documents Issued
                to KLS Legal Solutions LLC
22              (D.I. 6380, filed 9/27/21)

23              Court's Ruling:                            ---

24

25

1                                INDEX

2   MOTIONS:                                            PAGE

3   Agenda
    Item 10:  Debtors' Motion for Leave to File Debtors'    138
4             Omnibus Reply to the Objections by the Tort
              Claimants' Committee, Century, and AIG, to
5             the Debtors' Motion for Protective Order and
              Related Relief
6             (D.I. 6632, filed 10/15/21)

7             Court's Ruling:                              138

8
    Agenda
9   Item 11:  Motion for Leave to Exceed the Page Limit    138
              Regarding Debtors' Omnibus Reply to the
10            Objections by the Tort Claimants' Committee,
              Century, and AIG, to Debtors' Motion for
11            Protective Order and Related Relief
              (D.I. 6633, filed 10/15/21)
12
              Court's Ruling:                              138
13

14  Transcriptionist's Certificate                         140

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commence at 10:13 a.m.)

2            THE COURT:  Good morning, Counsel.  This is Judge

3   Silverstein.  We're here in the Boy Scouts of America

4   bankruptcy, Case Number 20-10343.

5            Mr. Abbott.

6            MR. ABBOTT:  Thank you, Your Honor.  And good

7   morning.  Your Honor, we've got an agenda today that's got a

8   couple of revisions and a couple of matters that have been

9   dealt with by orders having been entered or matters

10  withdrawn.  And some of those are reflected on the agenda,

11  Your Honor, today.

12           But further, I understand that Item Number 7 will

13  be withdrawn at least as to Zurich and the joinder filed by

14  Clarendon.

15           Your Honor, Number 9 we understand is going

16  forward as a status conference.

17           The two big items, Your Honor, are Numbers 4

18  and 5.  And we're obviously happy to proceed however the

19  Court would like.  It makes sense to the debtors, Your Honor,

20  to take Number 5 first, which is our motion for a protective

21  order.  It's a little bit broader relief, but it encompasses

22  some of the issues that may arise in Number 4, we think, and

23  thought it might make sense to take that out of order,

24  Number 5 first.  But we are certainly, obviously, subject to

25  the Court's preference on that.

1    THE COURT:  I had thought about the fact that 4

2  and 5 are somewhat related, although I do think 4 raises some

3  unique issues that 5 does not.  I guess I'm -- I don't know

4  if "agnostic" is the right word or not.  I guess I don't

5  really care which one we take first.  I may have to hear both

6  of them before I rule.  So it doesn't matter to me.  We can

7  take --

8    MR. ABBOTT:  Thank you --

9    THE COURT:  -- 5 first --

10    MR. ABBOTT:  -- Your Honor.

11    THE COURT:  -- if you think that's more efficient.

12    MR. ABBOTT:  I think that makes sense, Your Honor.

13  And I will cede the camera, as it were, to Mr. Kurtz, who

14  will be handling Number 5 for the debtors, Your Honor.

15    THE COURT:  Mr. Kurtz.

16    MR. KURTZ:  Good morning, Your Honor.  Glenn Kurtz

17  on behalf of the debtors.  Can you hear me?

18    THE COURT:  I can hear you, but I don't see you.

19    MR. KURTZ:  Right.  So I am back in my office,

20  which would suggest that I would do better with the

21  technology; and, instead, I can't get my video running.  I

22  realized that might have been happening, so I've now

23  literally called in on my phone, and I'm now speaking to my

24  phone because, when I introduced myself through the Zoom

25  video, no one seemed to hear me.

1          THE COURT:  Okay.

2          MR. KURTZ:  Is it okay if I proceed in this --

3          THE COURT:  Yes --

4          MR. KURTZ:  -- fashion --

5          THE COURT:  -- it is.

6          MR. KURTZ:  -- Your Honor?

7          THE COURT:  Yes.

8          MR. KURTZ:  Thank you very much.

9          Let me maybe start by pointing out that, although

10   the debtors really have nothing to hide and are happy to

11   submit anything for the Court to review, mediation privilege

12   is important, especially where, as here, the parties are

13   continuing to mediate, in fact, this whole week.  And as the

14   Court knows, we have a ways to go here, and we certainly

15   don't want to chill negotiations, as parties worry about what

16   they say and if it can be used against them.

17          Having said that, it's even more important that we

18   present any record that the Court wants to see.  Your Honor

19   talked about balance the last time this issue came up, and so

20   we filed this motion, so that we could understand the

21   parameters of the mediation privilege that will be applied in

22   the case, so that we can get the correct discovery out and,

23   at the same time, make the same record for Your Honor at

24   confirmation.

25          This comes up, obviously, based on the 1129(a)

1 requirement that we get as good faith finding.  Primarily, of

2 course, that's going to be determined based on the plan terms

3 and the reasons that the debtors are proposing those plan

4 terms.  In fact, one could argue that the information that's

5 being sought here really isn't particularly relevant because

6 it appears, at least to us, that what the objectors are

7 trying to get into is how the good faith finding

8 under 1129(a), a finding that actually has to be made, will

9 be used or not used in some future coverage litigation.

10          That's really for another case and for another day

11 and, really, by another court, so I'm not sure there's a

12 great deal of relevance to all of this.  But in any case,

13 process is also relevant and admissible in support of a

14 finding of good faith.  And we've cited a lot of cases where

15 the fact of mediation and the number of mediations and the

16 participants in mediations and the identity of the mediators

17 are all admissible in support of a good faith finding.

18          THE COURT:  So I have two questions.

19          MR. KURTZ:  We --

20          THE COURT:  Mr. Kurtz, I have two questions about

21 that:  One, in the cases that you cited, do any of them

22 involve a situation where the mediation privilege is also

23 discussed?

24          MR. KURTZ:  I think that -- I'm not sure that

25 they -- what -- I'm not sure they actually discuss the

1  mediation privilege.  I think what they discuss is the fact

2  that non-privileged information relating to a settlement

3  process; and, in particular, a mediation process, is evidence

4  that's admissible and not privileged and was used and relied

5  on to support a finding of good faith, even more broadly than

6  plans sometimes just in class settlements, where the Court

7  has an independent obligation to ferret out and assess the

8  good faith proposal of a settlement that impacts so many

9  absent class members.

10            THE COURT:  I ask that --

11            MR. KURTZ:  So I think --

12            THE COURT:  I ask that for two reasons.

13            MR. KURTZ:  Right.

14            THE COURT:  One, because it did not seem to me

15  there was an overlap between the cases that cite the

16  standard -- and by the way, some of the cases -- some of

17  those cites that appeared to be cases were actually just

18  findings of fact and conclusions of law that some court

19  entered, and I've probably entered something like that

20  somewhere, so no decision that -- as to what the appropriate

21  standard is.

22            But I ask that because, as I said, there doesn't

23  seem to be an overlap between the cases in which the standard

24  is discussed and then cases that discuss mediation privilege

25  or what type of evidence can be discovered and/or admitted.

1  And I also --

2          MR. KURTZ:  Right.

3          THE COURT:  -- ask that because of the rule that

4  everybody cites me to, our 9019-5, which says that no person

5  may rely on or introduce into evidence, evidence pertaining

6  to any aspect of the mediation effort, any aspect.  So I'd

7  like to understand what that means, as well, in this context,

8  where I'm --

9          MR. KURTZ:  Right, right.

10         THE COURT:  -- trying to do maybe some kind of

11  balancing.

12         MR. KURTZ:  Right, right.  Excellent question, and

13  that's why we wanted to get this out here.  Let me walk you

14  through the way I think it actually works.

15         So all of this, I think, is impressed over by lots

16  of propositions of law that have been raised in connection

17  with this, which includes preclusion and waiver.  And I think

18  the rules -- and I'm not sure it's come up quite as squarely

19  as we're dealing with it here because I don't think it's been

20  frequent that people have argued that the content of

21  mediation is admissible.

22         The fact of mediation is always non-privileged and

23  it is always admissible.  And I -- the reason I would say

24  that, Your Honor, is there's a mediation order, it's a

25  publicly filed order.  It says the parties are going to

1  mediation.  It identifies the mediating parties, it

2  identifies the mediators.

3        And so the only thing really left in terms of what

4  we are talking about and relying on would be the number of

5  mediation sessions and the dates of those sessions.  And that

6  is standard log information, that's codified in the Federal

7  Rule of Evidence for privileged matters, where you have to

8  identify for people the dates of the privileged information,

9  the topics of it, in fact, in a general way, not to disclose

10  the privilege, but the topics.

11        And so everything that we're talking about has

12  already been disclosed, it's already public.  So there is no

13  argument -- and we'll get into this in a minute.  But what

14  people are relying on, the objectors are relying on is sort

15  of the use of some privileged information as a sword and then

16  not giving the rest of the information, the privileged

17  information, as a shield.

18        But here, it would be as if someone took a

19  privilege log, took the information off the privilege log,

20  and argued either a waiver of a preclusion.  Not only does it

21  not support waiver or preclusion, but in fact, the privilege

22  log is a requirement, in order to identify non-privileged

23  information for the parties that seek it.  So, although there

24  may be -- I'm not positive we have a case that's addressed

25  everything so squarely.  I think the rules are pretty

1  established that we have non-privileged information.  And

2  frankly, the objectors haven't really challenged that.  None

3  of them have argued that what we've -- what we intend to rely

4  on, the fact of mediation, the identity of the mediators, and

5  so on, is actually privileged because it's obviously not

6  privileged.

7        The question then becomes:  Can Your Honor rely on

8  those facts?  And people have done that, we think, pretty

9  customarily because it's -- and it's only worth what Your

10  Honor thinks it's worth.  I mean, I'm not trying to make an

11  argument on the weight it gets.  If Your Honor doesn't find

12  it persuasive, maybe none of this is all that important to

13  you.  But in our minds, if you spend months of time and

14  dozens of sessions with some really reputable people working

15  through issues, that sort of imbues this with some good faith

16  as it relates to process.

17        When people look at process and terms, terms are

18  typically more important, unless you have a bad process.  The

19  process here is relevant.  To what extent only Your Honor

20  knows.  Some courts have found it important, especially in

21  class actions, where you're representing the interests of

22  unidentified parties, classes of parties.  Courts have relied

23  on this pretty extensively because they feel more comfortable

24  relying on a settlement when it's gone through a particular

25  process.

1          But ultimately, it's the terms that are going to

2    matter, if the terms are fair and it went through a process,

3    that may be different than if the terms are unfair and you

4    went through a process.  And by analogy, if we were in

5    Chancery Court, you'd look at -- and you were looking at

6    entire fairness, you'd be looking at process and price.

7          And so it all seems to me like fairly related

8    issues.  And so, while they may not have had a lot of people

9    that have tried to push because this has been an unusual

10   push -- and I'll tell you, we received yesterday all kinds of

11   objections to the discovery request by the objectors that are

12   far broader in invoking mediation privilege than what we've

13   done.

14         We've tried to address a balance here by really

15   looking at only seminal proposals and communications and

16   mediation.  It's not for today, but we have objectors that

17   are applying and raising mediation privilege, and we're

18   nowhere near -- we haven't had a meet-and-confer or

19   anything -- with respect to matters that don't relate to

20   getting to a deal and that relate to the positions.  So

21   they're not exactly raising this in -- you know, in a

22   balanced way.

23         But in terms of balance -- and the objectors

24   raised this -- Your Honor has made remarks.  We've agreed

25   with your remarks that -- at least in two respects:  That the

1  privilege covers -- it's obvious, you've read the language,

2  and it obviously covers settlement proposals and

3  communications made in the mediation.  It also covers things

4  that are prepared for and then used in the course of a

5  mediation.

6          But what it doesn't cover -- and Your Honor had

7  made this point -- is what the debtors considered and decided

8  in approving the plan, and it doesn't cover information that

9  was not prepared for mediation, but then was used in the

10  mediation, the same as it doesn't cover that for privilege.

11  You can't take a non-privileged document, drop it into a

12  mediation, and it becomes cloaked.  And so the debtors are

13  not withholding any of that information.

14          We've been very consistent, I guess, with what we

15  understand to be the rules and at least some preliminary

16  views that Your Honor has given on the rules.  You certainly

17  haven't given all your views, so maybe we're not doing

18  everything that we think we should be doing or you think we

19  should be doing.

20          But we're only trying to protect three basic

21  categories of information:

22          It's the mediation proposals, which include the

23  draft TDPs and the settlement agreements.  And we gave them

24  the terms, but we haven't given them the negotiation history,

25  and that's really where I was commenting.  That's -- they

1  want that, not to say this isn't in the best interests of the

2  estate, but they want that so they can argue later whether

3  your finding for 1129(a) purposes is usable in subsequent

4  coverage litigation, which is just not for today.

5         THE COURT:  Well, let me ask this.

6         MR. KURTZ:  The second cat --

7         THE COURT:  Let me ask this.  I do want to get

8  your three categories.  But with respect to the TDPs, I

9  looked back at these findings that the plan proponents want

10 me to make, and they're just not 1129(a)(3) findings.  They

11 want me to find --

12        MR. KURTZ:  Right.

13        THE COURT:  -- that the trust distribution

14 procedures were proposed in good faith.  They want me to make

15 certain findings with respect to the TDPs, that they're fair

16 and reasonable, other stuff that's not 1129(a)(3).  So, for

17 that purpose, for purposes of those findings, I'm not sure

18 the 1129(a)(3) standard, assuming the debtors are

19 articulating it correctly -- just assume that for the

20 moment -- I'm not sure that covers whatever it means by

21 saying the trust distributions are fair and reasonable and

22 they were proposed in good faith.

23        MR. KURTZ:  Right, right.  Let me offer maybe two

24 or three responses:

25        One is we have -- we haven't advised the Court of

1  this, and probably should have, but we have narrowed those

2  findings, I believe, and have filed them.  So maybe that

3  impacts the extent of what Your Honor is referring to.

4        Secondly, I think there is appropriate 1129(a)

5  findings with respect to the terms of the plan, which

6  includes the TDPs.

7        And I think that finding that, for purposes of

8  emergence and confirmation and the estate and good faith,

9  that that may be very different than what somebody ultimately

10  finds in a subsequent action.  I think we are going to

11  introduce proof of how those TDPs -- why they're reasonable,

12  what the underwriting was, what the claims history was, what

13  the exposures were, so there's going to be a full record on

14  that.

15        I don't believe that the back-and-forth that got

16  us to the terms that are subject to the adjudication matter.

17  But if Your Honor believes it matters --

18        THE COURT:  Uh-huh.

19        MR. KURTZ:  -- and Your Honor doesn't believe it's

20  protected by mediation privilege, then we'll produce those

21  drafts.  It's not as if we're trying to hide anything.  It's

22  just that it's literally draft proposals that went back and

23  forth in mediation, and so it's very clearly subject in our

24  minds, anyway, to mediation privilege.  And we don't believe

25  that introducing the fact of mediation and the other matters

1  is even related to the back-and-forth, and therefore, has to

2  be produced on some kind of waiver principle.  But that's,

3  you know, why we're trying to get to an understanding today.

4            THE COURT:  Okay.

5            MR. ABBOTT:  Does that --

6            THE COURT:  Well, if the --

7            MR. KURTZ:  Does that --

8            THE COURT:  If the findings are changing, then I

9  don't know what I'm ruling on.  And so I'm not sure how I can

10  tell you --

11            MR. KURTZ:  Right.

12            THE COURT:  -- what's appropriate, even assuming I

13  could or should, four months before I see the arguments that

14  people are making.

15            MR. KURTZ:  Right.

16            THE COURT:  But let's go through your three

17  categories.  So one are the mediation proposals.

18            MR. KURTZ:  Correct.

19            The second category is the mediation

20  communications.

21            And the third category, a little more limited, is

22  the portions of the board minutes where we have redacted for

23  either mediation or attorney/client privilege.  And so the

24  documents reveal non-privileged information and they're

25  redacted for privileged information.

1          And we think all three of those categories are

2    about as squarely covered by the rules and the cases as you

3    really could have, and that's the balance that we tried to

4    strike.  We tried to really get at only what are the

5    proposals, what are the communications, and what are the

6    documents that record the proposals or the communications or

7    otherwise contain attorney/client advice.

8          And we don't think the objectors have identified

9    any authority or reasoning to call into question those

10   invocations.  In fact, they haven't really argued in their

11   papers, that I could tell, that any of the documents at

12   issue, at least the way we're describing them, are not

13   privileged.  They are, in fact, as I mentioned, asserting

14   mediation privilege themselves on these categories and even

15   broader categories that probably don't enjoy mediation

16   privilege.

17         So I don't think the argument we have is whether

18   or not it's privileged.  It clearly is privileged.  I think

19   the arguments we've had are really -- well, before we get to

20   what they want to do with it, their first argument was, well,

21   it may be privileged and it's not admissible, but that

22   doesn't mean we don't get it in discovery.

23         And they cited the AE Liquidation case.  That case

24   was decided before Rule 9019-5(d) was amended to preclude

25   discovery of mediation materials, so it's been superseded by

 1  rule of the Court.  In AE Liquidation, in fact, it said

 2  there's no -- there's nothing in the rule that says you don't

 3  discovery, it just talks to admissibility.  That's been

 4  fixed.

 5              MR. KURTZ:  The second --

 6              THE COURT:  "Fixed" --

 7              MR. KURTZ:  -- response --

 8              THE COURT:  "Fixed" would be a word, "fixed" would

 9  be a word.  I'm not -- I'm, quite frankly --

10              MR. KURTZ:  Think --

11              THE COURT:  -- troubled by that last sentence

12  and -- but it is there.

13              MR. KURTZ:  Right.

14              THE COURT:  But it --

15              MR. KURTZ:  Right.

16              THE COURT:  -- troubles me because I think <u>AE</u>

17  <u>Liquidation</u> was correctly decided, so -- but I recognize --

18              MR. KURTZ:  Right.

19              THE COURT:  -- it's there and I incorporated --

20              MR. KURTZ:  Right.

21              THE COURT:  -- it in my order and --

22              MR. KURTZ:  Right.

23              THE COURT:  But I said I'm troubled by that last

24  sentence.  I think it's very over-broad --

25              MR. KURTZ:  Right.

1           THE COURT:  -- but okay.

2           MR. KURTZ:  Well, I -- right.  I mean, I -- the

3   only comment I would offer on that, because I understand why

4   AE Liquidation would be fair under 408 -- that's kind of the

5   408 rule, you don't get to use it, but that doesn't mean you

6   don't get to see it.

7           But mediations is -- because it's under the

8   auspices of the Court, is typically -- even the production of

9   the information is giving you insights that people shouldn't

10  have, and it's also giving you admissions that people,

11  invariably, will bring before the Court, and that the Court

12  is going to have a hard time sort of unseeing.  And so it

13  does enjoy these kinds of protections.

14          In any event, as you point out, it is the rule, it

15  is in the order.  And if it wasn't in the rule and it wasn't

16  in the order, the fight we'd be having now would be with

17  respect to admissibility, as opposed to discoverability, but

18  we are where we are.

19          The second sort of privilege-related issue that

20  the objectors are raising is that there's a provision in the

21  mediation order that says it's not applicable to, quote, "a

22  subsequent action concerning insurance coverage."  But this

23  is not a subsequent action and this is not an action that

24  concerns insurance coverage.  That -- the import of that

25  section is for another day and for another case, as I had

1   mentioned.

2           And then the third -- before sort of getting into

3   preclusion and waiver, the third response I saw to the

4   privileged nature of the documents is a notion -- and Your

5   Honor actually sort of just mentioned it in passing, as

6   well -- that, you know, these are kind of broad categories,

7   and is it too broad to get rulings now.  And I guess I would

8   respond in two ways:

9           One is we actually did identify very specific

10  documents by Bates Number and by log that we've appended to

11  the order, I believe, so we could make sure that we were

12  being very, very specific where we could be specific, and

13  we're certainly prepared to produce any of that in camera, if

14  Your Honor needs to see it or wants to see it.

15          But the -- but categories, when you're dealing

16  with privilege and especially mediation privilege, can be

17  done in what's known as "umbrella rules."  And so we have

18  also added to the specifics -- to the specific documents

19  where we're seeking for something more umbrella, so that

20  tomorrow we don't have a new fight, when they ask for what

21  happened in mediation tomorrow.  We think the parties, after

22  months of this, kind of need to come to a resolution on

23  what's fair and what's not fair.  And whatever the rules are,

24  we'll follow them.

25          But it's very untenable for us to have so many

1  fights and so many difficulties and so many applications,

2  motions, and requests for delay because we can't get on the

3  same page on what the rules are.  And that probably is a

4  little more relevant to something I'll end with.

5          But what the debtors -- I mean -- I'm sorry --

6  what the objectors really are trying to do here isn't to say

7  it's not privileged, it's to say that, one, if you're going

8  to introduce non-privileged information, and you're not going

9  to give us privileged information, then you're not going to

10 be able to use at trial that aren't privileged information.

11         And then secondly, they say that the fact that

12 you've relied on or disclosed non-privileged information

13 waives privilege on related or the same subject matters, even

14 where there was privilege.

15         And both of those are just wrong.  Their

16 preclusion issue is, as a matter of law, a party can't be

17 precluded from introducing non-privileged information because

18 it invoked a privilege with respect to privileged

19 information, whether it's the same subject or related

20 subjects.  And on this one -- we cited cases for it, there's

21 no contrary authority.

22         On this one, the objector is basically relying on

23 the board materials and the board minutes, where there's some

24 redactions saying, you know, you're trying to use non-

25 privileged in the same document as a privileged.  You can't

1  do that, that's not right.  Redactions are customary, they're

2  proper.  And in fact, the very purpose of redactions is to

3  permit parties to produce and use non-privileged information

4  and documents that contain privileged information, as well.

5  So I don't think there's much in that one.

6         Waiver is maybe the bigger focus of all this, and

7  maybe gets even closer to the things that Your Honor has been

8  talking about.  And it's a sword and shield concept, as I

9  mentioned.  It's the idea you can't disclose privileged

10  information, in part, where you like it, and the invoke

11  privilege on other privileged information, where it hurts

12  you.

13         And the premise for this and the price of

14  admission for this is the disclosure of the privileged

15  information, and that just doesn't apply here.  As I

16  mentioned, the matters that we've disclosed, which were

17  disclosed in public mediation orders and in logs, has to be

18  disclosed, and it's not privileged.  And so you can't, as a

19  matter of law, find waiver or argue for waiver based on non-

20  privileged information being released.

21         In fact, we're not allowed to withhold non-

22  privileged information and we'd be rightfully taken to task

23  if we did.  And there's a little bit of an irony here in

24  being accused of over-redacting.  And then, where we produced

25  documents, they say, well, having not redacted that, you sort

1  of now have to produce other things.

2          So -- but the sword and shield cases, they don't

3  apply because we haven't -- we don't have a disclosure of

4  privileged information.  They also don't apply because we

5  don't have any swords.  The debtors have made balls-and-

6  strikes decisions based on privilege.  We've tried to allow

7  discovery where it was appropriate and not privileged,

8  without regard to whether it hurts or whether it helps.

9  There are no swords.  There's nothing strategic about the

10  decisions we've made.  And the disclosures that have been

11  identified by the objectors are not swords, they are not

12  helpful to us, one way or the other.  And in fact, I'm not

13  even sure how we could use them.  And I think I've offered in

14  the past, we'll claw them back.  If you want us to

15  characterize those as privileged, we can do that, but they're

16  not because they're public matters.  And so that's sort of

17  the substance.

18          There's also a notion that Your Honor -- an

19  argument at least made that Your Honor should not be

20  resolving this months-long dispute, which we think is just an

21  effort at delay.  I wanted kind of start with maybe

22  practicality and common sense and with the efficient

23  administration of this case.  And that is that it is time to

24  resolve this longstanding dispute, so that we can figure out

25  the right discovery to produce and the right questions to

1  permit at depositions and to save the time and expense of

2  having to fight throughout discovery and throughout

3  depositions about this information and to avoid emergency

4  motions -- they get filed at the eleventh hour, doubtlessly

5  right before confirmation -- and to avoid, also, a constant

6  disruption throughout the confirmation hearing as objectors

7  make repeated and duplicative arguments about each document

8  and each question posed to witnesses concerning the issues

9  that we are raising in this motion.

10            We feel like this issue predominated the first

11  half, at least, of the RSA hearing, and we'd like to avoid

12  having that happen in confirmation.  We don't want piecemeal

13  adjudications, where we keep fighting about this in each and

14  every context.  We think the time has come to get a ruling on

15  it.

16            Now the objectors claim we're too far from trial

17  to resolve this core issue.  But this is discovery-related

18  issues, and we're in discovery.  We don't have that much time

19  for discovery, so it's exactly the right time.

20            It also disregards this Court's instructions to

21  the parties to please move promptly on protective orders

22  where you have disputes, as we have.

23            And I think the argument is also pretty consistent

24  with the arguments we've been hearing a few weeks ago that

25  trial is going to come up really fast.  In fact, the

1 objectors, the insurers complain that the confirmation

2 schedule did not build in enough time to resolve this

3 discovery dispute.  So I'm not sure how they would complain

4 now, as we found time resolve really what is the core

5 discovery dispute, at least so far.

6          The technical argument that the objectors raise

7 for ripeness -- which is really an unusual concept, I think,

8 for a protective order -- is that there were no outstanding

9 discovery requests.  And that's demonstrably incorrect.

10 Mr. Schiavoni has, I think now three times, reminded us that

11 we have obligations to make supplemental productions on the

12 previously served discovery requests, and we've been working

13 on doing exactly that.  So the premise for ripeness is gone.

14          It's also moot because all the objectors, exactly

15 as we knew they would and made a motion to resolve, have

16 sought the same privileged information weeks ago.  And so the

17 obligations are out there.

18          The last point I'll make, Your Honor, is -- in

19 support of this request for delay, is the idea we haven't met

20 and conferred.  We've met and conferred; we've, in fact,

21 litigated these issues before Your Honor.  The objectors are

22 intractable in seeking this information.  It's not going to

23 get resolved without the Court's intervention.

24          The point of the meet-and-confer, it's not a tool

25 for delay.  It's to try to work things out.  We're at an

1  impasse here, and so we need to get it resolved.  And so why

2  are we -- you know, why are the objectors raising it and

3  asking for delay?  Because they're not going to change their

4  position, they haven't in all this time.

5       I think, if they thought they were entitled to the

6  information, they would keen to have the Court rule on it now

7  and give it to them, so they'd have as much time as they

8  could have with it.  Maybe they're conceding they don't have

9  a viable position.  But I think, at a minimum, what they're

10 doing is they want this resolved, not now, but later, so that

11 they can later argue that they were entitled to get

12 discovery, that they didn't receive it, so the confirmation

13 schedule should change and the hearing should be adjourned;

14 or, in the alternative perhaps, to prevent the complete

15 record for the Court at confirmation by claiming that

16 there -- we should have produced discovery, and therefore,

17 should be precluded from doing so now.

18       So none of this is going away.  We think the

19 parties really need to get the ground rules here.  We do

20 think, given the schedule and where we are in this case and

21 the cash run-out, that the parties really just need to

22 cooperate to try to resolve issues quickly consensually, or

23 otherwise through motion practice.  And I certainly

24 understand that cooperation is sort of a scarce commodity in

25 this case.  But I think that the parties have to commit to

1  it.

2         And so we ask Your Honor to grant the motion and

3  to enter the proposed order that we have submitted.

4         THE COURT:  Thank you.

5         Mr. Kurtz, let me ask you this question.  With

6  respect to the -- so I see multiple things going on in the

7  request and in the order.  Some of them deal with discovery

8  and some of them deal with admission of evidence at the --

9         MR. KURTZ:  Right.

10         THE COURT:  -- confirmation hearing.

11         MR. KURTZ:  Right.

12         THE COURT:  And so why should I be addressing what

13  may or may not be admissible at a confirmation hearing, as

14  opposed to the discovery disputes?

15         MR. KURTZ:  Right, right.  Thank you.

16         So the issue there is we are, what now --

17  November, December -- three months or so from a confirmation

18  hearing?  So trial is, in ordinary parlance, somewhat

19  "imminent," and so motions in limine start to become

20  important.

21         The issue with us -- and I always view the debtors

22  as being in a slightly different position than maybe a

23  typical commercial party because there's these fiduciary

24  duties to so many parties here, and we're acting in a way

25  that's designed to benefit the estate, as is the Court, as

1   is, you know, certain statutory committees and the trustee's

2   office.

3             And so we think that, if Your Honor has a belief,

4   at this point in time, that the admissibility of particular

5   evidence would be appropriate only in the event that there

6   was discovery produced of some related subject, then we

7   think, in fairness to the estate, we should know that know,

8   so that the debtors can make an informed decision on how to

9   proceed.

10            In a normal case, if we ended up in a position

11  where there hadn't been discovery produced that the Court had

12  ultimately determined should have been produced in order to

13  allow the adjudication of a matter, there would not be the

14  same urgency to proceed to trial.  There could still be

15  opportunities to remedy any issues, so that the Court had the

16  benefit of a complete record, and not in the normal advocacy

17  adversarial nature, but in the nature of the case where we're

18  all trying to produce as much value as we can for the

19  estates, not just for the debtors that have filed.

20            And so we thought it would be appropriate to

21  understand what the ground rules were; and that, if there was

22  going to be a preclusion issue, based on the way we

23  approached discovery -- and we did have an opportunity to

24  waive, which is maybe an open issue, given the rule -- then

25  at least that should be something that the debtors and maybe

1  others should make an informed decision on, rather than

2  showing up on the day of or the day before, when you get an

3  emergency motion on the confirmation hearing and have

4  everything sort of compressed and -- into a -- maybe an

5  unreasonable schedule, with maybe jeopardizing either the

6  evidentiary record or the schedule that we would so

7  desperately need, given our cash burn.

8           THE COURT:  Okay.  Let ...

9       (Pause)

10          THE COURT:  Okay.  I understand that desire, and I

11 don't think it's unwarranted.  I'm just trying to figure out

12 how I can give you some kind of comfort on that because,

13 clearly -- and even one of the cases that's cited, I think,

14 by the debtors -- the Court certainly submitted redacted

15 documents, and I think that's what the case was cited for.

16          But then the Court actually ruled that, because of

17 the redactions, it didn't have the information it needed to

18 be able to give the movant the findings they wanted.  I think

19 that's RNI Wind Down.

20          MR. KURTZ:  Right.

21          THE COURT:  So there are multiple issues that are

22 intertwined here, that I'm trying to --

23          MR. KURTZ:  Right.

24          THE COURT:  -- determine --

25          MR. KURTZ:  Right.

1        THE COURT:  -- what I -- what information -- what

2   rulings I can make and what I can't.  And the --

3        MR. KURTZ:  Right.

4        THE COURT:  And if the findings are changing,

5   that's pretty material, I think, to what is going -- well, it

6   is material to what's going to be in front of me, and it's

7   probably very material to the relief that you want, in terms

8   of what may be admissible or not.

9        MR. KURTZ:  Right, right.

10        THE COURT:  So --

11        MR. KURTZ:  Let me suggest how we envision this

12   and what -- Your Honor, you raise an excellent point about

13   having a party sustained on the objection, and then having a

14   finding that, by reason of that, the Court is not going to

15   make the finding that was requested.  That would be

16   problematic -- obviously, that would be really a problem for

17   the cases and for all the constituencies in this case that

18   would benefit from having a confirmed plan.  And so that's

19   precisely what we're trying to avoid.

20        The Court is certainly free, at any point in time,

21   and particularly at this point in time, with a scheduled

22   trial to resolve issues.  And so our idea here is -- and I

23   hear you.  The findings are important, and my understanding

24   is they're getting closer.  I don't believe they'll ever be

25   in a position where we would resolve objections to what we

1  do, absent settlement with the objecting parties, so this

2  issue won't go away.

3          And what we thought was we had very, very clear --

4  it's very clear that what we're talking about is non-

5  privileged; and, therefore, it is admissible, so long as Your

6  Honor finds it relevant.  It's -- process is always relevant.

7  And so that part seems pretty straightforward and clear.

8          Again, Your Honor will decide how important it is.

9  It may be of some material importance, it may be of even

10  greater importance.  We don't know.  Only Your Honor will

11  know, after hearing the terms, the reasons for the

12  settlement, all of the confirmation issues, how much the non-

13  privileged admissible evidence of the fact of mediation

14  matters.  It mattered to most courts that considered it, but

15  we'll never really know how much it mattered.

16          The preclusion -- so I'm not too worried that

17  because -- there's no basis really for striking what we're

18  putting in.  And I don't think this is what's going to carry

19  good faith.  I think terms are going to, by and large, carry

20  good faith.

21          But when you get to the issues of waiver, we sort

22  of need to know whether the admissibility of non-privileged

23  information could affect the waiver because, if it does --

24  and it doesn't, as a matter of law, but it's sort of hanging

25  over our heads with these positions, if it does -- then the

1  time to deal with that has to be now, when we're in the

2  throes of discovery, not on January 23trd or 24th, when it's

3  too late to give discovery and maintain that confirmation

4  hearing date.

5          So we're really -- they're all kind of

6  interrelated, and we're just trying to make sure that these

7  repeated objections that are being made can be addressed.

8  And so the protective order part, I think as Your Honor

9  recognized, is pretty easy.  You either have to produce it or

10 you don't; it's either privileged or not.  We think that's

11 pretty clean.  The corollary that non-privileged information

12 is admissible we think is clear as a matter of law.  But if

13 Your Honor has a different view, the debtors kind of need to

14 know it, so we can make an informed decision.

15         So I don't think we're asking you to make -- you

16 know, we're not asking you to address something hypothetical.

17 It is absolutely the stated intent of the debtors to

18 introduce this information.  The issue we're asking is:

19 Does -- in your view, is there things we need to do in order

20 to be able to support that admission?  We don't think there

21 is.  But if there is, then we're trying to get that resolved

22 ahead of time because it will be too late later.

23         THE COURT:  Okay.  Thank you.

24         MR. KURTZ:  Thank you very much, Your Honor.

25         THE COURT:  Okay.  I will hear from Mr. Molton

1   next.

2              Before I do, let me make an observation that, as I

3   was reading through the submissions, it struck me on more

4   than one occasion -- so I don't leave anybody out -- that

5   they may be -- a party may be arguing a myopic view of

6   mediation, as it relates to a particular motion, and not

7   realizing that it either goes against their broader view of

8   positions that they take it in the case, or it may go against

9   when they seek to invoke mediation privilege.  So I'll just

10  put that out there.

11             Mr. Molton.

12             MR. MOLTON:  Your Honor, can you hear me?

13             THE COURT:  I can.

14             MR. MOLTON:  I just want to make sure.  Good.

15             Good morning, Judge.  Good morning, everybody.

16  David Molton of Brown Rudnick for the Coalition of Abused

17  Scouts for Justice.

18             I'm going to just have a few remarks, Your Honor,

19  and I'm going to be -- defer to Mr. Kurtz with respect to the

20  legal issues.  I'm going to dealing with some of the

21  practicalities we're facing going forward, as Your Honor is

22  entertaining the balancing that I thought that I heard in

23  earlier proceedings, as well as today, in terms of dealing

24  with this motion, which the Coalition supports.

25             Judge, we are in the midst of continued and

1  vigorous mediations.  I think Mr. Kurtz mentioned that to you

2  earlier.  We expect to have sessions by video this week, and

3  we have scheduled sessions already live for next week.

4          It's our position, from the Coalition's

5  perspective and I think from many of the other coalition --

6  mediation parties, that mediation privilege and having at

7  least some understanding from Your Honor now, as -- in terms

8  of the balancing, aids ongoing mediation and prevents a

9  chilling of future mediation negotiations.

10         And again, Judge, this isn't a case where the

11 mediations are done.  This isn't a case where the cake is

12 baked and it's going to Your Honor to decide whether it's

13 confirmable or not, and those issues may have to be viewed in

14 a different light.  We're looking at ongoing negotiations

15 with insurers, with charters, you know, specifically.

16         I know that, in addition to the insurers, the TCC

17 and others have objected to the debtors' motion for a

18 protective order.  I think Mr. Kurtz raised the issue that --

19 to me, at least, at least viewing the bucket load or dump-

20 truck load of discovery responses that hit the docket

21 yesterday, it's a little rich for some of the objectors to

22 have taken the position that they took because, as I've been

23 able to read some of those, including the TCC's responses and

24 some of the insurer's responses, they make certain to

25 preserve their right to assert mediation privilege; indeed,

1  some of them do so emphatically.  I just wanted to note that,

2  Your Honor, because it seems like, you know, to some extent,

3  people want to have it each way.

4          We know, as of now, at least as of now, that all

5  the objectors to this mediation motion are going to be

6  objecting to the plan.  You know, the -- it seems apparent,

7  at least to us, Your Honor, and the Coalition, as we sit in

8  the front seat or in the front desk, in terms of these

9  mediations, that many of our objectors -- and including if

10  you look at some of the public statements that have come out

11  from the TCC and lawyers associated therewith -- believe that

12  one of the best ammunition or the best arguments they have to

13  encourage plaintiff -- or encourage survivors to vote against

14  the -- this plan is that there may be no more settlements;

15  that the $1.8 billion is all there is.

16          As Your Honor notes, we're -- and Your Honor heard

17  during the last court sessions, the mediation parties that --

18  are still at it, and it's hopeful that that 1.8 billion --

19  which I think was referred to and is undisputed at this point

20  to be the largest sexual abuse settlement fund to date in

21  this history of United States -- if our mediations are

22  successful, will be materially augmented.

23          Solicitation is out, Your Honor.  The survivors

24  have the disclosures, and they can vote, as of today, through

25  the first -- the second week, I believe, in December.

1  Clearly, Your Honor, to the extent that mediations are going
2  to result in further augmentation of that historic settlement
3  fund, it's important that those move quickly and with
4  alacrity, and our mediators are making sure they do.

5          We know, Your Honor, that, if Your Honor rules
6  that the mediation privileges -- or the mediation
7  materials -- whether it be communications or other
8  information -- are discoverable, that decision will apply to
9  future mediation communications.  And the sharing of
10  information in mediation, not just past ones -- as I
11  mentioned, this isn't -- you know, we're not past the
12  mediations and dealing with what happened in those past
13  mediations, but we're dealing with going forward mediations,
14  where parties need to be frank, parties need to be open,
15  parties need to share, parties at times need to concede.  And
16  all of those various communications, you know, will be
17  hampered, indeed, chilled, I believe, if Your Honor takes a
18  view that all of the information, you know, including
19  specifically the communications, are discoverable.

20          As such, Your Honor, we would suggest that, if
21  Your Honor rules that the mediations are discover --
22  mediation materials are discoverable, as someone who, for the
23  past year, after Your Honor was so good as to make the
24  Coalition a mediation party approximately a year ago this
25  month, I believe, who sat in the front row of every mediation

1  that's happened, I can attest, Your Honor, that not providing

2  clarity and certainty now as to these issues, in terms of the

3  balancing that Your Honor is considering, will have a

4  chilling effect on current and going forward negotiations,

5  and could very well hamper the mediations upcoming with the

6  insurers and the charter organizations that have not yet

7  reached agreements that have been disclosed and put under the

8  docket and out to the public light.

9            In this light, Your Honor, we can't dismiss that

10 maybe a real purpose of the objections is an effort to hamper

11 those continued mediations and to prevent an augmentation of

12 what is already an historic compensation fund pot.  But

13 notwithstanding that, Judge, as somebody who does this for a

14 living, mediates often, I can only say that it's clearly

15 important, from a practical point of view and getting this

16 case done, that Your Honor, we respectfully submit, should be

17 cognizant of the mediations to come and to allow the

18 mediations to play out unimpaired and unchilled, so that, to

19 the extent they result in settlements, those settlements are

20 able to be disclosed, and hopefully, in due time, before most

21 of the vote is in, so that survivors can decide, one way or

22 another -- one way or another, whether they want to accept

23 the plan or not.  And of course, Your Honor, as supporters of

24 the plan, we believe that they should.

25            So, unless Your Honor has any further questions,

1  that's all I wanted to say.

2  THE COURT:  So, Mr. Molton, your presentation

3  reminded me of the note that I wrote to myself after I read

4  many of the mediation privilege cases, which was "square peg,

5  round hole," which is that the mediation cases deal with

6  traditional -- what I would call "more traditional

7  mediations," two-party disputes that go along for a while and

8  get sent to mediation for a day or two or maybe a week and

9  there's a resolution and then we're done.  And somehow -- or

10 there's not a resolution, there is or there isn't.  And then

11 somehow we end up in front of the Court, a court with someone

12 seeking to get documents that were produced or communications

13 that were made in the course of a one-day, two-day, one-week

14 mediation.

15 And that's not what I have here, and that's not,

16 I'll say, sort of common experience in bankruptcy mediations.

17 But I would say, even among bankruptcy mediations, this one

18 may be unusual, in its length and in its breadth.  So I'm

19 trying to figure out how to fit this square peg of this

20 mediation into the round hole of the mediation privilege

21 cases, and I don't know that I have the answer to that.

22 I will say, for example, in Tribune, the Court

23 there decided that only communications that were made during

24 mediation sessions or even outside of that session, but on

25 the day that mediation took place, would be protected from

1  disclosure.  And that was an attempt to balance in a

2  confirmation setting.  But even the Tribune mediation, I

3  think, was fairly short-term mediation.  So how do I balance

4  one year's worth of mediation?

5         MR. MOLTON:  Judge, that's a great question, and I

6  don't know if I have the exact answer.  But I can -- if there

7  is any dividing line and based on my experience in this case,

8  the mediations don't end with the formal sessions by

9  Mr. Gallagher, former Judge Carey, and Mr. Finn.  They are --

10 there's a continuous runway to those sessions and there's a

11 continuous runway after those sessions.  Those runways can be

12 with the mediators or without the mediators, but they're

13 always in the context of the mediation.

14        So my experience in this case, Your Honor, is that

15 the mediation has not ended.  It began when it began in

16 earnest, really, in the early part of this year, albeit I

17 know that there were mediation sessions before that.  But

18 really, once the claim forms were in and people were able to

19 look a hard look at the claim forms, so maybe I'm being a

20 little too conservative on that and saying, you know, after

21 November of last year, when the claim forms were in,

22 mediations began.

23        But it's been one continuous ride, Your Honor,

24 with calls to the mediators, either singularly or together

25 sometimes, occurring intermittently during weeks without

1  sessions, calls with mediation parties to advance progress

2  for those mediation sessions occurring.  I don't think you

3  can divide in the way Your Honor alluded to in Tribune; that,

4  you know, we are cabined or these mediations are cabined by

5  the day we had a formal session, the day it ended.  That's

6  not it's worked, Your Honor.  I know that communications

7  between adverse, but mediation parties continue outside of

8  those cabins.  They've continued since day one, they continue

9  to this day.

10        So, from my perspective, it's more a question of

11  the chilling -- chilling the nature of the -- chilling the

12  continuing mediations, which are so important to these

13  survivors here, Your Honor, so important, in terms of

14  augmenting this already historic settlement fund.

15        But you know, I don't -- what I would say, Your

16  Honor, is the communications, which are the key to effective

17  mediation, can't be cabined outside of specific boundaries.

18  They occur, they occur regularly, the progress the mediation.

19  And I think it would be a chill to somehow impose those

20  cabined limits that Your Honor alluded to from Tribune in

21  this case.

22        You know, to look at, Your Honor, drafts, you

23  know, iterative drafts -- which occur, by the way, outside of

24  formal mediation sessions.  They occur, again, on the ramp-up

25  to and then on the follow-up landing -- you know, the ramp

1   outside of those sessions, in order, if the parties are able

2   to, get to a yes.

3           You know, maybe the concern with drafts and

4   iterative drafts -- and I'm going to say because I know

5   technology has comment bubbles sometimes on those iterative

6   bubbles, as comment bubbles are often communications.  But

7   the iterative drafts themselves, I think, from my

8   perspective, are less -- you know, would be less troublesome.

9           And to the extent that they're at all relevant is

10  a different question because, at the end of the day, as

11  Mr. Kurtz said, it's the terms of what was baked that will

12  come in front of Your Honor for decision.  And I reiterate

13  that even in terms of Your Honor's comment on the findings.

14  And I think Mr. Kurtz answered that question.

15          With respect to the TDPs, Your Honor, note -- you

16  know, I just want to note that the request of the findings is

17  based on defendant on the Boy Scouts own historical

18  settlement history, and that's what those TDPs are based on.

19  That's discoverable, that's going to be out there, that's

20  going to be litigated.  I don't know how mediation, you know,

21  regarding the TDPs goes to that issue.  It's either

22  reflective of the settlement history or it's not.

23          In any event, Judge, I think Your Honor hit the

24  ball -- hit spot on that this is a *sui generis* case.  It's

25  the -- indeed, in the world of complex mass tort bankruptcies

1  in which I live, it is a *sui generis* case.  And a lot of us

2  have commented we've never seen anything like it, for a whole

3  lot of reasons.

4            UNIDENTIFIED:  We haven't.

5            MR. MOLTON:  But in any event, I think it's really

6  critical here, Your Honor, in order to give the mediation

7  part -- the mediation parties real flexibility and not chill

8  their efforts, that Your Honor do recognize how unique this

9  case is.  The fact is, we've been involved in a continuous

10 mediation since the bell rung until today, and it's going to

11 continue in the future.

12           And I think everybody who wants to see this plan

13 resolve, resolve fairly and equitably for the survivors,

14 should want those mediation activities to continue unchilled,

15 unimpaired, unaffected, and unburdened.  And that's how I can

16 answer your question, Judge, if that's at all helpful.

17           THE COURT:  Thank you.

18           Okay.  I would like to hear from those in support

19 of the debtors' request first.  So, Mr. Anker --

20           MR. ANKER:  Your Honor --

21           THE COURT:  -- are you in support?  I think you

22 are.

23           MR. ANKER:  We are, Your Honor.  Can you hear me

24 okay?

25           THE COURT:  I can.

1          MR. ANKER:  Thank you, Your Honor.

2          And first, let me just apologize.  I'm going to

3   have to be in and out of the hearing today because of some

4   other matters, and I apologize both to the Court and to the

5   other parties and counsel.

6          Your Honor, I just want to make a few points,

7   briefly, many of which have been made, but I want to try to

8   put it in some context, in the context of someone who -- of a

9   party, Hartford, who was on the other side of these

10  negotiations.

11         First, our negotiations are a round peg in a round

12  hole.  It is precisely the traditional negotiation.  If you

13  want, we are a would-be defendant sued by a would-be

14  plaintiff, the estate, to obtain coverage on what, in

15  essence, would be a breach of contract or insurance coverage

16  action.  There were -- there was enormous back-and-forth with

17  counsel for BSA and, yes, with counsel for the Coalition and

18  the FCR and -- although unsuccessfully -- with the TCC over

19  the terms for a settlement and negotiation.

20         That is the traditional context in which

21  negotiations are not only not admissible, but not

22  discoverable, both because of the specific mediation

23  privilege, but also because discovery is limited to matters

24  that are likely to lead to the discovery of admissible

25  evidence.  And it would -- it is not admissible, what the

1  back-and-forth was.

2           And it would -- to underscore Mr. Molton's

3  point -- chill enormously future discussions.  It would have

4  chilled ours.  We wouldn't have gotten where we were if we

5  had doubts -- and we didn't have doubts at the time -- that

6  our discussions would remain confidential.

7           I think Your Honor's point that people need to

8  think through what their position is going to be when the

9  shoe is on the other foot are spot on.  I'm not involved, so

10 I can't tell you anything other than hearsay.  But the

11 hearsay I hear is that there are almost daily discussions --

12           MR. SCHIAVONI:  Objection.

13           MR. ANKER:  Your Honor, may I finish?

14           THE COURT:  This is --

15           MR. ANKER:  My --

16           THE COURT:  -- argument.

17           MR. ANKER:  There are --

18           THE COURT:  Go ahead.

19           MR. ANKER:  There are daily discussions with other

20 parties about resolutions.  They are not going to allow

21 discover -- at least willingly, discovery into the back-and-

22 forth.  If Your Honor has any doubt, I have never been in a

23 case with this level of discovery.  I've glanced at it, and I

24 will acknowledge "glance" is the word because, had I stayed

25 up all night, I couldn't have read them all, the discovery

1   responses filed yesterday.

2           But every single one of them, including by parties

3   who were pushing here for -- to break the mediation

4   privilege, assert objection after objections after objection,

5   including objections based on the mediation privilege.  No

6   one is going to want to allow the discussions they have that

7   either result in or attempt to result in settlement to be

8   discoverable, and in my experience, it has never been.

9           Just a couple of other points, Your Honor.  I want

10  to underscore the point that Mr. Kurtz made.  The volume of

11  discovery here is staggering.  I, candidly, have serious

12  doubts -- and this troubles me -- that we get to a

13  confirmation hearing on January 24th or -- I think that was

14  the date Your Honor said -- given that discovery, even if

15  these issues are resolved now.  And I worry about whether the

16  Boy Scouts survive.  I take seriously the administrative

17  claim expense and the burn in this case.  If it's going to

18  happen, some of these issues need to be resolved now.  And

19  frankly, the scope of discovery needs to be trimmed.

20          In that regard, I think probably my last point.

21  We heard about good faith.  And I agree with Your Honor that

22  the TDP findings may go beyond good faith.  But at least as

23  to the discussions with my client, those don't have to do

24  with the TDP, they have to do with the terms of a Hartford

25  settlement.

1          The good faith standard, as I've always understood

2  it, under 1129(a)(3), focuses on whether on a plan would

3  serve the purpose of the Bankruptcy Code, and the central

4  purpose of Chapter 11 is reorganization and rehabilitation of

5  the debtor.  A plan that provides for the Boy Scouts to

6  survive, rather than die, by definition, serves that purpose.

7          Whether our initial offer was 200 million, 100

8  million, 198 million, 342 million, 487 million, and what the

9  initial counter was and how the back-and-forth went and how

10  the negotiations went says nothing about whether or not this

11  plan of reorganization would or would not serve the central

12  purpose of Chapter 11, which is, while respecting the rights

13  of all third parties and creditors, also allowing the debtor

14  to reorganize.

15          So I would suggest that, at least with respect to

16  mediation discussions, not about necessary the TDPs -- that's

17  a separate issue for other to cover -- but with respect to

18  settlement discussions with carriers, chartered

19  organizations, and the local council and other third parties,

20  that is the round peg in the round hole.  And it really needs

21  to be -- should be protected, both as a matter of law, given

22  all the case law out there, and as a matter of practicality,

23  if we are going to get to confirmation and allow Your Honor

24  to hear the evidence on the issues under 1129 that matter,

25  and let this company -- hopefully, if it satisfies its 1129

1  burden -- be reorganized.

2          Your Honor, those are my remarks.  And again, I

3  apologize if I'm going to be in and out, and I apologize for

4  speaking quickly.  But I'm happy to answer any questions the

5  Court may have.

6          THE COURT:  So I have two questions for you,

7  Mr. Anker:

8          In terms of the 1129(a)(3) standard then, are you

9  saying that a plan that is -- where is the standard?  That --

10  shoot.  That whether it -- a plan that achieves a result

11  consistent with the objectives and purposes of the Bankruptcy

12  Code could never be in bad faith?

13          MR. ANKER:  Your Honor, someone taught me long ago

14  never to answer a question that says "could never" by

15  answering, yes, it could never be.  I could imagine -- you

16  know, one could imagine a crazy hypothetical, money has

17  passed under the table, you know, the people who are running

18  the Boy Scouts turn out to be -- have significant financial

19  ownership in Hartford.  One can spin -- one can try to spin

20  an extraordinary hypothetical.

21          But I do think, Your Honor -- and I will confess I

22  did not re-research this in anticipation of this hearing.

23  But it has always been an under -- my understanding of the

24  case law that the case law on 1129(a)(3) says that,

25  overwhelmingly, the test for good faith is whether the plan

1  will serve an objective of the Code.  And reorganization is,

2  if not the central objection of the Code in Chapter 11, it is

3  a central objective of the Code under Chapter 11.

4          So, no, I'm not going to answer the question could

5  there ever be such a plan, but I am going to say I think it

6  is overwhelmingly the focus whether the plan would provide

7  for a purpose consistent with the Code, and that 1129(a)(3)

8  goes on to say and not by any means forbidden by law.  And

9  you know, one could think of the bribery example to buy

10  votes.  But I've always understood, in the main, that the

11  focus is on whether there has been a disclosure statement

12  that provided adequate information within to solicit votes

13  under 1125.

14          THE COURT:  Okay.  Thank you.

15          The other question I have for you is -- I do not

16  believe that the Third Circuit has established a mediation

17  privilege, and probably most circuits have not.  And is that

18  what we're doing here?  Do I have to find or establish some

19  mediation privilege?

20          MR. ANKER:  No, Your Honor.  I don't think you

21  need to go at all beyond the applicable rules.  Let's assume

22  there had been no mediation at all, and we had simply had,

23  without the benefit of the mediators and -- settlement

24  discussions outside of the mediation with the debtors and

25  with the FCR and the Coalition, and it reached a settlement.

1 Those discussions would be not admissible in litigation

2 under 408, and they would not be discoverable because they

3 would not, under the standards for discovery -- I think it's

4 Rule 26 -- be likely to lead to the discovery of admissible

5 evidence.

6　　　　　I also think, when it comes to mediation, the one

7 thing I would say there is you do have a local rule that I

8 think adds some gloss to it.  But I think this discussion --

9 I think that you get to the very same result, were the

10 discussions to have occurred outside of mediation and within

11 the meaning of the just 408 settlement.

12　　　　　Your Honor's question, though, raised one other

13 point.  I wanted to simply say that Mr. Molton's response was

14 spot on.  I mean, the nature of this mediation was, you know,

15 we'd sit there and have a mediation meeting in New York.  By

16 the way, there are three days of mediation scheduled for next

17 week in Los Angeles.  We'd have a meeting, and then you'd

18 break and you'd have phone calls the next day.  And the

19 mediators would be on some of those phone calls, but not all

20 the phone calls.  The mediation went on.

21　　　　　And certainly, from my client's perspective, there

22 was no premise that, gee, when we have the discussions that

23 are in the -- in White & Case's office in New York, we can be

24 candid, but gee, when we're on a phone call, we need to pull

25 our punches because that could be discoverable.  That

1  wasn't -- that's not the way, I think, any mediation works,

2  none that I've been involved in.  It certainly wasn't the one

3  this one worked.  These were all settlement communications

4  designed to, and in our case having achieve a settlement.

5              THE COURT:  Thank you.

6              MR. ANKER:  Thank you, Your Honor.

7              THE COURT:  Thank you.

8        Let me -- I still want anyone else in support.

9              MR. BRADY:  Your Honor, Robert Brady for the FCR.

10             THE COURT:  Mr. Brady.  There you are.  Mr. Brady.

11             MR. BRADY:  Yes, Your Honor.  I won't belabor the

12  record.  The FCR adopts the comments of Mr. Molton and

13  Mr. Anker.  We think they really hit the nail on the head

14  here, so we support the motion.  We think, because the

15  mediation is ongoing, Your Honor, we really need some

16  guidance today, so that those mediations can be fruitful and

17  we can add some settlements to the pot.

18             THE COURT:  Thank you.

19             Other supporters?

20        (No verbal response)

21             THE COURT:  Okay.  I do not hear others.  I know

22  we have multiple objectors.  I will start with TCC.

23             MR. BROWN:  Good morning, Your Honor.  Ken Brown

24  for the TCC.

25             THE COURT:  Mr. Brown.

1          MR. BROWN:  I don't think that it's

2  oversimplifying, and I think it's actually a helpful way to

3  look at this issue.  What the -- this isn't really a motion

4  for a protective order.  It is a motion to modify the

5  mediation order and to modify Local Rule 99 -- 9019-5(d),

6  which is embodied within the mediation order.  And I think

7  it's inappropriate because of that.

8          And the reason I say that is the mediation order,

9  which adopts 9019-5, the local rule, that local rule has two

10  parts to it.  The first part -- and they're both of

11  incredible breadth.

12          The first part of it deals with what is

13  discoverable, and it says the mediator and the participants

14  in mediation are prohibited from divulging outside of the

15  mediation any oral or written information disclosed by the

16  parties or by the witnesses in the course of the mediation.

17          The second part -- and this is -- I mean, the rule

18  is balanced in this way.  And what the debtor and the parties

19  that have just spoken, Your Honor, are trying to do is to

20  cherry-pick this rule to their advantage.  And the second

21  part of it what they want you to ignore.  They want to rely

22  on the first part, which gives broad protection from

23  discoverability, and they want you to ignore the second part,

24  which says:

25          "No person may rely on or introduce evidence in

1  any proceeding" --

2          Certainly, that would -- this would pertain to the

3  confirmation hearing.

4          "-- to any aspect of the" -- "of any aspect of the

5  mediation effort."

6          And what the debtor and Mr. Kurtz was very

7  specific on in their presentation to you was we want to rely

8  on and introduce process to show good faith and meet our

9  burden under 1129(a).  And in order for them to do that,

10  Judge, you would have to say, you know what, never mind about

11  Local Rule 9019 and never mind about the mediation order that

12  everybody relied on.

13          We, the TCC relied on both aspects of this rule

14  when we went through the mediation.  And that means that no

15  aspect of the mediation, including process, is admissible at

16  the hearing on confirmation.

17          THE COURT:  The TCC --

18          MR. BROWN:  And the --

19          THE COURT:  -- relied --

20          MR. BROWN:  -- reason --

21          THE COURT:  -- on that?

22          MR. BROWN:  Well, it's -- okay.  I wasn't part of

23  the mediation, Your Honor.  I came into this -- but the

24  bottom line it's in the order and it's in the rule.  So why

25  would we change that?

1            And it's material and here's why:  Because the

2    committee believes the process was tainted.  And if the

3    debtor and the parties that support this plan are permitted

4    to offer and rely on evidence of process but deny parties who

5    think the process was tainted from doing discovery on it,

6    then that is essentially unfair.  That is the sword and the

7    shield.

8            Mr. Kurtz went to great lengths to say there is no

9    sword, but there is.  The very fact that the debtor is

10   seeking and asking you to modify the local rule to allow

11   evidence of process at the confirmation hearing, but to deny

12   any discovery of process is fundamentally unfair.  And it is

13   fundamentally the sword and the shield problem.

14           THE COURT:  Okay.  So I'm not sure what the

15   discovery would be regarding the process.  But are you saying

16   you can't divorce the process from the communications?

17           MR. BROWN:  Yeah, there's a lot of the mediation

18   that we were not permitted to participate in.

19           THE COURT:  Okay.

20           MR. BROWN:  And there -- and you know -- and

21   again, I feel like I'm treading on thin ice here because I

22   wasn't at the mediation, but I was told about things are --

23   that are of great concern to the committee above and beyond

24   just the fact that we weren't permitted to participate in

25   large portions of it.

1          And I mean, I just made a big thing about how

2    process isn't admissible, so I'm reluctant to talk about that

3    now.  But we're concerned about it.  And I think that the

4    concept of altering the rule to allow a party to admit

5    process but denying other parties the right to explore

6    process in discovery is just not right.  It should -- it's

7    got to be the way the rule says it is, which is:  If it's not

8    discoverable, okay.  But then you don't get to rely on any

9    aspect of the mediation.  What part of that is ambiguous to

10   anybody, any aspect?

11         I mean, the plan, the Hartford settlement, and the

12   TCJC settlement -- and people have said this many times in

13   this presentation and they said it in the papers -- the good

14   faith of those, the plan and the settlements, should be shown

15   by the plan, the terms of the plan and the terms of the

16   settlement.  That's what the parties should rely on and

17   that's what this Court should rely on.

18         If parties are saying we are standing strong on

19   our privilege, so be it.  They've got a right to do so.  But

20   they don't then have a chance to say and, Your Honor, by the

21   way, we want to cherry-pick the mediation order and the local

22   rule to allow some aspect of the mediation process to come in

23   and to have you rely on it.

24         THE COURT:  Okay.  So the TCC's position is that

25   the documents speak for themselves.

1          MR. BROWN:  That's point -- that's heading one.

2   Certainly, that's the biggest concern.  I -- we have other

3   concerns with the proposed order that are not as -- they're

4   not as significant and they are not of the same breadth.

5          THE COURT:  Okay.

6          MR. BROWN:  And -- okay.  So it -- can we -- may I

7   proceed under those?

8          THE COURT:  Yes.

9          MR. BROWN:  Yeah.  So I -- this may be -- this may

10  be unintentional because I think Mr. Kurtz was very specific

11  in his presentation that it was not the intention of the

12  debtors to protect all information that was communicated in

13  the mediation from protection.  And I think it's -- there's

14  not a lot of controversy about the fact that, for any

15  privilege, the mere fact that you transmit information to an

16  attorney or that you transmitted information in the mediation

17  doesn't make it privilege.

18          Nevertheless, the exhibit attached to the order,

19  which is supposed to summarize the documents the debtor wants

20  protected, specifically says:

21          "All documents and communications, including

22  emails, that reveal communications made or information

23  provided in any of the mediation sessions."

24          So the terms of the order are contrary to what I

25  think both the rule, 9019, says, which specifically says you

1  don't get to protect things just because you communicated in

2  a mediation.  And what Mr. Kurtz said to the Court -- and I

3  think at the very least the order -- the terms of the order

4  should specifically delineate that -- you know, that only

5  information created for or in connection with the mediation

6  is protected and that the terms of the local rule apply, and

7  normal rules of privilege apply, that you don't get to cloak

8  information with privilege just because you transmit it.

9           THE COURT:  I think --

10          MR. BROWN:  That's point one.

11          THE COURT:  Yes.  I think you're correct,

12  Mr. Brown.  And I noted that in the order and in the

13  Exhibit 1, that the language "information provided" and also

14  the language "supporting documentation exchanged" would go --

15          MR. BROWN:  Right.

16          THE COURT:  -- beyond what I think would be

17  appropriate and what I thought I also heard Mr. Kurtz say.

18          MR. BROWN:  So I think that's just a drafting

19  glitch.

20          THE COURT:  Yes.

21          MR. BROWN:  I don't think it's controversial, but

22  I want to make sure that everybody is on the same page on

23  that.

24          And the other thing, I think, that is a concern to

25  us about the order -- and it's not clear, but I think it's

1  embedded in it -- is it seems to shift the burden.  I mean, I

2  think, normally, the party that is asserting the privilege

3  has the burden of establishing the elements.

4       And this order basically, I'm concerned that it

5  basically -- because of its blanket nature, it says, okay, it

6  could be construed as saying that, in advance, all of these

7  things are presumptively privileged, and that is now up to a

8  challenging party under the reservation clause of the order--

9  which I think is Clause 5 -- it's up to the challenging party

10 to rebut the presumption.  And that would be, I think, a

11 fundamental change of how this works.  So a simple fix, in my

12 view, would just be to state that clearly in the order that

13 nothing in the order is intended to alter whatever the burden

14 is under the law of establishing any privilege that's

15 asserted.

16       THE COURT:  Okay.  I hadn't picked up on that

17 implication, but I understand that argument.  And I -- we

18 would not be shifting any burdens.  Okay.  Thank you, Mr.

19 Brown.

20       MR. BROWN:  Thank you, Your Honor.

21       THE COURT:  Mr. Schiavoni.

22       MR. SCHIAVONI:  Thank you, Your Honor.  Tancred

23 Schiavoni for Century.

24       Your Honor, I'd like to start and, in a sense,

25 also finish with the same point, and that is that good

1  decisions follow from a good record.  And that is not what

2  Your Honor has before you on this very important issue, an

3  issue that's really critical to my client and to others.

4          You're being asked to rule in the abstract.

5  You're being asked to rule, effectively, on a pure issue of

6  law.  You are being asked to basically recognize mediation

7  privilege, when the Third Circuit hasn't done that.  You're

8  being asked to rule here in the context of not having any

9  concrete discovery dispute actually before you to rule.  This

10  is unripe, impermissible, I believe, advisory opinion that

11  Your Honor is being asked to rule upon.

12          You heard the proponents of the motion, in

13  essence, try to inflame the Court with different extremes.

14  You heard Mr. Anker talk about, you know, some hypothetical

15  motion to compel the exchange of his settlement offers.  You

16  heard similar things from Mr. Molton and from Mr. Kurtz.

17  Those specific issues aren't before the Court.  It's like

18  it's a complete hypothesis on whether or not anyone would

19  ever move to ask for Mr. Anker's specific settlement demands.

20  Those issues are just not before Your Honor.

21          It's the local rule here that deals with discovery

22  disputes, 7026-1(d).  First of all, it requires the parties

23  to meet and confer to narrow the disputes before they do so.

24  But importantly -- and it's one that's sort of rarely

25  cited -- is that 1(c) requires that the actual discovery

1   dispute in -- at issue be attached to the motion.  That's not

2   before Your Honor here.

3           It's -- you know, we have not --

4           THE COURT:  Are you --

5           MR. SCHIAVONI:  -- sat on our rights --

6           THE COURT:  Are you telling me that these demands

7   haven't been made, that they're not the subject of discovery

8   that's been issued.

9           MR. SCHIAVONI:  Your --

10          THE COURT:  Is it really that hypothetical that,

11  in fact, nobody has asked for the board minutes or nobody has

12  asked for the documents supporting the Hartford settlement or

13  the settlement with Latter Day Saints?

14          MR. SCHIAVONI:  Nobody has a motion before Your

15  Honor on any specific dispute and there's a really good

16  reason for that, and that is that these disputes are driven

17  by two things:  The specific response to a request, but much

18  more importantly, in this context, the specific findings that

19  are being sought.

20          As Your Honor has noted several times previously,

21  the discovery is driven by the findings and the discovery

22  responses are driven by those findings.  Just, I think, last

23  night or this morning, in the -- you know, the eve of the

24  late hours, after midnight, the findings were changed.  Your

25  Honor needs to have those findings before her and the

1 specific discovery disputes really to make an informed

2 decision here.

3        It's like we would -- we're prepared to bring

4 before you a motion on relatively short notice on the TDPs

5 specifically and put before you specific privilege log

6 entries that we think should be produced, in the context of

7 the finding that I have not yet read that was filed in the

8 late hours last night and the specific responses that we

9 received late last night from the other parties.

10        But to decide these issues in the abstract and to

11 effectively grant, at this stage of the case, a motion in

12 limine barring us from putting on any evidence about what

13 transpired, when the Court doesn't have before it the

14 specific findings sought on the TDPs or the specific document

15 requests or the specific log entry, it doesn't generate the

16 best of decisions.  We -- you know, if you would give us a

17 week, we will have that motion before you on the TDPs.  It's

18 extremely important to us and it would make for a better

19 decision, a better record on this motion.

20        On the merits, Your Honor, if you do feel that you

21 need to reach the merits here, I think it's incredibly

22 important to understand the context of where we are on this

23 and how we got to be.  You've heard, you know, the proponents

24 of the motion describe this as a, quote, "unique

25 circumstance."  But the factors behind that are exactly what

1  drive the importance of this TDP evidence.

2          There was a prepack negotiation here.  Your Honor

3  has had testimony before Your Honor on that, in connection

4  with earlier evidentiary hearings.  There was exchanges

5  between us and others with the debtor about the contractual

6  obligations the debtor had to cooperate with us, to

7  participate with us, to stand by the defense obligations in

8  the contracts, and to work together with us on anything that

9  dealt with the liquidation of the claims.

10          What then happened in the case?  It's like, at the

11  very, very outset of the case, the debtor moved for a motion

12  to mandatorily appoint mediators.  We objected to that, we

13  said it was premature, and we expressed concern that that

14  motion would be used to divorce the contractual obligations

15  that we had to cloak, in essence, engagement between the

16  debtor on negotiating the claim values and their obligations

17  under the contracts.  The entirety of the plan process, from

18  the very beginning of the case forward, when -- the

19  proponents here are asserting took place under that order; in

20  other words, the entire formation of the plan took place

21  under that order.

22          You've heard the debtors in their presentation

23  directly put at issue what happened at the mediation and to

24  offer that affirmatively as evidence that they will present

25  at confirmation.  They say that they will offer at

1  confirmation the fact of mediation, the number of mediations,

2  you know, that there was mediation, that these terms were

3  subject to mediation.

4         Your Honor has had before you, in connection with

5  prior hearings, including the RSA, our contention that we

6  were excluded entirely from the TDP negotiations, from

7  beginning to end.  We didn't -- that's not something we sat

8  silent on.  That's something that we brought to the Court on

9  at least three, I think four occasions, that the entirety of

10  this process to formulate a plan and, most specifically, to

11  formulate the allowance procedures were taking place to our

12  complete and total exclusion.  So the very evidence that the

13  debtor wants to offer is factually contested that we were

14  present, that a number of these mediations took place with --

15  to our exclusion, and the substance of what occurred at them.

16         There's also here, actually, even some more

17  incredible evidence about this.  It's like the submissions in

18  connection with the settlements were not uniform.  There were

19  ones where the three mediators couldn't reach consensus on

20  whether to submit a mediation statement.  There were others

21  where only two of the three submitted them.  It was

22  incredibly contentious on whether or not that should have

23  been done.

24         It's like we do not think that -- I agree with

25  Mr. Brown on this, that the debtor can't come forward and --

1   under the mediation order and offer evidence of the mediation

2   affirmatively in support of it, and then, at the same time,

3   you know, seek to cloak all of the things that occurred.

4   That's the context that the mediation happened.

5            What's the -- what's sort of --

6            THE COURT:  Can --

7            MR. SCHIAVONI:  -- the result that -- I'm sorry.

8            THE COURT:  Let me ask you a question --

9            MR. SCHIAVONI:  Yeah.

10           THE COURT:  -- before we go on to the result.

11           MR. SCHIAVONI:  Yeah.

12           THE COURT:  I'm trying to determine whether you're

13  talking substance or process again because, clearly, the

14  insurance companies have their -- have information about

15  their participation or lack of participation in various

16  mediation sessions, or maybe the entire mediation, I --

17  whatever.

18           So to be able to make the argument to counter the

19  debtor on process, the debtors' argument that I can rely on

20  process and that's evidence of good faith, the insurance

21  companies can come in and testify that, in fact, no, they

22  weren't included, and so I should ignore that evidence or

23  that evidence doesn't lead to a conclusion of good faith

24  because, in fact, necessary parties or appropriate parties or

25  certain parties were excluded from mediation sessions.

1  That's different than the communications that happened within

2  those sessions, at least I think it could be.  So are you

3  arguing process or substance?

4          MR. SCHIAVONI:  We would -- Your Honor, I think

5  we're really arguing both.  And we would like to put this

6  before you in the context of the specific facts of the TDP

7  exchanges and the specific privilege log provided in

8  connection with the TDP discussions.

9          THE COURT:  Don't I --

10          MR. SCHIAVONI:  And because --

11          THE COURT:  -- have that?  Don't I have the

12  privilege log on the TDP discussions?

13          MR. SCHIAVONI:  You do have the privilege log,

14  Your Honor.  It's not informed by a motion on what specific

15  entries we'd like from it and exactly why, but you do have

16  that privilege log.  You've -- it's very extensive.  It shows

17  that we -- I think it validates a lot of what I've just said

18  about that process and what was exchanged.

19          Your Honor has heard some of our other arguments

20  about that; that, in essence, when these exchanges were

21  taking place, Your Honor -- and this really does go to some

22  core arguments that we have -- that this was not something

23  that -- this was not Mr. Anker sitting on the other side of

24  the table from the debtor and negotiating price, where they

25  both had an -- where the Coalition had one interest in a

1  price and he had another.

2          You've heard our contention that, at the time

3  those TDPs were put together, the debtor lacked an economic

4  incentive to put them -- to argue for the dollar numbers.

5          You heard our arguments during the disclosure

6  statement that, when you look at what the dollar

7  contributions are of the local councils and the debtors,

8  they're not in line with the TDPs.  That's not us necessarily

9  arguing that the local councils should pay more, but it's

10 that, once they finish their arm's length negotiation about

11 price, they turn the pen over on how the TDPs were drafted.

12 We think that goes within the totality of the circumstances

13 arguments prong of 1129 that we ought to be able to put

14 before the Court.

15          But importantly here, Your Honor -- and I don't

16 want this lost on you -- it -- you know, I don't know.  In

17 the briefing, maybe it could have come out better.  But

18 the -- we anticipated this issue because we saw how this --

19 how the mediation order, you know, right at the beginning of

20 the case, before anything started -- look, I'm -- I use

21 mediation all the time, I think it's helpful.  It's like -- I

22 feel like arguing -- it's like the whole argument here has

23 been framed as if I'm arguing against mediation.  That's like

24 arguing against apple pie.  That's not what this is about.

25          At the beginning of this case, when the mediation

1  order was put before the Court, we were very concerned that

2  we would be excluded from the mediation.  And we specifically

3  brought that up at the hearing on the mediation order.  And

4  that's the source of the provision in the order that provides

5  a carveout that, if good faith is sought on something that

6  implicates coverage, then, yes, we can -- it's like the

7  discovery is permitted.

8          You heard the debtors' counsel allude to that

9  provision, and he was careful to add the words "in a

10 subsequent action."  Those words, "in a subsequent action,"

11 they're not in the order.  It's like what has happened here

12 is you've seen in the submissions by the plan proponents

13 before this motion multiple statements that they seek to

14 resolve all or as many coverage issues as possible as part of

15 the confirmation proceedings.  That's exactly what they're

16 trying to do here.

17         The findings -- and why we think it's important

18 that Your Honor have briefing and the precise findings before

19 you that are being -- that are at issue is because the

20 findings with regard to the TDPs are not, quote,

21 "normal 1129(a)(3) findings."  The findings that are being

22 sought are specifically ones that are seeking to bind us in

23 coverage.  They don't necessarily say on them that they are,

24 you know, coverage interpretations, but they've been put

25 together to be specific to coverage issues.

1        And I don't think that's what the Court's

2  intention is in addressing those, but it complicates the

3  entire proceeding.  That's why we'd like briefing on it.  And

4  it's because those findings, we believe, trigger exactly what

5  our concern was when the mediation order was put together;

6  that, if, in fact, it's going to be used in a preclusive way

7  against us on coverage, well, then we ought to get access to

8  those.

9        Now, you know, you've already heard Mr. Kurtz's

10  preview on that, that like, well, that's for another day,

11  that's for a subsequent action.  But they've loaded the plan

12  with provisions that say that it's binding and that it

13  carries forward.  There will never be another day under those

14  circumstances, that this is our chance and our only chance.

15        Now these findings don't have to be as they are.

16  We made this point during the scheduling, you know, argument,

17  we made it during the disclosure statement argument, that

18  these findings are a Trojan Horse, they don't belong in the

19  plan.  We -- you know, we think there should be further

20  argument on that.  But wherever that comes out, we need --

21  those findings need to be looked at in connection with what

22  discovery they're precluding us from getting at because

23  they're going to seek a good faith finding from you, a

24  finding of reasonableness and, at the same time, seek to

25  exclude all of the evidence that shows how the TDPs were put

1   together, under what circumstances, and under what tradeoffs.

2         And it's -- you know, you've heard our argument,

3   Judge, that there was a tradeoff here that local councils

4   would settle at numbers that they did and that they would

5   hand the pen over to the claimants to put together a TDP that

6   was completely different from what they settled on.  And

7   you'll see evidence about that at confirmation.  But we will

8   be seriously prejudiced in our ability to make our case if we

9   can't show, in the totality of the circumstances, what

10  happened in connection with those negotiations.

11        And there are cases, there are 1129 cases that

12  deal specifically with this, that talk about, you know, that

13  you can take into consideration, in determining good faith in

14  this context, who had substantial input in the drafting, who

15  was doing the drafting, what the negotiation was, in fact,

16  about.  If the negotiation of the TDP was a tradeoff of

17  rights between the two, there's one -- then we have our

18  arguments and we ought to be able to put them before the

19  Court.  But I ask Your Honor to please accept briefing on

20  that.

21        By the way, Your Honor, I have a cold and my voice

22  is a little ragged as a result of it.  I -- don't take any --

23  about my tone.  It's my laryngitis is speaking, not my

24  emotion.

25        The other couple of points I'd like to make, Your

1  Honor, about this is that, if you -- you've heard a lot about

2  chilling.  You know, it's a red herring.  Yes, we're still

3  engaged in mediation.  Yes, if -- you know, I will go to

4  mediations and participate in good faith.  But this is not a

5  chilling issue, Your Honor.  I'm not worried about -- you

6  know, I know how to participate in a mediation, as do others.

7  It's like we would like to bring specific issues before Your

8  Honor on specific motions, and we'll do it promptly, about

9  whether or not these TDPs -- you know, whether or not that

10  evidence should be precluded or not.

11          It's -- the Tribune case did not hold that you can

12  enter into a mediation order at the outset of a case and then

13  cloak everything in mediation privilege.  And you know, that

14  may sound extreme, that may sound like hyperbole from me.

15  But Your Honor, we served discovery requests on the Coalition

16  in advance of the RSA hearing.  Those sought general

17  discovery on plan documents.

18          The response we got -- we told this to you then,

19  and it remains true.  It's been updated since then.  The

20  Coalition produced literally zero documents.  They told us

21  that everything they've done, everything they have is subject

22  to mediation privilege, and they produced absolutely nothing.

23          We then went to the debtor, in the -- you know,

24  after the amendments were filed to the plan.  And Your Honor

25  has a separate motion to compel from us on that.  And we

1  said, under discovery we served in advance, we said, geez,

2  we'd like to see, in response to our discovery -- and this is

3  discovery that's already been due -- you know, the documents

4  about these amendments to the plan.  The response we got back

5  all privileged.

6        The invocation of privilege from the beginning of

7  a case forward, on all aspects of a plan, it's completely at

8  odds with lots of things about how the Code is designed.  The

9  Bankruptcy Court is specifically intended to be -- have

10 oversight with responsibility for the formulation of plans.

11       The interpretation that the debtors are coming to

12 you with on Tribune is utterly at odds with the broader scope

13 of how the plan is -- how the Code is supposed to apply.  It

14 would put everything about the formulation of a plan under

15 the cloak of privilege.  That's just not how it's supposed to

16 be.

17       It's like, if there were specific offers or

18 acceptances made in front of these mediators, terrific.  But

19 when you look at the privilege log for the TDPs, for

20 instance, you will find that the vast majority of the back-

21 and-forth didn't take place in mediations, didn't take place

22 with mediators.  And it's not of the nature of like dollar

23 numbers going back and forth.  And it's not of the nature,

24 also, that it really needs to be cloaked for any real reason,

25 the formulation of those TDPs.

1           So, Your Honor, for all of those reasons, we would

2   ask you not to rule prematurely on this motion, to allow us

3   to bring a motion before you -- we would do so in the next

4   seven days, if you'll permit us -- that would allow us to

5   review the discovery that was responded to last night, to

6   quickly meet and confer with regard to it, and then put

7   before Your Honor both the specific discovery requests and

8   the specific documents we seek in the context of the findings

9   that have been sought.

10           Thank you, Your Honor.  And again, I apologize for

11   my laryngitis.

12           THE COURT:  Thank you.

13           Okay.  Yes, and I'm sorry.  I see you waving and

14   I've forgotten your name.  My apologies.

15           MR. HALLOWELL:  Oh, no problem, Your Honor.  This

16   is Jim Hallowell for the --

17           THE COURT:  Yes.

18           MR. HALLOWELL:  -- AIG Companies.  Can you hear me

19   okay?

20           THE COURT:  Yes, Mr. Hallowell.  Thank you.

21           MR. HALLOWELL:  I will be very brief, Your Honor.

22   We just would like to underscore that we do believe that it

23   is appropriate for Your Honor to consider these issues in the

24   context of a concrete dispute.  There is a temptation to deal

25   with something, particularly after you've heard extensive

1  argument on the issues with what Mr. Kurtz has referred to as

2  an "umbrella order."  But we have great concerns about the

3  law of unintended consequences in that regard.

4         As the TCC mentioned, they raised the issue about

5  burden shifting.  And you correctly pointed out that that

6  won't occur in this situation.  But for the reasons

7  Mr. Schiavoni explained, it is better for the Court to

8  consider this in the context of concrete disputes that will

9  arise.

10        There are a lot of concrete disputes that will not

11 arise.  I don't believe that any party seeks to get at the

12 kind of negotiations that were talked about by Mr. Anker, for

13 instance.  On the other hand, there are issues that could

14 arise.  People have talked about the fact and everyone seems

15 to agree that information that is discoverable does not

16 become exempt just because it was used in the process of

17 mediation.  The contours of that and the circumstances of

18 that will be articulated in the context of specific disputes

19 between the parties.

20        The other thing to mention, Your Honor, as I think

21 you've identified, is the moving target nature of what is

22 taking place here.  Discovery requests and responses have

23 been put out and responded to on an expedited schedule.  But

24 that expedited schedule has taken place over the last week,

25 it's not something that took place in July and August.  And

1 indeed, as the people on this Zoom can attest, it was ongoing

2 until past midnight last week.  So no one has really had an

3 opportunity to look at the discovery and the responses and

4 identify what the real disputes are.

5         It's also worth noting that the findings and

6 orders which have been the subject of substantial discussion

7 and debate in these proceedings were modified only yesterday.

8 We believe that those findings and orders are still

9 substantially deficient, Your Honor.  But the fact remains,

10 as you've identified, a lot of this stems from those findings

11 and orders and what effect those findings and orders would

12 have, not only in this proceeding, but on future proceedings,

13 and they're changing as we speak.

14         So it does call for caution, Your Honor.  And

15 indeed, it calls for the parties to be permitted to raise

16 specific concrete disputes in a way that will allow us all to

17 move forward efficiently.  Thank you.

18         THE COURT:  Thank you.

19         Is there anyone else?

20         MR. PLEVIN:  Your Honor, this is Mark Plevin.  May

21 I be heard?

22         THE COURT:  Mr. Plevin.

23         MR. PLEVIN:  Your Honor, I'll be brief, as well.

24 There was some discussion about how the insurers are

25 allegedly trying to break the privilege here, and also that

1  it was inconsistent for us to have asserted mediation

2  privilege in our own discovery responses, which were served

3  yesterday.

4          I think it's clear that there's no effort here to

5  break the mediation privilege.  What there is, is a problem,

6  as Mr. Brown pointed out, with sword and shield, where the

7  debtors want to -- and Mr. Kurtz, I think, was candid about

8  this.  They want you to hear evidence that there was a

9  mediation, that there were three mediators, that the

10  mediators were qualified, that there were many meetings, and

11  to use that to cloak the plan in the protection of -- to say

12  that the plan was in good faith because of all of those

13  facts, when there's no ability to get behind those facts in

14  the way that Mr. Schiavoni described.

15          And you asked an important question to Mr. Anker,

16  which was about promoting reorganization and, you know, does

17  a plan -- is a plan in good faith just because it promotes

18  reorganization.

19          Excuse me.  I have a crazy dog who wants to be ...

20          A plan could be in good faith in the sense that it

21  promotes reorganization, but also that confection of the plan

22  could be problematic and not in good faith.  And I think

23  Mr. Schiavoni has explained how that could be:  That the

24  debtors and the local councils cut a deal that was to their

25  economic benefit; and, once that happened, they handed over

1   the pen.  And to the extent that a portion of the plan

2   negotiations may have been targeted at a particular party-in-

3   interest, as we suspect may be the case here, that could be

4   bad faith.

5          And so the fact that a plan moves towards

6   reorganization of the debtor does not mean that it's

7   necessarily in good faith.  And I don't think you need to

8   reach for the kind of crazy hypotheticals that Mr. Anker was

9   reaching for in order to reach that conclusion.

10          So, for all those reasons, we joined in

11   Mr. Schiavoni's brief, we continue to do so.  We think the

12   arguments he made and Mr. Hallowell made and Mr. Brown made

13   were all correct.  And this will be coming before the Court

14   at an appropriate time, but this isn't it.

15          THE COURT:  And the focus, Mr. Plevin, for your

16   client, is also on the TDPs.

17          MR. PLEVIN:  Primarily, yes, because what -- as I

18   said, what they want to do, Your Honor, is justify the TDPs

19   by telling you how wonderful the process was and, in doing

20   so, block us from examining the process.

21          THE COURT:  Thank you.

22          Anyone else in opposition?

23      (No verbal response)

24          THE COURT:  Okay.  Mr. Kurtz.

25          MR. KURTZ:  Thank you, Your Honor.

1          Let me start -- I'll try to tick through all the

2    issues that I heard come up, both from the Court and the

3    objectors.  But let me start with the final three speakers,

4    who spoke to needing a concrete dispute.

5          We have a concrete dispute.  We have discovery

6    requests.  We have Mr. Schiavoni said there were none

7    outstanding.  That's disproven from three emails he has sent

8    us in the last few weeks, specifically telling us that he has

9    outstanding discovery from prior requests that need to be

10   supplemented in connection with confirmation, which we agree

11   with.  We also have literally hundreds of requests that have

12   since been filed.  It is concrete.  The -- it's almost as if

13   the argument is there's no such thing as a protective order,

14   something becomes concrete only when a particular party makes

15   a motion to compel.  That's not the law, of course.

16         We have made a motion for a protective order.  We

17   specified, by Bates Number and by log and other exhibits,

18   precisely the documents that we seek to have protected, along

19   with categories.  The time to oppose that relief was now, in

20   connection with this application.  They have had, I think,

21   about a month to do so.

22         So the idea that they are opposing our request for

23   protection of the designated documents because they haven't

24   made a motion to compel and they're willing to do so is not

25   right.  It's a second bite at the apple, it's not

1 procedurally correct, and we have more than a concrete

2 dispute and we've had one for months.

3            The second issue I wanted to resolve -- or I

4 wanted to address, I should say, in the last presentations,

5 was Mr. Schiavoni's statement that we are seeking to bar him

6 from introducing evidence that they were not allowed to

7 participate in the mediation.  That, too, is incorrect.

8            Whether or not Century participated in one or more

9 sessions is exactly not privileged and falls squarely within

10 the debtors' position on what is privileged and what is not

11 privileged.  We never sought to bar it, that's made clear by

12 the motion and the brief, and I'll confirm it again now.

13            Your Honor correctly pointed out there's an issue

14 between substance and process.  We are only putting at issue

15 that there was a process, not what happened in the process,

16 not the content of the process.  The fact of mediation --

17 which is public and I won't readdress, it's in an order -- is

18 not -- does not open the content every mediation order is

19 public and the fact of mediation is public.  That does not

20 mean mediations don't enjoy privilege.

21            Mr. Schiavoni makes mostly legal arguments that

22 the debtors don't have an interest in the TDPs.  Of course

23 the debtors do have an interest in ensuring appropriate

24 mechanisms for compensating victims of sex abuse, and they

25 also have an interest in ensuring that we have a confirmable

1  plan of reorganization.  Nonetheless, that -- the interest by

2  the insurers, the objectors to any plan, in having mediation

3  privilege motion is there's no basis for doing that based on

4  your argument that the debtors have no interest.  You can

5  make the argument, it won't be right.

6           Lastly, on the -- Mr. Schiavoni, before moving to

7  the other objectors.  He had said that I had misrepresented

8  or misstated, I guess, what the terms of the order was on

9  subsequent actions.  He said that was important that --

10  because, if the order contains the words "subsequent action,"

11  then, of course, the exception doesn't apply here.  And then,

12  for some reason, he represented to the Court that the order

13  doesn't include that word.  That's just not the case.  It's

14  in front of me and it says that:

15           "If a party puts at issue any good faith finding

16  concerning the mediation in any subsequent action concerning

17  insurance coverage, the party's right to discovery, if any,

18  is preserved."

19           So I correctly articulated exactly what the words

20  were.

21           Going to the beginning, Your Honor asked questions

22  about the length of the mediation.  I thought I would kind of

23  weigh in that I don't think the length of mediation is

24  relevant.  I think it does demonstrate the difficulty of

25  getting to resolutions in this case.  But the policies behind

1   the protections for mediation privilege are resolutions

2   outside of court and confidentiality to allow candor.  And I

3   don't believe I've read any case that would suggest that

4   speed is part of the rationale.  And so I don't think the

5   length means anything, in terms of the scope of the privilege

6   or the application of the privilege.

7           I do think it means something, in terms of how

8   hard the parties had to work and how entrenched everybody has

9   been, as we've worked to gain some consensus and continue to

10  work to gain more consensus.

11          THE COURT:  What about --

12          MR. KURTZ:  Your Honor --

13          THE COURT:  What about the bankruptcy policy of

14  transparency?

15          MR. KURTZ:  Well, I think all courts have policies

16  of transparency, and I think that transparency is met or

17  there's nothing that's being hidden.  And I -- again, I said

18  this at the beginning and I'll repeat it:

19          If the Court has any concern whatsoever that the

20  debtors or any other party have not acted in good faith in

21  mediation, we are happy to give you each and every document

22  to review.  There is nothing that is being hidden.  But

23  privilege is privilege.  Attorney/client doesn't get invaded

24  based on transparency and mediation doesn't get invaded based

25  on transparency.

1          But it is worth noting the fact that we have

2  people who are going to object and probably will continue to

3  object, maybe to the conclusion of the case, doesn't mean

4  that those that settled acted in bad faith.  And there's no

5  reason to invade privilege and there's no basis to invade

6  privilege based on what is nothing but a completely incorrect

7  and probably not even honestly held fishing expedition.

8          There's nothing -- we -- I think Your Honor knows

9  who the mediators are, you know who the parties are.  It

10  doesn't even make sense that the people arguing about

11  appropriate resolutions in mediation have somehow colluded in

12  some way that -- and the only basis I think I'm hearing is

13  the concern about either the TDP numbers or the neutrality of

14  the insurance language, each of which is before the Court

15  because the TDPs are before the Court and the language is

16  before the Court, and it's either appropriate or it's not,

17  irrespective of who proposed it and how it was pushed back

18  against and what the back-and-forth was.

19          Your Honor asked about Tribune.  I did think it

20  was worth noting that Tribune protects everything that we are

21  seeking to protect here, that Tribune involved actually a

22  proposal by the mediating parties to agree to make

23  productions of discovery with certain limitations, which

24  included the settlement proposals and the mediation

25  communications, which is exactly what we're protecting here,

1   as well.  So Tribune didn't actually overrule an objection,

2   except to the extent that it adopted a proposal and made a

3   slight modification, which does not impact, I think, anything

4   that we have proposed to do here.

5          THE COURT:  Well, I think the modification was

6   pretty significant.  The modification that the Court made

7   said that the communications had to happen in mediation, on a

8   mediation day, in front of the mediator, but then he said or

9   I'll take the mediation day, even if it wasn't in front of

10  the mediator.  That was pretty significant.

11         MR. KURTZ:  Right.  And I guess that depends on --

12  you're right, Your Honor.  If that's considered to have been

13  a day that is formally noticed as a mediation day, as opposed

14  to a day where the mediating parties say I'll get back to you

15  in two days --

16         THE COURT:  And that's how --

17         MR. KURTZ:  -- with my --

18         THE COURT:  -- I read it.

19         MR. KURTZ:  -- with --

20         THE COURT:  I read his -- I read Tribune -- I read

21  Tribune do be on a mediation -- a formal mediation day.

22         MR. KURTZ:  Well, then I guess the two responses I

23  would have to that is, it's then inconsistent with I think

24  most cases in the way they've addressed mediation privilege,

25  I think it's inconsistent with the practice in large cases of

1  continuing mediations even when they're not exactly on the

2  same day.  And I'll also note that we've had so mediation

3  days that very much should still be protected and there's

4  still a stand-alone protection that the Court didn't modify

5  with respect to, quote, the -- it's going to pick up -- okay,

6  "written or oral communications reflecting the substance of

7  any discussion, which includes offers or counter offers

8  exchanged or agreements reached in the mediation day."  I

9  don't believe that the Tribune court was intending to lift

10  mediation privilege on proposals, that's sort of the most

11  core protection that exists here, I don't think this language

12  intended to cover it.  And the TDPs are actually settlement

13  proposals.

14         So I'm not sure, even with the -- even if you have

15  this modification, which I don't think should apply, even if

16  there is something that was exchanged that wasn't a, quote,

17  "mediation day," I don't think the communications that would

18  be on a non-mediation day would -- to the extent they -- I

19  would say, to the extent they include proposals, would still

20  be protected under the rest of the provision.  So I'm not

21  sure where it gets you for them, it would -- I guess you

22  would get a very -- a very difficult and lengthy review for

23  us as we parse through that sort of tight knit to find

24  whether anything fell through to the bottom, which I don't

25  think is maybe a sensible use of estate time right now, but

1    ultimately Your Honor will decide where you think you need

2    that.

3          Your Honor asked about mediation privilege and I

4    think where is it in federal.  And it's not in federal, but

5    it doesn't matter that it's not in federal because it's

6    primarily a state concept and it's a state concept here, and

7    it was -- not only does it apply, but --

8          THE COURT:  I don't think that's right.  That's

9    not my understanding, that's not my understanding of the read

10   of the cases.  If this were a state issue and involved state

11   law, that would be one thing, but this is federal.  And my

12   reading of the cases says that we're supposed to be

13   establishing federal privilege under federal common law on a

14   case-by-case basis and that's -- you might inform yourself by

15   what the state law does in your particular state, but that's

16   not my read that this is a state law issue.

17         MR. KURTZ:  Well, I do think that Rule 9019

18   applies in this Court and, even if it hadn't, that it was --

19         THE COURT:  That's a different issue.

20         MR. KURTZ:  Right -- well, maybe I've articulated

21   wrong.  What I mean to say is twofold.  One, we have a rule,

22   it applies in our case and it applies in federal court in our

23   case and that, even if it hadn't, it was included in a

24   mediation order.  Parties are certainly free to contractually

25   adopt any restrictions that they have and the parties here

 1  have agreed to Local Rule 9019, which includes the mediation

 2  privilege.

 3           I would say, secondly --

 4           THE COURT:  That's an interesting issue you just

 5  raised about who are the parties, so that's --

 6           MR. KURTZ:  Well, there are at least --

 7           THE COURT:  -- an interesting -- that's an

 8  interesting issue.  And if, for example, when the Hartford

 9  settlement is being negotiated and if people aren't in that,

10  are they a party to it, even though they may be a mediation

11  party, that's a really interesting question.

12           MR. KURTZ:  Right.  And I think they clearly are

13  because the parties to the mediation are defined and in fact

14  it's amended from time to time to allow people to come in

15  when they've expressed an interest in mediating.  The

16  mediation covers everything that takes place within the

17  mediation and the fact that some mediators -- in fact, in my

18  experience, basically all mediators meet separately with

19  people from time to time -- it doesn't eviscerate the rules

20  that all the parties agreed to going in and it doesn't

21  eviscerate a court order that's been issued and filed on the

22  docket.

23           So that's just the normal process for mediation, I

24  would submit, is that you take people a piece at a time.  If

25  you put everybody in one room, you'd get something that would

1  approximate what, unfortunately, Your Honor sees all the

2  time.  And maybe it's -- some people think one offs -- most

3  people think one offs kind of get you into a better place and

4  it's more productive, but the fact that you meet with one

5  party and not another doesn't have -- I don't believe has

6  anything to do with the extent of the privilege and I don't

7  think it's a ground to vitiate privilege, and I don't think

8  anyone has raised it or can raise it.

9          The last issue -- well, wait, I have just a couple

10  of other issues -- is Mr. Brown made some arguments about --

11  and this is new, this wasn't briefed, but he came in and

12  argued that every -- any, quote, "aspect" of the mediation

13  is -- I'm trying to find the actual -- any aspect of the

14  mediation is somehow inadmissible, that's not actually the

15  words.  The words are, "any aspect of the mediation effort,"

16  and then there is a list.  And, as a matter of law and a

17  matter of statutory construction, you then look to the list

18  to understand what is meant by mediation effort.

19          And when you look at that list, which is A through

20  D, it is all matters relating to the content of the

21  mediation; it's views expressed or suggestions made in

22  mediation, it's parties' expressions of a willingness to

23  accept the proposal, it is the proposals, and it is the

24  statements and admissions that are made -- it actually goes

25  to E, excuse me -- and documents prepared for the purpose of

1    the mediation.

2              So it's very clear from the words that the fact of

3    mediation isn't confidential.  In fact, the entire provision

4    addresses the, quote, "confidentiality of mediation

5    proceedings," that's the title of the provision, and there

6    can't be any reasonable argument that the fact of mediation

7    and the participants to mediation and the appointed mediators

8    are confidential because that information is set forth in

9    public orders that are filed on the docket.  So there is --

10   so this new argument that I guess was conceived between the

11   time the papers were filed and today is not right.

12             Lastly, the last two items, really quickly.

13   Mr. Brown is correct that that was a drafting glitch to the

14   extent the order says that it's anything that was used in a

15   mediation.  As I made clear, I think, in my comments and I've

16   tried to make clear, I think, in prior proceedings, you can't

17   cloak unprivileged documents with privileged by using them in

18   mediation.  And so that's a drafting glitch that we'll fix.

19             And then the last issue I was a little confused

20   by, by the notion about altering the burden.  Although it is

21   true that the debtors aren't seeking to alter any burdens and

22   we're happy to have any language that indicates that -- we

23   have today a very concrete motion for a protective order

24   that's addressed very specific documents, as well as

25   categories of documents -- we do have the burden on proving

1  the privilege, we believe we have easily satisfied that

2  burden and there is really -- I don't know what the burden

3  statement means going forward.  Our view is, once we come out

4  of today, what we were hoping to obtain is a ruling with

5  respect to the documents that we specified in the categories

6  that we specified.  And, although we're happy to agree that

7  we have not shifted any burdens today or any other day, I

8  don't know what's going to be left to argue about after the

9  resolution of this motion.

10            THE COURT:  Okay.  Thank you.

11            MR. KURTZ:  Thank you, Your Honor.

12            THE COURT:  Okay.  Well, I see a few more hands.

13  Mr. Anker, I'll give you a few minutes, and then,

14  Mr. Schiavoni, I'll give you a few minutes.

15            MR. ANKER:  Thank you, Your Honor.  Philip Anker.

16  It will only be a few minutes and I want to be concrete.

17            The suggestion has been made, including by counsel

18  for the TCC, that there really isn't an effort here to obtain

19  discovery of communications, including the back and forth

20  that led to the settlement with Hartford.  Let me state and

21  put this on the record, TCC request, Document Request

22  Number 1 -- and I will read it verbatim -- quote, "All

23  documents concerning the motion, the plan, the disclosure

24  statement, the Hartford Insurance settlement agreement, or

25  any actual or proposed settlements of your coverage

1  obligations to the debtors, including any drafts thereof;

2  including, but not limited, to all such documents prepared,

3  authored, sent, or received by the debtors, the FCR, and the

4  Coalition."

5          By the way, I believe that same request verbatim

6  was served on every other insurer by the TCC.

7          If there's any doubt, Interrogatory Number 5 by

8  the TCC, quote, "Identify all communications between you and

9  the debtors concerning any actual or proposed settlements of

10 your coverage obligations to the debtors."

11         So, not only are we having discovery about every

12 single communication about coverage issues, something Your

13 Honor said is not part of confirmation, but every

14 communication covered by a settlement privilege is absolutely

15 requested.  That is the round peg in the round hole that I

16 have suggested.

17         Finally, Your Honor -- and this is dangerous, it's

18 dangerous to do research on the fly, but I looked at

19 Collier's while on the break about what good faith means

20 for 1129, and it cites prominently the Seventh Circuit's

21 decision in Madison Hotel Associates, which -- I thought I

22 had the cite here, Your Honor -- 749 F.2d 410 (7th Cir.

23 1984).  Quote, "The term good faith as used in

24 Section 1129(a)(3), though it is not defined in the code, the

25 term is generally interpreted to mean that there exists a

1  reasonable likelihood that the plan will achieve a result

2  consistent with the objectives and purposes of the bankruptcy

3  code.  Thus, for purposes of determining good faith under

4  Section 1129(a)(3), the important point of inquiry is the

5  plan itself and whether such plan will fairly achieve a

6  result consistent with the objectives and purposes of the

7  bankruptcy code," end quote.

8           The way to get this case going and the way to

9  resolve this dispute is to narrow the issues, and the way you

10 narrow the issues is to focus on what 1129 -- as Your Honor

11 said, you are going to make 1129 determinations, not coverage

12 determinations -- read 1129 to mean what it says, limit the

13 issues, respectfully, to 1129, and not allow discovery

14 requests that most certainly on their face seek every single

15 communication back and forth between my client and the

16 debtor, the FCR, and the Coalition resulting in a settlement,

17 including every draft, including every bid and ask.  That is

18 exactly what has been sought and that's why we are supportive

19 of the debtors' motion.

20          Thank you, Your Honor.

21          THE COURT:  Thank you.

22          Mr. Schiavoni?

23          MR. SCHIAVONI:  Just four things, Your Honor.

24 First, you heard from Mr. Kurtz, he kept saying it over and

25 over again that the parties agreed to, as if this mediation

1  order was an agreed-to order, it was not.  And in that way

2  alone it's very distinguishable from most of the cases.

3  Where most of the cases involve a consensual agreement from

4  parties to submit their dispute to mediation, this order was

5  entered by the -- on the motion of the debtor at the

6  beginning of the case in the context I gave you and it was

7  entered on a mandatory basis that we had to be participants,

8  we had no choice.  We did not consent to allow the debtor and

9  the claimants to meet by themselves and to arrive at a TDP

10  after they had reached agreement on what the debtor would

11  contribute and what its affiliated local councils would

12  contribute.

13            So that's a very distinguishing fact, that's one.

14            Two, you heard this suggestion from Mr. Kurtz on

15  his moving argument and then also in reply that somehow -- he

16  alluded to it in his reply, but on his moving argument he

17  argued that privilege logs somehow can be offered into

18  evidence.  And you heard again this notion that who is the

19  mediator and that it was mediated is evidence that can be

20  submitted.  In fact, the case law is that privilege logs are

21  not evidence and may not be entered into evidence.  And the

22  whole notion that he can have his cake and eat it too by

23  offering evidence of a mediator and who they are, it's

24  completely wrong.  This is a sword-and-shield argument that,

25  once he goes down this route, it's all-encompassing.

1            Three, Mr. Anker would like to live in a world

2    where 1129 findings were the only findings being made, and he

3    does live in that world as a settled party, we don't.  We

4    have findings for the TDPs that are brand new, that we

5    haven't seen, nobody has read, that are not 1129 findings,

6    and that is our problem here.  That's why we want separate

7    briefing on the TDPs and why the TDPs are really different

8    and at issue.

9            At some point, I would like to put before the

10   Court some of Mr. Anker's arguments to appellate courts about

11   the breadth of 1129 findings, but this isn't the time for

12   that.

13           Fourth, and last, not only -- you know, it's like

14   you heard Mr. Kurtz talk about transparency in a very funny

15   way.  Besides everything else here, the debtor through its

16   plan is seeking extraordinarily broad exculpation provisions

17   that cover all -- every and all aspect of the formation of

18   the plan.  Make no mistake about it, a mediation order

19   entered on a mandatory basis at the debtors' urging at the

20   beginning of the case, covering the entire formation of the

21   plan, cloaks the entirety -- they will take the position that

22   it cloaks the entirety of the plan in -- you know, in

23   privilege and that nothing is producible, nothing can escape

24   that black hole.  It leaves the Court with no basis to make

25   those exculpation findings.  It's one of the reasons why some

1  level of transparency here is important and on key issues

2  like the TDP very important, especially in a case like this

3  where transparency, you know, is a hallmark for this kind of

4  case.

5          So, Your Honor, for all those reasons, we'd ask

6  that you please do not enter the order and that you at least

7  give us seven days to put in a motion on the TDPs.

8          THE COURT:  Thank you.  Ah, this is what happens

9  when you let other people go, now I have three hands.

10         Mr. Goldberg, did -- I don't recall that the

11  church filed a paper on this, but I could have missed it.

12         MR. GOLDBERG:  Your Honor, we did not file a

13  pleading on this.

14         THE COURT:  I'll give you a few minutes.

15         MR. GOLDBERG:  Thank you, Your Honor.  I'll be

16  very brief.  Adam Goldberg of Latham & Watkins on behalf of

17  the Church of Jesus Christ of Latter-day Saints.

18         Your Honor, I would make just two quick points.

19  First, to emphasize the point Mr. Molton made regarding the

20  practical reality of conducting a mediation across the

21  country with so many parties in the time of COVID, all across

22  Zoom.  You know, as I'm sure Your Honor will recall, there

23  were mediation sessions over the course of this case in New

24  York, Chicago, Miami, and Los Angeles at different points,

25  various people attended those in person and via Zoom, and

1  that necessitated a somewhat ad hoc nature of the sessions

2  that led to phone calls, Zooms, on and off formal mediation

3  days.  And so, when Your Honor is crafting a standard here, I

4  think the idea of formal mediation days in this case kind of

5  tended to ebb and flow into iterative discussions throughout

6  the process of this case.

7        Second, Your Honor, very briefly, we would like to

8  request that the Court limit its decision today to questions

9  of discoverability and questions of admissibility of any

10 particular evidence and for what purpose, particularly the

11 protections of Federal Rule of Evidence 408 would be left for

12 another day.

13        THE COURT:  Thank you.

14        MR. GOLDBERG:  Thank you, Your Honor.

15        THE COURT:  Okay.  Mr. Brown?

16        MR. BROWN:  Thank you, Your Honor.

17        Mr. Kurtz addressed the argument that I made that

18 the debtor was trying to cherry-pick Rule 9019 in a way that

19 I think glossed over or ignored the actual language of

20 Rule 9019.  He didn't include the fact that the rule starts

21 out by saying very broadly "No" -- that "No person may rely

22 on or introduce evidence in any arbitral, judicial, or other

23 proceeding, evidence pertaining to" -- and here's the key

24 words -- "to any aspect of the mediation effort, including,

25 but not limited to" -- which is the language that Mr. Kurtz

1  glossed over -- and then it gives, you know, an A through D

2  set of examples.  But the "any aspect" language is any --

3  it's any aspect, it is unlimited.

4        And so I just think it's disingenuous to say that

5  you can parse this rule to limit what the nature of the

6  inadmissibility of the mediation effort is and that includes

7  the process.

8        If you are going to -- you know, if you're going

9  to -- so the rule, if you adhere to the rule, it bars -- to

10 the extent applicable, it bars discovery of the mediation and

11 the mediation process, but it also bars admissibility of it

12 and reliance on it, and that's all we're saying.  And I think

13 it is just -- again, it is ignoring the language of the rule

14 or allowing the debtor to modify the rule to say, no, but

15 we -- we, because we're a debtor -- or I don't know what -- I

16 really don't understand what the basis is for modifying it

17 other than Mr. Kurtz seemed to say the debtor was special

18 here because of its duties, but I don't think that suffices.

19       The bottom line is, you don't get to discover it

20 and you don't -- if you don't get to discover it, you don't

21 get to admit it or rely on it at the hearing, and that's all

22 we're saying.  And there's nothing in the language of the

23 rule that indicates otherwise or supports Mr. Kurtz's

24 position that the admissibility, the bar on any aspect of the

25 mediation has a bunch of holes in it just because he wants

1  there to be holes in it.

2           THE COURT:  I think he used the list to say that

3  that's the type of thing that the any aspect relates to.  And

4  I haven't read my Scalia and Garner recently to know how I'm

5  supposed to interpret that sentence, but maybe I need to

6  glance at it.  Okay.

7           MR. BROWN:  Yeah.  I mean, he also, I think,

8  relied on the heading and the title, which I think if --

9           THE COURT:  Well, that probably --

10          MR. BROWN:  -- you look at the statutory --

11          THE COURT:  Yeah.

12          MR. BROWN:  -- it's the same thing.  You don't

13  look at that to limit the language of the rule --

14          THE COURT:  I probably don't.

15          MR. BROWN:  -- which is what Mr. Kurtz wants you

16  to do.

17          THE COURT:  Okay.  Mr. Kurtz, I'm giving you the

18  final couple of minutes here.

19          MR. KURTZ:  Thank you.  I'll be really brief and

20  thank you for your patience.

21          Just to address that issue, Your Honor, the

22  headings actually do go into the analysis and when Your Honor

23  does her research, because this was raised and so we'd have

24  the opportunity to brief it.  You will see that the cases

25  involving statutory construction, you look at the lists as an

1  indicator of what was intended by the preceding language, and

2  the list here clearly addresses the efforts, which is the

3  word used, not the fact of, and it's hard to characterize the

4  fact of mediation as confidential when it's a publicly-issued

5  order.

6          The only other point I really wanted to make here

7  is Mr. Schiavoni's first point about he didn't agree to the

8  Court's order.  It doesn't matter whether Mr. Schiavoni

9  agreed -- and, to the extent that I suggested otherwise, I

10  apologize -- it's a court order, and court orders apply

11  whether you oppose them or whether you agree to them, whether

12  you advocate for them or whether you object to them, and

13  they -- and so does the local rules.  And so -- and it's

14  commonplace for the judges in many jurisdictions to order

15  parties to mediation because it can be pretty productive,

16  it's actually almost automatic in New York.  So it just

17  doesn't matter.

18          And that's all I wanted to correct, Your Honor,

19  there's a court order and a local rule, both of them apply, I

20  haven't heard any authority for them not to apply --

21  actually, I'll just add one other thing.

22          The federal courts, there is no federal mediation

23  privilege in a statutory sense, but as far as I know just

24  about every court that's considered it, including courts that

25  the objectors had cited to us originally in dispute letters,

1  adopted one in recognition of what the policies are.  So you

2  don't need to adopt one because you have a rule, but, I mean,

3  we can certainly -- you know, we could brief this, if Your

4  Honor would like, but we have -- you know, at least the cases

5  I read, because Mr. Schiavoni and others cited them to us at

6  one point in the dispute, all ended up adopting a federal

7  mediation privilege where none had otherwise existed.  So

8  it's been promulgated by the courts in support of the policy,

9  but here's that's not really the issue because we have a

10  local rule and we have a court order.

11          THE COURT:  Yeah, it's interesting.  There's a

12  really good decision by Judge Norton, Lake Lotawana Community

13  Improvement District, 563 B.R. 909, where it's a Chapter 9

14  case and, apparently, in a Chapter 9 case you have to -- one

15  of the elements to be a debtor -- where is that -- is that

16  you have to have negotiated in good faith -- where is that --

17  and -- yeah, you have to have negotiated in good faith with

18  the movants prior to the filing for relief.  So it's an

19  interesting aspect that I hadn't thought about.

20          She's got a really nice decision here.  She deals

21  with work product and she deals with mediation privilege, and

22  she's the one who tells me that, of the circuits that have

23  addressed the issue, only the Sixth Circuit has adopted a

24  settlement privilege -- and this is in 2016, so it's not that

25  outdated -- and she does not adopt it there, but she rules on

1  some other grounds.  It's a really interesting read.  Okay.

2          MR. KURTZ:  Thank you, Your Honor.

3          THE COURT:  Thank you.  I'm going to give this

4  thought -- not for that long, but I'm going to give it some

5  thought, and I appreciate the arguments.  As you can see,

6  I've been thinking about this and what the proper approach

7  should be to this, I think, fairly unusual case.  Mr. Molton

8  says *sui generis* and he may be correct; I don't know that

9  that's good, but it might be.  And I'm going to issue some

10  ruling, but I'm struggling with exactly what ruling I can

11  give at this point, and I may be able to give some rulings

12  and not others that the debtors want.

13          Okay, it is quarter to 1:00.  I see that Mr. Hale

14  is on this call, and he's been on it for some time, and he

15  has his own matter that I would like to address so that

16  Mr. Hale does not have to remain on this call, if he chooses

17  not to.  So I'd like to take that next and I'd like to take

18  five minutes before we take that matter, so that everyone can

19  get situated, and it probably is also a good time to take a

20  break, and I know most of you will not be interested in

21  Mr. Hale's matter.

22          So why don't we take -- why don't we take our

23  lunch break and we'll come back, except for Mr. Hale and the

24  people involved in that matter -- Mr. Mones, I know -- why

25  don't we take the lunch break now and we'll reconvene on the

1  next matter at quarter to 2:00, at 1:45, that's an hour.

2  But, in the meantime, we'll take five minutes and then I will

3  hear Mr. Hale's matter, Mr. Mones' motion --

4            MR. MONES:  Your Honor?

5            THE COURT:  Yes?  I'm sorry.

6            MR. MONES:  I'm sorry, may I be heard?  Good

7  morning, Your Honor, Paul Mones.  Will this be held in

8  chambers?  Because I -- for a variety of reasons laid out in

9  the papers, I would think this is more appropriate that there

10 are no other -- because of attorney-client issues, no other

11 persons on the call and I wouldn't want somebody by mistake

12 to be listening to these arguments considering the papers

13 that have been filed here.  So, if we can do it in chambers,

14 that would be preferable for me or --

15           THE COURT:  I don't know how I have a record if I

16 do it in chambers.

17           Mr. Hale?

18           MR. HALE:  I'm a little bit concerned about what

19 Mr. Mones just requested -- I don't necessarily have a

20 problem with that -- regarding my *ex parte* filing that

21 somehow was published, not in its totality, but,

22 nevertheless, it was published.  So I'll leave that up to Her

23 Honor to decide what to do.

24           THE COURT:  Okay.  Give me one minute, please.

25      (Pause)

1          THE COURT:  Okay, this is my understanding of what

2   we can do.  We will -- do we just place everybody in -- okay,

3   we're going to end this call, okay?  And I will ask Mr. Mones

4   and Mr. Hale to come back in -- right?

5          THE ECRO:  Yes.

6          THE COURT:  To the Zoom call -- the same number,

7   but come back in.  We will only admit the two of you into the

8   Zoomcast.  Everybody else can come back in at 1:45.  I assume

9   we'll be done; if we aren't for some reason, you'll be in the

10  waiting room, but you will not be let into this matter.

11         So --

12         MR. MONES:  Your Honor, may --

13         THE COURT:  Yes?

14         MR. MONES:  I'm sorry.  May Ms. Veghte be since

15  she's --

16         THE COURT:  Yes --

17         MR. MONES:  -- local counsel?

18         THE COURT:  -- yes.

19         MR. MONES:  Thank you.

20         THE COURT:  Ms. Veghte, Mr. Mones, Mr. Hale.  Is

21  there anyone else who is supposed to be on this matter?

22         MR. MONES:  No, Your Honor.

23         THE COURT:  Okay.  Then, if the three of you will

24  also hang up on this call and then come back in to the Zoom,

25  we will handle that matter.  Thank you for raising that.

1          MR. MONES:  Thank you, Your Honor.

2          THE COURT:  We're adjourned until 1:45.

3          COUNSEL:  Thank you, Your Honor.

4      (Recess taken at 12:48 p.m.)

5      (Proceedings resumed under seal from 12:57 p.m. to

6  1:54 p.m.)

7          THE COURT:  Okay, this is Judge Silverstein.

8  We're back on the record at 1:55.

9          MR. ABBOTT:  Thank you, Your Honor.  I'm a little

10  at a loss for what the Court wants to hear next.

11          THE COURT:  Let's hear --

12          MR. ABBOTT:  I just want to make sure -- I think

13  it's Mr. Schiavoni, maybe?

14          THE COURT:  Yes.  Let's hear the moving insurers'

15  motion to compel documents from Mr. Green, Professor Green.

16          MR. ABBOTT:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18          MR. SCHIAVONI:  Your Honor, I think it's been the

19  better part of a decade before -- since Mr. Green last

20  taught, so I don't know if there's a statute of limitations

21  on professor, but -- so -- but for Mr. Green, Professor

22  Green, the discovery we seek here, Your Honor, goes to the

23  disclosures on whether or not he's conflicted.  We cited some

24  case law in the brief, I will say you'll get more of it on

25  confirmation about the duties a trustee owes to be impartial,

1  and we think the evidence that we are seeking goes to that

2  issue, as well as his qualifications to serve.

3        We were surprised to see that over 500 documents

4  were withheld by Mr. Green, you know, he provided a privilege

5  log.  We've attached a copy of the log with the items

6  highlighted that are not communications with other mediators

7  and, to be clear, we're not seeking any communications with

8  Mr. Carey, former Judge Carey or Mr. Gallagher or Mr. Finn,

9  that's not what's at issue here.  We think that the documents

10  on the log would facilitate an assessment of his impartiality

11  and qualifications.

12        This issue about, you know, this fellow is so

13  important to the plan proponents that they made it an express

14  condition of both the LDS settlement and the Hartford

15  settlement that they dropped their objections and stayed

16  silent with regard to Mr. Green's continued appointment in

17  the case.  That's in the term sheets for both of those

18  settlements.

19        The grounds for which the documents are withheld

20  is the assertion of mediation privilege.  You know, our

21  argument is fairly basic here, it's that he was not appointed

22  mediator, that under 9019-5(a) there isn't really -- there

23  isn't a mediation until the court appoints a mediator and

24  certainly, here, he wasn't appointed.  There's not a

25  recognized preparation or anticipation-of-mediation mediation

1  order and mediation privilege that we've been able to find

2  any cases on anywhere.

3         We have cited a case from the Northern District of

4  Georgia, a Bankruptcy Court decision, In re RDM Sports, which

5  did hold that the disclosure of documents prepared prior to a

6  mediation by someone purporting to be a mediator are not

7  subject to mediation privilege.

8         The sheer volume and number of people identified

9  on this log itself call into question any notion that these

10  are all in any way -- if there is a sort of preparation-for-

11  mediation privilege, that they would fall under that.

12  There's four different people in addition to Mr. Green

13  identified as having generated documents associated with him

14  or having received documents.  The documents are generated

15  both before he was appointed mediator and after he was found

16  not to be a mediator, making the assertion I think post-order

17  that he was not a mediator even harder to really understand.

18         We would like to draw your attention conceptually,

19  in like an illustrative way to just several documents about,

20  you know, why this isn't some sort of just pure fishing

21  expedition or whatnot, but the privilege log we exhibited in

22  highlighted form, attached, I think, to our reply brief.  It

23  was part of, I think, Mr. Green's moving submission; it's

24  docket entry 6316-1.

25         If one goes to that, it's organized

1  chronologically.  For May 7, 2020, there are communications
2  between Mr. Green and Mr. Molton, initiated by Mr. Molton.
3  There's additional ones on June 5, 2020 and on June 7th,
4  2020.  In context, this is Mr. Molton writing -- and on
5  June 8th is another one and on June 9th itself there's a
6  series of them -- this is Mr. Molton communicating with
7  Mr. Green in advance of the hearing on whether or not he
8  should be appointed.  And then there's a series of
9  communications between Mr. Green and Mr. Molton that post-
10  date -- that post-date that.  There's one on April 6th, 2021,
11  others in that same period.  They're also copied on those
12  people associated with this Resolutions entity, one of which
13  is a former Brown Rudnick lawyer, I believe, or employee in
14  one sense or another.  The descriptions associated with them
15  are extremely general, about the hearing, about -- mainly
16  about other things, but mentioning Boy Scouts.
17          But what -- you know, I point those out as
18  examples because Mr. Molton didn't make an appearance in the
19  case until August 10, his *pro hac* was granted on August 17.
20  That's docket entry 1108.  He was not a mediation party or,
21  you know, involved in any way we knew about in a mediation
22  for which Mr. Green was not appointed.
23          So we think that even -- even if the Court were
24  inclined to recognize an anticipation-of-mediation privilege
25  or a mediation privilege after one is not appointed mediator,

1  but as a phasing-down mediation privilege, these

2  communications with Mr. Molton wouldn't even seem to fit into

3  that at all because Mr. Molton is not a mediating party,

4  under the order or otherwise, at this point in time.  He's

5  not even in the case really, you know, at this point in time.

6          And we do think that these communications, you

7  know, they're all about the Boy Scouts and, you know, we

8  think that they're -- given the nature of the role this

9  gentleman is taking in the case, the important essential

10  elements of it, the issues about impartiality, that these

11  communications and the others that are exchanged, you know,

12  in particular post -- you know, post the decision that he

13  wasn't going to be a mediator, with other plaintiffs' lawyers

14  in the case are not privileged under any -- you know, he's

15  not -- I'll give you another example.  Here's February 3rd,

16  2021 communications between Mr. Green's employees, Carmen

17  Reis, and members of the Gilbert firm and Mr. Molton, we

18  don't think that has -- there's no cognizable privilege

19  associated with that in that, at this point in time,

20  Mr. Green is not -- he's not even -- he can't be anticipating

21  a mediation, it's long since he was not appointed a mediator,

22  so there's no phasing-out mediation privilege that would

23  apply.

24          He's simply communicating, you know, about the

25  case with others involved in the case and it's like that's --

1  it's not subject to any privilege at all and it, I think,

2  goes to -- it's relevant to issues about, you know, his

3  relationships with the other plaintiffs' lawyers that

4  subsequently selected him to be appointed for this role.

5         So, for all of those reasons, Your Honor, we'd ask

6  that the -- again, we do not want any of the communications

7  that Mr. Green or his staff exchanged with Messrs. Carey,

8  Gallagher, or Finn.  You know, we would say, we don't think

9  those are privileged.  It's during a time period where they

10  were just -- they were all simply trying to figure out how to

11  like submit their 1214s.  We have some of those, actually,

12  and it's obvious that they're not privileged from what we

13  have, but we're not seeking those documents.  We're seeking

14  the other documents, the ones that are highlighted in yellow

15  and particularly the ones that were exchanged with

16  Mr. Molton's and these other plaintiffs' firms, the Gilbert

17  firm and others at Brown Rudnick and Anne Andrews that are on

18  the log, that took place after he was no longer a mediator

19  and before he was even appointed in his current -- you know,

20  as a prospective settlement trustee, Your Honor.

21         Thank you very much for hearing me.

22         THE COURT:  Thank you.

23         Okay, let me hear from counsel on behalf of

24  Mr. Green, which is the only objection that I see.

25         MS. ROWE:  Good afternoon, Your Honor, I'm Rachael

1 Rowe for Professor Green and Resolutions.  Can you hear me

2 okay?

3          THE COURT:  Yes, Ms. Rowe.

4          MS. ROWE:  Thank you.  Before I address the points

5 raised by Mr. Schiavoni, do you have any specific questions

6 you'd like me to answer?

7          THE COURT:  Well, I'm curious about a pre-

8 mediation privilege.

9          MS. ROWE:  Well, I'm glad that you are.  Contrary

10 to Mr. Schiavoni's statement that there are no cases that

11 discuss pre-mediation privilege, in fact two of the four

12 cases relied on by the moving insurers here specifically

13 state that materials prepared in advance of mediation and

14 preparation for mediation are indeed privileged.  Those two

15 cases are the _Folb_ case and the _RDM_ case, which Mr. Schiavoni

16 mentioned.

17          The _Folb_ case, which is a Central District of

18 California case from 1998, specifically states, Your Honor,

19 "Communications to the mediator and communications between

20 the parties during the mediation are protected.  In addition,

21 communications in preparation for and during the course of

22 mediation with a neutral must be protected."

23          And the _RDM_ case, which Mr. Schiavoni mentioned,

24 states, "The mediation privilege should operate to protect

25 only those communications made to the mediator between the

1    parties during the mediation or in preparation for the

2    mediation."

3              So, clearly, preparation for mediation is indeed

4    privileged.

5              And, you know, I just sort of want to step back

6    for a second and explain the position that Professor Green

7    finds himself in here.  First of all, it's not a situation

8    where he was served with discovery requests and just outright

9    refused to produce responsive documents.  Really, to the

10   contrary, we produced hundreds of responsive documents from

11   both before the period when he was asked to work on

12   preparation for the mediation in the case and from after

13   June 9th, 2020, when you determined that he should not be

14   appointed a mediator in the case.

15             So the reason that he asserted a privilege is

16   because he's obligated to do so.  And in its papers the

17   moving insurers, and Century in particular, claimed that we

18   introduced no evidence that Mr. Green, Professor Green was in

19   fact acting as a mediator, together with Mr. Finn, in

20   preparation for the mediation during the discrete time

21   period, which is roughly 75 days in the spring of 2020 where

22   we asserted the privilege, and the issue is that he was

23   acting in that role.

24             You have a letter attached to my declaration in

25   support of our objection, which is 6299-1, from Mr. Finn,

1  which specifically states that he was working with Professor

2  Green during that time period and requests that the Court

3  maintain a privilege over those documents.  You also have

4  Professor Green's declaration in support of the objection,

5  which is 6299-1, at paragraphs 8 through 13 where he

6  describes being contacted by parties in late March of 2020 to

7  work on the mediation with Mr. Finn, and in fact working on

8  preparation for the mediation from that period of time

9  through June 9, 2020, when you issued your order.

10         So he clearly was working on the mediation.  The

11  cases cited by the insurers themselves clearly hold that work

12  in preparation for the mediation is privileged.  And most

13  importantly, from Professor Green's standpoint, is that he

14  understood from the parties that they expected him to

15  maintain the confidentiality over information that was shared

16  with him.  And ABA's standard of conduct for mediators,

17  Standard 5, requires him as a mediator to assert the

18  privilege.

19         Now, he recognizes absolutely that it's not

20  ultimately his call.  His obligation was, when receiving the

21  document requests, to assert the privilege over this finite

22  set of documents and he's done that.  Ultimately, it's your

23  decision whether that privilege should be invaded, whether

24  Century and the other insurers' need for the information

25  outweighs the need to protect the information that's been

1  recognized by this Court and others in connection with the

2  mediation privilege, Your Honor.

3          THE COURT:  Well, those cases, I assume, though,

4  are situations where the mediator was in fact a mediator.

5  Here, for whatever reason, the parties decided on their

6  own  -- and I guess Professor Green assented to it -- to

7  start before the appointment was approved.  So there was

8  never an assurance that in fact I would approve a mediation

9  or any particular mediator.

10          So what kind of reasonable reliance could anybody

11 have in a situation where the Court has to approve mediation

12 to just do that?  It's different than a private consensual

13 situation where the parties are agreeing as a matter of

14 private contract to mediate, that's not what this scenario

15 was.

16          MS. ROWE:  I don't disagree with you, Your Honor,

17 it is different, but in fact the vast, vast majority of

18 mediations that happen in this country are not court-

19 supervised or court-sanctioned mediations, they're mediations

20 between private parties --

21          THE COURT:  Right.

22          MS. ROWE:  -- in connection with the litigation

23 and the privilege applies.  And there's not a single case out

24 there that says that the privilege and the mediator's duty to

25 keep information confidential and refuse to disclose it

1  somehow evaporates because ultimately they weren't appointed

2  by the Court.  In fact, although neither party cited this

3  case, there is a case that's sort of on all four corners from

4  the Delaware Chancery Court, and it's 2013 Del. Ch. LEXIS

5  115.  And the reason I say it's on all fours is the Chancery

6  Court, like this Court, has a local rule that governs the

7  mediation privilege.

8           In that case, like in this case, the parties began

9  a mediation outside that court's rules on mediation, so

10  outside the application of the Chancery Court rules on

11  mediation privilege.  Ultimately, the case was resolved in

12  that mediation -- again, outside supervision of the court --

13  and later a dispute arose over whether -- really over the

14  terms of the settlement, and one of the parties that was a

15  proponent of these settlement terms submitted a communication

16  from the mediator that supported its assessment of the terms

17  of the settlement.  The opposing party moved to strike that

18  communication from the court -- or from the record and

19  essentially said that the mediator had an obligation to

20  protect that information from disclosure pursuant to the

21  mediation privilege, and the Delaware Chancery Court agreed

22  and struck it.

23           The Delaware Chancery Court ruled, even though the

24  mediation was done outside its supervision and so,

25  technically, the Delaware Chancery Court's rules on mediation

1  privilege didn't apply, the mediator, nevertheless, was still

2  under the same obligation to maintain the information as

3  confidential and to not disclose it.

4           So, you know, again, Your Honor, I don't think

5  that there's any real dispute here as to whether Professor

6  Green and Mr. Finn understood that he was acting as a

7  mediator and in preparation for the mediation of the case.

8  The ABA model standards don't allow Professor Green to

9  disclose the information unless the parties consent -- we're

10 not aware of that happening here -- or at --

11          THE COURT:  But no one has objected either?  I'm

12 sort of surprised I don't have any other objection in front

13 of me, I don't have the parties to the mediation objecting.

14 And this has been out on notice now for quite a while.

15          MS. ROWE:  Obviously, I can't speak to that, Your

16 Honor.  I know that they -- I know I can tell you they

17 haven't contacted Mr. Green, Professor Green to consent, and

18 so for that reason, as I said, he's obligated to assert the

19 privilege.  But, again, ultimately, if you decide that the

20 documents should be disclosed, he will indeed disclose them.

21          And I just want to mention, though, sort of

22 specifically this issue raised by Mr. Schiavoni about

23 documents between Carmen Reis and Eric Green and Mr. Molton

24 from the February 2021 time frame and later, to be clear, we

25 didn't withhold those documents based on mediation privilege.

1  You'll see from the privilege log itself, those documents

2  were withheld based on attorney-client privilege and that's

3  because Mr. Molton was working as counsel to entities that

4  Professor Green and Ms. Reis serve as trustee for.  And the

5  documents and communications in question really related to

6  those underlying attorney-client issues and that's why those

7  were withheld.  You know, obviously, the mediation privilege

8  applies to documents that were either, you know, created or

9  obtained by Professor Green during that, again, discrete

10 period of time when he was serving as a mediator in the case,

11 together with Mr. Finn.

12          And I guess one other thing I'd like to say before

13 I address any additional questions you have is that I very

14 much appreciate what Mr. Schiavoni said about not seeking

15 documents that reflect communications between Professor Green

16 and his staff at Resolutions and Mr. Finn and his folks at

17 Commonwealth, and that is helpful and certainly narrows the

18 issues.  And I just would ask that he would confirm that his

19 agreement not to seek those documents also covers Professor

20 Green's internal notes of conversations that he had with

21 Mr. Finn during that time period.  As I stated, Mr. Finn has

22 asked in writing that those documents be protected from the

23 disclosure.

24          Judge, do you have any other questions?

25          THE COURT:  No, I don't.  I just -- I'm struggling

1  with the idea that when approval of the court is required to

2  go to mediation and to appoint a mediator that the parties

3  and the proposed mediator believe that they can start having

4  communications, I just don't -- I think it is very different.

5  And, from what you're telling me about the Chancery Court

6  decision, that's different.  That was a private -- as I

7  understand what -- how you recited the case, that was a

8  private mediation, then someone files a suit in the Court of

9  Chancery, and the Court of Chancery upholds the private

10  mediation either agreement or disclosures, based on the

11  Chancery Court rule perhaps.

12       But I could certainly see a situation where a

13  mediation had happened pre-bankruptcy, private, between

14  parties to settle something and then somebody tries to use

15  that information gathered there in the bankruptcy case.  Then

16  I say, well, no, let's take a look at what you did pre-

17  bankruptcy, what agreement was in place, let's consider

18  perhaps the state law that governed that mediation, and let's

19  look at that, that would be how I would evaluate that.  This

20  is different.  This is where the mediation can't happen and

21  the mediator is not appointed until I rule.

22       And so that's, to me, a different scenario.  And

23  maybe we don't see those cases because people don't do this,

24  because people don't presume that the motion will be granted

25  and that they will be mediator, and the parties don't start

1  communicating with that person and putting that mediator in

2  the position of receiving information which perhaps they

3  shouldn't yet receive.  I understand Professor Green's

4  position and I don't necessarily think I disagree with it,

5  that he should raise it and let the Court figure it out.  I

6  probably agree that that's the better -- the better position

7  for him out of caution and for his reputation as a mediator,

8  et cetera, I get that, I get that.

9          MS. ROWE:  Thank you.

10          THE COURT:  He --

11          MS. ROWE:  I guess the only point maybe, if I can

12  sort of address the issue that you raised with respect to,

13  you know, the application of the privilege in these

14  particular circumstances, and I guess what I would say is

15  that I think the application of the privilege here is

16  consistent with what the court ultimately determined in the

17  Tribune case.

18          And I recognize, without reservation, that that

19  case involved in fact a mediator who was formally appointed

20  by the board and parties who were operating a mediation

21  order, and specifically in accordance with the local rules on

22  the mediation privilege.  But I will note that Judge Carey in

23  that opinion really relied on the reasoning set forth in the

24  Scheldone (ph) case, which was from the Western District of

25  Pennsylvania from 2000.

1    And Judge Carey, when -- you know, I'm not going

2 to recite all the language about why he explains that, you

3 know, observation of the mediation privilege is important,

4 but -- and I think the key sentence that he states for our

5 purposes is, "This policy is also reflected in Local Delaware

6 Bankruptcy Rule 9019-5(e)."

7    And I think what he's saying there -- and I don't

8 think there should be any real question about this -- is that

9 really the Local Bankruptcy Rule 9019-5(e) is a codification

10 of the policy to protect communications that are made by

11 parties that they expect that a neutral will keep

12 confidential.  And Scheldone in fact actually specifically

13 adopted the federal mediation privilege; I recognize this

14 court didn't do that in Tribune.

15    But, you know, for those reasons and really, you

16 know, for all of those that we state in our brief, we think

17 that the privilege assertion was important and reasonable.

18 As I said, we've produced hundreds of documents from both

19 before and after the period of time when he worked as a

20 mediator and, frankly, we feel comfortable leaving it in your

21 capable hands to decide anyway whether the privilege should

22 be asserted in this case or not.

23    THE COURT:  Thank you.  I will mention, I read

24 Professor Green's article on mediation privilege, and I

25 recognize it's dated at this point, but it was an interesting

1  read, his heretical view.

2           MS. ROWE:  Yeah.  It was, obviously, before the

3  mediation privilege had been adopted by statutes or courts

4  across the country back in the 1980s, but, yes.

5           THE COURT:  An interesting view.  Okay.

6           Mr. Schiavoni?

7           MR. SCHIAVONI:  I just have a couple quick points,

8  but if I may just observe on behalf of everyone just our --

9  my utter amazement that Your Honor has time for spare

10  reading, I've long since lost it just preparing for your

11  hearings.  So it's amazing the time you have.

12           THE COURT:  It's defensive, it's defensive in

13  nature.  When you start from nothing, then, you know, that's

14  where you end up.

15           MR. SCHIAVONI:  So, Your Honor, I've got just a

16  couple of quick points.  One, the proposed order that was

17  attached with the application, the mediation motion, was not

18  one *nunc pro tunc*; that setup was known to everybody at the

19  time.  It was also known pretty quickly that the application

20  was opposed.

21           I think for both of those reasons, there was no

22  reasonably reliance, you know, to be had here that before the

23  appointment order, one could rely upon mediation.

24           You know, the third thing that goes to the same

25  point is that the whole mediation order was structured in a

1   way that one had to be, quote, like, made a party to the

2   mediation, as far as the parties, themselves go.  So, pre-

3   entry of order, there were no mediation parties under the

4   record to mediate with and I don't think there was any actual

5   mediation pre-entry of a mediation order.  There's no

6   affidavit that supports that or that's been offered in

7   support of it.

8          If you remember how the case developed, there was

9   this whole thing about how the protective -- until the bar

10  date sort of ran, like, the debtor was complaining that the

11  mediation couldn't sort of get going.  So, this whole thing

12  about pre-mediation -- it's like, yes, it's true.

13         As far as RFS Sports goes, yes, there's a line in

14  there that says, you know, preparation for mediation is

15  covered, but what it's not saying is preparation to be a

16  mediator, you know, is covered.  Yes, once a mediator is

17  appointed and a mediation is scheduled, you know, one's

18  preparation for it could fall into that category, but that

19  was -- that's just not the fact pattern that we have here, at

20  all, and it just wasn't reasonable to rely on this for

21  anyone; that's one.

22         Two, the notion that these communications with

23  Mr. Molton are being withheld on attorney-client grounds, I

24  guess that means -- it's sort of a surprise to me, but I

25  guess it's an assertion that of attorney-client between

1  Mr. Molton and Mr. Green, which is not something we knew

2  about.  I don't know what that's about.

3         But it seems to me even if there is an attorney-

4  client relationship between the two of them, that to the

5  extent that they were talking about the Boy Scouts, that

6  would seemingly fall outside of that attorney-client

7  relationship and those communications should be, you know,

8  presented to us in an unredacted way.

9         The last here is, I'm sure Your Honor looked at

10  it, but U.S. Fidelity is a case where Mr. Green was very

11  involved on a mediation privilege, where the Court really

12  found that he had overapplied it.  I'm totally fine if he was

13  being caution here, and that's fine, but I think the

14  communications post-failure to be appointed are sort of

15  indisputably, should be produced and the pre-communications

16  should also, for the reasons we asserted.

17         We're not asking for his communications or that of

18  his staff with the three mediators in the case.  I don't know

19  what the notes issue are, but if they're genuinely notes

20  between them, that's fine, too; we'll exclude those.

21              THE COURT:  Okay.

22              MS. ROWE:  Thank you.

23              Your Honor, may I address, quickly,

24  Mr. Schiavoni's points?

25              THE COURT:  Yes.

1          MS. ROWE:  With respect to his knowledge that

2   Mr. Molton served as counsel to Professor Green, that was

3   disclosed in Exhibit H to the confirmation -- excuse me -- to

4   the disclosure statement, as requested by the Court.  During

5   the progress of the disclosure statement hearing, it was

6   clearly disclosed that Mr. Molton served as counsel to

7   Mr. Cotterdross (phonetic) and that Professor Green is the

8   trustee of that trust and, clearly, the insurers knew and

9   understood that and that's why that privilege is asserted.

10  Certainly, we can talk about producing an unredacted form,

11  redacting key plan information if that's what Your Honor

12  wishes.

13          Also, just with respect to the reliance issue and

14  Mr. Schiavoni's statement that it was understood pretty soon

15  after the motion to appoint mediators that there was some

16  objection on there.  I'll just note that the motion to

17  appoint the mediators was on April 30th of 2020, which was

18  about halfway through the period of time that Professor Green

19  was working in preparation for the mediation.

20          And I'll just say that our objection sort of lays

21  out, there really are four basic categories of documents that

22  were withheld on the basis of the mediation privilege.  And

23  Category 3, which is sort of documents and communications

24  related to the application for appointment, that's the vast

25  majority of them.

1      And Professor Green acknowledges, they're not

2  particularly sensitive, but they do have a nexus two the

3  mediation and they involve communications between him and the

4  mediating parties.  So, again, under the ABA standard, he was

5  required to assert the privilege, which is, again, leaves it

6  in your hands to determine whether the privilege should apply

7  to preclude the disclosure of those documents.

8      THE COURT:  Okay.  So, are you saying that there

9  could be a document that says -- from, let's say, debtors'

10 counsel, that says, Hey, Professor, are you available and do

11 you have the time and do you have any interest in being the

12 mediator for Boy Scouts?

13     And that could be covered in here and that is

14 mediation privilege is being asserted over that?

15     MS. ROWE:  Well, there isn't a document like that,

16 that's covered.

17     I guess what I'm saying is that I'm just trying to

18 clarify that the vast majority of documents fall into this

19 Category 3, which is really documents from May of 2020 up

20 through the date of your order, and that's primarily

21 communications about the motion for appointment and

22 disclosures that were requested so forth in the midst of

23 briefing on that motion, that sort of thing.

24     Those documents, those communications, we assert a

25 privilege over, again, because of the way the ABA model

1  standard reads to require a mediator to do.  But those

2  documents are set forth pretty clearly in our objection, what

3  the categories are.

4        And I appreciate, again, Mr. Schiavoni making

5  clear that they're not seeking, sort of the more substantive

6  communications, as between Professor Green and Mr. Finn and

7  documents reflecting those communications; anyhow, so I just,

8  I really just wanted to clarify that point.

9        And then, finally, on the USF&G case, I would just

10  note that, really, I'm not sure why the insurers cited it.

11  What the case held was that documents exchanged between the

12  mediating parties -- not the mediator -- but between the

13  mediating parties, after the conclusion of the actual

14  mediation, couldn't later be claimed to be privileged and

15  protected.  That's all that case said.

16        That's not what is at issue here.  Really, the

17  documents that are being (indiscernible) that, you know, that

18  are the mediator documents, so thank you.

19        THE COURT:  Thank you, very much, Ms. Rowe.

20        Mr. Molton, I see you had your hand up.  Is that

21  because your name has been mentioned?

22        MR. MOLTON:  Repeatedly, Your Honor.

23        If it were only mentioned once or twice, I

24  probably wouldn't have done it, but we really don't have a

25  dog in this hunt, other than, you know, and to the extent

1   that Ms. Rowe identifies attorney-client documents in

2   connection with our work on the <u>Takata</u> trust, which, you

3   know, Your Honor, comes out of your next-door neighbor, Judge

4   Shannon's courtroom.  You know, that's that.

5              But, you know, one of the things, Your Honor, I

6   just want to say, with respect to all of the mentions, you

7   know, I'm not an advocate of advocating by *innuendo* and,

8   unfortunately, in this case, that happens all too often.

9              At the proper time, again, we didn't object.  As

10  Your Honor noted, the mediation parties didn't object and we

11  look forward to the time that, if and when this gets in front

12  of Your Honor on the merits, we'll have a fair and fulsome

13  discussion.  That's all I want to say.

14             THE COURT:  Okay.  Thank you.

15             Okay.  I'm going to rule on this at the same time

16  as I rule on the other mediation matter and get my head

17  straight on where I come on all this.

18             One thing that I didn't bring out with me that I

19  did read was the commentary to the Model Rules -- I'm

20  sorry -- the uniform law, which has only been adopted in

21  about 12 states.  The commentary is very interesting and it

22  talks about self-determination and the expectation of the

23  parties, and it gives you a framework to approach these

24  things, even if your Circuit has not adopted federal common

25  law privilege and even if your state hasn't adopted the model

1   on the uniform law, et cetera, but this is helpful.

2          As I said, I'm going to get back to parties

3   promptly with respect to this.  The arguments have been

4   helpful.

5          Okay.  What's next, Mr. Abbott?

6          Thank you, Ms. Rowe.

7          MS. ROWE:  Thank you.

8          MR. ABBOTT:  Your Honor, I think that puts us up

9   to Mr. Mones' motion to withdraw, if I'm not mistaken,

10  Number 6.

11         THE COURT:  And I have addressed that.  That's

12  what I addressed during the break for you.  So, we're on the

13  next matter.

14         MR. ABBOTT:  Number 7 was the Zurich motion, that

15  I understand from Mr. Plevin, has been withdrawn.  Maybe he

16  would want to recite that or confirm that for the Court

17  before we move past it?

18         THE COURT:  Yes.

19         Mr. Plevin?

20         MR. PLEVIN:  Yes, Your Honor.

21         Mr. Abbott is correct; I sent him an email to that

22  effect an earlier today.  We were able to, as part of the

23  confirmation discovery, serve all the discovery that we were

24  hoping to or thinking we might need to join, and so it's

25  appropriate to withdraw that, and I apologize for not having

1   done that sooner.

2           THE COURT:  Not a problem.  Thank you.

3           Okay.

4           MR. ABBOTT:  Your Honor, I think that leaves us in

5   the remaining sort of what I would call "substantive matter,"

6   is Number 9, which I believe was to be a status conference.

7           And I'll turn it over to Mr. Sullivan, who I

8   believe will handle that.

9           THE COURT:  Yes, Mr. Sullivan?

10          MR. SULLIVAN:  Good afternoon, Your Honor.

11          Bill Sullivan of Sullivan Hazeltine Allinson, on

12  behalf of Mark J. Bern & Partners Law Firm.

13          Your Honor, thank you for scheduling this as a

14  status conference today.  I know that we did send you -- I

15  sent you a letter yesterday regarding the need for scheduling

16  assistance.  So, let me just give you a brief background

17  before we get to the status conference.

18          The motion to quash is a motion to quash a

19  subpoena issue to KLS Legal Solutions by Century.  KLS Legal

20  Solutions provides paralegals and other litigation support

21  services personnel, exclusively, to Bern & Partners; they do

22  so for more than just the Boy Scout case, and they are

23  located in the same office suite as Bern & Partners in their

24  Pennsylvania office in Conshohocken.

25          On behalf of Bern & Partners, we filed a motion to

1  quash the subpoena, asserting that any information or

2  communications involving KLS or held by KLS or protected by

3  the work product community and/or the attorney-client

4  privilege.

5        Your Honor, this happens to fit into a bit of a

6  procedural, I guess, gray area.  The Century subpoena was

7  issued on September 14th.  That was before confirmation

8  discovery scheduling was put into place.

9        We filed a motion to quash on September 28th.

10 Your Honor, the confirmation order, including certain

11 confirmation discovery protocols, was entered on October 8th.

12 Also on October 8th, the tort claimants committee issued

13 their own subpoena to KLS and then on October 12th, Century

14 filed a response to the motion to quash.

15        And so, that led us to Friday, when the item was

16 put on the agenda and the parties began conferring

17 procedurally, ultimately leading to the letter that I wrote

18 yesterday, that it would be premature to decide the issue on

19 the merits today because we certainly objected to the TCC not

20 being included with any ruling Your Honor was going to make

21 on the issues.  We believed it was appropriate for all issues

22 to be addressed at once.

23        And that also requires us to try to harmonize the

24 pleadings so we don't have multiple pleadings on the same

25 issue.  And then as the letter discloses, the third issue,

1   about what sort of discovery record the Court will need to

2   appropriately rule on the various claims.  And on that, we

3   also believe that the parties will need to confer before we

4   shove everything in front of Your Honor, in short order.

5        So, that was the genesis of the letter.  I have

6   been communicating with Mr. Stamoulis on behalf of Century

7   and Gillian Brown, on behalf of the committee about these

8   various procedural matters.  We did try to see if we could

9   all speak yesterday, but schedules did not permit and that's

10  what led to the letter.

11       So, sorry for the long lead-in, but that sort of

12  puts us where we are today, which is an appropriate, you

13  know, structural or procedural framework to resolve the

14  issue, you know, at one time at one hearing and permit the

15  parties time to confer to see if those issues can be reduced.

16       THE COURT:  Okay.  I did see the letter yesterday

17  and I read the reply.  There was a reply filed by Century

18  suggesting that a discussion needed to happen for compliance

19  with the Local Rules and then I didn't realize that the TCC

20  had also served a subpoena.

21       So, I do believe that this matter should be

22  coordinated so that it's only put in front of me once with

23  any party that's seeking to subpoena this entity, and that

24  the parties, in the first instance, ought to see if they can

25  work it out.  But I am prepared, once the parties have

1   discussed it, I am prepared to hear the matter promptly so

2   that it gets resolved.

3           Is there anyone else who would like to address me

4   on this?

5           MR. O'NEILL:  Your Honor, James O'Neill.

6           THE COURT:  Mr. O'Neill?

7           MR. O'NEILL:  Your Honor, James O'Neill of

8   Pachulski Stang Ziehl & Jones, on behalf of the TCC.

9           As Mr. Sullivan indicated, we, too, did issue a

10  subpoena and we are in discussions with Mr. Sullivan.

11  Obviously, the motion currently before you doesn't address

12  any of the -- it doesn't address the TCC subpoena; although,

13  they are similar and similar issues.

14          We're certainly willing to continue our

15  discussions with Mr. Sullivan and kind of see where we go,

16  and if all else fails and we're not able to reach some

17  agreement, then we'll be back before you, Your Honor.

18          THE COURT:  Thank you.

19          Mr. Stamoulis, do you have anything to add, or

20  Mr. Schiavoni?

21          MR. SCHIAVONI:  No, Your Honor.

22          We'll cooperate with Mr. Sullivan.  He's a

23  gentleman.  I appreciate working with him.

24          But, Your Honor, if I may, just on a bigger-

25  picture front, you know, this schedule was set.  To say it's

1  aggressive is, you know, is true; maybe it's more than

2  aggressive.

3          But, you know, Your Honor did suggest that

4  cooperation all around would be helpful.  I'm fine with

5  Mr. Sullivan, but the bigger picture here is that, you know,

6  we did serve discovery on the Coalition, you know, more than

7  a month ago.  They asserted everything as privilege and

8  hasn't produced anything.

9          All the Coalition firms that were served something

10  are in the same basic boat here, where they're opposing.  The

11  aggregators that supported them, every one of them has

12  stonewalled the subpoenaed we served.  And we served them as

13  soon as we could after Your Honor granted the 2004 discovery.

14          They're all taking the position that they're going

15  to proceed in the courts where they're located, oppose

16  transfer.

17          Mr. Kosnoff's counsel told us earlier this morning

18  that he, even though he's filed a document stating he's a

19  party in this case, he, himself, is going to oppose and take

20  us to Portland or California, wherever it is, to deal with

21  that.

22          So, I just wanted the Court to know we're

23  basically, like, working as fast as we can.  We will try to,

24  you know, we will consider motions to transfer them all to

25  this court or whatever is the fastest way to resolve them,

1  but we're not getting a huge amount of cooperation.

2          THE COURT:  Thank you.

3          Mr. Alberto?

4          MR. ALBERTO:  Good afternoon, Your Honor.

5          Justin Alberto from Cole Schotz.

6          Can you hear me okay?

7          THE COURT:  I can.

8          MR. ALBERTO:  Thank you, Your Honor.

9          My firm represents Slater Slater & Schulman, which

10 is one of the firms that Mr. Schiavoni just mentioned had

11 been served with discovery.  And while my client does not

12 have a matter pending today, I agree that there are, likely,

13 more discovery motions coming down the pike with respect to

14 law firms.

15         Many, if not all of the law firms have taken the

16 position that they, as a law firm, are not a party in

17 interest to this proceeding; they've appeared only as

18 advocates for their client or clients, did not file any

19 claims on behalf of their actual law firms, et cetera.  So, I

20 think to say that we've stonewalled and have not cooperated

21 is a misstatement; we have just simply taken the position

22 that the law firms are not party to this dispute and plan

23 discovery is outside the bounds of appropriate discovery

24 limits.

25         None of this is before you today, Your Honor, but

1  I did want to rise and just mention that we're not

2  stonewalling; we, simply, right now, have a disagreement with

3  the insurers, who propounded the discovery.  And if it ever

4  comes before you, you will have, of course, a complete record

5  at that time to make any factual or legal decisions that you

6  have to.

7           THE COURT:  Okay.  Thank you.

8           I do realize it's not in front of me.

9           Mr. Brown?

10          MR. BROWN:  Your Honor, this is really echoing

11  what Mr. Schiavoni just said, because the TCC has similarly

12  served subpoenas on some of the aggregators and litigation

13  financers and other third parties.  We have gotten back the

14  same responses, which are a complete refusal to cooperate.

15  They're either going to be moving to quash in other

16  jurisdictions or just flatly refusing and making us go to

17  other jurisdictions to compel.

18          So, as I was watching this mass of discovery

19  responses -- and there were hundreds of them going back and

20  forth, notices of, you know, filing discovery responses last

21  night -- given that the schedules that we're operating under,

22  it's, to be perfectly candid, it leaves me feeling nauseous

23  about actually the reality of doing this without cooperation.

24          Given the deadlines we're under, I just -- and I

25  think even Hartford referred to this earlier today -- is that

1    it's a great to shoot for a January 24 hearing date, but the

2    reality is very, very difficult to conceptualize, given the

3    mass of discovery that's being dealt with, the logistical

4    hurdles with accommodating so many people who are doing

5    discovery, and are going to want to be taking deposition, and

6    the very short time frames that we have for doing this all.

7            THE COURT:  Well, I think that just counsels

8    toward being selective in the discovery that you take and

9    making certain that the discovery that you propound -- and

10   "you" meaning every party -- propound, is really necessary

11   and proportional and appropriate.

12           And if everyone prioritized their discovery, I

13   suspect it would be helpful, but I can't truncate people's

14   rights.  We'll deal with it as we can.

15           Mr. Wilks?

16           MR. WILKS:  Well, Your Honor, I was just about to

17   lower my hand, but now that I've been called on, let me just

18   take a minute, because, once again, Mr. Schiavoni has invoked

19   Mr. Kosnoff's name.

20           Again, my -- oh, I'm sorry, I'm not on video; I

21   apologize -- so, to say that it's a stonewall job is really

22   inappropriate, Your Honor.  Mr. Schiavoni emailed me last

23   night and we had an exchange last night.  I refined my

24   responses this morning.

25           The problem we have is twofold; one, he issues

1  subpoenas out of the Central District of California and

2  Rule 45 says, the Central District of California is the place

3  or is the venue that needs to address any motions to compel

4  or motions for (indiscernible).  I told him I'd work with him

5  on that, I'd discuss it with him.  You know, we haven't

6  gotten together on that yet.

7        Secondly, what is left of his discovery requests,

8  he subpoenaed, I think there were 14 different requests.

9  There were four of them, I think were -- we could say there

10  is nothing responsive; the rest is basically asking for

11  Mr. Kosnoff's file, you know, and all his correspondence with

12  his co-counsel and his clients and so forth.

13        Your Honor, those are things that we can't turn

14  over without an order and I don't think Your Honor or any

15  Court would issue an order of that nature without some really

16  extreme showing.

17        So, I'm working with Mr. Schiavoni.  I'm happy to

18  talk to him if he can find the time to give me a buzz when

19  we're both available.  But this isn't a stonewall job, Your

20  Honor.  We have a lot of law firms here who are protecting

21  their clients' privileged information.  So, we're going to

22  have to work through it.

23        I understand Mr. Brown's concerns, too.  We are

24  all looking at the calendar and wondering how it gets done,

25  but that's not something that we have to worry about right

1  now.

2            THE COURT:  Okay.  Thank you.

3            Then, I will wait to hear back from the parties

4  with respect to discovery disputes that are not resolved and,

5  as I said before, I will reiterate, I will make myself

6  available as quickly as I can to address the discovery

7  disputes in this case, but they have to be brought in front

8  of me.

9            Okay.

10           MR. SULLIVAN:  Your Honor, Bill Sullivan.

11           One more point, Your Honor, just about the pending

12  matter that is on the agenda for today, you know, our motion

13  to quash.  Your Honor, we plan to obviously continue

14  discussions with the TCC and Century regarding the procedural

15  way to resolve this and, Your Honor, I am mindful that your

16  October 8th order talks about using letters to handle any

17  discovery disputes, but the parties have already had filings,

18  pleadings filed in the case.

19           And so, you know, I thought at present, we were

20  planning to file a reply on the motion yesterday before Your

21  Honor granted turning it into a scheduling conference, but

22  our present plan would be to continue to file by pleadings,

23  since this matter was initiated before that order was

24  entered.

25           THE COURT:  That's fine.

1          MR. SULLIVAN:  Okay.  Then we'll confer and to the

2    extent we need to get back before Your Honor, we'll do that.

3          THE COURT:  Okay.  And let me say, again, this

4    matter does not need to wait until the next omnibus date.  If

5    I can't be resolved, I can take it off, you know, calendar,

6    and I can set a special hearing to hear this.

7          So, we're going to address discovery disputes as

8    they arise; they don't need to all wait for the next omnibus

9    day.

10          Okay.  Mr. Abbott, what's next?

11          MR. ABBOTT:  Thank you, Your Honor.

12          The last two items on the agenda, I believe, are

13    Items 10 and 11.  Item 10 is the debtors' motion for leave to

14    file an omnibus reply to their motion for a protective order.

15    Number 11 is the motion by the TCC, Century, and AIG to

16    exceed page limits regarding their omnibus replies.

17          So --

18          THE COURT:  Okay.  We'll enter orders on those.

19          MR. ABBOTT:  And with that, Your Honor, I think

20    that is the balance of the agenda.

21          THE COURT:  Okay.  Thank you.

22          As I said, I will get back to you quickly on the

23    privilege issues.  I anticipate ruling from the bench.

24          Mrs. Johnson will reach out when I have my

25    thoughts together and we'll reconvene; not today, not this

1  afternoon.

2      (Laughter)

3          THE COURT:  Okay.  Thank you, everyone.

4          We're adjourned.

5          COUNSEL:  Thank you, Your Honor.

6      (Proceedings concluded at 2:52 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ William J. Garling                    October 20, 2021

8    William J. Garling, CET**D-543

9    Certified Court Transcriptionist

10   For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25