```
 1                   UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3                                    .    Chapter 11
      IN RE:                          .
 4                                    .    Case No. 20-10343 (LSS)
      BOY SCOUTS OF AMERICA AND       .
 5    DELAWARE BSA, LLC,              .
                                      .    Courtroom No. 2
 6                                    .    824 North Market Street
                                      .    Wilmington, Delaware 19801
 7                                    .
                          Debtors.    .    Monday, October 25, 2021
 8    . . . . . . . . . . . . . . . . .    11:00 A.M.

 9                    TRANSCRIPT OF TELEPHONIC RULING
             BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                    UNITED STATES BANKRUPTCY JUDGE

11    APPEARANCES:

12    For the Debtor:          Derek Abbott, Esquire
13                             MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                               1201 North Market Street, 16th Floor
14                             Wilmington, Delaware 19899

15

16

17    Audio Operator:         LaCrisha Harden, ECRO

18    Transcription Company:  Reliable
                              1007 N. Orange Street
19                             Wilmington, Delaware 19801
                               (302)654-8080
20                             Email: gmatthews@reliable-co.com

21    Proceedings recorded by electronic sound recording; transcript
22    produced by transcription service.

23

24

25
```

1          (Proceedings commence at 11:03 a.m.)

2                THE COURT:  Good morning.

3                This is Judge Silverstein.  We're here for my

4    ruling on the debtors' motion for protective order and I will

5    read it into the record.

6                Debtors filed what they titled a motion for

7    protective order on September 17th.  Debtors want me to make

8    multiple rulings regarding both discovery issues and

9    admissibility issues related to the ongoing mediation

10   proceedings for purposes of the scheduled confirmation

11   hearing.

12               In considering the objections filed by the TCC, the

13   Zalkin and Cochran Law Firms, certain insurers, the AIG

14   Companies, and the joinders by other insurers I conclude that

15   the motion is overly broad in the relief debtors seek at this

16   time, but there is one aspect of the motion that I can rule

17   on; namely, issues surrounding the trust distribution

18   procedures.

19               Some background is helpful:

20               At the request of BSA, on June 9th of last year, I

21   entered an order sending parties to mediation.  There were

22   objections, both as to the need for mediation at that time as

23   well as to particular provisions of the proposed order, and

24   with respect to the identity of the mediators.  Even though

25   modifications were made to address certain objections I would

1   not call it a consensual order.

2           The order appointed three mediators,

3           "For the purpose of mediating the comprehensive

4   resolution of issues and claims in BSA's Chapter 11 case and

5   through a Chapter 11 plan."

6           The debtors, the FCR, the TCC, the UCC, and the ad

7   hoc committee of Local Councils were very willing

8   participants.  Certain insurance companies either signed on

9   right away or apparently joined later.  At the time the

10  mediation order was entered the coalition did not yet exist

11  or, at least, had not yet appeared in the case.  With one

12  exception the mediation order provides that Local Rule 9019-

13  5(d) shall govern the mediation.  Rule 9019-5 is very broad in

14  application.

15          With respect to discovery the last sentence

16  provides that,

17          "No person shall seek discovery from any

18  participant in the mediation with respect to any information

19  disclosed during mediation."

20          This sentence is of recent vintage and has not been

21  interpreted, to my knowledge, by any of my colleagues current

22  or former.

23          The one exception in the mediation order is

24  important.  It provides that,

25          "If a party puts at issue any good faith finding

1  concerning the mediation and any subsequent action concerning

2  insurance coverage the parties right to seek discovery, if

3  any, is preserved."

4        At the time this provision was inserted into the

5  mediation order there were no proposed findings regarding

6  trust distribution procedures in a plan or conditions

7  precedent to confirmation before the court.  By the motion for

8  protective order, and as more particularly argued at the

9  hearing, debtors have identified three categories of documents

10  they seek to shield from discovery or redact based on

11  privileges.

12        The three categories of documents that debtors seek

13  to shield are minutes of board meetings of BSA's national

14  executive board, national executive committee and bankruptcy

15  task force; communications between mediation parties about the

16  terms of the Hartford settlement agreement, the TCJC

17  settlement agreement, RSA, plan, TDP's or other documents

18  filed with the plan; and drafts of settlement proposals

19  exchanged between the mediation parties including, without

20  limitation, the Hartford settlement agreement, TCJC settlement

21  agreement, RSA, plan, TDP's or other documents filed with the

22  plan.

23        The motion references three grounds for withholding

24  or redacting comments; attorney/client privilege, work product

25  doctrine and the so called mediation privilege, argument

1   focused on the mediation privilege, and the debtors and the

2   objectors focus mostly on 1129(a)(3) and the TDP's.

3           All objectors preliminarily argued, however, that

4   the request for a protective order is premature, requests an

5   advisory opinion or as more in the nature of a motion *in*

6   *limine*.  They argue that no specific discovery requests are

7   before me and no motions to compel have been filed.

8           As relayed to me at argument, in fact, further

9   discovery requests were recently propounded and responses were

10  filed the day before the hearing.  Understandably, then,

11  parties propounding the discovery did not have the opportunity

12  to review those responses in detail nor to meet and confer.

13          I agree with the objectors that the portion of

14  debtors' motions requesting rulings on admissibility of

15  evidence or premature.  I will not make these rulings divorced

16  from context.  It appears that debtors seek to have me bless

17  or not the adequacy of the record they will make at

18  confirmation.  On at least two occasions during argument Mr.

19  Kurtz stated that debtors have nothing to hide and are willing

20  to and want to put in all evidence and make any record that

21  the court wants at confirmation.

22          Debtors are confused.  Debtors, not the court, must

23  determine what record they need to make or at least offer to

24  obtain an order confirming their plan.  I will consider the

25  admissibility of evidence and any objections to it at trial or

1  perhaps on any motion *in limine* once objections to the plan

2  are filed and the issues are definitively framed.

3       The discovery dispute related to the TDP's has

4  crystalized over the last few months and I can address it.  To

5  start let me contrast the request before me now to the

6  privilege issues raised at the RSA hearing.  There I was asked

7  to find not only that the RSA was the product of debtors'

8  business judgment, a Section 363 standard, but also that the

9  RSA was negotiated in good faith.

10      I questioned what the term "good faith" meant in

11 the context of approving the RSA as it was not part of the

12 relevant standard.  The RSA parties then withdrew their

13 request for a good faith finding and I proceeded with the

14 hearing only on business judgement.  The standard before me at

15 the RSA hearing was whether debtors were reasonably informed

16 when making the decision to enter into the RSA. I addressed

17 admissibility issues and privilege assertions at the hearing

18 and in that context.

19      A debtors entry into an RSA is entirely different

20 then a debtor proposing a plan.  Entry into an RSA, while not

21 an insignificant undertaking, is, in any real sense, only an

22 interim measure.  As I said at that time debtors could file

23 the plan envisioned by the RSA without permission from the

24 court.  Now with discovery addressed to confirmation there are

25 two aspects to the context in which the privileged decisions

1  have been teed up.  The first is 1129(a)(3) standard.  The

2  second are the conditions precedent baked into the plan.

3         Turing to 1129(a)(3) first, section 1129(a)(3)

4  provides that a plan,

5         "Be proposed in good faith and not by any means

6  forbidden by law."

7         Debtors take the position that 1129(a)(3) is

8  basically a process test.  What is the process by which the

9  plan is proposed.  Debtors were quite candid at the hearing

10 about the evidence that they will adduce at confirmation to

11 meet this requirement.  Debtors are going to put into evidence

12 the fact of mediation itself, the mediation order, the

13 identity of the mediating parties, the identity of the

14 mediators, the number of mediation sessions, and the dates of

15 the sessions.

16        This evidence, debtors argue, imbue the process

17 with good faith.  They also argue that all of this evidence is

18 non-privileged and so it is both admissible and does not waive

19 any privileges that exist.

20        The TCC, somewhat surprisingly, believes the

21 process was tainted.  I say somewhat because at one point they

22 signed onto the RSA which forms a substantial basis of the

23 plan.  Century and other insurers, not surprisingly, also

24 believed the process was tainted.  Both the TCC and Century

25 want the ability to discover and admit evidence to that

1  effect.  The TCC does not tell me what in particular they

2  believe is tainted, but the insurers are clear.  As they have

3  repeatedly stated, insurers believe that debtors handed over

4  the pin to the abuse survivors to draft the TDP's which the

5  survivors then intend to use against the insurers in future

6  coverage litigation.

7      The code does not define good faith in the context

8  of 1129(a)(3).  The Third Circuits various expositions on

9  1129(a)(3) are fairly captured in Judge Owens decision in

10  Emerge Energy Services, 2019 Westlaw 7634308, and Judge

11  Andrews decision from earlier this year in Exide, 2021 Westlaw

12  3145612.

13      To quote liberally from those cases the important

14  point of inquiry is the plan itself and whether such a plan

15  will fairly achieve a result consistent with the objectives

16  and purposes of the bankruptcy code.  A plan must be proposed

17  with honesty and good intentions, and with a basis for

18  expecting that reorganization can be achieved, and with

19  fundamental fairness in dealing with creditors."

20      In making the good faith determination courts must

21  consider the totality of the circumstances focusing more to

22  the process of plan development then the content of the plan.

23  Good faith is shown when the plan has been proposed for the

24  purpose of reorganizing the debtor, preserving the value of

25  the bankruptcy estate and delivering value to creditors.  Good

1    faith has been found to be lacking if a plan is proposed with

2    ulterior motives.

3          At least as illuminating as the stated standards

4    are the circumstances courts have looked at in an 1129(a)(3)

5    analysis; for example, in Combustion Engineering, 391 F.3d 190

6    (2004), the Third Circuit recognized that the good faith

7    requirement is an additional check on a debtor's intentional

8    impairment of claims.  That the classification and treatment

9    of classes of claims is always subject to good faith.  And

10   that the Court can examine the motive of a debtor with respect

11   to classification under the good faith requirement.

12         In American Capital Equipment, LLC, 688 F.3d 145

13   (2012), the Third Circuit stated that collusive plans are not

14   in good faith and do not meet the requirements of 1129(a)(3).

15   It also ruled that a plan does not fairly achieve the

16   Bankruptcy Code's objectives when it establishes an inherent

17   conflict of interest under especially concerning

18   circumstances.  It also observed that the fact that there is

19   at least one valid purpose to the plan is not dispositive

20   because the purpose must be fairly achieved.

21         And in Washington Mutual, 461 B.R. 240, the

22   Bankruptcy Court considered in its good faith analysis the

23   role of certain noteholders in settlement negotiations, plan

24   drafting, and review, and the degree of control certain

25   noteholders exercise over the case.  Moreover, the Court

1  looked at whether any harm caused by the noteholders'

2  influence could be remedied by other means.

3          These cases reveal that good faith includes

4  process, but is not necessarily exclusively concerned with

5  process or, perhaps, process, in substance, can overlap in

6  certain instances.

7          While the focus is on the plan, debtors' motivation

8  in proposing the plan, others' participation in the drafting

9  of the plan, as well as the requirement that the plan fairly

10  achieve results consistent with the purposes of the Bankruptcy

11  Code permit, in an appropriate case, evidence beyond what BSA

12  characterizes as process.

13          Turning to the conditions precedent baked into the

14  plan, Findings (J), (Q), (R), (S), and (T) were a focus of the

15  disclosure statement hearing.

16          Findings (R), (S), and (T), in particular, are

17  directed at the trust-distribution procedures.

18          It does not appear that these findings have a code

19  or a confirmation-related purpose; rather, even as modified,

20  they appear to be more directed at most-confirmation

21  litigation with insurers.  To the extent these findings are

22  confirmation-related, however, they clearly open up discovery

23  related to the correctness of those findings.

24          It is in this setting that I turn to debtors'

25  invitation of the mediation privilege.  No party cited to me a

1  case in which the Third Circuit has acknowledged a federal

2  common law mediation privilege.  And, in, In re Lake Lotawana

3  Community Improvement District, 563 B.R. 909 (2016), the

4  Bankruptcy Court stated that of the circuits addressing the

5  issue, only the Sixth Circuit had adopted such a privilege.

6          Without a federal mediation privilege, relevant

7  information, exchanged in a confidential mediation is subject

8  to discovery, when jurisdiction is based on a federal statute.

9  But notwithstanding the lack of binding precedent in this

10  circuit, Local Rule 9019-5 exists and was incorporated into my

11  order.  As I've already said, the last sentence provides that:

12          "Except as set forth in the previous sentence, no

13  person shall seek discovery from any participant in the

14  mediation with respect to any information disclosed during the

15  mediation."

16          Aside from having absolutely no idea how this

17  sentence works in practice, it appears to be inconsistent with

18  mediation privilege, the collective nature of a bankruptcy

19  proceeding, and the fact that, notwithstanding a settlement of

20  a dispute within mediation, the Court ultimately must rule on

21  most settlements in the context of the bankruptcy case.  If

22  the approval process is met with objection, it complicates, at

23  least, the discovery process.

24          This is my "square peg, round hole" comment.  Much

25  of the law around mediation appears to be designed for two-

1  party disputes, in which the parties determine to attempt to

2  resolve their dispute consensually through mediation.  While

3  recognizing the Uniform Mediation Act has only been adopted by

4  12 jurisdictions, I found the commentary helpful in attempting

5  to understand the utility of mediation and what the precatory

6  note for the Uniform Act calls, "The appropriate relationship

7  of mediation with the justice system."

8         The drafters of the Uniform Act recognized that

9  because of the confidential nature of mediation, it was

10 necessary to tie confidentiality to the fairness of the

11 mediation process.  Fairness, in turn, is dependent upon the

12 integrity of the process and knowing consent.

13        Successful mediation is based on the integrity of

14 the process, act of party involvement, and informed self-

15 determination or, in other words, the ability to control the

16 outcome of the dispute.  These principles work well in

17 traditional, two-party disputes, in which the parties

18 voluntarily determine to try to resolve their dispute by

19 mediation and choose a mediator.

20        If both parties agree to an outcome in the

21 mediation, their dispute is resolved and litigation is

22 avoided; this is the essence of self-determination.

23        These principles do not describe the multiparty

24 mediation reflected in the mediation order, "Of a

25 comprehensive resolution of issues and claims in BSA's Chapter

1   11 case through a Chapter 11 plan."

2           Not all parties are involved in every aspect of the

3   comprehensive resolution.  Not all parties agree with the

4   comprehensive resolution.  And even if there is an agreed-to

5   resolution by most or even all of the mediation parties,

6   creditors must still vote on the plan and the Court must still

7   conclude that the relevant standards are met.  This is whole

8   not wholly consistent with self-determination.

9           Considering both, the 1129(a)(3) arguments and the

10  findings contained in the conditions precedent to confirming

11  the plan, I conclude that the communications regarding the

12  TDPs are discoverable.  There are three reasons.

13          First, debtors want to use the fact of mediation as

14  evidence of good faith.  From the argument, it appears that

15  the fact of mediation may be the primary evidence debtors will

16  induce to meet the good faith standard; as such, they have put

17  the mediation, at least with respect to the good faith of the

18  TDPs, at issue.

19          Debtors are correct that the facts that they seek

20  to put into evidence may not be privileged and courts have

21  relied upon such facts in determining good faith in the

22  context of class actions and settlements, but none of the

23  decided cases discuss any related discovery or admissibility

24  disputes.

25          It cannot be the case that if a party is relying on

1    the very fact of mediation to meet its standard of proof, that

2    discovery is prohibited regarding the *bona fides* of the

3    mediation.

4              Second, a find that the injection of the findings,

5    particularly (R), (S), and (T), into the confirmation process

6    has accelerated the insurers' reservation in the mediation

7    order with respect to discovery.  While it is true that the

8    good faith reservation is with respect to subsequent actions,

9    it is clear that the survivor representatives seek to

10   injection matters into this confirmation hearing that would

11   otherwise be determined in a subsequent action.

12             Based on the survivors submissions supporting the

13   RSA, with these findings, the survivors seek to foreclose

14   rulings that would otherwise be made in post-confirmation

15   litigation.  The survivors argue that these findings are

16   necessary to confirmation.

17             At this point, however, it is not clear whether

18   these findings are necessary in full or part, or whether these

19   findings are simply a desire to shore up disputes with non-

20   settling insurers.

21             And at that point, insurers are choosing to engage

22   on these findings; certain insurers are.  Whether they will

23   continue to do so or simply argue that the findings are not

24   appropriate, I don't know, but in the meantime, discovery is

25   appropriate.

1          Third, debtors do not suggest that evidence with
2   respect to the negotiation of the trust distribution
3   procedures is otherwise available from another source outside
4   the mediation process; accordingly, I deny debtors' motion to
5   the extent that debtors seek to shield discovery
6   communications, oral and written, regarding the trust
7   distribution procedures, based on the mediation privilege.

8          I make no ruling as to admissibility at this time.

9          I also deny the motion, but without prejudice, with
10  respect to debtors' other requests.  I find them to be
11  premature.

12          No objector has brought discovery disputes
13  regarding the Hartford settlement agreement or the TCJC
14  settlement agreement, and at argument, certain objectors
15  suggested such challenges would not be forthcoming.

16          I will deal with any objections as they arise and
17  when I have context.  Such disputes should be brought to me
18  promptly.  These more traditional two-party disputes may be
19  evaluated differently.

20          And that concludes my ruling on the debtors' motion
21  for protective order.

22          The second motion in front of me last Tuesday was
23  Century's motion, seeking discovery from Eric Green and his
24  company, Resolutions, LLC.  Debtors proposed Professor Green
25  to be one of the three mediators.  Ultimately, I did not

1 approve him in that role.

2          Debtors now propose Professor Green as the sole

3 trustee of their survivor trust.  In response, Century seeks

4 discovery of his connections with others in the case to assess

5 his impartiality and qualifications.

6          In response to Century's request, Professor Green

7 produced certain documents, objected to the requests, and

8 provided a privilege log.  The log raises both, mediation

9 privilege and attorney-client privilege.

10          I question whether mediation privilege is

11 applicable to our situation, where private parties were not

12 free to choose their own mediators, but rather, the selection

13 was subject to approval of the Court.  Further, most of the

14 communications were made prior to the entry of the mediation

15 order.

16          I need not decide that here.  First, Professor

17 Green, both, in his submission and through his counsel at

18 argument, said he felt constrained to raise the mediation

19 privilege, consistent with ABA standards of conduct for

20 mediators, but that the decision was ultimately up to the

21 Court.  Second, no mediation party is asserting the mediation

22 privilege to block production of the requested documents.

23 Third, Century has modified its request to exclude

24 communications between Professor Green and any appointed

25 mediator, as well as any internal notes Professor Green may

1  have made, as well as Professor Green's communications with

2  his staff.

3          Under these circumstances, I conclude that the

4  documents, other than those in the excluded categories, must

5  be produced.  If those documents also contain communications

6  that are protected by the attorney-client privilege, then

7  those communications may be appropriately redacted.

8          And that concludes my ruling with respect to

9  Century's motion seeking discovery from Professor Green.

10          Okay.  Any questions?

11      (No verbal response)

12          THE COURT:  When are we next in court?

13      (No verbal response)

14          THE COURT:  I think the next day I have on my

15  calendar is the 10th.

16          Mr. Abbott, does that seem right to you?

17          MR. ABBOTT:  Your Honor, let me just pull out my

18  calendar and take a quick peek.  I think you might be correct.

19      (Pause)

20          MR. ABBOTT:  Your Honor, the best I can tell, it is

21  correct.  I think that's one of the interim status

22  conferences.

23          THE COURT:  Okay.  If there are discovery disputes

24  that can be framed prior to the 10th, I will make time to hear

25  them prior to the 10th.

1   So, I know it's been about a week since I ruled.
2  My recollection, and what I said in my rulings to the best of
3  my recollection, is that there were discovery responses that
4  were received the day before the hearing.  I am hoping that
5  people have reviewed them and that if, in fact, there's going
6  to be challenges, that people meet-and-confer.
7   And if, in fact, there are going to be challenges
8  to any of the privileged communications, that they be raised
9  as soon as possible.  And I can hear them before the 10th.
10   So, I would like the parties to be thinking along
11 those lines and I will make myself available to hear discovery
12 disputes.
13   MR. ABBOTT:  Thank you, Your Honor.
14   THE COURT:  I'd, you know, rather not get them one
15 little dispute at a time, but, actually, if that's the way
16 they come in, that's fine; we'll handle them one at a time.
17   MR. ABBOTT:  Thank you, Your Honor.
18   I misspoke.  That's a regular omnibus hearing date,
19 but I assume it doesn't change what the Court just explained.
20   THE COURT:  Doesn't change.
21   And if, in fact, there are other disputes and they
22 cannot be determined before then, they should be noticed for
23 that date.  I don't want these discovery disputes to linger.
24   Okay.  I realize this was my party, but does
25 anybody else have anything they would like to raise?

1          (No verbal response)

2               THE COURT:  Then thank you, everyone.

3               We are adjourned.

4               COUNSEL:  Thank you, Your Honor.

5          (Proceedings concluded at 11:34 a.m.)

6

7                         CERTIFICATE

8

9      We certify that the foregoing is a correct transcript

10 from the electronic sound recording of the proceedings in the

11 above-entitled matter.

12
   /s/Mary Zajaczkowski              October 25, 2021
13 Mary Zajaczkowski, CET**D-531

14
   /s/William J. Garling             October 25, 2021
15 William J. Garling, CE/T 543

16

17

18

19

20

21

22

23

24

25