```
               UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE

                                    .    Chapter 11
IN RE:                              .
                                    .    Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA AND           .
DELAWARE BSA, LLC,                  .
                                    .    Courtroom No. 2
                                    .    824 North Market Street
                                    .    Wilmington, Delaware 19801
                                    .
                 Debtors.           .    Monday, October 25, 2021
. . . . . . . . . . . . . . . . . .      11:00 A.M.

              TRANSCRIPT OF TELEPHONIC RULING
       BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                UNITED STATES BANKRUPTCY JUDGE
```

APPEARANCES:

```
For the Debtor:          Derek Abbott, Esquire
                         MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                         1201 North Market Street, 16th Floor
                         Wilmington, Delaware 19899




Audio Operator:          LaCrisha Harden, ECRO

Transcription Company:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         (302)654-8080
                         Email: gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

1     (Proceedings commence at 11:03 a.m.)

2             THE COURT:  Good morning.

3             This is Judge Silverstein.  We're here for my
4  ruling on the debtors' motion for protective order and I will
5  read it into the record.

6             Debtors filed what they titled a motion for
7  protective order on September 17th.  Debtors want me to make
8  multiple rulings regarding both discovery issues and
9  admissibility issues related to the ongoing mediation
10 proceedings for purposes of the scheduled confirmation
11 hearing.

12            In considering the objections filed by the TCC, the
13 Zalkin and Cochran Law Firms, certain insurers, the AIG
14 Companies, and the joinders by other insurers I conclude that
15 the motion is overly broad in the relief debtors seek at this
16 time, but there is one aspect of the motion that I can rule
17 on; namely, issues surrounding the trust distribution
18 procedures.

19            Some background is helpful:

20            At the request of BSA, on June 9th of last year, I
21 entered an order sending parties to mediation.  There were
22 objections, both as to the need for mediation at that time as
23 well as to particular provisions of the proposed order, and
24 with respect to the identity of the mediators.  Even though
25 modifications were made to address certain objections I would

1  not call it a consensual order.
2          The order appointed three mediators,
3          "For the purpose of mediating the comprehensive
4  resolution of issues and claims in BSA's Chapter 11 case and
5  through a Chapter 11 plan."
6          The debtors, the FCR, the TCC, the UCC, and the ad
7  hoc committee of Local Councils were very willing
8  participants.  Certain insurance companies either signed on
9  right away or apparently joined later.  At the time the
10 mediation order was entered the coalition did not yet exist
11 or, at least, had not yet appeared in the case.  With one
12 exception the mediation order provides that Local Rule 9019-
13 5(d) shall govern the mediation.  Rule 9019-5 is very broad in
14 application.
15         With respect to discovery the last sentence
16 provides that,
17         "No person shall seek discovery from any
18 participant in the mediation with respect to any information
19 disclosed during mediation."
20         This sentence is of recent vintage and has not been
21 interpreted, to my knowledge, by any of my colleagues current
22 or former.
23         The one exception in the mediation order is
24 important.  It provides that,
25         "If a party puts at issue any good faith finding

1  concerning the mediation and any subsequent action concerning
2  insurance coverage the parties right to seek discovery, if
3  any, is preserved."
4           At the time this provision was inserted into the
5  mediation order there were no proposed findings regarding
6  trust distribution procedures in a plan or conditions
7  precedent to confirmation before the court.  By the motion for
8  protective order, and as more particularly argued at the
9  hearing, debtors have identified three categories of documents
10 they seek to shield from discovery or redact based on
11 privileges.
12          The three categories of documents that debtors seek
13 to shield are minutes of board meetings of BSA's national
14 executive board, national executive committee and bankruptcy
15 task force; communications between mediation parties about the
16 terms of the Hartford settlement agreement, the TCJC
17 settlement agreement, RSA, plan, TDP's or other documents
18 filed with the plan; and drafts of settlement proposals
19 exchanged between the mediation parties including, without
20 limitation, the Hartford settlement agreement, TCJC settlement
21 agreement, RSA, plan, TDP's or other documents filed with the
22 plan.
23          The motion references three grounds for withholding
24 or redacting comments; attorney/client privilege, work product
25 doctrine and the so called mediation privilege, argument

1  focused on the mediation privilege, and the debtors and the
2  objectors focus mostly on 1129(a)(3) and the TDP's.
3           All objectors preliminarily argued, however, that
4  the request for a protective order is premature, requests an
5  advisory opinion or as more in the nature of a motion *in*
6  *limine*.  They argue that no specific discovery requests are
7  before me and no motions to compel have been filed.
8           As relayed to me at argument, in fact, further
9  discovery requests were recently propounded and responses were
10 filed the day before the hearing.  Understandably, then,
11 parties propounding the discovery did not have the opportunity
12 to review those responses in detail nor to meet and confer.
13          I agree with the objectors that the portion of
14 debtors' motions requesting rulings on admissibility of
15 evidence or premature.  I will not make these rulings divorced
16 from context.  It appears that debtors seek to have me bless
17 or not the adequacy of the record they will make at
18 confirmation.  On at least two occasions during argument Mr.
19 Kurtz stated that debtors have nothing to hide and are willing
20 to and want to put in all evidence and make any record that
21 the court wants at confirmation.
22          Debtors are confused.  Debtors, not the court, must
23 determine what record they need to make or at least offer to
24 obtain an order confirming their plan.  I will consider the
25 admissibility of evidence and any objections to it at trial or

1  perhaps on any motion *in limine* once objections to the plan
2  are filed and the issues are definitively framed.
3         The discovery dispute related to the TDP's has
4  crystalized over the last few months and I can address it.  To
5  start let me contrast the request before me now to the
6  privilege issues raised at the RSA hearing.  There I was asked
7  to find not only that the RSA was the product of debtors'
8  business judgment, a Section 363 standard, but also that the
9  RSA was negotiated in good faith.
10        I questioned what the term "good faith" meant in
11 the context of approving the RSA as it was not part of the
12 relevant standard.  The RSA parties then withdrew their
13 request for a good faith finding and I proceeded with the
14 hearing only on business judgement.  The standard before me at
15 the RSA hearing was whether debtors were reasonably informed
16 when making the decision to enter into the RSA. I addressed
17 admissibility issues and privilege assertions at the hearing
18 and in that context.
19        A debtors entry into an RSA is entirely different
20 then a debtor proposing a plan.  Entry into an RSA, while not
21 an insignificant undertaking, is, in any real sense, only an
22 interim measure.  As I said at that time debtors could file
23 the plan envisioned by the RSA without permission from the
24 court.  Now with discovery addressed to confirmation there are
25 two aspects to the context in which the privileged decisions

1  have been teed up.  The first is 1129(a)(3) standard.  The
2  second are the conditions precedent baked into the plan.
3           Turing to 1129(a)(3) first, section 1129(a)(3)
4  provides that a plan,
5           "Be proposed in good faith and not by any means
6  forbidden by law."
7           Debtors take the position that 1129(a)(3) is
8  basically a process test.  What is the process by which the
9  plan is proposed.  Debtors were quite candid at the hearing
10 about the evidence that they will adduce at confirmation to
11 meet this requirement.  Debtors are going to put into evidence
12 the fact of mediation itself, the mediation order, the
13 identity of the mediating parties, the identity of the
14 mediators, the number of mediation sessions, and the dates of
15 the sessions.
16          This evidence, debtors argue, imbue the process
17 with good faith.  They also argue that all of this evidence is
18 non-privileged and so it is both admissible and does not waive
19 any privileges that exist.
20          The TCC, somewhat surprisingly, believes the
21 process was tainted.  I say somewhat because at one point they
22 signed onto the RSA which forms a substantial basis of the
23 plan.  Century and other insurers, not surprisingly, also
24 believed the process was tainted.  Both the TCC and Century
25 want the ability to discover and admit evidence to that

1  effect.  The TCC does not tell me what in particular they
2  believe is tainted, but the insurers are clear.  As they have
3  repeatedly stated, insurers believe that debtors handed over
4  the pin to the abuse survivors to draft the TDP's which the
5  survivors then intend to use against the insurers in future
6  coverage litigation.
7         The code does not define good faith in the context
8  of 1129(a)(3).  The Third Circuits various expositions on
9  1129(a)(3) are fairly captured in Judge Owens decision in
10 Emerge Energy Services, 2019 Westlaw 7634308, and Judge
11 Andrews decision from earlier this year in Exide, 2021 Westlaw
12 3145612.
13        To quote liberally from those cases the important
14 point of inquiry is the plan itself and whether such a plan
15 will fairly achieve a result consistent with the objectives
16 and purposes of the bankruptcy code.  A plan must be proposed
17 with honesty and good intentions, and with a basis for
18 expecting that reorganization can be achieved, and with
19 fundamental fairness in dealing with creditors."
20        In making the good faith determination courts must
21 consider the totality of the circumstances focusing more to
22 the process of plan development then the content of the plan.
23 Good faith is shown when the plan has been proposed for the
24 purpose of reorganizing the debtor, preserving the value of
25 the bankruptcy estate and delivering value to creditors.  Good

1 faith has been found to be lacking if a plan is proposed with
2 ulterior motives.
3       At least as illuminating as the stated standards
4 are the circumstances courts have looked at in an 1129(a)(3)
5 analysis; for example, in Combustion Engineering, 391 F.3d 190
6 (2004), the Third Circuit recognized that the good faith
7 requirement is an additional check on a debtor's intentional
8 impairment of claims.  That the classification and treatment
9 of classes of claims is always subject to good faith.  And
10 that the Court can examine the motive of a debtor with respect
11 to classification under the good faith requirement.
12       In American Capital Equipment, LLC, 688 F.3d 145
13 (2012), the Third Circuit stated that collusive plans are not
14 in good faith and do not meet the requirements of 1129(a)(3).
15 It also ruled that a plan does not fairly achieve the
16 Bankruptcy Code's objectives when it establishes an inherent
17 conflict of interest under especially concerning
18 circumstances.  It also observed that the fact that there is
19 at least one valid purpose to the plan is not dispositive
20 because the purpose must be fairly achieved.
21       And in Washington Mutual, 461 B.R. 240, the
22 Bankruptcy Court considered in its good faith analysis the
23 role of certain noteholders in settlement negotiations, plan
24 drafting, and review, and the degree of control certain
25 noteholders exercise over the case.  Moreover, the Court

1  looked at whether any harm caused by the noteholders'
2  influence could be remedied by other means.
3           These cases reveal that good faith includes
4  process, but is not necessarily exclusively concerned with
5  process or, perhaps, process, in substance, can overlap in
6  certain instances.
7           While the focus is on the plan, debtors' motivation
8  in proposing the plan, others' participation in the drafting
9  of the plan, as well as the requirement that the plan fairly
10 achieve results consistent with the purposes of the Bankruptcy
11 Code permit, in an appropriate case, evidence beyond what BSA
12 characterizes as process.
13          Turning to the conditions precedent baked into the
14 plan, Findings (J), (Q), (R), (S), and (T) were a focus of the
15 disclosure statement hearing.
16          Findings (R), (S), and (T), in particular, are
17 directed at the trust-distribution procedures.
18          It does not appear that these findings have a code
19 or a confirmation-related purpose; rather, even as modified,
20 they appear to be more directed at most-confirmation
21 litigation with insurers.  To the extent these findings are
22 confirmation-related, however, they clearly open up discovery
23 related to the correctness of those findings.
24          It is in this setting that I turn to debtors'
25 invitation of the mediation privilege.  No party cited to me a

1  case in which the Third Circuit has acknowledged a federal
2  common law mediation privilege.  And, in, In re Lake Lotawana
3  Community Improvement District, 563 B.R. 909 (2016), the
4  Bankruptcy Court stated that of the circuits addressing the
5  issue, only the Sixth Circuit had adopted such a privilege.
6           Without a federal mediation privilege, relevant
7  information, exchanged in a confidential mediation is subject
8  to discovery, when jurisdiction is based on a federal statute.
9  But notwithstanding the lack of binding precedent in this
10 circuit, Local Rule 9019-5 exists and was incorporated into my
11 order.  As I've already said, the last sentence provides that:
12          "Except as set forth in the previous sentence, no
13 person shall seek discovery from any participant in the
14 mediation with respect to any information disclosed during the
15 mediation."
16          Aside from having absolutely no idea how this
17 sentence works in practice, it appears to be inconsistent with
18 mediation privilege, the collective nature of a bankruptcy
19 proceeding, and the fact that, notwithstanding a settlement of
20 a dispute within mediation, the Court ultimately must rule on
21 most settlements in the context of the bankruptcy case.  If
22 the approval process is met with objection, it complicates, at
23 least, the discovery process.
24          This is my "square peg, round hole" comment.  Much
25 of the law around mediation appears to be designed for two-

1  party disputes, in which the parties determine to attempt to
2  resolve their dispute consensually through mediation.  While
3  recognizing the Uniform Mediation Act has only been adopted by
4  12 jurisdictions, I found the commentary helpful in attempting
5  to understand the utility of mediation and what the precatory
6  note for the Uniform Act calls, "The appropriate relationship
7  of mediation with the justice system."
8           The drafters of the Uniform Act recognized that
9  because of the confidential nature of mediation, it was
10 necessary to tie confidentiality to the fairness of the
11 mediation process.  Fairness, in turn, is dependent upon the
12 integrity of the process and knowing consent.
13          Successful mediation is based on the integrity of
14 the process, act of party involvement, and informed self-
15 determination or, in other words, the ability to control the
16 outcome of the dispute.  These principles work well in
17 traditional, two-party disputes, in which the parties
18 voluntarily determine to try to resolve their dispute by
19 mediation and choose a mediator.
20          If both parties agree to an outcome in the
21 mediation, their dispute is resolved and litigation is
22 avoided; this is the essence of self-determination.
23          These principles do not describe the multiparty
24 mediation reflected in the mediation order, "Of a
25 comprehensive resolution of issues and claims in BSA's Chapter

1  11 case through a Chapter 11 plan."

2          Not all parties are involved in every aspect of the
3  comprehensive resolution.  Not all parties agree with the
4  comprehensive resolution.  And even if there is an agreed-to
5  resolution by most or even all of the mediation parties,
6  creditors must still vote on the plan and the Court must still
7  conclude that the relevant standards are met.  This is whole
8  not wholly consistent with self-determination.

9          Considering both, the 1129(a)(3) arguments and the
10 findings contained in the conditions precedent to confirming
11 the plan, I conclude that the communications regarding the
12 TDPs are discoverable.  There are three reasons.

13         First, debtors want to use the fact of mediation as
14 evidence of good faith.  From the argument, it appears that
15 the fact of mediation may be the primary evidence debtors will
16 induce to meet the good faith standard; as such, they have put
17 the mediation, at least with respect to the good faith of the
18 TDPs, at issue.

19         Debtors are correct that the facts that they seek
20 to put into evidence may not be privileged and courts have
21 relied upon such facts in determining good faith in the
22 context of class actions and settlements, but none of the
23 decided cases discuss any related discovery or admissibility
24 disputes.

25         It cannot be the case that if a party is relying on

1  the very fact of mediation to meet its standard of proof, that
2  discovery is prohibited regarding the *bona fides* of the
3  mediation.
4         Second, a find that the injection of the findings,
5  particularly (R), (S), and (T), into the confirmation process
6  has accelerated the insurers' reservation in the mediation
7  order with respect to discovery.  While it is true that the
8  good faith reservation is with respect to subsequent actions,
9  it is clear that the survivor representatives seek to
10 injection matters into this confirmation hearing that would
11 otherwise be determined in a subsequent action.
12        Based on the survivors submissions supporting the
13 RSA, with these findings, the survivors seek to foreclose
14 rulings that would otherwise be made in post-confirmation
15 litigation.  The survivors argue that these findings are
16 necessary to confirmation.
17        At this point, however, it is not clear whether
18 these findings are necessary in full or part, or whether these
19 findings are simply a desire to shore up disputes with non-
20 settling insurers.
21        And at that point, insurers are choosing to engage
22 on these findings; certain insurers are.  Whether they will
23 continue to do so or simply argue that the findings are not
24 appropriate, I don't know, but in the meantime, discovery is
25 appropriate.

1              Third, debtors do not suggest that evidence with
2 respect to the negotiation of the trust distribution
3 procedures is otherwise available from another source outside
4 the mediation process; accordingly, I deny debtors' motion to
5 the extent that debtors seek to shield discovery
6 communications, oral and written, regarding the trust
7 distribution procedures, based on the mediation privilege.
8              I make no ruling as to admissibility at this time.
9              I also deny the motion, but without prejudice, with
10 respect to debtors' other requests.  I find them to be
11 premature.
12             No objector has brought discovery disputes
13 regarding the Hartford settlement agreement or the TCJC
14 settlement agreement, and at argument, certain objectors
15 suggested such challenges would not be forthcoming.
16             I will deal with any objections as they arise and
17 when I have context.  Such disputes should be brought to me
18 promptly.  These more traditional two-party disputes may be
19 evaluated differently.
20             And that concludes my ruling on the debtors' motion
21 for protective order.
22             The second motion in front of me last Tuesday was
23 Century's motion, seeking discovery from Eric Green and his
24 company, Resolutions, LLC.  Debtors proposed Professor Green
25 to be one of the three mediators.  Ultimately, I did not

1  approve him in that role.
2              Debtors now propose Professor Green as the sole
3  trustee of their survivor trust.  In response, Century seeks
4  discovery of his connections with others in the case to assess
5  his impartiality and qualifications.
6              In response to Century's request, Professor Green
7  produced certain documents, objected to the requests, and
8  provided a privilege log.  The log raises both, mediation
9  privilege and attorney-client privilege.
10             I question whether mediation privilege is
11 applicable to our situation, where private parties were not
12 free to choose their own mediators, but rather, the selection
13 was subject to approval of the Court.  Further, most of the
14 communications were made prior to the entry of the mediation
15 order.
16             I need not decide that here.  First, Professor
17 Green, both, in his submission and through his counsel at
18 argument, said he felt constrained to raise the mediation
19 privilege, consistent with ABA standards of conduct for
20 mediators, but that the decision was ultimately up to the
21 Court.  Second, no mediation party is asserting the mediation
22 privilege to block production of the requested documents.
23 Third, Century has modified its request to exclude
24 communications between Professor Green and any appointed
25 mediator, as well as any internal notes Professor Green may

1  have made, as well as Professor Green's communications with
2  his staff.
3              Under these circumstances, I conclude that the
4  documents, other than those in the excluded categories, must
5  be produced.  If those documents also contain communications
6  that are protected by the attorney-client privilege, then
7  those communications may be appropriately redacted.
8              And that concludes my ruling with respect to
9  Century's motion seeking discovery from Professor Green.
10             Okay.  Any questions?
11       (No verbal response)
12             THE COURT:  When are we next in court?
13       (No verbal response)
14             THE COURT:  I think the next day I have on my
15 calendar is the 10th.
16             Mr. Abbott, does that seem right to you?
17             MR. ABBOTT:  Your Honor, let me just pull out my
18 calendar and take a quick peek.  I think you might be correct.
19       (Pause)
20             MR. ABBOTT:  Your Honor, the best I can tell, it is
21 correct.  I think that's one of the interim status
22 conferences.
23             THE COURT:  Okay.  If there are discovery disputes
24 that can be framed prior to the 10th, I will make time to hear
25 them prior to the 10th.

1          So, I know it's been about a week since I ruled.
2  My recollection, and what I said in my rulings to the best of
3  my recollection, is that there were discovery responses that
4  were received the day before the hearing.  I am hoping that
5  people have reviewed them and that if, in fact, there's going
6  to be challenges, that people meet-and-confer.
7          And if, in fact, there are going to be challenges
8  to any of the privileged communications, that they be raised
9  as soon as possible.  And I can hear them before the 10th.
10         So, I would like the parties to be thinking along
11 those lines and I will make myself available to hear discovery
12 disputes.
13         MR. ABBOTT:  Thank you, Your Honor.
14         THE COURT:  I'd, you know, rather not get them one
15 little dispute at a time, but, actually, if that's the way
16 they come in, that's fine; we'll handle them one at a time.
17         MR. ABBOTT:  Thank you, Your Honor.
18         I misspoke.  That's a regular omnibus hearing date,
19 but I assume it doesn't change what the Court just explained.
20         THE COURT:  Doesn't change.
21         And if, in fact, there are other disputes and they
22 cannot be determined before then, they should be noticed for
23 that date.  I don't want these discovery disputes to linger.
24         Okay.  I realize this was my party, but does
25 anybody else have anything they would like to raise?

1      (No verbal response)
2           THE COURT:  Then thank you, everyone.
3           We are adjourned.
4           COUNSEL:  Thank you, Your Honor.
5      (Proceedings concluded at 11:34 a.m.)
6
7                          CERTIFICATE
8
9      We certify that the foregoing is a correct transcript
10 from the electronic sound recording of the proceedings in the
11 above-entitled matter.
12
13 /s/Mary Zajaczkowski                October 25, 2021
   Mary Zajaczkowski, CET**D-531
14
15 /s/William J. Garling               October 25, 2021
   William J. Garling, CE/T 543
16
17
18
19
20
21
22
23
24
25