**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC[1]<br><br>              Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER
(I) ENFORCING THE SOLICITATION PROCEDURES ORDER,
(II) ENFORCING SECTION 1103 OF THE BANKRUPTCY CODE AGAINST THE
TORT CLAIMANTS' COMMITTEE, AND (III) GRANTING RELATED RELIEF**

Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), submit this motion (this "Motion"), pursuant to sections 105(a), 1103 and 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) enforcing the Solicitation Procedures Order (as defined below) as set forth herein, (ii) enforcing the terms of section 1103 of the Bankruptcy Code and requiring that any official email address of the Tort Claimants' Committee (the "TCC") be used only for official TCC business applicable to the survivor community and not for the benefit of individual state court counsel, and (iii) granting related relief.  In support of this Motion, the Debtors submit the declaration of Blair M. Warner, an associate at White & Case LLP (the "Warner Declaration"), filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully state as follows:

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## PRELIMINARY STATEMENT AND RELEVANT BACKGROUND

1.      The Debtors, the Future Claimants' Representative (the "FCR"), the Coalition of Abused Scouts for Justice (the "Coalition"), and the other parties supporting the plan of reorganization spent much of the weekend attempting to investigate and mitigate the potentially disastrous effects of the TCC's brazen attempt to solicit votes to reject the plan in contravention of bankruptcy laws, rules of professional ethics, its duties to the survivor constituency as a whole, and this Court's orders.  None of the attorneys representing the Debtors or other plan supporters have ever encountered a more egregious solicitation violation by any party, much less a statutory committee appointed by the Office of the United States Trustee and charged with representing the interests of a class of survivors of sexual abuse.  The plan solicitation process in these cases is perhaps the most complex and sensitive solicitation of votes in mass-tort bankruptcy history, and the TCC's deliberate actions threaten to destroy the integrity of the voting process.  The Debtors are requesting that the Court take action quickly, as the Debtors' estates and creditors cannot afford the potentially irreversible damage caused by the TCC's misconduct.

2.      On Saturday, November 6, 2021, at 6:21 p.m. Eastern Time, attorneys Laura Baccash and Blair Warner of White & Case LLP received an urgent email from Omni Agent Solutions, the Court-appointed voting and solicitation agent in these chapter 11 cases (the "Solicitation Agent").  A true and correct copy of this email is attached to the Warner Declaration as **Exhibit 1**.  A survivor had just forwarded to the Solicitation Agent a screenshot of an email the survivor had received from the official creditor-facing email address of the TCC, BSASurvivors@pszjlaw.com.  The survivor and the Solicitation Agent were confused because what appeared to be an official communication from the TCC was instead an email signed by Timothy D. Kosnoff encouraging all survivors to vote against the plan and to contact him in

connection therewith.  The survivor in question is not a client of Mr. Kosnoff or "Abused in Scouting" ("AIS"), which is a cooperative of three law firms including Mr. Kosnoff's law firm, Kosnoff Law, PLLC ("Kosnoff Law").  The survivor is represented by separate counsel.

3.       Following receipt of this email, Jessica Lauria, Michael Andolina and Matthew Linder received two urgent emails from David Molton, counsel to the Coalition.  True and correct copies of these emails are attached to the Warner Declaration as **Exhibit 2**.  Mr. Molton had himself received the Kosnoff communication from the TCC's official email address.  Mr. Molton forwarded the communication to the Debtors, and it became apparent that the TCC email address reserved for official communications with survivors had been used to circulate an inflammatory, derogatory, false and misleading email (the "TCC/Kosnoff Email") and five-page letter (the "TCC/Kosnoff Letter" and, together with the TCC/Kosnoff Email, the "TCC/Kosnoff Communications") from Mr. Kosnoff urging survivors to vote to reject the Plan (as defined below).  Copies of the TCC/Kosnoff Communications are attached to the Warner Declaration as **Exhibit 3**.  The Debtors were informed Coalition counsel that the TCC's emails disseminating the TCC/Kosnoff Communications were sent to thousands of abuse survivors, many of whom were represented by counsel other than Mr. Kosnoff, and that the emails had already caused confusion among survivors.

4.       Mr. Kosnoff has been the subject of multiple hearings before this Court.  As the Court is aware, Mr. Kosnoff has been active on social media since the beginning of these chapter 11 cases.  The Court has previously characterized Mr. Kosnoff as having "poor judgment in how he expresses himself [and] how he views other professionals."  *See* Oct. 16, 2020 Hr'g Tr. at 12:23–13:2, Warner Decl. Ex. 4.

5.      Evidence provided to this Court has shown that Mr. Kosnoff:

- Has made derogatory statements about survivors, the mediators and counsel for the Debtors.  *See*, *e.g.*, D.I. 1285, Ex. 1 ("Andolina and the 3 Amigos need to get that message.  They are wasting their time talking to the TCC. . . . We are not going to do anything to help grease the gears for Stang and the dimwits including speeding up the insurance analysis.").

- Resigned from the Coalition, along with Mr. Van Arsdale, after the derogatory email referenced immediately above became public.  *See* Oct. 14, 2020 Hr'g Tr. (AM Session) at 33:4–5, Warner Decl. Ex. 5 ("[MR. MOLTON:] Your Honor, on September 29th, Kosnoff and Andrew Van Arsdale resigned from the Coalition."); Oct. 14, 2020 Hr'g Tr. (PM Session) at 23:18-24:2, Warner Decl. Ex. 6 ("[MR. MOLTON:] So dealing with what I call the second elephant in the room, the Kosnoff e-mail.  Listen, I'm not going to sit here and make up explanations for it, I wasn't there, I'm not going to make up excuses for it, I can't.  But I'm going to say, look what we've done and look who we are now.  Look at the firm representative [sic] who have joined us, all of whom have qualified bona fides in the mass tort bankruptcy world and in the mass tort world.").

- Has made demeaning statements about the Court and multiple attorneys associated with this case, including posting multiple photos of attorneys involved in the case.[2]

---

[2]      *See* Warner Decl. Exs. 7, 8, 9, 10, 11.  The photograph of Mr. Rothweiler set forth below in Mr. Kosnoff's tweet was taken during the Disclosure Statement hearing held on Zoom on September 28, 2021.  It is a violation of the Delaware District Court rules to record or photograph a hearing.  D. Del. L.R. 83.2 ("Broadcasting, televising, recording or taking of photographs in connection with any judicial proceedings within the United States Courthouse at Wilmington, Delaware, whether or not such judicial proceedings are actually in session, is prohibited . . .").



**Kosnoff Law**
@SexAbuseAttys
···

Ok, how many of you cried at the end when Old Yeller had to be shot? How about this Old Yeller?  Vote No on the plan and put this rabid lawyer down.



8:17 PM · Nov 2, 2021 · Twitter for iPhone

**Kosnoff Law**
@SexAbuseAttys
···

Ken and the SHYSTERETTES tell you there will be billions more in settlements. Mediations in LA a week ago and not a penny. But Kenny and his mass tort mobster buddies had a nice boat ride on your dime. He's incompetent and untruthful. Save yourselves survivors, Vote NO!

3:40 PM · Oct 30, 2021 · Twitter for iPhone



**Kosnoff Law** @SexAbuseAttys · Sep 29    ···
Biggest decision she made yesterday was keeping the $3500  election on the ballot. The BSA/Coalition/FCR ("the evil cabal") saw its ballot box stuffing scheme get stuffed up its...xxx. Lauria was noticeably crestfallen as no doubt was the entire cabal. No way to 2/3rds. It's over.

💬 2         ⟲         ♡ 4         ⬆️

**Kosnoff Law** @SexAbuseAttys · Sep 29    ···
Rothweiler's "leave no survivor behind" remark caused me to simultaneously gag and laugh. To be accurate, he and his mass tort mobster cohorts of the Coalition intend to enrich themselves in order to leave ALL survivors behind. They are beneath contempt.

💬         ⟲ 2         ♡ 4         ⬆️





- Has taken actions that have led to threats against an attorney for one of the Debtors' insurers. *See*, *e.g.*, July 29, 2021 Hr'g Tr. at 32:14-20, Warner Decl. Ex. 12 ("[MR. SCHIAVONI:] My client they published pictures outside – Mr. Kosnoff published pictures outside his house of, you know, I think it would put us in danger. I personally have threats made against me, my identity, identifying information on the internet. I have gone to the mediators to complain and ask for some relief. I have been told, basically, that there is nothing anybody can do."); *see* Warner Decl. Ex. 13, 14.





- Expressly acknowledges that the TCC/Kosnoff Communications have caused confusion among survivors.  *See* Warner Decl. Ex. 15.



6.      Mr. Kosnoff's attacks have intensified in recent weeks and have included posting photos of individual lawyers and at least one lawyer's family to his Twitter account.[3]  Warner Decl. ¶ 19.

7.      When the Debtors learned of the TCC/Kosnoff Communications, the Debtors could not have imagined that the TCC would ever intentionally send a communication to thousands of survivors on behalf of a single attorney, let alone an attorney that has personally denigrated the

---

[3]      In recent weeks, Mr. Kosnoff has posted multiple pictures of Mr. Rothweiler, including a picture of Mr. Rothweiler and his wife.  To protect the privacy of this individual's family or any other professionals involved in the case whose families may have been published by Mr. Kosnoff, the Debtors have not included images of these posts in the Motion or the Warner Declaration but will file such images with the Court under seal if requested by the Court.

participants in this matter.  The Debtors took immediate action.  On Sunday morning, November 7, 2021, Debtors' counsel sent a letter by email to the TCC requesting confirmation as to whether the TCC/Kosnoff Communications were an unauthorized use of the TCC's email address and listserv or if they were intentionally distributed by the TCC and, if the latter, requesting all facts and circumstances surrounding the TCC's distribution of the TCC/Kosnoff Communications (the "Debtors' First November 7 Letter").  A true and correct copy of the Debtors' First November 7 Letter is attached to the Warner Declaration as **Exhibit 16**.

8.      On November 7, 2021 at 10:32 a.m. Eastern Time, Mr. Molton sent an email to Mr. Stang, copying Ms. Lauria, Mr. Andolina, and Mr. Linder, confirming that Mr. Stang had just advised Mr. Molton by telephone that the TCC had intentionally distributed the TCC/Kosnoff Communications to survivors from its official creditor-facing email address.  Approximately three hours later, the Debtors received an email response from Mr. Stang confirming that the TCC had intentionally distributed the TCC/Kosnoff Communications, but indicating that the "staff" of Pachulski Stang Ziehl & Jones, LLP ("PSZJ") had sent the distribution to the "entire listserv," purportedly in error, rather than only to AIS clients for whom Mr. Kosnoff serves as co-counsel (the "TCC's First Response Email").  Mr. Stang stated that the TCC would send a further communication to the abuse survivors not represented by AIS to disregard the communication.  A true and correct copy of the TCC's First Response Email is attached to the Warner Declaration as **Exhibit 17**.

9.      The Debtors understand that the Coalition requested that the TCC refrain from sending a corrective email until the Coalition could advise as to the substance of the communication.  Despite this request, the TCC sent a brief follow-up email from BSASurvivors@pszjlaw.com, apparently to certain recipients of the TCC/Kosnoff

Communications, indicating that the TCC/Kosnoff Communications were only intended for Mr. Kosnoff's AIS clients, and that parties other than AIS clients should disregard the email (the "TCC Purported Correction Email").  The Purported Correction Email did nothing to address the false and misleading content that had been supplied to and likely read by survivors.  A true and correct copy of the TCC Purported Correction Email is attached to the Warner Declaration as **Exhibit 18**.

10.  Also on November 7, after receiving the TCC's First Response Email and immediately prior to becoming aware of the TCC Purported Correction Email, Debtors' counsel sent a follow-up letter to the TCC (the "Debtors' Second November 7 Letter") asking the TCC to: (a) provide its list of email addresses that were sent the TCC/Kosnoff Communications and the list of the AIS clients that the TCC asserted were the intended recipients of the email; (b) indicate how the TCC determined which claimants were clients of Mr. Kosnoff; (c) provide a response as to why the email was sent by the TCC and not from Mr. Kosnoff directly to his clients; (d) explain why the communication was apparently sent in multiple tranches over the course of several hours, as the Debtors understood from Coalition counsel; (e) explain the TCC's intended actions to correct its communications made on behalf of one lawyer to survivors represented by other counsel; (f) respond whether PSZJ intends to charge its fees and expenses attributable to the distribution of the TCC/Kosnoff Communications and the remediation of such distribution to the Debtors' estates; and (g) produce all documents and communications relating to these issues.  A true and correct copy of the Debtors' Second November 7 Letter is attached to the Warner Declaration as **Exhibit 19**.

11.  During the evening of November 7, the Debtors received an email response from Mr. Stang on behalf of the TCC (the "TCC's Second Response Email") which revealed, among other things, the following:

- The TCC intentionally distributed the TCC/Kosnoff Communications to Mr. Kosnoff's AIS clients, and in fact had "offered Mr. Kosnoff the opportunity to send his email via BSASurvivor@pszjlaw.com . . . ."

- The technology that PSZJ staff had used to distribute the email purportedly resulted in the emails being sent out in tranches.

- Despite the Debtors' understanding that the Coalition had requested the TCC refrain from sending additional emails relating to the TCC/Kosnoff Communications, Mr. Stang directed that the TCC Purported Correction Email be sent to all parties other than AIS clients for whom Mr. Kosnoff serves as co-counsel.

- The TCC would not provide the details of the listserv.

- The TCC would not charge the Debtors' estates for distributing the TCC/Kosnoff Communications and the TCC Purported Correction Email.

A true and correct copy of the TCC's Second Response Email is attached to the Warner Declaration as **Exhibit 20**.

12.     On November 8, Debtors' counsel sent a further letter to the TCC (the "Debtors' November 8 Letter") demanding that the TCC take the following actions: (i) provide (a) its entire listserv of names and email addresses that were sent the TCC/Kosnoff Communication, (b) the list of the AIS clients that the TCC asserted were the intended recipients of the email, and (c) the list of all individuals who were sent the TCC Purported Correction Email; (ii) immediately send to the entire listserv a corrective email, in the form drafted by the Debtors and set forth in the Debtors' November 8 Letter; (iii) attach the authorized solicitation package letters from the Debtors and from the Coalition and the FCR to the corrective email drafted by the Debtors; (iv) agree to respond to the Debtors' forthcoming discovery by November 9, 2021 and complete production by November 12, 2021; (v) refrain from distributing, for the duration of the chapter 11 cases, communications from or on behalf of any state court counsel, including to parties on the listserv; and (vi) agree to provide prior notice to the Debtors of any substantive communications that the TCC intends to distribute to parties on the listserv at least forty-eight (48) hours in advance.  A

true and correct copy of the Debtors' November 8 Letter is attached to the Warner Declaration as **Exhibit 21**.

13. On November 8, the Debtors served the TCC with interrogatories and requests for production regarding the transmittal of the TCC/Kosnoff Communications, copies of which are attached to the Warner Declaration as **Exhibits 22** and **23**. The Debtors also served Kosnoff Law with requests for production, a copy of which is attached to the Warner Declaration as **Exhibit 24**. In particular, the Debtors asked the TCC to identify (a) who it intended to receive the TCC/Kosnoff Communications, (b) who actually received the TCC/Kosnoff Communications, and (c) what steps the TCC took (if any) to prevent the TCC/Kosnoff Communications from reaching parties represented by counsel other than Mr. Kosnoff, who serves as co-counsel to certain survivors with the other AIS firms. The Debtors also asked what steps the TCC took to stop the TCC/Kosnoff Communications from being distributed to parties not represented by AIS after the TCC received notice of the improper distribution.

14. Shortly after midnight Eastern Time on November 9, 2021, Debtors' counsel received a letter from Mr. Stang in response to the Debtors' November 8 Email (the "TCC's Third Response Letter"), which purported to provide two documents responsive to the Debtors' discovery requests. The TCC proffered that its counsel sent a message on behalf of Mr. Kosnoff to approximately 12,895 AIS clients to whom he serves as co-counsel, and that Mr. Kosnoff himself provided the email addresses to the TCC (as defined in the TCC's Third Response Letter, the "Kosnoff List"). *See* TCC's Third Response Letter at 1. Mr. Stang did not explain why the TCC distributed the TCC/Kosnoff Communications on Mr. Kosnoff''s behalf. Mr. Stang also stated that PSZJ's "staff" sent the same communication, purportedly in error, to more than 7,500 email addresses, consisting of unrepresented abuse survivors, attorneys or firms that represent

survivors, and survivors that are represented by other counsel, including counsel who are providing the opposite advice from the TCC and Mr. Kosnoff with respect to the Plan (the "<u>TCC List</u>").  The Kosnoff List and the TCC List were attached to the email from Mr. Stang containing the TCC's Third Response Letter.  Other than the transmission of the Kosnoff List and the TCC List to the Debtors, the TCC refused to take the other actions requested in the Debtors' November 8 Letter. A true and correct copy of the TCC's Third Response Letter is attached to the Warner Declaration as **<u>Exhibit 25</u>**.

15.     In sum, in an intentional and illegal effort to solicit votes to reject the Debtors' plan of reorganization using statements that are either false or grossly misleading, as detailed herein, the TCC invited Mr. Kosnoff to co-opt the creditor-facing email address of the TCC.  As noted above, Mr. Kosnoff accepted the TCC's invitation and, *after providing the TCC with the names and email addresses of his own clients*, on November 6, 2021, with the imprimatur of a statutory committee appointed by the Office of the United States Trustee, the TCC emailed more than 20,000 individual abuse creditors a cover note and five-page letter from Mr. Kosnoff.  By sending the TCC/Kosnoff Communications to these survivors—more than one-third of which the TCC has conceded are represented by counsel *other* than Mr. Kosnoff—the TCC disregarded the best interests of survivors as a whole and deliberately undermined the Court-approved plan solicitation process in derogation of applicable bankruptcy laws, rules of professional ethics, and orders of the Court.

16.     During the five-day hearing to approve the Debtors' disclosure statement, the Court considered hundreds of pages of information about the plan that would be transmitted to voting creditors.  This information included the Debtors' and TCC's respective views of the plan and related settlements, potential recoveries for abuse creditors, and factors that could affect such

recoveries, as well as the risks that creditors should consider in casting their votes to accept or reject the plan. The TCC also obtained approval of a letter urging abuse survivors to reject the plan to be sent alongside countervailing letters from the Debtors, the FCR, and the Coalition urging survivors to accept the plan. All of the solicitation materials were subject to exacting scrutiny through voluminous briefing, lengthy oral argument, and extensive negotiations, and the TCC was the most active participant in this process. Now, five weeks after the disclosure statement was approved, the TCC has endorsed and broadly disseminated an inflammatory letter urging survivors to reject the plan based on false or misleading statements that find no support in the disclosure statement that the TCC had a prominent role in shaping. The Debtors have concluded that without the Court's swift intervention they cannot adequately remedy the potentially severe damage to the solicitation process and the confusion among survivors that could or already has resulted from the TCC's actions.

## STATUS OF THE CASES AND JURISDICTION

17.    The Debtors commenced these cases on February 18, 2020, and they continue to operate their non-profit organization and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases are being jointly administered for procedural purposes only pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

18.    On March 5, 2020, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the TCC and the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.

19.      On April 24, 2020, the Court appointed James L. Patton, Jr. as the representative of future abuse claimants pursuant to sections 105(a) and 1109(b) of the Bankruptcy Code.

20.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

21.      The statutory bases for the relief requested in this Motion are sections 105(a), 1103, and 1125 of the Bankruptcy Code.

## **GENERAL BACKGROUND**

### I.      **Mr. Kosnoff's Involvement in the Chapter 11 Cases**

22.      On August 9, 2021, AIS and Kosnoff Law each submitted a verified statement pursuant to Bankruptcy Rule 2019 [D.I. 5923, 5924] (the "AIS Verified Statement" and the "Kosnoff Verified Statement," respectively).  AIS described itself as a "cooperative effort by three law firms" to represent victims of child sexual abuse in connection with their participation in the BSA's programs on a co-counsel, contingency fee basis.  *See* AIS Verified Statement ¶¶ 1, 3.  The three law firms that formed this cooperative effort are Kosnoff Law, Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. ("Eisenberg Rothweiler"), and AVA Law Group, Inc. ("AVA Law Group").  *See id.* ¶ 1.  As described in the AIS Verified Statement, "neither AIS nor the Law Firms working together was ever formally organized into a legal entity, [and] there exist no

documents reflecting the formation and governance of AIS. AIS has no board of directors, advisory board, officers, employees, steering committee or any other leadership or operating structure." *Id.* ¶ 5. The AIS Verified Statement further states that each abuse survivor represented by AIS has employed the three firms under a signed engagement letter jointly with all three firms. *Id.* ¶ 10, Ex. B.

23. The Kosnoff Verified Statement expands on the joint efforts of the AIS law firms, asserting that the firms worked together cooperatively for approximately eighteen months, from roughly March 2019 until September 2020. Kosnoff Verified Statement ¶¶ 11, 16. In September 2020, shortly after the formation of the Coalition of Abused Scouts for Justice (the "Coalition"), Kosnoff Law and AVA Law Group withdrew from the Coalition. *Id.* ¶ 16. As a result, abuse survivor clients of AIS are in a co-counsel relationship with firms both in and outside of the Coalition, and no such survivor client is represented by Kosnoff Law independent of Eisenberg Rothweiler and AVA Law Group.

## II.    Plan and Disclosure Statement

24. On September 30, 2021, after five days of hearings, the Court entered the *Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 6438] (the "Solicitation Procedures Order").

25. On the same date, the Debtors filed the Court-approved solicitation versions of the *Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6443] (the "Plan") and the *Amended Disclosure Statement for the*

*Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 6445] (the "Disclosure Statement").[4]

26.     The Debtors understand that state court counsel representing more than 70% of abuse survivors support the Plan and are recommending to their clients that they vote in favor of the Plan.  *See*, *e.g.*, Coalition letter dated Sept. 30, 2021 [D.I. 6441-1] ("The Plan is currently supported by representatives of approximately 70,000 survivors.").

27.     Upon entry of the Solicitation Procedures Order, the Solicitation Agent commenced the distribution of solicitation packages to creditors in the voting classes.  As part of the approved solicitation package, in addition to letters from the Debtors, the FCR, the Coalition, and the Creditors' Committee recommending that creditors vote in favor of the Plan, the Solicitation Agent distributed a letter from the TCC recommending that abuse survivors vote to reject the Plan.  *See* D.I. 6365.

## RELIEF REQUESTED

28.     By this Motion, pursuant to sections 105(a), 1103, and 1125 of the Bankruptcy Code, the Debtors request entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, (i) enforcing the Solicitation Procedures Order as set forth herein, (ii) enforcing the terms of section 1103 of the Bankruptcy Code and requiring that any official email address of the TCC be used only for official TCC business applicable to the survivor community and not for the benefit of individual state court counsel, and (iii) granting related relief.

## BASIS FOR RELIEF

29.     The TCC's actions have injured the Debtors and potentially undermined the integrity of the votes on the Plan from survivors who received the TCC's distribution of the

---

[4]     Capitalized terms used but not otherwise defined in this Motion have the meanings ascribed to such terms in the Plan.

TCC/Kosnoff Communications.   Not only is much of the substance of the TCC/Kosnoff Communications either false or grossly misleading, but by distributing the TCC/Kosnoff Communications from the TCC's official creditor-facing email address (BSASurvivors@pszjlaw.com) and addressing the recipients of such email as a "Client of AIS," the TCC potentially caused survivors to vote to reject the Plan in contravention of their actual attorneys' advice.   Indeed, more than one-third of the survivors who apparently received the TCC/Kosnoff Communications are represented by counsel other than Mr. Kosnoff and AIS.   These survivors' counsel are recommending that their clients vote in favor of the Plan.   The TCC's refusal to take the Debtors' requested remedial actions, as set forth in the Debtors' November 8 Letter, and its contravention of applicable bankruptcy laws, rules of professional ethics, and orders of the Court supports the relief requested in this Motion.

30.     This Court has the inherent authority to enforce its own orders.   *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (recognizing that a bankruptcy court "plainly [has] jurisdiction to interpret and enforce its own prior order"); *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del. 1999) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379-80 (1994)). Moreover, the Court has the power to control the form, content, and manner in which information regarding these bankruptcy proceedings—including critical information regarding solicitation—is transmitted in order to protect the integrity of the process and safeguard the due process rights of creditors.   *See, e.g.*, Solicitation Procedures Order (approving the form of ballot, notice, and other contents of the solicitation package); *see also In re Coral Petroleum, Inc.*, 249 B.R. 721, 729 (Bankr. S.D. Tex. 2000) ("[T]he  bankruptcy court has core jurisdiction over matters that are so central to the operation of the bankruptcy case that creditors reasonably rely on the integrity of the federal judicial process to protect them.") (citing *In re Southmark Corp.*, 163

F.3d 925, 931 (5th Cir. 1999)).  Consistent with the foregoing, the Court expressly retained "exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Solicitation Procedures Order."  Solicitation Procedures Order ¶ 44.

31.    Additionally, section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) ("[Section 105(a)] has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings." (internal citation omitted)); *In re VII Holdings Co.*, 362 B.R. 663, 668 (Bankr. D. Del. 2007) ("Section 105(a) bestows broad equitable powers on the Court.").

32.    Accordingly, this Court can order the TCC to remediate its distribution of the TCC/Kosnoff Communications and grant further relief as requested herein.

**I.    The Court has the Power to Prohibit Dissemination of False or Misleading Materials Used to Solicit Rejections of the Plan.**

33.    Section 1125(b) of the Bankruptcy Code does not prohibit the solicitation of votes to accept or reject a plan if, at the time of such solicitation, there is a court-approved disclosure statement that is transmitted to holders of claims or interests. *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 102 (3d Cir. 1988); *see In re Cal. Fid., Inc.*, 198 B.R. 567, 571 (B.A.P. 9th Cir. 1996); *In re Mirant Corp.*, 334 B.R. 787, 792 (Bankr. N.D. Tex. 2005); *In re Apex Oil Co.*, 111 B.R. 245, 249-50 (Bankr. E.D. Mo. 1990); *In re Temple Ret. Cmty., Inc.*, 80 B.R. 367, 368 (Bankr. W.D. Tex. 1987). Indeed, the proper solicitation of votes to accept or reject a plan constitutes speech protected under the First Amendment.  *In re Gulph Woods Corp.*, 83 B.R. 339, 343 (Bankr. E.D. Pa. 1988) (holding that restraint of all communications between creditors

regarding a proposed plan would likely violate the First Amendment and that there is a "delicate balancing process between the principles of the first amendment and the purposes of § 1125(b) in which a court must engage to assess the legality of a certain communication"); *In re Mirant Corp.*, 334 B.R. at 792 ("[A] prior restraint on speech – even commercial speech – would ordinarily be offensive to the First Amendment of the Constitution.").  But the First Amendment's protections are not unlimited. Specifically, "[m]isrepresentations of fact or law in a commercial context are not entitled to First Amendment protection." *In re Mirant Corp.*, 334 B.R. at 792–93 (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commc'n*, 447 U.S. 557, 562–63 (1980)).[5]

34.    To be clear, the Debtors are not asking the Court to restrain the TCC from soliciting votes in opposition to the Plan, as permitted under *Century Glove*.  Indeed, since the Solicitation Procedures Order was approved, the TCC has launched an aggressive campaign to try to convince survivors to vote against the Plan through five press releases, five town hall meetings held on a weekly basis, and countless communications to survivors using the same official TCC email address used to disseminate the TCC/Kosnoff Communications.

35.    Here, however, the TCC has facilitated the dissemination of legal advice from a single state court lawyer to thousands of individuals who are not his clients and has thus endorsed the use of false or misleading information to solicit rejections of the Plan.  The TCC/Kosnoff

---

[5]    Solicitation of rejections of a plan through the use of misleading or counterfactual materials is commercial speech not entitled to First Amendment protection and does not constitute good faith selection within the meaning of section 1125(e).  *In re Mirant Corp.*, 334 B.R. at 799–800; *In re Snyder*, 51 B.R. 432, 437 (Bankr. D. Utah 1985) (determining that unauthorized solicitation would include a specific request for official votes for or against a plan that contains "misrepresentations or deliberate falsehoods and misleading statements calculated to deceive parties entitled to vote"). Such speech may be subject to limitation. *In re Mirant Corp.*, 334 B.R. 787 (determining that solicitation materials contained information so misleading and false they warranted the exercise of the court's equitable powers to prevent further dissemination); *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commc'n*, 447 U.S. at 566 ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading."); *U.S. v. DeFusco*, 930 F.2d 413, 415 (5th Cir. 1991) ("We agree with our colleagues of the Second Circuit that 'misleading commercial speech is beyond the protective reach of the First Amendment.") (citation omitted).

Communications contain improper statements under section 1125 of the Bankruptcy Code because they are replete with numerous false or misleading legal and factual statements that will confuse voters. The following table provides illustrative examples of the false or misleading statements in the TCC/Kosnoff Communications distributed by the TCC:

| False or Misleading Statement | Reason Statement Is False or Misleading |
|---|---|
| "It was wholly improper and possibly illegal for [Eisenberg Rothweiler] to solicit your vote on a ballot that is supposed to be neutral. Instead they used deceit to spew their patently false and misleading statements. There is a simple word for why lawyers do things like that: greed." TCC/Kosnoff Email. | The Debtors have been informed that the communication referenced in the TCC/Kosnoff Email was sent by Eisenberg Rothweiler to AIS clients for whom Mr. Rothweiler and Mr. Kosnoff serve as co-counsel. There is nothing improper or illegal about an attorney advising his clients in an attorney-client communication about the terms of the Plan, its effect on such clients' recoveries and opinions related to whether the Plan should be confirmed. |
| "Please stay current on what is happening by following me on Twitter @sexabuseattys." TCC/Kosnoff Email. | The TCC should not endorse the referral of survivors to the Twitter feed of a single state court court lawyer whose feed presents derogatory, false and misleading remarks about this Court, this proceeding, and those involved. Moreover, it is misleading to refer recipients to the Twitter feed of Mr. Kosnoff without reference to the Court-approved Disclosure Statement. |
| "Rejection of the Plan does not mean many more years of waiting. It means the BSA and the other entities will quickly come back to the negotiating table and finally be serious about fairly compensating survivors." TCC/Kosnoff Letter at 3–4. | This statement is inconsistent with the Court-approved Disclosure Statement, which states that if the Plan is rejected, the Debtors' possible alternatives include confirmation of a subsequent plan of reorganization, plan of liquidation or chapter 7 proceedings. Abuse survivors' recoveries under these scenarios are uncertain. *See* Disclosure Statement, Art. X.A.6. |
| "The Boy Scout's 'melting ice cube' defense is a hoax. The Boy Scouts hold hundreds of millions in cash and other assets that it designates as "restricted" and not available to pay you." TCC/Kosnoff Letter at 4. | This statement is inconsistent with the risk factors in the Disclosure Statement, which provide that the Debtors' failure to emerge from these chapter 11 cases in a timely manner could endanger the future of the BSA and, due to the continued accrual of professional fees, substantially reduce the BSA's contribution to the Settlement Trust as set forth in the chart in Article II.F of the Disclosure Statement. *See* Disclosure Statement, Art. X.A.34 & II.F. This statement is also inconsistent with the Court-approved Disclosure Statement, which states that the Debtors are projected to hold $111 |

| False or Misleading Statement | Reason Statement Is False or Misleading |
|---|---|
| | million of restricted investments and $22 million of restricted cash as of December 31, 2021. *See* Disclosure Statement, Ex. E-1. |
| "Eisenberg Rothweiler and the Coalition offered to settle with the Local Councils before undertaking any review of the claims or financial analysis of the Local Councils. In short, the Coalition blindly offered to settle for $600 million when the TCC demonstrated to the Coalition that the Local Councils had the ability to pay more than three times that amount without endangering their Scouting mission."  TCC/Kosnoff Letter at 3. | This statement is inconsistent with the Court-approved Disclosure Statement, which states that there were numerous mediation sessions between the parties prior to entry into the settlement with the Local Councils. *See* Disclosure Statement, Art. II.A. It is misleading for an attorney who did not attend a single mediation session to make any statement about what was considered in such sessions. |
| "The face value of Hartford's insurance coverage for the year 1972 alone is more than $800 million. And yet, the Coalition and Eisenberg Rothweiler want you to vote for a plan that pays less than that amount without taking into account the thousands of other claims in the same year and the many other thousands in 1971, 1973, 1974, 1975, and all the other years Hartford provided insurance coverage." TCC/Kosnoff Letter at 2. | This statement is inconsistent with the Court-approved Disclosure Statement, which describes Hartford's insurance coverage.  The value of Hartford's insurance coverage for a given year is dependent on many factors, including the value of the claims that arose in those years.  Accordingly, a "face value" of over $800 million cannot be credibly presented as fact.    *See* Disclosure Statement, Art. III.F.1. |
| "The $250 million is not only far below the level of its culpability for abuse in TCJC wards, but it will only be distributed to survivors who have claims against the Mormon Church." TCC/Kosnoff Letter at 3. | This statement is inconsistent with the Court-approved Disclosure Statement, which states that the proportionate share of liability attributable to TCJC is disputed.   TCJC has significant and potentially meritorious defenses to Abuse Claims that could impede recoveries by holders of Abuse Claims. *See* Disclosure Statement, Art. V.S.4.a. |
| "The settlement trust expenses (which must be paid first) could be as high as 10%, which reduces the average payment per survivor to approximately $17,000. If some survivors are paid more, that means most of the other survivors will receive much less or nothing at all." TCC/Kosnoff Letter at 2. | There is no support in the Disclosure Statement for how the estimate of $17,000 was calculated, and although the Disclosure Statement estimates that Settlement Trust expenses could range from 6-10%, no dollar amount estimate of how an individual claimant's recovery may be affected by settlement trust expenses is included in the Disclosure Statement.  *See* Disclosure Statement, Arts. II.H; VII.A.19.

The characterization of the relative payments to survivors is also inconsistent with the Disclosure Statement. Such amounts will be determined based upon, among other things, estimates of the number, types, and amount of Abuse Claims, the value of the assets of the Settlement Trust, the liquidity of the Settlement Trust, the Settlement Trust's |

| False or Misleading Statement | Reason Statement Is False or Misleading |
|---|---|
|  | expected future income and expenses, and other matters. *See* Disclosure Statement, Art. X.A.14. |
| "Those law firms came into the Boy Scout's bankruptcy case and have treated survivors like "inventories" for the sole purpose of collecting their contingency fee. While you and other survivors might not receive large or meaningful payments, the "mass tort" lawyers will because they will take a piece of your payment which under the current $1.854 billion settlement fund will total more than $425 million." TCC/Kosnoff Letter at 2. | The Disclosure Statement does not support this estimate of total attorneys' fees given that fee arrangements between counsel and their clients are not a matter of public record. The Debtors do not have any means of estimating the aggregate amount of attorneys' fees that may be payable by holders of Abuse Claims who receive compensation from the Settlement Trust. Accordingly, there is no basis for the estimate of "more than $425 million." Sept. 22, 2021 Disclosure Statement Hr'g Tr. 107:18–23, Warner Decl. Ex. 26 (Mr. Linder: "[T]here are attorneys' fees that will be payable by individual abuse claimants to their own, what we refer to as state court counsel. The debtors are not privy to those contractual arrangements so we don't have a basis to estimate what those might be so we don't have any disclosure on that point in [t]he disclosure statement."). |

## II.    Remedial Action Is Necessary.

36.    Since the TCC's dissemination of the TCC/Kosnoff Communications, the Debtors have learned both from the Solicitation Agent and from counsel to the Coalition that the TCC/Kosnoff Communications have caused significant confusion among survivors.    The TCC/Kosnoff Communications have resulted in a flood of inquiries from survivors to their respective state court counsel affiliated with the Coalition.    The Debtors are informed that survivors are confused about why they received an email from Mr. Kosnoff addressed to AIS clients from a source (BSASurvivors@pszjlaw.com) that distributes periodic updates about the status of the Debtors' bankruptcy case and not communications from individual state court counsel who do not represent them.    The Debtors are further informed that there have also been questions from survivors about who in fact is their counsel and whether Mr. Kosnoff represents them.    There may also be many survivors who have not contacted their counsel and will likely mistakenly rely

on the TCC/Kosnoff Communications as legal advice from their attorney and vote to reject the Plan.  Finally, the Coalition has also informed the Debtors that they are seeing more votes against the Plan since the dissemination of the TCC/Kosnoff Communications.  The outcome cannot be permitted.

**A.      Allowing Kosnoff to Co-Opt the TCC Listserv Was Not in the Best Interests of Survivors.**

37.      Section 1102 of the Bankruptcy Code provides that, in a chapter 11 case, the U.S. Trustee appoints a committee of creditors holding unsecured claims and may appoint additional committees of creditors as the U.S. trustee deems appropriate.  11 U.S.C. § 1102(a).  Pursuant to section 1102(b), such committee must consist of persons willing to serve who hold representative claims.  *Id.* § 1102(b).  "'The principal purpose of creditors' committees is not to advocate any particular creditor class's agenda, but rather to strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished.'"  *In re Res. Cap., LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012) (quoting *Mirant Americas Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.,* 2003 WL 22327118, *6 (S.D.N.Y. Oct. 10, 2003)).  An official committee need not be an exact replica of the creditor body, but rather must adequately represent various creditor types.  *In re Dana Corp.*, 344 B.R. 35, 39 (Bankr. S.D.N.Y. 2006).

38.      Section 1103(c) further sets forth some of the powers and duties that an official committee "may" exercise in a chapter 11 case; however, "[i]t is well settled that statutory unsecured creditors' committees owe a fiduciary duty to the entire class of creditors represented by such committee and are required to place the collective interest of the class they represent above their own personal stake in the bankruptcy case."  *In re Res. Cap., LLC*, 480 B.R. at 559 (citing *In re Dana Corp.*, 344 B.R. at 38).

23

39.    Moreover, "the members of a committee have a fiduciary duty to their constituents and are obligated to exercise those powers as necessary to protect the interests of those constituents."  7 Collier on Bankruptcy ¶ 1103.05 (16th ed. 2021); *see Shaw & Levine v. Gulf & W. Indus., Inc.* (*In re Bohack Corp.*), 607 F.2d 258, 262 n.4 (2d Cir. 1979) ("[T]he committee owes a fiduciary duty to the creditors, and must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors.").  Indeed, a member of a committee owes a fiduciary duty to the class the committee represents.  Such duty is to the class as a whole and not to individual members of the class.  *Westmoreland Human Opportunities, Inc. v. Walsh*, 246. F.3d 233, 256 (3d Cir. 2001) ("A committee member violates its fiduciary duty by pursuing a course of action that furthers its self-interest to the potential detriment of fellow committee members."); *In re Signature Apparel Grp. LLC*, 577 B.R. 54, 89 (Bankr. S.D.N.Y. 2017) (finding the members of an official committee owe a fiduciary duty to the constituents that the committee represents). The fiduciary duty includes duties of loyalty and honesty to the committee's constituency and to be without conflicts of interest that affect the committee member's discharge of its fiduciary duty.  *In re Signature Apparel*, 577 B.R. at 89 ("Because of this fiduciary relationship with the unsecured class of creditors, [the committee member] was obligated to be honest, loyal, trustworthy and without conflicts of interest.").

40.    By sending the TCC/Kosnoff Communications from the TCC's official email address to survivors, the TCC endorsed their contents. Given that the TCC/Kosnoff Letter is replete with blatant falsehoods and misleading statements that are plainly inconsistent with the Court-approved Disclosure Statement, the TCC's decision to send the TCC/Kosnoff Communications to a wide array of individual survivors was not in the best interests of survivors as a whole.  The Debtors will be conducting a thorough investigation into the circumstances

surrounding the TCC's decision to send the TCC/Kosnoff Communications.  In the meantime, the Court should order the remedial actions requested herein to safeguard the integrity of the solicitation process.

    **B.**    **The TCC's Dissemination of the TCC/Kosnoff Communications to Survivors Represented by Counsel Other than Mr. Kosnoff and AIS Without the Consent of Such Counsel Violated Rules of Professional Ethics.**

    41.    Communication with creditors regarding the Plan is "analogous to communicating with an adverse party regarding settlement.  In each case, the ethical canons require the prior consent from the communicant's attorney." *In re Snyder*, 51 B.R. 432, 438 (Bankr. D. Utah 1985); *In re Grand Union Co.*, 204 B.R. 864, 877 (Bankr. D. Del. 1997) ("Authorizing direct contact with the claimant contradicts prevailing ethical standards that require dealings with counsel where an opposing party is known to be represented, unless counsel consents or the communication is authorized by law. The ethical rule is meant 'to prevent lawyers from taking advantage of uncounselled [sic] lay persons and to preserve the integrity of the lawyer-client relationship.' . . . . The rule is designed to shield opposing parties not only from an attorney's approaches which are intentionally improper, but from approaches which are well-intended but misguided.") (quoting *Graham v. United States*, 96 F.3d 446 (9th Cir. 1996)); *Friendly Fin. Discount Corp. v. Tucker (In re Tucker)*, No. 99031069, 2000 U.S. App. LEXIS 40240, at *7-8 (5th Cir. June 28, 2000) (affirming lower courts' decisions to impose sanctions on attorneys who engaged in ex parte negotiations with a debtor represented by an attorney, without obtaining that attorney's permission); *see also* Del. Law. Prof. Conduct 4.2 ("In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.").

42.     Here, because the TCC/Kosnoff Communications were sent to survivors who are not represented by Mr. Kosnoff and AIS without the consent of such separate counsel, the TCC violated applicable rules of professional ethics.  Regardless of any purported error on the part of the TCC or PSZJ "staff," adequate remedial action must be taken to apprise survivors of the error. The TCC Purported Correction Email was inadequate because it failed to advise survivors that they should consult with their actual attorneys regarding their respective decisions on whether to accept or reject the Plan.  It also failed to mention that the advice of survivors' actual attorneys could be different from the views of the TCC and Mr. Kosnoff.  For these reasons, the Debtors have proposed a more appropriate corrective email that the TCC should be required to send to all recipients of the TCC/Kosnoff Communications.  This corrective email is set forth in paragraph 44, *infra*.

**C.     The Following Remediation Is Necessary to Mitigate the Damage Caused by the TCC's Actions and Preserve the Integrity of the Solicitation Process.**

43.     In order to remedy the injury caused by the TCC's blatant disregard of the rules of professional ethics, the Bankruptcy Code, and the Solicitation Procedures Order, certain of the Solicitation Procedures should be supplemented to guard against any future actions by the TCC that could further compromise the integrity of the solicitation process.  Specifically, the Debtors are requesting that the following provisions be included in any order granting this Motion:

(a)     The TCC shall refrain from distributing, for the entirety of the chapter 11 cases, any and all communications from or on behalf of any state court counsel, including to parties on its official listserv;

(b)     Any official email address of the TCC shall be used only for official TCC business applicable to the survivor community and not for the benefit of individual state court counsel; and

(c)     The TCC shall give prior notice to the Debtors of any substantive communications that it intends to distribute to parties on the listserv at least 48 hours prior to distribution.

If, upon 48 hours' notice to the Debtors (the "Notice Period"), the Debtors dispute any of the proposed communications, and the Debtors and the TCC are unable to agree to revised communications, the Debtors may seek an expedited hearing with the Court to resolve such disagreement. In that event, the TCC shall not oppose the request for expedited consideration provided that any such hearing is held on not less than 24 hours' notice to the TCC; provided further that, if a hearing to consider any appropriate relief in connection with any communications (as may be held on an expedited basis) is requested by the Debtors to be heard within the Notice Period but is scheduled for a later date by the Court, the communication at issue shall not be distributed until the hearing concludes. In the event of any dispute regarding the terms of such communications, the Debtors and the TCC reserve any and all rights under the Bankruptcy Code or applicable law.

44.      Additionally, to remedy the confusion caused by the distribution of the TCC/Kosnoff Communications to survivors who were not clients of Mr. Kosnoff, a more detailed corrective email should be sent from the TCC clarifying the mistake, repudiating the portions of the TCC/Kosnoff Communications that are misleading or false, including those statements that attack another attorney in these chapter 11 cases.  The email should attach the letters approved by this Court in connection with the Disclosure Statement from the Debtors, the FCR, and the Coalition.  The corrective email should state as follows:

To all concerned:

My firm sent an email from Mr. Kosnoff to all individuals on this listserv on November 6, 2021.  We urge each of you to disregard its contents, which included false and misleading statements that are inconsistent with the Court-approved Disclosure Statement. Many of you have counsel who represent your interests and who have very different opinions as to how you should vote on the Boy Scouts' plan of reorganization.    In fact, we understand that counsel representing a majority of the survivors in these cases support the plan and are urging their clients to vote "YES" on the plan.  We are not trying to interfere with the advice that you are receiving from your own counsel, and if you have questions on how to vote on the plan, we strongly encourage you to seek advice from your counsel. If you would like to change your vote on the Boy Scouts' plan, you must submit a new ballot on or prior to the Voting Deadline of December 14, 2021 at 4:00 p.m. (Eastern Time).

Furthermore, the TCC does not agree with and affirmatively rejects any and all statements made about the Eisenberg Rothweiler law firm in the letter from Mr. Kosnoff that was attached to the email sent to you. The TCC regrets any suggestion that its counsel endorsed the distribution of such statements. Finally, please see the attached letters from the Debtors, FCR and Coalition of Abused Scouts for Justice.

45.     Without the foregoing relief, the harm caused by the TCC's actions and any future similar actions (including further distribution of communications from state court counsel, from which the TCC has refused to refrain) will damage the Debtors' carefully coordinated solicitation efforts and potentially delay or derail the Debtors' emergence from chapter 11.

## RESERVATION OF RIGHTS

46.     As noted herein, the TCC's dissemination of the TCC/Kosnoff Communications is a serious violation of bankruptcy laws, rules of professional ethics, and the Solicitation Procedures Order. The Debtors will be continuing to conduct a thorough investigation into this matter. As such investigation proceeds, new facts may come to light that require or warrant further action by the Debtors. Nothing contained in this Motion is intended or should be construed as a waiver or limitation of the Debtors' or any other party in interest's rights to demand that the TCC take further corrective measures or to seek further relief from the Court, including legal or equitable remedies for the TCC's actions and the harm caused by such actions.

## NOTICE

47.     Notice of this Motion will be provided to (i) the U.S. Trustee; (ii) counsel to the TCC; (iii) counsel to the Creditors' Committee; (iv) counsel to the FCR; (v) counsel to the AHCLC; (vi) counsel to the Coalition; (vii) counsel to JPM; (viii) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B and 2012; and (ix) any party that has requested

notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested herein, no other or further notice need be given.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion and such other and any further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  November 9, 2021
        Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Paige N. Topper*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@morrisnichols.com
       aremming@ morrisnichols.com
       ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice)*
Blair M. Warner (admitted *pro hac vice)*
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com
      blair.warner@whitecase.com

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION