# EXHIBIT 1



# EXHIBIT 2



# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .  Chapter 11
                                .  Case No.: 20-10343 (LSS)
BOY SCOUTS OF AMERICA AND       .
DELAWARE BSA, LLC,              .  (Jointly Administered)
                                .
              Debtors.          .
                                .
. . . . . . . . . . . . . . . . .
                                .
BOY SCOUTS OF AMERICA,          .  Adversary Proceeding No.:
                                .  20-50527 (LSS)
              Plaintiff,        .
                                .
v.                              .
                                .  Courtroom 2
A.A., *et al.,*                 .  824 Market Street
                                .  Wilmington, Delaware 19801
              Defendants.   .
                                .  Wednesday, October 14, 2020
. . . . . . . . . . . . . . . . .  10:06 a.m.


           TRANSCRIPT OF HYBRID ZOOM/TELEPHONIC HEARING
            BEFORE THE HONORABLE LAURIE S. SILVERSTEIN
                  UNITED STATES BANKRUPTCY JUDGE








Electronically
Recorded by:          Nicki Barksdale, ECRO

Transcription Service:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         Telephone: (302) 654-8080
                         E-Mail:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1  APPEARANCES:

2  For the Debtors:              Derek C. Abbott, Esquire
                                 MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
3                                1201 North Market Street
                                 Wilmington, Delaware 19899
4
                                 -and-
5
                                 Jessica C. Boelter, Esquire
6                                SIDLEY AUSTIN, LLP
                                 787 Seventh Avenue
7                                New York, New York 10019

8
                                 Michael C. Andolina, Esquire
9                                Matthew E. Linder, Esquire
                                 SIDLEY AUSTIN, LLP
10                               1 South Dearborn Street
                                 Chicago, Illinois 60603
11
   For Century
12 Indemnity Company:            Tancred Schiavoni, Esquire
                                 O'MELVENY & MYERS, LLP
13                               Times Square Tower
                                 7 Times Square
14                               New York, New York 10036

15 For the Tort
   Claimants Committee:          James I. Stang, Esquire
16                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 10100 Santa Monica Boulevard
17                               11th Floor
                                 Los Angeles, California 90067
18
19                               John A. Morris, Esquire
                                 PACHULSKI STANG ZIEHL & JONES, LLP
20                               780 Third Avenue
                                 36th Floor
21                               New York, New York 10017

22
                                 John W. Lucas, Esquire
23                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 150 California Street
24                               Floor 15
                                 San Francisco, California 94111
25

1    APPEARANCES (CONTINUED):

2    For the Trustee:          David L. Buchbinder, Esquire
                               OFFICE OF THE UNITED STATES TRUSTEE
3                              J. Caleb Boggs Federal Building
                               844 King Street
4                              Suite 2207, Lockbox 35
                               Wilmington, Delaware 19801
5
      For the Ad Hoc Committee
6     of Local Councils of the
      Boy Scouts of America:    Joseph C. Celentino, Esquire
7                               WACHTELL, LIPTON, ROSEN & KATZ
                                51 West 52nd Street
8                               New York, New York 10019

9     For the Greater
      St. Louis Area Council,
10    Boy Scouts of America:    Mark I. Duedall, Esquire
                                BRYAN CAVE LEIGHTON PAISNER, LLP
11                              One Atlantic Center
                                1201 West Peachtree Street, N.W.
12                              14th Floor
                                Atlanta, Georgia 30309
13
      For the Baltimore Area
14    Council, Boy Scouts of
      America, Inc.:            Todd M. Brooks, Esquire
15                              Whiteford, Taylor & Preston, LLP
                                7 Saint Paul Street
16                              Baltimore, Maryland 21202

17    For Circle Ten Council:   Matthew C. Corcoran, Esquire
                                JONES DAY
18                              325 John H. McConnell Boulevard
                                Suite 600
19                              Columbus, Ohio 43215

20    For Del-Mar-Va
      Council, Inc.,
21    Boy Scouts of America:    William P. Bowden, Esquire
                                ASHBY & GEDDES, P.A.
22                              500 Delaware Avenue
                                8th Floor
23                              Wilmington, Delaware 19801

24

25

1  <u>APPEARANCES (CONTINUED)</u>:

2  For Hartford Accident
   and Indemnity Company:    James P. Ruggeri, Esquire
3                            SHIPMAN & GOODWIN, LLP
                             1875 K Street NW
4                            Suite 600
                             Washington, DC 20006
5
   For Waste Management:     Rachel B. Mersky, Esquire
6                            MONZACK MERSKY McLAUGHLIN AND
                                BROWDER, P.A.
7                            1201 North Orange Street
                             Suite 400
8                            Wilmington, Delaware 19801

9  For the Coalition
   of Abused Scouts
10 for Justice:              David J. Molton, Esquire
                             BROWN RUDNICK, LLP
11                           Seven Times Square
                             New York, New York 10036
12

13                           Sunni P. Beville, Esquire
                             BROWN RUDNICK, LLP
14                           One Financial Center
                             Boston, Massachusetts 02111
15

16                           Eric R. Goodman, Esquire
                             BROWN RUDNICK, LLP
17                           601 Thirteenth Street NW
                             Suite 600
18                           Washington, DC 20005

19 For Andrew Van Arsdale:   David E. Wilks, Esquire
                             WILKS, LUKOFF & BRACEGIRDLE, LLC
20                           4250 Lancaster Pike
                             Suite 200
21                           Wilmington, Delaware 19805

22 For the Official
   Committee of
23 Unsecured Creditors:      Rachael Ringer, Esquire
                             KRAMER LEVIN NAFTALIS & FRANKEL
24                           1177 Avenue of the Americas
                             New York, New York 10036
25

1 | <u>APPEARANCES (CONTINUED)</u>:

2 | For Jack Doe:                  Bradley L. Rice, Esquire
                                   NAGEL RICE, LLP
3 |                                103 Eisenhower Parkway
                                   Suite 103
4 |                                Roseland, New Jersey 07068

5 |

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                              INDEX

2   <u>MOTIONS</u>:                                                    <u>PAGE</u>

3   Agenda
    Item 5:   Motion of the Coalition of Abused Scouts for          29
4             Justice for an Order (I) Authorizing the
              Coalition to File Under Seal Exhibit A to the
5             Amended 2019 Statement and (II) Approving the
              Sufficiency of the Amended 2019 Statement
6             (D.I. 1144, Filed 8/24/20).

7   Agenda
    Item 7:   Motion of the Coalition of Abused Scouts for         107
8             Justice to Participate in The Mediation
              (D.I. 1161, Filed 8/26/20).
9
    Agenda
10  Item 8:   Century and Hartford's Motion to Compel the          146
              Attorneys Representing the Entity Calling
11            Itself the "Coalition" to Submit the
              Disclosures Required by Federal Rule of
12            Bankruptcy Procedure 2019
              (D.I. 1164, Filed 8/26/20).
13
    Agenda
14  Item 9:   Motion of the Official Tort Claimants'                12
              Committee Pursuant to Bankruptcy Rule 2004
15            and Local Rule 2004-1 for an Order Authorizing
              the Issuance of Subpoenas for Discovery from
16            Debtors and Certain Local Councils
              (D.I. 1379, 9/29/20).
17
    Agenda
18  Item 10:  The Tort Claimants' Committee's Motion to            147
              Supplement the Claims Bar Date Order Regarding
19            the Electronic Execution of Abuse Proofs of
              Claim (D.I. 1387, Filed 9/30/20).
20
    Agenda
21  Item 11:  Motion of Coalition of Abused Scouts for             158
              Justice for Order Permitting Filing of Proof
22            of Claim Forms Signed by Authorized Counsel
              in Accordance with Bankruptcy Code Sections
23            501 and 502, Bankruptcy Rule 3001, and
              Official Form 410 (D.I. 1388, Filed 9/30/20).

24

25

1                                 INDEX

2     MOTIONS:                                                    PAGE

3     Agenda
      Item 12:   Century's Motion to Compel the Depositions of    191
4                Timothy Kosnoff and Andrew Van Arsdale or in
                 the Alternative to Adjourn the Hearing on the
5                Pending 2019 Motions [D.I. 1144], [D.I. 1161],
                 and [D.I. 1164] (D.I. 1417, Filed 1/7/20)

6
      Agenda
7     Item 13:   Motion of Tim Kosnoff, Esquire for Protective    211
                 Order and to Quash Notice of Deposition
8                (D.I. 1420, Filed 10/7/20).

9     Agenda
      Item 14:   Boy Scouts of America v. A.A., et al.            211
10               (20-ap-50527).

11    Transcriptionist's Certificate                              213

12
                                -o0o-
13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Proceedings commenced at 10:06 a.m.)

2     THE COURT:  Good morning, counsel.  This is Judge

3 Silverstein.  We're here in the Boy Scouts of America

4 bankruptcy case, case number 20-50527.  Ginger, please remind

5 everyone of the protocol for the hearing.  Ginger, I'm not

6 hearing you.

7     THE CLERK:  It's extremely important that you put

8 your phones on mute when you are not speaking.  Once

9 speaking, please do not have your phones on speaker, as it

10 creates feedback and background noise, and it makes it very

11 difficult to hear you clearly.

12     Also, it's very important that you state your name

13 each and every time you speak for an accurate record.  Your

14 cooperation in this matter is appreciated.  Thank you.

15     THE COURT:  Thank you.  Mr. Abbott.

16     MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

17 of Morris, Nickels, Arsht & Tunnell here on behalf of the

18 Debtors.  Thank you, Your Honor, for making time.  I know

19 your schedule is quite tight these days.  It's been a little

20 while since we've been before the Court, so we thought it

21 might make sense for me to ask Ms. Boelter to give you just a

22 very sort of quick update on things about the case going on,

23 and then get to the agenda if we may, Your Honor.

24     THE COURT:  Okay.  Ms. Boelter.

25     MS. BOELTER:  Thank you, Your Honor.  Jessica

1  Boelter.  Again, we understand that there is a very full

2  agenda for this morning, so I will be brief.  We only have

3  two items that wanted to update the Court on.

4          The first of those is that the core members of the

5  Debtors legal team have switched law firms.  You may have

6  noticed that from our pleadings.  Myself, Mr. Andolina, and

7  Mr. Lindor have moved from Sidley, Austin to White & Case.

8          BSA has signed an engagement letter with White &

9  Case.  They've also directed Sidley, Austin to transfer files

10  from Sidley to White & Case.  And we, Your Honor, are very

11  mindful of the 30-day nunc program tunc rules in Delaware.

12  We will be filing our retention application in very short

13  order but wanted to give the Court a heads up with respect to

14  that transition.

15          The second item, Your Honor, is just a follow up

16  on the advertising motion that the Debtors filed previously

17  and was the subject of two Court hearings. In the past

18  several weeks, the Debtors have been inundated with

19  complaints related to unsolicited robo calling and

20  unsolicited what I'll call robo texting, if that is, in fact,

21  a term.  Some of these robo calls and robo texts run afoul of

22  the Court's advertising order, in other words, they contain

23  phrases that the Court ruled should not be permissible in

24  advertising.

25          They also -- it's the Debtors concern that they

1  also may run afoul of the legal ethics rules in the various

2  jurisdictions where the text messages and calls are being

3  made.  The Debtors are investigating the source of the text

4  messages and calls  We've already take it upon ourselves to

5  contact various parties and alert them of the Court's prior

6  order in this regard.  But just to give the Court a preview,

7  we may be before you in very short order to the extent was

8  have difficulty enforcing the Court's order.

9          With that, Your Honor, that's the totality of my

10 update for today.  I'm going to hand it back over to Mr.

11 Abbott unless the Court has any questions for me.

12         THE COURT:  I do not.

13         MS. BOELTER:  Thank you, Your Honor.

14         MR SCHIAVONI:  Your Honor, this is Tancred

15 Schiavoni for Century, if I may be heard briefly on this

16 retention issue?

17         THE COURT:  Yes.

18         MR. SCHIAVONI:  So, Your Honor, if you recall when

19 in the course of the retention hearing for Sidley, Austin,

20 the Debtor was asked to put in submissions that were relied

21 upon by the Court in exercising what the Court characterized

22 as discretion to allow Sidley, Austin to continue, and the

23 element of the Court's decision was the submissions by Sidley

24 and it's consultants that Sidley's retention was critical in

25 the declarations they submitted and in their briefs, they

1  said that the change involving Sidley would be "catastrophic"

2  to the Debtor.  This change that has now occurred has

3  happened at critical point in the case when a whole series of

4  decisions are being made between now and November 16th

5  including these motions that are before the Court.  We don't

6  think.  I know what the rule says about 30 days, but we don't

7  think the case can wait 30 days for the 2016 disclosures on

8  conflicts.  It should come in pronto.  They've known about

9  this change has apparently been in the works for some time

10  because an extension was sought of the appeal of the

11  retention application.  We've known about it.

12          The impact of it on the case is, it's the prior

13  representations of Sidley Austin are correct, are

14  significant.  So, we just ask that the 2016 disclosures be

15  made within a week.  There's no reason to wait, you know, for

16  the full 30 days for those disclosures to be put in.

17          THE COURT:  Okay, well, I'll deal with issues

18  related to retention when the retention is in front of me,

19  and White & Case, I was thinking of the firm, White & Case

20  takes the risk, as do all Counsel who come in, that their

21  retention may not be approved, and they may not get paid for

22  the work that gets done in this interim period.  But I'll

23  deal with the retention issues when they're in front of me.

24          MS. BOELTER:  Thank you, Your Honor.

25          THE COURT:  Mr. Abbott.

1          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott.

2     We get back to the agenda, Your Honor, I would like if the

3     Court would entertain it to go a little bit out of order just

4     out of professional courtesy.  We've got a large number of

5     folks on the phone or on Zoom that are here for Docket Item

6     No. 9 and probably only Docket Item No. 9.  That's the

7     motion of the TCC for authority under rule 2004 to issue

8     subpoenas to the Debtors and local counsels and if the Court

9     would entertain it, I'd to start with that and turn it over

10    to, I don't know if it's Mr. Morris would likely to handle or

11    one of his colleagues.

12          THE COURT:  That's fine.  You can start with that.

13          MR. MORRIS:  Your Honor, this is John Morris from

14    Pachulski, Stang, Ziehl, & Jones.  Can you hear me?

15          THE COURT:  I can.  Let me remind people other

16    than Mr. Morris, please mute your phones.  I'm getting a

17    little feedback.

18          MR. MORRIS:  Good morning, Your Honor, John Morris

19    for the Tort Claimant's Committee.  I'm pleased to report,

20    Your Honor, that the 2004 motion has been conditionally

21    resolved.  I'd like to provide just a brief background as to

22    what led to the filing of the motion, as well as the

23    description of the terms of the stipulation that the Parties

24    entered into.

25          Immediately after the TCC was formed, we began the

1  process of seeking informal discovery from the Debtors.  We

2  sought documents not just from the Debtors, but on behalf of

3  the local Counsels.  The document sought included everything

4  that's the subject of the 2004 motion itself, and the request

5  for -- were first made at the end of March.  Over time, I'm

6  happy to report that the Debtors, I believe, acted in good

7  faith and continue to act in good faith.  And it made

8  available a large swap of documents for our review.

9          And the TCC has been working very hard over the

10 last months to prepare itself for the mediation, and to

11 otherwise educate itself as the financial condition, the

12 assists that are available, and other matters related to this

13 bankruptcy.

14         In the Spring, in the late spring, early summer,

15 we reached out to the ad hoc committee to get documents from

16 the individual committee members, we were told that we had to

17 seek those documents on a member by member basis, and we did

18 so.  Again, informally, so as not to burden the Court.  I'm

19 happy to report that all of the ad hoc committee members did,

20 in fact, produce documents, albeit not at the same pace and

21 not at the same level.  But nobody refused to participate in

22 the document production.

23         And so, again, over the summer, we've collecting

24 documents from the ad hoc committee members and preparing

25 ourselves for this case.  In September, we reached out to a

1    certain group of the local Counsels - - those that we thought

2    had a combination of the most of the claims against them, and

3    the largest asset case, and we made informal requests of

4    those local Counsels.  We didn't receive a response.  But

5    with the bar date coming, with the mediation pressures

6    increasing to move this case along, we filed what we believed

7    was an extremely narrow and prudent 2004 motion that was

8    limited to three very discreet topics, insurance policies,

9    restricted asset information, and rosters.

10    We had discussions, you know, with the Boy Scouts

11    and the ad hoc committee for some time about all of these

12    issues.  We made it clear to everybody both in our papers and

13    in our communications that we weren't asking anybody to

14    reproduce anything that had been previously placed in the

15    data room.  We were looking to make sure that we had all of

16    our insurance policies, not just the insurance policies of

17    the Boy Scouts but the insurance policies of the local

18    councils.

19    We wanted to make sure that if assertions were

20    made that assets were restricted and unavailable for

21    distribution.  That there was a factual basis to support

22    those assertions, and so we've asked for that information and

23    we'd asked for the rosters, because that -- the rosters, we

24    believe, contain critical information relating to liability,

25    the validity of claims, potential claims the estate may have

1  against third partis.

2           And so, during the course of our discussions with

3  that the Debtor and with the ad hoc committee, we were able

4  to reach a quick agreement, particularly as to insurance

5  policies and the restricted asset information, and you know,

6  early on in the process they agreed that they would fill

7  whatever gaps remained with respect to those topics.

8           So, that's the first component of the stipulation.

9  The Boy Scouts and the local council ad hoc committees

10  members have agreed to produce all of the insurance policies

11  and all of the restricted asset information described

12  specifically in the stipulation.

13           With respect to the balance of the local councils

14  as Your Honor may recall, there is an injunction in place

15  preventing the prosecution of any claims outside of the

16  bankruptcy court against any of the local councils.  The Boy

17  Scouts have until October 22nd to seek an extension of that

18  injunction.  And we have agreed as part of the stipulation

19  that at least two of the conditions to an extension of that

20  injunction will be that all local councils complete the

21  production of insurance policies and restricted assets

22  information as described in the stipulation by mid-November.

23  Really by the bar date, that's the goal.

24           If for whatever reason we can't come to an

25  agreement on an extension of the injunction, the parties have

1  agreed that these matters, other than the Boy Scouts and the

2  ad hoc committee members commitment to providing insurance

3  policies and restricted assets information, all of that would

4  be back before the Court.

5           The one issue that we hadn't been able to agree on

6  my Sunday evening was the issue of the rosters.

7           So, the Boy Scouts and the ad hoc committee filed

8  their opposition papers on Sunday evening solely with respect

9  to the issue of the rosters.  Discussions continued.  On

10 Tuesday, yesterday afternoon, we presented a proposal that

11 would, you know, that we intended -- that the TCC intended to

12 address certain of the issues raised as regards to access and

13 use of the rosters.

14          And with that, Your Honor, we've reached an

15 agreement to simply fold that into the discussion concerning

16 the extension of the injunction.  And what we would ask --

17 the only thing we would ask the Court today, is to see if we

18 can get on the calendar for October 23rd or soon thereafter

19 as Counsel can be heard to keep a date available in the event

20 that we can't reach an agreement.  And I'm hopeful that we

21 can, but given the calendar, given the upcoming bar date,

22 given the need to participate in the mediation, if we're not

23 able to reach these agreements, Your Honor, the parties have

24 agreed that we would come back to Your Honor on October 23rd

25 or soon thereafter as Counsel can be heard.  So, that's the

1  only thing that we request here today.

2          THE COURT:  Oh, okay.  My first question to you,

3  and I have looked at the Rule 2004 Exam Motion.  You keep

4  saying the parties have agreed.  And this motion isn't

5  directed at the DXA, and it's not directed at the local

6  council committee, it's directed at specific local councils,

7  who themselves had objected, some of them, to production.  I

8  don't see how the BSA and the local council committee can

9  resolve a matter that doesn't involve them.  So, do you have

10 agreement with all of the local council, or certainly those

11 that have objected as to a course of conduct with respect to

12 them?

13         MR. ABBOTT:  I would say two things, Your

14 Honor. First, I think that question is more properly directed

15 at the ad hoc committee with whom I negotiated on behalf of

16 the local councils, but more importantly, Your Honor, we're

17 nothing seeking any relief today.  What we've done is we've

18 simply kicked the can so to speak.  And --

19         THE COURT:  Yeah.

20         MR. ABBOTT:  -- if they want to sign on,

21 they -- if they want to sign on to the injunction, they dan

22 do that.  They -- they're not obligated -- this doesn't

23 obligate them to do anything.  If want to hear them, the

24 merits of the motion, I'm happy to do that today, too.

25         THE COURT:  Well, people seem -- I'm seeming to

1  get --

2           MR. ABBOTT:  Appropriate --

3           THE COURT:  -- in this case and others, some

4  misapprehension of when you get to kick the can, and who you

5  have to speak to, okay?  If a matter's been joined, you don't

6  get to unilaterally kick the can on your motion.  You have to

7  speak with the people who have objected and see if it's

8  acceptable or come to the Court.  But you don't get to on

9  your own kick the can.  Nor do you get to, on your own,

10 decide that the replies are going to be filed at 4:00 o'clock

11 the day before the hearing, or extend deadlines --

12          MR. ABBOTT:  We do have the motion --

13          THE COURT:  -- beyond the --

14          MR. ABBOTT:  -- Your Honor.

15          THE COURT:  -- local rules.

16          MR. ABBOTT:  We do have a motion for the late

17 filing.

18          THE COURT:  Yeah, it's very presumptuous.  I saw

19 in the stipulation that the previous stipulation that you all

20 had agreed to that.  It's very presumptuous.

21              Let me hear from -- I'm not inclined to enter

22 any order.  I'm not sure why I need to enter any order that

23 addresses what the BSA and local council committee are going

24 to do in connection with the motion that's not directed to

25 them?  But let me hear - -

1          MR. ABBOTT:  But that's what it is, Your Honor.

2          THE COURT:  -- from the local council committee,

3   and I'll hear from the BSA, and then I'll hear from the

4   objectors.

5          MR. ABBOTT:  Okay.

6          MR. CELENTINO:  Your Honor, this is Joe Celentino

7   from Wachtell, Lipton, Rosen & Katz on behalf of the ad hoc

8   committee of local councils.  Can you hear me?

9          THE COURT:  I can.

10          MR. CELENTINO:  Can you hear me, Your Honor?

11          THE COURT:  I can hear you, I just can't see you,

12   so I have to look, but go ahead.  Ahh, got you.  Go ahead.

13          MR. CELENTINO:  Very good. Thank you, Your Honor.

14   Your Honor, Craig Martin of BLA Piper is Delaware Council for

15   the ad hoc committee.  He's on the line and I've admitted pro

16   hoc vice, but with your permission, Your Honor, I'd like to

17   speak on behalf of the ad hoc committee.

18          THE COURT:  Yes, of course.

19          MR. CELENTINO:  Thank you, Your Honor.

20          So, Your Honor, we've been -- as Mr. Morris said,

21   we've been working with the TCC on discovery for months here.

22   My committee has reached out even more broadly than

23   Mr. Morris Rule 2004 Motion goes to local councils and have

24   been engaged in a massive effort since the beginning of this

25   case, Your Honor, to collect information about local council

1  assets which we believe is important to a global resolution

2  of this case.

3          On the question that Your Honor just asked, you

4  know, I think it's important to realize that my committee

5  indeed does not represent all local councils.  I rep -- the

6  committee is made up of eight local councils and I'm

7  appearing today on behalf of the committee and not on behalf

8  of any individual council.

9          What we would say with this -- respect to this,

10  Your Honor, is that Your Honor doesn't need to enter any

11  order today, any stipulation between the TCC adjourning this

12  motion and my committee does not bind, if you look at the

13  terms of the stipulation, any of the objectors, they do not

14  have to take any action here at this time.  We are simply

15  moving the hearing date down the line in the hope that we

16  will be able to resolve it consensually, through voluntary

17  productions like the local contemplates.  And so, Your Honor,

18  we think there isn't any need for an order here, and we don't

19  proport to speak either today to you or in the stipulation on

20  behalf of the objecting local councils.

21          THE COURT:  Thank you.  I didn't think that you

22  did, but I appreciate that clarification.

23          MR. CELENTINO:  Thank you, Your Honor.

24          MR. ANDOLINA:  Your Honor, it's Michael Andolina,

25  White & Case, proposed co-counsel for the Debtor.  May I be

1  heard on this?

2          THE COURT:  Yes.

3          MR. ANDOLINA:  Your Honor, as Mr. Celentino

4  indicated, his group has been working extremely hard over the

5  last several months trying to serve as a coordination point

6  for communications with all of the local councils.  It's a

7  thankless job, and I think of all of us Mr. Celentino might

8  have the worst gig here. But what I will say in terms the

9  proposed stipulation is that the goal of the BSA, of the ad

10 hoc committee, and I think of the TCC, is to set up a

11 mechanism whereby we can have a proposed agreement on the

12 extension of a preliminary injunction.

13          As Mr. Morris indicated, October 22nd is the

14 expiration date for the current agreement that we have.  On

15 that date, either we will have a proposed termination

16 extension notice that is agreed to by the parties, or the BSA

17 will have to file a motion to extend the preliminary

18 injunction which we assume the TCC would object to.  The

19 negotiations that have been ongoing are an effort to create a

20 mechanism so that local councils will have an opportunity to

21 provide information, and the TCC will have an opportunity to

22 review that information and decide whether it sufficient so

23 that the extension of the preliminary injunction can be

24 continued.

25          So, as Mr. Morris indicated, the goal here really

1    is to allow the parties eight days to work through whatever

2    issues we may have to have an agreement that is either

3    adopted by all of the local councils or is rejected by some.

4    So, I don't think the current issue of the 2004 discovery is

5    before the Court, but what we're seeking is to have a hearing

6    on that delayed.

7              And I did want to address that the Court's concern

8    about extending the notice, that's well taken Your Honor.  I

9    apologize on behalf of the Debtors.  We were working hard to

10   try to get a resolution, but I recognize the Court probably

11   was preparing and in the future we will be sure to abide by

12   the local rules in terms of timing and I do apologize on

13   behalf of the Debtors for that.

14             THE COURT:  Okay, thank you.  Let me hear from any

15   objector who wants to speak.

16             MR. DUEDALL:  Hello, Your Honor, this is Mark

17   Duedall for the Greater St. Louis Area Council.  May I be

18   heard?

19             THE COURT:  Mr. Duedall.

20             MR. DUEDALL:  Thank you, Your Honor.

21             We have no objection subject of course to the

22   Court's calendar to the continuance.  We were not consulted

23   on this because this is excessively odd.  There's ad hoc

24   committee that's doing wonderful work but doesn't bind all

25   the local councils and there is good information flow from

1  time to time, but it is odd that though this seems to be

2  skirting the local rules in many respects.

3         There was no meet and confer before the motion

4  which happens, but it shouldn't happen.  There was no

5  agreement to continue the hearing upon any party's objection

6  except by the Debtor and the ad hoc committee.  There was not

7  agreement to extend the reply deadline, although they had

8  asked me if I had even heard from the TCC, which I still

9  haven't.  I, of course, would have consented to extend any

10 reply deadline.  So, have no objection to the procedure

11 they're laying out because there's no relief being granted

12 today.  My Council takes the view that much of this

13 information is important and relevant and we have been

14 producing it, and we produced more last night, and we will

15 continue to produce information.

16        In short, Your Honor, since there's no relief

17 being sought today as to my client, GSLAC, I have no

18 objection to what they've laid out and things being moved

19 eight or ten or 12 days, what have you.  But in the future,

20 it would just be good if there were -- there's not many

21 objectors, it would be good if there was dialogue among the

22 objectors as well as opposed to us just kind of hearing

23 what's being agreed to kind of on our behalf and kind of not.

24 That's what I would ask in the future.

25        THE COURT:  Thank you.

1           MR. BROOKS:  Your Honor, this is Todd Brooks from

2    Whiteford Taylor, may I be heard?

3           THE COURT:  Yes, Mr. Brooks.

4           MR. BROOKS:  Thank you.  I represent the Baltimore

5    Area Council which is an objector.  It's on the -- our

6    objection is on the docket at 1423.  I'll be brief.

7           I share Mr. Duedall's support in the idea of -- I

8    don't know if the right word is continuing this, but not

9    going forward with the relief the TCC seeks today. My Council

10   likewise never received a telephone call for meet and confer.

11   On that basis lone, the Court  could deny the motion as to

12   our Council.

13           I think that's I have to say for the time being.

14   Thank you.

15           THE COURT:  Thank you.  Anyone else?

16           MR. CORCORAN:  Your Honor, this is Matt Corcoran

17   with Jones Day, may I be heard?

18           THE COURT:  Yes. Mr. Corcoran.

19           MR. CORCORAN:  I represent Council 10, and I just

20   echo the comments of the other council for the respective

21   councils.  We did not receive any request to meet and confer

22   before the motion.  We weren't consulted on the stipulations.

23   In fact, when an extension was granted to the BSA and the ad

24   hoc committee to file their objection two days later, we

25   reached and requested an extension and were denied the same

1  courtesy.

2          With that said, Your Honor, we are okay with

3  continuing the motion to a later date as long as we can

4  reserve all our rights to prosecute our objection and deal

5  with it at the time the Court hears it.

6          THE COURT:  Thank you.

7          MR. BOWDEN:  Your Honor, it's Bill Bowden at Ashby

8  & Geddes, may I chime in very briefly?

9          THE COURT:  Yes, Mr. Bowden.

10         MR. BOWDEN:  Thank you very much, Your Honor.

11         Your Honor, we filed on behalf of the Capital Area

12 Council, ad joiner to Circle 10's objection.

13         Your Honor, I -- I'm confident that ever party to

14 this hearing heard Your Honor's admonishment at the outset of

15 this matter.  Capital Area Council does not object to the

16 brief adjournment of this issue to see if a resolution

17 acceptable to the parties can be achieved. And when I say the

18 parties, I mean the effected local councils and that's all I

19 have to add, Your Honor.  Thank you.

20         THE COURT:  Thank you. Any other objectors?

21         Okay.  Given that the objectors are not objecting

22 to a continuance, I will continue the hearing.  And I am

23 available on the 23rd, but this will be the only matter that

24 I hear then.  I'm generally opening that gate to anything

25 anybody wants to file.

1        So, we'll continue it to 10 o'clock.  And I expect

2   that the Tort Claimants Committee will reach out to the

3   actual objecting parties to see if there can be a resolution.

4   There should have meet and confer under the local rule which

5   requires as I recall, either in person or telephonic hearing,

6   or a telephonic communication.  Even emails, I do not think

7   meet our local rule, and there's a reason for that which is

8   to open the communication pathway to see if there can be a

9   resolution  Let me add that I recognize the job that the

10  local council committee has been doing.  I did not mean by my

11  comments to diminish their role.  But it's been clear from

12  the beginning that they're a group of a council who have been

13  in dialogue but don't bind the local councils themselves and

14  this motion was directed at the local councils specific

15  individual local councils.  And so the parties, in my mind,

16  are the Tort Claimants Committee and the individual effected

17  local councils.

18        Now, that doesn't mean that the Boy Scouts and the

19  local council committee can't make whatever agreements they

20  think are appropriate between them, but it doesn't resolve

21  the issues unless the Tort Claimants Committee wants to

22  withdraw its motion as to the individual local councils.  So,

23  I think I've said enough with respect to that, but it needs

24  to be clearer that people are negotiating and speaking with

25  the correct parties.

1          MR. BOWDEN:  Thank you, Your Honor.

2          MR. RUGGERI:  Your Honor, James Ruggeri for

3   Hartford, may I be heard for a point of clarification?

4          THE COURT:  Yes.

5          MR. RUGGERI:  The clarification that we want is

6   this is the first we've heard of a stipulation that was

7   entered and we just want to be sure that the information,

8   whatever information is produced in response or pursuant to a

9   stipulation in response to the request is disclosed and

10  produced to all parties and interests in the data room or

11  otherwise, including the insurers, Your Honor.

12          THE COURT:  Okay, well, I have not -- and I'm not

13  going to, quite frankly, in connection with this Rule 2000

14  for a motion intern order approving the stipulation.  The

15  parties can stipulate to whatever they want to stipulate to.

16          I'm not going to enter an order.  This doesn't

17  seem to me to be directed to the Rule 2000 for a motion.  It

18  seems to be directed to the adversary proceeding and the

19  preliminary injunction.

20          And if the parties want to do something with

21  respect to that, and I mean the parties to that proceeding,

22  which again is sort of at an odd posture because the parties

23  to that proceeding are not just the Tort Claimants Committee

24  and the Boy Scouts, but, in fact, however many Plaintiffs

25  that have -- that exist in the underlying litigation, and

1  that were named in that lawsuit.  So, it's been kind of

2  confusing from the beginning in terms of stipulations entered

3  among "parties" to certain litigation.

4          But I don't see a need to sign this, and I'm not

5  going to, and not in this context, because I think it has

6  nothing to do with the Rule 2004 motion.  If the parties want

7  to put another stipulation in front of me, the parties,

8  meaning the BSA, the TCC, and the local council committee

9  want to put a stipulation in front of me in connection with

10 the adversarial aisle, entertain it.

11          But I don't see a reason to enter this here and

12 let me add that if the parties come to arrangements, I don't

13 need to sign off on everything.  And I'm not sure why there

14 would be a need to.  The parties have agreed, I assume they

15 will keep their word, and they will agree to do what they

16 said they're going to do.  And I don't know that I need to

17 sign off on every agreement between the parties.

18          Mr. Derek -- Mr. Abbott, what's our next matter?

19          So, anyone who wants to be excused from the

20 hearing, feel free to drop off.  You know, of course at any

21 time anyone can do that, but since we took this matter first,

22 anyone who wants to drop off, please feel free.

23          MR. ABBOTT:  Thank you, Your Honor, Derek Abbott

24 again.

25          Moving back up the agenda to the first matter

1  going forward, that is the motion of the coalition with

2  respect to sealing their exhibit to the 2019 and approving

3  their 2019.  So, I'll turn the podium to Ms. Beville, I

4  suspect.

5          THE COURT:  Ms. Mersky, I think you're speaking

6  but you're still muted.

7          MS. MERSKY:  Can you hear me, Your Honor?

8          THE COURT:  Yes.

9          MR. ABBOTT:  Both, I misspoke.  I didn't mean

10 Ms. Beville, you're right.  Ms. Mersky.  Thank you, Your

11 Honor.  Sorry about that.

12         MS. MERSKY:  Good morning, Your Honor, on behalf

13 of the coalition, Rachel Mersky on behalf of the Coalition

14 for Abused Scouts for Justice.  Mr. Molton will be first

15 addressing the Court regarding our motion.

16         MR. MOLTON:  Judge, can you -- can you hear me,

17 Your Honor?

18         THE COURT:  Yes, Mr. Molton.

19         MR. MOLTON:  Okay.  Thank you, Your Honor, I

20 appreciate it.  I'm glad to be here.

21         I'm here, Judge, along with Ms. Mersky, I'm with

22 Sunni Beville who has spoken earlier in these proceedings,

23 Ms. Beville will be handing the 2119 issues and Eric Goodman

24 of our office will be handling the Proof of Claim issues,

25 Your Honor.

1          But I do want to take the opportunity at the onset

2   to announce two important events in connection with the

3   motions outstanding, and I'll be handling, Judge, when we get

4   to the Mediation Motion.

5          Number one is the resolution of the Trustee's

6   objection in connection with the Rule 21019 in connection

7   with the Coalition, Ms. Beville will be addressing that in an

8   instant.  That leaves Your Honor only as we see it, two

9   outstanding objections that are still live, and that would be

10  the objections of the insurers and that objections of the

11  TCC, Tort Claimants Committee.

12         Off of yesterday, Your Honor, the mediators filed

13  a statement which we think is an important event in

14  connection with our role in this case, and I'm going to get

15  to that more at length and when I have the honor and pleasure

16  of addressing Your Honor in the Mediation Motion.  But I

17  think it's important in the context of going into all of

18  these issues.  That's their sentence, and particularly part

19  of their last sentence, being that and that is -- and that

20  statement was filed through the Debtors on behalf of the

21  mediators and at their direction and request.  And it's to

22  quote, Your Honor, and this Docket No. 1500.  "The absence of

23  the Coalition is a mediation party has and will continue to

24  hinder the mediation efforts to guide the parties to a place

25  of consensus, the time for which grows increasingly short."

1 And I want to underscore that last clause.

2        I know that Ms. Boelter and Ms. Andolina on behalf

3 of the Debtors have repeatedly this Court and all of the

4 parties that the Debtor is a melting ice cube.

5        They need a plan by early 2021 to be teed up.  And

6 if this plan is going to result in Boy Scouts emerging and

7 continuing on its mission, which was I think broadcast to the

8 Court and the aspiration of the Debtor on its first day

9 hearing, if that's going to happen, Your Honor, then we have

10 to get moving.

11        The Coalition stands poised, ready, willing and

12 able to work with all of the parties, including those that

13 have stood up on, you know, and submitted objection against

14 our participation in this case, to see if that goal can be

15 reached.  And that mean, Your Honor, in the next few months,

16 working with all the parties to seek -- see if we can find a

17 consensual resolution that will allow Boy Scouts to emerge.

18        I do want to note, Your Honor, that perhaps the

19 emergence of Boy Scouts in the manner that Ms. Boelter, I

20 think, described in the first day, may not be in the economic

21 interests of the insurers who might have reasons to see Boy

22 Scouts go into a free fall and turn into a liquidation.

23        I want to say, Your Honor, that that's just not my

24 though, and my pontification, but actually if you take a look

25 at what's happened in this case, this six- month old case, as

1    we stand poised over a crucial next four months, I don't

2    think that that's a conclusion that is necessarily wrong.

3              You weren't here, but I know that there was a lot

4    of time spent a disqualification of the Debtor's Counsel,

5    Sidley Austin.  And we heard that again today.  It -- you

6    do -- this morning that, you know, issue ways in connection

7    with the Whiteen cases emerging from this case.  We saw time

8    wasted and useful resources utilized in challenges to a

9    mediators appointment.

10             Well, now it's our turn.

11             Your Honor has seen a rainfall of pleadings filed

12   in connection with what we think our useful participation in

13   this case, what the mediators have concluded is a necessary

14   participation in this case.  What the Debtors have said is a

15   useful and valuable participation in this case, and what

16   other actors and parties and interest in this case including

17   the Unsecured Creditors Committee, the FCR, as well as the ad

18   hoc group of local councils have not objected.  You know, and

19   I think that those non-objections also send a message.

20             Again, Your Honor, we'd like to -- we're looking

21   forward to presenting these motions today, getting through

22   them.  We're looking forward to Your Honor deciding them and

23   accordingly after that introduction, I respectfully would

24   like to turn the rostrum or the Hollywood Square as you would

25   say it in our age, over to Ms. Beville who will describe the

1  resolution of our 2019 issues with the US Trustee as well as

2  deal with certain of the various objections extant in

3  connection with that issue.  If Your Honor minds, I'll do

4  that right now.

5            THE COURT:  That's fine.  Ms. Beville.

6            MS. BEVILLE:  Hi, I'm here, Your Honor?

7            Your Honor, we took your comments to heart at the

8  last hearing, and as noted by Mr. Molton, works to resolve as

9  many objections as possible and complete disclosure of the

10 2019 documents in accordance with the order that Your Honor

11 entered regarding the motion to file the documents under

12 seal.  Your Honor, as we move forward just procedurally, it

13 is from our view that your order address our motion to file

14 under seal and it leaves open for today the sufficiency of

15 the disclosures under 2019 and then in regards to the

16 Coalition's Mediation Motion.

17           I'm very please, Your Honor, as Mr. Molton

18 reported that the Coalition has reached an agreement with the

19 United States Trustee's office that resoled this objection to

20 the Rule 2019 statement that was filed by the Coalition, and

21 as Mr. Molton noted we do have the full support of the

22 Debtors and the mediator. The only remaining objecting

23 parties, Your Honor, are the insurers and the TCC, and I will

24 address objections later on in my presentation.

25           But first, Your Honor, I would like to note that

1  the agreement that we've reached with the US Trustee was --

2  in the supplement that we filed last night at Docket No.

3  1510.  It was filed at the request of the US Trustee's Office

4  to document and reflect the terms of the agreement and I will

5  allow the US Trustees Office to speak for itself as to the

6  resolution.

7          But, Your Honor, for the benefit of everyone here,

8  I wanted to just highlight the agreement we -- is that the

9  Coalition's itself will consist of members that are the

10 survivors that have signed affirmative consent.  You may

11 recall on our papers, Your Honor, that one of the things we

12 did after the hearing was send written request for

13 acknowledgement by the clients of the law firms that are

14 representative on the committee, and I am pleased to report

15 that as of this morning's hearing, we have over 7,300

16 affirmative consents that we've received directly from

17 clients of the law firm that presented it.

18          So, Your Honor, going forward the Coalition will

19 not note that it represents all of the clients of the law

20 firm at this point, which totals over 28,000.  We will

21 restrict the membership of the Coalition to only those

22 members that sign the affirmative consent.

23          Your Honor, we also have acknowledged in our

24 papers that the individual survivors be Coalition members

25 themselves are not responsible for payment of the Coalition

1  fees and expenses that the professionals, those fees are

2  being paid by state court councils directly.  State Court

3  Counsel will provide notice to their clients of the same

4  change in payment status in accordance with their ethical

5  obligations in any applicable jurisdiction, whether it's

6  through affirmative consent or otherwise.

7         And Your Honor, just to be clear, the 2019

8  statement does not in any way prejudice any party's rights

9  to -- ethical or either issues that might arise or have

10  arisen in connection to the Coalition's formation or other

11  actions by the Coalition.

12         Your Honor, it our view that the Rule 2019

13  statement is a disclosure issue to the extent parties raise

14  other issues with respect to ethics compliance or otherwise.

15  Frankly, Your Honor, it's not relevant to the hearing now,

16  and if there are issues to raised, they can be done so in

17  reason and in as an affirmative motion but be the best to

18  whatever the issue may comport with, whether it's voting

19  or -- plans -- in other cases, but, Your Honor, those aren't

20  the facts before the Court today.

21         Before I move forward, Your Honor, it would be

22  helpful for us to just to back and give you sense of what's

23  happened since the last hearing like from a factual

24  development perspective.  Following the hearing, Your Honor,

25  and at your direction, the Coalition provided to all

1   requesting parties and those identified in the order -- into

2   the motion to file under seal, unredacted copies of the

3   Exhibit A document that were filed with our original 2019

4   statement, but the only redaction being with respect to the

5   pricing information included in the state court council

6   engagement letter.

7          Your Honor, on September 29th, Kosnoff and Andrew

8   Van Arsdale resigned from the Coalition.  In the weeks

9   following the hearing, several new law firms were added to

10  the Coalition and their clients became Coalition members.   `

11         The new firms, Your Honor, are Motley Rice, Napoli

12  Shkolnik, Mark J. Garn and Partners (phonetic), Crowd

13  Continsman Law Firm (phonetic), Juneau and Associates

14  (phonetic), and Whisevinda (phonetic).  But Your Honor, that

15  brings us to a total of 11 law firms acting as

16  representatives in the Coalition representing over 28,000

17  sexual abuse victims.

18         On October 7th, the Coalition filed its second

19  amended verified 2019 statement.  That, Your Honor, included

20  the pillars of 2019.  We'll walk through those later in my

21  presentation.  Included an updated disclosure from Exhibit A,

22  filed those under seal in accordance with Your Honor's order

23  and also produced those unredacted copies to the correcting

24  parties.

25         And to the entities identified in your order as

1  well. Thereafter, Your Honor, the Coalition continued its

2  discussions with the US Trustees and ultimately reached a

3  resolution of the US Trustee objection.  And as I noted

4  earlier, Your Honor, that resolution resulted in the

5  Coalition restricting its membership to only those members

6  who returned the affirmative consent, and as I noted to date

7  we've received about 7,300 returned affirmative consents.

8          Your Honor, the Coalition engaged in discussion

9  with the other objectors, namely the TCC and certain of the

10 insurers.  But we were unable to resolve those objections.

11         And so, Your Honor, now to focus on Rule 2019.

12 Rule 2019, Your Honor, is a disclosure requirement.

13         The issues relating to Rule 2019 generally relate

14 to what must disclosed and subject to what  confidentiality

15 restrictions.  And Your Honor, I would -- that Your Honor's

16 order on the motion to file under seal addressed the

17 confidentiality component and the decision before the Court

18 today is what must be disclosed.  And, Your Honor, we believe

19 that we have disclosed all documents that are required Rule

20 2019.

21         And, Your Honor, as we go through the cases that

22 are cited by the objecting parties, that are cited by the

23 Coalition, all of those cases go to disclosure.  They may

24 arise in different context, in context of plan voting or in a

25 context of a law firm trying to file proof of claim.  In each

1   of those instances, Your Honor, the Court that was

2   considering Rule 2019, what was the remedy.  It was

3   disclosure.  And underlying issues relating plan voting or

4   proof of claims was out -- separately as a separate matter.

5   But the resolution of the Rule 2019 issue was disclosure.

6           So, Your Honor, the Coalition is an ad hoc

7   committee and pursuant to Rule 2019 and we have asserted

8   otherwise.  We are subject to and have made our disclosures

9   pursuant to Rule 2019.  The Coalition represents -- the

10  Coalition as a whole, in consequently is a collective

11  interest of the individual members, we do not represent the

12  individual members individually.

13          I'll turn your attention, Your Honor, to the WaMu

14  Washington Mutual Case which outlined exactly how ad hoc

15  committees function and the value of how ad hoc committees

16  function in bankruptcy cases.  Your Honor, in Washington

17  Mutual, which is cited at 419BR271, it was a 2009 case Your

18  Honor, in the District -- bankruptcy court in Delaware before

19  Judge Walrath and their -- Your Honor, identified that ad hoc

20  committees are typically a loose affiliation of creditors.

21          There's an at will major of committee membership

22  is one of the defining characteristics of ad hoc committees.

23  Because membership at will, the ad hoc committee cannot bind

24  members absent their consent.

25          And generally, all members must agree on any

1  position the committee takes.

2          Your Honor, in Washington Mutual, the judge noted

3  that the ad hoc committee filed pleadings collectively, not

4  individually, and took its instructions from the group as a

5  whole.  And in this case, Your Honor, Judge Walrath noted

6  that the council does not represent each member in an

7  individual capacity but rather the group as a whole.  And I

8  bring your attention to that case, Your Honor, simply to

9  refute the statements and the objections that, you know, ad

10  hoc committees represent the individuals, this is unusual.

11  How can this ad hoc committee function?

12          An ad hoc committee as contemplated by Rule 2019,

13  is a group of creditors acting collectively to advance a

14  common interest.  And that is exactly what that Coalition is

15  here, Your Honor, it is a group of sexual abuse victims

16  represented by their law firm who formed the Coalition and

17  retained bankruptcy counsel to represent the collective

18  interests of the sexual abuse victims in these cases.

19          Your Honor, there have been various issues raised

20  regarding the Coalition's authority to act.  And to refresh

21  your recollection, Your Honor, I addressed this at the last

22  hearing, but to make sure there's not confusion, the -- each

23  member of the state court council engagement letter

24  explicitly authorizes Counsel to associate with co-counsel.

25          Your Honor, this express consent provided in the

1  engagement letter that authorizes the association of Brown

2  Rudnick as Counsel representing the collective interests; in

3  our view, nothing further was required.  Those State Court

4  Counsel, Your Honor, then signed engagement letters with

5  Brown Rudnick and the Murphy Firm verifying their authority

6  to sign and bind their members to a term.

7           At the time of our original 2019 filing, State

8  Court Counsel sent a letter to all of their clients informing

9  them of the formation of the Coalition and the retention of

10  bankruptcy counsel.  To address concerns -- hearing, Your

11  Honor, the State Court Counsel sent a request for written

12  acknowledgement to all clients.  At the time of our filing of

13  the amended 2019, we'd receive more than 4,500 affirmative

14  consents and in that short time that has passed since then

15  that number had now risen to over 7,300 affirmative consents

16  received.  And, Your Honor, part of the resolution that US

17  Trustee's office is that the United State Trustee may, at its

18  request audit the affirmative consent to review and make any

19  necessary assessments as to the validity of those affirmative

20  consents.

21           So, Your Honor, especially given now that the

22  membership of the Coalition is restricted to the members that

23  sign affirmative consents, and those affirmative consents,

24  Your Honor, acknowledge the formation of the committee, being

25  a coalition, acknowledge that the individual is a member of

1 the Coalition, acknowledged that the fees and expenses will

2 be borne by the State Court Counsel, acknowledged that the

3 State Court Counsel is authorized to direct Brown Rudnick as

4 counsel to the Coalition, and acknowledge that the Coalition

5 represents the collective interest of the Coalition and not

6 the individual member's interest.  And, Your Honor, with that

7 affirmative consent in hand, we don't see there being any

8 concern further in that Brown Rudnick has the authority to

9 act on behalf of the Coalition.

10         So, Your Honor, as I mentioned in the Washington

11 Mutual case, we cannot bind individual members and we cannot

12 bind the law firms individually, but we can make

13 representation and we can make recommendations that the law

14 firm client takes certain action, support a plan, development

15 of a plan a certain way, this is not unusual, Your Honor.  We

16 have seen instances like this in mass tort bankruptcy cases

17 where ad hoc committees have played a vital roles in

18 mediation and development of a plan, and in those cases, Your

19 Honor, and I'm referencing cases like Purdue, and PG&E, and

20 when Mr. Bolton has a chance to take over, he can describe

21 the role of the ad hoc committees in more detail.  But this

22 isn't anything that we have created out of --

23         Ad hoc committees can play a meaningful role and I

24 would deposit here Your Honor, that we have played a

25 constructive role in this case to date.  Our participation

1   that's been that's been -- as advertising motions, the motion

2   that we recently filed regarding a attainting of signatures,

3   I pushed the claim, Your Honor, even not being a -- we have

4   provided detailed claims data to the better than the

5   mediators that have been incredibly helpful for them to start

6   to really review what that claim - where are the located,

7   what would their claims resolutions have to start to look

8   like and as recently as yesterday, Your Honor, we spoke with

9   Counsel to the ad hoc committee of local councils, and have

10  given permission for the Debtor to share that claims data

11  with the local councils so they can start to identify what

12  types of claims may be raised as -- certain of the local

13  councils on an individual basis as opposed to a collective

14  aggregate number of 28,000 sexual abuse victims in the case

15  more generally.

16          Your Honor, moving into the specifics of Rule

17  2019, and I will ask if you'd like me to walk through each of

18  the, you know, requirements and there are C1, C2, C3, and C4.

19  And in summary fashion, Your Honor, we provided the names and

20  addresses, the incident data, the types of claims, how my new

21  Coalition members, we have provided, I think more than is

22  required on your C4.  The case, Your Honor, that deal with

23  additional disclosures under C4 almost all -- and that's

24  requiring the law firm or the ad hoc committee to disclose

25  their intention agreements, which we have already done here,

1  Your Honor.

2        In addition to that, we provided copies of the

3  affirmative consent that is being requested in the initial

4  notice that was sent out.  And, Your Honor, at least in my

5  review of the cases, I haven't seen a law firm that ad hoc

6  committees that extra step to provide evidence of their

7  authority to act as an ad hoc committee.

8        Your Honor, it is our view that these disclosures

9  comply with the governing Third Circuit precedent, the use of

10 exemplar if it was permitted in expressly in the Third

11 Circuit in a Pittsburg -- case.  All of these cases, Your

12 Honor, are included in our papers and I trust that you are

13 familiar with those and won't take up the Court's time

14 reviewing each of those cases.  But, Your Honor, I do want to

15 highlight that the cases that are cited by the insurers are

16 the distinguishable here and don't stand for the proposition

17 that the insurance company -- please review that somehow we

18 have failed to disclose or must be compelled for additional

19 disclosure.

20        In the Arch Dioses of Minneapolis case,  Your

21 Honor, that was a case where a law firm was responsible for

22 over 70 percent of the claims that were being voted on in the

23 plan by one law firm, and what developed in that case, Your

24 Honor, was the Court ordered the production of that law

25 firm's retention agreement.  And that is exactly what we have

1 already done here, Your Honor.  And there is, Your Honor, a

2 case that's been cited very heavily by the insurers.  That

3 was a pre-packaged bankruptcy, Your Honor, where the terms of

4 the plan had been negotiated pre-petition for solicitation

5 and voting on the plan had occurred pre-petition.  And there

6 was a small group of locked arms that presented a vast

7 majority of the -- creditors in that case.  And there were

8 objections and then crushed into a -- by the insurance

9 companies as to how -- whether or not that was a good, safe

10 process.  And relied on Rule 2019 to obtain disclosure from

11 the lock arms that were involved in that process, and the

12 outcome there, Your Honor, was disclosure.

13          The lock arms were required to produce copies of

14 their intention agreements which, again, Your Honor, we have

15 done both here.

16          I would like to make note, Your Honor, that the

17 same parties here that are going for additional disclosure or

18 are prohibiting the Coalition from shift -- in the cases,

19 themselves have not followed the rules of the cases.  The TCC

20 has not filed a 2019, the insurers' attorneys representing

21 more than one client, have not filed 2019 statements.  There

22 are other ad hoc committees involved in these cases, Your

23 Honor, that have not filed 2019 statements.  It is a

24 selective application of the rule here, Your Honor, designed

25 to prevent sexual abuse victims from having access to the

1  bankruptcy and having their voices heard, and it is time,

2  Your Honor, to make that stop and allow these victims to be

3  heard, have them participate in the mediation process and

4  allow these cases to move forward.

5           Your Honor, we made note in our motion that there

6  is a question regarding whether the insurers even had

7  standing to object to the 2019 disclosures.  There is a group

8  of cases, Your Honor, that we have cited that including the

9  Third Circuit in Ray Combustion Engineering (phonetic) at 391

10  at third 190, that indicates that insurers must demonstrate

11  that they are a grieved person by order that "diminishes

12  their property, increases their burden, or impaired their

13  rights" and, Your Honor, the case law followed from that

14  decision really, including it he 2019 context, Your Honor,

15  and I refer to Pittsburg Corning and Kaiser -- where the

16  Courts ruled that the insurers lacked standing to challenge

17  the Rule 2019 order, and Pittsburg Corning, Your Honor, very

18  familiar to the facts here, the insurers were alleging

19  conflicts of interest on the part of the Plaintiff's lawyers

20  and alleged the need to investigate fraudulent asbestos

21  claims.  And there, Your Honor, the Court did not deny access

22  to information, it ensured that the insurance companies had

23  access to the Rule 2019 disclosure, but they lack standing to

24  appeal the Rule 2019 order itself.

25           Similarly in Kaiser, Your Honor, the court ruled

 1   that the insurance companies lacked standing to challenge

 2   Rule 2019 order.  That required the insurance companies to

 3   file a motion to obtain access to the information.  And

 4   there, Your Honor, the Court noted that insurance-neutral

 5   plans are possible, and until such time as a plan is before

 6   the court that does not have insurance neutrality provisions,

 7   the insurance companies lack standing.

 8         There are other cases, Your Honor, where the

 9   insurers did have standing to object, and in those cases,

10   Your Honor, including Baron and Budd, which was a case where

11   it was arguable that the plan was not insurance-neutral, in

12   which case the insurance companies had standing.

13         But Your Honor, even if the insurance companies

14   have standing and you are here to hear their objection, I

15   must note that their accusations on Coalition is a marketing

16   label are baseless.  The Coalition itself has not undertaken

17   any advertising.

18         Your Honor -- and I mentioned it in the hearing

19   last time -- what the insurance companies and the TCC are

20   responding to is the number of victims here.

21         There have been allegations by the insurance

22   companies that these are fraudulent claims, that we're

23   drumming up claims.  But Your Honor, going back to 2002 when

24   the Boy Scouts did its own investigation and released a

25   portion of the files, the portion of the files that were

1  released, Your Honor, identified at least 5,000 individuals

2  that were released from the Boy Scouts for perpetrating or

3  potentially allegedly perpetrating abuse against Boy Scouts.

4        So Your Honor, that number is 5,000.  In many of

5  those cases, the perpetrators allegedly abused more than one

6  victim.  Your Honor, that brings you to the thousands of

7  victims that existed -- that the Boy Scouts potentially knew

8  of in 2002.  And that does not include the victims that did

9  not come forward, that did not speak, and that does not

10  include the perpetrators that were included in files that had

11  been lost.

12        So when we hear the insurance companies argue that

13  we're manufacturing claims, Your Honor, there is no evidence

14  to support that.  There will be a claims resolution process

15  as a part of a plan or any trust distribution procedures, and

16  that, Your Honor, is the appropriate time to review and

17  reconcile claims and ensure the validity of the claims.

18        Again, Your Honor, 2019 is a disclosure issue, and

19  I posit, Your Honor, there is no additional disclosure that

20  the Coalition needs to make here.  But to the extent, Your

21  Honor, you've identified something that the Coalition needs

22  to produce, we simply request the opportunity to hear about

23  the deficiency.  That is all for now.  Thank you, Your Honor.

24        THE COURT:  Thank you.  No, I don't have any

25  questions.  I wanted to hear your presentation.  I will say

 1 that the Rule 2019 statement is a little confusing.  Maybe of

 2 necessity by use of terms.  But as to who exactly the

 3 Coalition is, is it the law firms, is it the clients.

 4           I think you've cleared that up.  But more

 5 importantly from my perspective is the written

 6 acknowledgements that have now been received from the 7,300

 7 or so clients because it did -- I was concerned about that

 8 and who the committee is and even who the clients are.

 9           The -- but one thing about this case, and I don't

10 know if it's the same in other mass tort cases or not where

11 there are ad hoc committees, is the group seems to change.

12 And what's the anticipation if the group changes in terms of

13 updating the Rule 2019 statements?

14           MS. BEVILLE:  Your Honor, I would anticipate that

15 we would file periodic updated statements as either

16 additional law firms joins as representatives and their

17 clients join, as we continue to receive signed affirmative

18 consents.  I don't know the timing of when the numbers will

19 be changing materially.  Obviously, it happened rather

20 quickly over the past week.  But we would endeavor to provide

21 throughout reports, Your Honor, if you have specific time

22 frame, we're happy to do it every other week, once a month,

23 but in any event, when the numbers change materially, we have

24 updated either new law firms or a material number of new

25 affirmative consents, we will file an updated 2019 statement

1  reflecting those changes.

2          THE COURT:  Okay.  Let me -- let me hear from

3  the -- let me hear from Mr. Schiavoni.

4          MR. SCHIAVONI:  Your Honor, it's hard for me to

5  say I don't want to speak, but if I may pass to Mr. Ruggeri,

6  who has a witness.

7          THE COURT:  Yes, you can pass to Mr. Ruggeri.

8          MR. RUGGERI:  Good morning, Your Honor.  That

9  indeed is a first that Mr. Schiavoni has yielded the floor

10  when called upon.

11          Judge, let me start by addressing Mr. Molton's

12  comments in suggesting that we're making objections for

13  improper reasons.  We're not, Your Honor.  There's a process

14  that needs to be followed.  We're following the process.

15          Do we have an economic interest?  We do, as

16  everyone participating in this case has an economic interest.

17          So we're all trying to do what we need to do and

18  do our jobs to deal with our respective economic interests.

19  But there's nothing nefarious or improper about anything that

20  the insurers are doing.

21          With regard to standing, it's a little easier here

22  because we are a creditor.  So we don't even fall into the

23  argument, although the insurers clearly have a stake in the

24  2019 disclosure here.

25          We heard about a rainfall of pleadings.  There is

1  a rainfall going on, and the Court's talked about it before.

2  We just saw two days ago some websites now published 50,000

3  claimants -- more than 50,000 claimants are expected to be

4  filed in this case.

5          Why is that important?  It's important because the

6  predicate for the ad hoc committee, the Coalition's

7  participation in this case was the representation that it

8  represented the vast majority controlled the vast majority of

9  the claims, the sex abuse claims that we're talking about in

10  this case.

11          The Court has seen the Kosnoff email about

12  chilling out and going sailing and representing 80 percent or

13  more of the claims.  What we heard this morning is very

14  different.  What we heard this morning is that the Coalition

15  actually today represents as few as 14.6 percent of those

16  claims, if we're looking at the 50,000-plus number.  Or no

17  more than 26 percent of the claims, if we're using the 28,000

18  number, which counsel has said the law firms represent 28,000

19  claims, of which they've only received the affirmative

20  consents for 7,300.

21          And I will say -- and maybe it was inadvertent,

22  but Ms. Beville's presentation caused further confusion

23  because, on the one hand, she said the Coalition's only

24  represented the affirmative consents, and then later on when

25  she was introduced to the new counsel, she referenced that

1  the Coalition represents 28,000 members.

2          So we still don't know sort of the scope of the

3  engagement here.  I will tell you that I thought we were

4  looking at the Coalition coming in and asking the Court not

5  to kick the can down the road but to acknowledge that today's

6  proceeding on this issue was premature because late last

7  night, they filed a document that said the affirmative

8  consents are coming in, and that they will file in seven

9  days -- seven days they're going to file an amended 20 -- a

10  further amended 2019 disclosure, which is going to tell us

11  who they represent, at least as of that time.

12          That's one of the issues that we've been looking

13  for from the beginning, Your Honor.  Had they provided some

14  information to us?  They have.  We don't doubt that.  And

15  it's been helpful.  But have they made a complete showing on

16  who they represent?  No.  So we don't know on whose behalf

17  they're empowered to negotiate.

18          And presumably, it looks like we won't know that

19  for at least another seven days when they intend to file a

20  further supplemental filing.

21          Had they produced the foundational documents that

22  will allow us to see not only who purports to act on behalf

23  of these Coalition members but on what basis do they purport

24  to act on their behalf, we don't.  We saw recently filings

25  referring to by-laws.  I think they were by-laws from

1  September.  We haven't been produced the by-laws.

2            If we were produced those by-laws, it may help us

3  get our arms around to make sure we know who's at the table

4  and how they're at the table.  Where are the empowering

5  documents?  We don't have those.  There are by-laws.  We know

6  there are by-laws.  They have not been produced.

7            We heard today that it's not unusual to have an ad

8  hoc committee.  I agree with counsel.  It's not unusual to

9  have ad hoc committees, but what's unusual is to have an ad

10 hoc committee in my experience that really overlaps the job

11 of the official committee.

12            The official committee has the fiduciary

13 obligation to represent these same claims.  This is

14 apparently just a subgroup of those same claimants whose

15 interests are already being represented and not -- not a big

16 bag of representation or interests to be representative.

17 It's the same claimants.

18            But they want to be separately represented, and

19 they want to be separately recognized in negotiating, even

20 though their numbers may total as few as 14.6 percent of the

21 interest --

22            THE COURT:  Is that relevant --

23            MR. RUGGERI:  -- that are already represented by

24 the committee.

25            THE COURT:  Explain to me the relevance of that.

1  Explain to me the relevance of -- to 2019, the relevance of

2  a, as you call it, subgroup of those who are represented in a

3  representative capacity by the tort claimants committee.

4          MR. RUGGERI:  Admittedly, Your Honor, it gets into

5  the merits of the participation and the mediation motion.  It

6  really begs the question of why.  It's not a question of

7  disclosure in that regard once they identify who their

8  members are.  But there is a direct overlap of Mr. Stang and

9  his committee, who is charged with a fiduciary obligation to

10 represent those same claimants.  So it's a question of need.

11         And the representations on the stated need is that

12 these folks were needed because of their majority

13 representation, which appears to be incorrect in terms of the

14 affirmative consents that are coming back.

15         So I don't know -- I don't see the need for this

16 separate collection of an ad hoc committee, nor do I think

17 that it aids the process.  But more importantly from a

18 disclosure standpoint, we don't know who they are still.

19         We're not going to know for seven days who they

20 are.  We don't have the empowering documents.  We do have

21 concerns about the ability of the state court counsel to

22 purport to engage the Coalition counsel, the Brown Rudnick

23 firm and the Monzack Mersky firms to represent the Coalition.

24         And in turn, we have questions about the

25 affirmative -- the informed consent that the state court

1  counsel purports to have received.  And that's in connection

2  with our submission to the Court of declarations by Professor

3  Moore, we've offered the Court two declarations that go to

4  those issues and really go to the issue of informed consent

5  on every level.

6          What we can't happen here is to empower a

7  Coalition, it seems to me, that is tainted by virtue of

8  either Coalition counsel wasn't represented by law firms who

9  had the authority to represent them, or the claimants, the

10 claimants, the individual claimants -- I still don't know

11 who's the real client here of the Coalition -- but the

12 individual claimants did not give informed consent to their

13 lawyers to engage the Coalition counsel to represent this ad

14 hoc collection of interests, Your Honor.

15         We have offered the declarations to the Court.

16 They've been filed on the docket, ECF 1499-2 and 1499- 3.

17 Professor Moore has joined us here this morning.  She is

18 available to testify, if needed.  We're certainly pleased to

19 offer her declarations into evidence in lieu of her direct

20 testimony and to make her available for cross-examination and

21 allow her to support her testimony and her opinions on the

22 inadequacy of the disclosures and the conflicts that are

23 raised by the disclosures if the Court deems that

24 appropriate.

25         THE COURT:  Are they inadequacies of disclosures

1  relevant to 2019 or are they inadequacies of disclosure

2  relative to an attorney/client relationship?

3          MR. RUGGERI:  Your Honor, both.  I think that the

4  Coalition's filing last night tells us there's an inadequacy

5  disclosure of the interests they represent because they just

6  recently sent out those affirmative acknowledgements to their

7  clients.  They haven't come back and there's going to be more

8  filed within -- they say seven days.

9          THE COURT:  And as I said, this sort of rolling

10 nature of --

11         MR. RUGGERI:  Understood.

12         THE COURT:  -- the Coalition or committee is

13 something that I'm not sure exactly what to do with.

14 Nonetheless, what is it that your client doesn't understand

15 about who Ms. Beville represents?

16         MR. RUGGERI:  I don't understand the individual

17 claimants because it's incomplete.  I don't understand the

18 rolling admission of state court counsel in and out.  I don't

19 understand the Kosnoff and Van Arsdale situation, who still

20 have clients who apparently are represented by -- in the case

21 by the Rothweiler firm. They were the triumvirate, if you

22 will, that flashed and engaged people on the abuse and

23 scouting letterhead, all three of them.

24         So we're told that Kosnoff and Van Arsdale have

25 resigned.  Have they?  Have they really?  I don't know, but

1  who is really directing traffic?  If I saw the bylaws, for

2  example, I might be able to get an understanding of who's

3  directing traffic here.  Who's empowered to direct the

4  Coalition counsel to act on behalf of the Coalition.  We

5  don't know that today, and that is a disclosure issue, Your

6  Honor.  That is a disclosure issue with regard to that issue,

7  Your Honor.  It's an adequate disclosure.

8          THE COURT:  Well, I will state that the

9  resignations -- I don't want to say they're a red flag, but I

10  will say they're interesting.  And I'm not sure why they

11  happened or needed to happen or what the impact of that is.

12  I will agree because their clients are still -- at least some

13  of them, those who have returned the written

14  acknowledgement -- are still part of the Coalition.

15          MR. RUGGERI:  They are, Your Honor.

16          THE COURT:  Assuming the Coalition are the actual

17  clients.  So --

18          MR. RUGGERI:  And Your Honor, we don't have a

19  resignation from the Eisenberg Rothweiler firm either, and

20  that was -- the three firms were associated counsel on behalf

21  of their clients.  So we only have Kosnoff and Van Arsdale

22  who "resigned", but I don't know what that means, if it

23  really means anything given the nature of the situation.  But

24  there hasn't been full disclosure of that.

25          And it may be the Kosnoff resigned because of the

1  attention that his email is receiving in this case, and --

2          THE COURT:  Could have been.

3          MR. RUGGERI:  -- likely will continue to receive.

4          THE COURT:  It could have been.  Or the notice of

5  his deposition.  There could be a number of reasons for it,

6  and whether he's behind the scenes calling the shots is an

7  interesting question.  I guess for purposes of 2019 -- and I

8  want to understand -- I think there's no question that --

9  well, I shouldn't say that.

10          When you say you don't know who Ms. Beville's

11  representing, because you don't know every detail and nuance

12  of the relationships, or because you suspect, or because

13  there may be -- I don't want to put words in your mouth that

14  go beyond what you're saying -- that there may be some

15  impropriety in the solicitation of clients, the -- or there

16  may be some ethical obligations that underlying counsel are

17  not comporting with.

18          How does that impact Rule 2019 as opposed to

19  whatever concerns are raised by the conduct of not

20  Ms. Beville's firm but the six, nine, however many law firms

21  there are now --

22          MR. RUGGERI:  Your Honor, in addition to your

23  list, and this is a disclosure issue, seems to me, there's

24  the equivocation internally in the documents that have been

25  produced, including the engagement letter, both the state

1  court counsel engagement letters and the Brown Rudnick

2  engagement letter.  That makes it unclear who are the

3  clients.

4         There's internal equivocation on that.  So what

5  we've heard is Ms. Beville today seek to clarify that issue,

6  but that doesn't change what the documents themselves say.

7  So there are issues with regard to that.

8         There is a disclosure issue with regard to the

9  individual claimants as we talked about, and the Coalition

10  concedes in the filing it made last night and the

11  representation is going to make a further filing within seven

12  days of further supplemental disclosure to -- so we'll have a

13  better understanding of who they represent.

14         It's also undisputed that we don't have the

15  bylaws.  The by-laws, I think, are important disclosure so

16  that we understand, again, the empowering documents, who was

17  the authority to act on behalf of the Coalition and to

18  instruct someone to act on behalf of the Coalition.  Those

19  are all classic, in my view, disclosure issues, Your Honor,

20  and that are to be resolved at this stage.

21         The other issues with regard to the ethical

22  propriety or impropriety or those issues there get closer to

23  the line of whether they're disclosure issue or whether those

24  should be taken up separately.

25         But we do have (inaudible) at the same time that

1  there's a request for the Court to approve the sufficiently

2  admitted disclosure, we have a request to allow this

3  Coalition to participate in the mediation. And I dare say

4  that I don't know that the mediators have received the same

5  information that the Court received today, even in terms of

6  the scope of the representation of the Coalition and the

7  numbers that they represent.

8         So I think we get closer, but I do have a concern

9  that if we are going to be at a mediation and that mediation

10  with one of the parties is infected by conflict, and I think

11  the mediators have been clear that they only believe the

12  Coalition should be there if it's a legitimate Coalition

13  that's not tainted with any of those concerns that the last

14  thing we want to have is to go through a mediation and then

15  have another ad hoc committee come forward and say, that's

16  great you had that negotiation, but that Coalition didn't

17  represent my interests because I didn't give informed consent

18  for it to do that.

19         That's our concern, Your Honor.  One of our

20  concerns at the mediation to make sure that we have the right

21  parties there who have the authority to negotiate on the

22  people they say they have the right to negotiate on behalf

23  of.

24         THE COURT:  Well, they're going to have the --

25  let's assume they have the authority for the moment to

1   negotiate.  They've already said as the Coalition of local

2   counsel has said that they don't bind their individual

3   members.  They're negotiating, but they don't bind their

4   individual members, just like Mr. Ruggeri, you don't bind

5   your client until your client says you bind your client.  And

6   you --

7            MR. RUGGERI:  You're right.

8            THE COURT:  You negotiate, and you don't bind them

9   until your client agrees.

10           So I'm trying to understand whether the membership

11  is 7,000 clients, 10,000 clients, or 14,000 clients, or

12  28,000 clients.

13           In terms of the underlying policy of Rule 2019 and

14  understanding the motivation and the economic position so

15  that there's awareness of where a group is coming from, how

16  is that your client doesn't know that?

17           MR. RUGGERI:  Your Honor, we do now know the

18  7,300 -- although they haven't been provided to us, the

19  affirmative consent.  That's something we know.  What we

20  don't know is that this Coalition represents the majority of

21  interests that it purported to represent when it first

22  entered this case.  So that dynamic has changed.

23           At the end of the day, although the Coalition

24  counsel can't bind the client, the parties -- and with my

25  client as well -- you're correct in terms of I can't bind.

1    But I do come to the table with the authority, proper

2    authority, unconflicted authority to negotiate on my client's

3    behalf, on behalf of the client that I purport to represent.

4            And that's what makes this a little bit different

5    because we don't know, in fact, that the Coalition counsel

6    has the proper, unconflicted authority to participate at the

7    negotiating table the way the other parties do as to whom

8    there are no such issues.

9            THE COURT:  And what do you mean by unconflicted

10   authority?

11           MR. RUGGERI:  If the state court counsel did not

12   have authority to engage Coalition counsel on behalf of their

13   client, we have a problem.  We have a problem.  And if you

14   look at Professor Moore's declaration in this case that she

15   identifies that problem.

16           And simple example, for example, the word

17   associate.  What does associate mean?  If you look at the

18   engagement of the state court engagements, associate really

19   means to represent the individual interests.  And that's not

20   what we're told they're doing now with regard to associating

21   in the Brown Rudnick firm and the Monzack Mersky firm.  It

22   means something else.

23           So as a client who's told they're associating in

24   this new counsel, okay, I don't think it's clear to the

25   client that it means that counsel is not being engaged to

1 represent your individual interests.  I think the (inaudible)

2 is used.  So that's a real problem.  So that's an example

3 of --

4          THE COURT:  I think I raised that last time as a

5 possible question that I didn't know the answer to.

6          But I think I raised that as to what does

7 associate counsel mean.  But --

8          MR. RUGGERI:  And it still is --

9          THE COURT:  Now we have these written requests for

10 written acknowledgement.  Why doesn't that solve the problem,

11 to the extent there was one?

12          MR. RUGGERI:  I think the question is, Your Honor,

13 for example, there is no explanation of the divergent

14 interests that this counsel represents, for example.  There

15 also is -- my recollection is there's a statement that the

16 Coalition counsel has been -- or the individual members have

17 been availed of the opportunity to be provided information as

18 opposed to information being provided to them.

19          So there's a difference in terms of providing

20 acknowledgement whether you're providing acknowledgement

21 based on informed consent or an uninformed consent.

22          And the question these acknowledgements to me,

23 Your Honor, is whether the consent provided by these

24 claimants is informed consent after, for example, a full

25 disclosure of the conflicting interests that Coalition

1    counsel is representing through this Coalition, where if I'm

2    the individual claimant, again, if someone is associating for

3    me, then I believe they're associating in to represent my

4    interests.  That's a problem that still exists with regard to

5    these engagements, Your Honor.

6            THE COURT:  And how is that problem addressed in

7    other mass tort cases?

8            MR. RUGGERI:  Your Honor, I don't want to speak

9    out of school in terms of the other mass tort cases.  You are

10   familiar with the Baron and Budd case.  That case does

11   involve one of the new state court counsel who's entering --

12   who entered an appearance here a couple of days ago.  So

13   there was a requirement of full disclosure in terms of the

14   retention agreements that some would argue went above and

15   beyond.

16           So I think it does -- it varies based on the case,

17   Your Honor.  It varies based on the facts and circumstances

18   that are presented.

19           THE COURT:  I did read the Baron and Budd case.

20           It kind of plops you in the middle of the case

21   itself if you're not familiar with all the underlying facts,

22   which I'm not, and that's not a criticism of the judge

23   because I do that, too, sometimes and assume familiarity with

24   the case because I'm writing for the parties.

25           So it kind of plops you in the middle, and it deal

1  with ethical issues.  But ultimately -- it seemed to do so

2  because -- well, first of all, it also dealt with the

3  previous iteration of the rule.  So that's one issue that

4  could be a distinguishing factor.

5          But what does Judge Ferguson say?  She says -- she

6  seemed to suggest that the treatment under the plan that

7  was -- and the fairness of the plan's classification system

8  was involved.  So there was some very specific provisions of

9  this prepackaged plan, which I'm not -- don't know what they

10  were -- that seemed to call into question the good faith

11  filing issues.  But she seems to have had some very specific

12  concerns about a negotiation that went on pre-petition that

13  affected the rights of other creditors.

14          MR. SCHIAVONI:  Your Honor, this is Tanc

15  Schiavoni.  I argued before Judge Ferguson the 2019 motion,

16  and I -- perhaps after Mr. Ruggeri or now, I could just

17  address that specifically.

18          THE COURT:  I'll let you address it afterwards.

19  But I did read that -- you know, I did read that case, and

20  I'm not surprised to hear you argued it.  The -- but from the

21  case itself, it seems kind of -- yeah.  Somehow those clients

22  got preferential security interest.  I don't know what

23  happened there.

24          But we're certainly not at any of that kind of

25  stage.  But ultimately -- ultimately what she said was you

1  need to disclose stuff.

2          MR. RUGGERI:  Right.  I think we're not at that

3  stage, Your Honor.  Congoleum has a long and sordid history,

4  certainly, and there were good faith filing issues.  But with

5  regard to the issue that we're touching on today, from my

6  perspective, the importance of that ruling was the

7  requirement that there be full disclosure of potential

8  conflicting interests.  That's what the effect of the

9  requirement for the disclosure in that case was, and that was

10  my lesson that I take in terms of the 2019 issues at bottom.

11          And I'm happy to let Mr. Schiavoni expound from

12  there if he has a different take from the perspective of the

13  one who argued it.  But that's the lesson from that case with

14  regard to the issues that we're raising on behalf of my

15  clients is the adequacy of the disclosure of the potential of

16  conflicting interests, Your Honor.

17          THE COURT:  Okay.  And specifically, then, because

18  where I'm struggling is if there's disclosure, then how deep

19  do I get into the professional obligations of the underlying

20  counsel and whether they have fulfilled whatever their state

21  law, professional obligations are?

22          MR. RUGGERI:  Your Honor, I certainly think it

23  comes into play in terms of approving the adequacy of the

24  disclosure if we can't rule out the issues over the conflicts

25  and we can't satisfy ourselves that the disclosures were

 1  adequate and that the Claimants were adequately disclosed or

 2  informed of the potential conflicts, then I do think it goes

 3  in the adequacy of the 2019 disclosures because there's an

 4  absence of that information.

 5          And that leads in, again, I still don't know why

 6  we don't have the bylaws.  If folks wanted to address some of

 7  our concerns in terms of empowering documents, that to me

 8  seems to be one of the easiest documents that should have

 9  been made available so that we know what is the document or

10  what is the instrument that empowers people to do what

11  they're doing in good faith.  And that may go some of the way

12  towards satisfying our concern about not knowing who has

13  authority to act and on what basis do they have the authority

14  to act.

15          We have counsel coming in and out now.  How is

16  that happening?  We now have 11 counsel, right?  I thought --

17  I didn't know if the 11 counsel represented all 28,000.  They

18  apparently may but only a subset of the 28,000 is actually

19  represented through the Coalition.

20          So there's lots of inconsistency here, not just

21  the numbers, but in terms of the conflicts, in terms of the

22  empowering instrument and documents, and we think that is

23  part of the disclosure obligation here, and I think that

24  they're wrestling so much over this conflict issue.

25          And then you lay on top the withdrawal of Kosnoff

1  and Van Arsdale, there are lots of questions here.

2           And we don't have the information to really answer

3  those questions.

4           And again, the metaphor used by counsel at the

5  last hearing about the stool, if a stool has a rotten leg,

6  the stool collapses.  And that's what we're concerned about

7  here.

8           THE COURT:  What are the bylaws going to tell you?

9           MR. RUGGERI:  Who directs Coalition counsel, Your

10 Honor, for example.  How --

11          THE COURT:  So that they have to have a majority

12 vote of the -- I mean, what are they going to tell you?

13          MR. RUGGERI:  I don't know what they'll tell me

14 about, for example, who comes in -- you asked the question

15 who comes in and comes out.  That could be addressed in the

16 bylaws.  I don't know.  I don't know who purports to have the

17 authority to represent Coalition counsel.  I don't know if it

18 says anything about the basis on which they purport to have

19 the authority.  I would like to see it.  I think it's --

20          THE COURT:  Well, what you'd like to see -- I

21 don't think what someone would like to see is the standard.

22 I think the standard is what has to be disclosed under Rule

23 2019.  Whether somebody likes the disclosures or doesn't like

24 the disclosures, I don't think is the issue.  I think the

25 issue is what has to be disclosed.  And the reason --

1            MR. RUGGERI:  Correct, Your Honor.  Financial --

2            THE COURT:  -- the reason for the disclosure is so

3  that the other side knows where a party's coming from.

4  Right?  I mean, that was the whole impetus behind the rule

5  change.  I forget where I have that.

6            I actually went back to Judge Gerber's letter on

7  the -- and I think it was 2008 or 2009 when they were looking

8  at whether to abolish Rule 2019 or not.  The Rules Committee.

9  Or to extend it.

10           And the idea was parties and the Court need to

11 understand where people are coming from.  And I don't -- we

12 know where this group is coming from.  You may not like where

13 this group is coming from.  But we know where they're coming

14 from, don't we?

15           MR. RUGGERI:  I think we know they're coming from

16 state court counsel who purports to have the authority to

17 empower Coalition counsel.  But I really don't know where

18 they're coming from in terms of who is calling the shots.  I

19 didn't -- I used an improper word when I said I would like to

20 have the bylaws.  I think the bylaws are necessary to a full

21 disclosure here because the bylaws may tell us who is

22 empowered to direct the Coalition counsel.

23           The Court mentioned majority.  I don't know if

24 it's the majority or not.  I don't know if there's been a

25 single person -- single law firm appointed.  I don't know how

1  the firms come in and how they go out. Those are sort of the

2  issues.

3          So I think we don't know who really is at the

4  table and on what basis that person is at the table.  I think

5  that, again, that the concern grows up from the individual

6  Claimants to their state court counsel, state court counsel

7  to Coalition counsel.  So I think the bylaws are necessary to

8  a full and appropriate disclosure in a 2019 context when

9  these issues pervade, Your Honor.

10         MS. BEVILLE:  Your Honor, may I respond to the

11  issues that were raised here?

12         THE COURT:  Not yet.  Not yet.

13         MR. SCHIAVONI:  Judge, should I be heard when

14  they're done or after (inaudible)?

15         THE COURT:  I'm going to hear you after

16  Mr. Ruggeri's done.

17         MR. STANG:  And Your Honor, this is Mr. Stang, I

18  would like to make a couple of very points -- targeted

19  comments.

20         THE COURT:  Yeah, I'll hear from you too.  Just

21  looking for what I did with -- yeah, I don't have,

22  unfortunately, my -- where I annotated then-Judge Gerber's

23  January 9, 2009 letter.  But he talks about understanding the

24  other person's agenda.  What's their agenda.  And he talks --

25  this is in the context of distress debt, investors in

1 distress debt, and understanding that perhaps sometimes they

2 own multiple -- they own -- at different positions in the

3 debt structure.  And sometimes they may even want the company

4 to fail, that that might be in their best interest rather

5 than have the company succeed.

6 So he talks about understanding, having

7 information and disclosure to understand the agenda of the

8 parties in front of you.  He actually even suggested that

9 disclosures be made by every party in a case.  That did not

10 get adopted.

11 But his concern was, in particular, discretionary

12 decisions that judges have to make and understanding the

13 party who's in front of you making the argument about what's

14 in the best interest of the estate, when they have a

15 particular agenda that the judge and other parties do not

16 know about because there's been no disclosure.

17 Now again, this is his letter to the advisory

18 committee rules committee.  And it's his view, which then

19 Judge Drain actually adopted and came up with a copy of other

20 reasons why Rule 2019 should not be abolished.

21 But when you read the letters and you read the

22 legislate, you read the committee history, and you take a

23 look at the cases, the idea really is do you know the agenda

24 of the party, of the committee, and where they're coming

25 from.  Does everybody understand their economic -- or

1  other -- this was dealing with economic -- but their economic

2  or other interests that they are advocating for so that if

3  it's -- something's undisclosed, you don't know.

4          Here, I guess the question is what don't we know

5  about the agenda of these -- of the Coalition.  What don't we

6  know about their agenda?

7          MR. RUGGERI:  Well, Your Honor, I think one of the

8  questions is -- I think we learned a lot about the agenda

9  through Mr. Kosnoff's email that was sent on June 28th and

10  provided to the Court.

11          THE COURT:  Yes.

12          MR. RUGGERI:  And now what we know is that

13  Mr. Kosnoff has "resigned".  So I don't know if the agenda

14  that he set forth in that pretty long email, which was pretty

15  transparent on the agenda, continues to be the agenda or not.

16          THE COURT:  Let's assume it is the agenda.  Let's

17  assume it is and that we know the agenda.  And, yeah, we can

18  take a look at that letter, and we certainly know his agenda.

19          MR. RUGGERI:  And the question would be whether

20  that's a legitimate agenda.  It would come into --

21          THE COURT:  No, is that what Rule 2019 goes to?

22          I don't think Rule 2019 goes to whether it's a

23  legitimate agenda or I like the agenda because parties

24  certainly can advocate for their own positions, and they do

25  every single day.

1          MR. RUGGERI:  Sure, but --

2          THE COURT:  What is their best interest?  And

3  there's nothing nefarious about advocating for what you

4  believe is in your best interest.

5          MR. RUGGERI:  There's not, Your Honor, but we see

6  in the papers filed since then, where the Coalition has moved

7  itself away from that agenda, if you will.  And again, it

8  begs the question in terms of what is Mr. Kosnoff's real role

9  here now in light of this purported resignation, where he

10  still continues to represent -- purports to represent many of

11  the Claimants, and he's still part of Abuse in Scouting,

12  which as I said two days ago, published north of 50,000

13  claims it expects to be filed here.

14          So I don't know what the agenda is or not.  I

15  certainly haven't heard the Coalition say that their agenda

16  remains consistent with the agenda that Mr. Kosnoff charted

17  back in June, Your Honor.  So I think there is an open issue

18  there in terms of what is the Coalition's agenda.

19          THE COURT:  Well, I suspect you'd be happy if

20  their agenda deviated from what was in that -- what was in

21  that letter to be something more productive.

22          MR. RUGGERI:  I think that may be so.  But the

23  question marks about the agenda is another reason why there's

24  an open request for discovery of Mr. Kosnoff, which think the

25  Court will address later today.

1        THE COURT:  I will address it.

2        MR. RUGGERI:  So that is an open issues in terms

3   of the agenda.

4        THE COURT:  I will address that.  But what I'm

5   dealing here with -- and I agree, the issues for today are

6   somewhat intertwined, okay?  But I think for purposes of

7   2019, I'm focused on disclosure.

8        MR. RUGGERI:  Understood.

9        THE COURT:  And understanding where the ad hoc

10  committee is coming from and who they represent, and I think

11  it's abundantly clear who they represent.  There may be other

12  issues.  I do have some concern, quite frankly, about

13  ensuring that each underlying Plaintiff is adequately

14  represented by their underlying counsel.

15       But I'm not sure how I'd get involved in that.

16  And I have those concerns because of the numbers.  IF you get

17  calls from, you know, 500 people between now and

18  November 16th, can you effectively represent all of them?  I

19  don't know.

20       But -- so I have some concerns.  But I don't think

21  I have Rule 2019 concerns.  Let me -- if there's -- and I

22  appreciate the declarations of Professor Moore, which may

23  have very valid concerns.  I'm not sure how that impacts

24  2019.

25       MR. RUGGERI:  I think the most obvious point, Your

1  Honor, is the bylaws, and that is something that Professor

2  Moore does address in her declarations.  The absence of the

3  empowering documents.  So that is one of the opinions that

4  she expresses.  She knows who purports to have authority to

5  speak on behalf of the Coalition, but she doesn't see

6  evidence of the empowering documents, and that's added to her

7  also concerns about whether there are valid attorney/client

8  relationships that have been established on behalf of

9  Coalition counsel and the state court counsel or Coalition

10  counsel in the underlying Claimants.  Her opinion is that

11  there are no valid attorney/client relationships that have

12  been established between the Coalition counsel in either of

13  those groups.

14          And also, her concern is I still don't understand

15  where the empowering documents are, which is standard, even

16  for ad hoc committees.  And it actually is raised by the

17  supplemental filings the Coalition made in adding the new

18  state core counsel with the express reference to those

19  bylaws, Your Honor.

20          THE COURT:  Okay.  Thank you.  Thank you.  And --

21  okay, the bylaws.  Mr. Schiavoni, I'll hear from you next,

22  then I'll certainly hear from Mr. Stang, I think, spoke up

23  for the QCC.

24          MR. SCHIAVONI:  So you know, this is Tanc

25  Schiavoni for Century.  I'd like to address really Baron and

1  Budd because I think it's extremely relevant here.  But if I

2  can just take one step back from it, and that is that just

3  how -- what is 2019, and how did it come to pass, and what is

4  it intended to address?

5         The SEC was a major proponent behind the adoption

6  of Rule 2019, and it followed from a series of abuses that

7  had taken place in connection with a voting lockup agreements

8  being entered into that were undisclosed among creditors and

9  then how that distorted the plan process later that went on.

10        THE COURT:  Right, so wasn't that insiders --

11  wasn't that the concern that there were insiders and -- I

12  forgot what they called the committees that really ended up

13  controlling -- that really ended up controlling how a plan

14  was presented to the court, and nobody knew about the

15  insiders' influence?

16        MR. SCHIAVONI:  Exactly.  That's exactly what was

17  happening.  And Justice Belglitz (phonetic) at the time -- he

18  wasn't a justice that he was working at the SEC -- he wrote

19  about this as part of the advocacy to have 2019 adopted.  And

20  what he focused on was how these committees were being formed

21  and maintaining secrecy because they were trying to get, as

22  he put it, "the emollients of control".  There were financial

23  benefits -- if you could hold yourself out to the debtor as

24  "controlling" the plan process, you could derive from it

25  financial benefits that -- for your group that otherwise

1  would not be achievable.  And that's what led to these

2  terrible abuses that had happened.

3         Granted, sort of in different contexts.  But those

4  issues have direct application and in a much important way to

5  amass to our case.  You've seen, Your Honor, the - you've

6  seen Mr. Kosnoff's email.  There's almost no question here

7  that he's holding this group out as holding a voting lockup

8  arrangement of some sort, the nature of which is not

9  disclosed, but he's made it very clear to the mediators and

10  to the debtor that he holds that threat.

11         And the debtors are kind, you know, they're like

12  deer in a headlights with this.  It's like if they think that

13  they hold the veto over them emerging, they will do, in

14  essence, almost anything he says.  That's a problem.

15         And where -- let me just tie the connection to

16  that that what was going on at Baron and Budd.  You've seen

17  also, by the way, with Mr. -- with the retention agreements

18  that were disclosed here that in some ways, this sets up

19  incentives that were even worse than what Justice Douglas was

20  dealing with at the time because there it wasn't just the

21  creditor interest, but here, you've seen those retention

22  agreements -- 40 percent of the claim is held by these state

23  court firms.

24         In addition to that, the Coalition legal fees,

25  they -- if they obtain the emollients of control and they can

1  derive a plan as they want it, one of the things this

2  submission said last night is they reserve the right to have

3  the Coalition's legal fees -- Brown Rudnick's fees, and all

4  the costs of the Coalition borne by the Claimants out of the

5  plan itself, either through the plan or through the --

6        (Overlapping voices)

7        THE COURT:  Ms. Beville, you'll have a chance to

8  respond, but please don't interrupt.

9        MR. SCHIAVONI:  But through a substantial

10  contribution award.  What happened in the Baron and Budd case

11  was there was a pre-pet.  It failed, just like the pre-pet

12  here failed.  The case went into a regular bankruptcy.  That

13  group that was formed pre- petition, they continued to

14  operate as a group.  And Judge Ferguson was -- you know,

15  addressed that situation.  She had some emails that were a

16  little like what Mr. Kosnoff had.  And she -- it was

17  discovery there.  We were permitted to take Mr. Rice's

18  deposition of Motley Rice.  And by the way, that's the same

19  Mr. Rice and the same Motley Rice that is now behind the

20  Coalition.

21        This firm has no history of any involvement in

22  abuse -- sexual abuse cases with respect to the Boy Scouts as

23  far as we've been able to ascertain.

24        They've interjected themselves at this point in

25  the case.

1          When Mr. Rice was deposed, and one of the things

2     that came out was that there were agreements by and between

3     the law firms that were undisclosed to the clients about how

4     this voting -- how the emollients of control, the benefits

5     that they would derive from having a voting block would be

6     racked up among the different participating law firms.

7          Judge Ferguson saw that, and she entered an order

8     that basically sort of tracked 2019.  And this disclosure

9     requirement here that I don't think Mr. Ruggeri, or the Court

10    is really focused on, but it's 2019(c)(2)(b).  It's the one

11    about disclosing the -- all disclosable economic interests.

12    I mean, the Court probably could have just like kind of

13    skipped over that, thinking that's just about the fact that

14    they -- an abuse Claimant has a claim against the estate.

15    But it's more than that, and Judge Ferguson realized that.

16         She was like I want on the table all of the

17    arrangements that are out there.  And what that led to was

18    disclosure that among those law firms, they had agreed to

19    kickback some of their fees to Mr. Rice, that there was a

20    fee-sharing arrangement among them that was tied up into

21    their -- into the voting lockup agreement that was in place.

22         And what was critical about that was that that

23    then played itself out that the talk here about how these

24    secured interests worked in that case, it played itself out

25    over the course of the case because some Claimant groups --

1   there was a dispute.  You've got some minor case in Imerys,

2   and ultimately, you'll get a sense of here between how money

3   is sort of to be allocated among the different types of

4   claims and the different types of claimants based on the

5   proof they have.

6           Think about what you're presented here as far as

7   this fact pattern.  You have one set of lawyers and law

8   firms, who by the way are not part of the Coalition, who

9   historically have brought claims against the Boy Scouts, and

10  there were a relatively small number of these claims going

11  into the filing.

12          These lawyers think that because they vetted their

13  clients and the rejected ones that they didn't think were

14  meritorious, they think that their clients have very

15  meritorious claims, and they've collected a lot of proof on

16  them.

17          Then there's this other group, including the

18  Motley Rice firm, has no history in these cases, which is

19  somehow engage these call centers to generate huge numbers of

20  claims by running cable TV ads very quickly.  And it's like

21  there's almost no proof on them at all, and we're going to

22  find that they have a very different nature.  And they're

23  going to have a totally different interest than how a plan is

24  designed, how the TDPs are designed, and what claimants get

25  paid what.  That was the exact dispute that played itself out

1    in Congoleum.  And it totally distorted the plan so that

2    there was an effort by the group, the controlling group, to

3    put in place a TDP that you just simply had to sign -- just

4    check a box that you were exposed to the product, and you got

5    paid pretty much the same as most of the other people in the

6    case.

7            That kind of dispute, I don't think you'll hear

8    from Mr. Stang -- it's like what's going on behind the scenes

9    is something that I don't think we'll hear from him.  But

10   it's like that kind of thing plays itself out here.  And we

11   brought a cross-motion -- we actually brought the motion in

12   the first place, asking for an order that just ordered

13   compliance with these different provisions, including a

14   specific ordering clause of 2019(c)(2)(b) asking that each

15   disclosable economic interest be put out.

16           To the extent the small group affirms have

17   borrowed or may have borrowed a huge amount of money from

18   third-party vendors, if they've ceded any control to those

19   vendors in making settlement decisions, if they've reached

20   any agreements between each other about fee sharing between

21   them, that ought to be on the table.  That ought to be

22   disclosed so that the mediators and the debtor and us and the

23   Court all understand their economic interests here.

24           Because with Congoleum, it turned that it led to

25   the plan being held to be not in good faith because with

1  those economic interests on the table, it was clear to the

2  court that TDPs were being distorted by these fee-sharing,

3  split-up, you know, kickback agreements between the lawyers.

4        It's vital information.  If we had had

5  Mr. Kosnoff's deposition, we might have sort of been able to

6  get a peek at what was going on.  But without that discovery,

7  you don't have any assurance at all of that compliance with

8  2019(c)(2)(b).  That's why we'd ask for either -- you know,

9  we could have the affirmative discovery on this or we could

10  just have an affirmative order that we submit it with our

11  motion a copy of the order that was entered by Judge

12  Ferguson, that was upheld by the District Court, that laid

13  out exactly what should be -- you know, how -- it's an order

14  that tracks 2019 and requires these disclosures.

15        Otherwise, all we have are sort of these amorphous

16  statements by counsel that are hearsay and untested that

17  there's been compliance.  But we really don't know.  And

18  that's why this is vital.  It's vital to the tort committee.

19  It's vital to us that we know that we have a fair process in

20  front of us.

21        And that's, by the way, one of the reasons why the

22  courts found that we had standing to be heard on this.  It

23  goes fundamentally to the process.

24        Your Honor, that's all I really have to say

25  directly on Baron and Budd.  I did pass to Mr. Ruggeri so --

1   we had a witness to put on.  Just to comply with formalities

2   here, we would tender Ms. Moore into evidence and ask that

3   her declaration be accepted into evidence, and we offer her

4   for cross.

5               THE COURT:  Does anyone have an objection to

6   Ms. Moore's two declarations being admitted into evidence?

7               MS. BEVILLE:  Your Honor, the Coalition objects to

8   the admission of the declarations as evidence.  The

9   declarations were filed less than 24 hours before the hearing

10  and were being touted as expert reports.  And Your Honor, it

11  clearly defies compliance with any and all rules on

12  discovery, on notice, on ability to ask any questions on an

13  expert prior to the hearing.

14              There was no opportunity for the Coalition to

15  review and respond and perhaps even retain its own expert to

16  refute the conclusions that were made in the declaration.

17              Your Honor, the -- you may not have noticed, but

18  the first declaration signed by the -- by Professor Moore was

19  actually dated October 7th but was not filed with the Court

20  until October 13th and was not provided any notice to any of

21  the parties, at least to the Coalition counsel, that it was

22  going to be filed.

23              And Your Honor, this is just consistent with what

24  we've seen in the case.  As Mr. Molton pointed out earlier

25  with respect to delay, the late filing discovery, Your Honor

1  noticed at the last hearing that any discovery, evidentiary

2  issues, should be dealt with right away.  And I would argue

3  for reason of it being submitted less than 24 hours before

4  the hearing alone is reason to exclude those declarations as

5  evidence.

6          And beyond that, Your Honor, if you were to

7  consider the declarations, we would argue that the

8  evidentiary value should be limited.  We believe the

9  declarations contain essentially legal conclusions, Your

10 Honor, legal opinions that are not based on -- there's no

11 methodology.  There's simply a recitation of the rules, and

12 then Professor Moore's conclusion as to how those apply to

13 the facts of the case as interpreted by the insurers.

14          You know, the declarations violate Rule 702 as far

15 as expert testimony and the Daubert standard.

16          It's simply a statement by a professor that does

17 nothing more than recite general legal principles.

18          That is the model rule.  And applies them to the

19 facts of the case.

20          Your Honor, that is squarely within the province

21 of the Court, of your determination as to how to apply the

22 law to the facts of the case.  And having an expert report,

23 if you will, or a declaration of an outside counsel, we don't

24 see there being any probative value to that.

25          Moreover, Your Honor, I would note that it's the

1  declaration is based on what's entirely the faulty premise of

2  the use of ad hoc committees is improper and that ad hoc

3  committee was never properly formed as an entity or an

4  organization.

5          And in making that statement, she notes that the

6  engagement letter was not signed on behalf of the ad hoc

7  committee, cites to Rule 1.3 of the model rules, which she

8  notes typically applies to corporations and partnerships.

9          The ad hoc committee, as I noted earlier, Your

10  Honor, is not a partnership or a corporation.  It's a loosely

11  affiliated group of creditors that have retained bankruptcy

12  counsel in this bankruptcy case.  And so some of the

13  statements, Your Honor, are predicated on false assumptions.

14  I'm not sure how I would characterize the statements the

15  engagement letters were not signed on behalf of the ad hoc

16  committee when it was a law firm representative that signed

17  on behalf of their clients, who are the Coalition members.

18          Your Honor, she states in her declaration in my

19  opinion an informal group of 12,000 members is not capable on

20  being represented as an organization separate from its

21  individual members.  It goes straight to the heart of the

22  propriety of the role of an ad hoc committee in bankruptcy.

23  It's a legal conclusion, Your Honor.  It's not an expert

24  opinion based on ordinary practice in these bankruptcy cases.

25          She notes that there is almost no authority for

1  treating other informal groups as entitled to (inaudible)

2  status and notes that they're commonly applied to

3  corporations or partnerships.  She focuses as Mr. Ruggeri

4  described, on the lack of a decision- making structure.

5        And here, Your Honor, was where the focus on the

6  bylaws come into play.  But you know, it was noted in the

7  Washington Mutual court, the ad hoc committees are at-will.

8  The bylaws as far as how new firms are added, who comes in,

9  how are votes done, that is not what is required to be

10  disclosed under Rule 2019, and the premise of the declaration

11  assumes that bylaws are required to be disclosed, and I don't

12  think that's a determination that's been made.  I certainly

13  haven't seen the case law supporting that the bylaws at ad

14  hoc committees, which frankly are optional, may or may not

15  exist in many ad hoc cases.

16        I haven't seen any cases -- certainly none that

17  were cited by the insurance companies that require production

18  of bylaws that Your Honor could change from time to time.  I

19  just don't see the relevance to those here.

20        And Your Honor, it disregards the fact that even

21  the cases cited by the insurers involve ad hoc groups of a

22  multitude of mass tort victims.  In each of those cases,

23  their own declaration would suggest that every single one of

24  those cases violates some other rule.

25        And Your Honor, she offers no support as to why

1  the victims here, any conflict that may exist among the

2  victims.  She makes a simple statement that it rises to a

3  level that materially impaired counsel from acting.  And Your

4  Honor asked the right question earlier today -- how is that

5  different from any other mass tort case?

6        And you have a declaration, Your Honor, that

7  states that as a fact.  And what is the evidence cited to for

8  that fact, Your Honor?  She cited to her own book.  That is

9  the quote that she pulled out.  It's not other cases.  It's

10  not decisions by judges.  It's her own assessment of how ad

11  hoc committees don't work in the bankruptcy context.

12        And Your Honor, there have been several cases

13  where Professor Moore has submitted declarations, and in

14  those cases, Your Honor, the courts, and I would request the

15  Court do here, either excluded the declaration in its

16  entirety based on the fact that they are (inaudible) legal

17  conclusions and legal arguments, or at the very least,

18  acknowledge that to the extent it is legal argument discarded

19  the value and the evidentiary nature of those declarations.

20        Your Honor, I think this goes to -- and I

21  appreciate that you're asking about the declaration, but I do

22  want to touch on the ethics point because really the

23  declaration focuses on the model rules and compliance with

24  ethics.

25        And Your Honor, I can see you struggling with and

1  how to articulate it, Rule 2019 requires disclosure, and

2  that's what the Coalition has done to date and what impact,

3  if any, the concerns raised about the engagement letters have

4  on the 2019 disclosure.

5         And Your Honor, from my perspective, it would not

6  be in an ordinary case the insurance companies that would

7  raise the issue as to whether or not there is a potential

8  ethical violation in an agreement between two consenting

9  parties.  And in those cases, Your Honor, that would be an

10  ethical violation, that it is typically the client,

11  themselves, that raise the ethical violation.

12         Here, Your Honor, again, to go back to standing, I

13  don't understand and have not articulated how the insurance

14  companies have standing to raise issue with respect to the

15  validity of the engagement letters between State Court

16  counsel and their clients, especially, Your Honor, where

17  here, we have a direct line of ability between (inaudible) as

18  Coalition counsel with clients signing written

19  acknowledgements affirmative consent here.

20         So Your Honor, to the extent that there are

21  potential ethical issues, it's not a 2019 issue.  What are

22  the remedies here, Your Honor?  Under 2019, the remedy is

23  disclosure.  I have not seen a case in the (inaudible) for

24  context or otherwise where under 2019, a court has in mass,

25  invalidated consensual attorney- client engagement letters

1  based on the attack by an insurance company.  I haven't seen

2  it before.

3         And so, for these reasons, Your Honor, we believe

4  the declaration should not be admitted as evidence and to the

5  extent that it is, that the legal conclusions and the legal

6  arguments made should be disregarded by the Court.

7         I also have a number of responses to the other

8  issues raised, but I will wait for Your Honor to let me know

9  when you're ready to hear that.

10         THE COURT:  Thank you.  Okay.  I'll hear any

11  response to Ms. Beville's objection to the entry into

12  evidence of the declaration, and then, I'll hear argument

13  from the committee.

14         MR. RUGGERI:  Your Honor, James Ruggeri, again,

15  for Hartford.  Thank you.  With regard to the timing, I think

16  the timing of the filings, Court admonished the parties

17  earlier today, those have been coming in fast and furiously,

18  and Professor Moore was responding to the filings as they

19  were made, that we engage an expert to opine on these issues

20  comes as no surprise to anyone.  We previewed that at the

21  September 9th hearing when we asked for time to consult with

22  folks on the conflicts that we saw were presented.

23         With regard to the argument that it's

24  impermissible legal opinion, we disagree.  In fact, the

25  premise of the Coalition's filing last night and their other

1  papers was the sufficiency of the written consent of the

2  underlying claimants for the state court counsel to engage

3  the Coalition counsel on their behalf.

4          Professor Moore's declarations go to the

5  sufficiency of the Claimants' consent from the perspective of

6  a legal ethics expert.  It's not impermissible legal opinion

7  testimony.  Counsel references that Professor Moore's

8  declarations have been not accepted in other cases.

9          I don't know the other cases to which she's

10  referring.  But it's clear from the resume that we submitted

11  on behalf of Professor Moore, there's a reference that she

12  has been accepted in various other cases as an appropriate

13  expert opinion and her expert opinion is appropriate in this

14  case.  Again, it goes directly to the issue that was raised

15  by the Coalition at filings, including, again, last night,

16  Your Honor.

17          THE COURT:  Thank you.

18          MR. SCHIAVONI:  (Inaudible), Your Honor, we cite

19  specific cases, Oklahoma PAC, 122 BR 392, and in re Matter

20  FNC International, 194 -- or 1994 Bankruptcy Lexis 274 at

21  page 8, which is (inaudible).  Both of those cases deal

22  specifically with how 2019 is -- although it's a disclosure

23  requirement, it's one like bankruptcy rule 2014 and 2016 in

24  that, to quote Oklahoma PAC, "The Court should also play a

25  role in ensuring that the lawyers adhere to certain ethical

1  standards.  Rule 2019 was designed for such a purpose," cited

2  in our papers.

3          The FNC case similarly says that the 2019 is --

4  fits into these issues because it's to try to determine

5  whether there's actual real authority for the parties to act.

6  So we cite those cases for the support for Ms. Moore.  Thank

7  you.

8          MS. BEVILLE:  Your Honor, if I could please

9  respond on the two cases.  The Oklahoma PAC case, Your Honor,

10  dealt with a law firm that represented two secure creditors

11  with competing liens on the same property that was being sold

12  and valued as part of bankruptcy case.

13          In that case, Your Honor, the Court said that

14  (inaudible) confirms here because the value of this property

15  becomes an issue, there will be an immediate conflict between

16  the law firm's two clients.  And in that case, Your Honor,

17  the lawyer freely admitted that there was an insurmountable

18  conflict between his two clients was forced to withdraw.

19          I don't -- that case is not applicable in any

20  fashion here, and the FNC case, Your Honor, that was just

21  cited by Mr. Schiavoni.  That was a law firm was filing a

22  mass proof of claim on behalf of a number of different

23  claimants and have not filed a Rule 2019 disclosure

24  statement.  And again, Your Honor, the relief -- the remedy

25  in that case was disclosure under Rule 2019.  Thank you, Your

1    Honor.

2              THE COURT:  Is there any conflict between -- for

3    counsel for having clients on the -- as part of the Coalition

4    and clients that aren't?

5              MS. BEVILLE:  No, Your Honor.  The Coalition

6    represents the collective interest of the sexual abuse

7    victims, and I read in, for example, in Oklahoma, there was a

8    competing priority as to secured assets here.  I don't

9    believe there is a conflict at all, certainly not one that

10    would prohibit a law firm from acting on behalf of the

11    collective interest of the sexual abuse victims.  And in

12    fact, in essence, the other non-members of the Coalition

13    would essentially get the benefit of, you know, the

14    representation of the Coalition of the collective interest of

15    the members, but there's not a conflict that exists between

16    the clients themselves, Your Honor.

17              MR. RUGGERI:  Your Honor, James Ruggeri for

18    Hartford, our response is potentially and very likely there

19    is a conflict, and that's presumably why the Court may have

20    raised the question because the agendas of the Coalition

21    members may be very different from the agenda of the non-

22    Coalition members.

23              We haven't yet vetted the claims, so I don't know

24    for sure, but the strength and weakness of the claims, the

25    entitlement to recover assets may you put those camps in

1   conflict, if you will, so there is definitely the potential

2   for a conflict and there very likely is a conflict, Your

3   Honor.

4          MS. BEVILLE:  Your Honor, and that conflict is the

5   same that you would see in any other mass tort bankruptcy

6   where there's different levels of injuries. And here, there

7   is not a plan in place, Your Honor.  There has not yet been

8   discussions about the various  -- how that would even be

9   treated, and it is the agenda of the Coalition if you go for

10  equitable  treatment of all sexual abuse victims.

11          And I think, Your Honor, the touting of potential

12  conflicts between the sexual abuse victims, it's a red

13  herring, Your Honor.  You know, these sexual abuse victims

14  have a right to be heard.  They have a right to have counsel

15  at the bargaining table.

16          They have a right to form a group to be heard, and

17  whether it's a group of 5 victims or 1000 victims or 20,000

18  victims, Your Honor, there is the ability under Rule 2019 to

19  act as an ad hoc committee.  And the only requirement, Your

20  Honor, under 2019 is disclosure.  And here, I submit, again,

21  that the Coalition has made all the relevant disclosures, and

22  again, Your Honor, I would like to go back to some of the

23  points that were made earlier.

24          The Coalition members are those that have signed

25  affirmative consent.  There was question about, you know,

1  there being another amended 2019 and, you know, the smoke and

2  mirrors.  We don't know who they represent.  Your Honor,

3  there is no confusion.  The additional filing that would be

4  made within seven days is just to identify the subset of

5  28,000, the 7,300 that have filed affirmative consent.  It

6  would be the same names and addresses that were already

7  produced.

8            It will just be a smaller group.

9            The amended 2019 statement itself will not be

10  substantially changed, simply narrowing down the names and

11  addresses, and the only reason it wasn't filed earlier, Your

12  Honor, is just the technical issues of producing that

13  information.  There --

14            THE COURT:  Okay.  Let me hear from Mr. Stang.

15            MR. STANG:  Thank you, Your Honor.  Your Honor,

16  I'm going to address one very specific issue that's come out

17  in the course of the now, let's see, two-and- a-half hours of

18  discussion.  I'm not going to repeat what is in all papers.

19            But on the specific -- and then, I want to address

20  something that Ms. Beville has said, and Mr. Molton has said

21  because as someone pointed out, there's a real conflation

22  here of (inaudible) and 2019 and the motion for allowing the

23  Coalition to be (inaudible) party.  But on the very specific

24  issue, when it goes to the bylaws, it's unclear who has

25  accepted these bylaws.  They may exist but have the 7,300

1    people who have given the affirmative consents adopted those

2    bylaws, which might delegate authority.

3             I suspect the answer to that is no because when

4    you look at docket number 1429 at page -- I think this is 102

5    of the PDF, which is the invite to people to join the

6    Coalition, which is a vast improvement over what they did

7    before, which is opt-out.  There is no reference at all to

8    bylaws.

9             And then, when you look at the new -- what do they

10   call them -- the amendment (inaudible) to the engagement

11   letters, the new law firms are referred to as new voting

12   representatives.  Well, I did a word search in this document

13   to see when that phrase first arose or even voting

14   representative.  And it does not appear until these amended

15   or additional law firm agreements.

16            So someone was a voting representative before

17   because when you call someone a new voting representative,

18   there must have been someone else.  So A, who adopted these

19   bylaws, and B, maybe the bylaws explain who were the voting

20   representatives before since we now have new voting

21   representatives.

22            So as to the specific issues that have been

23   brought up today, I think they raise some really important

24   concerns.  I'm not going to go over them again because I

25   think after two-and-a-half hours, you probably have heard

1  enough about the details of this.

2        But I do want to make a comment about Mr.

3  Molton's introduction, and some things Ms. Beville has said.

4  And again, we are conflating a lot of matters that are on the

5  agenda.  And maybe we'll end up with you ruling across the

6  board at one time or another.

7        The Coalition, in their papers and in comments

8  today, have made some very, very inflammatory comments about

9  the Tort Claimants here.  They have said that victims need to

10  be heard, that the parties raising these very important 2019

11  issues are trying to stop them.

12        Well, we're one of the ones who raised some

13  important issues, and the suggestion -- not the suggestion,

14  the expressed statement that we are trying to stop victims

15  from being heard is insulting.  It is without any support and

16  is an attack on nine men who have spent months trying to get

17  this case in a go-forward direction.

18        And it's especially insulting when Ms. Beville and

19  Mr. Molton know that on August 21st, the TCC agreed in an

20  email to them, which they acknowledged and accepted, that

21  every one of their clients of the underlying state court

22  counsel and Brown Rudnick that at the time I think it was the

23  predecessor local counsel firm, could be mediation parties.

24        They accepted that offer and looked forward

25  working together.  So how dare they say to you and to the

1  world that this committee of fiduciaries is trying to stop

2  victims from being heard?  They can't accept yes for an

3  answer.

4          And so it raises the issue, really, of why the

5  Coalition.  Maybe it's so that they can try to figure out how

6  to make a substantial contribution claim because otherwise,

7  we have invited them into the tent. We did it two months ago,

8  and Mr. Molton wants to talk about wasting time.

9          Given what we agreed to, they are the ones that

10 are wasting time for purposes that, frankly, I cannot

11 discern.  The TCC is focused on trying to get the information

12 necessary to negotiate in the mediation, make monetary

13 demands where appropriate, and negotiate TDPs where

14 appropriate.

15         The Rule 2004 exam letter that you heard, first

16 matter on the agenda, reflects that we have spent months, in

17 fact, with the BSA, the entire case, trying to get documents.

18 And the Coalition has joined our limited 2004 exam, but the

19 idea that we are to rush to a mediation without full

20 disclosure tells me that there's a race to the bottom here.

21         No one can negotiate a case without asking for

22 insurance policies.  No one can negotiate this case without

23 finding out the local council assets, restricted,

24 unrestricted.  No one can negotiate this case without knowing

25 the rosters, which, amongst other things, won't disclose the

1   identity of parties are likely -- they want to be part of a

2   (inaudible) response reorganizations, local churches and

3   clubs that brought these troops into existence.

4           So I suspect this we-need-to-get-this-done-quickly

5   reflects some of the mass tort aspects of this case.

6           The final issue that I wanted to mention, Your

7   Honor, is that -- is this -- the mediator statement.

8           We were shocked that mediators who are neutrals

9   chimed in on a contested matter before you.  And while there

10  was a qualification that the Coalition -- this is the

11  qualification, using the same term -- if qualified, should be

12  part of the process.

13          That qualification made go to the 2019 issue

14  that, in fact, they're advocating on an issue that is before

15  the Court.  And we had hoped -- we hope they do that again

16  because we don't think it is appropriate.

17          So Your Honor, the specific issue was bylaws, who

18  are the voting representatives, and I wanted you to really

19  hear our position as you go into any additional argument on

20  mediation party that the notion that our committee is not

21  doing its job is -- I don't even have -- is so unfortunate,

22  that in an effort for the Coalition maybe to establish a

23  right to legal fees is attacking the fiduciaries in this

24  case.  Thank you, Your Honor.

25          MR. MOLTON:  Your Honor, it's David Molton.  Can

1  I -- we conflated the mediation issues here.  Can I just

2  preface a number of things and then, turn it over to

3  Ms. Beville?

4          THE COURT:  No, I haven't gotten to the mediation

5  motion.

6          MR. MOLTON:  Okay, that's fine.

7          THE COURT:  I'm on the Rule 2019 motion.  And I'd

8  like to finish that up, and then, we'll move to the next

9  motion.  I don't think I'm going to rule independently

10 because I think these are intertwined.  And so I understand

11 the difficulty, perhaps, in untwining them for purposes of

12 argument, but I want to make sure the 2019 issues are -- have

13 been fully vetted.

14         MR. MOLTON:  That's fine, Judge.  That's why I

15 asked.  Thank you.

16         MS. BEVILLE:  Your Honor, may I respond on the

17 2019 points?  I --

18         THE COURT:  Yes.

19         MS. BEVILLE:  -- would appreciate (inaudible), as

20 well, I will also keep it brief.

21         Your Honor, we heard a lot from the insurance

22 companies regarding, you know, who are -- who are the parties

23 represented.  I think it's clear, Your Honor, that we

24 represent the individuals that returned the affirmative

25 consents, and as of today, that number is 7,300.  Your Honor,

1   as we noted earlier in the hearing, we will provide

2   supplemental updates as that number changes materially as any

3   other ad hoc committee would as their membership changes.

4           Your Honor, there's been a lot of focus on, you

5   know, the term voting representatives and the bylaws must be,

6   you know, super important because we don't know, you know,

7   the voting representatives, we don't have the empowering

8   documents.

9           Your Honor, the empowering documents are the

10  retention agreements.  Bylaws are not empowering documents.

11  They don't grant authority.  They may govern whether it's

12  inter-issues among representatives or what the quorum at a

13  meeting and that your vote issues, Your Honor, are not

14  necessary.  And as you noted, some people may like to see

15  them, but it doesn't mean it's required under Rule 2019.

16          And again, Your Honor, I haven't seen any cases

17  where production of bylaws is required under Rule 2019 or

18  otherwise.  And Your Honor, just to be clear, it is stated

19  very clearly in our engagement letter that the law firms will

20  direct (inaudible) on behalf of their clients.  That is -- I

21  don't think there can be any confusion as to that statement.

22          Your Honor, the insurers, you know, said there's

23  not a need here for the ad hoc committee, and I'm not

24  understanding how that is at all relevant, the insurers' view

25  of whether or not we're necessary, how that's relevant to

1  2019, especially where we have the debtors and the mediators

2  supporting the ad hoc committee's participation (inaudible),

3  Your Honor, that's not a 2019 issue.

4          There seemed to be reference about the affirmative

5  consents and are they valid or not, and I just want to remind

6  the Court and the parties on the call here that the

7  affirmative consents do and will be monitored by the United

8  States Trustee.  That was a request from the United States

9  Trustee that we agreed to.  So the United States Trustee has

10 the ability to audit those affirmative consents.

11         The agreement with the U.S. Trustee also includes

12 the provision, though I don't think it needs to be stated,

13 but it is expressly stated, that the 2019 disclosure is

14 without prejudice to any parties' views, remedies, future

15 motions on any ethical issues.

16         Your Honor, Tim Kosnoff's name has had come up a

17 few times, and Your Honor, again, I'm not sure, I think the

18 mood of confusion is not a disclosure issue, it's that people

19 don't like the answer.

20         Mr. Kosnoff and Mr. Van Arsdale resigned from the

21 Coalition.  They have no role on the Coalition, Your Honor.

22 They're not -- they resigned as voting representatives.

23 They're not -- they don't participate on calls.  They don't

24 receive correspondence.  The Eisenberg Rothweiler firm has

25 continued on as a member of the Coalition.  That has been

1  disclosed.  And their clients, Your Honor, have received the

2  affirmative consents.  They are among the groups that are

3  responding and returning those affirmative consents.

4        THE COURT:  Should it concern me that those two

5  lawyers may be calling shots behind the scenes that are not

6  disclosed?

7        MS. BEVILLE:  Your Honor, there -- the engagement

8  letter identifies the co-counsel's relationships among

9  Eisenberg Rothweiler firm, and Van Arsdale and Tim Kosnoff

10 firm, so it has been disclosed, it's in the retention

11 agreement.  And the unredacted version identifies and

12 discloses the (inaudible) among those law firms.

13       So I don't think that there is any more to be

14 disclosed.  I am sure, Your Honor, that those attorney

15 conversations, that they have co-counsel relationships with

16 their clients.  But as among the Coalition and Coalition

17 counsel, we have only had interactions with the attorneys at

18 Eisenberg Rothweiler.

19       THE COURT:  Isn't that kind of artificial?

20       MS. BEVILLE:  I don't think so, Your Honor.  I

21 think there's, you know, there -- I don't have the -- I don't

22 see it being artificial in that we have one (inaudible) on

23 the Coalition.  You have co-counsel that are not.  They do

24 not participate in the discussions.  They do not have a vote.

25       If there is correspondence among lawyers, you

1  know, behind the scenes, I'm sure that people all talk to

2  each other on different levels.  But I don't think there's

3  anything artificial about it at all, Your Honor, and it's

4  been fully disclosed under 2019.

5          THE COURT:  It's been disclosed.  It's -- and I

6  don't know if the circumstances around the occurrence of the

7  resignations matter.  It's certainly been disclosed.  It

8  raises questions in my mind.  Okay.

9          MS. BEVILLE:  Your Honor, there's been questions

10  about (inaudible) engagement.  I will note that the

11  affirmative consents acknowledge the (inaudible) engagement

12  and (inaudible) ratified that.  The questions about divergent

13  conflicts and, Your Honor, the only conflicts that have been

14  identified that I'm aware of is potential conflicts among the

15  clients as identified by insurers that we relayed to you, the

16  victims have varied degrees of injury or harm that they

17  suffered.

18          And I would argue that that certainly doesn't rise

19  to the level of precluding participation of law firms,

20  especially in the mass tort context, Your Honor.  There's

21  been no evidence that that conflict actually exists.

22          And there's been questions raised as to whether

23  the individuals are aware that the Coalition does not

24  represent them individually.  And Your Honor, that was made

25  very clear in the affirmative consents that have been signed

1   by these individuals.  Your Honor, I just want to note again,

2   attention's been made regarding the Kosnoff email.  I just

3   want to highlight that that email predated the formation of

4   the Coalition.  It was sent in June.

5          The Coalition was not formed until July 18th.

6   And whatever agenda was set forth in that email or

7   (inaudible) agenda is not, I think, at all reflective of the

8   Coalition's actions that have been taken to date.  And I

9   don't see that what one attorney may have emailed, whether it

10  was a venting or something he truly believed, is not relevant

11  to the Coalition today, especially as that individual is no

12  longer a member, a law firm voting representative on the

13  Coalition.

14          Your Honor, there was also some question regarding

15  the economics of the state court counsel and I'd just like to

16  remind the Court that those contingency agreements, similar

17  to those that were requested in the Baron and Budd case, were

18  made available and I just want to make note the reason for my

19  interruption was that Mr. Schiavoni was making reference to

20  information that was filed under seal and making it now

21  publicly available, in violation of the order to file under

22  seal.

23          And just to touch on the Baron and Budd case, Your

24  Honor, the facts of that case were very different.  There was

25  a lock-up agreement that was negotiated pre-petition, and

1  there did seem to be economic incentives within the plan

2  itself.  I was not a party to that as Mr. Schiavoni was, but

3  that is not the case that we have here.

4          And to the extent that the mediators have had any

5  questions, Your Honor, we have been able to answer those, and

6  I have not -- there have been no discussion of economic

7  interest in the plan when especially you are here, the

8  agreements have all been disclosed, including the percentage

9  sharing between different co- counsel arrangements.

10          And I do want to just address briefly Mr. Stang's

11  comments that somehow the Coalition is dividing itself to

12  overtake TCC and its fiduciary duty.  And Your Honor, we've

13  made crystal clear in our papers and any inferences by

14  Mr. Molton or I that the TCC is not a fiduciary or has not

15  been acting on behalf of the sexual abuse victims is false.

16  In fact, we recognize their fiduciary duty.  We recognize

17  that they are the statutory-appointed committee representing

18  sexual abuse victims.

19          But, Your Honor, sexual abuse victims and

20  (inaudible) generally have a right to their own counsel.  And

21  I don't think that that in any way is overtaking, overriding,

22  or trying to in any way undermine the TCC.  In many other

23  cases, Your Honor, there are official committees and there

24  are ad hoc committees.  And that is a fact of life in these

25  bankruptcy cases.

1            And I just want to note as to the agreement that
2   had been reached with counsel for the TCC on the 2019 issues
3   and participation in the cases, we have reached an agreement.
4   We disclosed that in our motions before the Court, but the
5   agreement was premised on acceptance of those terms by other
6   parties in the case, and those terms were not accepted by
7   other parties in the case.

8            And so we would find ourselves in the same
9   position today, Your Honor, had we tried to move forward
10  where the insurers were objecting to participation on behalf
11  of the Coalition and on behalf of the law firm, on behalf of
12  lots of clients, however you framed it.

13           And so it's that reason, Your Honor, that we move
14  forward filing a 2019 statement and seeking the ability to
15  appear in these cases on behalf of the Coalition, which is
16  how this group originally came together.

17           So Your Honor, and any inference, also, Your
18  Honor, about the cases moving quickly, we have been relaying
19  information received by the debtors and by the mediators.
20  There has been no need for speed, if you will, recognized by
21  the Coalition other than its time to get started on the
22  substantive (inaudible) discussions.  We would like to have a
23  seat at that table, but before we can get there, we need to
24  have a ruling that we have complied with Rule 2019
25  disclosure.  Thank you, Your Honor.

1          MR. STANG:  Your Honor, this is Mr. Stang.  I know

2    you'd like to conduct these hearings in an orderly way, but

3    something Ms. Beville just said is simply not true, and I

4    think you should know that.

5          When we -- when she acknowledged our agreement to

6    allow the law firms, including Brown Rudnick, to appear for

7    mediation on behalf of their clients and all future clients,

8    she wrote email in response.  She said we accept your offer

9    on behalf of the law firms noted in your email below.  We,

10   then, reserve the right for the Coalition and its members to

11   participate in the mediation.

12         But when she says that their acceptance was

13   conditional, the next sentence in her email says, we look

14   forward to receiving the TCC's mediation brief and working

15   hard to construct (inaudible) mediation parties.  They're

16   only entitled to the mediation brief if they're a mediation

17   party.  So their acceptance of the offer was not conditional.

18         They reserved rights to expand who the mediation

19   party was, but it was not a conditional acceptance of our

20   agreement that all of their clients be mediation parties and

21   appear through their law firms.  Thank you, Your Honor, and

22   I'm sorry to do that because I know you don't like the back

23   and forth, but that was just not a true statement.

24         THE COURT:  Okay.  The 2019 argument is concluded.

25   We're going to take a break.  Trying to see what's next on

1   the agenda.

2            MR. ABBOTT:  Your Honor, Derek Abbott, it's the

3   mediation motion, docket item number 7.

4            THE COURT:  Okay.  We are going to an hour.  I'm

5   going to try to take a quick look at what was filed last

6   night, which I haven't seen that everyone's talking about.

7            So we will reconvene at quarter to 2. We're in

8   recess.

9        (Recess taken at 12:46 p.m.)

10       (Proceedings resumed at 1:48 p.m.)

11           THE COURT:  Okay, Mr. Abbott, you said we were

12  on --

13           MR. ABBOTT:  I think we're up to Item Number 7 on

14  the agenda, Your Honor, which is a motion for participation

15  and mediation, again, by the Coalition.

16           THE COURT:  Okay.

17           MR. MOLTON:  Your Honor, that's me, David Molton

18  for Brown Rudnick on behalf of the Coalition.

19           And again, Your Honor, it's a pleasure and an

20  honor to address this Court.  A lot of the issues that were

21  discussed this morning really come down to the question of

22  the Coalition's motion for participation and mediation.  And

23  I'll -- I'm going to try to address those.  I want to be

24  concise, Your Honor, I want to give you the facts, and I want

25  to give you answers to some of the questions as well as deal

1  with some of the attacks that were levelled against the

2  Coalition.

3           One of the first actions the Coalition took, Your

4  Honor, as to the formation -- is formation, was to request

5  participation in the mediation.  Indeed, Your Honor, the

6  entire -- the Coalition's entire purpose is to advocate for

7  its members' interest in this case in order to get to a fair,

8  equitable and just resolution.

9           And the Court has made clear that all of this

10  should be negotiated through the mediation process.  That's

11  an admirable goal, it's one that saves resources of the

12  Debtor and other case (inaudible), and it's one that has

13  achieved success in other mass tort cases, and I'll deal with

14  that shortly.

15           Most significantly, with the active participation

16  of ad hoc committees who may or may not be represented by the

17  creditors' committee as well who includes constituents.  In

18  sum, Your Honor, when boiled down the entire morning and all

19  the arguments we heard on September 9th, really the argument

20  comes down to this one last question; whether or not we, the

21  Coalition, should be permitted to participate if a

22  significant stakeholder party in this case, any significant

23  interested party, representing significant stakeholder in the

24  mediation, that motion, Your Honor, is at 1161 of the docket

25  as we understand.

1          Your Honor, I heard a lot this morning of

2     misdirection and attack, and it's a shame that with so much

3     at stake for these young men, old men, perhaps some women,

4     that this evolved into attacks, attacks on law firms, attacks

5     on individuals, on 20-year-old cases.  In any event, Your

6     Honor, the bona fides of our Coalition, the bona fides of our

7     disclosure, the work that we've done to try to get this thing

8     done properly and (indiscernible) up, Your Honor, cannot be

9     denied, as well as the work we've already done in this

10    mediation.

11          So I'm not going to utilize misdirection and

12    attack.  I'm going to try and deal squarely and solely with

13    the facts.  One of the things, Judge, is that, you know,

14    there's -- as Ms. Beville noted, we have 7,300 Coalition

15    members who have signed affirmative consents.  That number

16    may grow.  Your Honor may know that we've heard a lot from my

17    friend who represents the insurers that, oh, my God it's only

18    7,300.  They had said earlier it was more.  Well, the 7,300

19    isn't that much off from the 12,000 that existed when we

20    first made our motion and notwithstanding we anticipate that

21    we're going to have a lot more Coalition members with

22    affirmative consent, and with updates and filing and

23    supplements to 2019, you know, done in accordance

24    (indiscernible).

25               It seems to be, Your Honor, they're unable to

1  really address the narrative mediation.  The 2019 has become

2  a club by which those objectors who stand against our

3  participation are relegated or forced to you in order to do

4  that.  And that's a shame, Your Honor, because as I think as

5  Your Honor noted earlier today, and certainly I'm not going

6  to put words in Your Honor's mouth, but 2019 is a disclosure

7  item.  And a lot of your questions to my friends who are in

8  the objecting side had to go with, well, how did you deal

9  with the disclosure issue?  In any event, I think it's a fact

10  to realize that one of the things that is being done is

11  utilizing the 2019, you know, issue as a weapon on what is

12  the mediation motion.

13        I do want to deal, before I get into, you know,

14  the more substance of my discussion to deal with something

15  that Mr. Stang said regarding, you know, our agreement as to

16  how we would participate when we get objections to the

17  Coalition (inaudible) so.  And I also want to address also

18  his, what I think is an unfortunate attack on what is a very

19  qualified and esteemed group of mediators --

20        THE COURT:  Before you do, Mr. Molton -- before

21  you do, let me remind everyone, please check your phones and

22  make sure you have them muted if you are not Mr. Molton.

23        MR. MOLTON:  Thank you, Judge, I appreciate that.

24        THE COURT:  Thank you.

25        MR. MOLTON:  And I'm getting hoarse, Judge, so

1  maybe that's a part of the problem, too.  Too much speaking.

2  But Paragraph 3 of Your Honor's order which is Document 812,

3  and I'm going to read an excerpt from it.

4          Any additional party or parties who wish to

5  participate in the mediation, including without limitation

6  any additional insurers, shall be included in the mediation

7  if, one, all the mediation parties agree to include such

8  additional party or parties in the mediation, and two, the

9  mediators agree that the participation of such additional

10  party or parties if necessary would be beneficial to the

11  mediation.

12          I didn't draft this order, Judge, this was no

13  doubt done through negotiated efforts by the TCC, the debtors

14  and others, signed by you.  But Mr. Stang's offer and our

15  agreement to Mr. Stang's offer didn't get us into the

16  mediation, Judge.  What gets us into the mediation are all

17  the mediation parties agreeing to include such additional

18  party or parties in the mediation, as well as the consent of

19  the mediators or the agreement of the mediators.

20          When Mr. Stang made the offer, in an effort to

21  move this case along, because we also agree with the debtor

22  and with the mediators that time is of the essence.  We're

23  really looking at a four-month window before things can start

24  going sideways.  And that's just not just my opinion, Judge,

25  that's the opinion of a lot of folks who have done this sort

1 | of case, these sort of cases for a lot of time.

2 | So in any event, Judge, we did agree as Mr. Stang

3 | reminded Ms. Beville, and as we actually told Your Honor in

4 | our mediation motion that we would agree to a compromise.

5 | That compromise was not accepted by the insurers, so we -- we

6 | asked for their consent and we were told, you know, we

7 | weren't given that consent.  So that's why we made the

8 | motion, Judge, and there's nothing bad faith about it,

9 | there's nothing wrong about it.  And indeed in the motion we

10 | fully advised you of those facts.  So I just want to put that

11 | on the side, because my friend, Mr. Stang, wanted that to

12 | have an emphasis added, and I just thought you should know,

13 | you know, where we came from and what the actual facts on

14 | the ground were.

15 | And second of all, Judge, the order that the

16 | parties negotiated gives the mediator standing to make an

17 | assessment to give -- to make an agreement that participation

18 | of such additional party or parties is necessary or would be

19 | beneficial to the mediation.  And they did that yesterday,

20 | Judge, on a standalone pleading filed by debtor's counsel,

21 | where they said the absence of the Coalition at the mediation

22 | party has and will continue to hinder the mediator's efforts

23 | to guide the parties to a place of consensus, the time for

24 | which grows increasingly short.

25 | Now, some folks may not like the fact that they

1  used the term "time grows increasingly short", or that they

2  said based on their collective wisdom and opinion, that the

3  absence of the Coalition as a mediation partner will hinder

4  the mediator's efforts, but the order itself that was

5  negotiated by, you know, no doubt one of the very parties who

6  raised the issue of the mediator's statement, really gives

7  them that ability, and if not remarkable, in cases for

8  mediators to report on these and other issues.  So I just

9  wanted to get that behind us, Your Honor, because I think

10 it's important to do so.

11          Judge, taking the Court's comments to heart from

12 the last sharing where Your Honor did say at the end -- well,

13 the mediator said, I know Your Honor scolded me, because in

14 my haste I may have misspoke it, but you did say that, you

15 know, nothing you're doing is stopping us from talking to the

16 mediators, the mediators talking to them.  We've been doing

17 that, Judge, and we've been continuing to share information

18 with them. We're continuing to meet their requests for

19 information, for advice and for help.

20          And in so doing, we've also done it with other

21 parties as well, Judge.  We've been -- you know, with respect

22 to the debtors, as Ms. Beville noted, and last time we'd

23 given them robust data regarding, you know, at that time all

24 the Coalition, what we said at that point, the 12,000,

25 because I know people get hung up over these words.  I'm not

1   going to use them, I'm just going to say the 12,000, because

2   now we've agreed, per the US (indiscernible) limit our

3   representation to those who file affirmative consent.

4          In that robust data, Judge, which described

5   counsel at which the abuse may be connected which describes

6   the individual, which describes the nature of the abuse,

7   which describes location, is exactly what is needed for the

8   mediators, the debtors and the insurers and the local counsel

9   to move forward.  I do want to note, Judge, that we just

10  reached an agreement with local counsel who are interested in

11  that data as well, because we have data that can attribute

12  certain abuse claims to various local counsels and that's

13  important in how they assess going forward in the mediation.

14         So we've agreed to do that with them.  And we've

15  also been in, you know, in contact with -- with other

16  parties, too, about the sharing of information.

17         Interestingly, Judge, the insurers have asked us

18  for that information.  And so they want the benefit of our --

19  what we would do to participate in the mediation but without

20  giving us that seat.

21         So in any event, I must say that until our

22  position is -- certainly, we'd love to start sharing that

23  information, you know, as I mentioned before at the last

24  hearing, we're creating a database that's eminently usable

25  and deliverable and manipulatable that is going to be of

1  unbelievable value with all of these claimants' claims in it,

2  but we need a seat at the table.  We can't get at this point

3  without Your Honor's help.  And right now there's two

4  objectors.  There's many mediation parties, but only two

5  objectors, and I'm going to get to that in a minute, but we

6  need a seat at the table.  We need to be able to be privy to

7  the fulsome discussions under mediation confidentiality of

8  what's going on in that room between those three very

9  talented mediators and the various parties.

10        Other parties agree with us on that, Your Honor.

11 I'm delighted to say that the debtors from the very get-go

12 have been supportive of our efforts to join the mediation.

13 We liaise with them constantly, we discuss various issues

14 with them, we don't necessarily agree with them all the time,

15 but that's the world we're in; that's bankruptcy.  But in any

16 event, I think we all have a interest in moving the case

17 forward.

18        There are other mediation parties that are subject

19 to the mediation order who are not objectors, Judge, who

20 we've also been liaising with and dealing with.  The FCR, Jim

21 Patton (phonetic), the ad hoc committee of local counsel that

22 I just mentioned, as well as the non-tort UCC.

23        So in any event, Judge, it's -- I think I

24 mentioned it last time, if I didn't, I may have mentioned it

25 to somebody else.  It's as if we're in this with two hands

1   behind our back and our legs tied.  And people want to use

2   us, but they don't want us to be part in it, you know, part

3   of the process.  So in any event, our request to be a

4   participant in the mediation that may result in a plan that

5   certainly involves our Coalition members who comprise a

6   significant portion of the pool of abuse victims is not -- is

7   not remarkable and should, under most circumstances, have met

8   little or no resistance.

9           And that gets me, Your Honor, to dealing with why.

10  Why do we have the resistance?  Why do we have -- it's almost

11  like they protest too much and we've seen that, Judge, we've

12  seen the attacks, we've seen the attacks against lawyers,

13  we've seen the attacks against law firms.  Interestingly, I

14  want to deal with a few things.  You heard about the

15  conflicts.  You know, the law firms that are associated with

16  our Coalition, you know, are leaders in national tort.  Great

17  experience in NDLs, in bankruptcies, and I'm going to get to

18  that in a minute, and otherwise -- and wonderful experience.

19  No doubt that many of the parties who welcomed to the

20  mediation treasure our wonderful experience in helping attain

21  that old consensual, global resolution.

22          In any event, we've heard a little bit of what

23  really is the elephant in the room, and I just want to touch

24  on it before I go off -- go on, Your Honor.

25          But the elephant in the room, and I think it was

1   one of my insurers counsel friends, I don't know if it was

2   Mr. Schiavoni or Hartford's counsel, who basically said well,

3   you know, there's these other lawyers not in the Coalition.

4   Maybe he was referring to the ones who stand behind the nine

5   members of the TCC that had been doing this and work up their

6   cases and -- and have been in this field.

7           Well, the fact is, Judge, that the whole, you

8   know, bankruptcy of the Boy Scouts is a national case, Boy

9   Scouts is a national agency, this isn't a one-off diocese.

10  You have heard it is a national case, the opening of the

11  limitations windows and various big states with lots of

12  historical Boy Scout participation has made it a mass tort.

13          And guess what, that's what this has become.  And

14  the bottom line maybe, Judge, that the folks who have been in

15  this field for a long time don't like the fact that

16  experience, sophisticated, mass tort lawyers are coming in.

17          And it's just a fact.  And it's not true that the

18  folks that the -- the law firm representative associated with

19  the Coalition are new to the game.  I don't think that's

20  fair.  I think the folks associated with abuse in scouting,

21  you know, the Rothweiler, Eisenberg Firm have been at this

22  for 25 years.

23          Also, others in our firm have had decades of

24  experience dealing, you know, with not just national mass

25  torts, but also on occasion abuse cases, but not necessarily

1  predominantly, but clearly there's something to it that, you

2  know, hey, don't come in my sandbox.

3         And the elephant in the room is that -- and I'm

4  going to get to what -- how I think it's shown in a couple

5  minutes, but I don't think you can put that out of what's

6  going on here, especially in light of the attacks we've seen.

7  But the talent, Your Honor, that comes with our participation

8  looking why it is that so many mediation parties, including

9  the debtors and the mediators themselves say that, to use the

10  mediators' terms, our absence will hinder their efforts.

11         The talent we're bringing is pretty impressive,

12  and I'm not just talking and I don't want to toot Brown

13  Rudnick's horn, but Brown Rudnick and myself personally have

14  been involved recently and over 20 years in some of the most

15  major mass tort bankruptcies in the country and have helped

16  arrive at settlements and global resolutions that have

17  resulted in confirmed plans, both in connection with our role

18  as committee counsel sometimes, and sometimes as ad hoc

19  counsel.

20         So the fact that the Coalition decided to hire

21  Brown Rudnick is a good thing, we think, although I have

22  self-interest in saying that, but we think it's a good thing,

23  because we bring a lot of experience to the table.  You know,

24  and I'm going to get to that in a minute, but also the law

25  firms who are participant -- you know, are the

1  representatives of and representing our Coalition members

2  individually have immense experience.

3          And part of that experience, Judge, goes -- you

4  know, and Mr. Schiavoni mentioned it when referring to the

5  Baron & Budd case, because these wars between the insurance

6  company and national mass tort lawyers has been going on for

7  some time.  We've got lots and lots of case law about it, and

8  the bottom line is that some of the most experienced, nimble

9  and thoughtful people on how to deal with insurance companies

10 in mass tort as part of the law firms that are in our

11 Coalition.

12          And you know, we -- our Coalition law firm member

13 rep has been recently involved in (indiscernible) which

14 happened next door to you, where Judge Carey was the

15 mediator.  And you know, I represented the plaintiff's

16 executive committee of the National Opioid MBL which was made

17 a mediation party, and utilizing Judge Carey and, you know,

18 with the work of many, we got to a solution.  That case now

19 is with Judge Dorsey.

20          Purdue, Your Honor, has a plethora of ad hoc

21 committees, an ad hoc committee of hospitals, ad hoc

22 committee of NAS (indiscernible) plaintiff, ad hoc committee

23 of personal injury claimants, three governmental ad hoc

24 committees.  We represented the ad hoc committee of what we

25 call the consenting states, that's about half of the states.

1  Municipalities including the PEC again (indiscernible), that
2  basically cuts the framework of the settlement with the
3  Sacklers and what could do in the bankruptcy.

4          As we wrote in our paper, Your Honor, Judge Drain,
5  along with all the parties, including the UCC in that case of
6  which all the ad hoc committees that I just mentioned were
7  arguably represented by -- not just arguably, they were --
8  the UCC the fiduciary, all of them, even the government
9  entities that can't sit on the UCC.  The UCC is a fiduciary.

10         They all recognize the importance of -- of
11  involving all of these constituent groups in the mediation.
12  They -- some pretty talented mediators were hired, Ken
13  Feinberg and Lane Phillips, and we've disclosed in a more
14  recent paper, Judge, that the mediators issued a statement
15  that set forth in our record on September 23rd, 1920 [sic],
16  announcing much to Judge Drain's happiness, I'll say, he was
17  pleased, I would imagine, that the -- those parties had come
18  to terms at least on term sheets with respect to each of the
19  individual opioid claimants and what they would be getting
20  out of the estate.

21         I could go on, Your Honor.  PG&E, another case
22  that dealt with fire victim claimants, also had mediation and
23  the TCC, there was a tort claimants can be there with --
24  together with a group of fire victim professionals were made
25  mediation parties.  And that (indiscernible) by Judge Montali

1  in that mediation actually, you know, was utilized on various

2  occasions for various successes in various names.

3        So what we're asking for, Your Honor, here is

4  really not remarkable.  We think constructive, we think

5  valuable.  Lots of other folks in this case believe it to be

6  the case as well.  And you know, unfortunately, we've had to

7  spend valuable time and resources getting to this place.  And

8  I don't think Ms. Beville was incorrect when she mentioned

9  that, you know, if we had accepted the deal that Mr. Stang

10  offered which we were willing to go through, you know, as

11  noted, Judge, required to consent of all, we probably

12  would've been having the same argument.

13        I mean, you know, who can read (indiscernible),

14  but the bottom line is, we would have had to make a motion.

15  So in any event, but what -- getting back to, Judge, what the

16  nature of this case involves and why it's so important for us

17  to be here.

18        The bottom line is there's going to be a lot of

19  cases.  And there's going to be a lot of claims.  And that's

20  not a function of what my friends from the insurance side

21  call fake claims or ginned up claims.  That has to do with

22  the fact that you've now opened windows into lots of states,

23  but also the bar date order here says, irrespective of

24  whether your state has a window or not, you're required to

25  file if you want to preserve your claim.  That was the bar

1   date order that was negotiated.

2           And Judge, it should be noted, and I think Ms.

3   Beville made the point, but you know, we know -- you know,

4   what's publicly available from the -- what they call the

5   perversion files, it's not my name on it, that's the name

6   other people have ascribed to it, including I think the Los

7   Angeles Times, that there are 8,000 known predators and that

8   those files were not complete; there's more to them.  And we

9   also know, I think, and I've been told and seen information

10  that, you know, with respect -- that enamored some people say

11  as much as 117 abuse incidents per predator, but even if you

12  accepted more conservative figure 10 to 20, and even in that

13  10 to 20, you knock it down to 10, you're really -- you're

14  talking about 80,000 claims.

15          So the bottom line is it shouldn't be surprising

16  under the context of how this bankruptcy came about, the fact

17  that the Boy Scouts themselves, you know, and what happened

18  there and the lack of control and the lack of supervision and

19  the folks who were allowed to come in and harm young men over

20  decades, it shouldn't be surprising that you're going to have

21  lots of claims here.  And this has become much, much to the

22  chagrin of some of the folks on this Zoom room a mass tort;

23  it's just the way it's become.  And that's the reality of the

24  situation.

25          In any event, Judge, I do want to note, because I

1   know that in the insurers' recent filing from last night they

2   said that the number of claims cannot be squared with what

3   existed in the court system prior to beat the BSA bankruptcy

4   or prior abuse cases.  So what?  Is my reaction to it.

5           And I point them up to Judge Drain's courtroom in

6   Purdue, where if you look at the amount of personal injury

7   claims in the tort system before the filing was the minimus

8   next to -- and I'm probably undercounting it, 114 -- 120,000

9   files proof of claims for personal injury in the Purdue

10  bankruptcy regarding personal injury claims that barely

11  existed in the tort system before the bankruptcy was filed.

12          So before I get to deal with each of the insurers'

13  objection, I do want to deal with another elephant in the

14  room, because it's one that I've had to deal with as

15  Coalition counsel since, you know, I first saw the pleading

16  from Mr. Stang that disclosed a June e-mail from Mr. Kosnoff.

17          From my perspective, Judge, I'm one -- and those

18  who know me know and -- and the folks I represent will tell

19  you, I look ahead.  I don't look behind.

20          I don't know what happened in June that caused

21  that e-mail.  Listen, I've been in the business of dealing

22  with plaintiff lawyers for over 20 years, I've seen some

23  interesting e-mails, but in any event, I'd like you to note

24  two things.  First, Paragraph 37 of our pleading -- earlier

25  pleading, which is I think at 1257 on the dock -- 1257 on the

1   docket, I hope I'm not wrong on that, if so, I'll get you the

2   right one.  But I'm going to quote myself because I think I

3   wrote this.

4          These cases will not move forward with insults and

5   (indiscernible) and disclosing noncurrent e-mails that may

6   more truly reflect a writer's frustration or anger of the

7   moment rather than some grand purported plan; end quote.  I

8   stick by that.

9          And I also stick by, Your Honor, look at deeds not

10  words.  Look at deeds, not words.  Look at what this

11  Coalition has brought to this case since we first showed

12  ourselves in front of Your Honor, I think it was in response

13  to the advertising motion.  They decided -- the Coalition

14  decided to get serious and they hired bankruptcy counsel who

15  has experience in this.  We have weekly communications with

16  the mediators, with the debtors, with other parties in this

17  litigation -- in this case.

18          As I've mentioned before, the Coalition member

19  representatives are utilizing Brown Greer, which is going to

20  be a very helpful interface in dealing with the mediation as

21  it goes forward in dealing with claim information.  That's

22  going to be one of the most valuable pieces of real estate,

23  so to say, that's going to exist in this case.

24          On the advertising motion, and I do want to

25  mention this -- and listen, I acknowledge that committees and

1    folk who are represented who are the fiduciaries of committee

2    often as Your Honor well knows disagree.  Sometimes they go

3    at each other pretty hard, you know, that's not remarkable.

4              They can have different ideas.  And our ideas and

5    our views, which go back to who we are and what we're about,

6    are pretty laid out in the advertising motion, Judge.

7              I think, you know, there were a few law firms that

8    came forward to object, but none of the other parties to this

9    case including the TCC, which remain silent, and I'm not

10   throwing darts, I'm not doing that, I'm just stating facts,

11   that they remain silent on it.

12             We stood up and said, hey, wait, it's important to

13   these young men to get information.  It's important not to

14   chill the dissemination of free speech, you know, to the

15   abuse survivor world.

16             We were the ones who stood up, as Your Honor

17   knows, and put in principled opposition not just, you

18   can't -- you know everybody's free to do what they want,

19   not, you know, attack or misdirection of attack which is the

20   word I use, but a principled opposition to some of what the

21   debtors thought they needed.  And I think Your Honor also at

22   the get-go of that hearing remarked on the record said, hey,

23   with respect to X or Y, we don't see an issue.  Somebody

24   stood up and -- and it's okay that we stood up, but we added

25   value.  I'm not saying that -- and I'm not trying to use that

1  in any ploy other than to say that look at our deeds, look at

2  our deeds in this case.  And we worked with the debtor, we

3  worked hard with the debtor to come out with an order that

4  Your Honor signed that did address the misrepresentations

5  that were long and material and which we helped the debtor

6  with.  And you know, it's -- it's our goal to continue that

7  effort.

8          Judge, again, the robust data that we provided.

9  Now, you know, I don't know if other parties in this case are

10 doing what we're doing, but they can make their own decisions

11 and that's no criticism one way or another, but it's a fact

12 that we're moving this case along.

13         Number three, there's a motion that's going to

14 happen after this motion, and I don't -- what I'm trying very

15 hard not to do, because all sorts of things came into the

16 2019 motion this morning, hearing, but the attorneys'

17 signature motion is one that our group is really thinks is

18 important, and you'll hear from my colleague, Eric Goodman on

19 that hopefully very shortly. But you know, that's a motion

20 that, again, we think eases the burden on a claimant, eases

21 the burden on victims, subscribes with the aspirational

22 statements made by the debtor the first day that all victims,

23 all victims should be heard and have a right to file proof

24 of claims.

25         And in this COVID situation, Judge, when I'm

1  sitting here in my home office for the how many hundredth

2  day, we all know how difficult it is for us professionals

3  that have unbelievable resources at our disposal to

4  communicate and do things, compared to the universe of

5  victims out there, many of whom aren't as fortunate as we

6  are.

7           So you're going to be hearing more about that, but

8  we think that, again, something we've added value to in this

9  case and has shown deeds.  And again, in turning to the

10 mediator's statement, Judge, they too, think the same thing

11 that they put on the record that it would hinder their

12 efforts if we weren't involved.  So dealing with what I call

13 the second elephant in the room, the Kosnoff e-mail.

14          Listen, I'm not going to sit here and make up

15 explanations for it, I wasn't there, I'm not going to make up

16 excuses for it, I can't.  But I'm going to say, look what

17 we've done and look who we are now.  Look at the firm

18 representative who have joined us, all of whom have qualified

19 bona fides in the mass tort bankruptcy world and in the mass

20 tort world.  So that's how I tried to deal, Your Honor, with

21 some of the -- some of the things that were said earlier in

22 anticipation, but trying to really flesh out what's really

23 going on here.

24          Dealing with the substance of some of the

25 objections and I think I'm short and really Judge, I really

1  tried to be concise, you know, Century and related insurers

2  object that the Coalition's former counsel (indiscernible)

3  was conflicted.  They're go on -- Stanley Tarr (phonetic) who

4  was their counsel who is no longer part of this and Rachel

5  Mersky.  So I think that's gone.

6          And also, Judge, the whole issue then that was

7  raised today about conflicts among parties among the members

8  of the Coalition, sure, there may be a member of the

9  Coalition who has a different claim for damages or whatnot.

10  I don't think that really creates a conflict per se in terms

11  of the collective interests that we're -- that we're

12  representing, Judge.  And I do want to say that the ad hoc

13  committee of local counsel who we've been dealing with for

14  some time arguably has the same issue.

15          They've got local counsel there who have had lots

16  of property, they've got local counsel arguably within their

17  Coalition who doesn't or has very little or no property.

18  They have local counsel which may have many claims against

19  them, they also have local counsel that may have no claims or

20  few claims against them.

21          In any event, that's a red herring it's not a

22  reason for either addressing the 2019 or putting up a

23  disqualifier with respect to our mediation motion.  And

24  again, and I'll just point -- another principal argument

25  compliance with 2019 the Coalition should not be permitted to

1 participate.  I think we've resolved that.

2          I think we've jumped through a lot of hoops and

3 done a lot of work and worked very hard with the US Trustee

4 and others to resolve that.

5          And again, you know, I don't think it's a

6 coincidence that the two parties who are objecting to -- put

7 in objection papers to the 2019 are the same ones that are

8 doing with our mediation motion.  Hartford objects to the

9 presence of the Coalition is inappropriate, because the

10 Coalition's members interests are represented by the TCC and

11 the Coalition seeks to undermine the TCC.

12          Well, Judge, Your Honor's seen enough bankruptcy

13 cases to know that sometimes ad hoc committees get created

14 even though arguably, or in truth, their fiduciary is the

15 TCC, and they have different views and different opinions.

16 And guess what, sometimes they disagree like today on the

17 attorneys' signature motion where the TCC is, I believe,

18 taken an opposite view or sometimes they agree, like today,

19 when we did not object to the TCC's discovery motion.

20          So that's just part of bankruptcy case and there's

21 nothing (indiscernible) about an ad hoc committee that has

22 within it creditors whose fiduciary is the TCC.  And again, I

23 would point you to the cases that I cited earlier that are

24 cited in our more recent ones, Purdue, certainly,

25 (indiscernible), PG&E, you know, I just want to let you know,

1   Judge, that I think at 3 o'clock today the Malencar

2   (phonetic) case has its first day hearing in front of Judge

3   Dorsey next door, arguing next door, or digitally next door.

4              And in that case, I'm honored to represent an ad

5   hoc committee of almost all the states as well as the opioid

6   PEC and walking that case into bankruptcy with an RSN.

7              And there's going to be a committee in that case

8   and that committee represents the governmental entity.

9   It's -- it's not unusual, but what it does show, Judge, is

10  that the ad hoc committee such as the one that I've been

11  given the honor to represent can be very forceful, helpful,

12  constructive party in a bankruptcy case that can lead a case

13  to resolution.

14             I think that that's been recognized here by some

15  significant mediation parties, including the debtor.  I think

16  it's been recognized -- it has been recognized by the

17  mediator.  And we'd ask, Your Honor, respectfully that it be

18  recognized by you as well, and that we can start the process

19  getting there, roll up our sleeves and get to work in that

20  process.

21             I do want to note that we're not there.

22             What does that mean?  It just means the way,

23  Judge, and it may confound whatever deal is entered into

24  behind the cloak of mediation with our participation.  And

25  certainly that's why -- that's why the majority of mediation

1  parties and the mediators themselves have recognized that if

2  we're going to do this, and if this has any possibility of

3  success of working, it will be a hindrance if the Coalition

4  is not involved.

5         So unless Your Honor has any questions, I have a

6  few more things, but I -- I don't want to repeat myself and I

7  think I've taken enough time and I think I've addresses the

8  points I've wanted to take.  I appreciate Your Honor's

9  attention.

10         THE COURT:  Thank you.  I do not have any

11  questions.  Let me hear from (inaudible) .

12         MR. SCHIAVONI:  Your Honor, Tancred Schiavoni for

13  Century.  If I could just get -- cut right to the chase here.

14  This motion is an enormous red herring.  It's enormous.  If

15  you just listen, if you took notes like I did on what was

16  just said, what you heard from Mr. Molton is that he's in,

17  quote, weekly communication with the debtors and the

18  mediator, unquote.

19         You heard him say, quote, we have been talking to

20  the mediators, comma, sharing information, closed quote.  You

21  heard him say, we've been talking to the debtors constantly,

22  quote/unquote on constantly.  He didn't identify a single

23  thing, anything that's been done that could have been done or

24  that he wants to do in the mediation that he hasn't done.

25  He's been an active participant, he's been talking to the

1  mediators and his lawyers, individual lawyers, if we had

2  deposed Mr. Kosnoff, you would have found that he's been

3  talking to the mediators and you'd find that Joe Rice has

4  been talking to the mediators.  They've been fully engaged.

5        There is nothing -- and we said it at the last

6  hearing, the mediators are free to talk to whoever they want

7  to, they have been, they are.  What is this about?  Our

8  objection here was really sort of technical in nature.  In

9  the protective order the Court defined the word "mediation

10 party" is a defined term.  And the obligations of

11 confidentiality flow through that order.

12       We don't want highly confidential information

13 shared with people who have not submitted to the jurisdiction

14 of the Court.

15       Mr. Kosnoff and some of the others have not made

16 an appearance before the Court, they haven't submitted to

17 jurisdiction, we do not want highly- confidential information

18 disseminated to a huge group of people into an enormous group

19 of claimants for which it then ends up being used in other

20 proceedings, or it ends up being posted on the Web site of

21 the LA Times which attributes the postings to Mr. Kosnoff.

22 So that's the issue.

23       We think that if Mr. Molton had reached out to us

24 directly on this motion and met and conferred, we could have

25 basically shaped something to satisfaction, but nothing --

1  nothing prohibits him from mediating.  He has been mediating,

2  he's been fully engaged on the mediation side.

3       With respect to what else you heard, Your Honor,

4  the most noteworthy thing is what you didn't hear.  You

5  didn't hear any offer or explanation about anything that the

6  Coalition brings to the table that's different from the TCC.

7  You didn't hear any distinction between the client that

8  theoretically the Coalition represents and those of the

9  Coalition.  And these other cases that you heard, opioids and

10 whatnot, there are subgroups which are defined subgroups

11 within the claimant groups.  That's not what you're hearing

12 here.

13       What you really heard was a preview.  It's a

14 preview to a motion for substantial contribution, it was a

15 substantial contribution argument; that's what you heard.

16 There's no problem with these folks talking to the mediators,

17 negotiating with the mediators, participating in the

18 mediators; that's what they've done.  But there shouldn't be

19 a blanket provision of all highly confidential information of

20 anybody who claims to be under the umbrella of the Coalition.

21       With respect to what these groups -- what these

22 entities bring to the table, I mean, it's truly putting

23 lipstick on a pig to say that it's a positive for the

24 Coalition to bring to the table a group of asbestos firms

25 that have joined them.  The Motley Rice Firm is the subject

1  of published decisions by the Third Circuit, by the Superior

2  Court of New Jersey, which found that Mr. Rice had

3  specifically concluded with Scott Gilbert, blowing the

4  coverage in a (indiscernible) case there.  In the CE case the

5  Third Circuit specifically targeted his demands for arranger

6  fees in that case.

7          The notion of what's happened in these -- and how

8  the asbestos cases have been driven off the rails by large

9  inventories of unimpaired claims is -- is this type of --

10  it's lore in the area of mass torts.

11          That is not a positive here.

12          It is not a positive that firms have come in

13  through the Coalition that have never brought a claim against

14  the Boy Scouts ever.  It's not a positive.  But this isn't an

15  issue about positives or negatives, it's an issue about

16  theoretically can they talk to the mediators, can they

17  negotiate?  Yeah, they have been.

18          You heard from Mr. Molton that they've been doing

19  it constantly, and he's going to continue.  Nothing's going

20  to change in that (inaudible).

21          As far as if he wants some sort of modification to

22  the protective order, it's like we're happy to meet and

23  confer with him on it, but there should not be a blanket

24  turnover by his designation as a mediating party of all

25  highly confidential information to a broad group of

1  plaintiffs firms including ones that have never brought a

2  claim here and have every interest in pursuing nondebtor

3  claims against nondebtors that have nothing to do with about

4  bringing this case to conclusion.

5          And those are our concerns, we've done nothing --

6  I don't even think, frankly, the mediators understand that,

7  because they never spoke to us about it, right?  In the

8  mediation statement is a statement from them that, look, if

9  they comply with 2019 we're fine with them participating.

10 But they have been participating.  Your Honor, thank you.

11         THE COURT:  Thank you.  Jim Ruggeri.

12         MR. RUGGERI:  Your Honor, briefly.

13         Hartford joins in Century's comments.  Our

14 objections were fourfold in the 2019 disclosures which we

15 talked be at earlier.  And as for our paper, too, the access

16 to information people not before the Court and who aren't

17 entitled to it and the potential that the access to the

18 information could be used elsewhere.  Three, the concern that

19 this is an end-run around the TCC, in our view that if so,

20 that could frustrate the progress of the mediation, not

21 facilitate the progress of the mediation.

22         And I do believe Mr. Molton went too far in trying

23 to draw the analogy for the explosion in claims here to the

24 opioid situation where folks don't know they were insured.

25         These are sex abuse claims and this is a

1  defendant, the Boy Scouts who is somewhat a mature defendant

2  in the tort system.  So it's not an analogous situation.  In

3  my view, and we'll deal with this as we go forward, it

4  doesn't explain the unprecedented explosion in claims that

5  we've seen in this case.  Thank you, Your Honor.

6           THE COURT:  Thank you.  Is there anyone else who

7  filed an objection?  I think there's just those two.

8           MR. STANG:  Your Honor, the TCC filed a pleading

9  early on.

10           THE COURT:  Oh, I'm sorry.  Mr. Stang.

11           MR. STANG:  Thank you, Your Honor.  Your Honor, I

12  have been representing committees in sex abuse cases since

13  2004, I've represented over 20 of them.  And while Mr. Molton

14  may think it's disarming to call me his friend, in this

15  instance, these cases are very personal to me.  And these

16  constituents are very personal to me, and when he says that

17  my non-committee members and Ms. Beville said this without

18  reservation are trying to stop victims from being heard, I am

19  not his friend.

20           The mediators chimed in in a publicly-filed

21  document, and I don't want to spend a lot of time on the

22  mediators, but they put their fingers on the scale.

23           That order did not authorize them to file a public

24  pleading, it didn't prohibit them from doing it either, but

25  it didn't contemplate it the way Mr. Molton described it.  If

1  all the mediation parties agreed to admit a new member, a new

2  party, and the mediators agreed, then they're in, but I think

3  he's reading way too much into the order.

4          And Mr. Molton talks a lot about "we".  And it's

5  hard to tell sometimes whether the "we" is the Coalition or

6  the "we" is the various lawyers and I thought he did a great

7  pitch.  I mean, I've been through a lot of pitches, his was

8  about as good as they come.

9          But we said to him and his partner and all the

10  attorneys in August; you are welcome to come to the mediation

11  on behalf of your clients.

12          And maybe I don't understand, maybe we have two

13  elephants in the room, maybe this is the third elephant.  Why

14  did they go the route they went?  They wouldn't have been up

15  against the insurance companies if they had gone the path

16  that they accepted from us, by the way, without reservation.

17          But they decided to go the other way.  So to me,

18  the third elephant in the room is why?  And perhaps, counsel

19  for the insurers have hit upon it, that they are trying to

20  set themselves up for substantial contribution claims, which,

21  by the way, Judge, to the extent there's a reservation of

22  rights by the US Trustee regarding that, that should

23  obviously extend to everybody.

24          And this will be my last point, Your Honor.

25  Mr. Molton doesn't want to look at history, but those who

1  don't study history are bound to have it repeated. What

2  Mr. Kosnoff said in that e-mail refers to the term -- he used

3  the term "our Coalition".  So his Coalition wasn't formed on

4  July 18th, it didn't spring fully formed from the head of

5  someone like a Greek God does and suddenly occur for the

6  first moment on July 18th.

7           These lawyers who were at the time the originators

8  of the Coalition sat in on committee meetings without

9  disclosing to the committee that they were -- had formed or

10  in the process of forming a Coalition that ultimately caused

11  their clients to fire them.  And in one case of the two

12  committee members, there were two committee members who had

13  members of the now Coalition lawyers voting representatives,

14  and they don't represent him anymore.  And it was that bad.

15           So they sat in on committee calls.  The people

16  that we're being asked to deal with now sat in on committee

17  calls without telling us.  Second, he advertises that they've

18  retained Brown Greer.  Well, you may not know this, Your

19  Honor, but the debtor has arranged after consultation with

20  the committee to have Omni provide the exact same platform

21  that Brown Greer is going to provide to the Coalition.  And

22  by the way, Brown Greer interviewed with the committee for

23  that role, Omni was picked over them.  The debtor -- I don't

24  know if they talked to Brown Greer, but we told them about

25  Brown Greer, the debtor selected Omni.

1           So that's now a duplicative service, so this

2    contribution Mr. Molton talks about; already done, thank you

3    very much.  And finally, Your Honor, the Coalition stood up

4    for survivors at the hearing on the false -- on the false

5    advertising.  When I heard that, all I could think of, it was

6    the old joke about the orphan who kills his parents and then

7    asks for mercy from the Court.  Some of the lawyers who are

8    now Coalition members were the ones who were doing the

9    advertising.

10          So you know, we rest on the papers that we

11   submitted before, but I simply could not stand by and listen

12   to Mr. Molton talk about -- and Ms. Beville talk about an

13   attack.  The TCC, the attorneys who represent those members

14   in State Court who have spent, in some cases, their entire

15   professional careers protecting children.  And now, Mr.

16   Molton wants to present this as effectively sour grapes.  So

17   thank you, Your Honor, for your time and appreciate the

18   opportunity to address Mr. Molton's comment.

19          THE COURT:  Thank you.

20          Mr. Molton, how do we address the confidential

21   information issue that Mr. Schiavoni raised in that making

22   you an official mediation party, permits access to

23   confidential information that plaintiffs' attorneys would not

24   otherwise have access to?

25          Mr. Molton, you're still on mute.

1          MR. MOLTON:  Lesson of our times, Judge. Thank

2    you.  One of the things that we -- why we're moving to become

3    mediation parties is we can't receive that information unless

4    we're mediation parties.  That's what we'd asked the

5    mediators, we've asked others, and everybody is hesitant to

6    go anywhere close to even talking to us about it without us

7    becoming mediation parties.

8          You know, listen, there's protective orders in

9    this case, there's protective orders that have pretty firm,

10   you know, provisions in them.  And we're willing to live by

11   them and abide by them.  So I mean, what Mr. Schiavoni said

12   is, from my perspective, is logistics that's done in mass

13   tort cases and commercial bankruptcy cases, financial

14   bankruptcy cases, you know, we'll be able to arrive at

15   protocols in which we're going to be able to protect the

16   information from being misused.  So that's my answer, Judge.

17         And also, listen, I'm not going to get into

18   responding to the attack other than to say I think what

19   Mr. Schiavoni said actually shows the fact that we should be

20   mediation parties.  Yes, we've been talking, yes we hit a

21   wall, we can't go further and that's why the mediators want

22   us in.  That's why the debtor wants us in.  That's why other

23   parties who are significantly have interest in this case have

24   not objected, because Your Honor, my view, and my submission

25   is, you know, they understand the value we add.  And again,

1  so that's it.  I don't think I have to say anything else

2  unless Your Honor has any other questions.

3         THE COURT:  No, I don't have any other questions.

4  Okay.

5         MR. ANDOLINA:  Your Honor?

6         THE COURT:  Yes.

7         MR. ANDOLINA:  Hi, Mike Andolina, White and Case

8  on behalf of Debtors.  May I be heard very briefly?

9         THE COURT:  Yes.

10         MR. ANDOLINA:  So, Judge, first, let me point out

11  that I strongly disagree with some of the comments that Mr.

12  Molton made regarding our organization.  You know, one victim

13  is obviously too many, but in particular since the late 1980s

14  the Boy Scouts child protection efforts are -- have been gold

15  standard.  You're also going to hear from Mr. Linder about

16  our very strong disagreement with the Coalition's position on

17  the attorney signature issue.

18         That said, Mr. Molton and Ms. Beville and their

19  team have been cooperative, they have shared preliminary

20  claims information with the debtors, and they have also

21  agreed to share that information with the local counsel.

22  Their group does include law firms with substantial claim

23  that that's just a fact.  And as the debtors have said from

24  the beginning the equitable compensation of survivors is one

25  of our dual goals.

1          I will also acknowledge, and we appreciate that,

2  in particular, in the last several weeks we've had a very

3  cooperative relationship with the TCC.  As our discussion

4  this morning with Mr. Morris and the ad hoc committee

5  represent, although unartful, we did reach a very important

6  agreement and we have very important discussions upcoming

7  with respect to the extension of the preliminary injunction.

8          Our view, Your Honor, is that we need to be fully

9  engaged with both of these constituencies as well as the

10  insurers and the UCC who's been involved in the preliminary

11  injunction discussion to get a deal done as quickly as

12  possible.

13          There's something that Mr. Stang said with respect

14  to the Coalition that I feel the need to push back on.  The

15  timing issue from the debtor's perspective here is not a race

16  to the bottom.  The timing issue is that we are an American

17  institution that needs to get out of bankruptcy.  We're

18  facing a pandemic that as Your Honor knows has cut to the

19  heart of our ability to maintain membership, serve the young

20  and -- young men and women of this country, and the same

21  holds true for the local counsel.

22          So we think that this issue has been debated

23  extensively, we appreciate Your Honor's thoughtful

24  consideration of the 2019, but from our perspective, getting

25  everyone up to speed and involved in the mediation as quickly

1  as possible is paramount to getting us to where we need to be

2  preserving the mission and to making sure that survivors are

3  equitably compensated.

4          THE COURT:  Thank you.

5          MR. MOLTON:  Your Honor, I just got an e-mail.

6  Mr. Rice who was attacked both this morning and this

7  afternoon is online, it's a live line.  He's asked me if Your

8  Honor would allow us that he have a moment.

9          THE COURT:  Sure.  He can have a few minutes.

10          MR. RICE:  Your Honor, this is Joe Rice.

11          Can you hear me?

12          THE COURT:  Yes.

13          MR. RICE:  Thank you very much.  I feel that

14  you've heard a lot today that is premised on people promoting

15  their own positions which is expected.  I have a significant

16  history with both insurance counsel in the case as came out.

17          We have been adversaries in many bankruptcy

18  actions.  And they talk about some issues from 15 to 20 years

19  ago they fail to get to the end of it.  For instance, in the

20  combustion engineering the Third Circuit remanded the case to

21  the District Court and the District Court affirmed the

22  agreements.  But those are historical issues.

23          What you have now is a debtor that is in dire need

24  of moving this case along.  And you've got, for whatever

25  reason, it doesn't matter what they are right now, you've got

1   so much distrust between the constituencies that have to get

2   together that nothing's moving, and that's the frustration

3   that the mediators have expressed, I believe, in what they

4   (inaudible) with the Court.

5         I got involved in this, because for the last 20

6   years solving these kinds of problems is what I've done.  I

7   was counsel to 20 states in the national tobacco litigation

8   and was lead negotiator for the states in that.  I was lead

9   negotiator in the BP Oil spill case from Judge Barbier, and

10  was able to bring that to a conclusion within a matter of

11  months.

12        I was counsel in the Volkswagen case that led

13  those negotiations in front of Judge Byer and brought that to

14  closure.  I resolved -- part of the negotiation team that

15  resolved thousands of asbestos cases against these insurers

16  and others in the Third Circuit for over 20 years.  And I've

17  done many complex cases, the latest one being the Takata

18  bankruptcy where Mr. Stang was my counsel.  And we have a

19  great working relationship and the adversaries in that case

20  representing the Honda Motors were counsel for the debtors

21  here, Mr. Andolina and Ms. Boelter, and I have great respect

22  for their work.  So I've worked with all of these people

23  before.

24        And I think one of the reasons people ask me to

25  get involved is because I can bring some civility, hopefully,

1  to this process as well as a lot of experience in putting

2  complex cases together.  And many of the members of the

3  Coalition have great experience in this litigation, but zero

4  experience in the bankruptcy world.  And having the ability

5  to try to pull everybody together to get on the same page is

6  what's needed here. And that's what the Coalition is trying

7  to do.

8          And the objections from the insurers is fully

9  expected, because they know the more cases that are out there

10  and the better those cases are and the more competent counsel

11  is at the negotiating table, the more money they're going to

12  have to pay if they're going to get closure in this

13  bankruptcy suit, and they don't want to do that.  And

14  that's -- I understand that's their job.  But this case needs

15  to move and the only way it's going to do that is if we get

16  everybody in the same room at the same time.

17          And I think that's the frustration that the

18  mediators are begging the Court to help them accomplish,

19  because right now, for instance, we're not able to see the

20  insurance towers so we can't have an intellectual

21  conversation with the mediators about what the available

22  insurance is, because it's a confidential document.

23          None of the other parties want to talk to the

24  Coalition freely for fear that they will be challenged by the

25  insurers that they are not cooperating with the insurers or

1 somehow putting the insurance coverage at risk.  And until

2 you get into the mediation you don't solve that problem.

3           So I respectfully ask you to consider what's the

4 goal in this case is and try to bring these parties together.

5 And I -- I'm not going to respond to insurance counsel's

6 personal remarks, I'd be glad to, if the Court has questions,

7 but I think my history of work in the bankruptcy courts and

8 in the courts generally speaks for itself.  And I'm now

9 national lead in the opioid litigation on behalf of all of

10 the public entities, so recently appointed to that last year.

11 So I just wanted to give you my 2 cents' worth for Your Honor

12 to consider if you want to.  And thank you for letting me

13 speak.

14           THE COURT:  You're welcome.

15           Okay.  So what's our next matter?

16           MR. ABBOTT:  Your Honor on the agenda it's Item

17 Number 8, but I leave it to the Court I think that was

18 largely for the parties.  I think that was largely subsumed

19 in our discussion of Number 5.  So let me just ask counsel of

20 Century and Hartford if they feel like they need additional

21 arguing on that, or they believe that's been covered already.

22           MR. SCHIAVONI:  I'm sorry, the agenda item

23 Mr. Abbott, is our motion to compel compliance?

24           MR. ABBOTT:  It's to submit disclosure as required

25 by the rules on 2019, yes.

 1          MR. SCHIAVONI:  Your Honor, Tan Schiavoni. We

 2  don't need to argue that separately, I think you've heard

 3  argument, but I think just the important thing is that these

 4  two motions do go together, and we just would respectfully

 5  request if you look at the order that was entered that flowed

 6  from Baron & Budd that's exhibited, because I don't think

 7  the -- I think the better way to deal with this is an order

 8  compelling compliance and setting a certain day.  If they say

 9  they've complied, so be it.  But without that order, we don't

10  know whether the economic interest information in the

11  discovery -- and especially without the discovery we don't

12  know whether there's been compliance.  So it approaches the

13  same problem from a different angle.  And we'd ask you to

14  consider how those other courts dealt with that. Similarly,

15  the Baron & Budd court thing and the order that they entered.

16          THE COURT:  Okay, thank you.

17          MR. ABBOTT:  Your Honor, I think that leaves us

18  agenda Item Number 10 which is the TCC motion regarding

19  electronic execution of abuse groups of claim.

20          THE COURT:  Okay.

21          MR. LUCAS:  Good afternoon, Your Honor.

22          This is John Lucas, Pachulski, Stang, Ziehl and

23  Jones for the TCC.  Can you hear me?

24          THE COURT:  Yes.

25          MR. LUCAS:  I have my hand up.

1          THE COURT:  Thank you, Mr. Lucas.

2          MR. LUCAS:  Your Honor, as set forth in the motion

3   the bar date order and the sexual abuse proof of claim form

4   simply requires or simply states that it needs to be signed.

5   And there's no definition of what signed means.  There are a

6   variety of ways that the document can be signed, and

7   inquiries have been made to the TCC as to what it means and

8   whether or not docu-sign and the like are acceptable means of

9   executing the proof of claims.  And we communicated this

10  concern to debtor's counsel, and this has been the result of

11  those discussions, Your Honor.

12          I don't think I need to go into any more detail.

13  I believe that the USC filed a limited objection to the

14  motion, and I think that the USC sort of misunderstood sort

15  of the timing requirements with respect to the subsequent

16  filing documents for the verification for those who have

17  already executed and filed proof of claims to date.  And I'm

18  happy to go into the details of the mechanics of the order if

19  you'd like, Your Honor.

20          THE COURT:  Well, yes.  Why do people have to re-

21  execute proofs of claims that have been filed?

22          MR. LUCAS:  Your Honor, I don't disagree. Your

23  Honor, I mean, this is part when we brought this issue to the

24  debtors, this motion was the result of what came out of that.

25          Originally, it's our view that proofs of claim

1 | that are executed in this manner should be treated as

2 | presumptively valid until somebody contests or objects

3 | something like that.  And so there was inconsistent

4 | information coming from the debtor's side as to what's

5 | acceptable and this motion is the result of trying to clean

6 | that up, Your Honor.

7 | I hear Your Honor's concern about -- we're not

8 | asking anybody to re-execute anything.  What we're asking,

9 | Your Honor, is that, for example, proof of claim Number 65

10 | has a docu-sign signature that that counsel supplied the

11 | verification document so that Omni can sort of put it on the

12 | back of proof of claim form that was filed.  It's just --

13 | THE COURT:  What if they don't?  And what if they

14 | don't?

15 | MR. LUCAS:  Nothing in the order, Your Honor, says

16 | that the claim is disallowed or anything like that.  And I

17 | believe, Your Honor, if that the claim was subsequently

18 | objected to on that basis, I think it would be affirmative

19 | defense that the objection could be rebutted by supplying

20 | information of some sort of verification that the proof of

21 | claim was documented or executed in a valid manner.

22 | THE COURT:  Okay.  The reason I ask these

23 | questions is because I am concerned about people who've

24 | already filed their claims.  And our local rules, which

25 | granted is more directed toward clerk, the clerk, but we have

1   a local Rule 9011-4 which says that the filing of a proof of

2   claim electronically with the clerk shall constitute the

3   filing claim as approved signature by law.  Electronic

4   claimants are not required to be registered CMESC users.  So

5   again, it's really more filing it with the Clerk's Office.

6   Electronically filed proofs of claim are deemed signed when

7   electronic submission -- upon electronic submission with the

8   clerk.

9           And of course, we also have a local rule that says

10  that if there are more than 200 creditors, you have to get

11  a -- certainly have to get a noticing agent, I think you also

12  have to get a claims agent.  So when you put those two rules

13  together --

14          MR. LUCAS:  Your Honor, we don't disagree with

15  what you're saying, the tort claim committee does not

16  disagree with what Your Honor's saying.  We understand how

17  Your Honor is connecting the dots there. And Your Honor, in

18  so far as to keep concerned we also believe that this

19  submission of proofs of claims in this manner without the

20  verification should be valid, but we were trying to reach

21  consensus among the various constituencies in this case to

22  put a process in place.

23          And so Your Honor, your comments are heard, and

24  you know, if it's up to the TCC alone, Your Honor, we're fine

25  with the way that proofs of claims are being submitted.  But

1  parties are concerned and we're asking for clarification

2  about whether or not they may execute a document

3  electronically.  And so because of the mixed communications

4  coming from various constituencies in this case, that's why

5  the motion was filed.

6         THE COURT:  Okay.  Okay, yeah, we also have a

7  local Rule 3003-1; any entity filing a proof of claim in a

8  Chapter 11 case shall file the original and one copy of the

9  proof of claim with the claims agent and shall serve a copy

10 on the Trustee, if any, unless the claims agent accepts

11 claims electronically in which case only the electronically

12 filed claim shall be submitted.

13        I think it's been -- if it's been submitted

14 electronically through -- to the claims agent, I think it's

15 been submitted.  And I assume it's signed in some fashion and

16 what you're telling me what some kind of docu-sign but they

17 didn't attach the verification which, quite frankly, I didn't

18 even know there was such a thing, but okay.  But the person

19 has filed it.  I think to create a situation where the --

20 they have to refile something, and another document just

21 becomes confusing.

22        And I suppose if somebody wants to object to a

23 proof of claim on the basis that they didn't have the

24 verification page, I'll deal with that.  But I think people

25 can hear from me that that's not going to go too far.

1          MR. LUCAS:  Understood, Your Honor.  So then may

2     I -- may I suggest respectfully that the proposed order if

3     the Court would consider it, would just verify that

4     electronic execution or just cite to the local rules to give

5     various counsel to survivors out there that are filing claims

6     comfort that this is going to be satisfactory rather than

7     having to do wet signatures or ink signatures whether they be

8     mailed in or electronically uploaded with the claims agent?

9          THE COURT:  Yeah, we also have a rule on wet

10    signatures, and I don't think it applies to proofs of claim.

11    We've kind of carved them out as I -- I was never on the

12    Rules Committee, but we kind of carved them out, I think, to

13    make certain that parties could themselves file proofs of

14    claim, they don't have to have a lawyer, they don't have to

15    have an ECS number, they file with the claims agent.  It's

16    not supposed to be a -- there's not supposed to be barriers.

17    In terms of the order -- let me see the order.  Yeah, I don't

18    know what you do with the order.

19          MR. LUCAS:  Your Honor, I believe what given what

20    Your Honor has said to date, I mean, this order does not work

21    it's not consistent with your concerns, I mean, it would have

22    to be revised substantially, you know, to reflect the local

23    rules that you had referenced to give parties or the

24    clarification and comfort that signed means what it means

25    under the applicable local rule that you referenced, Your

1  Honor.

2         I believe that the proposed order's going far

3  beyond what you think is necessary.

4         THE COURT:  Okay.  Why don't you circulate

5  something and see if there's agreement.  And if there is, I

6  will probably enter it and if there's not, I'll take a look

7  at it.  But in my view, parties who have filed with some sort

8  of an e-signature but it just doesn't have that verification

9  page, I don't think is -- I mean, how is that different than

10 if I sign my name on something and you don't know if I signed

11 it or didn't sign it, I signed it.  So I'm not understanding

12 the issue, maybe I'm too much of a dinosaur, but I'm not sure

13 what the -- quite frankly, what the purpose of that

14 verification page is.  What does it say?

15         MR. LUCAS:  For example, Your Honor, I believe

16 that the -- I've seen them.  The verification pages will

17 state who was the originator of the document. And so, for

18 example, Your Honor, if I represented a survivor and I send

19 out the proof of claim form for a survivor, it will state my

20 e-mail, and it will state the time of day that the e-mail was

21 sent and to whom it was sent, an e-mail the recipient and

22 when the recipient opened it up, whether the recipient

23 adopted an electronic signature or sort of scribed one into

24 the program and how it used those, and when the signature was

25 applied and when the document was sent back.  And so it's

1  that trail was the type of document that we're looking to

2  attach.

3          THE COURT:  The trail, okay.  So it would be like

4  if I -- show my age, it would be like if I faxed proof of

5  claim form to my client and they signed it and sent it back

6  to me for filing.

7          MR. LUCAS:  Right, and Your Honor, I think so.  I

8  know that there are verifications to faxes, but I'm not sure

9  what they look like either so.

10          THE COURT:  I know what they look like. Okay.  So

11  but -- so it's that paper trail you're looking for.  To me,

12  the signature's the signature or it isn't the signature.  And

13  the paper trail as to how you got the signature doesn't

14  either make it valid or not valid. Maybe electronically it

15  verifies something.

16          MR. BUCHBINDER:  Your Honor, this is David

17  Buchbinder.  May I be heard?

18          THE COURT:  Yes, please.

19          MR. BUCHBINDER:  Yes, this is Dave Buchbinder on

20  behalf of the United States Trustee.

21          Given the Court's concerns about these signatures,

22  which we agree with completely from our limited objection,

23  and given that we aren't going to go back and make people

24  jump through hoops and refile claims, I'm wondering why we

25  need an order at all.

1        If someone wants to object to a claim later on and

2    challenge the verification as the Court has noted, someone

3    can do so, and if someone's used an electronic signature

4    program, presumably they could use that as part of their

5    evidence, but given the Court's comments, I don't even know

6    why we need an order at all here.  The motion should either

7    be denied or simply withdrawn.

8        THE COURT:  That's what I'm struggling with

9    Mr. Buchbinder.  And the other thing is, obviously on a go-

10   forward basis, I don't want anybody to feel comforted that

11   they don't need to have a signature.  They need to have a

12   signature.  All this thing was some verification that there

13   was a signature.  There needs to be signatures.  We can talk

14   about who in a moment, but there needs to be a signature on

15   the proof of claim form.  But when it's done electronically,

16   then it is.

17       And that doesn't bother me.  So I don't want

18   people to think, oh, I don't have to worry about getting a

19   verification page, maybe they should get one just to have it,

20   but to me, it's either signed or it's not signed.  And that

21   could go back to old school where you mail it to somebody

22   and -- or fax it or it can be, you know, current and

23   electronic.

24       MR. LUCAS:  Your Honor, this is John Lucas. My

25   suggestion, if it works is that I can reach out to

1          Mr. Andolina and perhaps, I think, discuss some
2  very simple language, not any intention to overcomplicate
3  things, but I think really just to clarify that the use of
4  the word signed and signing in the bar date order in the form
5  so that I think people aren't left -- so that claimants and
6  their counsel aren't left to believe that it must be a
7  conventional, handwritten signature.

8          And then (inaudible) not sort of given sort of
9  comfort about sort of what's valid or not valid, you know, if
10  there's some sort of question about how or a party executed
11  the proof of claims, then that's just left for another day.

12          THE COURT:  Okay.  You can give that a shot and
13  I'd like you to run it past Mr. Buchbinder as well.

14          MR. LUCAS:  Of course.  I didn't mean to exclude
15  you.

16          THE COURT:  Because the proof of claim form
17  obviously reflects the fact that they -- claims can be filed
18  electronically through the electronic filing system that was
19  set up on the Omni site.  And I assume that mostly that's the
20  preferred way is that they'd like to get them, because it's
21  probably easier for Omni than to get things through the mail.

22          But it was contemplated that things would be
23  electronically filed in the -- certainly in the form as I'm
24  looking at it.  I don't know if that's reflected in the
25  order, but certainly in the form.  But sure, you can do that.

1    Run it past Mr. Buchbinder.

2              MR. LUCAS:  Thank you, Your Honor.

3              MS. RINGER:  Your Honor, this is Rachael Ringer

4    from Kramer Levin.  If I may be heard just very briefly on

5    this?

6              THE COURT:  Okay.

7              MS. RINGER:  Rachael Ringer from Kramer Levin on

8    behalf of the unsecured creditors' committee.

9              I will tell you, I think in response to the volume

10   of paper that has been filed on this issue, we've started

11   getting some inquiries from not only these claimants about

12   whether e-signatures are sufficient for the general proof of

13   claim forms, so I would just ask Mr. Lucas and Mr. Andolina

14   to include us in that discussion to the extent we're having

15   any order clarifying that e-signatures are acceptable for the

16   abuse proof of claim form, I would just ask that it also

17   apply for the general proof of claim form as well.

18             THE COURT:  Certainly.  I have to say, this is the

19   first time I'm getting this issue in any case.

20             And at this point so many proofs of claims are

21   electronically filed.  So I'm a little surprised at the

22   question, but it could just be my -- like I said, my lack of

23   tech savvy.

24             MR. BUCHBINDER:  Your Honor, this is Dave

25   Buchbinder again.  I'm completely with you.  Just because a

1    motion gets filed doesn't mean there has to be an order.

2    There's no need for an order here.  It's entirely redundant

3    and utterly unnecessary given the Court's comments.

4           THE COURT:  I'll give him a shot and I'll take a

5    look at what there is submitted, and I'll make a

6    determination as to whether I sign it or not.  Okay, next.

7           MR. ABBOTT:  Thank you, Your Honor.  We've talked

8    about how things get signed, now it's time to talk about who

9    gets to sign them.

10          THE COURT:  Uh-huh.

11          MR. ABBOTT:  Item Number 11 is the Coalition's

12   motion for allowance of attorneys' signature, authorized

13   counsel's signatures rather than claimants' signature.  So

14   back to our friends at Brown Rudnick for this one.

15          THE COURT:  Mr. Goodman, try again.  Yes, now.

16          MR. GOODMAN:  So much for that headset, okay.

17          Good afternoon, Your Honor, Eric Goodman, Brown

18   Rudnick, counsel for the Coalition.  Your Honor, I will begin

19   by stating that creditors that have legal counsel do better,

20   is it obviously true of tort claimants.

21          Before this case I served as counsel on the

22   official committee of tort claimants in the PG&E bankruptcy.

23   I helped write the claim form in that case for the fire

24   victims.  Some of our committee members lost their children,

25   others lost their homes.  Out of respect for them, I

1  personally made certain that the claim form complied with the

2  bankruptcy rules, that it permitted attorneys' signatures,

3  and it generally made it easier for fire victims to file

4  proofs of claim before the bar date.

5         We had a very robust turnout in PG&E; it made a

6  difference.  And Your Honor, today I'm here today I think

7  fighting essentially the same battle but in a different case.

8  Your Honor, there are three bankruptcy rules in play here.

9  First, the bankruptcy Rule 3001-B that provides that a proof

10  of claim shall be executed by the creditor, by the creditor's

11  authorized agent.

12         Second, the bankruptcy Rule 9009-A which was

13  recently amended in 2017 and precludes modifications to the

14  official form other than minor changes not affecting wording.

15  The wording in the official Form 410, specifically Part 3,

16  permits attorneys' signatures.

17         Third, there's bankruptcy Rule 3001-A which

18  provides that a proof of claim shall conform substantially to

19  the appropriate official form.  And again, the official Form

20  410 specifically permits attorneys' signatures.  Based on

21  these rules we would expect that proofs of claim filed by

22  sexual abuse survivors in these cases could be executed by

23  authorized counsel, but there is a question as to whether or

24  not a bar date order eliminates this right.  And that is a

25  problem.

1          Just for a moment, consider the logistics of

2    filing one claim which forces a victim to recount being raped

3    when they were a teenager.  Now, consider filing thousands of

4    them that your clients do not get victimized again.  And now

5    add to that all of the victims that may come forward in the

6    next month and retain counsel and file claims in these cases

7    that they're not left out.

8          Your Honor, we do not assume that all sexual abuse

9    survivors have computer access or iPhones. I'm sure that many

10   do, but some do not.  And we have to consider victims that

11   are homeless or in prison, and we have to consider someone

12   who just hires counsel the day before the bar date.  No

13   survivors should be left behind.  Your Honor, the Coalition

14   first appeared in these cases after the bar date order was

15   entered.

16         Literally, I'm a stranger to it, because I was not

17   here back in May.  When we flagged this issue, we asked

18   whether the debtor undertook any kind of extraordinary

19   noticing that we think would need to happen to negate a

20   bankruptcy rule.  The answer appears to be no.

21         The bar date motion, as you know, was a first-day

22   motion in this case, it was noticed on a core service list.

23   That core service list did not conclude the majority of the

24   law firms that are part of the Coalition.  Based on our

25   review of the debtors' affidavits of service, notice was not

1  given to over 17,000 sexual abuse victims or their legal

2  counsel.

3        Debtors say, well, Your Honor, you gave them

4  notice of the bar date.  Not the point.  Victims were not

5  given notice before the bar date order was entered.  And the

6  bar date order creates the problem that we're trying to fix,

7  potentially.

8        THE COURT:  Okay, I understand that, but -- but

9  bar date -- bar date orders, bar date motions are not

10  generally served on the entire creditor body.  So I'm not --

11  I'm going to hear this on the merits, okay.

12        I'm not going to hear it based on, we didn't get

13  notice, because I think notice of the bar date motion was

14  appropriate.  In fact, I can issue them ex parte under our

15  local rules if they meet certain requirements, which this

16  one, except for the fact that it's been substance deviated,

17  that met.  So notice was appropriate, and now we're just

18  going to talk about this specific issue which I think is

19  worthy of a discussion.  So let's just hear the specific

20  issue.

21        MR. GOODMAN:  Thank you, Your Honor.  So we

22  further analyzed the transcript from the May 18th hearing on

23  the bar date motion.  And the statements that were made by

24  the Court seem to reflect, in our view, an expectation that

25  the bar date order would be consistent with the Bankruptcy

1  Code and the Bankruptcy Rules.  That gave us some hope.  And

2  to be clear, we think that there is an inconsistency.

3         Again, Rule 3001-B provides that a proof of claim

4  shall be executed by the creditor or the creditor's

5  authorized agent.  That means that the creditor's authorized

6  agent should be permitted to sign the claim.  Rule 3001-A

7  provides that a proof of claim shall conform substantially to

8  the official form; again, the official form permits

9  attorneys' signatures.

10        In Rule 9009-A precludes modifications to the

11  official form other than minor changes not affecting wording.

12        And again, the wording in the official form

13  permits attorneys' signatures.

14        I will note, Your Honor, that in the PG&E case

15  when the tort committee proposed a claim form for tort

16  victims, we did not try to preclude the victims from using

17  official Form 410, we just wanted a simplified form approved

18  to make it easier for victims to file claims before the bar

19  date.  Simply making the request that the official form not

20  be available, of course, it was indicated the TCC's form did

21  not substantially conform to the official form.

22        We don't think that we should be in a world where

23  sex abuse victims can file a claim that conforms

24  substantially to official Form 410, complies with every

25  bankruptcy rule currently in effect can be treated as having

1  violated a court order.

2         Your Honor, we filed a motion trying to correct

3  the problem.  Our solution is a very simple fix. We just want

4  an order entered clarifying that authorized counsel may sign

5  the claim forms; that's it.

6         Shortly after we filed the motion, the US Trustee

7  contacted us and asked us to withdraw the motion as quote,

8  unnecessary and moot, because the relief sought already

9  exists.  He told us that the Court- approved form is

10  consistent with the official form and that the Court-approved

11  form permits signature by the claimants' legal

12  representative.  We thought that is wonderful.  That's how

13  sex abuse victims should be treated.  The problem though, is

14  that the TCC, the debtors and the insurers vehemently

15  disagree.

16         The TCC, the debtors and the insurers assert that

17  prohibiting attorneys' signatures in these cases was the

18  product of negotiations among them.  Think about that for a

19  moment.  Product of negotiations among them.  They, from my

20  perspective, appear proud of this. They further state that

21  they believe that it is essential that attorneys not be

22  permitted to sign claim forms, even though three bankruptcy

23  rules indicate that they can.  Think about that, how could

24  that ever be essential?

25         Your Honor, if this Court understood back in May

1  that attorneys' signatures would not be permitted,

2  notwithstanding Rule 3001-A, 3001-B and 9009-A when the bar

3  date was ordered, bar date order was signed, there may be

4  very little that I can say right now that would change

5  anything, but I feel like I need to try.

6          And if it was not adequately disclosed to you and

7  the US Trustee, then let's just fix it.  I'm here today to

8  simply ask the Court to make it clear that when it's the day

9  before the bar date and victims are scrambling to get

10 everything completed so that their claims are not barred,

11 that they can rely on their authorized counsel to execute and

12 file the proof of claim form for them.  I think we all know

13 that if anyone comes in here late, even by one day, Century

14 and Hartford are going to strenuously object.

15         We obviously do not want fraudulent claims in this

16 case.  We're not looking to make it possible for unauthorized

17 attorneys to execute proofs of claim.  We are simply asking

18 that sexual abuse victims have the same rights as trade

19 creditors and bond holders in nearly every bankruptcy case

20 pending in this district to have their authorized counsel

21 sign the claim form.  And if the right to have counsel sign

22 the form is going to be restricted or denied here, we think

23 that it needs to be extremely clear that this is what's being

24 done.

25         Again, the fact that the US Trustee informed us

1  that our motion is unnecessary and moot after it was filed

2  indicates to me that we need clarity on this issue.  And in

3  my view, clarity means that the authorized legal counsel

4  should be permitted to execute the claim form consistent with

5  the Bankruptcy Rules.

6          Thank you for hearing me out on this, Your Honor.

7  I don't have anything further.

8          THE COURT:  Thank you.  Well, let me -- I did read

9  the papers.  Let me hear from the objectors as to why a

10 lawyer who's authorized -- the rules speak to authorized

11 agent as to who may execute.  It doesn't actually say signed;

12 that's interesting.  But an authorized agent shouldn't be

13 permitted, not whether it's a good practice or a bad

14 practice, because quite frankly, as a former lawyer I never

15 did it.  I don't think it's a good practice.  Okay?  But it

16 doesn't mean it's not -- it may not be permitted or that it

17 may not have consequences if you do, as a lawyer, sign a

18 proof of claim form.

19          And I notice that some of the cases that were

20 cited suggested that you might be able to be deposed.  And I

21 don't know, because I'd never had to think about that.  That

22 wasn't the reason that I didn't sign them for my clients.

23          I'll take it back, I think I did it once in an

24 emergency situation, pre-electronic filing.  Pre-electronic

25 filing, okay.  But why shouldn't a lawyer who has authority

1  from his client be able to sign -- why should they not be

2  able to sign the proof of claim form?  Let's start with --

3              MR. LINDER:  Your Honor, Matthew Linder, White and

4  Case, proposed co-counsel for the debtors.  I just want to

5  start, Your Honor, by making clear that Boy Scouts of America

6  want to equitably and timely compensate survivors of abuse

7  Mr. Andolina (inaudible) that but I think it bears emphasis

8  again here in the context of executing and submitting proofs

9  of claim.

10             Your Honor, counsel referenced the three

11 Bankruptcy Rules at issue here.  Rule 3001-B, 9009-A and

12 3001-A.  Two of those three rules, Your Honor, came to the

13 rules coiled (phonetic), you'd have a hard time discerning

14 how the Court could approve a proof of claim form that

15 deviates significantly from official Form 410.

16             From our perspective, Your Honor, it's critically

17 important that the claimants themselves, due to the nature of

18 these claims, be the individuals to execute the claims.

19 Counsel also referenced putting survivors on the same plain

20 giving them the same flexibility to the execution of claims

21 as bondholders and commercial claimants.  These claims, the

22 nature of these claims, Your Honor, could not be further from

23 a commercial claim, a bondholder claim and other similar

24 claims where you could look at a contract straight through

25 the argument, as an attorney, fairly quickly and then with

1   the reasonable belief that's what they're asking you the

2   contents of the claim, submit that claim.

3          Here, it's just not -- it's difficult for the

4   debtors to see in the explosion of claims on the part of the

5   Coalition, how that process which is required and, of course,

6   Rule 90 (inaudible) which is a rule that counsel did not

7   reference comes into play here.  It's difficult to see that

8   explosion of claims how counsel could, on the one hand,

9   adequately represent interests of his clients and on the

10  other hand, be executing the volume of claims and forming the

11  belief that -- the reasonable belief that the content of

12  those claims at that rate.

13         If you do the math, Your Honor, going back to

14  August 26th, the Coalition had 12,000 claims.  Today I

15  believe the Coalition is comprised of 28,000 claims.  If you

16  were to do just the division, that's a rate of increase of 3

17  and a half claims per minute.  To actually go through the

18  exercise, I'm assuming there are telephone calls, there may

19  be other rules by which these claims come in.  They actually

20  go to the exercise that as an attorney conducting that

21  reasonable investigation of the allegations set forth in the

22  proof of claim to the extent where you're comfortable

23  executing that claim under penalty of perjury and submitting

24  that claim to us, that is a difficult proposition.

25         Counsel also suggests in its papers --

1         THE COURT:  Let's explore that.  Let's explore

2  that.  And I also, have that concern that how many people do

3  these law firms have that are communicating with clients, and

4  so that they are comfortable that these claims are valid.  I

5  have that concern, too.  But you want me to assume they're

6  not doing their job.  And why should I assume they're not

7  doing their job?  And what does that have to do, in any

8  event, with what the Rule requires and what the Rule says?

9         MR. LINDER:  Your Honor, on that point, I think we

10  just circle back to what happened preceding the hearing on

11  the bar date.  This was -- this was one component of a proof

12  of claim form that was heavily negotiated between the tort

13  claimants committee, the debtors extensively over the course

14  of six plus weeks who traded numerous drafts.  As you know,

15  there was a lengthy evidentiary hearing at which the TCC

16  proffered the testimony of Dr. Conte (phonetic).

17         At that hearing, counsel represented to the Court

18  that the survivors themselves had gone through the proof of

19  claim form, line by line, to ensure that every line of the

20  proof of claim form made it easier for survivors to execute

21  the claim.

22         There were no less than four versions of the claim

23  form that was submitted to the Court filed on the docket,

24  (inaudible) version all.  One thing it did not change was the

25  signature requirement, because that was one point on which

1  the debtors and the tort claims committee, the fiduciary for

2  the interest of all survivors, that's one point on which we

3  agree.

4           So in the expert opinion of Dr. Conte and in the

5  view of the survivors that comprise the tort claims

6  committee, this was a component of a proof of claim form

7  that, in their view, was appropriate with --

8           THE COURT:  I don't recall -- I don't recall Dr.

9  Conte testifying about signatures.  I don't believe that was

10 part of his declaration.  I could be wrong.  But this issue

11 was not put in front of me squarely to rule on, and I do not

12 recall Dr. Conte's testimony to include who had to sign the

13 form.  Am I wrong?

14          MR. LINDER:  You're right.  And I did not mean to

15 suggest, Your Honor, that you did squarely opine on that

16 issue.  Our concern really stems from reopening this issue

17 five months after a final order was entered where despite the

18 arguments of counsel, everyone had the opportunity to appear

19 at the bar date hearing.  It's argued that this was an

20 inappropriate provision of the proof of claim form.  Now,

21 five months later we're faced with -- and one month out from

22 the bar date, we're faced with the request to materially

23 change the signature requirement on the proof of claim form.

24          THE COURT:  Yeah, but I don't know that the

25 parties get to negotiate the signature of the form.  Why do

1 the parties get to negotiate a deviation from the rule?

2          MR. LINDER:  Again, Your Honor, it's really we do

3 it as a mechanism to protect the integrity of the claims

4 process.  You've alluded to the case law that illustrates the

5 nature of the problem which is that by signing a proof of

6 claim form, an attorney is becoming a fact witness.  They're

7 attesting --

8          THE COURT:  They might be.  They might be and they

9 may be subject to a deposition.  So they ought to think long

10 and hard before they sign that proof of claim form.  I don't

11 know, because I haven't ruled on it, but I found those --

12 whoever cited that case, it looks kind of interesting.

13          MR. LINDER:  And our concern, Your Honor, going

14 back to the first statement that I made, we are focused on

15 delivering equitable and timely contribution to the holders

16 of valid survivor claims.  And if you play this process out,

17 we could have thousands, maybe even tens of thousands of

18 attorneys signing proofs of claims and putting themselves in

19 a position where they could be deposed as to the contents of

20 that.  I could see that very easily having -- posing major

21 issues for the administration of a potential settlement

22 trial.

23          We're focused on efficiency, we think this

24 deviation, if you will, from the default rule under official

25 Form 410 is not only permissible, we think it actually

1  advances that goal of making sure that survivors who have

2  valid claims proceed timely and equitable contribution for

3  compensation.

4              THE COURT:  Okay.

5              MR. LINDER:  And it's not without precedent, Your

6  Honor, I would just note parenthetically in this circuit or

7  in this district on --

8              THE COURT:  What precedent is there?  There were

9  orders that were submitted, I have no idea that any judge

10  actually ruled on this issue.  All I got was a string of

11  orders.

12             MR. LINDER:  That's right, Your Honor, it's not

13  without example is a more precise way to put it.

14             THE COURT:  Okay.  So there's no precedent.

15             MR. LINDER:  To my knowledge, no Court has

16  considered squarely whether or not it is permissible to alter

17  the default rule on official Form 410, that attorneys be

18  permitted to sign.

19             THE COURT:  Okay.  Do you have anything further,

20  Mr. Linder?

21             MR. LINDER:  No, Your Honor.  I'd let the other

22  objectors (inaudible).

23             THE COURT:  Thank you.  Let me hear from other

24  objectors.

25             MR. SCHIAVONI:  Your Honor, it's Tan Schiavoni for

1  Century.  Rule 9009 authorizes the Court to use forms, quote,

2  with alterations as may be appropriate.  There's at least two

3  circuits that have looked at that and said that's allowed

4  alterations.  In re; Robins is one such case in the Fourth

5  Circuit 862 F 2d 1092.  Eagle Pitcher is another case out of

6  Ohio, Rule 3001-A likewise contemplates that a proof of claim

7  form may deviate from 3001-A.  It doesn't say there must be a

8  signature from an attorney, it says the Court may accept if

9  it's either the signature -- it gives the Court the option of

10  accepting the signature from the claimant or from the

11  attorney.

12        There is authority that we've cited to you of

13  other courts, in re; Arch Diocese of New Orleans is an

14  example of the Court entered an order of authorizing a proof

15  of claim form that requires the abuse -- the abuse claimant

16  to sign.

17        Another case is Arch Diocese of Harrisburg. And

18  Your Honor, you know it's plain what's going on here, it's

19  like there was a -- it's something, there was a back-and-

20  forth between the TCC and the debtors in advance of the bar

21  date order.  The insurers weren't part of those negotiations,

22  I think we made clear in the bar date order.  But the whole

23  bar date hearing was about, in essence, these questions that

24  are posed, are they really adequate to deliver sort of a

25  presumptive validity for these claims.

1          And the Court overruled us on that, we wanted more

2    questions, but the debtor in the TCC in advancing to the

3    Court that what it had was enough specifically pointed the

4    Court to the fact that the proofs of claim would be signed

5    under oath and that these questions would be verified under

6    oath.  And Your Honor, you took note of that on the record at

7    that hearing, it's on I think Page 70, Lines 9 through 14

8    where you noted that (inaudible) proof of claim form, I can

9    look at it and understand it, it is what the claimant has

10   alleged and sort of (inaudible).  And if it's signed under

11   oath and otherwise meets the requirement that it's a valid

12   proof of claim.

13         And obviously, the Court can change its mind and

14   maybe the Court meant other things, but what's more important

15   is what prompted, I believe, that comment was the back-and-

16   forth between the parties in making their presentation, the

17   debtors and the TCC were saying look, what we have here as

18   questions are adequate, because in essence, we're going to

19   get verification of the truth of the statement by having it

20   signed by the claimant.

21         And the form, that's really important, because the

22   form provides on it that the signatory -- and look, I've had

23   the same problem as Your Honor mentioned in private practice,

24   like you know, being presented with these forms at the last

25   minute and signing them and questioning myself about what I'm

1  actually verifying, but it's very different for someone with

2  personal knowledge to sign that perjury statement than

3  somebody who's an attorney, right?  Because what the

4  statement says is that you as the signatory are affirming

5  with a reasonable belief that the information is true and

6  correct.

7          And but these types of claims, if the affirming

8  party is the actual claimant it has (indiscernible) to say

9  that they have a reason to belief the information is true and

10 correct.  If it's the attorney, it's a totally different

11 animal, okay.

12         And if you look at if they don't have personal

13 injury of the fact.  All right.  If you look at this specific

14 fact we're dealing with here, if we had been able to depose

15 Mr. Kosnoff or Mr. Vanarsdale, I think one of the things we

16 would have pursued is that all of them are solo

17 practitioners, they both claim to have the largest collection

18 of claims among the Coalition.

19         Mr. Vanarsdale graduated law school in 2018, he

20 owns an advertising company, he is a solo practitioner.  The

21 office he claims to have is just a storefront.  With

22 Mr. Kosnoff, the only office he listed is in Houston, there's

23 another one that's in a marina in Puerto Rico.  He's not

24 licensed in either of those states.  One's a mail drop, the

25 other's a condo.

1          There's nobody -- any notion that there's people

2    verifying that those two lawyers are verifying the largest

3    number of claims so that they can assert under a reasonable

4    belief that they're accurate is just -- it defies ascription

5    to think that that's really what's happening here.

6          So this has -- it has impact, it has a real impact

7    on the proofs of claim, especially in the context that the

8    Court saw what the advertising has said that has led to this

9    massive increase of claims that what they've asserted,

10     Mr. Kosnoff and Mr. Vanarsdale -- not asserted, it's

11   like in their Gateway Web site where all the advertising

12   channels them is that you don't have to appear in Court, you

13   don't have to be deposed.  You can remain anonymous.

14          You take away the signature requirement and it's

15   like it opens the floodgate to just about anything, okay,

16   coming in the door.  And sadly, I think that's what we're

17   going to see.  And I think what you had in the back-and-forth

18   in that hearing was some acknowledgment that the debtors and

19   the TCC, the TCC here wearing its fiduciary hats, they're

20   lawyers recognizing this was an important requirement and had

21   some impact here and was valuable to put in place.

22          And that's what they put in place?  The Court had

23   authority to enter the order it did.  I don't see, there's

24   been nothing offered that really provides a real basis to

25   reconsider that order.  COVID-19 was around then, the notion

1  that signing the proof of claim provides any real barrier,

2  everybody knew that -- you know, whatever there was, no

3  evidence was put on it then.  Many of the Coalition lawyers

4  were in the case at that time and didn't have anything to say

5  about it.  But my goodness, like in November it's supposedly

6  80 million Americans are going to vote by signature ballot by

7  mail. There's no reason that a proof of claim signed by --

8  you know, signed should get any sort of different type of

9  treatment.

10        So we'd suggest that the Court, you know, that

11  this is, in fact, an important requirement and that watering

12  it down will open the floodgates, especially in the context

13  of the Court's order that there's presumptive validity.  And

14  on the advertising, you sign, you get money, and not linking

15  that to any kind of signature under oath could have just

16  catastrophic effects here.  Thank you.

17        THE COURT:  Thank you.  You did say, and I think

18  you said this before that the order says something about

19  presumptive validity.  The order says nothing about

20  presumptive validity.  I think there was something in the

21  order, I took it out.  And I did so because -- at least I

22  think, if I'm wrong, people can correct me.  But the Code

23  provides what the evidentiary effect of filing a proper proof

24  of claim is.  I don't decide that, the Code says that and/or

25  maybe the Rules.  But so I didn't deviate from the Code or

1  the Rules with respect to that.

2         And I agree, there's no new evidence, I agree that

3  this is not COVID related.  People have had six months, I

4  believe, to file their proofs of claim.  This is a question

5  of what the Rules require.  And I think the Rule has been

6  amended since the cases that you cite were decided.  The Rule

7  says right now, 9009-A; the official forms prescribed by the

8  judicial conference of the United States shall be used

9  without alteration except as otherwise provided in these

10  Rules in a particular official form or in the national

11  instruction for a particular official form.

12         Official forms may be modified to permit minor

13  changes not affecting wording or the order of presenting

14  information.

15         And then it goes on.  And I'll be candid, I was

16  not -- I haven't read this rule before.  So my concern is

17  that -- is that this isn't a minor change.

18         But let me hear from other objectors who might

19  want to address that.  My concern is this is not a minor

20  change.  I share the concerns, Mr. Schiavoni, that you've

21  raised, and that Mr. Linder has raised that -- that lawyers

22  not be signing proofs of claim forms where they have not

23      done the due diligence necessary to sign it.

24         And if you've had enough communication with your

25  client to fill out this form and the back-and-forths, I'm not

1   really sure why the client can't sign it, certainly, in some

2   electronic form as I've just indicated it's, you know -- send

3   the form to your client.  And yes, I recognize there may be

4   some people who don't have access, I think that is real, I

5   don't discount that, but there may be some people who don't

6   have access to the Internet, although most people have access

7   to phones, but they may not have access to a computer,

8   certainly if they're homeless they may not have access, but

9   that is not going to be the bulk of people, I don't think.

10          So there should be a way for claimants to sign

11  these -- the proofs of claim form.  And if we get a thousand

12  signatures by an attorney on proofs of claim forms filed at

13  the last minute, I think that raises questions.  I just think

14  it does and we're going to have to deal with it.  So I don't

15  advise that, but what I'm really struggling with is the Rule;

16  is an attorney encompassed in this authorized agent in Rule

17  3001, I guess, or is that really more thinking about how you

18  would necessarily think of an authorized agent, rather than

19  it doesn't say attorney, it says authorized agent.

20          Although I think I had the proof of claim form, I

21  don't know what I did with it, but the official form.  But my

22  big concern is that it doesn't look like I'm supposed to

23  deviate from the Rule.

24          MR. GOODMAN:  Your Honor, I think these two cases

25  I cited, the Diocese of Harrisburg, Mr. Ruggeri may actually

1  have the dates for it.  Mr. (Inaudible) and the Arch Diocese,

2  the bulk cases in the last year to year and a half.  I -- I

3  don't have the specific dates right in front of me, perhaps

4  he does, and he can tell you, but they're not agent cases.

5           THE COURT:  But did they decide it?  Is it just

6  orders?  Because they may be like me, these judges may be

7  like me, they never read the Rule, they didn't know this rule

8  existed.

9           MR. GOODMAN:  The Court had entered the orders,

10 that's possible.

11          THE COURT:  Yeah.  They may be better than me,

12 they may have all the rules memorized, but you know.

13          MR. SCHIAVONI:  But Judge, I think the one thing

14 those courts shared in common with you is that you were asked

15 to deviate from the -- from the official form, as were those

16 courts, to put in these questions.

17          And the question is, you know, like here it was

18 very clear that like the nature of the questions were

19 dovetailing with -- the modifications allowing the questions

20 were dovetailing with the request that the order itself say

21 that the signatory be the claimant.

22          The two were tied together.

23          THE COURT:  Yeah, you may not want to go there.

24 You just may not want to go there with that argument given

25 the Rule 9009.

1      MR. LINDER:  Your Honor, it's Matt Linder again

2  for the debtors, if I may?

3      THE COURT:  Sure.

4      MR. LINDER:  You know, I would note, Your Honor,

5  that prior to 2012 it was a requirement that the official

6  Form 410 that an attorney signature be accompanied by

7  evidence of the authorization of that attorney to sign on

8  behalf of its client.  The form was amended in 2012 to renew

9  that as a requirement.  You know, I would suggest, Your

10  Honor, that you're inclined to grant the motion by the

11  Coalition it was -- it's removed as a requirement that proof

12  be provided, but it didn't prescribe as a fact under the

13  circumstances comparable to (inaudible).

14      So I would suggest, Your Honor, that if possible

15  the Third Circuit Law be clear here that in order to file a

16  claim on behalf of a client, an attorney needs to have

17  expressed authorization before filing the claim, or that it

18  needs to be ratification of that act prior to the bar date.

19  That's the WR (inaudible) decision that was affirmed by the

20  Third Circuit.  I could give you a pin cite if you need it,

21  Your Honor.

22      It is 356 BR 302 and that was affirmed at 316

23  Federal Appendix 134.

24      THE COURT:  Give me that again, 36 --

25      MR. LINDER:  316 Federal Appendix 134 is the Third

 1  Circuit decision, but the underlying Bankruptcy Court

 2  decision at 366 BR 302.

 3          THE COURT:  Okay.  That's not a precedential

 4  decision though, but okay.  Because it's in the Federal

 5  Appendix.

 6          MR. LINDER:  It was affirmed by the District

 7  Court, Your Honor, that on the way up.  But --

 8          THE COURT:  Sure.

 9          MR. LINDER:  -- in any event, we would just

10  suggest that is an alternative to assure -- to assuage part

11  of our concern.

12          THE COURT:  Okay.  So say that again for me.  So

13  prior to 2012, the official proof of claim form required

14  proof of authorized agency be attached; is that what you're

15  saying?  Did I get that right?

16          MR. LINDER:  That's correct, Your Honor. That was

17  an expressed requirement as noted in parentheses right under

18  the check box as to what kind of a signer was executing the

19  proof of claim.

20          THE COURT:  In the --

21          MR. LINDER:  As a requirement after 2012.

22          THE COURT:  Well, doesn't that tell us that they

23  wanted to make it easier?

24          MR. LINDER:  I think, Your Honor, in this case,

25  you know what we've outlined in the signature box in the

1  survivor proof of claim is that the only instance where a

2  non-claimant can execute is where the claimant is deceased or

3  incapacitated or is a minor.  I think my supposition, Your

4  Honor, is that Congress didn't likely have -- the Rules

5  Committee didn't have mass tort abuse cases in line when it

6  amended the Rule.

7          THE COURT:  You guys just really don't want to go

8  here.  You are going the wrong way on this.  You are going

9  the total wrong way on this.  I don't know why you don't

10 understand that.  Mr. Ruggeri, do you have anything to add?

11         MR. RUGGERI:  I'm a little nervous about adding

12 anything now, Your Honor.

13         THE COURT:  (Laughing)

14         MR. RUGGERI:  I would add, Mr. Schiavoni's right

15 with regard to the order entered in the Harrisburg case.  It

16 was this year in 2020.  It was this --

17         THE COURT:  But did the judge who entered it -- I

18 forget who's sitting in Harrisburg now, it's not Judge France

19 anymore, it's -- but did the judge sitting there, rule on

20 this issue?  Or just entered as agreed- upon order?

21         MR. RUGGERI:  Yeah, I can't represent one way or

22 the other on that issue.  I do think it's worth mentioning

23 that these claims are different, obviously, than your typical

24 commercial claims in that there's no requirement to provide

25 documentation which serves sort of as an evidentiary basis,

1  if you will, for your claim. And we're not going to go down

2  that path, but it's important that the one affirming that's

3  really what we have in terms of the proof of the claim.

4         Simple math.  28,000 divided by 11 firms as we've

5  heard today, it's 2,500 per law firm.  And then the other

6  point I would make is, as I think the Court recognized, that

7  there's no evidentiary basis for the speculation that any

8  survivor is going to be left behind or that the survivors who

9  don't have access to iPhones or computers don't have access

10  to mail.  I think that is just supposition and speculative.

11         I think that the bar date order, all of the notice

12  that's gone out is making sure that there is no legitimate or

13  alleged survivors that's going to be left behind here.  And I

14  don't think we need to change the process that's put in place

15  now.  What I think is important to have that, if you will,

16  affirmation by the claimant particularly the nature of these

17  claims.  Thank you, Your Honor.

18         THE COURT:  You know, I hear that, and I think

19  it's fair.  And it concerns me if I'm going to have, as I

20  said, a thousand claims signed by a particular lawyer.  And I

21  think that lawyer ought to be concerned about what impact

22  that could have on his -- on his clients.

23         MR. RUGGERI:  And Your Honor, I will say -- not to

24  get ahead of ourselves, but we see how much the lawyers

25  relish being deposed.  It's not easy for us to get the

1  lawyers to represent these claimants on other issues to agree

2  to sit through depositions as you are going to hear from

3  Mr. Schiavoni in a little bit.

4        THE COURT:  I think that's fair, except now

5  they've signed something under penalty of perjury not just as

6  a lawyer, but they've signed something under penalty of

7  perjury.  I view those as two different things which is why I

8  did not sign proofs of claim forms.

9        Mr. Buchbinder, do you as Trustee have a position?

10       MR. BUCHBINDER:  Your Honor, Dave Buchbinder,

11 again, for the record on behalf of the US Trustee.  And our

12 response we noted the ambiguity between the bar date order

13 and the official form, but we did not take a position on how

14 the Court should rule, but it would be helpful for the estate

15 to clarify the issue.

16       I've been working on official Form 410 as we

17 speak, too, Your Honor.  An official Form 410 at the

18 signature box Part 3 says it can be signed by the creditor,

19 creditor's attorney or authorized agent, by a trustee or by a

20 guarantor, and at least the warnings or admonitions on Part 3

21 say the person completing the proof of claim must sign and

22 date it.  If you file this claim electronically, FRBP 505 A2

23 authorizes courts to establish local rules specifying what a

24 signature is.

25       And finally, in bold type; a person who files a

1  fraudulent claim could be fined up to $500,000, imprisoned

2  for up to 5 years or both, 18 USC Sections 152, 157 and 3571.

3  And that's the signature block on the official form, Your

4  Honor.

5           I would also note, and I'll ask Mr. Molton or Mr.

6  Lucas to correct me.  I have the Takata case in this district

7  and I was on a special team -- or I am on a special team

8  involved in the PG&E case.  And I don't recall that this

9  issue was problematic in either of those two cases, Your

10 Honor.

11          THE COURT:  Okay.

12          MR. MOLTON:  Your Honor, David Molton.  Can I

13 respond to that?

14          UNIDENTIFIED:  Your Honor, may I be heard really

15 quick?  I just have a few points --

16          THE COURT:  Go ahead.  Mr. Lucas.

17          MR. LUCAS:  Your Honor, just a couple of comments.

18 And I wanted to sort of respond to Your Honor about Your

19 Honor's reaction to the other orders that were entered in

20 other cases and where you said they were agreed orders.  The

21 Movants here are treating this as if it was a surprise.  And

22 I think that sort of not true. Because Mr. Kosnoff,

23 Mr. Eisenberg and Mr. Goldbar (phonetic) were all the leaders

24 of abuse in scouting were at the table and providing comments

25 literally to the proof of claim form in connection with the

1  negotiation with the final form.

2          In the end, the form was adjudicated and

3  ultimately approved by the Court in the form in which we see

4  it.  But Your Honor, to single out the signature line as sort

5  of only provision, it was not a decision that was disputed,

6  but this was a package, Your Honor. This was a 12-page

7  package that was really hard fought over six to eight weeks

8  of Mr. (indiscernible) and that it is the committee -- the

9  tort claims committee finds as sort of unusual that the same

10 attorneys, not only participated in the form relation of the

11 form and approved the whole form as it went before the Court,

12 are now standing here complaining about the very thing that

13 they had approved before.

14         That's it, Your Honor.  And oh, one other thing,

15 Your Honor.  If you look at the claim register, the date, the

16 law firm under the Movant here, have already filed thousands

17 of these claims using electronic execution.  And it doesn't

18 really seem to be a problem for them to do what they're doing

19 today.  Nothing further, Your Honor, unless you have

20 questions.

21         THE COURT:  Thank you.  Mr. Goodman.

22         MR. GOODMAN:  Yes, thank you, Your Honor. First

23 off, the question was posed about the PG&E bankruptcy case.

24 I feel like this is a bit of an unfair quiz to give to me,

25 because again, I was one of the authors contributing to

1  drafting the proof of claim in that case for the tort victim.

2  Rule 9009-A was very much a concern that we had in that case,

3  which is why, one, the attorney's signature is permitted on

4  the claim form that was approved by the Court for tort

5  victims.

6        And again, we also in the motion that the tort

7  committee filed indicated that the tort victims, if they

8  wanted to, should be permitted to use the official Form 410,

9  which, as Mr. Buchbinder just pointed out, in Part 3

10  explicitly permits attorneys or authorized agents to sign the

11  form.

12        We did look very carefully at the New Orleans

13  case.  That order was actually entered two weeks ago, just

14  hours after we filed our motion on this issue. We went

15  through and we reviewed all of the pleadings in that case,

16  and we could not identify anything to indicate to us that the

17  counsel had flagged this issue for the Court.  I guess on

18  that point, someone could just as easily walk into the Court

19  in the Eastern District of Louisiana and present your order

20  to that judge indicating that this is all fine and good.

21        The Arch Diocese of Harrisburg case, that order

22  actually was entered 12 days before the May 18th hearing on

23  the bar date motion.  We also went through and reviewed the

24  record in relation to that order as well.  And we did not

25  find any indication that this issue was, in fact, flagged for

1  the bankruptcy court in that case.  The one case that we did

2  find that may be somewhat on point, there was recently a

3  published opinion entered in the Buffalo case where the Court

4  recently rejected the use of a claim form for sexual abuse

5  survivors on the grounds that it was inconsistent with the

6  official form, and therefore, violated Rule 9009-A.

7          And again, as the Court pointed out, 9009-A as

8  amended in 2017, now explicitly states that the official form

9  prescribed in the judicial conference of the United States

10  shall be used without alteration, and of course, an

11  alteration that would affect a change in wording such as

12  knocking out the explicit wording in Section 3 that permits

13  attorneys' signatures would be an impermissible change.

14          I'm not going to go back and talk about -- I'm

15  sorry, I'm blanking on their names Mr. Schiavoni probably

16  knows them better than I do.  Mr. Vanarsdale and Mr. Kosnoff,

17  I just view that as a distraction, Your Honor, but I want to

18  close on this point.  We are not defending anyone who is not

19  doing their job.  I am not here to help anyone who is not

20  doing their job.

21          If there is improper conduct by any attorney, then

22  they're going to have to face the consequences for those

23  actions.  I am simply here advocating for compliance for

24  Federal Bankruptcy Rules. And someone can take this

25  transcript and they can send it to my friend Andy Vera and

1  let him know that I stood up here today and I said these

2  things.

3          And again, it's a meaningful thing in this case,

4  you know, the statement that was made by Mr. Linder about

5  tort claimants versus commercial claimants, there's no

6  distinction in the rules, there's nothing in the rules that

7  say that they don't apply to tort victims.  And again, I --

8  this may end up being a nonissue for the vast majority of

9  claimants to come in in this case, but for the ones where it

10 does matter, it matters.

11         These are victims of sexual abuse, Your Honor.

12 And if someone retains counsel just before the bar date, they

13 give them all the information, they provide them with the

14 requisite authority, and they cannot get the claim signature

15 in to the attorney in time, that attorney should be given the

16 right and should have the right to sign that claim form on

17 behalf of their client just as the Bankruptcy Rules say.

18         And again, if it matters to one person, it

19 matters.  It matters.  Thank you, Your Honor.

20         THE COURT:  Thank you.  Okay.  Well, I'm going to

21 permit the signing of a proof of claim by a lawyer who is

22 authorized to do so.  And I'm doing it because of Rule 9009,

23 which would seem to give me very little option on that front.

24 This does not have anything to do with there being evidence,

25 because I have none that people -- that claimants cannot

1  themselves sign the proof of claim form.

2          This was not an issue I focused on at the hearing,

3  and consistent with my ruling that a proof of claim form has

4  the effect that it has, based on the Rules in the Code.  And

5  I don't make up the rules, I don't make up this rule either.

6  I don't think the parties -- I understand the parties

7  negotiated, I also understand that members who are now

8  lawyers who are now part of the Coalition may have been

9  involved in those negotiations.

10          So it does seem a little ironic and perhaps maybe

11  unfair that they're bringing the issue up now.

12          But nonetheless, I'm looking at the Rules.  And

13  they permit signature by an attorney, no matter how ill-

14  advised that practice might be and no matter what consequence

15  that might have in terms of a future deposition of that

16  attorney, or what it might mean with respect to that client's

17  claim or attorney-client privilege.  I am not making any

18  rulings on those, but the rule permits it.  So I will.

19          And if I were that attorney, notwithstanding what

20  I just said about authorized e-signature, I'd have that

21  authority witnessed, which also might suggest that the client

22  could sign the proof of claim form.  I don't know that I

23  focused on the order that was provided or that any parties

24  focused on the order.

25          Mr. Goodman, why don't you circulate that order

1  among counsel and see if there's any comment and then submit

2  it under certification, but it should be simple.  It should

3  be simple.

4          MR. GOODMAN:  We'll do our best.  Thank you.

5          THE COURT:  Thank you. * 12

6          MR. ABBOTT:  Your Honor, Derek Abbott from Morris

7  Nichols again.  Moving along the agenda, the next motion is

8  docket item -- excuse me, Agenda Item Number 12 which is

9  Century's motion to compel depositions.  So once again, I'll

10 turn it over to Mr. Schiavoni.

11         THE COURT:  Okay.  I'd like 5 minutes.  So let's

12 take a recess for 5 minutes, please.

13         (Pause)

14         MR. ABBOTT:  Your Honor, Derek Abbott again.  That

15 does bring us to Agenda Item Number 12, Century's motion to

16 compel depositions.  So I'll turn it over to them.

17         THE COURT:  Thank you.

18         UNIDENTIFIED:  Your Honor, we brought a motion to

19 compel and then the Coalition responded to it. Also there's a

20 separate motion to quash by Mr. Kosnoff and Mr. Vanarsdale.

21         As a threshold matter, one of the most revealing

22 things here is that the motion is opposed by not really by

23 Mr. Vanarsdale but by the Coalition itself.  Mr. Kosnoff and

24 Mr. Vanarsdale are founders of the Coalition.  Mr. Kosnoff

25 hold themselves out as such on video that's posted on the

1  Internet but has since been taken down.  This is signed

2  either he or Mr. Vanarsdale (inaudible) didn't sign the

3  stipulation that was submitted last night by the Coalition

4  that makes various assertions or makes various agreements, so

5  to speak, with the claimant that are offered to sort of

6  move the objections to their 2019 applications.

7          They represent, these two, what appears to be the

8  largest group of the Coalition claims, at least 9,000 if not

9  more claims.  Each of them are solo practitioners.  If my

10  fellow counsel could just put up on the video their intention

11  agreement, which is exhibited -- if you could see on there

12  they sort of held themselves out under the title of AIS, as

13  if it's sort of a law firm or not law firm but kind of like

14  an entity working for Boy Scouts.

15          They then list their current -- they list

16  themselves like large law firms often do, they list different

17  offices, like my firm has Chicago, New York -- -- I guess we

18  don't have Chicago, but we have Los Angeles, New York.  They

19  list themselves that way as if they're all members that

20  they're sort of separate offices of AIS, but and then they

21  describe the firm as Kosnoff and ABA group with comments

22  between them basically one law firm or one entity.  But in

23  fact, it's three separate firms with three separate groups of

24  claimants with Kosnoff and Vanarsdale having the largest

25  group.

1          Not only did they not find the stipulation that

2   was submitted last night and they say that claimants still

3   part of the Coalition just that they've resigned.  But they

4   haven't disclosed what they resigned from, okay.  They

5   have -- none of the documents explain what, quote, positions

6   they had with the group.  That suggests to us that key

7   documents about how the Coalition is organized, and the

8   financials haven't been disclosed.  Because they've asserted

9   that they're not, quote, members in the first place.  So the

10  resignation would have sort of impact.

11         The other thing they haven't disclosed are the co-

12  counsel agreements through which they can represent clients

13  in states other than where they are located.  Critically,

14  Mr. Kosnoff lists his office, you'll see in that letter,

15  Puerto Rico.  And on his Web site he puts Houston.  Neither

16  of those -- we sent private detectives to the Houston office,

17  and we also sent servers to the Puerto Rico place.  Puerto

18  Rico is a marina where they're selling like maybe condos.

19  And the fact -- but it's not a law office, so to speak, even

20  though it's listed as such, it's held out to the public as

21  such.

22         The Houston address is just a mail drop.

23         It doesn't appear that they're members of the bar,

24  Mr. Kosnoff, in either of those locations where they hold

25  themselves out as having offices.  It's illegal in Texas to

1  hold one's self out for a Texas office as being a practicing

2  member of the Bar when they're not.  I think the Rule's going

3  to be the same in Puerto Rico or certainly kind of a concern.

4         In Mr. Vanarsdale's case, he -- as I indicated,

5  indicates that on his Web site that he graduated the Bar in

6  2018.  He represents these (inaudible) in these ads thousands

7  and thousands of claimants, but there's no record of him ever

8  trying a case or actually doing -- personally appearing in

9  any kind of action.  When you run a search on him, it comes

10 up that he does own an advertising company, and he's owned it

11 for years.  So it appears to really own the advertising

12 company that has run a lot of the ads, which the ads have

13 been run themselves.

14        The (indiscernible) that the e-mail that we had

15 from Mr. Kosnoff makes a number of assertions that indicate

16 that there's a range of voting lock-up agreement that he

17 somehow controls it, that he's deployed that in various ways

18 and he proposes to deploy it.  We've heard all kinds of mea

19 culpas about that e-mail today and suggestions about what it

20 is and what it isn't.  But without deposing Mr. Kosnoff,

21 these are just -- you know, it's just lawyer advocacy, okay.

22        It's like all of that material is relevant

23 directly to their 2019 submission, you know, speaking of

24 whether or not they've -- because their clients are both

25 members of this group.  And you could apply each of those

1  elements of 2019 to them and say how -- how do they qualify,

2  and it's clear there's information missing with respect to

3  (inaudible).

4         We made efforts -- when we went to the Coalition

5  and said we want to depose them, we were told first, like

6  gee, they're not parties, you have to subpoena them.  They

7  gave us addresses.  The address turned out -- we got the

8  Houston, turns out to be a mail drop, (inaudible) serve them.

9  Mr. Vanarsdale addresses a storefront in San Diego that we

10 were given by the Coalition and it's closed.  There's nothing

11 there.

12        We also sent someone by what appears to be his

13 home, and no one would come to the door.  So either he's not

14 really there or he sort of ducked service.  Since then, they

15 filed a notice of appearance through David Wilks stating in

16 the notice, that they're, quote, parties of interest in the

17 case in which -- and they are.  I mean, they're -- the

18 submission of their letter agreement indicates that they hold

19 a very significant dollar amount of the claim of the

20 claimants themselves and they have a huge financial interest

21 in these claims.

22        They cited case law on the motion to dismiss that

23 says you don't need a subpoena for someone who is a party in

24 the case.  They themselves filed something saying they are a

25 party.  So we thought the notice that we served was adequate

1  in light of that filing.

2           Mr. Wilks is a terrific lawyer, we met and

3  conferred with us on this, but what I would -- and he will

4  make a long presentation about how somehow we delayed in

5  deposing Mr. Kosnoff, et cetera, but here's the bottom line.

6  It was obviously after the last year that the 2019 had to be

7  amended.  We knew it was going to be amended, and we made it

8  clear that we wanted to depose Mr. Kosnoff after it was

9  amended.  What the Coalition did was, they purported to offer

10 us a date before they filed the 2019 amendment so that would

11 have made the deposition -- it would have completely

12 frustrated the deposition to depose these fellows without the

13 amended statement.

14           But besides that, you know, the other thing that

15 happened was they hung all kinds of conditions on them

16 appearing, that we had to almost essentially give them the

17 question outline of what we were asking about. When, look, if

18 we ask anything privileged it was, you know, clearly, they're

19 lawyers, they're all lawyers.

20           They could have invoked privilege and we could

21 move on, but they wanted agreements on that up front.  But

22 the main thing here was we needed (inaudible) after we got

23 the amendment.

24           The Coalition waived it until the very last day to

25 make that amendment.  They made it (inaudible) when otherwise

1  briefs were required before this hearing, they then -- we

2  went back to them and said in advance of that notice that

3  they -- for the Friday after when we suspected they would

4  file it, which was the last day.

5          Then they told us, no, he's not going to appear

6  and that's when, you know, we moved immediately to compel,

7  they moved to quash.

8          The information on this is -- it goes beyond --

9  it's important.  It goes to like the substance of the

10  (inaudible) really, ultimately where the case would go.  And

11  it's essential for the 2019 issue.

12          Whatever the Court decides to do with the 2019

13  issue with, in a sense, the larger Coalition, it's -- a

14  deposition with respect to these two fellows is key with

15  respect to their 9,000 claims that are in the Coalition.

16          I would tell you, Your Honor, that it's important

17  to whether or not the Coalition 2019 should be allowed to go

18  forward.  Again, we don't want to hold up anything in the

19  mediation, the Coalition lawyers, the individual -- they're

20  all talking to the mediators, that can continue.  If you want

21  a stipulation that somehow (indiscernible) we'll even engage

22  in that.  But that is -- it's a total red herring that any of

23  this is holding up the mediation.

24          In the entire history of the mediation I've had

25  three audiences with the two mediators, both very short.  And

1   it's, you know, we are not in weekly contact like Brown

2   Rudnick is with the mediators.  They are fully exercising

3   their ability to talk to them.  I would ask that we could be

4   permitted to go ahead with the depositions and that

5   Mr. Kosnoff disclose where he is, because we have -- we have

6   sent servers through the Caribbean.

7            We actually thought we might catch him because

8   he's alleged to be on a very large boat in the Caribbean.  We

9   thought we might catch him in a port in Puerto Rico, but he

10  eluded us, I think, in that regard. But we'd depose him in

11  person or if he has COVID concerns, we could do it, you know,

12  electronically.  But we ask your permission to go forward

13  with that.  Thank you, Your Honor.

14           THE COURT:  Okay, thank you.  Mr. Wilks.

15           MR. WILKS:  Thank you, Your Honor.  I'd like to

16  start by addressing some questions that I think were

17  bothering Your Honor this morning.  Your Honor pondered

18  questions about what precipitated Mr. Kosnoff and

19  Mr. Vanarsdale to resign from the Coalition?  And were those

20  resignations bona fide, were they legitimate? I've been

21  waiting for hours, Your Honor, to answer those questions and

22  I'd like to do that right now.

23           This case is about victims, Your Honor, this case

24  is about victims of sexual abuse that had occurred to

25  children; that's what's important in this case.  The insurers

1 have seized upon a confidential e-mail which never should

2 have been made public, which expressed an attorney's views on

3 how to best advance his client's interest.  And this morning

4 Your Honor said there's nothing nefarious about that.  That's

5 what we're all supposed to do for a living.

6          I mean, smart lawyers, experienced lawyers,

7 aggressive lawyers should in every complex case have

8 different views and air them.  And good lawyers do air their

9 viewpoints with each other, at least I hope they do, because

10 we're supposed to do that.

11          Well, here, the insurance companies have seized on

12 that as some sort of smoking gun of some sort of awful

13 intent.  And they're using that and my clients as time-

14 wasting distractions, Your Honor.  Seeing that that's what

15 the insurance companies are doing, putting their clients

16 first, the victims in this case first, my clients took

17 themselves out of the equation.

18          If they're the ones that are getting in the way of

19 progress towards a 2019 statement being approved, they'll

20 step aside and they'll get out of the way, and that's what

21 they did.  They put their claimant clients first.

22          Your Honor, you've heard a lot today, it's

23 imperative that we get in case moving toward a resolution, an

24 effective mediation is imperative to help that along.  My

25 clients took themselves out of the way. They resigned from

1  the Coalition.  That's why they resigned and they're not

2  going to call the shots from behind some curtain somewhere,

3  because that might frustrate that purpose.  They are not on

4  the Coalition's calls, they don't participate in Coalition

5  correspondence, they have no voting authority, they're not

6  calling the shots for anyone except their clients.

7          Make no mistake, Your Honor, of course, these are

8  advocates, these are lawyers in a case.  They will continue,

9  of course, to represent their clients. They're not going to

10  be calling the shots for anyone else's clients.  So I hope

11  that puts Your Honor's questions to rest, because that's

12  exactly what's going on here.

13          Mr. Schiavoni seems to give me a lot more credit

14  than I'm entitled to, I think.  He thinks that I've

15  coordinated all this with the Coalition and timed it with the

16  filing of an amended 2019 statement.  I had nothing to do

17  with that.  I've never represented the Coalition; I've never

18  done anything for the Coalition.

19          I represent two individuals, and those two

20  individuals are lawyers in this lawsuit who have been sort of

21  targeted now for deposition as a sideshow.

22          The timing of the depositions -- I offered my

23  clients for deposition.  I gave dates certain and times

24  certain for Mr. Schiavoni to take those depositions.  I took

25  it upon myself to lay out some ground rules so that we

1  wouldn't have one of these obnoxious depositions that we all

2  know about where everyone is asking questions that call for

3  privileged information or confidential information.  They're

4  instructed not to answer, transcripts and videotapes go to

5  the Court, it's a wasteful exercise.

6          So I laid out what I thought was a great set of

7  boundaries for a deposition.  I put them up on dates and

8  times certain.  And the insurance companies ignored it.  They

9  completely ignored that.  They didn't respond at all.  The

10 day before the first date that I had offered, I reached out

11 to them, said hey, I assume you're not going forward.  And by

12 the way, as you know, my guys had resigned from the Coalition

13 so there's really no reason to go forward anyway.

14          It was then that we restart this conversation.

15 But it seems clear, Your Honor, these are not depositions

16 that the insurance companies actually subsequently want to

17 take.  And I'll kind of tell you why I think that.  There's a

18 few reasons.  First and foremost, the first time they

19 demanded the depositions before I was involved in the case,

20 which is the reason I became involved in the case, they asked

21 for depositions on the Friday -- the Friday evening of Labor

22 Day weekend and noticed them for the day after Labor Day.

23          So you get it on Friday night of a holiday

24 weekend, you're supposed to show up for a deposition on that

25 Tuesday.  That's just not a serious way to proceed if you

1    actually do want to take a deposition.  At least that's not

2    the way I've ever practiced in my 30 years. I've never seen

3    anybody else do it that way either.

4           Your Honor, in short really, the recitations in

5    this lengthy, lengthy motion to compel really have nothing to

6    do with what's at issue before you, Your Honor.  The

7    Coalition's amended 2019, I think there's been a supplement

8    to seem to answer all the questions that were raised in the

9    motion to compel. There's a lot of innuendo about unethical

10   conduct, I think that 2019 answers that also.  So really

11   here, there's lots of distracting extraneous debris on the

12   road to keeping this thing moving forward.

13          Century wants desperately, it seems, to delay

14   these proceedings and keep the Coalition from participating

15   in the mediation; that's above my pay grade.  I don't have

16   anything to do with that.  What I have to do with is the

17   propriety of deposing opposing counsel in a case; that's what

18   this is about.  There seems to be some question of whether or

19   not Mr. Kosnoff and Mr. Vanarsdale are actually opposing

20   counsel to the insurance companies.

21          Well, listening to this today and the way that my

22   clients have been kind of run up and down, it sure seems like

23   these are my opponents, Your Honor.  It seems pretty

24   adversarial to me.  I don't think there could be really any

25   question about it.

1    The case law is actually quite instructive, Your

2 Honor, to depose opposing counsel, which is what these two

3 witnesses are, Century must meet some requirements.  They

4 have to come forward with a showing, why?  Because this is

5 what the courts call it, these are the drastic measure.  Now,

6 I think that's very important to recognize that.  This isn't

7 just a deposition.  We're allowed a Notice of Deposition

8 under Rule 30 and you'll get some facts from a witness.

9    These are opposing counsel.  And much has been

10 made of the Baron & Budd decision today, Your Honor, and even

11 Mr. Rice spoke this morning -- well, maybe this afternoon.

12    The Baron & Budd decision has nothing to do with

13 whether or not opposing counsel should be deposed. Mr. Rice's

14 deposition wasn't the subject of that opinion.  Really, scope

15 and discovery in the 2019 setting really wasn't discussed too

16 much.  The question was whether or not engagement letters

17 should be disclosed.  And that court said, yeah, sure, you

18 need to disclose engagement letters.  Well, that's not really

19 at issue here, I don't think anymore, Your Honor, because I

20 think Your Honor's already cleaned that up at the last

21 hearing back in September.

22    So what really are we talking about here? Well,

23 there's three factors that Your Honor is, as the case law

24 suggests, Your Honor, should take into account. The first one

25 is the importance of the information to a central issue

1  before the Court.  How important is the information that

2  Century seeks here to an issue that's actually before Your

3  Honor?  That's the first consideration.

4         The second one is, are there -- is that

5  information available from less-intrusive sources?  And the

6  third one is, what harm might befall the victims'

7  representational rights?  Well, if we walk through

8  those, the answer to this question becomes awfully clear, I

9  think, Your Honor.  I hope you'll see it that way.  What

10  really is the central issue before the Court here?

11         Well, that's -- I'm trying to get my hands around

12  that.  If I were to listen to Century and read what they

13  wrote and all the things that they said today, I'd get a lot

14  of different things in mind, but really the only thing before

15  Your Honor seems to me is the 2019 statement.  Are these --

16  is the Coalition, you know, are they -- have they hit the

17  bogie for the 2019 statement? Again, I'm not here to advocate

18  the Coalition's position.  I don't represent the Coalition.

19         But what I can say is that's what is before Your

20  Honor.  There's this mediation participation issue. Is this

21  related to that?  I don't think so, because my clients aren't

22  involved in the Coalition anymore.  We've also heard other

23  topics, you know, Brown Rudnick.  How was Brown Rudnick being

24  paid, what is the Coalition, who are the Coalition's decision

25  makers?  Well, I've already explained, Your Honor, my clients

1  are not.  Mr. Kosnoff and Mr. Vanarsdale have removed

2  themselves from anything having to do with that.

3          But now, in listening to Mr. Schiavoni a moment

4  ago, now we're talking these lawyers' capabilities.  Do they

5  have enough bandwidth to do their job, can they -- should

6  they be able to allowed to sign proofs of claim?  What's the

7  nature of their firm?  And they have this fascination and

8  have exhausted pages in their motions with, gee, where do

9  these guys work?  Is it a marina?  There's a fascination

10 with, gee, how are we going to serve them?  Your Honor, as

11 soon as I entered my appearance, I mean, they knew how to

12 serve them.  They serve me.  I represent these individuals

13 and I've made that clear to Mr. Schiavoni a number of times.

14         They don't need to serve subpoenas, I've never

15 made that a, you know, a requirement here.  I said serve me,

16 I'll accept service, don't waste your time on that, Your

17 Honor.  So there's other questions of wonder why there's this

18 fascination and how many people are in this hearing are

19 actually working right now in a traditional law firm setting?

20 Very few, I would imagine.  Should we all depose each other

21 on that, because we're not working in a traditional law

22 office setting?  Of course not.  Those aren't reasons to

23 compel a deposition of an attorney, an advocate in a case.

24         So what's really at issue, Your Honor?

25         It's the 2019 statement is all that's before Your

1  Honor that has anything remotely to do with Mr. Kosnoff and

2       Mr. Vanarsdale.  The question though is how important

3  is the information that they have to that central issue?

4       And I could tell you, Your Honor, there's nothing that

5  they have that is not subject to confidentiality agreements,

6  be it a common interest agreement or work -- attorney-work

7  product or the attorney-client privilege.  There's nothing

8  that Mr. Schiavoni has mentioned today that is in the

9  possession of Mr. Kosnoff or  Mr. Vanarsdale.  They just

10  haven't identified anything that's important.

11       But I listen carefully to Mr. Ruggeri's remarks

12  today, and he kept coming back -- Your Honor kept talking

13  about what I'm talking about now, and I'm probably repeating

14  what you said much better, but he kept coming back to this --

15  what's my absolute fallback. And his fallback was I got to

16  have the bylaws, I got to have the bylaws.  That's where the

17  rubber meets the road here.  So if the bylaws are where the

18  rubber meets the road here, they certainly don't need a

19  deposition of opposing counsel.  That is I think very, very

20  telling, Your Honor.  So that's the first factor.

21       All the sideshow here that Century has discussed

22  really is not important to any of the central issues before

23  Your Honor.  Second factor, are there availability of less --

24  is misinformation available by less-intrusive sources?  I

25  mean, I just kind of hit that.  If the bylaws are so

1  sacrosanct and so important, maybe that's the solution.

2          Mr. Kosnoff and Mr. Vanarsdale aren't involved in

3  the Coalition anymore, so they aren't a source of information

4  of what's current.  Who are the current decision makers at

5  the Coalition?  Mr. Kosnoff doesn't know, Mr. Vanarsdale

6  doesn't know.  Who filled their role?  They don't know.  They

7  are not the best source they are not even a competent source

8  now.  They were made available for depositions while they

9  were a potential source of information like that, that they

10 didn't take them up on.  He didn't -- they weren't really

11 interested in taking that deposition.  Well, now, these two

12 individuals are no longer competent sources of current

13 information.  So their deposition, you know, doesn't meet

14 their second consideration.

15          And third, Your Honor, what's the harm to these

16 two individuals 'clients' representational rights? And

17 everyone here knows the attorney-client privilege is the most

18 sacrosanct of all privileges.  It'd be invaded with, I think,

19 just about every question I could think of that would be

20 relevant to any kind of relevant inquiry here.  If they were

21 subjected to deposition, their adversary seeks information,

22 their adversary's trying to limit their clients' recovery

23 here.

24          So what kind of questions are they going to ask

25 that are not privileged?  There really is nothing, Your

1  Honor, that would not jeopardize their client's

2  representational rights.  And I'll just close with just a

3  real practical thought, Your Honor.  We've all been involved

4  in a lot of depositions over the years, I suppose, and

5  sometimes they get off the rails and sometimes they're court

6  ordered and sometimes you go to a court-ordered deposition

7  and just wind up going back to court.

8          Your Honor, if Mr. Schiavoni hasn't yet nailed

9  down all the topics for his deposition, I've asked him for

10  now six weeks or so, tell me what you want to ask my clients,

11  just give me subject areas, and I haven't gotten an answer.

12  Today we got more and more answers.  If we don't know what

13  the scope of this deposition's going to be, Your Honor, I

14  hate to tell you, but I think we're going to be back before

15  you with an ugly transcript, and it's just going to be an

16  unworkable wasteful mess.  Maybe that's what my opponents are

17  after.

18          I'm asking, Your Honor, don't let that happen.

19  Let's not let this sideshow distract from what really needs

20  to get done in this case.  Deposition of opposing counsel is

21  a drastic measure.  The other side has not really made much

22  of an effort to meet or even address any of those three

23  criteria, those three considerations.  So Your Honor, I would

24  ask that Your Honor deny the motion to compel and grant our

25  motion to quash this notice and for a protective order

1  preventing these two depositions.  Thank you very much, Your

2  Honor.

3          THE COURT:  Thank you, Mr. Wilks.

4          Mr. Schiavoni?

5          MR. SCHIAVONI:  Your Honor, we attached to our

6  motion our papers excerpts from Mr. Kosnoff's Web site where

7  he holds himself out to the public as no longer practicing

8  law and is instead serving as a, quote, media consultant and

9  consultant in mass tort bankruptcies.  So you know, it's a

10  bit much for an attorney to uphold the protections of the

11  opposing counsel rule, and at the same time claim that he

12  doesn't have any continued role in the cases.  So I don't

13  think those standards apply.  There are direct and material

14  issues here about 2019 C2B whether those have been complied

15  with here.

16          The fact that he hasn't signed the stipulation

17  that was signed last night by the other members of the

18  Coalition itself causes issues, and you know, even if one

19  applied the standard for practicing looking for someone

20  who's, quote, opposing counsel, the e-mail that he's authored

21  which has been made public, there was no effort made to claw

22  it back.  There's a waiver on it now and nothing else, it

23  provides more than a basis to go forward with his deposition.

24          If for any reason the Court decides not to allow

25  this discovery, and this discovery was critical in Baron &

1  Budd, the District Court cites to Mr. Rice's deposition

2  testimony in the -- in the -- in its actual decision, because

3  without it, it was -- you know giving a list of questions

4  that one would be asked, one doesn't know what hasn't been

5  disclosed.  It's sort of the whole point here.

6         You know, it's why we moved affirmatively for an

7  order under 2019 CB2 that all disclosable economic interests

8  be disclosed.  Without that, there's no real way to know

9  what's been held back.  But in the email itself, they talk

10 about raising money from, quote, mother funders.  What the

11 interlocking ties and whether or not those parties all have

12 interests as part of a lock-up agreement to tie the votes,

13 without a deposition, I don't think we're going to get to the

14 bottom of it.  The next best thing would be an order

15 requiring all disclosable economic interests to be put out.

16        Thank you, Your Honor.

17        THE COURT:  Thank you.  Okay.  I'm hearing

18 somebody's computer probably.  Mr. Abbott, is that the

19 conclusion of our agenda, or we have a status conference?

20        MR. ABBOTT:  There is a quick status conference,

21 Your Honor.  I'm going to just assume, unless the parties

22 chime in that what we just heard was both 12 and 13; 13 being

23 Mr. Kosnoff's motion for protective order to which I think,

24 again, two sides of the same coin.  But if the Court wishes

25 to hear further on that or Mr. Wilks has something to add,

1  that would have been the next agenda item.

2         THE COURT:  All right.

3         MR. WILKS:  Thanks, Your Honor.  I feel content

4  that I've said my say, you know, I think

5         Mr. Schiavoni and I could probably go back and

6  forth for another few hours, but Your Honor's had a long day.

7  So let me be the first to spare you.

8         THE COURT:  Thank you.  I will consider those two

9  together.  Okay.  So let's have our status conference.

10        MR. ABBOTT:  Your Honor, it's not clear as I sit

11 here, that the parties necessarily feel it's necessary, but

12 I'll just defer quickly to Mr. Andolina who is a little

13 closer to it than I.

14        MR. ANDOLINA:  Good afternoon, Your Honor, thanks

15 for your time today.  Michael Andolina, White and Case on

16 behalf of the Debtors.  Judge, I think we gave you the status

17 of the adversary proceeding in the very first moments of the

18 hearing today which feels about like three months ago, I'm

19 sure, for everyone, especially for Your Honor.  But we do

20 have until October 22nd.  We're hopeful to make significant

21 progress and come back to the Court with an agreed order

22 extending the preliminary injunction.  We already have

23 meetings set up with the TCC, the UCC and the FCR on that

24 issue, and we'll certainly report back to the Court,

25 hopefully well in advance of that deadline.

1          THE COURT:  Okay.  And notice will get out to the

2   other parties in that litigation with respect to any

3   stipulation?

4          MR. ANDOLINA:  Correct, Your Honor.  That was

5   built into the schedule that Your Honor approved, I think,

6   two status hearings ago.

7          THE COURT:  Okay.  Great.  Anyone else on the

8   status?  Okay.  Thank you.  I am going to review the papers.

9   I think the matters that are outstanding are the 2019 motion,

10  the mediation party, the last two items with respect to

11  depositions of Mr. Kosnoff and Mr. Vanarsdale.  And I think

12  they're really all of a piece or at least they're all

13  interrelated.  So I'm going to review those papers and I will

14  rule probably not tomorrow, more likely Friday, and you'll be

15  contacted for a time.

16         MR. ABBOTT:  Okay, Your Honor.  Thank you.

17         THE COURT:  That's the rule.

18         MR. ABBOTT:  That's better said for today.

19         THE COURT:  Okay, thank you all.  We're adjourned.

20      (Proceedings concluded at 4:58 p.m.)

21

22

23

24

25

1                           CERTIFICATION

2          We, Carmel Martinez and Wendy Sawyer, do certify that

3     we were authorized to and did listen to and transcribe the

4     foregoing recorded proceedings and that the transcript is a

5     true record to the best of our abilities.

6

7     Dated this 16th day of October, 2020.

8

9     /s/ Carmel Martinez                October 16, 2020

10    Carmel Martinez

11    TX CSR No. 8128

12    FL FPR No. 1065

13

14    /s/ Wendy Sawyer                   October 16, 2020

15    Wendy Sawyer, CDLT

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 4

## KOSNOFF LAW PLLC.

A PROFESSIONAL SERVICE CORPORATION
7001 Seaview Ave N.W.
SEATTLE, WASHINGTON 98117
**TELEPHONE: (425) 837-9690**

Mail Forwarding Service: 1321 Upland Drive, PMB 4685, Houston, TX 77043

**Timothy D. Kosnoff**
Direct: 425-830-8201

E-mail: tim@kosnoff.com

# KOSNOFF LAW RECOMMENDS THAT ABUSED IN SCOUTING CLIENTS VOTE TO REJECT THE BOY SCOUT PLAN

Dear Clients,

I am the founder of a movement known informally as Abused in Scouting. I have represented child abuse survivors in civil litigation since 1996. I have successfully litigated in state courts on behalf of men abused as scouts in courts throughout the country and have tried seven child sexual abuse civil jury trials, five to verdict. In short, no attorney in the country has more experience in representing victims like you than I have.

My firm recruited Eisenberg Rothweiler law firm and AVA law firm in 2019 to join me in an effort to reach out to men abused as boys in the Boy Scouts of America when I learned that the BSA intended to permanently extinguish the legal rights of men abused in scouting for over a century. We are co-counsel for all of you.

The Boy Scouts' bankruptcy case has reached an important juncture. You need to decide whether to vote for or against the Boy Scouts' reorganization plan that would define your rights going forward. As your attorneys, it is our job to give you the best advice we can based on our experience and a true and accurate explanation of the facts. But this decision is yours to make.

My advice to you is the **opposite** of the advice that the Eisenberg Rothweiler law firm has given you. **I strongly urge you to VOTE NO**. Let me explain why I fervently disagree with my co-counsel and the group of six law firms that supports the Boy Scout's plan and calls itself the Coalition. The reasons for my disagreement with them are numerous and are based on my analysis of the objective facts and my decades of experience in exactly this kind of case.

A U.S. Senator once said, "You are entitled to your own opinions, but you are not entitled to your own facts." The supporters of the BSA Plan are telling you their opinions. But those opinions are not supported by the facts or the truth. Here are the facts and the conclusions I have drawn from them after considering how the BSA Plan will affect you.

## KOSNOFF LAW

October 18, 2021
Page 2

- ### **The BSA Plan will not compensate survivors fairly.**

    While $1.854 billion is an enormous amount of money, the number of sexual abuse claims filed in the Boy Scout's case sadly makes $1.854 billion a very small amount of money. The settlement trust expenses (which must be paid first) could be as high as 10%, which reduces the average payment per survivor to approximately $17,000. If some survivors are paid more, that means most of the other survivors will receive much less or nothing at all. Under your engagement letter with AIS, your payment will be reduced by 40% to pay for the attorneys' share of the payment.

- ### **Why are the numbers so low?**

    There are law firms that do not specialize in this type of work who borrowed millions of dollars from Wall Street hedge funds to run TV ad campaigns and finance the cost of their collection of claims from survivors. These are the same firms you see running ads for other injury cases like asbestos, opioids, vaginal mesh, baby powder talc, etc. Those law firms came into the Boy Scout's bankruptcy case and have treated survivors like "inventories" for the sole purpose of collecting their contingency fee. While you and other survivors might not receive large or meaningful payments, the "mass tort" lawyers will because they will take a piece of your payment which under the current $1.854 billion settlement fund will total more than $425 million.

    The Boy Scouts, Local Councils, and Hartford Insurance Company ("Hartford") negotiated with the "mass tort" lawyers instead of the Official Tort Claimants' Committee (the "TCC") because the "mass tort" lawyers were willing to accept much less as compensation for your claims.

- ### **Why was the Hartford Insurance settlement a cheap deal?**

    Hartford, the only settling insurer to date, has agreed to pay $787 million to settle with all of you. That amount is a tiny fraction of the coverage it is contractually obligated to pay. For example, let's consider only penetration claims in states where the statute of limitations is not a barrier to recover. The face value of Hartford's insurance coverage for the year 1972 *alone* is more than $800 million. And yet, the Coalition and Eisenberg Rothweiler want you to vote for a plan that pays less than that amount without taking into account the thousands of other claims in the same year and the many other thousands in 1971, 1973, 1974, 1975, and all the other years Hartford provided insurance coverage.

    Making matters even worse, the $787 million dollar settlement would not be dedicated to the specific survivor claims that trigger Hartford's policies. Instead, the $787 million will be used to pay all survivors even if their claims did not trigger a Hartford policy.

**KOSNOFF LAW**

October 18, 2021
Page 3

After all is said and done, the Hartford settlement would only yield approximately $8,500 per survivor after accounting for trust expenses and overhead. I cannot support a plan that is so generous to an insurance company and provides such a meager recovery for all of you. I urge you to reject it.

- **The BSA Plan cuts a cheap deal with the BSA local councils which are legally separate entities in exchange for complete legal immunity from separate claims you have against the local council in which you were abused.**

Eisenberg Rothweiler and the Coalition offered to settle with the Local Councils before undertaking any review of the claims or financial analysis of the Local Councils. In short, the Coalition blindly offered to settle for $600 million when the TCC demonstrated to the Coalition that the Local Councils had the ability to pay more than three times that amount without endangering their Scouting mission.

I find the Coalition's agreement (and Eisenberg Rothweiler's support of it) to be outrageous. The Plan releases the Local Councils from responsibility for the harm they caused you and requires them to pay far less than they can afford.

- **The Chartered Organizations that founded and ran your troop, including churches, schools, civic organizations, YMCA, etc. are getting a release for free for all claims after 1975 for not objecting to the Plan.**

Under the terms of BSA's Plan, Chartered Organizations do not pay a cent, but nevertheless receive broad releases for more than 40 years of sexual abuse claims (1976-2020). Instead, Chartered Organizations receive a release of their sexual abuse liability in exchange for a transfer of their interests in insurance policies purchased by the BSA and Local Councils. You might ask how that can possibly be fair to you. It cannot be and, in fact, is terribly unfair to you.

- **BSA's Plan includes a $250 million settlement with the Mormon Church (TCJC) which had direct involvement in every aspect of the Scouting program for 100 years. The $250 million settlement is tiny in comparison to the Church's legal exposure and its available assets which are in the billions of dollars.**

The $250 million is not only far below the level of its culpability for abuse in TCJC wards, but it will only be distributed to survivors who have claims against the Mormon Church. Therefore, most of you will not benefit at all from this arrangement.

- **Rejection of the Plan does not mean many more years of waiting. It means the BSA and the other entities will quickly come back to the negotiating table and finally be serious**

**KOSNOFF LAW**

October 18, 2021
Page 4

**about fairly compensating survivors. A YES vote would likely mean years of appeals and probable rejection of the Plan by a higher court.**

The Boy Scout's "melting ice cube" defense is a hoax. The Boy Scouts hold hundreds of millions in cash and other assets that it designates as "restricted" and not available to pay you. It is hard to understand how that money is not available to pay you when the money was made available to provide the framework that led to your sexual abuse. In the end, the Boy Scouts are ready and willing to cut any deal they can, because they will be protected by a bankruptcy discharge while your claims will be left to the "mass tort" lawyers to take their share then leave you with crumbs.

•      **There are grave *legal* problems with the BSA Plan even assuming it does receive the required two-thirds of the survivors' votes.  Those problems will delay this case for years. That is why it is critical that each and every one of you vote and that you vote NO**.

Under the BSA Plan, the Boy Scouts and the Coalition are trying to remove the insurance companies' contractual rights.  It is unclear if that effort will be successful, but it is sure to delay payments to survivors,  because the insurance companies will surely keep the case tied up in appeals and many years of litigation over their rights and obligations to provide any coverage.

Insurance coverage issues create other huge legal problem with the BSA Plan.  For example, the insurance companies will dispute they have to provide coverage to sexual abuse claims. The bankruptcy judge has acknowledged that she will not determine insurance coverage issues. Under the Plan, the Trust Distribution Procedures provides for the appointment of a Settlement Trustee who would evaluate all the survivor claims and make awards that would be legally binding on the insurance companies to pay. There is absolutely no legal support that would permit this and **ample law that says it cannot be done.**  The insurance companies will appeal this and stretch your claims out for years to come.

•      The TCC is made up of 9 survivors of scout leader abuse, just like you. They have served tirelessly for 20 months. They are not paid for their service. They have a fiduciary duty to all the survivors to advocate for your best interests. The TCC urges survivors to **REJECT** the BSA Plan. There is nothing in it for them except the pride that comes from doing their best for you.

•      **The TCC was shut out of the backrooms where these cheap, foolhardy deals were cut by the Coalition and Eisenberg Rothweiler.**

The TCC has its own Plan. For many months, it has been forbidden by the court to file its own Plan or to even talk about it until now. The TCC has the legal right to file its own bankruptcy plan starting next week. I don't know what it contains or if I will eventually support it but I want

**KOSNOFF LAW**

October 18, 2021
Page 5

to see it, because the BSA Plan is a disaster for all survivors. We can only go up from here. But first survivors must send a resounding message to all the players that the BSA Plan is a big fat **NO!**

## CONCLUSION

Your claims deserve fair compensation paid by those who are responsible for your pain and anguish. The Boy Scouts, Local Councils and Chartered Organizations are at fault and have the resources to compensate you adequately. The insurance companies have contractual obligations and the resources to live up to their contracts. The BSA Plan shortchanges you and lets responsible parties off the hook. That Plan compensates mass tort lawyers and paper pushers without adequately providing for you.

The BSA Plan is unacceptable. I urge you, therefore, to vote NO on the BSA Plan.

As always, please feel free to contact me at any time with your questions and comments. Thank you for the honor of representing you.

Very truly yours,

*Timothy D. Kosnoff*

TIMOTHY D. KOSNOFF

# EXHIBIT 5

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | |

## TIMOTHY KOSNOFF'S RESPONSE TO SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

Pursuant to Fed. R. Civ. Pro. 45 and Fed. R. Bankr. P. 9016, Timothy Kosnoff hereby responds to the subpoena of Century Indemnity Company served on October 4, 2021 (the "Requests") as follows:

## GENERAL OBJECTIONS

Mr. Kosnoff incorporates into his specific Responses the following general and continuing objections as if they were set forth in full in specific Responses to each Request (the "General Objections"). Although the General Objections may be specifically referred to in a Response, failure to mention a General Objection specifically should not be construed as a waiver of any such objection. Moreover, the assertion of the same, similar, or additional objections in response to a Request does not waive any of the General Objections set forth below.

1. Mr. Kosnoff objects to the Requests to the extent that they can be read as requiring Mr. Kosnoff to produce information or facts that are not in his possession, as the same information can be sought or obtained directly by Century from third parties as easily as Mr. Kosnoff could obtain the same. Likewise, Mr. Kosnoff objects to the Requests to the extent that any can be read

as requiring him to produce information or facts obtained or readily obtainable from material in the possession of Century or other Insurers.

2.      Mr. Kosnoff objects to the Requests to the extent that they seek information protected by the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Mr. Kosnoff hereby claims such privileges and does not waive any objection to the admission of privileged documents resulting from incidental or accidental production.

3.      Even if the Requests were properly propounded and served, Mr. Kosnoff objects to the Requests as premature, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and outside the scope of Civil Rule 26(b)(1).

4.      Mr. Kosnoff objects to the Requests to the extent that they seek to impose obligations on Mr. Kosnoff that are inconsistent with or greater than the obligations imposed by the Civil Rules, the Bankruptcy Rules, the Local Rules for the United States Bankruptcy Court for the Central District of California (the "Local Rules"), or any other applicable agreement or rule.

5.      Mr. Kosnoff objects to the Requests to the extent that they purport to require Mr. Kosnoff to conduct anything beyond a reasonable and good faith search for documents from reasonably accessible sources where responsive documents can reasonably be expected to be located.

6.      Mr. Kosnoff objects to the Requests to the extent they call for the production of confidential information and information protected from disclosure by law, court order, or any agreement with respect to confidentiality or nondisclosure.

7.      Mr. Kosnoff objects to the Requests to the extent they seek documents already in Century's possession, custody, or control.

8.      Mr. Kosnoff objects to the Requests to the extent they seek documents more easily obtained from the Debtors than Mr. Kosnoff.

9.      Mr. Kosnoff objects to the Requests to the extent they seek documents not in Mr. Kosnoff's possession, custody, or control.

10.      Mr. Kosnoff objects to each Request to the extent that it is cumulative or duplicative of other discovery requests.

11.      Mr. Kosnoff makes his response to these Requests based on his present knowledge and without prejudice to his rights to produce or object to evidence of any kind and to amend or supplement its responses as necessary at a later date.

12.      Mr. Kosnoff reserves the right to challenge the competence, relevance, materiality, or admissibility of, or to object on any grounds to the use of any documents or information produced in response to the Requests in any subsequent proceeding or trial of this or any other action.

13.      Mr. Kosnoff objects to the production of any documents falling within one of the General Objections above or Specific Objections set forth below.  In the event that documents falling within the scope of an objection are produced by Mr. Kosnoff, this production is inadvertent and does not constitute a waiver of the objection.

## OBJECTIONS TO DEFINITIONS

1.      Mr. Kosnoff objects to the definitions of "AIS Counsel," "You," and "Your" on the grounds that they are overbroad and unduly burdensome and purport to require Mr. Kosnoff to produce documents not within Mr. Kosnoff's possession, custody, or control. AIS is not a legal entity or a participant in these proceedings.  To the best of Mr. Kosnoff's knowledge, no entity

does business as Abused in Scouting. AIS is a collection of lawyers who work cooperatively to make these proceedings known to abuse victims, to reassure those victims that they are not alone and that help is available to them and to present and pursue their claims effectively and aggressively.

**OBJECTIONS TO INSTRUCTIONS AND MANNER OF PRODUCTION**

1.      Mr. Kosnoff objects to the Instructions on the grounds and to the extent they are overbroad, unduly burdensome, and seek to impose obligations on Mr. Kosnoff that are inconsistent with or greater than the obligations imposed by the Civil Rules, the Bankruptcy Rules, the Local Rules, or any other applicable agreement or rule.

2.      Mr. Kosnoff objects to the "Manner of Production" instructions to the extent they are overly burdensome under the circumstances.

**SPECIFIC RESPONSES AND OBJECTIONS**

1.      All Documents and Communications exchanged with Eisenberg Rothweiler, including but not limited to Ken Rothweiler and Stewart Eisenberg, Concerning Kosnoff Law's current and former clients as described in paragraph *5* of the Kosnoff 2019 Statement.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

2.       All Documents and Communications between or among You, Kosnoff Law, AVA

Law Group, and/or Eisenberg Rothweiler concerning the television advertising for potential Boy Scouts of America and/or Delaware BSA LLC sexual abuse victims as described in paragraph 5 of the Kosnoff 2019 Statement.

  **Response:**

  In addition to the General Objections set forth above, Mr. Kosnoff objects to this request on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

  3. All Documents relied upon or used in connection with the statement that the firms would "never accept the use of the master ballot" as set forth in paragraph 9 of the Kosnoff  2019 Statement.

  **Response:**

  In addition to the General Objections set forth above, Mr. Kosnoff objects to this request on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

  4. All Communications with (a) the Debtors, (b) Reciprocity Industries, or (c) any  other

third party vendor Concerning Abuse Claims.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

5.    All Communications between or among You, Kosnoff Law, AVA Law Group, or Eisenberg Rothweiler Concerning the review and signing process.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

6.    All Communications between or among You and/or Kosnoff Law, on the one hand, and any other law firm, on the other hand, to affix Your signature to a proof of claim.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request

on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

7.       Any other documented Communications between or among You, Kosnoff Law, the Debtors, AVA Law Group, and/or Eisenberg Rothweiler Concerning the events detailed in the 2019 Statements.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

8.       All Documents and Communications that You and/or Kosnoff Law exchanged with Omni Agent Solutions Concerning the use of Master Ballots for persons alleging Abuse Claims against the Debtors who are clients of Abused in Scouting, AVA Law Group, Eisenberg Rothweiler, and/or Kosnoff Law.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request

on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption. Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

9.     All Communications that You and/or Kosnoff Law sent to Eisenberg Rothweiler threatening legal or other action against Eisenberg Rothweiler for any actions or statements Concerning the Debtors and/or these Chapter 11 Cases and all of Your and/or Kosnoff  Law's responses Concerning  such Communications.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption. Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

10.     All Communications between or among You, Kosnoff Law, AVA Law Group, and/or Eisenberg Rothweiler Concerning the Master Ballots associated with these Chapter 11 Cases.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request

on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

11.     All Documents and Communications  that You and/or Kosnoff  Law exchanged with Eisenberg Rothweiler Concerning these Chapter 11 Cases or the Abuse Claims asserted against the Debtors.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

12.     All Communications between or among You (and/or Kosnoff Law) and anyone representing the Boy Scouts of America and/or Delaware BSA LLC pre-petition and/or the Debtors post-petition Concerning the Abuse Claims asserted against the Debtors.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request on the grounds that it seeks documents, information and materials that are covered by one or more

privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

13. All Communications between or among You, Kosnoff Law, and any lawyer at Brown Rudnick Concerning these Chapter 11 Cases, including but not limited to David Molton.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

14. All Documents Concerning the sale, transfer, or granting of a lien in any portion of the recovery to be made for an Abuse Claim asserted against the Debtors.

**Response:**

In addition to the General Objections set forth above, Mr. Kosnoff objects to this request on the grounds that it seeks documents, information and materials that are covered by one or more privileges, including but not limited to the attorney-client privilege, the attorney-client privilege, the work-product doctrine, the business strategy privilege, the consulting expert privilege, the joint defense or common interest privilege, information protected by any confidentiality agreement

and/or any other applicable discovery privilege, immunity or exemption.  Indeed, Century itself has refused to produce such documents on similar grounds in these proceedings.

Dated:  October 18, 2021                    WILKS LAW, LLC

                                             */s/ David E. Wilks*
                                            David E. Wilks (DE Bar No. 2793)
                                            4250 Lancaster Pike, Suite 200
                                            Wilmington, Delaware 19805
                                            Telephone: 302-225-0850
                                            Facsimile:  302-225-0851
                                            Email:  dwilks@wilks.law

                                            *Counsel to Timothy Kosnoff*

# EXHIBIT 6

**From:** "Schiavoni, Tancred" <tschiavoni@omm.com>
**Date:** October 18, 2021 at 9:55:24 PM EDT
**To:** David Wilks <dwilks@wilks.law>
**Cc:** "Svirsky, Gary" <gsvirsky@omm.com>, "Shamah, Daniel S." <dshamah@omm.com>, "Warren, Steve" <swarren@omm.com>, "Schiavoni, Tancred" <tschiavoni@omm.com>, "Stamatios Stamoulis (stamoulis@swdelaw.com)" <stamoulis@swdelaw.com>
**Subject: RE: BSA re deficiency letter (David Wilks and Tim Kosnoff)**


David

The Court made crystal clear the schedule and that she expect non-compliance to be brought to her attention right away. Mr. Kosnoff has made an appearance in the Delaware action identifying himself in doing so as a party.  I am assuming that you and Mr. Kosnoff have no objection to us reading your email to her tomorrow -- that you see "no immediate urgency" in the matter, that despite the Court's scheduling of this hearing to address discovery you are busy and that despite Mr. Kosnoff's appearance she has "no jurisdiction" over him.

Please let me know before the hearing whether Mr. Kosnoff will appear for his deposition as scheduled so I may let the Court know tomorrow.

**From:** David Wilks <dwilks@wilks.law>
**Sent:** Monday, October 18, 2021 9:25 PM
**To:** Schiavoni, Tancred <tschiavoni@omm.com>
**Cc:** Svirsky, Gary <gsvirsky@omm.com>; Shamah, Daniel S. <dshamah@omm.com>; Warren, Steve <swarren@omm.com>
**Subject:** RE: BSA re deficiency letter (David Wilks and Tim Kosnoff)


[EXTERNAL MESSAGE]

Tanc,

I am happy to discuss this with you.  I have a conflict tomorrow before the hearing, but will coordinate calendars with you.  Bear in mind that enforcement of the subpoena must take place in the California

1

court from which the subpoena issued, so Judge Silverstein has no jurisdiction over it.  Therefore, it seems that there is no immediate urgency to our conversation.

Best,

Dave


David E. Wilks
Wilks Law, LLC
4250 Lancaster Pike, Suite 200
Wilmington, Delaware 19805

(302) 225-0858


---

**From:** Schiavoni, Tancred <tschiavoni@omm.com>
**Sent:** Monday, October 18, 2021 8:56 PM
**To:** David Wilks <dwilks@wilks.law>
**Cc:** Schiavoni, Tancred <tschiavoni@omm.com>; Svirsky, Gary <gsvirsky@omm.com>; Shamah, Daniel S. <dshamah@omm.com>; Warren, Steve <swarren@omm.com>
**Subject:** BSA re deficiency letter (David Wilks and Tim Kosnoff)

Dear David

You asserted the same boiler plate objection of privilege to every request directed to Tim Kosnoff and his personal corporation without regard to the subject matter of the request or the context of the situation.  It is patently frivolous for you to assert such non-existent and certainly non-applicable privileges as the "business strategy privilege" and the "consulting expert privilege." The fact that you asserted these obviously meritless privilege objections to every request calls into good faith the entirety your response.

Just a few examples of meritless responses follow:

- All Communications that You and/or Kosnoff Law sent to Eisenberg Rothweiler threatening legal or other action against Eisenberg Rothweiler for any actions or statements Concerning the Debtors and/or these Chapter 11 Cases and all of Your and/or Kosnoff Law's responses Concerning such Communications.

  Threats of legal action are not privileged and do not by definition fall under any common interest or privilege.  We ask that you please confirm by tomorrow morning before the hearing that Mr. Kosnoff will with the objections to this request and comply.

- All Communications between or among You (and/or Kosnoff Law) and anyone representing the Boy Scouts of America and/or Delaware BSA LLC pre-petition and/or the Debtors post-petition Concerning the Abuse Claims asserted against the Debtors

  No privilege or common interest exists between Mr. Kosnoff and BSA or the Debtors. Your assertion of privilege over these documents is patently frivolous to the point of being sanctionable.  We ask that you please confirm by tomorrow morning before the hearing that Mr. Kosnoff will with the objections to this request and comply.

- All Communications between or among You, Kosnoff Law, and any lawyer at Brown Rudnick Concerning these Chapter 11Cases, including but not limited to David Molton.  We ask that you please confirm by tomorrow morning before the hearing that Mr. Kosnoff will with the objections to this request and comply.

  As you are aware, Brown Rudnick has disavowed representing Mr. Kosnoff. Mr. Kosnoff has publicly made clear that Brown Rudnick does not represent him and that he does not operate a common interest with Brown Rudnick.

- All Documents Concerning the sale, transfer, or granting of a lien in any portion of the recovery to be made for an Abuse Claim asserted against the Debtors.

  The sale of an interest in a claim is not privileged. We ask that you please confirm by tomorrow morning before the hearing that Mr. Kosnoff will with the objections to this request and comply.

You filed Mr. Kosnoff's verified statement without the assertion of privilege. It describes the process by which POCs were filed and agreements concerning the use of Master Ballots.  The statements made were voluntarily. The issues raised by the 2019 Statement that you filed for him are serious and are not privileged.

We urge you to cooperation. Mr. Kosnoff asked for a voice. This is his opportunity to be heard.

**From:** David Wilks <dwilks@wilks.law>
**Sent:** Monday, October 18, 2021 3:47 PM

3

**To:** Schiavoni, Tancred <tschiavoni@omm.com>; stamoulis@swdelaw.com
**Subject:** BSA

[EXTERNAL MESSAGE]

Gentlemen,

Attached please find Timothy Kosnoff's response to Century's subpoena.

Best,

Dave

David E. Wilks
Wilks Law, LLC
4250 Lancaster Pike, Suite 200
Wilmington, Delaware 19805

(302) 225-0858

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

# EXHIBIT 7

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IMERYS TALC AMERICA, INC., *et al.*, | ) | Case No. 19-10289 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| _____ | ) | **Re: Dkt. Nos. 3624, 3744, 3922, 4005** |

## OPINION

Before me are four related motions that were presented over the last several months

in this mass tort case. Each motion addresses the voting on Debtors' Ninth Amended Plan

of Reorganization.[1] The motions are not academic. Debtors' confirmation hearing is

scheduled to begin on November 15, 2021. Absent other developments in these cases, the

outcome here will determine whether the only voting class has accepted the Plan and

whether Debtors have the vote to support an argument that they are otherwise entitled to

receive a § 524(g) injunction.

The first motion is Arnold & Itkin LLP's Motion to Disregard[2] certain vote changes.

Arnold & Itkin asks that I disregard the votes of three other law firms—Bevan & Associates,

LPA, Inc., Trammel P.C. and Williams Hart Boundas Easterby LLP—that submitted

---

[1] Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 2864 ("Plan"). The Plan was amended post-solicitation, Dkt. No. 4099.

[2] Motion of Holders of Talc Personal Injury Claims Represented by Arnold & Itkin LP to Disregard Certain Vote Changes made without Complying with Bankruptcy Rule 3018, and the Required Showing of Cause in Connection with the Voting on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 3624. The Motion to Disregard was joined by Johnson & Johnson & Johnson & Johnson Consumer Inc. Dkt. No. 3653; the Cyprus Historical Excess Insurers, Dkt. No. 3679; Aylstock, Witkin, Kreis & Overholtz PLLC, Dkt. No. 3685; and Imerys S.A., Dkt. No. 3690.

Master Ballots in connection with the Plan. Arnold & Itkin, which has voted to reject the Plan on behalf of its clients, asserts that these other three law firms did not comply with the appropriate procedure for changing their votes from rejecting to accepting the Plan. Argument was heard on June 22, 2021.

I held off ruling on the Motion to Disregard as two of the firms stated that they intended to file their own motions. Thereafter, Bevan & Associates and Williams Hart each separately filed a motion seeking permission to change their respective votes pursuant to Bankruptcy Rule 3018;[3] Trammel did not. The Rule 3018 Motions were the subject of an evidentiary hearing on September 20, 2021. At that time, I also heard the fourth motion, J&J's Motion to Designate.[4] J&J also opposes the Plan. It seeks alternative relief pursuant to Bankruptcy Code § 1126(e) in the event any of the three law firms are permitted to change their respective votes.

Having considered the evidence and arguments:

(i)      the Motion to Disregard is granted with respect to Trammel—its 1670 votes will remain votes to reject the Plan;

(ii)      the Williams Hart Rule 3018 Motion is granted—its 493 votes will be changed to reflect votes to accept the Plan;

---

[3] Motion of Bevan Claimants to Affirm Certain Vote Changes in Connection with the Voting on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code Pursuant to Bankruptcy Rule 3018, Dkt. No. 3744 ("Bevan & Associates Rule 3018 Motion"); Williams Hart Plaintiffs' Motion Pursuant to Rule 3018 to Affirm Certain Vote Changes in Connection with the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 3922 ("Williams Hart Rule 3018 Motion" and together with the Bevan & Associates Rule 3018 Motion, the "Rule 3018 Motions").

[4] Johnson & Johnson and Johnson & Johnson Consumer Inc.'s (collectively, "J&J") Motion Pursuant to 11 U.S.C. § 1126(e) for Entry of an Order Designating Votes to Accept the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code Cast by Bevan & Associates LPA, Inc., Williams Hart Boundas Easterby LLP, and Trammell PC, Dkt. No. 4005.

(iii)    the Bevan & Associates Rule 3018 Motion is denied; further, its original Master Ballot will be deemed withdrawn—its 15,719 votes will not be counted as a vote for or against the Plan; and

(iv)    the Motion to Designate is moot with respect to Trammel and Bevan & Associates and is denied with respect to Williams Hart.

## Background[5]

### *The Solicitation Procedures*

Imerys Talc America Inc. ("Imerys" or "Debtor") and certain affiliated entities (collectively, with Imerys, "Debtors") filed voluntary petitions under chapter 11 of the United States Bankruptcy Code on February 13, 2019. The impetus for the filing was the thousands of prepetition lawsuits alleging personal injuries caused by talc mined, processed or distributed by Debtors. Those lawsuits were overwhelmingly based on exposure to cosmetic (not industrial) talc.

---

[5] The Court makes findings of fact and conclusions of law pursuant to Fed. R. Civ. Pro. 52, applicable to these contested matters by Fed. R. Bankr. Pro. 7052 and 9014(c). I thank the parties for supplying a Combined List of Potential Exhibits. There were no objections to the exhibits tendered for admission except for Exhibit 90, which consists of extracts from the Boundas deposition. Williams Hart objects to the admission of excerpts on completeness and asks that the entire Boundas deposition be admitted. J&J and Arnold & Itkin object to the entire deposition being admitted. I will admit the entire deposition transcript. Mr. Boundas took the stand and was cross-examined by both J&J and Arnold & Itkin. Notwithstanding the opportunity to elicit testimony from Mr. Boundas, J&J and Arnold & Itkin now seek to enter into evidence select portions of the Boundas deposition. Fairness and completeness dictate that the entire deposition be included in the record. References to the Exhibits herein shall be according to the number on the Combined List of Potential Exhibits. As all exhibits were not tendered, the Exhibit numbers are not sequential.

By Order dated January 27, 2021,[6] I approved a disclosure statement and Solicitation Procedures[7] for the Plan. The only voting class is Class 4: Talc Personal Injury Claims. Simply put, Talc Personal Injury Claims are claims of individuals based on bodily injury or death arising out of exposure to Debtors' talc or talc-containing products ("Direct Talc Personal Injury Claims") as well as claims of corporations, co-defendants or predecessors for indemnification, contribution or reimbursement ("Indirect Talc Personal Injury Claims").[8]

---

[6] Ex. 7 (Order (I) Approving Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (II) Establishing Solicitation Procedures, (III) Approving Form and Manner of Notice to Attorneys and Certified Plan Solicitation Directive, (IV) Approving Form of Ballots, (V) Approving Form, Manner, and Scope of Confirmation Notices, (VI) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement and Confirmation of Plan, and (VII) Granting Related Relief, Dkt. No. 2863).

[7] The Solicitation Procedures are Exhibit 1 to the Order. Capitalized terms herein that are not defined have the meaning set forth in the Solicitation Procedures, the Order or the Plan, as applicable.

[8] Less simply put, "**Talc Personal Injury Claim**" means any Claim and any Talc Personal Injury Demand against one or more of the Debtors or any other Protected Party whether known or unknown, including with respect to any manner of alleged bodily injury, death, sickness, disease or alleged disease process, emotional distress, fear of cancer, medical monitoring, or any other alleged personal injuries (whether physical, emotional or otherwise), directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products based on the alleged pre-Effective Date acts or omissions of the Debtors or any other Entity for whose conduct the Debtors have or are alleged to have liability (but only to the extent such Claim or Talc Personal Injury Demand directly or indirectly arises out of or relates to the alleged pre-Effective Date acts or omissions of the Debtors), including, without limitation any claims directly or indirectly arising out of or relating to: (a) any products previously mined, processed, manufactured, sold (including, without limitation, any Sale pursuant to the Sale Order) and/or distributed by the Debtors or any other Entity for whose conduct the Debtors have or are alleged to have liability, but in all cases only to the extent of the Debtors' liability; (b) any materials present at any premises owned, leased, occupied or operated by any Entity for whose products, acts, omissions, business or operations the Debtors have, or are alleged to have, liability; or (c) any talc in any way connected to the Debtors alleged to contain asbestos or other constituent. Talc Personal Injury Claims include all such claims, whether: (1) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation, or any other theory of law, equity or admiralty, whether brought, threatened or pursued in any United States court or court anywhere in the world; (2) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative or any other costs, fees, injunctive or

4

The Plan provides that Class 4 Claims are channeled into a § 524(g) trust governed by Trust Distribution Procedures. The Trust Distribution Procedures provide for distributions only to claimants suffering from mesothelioma or various stages of ovarian cancer. Except for the proceeds of a settlement with Cyprus Mines Corporation, the Imerys Trust Assets are split among three sub-funds: 40% to Sub-Fund A for the benefit of claimants suffering from Ovarian Cancer A; 40% to Sub-Fund B for the benefit of claimants suffering from Mesothelioma; and 20% to Sub-Fund C for the benefit of claimants suffering from Ovarian Cancer B, C or D. This has been referred to in these cases as the 40/40/20 split.

Several provisions of the Solicitation Procedures are particularly relevant to the four motions. First, the Solicitation Procedures require that all ballots be submitted by

---

similar relief or any other measure of damages; (3) seeking any legal, equitable or other relief of any kind whatsoever, including, for the avoidance of doubt, any claims arising out of or relating to the presence of or exposure to talc or talc-containing products assertable against one or more Debtors or any other Protected Party; or (4) held by claimants residing within the United States or in a foreign jurisdiction. Talc Personal Injury Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict. Talc Personal Injury Claims do not include any claim by any present or former employee of a predecessor or Affiliate of the Debtors for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer. For the avoidance of doubt, the term Talc Personal Injury Claim includes, without limitation (i) all claims, debts, obligations, or liabilities for compensatory damages (such as, without limitation, loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages; and (ii) Indirect Talc Personal Injury Claims. Notwithstanding the foregoing, Talc Personal Injury Claims do not include any claim that a Settling Talc Insurance Company may have against its reinsurers and/or retrocessionaires in their capacities as such, and nothing in the Plan, the Plan Documents, or the Confirmation Order shall impair or otherwise affect the ability of a Settling Talc Insurance Company to assert any such claim against its reinsurers and/or retrocessionaires in their capacities as such. Plan § 1.1.235. A Direct Talc Personal Injury Claim is any claim that is not an Indirect Talc Personal Injury Claim. Plan § 1.1.79.

March 25, 2021 at 4:00 p.m. (prevailing eastern time), which is defined in the Solicitation Procedures as the "Voting Deadline." Second, the Solicitation Procedures provide Debtors with significant discretion to extend deadlines, including for voting, and/or to permit defects in ballots to be corrected.

Third, the Solicitation Procedures provide "Special Procedures" for voting Direct Talc Personal Injury Claims. The Solicitation Procedures contemplate that individuals will be solicited in accordance with the directive of their respective counsel.[9] Law firms have three options: (i) a firm can certify that it has authority to vote on behalf of its clients and direct Prime Clerk[10] to serve the firm with one solicitation package and one Master Ballot on which the firm "must record the votes on the Plan" for each of its clients; (ii) if a firm does not have authority to vote on behalf of its clients or prefers not to exercise its authority it can elect to (x) direct Prime Clerk to solicit votes directly from its clients or (y) direct Prime Clerk to deliver the solicitation packages to the law firm, which will forward them to its clients; or (iii) a firm can vote some of its clients by Master Ballot and direct Prime Clerk to directly solicit others. So that Prime Clerk knows sufficiently in advance of the service deadline the method by which each holder of a Direct Talc Personal Injury Claim will vote, each law firm is required to complete and return a Certified Plan Solicitation Directive by no later than February 17, 2021. If a firm fails to timely submit a Certified Plan Solicitation

---

[9] The Solicitation Procedures do not appear to contemplate soliciting votes from holders of Direct Talc Personal Injury Claims that are unrepresented.

[10] Prime Clerk LLC was authorized to assist Debtors with the tabulation of votes on the Plan.

Directive or otherwise fails to select a solicitation method, Prime Clerk is to solicit that law firm's clients directly.

Fourth, Article VI. 2 of the Solicitation Procedures contain various rules for tabulating votes as well as certain "general solicitation procedures and standard assumptions." These rules include:

- Any voter that delivers a valid Ballot may withdraw his, her, or its vote by delivering a written notice of withdrawal to the Solicitation Agent before the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld). To be valid, the notice of withdrawal must be signed by the party who signed the Ballot to be revoked. The Debtors reserve the right to contest any withdrawals. (Art. VI. 2.c.).

- . . . if multiple Ballots are received form the same attorney or agent with respect to the same Claim (but not from the holder thereof), the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld) will be the Ballot that is counted as a vote to accept or reject the Plan. (Art. VI. 2.h).

- The Debtors will not be obligated to recognize any withdrawal, revocation or change of any vote received after the Voting Deadline (or such later date as agreed by the Debtors with the consent of the Plan Proponents, with such consent not to be unreasonably withheld). (Art. VI. 2. j).

- There will be a rebuttable presumption that any claimant who submits a properly completed superceding Ballot or withdrawal of a Ballot on or before the Voting Deadline has sufficient cause, within the meaning of Bankruptcy Rule 3018(a), to change or withdraw such claimant's acceptance or rejection of the Plan. (Art. VI. 2.f.)

***The Voting Declarations***

The Order required Prime Clerk to file its Voting Certification by April 8, 2021. On April 7, Christina Pullo, Vice President of Global Corporate Actions for Prime Clerk filed her declaration ("First Voting Declaration") regarding the solicitation of votes and

7

"preliminary" tabulation of ballots.[11] In the text of the First Voting Declaration, Ms. Pullo declares that Debtors directed Prime Clerk to include in the vote tabulation Master Ballots received after the Voting Deadline from nine law firms. She also declares that Prime Clerk received Master Ballots from law firms that did not submit a valid Certified Plan Solicitation Directive, which Debtors also instructed Prime Clerk to include in the vote tabulation

Exhibit C to the First Voting Declaration provides detail on each ballot not counted and the reason for exclusion. Bevan & Associates, Williams Hart and Trammel are each listed on Exhibit C as having submitted a Master Ballot rejecting the Plan. The reason for exclusion of each of these Master Ballots is "Master Ballot superseded by later received valid master ballot from *different laws firm* with *consistent vote* on account of the same holder."[12]

Taking into account the included and excluded ballots, Prime Clerk concluded that Class 4 Talc Personal Injury Claims voted to accept the Plan, as follows:

| Class | Class Description | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Class Voting Result |
|-------|-------------------|------------------|------------------|------------------|------------------|---------------------|
|       |                   | %                | %                | %                | %                |                     |
| 4     | Talc Personal Injury Claims | 62,549 | 15,900 | $62,549.00 | $15,900.00 | ACCEPTS |
|       |                   | 79.73%           | 20.27%           | 79.73%           | 20.27%           |                     |

---

[11] Ex. 11 (Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Preliminary Tabulation of Ballots Cast on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 3334).

[12] Certain of the votes recorded on Trammel's Master Ballot were also excluded from the voting tabulation because the ballot did not contain a valid social security number or an indication that the claimant does not have a social security number.

8

After the filing of the First Voting Declaration, Arnold & Itkin filed a motion seeking to extend the Plan discovery deadline in order to take discovery with respect to the voting and tabulation of the vote.[13] Arnold & Itkin argued that the First Voting Declaration was inaccurate as it seemed to encompass a statistically implausible result. In particular, the negative votes reflected in the Master Ballot submitted by Bevan & Associates alone accounted for all but 200 of the ballots to reject the Plan. I granted that request over a disappointing argument by Debtors (and others in support of the Plan) that the discovery deadline had passed and parties should have anticipated the issues raised by the First Voting Declaration.

As it turned out, Arnold & Itkin's suspicions were correct. A month later, on May 7, 2021, Christina Pullo filed a Supplemental Voting Declaration.[14] In the Supplemental Voting Declaration, Prime Clerk again concludes that Class 4 accepted the Plan:

| Class | Class Description | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Class Voting Result |
|-------|-------------------|------------------|------------------|------------------|------------------|---------------------|
|       |                   | %                | %                | %                | %                |                     |
|       |                   | 62,553           | 15,804           | $62,553.00       | $15,804.00       |                     |
| 4     | Talc Personal Injury Claims | 79.83%  | 20.17%           | 79.83%           | 20.17%           | ACCEPTS             |

[13] Motion of Holders of Talc Personal Injury Claims Represented by Arnold & Itkin LLP to Extend Discovery Deadlines and Permit Discovery of the Plan Proponents, Prime Clerk and Certain Third Parties Relating to the Solicitation and Voting With Respect to Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code [Dkt. No. 3425]. Others joined in: Certain Insurers, Dkt. No. 3491; Cyprus Historical Excess Insurers, Dkt. No. 3502; Aylstock Witkin, Kreis & Overholtz PLLC, Dkt. No. 3527.

[14] Ex. 12 (Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Preliminary Tabulation of Ballots Cast on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 3534).

But, the reason for exclusion of Master Ballots filed by Bevan & Associates, Williams Hart and Trammel now reads: "Master Ballot superseded by latest-dated valid Master Ballot from *the same law firm* with *inconsistent vote* on account of the same holder." The Supplemental Voting Certification, therefore, is the first time that parties or the court were advised that these three firms had changed their respective votes from rejecting the Plan to accepting the Plan.

**Resolution of the Motions**

*I.     The Motion to Disregard is Granted with respect to Trammel*

On June 8, 2021, Arnold & Itkin filed its Motion to Disregard.  Arnold & Itkin argues that none of the three firms sought permission to change their respective votes from rejecting to accepting in derogation of Bankruptcy Rule 3018(a).  While the Motion to Disregard is moot as to Bevan & Associates and Williams Hart, it is still relevant as to the 1,670 votes cast by Trammel.

In support of the vote changes, Debtors[15] and the law firms who seek to change their votes rely heavily on the Order arguing that Debtors and Prime Clerk complied with the Solicitation Procedures and so the vote changes should be permitted.  Specifically, Debtors argue that the Order requires Prime Clerk to count the last-dated ballot received before or after the Voting Deadline if Debtors consent, which they did.  Taken together with the

---

[15] Debtors' Objection to Motion of Holders of Talc Personal Injury Claims Represented by Arnold & Itkin LP to Disregard Certain Vote Changes made without Complying with Bankruptcy Rule 3018, and the Required Showing of Cause in Connection with the Voting on the Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code, Dkt. No. 3686.  In this objection, Debtors do not really argue in favor of Trammel or Williams Hart and thus it could be argued that they have no objection to the Motion to Disregard with respect to either of those firms.

rebuttable presumption of cause within the meaning of Rule 3018, Debtors argue that the Solicitation Procedures allow claimants to file superseding ballots before or after the Voting Deadline and obviate the need for the filing of a Rule 3018 motion.[16]

A presumption requires the factfinder to accept some facts as proven once provided proof of other facts. It is a procedural rule under which "if a basic fact (Fact A) is established than the finder of fact must accept that the presumed fact (Fact B) has been established."[17] A presumption is not evidence, however, and is not given the weight of evidence.[18] And, a rebuttable presumption is just that—rebuttable. Once the opposing party comes forward with some evidence to create a material fact, the presumption disappears; the party with the burden of persuasion always retains it.[19]

The creation of the presumption in the Solicitation Procedures arguably runs counter to Rule 3018. There is no general entitlement to change a vote once cast.[20] Bankruptcy Rule 3018(a) only permits a change "for cause."[21] The overarching concern underlying

---

[16] It is, of course, understandable that parties should rely on the Order, but as I discuss herein the presumption provision was arguably improvidently entered. While Debtors cited a string of orders for the proposition that such a presumption is typical, including in the mass tort context, there is no indication that any of the orders were contested or were otherwise challenged as is the case here.

[17] 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 301.01[1] (2d ed. 2021).

[18] *Id.* (citing New York Life Ins. Co. v. Gamer, 303 U.S. 161 (1938)).

[19] *Weinstein's Federal Evidence* § 301.01[2].

[20] 9 Collier on Bankruptcy, ¶ 3018.01[4] (16th ed. 2021) ("A change of vote may not occur as a matter of right.").

[21] The relevant part of Bankruptcy Rule 3018 provides: "[f]or cause shown, the court after notice and a hearing may permit a creditor or equity security holder to change or withdraw an acceptance of rejection."

Rule 3018 is that any vote change not be "improperly motivated,"[22] a proposition that requires both an explanation and scrutiny. The presumption created in the Solicitation Procedures requires neither; nor is there any logical nexus between Fact A (the change of vote) and Fact B (cause, or a proper motivation).

I expressed skepticism at argument regarding whether I could and/or should have created the presumption in the Solicitation Procedures, but I need not decide that here.[23] The three law firms do not meet even the minimal requisite in the Solicitation Procedures for the creation of the presumption because it arises only if a vote is changed prior to the Voting Deadline. It is undisputed that Trammel and Williams Hart changed their respective votes the day after the Voting Deadline. It is also undisputed that Bevan & Associates first withdrew its vote on March 29 and then resubmitted a Master Ballot accepting the Plan on April 6 more than a week after the Voting Deadline. "Fact A" has not been established by any of the three firms.

Debtors and others in support of counting the changed votes contend that because Trammel and Williams Hart changed their votes within the extended deadline granted by Debtors that those firms are entitled to the presumption. I disagree. The Solicitation Procedures contain multiple provisions in which the term Voting Deadline is qualified by the granting of an extension,[24] but the presumption provision contains no such qualification.

---

[22] *In re MPM Silicones, LLC*, 2014 Bankr. LEXIS 4062 * 5 (Bankr. S.D.N.Y. Sept. 17, 2014) (citing 9 Collier on Bankruptcy, ¶ 3018.01[4] (16th ed. 2021)).

[23] No party briefed the issue of whether a court can create a presumption and the circumstances under which it might be permissible to do so. As discussed at the hearing, in many circumstances the presumption created here could cut down on unnecessary and ancillary litigation.

[24] *See supra.*

I will not re-write the Solicitation Procedures to expand the presumption provision especially where, as here, it appears that the presumption may be in derogation of the very rule it references.

As importantly, there is nothing in the Order or the Solicitation Procedures that excuses the filing of a Rule 3018 Motion. Even assuming a presumption is permissible, the presumption must be applied in the context of an actual controversy. Under the Bankruptcy Rules, a change of vote is initiated by the filing of a Rule 3018 motion. While supporters of the vote changes argue that the Solicitation Procedures imply such a motion is unnecessary, given the atypical creation of the presumption, I will not entertain the waiver of the requirement to file a Rule 3018 motion by implication.

I received little evidence with respect to the votes cast by Trammel, which only came in peripherally through Mr. Boundas' testimony. His testimony as well as undisputed representations in the submissions are that Trammel originally cast a timely ballot rejecting the Plan, was given a one-day extension it did not request (but, was requested for it by Mr. Boundas) and then subsequently changed its vote to accept within the extended deadline. Because Trammel did not file a Rule 3018 motion, did not file an opposition to the Motion to Disregard nor present any evidence of its own, I have no evidence as to why Trammel changed its vote. Accordingly, I will not permit the vote change.

The Motion to Disregard is granted as to Trammel. As for Williams Hart and Bevan & Associates, the Motion to Disregard is moot. I will consider the Rule 3018 Motions on

the merits, but the law firms will not be entitled to a presumption of cause.[25]  Each has the

burden of both production and persuasion on its motion.

## II.    *The Rule 3018 Motions*

Bankruptcy Rule 3018 provides "[f]or cause shown, the court after notice and

hearing may permit a creditor or equity security holder to change or withdraw an

acceptance or rejection" of a plan.  Neither the Bankruptcy Rules nor the Bankruptcy Code

define cause.  It is up to judges to determine "cause" based on the context and to grant or

deny a motion in their discretion.[26]  While "cause" is necessarily a fact-driven

determination, some general principles have emerged from the caselaw as set forth in *MPM*

*Silicones*.[27]  First, the "for cause" standard should not be hard to meet.  "As long as the

reason for the vote change is not tainted, the change of vote should usually be permitted."[28]

Second, human error is "cause" to change a vote.   Human error occurs when there is (i) a

breakdown in communications at the voting entity; (ii) a misreading of the plan terms; or

(iii) the execution of a ballot by one without authority corrected by one with authority.[29]

Third, courts look unfavorably on votes changes made to enhance an objector's leverage in

---

[25]  Even if Williams Hart and Bevan & Associates were entitled to the presumption, I conclude that the presumption has been rebutted based on the evidence submitted at the hearing.

[26]  *MPM Silicones* *5; *In re J.C. Householder Land Trust # 1*, 502 B.R. 602 (Bankr. M.D. Fla. 2013).

[27]  *MPM Silicones, LLC* (collecting cases).

[28]  *In re Dow Corning Corp.*, 237 B.R. 374, 377 (Bankr. E.D. Mich. 1999) (citing 9 Collier on Bankruptcy ¶ 3018[4] (15th ed. Rev. 1999)).

[29]  *MPM Silicones* *2 (citing *In re Kellogg Square Partnership*, 160 B.R. 332, 334 (Bankr. D. Minn. 1993)).

situations such as to force a cram down.[30]  Fourth, cause should be "more than a mere change of heart."[31]  Fifth, where plan proponents support the vote change in furtherance of a consensual resolution, cause likely exists unless there is some extra consideration being offered for the vote change.[32]  I will apply these general principles separately to each Rule 3018 Motion.

### A.  The Bevan & Associates Rule 3018 Motion is Denied.

On June 25, 2021, Bevan & Associates filed its Rule 3018 Motion.  By its motion, Bevan & Associates seeks to change the votes of its 15,719 clients from votes to reject the Plan to votes to accept the Plan.  That same day, Bevan & Associates filed a Rule 2019 statement identifying its clients.[33]

**Findings of Fact**

Mr. Bevan is a named partner in Bevan & Associates LPA, Inc.[34]  He has been practicing for 30 years and his primary area of practice is asbestos litigation.[35]  While he is not a bankruptcy lawyer, he has represented clients in numerous bankruptcy cases over the years and has represented clients who have served on several creditors' committees in

---

[30]  *Id.*\* 2 (citing *In re Eastern Systems, Inc.*, 118 B.R. 223 (Bankr. S.D.N.Y. 1990) (denying motion), *In re Windmill Durango Office, LLC*, 481 B.R. 51 (B.A.P. 9th Cir. 2012) (denying motion)).

[31]  *Id.* (citing *Windmill Durango*, 481 B.R. at 66).

[32]  *Id. (*citing *Dow Corning*).

[33]  Exs. 16, 16A.

[34]  Hr'g Tr. 15:14-15, Sept. 20, 2021, Dkt. No. 4144.

[35]  Hr'g Tr. 15:18-19; 24:24-25:6.

asbestos cases.[36]  Mr. Bevan could not recall whether or how many lawsuits his firm may have filed against Imerys prepetition.[37]  Bevan & Associates was not involved in the multi-district talc litigation proceeding in New Jersey.[38]  For purposes of solicitation, it appears that Debtors supplied Prime Clerk the name of only one claimant represented by Bevan & Associates.[39]

Bevan & Associates did not take an active role (or any role) in the bankruptcy case prior to voting.  As for voting, Bevan & Associates did not send Prime Clerk a Certified Plan Solicitation Directive by the February 17, 2021 deadline.[40]  Rather, Bevan & Associates' first communication with Prime Clerk was by email on March 18, 2021 seeking a Master Ballot for voting purposes.[41]  On March 23, 2021, Bevan & Associates emailed a Certified Plan Solicitation Directive to Prime Clerk.[42]  After receiving approval from Debtors' counsel, Prime Clerk approved the late request to vote by Master Ballot[43] and Bevan & Associates submitted a Master Ballot to Prime Clerk, by email, on

---

[36]  Hr'g Tr. 15:20-21; 28:13-29:1.

[37]  Ex. 90 (Aug. 31, 2021 Dep. of Thomas W. Bevan 14:25-16:4, Dkt. No. 4092-28).

[38]  Bevan Dep. 20:24-21:4.

[39]  Ex. 26.  I say, "it appears" because the email from Prime Clerk to Bevan & Associates listing clients Prime Clerk has on file references the "Haffner law."

[40]  Ex. 23; Ex. 26.

[41]  Ex. 26.

[42]  Ex. 26.

[43]  Ex. 28.

March 25, 2021.[44] By the Master Ballot, Bevan & Associates voted on behalf of all of its clients to reject the Plan.[45]

From at least February 24, 2021, Prime Clerk sent Debtors and their counsel periodic updates on the progress of the voting tabulation.[46] Late in the evening of March 25, 2021, that report tallied all ballots received through the Voting Deadline and revealed that Class 4 rejected the Plan with only 57% of voters accepting the Plan and 43% of voters rejecting the Plan.[47]

That evening, Natalie Ramsey, counsel for the Tort Claimants Committee texted Mr. Bevan as follows: "Hi. Reaching out for another case. Could we chat about Imerys tomorrow morning? So you know before responding – I represent the committee and learned tonight you cast around 15,000 votes against the plan. Want to understand your concerns."[48] Mr. Baron, individual counsel for a member of the TCC, also reached out to Mr. Bevan that evening.[49]

Ms. Ramsey and Mr. Bevan spoke the following day (March 26).[50] Mr. Bevan expressed concern that a vote in favor of the Imerys Plan would preclude him from voting

---

[44] Exs. 32; 60.

[45] *Id.*

[46] Ex. 54.

[47] Ex. 54.

[48] Ex. 51.

[49] Ex. 30.

[50] Hr'g Tr. 75:4-13.

against a Plan in the Cyprus Mines bankruptcy case.[51]  Ms. Ramsey discussed the interplay

between the Cyprus Mines and Imerys cases and subsequently put in writing her

understanding of the same in a "settlement communication."[52]  The communication states,

among other things, that "[t]here is nothing in the Imerys Plan that attempts to limit or

circumscribe the rights of the Cyprus Committee or any creditor in the Cyprus Bankruptcy

Case."[53]  She also proposes to place the following language in any order confirming the

Imerys Plan: "Notwithstanding anything contained in this Confirmation Order, the failure

to submit a Ballot, withdrawal of a Ballot, or submission of a Ballot voting in favor of the

Imerys Plan does not and shall not affect any rights of any claimant with respect to the

Cyprus Bankruptcy, including without limitation the Cyprus Settlement.  For the avoidance

of doubt, a vote in favor of the Imerys Plan is not and shall not be deemed to be a vote in

favor of the Cyprus Settlement."[54]

Ms. Ramsey followed up with Mr. Bevan by text on March 27 and March 29 asking

if he could let her know whether he will be leaving his votes in place, withdrawing them or

changing them to accepting votes.[55]  On March 29, Mr. Bevan responds saying that he will

be withdrawing his votes that day based on the communication Ms. Ramsey sent him.[56]

---

[51] Hr'g Tr. 17:17-25; 76:14-77:1.  Cyprus Mines Corporation is a previous owner of Debtors' talc
assets and filed its own bankruptcy case in this Court, Case No. 21-10398.  The Cyprus Mines case is
proceeding separately, but prior to filing bankruptcy, Cyprus Mines and Debtors reached a
settlement agreement which is embodied in the Imerys Plan.

[52] Hr'g Tr. 18:5-13.

[53] Ex. 31.

[54] *Id.*

[55] Ex. 51; Hr'g Tr. 83:1-12; 84:14-85:1.

[56] Ex. 51.

Bevan & Associates did, in fact, withdraw its Master Ballot on March 29, via an email to Prime Clerk.[57] At that point, Mr. Bevan believed he was concluded with the voting process.[58]

Later on March 29, Debtors approved what they termed a "request" to withdraw Bevan & Associates Master Ballot.[59] Unfortunately from Debtors' perspective, Prime Clerk's revised report reflecting Bevan & Associates' withdrawal of its ballot revealed that while Class 4 now accepted the Plan, it did not meet the 75% threshold required for a § 524(g) channeling injunction, with only 73.65% of those voting, voting in favor.[60]

Ms. Ramsey reached out to Mr. Bevan by phone sometime between March 29 and April 6 as did Mr. Placitella, another attorney representing a member of the TCC.[61] While Mr. Bevan does not remember the particulars of either conversation, he had the impression that the TCC needed "yes" votes and was told that he could change the votes of his clients to accept the Plan.[62] On April 6, 2021, Bevan & Associates communicated with Prime Clerk again. This time, Bevan & Associates sought to "reinstate" its Master Ballot and vote

---

[57] Ex. 32; Hr'g Tr. 86:13-87:2.

[58] Hr'g Tr. 133:21-134:4.

[59] Ex. 55.

[60] Ex. 55.

[61] Hr'g Tr. 89:25-90:16.

[62] Hr'g Tr. 91:5-23; 134:5-19.

to accept the Plan.[63] Attached to the email was a Master Ballot and an excel spreadsheet with the name of the clients on whose behalf Bevan & Associates was voting.[64]

Mr. Bevan voted on behalf of 15,719 clients. He did not consult with any of his clients prior to voting on the Plan (either the vote rejecting the Plan, the withdrawal of the vote, or the vote accepting the Plan).[65] Rather, he relies on a one page general "Attorney Agreement" which provides that Mr. Bevan can vote on behalf of his client in a bankruptcy case filed by any debtor.[66] Clients may have signed the Attorney Agreement as far back as twenty years ago.[67] He uses this Attorney Agreement to act on behalf of his clients even if they are unaware that a specific bankruptcy has been filed. The only time that Mr. Bevan believes he informs a client of a specific bankruptcy case is if he going to submit that client for consideration on a creditors' committee.[68]

---

[63] Ex. 86.

[64] *Id.*

[65] Hr'g Tr. 97:12-16.

> Q: Okay. So, how do you know that your clients wanted you to vote against the plan, when you voted in March?
> A: Because my clients want me to do what's - - what's best, and I don't check with my clients on every little thing that I do on their case."

[66] Ex. 16 A ("The undersigned claimant hereby authorizes Thomas W. Bevan, as attorney in fact and with full power of substitution to vote on any questions that may be lawfully submitted by debtors and any debtor in bankruptcy, in any Chapter 11 filed on behalf of any Debtor; to vote, after review of the appropriate disclosure statement, for any Plan of Reorganization of the Debtor; and in general, to perform any act not constituting the practice of law of the undersigned in all matters arising in any bankruptcy case.").

[67] Hr'g Tr. 103:3-5.

[68] Hr'g Tr. 153:13-154:25.

In this case and in previous bankruptcy cases in which Mr. Bevan has cast votes for his clients, he votes in a block.  Mr. Bevan either accepts or rejects the plan on behalf of all of his clients; he has never split a vote.[69]  In voting in this fashion, he does what he believes is best for his clients as a whole.[70]  In other words, Bevan & Associates does not make an individual assessment of how to vote each client; rather Mr. Bevan treats his clients "as a group."[71]  Mr. Bevan is aware that a given plan may provide different treatment for his various clients, but he does not consider that to create a conflict situation.[72]  Rather, it is just a fact that some of his clients will be compensated under a given plan and some will not.[73]

It is likely that Bevan & Associates previously submitted claims on behalf of the majority of its 15,719 clients in other bankruptcy cases, including the Quigley, Garlock, ACandS and Sepco bankruptcy cases[74] and in the BASF class action litigation.[75]  Indeed, if Bevan & Associates were to submit a ballot in the Imerys case today, it is likely they would

---

[69]  Hr'g Tr. 104: 24-105:2.

[70]  Hr'g Tr. 104:24-105:2; 135:3-14.

[71]  Hr'g Tr. 133:14-20; 135:3-14. Hr'g Tr. 135:25–137:6.

> Q:  Okay, And just as you didn't make an individualized assessment for – on behalf of each of your clients to withdraw the master ballot, you did not make an individualized assessment on behalf of each of your clients to vote affirmatively, correct?
> A:  I – you know --, and I'm not sure how to characterize the individual assessment. Again, I – I assessed my clients' claims as a whole, because there is so much similarity in their claims as a whole, that I decided what's best for them as a whole.  Do I – did I go through each individual, with (indiscernable) a yes/no?  It doesn't really work that way in a – in our business.

[72]  Hr'g Tr. 155:1-14.

[73]  Hr'g Tr. 155:1-156:13.

[74]  Hr'g Tr. 117:6-119:4.

[75]  Hr'g Tr. 158:23-160:1.

vote for more than 15,719 clients as they have since taken on more clients. If the balloting deadline had been a year prior to the Voting Deadline it would have submitted fewer votes. In Mr. Bevan's words – "it's a moving target."[76]

Based on his in-take process and the characterization of Debtors' products as "ubiquitous," Mr. Bevan believes it is "likely" that all of his clients were exposed to Debtors' talc.[77] Bevan & Associates' in-take process included a question regarding exposure to talc,[78] but there was never a specific question directed to exposure to an Imerys talc product.[79] Bevan & Associates' intake process asks more general questions regarding exposures, work experience and disease diagnosis.[80] In submitting the Master Ballot, Bevan & Associates did not parse through its database to determine which of its clients were likely exposed to Debtors' product (or any talc product) and which were not.[81] Rather, Mr. Bevan "believes" that "it is likely" his clients have such claims.[82]

Approximately 400 of Bevan & Associates' clients suffer from mesothelioma with the remainder suffering from some other form of cancer.[83] None of its clients have been

---

[76] Hr'g Tr. 149:4-14.

[77] Hr'g Tr. 147:16-148:6; 160:14-21; *see also* Hr'g Tr. 48:6-15.

[78] Hr'g Tr. 163:9-15.

[79] Hr'g Tr: 60:4-18.

[80] Hr'g Tr. 162:14-25.

[81] Hr'g Tr. 145:22-146:7.

[82] Hr'g Tr. 59:22-25; 148:12-149:3; 145:22-146:7.

[83] Hr'g Tr. 56:2-11.

diagnosed with ovarian cancer.[84] Nor were any of its clients employed by Debtors.[85] Mr.

Bevan was aware when voting on the Plan that the Imerys Plan and proposed Trust

Distribution Procedures provide recoveries only for claimants diagnosed with mesothelioma

or ovarian cancer.[86] He was aware when voting on the Plan that approximately 15,319 of

his clients were currently ineligible for a recovery under the Trust Distribution Procedures.[87]

And, Mr. Bevan did not ask any individual client how he/she wanted to vote his/her claim.

Rather, as Mr. Bevan testified:

> THE WITNESS:    We do not ask our clients what they want us to do in any
> voting situation, because our clients have no expertise in this particular area.  And
> they, you know, it – it would be a exercise in futility, I guess I would call it, to – to
> ask each one of my clients what they want to do, when that, particularly as you've
> said, is why they've hired us.
>
> BY MR. TSEKERIDES:
>
> Q:    Okay.  Do you think it takes expertise to know you're not getting any money
> under a plan?
>
> A:    I think it takes expertise to understand the full plan, and why they wouldn't
> get any money in that particular case.[88]

*Discussion*

Were I to mechanically apply the general principles to the Bevan & Associates Rule

3018 Motion, I would likely grant it.  Mr. Bevan testified that he initially voted on behalf of

---

[84] Hr'g Tr. 54:25-55:23.  More accurately, Bevan & Associates is not pursuing ovarian cancer claims
against Imerys on behalf of any of its clients.

[85] Hr'g Tr. 62:7-9.

[86] Hr'g Tr. 56:12-15.

[87] Hr'g Tr. 51:4-9; 56:12-24.

[88] Hr'g Tr. 100:4-15.

his clients to reject the Plan because he believed a vote in support of the Plan could negatively impact his vote in the related, but separate, Cyprus Mines bankruptcy case. Mr. Bevan's reading of the Plan is incorrect as a vote for the Imerys Plan does not preclude a vote against any Cyprus Mines plan. As changing a vote after receiving corrected information falls squarely within the "human error" category (i.e. a misreading of the Plan), this counsels in favor of permitting the vote change.

So, too, I would likely reject the many reasons proffered by Arnold & Itkin and J&J for denying the motion. For example, I do not accept the argument that Mr. Bevan's reason for changing the vote is not genuine. The contemporaneous documentary evidence verifies his concern over the relatedness of the vote between the Imerys and Cyprus Mines plans. While it may be true that a person concerned more about recoveries against Cyprus Mines might vote to reject the Imerys Plan and that the clarification sent by Ms. Ramsey is not precisely accurate,[89] the correctness of Mr. Bevan's assessment based on his communications is not an issue in a Rule 3018 context. Relatedly, it may also be true that it is logical for a claimant who receives nothing under the Plan, at least currently, to vote to reject the plan. Once, again, however, a determination of what is in the best interest of a particular creditor is left up to that creditor in most instances. Finally, the evidence is clear that Bevan & Associates was not offered anything to change its clients' votes. While perhaps Mr. Bevan was trying to curry some favor with other members of the plaintiff's bar,

---

[89] A vote in favor of the Imerys Plan is, in essence, a vote in favor of the Imerys settlement with Cyprus Mines at least in the context of the Imerys Plan.

that, too, is not necessarily a reason to prohibit a vote change given the documented explanation.[90]

But, there are more fundamental issues at play here: the evidence raises significant questions as to whether any of Bevan & Associates' clients have a claim against any Debtor. What is crystal clear is that: (i) Bevan & Associates has a database of clients built up over the past thirty years, (ii) prior to voting, Bevan & Associates performed zero diligence to discern which of its clients, if any, had been exposed to talc, much less to Debtors' talc and (iii) Bevan & Associates submitted its Master Ballot without regard to whether any of its 15,713 clients had a Talc Personal Injury Claim as required to vote on the Plan. In other words, Bevan & Associates simply printed out a list of its clients in excel spreadsheet format and slapped it behind a Master Ballot.

Master Ballots seem to be commonplace in mass tort bankruptcies.[91] At Debtors' request, and without objection by any party-in-interest, as part of the Solicitation Procedures

---

[90] Two groups of insurers also objected to the Motion. The Cyprus Excess Insurers would have me deny the motion because of asserted conflicts among Bevan & Associates' clients. The Cyprus Excess Insurers contend that there is an inherent conflict between those claimants who will receive a distribution under the Trust Distribution Procedures and those who will not. To rule on this ground would require an exploration of the attorney-client relationships between Bevan & Associates and its clients, the various professional rules of responsibility in the states in which Bevan & Associates practices and the application of those rules to each of its clients and, perhaps, to mass tort representations, generally. I find the conflict-of-interest allegations concerning, but I hesitate to address them when it is not necessary to do so to decide what is before me and without the benefit of a complete factual record and legal briefing. The Certain Insurers argue by analogy to § 1126(g) of the Bankruptcy Code that claimants who receive nothing under a plan are deemed to reject the Plan and so Bevan & Associates' 15,319 clients who will not currently receive anything under the Plan should not be able to vote in favor of it. The Future Claimants' Representative does not challenge this argument directly, but instead argues that eligibility to vote is based on whether a claimant has a claim that will be "addressed" by the trust not on whether a claim "satisfies the presumptive validity" under trust distribution procedures. Limited Response to (A) the 3018 Objections and (B) Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Motion to Designate, D.I. 4080. These two positions raise a host of intellectually challenging issues that may also have very practical consequences in mass tort cases. I need not decide them either in order to determine this motion.

[91] I do not comment on whether Master Ballots should be commonplace.

I approved the use of a Master Ballot. Simultaneously, and again without objection, I temporarily allowed the claims of Direct Talc Personal Injury Claims (which are unliquidated and disputed claims) at $1.00 for voting purposes. The result was that law firms submitted at least eighty-five Master Ballots.[92] In order for Master Ballots to work, great trust is placed in the plaintiff's bar.[93] With respect to Bevan & Associates, the evidence shows that such trust was not well-placed. It is true that Direct Talc Personal Injury Claims will be channeled to a trust for liquidation, but a lawyer filing a Master Ballot still has the obligation to ensure that he only votes on behalf of clients who have a claim against Debtors. Indeed, embedded in the defined term is the requirement that a person must have been exposed to Debtors' talc. And, in signing the Master Ballot, the attorney certifies that each client he votes for has a Direct Talc Personal Injury Claim.[94]

Debtors argue that I should focus on the Rule 3018 standard and grant the motion because there was no improper motive underlying the vote change. In essence, Debtors' argument is that I should ignore the evidence regarding the questionable nature of the Bevan & Associates Master Ballot and just grant the motion. This thinking is misguided. While no case cited for the Rule 3018 standard appears to include a requirement that the

---

[92] The actual number of Master Ballots submitted does not appear to be in the evidence submitted. This number was based on a review of information in the Supplemental Declaration.

[93] In this case, Debtors did not request a bar date for holders of Direct Talc Personal Injury Claims, thus the Master Ballots and any Rule 2019 statements are the only opportunity for parties in interest to review the basis for any Direct Talc Personal Injury Claims.

[94] Ex. 86 ("[e]ach holder of a Direct Talc Personal Injury Claim listed on the Exhibit accompanying this Master Ballot, as of the Voting Deadline, has a Direct Talc Personal Injury Claim in Class 4.").

underlying claim be valid, that is hardly surprising. Application of Rule 3018 presupposes that the vote movant seeks to change is supported by a valid claim against the debtor.[95]

Debtors also argue that the issue of how to handle the Bevan & Associates Master Ballot should be reserved for confirmation. Upon questioning, however, counsel candidly admitted that the same arguments would be raised at that time. Delaying decision on a motion is sometimes attractive, but it is not appropriate here. This issue has been pending for several months, parties-in-interest engaged in discovery and a full evidentiary hearing was held. The immediacy of the confirmation hearing counsels in favor of, not against, resolution. Given the magnitude of its vote, all parties-in-interest need to know the outcome of the Bevan & Associates Rule 3018 Motion. While Debtors are free to address additional voting issues, as appropriate, if they choose,[96] this matter is ripe for decision.

Given the evidence, the only fair result is to use my discretion to exclude any vote by Bevan & Associates. I will not permit Bevan & Associates to change its votes and accept the Plan, but neither will I permit its Master Ballot to be counted as votes to reject the Plan. The Master Ballot will be considered withdrawn. While I do not make this move lightly, in ruling on this request, I cannot—and will not—ignore how the Master Ballot was generated.

Finally, before concluding my discussion on this motion, I feel compelled to observe my disagreement with Mr. Bevan's apparent strongly-held belief that that his clients cannot make a decision in their best interest when it comes to voting on a plan. I agree that plans

---

[95] If proofs of claim are filed, then assuming no objections, holders of those claims are entitled to vote on a plan. 11 U.S.C. § 1126(a). If an objection to a proof of claim is filed and the creditor wants to vote, it needs to file a motion to have its claim estimated for voting purposes. Fed. R. Bankr. P. 3018 (a).

[96] Debtors suggested at argument that it may be appropriate to review Master Ballots filed by other plaintiff firms. Whether or not that is appropriate, it does not change the outcome here.

of reorganization, including the Imerys Plan, are complicated documents. But, it is counsel's job to make the plan understandable and (if counsel is not empowered to vote for the client) to provide advice on whether to accept or reject the plan. This is the second time this year in a mass tort case that counsel has suggested that these types of cases are too complicated for individuals to comprehend. To paraphrase my previous response: "I don't buy it."[97]

### B. The Williams Hart Rule 3018 Motion is Granted.

On August 12, 2021, Williams Hart filed its Rule 3018 Motion. By its motion, Williams Hart seeks to change the votes of its 493 clients from votes to reject the Plan to votes to accept the Plan.

**Findings of Fact**

Mr. Boundas is a named partner in Williams Hart.[98] The firm represents 493 clients suffering from ovarian cancer, which are listed in the firm's Rule 2019 Statement.[99] During

---

[97] *In re Cyprus Mines Corporation, Case No. 21-10398 (LSS),* United States Bankruptcy Court, District of Delaware, May 17, 2021, Bench Ruling on Motion of the Kazan McClain Firm Personal Injury Plaintiffs for Modification of the Tort Claimants Committee or for Appointment of Tort Claimants Conflicts Committee, D.I. 302. ("Why this 'committee by proxy' universe has evolved, I can only guess. And, I won't speculate here.. But, it was suggested at argument it is because these are complex cases and the claimants have to rely on their individual counsel for bankruptcy experience. Mass tort cases are certainly unique and undoubtedly present complex and complicated issues. But, from the perspective of committee member participation, mass tort cases are no more or less complex than any other type of bankruptcy case. And, they are no more or less complex than patent infringement cases, medical malpractice cases or even the underlying asbestos cases in which individuals serve as jurors every day in this country and make decisions unaided by counsel in the jury room. Bottom line: I simply don't buy that argument. More importantly, individuals serving on committees bring valuable real life/non-legal perspectives (whether business or personal) to committee deliberations and how a case should proceed.").

[98] Hr'g Tr. 165:5-7.

[99] Ex. 9.

an interview and vetting process, Williams Hart confirms both exposure to talc products and a diagnosis of ovarian cancer.[100]

Williams Hart followed the bankruptcy case since its inception.[101] Through its own counsel, Williams Hart filed an objection to the approval of the disclosure statement raising two main objections. Williams Hart believes that Debtors may have a large indemnification claim against J&J, but Williams Hart does not see anything in the Plan or Trust Distribution Procedures that requires that claim to be vigorously pursued.[102] Williams Hart also questions the justification for the 40/40/20 split of the Imerys Trust Assets.[103] In addition to filing the disclosure statement objection, Mr. Boundas was in contact with other plaintiffs' firms (including Arnold & Itkin) regarding issues raised by the Plan and attended a zoom call in February 2021 with other plaintiff firms and counsel for the TCC.[104]

In the days leading up to the Voting Deadline, Mr. Boundas was in discussions regarding possible resolutions.[105] As the Voting Deadline approached with no firm agreement, Mr. Boundas reached out to Mr. Baron. On March 25, Mr. Boundas and Mr. Baron exchanged emails regarding possible resolutions, but Williams Hart's objections were not resolved by the 4:00 p.m. (eastern) deadline to submit ballots.[106] Accordingly, out of an

---

[100] Hr'g Tr. 167:11-20; *see also* Ex. 9 (Exemplar Power of Attorney and Employment Agreement: Talcum Powder Cancer Claim).

[101] Hr'g Tr. 168:3-8.

[102] Hr'g Tr. 168:9-23; 179:19-180:24.

[103] Hr'g Tr. 168:24-170:2;182:1-183:4.

[104] Hr'g Tr. 170:16-171:5.

[105] Hr'g Tr. 171:10-172:4.

[106] Hr'g Tr. 171:10-172:19.

"abundance of caution" at 3:59 p.m. Williams Hart emailed to Prime Clerk a Master Ballot voting each of its clients' claims to reject the Plan.[107]  At the same time, however, Debtors granted Williams Hart and four other firms an extension of the Voting Deadline to noon (eastern) the following day.[108]

Later in the day of March 25, Mr. Boundas and Mr. Baron reached an agreement after exchanging terms multiple times.  The final agreement, which was memorialized in an email, is as follows:

1. Vote on plan passes.

2. WH votes yes, withdraws all objections; contacts other objectors to discuss voting yes as well or changing votes if possible.

3. Indemnity claim will be pursued against J&J (no drafting changes in plan).

4. WH firm on TAC, and as a TAC member will be involved in indemnity matters to the extent the TAC is involved.

5. Trustees need (i) TAC consent* and (ii) court approval to settle claims.

6. Approval of indemnity settlement requires 66% of TAC members to approve.

7. WH reserves the right to object to court approval of any settlement on any grounds (including the division of funds among claimants) in their individual capacities.

*Note, if TAC doesn't consent, Trustee reserves the right to go to court to get approval over TAC objection. [109]

---

[107]  Ex. 49; Hr'g Tr. 173:8-22.

[108]  Ex. 48; Hr'g Tr. 176:4-25.  The other four firms were Aylstock Witkin, Trammell Law, Linville Johnson and Fears, Nachawati.  While these firms did not request an extension, Mr. Boundas was speaking with representatives of these firms and passed their names along to Mr. Baron.

[109]  Ex. 47.

Mr. Boundas believes that while not ideal, this agreement sufficiently addresses Williams Hart's two primary objections to the Plan.[110]  Further, he views the reservation of rights in item number 6 to apply to all claimants, not just Williams Hart.[111]  As for a position on the TAC (Trust Advisory Committee), Mr. Boundas believes that having a seat at the table is favorable for his clients and gives further voice to claimants suffering from ovarian cancer claimants.  But, he was not overly enthusiastic about this position.[112]

Mr. Boundas took several actions based on this agreement.  As promised, he reached out to the four firms for whom he got an extension.[113]  And, on March 26 at 11:10 a.m. he submitted a new Master Ballot to Prime Clerk voting all of his clients claims to accept the Plan.[114]

### Discussion

J&J is the primary objector to Williams Hart's request to change its vote.  J&J argues that Williams Hart has not met its burden to show cause for the vote change for two main reasons.  J&J contends that the change of vote is tainted because granting Williams Hart a seat on the TAC is providing something of value that is prohibited.  J&J posits that while it might have been appropriate to provide ovarian cancer claimants with another seat on the

---

[110]  Ex. 90 (Aug. 12, 2021 Dep. of John Theodore Boundas 91:8-17, Dkt. No. 4061-2).

[111]  Hr'g Tr. 185-86.

[112]  Boundas Dep. 91:22-94:3.

[113]  Hr'g Tr. 179:10-18.

[114]  Ex. 50.

TAC, offering it to Williams Hart was simply vote buying. J&J also argues that the reservation of rights on the 40/40/20 split is undisclosed and, perhaps, illusory.[115]

Having listened carefully to Mr. Boundas' testimony and read his deposition, I find cause exists to permit Williams Hart to change the vote of its clients. Mr. Boundas was entirely credible and straight forward in his answers to questions in both settings. Williams Hart expressed valid concerns with respect to the Plan and engaged in negotiations to see if a resolution could be reached. Ultimately, Williams Hart accepted a deal, not a perfect deal, but an agreement that was good enough to convince it to support the Plan. Williams Hart then changed its vote.

The two issues raised by J&J do merit consideration, but I am unconvinced that they require me to deny the motion. First, the evidence does not suggest that the seat on the TAC drove the negotiations; indeed, there is no evidence that Mr. Boundas initially made this demand. The only testimony on this front is that the seat on the TAC was the "least appealing" part of the agreement, but was part of advocating for pursuit of the indemnity claim against J&J.[116] In different circumstances, a seat on a governance board may constitute an improper motivation or "extra consideration" for a vote change. In the circumstances here, however, I do not find it to be outside of the bounds of proper negotiation to come to a consensual resolution of significant objections to a plan. Further, any objections to the make-up of the TAC (including the participation by Williams Hart) can be raised at confirmation.

---

[115] Arnold & Itkin filed a limited objection seeking only to ensure that point 7 in the settlement agreement reached between Williams Hart and the TCC would apply to all parties-in-interest.

[116] It is not lost on me that J&J is the only party objecting to Williams Harts' inclusion on the TAC.

As for the reservation of rights to revisit the 40/40/20 split in the future, to the extent it was not disclosed I do not attribute that to Williams Hart. Williams Hart is not a plan proponent and has no responsibility to amend the Plan or the Trust Distribution Procedures, if amendment is necessary. Further, the 40/40/20 split and any reservation of rights is a confirmation issue. As discussed on the record, I am skeptical that this split of Imerys Trust Assets can be revisited if there is a recovery against or settlement with J&J at some point in the future. The 40/40/20 split has been the subject of much discussion in the case and will no doubt be addressed at confirmation. In any event, that this aspect of the agreement may be illusory or that Williams Hart's clients may not receive the benefit of this aspect of the bargain is not a basis to deny Williams Hart the ability to change its votes.

Williams Hart has met its burden of proof. The Williams Hart Rule 3018 Motion is granted.

## III. The Motion to Designate is Denied.

J&J filed the Motion to Designate on September 3, 2021. By the Motion, J&J asks me to designate the votes of each of Bevan & Associates, Trammel and Williams Hart if any of them are permitted to change their votes. Given the resolution of the Motion to Disregard and the Bevan & Associate Rule 2019 Motion, the Motion to Designate is moot as to them. It remains pending as to Williams Hart.[117]

Of this seventy-one page speaking motion, approximately seven pages are devoted to Williams Hart's change of votes. Once again, J&J contends the sanctionable behavior is that Williams Hart improperly received a seat on the TAC and that the agreement reached

---

[117] The Findings of Fact on the Williams Hart 3018 Motion are incorporated herein by reference.

is arguably inconsistent with the Plan. J&J argues Williams Hart received an "unfair advantage" not available to other creditors.

Section 1126(e) provides that the court "may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."[118] Section 1126(e) is permissive, not mandatory, and is within the discretion of the court.[119] Designating a vote is a "drastic remedy" and the burden on the movant is a heavy one.[120]

A review of the authorities J&J cites directed to Williams Hart show that the conduct at issue here is not close to the conduct that would lead to designation of Williams Hart's votes. For example, the *Dune Deck* Court explains:

> Over the years, Courts have developed several badges of bad faith which may justify disqualification. They include creditor votes designed to (1) assume control of the debtor, (2) put the debtor out of business or otherwise gain a competitive advantage, (3) destroy the debtor out of pure malice or (4) obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize.[121]

---

[118] 11 U.S.C. § 1126(e).

[119] *In re Adelphia Communications Corp.*, 359 B.R. 54, 60 (Bankr. S.D.N.Y. 2006).

[120] *Id.* at 61.

[121] *In re Dune Deck Owners Corp.*, 175 B.R. 839, 844 (interior citations omitted) (Bankr. S.D.N.Y. 1995). *See also* 7 Collier on Bankruptcy ¶ 1126.06 [2] (interior citations omitted) (16th ed. 2021):

The party seeking to designate a claim under section 1126(e) bears a heavy burden. Courts generally reserve designation for situations in which the evidence demonstrates an improper purpose or ulterior motive on the part of the voting creditor. For example, a creditor's vote may be designated in the following instances:

- a competitor purchases a blocking position in a class of claims after a plan is proposed in order to control the bankruptcy process to pursue a strategic transaction with the debtor rather than maximize its return on its claim;
- a vote to block a reorganization plan in order to acquire the debtor company for one's self;
- the purchaser and potential voter of an impaired claim is a co-proponent of the plan and would become the general partner of the debtor upon confirmation;

34

These examples evidence some type of obstructive behavior or behavior inconsistent with the creditor's interest *qua* creditor.   The negotiation between Williams Hart and the TCC is not the type of destructive or controlling behavior that designation is designed to remedy. The agreement reached does not enable Williams Hart to control Debtors (or even the TAC), put Debtors out of business or prevent confirmation.

The decision in *Adelphia* is instructive.   There, the court refused to designate the votes of creditors even though their conduct was considered "overly aggressive and/or stepped over the line."   That conduct included extracting special consideration in the way of releases, exculpation and fee awards not provided to others in their class.   The court concluded that if complaints regarding such conduct were appropriate, they could be addressed at confirmation, but conduct furthering one's self-interest as a creditor is not sanctionable by designation.

I agree with the *Adelphia* court and once again conclude that the agreement reached with Williams Hart can be addressed at confirmation, if appropriate.   Any "unfair advantage" Williams Hart received furthered the interests of its clients in maximizing their recoveries from the Trust.   Even assuming such conduct was "over the line," it does not warrant the drastic remedy of disqualifying votes.

---

- the purchase of claims by an affiliate or an insider of the debtor for the sole purpose of blocking the confirmation of a competing plan;
- a vote to accept a plan motivated by financial incentives provided under a separate settlement agreement;
- a vote motivated by considerations not consistent with protecting the creditor's self-interest;
- a creditor's purposeful destruction of a debtor's business.

35

J&J has not carried its burden of proof.  The Motion to Delegate as to Williams Hart is denied.

**Conclusion**

Separate orders will be issued on each motion consistent with the above.

Dated: October 13, 2021

Laurie Selber Silverstein
United States Bankruptcy Judge