<pre>
 1                  UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA AND     .
     DELAWARE BSA, LLC,            .  (Jointly Administered)
 5                                 .
                  Debtors.         .
 6                                 .
     . . . . . . . . . . . . . . . .
 7                                 .  Adversary Proceeding No.
     BOY SCOUTS OF AMERICA,        .  20-50527 (LSS)
 8                                 .
                  Plaintiff,       .
 9                                 .
        v.                         .
10                                 .
     A.A., et al.,                 .  Courtroom 2
11                                 .  824 Market Street
                  Defendants.      .  Wilmington, Delaware 19801
12                                 .
                                   .  Wednesday, November 10, 2021
13   . . . . . . . . . . . . . . .    10:05 a.m.

14

15                  TRANSCRIPT OF ZOOM HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
16              CHIEF UNITED STATES BANKRUPTCY JUDGE

17

18

19

20   Electronically
     Recorded By:            Brandon J. McCarthy, ECRO
21
     Transcription Service:  Reliable
22                           1007 N. Orange Street
                             Wilmington, Delaware 19801
23                           Telephone: (302) 654-8080
                             E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
</pre>

1   APPEARANCES:

2   For the Debtors:              Derek Abbott, Esquire
                                  MORRIS, NICHOLS, ARSHT & TUNNELL LLP
3                                 1201 North Market Street
                                  16th Floor
4                                 Wilmington, Delaware 19899

5                                 - and -

6                                 Glenn M. Kurtz, Esquire
                                  Jessica C. Lauria, Esquire
7                                 WHITE & CASE LLP
                                  1221 Avenue of the Americas
8                                 New York, New York 10020

9                                 Matthew E. Linder, Esquire
                                  111 South Wacker Drive
10                                Suite 5100
                                  Chicago, Illinois 60606
11
                                  -and-
12
                                  Adrian C. Azer, Esquire
13                                HAYNES AND BOONE, LLP
                                  800 17th Street, NW
14                                Suite 500
                                  Washington, DC 20006
15
    For the Coalition of
16  Abused Scouts for
    Justice:                     David J. Molton, Esquire
17                                D. Cameron Moxley, Esquire
                                  BROWN RUDNICK, LLP
18                                Seven Times Square
                                  New York, New York 10036
19

20  For Hartford Accident
    and Indemnity Company:       Philip D. Anker, Esquire
21                                WILMER CUTLER PICKERING HALE
                                     and DORR, LLP
22                                7 World Trade Center
                                  250 Greenwich Street
23                                New York, New York 10007

24

25

1  APPEARANCES (CONTINUED):

2  For Century Indemnity
   Company:                    Tancred Schiavoni, Esquire
3                              O'MELVENY & MYERS, LLP
                               Times Square Tower
4                              7 Times Square
                               New York, New York 10036
5

6  For American Zurich
   Insurance Company:          Mark D. Plevin, Esquire
7                              CROWELL & MORING, LLP
                               Three Embarcadero Center
8                              26th Floor
                               San Francisco, California 94111
9

10 For the Future
   Claimants'
11 Representative:             Edwin J. Harron, Esquire
                               YOUNG CONAWAY STARGATT & TAYLOR, LLP
12                             The Brandywine Building
                               1000 West Street
13                             17th Floor
                               Wilmington, Delaware 19899
14
                               -and-
15
                               Emily P. Grim, Esquire
16                             GILBERT, LLP
                               1100 New York Avenue
17                             Suite 700
                               Washington, DC 20005
18

19 For the Tort
   Claimants' Committee:       James I. Stang, Esquire
20                             PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Boulevard
21                             11th Floor
                               Los Angeles, California 90067
22

   For Marc J. Bern &
23 Partners, LLC:              William D. Sullivan, Esquire
                               SULLIVAN HAZELTINE ALLINSON, LLC
24                             919 North Market Street
                               Suite 420
25                             Wilmington, Delaware 19801

1    <u>APPEARANCES (CONTINUED)</u>:

2    For Eisenberg,
     Rothweiler, Winkler,
3    Eisenberg & Jeck, P.C.:    Daniel K. Hogan, Esquire
                                HOGAN MCDANIEL
4                              1311 Delaware Avenue
                                Wilmington, Delaware 19806
5

6    For National Surety
     Corporation:               Harris B. Winsberg, Esquire
7                              TROUTMAN SANDERS, LLP
                                600 Peachtree Street, NE
8                              Suite 3000
                                Atlanta, Georgia 30308
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               INDEX

2   MOTIONS:                                                    PAGE

3   Agenda
    Item 3:   Motion of Marc J. Bern & Partners LLC to Quash    94
4             Subpoena to Produce Documents Issued to KLS
              Legal Solutions LLC
5             (D.I. 6380, filed 9/27/21)

6             Court's Ruling:                                   96

7   Agenda
    Item 4:   The Allianz Insurers' Motion for Relief from      57
8             the Automatic Stay
              (D.I. 6623, filed 10/14/21)
9
              Court's Ruling:                                   85
10
    Agenda
11  Item 5:   Debtors' Motion for Entry of an Order Modifying   85
              the Automatic Stay on a Limited Basis Solely to
12            the Extent Necessary to Facilitate Local Council
              Settlement Contributions to the Settlement Trust
13            Under the Plan
              (D.I. 6749, filed 10/20/21)
14
              Court's Ruling:                                   92
15
    Agenda
16  Item 6:   Letter to the Honorable Chief Judge Laurie        96
              Selber Silverstein Seeking an Order Compelling
17            Verus LLC to Comply with a Subpoena
              (D.I. 6813, filed 10/27/21)
18
    Agenda
19  Item 7:   [SEALED] Letter to the Honorable Chief Judge      93
              Laurie Selber Silverstein from Adrian Azer and
20            Derek C. Abbott to Respectfully Request the
              Court Compel Certain of the Debtors' Insurers
21            to Produce Documents (D.I. 6953, filed 11/03/21)

22

23

24

25

1                           EXHIBITS

2   EXHIBIT NO.:                                    PAGE

3   1) Declaration of Todd C. Jacobs               58

4   2) Declaration of Katie Nownes-Whitaker        92

5   Transcriptionist's Certificate                 98

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 10:08 a.m.)

2          THE COURT:  Good morning.  This is Judge

3  Silverstein.  We're here in the Boy Scouts of America

4  bankruptcy, Case 20-10343.

5          I will turn this over to debtors' counsel, Mr.

6  Abbott.

7          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

8  of Morris Nichols here for the debtors in these cases.

9          Your Honor, I am just going to turn the podium

10  right over to Ms. Lauria for a quick update on recent

11  happenings in the case, Your Honor.

12          THE COURT:  Ms. Lauria.

13          MS. LAURIA:  Thank you, Your Honor.  Jessica

14  Lauria, White & Case, on behalf of the debtors.

15          As Your Honor is aware, I like to start these

16  hearings with a status update for the court.  And typically

17  those status updates have focused on positive developments in

18  the case and, indeed, we do have some positive developments

19  to inform the court of.

20          The mediation has continued including in-person

21  mediation.  There have been a very important breakthrough in

22  that mediation; although, it's not quite ready for prime

23  time.  And as I understand it, the mediators do intend to

24  host additional mediation, in-person mediation sessions, next

25  week.

1          Unfortunately, Your Honor, today, my remarks are

2   going to focus on a negative development in the case, one

3   that we think is potentially disastrous, although we're

4   trying to get our arms around it, and an egregious

5   solicitation violation.  The debtors, last night, filed a

6   motion on an emergency basis, Your Honor may have seen it, at

7   Docket 7118.  We didn't schedule it for today; although, if

8   you want us to argue it today I am certainly prepared to do

9   so, but we have asked for a hearing within the next week,

10  Your Honor.

11          Without going through the papers, and the details

12  are fully laid out there, I do want to give some context for

13  why we are seeking emergency relief.

14          In short, over the weekend, the official tort

15  claimants committee, utilizing an official email address that

16  they had setup for communications with the survivor

17  constituencies, sent an email and a letter that was

18  purportedly authored by Mr. Timothy Kosnoff.  We believe that

19  that email and letter was sent from the official email

20  address to approximately 20,000 claimants and their state

21  court counsel.

22          This letter that was sent out under the official

23  TCC email address was consistent, frankly, with other emails

24  that this court has seen from Mr. Kosnoff and other tweets

25  that have been put in front of this court.  It contained

1  derogatory and, I would actually call it, a defamatory

2  statement about another state court law firm, as well as

3  false and misleading statements about the plan itself.  That

4  email also directed the survivors to visit -- and, again,

5  this was the email from the TCC on their official email

6  handle, directed survivors to Mr. Kosnoff's twitter feed.

7          I think you mentioned at one point in the past,

8  Your Honor, you don't look at twitter.  I don't either, but

9  as we understand it thousands of survivors do look at twitter

10  and it is that twitter feed that contains derogatory remarks

11  about myself, Mr. Schiavoni, other state court lawyers

12  involved in this case, the court itself.  It has at least one

13  or more personal photographs of peoples' families that are

14  involved in this case.  There is a photograph of, at least,

15  one individual as they were on a zoom hearing, Your Honor,

16  before this court which I know taking photographs of Federal

17  Bankruptcy Court proceedings, at least in the District of

18  Delaware, is a violation of this court's rules.

19          So the endorsement of this twitter feed by,

20  frankly, the TCC and through its official email it's

21  mindboggling, Your Honor, but we want to try to repair the

22  damage that was done and try to get our arms around it.

23          Omni has received calls expressing confusion from

24  individuals that were represented by other counsel wondering

25  why they received a law firm communication from Mr. Kosnoff.

1  I think you will hear from Mr. Molton that his -- that the

2  state court counsel that the coalition is in touch with have

3  received, I think, dozens, if not at this point, hundreds of

4  calls.  I did see a letter already before the court from a

5  survivor calling out this email. I think the survivor -- and

6  by the way, this survivor, as I read the letter, is not

7  necessarily a plan supporter, but I think is, sort of, saying

8  what the heck is going on here.

9          We want to try to, at least, start remediating

10  some of the damage that was done. I think only the discovery

11  and time is going to tell us what that is and we have served

12  discovery on the TCC and Mr. Kosnoff, but the TCC is holding

13  a very powerful, what I have always thought of as a tool and

14  it was used as a weapon this weekend.  You know, we believe

15  that we need some emergency relief from the court and an

16  emergency hearing.

17          I think you will probably hear some explanations

18  from the Pachulski Firm as to how this might have happened.

19  From the debtors' perspective the official committee should

20  not be sending communications on behalf of a particular state

21  court lawyer that contained particular communications.  That

22  state court lawyer knows how to communicate with its own

23  clients.  Utilizing the official tort claimants' committee

24  email was putting a stamp of officialness on that email.  It

25  would be tantamount to us utilizing the Omni official court

1  website to post letters that had not been authorized by this

2  court and Your Honor.

3      I understand that maybe, at least, they're telling us

4  they didn't intend to send it to 20,000 people, but when you

5  have a broad base tool like that not enough care can be

6  invested in how that is used.  So we have filed a motion for

7  an emergency hearing, Your Honor.  We would ask that that

8  motion be heard at some point. I think we asked within the

9  next week, a week from the filing of a motion yesterday.

10      I should note, Your Honor, that this is not an

11  attempt to curtail the committee's solicitation activities.

12  The committee has had, as I understand it, five town hall

13  meetings, five press releases; all encouraging folks to vote

14  against the plan.  Your Honor, we have had one first

15  amendment argument in front of you about, I think, 14 or 15

16  months ago.  We are very well aware of the court's views on

17  the first amendment.

18      We are also very well aware of the Third Circuit's

19  views in the Century Glove opinion.  But this, Your Honor,

20  was just beyond the pale and we needed to bring it to the

21  court's attention, and we needed some relief.  We had asked

22  for the relief in our motion from the committee in a letter

23  exactly as it is in the motion and it was denied.  We are

24  happy to keep working with them, but we believe we need some

25  relief.

1     I think Mr. Molton may have wanted to express a

2  few words about this as well.  Thank you, Your Honor.

3     THE COURT:  Thank you.

4     Mr. Molton.

5     MR. MOLTON:  Judge, can you hear me?

6     THE COURT:  I can.

7     MR. MOLTON:  Good morning.  Judge, I was -- during

8  our last hearing I noted that this case, in many ways, was

9  *sui generis* in terms of its challenge.  Little did I know

10  what was coming down the line.  I just want to say never in

11  all the years I've been doing this, which in the context of

12  tort cases in bankruptcy is about 20 years, have I seen an

13  official committee of creditors deliberately offer up and

14  turn over to a single lawyer that committee's official

15  communications platform, here it is an email platform, to

16  deliver to creditors, here the survivors, survivors who are

17  represented by other counsel to whom the committee owes

18  fiduciary duties, inflammatory, defamatory, and misleading

19  communication.

20     All, number one, Judge, in the middle of voting.

21  All, Your Honor, with what any reasonable person reviewing

22  that delivery of the Kosnoff email, Mr. Kosnoff's email, by

23  the TCC email platform, any reader would have reasonably

24  concluded that that was an endorsement of, acceptance of by

25  the official committee of what was in those communications.

1  Again, all in the middle of voting which notwithstanding the

2  fact that this, from my perspective, Judge, and as set forth

3  in the papers filed yesterday night, is improper in

4  connection just with respect to the abuse in scouting clients

5  to whom -- with whom Mr. Kosnoff is a co-counsel along with

6  two other firms including a firm associated with the

7  coalition.  And you have seen Mr. Rothweiler in court

8  proceedings.

9        Nonetheless, with respect to, I think, a third of

10 the 20,000 people it went out to invade the attorney/client

11 relationship between non-AIS represented survivors and their

12 attorneys.  Again, all in the middle of voting.  And as Ms.

13 Lauria mentioned, Your Honor, all this notwithstanding the

14 fact that Mr. Kosnoff always had and has the ability to

15 communicate with his own clients -- indeed, as I read the

16 email exchanges that happened subsequent to our difficult

17 weekend it would seem to be that Mr. Kosnoff provided the TCC

18 with the names and the lists of his clients.  Again, all in

19 the middle of voting.

20        Judge, we don't know yet the full damage and

21 consequences of what, in essence, is an attack on the

22 integrity of this case and the plan -- and the court approved

23 plan approval and solicitation process that Your Honor

24 approved.  We do understand, Your Honor, that our coalition

25 law firms, the law firms associated with the coalition have

1 received numerous inquiries from clients about what happened

2 on Saturday continuing through the night; notwithstanding

3 that I repeatedly put in Ms. Lauria's papers tried to advise

4 the committee of what was going on all from Saturday

5 afternoon through late Saturday night.

6        Your Honor has in front of you Docket No. 7125

7 just filed last night which I think Ms. Lauria referred too,

8 but I wanted to give Your Honor the docket number.  That, you

9 know, sets forth a letter to Your Honor regarding this issue.

10 So we are still trying to understand the damage that was

11 done.  And we are also watching, Your Honor, how this is

12 impacting the voting.

13        We believe, like debtor, that discovery is needed.

14 One of the things is that if this was sent out merely, as the

15 TCC says, inadvertently and it was sent -- and their intent

16 was to send it out to AIS only clients maybe we wouldn't

17 heard of it yet, maybe it would have taken some time for us

18 to hear of because, among other things, I got the notice

19 based on -- I got the email based on the fact that I was on

20 the list serve.

21        We need to discovery whether this is the first

22 time this sort of thing has been done, whether it's been done

23 other times, and we have to understand also whether the

24 effort was inadvertent or not among other things.  Your

25 Honor, Ms. Lauria, in her motion to which we joined, has

1  reserved her right or has made forth suggestions as to

2  potential remedies. I think until we fully understand the

3  damage that this has caused, again, in the middle of voting,

4  we reserve the right for other remedies and some of them may

5  be designation of votes of no votes during a period of time

6  before remediation.  It may be an examiner, Your Honor.

7          I am going to conclude because this is not --

8  unless Your Honor wants argument and it's not really teed up

9  in front of Your Honor, but it's such an important issue that

10 really goes to the integrity of the process.  To conclude,

11 Judge, whether or not TCC's counsel and its members

12 individually desire or want to become Mr. Kosnoff's partner

13 is their choice.  That is their choice, but what is not their

14 choice, Your Honor, or in accord with their fiduciary duties

15 is to hand over to Mr. Kosnoff the official committee's

16 official communications platforms for his use period, over

17 and out.

18          Thank you, Judge.

19          THE COURT:  Thank you.

20          Mr. Harron.

21          MR. HARRON:  Good morning, Your Honor.  For the

22 record, Ed Harron on behalf of the future claimants

23 representative.  Thank you for hearing me.

24          We share the concerns expressed by Ms. Lauria and

25 Mr. Molton.  It is a very serious allegation at a very

1   pivotal time in the case.  We think it is a very unfortunate

2   development.  There needs to be more discovery because this

3   is evolving quickly and I don't think anyone on our side of

4   the table has all the facts.  We would just encourage the

5   court to consider seriously the debtor's request to have this

6   addressed on an expedited basis.  After we have developed the

7   facts determine what remedial measures may be appropriate.

8           Thank you.

9           THE COURT:  Thank you.

10          Mr. Stang.

11      (No verbal response)

12          THE COURT:  Mr. Stang, you're still muted.

13          MR. STANG:  I'm sorry, Your Honor.  The TCC does

14  not object to having the matter heard on shortened time.  The

15  TCC told the debtor that last night.

16          The TCC has reviewed the debtors -- I have

17  reviewed the debtors' order.  I have not had a chance to

18  review the motion.  Last night I sent an email to the debtor,

19  and the FCR, and the coalition representatives that were on

20  certain emails regarding this.  And we would like to resolve

21  this in a way so that the court's attention is focused on

22  other matters of urgency as well.

23          We have sent a letter to the debtor, I believe it

24  was copied to others, but it certainly wasn't intended to be

25  confidential so I am sure it was, explaining what happened

1  and we intend to answer the discovery.  Ms. Lauria, in one of

2  her letters, set a deadline for answering, at the time,

3  unspecified discovery, but it consists of interrogatories and

4  requests for production of documents. And because this deals

5  with, at least some of it deals with a fairly circumscribed

6  period of time, essentially this past weekend, we have every

7  intention of responding as quickly as possible.  And I mean

8  as quickly as possible.

9        So we will be open about what happened and our

10  explanation, if it's not satisfactory in the form of a

11  letter, will be answered in interrogatories and, frankly,

12  ongoing communications with the debtor.

13        As the parties have noted, this -- we have an

14  unprecedented solicitation campaign going on between the tort

15  claimants committee and those who oppose the plan, and the

16  coalition, and those who support the plan.  This backdrop

17  includes, in my experience, fairly sophisticated websites, we

18  have one, the coalition has one; weekly town hall meetings

19  previously to the last maybe month we were doing them

20  monthly.  Those town hall meetings were announced in using

21  our list serve.  The coalition has now weekly town hall

22  meetings, at least I believe they are weekly.  They are

23  certainly periodic. And it has even gotten to the point of

24  having, in effect, dueling YouTube videos.

25        This motion concerns one email that was written by

1   Mr. Kosnoff.  We had no participation in the writing of it.

2   It was signed by Mr. Kosnoff, though it's probably the

3   digital type signature, but we did transmit it.  It was

4   transmitted to a subset of the constituency.  It was sent to

5   a client list that Mr. Kosnoff had provided to us.  He

6   provided it to us some time ago, I think it was just after --

7   I'm not sure of the exact timing, but we had used it to send

8   out announcements of our town halls.  Then it was also sent

9   to, what I refer to as, the TCC list.

10          By the way, Mr. Kosnoff gave us written authority

11   to use the, what I will call, Kosnoff list which consists of

12   what he represented to be his clients where he was co-counsel

13   with other parties, but we have expressed written authority

14   from him to use it.

15          As to what I call the TCC list, it consists of,

16   obviously, coalition lawyers, because Mr. Molton said that he

17   received it, and has always had them on it for some

18   substantial period of time parties who are unrepresented

19   which we gartered from the proof of claim forms.  And also

20   individuals who over the last almost two years have contacted

21   us saying they want to be kept apprised of what was going on

22   in the case.  These are generalities, Your Honor.  I don't

23   know if we're going to get into discovery that explains each

24   and every person on what I call the TCC list, but those are

25   generally how the two lists fall out.

1          As Ms. Lauria or Mr. Molton acknowledged, the

2    debtors' motion raises significant first amendment issues

3    which you have heard about in the prior context of the

4    debtor's other first amendment motion 1102, 1103, and Century

5    Glove.

6          The motion, again, I have been told about it, I

7    haven't had a chance to read it myself, attempts to associate

8    the TCC with certain of Mr. Kosnoff's statements and actions.

9    We did not turn over the platform to Mr. Kosnoff.  He does

10   not have access to it, he doesn't have control of it.  This

11   was something that he submitted to us that we then

12   transmitted.

13         The -- Mr. Kosnoff's statements in this case,

14   which often appear through this twitter account, are things

15   that we simply do not ascribe to.  We don't ascribe to the

16   propriety of making comments about people's physical

17   appearance.  We don't ascribe to posting pictures of court

18   hearings.  In fact, until Ms. Lauria just said it, I wasn't

19   aware that his twitter account contained it.  I am not a

20   registered follower of Mr. Kosnoff's.  I do look at it

21   occasionally. I have not seen it.

22         There are photos of individuals, attorneys in this

23   case, that were taken in social settings.  Those photos were

24   taken from someone's Facebook posting.  I don't ascribe to

25   his comments about this court's performance of the case.  And

1   he has certainly made comments about me that I don't ascribe

2   to.  But there is one thing that we share in common with Mr.

3   Kosnoff it is our belief that this plan should not be

4   confirmed because it is not in the interest of survivors.

5            There are certain things that the coalition is

6   doing that we apply especially in their efforts to try to

7   extract more concessions from the debtor regarding its

8   protection.  Do we think those concessions go far enough, we

9   don't.  We, in fact, have over the last few days sent an

10  invitation to Mr. Molton that the nine members of the TCC and

11  the members of the coalition's advisory committee consisting

12  of survivors meet to discuss non-monetary issues, not about

13  whether the Hartford settlement is good enough or not about

14  youth protection.  I hope that that offer is taken up.

15           So we want to resolve this.  Survivors deserve

16  that.  We -- there are certain portions of the motion that we

17  have already said we will recommend to our client -- I'm

18  sorry, the order that we said we would recommend to our

19  client, but what we cannot do is surrender our obligations

20  under 1102 and 1103 to -- these are duties that we have.

21  What we cannot do is, essentially, have a prior restraint on

22  what we say to our constituency.

23           So I am sorry that this hearing is taking time

24  away from the other issues.  It is something we did. I have

25  to take responsibility for what we did and what that

1  responsibility entails we will eventually see.  I wanted you

2  to hear our explanation of, at least, some of the facts

3  regarding who it went out to and our attitude towards the

4  things that are in Mr. Kosnoff's twitter that it was not

5  something we ascribe to.

6         So with that, Your Honor, I don't -- unless you

7  have questions of me, which I am more than happy to answer,

8  we consent to the shortened time, we will do everything in

9  our power to answer the discovery quickly and we will

10  continue our conversations with the debtor, and the

11  coalition, and the FCR to try to reach a resolution of this.

12         I should say one other thing, Judge, just so you

13  appreciate what happened.  My first understanding of -- my

14  first awareness that there was a response to what we had sent

15  out was from Mr. Molton and he called me, I was not in a

16  position to take the phone call, but when I saw the other

17  communications, and we did speak once, I thought it was about

18  his objection to the communication going out, what I call,

19  the Kosnoff list which are the AIS claims which we believe,

20  at least in terms of the communication, a communication with

21  them we were entitled to make because Mr. Kosnoff had given

22  us his consent.

23         I was not aware that it had gone out to, what I

24  call, the TCC list.  That was not our instruction when we

25  communicated with staff.  As soon as I was able to determine

1 that it had gone out to this other list, and I learned that

2 from an attorney who called me and said, hey, my clients got

3 this communication, what is going on, I promptly communicated

4 with Mr. Lucas, and he with our staff, to issue an email to

5 that TCC list saying it was sent to them by mistake, which it

6 was, it was not pursuant to a direction from an attorney in

7 my office, and that it should be disregarded.

8         It was a short email, it did not elaborate beyond

9 that.  So, again, within the context of communicating with

10 the people on the TCC list we attempted to mitigate the

11 effect of the communication.

12         So, Your Honor, that is what I wanted to say to

13 you today.  And as I said, I am prepared to answer any

14 question you have regarding this to the best of my knowledge.

15         THE COURT:  Thank you.  I am not asking any

16 questions today. I have not had a chance to review in detail

17 what was filed. I certainly suspect I will have questions.

18         Mr. Hogan.

19         MR. HOGAN:  Good morning, Your Honor.  Daniel

20 Hogan of Hogan McDaniel on behalf of Eisenberg, Rothweiler,

21 Winkler, Eisenberg & Jeck.

22         Your Honor, I will be brief.  I just wanted the

23 court to understand that my clients, Eisenberg, Rothweiler,

24 is the firm that has been implicated by this defamatory email

25 that was sent out by the TCC.  The vote -- the AIS votes

1    have, arguably, been tainted by this process.  My client,

2    Eisenberg, Rothweiler, had no knowledge that this email was

3    being sent out.  And we are very concerned not only about the

4    defamatory nature of the email as it relates to Mr.

5    Rothweiler, but more importantly I think the impact on the

6    voting process and ultimately on the plan confirmation

7    process.

8            It is interesting, Your Honor, from what I heard

9    from Mr. Stang it appears that the TCC will undertake and

10   utilize just about any means available to it to turn this

11   vote negative as it relates to the plan.  We think that that

12   is a corruption of the process.  We wish to avail ourselves

13   of the ability to join in the motion and to file something.

14   So I would ask that this matter not be heard today in full,

15   but that we be given an opportunity to wrap our head around

16   what exactly has happened and what the impact of it would be.

17           Thank you.

18           THE COURT:  Thank you.

19           Mr. Anker.

20           MR. ANKER:  Thank you, Your Honor.  Philip Anker,

21   Wilmer Cutler Pickering Hale & Dorr, for Harford.

22           I am really going to try to be brief given

23   everything that was said including Mr. Stang's remarks.  We,

24   Hartford, are not a plan proponent, but, obviously, we have -

25   - we care about whether the plan is or is not approved since

1  it would, if it is approved, approve the settlement of my

2  client in which it would be paying more than three quarters

3  of a billion dollars.

4         The letter spans half a page addressing the

5  Hartford settlement.  I will not argue the merits today, but

6  I will preview to say every single sentence, virtually every

7  single sentence, is misleading and false.

8         What Your Honor needs to appreciate here, and I

9  get the fact that Century Glove is out there, I get the fact

10  that the first amendment exists, but I may just be totally

11  naïve and a babe in the woods no matter how old I am, I have

12  never heard of an official committee in any case doing

13  anything more than sending out a letter with the disclosure

14  statement that is pre-approved.  I am in another case, not

15  representing an official committee, in this district, a major

16  case and I care deeply if my client wasn't happy with the

17  plan to have the plan voted down, and I advised -- I am not

18  going to say it that way, I refuse to communicate with any

19  other lawyer in my class because I just don't think that is

20  what you do.

21         You get a court to bless your communication and

22  you send out that communication, and that is what an official

23  committee, which is not supposed to be an advocate, but is

24  supposed to be representing all holders does.  What happened

25  here, and let's not put too fine a point on it, as I

1   understand it, it is now been said that Mr. Kosnoff could

2   have directly communicated with his clients. If that is right

3   why in the world did he give -- did he ask that the TCC send

4   out the communication from him other than to put the

5   imprimatur of the official committee on it.

6           That communication, maybe it was inadvertent, went

7   out not merely to clients jointly represented apparently by

8   Mr. Kosnoff and the Eisenberg Firm, but to thousands of other

9   claimants who either were unrepresented or represented by

10  other counsel.  Again, I am happy to be educated that what I

11  learned and the way I practiced the last 35 plus years is

12  wrong. It is per say, that is what I always thought, an

13  ethical violation for one lawyer to communicate to a client

14  represented by another lawyer directly. It's not a maybe,

15  it's not a gray, it's a black and white; you don't do it,

16  period.  That is what happened here.

17          Why does this matter?  It matters because of the

18  vote.  You -- I this vote comes in with an acceptance by the

19  class of abuse claimants.  You will no doubt hear from the

20  TCC that there are third-party releases here and that, they

21  will argue, requires a super majority vote.  And if that --

22  if they are convinced, Your Honor, of that then every vote

23  will count.  And to the extent there have been communications

24  here in violation of ethical rules that are materially

25  misleading, and I will get to that when we have the actual

1  hearing, that matter and remedies have to occur to ensure not

2  that the plan is confirmed, but to ensure that there is a

3  fair vote with legitimate communications by both sides.

4         I don't have anything more to add, Your Honor, but

5  I wanted the court to appreciate this issue.  There is

6  discussion of my client.  This issue effects more than just

7  the parties who have spoken and there are serious issues

8  here.

9         Thank you, Your Honor.

10        THE COURT:  Thank you.

11        Mr. Schiavoni.

12        MR. SCHIAVONI:  Your Honor, I just wanted to let

13 you know that we, Century, have Mr. Kosnoff under subpoena.

14 We were able to serve him with great, great difficulty

15 several weeks ago.  He has declined to comply with our

16 subpoena.  He has contended that he is not subject to the

17 jurisdiction of this court.  We don't think that is correct

18 because of the appearances he has made and the role he is

19 playing in connection with the voting.

20        We did serve a subpoena out, you know, in

21 California.  So I just think that if you are going to hold a

22 hearing on this matter you would want to have before you the

23 facts and the facts are going to be, you know, non-privileged

24 documents that Mr. Kosnoff holds and some of his testimony on

25 non-privileged communications.  I am going to be looking for

1  a way -- like we need to get our motion -- a motion to compel

2  his deposition decided very quickly.

3          We will get something -- we will consult with Mr.

4  Molton and Ms. Lauria about coordinating proceeding with

5  them, but, you know, we will either get before you, you know,

6  as soon as possible today/tomorrow morning, an application to

7  have you decide whether he is -- whether you have

8  jurisdiction to rule that he should appear, and/or motion for

9  shortened notice in California.

10         You know, but he shouldn't really be able to, sort

11  of, duck behind not appearing, you know, in connection -- you

12  know, given what has occurred.  There are, to be clear, very

13  important factual -- just purely factual issues about things

14  that he has said, you know, including in the 2019 statement

15  about the preparation of the proofs of claim, and things that

16  the said in his 2019 statement about how the AIS agreements

17  about how the AIS claimants were to vote.  So I think that

18  testimony is going to be very important for you to hear.  We

19  are going to need to get it, you know, within a week here if

20  there is going to be a hearing on this.

21         THE COURT:  Thank you.

22         Mr. Molton.

23         MR. MOLTON:  Judge, I normally don't come back

24  just to rebut things that will be dealt with later, but I

25  think it's important for everybody and for you, before we go

1  onto other things, to, at least, put the facts where they are

2  regarding the timing.

3       Saturday at 4 p.m. we started learning about this.

4  5:45 p.m. on Saturday or thereabouts I called Mr. Stang.  He

5  did not pick-up.  I wrote him an email at 6:05, Your Honor.

6  That email, which is part of Ms. Lauria's papers, clearly

7  advises him that the email is going to survivors' represented

8  by other lawyers.

9       7:12 p.m. another email, that is in Ms. Lauria's

10 papers I assume and I believe, I sent Mr. Stang an email

11 advising him that I just received the TCC email, it was going

12 out on a rolling basis.  At 11:20 I had not yet heard from

13 him and so what I wrote to him I told him,

14      "I have still not heard from you.  I understand

15 that emails from the list server is continuing to be used to

16 send, in what seems to be, regular time intervals.  Is this

17 being done with your and the TCC's authorization.  If so this

18 is improper and should be halted immediately.  If not, why

19 have you not shut it down?  Please answer forthwith."

20      Bottom line, Your Honor, from 6 p.m. that night he

21 was advised by me that this was going out to counsel to

22 survivors represented by other counsel.  It wasn't until the

23 next day at 10:30 a.m. that Mr. Stang called me and told me

24 that it was deliberate.  And when he told me that he did not

25 tell me that there was an inadvertent error.

1           So in any event, Judge, from 6 o'clock that night,

2    Eastern time, on a rolling basis these emails went out.

3    Repeatedly, in the course of my emails, I asked him to stop

4    it, halt it, shut it down and apparently it continued to do

5    so to 20,000 people.  I just needed the record to be straight

6    on that.

7           Thank you.

8           THE COURT:  Thank you.

9           Okay.  Well, this raises a very concerning issue

10   and my immediate concern is the potential taint of the vote

11   and what can be done to, if anything, to remedy that

12   situation.  So, I'm interested, yes, and concerned about

13   other aspects of this, but the most immediate concern is what

14   the remedy is.

15           MS. LAURIA:  Your Honor, this is Jessica Lauria,

16   if I may?

17           I understand you have not had the opportunity to

18   review the papers.  I think, as you pointed out, we do need

19   something more immediate.  What the Debtors had proposed was

20   yet another email to the 20,000 individuals indicating, and

21   the language of that is in the proposed form of order that we

22   filed, indicating that essentially this was done in error.

23   That they understand that many individuals are represented by

24   different counsel.

25           Those lawyers may have, in fact, indicated that

1  they should be voting yes, because there's a very clear, in

2  Mr. Kosnoff's email, "no" recommendation.  You know,

3  apologize, essentially, for the derogatory and defamatory

4  remarks that are in the cover email that went to all of these

5  individuals concerning Mr. Rothweiler and his firm, and then

6  attaching the official, Court-approved communications from

7  the Debtor, the Coalition, and the FCR.

8          As I think you've heard from a couple of parties

9  today, we still don't know what this is going to do to the

10  votes.  We may need remedial measures with respect to the

11  votes, themselves, in terms of -- and I hate to use the word

12  "vote designation" when we're talking about survivor

13  individuals who are essentially becoming re-victimized by

14  this official communication that they received.  But maybe

15  it's a communication concerning that you Chan change your

16  vote if you were improperly influenced by, again, the

17  derogatory and defamatory and false and misleading statements

18  that were sent out in this official TCC communication.

19          But we think at a minimum, there should be the

20  email that was in our form of order with the official

21  communications that this Court approved after five days of

22  trial, potentially additional information on how to change

23  your vote if you cast your ballot in error.  We'll be looking

24  into this further, Your Honor.

25          And then also, Your Honor, we just think it is

1  wholly inappropriate for that official email address to be

2  used to be sending out emails from State Court counsel.  We

3  think that should be shut down immediately.  In the motion we

4  also request, Your Honor -- and, again, this is not an

5  attempt to infringe parties' First Amendment rights or we're

6  mindful of <u>Century Glove</u> -- but, quite frankly, if this email

7  address is going to be used as a weapon, then the Court and

8  the Debtors need some notice when it is used for official

9  communications.

10         Those are the immediate things that we sought in

11 our motion that was filed last night, Your Honor.

12         MR. STANG:  Your Honor, can I just address the

13 exact, the specifics that Ms. Lauria has regarding what can

14 be done to remedy?

15         THE COURT:  Yes.

16         MR. STANG:  I want you to know that our

17 recommendation to the TCC is -- and this was communicated to

18 the Debtor last night -- that we will not, in effect, re-

19 transmit or whatever -- however you want to describe the

20 action we took -- other State Court counsel's communication.

21 We've agreed to that or, sorry, we're recommending that to

22 the TCC and I think the TCC will agree to that.

23         Second --

24         THE COURT:  I'm saying right now you're not to do

25 it.  I don't care what the TCC says.

1          MR. STANG:  Okay.

2          THE COURT:  Until I have a further hearing on

3     this, no communication from that official email address,

4     except for communications from the TCC.  I'm not, at this

5     point, going to prohibit the TCC from communications, but

6     none from any other party.

7          MR. STANG:  Correct.  Done.

8          Second, we will -- I don't want to -- to the

9     extent there has been confusion, I don't want to exacerbate

10    it by lots of additional emails.  We will send out another

11    email to the group that we sent the previous, the Kosnoff

12    letter.  We will re-transmit the letters that the Court has

13    approved that went in the solicitation package.  We believe

14    it should include all the letters and not just the one

15    saying, "vote yes," but we agree that those letters should go

16    out again.

17         We agree that we should express our apology for

18    sending -- well, I take that back.  I'm sorry -- that it was

19    a mistake to send it out to what I call the "TCC list."  I

20    don't think that there's any problem with us telling people

21    that they had the right to change their votes.  They

22    certainly do have the right to change their votes and do that

23    before the voting deadline.  And so, there's many things in

24    what Ms. Lauria has said that we've, in effect, agreed to

25    last night, and as I'm hearing more, as she speaks today,

1  things that we would also agree to.

2           What we do use the email lists for, and on every

3  occasion that we have sent out -- we have these town halls.

4  They occur on a weekly basis; they're on Thursdays.  We send

5  out -- we started doing them weekly about a month ago.  We

6  send out notices to people that the town halls are occurring

7  and Mr. Molton and others have received those, you know,

8  certainly for the ones that have occurred in the last week

9  and the last few weeks.

10          We want people to know about the town halls.

11  They're not substantive, except to the extent that we

12  discuss, we set forth what we're going to be discussing and

13  then they probably say, "Vote no in the plan."  We want to

14  let people know these town halls occur.

15          But, you know, this may be getting you into the

16  weeds that we're not ready to do right now, that you're not

17  ready to do right now.  But I want you to know that we

18  prepared to send out another email.  We hoped that it would

19  be the last one so that people don't have this drumbeat of

20  what's going on during this.

21          We acknowledge that the letters in the

22  solicitation package should be resent and as to, you know,

23  the contention that Mr. Kosnoff's comments were false or

24  misleading, I've got to be careful here because, obviously,

25  it opens up issues of conceding that there was slander or

1  defamation or other things that might have unintended

2  consequences, at least from our side, unintended

3  consequences.  We want to try to put this back so that the

4  Court's concerns about voting are as mitigated as possible,

5  and we will obviously -- well, I'll just leave it at that.

6        But I heard you and there will be no further

7  communications of other counsel's letters or memos or

8  whatever you want to describe it.  The communications will

9  come from the TCC, itself, and substantive communications.

10       MS. LAURIA:  Your Honor, this is Jessica Lauria.

11  May I briefly respond?

12       THE COURT:  Briefly.

13       MS. LAURIA:  Your Honor, over the weekend, Mr.

14  Molton requested the ability to see the corrective

15  communication that was sent out.  Neither he, nor the Debtor,

16  were able to see that the TCC sent it out.  It was not

17  helpful.  It was not sent to the entire group.

18       We then drafted language.  That language was

19  provided to the TCC and other parties on Monday.  They flatly

20  rejected sending it out.  That language was included in our

21  form of order.

22       I received an email from Mr. Stang at 1:20 a.m.

23  this morning with the language that his committee would be

24  prepared to send.  I have not had an opportunity to review

25  that language, as against our language.  I will note,

1 however, that there is no notion that the Committee is not

2 endorsing the derogatory remarks made about certain State

3 Court lawyers in the initial communication.  There is no

4 walking back from the fact that a Twitter feed containing the

5 information that I previously outlined was in there.

6         I would just say, Your Honor, that if they intend

7 to send another email, I think that email needs to be

8 reviewed by the other parties in this case before it is sent.

9         THE COURT:  Yes, that's going to happen.

10        MR. STANG:  I agree, Your Honor.

11        THE COURT:  That's going to happen.

12        MR. STANG:  I agree.

13        THE COURT:  I am going to give the parties today

14 and tomorrow to see if they can come to agreement on what

15 that communication should look like and we're going to

16 reconvene at ten o'clock on Friday morning for that purpose:

17 the communication that will come from the Committee on the

18 official committee -- from the official Committee email.  We

19 will have a hearing on anything else, well, I'm thinking next

20 Wednesday morning, but I need to double-check with Ms.

21 Johnson and I'll get back to your during the course of the

22 hearing.

23        Mr. Molton, I see your hand.

24        MR. MOLTON:  Yeah, two quick points, Your Honor,

25 just in terms of going forward and what we're really

1  concerned about.  We know that this went out to 20,000

2  people; mostly survivors and some professionals and others.

3  We don't know how many people actually received this by way

4  of forwarding, texting, or whatnot.  That's clearly

5  something.  I mean, that could be a huge multiple of the

6  20,000 and that's something that I think the discovery that

7  we've served, that the Debtors served, and I think we're also

8  serving, may address.

9          And also, Judge, with respect to what Mr. Stang

10  said about sending the prior Court-authorized solicitation

11  letters out, those don't address the comments that were made

12  in Mr. Kosnoff's letter.  Sending those out seems to me not

13  to be fixing the problem.

14          I mean, clearly, Mr. Rothweiler might want to

15  address and have a letter sent out, especially to his clients

16  on the TCC website, a response, and, clearly, the Committee,

17  the Coalition, and the Debtor might want to have a letter

18  sent in the manner that Mr. Stang suggested, but a new

19  letter, a fresh letter addressing some of the

20  miscommunications and inaccuracies.  So, I'm just going to

21  put that down there.  We don't have to argue it now.

22          But Your Honor should know that we don't believe

23  that just sending what this Court authorized with the

24  solicitation and disclosure materials would be effective.  We

25  didn't create this.  You know, we were fine with those at the

1  time in the manner they were going to go if people played by

2  the rules, but from my perspective, Judge, the rules were

3  changed and a remedy has to be fashioned to meet the harm.

4         Thank you, Judge.

5         THE COURT:  Thank you.

6         Yes, the problem is going to be a balance between

7  a remedy and not creating further confusion, so -- and I'm

8  not sure where that line is going to be.  So, in the first

9  instance, I would like the parties, again, to discuss the

10  communication that would go out and we'll be back here at ten

11  o'clock on Friday.  We will be back here at ten o'clock on

12  Wednesday for a further hearing on this matter.

13         MS. LAURIA:  Thank you, Your Honor.

14         MR. ABBOTT:  Thank you, Your Honor.

15         Derek Abbott, again --

16         THE COURT:  I'm also, in connection with the

17  hearing on Wednesday, going to consider whether I have

18  certain parties appear in person, okay.  I'll let you know.

19         MR. ABBOTT:  Thank you, Your Honor.

20         Your Honor, Derek Abbott, again, Morris Nichols,

21  for the Debtors.  If we turn now to the agenda, Your Honor, I

22  think the first item that is up for a hearing today on the

23  agenda is Item 4, which is the Allianz Insurers' motion for

24  relief from the automatic stay.  So, I will turn it over to

25  their counsel, Your Honor.

1          THE COURT:  Thank you.

2          MR. WINSBERG:  Good morning, Your Honor.

3          Harris Winsberg from Troutman Pepper, on behalf of

4    the Allianz Insurers.

5          Can you hear me okay?

6          THE COURT:  I can.  But let me ask a question.

7          MR. WINSBERG:  Yes, Your Honor.

8          THE COURT:  And maybe I haven't seen the most

9    recent agenda, but Mr. Abbott, what happened to Number 3?

10          MR. ABBOTT:  I apologize, Your Honor.

11          In the most recent agenda, which is the second

12    amended agenda that I'm looking at -- it may have been in the

13    first amended agenda -- all the parties to that matter did

14    agree to adjourn the matter to the week of November 15th,

15    obviously, subject to the Court's availability.

16          THE COURT:  Okay.  We'll deal with the hearing

17    time on that, then, after we get through the agenda, but

18    please remind me.

19          MR. ABBOTT:  Will do, Your Honor.

20          MR. STANG:  Your Honor, may I make a comment,

21    please?

22          Before you get to the specific agenda items, I

23    thought, perhaps, the Court would want to hear a short

24    presentation on how things were going regarding the discovery

25    on plan confirmation in general.  I thought, perhaps,

1  Ms. Lauria was going to do that.  She didn't, but we think

2  the Court should have an idea as to what's going on regarding

3  document productions, depositions, and the like.

4          If you're interested in hearing that, I am

5  prepared to make a short statement regarding it.

6          THE COURT:  If you think it's helpful and

7  informative, I will hear it.

8          MR. STANG:  I wouldn't take your time if I didn't

9  think so.

10          THE COURT:  Okay.

11          MR. STANG:  I understand my comment by switching

12  gears after what we just went through is, you know, I hope

13  the Court will be -- well, I'm sure the Court will be

14  receptive to hearing us on matters that are unrelated to it.

15  I'm not going to revisit anything you've just been through.

16          THE COURT:  Okay.

17          MR. STANG:  May I?

18          THE COURT:  The floor is yours.

19          MR. STANG:  Okay.  Thank you, Your Honor.

20          Your Honor, the timetable for the discovery and

21  the litigation leading up to the January 24th hearing is, in

22  our opinion, proving to be very untenable, frankly.  We are

23  cognizant.  We heard you when you said, Be targeted in your

24  discovery.

25          Everyone acknowledged that the schedule was, well,

1  I'll use my words -- aggressive -- and we are trying to do

2  the best we can to meet the Court's requirements and get this

3  done in a way that is fair to all the parties.  But, simply,

4  the volume of discovery is overwhelming, in my opinion,

5  people's resources.  To date, to prepare the discovery

6  responses that were put towards the TCC, we pulled from our

7  email systems and texts from our phones, almost 640,000

8  documents; that was the broad net.  That consisted of almost

9  six million pages.  This is just coming from my firm, the

10 Pasich firm, other parties who had to respond to the

11 discovery propounded on the TCC.

12        To date, understanding that last Friday was the

13 deadline for substantial compliance with the document

14 productions, we prepared -- we submitted, because there were

15 privilege issues and, frankly, some of those six million

16 pages were not relevant to this case because it was a broad

17 net that we additionally cast, almost 6400 documents,

18 totaling approximately 56,000 pages.

19        My firm has a team of almost a dozen people who

20 are working just on this.  They are working on weekends.

21 Some meet-and-confers are going on well late into the night

22 on weekends.  We believe that on our side, our outgoing

23 production is between 85 and 90 percent complete.

24        On the incoming, we kind of have what I call "A

25 Tale of Two Cities."  Some parties have produced an enormous

1  amount of documents and some have produced, literally, in one

2  case, four -- two pages.

3          The Debtors have provided in excess of a million

4  pages of documents.  I use that based on the Bates stamp

5  numbering that I'm seeing on the emails notifying me of the

6  productions.  I think they are on their tenth or eleventh

7  volume of production.  I don't know how they define "volume,"

8  but it says Volume 9, Volume 10, Volume 11.

9          Sometimes early Tuesday morning, I believe it was,

10 just after midnight, leading into Wednesday, almost 20

11 percent of their production came in.  I'm not suggesting that

12 the Boy Scouts are slow rolling out the production; it's

13 really just emphasizing how much there is and the need to

14 review these documents as we lead into depositions, which

15 I'll get into in a moment.

16         I saw some communications yesterday that the

17 latest production by the Boy Scouts might be largely of

18 charters, but since charter organizations are a very material

19 part of the confirmation issues, those need to be reviewed.

20 There's an enormous amount of data coming in and using the

21 Boy Scouts, alone, as an indicator.

22         When we talk about targeting discovery and

23 depositions, we think it is professionally necessary to

24 review documents so we can ascertain which depositions really

25 need to be taken and how long those depositions really need

1  to be.  But because of the truncated scheduling, this has

2  become -- on the deposition notices -- this is kind of a

3  "shoot, ready, aim" situation.  People have to be

4  professionally responsible, issue deposition notices in

5  anticipation of what the documents that have been produced,

6  might contain, in terms of targeted witnesses and those that

7  are still coming in, that some of which may come in even

8  after certain scheduled deposition dates.

9           So, the Debtor has produced an enormous amount of

10  data.  Hartford has produced, I think, a couple of tens of

11  thousands of pages.  And I don't know if it's our system or

12  what was delivered to us, but simply the process of uploading

13  these documents is a task that entails at least some delay.

14  I mean, I thought it was just the push of a button, but I've

15  been informed that's not the case, because everyone takes

16  these documents and they load them into some kind of review

17  database and that, in the case of the Hartford production,

18  has certain files that our system reads as corrupted.  And

19  so, even though Hartford has been producing, some of it, we

20  still have to work out, and I think Mr. Ruggeri is aware

21  through insurance counsel on our side that some of those

22  issues exist.  I'm not suggesting it was intentional; it's

23  just there is a lot of material going on.

24           But on the tale of the other city is Liberty

25  Mutual, which has a billion-dollar dispute regarding its

1  coverage, a billion-dollar dispute -- that's the swing
2  between their view of their coverage and our view of their
3  coverage -- they produced 40 pages.  And Travelers, I'm told,
4  produced 2 pages.

5           So, we have a December 1, I believe it's a
6  December 1 fact discovery cutoff and we are, what, about two
7  weeks ago with Thanksgiving factored in, to having to review
8  literally millions of pages while we are also taking
9  depositions.

10          In terms of taking the depositions, there are, by
11 our count, over 50 people who have been noted up for
12 deposition and several parties are seeking to depose the same
13 person.  So, in one case, I'm told, there are six people, six
14 noticing parties who want to depose Mr. Smith.  There are 125
15 deposition notices out there; obviously, this is where we get
16 the overlapping.

17          I saw stuff coming in from The Church of Jesus
18 Christ of Latter Day Saints yesterday.  I mean, the mailboxes
19 are just flooded with notices of deposition coming in.  And,
20 again, this is all against a December 1st fact cutoff with
21 Thanksgiving in between.

22          I was told by my insurance counsel this morning
23 that there are four depositions scheduled within -- there are
24 four depositions scheduled for December 2nd.  We have told
25 Hartford that we can't make, because of the document review,

1  we can't make the deposition date that was originally

2  scheduled.

3         There are other insurance companies who have some

4  dates locked in that we've now been told can't be -- either

5  we say we can't do it because of the review or they've told

6  us they are now unavailable.  So, we are trying to

7  coordinate, though.  The TCC picked up the pen and submitted

8  a deposition protocol to, essentially, all the parties that

9  are going to be involved in the confirmation fight.

10        The first meet-and-confer on that, I'm told, had

11  over 200 people on the Zoom.  There was a second meet-and-

12  confer, which I think they had some lesser attendance and it

13  was a little shorter.  So, again, this is part of having

14  listened to you saying, try to figure out how to do this in

15  an efficient way.

16        On top of all that fact discovery, we're going to

17  have expert testimony.  I believe November 15th is the

18  deadline for people to announce which experts they're going

19  to use and, generally, what those experts are going to

20  testify about.  I think there's no doubt that that expert

21  deposition and the reports are due sometime, obviously, after

22  the 15th:  Alvarez & Marsal, for the Debtor; Berkeley

23  Research Group for the TCC; The Claro Group, which is an

24  expert retained by the TCC, regarding claim evaluation;

25  possibly, Ankura.

1          I don't know if the FCR is going to submit Ankura
2    as an expert for evaluation of claims.

3          And if that weren't enough -- and I said I wasn't
4    going to talk about our first matter this morning -- there's
5    a discovery opportunity on the voting report, which is, you
6    know, we'll see, you know, whether that's even necessary.

7          This scheduling that I've laid out to you and the
8    volume of it is based on what we know today.  Ms. Lauria said
9    there is going to be some breakthrough announcement coming.
10    I don't know what that announcement is.  I don't know, but
11    I'm guessing it's going to be another settlement and it's
12    probably going to be a significant settlement, since she
13    characterized it as a "breakthrough."

14          Well, that could open up a whole other round of
15    discovery that, today, is irrelevant.  If you remember, the
16    Century Rule 2004 exam we brought where there wasn't a
17    Century settlement in front of you.  I don't know what the
18    settlement is going to be.  It could be with Century.  It
19    could be with somebody else.  I don't know.

20          But whatever volume of materials that have been
21    generated, based on the existing plan, if a new settlement is
22    announced and I suspect it's going to affect the plan because
23    it's breakthrough, it's like cutting into, like, a rubberband
24    ball and watching rubberbands just spin out of control.  So,
25    all the issues that we have regarding scheduling, it might

1  be -- might be -- exacerbated by this breakthrough

2  announcement we hear is coming.

3          This -- the plan that the Debtor is seeking to

4  confirm is, in my experience, unprecedented in terms of the

5  number of third-party releases being anticipated.  There are,

6  based on what I've been told, over 40,000 charter

7  organizations that are implicated by the releases

8  contemplated in the existing plan.  I don't know whether the

9  breakthrough announcement will change how much of those

10 nonconsensual releases are expanded, because right now

11 they're constrained by time parameters.

12         You know there are 250-plus local councils that

13 are going to be affected.  There are an untold number of

14 insurance policies.  You have a letter from us that was filed

15 yesterday, regarding discovery issues for the policies that

16 were issued to the charters in name, if you will, not as

17 additional insureds.

18         And so, that's the status.  We are working around

19 the clock.  We are throwing every available body that the two

20 law firms, Pasich and our firm, have, and I thought you

21 should know what's going on.  I mean, my notes say, Court,

22 what should I do about this, in anticipating that you might

23 ask me that.  I guess I'll wait for you to ask me that if you

24 want to, but, obviously, time is -- it's time limitations.

25         And we are cognizant of everything the Boy Scouts

1  have said about, what I will call the "melting ice cube" of

2  their contribution to the settlement, putting aside all the

3  other aspects of why they wanted to get this hearing started

4  on January 24th.

5          So, that's where we are in our outgoing discovery

6  and the incoming discovery, Your Honor.  Thank you.

7          THE COURT:  Okay.  Thank you.

8          Mr. Kurtz?

9          MR. KURTZ:  Good morning, Your Honor.  Glenn

10 Kurtz, White & Case, on behalf of Boy Scouts.

11         Can you hear me okay?

12         THE COURT:  Yes, I can.

13         MR. KURTZ:  Thank you.  And good morning, again,

14 Your Honor.

15         There's nothing new that would justify a re-

16 argument of the argument we've already had on setting the

17 schedule here, which was driven, at least in some part, if

18 not large part, by the Debtors' liquidity.  I can confirm to

19 the Court that that situation has not changed.  So,

20 unfortunately, we don't have any more runway than we had when

21 we set this.

22         When we went through these arguments, and they're

23 all the same arguments -- it's effectively a re-argument -- I

24 foreshadowed that I expected to be whipsawed a little here,

25 where they would ask for an enormous amount of discovery.

1  When we supplied it, they would complain that there was a lot

2  of discovery here and we didn't supply it.  They would

3  complain we're being uncooperative and hiding facts.

4        I don't think it should be well taken that we've

5  been burdened with some pretty significant discovery requests

6  and we've complied with them.  The discovery, we have

7  completed substantially last Friday.  There is additional

8  discovery that's going out.  It may have had a volume, but as

9  we advised the parties, what we recently produced was largely

10  local council charters.  That doesn't take a long time to get

11  through, nor do I think it has any particular relevance in

12  the case.

13        There were arguments made that we're having fact

14  discovery within a certain period of time and then we still

15  have expert discovery; of course, that's exactly the schedule

16  that was set.  That, also, is not new, nor is it unusual, and

17  it's not unusual where parties double-track, triple-track, or

18  more than triple-track on depositions as they need to, to

19  complete this, within the time period, which Your Honor may

20  recall, is still lengthier than the average in Delaware for a

21  confirmation hearing.

22        The last thing I would respond to is Mr. Stang

23  mentioned that there's a new event that maybe that's a new

24  settlement and, therefore, we should be resetting the

25  schedule.  I think it's exactly the opposite; I think as we

1  gain more and more consensus -- to the extent we gain more

2  and more consensus, that that's not a basis for resetting the

3  case and draining the Debtor of all of its liquidity and its

4  ability to contribute into the trust.  That's a reason to

5  move forward, if anything, on the same schedule or more

6  quickly.

7          I think we have gotten some sense today as to the

8  lengths that the TCC will go to defeat this plan and timing

9  out the Debtor and burning the Debtors' liquidity is a

10 particularly bad approach to doing so.

11         So, there's nothing, there's nothing that would

12 justify a change to the schedule, as it sits today.  And I'm

13 sure that this is not the first time Your Honor is going to

14 hear challenges like this.  I suspect you'll get them by

15 objectors at every hearing.

16         The parties are moving pretty cooperatively,

17 pretty quickly, and pretty well, and certainly well within

18 the schedule.

19         THE COURT:  Okay.  Thank you.

20         Mr. Plevin, I'll hear from you and then we're

21 going to go to the agenda item.  Mr. Plevin?

22         MR. PLEVIN:  Thank you, Your Honor.

23         I thought you might be interested in knowing that

24 this confirmation hearing has been transformed into a

25 coverage litigation, which nobody has spoken about.  At

1  present, based on our last count -- and this changes quickly,

2  so this count could be out of date -- the parties have

3  collectively noticed 58 depositions to be completed between

4  now and December 2.

5           And just to be clear, if there were four or five

6  notices for the same person, we're counting that as one

7  deposition, not as four or five.  So, 58 total depositions,

8  even though more than 200 notices, and amended notices have

9  been served.  Of those 58 depositions, 33 are 30(b)(6)

10  depositions of insurers.  In addition, on Monday, the Debtors

11  also noted the depositions of eight individuals who were

12  claims professionals for pre-petition sex abuse claims

13  against BSA.  Each of those eight individuals works for a

14  company that has been noticed to give a 30(b)(6) deposition.

15  So, all told, 41 of the 58 depositions that have been

16  noticed, or just over 70 percent, are of insurers or their

17  employees.

18           Now, circling back to the 30(b)(6) depositions,

19  what are the topics?

20           Well, they include things that are often sought in

21  coverage litigation, although usually not permitted even

22  there, such as reserves and reinsurance.  And you may recall

23  that in Imerys, Your Honor held that discovery of reserves is

24  improper.  The Debtors and the claimant representatives know

25  that, but yet, they are pressing on.

1          The 30(b)(6) topics also include the insurers'

2   pre-petition claims handling and, of course, that's going to

3   be the topic of the eight individual depositions.  That's

4   another topic that Your Honor concluded in <u>Imerys</u> was

5   improper because it was simply not relevant to confirmation.

6          Some of the topics are expressly about insurance

7   coverage issues.  Let me just give you some examples from the

8   TCC's notice:  Topic 22, your interpretation of the insurance

9   policies and application thereof, to claims for coverage of

10  abuse claims; 24, the underwriting of the insurance policies

11  you sold to the Debtors; Topic 25, the negotiations and

12  drafting of the insurance policies you sold to the Debtors;

13  Topic 26, the drafting of the forms used in drafting the

14  insurance policies you sold to the Debtors; Topic 27, your

15  interpretation of any terms or conditions of the insurance

16  policies you sold to the Debtors.

17         These issues are not before you today because no

18  motion to quash these depositions is pending.  There's a

19  reason for that, other than the fact that the individual

20  notices, which were served on Monday night.  Under the Local

21  Rules, we need to meet-and-confer, first.  Now, the Debtors

22  and the claimant representatives, with the exception of the

23  TCC, seem to be slow-walking to meet-and-confers.

24         When I served my client's responses and objections

25  to the 30(b)(6) notices from the Debtors, the Coalition, the

1   FCR, and the TCC on November 3, I asked them to meet-and-

2   confer with us, but not later than the close of business on

3   November 8th, which was Monday.  I heard back only from the

4   TCC, with whom we met-and-conferred with on November 8th.  I

5   still haven't heard from the Debtors, the Coalition, or the

6   FCR.

7           But unless agreement on the scope of these

8   depositions miraculously breaks out, motions to quash are

9   coming, as soon as the other side agrees to sit down and talk

10  to us.  And as you know under Rule 730-1(c), once we file a

11  motion to quash, the depositions are off calendar.  So,

12  that's going to exacerbate the pileup that we have here.

13          It's not clear to us why the Debtors, the

14  Coalition, the FCR, and the TCC think that the key to whether

15  the plan can be confirmed lies on the insurers' historical

16  documents or their post-petition communications with one

17  another.

18          And in the TCC's motion to compel further document

19  production from the insurers, which was filed late last

20  night, and will be responded to in due course, it seems to

21  assume that the insurers handled all the claims and,

22  therefore, their documents are not only relevant, but

23  necessary to understanding how the abuse claims were valued

24  and dealt with pre-petition, when the reality is that, at

25  least from the period from about 1976, the Boy Scouts had

1   fronting coverage and one-million-dollar SIRs and they

2   handled all the claims.  So, the discovery of these matters,

3   if directed to anybody, ought to be direct to the BSA and not

4   to the insurers.

5        Now, I mentioned that there will be at least 58

6   depositions.  None have been taken yet and the first

7   deposition may be scheduled for next Monday.  Assuming that's

8   the case, the parties will have to squeeze 58 depositions

9   into 11 business days between next Monday and December 1,

10  which is the fact-discovery cutoff.  That means an average of

11  more than five depositions per day.  And, actually, the

12  compression will be more than five per day; as I mentioned,

13  if there are motions to quash filed, there's going to be a

14  pileup.

15       And as Mr. Stang suggested, we need to get through

16  the documents before we can take the depositions.  Most of

17  the insurers are sharing a single document-review platform

18  and conducting a joint review, assisted by artificial

19  intelligence, as is standard these days.  This is an "around

20  the clock" effort that started last Friday and involves

21  dozens of lawyers from the law firms representing the

22  insurers.

23       But even with the assistance provided by

24  artificial intelligence, this is a massive effort.  Our

25  immediate problem, as Mr. Stang suggested, is that the

1  documents keep coming.  Friday, last Friday, November 5, was

2  the deadline for parties to substantially complete their

3  document productions, yet early yesterday, three days after

4  the deadline, Debtors produced two volumes of document

5  production that we are told, told approximately 725,000

6  pages.  And just before midnight last night, the Debtors

7  produced yet another volume of documents.  I don't have any

8  information yet on how many pages that includes.

9         There's also, yet, another volume of documents the

10  Debtors are not making available, pending a ruling on the

11  letter motion filed by Haynes & Boone yesterday, seeking

12  guidance on production of documents with victim names and

13  survivor and abuser names.  Presumably, we won't see those

14  documents until next week after the Court rules on their

15  motion.

16         In addition, after midnight today, the TCC sent us

17  a fourth volume of documents.  We don't yet have any

18  information on how many pages that includes.  It's just not

19  reasonable to expect us to take depositions before we've had

20  a chance to review and process the documents.

21         The productions were supposed to be substantially

22  complete last Friday, yet they are still coming and coming

23  and coming.  So, we can't start taking depositions yet.  And

24  I have to say, I think we are headed to the litigation

25  equivalent of a demolition derby, where we'll be taking 8 or

1  10 depositions a day or more in the few days between

2  Thanksgiving and December 2.

3          We are also discovering as we go through the

4  documents, the problems with the production that we will need

5  to bring to the Court's attention.  To give one example, the

6  Court ruled on October 25 that the Debtors had to produce

7  documents relating to the TDPs, notwithstanding their claims

8  of mediation privilege.  Among the documents we have reviewed

9  so far, there's a February 2, 2021, email from Mr. Molton to

10  several of the Debtors' lawyers stating, quote:

11          "Attached, please find the Coalition's proposed

12  termsheet describing," unquote, the initial terms of the

13  TDPs, the terms of the settlement trusts to be established

14  under the plan, and the Coalition's proposed claims matrix,

15  yet the attachments that Mr. Molton's email describes are not

16  attached or produced; instead, there's only a slip sheet

17  stating:  document withheld for privilege.

18          Clearly, the attachments described by Mr. Molton's

19  email should have been produced under this Court's October 25

20  bench ruling, but, apparently, they were not.  And as we make

21  our way through the more than one million pages of BSA's

22  document production, we expect to identify additional such

23  anomalies.

24          When we do, we'll meet-and-confer with Debtors;

25  either they'll agree to make a supplemental production or

1  we'll move to compel.  But either way, the access to the

2  documents will be delayed.  We're working as hard as we can,

3  Your Honor, but we can only move so quickly.

4          Now, we may be paranoid, but the insurers think

5  the fact that 41 deposition notices have been served on is

6  purposefully designed to distract us from focusing on the

7  offensive discovery we need to do to prepare our plan

8  confirmation objections and work with our experts on their

9  reports.  And while I got the same communication from Debtors

10 last night that the event production of 725,000 pages is just

11 local council and charters, we, of course, can't take their

12 word for that, but have to verify that for ourselves.  So,

13 perhaps the review will be quick, but it still needs to be

14 done, and even so, it's handicapping our ability to move

15 forward.

16         There really is no other good explanation, other

17 than the fact that they have been trying to distract us, but

18 the why the insurers, rather than the people who negotiated

19 the plan, who wrote the TDPs, are the principal focus of

20 discovery in this confirmation matter, which is about a plan

21 drafted, negotiated, and sponsored by other parties, from

22 which we were excluded, and no good explanation for why we're

23 having to try to process so many documents produced after the

24 deadline for substantial completion.

25         But we wanted you to have a status report, Your

1  Honor, so that as discovery motions come before you,

2  including the TCC's motion, the motions to quash that we're

3  going to file, the motions to compel we'll file with respect

4  to things like the Molton email, that you'll have a current

5  understanding of what the parties are dealing with.

6           I'm happy to answer any questions the Court has.

7           THE COURT:  I don't have any questions.  I will

8  say it's somewhat stunning that there are 41 depositions

9  noticed of the insurance companies.

10          Mr. Moxley?

11          MR. MOXLEY:  Good morning, Your Honor.

12          Cameron Moxley from Brown Rudnick, on behalf of

13  the Coalition.  Your Honor, I just wanted to briefly note,

14  just to correct the transcript, frankly, Your Honor, the

15  Coalition did, in fact, meet-and-confer with Mr. Plevin and a

16  number of other insurers on November 5th.  Mr. Plevin may

17  have mistakenly forgotten that that occurred.  We did, in

18  fact, meet-and-confer with him.

19          I don't think it's worth the Court's time to

20  understand what was discussed during that meet-and-confer, I

21  just wanted to note for the Court that it did happen.  Thank

22  you, Judge.

23          THE COURT:  Thank you.

24          Okay.  Let's get to Item 4.

25          MR. WINSBERG:  Again, good morning, Your Honor.

1   Harris Winsberg, for the Allianz Insurers, on the motion for

2   relief from stay we filed.  It's kind of hard to follow this

3   motion after all that's occurred this morning.

4           And we would act on Mr. Plevin's comments and that

5   dovetails a little bit into the stay relief motion.  You

6   know, the coverage cases are where those types of issues

7   should -- that type of discovery should be sought.

8           Just as a housekeeping matter, Your Honor, we'd

9   just move to admit Mr. Jacobs declaration with the exhibits

10  attached, thereto, into evidence.  Those were just some court

11  filings from the various State Court cases.  And BSA relied

12  upon them, as well, in their opposition papers.  We would

13  like to put those into evidence.

14          Mr. Jacobs is actually -- my co-counsel is on the

15  Zoom with me, as well.

16          THE COURT:  Does anyone object?

17          MR. AZER:  We have no objection, Your Honor.

18          THE COURT:  Thank you.  I hear no objection.

19          Thank you, Mr. Azer.

20          They're admitted.  The declaration is admitted.

21      (Jacobs Declaration received in evidence)

22          MR. WINSBERG:  Your Honor, I can go over some of

23  the background of the two coverage cases.  The Illinois

24  coverage case that was filed by National Surety, it has

25  already survived two motions to dismiss by BSA.  The Texas

1  case, which was -- that BSA brought and then brought a motion

2  for summary judgment, you know, that was stayed when National

3  Surety filed a writ petition with the Texas Appellate Court

4  and filed an emergency motion to get it stayed.  And that was

5  stayed and the briefing for that writ proceeding was

6  completed when BSA filed for bankruptcy.

7          The real detail on the coverage cases, is set

8  forth in our motion and in our reply, and I'm happy to go

9  over them.  But, certainly, if Your Honor finds it easier, I

10 can just go directly to the argument.  It's up to Your Honor.

11         THE COURT:  I think you can go to argument.

12         MR. WINSBERG:  Okay.  Thank you, Your Honor.

13         Your Honor, I just wanted to make -- I know the

14 Court is familiar with the three prongs for relief from the

15 automatic stay to continue pre-petition litigation, you know,

16 one being, is there a great prejudice to the Debtor or its

17 estate to let it go forward; two, whether, like a balancing

18 of the hardships, the hardships to the nondebtor party by the

19 maintenance of the stay outweighing the hardships of the

20 Debtor; and then three, whether the creditor has a

21 probability of failing on the merits.

22         And you know, we do go through those factors in

23 both, our motion and then our reply we filed on Sunday at

24 Docket 6986.  But I really wanted to focus the Court on four

25 main points.  First, we believe the Debtor is using the

1  automatic stay, here in this case, coupled with the plan, as

2  a sword, not a shield.  And what I mean by that, with the

3  automatic stay remaining in place, the State Court actions,

4  the Illinois case, which was filed on November of '17 and the

5  Texas case, which I guess was filed in '18, are stayed while

6  Boy Scouts pursues the anti-insurer findings that are in the

7  plan that have been the subject to several hearings this

8  Court has already had in this case, and we don't need to

9  repeat those.

10        The other aspect to this, and as Mr. Plevin noted,

11  the Debtors and others and other parties are seeking what

12  appears to us are insurance coverage-related discovery in

13  connection with this plan confirmation, such as reinsurance,

14  claims handling, reserves, and the like.

15        I mean, our clients, the Allianz Insurers, have, I

16  think, four or five 30(b)(6) notices from various parties and

17  a lot of the topics deal with things that we believe really

18  belong in a coverage case, not in connection with

19  confirmation.

20        And then, finally, if the Court were to confirm

21  the plan, it's entirely unclear to us what's going to happen

22  to these State Court actions.  And the only thing I really

23  wanted to walk you through with part of this, Your Honor -- I

24  don't know if you have the plan in front of you; it's Docket

25  6443 -- and I wanted to point the Court to the retention of

1  jurisdiction provision and that's Article 11, and I think it

2  starts on page 118.

3          THE COURT:  Yeah, I'm not sure if I have it, but I

4  also believe you put it in your filing.

5          MR. WINSBERG:  We did, Your Honor.  I'll just

6  point out a couple of aspects to it.

7          THE COURT:  I have it.  Okay.

8          What section is it?

9          MR. WINSBERG:  Your Honor, it's Section -- it's

10 Article 11, on page 118.

11         THE COURT:  Okay.

12         MR. WINSBERG:  So, if you look at the second

13 sentence, you know, it starts off with:

14         "Except as otherwise provided in the plan or the

15 settlement trust, the Bankruptcy Court shall retain

16 jurisdiction," and then if you skip over past the comma, and

17 it says, "and to adjudicate and enforce insurance actions,

18 among other things."

19         And so, what's an insurance action?

20         And you can learn what that is by looking at the

21 defined terms in the plan.  Definition 138 on page 22, you

22 know, defines insurance actions to include things such as

23 insurance coverage action.  So, it's kind of like putting a

24 puzzle together.

25         And then you look at insurance coverage action,

1  which is defined term 142 on page 23, and it includes the

2  Texas coverage case, which is subpart A of that defined term,

3  and then the Illinois coverage case as subpart C.  It doesn't

4  technically include the writ proceeding, Your Honor, but it's

5  broad enough, in our mind, that it's arguable it does, as

6  well, include it.

7          And so, as BSA admits in its own objection on

8  page 14 of its objection, the retention of jurisdiction

9  provisions provided for the Bankruptcy Court to retain

10  jurisdiction of the State Court action.  So, BSA is not

11  contesting it.  They don't provide an explanation why the

12  plan provides for the Bankruptcy Court to retain jurisdiction

13  over these cases, but it clearly does.

14          Now, we did point out in our opening motion, and

15  BSA pointed out, as well, in its objections, you know, there

16  is some reservation of rights language.  If you go down on

17  page 118, there is a "notwithstanding another" one of those

18  "nothing herein" -- the plan is full of them.  It says:

19          "Nothing contained, herein, concerning the

20  retention of the jurisdiction by the Bankruptcy Court shall

21  be deemed a finding or conclusion, one, that the Bankruptcy

22  Court, in fact, has jurisdiction with respect to an insurance

23  action; two, any such jurisdiction is exclusive, with respect

24  to an insurance action; and three, abstention or dismissal of

25  an insurance action pending in the Bankruptcy Court or

1   District Court, as an adversary proceeding, is or is not

2   advisable or warranted, so another court can hear of the term

3   in such insurance actions."

4          Now, as we pointed out in our papers, that

5   Clause 3 doesn't apply to State Court actions, as they were

6   not pending in the Bankruptcy Court or District Court.  That

7   clause appears to be drafted to address the Hartford

8   adversary proceeding that was filed in front of Your Honor.

9          So, the preservation language, whatever it means,

10  has -- doesn't preserve any sort of abstention rights or

11  dismissal rights with respect to our cases, the State Court

12  actions.

13         And then there is the last sentence that the

14  objectors point to is the next sentence that says:

15         "Any court, other than the Bankruptcy Court, that

16  has jurisdiction over an insurance action shall have the

17  right to retain that jurisdiction."

18         And that's confusing to us because why would the

19  Bankruptcy Court have a provision concerning jurisdiction

20  over the State Court cases in the first place if another

21  court has the right to exercise its jurisdiction over those

22  cases?

23         And, finally, to add to the confusion or to the

24  puzzle, whichever you want to call it, you go to subpart C,

25  which is specific purposes, and it says:

1        "In addition to the foregoing, the Bankruptcy

2   Court shall retain jurisdiction over all matters, including

3   jurisdiction to," and you go to subpart 17, C(17), which

4   says, "herein, determined insurance actions."

5        So, that's our State Court cases.  And there's a

6   provided [sic] at the bottom that says that such retention of

7   jurisdiction shall not constitute a waiver of any right of a

8   non-settling insurance company to seek to remove or withdraw

9   the reference of an insurance action filed after the

10  effective date.

11       The problem with C(17) is there's no incorporation

12  of -- reference any of the language in subpart A, above, that

13  was discussed.  And the provided language, that doesn't

14  appear to provide any protection at all to the Allianz

15  Insurers, because the State Court actions were filed prior to

16  the bankruptcy and certainly prior to the effective date.

17  And there's no mention of a dismissal or abstention right in

18  any of that.

19       So, what does this mean, when you look at all of

20  these provisions together?

21       Well, to us, it's not entirely clear, which is why

22  we filed the motion for relief from stay.  We also noted our

23  opposition to the jurisdictional provisions in the disclosure

24  statement, there's a footnote that the Debtors agreed to add.

25  It was at Footnote 106 on page 188 of the disclosure

1  statement, where the Debtors do note that we, the Allianz

2  Insurers, object to the retention provisions.

3       So, we filed the motion.  We're concerned that

4  these State Court actions, like, they're going to be impaired

5  in some way or divested from their proper forms.  And for

6  their part, when the Debtors filed their objection and the

7  Coalition and FCR filed theirs, they're noncommittal on these

8  points.  And the Debtors claim that any concerns that we have

9  about diverting jurisdiction of the State Court

10  (indiscernible) is a mere possibility.  The Coalition and FCR

11  state that it doesn't prejudice our arguments as to the

12  proper forum.

13       We would respectfully submit, Your Honor, that

14  there should be clarity here as to the forum as to these

15  State Court actions and not uncertainty created for the use

16  of the automatic stay, coupled with the language and the

17  retention provisions in the plan.  So, that was our first

18  point.

19       Our second point is that the lifting of the

20  automatic stay would not cause the Debtors to incur

21  significant legal costs or distract from reorganization

22  efforts.  We knew this was the argument they were going to

23  make.  Certainly, you've heard we're mindful of what's gone

24  on with this case.  We've all sat through an hour and a half

25  of it already on all of the issues and complexities going on

1  with confirmation.  We understand the discovery schedule.  We

2  understand that confirmation is going to start on

3  January 24th.

4          But we would submit that should the Court lift the

5  stay now, that all that's likely to happen between now and

6  confirmation are three things, should the Court lift the

7  automatic stay.  One is that we would submit letters to the

8  respective courts, informing them that the stay is going to

9  be lifted -- the stay has been lifted and attach Your Honor's

10  order.  Two, the Texas Appellate Court will begin to consider

11  the fully briefed writ proceeding.  And, three, the Cook

12  County Court will hold a status conference to allow the

13  parties to provide their views on how that case should

14  proceed because it's been stayed for over 19 months.

15          The Debtors and the Coalition and the FCR, for

16  their part, appear to agree that not much is likely to happen

17  over the next three months, should the stay be lifted.  The

18  Debtors at paragraph 29 say the State Court would, at best,

19  progress to some extent through the holidays, and then New

20  Year's, only to have the settlement trustee assume the duties

21  on the effective date.  And the Coalition FCR at paragraph 5

22  state that in any event, there is no chance that such issues

23  will be resolved in the State Court actions before plan

24  confirmation begins in three months.

25          So, we don't believe the lifting of the stay will

1  significantly distract BSA from plan confirmation,

2  particularly, when its coverage counsel, Haynes and Boone,

3  and not its bankruptcy counsel, White & Case, will be

4  handling those State Court actions.

5          There was a mention by the Coalition FCR in its

6  objection that somehow the lifting of the stay would impact

7  the mediation process and there are a substantial number of

8  insurers are engaged in a rigorous mediation over the plan

9  and insurance-related issues.

10          I would just note, Your Honor, without getting

11  into any sort of confidentiality, that we disagree with the

12  description of the mediation process, at least as to the

13  Allianz Insurers.

14          Your Honor, we don't think the State Court actions

15  should wait until confirmation to get started.  While the

16  Debtors and the FCR heavily rely on the Archdiocese of

17  Milwaukee bankruptcy case, that's the case where the District

18  Court held that the Debtors' argument that was adopted by the

19  Bankruptcy Court in that case, that allowing the State Court

20  to proceed would deprive the abuse survivors of input into

21  strategic decisions about the litigation, was clearly

22  erroneous, because the Debtor clearly has a fiduciary duty to

23  act in the best interests of creditors.  And that reasoning

24  of the District Court should apply -- that was applied,

25  should apply here, because like in that case, in this case,

1  the official committee -- the TCC didn't object to the

2  motion.

3          So, the Debtors can clearly carry the water for

4  the next three months.  Should Your Honor confirm the plan,

5  it would go to the settlement trustee and it would move

6  forward.  We just don't think there's any sort of real

7  reason, at this point, in light of where we are, for it to

8  continue to be delayed.

9          And then the final point I'd just like to make,

10  Your Honor, is, we do believe we've shown the probability

11  prevailing on the merits.  It shouldn't be lost on anybody

12  who read the -- Your Honor obviously read all the papers --

13  BSA doesn't like the Illinois coverage case.  It survived two

14  motions to dismiss by BSA already.

15          And the Texas case that BSA filed was stayed on an

16  emergency basis by the Texas Appeals Court after BSA filed a

17  motion for summary judgment and it's been fully pending and

18  briefed.  That writ proceeding has been fully pending and

19  briefed.  In fact, Your Honor, after BSA filed for

20  bankruptcy, it sought to move forward with the writ

21  proceeding, you know, and not the Illinois case.

22          And we actually briefed, in the Texas writ

23  proceeding, there was an issue, I think, of first impression

24  about whether the writ was a new proceeding or whether it was

25  akin to an appeal.

1          THE COURT:  Uh-huh.

2          MR. WINSBERG:  And then we also, as Your Honor is

3    aware, filed a motion for relief from stay early in the case

4    because our whole point all along has been either both cases

5    go forward together at the same time or they don't.  And at

6    this point, we believe that they should.

7          And then the last point along is that the

8    arguments that we're making in the underlying coverage cases,

9    those are similar arguments that were discussed actually in

10   Archdiocese of Milwaukee case.  So, we believe, in short,

11   that we've met the slight probability of success on the

12   merits standard in light of the underlying cases and for

13   those reasons and as further set forth in our motion and

14   reply, we would respectfully request that Your Honor grant

15   the motion.

16         THE COURT:  Mr. Winsberg, you know, on the third

17   factor, if that were all I were looking at, I would say,

18   sure, there's enough of a probability of success on the

19   merits, that's a slight -- that test is slight -- motions to

20   dismiss have been denied several times.

21         My real concern, quite frankly, is the timing and

22   that we're -- even before we had the last hour and a half of

23   the disaster that is this discovery, that I just don't really

24   see why this is the time for this dispute to go forward.

25         You know, as with respect to the retention of

1  jurisdiction, while I may have jurisdiction over disputes

2  that are involved in the insurance action as they may be

3  related to the case, those actions are pending where they're

4  pending, and I don't get to reach into that forum and say,

5  oh, I can yank that case, I have jurisdiction over it.

6           So I understand maybe, there may be some confusion

7  about the retention-of-jurisdiction provisions, but why isn't

8  that just a confirmation issue that we can address and clear

9  up any confusion about jurisdiction.  The Third Circuit is

10 very clear that I cannot make jurisdiction where I don't have

11 it by retention-of-jurisdiction provisions.  I think

12 everybody has heard my inclination to not preside over

13 coverage actions where at all possible.

14          So, while I understand that concern, I'm not sure

15 I'm seeing it as a reason to grant relief from stay.  So I'll

16 let you respond to that.

17          MR. WINSBERG:  Yeah, Your Honor, it's actually the

18 first point we kicked around when we've discussed this and

19 it's -- and it is also a confirmation objection, let's just

20 be clear about that.

21          The concern that we have was twofold, one is that

22 we don't raise it and we wait until confirmation.  And then

23 somebody says, well, you really didn't care too much about

24 those state court cases because you could move for relief

25 from stay and you never did.  And so we wanted to make sure

1 that we -- we certainly understand Your Honor's perspective

2 and understand this is a difficult motion to take at this

3 point in time in the case.  Look, I've done Chapter 11, you

4 know, for 20-plus years now and understand the posture.

5        But the other thing I would say about it is that

6 the sooner those cases get going, the sooner they will get

7 resolved.  And if BSA is right and we're wrong on the

8 coverage, that's money in the claimants' pockets.

9        So there is a notion that at some point these

10 cases are going to have to go forward.  And so -- and if Your

11 Honor is making clear they will go forward, they just won't

12 go forward now, we understand that, but we did want to make

13 you aware of that and let Your Honor decide on the merits.

14 But we do think there is some benefit to having them move

15 forward and having that -- at least have that process start

16 because, at some point, they're going to have to get

17 resolved.

18        THE COURT:  Okay.  Thank you.

19        Well, I'm not prejudging, obviously, anything with

20 respect to those cases, but -- and, clearly, the coverage

21 issues, if not settled, will have -- with the specific

22 insurance company, will have to get resolved in some forum.

23 But I think, actually, the argument that not much is going to

24 happen between now and the end of January in those cases,

25 even if relief from stay was granted, could cut the other way

1  or maybe it's a neutral factor, I mean, you can argue it

2  either way.

3          Thank you, Mr. Winsberg.

4          Mr. Azer?

5          MR. AZER:  Good morning, Your Honor, Adrian Azer

6  from Haynes and Boone on behalf of the debtors.

7          Your Honor, I do think you hit the nail on the

8  head with your questioning on actually all three, right?  The

9  question that comes up, which is why now, why are we hearing

10 this motion now versus, you know, potentially 18 months ago

11 when these actions were stayed, what's the impetus there.  We

12 also think Your Honor asked the right question about, you

13 know, why are we resolving plan issues and retention-of-

14 jurisdiction issues now versus at the confirmation hearing?

15         Those are more appropriately dealt with at that

16 point, not now.  And, indeed, we haven't found any cases

17 where the stay has been lifted based upon some dispute as to

18 plan provisions.  That's certainly not the circumstances that

19 have been cited by the parties.

20         And, third, I think Your Honor is right, which is,

21 you know, the fact that nothing is going to happen or

22 potentially nothing is going to happen we think actually

23 militates in favor of keeping the stay in place, right?  If

24 there's going to be no advancement, no additional help as to

25 the confirmation hearing, there should be no reason to

1   distract the debtors from the task at hand.

2          So let me go back -- let me go -- let me get into

3   the factors for a second, let me get into kind of the

4   presentation of the factors.

5          Your Honor, you heard a lot about the fact that

6   the debtors are using the automatic stay as a sword and not

7   really taking advantage of the breathing room, that's just

8   not the case.  You know, Allianz is referring to your opinion

9   in Scarborough St. James where you use that wording to

10  describe how the debtors were acting.  And, typically, that

11  occurs in two circumstances, at least as we read Scarborough

12  and we read Tribute and Pursuit, and Schanne and Laurel

13  Highlands.

14          There's two things that typically happen.  One is

15  the debtor pursues an adversary proceeding, we have not done

16  that.  Since we entered the stipulation in March of 2020, we

17  have done nothing to actually advance the coverage cases.

18  They have stayed still and we have no intention of re-raising

19  them.  And then, two, in those cases, Schanne, Laurel

20  Highlands, and Scarborough, there was an imminent underlying

21  ruling, that's just not the case here.  We're still working

22  out the venue disputes with our insurers related to which

23  jurisdiction should hear the case.  So we are nowhere near

24  either circumstance where courts have said, hey, you are

25  using this as a shield -- we're not, we're not using it as a

1 sword and we're not trying to manipulate it and, in fact,

2 proceeding is going to harm the debtors.

3          So let me get into the factors a little bit to

4 talk about why the debtors would be harmed and why Allianz

5 necessarily wouldn't.

6          So, Your Honor, first of all, you know, I'm not

7 going to retread the ground where everyone is talking about

8 this is going to be onerous discovery, but that's evident,

9 right?  We all are all working extremely hard to proceed with

10 the scheduling order, with the current discovery schedule,

11 and we certainly are expending resources to do that.  And the

12 most analogous case, that is the Kindisco (ph) case that we

13 cited, which is 271 B.R. 273.  And that court said, where the

14 lifting of the stay would distract from the reorganization,

15 especially plan confirmation, it's not appropriate, and we

16 think that's exactly the case here, right?  We have a complex

17 case, we're proceeding to confirmation, lots of discovery

18 going on; we don't need a distraction right now.

19          Now, Allianz seems to make two points as to why we

20 really wouldn't be harmed.  The first is, well, Haynes and

21 Boone is state court -- is coverage counsel in that state

22 and, therefore, can just handle.  Your Honor, I'm with Haynes

23 and Boone.  My partner and I, Mr. Martin, have been

24 intimately involved in these Chapter 11 proceedings.  I think

25 I was here before you as a fact witness; we were here before

1  you on the disclosure statement arguing.  And, as you may

2  note on the agenda, we actually have been handling the meet-

3  and-confer process with the insurers on discovery.

4         Now, fortunately -- I don't know if your agenda

5  reflects this -- we were able to resolve our issues, but we

6  are fully entrenched in this discovery process.  So pulling

7  our resources away to deal with the underlying coverage

8  actions would be a distraction both for our client and for

9  counsel.

10         Second, I think Your Honor noted this, is, well,

11  not a whole lot is going to happen, right, in the underlying

12  cases.  While I certainly hope that's the case, there is the

13  prospect that the Cook County proceeds to discovery.  We

14  don't know how the Cook County court will conduct itself or

15  what will it do.  And if the Court were to tell us to proceed

16  to discovery, certainly that would be a drain on our

17  resources.  So, while we're hopeful it wouldn't add to

18  anything, it certainly could.

19         But in that regard, if it really doesn't add

20  anything to confirmation and doesn't help us resolve our

21  issues, then the balance should weigh in favor of the debtors

22  and the harm it will cause from a distraction basis.

23         Now, I think you heard Mr. Winsberg say, well, the

24  debtors initially sought to proceed with Texas.  Your Honor,

25  that's correct.  Early on in the case we did try to proceed

1  with the Texas action, but we basically thought the better of

2  it and we reconsidered.  And, in March of 2020, we basically

3  said, no, okay, let's not proceed, let's enter into a

4  stipulation and stay everything.  Since that time, again,

5  we've done nothing to advance these cases, nor do we intend

6  to given the amount of work that's happened in this Chapter

7  11 proceeding.

8          So, given the harm to the debtors, the next step

9  is to obviously look at Allianz, what's the harm in Allianz.

10  And I think, as we talked about, Your Honor, there's kind of

11  two components to this argument, right, the first is the

12  retention of jurisdiction.  So one is we think that is a plan

13  confirmation issue and shouldn't be argued here, but, Your

14  Honor, if you look at our response in paragraph 33, we tried

15  to make clear to Allianz that we do not believe and have not

16  contended that the insurance action should be determined by

17  the Court.

18          Your Honor, we've heard that you don't want to

19  determine coverage cases and we're not asking you to, and

20  we're not trying with the retention of jurisdiction to say

21  that.  And I think you're right, what Your Honor said, you

22  have jurisdiction over disputes related to the case, but our

23  intent in the retention of jurisdiction is not to make you

24  the coverage court or to have you somehow usurp the state

25  court action.

1          You know -- and so, Your Honor, I think the second

2    argument that Mr. Winsberg didn't really address, but I'll

3    address it because it's in the papers, is, well, if you don't

4    allow the case to proceed, somehow all the prepetition work

5    will be lost.  Your Honor, we don't see that happening.  It's

6    been 19 months.  If that work hasn't been lost to date, I'm

7    not sure why another three months will cause it to be lost

8    for that matter.

9          And lastly, Your Honor, I just want to touch

10   briefly on the success on the merits.  And I know you

11   mentioned that it's a slight factor and it's a slight test,

12   but what I do want to say is those motions to dismiss dealt

13   with the venue issues, not substantive issues.  None of them

14   actually dealt with the merits of the coverage defenses that

15   are being raised.

16         So, given the fact that Allianz hasn't put

17   anything forward to show that it's actually going to prevail

18   on its coverage arguments, we actually think that factor,

19   even if it's high, weighs in favor of the debtors and keeping

20   the stay in place.

21         So, Your Honor, absent that, you know, obviously,

22   we think all the factors kind of weigh in favor of keeping

23   the stay, we are not using it as a sword.  I'll kind of end

24   where I started, which is we are not doing anything to

25   advance these cases and we don't understand why waiting three

1   months will somehow create some prejudice to Allianz.

2              THE COURT:  Thank you.

3              Ms. Grim?

4              MS. GRIM:  Thank you, Your Honor, Emily Grim,

5   Gilbert LLC, counsel for the FCR.

6              As Your Honor may know, the Coalition and FCR

7   filed their own objection to the Allianz motion and we also

8   join the debtors' objection.

9              And I think Mr. Azer covered most of the arguments

10  we raised in our motion, so I won't repeat them, but I did

11  want to highlight one other point, which is that, if the plan

12  is confirmed, the debtors are going to be transferring their

13  rights under the abuse policies to the trust.  So it's the

14  trust that's going to be pursuing coverage under the policies

15  for the benefit of the survivors.  So, in light of that, it

16  just doesn't make sense for the debtors, who will have no

17  interest in these policies if the plan is confirmed, to be

18  forced to litigate coverage under those policies now, two and

19  a half months before confirmation.  I think, among other

20  things, it would create substantial, unnecessary costs and

21  inefficiencies, because the debtors would have to consult

22  with the FCR, the Coalition, and the TCC on strategic

23  decisions regarding the litigation.

24              I'd also like to respond briefly to Allianz's

25  assertion that they need to lift the stay to get clarity over

1   whether coverage issues will be litigated at confirmation.

2   And I won't dwell on this, as I know we have talked about

3   this somewhat today.

4          I think the FCR and Coalition made very clear in

5   their replies to insurer objections to the disclosure

6   statement that they are not seeking coverage determinations

7   by this Court.  Today, we heard the insurers convey shock and

8   dismay that they've been noticed for deposition in connection

9   with confirmation, but the fact is the insurers are asserting

10  that the plan proponents have colluded in putting forth a

11  plan and TDPs currently on file, and that the TDPs are

12  otherwise completely unreasonable or that they lack

13  appropriate procedures for weeding out fraudulent claims.

14         So, in light of this, I just don't think it should

15  be surprising that the Coalition and FCR are serving

16  discovery to understand whether the TDP values and criteria

17  are in fact so different from those values the insurers

18  attributed to the abuse claims or the criteria they used to

19  evaluate them pre-confirmation.

20         But, in any event, we understand that the insurers

21  have concerns regarding the appropriateness of certain

22  aspects of the plan, including the concerns that Mr. Winsberg

23  just identified regarding the retention-of-jurisdiction

24  provisions.  And, to be clear, we don't agree that the plan's

25  retention-of-jurisdiction provision is problematic or that it

1 somehow prejudices Allianz.  We think it says, in essence,

2 that the bankruptcy court will retain jurisdiction, if

3 appropriate, and, if not, it won't.

4          We think this is somewhat of an unremarkable

5 concept, it regularly appears in mass tort plans, including,

6 most recently, in Delaware in the Takata plan.  But,

7 regardless of the FCR's position on this issue, any concerns

8 over the appropriateness of any plan provision is, as Your

9 Honor noted, appropriately litigated at confirmation and it's

10 just not a reason to reignite a coverage litigation in two

11 different venues two and a half months before a confirmation

12 hearing.

13          That's all I have, Your Honor, unless you have any

14 questions.

15          THE COURT:  I do not.  Thank you.

16          Is there anyone else who wishes to be heard before

17 I go back -- before I go back to Mr. Winsberg?

18          MR. WINSBERG:  Just a couple points, Your Honor.

19 One, like early in the case, it's disingenuous to say that

20 the debtor stopped pursuing the writ proceeding on their own.

21 They took a position that it had to move forward, that the

22 stay didn't apply in the Texas case.  They were very clear

23 about that, that response is on file with the Court.  And the

24 only reason that went away is we filed a motion in front of

25 Your Honor and we filed a motion for relief from stay.  And I

1   in my life have not seen a case where someone took a position

2   that the stay applied to one case and not the other.  So we

3   filed a motion for relief from stay and that's where it got

4   resolved.

5           So the notion that somehow that they are on their

6   good will decided to not move forward with that case at some

7   point just isn't true.  It was -- they didn't stop until we

8   motion on file early in the -- the stay relief motion early

9   in the case.

10          I guess on the other couple points I would just

11  raise is I still haven't heard from either side, you know,

12  clarity on when these cases are supposed to go forward, how

13  they're going to go forward, and is the plan going to impact

14  us.  And they just say, well, leave it to confirmation.

15          And the whole point we're trying to do by this is

16  these cases are going to have to go forward at some point,

17  they should go forward in the forums that they were filed in.

18  You know, I would note that neither the debtor -- the debtors

19  didn't -- has never filed a motion to remove these cases from

20  where they were, they never did.  And so we're stuck with

21  this jurisdiction provisions that are, in our minds,

22  confusing and prejudicial, and today we still don't have any

23  clarity on whether they're going to go forward, when they're

24  going to go forward, and where they're going to go forward.

25  And, at a minimum, we would ask that Your Honor at least give

1    us some clarity on when they could go forward, if it's not

2    today, and where they can go forward, so that we're not left

3    guessing at it.

4         And that matters, I guess for the last point, is

5    while I heard a lot of Ms. Grim talk about, well, discovery

6    needs to be served on the insurers, lifting the stay and

7    having the coverage cases go forward does help draw a line

8    between what truly is a coverage matter and what is an 1129

9    matter.  And to somehow say that the insurers' reserves and

10   reinsurance and claims handling is somehow relevant to

11   whether the debtors' own proposed -- or the claimants'

12   proposed TDPs are fair and reasonable, if that's even a thing

13   as an element of 1129, I just don't understand -- I don't

14   understand it.

15        So we do think that there is -- the cases do have

16   to go forward at some point or there should be some clarity

17   as to the timing of that and where they get to go forward.

18        And, with that, we would just respectfully submit,

19   Your Honor, we understand -- we do understand Your Honor's

20   concerns.  We had the same concerns when we filed the motion,

21   but I do think we -- these cases do deserve at least some,

22   you know, clarity on where we're going to end up before the

23   case is confirmed, and we'd respectfully Your Honor grant the

24   motion.  If you're not going to grant it, at least provide

25   some clarity on -- you know, on when they could go forward,

1    if it's not today, and some clarity on the forum, because the

2    plan, in our minds, is confusing on those points.

3              Thank you, Your Honor.

4              THE COURT:  Thank you.

5         (Pause)

6              THE COURT:  Okay.  Well, I was just looking at a

7    different section of the plan, which I think is probably

8    equally as important as to when cases go forward, and that's

9    the discharge injunction.

10             I appreciate that the motion was brought and I

11   understand why the motion was brought, but I'm going to deny

12   it.  That's without prejudice to any argument that the

13   insurance companies may have with respect to plan

14   confirmation, the jurisdiction provisions, the discharge

15   injunction, et cetera.  This is a request for motion for

16   relief from stay.  When and if a plan is confirmed, the

17   automatic stay will no longer apply, and that's the same as

18   it is in every case.  And litigation can go forward, really

19   depending on the discharge injunction and -- and if someone

20   needs relief from that, I guess I'll deal with that at that

21   point in time.

22             But I'm going to deny the motion, again, without

23   prejudice, to all of those issues because we are so close to

24   confirmation and that is where I believe the debtor needs to

25   focus its attention, and that is on confirmation and the

1 discovery related to confirmation.

2          I do believe that even though it's likely that not

3 much would go forward in the underlying litigation between

4 now and the confirmation hearing that even a little

5 distraction at this point is too much.  And to the extent

6 that in fact one or both courts would want something

7 substantive to go forward during that period, that is a

8 reason to deny the request.

9          In terms of the jurisdiction provisions, I'll need

10 to read through them more closely in connection with the

11 plan, but -- and I will entertain any and all objections and

12 the need for clarity as to what's going to happen around this

13 litigation, but I would also suggest that it's not different

14 than other non-mass tort cases in which there is litigation,

15 prepetition litigation, and the confirmation of the plan is a

16 line of demarcation.  Again, the automatic stay no longer

17 applies.  Mr. Winsberg is correct, there has been no removal

18 of these actions to this Court.  There quite frankly is

19 nothing in front of me to abstain from.

20          And I will address those issues as and when they

21 occur, but I have -- as I said earlier, have announced my

22 predilection not to get involved in coverage actions where

23 not necessary.  And I would say my experience, both on and

24 off the bench, is that those matters do not occur in front of

25 the bankruptcy court.

1            So, on balance, I find that lifting the stay at

2    this time is not appropriate, so I will deny the motion.

3            Okay.  And I will address --

4            MR. ABBOTT:  Thank you, Your Honor.

5            THE COURT:  -- the discovery disputes in the

6    discovery dispute portion of this hearing.

7            MR. ABBOTT:  Thank you, Your Honor.

8            THE COURT:  What's next?

9            MR. ABBOTT:  Your Honor, the next item is agenda

10   item number 5, which is D.I. 6749.  It's the debtors' motion

11   to modify the stay on a limited basis, and I understand Mr.

12   Linder will address the Court on that.

13           THE COURT:  Okay.  And before -- Mr. Linder,

14   before you start, my recollection is this was an objection --

15   the objection is filed by a pro se party.  I want to make

16   sure he is on --

17           MR. LINDER:  That is correct, Your Honor.

18           THE COURT:  -- the hearing.

19           MR. LINDER:  The objection was filed at Docket

20   6867.  For the record, Your Honor, Matt Linder of White &

21   Case on behalf of the debtors.  I'm not sure if he is on or

22   not.

23           THE COURT:  Okay.  Give me a moment here.

24       (Pause)

25           THE COURT:  I'm not seeing him signed up.  Let's

1  take five minutes.  I want to check with Mrs. Johnson.

2          MR. LINDER:  Very good, Your Honor.  Thank you.

3          THE COURT:  Thank you.  We're in recess.

4      (Recess taken at 12:13 p.m.)

5      (Proceedings resumed at 12:23 p.m.)

6          THE COURT:  Okay, this is Judge Silverstein.

7  We're ready to get back on the record, please.

8      (Pause)

9          THE COURT:  Okay.  We're not aware that the

10 individual who filed the objection is participating in this

11 hearing, but he's also -- he's identified himself as Claimant

12 Number 39.  Is Claimant Number 39 on the Zoomcast or on the

13 phone?

14     (No verbal response)

15         THE COURT:  I did not hear anybody or see anybody

16 identifying themselves.

17         So, Mr. Linder, we will go forward.  I did read

18 the objection; I will consider it as I hear your

19 presentation.

20         MR. LINDER:  Thank you, Your Honor.  Good

21 afternoon again, Matt Linder on behalf of the debtors.

22         As Mr. Abbott mentioned, this is item number 5 on

23 the agenda, which is the debtors' motion to modify the

24 automatic stay on a limited basis as necessary solely to

25 facilitate local councils' contributions to the settlement

1 trust as proposed under the plan.

2          As the Court and the parties are aware, the

3 debtors' proposed plan of reorganization contemplates a

4 contribution to be made by local councils to the settlement

5 trust for the benefit of abuse survivors.  This contribution

6 is comprised of approximately $500 million in cash and

7 property, as well as the additional $100 million note that

8 will be issued in favor of the settlement trust that the

9 local councils will pay down over time.

10          The plan provides that each component of the local

11 councils' -- I'm sorry, the cash component of local councils'

12 contribution will be made on the effective date.  There will

13 be an escrow mechanism set up to ensure that those

14 contributions of cash are made promptly on the effective

15 date.

16          As we are approaching plan confirmation, local

17 councils are beginning the process of ensuring that they are

18 prepared to transfer cash into that escrow.  They've

19 committed, in the aggregate, at least as of the disclosure

20 statement hearing, to make more than $400 million of cash

21 contributions to the settlement trust on the effective date.

22          This motion, Your Honor, was filed due to certain

23 provisions of the Boy Scouts of America's bylaws and rules,

24 as well as the form of bylaws for the local councils, as

25 promulgated by BSA.  These governance documents provide that

1   if a local council charter is terminated or if a council is

2   dissolved, then all of the assets of the local councils shall

3   become vested in the BSA after those assets are used at the

4   local level to satisfy claims of creditors.

5           It's our view that, in light of these provisions,

6   we have a contingent interest in local councils' assets,

7   including the assets proposed to be contributed to the

8   settlement trust.

9           I should note -- and this is an important caveat,

10  Your Honor -- that the local councils' dispute -- any local

11  council's dispute whether these governance documents have the

12  effect of giving the BSA an actionable contingent interest in

13  light of certain defenses that they believe they would be

14  able to assert under applicable state laws.

15          The local councils are obviously not debtors in

16  these cases, but it is the debtors' position that the BSA's

17  contingent interests -- not the assets themselves, but our

18  contingent interest in these local council assets is property

19  of the debtors' estate under Section 541 of the bankruptcy

20  code, and that is what has necessitated this motion being

21  filed out of an abundance of caution.  We need to ensure that

22  no action that the local councils take for the specific

23  purpose of ensuring that they can make the contributions

24  contemplated by the plan is later claimed to have -- have had

25  the effect of violating the automatic stay in place in these

1  cases.

2        And there's one particular set of examples that

3  illustrates, Your Honor, why we think this motion is well

4  advised and perhaps necessary.  Specifically, certain local

5  councils have trusts of which they are the beneficiaries.

6  Several of these councils have contacted the BSA to request

7  the BSA's consent to modify the underlying trust documents,

8  to enable them to access trust funds for the purpose of

9  making their contributions.  Under the Uniform Trust Code,

10  which we understand is the law in at least 36 states and the

11  District of Columbia, in order to actually modify an

12  underlying trust document there needs to be a judicial

13  proceeding commenced that names as a respondent all of the

14  entities that claim to have an interest in the trust assets.

15  In this instance, that would include both BSA and relevant

16  state attorneys' general.

17        So that presents an administrative problem or

18  perhaps a legal problem for local councils who need to make

19  these amendments to their trust agreements to release cash to

20  make their contributions to the trust.  State attorneys

21  general and the BSA from time to time do agree to waive

22  service of the summons that's required to be served on

23  entities that the trustees of these trusts know have asserted

24  an interest in the trust, they also agree to consent to trust

25  modifications, and the BSA would like to be in a position to

1   do the same to make sure that local councils can do what they

2   need to do to transfer the money to the escrow in advance of

3   the effective date of the plan.

4        In sum, Your Honor, we believe that there is

5   clearly cause here to modify the stay as we request in the

6   motion so that no party in interest will be prejudiced.  We

7   actually believe that there will be great prejudice

8   potentially arising from the failure to obtain relief from

9   the stay.  We want to ensure that there's a seamless

10  contribution of that $400 million of cash to the trust on the

11  effective date and that will obviously mean a great deal

12  toward compensating survivors of abuse pursuant to the TDP

13  and the trust document, assuming, of course, that the plan is

14  confirmed and becomes effective.

15       As for the objection, Your Honor, I'll address

16  that briefly.  There's only one objection, as the Court

17  noted, filed by Claimant Number 39.  As we stated in our

18  reply in support of the motion and in response to the

19  objection, we do not believe this individual has really

20  meaningfully addressed the standard for modifying the

21  automatic stay or any of the debtors' arguments in support of

22  modification of the stay.  Largely, the objection makes

23  allegations about what -- the nature of the relationship

24  between the BSA and the local councils, and expresses his

25  views on that relationship.  We don't believe that there's

1  any facts in existence, but much less on the record to

2  substantiate the allegations in the objection.

3        The objection also suggests that the BSA is asking

4  the Court to give its endorsement to the relationship between

5  the BSA and local councils, and perhaps to the way that each

6  of those entities is contributing to the trust under the

7  plan.  This is not what we're asking for, and in fact we've

8  made clear in the motion and in the proposed order that the

9  Court is not, you know, quote-unquote, "blessing or

10  approving" any substantive aspect of the plan.  This is

11  merely modifying the stay to permit local councils to take

12  whatever actions they need to take to make sure that they're

13  in a position to, from an administrative standpoint, transfer

14  cash and other property to the trust.

15        Finally, Your Honor, one of the allegations in the

16  objection is that the claimant was served with an incomplete

17  copy of the motion.  Certainly that would be an issue if it

18  were true, but it is not.  We have submitted the declaration

19  from Katherine Nownes-Whitaker of Omni; that was appended to

20  our reply at Docket 6970-1.  Ms. Nownes-Whitaker has averred

21  in the declaration that the full copy of the motion was

22  served on all noticed parties, including Claimant Number 39.

23  He is on the affidavit of service, which of course, pursuant

24  to the Court's confidentiality procedures, the order was

25  redacted when it was filed on the docket, and she has

1  confirmed that he was served with a full copy of the motion.

2  She's also confirmed that Omni has not been contacted by

3  anyone else who claims to have received an incomplete copy of

4  the motion.  And, Your Honor, I can confirm on behalf of the

5  debtors that we have received no other such inquiries.

6  Ms. Nownes-Whitaker is, I believe, on the hearing

7  today and available to answer questions, if necessary.  Just

8  as a housekeeping matter, I'd like to move her declaration

9  into evidence, if I could, at this point.

10  THE COURT:  Thank you.  It's admitted.

11  (Nownes-Whitaker Declaration received in evidence)

12  MR. LINDER:  With that, Your Honor, we request the

13  Court grant the motion and overrule the objection.  And

14  that's all I have, Your Honor, unless you have questions, of

15  course.

16  THE COURT:  Thank you.

17  Let me ask again, is Claimant 39 attending the

18  hearing, either through Zoom or by phone?

19  (No verbal response)

20  THE COURT:  Once again, I do not see or hear

21  anyone.

22  I am going to grant the motion.  I have this as a

23  process-oriented request to give assurance to local council

24  who may need to take steps that, arguably, are in violation

25  of the automatic stay in order to be in a position to make

1 their contribution to the settlement trust in the event the

2 plan is confirmed.

3          I did read the objection filed by Claimant 39.  I

4 think Mr. Linder has accurately described the concerns that

5 the Claimant made, but even accepting all of the claimant's

6 assertions as true, the would still grant the motion because

7 I am not making any determinations with respect to the

8 relationship between BSA and the local council or the nature

9 of any interest that BSA may have in the assets that are

10 owned by the local council.

11          And that is clear in the form of order that has

12 been requested that I am making no such findings.  So, I will

13 grant the motion, as requested, and overrule the objection.

14          MR. LINDER:  Thank you, Your Honor.

15          THE COURT:  Mr. Abbott?

16          MR. ABBOTT:  Thank you, Your Honor.

17          Derek Abbott, Morris Nichols, for the Debtors,

18 again.

19          Your Honor, the next item on the agenda is Item 7,

20 which was a letter that Mr. Azer and I sent to the Court

21 regarding some discovery issues, so I'll cede the podium to

22 Mr. Azer, if I may.

23          THE COURT:  Mr. Azer?

24      (No verbal response)

25          THE COURT:  Mr. Azer, you're muted.

1          MR. AZER:  All right.  Now can you hear me?

2          THE COURT:  I can.

3          MR. AZER:  I apologize.

4          Your Honor, that letter was withdrawn.  We either

5    resolved our disputes with the insurers or decided not to

6    pursue the one remaining insurer with regard to their one

7    issue.  So, from the Debtors' perspective, there is nothing

8    to be heard on the Debtors' behalf.

9          THE COURT:  Okay.  Thank you.

10         MR. ABBOTT:  Your Honor, the one thing that I

11   thought we were supposed to go back to, Your Honor, was

12   scheduling Agenda Item 3, which was the Bern motion to quash,

13   Your Honor.

14         THE COURT:  Okay.  And I guess here's my question.

15   I can provide a hearing time next week, but I'm wondering

16   whether it should be sooner or later in the sense of the

17   parties still talking and also so that I have a time for

18   other disputes, which are not yet in front of me, but I have

19   there have been some filed.

20         My inclination, because of that, is to push -- is

21   to hear this on Friday of next week, so that if there are

22   additional discovery matters that I can hear and can be teed

23   up for that day, there's time to do it.  Let me ask the

24   parties.

25         Mr. Schiavoni?

1       (No verbal response)

2           THE COURT:  Mr. Schiavoni, you're muted.  Mr.

3    Schiavoni, you're muted.

4           MR. SCHIAVONI:  So, Your Honor.

5           Your Honor, we were asked to adjourn this in

6    connection with a larger package of issues, including, in a

7    sense, this sort of marries with another motion, but I more

8    emphasize the larger package of issues.

9           If you could push it to Wednesday, you know,

10   perhaps the issue gets resolved.

11          THE COURT:  Well, I mean, I can put it on

12   Wednesday, along with the Debtors' emergency motion, but it

13   will come after the emergency motion.

14          MR. SCHIAVONI:  I understand that, Your Honor, and

15   if time doesn't permit, I understand that, too.

16          THE COURT:  That's fine.

17          Mr. Sullivan, is that -- I know that your clients

18   were on the other end of one of these.

19          MR. SULLIVAN:  Yes, Your Honor.

20          Bill Sullivan, on behalf of the Marc Bern firm.

21   It is our motion.  We have been sort of deferring to the

22   general scheduling issues going on because this is my only

23   piece of it.  So, again, I'm going to continue to defer to

24   the sort of bigger picture and I would just want to confirm

25   with my client that Wednesday is available for them, but

1  Wednesday or Friday, either way is okay, as far as I'm

2  concerned.

3            THE COURT:  Okay.  Thank you.

4            Mr. Plevin?

5            MR. PLEVIN:  Your Honor, I believe that we'll

6  have, unless, as I said, peace miraculously breaks out, with

7  respect to the discovery disputes, we'll have some discovery

8  disputes, with respect to the insurer depositions.  Those are

9  not ripe yet.

10            It is possible that if we were able to meet-and-

11  confer this weekend or the rest of this week that we could

12  get something on file this weekend, but if the other side has

13  three days to respond, I don't think we could have a hearing

14  on Wednesday unless they agree to shorten time on themselves.

15  So, for that purpose, Friday might be a better time if we're

16  going to try to resolve the discovery issues.

17            THE COURT:  Okay.  Well, I'm going to schedule the

18  two matters that were on today's docket to follow the

19  emergency motion on Wednesday the 17th, but I'm going to keep

20  Friday open so that if I have discovery disputes that can be

21  teed up for Friday, that that is an available day; if not,

22  then I'll schedule things as I can, but at the moment, Friday

23  is open, so I'm going to keep it open for this case for

24  discovery disputes.

25            Okay.  Anyone else?

1      (No verbal response)

2           THE COURT:  Mr. Abbott, are we done for today?

3           MR. ABBOTT:  I believe we are, Your Honor.  That's

4  all the items on the agenda.  We've dealt with the

5  scheduling.  I think we are complete.

6           Thank you, Your Honor.

7           THE COURT:  Okay.  Thank you, everyone.

8           We're adjourned.

9      (Proceedings concluded at 12:41 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>CERTIFICATION</u>

2              I certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of my

5   knowledge and ability.

6

7

8

9   /s/ William J. Garling_____              <u>November 10, 2021</u>

10  William J. Garling, CET**D-543

11  Certified Court Transcriptionist

12  For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25