

James P. Ruggeri
Phone: 202-469-7752
Fax: 202-469-7751
jruggeri@goodwin.com

November 12, 2021

**VIA CM/ECF AND EMAIL**

The Honorable Laurie Selber Silverstein
United States Bankruptcy Court
   for the District of Delaware
824 N. Market Street, 6th Floor
Wilmington, DE 19801

      Re:   *In re Boy Scouts of America and Delaware BSA, LLC*, No. 20-10343
             (Bankr., D. Del.)

Dear Judge Silverstein:

      Along with Bayard, P.A. and Wilmer Cutler Pickering Hale and Dorr LLP, this firm represents Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company ("Hartford"). Hartford writes in opposition to the November 9, 2021 letter brief from the Official Committee of Tort Claimants (the "Committee") [D.I. 7104] seeking to compel the production of three categories of documents from Hartford: (1) reserve-related documents (which Hartford has told the Committee it does not have); (2) "process-specific" documents relating to the mediation; and (3) certain documents subject to a protective order entered in pre-petition state court coverage litigation. The Court should deny each of those demands.

      The Committee's discovery demands on Hartford in this case have not been commensurate with the nature of this proceeding, nor Hartford's role in it. The parties are engaged in discovery regarding plan confirmation, and Hartford is not a plan proponent. Hartford's role, while important, is focused on approval of the Hartford Insurance Settlement Agreement, which is integrated into the plan. Hartford has produced more than 25,000 pages in response to the Committee's demands, including insurance policies, correspondence, settlement agreements, underlying complaints, pleadings setting forth the bases for Hartford's coverage defenses, and documents reflecting indemnity payments that Hartford has made on account of pre-petition Abuse Claims against BSA. These documents are more than sufficient to allow the Committee to evaluate the Hartford Insurance Settlement Agreement, particularly because approval of the settlement turns largely on factors that relate, not to Hartford, but the debtor, including whether the debtors have properly exercised their business judgment in entering into the Hartford Insurance Settlement Agreement.

Consequently, the remaining "disputes" that the Committee identifies in its letter-brief are over documents that (1) Hartford has previously told the Committee it does not have; (2) Hartford has already produced; and/or (3) have no legitimate bearing on the Hartford Insurance Settlement Agreement or plan confirmation. Accordingly, the Court should deny the Committee's request in its entirety.

I. Hartford Is Not Required to Produce Reserves and Claim-Related Information That the Committee Demands in Its Motion.

The Committee's motion acknowledges that Hartford has already produced substantial claim-related information, and that the disputes that remain with respect to its demands on these topics are narrow – as set forth on page 2 of the Committee's motion:

- Documents sufficient to show the value of any reserve established, set, changed, or maintained for each Abuse Claim for which Hartford has not yet made payment;

- Documents sufficient to show, for each Abuse Claim for which Hartford set a loss reserve and has not yet made payment, the Type of Abuse Category associated with the Abuse Claim, and where and when the Abuse at issue allegedly occurred; and

- Documents sufficient to show, for each Abuse Claim for which Hartford has neither set a loss reserve nor yet made payment, the Type of Abuse Category associated with the Abuse Claim, and where and when the Abuse at issue allegedly occurred.

The Committee's demands with respect to these items is unreasonable because the Committee already knows that most of what it is seeking does not exist. Hartford informed the Committee, as part of the meet and confer process, that "there are no loss reserves for individual BSA abuse claims on which Hartford has not yet made payment."[1] Accordingly, there are no responsive documents with respect to the first two bullet points, and those issues are moot.[2]

---

[1] *See* Nov. 8, 2021 e-mail from J. Ruggeri to S. Golden (attached as Ex. A).

[2] Moreover, even if there were responsive documents, there would be no basis to compel production of reserves-related documents here. Courts in coverage actions routinely recognize that reserves are not "an evaluation of coverage based upon a thorough factual and legal consideration" and are therefore irrelevant. *See Mirarchi v. Seneca Specialty Ins. Co. of Pittsburgh, Pa.*, 564 F. App'x 652, 655 (3d Cir. 2014). *See also TIG Ins. Co. v. Tyco Int'l Ltd.*, Civil Action No. 3:08-CV-1584, 2010 WL 4683594 (M.D. Pa. Nov. 12, 2010); *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co.*, 623 A.2d 1099, 1109-10 (Del. Super. Ct. 1991) ("Reserves do not represent an admission or evaluation of liability and are irrelevant. . . ."); *Sundance Cruises Corp. v. Am. Bureau of Shipping*, No. 87 Civ. 0819 (WK), 1992 WL 75097, at *1 (S.D.N.Y. Mar. 31, 1992) ("[R]eserves are, simply, not relevant").

Indeed, in *Imerys*, this Court recognized that reserves are not a representation of an insurer's liability and that in any event, are likely privileged and, because the Court is not required to resolve coverage issues, they are irrelevant to plan confirmation issues. The Court also agreed that this discovery likely would invade the attorney client privilege. *See, e.g., Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 139 F.R.D. 609, 614 (E.D. Pa. 1991) ("[I]ndividual case reserve figures reveal the mental impressions, thoughts and conclusions of an attorney in evaluating a legal claim. By their very nature they are prepared in anticipation of litigation . . . .); *In re: Residential Capital, LLC*, 575 B.R. 29, 50 n.14 (Bankr. S.D.N.Y. 2017); *In re Pfizer Inc. Sec. Litig.*, No. 90 Civ. 1260 (SS), 1994 WL 263610, at *1-2 (S.D.N.Y. 1994). Consequently, the Court agreed that the insurers there would not be required to present a witness to testify as to these issues. *See In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS), June 22, 2021 Hr'g Tr. at 238-40 (attached as Ex. B). And, contrary to the Committee's argument in its letter-brief,

With respect to the third bullet point the Committee has identified – the "Type of Abuse Category" and date/location of alleged abuse – there likewise is no basis to compel the production of additional documents. Hartford has already produced substantial documentation in its possession, custody or control relating to the details of alleged Abuse Claims, including complaints, depositions and reservation of rights correspondence. For other Abuse Claims, where Hartford does not have this type of documentation, the Committee already has access to the same information as Hartford, namely, the proofs of claim database. The claim forms ask the precise questions that the Committee identifies here, including the nature, date and location of alleged abuse. The Committee's access to this information is equal to Hartford's; accordingly, the motion to compel on this point is nothing short of harassment.

II.     The "Mediation Process" Documents the Committee Has Demanded Are Not Relevant to Plan Confirmation.

The second category of documents that the Committee demands in its letter brief is "process-specific" communications between Hartford and other mediation parties that reflect the scheduling of mediation sessions, the parties attending mediation sessions and discussion concerning the inclusion or exclusion of specific parties from the mediation (the "Mediation Documents").

This is an improper subject on which to compel the production of documents from Hartford. Other than a general reliance on the good faith finding required under § 1129(a)(3) of the Bankruptcy Code, the Committee offers no explanation as to how documents identifying how many mediations were held, or who was invited to which sessions, has any bearing on the good faith proposal of the Plan. But it is perfectly normal in any mediation – particularly one with the number of parties and complexity of issues as was present here – that parties in interest (including even the Committee) would be invited to some sessions but not others. Trying to reconstruct the participants in each session is neither necessary nor productive. In any event, Hartford is not the proper party for this discovery; Hartford did not have anything to do with who was invited to each mediation session and who was not.

And, in any event, documents that reflect communications about the conduct of particular mediation sessions are subject to Local Rule 9019-5(d), which is expressly incorporated into the Court's mediation order and which expressly provides for the confidentiality of mediation communications.[3] *See* Del. Bankr. Local R. 9019-5(d) ("[N]o person shall seek discovery from any participant in the mediation with respect to any information disclosed during mediation."). The Committee's request cannot be squared with that rule.[4]

---

Hartford has not put its reserves at issue, as it has not provided reserve information to any expert nor intends to introduce reserve information to validate any analysis or position regarding the Hartford Insurance Settlement Agreement (or any other confirmation issue).

[3]     In addition, numerous cases have recognized the need to protect draft settlements crafted under the auspices of a confidential mediation. *See, e.g., In re Student Fin. Corp.*, No. 02-11620-KJC, 2007 WL 4643881, at *1 (D. Del. May 25, 2007) ("[A]ssurance of confidentiality for communications made during the course of settlement negotiations is a critical component of the process."); *In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 386827, at *8 (Bankr. D. Del. Feb. 3, 2011) ("[C]onfidentiality is essential to the mediation process . . . .").

[4]     The Committee contends that, based on the Court's October 25, 2021 ruling, the privilege does not apply here. But that ruling applied only to the production of communications relating to the TDPs, the good faith of which

III.   Hartford Has Properly Declined to Produce IV Files Consistent With the Confidentiality Requirements of the Protective Order in the Texas Action.

Finally, the Court should deny the Committee's request to produce confidential IV Files that were provided to Hartford in the context of coverage litigation.[5] Hartford has acknowledged that it received portions of certain of the so-called "IV Files" in the course of the pre-petition litigation between BSA and Hartford in Texas state court (the "Texas Litigation").[6] In the Texas Litigation, however, the Court entered a protective order which provides that documents identified as confidential may not be disseminated to other persons or used for purposes other than the coverage action:

> 3.   Use and Disclosure:  No person receiving "Confidential Information" shall disclose such "Confidential Information" or use it for any purpose other than participation in the above-entitled action (this "Litigation"). Further, "Confidential Information" shall not be disclosure or communicated in any way to anyone other than the following (hereinafter "Qualified Persons") and then only in the manner and to the extent provided for herein.

Texas Litigation, Protective Order ¶ 3. BSA and the other plaintiffs in the Texas Litigation designated their production of IV Files and related documents as Confidential Information within the meaning of the protective order. And the Committee and other interested parties in these chapter 11 cases are not "Qualified Persons" within the meaning of the protective order.

Hartford disputes that the IV Files that BSA has produced to it in the Texas Litigation (which the Committee refers to as the "Restricted Documents") are relevant to plan confirmation issues. The Texas Litigation concerned Hartford's alleged obligations to provide coverage for certain pre-petition claims asserted against BSA and a few of the local councils. Accordingly, the Restricted Documents that Hartford received in the Texas Litigation were limited to those pre-petition claims. IV Files relating to those pre-petition lawsuits are a sideshow, not a confirmation issue.

---

is at issue. *See* Oct. 25, 2021 Tr. at 6:3-4 (attached as Exhibit C) ("The discovery dispute related to the TDPs has crystalized over the last few months and I can address it."). But the Court cautioned the parties that the ruling did not apply to other issues in which the mediation privilege might arise, particularly in the context of settlement of disputes. *See id.* at 15:18-19 (noting that the mediation of settlements may be "evaluated differently"). And there is good reason to honor the plain language of the local rule and the Court's mediation order here. Approval of the Hartford Insurance Settlement Agreement does not turn on what transpired in the mediation (or who participated in what mediation sessions), but instead on factors relating to the settlement itself, including whether the settlement falls within the range of reasonableness and the debtors have properly exercised their business judgment in entering into the settlement. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). The "process" oriented mediation documents that the Committee has demanded do not fall into any of these factors, and the debtors have not placed them at issue by seeking approval of the Hartford Insurance Settlement Agreement.

[5]   The only Request for Production that the Committee has identified with respect to this concern is Request No. 14: All IV Files and all Documents that evidence, interpret, constitute, refer, relate to, or otherwise Concern any IV Files.

[6]   That case is styled *Boy Scouts of America et al. v. The Hartford Accident and Indemnity Co.*, No. DC-18-07313 (Tex. Dist. Ct. Dallas Cnty.).

      Nonetheless, in an effort to try to avoid discovery disputes, Hartford both provided the Committee with a copy of the protective order and requested BSA's permission to produce the Restricted Documents. BSA has not consented to date. But the Committee has also failed to follow the procedures for the production of protected material. The protective order provides that Hartford can produce protected documents in response to a properly-served subpoena. *See* Protective Order ¶ 8. The Committee, however, has not attempted to serve a subpoena on Hartford, even after receiving the protective order and becoming aware of its requirements. Accordingly, the Court should deny the Committee's request even if it were to conclude that the Restricted Documents are somehow relevant to plan confirmation.

      We look forward to addressing these issues further at the convenience of the Court.

Respectfully submitted,

James P. Ruggeri

cc: All counsel of record (via CM/ECF)