# EXHIBIT 7

```
1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2
                                   .    Chapter 11
3    IN RE:                        .
                                   .    Case No. 19-10289 (LSS)
4    IMERYS TALC AMERICA, INC.,    .
5    et al.,                       .
                                   .    Courtroom No. 2
6                                  .    824 North Market Street
                                   .    Wilmington, Delaware 19801
7                                  .
                                   .    June 22, 2021
8                    Debtors.      .    10:30 A.M.
     . . . . . . . . . . . . . . . . .
9
                    TRANSCRIPT OF TELEPHONIC HEARING
10         BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                    UNITED STATES BANKRUPTCY JUDGE
11
12   TELEPHONIC APPEARANCES:

13   For the Debtors:          Amanda R. Steele, Esquire
                               Marcos Ramos, Esquire
14                             RICHARDS LAYTON FINGER, P.A.
                               One Rodney Square
15                             920 North King Street
                               Wilmington, Delaware 19801
16
                               - and -
17
18                             Matthew Salerno, Esquire
                               LATHAM & WATKINS LLP
19                             1271 Avenue of the Americas
                               New York, New York 10020
20
21   Audio Operator:           Brandon J. McCarthy

22   Transcription Company:    Reliable
                               1007 N. Orange Street
23                             Wilmington, Delaware 19801
                               (302)654-8080
24                             Email: gmatthews@reliable-co.com
25
     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
```

TELEPHONIC APPEARANCES (Cont'd):

For the Debtors:            Kimberly A. Posin, Esquire
                           Helena G. Tseregounis, Esquire
                           LATHAM & WATKINS LLP
                           355 South Grand Avenue, Suite 100
                           Los Angeles, California 90071

For Johnson & Johnson:     Theodore Tsekerides, Esquire
                           Ronit Berkovich, Esquire
                           WEIL GOTSHAL MANGES
                           767 Fifth Avenue
                           New York, New York 10153

For Zurich American        Mark Plevin, Esquire
Insurance:                 CROWELL & MORING LLP
                           Three Embarcadero Center, 26th Floor
                           San Francisco, California 94111

For the Representative     Robert Brady, Esquire
for Future Talc            YOUNG CONAWAY STARGATT & TAYLOR LLP
Claimants:                 Rodney Square
                           1000 N. King Street
                           Wilmington, Delaware 19801

For U.S. Trustee:          Linda Richenderfer, Esquire
                           Juliet Sarkessian, Esquire
                           UNITED STATES DEPARTMENT OF JUSTICE
                           OFFICE OF THE UNITED STATES TRUSTEE
                           844 King Street, Suite 2207
                           Lockbox 35
                           Wilmington, Delaware 19801

For Arnold & Itkin LLP:    Laura Davis Jones, Esquire
                           PACHULSKI STANG ZIEHL & JONES
                           919 North Market Street
                           Wilmington, Delaware 19801

                           - and -

                           John Morris, Esquire
                           780 Third Avenue, 34th Floor
                           New York, New York 10017

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For the Committee        Mark Fink, Esquire
     of Tort Claimants:       ROBINSON & COLE LLP
 3                            Chrysler East Building
                              666 Third Avenue, 20th Floor
 4                            New York, New York 10017

 5                            - and -

 6
                              Stuart Lombardi, Esquire
 7                            WILLKIE FARR & GALLAGHER LLP
                              787 Seventh Avenue
 8                            New York, New York 10019

 9                            - and -

10
                              Heather Frazier, Esquire
11                            GILBERT LLP
                              700 Pennsylvania Avenue, Suite 400
12                            Washington, DC 20003

13   For Cyprus Historical    Tancred Schiavoni, Esquire
     Excess Insurers:         Janine Panchok-Berry, Esquire
14                            O'MELVENY & MYERS
                              7 Times Square
15                            New York, New York 10036

16   For William Hart         Lisa Norman, Esquire
     Plaintiffs:              ANDREWS MYERS, P.C.
17                            1885 St. James Place, 15th Floor
                              Houston, Texas 77056
18

19   For TIG Insurance Co.:   George Calhoun, Esquire
                              IFRAH PLLC
20                            1717 Pennsylvania Avenue
                              Washington, DC 20006
21
     For Aylstock, Witkin,    Robert Pfister, Esquire
22   Kreis & Overholtz:       KTBS LAW LLP
                              1801 Century Park East, 26th Floor
23                            Los Angeles, California 90067

24

25
```

1  MATTERS GOING FORWARD:

2  1. Motion of Certain Insurers for Protective Order [Docket No.
   3364 – filed April 9, 2021
3

4  2. Motion of Holders of Talc Personal Injury Claims
   Represented By Arnold & Itkin LLP to Extend Discovery
5  Deadlines and Permit Discovery of the Plan Proponents, Prime
   Clerk and Certain Third Parties Relating to the Solicitation
6  and Voting With Respect to Ninth Amended Joint Chapter 11 Plan
   of Reorganization of Imerys Talc America, Inc. and Its Debtor
7  Affiliates Under Chapter 11 of the Bankruptcy Code [Docket No.
   3425 – filed April 17, 2021]
8

9  3. Debtors' Motion to Quash or for a Protective Order in
   Connection with (I) J&J's Subpoena to Prime Clerk LLC for
10 Production of Documents, Dated March 26, 2021, (II) J&J's
   Subpoena to Prime Clerk LLC for Production of Documents, Dated
11 April 13, 2021, and (III) the Cyprus Historical Excess
   Insurers' Subpoena to Prime Clerk LLC for Production of
12 Documents, Dated April 16, 2021 [Docket No. 3459 – filed April
   21, 2021]
13

14 5. Motion of Holders of Talc Personal Injury Claims
   Represented by Arnold & Itkin LLP to Disregard Certain Vote
15 Changes Made Without Complying with Bankruptcy Rule 3018, and
   the Required Showing of Cause in Connection with the Voting on
16 the Ninth Amended Joint Chapter 11 Plan of Reorganization of
   Imerys Talc America, Inc. and its Debtor Affiliates Under
17 Chapter 11 of the Bankruptcy Code [Docket No. 3624 – filed
   June 8, 2021]

18      **Ruling:  Matters Taken  Under Advisement**

19

20 DEBTORS' WITNESS(s):

21 **ERIC DANNER**

22      Direct Examination by Mr. Salerno        30

23      Cross Examination by Mr. Pfister         45

24      Cross Examination by Mr. Plevin          47

25      Cross Examination by Mr. Tsekerides      60

5

1      Cross Examination by Ms. Sarkessian        61

2      Redirect Examination by Mr. Salerno        64

3


4    EXHIBITS                                I.D.    REC'D

5    Declaration of Eric Danner                       33

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          So I can -- I could see an argument saying that, in

2    fact, some sort of discretion should be permitted to extend

3    the voting deadline to permit a change of ballot.  I'm not

4    sure that's the case here, where I think there have been

5    issues raised with respect to the change of ballots.  And the

6    language in this particular order I don't think says exactly

7    what the debtors and plan proponents think it said or wish it

8    had said.

9          Okay.  What's next?

10          MS. POSIN:  Your Honor, I think the other motion on

11    for hearing today was the motion to quash the insurer -- or

12    the motion of certain insurers for a protective order, Item 1

13    on the docket.

14          THE COURT:  Mister -- oh, no, this is Mr. Plevin.

15          MR. CALHOUN:  Your Honor, George Calhoun for

16    TIG Insurance Company, International Insurance Company,

17    International (indiscernible) Insurance Company, and a few

18    other certain insurers.  I've been nominated to take the lead

19    on this, so the moving insurers (indiscernible) seven hours

20    ago maybe I should have spoken up about the order in which we

21    take things because I like being first on the docket more than

22    being last.

23          Your Honor, hopefully this will be a little more

24    simple than the other issues you've dealt with today.  Unlike

25    the voting issues, which are integral and core to the

1    bankruptcy process and confirmation process, the discovery

2    served by the tort claimants on certain insurers and

3    substantively identical deposition notices is really -- do get

4    to the third party down-the-pike issues that you were

5    referencing earlier.

6            Each of these deposition notices contain ten

7    identical topics and when you look at those topics, which are

8    laid out in our moving papers, it's apparent that it's just --

9    it's (indiscernible) petition to the legal theories and

10   thought processes of certain insurers' counsel and information

11   that bears only coverage issues, if it bears on anything at

12   all.  And I'll try to keep my comments brief, Your Honor,

13   because most of the arguments are in the paper and it's late

14   in the day.

15           It's safe to say, Your Honor, that the opposition

16   gives the game away.  In the conclusion in their opposition

17   they state, "The deposition topics seek testimony from certain

18   insurers on issues relevant to the plan objections they intend

19   to advance, their standing to make those plan objections, and

20   the extent of their potential liability for talc claims."

21           So they're quite clear that what they're seeking is

22   testimony about legal objections and it's not yet been filed.

23   They have some concerns about standing and insurers'

24   liability.

25           As to the first of those groups, topics 7 and 8 in

1  particular, they're expressly seeking legal opinion of the

2  yet-to-be-filed objections.  I can appreciate why they might

3  want that.  I'd like to know what my opponents are thinking in

4  cases also, but the time for objections is after discovery and

5  only after insurers have evaluated that discovery, decided on

6  what objections should be filed and what their legal issues

7  are in connection with those theories.  If an objection hasn't

8  been filed, how can an insurer possibly testify as to facts

9  that might support a hypothetical objection?

10          And, perhaps more importantly, we're not in

11  reciprocal positions, Your Honor, because the operative facts

12  in a confirmation hearing are the plan, the plan documents,

13  the plan proponents' good faith, the facts that are relevant

14  to confirmation are almost exclusively in the control of the

15  plan proponents.  Information about coverage just isn't

16  relevant to confirmation.  In fact, Your Honor has previously

17  ruled in other contexts earlier in this case that you weren't

18  going to permit discovery of insurance issues because it

19  wasn't relevant to confirmation and that still remains the

20  case today, and no amount of maneuvering alters that

21  fundamental conclusion.

22          The other piece of the opposition that kind of

23  gives the game away, the tort claimants state repeatedly that

24  their discovery is relevant to insurers' potential liability,

25  and they may be right about that, it may be relevant to

1  insurers' potential liability, but the plan is not designed to

2  determine insurers' potential liability, nor could it be.

3  Determination of liability requires a trial and submission of

4  actual claims, neither of those is at issue in the plan.

5  There already are outstanding coverage actions where the

6  rights of insurers will be determined.  That's where the

7  coverage issues should stay.  And although this is a

8  complicated case with a number of significant and technical

9  issues, injecting insurance liability into the mix is not

10  necessary, nor is it appropriate here.

11          Topics 2, 4, and 5, Your Honor, all go to alleged

12  efforts of insurers to estimate, project, or value talc

13  claims.  To the extent that insurer evaluated any claim -- and

14  most of these requests are concerning prepetition efforts --

15  any such evaluations would be work product, they would be

16  counsel evaluating claims.  And in support of their arguments

17  that that type of discovery might be discoverable and not

18  privileged, they cite Your Honor to a couple of coverage

19  cases, not to confirmation cases.

20          But, even putting that aside, what they're really

21  asking for is expert testimony.  To the extent that there is

22  testimony concerning an estimate or projection of claims here,

23  that would be the subject of expert testimony in this case.

24  And, frankly, any estimate that may have been done, if any was

25  done -- I don't know that any was done, but if it was and it

1  was done prepetition, it was done based on a completely

2  different fact scenario than on this today where the number of

3  claims that have been filed in this bankruptcy vastly dwarfs

4  what existed prepetition.

5          The other topics they seek -- and it's in a similar

6  vein, Your Honor -- are in topics 3 and 6 (indiscernible) that

7  insurers provide to them information about their reserves and

8  about reinsurance.

9          As we said in our papers, and I won't repeat those

10 arguments at length, that type of information isn't even

11 discoverable in a coverage action, both because it's

12 irrelevant and because it's privileged.  Reserve and

13 reinsurance information, court after court after court after

14 court has found isn't relevant to any determination of an

15 insurer's liability because it's an accounting exercise, it

16 doesn't have anything to do with a determination of claim.

17 So, if it's not discoverable in a coverage action where an

18 insurer's liability might actually be at issue, there's no

19 reason for it to be discoverable here.  It just doesn't bear

20 on any confirmation issue.

21         And critically on that point, in our motion we said

22 this is oppressive because it doesn't have anything to do with

23 this confirmation.  We're going to have to try to prepare a

24 witness to testify about a bunch of issues that have nothing

25 to do with the case and we made this relevancy argument.  And,

1  in response to that, there was really no response.  There was

2  no effort to tie any of these deposition topics to any issue

3  in the confirmation proceedings, they didn't make any.

4          With respect to topics 1, 9, and 10, Your Honor,

5  those go to the insurers' claims handling limits and

6  exhaustion of their policies and the Court has previously

7  refused to permit discovery on those very same issues.  In

8  fact, the debtors argue that such coverage issues were wholly

9  irrelevant to the plan, there's no reason they'd become

10 relevant now, especially with respect to claims handling, that

11 just has nothing to do with confirmation standards.

12         Although the limits and exhaustion are issues that

13 are being litigated in the California case right now that many

14 of the insurers are a party to, those issues aren't really an

15 appropriate subject for deposition discovery anyway.  It

16 doesn't make any sense for us to try to figure out for each

17 policy on a policy-by-policy basis what we think the limits

18 are and then try to have a witness memorize that.

19         So if you think it's appropriate to have discovery

20 of those issues for confirmation purposes, we suggested to the

21 tort claimants that we provide that information in

22 (indiscernible) response and they refused.  We still think

23 that makes more sense.  We don't think it's relevant at all

24 and we don't think you should allow it to go forward, but

25 presume it does, under Rule 26(1)(C), you're authorized to

1  prescribe the discovery method other than the one selected by

2  the party seeking discovery.  They've argued that they get to

3  pick the means of discovery, but that's just not consistent

4  with the rule that governs discovery issues.

5          The last point I wanted to make, Your Honor, is

6  that the one issue that they really seem to be going at here

7  is that they think this discovery goes to support some sort of

8  standing objection, none has been raised to date.  What that

9  includes is -- I think I would describe it as (indiscernible)

10  at best.

11          As Mr. Plevin noted earlier today, many of the

12  insurers have filed proofs of claim, to which no objections

13  have been filed, to have standing as creditors.  Other

14  insurers such as my clients have entered into stipulations

15  that their indirect claims would be filed at a later date.

16  But the analysis of whether standing exists doesn't depend on

17  insurers' claims handling or reserves or whether they have

18  done anything in it prepetition with respect to particular

19  claims.

20          The Third Circuit said what you have to look when

21  evaluating standing is whether the insurers have a legally

22  defensive interest that could be affected by a bankruptcy

23  proceeding, and that was from the Global Industrial

24  Technologies case in 2011.  And actually (indiscernible)

25  decision is particularly telling on this point because the

1  Third Circuit in that case focused on the many-fold increase

2  in silica-related claims that were at issue there.  Here,

3  there's a much larger increase in the number of talc claims

4  because Imerys proposes to go from a company with essentially

5  zero liability to one in which it will establish a trust to

6  pay billions of dollars in claims, and that's from their own

7  disclosure statement, their own materials, that's not from

8  insurers.

9          So those two facts alone, I think, are enough to

10  establish standing, but we don't have a standing objection,

11  there's been no effort to link any of this discovery to any

12  sort of theory that would preclude the insurers from objecting

13  to the plan.  If insurers had somehow evaluated a claim, does

14  that mean we don't -- we can't object to the plan?  It just

15  doesn't -- there's no linkage and (indiscernible) following

16  that.

17          But in short, Your Honor, you're not going to be

18  asked to decide any insurance coverage issues in connection

19  with confirmation.  You're very unlikely to hear from any of

20  the excess insurers' clients as witnesses; it's not part of

21  confirmation.  And bear in mind, Your Honor, that these

22  clients are all excess insurers for the most part, with one

23  minor exception that we noted in the papers, and aren't called

24  to handle claims until underlying insurance is exhausted.

25          So it's not clear where this is going.  It seems to

1  be just an exercise in tit-for-tat, if you're going to take

2  discovery of us, we're going to take discovery from you,

3  without regard to what the purpose is, without advancing the

4  ball.  And, frankly, Your Honor, there's too much going on and

5  too much we're trying to crowd into a very tight discovery

6  schedule to have ten insurance depositions crowding the

7  calendar for issues that just don't go to confirmation at all.

8          So, respectfully, Your Honor, we'd ask that you

9  quash the subpoena and issue a protective order limiting the

10 method in which that discovery is taken.

11         THE COURT:  Thank you.

12         MS. FRAZIER:  Hi, Your Honor, Heather Frazier,

13 special insurance counsel to the TCC and FCR.

14         I think this hearing sets the table a bit --

15         MR. SCHIAVONI:  I'm sorry, Your Honor, could I be

16 heard for the defending parties first?  Tanc Schiavoni for

17 Century --

18         THE COURT:  Yes, Mr. Schiavoni.

19         MR. SCHIAVONI:  -- or for Cyprus.

20         Sorry.  I'm very sorry to TCC, I didn't mean to

21 interrupt them; I just had a problem working that mute button

22 once again.

23         So, Your Honor, I just -- I don't want to duplicate

24 what Mr. Calhoun had to say, but I think I'd come at this, and

25 my clients to some extent, from a unique perspective, and that

1  is we twice went to the TCC and to the debtors and asked for

2  specific discovery and specific relief related to insurance

3  matters when we were being asked to defend cases throughout

4  this case.  We came to the Court in 2019 and we asked for the

5  stay to be lifted at that point.  There was litigation that

6  followed and in that litigation the stay was not lifted.  We

7  were left to defend, to fund the cases, notwithstanding the

8  issues that were pending in the California court, and in that

9  litigation the debtors came forward and they joined the TCC in

10  opposing lifting the stay.

11         And one of the things they actually said was there

12  are three to ten causes of action in the -- this is the

13  debtors -- in the California coverage action that specifically

14  address which entity has coverage rights under the historical

15  policies.  And so, for that reason, the pure coverage issues

16  that may have to do with exhaustion and interpretation of

17  policy language, and whether or not there is actually

18  coverage, those are exclusively in the California coverage

19  actions.  The debtors do not intend to bring those before the

20  Court at this time.

21         So it's like we dealt with this very issue.  They

22  are now turning that shield -- which we wanted discovery on,

23  to be clear, at a time where we were spending money -- they're

24  now turning that shield into a sword.  They protected

25  themselves from having the stay lifted, us pursuing discovery

1  on it in the California action, by, you know, completely

2  representing to the Court that these issues that they're now

3  seeking 30(b)(6) on, specifically exhaustion and

4  interpretation of the policy language, would have nothing to

5  do with the proceedings in this court.

6          We then, Your Honor, came back and we said at the

7  end of the adversary proceeding involving whether or not the

8  debtor even owns the rights to the policies that are at issue

9  in the case, we said, jeez, could we have copies of the

10 transcripts of those depositions where these various debtor

11 parties were contending that they did or did not have -- in

12 fact have rights to those policies.  And the debtors argued

13 that the transcripts were, quote, "wholly relevant to the

14 evaluation of the third amended plan and beyond the proper

15 purpose of plan-related discovery."

16         And Your Honor granted them the relief they sought,

17 which was to protect all of that discovery that was exchanged

18 about whether or not the policies at issue in any way have to

19 do with, you know, whether or not they own the policies or not

20 -- I mean, none of that, none of that stuff would touch on

21 coverage has anything to do with the case.

22         And the Court further went on to note -- or went on

23 to note in that ruling that -- and this November 5, 2020, on

24 line 13, "that I should be concerned that no party be given a

25 litigation advantage in matters that aren't before this Court

1  by virtue of the bankruptcy proceeding."

2           So as I sort of read that at the time was the Court

3  was saying, look, these issues about discovery into how the

4  policy should be interpreted, how they should be applied, how

5  the claims should be handled all went to issues that weren't

6  before the Court on the third amended plan and weren't the

7  proper scope of discovery.  So having obtained the relief

8  here, the debtors and the TCC, that they sought blocking us

9  from access to any of that material, forcing us to defend and

10  pay during the pendency of the case, to wait until the end of

11  the case to go back to the California action, now they're

12  coming and saying they want depositions on all of these

13  topics, they want the very topics that they were precluding us

14  from seeking discovery on.  And that is most certainly a sword

15  being turned into a shield against us on this.

16           But there's something else even kind of more

17  incredible about this, from our perspective, and that is when

18  we dealt originally at the beginning of the case with the

19  application of Young Conaway to serve as counsel for the FCR,

20  we brought out that Young Conaway was concurrently serving as

21  counsel to one of our clients, had dealt on issues that were

22  substantially related about transfers of policies in Delaware,

23  that they were continuing to be in that engagement. In fact to

24  this day there's no resignation from that engagement, it is

25  sort of, you know, getting perhaps close to its end if there's

1  not an appeal, but that engagement is in placement.  And they

2  now have turned around and done exactly what they basically

3  said in the engagement in -- you know, at the beginning of the

4  case that they weren't going to do.  They said then that,

5  look, there's not an issue here about a conflict because we're

6  not really getting into coverage issues, we're not -- they're

7  not substantially related, we're not going to be taking

8  discovery from our clients here.  But here it's exactly --

9  it's like then, it's like the order was granted, and we

10  respect the Court's order, quite obviously, that there wasn't

11  a conflict, but the facts now are changing on the ground.

12  They're turning and asking to depose our very client on the

13  very issues that were in play in the Warren case.  That's

14  wrong, it would reopen the entire retention issue and create a

15  whole nest of issues that are just not necessary here.

16              I'd add just two last things in closing here, Your

17  Honor.  It's not like we're sort of in a sense hiding from

18  anything either here because we produced two witnesses.  If

19  you remember, there was an order in one -- both of them were

20  sort of in this adversary proceeding issue, both of them were

21  deposed about, you know, claims handling, they tried to depose

22  them also about like questions of interpretation of policy.

23  We've been through this.  We've been down the drill already

24  with two witnesses having been produced.  Nowhere in any of

25  the papers is there any explanation about why this isn't

1  cumulative, why anything else is needed beyond everything else

2  that they already have.

3        The discovery that they seek, you know, from us is

4  burdensome, but you should understand before we go down this

5  route just how burdensome it is overall.  The 30(b)(6)

6  requests are directed specifically at the individual issuing

7  companies.  So while Mr. Calhoun represents, you know, a

8  client here, he actually has, I think, several issuing

9  companies, and that's true for a number of us.  So there's

10  more than ten companies here in total.  It's like the notice

11  multiples out to a number that's north of 15 for each of the

12  individual ones.  It's like we heard endless back-and-forth

13  about whether or not an extra hour, you know, for four parties

14  to question someone from the TCC about voting was appropriate.

15  These are all -- these 15-plus depositions, all eight hours of

16  inquiry into what our reserves are, our litigation reserves,

17  these are privileged issues.  How our reinsurance works, how

18  we interpret the policies, has nothing to do with confirmation

19  Each one of these depositions will generate further motion

20  practice about the extent of privilege on these issues and it

21  will reopen the issue of the retention of Young Conaway as

22  they're pursuing depositions against their own clients here.

23        So we'd respectfully ask, Your Honor, that -- and,

24  you know, specifically with regard to our client, we produced

25  two witnesses already, they've been deposed, that should be

1    enough this, and they shouldn't have to carry an extra if

2    there's anything they planned that they didn't get from us in

3    those, but we ask for you -- that these would be quashed with

4    our client, but also with the group in total.

5              Thank you.

6              THE COURT:  Thank you.

7              Ms. Frazier?

8              MS. FRAZIER:  Yes, Heather Frazier, special

9    insurance counsel to TCC and FCR.  I'll try to keep it

10   relatively brief, I know everyone is itching to get off of

11   here, but I think that kind of this hearing in general has set

12   the stage for a lot of the arguments I want to make here.

13             The insurers just can't have it both ways.  They

14   stood up at every opportunity in this bankruptcy; they have

15   filed 13 motions, objected to 48 pleadings, served 36 sets of

16   discovery and asked for 18 depositions so far.  We have now

17   asked for discrete depositions of each insurer and now they

18   are claiming that these issues are irrelevant and it is

19   burdensome for them to produce a witness.

20             They are right, we have contended that insurance

21   coverage issues are irrelevant; however, they contend that

22   they are not, that their rights are affected by the plan, that

23   they have objections to the plan, and we have the right to

24   depose them about those issues.

25             First, I'd like to focus the Court a bit on the

1  standard.  It is their burden seeking a protective order to

2  point to specific reasons why that is required.  It is not our

3  burden to show relevance or why particular types of testimony

4  should be allowed, although I will of course go through those

5  reasons.

6          In general, I think we are seeking this discovery

7  for two reasons:  first, to support our case for confirmation;

8  second, to evaluate the insurers' standing to make objections

9  to the plan.  And just to kind of take the Court through the

10  topics as Mr. Calhoun addressed them, first with regard to

11  plan objections and neutrality.

12          These requests seek the facts, facts known by

13  insurers and are relevant to confirmation of the plan.  Courts

14  within the Third Circuit consistently hold that parties may

15  use 30(b)(6) depositions to explore facts underlying legal

16  theories, and every other objector in this case has agreed to

17  testify as to the facts underlying their contentions.  The

18  insurers cannot claim that just because a fact is relevant to

19  a legal issue it's therefore cloaked in privilege.

20          And I'll give the Court just one example.  From the

21  insurers' reply to this motion, that's docket entry 3962, the

22  insurers state, quote, "The facts put forth by the tort

23  claimants in their plan and disclosure statement demonstrate a

24  far greater explosion in claims and talc as a new tort is much

25  more analogous to silica than to asbestos for present

1  purposes."

2          The tort claimants might wish to question the

3  insurers about what facts set forth in the plan support this

4  statement, why they claim there is an explosion in claims.

5  What do they mean by explosion in claims?  What facts

6  demonstrate that talc is more analogous to silica?  All of

7  these facts are relevant to potential objections that may be

8  brought regarding confirmation and we are entitled to explore

9  those issues in order to support our case at confirmation.

10          Topics related to basic policy information and

11  claims handling, that's topics 1, 9, and 10, the insurers

12  would like us to issue interrogatories here.  They don't get

13  to pick what method of discovery we do.  And in fact I find it

14  interesting that the insurers served the TCC with

15  interrogatories and then served them with a deposition notice

16  asking for testimony about their interrogatory answers.

17  So --

18          THE COURT:  Okay, but what are you going to be

19  asking for -- well, one is super broad, but what are you going

20  to be asking for 9 and 10?  You want the name of the policy,

21  how much is nominally left?  You're going to sit there and ask

22  some guy to go through the policies?

23          MS. FRAZIER:  Well, and this is kind of an

24  important point because when discussing with the insurers in

25  the meet-and-confer process we recognized that this would be

1  perhaps a place where we could enter into a stipulation and we

2  offered that up.  But instead of taking us up on any sort of

3  compromise, the insurers' position was that, if they had to

4  present a witness on any topic, they were going to move to

5  quash the entirety of the deposition notices.

6          So we did recognize that it was possible in many

7  cases to have that type of information sought through a

8  stipulation or some other method, but the insurers refused

9  that offer.

10         THE COURT:  Okay.  What's topic number 1?  How is

11  that relevant to anything that's going to be in front of me at

12  confirmation?

13         MS. FRAZIER:  If insurers denied coverage of it

14  prepetition, it is possible they do not have standing to

15  object to the plan.  If there is no liability under their

16  policies, they have no interest in the proceeding.

17         THE COURT:  Well, I'm not going to decide whether

18  they have liability under their policies in connection with

19  confirmation.  How am I deciding that?

20         MS. FRAZIER:  And you wouldn't have to, Your Honor,

21  you wouldn't have to decide that.  I think if --

22         THE COURT:  Well, don't the debtors know if

23  coverage was denied?  There would have to be a letter and the

24  debtors would have it.

25         MS. FRAZIER:  We have some of that information, but

1  we don't have all of it.  The debtors may have some.  I know

2  that there have been disputes about privilege, but we do not

3  have definitive evidence from the insurers about the treatment

4  of those claims prepetition.

5          I don't think -- we do not intend -- and this is

6  another kind of meet-and-confer-process thing -- these are not

7  eight-hour depositions, these are not complicated issues.  It

8  may be that, sure, they denied coverage, or they never

9  received notice, there may be a simple answer, but I think

10 we're entitled to the answer.

11         THE COURT:  Because it goes to standing?

12         MS. FRAZIER:  Right, because, as the insurers point

13 out, the Third Circuit has focused on whether the insurers

14 have a legally-protected interest that could be affected by

15 the bankruptcy proceeding.  So we are exploring what that

16 interest is.

17         THE COURT:  Well, the debtors think that they've

18 got a huge interest; the debtors think there's coverage.  So

19 you want me to decide that if an insurance company sent a

20 denial letter that they don't have standing even though the

21 debtors say there's coverage?

22         MS. FRAZIER:  I don't think you have to decide the

23 coverage issue, but I think that what the insurance companies

24 have done or the position that they have taken prepetition are

25 relevant to considerations of whether they can object to -- if

1  they don't think they have any coverage obligations, why are

2  they here?  Why are we -- all day we've heard from the

3  insurance company, but what's the objection, what's the

4  problem if they are not going to pay for any of these claims

5  and never were?

6           THE COURT:  Well, because there's coverage

7  litigation in California which has been stayed.  So, until

8  that's decided, we don't know.

9           MS. FRAZIER:  I think that's right that they can

10  testify about their position, we're entitled to ask them if

11  they denied coverage; we're not asking whether it was correct,

12  we're not asking what the Court will ultimately determine, but

13  just like -- just like the testimony regarding what are your

14  limits.  Sure, they're going to testify about their position

15  about what the available limits are.  That's not a legal

16  determination, that's their position.

17           THE COURT:  Okay.  So when you say handling, you're

18  talking about did they deny coverage?  Because this is a --

19           MS. FRAZIER:  Did they deny coverage, did they

20  reserve rights, did they --

21           THE COURT:  Okay, did they deny --

22           MS. FRAZIER:  -- how did they treat the claims.

23           THE COURT:  Okay, okay.

24           MS. FRAZIER:  So do you want to go topic by topic?

25  I'm just trying to --

1          THE COURT:  Yeah --

2          MS. FRAZIER:  -- make it the most useful --

3          THE COURT:  -- I do want to go topic by topic.

4          MS. FRAZIER:  -- for the Court as possible.  Sure.

5   Okay.

6          Their topic 2, "Efforts to estimate or establish

7   the value of talc personal injury claims."

8          The insurers here state that this is privileged.

9   It may be, however, it is not always.  Many times in the

10  ordinary course of their business insurers will perform an

11  analysis of claims in their claims handling capacity, that is

12  not privileged.  Obviously, we're not asking for privileged

13  information, we are not asking for expert information, we made

14  that clear.

15         I will note, they have not said this information

16  does not exist, and I think it is relevant both to their

17  standing, if they thought there was liability there, as well

18  as to any objections they may make regarding claims value.  It

19  may also help the plan proponents to support the claim value.

20         THE COURT:  How does it help them support the claim

21  value?

22         MS. FRAZIER:  Well, if the insurers have done an

23  estimate of what their liability would be on a claim-by-claim

24  basis, it could be supportive of what -- the values we have

25  set and whether they're reasonable.

1        THE COURT:  Well, I think generally other people's

2   estimation, for example, of the value of a company is not

3   relevant to plan confirmation, so how is this relevant to plan

4   confirmation, what the insurance companies may have thought a

5   claim was worth?  Have they raised that issue?  And I was

6   trying to remember.  As opposed to J&J, who clearly has raised

7   valuation issues, have the insurance companies raised it?

8        MS. FRAZIER:  We don't know.  They have not raised

9   it in the pleadings to date, but as Mr. Calhoun and Mr.

10  Schiavoni pointed out, we don't know what objections they're

11  going to raise.  It also bears noting they have paid claims,

12  so the amount that they've actually paid for claims --

13       THE COURT:  Well, doesn't the debtor --

14       MS. FRAZIER:  -- would also be relevant.

15       THE COURT:  -- know that?  Doesn't the debtor know

16  what's been paid?

17       MS. FRAZIER:  We have some of that information.  I

18  think that we have the right to inquire about it from the

19  insurance company.

20       THE COURT:  Okay.  I think if the insurance company

21  has paid claims and the debtor doesn't have that information

22  for some reason, you can get that information.

23       With respect to item number 1, you can ask if

24  they've denied coverage, if they reserved rights, but the

25  topic of handling is a huge -- is a huge topic.  I don't even

1  know exactly what that means.  It's not a -- it cannot be used

2  as a way to look at coverage disputes; I'm not going to permit

3  that.

4         MS. FRAZIER:  Understood.  Okay, topics 3 and 4.

5  And now I've added a number in my notes, so now my numbers are

6  off.  Okay, so we're on 3.  Accounting treatment and reserves,

7  as well as reinsurance, are kind of the same issue.

8         THE COURT:  Uh-huh.

9         MS. FRAZIER:  The topic (indiscernible) we're

10 seeking to determine whether they believe that they have

11 liability here.  And where the insurer has denied coverage or

12 refused to defend, the facts of a reserve has been -- courts

13 have found is relevant to show that the insurer at least

14 acknowledged the potential for coverage.

15        THE COURT:  Well, but don't --

16        MS. FRAZIER:  Here --

17        THE COURT:  -- don't they have to set reserves in

18 certain circumstances and what does that -- I did read some of

19 these cases and -- that people cited to me and I don't

20 understand how the setting of a reserve by an insurance

21 company is an issue with respect to plan confirmation.

22        This talks about -- it reflects an assessment --

23 well, first of all, a lot of it says it's probably privileged,

24 but I agree that you can't get the privileged information and

25 you're going to have a lot of that.  But one of these cases,

1   even in the coverage cases, they say this is usually

2   irrelevant and not discoverable, and they talk about the need

3   to set reserves for accounting purposes, the need to set

4   reserves for maybe regulatory purposes.  So how does that have

5   anything to do with confirmation?

6           MS. FRAZIER:  I think here where the insurers have

7   contended, as they do in their papers, that the plan and

8   disclosure statement have led to an explosion of claims and

9   have inflated their potential liability for, you know,

10  whatever an explosion means --

11          THE COURT:  It means going from 20,000 to 80,000.

12          MS. FRAZIER:  But if they had planned to pay their

13  full limits, if they reserved and knew that these talc claims

14  were going to erode the entirety of the policy, what's the

15  objection?  It makes no material difference to them.

16          THE COURT:  Well, maybe it doesn't, but I'm trying

17  to explain how it's relevant -- I'm trying to understand how

18  it's relevant to confirmation.  I think I had the same

19  distinction with J&J.  Historical settlement, I said yes;

20  projections, J&J's internal, I said no.  It's the same sort of

21  thing here.  Internal to the insurance companies, their

22  setting reserves, like a prudent businessperson might or

23  they're regulatorily required, I don't understand how that's

24  relevant to confirmation.

25          Now, if the insurance companies end up filing some

1   objection and putting in value information, and they use this

2   information and they give it to an expert, that's different,

3   that's different, then it's going to be discoverable.  But how

4   is it relevant to confirmation and the plan proponents'  --

5   the plan proponents' burden under 1129?

6          MS. FRAZIER:  I think if Your Honor is willing to

7   allow us to reserve our rights to the extent to, say, present

8   the type of evidence that you just described, I think we're

9   fine with that as to reserves and reinsurance information.

10          THE COURT:  Absolutely, and I think the insurance

11   companies should know that.  If they're going to put their

12   information at issue, then it's going to be discoverable.

13          MS. FRAZIER:  Okay.  So that's -- we're all the way

14   through 6, we're moving right along.

15          Okay, so numbers 7 and 8, this is kind of the core

16   of the dispute.  Reasons that you contend the plan is not

17   insurance-neutral; and, to the extent you assert or plan to

18   assert an objection to the plan or any other plan documents,

19   what's the basis for that objection.

20          And this is what I talked about at the very

21   beginning.  We're not seeking privileged information, we're

22   not seeking legal conclusions, we're not seeking your

23   analysis, but there are facts that underlie these contentions,

24   just as the type of facts that I described earlier with regard

25   to the explosion in claims.  The insurers have made many,

1   many, many contentions in their disclosure statement

2   pleadings, in their discovery requests, there are facts within

3   their knowledge, I assume, that support those contentions and

4   we are entitled to ask them what those facts are.

5           THE COURT:  I think that's fair game.  And it's

6   limited to facts and not legal conclusions, and I think it's

7   fair game.

8           MS. FRAZIER:  Thank you.  And then with regard to 9

9   and 10 -- and these are the remaining limits and erosion of

10  limits issues, I'm happy to work with the insurers on these

11  issues.  They're going to be appearing for deposition anyway,

12  you've established on the prior two questions, I'm happy to

13  either ask those questions at the deposition or allow for a

14  stipulation or interrogatory response of some sort, if that's

15  preferable.

16          THE COURT:  It would seem to me you'd get better

17  information that way.  And, again, I'm not thinking that these

18  are coverage issues.  I understand there's a dispute as to

19  coverage, you're --

20          MS. FRAZIER:  Absolutely.

21          THE COURT:  -- I assume you're looking for here, if

22  it was a $10 million policy, what's remaining on it?  It's

23  that kind of --

24          MS. FRAZIER:  Exactly, what's left --

25          THE COURT:  -- factual information without

1  prejudice to anybody's arguments about coverage or any other

2  defenses that they have.

3          MS. FRAZIER:  Absolutely right, yes.  I think --

4          THE COURT:  I think that's --

5          MS. FRAZIER:  -- that's it.

6          THE COURT:  -- also fair game.

7          MS. FRAZIER:  Okay.  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MR. CALHOUN:  Your Honor, George Calhoun for

10  certain insurers again.

11          I just want to make clear, if possible, our one --

12  I think you suggested that they could inquire about whether or

13  not we'd lie to reserve rights, but if the debtors don't have

14  that information, I think it makes sense to have them confer

15  with the debtors and then get back to us with from whom they

16  need it because it might be from my clients, they've got all

17  of our reservation of rights letters, it may be from some

18  others they don't but appears somewhere else in

19  (indiscernible) rather than waste time trying to go insurer by

20  insurer because, as Mr. Schiavoni said, there are a lot of

21  different insurers here and that might cut through some of

22  this.

23          On 7 and 8, I just wanted to make sure that we're

24  clear on this.  We don't have any problem telling them, if

25  there's an argument that the plan is not insurance-neutral, at

1  the end of the day we object to this plan, which we haven't

2  done yet, they're asking for the reasons that we contend the

3  plan is not insurance-neutral and that would be contained

4  within the plan itself.  It's not a fact; it's our analysis of

5  the plan that determines that.  So (indiscernible) you

6  probably pick up that noise.

7          And the same is true with number 8.  We haven't

8  filed objections yet.  I just don't know how to prepare a

9  witness to testify about provisions of the plan that we find

10 objectionable because --

11         THE COURT:  Well, we're doing discovery here now,

12 we're not doing discovery after objections are filed.  So I

13 don't know either and if your answer is going to be that you

14 haven't made that decision yet, I guess you'll have to live

15 with that, and maybe your person will get deposed again.  I

16 don't know what's going to happen, but you're in the same

17 position that everybody else is in and you'll have to --

18         MR. CALHOUN:  I understand that.

19         THE COURT:  -- and you'll have to figure that out.

20 And I am talking here about facts and if your response is, we

21 don't have any facts, it's all in the plan, well, then that's

22 your client's answer.  I don't know.

23         MR. CALHOUN:  Yeah, we've litigated a lot of these

24 cases, Your Honor, and insurers have almost never testified

25 because the burden of proof and the facts are in the

1  possession of the plan proponent, it just --

2          THE COURT:  I do understand that, but these

3  insurance companies have been very active in this case and

4  there are some choices you have to make.  And once you get

5  active, then certainly as to any relevant information that you

6  may have you're fair game.  There's another -- you know,

7  another way to do it too, which is just to step back and say

8  it's going to be insurance-neutral, you know?  But if it's not

9  and you -- many of the insurance companies -- I shouldn't be

10  that general -- many of them have been very active in these

11  cases and I find that, as I have narrowed the topics, that the

12  -- of the requested depositions, I find that what's remaining

13  is relevant or it may lead -- and it may lead to some

14  admissible evidence with respect to plan objections or

15  standing.

16          MR. PLEVIN:  Your Honor, this is Mark Plevin.

17  Could I speak about topics 9 and 10 for a second?

18          THE COURT:  9 and 10.  Mr. Plevin.

19          MS. PLEVIN:  Those are the ones where Ms. Frazier

20  said she would work with us.  I don't know if she overlooked

21  the fact that in February of this year she served us with

22  interrogatories and document requests, to which we responded.

23  And my clients, among others, responded to one of these

24  interrogatories in March of 2021 by saying, quote, "We have

25  not paid defense costs or indemnity for a talc personal injury

1  claim," unquote.

2       And we also said that we would and we did produce

3  reservation of rights letters and to the FCR.  And so having

4  already said we haven't paid anything -- of course the stay

5  has been in effect since then and we haven't paid anything

6  while the stay has been in effect -- I don't know why that

7  interrogatory answer isn't adequate and why would have to sit

8  for a deposition on that.

9       MS. FRAZIER:  Well, first of all, I'm happy to work

10  with you, as I said, but I don't think that answers the

11  question because your policy could have been eroded by a

12  variety of other claims that were not talc personal injury

13  claims that you've paid prepetition.  And so the limits of

14  that policy may or may not be the facial limits on the face of

15  the policy that I can see.

16       But, again, Mark, I'm happy to work with you, and

17  it may be that those answers are sufficient.

18       THE COURT:  Okay.  Well, I would of course expect

19  that all of the parties will work together, that there not be

20  unnecessary work done by any party.  And if the TCC and FCR

21  have already received information that answers these

22  questions, then that may narrow what needs to be done.

23       But in the first instance, I've ruled on what I

24  think is relevant.  Whether it's already been produced, you

25  can point to something, you can stipulate to facts, you can do

1  an interrogatory rather than a deposition, that's -- you all

2  can work on offline.

3          Okay.  So I think we've concluded today's --

4          MR. RAMOS:  Your Honor?

5          THE COURT:  -- hearing -- is that Mr. Ramos?

6          MR. RAMOS:  It's Marc -- yes, it's Marcos Ramos

7  from Richards Layton.

8          Your Honor, I think you're correct, we've concluded

9  the agenda items.  I was wondering if you might indulge me for

10  two minutes for me to just give you a quick status update on

11  one matter?

12          THE COURT:  Yes.

13          MR. RAMOS:  Thank you, Your Honor.  The status

14  update relates to an adversary proceeding that the debtors

15  filed several months ago in which the Court also entered a

16  preliminary injunction at the debtors' request.  This was in

17  connection with the Cyprus entities and the talc actions

18  against Cyprus entities.

19          THE COURT:  Uh-huh.

20          MR. RAMOS:  Your Honor might recall, the

21  preliminary injunction that you entered was set to expire at

22  the end of June 2021, and that date was then based on the

23  confirmation schedule that was anticipated at the time that

24  the complaint was originally filed.  Obviously, the

25  confirmation schedule changed and earlier this month the

1   debtors filed a motion to extend the preliminary injunction to

2   a date December 31st, 2021, more consistent with the expected

3   confirmation schedule.  And, in connection with that motion,

4   the debtors also filed a motion to amend the complaint in

5   order to add a few additional parties that had filed claims

6   against Cyprus.

7           But in addition to that, Your Honor, in terms of

8   the extended injunction, the debtors also clarified that they

9   were only seeking the extended injunction period in favor of

10  the non-debtor Cyprus entities, CAMC, obviously in light of

11  the Cyprus bankruptcy filing.

12          So all of those filings were made earlier this

13  month, Your Honor, and we served those out.  I believe the

14  response deadline has passed and we haven't received any

15  responses to those.  So I just wanted to alert Your Honor to

16  the fact that those filings have been made, particularly since

17  it's in an adversary proceeding and you may not have seen

18  them, and the fact that we do expect in short order and in due

19  course to hopefully file a COC in connection -- or a CNO in

20  connection with those filings.

21          So I just wanted to give you that update and of

22  course if you'd like to send the filings over, we're happy to

23  do that as well.

24          THE COURT:  No, I don't need them, but please

25  contact my chambers when you file your CNO or COC, so that

 1  it's brought to my attention and then I'll look at them.  If I

 2  need the papers at that point, I'll let you know.

 3        MR. RAMOS:  Very good.  Thank you, Your Honor.  We

 4  appreciate --

 5        THE COURT:  Thank you.

 6        MR. RAMOS:  -- the additional time.

 7        THE COURT:  Thank you.

 8        MS. TSEREGOUNIS:  And, Your Honor, apologies,

 9  Helena Tseregounis again for the debtors.  So on the notice

10  procedures motion, am I correct in assuming that Your Honor

11  will issue her ruling at a later time or anything else that

12  you're waiting on from the debtors at this point?

13  ** 1.    THE COURT:  No, I will get back to you.  I'm not

14  waiting for anything else.

15        MS. TSEREGOUNIS:  Thank you, Your Honor.

16        THE COURT:  Thank you.

17        Okay.  Thank you very much.  We are adjourned.

18        COUNSEL:  Thank you, Your Honor.

19       (Proceedings concluded at 6:29 p.m.)

20

21

22

23

24

25

1                          CERTIFICATE

2

3        We certify that the foregoing is a correct transcript

4  from the electronic sound recording of the proceedings in the

5  above-entitled matter.

6
   /s/Mary Zajaczkowski              June 23, 2021
7  Mary Zajaczkowski, CET**D-531

8
   /s/Coleen Rand                    June 23, 2021
9  Coleen Rand, AAERT Cert. No. 341

10
   /s/William J. Garling             June 23, 2021
11 William J. Garling, CE/T 543

12
   /s/ Tracey J. Williams            June 23, 2021
13 Tracey J. Williams, CET-914

14

15

16

17

18

19

20

21

22

23

24

25