## Exhibit 5

**Excerpt of November 10, 2021 Hearing Transcript**

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                          .  Chapter 11
                                     .  Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA AND       .
     DELAWARE BSA, LLC,              .  (Jointly Administered)
 5                                   .
                  Debtors.           .
 6                                   .
     . . . . . . . . . . . . . . . . .
 7                                   .  Adversary Proceeding No.
     BOY SCOUTS OF AMERICA,          .  20-50527 (LSS)
 8                                   .
                  Plaintiff,         .
 9                                   .
        v.                           .
10                                   .
     A.A., et al.,                   .  Courtroom 2
11                                   .  824 Market Street
                  Defendants.        .  Wilmington, Delaware 19801
12                                   .
                                     .  Wednesday, November 10, 2021
13   . . . . . . . . . . . . . . . . .  10:05 a.m.

14

15                        TRANSCRIPT OF ZOOM HEARING
             BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
16                  CHIEF UNITED STATES BANKRUPTCY JUDGE

17

18

19

20   Electronically
     Recorded By:            Brandon J. McCarthy, ECRO
21
     Transcription Service:  Reliable
22                           1007 N. Orange Street
                             Wilmington, Delaware 19801
23                           Telephone: (302) 654-8080
                             E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1   and we intend to answer the discovery.  Ms. Lauria, in one of
2   her letters, set a deadline for answering, at the time,
3   unspecified discovery, but it consists of interrogatories and
4   requests for production of documents. And because this deals
5   with, at least some of it deals with a fairly circumscribed
6   period of time, essentially this past weekend, we have every
7   intention of responding as quickly as possible.  And I mean
8   as quickly as possible.
9            So we will be open about what happened and our
10  explanation, if it's not satisfactory in the form of a
11  letter, will be answered in interrogatories and, frankly,
12  ongoing communications with the debtor.
13           As the parties have noted, this -- we have an
14  unprecedented solicitation campaign going on between the tort
15  claimants committee and those who oppose the plan, and the
16  coalition, and those who support the plan.  This backdrop
17  includes, in my experience, fairly sophisticated websites, we
18  have one, the coalition has one; weekly town hall meetings
19  previously to the last maybe month we were doing them
20  monthly.  Those town hall meetings were announced in using
21  our list serve.  The coalition has now weekly town hall
22  meetings, at least I believe they are weekly.  They are
23  certainly periodic. And it has even gotten to the point of
24  having, in effect, dueling YouTube videos.
25             This motion concerns one email that was written by

1  Mr. Kosnoff.  We had no participation in the writing of it.
2  It was signed by Mr. Kosnoff, though it's probably the
3  digital type signature, but we did transmit it.  It was
4  transmitted to a subset of the constituency.  It was sent to
5  a client list that Mr. Kosnoff had provided to us.  He
6  provided it to us some time ago, I think it was just after --
7  I'm not sure of the exact timing, but we had used it to send
8  out announcements of our town halls.  Then it was also sent
9  to, what I refer to as, the TCC list.
10            By the way, Mr. Kosnoff gave us written authority
11 to use the, what I will call, Kosnoff list which consists of
12 what he represented to be his clients where he was co-counsel
13 with other parties, but we have expressed written authority
14 from him to use it.
15            As to what I call the TCC list, it consists of,
16 obviously, coalition lawyers, because Mr. Molton said that he
17 received it, and has always had them on it for some
18 substantial period of time parties who are unrepresented
19 which we gartered from the proof of claim forms.  And also
20 individuals who over the last almost two years have contacted
21 us saying they want to be kept apprised of what was going on
22 in the case.  These are generalities, Your Honor.  I don't
23 know if we're going to get into discovery that explains each
24 and every person on what I call the TCC list, but those are
25 generally how the two lists fall out.

1  responsibility entails we will eventually see.  I wanted you
2  to hear our explanation of, at least, some of the facts
3  regarding who it went out to and our attitude towards the
4  things that are in Mr. Kosnoff's twitter that it was not
5  something we ascribe to.
6          So with that, Your Honor, I don't -- unless you
7  have questions of me, which I am more than happy to answer,
8  we consent to the shortened time, we will do everything in
9  our power to answer the discovery quickly and we will
10 continue our conversations with the debtor, and the
11 coalition, and the FCR to try to reach a resolution of this.
12         I should say one other thing, Judge, just so you
13 appreciate what happened.  My first understanding of -- my
14 first awareness that there was a response to what we had sent
15 out was from Mr. Molton and he called me, I was not in a
16 position to take the phone call, but when I saw the other
17 communications, and we did speak once, I thought it was about
18 his objection to the communication going out, what I call,
19 the Kosnoff list which are the AIS claims which we believe,
20 at least in terms of the communication, a communication with
21 them we were entitled to make because Mr. Kosnoff had given
22 us his consent.
23         I was not aware that it had gone out to, what I
24 call, the TCC list.  That was not our instruction when we
25 communicated with staff.  As soon as I was able to determine

1  that it had gone out to this other list, and I learned that
2  from an attorney who called me and said, hey, my clients got
3  this communication, what is going on, I promptly communicated
4  with Mr. Lucas, and he with our staff, to issue an email to
5  that TCC list saying it was sent to them by mistake, which it
6  was, it was not pursuant to a direction from an attorney in
7  my office, and that it should be disregarded.
8      It was a short email, it did not elaborate beyond
9  that. So, again, within the context of communicating with
10 the people on the TCC list we attempted to mitigate the
11 effect of the communication.
12     So, Your Honor, that is what I wanted to say to
13 you today. And as I said, I am prepared to answer any
14 question you have regarding this to the best of my knowledge.
15     THE COURT: Thank you. I am not asking any
16 questions today. I have not had a chance to review in detail
17 what was filed. I certainly suspect I will have questions.
18     Mr. Hogan.
19     MR. HOGAN: Good morning, Your Honor. Daniel
20 Hogan of Hogan McDaniel on behalf of Eisenberg, Rothweiler,
21 Winkler, Eisenberg & Jeck.
22     Your Honor, I will be brief. I just wanted the
23 court to understand that my clients, Eisenberg, Rothweiler,
24 is the firm that has been implicated by this defamatory email
25 that was sent out by the TCC. The vote -- the AIS votes

1                           CERTIFICATION
2            I certify that the foregoing is a correct
3    transcript from the electronic sound recording of the
4    proceedings in the above-entitled matter to the best of my
5    knowledge and ability.
6
7
8
9    /s/ William J. Garling                    November 10, 2021
10   William J. Garling, CET**D-543
11   Certified Court Transcriptionist
12   For Reliable
13
14
15
16
17
18
19
20
21
22
23
24
25